## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Joint Administration Pending) |

## MOTION OF DEBTORS FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTORS TO (A) PAY PREPETITION COMPENSATION AND BENEFITS AND (B) CONTINUE COMPENSATION AND BENEFITS AND (II) GRANTING CERTAIN RELATED RELIEF

FTX Trading Ltd. and its affiliated debtors and debtors-in-possession

(collectively, the "Debtors") hereby submit this motion (this "Motion") for entry of an order,

substantially in the form attached hereto as Exhibit A (the "Order"), pursuant to sections 105(a),

362(d), 363(b), 507(a), and 541(b)(1) of title 11 of the United States Code, 11 U.S.C. §§ 101 *et

seq.* (the "Bankruptcy Code") and rules 6003 and 6004 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules"), (a) authorizing the Debtors to (i) pay prepetition wages,

salaries and other compensation and benefits, and reimbursable expenses (ii) continue the

compensation and benefits programs in the ordinary course of business, or to change their plans

or policies regarding compensation and benefits, including the Advisory Firm Obligations,

(b) authorizing applicable banks and other financial institutions to honor and process related

checks and transfers and (c) granting certain related relief.  Certain facts supporting the Motion

are set forth in the *Declaration of John J. Ray III in Support of Chapter 11 Petitions and First*

---

[1]    The last four digits of FTX Trading Ltd.'s tax identification number are 3288.  Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.ra.kroll.com/FTX.

*Day Pleadings* [D.I. 24] (the "Ray Declaration") and *Declaration of Edgar W. Mosley in Support of Chapter 11 Petitions and First Day Pleadings* (the "Mosley Declaration" and, together with the Ray Declaration, the "First Day Declarations").  In further support of the Motion, the Debtors respectfully state as follows:

### Preliminary Statement

1.      In light of the extraordinary circumstances of these Chapter 11 Cases, the Debtors are requesting only limited relief in this Motion with respect to the team of dedicated employees and newly appointed officers and directors working at the direction of the newly appointed Chief Executive Officer.  The Debtors are **not** requesting authority to pay any severance, retention, bonuses or incentive compensation at this time.

2.      **No** amounts will be paid under the authority requested by this Motion to any of the following persons or any person known by the Debtors to have a familial relationship to any of Samuel Bankman-Fried, Gary Wang, Nishad Singh or Caroline Ellison.

### Background

3.      On November 11 and November 14, 2022 (as applicable, the "Petition Date"), the Debtors filed with the United States Bankruptcy Court for the District of Delaware (the "Court") voluntary petitions for relief under the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  On November 14, 2022, the Debtors filed a motion with the Court pursuant to Bankruptcy Rule 1015 seeking joint administration of the Debtors' cases (the "Chapter 11 Cases").  As of the date hereof, no creditors' committee, trustee or examiner has been appointed in these Chapter 11 Cases.

4.      Additional factual background relating to the Debtors' businesses and the commencement of these Chapter 11 Cases is set forth in the First Day Declaration.

## Facts Specific to the Relief Requested

### I.    The Debtors' Workforce

5.    The Debtors' prepetition approach to human resources combined employees of various entities and outside contractors, with unclear records and lines of responsibility.  At this time, the Debtors have been unable to prepare a full and complete list of *who* worked for the Debtors as of the Petition Date, or the terms of their employment.  However, since the Petition Date, the Debtors have established a process for identifying current active Employees (as defined below) to identify persons who no longer provide services to the Debtors. Based on currently available information, prior to the Petition Date,[2] the Debtors employed or engaged approximately 330 employees in approximately 29 countries and other independent contractors (the "Independent Contractors" and together with all other employees, the "Employees").  These include approximately 140 employees based in the United States (together with independent contractors based in the United States, the "U.S. Employees") and the remaining approximately 190 located in, among others, Japan, Turkey, the Philippines, the Bahamas, Canada, Australia, the UAE, Hong Kong, China, Singapore, Vietnam, Taiwan, Russia, Switzerland, Germany, Mexico, New Zealand, Colombia, Great Britain, Africa, Argentina, Italy, Brazil, South Korea, Malaysia, Dominica, Andorra, Antigua, France, Liechtenstein, Austria, Croatia, Ethiopia and Indonesia (collectively, the "Non-U.S. Employees").  The Debtors experienced extraordinary attrition among their Employees in the period shortly before and following the Petition Date, and the Debtors are working diligently with their advisors to determine and assess the remaining Employee population.

---

[2]    The Petition Date for all Debtors is November 11, 2022 other than for Debtor West Realm Shires Inc. which is November 14, 2022.

6.     Nonetheless, there is a core team of dedicated Employees who have stayed focused on their jobs during the crisis and with whom the Debtors' newly appointed Chief Executive Officer has established appropriate lines of authority and working relationships.  The Debtors continue to review personnel issues and anticipate, based on the nature of the Debtors' businesses, that a large number of Employees will need to continue to work for the Debtors for the foreseeable future.  Additionally, the Debtors are exploring whether any of the Employees who departed in recent weeks may be critical to the Debtors' businesses based on their critical skills and/or information, including proprietary information or information that is not easily available to other Employees.  Following such review, the Debtors may determine, in their reasonable business judgment, that it would be in the best interest of the Debtors' businesses to offer to re-employ or re-engage such individuals on market terms.

7.     The vast majority of the Employees rely on their compensation and benefits to pay their daily living expenses.  These workers will be unfairly harmed if the Debtors are not permitted to continue paying compensation and providing health insurance and other benefits during the Chapter 11 Cases.  Consequently, the Debtors respectfully submit that the relief requested herein is necessary and appropriate under the facts and circumstances of the Chapter 11 Cases.

## II.     Compensation and Benefits

8.     To minimize the personal hardship that the Employees would suffer if prepetition Employee-related obligations remain unpaid during these Chapter 11 Cases, the Debtors seek authority to: (a) pay and honor certain prepetition claims, including with respect to the Wage/Pay Obligations, Unpaid Employee Compensation, Withholding Obligations, Reimbursable Expenses, TriNet Benefits Obligations, Rippling Obligations, Justworks Benefits Obligations, Other Third Party Providers Obligations, Unpaid Payroll Processing Fees, Advisory

Firm Obligations, Union Obligations, Paid Leave Benefits and certain other benefits that the Debtors have historically provided in the ordinary course (each as defined herein and discussed below in more detail, and as supplemented, modified, changed or discontinued from time to time, collectively, the "Compensation and Benefits"); and (b) pay all costs related to or on account of the Compensation and Benefits.[3]

9.      The Debtors request authority to continue their prepetition Compensation and Benefits in the ordinary course of business.  As the Debtors' newly appointed independent Chief Executive Officer and Non-Employee Directors (as defined below), together with their advisors, work to stabilize the Debtors' businesses and review the Debtors' books and records, they may determine in their reasonable business judgment that changes to the Debtors' ordinary course Compensation and Benefits are appropriate.  Accordingly, the Debtors further request confirmation of their right to modify, change, and/or discontinue any of their Compensation and Benefits and/or to implement new programs, policies, and benefits in the Debtors' sole discretion during these Chapter 11 Cases (subject in all respects to the terms of the Order) and without the need for further Court approval, subject to applicable law and compliance with the Bankruptcy Code.

10.      The Debtors and their advisors have worked to gather as much information as possible regarding the prepetition Compensation and Benefits, and continue to perform that diligence.  By this Motion, the Debtors seek authority to pay the certain prepetition amounts on account of the Compensation and Benefits, including, the following estimated amounts based on currently available information as of the date hereof:  $1,000,000 in respect of

---

[3]     The Debtors have provided details regarding certain administrative costs where available, but, for the avoidance of doubt, request authority to pay all administrative costs associated with the Compensation and Benefits, regardless of whether such costs are specifically described herein.

the Unpaid Employee Compensation, $20 in respect of the Union Obligations, $1,000 in respect

of the Justworks Benefits Obligations and $100 in respect of the Rippling Obligations.

11.     Due to the Debtors' ongoing diligence efforts to understand the Debtors'

prepetition Compensation and Benefits obligations and confirm the remaining population of

Employees, the Debtors do not have full clarity regarding the total amount of outstanding,

accrued and owed obligations with respect to the Compensation and Benefits as of the Petition

Date.  However, the Debtors believe, as of Petition Date, that approximately six employees were

owed a total of approximately $40,000 in excess of the $15,150 priority cap set forth in sections

507(a)(4) and 507(a)(5) of the Bankruptcy Code (the "Statutory Cap").  Other Employees may

be owed prepetition amounts over the Statutory Cap.  The Debtors seek authority to pay amounts

above the Statutory Cap in an estimated amount of up to approximately $40,000 pursuant to the

Order.

### III.   Compensation, Withholding Obligations, Payroll Processing and Reimbursable Expenses.

#### A.   Wage/Pay Obligations

12.     In the ordinary course of business, the Debtors incur obligations to their

Employees for Employee Compensation, Independent Contractor Obligations and the Non-

Debtor Employee Compensation (each as defined herein, and collectively, the "Wage/Pay

Obligations").  The Debtors respectfully request that the Court authorize the Debtors to continue

to honor the Wage/Pay Obligations and to pay any prepetition claims with respect thereto in the

ordinary course of business.

13.     The Debtors utilize various vendors across the globe to assist with human

resources and administrative functions.  One or more of the Debtors has had a co-employment

relationship with TriNet Group Inc. ("TriNet"), a professional employer organization that

administers payroll and health benefits and provides other related services to its clients, pursuant

to the TriNet Agreement and the TriNet Electronic Funds Transfer Agreement (collectively, with

all related agreements, amendments, and modifications, the "TriNet Electronic Funds Transfer

Agreement").  The Debtors' co-employment relationship with TriNet is set forth in the TriNet

Services Requisition Form (collectively, with all related agreements, amendments, and

modifications, the "TriNet Agreement").  Under the TriNet Agreement, TriNet serves as the

legal co-employer of the U.S. Employees and handles certain key administrative responsibilities

for human resources-related functions, including payroll processing, offer of employee health

and welfare benefits, and withholding, remittance, and reporting of payroll taxes (including the

employer-paid portion of payroll taxes) for certain of the U.S. Employees of certain Debtors.

Those Debtors handle the day-to-day oversight and direction of those U.S. Employees and their

activities related to the Debtors' businesses, while TriNet supports the Debtors in the

administration of many critical personnel functions.

14.     One or more of the Debtors has had a co-employment relationship with

Justworks Employment Group LLC ("Justworks") a professional employer organization that

administers payroll and health benefits and provides other related services to its clients, pursuant

to a customer services agreement (collectively, with all related agreements, amendments, and

modifications, the "Justworks Agreement").  The Debtors' co-employment relationship with

Justworks is set forth in the Justworks Agreement.  Under the Justworks Agreement, Justworks

serves as the legal co-employer of certain U.S. Employees and handles key administrative

responsibilities for human resources-related functions, including payroll processing, offer of

employee health and welfare benefits, and withholding, remittance, and reporting of payroll

taxes (including the employer-paid portion of payroll taxes) for certain of the U.S. Employees of

certain Debtors.  Those Debtors handle the day-to-day oversight and direction of those U.S.

Employees and their activities related to the Debtors' businesses, while Justworks supports the

Debtors in the administration of many critical personnel functions.

15.    One or more Debtors engage People Center, Inc. d/b/a Rippling

("Rippling") to provide certain human resource assistance functions pursuant to various services

agreements between certain of the Debtors and Rippling (collectively, with all related

agreements, amendments, and modifications, the "Rippling Agreements") for certain other

Employees who are not covered by the arrangements with TriNet, Justworks or the Other Third

Party Providers.  Under the Rippling Agreements, Rippling handles certain responsibilities for

human resources-related functions, including payroll, processing and IT hardware and security

services for those Employees, and in connection therewith, the Debtors incur certain

administrative fees (the "Rippling Obligations").

16.    Certain Debtors also engage other benefits and payroll processing

providers, administrators, tax advisory firms, and independent contractors worldwide, including

those listed herein, to provide certain human resource assistance functions and payroll services

pursuant to various services agreements between certain of the Debtors and such third party

vendors (the "Other Third Party Providers" and, collectively with TriNet, Justworks and

Rippling, the "Third Party Providers") for certain other Employees who are not covered by the

arrangements with TriNet, Rippling or Justworks.  In connection with these functions and

services, the Debtors incur fees in the ordinary course and may owe certain amounts to the Other

Third Party Providers (the "Other Third Party Providers Obligations").

17.    The Debtors' relationships with the Third Party Providers are vital to the

Debtors' progress moving forward.  Most importantly, many of the Debtors are virtually void of

any administrative personnel which would be customary to employ in any well-functioning company to administer even basic tasks.  Therefore, the Debtors are heavily reliant upon the services that the Third Party Providers perform.  These Third Party Providers allow the applicable Debtors to (a) realize substantial cost savings with respect to the administration of their employee payroll and benefits by not having to employ additional human resources professionals to administer payroll, benefit programs and IT services to applicable Employees, and (b) allows the Debtors to offer better and broader benefits to applicable Employees at significantly reduced rates relative to the costs of participating in those programs without a third-party intermediary.

18.     The Debtors seek the authority to pay any prepetition amounts owed to the Third Party Providers and to continue to engage the Third Party Providers to support the Debtors' businesses and administration of these Chapter 11 Cases.

### i.     Unpaid Employee Compensation and Fees

In the ordinary course of business, the Debtors incur obligations to their employees for wages, fees, overtime, and similar obligations (collectively, the "Employee Compensation").  Generally, U.S. Employees are paid bi-monthly, while Non-U.S. Employees are paid on a monthly basis.  As of the Petition Date, the Debtors estimate that $1,000,000 was owed in respect of accrued but unpaid Employee Compensation (the "Unpaid Employee Compensation").  By this Motion, the Debtors request authority to pay the Unpaid Employee Compensation; *provided* that the Debtors may not pay more than $40,000 in amounts that exceed the Statutory Cap.

### ii.     Unpaid Independent Contractor Obligations

19.     In the ordinary course of business, the Debtors incur payment obligations to the Independent Contractors for services rendered to the Debtors (the "Independent Contractor

Obligations"). The Independent Contractors perform critical services that support the Debtors' businesses. The Debtors believe the authority to continue paying their Independent Contractors is critical to maintaining and administering their estates.

   *iii.* *New Non-Employee Director Compensation*

  20. New independent non-employee directors (the "Non-Employee Directors") have been appointed at the controlling entities of the Debtors' businesses to ensure proper governance throughout the Chapter 11 process. Each Non-Employee Director is paid fees of $50,000 per month and is entitled to reimbursement for reasonable business-related expenses incurred in good faith in the performance of the Non-Employee Director's duties for the Debtors (collectively, the "Non-Employee Director Compensation"). The Debtors do not owe any prepetition amounts on account of Non-Employee Director Compensation. The Debtors may continue to pay the Non-Employee Director Compensation on a postpetition basis in the ordinary course of business.

   *iv.* *Advisory Firm Obligations*

  21. When the Debtors' co-founder Sam Bankman-Fried agreed to step aside, John J. Ray III, an experienced restructuring executive, was appointed as Chief Executive Officer (the "CEO") of the Debtors. Mr. Ray was delegated all corporate powers and authority under applicable law, including the power to appoint independent directors and commence these Chapter 11 Cases on an emergency basis.

  22. Mr. Ray's services were retained pursuant to an engagement letter between Owl Hill Advisory, LLC ("Owl Hill") and the Debtors (the "CEO Engagement Letter"). Pursuant to the terms of the CEO Engagement Letter, Owl Hill will furnish the services of Mr. Ray to serve as the CEO of the Debtors, but Mr. Ray will remain an employee of Owl Hill. Under the CEO Engagement Letter, the Debtors will pay a current hourly fee of $1,300, plus

reasonable out of pocket expenses, which will be billed not less than monthly.  Owl Hill remains

responsible for the payment of all compensation and benefits to Mr. Ray, and Mr. Ray is not

eligible to participate in any employee benefit plans of the Debtors.  The Debtors estimate that as

of the Petition Date, Owl Hill was owed approximately $20,000, which will be offset against a

$200,000 retainer established prepetition.

23.     Mr. Ray appointed Kathryn Schultea, Mary Cilia and Raj Perubhatla as

Chief Administrative Officer, Chief Financial Officer and Chief Information Officer,

respectively, of the Debtors (the "Executives").  The Executives were retained pursuant to an

engagement letter between RLKS Executive Solutions ("RLKS") and the Debtors (the

"Consultant Engagement Letter").  Pursuant to the terms of the Consultant Engagement Letter,

RLKS will furnish the services of the Executives to serve as Chief Administrative Officer, Chief

Financial Officer and Chief Information Officer of the Debtors, but the Executives will remain

employees of RLKS.  Under the Consultant Engagement Letter, the Debtors will be charged an

hourly fee of $975 for the services of each of the Executives.  RLKS remains responsible for the

payment of all compensation and benefits to the Executives and the Executives are not eligible to

participate in any employee benefit plans of the Debtors.  RLKS will also assist the Debtors with

Chapter 11 matters of the Debtors' businesses and estates, including without limitation,

accounting and treasury, financial analysis, audits and cash flow forecast, information

technology, human resource management, claims management, and such other related functions

as assigned by the CEO.  In consideration for these additional services performed by RLKS, the

Debtors will pay RLKS its customary hourly billing rates, which range from $800 to $950 for

Managing Directors, $600 to $775 for Directors, $450 to $575 for Senior Managers and $350 to

$425 for Analysts and Associates.

24.     Pursuant to the terms of the CEO Engagement Letter and the Consultant Engagement Letter, the Debtors agree to indemnify and hold each of Owl Hill, the CEO, RLKS, and the Executives (each an "Indemnitee") harmless from and against any damages, costs, expenses and liabilities, taxes and penalties of any kind and nature whatsoever ("Losses") (including, but not limited to, all reasonable attorney's fees) to the extent arising out of, related to, are imposed upon or asserted at any time against any Indemnitee, with respect to the performance of the services provided for under the CEO Engagement Letter or Consultant Engagement Letter, as applicable, including, without limitation, any Losses with respect to any threatened, pending or completed claim, any investigation, action, cause of action, suit, arbitration, appeal, controversy or other proceeding, whether civil, criminal, administrative or investigative.  An Indemnitee will not be entitled to indemnification arising from any acts by the Indemnitee of bad faith, willful misconduct, or gross negligence.  The Debtors will also include the Indemnitees as additional named insureds under the Debtors' D&O policies.

25.     The Debtors submit that retaining the expertise and dedicated services of Owl Hill and RLKS, including the services provided by Mr. Ray, Ms. Schultea, Ms. Cilia and Mr. Perubhatla, is critical to maintaining and administering their estates during these Chapter 11 Cases.  As of the Petition Date, the Debtors do not believe they owed any amounts related to Advisory Firm Obligations.  The Debtors request the authority to pay the unpaid Advisory Firm Obligations and continue to pay amounts owed under the CEO Engagement Letter and the Consultant Engagement Letter in accordance with their terms (collectively, "Advisory Firm Obligations").

v.      *Cryptocurrency and Equity-Based Compensation*

26.     The Debtors previously compensated certain of their Employees with their proprietary cryptocurrency token and/or stock options or equity-based compensation in addition

to the cash payments described above.  As of the Petition Date, the Debtors have suspended this practice.

B.    <u>Withholding Obligations</u>

27.    In the ordinary course of business, the Debtors incur obligations on account of Payroll Deductions and Payroll Taxes (each as defined below and collectively, the "<u>Withholding Obligations</u>").  The Debtors respectfully request that the Court authorize the Debtors to continue to honor their Withholding Obligations and to pay any prepetition claims with respect thereto in the ordinary course of business and in accordance with applicable law, including any Withholding Obligations that arise as a result of a taxing authority's claim for a prepetition tax period.

*i.    Payroll Deductions*

28.    During each applicable payroll period, the Debtors routinely deduct certain amounts from Employees' paychecks, including certain pre-tax and after-tax deductions payable pursuant to certain employee benefit plans discussed herein, such as an Employee's share of healthcare benefits and insurance premiums, 401(k) contributions, legally ordered deductions, and miscellaneous deductions (collectively, the "<u>Payroll Deductions</u>"), and forward the Payroll Deductions to various third-party recipients.

*ii.    Payroll Taxes*

29.    In addition to the Payroll Deductions, certain federal and state laws require that the Debtors withhold amounts from Employees' gross pay related to federal, state, and local income taxes, as well as Social Security and Medicare taxes for remittance to the appropriate federal, state, or local taxing authorities (the "<u>Employee Payroll Taxes</u>").  The Debtors must then pay, based on a percentage of gross payroll, additional amounts for federal and state unemployment insurance and Social Security and Medicare taxes (the "<u>Employer Payroll</u>

Taxes"). The Debtors have similar obligations under the laws of the foreign nations in which they operate (the "Foreign Payroll Taxes" and, together with the Employee Payroll Taxes and Employer Payroll Taxes, the "Payroll Taxes"). The Payroll Taxes are generally processed and forwarded to the appropriate federal, national, state, and local taxing authorities (both in the United States and in foreign jurisdictions) in accordance with remittance intervals and deadlines established by those taxing authorities.

C.   Payroll Processing

30.   Certain of the Debtors that do not engage TriNet, Justworks, or Rippling use other third-party payroll processors, including Roever Broenner Susat Mazars GmbH, Konkrit Accounting Services Ltd., Farahat & Co., Grant Thornton International, Links International, PayAsia Pte Ltd., among others, in the ordinary course. The Debtors respectfully request that the Court authorize the Debtors to continue to honor their unpaid payroll processing fees and to pay any prepetition claims (the "Unpaid Payroll Processing Fees") with respect thereto in the ordinary course of business.

D.   Union Obligations

31.   The Debtors do not believe that any of the Employees are represented by a union, collective bargaining agreement or works council other than one Employee working in Vietnam. In connection with such union representation, the Debtors incur certain expenses (the "Union Obligations"). The Debtors estimate that the total amount outstanding on account of the Union Obligations as of the Petition Date was approximately $20.

E.   Reimbursable Expenses

32.   Prior to the Petition Date and in the ordinary course of business, the Debtors paid (including manual individual payments, reimbursements within regular payroll, employee expense management software Expensify, or corporate cards as applicable) or

reimbursed certain Employees for approved business expenses incurred on behalf of the Debtors within the scope of their employment ("Reimbursable Expenses").

33.     Employees incurred Reimbursable Expenses as business expenses on the Debtors' behalf and with the understanding that such expenses would be reimbursed.  The Debtors' inability to repay Reimbursable Expenses would impose a hardship on the Employees where such individuals incurred obligations for the Debtors' benefit.

34.     By this Motion, the Debtors request authority to pay any outstanding prepetition Reimbursable Expenses or fees related thereto once the amounts owed for expenses have been verified as bona fide Reimbursable Expenses.

## IV.     TriNet Benefits Obligations

35.     As described further herein, TriNet administers the majority of the Health and Welfare Coverage and Benefits for West Realm Shire Services Inc. d/b/a FTX US, in addition to the Workers' Compensation Insurance Policy, the TriNet 401(k) Plan, and certain of the other Additional Benefit Programs (as defined below) (the obligations related to the Health and Welfare Coverage and Benefits, the Workers' Compensation Insurance Policy, the TriNet 401(k) Plan, and applicable Additional Benefit Programs together, the "TriNet Benefits Obligations").  The Debtors do not believe they owe any amounts on account of administrative fees in respect of the TriNet Benefits Obligations as of the Petition Date.

## V.     Justworks Benefits Obligations

36.     As described further herein, Justworks administers certain Health and Welfare Coverage and Benefits for Blockfolio, in addition to a Workers' Compensation Program, a 401(k) Plan, and certain other additional benefits (the obligations related to the Health and Welfare Coverage and Benefits, the Workers' Compensation Insurance Policy, the Justworks 401(k) Plan, and applicable additional benefits together, the "Justworks Benefits

Obligations"). The Debtors estimate that they owed approximately $1,000 on account of administrative fees in respect of the Justworks Benefits Obligations as of the Petition Date.

**VI.      Other Health and Welfare Coverage and Benefits.**

37.      The Debtors offer eligible Employees and their eligible dependents and beneficiaries who are not eligible to participate in the TriNet Benefits Obligations (the "Eligible Employees") eligibility to participate in a number of health and welfare and other benefits programs, including, among other programs, medical insurance, dental insurance, vision insurance, short- and long-term disability insurance and other employee benefit plans (collectively, the "Health and Welfare Coverage and Benefits"). Medical coverage, and other similar benefits, is provided by, among others, UnitedHealthcare, Kaiser Permanente, Aetna, Inc., HealthAdvocate, Inc., One Medical, Teladoc Health Inc., the Bahamas Group or statutorily mandated medical programs. Life insurance, basic accidental death and dismemberment and/or short- and long-term disability benefits are provided by vendors including MetLife, Generali, Medicard Philippines Inc., HDI Acibadem Insurance and Great Eastern Holdings Limited. Dental insurance coverage is provided by vendors including Delta Dental, and vision insurance coverage is provided by vendors including Aetna or VSP. Pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), certain Eligible Employees who are no longer employed by the Debtors ("COBRA Employees") may continue Medical and Prescription Coverage, Dental Insurance Coverage, and Vision Insurance Coverage ("COBRA Benefits"). COBRA Employees are entitled by law to continue to receive COBRA Benefits for up to 18 months, and in some instances up to 36 months, following termination of employment. Certain of the Debtors offer Eligible Employees other voluntary benefits including commuter allowances, phone allowances, lunch allowances, among others. The terms of the Health and Welfare Coverage and Benefits that are available to Eligible Employees depend on the

jurisdiction in which the Eligible Employee is based and the entity that employs or engages the Eligible Employee.  To date, the Debtors have identified approximately 17 unique providers of Health and Welfare Coverage across seven jurisdictions.  Additionally, certain Employees are reimbursed for securing Health and Welfare Coverage on an *ad hoc* basis.

38.     As described above, failure to continue the Health and Welfare Coverage and Benefits could cause Employees to experience severe hardship and make it difficult to retain the Debtors' remaining workforce.  Accordingly, the Debtors respectfully request that the Court authorize the Debtors to continue to honor their Health and Welfare Coverage and Benefits and to pay any prepetition claims with respect thereto in the ordinary course of business.

**VII.    Workers' Compensation.**

39.     The Debtors generally maintain workers' compensation insurance policies, including a policy administered by TriNet (the "Workers' Compensation Insurance Policy"), a policy administered by Justworks, and a policy provided through HUB International, among others, at the statutorily required level for jurisdictions in which they have Employees (collectively, and as described herein, the "Workers' Compensation Program").

40.     The Debtors must continue claim assessment, determination, adjudication, and payment pursuant to the Workers' Compensation Program, without regard to whether such liabilities were outstanding before the Petition Date, to ensure that the Debtors comply with applicable workers' compensation laws and requirements.  To the extent any Employees assert claims arising under the Workers' Compensation Program, the Debtors request that the Court modify the automatic stay under section 362 of the Bankruptcy Code to permit the Employees to proceed with such claims.  This requested modification of the automatic stay pertains solely to claims under the Workers' Compensation Program.

41.    Because the Debtors are statutorily and/or contractually obligated to maintain the Workers' Compensation Program, their inability to do so may result in adverse legal consequences that could potentially disrupt the reorganization process.  The Debtors request authority to (a) pay any prepetition amounts due on account of the Workers' Compensation Program and consistent with past practice, (b) continue the Workers' Compensation Program in the ordinary course of business, and (c) to the extent applicable, modify the automatic stay solely to allow Employees to assert claims under the Workers' Compensation Program.

**VIII.    401(k) Plans and Non-U.S. Defined Contribution Programs.**

42.    The Debtors maintain retirement savings plans for the benefit of certain Employees that are intended to satisfy the requirements of section 401(k) of the Internal Revenue Code (collectively, the "401(k) Plans").  Certain of the 401(k) Plans provide for employer an employer match of Employee contributions ("401(k) Matching Contributions").

43.    A 401(k) Plan for certain eligible employees that is provided through Empower Retirement and is administered by TriNet (the "TriNet 401(k) Plan") allows for automatic pre-tax salary deductions of eligible compensation up to the limits set forth by the Internal Revenue Code.  The TriNet 401(k) Plan provides for 401(k) Matching Contributions whereby the employer matches up to $20,500 in Employee contributions (the 2022 IRS contribution limit) per annum.

44.    A 401(k) Plan for certain eligible employees that is provided through Slavic 401(k) and is administered by Justworks (the "Justworks 401(k) Plan") allows for automatic pre-tax salary deductions of eligible Employees' qualified compensation up to the limits set forth by the Internal Revenue Code.  The Justworks 401(k) Plan provides for 401(k)

Matching Contributions whereby the employer matches up to $20,500 in Employee contributions (the 2022 IRS contribution limit) per annum.

45.     A 401(k) Plan for certain eligible employees that is provided through and administered by Human Interest (the "Human Interest 401(k) Plan") allows for automatic pre-tax salary deductions of eligible Employees' qualified compensation up to the limits set forth by the Internal Revenue Code.  The Human Interest 401(k) Plan provides for 401(k) Matching Contributions whereby the employer will match an amount equal to 100% of an Employee's contributions that are not in excess of 4% of the Employee's annual compensation.

46.     Certain of the Non-United States Debtors also maintain defined contribution plans for eligible Employees (the "Non-U.S. Defined Contribution Programs").  In at least three jurisdictions in Europe, the Debtors maintain a Contributed Benefit Plan (IAS 19), provided by Basler Versicherungen.  Other Non-United States Debtors enable Employees to maintain their statutorily required and managed retirement schemes by remitting Payroll Deductions on their behalf to the appropriate parties.

47.     The Debtors respectfully request that the Court authorize the Debtors to continue to honor their 401(k) Matching Contributions, other obligations under the 401(k) Plans, any obligations under the Non-U.S. Defined Contribution Programs and to pay any prepetition claims with respect to the 401(k) Plans and Non-U.S. Defined Contribution Programs in the ordinary course of business.

## IX.     Paid Leave Benefits.

48.     The Debtors also provide Eligible Employees with paid time off (the "Paid Leave Benefits") as well as other forms of paid and unpaid leave, including, for example, (a) paid holidays, (b) leave under the Family and Medical Leave Act, and (c) other paid and unpaid

leaves of absence for personal reasons, including those required by law. Paid leave programs in non-United States locations are offered primarily in accordance with statutory requirements.

49.     The Debtors believe that the continuation of the Paid Leave Benefits policies in accordance with prior practice is essential to maintaining Employee morale during these Chapter 11 Cases. Further, the policies are broad-based programs upon which all Employees have come to depend. The Debtors respectfully request that the Court authorize the Debtors to continue to pay amounts on account of Paid Leave Benefits if and when they come due in the ordinary course of business.

**IX.  Additional Benefit Programs**.

50.     In addition to the foregoing, certain of the Debtors offer their Employees the opportunity to participate in a range of ancillary benefits, including, flexible spending accounts, commuter allowance, phone allowance, lunch allowance, among others (collectively, the "Additional Benefit Programs"). The Debtors respectfully request that the Court authorize the Debtors to continue to honor any amounts that come due on account of the Additional Benefit Programs in the ordinary course of business.

**X.  Severance Benefits (No Relief Requested) and WARN Act Obligations**.

51.     In the ordinary course of business, it is expected that the Debtors provided certain severance benefits to Employees who experienced a qualifying termination of employment (the "Severance Benefits"). The Debtors are diligently working to gather information on the Severance Benefits, including the terms on which such Severance Benefits were granted and any prepetition obligations in connection therewith. By this Motion, the Debtors are **not** seeking authority to pay the Severance Benefits, but reserve the right to seek the authority to pay amounts under a severance program in a subsequent motion to the Court.

52.     Under the Worker Adjustment and Retraining Notification Act (the "<u>WARN Act</u>"), employees that are expected to be impacted by a qualified "mass layoff" are entitled to 60 days' advance notice prior to the implementation of a "mass layoff".  Although the Debtors do not admit that they have any liability under the WARN Act, by this Motion, the Debtors seek authority to comply with any obligations they may have under the WARN Act.

**XI.  Bonuses and Incentive Compensation (No Relief Requested)**.

53.     In the ordinary course of business, it is expected that the Debtors offer ad hoc bonuses to certain non-insider Employees (the "<u>Non-Insider Ad Hoc Bonuses</u>").  The Debtors are **<u>not</u>** seeking in this Motion the authority to pay any amounts in respect of the Non-Insider Ad Hoc Bonuses, but reserve the right to seek such authority in a subsequent motion to the Court.

<u>**Jurisdiction**</u>

54.     The Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper in the Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief requested herein are sections 105(a), 362(d), 363(b), 507(a), and 541(b)(1) of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004.  Pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "<u>Local Rules</u>"), the Debtors consent to the entry of a final order or judgment by the Court in connection with this Motion to the extent it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

**Relief Requested**

55.     By this Motion, the Debtors request entry of the Order, substantially in the

form attached hereto as <u>Exhibit A</u>, (a) authorizing the Debtors, in their sole discretion, to  (i) pay

prepetition wages, salaries and other compensation and benefits, and reimbursable expenses and

(ii) continue the compensation and benefits programs in the ordinary course of business, or to

change their plans or policies regarding compensation and benefits, (b) authorizing applicable

banks and other financial institutions to honor and process related checks and transfers and (c)

granting certain related relief.

**Basis for Relief**

**I.      Sufficient Cause Exists to Authorize the Debtors to Honor the Compensation and
Benefits Obligations.**

A.      <u>Certain of the Compensation and Benefits Are Entitled to Priority Treatment</u>

56.     Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code entitle the

majority of the Compensation and Benefits to priority treatment.  As priority claims, the Debtors

are required to pay these claims in full to confirm a chapter 11 plan.  *See* U.S.C. § 1129(a)(9)(B)

(requiring payment of certain allowed unsecured claims, given priority under sections 507(a)(4)

and 507(a)(5) of the Bankruptcy Code, for (a) wages, salaries or commissions, including

vacation, severance, and sick leave pay earned by an individual and (b) contributions to an

employee benefit plan).  To the extent that an Employee receives no more than $15,150 on

account of claims entitled to priority, the relief sought with respect to the Compensation and

Benefits only affects the timing of payments to Employees and does not have any material

negative impact on recoveries for general unsecured creditors.  To the extent an Employee is

owed more than $15,150 on account of certain Compensation and Benefits, the Debtors submit

that the full payment of such obligations in the ordinary course is warranted under section

363(b)(1) of the Bankruptcy Code and the doctrine of necessity; *provided*, *however*, that the

Debtors only seek authority in this Motion to pay amounts above the Statutory Cap in an

estimated amount of up to approximately $40,000 pursuant to the Order.

57.     The remaining Employees who have stayed focus on their jobs during this

crisis are essential to the Debtors' businesses, and payment of the Compensation and Benefits to

these Employees at this time is necessary to avoid material disruption to the Debtors' businesses.

These Employees' skills, training, knowledge and understanding of the Debtors' businesses and

essential to continuing the Debtors' operations during the pendency of these Chapter 11 Cases

and achieving an effective reorganization of the Debtors' businesses.  A delay or inability to pay

the Compensation and Benefits will further adversely impact the Debtors' relationships with

Employees and could irreparably impair Employees' morale, dedication, confidence and

cooperation to the detriment of the Debtors' restructuring efforts.  At this early stage in the

Chapter 11 Cases, the Debtors cannot risk the substantial damage to their business that would

inevitably result from any decline in Employees' morale attributable to the Debtors' failure to

pay the prepetition Compensation and Benefits or maintain the Compensation and Benefits.

Consequently, all of the Debtors' creditors will benefit if the requested relief is granted.

B.     Payment of Certain Compensation and Benefits Is Required by Law

58.     As discussed above, the Debtors seek authority to pay the Withholding

Obligations to the appropriate third-party payees.  These amounts principally represent

Employee earnings that governments, Employees, and judicial authorities have designated for

deduction from Employees' wages.  Certain Withholding Obligations are not property of the

Debtors' estates because the Debtors have withheld such amounts from Employees' wages on

another party's behalf.  *See* 11 U.S.C. §§ 541(b)(1), (d).  Further, federal and state laws require

the Debtors to withhold certain tax payments from Employees' wages and to pay such amounts

to the appropriate taxing authority.  26 U.S.C. §§ 6672, 7501(a); *see also City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95–97 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income tax from its employees' wages created a trust relationship between debtor and the city for payment of withheld income taxes).  Because the Withholding Obligations may not be property of the Debtors' estates, the Debtors request authorization to transmit the Withholding Obligations to the proper parties in the ordinary course of business, regardless of whether the Debtors collected the amounts prior to the Petition Date. *See In re Dameron*, 155 F.3d 718, 722 (4th Cir. 1998) (finding that real estate lenders' funds held by the debtor-closing agent for benefit of third parties were not property of the estate).

59.     Similarly, state laws require the Debtors to maintain the Workers' Compensation Program.  If the Debtors fail to maintain the Workers' Compensation Program, state laws may prohibit the Debtors from operating in those states.  Payment of all obligations related to the Workers' Compensation Program is therefore crucial to the Debtors' continued businesses and the Debtors respectfully request that the Court authorize the Debtors to continue operating the Workers' Compensation Program administered by TriNet in the ordinary course of business and as required by law.

## II.     Payment of the Compensation and Benefits Is Appropriate Under Sections 105(a), 363(b), 1107(a) and 1108 of the Bankruptcy Code.

60.     The relief requested is appropriate under sections 105(a), 363(b), 1107(a) and 1108 of the Bankruptcy Code.  The Debtors are operating their businesses as debtors-in-possession under sections 1107(a) and 1108 of the Bankruptcy Code, and they are therefore fiduciaries "holding the bankruptcy estate and operating the business for the benefit of . . . its creditors and (if the value justifies) equity owners." *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002).  Implicit in the duties of a chapter 11 debtor-in-possession is the duty

"to protect and preserve the estate, including an operating business's going-concern value." *Id.* Consistent with a debtor's fiduciary duties to preserve the estate, courts have authorized payment of prepetition obligations pursuant to sections 105(a) and 363(b) of the Bankruptcy Code. *See, e.g.*, *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) ("the bankruptcy court has considerable discretion" in granting motion pursuant to section 363(b)); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (stating that section 363(b) provides "broad flexibility" for a debtor to satisfy prepetition claims where supported by a proper business justification); *In re Just for Feet, Inc.*, 242 B.R. 821, 824 (D. Del. 1999) ("Section 105(a) of the Code provides a statutory basis for the payment of pre-petition claims."). Indeed, courts have recognized that there are instances when a debtor's fiduciary duty can "only be fulfilled by the preplan satisfaction of a prepetition claim." *In re CoServ, L.L.C.*, 273 B.R. at 497.

61.     Section 363(b) of the Bankruptcy Code empowers the Court to allow a debtor, in the exercise of its sound business judgment and after notice and a hearing, to "use, sell, or lease, other than in the ordinary course of business, property of the estate." *See* 11 U.S.C. § 363(b)(1); *see also In re Just For Feet, Inc.*, 242 B.R. 821, 825 (D. Del. 2009) ("The Supreme Court, the Third Circuit, and the District of Delaware all recognize the court's power to authorize payment of pre-petition claims when such payment is necessary for the debtor's survival during chapter 11."). For a court to approve the use, sale, or lease of estate property under section 363(b) of the Bankruptcy Code, including the payment of prepetition claims, the debtor must "articulate some business justification, other than mere appeasement of major creditors . . . ." *In re Ionosphere Clubs, Inc.*, 98 B.R. at 175 (holding that the debtor's payment of prepetition claims was necessary to protect its business and to ensure successful reorganization); *see also In*

*re Columbia Gas Sys., Inc.*, 136 B.R. 930, 939 (Bankr. D. Del. 1992) (recognizing that "[i]f payment of a pre-petition claim 'is essential to the continued operation of [the debtor], payment must be authorized'") (citing *In re Lehigh & New England Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981)).  Moreover, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct."  *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) (citation omitted).  Under this section, a court may authorize a debtor to pay certain prepetition claims.  *See In re Ionosphere Clubs, Inc.*, 98 B.R. at 175.

62.     Additionally, section 105(a) of the Bankruptcy Code authorizes the Court to issue "any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).  A bankruptcy court's use of its equitable powers to "authorize the payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept."  *In re Ionosphere Clubs, Inc.*, 98 B.R. at 175.  Under section 105(a), the Court "can permit pre-plan payment of a pre-petition obligation when essential to the continued operation of the debtor."  *In re NVR L.P.*, 147 B.R. 126, 127 (Bankr. E.D. Va. 1992); *see also In re Just for Feet, Inc.*, 242 B.R. at 825 ("To invoke the necessity of payment doctrine, a debtor must show that payment of the pre-petition claims is critical to the debtor's reorganization"); *see also In re C.A.F. Bindery, Inc.*, 199 B.R. 828, 835 (Bankr. S.D.N.Y. 1996) (recognizing "the doctrine of necessity . . . permits the bankruptcy court to authorize the payment of prepetition claims prior to confirmation").

63.     Courts in this district have recognized the "necessity of payment" doctrine. *See, e.g.*, *In re Energy Future Holdings Corp.*, 561 B.R. 630, 642-43 (Bankr. D. Del. 2016) ("The Third Circuit has explained that a 'necessity of payment' rule is intended to benefit all

parties and is applicable when such payment is critical to the Debtors' reorganization."); *In re Columbia Gas Sys.*, 171 B.R. 189, 192 (Bankr. D. Del. 1994) (allowing "payment of [a] class of pre-petition creditors in advance of a confirmed plan" where "the debtor . . . show[s] that payment is essential to the continued operation of the business"); *In re Lehigh & N. E. R. Co.*, 657 F.2d 570, 581 (3d Cir. 1981) ("[T]he 'necessity of payment' doctrine . . . teaches no more than, if payment of a claim which arose prior to reorganization is essential to the continued operation of the [debtor] during reorganization, payment may be authorized even if it is made out of corpus.").

64.     The necessity of payment doctrine is designed to foster a debtor's rehabilitation, which courts have recognized is "the paramount policy of Chapter 11."  *In re Ionosphere Clubs, Inc.*, 98 B.R. at 176; *In re Chateaugay Corp.*, 80 B.R. 279, 287 (S.D.N.Y. 1987) (authorizing payment of prepetition workers' compensation claims on grounds that the fundamental purpose of reorganization and equity powers of bankruptcy courts "is to create a flexible mechanism that will permit the greatest likelihood of survival of the debtor and payment of creditors in full or at least proportionately"); *In re Just for Feet*, 242 B.R. at 826 (finding that payment of prepetition claims to certain trade vendors was "essential to the survival of the debtor during the chapter 11 reorganization"); *In re Quality Interiors, Inc.*, 127 B.R. 391, 396 (Bankr. N.D. Ohio 1991) ("[A] general practice has developed . . . where bankruptcy courts permit the payment of certain pre-petition claims, pursuant to 11 U.S.C. § 105, where the debtor will be unable to reorganize without such payment."); *In re CoServ, L.L.C.*, 273 B.R. at 497 ("[I]t is only logical that the bankruptcy court be able to use Section 105(a) of the [Bankruptcy] Code to authorize satisfaction of the prepetition claim in aid of preservation or enhancement of the estate."); *In re Eagle-Picher Indus., Inc.*, 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991)

(approving payment of prepetition unsecured claims of tool makers as "necessary to avert a serious threat to the Chapter 11 process").

65.     The relief requested in this Motion represents a sound exercise of the Debtors' business judgment and is necessary for the preservation of the resources and value of their estates.  Payment of the Compensation and Benefits to the extent described in this Motion is critical to the Debtors' businesses.  The Debtors submit that the payment of the Compensation and Benefits represents a sound exercise of the Debtors' business judgment and is necessary to avoid immediate and irreparable harm to the Debtors' estates.  Indeed, the Debtors believe that without the relief requested herein, even more Employees may seek alternative employment opportunities, perhaps with the Debtors' competitors.  Such a development would further deplete the Debtors' workforce, thereby hindering the Debtors' businesses and, likely, diminishing stakeholder confidence in the Debtors' ability to successfully reorganize.  The loss of valuable Employees and the resulting need to recruit new personnel (and the costs attendant thereto) would be distracting at this crucial time when the Debtors need to focus on stabilizing their business operations.  Accordingly, the Debtors must do their utmost to retain their workforce by, among other things, paying Compensation and Benefits.

66.     In addition, many Employees rely exclusively on the Compensation and Benefits to satisfy their daily living expenses.  Consequently, Employees largely rely on the timely payment of the Compensation and Benefits to satisfy their living expenses and will be exposed to significant financial difficulties if the Debtors are not permitted to pay Compensation and Benefits.  Moreover, failure to timely satisfy such obligations will further jeopardize workforce morale and loyalty at this crucial time when needed most.  If this Court does not grant the relief requested herein, certain Employees will not receive health coverage and, thus, may be

obligated to pay certain health care claims that the Debtors have not satisfied. The loss of health

care coverage will result in considerable anxiety for Employees (and likely attrition) at a time

when the Debtors need all Employees to perform their best. Additionally, as set forth above,

further Employee attrition would cause the Debtors to incur additional expenses to find

appropriate and experienced replacements. For these reasons, and the supporting authority found

in sections 105(a) and 363(b) of the Bankruptcy Code, the Debtors submit that the relief

requested is essential, appropriate, and in the best interests of the estates and should be granted.

67.     The importance of a debtor's workforce to its operations and ability to

smoothly conduct a successful business has been repeatedly recognized by courts in this district,

and such courts have routinely granted relief similar to the relief requested herein. *See, e.g.*, *In

re Lehigh & New England Ry. Co.*, 657 F.2d at 581 (stating that a court may authorize payment

of prepetition claims when there "is the possibility that the creditor will employ an immediate

economic sanction, failing such payment"); *In re Just For Feet, Inc.*, 242 B.R. at 824–26 (noting

that debtors may pay prepetition claims that are essential to continued operation of business); *In

re Columbia Gas Sys.,* Inc., 171 B.R. 189, 191–92 (Bankr. D. Del. 1994) (same); *In re

Ionosphere Clubs*, 98 B.R. at 176 (recognizing that the rehabilitation of a debtor is a primary

rationale for the doctrine of necessity and is a "paramount goal of Chapter 11").

68.     Accordingly, the Debtors respectfully request that the Court authorize the

Debtors to continue the Compensation and Benefits and pay related obligations.

## III.    The Debtors Seek a Waiver of the Automatic Stay to the Extent it Applies to Workers' Compensation Claims.

69.     Section 362(a) of the Bankruptcy Code operates to stay "the

commencement or continuation, including the issuance or employment of process, of a judicial,

administrative, or other action or proceeding against the debtor that was or could have been

commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title[.]"  11 U.S.C. § 362(a)(1).  Section 362 of the Bankruptcy Code, however, permits a debtor or other parties in interest to request a modification or termination of the automatic stay for "cause."  *Id.* at § 362(d)(1).

70.     If and to the extent that section 362(a) is applicable to claims under the Workers' Compensation Programs, the Debtors seek authorization, under section 362(d) of the Bankruptcy Code, to permit current and former employees to proceed with any claims under the Workers' Compensation Program in the appropriate judicial or administrative forum.  Cause exists to modify the automatic stay, if and to the extent applicable, because the Debtors have an obligation to continue to abide by applicable workers' compensation laws and requirements and interrupting the administration of any claims under the Workers' Compensation Program could have a detrimental effect on the financial wellbeing and morale of certain Employees and lead to the departure of Employees who are critical at this juncture.  Such departures could cause a severe disruption in the Debtors' businesses, which would be to the detriment of all parties in interest.

**IV.    Cause Exists to Authorize Applicable Banks and/or Financial Institutions to Honor Checks and Electronic Fund Transfers.**

71.     In order to stabilize the Debtors' operations and to smoothly transition into chapter 11, it is imperative that the Debtors maintain their ability to perform their most basic functions.  The Debtors request that all applicable banks and other financial institutions should be authorized, when requested by the Debtors in their discretion, to receive, process, honor and pay any and all checks and fund transfer requests made by the Debtors related to the Compensation and Benefits, whether such checks or fund transfer requests were submitted prior

to or after the Petition Date.  Any financial institution may rely on the representation of the

Debtors as to which checks and fund transfer requests are made and authorized to be paid in

accordance with this Motion without any duty of further inquiry and without liability for

following the Debtors instructions.  The Debtors also seek authority to issue new postpetition

checks, or effect new electronic funds transfers, to replace any prepetition checks or electronic

funds transfer requests that may be dishonored or rejected as a result of the commencement of

these Chapter 11 Cases with respect to amounts owed in connection with any Compensation and

Benefits.

### **Bankruptcy Rule 6003 Is Satisfied**

72.     In order for a debtor to obtain relief to make payments within 21 days of

the Petition Date, it must establish that making such payments satisfies the requirements

mandated by Bankruptcy Rule 6003—namely, the relief requested is necessary to avoid

"immediate and irreparable harm."  If a debtor's prospect of reorganizing is threatened, or swift

diminution in value of the debtor's estate is likely absent the granting of the requested relief,

immediate and irreparable harm likely exists.  *See In re WorldSpace, Inc.*, 2008 WL 8153639, at

*2 (Bankr. D. Del. Oct. 20, 2008) (finding that relief requested by the debtors was necessary to

avoid irreparable harm to the debtors and their estates because such relief was essential for the

continued operation of debtors' businesses).

73.     Immediate and irreparable harm would result if the relief requested herein

is not granted.  As described above, if the Debtors are unable to make Compensation and

Benefits payments in the ordinary course, the Debtors may encounter difficulties in retaining

their Employees, which in turn would result in significant damage to the Debtors' businesses.

Moreover, the Debtors' inability to pay the Compensation and Benefits would impose substantial

hardship on the Employees who greatly rely on the Compensation and Benefits received from the Debtors as their primary sources of income. These effects would have an adverse impact to the Debtors' businesses. Failure to receive the requested relief during the first 21 days of these Chapter 11 Cases would severely disrupt the Debtors' businesses at this important juncture. For the reasons discussed herein, the relief requested is necessary for the Debtors to preserve the value of the Debtors' assets and maximize the value of the estates for the benefit of all stakeholders. Accordingly, the Debtors respectfully submit that they have satisfied Bankruptcy Rule 6003 as it relates to the relief requested herein.

## **Waiver of Bankruptcy Rules 6004(a) and 6004(h)**

74.     Given the nature of the relief requested herein, the Debtors respectfully request a waiver of (a) the notice requirements under Bankruptcy Rule 6004(a) and (b) the 14-day stay under Bankruptcy Rule 6004(h). Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until expiration of 14 days after entry of the order, unless the court orders otherwise." For the reasons described above, the relief requested is essential to prevent potentially irreparable damage to the Debtors' operations, value and ability to reorganize.

## **Reservation of Rights**

75.     Nothing in this Motion: (a) is intended or shall be deemed to constitute an assumption of any agreement pursuant to section 365 of the Bankruptcy Code or an admission as to the validity of any claim against the Debtors or their estates; (b) shall impair, prejudice, waive, or otherwise affect the rights of the Debtors or their estates to contest the validity, priority, or amount of any claim against the Debtors or their estates; (c) shall impair, prejudice, waive, or otherwise affect the rights of the Debtors or their estates with respect to any and all claims or

causes of action against any third party; or (d) shall be construed as a promise to pay a claim or continue any applicable program postpetition, which decision shall be in the discretion of the Debtors.  Any payment made pursuant to an order of the Court granting the relief requested herein is not intended to be nor should it be construed as an admission as to the validity of any claim or a waiver of the Debtors' rights to subsequently dispute such claim.

### Notice

76.     No creditors' committee, trustee or examiner has been appointed in these Chapter 11 Cases.  Notice of this Motion has been provided to: (a) the Office of the United States Trustee for the District of Delaware; (b) the Securities and Exchange Commission; (c) the Internal Revenue Service; (d) the United States Department of Justice; (e) the United States Attorney for the District of Delaware; (f) the parties identified on the Debtors' consolidated list of 50 largest unsecured creditors; and (g) to the extent not listed herein, those parties requesting notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be provided.

### Conclusion

WHEREFORE, for the reasons set forth herein, the Debtors respectfully request that the Court (a) enter the Order, substantially in the form attached hereto as Exhibit A and (b) grant such other and further relief as is just and proper.

Dated: November 19, 2022      **LANDIS RATH & COBB LLP**
    Wilmington, Delaware

*/s/ Kimberly A. Brown*
Adam G. Landis (No. 3407)
Kimberly A. Brown (No. 5138)
Matthew R. Pierce (No. 5946)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
E-mail: landis@lrclaw.com
        brown@lrclaw.com
        pierce@lrclaw.com

-and-

**SULLIVAN & CROMWELL LLP**
Andrew G. Dietderich (admitted *pro hac vice*)
James L. Bromley (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Alexa J. Kranzley (admitted *pro hac vice*)
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
E-mail: dietdericha@sullcrom.com
        bromleyj@sullcrom.com
        gluecksteinb@sullcrom.com
        kranzleya@sullcrom.com

*Proposed Counsel for the Debtors*
*and Debtors-in-Possession*