**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Joint Administration Pending) |

**DECLARATION OF EDGAR W. MOSLEY II  IN SUPPORT**
**OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

I, Edgar W. Mosley II, hereby declare under penalty of perjury:

1.      I am a Managing Director at Alvarez & Marsal North America, LLC ("A&M"), a restructuring advisory services firm specializing in interim management, crisis management, turnaround consulting, operational due diligence, creditor advisory services and financial and operation restructuring.

2.      I have more than 20 years of restructuring and distressed investment experience across various industries, including oil & gas, manufacturing, transportation, automotive, retail, industrial construction, telecommunications, healthcare, and consumer products.  I have a Bachelor's Degree from Harvard University, and have been recognized as a Certified Insolvency and Restructuring Advisor by the Association of Insolvency and Restructuring Advisors, where I served on the board from 2019 until 2020.

3.      Since joining A&M, I have been involved in numerous Chapter 11 restructurings including Seadrill Limited (2020 and 2017), Valaris plc, Diamond Offshore Drilling,

---

[1]     The last four digits of FTX Trading Ltd.'s tax identification number are 3288.  Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.ra.krollcom/FTX.

Inc., Imerys Talc America, White Star Petroleum, Southcross Energy, Magnum Hunter Resources, Exide Technologies (where I served as the Chief Restructuring Officer), and Visteon Corporation.

4.      I submit this declaration (the "Declaration") to assist the Court and parties-in-interest in understanding the circumstances that resulted in the commencement of these chapter 11 cases (the "Chapter 11 Cases") and in support of:  (a) the Debtors' petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") filed on November 11, 2022 and on November 14, 2022 (as applicable, the "Petition Date") and (b) the first day relief that the Debtors have requested from the Court pursuant to the motions and applications described herein (collectively, the "First Day Pleadings").

5.      On November 9, 2022, the Debtors retained A&M to assist in the process of preparing for a chapter 11 filing.  Since A&M's retention, I and the team of A&M professionals I oversee have worked to identify reliable books and records and to assemble the information necessary to determine the relief the Debtors need and to provide that information to the Court.  A description of the relief requested in and the facts supporting each of the First Day Pleadings is set forth below.

6.      Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, information obtained from the Debtors and their advisors, including the A&M team working under my supervision, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives or my opinions based upon my experience and knowledge.  If called as a witness, I would testify competently to the statements set forth in this Declaration.

-2-

## I.      Relief Sought in the Debtors' First Day Pleadings

A.      <u>Motion of Debtors for Entry of an Order (I) Authorizing Joint Administration of the Debtors' Chapter 11 Cases and (II) Granting Certain Related Relief [D.I. 3] (the "Joint Administration Motion").</u>

7.      Pursuant to the Joint Administrative Motion, the Debtors request entry of an order authorizing joint administration of the Chapter 11 Cases and the consolidation thereof for procedural purposes only. It is likely that most, if not all, of the notices, applications, motions, other pleadings, hearings and orders in these Chapter 11 Cases will affect all of the Debtors. I believe that not jointly administering these cases would result in numerous duplicative pleadings being served upon separate, but significantly overlapping, service lists. Such duplication of substantially identical documents would be wasteful. I also believe that joint administration will ease the administrative burden on the Court and all parties-in-interest, and will reduce the estates' fees and costs. For these reasons, the relief requested in the Joint Administration Motion is in the best interests of the Debtors, their creditors and all other parties-in-interest.

B.      <u>Motion of Debtors for Entry of an Order (I) Modifying Certain Creditor List Requirements; (II) Authorizing the Debtors to Serve Certain Parties by E-Mail; and (III) Granting Related Relief [D.I. 9] (the "Creditor List Motion").</u>

8.      Pursuant to the Creditor List Motion, the Debtors seek entry of an order (a) permitting the Debtors to file a single consolidated list of the Debtors' Top 50 Creditors, and (b) authorizing the Debtors to provide e-mail service to their customers and certain other creditors. The Debtors likely have over one million creditors in these Chapter 11 Cases. I believe that filing separate creditor lists for each Debtor would be of limited utility because there is potential overlap among certain of the various Debtors' creditor lists, and certain Debtors may have fewer than 20 significant unsecured creditors. I also expect that the exercise of compiling

separate creditor lists for each individual Debtor would consume an excessive amount of the

Debtors' limited time and resources at this critical time.  This is compounded by the current

difficulty in accessing the Debtors' customer information through their systems.

9.      Additionally, most the Debtors' creditors are their customers.  I believe

the Debtors' former customers will also require service of a voluminous number of notices.

Because the Debtors operate an online cryptocurrency platform, all of the Debtors' current and

former customers interact with the Debtors via e-mail and the Debtors interact with their

customers online through web-based applications and e-mail.  Accordingly, the Debtors request

authority to serve creditors by e-mail, where an e-mail account is available to the Debtors.  Not

only do I believe that this is likely the most efficient manner by which service of all interested

parties can be completed, I also believe that it is the most likely to facilitate creditor responses

because it is my understanding that the customer base currently receives all notices electronically

from the Debtors.  For these reasons, the relief requested in the Creditor List Motion is in the

best interests of the Debtors, their creditors and all other parties-in-interest.

C.      <u>Motion of Debtors for Entry of an Order Enforcing Sections 362, 365(e)(1), 525
and 541 of the Bankruptcy Code [D.I. 25] (the "Automatic Stay Motion").</u>

10.      Pursuant to the Automatic Stay Motion, the Debtors seek entry of an order

(a) enforcing the automatic stay, *ipso facto* and antidiscrimination provisions of the Bankruptcy

Code and (b) approving the form and manner of notice related thereto.  The Debtors conduct

business with parties in jurisdictions worldwide, many of whom I understand are unfamiliar with

the U.S. bankruptcy process and the protections afforded to debtors.  Absent an order granting

the Automatic Stay Motion, foreign counterparties may take precipitous action against the

Debtors or their property.  I believe that granting the Automatic Stay Motion will help the

Debtors manage and preserve the value of their assets and ensure that (a) the non-debtor parties

to unexpired leases and executory contracts with the Debtors will continue to perform and will

not attempt to unilaterally terminate their contracts, (b) creditors do not seize the Debtors' assets,

impose liens or take any other action in violation of the worldwide automatic stay and (c) foreign

governmental authorities do not deny, revoke or suspend any licenses or permits solely because

the Debtors are in chapter 11.  I also believe that the requested order would spare the Debtors

from the burden of commencing adversary proceedings to enforce the protections automatically

provided by the Bankruptcy Code.  For these reasons, the relief requested in the Automatic Stay

Motion is in the best interests of the Debtors, their creditors and all other parties-in-interest.

D. <u>Motion of Debtors for Entry of an Order (I) Extending the Time to File
(A) Schedules of Assets and Liabilities and Statements of Financial Affairs and
(B) Rule 2015.3 Financial Reports and (II) Granting Certain Related Relief
[D.I. 26] (the "Schedules and Statements Extension Motion")</u>.

11.      Pursuant to the Schedules and Statements Motion, the Debtors seek entry

of an order extending the deadlines to file their schedules of assets and liabilities and statements

of financial affairs ("<u>Schedules and Statements</u>") and their initial reports of financial information

with respect to entities in which the Debtors hold a controlling or substantial interest ("<u>2015.3

Reports</u>").

12.      The Debtors likely have over one million creditors and other parties-in-

interest.  To prepare the Schedules and Statements, the Debtors must compile a significant

amount of financial information from books, records and documents relating to their assets,

contracts and customers.  This information is voluminous, and assembling the necessary

information requires a significant expenditure of time and effort on the party of the Debtors, their

employees and their advisors, the difficulty of which is compounded as access to the information

necessary to prepare the Schedules and Statements has been hampered by the events preceding

the commencement of the Chapter 11 Cases.  I believe that the magnitude of that task and the

condition of the Debtors' books and records, when taken together with the transition into chapter 11, requires an extension of the deadline to file the Schedules and Statements, and will aid the Debtors' efforts to ensure the accuracy and completeness thereof.

13.    It is also my view that an extension of the deadline to file 2015.3 Reports is necessary.  The Debtors are still determining whether any of the Debtors hold interests in non-Debtor subsidiaries that fall under the requirements of the 2015.3 Reports.  The size, complexity and geographic scope of the Debtors' businesses require additional time to determine whether the filing of 2015.3 Reports is necessary.  To the extent the Debtors are required to file 2015.3 Reports, the Debtors are not in a position to do so within the time required without an extension. An extension will also enable the Debtors, if applicable, to work with their advisors and the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") to determine the appropriate nature and scope of the reports and any proposed modifications to the reporting requirements, which I believe would obviate the need for subsequent amendments to the reports.

14.    For these reasons, the relief requested in the Schedules and Statements Extension Motion is in the best interests of the Debtors, their creditors and all other parties-in-interest.

    E.    Debtors' Application for Entry of an Order Authorizing the Employment and Retention of Kroll Restructuring Administration LLC as Claims and Noticing Agent Effective *Nunc Pro Tunc* to the Petition Date [D.I. 28] (the "Claims and Noticing Agent Retention Application").

15.    Pursuant to the Claims and Noticing Agent Retention Application, the Debtors seek to entry of an order appointing Kroll Restructuring Administration LLC ("Kroll") as the claims and noticing agent in the Debtors' Chapter 11 Cases *nunc pro tunc* to the Petition Date.  I believe that the Debtors' estates, creditors, parties-in-interest and the Court will benefit from Kroll's experience.  Prior to retaining Kroll, the Debtors also solicited and reviewed

4858-5422-7007 v.2

engagement proposals from two other potential claims and noticing agents.  The Debtors believe

that Kroll's rates are competitive and reasonable given Kroll's quality of services and expertise,

and that the appointment of Kroll as claims and noticing agent is the most effective and efficient

manner by which to provide noticing and claims processing services in the chapter 11 cases and

is necessary and in the best interest of the Debtors and their estates.  For these reasons, the relief

requested in the Claims and Noticing Retention Application is in the best interests of the

Debtors, their creditors and all other parties-in-interest.

      F.    <u>Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Maintain a Consolidated List of Creditors in Lieu of Submitting a Separate Matrix for Each Debtor, (II) Authorizing the Debtors to Redact or Withhold Certain Confidential Information of Customers and Personal Information of Individuals and (III) Granting Certain Related Relief  D.I. 45] (the "Creditor Matrix Motion").</u>

16.    Pursuant to the Creditor Matrix Motion, the Debtors seek entry of interim

and final orders authorizing them to maintain one consolidated list of creditors (the "<u>Creditor</u>

<u>Matrix</u>") in lieu of submitting a separate matrix for each Debtor, to redact certain confidential or

personal information of customers and individuals from public filings and to establish procedures

for notifying parties of the commencement of the Debtors' Chapter 11 cases.

17.    There are over one hundred Debtors in these Chapter 11 Cases, many of

which have overlapping creditors.  The exercise of compiling separate creditor matrices for each

individual Debtor would consume an excessive amount of the Debtors' limited time and

resources.  Additionally, the Debtors historically did not keep reliable books and records, and the

Debtors are working to access certain sources of data and records that are currently unavailable.

It is my belief that presenting the information on a consolidated basis will ensure the most

relevant and known information can be promptly disclosed.  I also believe that converting the

Debtors' computerized information to a format compatible with the matrix requirements at the

4858-5422-7007 v.2

individual debtor level would be burdensome task and would greatly increase the risk of error with respect to information on computer systems maintained by the Debtors or their agents.

18.    It is my view that the Debtors' estates and their customers would benefit from the redaction of certain confidential customer information.  The Debtors operate a global platform catering to customers in various forms of cryptocurrency.  All of the Debtors' customers are creditors.  Thus, the Debtors' customer list, and related customer data, is a valuable asset to the Debtors' estate.  Public dissemination of the Debtors' customer list could give the Debtors' competitors an unfair advantage to contact and poach these customers, and I believe it would interfere with the Debtors' ability to sell their assets and maximize value for their estates at the appropriate time.

19.    Likewise, I believe that it is in the Debtors' and their estates' best interest to redact certain personal information of individuals.  It is my understanding that the Debtors may be subject to the GDPR, which restricts disclosure of certain personal information.  It is also my understanding that, notwithstanding the Court's authorization for the Debtors to redact personal information of customers and individuals, the Debtors will instruct Kroll to serve these individuals on their personal addresses or e-mail addresses, as applicable.  For these reasons, the relief requested in the Creditor Matrix Motion is in the best interest of the Debtors, the creditors, and all interested parties.

G.    Motion of Debtors For Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Claims of Critical Vendors, Foreign Vendors, 503(b)(9) Claimants and Lien Claimants, (II) Granting Administrative Expense Priority to All Undisputed Obligations on Account of Outstanding Orders, (III) Authorizing All Financial Institutions to Honor All Related Payments and (III) Granting Certain Related Relief [D.I. 46] (the "Vendor Motion").

20.    Pursuant to the Vendor Motion, the Debtors seek entry of interim and final orders (a) authorizing the Debtors to pay the prepetition claims of (i) Critical Vendors (as

defined below) in an amount not to exceed $9.3 million on an interim basis and $17.5 million on

a final basis, (ii) Foreign Vendors (as defined below), (iii) 503(b)(9) Claimants (as defined

therein) and (iv) Lien Claimants (as defined below) in an amount not to exceed $125,000 and (b)

granting administrative expense priority to all undisputed obligations on account of Outstanding

Orders (as defined below).  The Debtors will provide two business days' notice, with the

opportunity to object, to the U.S. Trustee and any official committee appointed in these Chapter

11 Cases of any payment to a Critical Vendor or Foreign Vendor of over $250,000.

21.    To ensure that only those vendors that provide goods and services that are

actually essential to the Debtors' businesses (collectively, the "<u>Critical Vendors</u>") are the subject

of the relief requested in the Motion, the Debtors, A&M and Sullivan & Cromwell LLP have

conducted an analysis and review of the Debtors' trade and service needs and supplier base.

Unfortunately, the Debtors books and records are incomplete and, as of the date of this Motion,

the Debtors have not yet been able to fully identify all vendors that are critical to the Debtors'

estates.

22.    That said, I believe that there are Critical Vendors who, if they ceased

providing goods or services, could cause irreparable harm to the Debtors' estates.  I believe that

Critical Vendors may refuse to supply the Debtors postpetition unless some or all of their

prepetition claims are paid and that replacement of the Critical Vendors might be impracticable

or, in some cases, impossible.  Without authority to pay Critical Vendors, I believe the Debtors

could face irreparable cyber security risks, potential data loss or other disruptions and ultimately

loss of value to their estates.  Based on my review of the Debtors' businesses, I believe that the

Critical Vendors may include vendors supporting regulated foreign or domestic exchanges,

vendors who are irreplaceable due to geography, vendors who supply or maintain specialized or

bespoke software, equipment or services, and technical service providers with expertise specific to the Debtors' businesses, equipment or IT infrastructure.  I also believe Critical Vendors may include vendors who provide security or storage for crypto assets and protection or preservation of other key information systems and assets, without which the Debtors' assets could be risk of loss.

23.     As a result of their global nature, a critical component of the Debtors' businesses involve transactions with foreign vendors (collectively, "Foreign Vendors").  In the ordinary course of business, the Debtors incur obligations to numerous suppliers of goods and services whose assets are located exclusively outside of the United States.  I believe that maintaining existing relationships with the Foreign Vendors is critical to continuing the Debtors' businesses.  Replacing these Foreign Vendors would be time-consuming, impracticable (and in many local jurisdictions, impossible) and cost prohibitive.  I also understand that Foreign Vendors often have skeptical reactions to the United States bankruptcy process because many of them are unfamiliar with the chapter 11 process.  Short of severing their contractual relations with the Debtors, nonpayment of prepetition claims may cause the Foreign Vendors to take other precipitous actions, including delaying shipments or the provision of services, or initiating a lawsuit in a foreign court to obtain a judgment against the Debtors to collect prepetition amounts owed to them.  Although I am advised that the automatic stay applies to protect the Debtors' assets where they are located in the world, the Foreign Vendors may erroneously believe that they are not subject to the automatic stay of section 362 of the Bankruptcy Code.  Attempting to enforce the Bankruptcy Code in foreign countries may also be uneconomical.

24.     I also understand that certain vendors (the "503(b)(9) Claimants"), including potential Critical Vendors, may have delivered goods to the Debtors within 20 days

-10-

4858-5422-7007 v.2

prior to the Petition Date.  Additionally, in the ordinary course of business, I understand that the Debtors may have ordered goods prior to the Petition Date which were not, or will not be, delivered until after the Petition Date (the "Outstanding Orders").  The Debtors also transact business with third parties who may assert various statutory liens (the "Lien Claimants") against the Debtors and their property if the Debtors fail to pay for the services rendered.  It is my belief that payment of prepetition amounts owed to the 503(b)(9) Claimants and Lien Claimants, and on account of the Outstanding Orders, is necessary and appropriate.  Absent such relief, the Debtors may be denied access to certain of their goods or be required to expend substantial time and effort reissuing Outstanding Orders, both of which could be disruptive to the Debtors' businesses.

25.    I believe that the relief requested in the Vendor Motion represents a sound exercise of the Debtors' business judgment and is necessary for the preservation of the resources and value of their estates.  For these reasons, the relief requested in the Vendor Motion is in the best interest of the Debtors, the creditors, and all interested parties.

H.    Motion of Debtors For Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Operate A Postpetition Cash Management System, (B) Maintain Existing Business Forms and (C) Performing Intercompany Transactions, (II) Granting a Partial Waiver of the Deposit Guidelines Set Forth in Section 345(b) and (III) Granting Certain Related Relief [D.I. 47] (the "Cash Management Motion").

26.    Historically, the Debtors maintained a decentralized cash system, by which each Debtor generally maintained individual bank accounts to collect, transfer and distribute funds.  To ensure that the Debtors can navigate the chapter 11 process in an orderly and efficient manner, the Debtors request approval of the new postpetition cash management system as set forth in the Cash Management Motion.

27.    Pursuant to the postpetition cash management system, the Debtors will utilize a cash pooling system, or "intercompany banks," to manage all of the Debtors' cash.   To implement this new system, the Debtors' Chief Executive Officer has authorized, and the Debtors are currently in the process of, opening new bank accounts in accordance with operating guidelines established by the U.S. Trustee for debtors-in-possession and compliant with applicable law.  The new bank accounts will include: (a) one or more accounts and/or subaccounts in the name of West Realm Shires Inc. ("WRS") to function as the main account (the "Master Pooling Account"), (b) one or more accounts and/or subaccounts in the name of WRS for it and its Debtor and non-Debtor subsidiaries, (c) one or more accounts and/or subaccounts in the name of FTX Trading Ltd. for it and its Debtors and non-Debtor subsidiaries, (d) one or more accounts and/or subaccounts in the name of Alameda Research LLC for it and its Debtor subsidiaries and (e) one or more accounts and/or subaccounts in the name of Clifton Bay Investments LLC for it and certain of its Debtor affiliates (each a "Silo Pooling Account" and, collectively, the "Silo Pooling Accounts").  In addition, the Debtors will continue using existing bank accounts where appropriate.

28.    All current and future cash receipts of any Debtor will be deposited in, or transferred to the applicable Silo Pooling Account; *provided* that the Debtors may keep restricted cash of each Debtor at such Debtor and, at the discretion of the Chief Executive Officer, the Debtors may keep current cash and future cash receipts at any Debtor in an amount not to exceed 45-day estimated payable and current cash and future cash receipts of foreign Debtor subsidiaries at such foreign Debtor subsidiary or its foreign Debtor affiliates.  The Debtors may use funds in any Silo Pooling Account to pay expenses of the Debtors within the applicable Silo.  The Debtors may also advance funds from any Silo Pooling Account to any Debtor within a Silo for

-12-

payments on account of such Debtor or to provide to any Debtor cash liquidity in an amount not to exceed 45-day estimated payables. The Debtors will maintain a record of each Silo Pooling Account showing the debits or credits of each Debtor within the applicable Silo against the Silo Pooling Account. Net balances will be determined promptly in arrears with at least monthly frequency.

29.     The Debtors may deposit current cash and future cash receipts of any non-Debtor into the applicable Silo Pooling Account at any time. The Debtors may advance funds from a Silo Pooling Account to a non-Debtor at any time; *provided* that, after giving effect to such advance, the net aggregate credit balance of all non-Debtors in a Silo against the applicable Silo Pooling Account is positive. The Debtors will maintain a record of each Silo Pooling Account showing the debits or credits of each non-Debtor within the applicable Silo against the Silo Pooling Account. Net balances will be determined promptly in arrears with at least monthly frequency.

30.     The Debtors may transfer cash in any Silo Pooling Account to the Master Pooling Account at any time. The Debtors may advance funds from the Master Pooling Account to any Silo Pooling Account at any time for payments on account of the Debtors within such Silo or to provide to any Debtor within such Silo cash liquidity in an amount not to exceed 45-day estimated payables as determined by the Chief Executive Officer. Notwithstanding the foregoing, the Debtors shall not advance funds from the Master Pooling Account to any Silo Pooling Account in an amount greater than $25 million in the aggregate prior to entry of the Final Order. The Debtors will maintain a record of the Master Pooling Account showing the debits or credits of each Silo against the Master Pooling Account. Net balances will be determined promptly in arrears with at least monthly frequency.

31.      I believe that the proposed postpetition cash management system is necessary and appropriate under the circumstances.  Requiring the Debtors to immediately fully dismantle the prepetition cash management system and to adopt a brand new system would incur material expenses and create unnecessary administrative burdens at a time when the Debtors have more pressing matters to attend to at the outset of these Chapter 11 Cases.  Furthermore, I believe that adopting a brand new cash management system is also impracticable given that there are 102 Debtors worldwide.  In contrast, I believe that the postpetition cash management system will enable the Debtors to efficiently track and control funds, ensure cash availability and reduce administrative costs.  I also believe that allowing the transfer of funds between Debtors, and Debtors and non-Debtors, is necessary for the Debtors to navigate these Chapter 11 Cases in an orderly and efficient manner and to account for an allocate all associated costs and expenses.

I.      <u>Motion of Debtors For Entry of Interim and Final Orders (I) Establishing Notice and Objection Procedures for Transfers of Equity Securities and Claims of Worthless Stock Deductions and (II) Granting Certain Related Relief [D.I. 49] (the "NOL Motion")</u>.

32.      Pursuant to the NOL Motion, the Debtors seek entry of an order (a) establishing notice and objection procedures related to certain transfers and declarations of worthlessness for federal and state tax purposes with respect to the existing common stock or equity interests or preferred stock or equity interests of West Realm Shires Inc., Alameda Research LLC, Hilltop Technology Services LLC, Clifton Bay Investments LLC, Deck Technologies Holdings LLC, Paper Bird Inc. and Blockfolio, Inc. (the "NOL Debtors"), and the existing classes (or series) of preferred stock or equity interests of the NOL Debtors and (b) directing that any purchase, sale, or other transfer of, or declaration of worthlessness with respect to, such interests in violation of such procedures be null and void *ab initio*.

-14-

33.    I understand that, based on filed 2021 tax returns, as of December 31, 2021, the Debtors collectively had federal NOL carryovers in the amount of at least approximately $3.7 billion and state NOL carryovers in the amount of at least $715 million.  The Debtors are also investigating whether they may have additional disallowed business interest carryforwards, foreign tax credits, net unrealized built-in loss or other tax attributes.  I understand that, based on currently available information, the Debtors will generate significant additional tax attributes during the 2022 tax year, including during the Chapter 11 Cases.  I understand that the proposed procedures do not create general prohibitions on transfers of, or declarations or worthlessness with respect to, the equity interests.  Rather, the Debtors seek to establish procedures only to monitor these types of transactions to preserve the Debtors' ability to seek substantive relief if it appears that a proposed transfer or declaration of worthlessness could jeopardize the Debtors' utilization of the tax attributes.

34.    I believe the relief requested in the NOL Motion is necessary and appropriate to preserve the value of the tax attributes for the benefit of the Debtors' estates.  The limitation or loss of the tax attributes could be materially detrimental to all parties-in-interest.  For these reasons, the relief requested in the NOL Motion is in the best interest of the Debtors, the creditors, and all interested parties.

J.    Motion of Debtors for Entry of an Order (I) Authorizing the Debtors to (A) Pay Prepetition Compensation and Benefits and (B) Continue Compensation and Benefits and (II) Granting Related Relief [D.I. 50] (the "Employee Wages and Benefits Motion").

35.    Pursuant to the Employee Wages and Benefits Motion, the Debtors seek entry of an order authorizing the Debtors to (a) pay prepetition wages, salaries and other compensation and benefits, and reimbursable expenses and (b) continue the compensation and

-15-

benefits programs in the ordinary course of business, or to change their plans or policies regarding compensation and benefits.

36.     Prior to the Petition Date, the Debtors employed or engaged approximately 330 employees in approximately 29 countries and other independent contractors. The Debtors experienced extraordinary attrition among their Employees in the period shortly before and following the Petition Date, and the Debtors are working diligently with their advisors to determine and assess the remaining Employee population.  I believe that, without the continued services of the remaining employees, the Debtors' businesses will be severely affected and the administration of the estate materially impaired.

37.     The Debtors pay and incur a number of obligations in compensating the workforce.  These obligations, which are described in the Employee Wages and Benefits Motion, include obligations to the Debtors' employees for wages, fees, overtime, and similar obligations as well as payment obligations to independent contractors for services rendered to the Debtors and obligations to non-debtor employees for certain compensation.  The Debtors are engaging in ongoing diligence efforts to understand the Debtors' prepetition payrolls and confirm the remaining population of employees, and do not yet have full clarity regarding the amount of accrued but unpaid Employee Compensation as of the Petition Date.  The Debtors estimate, however, that such amount was approximately $1,000,000.

38.     The Debtors previously compensated certain of their employees with their proprietary cryptocurrency token and/or stock options or equity-based compensation in addition to the cash payments described above.  As of the Petition Date, the Debtors have suspended this practice.

39.     The Debtors utilize various vendors across the globe to assist with human resources and administrative functions, including TriNet Group Inc. ("TriNet"), Justworks Employment Group, LLC ("Justworks"), People Center, Inc. d/b/a Rippling ("Rippling") and other third party providers.  As of the Petition Date, the Debtors estimate that they owed $1,000 in respect of administrative fees in connection with the Justworks benefits obligations, $0 in respect of administrative fees in connection with the TriNet benefits obligations and approximately $100 in respect of administrative fees in connection with Rippling obligations.

40.     Certain Debtors also engage other benefits and payroll processing providers, administrators, tax advisory firms, and independent contractors worldwide to provide certain human resource assistance functions and payroll services pursuant to various services agreements between certain of the Debtors and such third party vendors (collectively with TriNet, Justworks and Rippling, the "Third Party Providers").  In connection with these functions and services, the Debtors incur fees in the ordinary course and may owe certain amounts.  Many of the Debtors are virtually void of any administrative personnel which would be customary to employ in any well-functioning company to administer even basic tasks, and I believe that the Debtors' relationships with the Third Party Providers are critical to the Debtors' businesses.

41.     New independent non-employee directors (the "Non-Employee Directors") have been appointed at the controlling entities of the Debtors' businesses to ensure proper governance throughout the Chapter 11 process.  Each Non-Employee Director is paid fees of $50,000 per month and is entitled to reimbursement for reasonable business-related expenses incurred in good faith in the performance of the Non-Employee Director's duties for the Debtors (collectively, the "Non-Employee Director Compensation").  The Debtors do not owe any prepetition amounts on account of Non-Employee Director Compensation.

42.     When the Debtors' co-founder Samuel Bankman-Fried agreed to step aside, John J. Ray III, an experienced restructuring executive, was appointed as Chief Executive Officer (the "CEO") of the Debtors.  Mr. Ray was delegated all corporate powers and authority under applicable law, including the power to appoint independent directors and commence these Chapter 11 Cases on an emergency basis.  Mr. Ray's services were retained pursuant to an engagement letter between Owl Hill Advisory, LLC ("Owl Hill") and the Debtors (the "CEO Engagement Letter").  Pursuant to the terms of the CEO Engagement Letter, Owl Hill will furnish the services of Mr. Ray to serve as the CEO of the Debtors, but Mr. Ray will remain an employee of Owl Hill.  Under the CEO Engagement Letter, the Debtors will pay a current hourly fee of $1,300, plus reasonable out of pocket expenses, which will be billed not less than monthly. Owl Hill remains responsible for the payment of all compensation and benefits to Mr. Ray, and Mr. Ray is not eligible to participate in any employee benefit plans of the Debtors.

43.     Mr. Ray appointed Kathryn Schultea, Mary Cilia and Raj Perubhatla as Chief Administrative Officer, Chief Financial Officer and Chief Information Officer, respectively, of the Debtors (the "Executives").  The Executives were retained pursuant to an engagement letter between RLKS Executive Solutions ("RLKS") and the Debtors (the "Consultant Engagement Letter").  Pursuant to the terms of the Consultant Engagement Letter, RLKS will furnish the services of the Executives to serve as Chief Administrative Officer, Chief Financial Officer and Chief Information Officer of the Debtors, but the Executives will remain employees of RLKS.  Under the Consultant Engagement Letter, the Debtors will be charged an hourly fee of $975 for the services of each of the Executives.  RLKS remains responsible for the payment of all compensation and benefits to the Executives and the Executives are not eligible to participate in any employee benefit plans of the Debtors.  RLKS will also assist the Debtors with

Chapter 11 matters of the Debtors' businesses and estates.  In consideration for additional

services performed by RLKS, the Debtors will pay RLKS its customary hourly billing rates,

which range from $800 to $950 for Managing Directors, $600 to $775 for Directors, $450 to

$575 for Senior Managers and $350 to $425 for Analysts and Associates.

44.     Pursuant to terms of the CEO Engagement Letter and the Consultant

Engagement Letter, the Debtors agrees to indemnify and hold each of Owl Hill, the CEO, RLKS,

and the Executives (each an "Indemnitee") harmless from and against any damages, costs,

expenses and liabilities, taxes and penalties of any kind and nature whatsoever ("Losses")

(including, but not limited to, all reasonable attorney's fees) to the extent arising out of, related

to, are imposed upon or asserted at any time against any Indemnitee, with respect to the

performance of the services provided for under the CEO Engagement Letter or Consultant

Engagement Letter, as applicable, including, without limitation, any Losses with respect to any

threatened, pending or completed claim, any investigation, action, cause of action, suit,

arbitration, appeal, controversy or other proceeding, whether civil, criminal, administrative or

investigative.  An Indemnitee will not be entitled to indemnification arising from any acts by the

Indemnitee of bad faith, willful misconduct, or gross negligence.  The Debtors will also include

the Indemnitees as additional named insureds under the Debtors' D&O policies.

45.     As of the Petition Date, it is estimated that the Debtors owed Owl Hill

approximately $20,000, which will be offset against a $200,000 retainer established prepetition.

In the Employee Wages and Benefits Motion, the Debtors request the authority to pay amounts

owed under the CEO Engagement Letter and the Consultant Engagement Letter (the "Advisory

Firm Obligations").  I believe that retaining the expertise and services of RLKS, including the

services provided by Mr. Ray, Ms. Schultea, Ms. Cilia and Mr. Perubhatla, is critical to

maintaining and administering the Debtors' estates during these Chapter 11 Cases.

46.     The Debtors do not believe that any of the employees are represented by a

union, collective bargaining agreement or works council other than one employee working in

Vietnam.  In connection with this union representation, the Debtors incur certain expenses and

estimate that the total amount outstanding on account of such obligations as of the Petition Date

was approximately $20.

47.     The Debtors offer eligible employees and their eligible dependents and

beneficiaries eligibility to participate in a number of health and welfare and other benefits

programs, including, among other programs, medical insurance, dental insurance, vision

insurance, short- and long-term disability insurance and other employee benefit plans

(collectively, the "Health and Welfare Coverage and Benefits").  Pursuant to the Consolidated

Omnibus Budget Reconciliation Act of 1985, certain eligible employees who are no longer

employed by the Debtors may continue Medical and Prescription Coverage, Dental Insurance

Coverage, and Vision Insurance Coverage ("COBRA Benefits").  I am advised that such

employees are entitled by law to continue to receive COBRA Benefits for up to 18 months, and

in some instances up to 36 months, following termination of employment.  Certain of the

Debtors offer eligible employees other voluntary benefits including commuter allowances, phone

allowances, lunch allowances, among others.  The terms of the Health and Welfare Coverage and

Benefits that are available to eligible employees depend on the jurisdiction in which the eligible

employee is based and the entity that employs or engages the eligible Employee.  As failure to

continue the Health and Welfare Coverage and Benefits could cause employees hardship and

make it difficult for Debtors to retain their remaining workforce, I believe that the continuance of

Health and Welfare Coverage and Benefits is critical to maintaining and administering the

Debtors' estates during these Chapter 11 Cases.

48.    The Debtors generally maintain workers' compensation insurance policies

at the statutorily required level for jurisdictions in which they have employees (the "Workers'

Compensation Program").  Because the Debtors are statutorily and/or contractually obligated to

maintain the Workers' Compensation Program, their inability to do so may result in adverse

legal consequences that could potentially disrupt the reorganization process.

49.    The Debtors maintain retirement savings plans for the benefit of certain

employees that are intended to satisfy the requirements of section 401(k) of the Internal Revenue

Code (collectively, the "401(k) Plan").  Certain of the 401(k) Plans provide for employer an

employer match of employee contributions ("401(k) Matching Contributions").  Certain of the

Non-United States Debtors also maintain defined contribution plans for eligible employees (the

"Non-U.S. Defined Contribution Programs").  In at least three jurisdictions in Europe, the

Debtors maintain a Contributed Benefit Plan (IAS 19).  Other Non-United States Debtors enable

employees to maintain their statutorily required and managed retirement schemes by remitting

payroll deductions on their behalf to the appropriate parties.

50.    Prior to the Petition Date and in the ordinary course of business, the

Debtors paid (including through corporate cards as applicable) or reimbursed certain employees

for approved business expenses incurred on behalf of the Debtors within the scope of their

employment ("Reimbursable Expenses").  Employees incurred Reimbursable Expenses as

business expenses on the Debtors' behalf and with the understanding that such expenses would

be repaid.

51.     The Debtors also provide eligible employees with paid time off (the "Paid Leave Benefits") as well as other forms of paid and unpaid leave, including, for example, (a) paid holidays, (b) leave under the Family and Medical Leave Act and (c) other paid and unpaid leaves of absence for personal reasons, including those required by law.  Paid leave programs in non-United States locations are offered primarily in accordance with statutory requirements.  As the continuance of the Paid Leave Benefits policies is essential to maintaining employee morale, I believe that the continuance of these policies is critical to maintaining and administering the Debtors' estates during these chapter 11 cases.

52.     In addition to the foregoing, certain of the Debtors offer their employees the opportunity to participate in a range of ancillary benefits, including, flexible spending accounts, commuter allowance, phone allowance, lunch allowance, among others (collectively, the "Additional Benefit Programs").

53.     In the ordinary course of business, it is expected that the Debtors provided certain severance benefits to employees who experienced a qualifying termination of employment (the "Severance Benefits").  The Debtors are diligently working to gather information on the Severance Benefits, including the terms on which such Severance Benefits were granted and any prepetition obligations in connection therewith.  In the Employee Wages and Benefits Motion, the Debtors do **not** request the authority to pay any Severance Benefits.

54.     In the ordinary course of business, it is expected that the Debtors offered ad hoc bonuses to certain non-insider Employees (the "Non-Insider Ad Hoc Bonuses").  In the Employee Wages and Benefits Motion, the Debtors do **not** request the authority to pay the Non-Insider Ad Hoc Bonuses.

4858-5422-7007 v.2

55.    I believe that the relief requested in the Employee Wages and Benefits Motion is a sound exercise of the Debtors' business judgment and is necessary for the preservation of the resources and value of their estates.  It is my view that the requested relief is critical to the Debtors' businesses.  Without it, I believe that even more employees may seek alternative employment opportunities, which would further deplete the Debtors' workforce, thereby hindering the Debtors' businesses and, likely, diminishing stakeholder confidence in the Debtors' ability to successfully reorganize. The loss of valuable employees and the resulting need to recruit new personnel (and the costs attendant thereto) would be distracting at this crucial time when the Debtors need to focus on stabilizing their businesses.

56.    It is also my understanding that employees rely on the compensation and benefits to satisfy their daily living expenses, and may be exposed to significant financial difficulties if the Debtors are not permitted to pay the compensation and benefits.  I also believe that failure to timely satisfy such obligations will further jeopardize workforce moral and loyalty at this crucial time.

57.    Based on the facts and circumstances articulated herein, I believe that the relief requested in the Employee Wages and Benefits Motion is in the best interest of the Debtors' estates, their creditors, and all other parties-in-interest.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information and belief.

Dated: November 20, 2022              */s/ Edgar W. Mosley II*
                                      Edgar W. Mosley II
                                      Alvarez & Marsal North America, LLC
                                      Managing Director

4858-5422-7007 v.2