**EXHIBIT 1**

(Master Bank Services Agreement)

**MASTER BANK SERVICES AGREEMENT**

This Master Bank Services Agreement ("<u>Agreement</u>") is entered into [        ]by and between <u>Evolve Bank & Trust</u>, an Arkansas state bank, ("<u>Bank</u>") and <u>West Realm Shires Services Inc. dba/ FTX US</u> a Delaware Corporation ("<u>Program Manager</u>"). For purposes of this Agreement, Bank and Program Manager each may be referred to individually as a "<u>Party</u>" and together as the "<u>Parties</u>."

RECITALS

Bank is a depository institution with its deposits insured by the Federal Deposit Insurance Corporation ("<u>FDIC</u>").

Bank is a member of certain Networks and is in the business of providing financial products and other bank services to commercial and consumer customers.

The Parties desire to establish one or more programs under which the Bank will offer Bank Services to End Users and Program Manager will support such offering, as more fully described in <u>Schedule B</u> (<u>Program Schedules</u>) to this Agreement (each, a "<u>Program</u>").

Bank agrees to provide the Bank Services for the Program(s) pursuant to the terms and conditions set forth herein, and Program Manager agrees to service and support the Program(s) in accordance with the terms and conditions set forth herein.

The Parties wish to establish the terms and conditions to provide and receive certain services from each other in connection with the Program.

AGREEMENT

NOW, THEREFORE, in consideration of the mutual covenants and conditions hereinafter set forth, the receipt and sufficiency of which is acknowledged, the Parties hereto, intending to be legally bound, agree as follows:

1.  **Definitions**.  Capitalized terms used in this Agreement shall have the meanings set forth in <u>Schedule A</u> (<u>Definitions</u>) attached to this Agreement or elsewhere in this Agreement.

2.  **Effective Date and The Program(s)**.  On or following the Effective Date, the Parties agree to launch each Program on the terms and conditions provided for in this Agreement and as further described in <u>Schedule B</u> (<u>Program Schedules</u>).

    (a)    This Agreement shall become effective upon the later of (i) the date of execution and delivery hereof by the Parties hereto; and (ii) the date Bank delivers to Program Manager written notice that (a) Program Manager has successfully completed and fulfilled Bank's due diligence requirements to Bank's satisfaction, and (b) Bank has approved Program Manager to support one or more Programs (the "<u>Effective Date</u>").

    (b)    On or following the Effective Date, the Parties agree to launch each Program on the terms and conditions provided for in this Agreement and a s further described in <u>Schedule B</u> (<u>Program Schedules</u>). This Agreement and <u>Schedule B</u> (<u>Program Schedules</u>) sets forth the general terms and conditions applicable to all Programs in effect during the Term.  The description and terms and conditions of each Program shall be set forth in a corresponding Program Schedule set forth in <u>Schedule B</u> (<u>Program Schedules</u>), as amended from time to time, and approved by Bank in accordance with this Section ("<u>Effective Date and The Program(s)</u>").  Each Program Schedule set forth in <u>Schedule B</u> (<u>Program Schedules</u>) will also describe (a) any services additional to the services set forth in this Agreement to be provided by each Party to operate, offer, support and facilitate a Program, (b) the Bank Services to be offered or provided by Bank, (c) the applicable Program Manager Accounts; and (d) any additional obligations for which Program Manager is responsible for under this Agreement and in connection with any Program.  Program Manager agrees to cooperate with Bank and promptly execute any agreements as may be reasonably required under Applicable Law or by any Regulatory Authority for Bank to provide the Bank Services under any Program contemplated hereunder.

    (c)    All Programs in effect as of the Effective Date are set forth on <u>Schedule B</u> (<u>Program Schedules</u>).  To establish a new Program after the Effective Date, Program Manager will submit a business case substantially in the form required by Bank ("<u>Program Proposal</u>") to Bank for its approval; such Program Proposal will describe, among other things, the structure, operation and purpose of the Program, the proposed fees for the Program, the types of End Users that will participate in the Program, the proposed Bank Services to be offered in connection with the Program, the end date of the Program (if applicable), other details sufficient to permit Bank to evaluate whether the Program Proposal (including proposed Program) complies with Applicable Law, Bank Policies, Compliance Policies and the terms of this Agreement, and any other information or documentation requested by Bank.  Program Manager shall ensure that each Program Proposal is consistent and complies with Applicable Law, Bank Policies, Compliance Policies, and the terms of this Agreement for that type of product ("<u>Program Criteria</u>").  For any Program Proposal submitted to Bank, Bank will provide notice to Program Manager of its acceptance or rejection of the Program Proposal; such notice shall include any feedback the Bank deems

appropriate.  To the extent permitted by Bank, Program Manager shall revise such Program Proposal to conform to the Program Criteria and to address any comments or concerns raised by Bank during its review.  Upon Bank's determination, in its sole and absolute discretion, that the Program Proposal satisfies concerns raised by its review, Bank may approve the Program Proposal.  Approval of any Program Proposal shall be in writing and provided by an authorized representative of Bank.  All prospective Programs described in a Program Proposal approved pursuant to the terms of this section by Bank during the Term will be deemed a Program Schedule and the proposed Program(s) described by the approved Program Schedule(s) will be deemed a Program. Such approved Program Schedule will be added to and made a part of <u>Schedule B</u> (<u>Program Schedules</u>) and form part of this Agreement without the necessity of amending this Agreement and all pricing for such Program will be added to <u>Schedule C</u> (<u>Schedule of Fees and Charges</u>) and form part of this Agreement without the necessity of amending this Agreement.  For the avoidance of doubt, Bank is under no obligation to approve any proposed Program or Program Proposal. Program Manager shall be responsible for ensuring that each Program, Program Schedule, the servicing, approval, and management of each Program and any related Bank Services complies with Applicable Law and the terms of this Agreement. Each time a Program Proposal is submitted for approval to Bank as contemplated by this Agreement, Program Manager represents and warrants that there has been no material adverse changes in the information provided to Bank as part of Bank's underwriting and approval of Program Manager, including Due Diligence Materials, or in its financial condition or management.

(d)     Notwithstanding anything to the contrary and regardless of any Program description, no extension of credit of any kind or in any amount will be made available to an End User under any Program and no Program shall support any extension of credit or credit product.

3.     <u>**Grant of Right**</u>.

(a)     Bank and Program Manager hereby each acknowledge and agree that: (i) except as otherwise expressly provided in this Agreement and without modifying Program Manager's liability for the operation of each Program as set forth in this Agreement and applicable Program Schedule provided for in <u>Schedule B</u> (<u>Program Schedules</u>), Bank shall have full control and continued oversight over each Program, including without limitation all policies, activities and decisions with respect to such Program; and (ii) the Bank Services offered under each Program pursuant to the Program Schedule provided for in <u>Schedule B</u> (<u>Program Schedules</u>) and this Agreement are products of Bank.  Program Manager recognizes and acknowledges that, except as otherwise expressly provided in this Agreement, Bank shall retain decisional authority and control over each Program in all material respects, and that Program Manager shall not implement any changes to any aspect of any Program except as expressly stated herein.  Except as otherwise provided in this Agreement, Bank shall have the final determination as to any changes that may be required or advisable with respect to each Program.

(b)     Subject to the terms and conditions of this Agreement, Bank hereby appoints Program Manager as Bank's non-exclusive service provider for the sole and limited purposes of (i) developing and marketing Programs and Bank Services; (ii) providing Program Manager Services; (iii) providing Bank with access to the Dashboard; and (iv) performing any other services required by this Agreement or otherwise required to support each Program and to ensure each Program is offered and managed in compliance with Applicable Law.

4.     <u>**Marketing Materials and Activities**</u>.

(a)     <u>**Marketing Materials**</u>.

(i)     Program Manager shall, at its sole expense: (i) develop proposed Marketing Materials; and (ii) promote and market the Program and related Bank Services to prospective End Users using approved Marketing Materials.  All Marketing Materials and Marketing Activities must be developed and performed in compliance with Applicable Law, Bank Policies and Compliance Policies, and approved in advance by Bank in writing prior to distribution (in the case of Marketing Materials) and performance (in the case of Marketing Activities). Marketing Materials and Marketing Activities will be considered approved and authorized by Bank only if such approval and authorization are clearly communicated by Bank in writing, provided that Bank does not subsequently revoke its approval pursuant to the terms of Section 5 ("<u>Changes to Marketing Materials, Marketing Activities, or Program</u>").  Bank may review Program Manager's compliance with the foregoing at any time.  Bank shall be identified on all Marketing Materials for Bank Services and any Program contemplated under this Agreement.  All Marketing Materials must receive the prior written approval of Bank, in accordance with the procedures set forth in this Section 4 ("<u>Marketing Materials and Activities</u>").

(ii)     Prior to Program Manager's use of any Marketing Materials or conducting any Marketing Activities, Bank shall have completed an initial review of the forms of Marketing Materials and Marketing Activities proposed by Program Manager and approve or reject any such forms of Marketing Materials and Marketing Activities that have been provided to Bank.  Thereafter, Program Manager

shall make available for Bank's prior review and approval all new forms of Marketing Materials and Marketing Activities proposed by Program Manager.

(iii)    Only after approval of the form of Marketing Materials or Marketing Activities pursuant to the terms herein, Program Manager may use such forms of Marketing Materials and Marketing Activities, and need not seek further approval for use of such forms unless there is: (i) a Substantive Change in the Marketing Materials or Marketing Activities, or (ii) a new offering to be included in the Marketing Materials (each of the events in clauses (i) and (ii), a "Qualifying Change").  In the event of a Qualifying Change, Program Manager shall submit such forms of Marketing Materials and Marketing Activities to Bank for review and approval in accordance with the terms of this Agreement.

(iv)    Bank may request up to four (4) periodic reviews of the Marketing Materials and Marketing Activities then being used by Program Manager in each calendar year, provided, however, that Bank may request additional reviews of the Marketing Materials and Marketing Activities if required by a Regulatory Authority or if Bank determines, in its sole discretion, that Program Manager is in, or is likely in, breach of any provision of this Agreement, Applicable Law, Compliance Policies or Bank Policies.  Bank and Program Manager shall cooperate to determine the form, format, frequency, and timing of such reviews to minimize expense and disruption.

(v)    Regardless of any review or Approval by Bank, Program Manager shall be liable for all claims arising from the use by Program Manager or its Subcontractor of any Marketing Materials or Marketing Activities.  Program Manager shall ensure that all Marketing Materials and Marketing Activities shall comply with Applicable Law, shall be accurate in all respects and shall not be misleading.  Nothing herein shall serve to undermine Program Manager's liability to Bank and/or indemnification obligations under this Agreement.

(vi)    If the Program Manager fails to obtain Bank's prior approval of Marketing Materials and Marketing Activities two (2) times before distributing such Marketing Materials or engaging in Marketing Activities, to Persons, without limiting any other rights or remedies of Bank, Bank may, in its sole discretion, assess the fee set forth in Schedule C (Schedule of Fees and Charges); provided, Bank may also temporarily suspend the Program(s) or, in the case of repeated failures, Bank shall have the right to terminate this Agreement or the Program(s) by giving written notice of such termination of the Program(s), in which case the date of termination shall be as set forth in such notice. The penalties set forth in this Section 4(a)(vi) shall not restrict or otherwise limit Bank from exercising any right or remedy available to Bank under this Agreement and/or Applicable Law.

5.    **Changes to Marketing Materials, Marketing Activities or Program**.

(a)    Bank or a Regulatory Authority may require amendments, modifications or changes to any Program, Marketing Materials, Marketing Activities or other Disclosure Materials from time to time in order to ensure compliance with Applicable Law or Bank Policies, to address a reputational, financial, regulatory or safety or soundness risk to Bank, including to address any failure of any Program to meet the risk parameters set by Bank, or for any other purpose in the case of Regulatory Authority.  Program Manager agrees that if Bank determines, in its sole discretion, that any Program, Marketing Activities or any Disclosure Materials violate or may violate Applicable Law, Compliance Policies or Bank Policies or otherwise pose a risk to the reputation or safety or soundness of Bank, Bank may direct Program Manager to suspend the marketing of the Bank Services for any impacted Program until such time as the Parties can amend the Program(s), Marketing Activities or Disclosure Materials to ensure compliance with Applicable Law, Compliance Policies and Bank Policies or to otherwise resolve any such risk, as determined by Bank.  Upon Program Manager's receipt of written notice from Bank of any changes to a Program, Marketing Activities or Disclosure Materials or a determination that any Program, Marketing Activities or Disclosure Materials are no longer authorized, Program Manager shall implement such change or determination as soon as commercially practicable but in no event later than thirty (30) days (or earlier if required by Applicable Law or Regulatory Authority) from Program Manager's receipt of notice of such change or determination. Program Manager may suggest a change to a Program, Marketing Activities or Disclosure Materials at any time and Bank may approve or reject such requested change; any change approved by Bank in writing shall become effective as it relates to the Program and shall amend the relevant Program Schedule under Schedule B (Program Schedules) without further action. Except as otherwise provided in this Agreement, Bank shall have the final determination as to any changes that may be required or advisable with respect to the Disclosure Materials, Marketing Activities or as to each Program.  Program Manager, nor any of its Subcontractors, shall use or implement any suggested change prior to receiving Bank's written approval of such change.

(b)    Bank shall provide Program Manager annually or more frequently as Bank so determines, in its sole discretion, with a questionnaire (which may be provided electronically to Program Manager) regarding each Program, Disclosure Materials, and/or Marketing Activities under this Agreement.  Program Manager shall promptly, accurately and completely answer the questionnaire upon receipt of such questionnaire from Bank.  Program

Manager represents upon each submittal of a completed questionnaire that the answers contained in such questionnaire are true and accurate as submitted and will notify Bank of any change in Program Manager response within two (2) days of such change. Bank reserves the right in its reasonable discretion to seek additional information and documentation from Program Manager based on its review of such questionnaire and Program Manager agrees to cooperate with Bank in providing accurate and complete answers to the questionnaire and in providing any additional information Bank may request in its reasonable determination.

6.      **Disclosure Materials and Offering Bank Services**.

(a)     Program Manager, at its sole expense, shall be responsible for developing, producing, printing, and distributing the following: (i) Disclosure Materials; (ii) any amendments to the Disclosure Materials, including amendments required to ensure Disclosure Materials comply with Applicable Law; and (iii) all notices required by Applicable Law to Persons applying for or receiving Bank Services, including notices required for denial of an Application. Program Manager shall ensure all Disclosure Materials shall comply with Applicable Law, and all Disclosure Materials shall be delivered in form, content, and time in accordance with Applicable Law. Prior to the formal launch of a Program, Program Manager shall establish a policy governing approving Bank Services and opening or provisioning Bank Services for such Program that complies with Applicable Law, Bank Policies and Compliance Policies, which must be approved by Bank in writing prior to use ("Account Opening Policy"). Program Manager shall comply with Applicable Law, Compliance Policies and Bank Policies in servicing, approving, and managing each Program and any related Bank Services. For the avoidance of doubt, Program Manager shall be responsible for all liability associated with each Program or Bank Service, including fraud and error resolution liability, even if such Bank Service was approved in compliance with the Account Opening Policy. Within ten (10) Business Days of the Effective Date, Program Manager shall provide a form Bank Services Agreement, form Application and its privacy policy, all of which are considered Disclosure Materials to be used in connection with the applicable Program, to Bank for its approval. The Parties acknowledge that each Bank Services Agreement and all other documents referring to Bank Services shall identify Bank as the depository institution. The Bank Services Agreement shall further provide that it is governed by Tennessee and federal law. Any changes to the Disclosure Materials must be approved in advance by Bank in writing. Program Manager shall be liable for all losses and claims related to Disclosure Materials. Without modifying Program Manager's responsibility for Disclosure Materials, including compliance with Applicable Law, Disclosure Materials shall be submitted to and approved by Bank in writing prior to use.

(b)     Program Manager shall solicit Applications from Applicants and shall perform Application Processing on behalf of Bank to determine whether the Applicant meets the eligibility criteria set forth in the Account Opening Policy. Program Manager shall respond to all inquiries from Applicants and from Bank regarding the Application Processing. Program Manager shall conduct Application Processing for each Applicant who requests a Bank Service and shall approve on behalf of Bank only the requests of Applicants who meet the eligibility criteria set forth in the Account Opening Policy. In the event an Applicant's Application is denied or Applicant is otherwise denied access to a Bank Service, Program Manager shall provide such Applicant all notices required by Applicable Law and term of this Agreement. Such notices shall be delivered in form, content and timing in accordance with Applicable Law.

(c)     Each time Program Manager submits, or causes a Critical Subcontractor to submit, an Application to Bank, Program Manager represents and warrants that the Program Manager (or Critical Subcontractor, as the case may be) performed the Application Processing, the Applicant meets the eligibility criteria determined by Bank, and that the Application is true and complete in all material respects as of the date provided to Bank.

(d)     Subject to the terms of this Agreement and Applicable Law, Bank may provision Bank Services for Applicants who meet the eligibility criteria set forth in the Account Opening Policy and who accept the Bank Services offer. The Parties acknowledge and agree that the relationship with each End User shall be exclusively owned by Bank. Program Manager acknowledges that Bank is under no obligation to provide Bank Services to any Applicant. Notwithstanding anything to the contrary, Bank may, in its sole discretion, reject or decline to provide a Bank Service, subject to Applicable Law.

(e)     Program Manager shall obtain appropriate signatures and other authorizations from each Applicant, End User and/or any third party required by Bank in order for such Applicant, End User and/or third party to open, receive and/or access a Bank Service, and take all other actions necessary for Bank to provide the Bank Services, all in accordance with Applicable Law.

(f)     Program Manager shall perform its obligations described in this Agreement and deliver any other End User communications to Applicants as necessary to carry on the Program, in accordance with Applicable Law, all at Program Manager's own cost. Program Manager shall pay all third-party costs associated with processing transactions related to a Program and establishment of Bank Services.

7.      **Program Manager's Obligations**.

(a) **Applicable Law and Compliance Requirements.** At all times, Program Manager (and any of its Subcontractors), in performing its duties and obligations hereunder and in its performance or provisioning of Program Manager Services, shall comply with Applicable Law. All duties and obligations of Program Manager under this Agreement and in Program Manager's performance or provisioning of Program Manager Services shall be performed and provided in a manner consistent with the data security standards set forth in Section 23(b) ("Data Security") of this Agreement, Applicable Law, Bank Policies, and Compliance Policies and shall not cause any Bank Service to be out of compliance with Applicable Law. Program Manager will be responsible for costs associated with servicing and supporting the Bank Services in accordance with this Agreement and Applicable Law. Program Manager shall (and shall cause each Critical Subcontractor to) provide all necessary cooperation and assistance to Bank in connection with Bank's annual review of Program Manager (and each Critical Subcontractor's) compliance program, which review shall be conducted for the purpose of determining if Program Manager (and each Critical Subcontractor) is operating in compliance with Applicable Law, Bank Policies and Compliance Policies regarding Program Manager Services and marketing, solicitation, customer service, and other activities of Program Manager (and each Critical Subcontractor) related to Bank's authorized banking services provided to End Users pursuant to this Agreement. At all times and without reducing or otherwise modifying or limiting any terms of this Agreement, including Program Manager's liability set forth under this Agreement, Bank shall (and shall have the right to) supervise, oversee, monitor and review Program Manager's (and Program Manager's Critical Subcontractor's) performance of services hereunder and the results of the Programs developed and implemented pursuant to the terms of this Agreement. Such activities may include Bank reviewing reports and financials from or related to each Program (including any problems, losses or complaints, and any changes or modifications that may be necessary to ensure the viability of the Program(s)), which Program Manager shall provide to Bank upon Bank's request.

(b) **BSA/AML**. Program Manager is responsible for developing, administering and maintaining an anti-money laundering and OFAC compliance program compliant with Applicable Law, including any anti-money laundering requirements applicable to Bank, which must be approved by Bank (the "BSA/AML/OFAC Program"), and Program Manager shall be liable for any failure of its BSA/AML/OFAC Program in connection with the Program or Bank Services. The BSA/AML/OFAC Program must, at a minimum, include a system of internal controls to ensure ongoing compliance and annual independent testing of the BSA/AML/OFAC Program, including testing for compliance with Applicable Law, designating an anti-money laundering compliance officer responsible for managing anti-money laundering compliance and the BSA/AML/OFAC Program, and providing appropriate and ongoing training for Program Manager personnel. Bank must also approve any subsequent changes or modifications to the BSA/AML/OFAC Program in writing prior to any such change or modification. Bank may, in its sole discretion, require Program Manager to modify or amend or update the BSA/AML/OFAC Program, from time to time, and Program Manager shall effectuate such modification, amendment or update in compliance with Bank's instruction. The BSA/AML/OFAC Program shall be used by the CIP Vendor to provide CIP Verification Services. At the request of Bank, Program Manager shall, at its sole expense, retain a CIP Vendor to provide such CIP Verification Services with respect to the Program(s). In the event Bank is retained for CIP Verification Services, Program Manager shall enter into a separate agreement with Bank to govern the CIP Verification Services to be provided by Bank. Notwithstanding, nothing herein shifts liability away from Program Manager for any failure to comply with Applicable Law or any of its responsibilities herein. Program Manager shall have an independent third party approved by Bank perform, at least once per year, an audit of the BSA/AML/OFAC Program and Program Manager's compliance with its obligations hereunder. Program Manager shall provide to Bank a copy of the audit report. Program Manager shall promptly address any exceptions noted in such audit report with the development and implementation of a corrective action plan by Program Manager's management, such corrective action plan to be approved by Bank.

(c) **OFAC**. Program Manager shall comply with all regulations of OFAC, including: (a) ensuring that all Applicants and End Users are screened as required by Applicable Law and BSA/AML/OFAC Program, and (b) complying with all OFAC and Bank directives regarding the prohibition or rejection of unlicensed trade and financial transactions with OFAC specified countries, entities and individuals in connection with the Program.

(d) **Red Flag Rules**. Program Manager shall design, implement, maintain and administer written policies and procedures to identify, detect and respond to patterns, practices or specific activities that indicate or could indicate "Identity Theft", a fraud committed or attempted use of the identifying information of any Person without their authority, that is compliant with Bank Policies, Compliance Policies and Applicable Laws and approved by Program Manager's board of directors, committee of its board of directors or, if Program Manager does not have such a board, then by the Program Manager's designated senior management (the "Identity Theft Prevention Program" or "ITPP"). Program Manager's ITPP shall also include policies to periodically update the ITPP to reflect changes in risks to End Users and the safety and soundness of the Program Manager and Bank, proper training of staff in the implementation of the ITPP and oversight of any Subcontractors providing services related to or in connection with a Program, Bank Service or any Program Manager Services. Program Manager shall be liable for any failure of its ITPP in connection with the Program(s), Bank Services or this Agreement. Program Manager's ITPP, including any amendments, updates or other modification thereto, shall be provided to Bank for Bank's approval, and Bank shall have the right to make changes to Program Manager's

ITPP to comply with any Bank Policies or Applicable Law, requests of a Regulatory Authority or to comply with best practices, as reasonably determined by Bank. At least annually, Program Manager shall have completed, at Program Manager's expense, an Independent Third-Party Review of its ITPP in accordance with Section 7(f) ("Compliance Management System"). Program Manager shall be liable for any Losses incurred by Bank as a result of its ITPP arising out of or in connection with the Program(s), Bank Services, or this Agreement.

(e)    **Unusual Activities Report**. Program Manager shall identify activity that suggests or indicates potential money laundering or other potential criminal activity, does not appear to have a valid business purpose, is not consistent with the activities expected of an End User or a Subcontractor or that appears to be or is fraudulent or suspicious, as contemplated by Section 11 ("Fraud and Risk Management"). Bank shall assess the information contained in any such report and, after performing such investigation as it considers appropriate in light of such information, determine whether or not to file a Suspicious Activity Report ("SAR") with FinCEN or any other applicable Regulatory Authority. Program Manager shall assist Bank with any investigation and provide any information to Bank that Bank may request. Bank shall have sole discretion and responsibility as to whether to file a SAR with respect to any activity identified in an unusual activities report. Program Manager acknowledges that the contents of a SAR and the fact that Bank has filed a SAR are strictly confidential under Applicable Law.

(f)    **Compliance Management System**. Program Manager shall implement a Compliance Management System on or prior to the Effective Date and shall maintain a Compliance Management System throughout the Term of this Agreement. Within sixty (60) days of the Effective Date, Program Manager shall have completed, at Program Manager's expense, an independent third-party review concerning Program Manager's compliance with Applicable Law related to each Program and Program Manager's compliance with its obligations under this Agreement (the "Independent Third-Party Review"). An Independent Third-Party Review shall be completed once every year thereafter, within sixty (60) days of each anniversary date of the initial Independent Third-Party Review. Program Manager shall provide Bank with an advance written notice notifying Bank of the identity of its independent third-party reviewer Program Manager has elected to conduct an Independent Third-Party Review and the scope of such review. Upon such notice, and after Bank's review, Bank shall have the right, in its reasonable discretion, to reject the use of such independent third-party reviewer or the scope of the review, in which case, Program Manager shall work with Bank in reasonable and good faith effort to determine an acceptable third-party auditor and an acceptable scope of review. However, if Program Manager has conducted an Independent Third-Party Review as contemplated herein in relation to another program sponsored by another financial institution, Bank will accept such review so long as it is sufficient in scope, including auditing Program Manager's compliance with the terms of this Agreement and Applicable Law. Such review shall include but not necessarily be limited to: (i) transactional testing; (ii) risk assessment; (iii) a review of the Program Manager's compliance with Applicable Law and its BSA/AML/OFAC Program and Compliance Policies; and (iv) a comprehensive review of Program Manager's Compliance Management System. Upon completion of any Independent Third-Party Review contemplated herein, Program Manager shall immediately provide the Bank a copy of the third-party auditor's report and findings and address any violations of the foregoing as well as management responses and recommendations for changes. Program Manager agrees that it may not share the report with any other Person without such Person agreeing in writing to maintain the confidentiality of such report prior to disclosure. Program Manager agrees to address any violations or recommendations promptly with the development and implementation of a corrective action plan by Program Manager's management, such corrective action plan to be approved by Bank. Program Manager shall (and shall cause each Program Manager Critical Subcontractor to) provide all necessary cooperation and assistance to Bank in connection with Bank's annual review of Program Manager's and each Program Manager Critical Subcontractor's compliance program, which review shall be conducted for the purpose of determining if Program Manager and each Program Manager Critical Subcontractor is operating in compliance with Applicable Law, Compliance Policies, Bank Policies and this Agreement regarding Program Manager Services and marketing, solicitation, customer service, and other activities of Program Manager and each Program Manager Critical Subcontractor related to Bank's authorized banking products or services provided to End Users pursuant to this Agreement.

(g)    **Supplemental Review**. Subject to Section 7(f) ("Compliance Management System"), at the reasonable request of Bank and at Program Manager's expense, Program Manager shall also engage an independent third party for the purposes of reviewing or validating actions taken in response to specific compliance issues or customer remediation related to each Program. Upon completion of said review, Program Manager shall provide to Bank a copy of the third party's report and promptly address any additional violations or recommendations; provided, however, that Program Manager agrees that it may not share the report with any other Person without such Person agreeing in writing to maintain the confidentiality of such report prior to disclosure.

(h)    **Monitoring and Testing**. Program Manager shall conduct regular transaction and compliance testing of each Program based on a schedule and methodology that is subject to Bank's Approval, which testing shall occur on a basis that is no less frequent than monthly; provided, however, upon Program Manager's request, Bank may, in its sole discretion and after consideration of prior testing results, agree to future testing on a quarterly basis.

Reports of this testing shall be provided to Bank periodically on a schedule determined by Bank; provided, however, that Program Manager agrees that it may not share such reports with any other Person without such Person agreeing in writing to maintain the confidentiality of such report prior to disclosure.

(i)     **Risk Assessment**. Program Manager shall conduct an annual risk assessment of each Program, which shall be used, in part, to determine the appropriate level of testing of each Program. This risk assessment shall consider inherent risk, strength of controls and residual risk in areas concerning operations, regulatory compliance, and Program Manager Subcontractors. Program Manager shall also complete the annual risk assessment and questionnaire provided by Bank.

(j)     **Reporting**. Program Manager shall provide to Bank the monthly compliance monitoring reports and other reports or information in form and substance reasonably agreeable to Bank. In addition, Program Manager shall be responsible for preparing and providing all reporting necessary for all state, local and federal tax filings relating to each Program or Bank Service. To the extent filings are required to be made by Bank, Program Manager shall provide Bank with the data and reporting relating to each Program and Bank shall make the required filings. Subject to and without limiting any other provision of this Agreement, if Program Manager fails to provide to Bank any reports required under this Section 7(j)("Reporting"), then within five (5) Business Days of receipt of notice from Bank to Program Manager of such failure, Program Manager shall provide Bank with a letter from Program Manager senior management that explains such failure and the corrective actions to remedy such failure. For the avoidance of doubt, the provisioning of such letter shall not restrict or otherwise limit Bank from exercising any right or remedy available to Bank under this Agreement and/or Applicable Law.

(k)     **Compliance Policies**.   Program Manager agrees to maintain and enforce all Compliance Policies throughout the Term and ensure that such Compliance Policies comply in all respects with Applicable Laws. Program Manager shall review and, as necessary, update the Compliance Policies on at least an annual basis. All Compliance Policies, including any amendments to such Compliance Policies, shall be provided to Bank for Bank's approval, and Bank shall have the right to make changes to these policies to comply with any changes in Applicable Law, requests of a Regulatory Authority or comply with best practices, as reasonably determined by Bank.   Upon Program Manager's receipt of written notice from Bank of any changes to the Compliance Policies, Program Manager shall implement such change as soon as commercially practicable but in no event later than thirty (30) days (or earlier if required by Bank to ensure compliance with Applicable Law, as determined by Bank, or guidance provided by a Regulatory Authority) from Program Manager's receipt of notice of such change.

(l)     **Processing Services**. To the extent any Card is issued in connection with a Program, the Program Manager, at its sole expense, shall provide the Processing Services in accordance with the relevant Program Schedule set forth in Schedule B (Program Schedules) and terms of this Agreement, unless Bank agrees in writing to provide Processing Services.

(m)     **Customer Care Services**.   Bank will provide  Bank's Customer Care Services only for the Programs or Bank Services which Bank agrees to in writing and pursuant to the terms of this Agreement, Schedule K (Ancillary Services) and the Customer Care Services Addendum thereto (the "Customer Care Services"), which shall govern the provisioning of customer support and services to Applicants, End Users or other Persons in connection with any Program under this Agreement (the "Customer Care Services") except where Bank has provided written approval for Program Manager, at Program Manager's sole expense,  to provide the Customer Care Services in connection with any Program. For avoidance of doubt, Program Manager is not permitted to provide the provisioning of Customer Care Services prior to receiving Bank's written approval.  If Bank approves Program Manager to provide the Customer Care Services in connection with any Program under this Agreement, Program Manager shall (i) establish and maintain an internet website or mobile application that performs customer service functions to support Applicants, End Users or other Persons; (ii) administer and maintain a dedicated toll free phone number, which number shall be printed on the Disclosure Materials, for providing live telephonic customer service during normal business hours on each Business Day and interactive voice response telephonic customer service at all times; (iii) provide customer service, including any support required by Applicant or End User; and (iv) perform monthly quality monitoring of the customer service functions in accordance with the terms of this Agreement, Applicable Law, Bank Policies and Compliance Policies (collectively, "Customer Service" or "Customer Services"). To ensure the integrity of each Program, Bank may, or may retain a third party to, periodically, in its sole discretion, conduct random call sampling and/or mystery calls ("Call Monitoring"). Call Monitoring is intended to assess the abilities of live agents on a quality scorecard, including their range of knowledge and their skills (including "soft skills") used to govern the approach to delivering accurate information and reliable services with effective communication. If Bank or its designated auditor conducts Call Monitoring, Bank may request from Program Manager a minimum of ten (10) randomly selected recordings of calls from Applicants or End Users to live agents, which minimum may be increased in Bank's sole discretion.   In the event that Bank approves Program Manager to provide the Customer Services in support of any Program and Program Manager fails to comply with (i) through (iv) herein or if Bank is required to, at any time, perform any of Program Manager's obligations under this subsection (m)

or under the terms of this Agreement, Bank, in its sole discretion, shall have the right to require Program Manager to enter into a Customer Care Agreement with Bank and be subject to the applicable terms and conditions as set forth under the Customer Care Agreement and be obligated for any of the fees specified in Schedule C (Schedule of Fees and Charges) for Bank's performance of Program Manager's obligations under this subsection (m).

(n)     **Program Mobile Application; Website, Telephone Number**.  Program Manager shall maintain (or cause its Critical Subcontractors to maintain) a mobile application, toll-free phone number and website for End Users and Applicants to access the Program(s) and Bank Services.  The mobile application and website shall be accessible, subject to Applicable Law, by compatible mobile and computer devices.  Program Manager shall provide each Person visiting its mobile application or website a copy of its privacy notices, and Program Manager shall ensure such privacy notices are easily and clearly accessible to End Users on the mobile application and website.  The mobile application and website shall permit an End User to (i) apply for and view the Bank Services, transactions and balance information and account statements related to such Bank Services; (ii) initiate transactions related to the Bank Services approved by the Parties; (iii) perform account maintenance (e.g., update address or telephone, request replacement cards, update account cycle, etc.); (iv) contact customer service; and (v) other functions as determined by Program Manager and, to the extent affecting End User interactions with Bank Services, approved by Bank.  To the extent any of the above features or any future features require support from Bank, such features may be added with Bank's prior written consent.

(o)     **Program Records, End User Deposits and Deposit Ledger**.

(i)     Program Manager shall keep current and accurate records relating to each Program, including, without limitation, the Bank Services provided to End Users and transactions processed using Bank Services, all in accordance with Applicable Law, Compliance Policies and Bank Policies, or as otherwise reasonably required by Bank, which shall be considered to be "Records".  Program Manager shall provide to Bank any Records, including but not limited to data or other information in its possession or in the possession of its Subcontractors which is required to reconcile accounts or substantiate information concerning fees, transactions or Settlement or as required by any Regulatory Authority or Applicable Law.  Such records shall include, but is not be limited to, daily entries of activity (beginning balance, daily transactions, and ending balance) for each Deposit Account and FBO Account, as applicable.  Program Manager's records shall also include the name, address, date of birth and taxpayer identification number (or Social Security Number) of each End User with beneficial ownership in a Bank Service. Program Manager agrees to promptly and regularly (throughout the day) review and reconcile all transactions related to a Bank Service.

(ii)     Program Manager shall promptly and regularly (throughout the day and on each day of the Term) review and reconcile the Deposit Ledger, FBO Account and all Deposit Accounts, as well as all transactions related to each Bank Service, against (i) the records and information provided by Bank, (ii) the Deposit Ledger, and (iii) authorizations provided by Customers. As part of the daily reconciliation, Program Manager shall also ensure each Customer has sufficient available funds in the Deposit Account or FBO Account (as applicable) to fund every transaction processed by the Bank for the corresponding day in connection with such Customer and shall ensure that each transaction submitted to or processed by Bank for such day has a corresponding authorization from the appropriate Customer. Program Manager shall ensure its reconciliation is accurate and complete. Notwithstanding anything to the contrary, Bank shall not be liable for any transaction liabilities or other losses related to any transaction processed by Bank that was not reconciled by Program Manager within twenty four (24) hours of processing. In the event Program Manager identifies a transaction error (e.g., duplicate transaction, transaction for a Customer who has insufficient funds in the FBO Account or Deposit Account, etc.) after reconciling, Program Manager shall immediately (but within twenty four (24) hours) notify Bank of such error. Notwithstanding anything to the contrary, in the event Program Manager (i) fails to notify Bank of an erroneous transaction within twenty four (24) hours or (ii) fails to identify an erroneous transaction within twenty four (24) hours and such failure was caused by Program Manager's failure to maintain the Deposit Ledger and reconcile transactions, Deposit Ledger FBO Account or Deposit Account(s), all in accordance with the terms of this Agreement, Program Manager shall be liable for any losses, expenses, costs and liabilities associated with such erroneous transaction. In addition, and without regard to any other term of this Agreement, Program Manager shall be liable for all transactions, liabilities, losses and fraud related to any transaction posted to a Deposit Account or FBO Account if the transaction giving rise to related to such liabilities, losses or fraud would have been discovered but for Program Manager's failure to maintain complete and accurate Deposit Ledger and to reconcile as contemplated herein.

(iii)     Bank shall be provided with access to any Records, and to the Dashboard, and any other information and documents it reasonably requests from time to time from Program Manager or any of Program Manager's Subcontractors with regard to any activity contemplated by or relating to this Agreement or Program(s), and such information shall be provided in accordance with Bank's specifications and requirements, including, but not limited to, the timeframe and format in which such information and documents must be provided.  Program Manager shall ensure that it has ready access to all Records, including those maintained by its Subcontractor,

in order to comply with any request from Bank pursuant to this Section 7(o) ("<u>Program Records, End User Deposits and Deposit Ledger</u>").

(iv)    End User Deposits are held in an omnibus custodial account owned by Bank, in which Bank pools the funds held by all of Program Manager's End Users, for their benefit ("<u>FBO Account</u>").  To the extent the Program includes Deposit Accounts and the Bank agrees to provide such End User with Deposit Account in connection with the Program, within the FBO Account, each End User is issued a Deposit Account under the FBO Account, which consists of a subaccount established in each End User's name, with its own account number extension.  Program Manager is responsible for maintaining a Deposit Ledger accounting for the funds held in each FBO Account and Deposit Account (if applicable) or otherwise received by Bank in connection with Bank Services on behalf of and for Bank in accordance with the terms of this Agreement and Bank Policies. Program Manager has no ownership interest in, access to, or control over the FBO Account, any Deposit Account or any funds deposited or remitted to Bank in connection with an End User's use of Bank Services. Bank may reject any entry or instruction to debit or credit the FBO Account or Deposit Account in its discretion. Bank's obligation to repay amounts on deposit in the FBO Account or Deposit Account shall be owed to the End User that deposited such amounts.

(v)    Program Manager shall make available Bank approved means for End Users to make Deposits to Deposit Accounts or FBO Account(s) (as applicable) and shall describe the terms and conditions of such funding method in the Bank Services Agreement. Program Manager will administer the Deposit Accounts and FBO Account(s), including collecting and applying payments to the Deposit Account and FBO Account(s) (as applicable). If payment is not timely made on a Deposit Account or FBO Account(s) (as applicable), Bank shall have the right to exercise any security interest set forth in this Agreement or the Bank Services Agreement (if applicable).

(vi)    Program Manager shall maintain the Deposit Ledger and such Deposit Ledger shall, at all times, be complete and accurate and maintained and updated regularly and in a timely manner (at least daily). Program Manager acknowledges that Bank may treat and assume the Deposit Ledger as its definitive ledger setting forth the title, ownership, and content of each Deposit and related Bank Service; provided, however, Bank may require Program Manager to make changes to Deposit Ledger as Bank may determine in its sole and reasonable discretion. Program Manager shall make the Deposit Ledger available to Bank and shall provide Bank with access to the Deposit Ledger through the Dashboard at all times throughout the Term of this Agreement. Access to the Dashboard shall include the ability for Bank to view, edit, and manage Records, FBO Account and Deposit Account balances and transactions, provisioning and use of Program Manager Reserves and provisioning of Bank Services, and for  Bank to: (i) monitor for and investigate any suspicious or fraudulent activity; and (ii) adjust End User or account information, including but not limited to, the closing or suspension of a Card (to the extent issued under any Program) or End User account.  Any adjustments or modifications made by Bank within the Dashboard in accordance with this Section 7 (o)(vi) may not thereafter be altered or reversed without Bank's prior written approval.  Each Bank Service documented on the Deposit Ledger by Program Manager shall be titled in a manner to distinguish it from any other account or financial service offered by Program Manager or a third party. The Deposit Ledger shall, among other things, reflect Deposits, beneficial owners, End User Information necessary for FDIC Insurance, all transactions related to Bank Services, including transaction details and use of Bank Services by each End User and any other information required by Bank.

(vii)    Program Manager shall maintain software services necessary to (i) accurately and timely maintain and deliver the Deposit Ledger; (ii) maintain Records for transaction authorizations, including any customer authorizations required to initiate transactions related to, or otherwise access or use, Bank Services, as required by Applicable Law, this Agreement, Bank Policies and Compliance Policies; (iii) balance, reconcile and manage transactions related to Bank Services and the Deposits or funds held by Bank in connection with the Program(s); (iv) accurately and timely maintain Records; and (v) accurately and timely maintain, produce and recreate transaction logs and any reports required by Bank to monitor Program(s).

(viii)    Each Bank Service may be accessed by End Users only through Program Manager Services, as approved by Bank, and End User shall not have the right to access any Bank Services by dealing directly with Bank, unless otherwise approved by Bank.

(p)    **Transaction Processing and Settlement.**  On each Business Day during the term of this Agreement, the Deposit Account(s) and FBO Account(s) shall be credited for the following: (i) funds received by approved Program load formats; (ii) deposits to the Deposit Account(s) and/or FBO Account(s); and (iii) any other credits due to End User. Program Manager will administer the Bank Services and will be responsible for supervising and managing all daily funds flow processes, including ensuring all balances in the FBO Account(s) and Deposit Accounts are accurate and fully funded by deposits placed with the Bank by End Users in connection with FBO Account(s) and Deposit Accounts and all fund transfers requested by or on behalf of an End User or otherwise processed by Bank pursuant to Program Manager's instructions are fully funded by funds placed with Bank. Program Manager represents and warrants that the balance in each Deposit Account will be at all times

appropriately funded by deposits placed at Bank by the End User associated with such Deposit Account in an amount that is no less than 100% of the total amount of currency represented as active and available to End Users of the current day's Deposit Account balance, and that the balance in each FBO Account equals 100% of the amount of funds Deposited by End Users in connection with such FBO Account. Program Manager shall be responsible for overseeing and managing funding of any Bank Services (excluding any money transmission to be performed by Bank) and ensuring End Users have deposited with Bank funds sufficient to fulfill any transaction requested in connection with a Program. Program Manager shall be responsible and liable for any failure of the FBO Account, Deposit Account or any transaction requested in connection with a Program to be fully funded. In the event of any such failure, Program Manager shall, within one (1) Business Day after receiving notice of such failure, fully fund any shortfall in the FBO Account or Deposit Account. Program Manager is solely responsible for all ACH "origination" services required for the functioning of each Program. In the event Bank performs services as Originating Depository Financial Institution ("ODFI") (as defined in NACHA Rules), such services shall be performed based upon the terms, provisions and conditions of Schedule D (Origination Services) and service pricing for such services will be governed by the fee schedule set forth in Schedule C (Schedule of Fees and Charges) to this Agreement. Bank will act as Receiving Depository Financial Institution ("RDFI") (as defined in NACHA Rules) for receipt of all Deposits. Program Manager agrees to perform all services relative to Bank's RDFI functions in accordance with all Applicable Law. Program Manager shall be financially responsible for all Deposits transmitted with or by approved third-party agents or service providers, and Program Manager's contracts with any load networks shall reflect appropriate controls and indemnification regarding such activity. Bank shall not be responsible for misdirected Deposits through any load network of a Program or for any misdirected Deposits in connection with services offered by a third-party service provider of Program Manager.

(q)    **Program Manager Performance** Program Manager shall at no time fail to fulfill any of its obligations under this Agreement, including the provision of Program Manager Services, due to a dispute between Program Manager and any End User or Program Manager Subcontractor. Notwithstanding anything to the contrary contained in this Agreement, Bank shall have the right (but not the obligation), at any time as determined in its sole discretion (including during any wind-down or transfer period contemplated by this Agreement), to assume responsibility for the any of the services to be performed by Program Manager or any of its Subcontractors, and to perform, either directly or indirectly through the Program Manager's Subcontractor, or another third party designated by Bank, all services in connection therewith in the event that Bank determines with reasonable justification, in its sole discretion, that Program Manager's Subcontractor's actions or failure to act has resulted or could result in (A) a breach of the obligations of Program Manager to Bank; (B) a financial or reputational risk to Bank or any third party or a threat to the safety and soundness of Bank; (C) a material adverse impact to End Users; or (D) a risk of a security breach. In the event of any such action or failure to act by Program Manager or its Subcontractor, Bank shall provide written notice to Program Manager, and Program Manager shall have thirty (30) days from the date of such notice to cure the actions or failure to act that resulted in the notice, unless immediate action is required due to direction from a Regulatory Authority or such other extenuating circumstances that prevent the giving of advance notice and such a cure period. Any fees and expenses reasonably incurred by Bank in connection with the exercise of its rights set forth in this section shall be paid by the Program Manager, and Bank shall have the right to deduct all such fees and expenses from the compensation and other amounts payable to Program Manager hereunder.

8.    **Bank and Regulatory Audits**.

(a)    Program Manager agrees that Bank, its authorized representatives and agents, and any Regulatory Authority (collectively the "Auditing Party") shall have the right, at any time during normal business hours and upon reasonable prior written notice, or at any other time required by a Regulatory Authority, to inspect, audit and examine all of Program Manager's facilities, records, personnel, books, accounts, data, reports, papers and computer records relating to the activities contemplated in this Agreement or related to a Program or Bank Services, including, but not limited to, financial records and reports, Records, the Security Program, audit reports, summaries of test results or equivalent measures taken by Program Manager and/or any Critical Subcontractor to test compliance, or otherwise ensure compliance of the services of such parties, with Applicable Law, Bank Policies, Compliance Policies and/or this Agreement. Program Manager shall ensure each Critical Subcontractor makes all requested documentation, facilities, records, personnel, books, accounts, data, reports, papers, and computer records available to the Auditing Party for the purpose of conducting such inspections and audits, and the Auditing Party shall have the right to make copies and abstracts from Program Manager's and Critical Subcontractor's records, books, accounts, data, reports, papers, and computer records and other documentation pertaining to the subject matter of this Agreement.

(b)    Program Manager agrees (and shall cause each Subcontractor to) cooperate with any examination, inquiry, audit, information request, site visit or the like, which may be required by any Regulatory Authority with audit examination or supervisory authority over Bank, to the fullest extent requested by such Regulatory Authority or Bank. Program Manager shall also (and shall cause each Subcontractor to) provide to Bank any information which may be required by Bank or any Regulatory Authority in connection with such Regulatory Authority's audit or review of Bank or any Program and shall cooperate with such Regulatory Authority in connection with

any audit or review of Bank or any Program.  Program Manager shall also (and shall cause each Subcontractor to) provide such other information as Bank or Regulatory Authority may from time to time reasonably request with respect to the financial condition of Program Manager and each Subcontractor and such other information as Bank may request from time to time with respect to third parties who have contracted with Program Manager to perform Program Manager Services relating to or in connection with this Agreement.

(c)     Program Manager shall prepare a written response to Bank (a "<u>Response to Audit Letter</u>") to all criticisms, recommendations, deficiencies, and violations of Applicable Law identified in reviews conducted by any Auditing Party, including any Regulatory Authority ("<u>Audit Findings</u>"). The Response to Audit Letter shall be delivered to Bank within ten (10) Business Days of Program Manager's receipt of such Audit Findings, unless directed otherwise by a Regulatory Authority.  The Response to Audit Letter shall include, at a minimum, a detailed discussion of the following:

(i)     the planned corrective action to address the Audit Findings ("<u>Audit Corrective Action Plan</u>");

(ii)     employee(s) of Program Manager tasked to remedy the Audit Findings;

(iii)     remedial actions proposed to be directed to current or past End Users negatively impacted by the Audit Findings (provided no such action shall be taken without express written approval from Bank); steps to be taken to prevent any recurrence of the Audit Findings;

(iv)     a specific timeframe, not to exceed forty (40) Business Days, unless otherwise approved by Bank in advance, to implement the Audit Corrective Action Plan ("<u>Corrective Action Plan Deadline</u>");

(v)     documentation evidencing that the Audit Corrective Action Plan has been implemented;

(vi)     if additional time is needed to implement the Audit Corrective Action Plan or deviations from the Audit Corrective Action Plan are necessary, a written request shall be submitted to Bank detailing the extenuating circumstances that necessitate an extension of the Corrective Action Plan Deadline and such extension request shall be subject to the reasonable approval of Bank; and

(vii)     identification of any Audit Findings disputed by Manager or where corrective action is not possible or necessary, supported by a detailed explanation of Manager's position.

(d)     Notwithstanding anything to the contrary, on or prior to the Effective Date, Program Manager will submit to and complete a compliance audit of its operations to ensure compliance with consumer, privacy, cybersecurity and financial requirements and shall submit to and complete a financial reporting audit (collectively, "<u>Compliance Audit</u>"). The Compliance Audit shall be conducted by third party auditor mutually agreed to by Program Manager and Bank, and shall be conducted in compliance with all Applicable Law to Bank, including, but not limited to, Sarbanes-Oxley Act. Program Manager shall furnish within a reasonable time copies of SSAE-18 reports upon request from third party auditor in connection with the Compliance Audit. Program Manager shall be responsible for all expenses related to Compliance Audit. Program Manager shall thereafter submit to and complete a Compliance Audit on an annual basis in accordance with the terms set forth herein.

9.     <u>**Financial Documents and Audits**</u>.

(a)     Program Manager shall deliver to Bank (i) as soon as available but in any event not later than ninety (90) days following the end of each fiscal year of Program Manager, a copy of the annual audited financial report of Program Manager and its consolidated subsidiaries for such year, including a consolidated balance sheet, consolidated statement of income, consolidated statement of cash flows and all notes and schedules thereto as of the end of such period, certified by an independent public accountant of Program Manager and accompanied by an opinion of such independent public accountant to the effect that such financial statements fairly present, in all material aspects, the financial condition of Program Manager, and have been prepared in accordance with (a) the books and records of Program Manager (b) generally accepted accounting principles as in effect in the United States at the time of preparation; (c) all pronouncements of the Financial Accounting Standards Board; and (d) results of operations of Program Manager and its subsidiaries on a consolidated basis in accordance with generally accepted accounting principles as in effect from time to time and as consistently applied, and (ii) as soon as available but in any event not later than forty-five (45) days following the end of each fiscal quarter of Program Manager, an unaudited consolidated balance sheet of Program Manager and its consolidated subsidiaries as of the end of such fiscal quarter and an unaudited consolidated statement of income and consolidated statement of cash flows of Program Manager and its consolidated subsidiaries for such period, all in reasonable detail and duly certified (subject to normal year-end audit adjustments and the absence of footnotes) by the chief financial officer (or person performing similar functions) of Program Manager as having been prepared in accordance with generally accepted accounting principles as in effect from time to time and as consistently applied.  In the event such financial statements reveal that the financial condition of Program

Manager results in a higher risk to Bank, as determined in the discretion of Bank, or otherwise does not meet the standards of Bank or Regulatory Authorities, then Program Manager shall deliver additional information relating to the financial condition, business or operations of Program Manager and additional financial assurances as Bank or such Regulatory Authority shall from time to time reasonably request.

(b)     Program Manager has and will maintain all staffing, operational, and financial resources that are necessary or appropriate to perform its obligations under this Agreement and its agreements with its Subcontractors. Program Manager shall promptly give written notice to Bank of any material adverse change in the business, properties, assets, operations or condition, financial or otherwise, of Program Manager or, to the knowledge of Program Manager, or any of its Critical Subcontractors, or any significant staffing changes that would affect Program Manager's ability to fulfill its obligations under this Agreement. Program Manager shall provide notice to Bank at least forty five (45) days in advance of any change in the physical address of Program Manager or Program Manager's Critical Subcontractor.

(c)     Program Manager has and shall have at all times during the Term of this Agreement an aggregate of the following: (1) shareholders' equity of not less than the amount specified in <u>Schedule B</u> (<u>Program Schedules</u>); (2) the financial capacity to perform its obligations under this Agreement, (3) cash on hand in excess of what is needed in order for Program Manager to meet all debt-related covenants to any third party; and (4) three months of expected payments to Bank and all Program Manager's creditors (the "<u>Program Manager Financial Requirements</u>").

(d)     In the event that Program Manager receives criticism in a report of examination or in a related document or specific oral communication from, or is subject to formal or informal supervisory action by, or enters into an agreement with any Regulatory Authority or any Network with respect to any matter whatsoever relating to (including omissions from) a Program or this Agreement (any such event, a "<u>Criticism</u>"), Program Manager shall advise Bank in writing of the Criticism received (no later than two (2) Business Days after the receipt of the Criticism by Program Manager) and share the relevant portions of any written documentation (or provide a detailed written summary of any oral communications) received from the relevant Regulatory Authority, unless prohibited by Applicable Law, as applicable.

(e)     Program Manager shall provide, to the extent not specifically prohibited by Applicable Law or the applicable Regulatory Authority, Bank with notice and copies of any material communication to or from any Regulatory Authority or any official thereof, including, without limitation, any member of Congress, official of the executive branch of the United States Government, state legislator or federal or state agency, regarding this Agreement or any aspect of a Program (or provide a detailed written summary of any oral communications) (each, a "<u>Regulatory Communication</u>") within two (2) Business Days of such communication. For any Regulatory Communication for which a response is required from Program Manager, the Parties shall coordinate and cooperate on such response and Bank shall have final approval authority over any response to its Regulatory Authority(ies).

(f)     Program Manager shall provide Bank prompt notice and copies of all subpoenas, levies, garnishments or other legal requests received by Program Manager that concern a Program(s), whether from a Regulatory Authority, private attorney, court or otherwise, concerning a Critical Subcontractor (to extent such Legal Documents concerning such Critical Subcontractor are in connection with any service or product provided by such Critical Subcontractor on behalf of Program Manager or in support of a Program), End User, the Program, or this Agreement ("<u>Legal Documents</u>").  Bank, at its election, may prepare and file, in consultation with Program Manager, the necessary response to any Legal Documents, and Program Manager shall reimburse Bank for all reasonable costs (including reasonable attorneys' fees) associated with its preparation and filing of a response.

(g)     Program Manager shall provide Bank with notice and copies of any complaint regarding any Program received by Program Manager from a Regulatory Authority, attorney general or Better Business Bureau and any other material third party complaint received by senior management of such party related to a Program (each, a "<u>Third-Party Complaint</u>") within two (2) Business Days of receipt of such Third-Party Complaint.  Program Manager shall promptly investigate each Third-Party Complaint and any similar complaints received by Bank that are forwarded to Program Manager and propose an appropriate response.  Program Manager and Bank shall jointly approve the final responses for all Third-Party Complaints.

(h)     Program Manager shall notify Bank, promptly, but in no event later than two (2) Business Days after it becomes aware of or should have been aware, of any actual or threatened complaint, litigation, investigation, proceeding, or judicial, tax or administrative action by any Regulatory Authority, state attorney general or any other person that, if resolved adversely to it, would reasonably be expected to materially adversely affect Program Manager's continuing operations, its indemnity obligations under this Agreement, or its ability to perform its obligations under this Agreement or the Program, and Program Manager shall provide Bank with all related documentation thereof, unless Program Manager is prohibited from sharing any such notice or documentation.

(i)     In the event of any Supervisory Objection, Bank shall advise Program Manager in writing of such Supervisory Objection and share with Program Manager the relevant portions of any written documentation, to the extent not prohibited by Applicable Law. Following receipt of such Supervisory Objection, the Parties shall in good faith consult as to the appropriate action to be taken to address such Supervisory Objection. Program Manager shall take all actions deemed necessary by Bank, in its commercially reasonable discretion, to address such Supervisory Objection in the manner and time period specified by Bank.

10.     **Complaints and Error Resolutions**.

(a)     Program Manager will receive, investigate, process, log and resolve all complaints, disputes, chargebacks transaction disputes (including errors, as defined by Regulation E (12 C.F.R. 1005) as amended from time to time), received by a Party (or its Subcontractor) relating to a Bank Service, application for a Bank Service, or use of a Bank Service ("End User Complaint") and otherwise do all things necessary to service the Bank Services, on a timely basis and in accordance with the Bank Policies, Compliance Policies and Applicable Law. Without limiting the foregoing, Program Manager will conduct chargeback processing consistent with the data security standards set forth in this Agreement. Without limiting the foregoing, all End User Complaints that are material shall be promptly reported to Bank and addressed and resolved by Program Manager in accordance with Bank Policies, Compliance Policies and Applicable Law. Program Manager shall provide a copy of the forms of proposed standard responses to an End User Complaint to Bank for its approval, not to be unreasonably withheld, conditioned or delayed, prior to launch of any Program.

(b)     Program Manager shall maintain a log and audit trail of End User Complaints and responses. The log will include all information required by Bank and will be in a form and manner determined by or acceptable to Bank. Program Manager shall promptly advise Bank of the results of any investigation relating to an End User Complaint and provide, upon request, an audit trail of information pertinent to the matter (such information to include, but not be limited to, a copy of the End User Complaint, any response provided to an End User or Applicant related to the End User Complaint and any other correspondence from such End User or Applicant), all within any timeframes required by Applicable Law or the Bank. The audit trail of information shall be sufficiently detailed to allow Bank to fully respond to a Regulatory Authority or Network if such Regulatory Authority or Network inquires about an End User Complaint or to otherwise allow Bank to ensure Program Manager resolved the End User Complaint in compliance with Applicable Law, Compliance Policies and Bank Policies. Program Manager shall catalog and maintain copies of all End User Complaints, and responses thereto for the period required by Applicable Law or such longer period as specified by Bank in a written notice to Program Manager. Program Manager shall provide Bank with a monthly summary of all End User Complaints in the form and manner determined by or acceptable to Bank. Bank (i) shall have access at all times to pending and closed End User Complaints and responses, and (ii) in Bank's sole discretion, may audit a reasonable number of such End User Complaints. Program Manager shall also provide Bank with a trending analysis and observations of any material variances with respect to customer complaints on no less than a monthly basis. Program Manager shall provide Bank all related documentation concerning any End User Complaint within five (5) days of Bank's request. Program Manager shall cooperate in good faith and provide such assistance, at Bank's request, to permit Bank to promptly resolve or address any investigation, proceeding or complaint directed against Bank.

11.     **Fraud and Risk Management**. Program Manager shall adopt, implement, and maintain fraud monitoring practices consistent with customary, reasonable, and usual standards of fraud monitoring practices for well-managed, regulated financial institutions that originates or offers accounts and services that are similar to Bank Services. Program Manager shall (a) monitor usage of products and services offered under each Program, including Bank Services, to track, review and report to Bank any fraudulent use of such products or services; (b) immediately report any suspicious activities in accordance with BSA/AML/OFAC Program, Applicable Law, Compliance Policies and Bank Policies, including, but not limited to, reporting such suspicious activities related to Bank Services or a Program, in accordance with applicable timeframes contained within the Bank Policies or otherwise required by Applicable Law; (c) take appropriate steps to prevent or stop such fraudulent and/or suspicious activity; and (d) if required by Bank, immediately terminating the Bank Services Agreement or terminating End User's or Subcontractor's access to the Bank Services. As between Program Manager and the Bank, Program Manager is financially and operationally responsible for: (i) all chargebacks, dispute resolutions and associated services including fees or fines in accordance with Applicable Law; (ii) all compromised FBO Accounts, Deposit Accounts, Checks issued by Bank in connection with a Bank Service or drawn upon a Deposit Account or FBO Account, including duplicate Check deposits, forged or altered Checks and any fraud losses in connection with the Checks, unauthorized transactions, Checks or payment orders, "errors" (as defined by Regulation E), and all fraudulent or unauthorized transactions related to the Program(s) or Bank Services; (iii) any losses associated with the Bank Services; and (iv) losses, fines, penalties, or assessments by a Regulatory Authority that may be incurred by Bank in connection with a Bank Service dispute or error or any other unauthorized transaction in connection with a Program (collectively, "Transaction Losses"). Program Manager shall immediately reimburse Bank for Transaction Losses.

12.     **Escheatment**. With respect to each Bank Service, Program or Deposit that is subject to unclaimed property laws, Program Manager shall provide escheat recordkeeping services on Bank's behalf for the Program(s) and Bank Services in

compliance with all state unclaimed property laws. At Program Manager's expense, Bank shall remit, or oversee remittance of, such unclaimed funds to the appropriate jurisdiction in compliance with Program Manager's instructions with respect to amounts. Program Manager shall be solely liable for any costs and fines related to any challenge by any Regulatory Authority with respect to escheat or unclaimed property laws or related to Program Manager's instructions, regardless of whether such cost is incurred by, or such fines are assessed to, Bank or Program Manager; unless such challenge is directly related to Bank's failure to remit to the appropriate jurisdiction any unclaimed funds, except where Bank's failure to remit the funds was caused by Program Manager's failure to timely, completely or accurately submit instructions to Bank. Program Manager shall be liable to Bank for any amounts claimed by states under unclaimed property laws that represent "breakage" that has been previously paid to Program Manager by Bank.

13.   **Program Manager Reserve Account Requirement.**  On or before the Effective Date of this Agreement, Program Manager shall establish the Program Manager Reserve Account with an amount equal to the Initial Reserve Requirement as found on Schedule C (Schedule of Fees and Charges), incorporated herein as part of this Agreement, and shall maintain such amount in the Reserve Account for the first three (3) full months following the Effective Date (the "Initial Reserve Requirement").  Upon the three-month anniversary of the Effective Date, Program Manager shall ensure the Reserve Account maintains the balance as determined by the reserve calculation set forth in Schedule C (Schedule of Fees and Charges) of this Agreement (the "Reserve Amount").  Bank may deviate from this reserve calculation and require a greater Reserve Amount than would otherwise be required if Bank determines, based on its sole discretion, a greater amount is necessary to cover any risk of losses or liability (including, but not limited to, risk of customer complaints, chargebacks or payment reversals, violations of Applicable Law or increased anti-money laundering risk) to Bank or any third party.  "Negative Outcomes" is determined by Bank after taking into account all negative risk factors related to Program Manager, including its Critical Subcontractors, and each Program, including, but not limited to, ACH returns, provisional credits, chargebacks, returns, duplicate Check deposits, forged or altered Checks, errors (as defined by Regulation E) and any other unauthorized or fraudulent transactions or losses, including End User or third party fraud and fraud related to or in connection with the Bank Services, FBO Account(s), Deposit Accounts, Checks, Entries, wire payment orders or any Program under this Agreement.

(a)   The Program Manager Reserve Account shall be a segregated account at Bank in the name of Bank. At all times, it shall be Program Manager's responsibility to maintain funds in the Program Manager Reserve Account equal to the Required Balance. In the event that the actual balance in the Program Manager Reserve Account is at any time less than the Required Balance, Program Manager shall within two (2) Business Days of receipt of notice of insufficient balance make a payment into the Program Manager Reserve Account in an amount equal to the difference between the Required Balance and the actual balance in such account. In the event the actual balance in the Program Manager Reserve Account shall be less than the Required Balance and Program Manager shall fail to pay the difference within two (2) Business Days as specified in the immediately preceding sentence, Bank may charge Program Manager interest on the amount of the deficiency at a rate equal to the Wall Street Journal Prime Rate plus three percent (3%) per annum. In the event the actual balance in the Program Manager Reserve Account shall be less than the Required Balance and the deficiency shall not be cured within four (4) Business Days after notice from Bank to Program Manager, then Program Manager shall be in default and, without limiting its other remedies, Bank shall have the right to terminate any Program and/or this Agreement.

(b)   Bank will have the right to access the funds in the Program Manager Reserve Account to offset any deficiency in any amount owed to Bank by Program Manager or any losses that Program Manager is liable for under this Agreement.  Program Manager authorizes Bank, and irrevocably appoints Bank as its attorney-in-fact, to withdraw funds from the Program Manager Reserve Account to cover any amounts due under this Agreement, including but not limited to actual and potential losses, or any amounts owed under this Agreement or under other agreements between Bank and Program Manager. Bank shall have the right in its sole and absolute discretion, and without limitation, to sweep funds from the Program Manager Reserve Account, or any deposit account or other transactional account established by Program Manager or by Bank for the benefit of Program Manager or any Program under this Agreement, into (i) one or more custodial accounts ("Custodial Accounts") opened by the Bank within its trust department or at third party institutions, (ii) an overnight depository sweep account at another financial institution for investment in Federal Funds or (iii) a money market account.

(c)   To secure Program Manager's obligations under this Agreement, Program Manager hereby grants Bank a first priority security interest in the Program Manager Reserve Account and the funds therein or proceeds thereof, and agrees that Bank has control of the Program Manager Reserve Account for purposes of the Uniform Commercial Code, Article 9-314. Program Manager further agrees to take such steps as Bank may reasonably require to perfect or protect such first priority security interest. Bank shall have all of the rights and remedies of a secured party under Applicable Law with respect to the Program Manager Reserve Account and the funds therein or proceeds thereof, and shall be entitled to exercise those rights and remedies in its discretion upon a default by Program Manager. Program Manager agrees that it will maintain the lien against the Program Manager Reserve Account in favor of Bank and agrees that it will not grant any other party an interest in the Program Manager Reserve Account.

(d)     If any Regulatory Authority with jurisdiction over Bank notifies Bank that the Required Balance is inadequate to cover the costs or risks associated with a Program, Bank shall provide notice to Program Manager of the amount that Bank or such Regulatory Authority determines will be a sufficient reserve (the "New Required Balance"). Program Manager shall have thirty (30) days to increase the balance in the Program Manager Reserve Account to the New Required Balance, and the New Required Balance shall then become the Required Balance.

14.    **Program Manager Account(s)**. Prior to the Effective Date of this Agreement, Program Manager shall establish, or Bank shall establish the non-interest bearing demand deposit account(s) listed and identified in Schedule B (Program Schedules) (the "Program Manager Account") in accordance with the terms of this Section and this Agreement.

(a)     Program Manager Required Account Balance.  Any Program Manager Account established hereunder shall be a segregated deposit account(s) established with Bank and maintained at Bank. At all times, it shall be Program Manager's responsibility to maintain funds in the Program Manager Account equal to the balance for such account as set forth in Schedule C (Schedule of Fee and Charges) (the "Program Manager Required Account Balance") or as otherwise set forth herein or in Schedule B (Program Schedules). In the event that the actual balance in any Program Manager Account is at any time less than the required Program Manager Required Account Balance, Program Manager shall within two (2) Business Days of receipt of notice of insufficient balance make a payment into the Program Manager Account in an amount equal to the difference between the Program Manager Required Account Balance and the actual balance in such account. In the event the actual balance in the Program Manager Required Account Balance shall be less than the Program Manager Required Account Balance and Program Manager shall fail to pay the difference within two (2) Business Days as specified in the immediately preceding sentence, Bank may charge Program Manager interest on the amount of the deficiency at a rate equal to the Wall Street Journal Prime Rate plus three percent (3%) per annum.  In the event the actual balance in the Program Manager Account shall be less than the Program Manager Required Account Balance and the deficiency shall not be cured within two (2) Business Days after notice from Bank to Program Manager, then Program Manager shall be in default, and, without limiting its other remedies, Bank shall have the right to suspend or terminate any impacted Program, Account, Card (if applicable) and/or this Agreement.

(b)     Withdrawals. Bank will have the right to access the funds in the Program Manager Account(s): (i) to offset any deficiency in Program Manager's Reserve Account, (ii) to charge any amount owed by Program Manager to Bank under this Agreement, or (iii) to effectuate Settlements related to any reversal or chargeback in connection with any Program.  Program Manager authorizes Bank, and irrevocably appoints Bank as its attorney-in-fact, to withdraw funds from the Program Manager Account to cover any amounts due under this Agreement, including but not limited to actual and potential losses, or any amounts owed under other agreements between Bank and Program Manager, to transfer funds from the Program Manager Account to the Settlement Account or Reserve Account, and to effectuate transactions contemplated in the preceding sentence.

(c)     Security Interest. To secure Program Manager's obligations under each Program and this Agreement, Program Manager hereby grants Bank a first priority security interest in the Program Manager Account(s) and the funds therein or proceeds thereof, and agrees that Bank has control of the Program Manager Account(s) for purposes of the Uniform Commercial Code, Article 9-314. Program Manager further agrees to take such steps as Bank may reasonably require to perfect or protect such first priority security interest. Bank shall have all of the rights and remedies of a secured party under Applicable Law with respect to the Program Manager Account(s) and the funds therein or proceeds thereof, and shall be entitled to exercise those rights and remedies in its discretion. Program Manager agrees that it will maintain the lien against the Program Manager Account(s) in favor of Bank and agrees that it will not grant any other party an interest in the Program Manager Account(s).

(d)     Calculation of the Program Manager Required Account Balance.  Program Manager must at all times maintain in the Program Manager Account(s) a balance equal to at least the Program Manager Required Account Balance.  If any Regulatory Authority with jurisdiction over Bank notifies Bank or Bank reasonably determines, in its sole discretion, that the Program Manager Required Account Balance is inadequate to cover the operational costs or risks associated with a Program, Bank shall provide notice to Program Manager of Bank's determination of the amount that Bank determines will be a sufficient reserve (the "New Additional Program Manager Required Account Balance"). Program Manger shall have thirty (30) days to increase the balance in the Program Manager Account to the New Additional Program Manager Required Account Balance, and the New Additional Program Manager Required Account Balance shall then become the Program Manager Required Account Balance.

(e)     Termination of Program Manager Account(s).  Program Manager shall maintain funds in the Program Manager Account(s) equal to the Program Manager Required Account Balance for a period of at least one-hundred-eighty (180) days after the termination of this Agreement, and Bank will transfer to Program Manager any amounts remaining in the Program Manager Account(s) net of all payments due to Bank under this Agreement, including any Losses associated with a Program, Bank Services or transactions related to any Program under this Agreement, no later than five (5) Business Days after the end of such period.

DocuSign Envelope ID: 2780B3D1-6768-4138-9A3E-1F53CE889477

15.    **Overdrafts**. Program Manager agrees that it shall not allow any withdrawal from any Deposit Account or FBO Account in any manner, or permit any End User to do so if such withdrawal would cause an overdraft in the Deposit Account or would result in a withdrawal in excess of such End User's interest in the FBO Account. Program Manager will assume responsibility for curing any overdrafts in any Deposit Account or FBO Account, and Program Manager will immediately deposit funds into the Reserve Account or, if instructed by Bank, an Operating Account, Deposit Account, FBO Account or any other demand deposit account held for Program Manager at Bank, equal to the overdraft amount. Bank may apply such funds to the Deposit Account or FBO Account.

16.    **Prohibited Transactions**.  Program Manager shall not use or attempt to use (and shall prohibit each End User and Subcontractor from using or attempting to use) the Program(s) or any Bank Services provided herein (i) to engage in any illegal purpose or activity or to violate any Applicable Law; (ii) to breach any contract or agreement by which Program Manager (or such party) is bound; (iii) to engage in any internet or online gambling transaction, whether or not gambling is legal in any applicable jurisdiction unless, approved by Bank in writing and subject to any instructions provided to Program Manager by Bank; (iv) to engage in any transaction or activity that is not specifically authorized and permitted by this Agreement, including, but not limited to any activity or business that would result in Program Manager being or becoming a "money service business" as defined in the Bank Secrecy Act and its implementing regulations; (v) to submit or accept any transaction, including, but not limited to deposits in cash, money orders or in foreign currency; or (vi) to initiate any transaction using Bank Services under a Program without all necessary consumer or End User authorizations and consents. Bank will not accept deposits by personal check or cashier's check, unless approved by Bank in writing or as set forth in the applicable Program Schedule. Bank may decline to execute any transaction or activity that Bank reasonably believes violates the terms of this Agreement or Applicable Law and may, in its sole discretion, terminate any related Bank Services Agreement.  For avoidance of doubt, Bank will only accept U.S. funds submitted electronically by Program Manager or Program Manager's approved Subcontractor, including any applicable End User.  Bank shall not be liable for any transaction, including cash, lost in the mail, lost in transit or not received by Bank.  If Bank receives any of those instruments by mail, Bank will return such instrument to the address we have on file for the End User.  Only transactions made in accordance with this Agreement will be accepted by Bank.

17. **Subcontractors**.

(a) Program Manager may from time to time retain the services of one or more Subcontractors; provided, however, Program Manager must obtain Bank's written consent prior to retaining any Critical Subcontractor. For the avoidance of doubt, Program Manager will not make use of such Critical Subcontractor until Bank has notified Program Manager in writing that Bank has approved the Program Manager's Critical Subcontractor or that such approval is not necessary. Such approval may be withheld for any reason and is subject to such Critical Subcontractor's satisfactory completion of Bank's due diligence requirements (as determined by Bank). Program Manager shall ensure that each of its employees, sales representatives, sales offices, agents, Subcontractors, and any other representative comply with Applicable Law, Compliance Policies and Bank Policies in providing services on behalf of Program Manager. Program Manager shall actively and diligently monitor its employees, sales representatives, sales officers, agents, Subcontractors, and other representatives to ensure compliance with this Agreement, Compliance Policies, Bank Policies and Applicable Law.

(b) Each Critical Subcontractor that is or will be acting on behalf of Program Manager in performance of any Program Manager obligation arising out of or under this Agreement shall have full power and authority to perform any and all acts necessary to satisfy the obligations such Critical Subcontractor is undertaking, including, but not limited to, all licenses and authorizations. All copies of Critical Subcontractors' balance sheets and related statements of income and cash flow and such other items provided to Bank are, to Program Manager's knowledge, complete, true and accurate insofar as completeness may be necessary to give Bank a true and accurate knowledge of the subject matter.

(c) Each location of Program Manager and its then approved Critical Subcontractors have been disclosed in writing to Bank prior to the Effective Date of this Agreement. Program Manager shall provide notice to Bank at least forty-five (45) days in advance of any change in the physical address of Program Manager or Critical Subcontractor.

(d) A list of Program Manager Subcontractors (including Critical Subcontractors) reviewed and approved by Bank as of the Effective Date of this Agreement are identified in Schedule B (Program Schedules). Program Manager shall obtain or require Subcontractor to provide to Bank all information regarding such Subcontractor reasonably requested by Bank. Bank may, in its sole discretion, deny approval of a Subcontractor, or rescind its approval of Critical Subcontractor by providing written notice to Program Manager of such rescission in the event Bank determines, it its sole discretion, that such Subcontractor's actions or failure to act has resulted or could result in (i) a material breach of the obligations of a Subcontractor to Program Manager or of Program Manager to Bank; (ii) a reputational, legal or financial risk to Bank or a threat to the safety and soundness of Bank; (iii) a material adverse impact to End Users, Applicants or any other Person; (iv) a risk of a Security Breach; or (v) a violation of Applicable Law, Compliance Policies or Bank Policies, including third party oversight, by Bank or Program Manager. Within a reasonable period of time, not to exceed thirty (30) days or sooner if required by Regulatory Authority or to avoid a violation of Applicable Law, upon any such rescission, Program Manager shall no longer utilize such Subcontractor for any Program.

(e) Program Manager must conduct a due diligence review of each Subcontractor. Program Manager shall comply with the standards established by Bank for purposes of approving and conducting due diligence review of any Program Manager Subcontractor in compliance with Bank's policies and procedures and Applicable Law, including, but not limited to, compliance with FFIEC guidance on Vendor and Third-Party Management. Bank reserves the right to amend such standards at any time by written notice to Program Manager.

(f) Program Manager shall be responsible for all fees, costs and expenses, actions and omissions of each Subcontractor, including any fees or expenses (including reasonable attorneys' fees), incurred by Bank in connection with diligence of and approval of any Critical Subcontractor, and shall remain liable for any services performed by any subcontractor, representative or service provider of Program Manager.

(g) Program Manager shall be responsible for ensuring that each Critical Subcontractor (i) holds and utilizes all Applicant information and End User Information in accordance with the terms of this Agreement, Applicable Law, Compliance Policies and Bank Policies; and (ii) does not transmit or otherwise convey any Applicant information or End User Information to any Person other than Program Manager or Bank, without the prior written approval of Bank.

(h) Program Manager shall obtain and execute a written agreement with each Subcontractor for the rendering of services and obligations to be provided by such Subcontractor, and shall be responsible for all fees and expenses of each Subcontractor. Such written agreements shall be available to Bank for review upon its request. Program Manager shall include in any agreement with a Critical Subcontractor provisions that require such Critical Subcontractor to comply with any terms and conditions set forth in this Agreement that are applicable to Critical Subcontractor or the services provided by Critical Subcontractor and shall pass through any and all obligations and liabilities to Critical Subcontractor that are applicable to the services that such Critical Subcontractor is

performing on behalf of Program Manager. Any agreement Program Manager has with a Critical Subcontractor must include terms (i) that permit Bank and Regulatory Authority (A) to audit and otherwise oversee Critical Subcontractor and its respective services as such services relate to a Program (such audit rights to be no more restrictive than the audit rights set forth herein in connection with Program Manager); (B) to terminate such agreement Program Manager has with the Critical Subcontractor if the Critical Subcontractor, as applicable, violates any Applicable Laws, Compliance Policies, Bank Policies or poses a financial, compliance or reputational risk to Bank or any third party; (C) to terminate any agreement Program Manager has with a Critical Subcontractor if the services or activities or omissions of the Critical Subcontractor may or actually result in reputational, financial or compliance risk to Bank, as determined by Bank, or otherwise adversely impact the safety and soundness of the Bank; or (D) to require any written agreement with the Critical Subcontractor to be amended or modified to comply with Bank Policies, Applicable Law, the terms of this Agreement or any instruction of Regulatory Authority;  and (ii) that Critical Subcontractor, as applicable, shall be liable and shall indemnify Bank for any claims relating to its services or actions or omissions of the Critical Subcontractor. Program Manager shall deliver evaluations and reports, and such other information as shall be reasonably requested by Bank to enable Bank to evaluate Program Manager's oversight of Critical Subcontractors and Critical Subcontractors' compliance with the term and conditions of its agreement with Program Manager related to the services to be provided in connection with or related to a Program or this Agreement. Program Manager must ensure that that each agreement Program Manager has with a Critical Subcontractor names Bank as third party beneficiary to such agreement to the extent such Critical Subcontractor is performing services in connection with or related to a Program. Each agreement Program Manager has with a Critical Subcontractor related to performance of services in connection with or related to a Program is subject to Bank's prior approval and any costs and expenses incurred by Bank in connection with its review of such agreement shall be promptly reimbursed by Program Manager. No agreement Program Manager has with a Subcontractor may include any term which may result in liability for Bank. No terms of any agreement Program Manager has with a Subcontractor shall flow down to Bank or otherwise obligate Bank to perform or withhold performance.

(i)     Program Manager shall notify Bank in writing of any changes in Subcontractors at least thirty (30) days prior to entering into a contractual relationship with a new Subcontractor and at least sixty (60) days prior to terminating any contractual relationship with any existing Subcontractor.  Program Manager shall immediately notify Bank in writing of any changes in the scope or terms of any written agreement with any Subcontractor and shall obtain Bank's prior written approval to the extent such Subcontractor is a Critical Subcontractor.

(j)     Program Manager shall provide appropriate training for its officers, employees, agents, Subcontractors, and any other representatives with respect to duties of Program Manager and such officers, employees, agents, Subcontractors and representatives in compliance with Applicable Law, Bank Policies, Program Manager Policies and this Agreement. Such training shall include, but is not limited to, training on Bank Services, equipment, device(s), software, and/or mobile/web applications used for or in support of any Bank Service or Program, products and services offered hereunder and relevant law that may apply to the marketing, solicitation, processing and Customer Service activities instituted on behalf of Bank hereunder.  Program Manager will review and update the training material on an annual basis and will ensure that its employees, representatives, contractors, agents and Subcontractors receive annual training. Bank shall have the right to (i) periodically review and audit Program Manager's training program to ensure Program Manager's compliance with Bank's training program; and (ii) require changes to the training program to manage any risks identified by Bank.

(k)     Program Manager shall perform periodic compliance reviews of Program Manager's Critical Subcontractor's websites, customer facing interface, disclosures and services, and such review shall include a review and verification of Critical Subcontractor's compliance with regulatory, disclosures and marketing requirements applicable to Program Manager and any other requirements required to ensure the Program(s) and each Bank Service is operated, offered and maintained in compliance with Applicable Law, Compliance Policies, Bank Policies and the terms of this Agreement.  Program Manager shall have in place mechanisms to cease providing services to any End User or receiving services from any Subcontractor that is not in compliance with Applicable Law, Compliance Policies, Bank Policies or the terms of this Agreement applicable to the Program or the services contemplated by this Agreement.

18.  **Reserved.**

19.  **Bank's Obligations**.

(a)     **Membership in Network**.  Bank shall, at its sole expense, maintain its Membership in good standing and shall timely pay all fees, dues and assessments associated with Bank's Membership in any Network utilized by a Program.

(b)     **Deposit Account Issuance**. Notwithstanding anything to the contrary, to the extent Bank agrees to provide Deposit Account issuance in relation to or connection with a Program, as further described and identified in Schedule B (Program Schedules), Bank shall issue and maintain a Deposit Account for each End User in compliance with the terms of this Agreement for the related Program. Bank shall have the right to close the

Deposit Account and deposit the funds held in the Deposit Account into the registry of a court of proper jurisdiction in its discretion.

(c)     **FDIC Insurance**.  To the extent agreed to in a Program Schedule provided for in <u>Schedule B</u> (<u>Program Schedules</u>), Bank shall issue and maintain the Deposits in Deposit Accounts and/or FBO Account in order to ensure the Deposits are insured by the FDIC up to the standard maximum deposit insurance amount per End User, per FDIC-insured bank and per ownership category as permitted under and subject to Federal Deposit Insurance Act; provided, however, Program Manager maintains all necessary Deposit Ledger and Records necessary for FDIC Insurance.

(d)     **Origination Services**.  If elected by Program Manager and approved by Bank in <u>Schedule B</u> (<u>Program Schedules</u>) or other writing, Bank shall provide Program Manager with Origination Services for End User transaction services, as more fully described in <u>Schedule D</u> ("<u>Origination Services</u>").  As a condition to the Origination Services, Program Manager agrees to comply with all terms set forth in <u>Schedule D</u>, in addition to the terms set forth herein.  The Parties agree that Origination Services are subject to the commercially reasonable security procedure governing the origination, processing and/or submission of payment orders, as defined by UCC § 4A-103, and Entries (the "<u>Security Procedures</u>"), which is set forth in <u>Schedule J</u> (<u>Security Procedures</u>).

(e)     **Check Services**.  If elected by Program Manager and approved by Bank in <u>Schedule B</u> (<u>Program Schedules</u>) or other writing, Bank shall provide Program Manager with Check Services for End User Check transaction services, as more fully described in <u>Schedule E</u> ("<u>Check Services</u>").  As a condition to the Check Services, Program Manager agrees to comply with all terms set forth in <u>Schedule E</u>, in addition to the terms set forth herein. The Parties agree that Check Services are subject to the Security Procedures.

(f)     **Wire Services**.  If elected by Program Manager and approved by Bank in <u>Schedule B</u> (<u>Program Schedules</u>) or other writing, Bank shall provide Program Manager with Wire Services to process wire transfers (domestic and international wires incoming and outgoing) for End Users upon receipt of wiring instructions from Program Manager on behalf of End Users, as more fully described in <u>Schedule F</u> ("<u>Wire Services</u>").  Parties agree that Wire Services are subject to the commercially reasonable Security Procedures. As a condition to the Wire Services, Program Manager agrees to comply with all terms set forth in <u>Schedule F</u>, in addition to the terms set forth herein. Prior to allowing an End User to access Wire Services, Program Manager shall obtain any corporate or business-End User's consent to Bank approved security procedures.

(g)     **Debit Card Services**.  If elected by Program Manager and approved by Bank in <u>Schedule B</u> (<u>Program Schedules</u>) or other writing, Bank shall issue a Card to End Users in connection with Deposit Accounts established under the terms of this Agreement, as more fully described in <u>Schedule G</u> ("<u>Debit Card Services</u>").  As a condition to the Debit Card Services, Program Manager agrees to comply with all terms set forth in <u>Schedule G</u>, in addition to the terms set forth herein.

(h)     **Prepaid Card Services**.  If elected by and approved by Bank in <u>Schedule B</u> (<u>Program Schedules</u>) or other writing, Bank shall issue a Card to End Users in connection with funds deposited by such End Users with Bank to access on a prepaid basis under the terms of this Agreement, as more fully described in <u>Schedule H</u> ("<u>Prepaid Card Services</u>"). Funds will be maintained in an FBO Account and insured to the extent permitted by Applicable Law.  As a condition to the Prepaid Card Services, Program Manager agrees to comply with all terms set forth in <u>Schedule H</u>, in addition to the terms set forth herein.

(i)     **Remote Deposit Capture Services**.  If elected by Program Manager and approved by Bank in <u>Schedule B</u> (<u>Program Schedules</u>) or other writing, Bank shall provide Program Manager with Remote Deposit Capture Services for Checks deposited remotely by End Users, as more fully described in <u>Schedule I</u> ("<u>Remote Deposit Capture</u>").  As a condition to the Remote Deposit Capture Services, Program Manager agrees to comply with all terms set forth in <u>Schedule I</u>, in addition to the terms set forth herein.

(j)     **Ancillary Services**.  If elected by Program Manager and approved by Bank in <u>Schedule K</u> (<u>Ancillary Services</u>) or other writing, Bank shall provide Program Manager with the Ancillary Services more fully described in the applicable Ancillary Service Addendum under <u>Schedule K</u> (<u>Ancillary Services</u>).  As a condition to the Ancillary Services, Program Manager agrees to comply with all terms set forth in <u>Schedule K</u> (<u>Ancillary Services</u>) and the applicable Addendum thereto, in addition to the terms set forth herein.

(k)     **Bank Oversight**.  Bank shall have, at all times, and without reducing or otherwise modifying or limiting any terms of this Agreement or Program Manager's liability, the right to supervise,  oversee, monitor, review and audit (as set forth in this Agreement) the Program(s), Bank Services, Program Manager Services, Program Manager's (and Program Manager's Critical Subcontractor's) performance of services hereunder and the results of the various Programs developed and implemented jointly with Program Manager to ensure that Program Manager's performance of its obligations under this Agreement complies with Applicable Law, Bank's policies

and Compliance Policies. Such activities may include, but are not limited to: Bank's review of reports and financials from any Program (including any problems, losses or complaints, and any changes or modifications that may be necessary to ensure the viability of the Program(s) provided to it in the form, format and frequency required by Bank.

(l)     **Bank Compliance with Law**. Bank shall comply, at all times, in performing its duties and obligations under this Agreement, with all Applicable Law.

20.     **Compensation**.  In consideration of performing their respective obligations in connection with the Program, the Parties will receive the amounts provided in <u>Schedule C</u> (<u>Schedule of Fees and Charges</u>).  Bank shall transfer all amounts due to Program Manager pursuant to <u>Schedule C</u> (<u>Schedule of Fees and Charges</u>) to the account specified for such fees in <u>Schedule B</u> (<u>Program Schedules</u>).

21.     **Expenses**.

(a)     <u>General</u>.  Except as otherwise provided in this Agreement, each Party shall be responsible for payment of any federal, state, or local taxes or assessments associated with the performance of its obligations under this Agreement and for compliance with all filing, registration and other requirements with regard thereto (excluding tax on the other Party's revenue).

(b)     <u>Allocation of Costs for Program</u>.  Except as otherwise provided in this Agreement, any and all costs and expenses related to or concerning Program Manager Services or any other legal expenses, fees (including, but not limited to attorney fees) or fines related to or resulting from Program Manager's activities under or related to any Program and any fees specified in <u>Schedule C</u> (<u>Schedule of Fees and Charges</u>) to be paid by Program Manager shall be paid by Program Manager.

(c)     <u>Costs and Expenses Paid by Bank</u>. Bank shall be solely responsible for the membership fees related to its Membership and its cost and expenses related to its obligations under this Agreement, unless otherwise set forth in this Agreement.

(d)     <u>Costs and Expenses Paid by Program Manager</u>. In addition to any expenses specifically set forth elsewhere in this Agreement, including <u>Schedule C</u> (<u>Schedule of Fees and Charges</u>), Program Manager shall be solely responsible for the following:

(i)     advertising and other expenses associated with the marketing of the Program and Bank Services to potential End Users and Applicants;

(ii)     all fines, penalties, reimbursements, and other amounts assessed by any Regulatory Authority or Network due to Program Manager's performance or failure to perform (or the performance of its Subcontractor or the failure of such Subcontractor to perform any) of its obligations under this Agreement, or actions or omissions of Program Manager or any Subcontractor, or any Program under this Agreement (other than any cost, fee or fine charged directly to Bank due to Bank's gross negligence or willful misconduct);

(iii)     all taxes and insurance obligations arising under this Agreement related to the performance of Program Manager's duties and obligations;

(iv)     all fees, costs and expenses incurred by Bank in connection with any filing, registration or other requirements related to a Program, including any cost of registration of any of Program Manager and its Subcontractors as third-party agents with any Network.

(v)     all expenses associated with Program Manager's retention, oversight and supervision of any Subcontractors, and all expenses associated with Program Manager Services;

(vi)     all Negative Balances (as set forth in Section 22 ("<u>Negative Balances</u>"));

(vii)     all expenses associated with and losses resulting from: End User account disputes, transaction disputes, over limit processing, End User or third party fraud, chargebacks or reversals; and third party claims alleging that any aspect of the Programs, including, but not limited to, the End User fees, Marketing Activities, and/or Disclosure Materials, violate Applicable Law;

(viii)     all fees charged by a Network related to the Program(s), including, but not limited to, (A) Settlement fees which are assessed to Bank daily; (B) fees which are assessed to Bank monthly, including, but not limited to, file maintenance fees, authorization and Settlement services fees; (C) fees assessed to the Bank quarterly based on the quarterly Network report; and (D) registration and other fees assessed to Bank annually, including, but not limited to, related to Program Manager's registration, as

applicable, as a marketing agent or service provider of Bank, and registration of any independent service organization;

(ix)    all expenses associated with establishing and maintaining any accounts with, or receiving services from, any financial institution providing Settlement and all expenses in providing Bank with account balances and with completing a due diligence review for any third party vendor or contractor relationship contemplated in this Agreement;

(x)    All reasonable third-party expenses associated with completing required due diligence and annual reviews on Program Manager or its service providers from third party outsourced vendor relationships contemplated in this Agreement;

(xi)    all fees related to Bank's handling of End User Complaints and Bank's handling of Customer Service functions;

(xii)    such other fees and expenses reasonably related to Bank's oversight and control of a Program; and

(xiii)    Any costs resulting from Program Manager's actions or omissions that cause an error or omission by Bank.

(e)    <u>Collection Expenses</u>. Program Manager agrees to pay and reimburse Bank for its reasonable costs and expenses in attempting to collect amounts that Program Manager owes Bank arising out of transactions related to Bank Services. This includes payment and reimbursement of fees Bank incurs for collecting such amounts, including attorneys' fees (including Bank's in-house attorneys' fees) and court costs.

## 22.    **Negative Balances**.

(a)    Program Manager shall ensure that negative balances on Deposit Accounts, FBO Accounts or any other Bank Service ("<u>Negative Balances</u>") are charged off pursuant to Applicable Law and Bank Policies. Program Manager shall ensure that any Negative Balances outstanding for more than ninety (90) calendar days ("<u>Charge Off Event</u>") are charged off no later than the end of the calendar month in which the Charge Off Event occurred.

(b)    Any Negative Balance that is required to be charged off pursuant to this Section 22(a) above shall be deducted from Program Manager's compensation; provided, however, Bank may deduct on a daily basis any Negative Balance from Program Manager compensation, the Operating Account, Reserve Account or any other demand deposit account that Program Manager has with Bank.

## 23.    **End User Information and Data Security**.

(a)    **End User Information**.

(i)    The purpose of this Section 23 ("<u>End User Information and Data Security</u>") is to ensure that this Agreement conforms to applicable privacy laws, including GLBA, Interagency Guidelines Establishing Standards for Safeguarding End User Information and any other Applicable laws related to privacy, and otherwise sets forth the Parties' agreement with respect to the use and disclosure of End User Information.  All use and disclosure of End User Information under this Agreement shall be subject to the provisions of this Section 23 (("<u>End User Information and Data Security</u>"). Program Manager represents and warrants that its creation, collection, receipt, access, use, storage, disposal and disclosure of End User Information does and will comply with all applicable federal and state privacy and data protection laws, as well as all other applicable regulations and directives, including any privacy laws, regulations, guidance and rules applicable to Bank or for which Bank must comply with in connection with End User Information.  At a minimum, pursuant to Applicable Law, Program Manager must use reasonable encryption and authentication technology that provides a reasonable level of security that complies with Applicable Laws for End User Information.

(ii)    As between the Parties, the End User Information shall be owned exclusively by Bank and shall be considered Confidential Information of Bank. The End User Information shall at all times be subject to the privacy policy of Bank then in effect ("<u>Privacy Policy</u>").  Bank shall develop, and Program Manager shall provide End Users with, the Privacy Policy.  Notwithstanding anything to the contrary, Bank acknowledges that Program Manager may collect information from or about End Users in connection with Program Manager's services (excluding any services provided under this Agreement as a service provider of Bank), even if such information overlaps with End User Information, and Program Manager may use and disclose such information in accordance with its privacy policy disclosed to and agreed to by End User and with Applicable Law; provided, however, Program Manager agrees to indemnify and hold Bank harmless against any claim initiated by any Person

against Bank, and any Losses incurred by Bank, related to Program Manager's use or disclosure of such information.

(iii)    The Parties agrees that, that during and after the Term, it shall not use, nor permit any Subcontractor or any third party other than the other Party to use, any End User Information other than as necessary to perform such Party's obligations hereunder or to enforce it rights under any Bank Services Agreement, as required to comply with Applicable Law or as permitted hereunder. Bank hereby grants Program Manager a non-exclusive and non-transferrable license to use End User Information to exercise its rights and perform its obligations under this Agreement. Except as provided in, and subject to the limitations stated herein, neither Party will compile, use, sell or otherwise distribute any lists derived from End User Information nor use the names, account numbers or any other End User Information to compile, use, sell or distribute lists or data for use by either Party, its agents, subsidiaries or affiliates, or by any third parties without the prior written consent of the other Party, which may not be unreasonably withheld or delayed.

(iv)    Except as prohibited by Applicable Law or the Bank's Privacy Policy, Program Manager may disclose End User Information in its possession in compliance with Applicable Law solely: (i) to any Network or other entity to which disclosure is necessary in connection with the processing of a Bank Service or transaction initiated pursuant to a Bank Service; (ii) to its Critical Subcontractors in connection with a permitted use of such End User Information under this Section 23(a) ((("End User Information and Data Security"), provided that such Critical Subcontractor agrees in writing to maintain all such End User Information strictly confidential in perpetuity and not to use or disclose such information to any Person other than Program Manager or Bank, except as required by Applicable Law or any Regulatory Authority (after giving Bank or Program Manager, as applicable, prior notice and an opportunity to defend against such disclosure); provided, further, that each Critical Subcontractor maintains a Security Program in accordance with the terms of Section 23 ("End User Information and Data Security") and complies with Interagency Guidelines Establishing Standards for Safeguarding End User Information, and is obligated to notify Program Manager of any Security Breach; (iii) to its employees, consultants, attorneys and accountants with a need to know such End User Information in connection with a permitted use of such End User Information under this Section 23 (("End User Information and Data Security"); provided that (1) any such Person is bound by terms substantially similar to this Section 23 (("End User Information and Data Security") as a condition of employment or of access to End User Information or by professional obligations imposing comparable terms; and (2) Program Manager shall be responsible for the compliance by each such Person with the terms of this Section 23 (("End User Information and Data Security"); or (iv) to any Regulatory Authority with authority over Program Manager or Bank.

(v)    Subject to the terms set forth in this Section 23 (("End User Information and Data Security"), as between the Parties, Bank shall have the rights and interest with respect to the End User Information during the Term and following expiration or termination of this Agreement in its entirety. Upon the termination or expiration of this Agreement and any applicable wind-down or transition period, Program Manager and each Subcontractor shall return (or destroy if so directed by Bank) all End User Information in the possession of Program Manager or Subcontractor or in the possession of any representative, contractor or third party of Program Manager or each of Program Manager's Subcontractor. Bank acknowledges that Program Manager may use, store, analyze and disclose the Aggregated De-identified Data (i) for its own internal, statistical and trend analysis, (ii) to develop, improve and promote its products and services, and (iii) to create and distribute data, reports and other materials, including materials regarding access and use of a Program. For clarity, nothing in this Agreement gives Program Manager the right to publicly identify Bank as the source of any Aggregated De-identified Data without Bank's prior written approval. Any End User Information maintained in an electronic format shall be returned to Bank in an industry standard and secure format or, at the option of Bank, deleted and removed from all computers, electronic databases and other media in accordance with Applicable Law. Compliance by Program Manager with this subsection shall be certified in writing by an appropriate officer of Program Manager within thirty (30) days of the end of the Term, which certification shall include a statement that no End User Information has been retained.

(vi)    Without limiting any other provision of this Agreement, if Program Manager is required to disclose End User Information in response to legal process or a Regulatory Authority, Program Manager shall immediately notify Bank and, upon request, cooperate with Bank in connection with obtaining a protective order, unless otherwise prohibited. Program Manager shall furnish only that portion of the End User Information, which it is legally required to disclose, and shall use commercially reasonable efforts to ensure that confidential treatment will be accorded such End User Information.

(vii)    Program Manager will only store End User Information, Confidential Information and Records at its data center locations which have been approved by Bank (or in the case of approved Program Manager's Subcontractor, the Program Manager's Subcontractor address approved by Bank). Any

change of the location of a data center must be approved by Bank at least one hundred and twenty (120) days in advance of End User Information or Confidential Information being stored at such new location.

(viii)    At least once per year, Program Manager shall conduct, and shall cause each of Program Manager's Critical Subcontractors (at Bank's request) to conduct, a site audit of the information technology and information security controls for all facilities used in complying with its obligations under this Agreement, including obtaining a network-level vulnerability assessment performed by a recognized third-party audit firm based on recognized industry best practices. Program Manager shall (and shall cause each of Program Manager's Critical Subcontractors to) also provide Bank with copies of all other reports on compliance, quarterly and annual status forms and other reports filed by Program Manager with any Regulatory Authority, if applicable.

(b)    **Data Security**.

(i)    Program Manager shall, and shall require any of its Critical Subcontractors to, establish and maintain appropriate administrative, technical and physical safeguards designed to (i) protect the security, confidentiality and integrity of the End User Information and any associated Records; (ii) protect against any anticipated threats or hazards to the security or integrity of End User Information and any associated Records and systems maintaining End User Information; (iii) protect against unauthorized access to or use of End User Information or associated Records; and (iv) ensure the proper disposal of End User Information and any associated Records (collectively, the "Security Program"). Program Manager has, within the last twelve (12) months, tested such Security Program and has determined it is sufficient and will enable Program Manager to continue to comply with the requirements herein during the Term; such Security Program will be tested annually.  At all times during the Term, (x) Program Manager and Program Manager's Critical Subcontractor shall use the same degree of care in protecting the End User Information against unauthorized disclosure as it accords to its other confidential customer information, but in no event less than a standard of care applicable to well-managed, regulated financial institutions, (y) Program Manager shall, and shall require each of Program Manager's Critical Subcontractors to, protect the privacy of all End User Information to at least the same extent that Bank must maintain under Applicable Law, and (z) the Security Program shall be and remain compliant with PCI-DSS (if Debit Card Services are provided by Bank) and in compliance with all information and data security requirements promulgated by the Applicable Law, including GLBA and Interagency Guidelines Establishing Information Security Standards, as each of same may be revised from time to time.  Any material change to the Security Program by Program Manager or Program Manager's Critical Subcontractors shall be approved in advance by Bank.

(ii)    Program Manager shall, and shall require any of Program Manager's Critical Subcontractors to, complete and return to Bank, on an annual basis or as otherwise required by Bank, a data security questionnaire required by Network Rules or Bank.

(iii)    Program Manager shall cause, and shall cause each Critical Subcontractor (at Bank's request), to provide to Bank on an annual basis the Independent Service Auditor's Report – SOC1 Types I and II, as defined in the American Institute of Certified Public Accountants (AICPA's) Statement on Standards for Attestation Engagements ("SSAE") No. 18, *Reporting on Controls at a Service Organization*.  Program Manager shall (and shall cause each Critical Subcontractor to) also provide Bank with copies of all other reports on compliance, quarterly and annual status forms and other reports filed by Program Manager with any Network in accordance with the Network Rules, if applicable.

(iv)    To the extent Cards will be issued in connection with a Program, Program Manager and any Critical Subcontractors shall be assessed on an annual basis for compliance with PCI-DSS, such assessment to be performed by a qualified security assessor approved by the PCI Security Standards Council (a "QSA").  Program Manager and any Critical Subcontractor will submit to Bank for approval the name of the QSA engaged to perform the PCI-DSS assessment no later than thirty (30) days prior to each annual assessment.  Bank reserves the right in its reasonable discretion to reject Program Manager's selected QSA, at which time Program Manager shall submit an alternative name to Bank for approval until such time as Bank approves of the QSA.  In no event shall Bank's disapproval of a QSA relieve Program Manager of the obligation to provide the PCI-DSS assessment report to Bank annually. Promptly upon completion of such assessment, a copy thereof shall be provided to Bank.

(c)    **Security Breach Procedures**.

(i)    Each of the Parties has provided to the other Party the name and contact information of such Party's

designated primary and secondary "<u>Security Contact</u>" appointed for the purpose of being contacted in connection with (i) any security breach or failure requiring immediate notification to a Party with respect to the unauthorized use or disclosure of End User Information or (ii) any use or disclosure of a Party's Confidential Information except in the manner permitted by Section 25 ("<u>Confidentiality</u>"). A Party may from time to time change its primary and secondary Security Contact by providing written notice of such change in accordance with the notice requirements of this Agreement. In the event a named Security Contact is no longer in the employ of the applicable Party, or is otherwise unable or unwilling to perform the duties of a Security Contact as set forth herein, then a replacement Security Contact shall be named by such Party as soon as possible but in no event later than ten (10) days after the Security Contact has ceased employment with such Party or the occurrence of the event giving rise to such Security Contact's inability or unwillingness to perform such duties. Each Party shall further ensure that either the primary Security Contact or the secondary Security Contact is available at any given time to fulfill the purposes of this Section 23(b) ("<u>Data Security</u>"), unless otherwise approved in advance in writing by the other Party.

(ii)     Program Manager agrees that in the event there is a Security Breach, Program Manager will notify the primary, or if unreachable, the secondary Security Contact of Bank of such Security Breach and the nature of such Security Breach immediately, but in no event, later than forty-eight (48) hours, and will promptly report to the corrective action taken to respond to the Security Breach and shall take all steps at its own expense to immediately limit, stop or otherwise remedy such misappropriation, disclosure or use, including, but not limited to, notification and cooperation and compliance with Regulatory Authority; provided, Program Manager may not notify a Regulatory Authority or any Person (other than its Subcontractors and only to the extent required to remediate a Security Breach) of a Security Breach without Bank's prior written consent. Program Manager shall take action(s) requested by Bank or Regulatory Authority to mitigate such Security Breach and shall provide any required notifications to Customers in the event of unauthorized access to their non-public personal information, subject to Bank's prior approval.

(iii)    Immediately following notification under Section 23(c)(ii) ("<u>Security Breach Procedures</u>") above of a Security Breach, the Parties shall coordinate with each other to investigate the Security Breach. Program Manager agrees to (and shall cause each Subcontractor suffering a Security Breach to) fully cooperate with Bank, or any assessor engaged by Bank, to determine the extent of the data breach, including: (i) assisting with any investigation; (ii) providing Bank with physical access to Program Manager's (and, as the case may be, Program Manager Subcontractor's) facilities, records and personnel, as requested by Bank or any assessor engage by Bank, and operations affected; (iii) facilitating interviews with the Program Manager's employees (and, as the case may be, Program Manager Subcontractors) and others involved in the matter; and (iv) making available all relevant Records, logs, files, data reporting and other materials required to comply with Applicable Law, regulation, industry standards or as otherwise reasonably required by Bank. Program Manager shall be responsible for all costs, expenses, and fees of the assessor. Program Manager, upon receipt, shall provide Bank with all reports or documents prepared by or received by the assessor.

(iv)     Program Manager shall at its own expense use best efforts to immediately contain, limit, stop or otherwise remedy any Security Breach and prevent any further Security Breach, including taking any and all action necessary to comply with applicable privacy rights, laws, regulations and standards. Program Manager shall reimburse Bank for all actual reasonable costs incurred by Bank in responding to, and mitigating damages caused by, any Security Breach, including all costs of notice and/or remediation pursuant to Section 23(c)(iii) ("<u>Security Breach Procedures</u>").

(v)      If Program Manager or any Program Manager Subcontractor suffers a Security Breach that results, in Bank's sole discretion, in the engagement of Bank resources to investigate and/or correct the breach, Bank may in its sole discretion require Program Manager to make a deposit in an account designated by Bank in the amount specified in <u>Schedule C</u> (<u>Schedule of Charges and Fees</u>) to be applied against the investigation fees and other expenses incurred by Bank to investigate and/or correct the breach, including time and material and any third party pass through expenses. To the extent that actual costs incurred by Bank to investigate and/or correct the breach are less than the amount of the deposit, the excess shall be returned to Program Manager. To the extent that actual costs incurred by Bank to investigate and/or correct the breach exceed the amount of the deposit, Program Manager shall be liable for, and shall promptly upon demand reimburse Bank for, the amount of such excess.

(vi)     Program Manager agrees to maintain and preserve all documents, records and other data related to any Security Breach. Program Manager shall be liable to Bank for any Losses incurred by Bank as a result of a Security Breach of the systems of Breached Party or any Subcontractor.

(vii)    Program Manager agrees to make its internal practices, books, and records, including policies, procedures and End User Information, relating to the use and disclosure of End User Information available during normal business hours to Bank or, at the request of Bank, to a Network or their

respective designees, in a time and manner designated by Bank or Network for purposes of determining Bank's or Program Manager's compliance with the terms of this Section 23(b) ("Data Security"). Bank may at its discretion, conduct an on-site security audit and review of Program Manager's security procedures and systems. Without limiting any other provision of this Agreement, the Parties agree that this Section 23(b) ("Data Security") may be amended by Bank from time to time upon notice to Program Manager as is necessary for the Parties to comply with Applicable Law as they relate to Program Manager's performance hereunder.

(viii)    In the event of an inconsistency or conflict between any terms of this Agreement and this Section 23 (("End User Information and Data Security")), this Section 23 ("End User Information and Data Security") shall control any issues surrounding the End User Information. Any such inconsistency or conflict shall be resolved in favor of a meaning that permits a Party to comply with Applicable Law.

24.    **Disaster Recovery, Business Resumption and Contingency Plans**.  At all times during the Term, Program Manager shall and shall require all of Program Manager's Critical Subcontractors to, prepare and maintain disaster recovery, business resumption, and contingency plans appropriate for the nature and scope of the activities of and the obligations to be performed by Program Manager or any of Program Manager's Critical Subcontractors hereunder.  Program Manager shall ensure that such plans are sufficient to enable Program Manager or the Program Manager's Critical Subcontractor to promptly resume, without giving effect to the force majeure provisions of Section 30 ("Force Majeure") hereof, the performance of its obligations hereunder in the event of a natural disaster, destruction of facilities or operations, utility or communication failures or similar interruption in operations and shall ensure that all material records, including, but not limited to, End User Information, Records and Deposit Ledger, are backed up in a manner sufficient to survive any disaster or business interruption.  These plans shall ensure that, without giving effect to the force majeure provisions of Section 30 ("Force Majeure") hereof, such resumption takes place no later than forty-eight (48) hours after the interruption.  Program Manager shall make available to Bank copies of all such disaster recovery, business resumption, and contingency plans and shall make available to Bank copies of any changes thereto.  Program Manager or any of Program Manager's Critical Subcontractors shall periodically, and no less than annually, test such disaster recovery, business resumption, and contingency plans as may be appropriate and prudent in light of the nature and scope of the activities and operations of Program Manager and its obligations hereunder.  Program Manager shall further facilitate and cooperate with any requests by Bank to participate in, monitor or audit the annual testing process of Program Manager or a Program Manager Critical Subcontractor under this Section 23(b) ("Data Security").  A complete report of the results of such annual testing shall be promptly provided to Bank.

25.    **Confidentiality**.

(a)    Each Party agrees that Confidential Information of the other Party shall be used by each Party solely in the performance of its obligations and exercise of its rights pursuant to this Agreement. Except as set forth in this Section 25 ("Confidentiality"), neither Party (the "Restricted Party") shall disclose Confidential Information of the other Party (the "Disclosing Party") to third parties; provided, however, that the Restricted Party may disclose Confidential Information of the Disclosing Party (i) to the Restricted Party's Affiliates, agents, representatives or subcontractors for the sole purpose of fulfilling the Restricted Party's obligations under this Agreement (as long as the Restricted Party exercises best efforts to prohibit any further disclosure by its Affiliates, agents, representatives or subcontractors) and only on a "need to know" basis, (ii) to the Restricted Party's auditors, accountants and other professional advisors, and (iii) to any other third party as mutually agreed by the Parties, in each case, only if Disclosing Party is bound to maintain the confidentiality of Confidential Information in accordance with the terms of this Agreement. Each Restricted Party may disclose Confidential Information to the extent such Confidential Information is required to be disclosed by Applicable Law, including in the course of an examination by a Regulatory Authority; provided that (y) except in connection with disclosure in the ordinary course of an examination by a Regulatory Authority, the Party subject to such Applicable Law shall notify the Disclosing Party of any such use or requirement prior to disclosure of any Confidential Information obtained from the Disclosing Party in order to afford the Disclosing Party an opportunity to seek a protective order to prevent or limit disclosure of the Confidential Information to third parties; and (z) the Party subject to such Applicable Law shall disclose Confidential Information of the Disclosing Party only to the extent required by such Applicable Law.

(b)    Restricted Party agrees that any unauthorized use or disclosure of Confidential Information of the Disclosing Party might cause immediate and irreparable harm to the Disclosing Party for which money damages might not constitute an adequate remedy.  In that event, the Restricted Party agrees that injunctive relief may be warranted in addition to any other remedies the Disclosing Party may have.  In addition, the Restricted Party shall promptly (but in no event more than forty-eight (48) hours after discovery of same) advise the Disclosing Party by telephone and in writing via facsimile of any security breach that may have compromised any Confidential Information, and of any unauthorized misappropriation, disclosure or use by any Person of the Confidential Information of the Disclosing Party which may come to its attention and shall take all steps at its own expense reasonably requested by the Disclosing Party to limit, stop or otherwise remedy such misappropriation, disclosure or use, including, but not limited to, notification to and cooperation and compliance with any Regulatory Authority.

(c)     Upon written request or upon the termination or expiration of this Agreement, each Party shall return to the other Party all Confidential Information of the other Party in its possession or control that is in written form, including by way of example, but not limited to, reports, plans, and manuals, and delete any digitally or optically stored versions of Confidential Information of the other Party; provided, however, that each Party may maintain and retain in its possession all such Confidential Information in standard archival or computer back-up systems or pursuant to the normal document or e-mail retention practices of the Restricted Party or any of its Affiliates, agents, representatives or Restricted Party's Subcontractors (so long as the retention practices are compliant with Applicable Law and consistent with the terms of this Agreement) or each Party may maintain such Confidential Information in its possession as required to be maintained under Applicable Law relating to the retention of records for the period of time required thereunder.

(d)     Each Party shall require its respective subcontractors having access to Confidential Information to agree in writing to be bound by provisions substantially similar to the provisions of this Section 25 ("Confidentiality") prior to disclosure of any Confidential Information to such Party's subcontractors. Such Party shall keep and maintain such protective agreements and shall promptly provide the other Party with copies thereof upon request. Such permissible disclosure shall not relieve the Disclosing Party of liability for such disclosure.

(e)     The Parties acknowledge that any breach of the covenants or obligations set forth in this Section 25 ("Confidentiality") may cause the other Party irreparable harm for which monetary damages would not be adequate compensation and agrees that, in the event of such breach or threatened breach, the non-breaching Party is entitled to seek equitable relief, including a restraining order, injunctive relief, specific performance, and any other relief that may be available from any court, in addition to any other remedy to which the non-breaching Party may be entitled at law or in equity.  Such remedies shall not be deemed to be exclusive but shall be in addition to all other remedies available at law or in equity, subject to any express exclusions or limitations in this Agreement to the contrary.

(f)     Media releases, public announcements and public disclosures by Bank or Program Manager or their respective representatives, employees or agents, relating to this Agreement or the name or Bank Marks or Program Manager Marks, any Bank or Program Manager affiliate or supplier, including, without limitation, promotional or marketing material, but not including any disclosure required by legal, accounting or regulatory requirements beyond the reasonable control of the releasing Party, shall be coordinated with and approved by Program Manager or Bank, respectively, in writing prior to the release thereof.

(g)     Program Manager shall not file this Agreement (including any addendum, schedule, supplement, or attachment), or any future amendment or supplement hereto, with the U.S. Securities and Exchange Commission (the "SEC") unless such filing is required under Item 601 of Regulation S-K.  In the event that Program Manager determines that this Agreement (or amendment or supplement) must be filed with the SEC under Regulation S-K, Program Manager shall take all actions necessary to obtain confidential treatment of all exhibits, addenda, schedules, supplements and attachments (including all pricing attachments) and to the extent possible, this Agreement, in accordance with Rule 406 under the Securities Act of 1933.  Specifically, and without limitation, Program Manager shall omit all exhibits, addenda, schedules, supplements and attachments (including all pricing attachments) from the material filed with the SEC and, in lieu thereof, shall indicate in the material filed that the Confidential Information has been so omitted and filed separately with the SEC. Program Manager shall file all exhibits, addenda, schedules, supplements and attachments (including all pricing attachments) so as to maintain the confidentiality of the documents, and shall file an application making an objection to the disclosure of these materials.  If the SEC denies the application, Program Manager will seek review of the decision under Rule 431.

26.     **Export Restrictions**. Bank's Confidential Information, Bank Services and Ancillary Services is subject to export controls under Applicable Law. Accordingly, Program Manager shall, to the extent applicable, not utilize Bank's Confidential Information, Bank Services or Ancillary Services in any country that is embargoed by the U.S. government. Program Manager shall be solely responsible for the importation and exportation of Bank's Confidential Information in and out of the United States, including obtaining any approval or permit necessary for importation or use.

27.     **Other Relationships with End Users**.

(a)     Subject to Applicable Law, Bank's Privacy Policy and consistent with the Bank Service Agreement, Program Manager, at its own expense, shall have the right to solicit Applicants and/or End Users with optional offerings of general merchandise and services from Program Manager and others, including Bank-approved ancillary products and services, and to use Applicant and/or End User Information for purposes permitted by Applicable Law, Bank's Privacy Policy and the Bank Service Agreement.  Program Manager shall notify Bank of its intent to make any such offers and shall obtain the prior written approval of Bank, which shall not be unreasonably withheld.

(b)     Without limitation, Bank may at all times make solicitations for goods and services to the general public, which may include one or more Applicants or End Users; provided that Bank does not (i) target such solicitations to

specific Applicants and/or End User, or (ii) use or permit a third party to use any list of Applicants and/or End Users in connection with such solicitations; and Bank shall not be obligated to redact the names of Applicants and/or End Users from marketing lists acquired from third parties (e.g., magazine subscription lists) that Bank uses for solicitations.  Bank may at all times and without restriction:  offer credit, debit, prepaid and other electronic payment services or sponsor other Program Manager or companies who are offering credit, debit, prepaid or other electronic payment services.

28.    **Intellectual Property**.

(a)    **Bank Marks and Intellectual Property**.  Bank hereby grants to Program Manager a non-exclusive, non-transferable, revocable limited license to use and reproduce the name, logo and specified trademarks of Bank ("Bank Marks"), which Bank has made available to Program Manager, solely in connection with the Program or as required under Applicable Law, provided that any such use shall require the prior written approval of Bank.  If such approval is granted, Program Manager may utilize such Bank Marks subject to Bank's prior approval of such materials.  This use terminates upon termination of this Agreement and any agreed upon wind down period (if applicable). Bank represents and warrants that its Bank Marks do not violate the Intellectual Property rights of any third party.

(b)    **Ancillary Services, Bank's API, the Specifications and Intellectual Property**.  Subject to the terms and conditions of this Agreement, including the terms and conditions set forth in Schedule K (Ancillary Services) and the applicable Addendum(s) attached thereto, Bank hereby grants to Program Manager a non-exclusive, non-transferable, except in compliance with the terms of this Agreement, non-sublicensable, revocable right, during the Term of the Agreement, to (i) use the Ancillary Services and certain Third-Party Services made available by Bank through the Ancillary Services solely for Program Manager's internal business purposes; (ii) use the Bank's API solely for Program Manager's internal business purposes in developing Program Manager's applications that will communicate and interoperate with the Ancillary Services and/or (iii) to use the Specifications (as that term is defined in Schedule K (Ancillary Services)) solely in connection with Program Manager's use of the Ancillary Services.  The rights and licenses granted to Program Manager in this Agreement extend to Program Manager only. Without limiting the generality of the foregoing, no affiliate or third-party partner of Program Manager may access or use the Ancillary Services or Third-Party Services without Bank's prior written approval, which Bank may grant in its sole discretion, and which may require the execution of additional agreements between Bank, Program Manager, and such third party.  Program Manager shall not alter, obscure or revise any proprietary, restrictive, trademark or copyright notice included with, affixed to, or displayed in, on or by any Ancillary Service, Third-Party Service or Specifications.

(c)    **Program Manager Marks and Intellectual Property**.  Program Manager grants to Bank a non-exclusive, non-transferable, revocable limited license to use and reproduce the name, logo and specified trademarks of Program Manager ("Program Manager Marks"), which Program Manager has made available to Bank, solely in connection with the Program or as required under Applicable Law, provided that any such use shall require the prior written approval of Program Manager, such approval not to be unreasonably withheld or delayed and consistent with any Program Manager usage guidelines.  If such approval is granted, Bank may utilize such Program Manager Marks subject to Program Manager's prior approval of such materials.  Program Manager hereby grants Bank a revocable, non-exclusive, non-transferable (except in compliance with Section 40 ("Assignment") license during the Term to use the object code version of any Intellectual Property provided by Program Manager to Bank, including the Dashboard and Disclosure Materials, solely for Bank's use to perform its obligations under this Agreement or as otherwise contemplated by this Agreement ("Program Manager Intellectual Property"). Program Manager is the owner or licensor of Program Manager Intellectual Property, including Program Manager Marks and all systems, services (including Program Manager Services), software and hardware that Program Manager may provide to, or use to provide services to, Bank or an End User in connection with a Program, and Program Manager has the legal right, power and authority to use or permit the use of such Program Manager Intellectual Property as contemplated by this Agreement without violation of any Applicable Law or infringement of any rights, including Intellectual Property, of any Person.  This use terminates upon termination of this Agreement and any agreed upon wind down period (if applicable).

(d)    **Intellectual Property Rights of Others**. Each Party will obtain or will at all times maintain appropriate licenses with respect to any Intellectual Property affecting any and all aspects of its obligations under this Agreement. Program Manager shall ensure that the Disclosure Materials or other aspects of the Program will not violate any intellectual property rights of any third party and shall be liable for all fees associated with licensing any such intellectual property rights. To the extent Bank deems it necessary to purchase such licenses from a third party in connection with a Program, Bank shall notify Program Manager and the Parties shall consult as to whether such licenses should be obtained or whether the subject matter of such licenses should not be used so as to avoid such fees. Program Manager shall promptly reimburse Bank for costs for such licenses as to which Program Manager has agreed upon receipt of an invoice from Bank; provided, however, if Program Manager does not agree to the purchase of such licenses and Bank does not purchase such licenses, Program Manager shall indemnify and hold harmless Bank for all costs and losses related to any claim by a third party that Bank

violated the intellectual property of such third party to the extent such claim or loss could have been avoided if Bank purchased such licenses.

(e) **Reservation of Intellectual Property Rights**. Each Party acknowledges and agrees that the other Party shall retain all right, title, and interest in and to all Intellectual Property that is developed, established, used or otherwise created by the Party related to the Program, including mobile applications, underwriting algorithms, form of Applications, Disclosure Materials, Marketing Materials, Bank Services (including, but not limited to Bank's Customer Care Services), Program Manager Services and the Party's Confidential Information. Nothing in this Agreement shall be construed as granting either Party a license to use in any way the Intellectual Property of the other Party, except as provided in this Agreement. Neither Party shall take any action that interferes with the Intellectual Property of the other Party or attempt to copyright or patent any part of the Intellectual Property of the other Party or attempt to register any trademark, service mark, trade name, or company name which is identical or confusingly similar to the other Program Manager Marks or Bank Marks respectively.

29. **Term and Termination**.

(a) **General**. This Agreement will take effect on the Effective Date and continue until the third (3rd) anniversary of the Effective Date (the "Initial Term") and shall renew automatically for successive additional terms of one (1) year each (each a "Renewal Term" and such Initial Term and Renewal Term, with any wind-down or transition period and for so long as this Agreement remains in effect, the "Term"), unless either Party notifies the other Party of non-renewal at least ninety (90) days prior to the end of the Initial Term or any Renewal Term.

(b) **Material Breach**. Except as otherwise provided in this Agreement, if either Party materially breaches a material term of this Agreement, the nonbreaching Party may terminate this Agreement by giving written notice to the breaching Party. This notice will: (1) describe the material breach and (2) state the Party's intention to terminate this Agreement. If the breaching Party does not cure or substantially cure its material breach within thirty (30) Business Days (or a shorter period if required by Applicable Law) after receipt of notice as described in this Section 29 (b) ("Material Breach") (the "Cure Period"), then the nonbreaching Party may immediately terminate this Agreement by giving notice at any time following the end of such Cure Period.

(c) **Untrue or Misleading Representations or Statements**. In the event that any financial information or statement made by Program Manager under or pursuant to this Agreement or in any certificate, document or financial statement delivered or furnished by Program Manager under or pursuant to this Agreement shall be untrue or misleading in any material respect or shall omit material information, as of the date made or delivered, the, Bank may, in its reasonable discretion, immediately terminate this Agreement.

(d) **Insolvency**. Either Party may terminate this Agreement if the other Party (A) voluntarily or involuntary (and such involuntary petition or proceeding is not dismissed within sixty (60) days) commences (or is the subject of, as the case may be) any proceeding or files any petition seeking relief under Title 11 of the United States Code or any other federal, state or foreign bankruptcy, insolvency, liquidation or similar law, (B) applies for or consents to the appointment of a receiver, trustee, custodian, sequestrator or similar official for such other Party or for a substantial part of its property or assets, (C) makes a general assignment for the benefit of creditors, (D) commences the winding up or liquidation of its business or affairs, or (E) takes corporate action for the purpose of effecting any of the foregoing.

(e) **Force Majeure; Change in Applicable Law**. Either Party may terminate this Agreement as permitted by Sections 30 ("Force Majeure") or 44 ("Agreement Subject to Applicable Law").

(f) **Harmful Activities**. Bank may terminate this Agreement upon fifteen (15) Business Days' advance written notice to Program Manager of such intent to terminate if, at any time during the Term of this Agreement, Program Manager or any of its Subcontractors are conducting activities that the Bank reasonably determines are materially harmful to relationships with its federal or state supervisory or law enforcement agencies; provided that Bank promptly notifies Program Manager of such activity, provides evidence of such activity, and Program Manager does not cure such activity to Bank's sole and complete satisfaction within fifteen (15) Business Days of notification to Program Manager.

(g) **Termination for Cause**. Bank may immediately terminate this Agreement: (1) in the event of an act of fraud or willful misconduct of Program Manager; (2) in the event of any failure by Program Manager to maintain Reserve Account or Program Manager Required Account balances in accordance with Section 13 ("Program Manager Reserve Account Requirement") and Section 14 ("Program Manager Account(s)") of this Agreement, subject to any cure period provided for in this Agreement; (3) if Program Manager (i) materially breaches this Agreement on two (2) or more separate occasions within twelve (12) consecutive months or (ii) otherwise breaches this Agreement on four (4) or more occasions within twelve (12) consecutive months;

(4) in any event or circumstance that, pursuant to any specific provision contained herein, shall give Bank the right to terminate this Agreement; (5) in the event of a material adverse change in the financial condition of Program Manager; or (6) in the event of a Change in Control or assignment of this Agreement without Bank's prior written approval by Program Manager.

(h)    **Regulatory Requirement**.  Bank may terminate this Agreement following direction from any Regulatory Authority or any other authority with regulatory supervision over Bank or any Program, to cease or materially limit the exercise or performance of Bank's rights or obligations under this Agreement.

(i)    **Program Termination or Suspension**.

(i)    Notwithstanding and in addition to the provisions of this Section 29 ("Term and Termination") hereof, Bank shall have the right, at any time and for any reason, upon the giving of at least thirty (30) days prior written notice to Program Manager, to terminate or suspend any Program, Subcontractor's participation in any Program, or Bank Service under any or all Programs if Bank determines, in its sole and absolute discretion, that any activities of Program Manager or Program Manager Subcontractor, or any Program, any aspect of any Program or Bank Services or this Agreement results in or could result in (i) a violation of Applicable Law; or (ii) a risk to the reputation or safety and soundness of Bank.  If Bank determines to terminate or suspend Bank Services, under any Program or a Program, Program Manager's obligations to Bank under the suspended Program shall not be excused during the time period unless the Parties agree and determine to excuse Program Manager's obligations due to such suspension rendering the performance of such obligations impracticable or unnecessary. Any termination or suspension of any individual Program or Bank Services by Bank will not affect or impact any other Bank Service or Program not affected by such termination or suspension; provided, however, any terminated Program will be subject to a wind-down as set forth in Section 29 (j) ("Transition and Wind Down").

(ii)    If Bank seeks to exercise its rights under (i) above, Bank shall provide Program Manager written notice of its desire to exercise such rights and the Parties shall work in good faith to identify approaches to mitigate risk factors prior to Bank exercising such rights; provided, however, if Bank determines in good faith that such prior notice or mitigation efforts will violate Applicable Law or Supervisory Objection or pose a material risk of loss or damage to Bank or any other Person, Bank may terminate the Program within a reasonable time frame based on the circumstances.  If the Parties are unable to reach an agreement regarding mitigation activities, modifications, changes, or additions to the Program within ten (10) days after Bank's initial notice, Bank may exercise its rights under (i) without any obligation or penalty.

(j)    **Transition and Wind Down**.

(i)    Subject to the terms herein, in the event of the termination or expiration of any Program or the termination of this Agreement, the Parties will cooperate to transition or wind down such Program in accordance with Applicable Law pursuant to this Section 29(j) ("Transition and Wind Down"). Each Party acknowledges that the goals of any transition or wind-down are to benefit the End Users by minimizing any possible burdens or confusion and to protect and enhance the names and reputations of the Parties, each of whom have invested their names and reputations in the Program(s) and Cards issued hereunder (as applicable).  Subject to the terms of this Section 29(j)( ("Transition and Wind Down") and unless otherwise required by Applicable Law or Regulatory Authority, upon the expiration or termination of this Agreement for any reason, the Parties agree to cooperate in good faith to transition or wind down all affected Programs in a commercially reasonable way within ninety (90) days from the date of termination, unless otherwise agreed to in writing by the Parties (the "Transition Period") to provide for a smooth and orderly wind-down.  Subject to Program Manager's compliance with the terms of this Agreement and so long as Program Manager is not in breach of any term herein, such cooperation will include the End User's continued use of Bank Services until related Programs are wound down or transferred. Notwithstanding anything to the contrary, Bank is under no obligation to transition or wind down any Program if prohibited by a Regulatory Authority. Notwithstanding, the Bank is not required to provide any services under this Agreement or support any Program beyond the Transition Period.

(ii)    In the event that Program Manager elects to terminate any Program or this Agreement and is not in default of any provision of this Agreement, Program Manager shall have the right to cause the affected Program(s) and all associated End User accounts to be transferred to a successor qualified financial institution at its sole cost, unless Bank is prohibited from assisting or doing so by a Regulatory Authority, Supervisory Objection or Applicable Law. Written notice of 's decision to exercise this option shall be given within fifteen (15) days of the date of the notice giving rise to termination hereunder.  No later than thirty (30) days after exercising its option hereunder, Program Manager will provide to Bank in writing a proposed transition plan detailing a proposed timeline which shall designate a schedule of dates as of which each Program will be transferred and an allocation of associated cost among the Parties.  Bank and Program Manager shall meet promptly thereafter to review such proposed plan and to determine a mutually acceptable transition plan (a "Transition

Plan"). Such Transition Plan shall include a detailed outline of the Parties' intentions in connection with the transfer of the Program(s) and End User accounts, including timeframes for continuation of the Program(s) during the period of transition (not to exceed ninety (90) days, unless otherwise agree to in writing by the Parties), and target dates for transition milestones, such as entering into agreements with a successor financial institution, development of the transition procedures for the transfer of the Program(s) and any other information reasonably requested by Bank or the successor financial institution.  In the event that Program Manager elects to transition one or more Programs pursuant to a Transition Plan, Bank shall, subject to entering to an agreement with successor bank reasonably satisfactory to Bank (including assumption of all rights and liabilities by successor bank and indemnification of Bank by Program Manager), use commercially reasonable efforts to: (i) assign all of Bank's rights, duties and obligations with respect to the Program(s) to such successor bank designated by Program Manager; (ii) make any and all regulatory filings required by Applicable Law to effect the transition of its undertakings in connection with this Agreement to such successor bank (at Program Manager's cost); and (iii) take all other commercially reasonable actions necessary to transfer the Program(s) to such successor bank. Program Manager shall be responsible for all costs associated with its election to transfer the Program(s) to a successor bank.

(iii)    Subject to and without limiting any other provision of this Agreement, in the event that any Program or this Agreement is terminated by Bank for cause or Program Manager does not exercise its option under the first sentence of Section 29(j)(ii) (("Transition and Wind Down") above, the Parties will cooperate to provide a smooth and orderly wind-down of the Program(s) affected.  Such wind-down shall include the following: (1) as soon as reasonably practicable, commencing with the giving of notice of non-renewal or termination or at such other time as the Parties may otherwise mutually agree, Program Manager or Bank, as applicable, will provide to the other Party in writing a proposed wind-down plan detailing a proposed timeline which shall designate a schedule of dates as of which each Program will be wound down and an allocation of associated costs among the Parties.  Bank and Program Manager shall meet promptly thereafter to review such proposed plan and to determine a mutually acceptable wind-down plan (a "Wind-Down Plan"); provided, however, that if Bank and Program Manager fail to reach mutual agreement on a wind-down plan within thirty (30) days, Bank shall establish a wind-down plan that is appropriate for the affected Program and that is, to the extent practicable, substantially similar to other wind-down plans used by Bank for other programs similar to the affected Program hereunder, in which case such wind-down plan so established by Bank shall constitute the Wind-Down Plan hereunder as to the affected Program and shall be deemed to be approved by Program Manager, and Program Manager shall comply with the terms thereof; and (2) unless otherwise contemplated by the Wind-Down Plan, Bank and Program Manager shall continue to be bound by and perform and comply with the terms of this Agreement and perform all of their obligations hereunder during the wind-down period (regardless of whether the Term has expired or been terminated) until such time as Bank Services expire or are canceled pursuant to and consistent with the Bank Services Agreements or, to the extent permitted by Applicable Law, until such earlier time as mutually agreed upon by Bank and Program Manager.

(iv)    Subject to the terms herein, during any wind-down or transition period, each Party agrees to continue to provide all services set forth under this Agreement to the affected End Users in accordance with the terms of this Agreement.  If Bank determines in its sole discretion that Program Manager has failed to continue to provide Customer Service to the affected End Users during the wind-down or transition period in accordance with the terms of this Agreement, Program Manager shall take all necessary steps to either (i) effect the transfer of its obligations for Customer Service to Bank or (ii) re-direct End Users using the Program to such toll-free telephone numbers and websites as designated by Bank, all at the sole expense of Program Manager.

(v)    Except as required by Applicable Law (including applicable securities laws and the rules promulgated thereunder), in no event will any Party make any public statement or customer communication regarding the termination or wind-down of this Agreement, Bank Services or Programs without the express prior written approval of both Bank and Program Manager, which approval shall not be unreasonably withheld or delayed.  Notwithstanding the foregoing, each Party agrees that the other Party may communicate the termination or expiration of this Agreement with any party with which such Party has contracted to provide any marketing or other service in support of the applicable Program, and Bank may communicate with any Regulatory Authority.

(k)    **Effect of Termination**.

(i)    The termination of this Agreement shall not terminate, affect, or impair any rights, obligations or liabilities of any Party that accrue prior to termination or with respect to the Program occurring or arising prior to termination, or which, under this Agreement, continue after termination. Following termination or expiration of this Agreement, each Party will (1) return all property belonging to the other Party which is in its possession or control at the time of termination or expiration; and (2) discontinue using the other Party's trademarks.

      (ii)      Provisions of this Agreement that, by their nature, should survive termination of this Agreement shall survive termination (including, but not limited to, Sections 1 ("Definitions"), 13 ("Program Manager Reserve Account Requirement"), 14 ("Program Manager Account(s)"), 20 ("Compensation"), 21 ("Expenses"), 22 ("Negative Balances"), 23 (("End User Information and Data Security"), 25 ("Confidentiality"), 28(e) ("Reservation of Intellectual Property Rights"), 29 ("Term and Termination"), 31 ("Party Representations and Warranties"), 32 ("Disclaimers of Warranties"), 33("Limitation of Liability"), 34 ("Indemnification"), 35 ("Relationship of the Parties"), 38 ("Successor; Third Parties Beneficiaries"), 39 ("Severability"), 40("Assignment"), 41 ("Non-Solicitation"), 42 ("Cooperation"), 43 ("Governing Law; Waiver of Jury Trial; Dispute Resolution and Arbitration"), 45 ("Amendment and Waiver"), 46 ("Entire Agreement"), 47 ("Counterparts"), 48 ("Interpretation"), 51 ("Headings"), 52 ("Notices") and 53 ("Referrals").

30.     **Force Majeure**.  If any Party will be unable to carry out the whole or any part of its obligations under this Agreement by reason of a Force Majeure Event, then the performance of the obligations under this Agreement of such Party as they are affected by such cause will be excused during the continuance of the inability so caused, except that should such inability not be remedied within thirty (30) days after the date of such cause, the Party not so affected may at any time after the expiration of such thirty (30) day period, during the continuance of such inability, terminate this Agreement on giving written notice to the other Party.  No Party will be relieved of its obligations hereunder if its failure of performance is due to removable or remediable causes which such Party fails to remove or remedy using commercially reasonable efforts within a reasonable time period.  Either Party rendered unable to fulfill any of its obligations under this Agreement by reason of a Force Majeure Event will give prompt notice of such fact to the other Party, followed by written confirmation of notice, and will exercise due diligence to remove such inability with all reasonable dispatch.

31.     **Party Representations, Warranties and Covenants**.

    (a)      Each Party represents and warrants to the other Party as follows:

      (i)      Such Party is duly organized, validly existing and in good standing under the laws of the state of jurisdiction of its formation and has full corporate power and authority to carry on its business as currently conducted,  execute, deliver, and perform its obligations under this Agreement; the execution, delivery, and performance of this Agreement has been duly authorized, and is not in conflict with and does not violate the terms of the certificate of incorporation or bylaws of either Party, and will not result in a breach of or constitute a default under or require any consent under any indenture, loan, or agreement to which a Party is a party except such consents as a Party shall have received on or prior to the date hereof.

      (ii)      Such Party does not require consent or approval of any third party for the valid execution, delivery, and performance of this Agreement by it.

      (iii)      Such Party has obtained and is in compliance with all licenses, permits, memberships, consents and authorizations required to perform all its obligations under this Agreement or otherwise required under Applicable Law and other agreements which must be executed to effect the services provided by such Party as expressly set forth herein, and which shall be maintained at all times during the term of this Agreement.

      (iv)      Such Party's agreement to provide the services and other obligations hereunder do not violate any agreement or obligation between such Party and any third party.

      (v)      Such Party is not Insolvent.

      (vi)      When executed and delivered by such Party, this Agreement will constitute the legal, valid and binding obligation of such Party, enforceable in accordance with its terms, except: as such (1) enforceability may be limited by applicable bankruptcy, insolvency, reorganization, fraudulent conveyance, moratorium receivership, conservatorship or other similar laws now or hereafter in effect, including the rights and obligations of receivers and conservators under 12 U.S.C. §§ 1821 (d) and (e), which may affect the enforcement of creditor's rights in general, or (2) in the application of general principles of equity.

      (vii)      There are no proceedings or investigations pending or, to the best knowledge of such Party, threatened against such Party: (1) asserting the invalidity of this Agreement, (2) seeking to prevent the consummation of any of the transactions contemplated by such Party pursuant to this Agreement, (3) seeking any determination or ruling that, in the reasonable judgment of such Party, would materially and adversely affect the performance by such Party of its obligations under this Agreement, (4) seeking any determination or ruling that would materially and

adversely affect the validity or enforceability of this Agreement; or (5) that would have a materially adverse financial effect on Bank or its operations if resolved adversely to it.

(viii)    Each Party shall at all times comply with Applicable Laws that relate to each Party's respective obligations hereunder.

(b)    Bank represents and warrants to Program Manager as follows:

(i)    Bank has the authority to accept insured deposits and is an FDIC-insured state-chartered depository Institution.

(ii)    Bank is and will continue throughout the Term to be a duly registered principal member in good standing of each Network used in connection with a Program.

(iii)    Bank is in full compliance with applicable minimum capital requirements prescribed by the FDIC and any other Regulatory Authority having jurisdiction over Bank, and Bank meets the requirements to be considered "well capitalized" as defined in the Federal Deposit Insurance Act and applicable regulations promulgated thereunder.

(c)    Program Manager further covenants, represents and warrants to Bank that:

(i)    Program Manager has the financial capacity to perform its obligations under this Agreement. Program Manager has delivered to Bank complete and correct copies of its balance sheets and related statements of income and cash flow and such other items Bank has requested in connection with its due diligence review of the Program Manager and all representations, statements or information provided by Program Manager in the Program Manager application or otherwise provided to Bank are true, accurate and complete in all material respects (the "Due Diligence Materials"). All Due Diligence Materials furnished to Bank were (at the time provided to Bank) accurate and complete in all material aspects and complete insofar as completeness may be necessary to give Bank a true and accurate knowledge of the subject matter.

(ii)    Program Manager has the legal right, necessary authorizations, consents and waivers of privacy, from End Users and Critical Subcontractors to receive, share and communicate with Bank and Bank's representatives and agents, and which entitles Bank to communicate with Program Manager, Critical Subcontractor and End Users, information, records, data, transaction activity, balances, reports, complaints, End User Information, and other records and documentation regarding the financials and account activities associated with any Bank Services or the Program(s).

(iii)    Program Manager shall perform all obligations hereunder in a timely, skillful, professional, and workmanlike manner by qualified personnel exercising care, skill, and diligence consistent with best practices in the banking industry, and will devote adequate resources to meet its obligations hereunder, in accordance with the terms and conditions of this Agreement.

(iv)    Except as otherwise disclosed to Bank, neither Program Manager's nor any Critical Subcontractor's, to the actual knowledge of Program Manager, Principals has been or is subject to the following as of the date of this Agreement: (1) any criminal conviction (except minor traffic offenses and other petty offenses), (2) Federal or state tax lien, (3) administrative or enforcement proceedings commenced by the Securities and Exchange Commission, any state securities authority, Federal Trade Commission, or any Regulatory Authority, or (4) restraining order, decree, injunction, or judgment entered in any proceeding or lawsuit alleging fraud or deceptive practice on the part of Program Manager or Critical Subcontractor or any Principal thereof. Program Manager further agrees to notify Bank within two (2) Business Days upon the occurrence of any event contemplated by this paragraph.

(v)    Program Manager is and shall remain in compliance with all Bank Polices, Companies Policies and Applicable Law, including in its performance of any obligations or services under or relating to this Agreement (whether acting on their own behalf or as a service provider of Bank), and shall be solely responsible for complying with any state and federal licensing requirements, if applicable, and any Applicable Laws related to Bank Services, Program Manager Services, this Agreement, Program Manager, Subcontractor or a Program.

(vi)    Each time that Program Manager submits a report or causes a Program Manager Subcontractor to submit a report of information regarding a Program or the services provided by Program Manager to Bank, Program Manager represents and warrants that such report is, true, accurate and complete in all material respects as of the date of such report.

(vii)    The representations and warranties of Program Manager contained in this Sections 31(c) are made continuously throughout the Term of this Agreement. In the event that any investigation or proceeding of the nature described in Section 31(c)(iv) is instituted or threatened against Program Manager, Program Manager shall promptly notify Bank of the pending or threatened investigation or proceeding, unless otherwise prohibited by Applicable Law or a Regulatory Authority.

32.    **Disclaimers of Warranties**.

(a)    EXCEPT AS OTHERWISE SET FORTH IN THIS AGREEMENT, EACH PARTY SPECIFICALLY DISCLAIMS ALL WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, ARISING OUT OF OR RELATED TO THIS AGREEMENT, INCLUDING ANY WARRANTY OF MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE, EACH OF WHICH IS HEREBY EXCLUDED BY BOTH PARTIES UNDER THIS AGREEMENT.

(b)    EXCEPT AS OTHERWISE SET FORTH IN THIS AGREEMENT, BANK SOFTWARE, BANK SERVICES AND BANK SYSTEMS ARE PROVIDED "AS IS" AND "AS AVAILABLE," WITHOUT ANY REPRESENTATION OF WARRANTY, WHETHER EXPRESSED, IMPLIED OR STATUTORY.  USE OF BANK SOFTWARE, BANK SERVICES OR BANK SYSTEMS IS AT PROGRAM MANAGER'S OWN RISK.  BANK DOES NOT WARRANT SUCH SERVICES OR BANK SYSTEMS WILL MEET PROGRAM MANAGER'S REQUIREMENTS, BE CONTINUOUS, UNINTERRUPTED, SECURE, TIMELY, OR ERROR-FREE, OR THAT DEFECTS WILL BE CORRECTED.  BANK SHALL NOT BE RESPONSIBLE FOR ANY SOFTWARE SERVICE, BANK SERVICE OR BANK SYSTEM INTERRUPTIONS OR SERVICE FAILURES THAT MAY AFFECT PROGRAM(S), BANK SERVICE(S), PROGRAM MANAGER SERVICES, OR PROGRAM MANAGER OR SUBCONTRACTOR SERVICES.

(c)    BANK MAKES ABSOLUTELY NO REPRESENTATIONS OR WARRANTIES, WHATSOEVER, EXPRESS OR IMPLIED, IN LAW OR IN FACT, TO PROGRAM MANAGER OR ANY END USER OR SUBCONTRACTOR (INCLUDED ANY CRITICAL SUBCONTRACTOR) AS TO COMPUTER HARDWARE, SOFTWARE OR EQUIPMENT OF ANY THIRD PARTY (INCLUDING PROGRAM MANAGER, END USER AND/OR SUBCONTRACTOR) OR INTERNET SERVICE PROVIDERS OR SUCH PROVIDERS' SOFTWARE OR EQUIPMENT USED BY PROGRAM MANAGER, END USER OR SUBCONTRACTOR IN CONNECTION WITH A PROGRAM OR ANY BANK SERVICE(S), INCLUDING, BUT NOT LIMITED TO, THE SUITABILITY OR COMPATIBILITY OF SUCH HARDWARE, SOFTWARE OR EQUIPMENT WITH BANK'S SOFTWARE, BANK SYSTEMS, BANK SERVICES, BANK'S INTERNET SERVICE, BANK'S EQUIPMENT, OR ANY BANK RELATED COMMUNICATION INTERFACES WITH THOSE OF PROGRAM MANAGER, END USER OR SUBCONTRACTOR. BANK SHALL BE RESPONSIBLE FOR NEITHER (I) ANY ERRORS OR FAILURE RESULTING FROM DEFECTS IN OR MALFUNCTIONS OF PROGRAM MANAGER'S, END USER'S OR SUBCONTRACTOR'S COMPUTER HARDWARE, SOFTWARE OR EQUIPMENT, INCLUDING, BUT NOT LIMITED TO, ANY ERRORS OR FAILURES RELATED TO THE TRANSMISSION OR FAILURE OF TRANSMISSION OF ANY TRANSACTION OR INFORMATION FROM PROGRAM MANAGER, END USER OR SUBCONTRACTOR TO BANK OR FROM BANK TO PROGRAM MANAGER, END USER OR SUBCONTRACTOR OR OTHERWISE NOR (II) PROGRAM MANAGER'S OR END USER'S OR SUBCONTRACTOR'S SOFTWARE OR INTERNET DELIVERED SERVICE. BANK SHALL NOT BE RESPONSIBLE FOR PROGRAM MANAGER'S USE OF PROGRAM MANAGER'S, END USER'S, SUBCONTRACTOR'S OR ANY OTHER THIRD PARTY'S COMPUTER SYSTEMS, HARDWARE, DEVICES, SOFTWARE OR RELATED EQUIPMENT, OR THE USE OF ANY INTERNET SERVICE PROVIDER OR SUCH PROVIDER'S SYSTEMS, HARDWARE, DEVICES, SOFTWARE OR RELATED EQUIPMENT.  ANY SUCH USE IS AT PROGRAM MANAGER'S, END USER'S OR SUBCONTRACTOR'S OWN RISK.

(d)    THIS SECTION 32 ("DISCLAIMER OF WARRANTIES") SHALL APPLY TO THE FULLEST EXTENT PERMITTED BY LAW IN THE APPLICABLE JURISDICTION.

33.    **Limitation of Liability**.  Neither Party shall be liable to the other Party for any special, incidental, consequential, indirect, punitive or exemplary damages (including loss of anticipated profits) arising in any way out of this Agreement, provided, however, that the limitation set forth in this Section 33 ("Limitation of Liability") shall not apply to or in any way limit the damages or other Losses for which Bank is entitled to be indemnified by Program Manager under this Agreement in connection with a third party claim.  Notwithstanding anything to the contrary, the maximum aggregate liability of Bank to Program Manager or any third party for all claims arising out of or relating to this Agreement, regardless of the form of any such claim, shall not exceed the amount of fees paid by Program Manager to Bank in the six (6) months prior to such claim and Bank's liability to Program Manager or any third party for all claims arising out of or relating to Ancillary Services, regardless of the form of any such claim, shall be limited to direct damages which shall not exceed the amount of fees paid by Program Manager to Bank under this Agreement for the particular Ancillary Services that are the subject of the alleged losses or injuries during the twelve-month period preceding the date on which the alleged losses or injuries

first accrued. There shall be no duplication of losses indemnified by or recoverable against Bank under this Agreement and any other agreement by and between Program Manager and Bank.

34.    **Indemnification**.

(a)    Program Manager covenants and agrees to indemnify and hold harmless Bank and its parents, subsidiaries, affiliates and their respective officers, directors, members, employees, representatives, shareholders, agents (excluding Program Manager and Program Manager Contractors), attorneys and permitted assigns (collectively, the "Bank Indemnitee Parties"), from and against any damages, awards, judgments, settlement amounts, fines, penalties, losses, costs and expenses (including reasonable legal fees and expenses and costs of investigation) and other liabilities (collectively, the "Losses") arising out of any lawsuit, action, claim, demand, administrative action, arbitration or other legal proceeding brought or asserted against any Bank Indemnitee Parties by a third party as a result of or in connection with: (i) any untrue or inaccurate representation or warranty made by Program Manager or any Program Manager Contractor under, in connection with or pursuant to this Agreement, or any failure on the part of Program Manager or any Program Manager Contractor to perform or comply with any covenant or obligation required to be performed or complied with by Program Manager under or pursuant to this Agreement, including any failure to perform any obligations of Bank which Program Manager has undertaken on behalf of Bank, whether under this Agreement or in connection with any agreement related to a Program, such as the Bank Services Agreement; (ii) any violation of or noncompliance with Applicable Law, Compliance Policies or Bank Policies or  Network or Regulatory Authority mandate by Program Manager or any of its contractors (including any Subcontractor), service providers, agents or representatives (including any processor performing Processing Services, which shall be deemed to be a Subcontractor of Program Manager and not of Bank) (all such contractors, service providers, agents and representatives, including any processor and Subcontractor, collectively, the "Program Manager Contractors"); (iii) Program Manager's or Program Manager Contractor's Security Breach; (iv) claims alleging that any Program or any aspect of any Program, including but not limited to the Bank Services Agreement, End User fees, Marketing Materials, Marketing Activities and/or Disclosure Materials violate Applicable Law or any End User claims, breach, losses, regulatory actions, violations or penalties arising from the action or operations of Program Manager or Program Manager Contractors; (v) any misrepresentation or false or misleading statement made by Program Manager or any Program Manager Contractor to any Person, Regulatory Authority or legislative body regarding Bank, a Bank Service, a Program or the terms of this Agreement; (vi) any fraudulent activity related to Bank Services, including unauthorized use of the Bank Services and unauthorized, erroneous or fraudulent transactions; (vii) any action or inaction by Program Manager Contractor; (viii) any failure on the part of Program Manager or any Program Manager Contractor to comply with or discharge any of its or their obligations, liabilities or other amounts due or owing by Program Manager or such Program Manager Contractor to any third party, including, in the case of Program Manager, due or owing to any Program Manager Contractor; (ix) an act of fraud, embezzlement or criminal activity by Program Manager or Program Manager Contractor; (x) demands, claims or actions by any Person based on allegations that any Intellectual Property licensed by Program Manager to Bank hereunder or otherwise provided to End User in connection with a Program or Bank in connection with this Agreement and Bank's use thereof in accordance with this Agreement or Program Manager's instructions infringes on the rights or Intellectual Property of any Person; or (xi) the gross negligence or willful misconduct of Program Manager or Program Manager Contractors in connection with Program Manager's performance of its obligations under this Agreement; provided, however, that in no event shall any Bank Indemnitee Parties be entitled to be indemnified for any Losses pursuant to this Section 34(a) to the extent that such Losses arise out of (A) an act of fraud, embezzlement or criminal activity by such Bank Indemnitee Parties; (B) the gross negligence or willful misconduct of Bank Indemnitee Parties, or (C) the failure of such Bank Indemnitee Parties to comply with, or to perform its obligations under, this Agreement and such failure results in the Losses.

(b)    Bank covenants and agrees to indemnify and hold harmless Program Manager and its parents, subsidiaries and affiliates and their respective officers, directors, members, employees, representatives, shareholders, agents, attorneys and permitted assigns (collectively, the "Program Manager Indemnitees"), from and against any Losses arising out of any lawsuit, action, claim, demand, administrative action, arbitration or other legal proceeding brought or asserted against any Program Manager Indemnitee by a third party as a result of or in connection with: (i) any untrue or inaccurate representation or warranty set forth herein made by Bank under or pursuant to this Agreement, or any failure on the part of Bank or any of its contractors, agents or representatives (other than Program Manager or any of Program Manager Contractor) to perform or comply with any covenant or obligation required to be performed or complied with by Bank pursuant to this Agreement; (ii) any violation of or noncompliance with Applicable Law by Bank or any of its contractors, agents or representatives (excluding Program Manager and Program Manager Contractors); (iii) an act of fraud, embezzlement, or criminal activity by Bank or its agents or representatives (other than Program Manager or Program Manager Contractor); or (iv) the gross negligence or willful misconduct of Bank or its, agents or representatives (other than Program Manager or any of its Program Manager Contractor) in connection with Bank's performance of its obligations under this Agreement; provided, however, that in no event shall any Program Manager Indemnitees be entitled to be indemnified for any Losses pursuant to this Section 34(b) to the extent that such Losses arise out of (A) an act of fraud, embezzlement or criminal activity by such Program Manager Indemnitees or Program Manager Contractor, (B) the gross negligence, willful misconduct or bad

faith by such Program Manager Indemnitees or Program Manager Contractor, or (C) the failure of such Program Manager Indemnitees or Program Manager Contractor to comply with, or to perform its obligations under, this Agreement.

(c)     Program Manager Indemnitees and Bank Indemnitee Parties are sometimes referred to herein as the "Indemnified Parties", and Program Manager or Bank, as indemnitor hereunder, is sometimes referred to herein as the "Indemnifying Party". Any Indemnified Party seeking indemnification hereunder shall promptly notify the Indemnifying Party, in writing, of any notice of the assertion by any third party of any claim or of the commencement by any third party of any legal or regulatory proceeding, arbitration or action, or if the Indemnified Party determines the existence of any such claim or the commencement by any third party of any such legal or regulatory proceeding, arbitration or action, whether or not the same shall have been asserted or initiated, in any case with respect to which the Indemnifying Party is or may be obligated to provide indemnification (an "Indemnifiable Claim"), specifying in reasonable detail the nature of the Losses, and, if known, the amount, or an estimate of the amount, of the Losses, provided that failure to promptly give such notice shall only limit the liability of the Indemnifying Party to the extent of the actual prejudice, if any, suffered by such Indemnifying Party as a result of such failure. The Indemnified Party shall provide to the Indemnifying Party as promptly as practicable thereafter information and documentation reasonably requested by such Indemnifying Party to defend against the claim asserted. The Indemnifying Party shall have thirty (30) days after receipt of any notification of an Indemnifiable Claim (a "Claim Notice") to undertake, conduct and control, through counsel of its own choosing, and at its own expense, the settlement or defense thereof and the Indemnified Party shall cooperate with the Indemnifying Party in connection therewith if such cooperation is so requested and the request is reasonable; provided that the Indemnifying Party shall hold the Indemnified Party harmless from all its out-of-pocket expenses, including reasonable attorneys' fees incurred in connection with the Indemnified Party's cooperation. If the Indemnifying Party assumes responsibility for the settlement or defense of any such claim, (i) the Indemnifying Party shall permit the Indemnified Party to participate in such settlement or defense through counsel chosen by the Indemnified Party (subject to the consent of the Indemnifying Party, which consent shall not be unreasonably withheld); provided that, other than in the event of a conflict of interest requiring the retention of separate counsel, the fees and expenses of such counsel shall not be borne by the Indemnifying Party; and (ii) the Indemnifying Party shall not settle any Indemnifiable Claim without the Indemnified Party's consent, which involves anything other than the payment of money, including any admission by the Indemnified Party. So long as the Indemnifying Party is vigorously contesting any such Indemnifiable Claim in good faith, the Indemnified Party shall not pay or settle such claim without the Indemnifying Party's consent. If the Indemnifying Party does not notify the Indemnified Party within thirty (30) days after receipt of the Claim Notice that it elects to undertake the defense of the Indemnifiable Claim described therein, or if the Indemnifying Party fails to contest vigorously any such Indemnifiable Claim, the Indemnified Party shall have the right, upon notice to the Indemnifying Party, to contest, settle or compromise the Indemnifiable Claim in the exercise of its reasonable discretion; provided that the Indemnified Party shall notify the Indemnifying Party of any compromise or settlement of any such Indemnifiable Claim. No action taken by the Indemnified Party pursuant to this Section 34(c) shall deprive the Indemnified Party of its rights to indemnification pursuant to this Section 34 ("Indemnification").

35.     **Relationship of the Parties**.  It is understood that both Parties hereto are independent contractors and engage in the operation of their own respective businesses and in performing their respective obligations hereunder.  Each Party shall be fully responsible for its own employees, servants and agents, and the employees, servants, and agents of one Party shall not be deemed to be employees, servants, and agents of the other Party for any purpose whatsoever. Nothing in this Agreement or in the working relationship being established and developed hereunder shall be deemed, nor shall it cause, Bank and Program Manager to be treated as partners, joint venturers, or otherwise as joint associates for profit. Notwithstanding the foregoing, to the extent required by Applicable Law, Bank's appointment of Program Manager as Bank's authorized representative will establish an agency relationship, limited strictly to the rights, duties and obligations as set forth herein.

36.     **Insurance**.

(a)     Program Manager shall procure, pay for, and maintain the minimum insurance coverage set forth below for the entire Term of this Agreement.  All insurance coverage is subject to the approval of Bank and shall be issued by a fiscally sound insurance carrier which maintains an A.M. Best Rating of A- VII or better.

(i)     Workers' Compensation insurance providing coverage pursuant to statutory requirements.

(ii)    Commercial General Liability insurance with Completed Product and Operations covering bodily injury, property damage, and including contractual liability coverage with a combined limit of $1,000,000 per occurrence and $2,000,000 general aggregate.  The Commercial General Liability insurance policy shall name Bank as additional insured but solely as it relates to insurable losses and expenses that result from Program Manager's activities in the servicing of the Program(s).  Such policy shall contain a waiver of subrogation in favor of Bank.

(iii)   Commercial Umbrella Liability insurance with per occurrence and aggregate limits of $3,000,000 with the liability insurance required under clauses (i) and (ii) above scheduled as underlying. This insurance policy shall name Bank as additional insured but solely as it relates to insurable losses and expenses that result from Program Manager's activities in the servicing of the Program(s).  Such policy shall contain a waiver of subrogation in favor of Bank.

(iv)   Commercial Crime insurance covering Employee Theft and Computer Fraud with limits of $2,000,000 per loss for loss or damage arising out of fraudulent or dishonest acts committed by the employees of Program Manager, acting alone or in collusion with others, including the property and funds of others in their possession, care, custody or control.  This insurance policy shall name Bank as additional insured but solely as it relates to insurable losses and expenses that result from Program Manager's activities in the servicing of the Program(s).  Such policy shall contain a waiver of subrogation in favor of Bank.

(v)   Technology Errors and Omissions Liability and cybersecurity insurance in the amount of $2,000,000 per claim and aggregate.  This insurance policy shall name Bank as additional insured but solely as it relates to insurable losses and expenses that result from Program Manager's activities in the servicing of the Program(s).  Such policy shall contain a waiver of subrogation in favor of Bank.

(b)   In the event Critical Subcontractor stores, transmits or processes End User Information, Program Manager shall maintain (and regardless shall require each Critical Subcontract to maintain) throughout the term of this Agreement, an appropriate data security insurance policy in the name of Program Manager (or any Critical Subcontractor) and naming Bank as a loss payee, in the case of Program Manager or any processor, the limit of which shall be no less than five million dollars ($5,000,000) per occurrence or ten million ($10,000,000) aggregate and, in the case of a Critical Subcontractor other than a processor, no less than two million ($2,000,000) per occurrence and five million dollars ($5,000,000) aggregate, providing coverage in the event of loss of confidential data by Program Manager (or any Critical Subcontractor), including:

(i)   Theft, dissemination and/or unauthorized disclosure or use of Confidential Information and/or End User Information (including, but not limited to, account information, social security numbers, and confidential corporation information).  Such insurance shall also include coverage for credit monitoring, notification expenses and other related costs associated with mitigating a data security or privacy breach; and

(ii)   introduction of a computer virus into, or otherwise causing damage to, a computer, computer system, network or similar computer-related property and the data, software and programs used thereon.

(iii)   This insurance policy shall name Bank as additional insured but solely as it relates to insurable losses and expenses that result from Program Manager's activities in the servicing of the Program(s).  Such policy shall contain a waiver of subrogation in favor of Bank.

(c)   Program Manager must furnish Bank with certificates of insurance as evidence of the above insurance requirements prior to commencement of operations under this Agreement.  Such certificates shall verify that Bank is named as additional insured and the waiver of subrogation in favor of Bank under the policies designated above, and that in the event of a cancellation or material change in coverage, Bank would be given thirty (30) days prior written notice.  In the event Program Manager receives notice of cancellation for any of the required policies, Program Manager shall use commercially reasonable efforts to provide at least thirty (30) days prior notice of such event to Bank, unless the required coverage is immediately replaced by similar coverage in scope and limits.  Failure of Program Manager to provide or of Bank to request a certificate of insurance shall not waive Program Manager's obligation under this Agreement to maintain the insurance required herein.  In the event Program Manager fails to maintain the insurance set forth herein Bank shall have the right to terminate this Agreement immediately upon written notice. The policies set forth under this Section 36 ("Insurance") must not include exclusions that would adversely affect coverage regarding any of the obligations of Program Manager hereunder.

37.   **Non-Exclusive Agreement**. Bank and Program Manager agree that this Agreement is not intended to create an exclusive relationship of any type between Bank and Program Manager.  Bank and Program Manager may each enter into similar arrangements with one or more third parties.

38.   **Successor; Third Parties Beneficiaries.**  Except as limited by Section 40 ("Assignment") of this Agreement, the rights hereunder shall bind and inure to the benefit of the Parties and their successors and permitted assigns.  Except as may be expressly provided or incorporated by reference herein, including, without limitation, the indemnification provisions hereof, no provision of this Agreement is intended, nor shall it be interpreted, to provide, confer or create any third party beneficiary rights or any other rights of any kind in any Person. Without limiting the foregoing and for avoidance of doubt, no Subcontractor or End User is a third-party beneficiary of, or has any right under, this Agreement.

39.    **Severability**. If any provision of this Agreement is held to be illegal, invalid or unenforceable under present or future laws, (i) such provision shall be fully severable; (ii) this Agreement shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a portion of this Agreement; and (iii) the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance from this Agreement; provided, in lieu of such illegal, invalid or unenforceable provision there shall be added automatically as part of this Agreement a provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible and be legal, valid and enforceable.

40.    **Assignment**. Except as provided in Section 29 (j) ("Transition and Wind Down"), Program Manager may not assign or transfer any interest under this Agreement (including a transfer by a Change in Control) without the prior written consent of Bank, such consent not to be unreasonably withheld; provided, however, such consent may be conditioned on Bank's underwriting guidelines, satisfactory due diligence of any assignee and future reviews.

41.    **Non-Solicitation**. Program Manager agrees not to solicit or hire Bank's employees for employment during the Term of this Agreement and for one (1) year following any termination or expiration of this Agreement. Any violation of this Section 41 ("Non-Solicitation") is a material breach of this Agreement that will give Bank the right to terminate this Agreement without liability. However, Program Manager shall not be in violation of the foregoing sentence in circumstances where Bank's employee responds to a general solicitation for employment, Bank's employee directly contacts Program Manager or one of its affiliates, subsidiaries, or a recruiter, employment agency or any entity hired by the prospective employee refers Bank's employee to Program Manager or one of its affiliates or subsidiaries. Program Manager shall ensure compliance of its Program Manager Subcontractors, employees, representatives, agents, affiliates or subsidiaries with this section 41 ("Non-Solicitation").

42.    **Cooperation**. Each Party hereto agrees to cooperate with the other Party hereto in furnishing any information or performing any action reasonably requested by such Party that is needed by the requesting Party to perform its obligations under this Agreement or to comply with Applicable Law or any request from a Regulatory Authority.

43.    **Governing Law; Waiver of Jury Trial; Dispute Resolution and Arbitration**.

     (a)    This Agreement shall be governed by and construed in accordance with the laws of the State of Tennessee, without giving effect to any choice of law or conflict of law provisions. Each Party hereby submits to the jurisdiction of the courts of Tennessee, and (subject to Bank's reservation of preemption rights herein).

     (b)    TO THE EXTENT PERMITTED BY APPLICABLE LAW, THE PARTIES HEREBY EXPRESSLY WAIVE ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING HEREUNDER.

     (c)    Dispute Resolution and Arbitration.

         (i)    Cooperation to Resolve Disputes. The Parties shall cooperate and attempt in good faith to resolve any dispute, controversy, or claim arising out of or relating to this Agreement or the construction, interpretation, performance, breach, termination, enforceability or validity thereof (a "Dispute") promptly by negotiating between persons who have authority to settle the Dispute and who are at a higher level of management than the persons with direct responsibility for administration and performance of the provisions or obligations of this Agreement that are the subject of the Dispute.

         (ii)    Arbitration. Any Dispute which cannot otherwise be resolved as provided in subsection (i) above after the Parties have negotiated the resolution of the Dispute for at least fifteen (15) Business Days shall be resolved by arbitration conducted in accordance with the commercial arbitration rules of the American Arbitration Association ("AAA"), and judgment upon the award rendered by the arbitral tribunal may be entered in any court having jurisdiction thereof. The arbitration tribunal shall consist of a panel of single arbitrator, designated by mutual agreement of the Parties and absent such agreement within thirty (30) days from the date the Dispute was referred to AAA, then by AAA, unless a Party's demand is $35,000 or more or the resolution of any Dispute may result in a judgement of $35,000 or more, in which case, the panel shall consist of three (3) arbitrators mutually agreed upon by the Parties as follows: each Party shall select one arbitrator who shall be independent and unaffiliated with such Party, and the two arbitrators shall then select the third arbitrator. If the two arbitrators are unable to agree upon the third arbitrator, then AAA shall select the third arbitrator. All arbitrators, whether a single arbitrator or a panel of arbitrators, shall be knowledgeable about financial services and/or information technology transactions. The place of arbitration shall be Memphis, Tennessee, unless the Parties shall have agreed to another location within fifteen (15) days from the first referral of the Dispute to the AAA. The arbitral award shall be final and binding. The Parties waive any right to appeal the arbitral award, to the extent a right to appeal may be lawfully waived. Each Party shall bear its own fees, costs and expenses of the arbitration, and its own legal expenses, attorneys' fees, and costs of all experts and witnesses, provided, however, that the arbitrators may aware arbitration costs, including legal, auditing and other fees to the prevailing Party

in the arbitration proceeding if the arbitrators determine that such an award is appropriate. Each Party retains the right to seek judicial assistance: (1) to compel arbitration, (2) to obtain interim measures of protection prior to or pending arbitration, (3) to seek injunctive relief in the courts of any jurisdiction as may be necessary and appropriate to protect the unauthorized disclosure of its proprietary or Confidential Information, and (4) to enforce any decision of the arbitrators, including the final award.  In no event shall either Party be entitled to punitive, exemplary, or similar damages.

    (iii)    <u>Confidentiality of Proceedings</u>. The arbitration proceedings contemplated by this subsection shall be as confidential and private as permitted by Applicable Law. To that end, the Parties shall not disclose the existence, content or results of any proceedings conducted in accordance with this subsection, and materials submitted in connection with such proceedings shall not be admissible in any other proceeding, provided, however, that this confidentiality provision shall not prevent a petition to vacate or enforce an arbitral award, and shall not bar disclosures required by any laws or regulations.

44.    <u>**Agreement Subject to Applicable Law**</u>.  If (a) either Party has been advised by legal counsel in a written legal memorandum of a change in Applicable Law or any judicial decision of a court having jurisdiction over such Party or any interpretation of a Regulatory Authority that, in the view of such legal counsel, would have a materially adverse effect on a Program, the rights or obligations of such Party under this Agreement or the financial condition of such Party; (b) either Party shall receive a lawful written request of any Regulatory Authority having jurisdiction over such Party, including any letter or directive of any kind from any such Regulatory Authority, that prohibits or restricts such Party from carrying out its obligations under this Agreement; (c) either Party has been advised by legal counsel in a written legal memorandum that there is a material risk that such Party's or the other Party's continued performance under this Agreement would violate Applicable Law in any material respect or otherwise possess an unsafe or unsound banking practice; (d) any Regulatory Authority shall have determined and notified either Party that the arrangement between the Parties contemplated by this Agreement constitutes an unsafe or unsound banking practice or is in violation of Applicable Law; or (e) a Regulatory Authority has commenced an investigation or action against a Party which the other Party, in its reasonable judgment, determines that it threatens such Party's ability to perform its obligations under this Agreement, then, in each case, the Parties shall meet and consider in good faith any modifications, changes or additions to the Program(s) and/or this Agreement that may be necessary to eliminate such result. Notwithstanding any other provision of this Agreement, if the Parties, after using best efforts, are unable to reach agreement regarding modifications, changes or additions to the Program or this Agreement within fifteen (15) Business Days after the Parties initially meet, either Party may terminate the impacted Program or this Agreement (provided, (a), (b), (c), (d) or (e) above impact or relate to a majority of the Programs) upon thirty (30) days prior written notice to the other Party and without payment of a termination fee or other penalty. A Party shall be able to suspend performance of its obligations under this Agreement, or require the other Party to suspend its performance of its obligations under this Agreement, if (i) any event described in Section 44 ("Agreement Subject to Applicable Law") above occurs and (ii) such Party reasonably determines that continued performance hereunder may result in a fine, penalty or other sanction being imposed by the applicable Regulatory Authority, or in material civil liability, unless with regards to civil liability, the other Party agrees to indemnify the Party. For the avoidance of doubt, nothing in this Section 44 ("Agreement Subject to Applicable Law") shall obligate a Party to disclose, share, or discuss any information to the extent prohibited by Applicable Law or a Regulatory Authority.

45.    <u>**Amendment and Waiver**</u>. This Agreement may not be modified or amended except by an instrument or instruments in writing signed by the Party against whom enforcement of any such modification or amendment is sought. Neither Party shall be deemed to have waived any of its rights, powers, or remedies hereunder except in writing signed by an authorized agent or representative of the Party to be charged.  Either Party may, by an instrument in writing, waive compliance by the other Party with any term or provision of this Agreement on the part of the other Party to be performed or complied with.  The waiver by either Party of a breach of any term or provision of this Agreement shall not be construed as a waiver of any subsequent breach.

46.    <u>**Entire Agreement**</u>. This Agreement constitutes the entire agreement between the Parties with respect to the subject matter thereof, and supersedes any prior or contemporaneous negotiations or oral or written agreements with regard to the same subject matter.

47.    <u>**Counterparts**</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. This Agreement may be executed and accepted by facsimile or portable data file (PDF) signature and any such signature shall be of the same force and effect as an original signature.

48.    <u>**Interpretation**</u>. The Parties acknowledge that each Party and its counsel have reviewed and revised this Agreement and that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting Party shall not be employed in the interpretation of this Agreement or any amendments thereto, and the same shall be construed neither for nor against either Party, but shall be given a reasonable interpretation in accordance with the plain meaning of its terms and the intent of the Parties. References in this Agreement to any section are to such section of this Agreement. The words "include," "includes" or "including" mean without limitation by reason of enumeration.

49.     **Bank API**. Bank may, in its sole discretion, provide Program Manager access to certain Bank application program interfaces ("API"), subject and pursuant to a separate agreement with Bank and Program Manager (the "API Terms of Use"). Notwithstanding anything to the contrary, Program Manager shall remain liable for performance of its obligations under this Agreement, regardless of its use of Bank's API, and Bank shall not be liable hereunder for any access to Bank's API Bank may provide to Program Manager.

50.     **Sub-Deposit Accounts**.

      (a)      Bank may open one or more custodial accounts ("Sub-Deposit Accounts") within the Bank and will, from time to time, place funds provided by Program Manager or End Users in a Sub-Deposit Account. Program Manager hereby directs Bank, as agent for Program Manager (or End User, where applicable) and at Program Manager's written direction (as set forth herein), to open and maintain in Bank's Trust Department and/or with other financial institutions (each, an "Insured Depository Institution" and collectively, "Insured Depository Institutions") a deposit account or omnibus custody account (individually and collectively, a "Sub-Deposit Account") in the name of Bank (for Program Manager's (or End User's benefit), and to deposit in the Sub-Deposit Account from time to time (at Bank's discretion) all or some moneys Program Manager (or End User) may deliver to Bank from time to time for credit to the Program Manager Account, FBO Account or Deposit Account. The owner of the Sub-Deposit Account is Bank as agent and custodian for Program Manager (or as agent for End User) and ownership will be evidenced by a book entry in records maintained by Bank. Program Manager authorizes (and shall cause End Users to authorize) Bank to act as Program Manager's (or, in the case of an End User or End User's) agent with respect to establishing, maintaining and administering the Sub-Deposit Account, and Program Manager authorizes (and shall cause End Users to authorize) Bank to take any action necessary to establish, maintain and administer the Sub-Deposit Account and to initiate transfers to and from a Sub-Deposit Account, Program Manager Account, Reserve Account, FBO Account or Deposit Account as Bank may determine in its sole discretion. Bank, in its sole discretion, may divide the funds deposited into a Program Manager Account, Reserve Account, FBO Account or Deposit Account into one or more separate Sub-Deposit Accounts to be managed by Bank. As Program Manager's agent (or as the agent for End User, where applicable), Bank will determine the amount of funds to deposit in and withdraw from each Sub-Deposit Account, subject to the terms herein. Program Manager consents (and shall cause any End User to consent) to the assets deposited in the Sub-Deposit Account with the Bank's Trust Department being considered trust assets of the Trust Department. No evidence of ownership related to the Sub-Account will be issued to Program Manager or any End User, and Program Manager (or any End User) will not receive any written confirmation of the establishment of the Sub-Deposit Account or transfer of funds to or from the Sub-Deposit Account. All deposits to a Sub-Deposit Account and withdrawals from a Sub-Deposit Account necessary to satisfy any debits to or withdrawals from a Program Manager Account, Reserve Account, FBO Account or Deposit Account will be made by Bank, as Program Manager's (or, where applicable, as End User's) agent. The depositing of funds into the Sub-Deposit Account will not increase FDIC deposit insurance coverage of any Program Manager Account, Reserve Account, FBO Account or Deposit Account. Program Manager authorizes (and shall cause any End User to authorize) Bank to execute and deliver or file on their respective behalf all appropriate receipts, agreements, releases and other instruments, including whatever agreements may be required to establish and maintain the Sub-Deposit Account or to establish the ownership interest in the Sub-Deposit Account.

      (b)      Notwithstanding anything to the contrary, Program Manager acknowledges and agrees (and shall cause an End User to acknowledge and agree) that the funds deposited in the Program Manager Account, FBO Account or Deposit Account and transferred to the Sub-Deposit Account may be used by Bank and/or each Insured Depository Institution as a source of funding and for investment; provided, however, Bank will only invest such funds in certain securities, equities and debt (e.g., U.S. Treasury Bills, U.S. or state issued or guaranteed securities, corporate bonds, mutual funds, exchange traded funds, etc.) or any other investments or assets permitted by Applicable Law. For the avoidance of doubt and notwithstanding any other provision herein, Bank and each Insured Depository Institution intend to (and Program Manager authorizes (or will cause an End User, where applicable, to authorize) each such party to) use deposits in the Program Account, Reserve Account, FBO Account, Deposit Account and/or Sub-Deposit Account each such party holds to fund current and new businesses, including lending activities and investments, without benefit to such parties (and for such parties' respective benefit). Program Manager acknowledges and agrees (and shall cause an End User to acknowledge and agree) that the Sub-Deposit Account and any investments made by Bank in connection with the Sub-Deposit Account will earn no interest or fees for Program Manager (or, where applicable, an End User), and that Bank may collect any interest, investment returns and/or fees in connection with a Sub-Deposit Account or any investment contemplated herein for the exclusive benefit and account of Bank and/or Insured Depository Institutions (if applicable). However, the funds deposited with Bank in a Program Manager Account, Reserve Account, FBO Account or Deposit Account will be made available to Program Manager (or, where applicable, End User) in accordance with this Agreement (and regardless of the performance of any of our loans or investments, subject to FDIC insurance limitations. Program Manager further acknowledges and agrees (and shall cause End User, where applicable) to further acknowledge and agree) that the income that Bank and/or an Insured Depository Institution earn through their respective lending and investing activities may be greater than the interest earned by Program Manager (or End User, where applicable) pursuant to an Bank Services Agreement or other account agreement (if any), that Bank and Insured Depository Institutions may also receive

other financial benefits in connection with the funds in a Sub-Deposit Account. Bank's placement of funds in the Sub-Deposit Account may reflect considerations of federal and state law, Bank's funding needs and funding needs of Insured Depository Institutions, general economic conditions or other factors determined by Bank in its sole discretion. Bank may place funds to enhance its business objectives and for balance sheet management purposes without any benefit to Program Manager (or any End User). Bank is under no obligation to place any funds hereunder with an Insured Depository Institution. Subject to applicable law, Program Manager's (or End User's) only rights with respect to the Sub-Deposit Account are to demand that Bank repay such party all amounts in such party's Program Manager Account, Reserve Account, FBO Account or Deposit Account that were deposited with Bank, including those transferred to the Sub-Deposit Account from a Program Manager Account, Reserve Account, FBO Account or Deposit Account. The Sub-Deposit Account may not be transferred to another institution, except by Bank or the Insured Depository Institution. Program Manager may (or may on behalf of an End User) terminate our role as such party's agent hereunder by providing Bank with thirty (30) days' prior written notice, such notice to be sent to Bank at the address provided in Section 52 ("Notices"). Any termination will result in a return of funds in accordance with law and closing of the applicable Program Manager Account, Reserve Account, FBO Account and any Sub-Deposit Account opened specifically for Program Manager, End User or any account opened for the benefit of such parties. Each Sub-Deposit Account at each Insured Depository Institution constitutes an obligation of the Insured Depository Institution and is not directly or indirectly an obligation of Bank. Program Manager can obtain publicly available financial information concerning each Insured Depository Institution at www.ffiec.gov/nicpubweb/nicweb/nichome.aspx or by contacting the FDIC Public Information Center by mail at 3501 North Fairfax Drive, Arlington, VA 22226, or by phone at 1-877-275-3342. Bank does not guarantee in any way the financial condition of an Insured Depository Institution or the accuracy of any publicly available financial information concerning an Insured Depository Institution. Bank may provide Program Manager's (or, where applicable, an End User's) tax identification number and other pertinent identifying information to Insured Depository Institution, and other parties providing services in connection with the placement of your funds and the establishing and holding the Sub-Deposit Account. Although there are two or more accounts associated with Program Manager's funds (or the funds of an End User), the applicable account is treated as a single account with the Sub-Deposit Account for reporting deposits and withdrawals, as well as for tax reporting, balance requirement, service charges, and monthly statements (which will reflect the total balance in the Program Manager Account, Reserve Account, FBO Account, Deposit Account and each Sub-Deposit Account, excluding any interest or amounts owed or belonging to Bank or any Insured Depository Institution). The existence of the Sub-Deposit Account will not change the manner in which Program Manager (or an End User) uses, obtains information about or earns interest (if any) on the applicable deposit account. Transfers to and from the Sub-Deposit Account will not appear on any monthly statement.

51.     **Headings**. Captions and headings in this Agreement are for convenience only and are not to be deemed part of this Agreement and shall not affect the meaning or interpretation of any provision of this Agreement.

52.     **Notices**. All notices and other communications that are required or may be given in connection with this Agreement shall be in writing and shall be deemed received (a) on the day delivered, if delivered by hand; (b) on the day transmitted, if transmitted by facsimile or e-mail with receipt confirmed; or (c) three (3) Business Days after the date of mailing to the other Party, if mailed first-class postage prepaid, at the address at the address set forth in this Section 52 ("Notice") or such other address as either Party shall specify in a notice to the other. Notices under this Agreement shall be delivered pursuant to this Section 52 ("Notices") and addressed as set forth below:

To Bank:                                      To Program Manager:
Evolve Bank & Trust                           [Insert Program Manager Name]
6070 Poplar Avenue, Ste 100                   [Insert Address]
Memphis, TN 38119                             [Insert City, State and Zip Code]
Attn: Legal Department                        Attn: [Insert Name]
Email: legal@getevolved.com                   Email:[Insert Email]

53.     **Referrals**. Neither Party has agreed to pay any fee or commission to any agent, broker, finder, or other Person for or on account of such Person's services rendered in connection with this Agreement that would give rise to any valid claim against the other Party for any commission, finder's fee or like payment.

[*Intentionally left blank; signature page follows*]

**IN WITNESS WHEREOF**, this Agreement is executed by the Parties' authorized officers or representatives and shall be effective as of the Effective Date.

<u>**PROGRAM MANAGER:**</u>

**West Realm Shires Services Inc.**

By: _Sam Bankman-Fried_
      <sub>8720A08115904B9...</sub>

Name:   Sam Bankman-Fried

Title:   CEO

Date:   12/23/2021

<u>**BANK:**</u>

**EVOLVE BANK & TRUST**

By: _____

Name: _____

Title _____

Date: _____

**SCHEDULE A**

**DEFINITIONS**

"<u>Affiliate</u>" means, with respect to a Party, a Person, whether a legal entity or an individual, who directly or indirectly controls, is controlled by or is under common control with the Party. For the purpose of this definition, the term "control" (including with correlative meanings, the terms controlling, the terms controlling, controlled by and under common control with) means the power to direct the management or policies of such Person, directly or indirectly, through the ownership of twenty-five percent (25%) or more of a class of voting securities of such Person.

"<u>Aggregated De-identified Data</u>" means End User Information and/or any other information about a Person aggregated by Program Manager with other data and anonymized such that the resulting data does not contain any information identifiable or attributable to Bank or any Person, is otherwise incapable of being associated with or linked to a Person by any Person and is not capable of being back-derived by an expert in the field using industry knowledge and available data-analytic tools and techniques.

"<u>Agreement</u>" means this Master Bank Services Agreement and all policies, schedules, addendums, and exhibits referenced herein.

"<u>Applicable Law</u>" means any federal, foreign, provincial, state and local laws, statutes, rules, regulations, executive orders, supervisory requirements or guidance, directives, interpretive letters and other official releases of any Regulatory Authority, Supervisory Objection, judicial or administrative interpretations, Network Rules, including PCI DSS (to the extent any Card is issued to an End User in connection with a Bank Service), and any rules or requirements established by a Regulatory Authority, in each case as amended, consolidated, supplemented or replaced from time to time, that are related to, or otherwise applicable, to this Agreement, the Bank Services, the Program Manager Services, Bank, any Program and/or the services to be provided by a Party hereunder.

"<u>Applicant</u>" means a Person who submits an Application for a Bank Service.

"<u>Application</u>" means the action or document by which a Person requests and applies for a Bank Service.

"<u>Application Processing</u>" means those services necessary to establish and provide Bank Services in accordance with Applicable Law. Such services shall include, but are not limited to: application of the Account Opening Policy, Bank Policies and Compliance Policies to incoming Applications, Office of Foreign Assets Control screening, services to comply with know your customer and anti-money laundering requirements, customer service, statement preparation and issuance, regulatory compliance, security and fraud control, and activity reporting.

"<u>Approval</u>" or "<u>approval</u>" means Bank's approval or consent; provided, however, that the fact that Bank has provided such approval or consent shall not mean or otherwise be construed to mean that: (i) Bank has performed any due diligence with respect to the requested or required approval or consent; (ii) Bank agrees that the item or information for which approval or consent is being sought complies with any Applicable Law, Bank Policy or Compliance Policy; (iii) Bank has assumed Program Manager's or any other Person's obligations to comply with all Applicable Laws, Bank Policies or Compliance Policies arising from or related to any requested or required approval or consent; or (iv) any approval or consent impairs in any way Bank's rights or remedies under this Agreement, including indemnification rights, for the failure of Program Manager to comply with all Applicable Laws or the terms and conditions of this Agreement. Without limiting the foregoing, any approval provided by Bank under this Agreement is solely for exercising oversight over the Program(s) and Program Manager and no approval constitutes a waiver of any provision if this Agreement or a warranty as to compliance of the matters or materials being approved with Applicable Law, Bank Policies or Compliance Policies or as to the accuracy and completeness of such matters or materials.

"<u>Bank Policy</u>" or "<u>Bank Policies</u>" means the policies and procedures, guidelines, user guides, Service Level Standards (where applicable), prohibited and restricted business lists, or any other writing governing Bank Services or the Program(s), including the minimum requirements necessary to provide and service a Bank Service, as provided to Program Manager by Bank from time to time.

"<u>Bank Service</u>" or "<u>Bank Services</u>" means all financial products and services offered by Bank in connection with a Program pursuant to this Agreement. Bank Services may include, if approved by Bank in connection with a Program, establishing, offering and maintaining Deposit Accounts, Check Services, Origination Services, Wire Services, Debit Card Services, Prepaid Card Services, Customer Care Services and certain bill pay services. Notwithstanding anything to the contrary, Bank Services shall not include any extension of credit of any kind or in any amount.

"<u>Bank Services Agreement</u>" means the agreement between End User and Bank governing the Bank Services.

"<u>Business Day</u>" means Monday through Friday, excluding federal banking holidays.

"Card" means any debit card, prepaid card or account access device or number issued by Bank under a Program under this Agreement that may be used to access funds or access funds on Deposit in a Deposit Account or the FBO Account or with Bank.

"Change in Control" means any of (a) the sale or transfer of all or substantially all the assets of a Party to a Person who is not an Affiliate of such Party; (b) as to Program Manager, (i) the acquisition by a Person or group of Persons of more than twenty-five percent (25%) of the voting securities or voting interests in Program Manager; (ii) the acquisition or accumulation by any Person or group of Persons of the power, direct or indirect, to elect a majority of a Program Manager's board of directors or similar governing body or to direct or cause the direction of the management and policies of Program Manager, whether by contract or otherwise; or (iii) the merger or consolidation of Program Manager with or into another Person who is not an Affiliate of Program Manager, or the merger or consolidation of another Person who is not an Affiliate of Program Manager with or into Program Manager, in either case with the effect that, following such merger or consolidation, more than twenty five percent (25%) of the voting power of all securities or interests of the surviving entity are not owned, directly or indirectly, by Persons who directly or indirectly owned twenty five percent (25%) or more of the voting power of all securities or interests of Program Manager immediately prior to such transaction; and (c) as to Bank, any transfer of ownership or control, including the transfer or issuance of any voting securities of any type (whether debt or equity), that would constitute a Change of Control under the Change in Bank Control Act.

"Check" means any "check," as defined in Regulation CC, Substitute Check (as defined in Regulation CC), Eligible Item or Image, as each term is defined in Schedule E (Check Services), "electronic item" (as defined in Regulation J), or "draft" or "item" (as defined in Uniform Commercial Code, Articles 3 and/or 4), that is drawn on the Deposit Account or any other account maintained at Bank, including checks drawn on an account maintained at Bank to fund bill payments requested by an End User or Program Manager and FBO Account(s).

"Check Services" means the Bank Service that makes available Checks based on an End User's instructions provided to Bank by Program Manager. Check Services may include bill pay services to the extent approved by Bank.

"CIP Vendor" shall mean a Critical Subcontractor approved by Bank to use the BSA/AML/OFAC Program in order to perform CIP Verification Services or, as the case may be, Bank acting as a service provider of Program Manager.

"CIP Verification Services" means the documentary and non-documentary customer identification verification services provided by a CIP Vendor using or applying the BSA/AML/OFAC Program.

"Program Manager Services" or "Services" means the mobile application, ledger recording services (including maintaining accurate ledgers and records related to Bank Services, End Users, Applicants and services related to Deposit Ledger), Application Processing, any services of the Program Manager set forth in this Agreement or in any schedules or exhibits attached to this Agreement, and any applicable amendments thereto, and all services not provided by Bank pursuant to the terms of this Agreement that are otherwise required to maintain and offer the Program(s) (including Bank Services) in compliance with Applicable Law and End User Agreements.

"Compliance Management System" shall mean the process(es) by which Program Manager, under the direction of its board of directors and management, (i) learns about its compliance responsibilities with respect to applicable consumer protection laws and regulations and other Applicable Laws; (ii) assesses applicability and risk for Program Manager as to these compliance requirements; (iii) provides training to Program Manager employees to understand these compliance responsibilities; (iv) reviews Program Manager operations in light of the same; (v) incorporates these requirements into Program Manager's business processes; and (vi) takes corrective action as necessary. The Compliance Management System shall include all Compliance Policies required hereunder.

"Compliance Policy" or "Compliance Policies" means the policies developed by Program Manager, and approved by Bank, designed to ensure compliance of each Program with Applicable Law and Bank Policies. The following are examples of the regulations and/or subjects that such Compliance Policies shall address: Bank Secrecy Act (BSA)/Anti-Money Laundering (AML)/ Office of Foreign Assets Control ("OFAC"); Business Resumption/Contingency Planning & Testing, Change Management; Complaint Management; Compliance Management; E-Sign; Gramm-Leach-Bliley Act and implementing regulations promulgated thereunder, including the standards for safeguarding customer information or End User Information as set forth in 12 CFR 364 and 16 CFR 314, Interagency Guidelines Establishing Information Security Standards, all as they may be amended, supplemented and/or interpreted in writing from time to time by any Regulatory Authority ("GLBA"); Unfair, Deceptive and Abusive Acts and Practices (UDAAP); Reg V-Fair Credit Reporting Act (FCRA), Reg E-Electronic Fund Transfer Act; Unlawful Internet Gambling Enforcement Act of 2006 (UIGEA) and implementing regulation, Regulation GG; Right to Financial Privacy; Servicemembers Civil Relief Act; Military Lending Act; Telephone Consumer Protection Act (TCPA); and Fair and Accurate Credit Transactions Act and Identity Theft Red Flags and Address Discrepancies Rules ("Red Flags Rule"). The Compliance Policies shall also include the vendor management policy.

"Confidential Information" means the terms of this Agreement and any schedules exhibits, attachments, or amendments hereto and any proprietary information or non-public information of a Party, including without limitation a Party's trade secrets, technical data, pricing, know-how or business information, proprietary marketing plans and objectives, and, with respect to the Confidential Information of a Party, any proprietary custom model used by such Party in connection with the Program(s) or Bank Service, the

objectives of any Program, the financial results of any Program, any marketing plan for any Program or Bank Service and any marketing materials for any Program or Bank Service which are not publicly available; any and all deliverables, materials, software, flowcharts, ideas, concepts, designs, and reports or other analyses which relate thereto, including any modifications, enhancements or derivative works thereof, that is furnished to the other Party in connection with this Agreement. Each Party agrees that the existence of this Agreement, and pricing and other business terms offered to the other Party constitutes Confidential Information of Bank, and Program Manager agrees that End User Information constitutes Confidential Information of Bank. Except for End User Information, Confidential Information shall not include information which (i) is already rightfully known by the Restricted Party at the time it obtains the Confidential Information from the Disclosing Party; (ii) is or becomes generally available to the public other than as a result of disclosure in breach of this Agreement or any other confidentiality obligations; (iii) was or is in the possession of the Restricted Party prior to receipt from the Disclosing Party and was not acquired by the Restricted Party from the Disclosing Party under an obligation of confidentiality or nonuse; (iv) is lawfully received or acquired by the Restricted Party, on a non-confidential basis, from a third party authorized to disclose such information without restriction and without breach of this Agreement; (v) is contained in, or is capable of being discovered through examination of publicly available records or materials; or (vi) is independently developed by the Restricted Party without use of any proprietary, non-public, Confidential Information of the Disclosing Party.

"Critical Subcontractor" means any Person with which Program Manager has a direct contractual relationship whereby such entity fulfills some, any or all of Program Manager's obligations under this Agreement (a "Subcontractor") which (i) has access to unencrypted End User Information; (ii) has access to, stores, transmits or processes unencrypted End User Information; (iii) has access to encrypted End User Information and the ability to decrypt it; (iv) otherwise provides, on behalf of Program Manager, services to Applicants or End Users otherwise required of Program Manager under this Agreement; (v) provides functions or conducts other activities that could cause Bank to face significant risk if the third party fails to meet expectations; (vi) requires significant Bank investment in resources to implement the third-party relationship and manage the risk; (vii) could have a material impact on Bank operations if the Bank or Program Manager has to find an alternate third party or if the outsourced activity was to be brought in-house; (viii) may have a have an adverse impact on Bank's reputation if it fails to perform services it is required to perform on behalf of Program Manager; or (viii) is otherwise designated as a Critical Subcontractor by Bank in its sole discretion.

"Dashboard" means the online platform created and maintained by Program Manager for Bank through which Bank may view and access all information related to the Program(s), including information concerning Bank Services, Critical Subcontractors, End Users, Deposits, and transactions related to the Program(s), and any other services or view other information as set forth in this Agreement or required by Bank from time-to-time.

"Deposit Account" means a transaction account provided to an End User by Bank or any other account established by Bank for an End User in connection with a Program under this Agreement.

"Deposit Ledger" means the ledger record of all Deposit Accounts and FBO Account, as applicable, and transactions related to Bank Services in accordance with the terms herein and Bank's instructions. Deposit Ledger shall include all Deposit information, including amounts deposited and any withdrawals, and the owner(s) of the Deposits, including all indemnifying information required by Bank, including, but not limited to name and tax identification number.

"Deposits" means generally an unpaid balance of money received or held by Bank for the benefit of End Users in the Deposit Account or FBO Account(s), as further defined by 12 U.S.C. 1813(l) as amended and FDIC rules.

"Disclosure Materials" means any disclosures, documents, notices and statements, including periodic Bank Service statements, terms and agreements, including End User agreements and Bank Services Agreement, necessary and proper to administer the Program(s) and/or Bank Services in compliance with Applicable Law and to ensure each Deposit, transaction related to the Program(s) and Program(s) (including related Bank Services) is offered and operated in accordance with Applicable Laws and this Agreement. Disclosure Materials shall also include any documents required to be delivered by Applicable Law to an Applicant or End User in connection with Bank Services, applicable disclosures to address UDAAP (Unfair, Deceptive, or Abusive Acts or Practices) concerns related to Program Manager Services and/or Bank Services, privacy policies, notices required to be provided to Applicants who do not meet the eligibility criteria to access or receive a Bank Services, and any other End User agreements, authorizations or notices required for a Party to perform its obligations under this Agreement in compliance with Applicable Law. Applications, Marketing Materials, Program Proposals, Program Criteria, Program Schedules, and any other documentation related to any Program that is used to describe, support or administer a Program and/or Bank Services in compliance with this Agreement or Applicable Law shall also be deemed Disclosure Materials under this Agreement.

"End User" means: (i) the Person to whom Bank issues or provides Bank Services; (ii) any Person who possesses or otherwise uses a Bank Service; or (iii) any Person who purports to be the Person in whose name the Bank Services was issued or whose name or signature appears in connection with a Bank Service as an authorized user.

"End User Information" means all data or information, whether personally identifiable or in aggregate, that is submitted or is provided to or obtained by a Party in connection with the Program or an Application for Bank Services (whether or not completed) (including the servicing, marketing, processing, or administration thereof) or the performance by such Party of the terms and conditions of this Agreement, including but not limited to, lists of End Users, former End Users, prospective End Users, Applicants and all data and information relating to and identified with such End Users, including, but not limited to, "Cardholder Data" as defined under PCI-DSS (to the extent any Card is issued to an End User in connection with a Program), account transaction and

balance data, demographic data, "non-public personal information" and "personal identifiable financial information," as each term is defined by GLBA, postal and e-mail addresses and associated data, personally identifiable information "personal information," as defined by the California Consumer Privacy Act of 2018, or "personally identifiable information," "non-public personal information," "personal data," "personal information" and any other similar terms defined by applicable data protection laws or regulations.

"Entry" or "Entries" has the meaning specified in the NACHA Rules.

"Fees Account" means a demand deposit account used for the purpose of funding and paying fees charged by a Network related to a Program that are owed by Program Manager, including, but not limited to (a) daily settlement fees assessed to Bank; (b) monthly fees such as, but not limited to, file maintenance fees, authorization and settlement services fees and other BIN/ICA fees; (c) quarterly fees assessed to Bank on the quarterly Network report; and (d) any registration and other fees associated to Bank annually, including, but not limited to Program Manager's or Program Manager's Critical Subcontractor's registration as the marketing agent or service provider of Bank and registration of any independent service organization.  If applicable, Program Manager shall fund the Fee Account to ensure it maintains a balance sufficient to cover all fees owed by it pursuant to the terms of this Agreement, including Schedule C (Schedule of Fees and Charges) to this Agreement

"FDIC Insurance" means the insurance of Bank's deposits by the FDIC.

"Force Majeure Event" means an unanticipated event that is not reasonably within the control of the affected Party or its subcontractors (including acts of God, acts of governmental authorities, pandemics or epidemics, as declared by a Regulatory Authority, strikes, war, terrorist attacks, riot and any other causes of such nature), and which by exercise of reasonable due diligence, such affected Party or its subcontractors could not reasonably have been expected to avoid, overcome or obtain, or cause to be obtained, a commercially reasonable substitute therefore.

"In-Process Entries" means the aggregate dollar amount of all credit or debit Entries submitted by Program Manager and in process on any date for which settlement has not occurred with respect to credit Entries, or the applicable period for the return of items has not expired with respect to debit Entries.

"Insolvent" means the failure to pay debts in the ordinary course of business, the inability to pay its debts as they come due or the condition whereby the sum of a Person's debts is greater than the sum of its assets.

"Intellectual Property" means (i) inventions, improvements, patents (including all reissues, continuations, continuations-in-part, revisions, extensions, and reexaminations thereof) and patent applications, (ii) trademarks, service marks, trade names and trade dress, together with the goodwill associated therewith, (iii) works of authorship and copyrights, including copyrights in computer software, databases and television programming and all rights related thereto, (iv) confidential and proprietary information, including trade secrets and know how, (v) processes, methods, procedures and materials, (vi) data, databases and information, (vii) software, tools and machine-readable texts and files, (viii) literary work or other work of authorship, including documentation, reports, drawings, charts, graphics, and other written documentation, together with all copyrights and moral rights, (x) any and all tangible or intangible materials developed or derived from a Party's Intellectual Property, including, but not limited to, updates or modifications thereto, (xi) all other intellectual property rights, and (xii) all registrations and applications for registration and other intellectual property rights in or appurtenant to the foregoing items described in clauses (i) through (xii) above.

"Marketing Activities" means all advertising media of any kind or nature, in whole or in part, including without limitation, catalogs, email solicitation messages, published advertising (such as newspaper and magazine advertisements), SMS text messaging, Internet media, blogs, tweet posts, banner ads, RSS feeds, telemarketing scripts, television or radio advertisements, frequently asked questions, promoting, advertising and/or marketing a Program or Bank Service.

"Marketing Materials" means any promotional or marketing materials (whether oral, in print, on the internet, over the phone or in any other medium) related to a Program or otherwise using any Bank Marks, including any categories of marketing messages or materials intended to market the Program or Bank Services or to generate demand for Bank Services delivered through any activity, including Marketing Activities, of Program Manager or its Subcontractors.

"Membership" means collectively Network Membership and Bank's status as a member bank in the FDIC.

"Network" means, individually and collectively, Mastercard International Incorporated and its affiliates, Visa, Inc. and its affiliates, Discover Financial Services, Inc. and its affiliates, Cirrus, Plus, Pulse, MAC, NYCE, SHAZAM, STAR, Accel, SWIFT, National Automated Clearing House Association ("NACHA"), and any other payment network.

"Network Membership" means the membership of Bank in the Network applicable to a Program.

"Network Rules" means any and all rules, bylaws, standards, protocols, operating regulations, guidelines, or procedures, and any amendment, interpretation, or modification of any such rule, bylaw, standard, protocol, operating regulation, guideline, or procedure, promulgated by a Network that govern or apply to Bank Services related to a Program, including, without limitation,

PCI DSS and the rules, bylaws, standards, protocols, operating regulations, guidelines, and procedures of NACHA (the "NACHA Rules") and ECCHO.

"ODFI" has the meaning set forth in the NACHA Rules.

"Operating Account" means a demand deposit account that is used to fund miscellaneous items owed by Program Manager that are not otherwise contemplated by any other Program Manager Account under this Agreement, including but not limited to the Settlement of transactions, including Card transactions (if a Card is issued under this Agreement, chargebacks, returns, refunds, reversals and other similar transactions related to any Program. If an Operating Account is applicable to this Agreement, the balance required for the Operating Account will be further described in Schedule C (Schedule of Fees and Charges) to this Agreement.

"Origination Services" mean Bank's transmission and processing of certain Automated Clearing House ("ACH") Entries as more particularly set forth in this Agreement.

"Originator" shall have the meaning as defined in the NACHA Rules.

"Overlimit Entry" means an Entry in the amount of which would cause the aggregate amount of In-Process Entries to exceed the ACH Exposure Limit.

"PCI DSS" means the Payment Card Industry Data Security Standards administered by the PCI Standards Council that are in effect as of the Effective Date of this Agreement and as they may be amended from time to time.

"Person" means any natural or legal person, including any individual, corporation, partnership, limited liability company, trust or unincorporated association, or other entity.

"Principal" means any Person directly or indirectly owning ten percent (10%) or more of Program Manager, and any executive officer or director of Program Manager.

"Processing Services" means the processing of Card transactions in accordance with Applicable Law, Bank Policies and Compliance Policies.

"Program" means a system of services approved by Bank, including Bank Services, to be offered by Bank to End Users pursuant to the terms of this Agreement and supported by Program Manager pursuant to the terms of this Agreement. Each Program is further described in Schedule B (Program Schedules) of this Agreement, which is incorporated herein by reference and may be amended from time to time by written agreement. This Agreement contemplates that Program Manager may be permitted by Bank to offer multiple Programs (each relating to a specific Bank Service) hereunder, each subject to the terms hereof and the prior written approval of Bank. Each Bank approved Program will be incorporated into Schedule B (Program Schedules).

"Program Manager Reserve Account" means a non-interest bearing demand deposit account established by Bank to fund certain of Program Manager's obligations to Bank.

"Program Schedule" means the terms agreed upon by the Parties in writing describing a Program, as set forth in Schedule B (Program Schedules) and this Agreement.

"Records" means any Bank Service Agreement, Applications, change-of-terms notices, any other agreement, document, End User communication or statement related to a Program, credit bureau reports, copies of notices, transaction data, Deposit Ledgers, customer identification and know your customer information, and any other records or documentation (including computer tapes, magnetic or electronic files, and information in any other format) related to a Bank Service or Program.

"Regulatory Authority" means any Network and any of the following Persons with actual or apparent administrative, executive, judicial, legislative, police, regulatory or taxing authority or power that asserts such authority over this Agreement, a Program, either Party or their Affiliates, or any of their respective Subcontractors: (i) a country, state, county, city, town, borough, village, district or other jurisdiction; (ii) federal, state, local, municipal governmental body; (iii) any agency, branch, department, board, commission, court, tribunal or any other governmental or regulatory authority of any nature; (iv) any official body or self-regulatory body that supervises or otherwise exercise control over any Party; and (v) the Board of Governors of Federal Reserve System, the Consumer Financial Protection Bureau ("CFPB"), FDIC, Federal Trade Commission, the Financial Crimes Enforcement Network ("FinCEN"), Tennessee Department of Financial Institution and Arkansas State Bank Department.

"Remote Deposit Capture Services" or "RDC Services" means the Bank Service that allows End Users to make Deposits of Checks into their Deposit Accounts or FBO Account, as applicable, electronically from remote locations by using a Device (as defined in Schedule I (Remote Deposit Capture Services)) to create an image of the Checks and transmitting such image to Bank for processing, whether as an ACH or Check file.

"<u>Revenue Account</u>" means a non-interest bearing demand deposit account established by Program Manager, in Program Manager's name held at Bank for the purpose of receiving and maintaining from Bank any fees Bank may owe Program Manager pursuant to <u>Schedule C</u> (<u>Schedule of Fees and Charges</u>).

"<u>Security Breach</u>" means (i) any act or omission that materially compromises either the security, confidentiality or integrity of data or the physical, technical, administrative or organizational safeguards put in place by a Party or its third-party service provider (other than Program Manager or its Subcontractors, in the case of Bank) that relate to the protection of the security, confidentiality or integrity of data relating to the Program, including End User Information, or (ii) receipt of a complaint in relation to the privacy and data security practices of a Party or a third-party service provider (other than Program Manager or its Subcontractors, in the case of Bank) of a breach or alleged breach of this Agreement relating to such privacy and data security practices. Without limiting the foregoing, a material compromise shall include any unauthorized access to, unauthorized disclosure of or unauthorized acquisition of End User Information.

"<u>Settlement</u>" or "<u>Settled</u>" means the movement of funds between Bank, other financial institutions, and the Network to settle all transactions initiated by use of any Bank Service by or on behalf of an End User.

"<u>Substantive Change</u>" means a change to the Marketing Activities or the categories of the Marketing Materials; non-administrative or non-ministerial change to the content of any Marketing Materials; or any changes or amendments to Marketing Activities or Marketing Materials required by Applicable Law or by Bank in good faith as necessary due to safety and soundness or reputational concerns.

"<u>Supervisory Objection</u>" means (i) an objection, criticism, or guidance, orally or in writing (including, but not limited to an interpretive letter or official release), raised by a Regulatory Authority having supervisory or regulatory authority over Bank or any Program that expresses the Regulatory Authority's opinion that one or more provisions of this Agreement is likely to constitute or result in a violation of Applicable Law or unsafe or unsound practices, (ii) any cease-and-desist or other similar formal written order of a Regulatory Authority, or (iii) a written directive or requirement by Regulatory Authority to cease or limit performance of material obligations under this Agreement.

"<u>Web Entries</u>" means Entries originating or processed via the WEB, as defined in the NACHA Rules.

"<u>Wire Services</u>" means Bank's services relating to the real-time gross settlement funds transfer system operated by the United States Federal Reserve and/or Bank's services relating to the real-time gross settlement funds international transfer system operated by the Society for Worldwide Interbank Financial Telecommunication ("<u>SWIFT</u>").

**SCHEDULE B**

**PROGRAM SCHEDULES**

**[Insert Spreadsheet of approved Programs]**

**SCHEDULE C**

**SCHEDULE OF FEES AND CHARGES**

## SCHEDULE D

## ORIGINATION SERVICES

If approved by Bank in connection with a Program, Bank will provide Origination Services in accordance with the terms set forth in this <u>Schedule D</u> (Origination Services) and the ACH Guide, and Program Manager shall comply with the terms set forth herein and as set forth in the ACH Guide and this Agreement. Program Manager shall ensure all terms herein related or applicable to or otherwise referencing Program Manager (or its Subcontractor) that may be applicable to Customer are included in the Bank Services Agreement. Notwithstanding anything set forth herein or to the contrary, Program Manager shall only originate (or allow a Customer to originate) or submit to Bank transactions that qualify as WEB Entries or as any other SEC (as defined in the NACHA Rules) code approved by Bank in writing.

(a) **General**.  Bank offers to and Program Manager agrees to use the Origination Services pursuant to the terms herein and in compliance with Applicable Law.  In the event of inconsistency between a provision of Article 4A of the Uniform Commercial Code (the "<u>UCC</u>") and this Agreement, the provisions of this Agreement shall prevail. Program Manager agrees that its ability to originate Entries under this Agreement is subject to: (i) Bank's approval, (ii) receipt by the Bank of all required and properly executed forms, authorizations, and such other information as Bank may reasonably request from time to time in connection with this Agreement, including, without limitation, and (iii) Program Manager's compliance with the terms of this Agreement and all Applicable Laws.  Program Manager shall be responsible for all transactions initiated as an Originator.  Program Manager is prohibited from entering into an ACH origination agreement with any other Originator under this Agreement.

Bank shall make available to Program Manager, from time to time, its policies, procedures and guidelines governing the use of the Origination Services by Program Manager, as may be amended or supplemented from time to time by Bank (the "<u>ACH Guide</u>"). Notwithstanding any terms set forth herein, Program Manager shall comply with, and perform all of its obligations under this Agreement in compliance with the ACH Guide.  If there is a conflict between the ACH Guide and this Agreement, the ACH Guide shall control. The ACH Guide may be amended by Bank by providing Program Manager with prior notice of such amendment.

(b) **Provision of Origination Services**. Bank shall process and settle, in accordance with the provisions of this Agreement, Entries authorized by Customers and provided to Bank by Program Manager. Entries must be submitted to Bank by Program Manager for processing and Settlement in accordance with this Agreement and Bank Policies and procedures governing Third Party Senders (as defined by the NACHA Rules) and Third-Party Service Providers (as defined by the NACHA Rules), as well as any Settlement and cut-off times as set forth in the ACH User Guide. In conveying Entries, payment instructions, and other communications from Customers to Bank, Program Manager is acting as a Third-Party Service Provider.  Entries may be submitted by Program Manager pursuant to this Agreement only to the extent they arise as a result of instructions submitted by a Customer to Bank through Program Manager Services; provided, however, Bank is under no obligation to process an Entry if it believes such Entry is not authorized pursuant to this Agreement, Applicable Laws, Bank Policies, is prohibited by Regulatory Authority or, in Bank's reasonable sole determination, such Entry  creates safety and soundness concerns and/or any other risk concerns of Bank or ACH network. Program Manager may not initiate IAT Entries (as defined by the NACHA Rules) without Bank's prior written consent and without entering into an addendum supplementing this <u>Schedule D</u> (Origination Services) relating to IAT Entries. Program Manager may only submit Entries that are within the Standard Entry Class Codes (as defined by the NACHA Rules) that are approved in writing by Bank.

(c) **Transmittal of Entries by Program Manager**.  Subject to the terms of this Agreement, Program Manager and any Authorized User shall initiate debit or credit Entries hereunder on behalf of the Originator.  Only Authorized Users may initiate debit or credit Entries hereunder on behalf of Program Manager.  Bank shall be entitled to deem any person having knowledge of any Security Procedure, as set forth in <u>Schedule J</u> (Security Procedures), to be an Authorized User.  Program Manager or Authorized User(s) shall transmit or deliver Entries to Bank in computer readable form to the locations(s) specified by Bank and in compliance with the formatting and other requirements set forth in the NACHA file specifications, the ACH Guide or as otherwise specified by Bank.  Entries shall be transmitted to Bank's designated location not later than the time and the number of days prior to the Effective Entry Date (as defined by the NACHA Rules) specified by Bank or as set forth in the ACH Guide (it being understood that, absent any written instructions from Bank, Program Manager shall transmit such Entries in timely manner to allow Bank a reasonable period to process such Entries prior to the Effective Entry Date).  Program Manager acknowledges it has a copy or has access to a copy of the federal holidays schedule; a copy can be obtained from the Federal Reserve.  Entries received after the cut off time shall be deemed to have been received on the next Business Day.  The total dollar amount of Entries transmitted by Program Manager to Bank on any day shall not exceed the limit set forth in ACH Exposure Limit, unless otherwise approved by Bank in writing.  Program Manager must provide Bank secure access to Program Manager's system to view the total credit and debit count and dollar amount of each ACH file transmitted to Bank. Program Manager may not reinitiate Entries except as prescribed by the NACHA Rules.  Program Manager shall ensure Entries submitted to Bank comply with Applicable Law. Prior to such Entry submission, Program Manager shall ensure all debit or credit authorizations have been obtained as required by Applicable Laws. Program Manager agrees to promptly and regularly (throughout the day) review and reconcile all Entries, transactions or other communications submitted and received by Bank and confirm the accuracy of such review and reconciliation for each Entry, transaction or communication submitted and received by Bank.  Subject to Bank's prior approval, Program Manager may contract with third parties for services, but shall nevertheless retain all liabilities of an Originator or Receiver (as defined in the NACHA Rules) as set forth in the NACHA Rules.

(d) **Credit Approval and Limits**. In utilizing the Automated Clearing House Network in performance of this Agreement, Bank must make certain warranties on behalf of Program Manager.  Specifically, Bank is charged with assuring the financial soundness of Program Manager to make the intended Entries.  Program Manager agrees that: (i) the Origination Services and this Agreement are subject to the Bank's assessment and approval of its settlement risk, (ii) that in order to evaluate such risk and for underwriting purposes certain documentation is required from the Program Manager from time to time, and (iii) the Bank shall have the right to reject the application of Program Manager for the Origination Services or continuation of such Origination Services if, in the Bank's judgment, the information provided by Program Manager is not deem satisfactory including, without limitation, for purposes of the Bank's evaluation of its settlement risk. For purposes of this Agreement, "settlement risk" is the risk that a settlement in a transfer system does not take place as expected. Program Manager must submit, upon Bank's request, audited and unaudited financial statements in the form and manner required by Bank. Bank shall also be authorized to obtain a credit report(s) on Program Manager as may be necessary from time to time.  Program Manager agrees that if requested by Bank not more often than once per calendar year, Program Manager will complete a self-assessment of Program Manager operations, management, staff, systems, internal controls, training, and risk management practices that would otherwise be reviewed by Bank in an audit of Program Manager.  Program Manager will provide to Bank a copy of either their SSAE 18 or other independent audit annually.  If Program Manager refuses to provide the requested financial information, or if Bank concludes, in its sole discretion, that the risk of Program Manager is unacceptable or if Program Manager violates this Agreement or Applicable Law, Bank may suspend or terminate the Origination Services and this Agreement, at its election. Bank may also assign Program Manager a limit representing the maximum aggregate dollar amount of Entries (including a maximum amount for each SEC Code), as well as In-Process Entries, that may be initiated by Program Manager each day, month and/or year ("ACH Exposure Limit"). Each Entry limit contemplated by this Agreement applicable to Program Manager is considered an ACH Exposure Limit. Program Manager acknowledges that the ACH Exposure Limit is solely for the protection of Bank and its assets.  Program Manager shall not submit to Bank any Overlimit Entry; provided, however, if Bank receives any Entry from Program Manager that would be considered an Overlimit Entry or that would otherwise cause Program Manager to exceed the ACH Exposure Limit, Bank may, at its sole discretion, honor such Entry.  In addition to the limitations set forth herein, Bank may place additional limits on the amount or the type of Credit Entries or Debit Entries that Program Manager may originate or submit in a file, batch or any single Entry, and may otherwise impose limits as set forth in the ACH Guide. Any limit will be communicated by Bank to Program Manager from time to time and Program Manager hereby agrees to ensure that all Entries originated by Program Manager comply with such limit.  Bank will monitor Entries initiated by Program Manager relative to the ACH Exposure Limit across multiple settlement dates.  Bank may, in its sole discretion, determine to reject any Entry or file that exceeds the ACH Exposure Limit, that Bank reasonably suspects is fraudulent or unauthorized or for any other reason provided for under the terms of this Agreement.  Bank reserves the right to modify each ACH Exposure Limit from time to time at its sole discretion.

(e) **Designation of Representative** Program Manager must designate at least one authorized user (each such designated person, an "Authorized User").  Authorized User(s) shall be responsible for designating other users who Program Manager authorizes to issue Entries on its behalf (each to be considered an Authorized User). Bank shall be entitled to rely on the designations made by the Program Manager's Authorized User(s) and shall not be responsible for matching the names of the Authorized User to names or titles listed in Program Manager's banking resolutions.  Program Manager agrees that any Entries transmitted shall comply with the Security Procedures, which are subject to change without notice to Program Manager.

(f) **Processing, Transmittal and Settlement by Bank**.  Except as provided in Section (g) ("On-Us Entries") and Section (k) ("Rejection of Entries"), Bank shall (i) process Entries received from Program Manager to conform with the file specifications set forth in the NACHA Rules, (ii) transmit such Entries as an ODFI to the ACH Operator by the deposit deadline of the ACH Operator, provided: (x) such Entries are completely received by Bank prior to the Bank's cut-off time at the location specified by Bank to Program Manager from time to time; (y) the Effective Entry Date satisfies the criteria provided by Bank to Program Manager; and (z) the ACH Operator is open for business on such day and such day is a Business Day and (iii) settle for such Entries as provided in the NACHA Rules.  For purposes of this Agreement, Entries shall be deemed received by Bank, in the case of transmittal by tape, when received by Bank, and in the case of electronic transmission, when the transmission (and compliance with any related security procedures provided for herein) is completed to the Bank's systems and network.  If such requirements are not met, Bank shall use reasonable efforts to transmit such Entries to the ACH Operator by the next deadline of the ACH Operator.  Program Manager will hold Bank harmless from all fees and expense that may be incurred by Bank as a result of delivery of any late Entry..

(g) **On-Us Entries**.  Except as provided in Section (k) ("Rejection of Entries"), in the case of an Entry received for credit to an account maintained with Bank ("On-Us Entry"), Bank shall credit the Receiver's account in the amount of such Entry on the Effective Entry Date contained in such Entry or the deadline specified in the ACH Guide, whichever is later, provided the requirements set forth this Agreement are met.

(h) **Consumer Related Entries**.  Entries that are initiated, submitted or transmitted by Program Manager that involve a consumer, Program Manager agrees to comply with all Applicable Laws, including, but not limited to, NACHA Rules, Regulation E and EFTA with regards to all authorizations, disclosures and other requirements

(i) **Provisional Settlement**.  Program Manager shall be bound by and comply with the NACHA Rules as in effect from time to time, including, without limitation, the provision thereof making payment of an Entry by the RDFI to the Receiver provisional until receipt by the RDFI of final settlement for such Entry, and Program Manager acknowledges that it has received notice of

that NACHA Rule and or the fact that, if such settlement is not received, the RDFI shall be entitled to a refund from the Receiver of the amount credited and Program Manager shall not be deemed to have paid the Receiver the amount of the Entry.

(j)  **Refunds for Unauthorized Debit Entries**.  Program Manager acknowledges and agrees that in the event of an unauthorized debit Entry, a consumer Receiver has the right to obtain a refund of the funds debited from the consumer Receiver's account upon the consumer Receiver sending a written notice to its financial institution in accordance with Applicable Law.  In the event of an unauthorized debit Entry involving a corporate Receiver, Program Manager acknowledges and agrees that a corporate Receiver has the right to obtain a refund of the funds debited from the corporate Receiver's account upon the corporate Receiver sending a written notice to its RDFI within two (2) business days following the Settlement Date of the original Entry.  Program Manager hereby indemnifies Bank against any claim arising out of or in connection with any refund by any Receiver.

(k)  **Rejection of Entries**.  Bank may reject any Entry that does not comply with the requirements of this Agreement, ACH Guide or the Security Procedures set forth in Schedule J (Security Procedures) or that contains an effective Entry Date more than two (2) Business Days after the Business Day such entry is received by Bank (or any other applicable period determined by Bank and communicated to Program Manager).  Bank may reject an On-Us Entry for any reason for which an Entry may be returned under the NACHA Rules.  Bank may reject any Entry if Program Manager does not adhere to the Security Procedures, the ACH Guide, this Agreement or Applicable Law.  Bank may reject an Entry if Program Manager has failed to comply with any account balance or prefunding obligations under this Agreement.  Bank may (but is not obligated to) notify Program Manager by email or electronic transmission of such rejection no later than the Business Day such Entry would otherwise have been transmitted by Bank to the ACH Operator or, in the case of an On-Us entry, its Effective Entry Date.  Any notice of a rejected Entry will be effective when given; provided, however, Bank shall have no liability to Program Manager by reason of the rejection of any such Entry or the fact that such notices are not given.  In the event that any Entries are rejected by the ACH Operator for any reason, it shall be the responsibility of Program Manager to remake such Entries.  Should the File be rejected due to an error caused by Bank, Bank shall be responsible for remaking the File.  In such a case, Program Manager will supply sufficient information to allow Bank to recreate the Entries for up to five (5) Business Days after midnight of the Settlement Date.

(l)  **Cancellation or Amendment by Program Manager**.  Program Manager shall have no right to cancel or amend any Entry after its receipt by Bank.  However, if a Program Manager request for cancellation or amendment complies with the procedures for canceling or amending Entry data, Bank shall use reasonable efforts to act upon such a request by Program Manager prior to transmitting the Entry to the ACH Operator or, in the case of an On-Us Entry, prior to crediting or debiting a Receiver's account, but shall have no liability if such cancellation or amendment is not affected.  Program Manager shall reimburse Bank for any expenses, losses or damages Bank may incur in effecting or attempting to affect Program Manager's request for the cancellation or amendment of an Entry.

(m)  **Error Detection**.  Bank has no obligation to discover and shall not be liable to Program Manager for errors made by Program Manager or any other Person, including errors made in identifying the Receiver, or an Intermediary or RDFI, or for errors in the amount of an Entry or for errors in Settlement Dates.  Bank shall likewise have no duty to discover and shall not be liable for duplicate Entries issued by Program Manager.  Notwithstanding the foregoing, if Program Manager discovers that any Entry it has initiated was in error, it shall notify Bank of such error.  In the event that Program Manager makes an error or issues a duplicate Entry, Program Manager shall reimburse Bank for any loss, damages, or expenses, incurred by Bank as result of the error or issuance of duplicate Entries.

(n)  **Prohibited Transactions**.  Program Manager shall not use or attempt to use the Origination Services (i) to engage in any illegal purpose or activity or to violate any Applicable Law; (ii) to breach any contract or agreement by which Program Manager is bound; (iii) to engage in any internet or online gambling transaction, whether or not gambling is legal in any applicable jurisdiction, unless approved by Bank in writing and subject to any instructions provided to Program Manager by Bank; (iv) to engage in any transaction or activity that is not specifically prohibited by this Agreement or ACH Guide or by Bank in writing; or (v) to engage in any activity or business that would result in Program Manager being or becoming a "money service business" as defined in the Bank Secrecy Act and its implementing regulations.  Program Manager acknowledges and agrees that Bank has no obligation to monitor Program Manager's use of the Origination Services for transactions and activity that is impermissible or prohibited under the terms of this Agreement.  Notwithstanding, Bank may decline to execute any transaction or activity that Bank believes violates the terms of this Agreement.  Program Manager shall not initiate any IAT Entries without first receiving Bank's prior written approval.  If approved by Bank in writing, the Program Manager must sign an IAT addendum in a form approved by Bank.

(o)  **Notice of Returned Entries**.  Bank shall notify Program Manager by email or online notification in the form and format as specified in the ACH Guide.  Except for an Entry retransmitted by Program Manager in accordance with the requirements of Section (c) ("Transmittal of Entries by Program Manager"), Bank shall have no obligation to retransmit a returned Entry to the ACH Operator if Bank complied with the terms of this Agreement with respect to the original Entry.  Upon receipt of a return of Debit Entry as unauthorized, disputed or revoked transaction (or any other similar terms), Program Manager will cease transmission of said transactions until a new authorization has been signed by the consumer or until corrections have been made or an authorization has been obtained.  Bank has no obligation to originate an Entry where authorization has been revoked.

(p) **Notifications of Change**. Bank shall notify Program Manager of all Notification of Change ("NOC") Entries received by Bank relating to Entries transmitted by Program Manager in accordance with the ACH Guide. It is the responsibility of Program Manager to make the requested changes within the time period provided for in the ACH Guide or prior to the initiation of the next live Entry, whichever is later with the following exceptions: (i) the Originator may choose, at its discretion, to make the changes specified in any NOC or corrected NOC relating to ARC, BOC, POP, RCK, XCK and single entry TEL or WEB, (ii) in the case of CIE and credit WEB entries, the Program Manager is responsible for making the changes and (iii) for an NOC in response to a Prenotification Entry, the Originator must make the changes prior to originating a subsequent entry if the ODFI receives the NOC by opening of business on the second Business Day following the settlement date of the Prenotification Entry. If the NOC is incorrect, Program Manager will generate a refused NOC and deliver it to Bank. If Program Manager does not comply with the requirements to make changes requested by the NOC, Bank may charge Program Manager for any and all NACHA Rule violations fines resulting from such rule infraction or cease processing Entries until the changes are made.

(q) **Prenotification**. Program Manager, at its option, may send prenotification that it intends to initiate an Entry or Entries to a particular account within the time limits prescribed for such notice in the NACHA Rules. Such notice shall be provided to Bank in the format and on the medium approved by Bank and in compliance with the NACHA Rules. If Program Manager receives notice that such prenotification has been rejected by an RDFI within the prescribed period, or that an RDFI will not receive Entries without having first received a copy of an authorization signed by its customer, Program Manager will not initiate any corresponding Entries to such accounts until the cause for rejection has been corrected or until providing the RDFI with such authorization within the time limits provided by the NACHA Rules.

(r) **Unauthorized Rate in Excess of 0.5%.** In the event the rate of unauthorized returns of Entries submitted by Program Manager exceeds 0.5% based on the calculations noted in the NACHA Rules, Bank will share the data with Program Manager and Program Manager will take immediate steps to revisit its authorization procedures to reduce the unauthorized return rate below 0.5% and shall further promptly prepare and submit a written plan and timeline to Bank noting Program Manager's intended plan to reduce unauthorized returns. Bank will provide reporting information to NACHA regarding Program Manager if Program Manager's return rate for unauthorized Entries exceeds the Unauthorized Entry Return Rate Threshold, the Administrative Return Rate Level or Overall Return Rate Level as required by the NACHA Rules.

(s) **Reversals of Entries or Files**. Program Manager will be responsible for creating Reversing Entries within a NACHA formatted file in compliance with the NACHA Rules. In addition, if Program Manager transmits a Reversing Entry or Reversing File, it shall concurrently deposit into an account designated by Bank an amount equal to that Entry or File. Program Manager must make a reasonable attempt to notify the Receiver of any Reversing Entry initiated to correct any Entry it has initiated in error. The notification to the Receiver must include the reason for the reversal and be made no later than the Settlement Date of the reversing Entry. Except for the reasons explicitly permitted under the NACHA Rules, the initiation of reversing Entries or files because an Originator or Third Party Sender failed to provide funding for the original Entry or file and/or the initiation of reversing an Entry or file is beyond the time period permitted by the NACHA Rules are explicitly prohibited by NACHA Rules.

(t) **Electronic Debit Entries**. Provisions may be made for holding accounts to be maintained for posting of any return Debit Items received, as stated elsewhere within this Agreement and the NACHA Rules. Program Manager will promptly provide immediately available funds to indemnify Bank if any Debit Items are rejected after Bank has permitted Program Manager to withdraw immediately available funds, should funds not be available in the applicable Program Manager Account or the Reserve Account to cover the amount of the rejected or returned Entries.

(u) **Payment for Credit Entries and Returned Debit Entries**. Notwithstanding anything to the contrary, Program Manager agrees to pay Bank for all credit Entries submitted, processed or issued by Program Manager (or any of its Subcontractors or Authorized Users), or credit Entries otherwise made effective against Program Manager or Customers. Program Manager shall make payment at such time on the date of transmittal by Bank of such credit Entries as Bank, in its discretion, may determine ("Payment Date"), and the amount of each On-Us Entry at such time on the Effective Entry Date of such credit Entry as Bank, in its discretion, may determine. Program Manager shall pay Bank for the amount of each debit Entry returned by an RDFI or debit Entry dishonored by Bank. Payment shall be made by Program Manager to Bank in any manner specified by Bank. Notwithstanding the foregoing, Bank is hereby authorized to charge the account(s) held by Bank for Program Manager or any other Program Manager designated account as payment for credit Entries issued by Program Manager or returned or dishonored debit Entries. In the event that such accounts do not have sufficient available funds on the Payment Date, Bank is hereby authorized to charge any account maintained by Program Manager with Bank or any other Program Manager-designated account as payment for credit Entries issued by Program Manager or returned or dishonored debit Entries. Program Manager shall maintain sufficient collected funds in Program Manager's account(s) to settle for the credit Entries on the Payment Date. In the event that no Program Manager account has collected funds sufficient on the Payment Date to cover the total amount of all Entries to be paid on such Payment Date, Bank may take any of the following actions: (i) refuse to process all Entries, or (ii) process all credit Entries. In the event Bank elects to process credit Entries initiated by Program Manager, the total amount of the insufficiency advanced by Bank on behalf of Program Manager shall be immediately due and payable by Program Manager to Bank without any further demand from Bank. If Bank elects to pay Program Manager's account in the overdraft on any one or more occasions, it shall not be considered a waiver of Bank's rights to refuse to do so at any other time nor shall it be an agreement by Bank to pay other items in the overdraft. Bank may also charge the Reserve Account for any payments for credit Entries or returned debit Entries.

(v)  **Prefunding**. Bank reserves the right to require Program Manager to pre-fund an account maintained at Bank prior to the Settlement Date of the ACH file.  Bank shall determine whether pre-funding is required based on criteria established from time to time by Bank.  Bank will communicate directly to Program Manager if pre-funding is required and, if requested by Program Manager, will provide Program Manager with an explanation of its pre-funding criteria.  If it is determined that pre-funding is required, Program Manager will provide immediately available and collected funds sufficient to pay all Entries initiated by Program Manager (a) not later than the time instructed by Bank or set forth in the ACH Guide, whichever is earlier, and (b) prior to initiating any Entries for which pre-funding is required.

    a.   Payroll-only Entries and Payroll Entry Prefunding.  Notwithstanding any other requirements set forth in this Agreement, Bank may require, as a condition of initiating any payroll-only Entry (the "Payroll Entry" or "Payroll Entries"), that Program Manager pre-fund an account maintained at Bank for the total amount of all Payroll Entries submitted to Bank for processing at least two (2) business days prior to the effective date of the transactions. ("Payroll Entry Prefunding"). Bank may place a hold on funds in the account(s) held by Bank for Program Manager or any other Program Manager-designated account Program Manager holds with Bank equal to the total amount of the Payroll Entries on the business day that Bank begins processing a Payroll Entry file and Program Manager's account will be debited on the Settlement Date for such Payroll Entries, simultaneously with removal of the hold on the funds in Program Manager's account.

    b.   Bank reserves the right, in its sole and exclusive discretion, and at any time, to require prefunding under the terms of this Section (v)b.

(w)  **Inconsistency of Name and Account Number**. The Program Manager acknowledges and agrees that, if an Entry describes the Receiver inconsistently by name and account number, payment of the Entry transmitted by Bank to the RDFI may be made by the RDFI (or by Bank in the case of an On-Us Entry) on the basis of the account number supplied by the Program Manager, even if it identifies a person different from the named Receiver, and that the Program Manager's obligation to pay the amount of the Entry to Bank is not excused in such circumstances.  Similarly, if an Entry describes an RDFI inconsistently by name and routing number, payment of such Entry may be made based on the routing number, and Program Manager shall be liable to pay the amount of that Entry to Bank. Program Manager is liable for and must settle with Bank for any Entry initiated by Program Manager that identifies the Receiver by account or identifying number or by name and account or identifying number.

(x)  **Data Retention and Reporting**. Program Manager shall retain data on file adequate to permit remaking of Entries for one (1) year following the date of their transmittal by Bank as provided herein, or as required by NACHA rules, whichever is longer, and shall provide such data to Bank upon its request. Without limiting the generality of the foregoing provisions, Program Manager specifically agrees to be bound by and comply with all applicable provisions of the NACHA Rules regarding the retention of documents or any record, including, without limitation, Program Manager's responsibilities to retain all items, source documents, and records of consents and authorizations in accordance with the NACHA Rules.  Program Manager agrees that all telephone conversations or data transmissions between Program Manager (or any Authorized User) and Bank made in connection with this Agreement may be electronically recorded and retained by Bank by use of any reasonable means. Program Manager must provide to Bank reports on each Originator's ACH processing activity on at least a weekly basis in a format agreed upon by both Parties. The reports must include, at a minimum, (i) the count and amount of credit and debit Entries, (ii) the Unauthorized Return Entry Rate in total and by SEC Code calculated in compliance with the NACHA Rules, (iii) the Administrative Return Rate and Overall Return Rate in total and by SEC Code calculated in compliance with the NACHA Rules, and (iv) any additional reporting that may be required by Bank.

(y)  **Evidence of Authorization.** To the extent required by the NACHA Rules or Applicable Law, Program Manager will obtain all consents and authorizations for all Entries in accordance therewith. Such authorizations and any related disclosures shall be in a form that complies with (i) all requirements of the NACHA Rules and (ii) all Applicable Law, including, without limitation, any applicable requirements of Regulation E, the Federal Electronic Funds Transfer Act, and sanctions enforced by OFAC. Program Manager shall obtain and maintain current information regarding OFAC enforced sanctions. (This information may be obtained directly from the OFAC Compliance Hotline at (800) 540-OFAC or by visiting the OFAC website at www.ustreas.gov/ofac.) Each Entry will be made according to such authorization and shall comply with the NACHA Rules. No Entry will be initiated by Program Manager after such authorization has been revoked or the arrangement between a customer and Receiver or other party has terminated. Program Manager shall retain all consents and authorizations for the period required by the NACHA Rules. Program Manager will furnish to Receiver, or to Bank upon Bank's request, an original or a copy of an authorization as required under or for any purpose required by the NACHA Rules. No investigation or verification procedure undertaken by Bank shall be deemed to limit or waive Program Manager's obligations under this Section (y) ("Evidence of Authorization") or this Agreement.

(z)  **ACH Audits; Risk Management and Risk Assessments**.

    a.   **ACH Audits.**  At least once per year, Program Manager shall provide Bank with an ACH audit performed by a qualified third party approved by Bank in accordance with NACHA Rules.  The audit must assess Program Manager's compliance with the NACHA Rules and must be maintained for review by Bank for not less than six (6) years. Program Manager agrees to provide documentation supporting such audit within five (5) Business Days of request from Bank. Any exceptions noted on the audit reports will be promptly addressed with the development and implementation of a corrective action plan by Program Manager's management. The Program Manager shall retain data on file adequate to

permit remaking of Entries for 365 days following the date of their transmittal by Bank as provided herein and shall provide such data to Bank upon its request.

b. **Risk Management System and Risk Assessments**.  Program Manager shall implement a risk management system on or prior to the Effective Date and shall maintain a risk management system throughout the Term of this Agreement (the "Risk Management System"). At least once per year, Program Manager shall provide Bank with a risk assessment performed by a qualified third party in accordance with NACHA Rules ("Risk Assessment").  The Risk Assessment must consist of a comprehensive evaluation of Program Manager's ACH policies, procedures, processes, operations and activities against potential risk vulnerabilities (including, but not limited to, potential threats to its operations, controls, access points and other potential risk vulnerabilities) and shall take into consideration IT security, continuity plans, implementation of Program Manager's Risk Management System, compliance with NACHA Rules, Applicable Law, regulatory guidelines, industry standards and oversight of any Program Manager Subcontractor.  The Risk Assessment must be maintained for review by Bank for not less than six (6) years. Program Manager agrees to provide documentation supporting such Risk Assessment within five (5) Business Days of request from Bank.

(aa) **Additional Limits**. Program Manager agrees that Bank will not process an Overlimit Entry.  Bank will suspend any Overlimit Entry submitted by Program Manager and may, following its receipt of an Overlimit Entry, suspend all In-Process Entries. Program Manager acknowledges that any Overlimit Entry or other In-Process Entries suspended by Bank will not settle on their scheduled Settlement Date.  If Program Manager wishes to initiate an Entry that would cause the amount of In-Process Entries to exceed the ACH Exposure Limit, Program Manager may submit to Bank its request to initiate an Entry that otherwise would be an Overlimit Entry.  Program Manager must submit its request at least two (2) banking days prior to the date on which Program Manager wishes to initiate the Entry that otherwise would be an Overlimit Entry.  Bank may require from Program Manager financial or other information in connection with Bank's consideration of the request.  Bank may grant or deny Program Manager's request at its sole discretion.  In addition to the foregoing, Bank generally reserves the right to limit the nature and amount of the preauthorized debit/credit Entries processed under this Agreement or to refuse to process any debit/credit Entries under this Agreement if, in Bank's sole judgment (i) there is reasonable cause to believe that any Entry will be returned or will not settle in the ordinary course of the transaction for any reason, (ii) to do otherwise would violate any limit set by the applicable clearing house association or any governmental authority or agency to control payment system risk, or (iii) a preauthorized credit Entry or the return of a preauthorized debit Entry would create an overdraft of Program Manager's account(s).  Bank may limit the transactions initiated by Program Manager to specific SEC Codes. Program Manager may not reinitiate entries except as prescribed by the NACHA Rules.  PROGRAM MANAGER HEREBY INDEMNIFIES AND HOLDS HARMLESS THE BANK FOR ANY LOSSES, DAMAGES, FINES, ASSESSMENTS, COSTS AND EXPENSES INCURRED BY BANK ARISING FROM ANY SUSPENDED OR UNPROCESSED OVERLIMIT ENTRIES OR ANY IN-PROCESS ENTRIES THAT MAY BE SUSPENDED PURSUANT TO THIS SECTION.

(bb) **Notice of Improper Entries**. Bank may provide Program Manager with a periodic statement reflecting the total of each File transmitted by Bank or credited to a Receiver's account maintained with Bank. Program Manager shall promptly and regularly review and examine all Entries and other communication received from Bank, including the periodic statement, and notify Bank of any unauthorized or erroneous Entries within a responsible time, not exceeding thirty (30) days from the date that the periodic statement is made available to Program Manager.  If the Program Manager fails to deliver such notice, the Program Manager may not assert against the Bank any claim for interest on the amount of the Entries for the period prior to the date that such notice is delivered.  If the Program Manager fails to deliver notice to the Bank of any unauthorized or erroneous Entries within nine (9) months from Bank's issuance of any advice or statement reflecting such Entries, Program Manager is precluded from asserting that the Bank is not entitled to retain the principal amount of the unauthorized or erroneous debit of Program Manager's account(s).

(cc) **NACHA Rules**.  Program Manager acknowledges it has a copy or has access to a copy of the current NACHA Rules, which may also be purchased online at www.nacha.org.  Program Manager agrees to comply with and be subject to Applicable Law. Program Manager will comply with and be bound by Applicable Law whether or not an Entry is sent through the ACH network. It shall be the responsibility of Program Manager that each Entry originated or submitted complies with Applicable Law, including but not limited to sanctions enforced by the Office of Foreign Assets Control ("OFAC"). It shall further be the responsibility of Program Manager to obtain information regarding such OFAC enforced sanctions. Program Manager agrees that the performance of any action by Bank hereunder, including debiting or crediting an account or transfer funds otherwise required by the NACHA Rules is excused from the performance of such action to the extent that the performance is inconsistent with Applicable Law, including the obligations of Bank under OFAC or any program administered by the United States Department of the Treasury's Financial Crimes Enforcement Network. Program Manager agrees and warrants to Bank that all actions by Program Manager contemplated by this Agreement, including the preparation, transmittal, and settlement of Entries and payment orders, shall comply in all respects with Applicable Law.  Bank will charge Program Manager with any fines or penalties imposed by any Regulatory Authority or any organization which are incurred as a result of the actions or omissions of the Program Manager and Program Manager agrees to fully reimburse and/or indemnify Bank for such charges or fines assessed against or incurred by the Bank. The Bank reserves the right to suspend Program Manager, Originators and Third Party Senders for breach of the NACHA Rules or to terminate this Agreement pursuant to Section 29 ("Term and Termination") of this Agreement.  The Bank reserves the right to audit Program Manager and/or Third Party Sender's compliance with this Agreement and with the NACHA Rules. NACHA, in its role of ensuring the safety, security, and viability of the ACH network has determined that certain single-use or limited-use consumer authorizations have the

potential to increase risk in the ACH system and compromise system effectiveness by increasing the incidence of returned Entries. Therefore, Program Manager hereby warrants to Bank that for each such ACH Entry submitted for processing, Program Manager has obtained all authorizations from the Receiver as required by the NACHA Rules, by Regulation E or other applicable law, and this Agreement. Program Manager also makes the additional warranties to Bank that Bank makes to each RDFI and ACH Operator under the NACHA Rules for the respective SEC codes for Entries originated by Program Manager. PROGRAM MANAGER INDEMNIFIES AND HOLDS BANK HARMLESS FROM ANY LIABILITY ARISING OUT OF THIRD-PARTY SENDER'S BREACH OF THESE WARRANTIES.

(dd) **Program Manager as Third-Party Sender.** Subject to Bank's prior approval and in its sole discretion, Program Manager may elect to use the services provided hereunder as a "Third-Party Sender" (as defined under the NACHA Rules) to submit Entries to Bank on behalf of its clients. Program Manager shall execute any such other agreement(s) or documents as Bank deems necessary or appropriate prior to the initiation or continuation by Program Manager of any ACH services in the capacity of a Third-Party Sender. Program Manager understands that Bank must register Program Manager as a Third-Party Sender with NACHA and agrees to fully cooperate in that process. Program Manager agrees that Bank retains the right to reject any request by Program Manager to engage in Third-Party Sender activities as well as any Entries initiated by Program Manager in such capacity, in its sole discretion.

    (i) **Obligations of Program Manager as a Third-Party Sender**. The NACHA Rules contain special requirements and impose additional obligations on Bank when it acts as Program Manager's ODFI with respect to Entries Program Manager sends as a Third-Party Sender. In addition to any other duties, responsibilities, warranties, representations and liabilities under other sections of this Agreement, for each and every Entry transmitted by Program Manager as a Third-Party Sender to Bank, Program Manager represents and warrants to Bank and agrees that Program Manager, as a Third-Party Sender, shall: (i) perform all of the duties, including, but not limited to, the duty to identify Originators and, upon request of Bank, provide the identity of the Originators to Bank; (ii) assume all of the responsibilities, including, but not limited to, the responsibilities of ODFIs and Originators; (iii) make all of the warranties, including, but not limited to, the warranties of ODFIs, the warranty that each Originator has agreed to assume the responsibilities of an Originator under the NACHA Rules and is legally able to do so; (iv) assume all of the liabilities, including, but not limited to, liability for indemnification for failure of an Originator to perform its obligations as an Originator of Third-Party Sender in accordance with the NACHA Rules; and (v) limit the dollar value and types of the Entries that are transmitted to Bank by Program Manager as Third-Party Sender as set forth herein or in the ACH Guide. Program Manager will use a unique company identifier in the ACH transaction for each Originator.

    (ii) Nested Third-Party Senders. Program Manager is prohibited from entering into an ACH origination agreement with any Third-Party Sender (a "nested" Third-Party Sender) in connection with this Agreement, unless expressly permitted to do so by Bank in writing. In the event Bank permits Program Manager to provide services for a nested Third-Party Sender in accordance with the preceding sentence, Program Manager will provide Bank with the names and pertinent information required by Bank with respect to any nested Third-Party Sender for which it transmits Entries through Bank, before transmitting any such Entries, for the purpose of Bank's due diligence and registration of the nested Third-Party Sender with NACHA. If Program Manager transmits Entries for any nested Third-Party Sender, Program Manager must have an agreement with the nested Third-Party Sender that complies with the NACHA Rules and includes the requirements for submitting or originating Entries under of this Agreement as if the nested Third-Party Sender were Program Manager and Program Manager were Bank. Such agreement also shall include the representations and warranties made by Program Manager in this Agreement, with Bank as an express beneficiary, and the indemnification of Bank as provided in this Agreement. Further, before transmitting Entries for the nested Third-Party Sender, Program Manager must provide the list of such nested Third-Party Sender's Originators and any information considered to be reasonably necessary to identify each Originator on whose behalf it initiates Entries within two (2) Business Days of Bank's request. Bank reserves the right to conduct periodic audits and other due diligence of each such nested Third-Party Sender and its Originators in its discretion as long as the relationship continues to the same extent that Bank may audit or request information on Program Manager and its Originators.

(ee) **Program Manager as Receiver.** If Program Manager is the Receiver of an Entry or other funds transfer, and Bank does not receive final settlement for any payment made to Program Manager by the Receiving Depository Financial Institution, Program Manager acknowledges and agrees that Program Manager is obligated to Bank for the amount of the payment order and Bank is authorized to charge Program Manager's account(s) held at Bank or otherwise designated by Program Manager for any amount paid to Program Manager. If Bank credits Program Manager's account for an Entry or other funds transfer naming Program Manager as the Receiver, such credit Entry to Program Manager's account is not acceptance of the funds transfer by Bank until at least after the opening of business on the banking day after the credit Entry is made to the account. Notwithstanding the foregoing, Bank may make funds available to the Program Manager at an earlier time at Bank's option. Bank has no obligation to notify Program Manager of receipt of a funds transfer naming Program Manager as the Receiver even if payment for the funds transfer to Program Manager is made by credit to Program Manager's account or the payment order directs payment to an account.

(ff) **Standard Entry Class Code Entries.** Notwithstanding anything set forth herein or to the contrary, Program Manager shall only process or submit to Bank Entries that qualify as any SEC Code approved by Bank in writing subject to the terms and conditions set forth in this Schedule D (Origination Services), the ACH Guide and this Agreement. Program Manager will comply with all rules, terms and conditions, and hereby makes all representations and warranties, set forth in the NACHA

Rules for each SEC Code related to an Entry or Entries Program Manager processes or submits to Bank. Without limiting the generality of the foregoing, if Bank authorizes Program Manager to submit to Bank, or if Program Manager processes using the Origination Services or otherwise originates Entries with the SEC Codes for ARC, BOC, POP, RCK, TEL or WEB Entries, Program Manager will take all actions and obtain all consents and authorizations required under the NACHA Rules to allow Bank to meet its obligations as ODFI of such Entries as provided for herein. Bank reserves the right to reject any Entry or group of Entries that are not authorized by Bank. If Bank requires a test file be created prior to origination of Entries hereunder, Program Manager agrees to create such test file in accordance with Bank's standard processes and procedures.

(i) **Eligible Source Documents for SEC Codes ARC, BOC, POP.** Unless where otherwise provided for in this Agreement, Program Manager will use eligible source documents in connection with any transaction initiated using a SEC Code of ARC, BOC, POP, RCK that contain the following: (i) pre-printed serial number, (ii) contain an amount of $25,000 or less (or in the case of RCK, contain an amount less than $2,500); and, in the case of an ARC or BOC Entry, such source document must (iii) be completed and signed by the Receiver.

(ii) **Prohibited Source Documents for SEC Code Entries.** In addition to any other prohibition provided for in this Agreement, the ACH Guide, the NACHA Rules or otherwise communicated to Program Manager by Bank from time to time, the following source documents are not permitted to be used for SEC Code Entries hereunder and **CANNOT** be converted:

   a. Checks, sharedrafts or other items that contain an auxiliary on-us field in the magnetic ink character recognition ("MICR") line;
   b. Amounts greater than $25,000 (with exception of an RCK Entry, which such entry shall not be greater than $2,500);
   c. Third-Party checks or sharedrafts;
   d. Remotely created checks, as defined in Regulation CC, and third-party sharedrafts that do not contain the signature of the Receiver;
   e. Checks provided by a credit card issuer to access a credit card account or checks drawn on a home equity line of credit;
   f. Checks drawn on an investment company (as defined in the Investment Company Act of 1940);
   g. Travelers checks, cashier's checks, official checks, money orders or other similar obligations of a financial institution;
   h. Checks or drafts drawn on the U.S. Treasury, a Federal Reserve Bank, or a Federal Home Loan Bank;
   i. Checks or drafts drawn on a state or local government that are not payable through or at a participating depository financial institution or DFI; or
   j. Checks, sharedrafts or items payable in a medium other than United States Currency.

(iii) **Collection Fees for ARC, BOC and RCK Entries.** Program Manager shall not collect fees by adding to the amount of the source document for any transaction using SEC Codes ARC, BOC and RCK to initiate an Entry. A separate Entry using the appropriate Standard Entry Class Code must be used to collect a service fee from the Receiver if Receiver's authorization has been obtained in accordance with NACHA Rules.

(iv) **SEC Code Notice requirements.** For any SEC Code permitted hereunder, prior to the initiation of any SEC Code Entry, Program Manager shall provide the Receiver with notice that includes the following, or substantially similar language: "When you provide a check as payment, you authorize us either to use information from your check to make a one-time electronic fund transfer from your account or to process the payment as a check transaction" (the "SEC Code Notice").

In addition, for any BOC Entry, the SEC Code Notice shall also include language substantially similar to the following: "For inquiries, please call [*retailer insert phone number*]". Program Manager shall display on the SEC Code Notice an established, maintained, working telephone number for the Receiver to make an inquiry regarding the BOC Entry and that is answered during normal business hours.

Any SEC Code Notice required hereunder shall be prominently and conspicuously posted at the point-of-purchase or manned bill payment location and Program Manager shall provide a copy of the notice to the Receiver at the time of the transaction.

(v) **ARC Entries.** With respect to any origination of transactions identified with the SEC code of ARC, which is a single-Entry debit originated based on receipt of an eligible source document (e.g., check) that is received through the U.S. mail or delivery service, at a drop box location or in person for a bill at a manned location ("ARC"), Program Manager agrees to comply with NACHA Rules in converting eligible checks and collecting such checks using the Program Manager's accounts receivable journal entry or record. Program Manager acknowledges and agrees that for any transaction originated hereunder using the SEC Code of ARC, the source documents will only be used to initiate an ARC Entry if it has been sent through the U.S. Mail or delivered to a drop box and that any check used as a source document will not enter into a check collection process. During the initial processing of an ACR Entry, Program Manager shall capture information for the (i) amount of the ARC Entry, (ii) routing number, (iii) account number and (iv) the check serial number. In addition to any Program Manager representation and warranty provided under this Agreement, with each ARC Entry that Program Manager originates or transmits under this Agreement, Program

Manager represents and warrants that (a) the amount of the Entry, the routing number, and the check serial number are in accordance with the source document; (b) Program Manager will retain a reproducible, legible image, microfilm, or copy of the front of the Receiver's source document for two (2) years from the Settlement Date of the ARC Entry; (c) Program Manager has employed commercially reasonable procedures to securely store all source documents until destruction and securely store all information relating to the ARC Entries; (d) Program Manager has established reasonable procedures for the Receiver to notify Bank that the receipt of the Receiver's checks does not constitute authorization for ARC Entries to the Receiver's account and that allows the Receiver to opt-out of check conversion activity.  Program Manager may capture the information required under this Section (ff)(v) ("ARC Entries") by using a device used to capture the MICR line of the source of document.

(vi)  **BOC Entries**.  With respect to any origination of transactions identified with the SEC code of BOC, which is a single-Entry debit based on receipt of a check at the point-of-purchase or manned bill location for subsequent conversion during back-office processing ("BOC"), Program Manager agrees to comply with NACHA Rules in utilizing the ACH network to convert eligible checks presented by the Receiver for payments made at either the point-of-purchase or a manned payment location as follows:

a.  <u>Identity Verification</u>.  Prior to originating any BOC Entry, Program Manager shall employ commercially reasonable procedures to verify the identity of the Receiver

b.  <u>BOC Entry Representations and Warranties.</u>  In addition to any other Program Manager representation or warranty provided under the terms of this Agreement, with each BOC Entry that Program Manager originates or transmits under this Agreement, Program Manager represents and warrants that it (i) has employed commercially reasonable procedures to verify the identity of the Receiver, (ii) has established and maintains a working telephone number for Receiver inquiries regarding the transaction that is answered during normal business hours and that such number is displayed on the BOC entry notice, (iii) that the amount of the Entry, routing and account numbers, and the check serial number are in accordance with the source document, (iv) Program Manager will retain a reproducible, legible image, microfilm or copy of the front of the Receiver's source document for each BOC Entry for two (2) years from the Settlement Date of the BOC Entry, and (v) Program Manager has employed commercially reasonable procedures to securely store all source documents until destruction and securely store all information relating to the BOC Entries.

c.  <u>Additional Prohibited Source Documents for BOC Entries</u>.  In addition to those source documents listed in section (ff)(b) ("<u>Prohibited Source Documents for SEC Code Entries</u>"), for any BOC Entry, any checks or sharedrafts that have not been encoded in magnetic ink CANNOT be converted.

d.  <u>Accuracy of Information</u>.  Program Manager certifies that capture of information for the amount of the entry, routing number, the account number, and the check serial number are in accordance with the source document as required by the use of a reading device to capture the MICR line of the source document.  (Subsequent correction of errors related to MICR misreads, mis-encoding or processing rejects is permitted by key entry).

(vii)  **IAT Entries**.  Program Manager may not initiate (and no Originator may initiate) international payment transactions under SEC Code of IAT ("IAT") without Bank's prior written consent and without entering into an addendum supplementing this Agreement relating to IAT Entries.

(viii)  **POP Entries**.  With respect to any origination of transactions identified with the SEC code of POP, which is a single-Entry debit based on receipt of a check at the point-of-purchase or manned bill location ("POP"), Program Manager agrees to comply with NACHA rules in utilizing the ACH network to convert such eligible checks to a single-entry ACH debit entry to a Receiver's account for in-person purchases made at the point-of-purchase or manned bill payment location as follows:

a.  <u>POP Representations and Warranties</u>.  In addition to any other representation or warranty provided by Program Manager under the terms of this Agreement, with each origination or transmission of a POP Entry, Program Manager represents and warrants that (i) the POP Entry has not been returned voided to the Receiver after Program Manager's use and (ii) Program Manager has not provided the POP Entry to the Receiver for use in any prior POP Entry.

b.  <u>Requirements for MICR Capture</u>**.**  Program Manager will capture information for the amount of the entry, the routing number, the account number, and the check serial number by the use of a reading device to capture the MICR line of the source document during initial processing. (Subsequent correction of errors related to MICR misreads, mis-encoding, or processing rejects permits key entry).

c.  <u>Source Document Authorization; Receipt Requirements; Return of Source Documents to the Receiver</u>. Program Manager will obtain the written authorization of the Receiver and shall provide a copy of the authorization to the Receiver.  Notice is also required be made part of the authorization. In addition, Program Manager will provide the Receiver a receipt containing specific information relating to the purchase, including the following: (i) originator name (merchant); (ii) third-party service provider telephone number; (iii) date of the transaction; (iv) transaction

amount; (v) source document check serial number; (vi) merchant number (or other unique number that identifies the location of the transaction); and (vii) the state and city of the location of the point of sale equipment or terminal used to make the transaction.   Program Manager will return the source document to the Receiver marked "VOIDED".

(ix)   **RCK Entries**.  With respect to any origination of transactions identified with the SEC code of RCK, which is an Entry to re-present a paper check after the paper check has been returned for insufficient or uncollected funds by converting to a single entry ACH debit transaction ("RCK"), Program Manager agrees to comply with NACHA rules in utilizing the ACH network to convert such eligible re-presented checks to a single-entry ACH debit Entry as follows:

    a.   Presentment Requirements.  Program Manager will not present an RCK Entry unless the related Entry has been returned by the RDFI.

    b.   Restrictive Endorsements.  Program Manager agrees that any restrictive endorsement placed on the source document is void or ineffective when the source document is presented as a re-presented check Entry.

    c.   Formatting Requirements.  Program Manager shall comply with all technical specifications and formatting requirements in accordance with the NACHA Rules to include: (i) the description "REDEPCHECK" in the Program Manager Entry description field of the Program Manager/Batch Header Record; (ii) the original payee on the face of the check as it appears within the Program Manager name field of the Program Manager/Batch Header Record; and (iii) the check serial number of the check to which the re-presented check Entry relates is placed within the check serial number field of the RCK Entry detail record.

    d.   Request for Copy of Check.  Program Manager will provide Bank with a copy of the front and back of the check within seven (7) banking days of the Bank's request for a copy, provided that the request for a copy of the item was received within seven (7) years of the Settlement Date of the RCK Entry.  If the check has been finally paid, this must be indicated on the copy of the check.

    e.   Additional Permitted Source Documents for RCK Entries.  In addition to the source documents permitted under subsection (ff)(i) ("Eligible Source Documents for SEC Codes ARC, BOC, POP"), for an RCK Entry, Program Manager may convert the following eligible source documents: (i) An item within the mean of the Revised Article 4 of the Uniform Commercial Code (1990 Official Text), (ii) be in an amount less than $2,500; (iii) on the face of the document it indicates that it was returned for insufficient or uncollected funds; (iv) is dated less than one-hundred-and-eighty (180) days from the date Entry is transmitted to the RDFI; (v) is drawn on a consumer account and (vi) has been previously presented no more than two (2) times through the check collection system (as a physical item, substitute check or image) or no more than one (1) time through the check collection system and no more than one (1) time as an RCK Entry, if the Entry is reinitiated as an RCK Entry.

    f.   Additional Prohibited Source Documents for RCK Entries.  In addition to those source documents listed in section (ff)(ii) ("Prohibited Source Documents for SEC Code Entries"), for any RCK Entry, Program Manager may not convert ineligible items using an RCK Entry, which includes, but is not limited to: (i) non-cash items (as defined by Regulation CC); (ii) United States Postal Service money orders; (iii) items that are third-party items (e.g. the payee endorses a check over to a third party who also endorses the check) and (iv) remotely created checks, as defined by Regulation CC, and third-party drafts that do not contain the signature of the Receiver (e.g. the drawer does not sign a check but authorizes another party to debit the drawer's account via a draft).

    g.   Number of Presentations.  An RCK entry may not be submitted by Program Manager or an Originator more than twice after the first return of a paper item, and no more than once after the second return of a paper item.

    h.   RCK Entry Representation and Warranties.  In addition to any other representation or warranty provided by Program Manager under the terms of this Agreement, with each origination or transmission of a RCK Entry, Program Manager represents and warrants that (i) all signatures on the item are authentic and authorized, (ii) the RCK Entry accurately reflects the item, (iii) the item will not be presented unless the related RCK Entry has been returned by the RDFI, (iv) the information encoded after issue in magnetic ink on the item is correct and (v) any restrictive endorsement placed on the item is void or ineffective.

(x)   **TEL Entries**.  With respect to any origination of transactions identified with the SEC code of TEL, which is single-Entry or recurring debit originated based on an oral authorization provided to the Originator by the Receiver ("TEL"), Program Manager agrees to comply with NACHA Rules in collecting consumer debit transactions authorized orally via the telephone and understands that a separate oral authorization is required for each entry to the consumer's account using telephone-initiated entries and in accordance with the following terms:

    a.   Verification of Identity of Receiver and Routing Number Verification.  Program Manager warrants and represents that it has used reasonable procedures to verify the identity of the Receiver and has used reasonable procedures to verify the identity of the Receiver and that the routing numbers are valid.

b.    <u>Single-Entry vs. Recurring</u>**.**  Program Manager understands that a single-entry payment means a one-time transfer of funds initiated by an Originator in accordance with the Receiver's authorization for a single ACH debit to the Receiver's account.  Program Manager's obligation for recurring payments authorization means: (i) multiple entries based on an authorization provided by the consumer establishing a relationship with the Program Manager for a specific type of activity, that are originated each time upon the specific instructions of the consumer or (ii) an entry that has been set up to occur based on the Receiver's authorization obtained via the Telephone, at regular intervals without any additional intervention of the consumer.

c.    <u>Relationship Requirement Options</u>.  Program Manager may NOT initiate the telephone call related to a TEL Entry if the Program Manager has no existing relationship with the consumer (e.g., an existing written agreement with the consumer for provision of goods or services or the consumer purchased goods or services from Originator) in the past two (2) years); however, Originator may engage in a telephone call with the consumer where the consumer has initiated the telephone call to the Originator.

d.    <u>Oral Authorization Over the Telephone</u>.  For any oral authorization provided to Originator over the phone the (i) consumer must state clearly during the telephone call that the consumer is authorizing an ACH debit entry to the consumer's account, (ii) Originator must clearly express the terms of the authorization and (iii) the Receiver must unambiguously express consent (silence is not expressed consent).

e.    <u>Single-Entry TEL Authorizations</u>.  For single-entry TEL authorizations, the Originator must create a recording of the oral authorization that includes (i) date on which or after which the ACH debit will occur; (ii) amount of the transaction; (iii) the Receiver's name; (iv) account number to be debited; (v) telephone number for the Receiver to call with inquiries; (vi) date of oral authorization; and (vii) statement by the Originator that the authorization obtained from the Receiver will be used to originate an ACH debit entry to the consumer's account *or* the Originator must send a written copy of the authorization to the Receiver prior to the Settlement date of the Entry.

f.    <u>Recurring TEL Authorizations</u>.  For the authorization to originate recurring TEL Entries, the Originator must create a recording of the oral authorization prior to the Settlement Date of the first Entry that must include in the recording the following:

   i.     be readily identifiable as an authorization of a recurring transfer from the Receiver's account;
   ii.    state the terms of the recurring transfer clearly and in readily understandable terms;
   iii.   name or identify of the Receiver or other evidence identifying the Receiver;
   iv.    the telephone number for Receiver inquires to be answered during normal business hours;
   v.     date of the Receiver's oral authorization;
   vi.    evidence of the Receiver's assent to the authorization;
   vii.   the specific authorization language
   viii.  account to be debited;
   ix.    timing, number and/or frequency of the debits;
   x.     amount of the debit or a reference to the method used to determine the amount for the recurring transfers.

g.    <u>Invalid Authorization Methods</u>**.**  Program Manager understands and agrees that VRU Capture of consumer's authorization with key-entry responses by the authorization to input data and to respond to questions does not qualify as an oral authorization.  A VRU may be used by the consumer to key enter data and to respond to questions, provided that the actual authorization by the consumer is provided orally.

h.    <u>Improper use of SEC Code of TEL</u>.  Program Manager's use of any standard entry class code other than TEL in order to avoid the increased scrutiny required for such transactions shall constitute a violation of Applicable Law and may result in Program Manager's immediate loss of ACH Origination rights regardless of any termination notification period otherwise specified in this Agreement.

(xi)    **Web Entries.**  With respect to any origination of transactions identified with the SEC code of WEB for internet-initiated/mobile entries ("WEB"), Program Manager agrees to comply with NACHA Rules in originating WEB Entries (either recurring or by single-entry) to a consumer's account pursuant to the consumer's authorization that is obtained from the Receiver via the internet or wireless network as follows:

a.    <u>Risk Management Requirements for WEB Entries</u>.

   i.     Program Manager agrees it has performed or will perform an annual audit that satisfies the NACHA Rules before initiating a WEB Entry;

   ii.    Pursuant to NACHA Rules, Program Manager will establish and implement commercially reasonable: (A) fraudulent transaction detection systems to screen debit WEB Entries that, at a minimum, can verify the account number to be debited on the first use and that can detect any subsequent changes to such account thereafter; (B) methods of authentication to verify the identity of Receivers of debit WEB Entries; (C) procedures to verify that the routing number used in the debit WEB Entry is valid; and (D) security

technology for communications between Program Manager as the Originator and Receivers over the internet or wireless networks; and each time Program Manager submits to Bank or processes using the Origination Services a Web Entry, in addition to its other representations and warranties under this Agreement, Program Manager warrants that the Web Entry was screened by its fraudulent transaction detection system and that Program Manager has used commercially reasonable methods to authenticate and verify the Receiver's identity and to verify that the account number used in the Web Entry is valid.

      iii.      In accordance with Applicable Law, Program Manager must maintain records such as logs from an internet ordering system as proof of each Receiver's authorization. Bank from time to time may (without any obligation or duty to do so) require Program Manager to make such records available for Bank's review.

   b.    <u>Single Entry vs. Recurring WEB Entries</u>. Program Manager understands a Single-Entry payment means a one-time transfer of funds initiated by Program Manager in accordance with the Receiver's authorization for a single ACH debit to the Receiver's account. Recurring payments authorization means: (i) multiple entries based on an authorization provided by the consumer establishing a relationship with the Program Manager for a specific type of activity, that are originated each time upon the specific instructions of the consumer or (ii) an entry that has been set up to occur based on the Receiver's authorization obtained via the Internet or a wireless network at regular intervals without any additional intervention of the consumer.

   c.    <u>WEB Entry Authorization Requirements</u>. Program Manager is obligated to obtain a consumer's authorization prior to initiating a WEB debit Entry which shall meet the following requirements:

      i.      The consumer must be able to read the authorization language displayed on a computer screen or other visual display and it is suggested the Receiver be prompted to print and retain a copy and should be instructed to accept the terms of the authorization. Program Manager must be able to provide a hard copy of the authorization, if requested.

      ii.      Program Manager must prompt the Receiver to print the authorization and retain a copy.

      iii.      Program Manager must be able to provide the Receiver with a hard copy of the authorization if requested to do so.

      iv.      Only the Receiver may authorize the WEB Entry, and not Program Manager or any third-party service provider on behalf of the Receiver.

      v.      The authentication method chosen must not only identify the Receiver but must demonstrate the consumer's assent to the authorization.

   d.    <u>WEB Representations and Warranties</u>. In addition to any other representation or warranty provided by Program Manager under the terms of this Agreement, with each origination or transmission of a WEB Entry, Program Manager represents and warrants that (i) Program Manager employs commercially reasonable detection systems to minimize the risk of fraud related to payment Entries initiated over the internet and to verify the validity of routing numbers, (ii) uses commercially reasonable methods of authentication to verify the identity of the Receiver, (iii) uses commercially reasonable security technology that at a minimum is equivalent to 128-bit encryption technology, and (iv) where required by Applicable Law, conducts annual audits s to its security practices and procedures that include at a minimum, verification of adequate levels of (a) physical security to protect against theft, tampering or damage, (b) personnel and access controls to protect against theft, tampering or damage, (b) personnel and access controls to protect against unauthorized access and use and (c) network security to ensure secure capture, storage and distribution.

   e.    <u>Improper use of SEC Code WEB</u>. Program Manager's use of any standard entry class codes other than WEB in order to avoid the increased scrutiny required for such transactions shall constitute a violation of applicable law and may result in Program Manager's immediate loss of ACH rights regardless of any termination notification period otherwise specified in this Agreement.

(gg)   **Security Procedures**. **Security Procedures**. The Parties agree that the Origination Services are subject to the commercially reasonable security procedures governing the origination, processing and/or submission of payment orders, as defined by UCC § 4A-103, and Entries, which are set forth in <u>Schedule J</u> (<u>Security Procedures</u>).

**SCHEDULE E**

**CHECK SERVICES**

If approved by Bank in connection with a Program, Bank will provide (or Bank's third party service provider will provide) Check Services in accordance with the terms set forth in this <u>Schedule E</u> (<u>Check Services</u>) and subject to the terms of this Agreement. Bank will make available to Program Manager, from time to time, its policies, procedures, guidelines and other writings governing the use of the Check Services by Program Manager, as may be amended or supplemented by Bank from time to time (the "<u>Check Services Guide</u>"). Program Manager shall comply with all of its obligations under this Agreement in compliance with terms and conditions set forth in this <u>Schedule E</u> (<u>Check Services</u>), the Check Services Guide and this Agreement. If there is any conflict between the Check Services Guide and this Agreement, the Check Services Guide will control. Program Manager shall ensure all terms herein related or applicable to or otherwise referencing Program Manager (or its Subcontractor) that may be applicable to End User are included in the Bank Services Agreement.

(a)  **Stop Payment Orders.** Program Manager or any End User for whom a Check is issued on behalf may request Bank to stop payment on a Check drawn in connection with such End User's funds by providing Bank with all information Bank may request. Program Manager understands that unless Bank has received complete and accurate information requested from Program Manager, Bank may be unable to identify the Check for which a stop payment has been requested which will result in the Check being paid. Bank also requires a reasonable amount of time to act on the request. If two or more signatures are required to transact business, Bank may accept any one authorized signature for a stop payment order. Under certain circumstances, current transaction information may not be available, and the Check upon which a stop payment has been requested may already have been paid. If the Check upon which Program Manager or End User has stopped payment has already been paid, Bank will refund the stop payment fee at Program Manager's request if any fee is charged and collected by Bank. Written stop payment orders expire after six (6) months. Unless stop payment orders are returned in writing, Bank assumes no responsibility if the Check is paid after the expiration of the stop payment order. Program Manager will be charged a fee for initial and returned stop payment orders.

(b)  **Automated Processing.** In accordance with general banking standards, Bank has adopted automated collection and payment systems which rely on information encoded onto each paper Check in magnetic ink. Program Manager agrees (and shall ensure End User agrees) that Bank may disregard all information on any Check (front and back) other than maker's signature, the amount of the Check, and the information encoded in magnetic ink. Program Manager further agrees (and shall ensure End User agrees) that Bank shall not be deemed to have failed to exercise ordinary care in paying a Check solely because Bank's procedures do not require Bank to perform a sight examination of Checks with a face amount below a threshold level established by Bank from time to time.

(c)  **Postdated Checks.** If Program Manager or End User draws a post-dated Check, Bank may pay it and charge it against the Deposit of End User or Program Manager, even if it is presented prior to the date of the Check.

(d)  **Stale Checks.** Bank is not obligated to pay a Check presented for payment more than six (6) months after its date (a "<u>Stale Check</u>"). Notwithstanding the foregoing, Program Manager agrees to hold Bank harmless if Bank pays a Stale Check. If Program Manager or End User does not want Bank to pay a Stale Check, Program Manager (or End User through Bank) may place a stop-payment order on the Check.

(e)  **Restrictive Legends.** Bank is not required to honor any restrictive legend placed on Checks Program Manager draws. Examples of restrictive legends placed on Checks are "must be presented within 90 days" or "not valid for more than $1000.00". Bank is not responsible for any losses, claims, damages, or expenses that result from Program Manager's or End User's placement of these or other special instructions on Checks.

(f)  **Signature on Check.** Bank authorizes Program Manager in its capacity as agent of the Bank to place a signature of the Bank on any Check against the Deposits of an End User in connection with the Check Services; provided, however, that Program Manager may only place the signature of the Bank on a Check if (i) Program Manager is in compliance with all terms of this Agreement, (ii) the End User for which any such Check is issued on behalf of has remitted funds to the Bank, (iii) the Check is for an amount no greater than the amount of funds deposited by the End User with Bank, (iv) End User has lawfully authorized the Check; and (v) the issuance of the Check would not result in the Bank extending credit or creating a negative balance. Subject to the terms herein, the signature affixed to any such Check by Program Manager shall be considered affixed and made by Bank.

(g)  **Checks Presented Over the Counter for Payment by a Non-End User.** To the extent permitted by Applicable Law, if a Check is presented over-the-counter for payment by a Person who is not an End User of the Bank, then Bank may, in its sole discretion, refuse payment of the Check or charge a fee for payment of the Check. Program Manager shall indemnify Bank for any presentment, honoring or refusal to honor such Check.

(h)  **Adverse Claims.** If Bank receives conflicting instructions with respect to a Deposit or Check, or notice of an adverse claim of ownership, right to control, or access to funds deposited with Bank, or notice that the funds of End User may have been

obtained through fraudulent or criminal acts, Program Manager and End User agrees that if any such dispute exists, Bank may place a hold on the funds deposited and refuse to honor all withdrawal and transfer requests, including Checks, until all appropriate parties provide Bank with joint specific written instructions with respect to disposition of the funds. Bank is not required to determine whether a dispute has merit. If Bank elects to take any action(s) described herein, Program Manager agrees that Bank shall not be liable to Program Manager or End User for damages of any kind, and Program Manager agrees to pay and reimburse Bank for its reasonable costs and expenses including attorneys' fees (including Bank's in-house attorneys) and court costs.

(i)     **Uncollected Funds and Returning Checks for Insufficient Funds**.    Bank reserves the right to return and/or refuse to pay any Check or instruction which is presented for payment against uncollected/held funds. Bank may assess a fee against Program Manager for any Check drawing against uncollected funds, whether the Check is paid or returned unpaid, in accordance with Bank's current schedule of fees and charges. Program Manager shall not issue instructions to have a debit processed against or a Check drawn in connection with an End User's instructions if such End User has not remitted to Bank an amount equal to the debit or Check requested and Program Manager shall not issue instructions to have a debit processed against or a Check drawn in connection with an End User's instructions for any amount that exceeds the available Deposits of End User with Bank under the Program. At any time before final payment (as defined in the Uniform Commercial Code) Bank may return any Check, negotiable order of withdrawal, electronic debit, or other item presented for payment against the FBO Account or Deposit Account when there are insufficient available funds on deposit with Bank from End User to pay the Check or if for some other reason the Check is not good or payable.

**SCHEDULE F**

**WIRE SERVICES**

If approved by Bank in connection with a Program, Bank will provide Wire Services in accordance with the terms set forth in this Schedule F (Wire Services), the Wire User Guide and the terms of this Agreement. Bank will make available to Program Manager, from time to time, its policies, procedures, guidelines and other writings governing the use of the Wire Transfer Services by Program Manager, as may be amended or supplemented by Bank from time to time (the "Wire User Guide"). Program Manager shall comply with the terms set forth in this Schedule F (Wire Services), the Wire User Guide and this Agreement. If there is a conflict between the Wire User Guide and this Agreement, the Wire User Guide shall control. The Wire User Guide may be amended, modified or supplemented by Bank by providing Program Manager with thirty (30) days' prior notice of such amendment. Program Manager shall ensure all terms herein related or applicable to or otherwise referencing Program Manager (or its Subcontractor) that may be applicable to an End User are included in the Bank Services Agreement. Unless otherwise defined, the terms used in this Schedule F (Wire Services) shall have the meanings provided in Tennessee Uniform Commercial Code, Article 4A ("UCC 4A"). The following terms and conditions shall apply whenever Program Manager (or Subcontractor) requests a wire transfer on behalf of an End User to or from such End User's Deposit Account (or the balance of the FBO Account related to End User) in connection with an approved Program under this Agreement ("Wire Transfer").

(a) **General Description of Wire Services**.

    (i) Subject to the terms, provisions and conditions of this Agreement and this Schedule F (Wire Services), Bank shall provide Wire Services to Bank approved End Users in connection with the approved Program, and Program Manager may market such Wire Services to Persons in accordance with the terms of this Agreement and the applicable Program Schedule provided for in Schedule B (Program Schedules) to this Agreement. Pursuant to the terms set forth herein, the Wire User Guide and this Agreement, in the event an End User provides a validly authorized payment order or request to initiate a Wire Transfer from such End User's Deposit Account (or using the balance of the FBO Account related to End User), Program Manager shall, on behalf of End User, immediately provide such payment order or request for a Wire Transfer using Bank's API. Any payment order, wire instruction or Wire Transfer requested in connection with this Agreement or a Bank Services Agreement governing Wire Services may also be referred to herein as a "transfer request." A transfer request may involve the transfer of funds from a Deposit Account or FBO Account to another account End User has with Bank, to an account with any other financial institution, or to a third party or account of a third party maintained with Bank or with any other financial institution. Program Manager acknowledges that any incoming or outgoing Wire Transfers executed by Bank will be subject to the terms of this Schedule F (Wire Services), the Wire User Guide and this Agreement, including Schedule J (Security Procedures), and Program Manager shall ensure that such incoming or outgoing Wire Transfers and any transfer request comply with the terms of this Agreement and with Bank Policies, Compliance Polices and Applicable Laws.

    (ii) Program Manager shall obtain from End User all requisite authorizations and consents (all as required by and in accordance with Applicable Law) for Bank to debit such End User's Deposit Account (or the balance of the FBO Account related to End User) for an amount equal to the transfer request and any applicable fees related to such transfer request. Bank is under no obligation to process any transfer request if an End User's Deposit Account (or the balance of the FBO Account related to End User) is insufficient to cover the entire transfer request amount, plus fees. Program Manager shall ensure End User has sufficient funds on deposit with Bank for implementation of any transfer request from such End User. Bank will have no obligation to honor any transfer request which exceeds the balance of End User's immediately collected funds.

    (iii) Wire Transfers made from an End User's Deposit Account (or using the balance of the FBO Account related to End User) are processed through the Federal Reserve or correspondent financial institutions and are governed by Applicable Law, including Regulation J and UCC Article 4A (or the Electronic Fund Transfer Act and Regulation E in the case of consumer remittances), which determines the rights and liabilities of the parties to the transfer. Bank is under no obligation to follow any transfer request or initiate any Wire Transfer, nor is Bank obligated to follow instructions cancelling or amending any transfer request that does not afford the Bank sufficient time to verify the authenticity of the instructions. Program Manager's or End User's attempted modification of any transfer request shall not be binding on Bank unless received in accordance with the Security Procedures set forth in Schedule J (Security Procedures) (and the security procedures set forth in any Bank Services Agreement, to be ensured by Program Manager), and with such time and manner as to afford Bank a reasonable time to act thereon prior to transmission or release of the transfer.

    (iv) Once Bank receives a transfer request, it may not be able to be cancelled or amended, subject to Applicable Law. However, at Program Manager's or End User's discretion, Bank may use reasonable efforts to act on any request for cancellation or amendment, provided that the method by which Bank is notified of a request for cancellation or amendment complies with the Security Procedures set forth in Schedule J (Security Procedures) and any procedures set forth in any Bank Services Agreement. Notwithstanding, Bank shall have no liability if such cancellation or amendment is not effected. Program Manager agrees to indemnify and hold Bank harmless from any and all liabilities, claims, damages, costs and expenses Bank may incur in attempting to cancel or amend the Wire Transfer. Any cancellation or amendment of a Wire Transfer by Bank shall relieve Bank of any obligation to act on the original transfer request.

(v)   It is Program Manager's responsibility to ensure that Bank is provided with accurate, clear, and correct transfer requests and instructions, including beneficiary name and account number, and that such transfer requests are given only by the End User who has an ownership interest in the Deposit Account (or the balance of the FBO Account used in connection the Wire Transfer). Program Manager is liable for any incorrect, inaccurate or unclear information. If Program Manager, on behalf of an End User, provides Bank with the name and account number of a beneficiary, Bank and other financial institutions may process the payment order based on the account number alone, even though the number may identify a person other than the beneficiary named. Bank will not be liable if the beneficiary's financial institution does not accept the Wire Transfer or accepts the Wire Transfer and then places the funds in a suspense or holding account because of the discrepancy. Unless required by Applicable Law, Bank will not be liable to Program Manager, End User or any other Person for any losses resulting from the beneficiary's financial institution accepting and posting any Wire Transfer to an incorrect account, whether based on Program Manager's or End User's transfer request or for other reasons unrelated directly to a material breach of this Agreement by Bank. Incorrect, unclear or incomplete transfer requests may delay the processing of a Wire Transfer request. If a transfer request does not designate the beneficiary's financial institution, Bank may, in its sole discretion (i) accept the transfer request and make payment to any financial institution at which Bank has reason to believe the beneficiary maintains an account, or (ii) not accept the transfer request and seek further direction from Program Manager.  In either of the foregoing situations, unless Applicable Law requires otherwise, Bank will not be liable for losses resulting from Program Manager's failure (or the failure of the End User) to properly identify the financial institution where the beneficiary maintains an account. If a transfer request does not specify routing instructions, Bank may send the wire through such correspondents as Bank determines in its sole discretion and Program Manager shall ensure it obtains authorization for End User for Bank to do so. Unless otherwise required by Applicable Law, Bank is not required to accept transfer requests from Program Manager, End User or any Person acting or purporting to act on End User's behalf in a representative or fiduciary capacity, and Bank may refuse to accept any transfer requests in its sole and absolute discretion. Bank may also reject any incoming wire transfer. If Bank determines, in its sole discretion, not to honor, execute or accept a transfer request, Bank is under no obligation to inform Program Manager or End User and shall not be liable for any failure to inform Program Manager or End User. A transfer request is considered accepted by Bank when Bank executes it.

(b)   **International and Domestic Wire Transfers**.  Wire Transfers may be either domestic or international, provided, however, international Wire Transfers may not be sent by Bank through or into any country in violation of U.S. laws. All international Wire Transfers will be routed by Bank through one of Bank's correspondent financial institutions. Domestic Wire Transfers will settle only in U.S. Dollars, and international Wire Transfers will be sent in U.S. Dollars. Such international Wire Transfer may be converted to the currency of the destination country at a rate of currency exchange established by the correspondent financial institution or the beneficiary financial institution. Even if Program Manager or End User tells Bank that it wants the Wire Transfer sent in U.S. dollars, Bank cannot guarantee that the beneficiary institution will receive the funds in U.S. currency or will not convert the Wire Transfer into another currency. The actual amount that the beneficiary/designated recipient receives may be reduced by fees and taxes imposed by the beneficiary bank, or a correspondent bank, including currency conversion charges. Notwithstanding, no Program shall permit international Wire Transfers or remittance transfer (as defined by Regulation E) unless approved by Bank in writing.

(c)   **Consumer Wires**.  In the event that an End User is a consumer as defined by the Electronic Fund Transfer Act and its promulgating regulation, Regulation E, Program Manager shall ensure that all Wire Services made available to such End User are in compliance with Applicable Laws, including, but not limited to Regulation E and its remittance transfer rules.  Program Manager shall ensure it provides all disclosures to any consumer End User required under Applicable Law and shall not provide Bank any transfer request from such consumer End User until the window for cancellation of such transfer request has expired, but in no event, later than the date required for Bank to settle the transfer request in accordance with the disclosures provided to End User.

(d)   **Security Procedures**.  Program Manager will ensure that any Wire Transfer request is secure and that unauthorized access or issuance of transfer requests is prevented.  Program Manager agrees to adopt and comply with Schedule J (Security Procedures). Further, Program Manager shall include in any End User Bank Services Agreement security procedures governing any End User initiated transfer request (which Program Manager shall comply with); such security procedure must comply with Applicable Laws and the terms of this Agreement.  Program Manager shall remit valid transfer requests hereunder in compliance with Applicable Laws and the Schedule J (Security Procedures) and shall ensure that it accepts an End User transfer request in compliance with the Bank Services Agreement, including the security procedures set therein.

(e)   **Statements and Errors**.  Except as provided by Applicable Law, Bank shall not be required to provide Program Manager or any End User with a separate notice of incoming or outgoing Wire Transfers. Program Manager shall include all Wire Transfer transactions on Program Manager's periodic account statement. Program Manager agrees to reconcile Deposit Accounts and all FBO Accounts daily and notify Bank promptly of any discrepancy between its records and the information provided by Bank. Program Manager shall be responsible for reviewing all statements provided by Bank for any discrepancies, unauthorized transactions or errors in connection with any Wire Transfer, and shall require End User to review its account statement(s) for any discrepancies, unauthorized transactions or errors in connection with any Wire Transfer. Except as otherwise provided herein, if Program Manager or End User believes a Wire Transfer is wrong or if more information about a Wire Transfer is needed, Program Manager will first be responsible for managing any End User complaints or requests and Program Manager may contact Bank in writing upon discovery or notice of the error and Bank will provide any reasonably requested information. Failure to do so will relieve Bank of any obligation for an unauthorized or erroneous Wire Transfer for which Bank is liable, and Program Manager shall be responsible and liable for any damages or losses Bank incurs as a result

DocuSign Envelope ID: 2780B3D1-6768-4138-9A3E-4B52CE889477

of Program Manager's or End User's failure to notify Bank within the time period stated in this section or as otherwise required by Applicable Law. If Program Manager fails to notify Bank in writing of any discrepancy between its records and the information provided by Bank or any unauthorized or erroneous Wire Transfer that is reflected on its periodic statement within thirty (30) days of receipt of such periodic statement, Program Manager and End User will be precluded from asserting a claim related to such discrepancy or erroneous or unauthorized Wire Transfer against Bank and agrees to waive any such claim.

(f)   **Cut-Off Times**.  Transfer requests for domestic Wire Transfers must be received and verified in accordance with the terms of the Wire User Guide, as amended from time to time, or other writing provided to Program Manager by Bank. Transfer requests for international Wire Transfers must be received and verified in accordance with the terms of the Wire User Guide, as amended from time to time, or other writing provided to Program Manager by Bank.. Bank may treat any transfer request received at or after our cut-off time as if it were received that business day or may treat it as if it were received at the opening of the next business day. Bank is not required to make a Wire Transfer on the day a transfer request is received, unless the properly completed transfer request is received within a reasonable time before any cut-off hour the Bank has established. Bank may use any means and routes that Bank, in its sole discretion, consider suitable for the transmission of funds, and Bank may make use of correspondents, agents, subagents and funds transfer and communication systems. Such third parties shall be deemed agents of Program Manager or (if permitted) of End User and Bank shall not be liable for any errors, delay, mis-delivery, or failure of delivery by any of them unless Applicable Law says otherwise. Bank shall not be responsible for delays or mistakes caused by other parties through whom Bank transmit funds.

(g)   **Miscellaneous**.  In the event Bank is liable to Program Manager or End User for interest compensation related to or in connection with the Wire Services or under Applicable Law, interest shall be calculated at the average of the federal funds rate published by the Federal Reserve Bank for the period involved; or at such other rate that Bank may agree to, in writing, from time to time. The Bank may reject any transfer request in order to comply with the account transfer limitations imposed on non-transaction accounts under Regulation D.

**SCHEDULE G**

**DEBIT CARD SERVICES**

If approved by Bank in connection with a Program, Bank will provide Debit Card Services in accordance with the terms set forth in this Schedule G (Debit Card Services) and subject to the terms of this Agreement.  Bank will make available to Program Manager, from time to time, its policies, procedures, guidelines and other writings governing the use of the Debit Card Services by Program Manager, as may be amended or supplemented by Bank from time to time (the "Debit Card Services Guide").  Program Manager shall comply with all of its obligations under this Agreement in compliance with terms and conditions set forth in this Schedule G (Debit Card Services), the Debit Card Services Guide and this Agreement.  If there is any conflict between the Debit Card Services Guide and this Agreement, the Debit Card Services Guide will control.   Program Manager shall ensure all terms herein related or applicable to or otherwise referencing Program Manager (or its Subcontractor) that may be applicable to End User are included in the Bank Services Agreement.

(a)  **General Description of Debit Card Services**.  Subject to the terms, provisions and conditions of this Agreement and this Schedule G (Debit Card Services), Bank shall issue Cards and provide Debit Card Services to End Users who have access to a Deposit Account under a Bank Services Agreement in connection with the approved Program, and Program Manager may market such Cards and Debit Card Services to End Users or Persons in accordance with the terms of this Agreement and the applicable Program Schedule provided for in Schedule B (Program Schedules) to this Agreement. Program Manager shall ensure that any Card or Debit Card Services offered under any Program shall comply with the terms of this Schedule G (Debit Card Services), this Agreement, the Bank Services Agreement, Bank Policies, Compliance Policies and Applicable Laws.

(b)  **Issuance of Deposit Accounts and Cards**.

(i)  Bank shall be the issuer of all Cards hereunder.  Accordingly, Bank shall sponsor a BIN for the Cards and will issue Cards marketed and promoted by Program Manager pursuant to this Agreement.

(ii)  Subject to the terms of this Agreement and Applicable Law, including those on bank branching, Bank agrees to issue Cards to End Users, who meet the criteria set forth in Account Opening Policy, who have established a Deposit Account with Bank or have been approved for a Deposit Account with Bank and who reside in any state in the United States, its territories and the District of Columbia.

(iii)  Bank will establish an account maintained and controlled by Bank (the "Settlement Account") to be used for the Settlement of Card transactions initiated in connection with a Card for the related Settlement date. The aggregate amount of Card transactions to be Settled on any given Settlement date shall be referred to as the "Settlement Amount". Notwithstanding anything to the contrary, Program Manager shall be responsible for any deficiencies in Settlement Amount.

(iv)  Program Manager acknowledges that Bank is under no obligation to issue a Card or provide Debit Card Services to any Applicant or End User in connection with any Deposit Account. Bank may, in its sole discretion, reject or decline to issue a Card or provide Debit Card Services if Bank determines to do so would constitute an unsafe or unsound banking practice, pose a reputational, compliance, operational, regulatory or financial risk to Bank or violate Applicable Law.

(c)  **Cards and Cardholder Agreements.**  In addition to and subject to the terms and conditions of this Agreement, Program Manager shall, at its sole expense: (i) develop proposed Card designs (and shall ensure such designs do not violate the intellectual property rights of any third party or Applicable Law); and (ii) be responsible for the printing, producing, storing, maintaining, and embossing of Cards and any Card carriers, all in compliance with Applicable Law and the terms of this Agreement.  Bank shall review and approve any Card designs (such approval not to be unreasonably withheld or conditioned absent Bank's reasonable determination of a violation of the Network Rules or Applicable Law or risk to Bank's reputation or safety or soundness) in accordance with the terms of this Agreement. Notwithstanding, Card designs may also have to be approved by the applicable Network. Provided Bank approves of the Card design, Bank shall submit, at Program Manager's expense, such Card design to the applicable Network for approval, which may be withheld by the applicable Network in its discretion.  All Card designs shall identify Bank as the issuer of the Card and shall include such other names, trademarks or service marks and disclosures as may be required to conform with Applicable Law, Compliance Policies and Bank Policies.

(d)  **Account Origination and Servicing**

(i)  Program Manager will administer the Cards, including related Deposit Accounts, including posting Card transactions to the corresponding Deposit Account. If a Card transaction is approved and there is insufficient funds in the Deposit Account, Bank shall have the right to exercise any security interest set forth in this Agreement or the Bank Services Agreement.

(ii)  Program Manager shall pay all third-party costs associated with Card processing and origination, including but not limited to expenses related to Networks and credit bureaus.

(iii) In performing its obligations under <u>Schedule G</u> (<u>Debit Card Services</u>), Program Manager will act as Bank's third party service provider or TPA pursuant to applicable Network Rules. Program Manager will provide the necessary documentation, information and materials to Bank and Bank will apply for Network's approval of Program Manager to act as Bank's TPA, all at Program Manager's expense. Program Manager will not commence any activities relating to the marketing or soliciting of End Users or Persons for Cards or Debit Card Services until it has received the Network's approval to act as a TPA of Bank, and until Bank provides written approval to Program Manager to begin any Card-related marketing or processing activities. Thereafter, Program Manager agrees to maintain its status as TPA of Bank consistent with and to otherwise comply with Network Rules and in a manner that is consistent with the data security standards set forth in Section 23 ("<u>End User Information and Data Security</u>") of this Agreement. Upon receiving any notice from the Network or Bank that it is not in full compliance Network Rules, Program Manager shall cure any such non-compliance within thirty (30) days (or earlier if required by Applicable Law or a Regulatory Authority).

(e) <u>**Card Services, Transaction Processing, Settlement**</u>.

(i) Program Manager will be responsible and liable for all Program Manager Services for the Program and necessary to support Prepaid Card Services.

(ii) Program Manager, at its sole expense, shall provide for Processing Services in accordance with Section (f) ("<u>Processing Services</u>") of the terms of this <u>Schedule G</u> (<u>Debit Card Services</u>) and Network Rules and as otherwise necessary to support Debit Card Services and Card transaction processing. Program Manager may retain Bank to provide Processing Services, subject to the Bank's approval; in the event Program Manager retains Bank to provide such Processing Services, the parties shall enter into a separate agreement governing the Processing Services to be provisioned by Bank.

(iii) Bank shall be responsible for Settlement with the Networks each Business Day for all Card transactions, including Card purchases, automated teller machine withdrawals and other transactions in accordance with applicable Network requirements. Prior to the close of business each Business Day, Bank will debit or credit the Settlement Account for the Settlement Amount. Prior to any transfer contemplated by the prior sentence, Program Manager shall instruct Bank to cause funds equal to the Settlement Amount to be transferred from the Deposit Account(s) to the Settlement Account; provided, any deficiency in funds in the balance of End Users (as reflected in the Deposit Account(s)) whose Card transactions are subject to Settlement shall be the responsibility of Program Manager. For the avoidance of doubt and without limiting the foregoing, Program Manager shall ensure Program Manager has on deposit with Bank an amount no less than the Settlement Amount on each Settlement date and such funds may be used by Bank for Settlement purposes. Bank may, prior to the close of each Business Day, debit or set-off from any Program Manager account, including the Operating Account or Reserve Account, for any amounts owed to the Networks or any Settlement Amount.

(f) <u>**Processing Services**</u>.

(i) Program Manager, at its sole expense, shall provide for Processing Services. Program Manager may request Bank to provide Processing Services, and in such case, if Bank agrees in writing to provide Processing Services, it shall provide processing services set forth in Bank's policies and procedures, as provided to Program Manager from time to time, and all in accordance with Network Rules. In the event Bank provides Processing Services in accordance with the terms herein, Bank may pass through to Program Manager any processing costs assessed on a pass-through basis by a Network and may pass through reasonable, allocable share of any costs incurred by Bank in making changes or modifications to the Processing Service or Bank's processing systems in order for Program Manager to remain compliant with Network Rules or as otherwise requested by Program Manager. Program Manager hereby assumes responsibility and liability for all transactions Bank submits to the Network, including any chargebacks, costs (including reasonable attorneys' fees) and/or Losses associated with, related to or in connection with a Program. On the day that the Network provides Bank with a request for Settlement funding, Bank will make available to Program Manager a summary Settlement report showing all relevant transaction activity.

(ii) Any Person (other than Bank) retained by Program Manager to provide Processing Services must be approved in advance by Bank and must have executed a processing services agreement approved by Bank (such Person (other than Bank), the "Processor" and such processing services agreement, the "<u>Processor Agreement</u>"). Program Manager may act as Processor (and directly provide Processing Services), subject to compliance with the terms set forth herein, Applicable Law, Compliance Policies Bank Policies and any Bank instructions. Whether or not Program Manager retains a third party Processor or acts as Processor, Program Manager shall be liable for all Losses associated or related to or in connection with Processing Services. Program Manager shall also be responsible for all costs, including reasonable attorneys' fees, associated with the approval of and integration of Processor and shall ensure that Processing Services comply with Applicable Law and any instructions provided by Bank.

(iii) Notwithstanding Bank's provisioning of Processing Services in accordance with Section (f)(i) herein and unless Bank is providing such services described under this Section f (iii), the following Processing Services shall be provided by Program Manager, at its sole expense, to support Cards and Debit Card Services offered in relation to or in connection with a Program:

1. Transaction authorization, processing, clearing and settlement (unless performed by Bank) and all accounting relating to Cards;
2. helpdesk and technical support;
3. data capture and reporting and information management services;
4. Cardholder dispute processing and resolution in accordance with the procedures set forth in this Agreement or any policies provided by Bank and in accordance with Applicable Law, and any other informal disputes or resolutions as needed from the End User, as promptly as commercially reasonable, and not later than full resolution within sixty (60) days or as otherwise required by Applicable Law;
5. fraud prevention and security; and
6. any other services necessary or desirable to effectuate the Debit Card Services under each Program or as requested by Bank from time to time.

(iv) Program Manager shall, provide any data files to Bank at the frequencies and in the form reasonably required by Bank. Program Manager shall provide to Bank processing reports on a daily basis.

(v) Bank may identify additional data files or reports to be generated by Program Manager and delivered to Bank on an ad hoc or periodic basis.

(vi) Program Manager shall provide Bank with access to the Dashboard to enable Bank to adequately oversee the Debit Card Services in connection with each Program. Program Manager shall provide Bank with access to any sandbox environment and will cooperate with Bank in conducting any pilot test, including test Card profiles, requested by Bank to establish and oversee any Program.

(g) **Other Program Manager Services.** Program Manager, at its sole expense, shall also provide the following additional services to support each Card or Debit Card Service provided in connection with a Program (the "___Program    Manager Additional Debit Card Services"). Program Manager Additional Debit Card Services are considered Program Manager Services and shall be approved by Bank. The following are Program Manager Additional Debit Card Services to be provided by Program Manager:

(i) processing all Applications, establishing Cards and supporting Debit Card Services in connection with each Program on behalf of Bank and subject to Bank's final approval, including, but not limited to: providing information to Processor to establish the accounts; and Card creation, production and shipment, including: Card design; purchase and safekeeping of plastic stock; embossing and encoding of Cards; printing of Card carriers; mailing or other delivery of Cards; and preparation and mailing of PIN mailers;

(ii) providing monthly and other periodic Card account statements (which may be included as part of the Deposit Account statement);

(iii) Customer Service in accordance with the terms of this Agreement; and

(iv) any other services necessary or desirable to effectuate the offering of Card or Debit Card Services in connection with the Program or as agreed upon by Bank and Program Manager from time to time.

(h) **Data Files and Reports.** Program Manager shall provide to Bank on a daily basis via secure FTP the data files and reports, in a form reasonably requested by Bank, reasonably required by Bank to oversee the Debit Card Services, as well as the following:

(i) All Cards maintained on the Processor systems regardless of whether the Cards have been issued, activated, funded, closed, etc., or a plastic bearing the Card number has been produced.

(ii) Any reports provided by a Network or Critical Subcontractor that Bank can utilize for reconciliation and quality processes; provided, however, Program Manager is responsible for all reconciliation and quality processes.

**SCHEDULE H**

**PREPAID CARD SERVICES**

If approved by Bank in connection with a Program, Bank will provide Prepaid Card Services in accordance with the terms set forth in this Schedule H (Prepaid Card Services) and subject to the terms of this Agreement. Bank will make available to Program Manager, from time to time, its policies, procedures, guidelines and other writings governing the use of the Prepaid Card Services by Program Manager, as may be amended or supplemented by Bank from time to time (the "Prepaid Card Services Guide"). Program Manager shall comply with all of its obligations under this Agreement in compliance with terms and conditions set forth in this Schedule H (Prepaid Card Services), the Prepaid Card Services Guide and this Agreement. If there is any conflict between the Prepaid Card Services Guide and this Agreement, the Prepaid Card Services Guide will control. Program Manager shall ensure all terms herein related or applicable to or otherwise referencing Program Manager (or its Subcontractor) that may be applicable to End User are included in the Bank Services Agreement.

(a) **General Description of Prepaid Card Services.** Subject to the terms, provisions and conditions of this Agreement and this Schedule H (Prepaid Card Services), Bank shall issue Cards and provide Prepaid Card Services to End Users who have Deposited funds into and have access to an FBO Account under a Bank Services Agreement in connection with the approved Program, and Program Manager may market such Cards and Prepaid Card Services to End Users or Persons in accordance with the terms of this Agreement and the applicable Program Schedule provided for in Schedule B (Program Schedules) to this Agreement. Program Manager shall ensure that any Card or Prepaid Card Services offered under any Program shall comply with the terms of this Schedule H (Prepaid Card Services), this Agreement, the Bank Services Agreement, Bank Policies, Compliance Policies and Applicable Laws. Bank and Program Manager further agree and acknowledge that, for purposes of the FinCEN Prepaid Access Rule, Bank is designated as the program participant exercising "principal oversight and control" over the Cards and Prepaid Card Services in connection with the Program.

(b) **Issuance of Prepaid Cards.**

   (i) Bank shall be the issuer of all Cards hereunder. Accordingly, Bank shall sponsor a BIN for the Cards and will issue Cards marketed and promoted by Program Manager pursuant to this Agreement.

   (ii) Subject to the terms of this Agreement and Applicable Law, including those on bank branching, Bank agrees to issue Cards and provide Prepaid Card Services to End Users who meet the criteria set forth in Account Opening Policy, and who have entered into a Bank Services Agreement governing the Prepaid Card Services and deposited funds into the FBO Account with Bank or have been approved to Deposit funds into the FBO Account with Bank. All Cardholders must reside in any state in the United States, its territories and the District of Columbia, and Program Manager shall not approve any Applicant who does not reside in state in the United States, its territories or the District of Columbia.

   (iii) Bank will establish an account maintained and controlled by Bank (the "Settlement Account") to be used for the Settlement of Card transactions initiated in connection with a Card for the related Settlement date. The aggregate amount of Card transactions to be Settled on any given Settlement date shall be referred to as the "Settlement Amount". Notwithstanding anything to the contrary, Program Manager shall be responsible for any deficiencies in Settlement Amount.

   (iv) Program Manager acknowledges that Bank is under no obligation to issue a Card or provide Prepaid Card Services to any Applicant or End User. Bank may, in its sole discretion, reject or decline to issue a Card or provide Prepaid Card Services if Bank determines to do so would constitute an unsafe or unsound banking practice, pose a reputational, compliance, operational, regulatory or financial risk to Bank or violate Applicable Law.

(c) **Cards.** In addition to and subject to the terms and conditions of this Agreement, Program Manager shall, at its sole expense: (i) develop proposed Card designs (and shall ensure such designs do not violate the intellectual property rights of any third party or Applicable Law); and (ii) be responsible for the printing, producing, storing, maintaining, and embossing of Cards and any Card carriers, all in compliance with Applicable Law and the terms of this Agreement. Bank shall review and approve any Card designs (such approval not to be unreasonably withheld or conditioned). Notwithstanding, Card designs may also have to be approved by the applicable Network. Provided Bank approves of the Card design, Bank shall submit, at Program Manager's expense, such Card design to the applicable Network for approval, which may be withheld by the applicable Network in its discretion. All Card designs shall identify Bank as the issuer of the Card and shall include such other names, trademarks or service marks and disclosures as may be required to conform with Applicable Law, Compliance Policies and Bank Policies.

(d) **Account Origination and Servicing**

   (i) Program Manager will administer the Cards, including related FBO Accounts (and balances associated with such Cards), including posting Card transactions to the corresponding FBO Account and reducing the applicable End User's balance in such FBO Account accordingly. If a Card transaction is approved and there is insufficient funds in the FBO Account related to the applicable End User, Bank shall have the right to exercise any security interest set forth in this Agreement or the Bank Services Agreement.

    (ii)   Program Manager shall pay all third-party costs associated with Card processing and origination, including but not limited to expenses related to Networks and credit bureaus.

    (iii)   In performing its obligations under Schedule H (Prepaid Card Services), Program Manager will act as Bank's third party service provider or TPA pursuant to applicable Network Rules. Program Manager will provide the necessary documentation, information and materials to Bank and Bank will apply for Network's approval of Program Manager to act as Bank's TPA, all at Program Manager's expense. Program Manager will not commence any activities relating to the marketing or soliciting of End Users or Persons for Cards or Prepaid Card Services until it has received the Network's approval to act as a TPA of Bank, and until Bank provides written approval to Program Manager to begin any Card-related marketing or processing activities. Thereafter, Program Manager agrees to maintain its status as TPA of Bank consistent with and to otherwise comply with Network Rules and in a manner that is consistent with the data security standards set forth in Section 23 ("End User Information and Data Security") of this Agreement. Upon receiving any notice from the Network or Bank that it is not in full compliance Network Rules, Program Manager shall cure any such non-compliance within thirty (30) days (or earlier if required by Applicable Law or a Regulatory Authority).

(e)   **Card Services, Transaction Processing, Settlement.**

    (i)   Program Manager will be responsible and liable for all Program Manager Services for the Program and necessary to support Prepaid Card Services.

    (ii)   Program Manager, at its sole expense, shall provide for Processing Services in accordance with Section (g) ("Processing Services") of the terms of this Schedule H (Prepaid Card Services) and Network Rules and as otherwise necessary to support Prepaid Card Services and Card transaction processing. Program Manager may retain Bank to provide Processing Services, subject to Bank's approval; in the event Program Manager retains Bank to provide such Processing Services, the Parties shall enter into a separate agreement governing the Processing Services to be provisioned by Bank.

    (iii)   Bank shall be responsible for Settlement with the Networks each Business Day for all Card transactions, including Card purchases, automated teller machine withdrawals and other transactions in accordance with applicable Network requirements. Prior to the close of business each Business Day, Bank will debit or credit the Settlement Account for the Settlement Amount. Prior to any transfer contemplated by the prior sentence, Program Manager shall instruct Bank to cause funds equal to the Settlement Amount to be transferred from the FBO Account(s) to the Settlement Account; provided, any deficiency in funds in the balance of End Users (as reflected FBO Account(s)) whose Card transactions are subject to Settlement shall be the responsibility of Program Manager. For the avoidance of doubt and without limiting the foregoing, Program Manager shall ensure Program Manager has on deposit with Bank an amount no less than the Settlement Amount on each Settlement date and such funds may be used by Bank for Settlement purposes. Bank may, prior to the close of each Business Day, debit or set-off from any Program Manager Account, including the Operating Account or Reserve Account, for any amounts owed to the Networks or any Settlement Amount.

(f)   **Approved Entities for Loads.** End Users may only load funds onto the Card using Bank approved entities for such loads, which include correspondent banks, the Federal Reserve and/or approved Program Manager load networks.

(g)   **Processing Services.**

    (i)   Program Manager, at its sole expense, shall provide for Processing Services. Program Manager may request Bank to provide Processing Services, and in such case, if Bank agrees in writing to provide Processing Services, it shall provide processing services set forth in Bank's policies and procedures, as provided to Program Manager from time to time, and all in accordance with Network Rules. In the event Bank provides Processing Services in accordance with the terms herein, Bank may pass through to Program Manager any processing costs assessed on a pass-through basis by a Network and may pass through reasonable, allocable share of any costs incurred by Bank in making changes or modifications to the Processing Service or Bank's processing systems in order for Program Manager to remain compliant with Network Rules or as otherwise requested by Program Manager. Program Manager hereby assumes 1 responsibility and liability for all transactions Bank submits to the Network, including any chargebacks, costs (including reasonable attorneys' fees) and/or Losses associated with, related to or in connection with a Program. On the day that the Network provides Bank with a request for Settlement funding, Bank will make available to Program Manager a summary Settlement report showing all relevant transaction activity.

    (ii)   Any Person (other than Bank) retained by Program Manager to provide Processing Services must be approved in advance by Bank and must have executed a processing services agreement approved by Bank (such Person (other than Bank), the "Processor" and such processing services agreement, the "Processor Agreement"). May act as Processor (and directly provide Processing Services), subject to compliance with the terms set forth herein, Applicable Law, Compliance Policies Bank Policies and any Bank instructions. Whether or not Program Manager retains a third party Processor or acts as Processor, Program Manager shall be liable for all Losses associated or related to or in connection with Processing Services. Program Manager shall also be responsible for all costs, including reasonable attorneys' fees, associated with the approval of and integration of Processor and shall ensure that Processing Services comply with Applicable Law and any instructions provided by Bank.

(iii) Notwithstanding Bank's provisioning of Processing Services in accordance with Section (g)(i) herein and unless Bank is providing such services described under this Section (g)(iii), the following Processing Services shall be provided by Program Manager, at its sole expense, to support Cards and Prepaid Card Services offered in relation to or in connection with a Program:

    1.    Transaction authorization, processing, clearing and settlement (unless provided by Bank) and all accounting relating to Cards;

    2.    helpdesk and technical support;

    3.    data capture and reporting and information management services;

    4.    Cardholder dispute processing and resolution in accordance with the procedures set forth in this Agreement or any policies provided by Bank and in accordance with Applicable Law, and any other informal disputes or resolutions as needed from the End User, as promptly as commercially reasonable, and not later than full resolution within sixty (60) days or as otherwise required by Applicable Law;

    5.    fraud prevention and security; and

    6.    any other services necessary or desirable to effectuate the Prepaid Card Services under each Program or as requested by Bank from time to time.

(iv) Program Manager shall, provide any data files to Bank at the frequencies and in the form reasonably required by Bank. Program Manager shall provide to Bank processing reports on a daily basis.

(v) Bank may identify additional data files or reports to be generated by Program Manager and delivered to Bank on an ad hoc or periodic basis.

(vi) Program Manager shall provide Bank with access to the Dashboard to enable Bank to adequately oversee the Prepaid Card Services in connection with each Program. Program Manager shall provide Bank with access to any sandbox environment and will cooperate with Bank in conducting any pilot test, including test Card profiles, requested by Bank to establish and oversee any Program.

(h) **Other Program Manager Services.** Program Manager, at its sole expense, shall also provide the following additional services to support each Card or Prepaid Card Service provided in connection with a Program (the "Program Manager Additional Prepaid Card Services"). Program Manager Additional Prepaid Card Services are considered Program Manager Services and shall be approved by Bank. The following are Program Manager Additional Prepaid Card Services to be provided by Program Manager:

(i) processing all Applications, establishing Cards and supporting Prepaid Card Services in connection with each Program on behalf of Bank and subject to Bank's final approval, including, but not limited to:

    1. providing information to Processor to establish the accounts; and

    2. Card creation, production and shipment, including: Card design; purchase and safekeeping of plastic stock; embossing and encoding of Cards; printing of Card carriers; mailing or other delivery of Cards; and preparation and mailing of PIN mailers;

(ii) providing monthly and other periodic Card account statements (which may be included as part of the Deposit Account statement);

(iii) Customer Service in accordance with the terms of this Agreement; and

(iv) any other services necessary or desirable to effectuate the offering of Card or Prepaid Card Services in connection with the Program or as agreed upon by Bank and Program Manager from time to time.

(i) **Data Files and Reports.** Program Manager shall provide to Bank on a daily basis via secure FTP the data files and reports, in a form reasonably requested by Bank, reasonably required by Bank to oversee the Debit Card Services, as well as the following:

(i) All Cards maintained on the Processor systems regardless of whether the Cards have been issued, activated, funded, closed, etc., or a plastic bearing the Card number has been produced.

(ii) Any reports provided by a Network or Critical Subcontractor that Bank can utilize for reconciliation and quality processes; provided, however, Program Manager is responsible for all reconciliation and quality processes.

(j) **Taxes**.    Program Manager shall be solely responsible for the collection and remittance of any sales, use or other taxes applicable to the sale or issuance of Cards under this Agreement.  Further, Program Manager will, or will cause it Subcontractors to, accurately and timely calculate, report and pay all sales, use or other taxes applicable to the sale of Cards issued or Prepaid Card Services provided in connection with the Program under this Agreement, and accurately disclose to each Cardholder the amount of such sales, use or other taxes applicable to each Card purchase, if necessary.

**SCHEDULE I**

**REMOTE DEPOSIT CAPTURE SERVICES**

If approved by Bank in connection with a Program, Bank will provide Remote Deposit Capture Services in accordance with the terms set forth in this Schedule I (Remote Deposit Capture Services) and subject to the terms of this Agreement. Bank will make available to Program Manager, from time to time, its policies, procedures, guidelines and other writings governing the use of the Remote Deposit Capture Services by Program Manager, as may be amended or supplemented by Bank from time to time (the "Remote Deposit Capture User Guide"). Program Manager shall comply with all of its obligations under this Agreement in compliance with terms and conditions set forth in this Schedule I (Remote Deposit Capture Services Services), the Remote Deposit Capture User Guide and this Agreement. If there is any conflict between the Remote Deposit User Guide and this Agreement, the Remote Deposit User Guide will control. Program Manager shall ensure all terms herein related or applicable to or otherwise referencing Program Manager (or its Subcontractor) that may be applicable to End User are included in the Bank Services Agreement.

(a) **General Description of RDC Services**. Subject to the terms, provisions and conditions of this Agreement and this Schedule I (Remote Deposit Capture Services), Bank shall provide RDC Services to End User in connection with the approved Program, and Program Manager may market such RDC Services to Persons in accordance with the terms of this Agreement and the applicable Program Schedule provided for in Schedule B (Program Schedules) to this Agreement. Pursuant to the RDC Services, an End User may make deposits to such End User's Deposit Account or to the FBO Account, as applicable, from a home, office or other remote location using a compatible mobile device (camera), computer hardware (scanner), software or web-based application (individually and collectively, the "Device"). Bank is not responsible for providing the Device, and Program Manager shall ensure that any computer hardware (scanner), software or web-based application or other Intellectual Property used in connection with the RDC Services do not infringe on the Intellectual Property of any Person. End Users may use the RDC Services to prepare an accurate electronic picture or replica of the front and back of an Eligible Item (the "Image") and deliver the Image and associated deposit information to Bank. "Eligible Items" are Checks or other paper items (not a Prohibited Item under this Schedule I (Remote Deposit Capture Services) or item rejected by Bank), payable on demand and drawn on (or payable through) an office of a United States bank, to be converted to Images and deposited into a Deposit Account or FBO Account using the RDC Services. The Image must accurately capture the front and back of the Check to be deposited. After capture of the Images and all other required data and information from each Check, Program Manager will transmit one or more files containing the Images and all other required information pertaining to all Checks (the "File") from the End User to Bank. Subject to the terms and conditions herein, Bank will process the File(s) in accordance with this Schedule I (Remote Deposit Capture Services) and Bank Policies. Program Manager agrees that Bank shall be the exclusive provider of RDC Services for the applicable Program and that Program Manager will not use (and will cause Subcontractor not to use) the same or similar services of any other party to provide RDC Services for the applicable Program.

(b) **Limitations for the RDC Services**.

(i) The RDC Services are subject to limits, including daily, weekly and monthly limits on the dollar amounts of Images that End User or Program Manager may transmit or submit and limits on the value of each Eligible Item, which applies to each separate Image. Bank may modify End User limits and add others at any time at Bank's option. Program Manager agrees to provide Bank with any and all information needed to establish such limitations and shall not accept or attempt to process Checks in excess of the maximum limitations established by Bank.

(ii) Program Manager shall prohibit any End User from using the RDC Services if the current balance of the applicable Deposit Account (or the balance of the FBO Account related to End User) is negative, there are restrictions on the Deposit Account (or the balance of the FBO Account related to End User) that prevent the depositing or withdrawing of funds, or there are more than (2) two returned deposited items in the last two (2) statement cycles from End User. Program Manager shall further ensure it does not request Bank to process any Check transaction in the event of the foregoing.

(iii) The RDC Services are only available within the United States. Once an Image has been accepted for deposit, Bank is not able to delete or remove the item from the collection process.

(c) **Image Requirements**.

(i) Program Manager shall only submit to Bank for processing Files based on the following Eligible Items as source documents, and shall ensure each End User uses only Eligible Items as source documents to that comply with the following: (a) all instruments must be drawn on or payable through a federally insured depository financial institution; (b) no instrument may be a starter Check; (c) each instrument must be machine-readable full-field magnetic ink character recognition ("MICR") encoded with the bank routing number, account number and check serial number printed on the Check; and (d) each instrument must be for an amount less than or equal to the approved Check limit assigned by Bank. When Bank receives an Image of a Check transmitted from Program Manager that that has been converted to a digital version of the original

Check (a Substitute Check) for subsequent presentment and collection, it shall thereafter be deemed an "item" within the meaning of Articles 3 and 4 of the Uniform Commercial Code.

(ii) Each File transmitted by Program Manager to Bank shall contain Images of the front and the back of Checks that are of minimum required size, not too dark, too light, or too bright, and must be legible and scanned and remotely deposited by an End User. The Check MICR information must be machine-readable and MICR "on us" field value must contain valid data. Each Image of each Check shall be of such quality so that the following information (which must be included on the Image) can be clearly read and understood from sight review of the Image: (i) the amount of the check; (ii) the payee of the Check; (iii) the signature of the drawer of the Check; (iv) the date of the Check; (v) the Check number; (vi) information identifying the drawer and paying bank that is preprinted on the Check; and (vii) all other information placed on the Check prior to the Image being captured (including, but not limited to, any identification (current phone number and driver's license number) written on the front of the check or any endorsements on the back of the Check). An Image cannot be missing or incomplete and the Check must be filled out in its entirety for the Check to be processed, and each Check and Image shall contain all proper endorsements. Each Image shall meet all standards of image quality, all requirements necessary to create a Check and must meet all technical requirements of an "electronic item" established by Applicable Law, including Regulation J. Any Check or Image not meeting these minimal requirements or that fails to comply or violates Applicable Law will be ground for immediate suspension or termination of the RDC Services and Program Manager shall indemnify Bank for all losses suffered as a result of or in connection with such failure or violation.

(iii) Program Manager shall ensure that each Image or File submitted to Bank is the legal equivalent of the Eligible Item for all purposes, including that Bank qualifies as a holder-in-due-course for the Image under the Uniform Commercial Code, and shall ensure End User consents to such treatment.

(iv) Notwithstanding anything to the contrary, Bank reserves the right, in its sole discretion, to reject or deny, for any reason and without liability, the processing of any Check or Image scanned or deposited using the RDC Services even where Bank has provided Program Manager with a confirmation notice. If an Image does not comply with the requirements set forth in this Section (c) ("Image Requirements") and Bank's processing requirements, Bank may, in its sole discretion and without liability, process the Image as received for payment, correct the Image or it's Program Manager data and process the corrected Image for payment, process the deposit for payment in another format as allowed or chargeback (debit) the Deposit Account, FBO Account, Operating Account, Program Manager Account or Reserve Account for the amount of the Image. In addition, Bank reserves the right to chargeback (or debit) the Deposit Account, FBO Account, Operating Account, Program Manager Account or Reserve Account for the amount of any item, an Image or any paper item or other electronic representation of an item that is rejected by Bank for any reason, including where Bank, in its reasonable determination, the Eligible Item, Image or any paper item has been previously submitted or deposited with Bank or with anyone else or is returned to Bank. This is true even if there has been made any withdrawals against it. Bank shall not be liable for any losses, costs or fees Program Manager or End User may incur as a result of a chargeback of an ineligible item.

(v) Bank may supplement the requirements of this Section (c) ("Image Requirements") at any time by providing written notice to Program Manager, who will, in turn, notify End Users.

(d) **Restricted Images; Prohibited Items**.

(i) Program Manager shall not submit Files for a Prohibited Item and shall prohibit End User from remotely depositing a Prohibited Item. "Prohibited Item" means checks and other items that are not considered eligible, including the following: (i) items payable to any person other than the Person that owns the Deposit Account or funds in the FBO Account into which the Check is being deposited; (2) items containing any alteration or erasures, or which Program Manager or End User knows or suspects, or should know or suspect, are fraudulent or otherwise not authorized by the owner of the Deposit Account or funds in the FBO Account on which the item is drawn; (3) items not payable in U.S. currency; (4) items not drawn on a financial institution located in the U.S.; (5) items authorized over the telephone and created remotely; (6) items payable jointly; (7) items that never existed in paper form; (8) items previously converted to a Substitute Check and pre-existing Substitute Checks; (9) items that are dated, post-dated, or more than six (6) months old when transmitted; (10) items that are not legible (as determined by Bank) or do not conform to Section (c) ("Image Requirements") herein or any standard established by the Board of Governors of the Federal Reserve Board or any other regulatory agency, clearinghouse or association; (11) items payable on sight or payable through drafts; (12) items with any endorsement on the back other than that approved by Bank; (13) items that are drawn or otherwise issued by the U.S. Treasury Department; (14) non-cash items; (15) promissory notes and similar obligations, such as savings bonds; (16) items that have previously been submitted through the RDC Services or through remote deposit capture service offered at any other financial institution; (17) third party checks; (18) checks that have been previously returned as unpaid or uncollected; (19) checks drawn on a bank trust account; (20) Checks that the written and numerical amounts or customer name on the Image does not match; (21) Checks not signed by the payee; (22) Items that are missing processing information (examples: missing or illegible routing numbers or account numbers); (23) any other class of checks or drafts as communicated to Program Manager from time to time; or (24) Checks or items prohibited by Bank Policies or Compliance Policies relating to the RDC Services or otherwise not acceptable under the terms of the Bank Services Agreement, this Schedule I (Remote Deposit Capture) or Applicable Law.

(ii) In addition to the restrictions set out above and in any event, the following transactions are unacceptable for remote check deposit processing using the RDC Services, which shall also be considered Prohibited Items, and Program Manager agrees not to submit (and shall cause End User not to submit) any of the following transactions to Bank for electronic processing: (a) temporary checks or checks that do not have the customer's current name, address and phone number pre-printed on its face; (b) any checks drawn on any depository institution that is not federally insured or part of the ACH network; (c) any checks drawn on the personal checking account of Program Manager or any of their respective agents or employees; (d) any third party items for electronic remote check deposit processing or checks made payable to "cash" or "bearer"; (e) traveler's check, money order, payroll check, counter check or sight draft; (f) any check dishonored as a result of a "stop payment" order issued by the presenter to Bank; (g) any transaction representing the financing of an existing obligation whether previously owed to Program Manager or End User arising from the dishonor of a check or arising from a credit card, debit card or smart card dispute with Program Manager or End User; (h) in an attempt to collect a debt or financed obligation; (i) was one of multiple instruments or payment methods presented that day; (j) a check written for goods or services that are not concurrently provided to the customer, including any check given for a service contract, gift certificate, a layaway (except for the final payment) or for a similar transaction, or for goods or services provided to a third party; (k) that contains erasures, or which is altered, unless the alteration is initialed by the customer at time of presentation; (l) is likely to be dishonored or appears forged, stolen or otherwise fraudulent; and/or (m) knowingly submit a check on an account which Bank previously denied authorization. Program Manager or their respective agents or employees shall not submit or process (and shall prohibit End Users from submitting) any item with prior knowledge that the item is likely to be dishonored or that the identification used was forged, stolen, or otherwise did not belong to the check writer, or that the transaction for which the item was tendered is illegal, void or invalid. Program Manager's submission of any of the above transactions for remote deposit check processing may subject the RDC Services to immediate suspension or termination, and all funds of Program Manager or End User, including those in the Deposit Account and FBO Account, may be placed on hold.

(iii) In addition to Program Manager's other indemnification obligations under this Agreement, if Program Manager submits or processes a Prohibited Item, Program Manager agrees to indemnify and reimburse Bank for, and hold Bank harmless from and against, any and all losses, costs and expenses (including reasonable attorney's fees) Bank may incur as a result of or in connection with the Prohibited Item.

(e) **Handling of Original Item and Creating the Image**: Program Manager agrees that it shall (and shall cause End User to) only submit Images of the original Eligible Item that is still in the possession of End User. Program Manager shall (and shall cause End User to) follow any and all other procedures and instructions set forth in this Schedule I (Remote Deposit Capture Services), the RDC User Guide, the Bank Services Agreement and this Agreement.

(i) Restrictive Endorsements. Prior to transmitting an image of an item using the RDC Services, Program Manager shall ensure End User's signature is affixed to the back of the Eligible Item and the End User restrictively endorses any Eligible Item transmitted to Bank as "For remote deposit only at Evolve Bank & Trust" or as otherwise instructed by Bank. Bank is not responsible or liable for any losses, claims, damages or expenses that result from placement of any other special instructions on any Checks submitted or transmitted for deposit by End User related to the RDC Services, and Program Manager shall be responsible for such losses, claims, damages or expenses. Program Manager understands that any message text or other information End User elects to add to the check image transmitted to Bank may cause the depository bank's endorsement not to be legible which may result in the delayed return of the Check or electronic representation if it is not paid, and, as between Bank and Program Manager, Program Manager shall be responsible for any liability or Losses resulting from such delay.

(ii) Creating the Image. Prior to submitting a File, Program Manager shall accurately create (and shall ensure End User accurately creates) an Image and inputs the correct dollar amount of the check into the Device and shall ensure the MICR data, check number, and name of the maker of the Check are commercially printed on any Check and included in the File. Program Manager also understands that the appearance of the original Check and the use of certain background colors, decorative images, and choices in ink on the original check may affect the ability to produce a readable digital image of the check or the creation of a Substitute Check that meets legal equivalence requirements which may require the original check to be processed for collection, and any such liability or Losses related to the foregoing shall be the responsibility of Program Manager. Program Manager is responsible for the inspection of and causing its End Users to inspect all Images to ensure the legibility of the Images including without limitation the dollar amount, the signature of the maker of the Eligible Item, and for ensuring that any and all information on the Eligible Item is accurately captured and legible in the resulting Image.

(f) **Processing, Transmission of Files and Returns**.

(i) Processing.

a. Bank may attempt to process, collect, present for payment, return or re-present Images in any way in Bank's discretion, including, as Images under private agreement or clearinghouse rules, as automated ACH entries under NACHA Rules, through a Federal Reserve payment service under Regulation J and Federal Reserve Operating Circulars, as Substitute Checks or as permitted under Applicable Law. Upon Bank's request, Program Manager shall and shall cause End Users to provide Bank with the Eligible Item from which the Image was created and then collect the original Eligible Item. Without limiting anything herein, Bank may, in its sole discretion, reject, repair,

alter, amend, re-format or convert the Image or MICR data submitted in a deposit through the RDC Services in accordance with general check collection practices and industry presentment standards, but Bank has no obligation to do so, and Bank shall not be liable to Program Manager or End User for doing so or failing to do so. If Bank requires that Program Manager or End User comply with certain formatting standards or other guidelines when submitting a File or Image RDC Services and Program Manager and/or End User declines to implement, or comply with such standards or guidelines, Program Manager acknowledges that it shall be liable for any error or loss that results from its processing of such deposits or any delays caused from Bank's re-formatting or conversion of the deposit prior to processing the deposit. Bank shall have no liability to Program Manager, End User or any other Person in the event that any deposited Check is processed as, or converted by Bank to, an Image or Substitute Check.

b.    Bank is authorized to process transactions hereunder and to disseminate information in accordance with the information Bank receives electronically from Program Manager or End User.  Bank shall have no responsibility for erroneous data provided by Program Manager, End User or third party designee.  Program Manager shall bear all losses and liability related to the erroneous data provided in connection with a Check, Image, File data or information that is transmitted to Bank in connection with the RDC Services.

c.    All settlements related to RDC Services are provisional and are subject to the End User's rights to dispute the debits and/or credits to the applicable FBO Account or Deposit Account or subject to Bank's right to revoke the same without prior notice in the event one or more of the transactions are rejected or returned to Bank for any reason. Program Manager acknowledges that if for any reason funds are credited to an End User in excess of the amount that the End User is entitled to receive in connection with the Eligible Image, Program Manager shall provide to Bank the excess funds upon demand by Bank. Such excess funds may be collected by Bank by a debit to the applicable FBO Account or Deposit Account initiated by Bank. If for any reason the FBO Account or Deposit Account does not have sufficient funds, then Bank may debit any Program Manager Account or the Reserve Account.

d.    In the event a File or information contained therein cannot, be processed hereunder, Program Manager shall notify Bank in writing (and/or by phone, fax or email).  Once notification is received by Bank, Program Manager shall not submit the File for processing without Bank's written approval.

e.    Program Manager shall permit End User to only scan each Check, Image or File submitted to Bank for processing through no more than one Bank approved Device. Program Manager understands that it is a violation of Applicable Law and this Agreement to process debit requests against an End User's or Person's account without the End User's or Person's express, written consent and authorization. Program Manager shall be exclusively responsible and liable for any such counterfeit, fictitious, lost, stolen or fraudulently obtained debit instrument. It is also understood by Program Manager that any transaction initiated as an unauthorized entry or deposit is unlawful.  In the event of a violation of Applicable Law or the processing of a counterfeit, fictitious, lost, stolen or fraudulently obtained debit instrument or item, Program Manager shall be liable to Bank for any Losses or liability related to or arising out of or in connection with such transaction and shall reimburse Bank for such transaction immediately.

(ii)    Batch Out and Receipt and Transmission of a File.

a.    Program Manager agrees to "batch out" all deposits by End Users using or in connection with the RDC Services on a daily basis.  "Batch Out" shall mean the totaling, settling, or reconciling by Program Manager of all check images processed by midnight (12:00 a.m.) of the day Bank authorizes the transmission of the information contained in the batch submitted to Bank.  Program Manager agrees to upload Files based on Images from the Device daily and acknowledges that Bank cannot process the Files where the Images have not been made available to Bank.  In addition, for any Image(s) contained in an untimely Batch Out, Bank may refuse, chargeback or hold the batch until after a sixty (60) day period for consumer or customer disputes.  Program Manager acknowledges that failure to Batch Out on a timely basis may be grounds for suspension or termination of the RDC Services by Bank in Bank's sole discretion. Further, Program Manager acknowledges that failure to Batch Out will delay funds being deposited and repeated failure to Batch Out will constitute a breach of this Agreement.

b.    Program Manager shall be solely liable for any File, Image or other information contained therein that is not received by Bank, that is dropped during transmission of any File, Image or other information contained therein, or that is intercepted or altered by an unauthorized third party. Program Manager agrees that Bank shall have no obligation to accept a File or Image if it violates the terms of this Agreement, including any Bank policies related to check processing, and, therefore, may reject any File, Image or other information contained therein submitted by Program Manager. Bank shall have no liability to Program Manager or any Person for the rejection of a File, an Image or other information contained therein or for the failure to notify Program Manager or Person of such rejection.

c.    Upon receipt of a File or Image submitted by Program Manager or End User, Bank may examine such File and Image and other information contained therein to ensure that it complies with the terms of this Schedule I (Remote Deposit Capture Services), the RDC User Guide, the Bank Services Agreement, this Agreement and Applicable

Law. If Bank determines that the File and/or Image does not comply with the terms herein, the Bank Services Agreement, this Agreement or Applicable Law or if errors exist in the Images or other information contained in the File, Bank may, in its sole discretion, either reject the File or elect to correct the error and accept and process the corrected File. As a form of correction, Bank may or may cause Program Manager to credit the Deposit Account or FBO Account for the full amount of the deposit and make any necessary adjustments to the Deposit Account or FBO Account to correct the error.  If after examination of a File and the Images and other information contained therein, Bank determines that the File, Image or other information contained therein complies with and was processed and transmitted in accordance with this Schedule I (Remote Deposit Capture Services), the RDC User Guide, the Bank Services Agreement, this Agreement and Applicable Law, the File is balanced and the Images meet the requirements of the RDC User Guide and this Agreement, then Bank shall accept the File for deposit to the Deposit Account or FBO Account. Upon acceptance of the File, Bank may notify Program Manager of receipt and acceptance of the File for deposit; provided, however such confirmation and acceptance does not mean the transmission or deposit is error free or complete. Notwithstanding the fact that Bank has accepted a File for deposit, Program Manager shall remain liable to Bank for any inaccuracies, breach of warranties and any other loss sustained by, or claim made against, Bank in relation to any credit made to a Deposit Account or FBO Account.

d.  At the time Program Manager or End User initiates authorization or processing with Bank of any File, including any Check or Image through the use of the RDC Services, Program Manager represents and warrants that: (i) End User has or has authorized Program Manager to endorse all checks and other cash items for collection; (ii) the preparation and presentment of the transaction complies with the terms and conditions set forth in this Schedule I (Remote Deposit Capture Services), the RDC User Guide and this Agreement; (iii) the Image of the Check transmitted to Bank is a sufficient copy that is a true, correct, and an accurate Image that represents all the information on the front and back of the original Check at the time the original Check was truncated so that a Substitute Check created from the Image will satisfy legal equivalence requirements and the Image has not been altered in any manner by any Person; (iv) Program Manager or any third party acting on behalf of Program Manager has reviewed and confirmed that the transmission of MICR line information is identical in all respects to the original Check and that the encoded Check amount is accurate, (v) the original Check, or a paper or electronic representation, has not previously been deposited for collection with any financial institution, and no depositary bank, drawee, drawer, or endorser will be asked to pay a Check that it already has paid, (vi) Program Manager will or will cause End User to retain the original Check, or in the event that Program Manager utilizes the lockbox services of a third party or other similar services that such third party designee will retain the original check, until final settlement of the transaction and for such additional period as may be required in the event of a disputed truncated or Substitute Check, including claims that the Check or electronic representation does not satisfy legal equivalence requirements, so that the original check can be processed for collection, and that Program Manager or its third party designee or End User will take reasonable efforts to safeguard any original Checks until they are destroyed, (vii) Program Manager has no knowledge or notice of information to indicate that the transaction is fraudulent; (viii) that each Check is for an amount agreed to by the End User; (ix) Program Manager nor any of its respective employees or third party designees have submitted Checks drawn from their personal checking accounts; and (x) no transaction submitted for authorization to Bank is with or through a Person other than Program Manager or End User.

e.  Bank shall be conclusively entitled to deem the remote deposit capture transaction authorized and binding upon Program Manager and End User: (i) if the electronic transmission of the Check, Image or File is made by, or Bank reasonably believes the transmission of the Check, Image or File was made by, Program Manager, End User or any of their apparent agents or authorized representatives; (ii) if Program Manager utilizes the services of a third party to facilitate the processing of the Check, Image or File, and Bank reasonably believes that such transaction and transmission by such third party are sent on behalf of Program Manager or End User; (iii) if the Program Manager, End User, or any off their respective affiliates, principals, employees, representatives or agents benefit from the transaction or transmission of such Check, Image of File, whether directly or indirectly; or (iv) the Check, Image or File is transmitted through the application program interface (API) made available by Bank; such API submission to be deemed a commercially reasonable security procedure by the parties, as contemplated by the Uniform Commercial Code.  See Schedule J (Security Procedures) for additional information.

(iii)  Returned Items.

a.  Program Manager shall obtain End User's authorization for Bank to represent all items that are returned to Bank and to originate an electronic entry for the amount of any allowable recovery fee. Bank shall present the entry no more than two (2) times.  Bank shall be entitled to assess a transaction fee from Program Manager for each representment. If a check is returned unpaid after presentment, Bank shall be entitled to debit any account Program Manager holds with Bank or exercise any other rights it has under this Agreement or under Applicable law.

b.  Bank shall have no liability or obligation regarding any transaction processed at the request of Program Manager or Servicer for any dishonored or returned check transaction, including, if any Check is: (i) not honored by a customer's financial institution; (ii) fraudulent, whether Program Manager, its Servicers or their respective employees or agents are involved, either as a principal or as an accessory, in the issuance; (iii) lost, stolen, altered or counterfeit; (iv) given as a substitute for a previously accepted Check, whether or not the previous Check was authorized by the maker or, any Check upon which Program Manager or its Servicer has accepted full or partial payment; (v) one of multiple Checks presented in a single transaction; (vi) for goods, if the goods are subsequently

 — not applicable

returned by customer or repossessed; (vii) previously denied authorization; (viii) related to a transaction for which cash is returned back to a customer; (ix) not in compliance with this Agreement, Bank Policies, Compliance Policies, the Bank Services Agreement or Applicable law and not processed in accordance with this Schedule I (Remote Deposit Capture Services); or (x) illegible or not permitted for deposit, including Checks with incorrect MICR data scans or reads.

c.   Program Manager shall notify End User that if an Eligible Item deposited using the RDC Services is dishonored or otherwise returned to Bank as unpaid, for non-sufficient funds, or for any other reason, including by a clearing agent for any reason (including but not limited to, issues relating to the quality of the Image) and the original Check was destroyed, the original Check will not be returned, and Bank may charge back an Image of the Check and all fees associated with the returned item to the Deposit Account or FBO Account balance associated with the End User. Program Manager understands and shall obtain End User's consent in order for Bank to process the Image of any replacement of an original Check in the form of an electronic or paper reproduction of the original Check. Unless otherwise instructed by Bank, Program Manager agrees not to (and shall cause End User not to) deposit or submit the original Check if an Image or other debit is charged back to the Deposit Account or FBO Account balance associated with the End User.

d.   If this Agreement is terminated for any reason, Bank will retain the right to complete the representment process for all returned Check items prior to said termination. Any collection fees received by Bank in collecting returned Checks shall be the sole property of Bank.

(g)   **Maintenance, Retention and Destruction of Original Check**.

(i)   After the Check is deposited using the RDC Services, Program Manager shall (or shall cause End User to) securely store all original Checks for a minimum of ninety (90) days after the Check has been posted to the Deposit Account(s) or applicable FBO Account (such period is the "Retention Period"). During the Retention Period, Program Manager shall (or shall cause End User to) take appropriate security measures to ensure that: (a) such deposited Checks are stored in a location away from daily processing activity; (b) only authorized individuals or personnel have access to original Checks, (c) the information contained on such Checks shall not be disclosed, (d) such Checks will not be duplicated or scanned more than one time or physically deposited at the Bank after being electronically deposited and (e) such Checks will not be deposited or negotiated in any form.

(ii)   Program Manager shall (or shall cause End User to) destroy original Checks upon the expiration of the Retention Period applicable to such Checks. Program Manager will use (and cause End User to use) commercially reasonable methods to destroy original Checks after expiration of the Retention Period. Cross-cut shredding is strongly recommended for Check destruction. Program Manager is responsible and liable for any claims, losses or damages incurred by Bank resulting from or in connection with the destruction of original Checks.

(iii)   Program Manager will promptly (and cause End User to promptly) (but in all events within forty-eight (48) hours) provide any retained original Check or other information to Bank as requested by Bank to aid in the clearing and collection process or to resolve claims by third parties with respect to any Check or in connection with any deposit using the RDC Services. If the original Check has been destroyed and Bank needs the original Check to process a payment, re-present a Check in order to collect a returned Image or Substitute Check, or resolve a dispute arising from a deposit through the RDC Services, Program Manager shall be responsible for providing (or causing its End User to provide) Bank with a replacement check.  However, if the original Check was not retained and not able to be replaced or lost by Program Manager or End User, Bank will not be able to process or re-present the transaction.

(h)   **Hardware and Software**.

(i)   Program Manager shall and shall cause End Users to scan each Check through a Bank approved Device to initiate the RDC Services under this Schedule I (Remote Deposit Capture Services), the RDC User Guide, this Agreement and Applicable Law; provided, however, Bank shall not be liable for any Losses related to the Device (it being understood that Program Manager is completely liable for all Losses and obligations associated with a Device). Program Manager shall provide to End User a Device in order to access or otherwise use the RDC Services in compliance with the terms of this Agreement and the Bank Services Agreement. Program Manager shall ensure it has all Intellectual Property rights to a Device and has otherwise obtained all licenses necessary for each End User and Bank (to the extent applicable) to use a Device in connection with the RDC Services, and Program Manager represents and warrants that the Device and any related software used by an End User to access the RDC Services shall not infringe upon the Intellectual Property rights of any Person.  Program Manager shall defend, indemnify and hold Bank Indemnitee Parties harmless for any Losses arising out of or in connection with any claim that the Device or any related Intellectual Property (including any technology to capture or create an image of a Check) infringes or misappropriates the Intellectual Property of any third Party. Upon approval of such Device by Bank, Program Manager shall assign an identification number for each Device. As between Bank and Program Manager, Program Manager is responsible for all telecommunication fees and charges, including but not limited to telephone fees, associated with and related to the use of the software or Device.  Program Manager shall maintain (and shall cause End User to maintain) all equipment related to electronic check processing in good working order and shall monitor such equipment for viruses, defects, malfunctions, Device, system or software failures or interruptions at Program Manager's sole expense. Program Manager shall advise Bank immediately in the event of a breakdown of a Device, software, or of any other system failure.

Program Manager acknowledges that Bank is not responsible for any equipment or software problems. Moreover, Bank's approval of such equipment does not constitute nor express an implied warranty, representation or endorsement of such equipment. Program Manager agrees to utilize only equipment approved by Bank for the processing of Checks and in a format and medium of transmission acceptable to Bank.

(ii) Program Manager acknowledges that a Device may not capture all security features (e.g., watermarks) contained in or on the Eligible Item, and that Program Manager shall (or shall cause End User) to manually examine the paper item to determine the authenticity prior to creating an Image. Program Manager assumes all responsibility for any losses resulting or in connection with any claims based on the security features that do not survive the processing of the Image.

(iii) If Bank determines to provide any software or user materials (the "<u>Bank Software</u>") for use with the RDC Services, Bank may from time to time, make modifications or updates to the Bank Software and Program Manager agrees to (and agrees to cause Servicer to) adopt such updates or modifications as they become available. Any Bank Software shall be subject to a separate software licensing agreement. The Bank Software may only be used to submit transactions to Bank as contemplated herein. Any license of and permission to use the Bank Software is non-exclusive and nontransferable, and it extends only to Program Manager's or End User's use for the purpose of processing transactions hereunder in accordance with this <u>Schedule I</u> (<u>Remote Deposit Capture Services</u>), the RDC User Guide and this Agreement. The Bank Software may not be used to process transactions with or through any other party without the express written consent of Bank and may not be exported in contravention of U.S. or foreign export laws.

(i) **<u>Fund Availability</u>**.

(i) Program Manager agrees that items transmitted using the RDC Services are not subject to the funds availability requirements of Federal Reserve Board Regulation CC, and Program Manager shall notify End User of such exclusion. Bank, in its sole discretion, may make funds available sooner or may extend the hold period based on such factors as credit worthiness, the length and extent of End User's relationship with Bank, transaction and experience information, risk associated with the item and such factors as Bank, in its sole discretion, deem relevant. Bank may also delay availability if there is an emergency, such as failure of computer or communications equipment.

(ii) Program Manager shall not reflect to any End User that funds are available for use before Bank receives funds for any Check deposited through the RDC Services. Until Program Manager receives confirmation that the funds are made available, Program Manager may not permit End Users to withdraw funds. If Bank pays items or honors other withdrawals before funds are available, Bank may charge a fee for this. If Program Manager successfully transmits an Image to Bank before the cutoff time of [6 PM CT] for the Deposit Account or FBO Account on a Business Day, Bank will consider that day to be the day of the deposit. After that time, Bank will consider the deposit to be made on the next Business Day. Even after the item has "cleared," Bank has made funds available to End User, and End User has withdrawn the funds, Program Manager is still responsible for items deposited that are returned to Bank unpaid and for any other problems involving the End User's deposit.

**SCHEDULE J**

**SECURITY PROCEDURES**

The Parties agree that certain Bank Services, Entries, payment orders and transactions initiated, processed or submitted in connection with Bank Services are subject to the Security Procedures. Program Manager and Bank agree to the Security Procedures set forth in this Schedule J (Security Procedures). In the event Program Manager does not agree to the Security Procedures set forth in this Schedule J (Security Procedures), Program Manager authorizes Bank, as Program Manager's limited agent, to adopt security procedures that shall then be considered to be the Security Procedures and shall be considered and deemed adopted by Program Manager as a "security procedure" for purposes of UCC § 4A-201. Program Manager represents, warrants and agrees that the Security Procedures constitute a "security procedure" for purposes of UCC § 4A-201. Program Manager represents and warrants that: (a) it considers itself qualified to have, and has, independently evaluated the risks presented by the Security Procedures; (b) it has determined that the Security Procedures are no less protective than other security procedures in use by similarly situated companies; and (c) the Security Procedures are commercially reasonable under Applicable Law, including within the meaning of UCC § 4A-202, for the initiation, submission, processing and/or origination of Entries, transaction requests, payment orders, and any payment instructions related to the Bank Services (each a, "Covered Transaction" and collectively, "Covered Transactions").

The Program Manager and Bank shall comply with the Security Procedures with respect to Covered Transactions it submits or will submit to Bank. The Program Manager acknowledges that the purpose of such Security Procedures is to verify authenticity and not to detect an error in the transmission or content of Covered Transactions. No Security Procedures have been agreed upon between Bank and the Program Manager for the detection of any such error and Program Manager shall be solely responsible for any errors, including transmission errors. If Program Manager believes or suspects that any such information or instructions have been known or accessed by unauthorized persons, Program Manager agrees to notify Bank within one (1) Business Day, followed by written confirmation. The occurrence of unauthorized access will not affect any Covered Transactions made in compliance with the Security Procedures prior to receipt of such notification and within a reasonable time period to prevent unauthorized transfers or requests. Program Manger acknowledges and agrees that the Security Procedures include Bank's Positive Pay service, which prevents unauthorized transfers or requests through debit and credit filters.

Program Manager must ensure that no individual will be allowed to initiate or submit a request for a Covered Transaction in the absence of proper supervision and safeguards, and agrees to take reasonable steps to maintain the confidentiality of Security Procedures and any passwords, codes, security devices and related instructions provided by Bank in connection with the Security Procedures. If Program Manager believes or suspects that any such information or instructions are accessed by unauthorized persons, Program Manager will verbally notify Bank immediately followed by written confirmation. The occurrence of unauthorized access will not affect any Covered Transactions or any other transfers in connection with Origination Services made in good faith by Bank prior to receipt of notification and within a reasonable time period to prevent unauthorized transfers or transactions.

If a Covered Transaction (or a request for cancellation or amendment of a Covered Transaction) received by Bank purports to be transmitted or authorized by Program Manager, it will be deemed effective as Program Manager's Covered Transaction (or request) and Program Manager shall be obligated to pay Bank the amount of such Covered Transaction (or request) even though the Covered Transaction (or request) was not authorized by the Program Manager, provided Bank acted in compliance with the Security Procedures. If a Covered Transaction (or request for cancellation or amendment of a Covered Transaction) received by Bank was transmitted or authorized by the Program Manager, the Program Manager shall be obligated to pay the amount of the Covered Transaction, whether or not Bank complied with the Security Procedures and whether or not that Covered Transaction was erroneous in any respect or that error would have been detected if Bank had complied with such Security Procedures.

If Program Manager has been given access to and otherwise uses the Bank's API, any Covered Transaction submitted to Bank through the API shall be considered authorized by Program Manager in accordance with this Security Procedure. Program Manager acknowledges and agrees that the submission of a Covered Transaaction to Bank's API using the application program interface of Program Manager shall constitute a commercially reasonable means to verify that authenticity of the Covered Transaction and that such Covered Transaction is that of the Program Manager's. No Covered Transaction will be considered delivered to Bank until the Bank's API receives the Covered Transaction and such Covered Transaction enters the Bank's environment. Bank may rely on any Covered Transaction submitted through the API.

Program Manager acknowledges and agrees that limiting access and securely storing data used in the routing and settlement of ACH and wire transactions is a critical data security precaution. Program Manager's ability to limit access to production data can be done through commercially available software products. Access can be limited to specific programs, user IDs or read-only or read-and-edit-only access functionality. Files can also be transmitted between ACH and/or wire participants using the following data protection methods: encryption and authentication.

- **Encryption** is a process of scrambling data content through hardware or software in order to protect the confidentiality of a file's contents. This information should remain encrypted between all parties in the ACH network using a technology that provides a commercially reasonable level of security that complies with applicable regulatory requirements.

DocuSign Envelope ID: 2780B3D1-6768-4138-9A3E-4552CE889477

- **Authentication** is a process of ensuring that files and data content have not been altered between the Orginator and receiving points.  Like encryption, this can be done using hardware or software to ensure data integrity.

**Transmittal of Covered Transactions:**

- Files will be encrypted by the Program Manager before being transmitted to Bank.

- Program Manager will only transmit files on the dates specified by Bank or as set forth in the Bank Policies. Program Manager will email Bank for every file transmission in the form or format required by Bank or as set forth in the Bank Policies.

Should any of the above procedures not be met, the file will be rejected by Bank and Company will be notified.

DocuSign Envelope ID: 2780B3D1-6768-4138-9A2E-1552CE880477

## SCHEDULE K

## ANCILLARY SERVICES

If approved by Bank in connection with any Program, Bank may, from time to time, provide additional services described in each addendum annexed hereto and made part of this Agreement (each, "Addendum" and each service set forth in the Addendum, the "Ancillary Service" and collectively with any other Ancillary Service, the "Ancillary Services") in accordance with the terms set forth in this Schedule K (Ancillary Services), the Addendum applicable to the Ancillary Service, the Specifications and this Agreement. Program Manager shall comply with and use each Ancillary Service in accordance with the Specifications, the applicable Addendum, this Agreement and in compliance with Applicable Law. Capitalized terms used in this Schedule K (Ancillary Services) shall have the meaning prescribed to them under the terms of the Agreement.

(a) **Accessing the Ancillary Services**. If Program Manager pays all applicable fees when due, Bank shall provide Program Manager with access to and use of the Ancillary Services approved by Bank in accordance with this Schedule K (Ancillary Services), the applicable Addendum, this Agreement and Bank's then-current standard user operating instructions, policies, procedures and requirements made available to Program Manager from time-to-time and as amended from time-to-time ("Specifications"). Based on Program Manager's instructions, Bank shall use commercially reasonable efforts to implement parameter settings, features and options (collectively, the "Parameters") within the Ancillary Services; provided, however, Program Manager shall ensure all Parameters comply with Applicable Law and with the terms and conditions of any agreements with End Users and the implementation of such Parameters, and the operation of the Ancillary Services incorporating such Parameters, complies with Applicable Law. Bank shall have the right to approve or refuse any requested Parameters without liability.

(b) **Data Necessary to Access or Provide the Ancillary Services**. Program Manager shall provide to and timely deliver to Bank: (i) all information Bank determines, in its sole discretion, necessary to provide or furnish the Ancillary Services in accordance with the terms of this Agreement, the applicable Addendum and Specifications; (ii) any information, data, records or documents necessary for Bank to perform an Ancillary Service; or (iii) any other information deemed necessary by Bank for the provision of the Ancillary Service in an electronic form and format approved by Bank (collectively, (i) through (iii) in this subsection (b) are referred to as the "Data"). Program Manager shall be solely responsible for timely procuring any information or cooperation required from any third party in order to commence the Ancillary Services, ensuring the accuracy, completeness or authenticity of any Data furnished by Program Manager or a third party (other than a third party engaged on Bank's behalf, other than Program Manager) and for training its employees and representatives to comply with Applicable Laws and the Specifications or any manual or other literature provided to Program Manager by Bank.

(c) **Transmission and Submission of Data**. Program Manager shall be solely responsible for the transmission of any Data at Program Manager's expense, and, as between Program Manager and Bank, Program Manager shall bear any risk of loss resulting from that transmission until the Data enters Bank's environment. Data may include End User or information of other Persons. Bank shall bear the risk of loss resulting from Data transmitted from Bank's systems to Program Manager until the Data enters Program Manager's environment. Program Manager hereby authorizes and directs Bank to transmit Data to the providers of Third-Party Services as necessary to perform its obligations under this Agreement or to provide or make available the Ancillary Services or Third-Party Services. Program Manager shall call Bank's APIs to provide Bank with Data in accordance with this Agreement and the Specifications for the provision of Ancillary Services and/or Third-Party Services. Bank shall not be responsible for the accuracy, completeness or authenticity of any Data furnished by Program Manager or a third party, and shall have no obligation to audit, check or verify that Data. If any Data submitted by Program Manager or a third party to Bank is incorrect, incomplete or not in the required format, Bank may require Program Manager to resubmit the Data or Bank may correct the Data and bill Program Manager its then-current rates for performing those corrections. Bank shall attempt to notify Program Manager prior to Program Manager incurring such expense. Program Manager shall maintain a copy of all Data submitted to Bank (whether directly or through a third party) to permit reconstruction if ever required. Program Manager assumes all risk and expense associated with Data reconstruction, except for those expenses incurred as a direct consequence of Bank's breach of this Agreement. If Data reconstruction is ever required, the Parties shall mutually agree on a schedule for that reconstruction.

(d) **Changes to Ancillary Services, API or Specifications**. Bank may, in its sole discretion, make changes to any feature, function, brand, third-party provider, or attribute of an Ancillary Service, API or any Specification, from time-to-time. Bank may require Program Manager to obtain and use the most recent version of the Bank API. Updates may adversely affect how Program Manager's applications communicate with the Ancillary Services. Program Manager shall be responsible for making any changes to Program Manager's application that are required for any integration as a result of such update at Program Manager's sole cost and expense. Neither Bank nor any Third-Party Provider is obligated to provide any updates or modifications to Ancillary Services, Specifications or Third-Party Services; however, this Schedule K (Ancillary Services), applicable Addendum, this Agreement and the Third-Party Agreement (if any) will govern any updates which are made available. Program Manager's continued use of the Ancillary Services following an update constitutes acceptance of the update. If Program Manager requests a change to an Ancillary Service, the Parties shall negotiate the terms for such change, which terms will be set forth in a mutually agreed upon amendment to the Addendum describing the specific Ancillary Service to be changed. Bank shall have the right to modify its parameters, controls, specifications on the various components of the Ancillary Services to improve the Ancillary Services or to prevent fraud or other illegal or criminal activity or to address any risk concerns of Bank.

(i)  Third Party Providers and Third-Party Services. Bank may, directly or indirectly, at any time and from time to time, provide or delegate some or all of its duties to perform the Ancillary Services through one or more third parties at its sole discretion. Program Manager shall not rely on the identification of specific brands associated with or names of third-party providers of an Ancillary Service as an obligation of Bank to use any particular brand or third-party provider. If an Ancillary Service is provided by a third party ("Third-Party Service" and such provider, the "Third-Party Provider"), the following subsections also apply: (i) Program Manager acknowledges that Bank is not the provider of any Third-Party Service; (ii) Bank makes no warranties or representations of any kind regarding the correctness, accuracy, completeness, merchantability or fitness of any Third-Party Service or any associated data, information or system; and (iii) if a Third-Party Service is terminated prior to the end of its term either (a) by Program Manager or by Bank at Program Manager's request, or (b) as a result of Program Manager's action or inaction, Program Manager shall pay Bank, in addition to any other amounts owed, an amount equal to any termination costs and fees incurred or owing by Bank as a result of such termination. Program Manager shall not be entitled to a refund of any pre-paid amounts.

(ii)  From time to time, a Third-Party Provider may require (i) Program Manager to enter into separate agreement(s) related to the Third-Party Service (each, "Third-Party Agreement") and/or (ii) changes to the terms herein related to the Third-Party Service. If Program Manager uses the Third-Party Service, Program Manager must enter into a Third-Party Agreement with the Third-Party Provider, and comply with the terms and conditions of such Third-Party Agreement.

(iii)  In the event of a change to the Third-Party Service required by a Third-Party Provider, Bank shall use reasonable efforts to notify Program Manager of such changes by any reasonable means. Program Manager's continued use of the applicable Third-Party Service after notification by Bank shall constitute Program Manager's acceptance of such changes.

(iv)  From time to time, Bank may make additional Third-Party Services available to Program Manager. Unless otherwise agreed in writing by the Parties, such additional Third-Party Services shall be subject to this Schedule K (Ancillary Services), the applicable Addendum and this Agreement and may be subject to additional Third-Party Agreements. Program Manager shall comply with all Applicable Laws which govern the use of the Ancillary Services and Third-Party Services, and any information provided therein.

(v)  Except as otherwise permitted in the Agreement or in writing by Bank, Program Manager agrees to use any Ancillary Service or Third-Party Service only for its own internal business purposes to service its U.S.-based operations and customers and will not sell or otherwise provide, directly or indirectly, any of the Ancillary Services, Third-Party Services, or any portion thereof to any other third party.

(e)  **Disclaimer of Warranties Regarding Ancillary Services and Third Party Services**. IN ADDITION TO THE DISCLAIMERS OF WARRANTIES UNDER THE TERMS OF THIS AGREEMENT, BANK AND EACH THIRD-PARTY PROVIDER DISCLAIMS ANY AND ALL WARRANTIES, CONDITIONS, OR REPRESENTATIONS (EXPRESS OR IMPLIED, ORAL, STATUTORY OR WRITTEN) WITH RESPECT TO THE ANCILLARY SERVICES, THIRD-PARTY SERVICES, AND OBLIGATIONS PROVIDED UNDER OR PURSUANT TO THIS SCHEDULE K (ANCILLARY SERVICES) OR ANY ADDENDUM, INCLUDING, WITHOUT LIMITATION, ANY AND ALL IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS OR SUITABILITY FOR ANY PARTICULAR PURPOSE, TITLE AND NON-INFRINGEMENT AND ERROR-FREE OPERATION (INCLUDING THAT THE ANCILLARY SERVICES OR THIRD-PARTY SERVICES WILL OPERATE IN COMBINATION WITH ANY OTHER HARDWARE, SOFTWARE, OR SYSTEMS) (EVEN IF CREATED BY THE INTERNATIONAL SALE OF GOODS CONVENTION, AND WHETHER OR NOT BANK OR A THIRD-PARTY PROVIDER KNOWS, HAS REASON TO KNOW, HAS BEEN ADVISED, OR IS OTHERWISE IN FACT AWARE OF ANY SUCH PURPOSE), WHETHER ALLEGED TO ARISE BY LAW, BY REASON OF CUSTOM OR USAGE IN THE TRADE, OR BY COURSE OF DEALING. THE ANCILLARY SERVICES AND ALL THIRD-PARTY SERVICES ARE PROVIDED "AS IS". IN ADDITION, BANK AND EACH THIRD-PARTY PROVIDER DISCLAIMS ANY WARRANTY OR REPRESENTATION TO ANY PERSON OTHER THAN PROGRAM MANAGER WITH RESPECT TO THE ANCILLARY SERVICES, THIRD-PARTY SERVICES, AND MATERIALS PROVIDED UNDER THIS SCHEDULE K (ANCILLARY SERVICES) OR ADDENDUM. WITHOUT LIMITING THE FOREGOING, NEITHER BANK NOR THIRD-PARTY PROVIDER MAKES ANY WARRANTY OF ANY KIND THAT THE ANCILLARY SERVICES OR THIRD-PARTY SERVICES, OR ANY PRODUCTS OR RESULTS OF THE USE THEREOF, WILL MEET PROGRAM MANAGER'S OR ANY OTHER PERSON'S REQUIREMENTS, OPERATE WITHOUT INTERRUPTION, ACHIEVE ANY INTENDED RESULT, BE COMPATIBLE OR WORK WITH ANY SOFTWARE, SYSTEM, OR OTHER SERVICES, OR BE SECURE, ACCURATE, COMPLETE, FREE OF HARMFUL CODE, OR ERROR FREE. DUE TO THE NATURE OF PUBLIC RECORD AND DATA CONSORTIUM INFORMATION, THE PUBLIC RECORDS AND COMMERCIALLY AVAILABLE DATA SOURCES MADE AVAILABLE WITH THE ANCILLARY SERVICES MAY CONTAIN ERRORS. SOURCE DATA IS SOMETIMES REPORTED OR ENTERED INACCURATELY, PROCESSED POORLY OR INCORRECTLY, AND IS GENERALLY NOT FREE FROM DEFECT. THE CRIMINAL RECORD DATA THAT MAY BE PROVIDED AS PART OF THE ANCILLARY SERVICES MAY INCLUDE RECORDS THAT HAVE BEEN EXPUNGED, SEALED, OR OTHERWISE HAVE BECOME INACCESSIBLE TO THE PUBLIC SINCE THE DATE ON WHICH THE DATA WAS LAST UPDATED OR COLLECTED. THE ANCILLARY SERVICES ARE NOT THE SOURCE OF DATA, NOR ARE THEY A COMPREHENSIVE COMPILATION OF THE DATA. BEFORE RELYING ON ANY DATA, IT SHOULD BE INDEPENDENTLY VERIFIED.

(f) **Reporting a Problem with an Ancillary Service**. Program Manager shall timely report any problems encountered with any Ancillary Service. Bank shall promptly respond to each reported problem based on its severity, the impact on Program Manager's operations and the effect on such Ancillary Service. Bank shall use reasonable commercial efforts to either resolve each problem or provide Program Manager with information to enable Program Manager's personnel to resolve it.

(g) **Restrictions**.

(i) Except as expressly permitted in this Schedule K (Ancillary Services), the accompanying Addendum or this Agreement, Program Manager may not, and may not enable others to: (i) use the Ancillary Services or Third-Party Services for personal (non-business) purposes and Program Manager represents and warrants that all of Program Manager's use of the Ancillary Services and any Third-Party Services shall be for only legitimate business purposes, including those specified by Program Manager in connection with a specific information request, relating to its business and as otherwise governed by the Agreement; (ii) assign, distribute, display, outsource, disclose, rent, lease, lend, upload to or host on any website or server, license, sublicense, copy, transfer, sell, broker, publish or otherwise distribute or make available the Ancillary Services or Third-Party Services, or permit either direct or indirect access to or use of the Ancillary Services or Third-Party Services, in whole or in part; (iii) exceed the usage rights for the Ancillary Services or Third-Party Services; (iv) allow or otherwise permit access or use of the Ancillary Services or Third-Party Services on a commercial time-sharing, lease, rental, outsourcing, or service bureau basis; (v) use Ancillary Services or Third-Party Services in a manner that is illegal, libelous, obscene, threatening, defamatory, or in any manner that violates, infringes or misappropriates the privacy or intellectual property rights of third parties; (vi) attempt to gain unauthorized access to the Ancillary Services or Third-Party Services or its related systems or networks, or systematically access the Ancillary Services or Third-Party Services using "bots" or "spiders"; or (vii) copy, decompile, reverse engineer, disassemble, adapt, attempt to derive the source code of, modify, decrypt, or create derivative works, or make any other attempt to: (a) discover, derive, or obtain the source code of any Ancillary Service or Third-Party Service (as applicable); (b) send through or store infringing or unlawful material in any Ancillary Service or Third-Party Services; (c) use the Ancillary Services or Third-Party Services in any manner or for any purpose that infringes, misappropriates, or otherwise violates any intellectual property right or other right of any person, or that violates any applicable law; (d) send through or store malicious code (such as viruses or Trojan horses) in any Ancillary Service or Third-Party Service; (e) attempt to or gain unauthorized access to, or disrupt the integrity or performance of, any Ancillary Service or Third-Party Services; (f) access any Ancillary Service or Third-Party Service for the purpose of building a competitive product or service; (g) use any Ancillary Service or Third-Party Service, or permit it to be used, for purposes of product evaluation, benchmarking, or other comparative analysis intended for publication (except as and only to the extent any foregoing restriction is prohibited by Applicable Law); (h) design or permit its applications to disable, override, or otherwise interfere with any Bank-implemented communications to end users, consent screens, user settings, alerts, warning, or the like; (i) remove any proprietary notices from the Bank platform; (j) use the Ancillary Services in any of its applications to replicate or attempt to replace the user experience of the Ancillary Service; (k) attempt to cloak or conceal its identity or the identity of its applications when requesting authorization to use the Ancillary Services or Third-Party Services; (l) except to the extent required by Applicable Law, use or access the Ancillary Services in a manner that contributes to the discrimination or denial of services to an end user of Program Manager's product or service on the basis of nationality or national origin; (m) use the Ancillary Services or Third-Party Services for marketing purposes; or (n) access the Ancillary Services or Third-Party Services through any internet protocol or over any internet or network address ("Internet Protocol") located outside of the United States and its territories.

(ii) In addition to the above restrictions, Program Manager shall not use any Ancillary Services or Third-Party Services to: (i) distribute e-mail, instant messages, text messages, or other communications in an illegal manner, including, but not limited to, creating or sending hoax e-mail or chain e-mail, sending unsolicited commercial e-mail or bulk e-mail (aka spam or spamming), harvesting e mail addresses, using open proxies or relays to allow spamming, impersonating someone else (aka spoofing), or falsifying message header information; (ii) gain unauthorized access to computer systems or engage in security attacks of any kind, including, but not limited to, security attacks against trust (such as e-mail spoofing, password cracking, IP spoofing, and DNS poisoning), against confidentiality and integrity (by using malware such as computer viruses, worms, Trojan horses, rootkits, keyloggers, spyware, or other malicious programs and code), or against availability (such as denial of service and e-mail bombs); (iii) corrupt, modify, or intercept electronic communications intended for any other person or entity; (iv) interfere with or disrupt the operation of the Ancillary Services or Third-Party Services; (v) conduct or engage in any illegal business or activity, infringe any third-party intellectual property rights, collect, copy, or process information in a way that breaches data protection laws or leads to a wrongful breach of privacy, or create, distribute, process, or view any defamatory, obscene, indecent, pornographic, racist, sexist, or otherwise discriminatory, misleading, deceptive, fraudulent, or otherwise objectionable, offensive, or illegal material; (vi) use the Ancillary Services or Third-Party Services for eligibility determinations regarding consumers for credit, insurance, employment, or any other "permissible purpose" as defined in Section 604 of the Fair Credit Reporting Act ("FCRA"); (vii) use the Ancillary Services in violation of the provisions of and regulations pursuant to the Drivers Privacy Protection Act (18 U.S.C. Section 2721 et seq.) and related state laws (the "DPPA"); (viii) use the Ancillary Services other than pursuant to an exception of the privacy provisions of and regulations issued pursuant to the GLBA; or (ix) use the Ancillary Services in violation of such other future legislation that Bank or Third-Party Provider reasonably determines limits the use of the Services and Data.

(h) **No Grant of Rights**. There are no implied licenses granted under this <u>Schedule K</u> (<u>Ancillary Services</u>), any Addendum or this Agreement and, neither this <u>Schedule K</u> (<u>Ancillary Services</u>) or any Addendum thereto, shall be construed as granting or implying any rights to Program Manager with respect to any intellectual property rights of Bank or any Third-Party Provider that are not expressly granted under the terms of this Agreement. As between Program Manager and Bank, Bank retains all rights, title and interest in and to the Specifications, Ancillary Services and any data related to Ancillary Services. Program Manager further agrees that each Third-Party Provider is the sole and exclusive owner of all rights, title, and interest in and to such provider's Third-Party Service. Program Manager agrees it will not contest Bank's or such provider's ownership of Ancillary Services, Third-Party Services and any data or intellectual property related thereof.

(i) **Professional Services**. Bank may provide Program Manager with general support for Ancillary Services during normal business hours, provided Program Manager has paid all fees due hereunder. In the event that Program Manager wishes to receive implementation, customization, and/or other professional services from Bank in connection with the Ancillary Services or Third-Party Services (collectively, the "<u>Professional Services</u>"), Program Manager may purchase such Professional Services at Bank's then-current hourly rates under a separate professional services agreement. Bank is not responsible for the configuration, maintenance, or correction of third-party software, hardware, or communications facilities.

(j) **Control of Systems and Applications**. Except as otherwise expressly provided in this <u>Schedule K</u> (<u>Ancillary Services</u>) and this Agreement, as between the parties, Bank shall retain sole control over the operation, provision, maintenance and management of its systems and applications, and Program Manager shall retain sole control over the operation, maintenance and management of, and access to and use of, the Program Manager's systems and applications.

(k) **Suspension of Services**. Notwithstanding anything to the contrary in this Agreement, Bank may suspend Program Manager's and any authorized End User's or Person's access to any portion of the Ancillary Services or any Third-Party Service if Bank determines or reasonably suspects that (i) the continued provision of the Ancillary Services or any Third-Party Service to Program Manager entails a potential security risk to Bank, a Third-Party Provider or any other third party; (ii) Program Manager is violating any material provision of this Agreement; (iii) Program Manager, or any authorized End User or Person, is using the Ancillary Services or any Third-Party Service for any fraudulent or illegal activity; (iv) Bank's provision of services to Program Manager or any authorized End User or Person violates Applicable Law; (v) any vendor of Bank has suspended or terminated Bank's access to or use of any third-party product or service required to enable Program Manager to access or use an Ancillary Service or (vi) to suspend any Program that any Ancillary Service supports. Bank may at any time mask or cease to provide Program Manager access to any Bank's services or portions thereof which Bank may deem, in Bank's sole discretion, to be sensitive or restricted information.

(l) **Bank's Business Interests**. Program Manager acknowledges that Bank has, and shall be entitled to continue to have, create and acquire, directly or indirectly, business interests in addition to those in relation to the provision of the Ancillary Services hereunder, including, without limitation, the provision of services similar to Ancillary Services to other third parties who may have a direct or indirect relationship with Bank. Further, Bank shall be entitled to have, create, acquire business interests and activities for its own account and for the account of others, without having our incurring any obligation to offer any interest in such businesses, activates or opportunities to Program Manager. Program Manager shall not have any rights by virtue of this Agreement or relationship created by this <u>Schedule K</u> (<u>Ancillary Services</u>) or any Addendum thereto in any such business interests, activities or opportunities, whether now existing or hereafter created or acquired.

(m) **Administrator and Users**. Bank will offer Program Manager's designated employees an account to access the Ancillary Services and certain Third-Party Services (the "<u>Administrators</u>"). Administrators can add, remove, and manage other employees of Program Manager that are authorized to open an account to access the Ancillary Services (<u>"Users"</u>). Program Manager is responsible for any actions or failure to act on the part of Administrators, Users, and those using credentials issued to Administrators or Users to access the Ancillary Services or Third-Party Services on behalf of Client. For the avoidance of doubt, Bank is not responsible for any harm caused by an Administrator or User in connection with such Person's access to or use of the Ancillary Services. Program Manager acknowledges that the information available through the Ancillary Services and/or Third-Party Services may include personally identifiable information and the proprietary data of the Third-Party Provider and it is Program Manager's obligation to keep all such accessed information confidential and secure. Accordingly, Program Manager shall (i) restrict access to the Ancillary Services and Third-Party Services to those employees who have a need to know as part of their official duties; (ii) ensure that none of its employees shall (y) obtain and/or use any information from the Ancillary Services or Third-Party Services for personal reasons, or (z) transfer any information received through the Ancillary Services and/or Third-Party Services to any party except as permitted hereunder; (iii) keep all user identification numbers, and related passwords, or other security measures (collectively, "<u>User IDs</u>") confidential and prohibit the sharing of User IDs; (iv) immediately deactivate the User ID of any employee who no longer has a need to know, or for terminated employees on or prior to the date of termination; (v) in addition to any obligations herein or Specifications, take all commercially reasonable measures to prevent unauthorized access to, or use of, the Ancillary Services and/or Third-Party Services or data received therefrom, whether the same is in electronic form or hard copy, by any person or entity; (vi) be capable of receiving data from the Ancillary Services and Third-Party Services where the same are provided utilizing "secure socket layer," or such other means of secure transmission as is deemed reasonable by Bank; (vii) not access and/or use the information provided through the Ancillary Services or Third-Party Services via mechanical, programmatic, robotic, scripted or other automated search means, other than through batch or machine-to-machine applications approved by Bank; and (viii) take all steps to protect their networks and computer environments, or those used to access the Ancillary Services or Third-Party Services, from compromise. Program Manager immediately will notify Bank if Program Manager knows of or suspects unauthorized access to Ancillary Services or User ID.

## CUSTOMER CARE SERVICE ADDENDUM

This Customer Care Service Addendum (the "Customer Care <u>Addendum</u>") is attached to, made a part of and incorporated into the Agreement and <u>Schedule K</u> (<u>Ancillary Services</u>) under the Agreement, and capitalized words not otherwise defined herein have the meaning set forth in the Agreement. The Agreement applies to the Customer Care Services (as defined below) provided pursuant to <u>Schedule K</u> (<u>Ancillary Services</u>) and this Customer Care Addendum, and Services hereunder are considered Ancillary Services under <u>Schedule K</u> (<u>Ancillary Services</u>) and the Agreement. To the extent that there is a conflict between this Customer Care Addendum and any other provision in the Agreement, including any schedule or exhibit thereto, the Agreement shall govern.

(a) **General Description of Services**. The Customer Services shall only be provided to Program Manager for an approved Program if Bank approves and agrees to provide such KYC Services in the applicable Program Schedule under <u>Schedule B</u> (<u>Program Schedules</u>), subject to the terms, provisions and conditions of this Agreement, <u>Schedule K</u> (<u>Ancillary Services</u>) and this Customer Care Addendum, as well as any Specifications Bank makes available to Program Manager from time to time, Bank shall, on behalf of Program Manager, provide the level one customer services detailed in the applicable Program Schedule under <u>Schedule B</u> (<u>Program Schedules</u>) under this Agreement (the "<u>Customer Care Services</u>"). Bank shall not provide Customer Care Services, including, but not limited to any inbound teleservice support to End Users, directly or indirectly, for any program or service that has not been approved by Bank or is otherwise not a Bank Service. For the avoidance of doubt, Program Manager shall be responsible for all customer service related to products or services provided or offered by it. Program Manager shall obtain appropriate signatures and other authorizations from End Users or third parties required by Bank in order for Bank to provide the Customer Care Services (including, but not limited to all authorizations required under the Telephone Communication Protection Act ("<u>TCPA</u>")) in accordance with Applicable Law. Nothing herein shall diminish or modify Program Manager's obligations under the Agreement, including Section 10 (<u>Complaints and Error Resolutions</u>).

(b) **Implementation of Customer Care Services**.

    (i) <u>Bank Facilities</u>. Bank will determine the location of its support facility or facilities, which may include a remote location(s) (the "<u>Facility</u>" or "<u>Facilities</u>") for delivery of the Customer Care Services, in Bank's discretion. Each Facility will be equipped with telephone systems, computer systems and various Bank support and call monitoring tools to be used in providing the Customer Care Services. Bank will bear the cost of operating any Facility, including all expenses for equipment and systems necessary to provide the Services at such Facility. Program Manager shall be responsible for all costs and expenses required for Bank to connect to any facilities or systems used by Program Manager or its third parties, and shall provide Bank all requested assistance in order for Bank to connect to the systems of Program Manager in order to transfer or connect End User calls received by Bank to Program Manager.

    (ii) <u>Provisioning Services</u>. Bank will provide the Customer Care Services for Bank Services through a designated Bank toll-free number provided by Bank to Program Manager. Bank may establish an email address, website or any other customer support mechanism, which an End User may utilize to access the Customer Care Services. Bank will provide Customer Care Services in a professional manner, consistent with reasonable industry standards.

(c) **Non-Customer Care Services**. Any customer service or support function not provided for in this Customer Care Addendum and the Customer Care Specifications shall remain the responsibility of Program Manager, unless otherwise agreed to in writing and in advance by Bank.

(d) **Related Products.** Prior to any updates, changes, upgrades or evolutionary developments related to the Program or any services related thereof, Program Manager shall provide reasonable advance notice of and information about such updates, changes, upgrades or evolutionary developments to Bank to enable Bank to inform and train its customer care representatives ("<u>CCRs</u>") as necessary and appropriate to provide quality Customer Care Services. Program Manager acknowledges that Bank may require an adjustment of the fees set forth in <u>Schedule C</u> (<u>Schedule of Fees and Charges</u>) to this Agreement, if the updates, changes, upgrades or evolutionary developments are of a nature as to require materially more or additional (or materially different or expensive) resources in order for Bank to provide quality Customer Care Services.

(e) **Additional Indemnification Obligation**. In addition to Program Manager's other indemnification obligations under the terms of the Agreement and any schedule attached thereto, Program Manager shall defend, indemnify and hold Bank harmless for any and all Losses as a result or in connection with Program Manager's or any third party's use or misuse of the Customer Care Services provided by Bank.

(f) **Program Manager's Cooperation**. In addition to Program Manager's cooperation obligations set forth under the terms of <u>Schedule K</u> (<u>Ancillary Services</u>) and the Agreement, Program Manager shall cooperate with Bank and provide assistance to Bank in all matters relating to the provision of the Customer Care Services. Program Manager acknowledges that such cooperation and assistance is necessary to enable Bank to perform the Customer Care Services. Such cooperation shall include, without limitation, providing sufficient and timely access (free of charge) to facilities, data, information and personnel of Program Manager, exchanging information, providing Data, performing reconciliations and adjustments, and, upon request, obtaining all potential End User's, End User's and/or third party's authorizations necessary, including, the right to record calls, to permit Bank to perform its obligations hereunder. The costs of obtaining such potential End User's, End User's and/or third party's consents, authorizations or approvals shall be borne by Program Manager. Program Manager will maintain in

accordance with this Agreement, all Records supporting the information relevant to the Customer Care Services and Program Manager agrees to cooperate in making such information available as needed in the event of an audit or inquiry by any Regulatory Authority or Bank.

In the event there is any delay by Program Manager in fulfilling its obligations as stated herein, under the terms of <u>Schedule K</u> (<u>Ancillary Services</u>), the Agreement or the Customer Care Specifications, there is a disagreement between the Parties as to the cooperation required from Program Manager, or there are errors or inaccuracies in the information provided, Bank shall be entitled to adjust pricing or suspend the Customer Care Services until Program Manager provides the requested cooperation or fixes the error or inaccuracy in the information or data provided to Bank. If such delay, error or failure to cooperate occurs on more than three (3) separate occasions, Bank, in its sole discretion, has the right to suspend or terminate the Customer Care Services.

(g) **Recorded Calls**.

    (i) <u>Bank's Use of Recorded Calls</u>. Bank or its third party service providers screen and record calls in connection with the Customer Care Services and may use such recorded calls to develop, derive and/or modify the Customer Care Services or any other materials, hardware, software, methods, processes and documentation.

    (ii) <u>Recording Customer Care Service Calls</u>. Program Manager acknowledges that federal and state laws require one-party or two-party consent to enable any conversation with a Person over the phone to be recorded. It is illegal to engage in any recorded call without obtaining the requisite consent to record the call in compliance with Applicable Law. In appropriate Marketing Materials, including any email communications or website disclaimers, or Disclosure Materials provided to or accessible to any End User under any Program for which the Customer Care Services is provided by Bank, Program Manager shall include the following language: "All calls will be recorded for record-keeping, quality assurance, and training purposes." Bank shall have the right to review any such materials from time to time to determine if Program Manager is providing the proper disclaimer in such materials. Bank will also provide similar announcement when handling any Inbound Call or End User callback in its performance of the Services. "Inbound Call" means a call that is physically received by Bank's Interactive Voice Response Unit (an "<u>IVR</u>") or similar system or by CCR.

(h) **Customer Callbacks**. Bank agrees that in the event a Bank CCR is unable to resolve a End User support request during an Inbound Call, the CCR will make all reasonable efforts to contact the End User as soon as possible with the solution. All telecommunications costs for these callbacks shall be borne by Program Manager.

(i) **Call Length**. Program Manager recognizes that the amount of time a CCR spends on an individual voice Contact can impact both Bank's performance levels and fees. The expected average call length for each Contact is set out in the Customer Care Specifications or otherwise disclosed to Program Manager by Bank. If Bank experiences any significant increase in call length, Bank will notify Program Manager and will work with Program Manager toward determining how to accommodate the increase or to bring the call length set forth in the Customer Care Specifications or otherwise disclosed to Program Manager by Bank. If no accommodation can be reached or is not feasible to Bank, Bank shall have the right, in its sole discretion, to add additional resources (including, but not limited to increased staffing) at Program Manager's sole expense, increase the fees set forth in <u>Schedule C</u> (<u>Schedule of Fees and Charges</u>), or suspend the Customer Care Services for the applicable Program until such time as an agreeable modification or accommodation is reached between the Parties. "<u>Contact</u>" means an End User initiated request or communication, defined as a single in-coming End User request or communication via telephone, email, chat, or virtual agent from an End User regarding any Bank Service related to or in connection with a Program under this Agreement.

(j) **Tools, Communications and Training**.

    (i) <u>Tools</u>. Program Manager agrees to provide Bank with sufficient access to its databases and systems (including providing login and other credentials to enable Bank to have adequate access to perform the Customer Care Services) and copies of its products or services and related materials, including, but not limited to, copies of software, documentation, licenses and product or service information as reasonably necessary to provide the Customer Care Services for the Program. Program Manager shall provide such access, documentation, information or other tools that will enable Bank to perform the Customer Care Services and do so promptly upon Bank's request. Program Manager shall be responsible for all expenses and costs associated with granting and providing Bank such access and copies of information and materials. Bank acknowledges that its use of such tools may be subject to the terms of license agreements required by Program Manager or its third party providers, and Bank agrees to abide by all the terms and conditions of such licenses in connection with its use of such tools. Program Manager shall only be obligated to supply one copy of any documentation or other such written materials relating to such tools, and Bank may make such number of copies of such materials as necessary for Bank to provide the Customer Care Services.

    (ii) <u>Telecommunications</u>. Program Manager assumes all expenses related to the sending of End User contacts to Bank, including provision of telecommunication lines and the bearing of network costs associated with routing inbound calls to Bank.

(iii)  <u>Training</u>.  Program Manager will provide one copy of necessary training materials to Bank on all versions and aspect of the Program and any products or services of Program Manager related to the Program at no charge to Bank. Bank trainers at Bank's facility will provide training for Bank customer service representatives, unless otherwise agreed to in writing by the Parties. Training will be delivered based on technical documentation provided by Program Manager to Bank (at no cost to Bank) detailing all aspects of Program Manager's products and/or services which relate to the Program and all updates, upgrades and revisions thereto.

(k)  **Escalation Procedure**.  Program Manager recognizes that there may be instances where Bank will not be able to resolve an End User inquiry or complaint without Program Manager's assistance.  Promptly following the execution of this Agreement, both Parties will mutually agree to an escalation procedure for resolving any End User inquiry or complaint.

(l)  **Excusable Delay**. Notwithstanding anything to the contrary contained herein, Bank shall not be required to perform any Customer Care Services if and to the extent that (i) it cannot provide the Customer Care Services due to causes which are outside of its reasonable control, or (ii) if providing such Customer Care Services would be prohibited by, or violate, any Applicable Law or any order of or direction from Regulatory Authority.

(m)  **Customer Care Service Errors or Delays**.  Notwithstanding anything to the contrary, Bank's sole responsibility to Program Manager with respect to errors or delays in performing the Customer Care Services hereunder are as follows:

(i)  For errors or omission in the Customer Care Services, shall be to furnish correct information and/or adjustment in the Customer Care Services, at no additional cost or expense to Program Manager; provided, however, that Program Manager shall promptly advise Bank of any such error or omission of which Program Manager becomes aware after having used reasonable efforts to detect any such errors or omissions; and

(ii)  For failure to deliver any Customer Care Services shall be to use reasonable efforts, subject to the other provisions hereof, to make the Customer Care Services available and/or to resume performing the Customer Care Services as promptly as reasonably practicable.

(n)  **Fees and Payment Terms**.

(i)  <u>Fees</u>.  Fees and charges, including, but not limited to payment terms, for the Customer Care Services are set forth in Schedule C (<u>Schedule of Fees and Charges</u>) for which the Customer Care Services are used.  Bank may, in its sole discretion, determine to increase the fees in each subsequent year of the Agreement, without any further action by Bank.  For avoidance of doubt, Bank is not precluded by this section from passing through any increased fees or costs incurred by Bank in connection with providing the Customer Care Services to Program Manager.

Bank may charge Program Manager for Program Manager's share of direct Bank costs of maintaining regulatory compliance and/or meeting relevant third party standards (such as PCI-DSS).

(ii)  <u>Reimbursement of Expenses</u>.  All out-of-pocket expenses incurred by Bank in connection with the Customer Care Services, such as outside legal, accountants, auditors, valuation consultants, casualty losses and excess insurance coverage, shall be invoiced to and reimbursed by Program Manager to Bank.

(iii)  <u>Taxes</u>.  The fees and expenses for the Customer Care Services do not include taxes. If Bank is required to pay any federal, state, country or local taxes based on the Customer Care Services provided under this Agreement, other than taxes based solely on the Bank's income, such taxes shall be billed to and paid by Program Manager.