<pre>
 1                   UNITED STATES BANKRUPTCY COURT
                      DISTRICT OF DELAWARE
 2

 3   IN RE:                      .  Chapter 11
                                 .  Case No. 22-11068 (JTD)
 4   FTX TRADING LTD., et al.,   .
                                 .
 5                               .  Courtroom No. 5
                                 .  824 Market Street
 6            Debtors.           .  Wilmington, Delaware 19801
                                 .
 7                               .  Tuesday, November 22, 2022
     . . . . . . . . . . . . . . .  11:00 a.m.
 8

 9               TRANSCRIPT OF FIRST DAY HEARING
              BEFORE THE HONORABLE JOHN T. DORSEY
              CHIEF UNITED STATES BANKRUPTCY JUDGE
10

     APPEARANCES:
11

     For the Debtor:        Adam Landis, Esquire
12                          Kimberly Brown, Esquire
                            Matthew Pierce, Esquire
13                          LANDIS RATH & COBB LLP
                            919 Market Street, Suite 1800
14                          Wilmington, Delaware 19801

15                          Andrew G. Dietderich, Esquire
                            James L. Bromley, Esquire
16                          Brian D. Glueckstein, Esquire
                            Alexa J. Kranzley, Esquire
17                          SULLIVAN & CROMWELL LLP
                            125 Broad Street
18                          New York, NY 10004

19   (APPEARANCES CONTINUED)

20   Audio Operator:        Jermaine Cooper

21   Transcription Company: Reliable
                            The Nemours Building
22                          1007 N. Orange Street, Suite 110
                            Wilmington, Delaware 19801
23                          Telephone: (302)654-8080
                            Email:  gmatthews@reliable-co.com
24

     Proceedings recorded by electronic sound recording,
25   transcript produced by transcription service.
</pre>

1   APPEARANCES (CONTINUED):

2   For the U.S. Trustee:        Benjamin Hackman, Esquire
                                 OFFICE OF THE UNITED STATES TRUSTEE
3                                844 King Street, Suite 2207
                                 Lockbox 35
4                                Wilmington, Delaware 19801

5   For the Ad Hoc Group
    of Account Holders:          Matthew Kelsey, Esquire
6                                ALSTON & BIRD LLP
                                 90 Park Avenue, 15th Floor
7                                New York, New York 10016

8   For Certain Customers:       Michael Roeschenthaler, Esquire
                                 WHITEFORD TAYLOR & PRESTON LLP
9                                11 Stanwix Street, Suite 1400
                                 Pittsburgh, Pennsylvania 15222

10
    For Joint Provisional
11  Liquidators:                 Christopher Shore, Esquire
                                 WHITE & CASE LLP
12                               1221 Avenue of the Americas
                                 New York, New York 10020

13
    For Evolve Bank:             Scott Cousins, Esquire
14                               COUSINS LAW LLC
                                 1521 Concord Pike, Suite 301
15                               Wilmington, Delaware 19803

16  For Philadelphia
    Insurance Indemnity:         Gaston Loomis, Esquire
17                               MCELROY DEUTSCH MULVANEY
                                   & CARPENTER LLP
18                               300 Delaware Avenue, Suite 1014
                                 Wilmington, Delaware 19801

19

20

21

22

23

24

25

1

INDEX

2

MOTIONS:                                                          PAGE

3

Agenda

4    Item 2: Motion of Debtors for Entry of an Order (I)          35
              Authorizing Joint Administration of the Debtors'
5             Chapter 11 Cases and (II) Granting Certain
              Related Relief [D.I. 3; Filed on 11/14/22]
6

7            Court's Ruling:                                      36

8    Agenda
     Item 3: Motion of Debtors for Entry of an Order (I)          36
9             Modifying Certain Creditor List Requirements;
              (II) Authorizing the Debtors to Serve Certain
10            Parties by E-Mail; and (III) Granting Related
              Relief [D.I. 9; Filed on 11/14/22]
11

12   Agenda
     Item 7: Motion of Debtors for Entry of Interim and Final
13            Orders (I) Authorizing the Debtors to Maintain a
              Consolidated List of Creditors in Lieu of
14            Submitting a Separate Matrix for Each Debtor, (II)
              Authorizing the Debtors to Redact or Withhold
15            Certain Confidential Information of Customers and
              Personal Information of Individuals and (III)
16            Granting Certain Related Relief
              [D.I. 45; Filed 11/19/22]
17

18           Court's Ruling:                                      52

     Agenda
19   Item 4: Emergency Motion Pursuant to Fed R. Bankr. P.       54
              1014(B) (I) to Transfer Chapter 15 Proceeding
20            Relating to FTX Digital Markets Ltd. and (II) for
              a Stay [D.I. 22; Filed 11/17/22]
21

22           Court's Ruling:                                      55

23

24

25

1

INDEX

2   MOTIONS:                                                          PAGE

3   Agenda
4   Item 5:  Motion of Debtors for Entry of an Order              55
            Enforcing Sections 362, 365I(1),525 and 541 of
5           the Bankruptcy Code [D.I. 25; Filed 11/17/22]

6           Court's Ruling:                                      60

7   Agenda
    Item 6:  Debtors' Application for Entry of an Order          60
8            Authorizing the Employment and Retention of Kroll
             Restructuring Administration LLC as Claims and
9            Noticing Agent Effective *Nunc Pro Tunc* to the
             Petition Date [D.I. 28; Filed 11/17/22]
10
            Court's Ruling:                                      62
11
12  Agenda
    Item 9:  Motion of Debtors for Entry of Interim and          63
13           Final Orders (I) Authorizing the Debtors to (A)
             Operate A Postpetition Cash Management System,
14           (B) Maintain Existing Business Forms, and (C)
             Perform Intercompany Transactions, (II) Granting
15           a Partial Waiver of the Deposit Guidelines Set
             Forth in Section 345(B), and (III) Granting
16           Certain Related Relief [D.I. 47; Filed 11/19/22]

17          Court's Ruling:                                      68

18  Agenda
    Item 8:  Motion of Debtors for Entry of Interim and Final    68
19           Orders (I) Authorizing the Debtors to Pay Certain
             Prepetition Claims of Critical Vendors, Foreign
20           Vendors, 503(B)(9) Claimants and Lien Claimants,
             (II) Granting Administrative Expense Priority to All
21           Undisputed Obligations on Account of Outstanding
             Orders, (III) Authorizing All Financial Institutions
22           to Honor All Related Payment Requests and (IV)
             Granting Certain Related Relief
23           [D.I. 46; Filed 11/19/22]

24          Court's Ruling:                                      70
25

1                                   INDEX

2  MOTIONS:                                          PAGE

3  Agenda
4  Item 10: Motion of Debtors for Entry of Interim and      70
                Final Orders (I) Establishing Notice and
5               Objection Procedures for Transfers of Equity
                Securities and Claims of Worthless Stock
6               Deductions and (II) Granting Certain Related
                Relief [D.I. 49; Filed 11/19/22]
7
                Court's Ruling:                             71
8
   Agenda
9  Item 11: Motion of Debtors for Entry of an Order (I)     71
                Authorizing the Debtors to (A) Pay Prepetition
10              Compensation and Benefits and (B) Continue
                Compensation and Benefits and (II) Granting
11              Certain Related Relief [D.I. 50; Filed 11/19/22]

12              Court's Ruling:                             73

13


14 DECLARATIONS:                                     PAGE

15 John J. Ray III                                     33

16 Edgar W. Mosley II                                  33

17

18

19

20

21

22

23

24

25

1        (Proceedings commence at 11:02 a.m.)

2          THE COURT:  Good morning, everyone.  Thank you.

3   Please be seated.

4          All right.  Before we begin, I wanted to make some

5   announcements about conduct and decorum.  I know this case

6   has generated a great deal of public interest and publicity.

7   And understandably, a lot of people are anxious and upset

8   about what happened with this company.  But it's important to

9   remain -- to maintain proper courtroom decorum, both in the

10  court, for those who are here, and for those participating

11  remotely.  At this point, we have 535 people on the Zoom

12  call.

13         So, if you're participating in the courtroom,

14  please keep in mind that the proceeding is being recorded.

15  If you want to speak, you will need to approach the podium or

16  speak from one of the microphones at counsel table, so that

17  we can pick up the recording and make sure we have a good

18  record.  Everyone should have their cell phones on silent.

19  If you haven't done that already, please do so.

20         If you're on the Zoom call, please keep the line

21  muted and your video off, unless you are asking to speak.

22  And if you do want to speak, you need to use the raise-your-

23  hand function on the Zoom call, and I will recognize you and

24  give you an opportunity.  But keep in mind that, you know,

25  everyone has a right to be heard, but today might not be the

1  day for everyone to be heard because we have a lot of people

2  involved in this case.

3        Any interruptions, of course, will not be

4  tolerated.  If you -- you know, if you make noise on the Zoom

5  call, I will have you removed from the call.  You will not be

6  allowed to reenter.  If you turn your video on before

7  recognized, I will have you removed from the call, as well.

8        And for the future, there is, on the court's

9  website, we have set up a YouTube channel for this case, so

10  that parties who are -- want to -- don't need to participate,

11  but what to listen to what's happening -- it's only audio,

12  it's not video -- so you can listen to proceedings on the

13  YouTube channel going forward from here.

14        One other thing is, prior to the hearing, I did

15  conduct a chambers conference with debtors' counsel and

16  counsel for the Government -- and I see I already have people

17  coming on with their videos on -- with government counsel and

18  the U.S. Trustee's Office over the -- regarding the motion to

19  seal and the accompanying motion that was filed yesterday.

20        I heard the discussion and I will be granting the

21  relief, both on the motion to seal and the underlying request

22  for relief that was requested under seal, but it's on an

23  interim basis only, both of those; meaning, the seal motion

24  and the motion for relief is on an interim basis only, and it

25  will probably be lifted relatively quickly and we'll put this

1  on for the final hearing when we come back in a few weeks.

2         Okay.  All right.  With that, I will turn it over

3  to debtors' counsel to run the agenda.

4         MR. LANDIS:  Good morning, Your Honor, and may it

5  please the Court, Adam Landis from Landis, Rath & Cobb,

6  proposed co-counsel to the debtors in the FTX Trading Limited

7  group of debtors that we have filed.

8         Let me thank Your Honor for not only hearing us

9  today with respect to the request for relief filed on the

10 agenda, but also in connection with the Section 105 chambers

11 conference that you conducted this morning.

12        With me this morning is a team from Sullivan &

13 Cromwell, proposed counsel to the debtors.  At counsel table:

14 Andrew Dietderich, James Bromley, Brian Gluckstein, Alexa

15 Kranzley, Julie Petiford.

16        Our declarants are in the courtroom:  Mr. John Ray,

17 Edgar Mosley from A&M.

18        And I would remiss if I didn't also recognize the

19 Office of the United States Trustee, who has been here and

20 been working with us tirelessly, really, over the last

21 several days, hours, into the wee hours of the night.

22 They've gone above and beyond to work through a number of

23 issues with us.  And I'm pleased to report that almost

24 everything that has been raised by the United States Trustee

25 has been consensually resolved in connection with the first-

1  day motions, almost everything.

2           THE COURT:  I was going to say "almost everything."

3           MR. LANDIS:  Almost everything.  That word "almost"

4  is doing a lot of work in that sentence.

5           But with that, Your Honor, what I'd seek to do --

6  and -- is cede the podium to Mr. Bromley, who will present,

7  and we'll work our way through the agenda in due course.

8           THE COURT:  All right.  Thank you.

9           Mr. Bromley.

10          MR. BROMLEY:  Good morning, Your Honor.  May it

11 please the Court, James Bromley of Sullivan & Cromwell,

12 proposed co-counsel to the debtors in these cases.

13          I'd like to echo Mr. Landis' comments and thank the

14 Court for the accommodation of hearing us today and for

15 hearing us earlier in chambers with respect to the motion

16 under seal.

17          Your Honor, we are here on an unprecedented matter,

18 and I don't say those words lightly.  We are dealing with a

19 first-day hearing that is taking place well over a week after

20 these cases were filed.  That, in and of itself, is uncommon.

21 But what we have here with respect to the FTX Debtors is a

22 different sort of animal.

23          Before I get into it, Your Honor -- and I have a

24 presentation to go through -- I do want to go through in some

25 detail just to talk a little bit about the folks who are in

1  the courtroom and who Mr. Landis has already introduced.

2          First of all, we do have in the courtroom Mr. John

3  Ray, who is the Chief Executive Officer and Chief

4  Restructuring Officer of the FTX Debtors before you.  Mr. Ray

5  has over 40 years of experience in the law and restructuring,

6  including leading the Enron estate, Fruit of the Loom,

7  Nortel, Residential Capital.  Mr. Ray is uniquely qualified

8  to be guiding this very complex and developing exercise.

9          In addition, Mr. Ray has assembled a team of

10 advisors, and we have Mr. Landis and his terrific crew here

11 in Wilmington.

12         We have the Alvarez & Marsal team, led by Ed Mosley

13 and Steve Coverick.  The A&M team are critical to this

14 exercise because I think, as many people have read Mr. Ray's

15 first-day declaration, unfortunately, the FTX Debtors were

16 not particularly well run, and that is an understatement.

17         One of the things that Mr. Ray says in his first-

18 day declaration is we are now writing things down.  And it is

19 with the incredible efforts of the A&M team that we are

20 working to organize and secure all of the assets of these

21 very complex estates.

22         In addition, Your Honor, we have the team from

23 Sullivan & Cromwell, who Mr. Landis has already introduced.

24 But there are three other individuals I'd like to mention.

25 Because of the issues that we're facing here, we have

1  assembled a team of investigators who are at the top of their

2  fields:

3          In the courtroom today is Mr. Steve Peikin, who is

4  a former Director of Enforcement at the SEC and a former U.S.

5  Attorney -- Assistant U.S. Attorney for the Southern District

6  of New York.

7          With him is Jamie McDonald, a former head of

8  enforcement at the CFTC and also a former AUSA and [sic] the

9  Southern District of New York.

10          Not here in the courtroom, but an equally important

11  member of the team is Nicky Friedlander, the former Chief of

12  Complex Frauds and the Cyber Crime Unit in the Southern

13  District of New York.

14          These individuals are working tirelessly to help us

15  identify all of the issues that we need to deal with, in

16  terms of what has happened.  And in particular, they are

17  interfacing, as I will indicate in -- later in the

18  presentation, with the U.S. Government and the various

19  regulators around the world who have taken a very keen

20  interest in this situation.  They will be reporting to Mr.

21  Ray as the CEO and CRO.

22          In addition, we have engaged Nardello & Company,

23  which is a leading investigative firm.  That was one of the

24  first things that Mr. Ray instructed us to do, and we brought

25  Nardello on, and they are working with us both here in the

1  United States and around the world.

2          We have engaged a firm named Chainalysis, which is

3  the leading consultant with respect to blockchain analysis

4  because all of the issues that we're dealing with in the

5  cyberspace relate to blockchain transactions, and Chainalysis

6  has been working around the clock with us to secure the

7  assets and identify them.

8          In addition, we have retained a cyber security

9  firm, the identity of which we have not disclosed because of

10 concerns that those who are undertaking cyber attacks on the

11 company and its assets will use that information to their

12 benefit.

13         We've also engaged Kroll, formerly known as Prime

14 Clerk, to be our noticing and claims agent;

15         Joele Frank to be our communications consultant.

16         And in addition, the law firm of Quinn Emanuel has

17 been retained to provide advice to the board of directors,

18 the independent board that we have appointed, and I will

19 describe them in a few moments.

20         With that, Your Honor, that's the team that's been

21 assembled.  And we have been working literally around the

22 clock to get to this day.

23         As I mentioned earlier, "unprecedented" is the word

24 of the day.  The crypto crisis that we're facing in the

25 United States and around the world is well documented, but

1  the FTX situation is both the latest and the largest failure

2  in this space.

3         Beginning at the -- in the first week of November,

4  there was effectively a run on the bank with respect to FTX,

5  both with respect to the international exchange, which is

6  operated under the brand name FTX.COM, as well as the U.S.

7  exchange, which was under -- operated under the brand name

8  FTX US.

9         At the same time that the run on the bank was

10 occurring, there was a leadership crisis.  As I will describe

11 in a moment, the FTX companies were controlled by a very

12 small group of people led by Mr. Sam Bankman-Fried.  During

13 the run on the bank, Mr. Fried's leadership frayed and that

14 led to resignations throughout the ranks.

15        This is a developing situation, Your Honor.  We

16 recognize that there are millions of customers around the

17 world and in the United States.  We recognize that the

18 debtors have unreliable books and records.  We recognize that

19 the debtors have compromised systems and have been subject to

20 cyber attacks.  We recognize that press and internet

21 attention is at an all-time high with respect to these

22 debtors.

23        It is for that reason, Your Honor, that we have

24 decided that we are going to -- that Mr. Ray has set out five

25 core objectives, and I'm going to go through those

1 objectives.  But I think it's fair to say that those who are

2 involved right now, today, in running FTX understand the

3 concern and the outrage as to what has happened and we are

4 working day and night to bring order to disorder.

5          Your Honor, as Mr. Ray has set forth in his first-

6 day declaration, there are five core objectives that we are

7 pursuing at the moment:

8          The first is the implementation of controls.  As I

9 described, Mr. Ray has been installed as the CEO and CRO of

10 the debtors.  He has assembled an impeccable team of advisors

11 and put in place an independent board.

12          This independent board provides, for the first time

13 in the history of FTX, a traditional and dependable

14 governance structure.  Prior to the commencement of these

15 cases, FTX was in the control of a small group of

16 inexperienced and unsophisticated individuals.  And

17 unfortunately, the evidence seems to indicate that some or

18 all of them were also compromised individuals.

19          Now the types of controls that we're putting in

20 place right now with the assistance, in particular, of

21 Alvarez & Marsal are traditional and market standard

22 accounting, audit, cash management, human resource, risk

23 management, and data management standards.  In doing this,

24 it's important to note that the -- there are -- is a core

25 group of employees who have remained at the FTX companies who

1  have stepped up in the face of incredible uncertainty and

2  have been assisting all of the advisors in making sure that

3  the assets are secured and the records are now being kept in

4  a manner that is appropriate.

5         I'd like to focus for a moment, Your Honor, on

6  board governance.  We have several -- identified several

7  silos of the business.  And this is for organizational

8  purposes.  We'll talk in a moment about the organizational

9  chart.

10        But with respect to these silos, the first is -- we

11  call it the "WRS Silo," which is the U.S. currency exchange

12  silo.  An independent director, Mitchell Sonkin, has been

13  appointed to the board of WRS.  He is a lawyer.  He is the

14  former Chief Executive at MBIA, who led the -- MBIA's

15  exposure in the Puerto Rico situation for almost ten years.

16  He's a member of the board of Residential Capital.  He is

17  also a former partner of King & Spaulding, with over 40 years

18  of experience.

19        The next silo is the Alameda Silo.  Alameda

20  Research is a substantial debtor here and it operated

21  effectively as a hedge fund within the FTX group of families

22  -- group of companies.  Installed as a director at Alameda is

23  Matthew Rosenberg, with an expertise in finance.  He is an

24  investment banker and investor with Lincoln Park Advisors

25  from Chicago.  Before starting at Lincoln Park Advisors, he

1   was a partner at Chilmark Partners and advised on matters,

2   including SuperMedia, Covanta, USG, Nortel, Overseas

3   Shipholding Group, and Conte Group.  He has over 30 years of

4   experience.

5           There's a silo that we have identified as the

6   Venture Silo.  The director at that silo, independent

7   director, is Rishi Jain.  Rishi has a background in finance,

8   he is a Managing Director at the Accordion Group, which

9   specializes in financial and technology consulting.  He also

10  worked for Alvarez & Marsal for over ten years and was

11  instrumental in the Washington Mutual exercise.

12          At the Dotcom Silo, which is the international

13  business, we have two directors, Your Honor, independent

14  director:

15          First is Joseph Farnan, a lawyer from Delaware,

16  former judge and U.S. Attorney, with experience in complex

17  financial disputes and investigations.

18          Joining Mr. Farnan at the dot-com board is Matthew

19  Doheny.  Matthew Doheny is a financial expert.  He is the

20  Chief Executive of North Country Capital.  He has been either

21  on the board of directors or Chief Restructuring Officer of

22  Yellow Corp., the trucking company, Residential Capital,

23  Kodak, and MatlinPatterson.  Prior to that, he worked at HSBC

24  and Deutsche Bank.

25          Our second core objective, Your Honor, is asset

1  protection and recovery.  It's important to note that we're

2  not just talking about crypto assets or cash assets or

3  physical assets; we're also talking about information.  And

4  information, here, is an asset.

5       Unfortunately, as the debtors have -- new advisors

6  have -- and Mr. Ray have been exercising their investigations

7  so far, a substantial amount of assets have either been

8  stolen or are missing.  We are suffering from high cyber

9  attacks, both on the petition date and in the days following.

10 And we have, as I mentioned earlier, engaged sophisticated

11 expertise to protect against the hacks, but they continue.

12      The third objective, Your Honor, is transparency

13 and investigation.  As I noted, there is a team of

14 investigators who are working tirelessly with the debtors to

15 collect and coordinate information.

16      The debtors will conduct the investigation.  We

17 recognize this is not a normal situation and that there are

18 others who will have to review the facts and the history.  We

19 are going to serve as a central repository.  Unlike many

20 debtor cases, where the debtor already knows what information

21 it has, this debtor is accumulating the information in

22 realtime.

23      We are also in constant communication with the U.S.

24 Department of Justice and the Southern District of New York

25 Cyber Crimes Unit, which has opened a criminal investigation

1  with respect to these debtors.  We are in communication

2  constantly with the Securities and Exchange Commission, the

3  Commodities Futures Trading Commission.  We have received

4  requests, I would say -- some might say "demands" -- from the

5  U.S. Congress, both from the Senate and the House, to have

6  Mr. Ray appear during the month of December.  We are

7  coordinating with regulators in multiple states around the

8  United States, as well as foreign regulators around the

9  world.

10         I think, Your Honor, it's fair to say we typically

11  would not quote things that happen on Twitter, but there was

12  a quote that I think summarizes this quite well, which is:

13         "What appears to be taking place is a serious

14  investigation by serious adults."

15         And we would respectfully agree with that

16  characterization.

17         THE COURT:  There might be other things on Twitter

18  you wouldn't agree with, though, about this case.

19         MR. BROMLEY:  Well ...

20     (Laughter)

21         MR. BROMLEY:  That's for sure.

22         Our fourth core objective, Your Honor, is

23  efficiency and coordination.  As you will see, Your Honor,

24  this was an enterprise that operated around the world, not

25  only at the time of the petitions, but also during the brief

1  history that it had leading up to the filing of the

2  petitions.

3          There has been a joint administration proceeding

4  commenced in Australia.  We have already made arrangements to

5  meet with the joint administrators from Australia, who are

6  coming to New York in the next couple of weeks, and it is our

7  hope to be able to approach Your Honor with a consensual

8  protocol with respect to the Australian proceedings.

9          I think Your Honor is also aware that there has

10  been a liquidation proceeding commenced in the Bahamas with

11  respect to a single entity, FTX Digital Markets Limited.  And

12  representatives of the joint provisional liquidators are here

13  in the courtroom today.

14          Your Honor may also be aware that the joint

15  provisional liquidators had filed a petition before the

16  Southern District of New York Bankruptcy Court to recognize

17  the proceedings in the Bahamas under Chapter 15 of the

18  Bankruptcy Code.  We had filed with Your Honor a motion to

19  transfer that case from the Southern District of New York to

20  the District of Delaware, and we are pleased to report that

21  we have reached an agreement with the joint provisional

22  liquidators to do just that, to bring the case from New York

23  here to Delaware.

24          It is our wish to engage in a constructive dialogue

25  with the joint provisional liquidators.  However, as we noted

1  in our pleadings to transfer, we do have evidence that there

2  have been movement of assets out of the debtors' estates to

3  the Bahamas, and there have been somewhat cryptic comments

4  that have been issued by the Government of the Bahamas as to

5  the actions they have taken with respect to certain assets.

6          It's sufficient to say at this point, Your Honor,

7  that the debtors reserve all of their rights with respect

8  both any requests by the joint provisional liquidators to

9  recognize the proceedings here and with respect to any relief

10 they may request.

11         I would say, Your Honor, though, it is essential to

12 keep in mind that, as we are going forward and dealing with

13 any of these foreign entities and with respect to any

14 regulators or liquidators that might be appointed, that we

15 are focusing on a single word, which is "reciprocity."  It is

16 essential that any dealings that we have are characterized by

17 reciprocal relationships, both with respect to asset recovery

18 and information sharing.

19         Finally, Your Honor, maximization of value.  We

20 realize that there are many people that are looking to get

21 their money back immediately, and we sympathize with that and

22 we are working towards being able to do that.  It is

23 essential, though, Your Honor, that we first maximize the

24 value of the assets of the estates.  We have to identify

25 those assets, we have to collect them, and we have to

1  maximize them, whether that means selling assets, selling

2  businesses, or reorganizing businesses.  All of those things

3  are on the table.  And we believe, Your Honor, that we will

4  be before you quite quickly with an attempt to sell certain

5  of the businesses that we understand, at least today, are

6  self-sufficient, robust, and have generated interest from

7  others in the marketplace.

8        So, Your Honor, just I put up on this screen a

9  slide which duplicates the big board that we have here in the

10 courtroom.  And just before I go further, this does capture,

11 from a summary perspective, the four silos that this business

12 operates.

13       The green silo, WRS, is the U.S. domestic currency

14 exchange.  You will see that that was ultimately controlled

15 by Mr. Sam Bankman-Fried, and that the control of the WRS

16 Silo was also then shared with two other of the founders of

17 the business, Gary Wang and Nishad Singh.  There were

18 approximately 23 percent of the business that was also owned

19 by third-party investors, and I will get to that in a moment.

20       The Alameda Silo, again, relates to Alameda

21 Research.  That is, effectively, the hedge fund within the

22 FTX enter -- world.  The Alameda Silo was controlled by Mr.

23 Sam Bankman-Fried and Gary Wang.

24       The Venture Silo is the most recent addition to the

25 FTX world.  That was controlled, effectively, 100 percent by

1   Mr. Sam Bankman-Fried.

2          And the Dotcom Silo is the international exchange.

3   As you can see, Your Honor, that was 75 percent controlled by

4   Mr. Sam Bankman-Fried and 25 percent by third-party

5   investors.

6          Your Honor, I'd like to go through a bit of the

7   history with respect to FTX.

8          This does start with Mr. Sam Bankman-Fried.  Mr.

9   Fried -- Bankman-Fried went to MIT, and it was at MIT that he

10  met Gary Wang.  Mr. Bankman-Fried graduated in 2014, less

11  than ten years ago.  Mr. Wang graduated in 2015.  The third

12  founder, Nishad Singh, graduates in June of 2017 from the

13  University of California at Berkeley.

14         It's in November of 2017 that Mr. Bankman-Fried and

15  Gary Wang found the Alameda Research business, which is

16  effectively a crypto hedge fund that is headquartered in

17  Berkeley, California.

18         Fast-forward two years, a little less than two

19  years, April of 2019, the Dotcom Silo or FTX.COM is founded.

20  It is founded in Hong Kong.  It is founded in Hong Kong

21  because of the regulatory regime that was present in Hong

22  Kong and it was founded with the business FTX Trading

23  Limited, and Antiguan company, which is a U.S. debtor in

24  these cases.

25         In July of 2019, the FTT Token was launched.  The

1   FTT Token is effectively a credit that is able to be used on

2   the FTX exchanges.  And also, because of that credit that's

3   able to be used, it also carries with it or did carry with it

4   a value in the marketplace and traded separately.

5          In July of 2020, the Clifton Bay Investments LLC

6   was formed here in Delaware.

7          In January of 2020, FTX US is founded by Sam

8   Bankman-Fried, by Gary Wang and Nishad Singh.  That is

9   founded, as well, in Berkeley, California.

10         In November of 2020, the Bahamas passes the DARE

11  Act, a digital assets act, which is intended to encourage the

12  relocation of crypto businesses to the Bahamas.

13         In July of 2021, FTX Digital Markets, the Bahamian

14  single debtor, is formed.

15         And in September of 2021, Mr. Bankman-Fried

16  announces that FTX Digital Markets is going to be registered

17  with the Securities Commission of the Bahamas.

18         In May of 2020, the U.S. silo, WRS, moves its

19  headquarters from Berkeley, California to Chicago, Illinois.

20         Then, in September of 2022, the U.S. silo announces

21  that it's in the process of moving its headquarters from

22  Chicago to Miami.

23         There were a series of investments that were made

24  in FTX:

25         November of '19, Binance, a current --

1  cryptocurrency exchange that operates offshore, enters into a

2  strategic partnership and invests in FTX.  Binance will

3  appear later in the script, so to speak.

4          In July of 2021, Binance divests the entirety of

5  its equity stake.  This is a substantial outbound payment

6  that is made by FTX and it also includes a substantial amount

7  of the FTT Token.  An investigation will have to take place

8  with respect to the Binance divestment and the amounts of

9  money and tokens that were paid to Binance.

10          Also, at the same time, in July of 2021, there was

11  an investment of a billion dollars by a series of third-party

12  investors, including Sequoia, Paradigm, and Thoma Bravo.

13          Just a few months later, in October of 2021, there

14  was an additional investment, Series B1, of another 420

15  million.  This included, at the time, the Ontario Teachers

16  Pension Fund, Tiger Global, and Blackrock.  At the time, in

17  October of '21, this is, again, just FTX.COM, the

18  international exchange.  The market valued the company at $25

19  billion.

20          In January of '22, two things happened:

21          First, there was an investment into the U.S. silo,

22  a Series A four-hundred-million-dollar investment by

23  investors, including Multicoin, Paradigm, and Sequoia.  That

24  valued the U.S. silo, the U.S. currency exchange, at $8

25  billion.

1           And at the same time, in January of '22, there was

2    an investment of another $500 million in the international

3    business, the Dotcom silo, with investors including Paradigm,

4    SoftBank, and Temasek, the sovereign wealth fund of

5    Singapore.  That valued the business, at the time, at $32

6    billion.

7           So, when you combine the U.S. silo and the

8    international silo, in January of '22, just 10 months ago,

9    the overall value of those two businesses was $40 billion,

10   from a market cap perspective.

11          Your Honor, I want to talk a little bit about the

12   employee base with respect to the debtors, and this is as of

13   October 31, 2022.  And we picked that date because it was a

14   date that seemed to correspond with sort of the last clear

15   information date that was also a point in time when the

16   business seemed to be stable.

17          So, as of October 31, 2022, the debtors, the U.S.

18   debtors, employed 330 employees around the world.  This pie

19   chart gives you a sense of where they were located.  They

20   were located in many different jurisdictions, but the largest

21   number were located here in the United States.

22          When you take into account the nondebtor employees

23   -- and that would include those who were employed by the

24   Australian business, as well as FTX Digital Markets in the

25   Bahamas, the number increases by 190 to 520 employees.  And

1  when you look at the worldwide number of employees as of

2  October 31, 2022, including nondebtors, again, the United

3  States has the largest number of employees, the Bahamas

4  second, and -- well, other is second -- and these are people

5  who are working remotely -- and the Bahamas is third.

6          This chart, Your Honor, focuses on the distribution

7  of customers on a global basis, between both the U.S. WRS and

8  the Dotcom international silos.  This is as of the petition

9  date, based on the best information that we have.  You will

10 see, Your Honor, that the largest jurisdictions are the

11 Cayman Islands and the Virgin Islands, with China, Great

12 Britain, and Singapore following.

13         With respect to the Dotcom Silo -- and this is the

14 international silo, 94 percent of the customers were

15 customers of FTX Trading Limited, that is a U.S. debtor, and

16 approximately 6 percent were customers of FTX Digital Markets

17 Limited, the Bahamian entity that is under the jurisdiction

18 of the joint provisional liquidators.

19         The reason for this disparity is that, in May of

20 2022, when FTX Trading Limited was considering transferring

21 its customers over to Digital Markets, it did not do so.  So

22 none of the customers that preexisting FTX Trading customers

23 as of the middle of May of 2022 transitioned over to being

24 official customers of FTX Digital Markets.  They remained

25 customers of FTX Trading Limited, a U.S. debtor, which,

1  again, Your Honor, brings us back to the recovery silos.

2         The exercise here, Your Honor, is to identify the

3  assets in each of these silos.  And you can see that each of

4  these silos has different types of assets, right?  In the --

5  if you look at the Dotcom Silo and the WRS Silo, the assets

6  are relatively similar:  Cash and cash equivalents,

7  cryptocurrency, subsidiaries, and that's about it, cash, cash

8  equivalents, cryptocurrency.  They were operating as crypto

9  exchanges.

10         The Alameda Silo, Your Honor, is somewhat

11 different, right?  That is the hedge fund.  Substantial funds

12 appear to have been transferred from other silos to Alameda,

13 and it appears that assets were used for a number of

14 purposes.  Substantial investments were made in ventures that

15 were primarily focused on the crypto and technology sphere.

16 But there were also substantial amounts of money that were

17 spent on things that were not related to the business.

18         For instance, one of the U.S. debtors is an entity

19 that is operate -- that purchased almost $300 million worth

20 of real estate in the Bahamas.  Based on preliminary

21 investigations, most of those -- most of those real estate

22 purchases related to homes and vacation properties that were

23 used by senior executives of the company.

24         Substantial funds were also spent in the Venture

25 Silo to make venture investments in a number of different

1  businesses.  One of the things that the debtors are doing

2  right now is to identify whether or not any of these venture

3  investments are able to be sold and how much they're able to

4  be sold for.

5         So, Your Honor, what we have is a worldwide

6  organization, but an organization that was run, effectively,

7  as a personal fiefdom of Sam Bankman-Fried.

8         The business only had a short life.  It was founded

9  in 2017 at Alameda.  The currency exchanges were founded in

10 2019 and 2020.  And here we are, less than two years later,

11 in bankruptcy, having collapsed.

12        In effect, the company, during that period of time,

13 wandered the world.  It started in Berkeley, it went to Hong

14 Kong, it went to Chicago, it went to Miami, it went to the

15 Bahamas.  But at all times, it was, effectively, under the

16 control of Mr. Bankman-Fried.  And effectively, what we had

17 was a lack of corporate controls at a level that none of us

18 in the profession that have looked at it so far have ever

19 seen.

20        Your Honor, this is a slide that gives you a sense

21 of the different investments that exist in the silos.  So no

22 need to focus too much on it, but what we have is a number of

23 different investments that were made in the Venture Silo, a

24 number that were made in the Alameda Silo, a number that were

25 made at the WRS silo -- including LedgerX, which is a

1 licensed derivatives brokerage business and still operating

2 as nondebtor -- and others at the Dotcom Silo.

3         I'd like now, Your Honor, to take you through the

4 collapse.  It happened very quickly, it was quite shocking,

5 but I think it's worthwhile to walk through the past couple

6 of weeks.

7         On November 2nd, documents leaked online showing

8 that the FTT Token position in the Alameda balance sheet was

9 substantially larger than most anticipated.  So what does

10 that mean?  It means the FTT Token is a token that is created

11 by FTX.  It's an asset that it creates and it had a

12 substantially larger amount on its balance sheet than anyone

13 had anticipated.

14         A few days later, on November 6th, Caroline

15 Ellison, who was then the CEO of Alameda Research and is no

16 longer the CEO and no longer employed, tweets out information

17 with respect to the balance sheet of Alameda.  In this tweet,

18 she indicates that there are approximately -- there are less

19 than ten -- that there are greater than $10 billion of assets

20 that are not reflected on the balance sheet.

21         That same day, Your Honor, is when Changpeng Zhao -

22 - known in the business as "CZ" -- who is the Chief Executive

23 Officer of Binance -- and remember, Binance had been an

24 initial investor in FTX and also had been taken out entirely

25 from its equity investment.  He tweets that, as part of

1  Binance's exist from FTX Equity last year, Binance received

2  roughly $2.1 billion equivalent in cash and FTT, but:

3           "Due to recent revelations that have come to light,

4  we have decided to liquidate any remaining FTT on our books."

5           This, in effect, tells the market that CZ believes

6  that FTT is worth substantially less than prior -- than

7  previously anticipated and the value of FTT plummets in the

8  marketplace.

9           Two days later, on November 8th, in the face of a

10  run on the bank, FTX pauses all customer withdrawals and the

11  FTT price continues to fall by approximately 80 percent just

12  over a period of two days.

13           On the afternoon of November 8th, CZ tweeted that

14  FTX and Mr. Bankman-Fried had asked for help, that there was

15  a significant liquidity crunch at FTX generally, and to

16  protect users, that a non-binding LOI had been signed,

17  intending to fully acquire FTX.COM, and help cover the

18  liquidity crunch.  He concludes by saying:

19           "We will be conducting a full DD" -- meaning due

20  diligence -- "in the coming days."

21           Just one day later, Binance tweets:

22           "As a result of corporate due diligence as well as

23  the latest news reports regarding mishandled customer funds

24  and alleged U.S. agency investigations, we have decided we

25  will not pursue the potential acquisition of FTX.COM."

1          Mr. Bankman-Fried is an active tweeter throughout

2    this period and indicates online that he is requesting

3    emergency funding to cover -- from investors to cover up a

4    shortfall of up to $8 billion.

5          The next day, on the 10th, the Bahamas Securities

6    Commission freezes assets of FTX Digital Markets and appoints

7    a provisional liquidator.

8          Also on November 10th, Alameda Research announces

9    via tweet that it is winding down trading.

10          During the course of the day of November 10th and

11    into the early morning hours of November 11th, near constant

12    communication is going on with Mr. Bankman-Fried.  He is

13    being interviewed by regulators in the Bahamas, he has hired

14    lawyers in the United States at the Paul Weiss law firm.  He

15    has also engaged a professor at Stanford Law School, Mr.

16    David Mills, and is consulting with his father, who is also a

17    professor at Stanford Law School.

18          Throughout the day, consideration is being given by

19    Mr. Bankman-Fried as to whether or not he should relinquish

20    control over the entities.  It is during that time that

21    Sullivan & Cromwell and Alvarez & Marsal have been engaged on

22    an emergency basis to consult on contingency planning.  The

23    first reach-out to Mr. Ray and other potential candidates to

24    come in as CRO were made.

25          And at 4:30 a.m. on November 11th, Mr. Bankman-

1   Fried resigned and he signed documentation authorizing Mr.

2   Ray to take control of the businesses and having full power

3   of any officer at any of the entities, including, among other

4   things, to commence these Chapter 11 cases.

5          And then, starting on the morning of the -- the

6   traditional morning, rather than the 4:30 a.m. morning, of

7   November 11th, these Chapter 11 cases began to be filed,

8   after Mr. Ray had authorized them.

9          This graph, Your Honor, gives you a sense of what

10  the market was doing with respect to the FTT Token.  This

11  gives you a sense of market cap over time and it shows the

12  complete collapse of the value of the FTT Token at the time

13  of the bankruptcy filing.  At the peak, the market cap was

14  $9.6 billion.  Right now, the market cap is approximately 422

15  million.

16         So, Your Honor, that's where we are.  We have

17  witnessed probably one of the most abrupt and difficult

18  collapses in the history of corporate America, the history of

19  corporate entities around the world.

20         When Mr. Bankman-Fried signed over control of these

21  businesses, he signed over control in a way that allowed

22  everyone, for the first time, to really see under the covers

23  and to recognize that the emperor had no clothes.  These

24  businesses were not operated in a manner that was consistent

25  with any sort of traditional best practices.  And since that

1    time, mister -- under Mr. Ray's direction, the advisors and

2    the remaining loyal employees at FTX have worked day and

3    night to identify the assets, to secure those assets wherever

4    they are located, to start applying the controls that are

5    necessary, and substantial progress has been made.

6          But we stand here today, Your Honor, with an

7    absence of information.  We do not have the traditional

8    amount of information that a debtor would traditionally have,

9    but every day, we generate more and more.

10          So we do have, finally, before Your Honor a series

11    of traditional first-day motions.  We are ready to request

12    that relief.  And I will now hand over the dias to my

13    colleagues.

14          I would ask, Your Honor, though, before doing that,

15    if we could move the declarations that have been submitted in

16    support of the relief into evidence.  There are two

17    declarations by Mr. Ray and two declarations by Mr. Mosley of

18    Alvarez & Marsal.

19          THE COURT:  Okay.  Is there any objection?

20      (No verbal response)

21          THE COURT:  They're admitted without objection.

22      (Ray Declarations received in evidence)

23      (Mosley Declarations received in evidence)

24          MR. BROMLEY:  Thank you very much, Your Honor.

25          THE COURT:  Before you sit down --

1           MR. BROMLEY:  Yes.

2           THE COURT:  -- Mr. Bromley.  How many employees

3    remain at the company?  Do you know?

4           MR. BROMLEY:  That's a good question.  I can check,

5    Your Honor.

6           THE COURT:  Okay.

7           MR. RAY:  Your Honor, John Ray.  Roughly 260.

8           MR. BROMLEY:  Roughly 260, Your Honor.

9           THE COURT:  Okay.  Thank you.  That's all.  Thank

10   you.

11          MR. BROMLEY:  Okay.  Thank you very much, Your

12   Honor.

13          THE COURT:  We can begin --

14          MR. BROMLEY:  I'll hand over to --

15          THE COURT:  -- the first-days.

16          MR. BROMLEY:  -- my partner Brian Gluckstein.

17   Thank you very much.

18          THE COURT:  Okay.

19          MR. GLUCKSTEIN:  Good morning, Your Honor.  Brian

20   Gluckstein --

21          UNIDENTIFIED:  Good morning.

22          MR. GLUCKSTEIN:  -- off Sullivan & Cromwell on

23   behalf of the debtors.

24          Your Honor, with the Court's indulgence, we will

25   largely take today's agenda as it appears -- today's matters

1   as they appear on the agenda, with a couple of exceptions.

2          But starting at the top, Your Honor, the first

3   motion that we have is Agenda Item 2, which was filed at

4   Docket Number 3, and it is our motion for joint

5   administration.

6          By this motion, the debtors request -- it's 102

7   debtors that have been filed, the cases be jointly

8   administered under the caption of FTX Trading Limited, to

9   allow for efficient administration, pursuant to Rule 1015(b).

10          The debtors are affiliates here.  The 102 entities

11   fall into the 4 silos that Mr. Bromley just walked through,

12   all of which have common ownership and, prior to the filing

13   of these cases, were under the common control of Mr. Bankman-

14   Fried.  The debtors believe joint administration of these

15   cases, of course, will permit the efficient and convenient

16   administration of these matters.  Most, if not all, of the

17   notices, applications, hearings in these cases will affect

18   each and every one of the debtors.  Absent joint

19   administration, it would result in numerous duplicative

20   filings.

21          The motion, Your Honor, of course only requests

22   administrative and non-substantive consolidation of the

23   debtors' estates; thus, joint administration will not

24   adversely affect the debtors, creditors, or other

25   stakeholders, and rather, constituents stand only to benefit

1  from joint administration through cost reductions and

2  efficiency gains.

3          Your Honor, the U.S. Trustee did provide --

4  reviewed the motion and provided minor comments that are

5  reflected in the revised form of order that was filed

6  overnight at Docket Number 80 -- 98, at Exhibit A.

7          And unless Your Honor has any questions, we request

8  entry of the joint administration order.

9          THE COURT:  Okay.  I have no questions.

10          Does anyone else wish to be heard?

11     (No verbal response)

12          THE COURT:  No.

13          I'm satisfied the requested relief is appropriate

14  and I'll grant the relief.

15          MR. GLUCKSTEIN:  Thank you, Your Honor.

16          The next item on the agenda, which is Item Number

17  3, is the debtors' motion for entry of an order modifying

18  certain creditor list requirements and authorizing the

19  service of creditors by email.

20          And I would suggest, Your Honor, if it pleases the

21  Court, that we consider Agenda Item 7 in connection with

22  Agenda Item 3.  That is the debtors' motion authorizing

23  consolidated creditor matrix and to redact certain customer

24  information, as that relief is quite related.

25          THE COURT:  That's fine.  Thank you.

1          MR. GLUCKSTEIN:  With respect to Agenda Item 3,

2    Your Honor, in that motion, the debtors are requesting that

3    we be permitted to file a consolidated list of top 50

4    creditors and to serve the debtors' customers by email.

5          With respect to the creditor list, Your Honor,

6    there have been 102 debtors filed in these cases, many of

7    which are expected to have very few creditors and many others

8    expected to have overlapping creditors.

9          In addition, as detailed in Mr. Ray's declaration,

10   the state of the debtors' historical books and records has

11   been substandard; thus, the exercise of compiling separate

12   creditor lists for each debtor would be particularly time

13   consuming and resource intensive at this point, as the

14   debtors' team works to protect assets and maximize value.  We

15   submit the consolidated top 50 creditors list is appropriate

16   under the circumstances.

17         Furthermore, Your Honor, as reflected in the

18   revised form of order that was filed at Docket 98, Exhibit B,

19   the debtors have now agreed, at the request of the United

20   States Trustee, to file a consolidated top 50 creditors list

21   for each of the four main debtors and their subsidiaries --

22   the so-called "silos," for WRS, Alameda, Ventures, and Dotcom

23   -- separately, as applicable.  So, to the extent that each of

24   those silos have individual creditors, we will file a

25   consolidated list, effectively, for each silo.  And that's

1  reflected in the amended order that was filed late last

2  night.

3          THE COURT:  I did see it.  Thank you.

4          MR. GLUCKSTEIN:  As noted in Paragraph 75 of Mr.

5  Ray's declaration, the debtors have struggled to gain access

6  to their customer data due to ongoing security risks in

7  accessing that information.

8          The debtors have now succeeded in finding a way to

9  safely view the necessary customer information to prepare and

10  file the consolidated top 50 list that was filed in redacted

11  form at Docket Number 51, despite the debtors still not

12  having full access to their customer data.  We will now work

13  to promptly file those 4 creditor lists for each of the main

14  debtors, assuming the relief in this motion is granted today.

15  Presenting the information on a consolidated basis will

16  ensure the most relevant and reliable information can be

17  promptly disclosed.

18          With respect to the second part of Agenda 3, Your

19  Honor, the email service request, the motion seeks to modify

20  the service requirements, under Bankruptcy Rule 2002(g), to

21  permit email service to customers, unless they have

22  designated a mailing address or come forward and request hard

23  copy service.

24          The Court has significant discretion to modify the

25  general rule pursuant to Bankruptcy Rule 2002(m) and has

1  permitted email service in similar situations, including the

2  in Cred case involving customers of a cryptocurrency

3  platform.

4         The number of customers and former customers to be

5  noticed in these cases could certainly number in the

6  millions.

7         The debtors operate cryptocurrency platforms and

8  all of the debtors' customers interact online and through

9  email in the ordinary course.  In fact, with respect to the

10  exchange customers, both FTX US and FTX.COM user agreements

11  expressly provide that notice or other communications will be

12  by email or through online applications.

13         Following discussions with the United States

14  Trustee, we have revised a form of order to make clear that

15  email service is permitted for customers unless hard copy

16  service by mail is requested.  As we understand it, there is

17  no continuing concerns with respect to the relief from the

18  United States Trustee with respect to that motion.

19         The other piece of the relief, Your Honor, is set

20  forth in the motion docketed at Agenda Item Number 7.

21  Pursuant to that motion, the debtors are seeking authority to

22  file a single consolidated creditor matrix in lieu of

23  separate lists for each debtor to establish procedures for

24  providing notice of commencement and only on an interim

25  basis, Your Honor, at this time, redact confidential customer

1   and creditor information from public viewing of court

2   filings.

3        Your Honor, FTX's customers were the lifeblood of

4   the company.  The debtors are very cognizant of customers'

5   concerns, particularly with respect to privacy, and intend to

6   try to protect customers and their interests as these cases

7   progress.

8        The revised form of order filed at Docket Number 98

9   at Exhibit E incorporates a number of comments from the

10  United States Trustee.  As we understand it, the only open

11  issue is whether to redact on an interim basis the

12  confidential customer information in the scope that is

13  requested.

14       And Your Honor, the requested redactions include

15  that we would be permitted to redact, again, only on an

16  interim basis at this time, confidential names and addresses

17  of customers from all the court filings, addresses and email

18  addresses of individual non-customer creditors and

19  shareholders, and the names and addresses of all creditors

20  who are Citizens of the United Kingdom or European Union

21  member country, subject to local data privacy protections.

22       It's my understanding that the United States

23  Trustee has agreed, for purposes of this motion today, to the

24  redaction of information for customers residing in the

25  European Union covered by the GDPR is appropriate and is

1  willing to permit the redaction of individual customer

2  addresses, but not names.

3        We submit, Your Honor, that there is no basis at

4  this point in the case to treat some customers worse and to

5  immediately reveal their customer sensitive personal

6  information.  These cases present very unusual circumstances,

7  as Mr. Bromley just walked through this morning; and, thus,

8  the complete redaction relief on an interim basis we submit

9  is appropriate here.

10        The debtors' customer records include the names and

11  email addresses of millions of individuals and entities.

12  There are two independent reasons, Your Honor, why redaction,

13  at least on an interim basis, is in the best interests of the

14  estates and their stakeholders:

15        First, Your Honor, the debtors' customer list,

16  numbering in the millions, is an asset of the estate that is

17  important to any potential reorganization or sale to maximize

18  value for all stakeholders.  These cases are in their

19  infancy.  Mr. Ray states in his declaration, in Paragraph 6,

20  as Mr. Bromley walked through this morning, that one of the

21  core objectives of these cases is asset protection and

22  recovery.  Public release of the debtors' customer list and

23  identifying information would give the debtors' competitors a

24  free opportunity to poach the debtors' customers and would

25  interfere with the ability to sell assets and maximize value

1  as these cases progress.  There is no counter-reason to

2  eliminate a potentially significant source of value on the

3  first hearing before Your Honor, in the very first week of

4  these cases.

5       Mr. Mosley states in his declaration, Paragraph 18,

6  that the debtors' customer list and related data is a

7  valuable asset.  How valuable, Your Honor, is to be

8  determined.  But the debtors and all of their stakeholders

9  have an interest in preserving that asset today.

10      The circumstances are similar to those considered

11  by the Court in Cred, but we would submit, respectfully, on a

12  much larger scale.  We submit that, under the circumstances,

13  Section 107(b)(1) provides a basis consistent with the

14  Court's prior decision in the Cred case to permit the

15  redaction of the customer's personal information on an

16  interim basis.

17      Second, Your Honor, there are significant privacy

18  concerns raised by the disclosure of this customer and

19  protected creditor information.  The debtors' customer base

20  is global.  Those customers who reside in the United Kingdom

21  and the European Union country -- member countries have

22  additional data privacy protections under local law.  But

23  privacy concerns are not limited to the customers in those

24  jurisdictions.

25      Customers in the cryptocurrency space are not the

1   typical creditors.  Many customers invest in cryptocurrency,

2   in part, to not be publicly identified.  This is a highly

3   sensitive issue for the customer community.  And we've heard

4   from numerous customers in that community, both individuals

5   and entities, already in these cases, requesting that their

6   personal information be protected.

7         Many of the debtors' creditors are high net worth

8   individuals and entities with significant positions in

9   digital assets.  As explained in Mr. Ray's declaration, the

10  debtors have been the targets of ongoing hacking and

11  unauthorized access to their systems.  Identifying the

12  personal contact information of the debtors' customers,

13  particularly at this time, while emotions are running high,

14  could put them in the crosshairs of bad actors.

15        In addition, the immediate identification of the

16  debtors' customers with exposure to FTX could have the effect

17  of further destabilizing the broader crypto markets.  Section

18  107(c) of the Bankruptcy Code provides that the Court may,

19  for cause, protect personal information from disclosure,

20  which would create a risk of injury to the individual's

21  property.  And courts in this district have taken a strong

22  stance with respect to the protection of customer and

23  personally identifiable information.

24        In contrast, Your Honor, there is minimal benefit,

25  in our opinion, to requiring the immediate mass disclosure of

1   the customers -- the debtors' customer and individual

2   creditor personal information.  The Court and the U.S.

3   Trustee have been and will continue to be provided the

4   unredacted information, as will any statutory committee

5   appointed in these cases; thus, we submit there is no

6   prejudice to any party-in-interest by granting this relief on

7   an interim basis.  Creditors will be noticed through our

8   claims agent and receive all notices that they're entitled to

9   under the Bankruptcy Code and Rules.

10         Finally, Your Honor, on this issue, the debtors

11   have included language in the proposed order before Your

12   Honor today consistent with the language the Court suggested

13   in the Cred case, reserving rights and providing that, upon

14   request of any party-in-interest, the Court may revisit this

15   issue upon a showing of good cause to release some or all of

16   the redacted information.

17         Under the circumstances, Your Honor, we

18   respectfully request that the entirety of the relief

19   requested in this motion be granted in its entirety.

20         THE COURT:  Okay.  Thank you.

21         Let me hear from the U.S. Trustee.

22         MR. HACKMAN:  Good morning, Your Honor.  May I

23   please the Court, Ben Hackman for the U.S. Trustee.

24         We object to two aspects of the creditor matrix

25   motion:

1          First, in ordered Paragraph 4, we oppose the

2   redaction of the names and addresses of creditors and

3   customers who are not individuals.  We see no basis to redact

4   that information for legal or business entities.  There

5   should be transparency about who those entities are including

6   on the top 50 lists that are to be filed.

7          Second, we object to order Paragraph 7, in

8   particular ordered Paragraph Sub (c), which would authorize

9   the claims and noticing agent to withhold publication of

10  proofs of claim filed by the debtors' customers.  We're not

11  entirely sure what that means.

12         We submit, respectfully, that proofs of claim

13  should not be withheld from being published on the claims

14  register wholesale. If Your Honor authorizes certain types of

15  other information to be redacted in other papers that are

16  filed with the Court such as individual customer addresses we

17  take no position on that same information being redacted in

18  filed proofs of claim, but there should not be redactions

19  beyond that in proofs of claim.

20         The claims register paints a picture and in a case

21  with over 100,000, potentially over a million, creditors that

22  picture may be substantial.  Proofs of claim allow creditors

23  to tell their story.  And we submit that those proofs of

24  claim should not be withheld or sealed wholesale.

25         In the Altera Healthcare decision Judge Walrath

1  wrote that "There is a strong presumption in favor of public

2  access to bankruptcy proceedings and records.  During a

3  Chapter 11 reorganization a debtor's affairs are an open

4  book, and the debtor operates in a fishbowl."

5       The Supreme Court has written that "It is clear

6  that the Courts of this country recognize a general right to

7  inspect and copy public records and documents including

8  judicial records and documents."  That is the Nixon v. Warner

9  Communications case.

10      The Third Circuit has, likewise, recognized that

11 there is a strong presumption -- I apologize, the District of

12 Delaware recognizes "There is a strong presumption in favor

13 of public access to judicial records and papers which has

14 statutory common law and first amendment under-pinnings."

15 That is the Continental Airlines decision, 150 B.R. at 334,

16 Pin Site 341.

17      I believe Mr. Bromley described this case as one

18 of the most abrupt collapses in the history of corporate

19 America.  And in counsel's presentation earlier they

20 indicated that one of Mr. Ray's five core objectives in this

21 case is transparency and investigation.  We submit that over

22 broad redactions do not serve transparency in these cases.

23      We're also concerned that presently the top 50

24 list contains no information identifying who the creditors

25 are.  And if our office appoints a creditors committee we

1  will need to identify who we are appointing to that committee

2  or those committees.  We need to be able to do that with

3  transparency.  Any redaction or sealing relief should not

4  prevent us from filing those notices of appointment.

5          We would also point out, Your Honor, that we do

6  object to the names of individuals being redacted.  We take

7  no position about individual addresses being redacted, but as

8  to their names we respectfully submit they should not

9  redacted unless they are citizens, members of the European

10 Union and are covered by the GDPR.

11         Unless Your Honor has any questions that's all I

12 have.

13         THE COURT:  Thank you, Mr. Hackman.

14         MR. HACKMAN:  Thank you, Your Honor.

15         THE COURT:  Mr. Glueckstein, can you address the

16 issue about the proofs of claim.

17         MR. GLEUCKSTEIN:  I can, Your Honor.  We have

18 requested, in the motion, at this point, that the idea of all

19 of this is to ensure that creditors -- customers are not

20 having their information involuntarily disclosed.  No bar

21 date has been set yet in this case.  It will be at some point

22 and creditors will need to file claims in order to preserve

23 those claims.

24         So with the disclosure issue at this point there

25 are some folks, I think there have been a couple of people

1  who have voluntarily come forward and have started to put

2  claims on the docket; that is their prerogative.  From the --

3  that is self-identification.  But what we are trying to

4  protect, again, Your Honor, just for this interim period, is

5  to ensure that nobody's personal information is being

6  involuntarily disclosed.  And, two, Your Honor, that the

7  debtors' customer list is not being compromised in a

8  significant way before we're able to marshal that asset.

9  Both of those issues are in play.

10        I think the proof of claim issue can be avoided

11  for the interim period because we haven't set a bar date.  So

12  I think at this point we could table that portion of the

13  relief if somebody has voluntarily filed a proof of claim on

14  a docket.  We haven't yet sought to take any action with

15  respect to that claim, its very few.

16        The issue that is raised by counsel with respect

17  to the creditor's committee, I think, is a good example of

18  how we see this playing out, Your Honor.  We don't believe

19  the top 50 list should be unredacted including names, the

20  names of customers, once you have customer names it's not

21  very difficult to solicit those customers, find information

22  about them and know that they are customers of FTX.

23        The United States Trustees Office, of course, is

24  presumably going to form a creditors committee and those

25  members of that committee will have come forward voluntarily

1 to serve on that committee, and presumably are comfortable

2 with the requirements of service that are necessary including

3 the disclosure of their names and their participation in this

4 process.  That will be a handful of customers who agree to

5 serve on a creditors committee.  That is very different and,

6 again, that is voluntary.  That is very different than the

7 millions of customers that are sitting in a data base that

8 need to be noticed in this case and will appear on the

9 debtors' creditor matrix.  That is a very different

10 situation.

11        Again, Your Honor, there is no need, certainly at

12 this time, in the first month of the case, we submit, for the

13 world to have all of those names and addresses,

14 understanding, Your Honor, for most of our customers.  We

15 don't have physical addresses.  These are folks who conducted

16 business with the debtors entirely online through

17 applications.  For many of these customers we have email

18 addresses or other contact information, identifiable

19 information, but not necessarily brick and mortar mailing

20 addresses.

21        So the -- I think many people would view email

22 addresses and the ability to contact people as some of the

23 most valuable customer information.  So I don't think --

24 there is absolutely a balance.  We are very cognizant of the

25 need for transparency in these cases.  The debtors intend to

1  provide that transparency to its stakeholders including the

2  customer base.

3         What is being asked here today, Your Honor, is

4  simply to ensure for now, on an interim basis, that the

5  customer information in its entirety, individuals and

6  entities because entities many times are individuals behind

7  those entities in this space, those are all valuable

8  customers, and the identifiable information of customers,

9  including email addresses, be redacted from all filings.  I

10 think for purposes of the interim order we could remove the

11 proof of claim issue.

12        THE COURT:  All right.  Anyone else wish to be

13 heard?  I got some other folks standing up.  Come forward.

14        MR. PIERCE:  Good afternoon, Your Honor.  This is

15 Matthew Kelsey of Alston & Bird.  We represent an ad hoc

16 group of account holders.

17        The relief requested in the motion, which we

18 support, you know, by implication effects our group in the

19 sense of 2019 requirements, Your Honor.  I think both

20 confidentiality and privacy are implicated here.

21        Our group was formed yesterday and we have not

22 filed a 2019 yet, but we were hoping for some guidance from

23 the Court in connection with your resolution as to the

24 ability to redact names and addresses particularly of

25 individual holders, especially given what we have heard

1 today; the risk of cyber-attack and the lack of controls, at

2 least, that was handed to the current management now.

3          I have no doubt that they are working hard to put

4 those controls into place, but, at least, on an interim basis

5 redacting this sort of information on a 2019 seems

6 appropriate.

7          THE COURT:  Okay.

8          MR. KELSEY:  Thank you, Your Honor.

9          THE COURT:  Thank you.

10          MR. ROESCHENTHALER:  Good afternoon, Your Honor.

11 Mike Roeschenthaler from Whiteford Taylor & Preston. I am

12 here with my colleague, Rich Riley.  We too are here on

13 behalf of a significant number of customers, some of which,

14 based on what's been disclosed so far, will likely be on that

15 consolidated 50 list of unsecured creditors.

16          We certainly join in the debtors' motion.  This is

17 a case filed crypto currency.  So, obviously, confidentiality

18 is, candidly, part of the benefit of the bar date for those

19 that participated in this space.  We think the disclosures

20 being sought by the Office of the United States Trustee could

21 actually disincentivize participation in the case.  And by

22 extension impairs the ability of creditors to recover from

23 this case which, of course, would be contrary to the best

24 interest of the creditors.  So we join in the debtors'

25 motion.

1          Thank you.

2          THE COURT:  Anyone else?

3      (No verbal response)

4          THE COURT:  Well this certainly is a pull and tug

5  here between the right to privacy and the right to, everybody

6  in this case, to have transparency.  As I did in the Cred,

7  Inc., case -- well let's deal first with the modified

8  creditors list of 50.  I think the only issue there from the

9  U.S. Trustee is the disclosure of the names.  Is that right,

10 Mr. Hackman?

11         MR. HACKMAN:  We would submit, Your Honor, that

12 for institutional entities names and addresses should not be

13 redacted for any individuals.  Only their addresses should be

14 redacted.

15         THE COURT:  All right.  Here is what I am going to

16 do on that: I am going to, on an interim basis, enter the

17 order as the debtors have requested, but it does raise a

18 factual issue and there may be a factual basis for why names

19 need to be disclosed.  So we will reserve that for the final

20 hearing and if there is still an objection by the U.S.

21 Trustee at that time, once they have seen the list and know

22 who these parties are, if they think there should be

23 disclosure of those entities we will revisit it at that time.

24 On an interim basis I will enter the order allowing the

25 redaction of the names and address of the top 50 list.

1        The same goes for the consolidated creditor list.
2   It -- again, I need to make sure I am protecting the interest
3   of these individuals.  This is a space where it's all done
4   over the internet and everyone in this room knows the
5   internet is wrought with potential dangers; hacking happens
6   all the time, people's individual accounts get hacked.  I
7   think it's important that we protect those individuals who
8   are seeking -- who want to participate in this case, want to
9   file their proofs of claim, but also want to protect their
10  assets.
11       So, again, on an interim basis I will grant the
12  release requested by the debtor excluding the proof of claim.
13  We will take that out of the form of order.  We will deal
14  with that once we set a bar date because, as debtors' counsel
15  pointed  out, if someone wants to voluntarily disclose who
16  they are that's perfectly okay, they can do that.
17       On the -- certainly, Mr. Hackman, on the -- when
18  you come to the time of appointing a statutory committee they
19  have to be disclosed.  I would assume that anybody who is
20  coming forward who wants to serve on the committee is
21  voluntarily agreeing to disclose their names.  I would not,
22  under any circumstances, allow a committee member to withhold
23  their information.  They have to disclose.
24       Again, on an interim basis we can revisit this on
25  the final.  Again, if there is some evidentiary basis for why

1   you think I should not allow this relief, Mr. Hackman, you

2   can come back and we will deal with it at the final hearing.

3           MR. HACKMAN:  Thank you, Your Honor.

4           THE COURT:  Okay.  So with that, based on my

5   comments, I will approve both the motion regarding the

6   modification of the creditors list and the consolidated

7   creditors list, Items 3 and 7.

8           UNIDENTIFIED SPEAKER:  Thank you very much, Your

9   Honor.

10          Continuing to move through the agenda, the next

11  item on the list -- on the agenda is Agenda Item 4 which was

12  the debtors' emergency motion to transfer the Chapter 15 case

13  of FTX Digital Markets to this Court.  As filed on the docket

14  yesterday and as Mr. Bromley touched on in his opening

15  remarks we have reached an agreed form of order with counsel

16  for the joint provisional liquidators to, in fact, permit and

17  have the Chapter 15 case transferred to this Court with the

18  rights of all parties reserved.  So absent any questions from

19  the Court we would ask that that be entered.

20          THE COURT:  I have no questions.  Do the

21  liquidators wish to be heard on that?

22          MR. SHORE:  Your Honor, Chris Shore from White &

23  Case on behalf of the three JPL's.

24          We have nothing to address.  I will note, because

25  I am going to stand on one motion in a bit, that we're going

1  to need a recognition hearing setting, but we can discuss

2  that we're going to need a recognition hearing setting, but

3  we can discuss that in the context of the setting the second

4  days.

5           THE COURT:  We will get to that.  I will enter

6  that order.  Thank you.

7           Has it been uploaded, the final on that one?

8           UNIDENTIFIED SPEAKER:  Yes, Your Honor, it has.

9           THE COURT:  We can go ahead and enter that one

10  right away.

11           UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

12           That brings us to the next item on the agenda

13  which is Agenda Item 5.  This is a motion of the debtors for

14  entry of an order filed -- a motion filed at Docket No. 25

15  with respect to the automatic stay.

16           By this motion, Your Honor, the debtors are

17  requesting entry of an order enforcing and restating the

18  worldwide stay.  As a result of the debtors' international

19  business operations, Your Honor, the debtors have many

20  foreign creditors, contract counterparties and other parties

21  in interest in countries who are not and may not be as well-

22  versed in the protections and restrictions of the bankruptcy

23  code.  These creditors and parties in interest may be

24  unfamiliar with the operation of the stay and the other

25  provisions, operative provisions, of the bankruptcy code.

1          Upon commencement of the cases non-US parties may,

2   in fact, try to take action to violate the protections

3   afforded to the debtors under the code and we have started to

4   see some notices in that regard.  We are responding to those,

5   but accordingly the debtors submit that such circumstances

6   warrant an order apprising all parties of such protections as

7   set forth in the code.

8          Importantly, Your Honor, the debtors are not

9   seeking to expand the protections provided by the code,

10  rather only seeking an order to be able to notify parties in

11  a standalone order of this Court who are unfamiliar with the

12  code of the scope and effect of Section 362 and related

13  provisions including 365(e)(1) and 541.

14         Your Honor, the debtors did receive some comments

15  from the United States Trustee and other parties on the

16  proposed form of order that we incorporated in the form filed

17  at Docket No. 98, Exhibit C.  We would ask that under the

18  circumstances Your Honor enter that order unless the Court

19  has any questions.

20         THE COURT:  No, I don't have any questions.

21         Mr. Shore.

22         MR. SHORE:  Thank you, again, Your Honor.  Chris

23  Shore from White & Case on behalf of the three JPL's, Brian

24  Simms, Peter Greaves, and Kevin Cambridge, who have all been

25  appointed as joint provisional liquidators of FTX Digital

1  Markets, a Bohemian Company in a Bohemian wind-down

2  proceeding.

3          I will note that some of what Mr. Bromley said

4  when he put the charts up is not in the evidentiary record.

5          THE COURT:  I understand.

6          MR. SHORE:  Yeah, and we have some disagreements

7  which we will work out over time as to how we fit-in and what

8  portion of customers sat where within the organization.  But

9  for now, as noted, we had started a Chapter 15 in New York.

10 We have consented to having it come down here.  And we will

11 need to get a scheduling date which we can do at the end of

12 the hearing.

13         For now the 15 isn't being called, it's just the

14 11.  We are only appearing, we are not seeking any provision

15 or relief.  We are just participating to make sure that what

16 is happening today isn't impinging upon any relief that the

17 JPL's might need pending recognition.

18         We have been working with the debtors to begin the

19 process of coordinating our efforts on information flow,

20 asset containment, and ultimately judicial coordination.  We

21 worked out everything except for the automatic stay.  We are

22 not objecting to the relief, we're actually asking for a

23 comfort clarification on a comfort order.

24         There is a tension that is going on right now

25 between the automatic stay.  The automatic stay is what the

1  automatic stay is, but also Mr. Ray's guiding principles that

2  went up.  There is a lot that needs to get done in between

3  now and a recognition hearing, and now and second day

4  hearings with respect to information gathering, asset

5  containment, developing information, sharing information,

6  coordinating information.

7        You heard Mr. Bromley say information is property.

8  It can't be that the JPL's seeking to access information of

9  their debtor is a stay violation in a Chapter 11 case.  We

10 are going to try to work this out.  We were able to work out

11 everything else.  We weren't able to put language in the

12 order with respect to the automatic stay.  We are going to

13 continue to work with them.

14        My caveat on provisional relief is we can't get to

15 a place where we can develop and information flow between the

16 .com silo and the JPL's.  We may have to come back and get

17 provisional relief because from the perspective of the JPL's

18 order number one in this case is to make sure that all assets

19 are protected and all information is protected.  We can

20 figure out later what that information means or where those

21 assets get mapped, but we can't have assets being dissipated,

22 nor can we have information sitting there unassessed because

23 we can't get out of our own ways to come up with a protocol

24 to share information.

25        So, again, we don't object to the order being

1  entered, but we're going to have to work out some arrangement

2  between ourselves; otherwise, we may have to come back and

3  address it with Your Honor.

4         THE COURT:  Mr. Glueckstein.

5         MR. GLUECKSTEIN:  Thank you, Your Honor.  I don't

6  think there is -- I don't have any agreement with what Mr.

7  Shore said, but --

8         THE COURT:  You mean disagreement.  You said I

9  don't have any agreement with what --

10         MR. GLUECKSTEIN:  I'm sorry, a disagreement.  We

11  might have disagreements later.  You know, sometimes we have

12  disagreements, but I like working with Mr. Shore.

13         I think that the issue here -- everything he said

14  goes both ways, right.  They are going to be looking for

15  information from us, we are going to be looking for

16  information from them.  We are actually looking forward to

17  the possibility of coming up with a protocol that makes

18  sense.  It is something that we suggested to prior counsel

19  for the joint liquidators.  It didn't get traction last week.

20  We are glad that Mr. Shore and his colleagues are now on the

21  scene and we hope to make some progress in that regard.

22         With respect to this motion Paragraph 7, as

23  revised, with input from other parties makes very clear that

24  this order is simply declarative and intended to simply state

25  what is in the statute and all parties' rights are reserved.

1  So I think with respect to the relief today, Your Honor, I

2  didn't hear any objection from Mr. Shore on this order being

3  entered.  We would ask that this order be entered and we look

4  forward to working with them on the issues as related to the

5  Bahamas and the Chapter 15 v the Chapter 11.

6            THE COURT:  Okay.  Yeah, I didn't hear Mr. Shore

7  saying he actually said he doesn't object to entry of the

8  order and I will enter the order.  It obviously is a comfort

9  order that gives the Debtors an opportunity to send something

10  under the signature of a judge to parties outside the items

11  who might not understand the automatic stay.

12            But the automatic stay is what the automatic stay

13  is, and if someone violates it, they do so at their own risk.

14            MR. GLUECKSTEIN:  Thank you very much, Your Honor.

15            THE COURT:  Okay.

16            MR. GLUECKSTEIN:  The next item on the agenda,

17  Item 6 is the Debtors' application, which was filed at Docket

18  28 to retain Kroll Restructuring Administration LLC.  The

19  Debtors, by this motion, are seeking to employ and retain

20  Kroll as claims and noticing agent, effective *nunc pro tunc*,

21  to the petition date, pursuant to 28 U.S.C. 156(c).

22            Appended to the motion as Exhibit B was the

23  declaration of Benjamin J. Steele, the managing director at

24  Kroll.  The Debtors also filed a supplemental declaration for

25  Mr. Steele at Docket 96, which includes additional

 1 disclosures that were requested by the United States Trustee.
 2 Mr. Steele is on the Zoom hearing today.
 3            The Debtors, Your Honor, anticipate, as we've been
 4 discussing this morning, and now this afternoon, that there
 5 will be millions of creditors in these Chapter 11 cases.  In
 6 light of the number of anticipated claimants and the
 7 complexity of the Debtors' businesses, the Debtors submit
 8 that appointment of a claims and noticing agent, required by
 9 Local Rule 2002(1)(f) and, otherwise, is in the best
10 interests of both, the Debtors' estates and their creditors.
11            By appointing Kroll, the distribution of notices
12 and processing of claims will be expedite and the Office of
13 the Clerk and Bankruptcy Court will be relieved of an
14 administrative burden, of what otherwise could be an
15 overwhelming number of claims and contacts.  In selecting
16 Kroll, Your Honor, the debtors obtained and reviewed
17 proposals from two other court-approved claims and noticing
18 agents, to ensure selection was through a competitive
19 process.  The Debtors believe that Kroll is qualified due to
20 its significant experience in both, legal and administrative
21 aspects of large and complex Chapter 11 cases.
22            The Debtors further submit, Your Honor, that *nunc*
23 *pro tunc* relief is appropriate because Kroll has provided and
24 continues to provide valuable services to the Debtors'
25 estates in this interim period.

 1          The Debtors did receive informal comments on

 2  Kroll's retention application from the United States Trustee,

 3  which the Debtors addressed in the revised order that was

 4  filed at Docket 98, Exhibit D, and the supplemental

 5  declaration of Mr. Steele.

 6          Unless Your Honor has any questions, we would

 7  request, respectfully, enter of that order.

 8          THE COURT:  Does anyone else wish to be heard?

 9      (No verbal response)

10          THE COURT:  Okay.  I'm satisfied the retention is

11  appropriate and I will enter the order.

12          MR. GLUECKSTEIN:  Thank you very much, Your Honor.

13          I think we're going to go, with Your Honor's

14  indulgence, slightly out of order, and would take, next, the

15  cash management, which is at Item 8 on the agenda and I would

16  turn it over to -- to Mr. Dietderich to present that motion.

17          THE COURT:  We've been going about an hour and a

18  half.  Why don't we take a 10-minute recess and allow people

19  a little break and we'll come back and we'll take up that

20  next order.

21          MR. GLUECKSTEIN:  Sounds great.  Thank you, Your

22  Honor.

23      (Recess taken at 12:30 p.m.)

24      (Proceedings resumed at 12:47 p.m.)

25          THE COURT:  I heard we had some entertainment

1   while we were on break, music playing on the system.

2           All right.  You may proceed.

3           MR. DIETDERICH:  May I please the Court?  Andy

4   Dietderich, Sullivan & Cromwell.

5           Your Honor, I present the cash management motion

6   today.  We have, I think, a consensual motion.  We have one

7   objection on the record.  I think it's been rendered moot by

8   language that we put into the order last night and maybe when

9   I through, we can confirm that on the record.

10          Your Honor, the cash management motion takes the

11  Debtors' current accounts -- there are 216 bank accounts, 36

12  institutions, 19 countries -- and creates on top of those, a

13  new set of five pooling account, that are compliant with the

14  U.S. Trustee Guidelines.  I put up on the screen for Your

15  Honor, the snapshot of liquidity that we have in all four

16  silos as of today.  Your Honor, there was a revised

17  declaration of Ed Mosley we filed overnight, which shows the

18  additional cash the Debtors have been able to verify.  This

19  process will continue.  It's likely we find additional cash,

20  additional marketable securities and other liquid assets, so

21  we hope our cash situation does approve or improve.

22          And what you have in front of you are the cash

23  projections we're using for the five-week period that was our

24  initial estimation for an interim period of relief.  And

25  you'll see, Your Honor, that at the end of the period, each

1   of the silos has positive cash.

2          Now, Your Honor, it's very important that this is

3   unencumbered or unrestricted cash.  So, within the Debtors'

4   system, there's restricted cash which consists of cash held

5   in custodial accounts, FOB accounts, cash necessary to keep

6   the regulated entities for regulatory capital purposes; all

7   of that is excluded from these calculations, so this only

8   shows unencumbered cash.

9          Your Honor, we do have a revised form of order

10  that we put in last night.  I think that's been reviewed by

11  all the applicable parties.  And then I have two comments

12  that came in this morning that we resolved.  One is from the

13  SEC, Securities and Exchange Commission, which has some

14  additional reservation-of-rights language and the second is a

15  comment from the U.S. Trustee, who has asked us to reduce the

16  amount we can move from the master pooling account into the

17  silo pooling accounts from the $25 million initially

18  requested in the motion to $5 million.  And, Your Honor, the

19  Debtors are fine with that, given the robust liquidity

20  picture in each of the silos.  So, with that, Your Honor, I'd

21  ask for entry of the order.

22          THE COURT:  Okay.  Does anyone else wish to be

23  heard?

24          MR. COUSINS:  Good afternoon, Your Honor.  Scott

25  Cousins, on behalf of Evolve Bank, but we're close.  We did

1  file an objection this morning.

2          When we first saw the motion, we were concerned

3  about, with respect to Evolve Bank, these FBO accounts, which

4  according to our agreement with WRS, our property, our

5  property of the estate, the Debtors have made some additional

6  language.  We're not quite there.  We saw the final last

7  night.

8          Footnote 3 says the FBO accounts, these are the

9  accounts that are of concern to Evolve Bank, are frozen, but

10  paragraph 11 allows the existing bank accounts to be closed.

11  And Exhibit C of the motion includes the Evolve FBO accounts.

12          So, we've given the Debtors language that would

13  say that the identified FBO accounts, 0066, 0078, and 0082,

14  shall remain frozen and shall not be closed or accessed until

15  we can determine, you know, a final order of the Court,

16  presumably the next cash management order, that determines if

17  it's our property.

18          So, we want to avoid a situation where these

19  accounts, which belong to the bank.  It's in fiat currency.

20  It's used for credit cards of our customer.  So, in other

21  words, when a customer uses a credit card, it's fiat

22  currency.  It's not, in our view, property of the estate.

23          So, we've asked to punt it, but we still need that

24  reservation of rights so that the bank accounts aren't closed

25  since we believe these are not property of the estate.

1           THE COURT:  Okay.  I think we have somebody else

2   who wants to speak, as well.  Why don't we get both the --

3   yeah, you are?

4           MR. LOOMIS:  Thank you, Your Honor.

5           THE COURT:  Yeah, go ahead.  And I'll have you

6   address both.

7           MR. LOOMIS:  Your Honor, Gaston Loomis from

8   McElroy Deutsch, here, on behalf of Philadelphia Indemnity

9   Insurance Company.  I'm joined today by co-counsel to

10  Philadelphia Indemnity, Scott Williams, who is appearing

11  remotely.  He's based in the law firm of Manier & Herod,

12  based in Nashville, Tennessee.

13          My client conveyed a limited objection to the

14  Debtors about the cash management motion, which I'm glad to

15  announce has been resolved, at least for purposes of this

16  interim order.  As background, Philadelphia is a surety that

17  issued 7 million in money transmittal and other surety bonds

18  connected to various state licenses the Debtors possessed

19  that allowed to operate custodial (indiscernible) to flow

20  into other accounts in those states.

21          Philadelphia had concerns about the motion as it

22  related to funds in those accounts, as well as the Debtors'

23  management of those accounts in compliance with trust fund

24  and other state laws.  Philadelphia reached out to the

25  Debtors to address these concerns and, again, I'm pleased to

1 say the parties have reached an agreement on language to

2 include in the interim order, that is addressed at Footnote

3 3, that counsel just talked about, Your Honor.

4            Again, I wish to thank the Debtors for working

5 with my client at this point on this issue, especially given

6 all the other matters we're having to deal with at this time

7 in this case.

8            THE COURT:  All right.  Thank you, Mr. Loomis.

9            Mr. Dietderich, do you want to address Mr.

10 Cousins' proposed additional change, I guess.

11            MR. DIETDERICH:  Yes.  Thank you, Your Honor.

12            We can confirm on the record we will not close any

13 accounts at Evolve Bank during the interim period.

14            THE COURT:  All right.  Thank you.  Does that

15 satisfy you, Mr. Cousins, or do you need something in the

16 order?

17            MR. COUSINS:  I would like something -- I

18 apologize -- Scott Cousins, on behalf of Evolve Bank.  I

19 would like something in the order, Your Honor.

20            MR. DIETDERICH:  Your Honor, we have 36 banks and

21 216 bank accounts.  I think by negative implication, that

22 might just concern others.  I'm just a little bit loathe to

23 put specific bank names in the order.

24            We're happy to have Alvarez & Marsal look at the

25 particular account numbers that he referenced and confirm in

 1 writing that those accounts are FBO accounts, as specified in

 2 the order.

 3         MR. COUSINS:  With that, Your Honor, maybe we'll

 4 see you at the final hearing, but I think that representation

 5 works.

 6         THE COURT:  All right.  Yeah, I think the

 7 representation on the record is sufficient to address the

 8 issues.

 9         MR. COUSINS:  Thank you, Your Honor.

10         MR. DIETDERICH:  Thank you, Your Honor.

11         THE COURT:  So, for the record, I will enter the

12 order, if I didn't say that.  Thank you.

13         MS. KRANZLEY:  Good afternoon, Your Honor.  Alexa

14 Kranzley from Sullivan & Cromwell, proposed counsel for the

15 Debtors.  Your Honor, I'll take the remaining items on the

16 agenda.

17         Going back to Item 8, which is the vendor motion

18 at Docket 46, Your Honor, the Debtors are seeking authority

19 to pay prepetition claims of certain critical domestic

20 vendors, foreign vendors, 503(b)(9) claimants, and potential

21 lien claimants.  Notwithstanding that the Debtors and their

22 advisors do not currently have full books and records, the

23 Debtors and their advisors have identified certain vendors

24 who are critical to their business.

25         Given the nature of the business, most of these

1  vendors relate to data systems, data storage, and security

2  measures.  As such, the Debtors' businesses do not require a

3  material amount of physical goods or shipments and primarily

4  rely on these services.  Additionally, as Mr. Bromley

5  discussed earlier, the debtors' businesses are international

6  and involve foreign vendors all over the world.

7          Your Honor, we had requested in the motion,

8  authorization to pay critical vendors up to an interim cap of

9  9.3 million, to pay foreign vendors with no cap, to pay

10 503(b)(9) claimants with no cap, and to pay potential lien

11 claimants up to a cap of 125,000.

12         Your Honor, further, to discussions with the U.S.

13 Trustee, the Debtors have agreed to make a number of

14 revisions as follows:  first, the Debtors will reduce the

15 critical interim cap from 9.3 million to 8.5 million; second,

16 to include a foreign vendor interim cap of 1 million; third,

17 to include an interim cap of 200,000 for 503(b)(9) claimants;

18 and, fourth, to remain and leave the cap for lien claimants

19 at 125,000.

20         With those changes, Your Honor, we understand the

21 U.S. Trustee's issues with respect to this motion and order

22 are resolved and unless Your Honor has any questions, we

23 request that the relief be entered.

24         THE COURT:  Okay.  I don't have any questions.

25         Mr. Hackman?

1          MR. HACKMAN:  Yes, Your Honor.  I rise to confirm

2    that our comments on this motion resolved.

3          THE COURT:  Okay.  Thank you.

4          With that, I'm satisfied the requested relief is

5    appropriate and I will enter the order.

6          MS. KRANZLEY:  Thank you, Your Honor.  This is one

7    order where we did not file last evening, so we'll submit a

8    new order.

9          THE COURT:  Okay.  Thank you.

10          MS. KRANZLEY:  Item 10 and the agenda and Docket

11    49 is the equity NOL motion.  By this motion, the Debtors are

12    requesting entry of an interim order to establish two things.

13    First, notice an objection procedures related to certain

14    transfers and declarations of worthlessness for federal or

15    state tax purposes, with respect to common or preferred or

16    equity interests in seven Debtors for U.S. taxpayers.  And,

17    second, to direct that any purchased, sale, transfer, or

18    declaration of worthlessness, in violation of the procedures

19    to be null and void.

20          Your Honor, we did serve this motion on all the

21    shareholders of these seven Debtors based on the contact

22    information available to the Debtors.  Similar to the other

23    motions we've discussed with the U.S. Trustee, there were

24    limited comments made to the revised form of order filed last

25    evening at Docket 98, Exhibit (indiscernible).

1      If Your Honor doesn't have any questions, we

2  request entry of this order.

3      THE COURT:  Mr. Hackman, anything from the U.S.

4  Trustee?

5      MR. HACKMAN:  Yeah, this is Ben Hackman for the

6  U.S. Trustee.  Our comments are resolved on this motion, Your

7  Honor.  The change we've requested was increasing the number

8  of days from 14 to 30 that current, substantial shareholders

9  are required to make their initial disclosures.

10      THE COURT:  All right.  Thank you.

11      I don't have any questions.  I'm satisfied the

12  requested relief is appropriate.  I'll enter the order.

13      MS. KRANZLEY:  Thank you, Your Honor.

14      Last item on the agenda is Item 11 and Docket 50,

15  the employee and wages motion.  Your Honor, we're seeking

16  limited relief with respect to the dedicated employees and

17  the newly appointed officers, working under the direction of

18  the newly appointed chief executive officer.  The Debtors are

19  not seeking approval of any severance, retention, incentive,

20  or bonus payments for any employees or insiders.  The Debtors

21  are also not seeking to make any payments to Mr. Sam Bankman-

22  Fried, Mr. Gary Wang, Mr. Nishad Singh, or Ms. Caroline

23  Ellison.

24      The Debtors' limited relief includes payment of

25  prepetition wages, salary, and compensation and benefits, and

1  continuing the compensation and benefit programs in the

2  ordinary course and making any changes, as necessary.

3           Your Honor, we've likewise, worked with the U.S.

4  Trustee and resolved all their objections.  There were a

5  number of changes that were reflected in the revised form of

6  order filed last evening.  First, the Debtors have agreed

7  that the relief in this motion will be sought on an interim

8  basis and then on a final basis at the second day hearing.

9           In paragraph 2 of the proposed form of order, we

10 would clarify that the Debtors are only seeking authority to

11 pay amounts above the 15,000 statutory cap by no more than

12 40,000 in the aggregate.  We've incorporated a new paragraph

13 3 that the new, non-employee director compensation is

14 approved on an interim basis, and, finally, we've agreed with

15 the U.S. Trustee that with respect to the advisory firm

16 obligations to Owl Hill and RLKS Executive Solutions, that we

17 have agreed to remove the request from this motion and will

18 seek approval of these obligations by separate motion.

19           THE COURT:  Okay.  Thank you.

20           MS. KRANZLEY:  Your Honor, with that, we'd ask you

21 to enter the proposed order.

22           THE COURT:  Mr. Hackman, anything?

23           MR. HACKMAN:  I'd confirm that our informal

24 comments are resolved, Your Honor.  Thank you.

25           THE COURT:  Okay.  Thank you.

1          All right.  Again, I'm satisfied the requested

2    relief is appropriate and I will enter the order.

3          MS. KRANZLEY:  Thank you very much, Your Honor.  I

4    believe that that concludes the agenda, so I think the only

5    item is a housekeeping one, scheduling the second day

6    hearing.

7          THE COURT:  Okay.

8          MS. KRANZLEY:  We've been in touch with your

9    chambers and understand that Your Honor is available on

10   January 11th at 10:00 a.m.

11         THE COURT:  Well, if Mr. Cavello says I'm

12   available, I guess I'm available.  So, January 11th, it is.

13         MR. LANDIS:  Your Honor, Adam Landis from Landis

14   Rath & Cobb, I can confirm that you are available.

15         THE COURT:  Okay.  All right.

16         I think we have another housekeeping matter.  We

17   need to schedule the recognition hearing or the U.S. Trustee

18   has an issue?

19         MS. SARKESSIAN:  Your Honor, Juliet Sarkessian, on

20   behalf of the U.S. Trustee.

21         I have some -- I'm sorry, let me take this off --

22   I'll say that again in case it wasn't picked up.  Juliet

23   Sarkessian, on behalf of the U.S. Trustee.

24         Your Honor, I'm worried about waiting until

25   January 11th, was it, to have the second day hearing.  That

1  means that the sealing, all the items that are sealed will

2  continue to be sealed to that -- through that date.  So, Your

3  Honor, I would ask that there be, if possible, a hearing date

4  set, you know, maybe in the week of December the 12th to

5  address, at least, that and, you know, potentially other

6  final orders on some of the other first day -- actually, I

7  don't really see why we shouldn't have the final order and

8  all the rest of the first day relief in December, because the

9  interim order stays in place until we have that final

10 hearing.

11              THE COURT:  Mr. Bromley?

12              MR. BROMLEY:  Your Honor, James Bromley of

13 Sullivan & Cromwell.  Just to be clear, Ms. Sarkessian, are

14 you suggesting only with respect to the sealing we go forward

15 on an earlier date or are you suggesting all the second day?

16              MS. SARKESSIAN:  All of it.

17              MR. BROMLEY:  Because I think we can accommodate

18 with moving -- if we could find a date, perhaps, in the

19 middle of December, just to deal with the sealing and then on

20 the rest of the second day, we could deal with January 11th?

21              MS. SARKESSIAN:  Let me -- if I could have just a

22 minute to speak with my colleague?

23              THE COURT:  All right.  That's fine.

24              And in the meantime, Mr. Shore, you wanted to

25 schedule a recognition hearing?  Have you conferred with the

1   other side about potential dates on that one?

2           MR. SHORE:  No, I thought we were talking about

3   everything in the middle of December, but it just sounded

4   like -- we're fine in the mid-December.  I have a conflict,

5   14th, 15th, 16th in front of Judge Owens and Judge Goldblatt,

6   but other than that, we're kind of available at Your Honor's

7   convenience.

8           THE COURT:  Mr. Bromley, do you have any --

9           MR. BROMLEY:  I apologize to Mr. Shore.  I think

10  we were talking about numbers and not months.  I thought we

11  were talking about January.

12          MR. SHORE:  No, for recognition.

13          MR. BROMLEY:  For recognition.

14          MR. SHORE:  Well, we're going to have to have a

15  discussion.

16          THE COURT:  Yeah, why don't you meet-and-confer on

17  it.  It's going to be an evidentiary hearing, obviously.  I

18  need to make findings of fact and conclusions of law, so make

19  sure that you've left yourself enough time for whatever

20  discovery and you coordinate with other witnesses you're

21  going to need to bring and so forth.

22          MR. SHORE:  Understood, Your Honor.

23          THE COURT:  So, we'll schedule the recognition

24  hearing.  You can contact chambers once you've conferred.

25          MR. SHORE:  Okay.

1          THE COURT:  Ms. Sarkessian, have you --

2       (Pause)

3          MS. SARKESSIAN:  So, Your Honor, I think we can

4   live with having that interim, that hearing in December for

5   just the sealing motion.

6          THE COURT:  Okay.

7          MR. BROMLEY:  Just so that we're clear, we're

8   talking about sealing -- we're talking about the sealing with

9   respect to the motion that we dealt with before the hearing,

10  right?

11         MS. SARKESSIAN:  And the creditor matrix motion

12  and the 30 -- the top-50 and the creditor matrix being

13  sealed.  I don't want that to wait until January to be heard.

14  And then the sealing motion, with respect to the other

15  matter, yes.  (Indiscernible) can also be in December.

16  Anything related to sealing should be in December.

17         MR. BROMLEY:  Well, Your Honor, the issues with

18  respect to the creditor matrix, I believe, are going to

19  require an evidentiary hearing, assuming that we're not going

20  to be able to get over the hump with the U.S. Trustee's

21  Office.  And I do understand that the U.S. Trustee's Office

22  has a policy position on this, so I don't think we're

23  anticipating we're going to get past it.

24         So, I guess the question is, is whether we think

25  that's enough time to have an evidentiary hearing -- to

1  prepare for and have an evidentiary hearing on those issues.

2          Ms. Sarkessian, I'm sorry, what date did you

3  suggest?

4          MS. SARKESSIAN:  There was some time available the

5  week of December 12th.

6          THE COURT:  That's a month from today, so --

7          MS. SARKESSIAN:  That's a good amount of time.

8          THE COURT:  -- that should be enough time, I would

9  think.

10          MR. BROMLEY:  Do you have -- I'm sorry, Your

11  Honor, during that week, is it -- this is your calendar not

12  the judges.

13          MS. SARKESSIAN:  I can do it any time during the

14  week of the 12th.

15          THE COURT:  I could -- I'm fairly jammed up that

16  week, other than the 16th.

17          MS. SARKESSIAN:  That's good for me.

18          Does that work for you?

19          MR. BROMLEY:  Okay.  I guess we'll take     the

20  16th.

21          MS. SARKESSIAN:  That would be wonderful, Your

22  Honor.  Thank you so much.

23          THE COURT:  Okay.  The 16th and we'll start at

24  10:00 a.m.

25          MS. SARKESSIAN:  Thank you, Your Honor.

1          MR. BROMLEY:  Thank you very much, Your Honor.

2          THE COURT:  All right.  It was going so smoothly

3  until --

4      (Laughter)

5          THE COURT:  Yes?

6          MR. BROWN:  Your Honor, if I may?  Stuart Brown.

7          I was just looking for an objection deadline for

8  the hearing on the 16th in case others wanted to weigh in on

9  the issues.

10          THE COURT:  Let's set the -- let's set it for the

11  9th with replies due on the 14th.

12          MR. BROWN:  Thank you, Your Honor.

13          THE COURT:  Okay.  Anything else, Mr. Bromley?

14          MR. BROMLEY:  That is it for the Debtors, Your

15  Honor.  We want to thank you very much for the time and

16  attention.  We appreciate the effort.

17          THE COURT:  Thank you all for a smooth

18  presentation and a very thorough presentation.  I appreciate

19  it.  You brought me up to speed on the case and I'm glad to

20  hear the parties are cooperating, frankly, with the

21  liquidators and the Debtors here and the Chapter 11,

22  hopefully, that will continue and come to a resolution about

23  how to proceed forward with the sharing of information and

24  recognition and maybe we can avoid the whole hearing in

25  January or whenever it's going to be, because we don't have a

1  date yet for recognition.  Okay.  Well, thank you all very

2  much.  We're adjourned.

3              (Proceedings concluded at 1:08 p.m.)

CERTIFICATION

        We certify that the foregoing is a correct
transcript from the electronic sound recording of the
proceedings in the above-entitled matter to the best of our
knowledge and ability.


/s/ William J. Garling                  November 22, 2022
William J. Garling, CET-543
Certified Court Transcriptionist
For Reliable


/s/ Mary Zajaczkowski                   November 22, 2022
Mary Zajaczkowski, CET-531
Certified Court Transcriptionist
For Reliable


/s/ Coleen Rand                         November 22, 2022
Coleen Rand, CET-341
Certified Court Transcriptionist
For Reliable