**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| *In re*<br><br>FTX TRADING LTD., *et al.*,[1]<br><br>Debtors. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | Chapter 11<br><br>Case No. 22-11068 (JTD)<br>(Jointly Administered)<br><br>**Hearing Date:  TBD**<br>**Objection Deadline:  TBD** |

**MOTION OF THE UNITED STATES TRUSTEE FOR ENTRY OF AN**
**ORDER DIRECTING THE APPOINTMENT OF AN EXAMINER**

Andrew R. Vara, United States Trustee for Regions Three and Nine (the "U.S. Trustee"), through his counsel, files this Motion (the "Motion") for the entry of an order directing the appointment of an examiner pursuant to 11 U.S.C. § 1104(c). In support thereof, the U.S. Trustee respectfully represents:

## I.    PRELIMINARY STATEMENT

Over the course of eight days in November, beginning with reports of significant problems with one debtor's (Alameda Research) balance sheet, the Debtors suffered a virtually unprecedented decline in value—from a market high of $32 billion just earlier this year—and a severe liquidity crisis after a proverbial "run on the bank" amid revelations of multiple corporate failures and misuse of customer funds facilitated by "software to conceal" it.  *Declaration of John J. Ray in Support of Chapter 11 Petitions and First Day Pleadings* ("Ray") [D.I. 24] ¶ 65.  The

---

1    The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification numbers are 3288 and 4063, respectively. Due to the large number of debtor entities in these chapter 11 cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.ra.kroll.com/FTX.

result is what is likely the fastest big corporate failure in American history, resulting in these "free fall" bankruptcy cases.  Debtors' approximately one million worldwide creditors,[2] outside investors, and regulators are demanding answers to what happened and how.  The CEO provided an initial answer in his "first day" testimony:  there was a "complete failure of corporate controls and [] a complete absence of trustworthy financial information . . . . From compromised systems integrity . . . to the concentration of control in the hands of a very small group of inexperienced, unsophisticated and potentially compromised individuals, this situation is unprecedented."  Ray ¶ 4.  Like the bankruptcy cases of Lehman, Washington Mutual Bank, and New Century Financial before them, these cases are exactly the kind of cases that require the appointment of an independent fiduciary to investigate and to report on the Debtors' extraordinary collapse.

The appointment of an independent examiner would be in the interests of the Debtors' creditors and other parties in interest in the Debtors' estates, consistent with Code section 1104(c)(1).  An examiner could—and should—investigate the substantial and serious allegations of fraud, dishonesty, incompetence, misconduct, and mismanagement by the Debtors, the circumstances surrounding the Debtors' collapse, the apparent conversion of exchange customers' property, and whether colorable claims and causes of action exist to remedy losses.  The appointment of an examiner is mandatory under 11 U.S.C. § 1104(c)(2) because the Debtors' fixed, liquidated, unsecured debts to its customers alone far exceed section 1104(c)(2)'s $5 million threshold.

---

[2]    The Debtors' customers constitute most of their creditors.  *Mot. of Debtors for Entry of an Order (I) Modifying Certain Creditor List Requirements; (II) Authorizing the Debtors to Serve Certain Parties by E-Mail; and (III) Granting Related Relief* [D.I. 9] ¶¶ 19, 22.

An examination is preferable to an internal investigation under the facts of these cases because the findings and conclusions of the examination will be public and transparent, which is especially important because of the wider implications that FTX's collapse may have for the crypto industry.  Mr. Ray and FTX's new management have done valuable preliminary work in untangling some of these issues.  But the questions at stake here are simply too large and too important to be left to an internal investigation.  Although the U.S. Trustee does not question the qualifications, competence, or good faith of Mr. Ray, his role in these cases is that of a fiduciary for the Debtors' estates with objectives that may not necessarily be aligned with those of all other interested parties.  By contrast, because an examiner would be able to act as a true neutral as to all affected parties, an examiner's findings likely would enjoy broader acceptance and credibility than an examination conducted by any stakeholder in these cases.  An examiner may also allow for a faster and more cost-effective resolution of these cases by allowing Mr. Ray to focus on his primary duty of stabilizing the debtors' businesses while allowing the examiner to investigate the Debtors' collapse and prior management.  The Motion should be granted.

## II.        JURISDICTION, VENUE AND STANDING

1.        This Court has jurisdiction over the above-captioned cases pursuant to 28 U.S.C. § 1334.  This Court is authorized to hear and determine the Motion pursuant to 28 U.S.C. § 157(a, b), and the amended standing order of reference issued by the United States District Court for the District of Delaware dated February 29, 2012.  Venue of the cases is proper in this District pursuant to 28 U.S.C. § 1408(1).

2.        Under 28 U.S.C. § 586, the U.S. Trustee is generally charged with monitoring the federal bankruptcy system. *See United States Trustee v. Columbia Gas Sys., Inc. (In re Columbia*

*Gas Sys., Inc.)*, 33 F.3d 294, 295-96 (3d Cir. 1994) (noting that U.S. Trustee has "public interest standing" under 11 U.S.C. § 307 which goes beyond mere pecuniary interest); *Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 500 (6th Cir. 1990) (describing the U.S. Trustee as a "watchdog"). Specifically, the U.S. Trustee is charged with "monitoring the progress of cases under title 11 and taking such actions as the United States trustee deems to be appropriate to prevent undue delay in such progress." 28 U.S.C. § 586(a)(3)(G).

3.      The U.S. Trustee has standing to be heard with respect to the Motion pursuant to 11 U.S.C. § 307.

### III.      FACTUAL BACKGROUND

#### A.   *The Debtors' Businesses*

4.      The Debtors' businesses have been divided into four "silos" by its new management: (a) a group composed of Debtor West Realm Shires Inc. and its Debtor and non-Debtor subsidiaries (the "WRS Silo"), which includes the businesses known as "FTX US," "LedgerX," "FTX US Derivatives," "FTX US Capital Markets," and "Embed Clearing," among other businesses; (b) a group composed of Debtor Alameda Research LLC and its Debtor-subsidiaries (the "Alameda Silo"); (c) a group composed of Debtor Clifton Bay Investments LLC, Debtor Clifton Bay Investments Ltd., Debtor Island Bay Ventures Inc. and Debtor FTX Ventures Ltd. (the "Ventures Silo"); and (d) a group composed of Debtor FTX Trading Ltd. and its Debtor and non-Debtor subsidiaries (the "Dotcom Silo"), including the exchanges doing business as "FTX.com" and similar exchanges in non-U.S. jurisdictions. Ray ¶ 9.

5.      Each of the four Silos was controlled by Samuel Bankman-Fried ("Bankman-Fried").  Minority equity interests in the Silos were held by Zixiao "Gary" Wang (Chief Technology Officer) and Nishad Singh (Director of Engineering) who, together with Bankman-Fried, co-founded the business.  The WRS Silo and Dotcom Silo also have third-party equity investors, including investment funds, endowments, sovereign wealth funds, and families.  No single investor other than the co-founders owns more than 2% of the equity of any Silo.  *Id.* ¶ 10.

6.      The WRS Silo includes FTX US, an exchange for spot trading in digital assets and tokens.  FTX US was founded in January 2020, is available to U.S. users, and according to statements by Bankman-Fried, had approximately one million users as of August 2022.  *Id.* ¶ 12.  The WRS Silo made loans and investments, including a loan of FTT tokens to BlockFi Inc. in a principal amount of FTT tokens valued at $250 million as of September 30, 2022.  *Id.* ¶ 17.  Upon information and belief, FTT is a cryptocurrency created by one or more of the FTX Debtors.

7.      The Alameda Silo is a "crypto hedge fund" with a diversified business that trades and speculates in digital assets and related loans and securities for the account of its owners, Bankman-Fried (90%) and Mr. Wang (10%).  The Alameda Silo operated quantitative trading funds specializing in crypto assets.  The Alameda Silo's strategies included arbitrage, market making, yield farming, and trading volatility.  The Alameda Silo offered over-the-counter trading services.  The Alameda Silo also made and managed other debt and equity investments.  *Id*. ¶ 22.

8.      The Venture Silo makes and manages private investments, which are held in Debtors Clifton Bay Investments, LLC, Clifton Bay Investments Ltd., FTX Ventures Ltd., Island Bay Ventures Inc. and, potentially, in affiliated companies.  *Id.* ¶ 27.

9.      The Dotcom Silo includes FTX.com, the trade name for the business conducted by the parent company in the Dotcom Silo, FTX Trading Ltd., which is organized in Antigua. FTX.com is a digital asset trading platform and exchange founded by Bankman-Fried, Mr. Wang, and Mr. Singh which commenced operations in May 2019.  The Dotcom Silo also holds certain marketplace licenses and registrations in certain non-U.S. jurisdictions, including the European Union and Japan.  The FTX.com platform is not available to U.S. users.  *Id.*  ¶ 33.  In addition to its core digital asset exchange, the Dotcom Silo offered an off-exchange portal that enabled users to connect and request quotes for spot digital assets and trade those assets directly.  The portal enabled users to lend their digital assets to other users for spot trading and matched users wanting to borrow with those willing to lend.  *Id.* ¶ 34.

10.      The FTX.com platform grew quickly to become one of the largest cryptocurrency exchanges in the world.  *Id.* ¶ 35.  Bankman-Fried apparently claimed that, by the end of 2021, around $15 billion of assets were on the platform, which handled approximately 10% of global volume for crypto trading at the time.    Bankman-Fried also claimed that FTX.com, as of July 2022, had "millions" of registered users, but those figures have not been verified by Mr. Ray's team.  *Id*.

11.      Digital assets generally include cryptocurrency such as Bitcoin (BTC) and are transacted on digital ledgers known as a blockchain.  Control over those sorts of digital assets is dependent upon control over the relevant "private key" (like a password or PIN).  If a person

controls the relevant private key (a unique alpha-numeric code), that person can conduct transactions of the digital assets secured by that private key.[3]

12.    A digital asset exchange allows customers to convert fiat currency to digital assets, to store digital assets within provided wallets, and to exchange a digital asset for another form of digital asset.[4]

**B.  The FTX Debtors' Customer Contracts**

13.    Section 8.2.6 of the FTX Trading Terms of Service with its customers, dated May 13, 2022, a copy of which is attached as **Exhibit A**,[5] provides:

> All Digital Assets are held in your Account on the following basis:
>
> (A) ***Title to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading***. As the owner of Digital Assets in your Account, you shall bear all risk of loss of such Digital Assets. FTX Trading shall have no liability for fluctuations in the fiat currency value of Digital Assets held in your Account.
>
> (B) ***None of the Digital Assets in your Account are the property of, or shall or may be loaned to, FTX Trading; FTX Trading does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading***.
>
> (C) You control the Digital Assets held in your Account. At any time, subject to outages, downtime, and other applicable policies (including the Terms), you may withdraw your Digital Assets by sending them to a different blockchain address controlled by you or a third party.

---

3    Kevin Roose, *The Latecomer's Guide to Crypto*, N.Y. TIMES (March 18, 2022), https://www.nytimes.com/interactive/2022/03/18/technology/cryptocurrency-crypto-guide.html (hereinafter "*Guide to Crypto*").

4    *Guide to Crypto*.

5    https://help.ftx.com/hc/article_attachments/9719619779348/FTX_Terms_of_Service.pdf.

Ex. A (FTX Trading Terms of Service), p. 10, § 8.2.6 (emphasis added).

### C. Reported Misconduct of the Debtors' Management

14.    In May and June of 2022, according to news reports, Alameda suffered severe losses from many deals it was engaged in, including a $500 million loan on which its borrower defaulted.[6] *The New York Times* has reported that Bankman-Fried was heavily involved in the decision-making for all of Alameda's "big trades."[7]

15.    On or about November 2, 2022, *CoinDesk* published that a substantial part of Alameda's $14.6 billion in assets were held in FTT, the cryptocurrency created by the FTX Debtors, per Alameda's June 30, 2022, balance sheet.[8]

16.    *The Wall Street Journal* reported that Bankman-Fried said in investor meetings during the week of November 6 that Alameda owed FTX about $10 billion based on loans FTX extended to Alameda to fund risky bets.[9]  The $10 billion came from money customers had

---

[6]    Angus Berwisk and Tom Wilson, *Exclusive: Behind FTX's fall, battling billionaires and a failed bid to save crypto*, REUTERS (Nov. 10, 2022, 5:46 P.M.), https://www.reuters.com/technology/exclusive-behind-ftxs-fall-battling-billionaires-failed-bid-save-crypto-2022-11-10/.

[7]    David Yaffe-Bellany, *Embattled Crypto Exchange FTX Files for Bankruptcy*, N.Y. TIMES (Nov. 11, 2022), https://www.nytimes.com/2022/11/11/business/ftx-bankruptcy.html; Tracy Wang, et al., *Sam Bankman-Fried's crypto empire 'was run by a gang of kids in the Bahamas' who all dated each other*, FORTUNE (Nov. 11, 2022, 6:14 A.M.), https://fortune.com/2022/11/11/sam-bankman-fried-crypto-empire-ftx-alameda-run-gang-kids-bahamas-who-all-dated-each-other/.

[8]    Ian Allison, *Divisions in Sam Bankman-Fried's Crypto Empire Blur on His Trading Titan Alameda's Balance Sheet*, CoinDesk (Nov. 9, 2022 10:44 A.M.), https://www.coindesk.com/business/2022/11/02/divisions-in-sam-bankman-frieds-crypto-empire-blur-on-his-trading-titan-alamedas-balance-sheet/

[9]    Vicky Ge Huang, et al., *FTX Tapped Into Customer Accounts to Fund Risky Bets, Setting Up Its Downfall*, WALL ST. J. (Nov. 11, 2022, 12:16 P.M.),

deposited on the exchange for trading purposes.  *Id.*  Bankman-Fried described the decision to

move FTX customer property to Alameda as a "poor judgment call."  *Id.*  The $10 billion

constituted more than half of the approximately $16 billion in customer funds on the FTX

cryptocurrency exchange.  *Id.*

17.    According to a Reuters report dated November 9, 2022, Bankman-Fried issued an

apology to all FTX employees via an internal messaging application that stated: "I'm deeply sorry

that we got into this place, and for my role in it. That's on me, and me alone, and it sucks, and I'm

sorry, not that that it makes it any better."[10]  That same day, *The Wall Street Journal* reported that

Alameda CEO Caroline Ellison—joined by Bankman-Fried and two other members of FTX Digital

Markets Ltd.'s ("FTX Digital") management team (Messrs. Wang and Singh)—told Alameda

employees that they were aware of the decision to send customer funds to Alameda.[11]

Specifically, according to the report, Ms. Ellison stated that "FTX used customer money to help

Alameda meet its liabilities."  *Id.*

---

https://www.wsj.com/articles/ftx-tapped-into-customer-accounts-to-fund-risky-bets-setting-up-its-downfall-11668093732.

[10]    Hannah Lang and Angus Berwisk, *Crypto's FTX CEO looking at all options as Binance deal collapses*, REUTERS (Nov. 10, 2022, 1:29 A.M.), https://www.reuters.com/markets/currencies/ftx-turmoil-causes-crypto-concern-sending-token-prices-sliding-2022-11-09/.

[11]    Dave Michaels, et al., *Alameda, FTX Executives Are Said to Have Known FTX Was Using Customer Funds*, WALL ST. J. (Nov. 12, 2022, 2:42 P.M.), https://www.wsj.com/articles/alameda-ftx-executives-are-said-to-have-known-ftx-was-using-customer-funds-11668264238.

### D. *Actions by Bahamian Regulators[12]*

18.    On November 10, 2022, the Securities Commission of the Bahamas suspended the business license of one of the Debtors' affiliates, FTX Digital, and froze its assets.  Simms ¶ 10. On that date, the Commission filed a petition in the Bahamas Supreme Court for an order that FTX Digital be wound up because (1) it was insolvent according to the Companies (Winding Up Amendment) Act, 2011, (2) the Bahamas Commission suspended its license, and (3) it was in breach of its duties under the Digital Assets and Registered Exchanges Act, 2020.  *Id.*

19.    On November 10, 2022, a hearing took place in the Bahamas Court.  The Bahamas Court issued an order directing that FTX Digital be placed into provisional liquidation and appointed Brian C. Simms as Joint Provisional Liquidator over FTX Digital (the "Provisional Liquidation Order").  On November 14, 2022, the Bahamian Court appointed Brian C. Simms, Kevin G. Cambridge, and Peter Greaves as Joint Provisional Liquidators.  Simms ¶ 16.

20.    On November 15, 2022, a Chapter 15 Petition for Recognition of a Foreign Proceeding was filed in the Bankruptcy Court for the Southern District of New York, No. 22-11516 (MEW) (the "chapter 15 case").

21.    In his declaration in support of the chapter 15 case, the Joint Provisional Liquidator of FTX Digital, Mr. Simms, asserted that "the Joint Provisional Liquidators' findings to date indicate that serious fraud and mismanagement may have been committed with respect to FTX

---

[12]  The information in this section of the Motion regarding Bahamian proceedings is taken from the *Declaration of Brian Cecil Simms KC in Support of Petition for Recognition Under Chapter 15 of the Bankruptcy Code* ("Simms") [D.I. 2], Nov. 15, 2022, in *In re FTX Digital Markets Ltd.*, a Debtor in a Foreign Proceeding, No. 22-11516 (MEW) (Bankr. S.D.N.Y.).  The U.S. Trustee does not have independent knowledge of any proceedings outside of the United States.

Digital and the FTX Affiliates."  Simms ¶ 17.  "FTX Affiliates" is defined in the Simms

Declaration to include the Debtors who filed their chapter 11 cases in this Court.[13]  *Id.* ¶ 14.

22.     On November 17, 2022, the above-captioned Debtors filed a motion in this Court to

transfer venue of the chapter 15 case to this Court.  D.I. 22.  On November 22, 2022, this Court

entered an order transferring venue of the chapter 15 case to this Court.  D.I. 131.

### E. The Debtors' Chapter 11 Cases

23.     On the Petition Date, FTX Trading Ltd. and its debtor-affiliates filed the voluntary

petitions that initiated these cases.

24.     The U.S. Trustee has solicited for interest in serving on—but not yet formed—an

official committee of unsecured creditors.

25.     The only documents the Debtors filed on the petition date were their petitions.  The

first day declaration, which is traditionally filed with the petition in large chapter 11 cases in this

District, was not filed until six days later.  Nor were any motions or applications filed on the

petition date.  What are traditionally considered first day motions did not begin to be filed until

November 14, 2022, and continued to be filed through November 19, 2022.  The hearing to

consider the Debtors' first day relief was held on November 22, 2022.

26.     The petitions state that the Debtors' liabilities are between $10 billion and $50

billion.  D.I. 1.  Based on the information in the unaudited balance sheets addressed in Mr. Ray's

first day declaration, it appears that the Debtors' fixed, liquidated, unsecured debts, other than

---

[13]    The U.S. Trustee has not verified ownership of the entities listed on the Debtors' "preliminary"
corporate structure chart or determined whether the entities are otherwise "affiliated."  Ray Ex. B
(preliminary corporate structure chart); *see* 11 U.S.C. § 101(2) (defining "affiliate").

debts for goods, services, or taxes, or owing to an insider, far exceed $5 million.  Ray ¶¶ 20, 25, 31, and 38.

27.     The Debtors' petitions each attached an "Omnibus Corporate Authority" signed by Bankman-Fried dated November 10, 2022.  That document reflects that Bankman-Fried "authorize[d], instruct[ed] and consent[ed] [to]" certain "corporate actions with respect to all members of the FTX Group," including the following:

- "the appointment of John J. Ray III (the "CEO") as Chief Executive Officer," whose power included authority "in connection with a voluntary filing for protection from creditors under Title 11 of the United States Code . . . with respect to all members of the FTX Group;"

- the "appointment of Mr. Stephen Neal (if willing to serve) as the Chairman of the Board, to the extent applicable law permits me to so designate him as such, and one to three other individuals chosen by the CEO and not affiliated with me or the CEO as new directors of FTX Trading Ltd," and of Alameda Reach Ltd. and West Realm Shires Inc.;[14] and

- "if the CEO shall so determine, the appointment of one or more individuals chosen by the CEO and not affiliated with me as director of other members of the FTX Group."

D.I. 1.

28.     The Omnibus Corporate Authority also reflected that it was Bankman-Fried's "wish that the CEO [Mr. Ray] consult with [Bankman-Fried's] counsel at Paul, Weiss, Rifkind, Wharton

---

[14]   Mr. Neal is not mentioned in Mr. Ray's first day declaration as one of the newly appointed directors. Ray ¶ 47.

& Garrison LLP with respect to the foregoing director appointments" referenced in the Omnibus

Corporate Authority.[15]  *Id.*

29.      Mr. Ray's first day declaration included the following facts regarding the Debtors'

directors and officers:

a.   Mr. Ray was appointed the CEO of the Debtors on the Petition Date, after
     Bankman-Fried resigned as CEO.  Mr. Ray does not indicate who appointed
     him.  Ray ¶ 1.  As noted above, the Omnibus Corporate Authority signed by
     Bankman-Fried reflects that he "authorize[d], instruct[ed] and consent[ed]" to
     Mr. Ray's appointment.  D.I. 1.

b.   Mr. Ray's first official act was to authorize the chapter 11 filings of the Debtors
     and the commencement of these cases.  Ray ¶ 2.  But the Omnibus Corporate
     Authority attached to the Debtors' petitions was signed solely by Bankman-
     Fried.  D.I. 1.

c.   Mr. Ray states that "new independent directors" have been appointed to what
     Mr. Ray calls the "the primary companies in the FTX Group," with one separate
     director being appointed to each of the WRS, the Alameda, and the Ventures
     Siloes and two other directors to the Dotcom Silo.[16] Ray ¶ 47. Mr. Ray does not
     disclose who appointed these directors.  Mr. Ray does not indicate whether
     Bankman-Fried's counsel was consulted with respect to the appointments.  He
     also does not indicate whether these new directors are the only directors on the
     Debtors' boards or whether any directors from the prepetition period remain.

---

[15]   On or about November 18, 2022, Paul Weiss terminated its representation of Bankman-Fried, citing
       conflicts of interest.  *Paul Weiss Drops Ex-FTX CEO Bankman-Fried on Conflicts*, BLOOMBERG LAW
       (Nov. 21, 2022 11:01 A.M.), https://news.bloomberglaw.com/business-and-practice/paul-weiss-drops-
       ex-ftx-ceo-bankman-fried-as-client-on-conflicts.

[16]   With respect to the new directors referenced in Mr. Ray's declaration, there is no overlap of names
       between the four Silos of the Debtors' business.

30.     Other than the replacement of Bankman-Fried as CEO by Mr. Ray, it is not clear what other officers or employees of the Debtors, if any, have been removed or replaced.  Nor have the Debtors disclosed whether they are investigating if any of the officers and employees who remain at the Debtors were involved in any of the misfeasance or malfeasance that Debtors may have committed, which, according to Mr. Ray's first day declaration, includes the following:

a.  The Debtors' use of "software to conceal the misuse of customer funds."  Ray ¶ 65.

b.  The absence of "appropriate corporate governance," including the absence of board meetings of certain Debtors.  *Id.* ¶ 46.

c.  The absence of any accounting department.  *Id.* ¶ 58.

d.  The existence of audit opinions for certain aspects of the Debtors' business over which Mr. Ray has "substantial concerns as to the information presented."  *Id.* ¶ 56.

e.  The existence of unaudited balance sheets and financial statements as to which Mr. Ray does not have confidence.  *Id.* ¶¶ 18, 23, 28, 36 and 56.

f.  The absence of any locatable unaudited financial statements for the Alameda or Venture Silos of the Debtors.  *Id.* ¶ 57.

g.  The absence of centralized control of the Debtors' cash.  *Id.* ¶ 50.

h.  The absence of an "accurate list of bank accounts and account signatories," and "insufficient attention to the creditworthiness of banking partners around the world."  *Id.*

i.  The absence of "appropriate books and records, or security controls, with respect to [the Debtors'] digital assets."  *Id.* ¶ 65.  Mr. Ray reports that Bankman-Fried

and Mr. Wang controlled access to digital assets of the main businesses in the FTX Group, with certain exceptions. *Id.*

j.   The Debtors engaging in "[u]nacceptable management practices," such as "the use of an unsecured group email account as the root user to access confidential private keys and critically sensitive data for the FTX Group companies around the world." *Id.* ¶ 65.

k.   The absence of complete books and records for the Debtors' investments in assets other than cryptocurrency. *Id.* ¶ 69.

l.   The absence of appropriate disbursement controls. Mr. Ray reports that "corporate funds of the FTX Group were used to purchase homes and other personal items for employees and advisors." *Id.* ¶¶ 62-63.

m.   The "absence of lasting records of decision-making." *Id.* ¶ 71.

n.   The absence of liquidity forecasting. *Id.* ¶ 54.

o.   The likelihood of "a multitude of intercompany claims." *Id.* ¶ 49.

p.   The absence of information sufficient to determine who worked for the Debtors as of the Petition Date, and "unclear records and lines of responsibility" for such employees. *Id.* ¶ 59.

31.   Shortly after these cases were commenced, there were alleged hacks on the Debtors' exchange which "resulted in more than $600 million in digital assets leaving the exchange's wallets in a flurry of withdrawals."[17]  The Bahamian government stated in the wake of the hacks that it had seized assets of FTX Digital and moved same to a digital wallet it controlled for

---

[17]   Krisztian Sandor, *FTX Hack or Inside Job? Blockchain Experts Examine Clues and a 'Stupid Mistake'*, COINDESK (Nov. 21, 2022, 12:57 P.M.), https://www.coindesk.com/business/2022/11/14/ftx-hack-or-inside-job-blockchain-experts-examine-clues-and-a-stupid-mistake/.

safekeeping.[18]  The Debtors contend that the Bahamian government's actions "flaunted" U.S.

bankruptcy law.  *Emergency Mot. Pursuant to Fed. R. Bankr. P. 1014(b) (I) to Transfer Chapter 15*

*Proceeding Relating to FTX Digital Markets Ltd. and (II) for a Stay* [D.I. 22] ¶¶ 6, 7.

## IV.  <u>BASIS FOR RELIEF</u>

### A.  *The Appointment of an Examiner Is Mandated*

32.    Under 11 U.S.C. § 1104(c), if the Court has not ordered the appointment of a

chapter 11 trustee, then:

> [O]n request of a party in interest or the United States trustee, and after
> notice and a hearing, the court **shall** order the appointment of an examiner to
> conduct such an investigation of [the Debtors] as is appropriate, including an
> investigation of any allegations of fraud, dishonesty, incompetence,
> misconduct, mismanagement, or irregularity in the management of the
> affairs of [the Debtors] of or by current or former management of [the
> Debtors], if -
>
> (1) such appointment is in the interests of creditors, any equity security
>     holders, and other interests of the estate; *or*
>
> (2) [the Debtors'] fixed, liquidated, unsecured debts, other than debts for
>     goods, services, or taxes, or owing to an insider, exceed $5,000,000.

11 U.S.C. § 1104(c) (emphasis added).

33.    Based on the information in the Debtors' petitions and in Mr. Ray's first day

declaration, it appears that the Debtors' fixed, liquidated, unsecured debts, other than debts for

goods, services, or taxes, or owing to an insider, substantially exceed the $5 million threshold of

---

[18]  *Bahamas Regulator Confirms FTX Asset Seizure After Hack Accusation*, REUTERS (Nov. 18, 2022, 1:18
P.M.), https://www.reuters.com/technology/bahamas-regulator-says-it-assumed-control-digital-assets-
ftx-2022-11-18/.

Code section 1104(c)(2).[19]  Ray ¶¶ 20, 25, 31, and 38.  The custodial funds due to customers

through the FTX US platform alone are over a hundred million dollars.  *Id.* ¶ 20.  Accordingly, the

appointment of an examiner under that section to investigate the affairs of the Debtors is

mandatory.  *See Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 500-01

(6th Cir. 1990) ("[Section 1104(c)(2)] plainly means that the bankruptcy court 'shall' order the

appointment of an examiner when the total fixed, liquidated, unsecured debt exceeds $5 million if

the U.S. trustee requests one."); *In re Loral Space & Communications Ltd.,* No. 04 Civ. 8645RPP,

2004 WL 2979785, at *4, 5 (S.D.N.Y. Dec. 23, 2004) (reversing bankruptcy court's decision

denying appointment of examiner where $5 million debt threshold under section 1104(c)(2) was

met and parties seeking appointment had standing to do so); *In re UAL Corp.,* 307 B.R. 80, 83-86

(Bankr. N.D. Ill. 2004) ("best reading of the statute" is that appointment of an examiner is

mandatory if the requirements of section 1104(c)(2) are satisfied); *see also In re Mechem Fin. of*

*Ohio, Inc.*, 92 B.R. 760, 761 (Bankr. N.D. Ohio 1988); *In re The Bible Speaks*, 74 B.R. 511, 514

(Bankr. D. Mass.1987); *In re 1243 20th Street, Inc.*, 6 B.R. 683, 685 n.3 (Bankr. D.C. 1980); *In re*

*Lenihan*, 4 B.R. 209, 211 (Bankr. D.R.I. 1980).

34.    Although this Court has authority under Code section 1104(c)(2) to specify (and

thereby effectively limit) the appropriate scope of an examination, the "as is appropriate" language

in that statutory subsection does not confer discretion upon this Court to decide whether an

examiner should be appointed once it is clear that the statute's monetary threshold is met.  *See*

*Loral,* 2004 WL 2979785, at *5 ("[i]t is [the bankruptcy court's] duty to fashion the role of an

---

[19]    It is unclear whether each Debtor individually satisfies the $5 million debt threshold under section
1104(c)(2).  Accordingly, the U.S. Trustee requests that the Court direct the appointment of an examiner
under section 1104(c)(1) for any debtor which does not meet the threshold.  The vagaries of the balance
sheets of these interrelated Debtors should not limit the examiner's investigation.

examiner to avoid substantial interference with the ongoing bankruptcy proceedings."); *UAL Corp.*, 307 B.R. at 85 n.2 (construing the "as is appropriate" language in section 1104(c)(2) to vest discretion in the bankruptcy court nullifies its mandate).  Here, given that there is a substantial basis to believe that Bankman-Fried and other managers of the Debtors mismanaged the Debtors or engaged in fraudulent conduct, this Court should authorize an examiner to investigate "any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor[s] of or by current or former management of the debtor[s]." 11 U.S.C. § 1104(c).

> ### B.   The Appointment of an Examiner Is in the Best Interests of the Debtors' Creditors and Other Parties in Interest

35.     Finally, even if an examiner were not mandated under section 1104(c)(2), this Court should direct the appointment of an examiner under section 1104(c)(1) because the appointment would be in the best interests of the Debtors' estates, their creditors, and equity security holders. Here, the published news reports cited in this Motion, taken together with Mr. Ray's first day declaration, provide reasonable grounds to suspect that Bankman-Fried and others participated in actual fraud, dishonesty, or criminal conduct in the management of the Debtors.  Additionally, although Bankman-Fried has been replaced as the Debtors' CEO as of the Petition Date, it is unclear how many of the Debtors' other officers who were in place prepetition—and may have participated in fraud, dishonesty, or mismanagement—remain.

36.     An investigation by an examiner into the alleged conversion by the FTX Trading arm of the Debtors of $10 billion of customers' property to lend to its affiliate Alameda, in violation of the express provisions in FTX's customer contracts, and into the use of software to

conceal such misuse is unquestionably in the interests of the Debtors' creditors and other interests

of the estates.  The many instances of what Mr. Ray describes as a "complete failure of corporate

controls and [] a complete absence of trustworthy financial information as occurred here" (Ray ¶

5), such as those detailed in paragraph 30 of this Motion, also warrant examination.

37.    An appointment of an examiner would also be in the interests of the Debtors'

creditors and other parties in interest in the Debtors' estates, consistent with Code section

1104(c)(1), because there is an actual conflict of interest between Debtors FTX Trading Ltd. and

Alameda Research.  FTX Trading has a claim against Alameda Research in the billions of dollars

on behalf of its customers in connection with one or more loans of allegedly converted customer

funds that FTX Trading had no right to make in the first instance.  Such an immense, out-of-the-

ordinary course claim of one Debtor against another, especially one that involves the alleged

conversion of customer funds, calls out for independent scrutiny by an independent examiner.

38.    The interests of the Debtors' estates and their creditors are best served by permitting

an independent examiner to investigate the Debtors' prepetition activities and to identify colorable

claims that the estates may assert, including claims that may be asserted between Debtors.  The

Debtors' financial affairs and business operations need to be reviewed by a disinterested person

with clear authority to untangle the mess and provide transparency to all parties in interest.  This is

especially true where, as here, there are colorable claims that certain of the Debtors

misappropriated $10 billion of their customers' assets to fund the operations and investments of

other Debtors.

39.    Even in their early stages, these cases have been highly contentious,[20] and the parties affected by FTX's collapse are likely to have even more sharply diverging interests over matters such as the ownership of particular assets and remedies.  For this reason, it is imperative that the investigation be conducted not by any person who will be directly involved in these disputes, but by a truly neutral examiner as the cases proceed.

40.    The U.S. Trustee understands that Mr. Ray and FTX's new management have done valuable preliminary work in untangling some of these issues.  But the questions at stake here are simply too large and too important to be left to an internal investigation.  Although the U.S. Trustee has no reason to question the qualifications, competence, or good faith of Mr. Ray, as an officer of the Debtors (and as an appointee of prior management), he cannot act as a true neutral, especially as to parties whose objectives may conflict with those of these Debtors.

41.    This is not simply the U.S. Trustee's position.  Others have noted the important distinctions between investigations conducted by independent examiners and those by fiduciaries for economic stakeholders.  Indeed, the economic predispositions of debtors in possession and committees are an important and intentional part of the Code's structure, but those predispositions prevent their neutrality:

> Unlike examiners, neither trustees nor committees are neutrals charged with finding truth. They occupy adversarial roles and must advance the interests of particular constituencies.  Trustees of insolvent estates owe fiduciary obligations to general

---

[20]    *See, e.g.,* Amrith Ramkumar, *Bahamian Attorney General Defends Handling of FTX Collapse*, Wall St. J. (Nov. 27, 2022, 8:15 P.M.), https://www.wsj.com/articles/bahamian-attorney-general-defends-handling-of-ftx-collapse-11669597384 (criticizing statements made by management and professionals of the Debtors in these chapter 11 cases); Katanga Johnson, *FTX Tensions Intensify as Bahamas Blasts Company's New Chief Ray,* Bloomberg News (Nov. 28, 2022, 8:28 P.M.), https://www.bloomberg.com/news/articles/2022-11-28/ftx-tensions-intensify-as-bahamas-blasts-company-s-new-chief-ray (criticizing Mr. Ray's "intemperate statements" and "urg[ing] prudence and accuracy in all future filings [in this bankruptcy court]").

creditors and are duty-bound to maximize the value of the estate. They are not neutrals as to any claims or defenses that affect the estate. Indeed, trustees' personal economic interests are purposely aligned with the goal of estate maximization. Similarly, creditors' committees consist of creditors from particular interested constituencies who serve and negotiate on behalf of those constituencies. As I have noted elsewhere, in the hands of a committee, investigations are generally used strategically to advance the committee's position in plan negotiations. Unsurprisingly, trustee- and committee-led investigations quickly and naturally fall into the adversarial model.

*      *      *

So far, examiner appointments in major Chapter 11 cases have been few and far between and reserved for the most elite lawyers. Recent examiners conducting inquisitorial investigations have been self-conscious in breaking new methodological ground, zealous in protecting their own reputations for integrity and good judgment, and cautious in their use of inquisitorial methods. Their investigations have been remarkably well executed and yielded successful results.

Daniel J. Bussel, *Ethics for Examiners*, 84 FORDHAM L. REV. 2073, 2074-75 (2016) (all footnotes omitted).

42.     A section 1104 examination is also preferable to an internal investigation under the facts of these cases because the findings and conclusions of the examination will be public and transparent, which is especially important here because of the wider implications that FTX's collapse may have for the crypto industry.

43.     Unlike robust investigations by bankruptcy examiners, "settlements in bankruptcy [resulting from committee or trustee investigations] avoid assigning culpability, pretermit fact-finding, and may manipulate consent doctrines in ways that undermine legitimacy in the eyes of the public and aggrieved constituencies." *Id.* at 2075. With such a precipitous and devastating failure in these cases affecting stakeholders worldwide, any investigation here must not only be legitimate and independent but also must be seen as beyond reproach by stakeholders and the public. Every party in interest, including Debtors' CEO, acknowledges that FTX's entire business is surrounded

21

by unanswered questions. On this there is universal agreement. But the questions here are much broader than in a typical chapter 11 case; they are not merely about where money flowed or who can sue whom. Rather, they are larger questions about the fundamentals of these cases. Was this an unsuccessful business or a successful fraud? In other words, is there anything to save here? Moreover, examiner reports in bankruptcy cases with potentially broad economic implications serve the public interest as well as those of the economic stakeholders. Among others, the examiner reports in Lehman Brothers and New Century Financial[21] stand as examples of the bankruptcy system serving the public interest in transparency and accountability.

44.    If the Court is concerned about potential duplication of work already performed, it can permit the examiner to have access to any work product already created. An examiner may also allow for a faster and more cost-effective resolution of these cases by allowing Mr. Ray to focus on his primary duty of stabilizing the Debtors' businesses while allowing the examiner to conduct the investigation. This is particularly true as new management continues to confront post-petition hacks and diversion of assets by apparently malign actors, as discussed at the first day hearing.

45.    The U.S. Trustee acknowledges that parties in interest will have concerns about how much an examination will cost and how the examiner's investigation will intersect with FTX's newly undertaken internal investigation. But those concerns do not negate the need for an examiner. Instead, they can be resolved by the Court and the U.S. Trustee using the tools already at their disposal to supervise the examiner: budgets and information sharing protocols can be

---

[21]    Vikas Bijaj, *An Inside Look at a Subprime Lender's Collapse,* N.Y. Times (Mar. 27, 2008), https://www.nytimes.com/2008/03/27/business/worldbusiness/27iht-account.1.11463355.html ("The [examiner's] 580-page report is the most comprehensive document made public about the failings of a mortgage business.").

established, and the examiner and the Debtors can coordinate to ensure that nobody is duplicating the work of the other.  These matters can be negotiated once an examiner is appointed.

## V.    CONCLUSION

WHEREFORE the U.S. Trustee requests that this Court enter an order directing the appointment of an examiner and granting such other and further relief as the Court finds just and appropriate.

Dated:  December 1, 2022
            Wilmington, Delaware

Respectfully submitted,

**ANDREW R. VARA**
**UNITED STATES TRUSTEE,**
**REGIONS 3 and 9**

By: */s/ Juliet M. Sarkessian*
Juliet M. Sarkessian
Trial Attorney
Benjamin A. Hackman
Trial Attorney
United States Department of Justice
Office of the United States Trustee
J. Caleb Boggs Federal Building
844 King Street, Suite 2207, Lockbox 35
Wilmington, DE 19801
(302) 573-6491 (Phone)
(302) 573-6497 (Fax)
juliet.m.sarkessian@usdoj.gov
benjamin.a.hackman@usdoj.gov

-and-

David Gerardi
Trial Attorney
One Newark Center
1085 Raymond Boulevard
Suite 2100
Newark, NJ  07102
(973) 645-3014 (Phone)
(973) 645-5993 (Fax)
david.gerardi@usdoj.gov