**Exhibit C**

*Northshore Mainland Services Inc. v. Export Import Bank of China*, **2015/COM/Com/00039**

# COMMONWEALTH OF THE BAHAMAS
## IN THE SUPREME COURT
### Commercial Division
### 2015/COM/Com/00039

**IN THE MATTER** of an Application made under the inherent jurisdiction of the Court,
alternatively pursuant to Section 254 of the Companies (Winding Up Amendment) Act 2011;

**AND**

**IN THE MATTER** of an Application made on behalf of:

1. Northshore Mainland Services Inc.
2. Baha Mar Ltd.
3. Baha Mar Land Holdings Ltd.
4. Baha Mar Operating Company Ltd.
5. Riviera Golf Ventures Ltd.
6. Baha Mar Entertainment Ltd.
7. Cable Beach Resorts Ltd.
8. Baha Mar Enterprises Ltd.
9. Baha Mar Support Services Ltd.
10. Baha Mar Sales Company Ltd.
11. Baha Mar Leasing Company Ltd.
12. Baha Mar Properties Ltd.
13. BMP Golf Ltd.
14. BMP Three Ltd.
15. BML Properties Ltd.

**Applicants**

**AND**

The Export Import Bank of China

**First Respondent**

**AND**

The Attorney General of The Commonwealth of The Bahamas

**Second Respondent**

1

**AND**

CCA Bahamas Ltd

**Third Respondent**

**AND**

Cable Bahamas Ltd.

**Fourth Respondent**

**Before Hon. Mr. Justice Ian R. Winder**

**Appearances:** **Roy Sweeting with Darren Pickstock for the Applicants**

**Brian Simms QC with Marco Turnquest and Sophia Rolle-Kapousouzoglou for the First Respondent**

**Damian Gomez QC with Loren Klein and Hyacinth Smith for the Second Respondent**

**Sean Moree with Timothy Eneas for the Third Respondent**

**Lester Mortimer QC with Simone Morgan-Gomez for the Fourth Respondent**

**Hearing Dates: 2, 7, 20 and 22 July 2015**

## JUDGMENT

### WINDER J.

This is an application seeking various orders and relief in aid of bankruptcy proceedings in the District of Delaware in the United States of America. On Wednesday 22 July 2015, I dismissed the Applicants Originating Summons and promised to reduce my reasons therefor in writing, I do so now.

2

**Background**

1. I have adopted the factual matrix contained in the Applicants' submissions with modifications to incorporate the opposite views of the Respondents where necessary.

2. The Baha Mar Group, (said to comprise the 15 Applicants) was initiated more than a decade ago by Mr. Sarkis Izmirlian and has been engaged in the redevelopment of the Cable Beach area of western New Providence into a multi-faceted, luxury resort complex. The initial proposal for the development was made at the invitation of the Government of The Bahamas to revitalize Cable Beach. The development consolidates nearly 1,000 acres of land and 3,000 feet of beachfront. It has required the re-routing of West Bay Street around the perimeter of the development land.

3. The finished project is slated to cost in excess of $3.5 Billion and will represent the largest ever foreign direct investment in The Bahamas. The project will create approximately 5,000 full-time jobs, 2,323 guest rooms (inclusive of condos and villas), a signature 18-hole Jack Nicklaus golf course, over 30 restaurants bars and lounges, a 30,000 square feet destination spa, a 100,000 square feet Las Vegas-style casino, convention center and other amenities. The Government of The Bahamas has acknowledged the project as vital to the continued growth and further strengthening of the Bahamian economy.

4. The project is estimated to be 97% complete, but the path has been far from smooth. Following the loss in 2008, in the midst of the global financial crisis, of the Group's initial financing and hotel partnership agreements the Export-Import Bank of China ("the Lender") was finally identified and contacted in March of 2009. Also in March 2009 China State Construction and Engineering Co. engaged in a contract for construction of the project. Subsequently, the

3

respective rights and obligations under the Construction Contract were assigned and assumed by Baha Mar Ltd and CCA Bahamas Ltd. ("CCA"). After two years of negotiation, construction commenced in February of 2011.

5.  The Construction Contract provided for completion of the project in 44 months. Construction commenced in February of 2011 with a contractual completion date of 20 November 2014.  The initial completion date as well as the subsequent completion date of 27 March 2015 also passed. Following the missed deadlines a dispute arose between the Contractor and the Developer over the cause thereof, with each party placing blame at the feet of the other. The Lender refused to advance any further funding in the face of the dispute.

6.  According to the Applicants, the Baha Mar Group's cash reserves were rapidly depleted and it began to experience a severe liquidity crisis. By the end of June 2015, Baha Mar Group was in default of its obligations to various creditors and running perilously low on cash. Work had entirely stopped on the project and an opening date was indefinitely delayed. The Group had no revenue source to remedy its existing credit defaults or those inevitably to come.

7.  The Group filed for Chapter 11 bankruptcy protection in the Bankruptcy Court for the District of Delaware USA on 29 June 2015. The bankruptcy petitions were brought by the affiliated companies and by North Shore Mainland Services Inc., a Delaware corporation which "leases and manages the Debtors' call centers in New Jersey and Florida, and performs general sales and marketing duties for the Project." All of the other Debtor companies are companies incorporated and established in The Bahamas.

8.  The Bankruptcy Court heard the Baha Mar Debtors' first-day motions on Wednesday 1 July 2015, and granted them on an interim basis. The Bankruptcy Court made an order (1) enforcing and restating automatic stay provisions and authorizing North Shore Mainland Services Inc to act as Foreign Representative

4

and (2) authorizing the debtor in possession to obtain post possession financing, use of cash collateral and other relief.

9. Baha Mar has applied by Originating Summons with supporting affidavits seeking to have The Bahamian Court recognise the Chapter 11 proceedings and give assistance to such proceedings by extending and giving effect to the bankruptcy court Order in The Bahamas, or in the alternative by making ancillary Orders staying any and all legal proceedings in The Bahamas against the Debtors and seeking various directions to aid the foreign bankruptcy proceedings.

10. The Government of The Bahamas claims: (i) to be the second largest unsecured creditor (as disclosed in the Consolidated List of Creditors Holding the 20 Largest Unsecured Claims filed before the bankruptcy court); (ii) to have provided an estimated $1.3 Billion worth of concessions to the Developers to facilitate the development; and, (iii) to be owed along with its entities a sum of approximately $58,995,729.27. They say that there is also a huge public interest in the project owing to the large number of Bahamians employed and it's economic importance to The Bahamas. Whilst acknowledging that the Government is a creditor there are disputes as to amounts and whether sums, though owed, have become due.

11. The Lender's loan is secured by a Bahamian registered debenture over the assets of the Baha Mar Group in an amount of $2.45 Billion. CCA claims to be owed a sum of $140 Million for unpaid work, which is disputed by the Applicants who claim damages and defective work under the contract. Cable Bahamas Ltd., a utility provider, claims to be owed $1,638,922.90 and to have a security interest in equipment provided to the Applicants on which is owed another $587,617.74. A further sum of approximately $123,000,000 is owed in unsecured debts, the vast majority of which are to Bahamian vendors and sub-contractors. Approximately 2,500 employees are presently employed at the resort project.

**The Application**

12. The Applicants filed its Originating Summons on 30 June 2015, which it subsequently amended on 6 July 2015. By the Amended Originating Summons the Applicants seek an order:

> 1.     Under the inherent jurisdiction of the Court, recognizing the primary insolvency proceedings now underway in respect of each of the Applicants in the Bankruptcy Court for the District of Delaware and providing assistance thereto by extending to, and giving effect within The Commonwealth of The Bahamas until further Order the automatic stays arising in those proceedings pursuant to Section 362 of the United States Bankruptcy Code, subject to an exception providing that the Government of The Commonwealth of The Bahamas will not be bound in any way nor its interests in any way affected by the aforementioned stays.
>
> 2.     Alternatively, pursuant to Section 254 of the Companies (Winding Up) Amendment Act 2011, making Orders ancillary to the aforementioned insolvency proceedings:
>
> > a) staying until further Order any and all legal proceedings in the Courts of the Commonwealth of The Bahamas (save these proceedings to which the Applicants or any of them are party, and;
> >
> > b) barring until further order the commencement of any and all new proceedings in the Courts of the Commonwealth of The Bahamas against the Applicants or any of them, but otherwise subject to the same exception as described in Paragraph 1 above.
>
> 3.     Giving any and all such directions as the Court may find necessary and expedient for the provision of notice of the Order(s) above to the creditors of the Applicants and the general enforcement thereof, and;
>
> 4.     Making provision for any creditor of the Applicants or any other party interested in or affected by the Order(s) to apply for a variation or discharge thereof.

6

13. The Application was supported by the affidavits:

    a) Patrick H. Ryan, filed 30 June 2015.

    b) Steven Z. Szanzer, filed 30 June 2015.

    c) Patrick H. Ryan (2nd), filed 2 July 2015.

    d) Mark Shinderman, filed 7 July 2015

    e) Thomas M. Dunlap, filed 7 July 2015.

    f) Whitney Thier, filed 16 July, 2015.

    g) Lance Millage, filed 16 July 2015

14. Upon making application to intervene, the Attorney-General ("the AG") and the Lender were joined in the action on 2 July 2015 as Respondents. Upon application to intervene CSA Bahamas Limited ("CSA") was joined in the action on 7 July 2015 as the 3rd Respondent. Upon making application to intervene Cable Bahamas Limited ("CBL") was joined in the action on 20 July 2015 as the 4th Respondent.

15. The Respondents filed the following affidavits in opposition to the application:

**The Lender:**

Daniel Guyder, sworn 6 July 2015.

Mo Yan Ping, sworn 7 July 2015.

**AG:**

Deidre Clarke-Maycock, filed 9 July 2015.

Sir Baltron Bethel, filed 13 July 2015.

John Rolle, filed 6 July 2015.

John Rolle (2nd) , filed 13 July 2015.

**CCA:**

Jun Li, filed 16 July 2015

**CBL:**

7

Affidavit of Nicole Watkins filed 15 July 2015

Affidavit of Nicole Watkins (2nd)filed 15 July 2015

**Issues**

16. The Applicant's legal case is set out in paragraph [46] of their supplemental submissions and which provide as follows:

> **46.** The Applicants contend for the following propositions of law:
>
> I.   That the Applicants had both the capacity and the unquestionable right to submit themselves to the jurisdiction of the [Bankruptcy Court in Delaware] and that as a result of that submission the [Bankruptcy Court in Delaware] enjoys jurisdiction over the Applicants according to well-established rules of private international law.
>
> II.  That this Court has a common-law jurisdiction to recognise the validity of foreign insolvency proceedings, and to render assistance to those proceedings.
>
> III. That recognizing and assisting the Chapter 11 proceedings does not compromise Bahamian sovereignty. Rather, the Court would be supporting the doctrine and principle of universalism in cross-border insolvency proceedings, the desirability of which has been acknowledged by the Courts of many countries, and Commonwealth countries in particular, for more than 100 years.
>
> IV.  That insofar as this Court has a discretion as to whether or not to grant the recognition and assistance applications, the balance of considerations is heavily in favour of granting both applications.
>
> V.   That in granting the applications it is open to this Court to retain and exercise a continuing power of review and

8

supervision over the assistance it provides to the [Bankruptcy Court in Delaware].

17. At the hearing of the substantive application, all of the Respondents opposed the grant of relief to the Applicants, which they described generally as "unprecedented, misconceived and contrary to statute and principle". The Applicants themselves accepted that this was indeed a case of first impression and state, at paragraph [31] of their written submissions, that "[t]here can be no disputing the fact that the order being sought is probably unique in the history of Bahamian jurisprudence."

18. The opposition to the application by the Respondents was framed on various grounds which may be identified as follows:

   a) The application is misconceived.

   b) The application is procedurally flawed.

   c) Such common law inherent jurisdiction as may have existed in The Bahamas was abrogated by virtue of the passing of the Companies Winding Up Amendment Act 2011 ("CWUA") and as such there is no jurisdiction to grant the relief sought.

   d) If the common law powers of recognition and the provision of judicial assistance survived at all, the relief sought could not be granted.

   e) The alternative prayer for relief under section 254 of the CWUA must fail as Sections 253-255 of the CWUA could not apply to these proceedings.

### Whether application is misconceived

19. The Lender argues that the application is misconceived as:

   a) the application is by the individual companies which had filed for bankruptcy in the US for recognition of the "primary bankruptcy

proceedings" rather than by a duly appointed foreign representative for his recognition; and

b) the application is for assistance in the importation of the entirety of a US statutory provision rather than a request for specific assistance.

20. According to Mr. Simms QC, "Whereas the orthodox approach is to ask the Court to recognise the authority of the foreign representative (such as the liquidator) appointed in the foreign proceedings (see, for example. Walker v Lundborg [2008] UKPC 17 at [25] …) the Applicants are asking the Court to recognise the foreign insolvency proceedings themselves. This approach is presumably dictated by the fact that, in the present case, no foreign liquidator has been appointed. Further, whereas the orthodox approach is to ask the Court to grant assistance in accordance with the Court's inherent powers under local law, the Applicants are asking the Court to give effect to the U.S. Bankruptcy Code in The Bahamas. In so doing, the Applicants are asking the Court to apply U.S. insolvency legislation. This is misconceived. U.S. legislation does not apply in The Bahamas. The fact that the Application is unique and unprecedented is no coincidence. The reality is that the Application is entirely misconceived and contrary to principle.

   a.   The concept of common law recognition involves the recognition of the authority of the foreign office-holder, rather than recognition of proceedings. …

   b.   The type of insolvency proceedings of which the Applicants seek recognition (namely, a reorganization process under Chapter 11 of the US Bankruptcy Code, in which the business and assets of the debtor remain under the control of the debtor itself without the appointment of any liquidator or trustee or other officer of the Court) is an unusual type of insolvency proceedings which is unknown to Bahamian law. …

   c.   No foreign statutory insolvency law has any application within The Bahamas. …"

10

21. On any fair reading of the Originating Summons, the observations of Mr. Simms QC appear to be correct. The relief sought in the application seeks recognition of the "primary insolvency proceedings" underway in the District of Delaware, and for assistance in extending to The Bahamas the automatic stays available pursuant to Section 362 of the US Bankruptcy Code. It ought not to be the entire bankruptcy proceedings upon which the Applicants seek recognition, as there may be some aspect of the foreign proceedings, which may be incompatible which local laws. For this reason, it is not the entire proceedings which recognition is usually sought but rather the recognition of the status and appointment of the foreign representative.

22. The Applicants are ambivalent as to the appointment of the foreign representative. The Order made in the foreign proceedings by Bankruptcy Judge Hon. Kevin Kelly on 1 July 2015 appointed the 1st Applicant North Shore Mainland Services Inc. to act as the foreign representative for all of the Applicants. Despite this appointment the Applicants maintain that by virtue of the operation of the US Bankruptcy Code, they are the trustees of their assets for their creditors and contend that the appointment of the foreign representative was only for the purpose of the Section 254 application. They say that they could bring this application in their own names.

23. No formal application is made specifically for recognition of the authority of North Shore Mainland Inc., the foreign representative. It appears however, that this is not the relief being sought and that all 15 Applicants are joined for the purpose of obtaining an Order recognizing the primacy of the Delaware bankruptcy proceedings and obtaining the Section 362 type stay here in The Bahamas.

24. All of the authorities (discussed below) say that there must the preliminary application for recognition of the status and the appointment of the foreign appointed representative, prior to the application of assistance, as otherwise he has no authority to move the local court for any assistance. The only person who

11

may move this request for assistance in respect of the Applicants is their duly recognised foreign representative(s). This is so even if these companies are trustees for themselves as they contend, as their appointments as trustees would be a matter of foreign law. To do so in the absence of such recognition would result in the direct application of the foreign law (or order of the foreign court) in The Bahamas, which is not permissible. In the absence of an application for recognition, the Applicants' action would be misconceived and could not proceed until there is the recognition of the status of the foreign representative, to move this Court.

25. The application also framed the request for assistance in terms of extending and giving effect to Section 362 of the US Bankruptcy Code. The framing tends to suggest a request for the application of the foreign law in The Bahamas. However, what the Applicants appear to seek, notwithstanding the way the action is framed, is the grant of a stay in The Bahamas analogous to the stay emanating from Section 362 of the US Bankruptcy Code.

26. Notwithstanding that North Shore Mainland Inc. is itself a debtor, its appointment as the foreign representative obviates the need to join the 2nd to 15th Applicants in these proceedings. It would seem therefore that they are improperly joined and the application ought to have proceeded with the 1st Applicant alone, seeking firstly his recognition and secondly the specific request being sought. Despite the inappropriateness of the framing of the action I would nonetheless look past the form and treat the application for recognition of the entire proceedings as including a request for the recognition of the status of the foreign representative, North Shore Mainland Inc.

### Application procedurally flawed

27. The Respondents argue that the application is procedurally flawed as it was commenced by Originating Summons rather that by Petition as mandated by

12

Rule 4(1) of the Foreign Proceedings (International Co-Operation) Liquidation Rules, 2012. Rules 3 and 4(1) of the Foreign Proceedings (International Co-Operation) Liquidation Rules, 2012 made by the Liquidation Rules Committee, provides as follows:

> *Rule 3: "These Rules shall apply to every application made pursunt to Part VIIA of the Act."_*
>
> *Rule 4(1): "An application by a foreign representative made under section 254(1)(a) of the Act for a declaratory order recognizing his right to act on behalf of a debtor shall be made by petition in accordance with RSC Order 9."*

28. Notwithstanding the general breadth of the application, at the hearing of the action counsel for the Applicants clarified the scope of his client's case. Reliance on Section 254 relief was not only pleaded in the alternative but would relate only to the first applicant, North Shore Mainland Inc. The substance of the claim therefore, was seeking relief under the common law inherent jurisdiction.

29. Having regard to the concession as to the scope of the application, I find little merit in the argument that there was any procedural irregularity in applying by Originating Summons rather than Petition. Further, the relief pleaded in the action, as it relates to section 254, does not appear to seek the recognition of the status of the first Applicant to act in this Court but only for ancillary orders staying and barring proceedings.

30. It is noted that none of the Applicants sought to move the court in a representative capacity. This omission would seem to have presented a procedural flaw, but in the circumstances, I proceeded to consider the case on its merits nonetheless.

13

**Has the Court's inherent jurisdiction to provide judicial assistance survived the CWUA?**

31. Sections 253-255 of the CWUA provides as follows:

> **253.  Definitions.**
> In this Part—
>> **"debtor"** means a foreign corporation or other foreign legal entity subject to a foreign proceeding in the country in which it is incorporated or established;
>>
>> **"foreign proceeding"** means a judicial or administrative proceeding in a relevant foreign country, including an interim proceeding, pursuant to a law relating to liquidation or insolvency in which proceeding the property and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganisation, rehabilitation, liquidation or bankruptcy of an insolvent debtor;
>>
>> **"foreign representative"** means a trustee, liquidator or other official appointed in respect of a debtor for the purposes of a foreign proceeding;
>>
>> **"relevant foreign country"** means a country, territory, or jurisdiction designated as a relevant foreign country in rules made under section 252 by the Liquidation Rules Committee for the purposes of this Part.
>
> **254.  Ancillary orders.**
>
> (1)  Upon the application of a foreign representative the court may make orders ancillary to a foreign proceeding for the purposes of—
>> (a)  recognising the right of a foreign representative to act in The Bahamas on behalf of or in the name of a debtor and, in the court's discretion, to do so jointly with a qualified insolvency practitioner;
>> (b)  enjoining the commencement or staying the continuation of legal proceedings against a debtor;
>> (c)  staying the enforcement of any judgment against a debtor;
>> (d)  requiring a person in possession of information relating to the business or affairs of a debtor to be examined by and produce documents to its foreign representative;
>> (e)  ordering the turnover to a foreign representative of any property belonging to a debtor; and
>> (f)  granting such other relief as it considers appropriate.
>
> (2)  An ancillary order may only be made under subsection (1)(d) against—
>> (a)  the debtor itself; or

14

(b)    a person who was or is a relevant person as defined in section 198(1).

(3)    An ancillary order shall not affect the right of a secured creditor to take possession of and realize or otherwise deal with property of the debtor over which the creditor has a security interest.

(4)    The court shall not make an ancillary order that is contrary to the public policy of The Bahamas.

**255.    Criteria upon which the court's discretion shall be exercised.**

(1)    In determining whether to make an ancillary order under section 254, the court shall be guided by matters which will best assure an economic and expeditious administration of the debtor's estate, consistent with—

(a)    the just treatment of all holders of claims against or interests in a debtor's estate wherever they may be domiciled;

(b)    the protection of claim holders in The Bahamas against prejudice and inconvenience in the processing of claims in the foreign proceeding;

(c)    the prevention of preferential or fraudulent dispositions of property comprised in the debtor's estate;

(d)    the distribution of the debtor's estate amongst creditors substantially in accordance with the order prescribed by Part VII;

(e)    the recognition and enforcement of security interests created by the debtor;

(f)    the non-enforcement of foreign taxes, fines and penalties; and

(g)    comity.

(2)    In the case of a debtor which is registered under section 174, the court shall not make an ancillary order under section 254 without also considering whether it should make a winding up order under Part VII in respect of its local branch.

32. Whilst there may be disagreement as to the extent of the Court's inherent jurisdiction to grant recognition and provide assistance in insolvency matters, all parties agree that prior to the enactment the CWUA, such a power existed. The Respondents argue that the common law power of recognition and assistance is no longer available, having been abrogated by Sections 253-255 of the CWUA. They also say that the continued survival of an unlimited common law power to

assist in all cases would be inconsistent with the limited statutory power, which exists under Sections 253-255 to grant assistance only to relevant countries.

33. The Applicants say at paragraphs 79-82 of their submissions that:

**79**…. Part VIIA was enacted to create, extend or clarify the jurisdiction of the Supreme Court to provide assistance to foreign companies subject to insolvency proceedings in the countries in which they were incorporated. Of the 15 Applicants, only North Shore falls within the definition of a "debtor in section 253. Part VIIA has no application to the remaining 14 Applicants.

**80.** It is certainly true that Parliament may abolish common-law rules, or simply enact legislation that includes provisions that are contradictory of established rules. Academic authority suggests however, that if Parliament's intention is to abolish certain common-law rules, that intention is usually made explicitly clear in the relevant legislation. For a specifically Bahamian example of such an expression of the will of the legislature, see Section 3 of the Inheritance Act 2002, which reads as follows:

> *With regard to the real and personal estate of every person dying after the commencement of this Act, there shall be abolished –*
>
> a. *all existing modes, rules and canons of descent, and of devolution by special occupancy or otherwise, of real estate, or of personal estate;*
> b. *tenancy by the curtesy;*
> c. *dower.*

**81.** That section leaves little doubt about its effect on previously existing rules, i.e. "they shall be abolished". By contrast, Part VIIA of the amended Companies Act is wholly silent on the question of providing assistance to foreign insolvency proceedings in respect of Bahamian

16

companies. Academic authority suggests that the silence of a statute on any particular area of law is most generally treated in the courts as a "positive decision on Parliament's part not to interfere with the existing law." See ... Craies on Legislation (10th Edition, 2012, Sweet & Maxwell) …

**82.** The Section 254 jurisdiction applies specifically to North Shore Mainland Services Inc. The common-law jurisdiction which is wholly unaffected by Section 254, applies to the remaining 14 Applicants.

34. The authorities demonstrate very clearly how the Court ought to determine whether the enactment of legislation has replaced or abolished the common law. In *West Ham Churchwardens v Fourth City Mutual Building Society [1892] 1 QB 654, 658*, *Smith J* held:

> *"The test of whether there has been a repeal by implication by subsequent legislation is this: Are the provisions of a later Act so inconsistent with, or repugnant to, the provisions of an earlier Act that the two cannot stand together?"*

35. Earlier, in *Kutner v Phillips [1891] 2 QB 267, 271*, *Smith J* also stated:

> *"[A] repeal by implication is only effected when the provisions of a later enactment are so inconsistent with or repugnant to the provisions of an earlier one, that the two cannot stand together … Unless two Acts are so plainly repugnant to each other, that effect cannot be given to both at the same time, a repeal will not be implied".*

*Sawyer J* (as she then was) approved *Kutner v Phillips* in the decision in *LaFleur v LaFleur [1992] BHS J No. 148.*

17

36. The learned editors of **Halsbury's Law of England, Vol. 96** (Statutes and legislative process), at paragraph [698], confirm that "[t]he principles relating to implied repeal of an enactment apply equally to the abrogation by statute of a rule of common law".

37. More recently, **Lord Sumption** in the Privy Council decision in **Singularis Holdings Ltd v PricewaterhouseCoopers [2015] 2 W.L.R. 971** at paragraph [28], set out the guiding principles, for considering whether a statutory enactment has displaced a common law power, as follows:

> *"The existence of a statutory power covering part of the same ground may impliedly exclude a common law power covering the whole of it. But it does not necessarily do so. An implied exclusion of non-statutory remedies arises only where the statutory scheme can be said to occupy the field. This will normally be the case if the subsistence of the common law power would undermine the operation of the statutory one, usually by circumventing limitations or exceptions to the statutory power which are an integral part of the underlying legislative policy"*

38. I find it to be an untenable proposition that a statutory scheme created by the CWUA which limits the power of the Court to grant recognition and assistance only to the countries which have been designated to receive assistance could expect to co-exist with a parallel regime providing assistance to countries which are not designated to receive assistance. Or, where the statutory scheme limits the debtor corporations to which the statute apply to foreign corporations incorporated under the laws of the foreign jurisdiction, a parallel scheme with no such limits could remain available to be utilized.

39. Such co-existence would clearly undermine the statutory framework and render its entire application otiose. Parliament could not have intended such as absurd result and must therefore have by, necessary implication, repealed it.

40. The Applicants argue that the enactment was only intended to affect foreign corporations, which are the subject of insolvency proceedings abroad and not Bahamian corporations, which are subject of foreign proceedings. I find such an argument difficult to accept having regard to the fact that the CWUA will not render assistance to a foreign court winding up a corporation which is not incorporated in that jurisdiction. This prohibition suggest a policy which frowns upon such a practice of winding up companies which are not incorporated in the foreign jurisdiction. Why would Parliament find it distasteful for a foreign court to permit insolvency proceedings against corporations, which are not incorporated in that jurisdiction, yet permit this in respect of Bahamian corporations? This is against the backdrop of the general rule (discussed below) that a company ought to be dissolved, wound up, or restructured in its place of incorporation. To permit such an interpretation as suggested by the Applicants, would lead to an absurdity. In accordance with the Golden Rule of statutory interpretation absurd interpretations ought to be avoided.

41. The view that the CWUA was only intended to affect foreign corporations, which are the subject of insolvency proceedings abroad and not Bahamian corporations, which are subject of foreign proceedings is also not supported by the records of Hansard. It is now well settled, since the celebrated case of **Pepper v. Hart 1992 3 WLR 1032,** that regard could be had to the debate in Parliament to aid in the interpretation of statutes. **Gonsalves-Sabola CJ** (as he then was) the first to approve this decision in this jurisdiction in **Commissioner of Police v Lockhart SC 21/1992**. In that case, **Gonsalves Sabola CJ** took into account the parliamentary speech of then Attorney-General, Hon. Paul Adderley in order to determine whether an amendment to the Penal Code permitting arrests on the high seas was confined to offences under the Penal Code or could extend to offences created by other legislation. Similarly in this case, the AG has sought to rely on the remarks of the Government Minister, the Hon. Zhivargo Laing, when the CWUA was introduced during the relevant debate in Parliament on Monday 12 December 2011. An excerpt of that presentation is as follows:

"Mr. Speaker we currently have registered under the Companies Act of the Bahamas some 53,691 companies and we have registered under International Business Companies and we have registered under International Business Companies Act some 162, 217 companies. And do before us is a Bill to repeal and replace Part 7 of the Companies Act which governs the winding up of companies, and it will be replaced with a new replaced with a new regime called Part 7 and Part 7A and it will be replaced with a new regime called Part 7 and Part 7A.

Part 7 of the new regime Mr. Speaker will regulate the liquidation of local companies and Part 7A will provide a regime by which the Supreme Court may make orders to facilitate foreign liquidations where they need to carry out some activity within the Bahamas.

It seems clear that there was no intention to delineate the type of company, which is to be the subject to the foreign liquidation as suggested by the Applicants.

42. Whilst the designated list of relevant countries have not been promulgated, the amendment has been brought into effect. Parliament left open the ability to determine not only which countries will benefit from the Court's assistance but also when such benefit will be available. It was suggested that it may very well be that these are matters for reciprocity and hence the reason why the list may not have been settled. In any event, with or without the list, the courts cannot legislate in the interim by continuing to apply the common law in the face of the bringing into force of the CWUA. In this regard I accept the submission of Counsel for the Lender that "in circumstances where the legislature has circumscribed the Court's powers of recognition and assistance to relevant countries, the Court has no residual power to grant recognition or assistance to non-relevant countries."

43. As one would expect, the introduction of a statutory framework for the implementation of judicial assistance in cross border insolvency cases was not first introduced in The Bahamas with the CWUA. By analogy, both the Section 426 of the UK Insolvency Act 1996 and the amendments to Parts XVII, XVIII and XIX of the BVI Insolvency Act provide similar avenues for judicial assistance. In the BVI legislation in particular, Section 466 of the BVI Act is in terms of Section 253 of the CWUA; Section 467 of the BVI Act is in terms of section 254 of the CWUA; and Section 468 of the BVI Act is in terms of section 255 of the CWUA. What is remarkable however is that in both instances, UK and BVI, there exists a clause which sought to preserve aspects of the common law relative to judicial assistance. Section 470 of the BVI Act, (which is similar to Article 7 of Schedule 1 to the UK Cross-Border Insolvency Regulations 2006), provides:

> *"nothing in this Part limits the power of the Court or an insolvency officer to provide additional assistance to a foreign representative where permitted under any other Part of this Act or under any other enactment or rule of law of the Virgin Islands".*

44. The reference to any other rule of law incorporates the common law. However, notwithstanding the existence of such a "savings" clause, the British and BVI courts have found that aspects of these enactments have abrogated the ability to continue to rely on the common law forms of assistance, which existed prior to legislative intervention on the basis of incompatibility. In ***Re HIH Casualty & General Insurance [2008] 1 W.L.R. 852,*** Lord Neuberger, on considering whether the common law framework for the provision of assistance would continue to operate in the face of the statutory power of assistance in section 426 of the ***U.K. Insolvency Act 1986***, stated *at* paragraph [76]:

> *"The notion that the court has inherent jurisdiction to remit English assets to liquidators in another jurisdiction on the basis that the insolvency regime of that jurisdiction would apply, seems to me to sit uneasily with the provisions of section 426(4) and (5), at least in relation to remittal of assets. The inherent jurisdiction to remit must be exercisable in relation to*

21

*any other country whereas section 426 only applies to a "relevant country or territory", i.e. one designated by the Secretary of State. If the courts had an inherent power to remit to a country with a different insolvency regime, either the courts could exercise that power in relation to a country which was not so designated, or section 426 impliedly restricts the inherent jurisdiction to designated states. The former possibility renders the significance of designation questionable in a case where remittal is sought; indeed it can be said to involve the inherent jurisdiction almost thwarting the statutory purpose. The latter possibility not only involves an implication as to the effect of section 426 which is not exactly obvious: it would mean that the inherent power (if it ever existed) had very little, if any, further purpose".*

45. In **Re C (A Bankrupt) [2013] BVIHC (COM) 0080 (31 July 2013)**, Bannister J of the BVI High Court came to a similar conclusion in relation to the BVI Insolvency Act, finding that the common law powers of assistance and recognition had been abrogated by the Statute. At paragraph [24] of the decision he stated as follows:

> *"As for the wider question [as to] whether the common law approach to recognition and assistance survives generally in this jurisdiction in parallel to Parts XVII and XIX … I have no doubt that it does not. The provisions of Part XIX (and, for that matter, of Part XVIII) are quite clearly intended to be restrictive of the class of persons who may be the object of the Court's recognition and the beneficiaries of its assistance. Those restrictions would be rendered futile if it were the case that the Court remained at liberty to grant recognition to any office holder it chose, regardless of the jurisdiction in which he had been appointed … In my judgment, what Lord Neuberger said in Re HIH Insurance Ltd about the existence of an inherent power in tandem with but extending further than section 426 of the UK Insolvency Act 1986 applies with equal or greater force in this case".*

22

46. The Bahamas, whose legislative intervention is later in time to the BVI and the UK, has no such "savings" clause, which must reflect a deliberate decision that the common law was not intended to survive the enactment of the CWUA. Additionally, the fact that notwithstanding these "savings" clauses the Courts have nonetheless determined that the common law has been abrogated, enhances the view that the common law rules for the provision of judicial assistance has been abrogated by the enactment of the CWUA.

47. Parliament could have expressly stated that it intended to revoke the common law rule, as it did in the Inheritance Act, and put the position beyond peradventure, however in the face of such incompatibility such language was unnecessary. I am satisfied therefore that the intention of Parliament was to abrogate the common law relating to the provision of judicial assistance in cross-border insolvency matters and replace it with the statutory regime under the CWUA. Therefore, on the passing of the CWUA, application for recognition and the provision of judicial assistance to foreign insolvencies could only proceed in accordance with the statutory framework.

48. Whilst I had found that there could not co-exist a common law framework, for the provision of judicial assistance alongside the statutory framework introduced by the CWUA, I ought to nonetheless consider the merits of the substantive application in the event I am wrong as to the effect of the CWUA.

**Recognition**

49. The seeking of recognition is a preliminary step to the making of a request for judicial assistance. In the absence of recognition no assistance could be provided. As indicated above, the usual measure is to seek recognition of the status and authority of the foreign representative appointed in the bankruptcy proceedings however the Applicants in this case seek recognition of the foreign

23

insolvency proceedings as the primary (or main) bankruptcy proceedings. This feeds into the concept of universality.

50. The Applicants say that: "[u]niversalism in respect of cross-border insolvency, is the general idea that an insolvent entity ought to be subject to a single insolvency proceeding in a single jurisdiction, and that the courts of other jurisdictions ought, so far as possible, to recognise and assist that proceeding rather than allow separate and conflicting insolvency or other proceedings against the entity to be commenced in their own jurisdiction. The aim is to ensure that insolvency proceedings are as predictable and as fair to all creditors of an insolvent entity as possible. The plain common sense of the principle is obvious."

51. The Applicants rely on the dicta of **Lord Hoffman** in **Cambridge Gas 2006 3 All ER 829** at paragraphs 16 and 17. At paragraph [16] **Lord Hoffman** stated:

> **[16]** The English common law has traditionally taken the view that fairness between creditors requires that, ideally, bankruptcy proceedings should have universal application. There should be a single bankruptcy in which all creditors are entitled and required to prove. No one should have an advantage because he happens to live in a jurisdiction where more of the assets or fewer of the creditors are situated. For example, in *Solomons v Ross* (1764) 1 Hy Bl 131n a firm in Amsterdam was declared bankrupt and assignees were appointed. An English creditor brought garnishee proceedings in London to attach £1200 owing to the Dutch firm but Bathurst J, sitting for the Lord Chancellor, decreed that the bankruptcy had vested all the firm's moveable assets, including debts owed by English debtors, in the Dutch assignees. The English creditor had to surrender the fruits of the garnishee proceedings and prove in the Dutch bankruptcy.

52. The Applicants summarise their case for recognition as follows:

24

a) Submission to the jurisdiction of the foreign court in bankruptcy proceedings is sufficient ground of an English court to recognise the validity of those proceedings.

b) In respect of foreign insolvency the court can and should give effect to the principle of universalism by recognizing the person empowered to act on behalf of the company under the law of the place where the bankruptcy proceedings are taking place.

c) Recognition of the validity of the foreign bankruptcy proceedings and, in the case of corporate insolvency, the person empowered to act on behalf of the insolvent company "carries with it the active assistance of the court.

d) The means by which the court can provide such assistance must include at least doing what ever it could have done in the case of a domestic insolvency.

53. The Respondents say that:

a) The Court will only recognise foreign insolvency proceedings taking place in the jurisdiction of the company's incorporation. It will not recognise foreign insolvency proceedings taking place in some other jurisdiction. In the present case, the Court will not recognise U.S. insolvency proceedings in respect of Bahamian companies.

b) Recognition cannot be granted to the Chapter 11 proceedings in the face of the pending petition presented to this Court for the winding-up of the 2nd to 15th Applicants. This is a complete bar to the recognition of the Chapter 11 proceedings as the 2nd to 15th Applicants are incorporated in The Bahamas.

c) The grant of such orders are inconvenient, unfair and unconscionable to the rights of the vast majority of creditors rights having regard to the

25

absence of any substantive connection of the 2nd through 15th Applicants to the State of Delaware.

d) Whilst a Bahamian liquidation of a foreign incorporated company may be ancillary to the main liquidation of the foreign incorporated company in the jurisdiction of its incorporation, a Bahamian liquidation of a Bahamian-incorporated company will never be ancillary to anything; rather, by definition, a Bahamian liquidation of a Bahamian incorporated company will be the main proceedings with universal effect as a matter of Bahamian law.

54. In Anderson's *"Caribbean Private International Law" 2nd ed (2014)* at 13-008, he writes, "a Caribbean Court will recognise foreign winding up orders and the status of the liquidators appointed by a court in the country of the corporation to act on behalf of the insolvent company. This in line with the fundamental conflict rule that matters of corporate status are for the law of incorporation and with the further rule allowing for recognition of foreign judgments". The learned jurist found support for the proposition in the decision of the Eastern Caribbean Court of Appeal in *Globe-X Canadiana Ltd. et al v Johnson et al* **(4/2003)** and the dicta of **Gordon JA** where he opined as follows:

In Smart's 'Cross Border Insolvency' at Chapter 6, a large number of examples are given of the practice of courts, both common law and non-common law, recognizing the effect of a winding-up order made in the country of domicile of the company being wound-up.  As learned Queen's Counsel for the Respondent put it in his argument, it is a necessary concomitant of the recognition accorded to a body corporate established under a foreign legal system.  I am therefore satisfied that the High Court of Anguilla has the necessary jurisdiction to recognise the Winding-up Order made by the Bahamian court.

55. Anderson continues, "[o]n the other hand liquidators appointed by a foreign court over a local company domiciled in the forum will not normally be recognised by

the forum. This is especially the case where liquidators have already been appointed locally…" Support for this proposition is to be found in the UK Supreme Court decision in **Rubin v Eurofinance [2013] 4 LRC 132** per **Lord Collins** at paragraph [122] where he identified the traditional rule that recognition will be limited to proceedings taking place "in an individual bankrupt's place of domicile, or, in the case of corporations, the place of incorporation". He went further, in paragraph [129] of the judgment to find that the Courts could not alter this traditional rule and that any change to the traditional rule would have to be a matter for legislative intervention. In The Bahamas, rather than alter the traditional rule, Parliament has reflected this traditional rule in Section 253 of the CWUA, which will only permit statutory recognition and assistance to insolvency proceedings taking place in the jurisdiction of the company's incorporation.

56. The Applicants relied upon the ex parte decision of the High Court of Bermuda in **Re Dickson Group Holdings (2008) 73 WIR 102**, where judicial assistance was granted to a Hong Kong liquidation of a Bermudian company. Notwithstanding the decision however, **Kawaley CJ** in **Re Dickson Group** endorsed the traditional rule when he states that, "most creditors dealing with the company before it became insolvent would reasonably have contemplated that their rights in any insolvency would be dealt with in accordance with the law of the company's place of incorporation". **Kawaley CJ** sought to justify the decision on the fact that the principal place of business of the company was Hong Kong and that there was no creditor concerns in Bermuda which was merely a "paper jurisdiction". He cited **Re Dickson** as the exception to the rule. In light of subsequent decisions such as **Rubin** and **Singularis** the conclusion in **Re Dickson** is difficult to sustain.

57. The Respondents argue that the "basic principle that recognition is limited to insolvency proceedings in the country of incorporation has a very sound explanation which is rooted firmly in the legitimate expectations of creditors and cannot sensibly be rejected". Support for their argument is found in the decision

27

of *Larsen v Navios International Inc [2012] Bus. L.R. 1124* where at
paragraph [26], *Norris J* states, "Those who contract with a Danish entity might
expect that balance to govern their relationships inter se when insolvency
supervenes".  Additionally, in *Firswood Ltd v Petra Bank [1996] C.L.C. 608*, per
*Schiemann LJ* at p.618, "the creditor has chosen to contract with a company
whose domicile is Jordan and therefore has to take Jordanian law as governing
the priorities in the distribution of the company's assets".

58. There is considerable force to this argument, in the context of this dispute, as
none of the Applicants' 2,500 employees, the Government, the Lender, the
Contractor, CBL or any of the other creditors (whose numbers have been
described as legion) could ever have had an expectation that if insolvency should
intervene the laws of the District of Delaware or the United States would govern
or be engaged at all. The predictability, which the Applicants speak about as a
tenant of the principle of universalism, could not be supported by insolvency
proceedings in the District of Delaware. Whilst the Chapter 11 proceedings were
commenced in the District of Delaware the Applicants principal place of business
and the location of its assets are in The Bahamas and not the District of
Delaware. No more telling fact that the closest and most real connection or the
center of main interest of this group of companies is The Bahamas, is the
Applicants own admission of this fact. They say at paragraph [24] of the written
submission that "the Bahamian companies' principal business and interests are
in The Bahamas".

59. In *Re African Farms Ltd [1906] TS 373* the Supreme Court of the Transvaal
noted, per *Innes CJ* at page 377, that:

> "It only remains to consider whether we are justified in recognising the
> position of the English liquidator. And by that expression I do not mean a
> recognition which consists in a mere acknowledgment of the fact that the
> liquidator has been appointed as such in England, and that he is the
> representative of the company here; I mean a recognition which carries

28

with it the active assistance of the court. A declaration, in effect, that the liquidator is entitled to deal with the Transvaal assets in the same way as if they were within the jurisdiction of the English courts, subject only to such conditions as the court may impose for the protection of local creditors, or in recognition of the requirements of our local laws".

The decision reflects a view that according recognition to the foreign representative ought not be made at the expense of local creditors.

60. The Respondents assert that considerable inconvenience will inure to the prejudice of claim holders by having to prove claims in the foreign proceedings. The Applicants have indicated that they are prepared to create a call center and train their employees to assist in the claims processing for the Delaware bankruptcy, locally. The Applicants advise that it will only be in the context of a disputed claim that creditors may have to formally appear in the Delaware proceedings. Whilst the effort of the Applicant is laudable in trying to surmount this issue, it seems to me to be an undesirable situation for creditors, whose numbers are likely to measure in the thousands, to be face with seeking to access an overseas jurisdiction with no real connection to the 14 Bahamian corporations.

61. A winding-up petition in respect of the 2nd to 15th Applicants having been presented, there are now parallel proceedings in train with respect to these companies. The Petitioners have also applied for the appointment of provisional liquidators in respect of the 2nd to 15th Applicants, under Section 199 of the CWUA. Whilst there is no order for the winding up of the Applicants, and the ultimate disposition of the petition unknown, the petition is nonetheless pending and proceedings underway in The Bahamas. A similar status of pending is likely accorded to the Delaware proceedings as only interim orders have been made (at the date of decision).

62. Where: (a) the place of incorporation and domicile of the corporations; (b) the center of main interest or principal place of business; (c) the residence or domicile of the bulk of the creditors; and, (d) location of the assets, are in The Bahamas there can be no reason to subordinate local proceedings to proceedings in a locale with such a limited connection to the subject companies. I adopt the opinion of Lord Hoffman expressed at paragraph [6] in *Re HIH Casualty and General Insurance* **Ltd [2008] 1 WLR 852**

> "There should be a unitary bankruptcy proceeding in the court of the bankrupt's domicile which receives worldwide recognition and it should apply universally to all the bankrupt's assets"

63. The only insolvency proceedings, which can give true effect to the principal of modified universality, would be a unitary insolvency proceedings in The Bahamas. It cannot be, as suggested by the Applicants, that the mere submission to a jurisdiction no matter how inappropriate, would be sufficient to accord recognition where it offers an attractive restructuring regime. In all the circumstances therefore, I would not accord recognition to the Applicants or primacy to the Chapter 11 Bankruptcy proceedings underway in the District of Delaware.

## Whether relief sought could be granted under the scope of the Court's inherent jurisdiction to provide assistance

64. The principal assistance requested by the Applicants is a stay in The Bahamas analogous to the stay emanating from Section 362 of the US Bankruptcy Code. The nature of that stay, which is comprehensive in nature, is set out in the Interim Order granted by Bankruptcy Judge Hon. Kevin Kelly made on 1 July 2015. The relevant parts of that Order provided as follows:

> "[A]ll persons (including individuals, partnerships, corporations, and other entities and all those acting on their behalf) whether located within the United States or otherwise, and governmental units, whether of any

foreign country (including any division, department, agency, instrumentality or service thereof and all those acting on their behalf) … are hereby stayed, restrained and enjoined from:

(a) taking any action whether inside or outside the United States to (i) obtain possession of assets or interests of the Debtors' estates wherever located or (ii) or exercise control over property of the estate wherever located;

(b) taking any action to create, perfect or enforce any lien against any assets or interests of the Debtors' estates;

(c) commencing or continuing (including the issuance of employment of process) any judicial administrative or other action or proceeding against the Debtors that was or could have been commenced before the commencement of the Chapter 11 Cases, or recovering a claim against the Debtors that arose before the commencement of the Chapter 11 Cases;

(d) enforcing against the debtors or against assets or interests of their estates a judgment or order obtained before the commencement of the Chapter 11 Cases;

(e) taking any action to create, perfect, or enforce against any assets or interests of the Debtors any lien to the extent that such lien secured a claim that arose prior to the commencement of the Chapter 11 Cases;

(f) taking any action to collect, assess, or recover a claim against the Debtors that arose prior to the commencement of the Chapter 11 Cases; and

(g) offsetting any debt owing to the Debtors that arose before the commencement of the Chapter 11 Cases against any claim against the Debtors.

65. The Applicants say "[t]here is nothing remotely unusual about a stay on creditors' claims as a by-product of insolvency proceedings, whether in a domestic or cross-border context: see *Rubin and anr v. Eurofinance SA and ors [2012] UKSC 46* at paragraph 33 (per Lord Collins). The Companies Act provides that a stay arises automatically on the making of a Winding Up Order".

66. The Respondents say that assistance of this nature cannot and ought not to be granted as the assisting Court can only act within the limits of its own inherent powers. In the present case, even if the Court will recognise the U.S. insolvency proceedings, it cannot grant assistance in the terms sought, because it has no inherent power to order assistance in the nature of what is being sought by the Applicants which:

    a) amount to an injunction and must comply with the requirements of the common law for the grant of injunctive relief;

    b) is contrary to local laws;

    c) interferes with the Lenders proprietary right to enforce its valid and enforceable security over validly encumbered assets; and,

    d) is contrary to Bahamian public policy with respect to proprietary rights of secured creditors.

67. In particular, at paragraph 65, 66 and 72 of the Lenders submissions, they state that the Applicants are seeking an order to give effect to Section 362 of the U.S. Bankruptcy Code in the territory of the Bahamas which unlike any statutory insolvency stay under Bahamian law, Section 362 of the US Bankruptcy Code includes a stay on the enforcement of security interests. In particular:

    a) Section 362(a)(4) purports to stay "any act to create, perfect, or enforce any lien against property of the estate".

    b) Section 362(a)(5) purports to stay "any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title".

    c) The term "lien" is defined very broadly by Section 101(37) of the US Bankruptcy Code to mean any "charge against or interest in property to secure payment of a debt or performance of an obligation".

    d) The U.S. statutory stay therefore purports to stay [the Lender's] enforcement of security rights which are valid and enforceable under Bahamian law. …

68. They conclude that the relief which the Applicants seek is simply unavailable under Bahamian law and that this Court has no inherent power under local law to grant the relief sought by the Applicants. "In particular it has no power to impose a blanket ban on security enforcement to prevent the Lender from enforcing its security. This is not part of Bahamian law."

32

69. I accept the Respondent's submission, as there are clearly defined limits to the common law power of the Court to grant cross-border judicial assistance in insolvency matters and the nature of the stay arising in Section 362 of the US Bankruptcy Code exceeds those limits. The appropriate starting point in the discussion as to the extent of the Court's common law power to grant assistance is the recent decision of the Privy Council in **Singularis Holdings Ltd. v. Price WaterhouseCoopers [2015] 2 WLR 971**. In **Singularis** the Bermuda Court had to consider whether it had common law jurisdiction to make an order, at the request of a Cayman appointed liquidator, compelling the production of documents and examination under the domestic Bermuda statute. The Privy Council agreed with the Bermuda Court of Appeal that no production order could properly be made as the particular production order that was sought could not have been made by the Cayman court itself.

70. At paragraphs, 18, 19 and 25 of the opinion of the Board, **Lord Sumption** stated that:

> **[18]** *Cambridge Gas* marks the furthest that the common law courts have gone in developing the common law powers of the court to assist a foreign liquidation. It has proved to be a controversial decision. So far as it held that the domestic court had jurisdiction over the parties simply by virtue of its power to assist, it was subjected to fierce academic criticism and held by a majority of the Supreme Court to be wrong in *Rubin v Eurofinance SA* [2012] UKSC 46, [2013] 1 AC 236, [2013] 1 All ER 521. So far as it held that the domestic court had a common law power to assist the foreign court by doing whatever it could have done in a domestic insolvency, its authority is weakened by the absence of any explanation of whence this common law power came and by the direct rejection of that proposition by the Judicial Committee in *Al Sabah v Grupo Torras SA* [2005] UKPC 1[2005] 2 AC 333,, [2005] 1 All ER 871, a case cited in argument in *Cambridge Gas* but not in the advice of the Board. Lord Walker, giving the

33

advice of the Board in *Al Sabah*, had expressed the view that there was no inherent power to set aside Cayman trusts at the request of a foreign court of insolvency, in circumstances where a corresponding statutory power existed under the Cayman Bankruptcy Law but did not apply in the circumstances. <u>The Board considers it to be clear that although statute law may influence the policy of the common law, it cannot be assumed, simply because there would be a statutory power to make a particular order in the case of domestic insolvency, that a similar power must exist at common law.</u> So far as *Cambridge Gas* suggests otherwise, the Board is satisfied that it is wrong for reasons more fully explained in the advice proposed by Lord Collins. (emphasis added)

 **[19]** … In the Board's opinion, the principle of modified universalism is part of the common law, but it is necessary to bear in mind, first, that it is subject to local law and local public policy and, secondly, that the court can only ever act within the limits of its own statutory and common law powers. What are those limits? In the absence of a relevant statutory power, they must depend on the common law, including any proper development of the common law. The question how far it is appropriate to develop the common law so as to recognise an equivalent power does not admit of a single, universal answer. It depends on the nature of the power that the court is being asked to exercise".

**[25]** In the Board's opinion, there is a power at common law to assist a foreign court of insolvency jurisdiction by ordering the production of information in oral or documentary form which is necessary for the administration of a foreign winding up. In recognising the existence of such a power, the Board would not wish to encourage the promiscuous creation of other common law powers to compel the production of information. The limits of this power are implicit in the reasons for recognising its existence. <u>In the first place, it is available only to assist the officers of a foreign court of insolvency jurisdiction or equivalent public</u>

34

officers. It would not, for example, be available to assist a voluntary winding up, which is essentially a private arrangement and although subject to the directions of the court is not conducted by or on behalf of an officer of the court. Secondly, it is a power of assistance. It exists for the purpose of enabling those courts to surmount the problems posed for a world-wide winding up of the company's affairs by the territorial limits of each court's powers. It is not therefore available to enable them to do something which they could not do even under the law by which they were appointed. Thirdly, it is available only when it is necessary for the performance of the office-holder's functions. Fourth, the power is subject to the limitation in *In re African Farms Ltd* and in *HIH* and *Rubin*, that such an order must be consistent with the substantive law and public policy of the assisting court, in this case that of Bermuda. (emphasis added)

71. Further, per **Lord Collins** at paragraph [38]:

> **[38]** In my judgment the answer to the present appeal is to be found in the following propositions. First, there is a principle of the common law that the court has the power to recognise and grant assistance to foreign insolvency proceedings. Second, that power is primarily exercised through the existing powers of the court. Third, those powers can be extended or developed from existing powers through the traditional judicial law-making techniques of the common law. Fourth, the very limited application of legislation by analogy does not allow the judiciary to extend the scope of insolvency legislation to cases where it does not apply. Fifth, in consequence, those powers do not extend to the application, by analogy "as if" the foreign insolvency were a domestic insolvency, of statutory powers which do not actually apply in the instant case*". (emphasis added)

72. The limits therefore, within which the common law jurisdiction to grant assistance must operate, are:

a) The court's powers are available only to assist the officers of a foreign court of insolvency jurisdiction or equivalent public officers.

b) The court's power is not available to permit the foreign representative to do something it could not do under the law by which they were appointed.

c) The court's power is only available when it is necessary for the performance of the office holder's functions.

d) The court's powers are available only where the nature of the assistance is consistent with the substantive law and public policy of the assisting court, i.e. it must be available under the local law and can be exercised by the Court in the exercise of its inherent powers under existing local law.

73. Whilst the Court, in the exercise of its inherent equitable jurisdiction, will in an appropriate case grant a stay of proceedings in a matter relative to disputes between parties, I am not satisfied that there has ever been the injunctive relief which could mirror the general global stay of proceedings granted by Section 362 of the US Bankruptcy Code and as ordered by Bankruptcy Judge Hon. Kevin Kelly. The nature of an anti-suit injunction is that it is an *in personam* order which bites at the individual before the Court and as such is wholly incompatible to being granted globally against un-named persons and genuine secured and unsecured creditors of the Applicants.

74. The Lender also argues that, in addition to these considerations, the ordinary common law powers to grant an injunction in the context of a secured creditor poses other difficulties for the application:

a) The Applicants have not provided a cross-undertaking in damages, which is a mandatory condition to the grant of injunctive relief.

b) It would be necessary for the Applicants to either pay the entire sums due to the Lender, as a secured creditor, into Court in order to obtain injunctive relief.

75. In *Allure Bahamas v North Andros Assets Limited et.al. [2010] 3 BHS J. No.
    23, Barnett CJ* stated, at paragraph [13] of his ruling, that:

> "[It] is settled practice that in exercising its discretionary power "the court
> will not grant an interlocutory injunction to restrain the exercise of a
> mortgagee's power of sale except on terms that the mortgagor paying into
> court the sum of monies found due for principle, interest and costs." See
> Gonsalves-Sabola CJ in American British Canadian Motors Ltd v Imperial
> Life Assurance Company of Canada [1991] BHS J No 129 and followed by
> Hall J in B.G. Investments Ltd v Crown Life Insurance [1991] BHS J No.
> 181. I see no reason to depart from this practice."

76. It appears therefore that even if the stay sought could have been available under
    the common law, it would be an improper exercise of the discretion to grant such
    relief in the absence of an undertaking in damages or paying into court of the full
    amount due and owing under the security. In the circumstances, the Applicants
    are in no position to fulfill either precondition.

77. Counsel for the Applicants readily conceded that he had no judicial authority to
    demonstrate where the courts have provided, under the inherent jurisdiction,
    such a global stay in the nature of the Section 362 type stay. A fact reflected in
    his description of the application as unique in the history of The Bahamas. He
    nonetheless says that the Court may fashion relief analogous to the statutory
    power.

78. I am satisfied that the Court has no common law power under Bahamian
    common law to impose a comprehensive stay in the terms sought by the
    Applicants. Such stay as would arise under the provision of the CWUA exists by
    virtue of section 193 of the CWUA. Section 193 provides that:

    **193 Avoidance of attachments and stay of proceedings**

> (1) When a winding up order is made or provisional liquidator appointed, no suit, action o other proceedings, including criminal proceedings, shall be proceeded with or commenced against the company except with the leave of the court and subject to such terms as the court may impose.
>
> (2) When a winding up order has been made any attachment, distress or execution put in force against the estate or effects of the company after the commencement of the winding up is void

Clearly this is not a power that Court possesses but rather a circumstance which arises automatically, by operation of law, on the happening of a particular event, namely the making of a winding-up order by the Court or the appointment of a provisional liquidator. In any event, none of the triggering events have occurred in the context of this case and Section 193 is therefore inapplicable.

79. For the court to extend this automatic stay, to a foreign insolvency, in the absence of a winding-up order or appointment of a provisional liquidator, in the context of this matter, would amount to adjusting the legislation to suit the Applicants case in a manner not permitted by the legislation. I accept without reservation, the admonition placed by the Privy Council in paragraph [38] of *Singularis* '*that the very limited application of legislation by analogy does not allow the judiciary to extend the scope of insolvency legislation to cases where it does not apply'*. In the exercise of the Court's power to assist I cannot treat the US Bankruptcy as a domestic insolvency and thereby access statutory provisions, which were created for the purposes of a domestic insolvency.

80. A further challenge is posed by the Section 362 type stay in that it also seeks to restrain the activity of secured creditors as well as restraining the commencement of proceedings. Such a stay which the Applicants cited in paragraph [36] of its submissions as the usual by-product of insolvency proceedings in The Bahamas, as a matter of law do not extend to secured

creditors such as the Lender. Section 193 of the CWUA does not interfere with
security interests. Section 238 of the CWUA provides:

**238 Secured creditors**

(1) Notwithstanding section 232 or that a winding up order has been
made, a creditor who has security over the whole or part of the assets
of a company is entitled to enforce his security without the leave of the
court and without reference to the liquidator.

(2) …

I accept the argument of the Lender that in a purely domestic case, the Court
could not, arising purely out of an insolvency, impose a ban on security
enforcement.  A fortiori, the Court cannot therefore impose such a ban by way of
assistance in a cross-border insolvency case.

81. In a recent decision in *Joint Administrators of African Minerals Ltd. (In
Liquidation) v Madison Pacific Trust Ltd [2015] HCMP 865/2015 (16 April
2015)* the Court of First Instance in Hong Kong refused to grant relief to give
effect to an English administration stay on security enforcement under the
provisions of the Insolvency Act 1986. The basis of the refusal was that the Hong
Kong Court had no power at common law or under any applicable statute to
impose a stay on security enforcement.  At paragraph [12] of the decision it was
stated:

"Hong Kong does not currently have any equivalent to administration and
no statutory provision which provides for a moratorium on the enforcement
of secured debt. A Hong Kong company or its liquidator could only seek
an order which would achieve the effect of the order sought by the
Administrators in limited circumstances. They could do so if it could be
demonstrated that the proposed enforcement would improperly prejudice
the equity of redemption. It might also be possible to do so if it could be
demonstrated that the company after having failed to meet its payment
obligations had become able to do so and thus it would be inequitable to

allow enforcement of the security: see Cukurova Finance International Limited & others v Alfa Telecom Turkey Ltd [2013] ULKPC 2 at paragraph 90. Applications made on either of these grounds would be for injunctions and it would be necessary for the applicants to establish an arguable case and comply with the requirements normally imposed on an applicant for an injunction such as the need to provide an undertaking in damages. As I noted early in this Decision the application before me is not made on that basis. It is made on the basis that I have the power at common law to grant an order that has the effect of restraining the sale of the charged shares to aid the administration in England despite the fact that in my view there is no equivalent statutory, common law or equitable power in Hong Kong. It seems to me that this would be an impermissible extension of the common law principle that requires the Court to recognise foreign liquidators and assist them. For this reason I have refused the application."

I accept this reflects the position of the law in The Bahamas and the proper basis for the refusal of the relief sought by the Applicants in this case.

82. There is also a good argument that the granting of the assistance sought by the applicant is contrary to another limiting factor, namely, public policy. Public policy is clearly reflected in the provisions of the CWUA, specifically Sections 193, 238(1) and 254. Sections 193 and 238(1), as discussed above, reflects Bahamian law and public policy in protecting the rights of secured creditors to enforce their security outside of, and insulated from, any insolvency process. Section 254(3) of the CWUA provides that:

> "An ancillary order shall not affect the right of a secured creditor to take possession of and realize or otherwise deal with property of the debtor over which the creditor has a security interest".

83. Further, Section 255 of the CWUA provides that, in the exercise of its discretion under Section 254, the Court must have regard to the following:

> (a)…
>
> (b) the protection of claim holders in the Bahamas against prejudice and inconvenience in the inconvenience in the process of claims in the foreign proceedings. …
>
> (c)…
>
> (d)…
>
> (e) the recognition and enforcement of security interest created by the debtor".

84. Notwithstanding that the Order granted by Bankruptcy Court Judge Hon. Kevin Kelly imposed an automatic stay against all creditors, the stay sought and reflected in the Amended Originating Summons carved out an exception for the Government of The Bahamas. Such an Order for a stay, which restrains the secured creditor and all other creditors, whilst carving out an exception for the Government, an unsecured creditor, will create an inequitable result which skews the usual priorities in the distribution process. This exception, would also appear to offend public policy by according preferential treatment to an unsecured creditor.

85. As stated, the public policy of The Bahamas tends to protect secured creditors and insulate them from the insolvency process. The principle also involves the *pari pasu* rule, which equalizes all non-preferential creditors and ensures that they all benefit from the estate of the insolvent company equally, i.e. "step by step". The Order proposed therefore will not only alter this position but also potentially elevate an unsecured creditor, the Government, above the secured creditors and its fellow unsecured creditors contrary to public policy.

86. As the Section 362 type Stay would:

> (a) exceed the power of the court (or otherwise not be granted) in a domestic setting either under the common law or by statute; and
>
> (b) offend public policy, as outlined,

I find that, even if the common law survived the passage of the CWUA, the relief sought could not be granted in accordance with the stated common law rules.

## Application of the CWUA to the 1st Respondent

87. The Applicant indicates that the reliance upon Section 254 of the CWUA, pleaded in the alternative related only to the 1st Respondent. Section 253 provides that the recognition and assistance provisions of the CWUA apply only to proceedings in a relevant foreign country. Sections 253-255 do not apply for the simple reason that the Liquidation Rules Committee has not designated the United States of America as a relevant country. In the circumstance it is unnecessary to consider any other factor. The alternative claim for relief pursuant to Section 254 of the CWUA must therefore fail.

## Conclusion

88. The Applicant contends that '[t]he reasons for permitting the Applicants the breathing space they need to complete the Baha Mar development are wholly compelling. There is no equivalent to Chapter 11 under Bahamian law by which the breathing space can be created or, very importantly, new capital can be injected on terms acceptable to any reasonable lender." They say that "they have proposed safeguards for Bahamian creditors within the Chapter 11 in a way that means the creditors are not compelled to engage in proceedings in the US. No sensible alternative has been proposed by the Respondents."

89. The Applicants have admitted to forum shopping but probably could not be faulted for doing all that they thought possible to ensure their survival. Despite

the attractiveness of the laws of our neighbours it is not for the Court to advance matters, which are the exclusive purview of the legislature.  In **Credit Lyonnais v SK Global Hong Kong Ltd. [2003] 4 HKC, Ma CJ** said it quite appropriately at paragraph [10]:

> "It is not up to the court to use its inherent jurisdiction to create a regime in which a judgment debtor or insolvent company is able to obtain a moratorium on its debts (or to put it more crudely, to give it some 'breathing space' to allow it to negotiate with creditors). This is a matter for the legislature to contemplate and if seen fit, to legislate on. The inherent jurisdiction of the court is only to be exercised in the circumstances set out above; it is not there to fill in perceived lacunae in the insolvency legislation"

90. In all the circumstances therefore, and for the reasons cited, I refused the application for an Order recognizing the primary insolvency proceedings underway in the District of Delaware and for the provision of assistance by extending and giving effect to the automatic stays arising pursuant to Section 362 of the United States Bankruptcy Code.  I also refused the relief, pleaded in the alternative, seeking the making of ancillary orders pursuant to Section 254 of the Companies (Winding Up) Amendment Act 2011.

91. The Originating Summons filed on 30th June 2015 and amended on 6th July 2015 was dismissed and costs awarded to the Respondents to be taxed if not agreed.

Dated the 31st day of July 2015

Ian R. Winder

Justice

43