## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| | **Hearing Date:** January 11, 2023 at 9:00 a.m. (ET) |
| | **Objection Deadline:** December 29, 2022 at 4:00 p.m. (ET) |

**MOTION OF DEBTORS FOR ENTRY OF ORDERS (I)(A) APPROVING BID PROCEDURES, STALKING HORSE PROTECTIONS AND THE FORM AND MANNER OF NOTICES FOR THE SALE OF CERTAIN BUSINESSES, (B) APPROVING ASSUMPTION AND ASSIGNMENT PROCEDURES AND (C) SCHEDULING AUCTION(S) AND SALE HEARING(S) AND (II)(A) APPROVING THE SALE(S) FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES AND (B) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

FTX Trading Ltd. ("<u>FTX Trading</u>") and its affiliated debtors and debtors-in-possession (collectively, the "<u>Debtors</u>") hereby submit this motion (this "<u>Motion</u>") for entry of (a) an order, substantially in the form attached hereto as <u>Exhibit A</u> (the "<u>Bid Procedures Order</u>"), pursuant to sections 105(a), 363, 365, 503 and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "<u>Bankruptcy Code</u>"), rules 2002, 6004, 6006, 9007, 9008 and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") and rules 2002-1, 6004-1 and 9006-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "<u>Local Rules</u>"), (i) authorizing and approving

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively.  Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

bid procedures for the sale of certain assets of the Debtors, (ii) approving stalking horse bid protections, (iii) scheduling auction(s) for, and hearing(s) to approve, the sale of certain of the Debtors' assets, (iv) approving the form and manner of notices of sale, auction(s) and sale hearing(s) and (v) authorizing and approving assumption and assignment procedures and (b) one or more orders (each, a "Sale Order"), in form(s) to be submitted to the Court, pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002(a)(2), 6004, 6006, 9007, 9008 and 9014 and Local Rules 2002-1 and 6004-1, authorizing and approving (i) the sale of certain assets of the Debtors free and clear of any liens, claims, interests and encumbrances and (ii) the assumption and assignment of certain executory contracts and unexpired leases.  In further support of this Motion, the Debtors respectfully state as follows:

## Preliminary Statement

1.     As described more fully in the *Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 24], the *Declaration of Edgar W. Mosley II in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 57], the *Supplemental Declaration of John J. Ray III in Support of First Day Pleadings* [D.I. 92] and the *Supplemental Declaration of Edgar W. Mosley II in Support of First Day Pleadings* [D.I. 93] (collectively, the "First Day Declarations"), prior to the filing of the Debtors' chapter 11 cases (the "Chapter 11 Cases"), the Debtors operated one of the largest cryptocurrency exchanges in the world (through the FTX.com platform), operated a U.S. exchange for spot trading in digital assets and tokens (through FTX US), operated quantitative trading funds specializing in crypto assets (through Alameda Research LLC and its affiliates) and conducted diverse private investment and other businesses.  The Debtors faced a severe liquidity crisis that necessitated the filing of these Chapter 11 Cases on an emergency basis on November 11, 2022, and in the case of Debtor West Realm Shires Inc. ("WRS"), on November 14, 2022.  The Debtors commenced these Chapter 11

Cases intending to achieve certain core objectives, including the maximization of value for all stakeholders through the eventual reorganization or sale of the Debtors' complex array of businesses, investments and digital and physical property.

2.       On November 19, 2022, the Debtors announced that as part of the chapter 11 process, they would be launching a strategic review of their global assets to begin maximizing recoverable value for stakeholders.  Based on their preliminary review, the Debtors own or control a number of subsidiaries and assets that are regulated, licensed and/or largely not integrated into the Debtors' operations, within and outside of the United States.  The Debtors believe a number of these entities have solvent balance sheets, independent management and valuable franchises.  It is a priority of the Debtors to explore sales, recapitalizations or other strategic transactions with respect to such subsidiaries and assets.

3.       By this Motion, the Debtors seek approval of bid procedures for, and the sale of, the following businesses of the Debtors, in each case, including any associated contracts, rights or other property of the Debtors (each such business, a "Business," and collectively, the "Businesses"):

- Embed Business:  Non-Debtor Embed Financial Technologies Inc., a Delaware corporation ("Embed Technologies"), together with its wholly-owned non-Debtor subsidiary, Embed Clearing LLC, a Delaware limited liability company ("Embed Clearing" and, together with Embed Technologies, "Embed"), operate a correspondent clearing and custody platform that provides registered investment advisors, broker-dealers and other financial institutions with APIs and brokerage services.  Embed Technologies was acquired in September 2022 by WRS, which continues to directly own 100% of the common stock of Embed Technologies.  Embed Clearing is registered with

the U.S. Securities and Exchange Commission (the "SEC") as a clearing broker-dealer
and is a member of the Financial Industry Regulatory Authority, Inc. ("FINRA"), The
Nasdaq Stock Market LLC, Investors Exchange LLC, The Depository Trust Company,
the National Securities Clearing Corporation and the Options Clearing Corporation.  The
Debtors are soliciting bids for the disposition of 100% of the common stock of Embed
Technologies held by WRS;

- LedgerX Business:  Non-Debtor LedgerX LLC, a Delaware limited liability company
  ("LedgerX"), is a digital currency futures and options exchange and clearinghouse
  regulated by the Commodity Futures Trading Commission (the "CFTC").  LedgerX
  offers and clears futures, options and swaps contracts on digital assets and other
  commodities primarily for U.S. persons and is registered with the CFTC as a Designated
  Contract Market ("DCM"), Derivatives Clearing Organization ("DCO") and Swap
  Execution Facility ("SEF").  LedgerX was acquired in October 2021 by WRS, which
  continues to indirectly own 100% of the interests of LedgerX through a holding
  company, Debtor Ledger Holdings Inc., a Delaware corporation ("Ledger Holdings").
  The Debtors are soliciting bids for the disposition of 100% of the interests in LedgerX
  held by Ledger Holdings;

- FTX Japan Business:  Debtor FTX Japan Holdings K.K., a Japanese company ("FTX
  Japan Holdings"), is the holding company for its wholly-owned subsidiaries Debtor FTX
  Japan K.K. ("FTX Japan"), which operates a registered cryptocurrency exchange
  providing residents of Japan the ability to trade crypto and crypto derivatives, and Debtor
  Quoine Pte Ltd. ("FTX Singapore"), which operates a cryptocurrency exchange in
  Singapore under exemption while its license application is being processed, among

certain other subsidiaries with limited operations.  FTX Japan is subject to the regulatory supervision of the Financial Services Agency of Japan (the "JFSA") and is registered as a Crypto-Asset Exchange Service Provider and Type I Financial Instruments Business Operator.  Previously known as Liquid Group Inc., FTX Japan Holdings was acquired in April 2022 by FTX Trading, which continues to directly own 100% of the equity interests of FTX Japan Holdings.  The Debtors are soliciting bids for the disposition of the FTX Japan Business, which may involve a sale of 100% of the interests in FTX Japan Holdings held by FTX Trading or separate sales of 100% of the interests in FTX Japan or FTX Singapore held by FTX Japan Holdings; and

- FTX Europe Business:  Debtor FTX Europe AG, a Swiss corporation limited by shares ("FTX Europe"), is the holding company for a number of operating and non-operating subsidiaries constituting the Debtors' European digital assets and derivatives business (not including the Debtors' crypto exchange).  FTX Europe provides a technology platform and exchange for crypto and equity derivatives trading for EU institutional and retail investors and offers single asset derivative contracts linked to equities or crypto assets, as well as index-based futures contracts.  FTX Europe's Cyprus subsidiary, Debtor FTX EU Ltd., holds a license (currently suspended) as an investment firm allowing it to provide its services in the European Union member states, and has opted into the United Kingdom's Temporary Permission Regime.  FTX Europe's UAE subsidiary, Debtor DAAG Trading, DMCC, is regulated as an exchange in Dubai (license currently suspended).  Formerly Digital Assets DA AG, FTX Europe was acquired by FTX Trading in November 2021, which continues to directly own 100% of the equity interests of FTX Europe.  The Debtors are soliciting bids for the disposition of the FTX Europe

Business, which may involve a sale of 100% of the interests in FTX Europe held by FTX Trading or sales of stock and/or assets of FTX Europe and/or its subsidiaries.

4.     For organizational purposes, the Debtors consider the Embed Business and the LedgerX Business as part of the "WRS Silo" as described in the First Day Declarations, and the FTX Japan Business and the FTX Europe Business as part of the "Dotcom Silo" as described in the First Day Declarations.

5.     Since the commencement of these Chapter 11 Cases, each of the Businesses has experienced regulatory pressures which merit an expeditious sale process.  The Debtors and/or the Businesses have been in active conversations with a number of regulators for the Businesses, including FINRA with respect to Embed, the CFTC with respect to LedgerX's registrations as a DCM, SEF and DCO, the JFSA with respect to FTX Japan, and the Swiss Financial Market Supervisory Authority ("FINMA") and the Cyprus Securities and Exchange Commission ("CySEC") with respect to FTX Europe.  The licenses held by FTX Europe have been suspended along with its operations, and FTX Japan is subject to business suspension and business improvement orders.  The longer operations are suspended, the greater the risk to the value of the assets and the risk of a permanent revocation of licenses.

6.     In addition, each of the Businesses has experienced significant customer and employee attrition pressures.  Customer and employee attrition is likely as long as the companies are owned by the Debtors.  The Debtors believe that a sale to an approved buyer may allow the Businesses to continue and/or restart operations as going concerns and, as a result, maximize the value of the Businesses to the Debtors' estates.

7.     Because each of the Businesses was acquired by the Debtors fairly recently, but before the Debtors commenced these Chapter 11 Cases, the Businesses have each

operated on a generally independent basis from the Debtors' other operations, holdings and investments.  Each of the Businesses has maintained segregated customer accounts.  In addition, each of the Businesses has a separate management team from the Debtors' other businesses, Embed, LedgerX and FTX Europe each maintain separate IT systems and Embed, FTX Europe and FTX Japan Holdings each maintain separate headquarters.  The relative independence of each of the Businesses' operations from the remainder of the Debtors' core business operations make a potential sale process for each of the Businesses relatively less complex.

8.      Since the commencement of these Chapter 11 Cases and the announcement of the Debtors' strategic review of certain assets, there has been significant interest expressed by third parties in acquiring the Businesses.  Having received dozens of unsolicited inbound inquiries for the Businesses, the Debtors anticipate that a broader marketing process will yield multiple offers for the purchase of the Businesses.  Considering the interest expressed by third parties in the Businesses, the value of the Businesses and the other rationales for selling the Businesses on an expeditious timeline, the Debtors have determined that pursuing one or more sales (the "Sale(s)") of the Businesses is important to preserve and maximize the value of the Debtors' estates.  No final decision has been made to sell any of the Businesses, and any Sale will be subject to the approval of the independent directors of the Debtors as well as the approval of the Court.

9.      To ensure that each of the Businesses is sold for the highest or otherwise best bid(s), the Debtors have developed bid and auction procedures, a copy of which is attached as Exhibit 1 to the Bid Procedures Order (the "Bid Procedures"), to govern the sale of the Businesses.

10.     The Debtors submit that the Bid Procedures are reasonable and designed with the objective of generating the greatest level of interest in, and best value for, the Businesses and that the time periods proposed in the Bid Procedures will provide all parties with sufficient time and information to formulate competitive bids for each of the Businesses, while ensuring that the sale occurs in an expeditious manner that preserves and maximizes the value of the Businesses.  The Debtors further submit that the Bid Procedures and the other relief requested herein satisfy the requirements of section 363 of the Bankruptcy Code and will facilitate the sale of the Businesses for the highest or otherwise best value for the benefit of all of the Debtors' stakeholders through a fair, open and transparent process.

## Background

11.     On November 11 and November 14, 2022, the Debtors filed with the Court voluntary petitions for relief under the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Joint administration of these Chapter 11 Cases was authorized by the Court by entry of an order on November 22, 2022 [D.I. 128].  On December 15, 2022, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (the "Committee") pursuant to section 1102 of the Bankruptcy Code [D.I. 231].

12.     Additional factual background relating to the Debtors' businesses and the commencement of these Chapter 11 Cases is set forth in the First Day Declarations.

## Jurisdiction

13.     The Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This matter is a core proceeding

pursuant to 28 U.S.C. § 157(b).  Venue is proper in the Court pursuant to 28 U.S.C. §§ 1408 and

1409.  The statutory predicates for the relief requested herein are sections 105(a), 363, 365, 503

and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9007, 9008 and 9014 and

Local Rules 2002-1, 6004-1 and 9006-1.  Pursuant to Local Rule 9013-1(f), the Debtors consent

to the entry of a final order or judgment by the Court in connection with this Motion to the extent

it is later determined that the Court, absent consent of the parties, cannot enter final orders or

judgments consistent with Article III of the United States Constitution.

### Relief Requested

14.    By this Motion, the Debtors request entry of (a) the Bid Procedures Order,

substantially in the form attached hereto as Exhibit A, (i) authorizing and approving the Bid

Procedures, (ii) authorizing the Debtors to select one or more Stalking Horse Bidder(s) (as

defined below) and approving bid protections for such Stalking Horse Bidder(s), (iii) scheduling

auction(s) (each, an "Auction") for and hearing(s) (each, a "Sale Hearing") to approve the sale of

each of the Businesses, (iv) approving the form of (x) notice of the proposed Sale(s), Auction(s)

and Sale Hearing(s), substantially in the form attached as Exhibit 2 to the Bid Procedures Order

(the "Sale Notice") and (y) notice to each relevant non-Debtor contract counterparty (each, a

"Counterparty") to an Assumed Debtor Contract (as defined below) regarding the Debtors'

potential assumption and assignment of such contract and the proposed Cure Amount (as defined

below), substantially in the form attached as Exhibit 3 to the Bid Procedures Order and

(v) authorizing and approving procedures (the "Assumption and Assignment Procedures") for

the assumption and assignment of the Assumed Debtor Contracts and the determination of Cure

Amounts and (b) one or more Sale Orders, in form(s) to be submitted to the Court, authorizing

and approving (i) the sale of the Businesses free and clear of any liens, claims, interests and

encumbrances and (ii) the assumption and assignment of the Assumed Debtor Contracts in connection with the proposed Sale(s).

### Marketing Process[2]

15.     Since the commencement of these Chapter 11 Cases, approximately 111 parties, including various financial and strategic counterparties globally, have expressed interest to the Debtors in a potential purchase of one or more of the Businesses.  The Debtors, with the assistance of their investment banker, Perella Weinberg Partners ("PWP"), are initiating a comprehensive marketing process to further solicit interest in the Businesses from potential purchasers.  As of the date of this Motion, the Debtors have entered into 26 confidentiality agreements with potential counterparties who have expressed interest in any of the Businesses and other businesses and assets of the Debtors, and are in the process of entering into a number of additional confidentiality agreements with potential counterparties.

16.     PWP has also developed an extensive, proprietary list of additional potential acquirers and has begun an outreach process to such potential acquirers.  Parties who express interest in any of the Businesses, are determined by the Debtors to have delivered reasonably satisfactory Preliminary Documents (as defined below) and with whom the Debtors execute a confidentiality agreement will receive access to virtual data room(s) containing information regarding the relevant business, operations, finances and technology.  In addition, the Debtors, with the assistance of PWP and management, have established a process and timeline with respect to the sale of each of the Businesses, as set forth in this Motion.

---

[2]     A more detailed description of the Debtors' and PWP's marketing and sale efforts will be set forth in a declaration to be filed prior to the Bid Procedures Hearing.

17.    The Debtors believe that the conduct of a marketing process that contemplates a sale of each of the Businesses in the time and manner set forth herein will maximize the value of the Businesses for all stakeholders.  In formulating the Bid Procedures and time periods contained therein, the Debtors and their professionals balanced the need to provide adequate and appropriate notice to parties-in-interest and potential purchasers against the need to provide for efficient and orderly Sale(s) if appropriate terms are reached with one or more buyers.  The Debtors submit that the proposed auction process and time periods set forth in the Bid Procedures provide parties with sufficient time and information to formulate competing bids to purchase the Businesses.  Therefore, the Debtors have determined that pursuing potential Sale(s) in the manner and within the time periods described herein is in the best interest of the Debtors' estates and stakeholders.

## **Summary of Bid Procedures and Other Relief Requested**

### I.    **Overview.**

18.    The Bid Procedures are designed to promote a competitive, efficient, open and transparent sale process.  If approved, the Bid Procedures will allow the Debtors to solicit and identify bids from potential buyers that constitute the highest or otherwise best offer for each of the Businesses.  The Bid Procedures also contemplate an important role for the Committee.  The lead financial advisor and legal counsel for the Committee are "Consulting Professionals" under the Bid Procedures, with the right to attend the Auction(s) and consult with the Debtors on the major business judgments concerning the qualification of bidders, the extension to any bidder of stalking horse protections, the selection of successful bid(s) and any back-up bids, changes in auction procedures as the Auction(s) progress in order to maximize the value of bids received, and other important decisions.

19.     The Bid Procedures are attached to the Bid Procedures Order and they are

not restated in their entirety in this Motion.  Pursuant to Local Rule 6004-1(c)(i), certain of the

key terms of the Bid Procedures are highlighted below:[3]

| Businesses for Sale | <ul><li>The Embed Business;</li><li>the LedgerX Business;</li><li>the FTX Japan Business; and</li><li>the FTX Europe Business.</li></ul> |
|---|---|
| Potential Bidders | To be eligible to participate in the bidding process for the Businesses, any interested party (an "<u>Interested Party</u>") must first deliver the following documents (the "<u>Preliminary Documents</u>") to each of (i) proposed counsel to the Debtors, (a) Sullivan & Cromwell LLP, 125 Broad Street, New York, New York 10004, Attn: Andy G. Dietderich (dietdericha@sullcrom.com), Mitchell S. Eitel (eitelm@sullcrom.com), Audra D. Cohen (cohena@sullcrom.com) and Stephen M. Salley (salleys@sullcrom.com) and (b) Landis Rath & Cobb LLP, 919 N. Market St., Suite 1800, Wilmington, Delaware 19801, Attn: Adam G. Landis (landis@lrclaw.com) and Kimberly A. Brown (brown@lrclaw.com) and (ii) the Debtors' proposed financial advisor in these Chapter 11 Cases, Perella Weinberg Partners (PWP-M&AInternalProjectFocus@pwpartners.com) (collectively, the "<u>Bid Notice Parties</u>"):<br><br>i.  a statement indicating which Business(es) the Interested Party has an interest in purchasing;<br><br>ii.  a complete list, to such Interested Party's knowledge after reasonable inquiry, of (A) any contracts between the Interested Party and its affiliates (the "<u>Interested Party Group</u>") and any Debtor, (B) all property in the custody or control of the Interested Party Group in which any Debtor may have an interest, (C) all claims that any member of the Interested Party Group may have against any Debtor, and (D) any other connections between any member of the Interested Party Group, on the one hand, and the Debtors and their current or former directors and officers, on the other hand (collectively, any "<u>Interested Party Transactions</u>");<br><br>iii.  the most current audited and unaudited financial statements of |

---

[3]   Capitalized terms used in this section but not otherwise defined herein shall have the meanings ascribed to them in the Bid Procedures.  To the extent there are inconsistencies between any summary description of the Bid Procedures and the Bid Procedures, the terms of the Bid Procedures shall control.

| | |
|---|---|
| | the Interested Party or any equity holder or sponsor of the Interested Party that will be responsible to the Debtors for the Interested Party's obligations in connection with the bidding process or, if no such financial statements are available or provided, preliminary proof of or information as to the Interested Party's financial capacity to close a proposed Sale; |
| | iv.   a description of such Interested Party's familiarity with any regulatory approval process for the applicable Business(es) and ability to obtain any required regulatory approvals on a timely basis; and |
| | v.   such other information as the Debtors may determine to be appropriate to assess whether the Interested Party is an appropriate recipient of the confidential information of the Debtors. |
| | An Interested Party that has delivered Preliminary Documents reasonably satisfactory to the Debtors shall become a Potential Bidder and will receive confidential information regarding the applicable Business(es) and access to the applicable Data Room(s) when so notified by the Debtors and after executing a customary confidentiality agreement in a form satisfactory to the Debtors. The Debtors may withhold or limit access by any Potential Bidder to the Data Room(s) or other due diligence materials at any time and for any reason. |
| | The Data Room(s) will contain form(s) of purchase agreement(s) for the Businesses (the "Proposed Purchase Agreement(s)") for review by Potential Bidders.[4] |
| **Stalking Horse Bidder(s)** | After consultation with the Consulting Professionals, the Debtors may, at any time up until six days prior to each Auction (each, a "Stalking Horse Designation Deadline"), designate one or more stalking horse bids (each, a "Stalking Horse Bid") and execute a purchase agreement (each, a "Stalking Horse Agreement") with the applicable stalking horse bidder (each, a "Stalking Horse Bidder"). The Debtors may designate no more than one Stalking Horse Bid for each Business. The Debtors may designate the same bidder as the Stalking Horse Bidder for more than one Business, whether such bidder has submitted individual bids for each Business or a combined bid for multiple Businesses. |
| | Upon execution of a Stalking Horse Agreement, the Debtors may grant the applicable Stalking Horse Bidder a cash break-up fee (the "Topping Fee") equal to up to 3.0% of the value of the consideration to be paid by the Stalking Horse Bidder for the applicable Business(es) (the "Stalking Horse Purchase Price") and may further agree to reimburse the |

---

[4]   The Debtors intend to file copies of the Proposed Purchase Agreement(s) and proposed Sale Order(s) with the Court following the applicable Preliminary Bid Deadline(s).

| | |
|---|---|
| | reasonable and documented out-of-pocket expenses incurred by the Stalking Horse Bidder in an amount up to 0.5% of the Stalking Horse Purchase Price (the "Expense Reimbursement Amount" and, together with the Topping Fee, the "Bid Protections"); provided that the Expense Reimbursement Amount will not exceed $1,250,000 for any individual Business. |
| | The Debtors shall promptly file with the Court notice of the identity of any Stalking Horse Bidder, a description of any Bid Protections awarded and a copy of any Stalking Horse Agreement (a "Stalking Horse Notice"). |
| | If the Committee or the U.S. Trustee objects to the Bid Protections within five days after the Debtors file a Stalking Horse Notice, then the Debtors shall schedule a hearing to be heard on an expedited basis seeking approval of the Bid Protections.  If there is no objection to the Bid Protections by the Committee or the U.S. Trustee prior to the applicable Bid Protections objection deadline, or each such objection is resolved, the Bid Protections shall be deemed approved by the Bid Procedures Order and may be paid without further action or order by the Court.  Once approved and to the extent payable pursuant to the Bid Procedures Order, the Bid Protections shall constitute allowed administrative expense claims arising in these Chapter 11 Cases under sections 503(b) and 507(a)(2) of the Bankruptcy Code. |
| | If a Stalking Horse Bid is selected as the Starting Bid at an Auction, a topping bid must include a minimum purchase price or other value determined by the Debtors in an amount equal to the sum of (a)(i) the Stalking Horse Purchase Price, (ii) the Topping Fee and (iii) the maximum amount of the Expense Reimbursement Amount (the sum of items (a)(i) through (iii), the "Stalking Horse Bid Value") and (b) the applicable Minimum Overbid (as defined below) (such topping bid, a "Stalking Horse Overbid"). |
| | The Bid Protections will be payable solely from the proceeds of a successful topping bid that is consummated, and shall not be payable to a Stalking Horse Bidder under any other circumstance. |
| **Qualified Bidders** | Participation in the Auction(s) shall be limited to those Potential Bidders who satisfy the conditions set forth in "Preliminary Bid Deadlines," "Indications of Interest," "Final Bid Deadlines" and "Bid Requirements" below and, after consultation with the Consulting Professionals, are deemed by the Debtors to be a "Qualified Bidder" with a timely "Qualified Bid." |
| **Preliminary Bid Deadlines** | In order to be a Qualified Bidder, a Potential Bidder first will be required to submit an Indication of Interest in electronic format to the Bid Notice Parties so as to be received not later than the applicable Preliminary Bid Deadline set forth below; provided that the Debtors may extend any Preliminary Bid Deadline without further order of the |

|  | Court: |
|--|--------|

| Business | Preliminary Bid Deadline (5:00 p.m. prevailing Eastern Time on the below listed dates) |
|----------|-----------------------------------------------------------------------------------------|
| Embed Business | January 18, 2023 |
| LedgerX Business | January 25, 2023 |
| FTX Japan Business | February 1, 2023 |
| FTX Europe Business | February 1, 2023 |

| **Indications of Interest** | Potential Bidders may submit Indications of Interest for any one or more of the Businesses on or prior to the Preliminary Bid Deadline for the applicable Business(es).  Each Indication of Interest must contain the following information, except as the Debtors otherwise determine: |
|-----------------------------|-------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|

1. Identity of Purchaser and its Affiliates:  A description of each person or legal entity that would acquire the applicable Business(es), each such person's or legal entity's ultimate parent company, the identity of all key shareholders and ultimate beneficial owners of such person or legal entity and any relevant history and/or experience of the Potential Bidder in the industry, and an updated list of any Interested Party Transactions;

2. Terms; Consideration:  A description of (a) the Business(es) proposed to be acquired; (b) the total purchase price and form of consideration for such Business(es), which must be either cash (fiat currency) or public equity or other liquid securities; (c) if the Potential Bidder is seeking to acquire more than one Business, an allocation of consideration for each Business to be acquired; and (d) the structure and key terms and conditions of the proposed Sale;

3. Due Diligence:  A description of all remaining due diligence requests and any material conditions to be satisfied prior to the submission of a Qualified Bid, and a statement that the Potential Bidder is prepared to work in good faith to finalize a binding proposal for the applicable Business(es) by the applicable Bid Deadline;

4. Sources of Financing:  Written evidence acceptable to the Debtors demonstrating the financial wherewithal to acquire the applicable Business(es) and an indication of expected sources of funds (including the amounts of debt and equity financing necessary to fund the Sale together with indications from any third-party sources of their commitment to provide such funds) and the steps required (and anticipated timing) to obtain any

definitive financing commitments.  If the Potential Bidder is a newly formed entity, the Indication of Interest must identify the entity or entities that will provide backstops for the potential Sale in the form of a guarantee, equity commitment letter or other credit support, and describe the nature of such support;

5. <u>Required Approvals and Timing</u>:  A description of the level of review, authorization and approval within the Potential Bidder's organization that the potential Sale has received to date and an indication of any anticipated need (and associated timing) for further corporate, shareholder or other authorization, approvals and waivers and any other material conditions or time constraints related to closing a potential Sale;

6. <u>Governmental and Regulatory Approvals</u>:  A statement or evidence of the Potential Bidder's plan and ability to obtain all governmental, regulatory or other third-party approvals required to close the proposed Sale and to operate the applicable Business(es) from and after the closing of the Sale transaction and the proposed timing for the Potential Bidder to undertake the actions required to obtain such approvals.  Each Potential Bidder further agrees that its legal counsel will coordinate in good faith with the Debtors' legal counsel to discuss and explain such Potential Bidder's regulatory analysis, strategy and timeline for securing all such approvals as soon as reasonably practicable, and in no event later than the time period contemplated (a) to submit a Stalking Horse Bid or (b) if not submitting a Stalking Horse Bid, to submit a Qualified Bid; and

7. <u>Material Conditions</u>:  A list of any other material conditions to which the consummation of the proposed Sale would be subject.

| **Final Bid Deadlines** | In order to participate in an Auction for a Business, a Potential Bidder must deliver the Required Bid Documents (as defined below) in electronic format to the Bid Notice Parties so as to be received not later than the applicable Bid Deadline set forth below; <u>provided</u> that the Debtors may extend any Bid Deadline without further order of the Court: |
|---|---|

| **Business** | **Bid Deadline**<br>(5:00 p.m. prevailing Eastern Time on the below listed dates) |
|---|---|
| Embed Business | February 15, 2023 |
| LedgerX Business | March 1, 2023 |
| FTX Japan Business | March 15, 2023 |
| FTX Europe Business | March 15, 2023 |

| | |
|---|---|
| | Potential Bidders may submit the Required Bid Documents, and become Qualified Bidders, at any time after the applicable Preliminary Bid Deadline and prior to the applicable Bid Deadline (provided such Potential Bidder has submitted an Indication of Interest that meets the requirements under the Bid Procedures on or prior to the applicable Preliminary Bid Deadline).  A Potential Bidder submitting a combined bid for Businesses with multiple Bid Deadlines must submit such bid by the earliest applicable Bid Deadline.  If the Debtors extend any Bid Deadline, the Debtors will promptly notify all Potential Bidders.  The Debtors will promptly provide copies of all bids received to the Consulting Professionals. |
| **Bid Requirements** | All bids, including Stalking Horse Bids, should include the following, except as the Debtors otherwise determine (the "Required Bid Documents"): |
| | 1. Proposal Letter:  A letter outlining the Business(es) proposed to be acquired, the bidder's offer and any conditions precedent and stating that the bidder's offer is irrevocable until the 10th day following the conclusion of the applicable Auction(s) or, if later, the day after the date of the applicable Sale Hearing(s) (provided that, if such bidder is selected as a Successful Bidder (as defined below) or an Alternate Bidder (as defined below), its offer shall remain irrevocable until the closing of the Sale to the Successful Bidder or Alternate Bidder, as applicable; provided further that, the applicable reference dates for a bid for more than one Business shall be the dates of the latest applicable Auction or Sale Hearing), and including written evidence acceptable to the Debtors demonstrating the financial wherewithal and corporate authorization to consummate the proposed transaction; and |
| | 2. Purchase Agreement:  A draft purchase agreement, including the purchase price for the Business(es) to be purchased, together with all exhibits and schedules, marked to show any amendments and modifications to the applicable Proposed Purchase Agreement(s) (or, if Stalking Horse Bid(s) have been designated with respect to the applicable Business(es), the applicable Stalking Horse Agreement(s)), in a form that has been duly authorized and executed by the bidder. |
| | In addition, a bid will be considered a Qualified Bid only if the bid includes the following: |
| | 3. Identity of Purchaser and its Affiliates:  A description of (a) each person or legal entity that would acquire the applicable Business(es) or sponsor, finance (including through the issuance of debt in connection with such bid) or participate in such bid (including through a license or similar arrangement), and the complete terms of such participation, (b) each such person's or |

legal entity's ultimate parent company, (c) the identity of all key shareholders and ultimate beneficial owners of such person or legal entity and (d) any past or present connections or agreements with any other known Potential Bidder or Qualified Bidder and any director or officer of the foregoing, and an updated list of any Interested Party Transactions;

4. <u>Terms; Consideration</u>:  A description of (a) the Business(es) proposed to be acquired; (b) the total purchase price and form of consideration for such Business(es), which must be either cash (fiat currency) or public equity or other liquid securities (<u>provided</u> that, if a Stalking Horse Bidder has been designated with respect to any of the Businesses subject to the bid, the applicable portion of the bid value must exceed the Stalking Horse Bid Value (as defined below) or the bid must otherwise provide higher value or better terms than the applicable Stalking Horse Bid as determined by the Debtors in their business judgment, after consultation with the Consulting Professionals); (c) if the Potential Bidder is seeking to acquire more than one Business, an allocation of consideration for each Business to be acquired; and (d) the structure and key terms and conditions of the proposed Sale;

5. <u>Financial Information; Financing</u>:  A statement (a) representing that the Potential Bidder is financially capable of consummating the contemplated Sale, together with the Potential Bidder's (i) *pro forma* capital structure and (ii) if available, audited financial statements for the prior two years, or if such financial statements are not available, written evidence acceptable to the Debtors sufficient to support a conclusion that the Potential Bidder is financially capable of consummating the contemplated Sale; and (b) identifying any person or entity providing debt or equity financing for the purchase, setting forth in reasonable detail the proposed structure and material terms of any financing and confirming that the bid is not subject to any financing contingencies.  The Debtors reserve the right, in their sole discretion, to reasonably request additional financial information from any Potential Bidder;

6. <u>Regulatory Approvals</u>:  A statement (a) identifying all regulatory approvals (including the regulatory body and nature of the approval) required in order to complete the transaction; (b) describing the timing and process to complete the foregoing; and (c) providing evidence of the Potential Bidder's ability to obtain any required approval on the timeline indicated in (b);

7. <u>Authorization</u>:  Evidence of authorization and approval from the Potential Bidder's board of directors (or comparable governing body) with respect to the bid submission, participation in the

Auction(s) and the closing of the proposed Sale; and

8. <u>Good Faith Deposit</u>:  Each Qualified Bid must be accompanied by a cash deposit by wire transfer in the amount equal to 10% of the aggregate value of the cash and non-cash consideration of the bid, to be held in an escrow account to be identified and established by the Debtors (the "<u>Good Faith Deposit</u>").

9. <u>Other Requirements</u>:  Each Qualified Bid must also:

   a.  describe all conditions to the bid, including the need for any third-party approvals or consents, except required Court approval (for the avoidance of doubt, the bid cannot be conditioned on obtaining financing);

   b.  confirm that the bidder has completed due diligence;

   c.  indicate that the bidder will not seek any transaction or break-up fee, expense reimbursement, work fee or similar type of payment and that it waives any substantial contribution administrative expense claims under section 503(b) of the Bankruptcy Code related to bidding for the Businesses (except in the case of a Stalking Horse Bid);

   d.  constitute a good faith, *bona fide* offer to effectuate the proposed transaction;

   e.  identify the extent to which the Potential Bidder intends to assume obligations related to employees of the Debtors and whether the Potential Bidder proposes to purchase avoidance actions and other claims against directors, officers and employees and related insurance assets as part of the transaction;

   f.  if applicable, identify any executory contracts and unexpired leases of which the Potential Bidder seeks assignment from the Debtors and, if the bid contemplates the assumption and assignment of any contracts or leases, include evidence of the bidder's ability to comply with section 365 of the Bankruptcy Code;

   g.  state that the bidder agrees to serve as an Alternate Bidder, if selected as such by the Debtors;

   h.  confirm that the bidder consents to the jurisdiction of the Court and agrees to be bound by the Bid Procedures and waive any right to a jury trial in connection with any disputes relating to the Auction(s) and the construction and enforcement of the Bid Procedures; and

   i.  be received on or before the applicable Bid Deadline.

For the avoidance of doubt, bidders are advised that they may submit

| | |
|---|---|
| | bids for one or more Businesses, including combined bid(s) for multiple Businesses. |
| | A bid received from a Qualified Bidder will constitute a Qualified Bid only if the Debtors confirm that it includes all of the Required Bid Documents and meets all of the above requirements; provided that, after consultation with the Consulting Professionals, the Debtors may designate any bid or combination of bids that does not meet the above requirements as a Qualified Bid. |
| | Within two days after the applicable Bid Deadline, the Debtors will notify each bidder whether such bidder is a Qualified Bidder.  All Qualified Bids will be considered, but the Debtors reserve the right to reject any and all bids that would otherwise constitute Qualified Bids after consultation with the Consulting Professionals.  If any bid is determined by the Debtors not to be a Qualified Bid, the Debtors shall promptly instruct the escrow agent designated by the Debtors to return such bidder's Good Faith Deposit. |
| | Between the date that the Debtors notify a Potential Bidder that it is a Qualified Bidder and the applicable Auction(s), the Debtors may discuss, negotiate or seek clarification of any Qualified Bid from a Qualified Bidder.  The Debtors reserve the right to cooperate with any Potential Bidder in advance of the applicable Auction(s) to cure any deficiencies in a bid that is not initially deemed to be a Qualified Bid.  Without the prior written consent of the Debtors, a Qualified Bidder may not modify, amend or withdraw its Qualified Bid, except for proposed amendments to increase the purchase price or otherwise improve the terms of the Qualified Bid during the period that such Qualified Bid remains binding as specified in the Bid Procedures; provided that any Qualified Bid may be improved at the Auction(s) as set forth herein.  Any improved Qualified Bid must continue to comply with the requirements for Qualified Bids set forth in the Bid Procedures. |
| **Bid Protections** | Other than the Bid Protections or as separately approved by the Court, no party submitting a bid shall be entitled to a transaction or break-up fee, expense reimbursement or work fee.  All substantial contribution claims by any bidder are deemed waived upon submission of a Qualified Bid. |
| **Auction(s)** | If the Debtors receive no more than one Qualified Bid on or prior to the applicable Bid Deadline with respect to any Business(es), after consultation with the Consulting Professionals, the Debtors may cancel the applicable Auction and seek approval of the sole Qualified Bid. |
| | In the event that the Debtors timely receive two or more Qualified Bids with respect to the same or overlapping Businesses, the Debtors shall conduct one or more Auctions with respect to such Businesses on one or more auction dates.  The Debtors expect to hold Auctions for the Embed Business, the LedgerX Business, the FTX Japan Business and the FTX |

Europe Business, if applicable, at the offices of Sullivan & Cromwell LLP, 125 Broad Street, New York, New York 10004 on the following dates, at times to be determined:

| Business | Auction Date |
|---|---|
| Embed Business | February 21, 2023 |
| LedgerX Business | March 7, 2023 |
| FTX Japan Business | March 21, 2023 |
| FTX Europe Business | March 21, 2023 |

The Debtors may hold the Auction(s) at such other dates and locations as they designate, cancel any scheduled Auction and conduct Auctions for one or more of the Businesses other than as indicated above. In particular, the Debtors may elect not to conduct an Auction with respect to any Business to the extent that the Debtors determine, after consultation with the Consulting Professionals, that there are at least two higher and better Qualified Bids for such Business included in a larger transaction. The date, time and location of any Auction shall be timely communicated to all Qualified Bidders entitled to attend such Auction. Each Auction shall be in accordance with the Bid Procedures and any procedural rules for the conduct of the Auction provided in advance to all Qualified Bidders entitled to attend such Auction.

Only the Debtors, the Consulting Professionals, representatives of the U.S. Trustee and any Qualified Bidder that has submitted a Qualified Bid for the applicable Business(es) (and the legal and financial advisors to each of the foregoing) shall be entitled to attend the Auction(s), along with such other persons as the Debtors may agree. No bidder other than a Qualified Bidder will be entitled to make a bid at the Auction(s). Each Qualified Bidder participating in an Auction must confirm that it (i) has not engaged in any collusion with respect to the bidding or the sale of any of the Businesses; (ii) has reviewed, understands and accepts the Bid Procedures and any procedural rules for the conduct of the Auction described by the Debtors to the Qualified Bidders in advance of the Auction; (iii) has consented to the jurisdiction of the Court and (iv) intends to consummate its Qualified Bid if it is selected as a Successful Bid (as defined below). Each Qualified Bidder participating in an Auction shall appear in person (including virtually, if allowed by the Debtors) at the Auction or through a duly authorized representative. The Debtors may require proof of due authorization of any representative.

The Debtors may employ and announce at the Auction(s), after consultation with the Consulting Professionals, additional procedural

<table>
<tr><td></td><td>rules that are reasonable under the circumstances (<em>e.g.</em>, the amount of time allotted to make Subsequent Bids (as defined below) for conducting the Auction(s), which rules shall constitute an essential part of the Bid Procedures; <u>provided</u> that such rules are (i) not inconsistent with the Bid Procedures Order, the Bankruptcy Code or any other order of the Court entered in connection with the Bid Procedures and (ii) disclosed to each Qualified Bidder participating in the applicable Auction.  After consultation with the Consulting Professionals, the Debtors may establish at any time reasonable bonding or deposit requirements in connection with the Auction(s), and any bidder that fails to comply with such requirements shall cease to constitute a Qualified Bidder.<br><br>The Debtors shall maintain a transcript of all bids made and announced at the Auction(s), including the Starting Bid(s), all Subsequent Bid(s), the Leading Bid(s), the Successful Bid(s) and any Alternate Bid(s) (as defined below).</td></tr>
<tr><td><strong>Starting Bid(s)</strong></td><td>No later than 5:00 p.m. (prevailing Eastern Time) on the day prior to the Auction(s), the Debtors will notify all Qualified Bidders and the Consulting Professionals whether the Auction(s) will occur and if so, provide copies of the Qualified Bid(s) which the Debtors believe, after consultation with the Consulting Professionals, is the highest or otherwise best offer (the "<u>Starting Bid(s)</u>") to all Qualified Bidders for the applicable Business(es).  For each Auction, the Debtors may provide an explanation of how the Starting Bid is valued and a list containing the identification of all Qualified Bidders.</td></tr>
<tr><td><strong>Subsequent Bids</strong></td><td>Bidding at the Auction(s) will begin with the Starting Bid and continue, in one or more rounds of bidding, so long as during each round at least one subsequent bid is submitted by a Qualified Bidder that the Debtors determine, after consultation with the Consulting Professionals, (i) improves upon such Qualified Bidder's immediately prior Qualified Bid (a "<u>Subsequent Bid</u>"); and (ii) such Subsequent Bid or combination of Subsequent Bids is (A) for the first round, a higher or otherwise better offer than the Starting Bid (<u>provided</u> that if the Starting Bid is a Stalking Horse Bid, the bidding will start at an amount equal to the Stalking Horse Overbid), and (B) for subsequent rounds, a higher or otherwise better offer than the Leading Bid (as defined below).  The Debtors shall determine appropriate minimum bid increments or requirements for each round of bidding (the "<u>Minimum Overbid</u>").<br><br>After the first round of bidding and between each subsequent round of bidding, the Debtors shall announce the bid or bids that they believe to be the highest or otherwise best offer or combination of offers (the "<u>Leading Bid</u>").</td></tr>
<tr><td><strong>No Round-Skipping</strong></td><td>To remain eligible to participate in an Auction, each Qualified Bidder must submit a bid in each round of bidding that is higher or otherwise</td></tr>
</table>

| | better than the immediately preceding bid submitted in such round of bidding; to the extent a Qualified Bidder fails to bid at any round of bidding or to submit a bid in each round of bidding that is higher or otherwise better than the immediately preceding bid submitted in such round of bidding, such Qualified Bidder will be disqualified from continuing to participate in the Auction (provided that the Debtors may, at their discretion, allow each Qualified Bidder a "pass" on bidding in one, but not more than one, round of bidding in an Auction). |
|---|---|
| **Successful Bid(s)** | Prior to the conclusion of an Auction, the Debtors will:  (i) review and evaluate each bid made at the Auction on the basis of financial and contractual terms and other factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the transaction; (ii) after consultation with the Consulting Professionals, identify the highest or otherwise best offer(s) (the "Successful Bid(s)") for the Business(es) subject to the Auction; and (iii) notify all Qualified Bidders participating in the Auction of the maker(s) of the Successful Bid(s) (the "Successful Bidder(s)"), and the amount and other material terms of the Successful Bid(s).  The Debtors may, after consultation with the Consulting Professionals, identify the next highest or otherwise best offer(s) (the "Alternate Bid(s)") for the Business(es) subject to the Auction and if so, notify all Qualified Bidders participating in the Auction, prior to its adjournment, of the identity of the party or parties that submitted the Alternate Bid(s) (the "Alternate Bidder(s)").

The Debtors shall file notice of the identity of the Successful Bidder(s) and any Alternate Bidder(s) at the Auction(s), and the amount of the Successful Bid(s) and any Alternate Bid(s) (each such notice, a "Notice of Successful Bidder"), with the Court within one business day following the conclusion of the applicable Auction and shall use their reasonable efforts to obtain Court approval of the Successful Bid(s).

Before the hearing to approve the Sale contemplated by the Successful Bid(s) or Alternate Bid(s), the applicable Debtors shall complete and execute all agreements, instruments or other documents necessary to consummate such Sale.  For the avoidance of doubt, the Debtors shall have no obligation to consummate the transactions contemplated by a Successful Bid or an Alternate Bid until the entry of the applicable Sale Order by the Court in form and substance satisfactory to the Debtors in consultation with the applicable Successful Bidder or Alternate Bidder. |
| **Sale Hearing(s); Sale Objections** | The hearing(s) to consider approval of the Sale(s) (the "Sale Hearing(s)") will be held before the Honorable John T. Dorsey, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Delaware, located at 824 N. Market St, Wilmington, Delaware 19801 on the following dates, at times to be determined, or as |

soon thereafter as the Debtors may be heard:

| Business | Sale Hearing Date |
|---|---|
| Embed Business | February 27, 2023 |
| LedgerX Business | March 13, 2023 |
| FTX Japan Business | March 27, 2023 |
| FTX Europe Business | March 27, 2023 |

The Sale Hearing(s) may be adjourned or modified by the Debtors by an announcement of the adjourned date or modification at a hearing before the Court or by filing a notice on the Court's docket.  If the Debtors do not receive any Qualified Bids, the Debtors will report the same to the Court at the applicable Sale Hearing.  At the Sale Hearing(s), the Debtors will seek approval of the offer(s) constituting the Successful Bid(s) and, at the Debtors' election, the offer(s) constituting any Alternate Bid(s).

Objections to a Sale, including any objection to the sale of the applicable Business(es) free and clear of any liens, claims, interests and encumbrances pursuant to section 363(f) of the Bankruptcy Code (each, a "Sale Objection"), or to entry of the applicable Sale Order, must (i) be in writing and specify the nature of such objection; (ii) state, with specificity, the legal and factual bases thereof; (iii) comply with the Bankruptcy Code, Bankruptcy Rules, Local Rules and all applicable orders of the Court and (iv) be filed with the Court and served on (A) the U.S. Trustee, (B) proposed counsel to the Debtors, (C) counsel to the Committee, (D) counsel for any relevant Stalking Horse Bidder, (E) counsel for any relevant Successful Bidder, (F) counsel for any relevant Alternate Bidder(s) and (G) all parties requesting notice in these Chapter 11 Cases pursuant to Bankruptcy Rule 2002 (collectively, the "Objection Notice Parties"), so as to be received no later than (1) **seven days prior to the applicable Sale Hearing at 4:00 p.m. (prevailing Eastern Time)** (the "Sale Objection Deadline"), or (2) in the event an Auction is conducted, and solely with respect to objections related to the conduct of the Auction or the identity of the Successful Bidder, the earlier of (a) two business days after the Notice of Successful Bidder is filed at 4:00 p.m. (prevailing Eastern Time) and (b) 10:00 a.m. (prevailing Eastern Time) on the day of the Sale Hearing (the "Post-Auction Objection Deadline").

All Sale Objections not resolved by the parties prior thereto will be heard at the applicable Sale Hearing.  The failure of any party to timely file and serve a Sale Objection forever will bar such party from asserting, at the Sale Hearing or thereafter, any objection to the relief

| | |
|---|---|
| | requested in the Motion, or to the consummation of the Sale, including the transfer of the applicable Business(es) to the Successful Bidder, free and clear of any liens, claims, interests and encumbrances pursuant to section 363(f) of the Bankruptcy Code. |
| **Breaching Bidder** | The Debtors' presentation to the Court of the Successful Bid(s) and Alternate Bid(s) will not constitute the Debtors' acceptance of such bid(s), which acceptance will only occur upon the approval of such bid(s) by the Court.  Following the approval of a Sale to a Successful Bidder and, at the Debtors' option, Alternate Bidder(s), if the Successful Bidder fails to consummate such sale because of (i) failure of a condition precedent beyond the control of either the Debtors or the Successful Bidder upon which occurrence the Debtors have filed a notice with the Court advising of such failure or (ii) a breach or failure to perform on the part of such Successful Bidder (such bidder, the "Breaching Bidder") upon which occurrence the Debtors have filed a notice with the Court advising of such breach or failure to perform, then the applicable Alternate Bid will be deemed to be the Successful Bid and the Debtors will be authorized to effectuate the Sale to the applicable Alternate Bidder subject to the terms of the Alternate Bid of such Alternate Bidder without further order of the Court.  If such failure to consummate the Sale is the result of a breach by the Breaching Bidder of its purchase agreement, the Debtors reserve the right to seek and pursue all available remedies against the Breaching Bidder, including, without limitation, the retention of the Good Faith Deposit of the Breaching Bidder as liquidated damages, subject to the terms of the applicable purchase agreement and applicable law. |
| **Highest or Otherwise Best Bid** | Whenever the Bid Procedures refer to the highest or best offer or Qualified Bid, such determination shall take into account any factors the Debtors reasonably deem relevant to the value of the offer or Qualified Bid to the estates and may include, without limitation, the following: (i) the amount and nature of the consideration; (ii) any liabilities or employee, vendor or supplier relationships assumed, excluded or rejected and the impact on the Debtors' estates of same; (iii) the Business(es) the Qualified Bidder seeks to purchase; (iv) the number, type and nature of any changes to the applicable Proposed Purchase Agreement(s) (or Stalking Horse Agreement(s), as applicable) requested by the Qualified Bidder; (v) the extent to which such modifications are likely to delay the closing of the Sale of the Business(es) and the cost to the Debtors of such modification or delay; (vi) the likelihood of the Qualified Bidder being able to close the proposed transaction and the timing thereof, including taking into account any conditions precedent, regulatory approvals and the cost of funds for the Debtors and their stakeholders; (vii) the reputation of the Qualified Bidder; (viii) any potential "know your customer" implications; (ix) the relative complexity of any transaction and the costs of executing such |

| | |
|---|---|
| | transaction and any related transactions it may require in the future; (x) to the extent applicable, the milestones, covenants and events of default arising under the Debtors' debtor-in-possession financing facility and the availability and cost of any necessary modifications; and (xi) the net benefit to the Debtors' estates. |
| **As-Is Where-Is** | The sale of Businesses pursuant to the Bid Procedures shall be on an "as is, where is" basis and without representations or warranties of any kind, nature or description by the Debtors, their agents or their estates, except as provided in any agreement with respect to a Sale approved by the Court.  The Successful Bidder(s) and any Alternate Bidder(s) must acknowledge and agree that neither the Debtors nor any of their advisors, representatives or agents will be liable for or bound by any express or implied warranties, guaranties, statements, representations or information pertaining to the Businesses or relating thereto that the Debtors or any advisor or agent representing or purporting to represent the Debtors might have made or furnished to whomever, directly or indirectly, orally or in writing, unless, with respect to the Debtors only, specifically set forth in the Court's order approving a Sale. |
| **Reservation of Rights; Fiduciary Duties** | The Debtors reserve their rights to modify the Bid Procedures at any time or impose, at or prior to the Auction(s), additional customary terms and conditions on the sale of the Businesses after consultation with the Consulting Parties if the Debtors determine that it will better promote the goals of the bidding process and discharge the Debtors' fiduciary duties and not be inconsistent in any material respect with any Court order (provided that the Debtors may not increase the Bid Protections without further approval of the Court). <br><br> Notwithstanding anything to the contrary contained therein, nothing in the Bid Procedures will prevent the Debtors from exercising their respective fiduciary duties under applicable law. |

20.    The Debtors propose to conduct the sale of the Businesses on the

following timeline:

| Event | Description | Deadline for Embed Business | Deadline for LedgerX Business | Deadline for FTX Japan or FTX Europe Business |
|---|---|---|---|---|
| Preliminary Bid Deadlines | The deadline by which Indications of Interest must be actually received pursuant to the Bid Procedures. | 5:00 p.m. (prevailing Eastern Time) on January 18, 2023 | 5:00 p.m. (prevailing Eastern Time) on January 25, 2023 | 5:00 p.m. (prevailing Eastern Time) on February 1, 2023 |
| Stalking Horse Designation Deadline(s) | The deadline(s) by which the Debtors may designate a Stalking Horse Bid. | Six days prior to the applicable Auction | | |
| Bid Protections Objection Deadline(s) | The deadline(s) by which objections to the Bid Protections must be filed with the Court and served so as to be actually received by the appropriate notice parties. | 4:00 p.m. (prevailing Eastern Time) on the date that is five days after the Debtors designate a Stalking Horse Bid | | |
| Bid Deadlines | The deadlines by which all binding bids must be actually received pursuant to the Bid Procedures. | 5:00 p.m. (prevailing Eastern Time) on February 15, 2023 | 5:00 p.m. (prevailing Eastern Time) on March 1, 2023 | 5:00 p.m. (prevailing Eastern Time) on March 15, 2023 |
| Sale Objection Deadline(s) | The deadline(s) by which Sale Objections (other than those that may be raised post-Auction, if applicable) must be filed with the Court and served so as to be actually received by the appropriate notice parties. | 4:00 p.m. (prevailing Eastern Time) on the date that is seven days prior to the applicable Sale Hearing | | |
| Contract Objection Deadlines | The deadlines by which Contract Objections (as defined below) must be filed with the Court and served so as to be actually received by the appropriate notice parties. | The later of (i) the applicable Sale Objection Deadline and (ii) 14 days following the service of a Contract Notice; provided that objections to the adequate assurance of future performance may be filed with the Court and served on the Objection Notice Parties no later than the applicable Post-Auction Objection Deadline. | | |
| Auction(s) | The date and time of the Auction(s), if needed, which will be held at the offices of Sullivan & Cromwell LLP, 125 Broad Street, New York, New York 10004 or at such other location as the Debtors designate. | February 21, 2023, at a time to be determined | March 7, 2023, at a time to be determined | March 21, 2023, at times to be determined |
| Notice of Successful Bidder Deadline(s) | Deadline(s) to file notice of the identity of the Successful Bidder(s) at the Auction(s), and the amount of the Successful Bid(s), with the Court. | Within one business day of the conclusion of each Auction | | |
| Post-Auction Objection Deadline(s) | The deadline(s) by which objections related to the conduct of the Auction(s) or the identity of the Successful Bidder(s) must be filed with the Court and served so as to be actually received by the appropriate notice parties. | The earlier of two business days after the Debtors file a Notice of Successful Bidder and 10:00 a.m. (prevailing Eastern Time) on the day of the applicable Sale Hearing | | |

| Sale Hearing(s) | The hearing(s) before the Court to consider the approval of the Successful Bid(s), pursuant to which the Debtors and the Successful Bidder(s) will consummate the Sale(s). | February 27, 2023, at a time to be determined | March 13, 2023, at a time to be determined | March 27, 2023, at times to be determined |
|---|---|---|---|---|

21.     The Debtors request that the Court waive the requirements in Local Rule 6004-1(c)(ii) that the Auction(s) be conducted openly and all creditors be permitted to attend the Auction(s).  The Debtors have hundreds of thousands, if not over one million, creditors and other parties-in-interest.  Moreover, as the Court has noted, these Chapter 11 Cases have generated a "great deal of public interest and publicity."  *First Day Hearing Transcript* [D.I. 142] (Nov. 22, 2022 Hr'g Tr. at 6:5–6).  Given the unique circumstances of these Chapter 11 Cases, the Debtors submit that limiting attendance at the Auction(s) to the Debtors, the Consulting Professionals, representatives of the U.S. Trustee and any Qualified Bidder that has submitted a Qualified Bid for the applicable Business(es) (and the legal and financial advisors to each of the foregoing) as set forth in the Bid Procedures is appropriate.

**II.     Proposed Noticing Procedures.**

22.     The Bid Procedures and the Bid Procedures Order provide the following noticing procedures (collectively, the "Noticing Procedures"):

A.     Notice of the Auction(s), Sale Objection Deadline(s) and Sale Hearing(s).

23.     Within three business days after entry of the Bid Procedures Order, or as soon as reasonably practicable thereafter, the Debtors shall serve the Sale Notice by first-class mail (and/or by email, as applicable) upon the following parties or, in lieu thereof, their counsel, if known:  (a) the U.S. Trustee; (b) the Committee; (c) the SEC; (d) all taxing authorities having jurisdiction over the Businesses, including the Internal Revenue Service; (e) the United States Department of Justice; (f) the United States Attorney for the District of Delaware; (g) the CFTC; (h) all persons and entities known by the Debtors to have expressed interest to the Debtors in

-28-

acquiring all or a material portion of any of the Businesses during the past 12 months; (i) all persons and entities known by the Debtors to have asserted any lien, claim, interest or encumbrance on, in, to or against the Businesses (for whom identifying information and addresses are available to the Debtors); (j) the attorneys general for the states in which the Debtors conduct business; (k) the JFSA; (l) the Kanto Local Finance Bureau (*Kanto Zaimu Kyoku*); (m) FINRA; (n) CySEC; (o) FINMA; (p) any other applicable governmental entities; (q) the parties identified on the Debtors' consolidated lists of 50 largest unsecured creditors; and (r) any other party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "Sale Notice Parties").  On or about the same date, the Debtors shall publish the Sale Notice on the Debtors' case information website (located at https://restructuring.ra.kroll.com/FTX).  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be provided.

        B.      Notice of Auction Results.

        24.      The Debtors shall file notice of the identity of the Successful Bidder(s) and any Alternate Bidder(s) at the Auction(s), and the amount of the Successful Bid(s) and any Alternate Bid(s), with the Court within one business day of the conclusion of the applicable Auction and shall use their reasonable efforts to obtain Court approval of the Successful Bid(s).

        25.      The Debtors submit that the Noticing Procedures constitute adequate and reasonable notice of the key dates and deadlines for the sale process, including, among other things, the Bid Deadlines, the Sale Objection Deadline(s), the Post-Auction Objection Deadline(s) and the time and location of the Auction(s) and Sale Hearing(s).  Accordingly, the Debtors request that the Court find that the Noticing Procedures are adequate and appropriate under the circumstances and comply with the requirements of Bankruptcy Rule 2002 and Local Rule 2002-1.

III.    **Procedures for Assumption and Assignment of Executory Contracts and Unexpired Leases.**

26.    In connection with the Sale(s) contemplated by this Motion, the Debtors anticipate that they may assume and assign to the Successful Bidder(s) (or their designated assignee(s)) certain executory contracts and unexpired leases pursuant to section 365 of the Bankruptcy Code as applicable for any of the Businesses.  Accordingly, the Debtors propose that the assumption and assignment of executory contracts and unexpired leases in connection with the Sale(s) be subject to the following Assumption and Assignment Procedures and request that the Assumption and Assignment Procedures be approved by the Court pursuant to the Bid Procedures Order:

a.    On or before February 6, 2023, the Debtors will file with the Court and serve by first-class mail (and/or by email, as applicable) a notice, substantially in the form attached as Exhibit 3 to the Bid Procedures Order (each, an "Initial Assignment Notice") on each Counterparty to those certain executory contracts and unexpired leases that the Debtors may, in their discretion, assume and assign to a Successful Bidder in connection with a Sale (each, an "Assumed Contract"); provided that no notice will be filed or served if there are no executory contracts or unexpired leases that the Debtors seek to assume and assign in connection with a Sale.

b.    The Initial Assignment Notice served on a Counterparty shall (i) identify each Assumed Contract then applicable to such Counterparty, (ii) set forth the proposed amount (the "Cure Amount") necessary to cure any default under the relevant Assumed Contract pursuant to section 365 of the Bankruptcy Code and (iii) inform such Counterparty of the requirement to file and duly serve any Contract Objections (as defined below) no later than applicable Contract Objection Deadline (as defined below).

c.    If, following service of the Initial Assignment Notice, the Debtors identify additional executory contracts and unexpired leases for assumption and assignment in connection with the Sale(s) ("Additional Assumed Contracts," and, together with the Assumed Contracts, the "Assumed Debtor Contracts") or any previously proposed Cure Amounts are modified, the Debtors may file with the Court and serve by first-class mail (and/or by email, as applicable) a notice (a "Further Assignment Notice," and, together with the Initial Assignment Notices, the "Contract Notices") on each impacted Counterparty.  Further Assignment Notices shall contain the same information as the Initial Assignment Notice. Further Assignment Notices may be filed and served at any time up to the 30th day following the closing of any applicable Sale.

-30-

d.      Service of the Contract Notices does not constitute an admission that an Assumed
        Debtor Contract is an executory contract or unexpired lease, or confirm that the
        Debtors are required to assume and assign such Assumed Debtor Contract.

e.      Objections (the "Contract Objections"), if any, to (a) the proposed Cure Amount,
        (b) the proposed assumption and assignment of the Assumed Debtor Contracts,
        (c) the adequate assurance of future performance or (d) whether applicable law
        excuses a Counterparty from accepting performance by, or rendering performance
        to, the Successful Bidder must (i) be in writing; (ii) state with specificity the
        nature of such objection and, if disputed, the alleged Cure Amount and any and all
        defaults that must be cured or satisfied in order for such Assumed Debtor
        Contract to be assumed and assigned (with appropriate documentation in support
        thereof); (iii) comply with the terms of these Assumption and Assignment
        Procedures, the Bankruptcy Rules and the Local Rules; and (iv) be filed with the
        Court and properly served on the Objection Notice Parties.

f.      The Counterparty will have until the later of (i) the applicable Sale Objection
        Deadline and (ii) 14 days following the service of a Contract Notice to file and
        duly serve a Contract Objection; provided that objections to the adequate
        assurance of future performance provided by a Successful Bidder may be filed
        with the Court and served on the Objection Notice Parties no later than the
        applicable Post-Auction Objection Deadline (the "Contract Objection
        Deadlines").  The Debtors may in their discretion extend the Contract Objection
        Deadlines one or more times without further notice.

g.      If no objections are received by the applicable Contract Objection Deadline with
        respect to an Assumed Debtor Contract, then the applicable Counterparty shall be
        deemed to have consented to the assumption and assignment of such Assumed
        Debtor Contract and the proposed Cure Amount shall be binding on the applicable
        Counterparty for all purposes and will constitute a final determination of the total
        Cure Amount required to be paid in connection with the assumption and
        assignment of such contract.  The Debtors may then submit to the Court a form of
        order (an "Approval Order") authorizing the assumption and assignment of such
        Assumed Debtor Contract.  Upon entry of an Approval Order with respect to the
        assumption and assignment of an Assumed Debtor Contract, any and all
        previously filed Contract Objections with respect thereto shall be deemed
        overruled.

h.      Any Counterparty who fails to timely file and properly serve a Contract Objection
        (i) will be deemed to have forever waived and released any Contract Objection
        and consented to the assumption and assignment of such Assumed Debtor
        Contract on the terms set forth in the applicable Contract Notice, subject to the
        occurrence of the closing of the applicable Sale, and (ii) will be barred and
        estopped forever from asserting or claiming against the Debtors or the Successful
        Bidder that any additional amounts are due or defaults exist, or conditions to
        assignment must be satisfied, under such Assumed Debtor Contract.

i.       If a Contract Objection is timely filed and properly served in accordance with these Assumption and Assignment Procedures, the Debtors and the Counterparty shall meet and confer in good faith to attempt to resolve any such objection without Court intervention.  If the parties determine that the Contract Objection cannot be resolved in a timely manner without judicial intervention, the Court shall make all necessary determinations relating to such Contract Objection at the applicable Contract Hearing (as defined below).

j.       A hearing with respect to Contract Objections to the Initial Assignment Notice or adequate assurance of future performance provided by a Successful Bidder shall be held at the applicable Sale Hearing or at such other earlier or later date prior to the closing of the applicable Sale as the Court may designate (the "Initial Contract Hearing").  Hearings with respect to Contract Objections to any Further Assignment Notices may be held on such dates as the Court may designate (each, an "Additional Contract Hearing," and, together with the Initial Contract Hearing, each, a "Contract Hearing").  Upon resolution of a Contract Objection, provided that neither the Debtors nor the applicable Successful Bidder have determined to exclude the relevant contract from the applicable Sale, and upon payment of the applicable cure amount, if any, the contract will be deemed assumed and assigned to the applicable Successful Bidder as of the closing date of the applicable Sale.  If the Court determines at a Contract Hearing that a particular Assumed Debtor Contract cannot be assumed and assigned for any reason, then such Assumed Debtor Contract shall no longer be considered an Assumed Debtor Contract.

## Basis for Relief

I.    **Approval of the Bid Procedures Is Fair, Appropriate and in the Best Interests of the Debtors' Estates and Their Stakeholders.**

27.    The Bid Procedures are specifically designed to promote what courts have deemed to be the paramount goal of any proposed sale of property of a debtor's estate: maximizing the value of sale proceeds received by the estate.  *See In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004) (finding that a debtor had a fiduciary duty to maximize the value of the estate's assets); *Official Comm. of Unsecured Creditors of Cybergenics Corp.* v. *Chinery*, 330 F.3d 548, 573 (3rd Cir. 2003) (same); *Four B. Corp.* v. *Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 564–65 (8th Cir. 1997) (recognizing the paramount goal of any proposed sale of property of estate is to maximize value).

28.     Courts uniformly recognize that procedures established for the purpose of enhancing competitive bidding are consistent with the fundamental goal of maximizing the value of a debtor's estate.  *See Calpine Corp.* v. *O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 536–37 (3d Cir. 1999) (noting that bidding procedures that promote competitive bidding provide a benefit to a debtor's estate); *In re Psychrometric Sys., Inc.*, 367 B.R. 670, 676 (Bankr. D. Colo. 2007) (recognizing the "strong policy favoring competitive bidding" for sales in bankruptcy proceedings) (citations omitted).

29.     The Bid Procedures provide for an orderly, uniform and appropriately competitive process through which interested parties may submit offers to purchase the Businesses.  The Debtors, with the assistance of their advisors, have structured the Bid Procedures to promote active bidding by interested parties and to obtain the highest or otherwise best offer(s) reasonably available for the Businesses.  Additionally, the Bid Procedures will allow the Debtors to conduct the Auction(s) in a fair and transparent manner that will encourage participation by financially capable bidders with demonstrated ability to consummate a timely sale.  Courts in this district have approved procedures similar to the Bid Procedures*. See, e.g.*, *In re Armstrong Flooring, Inc.*, No. 22-10426 (MFW) (May 31, 2022), D.I. 233; *In re Ector Cnty. Energy Ctr., LLC*, No. 22-10320 (JTD) (May 6, 2022), D.I. 136, *In re American Eagle Del. Holding Co., LLC*, No. 22-10028 (JKS) (Feb. 11, 2022), D.I. 147; *In re RTI Holding Co., LLC*, No. 20-12456 (JTD) (Nov. 20, 2020), D.I. 585; *In re Valeritas Holdings, Inc.*, No. 20-10290 (LSS) (Mar. 6, 2020), D.I. 129; *In re Celadon Grp., Inc.*, No. 19-12606 (KBO) (Jan. 6, 2020), D.I. 218.  Accordingly, the Bid Procedures should be approved because, under the circumstances, they are reasonable, appropriate and in the best interests of the Debtors and their estates and stakeholders.

II.     **The Bid Protections That May Be Granted to a Stalking Horse Bidder Should Be Approved.**

30.     The Bid Procedures provide that the Debtors may, after consultation with the Consulting Professionals, at any time prior to the applicable Stalking Horse Designation Deadline, (a) designate a Qualified Bid as a Stalking Horse Bid and execute a purchase agreement with the applicable Stalking Horse Bidder; and (b) grant the Bid Protections to the Stalking Horse Bidder of a cash break-up fee equal to up to 3.0% of the Stalking Horse Purchase Price and the reimbursement of reasonable and documented out-of-pocket expenses in an amount up to 0.5% of the Stalking Horse Purchase Price; provided that the Expense Reimbursement Amount will not exceed $1,250,000 for any individual Business.  The Bid Protections will be payable solely from the proceeds of a successful topping bid that is consummated, and shall not be payable to a Stalking Horse Bidder under any other circumstance.  While the Debtors are not committed to selecting a Stalking Horse Bidder or offering the Bid Protections at this time, the Debtors request the Court authorize the Bid Protections because the Debtors believe that, in appropriate circumstances, the presence and availability of one or more Stalking Horse Bidders will benefit all stakeholders.  The Debtors seek to utilize such authority only in their discretion if the Debtors determine in their business judgment that the Bid Protections likely will facilitate a competitive sale process and after consultation with the Consulting Professionals and an opportunity for the Committee and the U.S. Trustee to object.  Such Bid Protections shall then be deemed approved pursuant to the Bid Procedures Order and may be paid solely from the proceeds of a successful topping bid without further action or order by the Court.

31.     Approval of bid protections in connection with sales pursuant to section 363 of the Bankruptcy Code has become an established practice in chapter 11 cases.  Bid protections enable a debtor to ensure a sale to a contractually committed bidder at a price the

debtor believes is fair, while also providing the debtor with the potential of obtaining an enhanced recovery through an auction process wherein that fair price serves as the floor for other bids.  The Third Circuit has held that even though bidding incentives are measured against a business judgment standard in non-bankruptcy transactions, the administrative expense provisions of section 503(b) of the Bankruptcy Code govern in the bankruptcy sale context.  Accordingly, when a stalking horse bidder seeks approval of its costs and fees, bidding incentives must provide an actual benefit to a debtor's estate and be necessary to preserve the value of estate assets.  *In re O'Brien Envtl. Energy, Inc.*, 181 F.3d at 533–35; *see also In re Reliant Energy Channelview LP*, 594 F.3d 200, 206–07 (3d Cir. 2010) (holding that the business judgment rule may not be used as an alternative to the administrative expenses section of the Bankruptcy Code as a basis for approving certain bid protections).  Whether a proposed break-up fee benefits the estate depends on the "totality of the circumstances" and ultimately requires "a judgment call about whether the proposed fee's potential benefits to the estate outweigh any potential harms."  *In re Energy Future Holdings Corp.*, 904 F.3d 298, 314 (3d Cir. 2018).

32.     The Third Circuit has identified several instances in which bid protections in the form of break-up fees and expense reimbursements may be necessary to preserve the value of estate assets.  First, a break-up fee or expense reimbursement may be necessary to preserve the value of a debtor's estate if assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited."  *In re O'Brien Envtl. Energy, Inc.*, 181 F.3d at 537.  Second, "if the availability of break-up fees and expenses were to induce a bidder to research the value of the debtor and convert the value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the

debtor is sold will reflect its true worth." *Id.*  Finally, such bid protections could preserve an estate's value by "assuring that a bidder 'adhered to its bid rather than abandoning its attempt to purchase . . . in the event that the Bankruptcy Court required an auction for [the] sale' of the relevant asset." *In re Energy Future Holdings Corp.*, 904 F.3d at 314 (quoting *In re Reliant Energy Channel View LP*, 594 F.3d at 207).

        33.    The Bid Protections will be necessary to preserve the value of the Debtors' estates, as their potential benefits to the estates will outweigh any potential harms such as deterring other bids.  *See In re Energy Future Holdings Corp.*, 904 F.3d at 314.  The Debtors, in exercising their business judgment, will award the Bid Protections to one or more Stalking Horse Bidders as appropriate to induce bidding for the applicable Business(es).  The Bid Protections will enable the Debtors to secure an adequate floor for the applicable Business(es) and ensure that competing bids be materially higher or otherwise better than the Stalking Horse Bid—a clear benefit to the Debtors' estates.  Moreover, it is likely that a prospective Stalking Horse Bidder would not agree to act as a stalking horse without the Bid Protections, particularly given the time and money that will necessarily have been expended by a Stalking Horse Bidder.  Without the Court authorizing the Debtors to offer the Bid Protections, the Debtors might lose the opportunity to obtain the highest or otherwise best offer(s) for the Businesses, and would lose the downside protection provided by the existence of one or more Stalking Horse Bidders.  Under the Bid Procedures, the Debtors have flexibility to designate the same bidder as the Stalking Horse Bidder for more than one Business, whether such bidder has submitted individual bids for each Business or a combined bid for multiple Businesses.  The Bid Protections may only be paid out of the proceeds of consummation of a topping bid, ensuring that the Debtors would not pay any amounts related to incentivizing a bidder to act as a Stalking Horse Bidder directly from

assets of the estates and therefore reducing the possibility of harm to the estates.  The Bid

Protections also may only be awarded to one Stalking Horse Bid for each Business.  Moreover,

the Debtors shall consult with the Consulting Professionals as to whether it is appropriate to

award the Bid Protections to any Stalking Horse Bidder and if the Committee or the U.S. Trustee

believes such award does not appropriately benefit the estates, the Bid Procedures permit the

Committee or the U.S. Trustee to involve this Court promptly before any Bid Protections are

awarded.

        34.     Courts in this district have approved protections similar to the proposed

Bid Protections as reasonable and consistent with the type and range of bidding protections

typically approved.  *See, e.g.*, *In re Armstrong Flooring, Inc.*, No. 22-10426 (MFW) (May 31,

2022), D.I. 233 (authorizing debtors to grant break-up fee and expense reimbursement amount in

the aggregate not to exceed 3% of the cash portion of the purchase price); *In re Ector Cnty.

Energy Ctr., LLC*, No. 22-10320 (JTD) (May 6, 2022), D.I. 136 (approving break-up fee of 3%

of the stalking horse bid plus expense reimbursements of up to 0.5% of the stalking horse bid);

*In re Valeritas Holdings, Inc.*, No. 20-10290 (LSS) (Mar. 6, 2020), D.I. 129 (approving a break-

up fee of up to 3% of the purchase price and expense reimbursement of up to $1 million); *In re

Celadon Grp., Inc.*, No. 19-12606 (KBO) (Jan. 6, 2020), D.I. 218 (authorizing the debtors to

grant a break-up fee of up to 3% of the purchase price and an expense reimbursement of up to

1.5% of the purchase price).

        35.     Accordingly, the Debtors submit that the Bid Protections will be necessary

to preserve the value of the estates, are fair and are appropriate under the circumstances, and

therefore should be approved.

**III.    The Proposed Sale Satisfies the Requirements of Section 363 of the Bankruptcy Code.**

36.    Section 363 of the Bankruptcy Code provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Section 363 does not provide a standard establishing when it is appropriate for bankruptcy courts to authorize the sale of a debtor's assets. Courts in this district, however, have held that such a sale may be authorized under section 363 of the Bankruptcy Code if the Court finds a "sound business purpose" for the sale. *See Dai-Ichi Kangyo Bank, Ltd.* v. *Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999) (citing *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983)) (citations omitted); *Culp* v. *Stanziale (In re Culp)*, 550 B.R. 683, 697 (D. Del. 2015), *appeal dismissed*, 681 Fed. Appx. 140 (3d Cir. 2017). In evaluating whether a sale under section 363 is justified by a sound business purpose, courts consider a variety of factors which essentially amount to a business judgment test. *See In re Culp*, 550 B.R. at 697 (citing *In re Montgomery Ward Holding Corp.*, 242 B.R. at 153). In Delaware, the business judgment rule is a "presumption that directors act in good faith, on an informed basis, honestly believing that their action is in the best interests of the company." *Stanizale* v. *Nachtomi (In re Tower Air, Inc.)*, 416 F.3d 229, 238 (3d Cir. 2005) (citing *Aronson* v. *Lewis*, 473 A.2d 805, 812 (Del. 1984)); *see also In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (holding that Delaware's business judgment rule principles have "vitality by analogy" in chapter 11).

37.    Courts have considered the following factors in determining whether a proposed sale satisfies this standard: (a) whether a sound business justification exists for the sale; (b) whether adequate and reasonable notice of the sale was provided to interested parties; (c) whether the sale will produce a fair and reasonable price for the property and (d) whether the

parties have acted in good faith.  *See In re Decora Indus., Inc.*, No. 00-4459 (JJF), 2002 WL

32332749, at *2 (D. Del. May 20, 2002) (citing *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 176

(D. Del. 1991)); *see also In re Elpida Memory, Inc.*, No. 12-10947 (CSS), 2012 Bankr. LEXIS

5367, at *18 (Bankr. D. Del. Nov. 16, 2012).

A.   The Proposed Sale of the Businesses Is Justified by Good and Sound Business Justification.

38.   A sound business purpose for the sale of a debtor's assets outside the

ordinary course of business exists where such sale is necessary to maximize and preserve the

value of the estate for the benefit of creditors and interest holders.  *See, e.g.*, *In re Mushroom

Transp. Co.*, 382 F.3d at 339 (finding that a debtor had a fiduciary duty to protect and maximize

the value of the estate's's assets); *In re Lionel Corp.*, 722 F.2d at 1071; *In re Food Barn Stores,

Inc.*, 107 F.3d at 564–65.

39.   As set forth above, a strong business justification exists for the sale of

each of the Businesses to preserve and maximize the value of such assets.  A sale of the

Businesses through a competitive process and efficient timeline set forth in the Bid Procedures

could be critical to maximizing the value of the Businesses and recoveries for the Debtors'

stakeholders.

B.   The Noticing Procedures Are Reasonable and Appropriate.

40.   The Noticing Procedures described herein are reasonably calculated to

provide all of parties interested in the Businesses and parties with potential liens and claims in

the Businesses with adequate and timely notice of, among other things, the proposed Sale(s), Bid

Procedures, Auction(s) and Sale Hearing(s).

C.     The Proposed Sale Will Produce a Fair and Reasonable Purchase Price for the
        Businesses.

        41.     The Bid Procedures are designed to produce a fair and reasonable

purchase price for the Businesses.

        42.     Specifically, the ability to include one or more Stalking Horse Bidders is

designed to facilitate a robust and competitive bidding process.  The Debtors are in a position to

commence a competitive bidding process to maximize the value of the Businesses sold at the

Auction(s).  The Bid Procedures provide an appropriate framework for the Debtors to review,

analyze and compare all bids received to determine which bids are in the best interests of the

Debtors' estates and their stakeholders, while allowing the Debtors appropriate discretion to

determine the Successful Bidder(s).  Furthermore, the Debtors intend to ensure that any sale of

the Businesses reflects their fair market value by continuing, with the assistance of PWP, to

actively and robustly market the Businesses up until the applicable Bid Deadlines.  A sale

governed by the Bid Procedures will ensure not only that fair and reasonable value will be

received pursuant to any sale but that the purchase price will be the highest or best under the

circumstances, benefiting all parties-in-interest in these Chapter 11 Cases.

D.     The Successful Bidder Should Be Entitled to the Good Faith Protections of
        Section 363(m) of the Bankruptcy Code.

        43.     Section 363(m) of the Bankruptcy Code protects a good faith purchaser's

interest in property purchased from the debtor notwithstanding that authorization of the sale

conducted under section 363(b) is later reversed or modified on appeal.  Specifically, section

363(m) provides, in relevant part, as follows:

> The reversal or modification on appeal of an authorization under
> [section 363(b)] . . . does not affect the validity of a sale . . . to an
> entity that purchased . . . such property in good faith, whether or
> not such entity knew of the pendency of the appeal, unless such
> authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m).

44.     Section 363(m) "reflects the . . . 'policy of not only affording finality to the judgment of the bankruptcy court, but particularly to give finality to those orders and judgments upon which third parties rely.'" *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986) (quoting *Hoese Corp.* v. *Vetter Corp. (In re Vetter Corp.)*, 724 F.2d 52, 55 (7th Cir. 1983)); *see also United States* v. *Salerno*, 932 F.2d 117, 123 (2d Cir. 1991) (noting that section 363(m) furthers the policy of finality in bankruptcy sales and "assists bankruptcy courts in maximizing the price for assets sold in such proceedings").

45.     While the Bankruptcy Code does not define "good faith," the Third Circuit has held that "the phrase encompasses one who purchases in 'good faith' and for 'value.'" *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d at 147.  To constitute lack of good faith, a purchaser's conduct in connection with a sale must usually amount to "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *Id.* (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)) (citations omitted).  Due to the absence of a bright-line test for good faith, the determination is based on the facts of each case, with a focus on the "integrity of [a bidder's] conduct in the course of the sale proceedings." *See id.*; *see also Pursuit Capital Mgmt. Fund I, L.P.* v. *Burtch (In re Pursuit Capital Mgmt., LLC)*, 874 F.3d 124, 135 (3d Cir. 2017).

46.     The selection of the Successful Bidder(s) will be a product of arm's-length and good faith negotiations.  Furthermore, the Bid Procedures are designed to produce a fair and transparent competitive bidding process.  Each Qualified Bidder participating in an Auction must confirm that it has not engaged in any collusion with respect to the bidding or the sale of any of the Businesses.  *See* Bid Procedures § 4(a).  In addition, parties participating in the bidding

process for the Businesses are required to disclose their relationships with the Debtors and the

Debtors' current or former officers and directors. *See* Bid Procedures § 1(a).

47.     Based on the foregoing, the Debtors request that the Court determine that

each Successful Bidder is a good faith purchaser entitled to the protections of section 363(m) of

the Bankruptcy Code.

## IV.   The Sale of the Businesses Should Be Free and Clear of Liens, Claims, Interests and Encumbrances Under Section 363(f) of the Bankruptcy Code.

48.     In the interest of attracting the best offers, the Debtors request

authorization to sell the Businesses free and clear of any liens, claims, encumbrances and other

interests in accordance with section 363(f) of the Bankruptcy Code, with any such liens, claims,

encumbrances and other interests attaching to the proceeds of the sale of the Businesses.

49.     The sale of estate property free and clear of any interest is governed by

section 363(f) of the Bankruptcy Code, which provides:

> The trustee may sell property under subsection (b) or (c) of this
> section free and clear of any interest in such property of an entity
> other than the estate, only if—
>
> (1)     applicable nonbankruptcy law permits sale of such property
>         free and clear of such interest;
> (2)     such entity consents;
> (3)     such interest is a lien and the price at which such property
>         is to be sold is greater than the aggregate value of all liens
>         on such property;
> (4)     such interest is in bona fide dispute; or
> (5)     such entity could be compelled, in a legal or equitable
>         proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

50.     Section 363(f) of the Bankruptcy Code is drafted in the disjunctive:

approval of a proposed sale of assets free and clear of interests requires only that one of the five

requirements be satisfied with respect to each such interest. *See In re Kellstrom Indus., Inc.*,

282 B.R. 787, 793 (Bankr. D. Del. 2002) ("Section 363(f) is written in the disjunctive, not the

conjunctive, and if any of the five conditions are met, the debtor has the authority to conduct the

sale free and clear of all liens.") (citation omitted).

51.    Furthermore, section 105(a) of the Bankruptcy Code grants the Court

broad discretionary powers, providing that "[t]he Court may issue any order, process or

judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."

11 U.S.C. § 105(a).  This equitable power may be utilized to effectuate the provisions of section

363(f).  *See, e.g.*, *In re Trans World Airlines, Inc.*, No. 01-0056 (PJW), 2001 WL 1820325

(Bankr. D. Del. 2001), at *8 (highlighting bankruptcy courts' equitable authority to authorize

sale of estate assets free and clear).

52.    One or more of the standards set forth in section 363(f)(1)–(5) of the

Bankruptcy Code will apply to each creditor or to each claim or interest in the Businesses

asserted by such creditor.  All parties-in-interest will have sufficient opportunity to object to the

relief requested in this Motion, and parties that do not object or withdraw their objections to a

Sale or to this Motion should be deemed to have consented to the Motion and Sale within the

meaning of section 363(f)(2) of the Bankruptcy Code.  *See, e.g.*, *Hargrave* v. *Twp. of Pemberton*

(*In re Tabone, Inc.*), 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (failure to object to sale free and

clear of liens, claims and encumbrances satisfies section 363(f)(2)) (citations omitted); *In re*

*BSA*, 642 B.R. 504, 569 (Bankr. D. Del. 2022) (citing *In re Tabone, Inc.*, 175 B.R. at 858).  With

respect to any party that objects to a Sale and does not withdraw such objection, the Debtors

expect that they will be able to satisfy one or more of the other conditions set forth in section

363(f).

53.     A sale of the Businesses free and clear of claims and interests is necessary to maximize the value of bids to acquire the Businesses.  If the Businesses are not sold free and clear of claims and interests, or if the Successful Bidder(s) would, or in the future could, be liable for any such claim or interest, the Debtors would be unable to successfully market the Businesses without a significant reduction in price.  Such a sale would provide substantially less value and certainty for the Debtors' estates.

54.     Furthermore, any lien or claim on, in, to or against the Businesses existing immediately prior to the sale will attach to the sale proceeds with the same validity, priority, force and effect as it had at such time, subject to the rights and defenses of the Debtors or any party-in-interest.  The Debtors submit that holders of any claim or interest will be sufficiently protected by the availability of the proceeds of the sale to satisfy their claims and interests. Accordingly, the Debtors submit that a Sale, if consummated, that is free and clear of claims and interests is in the best interests of the Debtors' estates and stakeholders.

## V.    The Assumption and Assignment Procedures and the Assumption and Assignment of Executory Contracts and Unexpired Leases Should Be Approved.

55.     Section 365 of the Bankruptcy Code provides that a debtor-in-possession may generally assume and assign any executory contract or unexpired lease of the debtor, subject to approval of the court, if it:  (a) cures, or provides adequate assurance that it (or its assignee) will promptly cure, the applicable defaults and (b) provides adequate assurance of future performance under such contract or lease, including by its assignee.  11 U.S.C. § 365.  Courts employ the business judgment standard in determining whether to approve a debtor's decision to assume or reject an executory contract or unexpired lease.  *See, e.g.*, *Mission Prod. Holdings* v. *Tempnology, LLC*, 139 S. Ct. 1652, 1658 (2019) (noting that a bankruptcy court will generally approve a debtors' choice to assume or reject an executory contract under the deferential

business judgment rule) (citation omitted); *In re HQ Global Holdings, Inc.*, 290 B.R. 507, 511

(Bankr. D. Del. 2003) (holding that a debtor's decision to reject an executory contract "is

governed by the business judgment standard" and "can only be overturned if the decision was the

product of bad faith, whim or caprice") (citations omitted).  The "business judgment" test in this

context only requires that a debtor demonstrate that assumption or rejection of an executory

contract or unexpired lease benefits the estate.  *See Sharon Steel Corp.* v. *Nat'l Fuel Gas*

*Distribution Corp.*, 872 F.2d 36, 40 (3d Cir. 1989).

56.     Assuming and assigning the Assumed Debtor Contracts to the Successful

Bidder(s) pursuant to the Assumption and Assignment Procedures is an appropriate exercise of

the Debtors' business judgment.  In the event of a Sale, the applicable Assumed Debtor

Contracts will no longer have any value to the Debtors.  By assuming and assigning the Assumed

Debtor Contracts to the Successful Bidder(s), the Debtors will be able to maximize the value of

the applicable Sale to their estates, while avoiding any damages claims that would arise from the

rejection of the Assumed Debtor Contracts.  The Debtors therefore submit that the assumption

and assignment to the Successful Bidder(s) of the Assumed Debtor Contracts is an appropriate

exercise of the Debtors' business judgment and should be approved.

57.     The consummation of any Sale involving the assignment of an Assumed

Debtor Contract will be contingent upon the Debtors' compliance with the requirements of

section 365 of the Bankruptcy Code.  Section 365(b)(1) requires that any outstanding defaults

under the contract or lease to be assumed be cured or that the Debtors provide adequate

assurance that such defaults will be promptly cured.  11 U.S.C. § 365(b)(1).  The Debtors'

assumption and assignment of Assumed Debtor Contracts will be contingent upon payment or

reserve of Cure Amounts and effective only upon the closing of an applicable Sale.  As set forth

above, the Debtors propose to file with the Court and serve on each Counterparty Contract Notices, which will set forth the Debtors' good faith calculations of Cure Amounts with respect to each Assumed Debtor Contract listed on such notice.  Counterparties will have the opportunity to file any objections to the proposed assumption of their respective Assumed Debtor Contract.

58.    Additionally, pursuant to section 365(f)(2) of the Bankruptcy Code, a debtor may assign an executory contract or unexpired lease only if "adequate assurance of future performance by the assignee of such contract or lease is provided."  11 U.S.C. § 365(f)(2).  The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction."  *See In re Fleming Cos.*, 499 F.3d 300, 307 (3d Cir. 2007) (citing *Cinicola* v. *Scharffenberger*, 248 F.3d 110, 120 n.10 (3d Cir. 2001)); *see also In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.") (citation omitted).  Among other things, adequate assurance may be provided by evidencing the assignee's financial health and experience in managing the type of enterprise or property assigned.  *See In re Bygaph, Inc.*, 56 B.R. 596, 605–06 (Bankr. S.D.N.Y. 1986) (finding adequate assurance of future performance where prospective assignee of lease has financial resources and expressed willingness to devote sufficient funding to business to give it strong likelihood of succeeding).

59.    As set forth in the Bid Procedures, for a bid to qualify as a "Qualified Bid," a Potential Bidder must include information regarding its ability to perform under applicable Assumed Debtor Contracts.  Any objections to any Successful Bidder's proposed form of adequate assurance of future performance must be raised by the applicable Post-Auction Objection Deadline and resolved prior to or at the applicable Sale Hearing.  Thus, adequate

assurance of future performance will be provided prior to the assumption and assignment of Assumed Debtor Contracts.

60.    In addition, to facilitate the assumption and assignment of Assumed Debtor Contracts, the Debtors further request that the Court find that all applicable anti-assignment provisions, whether such provisions expressly prohibit or have the effect of restricting or limiting assignment of such contract or lease, to be unenforceable and prohibited pursuant to section 365(f) of the Bankruptcy Code.  Section 365(f)(1) provides in part that, "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease . . . ."  11 U.S.C. § 365(f)(1).  Section 365(f)(3) further provides that:

> Notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee.

11 U.S.C. § 365(f)(3).

61.    Based on the foregoing, the Assumption and Assignment Procedures and the Debtors' assumption and assignment of the Assumed Debtor Contracts satisfy the requirements under section 365 of the Bankruptcy Code and should be approved.

## **Bankruptcy Rules 6004(a), 6004(h) and 6006(d)**

62.    The Debtors request that the Court (a) find that notice of the Motion is adequate under Bankruptcy Rule 6004(a) under the circumstances and (b) waive the 14-day stay requirements under Bankruptcy Rules 6004(h) and 6006(d).  In light of the Debtors' current

financial conditions and the importance of an efficient timeline for preserving the value of the Businesses, the proposed sale of the Businesses contemplated herein should be consummated as soon as practicable to allow the Debtors to maximize value for their estates and stakeholders. Accordingly, the Debtors request that the Bid Procedures Order, the Sale Order(s) and any order(s) authorizing the assumption and assignment of an Assumed Debtor Contract in connection with a Sale be effective immediately upon entry and that the 14-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d) be waived.

### Notice

63.    Notice of this Motion will be provided to the Sale Notice Parties.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be provided.

### No Prior Request

64.    No prior motion for the relief requested herein has been made to this or any other Court.

**Conclusion**

WHEREFORE, for the reasons set forth herein, the Debtors respectfully request that the Court (a) enter the Bid Procedures Order, (b) enter, after the Sale Hearing(s), one or more Sale Orders and (c) grant such other and further relief as is just and proper.

Dated: December 15, 2022
      Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Kimberly A. Brown*
Adam G. Landis (No. 3407)
Kimberly A. Brown (No. 5138)
Matthew R. Pierce (No. 5946)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
E-mail: landis@lrclaw.com
      brown@lrclaw.com
      pierce@lrclaw.com

-and-

**SULLIVAN & CROMWELL LLP**
Andrew G. Dietderich (admitted *pro hac vice*)
James L. Bromley (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Alexa J. Kranzley (admitted *pro hac vice*)
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
E-mail: dietdericha@sullcrom.com
      bromleyj@sullcrom.com
      gluecksteinb@sullcrom.com
      kranzleya@sullcrom.com

*Proposed Counsel for the Debtors*
*and Debtors-in-Possession*