**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Case No. 22-11068 (JTD) |
| FTX TRADING LTD., *et al.*[1], | (Joint Administration Pending) |
| Debtors. | Chapter 11 |
| | **Hearing Date: January 11, 2023 at 10:00 a.m.**<br>**Objections Due: January 4, 2023 at 4:00 p.m.** |

**MOTION TO COMPEL REJECTION OF EXECUTORY CONTRACT OR IN THE
ALTERNATIVE FOR RELIEF FROM AUTOMATIC STAY TO TERMINATE
AGREEMENT UNDER SECTIONS 365 AND 362(D), OF THE BANKRUPTCY CODE**

North America League of Legends Championship Series, LLC (hereinafter referred to as "Riot"), by and through its undersigned attorneys, hereby moves the Court (this "Motion") for an order compelling the rejection of the Strategic Sponsorship Agreement dated August 21, 2021 by and between West Realm Shires Services, Inc., d/b/a FTX.US ("FTX") and Riot (the "Agreement") pursuant to section 365 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"); or, in the alternative, granting relief from the automatic stay for cause under section 362(d)(1) of the Bankruptcy Code to permit Riot to terminate the Agreement. The facts and circumstances supporting this Motion are set forth in the Declarations of Vyte Danileviciute and Brian L. Davidoff filed in support hereof.

The Court should compel FTX to reject the Agreement. First, the Agreement is non-assignable and thus FTX cannot assume it under the Bankruptcy Code. Second, there is simply no way for FTX to cure the reputational harm already caused to Riot as a result of the highly public

---

[1] The last four digits of FTX Trading, Ltd.'s tax identification number are 3288. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.ra.kroll.com/FTX.

disrepute wrought by the debacle preceding FTX's bankruptcy filing.  FTX cannot turn back the clock and undo the damage inflicted on Riot in the wake of its collapse.  Riot also has an independent contractual right to terminate the Agreement on the grounds that FTX violated the agreed-to morality clause contained therein.

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated February 29, 2012.  This Motion is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Court may enter a final order consistent with Article III of the United States Constitution.  Riot consents to the entry of a final judgment or order with respect to the Motion if it is determined that the Court, absent consent of the parties, cannot enter a final order or judgment consistent with Article III of the United States Constitution.

2.      The legal predicates for the relief requested herein are sections 105(a), 362 and 365 of the Bankruptcy Code.

3.      Venue is proper pursuant to 28 USC §§ 1408 and 1409.

## I.      FACTUAL BACKGROUND

### A.      The Parties and the Agreement

4.      Riot Games, Inc. ("Riot Games") is the developer and publisher of *League of Legends*, an internationally renowned multiplayer online battle arena video game. Riot Games, together with its affiliate, North America League of Legends Championship Series, LLC (as defined above, "Riot"), host various live-event competitions featuring competitive play of *League of Legends*.  Declaration of Vyte Danileviciute ("Danileviciute Decl.") ¶ 1.

5.      FTX is a cryptocurrency exchange; a platform which allows an individual or entity to buy, sell, and trade cryptocurrency.  On November 11, 2022 (the "Petition Date"), FTX filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, commencing the above captioned case. Samuel Bankman-Fried was the Chief Executive Officer of FTX until his resignation on the Petition Date.

6.    On August 21, 2021, Riot and FTX entered into the Agreement. A redacted copy of the Agreement is attached as <u>Exhibit A</u> to the Danileviciute Decl. The portions of the Agreement that are of particular importance to this Motion include the following:[2]

- The primary purpose of the Agreement was to promote the FTX name and brand in connection with Riot's League of Legends Championship Series (the "<u>LCS</u>"). (¶ 1.2)

- The "Territory" covers the United States and Canada. (p.1, "Business Terms Cover Sheet")

- FTX is designated as the "Official Cryptocurrency Exchange Partner of the LCS" under the Agreement.  (p. 9, "Sponsorship Package, Promotional Activities and Additional Business Terms")

- In exchange for placement of the FTX name and logo in Riot's marketing materials, FTX is obligated to make substantial payments to Riot over the course of seven years. *Id.* at 1.  For the 2022 calendar year, FTX is obligated to pay $12,500,000, of which it has paid $6,250,000 with a balance of $6,250,000 which is now past due. Riot has performed and provided all of the services required of it under the Agreement for 2022 (but not for later years). For 2023, FTX will owe $12,875,000, with the first quarterly installment of $3,218,750 due on the first business day of January. *Id.* Payments escalate each year through 2028, which is the final year of the Agreement. (p.1, "Business Terms Cover Sheet")

- After 2028, the Agreement renews for a further seven year term unless either party cancels before the expiration of the initial term. *Id.*

- FTX will, at the request of Riot, promptly withdraw any materials, which, in Riot's opinion, do not comply with the provisions of the Quality Standards (as defined in the Agreement), the terms of the Agreement or applicable law. (¶ 5.4).

---

[2] Portions of the Agreement describing payments due after 2023 under the Agreement are redacted, as they constitute highly confidential and sensitive proprietary information that Riot carefully protects as a trade secret.

- FTX acknowledges that Riot exclusively owns all right, title and interest in and to (a) Riot's name and any trade name, trademark, trade device, service mark or symbol used by Riot, including the marks LEAGUE OF LEGENDS™, RIOT GAMES™ and their associated logos, among other items, including any advertising or promotional materials created or used in connection with the Game, as defined in the Agreement. (¶ 7.1).

- FTX agrees that when using the Riot Materials, it will not put into issue or otherwise adversely affect any registration of, or the strength, validity, enforceability, or ownership of, the Riot Materials, or (ii) **damage, dilute, devalue or prejudice the reputation or goodwill of Riot, the Riot Entities or any of the Riot Materials** (¶ 7.6) [emphasis added].

- Each party indemnifies the other party from any breach of the Agreement (¶ 9.3). **Either Party has the right to immediately terminate the Agreement in the event the other Party commits a material breach that is not cured within thirty (30) days of its receipt of notice from the nonbreaching Party of such breach.** (¶ 10.2) [emphasis added].

- The right by either Party **to terminate the agreement if the other party "brings the impacted Party's products and services into material public disrepute.** (¶ 10.3) [emphasis added] [Discussed in Section 3(a) below.]

- A non-assignment provision. (¶ 11.3) [Discussed in Section 3(c) below.]

- California law governs the Agreement. (¶ 11.4)

- Any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be settled by arbitration administered by JAMS in accordance with the JAMS Comprehensive Arbitration Rules and Procedures ("JAMS Rules") (¶ 11.5).

**B.**     **FTX's Public Financial Misfeasance**

7.      Since FTX's precipitous collapse and bankruptcy filing in November 2022, FTX and its management have been the subject of widespread criticism and public rebuke throughout the world.  Indeed, FTX's own new Chief Executive Officer, John J. Ray III, in his filing with the Court, states: "Never in my career have I seen such a complete failure of corporate controls and such a complete absence of trustworthy financial information as occurred here."[3] Ray described the problem as "unprecedented" with the "concentration of control in the hands of a very small group of inexperienced, unsophisticated and potentially compromised individuals."[4] Regulators in the United States, Japan, Australia, Turkey, and the Bahamas have all taken actions to investigate the company.[5] Publications and news outlets throughout the United States have reported on these events.  *The New York Times* recently wrote that "hundreds of thousands" of FTX customer's savings are in jeopardy due to recent events.[6]  The media coverage of the events which led to FTX's collapse characterize FTX as engaged in breathtaking corporate mismanagement at best, and criminal conduct at worst.

8.      Public indignation of FTX has reached the Congress of the United States. Representative Maxine Waters in her request that Mr. Bankman-Fried testify before the House Committee on Financial Services, tweeted: "As you know, the collapse of FTX has harmed over one million people.  Your testimony would not only be meaningful to Members of Congress, but is also critical to the American people."[7]  Many notable commentators believe Mr. Bankman-Fried engaged in criminal conduct, with the CEO of Coinbase, another cryptocurrency trading platform,

---

[3] .See Dkt. No. 24 The Court is respectfully requested to take judicial notice thereof under Federal Rule of Evidence ("FRE") 201.

[4] *Id.*

[5] Jesse Coghlan, *FTX's ongoing saga: Everything that's happened until now*, Coin Telegraph, (Nov. 10, 2022) https://cointelegraph.com/news/ftx-and-binance-s-ongoing-saga-everything-that-s-happened-until-now

[6] Kelly Huang, *Why Did FTX Collapse? Here's What to Know*, https://www.nytimes.com/2022/11/10/technology/ftx-binance-crypto-explained.html, (Nov. 18, 2022)

[7] @RepMaxineWaters, TWITTER, (Dec. 5, 12:08PM) https://twitter.com/RepMaxineWaters?ref_src=twsrc%5Etfw%7Ctwcamp%5Etweetembed%7Ctwterm%5E1599866739667308544%7Ctwgr%5Ea77805ee3585d9338947615580b8784b4b9932d0%7Ctwcon%5Es2_&ref_url=https%3A%2F%2Fdecrypt.co%2F116489%2Fmaxine-waters-insists-sbf-attend-ftx-hearing

74677-00015/4630014.2

commenting, "Even the most gullible person should not believe Sam's claim that this was an accounting error."[8]

9.      Adding fuel to the fire, until his arrest, Mr. Bankman-Fried continued to speak to the press.  On the day FTX filed for bankruptcy, Mr. Bankman-Fried tweeted an apology to his 1 million followers.  Less than a week later, he spoke to reporters through direct messages.[9] On November 30, Mr. Bankman-Fried spoke to *The New York Times*, stating that the company's downfall was caused by "a massive failure of oversight on [his] part" since there was no person in charge of customer risk which "feels pretty embarrassing."[10] The interview was subsequently posted on *The New York Times'* website and has been widely reported on.[11]

10.      On December 12, Mr. Bankman Fried was arrested in the Bahamas. On December 13, the United States Attorney for the Southern District of New York unsealed an indictment containing eight counts against Mr. Bankman-Fried (SBF): conspiracy to commit wire fraud on customers, wire fraud on customers, conspiracy to commit wire fraud on lenders, wire fraud on lenders, conspiracy to commit commodities fraud, conspiracy to commit securities fraud, conspiracy to commit money laundering and conspiracy to defraud the United States and violate the campaign finance laws. (Indictment., Dkt. No. 1, 22-cr-673, U.S.D.C., S.D.N.Y., Dec. 13, 2022).

11.      Also on December 13, the Securities and Exchange Commission charged Mr. Bankman-Fried with orchestrating a scheme to defraud equity investors in FTX. (Compl., Dkt. No. 1, 22-cv-10501 U.S.D.C, S.D.N.Y., Dec. 13, 2022). On the same day, the Commodity Futures Trading Commission filed a complaint in the U.S. District Court for the Southern District of New

---

[8] @brian_armstrong, TWITTER (Dec. 3, 1:53PM)
PM)https://twitter.com/brian_armstrong?ref_src=twsrc%5Etfw%7Ctwcamp%5Etweetembed%7Ctwterm%5E15991
59873232842758%7Ctwgr%5E47dedb502fc928e2902009ef430197d0ce846aff%7Ctwcon%5Es1_&ref_url=https%
3A%2F%2Fdecrypt.co%2F116394%2Fcoinbase-ceo-doubts-ftx-accounting-error-explanation-funds-obviously-
stolen
[9] Piper, Kelsey. *Sam Bankman-Fried Tries to Explain Himself*, https://www.vox.com/future-perfect/23462333/sam-
bankman-fried-ftx-cryptocurrency-effective-altruism-crypto-bahamas-philanthropy. (Nov. 16, 2022)
[10]Sorkin, Andrew Ross, '*Look, I Screwed Up': Sam Bankman-Fried Is Challenged on the Collapse of FTX*,
https://www.nytimes.com/live/2022/11/30/business/sam-bankman-fried-interview. (Nov. 30, 2022)
[11] *Id.*

York against Mr. Samuel Bankman-Fried, FTX, and Alameda Research LLC, charging all three defendants with fraud and material misrepresentations in connection with the sale of digital commodities in interstate commerce. (Compl., Dkt. No. 1, 22-cv-10503 U.S.D.C, S.D.N.Y, Dec. 13, 2022).

    **C.**    <u>**Riot's Close Association with FTX Through the Agreement**</u>

    12.    Prior to, and throughout this media firestorm, Riot's image and reputation to its customer base, remained inextricably linked to FTX through its former CEO, Mr. Bankman-Fried. Media outlets and Twitter commentators splashed images of Mr. Bankman-Fried playing *League of Legends*—**Riot Games'** *game*— at the same time that FTX was crashing.[12] Mr. Bankman-Fried is famous for his affinity for the game. He is well-known among investors to play *League of Legends* during meetings. He acknowledged on Twitter that he played "a lot more [*League of Legends*] than you'd expect from someone who routinely trades off sleep vs work." Even Mr. Bankman-Fried's ranking in *League of Legends* has been the subject of online commentary with public figures Alexandria Ocasio-Cortez and Elon Musk weighing in.[13]

    13.    Running parallel to Mr. Bankman-Fried's personal interest in *League of Legends*, FTX entered into public business ventures with entities participating in the Riot esports ecosystem. In June 2021, shortly before entering into the Agreement, FTX acquired the naming rights for an esports team participating in the LCS, TSM. TSM first began as a *League of Legends* website and playing guide resource in 2009 before becoming one of the first teams in the LCS, where TSM has competed for over 10 years.[14] FTX publicized that it would directly sponsor the LCS' "Most Improved Player Award." Reddit threads among the cryptocurrency and gaming communities discussed the partnership in a post on a League of Legends Reddit community with 6.1 million

---

[12] Gault, Matthew. *Is Sam Bankman-Fried Playing 'League of Legends' While FTX Burns?*
https://www.vice.com/en/article/pkgwxn/is-sam-bankman-fried-playing-league-of-legends-while-ftx-burns
[13] Hogg, Ryan, *Elon Musk and AOC Finally Agree on* Something, (Dec. 4, 2022)
https://www.businessinsider.com/elon-musk-aoc-finally-agree-sbf-bad-league-of-legends-2022-12
[14] Sinclair, Sebastian. *FTX strikes 7-year Deal With 'League of Legends' Riot Games.* (Aug. 3, 2021)
https://www.coindesk.com/markets/2021/08/04/ftx-strikes-7-year-deal-with-league-of-legends-riot-games/

74677-00015/4630014.2

members, with users commenting, "That's huge news, Riot has possibly the biggest esports title in the world right now in League of Legends" and "FTX is really smart approaching the eSports scene because of its all young viewers."[15] With audiences in North and South America, Asia, and Europe, and accessible on 30+ digital and TV platforms, League of Legends esports is the third most watched professional sport in the world among the demographic of 18- 34 year old males, behind only the NFL and NBA.

14.    Prior to entering into the agreement with FTX, Riot considered other cryptocurrency platforms, but selected FTX for its reputation among Riot's audience.  After conducting market research to ensure the proper data set for its viewers and their interests, Riot made FTX its official sponsor.  In addition, Riot created a new asset that included FTX's fixed logo on the screen throughout the entire game – a step which was unprecedented in *League of Legends* globally.  At times, the FTX logo was more visible than Riot's.  (Danileviciute Decl. ¶ 5).

### D.    Riot's Attempts to Confer With FTX

15.    Concerned about the negative publicity surrounding FTX's management of consumer funds and its effect on Riot, Riot attempted, on numerous occasions, to confer with FTX. These attempts have been futile.  Riot has called FTX on several occasions and emailed Claire Watanabe, FTX's Head of Partnerships and Partner Management, and Mr. Bankman-Fried. (Danileviciute Decl. ¶ 7) Riot has also attempted to reach FTX through FTX's agency of record, Wasserman.  *Id.* As a last-ditch effort, Riot's counsel sent FTX's legal counsel a letter describing their attempts at communication and requesting FTX's voluntary consent to mutual termination of the Agreement under section 10.3(b).  A copy of this letter is attached as Exhibit B to Davidoff Decl.  Neither FTX nor its counsel has ever responded. (Davidoff Decl. ¶ 2).

---

[15] @Minato28, @HylissickOP, REDDIT, *FTX Exchange partnered with Riot Games, the League of Legends developer and esports tournament organizer with a 7-year contract*, (2021) https://www.reddit.com/r/CryptoCurrency/comments/pm88kt/ftx_exchange_partnered_with_riot_games_the_league /

E.        **FTX's Public Debacle Has Caused Substantial Damage to Riot**

16.        Since the public unraveling of FTX, Riot has faced significant non-monetary and monetary damage as a result of its ongoing association with FTX.  Under the Agreement, Riot Games has promoted FTX as the "Official Cryptocurrency Exchange of the LCS," in its premier North American esports league for the game *League of Legends*.  The Agreement with FTX represents the largest sponsorship agreement Riot has ever signed for an esports league.  Following the bankruptcy, a number of traditional and esports-focused news outlets, including the publications Decrypt, Axios, and Sports Business Journal have reached out to Riot for comment. (Danileviciute Decl. ¶ 8).

17.        Notably, TSM, one of Riot's longstanding esports teams, cut ties with FTX following the bankruptcy filing and suspended its FTX partnership and all corresponding marketing obligations.[16]  The Miami Heat and Formula 1 announced that they have terminated their naming rights agreements.[17]  Fans and players have wondered why Riot has not done the same via Reddit and other platforms.[18] One Reddit user commented that it was a "very bad look for esports doing business with such unstable financial entities."[19]

18.        In addition to these non-monetary negative repercussions that Riot has endured, Riot has also been hurt financially by the failure of FTX to pay its remaining 2022 obligations totaling $6,250,000.  FTX's nonpayment has a direct financial impact on Riot. Sponsors are a key part of allowing leagues, teams, and other industry participants to break even or make a profit, which then makes the industry as a whole more attractive to investors and other potential

---

[16] Eli Tan, *Esports Giant TSM Suspends $10M Partnership with FTX,* (Nov. 16, 2022) https://www.coindesk.com/web3/2022/11/16/esports-giant-tsm-suspends-210m-partnership-with-ftx/

[17] Marco Quiroz-Gutierrez, *FTX still on the hook for 16.5 million after Miami naming rights deal evaporates*, (Nov. 14, 2022) https://fortune.com/crypto/2022/11/14/ftx-sports-sponsorships-miami-heat-mlb-nfl-formula1/

[18] TSM/FURIA/RIOT partner FTX files for bankruptcy, REDDIT, (Nov. 12, 2022) https://www.reddit.com/r/esports/comments/ysh14e/tsmfuriariot_partner_ftx_files_for_bankruptcy/

[19] @LogicKennedy, TSM/FURIA/RIOT partner FTX files for bankruptcy, REDDIT, (Nov. 12, 2022) https://www.reddit.com/r/esports/comments/ysh14e/tsmfuriariot_partner_ftx_files_for_bankruptcy/

participants.  Sponsorship revenue is critical to the sustainability of the overall esports ecosystem. (Danileviciute Decl. ¶ 9).

19.    Riot made financial commitments to franchised teams specifically based on FTX's sponsorship.  The LCS features a revenue share model, whereby a significant portion of the revenues generated by Riot are equally distributed to the professional esports teams participating in the LCS. The sponsor payments are therefore a key source of income for participating teams, which then, in turn, pay their players, etc. (Danileviciute Decl. ¶ 10).

20.    Even if the Agreement is terminated promptly, there will not be enough time to replace FTX as a partner for the 2023 competitive season.  Thus, Riot will only be able to mitigate the financial loss.  The longer Riot is prevented from commercializing the crypto-exchange sponsorship category and the broadcast assets currently owned by FTX, the more damages Riot incurs.  (Danileviciute Decl. ¶ 12).

21.    Additionally, under the Agreement, Riot is prohibited from selling sponsorship rights to other partners which they must sell by the beginning of the season, which begins in January 2023.  (Exhibit A, p. 12, "Category Exclusivity").

## II.    THE LAW APPLICABLE TO THE AGREEMENT

### A.    The Agreement is an Executory Contract

22.    An executory contract is one "under which the obligation of both the bankrupt and the other party . . . are so far unperformed that the failure of either to complete performance would constitute material breach excusing the performance of the other." *See Sharon Steel Corp. v. Nat'l Fuel Gas Distribution Corp.*, 872 F.2d 36, 39 (3d Cir. 1989) (quoting *Countryman, Executory Contracts in Bankruptcy*, Part 1, 57 Minn. L. Rev. 439, 460 (1973)).

23.    Here, the Agreement is executory because both FTX and Riot have yet to perform material obligations required under the terms.  FTX has yet to pay Riot its past due balance of $6,250,000 for 2022, and FTX is also required to pay multiple millions more over the course of the next six years.  For its part, Riot used FTX marks and logos in its marketing materials for 2022, but has yet to fulfill its commitment to publicize FTX on the Riot platform through 2028.

(Danileviciute Decl. ¶ 13) Since both parties have yet to perform material aspects of their arrangement, the Agreement is executory under the *Countryman* test.

## B.    **Provisions of the Bankruptcy Code Relevant to Executory Contracts**

24.    Pursuant to section 365(a) of the Bankruptcy Code and subject to certain enumerated exceptions, a debtor in possession ("DIP") may assume or reject any executory contract of the debtor.

25.    Section 365(b)(1)(A) provides that if there has been a default in an executory contract, a debtor may not assume it unless, at the time of assumption, the DIP cures or provides adequate assurances that the trustee will promptly cure the default. Section 365(b)(1), provides in part:

> (b)(1) If there has been a default in an executory contract… the [DIP] may not assume such contract or lease unless, at the time of assumption of such contract … the [DIP] —
>
> (A) cures, or provides adequate assurance that the [DIP] will promptly cure …;
>
> (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>
> (C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

26.    Traditionally, a DIP may "cure" through a two-step process.  First, the DIP must bring the contract back into compliance with its terms. *See e.g., In re Jennifer Convertibles, Inc*., 447 B.R. 713, 725 (Bankr. S.D.N.Y. 2011).  Second, the DIP must compensate the other party's pecuniary losses, including reasonable attorney's fees if recoverable under applicable state law. *In re Crown Books Corp*., 269 B.R. 12, 17 (Bankr. D. Del. 2001).

27.    If the DIP assumes an executory contract under section 365(a), they may also assign that contract pursuant to section 365(f) of the Bankruptcy Code.  Specifically, section 365(f) authorizes the trustee or DIP to assign an executory contract even if contractual provisions or

11

governing law prohibits, conditions or otherwise restricts assignment. Section 365(f) provides in

relevant part:

> (f) (1) Except as provided in subsections (b) and (c) of this section, notwithstanding a provision in an executory contract … of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2) of this subsection.
>
> (2) The trustee may assign an executory contract or unexpired lease of the debtor only if—
>
>> (A) the trustee assumes such contract or lease in accordance with the provisions of this section; and
>>
>> (B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.
>
> (3) Notwithstanding a provision in an executory contract … of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract … or a right or obligation under such contract …on account of an assignment of such contract …, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee.

11 U.S.C. § 365(c).

28.     However, the authority of the DIP to assume a contract under section 365(a) and/or

assign a contract under section 365(f)(1) is expressly limited by the exceptions set forth in section

365(c). Section 365(c) contains four exceptions to the trustee's ability to assume or assign an

executory contract. Section 365(c) provides in part as follows:

> (c) The trustee may not assume or assign any executory contract… whether or not such contract… prohibits or restricts assignment of rights or delegation of duties, if—
>
>> (1) (A) applicable law excuses a party, other than the debtor, to such contract… from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession, whether or not such contract …prohibits or restricts assignment of rights or delegation of duties; and

74677-00015/4630014.2

(B) such party does not consent to such assumption or assignment.

11 U.S.C. § 365(c).

29.    In this case, the relevant exception is set forth in section 365(c)(1) noted above, namely that a DIP may not assume or assign an executory contract if applicable law excuses a party from accepting performance from an entity other than the debtor and such party does not consent to such assumption or assignment.

30.    So too, in a provision generally consistent with, but not identical to, section 365(c), section 365(e)(2) provides that the invalidation of *ipso facto* clauses does not apply to contracts or leases that are non-assignable under applicable non-bankruptcy law:

> (e) (1) Notwithstanding a provision in an executory contract …, an executory contract …of the debtor may not be terminated or modified, and any right or obligation under such contract …may not be terminated or modified, at any time after the commencement of the case solely because of a provision in such contract or lease that is conditioned on—
>
> > (A) the insolvency or financial condition of the debtor at any time before the closing of the case;
> >
> > (B) the commencement of a case under this title; or
> >
> > (C) the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement.
>
> (2) Paragraph (1) of this subsection does not apply to an executory contract… of the debtor, whether or not such contract      … prohibits or restricts assignment of rights or delegation of duties, if—
>
> > (A)(i) applicable law excuses a party, other than the debtor, to such contract …from accepting performance from or rendering performance to the trustee or to an assignee of such contract or lease, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties; and
> >
> > (ii) such party does not consent to such assumption or assignment.

11 U.S.C. § 365(e).

31.     Section 365(e) makes clear that not only may a non-assumable contract not be assumed or assigned, but that the obligations of the other party may be terminated, subject to section 362. *3 Collier on Bankruptcy* P 365.08 (16th 2022).

## III.    THE COURT SHOULD COMPEL FTX TO REJECT THE AGREEMENT

### A.    The Morals Clause in the Agreement

32.     Riot, in the conduct of its business, has taken pains to ensure that its business partners are of high moral character.  As such, the Agreement has specific language relating to the character and conduct of each of the parties.

33.     The parties agreed to a reciprocal morality clause, granting both parties termination rights.  Exhibit A, ¶ 10.3(b).  "Either Party shall have the right to terminate this Agreement" if the other "commits any act or becomes involved in any situation or occurrence" bringing "the Impacted Party's products and services into ***material public disrepute***" which cannot be mitigated. *Id.* (emphasis added).  This clause is what commentators have to referred to as a "reverse-morals clause" – a reciprocal contractual warranty to a traditional morals clause intended to protect the reputation of talent from the negative, unethical, immoral, and/or criminal behavior of the endorsee-company or purchaser of talent's endorsement. *See* The Reverse Morals Clause *Cardozo Arts & Entertainment* Vol. 28:65.

34.     The Agreement adds that prior to terminating, "the Impacted Party shall notify the other thereof as soon as possible" and both parties shall "jointly discuss in good faith any potential remedies and options which may be taken in order to reasonably address the other Party's concerns and mitigate such material adverse effect."  *Id.* As detailed above, Riot has attempted to so confer, but FTX has not responded.

35.     This mutual morality clause is a standard provision in Riot agreements. In this instance, the existence of a morality clause was particularly important to Riot.  Riot was concerned that cryptocurrency exchanges were a relatively new industry, subject to evolving regulation and crypto market volatility, in general. This was also the first cryptocurrency exchange partnership for Riot.  Having language in the Agreement that monitored the goodwill generated by the

14

Agreement, or permitting the termination of the Agreement in the absence of FTX's positive public reputation was essential to Riot. (Danileviciute Decl. ¶ 14).

36.     Riot's insistence on ensuring quality is found elsewhere in the Agreement as well. For example, in paragraph 5.4 of the Agreement, FTX is required, at the request of Riot, to promptly withdraw any materials, which, in Riot's opinion, do not comply with the provisions of the "Quality Standards" (a defined in the Agreement), the terms of the Agreement, or applicable law (¶ 5.4).  Section 5 of the Agreement has substantial language to ensure that quality standards are adhered to by FTX.

37.     Likewise, paragraph 7.6 of the Agreement prohibits FTX from using any materials that may damage, dilute, devalue or prejudice the reputation or goodwill of Riot, the Riot Entities or any of the Riot Materials.

**B.     The Morals Clause in the Agreement is Non-Curable and Therefore the Agreement is Non-Assignable**

38.     Certain nonmonetary defaults are not curable for the simple reason that the DIP cannot go back in time. State law determines the existence and nature of a default. *See e.g., Elkton Assocs. v. Shelco Inc. (In re Shelco, Inc.)*, 107 B.R. 483, 485 (Bankr. D. Del. 1989). As noted above, California law applies to the Agreement.  In this case, FTX's breach of the morals clause is not curable.

39.     California law affords significant deference to contracts with morality clauses, even when they do not proscribe specific types of conduct. *See e.g., RKO Radio Pictures, Inc. v. Jarrico,* 128 Cal. App. 2d 172, 173-76 (upholding lower court's finding that written contract requiring employee to conduct himself "with due regard to public conventions and morals" and to maintain a "good reputation with the public" was enforceable); *Twentieth Century-Fox Film Corp. v. Lardner*, 216 F.2d 844, 847–48 (9th Cir. 1954) (finding that company was justified in terminating employee based on agreement not to "do or commit any act or thing that will tend to degrade him in society or bring him into public hatred" when employee refused to testify about Communist activities).

40.      Although there are no clear guidelines for determining when these clauses are triggered, Courts focus on 1) the connection between the impacted party's business interest and the offending conduct and 2) the public's opinion about the nature of the conduct.  *See e.g., Loew's, Inc. v. Cole*, 185 F.2d 641, 661 (9th Cir. 1950) (noting that whether the company had the right to terminate employment contract depended on public opinion of employee's action); *Twentieth Century-Fox Film Corp. v. Lardner*, 216 F.2d at 851 (morals clause justified termination because the Congressional investigation occurred during the writer's employment, thereby affecting the company's business interest).[20]

41.      California law supports the enforcement of the Agreement's morality provision, and it is difficult to imagine a set of facts that more clearly trigger such a clause. The Agreement was executed in late August, and the news of FTX's collapse broke just three months later. The interplay between FTX's actions and Riot's business interest was on full public display to Riot's customers and gamers.  Images of Mr. Bankman-Fried playing *League of Legends* were displayed alongside text describing his cavalier attitude towards investor meetings and irresponsibility with corporate funds. These images created a public narrative that Mr. Bankman-Fried's interest in *League of Legends*, once relatable and human, was now reckless and juvenile. Articles describing the situation as a "hellscape" added to the public's disdain for FTX.

42.      Once a public linkage has been established between talent and a corporate brand, negative information about either could result in a "damaged consumer evaluation of both entities." *See* Darin W. White et al., *The Effects of Negative Information Transference in the Celebrity Endorsement Relationship*, 37 INT'L J. RETAIL & DISTRIBUTION MGMT 322, 323 (2009).

---

[20] Other circuits have used a similar analysis and arrived at the same conclusions when evaluating morals clauses. *See e.g., Galaviz v. Post-Newsweek Stations, San Antonio Inc.*, 380 Fed. Appx. 457, 459 (5th Cir. 2010) (finding that morals clause of television reporter's employment contract with television station justified termination following reporter's domestic disputes that received local media publicity); *Nader v. ABC TV, Inc.*, 150 Fed. Appx. 54, 56 (2d Cir. 2005)(upholding summary judgment for broadcasting company when reporter alleged breach of contract claim following termination of contract under morals clause due to his arrest)

43.     The reputational harm inflicted upon Riot cannot be undone.  FTX cannot go back in time and put in place corporate controls for the safekeeping of customer funds that have in the public eye now been absconded.   Yet absent termination, the Agreement is set to operate continuously for six more years.   It would be untenable for Riot to be forced to continue its association with a company whose reputation is forever tarnished in the eyes of the public. Given these circumstances, FTX is unable to cure the nonmonetary harm caused to Riot.

44.     Because the breach of the morals clause is non-curable, FTX is unable to bring the Agreement "back into compliance with its terms" as required by *In re Jennifer Convertibles, In, Supra.*  FTX is therefore unable to assume the Agreement.

C.     **The Agreement also Cannot be Assumed and is Non-Assignable Because It Relies on the Character, Reputation, and Skill of Both Parties.**

45.     The Third Circuit has adopted the "hypothetical test" to interpret section 365(c)(1), meaning that even if the debtor has no intention of assigning the contract to a third-party, it still may not be assumed if its assignment is precluded under applicable non bankruptcy law.  *Matter of W. Elecs. Inc.*, 852 F.2d at 83.

46.     Here, applicable nonbankruptcy law precludes assignment of the Agreement. Courts do not allow assignment of certain contracts because parties to such contracts rely on "character, reputation, taste, skill or discretion of the party that is to render performance." *In re Planet Hollywood Int'l, Inc.* Case No. 99-3612(JJF), 2000 U.S. Dist. (D. Del. Nov. 21, 2000) (citing *In re Compass Van & Storage Corp.,* 65 B.R. 1007,1011 (Bankr. E.D.N.Y)). As pointed out by the *Planet Hollywood* court "…the law in …California, provide[s] that contracts involving relationships of personal confidence and trust or personal services are not assignable by either party without the consent of the other party." *See e.g.*, *Knipe v. Barkdull,* 222 Cal. App. 2d 547, 551 (Cal. Ct. App. 1963). These contracts are non-assignable because the duties are so unique that the parties have a substantial interest in having a specific person or entity perform the duties as promised. *Id.* Whether a contract falls within this category depends on the nature and subject matter of the contract, the circumstances of the case, and the intention of the parties. *Id.*

47.     Where a contract calls for the skill, credit, or other personal quality of the promisor, it is not assignable. *Manela v. Stone*, 66 Cal. App. 5th 90, 107 (2021); *Knipe v. Barkdull*, 222 Cal. App. 2d 547, 551 (Cal. Ct. App. 1963). Historically, this arises in the case of a personal service contract. *See e.g., In re Carrere*, 64 B.R. 156, 157 (Bankr.C.D.1986) (actresses' contract with broadcasting company found not assignable); *In re Planet Hollywood Int'l, Inc*. Case No. 99-3612(JJF), 2000 U.S. Dist. 33, (D. Del. Nov. 21, 2000) (celebrity contracts with restaurant found not assignable).  Corporations may enter into personal service contracts. *In re Planet Hollywood Int'l, Inc*., Case No. 99-3612(JJF), 2000 U.S. Dist. at n. 6. Still, "it is now well established that Section 365(c)(1) does not apply solely to personal service contracts."  *In Re Grove Rich Realty Corp.* 200 B.R. 502, 506 (1996) (*citing In re Braniff Airways, Inc.*, 700 F.2d 935, 943 (5th Cir. 1983);  *In re Pioneer Ford Sales, Inc.* 729 F.2d 27, 28 (1st Cir. 1984).

48.     When a party's identity is a "material inducement" to the contract, it is not assignable.  *Manela v. Stone,* 66 Cal. App. 5th at 107 (finding that a contractor's services were a material inducement since he was hired despite a substantially higher bid because he represented that he would provide superior services, and so the contract *was not* assignable).  If the party's identity was not an inducement, then the contract is assignable.  *La Rue v. Groezinger*, 84 Cal. 281, 289 (1890) (finding that a vineyard owner's identity was not a material inducement to entering into the contract since others could grow grapes, and so the contract *was* assignable).

49.     The Agreement is non-assignable for two reasons. First, on its face, the Agreement clearly prohibits assignment without the parties' consent, and in this case Riot does not consent.[21] Second, even absent the "No Assignment" clause, contracts relying on the unique nature and qualities of the parties, such as the Agreement, cannot be assigned as matter of law.

50.     Trust and confidence underlie the Agreement between FTX and Riot.  The Agreement is replete with specific language to ensure that neither tarnishes the reputation of the

---

[21] Section 11.3 of the Agreement states that, absent the other Party's prior written consent, "neither Party shall assign or delegate any of its rights or obligations arising out of this Agreement, by operation of law or otherwise. Any attempted assignment or delegation shall be null, void and without effect."

other. ¶ 7.6 (FTX agrees not to use any materials which damage, dilute, devalue or prejudice the reputation or goodwill of Riot, the Riot Entities or any of the Riot Materials); ¶ 10.3 (either Party to terminate the agreement if the other party "brings the impacted Party's products and services into ***material public disrepute.***")  The inclusion of the morality clause shows that the promises made by both parties were dependent on each of them maintaining their positive standing with the public.

51.    Riot was very specific in its business decision to choose FTX as its first crypto currency sponsor. As noted above, Riot considered other cryptocurrency platforms, but selected FTX for its reputation among Riot's audience, and then only after conducting market research to ensure the proper data set for its viewers and their interests.  In addition, Riot created a new asset that included FTX's fixed logo on the screen throughout the entire game – a step which was unprecedented in *League of Legends* globally. At times, the FTX logo was more visible than Riot's. (Danileviciute Decl. ¶ 5) In turn, Riot provided a unique platform for FTX to advertise because of its high viewership and international appeal.

## IV.    FTX CANNOT PROVIDE A MONETARY CURE OF THE EXSITING DEFAULT AND PROVIDE ASSURANCES OF FUTURE PERFORMANCE

52.    Even if FTX could cure its non-monetary breach, which it cannot, FTX has not cured the existing monetary default or provided adequate assurances that the Agreement will be performed in the future. Thus, for this reason as well, the Court must compel the Debtor to reject the Agreement.

53.    As noted above, FTX has defaulted on its 2022 obligation to pay $6,250,000.  FTX has not cured that default.  Indeed, FTX has made no attempt to even respond to Riot's multiple attempts to contact it regarding FTX's existing defaults. (*See* Davidoff Decl. ¶ 2).

54.    Moreover, FTX has significant obligations coming due under the Agreement.  For 2023, FTX owes Riot $12,875,000, which is due on a quarterly basis at the beginning of each quarter.  FTX will thus owe an additional $3,218,750 on the first business day of January 2023. (Exhibit A, p.1, "Business Terms Cover Sheet").  Here too, FTX has provided no assurance of its

willingness or indeed ability to pay. (Danileviciute Decl.¶ 11) Tens of millions more will be due under the Agreement for the balance of the Agreement term through 2028. (Exhibit A, p.1, "Business Terms Cover Sheet").

55.    In determining adequate assurance of future performance, courts look to the specific facts and circumstances of the case. *Cinicola v. Scharffenberger*, 248 F.3d 110, 120, n.10 (3d. Cir. 2001).  Commercial standards, rather than legal rules, guide this analysis. *Id.*  In the context of leases, courts have considered the following factors: the debtor's payment history; presence of a guarantee; presence of a security deposit; evidence of profitability; a plan which would earmark money exclusively for the creditor; the general outlook in the debtor's industry; and whether the contract is at or below, the prevailing rate.  *In re Filene's Basement*, *LLC*, 2014 Bankr. No. 11-13511 (KJC), 2014 WL 1713416, (Bankr. D. Del. Apr. 29, 2014).

56.    None of the factors weigh in favor of FTX.  FTX defaulted in the first full calendar year of the Agreement.  Not only is there no evidence of profitability, but to the contrary, FTX is desperately seeking to recover billions of dollars that have apparently disappeared. Preliminary filings with this Court indicate that FTX's liabilities far outstrip its assets. Acting CEO John Ray's declaration to this Court only highlights the Debtor's irreparable state of disrepair.  Given the number of creditors and FTX's current financial condition, it is not realistic to assume that FTX will ever be able to provide assurances of future performance.

57.    Since it is not feasible for FTX to assume the agreement, the Court must compel FTX to reject the Agreement.

## V.    IN THE ALTERNATIVE, THE COURT SHOULD GRANT RELIEF FROM STAY TO PERMIT RIOT TO TERMINATE THE AGREEMENT

58.    If the Court does not compel FTX to reject the Agreement, the Court should, in the alternative, grant Riot relief from the automatic stay to permit Riot to terminate the Agreement. Unlike other contracting parties with FTX who have reportedly taken unilateral action to distance

themselves from FTX since its bankruptcy filing,[22] Riot is seeking termination of the stay before it takes action to terminate the Agreement under the morals clause.

59.     Section 362(d)(1) directs the Court to grant relief from the automatic stay upon a showing of "cause."  Cause is a flexible concept and courts conduct a fact intensive, case-by-case analysis, examining the totality of the circumstances to determine whether cause exists to lift the stay. *Izzarelli v. Rexene Prods. Co. (In re Rexene Prods. C*o.), 141 B.R. 574, 576 (Bankr. D. Del. 1992).

60.     Cause exists when an executory contract is unassignable and therefore non-assumable under section 365(c)(1).  The Third Circuit and others have held that "a contract subject to a legal prohibition against assignment" may not be assumed by a trustee.  *Matter of W. Elecs. Inc*., 852 F.2d 79, 82 (3d Cir. 1988) (government contracts are unassignable and therefore the government was entitled to relief from stay); *In re Pioneer Ford Sales, Inc.*, 729 F.2d at 28 (car manufacturer's lack of consent to assignment of franchise made contract non-assumable by debtor-car dealership); *In re Catapult Entertainment*, 165 F.3d 747 (9th Cir.1999) (patent licenses were unassignable and non-assumable by debtor-online gaming company).

61.     Further, although section 365(e) bars the termination of a contract based on the commencement of a bankruptcy case, an exception in section 365(e)(2)(A) applies to contracts under which the other party is excused from rendering performance to or accepting performance from the trustee or an assignee of the contract.  Such contracts may be terminated upon commencement of a case, subject to obtaining relief from stay. 3 *Collier on Bankruptcy* P 365.07 (16th 2022).

62.     Just as in *Pioneer Ford Sales, Inc.* and *Catapult Entertainment,* the Agreement here is also non-assignable for the reasons set out in Section III(b)-(c) above and is therefore non-assumable. The Court should therefore terminate the stay.

---

[22] Tina Reynolds, *Miami Heat terminate relationship with FTX, search for new naming rights partner*, (Nov. 11, 2022, 4:52 PM) https://www.nba.com/news/miami-heat-terminate-relationship-with-ftx

## VI.   <u>CONCLUSION</u>

63.     Based on the foregoing, Riot respectfully requests entry of an order of the Court to compel FTX to reject the Agreement pursuant to sections 365(b)(1), 365(c)(1)(A) and (B), or in the alternative granting relief from the automatic stay for "cause" under section  362(d)(1).

WHEREFORE, for all of the above reasons, Riot requests that the Court enter an order (i) compelling FTX to reject the Agreement; (ii) in the alternative, granting relief from the automatic stay for "cause"; and (iii) granting such other and further relief as is just and equitable.

Dated:  December 16, 2022
Wilmington, Delaware

**ROBINSON & COLE**

*/s/ Jamie L. Edmonson*
Jamie L. Edmonson (No.4247)
1201 N. Market Street, Suite 1406
Wilmington, Delaware 19801
Telephone: 302.516.1700
Fax: 302.516.1699
Email: jedmonson@rc.com

-and-

**GREENBERG GLUSKER FIELDS
CLAMAN & MACHTINGER LLP**

Brian Davidoff (*pro hac vice pending*)
2049 Century Park East, Ste. 2600
Los Angeles, California 90067-4590
Telephone:  310.553.3610
Fax:  310.553.0687

Attorneys for Creditor North America League
of Legends Championship Series, LLC