# EXHIBIT "A"

# SPONSORSHIP AGREEMENT



| | BUSINESS TERMS COVER SHEET |
|---|---|
| Effective Date: | August 1, 2021 |
| Sponsored Events: | The following Events are sponsored during the Term (check boxes as applicable), subject to the specifications, terms, and conditions of this Agreement:<br><br>☒ 2021* - 2028 League of Legends Championship Series ("**LCS**):<br>• LCS Lock-In Tournament<br>• LCS Spring Split, Playoffs & Finals<br>• LCS Summer Split, Playoffs & Finals<br><br>* 2021 Events will begin with the Summer Split Playoffs in August 2021 |
| Sponsorship Package: | See Exhibit A, 1 |
| Territory: | The "Territory" for purposes of this Agreement is limited to the following:<br><br>☒ North America, including USA and Canada. See Exhibit A, 3 for further detail. |
| Sponsor Categories: | Cryptocurrency Exchange, which is a platform where an individual or entity may buy, sell or trade cryptocurrency. |
| Sponsorship Fee: | Sponsor will provide the following funds to Riot in consideration for official designations, licenses, and activations in the total amount of ▮▮▮▮▮▮ as set forth below. |

**SPONSOR INFORMATION**

Name: West Realm Shires Services Inc
Address: 2000 Center Street, 4th Floor
City/State: Berkley
Country: USA    Postal Code: CA94704
Email: legal@ftx.us
Attn: Legal

| 2021 | 2022 (Year 1) | 2023 (Year 2) | 2024 (Year 3) |
|---|---|---|---|
| $4,000,000 | $12,500,000 | $12,875,000 | ▮▮▮ |
| **2025 (Year 4)** | **2026 (Year 5)** | **2027 (Year 6)** | **2028 (Year 7)** |
| ▮▮▮ | ▮▮▮ | ▮▮▮ | ▮▮▮ |

Payments will be made on a calendar quarterly basis, at the beginning of each quarter, provided that the full 2021 payment will be made upon execution of the Agreement. Riot shall issue an invoice to Sponsor for each payment issuable on the invoice date, upon which Sponsor shall remit such payment within sixty (60) days of receipt.

| | |
|---|---|
| North America League of Legends Championship Series, LLC<br>12333 W. Olympic Blvd.<br>Los Angeles CA 90064<br>Attention: Matthew Archambault<br>424-231-1111<br>marchambault@riotgames.com<br>With a copy to:<br>legalnotices@riotgames.com | Term of Agreement: The term of the Agreement shall begin on the Effective Date specified above and shall terminate on December 31, 2028 (the "**Term**"). The Agreement shall automatically renew for an additional 7 year term (the "Renewal Term"), unless either Party provides the other Party with a written notice of non-renewal by no later than March 31, 2028. The annual Sponsorship Fee for the Renewal Term shall be based off of Year 7 Sponsorship Fee subject to a 3% escalator year-over-year. |

The Strategic Sponsorship Agreement between North America League of Legends Championship Series, LLC (**"Riot"**) and the Sponsor identified above (**"Sponsor"**) is comprised of this Cover Sheet, the attached Standard Terms and Conditions and all exhibits/additional terms and conditions referenced in the Standard Terms & Conditions.  Please read the Standard Terms & Conditions before signing this Cover Sheet.  **Your signature on this Cover Sheet indicates your agreement to the attached Standard Terms & Conditions.**  Please send a PDF version of the full signed agreement (Cover Sheet and the Standard Terms & Conditions) to the Riot Contact listed above.  **All Cover Sheets must be signed**.

| **West Realm Shires Services Inc** | **North America League of Legends Championship Series, LLC** |
|---|---|
| NAME: _SAMUEL BANKMAN-FRIED_ | NAME: _____ |
| SIGNATURE: *Sam Bankman-Fried* (DocuSigned, F0D59F19C7D34BA...) | SIGNATURE: _____ |
| TITLE: _____CEO_____ | TITLE: _____ |

Classified - Confidential



**STRATEGIC SPONSORSHIP AGREEMENT**
**STANDARD TERMS AND CONDITIONS**



This Strategic Sponsorship Agreement (**"Agreement"**) is made as of the effective date (**"Effective Date"**) specified on the attached cover sheet (**"Cover Sheet"**) by and between North America League of Legends Championship Series, LLC a Delaware limited company ("**Riot**"), and the sponsor identified on the **Cover Sheet** ("**Sponsor**"). This Agreement is comprised of the Cover Sheet, these Standard Terms and Conditions and the additional exhibits and terms and conditions expressly referenced herein. In consideration of the mutual covenants contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree and contract as follows:

1. **BACKGROUND AND PURPOSE**

    1.1 <u>Background</u>. Riot Games, Inc. is the developer and publisher of League of Legends (**"Game"**), a multiplayer online battle arena video game. Riot Games, Inc. and its affiliates, including North America League of Legends Championship Series, LLC, host various live-event competitions featuring competitive play of the Game (each, an "**Event**").

    1.2 <u>Objectives of the Parties</u>. Riot offers sponsorship opportunities as a package that includes specific branding rights, promotional rights and live event display and activation rights. Sponsor wishes to become an official sponsor of the Event(s) described in the Cover Sheet (**"Sponsored Events"**) and to purchase the sponsorship package for such Sponsored Event(s) as further described in the Cover Sheet and Exhibit A (**"Sponsorship Package"**). Riot and Sponsor also desire to co-market each other's products and services as further described below.

2. **SPONSORSHIP PACKAGE**

    2.1 <u>Grant of Rights</u>. In consideration of the payment to Riot by Sponsor of the Sponsorship Fee (as defined below), Riot grants to Sponsor the rights to the Sponsorship Package during the Term (as defined below).

    2.2 <u>Exclusions</u>. Sponsor acknowledges and agrees that Riot grants no rights or licenses in this Agreement with respect to (a) the name or trademarks of any professional esports team, or (b) the name, likeness or life rights of any player or manager of any esports team.

    2.3 <u>Substitutions</u>. In the event that, for whatever reason, Riot is not able to deliver any part of the Sponsorship Package precisely as set out in Cover Sheet and exhibits hereto, Riot may, in its reasonable discretion, substitute alternative sponsorship opportunities having an equivalent value.

3. Co-Marketing Obligations

    3.1 <u>Services</u>. If the Cover Sheet specifies that The Parties will perform co-marketing obligations, then Sponsor will work with Riot to establish an effective co-marketing program whereby Sponsor and Riot each promote the other's products and services during the Term on a non-exclusive basis in a manner that is mutually acceptable to Sponsor and Riot. In particular, Each Party will use commercially reasonable efforts to perform the co-marketing services, if any, specified for it in the Cover Sheet and/or <u>Exhibit A</u> (**"Co-Marketing Obligations"**).

    3.2 <u>Co-Marketing</u> Expenses. Unless otherwise provided in Exhibit A, each party shall bear its own costs and expenses arising out of the performance of its Co-Marketing Obligations.

4. **CONSIDERATION**

    4.1 <u>Sponsorship Fee</u>. Sponsor shall pay Riot the non-refundable fees at the times and in the amounts specified in Cover Sheet (**"Sponsorship Fee"**). Sponsor acknowledges and agrees that its obligation to pay Riot the Sponsorship Fee in its entirety arises on the Effective Date, notwithstanding the installment dates set forth in the Cover Sheet.

    4.2 <u>Payment Terms</u>. On or before the date any Sponsorship Fee or any other payment hereunder becomes due, Riot shall submit an invoice to Sponsor. Sponsor agrees to pay Riot the invoiced amount within sixty (60) days of receipt of such invoice without any set-off, deduction or other withholding of any kind.

    4.3 <u>Taxes</u>. The Sponsorship Fee is exclusive of all national, federal, state and local taxes, which shall be paid by Sponsor in addition thereto.

    4.4 <u>Benefits in Kind</u>. Sponsor will provide Riot with the products and services, if any, listed in Cover Sheet or in <u>Exhibit A</u>. If Sponsor desires that any of its in-kind products be used at a Sponsored Event, it shall provide such products to Riot sufficiently in advance of the Sponsored Event so that Riot may properly test and evaluate such products and incorporate them into the Sponsored Event.

5. **QUALITY STANDARDS AND APPROVAL PROCESS**

    5.1 <u>Procedures for Submission and Review</u>. Sponsor shall submit to Riot for its approval a sample of any promotional materials depicting Riot Marks (as defined below) or including the Riot Materials (as defined below) at least ten (10) business days prior to distributing, displaying, and/or otherwise using such promotional materials and shall not distribute, display, and/or otherwise use such promotional materials without the prior written approval of Riot. Riot's approval, which may be granted or denied by Riot in exercise of its reasonable discretion, shall be given or denied within seven (7) business days after Riot's receipt

of Sponsor's request for approval. If Riot fails to respond to Sponsor's request for approval within the aforementioned seven (7) day period, then Riot's approval shall be deemed to have been denied. In such case, Sponsor shall have the right to request a response to its initial request by submitting such request in writing in accordance with the notice provisions of Section 11.6 below. Riot shall then be required to approve or deny the request within seven (7) business days following their receipt of Sponsor's written request for a response. If Riot again fails to respond to Sponsor's request within the subsequent seven (7) business day period, Sponsor's request for approval shall be deemed to have been granted by Riot.

5.2   Previously Approved Materials. Sponsor shall not be required to submit any previously approved (or deemed approved) usage of promotional materials for subsequent use. However, any change proposed by Sponsor in any previously approved promotional materials shall be submitted to Riot for approval and shall not be implemented without the prior written approval of Riot.

5.3   Restrictions on Certain Promotional Materials. Sponsor shall not place, display or post any promotional materials depicting the Riot Marks (or within or adjacent to any Riot Materials, wherever or however distributed) which, in the opinion of Riot, contains any material which is unlawful, libelous, obscene, indecent, threatening, intimidating, or harassing or otherwise objectionable, or that may harm the goodwill of the Game, Riot or any Riot Entity.

5.4   Quality Standards. Sponsor shall ensure that all of its uses of the Riot Marks conform to or exceed those quality standards and technical and operational specifications adopted and approved by Riot from time to time ("**Quality Standards**") and those imposed by applicable law. In the event that Riot wishes to modify the established Quality Standards, it will notify Sponsor in writing of such change, and will afford Sponsor a reasonable time period in which to adopt such changes as may be required in order for Sponsor to conform to the revised Quality Standards. Sponsor shall, at the request of the Riot, promptly withdraw any materials, which, in Riot's opinion, do not comply with the provisions of the Quality Standards, the terms of this Agreement or applicable law. For the avoidance of doubt, failure by Sponsor to comply with such a request shall constitute a material breach of this Agreement.

5.5   Trademark Designations. Sponsor shall cause the appropriate designation "™", or the registration symbol "®" to be placed adjacent to any Riot Mark in connection with the use thereof and to indicate such additional information as Riot shall reasonably specify from time to time concerning the license rights under which Sponsor uses the Riot Mark.

6.   **CONFIDENTIALITY AND PUBLIC COMMUNICATIONS**

6.1   Confidentiality Obligations. This Section 6 governs all disclosures of Confidential Information by either Party or any of its employees ("**Discloser**") to the other Party or any of its employees ("**Recipient**") that have been made prior to the Effective Date or may be made in the future. Recipient agrees not to use the Confidential Information of Discloser for any purpose, other than to perform its obligations under this Agreement. Recipient shall retain all Confidential Information in confidence, exercising at least the same standard of care used by Recipient to protect its own confidential or proprietary information (but in no event less than a reasonable degree of care), to prevent disclosure of Confidential Information to any third Party. However, Recipient may disclose Confidential Information to those employees, consultants, and/or agents of Recipient that have a need to know such information, provided that such persons are bound by non-disclosure terms at least as stringent as those set forth in this Section 6.1. Recipient agrees to promptly notify Discloser of any unauthorized possession or use of Confidential Information which may come to its attention. Nothing herein shall prevent Recipient from disclosing Confidential Information to the extent necessary to its auditors or legal advisors. The term "**Confidential Information**" means, whether disclosed prior to, on or after the Effective Date, any information transmitted to Recipient or its affiliates by Discloser or its affiliates, including software, all works of authorship (such as documents, artworks, music, etc.), programs, algorithms, devices, methods, techniques and processes, financial information and data, business plans, business strategies, marketing plans, customer lists, price lists, cost information, information about employees, descriptions of inventions, process descriptions, descriptions of technical know-how, information and descriptions of new products and new product development, technical specifications and documentation, or any other information that is not generally known to, and cannot be readily ascertained by others, and which has actual or potential economic value.

6.2   Exception to Confidentiality Obligations. Notwithstanding the foregoing, the obligations of the Recipient under Section 6.1 shall not apply to information that Recipient can prove: (a) was already known to Recipient at the time of its disclosure; (b) has been independently developed or ascertained by Recipient without reference to Discloser's Confidential Information; (c) becomes or has become publicly known through no wrongful action of Recipient; (d) is lawfully obtained from a third Party without any breach of a confidentiality or other legal obligation to the Discloser; (e) is approved for release by the Discloser in writing; or (f) is required by law, court or administrative order to be disclosed, provided that Recipient limits its disclosures to only that portion of Confidential Information that its counsel reasonably advises that it is legally required to disclose and, to the extent legally permissible, promptly provides prior written notice of the order to Discloser so that it may seek legal remedies to maintain the confidentiality of such Confidential Information.

6.3   Public Announcements. Without prejudice to Section 6.1 or any other non-disclosure or confidentiality agreement by and between the Parties, no public announcement or press release shall be made by either Party in relation to this Agreement or the transactions contemplated hereby, or otherwise in relation to the other Party, without the prior written consent of the other Party.

6.4 <u>Non-Disparagement</u>. Each Party agrees that it shall not make, publish or communicate to any person or entity in any online or other public forum any defamatory or disparaging remarks, comments or statements concerning (a) the other Party or any of its affiliates, or any of its or their respective employees, officers, or directors (each, an **"Affiliate" or "Entity"** and collectively, the **"Affiliates"**), (b) in the case of Sponsor, the Game or any other software, products or services of Riot; or (c) in the case of Riot, the products or any other products or services of Sponsor.

6.5 <u>Feedback</u>. Sponsor may from time to time provide suggestions, comments or other feedback (**"Feedback"**) to the Riot regarding new features or functionality for the Game and/or improvements to the Events, competitive Game play or the Riot Materials. Both parties agree that all Feedback is and shall be given entirely voluntarily. Feedback, even if designated as confidential by the person or entity offering the Feedback, shall not, absent a separate written agreement, create any confidentiality obligation for Riot or Riot Entities. Furthermore, except as otherwise expressly provided in a separate subsequent written agreement between the parties, Riot and the Riot Entities shall be free to use, disclose, reproduce, license or otherwise distribute and exploit the Feedback as it/they see fit, entirely without obligation or restriction of any kind on account of intellectual property rights, confidentiality obligations or otherwise.

7. **LICENSE AND OWNERSHIP**

7.1 <u>Ownership of Riot Materials</u>. Sponsor acknowledges and agrees that, as between the Sponsor on the one hand, and Riot and Riot Entities on the other hand, Riot or Riot Entities exclusively own all right, title and interest in and to (a) Riot's name and the names of Riot Entities, and any trade name, trademark, trade device, service mark or symbol used by Riot any Riot Entity, and any abbreviation or contraction thereof, including the marks LEAGUE OF LEGENDS™, RIOT GAMES™, and their associated logos; (b) the Game (including all versions, improvements, derivatives and sequels thereof) and all related content, data and materials developed for, displayed, played or otherwise made available in connection with the Game, including (i) the game interface, (ii) the data provided to or collected by the Game or generated from Game play, including user profile and account information, (iii) the storyline and the names of the characters or persons that appear or are described in the Game, (iv) the names of the places, scenes, things and events described in the Game, and (v) the short phrases, short sayings and the like that are set forth in the Game, as well as any translation, foreign language equivalents and combinations of the foregoing; (c) the emblems, badges, shields, insignia, designs, artwork, coats of arms and trophies used by Riot and the Riot Entities for the League of Legends Championship Series, World Championship and other Events; (d) any advertising or promotional materials created or used in connection with the Game or the Events(s); (e) any audio or video recording, or any photograph or digital image, of any Event or Game play; and (f) all goodwill, copyrights, trademark rights and other intellectual property and proprietary rights to all of the foregoing (collectively, the **"Riot Materials"**).

7.2 <u>Riot Grant of License</u>. Subject to the terms and conditions of this Agreement, Riot hereby grants to Sponsor during the Term a limited, non-transferable, non-exclusive right and license (without the right to sublicense) solely within the territory selected in the Cover Sheet (**"Territory"**) to reproduce, display, broadcast, distribute, and stream those trademarks and logos of Riot depicted on <u>Exhibit A</u> hereto (the "**Riot Marks**") solely in connection with the Co-Marketing Obligations, Sponsored Events and the Sponsorship Package in the product or service category or categories described in the Cover Sheet (**"Sponsor Category"**). All use of Riot Materials by Sponsor and all goodwill associated therewith shall inure solely to the benefit of Riot.

7.3 <u>Sponsor Grant of License</u>. Subject to the terms and conditions of this Agreement, Sponsor hereby grants to Riot and the Riot Entities a perpetual, transferable, non-exclusive, royalty-free, fully-paid, worldwide, and irrevocable right and license (with the right to sublicense) to use, reproduce, promote, host, display, broadcast, distribute, stream and otherwise utilize the trademarks and trade names of Sponsor depicted on <u>Exhibit A</u> hereto or otherwise provided or made available to Riot by Sponsor (**"Sponsor Marks"**) in connection with the Co-Marketing Obligations, Sponsored Events and the Sponsorship Package. The rights granted by Sponsor include the right to use the Sponsor Marks in connection with (a) streams or broadcasts of any Sponsored Event; (b) the websites of Riot and the Riot Entities and social media (e.g., Facebook and YouTube) postings and editorial content; or (c) any other activities related to the Game and Sponsored Events, in each case (items (a) through (c)), in any manner and in any media. Riot acknowledges and agrees that, as between Riot, on the one hand, and Sponsor on the other hand, Sponsor exclusively owns all right, title and interest in and to the Sponsor Marks.

7.4 <u>No Implied Rights</u>. Nothing in this Agreement or any invoice or purchase order issued hereunder shall be interpreted as granting to Sponsor any rights in or to the Riot Materials, other than the limited license rights set forth in Section 7.2.

7.5 <u>Restrictions</u>. Sponsor agrees that it shall not (a) use the Riot Materials on or in connection with any products or services other than the Sponsored Events, Co-Marketing Obligations and the Sponsorship Package in the Sponsor Category; (b) register or seek to register any Riot Materials with any governmental or other authority in its own name or in the name of any other person or entity anywhere in the world; (c) register or seek to register a domain name that consists of, incorporates, or is based, in whole or in part, on, any of the Riot Materials in its own name or in the name of any other person or entity; or (d) register, seek to register, or use anywhere in the world any word, symbol, character, or set of or combination of words, symbols, or characters, which in any language would be identified as the equivalent of any Riot Materials, or is confusingly similar in appearance, sound, meaning, or commercial impression to, a colorable imitation of, substantially similar to, misleading or deceptive with respect to, or dilutive of the distinctiveness of, the Riot Materials anywhere in the world,

in each case (items (a) through (d)) whether during the Term or at any time following the expiration or termination of this Agreement.

7.6  Compliance with Law.  Sponsor shall, when using the Riot Materials, (a) comply with all applicable law; (b) comply with Sponsor's privacy policies in handling, using and disclosing any information or materials received from end users of the Game or customers of Riot or the Riot Entities; (c) use industry standard security safeguards and software to protect such information and materials from loss, misuse and unauthorized alternation during its storage, processing and transmission. Sponsor shall at no time do, or allow to be done by any person or entity on behalf of Sponsor, whether by act or omission, anything that would (i) put into issue or otherwise adversely affect any registration of, or the strength, validity, enforceability, or ownership of, the Riot Materials, or (ii) damage, dilute, devalue or prejudice the reputation or goodwill of Riot, the Riot Entities or any of the Riot Materials.

8.  **REPRESENTATIONS AND WARRANTIES**

8.1  Representations of the Parties.  Each Party hereto represents and warrants to the other Party hereto, as follows: (a) it has the right to enter into, and fully perform its obligations under, this Agreement; (b) the execution and performance by it of its obligations hereunder will not constitute a breach of, or conflict with, any other agreement or arrangement, whether written or oral, by which it is bound; (c) it does not require the consent of any third Party to enter into and perform its obligations or to otherwise bind itself hereto as contemplated herein; (d) the materials provided by the Party will not infringe or violate any third party rights (including without limitation patents, trademarks, copyrights, trade secrets, moral rights, privacy or publicity rights, or rights of ownership); and (e) this Agreement is its legal, valid and binding obligation, enforceable in accordance with the terms and conditions hereof.

8.2  Disclaimer.  THE REPRESENTATIONS AND WARRANTIES SET FORTH IN THIS SECTION 8 ARE EACH PARTY'S ONLY REPRESENTATIONS AND WARRANTIES AND NO OTHER REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, WILL APPLY. WITHOUT LIMITING THE FOREGOING, SPONSOR EXPRESSLY ACKNOWLEDGES AND AGREES THAT ALL RIOT MATERIALS ARE MADE AVAILABLE ON AN **"AS IS"** BASIS.

9.  **LIMITATIONS OF LIABILITY; INDEMNIFICATION**

9.1  Limitations.  THE AGGREGATE LIABILITY OF EITHER PARTY TO THE OTHER PARTY FOR DAMAGES OF ANY KIND, WHETHER DIRECT OR INDIRECT AND REGARDLESS OF THE FORM OF ACTION OR THEORY OF LIABILITY (INCLUDING AN ACTION BASED UPON CONTRACT, TORT (INCLUDING NEGLIGENCE), MISREPRESENTATION, BREACH OF WARRANTY OR ANY OTHER LEGAL OR EQUITABLE GROUNDS) SHALL NOT EXCEED, AND EACH PARTY HEREBY WAIVES ANY CLAIMS IT MIGHT OTHERWISE HAVE TO BE COMPENSATED BY THE OTHER PARTY AND/OR THE OTHER PARTY AFFILIATES FOR ANY AMOUNT IN EXCESS OF, THE CUMULATIVE SPONSORSHIP FEES PAYABLE TO RIOT PURSUANT TO THIS AGREEMENT.  THE FOREGOING LIMITS (a) APPLY IN RESPECT OF ALL CLAIMS ARISING OUT OF THIS AGREEMENT, THE RESPECTIVE PARTIES' MARKS OR, IN THE CASE OF SPONSOR, THE RIOT MATERIALS, THE SPONSORED EVENT(S) AND THE OTHER ACTIONS CONTEMPLATED BY THIS AGREEMENT, AND (b) ARE THE CUMULATIVE MAXIMUM FOR WHICH EITHER PARTY AND ITS RESPECTIVE AFFILIATES ARE COLLECTIVELY RESPONSIBLE. MULTIPLE CLAIMS SHALL NOT INCREASE THESE LIMITS.

9.2  Limitation of Type of Damages.  REGARDLESS OF THE FORM OF ACTION OR THEORY OF LIABILITY, IN NO EVENT SHALL EITHER PARTY OR ITS RESPECTIVE AFFILIATES BE LIABLE FOR, AND THE OTHER PARTY HEREBY WAIVES ANY CLAIMS IT MIGHT OTHERWISE HAVE TO BE COMPENSATED BY SUCH PARTY OR ITS AFFILIATES FOR, ANY INDIRECT, SPECIAL, INCIDENTAL, PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES ARISING OUT OF THIS AGREEMENT, THE MARKS, THE RIOT MATERIALS, THE SPONSORED EVENT(S) AND THE OTHER ACTIONS CONTEMPLATED BY THIS AGREEMENT, INCLUDING ANY LOSS OF USE, LOSS OF DATA, LOSS OF PROFITS, LOSS OF SAVINGS, LOSS OF GOODWILL, PECUNIARY LOSS, LOSS OF BUSINESS, BUSINESS INTERRUPTION OR CLAIMS OF THIRD PARTIES.

9.3  Indemnification.  Each Party shall indemnify, defend, and hold harmless the other Party and its Affiliates from and against any and all damages, liabilities, penalties, costs (including reasonable counsel fees and court costs), or other losses finally awarded in a court of competent jurisdiction and to the extent arising from or caused by any third Party claim, suit, action, demand, or proceeding (a) that is based on any allegation which, if true, would constitute a material breach by a Party of any of its covenants or obligations in this Agreement, and/or a material breach of, or any material inaccuracy in, any representation or warranty made by a Party in this Agreement; (b) that alleges personal injury or property damage arising out of the fault or negligence of a Party, its representatives, agents, or employees; or (c) that alleges that any trademarks or intellectual property of a Party, or the use thereof by the other Party pursuant to this Agreement infringes or misappropriates any trademark or other proprietary right held by any third Party. The indemnifying Party's indemnity obligations under this Section 9.3 are contingent on (a) the indemnified Party's provision to the indemnifying Party of reasonably prompt notice in writing upon receiving knowledge of any claim; (b) the indemnifying Party having sole control over the defense of the claim and any negotiation for its settlement or compromise (other than to the extent prejudicial to the indemnified Party); and (c) the indemnified Party taking no action that impairs the indemnifying Party's defense of the claim.

10.  **TERM AND TERMINATION**

10.1  Term.  This Agreement shall commence on the Effective Date and shall continue through the date that is specified on Cover Sheet, unless sooner terminated as provided herein (the **"Term"**).

10.2  Termination for Breach (General).  Either Party has the right to immediately terminate this Agreement in the event the other Party commits a material breach that is not cured

within thirty (30) days of its receipt of notice from the non-breaching Party of such breach.

10.3 Termination for Breach (Specific).

(a) Either Party shall have the right to immediately terminate this Agreement, in the event that the other Party terminates its business activities or becomes insolvent, admits in writing to inability to pay its debts as they mature, makes an assignment for the benefit of creditors, or becomes subject to direct control of a trustee, receiver or similar authority.

(b) Either Party shall have the right to terminate this Agreement (the "**Terminating Party**") if the other Party commits any act or becomes involved in any situation or occurrence which, the Terminating Party demonstrates, brings the impacted Party's products and services into material public disrepute (the "**Impacted Party**"), and such impact may not be reasonably addressed or mitigated through the Impacted Party's good faith efforts. In the event of such act, situation or occurrence, the Impacted Party shall notify the other Party thereof as soon as possible, and both Parties shall elevate to their respective senior management to jointly discuss in good faith any potential remedies and options which may be taken in order to reasonably address the other Party's concerns and mitigate such material adverse effect. If Parties are unable to agree on remedies or mitigation strategy within a reasonable period considering the severity of the conduct to the other Party's reasonable satisfaction, Terminating Party may promptly terminate this Agreement by giving written notice thereof to the Impacted Party.

10.4 Effect of Termination and Survival. The termination or expiration of this Agreement shall not affect any of the provisions of this Agreement which are expressly or by implication to continue in force after such termination or expiration, including Sections 4.3, 6, 7, 9 and this Section 10.4. Following the termination or expiration of this Agreement, Sponsor will immediately (a) cease any and all uses of Riot Materials; and (b) return to Riot or destroy (as designated by Riot) any and all Riot Materials and Riot Confidential Information in Sponsor's possession or control. Notwithstanding the return of Riot Confidential Information, Sponsor will continue to be bound by the obligations of confidentiality hereunder.

11. **GENERAL TERMS**

11.1 Costs and Expenses. Except as expressly provided herein, each Party shall bear its own costs and expenses arising out of the negotiation and performance of this Agreement.

11.2 Relationship of the Parties. Sponsor is and shall be deemed to be an independent contractor of Riot and nothing contained herein shall be deemed to constitute a partnership between or a joint venture by the Parties hereto, or cause either Party to be deemed the employee or agent of the other. Each Party acknowledges that nothing in this Agreement gives either Party the right to bind or commit the other to any agreements with any third Parties. With the exception of the Riot Entities, each of which is expressly an intended third Party beneficiary of this Agreement (with independent rights of enforcement), this Agreement is not entered into for the benefit of any other third Party and shall not be deemed to give any right or remedy to any such Party regardless of whether it is referred to herein.

11.3 No Assignment. Unless prior written consent of the other Party is obtained (not to be unreasonably withheld), neither Party shall assign or delegate any of its rights or obligations arising out of this Agreement, by operation of law or otherwise. Any attempted assignment or delegation shall be null, void and without effect.

11.4 Governing Law; Remedies. This Agreement shall be governed by and construed in accordance with the laws of the State of California, without giving effect to its principles or rules of conflicts of laws. Except as otherwise provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by applicable law. In the event of a breach by Riot of any provision of this Agreement, Sponsor shall be limited to Sponsor's remedies at law for direct damages, if any, and in no event shall Sponsor be entitled to enjoin or restrain Riot from operating any Event or conducting any other activity contemplated by this Agreement.

11.5 Dispute Resolution. Any controversy or claim arising out of or relating to this Agreement, or the breach thereof (**"Dispute"**), shall be settled by arbitration administered by JAMS in accordance with the JAMS Comprehensive Arbitration Rules and Procedures (**"JAMS Rules"**), and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. There shall be a single, neutral arbitrator appointed as provided in the JAMS Rules. The Parties agree that the process set forth in this Section shall be the exclusive means for resolving all Disputes and that any arbitration conducted pursuant to this Agreement shall be limited to the Disputes between Sponsor and Riot. SPONSOR ACKNOWLEDGES AND AGREES THAT (A) THERE IS NO RIGHT OR AUTHORITY FOR ANY DISPUTE TO BE ARBITRATED ON A CLASS-ACTION BASIS OR TO UTILIZE CLASS ACTION PROCEDURES; (B) THERE IS NO RIGHT OR AUTHORITY FOR ANY DISPUTE TO BE BROUGHT IN A PURPORTED REPRESENTATIVE CAPACITY OR AS A PRIVATE ATTORNEY GENERAL; AND (C) NO ARBITRATION SHALL BE JOINED WITH ANY OTHER.

11.6 Notices. All notices, consents, approvals and other communications provided for herein shall be in writing addressed as set forth on the Cover Sheet attached hereto and shall be deemed delivered three days after being sent by a recognized express courier service that maintains records of receipt.

11.7 Force Majeure. Notwithstanding anything to the contrary in this Agreement, neither Party will be liable for any delays in the performance or non-performance of any of its obligations hereunder due to causes beyond its reasonable control, including earthquake, fire, strike, war, riots, acts of any civil or military authority, acts of God, judicial action, changes in applicable law, unavailability or shortages of labor, materials or

equipment, terrorism or threat thereof, outbreak of disease or other public health hazard, including continued or repeated outbreak of COVID-19. In such an event, the Party unable to meet its obligations will promptly notify the other in writing (email sufficient) of the circumstances. Notwithstanding anything set forth above, in the event that Riot makes a reasonable determination (taking into account travel restrictions, the health and safety of players and production crews, public safety concerns, applicable laws and regulations and other relevant factors) that any of the Sponsored Events is required to be cancelled in light of any such Force Majeure event, then Parties shall in good faith collaborate on a substitution or alternative sponsorship opportunity of equivalent brand and exposure value.

11.8    Severability. The provisions of this Agreement are severable and the unenforceability of any provision of this Agreement shall not affect the enforceability of any other provision of this Agreement.  In addition, in the event that any provision of this Agreement (or portion thereof) is determined by an arbitrator or court of competent jurisdiction to be unenforceable as drafted by virtue of the scope, duration, extent or character thereof or otherwise, then such provision (or portion thereof) shall be construed in a manner designed to effectuate the purposes of such provision (or portion thereof) to the maximum extent enforceable under applicable law.

11.9    Construction. Except where the context requires otherwise, whenever used in this Agreement, the singular includes the plural, the plural includes the singular, the use of any gender is applicable to all genders and the word "or" has the inclusive meaning represented by the phrase "and/or." The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."

11.10    Entire Agreement. This Agreement:  (a) may be executed in one or more counterparts, each of which shall be an original, but all of which together shall constitute one instrument; (b) may be amended, waived or supplemented only by written instrument signed by the Parties hereto; and (c) shall be binding upon the respective successors, trustees and permitted assigns of the Parties hereto.  This Agreement and the exhibits attached hereto constitute the entire agreement and understanding of the Parties with respect to its subject matter and supersede all oral communications and prior writings with respect thereto.  For purposes of this Agreement, a signature on a counterpart sent by facsimile or as a Portable Document Format (PDF) attachment to an email shall be fully binding as though it was an original signature.

Exhibit A
Sponsorship Package, Promotional Activities and Additional Business Terms

1. **Sponsorship Package:** The Sponsorship Package purchased by Sponsor confers on Sponsor the following benefits, solely in the Territory and solely during the Term:

a) **Official Status**. Official designation and the right to use such designation on all of Sponsor's products and services in the Sponsor Category during the Term: Official Cryptocurrency Exchange Partner of the LCS.

In the event that Riot allows "crypto" as a permitted sponsor designation for the Sponsored Events, Sponsor shall have the right to use the official designation "Official Crypto Partner of the LCS" (or other mutually agreed upon designation) in the Territory.

b) **Intellectual Property/Marks**

(1) Sponsor shall have the right to utilize Riot Marks and specified other LoL esports images, photos, artwork, and footage, in connection with the promotion, marketing, and advertising of the Sponsored Events within the Territory, with each use subject to Riot's prior written approval.
(2) Access to approved, official LoL Esports photography for PR and social media uses.
(3) Use of Riot Marks, footage, images and logos for consumer promotions, including content and promotional materials, in each instance with Riot's written approval. Final execution shall align with Riot guidelines on usage of athletes, team logos, etc., which Riot shall provide prior to campaign launch.

c) **Tentpole Partnership Platforms**

(1) **GOLD ENTITLEMENT: FTX GOLD**

Fixed Broadcast Placement

FTX Gold will enable Sponsor branding next to both team's gold meters as shown below, by way of example. For the avoidance of doubt, the branding under the gold meter is fixed. The lower left unit on all images is a rotating brand billboard for LCS partners (see the Summary of Broadcast Integrations chart in Section 1(e) below for frequency of rotation).



FTX Gold Players Graph

In addition to the fixed placement above, the FTX Gold Players Graph will showcase player gold breakdowns, as shown by way of example below.



FTX Gold Team Graph

The FTX Gold Team Graph will engage fans as teams' gold levels are analyzed by shoutcasters throughout the broadcast, as shown below by way of example only.



(2) **FTX MOST IMPROVED PLAYER AWARD AND TROPHY** (beginning in 2022). Sponsor will have the opportunity to entitle the Most Improved Player ("**MIP**") award. As part of the partnership, Riot will expand the MIP award to twice a year. The award will be given during each split's postseason to a player that is on track to take their career to the next level. As the entitlement partner, Sponsor will have the designation and exposure for all content and/or components surrounding the MIP race and award delivery, including but not limited to the following:
- Broadcast segment following the MIP race (see Summary of Broadcast Integrations chart in Section 1(e) below)

- Trophy branding
- Bespoke logo lock
- Award announcement during each Split Postseason (2x per year)

(3) **FTX COMMUNITY TOURNAMENTS**. Riot will coordinate two online community tournaments each year for Sponsor. Riot will engage a mutually agreed tournament operator to run the online tournaments, and Sponsor and Riot will agree on the themes and prizing for the tournaments.
- Riot Responsibilities
    - Identify and secure the third party tournament operator to produce two community tournaments per year (at Riot's expense)
    - Collaborate with Sponsor on the theme of the community tournaments, prizing and messaging.

- Sponsor Responsibilities
    - Collaborate with Riot on the choice of tournament operator
    - Collaborate with Riot on the theme of the community tournaments, prizing and messaging.
    - Cover cost of mutually agreed prizing

d) **Miscellaneous Benefits**

(1) **Quarterly Executive Partnership Meetings.** Riot and Sponsor will meet quarterly to discuss key initiatives, R&D projects, educational platforms, marketing initiatives and other mutually agreed topics with the goal of growing and evolving the partnership. Discussions may include but are not limited to:
- Early briefings on new LCS and broader Riot opportunities and potential future endeavors
- Early briefings on new Sponsor technology and business plans
- Explore additional opportunities to collaborate

(2) **Social Media Amplification.** The Parties will collaborate to create a social and digital plan that can be jointly promoted throughout the Term (e.g. amplifying Sponsor's broadcast integrations on Riot and Sponsor official social channels). All digital and social media amplification platforms shall be mutually agreed upon by both Parties.

- Riot Responsibilities
    - Minimum of 6 social media posts annually on official LCS social channels. Content, platforms and frequency will be at Riot's creative discretion.

- Sponsor Responsibilities
    - Minimum of 6 social media posts annually on official Sponsor social media pages. Content, platforms and frequency will be at Sponsor's creative discretion.

(3) **VIP Hospitality**. Riot will provide Sponsor with the following complimentary number of event tickets to be used as hospitality and giveaways, subject to compliance with the conditions of entry applicable to such tickets.
- Tickets (across all days) to each key event (based on venue size, flexibility of layout, and subject to availability):
    - LCS Spring and Summer Splits- 30 tickets to be used during season
    - LCS Mid-Season Showdown (Spring Split Final) and LCS Championship (Summer Split Final)- 10 tickets each event (20 total)
- For use by Sponsor employees, recruits, partners, vendors and key customers
- For use in promotional sweepstakes and activations in connection with the LoL Esports partnership

e) **Broadcast Integration.** Riot shall provide Sponsor with the following content integration opportunities in the English language streams of the Sponsored Events as set forth in the chart below.

(1) **Broadcast Segment: FTX Most Improved Player Segment (working title)**. Sponsor shall have the opportunity to present a broadcast segment updating fans on the race to secure the MIP. This can include, but is not limited to, an update on the MIP race, rankings, or the award winner's player profile. Sponsor will have the right to use the broadcast footage replays and highlights, with Riot approval, to create shareable moments on social media. The specific details of this integration shall be mutually determined by the Parties.

(2) **In-Game Rotating Logo Billboard (online broadcast).** Content to be mutually agreed upon and must fit within the billboard specifications provided by Riot. Sponsor creative content can include product, full-color logo, call-to-action,

etc.

(3) **Advertisement Spots Aired in the Broadcast.** Sponsor will have the right to run mutually agreed upon Sponsor advertisements to be aired in the broadcast marketing to LCS Esports viewers. The :15 or :30 second spot will be run in high-impact placements throughout the broadcast. All broadcasts are posted as VODs.

(4) **Summary of Broadcast Integrations.** Unless otherwise mutually agreed upon and subject to the terms herein, the following summary of broadcast integrations shall be included:

| **Key Broadcast Feature** | **Sponsored Events** | **Broadcast Feeds** | **Length** | **Frequency** |
|---|---|---|---|---|
| FTX Gold Fixed Broadcast Placement | LCS Spring & Summer Split, Playoffs & Finals | English | Entire game | Persistent on screen branding |
| FTX Gold Players Graph | LCS Spring & Summer Split | English | :15 | 1x per game |
| FTX Gold Team Graph | LCS Spring & Summer Split | English | :15 | 1x per game |
| Broadcast Segment: FTX Most Improved Player Segment (working title) | LCS Spring & Summer Split | English | Up to 1 minute | 1x per weekend (starting wk 6) |
| In-Game Rotating Logo Billboard | LCS Spring & Summer Split, Playoffs & Finals | English | Up to 1 minute | Est. 3x per game (total frequency contingent upon gameplay) |
| Advertisement Spot | LCS Spring & Summer Split, Playoffs & Finals | English | :15 to :30 seconds | 1x/weekend |

(5) The Parties agree that Sponsor will be considered at least a top-four partner in terms of on-screen exposure time during gameplay (where gameplay is defined as when the game timer starts until game ends, and where partner is defined as a commercial 3rd party, non-broadcast, LCS partner (pro-teams excluded)).

**2. Category Exclusivity:**

Sponsor shall be the exclusive sponsor of the Sponsored Events within the Territory in the Sponsor Category during the Term.

Sponsor acknowledges and agrees that Sponsor is not the sole or exclusive sponsor of the Game or the Sponsored Event(s), and that Riot and any Riot Affiliate shall be free to enter into a sponsorship or other agreement with any third party outside of the applicable Sponsor Categories as such Sponsor Categories are restricted above. Sponsor understands, acknowledges and agrees that Riot does not control or direct the relationships between other companies in the Sponsor Categories and any professional esports team and/or their players; that such team and/or player partner branding may appear during competition matches and at other times.

**3. Territory and Language:**

The scope of Sponsor's rights under this Agreement would apply to North America (United States and Canada), provided that the Internet is accessible worldwide.

The broadcast integration applies to the English stream of LCS. Note that Riot does not geo-restrict broadcast streams to specific territories. Broadcast streams are available in any part of the world where the applicable streaming platform is available.

4. **Joint Promotional Activities:**

   The Parties will reasonably support the promotions described in Section 1 above with web messaging/content and a fully-developed social media plan as mutually determined by the Parties.

5. **Riot Mark(s) (insert below):**

   

   The foregoing Riot Marks are provided subject to the terms and conditions set forth herein, and are subject to revision at Riot's discretion. Additional Riot Marks to the extent mutually agreed upon.

6. **Sponsor Mark(s) (insert below):**

   

   The foregoing Sponsor Marks are provided subject to the terms and conditions set forth herein, and are subject to revision at Sponsor's discretion. Additional Sponsor Marks may be provided to the extent mutually agreed upon.

*   *   *