# Exhibit C

**Exhibit C**



Alvarez & Marsal North America, LLC
2100 Ross Avenue, 21st Floor
Dallas, TX 75201
Phone: +1 214 438 1000
Fax: +1 214 438 1001

November 9, 2022

FTX Trading Ltd.
Friar's Hill Road, Mandolin Place
Saint John's, AG-04, Antigua and Barbuda

Dear Ladies and Gentlemen:

This letter confirms and sets forth the terms and conditions of the engagement between Alvarez & Marsal North America, LLC ("A&M") and FTX Trading Ltd. and its affiliates who file for chapter 11 (jointly and severally, the "Company"), including the scope of the services to be performed and the basis of compensation for those services. Upon execution of this letter by each of the parties below and receipt of the retainer described below, this letter will constitute an agreement between the Company and A&M (the "Agreement").

1. Description of Services

    (a) A&M shall provide consulting services to the Company at the direction of the Company's officers and directors (the "Responsible Officer(s)") in connection with their efforts in seeking to improve the Company's financial and operating performance, reporting directly to them, and assist the Company in its reorganization efforts. It is anticipated that A&M's activities shall include the following:

    *(i)* assistance in contingency planning and preparation of related documentation, relevant reporting and analyses;

    *(ii)* assistance in the development and management of a 13-week cash flow forecast;

    *(iii)* provide testimony on matters related to our engagement;

    *(iv)* report to the Board as desired or directed by the Responsible Officer(s); and

    *(v)* other activities as are approved by you, the Responsible Officers or the Board and agreed to by A&M.

    In rendering its services to the Company, A&M will report directly to the Responsible Officer(s) and will make recommendations to and consult with the

    Responsible Officers and other senior officers as the Board or Responsible Officer(s) direct.

(b) In connection with the services to be provided hereunder, from time to time A&M may utilize the services of employees of its affiliates and subsidiaries. Such affiliates are wholly owned by A&M's parent company and employees.

A&M personnel providing services to the Company may also work with other A&M clients in conjunction with unrelated matters.

2.  Information Provided by the Company and Forward Looking Statements

The Company shall use all reasonable efforts to: (i) provide A&M with access to management and other representatives of the Company; and (ii) to furnish all data, material, and other information concerning the business, assets, liabilities, operations, cash flows, properties, financial condition and prospects of the Company that A&M reasonably request in connection with the services to be provided to the Company. A&M shall rely, without further independent verification, on the accuracy and completeness of all publicly available information and information that is furnished by or on behalf of the Company and otherwise reviewed by A&M in connection with the services performed for the Company. The Company acknowledges and agrees that A&M is not responsible for the accuracy or completeness of such information and shall not be responsible for any inaccuracies or omissions therein. A&M is under no obligation to update data submitted to it or to review any other areas unless specifically requested by the Board to do so.

You understand that the services to be rendered by A&M may include the preparation of projections and other forward-looking statements, and numerous factors can affect the actual results of the Company's operations, which may materially and adversely differ from those projections. In addition, A&M will be relying on information provided by the Company in the preparation of those projections and other forward-looking statements.

3.  Limitation of Duties

A&M makes no representation or guarantee that, inter alia, (i) an appropriate restructuring proposal or strategic alternative can be formulated for the Company (ii) any restructuring proposal or strategic alternative presented to the Company's management or the Board or Responsible Officers will be more successful than all other possible restructuring proposals or strategic alternatives, (iii) restructuring is the best course of action for the Company or (iv) if formulated, that any proposed restructuring plan or strategic alternative will be accepted by any of the Company's creditors, shareholders and other constituents. Further, A&M does not assume any responsibility for the Company's



decision to pursue, or not pursue any business strategy, or to effect, or not to effect any transaction. A&M shall be responsible for assistance with the implementation only of the restructuring proposal or strategic alternative approved by the Board or Responsible Officers and only to the extent and in the manner authorized by and directed by the Board or Responsible Officers and agreed to by A&M.

Depending on future developments the spread of the Coronavirus has the potential to affect the services provided under this Agreement. Travel, work place and mobility restrictions (to include measures reasonably mandated by A&M with respect to its employees and personnel) may restrict travel to the Company and other work sites as well as limit access to facilities, infrastructure, information and personnel of A&M, the Company or others. Such circumstances may adversely affect the timetable or content of A&M's deliverables and completion of the scope of services included in this Agreement. A&M will discuss with the Company if A&M believes that the services may be impacted in this way. The Company accepts and acknowledges that A&M employees and personnel may attend at the Company's locations or physically interact with the Company's employees and personnel in connection with the services, unless A&M or the Company decide that this should not be the case.

4. <u>Compensation</u>

   (a) A&M will receive fees based on the following hourly rates:

   | Managing Directors | $975-1,295 |
   | Directors | $750-950 |
   | Analysts/Associates | $425-750 |

   Such rates shall be subject to adjustment annually at such time as A&M adjusts its rates generally.

   (b) In addition, A&M will be reimbursed for its reasonable out-of-pocket expenses incurred in connection with this assignment, such as travel, lodging, meals, messenger and wireless charges. A&M also charges a flat rate of 3% of professional fees to cover otherwise unbilled items such as telephone and conferencing charges, computer use, technology and software license fees, research subscriptions and other internal services. All fees and expenses will be billed on a weekly basis or, at A&M's discretion, more frequently. Invoices are payable upon receipt.

   (c) The Company shall promptly remit to A&M a retainer in the amount of $1,000,000.00 (the "Retainer"). The Retainer will be held in a segregated non-interest-bearing account (which may hold other A&M and A&M affiliate client



retainers), separate from the general account to which A&M will direct payment of ongoing fees and expenses. Absent your agreement to the contrary, A&M may only draw on the Retainer (or a portion thereof) in order to apply to invoices that are due and payable or other amounts due under this Agreement or as the Company may otherwise agree and the Company will be informed of such application of the Retainer. If a Retainer is to be increased or decreased, the foregoing shall apply.

5. Term

 (a) This Agreement will apply from the commencement of the services referred to in Section 1 and may be terminated with immediate effect by either party without cause by written notice to the other party.

 (b) A&M normally does not withdraw from an engagement unless the Company misrepresents or fails to disclose material facts, fails to pay fees or expenses, or makes it unethical or unreasonably difficult for A&M to continue performance of the engagement, or other just cause exists.

 (c) On termination of the Agreement, any fees and expenses due to A&M shall be remitted promptly (including fees and expenses that accrued prior to but are invoiced subsequent to such termination).

 (d) The provisions of this Agreement that give the parties rights or obligations beyond its termination shall survive and continue to bind the parties.

6. Relationship of the Parties

The parties intend that an independent contractor relationship will be created by this engagement letter. Neither A&M nor any of its personnel or agents is to be considered an employee or agent of the Company and the personnel and agents of A&M are not entitled to any of the benefits that the Company provides for the Company employees. The Company acknowledges and agrees that A&M's engagement shall not constitute an audit, review or compilation, or any other type of financial statement reporting engagement that is subject to the rules of the AICPA, SEC or other state or national professional or regulatory body.

7. No Third Party Beneficiary

The Company acknowledges that all advice (written or oral) provided by A&M to the Company in connection with this engagement is intended solely for the benefit and use of the Company (limited to its Board and management) in considering the matters to which



this engagement relates. The Company agrees that no such advice shall be used for any other purpose or reproduced, disseminated, quoted or referred to at any time in any manner or for any purpose other than accomplishing the tasks referred to herein without A&M's prior approval (which shall not be unreasonably withheld), except as required by law.

8. Conflicts

A&M is not currently aware of any relationship that would create a conflict of interest with the Company or those parties-in-interest of which you have made us aware. We note that A&M has made certain personnel available to provide financial advisory services to Celsius Network LLC, and its affiliated debtors and debtors-in-possession ("Celsius") in connection with Celsius' Chapter 11 bankruptcy cases. The Company has an account with Celsius and is a creditor in Celsius' Chapter 11 cases. Because of A&M's representation of Celsius, A&M personnel will recuse themselves on this engagement from any involvement in disputes related to the Company's Celsius account or other matters adverse to Celsius. In addition, A&M will institute an information barrier to ensure that confidentiality of information is protected and that the engagements are not cross-staffed. Because A&M and its affiliates and subsidiaries comprise a consulting firm (the "Firm") that serves clients on a global basis in numerous cases, both in and out of court, it is possible that the Firm may have rendered or will render services to or have business associations with other entities or people which had or have or may have relationships with the Company, including creditors of the Company. The Firm will not be prevented or restricted by virtue of providing the services under this Agreement from providing services to other entities or individuals, including entities or individuals whose interests may be in competition or conflict with the Company's, provided the Firm makes appropriate arrangements to ensure that the confidentiality of information is maintained. Each of the entities comprising the definition of Company (each, a "Company Entity") acknowledges and agrees that the services being provided hereunder are being provided on behalf of each of them and each of them hereby waives any and all conflicts of interest that may arise on account of the services being provided on behalf of any other Company Entity. Each Company Entity represents that it has taken all corporate action necessary and is authorized to waive such potential conflicts of interest.

9. Confidentiality / Non-Solicitation

A&M shall keep as confidential all non-public information received from the Company in conjunction with this engagement, except: (i) as requested by the Company or its legal counsel; (ii) as required by legal proceedings or (iii) as reasonably required in the performance of this engagement. All obligations as to non-disclosure shall cease as to any part of such information to the extent that such information is or becomes public



other than as a result of a breach of this provision.  The Company, on behalf of itself and its subsidiaries and affiliates and any person which may acquire all or substantially all of its assets agrees that, until two (2) years subsequent to the termination of this engagement, it will not solicit, recruit, hire or otherwise engage any employee of A&M or any of its affiliates who worked on this engagement while employed by A&M or its affiliates ("Solicited Person").  Should the Company or any of its subsidiaries or affiliates or any person who acquires all or substantially all of its assets extend an offer of employment to or otherwise engage any Solicited Person and should such offer be accepted, A&M shall be entitled to a fee from the Company equal to the Solicited Person's hourly client billing rate at the time of the offer multiplied by 4,000 hours for a Managing Director, 3,000 hours for a Senior Director and 2,000 hours for any other A&M employee. The Company acknowledges and agrees that this fee fairly represents the loss that A&M will suffer if the Company breaches this provision.  The fee shall be payable at the time of the Solicited Person's acceptance of employment or engagement.

10. Indemnification and Limitations on Liability

The attached indemnification and limitation on liability agreement is incorporated herein by reference and shall be executed upon the acceptance of this Agreement.  Termination of this engagement shall not affect these indemnification and limitation on liability provisions, which shall remain in full force and effect.

11. Data Protection.  In the provision of Services under this Agreement, A&M may collect, access, process, store, or transfer Company Personal Data (as defined below).  A&M and Company shall each comply with all Data Protection Laws (as defined below) directly applicable to their respective processing of Company Personal Data.  A&M shall implement and maintain appropriate physical, technical, and organizational safeguards reasonably designed to protect the security of Company Personal Data.  A&M shall notify Company without undue delay (within 72 hours) of becoming aware of any Personal Data Breach (as defined below) affecting Company Personal Data.  Company is responsible for providing notices to, and obtaining consents from, any individuals whose Personal Data will be processed by A&M as part of the Services, to the extent any such notice and/or consent is required under applicable Data Protection Laws; and, for responding to any personal data access, deletion, and/or similar requests made under applicable Data Protection Laws.  Company shall use reasonable efforts, where able, to limit the Company Personal Data that it provides or makes available to A&M to only information that is necessary for A&M's performance of the Services, including by removing and/or de-identifying datasets where feasible.  Company is responsible for determining the requirements of Data Protection Laws applicable to its business, and for providing A&M with any instructions that A&M must comply with in order for Company to satisfy its own regulatory obligations.  If Company's transfer of Company Personal

Data to A&M would be prohibited by General Data Protection Regulation 2016/679 of the European Parliament and of the Council ("GDPR") or other Data Protection Laws in the absence of an adequacy decision, standard contractual clauses, or other permitted transfer mechanism, Company shall be responsible for ensuring that appropriate safeguards are in place including, where applicable, by entering into appropriate standard contractual clauses with A&M. Company acknowledges that A&M may, where relevant to the Services, transfer Company Personal Data to third parties, including, but not limited to, other agents and professionals of the Company acting within this matter (i.e., the Company's counsel, other advisors or agents) as well as, at Company's direction, other Company constituents; and, that A&M's transfer of such data directly to third parties (rather than by the Company to a third party) is for the Company's convenience and such transfers shall always be deemed to be on the Company's behalf.

As used herein, "Data Protection Laws" means all laws, rules and regulations pertaining to the privacy and security of Personal Data; "Personal Data" means all "personal data", "personal information", "personally identifiable information" and similarly defined terms under Data Protection Laws directly applicable to Company and/or A&M in connection with A&M's performance of the Services, or where no such laws apply, any information that identifies or relates to an identified individual; "Company Personal Data" means any Personal Data (in respect of Company (e.g., its own workforce) or any third-party (e.g., target entity, creditor, supplier, etc.) that Company provides or makes available to A&M (e.g., through a data room) in connection with A&M's performance of the Services, but excludes contact details of Company personnel that A&M processes in order to manage the business relationship with Company; and, "Personal Data Breach" means any breach of security leading to the accidental or unlawful destruction, loss, alteration, unauthorized disclosure of, or access to, Personal Data.

12. <u>Joint and Several Liability</u>

   <u>Each Company Entity hereby acknowledges and agrees that they are each jointly and severally liable to A&M and its affiliates for all of the Company's representations, warranties, covenants, liabilities and obligations set forth in the Agreement. Any beneficiary of this agreement may seek to enforce any of its rights and remedies hereunder against any or all Company Entities in any order at any time in its sole discretion.</u>

13. <u>Miscellaneous</u>

   This Agreement (together with the attached indemnity provisions), including, without limitation, the construction and interpretation thereof and all claims, controversies and disputes arising under or relating thereto, shall be governed and construed in accordance



with the laws of the State of New York, without regard to principles of conflict of law that would defer to the laws of another jurisdiction. The Company and A&M agree to waive trial by jury in any action, proceeding or counterclaim brought by or on behalf of the parties hereto with respect to any matter relating to or arising out of the engagement or the performance or non-performance of A&M hereunder. The Company and A&M agree, to the extent permitted by applicable law, that any Federal Court sitting within the Southern District of New York shall have exclusive jurisdiction over any litigation arising out of this Agreement; to submit to the personal jurisdiction of the Courts of the United States District Court for the Southern District of New York; and to waive any and all personal rights under the law of any jurisdiction to object on any basis (including, without limitation, inconvenience of forum) to jurisdiction or venue within the State of New York for any litigation arising in connection with this Agreement.

This Agreement shall be binding upon A&M and the Company, their respective heirs, successors, and assignees, and any heir, successor, or assignee of a substantial portion of A&M's or the Company's respective businesses and/or assets, including any Chapter 11 Trustee. This Agreement incorporates the entire understanding of the parties with respect to the subject matter hereof and may not be amended or modified except in writing executed by the Company and A&M. The Company agrees that A&M may aggregate information provided by or on behalf of the Company during this engagement with information provided by or on behalf of others and use and disclose that information in de-identified form as part of research and advice, including, without limitation, benchmarking services. Notwithstanding anything herein to the contrary, A&M may reference or list the Company's name and/or logo and/or a general description of the services in A&M's marketing materials, including, without limitation, on A&M's website.

If the foregoing is acceptable to you, kindly sign the enclosed copy to acknowledge your agreement with its terms.

    Very truly yours,

    Alvarez & Marsal North America, LLC

    By: _____
        Ed Mosley
        Title: Managing Director

Accepted and agreed:



FTX Trading Ltd.
*on behalf of itself and its affiliates*

By: Timothy Wilson
    —DocuSigned by:
    E82DEF6B51A44D7...
Timothy Wilson, Authorized Signatory



## **INDEMNIFICATION AND LIMITATION ON LIABILITY AGREEMENT**

This indemnification and limitation on liability agreement is made part of an agreement, dated November 9, 2022 (which together with any renewals, modifications or extensions thereof, is herein referred to as the "Agreement"), by and between Alvarez & Marsal North America, LLC ("A&M") and FTX Trading Ltd. and its affiliates (jointly and severally, the "Company"), for services to be rendered to the Company by A&M.

A.  The Company agrees to indemnify and hold harmless each of A&M, its affiliates and their respective shareholders, members, managers, employees, agents, representatives and subcontractors (each, an "Indemnified Party" and collectively, the "Indemnified Parties") against any and all losses, claims, damages, liabilities, penalties, obligations and expenses, including the costs for counsel or others (including employees of A&M, based on their then current hourly billing rates) in investigating, preparing or defending any action or claim, whether or not in connection with litigation in which any Indemnified Party is a party, or enforcing the Agreement (including these indemnity provisions), as and when incurred, caused by, relating to, based upon or arising out of (directly or indirectly) the Indemnified Parties' acceptance of or the performance or nonperformance of their obligations under the Agreement; provided, however, such indemnity shall not apply to any such loss, claim, damage, liability or expense to the extent it is found in a final judgment by a court of competent jurisdiction (not subject to further appeal) to have resulted primarily and directly from such Indemnified Party's gross negligence or willful misconduct. The Company also agrees that (a) no Indemnified Party shall have any liability (whether direct or indirect, in contract or tort or otherwise) to the Company for or in connection with the engagement of A&M, except to the extent that any such liability for losses, claims, damages, liabilities or expenses are found in a final judgment by a court of competent jurisdiction (not subject to further appeal) to have resulted primarily and directly from such Indemnified Party's gross negligence or willful misconduct and (b) in no event will any Indemnified Party have any liability to the Company for special, consequential, incidental or exemplary damages or loss (nor any lost profits, savings or business opportunity). The Company further agrees that it will not, without the prior consent of an Indemnified Party, settle or compromise or consent to the entry of any judgment in any pending or threatened claim, action, suit or proceeding in respect of which such Indemnified Party seeks indemnification hereunder (whether or not such Indemnified Party is an actual party to such claim, action, suit or proceedings) unless such settlement, compromise or consent includes an unconditional release of such Indemnified Party from all liabilities arising out of such claim, action, suit or proceeding.

B.  These indemnification provisions shall be in addition to any liability which the Company may otherwise have to the Indemnified Parties. In the event that, at any time whether before or after termination of the engagement or the Agreement, as a result of or in connection with the Agreement or A&M's and its personnel's role under the Agreement, A&M or any Indemnified



Party is required to produce any of its personnel (including former employees) for examination, deposition or other written, recorded or oral presentation, or A&M or any of its personnel (including former employees) or any other Indemnified Party is required to produce or otherwise review, compile, submit, duplicate, search for, organize or report on any material within such Indemnified Party's possession or control pursuant to a subpoena or other legal (including administrative) process, the Company will reimburse the Indemnified Party for its out of pocket expenses, including the reasonable fees and expenses of its counsel, and will compensate the Indemnified Party for the time expended by its personnel based on such personnel's then current hourly rate.

C.     If any action, proceeding or investigation is commenced to which any Indemnified Party proposes to demand indemnification hereunder, such Indemnified Party will notify the Company with reasonable promptness; provided, however, that any failure by such Indemnified Party to notify the Company will not relieve the Company from its obligations hereunder, except to the extent that such failure shall have actually prejudiced the defense of such action. The Company shall promptly pay expenses reasonably incurred by any Indemnified Party in defending, participating in, or settling any action, proceeding or investigation in which such Indemnified Party is a party or is threatened to be made a party or otherwise is participating in by reason of the engagement under the Agreement, upon submission of invoices therefor, whether in advance of the final disposition of such action, proceeding, or investigation or otherwise. Each Indemnified Party hereby undertakes, and the Company hereby accepts its undertaking, to repay any and all such amounts so advanced if it shall ultimately be determined that such Indemnified Party is not entitled to be indemnified therefor. If any such action, proceeding or investigation in which an Indemnified Party is a party is also against the Company, the Company may, in lieu of advancing the expenses of separate counsel for such Indemnified Party, provide such Indemnified Party with legal representation by the same counsel who represents the Company, provided such counsel is reasonably satisfactory to such Indemnified Party, at no cost to such Indemnified Party; provided, however, that if such counsel or counsel to the Indemnified Party shall determine that due to the existence of actual or potential conflicts of interest between such Indemnified Party and the Company such counsel is unable to represent both the Indemnified Party and the Company, then the Indemnified Party shall be entitled to use separate counsel of its own choice, and the Company shall promptly advance its reasonable expenses of such separate counsel upon submission of invoices therefor. Nothing herein shall prevent an Indemnified Party from using separate counsel of its own choice at its own expense. The Company will be liable for any settlement of any claim against an Indemnified Party made with the Company's written consent, which consent shall not be unreasonably withheld.

D.     In order to provide for just and equitable contribution if a claim for indemnification pursuant to these indemnification provisions is made but it is found in a final judgment by a court of competent jurisdiction (not subject to further appeal) that such indemnification may not



be enforced in such case, even though the express provisions hereof provide for indemnification, then the relative fault of the Company, on the one hand, and the Indemnified Parties, on the other hand, in connection with the statements, acts or omissions which resulted in the losses, claims, damages, liabilities and costs giving rise to the indemnification claim and other relevant equitable considerations shall be considered; and further provided that in no event will the Indemnified Parties' aggregate contribution for all losses, claims, damages, liabilities and expenses with respect to which contribution is available hereunder exceed the amount of fees actually received by the Indemnified Parties pursuant to the Agreement.  No person found liable for a fraudulent misrepresentation shall be entitled to contribution hereunder from any person who is not also found liable for such fraudulent misrepresentation.

E.    In the event the Company and A&M seek judicial approval for the assumption of the Agreement or authorization to enter into a new engagement agreement pursuant to either of which A&M would continue to be engaged by the Company, the Company shall promptly pay expenses reasonably incurred by the Indemnified Parties, including attorneys' fees and expenses, in connection with any motion, action or claim made either in support of or in opposition to any such retention or authorization, whether in advance of or following any judicial disposition of such motion, action or claim, promptly upon submission of invoices therefor and regardless of whether such retention or authorization is approved by any court.  The Company will also promptly pay the Indemnified Parties for any expenses reasonably incurred by them, including attorneys' fees and expenses, in seeking payment of all amounts owed it under the Agreement (or any new engagement agreement) whether through submission of a fee application or in any other manner, without offset, recoupment or counterclaim, whether as a secured claim, an administrative expense claim, an unsecured claim, a prepetition claim or a postpetition claim.

F.    Neither termination of the Agreement nor termination of A&M's engagement nor the filing of a petition under Chapter 7 or 11 of the United States Bankruptcy Code (nor the conversion of an existing case to one under a different chapter) shall affect these indemnification provisions, which shall hereafter remain operative and in full force and effect.

G.    The rights provided herein shall not be deemed exclusive of any other rights to which the Indemnified Parties may be entitled under the certificate of incorporation or bylaws of the Company, any other agreements, any vote of stockholders or disinterested directors of the Company, any applicable law or otherwise.



FTX TRADING LTD.
*on behalf of itself and its affiliates*

By: *Timothy Wilson*
Name: Timothy Wilson
Title:  Authorized Signatory

ALVAREZ & MARSAL NORTH AMERICA, LLC

By: _____
Name: Ed Mosley
Title:  Managing Director



Alvarez & Marsal North America, LLC
2100 Ross Avenue, 21st Floor
Dallas, TX 75201
Phone: +1 214 438 1000
Fax: +1 214 438 1001

As of November 9, 2022

FTX Trading Ltd.
Friar's Hill Road, Mandolin Place
Saint John's, AG-04, Antigua and Barbuda

Dear Ladies and Gentlemen:

This letter amends and supplements the engagement letter dated November 9, 2022 (the "Agreement"), between Alvarez & Marsal North America, LLC ("A&M") and FTX Trading Ltd. and its affiliated debtors and debtors-in-possession (jointly and severally, the "Company"). As of the date set forth above, this letter will constitute an agreement between the Company and A&M (the "Amendment").

Section 11 "Data Protection" is revised to add the following language:

(a) "CCPA" means the California Consumer Privacy Act of 2018, as amended by the California Privacy Rights Act ("CPRA") when in force, including all regulations issued thereunder. The terms "personal information", "consumer", "business", "service provider", "business purpose", "commercial purpose", "sell" and "share" shall have the meanings defined under CCPA.

(b) Company instructs A&M to process Company Personal Data on its behalf to provide the services as set forth in (i) Paragraph 1(a) of this Agreement and (ii) Section 11 of the *Debtors' Application to Employ and Retain Alvarez & Marsal North America, LLC as Financial Advisors to Debtors and Debtors in Possession Pursuant to Sections 327(a) and 328 of the Bankruptcy Code Nunc Pro Tunc to the Petition Date* (the "Application") Together, (i) and (ii) are referred to herein as the "Business Purpose". In connection with the foregoing, Company further instructs A&M to transfer Company Personal Data to (i) Company's other agents and professionals acting within the context of this engagement (e.g., Company's counsel, accountant, claims agent, etc.), and (ii) other constituents in this engagement, including but not limited to creditors and their representatives as well as any applicable judicial, regulatory, or governmental bodies. Company permits A&M, where reasonably necessary in connection with the Business Purpose, to transfer (including permit remote access to) Company Personal Data to employees of A&M's affiliates and vendors engaged to assist A&M in processing Company Personal Data for the Business Purpose, including, where Company specifically consents in writing (e-mail to suffice), to employees of A&M affiliates and vendors located outside the United States. Company acknowledges that A&M's transfer of Company Personal Data as described herein is for Company's convenience and that such transfers shall always be deemed to be made on Company's behalf

and at its instruction. Notwithstanding the foregoing, A&M may process Company Personal Data for other purposes if such processing is required by laws or regulations applicable to A&M, in which case A&M shall inform Company of that legal requirement before such processing unless such law or regulation prohibits A&M from sharing such information. A&M shall immediately inform Company if, in A&M's opinion, Company's instructions infringe applicable Data Protection Laws, or if A&M determines it can no longer meet its obligations under applicable Data Protection Laws.

(c) A&M shall reasonably assist Company in responding to any personal data access, deletion, and/or similar requests made under applicable Data Protection Laws.

(d) A&M shall notify Company when it engages any vendor to assist A&M in processing Company Personal Data for the Business Purpose. A&M's agreements with such vendors shall include privacy and data protection terms no less protective than as set forth in Paragraph 11 of this Agreement.

(e) To the extent A&M will process Company Personal Data about California consumers (as defined under CCPA), A&M and Company further agree A&M shall not: (i) sell or share Company Personal Data; (ii) retain, use, or disclose Company Personal Data for any purpose other than for the Business Purpose; (iii) retain, use, or disclose Company Personal Data for a commercial purpose other than the Business Purpose, or as otherwise permitted under CCPA; (iv) retain, use, or disclose Company Personal Data outside of the direct business relationship between Company and A&M, except as otherwise permitted under CCPA; or (v) combine Company Personal Data it receives from, or on behalf of, Company with personal information that it receives from, or on behalf of, another person or persons, or collects from its own interaction with the consumer, provided that A&M may combine personal information to perform any business purpose as defined in regulations adopted pursuant to Cal. Civ. Code § 1798.185(a)(10), except as provided for in Cal. Civ. Code § 1798.140(e)(6) and in regulations adopted by the California Privacy Protection Agency.

(f) A&M shall, upon Company's request, make available to Company all information necessary to demonstrate compliance with applicable Data Protection Laws and this Agreement.

In the event of any conflict between Paragraph 11 of the Agreement and this Amendment, this Amendment shall control. All other provisions of the Agreement shall remain in full force and effect.

If the foregoing is acceptable to you, kindly sign the enclosed copy to acknowledge your agreement with its terms.

Very truly yours,

Alvarez & Marsal North America, LLC

By: _____
Ed Mosley
Title:  Managing Director

Accepted and agreed:

FTX Trading Ltd.
*on behalf of itself and its affiliated debtors*
*and debtors-in-possession*

By: _____
John J. Ray III, Chief Executive Officer

