## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| | **Hearing Date**: TBD |
| | **Objection Deadline**: January 5, 2023 at 4:00 p.m. (ET) |

### DEBTORS' MOTION TO ENFORCE THE AUTOMATIC STAY
### OR, IN THE ALTERNATIVE, EXTEND THE AUTOMATIC STAY

Debtors FTX Trading Ltd. ("FTX Trading"), Alameda Research Ltd. ("Alameda"), and their affiliated debtors and debtors-in-possession (collectively, "Debtors") hereby submit this motion ("Motion") for entry of an order substantially in the form of **Exhibit 1** attached hereto ("Order"), pursuant to section 362 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*. ("Bankruptcy Code"), to enforce the automatic stay against the BlockFi Adversary Proceeding and with respect to the Robinhood Shares or, in the alternative, to extend the stay to nondebtor defendants in the BlockFi Adversary Proceeding (as such terms are defined below). In support of the Motion, Debtors respectfully state as follows:

### PRELIMINARY STATEMENT

1. Approximately 56 million shares of Robinhood Markets, Inc.'s ("Robinhood") Class A common stock (the "Robinhood Shares" or "Shares") are currently frozen in a brokerage account at ED&F Man Capital Markets Inc. ("EDFM") in New York City. Alameda held other assets at EDFM for which there is no dispute as to ownership. However, unlike other

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

Debtor assets at EDFM, the Robinhood Shares were nominally held, on the Petition Date, in street name for an affiliated nondebtor company organized in Antigua and Barbuda named Emergent Fidelity Technologies Ltd. ("Emergent").  Emergent is a special-purpose holding company that appears to have no other business, and is 90% owned by Samuel Bankman-Fried, former CEO of FTX Trading and former ultimate controlling person of FTX Trading and Alameda.

2.      Since the commencement of these chapter 11 cases, three different competing stakeholders of the Debtors have filed court actions in different jurisdictions to gain control of the Robinhood Shares to collect on claims against the Debtors, including BlockFi Inc., BlockFi Lending LLC, and BlockFi International LLC (together, "BlockFi") (a prepetition creditor of Alameda seeking to sell the Robinhood Shares to pay BlockFi's claim), Yonathan Ben Shimon (a prepetition creditor of FTX Trading who has successfully appointed a receiver in Antigua to obtain control of and sell the Robinhood Shares under the supervision of a court in Antigua), and Mr. Bankman-Fried himself (who has repeatedly sought a source of payment for legal expenses). For their part, the Debtors instructed EDFM to freeze the Shares promptly after commencement of these chapter 11 cases, which EDFM confirmed has been done.

3.      The Debtors are conducting an investigation into the business affairs of the FTX group.  This investigation to date indicates that the Robinhood Shares are property of the Debtors' estates, held only nominally by Emergent.  The Debtors' ongoing investigation establishes that the Debtors have at least a "colorable" claim to ownership of the Robinhood Shares, such that the automatic stay under section 362(a) of the Bankruptcy Code should be enforced and the Shares should remain frozen at EDFM by order of this Court pending resolution of competing claims by the diverse stakeholders of the Debtors.

4.    BlockFi has been a lender to Alameda for at least three years.  With news of FTX's imminent collapse making headlines worldwide, just two days before the Debtors (including FTX Trading and Alameda) filed for bankruptcy, BlockFi scrambled to protect itself from impending losses on antecedent loans by threatening to seek remedies against Alameda if Alameda did not pledge additional collateral for those loans.  In response to those threats, and despite the perilous financial position of Alameda and the other Debtors, Alameda's then-CEO Caroline Ellison, with knowledge and encouragement from Mr. Bankman-Fried, purportedly agreed to pledge over $1 billion worth of additional Alameda assets to secure Alameda's outstanding loan obligations to BlockFi.  The Robinhood Shares were included in these pledged assets by Alameda's then-CEO, despite the fact that the Robinhood Shares were nominally held by Emergent, because Alameda had then, and continues to have, a property interest in the Robinhood Shares.

5.    On November 28, 2022, BlockFi filed for bankruptcy protection.  That same day—17 days after the Debtors filed their voluntary petitions and the automatic stay prohibited execution on assets in which the Debtors claimed an interest—BlockFi sought turnover of the Robinhood Shares in an adversary proceeding it filed in the United States Bankruptcy Court for the District of New Jersey against Emergent and EDFM ("BlockFi Adversary Proceeding").  The BlockFi Adversary Proceeding did not name Alameda as a defendant.  In fact, attempting to capitalize on Emergent's nominal ownership of the Robinhood Shares in an end-run around the automatic stay in the Debtors' cases, BlockFi omitted entirely from its complaint the key fact that BlockFi was seeking to levy on the Robinhood Shares to collect on an antecedent debt against Alameda.  Although BlockFi has, nearly one month after having initiated the proceeding,

supplemented the record with additional information, the complaint itself still does not mention FTX Trading or Alameda.

6.      Meanwhile, in Antigua, a creditor of FTX Trading, Mr. Ben Shimon, has obtained a freezing injunction from an Antiguan court with respect to the assets of Emergent, including the Robinhood Shares, following the appointment of receivers for Emergent and the Shares.  The receivers were appointed after the Antiguan court concluded there was sufficient evidence that the Robinhood Shares were purchased with funds from FTX Trading and, therefore, should be available to pay prepetition claims of creditors of FTX Trading, such as Mr. Ben Shimon. The receivers have purported to replace Mr. Bankman-Fried as sole director of Emergent.

7.      Then, on December 11, 2022, immediately prior to his arrest, Mr. Bankman-Fried surfaced and petitioned the Antiguan court to displace the receivers so that he can regain control of Emergent and the Robinhood Shares.  Mr. Bankman-Fried's application in the Antiguan proceedings remains pending.

8.      The fact that multiple prepetition creditors of *different* Debtors and Mr. Bankman-Fried are all seeking to obtain possession of the Robinhood Shares demonstrates that the asset should be frozen until *this Court* can resolve the issues in a manner that is fair to all creditors of the Debtors.

9.      While the full evidentiary record, once completely developed, will show the Robinhood Shares are conclusively estate property, this Court need not need make that determination now in order to enforce the stay with respect to the Robinhood Shares.  The Court need find only that the Robinhood Shares are "arguably" estate property, which requires a finding that Alameda has "arguable claims of right to the [Robinhood Shares], or a colorable basis for

asserting an interest in the [Robinhood Shares]." *In re ABC Learning Ctrs. Ltd.*, 2011 WL 4899789, at *2 (Bankr. D. Del. Oct. 13, 2011).  That low bar is satisfied here.

10.    The current record is replete with evidence, including facts concerning the agreements executed with BlockFi on the eve of these chapter 11 cases, that Alameda's then-CEO, Ms. Ellison, not only treated the Robinhood Shares as Alameda assets, but expressly represented that Alameda owned the Shares.  For example, BlockFi accepted the Robinhood Shares as collateral for its loan to Alameda only after Alameda's then-CEO:

- included the Robinhood Shares on a spreadsheet listing Alameda's liquid assets, without any indication that the Shares were owned differently than assets for which Alameda held title;

- represented to BlockFi at its request that she had authority to pledge the Robinhood Shares on *Alameda's* behalf; and

- pledged the Robinhood Shares as collateral to secure a loan that BlockFi made to Alameda.

11.    Beyond that, the Schedule 13D filed with the U.S. Securities and Exchange Commission by Emergent and Mr. Bankman-Fried states that the Robinhood Shares were purchased "through an affiliate of [Mr. Bankman-Fried and Emergent] that transferred such Shares to Emergent."  Alameda's general ledger shows that, from February 7, 2022 to May 11, 2022, Alameda transferred well in excess of four hundred million dollars to EDFM.  And, pursuant to a May 11, 2022 agreement among Alameda, Emergent, Mr. Bankman-Fried, and EDFM, the Robinhood Shares were transferred after they were acquired from an *Alameda brokerage account* at EDFM to Emergent's brokerage account at EDFM for no apparent consideration.

12.    For his part, Mr. Bankman-Fried was extensively involved in the purported pledging of the Robinhood Shares to BlockFi in order to secure the loans that BlockFi made to Alameda.  The evidence uncovered to date suggests that Mr. Bankman-Fried regularly treated assets owned by his many companies interchangeably.  Indeed, Mr. Bankman-Fried has suggested

publicly that he may have allowed customer funds to be commingled between FTX Trading and Alameda, and the First Day Declaration of the Debtors' new CEO describes "potential commingling of digital assets," and that "the main companies in the Alameda Silo," which includes Alameda, "did not keep complete books and records of their investments and activities" [D.I. 24 ¶¶ 5, 68-69].

13.    These facts are more than sufficient for this Court to discount the unrealistic premise of BlockFi's adversary proceeding: that Alameda has no basis to assert any property interest in the Robinhood Shares because those Shares are nominally held in Emergent's name. This Court should freeze the Robinhood Shares at EDFM and preclude creditors, including BlockFi, Mr. Ben Shimon, the Antiguan receiver, Mr. Bankman-Fried, and anyone else, from pursuing claims to those assets without the involvement of this Court.

14.    In the alternative, if the Court were to determine that Alameda has failed to show that the Shares arguably are property of the bankruptcy estate, the Court should exercise its discretion to *extend* the automatic stay to Emergent and EDFM (the nondebtor defendants named in the BlockFi Adversary Proceeding), and ensure that all creditors—including BlockFi and the others—can participate in an orderly claims process before this Court.

## BACKGROUND

### A.    The Debtors and Their Chapter 11 Cases

15.    On November 11 and November 14, 2022 (as applicable, the "Petition Date"),[2] the Debtors filed with the Court voluntary petitions for relief under the Bankruptcy Code. The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Joint administration

---

[2]       November 11, 2022 is the Petition Date for all Debtors, except for Debtor West Realm Shires Inc.

of the Debtors' cases was authorized by the Court by entry of an order on November 22, 2022 [D.I. 128].  On December 15, 2022, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (the "Committee") pursuant to section 1102 of the Bankruptcy Code [D.I. 231].

16.     Certain facts supporting this Motion are set forth in the Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings [D.I. 24], the Declaration of Edgar W. Mosley II in Support of Chapter 11 Petitions and First Day Pleadings [D.I. 57], the Supplemental Declaration of John J. Ray III in Support of First Day Pleadings [D.I. 92], and the Supplemental Declaration of Edgar W. Mosley II in Support of First Day Pleadings [D.I. 93].

**B.     Alameda, Emergent, and the Robinhood Shares**

17.     Emergent is a holding company incorporated in Antigua and Barbuda on April 22, 2022, with Mr. Bankman-Fried purporting to own 90% of its shares.

18.     On May 12, 2022, Mr. Bankman-Fried and Emergent filed a Schedule 13D with the United States Securities and Exchange Commission, disclosing their nominal ownership of 56,273,469 shares of Robinhood, constituting in the aggregate 7.6% of Robinhood's outstanding shares.  (Ex. A at 2.)[3]  The Schedule 13D also discloses each of Mr. Bankman-Fried's or Emergent's purchases of Robinhood shares between March 14, 2022 and May 11, 2022, noting that the relevant "transactions were open-market purchases of Shares made through an affiliate of [Mr. Bankman-Fried and Emergent] that transferred such Shares to Emergent."  (*Id*. at 9.)

---

[3]     With the exception of the proposed order attached hereto as Exhibit 1, all citations to exhibits refer to materials attached to the *Declaration of Brian D. Glueckstein in Support of Debtors' Motion to Enforce the Automatic Stay or, in the Alternative, Extend the Automatic Stay*, filed contemporaneously herewith.

19.     According to Alameda's general ledger entries, from February 7, 2022 to May 11, 2022, Alameda transferred well in excess of four hundred million dollars to EDFM. (Ex. B.)

20.     On May 11, 2022, Alameda, Emergent, and Mr. Bankman-Fried entered into an agreement with EDFM requiring EDFM to "**transfer all stock of Robinhood Markets, Inc. (NASDAQ: HOOD) held in Alameda's account carried by [EDFM] to Emergent's account carried by [EDFM]**."  (Ex. C at 1 (emphasis added).)  Alameda, Emergent, and Mr. Bankman-Fried agreed to "indemnify and hold harmless [EDFM] from and against any and all claims, suits, damages, judgments, liabilities, costs, and expenses, including reasonable attorneys' fees" to which EDFM "may be subject in connection with the Transfer" of the Robinhood Shares from Alameda's account at EDFM to Emergent's account.  (*Id*.)

## C.     The BlockFi and Alameda Lending Relationship

21.     BlockFi began lending digital currency to Alameda in 2019.  Under a "Master Digital Currency Loan Agreement" dated July 15, 2019, BlockFi agreed that Alameda "may, from time to time, seek to initiate a transaction pursuant to which [BlockFi] will lend certain Digital Currency [consisting of Bitcoin, Bitcoin Cash, Ether, and other digital currencies agreed upon]" to Alameda. (Ex. D at 1.)  As described in BlockFi's first day declaration, "[t]he amounts of BlockFi's loans to Alameda have varied over time and typically consisted of digital assets (primarily BTC and ETH) and USD-denominated stablecoins."  (BlockFi Adversary Proceeding [D.I. 2] ("Turnover Motion" or "TM"), Exhibit C ("BlockFi First Day Decl.") ¶ 92.)

22.     On August 14, 2020, BlockFi and Alameda entered into a separate Master Loan Agreement.  That agreement was later replaced by an "Amended and Restated Master Loan Agreement" dated January 26, 2022. (Ex. E (together with the Master Digital Currency Loan Agreement, the "Loan Agreements").)  This agreement provides that Alameda "may, from time to

time, seek to initiate a transaction pursuant to which [BlockFi] will lend certain Digital Currency [defined as Bitcoin (BTC), Ether (ETH) and other digital currencies], [US] Dollars or Alternative Currency [other than U.S. Dollars as agreed upon by the parties]" to Alameda.  (*See* Ex. E at 1.)

23.     Separately, on June 30, 2022, Debtor West Realm Shires Inc., as lender, entered into a loan agreement with BlockFi Inc., as borrower, and other BlockFi entities, as guarantors, to provide senior unsecured financing to BlockFi.  (BlockFi First Day Decl. ¶ 67.)  As of the date BlockFi filed its First Day Declaration, there was approximately $275 million of USD stablecoins loans outstanding, making the Debtors a significant creditor of BlockFi.  (*Id*. ¶ 72.)

24.     By November 2, 2022, "public reports began to circulate citing leaked, internal financial statements and questioning the health and liquidity of both FTX and Alameda." (BlockFi First Day Decl. ¶ 93.)  In response to this, BlockFi engaged in self-help and "took several proactive measures to attempt to limit its exposure to FTX and Alameda through a combination of margin calls and recalls of open-term loans."  (*Id*. ¶ 96.)

25.     Following alleged defaults by Alameda, BlockFi sought preferential treatment through the grant of additional security from Alameda.  The resulting negotiations between Alameda and BlockFi—which took place against the backdrop of FTX's well-publicized financial distress—culminated when Ms. Ellison, then the CEO of Alameda, offered the Robinhood Shares as collateral for Alameda's debts.  In a November 9, 2022 email from Ms. Ellison to Zachary Prince, CEO of BlockFi, Ms. Ellison wrote:  "We have $1.1b of shares in HOOD+GBTC+ETHE+BITW that we could post as collateral.  Here's a proposed repayment schedule; would this work?"  (Ex. F.)[4]  "HOOD" is the stock ticker symbol for the Robinhood Shares.

---

[4]     On December 18, 2022, Ms. Ellison agreed to plead guilty to numerous federal criminal charges, including

26.     The assets were further described on an attached spreadsheet, which Ms. Ellison represented to BlockFi was "a spreadsheet of [Alameda's] liquid assets." (Exs. F, H.) That spreadsheet lists the Robinhood Shares as a liquid asset of Alameda alongside other assets to which Alameda holds title.

27.     Later in the same email chain, Ms. Ellison noted that Alameda was "talking to a couple buyers interested in buying the remaining HOOD OTC.  [I]f that comes through, would it work to just use the proceeds from that to repay the loan?"  (Ex. G.)  In another email thread during these negotiations, Ms. Ellison confirms that she had "the power to and d[id] pledge **on behalf of Alameda Research Limited**, all of the HOOD shares . . . to BlockFi Lending LLC and BlockFi International as Collateral under their respective Master Loan Agreements and the Loans thereunder."  (Ex. I (emphasis added).)

28.     Mr. Prince agreed to Ms. Ellison's offer to pledge the Robinhood Shares and certain other Alameda assets as security for Alameda's debts.  (*See* Ex. G.)  Shortly afterward, on November 9, 2022, Ms. Ellison and Mr. Prince signed three agreements, each detailed below.

29.     *First*, Alameda and BlockFi entered into a purported Forbearance Agreement. (Ex. J.)  The Forbearance Agreement refers to the two Loan Agreements and declares that Alameda has defaulted on them.  (*See* Ex. J § 3.1.)  Under the Forbearance Agreement, BlockFi agreed to forbear from exercising its rights and remedies under the Loan Agreements for a single week—until only November 16, 2022—or until a specified event of default or termination event occurred.  (*Id.* § 3.2.)  In exchange for *one week* of forbearance, Alameda agreed to make payments to BlockFi according to a specified schedule and to enter into two agreements pledging over $1 billion of additional collateral to secure BlockFi's claims.

---

wire fraud, conspiracy to commit securities fraud and conspiracy to commit money laundering.

30.     *Second*, "[a]s a condition to the effectiveness of the Forbearance Agreement" (BlockFi Adversary Proceeding [D.I. 14] ("Prince Decl.") ¶ 10), BlockFi and Emergent purportedly entered into a Pledge Agreement (the "Robinhood Pledge"), which was signed for Emergent by Ms. Ellison as "Co-CEO."[5]  (Ex. K.)  Under the Robinhood Pledge, BlockFi received a security interest in the Robinhood Shares in order to further secure Alameda's obligations under the Loan Agreements.  (*See* Ex. K § 1 & Schedule A.)

31.     *Third*, also "[a]s a condition to the effectiveness of the Forbearance Agreement" (Prince Decl. ¶ 9), BlockFi and Alameda purportedly entered into a Pledge Agreement (the "Alameda Pledge," and together with the Robinhood Pledge, the "Pledge Agreements").  (Ex. L.)  Pursuant to the Alameda Pledge, BlockFi received a security interest in Alameda's equity interests in "Grayscale Bitcoin Trust (GBTC)," "Grayscale Ethereum trust (ETHE)," and "Bitwise 10 Crypto Index Fund (BITW)," in order to further secure Alameda's obligations under the Loan Agreements.  (*See* Ex. L § 1 & Schedule A.)  BlockFi has not attempted to enforce the Alameda Pledge, presumably because it cannot due to the stay imposed by the filing of these chapter 11 proceedings.

32.     The two Pledge Agreements are identical in nearly all respects:  both were entered into on the eve of the Debtors' filing their petitions and both refer to the Loan Agreements and Forbearance Agreements and purport to grant BlockFi a security interest in additional collateral as security for Alameda's obligations under the Loan Agreements.  The only distinctions between the Pledge Agreements are the respective identities of the entity for which Ms. Ellison purported to sign, and the assets being pledged.

---

[5]     The Debtors are not currently aware of any evidence that Ms. Ellison—the then-CEO of *Alameda*—had any position at Emergent or any authority to act for Emergent.

11

33.     As his companies were collapsing and customers faced billions of dollars in losses, Mr. Bankman-Fried was directly involved in this eleventh-hour attempt to execute the Forbearance Agreement and Pledge Agreements to divert value to BlockFi, writing separately to Mr. Prince in the early hours of November 10, 2022, to inquire if the documents had been executed. (Ex. M.)

### D.     The BlockFi Adversary Proceeding

34.     On November 28, 2022, BlockFi filed voluntary petitions for relief under the Bankruptcy Code in the United States Bankruptcy Court for the District of New Jersey.  (*See In re BlockFi Inc.*, No. 22-19361 (MBK) (Bankr. D.N.J Nov. 28, 2022).)  BlockFi alleges that one of the contributing causes to its bankruptcy was that Alameda has "defaulted on approximately $680 million of collateralized loan obligations" under the Loan Agreements.  (BlockFi First Day Decl. ¶ 96.)  Nowhere in its First Day Declaration does BlockFi reference or rely upon the Pledge Agreements.

35.     Later that same day, November 28, 2022, BlockFi filed an adversary proceeding against Emergent and EDFM, seeking turnover of the Robinhood Shares to BlockFi. (*See* Complaint, BlockFi Adversary Proceeding [D.I.1] ("Adversary Complaint" or "AC").) BlockFi also filed an accompanying *Motion for Entry of an Order Pursuant to Sections 105(A), 542, and 543 of the Bankruptcy Code (I) Directing the Collateral Be Transferred to a Neutral Broker or Escrow Under the Court's Supervision or (II) Enjoining the Defendants from Transferring or Using the Collateral Pending Final Resolution of the Turnover Claims*, seeking to move the Robinhood Shares to a new brokerage account outside of EDFM under the supervision of the bankruptcy court overseeing the BlockFi bankruptcy.  (*See* Turnover Motion.)

36.     Three weeks later, on December 19, 2022, BlockFi filed two additional declarations in support of its Turnover Motion, attaching certain of the relevant documents

concerning the Alameda debt at issue.  (*See* Prince Decl.; BlockFi Adversary Proceeding [D.I. 15] ("Anigian Decl.").)

37.     BlockFi's Adversary Complaint seeks to enforce an agreement that Emergent purportedly made with BlockFi to "absolutely, unconditionally, and irrevocably guarantee[] the payment obligations of" an unspecified borrower, which "guaranty was secured by a first priority security interest—in favor of BlockFi—in all of Emergent's rights, titles, and interests in, among other things, the collateral described in the Pledge Agreement, including certain shares of common stock." (*See* AC ¶ 21.)  As explained below, the borrower that BlockFi chose not to disclose in its complaint, but has now belatedly disclosed to the New Jersey court, is Alameda, and the only recently specified collateral is the Robinhood Shares.

38.     BlockFi alleges that Emergent then immediately defaulted on its obligation under the guarantee when it failed to transfer the unspecified collateral to BlockFi, pursuant to the putative pledge agreement.  (*See* AC ¶¶ 2, 23-24.)  BlockFi also alleges that, "due to an event of default, including borrower's failure to timely make a required payment in accordance with the payment schedule . . . all obligations were immediately due and payable . . . and that BlockFi Lending and BlockFi International intended to exercise all remedies available to them under the Pledge Agreement, including the sale of all or any part of the Collateral." (AC ¶ 24.)

39.     BlockFi further alleges that EDFM, a "broker who is designated as the custodial entity under the Pledge Agreement[,] holds the Collateral in a specified numbered account.  Following the event of default, BlockFi sought to have the Collateral transferred to it, but EDFM has refused to transfer the Collateral to BlockFi." (AC ¶ 26.)

E.     **The Antigua Creditor Proceedings**

40.     On November 17, 2022, Mr. Ben Shimon, a customer of FTX Trading who allegedly deposited roughly $11 million worth of cryptocurrency in the FTX.com exchange, filed

a claim against Emergent and Mr. Bankman-Fried in a court in Antigua and Barbuda, where Emergent is incorporated ("Antigua Action").  (Exs. N, S ¶ 9.)

41.     Mr. Ben Shimon argued to the Antiguan court that he is entitled to recover the amount of his deposit in FTX.com, which he alleges FTX Trading has not permitted him to withdraw, against the Robinhood Shares held by Emergent.  (*See* Ex. S ¶ 14.)  To that end, he sought (a) an order freezing Emergent's assets located in Antigua, up to the value of his deposit, and (b) the appointment of a receiver of all of Emergent's worldwide assets, as well as of Mr. Bankman-Fried's ownership interest in Emergent itself.  (*See* Ex. S ¶ 1.)

42.     Following an *ex parte* hearing on November 18, 2022, the Antiguan court granted Mr. Ben Shimon's application, entering the freezing injunction and appointing receivers for Emergent ("Antigua Order").  (Ex. O.)  On November 21, 2022, pursuant to the Antigua Order, the receivers removed the directors of Emergent and appointed themselves as directors.  (Ex. P.)

43.     On December 11, 2022, Mr. Bankman-Fried petitioned the Antiguan court to displace the receivers so that he can regain control of Emergent and the Shares.  (Ex. R.)  Mr. Bankman-Fried was arrested the following day but his application in the Antiguan proceeding remains pending.

## JURISDICTION

44.     The Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper in the Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief requested herein are sections 362(a)(1) and 362(a)(3) of the Bankruptcy Code.  Pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, the Debtors

consent to the entry of a final order or judgment by the Court in connection with this Motion to the extent it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## RELIEF REQUESTED

45.     By this Motion, Debtors request entry of the Order, substantially in the form of **Exhibit 1** attached hereto, enforcing the automatic stay with respect to the BlockFi Adversary Proceeding or, in the alternative, extending the automatic stay under section 362 of the Bankruptcy Code to the nondebtor defendants in the BlockFi Adversary Proceeding.

## BASIS FOR RELIEF

### I.    THE BLOCKFI ADVERSARY PROCEEDING IS BARRED BY THE AUTOMATIC STAY BECAUSE THE ROBINHOOD SHARES ARE ASSETS OF THE DEBTORS' ESTATES

46.     Section 362 of the Bankruptcy Code automatically stays "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."  11 U.S.C. § 362(a)(3).  This automatic stay is not limited to property for which the debtor holds title, but rather includes any property "in which the debtor has a legal, equitable or possessory interest," including "beneficial rights and interest that the debtor may have in property of another."  *In re Ramirez*, 183 B.R. 583, 587 (B.A.P. 9th Cir. 1995) (citation omitted); *see* 11 U.S.C. § 541(a)(1) (the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case").

47.     Moreover, the automatic stay applies even to property "to which the debtor has only an arguable claim of right."  *In re Glob. Outreach, S.A.*, 2009 WL 1606769 at *7 (Bankr. D.N.J. June 8, 2009) (quoting *Brown* v. *Chesnut*, 422 F.3d 298, 303 (5th Cir. 2005)); *see also Denby-Peterson* v. *Nu2u Auto World*, 595 B.R. 184, 194 (D.N.J. 2018), *aff'd sub nom. In re Denby-Peterson*, 941 F.3d 115 (3d Cir. 2019) ("property [that is] only arguably a part of the estate is

subject to the automatic stay").  The purpose of this rule is to prevent "particular creditors from acting unilaterally in self-interest to obtain payment from a debtor to the detriment of other creditors." *Maritime Elec. Co., Inc.* v. *United Jersey Bank*, 959 F.2d 1194, 1204 (3d Cir. 1991). It does this by "centraliz[ing] all prebankruptcy civil claims against a debtor in the bankruptcy court," *McCartney* v. *Integra Nat. Bank N.*, 106 F.3d 506, 511 (3d Cir. 1997), thus allowing the court to make a final determination of the ownership and disposition of assets, which would be impossible if creditors use proceedings in other courts to raid the estate.

48.    Accordingly, the "relevant inquiry is whether the Debtors have arguable claims of right to the [Robinhood Shares], or a colorable basis for asserting an interest in the [Robinhood Shares]." *In re ABC Learning Ctrs. Ltd.*, 2011 WL 4899789, at *2.  That low bar is easily met given the current facts of record.

49.    Notwithstanding that BlockFi's Adversary Complaint and Turnover Motion omit key facts, the Prince and Anigian Declarations recently filed in the BlockFi Adversary Proceeding demonstrate that BlockFi has all along known the relationship among Alameda, BlockFi, and Emergent.  The record of the negotiation of the relevant agreements among BlockFi, Alameda, and Emergent goes much further, demonstrating that Alameda considered the Robinhood Shares to be its own assets, and that Alameda made express representations that it owned the Shares.  As part of those negotiations, Alameda's then-CEO:

- Affirmed that she had "**the power to and d[id] pledge on behalf of Alameda Research Limited, all of the HOOD shares** . . . to BlockFi Lending LLC and BlockFi International as Collateral under their respective Master Loan Agreements and the Loans thereunder."  (Ex. I (emphasis added).)

- Listed those same shares in what she described as "a spreadsheet of [Alameda's] liquid assets," along with certain other assets for which Alameda held title.  (Exs. F, H.)

- Stated that "*[w]e* have . . . shares in HOOD," *i.e.*, the Robinhood Shares, "that *we* could post as collateral."  (Ex. F (emphasis added).)

16

- Informed BlockFi that Alameda was "talking to a couple buyers interested in buying the remaining HOOD OTC" and asked if Alameda could "use th[ose] proceeds" instead if the sale went through. (Ex. G.)

50. In addition, while the Debtors continue to develop the factual record, their investigation to date indicates that the Robinhood Shares may have been purchased by Alameda. The Schedule 13D filed by Mr. Bankman-Fried and Emergent discloses all purchases of shares in Robinhood between March 14, 2022 and May 11, 2022. Emergent had not been incorporated for the first month of those transactions. Additionally, the Schedule 13D explains that the relevant "transactions were open-market purchases of Shares made through an affiliate of [Mr. Bankman-Fried and Emergent] that transferred such Shares to Emergent." (Ex. A, Exhibit 2.) That unnamed affiliate appears to have been Alameda. Alameda's general ledger shows that, from February 7, 2022 to May 11, 2022, Alameda transferred well in excess of four hundred million dollars to EDFM. And on May 11, 2022, Alameda, Emergent, and Mr. Bankman-Fried entered into an agreement with EDFM to "transfer all stock of Robinhood Markets, Inc. (NASDAQ: HOOD) held in Alameda's account carried by [EDFM] to Emergent's account carried by [EDFM]." (Ex. C at 1.) There is no indication that Emergent paid Alameda any consideration for this transfer.

51. This blurring of ownership interests appears to be par for the course for Mr. Bankman-Fried's companies, based on evidence developed to date suggesting that Mr. Bankman-Fried, who controlled both Alameda and Emergent, treated assets of his different companies interchangeably. For example, in a public interview, Mr. Bankman-Fried appeared to admit that he may have allowed FTX Trading and Alameda funds to be commingled:

SORKIN: Was there commingling of funds? That's what it appears like. It appears like there's been a genuine commingling of funds that are of FTX customers that were not supposed to be commingled with your separate firm.

BANKMAN-FRIED: I didn't knowingly commingle funds. . . . I was frankly surprised by how big Alameda's position was, which points to another failure of oversight on my part and failure to appoint someone to be chiefly in charge of that. But I wasn't trying to

commingle funds.

*Transcript of Sam Bankman-Fried's Interview at the DealBook Summit*, NY Times (Dec. 1, 2022),

https://www.nytimes.com/2022/12/01/business/dealbook/sam-bankman-fried-dealbook-

interview-transcript.html.

52.     Likewise, the First Day Declaration of John J. Ray III, the Debtors' new
CEO, indicates that the Debtors had "a complete failure of corporate controls and [] a complete
absence of trustworthy financial information" and "potential commingling of digital assets," and
that "the main companies in the Alameda Silo," which includes Alameda, "did not keep complete
books and records of their investments and activities" [D.I. 24 ¶¶ 5, 68-69].  Further, based on
advancements in the Debtors' investigation of Mr. Bankman-Fried's management of the Debtors,
Mr. Ray testified before the House Financial Service Committee on December 13, 2022, that,
"[w]hile many things are unknown at this stage, we [are] at a very preliminary stage [and] many
questions remain[, w]e know the following:  First[,] customer assets at FTX.com were commingled
with assets from the Alameda [] trading platform[.  T]hat much is clear.  Second, Alameda used
client funds to engage in margin trading, which exposed customer funds to massive losses."  (Ex.
Q at 7.)

53.     In sum, the evidence that Alameda beneficially owned the shares despite
Emergent's nominal ownership—especially against the backdrop of Mr. Bankman-Fried's practice
of commingling the assets of his companies—is sufficient to establish that Alameda at a minimum
has an interest in the Robinhood Shares, and is arguably their beneficial owner.  As a result, the
Robinhood Shares are assets of Alameda's bankruptcy estate for purposes of the automatic stay,
which forbids any action to obtain those shares, including the BlockFi Adversary Proceeding.

54.     Despite all of these facts, BlockFi points to Emergent's nominal ownership
of the Shares—without any context—in a clear attempt to avoid the automatic stay.  Any

reasonable evaluation of the full picture shows that the Robinhood Shares belong to the Debtors' estate.  To the extent that BlockFi is claiming it has a secured claim against any of the Debtors, that will be addressed in the Debtors' claim process at the appropriate time.

55.    *In re Nat'l Century Fin. Entrs., Inc*., 423 F.3d 567 (6th Cir. 2005) is instructive.  There, the Sixth Circuit affirmed the district court's enforcement of the automatic stay in connection with a suit filed against a nondebtor custodian by a creditor seeking possession of estate assets held by the nondebtor custodian.  *Id.* at 569.  The court rejected the creditor's argument that it merely was seeking damages from the nondebtor custodian for breach of a contractual duty to the creditor to transfer the assets to the creditor.  *Id.* at 575.  The court reasoned that, although the debtor was not named as a defendant in the state court proceeding in which the assets were being sought, and even though the creditor disputed whether the assets were truly assets of the estate, the action was barred by the automatic stay because it sought to obtain possession of assets that likely belonged to the debtor's estate.  *Id.*

56.    Likewise here, BlockFi seeks to take assets likely belonging to the Alameda bankruptcy estate by bringing a claim against a nondebtor third party predicated on a putative obligation owed directly to it.  But as *National Century* makes clear, even if assets are in the possession of a third party, so long as they are arguably property of the estate, suits to seek possession of them are barred by the automatic stay.

57.    Alameda has far more than a "colorable" claim to ownership of the Robinhood Shares.  But critically, "[i]t is not necessary at this stage that the Debtors establish an ownership interest in or title to the property[,] and the bankruptcy court need not make that determination at the outset for the automatic stay to apply."  *In re ABC Learning Ctrs. Ltd*., 2011 WL 4899789, at *2.

58.     Nor would it be fair for the Court to be forced to make that determination, or for Alameda to have to prove its ownership interest, based on the current record, which is still developing.  All the Court need determine in order to enforce the stay is that there is a meaningful and colorable *dispute* about whether the Robinhood Shares are part of the Alameda bankruptcy estate.  *See In re Kaiser Aluminum Corp., Inc*., 315 B.R. 655, 659 (D. Del. 2004) (enforcing the automatic stay and rejecting creditor's argument that debtor "has not demonstrated that the property at issue is property of the estate, and [] contend[ing] that it is the rightful owner of the premiums at issue").  Because BlockFi and Mr. Ben Shimon "seek[] to obtain [estate assets held by a third party], and because the [assets] likely constitute property of the bankruptcy estate, the bankruptcy court [may] properly enforce[] the automatic stay under 11 U.S.C. § 362(a)(3)."  *In re Nat'l Century Fin. Enters., Inc.*, 423 F.3d at 575.

59.     The Antigua Action is also persuasive.  It demonstrates that other creditors of the Debtors have competing claims to the Robinhood Shares and have convinced an Antiguan court that a basis exists to appoint a receiver.  Notably, the competing claims were filed in different jurisdictions and under different legal theories.  Resolving such disparate claims in the Debtors' bankruptcy claims process will be challenging.  But a fair resolution will be impossible if each purported prepetition creditor is permitted to separately attempt to seize the assets for itself outside this Court in a race to liquidate property that otherwise would be available for the Debtors' creditors.  Such a situation is precisely why the automatic stay "centralize[s] all prebankruptcy civil claims against a debtor in the bankruptcy court."  *McCartney*, 106 F.3d 506 at 511 (citation omitted).

60.     Importantly, enforcing the stay here will not deprive BlockFi, Mr. Ben Shimon, or any other creditor of anything to which it is entitled.  Each creditor will still get its day

in court—*this Court*—and will have the opportunity to argue why the Robinhood Shares are purportedly not part of Alameda's bankruptcy estate, or that, if they are, why BlockFi has a superior secured claim to the Shares. Even if BlockFi or another creditor ultimately were to prevail on the merits, "a creditor cannot seize property that is arguably part of the estate, and then defend its actions by stating it believes the debtor does not have any interest in it, regardless of what the final determination on ownership of the property is." *In re Manley Toys Ltd.*, 2018 WL 1033426, at *4 (Bankr. D.N.J. Feb. 14, 2018) (citing *Chesnut*, 422 F.3d at 303), *aff'd*, 2019 WL 3229301 (D.N.J. July 18, 2019).

## II.   IN THE ALTERNATIVE, THE COURT SHOULD EXTEND THE STAY TO EMERGENT TO FREEZE THE EDFM ACCOUNT

61.   The scope of the automatic stay "is not determined solely by whom a party chose to name in the proceeding, but rather, by who is the party with a real interest in the litigation." *Kaiser Aluminum Corp.*, 315 B.R. at 658. Because BlockFi seeks to collect a debt that Alameda allegedly owes to BlockFi, and the receivers seek to collect a prepetition debt that FTX Trading allegedly owes to Mr. Ben Shimon, this Court should extend the automatic stay to Emergent and stay actions to recover the Robinhood Shares.

62.   "Consistent with congressional intent and with the fundamental purposes underlying the automatic stay, numerous federal courts have held that, under appropriate circumstances, the automatic stay may be extended beyond direct actions against the debtor to lawsuits against nondebtors." *In re Midway Games, Inc.*, 428 B.R. 327, 333 (Bankr. D. Del. 2010). Thus, the Third Circuit has extended the protections of section 362(a) to nondebtors in "unusual circumstances." *McCartney*, 106 F.3d at 510; *see also Midway Games*, 428 B.R. at 334. This "unusual circumstances" test depends on "(1) whether the nondebtor and debtor share an identity of interest such that a suit against the nondebtor is essentially a suit against the debtor and (2)

whether the third-party action will have an adverse impact on the debtor's ability to accomplish reorganization." *In re W.R. Grace & Co*., 386 B.R. 17, 30 (Bankr. D. Del. 2008).

63.     There are many "unusual circumstances" about these chapter 11 cases. Those include the circumstances described herein that support an "identity of interest" between Emergent and the Debtors, and the potential adverse impact on the Debtors' ability to reorganize and protect estate assets posed by the BlockFi Adversary Proceeding and the Antigua Action.

64.     The interests of Emergent and the Debtors are sufficiently identical to warrant extending the stay in this case, because an identity of interest can be shown when "it is the *Debtors'* operations and conduct . . . that are at the core of the issues raised in" the proceeding against a nondebtor. *W.R. Grace*, 386 B.R. at 30-31 (emphasis added). The BlockFi Adversary Proceeding fundamentally concerns Alameda's loans from BlockFi. As explained above, and as BlockFi now acknowledges, the underlying debt that BlockFi seeks to collect against was Alameda's. Indeed, Emergent, which is a holding company with little to no business of its own, did not have meaningful "operations and conduct." Its only role in the transaction was to hold nominal ownership of the Robinhood Shares. Emergent had *no* obligations to or relationship with BlockFi prior to November 9, 2022—less than 48 hours before the Debtors commenced their chapter 11 proceedings.

65.     This reality is further laid bare by the fact that the agreement to pledge Emergent's purported shares as a guarantee for *Alameda's debt* was negotiated by Ms. Ellison, using assets that she treated as belonging *to Alameda*. BlockFi's alleged ownership interest in the Robinhood Shares depends on an alleged "event of default, including [Alameda]'s failure to timely make a required payment in accordance with the payment schedule." (AC ¶ 24.) And by BlockFi's own admission, the effectiveness of the Forbearance Agreement—pursuant to which Alameda

avoided BlockFi's attempts to collect its debt—was expressly conditioned on the Pledge Agreements. (Prince Declaration ¶¶ 9-10.) Because BlockFi cannot ultimately succeed in its case without a determination as to whether Alameda did in fact default on its obligation to BlockFi (or whether it even had such an obligation in the first place), there is an identity of interest between Emergent and Alameda.

66.    The BlockFi Adversary Proceeding also presents risk of an adverse impact on the Debtors' ability to reorganize and/or protect the value of their assets. The Robinhood Shares represent *hundreds of millions of dollars* of relatively liquid assets. *Cf. In re Uni-Marts, LLC*, 404 B.R. 767, 781 (Bankr. D. Del. 2009) (refusing to find an identity of interest in part because of the "relatively modest size" of the assets at issue). Requiring Alameda to appear now in multiple venues to protect this substantial asset would distract from the Debtors' reorganization efforts and waste important estate resources. This would be particularly harmful because, as explained above, the facts concerning the ownership of the Robinhood Shares are actively being investigated. Moreover, EDFM has a potential indemnification claim under the May 11, 2022 agreement resulting from the BlockFi Adversary Proceeding. (*See* Ex. C.) Courts regularly determine that the trigger of a contractual indemnity claim against a debtor creates risk that supports extending the stay.[6] *See*, *e.g.*, *W.R. Grace*, 386 B.R. at 31 ("[T]he contractual indemnification agreements discussed above indicate an identity of interest between [nondebtor third party] and Debtors."); *In re Am. Film Techs., Inc.*, 175 B.R. 847, 853 (Bankr. D. Del. 1994) (extending the automatic stay to nondebtor directors and officers in part because "there is an entitlement to indemnification between the debtor and its officers and directors").

---

[6] For the avoidance of doubt, the Debtors do not concede that any such potential claim would be viable and reserve all rights.

67.     Finally, it is in the interest of judicial economy for this Court to resolve the disputes concerning the Robinhood Shares, which will require a deep understanding of the complex issues of corporate governance, corporate separateness, and intercompany claims that will be central to these chapter 11 cases.  The Motion should be granted.

## RESERVATION OF RIGHTS

68.     The Debtors expressly reserve, and do not waive, any and all of their rights, claims, causes of action, remedies, and defenses, in any and all courts and jurisdictions, under law or in equity, in connection with the Robinhood Shares, the BlockFi Adversary Proceeding, the Loan Agreements, the Forbearance Agreement, the Pledge Agreements, the Bankruptcy Code, applicable law or otherwise against BlockFi, the BlockFi bankruptcy estates, any successor in interest to BlockFi or its bankruptcy estates, EDFM, Emergent, Mr. Bankman-Fried, Ms. Ellison, Mr. Ben Shimon, and any and all third-parties.

## NOTICE AND NO PRIOR REQUEST

69.     Notice of this Motion has been provided to: (a) the U.S. Trustee; (b) counsel to the Committee; (c) the Securities and Exchange Commission; (d) the Internal Revenue Service; (e) the United States Department of Justice; (f) the United States Attorney for the District of Delaware; (g) counsel for BlockFi; (h) counsel for the Joint Provisional Liquidators of Emergent Fidelity Technologies Ltd; (i) the parties identified on the Debtors' consolidated lists of 50 largest unsecured creditors; and (j) to the extent not listed herein, those parties requesting notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be provided.

70.     No prior application for the relief requested herein has been made by the Debtors to this or any other court.

## CONCLUSION

WHEREFORE, for the reasons set forth herein, the Debtors respectfully request that the Court (a) enter the Order, substantially in the form of **Exhibit 1**, and (b) grant such other and further relief as is just and proper.

Dated:  December 22, 2022
       Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Adam G. Landis*
Adam G. Landis (No. 3407)
Kimberly A. Brown (No. 5138)
Matthew R. Pierce (No. 5946)
919 Market Street, Suite 1800
Wilmington, Delaware  19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
E-mail: landis@lrclaw.com
       brown@lrclaw.com
       pierce@lrclaw.com

-and-

**SULLIVAN & CROMWELL LLP**
Andrew G. Dietderich (admitted *pro hac vice*)
James L. Bromley (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Matthew J. Porpora (*pro hac vice* forthcoming)
Alexa J. Kranzley (admitted *pro hac vice*)
125 Broad Street
New York, New York  10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
E-mail: dietdericha@sullcrom.com
       bromleyj@sullcrom.com
       gluecksteinb@sullcrom.com
       porporam@sullcrom.com
       kranzleya@sullcrom.com

*Proposed Counsel for the Debtors*
*and Debtors-in-Possession*