# Exhibit Q

# Bloomberg
## GOVERNMENT

# House Financial Services Committee hearing Investigating the Collapse of FTX, Part I, sked FINAL

December 13, 2022 5:35PM ET

TRANSCRIPT

December 13, 2022

COMMITTEE HEARING

REP. MAXINE WATERS, D-CALIF.

HOUSE FINANCIAL SERVICES COMMITTEE HEARING INVESTIGATING THE

COLLAPSE OF FTX, PART I

Bloomberg Government

Support: 1-877-498-3587

www.bgov.com

Copyright 2022. Provided under license from Bloomberg Government.

All materials herein are protected by United States copyright law

and/or license from Bloomberg Government, and may not be

reproduced, distributed, transmitted, displayed, published or

broadcast without the prior written permission of

Bloomberg Government.

You may not alter or remove any trademark, copyright or other

notice from copies of the content.

HOUSE FINANCIAL SERVICES COMMITTEE HEARING INVESTIGATING THE

COLLAPSE OF FTX, PART I

DECEMBER 13, 2022

SPEAKERS:

REP. MAXINE WATERS, D-CALIF., CHAIR

REP. CAROLYN B. MALONEY, D-N.Y.

REP. NYDIA M. VELAZQUEZ, D-N.Y.

REP. BRAD SHERMAN, D-CALIF.

**Bloomberg**
**GOVERNMENT**

REP. GREGORY W. MEEKS, D-N.Y.

REP. STEPHEN F. LYNCH, D-MASS.

REP. DAVID SCOTT, D-GA.

REP. AL GREEN, D-TEXAS

REP. EMANUEL CLEAVER II, D-MO.

REP. ED PERLMUTTER, D-COLO.

REP. JIM HIMES, D-CONN.

REP. BILL FOSTER, D-ILL.

REP. JOYCE BEATTY, D-OHIO

REP. JUAN C. VARGAS, D-CALIF.

REP. VICENTE GONZALEZ, D-TEXAS

REP. JOSH GOTTHEIMER, D-N.J.

REP. ALMA ADAMS, D-N.C.

REP. CYNTHIA AXNE, D-IOWA

REP. SEAN CASTEN, D-ILL.

REP. MADELEINE DEAN, D-PA.

REP. JESUS GARCIA, D-ILL.

REP. SYLVIA GARCIA, D-TEXAS

REP. AL LAWSON, D-FLA.

REP. ALEXANDRIA OCASIO-CORTEZ, D-N.Y.

REP. AYANNA PRESSLEY, D-MASS.

DEL. MICHAEL SAN NICOLAS, D-GUAM

REP. RASHIDA TLAIB, D-MICH.

REP. RITCHIE TORRES, D-N.Y.

REP. JAKE AUCHINCLOSS, D-MASS.

REP. NIKEMA WILLIAMS, D-GA.

REP. PATRICK T. MCHENRY, R-N.C., RANKING MEMBER

REP. FRANK D. LUCAS, R-OKLA.

**Bloomberg**
**GOVERNMENT**

REP. BILL POSEY, R-FLA.

REP. BLAINE LUETKEMEYER, R-MO.

REP. BILL HUIZENGA, R-MICH.

REP. STEVE STIVERS, R-OHIO

REP. ANN WAGNER, R-MO.

REP. ANDY BARR, R-KY.

REP. ROGER WILLIAMS, R-TEXAS

REP. FRENCH HILL, R-ARK.

REP. TOM EMMER, R-MINN.

REP. LEE ZELDIN, R-N.Y.

REP. BARRY LOUDERMILK, R-GA.

REP. ALEX MOONEY, R-W.VA.

REP. WARREN DAVIDSON, R-OHIO

REP. TED BUDD, R-N.C.

REP. DAVID KUSTOFF, R-TENN.

REP. TREY HOLLINGSWORTH, R-IND.

REP. ANTHONY GONZALEZ, R-OHIO

REP. JOHN ROSE, R-TENN.

REP. BRYAN STEIL, R-WIS.

REP. LANCE GOODEN, R-TEXAS

REP. WILLIAM TIMMONS, R-S.C.

REP. VAN TAYLOR, R-TEXAS

WITNESSES:

JOHN J. RAY III, CHIEF EXECUTIVE OFFICER, FTX GROUP

WATERS: The Committee will come to order. Without objection, the Chair is authorized to declare recess of the Committee at any time. This hearing is entitled investigating the collapse of FTX, Part I. I now recognize myself for five minutes to give an opening statement. First, I'd like to welcome Mr. John Ray III, who has been appointed CEO of FTX to oversee its bankruptcy to testify before our Committee for the first part of our investigation into the fall of FTX.

© 2022 BGOV LLC A R ghts Reserved

**Bloomberg**
**GOVERNMENT**

I am hopeful that the arrest of Mr. Bankman-Fried, the founder and former CEO of FTX means, he will be held accountable for the fraud he has committed and the harm he has caused. He was scheduled to testify under oath before this Committee today. Unfortunately, the timing of his arrest denies the public the opportunity to get the answers they deserve. Rest assured that this Committee will not stop until we uncover the full truth behind the collapse of FTX.

Just a few months ago, FTX was one of the largest cryptocurrency exchanges in the world, with a valuation of $32 billion in just three years since its founding. Today, FTX is bankrupt, and possibly looted, FTX misuse and an approximately $10 billion in customer bonds, and owes creditors at least $3 billion. Today, as many as 1 million people, many of whom are here in the United States, are locked out of their FTX accounts, and may recover only a fraction of their hard-earned investments, if any at all.

But this failure is not just noteworthy for its size, but for the company's total disregard for standard business practices, governance, risk management and criminal conduct. Mr. Ray, who also oversaw one of the largest corporate bankruptcies in United States history, Enron, declared that he had never in his career seen such an I quote, "complete failure of corporate controls and such a complete absence of trustworthy than actual information as occurred here," end of quote.

I'm so deeply troubled to learn how common it was for Bankman-Fried and FTX employees to steal from the cookie jar of customer funds to finance their lavish lifestyles. Today, this Committee will dig deeper into mysteries findings, with the hosts are piecing together the events that led to the collapse of FTX and the subsequent harm to millions of customers who put their trust in the platform.

We will also look at FTX's deep ties with Alameda, a crypto hedge fund, predominantly owned by Bankman-Fried, that gambled away billions of dollars in customer assets that were inappropriately transferred from FTX. And importantly, we want to hear how Mr. Ray and his team of trying to recover funds but customers by piecing together Bankman-Fried's broken record keeping and by identifying potentially unlawful transfers to himself, as well as his friends and family. Under my leadership over the past four years, this Committee is closely focused on the growth and popularity of crypto precisely because of the many concerns that the failure of FTX has highlighted.

Last year, I created a digital assets working group comprised of Democratic members of the Committee with the goal of learning more about the underlying technologies, applications for finance, and the risk they pose to customers, consumers, and the economy. When the President's Working Group on Financial Markets urged Congress to safeguard the economy from stable coin risk, I and Ranking Member McHenry jumped into action and continued to work on a bill with the members of this Committee.

© 2022 BGOV LLC A R ghts Reserved

**Bloomberg**
**GOVERNMENT**

The ongoing failures of crypto firms like Terra U.S.D, Celsius, BlockFi, and most significantly, FTX and Alameda Research only serves to strengthen the importance for Congress and the public to understand the harm caused to customers, what laws have been broken or flaunted, and how Congress and the regulators can prevent this from happening again. I want to say that I'm pleased that the Committee's efforts have pushed enforcement agencies across the country to take greater action against bad actors who misuse customers' funds. I also applaud the SEC for authorizing separate charges relating to Mr. Bankman-Fried and I look forward to additional actions to hold him accountable and make customers more whole again.

I yield back.

And I now recognize the Ranking Member of the Committee, the gentleman from North Carolina, Mr. McHenry, for five minutes.

MCHENRY: Thank you, Madam Chair.

We've heard everything but the truth. Tweets, DMS and interviews are no substitute for the facts. And that's why Chairwoman Waters and I worked together to get this hearing on the books, the first bipartisan hearing this Committee in the last four years, and we've worked together to invite two witnesses. One, Mr. Ray has proven to be a reliable witness. The second, well, frankly, I look forward to getting his lies here on the records under oath.

Nevertheless, the arrest of Sam Bankman-Fried is welcome news. But it still does not get to the bottom of what happened at FTX, and why it happened, and who else may be responsible. We need to understand the flow of funds between FTX and Alameda Research and 130 related entities. We need to examine the actions of those who may have contributed to what has been called a quote, "complete failure of corporate controls" end quote. That quote comes from Mr. Ray, the newly appointed CEO. And we need to answer -- we need answers for the U.S. platform customers stuck in limbo.

But our work here, -- well, our work doesn't stop there. We have an obligation to do everything in our power to ensure this never happens again. But let's face it, there's an old saying, there's nothing new under the sun. And it's safe to assume that fraud and fraudsters have been around just as long as that phrase has been around. Bankman-Fried's play is nothing new. We've -- we've seen it before. In the late 1800s, when the Union Pacific purposefully inflated the price of railroad construction to line its executive pockets, or in the 1900s when the con man George C. Parker was arrested for illegally, quote, unquote, "selling" the Brooklyn Bridge, Madison Square Garden and Statue of Liberty, and in the 2000s, when it was revealed Enron engaged in a massive corporate fraud and corruption sending shockwaves throughout the business world.

**Bloomberg**
**GOVERNMENT**

There are many comparisons you can draw between each one of these pretenders and the alleged actions of Mr. Bankman-Fried. It appears to be the same old-school fraud just using new technology. But it's important to note, and I think it's very important to note, we still use railroads, we still buy and sell real estate, and we still rely on businesses to provide services. We have to separate out the bad actions of an individual from the good created by an industry and an innovation.

So let me be clear, I believe in the promise of digital assets and those around the world building on blockchain technologies. And that's why I've worked and will continue to work to provide clear rules of the road for the digital asset ecosystem here in the United States. And that's how we protect American consumers and investors in this marketplace and allow innovation to occur here in the United States.

I'll finish with this. We know the Securities Exchange Commission Chair Gensler's regulation by enforcement approach is not going to stop bad actors. Next year, I look forward to hearing from Mr. Gensler early and often. And we'll hear from him and how we can provide clarity on the application of our securities laws to trading platforms, which he has failed to do. The Financial Services Committee has an important role to play in this factfinding mission, which we will start today, and continue as we work towards a legislative outcome to prevent this from happening again.

Thank you, Madam Chairwoman. I yield back.

WATERS: I want to welcome our witnesses for this hearing, John J. Ray III, who is the Chief Executive Officer of FTX Group. Without objection, your written statement will be made part of the record. You will have five minutes to present your oral testimony. You should be able to see a timer that will indicate how much time you have left. I would ask you to be mindful of the timer so that we can be respectful of everyone's time. Mr. Ray, you are now recognized for five minutes to present your oral testimony.

RAY: Chairwoman Waters, Ranking Member McHenry, distinguished members of the Committee, thank you for your invitation to appear today. I truly appreciate your interest in this matter, and I hope my testimony can be helpful to you as the Committee continues its inquiry into the collapse of FTX, and the efforts that are underway to help those who have been harmed.

I accepted the position of Chief Executive Officer of FTX in the early morning hours of November 11th. Immediately became clear to me that Chapter 11 was the best course available to preserve any remaining value of FTX. Therefore, my first act as CEO was to authorize the Chapter 11 filings. I've implemented a five-part bankruptcy plan, which is detailed in my written statement. Our overarching objective is to maximize value for FTX customers and creditors, so that we can mitigate to the greatest extent possible the harm suffered by so many. The FTX Group's collapse appears to stem from absolute concentration of control in the hands of a small group of grossly inexperienced and unsophisticated individuals who failed to implement virtually any of the systems or controls that are necessary for a company entrusted with other people's money or assets.

**Bloomberg GOVERNMENT**

Some of the unacceptable management practices we've identified so far include the use of computer infrastructure that gave individuals and senior management access to systems that stored customers assets without security controls to prevent them from redirecting those assets; the storing of certain private keys to access hundreds of millions of dollars in crypto assets without effective security controls or encryption; the ability of Alameda to borrow funds held in ftx.com to be utilized for its own trading or investments without any effective limits whatsoever; the commingling of assets; the lack of complete documentation for transactions involving nearly 500 separate investments made with FTX Group funds and assets; and the absence of audited or reliable financial statements, the lack of personnel and financial risk management functions and the absence of independent governance throughout the FTX group.

The fundamental challenge we face is there in many respects starting from near zero in terms of the corporate infrastructure, and record keeping that one would expect in a multibillion-dollar corporation. Still, in just over four weeks, we've instituted meaningful steps to gain command and control. And every week, we gain a better understanding of what occurred, and the path forward, all of which will be shared with interested parties, and affected parties throughout the Chapter 11 processes. The scope of our investigation is truly enormous, involves detailed tracing of money flows and asset transfers from the time of FTX's founding, and complex technological efforts to identify and trace crypto assets.

We're the process of collecting or reviewing dozens of terabytes of documents and data, including billions of individual transactions, we're leveraging sophisticated technology and expertise to identify and trace additional transactions and assets. While many things are unknown at this stage, we're at a very preliminary stage, many questions remain. We know the following. First customer assets at ftx.com were commingled with assets from the Alameda, the trading platform that much is clear.

Second, Alameda used client funds do engage in margin trading, which exposed customer funds to massive losses. Third, the FTX group went on a spending binge and 2021 and 2022, during which $5 billion was spent on a myriad of businesses and investments, many of which may only be worth a fraction of what was paid for them. Fourth, loans and other payments were made to insiders in excess of $1.5 billion. Fifth, Alameda's business models a market maker required funds to be deployed to various third-party exchanges, which were inherently unsafe and further exacerbated by the limited protections offered in certain of those foreign jurisdictions.

I know the resolution of the Chapter 11 process as well as the investigation and the causes of the FTX Group's collapse are of keen interest to this Committee and to your constituents. Although, there are many who need and deserve answers, there's customers, there's creditors, there's investors, counterparties, employees, and regulators, we're positioning ourselves to provide each of these constituents with the answers that they deserve.

© 2022 BGOV LLC A Rights Reserved

**Bloomberg**
**GOVERNMENT**

Although a bankruptcy proceeding of this unprecedented nature will take some time to run its course, I'm committed to working as quickly as possible to investigate what happened, formulate conclusions, and hopefully inform the Committee's work here. I should note that my ability to comment on certain other matters today will be inherently limited by the state of FTX's records, ongoing bankruptcy proceedings, and of course, the numerous ongoing investigations by the U.S. law enforcement regulators.

I look forward to answering your questions to the best of my ability. Thank you again, for allowing me to present in front of this Committee. Thank you.

WATERS: Thank you very much, Mr. Ray.

It has been widely reported how FTX shifted customer bonds held at the exchange to Alameda Research, which was a hedge fund owned almost entirely by Mr. Bankman-Fried. This allowed the firm to effectively gamble with customer money without their knowledge or consent. If FTX was registered as a securities exchange, several laws would have required the segregation of customer assets and prevented such clear conflicts of interest. Mr. Bankman-Fried also appears to have tried to hide the linkages between the exchange and his hedge fund.

Have you seen evidence of such a cover up? Have you seen evidence that there was any independent governance of Alameda separate and apart from that of the exchange?

RAY: The operations of the FTX Group were not segregated, it was really operated as one company. As a result, there's no distinction virtually between the operations of the company and who controls those operations.

WATERS: Well, Mr. Ray, another bankruptcy filing revealed that Mr. Bankman-Fried personally received $1 billion -- a $1 billion loan from Alameda Research. In a meeting with Committee staff, Mr. Bankman-Fried was unaware of the terms of the repayment, interest details, and could not competently state who authorized the loan. He claimed that he reinvested this money into the exchange, but knowingly chose to have the loan issued to him, rather than FTX to avoid directly connecting Alameda Research to FTX.

Can you elaborate on any significant findings in connection with this loan?

RAY: The loans that were given to Mr. Bankman-Fried were not just one loan, it was numerous loans, some of which were documented by individual promissory notes. There's no description of what the purpose of the loan was. In one such instance, he signed both as the issuer of the loan as well as the recipient of the loan. But we have no information at this time as to what the purpose or the use of those funds were, and that is part of our investigation.

WATERS: Did you find any business or operational activities that the entities jointly engaged in that you would consider inappropriate or detrimental to FTX? If so, could you give us an example?

© 2022 BGOV LLC A  R ghts Reserved



RAY: Certainly, thank you. The operation of Alameda really depended based on the way it was operated for the use of customer funds. That's the major breakdown here of funds from ftx.com, which was the exchange for non-U.S. citizens. Those funds were used at Alameda to make investments and other disbursements.

WATERS: Did FTX have sufficient risk management systems and controls to appropriately monitor any leverage the business took on and the interconnections it had with businesses like again, Alameda?

RAY: There were virtually no internal controls and no separateness whatsoever.

WATERS: With that, I'm going to call on the gentleman from North Carolina, Mr. McHenry, who is the Ranking Member of the Committee. You are now recognized for five minutes.

MCHENRY: Thank you, Madam Chair. Mr. Ray, thank you for your testimony. We had your predecessor, Mr. Sam Bankman-Fried before this Committee a year ago. And given -- given where we are, can we just start from the beginning? You have in your declarations some clear outlines, but I want to make sure we have this in the record. There are different groups of businesses under the FTX -- FTX platform, or umbrella. Your declaration separates the businesses into four silos. Would you describe that?

RAY: Yes. For structural purposes and just for ease of presentation, we tried to take the over 100 entities and we put those in for silos. To demystify that, it's very simple. There was a U.S. silo, which was the FTX us exchange for U.S. investors. There was an international exchange called ftx.com, again, for non-U.S. persons that invested in crypto. There was Alameda, which is purely a crypto hedge fund, which made other investments venture capital type investments. And there's a fourth entity which was purely investments.

And although our investigation is not complete, those -- those investments were most likely made with either Alameda money or money that originally came from ftx.com. But that fourth silo is just purely investments.

MCHENRY: And who own those four silos?

RAY: All those entities are owned or controlled by Sam Bankman-Fried.

MCHENRY: Okay. And so, can you describe the differences between the ftx.com and FTX U.S. silos?

RAY: Yes. Very simply, FTX U.S. for the U.S. citizens who wanted to trade crypto, ftx.com was for -- U.S. citizens were not allowed to trade on that exchange. That's very simple. And I would make one other comment, which is separate apart from any of those two silos. It was Ledger x, which is a regulated entity regulated by the CFTC solvent and separate from the FTX us silo.

MCHENRY: Okay. And that is a distinct -- that's a distinct company.

**Bloomberg**
**GOVERNMENT**

RAY: That is a distinct company within the U.S. silo, yes.

MCHENRY: Okay. So, then Alameda Research and the venture capital businesses, what did Alameda Research do?

RAY: Essentially, made crypto investments, engaged in margin trading, took long and short positions in crypto, essentially invested in crypto, but of course, we now know also invested in over $5 billion of other assets, which are in a variety of sectors.

MCHENRY: And what was the practice between Alameda research and ftx.com? Do you have -- have you established anything you can disclose to us today?

RAY: In essence, Alameda was a user, effectively a customer of ftx.com. That's how it was essentially structured.

MCHENRY: Was that a distinct set of capital between those two companies?

RAY: Well, we now know the answer to that is no.

MCHENRY: No. Okay. And with the information you have right now, when -- when approximately, did FTX begin to experience financial trouble?

RAY: Well, it was first disclosed to the public beginning around November 2nd. But when this began was months, if not earlier years. Our investigation is -- is continuing this is -- but this is not something that happened overnight or in the context of a week.

MCHENRY: Okay. So, you said the distinction between FTX U.S. ftx.com, Alameda Research, what was -- what was the relationship between ftx.com and FTX U.S.? Was there a distinction between the two?

RAY: There was a public distinction between the two. What we're seeing now is that the crypto assets for both ftx.com and for FTX U.S. were housed in the same database that's called the AWS system, which is just an acronym for Amazon Web Services. It was all housed in the same web format.

MCHENRY: And is that distinct from Alameda's assets?

RAY: Yes, it is.

MCHENRY: Okay. So, in your testimony, you said that there's quote, "an absence of independent governance throughout the FTX group," end quote, yet Mr. Bankman-Fried said that, quote, "he wasn't running Alameda or making decisions on the Alameda side," end quote. Is this an accurate statement by Mr. -- I assume you're going to say your statement is accurate. Is Mr. Bankman-Fried's statement accurate?

RAY: I don't know the basis for his comment. I will note that he owned 90% of Alameda.

MCHENRY: So -- but you've seen that -- you've seen no distinction in governance between the two?

**Bloomberg**
**GOVERNMENT**

RAY: Oh, absolutely not. There's no distinction whatsoever. The owners of the company could really run free reign across all four silos.

MCHENRY: Thank you for testimony.

WATERS: The gentlewoman from New York, Mrs. Velasquez, who is also the Chair of the House Committee on Small Business, is now recognized for five minutes.

VELASQUEZ: Good morning, Mr. Ray. You have long -- you have had a long career working on several high-profile bankruptcies, most notable being the Enron debacle. Mr. Ray, you were recently quoted in the New York Times as saying you have never seen such a complete failure of corporate control and the level of disfunction was the worst you have ever seen. Can you expand on this statement, and what you have seen since taking over a CEO to make such a remark?

RAY: Yes, thank you. That comment went to really one thing that we found, which every case is different. The challenges of every case is different. The issue here that I was speaking to is I've just never seen an utter lack of record keeping. Absolutely no internal controls whatsoever. And, of course, this case is then made difficult in that context when you're dealing with technology.

VELASQUEZ: Mr. Ray, a number of debtors in the FTX Group are located in offshore jurisdictions. Will this complicate the efforts to retrieve the assets of those debtors? If so, why?

RAY: No, I don't think complicated at all. The various jurisdictions historically in bankruptcy, and I've been in a number of cross border situations, the jurisdictions will cooperate with each other. The regulators in all these jurisdictions, I think, realize that everyone's there for a common purpose, to protect the victims and recover assets for the victims of these situations.

VELASQUEZ: Have -- how much have you been able to secure and where are most of these assets located?

RAY: We've been able to secure over a billion dollars of assets, we've secured those two cold wallets in a secure location. It's an ongoing process, though, which -- which will -- will take weeks and perhaps months to secure all the assets?

VELASQUEZ: Are most creditors located in the U.S. or foreign jurisdictions?

RAY: The majority of the creditors trade through the .com silo and are outside of this jurisdiction, although there are some foreign customers that are on the U.S. silo, and vice versa.

VELASQUEZ: So, it is my understanding you established for silos. Can you explain why you believe establishing these silos and taking this approach will maximize asset recovery for creditors? And do you think this approach could help determine what happened to the $1 billion that is gone missing?

© 2022 BGOV LLC A Rghts Reserved



RAY: Yes. So, one of the reasons why we set up the silos the way we did was to first focus on the -- the FTX silo for the U.S. It's a relatively smaller trading volume, fewer users. It's truly meant to be for the U.S. customers. The .com silo was really for -- for non-U.S. customers. So, there's a logical reason why we separated those two out. The Alameda fund, that's just the fund that -- that drew resources from the exchanges. So, it's, it's really separate, it was not for customers, per se. It was just simply a hedge fund.

VELASQUEZ: And as we hear in Congress consider the possibility of legislation in this area, what is the one thing that you have seen in your short amount of time at FTX that you will urge us to keep in mind or is needed the most?

RAY: I don't want to speak to detailed regulations or make observations about regulations. That is certainly not an area of my expertise. However, we're dealing with people's money and their assets, and my basic observation is, you need records, you need controls, and -- and you need to segregate people's money.

VELASQUEZ: Thank you.

RAY: That's simple.

VELASQUEZ: Thank you.

Madam Chair, I yield back.

WATERS: The gentlewoman from Missouri, Mrs. Wagner, is now recognized for five minutes.

WAGNER: I thank you, Madam Chairwoman.

And I thank you, Mr. Ray for being here for the work that you're doing.

Mr. Ray, you have compared FTX as worse than Enron. Can you please elaborate on some of the specific ways FTX is worse than one of the largest corporate frauds in history?

RAY: The FTX group is unusual in the sense that I've done probably a dozen large-scale bankruptcies over my career, including Enron, of course. Every one of those entities had some financial problem or another. They have some characteristics that are in common. This one is unusual, and it's unusual in the sense that literally, there's no record keeping whatsoever in the absence of record keeping.

Employees would communicate invoicing and expenses on -- on Slack, which is essentially, a way of communicating for chat rooms. They use QuickBooks, a multibillion-dollar company using QuickBooks.

WAGNER: QuickBooks?



RAY: QuickBooks. Nothing against QuickBooks, very nice tool, just not for a multibillion-dollar company. There's no independent board, right? We had one person really controlling this, no independent board. That's highly unusual in a size -- company this size. And it's made all the more complex because we're not dealing with widgets, or something that's tangible. We're dealing with -- with -- with crypto, and the technical technological issues are made worse when you're dealing with an asset, such as crypto.

WAGNER: Mr. Ray, Mr. Bankman-Fried has apologized. I'll -- I'll sub quote here for "mistakes" he has made. Based on your review, is there a way to know if the transfer of FTX customer funds to Alameda research was done by mistake?

RAY: I don't find any such statements to be credible.

WAGNER: Reports suggest that ftx.com transferred more than half of its customer funds, roughly $10 billion to Alameda Research. Is that accurate, sir?

RAY: Our work is not done. We don't have exact numbers for you today. But I will say yes, it's several billion dollars in that range. So, we know that the size of the harm was significant.

WAGNER: Mr. Ray, ftx.com held itself out as having a sophisticated risk management system commensurate with the size of its operations. You've touched on this a little bit. Based on your work to date, is this accurate? And can you explain the, quote "sophistication" of its risk management system?

RAY: I can say that's absolutely false. There was no sophistication whatsoever. There was an absence of -- of any management.

WAGNER: Mr. Ray, Mr. Bankman-Fried has been able to confuse interviewers, by talking in circles around the multiple business activities of ftx.com. Mr. Ray, would you break down for us the different business quote "activities" of ftx.com?

RAY: Much of this I've described, essentially, they had two exchanges for allowed users to trade crypto, and then there was the hedge fund. It's as simple as that. The users were allowed to make a variety of investments, they had a more expansive ability to trade crypto, if you were a non-U.S. citizen on the.com Exchange, but I know what's been described publicly is very complex, and it is to some extent. But essentially, you had two exchanges and you had a hedge fund. Inside both the U.S. silo as I've mentioned, and inside the silos for .com, there were regulated entities.

We have regulated entities that are, for example, in Japan that are solvent, we had a regulate entity in the Ledger X that was solvent. Those are sort of distinct from the other basic operations that we had, which are the two exchanges.

WAGNER: I thank you, Mr. Ray.

© 2022 BGOV LLC A Rights Reserved



And Madam Chairwoman, I'd like to submit an op ed, for the record describing an existing SEC Rule that could have prevented customer assets from being misused, and I appreciate my constituent, Ron Kruszewski (ph), President of -- CEO of Stifel Nicholas, for his thoughtful comments. I associate myself with those and I like this entered for the record. I thank you, and I yield back.

WATERS: Thank you very much.

The gentleman from California, Mr. Sherman, who is also the Chair of the Subcommittee on Investor Protection, Entrepreneurship and Capital Markets, is now recognized for five minutes.

SHERMAN: For five years, I've been trying to ban American investments in crypto. I'm the only member of the House to get an F from the only crypto promoting organization that rates members of Congress. My fear is that we will view Sam Bankman-Fried as just one big snake in a crypto Garden of Eden. The fact is, crypto is a garden of snakes. Now from the outside, crypto just looks like a non-fungible token, an electronic pet rock for the 21st century, something that might be good to invest in, even though it has no apparent value because you might get somebody else to buy it from you for even more.

But in reality, the hope of crypto is to be a currency to compete with the U.S. dollar and to announce its advantage over the U.S. dollar in that competition. It puts the advantage right in the name, crypto, hidden currency. Well, what is there a big market for that? Is there a big advantage that crypto has over the U.S. dollar if it actually became a currency which it's not yet? Well, there are drug dealers, human traffickers, sanctions evaders who will find that to be a good feature. And as Sam Bankman-Fried would tell you, there's a hell of a market for bankruptcy court evasion. But the big market is tax evasion.

And I know there are some on the other side who cheer every time a billionaire escapes taxes. The other purpose -- the other announced purpose of crypto is to compete with the U.S. dollar as a world reserve currency, thereby enriching the corporate billionaire bros and taking thousands of dollars of advantage away from every American family because we benefit from being a reserve currency.

Now, Sam Bankman-Fried, or should I say inmate 14372, had one purpose in all of his efforts here in Congress, was a well-known figure, only one wearing shorts. His one purpose was to keep the SEC out of crypto, to provide a patina of regulation, baby regulation from the CFTC. And I'll have one comment from my colleagues. Don't trash Sam Bankman-Fried and then pass his bill.

I fear that could happen because Sam was not the only crypto bro with PACs and lobbyists. And there is no PAC or lobbyist here to work for efficient tax enforcement or sanctions enforcement. Now I've heard from some on the other side criticizing the SEC. In July in this room, I criticized the head of the SEC for not going out -- the head of enforcement of the SEC for not going after crypto exchanges.

But the fact is that, without objection, I'd like to put on the record a letter signed by 19 Republican members designed to push back on the SEC, a brushback pitch if you're familiar with baseball --

© 2022 BGOV LLC A  R ghts Reserved

**Bloomberg**
**GOVERNMENT**

WATERS: Without objection, such is the order.

SHERMAN: Thank you.

-- attacking the SEC for paying attention to and I quote, "the purported risks of digital assets." And I'd like to put on the record without objection comments from eight members made in this room that were designed to attack the SEC as being a Luddite and anti-innovation for their efforts.

Mr. Ray, you're going to be looking at FTX. We know that Sam Bankman-Fried is already in -- faces criminal charges, but he did have help. Will you be looking for and turning over to U.S. law enforcement authorities information about the possible criminal actions by Ryan Salame, Carolyn Olson, and the -- the other folks in the -- in the fancy apartment?

RAY: We are doing a thorough investigation. And we will of course, we have been cooperating with the U.S. regulators and law enforcement agencies. So, we will cooperate to turn over any information that would be relevant to them.

SHERMAN: Thank you.

And I'll point out in particular that one of the counts count eight in the complaint or indictment is violation of campaign finance laws. And I hope that what you will turn over is a list of the major bonuses and or loans, it's reported that the Ryan Salame got a $55-million loan so that a law enforcement can piece together when those loans and bonuses were made, and whether they immediately preceded illegal campaign -- oh, disguise campaign contributions. So, can we count on you to do that?

RAY: Yes, I can confirm that.

SHERMAN: My time has expired.

WATERS: Thank you.

The gentleman from Oklahoma, Mr. Lucas, is now recognized for five minutes.

LUCAS: Thank you, Madam Chairman.

And thank you, Mr. Ray for appearing before the Committee this morning, particularly in light of the recent arrest of Bankman-Fried. I expected you to be very cautious this morning in your answers. And in fact, I suspect you have been but you've been very thorough and methodical. And the Committee and I appreciate indeed.

First, I'd like to discuss the bankruptcy process, Mr. Ray. It's our understanding that some of the FTX entities were not included in bankruptcy, including Ledger X. Could you explain why those entities were not included and what -- what might ultimately happen with them?

© 2022 BGOV LLC A  R ghts Reserved



RAY: Ledger X is a perfect example of the entities that were kept out of bankruptcy. It's a regulated entity. It's fully solvent that customer funds were segregated. We --we believe that there's been no harm there whatsoever. There's no reason to put it into bankruptcy. Ultimately, we will look to sell Ledger X, and put it in the hands of a good steward.

LUCAS: And would you expand on how U.S. bankruptcy proceedings interact with international proceedings for instance, like those in Australia?

RAY: Yes, its -- the system is really designed to have a cooperative relationship with liquidators and other jurisdictions. We share information, we cooperate with each other relative to maximizing customer value, and -- and ultimately, facilitating distributions and overall facilitation of the completion of the scheme in order to render customers as whole as possible.

LUCAS: As we've all seen, of course, SEC has charged Mr. Bankman-Fried with defaulting investors along with charges from the CFTC and the Southern District of New York. And in your testimony, you describe FTX Group as having an acceptable management practices. And you made that graphically clear, in particular to how Mr. Bankman-Fried is accused of. The SEC specifically alleges that one way in which Mr. Bankman-Fried diverted FTX funds to Alameda Research was by directing customers to deposit cash into Alameda-controlled bank accounts.

Mr. Ray, could you explain how FTX was able to conceal that?

RAY: We're still somewhat early in our investigation, but we can confirm that funds were deposited directly into Alameda as opposed to FTX bank accounts, unfortunate, obviously, situation.

LUCAS: One last question on the bankruptcy. It's been reported that FTX digital and FTX Australia were not included in the bankruptcy filing because local regulators had already initiated their own proceedings. Is it true that they could not have been included because of that?

RAY: Yes, our filing occurred on November 11, and there was other filings that had occurred shortly before.

LUCAS: One last thought must write clearly your profession is cleaning up messes that other people have made? That's a fair way to describe it, not messes that you made, but they made. How does this compare in your experience magnitude wise?

RAY: Well, it's --

LUCAS: Is it the worst of the worst by magnitudes?



RAY: It's one of the worst from a documentation standpoint. Even in the most failed companies, you have a fair roadmap of what happened. We're dealing with literally a sort of a paperless bankruptcy in terms of how they created this company. It makes it very difficult to trace and track assets, and particularly, as I've said, in the crypto world. It's really unprecedented in terms of the lack of documentation.

LUCAS: Bankman-Fried clearly tried to exhibit himself as the brightest of the bright. Being bright neither makes you honest nor fool, does it?

Thank you, Mr. Ray.

WATERS: Thank you.

The gentleman from Texas, Mr. Green, who is also the Chair of the Subcommittee on Oversight and Investigations, is now recognized for five minutes.

GREEN: Thank you, Madam Chair.

And I thank the witnesses for appearing today.

Sir, I have in my left hand in a sealed indictment from a grand jury as it relates to Mr. Samuel Bankman-Fried, and in my right hand the Securities and Exchange Commission's complaint that has been filed against the same defendant. Let's put aside the civil complaint. I have one question, but first I'd like to lay a predicate by going through these charges in the criminal complaint. Wire fraud on customers, conspiracy to commit wire fraud on lenders, conspiracy to commit commodities fraud, conspiracy to commit securities fraud, conspiracy to commit money laundering, and the list goes on with a few others.

I mentioned these things to you, sir, because Dr. King reminded us that nothing in all the world is more dangerous than sincere ignorance and conscientious stupidity. Mr. Bankman-Fried has pretty much indicated that he just made a big mistake, that he was doing the best that he could to be a servant, and of great service to humankind. But I would also mention this, he did attend Canada, USA math camp, a summer program for mathematically talented high school students, he also has a degree from MIT, 2014 bachelor's degree in physics with a minor in Mathematics.

Is all of this just one big mistake that was made by this -- this gentleman, sir, as you see it based upon what you've seen so far? It looks to me like there may be some malfeasance here.

RAY: We're certainly investigating everything that happened relative to the circumstances. At this stage we're trying not to lay judgment or put labels on actions, we're focused on accumulating and maximizing the assets for the victims. That's our number one priority. In doing so, we will also investigate potential causes of actions to maximize value. And that does require us to get into the underlying facts and motivations and what happened. So, we fully expect to explore that.

© 2022 BGOV LLC A R ghts Reserved



GREEN: Thank you.

Would you consider this to be sincere ignorance?

RAY: Again, I don't want to put labels on it. Obviously, there's been failure here of a massive proportion. Ultimately, others will judge him by his actions.

GREEN: Mm-hmm. I -- I find it difficult to believe that we're dealing with conscientious stupidity. It seems to me that you have to be rather talented to do all of these things to the extent that they were done and do them successfully for as long as he was able to accomplish these things, that they just don't emanate from ignorance and stupidity. And a lot of people have been hurt. And aside from the civil actions, I think that we've -- we have to send a message to the others who would take advantage of people that this is not going to be tolerated.

And I thank you for what you've done. You've been very direct. I read your testimony. And based upon your testimony, it just seems to me that we have more than sincere ignorance and conscientious stupidity. I yield back the balance of my time.

WATERS: Thank you, the gentleman from Texas.

Mr. Sessions.

SESSIONS: Madam Chairman, thank you very much.

Mr. Ray, thank you very much for being here. I think each of our members have been sincere and saying thank you for your professionalism, and adding this to your career of other restructuring that you have not only experience in but bringing to bear.

I've got several questions and perhaps you can answer them which would help me. At its best, the largest point of -- of investor exposure by an American investor, what amount of money do you think that was that was held in FTX?

RAY: I'm not in a position really to give you individual numbers at this point. And we do know what the U.S. there's hundreds of millions of dollars that were at stake. And of course, on the.com, which is the international exchange, that's in the billions of dollars. There's -- one of the difficulties we have is that there's millions of accounts. Some of those accounts could be by multiple users. So, we're in the process of really analyzing how those accounts roll up to individual customers.

SESSIONS: Are you -- are you aware of the SEC at any point asking questions, coming to visit, providing paperwork about these hundreds of millions or billions of dollars that the -- drew some attention from the SEC about this American investment, or what I would say exposure?

RAY: I'm not, but you have to recognize that I parachuted in on November 11th. So, I have no history with the company at all whatsoever.



SESSIONS: So, you do not know about any question questions, interaction? Have you heard about whether there was an attempt to avoid any of this? Was any of it ever discussed by any of the people that you have gained information from?

RAY: I'm not privy to anything pre-petition basis.

SESSIONS: Thank you.

Do you have an idea about the value of assets that was lent to FTX -- by FTX, or Alameda to Mr. Bankman-Fried, the amount of money that they loaned him?

RAY: Well, we know that the size of the loss measured, essentially, at this period of time and several billion dollars, but you have to remember that asset values fluctuate. So, how much the value assets are worth at the time that they may have been transferred to ftx.com, maybe a different number than the loss as of any particular date. We do, of course, know that we have several billion dollars of losses. And we know that there was billions of dollars lent out, billions of dollars of other investments, so that we essentially have a roadmap to figure that out.

SESSIONS: The roadmap that you're speaking about, in your past, I don't claim you necessarily know it now, were IRS forms that were filled out by the company, were they properly filled out? Have you looked at those to see that they weren't complying with the IRS law?

RAY: We are looking into that very thing. We've hired Ernst and Young. They are taking comprehensive review. They're going backwards and starting with the earlier years. We're reviewing the return that was filed in 2020, 2021. And of course, they're looking at all the transactions within 2022. So, that review is ongoing, and we certainly will look at that in detail.

SESSION: As an expert, I would consider you an expert in this arena, would you think that it would be important that the SEC, and I don't know the law, but would have access to as part of their -- any due diligence they were doing to look at that IRS filing to determine perhaps whether someone was or was not following the law, would that be part of a due diligence?

RAY: Well, we certainly would make anything like that available to any other regulatory agencies, whether it's the SEC or the IRS, and we're fully cooperative to them. Anything that would aid in their investigation, would be available to them.

SESSION: Do you think it would be pertinent for this Committee to be able to receive that IRS information going back, so that we would make a determination about whether proper utilization of oversight was being done?

RAY: We certainly, we want to be cooperative with the Committee as well. And we can certainly work with staff to -- to address what you might need.

SESSION: Thank you very much.

© 2022 BGOV LLC A Rights Reserved

**Bloomberg**
**GOVERNMENT**

Thank you, Chairman -- Chairwoman.

WATERS: Thank you.

The gentleman from Missouri, Mr. Cleaver, who is also the Chair of the Subcommittee on Housing, Community Development, and Insurance, is now recognized for five minutes.

CLEAVER: Thank you, Madam Chair.

Mr. Ray, thank you so kindly for being here today. Have you read the full testimony that was planned by our missing guest?

RAY: I have not read his full testimony. I've -- just some pieces of it been relayed to me, but I have not read it -- I've not read one word of it, actually.

CLEAVER: Yes, I don't know him personally, and probably don't want to, but this testimony is so disrespectful. I mean, there's not a person up here would like to show this to their children on line two of this -- of this mess. He says, and I quote, "I would like to start out by firmly stating under oath --

SESSIONS?: You can't say it.

CLEAVER: And I -- yes, I can't even say it publicly. The next two words, absolutely insulting and this is the Congress of the United States.

And I like to submit this, Madam Chair, for the record.

WATERS: Without objection, if you're inserting that into the record, without objection, such is the order.

CLEAVER: I want to follow up on what Mr. Sessions -- on the discussion Mr. Sessions was having with you on this -- the issue. And if you are required -- we have -- you have one requirement that you are supposed to submit to each customer and the IRS, the form 109b, right?

RAY: Yes.

CLEAVER: What else are you required to do?

RAY: I'd have to defer to the -- the tax folks. They're experts in their field and I'm sure they'll -- they'll do a thorough review of what should have been submitted.

CLEAVER: No. What do you know now that you you're supposed to submit other than the 109B to every customer into the Internal Revenue Service?

RAY: And I don't -- I don't know personally at this point what was required to be submitted. That's part of our review with -- with our independent accountants.

CLEAVER: Well, could you expand or maybe even update us on the extent of the poor controls in the areas previously identified in your November 17th declaration?



RAY: It's an extensive list. It really crosses the entire spectrum of the company, from lack of lists of bank accounts, hundreds of bank accounts dispersed all over the world, lack of a just a complete list of employees and their functions by a group or name, extensive use of independent contractors as opposed to employees, lack of insurance that you'd normally would see in certain businesses, either inadequate insurance or complete gaps in insurance.

For example, the Alameda silo had no insurance whatsoever. So, those are, I mean, the list goes on and on. We could spend all day on that.

CLEAVER: I would have time, but I wonder if you would support a resolution that I've been thinking about introducing, changing the name of cryptocurrency to Creepy Doe Currency. I'm going to discuss this with my colleagues. I think it's an appropriate name. I just wanted to know whether you would support changing it to Creepy Doe.

RAY: I'll leave that skill set to the committee.

CLEAVER: All right, thank you. I yield back.

WATERS: Thank you. The gentleman from Missouri, Mr. Luetkemeyer, is now recognized for 5 minutes.

LUETKEYMEYER: Thank you, Madam Chair. Mr. Ray, it's been reported that FTX couldn't get a bank account for some time. As a result, FTX used Alameda Research's bank accounts. Does this raise any red flags for you, the fact they couldn't find a way to get a bank account?

RAY: Well, there's a few red flags. Obviously, the bank situation should have been a real red flag for someone being asked to deposit money into an account that was not the exchange account. Certainly should have been a red flag for customers.

LUETKEYMEYER: Is Alameda a U.S. chartered bank? Or is it offshore? Or the bank that they're using, I should say.

RAY: It's really not a bank per se. It's just most of the entities in the structure are just unregulated entities.

LUETKEYMEYER: So, it's just an entity that passes through money? It's the hedge fund that does things. It doesn't have a bank account per se?

RAY: Oh, it has bank accounts. Absolutely.

LUETKEYMEYER: In the U.S.?

RAY: Yes.

© 2022 BGOV LLC A  R ghts Reserved



LUETKEYMEYER: Okay, so here we have a company that's offshore. It can't get a bank account offshore. It has to come into the U.S. to be able to do its banking business. In other words. And the important part of this comment is that in order for these companies to exist, they've got to be able to change their digital assets into hard U.S. dollars at some point. So, they need a bank account, and so they needed Alameda to be able to do that. Is that roughly correct?

RAY: Any of the silos had in bank accounts, that certainly exist. The separate bank accounts do exist. I think the real issue here for us is that money was transferred from one account to the other, seemingly without limit. That is the issue.

LUETKEYMEYER: Okay, you talked about the accounting issues. It's interesting from the standpoint that we're talking today about a problem with these crypto currency firms, with securities firms, and we can't have an accounting system that actually works. This should be a really big red flag for all of us who are in the financial services world with regards to the Chinese investments that we're making. And we're not able to get accounting information on those firms. What else is going on with those firms, similar to what the debacle is that we have here with FTX? That's just a sideline comment. One of the questions I've got is with regards to the Farmington State bank. This is an investment that Alameda made into, and it's a little bitty bank.

According to a New York Times article, State of Washington (ph) 26 smallest bank out of 4,800 in the country. They bought it in 2020, had a net worth of 5.7 million, and they dropped 11.5 million in for a percentage of the ownership. Do you know off top of your head what the percentage of ownership was in that bank they purchased?

RAY: I believe that ownership was approximately 10 percent, but I can -

LUETKEMEYER: That's what I've heard too, so carefully (ph), they paid 20 times book, which is off the charts outrageous. So, it should be a red flag all over the place, yet they were able to purchase that, even though it's a minority interest, of 20 times book. FDIC allowed that to happen. They changed names to Moonstone Bank, and since then, they've four separate accounts have dropped roughly 71 million, again, according to FDIC data, and according to this article. Have you looked into this relationship at all yet, to see what's going on here, and whether there was any regulatory at all?

© 2022 BGOV LLC A R ghts Reserved



RAY: We are looking at it. It certainly is one of the things that came to our attention fairly quickly. We're looking at what the dollars were that went from the FTX Group to that bank. And we're looking at the connections of that bank to the Bahamas. LUETKEMEYER: The way this all transacted here, is this common, by the way, that they purchase businesses and dump excessive amounts of money based on the fact they had it, whether it was a good investment or not, in all these different companies. I mean, this looks like a really excessive investment to actually go out and buy a bank, to be able to do something with it, stuff it full of money. So, I don't know, is there money laundering going on here? Is there some missing dollars or somebody stuffing always something in their back pocket to be able to, at some point down the road, take off with it? Is that what's going on here? I mean, it begs a lot of questions here when you see this kind of activity.

RAY: There's a lot more questions than there are answers. Certainly, it's highly irregular, and that's what's gotten our attention.

LUETKEMEYER: Well, I thank you for your comments this morning. And it's concerning when you see this sort of lack of accounting and you see somebody dealing in this sort of level of money and there's lots of different companies where money shifts back and forth. And you wonder by living offshore in the Bahamas if there's not some far away bank account that's being stuffed with money we'll never ever find. I hope you do your job and do it well, Mr. Ray. Thank you for being here this morning.

WATERS: Thank you. The gentleman from Colorado, Mr. Perlmutter, who is also the chair of the Subcommittee on Consumer Protection and Financial Institutions. You're now recognized for five minutes.

PERLMUTTER: Thanks, Madam Chair. Mr. Ray, I have so many questions, it's hard to even figure out what questions to ask, so let's just start with some easy ones. How long have you been on this job?

RAY: Four weeks.

PERLMUTTER: Four weeks. Do you know when the Madoff bankruptcy was filed?

RAY: Probably circa 2008, I guess.

PERLMUTTER: So, say 2008. And do you know they just made a distribution out of that bankruptcy last week?

RAY: That's what I understand. Yes.

PERLMUTTER: So that's, what, 14 years? How old are you?

RAY: Is that a permitted question? [laugh]



PERLMUTTER: Because I want you to add 100 to whatever your age is when you finally untangle all of this. And the reason I say that is we watched this FTX, but a bunch of other crypto companies, start thrashing about, say, nine, 10, twelve months ago. And as the house of cards started falling down, the thrashing became more. We had something like that in Colorado back in the '80s, when the savings and loans were failing and everybody was sort of trading their funny money. We called it trading cats for dogs, to hide lousy loans, to not show the failures of those particular banks.

Here, you know, your job, I think, as the bankruptcy trustee or conservator or whatever you are, is to go gather as many assets as you can. And that could be from some very innocent people who got paid money to then spread it out equally among who you think the real creditors are. Is that sort of a fair statement?

RAY: It's a general statement, but it's not far off.

PERLMUTTER: Well, because we on this committee, and a number of us had to deal with the Madoff stuff, one of the things you're going to face is some guys say I'm more innocent than that guy. I should get to keep my money even though I got paid yesterday, but I'm an innocent guy. You're going to be dealing with so many preferences, so many fraudulent transfers. Have you any idea what the total money in and the total money out of FTX was?

RAY: We don't have a full accounting at this early stage. No.

PERLMUTTER: Do you know how much was in tokens? So, let's say I have Doje coin, or I don't even know how you say it, but I have ten Doje coin, which a year ago - is it doggy coin or Doje? Doje. Doje coin. I have ten Doje coins. All right. A year ago, ten Doje coins, for sake of argument, was worth $1,000. So $100 a coin. I put that in there. But Doje coin today is worth like, I don't know what say not nearly that much. I mean, how are you going to evaluate that as to what I should get out of the bankruptcy?

RAY: Well, at first it starts with doing an accounting and a tracing of all the assets, both the ins and the outs. And that's made difficult, of course, by the commingling of assets. So, perhaps you may have invested in a certain coin or an alt coin. We'll have to trace what happened to that coin, because again, what we've explained here today and through our testimony is there's commingling of assets. So that makes it a bit more complicated than simply how much is my coin worth? Right?

So, it's going to be a painstaking process of looking for the ins and outs. What happened to your crypto? Of course, at the bankruptcy, at the time of the bankruptcy, we know when that occurred. We have a very specific time when that bankruptcy occurred, and we will look at customer accounts as of that date, and that will be determined essentially what your account position was. But of course, assets vary in terms of fluctuating in the value.

© 2022 BGOV LLC A  R ghts Reserved

**Bloomberg**
**GOVERNMENT**

And again, because of the circumstances we find ourselves in and the lack of documentation, the potential commingling between silos and then also what happened with Alameda taking funds from ftx.com. It isn't as simple as how many coins did I have in my account.

PERLMUTTER: Well, I guess what I'm saying is if I put $1,000 in and it's gone, and I put ten Doje coins in and they're gone, eventually, you're going to have to figure that out. And my guess is you will be back here in a year when you have a better handle on the numbers to be talking to this committee. And thank you for doing this. I yield back.

WATERS: Thank you very much. You know by now that Mr. Perlmutter is a bankruptcy attorney. You can tell by those questions. So, this would be a good time to enter to the record. Without objection. I would like to enter into the record the indictment of Sam Bankman-Fried by the Southern District of New York that was unsealed this morning, and the separate filings from the securities and Exchange Commission and the Commodity Futures Trading Commission, both of which were filed this morning. Thank you. With that, the gentleman from Michigan, Mr. Huizenga, is now recognized for five minutes.

HUIZENGA: Thank you, Madam Chair. And Mr. Ray. I'm going to get my colleague to shift a little bit or get up. Thank you. One quick question. Have you been sharing your findings with the SEC at all as you've been going through this?

RAY: Yes.

RAY: Okay.

HUIZENGA: How about the Southern District of New York?

RAY: Yes.

HUIZENGA: Okay, I'm going to get to a couple of practical questions because I think these were the things I was going to ask you and then also ask Mr. Bankman-Fried. In your declaration, you said that, quote, the ftx.com platform was not available to U.S. users, close quote. However, earlier this month, CFTC Chairman Benham suggested in testimony before the Senate Agriculture Committee that two percent of funds housed at ftx.com were from U.S. individuals. Can you confirm whether there were U.S. individuals or in persons, in fact, customers of ftx.com?

RAY: Yes, we found that there's a small number of U.S. customers that had engaged in -

HUIZENGA: Is two percent small in your estimation, or is it less or more?

RAY: We don't have those kinds of numbers on an investor basis. We have it on a customer basis. But you're talking about less than a couple of hundred.

HUIZENGA: But it could amount to billions. I mean, you said earlier it is billions of dollars that was in there. Or at least it could be millions or hundreds of thousands. We don't know that number. Or do you know that?

© 2022 BGOV LLC A  R ghts Reserved

**Bloomberg**
**GOVERNMENT**

RAY: I don't know that number. Billions would sound very, very high.

HUIZENGA: Okay, well, you had mentioned that there was billions in it. I'm giving you the range, so.

RAY: Clearly, as U.S customers there, we don't have an accounting of what those particular customers had in the document exchange.

HUIZENGA: Will determining this be part of your work through this bankruptcy process?

RAY: Oh, absolutely.

HUIZENGA: Yeah, okay. Will part of your work be determining which assets belong to which customers? More specifically U.S. customers of ftx.com?

RAY: Yes, we will do really a tracing analysis that will try to identify both the sources and the use of all the funds.

HUIZENGA: So, whether it's 10 customers that had a lot of money, or 1,000 customers that had some money.

RAY: Absolutely.

HUIZENGA: Okay. Can you provide some indication of whether customer funds from ftx.com were, in fact, transferred to Alameda Research?

RAY: Well, definitely assets of customers in the dotcom silo were transferred to Alameda, no question about it. We have not seen this at this stage from the U.S. silo. But of course, we do have one concern, and that's the concern we're chasing down, which is whether or not there's commingling between that dotcom silo and the U.S. silo exchanges. And the reason for that is we know that there was sort of common control and access of authorized users at this most senior management level amongst all of the assets. So, it's something where we have to focus on. We haven't seen evidence right now of that. But certainly, that's something that we need to investigate and trace.

HUIZENGA: Okay. In my remaining two minutes, I want to turn a little bit to operations. Is there any evidence of his parents involvement in the operations?

RAY: We're investigating that, as well as any other players in the -

HUIZENGA: Email, Slack, Signal?

RAY: It's billions of records. It's a very vibrant environment.

HUIZENGA: So, I hear that you haven't discovered that. I mean, it would seem interesting that they didn't either give legal advice or business advice or parental advice, maybe.

RAY: Well, certainly. Clearly in our first day papers, we indicated that Mr. Bankman had given legal advice.

HUIZENGA: Okay. Had he been an employee of FTX? Has it been reported?

**Bloomberg**
**GOVERNMENT**

RAY: I don't know if he actually had an employee status. But he certainly received payments from, the family did receive payments.

HUIZENGA: Okay, that sounds like employment to me. You got a payment for, okay. Well, I raise that because on December 8 of 2021, I met with Sam Bankman-Fried in my office, which I will note was just immediately before he came down to the hearing. He was at least 15 minutes late, and his father accompanied him in that meeting. I asked him focused on what types of regulation he was under, his engagement with regulators, and how that affected FTX. But it seems to me that there's a lot more to uncover here. Certainly, Mr. Bankman-Fried has, let's say, wooed many in New York, Silicon Valley, around the world, and yes, certainly here in DC. They loved everything. Everybody loved the exciting idea of a politically progressive, smart entrepreneur who is going to reimagine capitalism and change the world, feeling better about themselves, all while making them gobs of money. And I'm glad to see it's finally unraveled. So, my time is up, and I yield back.

WATERS: Thank you. The gentlewoman from Ohio, Mrs. Beatty, who is also the chair of the Subcommittee on Diversity and Inclusion, is now recognized for five minutes.

BEATTY: First of all, let me just say thank you to Chairwoman Waters and our ranking member, and certainly to you, Mr. Ray. We have heard a lot. A lot of this has been difficult to digest, primarily because of what has happened to so many people and so much money involved. Mr. Ray, you mentioned in your testimony that one of your primary goals is to limit to the greatest extent possible the harm suffered by FTX customers. Hundreds and hundreds of million dollars have been removed from crypto wallets, and in its estimates, that about one million people have money frozen in the exchange. Can you (inaudible) draw the likelihood (inaudible) of funds back? And if you can't answer that question (inaudible).

WATERS: Ms. Beatty, would you repeat the question? You were interrupted for a minute or so there.

BEATTY: I am sorry. I am at home recovering, so sorry about any connection. Basically, hundreds of dollars have been removed from crypto wallets, and it's estimated that about one million people have money frozen in their exchange. Can you tell us how many users have lost money and when will they get their money back?

RAY: Well, our process is such that we are securing our assets every day. Every day we are out looking for wallets and the keys to those wallets to maximize the recovery of value. So that's an ongoing process, we've secured all the cash in the bank accounts, to the extent that we can at this point. We've secured crypto assets. We're still in the process of doing that. Ultimately, that's a question of months. The litigation has been pointed out by other members. Certainly, will take a longer time frame, but that is our number one focus is to generate value to repay those customers.



I don't have a customer account for you today. We do know that there was 2.7 million users in the U.S. silo, which, again, overstates the customer relationships because people had multiple trading accounts in the dotcom silo. We had over 7.6 million users, again, overstating the actual customer relationships due to the multitude of accounts by any particular customer. So we need to get to the bottom of those customer numbers.

BEATTY: Thanks, Mr. Ray. Let me ask you this. Despite the fact that FTX told customers it would not trade customers funds, we know now that FTX loans out, I think, about $10 billion in customer assets for dietary trading. Mr. Ray, do you know how it was possible for FTX to access clients funds in violation of his own terms of service that noted Rayt (ph) without clients permission and expose his customers to such massive loss?

RAY: Well, as I indicated, there was no corporate controls, no corporate oversight, no independent board, and, the owners of the business, the senior management, had virtual control of the accounts of each of the silos and could move money or assets as they desired, undetected by customers. So, to the extent there were rules, and there were very few, obviously they were made to be broken.

BEATTY: So, I think what I'm hearing you saying is that there was no one personally approved this. Let me ask you a last question. Can you tell us what regulatory changes could prevent the unauthorization or the unauthorizing customer funds in the future based on your wealth of experience?

RAY: Without speculating about what regulatory fix there could be, and I've said in my earlier testimony, the critical thing is segregation of customer funds and transparency.

BEATTY: Okay. And lastly, in your five points that you outlined, and I'm sorry if you said it before, is there a timetable that you think you can get to that? And that can be a yes or no? I think I'm getting close to my time.

RAY: There's no particular time frame, but it's as quickly as possible in my experience with Enron.

BEATTY: And is that months? Is that weeks, quickly as possible?

RAY: It certainly isn't weeks. It's definitely months. And the causes of action could take longer. But we will marshal assets on a weekly basis and on a monthly basis, and we'll do that as quickly as possible.

BEATTY: Thank you so much for taking the time to try to help us out. I yield back.

WATERS: Thank you. The gentleman from Kentucky, Mr. Barr, is now recognized for five minutes.

BARR: Thank you, Madam Chair. Mr. Ray, in your declaration, you said that many of the companies in the FTX group did not have appropriate corporate governance and that this situation is unprecedented. You also in your testimony today, said that the FTX collapse stems from the lack of an independent board and a complete failure of any internal controls or governance whatsoever. Can you elaborate, in describing the governance structures for ftx.com, that led you to make those comments?

RAY: Well, first and foremost, there's no independent board of directors. So, one of the first things that I did was put on an independent board of directors led by our chairperson, who's the former U.S. attorney and honorable Joseph Farnan, former U.S. district court judge. So put in a corporate structure of independent directors. Put in separate officers, the new officers of the company. I put in a new CFO, a new Chief Information Officer, a new head of administration, all independent, with some background and experience in these sectors. None of the employees, there's a lot of titles in the company, but no experience to back it up.

BARR: Can you explain how the ftx.com governance structure differs from the governance structures of FTX U.S.?

RAY: Virtually no difference. There was no structure.

BARR: Mr. Ray, in your work so far, have you examined the governance structure or the flow of assets to the FTX Foundation or its various affiliates, including FTX Community, FTX Climate, or the Future Fund?

RAY: We are digging into that. We've not completed our review.

BARR: I am curious in your work whether or not you will determine whether those entities were established properly as nonprofits, or whether or not the funds received were improperly transferred customer accounts. Do you have any visibility into that yet?

RAY: We're looking at that right now. We've asked our folks at Ernst & Young to look at the attack side of it, and we're investigating the money transfers, so you can be sure we're going to dig into those details.

BARR: Was the FTX Foundation and those other not for profit, ostensibly not for profit, entities, were they completely separate from any of the for-profit entities?

RAY: They were owned by Sam Bankman-Fried. I can't tell you that they were separate because they got funds from Alameda. So, we know the source of their funding was from the FTX group. They were separate ownership, but not separate funding.

BARR: So commingled assets in that case as well?

RAY: Absolutely.

BARR: Okay. At least one ESG ratings firm gave FTX a higher score for governance than ExxonMobil. Given your testimony that FTX's collapse stems from the absolute concentration of control in the hands of a very small group of grossly inexperienced and unsophisticated individuals who failed to implement virtually any of the systems or controls necessary for a company that is entrusted with other people's money or assets. What would you say about this ESG governance rating, which rated FTX higher than ExxonMobil?

**Bloomberg**
**GOVERNMENT**

RAY: I'd get my money back.

BARR: Can you identify which entities had audited financial statements?

RAY: Yes, I can. So, there was no audit at Alameda, no audit at the venture silo. There was audit at the U.S. silo and also audit at the dotcom silo. I can't speak to the integrity or quality of those audits. We're reviewing, obviously, the books and records, and as I've said earlier, much of those books and records were maintained on fairly unsophisticated ledger workbooks.

BARR: And you testified the lack of record keeping. And so, there's a whole lot of financial statements that are either not audited or not available. Is that fair to say?

RAY: That's fair to say.

BARR: In your declaration, you stated that you did not believe that those audited financial statements were reliable. Can you elaborate on why you believe that to be the case?

RAY: Well, we've lost $8 billion of customer money, so, by definition, I don't trust a single piece of paper in this organization.

BARR: Sam Bankman-Fried, in his testimony to this committee on December 8 of last year, said that FTX has designed and offered a platform with a market structure that is risk reducing. To be sure, there are irresponsible actors in the digital asset industry, and those actors attract the headlines, but FTX is not one of them. Was that statement incorrect?

RAY: False. Yes.

BARR: Thank you. And let me conclude by describing what is going on here by a popular crypto commentator. If you set up an exchange where you're the market maker, you're the issuer, you're the prime broker, and then you trade against your own customers, you have a vested interest in creating the assets, promoting the assets, and manipulating the price of the assets. What you have is a crypto casino. I yield back.

WATERS: Thank you. The gentleman from California, Mr. Vargas, is now recognized for five minutes.

VARGAS: Thank you very much, Madam Chair. I'd like to begin by thanking you once again for taking the lead to hold bad actors accountable and pursue transparency in the cryptocurrency space. And also, Mr. Ray, I want to thank you for being here today to testify. I think I start off a little bit like Paul Krugman does in the New York Times. I don't get the point. I really don't get the point of blockchain and cryptocurrency. It's like keeping track of how many times you chew gum. Like, who cares? There's other ways that are, I think, less fraudulent to make transactions. But anyway, that being said, how many times have we talked here about the potential for abuse of fraud in the crypto market? Quite a bit.



We've had a lot of cheerleading from some people, especially on the other side of the aisle. I don't hear it today. Haven't heard it yet. But I do want to hear it like we normally hear it. How wonderful it is, and how they shouldn't be regulated by the SEC, that they're too tough on them. Imagine we're not going to hear that today, especially after what we saw with FTX. But we do want to see order and transparency in this industry and throughout the financial markets. If you are an issuer of cryptocurrency or manager of cryptocurrency exchange and you conduct business with U.S customers, consider this FTX collapse as your public service announcement. Come into compliance with the Securities Act of 1933, the Securities Act of 1934, and all other applicable federal and state laws do not skirt the law, mishandle U.S. citizens' funds, and then claim innocence. For the cryptocurrency industry to continue, citizens need to be informed, regulators need to uphold the laws, and companies need to comply. Now, that wasn't happening, was it, Mr. Ray, under this particular company?

RAY: No, sir.

VARGAS: Why wasn't it?

RAY: Again, you have control and a small group of individuals without any oversight whatsoever from an independent board or experienced managers, it's just a recipe for problems.

VARGAS: What government entity is responsible for this fiasco?

RAY: That's not for me to say.

VARGAS: No, it is for you to say. You're right there. I'm asking you, if you had to opine, that's why you're there in the hot seat. Who is it? Should the SEC have been more aggressive? Even though we had a lot of our friends on the other side saying they shouldn't have been. Should the SEC have been more aggressive?

RAY: I'm not experienced, I'm not a regulatory lawyer. I'm not here to express views about who should regulate it. I've said, and very clearly, that we need transparency. Customers need to have segregated accounts. They need to have ownership. It's their money, it's assets. It's really no different than a bank. You'd expect the same level of scrutiny of any funds that you have on deposit with someone else. That is a minimum.

VARGAS: I agree with everything you've said, but at the same time, I have to say that the product that they give is a hybrid product, is it not?

RAY: Well, certainly it's a currency. It's an alternative currency, yes.

VARGAS: So, then who should regulate it?

RAY: I don't have an opinion on that. I don't, Mr. Congressman, no.



VARGAS: Okay. Well, that's the whole problem. I think. I don't get the point of cryptocurrency to begin with other than if you're a terrorist or someone that wants to hide money, and then I get the point, but other than that, I don't get the point myself. But if we are going to have it, we have to regulate it. Someone has to be in charge. We have to make sure that we don't continue to defraud the American people. And that's where the government comes in. Somebody's got to take charge of this. I think it's the SEC. I've always thought it was the SEC. They had a lot of pushback from my friends on the other side. I didn't hear them quite today pushing back as they normally do. I'd love to see that. But again, someone has to regulate this if it's going to exist. Don't you agree?

RAY: I certainly think there has to be more controls in this sector. Who should regulate it? I defer to this committee

VARGAS: With that, Madam Chair, I yield my time back. Thank you.

WATERS: Thank you. Now, the gentleman from Texas, Mr. Williams, is now recognized for five minutes.

R. WILLIAMS: Thank you, Madam Chair. And thank you, Mr. Ray, for being here. Appreciate it. There's been many comparisons that have been made as people examine what happened to FTX and from Bernie Madoff to Enron. It looks like this will go down as one of the largest frauds in history. And, Mr. Ray, you have a unique perspective on the fact that you have worked on the Enron bankruptcy. I'd be interested real quick if you talk a little bit real quick about how it compares. You got cut off in early time, and I'd like to hear a little bit about that.

RAY: Enron was really a different company. The crimes that were committed there were highly orchestrated financial machinations by highly sophisticated people to keep transactions off balance sheets. This is really old-fashioned embezzlement. This is just taking money from customers and using it for your own purpose. Not sophisticated at all. Sophisticated, perhaps, in the way they were able to sort of hide it from people, frankly, right in front of their eyes. But this isn't sophisticated whatsoever. This is just plain old embezzlement.

R. WILLIAMS: Old school?

RAY: Old school.

R. WILLIAMS: There you go. It seems like Fried has some interesting ideas on how you can stay relevant in the FTX world, and even after stealing customers' money and driving the company to bankruptcy. And I have read that he wants to be retained as an outside consultant and been very critical of your own appointment, quite frankly, into this position. So, after his arrest last night, all of his wishes seem even more unlikely. So what role, if any, should he play in FTX moving forward?

RAY: The role he's currently playing: zero.

**Bloomberg**
**GOVERNMENT**

R. WILLIAMS: Good. You stated that FTX was a platform allowing for users to trade digital assets. Were users engaged in simple exchanges of assets, or were users permitted to engage in leveraged complex transactions?

RAY: Yes. I'm sorry. Can you repeat your question?

R. WILLIAMS: Sure. You stated that FTX was a platform allowing for users to trade digital assets. Were users engaged in simple exchanges of assets, or were users permitted to engage in leveraged complex transactions?

RAY: Yes.

R. WILLIAMS: You also stated that you have recovered over $1 billion in assets. Can you give a description of the nature and type of assets you have recovered to date?

RAY: We've recovered over a billion dollars of crypto assets. These are coins of various nature, and we've secured those, but that's been our primary focus. We've certainly also secured our cash in all of our bank accounts. The bank accounts were frozen. We've got control over those accounts with new authorized users, which certainly includes myself. But our main goal is to secure the cash and secure the crypto assets, and that is an ongoing venture.

R. WILLIAMS: Okay, thank you for being here, and I yield my time back.

WATERS: Thank you very much. The gentleman from Guam, Mr. San Nicolas, is now recognized for five minutes.

SAN NICOLAS: Thank you, Madam Chair. Mr. Ray, thank you for being with us here today. There's a lot of people following this, trying to understand what happened for a variety of reasons. Of course, your primary responsibility will be to make sure that the creditors are made whole, as well as depositors and everybody else who has a stake, in varying degrees, within the company. My first question is have you been able to pinpoint the specific cause for FTX's collapse? I know that there's all kinds of stories about loans to the owner and no internal controls, loans to Alameda, commingling, but is there a specific trigger point or a specific cause that has resulted in the FTX collapse?

RAY: I think I've described it. It's really just the unlimited ability of those in control positions, to borrow customer funds or take customer funds and then deploy them for their own use. That use involved margin trading, which is inherently risky. And of course, they've spent enormous amounts of money beyond that. But it's really the misuse of funds, and it's as simple as that on a large-scale basis.

SAN NICOLAS: So, what is the big picture balance loss as a result of this bankruptcy? How much has FTX lost as a result of this?

RAY: We don't have exact numbers, but we know ballpark several billion dollars, in excess of 7 billion.

© 2022 BGOV LLC A Rights Reserved



SAN NICOLAS: In excess of 7 billion. So, in excess of $7 billion, we're saying that the Sam Bankman-Fried company basically took or misallocated $7 billion. And that's why the, and that's why FTX has collapsed.

RAY: Right? So, funds were taken from customers, funds were invested, trading losses incurred in Alameda, and then funds were deployed that will never be valued at the same dollar amount. There was over $5 billion of investments made. Certainly there's some value there, and we will try to get that value and sell those assets. But oftentimes, even when he made those sorts of investments, whether it was directly or through others in management, sometimes he would do that really without any pro forma or any valuation. Not really quite sure how some of the purchase price numbers were derived. So, it gives you a sort of worry, obviously, that the purchases were overvalued. So, there's a concern there as well.

SAN NICOLAS: So, Alameda lost $7 billion as a result of investment decisions and margin trading?

RAY: There's a multitude of reasons that cause the gap in assets between the customer balances and what's there today and what we hope to gain. It can't be pinpointed just on losses on trading activity.

SAN NICOLAS: The reason I'm asking, and I'm just kind of narrowing it down because my time is expiring, but it's important for us to very clearly understand what caused this collapse. You know, when we had the 2008 financial crisis and Bear Stearns collapsed and Lehman Brothers collapsed, you know, we could have gone in there and we could have pointed all these different reasons that could potentially have have contributed to it.

But the underlying reasons were there was a subprime crisis and a lack of liquidity in these respective institutions. That allowed us to have a policy response, a regulatory response, to prevent that kind of thing from occurring in the future. The FTX collapse right now is just FTX. But are these lack of controls, and are these environments that resulted in the FTX collapse, are those still existing today? And could the same thing happen in similar operations, such as finance (ph), for example? Could they also engage in the same activities under the current regulatory regime, and if things go wrong, have the same outcome?

RAY: Well, just three points I'd make. First of all, we are going to detail the sources and uses and what happened to all the funds. That will tell us exactly how the losses were incurred. Some of those may be lessons learned. Some of them just, frankly, will just be payments that were made from other people's money.

SAN NICOLAS: Just going back to my question, Mr. Ray. The circumstances that led to FTX's collapse, those circumstances still exist in the crypto space, and can other companies collapse in a similar set of circumstances?



RAY: Well, certainly, we cease trading, so it won't happen at our company. Could it happen at other companies? I can't speak to them because I don't know how each of these companies are operated. Obviously, our company operated in a very distinct way that led to losses. But I think every company is different.

SAN NICOLAS: My time has expired.

MCHENRY: Gentleman from Arkansas, Mr. Hill, is now recognized for five minutes.

HILL: I thank the chairman, and I appreciate you being here, Mr. Ray. Glad to have you before the committee. And I want to thank the ranking member, Mr. McHenry, and the chair, Chair Waters, for working constructively in the digital asset space over the past four years. And I want to remind my colleagues that Mr. McHenry talked about bond rip offs in the railroad expansion in the 1870s and 1880s. True. Fannie Mae and Freddie Mac leading us down the primrose path in the early 2000s on housing ownership in the secondary market. And there were frauds and fraudulent actors, but that didn't mean that we didn't want to invest in railroads in the United States for the history of the country. And it didn't mean that we don't need a vigorous single family housing market and secondary market in our country.

So, let's not confuse the malfeasance and disgusting activity of FTX with the fact that we need a proper, thoughtful regulatory oversight of digital assets. And so, I thank chair Waters and ranking member McHenry. 14 years ago this week, Bernie Madoff was arrested and charged with operating the largest Ponzi scheme in American history. Its collapse injured 37,000 investors and led to major reforms at the Securities and Exchange Commission and their oversight and FINRA (ph). Bankman-Fried was arrested in the Bahamas last night.

And in many ways, the fall of FTX dwarfs that of Bernie Madoff, with court filings suggesting that over 1 million creditors are somewhere in the lurch in the FTX silos. Americans were hurt. And I want everyone listening to know in today's hearing that this is just the first step that Congress is taking in understanding what happened and how to create the appropriate regulatory environment. We do want to understand the events and decisions that led to the collapse and the impact on our customers and other market participants, and how to prevent it from happening again.

Mr. Ray, thanks for stepping up in your leadership capacity. And in looking at the bankruptcy filing, Prager Metis was the audit firm for the dotcom silo. Their website says they're the first ever CPA firm in the Metaverse. So, looking at their website, they have 24 offices, 600 staff, 100 partners, principally California, New York and New Jersey. You stated you're not familiar with Prager Metis, is that correct?

RAY: That's correct.

HILL: Are they cooperating with you in your role as bankruptcy trustee?

**Bloomberg**
**GOVERNMENT**

RAY: We're reaching out to both firms, audit firms, as well as the firm that does our taxes. And we certainly have tools available if they don't cooperate, but everyone seems to be cooperating at this point.

HILL: And do you anticipate they'll actively participate in the forensic accounting work you're doing with Ernst & Young?

RAY: Absolutely not. No. We are taking information that we get from the prior auditors and accountants and tax professionals, and then we're going to take our investigation from there on an independent basis.

HILL: Can you tell us who the partner in charge is of the audit at that firm?

RAY: I can't tell you off the top of my head.

HILL: Is it Jerry Eatle (ph)? Brian Goldblatt? Michael Williams? Those names ring a bell?

RAY: No, it's not. I can get your staff that.

HILL: Would you provide that to us, please?

RAY: Absolutely.

HILL: Thank you. And then the second auditing firm, Armanino, you say you are familiar with them, and that's part of a London based firm?

RAY: Yes. That's correct.

HILL: Do you feel the same way about their performance based on the books and records you've seen that they also were inadequate in serving as an auditing firm?

RAY: I certainly don't want to disparage that firm. We do have to look through the books and records and look at the audits themselves and see how comprehensive they were to see if the audit would have picked up anything that we see. And certainly, we're going to look at the related party disclosures that are in those audits, whether there's any footnotes or exceptions. We need to go back and look at all those audits just from a look back perspective to determine what maybe could have been done that wasn't done.

HILL: Do you anticipate the United States being a creditor in these proceedings, either for tax purposes?

RAY: It's premature to tell. I mean, certainly looking at that ourselves, and to the extent that we find any irregularities in the tax area, we'll certainly be notifying the IRS, but nothing we've seen at this point. But again, our investigation is so early.



HILL: You state that the internal controls were the weakest that you've seen sort of in your experience, but FTX U.S. and ftx.com, essentially there is no distinction between those. And so, whether you were an international investor or domestic investor, it's all the same pot. Is that fair to say?

RAY: That is certainly our worry. I mean, there's a limited amount of U.S. customers in the dotcom exchange, but we are focused on commingling, and we're worried that the silos weren't respected for purposes of the crypto assets.

MCHENRY: The gentleman's time has expired. The gentleman from Connecticut, Mr. Himes, who is also the chair of the Subcommittee on National Security, International Development and Monetary Policy, is now recognized for five minutes.

HIMES: Thank you, Mr. Chairman. And thank you, Mr. Ray, for being here and for undertaking this remarkably complicated task. At the end of the day, our job here is to learn from the mistakes that were made, who made them, and what we can do going forward. Like it or not, we're moving into a crypto assets crypto world, and we really do need to learn. This whole thing has the feeling of a Hollywood blockbuster. That's why the cameras are here, right? We've got a 30-year-old gazillionaire who raised billions of dollars living in some condo with a bunch of young people, exotic products, tokens, and crypto assets.

It feels to me, though, as I look through particularly the SDNY indictment unsealed this morning, that a lot of what we're seeing here is as old as the hills. It's wire fraud, it's misleading investors, it's commingling of funds. This is as old as the hills. There is something that I really do want to ask you about, though, which is a little different here. All the good work you've done with other companies, you were dealing with, by and large, money in banks or in other financial institutions. Here we've got tokens, which evidently were things of, quote, value, valued in some way or another that were used as collateral living in places called wallets, not in banks.

So, my question for you, that feels to me like, what's exotic and different about this, how much more challenging is your job going to be? Because you're now operating in a world of tokens and wallets as opposed to dollars and banks. And I know you're hesitant to get into regulatory questions, but what should we be thinking about, if nothing else, to help with more smooth unwindings of the inevitable bankruptcies that will occur in this industry moving forward?

RAY: The principal issue that the company is facing in the crypto area, it is from a technology perspective, it is different from the other bankruptcies because it's not a plane, not a boat, it's crypto asset. And it has inherently some difficulties. The assets can be taken or lost. We have assets that are in what are called hot wallets and those are in cold wallets. Hot wallets are very vulnerable to hacking. If you've done any looking on the Internet, you'll find that hacking is almost ordinary course in this business sector. There are lots of vulnerability to the wallets.



So, this company, unfortunately, had a very, very challenging record here. For some transfers, there was no pathway for it. Our keys aren't stored in a centralized location. We don't know where all of our wallets are. Passwords were sometimes kept in just plain text format. So, this company was sort of uniquely positioned to fail. The lack of discipline on control of the wallets, their storage, the storage of passwords, allowing multiple users to set up accounts almost created an environment where there was not a complete inventory of wallets. You can learn some lessons from that. I mean, you need to have more controls, more discipline, more centralized accounting functions, more oversight and management. That's not to say that people, things won't happen. The hacking might occur.

HIMES: Yeah, thanks, Mr. Ray. I have one more question, but I really appreciate that we got to follow up on that because that's something for us to do. The other thing that I can't stop thinking about here is, again, 30-year-old Gazillionaire. I get it. All sorts of attractive things. Some of the supposedly smartest money on the planet, venture capitalists who are paid tens of millions of dollars to invest money. And maybe I wouldn't care if it was just the money of the very wealthy, but they're investing pension money. You know, they're investing university endowments. Companies like Lightspeed, Sequoia, Greylock. The best of the best invested in this. And you told us, you made a statement that this was the worst governance, the worst you had ever seen. Did you see any evidence of any appreciable due diligence on the part of these entities that gave Sam Bankman-Fried hundreds of millions of dollars?

RAY: Yeah, I'm not aware of what, you know, these parties may have have done in terms of their due diligence. It is surprising, obviously, in light of all the circumstances, but I don't know what they did internally to verify these investments. So, obviously, only they know that.

HIMES: Thank you. Thanks very much. Yield back.

EMMER: Gentleman from Minnesota, Mr. Emmer is now recognized for five minutes.

EMMER: Thank you, Mr. Chair. Thank you, Mr. Ray. Like everyone else, we're appreciative of you being here today and testifying. I'm going to start for my part with a series of quick questions that hopefully will assist this Committee's investigation, and then I want to move on to some additional points, time permitting. Mr. Ray, there were over 100 corporate entities within FTX group. Some had boards of directors and others did not. Was there a group level board of directors overseeing the entirety of FTX?

RAY: No, there was not.

EMMER: Would you agree that it's a bad decision for a complex firm like FTX to not have a top-level board of directors?

RAY: Yes.

EMMER: Do you have concerns about the concentration of power in a small group of inexperienced individuals with no oversight?

**Bloomberg**
**GOVERNMENT**

RAY: Yes.

EMMER: Did ftx.com have basic corporate functions like an accounting or human resource department?

RAY: No.

EMMER: Was there a legal department at ftx.com?

RAY: Yes, there was.

EMMER: Was there a compliance department?

RAY: There were people with titles.

EMMER: Fair enough, and thank you. Finally, to assist the Committee's investigation, would you agree that a financial firm the size of FTX needs accounting, human resources, legal compliance, and risk departments to help prevent something like this from happening?

RAY: Absolutely.

EMMER: In early April 2022, FTX and IEX announced a strategic partnership. Last week the Financial Times reported on Alameda's Venture Capital Portfolio which listed FTX Trading's $270 million investment into IEX as a, quote, acquisition. Did FTX Trading acquire IEX, and if not, what type of investment did FTX Trading make into IEX?

RAY: I'd have to get back to the committee on that specific investment. I'm not sure that was completed.

EMMER: Can you provide us with some information?

RAY: Absolutely. I can get back to you and the staff on that.

EMMER: We know that Chair Gensler had more meetings with FTX than anyone else in the crypto industry. We understand that what was being negotiated was a framework for digital asset exchange registration and token registration with the SEC that would benefit both parties. It would expand the SEC's jurisdiction in exchange for the SEC's preferential treatment of FTX over other industry participants. We understand there was a lot of activity to move this idea forward, including the circulation of draft short form disclosures that would enable filers to get tokens listed on this newly formed Bespoke Exchange. Mr. Ray, I know you're handicapped with the information you currently have obtained, but Chair Gensler refuses to answer our questions or testify before this committee. Will you commit to sharing with this committee any internal documents you come across regarding communication between FTX and Mr. Gensler or others at the SEC?

RAY: We'll fully cooperate with the committee and the regulatory authorities with respect to our investigation.

© 2022 BGOV LLC A  R ghts Reserved

**Bloomberg**
**GOVERNMENT**

EMMER: Again, specifically, I just want copies that this committee will want copies of those communications to the extent they exist.

RAY: We can certainly work with your staff to get you what you need.

EMMER: Thank you. And Mr. Ray, I appreciate you mentioning your concerns in the beginning of my questioning about the concentration of power in a small group of individuals with no oversight. That is the exact problem that open and permissionless technology like crypto and blockchain solve. It solves for the problems of centralization. You stated in your testimony that you've never seen such a, quote, utter failure of corporate controls at every level of an organization, from the lack of financial statements to a complete failure of any internal controls or governance whatsoever. Close quote. F

TX had disastrous or even nonexistent systems for accounting, audit, cash management, cybersecurity, human resources, risk management, and other unacceptable management practices that currently make your job to uncover the facts quite difficult. Fortunately, the immutable characteristics of public blockchains that some people would care not to understand in this committee allowed the crypto community to reveal Sam Bankman-Fried's fraud. And the on chain public record will assist law enforcement moving forward. I encourage my colleagues to understand Sam Bankman-Fried's con for what it is: a failure of centralization, a failure of business ethics and a crime. It is not a failure of technology. I've worked across the aisle since I came to Congress.

So, the future of crypto reflects American values the same way the Internet does today. For the most engaged members of Congress on crypto policy, the FTX collapse remind us of why we care so deeply about this technology. Decentralization is the point. Thank you, and I yield back the balance of my time.

MCHENRY: The gentleman from Illinois, Mr. Casten, who was also the vice chair of the Subcommittee on Investor Protection, Entrepreneurship, and Capital Markets, is recognized for five minutes.

CASTEN: Thank you, Mr. Chair, and Mr. Ray, thank you so much for this. I'm struck by a lot here, at least Mr. Perlmutter's comment that this is going to take a long time to untangle. Maybe your comment to Mr. Lucas that this is a paperless bankruptcy saves you time because you run out of paper. But I appreciate your service. A bunch of questions. One I just want to clarify because it's all been implicit, all this bankruptcy is dollar denominated, correct? So, as you go through to chase down values.

RAY: Yes.

CASTEN: I asked that because we talked about commingling, we've talked about customer losses. There's been some public reporting, suggesting that there may have been some inflation or misrepresentation of the value of FTT tokens. And I'm not asking you to opine on that right now, but to the extent there is some customer loss claimed from that, is that also one of the categories of losses you're going after?



RAY: Well, FTT was on a balance sheet of Alameda, and it certainly was served as effectively sort of collateral, and it was largely controlled by Alameda. So, it was a very illiquid token. It was, effectively, a token created by the company itself with a limited float. So inherent in the token itself was the illiquidity. And, certainly, the size of the position the company had in its own token contributed to this problem.

CASTEN: But if a customer were to buy that token at some value that because of its illiquidity could be manipulated, would the customer not effectively be sitting on, for lack of a better word, a 4x risk?

RAY: Well, there's certainly, all the crypto, like any asset, has a certain volatility to it and some are more volatile than others. And FTT was very volatile.

CASTEN: Sure. Again, to the extent that the volatility is natural, it's fine. To the extent it's manipulated, let me move on because we're close on time. There's been in a number of the public conversations that Sam Bankman-Fried has had, when asked about commingling, he often responds by talking about open margin positions. I want to just give you a chance to react to the difference between an open margin position and the commingling that you've observed.

RAY: I'm not sure exactly. I tried to follow some of what his statements were and it was very, very hard to really understand what he was really trying to say. We do know that they had open margin positions at various times in Alameda. And Alameda was a customer, if you will of the exchange. And it's through that customer relationship, plus other arrangements that allowed Alameda to borrow those funds, and then pick positions on the exchange like anyone, you know, who would hedge an asset in the market. He had unusually large positions, of course, and sometimes they were wrong in those positions, and they resulted in big losses. But ultimately, the commingling issue is, is the same in a different issue. He took the money from FTX to cover those positions. And ultimately, when customers went to get their money back from .com, there was a run on the bank.

CASTEN: OK. On November 12th, I guess just the second day here the first day you were there?

RAY: Yes.

CASTEN: It was a hacker who's who stole some $477 million worth of tokens from FTX. There was a November 29th interview with Mr. Bankman-Fried with Tiffany Fong when he said he's narrowed it down to like eight people, quote. If you hadn't discussions with him, do you have any sense of where give me more visibility since November 12th on that hack, maybe you had conversations with him about who those eight people might be? Is that what's your (inaudible) ...

RAY: I have not had any conversations with him. We're relying on forensic and cybersecurity experts who are tracking the crypto, it is an open, you know, an open interface. So, you can see, you can ultimately find where, you know, where the crypto ends up. We've had law enforcement involved. So, we're tracking it, you know, I think we've got all the help we need in that front.

© 2022 BGOV LLC A  R ghts Reserved



CASTEN: OK. As I get close on the end of my time here. So far, it seems like most of the losses have been within these four silos, and I mean, 2.7 million customers, whatever that means is some exposure. Are you worried about any broader contagion? Are there broader contagion issues we should worry about as we from our perspective here? I mean, certainly other bankruptcies of the scale have spilled into other sectors.

RAY: Look, I think the industry, you know, we've made a number of investments in the crypto sector, if you look at that portfolio of $5 billion, one of our major investments, top 20 investments are in the crypto sector. So, it's a very trying time for the crypto sector. And what I worry about is the impairment to that portfolio of 5 billion because obviously that's a recovery pool for our customers.

CASTEN: I yield back.

AUCHINCLOSS: The gentleman from New York, Mr. Zeldin is now recognized for five minutes.

ZELDIN: Thank you. Mr. Ray, I know, you referenced earlier that you had not yet read Sam Bankman-Fried's testimony. It was prepared for today. I had a question that I wanted to ask, and I was going to read you something that he had included in his remarks in late 2021. I believe that Alameda research likely had a net asset value of substantially over $50 billion market to market. I believe that Alameda was likely leveraged long, perhaps about 1.1 times leverage. That is, it had corresponding assets for roughly 90 percent of its position borrowing the remaining 10 percent. That was roughly 1/20 of the maximum leverage FT allowed and roughly 1/3 of the leverage assumed by the average FT margin trader. In early November 2022, over a three-day period, the market value of assets, the Alameda Research has held declined dramatically, I believe by more than 50 percent.

Have you yet seen any evidence of a market value drop in Alameda's assets before November 2022?

RAY: We haven't gotten back to trace, you know, the actual -- I mean to compare his statements with what actually happened in the marketplace. I mean, clearly there was volatility in the huge market drop in crypto over that 12-month period. So, it wouldn't surprise me that, you know, his leverage numbers changed, perhaps even dramatically during that time period. I think the problem at the heart of this is that, you know, his positions, you know, the collateral that he had behind that he didn't have the same auto liquidation provision that a margin account would normally have, usually can't lose its structure properly, you shouldn't be able to lose more than your collateral. Otherwise, the position closes out, and there's no harm in the brokerage firm, you know, isn't if it's a brokerage account, for example, it wouldn't be short cash, they wouldn't have to go out to get the money from you, you close out the position. None of that existed with the Alameda positions. They had almost a complete ability to lose money beyond the collateral.

ZELDIN: Are you yet in a position to be able to describe summarize, the assets that Alameda had?



RAY: We do have an inventory of investments we made. That's pretty clear. We've got those in the hands of our investment bankers at Perola (ph) are trying to understand those investments, ultimately will market those investments, you'll see this week that some of those investments will be put up for sale. The crypto assets a little bit different. What's on the exchanges, we can see there's exchanges, about two dozen exchanges across the world where we know we have crypto assets that are in our name, we're securing those that are moving those into cold storage. We have you know, other positions and cold wallets and hot wallets. We've got visibility to that.

The question really is, are there wallets that we don't know about? Certainly, that has the potential because the way this company was organized, there may be wallets that don't have our names, we don't know where they are. And that's going to be, you know, a difficult task ahead of us. But what we can see what we have visibility to, we're grabbing control over.

ZELDIN: So, we'll learn more this week.

RAY: We should learn more in the coming weeks.

ZELDIN: Mr. Ray, you mentioned the documentation that you don't have earlier during your testimony. Can you share what documents you have uncovered with respect to the transfer of funds from FTX to Alameda?

RAY: It's voluminous. You know, the record keeping, you know, wasn't very clean in the company. But we should be able to trace the movement of crypto assets. I mean, inherently in the nature of the crypto, you should be able to see the movement and where it started and where it ended up. Well, obviously track you know, the banking information, we do have bank records. Sometimes we have to go right to the source of the right to the bank, to get historical records because they're not in hand, if you will, at the company.

But one way or another, we'll get the banking records, and we'll be able to trace the sources of, of cash, how that cash was utilized to buy assets. Once we can identify the assets, we can then trace the asset from either transferred other currencies or ultimate payment outside the company. So, it's just a very intense forensic process. But we'll have the records ultimately, to do that.

ZELDIN: And we'd be interested in receiving more detailed explanation of the documents that you have. And one last question, can you describe what documents you identified with respect to internal controls and governance?

RAY: Well, there isn't any, you know, to speak of I mean, the company is virtually void of any internal controls or documentation, resolutions or absent, authorizations approving massive loans of, for example, the loans of the insiders. I haven't seen any resolutions approving those when Sam Bankman-Fried signs of half the company and that signs on loan, that should tell you a lot right there.



AUCHINCLOSS: Gentleman's time has expired. The gentleman from New York, Mr. Meeks was also the chair of the House Committee on Foreign Affairs is now recognized for five minutes.

MEEKS: Thank you, Mr. Chairman. And Mr. Ray, it's -- thank you for your testimony here today. And you know, and if you've been a member of Congress, as long as I have been, and it just seems eerily, it was you to have to take over Enron when I was sitting here at that particular time. And we were looking at that as being one of the biggest scandals that we've ever seen. And now, believe in your testimony today, you said this may be even bigger of which is, is really concerning to me. Particularly since you know, I do believe that blockchain technologies have a role in fostering financial inclusion facilitates cross border transactions. But what we didn't have, and we don't have, are the real safeguard against misuse by bad actors. And as a result of that, I know, I've been intimately involved with New York State. And New York State was one of the first nations to create a virtual currency license and supervisory framework. And so, in your testimony, you were very frank about the total lack of internal control in FTX and critical of their governance structure.

So, I guess my first question to you is your estimation, how much did the lack of a board of directors' attribute to the failure of FTX? And do you believe that would have been an opportunity to change costs if this default structure were identified early on?

RAY: Yes, I do. I think the lack of an independent board was a critical aspect of the failure.

MEEKS: And also, in New York state, there are capitalization requirements for licensee holders to have highly liquid capital to ensure that financial integrity and to protect against outside shocks. Now, and this is tips (ph), how would a capital requirement have changed the outcome of the FTX failure?

RAY: I'm not a regulatory expert. I mean, what I've set forth in my testimony is that I think it's important for customer accounts to be segregated. And for there to be transparency and what people can visualize in their account. And they have, you know, some strict rules relative to using customer assets. FTX extent of my, my views about the regulatory scheme. And I defer to others, you know, who are obviously more experienced on the regulatory side.

MEEKS: I guess one of the issues that we're trying to deal here is how do we get the appropriate in the proper regulation so that we can make sure that individuals are protected? For example, do you know and to what extent were U.S. persons trading on the FTX exchange? And do you believe that the controls were adequate and restricting access for U.S. persons? Because, you know, ftx.com, was listed in the chapter 11 bankruptcy. And despite it being publicly reported that the U.S. subsidiary was a stronger and stronger (inaudible) because of the narrowed offerings and oversight. They still seem to be this direction toward U.S persons.

So, what do you think? Do you think that there should be or the restricting access for U.S. persons are the controls were adequate?

© 2022 BGOV LLC A  R ghts Reserved

**Bloomberg**
**GOVERNMENT**

RAY: Well, certainly there was a limited number of people that invested on the on the .com, which was not intended -- the intended use of that exchange. How that happened, obviously, we'll have to investigate and what where the breakdown was internally in our controls, that would have allowed that to happen.

MEEKS: So, I'd like, you know, at some point, I know you're not a regulatory expert, but you know, to have conversation with you about looking at some of the rules and regulation that we put in place in the state of New York, because the debate that we have here at times is ceilings and floors, and what would be appropriate to make sure that people are protected. And, you know, you've already stated that FTX is lack of internal controls, unlike anything that you've ever seen in your career, and obviously has had a devastating impact on people who have trusted FTX with their savings and investments.

I also chair the House Foreign Affairs Committee. And I'm also concerned that these internal failures could have led to sanctions evasion, and illegal transactions on FTX's platform at a time when sanctions compliance is critical for supporting countries like Ukraine, and slowing down Putin's war machine. Have you on your team investigated these issues since taking the helmet FTX about anyone trying to avoid sanctions?

RAY: We're certainly investigating all the aspects of the failure and as the coming weeks we'll learn more and I think we'll certainly be willing to work with the committee to understand really what happened and share with the extent possible.

AUCHINCLOSS: Gentleman's time has expired. Gentleman from Georgia, Mr. Loudermilk, is now recognized for five minutes.

LOUDERMILK: Thank you, Mr. Chairman. Mr. Ray, thank you for being here today. Unfortunately, we aren't able to question Sam Bankman-Fried. I was looking forward to that. And however, I was concerned that you were going to testify first, I would have rather have had him testify first so we could qualify some of the statements that he may make with you who's in the current position. However, since we've been in here, there's been a leak of what was to be his testimony that has come out.

And I'd like to ask you about something that he has related in his testimony. He said if he had not been arrested ahead today's hearings that he alleges that that FTX U.S. has been and remains solvent and could pay off all of its customers tomorrow. Given the evidence you have what you gathered, is there any degree of truth to this claim?



RAY: We still have a hole in the U.S. So, as we sit here today that it is not solvent that's just inaccurate. And I'm not sure how would you even know that it went honestly. So, we're hopeful because the number of customers and the volume of trading on the U.S. exchange was much smaller than .com, somewhat driven by the number of withdrawals that took place before the bankruptcy on the U.S. silo. But right now, we have a few $100 million of value. Again, you have to look at value as of say today, still missing. We haven't ultimately, though, found all the keys to the wallets as we find and open those wallets, will hopefully, we'll be able to find more assets. And if we can attribute those to the U.S. silo, you know, certainly there's a pathway to recovery there. And so, really, the case isn't closed yet. On the U.S., it's just premature, you know, to make a determination such as this.

LOUDERMILK: So, there is a potential that what he is claiming is true, but so -- is I guess that would be the reason why all of the assets in those wallets had been frozen on the U.S. side. My follow up question would be if they are solvent, why would we freeze those, you know? And along with that, is there any evidence of commingling of funds between ftx.com, FTX U.S. or Alameda or any of the three together?

RAY: That's what we're looking at right now. I can't give you a clear answer on that today. We're looking -- when we open up all the wallets, we look where the source is from, from whence they came. We'll have an answer for you. But it's just much too early to tell you.

LOUDERMILK: I appreciate that. But summarizing, there's not evidence right now that his statement would be true that FTX U.S. is completely solvent?

RAY: Clearly not.

LOUDERMILK: OK. And something else that he did previously, he stated that the Bahamian regulators, he gave the Bahamian regulators a one-day advance warning to allow investors in the Bahamas to withdraw their funds. No one else outside the Bahamas was able to withdraw funds before the bankruptcy was filed. Mr. Fried said that he allowed the withdrawals because, quote, it was critical to the exchange to be able to have a future because that's where I am right now. And you do not want to be in a country with a lot of angry people in it. Is this explanation accurate?

RAY: Well, here's what we know. I mean, I can't speak to his words. What we do know is the liquidation proceeding in the Bahamas, was filed effectively 24 hours before chapter 11 proceeding. During that time period, and we've documented this in our court filings as of last night. The accounts were unfrozen just in the Bahamas, over $100 million, was released to approximately 1,500 customers in the Bahamas.

LOUDERMILK: Did you say 15 million ...

RAY: One hundred million.

LOUDERMILK: One hundred million.

© 2022 BGOV LLC A R ghts Reserved

**Bloomberg
GOVERNMENT**

RAY: To 1,500 customers approximately.

LOUDERMILK: Right.

RAY: These are approximate numbers.

LOUDERMILK: OK.

RAY: And then then the door was closed about the time of our chapter 11 filing. And there were communications between Mr. Bankman-Fried and the Bahamian government, specifically related to this leakage of assets.

LOUDERMILK: So, Mr. Fried would have known that the bankruptcy filing was imminent when he did this?

RAY: Yes, he was certainly in discussions with his counsel, who was in discussions with the debtors council.

LOUDERMILK: All right. I see my time is quickly running out. Thank you for what you're doing and trying to recover what assets we can. And Mr. Chairman, I yield back.

AUCHINCLOSS: The gentleman from New Jersey, Mr. Gottheimer, who is also the vice chair of the subcommittee on National Security of National Development in Monetary Policy is now recognized for five minutes.

GOTTHEIMER: Thank you, Mr. Chairman. Thank you for convening this hearing.

Since 2019, I have raised concerns about the Securities and Exchange Commission's approach to digital assets. SEC Chairman Gensler has repeatedly claimed that most cryptocurrencies are covered by existing securities laws. Despite that the SEC has not proposed a single rule to create guardrails for digital assets. And it's done a haphazard job of overseeing the space. There has always been a lack of certainty and clear rules of the road. And we're seeing the impact of that front and center today. They failed to do their job and they failed to protect consumers in my opinion, I've been calling on with other members on financial regulators to step up and create clear guardrails for digital assets. Nearly a year ago, I addressed the Stable Coin Innovation Protection Act to create tough consumer protections and prevent destabilizing runs, like we saw with the so-called stablecoin Terra had failed earlier this year.



I also invited Chairman Rostin Benham to my district to discuss the clear regulatory steps the CFTC could take to better protect consumers and when thieves and snake oil salesmen from ripping off Americans with worthless digital assets. I've consistently been engaging with all market participants, associations and regulators to remote innovation the responsible development of promising financial technology, all with a clear eye to protect consumers. Instead of writing clear rules and guidelines for digital asset firms. However, the SEC has created a patchwork of ad hoc policies for crypto firms purely through spotty enforcement actions and random letters, haphazard enforcement that has missed the worst offenders. You can't regulate through a random patchwork of letters. You have to write clear rules of the road, which is what I've been calling on for years now.

Chairman Gensler has told our committee and stated publicly that he is the authority he needs to oversee this industry. Yet the SEC has unwritten rules and has failed to foresee and prevent disasters in the industry and protect consumers from Terra Luna and FTX. It's time for the SEC to step up and do its job or another lead regulators should take the lead.

Mr. Ray, thank you for being here. Do you think U.S. financial regulators would have been satisfied with the accounting and risk mitigation practices that were in place at FTX International to prevent its failure from spilling over FTX U.S. and American investors?

RAY: I, you know, again, as I said on the record, I can't speak to what the regulatory fixes here have, obviously, oversight is needed. Obviously, we need -- we have customers have to have control over their accounts. And clearly, there's some needs here. I, you know, I can't really specify what they might be. And I leave that to the committee to obviously work with the agencies to ...

GOTTHEIMER: FTXs groups U.S. based crypto derivatives and clearing platform LedgerX that has been overseen by the CFTC since 2017, was not included in FTXs wider bankruptcy filing. And according to your initial review of the situation, LedgerX is still solid (ph). During his testimony for the Senate Agriculture Committee last week, Chairman Venom argued that it was the oversight of his agency that ensured LedgerX was insulated from the failure of other FTX firms. From what you've seen what protected LedgerX from the failures of the broader FTX ecosystem? And what could U.S. regulators, including the SEC have done to protect Americans using FTX U.S.?

RAY: Certainly, you know, we believe LedgerX it is a regulated entity, and it is solvent and the customer accounts are segregated. And obviously that that goes a long way to protecting customers.

GOTTHEIMER: Do you believe that Mr. Bankman-Fried when he says that all FTX U.S. users will receive $1 on the dollar return of funds at the end of these bankruptcy proceedings?

RAY: That's very speculative at this point.

GOTTHEIMER: What are some of the biggest questions you still have for Mr. Bankman-Fried and his associates now that you've been through this for some period?

© 2022 BGOV LLC A  R ghts Reserved



RAY: I think the questions we have are not necessarily Mr. -- question for Mr. Fried. The questions we have are, you know, where are the assets, how we locate those assets? It's a mining exercise at this point. And look, you know, at the end of the day, we're not going to be able to recover all the losses here. Money was spent that we'll never get back. There will be losses on the international side. We're hopeful on the U.S. side. He'll answer to others related to what happened here. Our job is just to find the assets and try to get customers their money back as quickly as possible.

GOTTHEIMER: When you expect that to be?

RAY: You know, it's these bankruptcies take time the assets will take time to locate. The process will, as I say will take months, not weeks. But we try to do this in the most expeditious way possible.

GOTTHEIMER: Thank you for being here. I yield back.

AUCHINCLOSS: Gentleman from Ohio, Mr. Davidson is now recognized for five minutes.

DAVIDSON: Mr. Ray, thanks for what you're doing to recover funds that are missing and for helping us build the evidence trail to find out you know what happened. I think a lot of people look at your initial statements and you say, you know, we know the following. First customer assets from ftx.com were commingled with assets from the Alameda trading platform. Second, Alameda used funds to engage in margin trading, which exposed customer funds to massive losses. Based on your review of the records is the transfer of customer funds from ftx.com to Alameda Research in conflict with the ftx.com terms of service.

RAY: Yes, that's my view.

DAVIDSON: Right. So, they claim that they weren't supposed to be able to trade those funds. And clearly, they traded those funds?

RAY: I think that you know, the difference in what's what you may be hearing is that on like, generally, customer accounts, the Alameda account had no trading limitations. So, virtually unlimited positions they could take.

DAVIDSON: Right. So, when customers deposited funds into their FTX account, where did the cash go?

RAY: Well, sometimes the money wasn't deposited in the FTX account, it was sent to Alameda to begin with, so.

DAVIDSON: So, it was misdirected from the start straight down Alameda?

RAY: There, there was certainly some time period where there's no bank account at .com. And then ultimately, as we -- if you look at the structure of this Alameda is essentially a customer on that .com exchange, and effectively, you know, borrowed money from or just transferred money from FTX customers to take its own positions on the Alameda hedge fund.

© 2022 BGOV LLC A  R ghts Reserved



DAVIDSON: Right. So, at times, it was just going straight to Alameda. At other times, did you uncover a path where there was some sort of settlement like in stocks where there's t plus two, where the, you know, there was settlement back and forth between FTX and Alameda?

RAY: Ultimately, when we look at this, I mean, there's going to be, you know, I'm sure thousands and thousands of trades, right? So, we're going to have to go back and do a very detailed analysis about every single ...

DAVIDSON: But they didn't have a structured settlement framework at all in any other software accounting systems?

RAY: It doesn't appear (inaudible).

DAVIDSON: OK. And have you ever done bankruptcies where you had to deal with custody of stocks?

RAY: Yes.

DAVIDSON: Yeah. So, you know, obviously, they're you settled as you're clearly you own shares, or you don't own shares, you take custody of the shares, normally, after a two-day settlement period, there's a netting period where firms to trade in this net out and settle the position at the end of the day. It doesn't seem any of this kind of thing existed for FTX.

RAY: That's one of the findings, there was no reconciliation of the Ledger on a day-to-day basis.

DAVIDSON: Was there anything that you could -- have you detected a point in time where the assets on hand for this enterprise matched the amount of customer deposits?

RAY: We have to go back and look at that. I mean, we're looking at a timeline, we're going to have to backup from the petition date. My guess would be you'd have to backup for more than a year. And then we'll look at, you know, on a day-to-day basis, again, they didn't reconcile Ledger on a day-to-day basis. We've got to now do that to find the answer your question.

DAVIDSON: OK. So, custody really seems to be one of the big things here. Clearly, they didn't have a way to reconcile custody on behalf of their customers. But sometimes when people were saying, well, you know, I don't know about this, maybe I'm going to take my funds out. Let's say somebody bought Bitcoin, and now they want to exit with custody of Bitcoin and have self-custody. Is that the point in time when FTX, or some combination of these entities acquired the Bitcoins so that they could deliver what the customer was requesting?

RAY: Well, there's a certain amount of liquidity at a point in time, I think the problem happened when, when there was effectively a run on the bank and there was just less assets there than then the depositors effectively would require to be drawn out. Underscoring that is a commingling of those assets even amongst the customers themselves. So, it's just really one pot of crypto if you will.

© 2022 BGOV LLC A  R ghts Reserved



DAVIDSON: Right. OK, so no, no control, no custody. And the only real safeguard the individual consumer had as this was unwinding was the hope that they could somehow be one of the lucky people that decided to say, I'm going to take possession and self-custody, my own digital asset. Those people if they've exited, and they have custody of the assets or their assets now safe?

RAY: Well, you're exactly on point. I mean, we can all be as lucky as the Bahamian customers or get the money out.

DAVIDSON: All right, thank you. My time has expired. I yield back.

AUCHINCLOSS: The gentlewoman from Massachusetts, Ms. Pressley, who is also the vice chair of the subcommittee on Consumer Protection and Financial Institutions is now recognized for five minutes.

PRESSLEY: Thank you, Mr. Vice Chair, and thank you to our Chairwoman for making this hearing an absolute priority.

Due to the collapse of the cryptocurrency exchange FTX, over one million people have not been made whole, including consumers in my district, the Massachusetts seventh. Now Mr. Ray, in a bankruptcy filing a few weeks ago, you stated quote, never in my career, have I seen such a complete failure of corporate controls? Is it a complete absence of trustworthy financial information, as occurred here, end quote? So that we can continue to get a better sightline into this failure. Can you elaborate on the internal failures and the inadequate policies that occurred and FTX leading to the collapse?

RAY: You know, it's virtually unlimited in terms of the lack of controls, no centralized records on banking, no daily reconciliations of crypto assets, silos where there's no insurance, inadequate insurance, no independent board. No safeguards that limit, who controls an asset. So senior management literally could get access to any of the accounts in any of the silos. No separateness between customer money, and other customer money or other assets. It's virtually unlimited in terms of the lack of controls. And that's really the point of the unprecedent comment, I've just never seen anything like it in 40 years of doing restructuring work and in corporate legal work. It's just a dearth of information.

PRESSLEY: Thank you very much, Mr. Ray for numerating, that for the purposes of the record, to better understand the depth of the incompetence here. And again, really just egregious, and really criminal. Can you tell us how customer funds were handled at FTX, including the exact amount that FTX misused?

RAY: We don't have ...

PRESSLEY: What the number is?



RAY: Yeah, we don't have totals today on the losses. I mean, we do know that the customer funds have existed effectively in a pool, we're going to have to do an accounting of tracing analysis to really determine the number of customers affected. Right now, we have the number of accounts, but again, users had multiple accounts. For example, if they had a different trading position, they may have opened multiple accounts. We know it's a big number, it's in the millions on the customer accounts. And we know it's several billion dollars in losses. Assigning those losses to customer accounts will be our next challenge.

PRESSLEY: And I saw one report that was putting it at about 8 billion. In light of what is FTX has planned to make sure that every single dollar that was misused is returned to the customers. Do you have an estimate of the amount of funds that FTX will actually be able to repay?

RAY: You know, not at this stage. I mean, the one thing that -- I want to express to the committee is that every day we find more assets, we unlock more assets, we find, you know, keys that we can then unlock wallets. And then we assign those to the proper silos. So, every day, we're, you know, we're more encouraged, but clearly, you know, we anticipate some massive losses here. And we're just too early right now to speculate what that would be. And hopefully, you know, in the coming weeks, we will get a better handle on that and obviously, make more information available to the public.

The one thing about the bankruptcy process, which should be comforting to the committee, is that there's absolute transparency and disclosure. And they have there's reporting in the bankruptcy process. So, everyone will know every step of the way exactly what's happening in this bankruptcy.

PRESSLEY: Thank you. Without questions collapse has been devastating to people across the globe, my constituents in the Mass. seventh included, which is why it really is essential that we understand the anatomy of this collapse so that we can not only ensure that they are made whole, that we are mitigating the damage cost here maximizing the value that is returned to customers, but that we ensure with stringent regulations and procedures in place, that this does not happen in the future.

Thank you. And Mr. Vice Chair, and I yield back.

AUCHINCLOSS: Gentleman from North Carolina, Mr. Budd is now recognized for five minutes.

BUDD: To the story of FTX is a story as old as time. What FTX engaged in its fraud plain and simple. Sam Bankman-Fried, he lied to investors. He violated his own terms of service. He knowingly and improperly loan $10 billion in customer funds to FTX to his own -- from FTX to his own hedge fund. This is the stuff that would make Bernie Sanders cringe. Mr. Bankman-Fried is right where he belongs arrested for fraud. And from where I sit, the number one priority right now is to make each and every investor financially hole. So, thank you, Mr. Ray, for being here for your efforts and for lending your expertise today.

© 2022 BGOV LLC A  R ghts Reserved



So, the bankruptcy filing it notes several unacceptable practices, like the use of software to conceal the misuse of customer funds and Alameda's secret exemption from certain aspects of ftx.com's auto liquidation protocol. So, can you expand on these practices? And what more you've learned since the bankruptcy filing?

RAY: In the basic concept is that Alameda was able to borrow on an unlimited basis, or transfer. I'm not sure I could call describe it, you know, borrowing is almost a technical term. So, transfer of assets, borrowing of assets on an unlimited basis, which then that allowed -- was allowed to take massive positions with other people's money. And because they had no auto liquidation feature. Ultimately, those losses could exceed the value of, you know, of that account. So that's essentially what happened in a nutshell.

BUDD: Thank you. So, another question. If ftx.com were domiciled here in the U.S., do you think the outcome would have been the same?

RAY: You know, the extent of the lack of, you know, of controls in the way this business was operated, I don't think it would matter where this company was located.

BUDD: Yeah. So, here's really what I'm getting at. So, I've been a longtime supporter of both blockchain technology and the digital asset industry. I view them as uniquely American innovations that have the potential to help and revolutionize financial services. But what happened at FTX was fraud on a massive scale, not unlike other scams throughout our country's history. The head of FTX should be dealt with in the same way that other disgraced leaders of Enron, like prosecuted to the fullest extent of the law.

So, what I want to protect is innovation. And we want to see it flourish right here on our shores under proper regulatory oversight. So, it's clear now more than ever, that regulatory ambiguity coupled with the practice of regulation by enforcement used by agencies like the SEC, it's led to companies moving offshore, where they're often out of reach of proper American oversight, which puts all investors at risk of another FTX type scam.

So, what we need is for Congress to take the lead and establish clear rules for this industry. From the very beginning of my time in Congress, I've introduced and supported countless bills that would do just that. And it's my hope that we can finally work together to establish these rules to protect U.S. investors, and the future of American innovation.

Thank you. I yield back.

AUCHINCLOSS: The gentleman from New York, Mr. Torres is now recognized for five minutes.



TORRES: Thank you, Mr. Chair. You know, to read the bankruptcy filing one gets the impression that FTX had the corporate governance of a college fraternity. In the bankruptcy filing you note that decisions about the disbursement of funds were made via an online chat with personalized emojis. And it seems to me corporate governance by emoji sounds like a recipe for the misuse of funds.

During the New York Times deal book interview, Sam Bankman-Fried said that FTX and Alameda where if quote, if not an intention, in effect, tie together more substantially than I wanted it to be. And Mr. Bankman-Fried speaks as if the conflict of interest came as a shock to him, as if it arose by accident or by mistake, rather than by design. But it seems to me that Mr. Bankman-Fried, set up a mutually beneficial relationship between Alameda and FTX. He would use Alameda as a market maker to generate liquidity and trading revenues for FTX and then use that TX as a lender to generate leverage for Alameda. And that incestuous relationship was neither accidental nor incidental that incestuous relationship was central to the crypto empire, then Mr. Bankman-Fried. Do you agree with that analysis?

RAY: I can't take any exception always.

TORRES: And so, do you think that Mr. Bankman-Fried knew or should have known that the conflict of interest would foreseeably culminate in the commingling of customer funds?

RAY: I certainly think he should have known his actions would result in the circumstances that we now find ourselves in. Absolutely.

TORRES: When FTX was seeking a bailout, FTX circulated to investors a balance sheet, whose largest assets were tokens that FTX itself had invented. The largest asset on the balance sheet were $2.2 billion in Serum tokens. The Serum token is a creation of FTX. And needless to say, the value of a Serum token depends on the value of FTX as a company. If FTX collapses, the token is worthless becomes no different from monopoly money. Is that -- do you agree that there's something fundamentally fraudulent about the practice of counting your own tokens as assets on your balance sheet?

RAY: Well, clearly, because of the way the token was created, and the liquidity, it's a very, very risky position to use your own asset effectively as collateral.

TORRES: What I think of an asset, I think of something that has value independently of the company. Just like a corporation would not count its own stock as an asset. It seems to me no crypto company should count its own tokens as an asset because if the company collapses, so does the token.

RAY: Well, in terms of tokens, generally, I'm not really making a judgement about, you know, homegrown tokens. They're certainly out there in the marketplace, they trade limitations on the use of your own assets as collateral, certainly seems inherently risky. And I suspect the customers themselves didn't realize that. So those are at least two problems.

© 2022 BGOV LLC A R ghts Reserved

**Bloomberg**
**GOVERNMENT**

TORRES: FTX reportedly holds $900 billion in liquid assets against $9 billion in liabilities. These are based on media reports. And it's been reported of the liquid assets, the largest among them, is about a half a billion dollars in Robinhood stock. According to the Financial Times, the Robinhood shares are controlled by a foreign entity called a merchant entity, which is said to be personally controlled by Sam Bankman-Fried. So the largest liquid asset, the Robinhood stocks, who controls it? Is it you as the FTX CEO or Sam Bankman-Fried?

RAY: Sam Bankman-Fried does not control that asset we -- that's an asset of the estate.

TORRES: During the New York Times deal book interview, Mr. Bankman-Fried said that he knew that there was a problem on November 6, yet, despite knowing what he knew, on November 6, on November 7th, he proceeded to tweet the following statement, quote, FTX has enough to cover all client holdings, leading the public to believe that there was no problem.

In your view, was he telling the truth? Or was he lying?

RAY: Again, I can't -- I don't want to give the dignity to his comments. He also said that he had $10 billion to invest in the company that day.

TORRES: Let me ask the question differently, at that time, when he sent out the tweet, leading the public to believe that we have enough to cover all client holdings, did FTX actually have enough liquidity, enough assets to cover their liabilities?

RAY: Absolutely not.

TORRES: So that statement was false?

RAY: Yes.

TORRES: Okay. And I'll leave it at that. Thank you.

WATERS: The gentleman from Ohio, Mr. Gonzalez, is now recognized for five minutes.

A. GONZALEZ: Thank you, Madam Chair. And thank you, Mr. Ray.

I want to start with Alameda and some of the loans. So Alameda took out loans from various counterparties, is that correct? Not just FTX.

RAY: Yes.

A. GONZALEZ: Okay. To your knowledge, were any of those loans called?

RAY: You know, we're going through the corporate history of what was repaid. And some of those loans, in fact, I think were repaid, but they had counterparty positions with a lot of those companies as well.

A. GONZALEZ: To your knowledge, were customer funds transferred from FTX to Alameda for the purposes of paying off called loans?

© 2022 BGOV LLC A R ghts Reserved



RAY: That's certainly possible. I mean, we need to investigate that further. But that's certainly one of the paths that we would potentially find.

A. GONZALEZ: Thank you. And then in your testimony, you describe the use of computer infrastructure that gave individuals and senior management access to systems. That's the alternatives, the backdoor of the quote, backdoor that we've heard about.

One of the things that Sam Bankman-Fried has said is he had no knowledge of commingling of funds. He said that multiple times that backdoor, which you've said, allowed for unlimited access of Alameda, essentially unlimited access into the FTX customer accounts to fund their investments. In your eyes, is there any way that Sam Bankman-Fried or senior management wouldn't know about this sort of thing?

RAY: No.

A. GONZALEZ: Thank you.

Now shifting towards the goal of the bankruptcy proceeding, which is to find the assets and return those assets ASAP. I think that's the goal that we all share.

Part of that, of course, is having the data in a paper trail that will allow you to recreate transaction histories, figure out where the assets are, so you can actually go get them. How would you characterize the quality of the record keeping at FTX in Alameda?

RAY: Well, ultimately, you know, we hope, you know, the raw data is there. And through the expertise that we have, we will -- we will be able to assemble it. It'll be time consuming because it's raw data. You know, the jumpstart you normally have in companies that we just don't have. So starting at near zero?

A. GONZALEZ: Do you have any evidence that suggests that data was willfully destroyed prior to your arrival in the company?

RAY: We have imaged the slack environment that the company had, but we are aware that there were certain forms of communications with disappearing messaging. So there's obviously risk of loss there.

A. GONZALEZ: Okay. And one of the things in Mr. Bankman-Fried's testimony that has, I guess, leaked, that wasn't submitted, is he spends a considerable amount of time talking about Binance and how Binance effectively created a run on the bank, suggesting that, you know, had that not occurred, FTX was solvent and would have been just fine.

Prior to that episode, is your belief that FTX was solvent?

RAY: No.

A. GONZALEZ: I didn't think so either.

© 2022 BGOV LLC A Rights Reserved



That's pretty much all I have for questions. The one final thing I'll note, also in that testimony, there's some accountability, which is, of course, good, but then there's a lot of excuse making and some complaining, like, in fact, many of us are still missing access to our own personal data, which is being held hostage by the Chapter 11 Teams Leadership.

I would note, that's what happens in life when you perpetrate a massive fraud and steal billions of dollars from your customers. You lose your freedom and you lose access to a whole bunch of things that otherwise you wish you would have. So just a simple reminder for everybody that that's what happens.

Final question, actually, I do have one minute left. You've mentioned the 100 million dollars that was transferred to 1,500 Bahamian accounts prior to the bankruptcy. I'm not going to ask you to say this is exactly what happened. But what is your sort of spidey-sense say about what might have gone on there? It's awfully suspicious.

RAY: Obviously, it's alarming. You know, in my job, I tried to keep focus on one thing, follow the money. So we'll see, we'll investigate who received that money and what the circumstances were.

A. GONZALEZ: Well, thank you. And thank you again for being here. I wish you luck in tracking down all the customer funds, making sure they're returned to their rightful owners. And thank you, Madam Chair. I yield back.

WATERS: Thank you. The gentlewoman from Michigan, Ms. Tlaib is now recognized for five minutes.

TLAIB: Thank you so much, Chairwoman. You know, Mr. Ray, I really appreciate you coming here. You know, one of the things that kind of stood out for me is the, you know, how much FTX spent on celebrity endorsements and arena naming rights, really targeting residents like myself and others, you know, in my community.

Naming rights of the Miami Heat arena, I think, you all spent like 135 million. And FT partnerships with the Golden State Warriors in Washington Capitals. I think 210 million sponsorship of the Mercedes. I don't know some little long line here. Endorsements and ads with Tom Brady, Naomi, Stephen Curry, Larry David. It goes on and on.

Do you know the total amount of FTX -- how much they spent on sport endorsements and arena naming rights?

RAY: You know, we haven't -- we don't have a full tally of that, because it's just the accumulation of data.

TLAIB: Do you know, if you all spent more on FTX versus ftx.us?

RAY: I -- no, I don't have a breakdown for you. And I can't tell you how much was paid in crypto versus cash.

**Bloomberg**
**GOVERNMENT**

TLAIB: When you all ran that TV -- that -- during the Super Bowl, I think you've doubled the number of U.S. users, is that true?

RAY: You know, I don't have data on that.

TLAIB: Do you think it's financially responsible to be spending hundreds of millions of dollars on these kinds of sponsorships and quote-unquote, partnerships, while they weren't enable to cover the customer deposits?

RAY: No.

TLAIB: Personally sounds a lot like, you know, Houston Astros playing at Enron Park.

I represent the third poorest congressional district, Mr. Ray. This really impacts everyday folks like my residents who were really targeted by a lot of those ads. The crypto industry has spent millions on this marketing.

And, you know, one of the things I read which was really taken aback, and I know, Madam Chair might have heard, but, you know, the Ontario teachers' pension had to write off $95 million. These are teachers.

And the consequences of the crypto collapse on everyday people is something that doesn't get discussed enough. And understanding why accountability and oversight is important. That's why I really appreciate the chairwoman doing this hearing.

The idea that cryptocurrency can be a solution for financial inclusion is not only laughable, it's dangerous, Mr. Ray.

These quick, rich -- get quick rich kind of ads and targeting my residents, it is predatory. And quote my friend, Senator Warren, it's bullshit. And let me talk about that BS a little bit. The role of exchange tokens in the crypto industries business models has reported that how media held billions and, you know, illiquid the FTT, and then FTX's own exchange token. Meanwhile, FTX's own website stated the FTT was the backbone of FTX's ecosystem. I know. You're rolling your eyes. I don't know if anybody can see it.

But the price of FTT traded in the high 70s over the summer. But by the start of November, it hovered, I think, around $20 and then the collapse in value triggered a so-called a bank run like situation. And then right now FTTs, I think, valued at just over $1 per token. Is that correct?

RAY: That's correct.

TLAIB: Clearly, FTX had an interest in inflating the value of their own token and ensure to -- it seems in hindsight that FTX will be propped up by monopoly money, is that correct?

RAY: There may be a pattern there, yes.

TLAIB: Mr. Ray, have you discussed the length how ftx.com is siloed from ftx.us and ftx.us users?



RAY: Structurally, they are they. I mean, they do share a common environment. The AWS system --

TLAIB: Can ftx.us -- sorry, users, though, trade -- could they trade with FTT? Is that --

RAY: On their -- on their particular exchange, which would be the FTS -- or ftx.us exchange, yes.

TLAIB: So can you describe how FTTX -- FTTs have collapsed and value has affected ftx.us silo and how it's affected U.S. customers, residents' ability to recover their funds?

RAY: We don't have a full accounting of what crypto assets are within each silo that backup those customer accounts. And we need to -- we need to accumulate the full value of the collateral and then we'll, you know, obviously look at what type of crypto is there and that'll be an exercise we'll have to go through.

TLAIB: Can you explain like this whole thing around FTX is over our reliance on digital token that they control mint [ph] and have vested interest in manipulating the value of? That's something that I think -- I hope we dig deeper into.

RAY: You know, I've seen stories about that. And I've read quite a bit about it. I mean, we have not done a full investigation into what was going on in the marketplace relative to the various tokens. I know that's of particular interest to the regulatory community. It -- you know, some of this may have played into what happened in terms of the downfall of FTX and other crypto companies. So it's certainly something we're going to investigate.

TLAIB: Thank you.

WATERS: Thank you very much.

The gentleman from Tennessee, Mr. Rose, is now recognized for five minutes.

ROSE: Thank you, Chairwoman Waters. And I want to also thank Ranking Member McHenry for holding this hearing. And thank you to our witness, Mr. John Ray for lending his expertise to this committee to examine the collapse of FTX.

The mismanagement of funds, the use of complex margin and collateralization of certain digital assets and, of course, alleged fraud. The timing of the events of the last 12 hours is certainly interesting. As a recovering attorney, it makes me wonder why a prosecutor wouldn't want to potentially add lying to Congress to accompany the list of charges against Mr. Bankman-Fried.

It also makes me wonder why the SEC waited until today to file its own charges. Frankly, Chair Gensler has failed at his job. And worst of all, he has failed to protect investors, which is one of the key components of the SEC's tripartite mission.



Similarly, while he has been asleep at the wheel, the Democratic majority has failed to have him to testify before this committee for over 14 months, which I believe is a disservice to investors. I hope that in a few weeks that, we in the new Republican majority, will finally start to hold the Biden administration accountable for their failures.

Now I see my time is limited. So I will dive right into my questions.

Mr. Ray, it is my understanding that FTX and Alameda hold a number of digital assets, including more than 30 billion of tether USDT. Can you describe the efforts that you're taking to ensure that unwinding FTX in the bankruptcy proceeding won't cause unnecessarily negative impacts to these digital asset markets?

RAY: At this stage, what we're doing is sequestering those assets into cold storage and securing those. We have not embarked on any sort of liquidation process related to those crypto assets. And, you know, when it comes time to look at the ultimate distribution of those assets, whether it's in cash or in kind, obviously, we'll be -- we'll be instituting every procedure and process in place to make sure that there's no depreciation of value of what we're distributing or how we -- our goal is to maximize the value to customers.

ROSE: Thank you, Mr. Ray, you have said that among other things, Alameda and FTX used customer funds to make investments in a variety of businesses and ventures. Have you seen any documents suggesting that the recipients of those investments did any due diligence as to the source of funds being used by FTX and Alameda?

RAY: I've not personally seen any documentation relative to other party's due diligence. I'm not sure we would necessarily be privy to that. But we certainly haven't found anything today.

ROSE: On the flip side, have you seen any indication as to whether adequate due diligence by FTX's institutional investors would have raised red flags?

RAY: You know, I don't know what work they did. Obviously, they found themselves in a fairly great position. I don't know what due diligence they may have done. It's hard for me to answer that.

ROSE: Is there any indication as to whether any potential investors before the advance in November took a pass on investing after taking a hard look at FTX?

RAY: Again, I'm not really privy to what due diligence people may have done. It's just not something that I've got visibility to.

ROSE: So I -- from owning a company myself and responding -- both responding to due diligence requests and making them as we looked at companies, we kept significant records of the due diligence, both that we requested and that we responded to. Are you seeing evidence that any such records were being kept by FTX?

© 2022 BGOV LLC A R ghts Reserved

**Bloomberg**
**GOVERNMENT**

RAY: Not that I'm aware. Again, you know, part of my testimony was that the company's record keeping was very minimal. You know, even as to some of the investments, we don't even have the complete transactional documents that we got from the investment itself. So I think and speak somewhat for your question.

ROSE: And, again, just to give you a chance to reiterate, you, from all of your experience throughout your career, you find that to be remarkable, I would take it.

RAY: Yes, truly remarkable.

ROSE: Well, thank you, again, for being with us today. And, Chairman, thank you. I yield back the balance of my time.

WATERS: Thank you.

The gentlewoman from North Carolina, Ms. Adams, is now recognized for five minutes.

ADAMS: Thank you, Madam Chair. And thank you, Ranking Member McHenry, for hosting the hearing today. As you, Mr. Ray, thank you for being here.

Mr. Ray, judging by the reaction of my colleagues, it's clear how frustrated we are, especially given your testimony where you say that you had never seen such an utter failure of corporate controls at every level of an organization.

So, Mr. Ray, my question, my colleagues and I have asked repeatedly about your efforts to recover customer's assets, and you've told us today, it'll take some time. But you're the expert here. Do you genuinely believe that these customers are ever going to get their money back?

RAY: Well, certainly, we're working hard to, you know, cover all of the assets in the sequester those for ultimate return to customers. It's obviously a challenge. It's a massive loss. It's very speculative right now what that recovery will be. It's too early to tell what the ultimate recovery will be to each particular customer. At some point, we'll obviously know that and we hope, obviously, to maximize them.

ADAMS: Wow, okay. Then sound like you really think they're going to get their money back.

But let me -- you know, do you think that some of the losses suffered by these investors are simply a result of the nature of investment and risk taking in the market? Or was this fraud?

RAY: Well, certainly, I think the way the company operated, lended itself to materially risky losses positions, you know, I clearly -- a better run company would have had controls and procedures in place to avoid losses.

ADAMS: Okay. Thank you, sir.

Let me -- let me revisit the quote from your testimony. I want you to touch on the quality of FTX's bookkeeping. Was there a discrepancy between what it disclosed to its investors versus what was going on in the company internally? And can you provide an update on your efforts to fill those gaps?



RAY: Right. The quality of the of the record keeping was very poor in the company. We still don't have, you know, complete financial statements for every one of the entities. We're going back and rebuilding those right now. Our processes to have a beginning entry with our assets and cash and our liabilities, and we'll do that on an entity-by-entity basis.

In the coming months, through the bankruptcy process, there'll be disclosures about the financial status of every one of the entities, but that's a process that we'll build out over the next four months.

ADAMS: So in your testimony, you discussed the existence of a computer infrastructure that gave senior management personnel access, personal access to customer funds and lack of security controls. So can you describe examples of the misuse of customer funds that took place as a result of these vulnerabilities?

RAY: The main issues is just simply taking customer funds and using it for other purposes. I mean, obviously, there's investments made, payments made, expenditures that were made with customer funds, and then obviously trading that occurred that caused losses that ultimately harmed the customer.

ADAMS: All right. Thank you, sir. Madam Chair, I yield back. Thank you.

WATERS: Thank you very much.

The gentleman from Wisconsin, Mr. Steil, is now recognized for five minutes.

STEIL: Thank you, Madam Chair. Thank you, Mr. Ray, for being here.

There's a lot of questions about early stage due diligence, about why the indictment and the timing of that indictment by justice. But I think as policymakers, we're here to understand the FTX collapse. And what can be done to prevent a future fraud like this from ever occurring again, where individuals lost their money.

It's complicated by the fact that FTX is domiciled in a foreign jurisdiction. And by all indications, Mr. Bankman-Fried is also in a foreign jurisdiction at this time. And so we should ask ourselves tough questions as to why a company like FTX would choose to set itself up in the Bahamas rather than the United States in the first place. I think that's a question for Congress.

And, also, we can't lose sight of the fact that millions of Americans lost money in this. I'm outraged. I think you're outraged, the American people should be outraged.

Let me dive in a day after FTX filed for bankruptcy, multiple outlets reported that there was a hacker potential theft. You have stated unauthorized access to certain assets occurred, and that the company was in touch with law enforcement officials and regulators. Have you determined whether in fact assets were moved out after the bankruptcy?

RAY: Yes, clearly there was assets moved out after the bankruptcy.



STEIL: And do you know whether or not that was an actual hack? Or was this done as has been reported in the direction of the Bahamian authorities?

RAY: It was both.

STEIL: It was both. And so some was done -- some was done as a result of a -- of a hack. Some was done as a result of the request of Bahamian authorities?

RAY: Yes, that's right.

STEIL: And do you -- do you have indication as to why the Bahamian authorities made that request?

RAY: It wasn't a request. They just took it.

STEIL: The Bahamian authorities took the funds that were at FTX --

RAY: Yes.

STEIL: -- through their own action. Was no action required by the FTX employees? Maybe we can provide --

RAY: They were aided by the ex-employees, yes.

STEIL: They were aided by former employees --

RAY: Yes, Mister --

STEIL: -- of FTX.

RAY: Yes, Mr. Wang and Mr. Fried.

STEIL: Is it in the eyes of the Bahamian authorities did this to protect clients and creditors? What was the -- what was the -- do you -- do you have the insight into the motivation behind this action?

RAY: Unlike the Chapter 11 process, there's no transparency in the process and the Bahamians, and we've repeatedly asked them for clarity about what they've been doing, and we've been shut down on them.

STEIL: So from you -- you've requested insight as to why this was done from the Bahamian authorities and the Bahamian authorities, their reply to you was that they did not reply or they replied and it was unsatisfactory?

RAY: They put out statements that it was in the interest of Bahamian creditors, although, you know, our view is that it violated the automatic stay in bankruptcy.

STEIL: And so you have questions that's still remain unanswered by Bahamian authorities that would shed additional light into your investigation if that information was provided?

RAY: Yes.

**Bloomberg**
**GOVERNMENT**

STEIL: Do you -- do you believe that if that time Mr. Bankman-Fried was attempting to undermine Chapter 11 cases by expanding the scope, by moving assets to accounts under the control of the Bahamian authorities?

RAY: It appears so.

STEIL: So it appears that he may be working to undermine the scope of federal bankruptcy -- U.S. federal bankruptcy law.

RAY: That's what it appears, yes.

STEIL: And so then do you still believe that the Chapter 15 case should be consolidated in the Delaware bankruptcy court?

RAY: No, I do not think so.

STEIL: What do you think should be -- what do you think would be the best course of action?

RAY: They have a liquidation proceeding relative to FTS digital markets. They filed that proceeding there. That is their proceeding.

We think the Chapter 11 process is the only open transparent process that gives visibility to customers of what happened, and when they're going to get their money and how they're going to get their money.

The process in the -- in the Bahamian islands is not a transparent process. We have opened up the ability to share everything that we have with the Bahamian government, similar to how we share with other liquidators around the world, not only in this case and other cases, it's meant to be a very cooperative situation.

The pushback that we've gotten is sort of extraordinary in the context of bankruptcy. It raises questions, it seems irregular to me, there's lots of questions on our part. And obviously, we're investigating it.

STEIL: I appreciate your candor on that point. I think that's a really important point that we look at.

Again, one of my concerns is we look at overall crypto policy shifting away from this specific bankruptcy, is that we have a large number of crypto companies that have chosen to domicile outside the United States, rather than inside the United States and a lack of a regulatory framework inside the United States.

My concern is that's moving people to be offshore. And when they're offshore, when a fraud like this occurs, is to the detriment of Americans who have placed their money in trust of a company like FTX. I appreciate you being here cognizant my time. I yield back.

WATERS: The gentleman from Massachusetts, Mr. Lynch, who is also the chair of the task force on Financial Technology, is now recognized for five minutes.

**Bloomberg**
**GOVERNMENT**

LYNCH: Thank you, Madam Chair. Thank you, Mr. Ray. I appreciate your patience with us today and your testimony.

Recently, we received a leaked copy of Mr. Bankman-Fried's intended testimony, apparently, it was leaked to Forbes. Basically, he continues to allege that this was all an accident that was unintentional on his part, that he was unaware of his company's various company's activities.

However, as my colleagues have pointed out, previously, this, you know, structuring, as you have said, about these four silos of companies, the location in Bahama -- in the Bahamas, indicates a deliberate attempt to avoid U.S. jurisdiction and U.S. security laws.

So in our conversations with Mr. Gensler of the SEC last week, he indicated that there are laws in place that would have protected investors and customers had Mr. Bankman-Fried decided to register his offshore operations here in the United States. Is that -- is that your understanding?

RAY: You know, I'm not familiar with the regulations he's speaking to. I'm -- and, obviously, there was an absence of regulation relative to these operations. So, clearly, any regulation would have helped.

LYNCH: The Southern District of New York also unsealed its criminal indictment this morning which alleges that Mr. Bankman-Fried lied to investors. He now faces about eight counts, including wire fraud on customers and lenders and conspiring to defraud the U.S. and violate campaign finance laws.

Do you have any information that would countervail those charges? Is there anything that you've seen in the way that Mr. Bankman-Fried structured this company or in any way that he tried to comply with U.S. securities law in your investigation so far?

RAY: We've certainly made our -- all of our information available to the regulators and the enforcement agencies. And, obviously, they're seeing what we're seeing.

LYNCH: What I'm trying to get at is that while Mr. Bankman-Fried continues to say this was an accident, it appears to me at every step of the way that his acts were intentional, and they were willful and these were conscious decisions made by him in structuring his company as he did.

RAY: I don't know what his intent was. I certainly know what the results were and they were disastrous, obviously, for customers.

LYNCH: I realized that only -- well, at least so far, the reports say that only about 2% of the people defrauded in this -- in the FTX collapse were from the United States. Is that correct?

RAY: You know, I don't know how they're calculating that numbers, customer bases or value bases. I -- it's hard to comment on that. We do know that the -- you know, the U.S. investors were on the U.S. exchange. And the relative losses there are a fraction.

© 2022 BGOV LLC A  R ghts Reserved



But it's too early to tell exactly how much those losses are in either silo. There's a general truth to the statement that the U.S. will suffer -- that the particular exchange will suffer less than the Dotcom [ph] exchange, purely because of the siphoning off of cash and assets. From Dotcom over to Alameda.

LYNCH: There also seem to be -- despite the structural differences between these different operations in ftx.com, ftx.us, there is, without a doubt, a barrage of advertisements, endorsements, especially in the minority communities where Bankman-Fried admitted that he was trying to, supposedly, bank the unbanked with access to FTX.

Is that how the U.S. citizens were sort of swept up into this? Do you have any indication if that was the process? They do heavily -- there's a lot of -- a lot of hype around crypto. There were, you know, hundreds of millions of dollars was spent on advertising to U.S. citizens on FTX. I'm just wondering if that was what drew some of these victims into this disaster.

RAY: You know, I don't -- I don't have a professional view of that. I think your own observations will guide you there.

LYNCH: Okay. Well, my time has expired. Madam Chair, I yield back. Thank you.

WATERS: Thank you. The gentlewoman from Pennsylvania, Ms. Dean, is now recognized for five minutes.

DEAN: Thank you, Madam Chair. And thank you to the ranking member for hosting this important hearing at an extraordinary time in the cause of this case.

So, Mr. Ray, I want to just make sure we set the stage which is that no matter what the failure, the fraud, the infliction of pain on people is extraordinarily real, as intriguing as disastrous as the events leading up to the filings of bankruptcy are and, of course, you have the task of trying to recapture the assets and protect them and transparently convey them back to folks as best as possible. So all that is outrageous.

I'd like to focus my time a little bit on what happened on the 11th and the 12th of November. You say in your testimony, I'm going to cite both your testimony and the declaration of the filing yesterday in court, that you were -- you accepted the position of Chief Executive Officer for FTX group in the early morning hours of November the 11th, and quickly realized bankruptcy filing was necessary, which began that day.

You also say that as the cases were filed, debtors and their representatives worked tirelessly through the night to secure assets. You then go on in this last -- yesterday's pleading, trying to block what the other liquidator was trying to do, to say that during this period on the 11th and the 12th, as best I can build this, information emerge, the debtor systems in assets were accessed from at least two sources. What are those two sources?



RAY: Well, there was two situations going on. One is there was a hacking by a third-party. We are tracing that hacking using our own cyber teams, plus, we're being assisted by the government in tracking the ultimate location of those crypto assets. And the other thing that happened at the same time was the aided with resources of our former management. The Bahamian government took control of certain crypto assets.

DEAN: Bahamian commission?

RAY: Yes.

DEAN: Instructed Misters Bankman-Fried and Wang to mint. What does that mean to mint a substantial number of new tokens and transfer hundreds of millions of dollars' worth of these new tokens to cold storage for their benefit?

RAY: So the -- what that refers to is that it's mentioning the FTT, which is a coin created by the company that could literally be minted, you could create new money with it. And so in that process, FTT was transferred to the Bahamian authorities.

DEAN: To the tune of how much money?

RAY: Approximately --

DEAN: I read here, hundred --

RAY: About 300 million.

DEAN: Three hundred million. And you said that would be Mr. Bankman-Fried and Mr. Wang who did that minting and transferring. And it's --

RAY: I know -- I know -- we have information that they were both involved, whether Mr. Wang did or Mr. Freid, you know. Obviously, they were cooperating with the government doing so.

DEAN: And this is post-bankruptcy filings?

RAY: Post-bankruptcy -- when the automatic stay was in effect.

DEAN: That kind of wrongdoing, for somebody of your expertise, how is it that the walls were not secure, that someone was able, in this case, one unknown and the other known, likely known, was able to go in, mint, manufacture tokens and transfer them to a foreign government?

RAY: It really goes back to the, you know, the control of the company and its assets in the hands of a few people, in this case, wrongdoers. They held the keys and they knew where the wallets were. And there's just a lack of documentation, internal controls of separateness between the company's assets, who held the keys, and they were able to take those assets, which purely by the way the company was established.

DEAN: And post the 11th or 12th, has that kind of access to the keys, minting transferring stopped?

© 2022 BGOV LLC A Rghts Reserved



RAY: We haven't seen any evidence of hacking. We've certainly have isolated any involvement of the former founders from the company, whether that's cash or other assets. What we don't know, right, is whether or not the founders could have taken crypto and put it in a cold wallet that we just don't have an awareness of.

And if they did, hopefully, we can -- we can trace that. We may find in the billions of data that we have, a trail there. But it's possible that assets would have escaped the system and maybe exist in a thumb drive that we just don't have knowledge or possession of.

DEAN: Thank you, Mr. Ray, and thank you for your team's work.

WATERS: Thank you very much.

The gentleman from New York -- the gentlewoman from New York, Ms. Ocasio-Cortez, is now recognized for five minutes.

OCASIO-CORTEZ: Thank you very much. And thank you for coming here to testify today, Mr. Ray. A lot to get through. So we're going to try to get these answers as quickly as possible.

I want to put together a little bit of a timeline of this collapse between November 12th and yesterday. On November 2nd, we have CoinDesk leaking these balance sheets, on the 8th Binance signs a non-binding letter to acquire FTX and Bankman-Fried freezes or pauses withdrawals from FTX.

I would like to submit to the record your declaration to the U.S. bankruptcy court or FTX is a declaration for U.S. banks bankruptcy court that was filed yesterday.

Now on November 9th, the day after those assets were frozen, Binance announced it would not go through with the purchase. And according to this filing, the same day Bankman-Fried e-mailed the Bahamian Attorney General with an offer. That offer stated just -- that he would offer to unfreeze withdrawals just for Bahamian customers on FTX, quote, so they can, tomorrow, fully withdraw all their assets, correct? Is that correct?

RAY: Yes.

OCASIO-CORTEZ: Now on November 10th, FTX DM, the next day was placed into a foreign provisional liquidation in the Bahamas. Correct?

RAY: Correct.

OCASIO-CORTEZ: The next morning.

Now after that, Bankman-Fried then made good on his offer on his previous day's offer in that e-mail to the Bahamian AG, opening withdrawals just in the Bahamas for a period of 25.5 hours. Is that correct?

RAY: Correct.



OCASIO-CORTEZ: Now, during that period, $100 million was withdrawn in the Bahamas from FTX by 1,500 individuals, correct?

RAY: Correct.

OCASIO-CORTEZ: And this was before -- this was the day before you were set to take over. So he was still in control. This was like right before he was supposed to hand this off.

RAY: Correct.

OCASIO-CORTEZ: Now, I think what we have here is that -- rather afterwards on November 12, we have what Congresswoman Dean was just asking about with this additional minting, these questions around this additional minting.

And then on November 16th, the Bahamian appointed joint provisional liquidators did something very interesting. They came here to the United States bankruptcy court and sought an entry to recognize the Bahamian liquidation as the main foreign proceeding. Would that additional control be of any potential value to Mr. Bankman-Fried for that Bahamian proceeding to be the main one?

RAY: Well, clearly, you know, there seemed to be an effort by the Bahamian commission to get control of the bankruptcy process. And I think that was evident by their filing, which by the way was made up in New York, not Delaware.

OCASIO-CORTEZ: Oh, thank you. Thank you for that correction.

Now, did you uncover any evidence that demonstrates that this window, that 25.5 hour window, opened an exchange for any consideration offered to Mr. Bankman-Fried by the Bahamian attorney general or any state official, including a promise to initiate liquidation proceedings which might offer a path towards Mr. Bankman-Fried, retaining some control or influence over FTX.com?

RAY: We intend to investigate that very thing.

OCASIO-CORTEZ: Thank you very much.

Now, I'd like to dig into a little bit of the timeline of yesterday. Yesterday, you filed that same declaration that revealed some of this explosive information, what time did you file this?

RAY: Uh, that was...

OCASIO-CORTEZ: Around what time?

RAY: ... yes (ph) about 3, 4 o'clock in the afternoon (ph).

OCASIO-CORTEZ: Around 3 or 4 o'clock. Now, when you filed this information, that requires that essentially discloses that you are sharing this information and it - it discloses that to opposing counsel, correct?

RAY: Yes, we docket it and the world knows about it.

**Bloomberg
GOVERNMENT**

OCASIO-CORTEZ: Now, if opposing counsel re - essentially becomes notified of this, that would mean that Bankman-Fried and potentially Bahamanian (ph) officials would have been potentially privy to that information, starting around 3 or 4 PM, correct?

RAY: Correct.

OCASIO-CORTEZ: What time was Mr. Bankman-Fried arrested...

UNKNOWN: (Inaudible).

OCASIO-CORTEZ: ... yesterday?

RAY: I - I believe it was in the - in the early evening hours, after 4 o'clock (inaudible)...

OCASIO-CORTEZ" About - I think - I believe it was around...

RAY: Seven o'clock (ph) perhaps (ph)...

OCASIO-CORTEZ: ... it was in the evening, after that filing...

RAY: Six, seven o'clock, yes.

OCASIO-CORTEZ: I would like to submit to the record, the statement from the attorney general of the Bahamas issued yesterday on the arrest of Mr. Samuel Bankman-Fried. And after submitting that to the record, I would like to note that this - that in this statement, they stated at such time as a formal request for extradition is made, presumably by the - by the Southern District of New York, but they do not state when that request or extradition was made.

Do you believe that information is important for us to understand in order to piece together a timeline, Mr. Ray?

RAY: Yes, cer - I certainly don't have the full time line and - and that's something that we look forward to learning.

OCASIO-CORTEZ: Thank you very much.

WATERS: Thank you. The gentlewoman from Texas, Ms. Garcia, who is also the Vice Chair of the Subcommittee on Diversity and Inclusion is now recognized for five minutes.

GARCIA: Thank you, Madam Chair and thank you, Mr. Ray, and thank you for your patience today as we come towards the end of this hearing.

Let me just say that I was once (ph) City Comptroller (ph) of Houston and under me was the City Auditor, so I've done a lot of audits, overseen a lot of audits and this has got to be one of the most ridiculous loosely goosey operation I've ever seen. I wouldn't be surprised if you come back and tell us found money under somebody's mattress, because it seems like there was total lack of controls, total lack of transparency, total lack of any accountability and it's much like a - an onion that every time you peel a layer, it gets a little smellier and uglier.

© 2022 BGOV LLC A R ghts Reserved

**Bloomberg**
**GOVERNMENT**

So, when (ph) - I know we need to stay tuned - I wanted to also go over a little quick timeline following up on my colleagues' questions and FTX International was founded before FTX US, correct?

RAY: (Inaudible) can you repeat the question?

GARCIA: FTX International was put together before FTX US?

RAY: Yes.

GARCIA: So, before FTX US, US customers were not - didn't have a forum or a platform to participate in because, as I understand it, FTX International was for non-USA customers.

RAY: That's correct.

GARCIA: So, do you happen to know how many FTX US customers there really is?

RAY: We don't have an accurate customer account. We do have a user number, which is about 2.7 million, but - but customers did have multiple accounts and some of those accounts have zero balances...

GARCIA: So (ph), 2.7...

RAY: ... we need to get to the bottom...

GARCIA: ... million.

RAY: Right.

GARCIA: We were told like (ph) it - I saw some information that said that it was about - I think it was 2 percent of the total picture of FTX customers? Is that about...

RAY: Yes, I - I don't know how they're calculating that. I mean on a relative basis though, the - the US number - the US users and the value at the petition date - you know, was - is - is - is a relatively small compared to .com.

GARCIA: Well, I've been curious to find out and I've asked this question of the White House working group and another (ph) - a number of people that have appeared before us just about this whole crypto space, who is the consumer here? Who are the people being harmed? I'm not talking about hedge fund managers, I'm not talking about investors, I'm not talking about entities, how many real people are being hurt?

RAY: Well - well (ph) we haven't - we don't - we don't have a breakdown by say institution versus individual. You know, clearly, there's a lot of individuals harmed by this, a lot of individual accounts. You know, crypto accounts are current - are - are - are certainly a - a - you know, something that you know, it's available to - to consumers, so I would expect the population would include a large amount of consumers.

**Bloomberg**
**GOVERNMENT**

GARCIA: So, when you say that - are you telling me that you have no consumer data, you just have account numbers right now?

RAY: We have account numbers. We can - we can ultimately - you know, figure out the names associated with those accounts. What we don't know of course if (ph) - necessarily is - you know, what the identity necessarily is behind some of those account names.

GARCIA: So, you don't have any information on their demographics or states? You can't tell me if I have any (ph) (inaudible)...

RAY: Not at - not at - not at my (ph)...

GARCIA: ... my district...

RAY: ... not at my finger...

GARCIA: ... (inaudible) can't tell Mr. (Inaudible) if there's any from his district?

RAY: Not at my - not at my fingertips. We certainly can accumulate that and break that down.

GARCIA: Well, I would be really interested because obviously, for many of us it is our constituents that we want to make whole, while we have a concern for the entire crypto space and all of the people who participated in any of these trades on their platforms, we have a deeper concern, if you will, for our own constituents. And we need to make sure that - that we do make them whole.

And I know in response to a previous question, you said you weren't sure when you'd be able to make everyone whole. Is that answer the same for the people from - for just the US or is that also the same for the people in the FTX International?

RAY: It - it - it's same for all - you know, for all the customers. I mean obviously, the extent of the harm appears greater on the international side, so you know, we're hopeful again, on the US side, that the dissipated assets are not significant and that obviously would lead to a greater recovery and a sooner recovery, but it's a little bit premature to - to really nail that down today.

GARCIA: Well, thank you. And - and I - I - when you do the demographics and the - the consumer data, keep in mind that a Morning Consult (ph) study showed that about a quarter of black and Latino respondents own a crypto currencies (ph) - it's a quarter compared to 17 (ph) percent - 17 (ph) percent of white respondents. This - we need to make sure that when we talk about making everybody whole, we're talking about everybody.

RAY: Absolutely.

GARCIA: Thank you. I yield back.

WATERS: Thank you very much.

The gentleman from South Carolina, Mr. Timmons is now recognized for five minutes.

**Bloomberg**
**GOVERNMENT**

TIMMONS: Thank you, Madam Chair. Thank you, Mr. Ray. Let's go back to Enron, that trial was from January 30, 2006 until May 25th, 2006, pretty lengthy trial. I imagine that the federal prosecutors presented ample evidence, there were all kind of witnesses, would it have been helpful to have the defendant testify before Congress for like six hours and answer a whole bunch of questions under oath prior to that trial? Would that have been helpful to federal prosecutors?

RAY: Well, if - by - by - by - by that time, the company had been confirmed out of bankruptcy. We - we had (inaudible)...

TIMMONS: Before - before he was arrested, would it have been helpful for him to come before Congress and testify for hours on end, and answer every question we could come up with?

RAY: Oh, absolutely...

TIMMONS: Under oath?

RAY: ... absolutely.

TIMMONS: So, it would have been (ph) really helpful?

RAY: Yes - oh, yes.

TIMMONS: Okay, okay. So, why 36 hours before he was scheduled to testify before this Committee for hours on end did the Southern District of New York send a provisional arrest warrant to the Bahamian government to facilitate his arrest to preclude his testimony which would have been incredibly helpful in the prosecution of Sam Bankman-Fried?

RAY: I mean I - I - I obviously can't speak for the - you know, for the agency.

TIMMONS: It's kind of bizarre - I mean I was a prosecutor for a number of years. I prosecuted complex white collar cases, the thought of getting six hours of congressional grilling for a targeted investigation or a defendant, that would be great for my case. So, I just don't understand - I guess the - the grand jury returned the indictment on the 9th.

Technically you can delay weeks if you want to, so this was a decision made by somebody at DOJ to prevent Sam Bankman-Fried from coming here in a couple of hours and testifying before Congress answering questions in front of the American people. I - I've read his alleged testimony that he was going to give - he's basically saying that he lacks the criminal intent - he lacked mensria (ph).

He's saying that his attorneys pressured him into filing Chapter 11, that he immediately - after doing a docusign to sign away everything, said I don't want to do that - told his attorneys - again, this is all what he says - told his attorneys that undo it, I do not want to do that, and it seems that he's been taking steps ever since that to try to wrangle control of his companies back, is that fair to say?

RAY: You - you know, I - I - I can only - I can only read what you read in the - in the - in the press. I haven't talked to Mr. Fried.



TIMMONS: So, my friend from Wisconsin was talking about Chapter 15 versus Chapter 11, and that's basically the - the Bahamian government or outside - what do they call it - joint provisional liquidators are trying to wrangle control of this bankruptcy, is that fair to say?

RAY: It seems that way, yes.

TIMMONS: And arguably, you're going to be going after the $100 million that was allowed by 1,500 Bahamian citizens to take out, that was allegedly owed. You're still going to get to the bottom of that, so you plan on going after that money, correct?

RAY: We'll investigate every potential cause of action.

TIMMONS: And if 1,500 people in the Bahamas were allowed 25.5 hours to withdraw $100 million do you plan on trying to get that back and distribute it appropriately?

RAY: We will certainly pursue every course of action to recover.

TIMMONS: Okay. So, where do you go from here? You're obviously going to do everything you can to maintain control of it and keep it Chapter 11, is that fair to say?

RAY: It is fair to say. I - you know, we think the bankruptcy process here is the one place that has transparency and has the greatest ability to maximize value for creditors.

These things aren't usually mutually exclusive. We work with liquidators all the time on a cooperative basis, so this is a little bit unprecedented.

TIMMONS: I think that's fair to say. This is going to be a law school exam for many students in years to come.

I'll - I'll end with this, I really look forward to figuring out why the Department of Justice issued the provisional arrest warrant to preclude Sam Bankman-Fried from testifying before us this afternoon. I do not understand it. As a former prosecutor, the thought of him going on the record for three, four, five hours, and answering every question to try to keep his alleged mensria (ph) out of this would be wonderful. I look forward to figuring out why they did it. With that, Madam Chair, I yield back.

WATERS: Thank you. The gentleman from Illinois, Mr. Garcia is now recognized for five minutes.

GARCIA: Thank you, Chair Waters and Ranking Member McHenry for hosting this important hearing. And thank you, Mr. John Ray for joining us today.

I want to start by zooming out a bit because FTX isn't (ph) an anomaly, if (ph) the collapse is just the case of one corru - isn't just the case of one corrupt buy stealing money, it's about an entire industry that refuses to comply with existing regulation that thinks it's above the law. It is not.

As we speak, Binance is being investigated by the Department of Justice, Tether is being investigated by DOJ as well. The SEC is - is investigating the co-founder of Terra Luna, which collapsed earlier this year. And digital currency group has many of the same conflicts of interest present in the FTX case.



WATERS: Thank you so very much. The gentleman from Massachusetts, Mr. Auchincloss, who is also the Vice Chair of the full Committee is now recognized for five minutes.

AUCHINCLOSS: Thank you, Madam Chair.

Mr. Ray, I appreciate your patience and - and diligence this afternoon in asking - in - or answering these long questions. You've - you've addressed everything with care and thought. You haven't played any video games while you're talking to us, so it's terrific.

Mr. Bankman-Fried leaked his written testimony to Forbes today. Just one more link in a long chain of dissembling (ph) and lies from Mr. Bankman-Fried. So, I think it's important to allow you to respond to anything he put in there on - on the record here with us. He really makes two pointed assertions, one is that you haven't engaged with him and haven't allowed him access his passwords and accounts. Can you explain to the Committee now, why that is the appropriate course of action?

RAY: Uh - well, for a couple of reasons. I mean first of all, we wanted an independent - you know, examination. We didn't want to rely on people who were potentially compromised and as we now sit here today, we know that was a wise decision.

Second of all, what he was asking for fundamentally was to allow access to a system that we know just hours after the bankruptcy filing he had dissipated assets from the estate. So, it - it - it's...

AUCHINCLOSS: I think that's - those two are sufficiently good reasons. I'll reclaim - the second broad point he makes is that were he allowed to - were he allowed to restart FTX, he could raise the financing and make customers whole. That's, I think, a - a - a fair paraphrasing of what he's asserting. Again, can you respond to that and whether that's - that's true and credible?

RAY: You know (ph), in my (ph) - my history of doing corporate restructurings, I don't find that remotely believable, because the first thing an investor would have to do is pay several billion dollars just to have the company - you know, back to the position it was in, so it's - it's - it's a fantastic idea.

AUCHINCLOSS: It (ph) would be throwing good money after bad in the - in the biggest sense of the word, right?

RAY: Correct.

AUCHINCLOSS: Good. Thank you. I just wanted to give you that opportunity. And I also want to associate myself with the - the - the very thoughtful line of questioning from both Ms. Ocasio Cortez and - and Mr. Timmons actually (inaudible) from both sides of the aisle on the timeline here, and I'll just reiterate the timeline quickly.



The crypto industry is in crisis because crypto assets have no inherent value. These companies are making money using one thing, hype. And when the hype runs out, these businesses fail and ordinary investors, especially late comers, who are disproportionately low income, black and Latino, loose.

Mr. Ray, in your November 17th, filing, you noted that your team had detected unauthorized minting of approximately 300 million in FTT tokens by an unauthorized source after the bankruptcy petition date. You're December 12th filing notes that while one source of this unauthorized minting remains under investigation, a second source has been confirmed without doubt. Who was the source of this unauthorized minting that your team has confirmed without a doubt?

RAY: Uh, the - the second source I think you're referring to is the Bahamian Commission.

GARCIA: And Mr. Ray, one of the unacceptable management practices at FTX that you identified was the absence of independent governance throughout the FTX Group, people from the same group were leading various companies and there were potential conflicts of interest because of this. Could you tell us more about the risk - the lack of independent governance and what risks were created as a result?

RAY: We had no independent board of directors and - and with a lack of - of oversight by an independent board, it leaves the - the company in the hands of a small group of individuals, and the company is effectively sort of naked where - when it comes to internal controls. So, that was certainly the case here. And it's - it's - it's something that - you know, is an - atypical of companies of this size.

GARCIA: And customers report and you've confirmed during the hearing that FTX was asking customers to send money to Alameda instead of FTX. Mr. Bankman-Fried claims this is because in the early days of FTX, the company did not have a bank account. On a Twitter Space yesterday, Mr. Bankman-Fried said he does not know if assets were moved over from the Alameda to FTX after those early days.

To your knowledge, how long were customers instructed to send funds to Alameda that were meant for FTX?

RAY: We - we don't have a precise timeline of - of - of - of - of that - that circumstance. That's one of our investigations. We'll certainly look to what kind of communications were - were given to customers, did they know - did they actually have knowledge of - of that direction, those are all questions.

GARCIA: And were the assets ever moved over to FTX or were they allowed to stay with Alameda?

RAY: There was certainly certain assets were - stayed with - with the exchange. And it effectively popped (ph) if you will, but clearly, assets moved to Alameda or those assets were (ph) there you know (ph), continuously. So, you know, clearly there was a - an allocation to Alameda of customer funds that were utilized for other purposes.

GARCIA: Thank you, sir. Madam Chair, I yield back the balance of my time.



On November 6th, FTX Group was facing a liquidity crisis. On November 8th, FTX withdrawals were halted. On November 9th, Mr. Bankman-Fried sent an email to the Attorney General of the Bahamas, saying the Bahamanian (ph) customers could make withdrawals as they had "segregated funds for all Bahamanian (ph) customers" despite his awareness of FTX's withdrawal halt. And then on November 10th, two days after withdrawals were halted, nearly $100 million in crypto currency was - was withdrawn by those "asserting to be Bahamanian (ph) customers".

And then, quite conveniently, for Mr. Bankman-Fried's counsel, he is arrested right before he was due to provide hours' worth of sworn testimony to Congress. Mr. Ray, do we have your commitment that as you continue to unravel these - these - this ball of yarn and pull on these red (ph) relative (ph) threads here, that if you find any evidence of improper collusion between Mr. Bankman-Fried and any authorities in the Bahamas or elsewhere, that you will make that known to us?

RAY: Absolutely.

AUCHINCLOSS: Thank you. And I want to close, really with comments directly to the - to the broader industry here. And I've long said that I'm neither a crypto bull nor a bear, my job as a policy maker is not to deliver new products for - or technology but rather to advance laws and regulations that protect consumers, that preserve market integrity and advance the US dollar as the world's reserve currency.

And I maintain this market and tech agnostic position. I think it's the appropriate one. We need strong and clear regulations here from Washington, but I do want to say that my patience with the crypto bulls is wearing thin. It - it's been 14 years and the American public has heard lots of promises, but it has seen lots of Ponzi schemes.

For crypto it's time to put up or shut up. it's worth noting that Ark (ph) the innovation investor, several years ago, identified five general purpose technologies of the future, DNA sequencing, artificial intelligence, robotics, energy storage and block chain.

And yet, those first four disruptive technologies have already delivered game changing innovation that affects my constituents in daily life. Block chain, has thus far, delivered white papers and podcasts about Bitcoin and dows (ph) and NFTs, Defi (ph) and more and it's all interesting, it's exciting even, but none of it has achieved product market fit at scale, and it's time for the block chain investors and entrepreneurs to build things that matter or to lose more credibility.

Madam Chair, I yield back.

WATERS: Thank you very much. Without objection, I would like to enter into the record the closing statements from Ranking Member McHenry and myself. And I'd like to thank you, Mr. John Ray the Third (ph)...

GOODEN: Chairwoman Waters...

WATERS: ... for your (ph) presence here today.

© 2022 BGOV LLC A R ghts Reserved

**Bloomberg**
**GOVERNMENT**

GOODEN: Chairwoman Waters, I've not had the opportunity to testify or to question the witness.

WATERS: I'd like to thank you for your presence (inaudible)...

GOODEN: Chairwoman Waters, parliamentary inquiry...

WATERS: Yes.

GOODEN: Are all members entitled to question witnesses?

WATERS: You are, and if you would like to miss the votes on the floor for everybody...

GOODEN: Hey, it's - it's the...

WATERS: ... just (inaudible)...

GOODEN: ... Chairwoman's prerogative to call a recess...

WATERS: ... just one moment, please...

GOODEN: ... that's your decision, not mine.

WATERS: Just one moment, please. You may go right ahead and have five minutes.

GOODEN: Thank you, Madam Chair.

WATERS: You're certainly welcome, sir.

GOODEN: Mr. Ray, earlier today, you said FTX was one of the worse bankruptcies you have handled in your 40 years of legal and restructuring experience. Under Mr. Bankman-Fried, FTX had almost no record keeping, risk management or accounting. In fact, FTX had zero accountants on their payroll.

Mr. Bankman-Fried explained to Bloomberg Business Week that FTX's accounting was done by him and in his head "I was real lazy about the mental math". The complete lack of any basic record keeping makes it difficult to track down assets and untangle this mess. Are you aware of any additional wallets that co-founders potentially have access to that contain debtor assets?

RAY: No, we're not.

GOODEN: There's also been very little attention to the banks that FTX had a relationship with. I don't know that I've heard about any questions today, but the ties between FTX and Farmington State Bank began in March when Alameda Research invested $11.5 million in the bank's parent company FBH (ph), do you have any insight or additional information as to why a small agricultural lending bank, with really no footprint in fintech or crypto has a relationship with FTX?

RAY: No, that's the subject of our inquiry and we do know (ph) obviously we made that investment.

GOODEN: Well, thank you, I appreciate that.

© 2022 BGOV LLC A Rghts Reserved



You've also stated that Alameda's business model, as a market maker required deploying funds to various third party exchanges, which are inherently unsafe and further exacerbated by the limited protections offered in certain foreign jurisdictions, to your knowledge, are any of the FTX co-founder or their family members affiliated with third party exchanges that received funds from Alameda?

RAY: We're certainly investigating that. That's going to take some time to dig through that request, but that's clearly a part of our focus.

GOODEN: Thank you, I appreciate you coming here today, and I'd like to yield the balance of my time to the Ranking Member, Mr. McHenry.

MCHENRY: I - I yield back. Thank you.

WATERS: Thank you. As I was saying before, without objection, I would like to enter into the record, the closing statements from Ranking Member McHenry and myself. I would like to thank you so very much, Mr. John Ray for the time that you have spent here today and the way that you had helped us.

And with that, I would recognize the Ranking Member for a minute.

MCHENRY: Well, thank you, Madam Chair. And first, I want to say thank you to you, Madam Chair and your team. Over the last four years as Ranking Member and Chair of this Committee, there are times we've worked together, there are times we haven't. There are times where we've agreed in public and disagreed in private and then other times we've done the opposite.

But I want to thank you for how we have attempted one another - with one another to treat digital assets and the bipartisan work we have here.

Mr. Ray, thank you for you and your team, your willingness to participate today and the forthright nature by which you've handled a hearing like this. We know there'll be ongoing conversations in the new year. The title of this hearing was part one. Part two will be next year. And as Chair of the Committee, it's my intention to continue the work of Chairwoman Waters when it comes to this matter.

We know more because of your testimony. You had somebody who's a crypto genius behind closed doors who's using QuickBooks. We know somebody who was a pretender to the technology, but was doing everything possible to obscure something that is innately a transparent product. Now, we understand why, a lot more of the why.

We wish you well in resolving these matters and look forward to continue the conversation.

Thank you, Madam Chair (ph)...

RAY (?): Thank you.

**Bloomberg**
**GOVERNMENT**

WATERS: Without objection, all members will have five legislative days within which to submit additional written questions for the witnesses to the Chair, which will be forwarded to the witnesses for their response. I ask our witnesses to please respond as promptly as you're able. Without objection, all members will have five legislative days within which to submit extraneous materials to the Chair for inclusion in the record.

The hearing is adjourned.

(UNKNOWN): Thank you.

END

Dec 13, 2022 17:35 ET .EOF

© 2022 BGOV LLC A R ghts Reserved

# Exhibit R

FILED
HIGH COURT
ANTIGUA AND BARBUDA

THE EASTERN CARIBBEAN SUPREME COURT
IN THE HIGH COURT OF JUSTICE
Antigua and Barbuda

Submitted Date:12/12/2022 11:21

Filed Date:12/12/2022 11:22

Fees Paid:22.00

Claim No. ANUHCV2022/0480

IN THE MATTER OF EMERGENT FIDELITY TECHNOLOGIES LTD

**And**

IN THE MATTER OF THE INTERNATIONAL BUSINESS CORPORATIONS ACT, CAP. 222

BETWEEN

|  |  |
|---|---|
| ANGELA BARKHOUSE AND TONI SHUKLA (AS RECEIVERS OF EMERGENT FIDELITY TECHNOLOGIES LTD) | **Respondents- Petitioners** |
| – and – | |
| EMERGENT FIDELITY TECHNOLOGIES LTD | **Respondent** |
| – and – | |
| SAMUEL BENJAMIN BANKMAN-FRIED | **Applicant-Intended Interested Party** |

## AFFIDAVIT OF SAMUEL BENJAMIN BANKMAN-FRIED

I Samuel Benjamin Bankman-Fried of 27 Veridian Corporate Center, Western Road, New Providence, Nassau, Bahamas, state as follows:

[1]   I make this affirmation on my own behalf and as the 90% shareholder in Emergent Fidelity Technologies Ltd and in support of an application that I be accorded the status of an Interested Party in this matter and that there be a stay of any proceedings in this matter pending the determination of my application in the matter of **ANUHCV2022/0456** - *Yonatan Ben Shimon v (1) Emergent Fidelity Technologies Ltd and (2) Samuel Benjamin Bankman-Fried,* in which I am the 2nd Defendant ("the *Shimon* matter").

[2]  In the *Shimon* matter the Claimant was represented by the law firm of Lake & Kentish and on 18th November 2022 obtained an order by which the petitioners in this matter (Barkhouse and Skula) assumed control of my shares in Emergent Fidelity Technologies Ltd. On the strength of that order, Barkhouse and Skula purported to pass a written resolution appointing themselves as directors of Emergent Fidelity Technologies Ltd ousting me as the sole director of Emergent Fidelity Technologies Ltd.

[3]  Barkhouse and Skula have now engaged the law firm of Lake & Kentish in the instant proceedings and have obtained an order appointing themselves (Barkhouse and Skula) as provisional liquidators of Emergent Fidelity Technologies Ltd.

[4]  I am in the process of filing an application in the *Shimon* matter for an order discharging and setting aside the order of 18th November 2022 appointing Barkhouse and Skula as receivers. A copy of my application and submissions in support of the said application (in draft) is attached as **Exhibit SBBF1 and 2**. The submissions advance my contention that Barkhouse and Skula have not been properly or lawfully appointed directors (by way of written resolution) of Emergent Fidelity Technologies Ltd and as such have cannot lawfully act as directors of Emergent Fidelity Technologies Ltd.

[5]  Clearly, if the order appointing Barkhouse and Skula as receivers is revoked then the standing of Barkhouse and Skula in this matter falls away.

[6]  In the circumstances I ask that my application be granted as prayed.

**Affirmed** at

this the 11 day of December 2022

....................................................
Notary Public/Commissioner for Oaths

...................................................
Samuel Benjamin Bankman-Fried

2

THE EASTERN CARIBBEAN SUPREME COURT
IN THE HIGH COURT OF JUSTICE
Antigua and Barbuda

**Claim No. ANUHCV2022/0480**

IN THE MATTER OF EMERGENT FIDELITY TECHNOLOGIES LTD

And

IN THE MATTER OF THE INTERNATIONAL BUSINESS CORPORATIONS ACT, CAP. 222

**BETWEEN**

ANGELA BARKHOUSE AND TONI SHUKLA (AS RECEIVERS OF EMERGENT FIDELITY TECHNOLOGIES LTD)          **Respondents- Petitioners**

– and –

EMERGENT FIDELITY TECHNOLOGIES LTD          **Respondent**

– and –

SAMUEL BENJAMIN BANKMAN-FRIED          **Applicant-Intended Interested Party**

---

**EXHIBITS**

---

Attached is the exhibits referred to in the Affidavit annexed hereto and marked **SBBF1-SBBF2**.

Dated the 11 day of December 2022

BEFORE ME:

.......................................................................
Notary Public / Commissioner of Oaths

Exhibit SBBF1 - page 1

**THE EASTERN CARIBBEAN SUPREME COURT**
**IN THE HIGH COURT OF JUSTICE**
**ANTIGUA AND BARBUDA**

**Claim No. ANUHCV2022/0456**

**IN THE MATTER OF CPR 7.7 AND 9.7**

**BETWEEN**

YONATAN BEN SHIMON          **Respondent-Claimant**

– and –

(1) EMERGENT FIDELITY TECHNOLOGIES LTD          **1st Defendant**
(2) SAMUEL BENJAMIN BANKMAN-FRIED          **Applicant-2nd Defendant**

**NOTICE OF APPLICATION**

The Applicant, Samuel Benjamin Bankman-Fried of 27 Veridian Corporate Center, Western Road, New Providence, Nassau, Bahamas, applies to this Honourable Court, without prejudice to his right to apply to stay the proceedings on forum non-conveniens ground, for the following orders pursuant to Parts 7.7 and 9.7 of the Civil Procedure Rules ('the Rules'):

1. The order of 18th November 2022 is discharged.

2. Permission to service the Claim Form on the 2nd Defendant out of the jurisdiction is set aside.

3. The Claimant pay the 2nd Defendant's costs as assessed for these proceedings.

**A draft of the Order sought is attached**.

**The grounds of the Application are**:

1. The Claimant does not have a good cause of action against either the 1st or 2nd Defendants.
2. The proceedings brought by the Claimant constitute an abuse of the process of the court in that:
   a. It is now apparent that there is no intention on the part of the Claimant of bringing the proceedings to a proper conclusion
   b. The Claimant has brought a claim which he cannot prove.

Exhibit SBBF1 - page 2

3. There is no evidence that justifies an injunction and/or the appointment of a Receiver.
4. The 2nd Defendant is not a necessary or proper party to any proceedings against the first Defendant.
5. Antigua and Barbuda is not the most suitable jurisdiction in which to try any claim that the Claimant might have.
6. The does not fall within CPR 7.3(1)(a).
7. The case is not a proper one for the Court's jurisdiction.

**The supporting affidavit of the 2nd Defendant accompanies this application**.

Dated the 12th day of December 2022

**David Dorsett, Ph.D.**
Watt, Dorsett, Hewlett Law
Attorneys-at-law for the Applicant-2nd Defendant
Kingsgate Chambers
55 Newgate Street
St. John's, Antigua
(T): 462-1351

NOTICE:

This application will be heard by                    on the              day          of
            2022 at [                ] at the High Court of Justice, Parliament Drive, St. John's, Antigua.

**If you do not attend this hearing an order may be made in your absence.**

**NB This notice of application must be served as quickly as possible on the respondent to the application.**

The court office is at Parliament Drive, St. John's, Antigua, telephone number 462-0609, FAX 462-3929. The office is open between 9:00 am and 3:00 pm Monday to Friday expect public holidays.

The Applicant's address for service is:        Watt, Dorsett, Hewlett Law
                                               Kingsgate Chambers
                                               55 Newgate Street
                                               St. John's, ANTIGUA

THE EASTERN CARIBBEAN SUPREME COURT
IN THE HIGH COURT OF JUSTICE
ANTIGUA AND BARBUDA

Claim No. ANUHCV2022/0456
BETWEEN

YONATAN BEN SHIMON                          Respondent-Claimant

– and –

(1) EMERGENT FIDELITY TECHNOLOGIES LTD                    1st Defendant
(2) SAMUEL BENJAMIN BANKMAN-FRIED      Applicant-2nd Defendant

---

NOTICE OF APPLICATION

---

David Dorsett, Ph.D.
Watt, Dorsett, Hewlett Law
Attorneys-at-law for the Applicant
Kingsgate Chambers
55 Newgate Street
St. John's, Antigua
(T): 462-1351

Exhibit SBBF2 - page 1

**THE EASTERN CARIBBEAN SUPREME COURT**
**IN THE HIGH COURT OF JUSTICE**
**ANTIGUA AND BARBUDA**

**Claim No. ANUHCV2022/0456**

**IN THE MATTER OF CPR 7.7 AND 9.7**

**BETWEEN**

<table>
<tr><td align="center">YONATAN BEN SHIMON</td><td align="right"><u>Respondent-Claimant</u></td></tr>
</table>

**– and –**

<table>
<tr><td>(1) EMERGENT FIDELITY TECHNOLOGIES LTD</td><td align="right"><u>1st Defendant</u></td></tr>
<tr><td>(2) SAMUEL BENJAMIN BANKMAN-FRIED</td><td align="right"><u>Applicant-2nd Defendant</u></td></tr>
</table>

**APPLICANT-2ND DEFENDANT'S SUBMISSIONS**

**<u>Introduction</u>**

[1]     The Defendants make these submissions, and files the application referred to below, without prejudice to their right to apply to stay the proceedings on forum non conveniens grounds. Any such application must be filed before the Defendants' time for filing a defence expires – such time (14 days for the first Defendant and 35 days for the second Defendant) has not yet commenced because the Claimant has not, to date, filed a Statement of Claim.

[2]     These submissions are filed on behalf of the Applicant in support of his application that, among other things, the freezing injunction and receivership order of this court made on 18th November 2022 is discharged and that the service on the 2nd Defendant outside of the jurisdiction is set aside.

[3]     In summary, the Applicant submits that:

(1) The Claimant does not have a good arguable case and has made no showing that the freezing injunction is necessary, and hence the freezing injunction and receivership order must be discharged and

2

(2) The Claimant fails to satisfy the test to be met for service outside the jurisdiction as stated in *Altimo Holdings and Investment Ltd v Kyrgyz Mobil Tel Ltd* [2011] UKPC 7, [2012] 1 WLR 1804 at [71] and hence service on the Applicant should be set aside.

(3) Even if the Claimant had a good arguable basis for the freezing injunction and service were proper (neither are true), the action taken by the receivers to appoint themselves as directors is wrong in law it been contrary to section 119 of the International Business Corporations Act and contrary to the Company's articles.

(4) CPR 17.4 provides that an ex parte order can only be granted for a period of 28 days. The order was granted on 18 November 2022, and therefore expires on 16 December 2022. Paragraph 3 of the order required that '*there be a further hearing date in respect of the order* within 28 days (the "Return Date") such date to be fixed by the Registrar on the application of the [Claimant]. The Claimant has failed to apply for any return date, and no date has been fixed.

(5) The conduct of the Claimant to date in not properly progressing his case coupled with the Claimant's admission that he does not know certain facts, which facts are essential to proving his claim (or intended claim), means that the present proceedings are an abuse of the process of the court and the proceedings should be struck out.

## The Claim

[4]    As stated by the Claimant in his Claim Form:

"for the reasons to be set out in a Statement of Claim to be served following this Claim Form, the following relief:

1. A declaration that the First and/or Second Defendants hold funds which the Claimant invested with FTX Trading Ltd or their traceable proceeds on trust for the Claimant;

2. Such amount as the Court may assess on the basis that funds which the Claimant invested with FTX Trading Ltd were knowingly received by

the First and/or Second Defendants in breach of trust and/or that the First and/or Second Defendants dishonestly assisted breaches of trust;

3. The taking of an account and consequential orders thereupon;

4. Damages in tort;

5. Interest;

6. Costs; and

7. Such further or other orders as the Court thinks fit."

[5]    To date, the Statement of Claim has not been served on the Applicant. In the context of non-service of the Statement of Claim the Applicant wishes to make the following points

(1)    The general rule is that a Statement of Claim must be served with a Claim Form.

(2)    CPR 8.2(1) provides that a clamant may serve a Claim Form without a Statement of Claim if the Court gives permission. CPR 8.2(6) provides that when giving such permission the Court must fix a date by which the Statement of Claim must be served. CPR 8.2(9) provides that a Clamant must serve a Statement of Claim within such period specified by the Court.

(3)    On 18th November 2022 the Court made an order (paragraph 31) requiring the Claimant to serve a Statement of Claim within 14 days. The 14 day period expired on 5th December 2022.

(4)    In breach of the order dated 18th November 2022 and in breach of CPR 8.2(9) the Claimant did not serve a Statement of Claim by 5th December 2022 and has still not served a Statement of Claim.

[6]  No doubt the failure of the Claimant to serve a Statement of Claim is indicative of the fact that the Claimant does not have any material facts to plead a claim.

[7]  The failure of the Claimant to serve a Statement of Claim and/or to apply for a Return Date for the Injunction/Receivership order suggests that the Claimant's tactics are to obtain draconian ex parte relief and then sit back without giving the Court an opportunity to consider on an inter partes basis whether such relief should

4

have been granted. CPR 8.2(9) and CPR 17.4 were intended to prevent that very tactic from being employed.  The Claimant has acted in breach of both paragraphs 3 and 31 of the order in an attempt to prevent the Court from properly considering the matter on an inter partes basis.

[8] The Claimant's claim, with utmost respect, is really a claim in the dark. At paragraph [30](iii) of his affidavit, the Claimant in language clear and plain (and not for want of candour) makes the confession:

> "… the First Defendant acquired a 7.6% shareholding in Robinhood for about US$650 million, **_possibly_**[1] using improperly diverted from those invested by me and others with FRX. _I know nothing regarding the source of the funds used to acquire the 7.6% interest in Robinhood_[2] beyond the fact that it was allegedly "working capital"._

[9]    Whilst the Claimant does not know the 1st Defendant's source of funds, the source of funds is adequately explained by the 2nd Defendant in his affidavit. The 1st Defendant's source of funds was by way of an introduction of capital to it from its two shareholders.

## The freezing injunction and receivership should be discharged

[10]    The principles pursuant to which the Court will make interlocutory orders such as injunctions and appoint receivers as set out in _American Cyanamid Co v Ethicon Ltd_ [1975] AC 396 are well known to the Court.  In brief:

(1)  Whether there is a serious question to be tried.

(2)  What would be the balance of convenience of each party should the order be granted (in other words, where does that balance lie?)

(3)  Whether there are any special factors.

[11]    The American Cyanamid principles were applied by the Privy Council in _National Commercial Bank Jamaica Ltd v Olint Corpn Ltd_ (Practice Note) [2009] UKPC 16, [2009] 1 WLR 1405 in which it was held (as stated in the headnote):

---

[1] Emphasis added
[2] Emphasis added

In deciding at the interlocutory stage whether granting or withholding an injunction is more likely to produce a just result, the basic principle is that the court should take whichever course seems likely to cause the least irremediable prejudice to one party or the other. That applies whether the injunction is prohibitory or mandatory. Among the matters which the court may take into account are the prejudice which the claimant may suffer if an injunction is not granted or which the defendant may suffer if it is, the likelihood of such prejudice actually occurring, the extent to which it may be compensated by an award of damages or enforcement of the cross-undertaking, the likelihood of either party being able to satisfy such an award, and the likelihood that the injunction will turn out to have been wrongly granted or withheld: that is to say, **the court's opinion of the relative strength of the parties' cases**[3]. Arguments over whether the injunction should be classified as prohibitive or mandatory are barren: what matters is what the practical consequences of the actual injunction are likely to be.

[12]    The Privy Council in *Convoy Collateral Ltd v Broad Idea International Ltd* [2021] UKPC 24, [2022] 2 WLR 703 held (as stated in the headnote) that there are three conjunctive conditions for the grant of a freezing injunction:

A court with equitable and/or statutory jurisdiction to grant injunctions where it is just and convenient to do so has power — and it accords with principle and good practice — to grant a freezing injunction against a respondent over whom the court has personal jurisdiction provided that: (i) the applicant has already been granted, or **has a good arguable case**[4] for being granted, a judgment or order, whether or not through the domestic courts or directly against the respondent, for the payment of a sum of money that is or will be enforceable through the process of the domestic courts; (ii) the respondent holds assets, or is liable to take steps other than in the ordinary course of business which will reduce the value of assets, against which such a judgment could be enforced; and (iii) there is a real risk that unless the freezing injunction is granted the respondent will deal with the assets, or take steps which make them less valuable, other than in the ordinary course of business with the result that the availability or value of the assets is impaired and the judgment is left unsatisfied

[13]    The failure to meet any one of the conjunctive conditions is fatal to an application for a freezing injunction.

---

[3] Emphasis added
[4] Emphasis added

6

[14]    It is respectfully submitted that the Claimant has not satisfied conditions (i) and
(iii), both of which are absolutely essential and elementary conditions to be met.
The Claimant cannot be said to have a "good arguable case" against the 2nd
Defendant (or indeed any of the Defendants) if he "*know[s] nothing regarding the
source of the funds used to acquire the 7.6% interest in Robinhood*". Moreover, the
Claimant has not made a sufficient showing that the assets will be impaired or
dissipated without the freezing injunction.

[15]    The Claimant's case, at its highest, is no more than a suspicion that the 2nd
Defendant held the Claimant's funds in trust and that the 2nd Defendant
conspired with the 1st Defendant to misappropriate those funds in breach of trust
by investing them in Robinhood. However, the Claimant cannot make a good
arguable case with respect to these allegations if he "*know[s] nothing regarding the
source of the funds used to acquire the 7.6% interest in Robinhood*". The Claimant's
case is one that inevitably is bound to fail at trial based on that evidence – but
more relevantly for the purpose of any injunction/receivership the Claimant's
own evidence – even before looking at the 2nd Defendant's evidence, clearly
establishes that he does not have a good arguable case and/or that there is no
serious issue to be tried on the Claimant's own evidence. As noted above, the
Claimant cannot even plead a Statement of Claim setting out his case – and
without seeking to be unkind – because he has no case to plead.

[16]    A freezing order has been described as a "nuclear remedy". Because it is a
"nuclear remedy" there is need for appropriate judicial restraint prior to such a
remedy being deployed. The proper purpose of a freezing order must always be
borne in mind. As stated by Andrews LJ in *Les Ambassadeurs Club Ltd v Yu* [2021]
EWCA Civ 1310, [2022] 4 WLR 1 at [14]:

> 14. The purpose of a freezing injunction is to ensure that a judgment in the
> applicant's favour will not go unsatisfied by reason of assets that would
> otherwise be available to satisfy it being dealt with in a manner that will
> make them unavailable by the time the judgment comes to be enforced. **It
> is designed to protect against the frustration of the process of the court
> by depriving the claimant of the fruits of any judgment obtained in his**

**favour. It is not intended as a safeguard against insolvency, nor as a means of providing security for a claim, however strong that claim may be and however large a sum of money may be involved** [emphasis supplied]. Nor is it just another standard means of securing enforcement of a judgment in favour of the applicant, like a charging order or third party debt order. It is a potent weapon in the armoury available for dealing with those individuals and companies who may seek to make themselves judgment-proof.

[17]    In *Les Ambassadeurs Club Ltd* it held (as stated in the headnote)

… that, when determining whether an applicant for a freezing order had shown that there was a real risk of dissipation, **the focus should be on whether, on the facts and circumstances of the particular case, the evidence adduced before the court objectively demonstrated a risk of unjustified dissipation** [emphasis supplied] which was sufficient to make it just and convenient to grant a freezing order

[18]    In *Al Assam v Tsouvelekakis* [2022] EWHC 2137 (Ch) at [174]-[176] Davis-White QC (sitting as a judge of the High Court) said:

174.    I accept and remind myself of Mr Head's submission that a freezing order is one of the law's "nuclear weapons" which should not be granted lightly, that the burden is on the applicants to satisfy the evidential threshold in relation to risk of improper or unjustified dissipation, that solid evidence, not mere inference or generalised assertion, is required, and that the question is whether there is a current risk of dissipation (*JSC Mezhdunarodniy Preomyslenniy Bank v Pugachev* [2014] EWHC 4336 (Ch) at [221]; *Bank Mellat v Nikpour* [1985] FSR 87 at p. 92; *Holyoake v Candy* [2017] EWCA Civ 92; [2018] Ch 297 at [50]; *Fundo Soberano de Angola v Jose Filomeno dos Santos* [2018] EWHC 2199 (Comm) at [86]; *National Bank Trust v Yurov* [2016] EWHC 1913 (Comm) at [70]).

175.    Further, I remind myself that the test is real risk of dissipation rather than that dissipation is "likely" (*Les Ambassadeurs Club Ltd v Yu* [2021] EWCA Civ 1310; [2022] 4 WLR 1 at [27], [34]-[36]).

176.    Finally, in this context, "dissipation" means putting assets that would otherwise be available to meet a judgment out of reach, whether by concealment or transfer. **The dealing must be improper or unjustified in the sense that they are not justified as being made for normal and/or proper business purposes** [emphasis supplied] (*Ninemia Maritime Corporation v Trave Schiffahrtsgesellschaft mbH und Co KG (The Niedersachsen)* [1983] 2 LLR 600 at p. 617; *Congentra AG v Sixteen Thirteen Maritime SA (The Nicholas M)* [2008] EWHC 1615; [2009] 1 All ER (Comm)

8

479 at [49]; *Fundo Soberano* at [86](1)).  The purpose of a freezing order is to protect against improper dealings entered into to thwart or hinder satisfaction of a judgment, not to provide the applicant with security.

[19]    What is required for the grant of a freezing injunction is "solid evidence, not mere inference or generalised assertion" of a real risk of unjustified dissipation of assets.  There is absolutely none in the instant case, and indeed there is an admission that the Claimant does not have any such evidence.

**Service should be set aside**

[20]    The Applicant has applied for an order, pursuant to CPR 7.7 and 9.7, to set aside the permission to serve the Claim Form on him out of the jurisdiction. The only ground of the application relied on by the Claimant in support of its application to serve out of the jurisdiction is CPR 7.3(2) – i.e.:

(1)    there is between the Claimant and the 1st Defendant a real issue which it is reasonable for the Court to try, <u>and</u>

(2)    the 2nd Defendant is a necessary and proper person to the claim. – see paragraph 1 of Notice of Application dated 18th November 2022 and paragraphs [6]-[10] of the Claimant's skeleton argument dated 18th November 2022.

[21]    The requirements for service out of the jurisdiction are: (i) the claimant must have a good cause of action (CPR 7.7(2)(b)); (ii) service must be permitted under the rules (CPR 7.7(2)(a)); and (iii) the case must be a proper one for the court's jurisdiction (CPR 7.7(2)(c)).

[22]    Lord Collins of Mapesbury in the Privy Council case of *Altimo Holdings and Investment Ltd v Kyrgyz Mobil Tel Ltd* [2011] UKPC 7; [2012] 1 WLR 1804 at [71] summarised these requirements in the following terms:

71. On an application for permission to serve a foreign defendant (including an additional defendant to counterclaim) out of the jurisdiction, the claimant (or counterclaimant) has to satisfy three requirements: *Seaconsar Far East Ltd. v Bank Markazi Jomhouri Islami Iran* [1994] 1 AC 438, 453-457. First, the claimant must satisfy the court that in relation to the foreign defendant there is a serious issue to be

tried on the merits, i.e. a substantial question of fact or law, or both. The current practice in England is that this is the same test as for summary judgment, namely whether there is a real (as opposed to a fanciful) prospect of success: e.g. *Carvill America Inc v Camperdown UK Ltd* [2005] EWCA Civ 645, [2005] 2 Lloyd's Rep 457, at [24]. Second, the claimant must satisfy the court that there is a good arguable case that the claim falls within one or more classes of case in which permission to serve out may be given. In this context "good arguable case" connotes that **one side has a much better argument than the other** [emphasis supplied]: see *Canada Trust Co v Stolzenberg (No 2)* [1998] 1 WLR 547, 555-7 per Waller LJ, affd [2002] 1 AC 1; *Bols Distilleries BV v Superior Yacht Services* [2006] UKPC 45, [2007] 1 WLR 12, [26]-[28]. Third, the claimant must satisfy the court that in all the circumstances the Isle of Man is clearly or distinctly the appropriate forum for the trial of the dispute, and that in all the circumstances the court ought to exercise its discretion to permit service of the proceedings out of the jurisdiction.

[23]    The Court may set aside service if the Claimant does not meet all three requirements for service out of the jurisdiction and it is the Claimant who bears the burden of proving all three requirements. This is not a burden lightly discharged, the courts having made clear that it is a "very serious question . . . whether [the] court ought to put a foreigner, who owes no allegiance here, to the inconvenience and annoyance of being brought to contest his rights in this country" and the court "ought to be exceedingly careful before it allows a writ to be served out of the jurisdiction": *Société Générale de Paris v Dreyfus Bros.* (1885) 29 Ch. D. 239, 242-243, approved by Lord Goff of Chieveley in *Spiliada Maritime Corp.* v. *Cansulex Ltd.* [1987] 1 AC 460 at 481.

*Service out of the jurisdiction is not permitted by the rules (CPR 7.7(2)(a))*

[24]    The burden is on the Claimant to satisfy the court that there is a "good arguable case" that the claim falls within one or more of the rules (or gateways) under which permission to serve out may be given: *Altimo Holdings and Investment* case, above. In this context a "good arguable case" means that

the Claimant has a much better argument than the 2nd Defendant: see *Altimo Holdings and Investment* case, above. Further, the Claimant must show that each of the claims made against the 2nd Defendant falls within one of the rules; in other words, it is not sufficient to show that one claim falls within one of the rules and seek to add other claims for which permission would not be granted: *Donohue v Armco Inc* [2001] UKHL 64, [2002] 1 All ER 749 at [21].

[25]    Evidence is critical to establishing that the domestic court should exercise jurisdiction over a foreign defendant. There must be a plausible evidential basis for getting through the jurisdictional gateway. As stated in *Goldman Sachs International v Novo Banco SA* [2018] UKSC 34, [2018] 1 WLR 3683 by Lord Sumption (with whom Lord Mance, Lord Hodge, Lady Black, and Lord Lloyd-Jones agreed):

> For the purpose of determining an issue about jurisdiction, the traditional test has been whether the claimant had "the better of the argument" on the facts going to jurisdiction. In *Brownlie v Four Seasons Holdings Inc* [2018] 1 WLR 192, para 7, this court reformulated the effect of that test as follows:
>
> "… (i) that the claimant must supply a plausible evidential basis for the application of a relevant jurisdictional gateway; (ii) that if there is an issue of fact about it, or some other reason for doubting whether it applies, the court must take a view on the material available if it can reliably do so; but (iii) the nature of the issue and the limitations of the material available at the interlocutory stage may be such that no reliable assessment can be made, in which case there is a good arguable case for the application of the gateway if there is a plausible (albeit contested) evidential basis for it."
>
> It is common ground that **the test must be satisfied on the evidence relating to the position as at the date when the proceedings were commenced** [emphasis supplied].

[26]    In fact, by his own admission, the Claimant does not have a good cause of action against the 1st Defendant (or indeed against the 2nd Defendant). The Claimant admits that he does not know what happened and that he has no evidence whatsoever to support his theory that the shares in Robinhood were acquired with the proceeds of his investment in FTX. He fails to establish that

there is a real issue to be tried, and consequently fails to establish the requirements of CPR 7.3(2)(a).  In those circumstances, the application for leave to serve out must be set aside.

[27]   Even if the Claimant did, contrary to these submissions, satisfy the requirement of CPR 7.3(2)(a), the second Defendant is not a necessary or proper party to the proceedings.  In fact the Claimant does not in reality seek any substantive relief against the second Defendant – whilst paragraph 1 of the Claim Form asserts a declaration against the 2nd Defendant, the speculative case advanced in the evidence is that the Robinhood shares are held by the 1st Defendant – no suggestion is made that those shares are held by the 2nd Defendant.  The 2nd Defendant maybe a witness in the proceedings, but there is no basis to say on the evidentiary case advanced by the Claimant that he is a necessary or proper party to the proceedings.

[28]   Moreover, Antigua does not appear to be the logical jurisdiction in which the Claimant should advance any claim that he asserts against the Defendants.  There is no evidence that any of the matters complained about by the Claimant occurred in Antigua, or that any witnesses or documents are located in Antigua.  It is not asserted that any funds passed through Antigua. Quite tellingly, **the shares that are the subject of the proceedings are shares in a US corporation**. The only connection with Antigua is the incorporation of the 1st Defendant, and that in itself is not a sufficient basis for the Court to accept jurisdiction.  The Defendants have reserved the right to bring a forum non conveniens application in the period prescribed by the CPR – which period has not yet commenced to run.

[29]   In the circumstances, the order giving permission to serve the proceedings on the second Defendant out of the jurisdiction should be set aside.

12

**Material non-disclosure**

[30] A Claimant and his Counsel are under a duty to make full and frank disclosure to the Court on any ex parte application, it being a collective duty. That duty extends to speculating about matters that a Defendant might raise by way of defence to the ex parte order and bringing those matters to the attention of the Court (see **Commercial Injunctions** at [9-0006]). Counsel must make the fullest disclosure to the Court of all matters relevant to such an application, whether or not counsel considers any such matter unimportant. He has a duty to disclose to the Court the defence to the action if he knows it, and the facts on which it is based, so that the Court can judge for itself whether they are material or not.

[31] The dicta of Baptiste JA in *Liberty Club Limited v Grenada Technical and Allied Workers Union* GDAHCVAP2013/0010 at under the caption "Material Non-disclosure" [17]-[18] is highly instructive and (it is hoped) uncontroversial:

> **Material Non-disclosure**
>
> [17] It is recognised that freezing orders can be draconian in effect. Such orders are capable of having such devastating effects that the courts place a high duty on a party seeking such an order without notice. In **The Complete Retreats Liquidating Trust v Geoffrey Logue et al**,Mr. Justice Roth stated at paragraph 23:
>
> > "The draconian remedy of a freezing order, obtained at a "without notice" hearing where the defendant subject to the order is not present to put his case, was described by Donaldson LJ as one of the law's two nuclear weapons (the other being a search order) : Bank Mellat v Nikpour [1985] FSR 87, 92. Subsequently, Jacob J referred to it as a "thermo-nuclear weapon" because its consequences can be much more devastating than a search order: Alliance Resources Plc v O'Brien (unreported, 8 December 1995). It is in that context that the duty on the applicant to make full and fair disclosure assumes such importance."
>
> In **Fourie v Le Roux and Others**, Lord Scott stated at paragraph 33 that:
>
> > "Assets of the defendant to which the claimant has no proprietary claim whatever are to be frozen so as to constitute a source from

which the claimant can hope to satisfy the money judgment that, in the substantive proceedings, he hopes to obtain. The frozen assets are removed for the time being from any beneficial use by their owner, the defendant. This is a draconian remedy and the strict rules relating to full disclosure by the claimant are recognition of the nature of the remedy and its potential for causing injustice to the defendant."

In **Memory Corporation Plc. and Another v Sidhu and Another (No.2)** Mummery LJ referred to the "high duty to make full, fair and accurate disclosure of material information to the court and to draw the court's attention to significant factual, legal and procedural aspects of the case." This passage was cited with approval by the House of Lords in **Fourie v Le Roux and Others** at paragraph 34.

[32]    Whilst the Claimant candidly admitted at paragraph 30(iii) of his affidavit that not only did he have no relevant evidence to support his claim but that he knew nothing regarding the source of funds, it does not appear from the skeleton argument relied on by the Claimant at the ex parte injunction, nor the note of the hearing prepared by Junior Counsel, that this admission was specifically drawn to the attention of the Court.

[33]    Indeed in the Claimant's ex parte Skeleton Argument at paragraph [7] it is submitted:

7.  The first requirement (a serious issue to be tried on the merits) is satisfied. The evidence establishes a good arguable case that:

(a)  Funds invested by the Applicant with FTX (of which the Second Respondent was a founder and director) have been improperly diverted to the First Respondent (of which the Second Respondent is the sole director and majority owner) in circumstances which give rise to the Applicant having a proprietary tracing claim against those funds and/or claims against the First and/or Second Respondents in knowing receipt and/or dishonest assistance; and

(b)  The First and Second Respondents conspired to perform and did perform lawful and/or unlawful acts, involving the improper diversion of funds invested by the Applicant and other investors with FTX to the First Respondent, for the predominant purpose of injuring the Applicant and other investors by expropriating those funds to the personal benefit of the Second Respondent, and thereby causing loss to the Applicant.

[34]  At paragraph [21] of the Claimant's ex parte Skeleton Argument it is submitted:

> 21. As to the first requirement (a good arguable case), this criterion is satisfied for the reasons given above in relation to the evidence establishing a serious issue to be tried.

[35]  In fact those submissions were a grotesque misrepresentation of the evidence - the evidence was at its highest that ... *the First Defendant acquired a 7.6% shareholding in Robinhood for about US$650 million,* **possibly**[5] *using improperly diverted from those invested by me and others with FRX.* **I know nothing regarding the source of the funds used to acquire the 7.6% interest in Robinhood**[6] *beyond the fact that it was allegedly "working capital".*

[36]  The duty on Counsel was not only to specifically highlight the evidence to the learned Judge, but to specially submit that such evidence came nowhere near that required to satisfy the evidential burden required for an ex parte application for an injunction/receiver. The brief comment made in paragraph 46 of the affidavit falls woefully short of what was required.

> 46. The Defendants may argue that there is an innocent explanation for the collapse of FTX and that the working capital (US$648,293,886.33) used to acquire the 56 million shares in Robinhood is unrelated to the client funds unlawfully lent to Alameda Research Ltd. This may be the case. It is too soon to tell. However, the collapse of the trading platform and the discovery that over half of its assets were unlawfully lent to a related third party subject to the control of the Second Defendant undermines any argument that there could be an innocent explanation.

[37]  The note prepared by junior Counsel reveals that **the Court's attention was not even drawn to paragraph 30(iii) of Shimon's affidavit**. What the Court was told was that there was evidence to establish a good arguable case,

---

[5] Emphasis added
[6] Emphasis added

when in fact it was accepted by the Claimant in his evidence that there was no such evidence.

### Action by the Receivers

[38]   Since the granting of the order of 18th November 2022, court appointed receivers have appointed themselves as directors of the 1st Defendant by way of a resolution in writing. Such an action is contrary to section 119 of the International Business Corporations Act which provides:

> 119. (1) Except where a written statement is submitted by a director under section 71 or an auditor under section 157 –
>
> > (a) a resolution in writing signed by **all the shareholders** [emphasis supplied] entitled to vote on that resolution at a meeting of shareholders is as valid as if it had been passed at a meeting of the shareholders; and
> >
> > (b) a resolution in writing dealing with all matters required by this Act to be dealt with at a meeting of shareholders, and signed by **all the shareholders** [emphasis supplied] entitled to vote at that meeting, satisfied all the requirements of this Act relating to meetings of shareholders.
>
> (2) A copy of every resolution referred to in subsection (1) must be kept with the minutes of the meetings of shareholders.

[39]   The action of the court-appointed receivers also is contrary to Article 12.10 of the 1st Defendant's Articles of Incorporation which provides that "Notwithstanding any of the foregoing provisions of this by-law a resolution in writing signed by **all** [emphasis supplied] of the shareholders entitled to vote on that resolution at a meeting of the shareholders is subject to section 119 of the Act as valid as if it had been passed at a meeting of the shareholders."

[40]   The court-appointed receivers have effective control of the shares owned by the 2nd Defendant. The court's order gives the Receivers control over 90% of the shares in the 1st Defendant but does not give them control over **all the shares in the 1st Defendant** and in the circumstances it is respectfully submitted that the

16

removal of the 2nd Defendant as the director of the 1st Defendant is unlawful and void.

**Abuse of process**

[41]    It is respectfully submitted that the instant proceedings brought by the Claimant constitute an abuse of the process of the court. The Privy Council in *Fuller v The Attorney General of Belize* [2011] UKPC 23, 79 WIR 173 at [5] made the point that

> 'abuse of process' is not a term that sharply defines the matter to which it relates. It can describe (i) making use of the process of the court in a manner which is improper, such as adducing false evidence or indulging 'in inordinate delay, or (ii) **using the process of the court in circumstances where it is improper to do so** [emphasis supplied], as for instance where a defendant has been brought before the court in circumstances which are an affront to the rule of law, or (iii) using the process of the court for an improper motive or purpose, such as to extradite a defendant for a political motive.

[42]    More recently the Privy Council in *Brandt v Commissioner of Police* [2021] UKPC 12, [2021] 1 WLR 3125 at [34] stated that "Abuse of process must involve something which amounts to a misuse of the process of litigation."

[43]    In *St. Kitts Nevis Anguilla National Bank Ltd v Caribbean 6/49 Ltd* SKNHCVAP2002/0006 at [35] Barrow JA stated:

> The text book examples given of abuse of process include issuing a claim after the expiry of the limitation period, bringing a private law action instead of proceedings for judicial review, **starting a case with no intention of pursuing it further, bringing a case which is known to be incapable of proof**[7], re-litigating a matter that has been decided and bringing a second action based on the same cause of action as forms the basis for proceedings in existence at the time of filing the second action.

[44]    In the instant case the Claimant having obtained – **on an urgent basis** - an order for a freezing injunction, and ordered by the court to file his Statement of Claim within 14 days has not done so and for all intents and purposes has parked the intended proceedings against the Defendants. Without the filing of the Statement of Claim the intended proceedings cannot properly get off the ground.

---

[7] Emphasis added

2277847.1

[45]    CPR 8.1(1) provides as follows:

> 8.1 (1) A claimant **starts proceedings** [emphasis supplied] by filing in the court office the original and one copy (for sealing) of –
>
> (a) the claim form; and (subject to rule 8.2)
>
> (b) the statement of claim; or
>
> (c) if any rule or practice direction so requires – an affidavit or other document.

[46]    In the instant case the Claimant has yet to properly start proceedings and yet has the benefit of a freezing injunction and other oppressive orders against the Defendants and there is no sign that the Claimant has any intention of getting on with his case. Indeed it seems more likely that he has no case to get moving on.

[47]    The Claimant has admitted "*I know nothing regarding the source of the funds used to acquire the 7.6% interest in Robinhood*[8] beyond the fact that it was allegedly "working capital*". Clearly, the Claimant is incapable of proving the case that he has brought or is intending to bring. This is a text book example of an abuse of the process of the court.

[48]    Stephens JSC in *Brandt* at [39] said:

> Generally, in the exercise of discretion, those proceedings, or those parts of proceedings, which are held to be an abuse of the court's process, should be dismissed. There may be exceptions. For instance, the party bringing the proceedings may be given the opportunity to withdraw them or the court may permit the proceedings to be amended.

[49]    In the instant case it is respectfully submitted that the only principled course open to the court in the exercise of its discretion is to strike out the instant proceedings with costs as strictly speaking there are no proper proceedings to dismiss.

## Conclusion

[50]    For all of the above reasons it is respectfully submitted that the injunctive/receivership order of 18th November 2022 should be discharged and

---

[8] Emphasis added

an order made setting aside service on the 2nd Defendant, and if the court finds

that there has been an abuse of the process the proceedings should be struck out.

Dated the 12th day of December 2022

David Dorsett, Ph.D.
Watt, Dorsett, Hewlett Law
Attorneys-at-law for the Applicant-2nd Defendant
Kingsgate Chambers
55A Newgate Street
St. John's, Antigua
(T): 462-1351

THE EASTERN CARIBBEAN SUPREME COURT
IN THE HIGH COURT OF JUSTICE
ANTIGUA AND BARBUDA

Claim No. ANUHCV2022/0456

IN THE MATTER OF CPR 7.7 AND 9.7

BETWEEN

YONATAN BEN SHIMON                    **Respondent-Claimant**

– and –

(1) EMERGENT FIDELITY TECHNOLOGIES LTD          **1st Defendant**
(2) SAMUEL BENJAMIN BANKMAN-FRIED   **Applicant-2nd Defendant**

---

**APPLICANT-2ND DEFENDANT'S
SUBMISSIONS**

---

David Dorsett, Ph.D.
Watt, Dorsett, Hewlett Law
Attorneys-at-law for the Applicant-2nd Defendant
Kingsgate Chambers
55A Newgate Street
St. John's, Antigua
(T): 462-1351

2277847.1

THE EASTERN CARIBBEAN SUPREME COURT
IN THE HIGH COURT OF JUSTICE
Antigua and Barbuda

Claim No. ANUHCV2022/0480

IN THE MATTER OF EMERGENT FIDELITY TECHNOLOGIES LTD

And

IN THE MATTER OF THE INTERNATIONAL BUSINESS CORPORATIONS ACT, CAP. 222

BETWEEN

ANGELA BARKHOUSE AND TONI SHUKLA (AS RECEIVERS OF EMERGENT FIDELITY TECHNOLOGIES LTD)

**Respondents-Petitioners**

– and –

EMERGENT FIDELITY TECHNOLOGIES LTD

**Respondent**

– and –

SAMUEL BENJAMIN BANKMAN-FRIED

**Applicant-Intended Interested Party**

## AFFIDAVIT OF SAMUEL BENJAMIN BANKMAN-FRIED

DAVID DORSETT, PH.D.
Watt, Dorsett, Hewlett Law
Attorneys-at-law for the Applicant
KINGSGATE CHAMBERS
55 Newgate Street
St. John's, Antigua
(T): 1-268-462-1351;
(E): david.dorsett@richards.ag