## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:

FTX TRADING LTD., *et al.*,

      Debtors.

---

AUSTIN ONUSZ, CEDRIC KEES VAN PUTTEN, NICHOLAS J. MARSHALL and HAMAD DAR, on behalf of themselves and all others similarly situated,

                Plaintiffs,

    v.

WEST REALM SHIRES INC., WEST REALM SHIRES SERVICES INC. (D/B/A FTX US), FTX TRADING LTD., ALAMEDA RESEARCH LLC, SAM BANKMAN-FRIED, ZIXIAO WANG, NISHAD SINGH and CAROLINE ELLISON,

                Defendants.

Chapter 11

Case No. 22-11068 (JTD)

(Jointly Administered)

Adversary Proceeding No. _____

---

## ADVERSARY COMPLAINT FOR DECLARATORY JUDGMENT AND VIOLATIONS OF COMMON LAW

## TABLE OF CONTENTS

I.      INTRODUCTION .................................................................................................1

II.     JURISDICTION AND VENUE ..........................................................................10

III.    THE PARTIES.....................................................................................................10

    A.      Plaintiffs ..................................................................................................10

    B.      Defendants ...............................................................................................11

        1.      West Realm and FTX US .............................................................11

        2.      FTX Trading.................................................................................11

        3.      The FTX Executive Defendants ...................................................12

        4.      The Alameda Defendants ..............................................................12

IV.     FACTUAL BACKGROUND ...............................................................................13

    A.      Cryptocurrency, Cryptocurrency Exchanges and Inadequate Regulation ............13

        1.      Cryptocurrency, Blockchain and Coins/Tokens...........................13

        2. Underregulated Cryptocurrencies and Cryptocurrency Exchanges...................15

        3.      The Creation of Bitcoin ...............................................................19

    B.      Defendant Bankman-Fried Co-Founds Alameda Research in November 2017....19

    C.      Several Alameda Staffers Leave in a Dispute Over Failed Internal Controls .......22

    D.      Defendant Ellison and Sam Trabucco Join Alameda .............................24

    E.      Defendants Bankman-Fried and Wang Launch FTX in May 2019.....................24

    F.      FTX Creates Its Proprietary Token – FTT – in July 2019...............................26

    G.      Binance Makes a Strategic Investment in FTX and FTT .......................27

V.      FTX'S REGULATORY DISCLOSURES AND CUSTOMER AGREEMENTS ...........27

VI.     FTX CUSTOMERS DEPOSIT MONEY AT ALAMEDA .............................29

VII.    ALAMEDA'S RISKIER STRATEGIES .........................................................30

    A.      Alameda Changes to Riskier Strategies..................................................30

    B.      Cryptocurrency's Historic Bull Market .................................................31

    C.      Alameda Used FTTs to "Borrow" Customer Funds ..............................32

VIII.   THE FTX GROUP'S AND ALAMEDA'S MASSIVE SPENDING ...............32

    A.      More Than $1.7 Billion in Loans to the FTX Executive Defendants...................33

    B.      More Than $5 Billion in Venture Investments .......................................33

    C.      Naming Rights and Promotional Spending.............................................34

IX.     BINANCE SELLS ITS STAKE IN FTX .........................................................34

X.      THE FTX GROUPS' PROPERTY PURCHASES ...........................................35

XI.     CRYPTOCURRENCY'S BEAR MARKET CAUSES INDUSTRY LIQUIDITY PROBLEMS ...........................................................................................................36

XII.    FTX AND ALAMEDA COLLAPSE REVEALING A CUSTOMER PROPERTY SHORTFALL ......................................................................................................37

        A.      CoinDesk Reports on Alameda's Alarming Balance Sheet.................................37

        B.      Binance's Announcement of Its Intent to Sell All Its FTT Tokens Causes the Price to Crash.........................................................................................39

        C.      FTX Sustains Billions in Customer Withdrawals and Halts Withdrawals ...........40

        D.      The Lack of Controls Causes Binance to Withdraw Its Offer to Save FTX Trading......................................................................................................40

        E.      Insiders Confirm that Customer Funds Were Intentionally Misappropriated .......41

XIII.   THE BANKRUPTCY OF ALAMEDA RESEARCH AND FTX – AND THE MISSING CUSTOMER PROPERTY .................................................................42

XIV.    THE REGULATORY ACTIONS AND FEDERAL CRIMINAL CHARGES ...............44

XV.     CLASS ACTION ALLEGATIONS .................................................................46

XVI.    DECLARATORY JUDGMENT CAUSES OF ACTION.................................................48

        COUNT I:  Declaratory Judgment Against FTX US and FTX Trading...........................48

        COUNT II:  Declaratory Judgment Against Alameda.......................................................51

XVII.   COMMON LAW CAUSES OF ACTION .......................................................52

        COUNT III:  Breach of Contract Against FTX US and FTX Trading .............................52

        COUNT IV:  Breach of Fiduciary Duty Against FTX US, FTX Trading and FTX Executive Defendants ............................................................................54

        COUNT V:  Negligence Against FTX US, FTX Trading and the FTX Executive Defendants ..........................................................................................55

        COUNT VI:  Conversion Against FTX US, FTX Trading and THE FTX Executive Defendants ..........................................................................................57

        COUNT VII:  Aiding and Abetting Breach of Fiduciary Duty Against Alameda and Defendant Ellison...............................................................................57

        COUNT VIII:  Aiding and Abetting Conversion Against Alameda and Defendant Ellison ................................................................................................58

XVIII.  PRAYER FOR RELIEF .................................................................................59

XIX.    JURY TRIAL DEMAND ................................................................................60

Plaintiffs Austin Onusz, Cedric Kees van Putten, Nicholas J. Marshall and Hamad Dar (together, the "Plaintiffs") bring this class action adversary proceeding (the "Adversary Proceeding" or "Adversary Complaint") under Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") 7002(2) and (9), and pursuant to Federal Rules of Civil Procedure (the "Federal Rules") Rule 23(a), 23(b)(1)(B) and (b)(3), made applicable herein by Bankruptcy Rule 7023, on their own behalf and on behalf of all others similarly situated.

The allegations in this Adversary Complaint are made on information and belief based on a review of public information, including filings by the Debtors (as defined below) in their pending bankruptcy proceedings before this Court and recent testimony before Congress.

## I.    INTRODUCTION

1.    This Adversary Proceeding arises because a closely-knit group of young executives (the "FTX Executive Defendants") who operated the second largest "cryptocurrency" electronic trading exchange, known worldwide as FTX (the "FTX Group" or "FTX"),[1] totally abdicated or ignored their duty to put in place adequate controls to protect customer property held at FTX.  As with any trading exchange, or similar financial institution, FTX was absolutely duty bound (and by contract with FTX's customers) to implement procedures to ensure that customer property was held separately for customers, whether or not regulations were in place requiring them to do so. Instead, whether caused by arrogance, ambition, avarice or vainglory, the FTX Executive Defendants failed to institute *any* corporate controls and were therefore able to cause, direct or allow the misappropriation of billions of dollars in customer funds and digital assets deposited or held worldwide at FTX.

---

[1] As set forth in Part III.B.3 below, the FTX Executive Defendants are Samuel Bankman-Fried, Zixiao "Gary" Wang and Nishad Singh.

2.      The FTX Executive Defendants' misappropriation (or outright theft) of customer property was not accidental.  Whether or not they intended to repay it, the FTX Executive Defendants – who insiders at the FTX Group confirm controlled, and were the only individuals with the access and authority to transfer, customer property – ***intentionally*** used customer property to fund: (i) obligations and losses from risky strategies employed by their intwined cryptocurrency trading firm known as Alameda Research LLC ("Alameda"); (ii) acquisitions and investments by the FTX Group and Alameda to grow their personal cryptocurrency fiefdom; and (ii) their lavish lifestyles, including through more than $1.7 billion in loans from Alameda that were never repaid.

3.      Because of the FTX Executive Defendants' breaches of customer agreements, fiduciary duties and duties of care, millions of customers of the FTX Group who deposited cash and digital assets at either or both the FTX Group's U.S.-based and non-U.S.-based trading platforms have been unable to withdraw, use or access the billions of dollars in assets that were contractually required to be held safely in accounts on their behalf (the proposed "Customer Class") since shortly before the FTX Group, Alameda, and their affiliated debtors (the "Debtors") filed these Chapter 11 cases (the "Bankruptcy Proceedings").   Even worse, according to widespread reports, up to $2 billion in customer property is missing.

4.      At its simplest, this Adversary Proceeding is necessary because the Customer Class members should not have to stand in line along with secured or general unsecured creditors in these Bankruptcy Proceedings just to share in the diminished estate assets of the FTX Group and Alameda.  Cash and assets traceable to customers, which never belonged to FTX or Alameda and do not belong to the estates, should be earmarked solely for customers, and victimized customers should likewise have priority to any other cash possessed or recovered by Debtors.

5.       Accordingly, as set forth in Part XVI below, Plaintiffs bring this Adversary Proceeding on their own behalf, and on behalf of the proposed Customer Class seeking declaratory judgments establishing that:

- Customer property currently held in accounts at "FTX US" (the FTX Group's exchange for U.S. customers) or "FTX Trading" (the exchange for non-U.S. customers, also known as "FTX.com"), or misappropriated cash and assets that are traceable as customer property, is not property of the Debtors' estates subject to distribution to non-customer creditors;

- In the alternative, if the Court determines that such customer property is in whole or part property of the Debtors' estates, the Customer Class has priority rights to repayment and/or recovery before any non-customer creditors; and

- Specifically, property held at Alameda that is property of the FTX Group's customers, or misappropriated cash and assets that are traceable as customer property, is not property of the Alameda estate subject to distribution to non-customer creditors.

6.       Aside from the primary function of this Adversary Proceeding to establish the Customer Class's rights regarding the customer property held by the Debtors (and priority to non-customer cash), as set forth in Part XVII, below, Plaintiffs also assert claims on behalf of the Customer Class claims against FTX US, FTX Trading and the FTX Executive Defendants for, variously, breach of contract, breach of fiduciary duty, negligence, and conversion, and against Alameda and its former Chief Executive Officer ("CEO") for aiding and abetting breach of fiduciary duty and conversion.  The Customer Class is entitled to damages on these claims in an amount to be determined at trial.

*                    *                    *

7.       Cryptocurrencies or "crypto" – which are digital currencies that can be transferred on a peer-to-peer basis – are comparatively new and largely unregulated assets that proponents say will revolutionize (and democratize) worldwide finance by creating currency independent from

governments and banks.  Here, the problem is that Defendant Bankman-Fried, the now infamous former co-founder and CEO of the FTX Group, and the other FTX Executive Defendants, used the cover of their celebrity and putative preeminence in the "brave new world" of underregulated cryptocurrency to disregard age-old pre-digital rules and duties: exchanges, investment firms, and their executives are simply not allowed to take funds that do not belong to them for their own purposes and are duty bound to implement company controls to protect customer property in their care.

8.      The FTX Executive Defendants took customer funds and assets anyway.  In the hours and days after the FTX Group and Alameda declared bankruptcy on November 11, 2022, customers of FTX learned that up to $2 billion in customer funds are missing and customer funds and digital assets are unavailable for withdrawal, all because the FTX Executive Defendants breached the FTX Group's contracts, their fiduciary duties, and their duties of care by causing, directing, or allowing unlawful transfers by the FTX Group to Alameda.  Such misconduct was *__in direct violation of FTX's own customer agreements and terms of service__*, as well as common law and basic principles of honesty and fair dealing.  For all the complexity of cryptocurrencies and the associated technology, it turns out to be a simple story.

9.      *First*, from 2019 to 2022, cryptocurrency traders entrusted FTX with approximately $16 billion in cash and digital assets while the FTX Executive Defendants knowingly failed to implement even basic internal controls to safeguard customer property.  *Second*, the FTX Executive Defendants exploited the lack of adequate corporate controls and the under regulation of the cryptocurrency industry to access customer property at FTX as a slush fund to allow Alameda to make increasingly risky bets on massively volatile cryptocurrencies, to engage in hundreds of crypto "venture" investments (and some non-crypto investments), and to cover losses

when a massive cryptocurrency bear market (known as a "crypto winter") occurred in 2022. *Third*, the FTX Executive Defendants also used FTX customer funds to purchase more than $250 million in real estate in the Bahamas for use by the FTX Group and Alameda insiders and caused Alameda to lend them more than $1.3 billion (presumably paid with customer funds). *Fourth*, this conduct predictably led to the failure of the FTX Group and Alameda and left FTX customers holding the bag.

10.    This failure was, while inevitable in hindsight, a shock to the cryptocurrency community because of the esteem unwisely heaped on the FTX Group, Alameda, and Defendant Bankman-Fried.  In the years preceding the November 2022 collapse of Alameda and the FTX Group, Defendant Bankman-Fried was viewed as crypto celebrity wunderkind, the FTX Group was deemed a "safe" exchange in an otherwise wild and underregulated industry, and the FTX Group's close relationship to Alameda – which would normally be troublesome – ostensibly provided the FTX Group stability by virtue of Alameda's role as a cryptocurrency market-maker. Of course, as with other recent instances in which customer and investor funds have been looted by companies – including the MF Global Inc. and Bernard L. Madoff scandals – nothing was as it appeared to be.

11.    Alameda was co-founded in late 2017 by Defendants Bankman-Fried and Gary Wang ostensibly as a "quantitative" cryptocurrency trading firm (a firm that uses mathematical and statistical models to identify and execute opportunities) and appeared to be a wild success – the investment fund purportedly had more than $14 billion in assets less than 5 years later. However, Defendant Bankman-Fried has since admitted in interviews that he knew nothing about cryptocurrency and Alameda was founded merely to engage in simple cryptocurrency arbitrage to take advantage of price differences in the U.S. and Asia.

12.     Moreover, by 2018, when Defendant Caroline Ellison joined Alameda as a trader – after being a trader on Wall Street (like Defendant Bankman-Fried) for only a few years – the cryptocurrency arbitrage on which Alameda was founded had dried up as worldwide prices normalized.  Alameda moved toward riskier strategies, such as taking long positions on volatile cryptocurrencies and "yield farming" – the dangerous process of lending or staking cryptocurrencies to "start-ups" to generate massive returns.  Alameda also made hundreds of venture investments – including in cryptocurrency issuers, exchanges, and "tokens" that propped up the industry.

13.     Significantly, Alameda was not engaging in these risky strategies using its own balance sheet, but rather was unlawfully using customer property and loans.  In addition to using customer funds intended for the FTX Group that were sent directly to Alameda, Alameda was "borrowing" customer property and taking out other loans and sometimes using a proprietary "token" (a type of cryptocurrency) created by the FTX Group as collateral for such customer "loans" and for loans from other counterparties.  The FTX Group's tokens – known as "FTT" – could be purchased by FTX Group users to receive discounts and other rewards on the exchange.  FTT was an "asset" essentially created from thin air by FTX that Alameda that FTX used as if it were a hard asset.  And Alameda's balance sheet was infected with overvalued FTT.   Indeed, in November 2022, it was revealed that, as of June 30, 2022, Alameda held more than $5.8 billion "worth" of FTT among its purported $14 billion in assets.

14.     According to recent Congressional testimony by the FTX Group's new CEO, the interrelationship between the FTX Group and Alameda was intentionally set up and maintained to allow Alameda to freely use customer property for highly leveraged trades, without controls placed on other traders (customers) such as the normal "auto-liquidation" procedures that would have

cause the FTX Group to sell Alameda's collateral to cover trading losses that exceeded the value in its accounts:

> In the basic concept is that Alameda was able to borrow on an unlimited basis, or transfer. I'm not sure I could call describe it, you know, borrowing is almost a technical term. So, transfer of assets, borrowing of assets on an unlimited basis, which then that allowed -- was allowed to take massive positions with other people's money. And because they had no auto liquidation feature. Ultimately, those losses could exceed the value of, you know, of that account. So that's essentially what happened in a nutshell.

15.     Unfortunately for Alameda (and customers), the bill for its reckless bets on cryptocurrency, start-ups, the tokens those start-ups issued, and yield farming, came due in 2022 as the crypto winter arrived.  In 2022 alone, cryptocurrencies lost $2 trillion in value from the height of the massive bull market in 2021 that drove Alameda's "success."  For example, the most well-know and prominent cryptocurrency – Bitcoin – lost 70% of its value from its all-time high price November 2021 and many "altcoins" (the terms for all cryptocurrencies other than Bitcoin) lost all their value.

16.     Whether now characterized as misappropriation, misuse, conversion, or outright theft, the FTX Executive Defendants intentionally caused, directed, or allowed customer funds to be used to cover Alameda's losses.  Instead of complying with the FTX Group's own agreements to protect customer property, Defendants did the opposite and used it to cover losses to hide what was happening at Alameda.  Even worse, it was not a mistake – Defendants **knew** they were misappropriating customer assets.

17.     Indeed, Defendant Ellison, the 28-year-old former Chief Executive Officer of Alameda, has admitted that the FTX Executive Defendants intentionally directed customer funds to Alameda to cover massive shortfalls.  Once again, this was made possible in part by the fact that the FTX Group had failed to institute any internal controls to safeguard the approximately $16

billion worth of customer assets.  The lack of internal controls was particularly egregious – and opportunistic – because the FTX Group was not subject to the normal types of regulation covering financial institutions that handle customer property that would have protected customers.

18.    The FTX Executive Defendants' decision to delay the collapse of Alameda by looting the FTX Group's customer deposits to cover Alameda's obligations and losses – and to fund loans to FTX Executive Defendants – ultimately caused the FTX Group's collapse in a matter of days.  In fact, days after Alameda's troublesome balance sheet – and position in FTT tokens – became public on November 2, 2022 and a former strategic investor in the FTX Group announced it was selling $2.1 billion "worth" of FTT tokens, alarmed customers sought to withdraw approximately $6 billion in 72 hours.  Unable to satisfy the withdrawal requests for customers' (now missing) property from what should have been segregated customer accounts, the FTX Group "paused" withdrawals.  What has been incorrectly described as a "run on the bank" was, in reality, a failure brought about because the FTX Executive Defendants stole customer funds that consequently were unavailable to cover withdrawals.

19.    The defalcation of customer funds also prevented the FTX Group from rescue. After the massive customer withdrawals on November 8, 2022, the former strategic investor (and rival) offered to buy the FTX Group's non-U.S. business.  However, the next day, the buyer announced it was walking away from the transaction because, following due diligence, it recognized the FTX Group's massive problems regarding customer property.  After unsuccessfully scrambling for cash from other potential investors, overnight on November 10, 2022, Defendant Bankman-Fried resigned as CEO.  The other FTX Executive Defendants – Defendants Wang and Singh – resigned their positions shortly thereafter.

20.     Defendant Bankman-Fried was replaced as CEO by John J. Ray III, who in his first official act authorized 134 of the entities that comprised the FTX Group and Alameda (the "Debtors" to commence their Chapter 11 cases on November 11, 2022 (the "Bankruptcy Proceedings").  In his declaration in support of Debtors' first day pleadings, Mr. Ray noted his "over 40 years of legal and restructuring experience" and service as "the Chief Restructuring Officer or Chief Executive Officer in several of the largest corporate failures in history" – including Enron Corp. – while describing the failures at the Debtors as like nothing he has ever seen:

> Never in my career have I seen such a complete failure of corporate controls and such a complete absence of trustworthy financial information as occurred here. From compromised systems integrity and faulty regulatory oversight abroad, to the concentration of control in the hands of a very small group of inexperienced, unsophisticated and potentially compromised individuals, this situation is unprecedented.[2]

21.     On December 12, 2022, Bahamian authorities arrested Defendant Bankman-Fried at the request of the U.S. government, based on an indictment charging him with wire fraud and conspiracy arising from his scheme to loot customer property.  On December 13, 2022, the Securities and Exchange Commission ("SEC") and Commodities Futures Trading Commission ("CFTC") sued Defendant Bankman-Fried for fraud.  The CFTC also sued the FTX Group and Alameda.

22.     On December 20, 2022, Defendants Wang and Ellison pleaded guilty to federal wire fraud and conspiracy charges.

---

[2] *Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings*, No. 22-11068(JTD), D. I. No. 24 (Bankr. D. Del.)

## II.   JURISDICTION AND VENUE

23.    This Court has jurisdiction over this Adversary Proceeding under 28 U.S.C. §§ 157 and 1334.

24.    This Adversary Proceeding is a core proceeding pursuant to pursuant to 28 U.S.C. § 157(b)(2)(A), (B) and (E) and Rule 7001 of the Federal Rules of Bankruptcy Procedure.

25.    Venue in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

26.    This Adversary Proceeding arises in and relates to the Debtors' Bankruptcy Proceedings.

27.    This Adversary Proceeding presents both "core" and "non-core" proceedings under 28 U.S.C. § 157(b).

28.    The Plaintiffs seek and are entitled to declaratory and other relief pursuant to 28 U.S.C. §§ 2201, *et seq*.

## III.   THE PARTIES

### A.   Plaintiffs

29.    Austin Onusz, an individual, is a citizen of the United States residing in California.

30.    Cedric Kees van Putten, an individual, is a citizen of the Netherlands residing in the Netherlands.

31.    Nicholas J. Marshall, an individual, is a citizen and resident of the United Kingdom.

32.    Hamad Dar, an individual, is a citizen and resident of Turkey.

33.    Plaintiffs Messrs. Onusz, van Putten, Marshall and Dar deposited and held property in the form of cash and Digital Assets at the FTX Group for the purposes of transacting in cryptocurrency and have been unable to withdraw, use or otherwise access their customer property and bring this action collectively on behalf of themselves and on behalf of the proposed Customer

Class.  Plaintiffs are a representative sample of customers of FTX Group who have suffered injuries-in-fact due to the Defendants' conduct alleged herein, and thus will effectively and adequately represent the Customer Class with respect to the issues set forth in this Adversary Complaint.

### B.    Defendants

#### 1.    West Realm and FTX US

34.    Debtor West Realm Shires Inc. ("West Realm"), a corporation organized under the laws of the State of Delaware with its principal place of business in Illinois, at all relevant times owned 100% of West Realm Services Inc. (d/b/a FTX US).

35.    Debtor West Realm Services Inc. (d/b/a FTX US) ("FTX US" or "West Realm Services"), a corporation organized under the laws of the State of Delaware with its principal place of business in Chicago, Illinois, provides a platform and exchange for U.S. users to trade cryptocurrency.  FTX US accounted for approximately 5% of the FTX Group's revenue, which exceeded $1.02 billion in 2021.

36.    West Realm and FTX US, together with its U.S. debtor subsidiaries, filed for bankruptcy protection on November 11, 2022.

#### 2.    FTX Trading

37.    FTX Trading Ltd. ("FTX Trading"), a corporation organized under the laws of Antigua with its principal places of business in Antigua and Barbuda, and its headquarters in the Bahamas, conducts business under the trade name "FTX.com" and provides a platform and exchange for non-U.S. users to trade cryptocurrency and other "Digital Assets."[3]

---

[3] As set forth below, FTX.com permitted non-U.S. customers to engage in much broader transactions. FTX.com's Terms of Service defined "Digital Assets" to include "[Bitcoin, Ethereum], FTT and any other digital asset, cryptocurrency, virtual currency, token, leveraged token, stablecoin, tokenised stock, volatility

38.     FTX Trading and its debtor subsidiaries filed for bankruptcy protection on November 11, 2022.

### 3.  The FTX Executive Defendants

39.     Samuel Bankman-Fried, an individual, is a citizen of the United States who, before his recent arrest, resided in the Bahamas.  Defendant Bankman-Fried is the co-founder and former CEO of the FTX Group.  Defendant Bankman-Fried directly owns approximately 53% of West Realm; indirectly approximately 75% of FTX Trading; and directly approximately 90% of Alameda.  Defendant Bankman-Fried resigned as CEO of FTX on November 10, 2022.

40.     Zixiao "Gary" Wang, an individual, is a citizen of the United States residing in the Bahamas.  Defendant Wang is the co-founder and former Chief Technology Officer of the FTX Group.  Defendant Wang owns 16% of the FTX Group and 10% of Alameda.  Defendant Wang left the FTX Group on or about November 15, 2022.

41.     Nishad Singh, an individual, is a citizen of the United States residing in the Bahamas.  Defendant Singh joined Alameda in December 2017 and became Director of Engineering at the FTX Group in April 2019.  Defendant Singh left the FTX Group on or about November 15, 2022.

42.     Defendants Bankman-Fried, Wang, and Singh are the "FTX Executive Defendants."

### 4.  The Alameda Defendants

43.     Alameda Research LLC, a limited liability company organized under the laws of the State of Delaware with its principal place of business in Dover, Delaware, that operated in

---

token, tokenised futures contract, tokenised option or other tokenised derivatives product that is supported by and made available from time to time to transact in using the Platform."

Hong Kong and the Bahamas, was an investment firm.  Alameda and its Debtor subsidiaries filed for bankruptcy protection on November 11, 2022.

44.     Caroline Ellison, an individual, is a citizen of the United States residing in the Bahamas.  Defendant Ellison joined Alameda in 2018, became co-CEO in 2021, and sole CEO in August 2022.

45.     Defendants Alameda and Ellison are the "<u>Alameda Defendants</u>."

46.     Defendants Bankman-Fried, Wang, Singh and Ellison are the "<u>Individual Defendants</u>."

## IV.    FACTUAL BACKGROUND

### A.    Cryptocurrency, Cryptocurrency Exchanges and Inadequate Regulation

#### 1.  Cryptocurrency, Blockchain and Coins/Tokens

47.     Cryptocurrency or crypto is decentralized digital currency that can be transferred on a peer-to-peer network rather than requiring facilitation from a financial institution.  Instead of being physical, government issued currency (fiat currency) that can be carried around and exchanged, transactions involving cryptocurrency exist purely as digital entries to an online database or ledger.  These peer-to-peer transactions are placed in "blocks" for verification.  Once transactions are verified as legitimate through one of several accepted processes (such as, as discussed below, "proof of work" verification), the blocks are then recorded in public ledger – known as a "blockchain" – that is unique to that cryptocurrency.

48.     The native cryptocurrency on an individual blockchain is referred to as a "coin." Although often used interchangeably, "coins" and "tokens" are different concepts in cryptocurrency with unique characteristics.  *First*, coins operate on an independent blockchain specifically created to launch and record transactions for that coin.  Because it requires building a blockchain, creating and launching a coin is difficult and labor intensive.  By contrast, tokens

operate on top of existing blockchains and require less expertise or expense to launch. In this regard, tokens can be created by an issuer "out of thin air." The FTT proprietary cryptocurrency created by the FTX Group as discussed herein were tokens.

49.     *Second*, coins are intended to function as digital money with purchasing power and therefore endeavor to have the attributes of more traditional currency: scarcity, durability, and inherent value. Tokens, by contrast, can be created by an issuer for a variety of reasons to represent a variety of assets or services. For example, the FTX Group's proprietary token FTT was the basis of an elaborate, rewards-based marketing scheme to attract users to the FTX Group. For example, customers who bought FTT were able to execute trades on the FTX Group's exchanges at a discount. Crucially, FTT could also be used as collateral. Indeed, as discussed below, Alameda and the FTX Group were secretly using FTT as collateral to "borrow" customer property and take out other loans to use in trading and/or covering losing trades.

50.     *Third*, new coins are issued by "mining" – which involves "miners" solving complex math problems to validate transactions and be rewarded with freshly minted coins. Specifically, the process uses sophisticated hardware to compute extremely complex math problems. The first computer to find the solution to the problems receives the next block of coins and the process begins again. This verification process is known as "proof of work." Tokens, by contrast, are created and distributed at the issuers' discretion – and are thus much easier to create and acquire – and lack intrinsic value.

51.     The decentralized nature and lack of affiliation with any government, as well as the ease with which some are created and issued (along with under regulation), subject cryptocurrencies to unusual volatility based upon the impulses of the market and cause massive gains and losses to investors.

52.     Cryptocurrency (coins or tokens) are stored in digital "wallets."  Digital wallets are applications that store the passkeys – private codes – used by owners to engage in cryptocurrency transactions and provide the interface that lets owners access their cryptocurrency.  There are three types of digital wallets.  A "hardware wallet" is the most secure because the cryptocurrency owner is in possession of a hardware device that is disconnected from the blockchain but can be plugged into a computer via USB or via Bluetooth on a mobile device to access the blockchain of choice.   A "software wallet" is similarly disconnected, except the wallet that can be plugged in to access the blockchain is kept in software rather than hardware.  A "custodial wallet" is typically held by crypto exchanges (such as FTX US and FTX.com).  These custodial wallets are owned by the customer; however, the exchange or custodian is the one that controls the passkeys.

53.     The FTX Group's act of holding billions in customer cryptocurrencies in custodial wallets and cash in custodial accounts is what allowed the FTX Defendants to misuse, misappropriate, or convert customer property for use by Alameda.  Likewise, the FTX Group's creation of FTT allowed Alameda to make hugely leveraged trades with the FTX Group's customer funds.

54.     Cryptocurrencies are big business.  As of December 2022, there are more than 9,000 active cryptocurrencies, used/traded by more than 300 million people worldwide, with a market-cap exceeding $830 billion.

## 2. Underregulated Cryptocurrencies and Cryptocurrency Exchanges

55.     As stated, one of the most prominent features of cryptocurrencies is that they are not issued by any government and do not rely on financial institutions to facilitate or verify transactions.   Moreover, cryptocurrencies, for the massive value they represent, are a comparatively new financial asset.  For these reasons, cryptocurrencies, and the exchanges on which they are traded, are vastly underregulated compared to, for example, securities traded

through broker-dealers on the New York Stock Exchange or commodities traded through the CME Group Inc.

56.     There are currently two types of exchanges in which investors can trade cryptocurrencies.  The first, and most relevant to the collapse of the FTX Group, are "centralized exchanges" that allow trading/swapping in cryptocurrencies and allow selling/trading cryptocurrencies back into fiat currencies (such as U.S. dollars).  These include U.S.-based and non-U.S. based exchanges.  Companies such as Coinbase Global, Inc. ("Coinbase"), which became a public company in April 2021, and Gemini Trust Company, LLC ("Gemini"), which was forced to freeze $700 million in Customer withdrawals due to its exposure to the FTX Group, are U.S.-based exchanges that attempt to comply with domestic regulatory frameworks, even though such regulations are ill-suited to cryptocurrency (as discussed below).  These companies offer a more limited set of products and services, such as spot-market trades of a select list of cryptocurrencies.  FTX US is such a company.  These companies are permitted to provide services to U.S.-based customers.

57.     By contrast, large well-known companies like BitMEX, a Seychelles-incorporated, Hong Kong-based company, and Binance, originally a Chinese company most recently registered in the Cayman Islands (2017) and Seychelles (2019), serve non-U.S. Customers.  In addition to spot market trading, the non-U.S. exchanges offer more risky and wide-ranging products such as cryptocurrency futures, swaps, and other derivatives.  Such companies, which are more lucrative than their U.S. counterparts, also let traders – including less sophisticated retail traders – trade these complicated cryptocurrency products on high margin.  These non-U.S. companies are

typically subject to the regulations, or lack thereof, of their country of residence.[4]  FTX Trading is one of these non-U.S. based companies which, as reflected in its definition of Digital Assets, (*see* footnote 3 above), offers customers a myriad of complex products that can be traded.

58.    Although they typically face more regulation in the U.S. versus overseas, cryptocurrency and U.S.-based cryptocurrency businesses/exchanges, including Coinbase and FTX US, remain underregulated in the U.S. compared to traditional securities and commodities, and the exchanges on which they trade.  Indeed, instead of federal regulations, cryptocurrency exchanges are subject to state-by-state regulations covering "money transmitters" (such as Western Union and PayPal).[5]

59.    Each state (except Montana) has its own set of money transmitter laws, which often differ wildly in degree of regulation.  For example, New York State is not "crypto-friendly."  For any New York resident to transact on an exchange, that exchange must have a BitLicense issued by the New York State Department of Financial Services, which is very difficult and expensive to get.  By contrast, Wyoming and Florida are more friendly – both have exempted crypto businesses from money transmission licenses.

60.    Whatever the various state regulations provide, the protections afforded by money transmitter laws are particularly inadequate for cryptocurrency exchanges.  Most prominently, they involve insufficient protection of customer funds.   Exchanges like FTX US and Coinbase that offer brokerage services and liquid marketplaces for trading often store significant customer assets

---

[4] Through the use of a Virtual Private Network ("VPN"), U.S.-based investors often circumvent location blocking to access non-U.S. exchanges.

[5] Money transmitter regulations originated in the early 1900s with so-called "immigrant banks."  To protect immigrants from fraudsters, states began to impose licensing requirements on money transmission agents that would collect funds from local immigrant communities and forward it by steamship to their families in Europe and elsewhere.

for long periods (in contrast to the short period to transmit such property).  Without corresponding protections these customer funds are at risk.

61.     The custody of customer funds is why brokerages and exchanges are typically the domain of significant federal agencies like the SEC and the CFTC, which have far stricter rules around custody of customer property.[6]  Indeed, SEC Chairman Gary Gensler has been an advocate of stricter regulation that would recognize cryptocurrencies as securities.  In April 2022, he opined that "the platforms themselves [should be] registered and regulated much like exchanges. . . . These crypto platforms play roles similar to those of traditional regulated exchanges. Thus, investors should be protected in the same way."

62.     In this context, where it was well-known that regulations did not provide protection of customers, it was incumbent on the FTX Executive Defendants to ensure the FTX Group – which was handling billions in customer property – to institute company safeguards and procedures consistent with their fiduciary duty and duty of care.

63.     The second type of Cryptocurrency exchanges are "decentralized exchanges" (a/k/a "DEXs").  DEXs use customer liquidity pools, which are basically funded by investors who deposit their crypto assets into a pool.  In turn they earn a yield from the transaction fees charged to users.  DEXs play an integral role in the world of Decentralized Finance ("DeFi").  The world of DeFi is typically controlled and enforced by smart contracts – self-executing contracts where terms of the agreement are directly written into lines of code.  DEXs are totally unregulated and when transacting in DeFi there are zero restrictions.

64.     DeFi is also where crypto owners engage in "yield farming" as discussed below.

---

[6] For these reasons, the bankruptcy status of FTX US stands in sharp contrast to those parts of the FTX US companies that are regulated by the SEC and CFTC, and remain solvent.

### 3.   The Creation of Bitcoin

65.     Bitcoin was the first cryptocurrency and remains the most prominent, popular, and valuable (and ultimately led to the creation of Alameda).  Bitcoin was created in 2009 by an anonymous developer (or group of developers).  Like other cryptocurrencies, Bitcoin are generated, traded, and stored using a blockchain.  The transactions on the Bitcoin blockchain are validated by a "proof-of-work" consensus – the process of solving complex math problems – which, as stated, is also the process through which "miners" are awarded new Bitcoins.

66.     Bitcoin first became available to buy, sell and trade on online exchanges in 2010. In April 2011, the price of Bitcoin crossed the $1 threshold for the first time.  While it has been very volatile, the price of Bitcoin overtime has risen meteorically.  Bitcoin reached $1,000 per coin in November 2013.  By late 2017, when Defendant Bankman-Fried began trading Bitcoin, the price was on another massive upswing.  Prices hit $10,000 per coin for the first time in November 2017 and reached about $20,000 in December 2017.

67.     Bitcoin's market-cap exceeded $134 billion in December 2017.  Other well-known Cryptocurrencies such as Litecoin (which began trading in 2011) and Ethereum (which began trading in 2015) had market-caps exceeding $3 billion and $16 billion, respectively, by December 2017.  Bitcoin's current market cap exceeds $330 billion.

### B.   Defendant Bankman-Fried Co-Founds Alameda Research in November 2017

68.     The meteoric rise and catastrophic collapse of the FTX Group, and resulting billions of dollars in misused, misappropriated, or converted Customer Property, was set in motion by Defendant Bankman-Fried's co-founding of Alameda in late-2017.  Alameda was founded to capitalize on the spreads between Bitcoin prices in the U.S. and Asia.  While purportedly a "quantitative" trading firm (firms that use mathematical models and data to inform decisions) focusing on cryptocurrencies, Alameda was in fact a firm – run by arrogant and inexperienced

management and traders unable or unwilling to create proper internal controls – that employed risky strategies and made huge bets that cryptocurrency prices would continue to increase.

69.     Defendant Bankman-Fried graduated from Massachusetts Institute of Technology ("MIT") in 2014 with a degree in Physics.  Defendant Wang, who graduated in 2015 with degrees in Mathematics and Computer Science, was Defendant Bankman-Fried's roommate at MIT.

70.     Following graduation, Defendant Bankman-Fried worked at Jane Street Capital LLC ("Jane Street") as a trader specializing in exchange-traded funds ("ETFs").  Jane Street is a preeminent global proprietary quantitative trading giant known for its comprehensive focus on risk and risk controls.  Among Defendant Bankman-Fried's colleagues at Jane Street was Defendant Ellison.

71.     After a few years, in 2017, Defendant Bankman-Fried left Jane Street, believing he could make more money elsewhere.  Ultimately, Defendant Bankman-Fried's search caused him to stumble upon cryptocurrency.  Indeed, in an interview with Yahoo, Defendant Bankman-Fried claimed to have decided on cryptocurrency from the "bunch of things that seemed like maybe very high upside," explaining that "[t]here was huge demand, huge volatility, huge inflows, huge price appreciation, huge amounts of attention and interest—and the infrastructure wasn't there." Specifically, Defendant Bankman-Fried noticed the wildly different prices of Bitcoin on exchanges around the world and the potential for arbitraging those price discrepancies.

72.     Today, Bitcoin prices are uniform (or very close) across all exchanges.  However, in late 2017, Defendant Bankman-Fried purportedly saw huge differences in the value of Bitcoin on various exchanges.  The opportunity for arbitrage was especially compelling in Asia, where massive profits could be realized by buying Bitcoin cheaply in the U.S. and selling it expensively in Japan and South Korea.

73.     In October 2017, after leaving Jane Street, Defendant Bankman-Fried was working as director of development at the Centre for Effective Altruism ("CEA") – a charity focusing on "using evidence and reason to figure out how to benefit others as much as possible."  According to Defendant Bankman-Fried, during that time he "was trading all night and, in theory, working all day" and, "after a month or two" he quit the CEA to focus on Cryptocurrency trading.

74.     Defendant Bankman-Fried has admitted that these first investments in cryptocurrency were made with no expertise in cryptocurrency or knowledge about the underlying blockchain technology.   Indeed, in a May 2022 article in the *Financial Times*, Defendant Bankman-Fried admitted that: "I first got involved with no f*&%ing clue what a blockchain was, I was just doing arbitrage."

75.     Nevertheless, without any expertise, Defendant Bankman-Fried's trading quickly generated millions of dollars and, in November 2017, he co-founded Alameda with Defendant Wang (who was then at Google), and Tara Mac Aulay (a one-time Chief Executive Officer of CEA with no trading experience), to take advantage of the (as he has described it) "free money" available from the Japan arbitrage strategy, and to a lesser extent, a similar strategy in South Korea.

76.     Alameda began in a three-bedroom apartment in Berkeley, California, with the downstairs serving as its office.  Defendant Bankman-Fried named the company after the county in which Berkeley is located and, as he has acknowledged, added "Research" for an air of legitimacy because "[i]f you named your company like 'We Do Cryptocurrency Bitcoin Arbitrage Multinational Stuff,' no one's going to give you a bank account."  However, "everyone wants a Research Institute."  The firm initially managed a few million dollars from a mix of the employees' own funds and high-interest cryptocurrency loans from wealthy investors.

77.     In addition to Defendants Bankman-Fried and Wang, and Ms. Mac Aulay, early Alameda employees included Defendant Singh.  Defendant Singh – who was best friends with Defendant Bankman-Fried's brother in high school – graduated in 2017 with a Bachelor of Science (BS) in Electrical Engineering and Computer Science Engineering from the University of California, Berkeley.  Following five months working on applied machine learning at Facebook, Defendant Singh joined Alameda as Director of Engineering.

78.     By December 2017, Alameda Research was successfully capitalizing on the persistent but hard to exploit price differences between cryptocurrencies (mainly Bitcoin) in the U.S. and in Japan, where Bitcoin traded at a roughly 10-20% premium.  Alameda Research had purportedly generated as much as $1 million in profit per day from the strategy.

79.     However, as more sophisticated investors joined the cryptocurrency arbitrage space, by January 2018 the price discrepancy in the U.S. and Japan of Bitcoin and other cryptocurrencies decreased and the strategy became less profitable to Alameda. Accordingly, as discussed below, Alameda expanded to trading more broadly across the entire cryptocurrency domain and moved its headquarters from California to Hong Kong due to the difficulty of establishing and maintaining relationships with banks in the U.S. as a cryptocurrency trading firm.

### C.     Several Alameda Staffers Leave in a Dispute Over Failed Internal Controls

80.     Despite his time at Jane Street, a firm known for its obsession with risk and controlling risk, Defendant Bankman-Fried did not create internal controls at Alameda and, indeed, seemed to actively object to any controls that may have restricted his activities.

81.     By early 2018, colleagues at Alameda – including Ms. Mac Aulay – proposed setting up rigorous structures and systems for risk, compliance, and accounting based on concerns about the company's poor approach in these areas.  According to the *Wall Street Journal*, Defendant Bankman-Fried was placing huge bets on cryptocurrencies while largely disregarding

the risk of those trades and staffers believed Alameda needed to do a better job tracking its trading to properly account for its gains and losses.

82.     Staffers also had concerns about how the firm's trading capital was commingled with money dedicated to run the firm.  That made it harder to track Alameda's performance and its operating expenses.  Defendant Bankman-Fried was reportedly dismissive of the idea of increased controls, stating that controls could limit Alameda's activity and potential profit. According to a former software engineer, Defendant Bankman-Fried "didn't want to feel constrained . . . But as a result we ended up not really knowing how much money we even had."

83.     By early 2018, Defendant Bankman-Fried had placed a series of big bets, including one on the price of Ethereum.  Alameda had made solid profits with the Bitcoin arbitrage but suffered losses from other wagers betting on price moves.  According to 2018 documents written by Defendant Bankman-Fried, he acknowledged that Alameda's lack of accounting and risk controls led to trading losses.  "No one was ultimately making sure that our trading and accounting were OK.  We did a lot of sloppy trades, many of which some people were at the time worried about."  Defendant Bankman-Fried conceded that the issues helped precipitate "a number of clashes" at the firm.  According to one early venture capital investor who described "red flags" at Alameda, "[a] few months before we met Sam, Alameda lost north of $10M - a huge amount of their assets - on 'trade errors.' We could never figure out if this was due to fraud, incompetence, or a well-meaning mistake."

84.     Following the losses, in April 2018, Ms. Mac Aulay and other staffers quit, leaving Alameda with only about a dozen less-experienced employees.  While Defendant Bankman-Fried told the *Wall Street Journal* that these staffers left because of personal disputes and lack of

productivity, Ms. Mac Aulay tweeted on November 16 that "I and a group of others all quit, in part because of concerns over risk management and business ethics."

### D. Defendant Ellison and Sam Trabucco Join Alameda

85.     After graduating from Stanford in 2016 with a B.S. in Mathematics, Defendant Ellison went to work at Jane Street as a junior trader.  After less than two years trading equities at Jane Street, in March 2018 Defendant Ellison joined Alameda.   Defendant Ellison has acknowledged she was a comparatively inexperienced trader – and lacked knowledge about aspects of crypto – but that most of Alameda Research's traders were less experienced than she was: "I was like a trader for . . . not that long at Jane Street but a year and a half, which was kind of more trading experience than a lot of Alameda traders had at the time. I kind of wanted to come in and be like an expert on everything, but there was still lots of stuff in the crypto world that I knew nothing about."

86.     Sam Trabucco graduated from MIT – where he was friends with Defendant Bankman-Fried and Wang – in 2015 with degrees in Mathematics and Computer Science.   After graduation, Defendant Trabucco went to work for Susquehanna International Group ("SIG") as a trader on SIG's bond ETF desk for approximately two years.  In March 2019, Defendant Trabucco left SIG and joined Alameda as a trader.  At the time, like Defendant Ellison, Defendant Trabucco did not have any experience trading cryptocurrencies.

### E. Defendants Bankman-Fried and Wang Launch FTX in May 2019

87.     In late 2018, the team at Alameda had grown frustrated about the inefficiencies in cryptocurrency exchanges and Defendant Bankman-Fried believed they could do better. According to Defendant Bankman-Fried, while attending meetings in Hong Kong, he received encouragement from large players in cryptocurrency.  He summoned Defendant Wang to Hong Kong, and they went to work creating the FTX Group.

88.     The decision was controversial at Alameda.  According to Defendant Singh, Alameda Research was "hugely understaffed" and its best trader and best engineer, Defendants Bankman-Fried and Wang, leaving for Hong Kong to develop the new project was risky.

89.     But the idea for the FTX Group served another function beyond creating an innovative exchange.  Defendants Bankman-Fried thought the FTX Group could generate revenue to fund Alameda's activities.  As more sophisticated investors engaged in cryptocurrency arbitrage, the opportunities to exploit market efficiencies had decreased.  Despite marketing materials offering investors and lenders "high returns with no risk" and "no downside," finding investors and dependable lenders was difficult since banks and traditional Wall Street firms largely shunned crypto because of the lack of regulation and oversight.

90.     In late 2018, Alameda relocated from Berkeley to Hong Kong.

91.     FTX – which stood for "Fu-Tures eXchange" – was registered as an Antigua and Barbuda limited company in April 2019 and then launched the exchange from its Hong Kong offices on May 9, 2019.  The FTX Group intended to alleviate a variety of issues that existing crypto spot trading exchanges and crypto derivatives exchanges experienced, such as time-consuming trading procedures and low liquidity.

92.     As would later become significant, the FTX Executive Defendants did not implement internal controls over customer property when they created and launched the FTX Group, nor did they do so later.  In his recent testimony before the House Financial Services Committee, Mr. Ray said:

> there was [sic] no corporate controls, no corporate oversight, no independent board, and, the owners of the business, the senior management, had virtual control of the accounts of each of the silos and could move money or assets as they desired, undetected by customers. So, to the extent there were rules, and there were very few, obviously they were made to be broken.

93.     In addition to the identity of its co-founders, Alameda's relationship with the FTX Group was intertwined from the start.  Alameda was the FTX Group's largest initial customer. Indeed, Defendant Bankman-Fried acknowledged the crucial role of Alameda in the beginning as the main "liquidity provider" accounting for "half the volume on the exchange."  Defendant Bankman-Fried further explained that Alameda "helped solve the problem of how'd you get users without volume, or volume without users."

**F.      FTX Creates Its Proprietary Token – FTT – in July 2019**

94.     To generate additional revenue, approximately two months after its May 2019 debut, the FTX Group launched its proprietary token – FTT – on July 27, 2019.  FTT was launched with an initial supply of 350 million, 175 million of which were "locked" (*i.e.*, non-circulating) tokens held at FTX.com and scheduled to "unlock" over a three-year period.

95.     FTT started as an incentive tool – a "frequently flyer" program for customers. FTX.com offered rewards in exchange for ownership of the FTT tokens, including trading discounts and preferred status on its site.  Defendant Bankman-Fried promised investors "guaranteed liquidity" in FTT, implying that the risk of buying FTT tokens was nonexistent. Customers were also permitted to use their FTT tokens as collateral to increase their leverage – *i.e.*, trade on "margin."  As investors, enticed by the trading discounts, embraced FTT to trade on FTX, the newly minted token became one of the biggest sources of trading revenue for the exchange.

96.     To maintain the value of FTT and keep its price stable, Alameda, still based in Hong Kong, served as the token's main market maker.  That meant it bought and sold the majority of FTT on the exchange and, as a major trader, had the ability to set prices for the token.  Moreover,

by keeping half the tokens uncirculated, FTX.com and Alameda could artificially prop up the price while still counting the uncirculated tokens as assets.

97.    FTT opened trading on July 31, 2019 at approximately $1.72 per token.

**G.    Binance Makes a Strategic Investment in FTX and FTT**

98.    Binance, which is the world's largest crypto exchange, was founded in China in 2017 by Changpeng Zhao and subsequently relocated in September 2017 after the Chinese government banned crypto exchanges.  Registered in the Cayman Islands and Seychelles, Binance has offices in Abu Dhabi, Bahrain, Dubai and Paris.

99.    On December 19, 2019, Binance announced a strategic partnership with FTX and long-term investment in FTT.  While the specific amount of Binance's investment in FTX and FTT was not disclosed, Defendant Bankman-Fried said at the time it was in the "tens of millions" and valued FTX in the "hundreds of million of dollars."

100.    As part of the agreement, Binance listed FTT on its exchange and received an allocation of FTT as part of its investment in FTX.

**V.    FTX'S REGULATORY DISCLOSURES AND CUSTOMER AGREEMENTS**

101.    FTX US provided each of its U.S. Customers with "FTX US Regulation and Licensure Information."  That disclosure listed the 40 U.S. states for which FTX US had a money transmitter license, as well as Washington D.C. and Puerto Rico.  The disclosure also implied that FTX US had customer protections in place:

> West Realm Shires Services Inc. ('FTX US') is generally regulated on both the Federal and State level and the primary regulatory compliance obligations are within the United States. FTX US is required to comply with many financial services and consumer protection laws. . . . On the State level, the primary issues arise around consumer protection and money transmission laws.

102.    FTX US also provided each of its U.S. Customers with the "FTX.US User Agreement" – between U.S. customers and West Realm Services – which made it clear that both cryptocurrency and cash was held exclusively for the benefit of customers and title to any assets remained with the customers:

- As part of your FTX.US Account, FTX.US provides qualifying users access to accounts for you to store, track, transfer, and manage your balances of cryptocurrency and/or dollars or other supported currency. All cryptocurrency or dollars (or other supported currencies) that are held in your account are held by FTX.US for your benefit.

- Title to cryptocurrency represented in your FTX.US Account shall at all times remain with you and shall not transfer to FTX.US.

- FTX.US does not represent or treat assets in your FTX.US Account as belonging to FTX.US.

- Your FTX.US Account allows you to hold and transfer US dollars which are held by FTX.US for your benefit at U.S. banks. . . .  To the extent you hold USD fiat balances (and such balances are not held in stablecoins or other investments), those fiat balances are held in customer omnibus accounts at FDIC-insured banks (Silvergate Bank and Signature Bank for customers of the FTX.US, and Evolve Bank & Trust for users of our virtual accounts, as of August 2022).

103.    FTX.com likewise provided its "FTX Terms of Service" – between non-U.S. Customers and FTX Trading – which also made it clear that the title and ownership of customers' cryptocurrencies remained with the customers and could not be loaned to FTX Trading (or Alameda):

- Title to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading.

- None of the Digital Assets in your Account are the property of, or shall or may be loaned to, FTX Trading; FTX Trading does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading.

- You control the Digital Assets held in your Account. At any time, subject to outages, downtime, and other applicable policies (including the Terms),

you may withdraw your Digital Assets by sending them to a different blockchain address controlled by you or a third party.

104.    Accordingly, while Customer Property held at FTX US and FTX.com was not subject to segregation requirements such as those in the U.S. Commodity Exchange Act or SEC Rule 15c3-3 (both of which prohibit commingling of firm and customer assets), by its own terms of service, the FTX Group was contractually prohibited from using customer property for its own purposes or treating customer property as belonging to the FTX Group or Alameda.

## VI.    FTX CUSTOMERS DEPOSIT MONEY AT ALAMEDA

105.    Despite the foregoing contract terms requiring the FTX Group to hold customer funds in accounts for the benefit of customers, the FTX Group actually directed customers to deposit funds in accounts belonging to Alameda as a workaround to use regulated banks.

106.    Because regulated banks were cautious about dealing with cryptocurrency companies like the FTX Group, some FTX customers were instructed to make deposits at FTX by wiring the funds to Alameda's bank accounts at Silvergate Bank ("Silvergate").  Silvergate, which describes itself as a "leading provider of innovative financial infrastructure solutions and services for the growing digital currency industry," is among the few Federal Reserve member banks through which customers can "on ramp" funds into crypto exchanges like FTX.

107.    Moreover, according to a civil complaint against Defendant Ellison filed by the SEC:

> From the start of FTX's operations in or around May 2019 until at least 2021, FTX customers deposited fiat currency (e.g., U.S. Dollars) into bank accounts controlled by Alameda. Billions of dollars of FTX customer funds were so deposited into Alameda-controlled bank accounts. Ellison was aware that Alameda was receiving FTX customer funds.

> At least some of these bank accounts were not in Alameda's name, but rather in the name of North Dimension Inc. ("North Dimension"), an Alameda subsidiary. North Dimension's website

29

does not disclose any connection to Alameda. Ellison knew that
Bankman-Fried had directed FTX to have customers send funds to
North Dimension in an effort to hide the fact that the funds were
being sent to an account controlled by Alameda.

108.    These deposits, which Defendant Bankman-Fried has admitted totaled as much as

$6 billion, were, according to Defendant Bankman-Fried, not sent to FTX Group accounts and/or

were "miscounted" as Alameda funds.

## VII.    ALAMEDA'S RISKIER STRATEGIES

### A.    Alameda Changes to Riskier Strategies

109.    Alameda was ostensibly founded as a "quantitative" trading firm – *i.e.*, a firm that

engaged in trading based on complex mathematical analysis – and began with a comparatively

safe strategy of U.S. to Asia Bitcoin arbitrage that Defendant Bankman-Fried described as "free

money."  Alameda was also a market-maker that provided liquidity – high-frequency buying and

selling of crypto assets exchanges throughout the day – and generated revenue by collecting a

spread on each trade.

110.    However, as arbitrage opportunities dried up, beginning no later than 2020,

Alameda was engaging in much risker strategies.  For example, as the price of Bitcoin and

Ethereum began to increase drastically in 2020, Alameda made substantial long bets on those and

other cryptocurrencies.  As Mr. Trabucco noted in an April 2021 tweet, Alameda moved away

from its original strategy of arbitrage and spreads, and toward long positions:

> 2 years ago, Alameda maintained pretty strict delta neutrality most
> of the time, generally trying quite hard to make sure our PNL was
> from spreads and arbs. Today, not so much -- we got ... uh, really
> long in winter 2020, for instance.

Mr. Trabucco attributed Alameda's change in strategy going "where the money is."  Defendant

Ellison likewise tweeted in 2021 relating to "wasting time trying to trade back and forth for a few

points of edge and the way to really make money is figure out when the market is going to go up and get balls long before that."

111.    Far from "quant" trading, Defendant Ellison – who was named co-CEO of Alameda with Mr. Trabucco in 2021 – has characterized her trades as utilizing "elementary school math." Co-CEO Trabucco likewise admitted in 2021 that Alameda was making bets on certain cryptocurrency based upon nothing more than the timing of Elon Musk's tweets.

112.    In addition, by 2021, up to 30% of Alameda's traders were engaged in "yield farming."  Yield farming is a very risky investment strategy where owners deposit their crypto into pools which can be used by borrowers to speculate on or create other tokens and the owner earns a return when the liquidity generates income.  Yield farming is risky because the digital assets often have an initial run-up in price as investors put money in and then a crash as they get out.

**B.    Cryptocurrency's Historic Bull Market**

113.    Fortunately for the FTX Group and Alameda, Alameda's change in strategy to riskier long positions coincided with a historic cryptocurrency bull market.  For example, Bitcoin was trading at less than $5,000 per coin on March 11, 2020 and, by April 13, 2021 the price reached more than $63,000.  Following a correction in the spring and summer of 2021, the price reached an all-time high in November 2021 of nearly $69,000 per coin.  Similarly, Ethereum (the most prominent altcoin), was trading around $100 in March 2020 and reached an all-time high of more than $4,800 per coin in November 2021.

114.    This bull market resulted in a flood of market participants creating new crypto companies and blockchains, which created and issued their own coins and tokens.  Alameda and Defendant Bankman-Fried invested in numerous of these new companies and cryptocurrencies as a prominent proponent of the industry.

### C. Alameda Used FTTs to "Borrow" Customer Funds

115.    The FTX Group's proprietary token – FTT – likewise rode the wave of the bull market.  FTT was trading around $2 per token in March 2020 and reached an all-time high exceeding $85 per coin in September 2021.

116.    The FTX Group's "spot margin" trading feature enabled customers to lend or borrow other customers' assets.  Like yield farming, customers could deposit a cryptocurrency – such as a Bitcoin or FTT token – and lend it to another user and earn yield on it.

117.    Alameda, as a "customer" of the FTX Group, took advantage of this feature to "borrow" customer funds using FTT tokens it held as collateral.  Even if the FTX Group created more FTT tokens, because these coins never made it onto the open market it would not drive down the coin's value.  As a result, these tokens held their market value, allowing Alameda to borrow against them – essentially receiving free money to trade with.

118.    Moreover, the higher FTT traded, the more "collateral" Alameda had to take out loans.  According to the SEC, Defendant Ellison, acting at the direction of Defendant Bankman-Fried, purchased FTT tokens "on various platforms in order to increase the price of those tokens and inflate the value of Alameda's collateral, which allowed Alameda to borrow even more money from external lenders at increased risk to the lenders and to FTX's investors and customers."

119.    Crucially, the FTX Group exempted Alameda from the normal auto-liquidation procedure governing other customers under which FTX Group would automatically sell collateral on losing leveraged trades.

## VIII.  THE FTX GROUP'S AND ALAMEDA'S MASSIVE SPENDING

120.    From 2020 to 2022, enriched by new capital and the increased customer deposits brought on by the bull market, the FTX Group and Alameda engaged in massive (and risky) investments and spending.

A.      **More Than $1.7 Billion in Loans to the FTX Executive Defendants**

121.    For example, between March 2020 and September 2022, the FTX Executive Defendants gave themselves massive loans from Alameda.  Defendant Bankman-Fried received more than $1 billion and Defendants Singh and Wang also borrowed $554 million and $224.7 million, respectively.  According to Mr. Ray, in hindsight it is clear the loans to the FTX Executive Defendants were poorly documented, and at times not documented at all.

122.    Indeed, Mr. Ray has testified that:

> The loans that were given to Mr. Bankman-Fried were not just one loan, it was numerous loans, some of which were documented by individual promissory notes. There's no description of what the purpose of the loan was. In one such instance, he signed both as the issuer of the loan as well as the recipient of the loan. But we have no information at this time as to what the purpose or the use of those funds were, and that is part of our investigation.

123.    It appears these loans were never repaid.

124.    Moreover, as discussed below, the FTX Group – at the direction of Defendant Bankman-Fried – also purchased hundreds of millions in Bahamian real estate on behalf of the Individual Defendants and others.

B.      **More Than $5 Billion in Venture Investments**

125.    In addition, Alameda and the FTX Group made hundreds of venture investments in other crypto companies and digital assets totaling more than $5 billion.  For example, in late 2021 through early 2022, Alameda invested more than $1.1 billion in Genesis Digital Assets, a Bitcoin mining company.  Alameda and the FTX Group also lent crypto currency company Voyager Digital $150 million.

126.    As Mr. Ray has described, these investments were often made without any legitimate valuation:

There was over $5 billion of investments made. Certainly there's some value there, and we will try to get that value and sell those assets. But oftentimes, even when he made those sorts of investments, whether it was directly or through others in management, sometimes [Defendant Bankman-Fried] would do that really without any pro forma or any valuation. Not really quite sure how some of the purchase price numbers were derived. So, it gives you a sort of worry, obviously, that the purchases were overvalued.

127.    Some details shared by the *Financial Times* shows that the venture investments by Alameda and the FTX Group amounted to almost 500 different investments, including investments by Alameda and the FTX Group in dozens of speculative tokens created by other crypto companies.

### C.    Naming Rights and Promotional Spending

128.    The FTX Group's wild spending also extended into other areas.

129.    For example, in March 2021, the FTX Group entered a $135 million deal with Miami-Dade County to rename the "American Airlines Arena" – which acts as the home area for the Miami Heat – "FTX Arena."

130.    In June 2021, the FTX Group acquired the naming rights to TSM – an "e-sports" organization that competes in videogame competitions – for $210 million.  Also in June 2021, Major League Baseball and the FTX Group announced a new long-term, global partnership that "established FTX as the Official Cryptocurrency Exchange brand of MLB."

131.    In February 2022, FTX spent a reported $7 million to buy 30-seconds of advertising time during the Super Bowl for a spot featuring Larry David sarcastically predicting – presciently, it turns out – that FTX would not make it.

### IX.   BINANCE SELLS ITS STAKE IN FTX

132.    In July 2021, Binance announced that it had sold its stake in FTX.com back to the FTX Group.  While the initial investment and exit sum were not disclosed, Mr. Zhao revealed in

a November 2022 Tweet that "[a]s part of Binance's exit from FTX equity last year, Binance received roughly $2.1 billion USD equivalent in [FTT tokens and Binance USD]" (a "stablecoin" tied to U.S. Dollars).

133.    In an interview, Defendant Bankman-Fried implied that FTX's separation from Binance was at least in part attributable to "quite the barrage" of warnings Binance was receiving from regulators around the world.  In what has now been proven to be the height of irony, Defendant Bankman-Fried implicitly criticized Binance's regulator issues by stating that "there are some differences between how we run our businesses.  I think there are ways I would have reacted, responded, and run things differently.  And we have been running things differently."

134.    At nearly the same time, FTX announced it had raised $900 million from 60 high-profile investors, including Sequoia Capital, Paradigm Capital, Softbank, in the largest ever funding round for a Crypto exchange that valued FTX at $18 billion – up from a $1.2 billion valuation a year before.  This was part of nearly $1.8 billion that the FTX Group raised in several rounds of funding.  Defendant Bankman-Fried sold a stake in the company for $300 million during these rounds of funding.

X.    **THE FTX GROUPS' PROPERTY PURCHASES**

135.    The FTX Group relocated from Hong Kong to the Bahamas in September 2021, reportedly citing the favorable regulatory environment amidst regulators worldwide beginning to examine cryptocurrencies and China outlawing cryptocurrency transactions.

136.    In the ensuing year, the FTX Group – through various subsidiaries including its Bahamian subsidiary FTX Holdings Ltd. (itself a subsidiary of Bahamas based subsidiary FTX Digital Markets Ltd. ("FTX Digital")) – purchased more than 35 properties in the Bahamas for more than $250 million in real estate, including luxury condos and vacation homes for management, and land for a future corporate headquarters.

35

137.    Mr. Ray has declared that:

> [C]orporate funds of the FTX Group were used to purchase homes
> and other personal items for employees and advisors and that there
> does not appear to be documentation for certain of these transactions
> as loans, and that certain real estate was recorded in the personal
> name of these employees and advisors on the records of the
> Bahamas.

138.    The most expensive property was a $30 million penthouse in a luxury resort community, which records was a residence for "key personnel."   Reports are that the FTX Executive Defendants and Defendant Ellison (and other insiders) lived together in the penthouse or adjacent condos.

## XI.    CRYPTOCURRENCY'S BEAR MARKET CAUSES INDUSTRY LIQUIDITY PROBLEMS

139.    Beginning in fall of 2021, cryptocurrency entered an "crypto winter" in which prices fell steadily and drastically.  For example, Bitcoin dropped from its all-time high of nearly $69,000 in November 2021 to below $34,000 in January 2022.  After a minor rally, Bitcoin fell again from approximately $47,000 in March 2022 to below $18,000 in June 2022.  Ethereum likewise declined from its all-time high of $4,800 in November 2021 to below $900 in June 2022.

140.    During roughly the same period, FTT – which Alameda was using as collateral – fell from its all-time high of $85 in September 2022 to around $23 in June 2022.

141.    In addition to hitting Alameda's long bets on crypto prices hard and decreasing the value of FTT tokens held by Alameda and used as collateral, falling cryptocurrency prices set off a liquidity problem throughout the interrelated crypto industry.

142.    For example, in May 2022, the price of the then-$18-billion "stablecoin" called TerraUSD – which was supposed to maintain a $1 price pegged to the U.S. Dollar – fell to $0.35 in a matter of days and its companion token, Luna, which was meant in turn to stabilize TerraUSD's price, fell from $80 to almost nothing within a few days.

143.     Within a month, a prominent crypto hedge fund named Three Arrow Capital collapsed due to up to $200 million in losses to its Luna investments.

144.     In June 2022, Voyager Digital – in which Alameda and the FTX Group were investors and lenders – announced that Alameda would provide Voyager Digital $500 million in financing to address liquidity problems caused by default by Three Arrows Capital on a $660 million loan from Voyager Digital.  The attempt to rescue its investment in Voyager Digital failed when, in July 2022, Voyager Digital declared bankruptcy when it was unable to redeem withdrawals from customers.

145.     The FTX Group also extended credit to other crypto companies, including more than $100 million to Celsius and a $250 million revolving credit line to crypto lender BlockFi.  Both Celsius and BlockFi have since declared bankruptcy.

146.     The falling prices and escalating industry problems motivated the FTX Executive Defendants and Defendant Ellison increasingly to shift additional funds to Alameda in a scheme to plug holes in the fund's balance sheet, including covering loans (which, as of June 2022, were as much as $7.4 billion) and margin calls.

147.     On September 20, 2022, FTT closed at $22.80 per token, down from over $85 per token little more than a year earlier on September 9, 2021.

## XII.   FTX AND ALAMEDA COLLAPSE REVEALING A CUSTOMER PROPERTY SHORTFALL

### A.     CoinDesk Reports on Alameda's Alarming Balance Sheet

148.     On November 2, 2022, CoinDesk – a news site that reports on the cryptocurrency industry – published a report further detailing the intertwined relationship between Alameda and FTX and revealing troublesome details about Alameda's balance sheet, including that it was

heavily laden with FTX's proprietary token, FTT, and other tokens affiliated with Defendant Bankman-Fried's companies.

149.    Citing internal Alameda documents, CoinDesk reported that, as of June 30, 2022, Alameda's $14.6 billion in assets included $3.66 billion worth of "unlocked FTT" (FTT tokens "unlocked" – *i.e.*, entered circulation – on a set schedule while the "locked" tokens were held at FTX).  Notably, Alameda's $3.66 billion of FTT constituted the majority of the $5.1 billion in FTT then in circulation.  Alameda's balance sheet included another $2.66 billion in otherwise opaque "FTT collateral" and $3.37 billion of "crypto held."  The balance sheet also included $292 million of "unlocked SOL" and $863 million of "locked SOL," referring to the native token issued by Solana, a public blockchain platform in which Defendant Bankman-Fried was an early investor. Alameda also held "SRM" – the token issued by Serum, another exchange co-founded by Defendant Bankman-Fried.  Alameda's balance sheet listed only $134 million of cash and equivalents and a $2 billion "investment in equity securities."

150.    Put another way, Alameda had comparatively little cash on hand or stable assets. Alameda's largest asset categories consisted of tokens created by FTX and other tokens affiliated with FTX and Defendant Bankman-Fried.  The CoinDesk article quoted the CEO of Swan Bitcoin – a platform that allows investors to acquire Bitcoin – as questioning the concentration of FTT on Alameda's balance sheet:

> It's fascinating to see that the majority of the net equity in the Alameda business is actually FTX's own centrally controlled and printed-out-of-thin-air token.

151.    According to CoinDesk, Defendant Ellison – who was by then the sole CEO of Alameda – initially declined to comment on the article.  But as concern about Alameda and FTX

increased, on November 6, 2022 she tweeted a claim that the balance sheet reported by CoinDesk did not reflect all of Alameda's assets:

> A few notes on the balance sheet info that has been circulating recently: - that specific balance sheet is for a subset of our corporate entities, we have > $10b of assets that aren't reflected there.

152.     The CoinDesk article reported Alameda's had $8 billion in liabilities, including $7.4 billion in loans and $292 million of "locked FTT."

**B.     Binance's Announcement of Its Intent to Sell All Its FTT Tokens Causes the Price to Crash**

153.     Four days later, on November 6, 2022, Mr. Zhao reacted to the CoinDesk revelations about Alameda's balance sheet by tweeting that Binance would sell all its FTT tokens received when it sold its FTX stake in July 2021:

> As part of Binance's exit from FTX equity last year, Binance received roughly $2.1 billion USD equivalent in cash (BUSD and FTT). Due to recent revelations that have come to light, we have decided to liquidate any remaining FTT on our books.

154.     The Crypto community immediately speculated that Binance was attempting to destroy the FTX Group or Mr. Zhao was retaliating for Defendant Bankman-Fried's 2021 comments about the regulatory scrutiny directed at Binance.  Indeed, early in the morning on November 7, 2022, Defendant Bankman-Fried sent a tweet blaming Mr. Zhao for spreading false rumors of insolvency and claiming, falsely as it turns out, that assets at the FTX Group were safe:

> A competitor is trying to go after us with false rumors.  FTX is fine. Assets are fine.

155.     Defendant Bankman-Fried also falsely tweeted that the FTX Group did not invest customer property for its own purposes:

> FTX has enough to cover all client holdings.  We don't invest client assets (even in treasuries).

156. Regardless, the news had a devastating effect on FTT's price. Concerns about the solvency of FTX and Alameda caused a major sell-off of FTT beginning on the evening of November 7. The price fell from around $22 per token on November 7 to below $5 November 8, wiping out more than $2 billion in value in the space of 24 hours.

### C.    FTX Sustains Billions in Customer Withdrawals and Halts Withdrawals

157. At the same time the price of FTT was falling, FTX was suffering from massive customer withdrawals. On the morning of November 8, 2022, Defendant Bankman-Fried wrote a message to FTX staff stating that "[o]n an average day, we have tens of millions of dollars of net in/outflows. Things were mostly average until this weekend, a few days ago," and revealing that "[i]n the last 72 hours, we've had roughly $6b of net withdrawals from FTX" and withdrawals from FTX.com, are "effectively paused."

158. Put another way, the rapid withdrawals by customers concerned about FTT's value and FTX's liquidity caused FTX to halt withdrawals, thereby depriving customers of their property that was supposed to be held in accounts for their benefit.

159. According to Arkham Intelligence – a blockchain analytics firm – the FTX Group's balances were $8.4 billion as of November 5, 2022 and dropped to $1.1 billion as of November 10, 2022

### D.    The Lack of Controls Causes Binance to Withdraw Its Offer to Save FTX Trading

160. Ultimately, the missing customer funds enabled by the lack of controls at FTX prevented a company-saving sale.

161. Amid the liquidity crisis brought on by massive withdrawal requests at FTX, Defendant Bankman-Fried scrambled to raise money from venture capitalists and other investors before approaching Binance, which agreed to help. On November 8, 2022, Mr. Zhao tweeted

concerning the FTX Group's liquidity crisis and announced that Binance had agreed to acquire

FTX Trading pending due diligence:

> This afternoon, FTX asked for our help.  There is a significant
> liquidity crunch.  To protect users, we signed a non-binding LOI,
> intending to fully acquire FTX.com and help cover the liquidity
> crunch.  We will be conducting a full DD in the coming days.

162.     The agreement was limited to FTX Trading.  Binance was not going to purchase

FTX US.

163.     However, the final death knell for the FTX Group came just one day later, on

November 9, 2022, when Binance announced it was walking away from the agreement to purchase

FTX Trading.  Alarmingly, in a series of tweets Binance stated that FTX was beyond help and

referred to missing customer funds:

> As a result of corporate due diligence, as well as the latest news
> reports regarding mishandled customer funds and alleged US
> agency investigations, we have decided that we will not pursue the
> potential acquisition of FTX.com.
>
> In the beginning, our hope was to be able to support FTX's
> customers to provide liquidity, but the issues are beyond our control
> or ability to help.

164.     At the same time, Defendant Bankman-Fried sought emergency funding from other

investors, including U.S. investors, to cover a shortfall at FTX of approximately $8 billion.  As

part of this effort, Defendant Bankman-Fried circulated a balance sheet to potential investors that

listed a negative $8 billion entry labeled as a "hidden, poorly internally labeled 'fiat@ account.'"

This entry reflected customer funds intended to be deposited at the FTX Group that were instead

deposited in Alameda's Silvergate accounts.

**E.     Insiders Confirm that Customer Funds Were Intentionally Misappropriated**

165.     Also on November 9, 2022, as Defendant Bankman-Fried scrambled for emergency

funding, Defendant Ellison held a meeting with Alameda employees during which she revealed

what has now been widely reported:  that she and Defendants Bankman-Fried, Wang, and Singh knew FTX customer funds had been improperly used by Alameda.

166.    Similarly, according to a November 10, 2022 affidavit submitted to the Supreme Court of the Bahamas (and submitted to this Court by the Joint Provisional Liquidators of FTX Digital on December 14, 2022), on November 9, 2022, the Executive Director of the Securities Commission of the Bahamas met with the CEO of FTX Digital Markets – Ryan Salame – and certain counsel for the FTX Digital and FTX US, who "advised that clients' assets which may have been held with FTX Digital were transferred to Alameda Research ( ) to cover financial losses of Alameda."

167.    Mr. Salame also reported "that there were only three (3) persons who had the necessary codes (or passwords) to transfer clients' assets to Alameda in this manner, that is, the founders of FTX namely Sam Bankman-Fried, Nishad Singh and Zixio (Gary) Wang."

## XIII.  THE BANKRUPTCY OF ALAMEDA RESEARCH AND FTX – AND THE MISSING CUSTOMER PROPERTY

168.    On November 10, 2022, FTX Trading and FTX US halted all trading and withdrawals, and Defendant Bankman-Fried announced that Alameda was being wound down.  He also posted lengthy tweets explaining how he "f[***]ed up."

169.    Also on November 10, 2022, Defendant Bankman-Fried resigned his position as CEO of the FTX Group and, as majority owner of all the FTX Group and Alameda companies, authorized the appointment of an independent CEO and the filing of Chapter 11 bankruptcy proceedings.

170.    The next day, on November 11, 2022, the 134 separate Debtors simultaneously initiated the Bankruptcy Proceedings.

171.    In his declaration in support of Debtors' first day pleadings, Mr. Ray stated that among the objectives in the Bankruptcy Proceedings is "the location and security of property of the estate, a substantial portion of which may be missing or stolen."  He also noted that "[n]ever in my career have I seen such a complete failure of corporate controls," including "compromised systems integrity" and "the concentration of control in the hands of a very small group of inexperienced, unsophisticated and potentially compromised individuals."

172.    Mr. Ray listed the failures on the Individual Defendants, including:

- The FTX Group did not keep appropriate books and records, or security controls, with respect to its digital assets;

- Mr. Bankman-Fried and Mr. Wang controlled access to digital assets of the main businesses in the FTX Group;

- The absence of daily reconciliation of positions on the blockchain;

- The use of software to conceal the misuse of customer funds;

- The secret exemption of Alameda from certain aspects of FTX.com's auto-liquidation protocol; and

- The absence of independent governance as between Alameda (owned 90% by Mr. Bankman-Fried and 10% by Mr. Wang) and the [FTX.com].

173.    On December 12, 2022, Mr. Ray submitted written testimony to Congress that, among other things, further detailed the failed internal controls and procedures that allowed the misappropriation of customer property, including:

- The use of computer infrastructure that gave individuals in senior management access to systems that stored customer assets, without security controls to prevent them from redirecting those assets;

- The storing of certain private keys to access hundreds of millions of dollars in crypto assets without effective security controls or encryption;

- The ability of Alameda, the crypto hedge fund within the FTX Group, to borrow funds held at FTX.com to be utilized for its own trading or investments without any effective limits;

- The commingling of assets;

- The lack of complete documentation for transactions involving nearly 500 investments made with FTX Group funds and assets;

- The absence of audited or reliable financial statements;

- The lack of personnel in financial and risk management functions, which are typically present in any company close to the size of FTX Group; and

- The absence of independent governance throughout the FTX Group.

174.   Finally, in his December 13, 2022 live testimony before the House Financial Services Committee, Mr. Ray confirmed that the FTX Executive Defendants transferred untold billions in assets to Alameda and the missing funds and losses attributable to those funds are substantial:

> We know it's a big number, it's in the millions on the customer accounts. And we know it's several billion dollars in losses. Assigning those losses to customer accounts will be our next challenge.

175.   Notably, customers did not intentionally undertake any risk by their deposits at the FTX Group.  They were neither equity investors or lenders to the FTX Group and their customer property, under the agreements with the FTX Group, were required to be maintained on behalf of customers.

## XIV.   THE REGULATORY ACTIONS AND FEDERAL CRIMINAL CHARGES

176.   On December 9, 2022, a federal grand jury sitting in the United States District Court for the Southern District of New York (S.D.N.Y.) issue a sealed indictment charging Defendant Bankman-Fried with eight counts, including wire fraud on customers and conspiracy to commit wire fraud on customers.  Among other things, the grand jury charged that Defendant Bankman-Fried "agreed with others" and "along with others, engaged in a scheme" in order "to defraud

customers of FTX.com by misappropriating those customers' deposits, and using those deposits to pay expenses and debts of Alameda Research . . . and to make investments."

177.    On December 12, 2022, Bahamian authorities arrested Defendant Bankman-Fried at the request of the U.S. government, based on the sealed indictment.

178.    On December 13, 2022, the SEC filed a civil complaint in the S.D.N.Y. alleging two violations of federal securities laws in connection with raising more than $1.8 billion from equity investors beginning in 2019.   The SEC alleges that Defendant Bankman-Fried raised more than $1.8 billion from equity investors since May 2019 by promoting FTX as a trustworthy company while, "orchestrating a massive, years-long fraud, diverting billions of dollars of the trading platform's customer funds for his own personal benefit and to help grow his crypto empire."

179.    Also on December 13, 2022, the CFTC likewise filed a civil complaint in the S.D.N.Y. against Defendants Bankman-Fried, FTX Trading and Alameda alleging two fraud-related violations of the Commodity Exchange Act.  Among other things, the CFTC alleges that "unbeknownst to all but a small circle of insiders, FTX customers deposits, including fiat currency and digital assets such as bitcoin (BTC) and ether (ETH), that were intended to be used for trading or custodies on FTX, were regularly accepted, held by, and/or appropriated by Alameda for its own use."

180.    On December 21, 2022, Defendants Wang and Ellison pleaded guilty to federal charges in the S.D.N.Y.  Defendant Wang pleaded guilty to conspiracy to commit wire fraud, wire fraud, conspiracy to commit commodities fraud and conspiracy to commit securities fraud. Defendant Ellison pleaded guilty to two counts of wire fraud, two counts of conspiracy to commit wire fraud, conspiracy to commit commodities fraud, conspiracy to commit securities fraud and

conspiracy to commit money laundering.  Also on December 21, 2022, the SEC and CFTC filed civil cases against Defendants Wang and Ellison.

## XV.   CLASS ACTION ALLEGATIONS

181.   Plaintiffs bring this action pursuant to Rules 23(a), 23(b)(1)(B) and 23(b)(3) of the Federal Rules, made applicable to this Adversary Proceeding by Bankruptcy Rule 7023, on behalf of themselves and the members of the proposed Customer Class who deposited or held customer property with FTX US and/or FTX.com.  The four requisites for class certification in Federal Rule 23(a) have been satisfied, as have the requirements of Federal Rule 23(b)(1)(B) and 23(b)(3).

182.   The members of the Customer Class are so numerous that joinder of all members is impracticable.  Although the exact number of Customer Class members is presently unknown and can only be ascertained through appropriate notice and discovery, the Plaintiffs reasonably believe that the Customer Class includes more than one million members.

183.   Plaintiffs' claims asserted in this Adversary Proceeding are typical of the claims of the proposed Customer Class as all members of the proposed Customer Class were similarly affected by the Defendants' unlawful conduct, as alleged in this Adversary Complaint.

184.   Plaintiffs will fairly and adequately protect and represent the interests of the members of the proposed Customer Class and have retained counsel competent and experienced in adversary proceedings under Bankruptcy Rule 7001, and class action litigation under Federal Rule 23 to recover misappropriated, misused, or stolen customer funds from commodities brokerages, securities broker-dealers, and asset managers.

185.   Common questions of law and fact exist as to all members of the proposed Customer Class and predominate over any questions solely affecting individual members.  Among the many questions of law and fact common to the proposed Customer Class are:

(a)     Whether the Customer Class is entitled to a declaratory judgment that members of the Customer Class have priority rights to return of cash held on their behalf at FTX US or FTX.com that was misappropriated, misused, or outright stolen by Defendants;

(b)     Whether the Customer Class is entitled to a declaratory judgment that members of the Customer Class have priority rights to return of digital assets held on their behalf at FTX US or FTX.com that was misappropriated, misused, or outright stolen by Defendants;

(c)     Whether the FTX Defendants committed breach of contract by misappropriating, misusing, or stealing customer property, and are thereby liable to the Customer Class;

(d)     Whether the FTX Defendants committed breach of fiduciary duty by misappraising, misusing, or stealing customer property, and are thereby liable to the Customer Class;

(e)     Whether the FTX Defendants committed conversion by misappropriating, misusing, or stealing customer property, and are thereby liable to the Customer Class;

(f)     Whether the FTX Defendants acted negligently by misappropriating, misusing, or stealing customer property, and are thereby liable to the Customer Class; and

(g)     Whether the Alameda Defendants aided and abetted the FTX Defendants misconduct and are thereby liable to the Customer Class.

186.    The Customer Class should be certified under Fed. R. Civ. P. 23(b)(1)(B).  The prosecution of separate actions by individual customers of FTX US and FTX.com would create a risk of adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of other customers who are not parties to the individual adjudications, or would substantially impair or impede their ability to protect their interests.

187.    The Customer Class should also be certified under Fed. R. Civ. P. 23(b)(3). Questions of law or fact common to class members predominate over any questions affecting only individual members.  Additionally, a class action under Fed. R. Civ. P. 23(b)(3) is superior to all other available methods for the fair and efficient adjudication of this controversy.  Furthermore, as the damages suffered by individual Customer Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Customer Class to individually redress the wrongs done to them. There will be no unusual difficulty in the management of this action as a class action.

## XVI.    DECLARATORY JUDGMENT CAUSES OF ACTION

### COUNT I:  Declaratory Judgment Against FTX US and FTX Trading

188.    Plaintiffs repeat and reallege the averments in paragraphs 1 through 187 of this Adversary Complaint as if fully set forth herein.

189.    Members of the proposed Customer Class deposited or held U.S. Dollars, other fiat currencies, or cryptocurrencies at FTX US.  Under the terms of the FTX US User Agreement, FTX US is required to hold such customer property in accounts on behalf of customers and in the name of customers.  Specifically, the FTX US User Agreement provides that customer property:

- Is held in Customer accounts by FTX US for Customers' benefit;

- Title to Cryptocurrency shall remain with Customers and shall not transfer to FTX.US;

- FTX.US will not represent or treat Customer Property in accounts a belonging to FTX.US; and

- Customers' U.S. Dollars are held by FTX.US for Customers' benefit in omnibus Customer accounts at U.S. banks.

190.    Members of the proposed Customer Class likewise deposited or held U.S. Dollars, other fiat currencies, or Digital Assets (as that term is defined in the FTX Terms of Service) at FTX Trading.  Under the terms of the FTX Terms of Service, FTX Trading is required to hold such Customer Property in accounts on behalf of customers and in the name of customers. Specifically, the FTX Terms of Service provide that customer Digital Assets:

- Shall remain titled with Customers and not transfer to FTX Trading;

- Are not the property of, nor shall or may be loaned to, FTX Trading; and

- Remain in the control of Customers.

191.    The FTX US User Agreement and FTX Terms of Service did not permit the FTX Group to use Customer Property for its own purposes, including borrowing such customer property for any purpose or otherwise using it for operating expenses, to pay creditors, or to make, collateralize and/or repay loans to or on behalf of Alameda, or to fund trading activities by Alameda.  Accordingly, any such conduct by FTX US and FTX Trading, or any other conduct, that resulted with the removal of customer property from Customer accounts or uses of that property as collateral, was an impermissible co-mingling, misappropriation, misuse, or conversion of customer property.

192.    Plaintiffs are entitled to declaratory judgment that:

(a)    U.S. Dollars, other fiat currencies or cryptocurrencies currently held in customer accounts or wallets by FTX US is not property of FTX US's estate or the estate of any associated Debtors;

(b)    U.S. Dollars, other fiat currencies or crypto currencies currently held by FTX US or its any associated debtors that is traceable as customer property that should have been held in

customer accounts or wallets is not property of FTX US's estate or the estate of any associated Debtors;

(c)    Such U.S. Dollars, other fiat currencies or cryptocurrencies currently held in customer accounts or wallets by FTX US or are traceable as customer property that should have been held in customer accounts or wallets, that is consequently not property of FTX US's estate or the estate of any associated Debtors, cannot be used to pay non-customer expenses, claims or creditors until FTX US customers are repaid all their U.S. Dollars, other fiat currencies or cryptocurrencies deposited or held at FTX US;

(d)    U.S. Dollars, other fiat currency, or Digital Assets currently held in customer accounts or wallets by FTX Trading are not property of FTX Trading's estate or the estate of any associated Debtors;

(e)    U.S. Dollars, other fiat currency, or Digital Assets currently held by FTX Trading or its any associated Debtors that is traceable as customer property that should have been held in customer accounts or wallets is not property of FTX Trading's estate or the estate of any associated Debtors; and

(f)    Such U.S. Dollars, other fiat currency, or Digital Assets currently held in customer accounts or wallets by FTX Trading or are traceable as customer property that should have been held in customer accounts or wallets, that is consequently not property of FTX Trading estate or the estate of any associated Debtors, cannot be used to pay non-customer expenses, claims or creditors until FTX Trading Customers are repaid all their U.S. Dollars, other fiat currency, or Digital Assets deposited or held at FTX Trading.

193.    Alternatively, if the Court determines that U.S. Dollars, other fiat currency, cryptocurrencies or other Digital Assets currently held in Customer accounts or wallets by FTX

US or FTX Trading, or are traceable as Customer Property that should have been held in customer accounts or wallets, are property of the FTX US or FTX Trading estates, or the estate of any associated Debtors, Plaintiffs are entitled to a declaratory judgment that customers are entitled to priority payment from such customer property before it can be used to pay non-customer expenses, claims or creditors.

## COUNT II:  Declaratory Judgment Against Alameda

194.    Plaintiffs repeat and reallege the averments in paragraphs 1 through 187 of this Adversary Complaint as if fully set forth herein.

195.    Members of the proposed Customer Class deposited or held U.S. Dollars, other fiat currencies or cryptocurrencies at FTX US.  Under the terms of the FTX US User Agreement, FTX US is required to hold such customer property in accounts or wallets on behalf of customers and in the name of customers.

196.    Members of the proposed Customer Class likewise deposited or held U.S. Dollars, other fiat currencies, or Digital Assets (as that term is defined in the FTX Terms of Service) at FTX Trading.  Under the terms of the FTX Terms of Service, FTX Trading is required to hold such customer property in accounts or wallets on behalf of customers and in the name of customers.

197.    The FTX US User Agreement and FTX Terms of Service did not permit the FTX Group to direct, give, loan, or otherwise transfer customer property to Alameda, including borrowing such customer property to use it to collateralize and/or repay loans to or on behalf of Alameda, or to fund trading activities by Alameda.

198.    Alameda likewise had no, and has no, right, title or interest in any Customer Property from FTX.  Plaintiffs are entitled to declaratory judgment that:

(a)     U.S. Dollars, other fiat currencies or cryptocurrencies traceable as customer property that was directed, given, loaned, or otherwise transferred to Alameda by FTX US is not property of Alameda's estate or the estate of any associated debtors, and cannot be used to pay non-customer expenses, claims or creditors until FTX US customers are repaid all their U.S. Dollars, other fiat currencies or cryptocurrencies they deposited or held at FTX US; and

(b)     U.S. Dollars, other fiat currency, or Digital Assets traceable as customer property that was directed, given, loaned, or otherwise transferred to Alameda by FTX Trading is not property of Alameda's estate or the estate of any associated debtors, and cannot be used to pay non-customer expenses, claims or creditors until FTX Trading customers are repaid all their U.S. Dollars, other fiat currency, or Digital Assets they deposited or held at FTX Trading.

199.     Alternatively, if the Court determines that U.S. Dollars, other fiat currency, cryptocurrencies or other Digital Assets currently at Alameda are property of the Alameda estate, or the estate of any associated Debtors, Plaintiffs are entitled to a declaratory judgment that Customers are entitled to priority payment from such customer property before it can be used to pay non-customer expenses, claims or creditors of Alameda.

## XVII.  COMMON LAW CAUSES OF ACTION

### COUNT III:  Breach of Contract Against FTX US and FTX Trading

200.     Plaintiffs repeat and reallege the averments in paragraphs 1 through 187 of this Adversary Complaint as if fully set forth herein.

201.     Members of the proposed Customer Class deposited or held U.S. Dollars, other fiat currencies or cryptocurrencies at FTX US.  Under the terms of the FTX US User Agreement, FTX US is required to hold such customer property in accounts or wallets on behalf of customers and in the name of customers.

202.    Members of the proposed Customer Class likewise deposited or held U.S. Dollars, other fiat currencies, or Digital Assets (as that term is defined in the FTX Terms of Service) at FTX Trading.  Under the terms of the FTX Terms of Service, FTX Trading is required to hold such customer property in accounts or wallets on behalf of customers and in the name of customers.

203.    The FTX US User Agreement and FTX Terms of Service did not permit the FTX Group to use customer property for its own purposes, including borrowing such customer property for any purpose or otherwise using it for operating expenses, to pay creditors, or to make, collateralize and/or repay loans to or on behalf of Alameda, or to fund trading activities by Alameda.  Accordingly, any such conduct by FTX US and FTX Trading, or any other conduct, that resulted with the removal of customer property from Customer accounts or wallets or uses of that property as collateral, was a breach of the FTX US User Agreement and FTX Terms of Service.

204.    As set forth above, FTX US and FTX Trading used, and/or allowed the FTX Group and Alameda, to use customer property for their own purposes, including borrowing such customer property to use for as operating expenses, to pay creditors, or to make, collateralize and/or repay loans to or on behalf of Alameda, or to fund trading activities by Alameda.

205.    By failing to maintain customer property in customer accounts or wallets, and the resulting co-mingling, misappropriation, misuse, or conversion of customer property constituted breaches of the FTX US User Agreement by and FTX Terms of Service.

206.    As a direct and proximate consequence of FTX US's and FTX Trading's breaches as described in this Adversary Complaint, Plaintiffs and the members of the proposed Customer Class have been unable to withdraw their customer property and been denied the use of their

customer property since no later than November 8, 2022, and have been damaged thereby at an amount to be determined at trial.

### COUNT IV:  Breach of Fiduciary Duty Against FTX US, FTX Trading and FTX Executive Defendants

207.    Plaintiffs repeat and reallege the averments in paragraphs 1 through 187 of this Adversary Complaint as if fully set forth herein.

208.    FTX US, FTX Trading and the FTX Executive Defendants were responsible for preserving the safety and security of customer property that Customers held, deposited, paid, delivered and/or entrusted to FTX US and/or FTX Trading to allow such customers to trade cryptocurrency and other Digital Assets.  Accordingly, FTX US, FTX Trading and the FTX Executive Defendants owed fiduciary duties to Plaintiffs and the members of the proposed Customer Class.

209.    FTX US, FTX Trading and the FTX Executive Defendants breached their fiduciary duties to Plaintiffs and the members of the proposed Customer Class by, among other things, intentionally, knowingly, recklessly, willfully, or negligently:

(a)    Failing to establish adequate internal controls and procedures at the FTX Group to preserve the safety and security of property that customers held, deposited, paid, delivered and/or entrusted to FTX US and/or FTX Trading;

(b)    Commingling the property of FTX US, FTX Trading and Alameda with customer property;

(c)    Failing to properly safeguard and segregate customer property as required by the FTX US User Agreement, the FTX Terms of Service, applicable regulations and/or common law; and

(d)     Using, or directing, authorizing, or causing FTX US, FTX Trading and/or Alameda to use Customer Property for their own purposes, including borrowing such customer property to use for as operating expenses, to pay creditors, or to make, collateralize and/or repay loans to or on behalf of Alameda, or to fund trading activities by Alameda.

210.    As a direct and proximate consequence of the breaches of fiduciary duty by FTX US, FTX Trading and the FTX Executive Defendants as described in this Adversary Complaint, Plaintiffs and the members of the proposed Customer Class have been unable to withdraw their customer property and been denied the use of their customer property since no later than November 8, 2022, and have been damaged thereby at an amount to be determined at trial.

### COUNT V:  Negligence Against FTX US, FTX Trading and the FTX Executive Defendants

211.    Plaintiffs repeat and reallege the averments in paragraphs 1 through 187 of this Adversary Complaint as if fully set forth herein.

212.    At all times relevant hereto, FTX US, FTX Trading and the FTX Executive Defendants exercised dominion and control over and jointly had custodial responsibility for customer property deposited or held at FTX and required to be held on behalf of customers of FTX US and FTX Trading by the FTX US User Agreement, the FTX Terms of Service, applicable regulations and/or common law.

213.    At all times relevant hereto, the FTX Defendants, by reason of their dominion and control over customer property deposited or held at FTX US and FTX.com Entities, owed Plaintiffs and members of the proposed Customer Class a duty of care in the handling of customer property required to be held in at FTX US and FTX Trading.

214.    Each of the FTX Defendants was in privity or near privity with Plaintiffs and members of the proposed Customer Class because they were aware that customers were reliant on

the proper handling of customer property in designated customer accounts or wallets, were a discrete group, and because the FTX Defendants intended that Plaintiffs and members of the proposed Customer Class rely upon the continuing proper treatment of customer property to assure such property was available for withdrawal, use or transfer.

215.    FTX US, FTX Trading and the FTX Executive Defendants breached their duty of care by, among other things, intentionally, knowingly, recklessly, willfully, or negligently:

(a)    Failing to establish adequate internal controls and procedures at FTX to preserve the safety and security of customer property that customers held, deposited, paid, delivered and/or entrusted to FTX US and/or FTX Trading;

(b)    Commingling the property of FTX US, FTX Trading and Alameda with customer property;

(c)    Failing to properly safeguard and segregate customer property as required by the FTX US User Agreement, the FTX Terms of Service, applicable regulations and/or common law; and

(d)    Using, or directing, authorizing, or causing FTX US, FTX Trading and/or Alameda to use customer property for their own purposes, including borrowing such customer property to use for as operating expenses, to pay creditors, or to make, collateralize and/or repay loans to or on behalf of Alameda, or to fund trading activities by Alameda.

216.    As a direct and proximate consequence of the breaches of their duty of care by duty by FTX US, FTX Trading and the FTX Executives as described in this Adversary Complaint, Plaintiffs and the members of the proposed Customer class have been unable to withdraw their Customer Property and been denied the use of their Customer Property since no later than November 8, 2022, and have been damaged thereby at an amount to be determined at trial.

## COUNT VI:  Conversion Against FTX US, FTX Trading and
## THE FTX Executive Defendants

217.    Plaintiffs repeat and reallege the averments in paragraphs 1 through 187 of this Adversary Complaint as if fully set forth herein.

218.    At all times prior to the Bankruptcy Proceedings, Plaintiffs and the members of the proposed Customer Class retained title to the Customer Property they deposited with FTX US and FTX Trading and the right to withdraw the funds they deposited at all times.  FTX US, FTX Trading and the FTX Executive Defendants exercised dominion and control over such customer property held or deposited at FTX US and FTX Trading, and interfered with the possessory rights of Plaintiffs and the members of the proposed Customer Class, in derogation of those rights.

219.    As set forth above, FTX US, FTX Trading and the FTX Executive Defendants interfered with the possessory rights of Plaintiffs and the members of the proposed Customer Class by, using, directing, authorizing, or causing FTX US, FTX Trading and/or Alameda to use up to $10 billion customer property for their own purposes, including borrowing such customer property to use for as operating expenses, to pay creditors, or to make, collateralize and/or repay loans to or on behalf of Alameda, or to fund trading activities by Alameda.

220.    As a direct and proximate consequence of FTX US, FTX Trading and the FTX Executive Defendants transferring up to $10 billion in customer property to Alameda, Plaintiffs and the members of the proposed Customer class have been unable to withdraw their customer property and been denied the use of their customer property since no later than November 8, 2022, and have been damaged thereby at an amount to be determined at trial.

## COUNT VII:  Aiding and Abetting Breach of Fiduciary Duty
## Against Alameda and Defendant Ellison

221.    Plaintiffs repeat and reallege the averments in paragraphs 1 through 187 of this Adversary Complaint as if fully set forth herein.

222.    As set forth above, FTX US, FTX Trading and the FTX Executive Defendants breached their fiduciary duties to Plaintiffs and the members of the proposed Customer Class by, using, directing, authorizing, or causing FTX US, FTX Trading and/or Alameda to use up to $10 billion in customer property for their own purposes, including borrowing such customer property to use for as operating expenses, to pay creditors, or to make, collateralize and/or repay loans to or on behalf of Alameda, or to fund trading activities by Alameda.

223.    As a direct and proximate consequence of Alameda and Defendant Ellison accepting and using up to $10 billion in customer property, Alameda and Defendant Ellison aided and abetted breaches of fiduciary duty FTX US, FTX Trading and the FTX Executive Defendants. As a result, Plaintiffs and the members of the proposed Customer Class have been unable to withdraw their customer property and been denied the use of their customer property since no later than November 8, 2022, and have been damaged thereby at an amount to be determined at trial.

### COUNT VIII:  Aiding and Abetting Conversion Against Alameda and Defendant Ellison

224.    Plaintiffs repeat and reallege the averments in paragraphs 1 through 187 of this Adversary Complaint as if fully set forth herein.

225.    As set forth above, FTX US, FTX Trading and the FTX Executive Defendants interfered with the possessory rights of Plaintiffs and the members of the proposed Customer Class by, using, directing, authorizing, or causing FTX US, FTX Trading and/or Alameda to use up to $10 billion customer property for their own purposes, including borrowing such customer property to use for as operating expenses, to pay creditors, or to make, collateralize and/or repay loans to or on behalf of Alameda, or to fund trading activities by Alameda.

226.    As a direct and proximate consequence of Alameda and Defendant Ellison accepting and using up to $10 billion in customer property, Alameda and Defendant Ellison

interfered with the possessory rights of Plaintiffs and the members of the proposed Customer Class to their customer property, in derogation of those rights, and therefore aided and abetted the conversion by FTX US, FTX Trading and the FTX Executive Defendants.  As a result, Plaintiffs and the members of the proposed Customer Class have been unable to withdraw their customer property and been denied the use of their customer property since no later than November 8, 2022, and have been damaged thereby at an amount to be determined at trial.

## XVIII.  PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs, on their own behalf, on behalf of the proposed Customer Class, pray for relief and judgment, as follows:

A.      Determining that this action is a proper class action and certifying Plaintiffs as class representatives under Rule 23(a), 23(b)(1)(B) and (b)(3) of the Federal Rules;

B.      Declaring that any customer property – U.S. Dollars, other fiat currencies, cryptocurrencies, and/or Digital Assets – that customers deposited or held at FTX US and/or FTX Trading and were contractually required to be held for customers are not property of the FTX Group, FTX US, FTX Trading, Alameda or affiliated Debtor estates or, in the alternative, customers have priority to repayment of customer property;

C.      Awarding compensatory damages in favor of Plaintiffs and other Customer Class members against all Defendants, jointly and severally, for the damages sustained by the proposed Customer Class a result of the wrongdoings of Defendants, in an amount to be proved at trial, including interest thereon;

D.      Awarding Plaintiffs and the Customer Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

E.      Granting such other and further relief as the Court may deem just and proper.

**XIX.    JURY TRIAL DEMAND**

Plaintiffs hereby demand a trial by jury of all issues so triable.

Dated:  December 27, 2022
                Wilmington, Delaware

**CHIMICLES SCHWARTZ KRINER &
DONALDSON-SMITH LLP**

*/s/ Robert K. Kriner, Jr.*
Robert J. Kriner, Jr. (Del. Bar. No. #2546)
Scott M. Tucker (Del. Bar. No. #4925)
2711 Centerville Rd, Suite 201
Wilmington, Delaware 19808
Tel. (302) 656-2500
robertkriner@chimicles.com

**ENTWISTLE & CAPPUCCI LLP**
Andrew J. Entwistle (*pro hac vice pending*)
500 W. 2nd Street, Suite 1900
Austin, Texas 78701
Tel: (512) 710-5960
aentwistle@entwistle-law.com

-and-

Robert N. Cappucci (*pro hac vice pending*)
Joshua K. Porter (*pro hac vice pending*)
230 Park Avenue, 3rd Floor
New York, NY 10169
Tel: (212) 894-7200
Fax: (212) 894-7272
rcappucci@entwistle-law.com
jporter@entwistle-law.com

*Counsel For Plaintiffs Austin Onusz, Cedric
Kees van Putten, Nicholas J. Marshall and
Hamad Dar*