## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| | **Ref No. 197** |
| | Hearing Date: **January 6, 2023 at 9:30 a.m. (ET)** |
| In re | Chapter 15 |
| FTX DIGITAL MARKETS LTD.,[2] | Case No. 22-11217 (JTD) |
| Debtor in a Foreign Proceeding. | |

## DEBTORS' OBJECTION TO EMERGENCY MOTION (I) FOR RELIEF FROM AUTOMATIC STAY AND (II) TO COMPEL TURNOVER OF ELECTRONIC RECORDS UNDER SECTIONS 542, 1519(A)(3), 1521(A)(7) AND 1522 OF BANKRUPTCY CODE

FTX Trading Ltd. ("FTX Trading") and its affiliated debtors and debtors-in-possession (collectively, the "Debtors") hereby submit this objection (this "Objection") to the *Emergency Motion of the Joint Provisional Liquidators of FTX Digital Markets Ltd. (I) For Relief from the Automatic Stay and (II) To Compel Turnover of Electronic Records Under Sections 542, 1519(A)(3), 1521(A)(7) and 1522 of the Bankruptcy Code* [D.I. 197] (the "Motion to Compel" or "Mot."). In support of the Objection, the Debtors rely upon and incorporate by reference the *Declaration of Edgar W. Mosley II* (the "Mosley Declaration" or "Mosley Decl.")

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively. Due to the large number of debtor entities in these Chapter 11 cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

[2] FTX Digital Markets Ltd. (in Provisional Liquidation) was incorporated in the Commonwealth of The Bahamas as an International Business Company, registered number 207269B.

and the *Declaration of James L. Bromley* (the "<u>Bromley Declaration</u>" or "<u>Bromley Decl.</u>"), submitted contemporaneously herewith.

In support of this Objection, the Debtors respectfully state as follows:

## **PRELIMINARY STATEMENT**

1.     The Motion to Compel fails on multiple fronts.

2.     *First*, the Motion to Compel is premature.   This Court has neither recognized the provisional liquidation (the "<u>PL</u>") of FTX Digital Markets Ltd. ("<u>FTX DM</u>") as a foreign proceeding, nor recognized Messrs. Simms, Cambridge, and Greaves (the "<u>JPLs</u>") as foreign representatives.   Chapter 15 of the Bankruptcy Code ("<u>Chapter 15</u>") requires both.   Only "upon recognition of a foreign proceeding" are the foreign representatives "entitled to participate as a party in interest in a case regarding the debtor under this title."   11 U.S.C. § 1512.   The Motion to Compel puts the cart before the horse.   Recognition must be addressed first.[3]   Until recognition, the JPLs are not parties in interest.

3.     *Second*, the Motion to Compel is premised on inaccurate factual assumptions regarding the ownership of the materials sought by the JPLs.   The JPLs make no showing, *prima facie* or otherwise, that any of the materials sought through the Motion to Compel are assets of FTX DM.   They are not.   The materials are resident within computer architecture that is property of the Debtors.   FTX DM has no contractual right to any of these materials or access to the architecture.   Thus, the Motion to Compel is not a motion to compel

---

[3]     The JPLs have filed five separate requests for relief with this Court:   (i) the Verified Petition for Recognition of Foreign Insolvency Proceedings and Related Relief (the "<u>Recognition Petition</u>") [D.I. 1]; (ii) the Emergency Motion for Provisional Relief Pursuant to 11 U.S.C. §§ 105(A), 1519, and 1521 (the "<u>Motion for Provisional Relief</u>") [D.I. 7]; (iii) the Motion to Compel; (iv) the Motion of the Joint Provisional Liquidators of FTX Digital Markets Ltd. to Dismiss the Chapter 11 Case of FTX Property Holdings Ltd. (the "<u>Motion to Dismiss</u>") [D.I. 213]; and (v) the Motion of the Joint Provisional Liquidators of FTX Digital Markets Ltd. for Provisional Relief Under 11 U.S.C §§ 105(a), 542(e), 1519(a), 1519(e), 1521(a)(7), and 1522 (the "<u>Second Motion for Provisional Relief</u>") [D.I. 55].   Both logic and the law dictate that the first motion to be addressed should be the Recognition Petition.

the Debtors to turnover FTX DM property to the JPLs.  Instead, it is a motion to compel the production of information owned by the Debtors only available through discovery.  As to such discovery, the Debtors have objections to the breadth of the requests, the relevance of the requests, and the unreasonable burden the requests would impose on the Debtors. Notwithstanding the JPLs' lack of any right to the materials demanded, the Debtors have made a good faith proposal that should resolve the pending dispute, as described below, to provide documents and information to the JPLs relating to FTX DM and the services it provided.[4]

4.      *Third*, the Motion to Compel is premised on inaccurate factual assumptions regarding FTX DM itself.  FTX DM was never the center of the FTX group.  It was nothing more than a short-lived provider of limited "match-making" services for customer-to-customer transactions, on the cryptocurrency exchange built, owned, and operated by Debtor FTX Trading, its immediate corporate parent.  FTX DM operated for just under six months, from May 13, 2022 to November 10, 2022.  Over 90% of customers who used the FTX.com exchange were customers before FTX DM even became operational.  Once operational, FTX DM never earned a dollar of third-party revenue.  FTX DM was a virtual nullity within the FTX group.

5.      *Fourth*, the Debtors will object to recognition.  The objections are premised on, among other things, clear evidence that (a) nearly $100 million of the Debtors' cryptocurrency assets were released to account holders identified as Bahamian residents during a 25.5-hour period that began on November 10, 2022, the day that the PL was commenced, and continued to midday on November 11, 2022, the day that these Chapter 11 Cases were commenced, during which time Mr. Simms was in control of FTX DM, and (b) on November 11

---

[4]      In addition, the Debtors are in the process of providing the JPLs with the data resident on the Debtors' QuickBooks system that relates to FTX DM.  The Debtors also remain willing to enter into a reciprocal inter-court protocol that respects the sovereignty and jurisdiction of each of the United States and The Bahamas and which is mutually agreeable to both courts.

and November 12, 2022, digital assets located in digital wallets of the Debtors, worth at the time approximately $300 million, were taken by some combination of the Securities Commission of The Bahamas (the "Commission"), Mr. Simms, Mr. Bankman-Fried, and Mr. Wang.  Allowing the withdrawals and taking the digital assets both violated the automatic stay.[5]  Those purporting to be foreign representatives who have, without explanation, either violated the automatic stay or aided and abetted violations of the automatic stay by others, are not entitled to recognition. Discovery, both documentary and depositions, as well as an evidentiary hearing will be required. A schedule for discovery and trial will need to be approved by the Court.

6.     *Fifth*, as described in the First Day Declarations (as defined below), on the Petition Date (as defined below), the books and records of the Debtors were in a terrible state and the Debtors' administrative structures ranged from severely flawed to non-existent.  Since the Petition Date, the Debtors and their advisors have been engaged in the painstaking task of creating administrative structures and compiling books and records that are capable of providing usable information regarding the Debtors, their businesses, assets, liabilities, customers, and creditors.  At the same time that these efforts have been ongoing, the Debtors have been responding to multiple urgent requests for information from U.S. law enforcement and regulatory authorities, including, among others the Department of Justice ("DOJ"), the Securities and Exchange Commission ("SEC"), and the Commodities Futures Trading Commission ("CFTC"), as well as the Office of the United States Trustee ("U.S. Trustee") and the United States House

---

[5]     It is also possible that after his appointment Mr. Simms violated his fiduciary duties as provisional liquidator by allowing the withdrawal window to remain open for Bahamas residents after his appointment and cooperating with the Commission, Mr. Bankman-Fried, and Mr. Wang to move digital assets of the Debtors to the Commission.  The Debtors have advanced substantial funds to FTX DM, which as discussed below had no other source of revenue, and may be the largest creditor to whom Mr. Simms owes his fiduciary duties.

of Representatives.  A criminal indictment has been issued against Mr. Bankman-Fried, who was arrested in The Bahamas and extradited to the United States.[6]  Caroline Ellison (the former CEO of Alameda Research LLC) and Mr. Wang have pled guilty to multiple crimes and entered into cooperation agreements with the United States Attorneys' Office for the Southern District of New York.[7]  The SEC and the CFTC have filed civil complaints against Mr. Bankman-Fried, Ms. Ellison, and Mr. Wang.[8]  The Debtors continue to cooperate with these authorities.  The fact that the founders left the Debtors more closely resembling a crime scene than an operating business cannot be ignored.

7.    *Sixth*, on December 15, 2022, the U.S. Trustee appointed the Official Committee of Unsecured Creditors (the "Committee"), which has only recently selected proposed legal and financial advisors.  Since the appointment of the Committee, the Debtors and their advisors have been working to provide information to the Committee and their advisors. The Committee is an estate fiduciary, appointed pursuant to Section 1102 of the Bankruptcy Code.  Bringing the Committee and its advisors up to speed as quickly as possible is one of the Debtors' core obligations.

8.    *Seventh*, despite having backed off from their immediate demand for dynamic access to the Debtors' systems, the issue is merely dormant, not resolved.  The JPLs only retreated following the Court's comments at the December 14, 2022 hearing.  It remains to be seen exactly what the JPLs seek in terms of ongoing access.

[6]    Sealed Indictment, *United States* v. *Bankman-Fried*, No. 22-cr-00673 (S.D.N.Y. Dec. 9, 2022), ECF No. 1.

[7]    Order, *id.*, ECF No. 15.

[8]    Complaint, *SEC* v. *Bankman-Fried*, No. 22-cv-10501 (S.D.N.Y. Dec. 13, 2022), ECF No. 1; Complaint, *SEC* v. *Ellison*, No. 22-cv-10794 (S.D.N.Y. Dec. 21, 2022), ECF No. 1; Amended Complaint, *CFTC* v. *Bankman-Fried*, No. 22-cv-10503 (S.D.N.Y. Dec. 21, 2022), ECF No. 13.

9.      The Debtors' resources (financial and human) are not unlimited.   The demands on the Debtors to produce information to multiple requesting parties requires that the requests be prioritized, taking into account the standing of the requesting entity, the entitlement to the information, the need for the information, and the harm (if any) that may accrue while gating issues are addressed.

10.      *Finally*, the stunning press release issued late yesterday, on December 29, 2022, by the Commission, along with certain related materials, is a game changer.   The press release (and the supporting affidavit of the Executive Director of the Commission) boldly admits that the Commission violated the automatic stay in taking certain of the Debtors' digital assets and then recklessly values the assets taken at $3.5 billion.[9]  As described in more detail below, yesterday's disclosures demonstrate conclusively that the JPLs and the Commission are cooperating closely to do an end run around this Court and chapter 11.   In a situation where maximizing recoveries for creditors should be the primary goal of all concerned, one can only wonder why.

11.      The JPLs and the PL have not been recognized by this Court and the Debtors will oppose recognition.   The JPLs have either violated the automatic stay or aided and abetted violations by others.   The materials the JPLs seek are not FTX DM's property, but are

---

[9]      On December 29, 2022, the Commission issued a press release announcing that it had sought direction from the Supreme Court of The Bahamas (the "Bahamas Court") with respect to the disclosure to the Debtors of information regarding the digital assets taken from the Debtors on November 11 and 12, 2022. (Bromley Decl. Ex. 6.)  In the context of describing the relief obtained, the Commission announced, without support, that the digital assets taken were "valued at more than $3.5 billion."  (*Id.* at 2.)  As described in more detail below, the actions this week of the Commission and the JPLs continue to demonstrate a complete lack of transparency, continued hand in glove cooperation between the Commission and the JPLs, and complete disregard for this Court and the Bankruptcy Code.  Moreover, the valuation statement was reckless in the extreme.  Based on their investigation, the Debtors believe this cryptocurrency consists almost entirely of 195 million shares of FTT, the loyalty token for FTX.com.  This cryptocurrency has a current market value of less than $167 million if sold at today's spot price, and there may be no buyer for large amounts of FTT at anything near spot price.

the Debtors' property.  The JPLs show no threat of immediate harm or irreparable injury.  They do not show how any hardship they would suffer outweighs the hardship that the Debtors would suffer.  They do not show any likelihood of success on the merits.  The Motion to Compel must be denied.

## **BACKGROUND**

### A.   **The Debtors and Their Chapter 11 Cases**

12.   On November 11, 2022 and on November 14, 2022 (as applicable, the "Petition Date"), the Debtors filed with the Court voluntary petitions for relief under title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*. (the "Bankruptcy Code").  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Joint administration of the Debtors' cases (the "Chapter 11 Cases") was authorized by the Court by entry of an order on November 22, 2022 [D.I. 128].  On December 15, 2022, the U.S. Trustee appointed the Committee pursuant to Section 1102 of the Bankruptcy Code [D.I. 231].

13.   Additional factual background relating to the Debtors' businesses and the commencement of these Chapter 11 Cases is set forth in the *Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 24], the *Declaration of Edgar W. Mosley II in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 57], the *Supplemental Declaration of John J. Ray III in Support of First Day Pleadings* [D.I. 92], and the *Supplemental Declaration of Edgar W. Mosley II in Support of First Day Pleadings* [D.I. 93] (collectively, the "First Day Declarations").

### B.   **FTX Trading and FTX DM**

14.   The history of the Debtors is relatively short.  Samuel Bankman-Fried and Zixiao "Gary" Wang founded Alameda Research LLC ("Alameda LLC") in November 2017.

(Mosley Decl. Ex. A.)  Mr. Bankman-Fried, Mr. Wang, and Nishad Singh founded FTX Trading (a/k/a FTX.com) in April 2019 and West Realm Shires Services, Inc. (a/k/a, FTX US and "FTX US") in January 2020.  (Mosley Decl. Exs. B and C.)  These three entities, together with 99 other affiliates, filed for Chapter 11 protection on the Petition Date.

15.     The history of FTX DM is even shorter.  FTX DM existed as a corporate entity for just over 16 months.  It was incorporated in the Commonwealth of the Bahamas ("The Bahamas") on July 22, 2021.  (Mosley Decl. Ex. D.)  Its registration to operate as a Digital Asset Service Provider (but not a Digital Token Exchange) was approved by the Securities Commission of The Bahamas (the "Commission") on September 20, 2021.  FTX DM began operations on May 13, 2022 and operated for just under six months (May 13, 2022 to November 10, 2022) before it was shut down by the Commission.

### C.     FTX Trading Operations

16.     Upon its creation in April 2019, FTX Trading operated an exchange and trading platform which allowed customers to buy, sell, exchange, hold, or otherwise transact in digital assets, use the FTX Application Programming Interface ("API"), and use any other services through the FTX.com website (the "Site").  The relationship between customers and FTX Trading was governed by the 2019 and 2020 Terms of Service.  (the "Original Terms of Service").  (Mosley Decl. Exs. H and I.)

17.     The Original Terms of Service and other records identified by the Debtors during their ongoing investigation demonstrate:

- FTX Trading owns, and for all relevant periods has owned, the API.  (Mosley Decl. Exs. H and I at 1.)

- FTX Trading owns, and for all relevant periods has owned, the Site.  (*Id.*)

- At all times, through and including the present date, all customer accounts for the Site were maintained in the AWS cloud environment.  (Mosley Decl. ¶ 24.)

- At all times, through and including the present date, all fee income generated by customers using the Site (other than those for FTX Japan and Singapore) were paid to FTX Trading.  (Mosley Decl. Ex. E.)

- No customer that opened an account on the Site prior to May 13, 2022 ever had a relationship with FTX DM, whether contractual, service, or otherwise.  (Mosley Decl. Exs. G and H.)

- No customer that opened an account on the Site prior to May 13, 2022 ever effectively novated any part of its contractual relationship with FTX Trading to FTX DM.

- During calendar year 2021, FTX Trading generated over $1 billion in third-party revenue.  (Mosley Decl. ¶ 14.)

- During the first three quarters of 2022, FTX Trading generated over $700 million in third-party revenue.  (Mosley Decl. ¶ 15.)

**D.     FTX DM Operations**

18.     During its six-month operational lifespan, FTX DM had a limited mandate and a limited balance sheet.  (Mosley Decl. ¶ 12.)  From and after May 13, 2022, FTX DM provided certain "Specified Services" as a "Service Provider" under the FTX Terms of Service dated May 13, 2022 (the "New Terms of Service").  (Mosley Decl. Ex. G.)  From and after May 13, 2022, FTX Trading continued to own and operate the exchange and platform.

19.     The New Terms of Service and other records identified by the Debtors during their ongoing investigation demonstrate:

- FTX DM is 100% owned by FTX Trading.

- FTX Trading is the named counterparty to the New Terms of Service, just as it was for the Original Terms of Service.  (Mosley Decl. Ex. G at 1.)

- FTX DM did not exist, or was not licensed to conduct business, for those customers who signed the Original User Agreement.  (*Compare* Mosley Decl. Ex. D *with* Mosley Decl. Ex. G.)

- For the New User Agreement, FTX DM is not the named party, but is identified as one of several "Service Providers" that provides "Specified Services."  (Mosley Decl. Ex. G at 31–40.)

- The "Specified Services" to be provided by FTX DM all involve providing technology to facilitate certain transactions on the FTX.com platform with other customers.  The Specified Services did not include trading as principal or entering into privity of contract with any customer with respect to any trade.  (*Id.*)

- FTX DM was licensed by the Commission as a Digital Assets Service Provider ("DASP") under section 6(d) of The Bahamas' Digital Assets and Registered Exchanges Act of 2020 (the "DARE Act"), and not as a Digital Token Exchange ("DTO"), under section 6(a) of the DARE Act.

- As a DASP, FTX DM was not in the business of providing distinct custodial services.

- $10 million was deposited into an account in FTX DM's name with Fidelity Bank and Trust (Bahamas) Limited ("Fidelity Bahamas"), which sum represented the estimated cost of an orderly wind down of FTX DM's business over a six month period.  (Mosley Decl. ¶ 20.)

- The $10 million deposited in FTX DM's name with Fidelity Bahamas was provided by FTX Trading.  (Mosley Decl. ¶ 21.)

- All FTX.com accounts opened after May 13, 2022 that held digital assets or e-money were maintained in the AWS cloud environment.  (Mosley Decl. ¶ 24.)

- FTX DM never generated revenue from third parties or customers.  (Mosley Decl. ¶ 12.)

- All transactional fees earned under the New User Agreement were paid to FTX Trading.  (*Id.*)

- FTX DM only generated intercompany or related-party revenue, which was paid to it primarily by FTX Trading, as well as other related parties.  (*Id.*)

- FTX DM earned approximately $604,000 net income during calendar year 2021 and approximately $5.17 million net income through the first three quarters of 2022.  (Mosley Decl. ¶ 13.)

- In the first three quarters of 2022, FTX DM had total operating expenses of approximately $73 million, including over $40 million labeled "other expenses." (Mosley Decl. ¶ 18.)

- These "other expenses" include over $15 million for "Hotels and Accommodation" paid primarily to three hotels in The Bahamas:  the Albany ($5.8 million), the Grand Hyatt Baha Mar ($3.6 million), and the Rosewood Baha Mar ($807,000).  (Mosley Decl. ¶ 17 and Ex. F.)

### E.    AWS Cloud Environment

20.    As noted in the First Day Declarations, the businesses of the Debtors can be divided into four silos:  the WRS Silo, the Alameda Silo, the Ventures Silo, and the DotCom Silo.  The exchange businesses were located in the WRS and DotCom Silos.  The domestic exchange for the U.S. was located in the WRS Silo and operated through FTXUS.com.  The international exchange was located in the DotCom Silo and operated through FTX.com.  The U.S. and international exchange and trading platforms were hosted by Amazon Web Services ("AWS").  All digital assets of the FTX group, including all digital assets deposited by or associated at any time with any customer, whether of the WRS Silo or the DotCom Silo were held in the AWS cloud environment.  In addition to AWS, Google Cloud Platform ("GCP"), holds a copy of select data tables from AWS for analytics purposes.  (Mosley Decl. ¶ 24.)  Private keys for cryptocurrency that the Debtors have identified as being associated with the FTX.com and FTXUS.com exchange (outside of Japan and Singapore) were held in the AWS cloud environment.

21.    Debtor Alameda Research LLC ("Alameda Research") contracted for, pays for, and has the right to control access to, the AWS.  (Mosley Decl. ¶ 25.)  FTX DM has no rights under the operative agreements relating to those services, express or implied.  (Mosley Decl. Ex. J.)  FTX DM is not a party to the agreement, which expressly disclaims benefits to any third party.  (Mosley Decl. Exs. J, R, S.)

### F.    Collapse of FTX Group

22.    During the week beginning Sunday, November 6, 2022, the FTX group collapsed.

23.    On November 8, 2022, in the face of a severe liquidity crisis, withdrawals were initially halted for all customers with accounts on FTX.com.  (Mosley Decl. ¶ 29.)

24.     On November 9, 2022, internal counsel at FTX Trading was authorized by Mr. Bankman-Fried to engage counsel to begin contingency planning that included the possibility of a Chapter 11 filing.

25.     On November 9, 2022, according to a recent filing by the Commission with the Bahamas Court, a call took place that included the Commission, Ryan Salame (then-Chairman and Director of FTX DM, and officer at FTX Property Holdings Ltd.), Allyson Maynard-Gibson KC (at the time, FTX DM's Bahamas counsel), and Ryne Miller (FTX US's internal counsel).   The Commission reported that during that call, Mr. Salame advised the Commission that "clients' assets which may have been held with [FTX DM] were transferred to Alameda Research[] to cover financial losses."  (Bromley Decl. Ex. 1 ¶ 34.)[10]

26.     On November 9, 2022, after the Commission had spoken to Mr. Salame and was aware of the alleged wrongdoing by Mr. Bankman-Fried and others, Mr. Bankman-Fried sent an email to Ryan Pinder, Attorney General of The Bahamas, copying Christina Rolle, Executive Director of the Commission.   In this email, Mr. Bankman-Fried wrote "we have segregated funds for all Bahamian customers" and "**would be more than happy to open up withdrawals for *all* Bahamian customers on FTX, so that they can, *tomorrow*, *fully* withdraw *all* of their assets, making them fully whole.**"  (Mosley Decl. Ex. K (emphasis in original).)  Mr. Bankman-Fried continued, "***If we don't hear back from you*, we are going to go ahead** and do it tomorrow."  (*Id.* (emphasis added).)

27.     On November 10, 2022, the Commission filed a petition for provisional liquidation of FTX DM with the Bahamas Court.  (Bromley Decl. Ex. 2.)  The petition and the

---

[10]     The information relating to this November 9, 2022 call was only disclosed to the public by the JPLs on December 14, 2022 in response to the disclosure by the Debtors of the email described in paragraph 26 hereof.  This information appears to have been submitted to the Supreme Court of the Bahamas in support of the Petition for Provisional Liquidation.

declarations in support were filed under seal.  (Bromley Decl. Ex. 3.)  No public hearing was held.  (Bromley Decl. Ex. 3.)  The petition was granted and Mr. Simms, an experienced insolvency practitioner, was appointed provisional liquidator.  (Bromley Decl. Ex. 3.)  On December 14, 2022, the November 10, 2022 Affidavit of Ms. Rolle was made public [D.I. 225-4.]  In it, Ms. Rolle disclosed to the Court—on November 10, 2022—among other things, (a) the content of the conversation with Mr. Salame concerning the comingling of assets (*id.* ¶¶ 32–37), and (b) the email from Mr. Bankman-Fried offering to open FTX.com to withdrawals to Bahamian customers (*id.* ¶ 26).  No transcript of the November 10 hearing before the Bahamas Court has been released.

28.    It is not clear what, if anything, was said to the Bahamas Court on this subject other than the submission of Ms. Rolle's Affidavit.  However, because of Ms. Rolle's Affidavit, the Bahamas Court, Ms. Rolle, Mr. Pinder, and Mr. Simms all had knowledge of Mr. Bankman-Fried's November 9, 2022 email.  The Debtors have found no evidence that Mr. Pinder or Ms. Rolle responded to Mr. Bankman-Fried and requested that he prevent withdrawals.  To the contrary, Mr. Bankman-Fried in correspondence and FTX on their official twitter account made clear that the resumption of withdrawals was "per SCB's wishes" (*i.e.*, the Commission).  (Mosley Decl. Ex. P ("[W]e're about to announce that withdrawals opened up for BAhamians [*sic*]/ heads up/ per SCB's wishes."); Bromley Decl. Ex. 4 ("Per our Bahamian HQ's regulation and regulators, we have begun to facilitate withdrawals of Bahamian funds.  As such, you may have seen some withdrawals proceed by FTX recently as we complied with the regulators.").)  The Debtors' records show that on November 10, 2022, cryptocurrency withdrawals were opened for Bahamian customers of FTX.com, with nearly $100 million of cryptocurrency being withdrawn within a 25.5-hour period by approximately 1,500 individuals

purporting to be Bahamian residents for KYC purposes. All of these withdrawals were processed through access to the AWS cloud environment, as to which FTX DM had no contractual rights.

29.     The opening of this window for Bahamian withdrawals took place *after* the commencement of the provisional liquidation proceedings in The Bahamas and *after* U.S. counsel was engaged to begin contingency planning. It continued for over 24 hours into November 11, 2022, the day on which FTX Trading filed for Chapter 11 protection.[11]

30.     In the early morning hours of November 11, 2022, John J. Ray, III was appointed CEO and Chief Restructuring Officer of the Debtors pursuant to an omnibus corporate authority signed by Mr. Bankman-Fried. (*See* Ray First Day Declaration ¶¶ 1, 44.) Shortly after his appointment, Mr. Ray provided corporate authority to commence the Chapter 11 Cases. (*Id.* ¶ 2.)

### G.     The Commission and the JPLs Knowingly Violate the Automatic Stay

31.     Immediately upon the filing of the Chapter 11 Cases, the Debtors and their representatives began working on securing their digital assets, focusing on the AWS systems.

32.     On the evening of November 11, 2022, while Debtors were in the process of securing these systems, it became clear that the systems were being accessed by one or more unidentified and unauthorized actors. The Debtors and their advisors worked through the night into the early morning hours of November 12, 2022 to block such access and move digital assets to secure cold wallets. On the evening of November 12, 2022, the Debtors observed the movement of primarily a large volume of formerly non-circulating FTT tokens—the native

---

[11]     The Debtors continue to investigate the identities of those who received these withdrawals, including whether they actually satisfied applicable KYC and other legal requirements. The Debtors reserve all rights with respect to such withdrawals, including without limitation, the right to claw back any payments.

cryptocurrency of the FTX.com exchange—from a cryptocurrency wallet that the Debtors previously had used to release additional FTT tokens for circulation.

33.    Information quickly emerged that Debtors' systems were accessed from at least two sources.  (*See* Ray First Day Declaration ¶ 75.)    One source continues to be investigated.  As for the second source, evidence collected by the Debtors shows without doubt that the Commission—after the filing and public announcement of the Chapter 11 Cases— instructed Messrs. Bankman-Fried and Wang to transfer hundreds of millions of dollars' worth of previously non-circulating FTT tokens as well as other digital assets to cold storage under the control of the Commission.  (*See* Mosley Decl. Ex. Q (responding to a Slack inquiry regarding a "large FTT mint/transfer", Wang reported that he "was directed by bahamas [*sic*] regulators to transfer the FTT").)  Mr. Simms, who was copied on all correspondence, was involved at every step.  The Debtors have consistently requested that the JPLs and the Commission provide full transparency with respect to the events of November 11 and 12, 2022.  While certain information has been grudgingly disclosed, in the context of the present dispute, the full story remains hidden.[12]

34.    On November 12, 2022, after taking assets from the AWS cloud environment, "the Commission sought an additional Order (the 'November 12 Order') from the Supreme Court of The Bahamas for authority under the DARE Act to transfer *all digital assets of FTX* into digital wallets under the exclusive control of the Commission for the benefit of clients and creditors of [FTX DM]."  (Emphasis added.)  The existence of this Order was not revealed to

---

[12]    On December 29, 2022, the Commission issued a press release confirming that the Bahamas Court would not allow it to share information with the Debtors.  (Bromley Decl. Ex. 6.)  The Bahamas Court's cryptic order allowing the JPLs to "cooperate with, and provide information to, the US Debtors by sharing with their representatives, in a highly confidential manner, *certain information* respecting the digital assets being held in the secure digital wallets established by, and under the control of, the Commission" does not provide any comfort that there will be increased transparency going forward.  (*See id.*)

Debtors until November 23, 2022, when the Commission issued a press release in response to Debtors' motion to transfer (discussed below).  (*See* Bromley Decl. Ex. 5.)[13]

35.     The November 12 proceedings were, once again, conducted on an *ex parte* basis and under seal.  The Debtors did not receive (i) notice that the Commission was seeking entry of the November 12 Order; (ii) an opportunity to be heard in respect of the November 12 Order; (iii) a copy of the pleadings filed by the Commission in support of the application for the November 12 Order; or (iv) a copy of the November 12 Order itself.

36.     The evidence shows that the Commission knew, at a minimum, that the assets it was seizing did not belong solely to FTX DM.  On November 12, 2022, the Commission sent a letter to the CEO of Tether International Limited, which held cryptocurrency accounts on behalf of Debtors and FTX DM, with the subject line "Lifting of Freeze and Accounts for and/or in the name of FTX Digital Markets Limited and **Related Parties**."  (Mosley Decl. Ex. L (emphasis added).)  The letter instructed Tether to "burn [destroy] the tether coins that were frozen and simultaneously mint new tether coins for the equivalent amount and transfer all USDT coins" to the Commissions' wallet—not a wallet held by the JPLs.  (*Id.*)  No notice was given to the Debtors.

37.     On November 13, 2022, at 6:25 a.m. UTC, Mr. Wang sent Ms. Rolle, the Executive Director of the Commission, an email titled "Transfer logs," attached to which was a spreadsheet listing all of the **FTX.com** hot wallets and a column indicating the digital wallets, the contents of which had been sent to the Commission.  (Mosley Decl. Ex. M.)  Roughly an hour later, at 7:15 a.m., Mr. Wang sent Ms. Rolle his cell phone number.  (Mosley Decl. Ex. N.)

---

[13]     The misappropriated assets remain in the control of the Commission, suggesting that the Commission has usurped the distributive fiduciary role supposedly entrusted to the JPLs.

38.      On November 13, 2022, at 4:56 p.m., Mr. Bankman-Fried sent an email to Ms. Rolle, copying Mr. Simms (the then-sole provisional liquidator), stating that he understood the Commission "moved almost all of the assets last night!" (emphasis in original), but also indicating that their access to AWS was suspended before the remainder could be transferred. (Mosley Decl. Ex. O.)   Ms. Rolle replied, asking Mr. Bankman-Fried to provide details on the assets that could not be transferred.   Mr. Wang replied with a list of those assets.   (*Id.*) Mr. Simms was copied on every email and reply.

39.      On November 13, 2022, with knowledge of the Commission's unauthorized access to the Debtors' systems, but without knowledge of the November 12 Order, Debtors' counsel wrote a letter to Ms. Rolle and Mr. Simms informing each of the Chapter 11 Proceedings and the existence of the automatic stay of Section 362(a) of the Bankruptcy Code. (Bromley Decl. Ex. 7.)   The Debtors did not receive an acknowledgement of that letter until December 7, 2022.  *See* ¶ 46, *infra*.

40.      On November 14, 2022, the Bahamas Court appointed Kevin G. Cambridge and Peter Greaves of PwC as additional JPLs, to serve alongside Mr. Simms.   No notice of these appointments was provided to the Debtors.

**H.      The JPLs and Bahamian Government Ignore Debtors' Offers to Coordinate**

41.      On November 15, 2022, lawyers from Holland & Knight LLP (then-counsel for the JPLs) requested an introductory call with Debtors' counsel.   During that call, the Debtors' counsel proposed the development of a consensual protocol to facilitate coordination between the Chapter 11 Cases and the Bahamian Liquidation.   Then-counsel for the JPLs told the Debtors' counsel that they would consider the proposal but never responded.

42.      On November 16, 2022, with no notice to the Debtors, the JPLs filed a Chapter 15 Petition for Recognition of a Foreign Proceeding relating to FTX DM in the United

States Bankruptcy Court for the Southern District of New York ("<u>SDNY</u>"), captioned *In re FTX Digital Markets Ltd. (in Provisional Liquidation)*, Case No. 22-BK-11516 (MEW) (the "<u>Chapter 15 Case</u>").  The JPLs sought entry of an order pursuant to Chapter 15 of the Bankruptcy Code to, among other things, recognize the Bahamian Liquidation as a foreign main proceeding pursuant to 11 U.S.C. §§ 1502, 1517(a) and (b)(1), and appointing the JPLs as FTX DM foreign representatives pursuant to 11 U.S.C. §§ 101(24), 1509 and 1517(a).  Among other things, the JPLs alleged that some or all of the Chapter 11 Cases are illegitimate, that the center of main interests for the "FTX Group" and the "FTX Brand" is in the Bahamas, and strongly suggested that upon recognition the JPLs will seek to dismiss some or all of these Chapter 11 Cases.

43.     On November 17, 2022, the Debtors filed an emergency motion to transfer the Chapter 15 Case to this Court for coordinated proceedings with the Chapter 11 Cases [D.I. 22].

44.     On November 22, 2022, the first day hearing in the Chapter 11 Cases took place (the "<u>First Day Hearing</u>").  At the First Day Hearing, the JPLs consented to the transfer of the Chapter 15 Case to this Court, subject to certain limitations and conditions, and the Court entered an order transferring the Chapter 15 Case to this Court on the same day [D.I. 131].

45.     On November 27, 2022, the Debtors wrote to the Prime Minister (Mr. Davis) and Attorney General (Mr. Pinder) of The Bahamas "to open a new line of communication so that [the Debtors and the Bahamian government] can collectively move forward on a coordinated basis" and offered "to speak with [them] at [their] earliest convenience about how the Government of the Bahamas can participate directly and meaningfully in the Chapter 11 Proceedings on behalf of itself and Bahamian citizens in general."  (Bromley Decl. Ex. 8.)

46.     Later on the same day, November 27, 2022, the Attorney General of The Bahamas addressed the Bahamian nation on the "current situation regarding FTX Digital Markets Limited" (the "AG's Address").  (Bromley Decl. Ex. 9.)  The AG's Address admits that the Commission's regulatory mandate only extends to FTX DM.  At the same time, the AG's Address blurs lines stating that the Bahamian government has taken steps to protect "the interests of *FTX's* customers and creditors" rather than focusing solely on FTX DM.  (*Id.* at 2 (emphasis added).)  Echoing the JPLs' Chapter 15 pleadings, the AG's Address called into question the legitimacy of these Chapter 11 Cases, asserting the Debtors' counsel made "inaccurate allegations" in its filings before this Court and suggesting that the Debtors' "legal strategy" is being driven by the "prospect of multi-million dollar legal and consultant fees."  (*Id.* at 5.)  The AG's Address acknowledged the Commission's involvement in the unauthorized access of the Debtors' assets, stating that the Commission had "secured the assets of [FTX DM] to be held on behalf of and *for the benefit and restitution of clients and creditors of FTX*," (*id.* at 2 (emphasis added)), but provided no details as to what occurred and failed to note that those assets were secured in collaboration with Messrs. Bankman-Fried and Wang.

47.     On December 1, 2022, following the AG's Address, the Debtors wrote to the Prime Minister and the Attorney General, again offering "to discuss areas where cooperation would be mutually beneficial."  The letter also set out a detailed summary of the facts known to the Debtors and requested that the Bahamian authorities correct any inaccuracies in the Debtors' summary.  The letter also again requested information as to the assets taken by the Commission. (Bromley Decl. Ex. 10.)

48.     On December 7, 2022, Bahamian counsel for the Debtors, Peter D. Maynard and Co. ("Maynard"), received a letter from Bahamian counsel for the Commission,

Delaney Partners ("Delaney").  This letter acknowledged the Debtors' November 13 and December 1 Letters.  (Bromley Decl. Ex. 11.)  In doing so, the Commission's counsel "decline[d] to provide certain information [the Debtors] seek as to" the assets seized.  (*Id.* at 3.) Further, the letter stated that the Commission had "no comment on [the Debtors'] suggestion that [they] and The Bahamian Joint Provisional Liquidators enter into one or more joint protocols to facilitate the efficient conduct and mutual respect for the pending insolvency proceedings."  (*Id.*) The letter's lack of responsiveness speaks volumes.

49.     At around 1:00 p.m. on December 7, 2022, the Debtors' counsel received a letter from the JPLs' current counsel, White & Case LLP, that stated they "urgently require immediate access to [FTX DM's] electronic records that are contained on certain of the systems controlled by the Chapter 11 Debtors" and requested unfettered access to all of Debtors' systems, including Slack, Google Mail/Google Chat, Google Drive, AWS, and Google Cloud Platform BigQuery.  (Bromley Decl. Ex. 12.)  The letter demanded that the JPLs be provided access "by no later than 5PM EST on Thursday, December 8, 2022".  (*Id.* at 1.)[14]

50.     On December 8, 2022, Debtors' counsel responded to the letter by email, offering "an in person meeting next Wednesday to see if we can take the temperature down." (Bromley Decl. Ex. 13.)  The next morning, counsel for the JPLs responded, "[w]e'll discuss on our end and consider schedules/availability and will get back to you."  (*Id.*)  The email said nothing about their intent to file the instant Motions.

51.     The JPLs largely omit the interactions between the Debtors, the JPLs, and the Commission from their Motions.  The Debtors have made repeated overtures to the JPLs and the Commission to meet and those overtures have been met with obfuscation and hostility.  The

---

[14]     JPLs' counsel sent a 'document' hold letter identifying this group of materials on November 30, 2022.

JPLs and the Commission have refused to provide responses to Debtors' legitimate questions about the assets "secured" by the Commission. Instead, the JPLs chose to file multiple motions seeking extraordinary relief on an unnecessarily truncated time frame.

### I.     The JPLs Continue to Push for Live Access to Debtors' Systems

52.     On December 15, 2022, following a conference with the Court concerning the Motion to Compel, among other matters, the parties (including counsel for the Commission) met and conferred regarding the potential for an information-sharing protocol. Prior to that meeting, counsel for the JPLs sent Debtors' counsel a draft term sheet, which was consistent in scope with the JPLs' prior requests (the "JPL Requests"). (Bromley Decl. Ex. 14.) The breadth of the information requested by the JPLs is stunning, and includes, among other information:

- A copy of all AWS databases used to run the FTX.com platform, including all customer information and complete transaction data for every single customer of FTX Trading;

- Slack and email extracts for every employee of FTX DM for the their entire tenure at any of the Debtors. This request includes, for example, every email and Slack message for Mr. Bankman-Fried since he founded Alameda and would provide FTX DM every single email and Slack message sent about any topic whatsoever—whether it related to Alameda, FTX Trading, FTX US or anything else wholly unrelated to FTX DM.

- Extracts of the entirety of the Debtors' Google Drive system because Mr. Bankman-Fried or others had access to folders or user files, irrespective if those records have any connection to FTX DM.

53.     In addition, while the JPL's put aside their request for immediate dynamic access, they made clear to the Debtors they reserved the right to seek it in the future.

54.     On December 20, 2022, Debtors' counsel sent to counsel for the JPLs a counterproposal, in which the Debtors agreed to provide the JPLs with information targeting records relating to FTX DM. That proposal was rejected by counsel to the JPL's with a counterproposal that was little more than a restatement of their original December 15 request.

55.     On December 23, 2022, Debtors' counsel nonetheless responded with a further counterproposal in an attempt to resolve this dispute ("Debtors' Proposal").  (Bromley Decl. Ex. 15.)  That proposal detailed the information the Debtors are prepared to provide to the JPLs prior to a recognition order issued by this Court in FTX DM's chapter 15 case.   The Debtors' proposal offered to provide all information identified as relating to FTX DM, and constituted significant information.  This included:

- A full data export for all FTX DM records held within QuickBooks;

- All agreements and contract to which FTX DM is a party;

- File folders or other identifiable information located on the Google Drive related to the services performed by FTX DM;

- A schedule of bank accounts held in the name of FTX DM, and related information;

- Extracts from the Debtors Slack and email systems using all FTX DM employees as custodians and applying to be mutually-agreed search terms targeting documents reasonably calculated to return documents relating to FTX DM and the services provided by FTX DM; and

- Any other information later identified as owned by FTX DM or reasonably necessary for the administration of any property of FTX DM.

The JPLs have not responded to the Debtors' proposal.

## ARGUMENT

## I.     NO RELIEF SHOULD BE GRANTED WHILE JPL/COMMISSION SHELL GAME CONTINUES.

56.     Through the Motion to Compel and the other four motions filed by the JPLs pending before this Court, the JPLs make it clear that they want to participate fully in these Chapter 11 Cases.  The JPLs want recognition, they want access, they want rights, they want control, and they want everything immediately, without hesitation.  Yet the JPLs have violated the automatic stay and continue to do so.  The Commission, which admits to violating the

automatic stay, feels insulted because it has been questioned while sitting imperiously in the Bahamas. It seeks "direction" at its whim, without notice and without opposition, from the very court that oversees both the regulatory exercise the Commission claims to be engaged in and the provisional liquidation of FTX DM. (*See* Bromley Decl. Ex. 6.) Unsurprisingly, it receives the very direction it expected—it need not provide the Debtors with any information regarding the Debtors' assets that it has in its possession. (*Id.*)

57.     The Commission has not appeared in these proceedings, yet it casts a shadow over everything at issue involving the JPLs and the JPLs' involvement in these Chapter 11 Cases. Typically, when a question is posed to the JPLs (*e.g.*, what was taken?), the JPLs throw up their hands and point to the Commission. The Commission, when asked, either refuses to engage with the Debtors or states that it need not speak to the Debtors, who do not have appropriate status in their eyes. When attempts are made to reach out to the Prime Minister and the Attorney General of The Bahamas to arrange an in person meeting to take down the temperature, counsel to the Commission responds to the Debtors' Bahamas counsel saying absolutely nothing. When the communications to the Prime Minister and the Attorney General, or a national speech by the Attorney General on FTX DM, are mentioned to the JPLs and the Commission, both of which were copied on the communications and both of which heard the speech, the response is that the central government does not speak for the JPLs or the Commission. An elaborate and intentional game is being played.

58.     The facts that the Debtors have repeated over and over are clear and uncontroverted. The Commission shut down FTX DM on November 10, 2022. The Commission appointed Mr. Simms on November 10, 2022 and Messrs. Cambridge and Greaves on November 14, 2022. The Commission and Mr. Simms sat by as $100 million was withdrawn

by Bahamian "residents" on November 10 and 11, 2022 from digital wallets resident in the Debtors' AWS Cloud environment.   This was in violation of the automatic stay.   The Commission and the JPLs worked with Mr. Bankman-Fried, under criminal indictment for one of the largest financial crimes in history according the USAO SDNY, and Mr. Wang, a confessed criminal, to take digital assets from the Debtors' AWS Cloud environment on November 11 and 12, 2022.   This too was in violation of the automatic stay.   Only after the assets were taken did the Commission return, again on an *ex parte* basis, to obtain after the fact approval of its improper actions from the Bahamas Court.

59.     The ongoing close cooperation between the JPLs and the Commission is illustrated by the shocking press release issued on the evening of December 29, 2022 by the Commission (Bromley Decl. Ex. 6), and the release on the same day of the equally shocking Third Affidavit of Christina R. Rolle (Bromley Decl. Ex. 16.).   On December 29, 2022, the Commission, with notice apparently only given to the JPLs (as the JPLs were present through their counsel at the December 29, 2022 hearing), applied to the Bahamas Court for directions concerning the dispute before this Court over the Motion to Compel.   (Bromley Decl. Ex. 17.)   This sort of approach to the Bahamas Court is par for the course.   Indeed, to the Debtors' knowledge, not a single hearing before the Bahamas Court has been on notice to the Debtors or with any independent party being heard.

60.     While the Commission has gradually admitted that it took Debtor assets into its possession, before December 29, 2022, it had not attempted to ascribe a value to the assets taken.   Rather than give any detail, the Commission irresponsibly stated in its press release that the digital assets taken are "valued at more than $3.5 billion," a statement qualified by Ms. Rolle in her third affidavit as "at the time of transfer."   (Bromley Decl. Ex. 6.)   Based on

independent investigations conducted by the Debtors in light of the stonewalling by the JPLs and the Commission, the Debtors believe this value information is materially misleading. Based on their review of blockchain information, the Debtors believe that the cryptocurrency of the Debtors in the control of the Commission consists of 195 million FTT, 1,938 ETH, and miscellaneous coins that do not have substantial value. At current market values, these assets are worth a mere fraction of the $3.5 billion claimed by the Commission. The Debtors call on the Commission and the JPLs to immediately clear up any confusion by providing this Court and the public a clear view of the specific assets transferred and how the assets were valued for purposes of the statements in the press release and Ms. Rolle's third affidavit. If in fact more crypto was taken by the Commission or the JPL's than previously stated by the Commission in violation of the automatic stay, this is even a more troubling disclosure and demands clarity before this Court and the customers around the world and corresponding consequences.

61.    Apart from the value misinformation, the mere fact of the request for relief, which was done with the involvement of the JPLs is simply further weight in favor of the argument that the first question to be answered is the question of recognition. As the Debtors have stated repeatedly, they are concerned that whatever information is given to the JPLs will be given immediately and unconditionally to the Commission. There is simply too much at risk to allow that to occur. Nothing that the JPLs or the Commission has done entitles them to jump the line or to receive the benefit of the doubt that often is given to foreign proceedings and foreign representatives. Here, the JPLs must earn recognition.

## II.    THE BURDEN IS ON THE JPLS TO ESTABLISH CAUSE FOR STAY RELIEF

62.    The automatic stay set forth in section 362(a) of the Bankruptcy Code applies to the "commencement" of an action that "was or could have been commenced" before the commencement of a Chapter 11 case. 11 U.S.C. § 362(a)(1). The automatic stay is one of

the "fundamental" protections afforded to the Debtors under the Bankruptcy Code. *Midlantic Nat'l Bank* v. *New Jersey Dep't of Env't. Prot.*, 474 U.S. 494, 503 (1986).

63.     The automatic stay shields debtors from harassment and a multiplicity of litigation at a time when the debtors should be focusing on their restructuring efforts. *In re Linear Elec. Co., Inc.*, 852 F.3d 313, 323 (3d Cir. 2017) ("The purpose of the automatic stay is to give breathing room for the development of . . . a plan."); *In re THG Holdings LLC*, 604 B.R. 154, 160 (Bankr. D. Del. 2019) (Dorsey, J.) ("Clearly, the stay is designed to halt all collection efforts in order to allow the debtor time to reorganize."). "The automatic stay was designed to prevent certain creditors from gaining a preference for their claims against the debtor; to forestall the depletion of the debtor's assets due to legal costs in defending proceedings against it; and, in general, to avoid interference with the orderly liquidation or rehabilitation of the debtor." *In re Advanced Elecs., Inc.*, 283 F. App'x 959, 965–66 (3d Cir. 2008) (*quoting Borman* v. *Raymark Indus., Inc.*, 946 F.2d 1031, 1036 (3d Cir. 1991)).

64.     Section 362(d) allows a party to obtain relief from the automatic stay only "for cause."  11 U.S.C. § 362(d).  The party seeking to lift the stay bears the burden to make a *prima facie* showing of "cause" for relief from the automatic stay and, if established, the debtor must then show the absence of cause. *In re Trib. Co.*, 418 B.R. 116, 127 (Bankr. D. Del. 2009). In determining whether to grant stay relief, this Court generally considers the following three factors:

> Whether any great prejudice to either the bankrupt estate or the debtor will result from continuation of the civil suit; . . . Whether the hardship to the non-bankrupt party by maintenance of the stay considerably outweighs the hardship to the debtor; and . . . The probability of the creditor prevailing on the merits.

*Id*. at 120–21 (quoting *Izzarelli* v. *Rexene Prods. Co. (In re Rexene Prods. Co.)*, 141 B.R. 574, 576 (Bankr. D. Del.1992)).

65.     "[C]ourts often conduct a fact intensive, case-by-case balancing test, examining the totality of the circumstances to determine whether sufficient cause exists to lift the stay." *In re Trump Ent. Resorts, Inc.*, 526 B.R. 116, 120 (Bankr. D. Del. 2015) (quoting *In re The SCO Group, Inc.*, 395 B.R. 852, 856 (Bankr. D. Del. 2007)).   However, "establishing that the balance of hardships tips in [the movant's] favor imposes a significant burden." *In re Ronald Perlstein Enterprises, Inc.*, 70 B.R. 1005, 1010 (Bankr. E.D. Pa. 1987).

## III.     THE JPLS ARE NOT ENTITLED TO RELIEF FROM THE AUTOMATIC STAY

66.     The JPLs fail to carry their "significant burden" and demonstrate cause to lift the automatic stay under the three *Rexene* factors.   Under the totality of the circumstances, the JPLs cannot establish sufficient cause to lift the stay.

67.     *First*, granting stay relief would prejudice the Debtors.   Contrary to the JPLs' claims, the vast majority of information to which the JPLs demand access belongs solely to the Debtors.   In addition, the breadth of the information sought by the JPLs would require the turnover of large swaths of the Debtors' most sensitive customer information, with FTX DM having no basis for possessing and reviewing it.   Granting relief as requested also would prejudice the Debtors by permitting the JPLs to circumvent the ordinary discovery process.   The Debtors moreover face significant hardship in responding to the JPLs' sweeping, overbroad access requests at the same time they are producing information to regulators, both domestic and abroad, and to the Committee.

68.     *Second*, the JPLs will not be prejudiced if this Court denies stay relief. The JPLs have no urgent need for access.   Although they claim that there is a "risk of dissipation [of assets] and "a risk that critical information will be automatically deleted and forever lost," the Debtors are fiduciaries required to preserve all assets and information and are doing so.   *See In re*

*Morningstar Marketplace, Ltd*, 544 B.R. 297, 303 (Bankr. M.D. Pa. 2016).   No assets will be dissipated; no data will be lost.

69.     *Third*, as a party that has already violated the stay, and for the reasons detailed above, there is a serious question whether the FTX DM provisional liquidation or the JPLs will be able to obtain recognition before this Court.

A.      **Stay Relief Would Prejudice the Debtors and Their Stakeholders.**

70.     Granting stay relief would prejudice the Debtors by enabling the JPLs to obtain ongoing, unrestricted discovery of information relating to *all* of the Debtors and *all* of the FTX.com exchange customer and transaction information.   This problem is compounded by the ongoing dispute with respect to the gating issue of Chapter 15 recognition.   The JPLs demand *complete* access to the Debtors' DotCom Silo customer records and all types of email and other electronic dates entirely unrelated to FTX DM or the services it provided for less than six months.

71.     The staggering overbreadth of the JPLs' requests is not immediately evident on the face of their motion.   For example, the JPLs purport to request only the materials needed for them to "perform their duties" (Mot. ¶ 18), but the substance of the JPL Requests goes miles beyond that.   The JPLs argue that the Debtors will not be prejudiced because they will merely have to "*share* access to the Recorded Information."   (Mot. ¶ 35.)   Yet the JPLs characterize "their" records as including *all* FTX.com and other records—not merely those of FTX DM or even relating in some way to FTX DM.   They characterize "their" emails and Slack messages as *all* the emails and Slack messages sent or received by any person employed by FTX

DM,[15] even if the communications relate not to FTX DM but to a different FTX entity entirely. The JPLs' requests are designed to provide far more information than they need to "perform their duties." In contrast, the Debtors' Proposal that was not even responded to attempts to actually provide FTX DM what they argue is necessary.

72.     Overbreadth notwithstanding, it is Alameda, not FTM DM, that contracted for and actually owns these cloud-based systems—and the information on them. Only a tiny fraction of the hosted information even *relates* to FTX DM—and *none* of it is FTX DM's property. They are not entitled to request it in the first instance, let alone on an expedited basis through stay relief.

73.     As the JPLs know full well, the appropriate means by which to seek access to information that is the property of another party is to submit discovery requests in an appropriate proceeding. Discovery requests must be propounded by a party in interest with standing and comply with the Federal Rules of Civil Procedure; they cannot be overbroad or overly burdensome, and responding parties receive 30 days to comply. This motion, with its sprawling, immediate demands for information, is an attempt to circumvent these protections.

74.     Granting the JPLs relief from the stay would accordingly permit them to conduct unrestricted *de facto* discovery, causing significant prejudice to the Debtors. The JPLs seek an enormous amount of confidential information concerning the Debtors' worldwide businesses and personal information and transaction history for millions of FTX Trading customers. They also seek information relevant to litigate with the Debtors with respect to

---

[15]     Notably, the JPLs include in the universe of FTX DM employees "employees that are now fully/partially employed by FTX Digital." (Mot. ¶ 18.) Meaning that the JPLs could unilaterally expand the breadth of those requests by simply rehiring, on a partial basis, former (and potentially disgraced) FTX DM employees.

Chapter 15 recognition and other issues in the Debtors' Chapter 11 Cases.  As set forth above, the Debtors continue to uncover information indicating that the JPLs and the Bahamian government colluded to deplete the Debtors' estate assets.  The Debtors and JPLs are thus at cross-purposes.  The Debtors' ability to protect the estate's assets will be hindered if they are forced to offer an adversary ongoing, unrestricted access to information with no opportunity to object or maintain confidentiality.

75.     Additionally, the Debtors will be forced to shoulder a significant burden if the stay is lifted and they are compelled to immediately produce information to the JPLs.  The Debtors are already responding to myriad targeted requests from the DOJ, SEC, the CFTC, state banking regulators, numerous states attorneys-general, and Congress.  The Debtors are also responding to requests for information from the Committee and the U.S. Trustee on issues central to their Chapter 11 Cases.  The Debtors simply cannot allow the JPLs to force their way to the front of the line to the detriment of all other stakeholders.  *See In re SN Liquidation, Inc.*, 388 B.R. 579, 585 (Bankr. D. Del. 2008) ("The Court expects the Debtors to treat all litigants equitably and that is not possible if one litigant . . . proceeds with its lawsuit and as a result the [estate] is diminished while other litigants honor the stay.").  Lifting the stay now would vitiate one of the "fundamental purposes of the Bankruptcy Code" and of the automatic stay: "provid[ing] breathing space necessary to permit the debtor to focus on rehabilitation and reorganization."  Collier on Bankruptcy ¶¶ 362.03, 541.01 (Alan R. Resnick & Henry J. Sommer eds., 16th ed.).  The Debtors should remain focused on administering these Chapter 11 Cases and maximizing value of the estates for all stakeholders.

**B.     Denial of Stay Relief Would Not Prejudice the JPLs.**

76.     The JPLs argue that they "urgently" need stay relief because there is a "risk of dissipation [of assets]" and a "risk that critical information will be automatically deleted

and forever lost." (Mot. ¶ 25.) They are wrong. The Debtors are fiduciaries. "In exchange for the authority to continue to manage the business affairs of a company, a debtor-in-possession owes fiduciary duties to its creditors and the estate. These duties include the duty of care to safeguard estate assets, the duty of loyalty and the duty of impartiality." *Morningstar Marketplace*, 544 B.R. at 303 (cleaned up); *see also In re Reliant Energy Channelview LP*, 594 F.3d 200, 210 (3d Cir. 2010). In keeping with these duties, the Debtors will not permit assets to be dissipated or data to be lost. The Debtors have already taken measures to preserve all relevant data from automatic deletion. Indeed, the JPLs acknowledge as much by asking for the very backups the Debtors created to preserve the information. (Bromley Decl. Exs. 12, 14.)

77.       The JPLs thus face no prejudice from the denial of stay relief. The assets and information they seek will continue to be available while the stay remains in place. To the extent they require information, they are entitled to seek it through ordinary discovery, subject to the Federal Rules of Civil Procedure. On balance, the first two *Rexene* factors weigh in favor of the Debtors and against lifting the stay. The JPLs have not carried their significant burden to show the opposite.

### C.       Granting Stay Relief Would Reward the JPLs' Previous Stay Violations.

78.       Finally, the court should deny stay relief because, as set forth above, the JPLs have either actively colluded in or passively acquiesced to the Commission's violation of the automatic stay. As set forth above, the Commission seized hundreds of millions of dollars of estate assets after the automatic stay went into effect. The seized assets include funds for which the JPLs are—nominally—fiduciaries. But whether the JPLs are complicit or just complaisant is unimportant. The fact remains that the automatic stay is meant to preclude self-help like the Commission's raid on the estate. *In re Am. Home Mortg. Holdings, Inc.*, 401 B.R. 653, 655–56 (D. Del. 2009) (affirming denial of stay relief where bankruptcy court considered evidence of

movant's self-help); *see also In re Fugazy Exp., Inc.*, 982 F.2d 769, 776 (2d Cir. 1992) ("Nothing in the Code suggests that a party is entitled to engage in 'self-help' in derogation of the automatic stay."); *In re Computer Commc'ns, Inc.*, 824 F.2d 725, 731 (9th Cir. 1987) ("Judicial toleration of an alternative procedure of self-help and post hoc justification would defeat the purpose of the automatic stay.").  Granting the JPLs relief from the stay after they already violated it would legitimize their derogation of this Court's jurisdiction and invite other similarly situated parties to engage in the same conduct.

79.    Outside of their stay violations, the JPLs have also consistently subverted the Debtors' efforts to meet and discuss an appropriate resolution.  The JPLs have not attempted to explain why the Debtors' Proposal to target and provide information relating to FTX DM and the services it provided is insufficient at this stage.  To the extent the JPLs' demand for an exemption from the stay is necessitated by their own failure to work with the Debtors, they are not entitled to relief.

80.    For the foregoing reasons, there is no cause to lift the stay.  The balance of hardships favors the Debtors, not the JPLs.  The motion must be denied.

## IV.    THE JPLS CANNOT SEEK TURNOVER OF DEBTORS' PROPERTY.

81.    The JPLs recite a litany of sections of the Bankruptcy Code for the proposition that the Debtors should be required to "provide the [JPLs] with access to the Recorded Information."  (Mot. at ¶ 29.)  However, none of those sections provide the relief that the JPLs seek.

82.    *First*, the JPLs have not carried their burden—nor can they—of establishing that the property they seek turnover of belongs to FTX DM.  Section 1519(a)(3) requires, as a condition for granting provisional relief, that relief be "urgently needed to protect ***the assets of the debtor***"—here, referring to the Chapter 15 debtor FTX DM.  *See* 11 U.S.C.

§ 1519(a)(3) (emphasis added).   Likewise, Section 542(a) requires any entity in possession "of *property* that the [Chapter 15 petitioner as stand-in] trustee may use, sell, or lease under section 363 [*i.e., estate property*]" to turnover said property to the Chapter 15 petitioner, and Section 542(e) provides that "the court may order an attorney, accountant, or other person that holds recorded information, . . . *relating to the debtor's property*"—again, referring to FTX DM—"to turn over or disclose such recorded information."   (Emphasis added.)   By their plain terms, Sections 1519 and 542 only allow the JPLs to seek turnover of FTX DM's property.  *See also In re Miller*, 741 F. App'x 859, 862 (3d Cir. 2018) (holding that the party moving for turnover carries "the burden of proving, by a preponderance of the evidence, that (1) the property is available for the [movant's] use as ***property of the estate*** . . . ." (emphasis added)).

83.     The JPLs admit, however, that they are seeking more than FTX DM's property: "The Joint Provisional Liquidators are entitled to the Recorded Information . . . , as the Recorded Information ***includes*** FTX Digital Records that are the property of FTX Digital, and the Record Information ***contains*** books and records of FTX Digital."  (Mot. ¶ 35.)   The JPL Requests detailing their proposed scope of information similarly reveal that any information of FTX DM is at best a tiny portion of the information sought.  The Debtors are in the process of providing the JPLs the information clearly belonging to FTX DM (*i.e.*, FTX DM's records in QuickBooks), and in the Debtors' Proposal offered a substantial set of additional documents targeted at anything relating to FTX DM that the JPLs could possibly need, with the commitment to discuss additional information if the need were to arise.  The JPLs' rejection of that offer (by not even responding to it) reveals their true intentions—a grasp at the Debtors' property.

84.     *Second*, the equities weigh in favor of denying the JPL's requested relief. Section 1519(e) of Bankruptcy Code establishes that "[t]he standards, procedures, and

limitations applicable to an injunction shall apply to" Chapter 15 petitioners' motions for provisional relief.  11 U.S.C. § 1519(e); *see In re Innua Canada Ltd.*, 2009 WL 1025088, at *3 (Bankr. D.N.J. Mar. 25, 2009) ("Provisional relief under Section 1519 of the Bankruptcy Code requires satisfaction of the injunctive relief standard by the foreign representative . . . ."); *accord* Order Granting Provisional Relief at 2–3, *In re NMC Health PLC (in Administration)*, No. 20-11385 (Bankr. D. Del. June 1, 2020), ECF No. 18 (assessing whether "Provisional Relief is warranted under 11 U.S.C. § 1519(e)" and applying preliminary injunction factors before granting provisional relief).  Under that standard, the JPLs must show:  (a) there is a likelihood of success on the merits (*i.e.*, the request for recognition); (b) there is an imminent irreparable harm to the debtor if the preliminary injunction is not issued; (c) the balance of harms tips in favor of the moving party; and (d) the public interest weighs in favor of an injunction.  *Innua Canada*, 2009 WL 1025088, at *3; *see also* Order Granting Provisional Relief at 2–3, *NMC Health*, No. 20-11385 (applying these factors).

85.     The JPLs have not even attempted to establish the elements necessary to make a claim for provisional relief, nor could they if they tried.  With regard to the likelihood of the JPLs obtaining recognition, the Debtors have serious questions about whether recognition is appropriate, especially given the JPLs' violation of the automatic stay in these Chapter 11 Cases and their apparent cooperation with the government of the Bahamas to undermine these Chapter 11 Cases.  *See, e.g.*, *In re Gold & Honey, Ltd.*, 410 B.R. 357, 371–72 (Bankr. E.D.N.Y. 2009) ("Recognition of the Israeli Receivership Proceeding as a foreign proceeding would be manifestly contrary to the public policy of the United States because such recognition would reward and legitimize FIBI's violation of both the automatic stay and this Court's Orders regarding the stay.").

86.     Moreover, there is no imminent irreparable harm.  The JPLs continue to repeat, without evidence, that there is a "risk that the Joint Provisional Liquidators will be unable to identify, locate, and protect assets at risk of dissipation" and "there is an additional risk that critical information will be automatically purged and forever lost."  (Mot. ¶ 14.)  The JPLs acknowledge, however, that the Debtors have "created a recent 'clone' of the live database" in order to preserve the information sought.  (Mot., Ex. A.)  The JPLs fail to explain, nor could they, how information could be "purged and lost forever," when Debtors have already taken steps to preserve the information.  Similarly, the JPLs do not explain how access would help them to "protect assets at risk of dissipation."  In any event, like the JPLs purport to, "debtors-in-possession have a fiduciary duty to maximize the value of the estate . . . ."  *See In re Reliant Energy Channelview LP*, 594 F.3d 200, 210 (3d Cir. 2010).  In carrying out those duties, the Debtors will necessarily be required to preserve all assets, regardless of whether they belong to the Debtors or to FTX DM.  The JPLs cannot do anything to increase the value of those claims that the Debtors are not already doing with an army of seasoned bankruptcy professionals.

87.     To the contrary, the balance of harms tips decidedly in favor of the Debtors, who would have to exhaust significant time and resources in order to prepare the confidential materials, including personal and transaction information for FTX Trading customers, for production to the JPLs.  That is not to say that the JPLs will never receive any data beyond what the Debtors have already agreed to provide; it simply means the JPLs should follow the procedures set forth in the Bankruptcy Code by seeking recognition of its proceedings and then serving discovery requests, if necessary, consistent with the applicable rules.  Ultimately, the public interest favors maximizing the security of the Debtors' assets, not creating the security risks that would attend the relief sought here.

88.     Even if the Debtors could qualify for Section 1519 relief, that relief would still be barred by Section 1522(a) because "[t]he court may grant relief under section 1519 . . . only if the interests of the creditors and other interested entities, including the debtor, are sufficiently protected."  11 U.S.C. § 1522(a).  Here, they are not.  The Debtors, as targets of a demand for information, are interested entities.  *See In re Nortel Networks Corp.*, 2013 WL 6053845, at *4 (D. Del. Nov. 15, 2013) (affirming bankruptcy court's denial of relief from stay to serve document preservation subpoena, where bankruptcy court had "concluded that the relief sought was not warranted, given a balance of the hardships which clearly rests in favor of the debtors").  The Debtors—and the creditors of the Debtors and FTX DM—are hardly protected by relief requiring the Debtors to deplete estate assets to marshal confidential and sensitive data for an actor the Debtors have learned not to trust with the estate's assets and information.  Not even a protective order from this Court would provide the Debtors with adequate protection, as the JPLs admit that where a Bahamian company like FTX DM is concerned, Bahamian courts "cannot recognize this Court's orders because Bahamian law does not allow recognition of a foreign insolvency proceeding for a Bahamian company."  (Motion to Dismiss ¶ 1.)

## CONCLUSION

89.     For the foregoing reasons, the Debtors respectfully request that the Court deny the Motion to Compel.

Dated: December 30, 2022
     Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Adam G. Landis*
Adam G. Landis (No. 3407)
Kimberly A. Brown (No. 5138)
Matthew R. Pierce (No. 5946)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
E-mail: landis@lrclaw.com
       brown@lrclaw.com
       pierce@lrclaw.com

-and-

**SULLIVAN & CROMWELL LLP**

Andrew G. Dietderich (admitted *pro hac vice*)
James L. Bromley (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Alexa J. Kranzley (admitted *pro hac vice*)
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
E-mail: dietdericha@sullcrom.com
       bromleyj@sullcrom.com
       gluecksteinb@sullcrom.com
       kranzleya@sullcrom.com

*Proposed Counsel for the Debtors*
*and Debtors-in-Possession*