# **EXHIBIT 16**

SUPREME COURT

DEC 2 9 2022

NASSAU, BAHAMAS

**COMMONWEALTH OF THE BAHAMAS**

**IN THE SUPREME COURT**

**COMMERCIAL DIVISION**

2022/COM/com

**IN THE MATTER OF the Digital Assets and Registered Exchanges Act, 2020**
**(as amended)**

**AND IN THE MATTER OF FTX DIGITAL MARKETS LTD.**
**(A Registered Digital Asset Business)**

**BETWEEN**

**SECURITIES COMMISSION OF THE BAHAMAS**

**Plaintiff**

**AND**

**FTX DIGITAL MARKETS LTD.**

**Defendant**

---

# THIRD AFFIDAVIT OF CHRISTINA R. ROLLE

---

I, **CHRISTINA R. ROLLE,** Executive Director of The Securities Commission of The Bahamas ("the Commission") of the Island of New Providence, one of the Islands of the Commonwealth of The Bahamas, **MAKE OATH AND SAY** as follows:

1. I make this Affidavit on behalf of the Commission, the Plaintiff herein, in my capacity as the Executive Director of the Commission.

2. The facts referred to herein are, unless otherwise stated, within my own knowledge or are obtained from information and documents in possession of the Commission and are true to the best of my knowledge, information and belief. Where the matters deposed hereto are not within my knowledge, they are derived from sources I have identified herein and verily believe to true and correct.

3.  This is the Third Affidavit sworn by me on behalf of the Commission in this Action. For the avoidance of doubt, I continue to rely upon the content of my previous affidavits and exhibits.

4.  There is now produced and shown to me marked **Exhibit "CR-1",** a paginated bundle of documents to which I shall refer in the course of my Affidavit. References to pages numbers in this Affidavit are references to page numbers in the said paginated bundle unless otherwise stated.

5.  I make this Affidavit in further support of the regulatory action taken by the Commission in relation to FTX Digital Markets Ltd ("FTXDM") and in support of the Commission's application as trustee for directions as to the following matters; namely –

    (i)   Whether the Commission should provide to representatives of the US Debtors in the US Chapter 11 bankruptcy proceedings ("Chapter 11 proceedings"), information respecting the digital assets being held in the secured digital wallets established by, and under the control of, the Commission ?

    (ii)  If the answer to question (i) is in the affirmative, what information and details (if any) should  the Commission provide the US Debtors' representatives having regard to the circumstances of this particular case and the manner in which such information and details ought to be provided ?

**BACKGROUND TO THIS APPLICATION**

6.  The Commission's application for directions is made against the background of a dispute between the court-appointed Joint Provisional Liquidators of FTXDM ("JPLs") and the US Debtors over the Joint Provisional Liquidators being granted access to the records of FTXDM. These records sought by the JPLs from the US Debtors are also required by Commission to be produced by the JPLs in connection with the Commission's ongoing regulatory investigations into FTXDM.

7.  On Wednesday,14 December 2022 during a hearing in the Chapter 11 proceedings, Mr

James Bromley, Attorney for the US Debtors claimed that the US Debtors do not trust The Government of The Commonwealth of The Bahamas and that the Commission has exercised its regulatory power to safeguard the digital assets under the control of FTXDM *'in collaboration with'* the Joint Provisional Liquidators of FTXDM. Mr. Bromley's statement made on behalf of the US Debtors was, and is, untrue and calculated to disparage the Commission as regulator of FTXDM and trustee of the said digital assets as well as The Commonwealth of The Bahamas.

8. Further, the Commission has been recently asked by representatives of the US Debtors to provide an inventory of the digital assets under the control of the Commission by virtue of the regulatory action taken under the authority of the Order made by this Honourable Court on 12 November, 2022.

9. The Commission is not a party to the Chapter 11 proceedings. As regulator and trustee of said digital assets, however, the Commission has determined that it is in public's interest that the US Debtors' misunderstanding regarding the manner in which the Commission exercised its regulatory powers in relation to FTXDM must be addressed. Accordingly, the Commission seeks the Court's direction whether information respecting the digital assets in the secure digital wallets established by the Commission may be provided to the US Debtors representatives.

## THE COMMISSION

10. The Commission, formerly the Securities Board of the Bahamas, is a statutory body established in 1995 pursuant to the Securities Board Act, 1995 (the "1995 Act") which has been repealed and replaced by new legislation. The Commission's mandate is now defined in the Securities Industry Act, 2011 ("the Act"). A true copy of the Act is now produced at pages **[1] – [106]** of **Exhibit CR-1.** .

11. The Commission is the sole competent authority responsible for regulating and overseeing The Bahamas' securities, capital markets, investment funds, financial and corporate service providers, in addition to the recently expanded oversight in relation to digital assets business ("DABs"). To this end, the Commission utilizes market surveillance, regulatory oversight, enforcement of securities laws and its investor education program to protect investors, maintain fair, efficient, and transparent markets, and reduce systemic risk.

12. The Commission is a body independent of the Bahamian executive arm of Government. It has been a member of the International Organization of Securities Commissions ("IOSCO") since 1996.

13. The Commission is an "A" Signatory to IOSCO's Multilateral Memorandum of Understanding ("MMOU") with respect to Information Sharing and Cooperation and an A.1 signatory to IOSCO's Enhanced MMOU. A true copy of the MMOU is produced at pages **[107] – [125]** of **Exhibit CR-1.**

14. In accordance with section 31(1) of the Act, the Commission published its 2021 Annual Report dated 30 June 2022 (the "Report"), and accompanying independent auditor's report, which I produce at pages **[126] to [210]** of **Exhibit CR-1.**. The Report details, amongst other things, the Commission's operations, including across information technology (pp. 141 – 156 of Exhibit CR-1) and Supervision, Risk Analytics and Examinations, and Enforcement (pp. 157 – 159 of Exhibit CR-1).

15. The Commission's vision is to provide oversight and exercise its enforcement powers in order to foster a vibrant, competitive financial services sector in The Bahamas that has sound regulatory practices and policies that promote consumer confidence and protections.

## COMMISSION'S STATUTORY FUNCTIONS, DUTIES AND POWERS

16. The functions of the Commission under the Security Industry Act, 2011 are to:

- advise the Minister (Finance) on all matters relating to the capital markets and it participants;
- maintain surveillance over the capital markets and ensure orderly, fair, and equitable dealings in securities;
- foster timely, accurate, fair, and efficient disclosure of information to the investing public and the capital markets;
- protect the integrity of the capital markets against any abuses arising from financial crime, market misconduct and other unfair and improper practises;
- promote an understanding by the public of the capital markets and its participants and the benefits, risks, and liabilities associated with investing;

- create and promote conditions that facilitate the orderly development of the capital markets; and
- perform any other function conferred or imposed on it by securities and digital asset laws or Parliament to support our statutory mandate and obligations.

17. Further, in the exercise of its functions, the Commission is to satisfy itself that the provisions of the Financial Transactions Reporting Act, 2018 ("FTRA") and any other Act or regulation administered by the Commission are being complied with.

18. For the purpose of the discharge of its functions, the Commission has power, subject to the provision of the Act, to:

- monitor the solvency of regulated persons and take measures to protect the interests of clients and others where the solvency of any such person is in doubt,
- regulate issuers offering their securities to the public, including public issuers and investment funds, adopt measures to supervise and minimize any conflict of interests that may arise in the case of market participants,
- regulate take-over bids,
- take enforcement action against any person for failing to comply with securities laws,
- recommend regulations to the Minister and formulate rules
- publish notices, guidelines, bulletins, and policies describing the views of the Commission regarding the interpretation, application, or enforcement of securities laws,
- make any order which the Commission may make under securities laws; and.
- do all things, and take all actions, which may be necessary or expedient or are incidental to the discharge of any function or power given to the Commission.

19. As part of its functions, in recent years, the Commission has worked to support growth in its regulated sectors through innovative and facultative legislation and policies. Some of the initiatives include:

- updating the investment funds' regulatory regime;
- expanding the financial and corporate service providers' regulatory regime;
- expanding coverage in the securities and capital markets with the introduction of:
  o Securities Industry (Contracts for Differences) Rules, 2020; and
  o Securities Industry (Business Capital) Rules, 2021.

20. The Commission must act in the public interest when discharging its duties, including in relation to enforcement. Section 134 of the Act, for instance, provides that where the Commission considers it in the public interest to do so, it may, at any time and without a hearing, apply to the court for an order to take any actions it considers necessary.

21. The Commission administers primary legislation including the Act, the Investment Funds Act 2019, the Financial and Corporate Service Provider Act 2020, the Digital Assets and Registered Exchanges Act, 2020 ("the DARE Act" or "DARE"), the Carbon Credit Trading Act 2022 and Financial Transactions Reporting Act 2018.

### *The DARE Act*

22. In March 2018, the Commission began an initiative with the purpose of initiating a collective regulatory review and analysis of digital tokens and their potential offerings in The Bahamas. As a result, in May 2018, a Crypto Asset Working Group (the "Working Group") was formed to comprehensively review the considerations and requirements for the registration of DABs in or from within The Bahamas. The Working Group comprised various governmental agencies and regulators that had a stake in the orderly growth and development of the financial technology and digital asset sector in The Bahamas.

23. The extensive work of the Commission, the Working Group, a leading international consultant and other stakeholders throughout July 2018 to December 2020 is detailed at paragraphs 3.4.1 to 3.4.4 of the policy statement PS1/2022 (r) titled 'The Bahamas' Approach to the Regulation of DABs' ("the Statement") last updated on 28 September 2022 which I produce as at pages **[211] – [244]** of **Exhibit CR-1**.Further, the Statement:

- explains the Commission's considerations in developing the digital asset regulatory

framework, including examining the risks and threats associated with digital asset activities and the respective measures to mitigate those risks and threats;

- describes the Commission's philosophy regarding the regulation of DABs;
- clarifies the registration and supervision process for DABs; and
- outlines the Commission's future legal and regulatory considerations for the digital asset sector.

24. The DARE Act was enacted on 14 December 2020 and has since been amended. A true copy of the DARE Act and its 2022 amendment are produced at pages **[244] to [319]** of **Exhibit CR-1**.

25. DARE has established a bespoke regulatory framework for activities relating to digital assets in The Bahamas encompassing their regulation, issuance, sale, and trade. Its entry into force followed several public consultations during which time industry experts' views were considered to ensure the framework was in keeping with emerging international best practices and standards as well as providing robust consumer protections.

26. Alongside the enactment of the DARE Act, FTRA, Proceeds of Crime Act 2018 ("POCA") and Anti-Terrorism Act 2018 ("ATA"), were all amended specifically to address digital assets and DABs in compliance with the Financial Action Task Force recommendation 15 regarding new technologies. As such, DARE has brought DABs under national anti-money laundering and counter terrorist financing risk coordination frameworks.

27. In sum, the Bahamian digital assets regulatory framework consists of the DARE Act as amended, FCSPA, Digital Assets and Registered Exchanges (Anti-Money Laundering, Countering Financing of Terrorism and Countering Financing of Proliferation) Rules, 2022, Financial and Corporate Service Providers (Anti-Money Laundering and Countering Financing of Terrorism) Rules 2019 and Policy guidance.

28. On 22 December 2022, the Financial Action Task Force confirmed that The Bahamas has achieved a rating of "compliant" with respect with FATF's recommendation 15 on New Technologies. This FATF recommendation covers digital assets and digital asset service providers. The Bahamas is one of the few, if not the only, country in the world to achieve a "compliant" rating on this recommendation. This achievement speaks to the Commission's as well as The Bahamas' commitment to maintaining the highest standards of international

best practices as promoted by standard setting bodies.

## THE COMMISSION'S REGULATORY POWERS UNDER DARE

29. I will now turn to address how the Commission's regulatory powers under the DARE Act.

30. The DARE Act is administered by the Commission. As such, the Commission regulates and supervises the issuance of digital assets, DABs and their activities in The Bahamas for the purpose of ensuring the orderly development of digital asset activities in The Bahamas and the development and maintenance of investor protection standards with respect to DAB and initial token offers.

31. For the purposes of the DARE Act, the Commission's functions are:

- to regulate, monitor and supervise the issuance of digital assets and persons conducting DABs in or from within The Bahamas;
- to develop rules, guidance and codes of practice in connection with the conduct of DAB and initial token offers;
- to advise the Minister on all matters relating to DABs; and
- to promote investor education and other conditions that facilitate innovation and development of DABs within The Bahamas.

32. For the purposes of the discharge of these functions, the Commission has the power under DARE to:

- approve and regulate a DAB;
- regulate initial and subsequent token offers;
- make and issue rules on the conduct of DABs and issuers;
- take enforcement action against any person for failing to comply with DARE (as I will address in due course);
- publish notices, guidelines, bulletins, and policies regarding the interpretation, application or enforcement of DARE Act and any rules or regulations issued under this Act;
- prescribe fees payable to the Commission for the purposes of carrying out its functions under DARE;

- make recommendations to the Minister for regulations; and
- do all things, and take all actions, which may be necessary or expedient or are incidental to the discharge of any function or power given to the Commission.

33. DABs for the purpose of the DARE Act include the business of a digital token exchange, providing services related to a digital token exchange, operating as a payment service provider business utilizing digital assets, operating as a digital asset service provider, the exchange between digital assets and fiat currencies and the exchange between one or more forms of digital assets; and the transfer of digital assets.

34. A person carries on a DAB for the purpose of DARE where the person offers DAB services to Bahamian residents from anywhere in the world, irrespective of their physical location. Where the person is a legal entity registered and incorporated under the laws of The Bahamas, they are deemed under section 2(2)(b) of DARE to be carrying on a DAB whether they offer DAB services to persons within The Bahamas or outside.

35. Carrying on a DAB is prohibited, unless the person is a legal entity registered under the DARE Act.

36. Where the Commission deems appropriate, it may exercise its powers under DARE to assist with the performance by another domestic regulatory authority of its functions, including by providing information, documents or material it has acquired in the exercise of its functions under DARE. In addition, the Commission may require a person to give information and or produce documents relevant to its conduct of an investigation.

37. The Commission has a duty to cooperate with regulators of other jurisdictions whom are signatories to IOSCO's MMOU with respect to information sharing and cooperation. In addition, under the DARE Act, the Commission has a cooperative power in respect of overseas regulatory authorities and may provide assistance where satisfied that:

- such assistance may be relevant to the functions of the overseas regulatory authority and is intended to enable such authority to carry out the supervision, investigation or enforcement to which the request relates;
- the overseas regulatory authority has given a written undertaking that any

material obtained pursuant to its request shall not, except with the approval or consent of the Commission be:

- o   used for any purpose other than a purpose that is specified at the time of the request; and

- o   disclosed to any third party, other than a designated third party;

- ▪   the material requested is of sufficient importance to the carrying out of the supervision, investigation or enforcement to which the request relates and cannot reasonably be obtained by any other means;

- ▪   the matter to which the request relates is of sufficient gravity; and

- ▪   the provision of the requested assistance will not be contrary to the national interest of The Bahamas or the interest of the investing public.

38. Further, DARE entitles the Commission, subject to certain conditions, to enter into a memorandum of understanding providing for mutual and reciprocal assistance with an overseas regulatory authority, or any designated third party, to further its carrying out of supervision, investigation or enforcement functions.

39. A person who fails to comply with the provisions of DARE commits an offence for which the Commission can impose sanctions, in addition to any court sentence. For instance, the Commission may apply to the Court for an order to take such action as the Commission considers necessary to protect the interest of clients or creditors of a registrant.

### FTXDM

40. FTXDM (now in provisional liquidation) is a company duly incorporated under the laws of The Bahamas. A true copy of the Certificate of Incorporation is produced at page **[320]** of. **Exhibit CR-1**

41. FTXDM was thereafter registered by the Commission on 10 September, 2021. A true copy of the Certification of Registration is produced at page **[321]** of **Exhibit CR-1**.

42. FTXDM was approved to conduct the following DABs:

- ▪   an exchange between assets and fiat currency;

- ▪   exchange between one or more forms of digital assets; and

- the transfer of digital assets

43. The following further details were entered onto the Register for FTXDM:

- Principal and CEO: Samuel Bankman-Fried (hereafter "Bankman-Fried"");
- Chairman: Ryan Salame ("RS")
- Secretary: Daniel Friedberg ("DF")
- Compliance and Money Laundering Reporting Officer: Jessica Murray ("JM")

I produce at page **[322]** of **Exhibit CR-1**, a true copy of the Register entry for FTXDM as at 30 September, 2022. Pages **[323] – [324]** of **Exhibit CR-1** has intentionally been left blank.

## COMMISSION'S REGULATORY ACTION TAKEN AFTER FTX'S COLLAPSE

44. I will now turn to detail the course of events from 8 November 2022 relevant to the Commissions regulatory action in respect of FTXDM to date.

### *8 November 2022*

45. On 8 November 2022, an article published by Yahoo Finance titled "FTX Exchange Halts All Crypto Withdrawals" came to my attention. A true copy of the article has been produced at pages **[325] - [329]** of **Exhibit CR-1**. The article alleged that (i) FTX had halted all non-fiat customer withdrawals and (ii) FTX had reached a non-binding agreement to be acquired by cryptocurrency exchange, Binance. The claims made in the article were verified by (i) claims from an FTX employee whistleblower posted on Telegram and (ii) social media posts published by Bankman-Fried. The article cast doubt as to FTXDM's fitness and proprietary and ability to satisfy its obligations under DARE, including its ability to maintain solvency and levels of capital as required by the Commission. This prompted me to email Bankman-Fried and JM that day, in accordance with the Commission's supervisory and off-site investigative powers as follows:

*"[g]ood Morning Sam/Jessica, Please advise your availability to meet with the Securities Commission of The Bahamas to discuss recent press regarding liquidity issues as well as*

*the potential acquisition of FTX by Binance"* . A true copy of the said email message has been produced at pages **[330] - [331]** of **Exhibit CR-1.**

46. JM acknowledged receipt of my email. I replied to JM, also copying Bankman-Fried, stating that it would be good if the call could take place *"today"* [8th November 2022].Thereafter, Bankman-Fried also responded as follows:

   *"Hey! I'm pretty pressed for time but will make sure that we talk to you ASAP; I'll briefly say that, as of now, no sale has happened or been finalized although there are active talks. We'll keep you updated about those"* .A true of the said email has been produced at page **[332]** of **Exhibit CR-1.**

47. On behalf of the Commission, I then sent a further email in response as follows:

   *""…[w]e are keen to understand the issues as they specifically relate to the regulated entity including potential impact for clients. Please get in touch soonest. Due to the Tropical Storm alert, we will be working from home until the all clear is given but I will be reachable by email and by phone …"* . A true copy of the said email is produced at pages **[333] - [334]** of **Exhibit CR-1**.

   **9 November 2022**

48. The following day, on 9 November 2022, numerous articles were published reporting further alleged revelations surrounding FTX's liquidity and governance. In the absence of a response to the Commission's most recent communication, a further email was sent by me to Bankman-Fried and JM of FTXDM at 10:17 a.m. asking a series of questions in relation to its business, the articles in the media and its relationship with Alameda Research Ltd ("Alameda") and other entities for immediate answer:

   *"Further to my note below, please see some initial queries from the Securities Commission of The Bahamas with respect to ongoing issues. Please advise as follows:*

   1. *Number of clients registered on the FDM platform, total value of assets held for all FDM clients and whether those assets are held in a segregated account;*

2.  *Total value of client withdrawals from FDM platform over the past week. Have there been any withdrawal requests that were unsatisfied or that remain Outstanding?*

3.  *The extent to which FDM clients' assets may have been invested, loaned, used as collateral or otherwise hypothecated or encumbered on behalf of FDM, Alameda, other related parties and/or third parties;*

*Please also provide an explanation with respect to the following:*

1.  *Which FTX Group entity is party to the non-binding LOI with Binance? What are the terms of the LOI and what is the potential impact for clients of FDM;*

2.  *Details of the connection between FDM and Alameda. Were there any services provided by Alameda to FDM or vice versa? Were there any related party or counter-party transactions between the entities.*

*Please also provide a sample of FDM's client agreement (including general terms and conditions).Your urgent attention and response by end of day is needed. If you wish to discuss, please feel free to reach out to us…."* A true copy of the said email message has also been produced at pages **[333] - [334]** of **Exhibit CR-1.**

49. Neither Bankman-Fried nor JM responded to my email message sent to them at 10:17 a.m. EST. I am aware that JM had resigned earlier that morning.

50. During the course of the day, the Commission monitored news of the events and considered taking regulatory action with respect to FTXDM. I also contacted FTXDM's local external commercial lawyer to ascertain whether she had any knowledge of the events which were unfolding in real time. She advised that she had no knowledge of the events and I requested that she organize a meeting between me and the individuals registered with the Commission.

51. A meeting was arranged for 4:00 p.m. via zoom and attended by Mr. Ryan Salame, Chairman and former CEO of FTXDM, Mr. Ryne Miller ("RM"), General Counsel for FTX and Mrs. Allyson Maynard-Gibson, KC, external counsel for FTXDM. During the interview, RS made various statements which exacerbated the Commission's concerns regarding FTXDM. In particular, RS disclosed which I understood to be his recent knowledge and/or information that

(i) FTXDM client assets had been transferred to Alameda to cover Alameda's financial losses and that only three individuals within the FTX Group had specific access to make such transfers.

52. After the meeting, the Commission assessed known information and determined that it was in the public interest to, immediately proceed with suspending the license, and placing FTXDM into immediate involuntary provisional liquidation.

53. Given the report of serious wrongdoing, I initially contacted the Commissioner of Police at 6:54pm by phone, briefed him on the potential for criminal activity and advised him that I would be making a formal referral to him for a police investigation.

54. I also contacted the Attorney General who is the Minister responsible for Legal Affairs and verbally informed him of all information then known to the Commission with respect to FTX's liquidity crisis. I also informed him that the Commission had determined to take regulatory action against FTX the following day. Such actions included the freezing of assets, suspension of the license and application to the Court for the appointment of a provisional liquidator.

55. After making arrangements for an urgent application to be made for the appointment of a provisional liquidator, I drafted a letter to the Commissioner of Police and emailed it to him at 9:32pm., a true copy of which is produced at pages **[335] – [336]** of **Exhibit CR 1.**

56. Upon review of my email inbox, I noticed an email message from Bankman-Fried addressed to Ryan Pinder KC, Attorney General of The Bahamas, ("RP") sent by Bankman-Fried at 9:27 p.m. Bankman-Fried had copied  the email message to several individuals, including his external counsel Allyson Gibson, KC and me. In his email message to RP, Bankman-Fried indicated, inter alia, that FTXDM (i) had segregated funds for Bahamian customers (ii) was willing to allow those customers to withdraw such funds and (iii) that he had not briefed the Commission on where matters stood at that time:

*"Hi All, I'm really sorry about the delayed responses here -- it's been a hectic week but that's on me. Myself, and Joe (cc'ed), will be responsive going forward. And I'm also deeply sorry for ending up in this position in the first place. I'll give the answers I can give right now and try to get to the others ASAP.*

1)Right now we are focused on one thing: making customer's whole. We are focusing exclusively on doing that this week. We are ceasing all nonessential operations beyond that I am doing everything I can to try to do right by our customer's.

2)I have not briefed the securities commission. I would be more than happy to have a phone call with you, the PM, and [the commission] in the next few days to give a thorough overview of the situation.

3)I am cautiously optimistic that we will be able to survive the turmoil and have enough liquidity for all customer withdrawals, and that is my sole focus this week. I will keep you guys updated.

4)We are investigating a more thorough answer to this question; we did not intend to, but are concerned that poor risk management lead to a liquidity issue.

5)As you saw, Binance did not end up following through on their transaction. However', we are in the middle of a separate process to make users whole; we will know within a week if that comes through. So far, we have strong indications of interest that would be more than enough to cover all liquidity needs; we are working on confirming those. I am cautiously optimistic that we will be able to.

6)We are deeply grateful for what The Bahamas has done for us, and deeply committed to it. We are also deeply sorry about this mess.

7)As part of this: we have segregated funds for all Bahamian customers on FIX. And we would be more than happy to open up withdrawals for all Bahamian customers on FIX, so that they can, tomorrow, fully withdraw all of their assets, making them fully whole. It's your call whether you want us to do this--but we are more than happy to and would consider it the very least of our duty to the country, and could open it up immediately if you reply saying you want us to. If we can't hear back from you, we are going to go ahead and do it tomorrow"
A true copy of the email is produced at page **[337]** of **Exhibit CR-1.**

57. In light of the above-mentioned email, the Commission took immediate steps to remove the authority of Bankman-Fried and other directors to operate FTXDM by initiating proceedings

before the Supreme Court of The Bahamas as soon as possible for the appointment of a provisional liquidator. In so doing, the Commission took urgent steps to obtain the requisite court orders to remove the authority of Bankman-Fried and other directors of FTXDM to continue to operate FTXDM. The Commission did not condone or approve, either expressly, impliedly or otherwise, Bankman-Fried's decision to 'open up withdrawals for all Bahamian customers' on FTX on the following day.

### *10 November 2022*

58. On 10 November 2022, the Commission also suspended FTXDM's registration under the DARE Act with immediate effect in the exercise of its obligation to "protect the public" under section 19(3) DARE Act. The Commission's letter notifying Bankman-Fried of suspension of FTXDM's registration was delivered on the same day, via email, at 2:28 p.m. In addition, the Commission's letter informed Bankman-Fried that it intended:

 *'...to seek court supervised provisional liquidation of FTXDM to preserve the assets and ensure the protection of clients, investors and/or creditors in the process".*
 A true copy of the letter of suspension has been produced at pages **[338]** – **[339]** of **Exhibit CR-1.**

59. On the same day, the Commission also issued Freeze Orders under section 46 A of DARE to Fidelity Bank (Bahamas) Limited and Tether International Limited. Copies of the Freeze Orders are produced at pages **[340]** – **[343]** of **Exhibit CR-1.**

60. Further, on the same day, the Commission, in its capacity as regulator, commenced a winding-up proceeding before the Supreme Court and simultaneously made an urgent without notice application for the appointment of Mr Brian Simms K.C, as provisional liquidator of FTXDM (the "Provisional Liquidator").The Commission's application was advanced on the basis that, inter alia, it was in the public interest to obtain a court order appointing a provisional liquidator over FTXDM to secure the assets of FTXDM. The order ("Urgent Order") was granted by The Chief Justice of The Bahamas Supreme Court as prayed that day, as there was a real risk of dissipation on the basis of the information received that the founders of FTXDM were the only individuals with the passcodes, they had made unauthorized transfers of client digital assets and there was a possibility they may do so again. I produce a true copy of the Urgent Order at pages **[344]** – **[347]** of

**Exhibit CR-1.**

61. The Chapter 11 proceedings did not exist at the time the Commission commenced its winding up proceeding against FTXDM, and the Commission had no information the US Debtors were contemplating initiating Chapter 11 proceedings.

62. Further, the Commission subsequently published a media release (the "10 November Media Release") 'Securities Commission of The Bahamas Freezes Assets of FTX' on the Commission's website. Given the scale of the potential loss to members of the public and the resulting significant public interest in what was a quickly developing situation, the Commission deemed it in the public interest to publish the Media Release on its website in the interest of transparency. A true copy of the 10 November Media Release has been produced at pages **[348] – [349]** of **Exhibit CR-1.**

### *11 November 2022*

63. On 11 November 2022, the Commission filed the Winding-Up Petition and supporting documents, inclusive of the Urgent Order appointing Mr. Brian Simms, KC as Provisional Liquidator, in accordance with the Commission's undertaking given to the Court on the previous day.

64. FTX Trading Ltd and certain affiliates, but not including FTXDM, commenced the Chapter 11 proceedings in the District of Delaware on 11 November 2022.

### *12 November 2022*

65. On 12 November, 2022, the Commission issued a media release (the "12 November Media Release") titled 'Securities Commission Addresses FTX Statement on Bahamian Withdrawals' notifying the public:

*"The Commission notes the statement made by representatives of FTX which advised "Per Bahamian HQ's regulation and regulators, we have begun to facilitate the withdrawal of Bahamian funds. As such you may have seen some withdrawals processed by FTX recently as we complied with the regulators.*
*The Commission wishes to advise that it has not directed, authorized or suggested to FTX*

*Digital Markets Ltd the prioritization of withdrawals for Bahamian clients. The Commission further notes that such transactions may be characterized as voidable preferences under the insolvency regime and consequently result in clawing back funds from Bahamian customers. In any event, the Commission does not condone the preferential treatment of any investor or client of FTX Digital Markets Ltd or otherwise.".* A true copy of the 12 November Media Release is produced at **[350] – [351]** of **Exhibit CR-1.**

66. Further, from 12:40 pm – 3:08 pm on 12 November, the Commission, in furtherance of its regulatory responsibilities, conducted the sworn examination of Bankman-Fried.

67. Mr. Samuel Bankman-Fried, inter alia, informed the Commission that there had been hacking attempts overnight and that he and Mr. Gary Wang spent much of the night trying to move assets out of harm's way

68. The Commission was also informed by the Provisional Liquidator that:

   ▪ he had received reports, that were yet to be confirmed, that on the previous day a substantial amount of digital assets under the control of FTXDM had been removed by persons believed to be hacker/s;

   ▪ He had been informed by Bankman-Fried and Mr. Gary Wang that as of 11 November 2022, an attempt had been made by an unknown actor, without authorization, to restrict access by the employees of FTXDM to its AWS system, (the "AWS System").

69. The information provided by Bankman-Fried and the Provisional Liquidator to the Commission, significantly heightened concerns about the risk of dissipation of digital assets held by FTXDM to the prejudice of its clients and other creditors. Accordingly, the Commission determined, in the exercise of its regulatory powers, it was necessary to take steps to protect the interests of the clients and other creditors in the assets of FTXDM and the public interest by obtaining a court order to safeguard the digital assets by transferring them to secure digital wallet/s under the exclusive control the Commission.

70. Accordingly, the Commission issued an administrative order and advanced an urgent ex

parte application, on notice to the Provisional Liquidator, before Supreme Court Justice Loren Klein pursuant to section 46(1)(f) of the DARE Act for an order directing FTXDM to transfer the digital assets in its possession to a secure digital wallet established and maintained by the Commission. A true copy of the administrative order is produced at **[352] – [353]** of **Exhibit CR-1.**

71. The urgent ex parte application was made, pursuant to section 46 (1) (f) of DARE, due to, the information received concerning the cyberattacks on the systems of FTXDM and risk of imminent dissipation as to the digital assets under the custody or control of FTXDM.

72. Supreme Court Justice Loren Klein granted the Commission leave to commence these proceedings against FTXDM despite a Provisional Liquidator having been appointed,  and granted an order authorizing the Commission, in the exercise of its power as regulator, to direct that digital assets of, or under control of FTXDM, its officers, directors, employees and agents, including assets held upon trust by FTXDM, be transferred to digital wallet/s controlled by the Commission (hereafter the "**Transfer Order**").A true copy of the Transfer Order is produced at pages **[354] – [356]** of **Exhibit CR-1.**

73. The Commission immediately acted to effect transfer of the digital assets in FTXDM's hot, warm and cold wallets to secure digital wallets established by or under the control of the Commission. Pursuant to the Commission's exercise of its regulatory powers and under the authority of the Bahamas Supreme Court Order, Bankman-Fried and Gary Wang were directed by the Commission to effect the transfer of the digital assets remaining under their control because they possessed the access codes required to effect the transfer of such assets to digital wallets established by the Commission. There was no other timely option available to the Commission to achieve compliance with the terms of the order made by Supreme Court Justice Klein.

74. The digital assets transferred under the Commission's court-authorized regulatory directive to Messrs. Wang and Bankman-Fried was effected by transferring such assets to the digital wallets under the exclusive control of the Commission. While certain token protocols may require the burning of old tokens and the simultaneous minting of new (i.e. replacement) tokens to effect transfer, in no case, did the process involve the creation of any additional tokens.

75. By the end of the process, the Commission had taken possession of most tokens within the control of FTXDM, Bankman-Fried and Mr. Wang (valued at more than US$3.5 billion at the time of transfer).

76. Additionally, the Commission sent instructions for the transfer of approximately US $46 million of Tether tokens to a secured wallet under the control of the Commission. These Tether tokens were not transferred to the Commission's wallet but, after a meeting with Tether representatives, the Commission agreed that Tether, in light of the Chapter 11 proceedings, would maintain a freeze over the Tether tokens until ownership of the tokens is resolved.

77. On 12 November 2022, all actions taken by the Commission to safeguard the assets were effected, and those assets remain protected by the Commission, solely pursuant to the due exercise of its powers as regulator of FTXDM.

78. The Commission is maintaining the digital assets in wallets hosted by the institutional digital asset custodian, Fireblocks. I am reliably advised that Fireblocks maintains ISO certifications in Security (ISO 27001), Cloud (ISO 27017), and Privacy (ISO 27018). I am further advised that Fireblocks meets or exceeds SOC 2 Type II requirements and is the first and only company in the world to achieve a Cryptocurrency Security Standard (CCSS) Qualified Service Provider Level 3 certification by the Cryptocurrency Certification Consortium (C4).

79. The Commission did not incur any costs for the setup of these wallets but expects to incur annual maintenance costs in the amount of US$631,200. The indemnity order issued by this Court entitles the Commission to be reimbursed with respect to the expenses, costs and charges reasonably incurred in connection with establishing and maintaining the digital wallets.

80. For the avoidance of doubt, at no time has the Commission colluded with any principal, officer or director of FTXDM, the Provisional Liquidator or any third party to transfer digital assets owned by or under the custody or control of FTXDM. Upon completion of the transfers, Bankman-Fried and Gary Wang no longer had access to the tokens that were transferred or frozen. All transferred assets were and remain under the sole control of the Commission. The Provisional Liquidator played no role in the transfer.

81. Further, the Commission updated the Register to reflect the suspension of FTXDM's registration. I produce a true copy of the amended entry made in the Register at page **[357]** of **Exhibit CR-1**. Pages **[358] – [361]** of **Exhibit CR-1** has intentionally been left blank.

### 13 November 2022

82. On 13 November, via email addressed to me and the Provisional Liquidator, Bankman-Fried informed us that –

> *"I understand you guys moved almost all of the assets last night!*
> *As of now, it looks like Gary has been locked out of AWS by the Delaware Chapter 11 team - we're looking into details but it looks like he isn't able to transfer any of the remaining assets because of that unless/until that is reversed."*

There is now produced a copy of that email at page **[362]** of **Exhibit CR-1.**

83. I responded requesting details of the type and number of remaining digital assets. A true copy of my response is produced at page **[363] – [364]** of **Exhibit CR-1.** I subsequently received a response from Mr. Wang providing a list of the remaining digital assets by type, blockchain, number of tokens and USD value in the body of the email. Due to the need to protect and preserve confidentiality regarding the security of the digital assets held by the Commission, I will not disclose the content of Gary Wang's email to me.

### 14 November 2022

84. An ex-parte application was made by the Provisional Liquidator in the Winding Up Proceedings for the appointment of additional joint provisional liquidators An order appointing Kevin Cambridge and Peter Greaves to act as joint appointed liquidators (the "JPL's") with the Provisional Liquidator was filed (the "14 November Order"). A true copy of the Order has been produced at pages **[365]- [368]** of **Exhibit CR-1.**

85. The Commission published a further media release (the "14 November Media Release") titled 'Securities Commission Update on FTX' providing a further update to the public on the actions taken by the Commission to date and its intention to engage with other

supervisory authorities and regulators in the interests of clarity and transparency. A true copy of the 14 November Media Release is produced at pages **[369] – [370]** of **Exhibit CR-1**.

**15 November 2022**

86. On 15 November 2022, I replied to Gary Wang's last email of 13 November detailing the remaining digital assets and asked him and Bankman-Fried the following with a view to the Commission further exercising its supervisory functions in the public interest:

*"Good afternoon Sam/Gary,*

*Are you able to provide details on any tokens which may have been moved (including value of same) since you received notice of the suspension of the registration on Thursday 10 November and the seizure of assets by the Commission on 12 November? Please include any assets which may have been moved by U.S. liquidators or others.*

*Thanks and kind regards,"*

I have produced a true copy of the email at page **[371]** of **Exhibit CR-1.**

87. If as reported by Bankman-Fried in his email dated 13 November, 2022, Gary Wang had been locked out of the AWS System and if such action was accurately attributed by him to representatives of the US Debtors, I am advised by counsel for the Commission and verily believe, without waiving privilege, that such conduct could constitute contempt of court in respect of the order made by Supreme Court Justice Klein on 12 November, 2022.

88. The Commission understands that the Joint Provisional Liquidators are also locked out of the AWS System and as such, do not have access to the records of FTXDM. Access to its records is required for FTXDM to maintain compliance with its regulatory obligations under the FTRA and under the DARE Act. As of the AWS lockout, FTXDM is not able to be compliant with its legislative obligations.

**16 November 2022**

89. On 16 November, 2022 the Commission made an application for an order (the "Sealing Order") sealing my First Affidavit filed in support of the Originating Notice of Motion and other documents, save for orders made on 12 November 2022 and filed herein on 14 November 2022 and 15 November 2022 respectively. The Sealing Order was duly granted and is produced at pages **[372] – [374]** of **Exhibit CR-1**. The application to seal my First Affidavit was made to promote the protection and security of the assets being held by the Commission for the clients and other creditors of FTXDM.

### *17 November 2022*

90. On 17 November, 2022, by his Declaration filed in the Chapter 11 proceedings, Mr. Ray stated as follows

   *"5. Never in my career have I seen such a complete failure of corporate controls and such a complete absence of trustworthy financial information as occurred here. From compromised systems of integrity and faulty regulatory oversight abroad, to the concentration of control in the hands of a very small group of inexperienced, unsophisticated and potentially compromised individuals, this situation is unprecedented."*

   *"46. Many of the companies of the FTX Group, especially those organized in Antigua and The Bahamas, did not have appropriate corporate governance."*

   *"63. In the Bahamas, I understand that corporate funds of FTX Group were used to purchase homes and other personal items for employees and advisors. I understand that there does not appear to be documentation for certain of these transactions as loans and that certain real estate was recorded in the personal names of these employees and advisors on the records of the Bahamas."*

   *"76. Mr. Bankman-Fried, whose connections and financial holdings in the Bahamas remains unclear to me…".*

   A true of copy of the said Declaration is produced at pages **[375] – [404]** of **Exhibit CR-1.**

91. A further media release (the "17 November Media Release") was issued by the Commission

titled 'Securities Commission of The Bahamas Assumes Control of Assets of FTX Digital Markets Ltd' to keep the public informed as to the Commission's actions and progress in this matter. It reiterated that, in the Commission's view, the *"[u]rgent interim regulatory action was necessary to protect the interests of clients and creditors of FDM"* and clarified that FTXDM was not a party to the Chapter 11 proceedings.A true copy of the 17 November Media Release is produced at pages **[405] – [406]** of **Exhibit CR-1.**

### 21 November 2022

92.  The Commission filed an application for supplemental orders (together the "Trusteeship Orders" arising out of the earlier events and orders made directing that (i) the digital assets transferred by the Commission to digital wallet(s) established and maintained by the Commission shall continue to be held in the custody of the Commission, as regulator, under the continuing direction of the Court and that the Commission shall be regarded as having acted as trustee in the administration of trust assets within the meaning of the Trustee Act Ch.176 for the benefit of the clients and/or creditors of FTXDM, pending directions for the continued safe custody of the said assets and is entitled to rights of indemnity and re-imbursement afforded a trustee under the law. A true copy of the Summons filed is produced at pages **[407] – [409]** of **Exhibit CR-1.**

93.  The Commission advanced an application for supplemental orders (the "21 November Supplemental Orders"). The 21 November Supplemental Orders were granted as prayed. A true copy of the said order has been produced at pages **[410] – [413]** of **Exhibit CR-1.**

94.  The Commission published a further media release (the "21 November Media Release") titled 'Securities Commission of The Bahamas Secures Court Order For Right of Indemnity and Reimbursement'. A true copy of the 21 November Media Release is now produced at pages **[414] – [415]** of **Exhibit CR-1.**

### 23 November 2022

95.  The Commission published a further media release (the "23 November Media Release") titled 'Securities Commission Statement on Transfer Motion In FTX Digital Markets Chapter 15

Proceedings'. By the 23 November Media Release, the Commission sought to address misunderstandings surrounding the Commission's actions taken in the public interest to secure the digital assets in the custody of FTXDM. A true copy of said Media Release has been produced at pages **[416] – [418]** of **Exhibit CR-1**

### *29 November 2022*

96.   From 11:59am – 1:40pm on 29 November 2022, the Commission examined under oath Daniel Friedberg, Legal Counsel and Chief Regulatory Officer at the FTX Group, and Secretary of FTXDM.

### *1 December 2022*

97.   From 12:09 pm – 2:49 pm on 1 December 2022, the Commission examined under oath Bankman-Fried for a second time.

### *7  December 2022*

98.   By letter dated 7 December 2022 the Commission informed the US Debtor representatives the Commission was prepared to assist in the efficient and mutually respectful conduct of several proceedings so long as the Commission is able to do so without impairing the conduct or confidentiality of its ongoing investigation. Copies of all the unsealed documents filed in the Winding-Up Proceedings and in this regulatory Action were provided, via counsel, by the Commission to the US Debtors. A true copy of the letter dated 7 December, 2022 has been produced at pages **[419] – [441]** of **Exhibit CR-1.**

### *12 December 2022*

99.   Bankman-Fried was arrested by The Royal Bahamas Police Force in respect of a request for his extradition to United States of America to answer criminal charges before criminal courts in the Southern District of New York.

100.  On 12 December 2022, Mr. John Ray III, Chief Restructuring Officer of the US Debtors in filed a Debtors' Objection to Motion For Entry of An Order Shortening The Notice and

Objections Periods With Respect an Emergency Motion filed on behalf of the JPLs ("the Debtors' Objection") in the Chapter 11 proceedings. At paragraph 15 of the Debtors; Objection, it was stated that the Commission instructed Mr. Bankman-Fried and/or Mr. Gary Wang to '*mint a substantial amount of new tokens*', but without producing any evidence to substantiate his statement. A true copy of the Debtors' Objection has been produced at pages **[442] – [455]** of **Exhibit CR-1.** This statement is unsubstantiated and untrue, and has the effect of casting a pall of mistrust over public institutions in The Bahamas and otherwise sully the reputation of this jurisdiction.

101.   To be clear, the Commission did not at any time direct the minting of new (i.e. additional) tokens.

### *13 December 2022*

102.   On 13 December 2022, my affidavit filed in support of the Winding Up Petition was unsealed and the court granted the JPLs permission to assist the Commission in its regulatory investigation and authorized the JPLs to enter into a common interest privilege agreement with the Commission (the "Unsealing Order").

103.   A further media release was issued by the Commission (the "13 December Media Release") titled 'Securities Commission of The Bahamas Addresses Misstatements In FTX's U.S. Bankruptcy Case' seeking to address baseless allegations made against the Commission, which I shall come onto address. A true copy of the said Media Release is produced at pages **[456] – [458]** of **Exhibit CR-1.**

### **ALLEGATIONS**

104.   Since the order was made by Supreme Court Justice Klein authorizing the Commission to safeguard the assets of, or under the control of FTXDM and its principals, misguided and unsubstantiated allegations have been levelled by representatives of the US Debtors against the Commission in respect of this matter in documents filed in the Chapter 11 proceedings and in the press. A great deal of the confusion on their part has arisen by reason of two factors:

- First, due to the imminent danger of dissipation of the relevant digital assets, and the overriding public interest in protecting clients and other creditors, swift action, including enforcement action by the Commission was necessary. The situation

that the Commission has faced, with urgent, decisive and effective action, has been unprecedented.

- Secondly, the Commission has been precluded from sharing all facts and matters with the public contemporaneously, as set out in my initial affidavit, as it was sealed by court order along with other documents subject to a confidentiality order made by the court dated 16 November 2022 (the "Confidentiality Order") in light of ongoing investigations and out of an abundance of caution to protect, to the greatest extent possible, the rights and interests of all clients, other creditors of FTXDM and any other persons who may be determined to have an interest in any of them. The Confidentiality Order was initially required to avoid tipping off persons with adverse interests to FTXDM. The Commission is now at liberty to disclose information, which is not subject to the Confidentiality Order that remains in force and which informed the actions taken. Further, in the interest of transparency, I have taken the opportunity in this Affidavit to detail the chronology of events and exhibit documents accordingly.

*'Collaboration' with The JPLs*

105. It has been further asserted by the US Debtors and their representatives that the Commission conducted itself improperly in 'collaborating' with FTXDM and its Provisional Liquidators in bad faith by directing that FTXDM or its agents:

- access the FTXDM computer systems; and/or

- make onward transfers of digital assets in the custody of FTXDM and/or other entities forming part of the FTX Group; and/or

- mint new tokens.

106. As stated above, at no time did the Commission collude with the Provisional Liquidator or any principal, director or officer of FTXDM to transfer the digital assets to the secure wallets under the control of the Commission or otherwise. The Commission has at all times acted in its capacity as regulator (i) in good faith (ii) in the public interest (iii) in compliance with the Orders

of the Bahamas Supreme Court (iv) under the supervision of the Bahamian Supreme Court and (v) in accordance with its fiduciary duties, as confirmed by the Trusteeship Order.

107. The Commission conducted itself in a reasonable, considered, and proactive manner by urgently carrying out its investigations to assess risk to clients and creditors by directly corresponding with Bankman-Fried, Mr Wang and others from the outset of media coverage into FTX liquidity issues and the potential Binance takeover bid as early as 8 November 2022. It was important that due process was followed. Indeed, the following day, my colleagues and I conducted a zoom meeting (given a severe weather warning) with RS, FTXDM's Chairman. The information gathered from this expeditious and targeted investigation informed the Commission's regulatory decision to seek urgent relief from the Court to protect the interest of clients and creditors of its registrant, FTXDM.

108. The Commission also has a statutory duty to apply to the Court for urgent relief where it is necessary and in the public interest to do so. The applications it advanced on 10 November 2022 to secure the Urgent Order, in particular the order pertaining to the freeze and transfer of the relevant digital assets, were (i) informed by the intelligence gathered in the preceding 48 hours and (ii) made in furtherance of the Commission's statutory mandate to act swiftly in the public interest. These actions dramatically reduced the risk of dissipation.

109. Upon the Urgent Order and the subsequent Transfer Order being issued, steps taken by the Commission to secure the relevant digital assets into wallet(s) under the Commission's control, were carried out in furtherance of (i) the Commission's statutory duty to act in the public interest and (ii) to protect the interest of client and other creditors of FTXDM.

110. The Commission also did not direct Mr. Bankman-Fried and/or Mr. Gary Wang to mint new (i.e. additional) tokens as alleged or at all. The above-mentioned allegations have been made without reference to any cogent evidence and ignore the expeditious steps taken to safeguard the digital assets.

*Automatic Stay Violation*

111. It would be incorrect to assert the regulatory action taken by the Commission on or after 10 November 2022 constituted a violation of the automatic stay imposed by the Chapter 11

proceedings. The proceeding in relation to FTXDM was commenced in The Bahamas Supreme Court was a Regulatory Winding Up Petition presented in Court on 10 November 2022.This further action was also initiated by Commission in the exercise of its regulatory powers conferred by statute.

*Risk of Dissipation*

112. At the material time, there was a genuine risk of dissipation of the digital assets under the control of FTXDM. Due to reported hacking attempts and the fact that the assets remained within the control of Bankman-Fried and Gary Wang, both of whom were under investigation by the Commission and the Police, the Commission quickly formed the view prior to seeking the Urgent Order that there was an imminent risk of dissipation of the digital assets in the custody of FTXDM.

113. Digital assets by their very nature can be susceptible to misappropriation where correct security custodian protocols are not deployed. To this end, the Commission has taken all reasonable steps to safeguard the digital assets that it now holds on trust.

*Ownership*

114. The Transfer Order provided for the transfer of all digital assets irrespective of whether they were the property of FTX Digital Markets. The Commission's regulatory investigation is ongoing. This includes steps to ascertain the identities of all persons and entities that may enjoy an ownership or other interest in any of the relevant digital assets. At this stage, the Commission is obliged to maintain a balance between pursuing a proactive approach to establish lawful ownership and ensuring the digital assets remain secure. The current scope of the Transfer Order and Trusteeship Order are proportionate, in keeping with the public interest and commensurate with the Commission's statutory and fiduciary duties whilst the investigation continues. The Commission will continue to hold the digital assets until such time as a full and proper determination of ownership rights has been adjudicated by the Supreme Court, and the Commission anticipates that it will soon establish, cooperatively with the JPLs, legally appropriate and transparent processes for such determinations, to be brought before the Supreme Court for its approval.

*'Stone Walling'*

115. The US Debtors' representatives further claim the Commission has improperly failed to make publicly available information obtained as regulator and information concerning the digital assets held by the Commission pursuant to the exercise of its regulatory powers under the law. They also allege that the Commission has acted improperly by 'stone walling' the US Debtors and other Debtors by failing to disclose information to date including an accounting of the digital assets transferred into the Commission's custody pursuant to the Urgent Order and Transfer Order. The Commission strongly denies any impropriety. I note that in a letter dated 7 December 2022, an invitation was given to a US Debtor's representative to meet with the Commission. As of the date of this Affidavit, no response to this invitation has been received.

116. The DARE Act and the IOSCO MMoU provides the parameters within which the Commission can exercise its 'cooperative power' to offer assistance to certain other authorities. The relevant statutory power appears in section 41 of the DARE Act. Subsections (3) – (10) provide that the Commission may only provide assistance, including by sharing material, with an 'overseas regulatory authority'.

   ▪ For the purposes of the DARE Act, a body is an 'overseas regulatory authority' if it is an authority in a jurisdiction outside The Bahamas that exercises similar functions as the Commission regulating DABs and activities and includes a 'designated third party'.

   ▪ A 'designated third party' under the DARE Act is: (i) a person or body responsible for supervising the relevant regulatory authority (ii) any authority responsible for carrying out the supervision, investigation or enforcement of laws alleged to have been breached or (iii) any authority of the foreign jurisdiction, other than the requesting overseas regulatory authority, exercising a function that corresponds to a regulatory function of the Commission under the Dare Act.

Against this background, the Commission has been advised that it has acted entirely properly, and in full accordance within the limitations of its statutory authority by not making material disclosures to the US Debtors, their representatives or other private civil litigants who do not

fall within the statutory definitions of an 'overseas regulatory authority' or 'designated third party'. The advice received by the Commission, however, conflicts with the statements and position expressed by representatives of the US Debtors. In the circumstances, the Commission is seeking the Court's direction in this regard. Moreover, the Commission's respectful adherence to its governing laws by declining unpermitted disclosure to private litigants to date has been entirely proper given the Court's sealing of my previous affidavit(s) and the need for the Commission to secure the relevant digital assets from being misappropriated in accordance with its statutory and fiduciary duties.

117. The Commission is working, and will continue to work, cooperatively with its regulatory counterparts overseas, under the IOSCO MMOU and EMMOU, to share information in this matter in compliance with the Commission's statutory remit. Additionally, the Commission has taken steps to execute a memorandum of understanding with an appropriate body falling under the statutory definition of an 'overseas regulatory authority' for the sharing of information in this matter.

118. The documents filed and served for the Originating Notice of Motion and Orders made herein on 12 November 2022 filed on 14 and 15 November 2022, including my affidavit filed in support of the Commission's applications remain subject to the Confidentiality Order. Any variation or revocation of the Confidentiality Order is, of course, a matter for this Honourable Court's discretion should a party seek its variation or revocation.

**SPECIFIC RELIEF SOUGHT**

119. In its capacity, as regulator of the securities industry and DABs and as a trustee of the digital assets under its control, the Commission seeks directions of this Honourable Court on the following matters; namely –

    (i)    Whether the Commission should provide to representatives of the US Debtors, information respecting the digital assets being held in the secured digital wallets established by, and under the control of, the Commission?

    (ii)    If the answer to question (i) is in the affirmative, what information and details (if any) should the Commission provide the US Debtors'

representatives having regard to the circumstances of this particular case
and the manner in which such information ought to be provided?

**SWORN TO** at Nassau,  New

Providence, this 28th day of

December, A.D., 2022

)

)

)_____

Before me,

**NOTARY PUBLIC**

**COMMONWEALTH OF THE BAHAMAS**                    **2022/COM/com**

**IN THE SUPREME COURT**

**COMMERCIAL DIVISION**


**IN THE MATTER OF the Digital Assets and Registered Exchanges Act, 2020**
**(as amended)**


**AND IN THE MATTER OF FTX DIGITAL MARKETS LTD.**
**(A Registered Digital Asset Business)**


**BETWEEN**

**SECURITIES COMMISSION OF THE BAHAMAS**

**Plaintiff**

**AND**

**FTX DIGITAL MARKETS LTD.**

**Defendant**

_____

# CERTIFICATE

_____


**I HEREBY CERTIFY** that this is the Exhibit marked **"CR.1"** mentioned and referred to in the

Third Affidavit of Christina R. Rolle dated and sworn to before me this 28th day of

**December**, A.D., 2022.


*G Bron Jr*

**NOTARY PUBLIC**

**Exhibit CR.1**



*EXTRAORDINARY*

# OFFICIAL GAZETTE
# THE BAHAMAS

PUBLISHED BY AUTHORITY

| NASSAU | 1ˢᵗ June, 2011 | (A) |
|---|---|---|



SECURITIES COMMISSION
RECEIVED
NOV 1 5 2011
OF THE BAHAMAS

# SECURITIES INDUSTRY ACT, 2011

## Arrangement of Section

**Section**

### PART I –PRELIMINARY    7

| | | |
|---|---|---|
| 1. | Short title | 7 |
| 2. | Commencement | 7 |
| 3. | Purposes | 7 |
| 4. | Interpretation | 8 |
| 5. | Ownership and control of securities | 18 |
| 6. | Control of an issuer | 18 |
| 7. | Securities business | 19 |
| 8. | Carrying on business in The Bahamas | 19 |
| 9. | References | 20 |

### PART II – THE SECURITIES COMMISSION    20

| | | |
|---|---|---|
| 10. | Continuation of the Commission | 20 |
| 11. | Declaration of interest | 22 |
| 12. | Functions of the Commission | 22 |
| 13. | Powers of the Commission | 23 |
| 14. | Delegation | 23 |
| 15. | Executive Director | 24 |
| 16. | Funds and Resources | 24 |
| 17. | Borrowing powers | 24 |
| 18. | Advances and Guarantees | 24 |
| 19. | Repayment of interest | 25 |
| 20. | Surplus funds | 25 |
| 21. | Reserve fund | 25 |
| 22. | Authority to set fees | 26 |
| 23. | Balancing revenue and surplus | 26 |
| 24. | Secretary and other officers | 27 |
| 25. | Commission staff | 27 |
| 26. | Appointment of experts | 27 |
| 27. | Indemnity | 28 |
| 28. | Confidentiality | 28 |
| 29. | Powers of Minister | 29 |
| 30. | Accounts, auditor and audit | 30 |
| 31. | Annual report | 30 |

32.     Commission procedures.................................................................30
33.     Panels of the Commission............................................................31

## PART III – ASSISTANCE TO DOMESTIC AND FOREIGN REGULATORY AUTHORITIES                                                    32

DIVISION 1 – INTERPRETATION                                               32

34.     Interpretation................................................................................32
DIVISION 2 – ASSISTANCE TO DOMESTIC REGULATORY AUTHORITIES     33

35.     Exercise of powers on behalf of domestic regulatory authorities.......33
DIVISION 3 – ASSISTANCE TO FOREIGN REGULATORY AUTHORITIES      33

36.     Conditions for provision of assistance.............................................33
37.     Assistance that may be rendered.....................................................34
DIVISION 4 – GENERAL                                                     35

38.     Authority to enter into Memoranda of Understanding........................35
39.     Offences under this Part.................................................................36
40.     Immunities....................................................................................36

## PART IV – INVESTIGATIONS AND INSPECTIONS                              37

DIVISION 1–INTERPRETATION                                                37

41.     Interpretation................................................................................37
DIVISION 2–INVESTIGATIONS                                                37

42.     Power to investigate......................................................................37
43.     Powers to obtain information for investigation..................................37
44.     Uncooperative witness liable for contempt......................................38
DIVISION 3–INSPECTIONS                                                   38

45.     Compliance inspections–regulated persons......................................38
46.     Power to require reports.................................................................39
47.     Compliance inspection of other market participants..........................40
48.     General.........................................................................................40
49.     Participation of other regulatory authorities in inspections under this Part........41
DIVISION 4–PROVISION OF INFORMATION RELATING TO TRANSACTIONS
                                                                         41

50.     Provision of information.................................................................41
DIVISION 5–GENERAL                                                       42

51.     Liens............................................................................................42
52.     Information about documents not in person's possession....................42
53.     Secrecy........................................................................................43
54.     Exemption.....................................................................................43
55.     Privilege.......................................................................................43

56.  Use of documents etc..............................................................................44
57.  Offence of obstruction of investigations and inspections........................44

## PART V – REGULATION OF MARKETPLACES, ETC          44

58.  Registration..........................................................................................44
59.  Conditions and restrictions on registration..............................................45
60.  Approval of regulatory instruments.........................................................45
61.  Commission powers...............................................................................45
62.  Delegation.............................................................................................46
63.  Voluntary surrender...............................................................................46
64.  Auditors and audits................................................................................46
65.  Reporting to the Commission..................................................................47
66.  Notices..................................................................................................47
67.  Keeping of records.................................................................................47
68.  Offences................................................................................................48

## PART VI – REGISTRATION OF PERSONS CARRYING ON SECURITIES BUSINESS          48

69.  Registration requirement........................................................................48
70.  Notices..................................................................................................50
71.  Surrender of registration........................................................................50
72.  Criminal convictions..............................................................................50
73.  Voluntary liquidation.............................................................................50
74.  Offence..................................................................................................51

## PART VII – CONDUCT OF SECURITIES BUSINESS          51

75.  Duties to clients.....................................................................................51
76.  Auditor..................................................................................................51
77.  Reporting to the Commission..................................................................52
78.  Responsibility for actions of persons acting on behalf of registered firm or party related to investment fund.........................................................53
79.  Keeping of records.................................................................................53
80.  Prohibition.............................................................................................53

## PART VIII – COMPENSATION FUND          54

81.  Compensation funds...............................................................................54

## PART IX – DISTRIBUTIONS AND PROSPECTUSES          54

82.  Interpretation.........................................................................................54
83.  Prospectus required................................................................................54
84.  Receipt for preliminary prospectus..........................................................55
85.  Selling activities before issue of receipt for prospectus............................55

86.    Defective preliminary prospectus........................................................................55
87.    Delivery of prospectus........................................................................55
88.    Amendments........................................................................56
89.    Certificates........................................................................56
90.    Expert's consent........................................................................56
91.    Issue of receipt........................................................................56
92.    Exempt distributions........................................................................57
93.    Exemptions for approved foreign issuers........................................................................58
94.    Distributions made outside The Bahamas........................................................................58
95.    Resale restrictions........................................................................58
96.    Lapse date........................................................................58
97.    Offence........................................................................59

**PART X – CONTINUING OBLIGATIONS OF PUBLIC ISSUERS       59**

98.    Disclosure to the public........................................................................59
99.    Timely disclosure of material changes........................................................................60
100.   Auditors and audits........................................................................61
101.   Filing of annual audited financial statements........................................................................61
102.   Delivery of continuous disclosure documents to security holders........................61
103.   Proxies and proxy solicitation........................................................................62
104.   Exemptions for certain foreign issuers........................................................................63
105.   Offence........................................................................63

**PART XI – GOVERNANCE OF PUBLIC ISSUERS       64**

106.   Governance of public issuers........................................................................64

**PART XII – TAKE-OVER BIDS       64**

107.   Take-over bids........................................................................64

**PART XIII – MISCONDUCT       64**

108.   Application and definitions........................................................................64
109.   Market manipulation........................................................................65
110.   False trading and market rigging-creating a false or misleading  appearance of
        active trading etc........................................................................65
111.   False trading and market rigging–artificially maintaining etc. trading price......66
112.   Misleading or deceptive conduct........................................................................66
113.   Misleading the Commission........................................................................67
114.   Dissemination of information about illegal transactions........................................67
115.   False or misleading statements........................................................................67
116.   Inducing persons to deal........................................................................68
117.   Dishonest conduct........................................................................68
118.   Prohibited representations........................................................................68
119.   Prohibition on purchasing or selling of securities by certain persons................69

120. Front running.................................................................................70
121. Defence-belief that other party knows information.............................71
122. Defence of automatic or predetermined trade...................................71
123. Defences- trading as agent...........................................................71
124. Defences-trade or recommendation by individual with no inside or material
     order information......................................................................72
125. Exemptions and modifications.......................................................72
126. Offences..................................................................................72

## PART XIV – REPORTING BY SECURITY HOLDERS OF PUBLIC ISSUERS   73

127. Application...............................................................................73
128. Initial insider report...................................................................73
129. Disclosure of beneficial interest in share capital...............................74
130. Public issuer to keep register of its security holders..........................75
131. Offence...................................................................................75

## PART XV – ENFORCEMENT   75

132. Compliance orders......................................................................75
133. Orders in the public interest.........................................................75
134. Application to court....................................................................78
135. Administrative penalty.................................................................79
136. Removal of benefits....................................................................79
137. Payment of costs.......................................................................79
138. Order to freeze property..............................................................79
139. Hearings..................................................................................80
140. Limitation periods......................................................................81
141. Directors and officers..................................................................81

## PART XVI – CIVIL LIABILITY FOR MISREPRESENTATIONS   82

142. Interpretation ...........................................................................82
143. Liability for misrepresentation in prospectus–damages.......................82
144. Action by security holders for rescission for misrepresentation in prospectus...84
145. Due diligence defence..................................................................84
146. Commission may seek leave to bring action or appear or intervene in an action.
     ..............................................................................................84
147. General....................................................................................85

## PART XVII – GENERAL PROVISIONS   85

148. Regulations...............................................................................85
149. Rules......................................................................................86
150. Rule-making process...................................................................86
151. Regulation prevails over rule.........................................................87

152.  Power to vary Commission rules..................................................................87
153.  Power to remove exemption contained in Commission rule............................87
154.  Guidelines.....................................................................................................87
155.  Administrative proceedings and reviews.:.....................................................88
156.  Review of decisions of securities exchange etc...............................................88
157.  Appeals to court.............................................................................................88
158.  Filing of documents and public availability....................................................89
159.  Verification....................................................................................................90
160.  Register as evidence.......................................................................................90
161.  Discretionary exemptions...............................................................................90
162.  Designation orders.........................................................................................90
163.  Conditions on decisions..................................................................................91
164.  Discretion to revoke or vary decision.............................................................91
165.  Recognition of foreign jurisdictions and foreign securities exchanges..............91
166.  Commission to keep register..........................................................................91
167.  Stamp duty exemption...................................................................................91

**PART XVIII – TRANSITION PROVISIONS AND REPEALS**    **91**

168.  Definitions.....................................................................................................91
169.  Existing unregistered market participants.......................................................92
170.  Securities exchanges registered under the former Act.....................................92
171.  Clearing facilities registered under the former Act..........................................92
172.  Broker-dealers and securities investment advisors..........................................92
173.  Registered individuals....................................................................................92
174.  Interim financial statement requirements for public issuers.............................92
175.  Insider reporting obligations...........................................................................93
176.  Savings..........................................................................................................93
177.  Repeals..........................................................................................................93

**FIRST SCHEDULE**    **94**

PART 1 – SECURITIES    94

PART 2 - SECURITIES BUSINESS - REGULATED ACTIVITIES    97

PART 3 – EXCLUDED ACTIVITIES    98

PART 4 - EXCLUDED PERSONS    102

**SECOND SCHEDULE**    **104**

THE COMMISSION    104

**THIRD SCHEDULE (SECTION 177)**    **105**

REPEALS    105



No. 10 of 2011

### SECURITIES INDUSTRY ACT, 2011

**AN ACT TO UPDATE AND MODERNISE THE LAW RELATING TO
THE REGULATION OF SECURITIES EXCHANGES AND THE
SECURITIES INDUSTRY; TO EXPAND AND ENHANCE THE
POWERS OF THE SECURITIES COMMISSION; TO REPEAL THE
SECURITIES INDUSTRY ACT, CHAPTER 363 AND FOR
CONNECTED MATTERS**

[Date of Assent - 1st June, 2011]

**Enacted by the Parliament of The Bahamas**

# PART I –PRELIMINARY

**1.   Short title.**

This Act may be cited as the Securities Industry Act, 2011.

**2.   Commencement.**

This Act shall come into operation on such day as the Minister, by notice published in the Gazette, may appoint and the Minister may cause different provisions of this Act to come into operation on different days by notice or notices published in the Gazette.

**3.   Purposes.**

The purposes of this Act are to —

    (a)    provide protection to investors from unfair, improper or fraudulent practices;

    (b)    foster fair and efficient capital markets and confidence in the capital markets in the Bahamas;

    (c)    reduce systematic risk;

(d) reduce the extent to which it is possible for a regulated business to be used for a purpose connected with financial crime such as money laundering, fraud and insider dealing; and

(e) promote public understanding of the financial system including awareness of the benefits and risks of different kinds of investment or other financial dealing.

## 4. Interpretation.

In this Act —

"**affiliate**" means, in relation to an issuer, another issuer if —

(a) one of them is the subsidiary of the other; or

(b) the same person controls each of them;

"**alternative trading system**" or "**ATS**" means a marketplace that —

(a) is not a quotation and trade reporting system or a securities exchange; and

(b) does not —

(i) require an issuer to enter into an agreement to have its securities traded on the marketplace;

(ii) provide, directly, or through one or more subscribers, a guarantee of a two-sided market for a security on a continuous or reasonably continuous basis;

(iii) set requirements governing the conduct of subscribers, other than conduct in respect of the trading by those subscribers on the marketplace; and

(iv) discipline subscribers other than by exclusion from participation in the marketplace;

"**ancillary facility**" means any person providing prescribed services to a marketplace, clearing facility, registrant, or to a public issuer with securities listed or traded on a marketplace, where the services facilitate or are ancillary to the operations of a marketplace;

"**approved auditor**" has the prescribed meaning;

"**approved foreign issuer**" means a foreign issuer that —

(a) is a public issuer, or equivalent, under the securities laws of a recognised foreign jurisdiction; and

(b) meets the prescribed criteria;

"**approved rating organization**" means an organization that is prescribed as such;

"**associate**" means, if used to indicate a relationship with a person, —

(a) a partner, other than a limited partner, of the person;

(b)  a trust or estate in which the person has a substantial beneficial interest or for which the person serves as trustee or in a similar capacity;

(c)  an issuer of which the person owns or controls voting securities carrying more than 10% of the voting rights attached to all outstanding voting securities of the issuer; or

(d)  a family member of the person, or a family member of the person's spouse, if the family member has the same home as that person;

**"beneficial owner"** means the person who is entitled to the benefits of ownership of a security although that person may not be the registered owner of the security;

**"beneficial ownership"** includes ownership through a trustee, legal representative, agent or other intermediary;

**"business combination"** means an amalgamation, merger, arrangement or similar transaction;

**"clearing facility"** means a person that —

(a)  maintains records of trades of securities for the purpose of settling claims for money and securities;

(b)  maintains records of transfers and pledges of securities for the purpose of permitting securities to be transferred by record entry;

(c)  holds security certificates deposited with it for the purpose of permitting securities to be transferred by record entry; or

(d)  performs any combination of two or more functions referred to in paragraphs (a) to (c), but does not include a registrant or financial institution acting exclusively in the ordinary course of its customary business;

**"Commission"** means the Securities Commission of The Bahamas as continued under Part II;

**"company"** means any corporation or other incorporated person;

**"Consolidated Fund"** means the fund established by Article 128 of the Constitution;

**"control block holder"** means a person that —

(a)  holds more than 30% of the voting rights attached to all an issuer's outstanding voting securities; or

(b)  is able to affect materially the control of the issuer, whether alone or by acting in concert with others;

**"decision"** means —

(a) if used in relation to the Commission or a person delegated a power of the Commission, a direction, decision, order, ruling or requirement made under securities laws, or

(b) if used in relation to a marketplace, self-regulatory organisation or clearing facility, a direction, decision, order, ruling or requirement made in relation to a regulatory instrument;

**"director"** means a director of a corporation or an individual performing a similar function or occupying a similar position for a company or for any other person;

**"distribution"** means —

(a) a trade in a security of an issuer that has not been previously issued;

(b) a trade, by or on behalf of an issuer, in a previously issued security of that issuer that has been redeemed, purchased by or donated to that issuer;

(c) a trade in a previously issued security of an issuer by a control block holder;

(d) a trade within a prescribed class of trades; or

(e) a trade described in an order made under subsection 161 (2);

**"distribution period"** means the period between the issue of the receipt for a prospectus and the earlier of —

(a) the date the distribution ceased; and

(b) the lapse date of the prospectus under section 96;

**"document"** includes, in addition to a document in writing, —

(a) an electronic communication as defined in the Electronic Communications and Transactions Act, 2003;

(b) any map, plan, graph or drawing;

(c) any photograph;

(d) any disc, tape, sound track or other device in which sounds or other data, not being visual images, are embodied so as to be capable, with or without the aid of some other equipment, of being reproduced; and

(e) any film, negative, tape or other device in which one or more visual images are embodied so as to be capable, with or without the aid of some other equipment, of being reproduced;

**"domestic regulatory authority"** means an authority in The Bahamas that exercises regulatory, supervisory, enforcement or similar functions and includes —

(a)     authorities that regulate or supervise financial institutions;

(b)     securities exchanges;

(c)     self-regulatory organisations;

(d)     law enforcement agencies;

(e)     governmental or regulatory agencies not mentioned in paragraph (a) to (d); and

(f)     any other Bahamian authority, as prescribed;

**"Executive Director"** means the Executive Director of the Commission;

**"expert"** means a lawyer, engineer, accountant, valuator or any other person whose profession or reputation gives authority to a statement made by the person;

**"expert's report"** means a report, opinion, valuation or statement made or purporting to be made by an expert;

**"family member"** means a person's spouse, parent, grandparent, brother, sister, child or grandchild;

**"file"** means to submit a document to the Commission as required under a provision of securities laws that requires such document be filed, other than a document provided to the Commission under Part IV;

**"financial institution"** means a bank or trust company licensed under the Banks and Trust Companies Regulation Act (*Ch. 316*) or an insurance company registered under the Insurance Act (*Ch. 347*);

**"foreign issuer"** means an issuer that is not organized under the laws of The Bahamas;

**"foreign disclosure requirements"** means the requirements to which a foreign issuer is subject concerning disclosure made to an overseas regulatory authority in a recognised foreign jurisdiction, which disclosure is made publicly available;

**"foreign jurisdiction"** means a jurisdiction other than The Bahamas;

**"form of proxy"** means a written or printed form that, upon completion and signature by or on behalf of a security holder, becomes a proxy;

**"former Act"** means the Securities Industry Act (*Ch. 363*);

**"generally accepted accounting principles"** means the standards promulgated by the International Accounting Standards Board or as prescribed;

**"generally accepted auditing standards"** means the International Standards on Auditing issued by the International Auditing and Assurance Standards Board or as prescribed;

**"inside information"** means material information that has not been generally disclosed;

**"insider"** means —

    (a)    a director, senior officer or significant security holder of an issuer; or

    (b)    a director or senior officer of a subsidiary of an issuer, or of a significant security holder of an issuer, if the director or senior officer's responsibilities routinely provide the individual with access to inside information about the issuer;

**"interim period"** means a completed three, six or nine month period in a financial year;

**"investment fund"** has the meaning given in the Investment Funds Act, 2003;

**"investment fund administrator"** has the meaning given in the Investment Funds Act, 2003;

**"issuer"** means a person that —

    (a)    has a security outstanding; or

    (b)    proposes to issue a security;

**"issuer bid"** has the prescribed meaning;

**"jurisdiction"** means a country or territory or a political subdivision of a country or territory;

**"market participant"** means —

    (a)    a marketplace;

    (b)    a self-regulatory organization;

    (c)    a clearing facility;

    (d)    a registrant;

    (e)    a compensation, contingency or similar fund formed to compensate clients of registrants;

    (f)    a custodian of assets of a registrant or a client of a registrant;

    (g)    a public issuer;

    (h)    a transfer agent or registrar for securities of a public issuer;

    (i)    an investment fund;

    (j)    a party related to an investment fund;

    (k)    a general partner or a partner, director, officer or significant security holder of a person referred to in this definition;

    (l)    a person that the Commission has ordered is exempt from a provision of securities laws;

    (m)    a rating organisation; or

    (n)    a person described in an order made under subsection 161(2);

but does not include a person —

        (aa)    described in an order made under subsection 161(1); or

(bb)   within a prescribed class of persons;

**"marketplace"** means —

    (a)   a securities exchange, a quotation and trade reporting system, or an ATS;

    (b)   a person not included in paragraph (a) that —

        (i)   constitutes, maintains or provides a market or facility for bringing together buyers and sellers of securities;

        (ii)   brings together the orders for securities of multiple buyers and sellers; and

        (iii)   uses established, non-discretionary methods under which the orders interact with each other, and the buyers and sellers entering the orders agree to the terms of a trade; or

    (c)   a person described in an order made under subsection 161(2),

but does not include a person —

        (aa)   described in an order made under subsection 161(1); or

        (bb)   within a prescribed class of persons;

**"material information"** means information relating to the business, operations or securities of an issuer that would reasonably be expected to significantly affect the value or market price of the issuer or a security of the issuer;

**"Member"** means a person appointed by the Minister to the Commission under section 10;

**"Minister"** means the Minister to whom responsibility for finance is assigned;

**"misrepresentation"** means —

    (a)   in relation to an issuer —

        (i)   an untrue statement of material information;

        (ii)   the failure to disclose material information that is required to be disclosed; or

        (iii)   the omission of material information from a statement, if that information is necessary to prevent the statement from being false or misleading in the circumstances;

    (b)   in any other circumstance, a statement about something that a reasonable investor would consider important —

        (i)   in making a decision to trade a security; or

        (ii)   in relation to a trading or advising relationship with a person,

if the statement is untrue or omits information necessary to prevent the statement from being false or misleading in the circumstances;

**"offering document"** means a document, together with any amendments to that document, purporting to describe the business and affairs of an issuer that has been prepared primarily for delivery to and review by a prospective purchaser so as to assist the prospective purchaser to make an investment decision regarding securities being sold in a distribution to which section 83 would apply but for the availability of one or more of the exemptions contained in this Act or regulations;

**"officer"** means an individual working in an executive capacity for the Commission, an issuer, a registrant or any other person;

**"order"** means, unless a contrary intention appears, an order or decision of the Commission or its delegatee;

**"overseas regulatory authority"** means an authority in a jurisdiction outside The Bahamas that exercises functions corresponding to any function of the Commission;

**"party related to an investment fund"** has the meaning given in the Investment Funds Act, 2003;

**"person"** includes an individual, company, partnership, party, trust, fund, association and any other organized or incorporated group of persons, and the personal or other legal representative of any person to whom the context can apply;

**"prescribe" or "prescribed"** means prescribed by regulation or rule;

**"private company "** means a company whose constitutive document —

    (a)    restricts the right to transfer its shares;

    (b)    limits the number of its security holders to no more than fifty beneficial owners, where two or more persons holding securities jointly shall be counted as one person; and

    (c)    prohibits any invitation to the public to subscribe for any securities of the company;

**"prospectus"** means a notice, circular, advertisement or document inviting applications or offers to subscribe for or purchase securities, or offering any securities for subscription or purchase;

**"proxy"** means a completed and signed form of proxy by which a holder of voting securities of an issuer appoints a person to attend and act on the security holder's behalf at a meeting of security holders;

**"promoter"** means a person that takes the initiative in founding or organizing an issuer;

**"public issuer"** means an issuer that —

 (a) has filed a prospectus for which the Commission has issued a receipt under Part IX;

 (b) has completed a takeover, business combination or other reorganisation, involving an exchange of securities in which one of the parties was a public issuer;

 (c) has issued a security that —

  (i) was listed for trading on a securities exchange registered with the Commission at the time this Act comes into force; or

  (ii) at any time after this Act comes into force, has been traded on a registered marketplace registered under Part V;

 (d) was a public company or deemed public company under the former Act at the time that Act was repealed; or

 (e) is described in an order made under subsection 161(2);

but does not include an issuer —

  (aa) described in an order made under subsection 161(1);

  (bb) that is an investment fund; or

  (cc) within a prescribed class of issuers;

**"publish"** with respect to an action to be taken by the Commission includes —

 (a) publish in a daily newspaper of general circulation in The Bahamas;

 (b) print in a periodical regularly published by the Commission;

 (c) post on the Commission's website; or

 (d) any other method of publication of the rule or proposed rule as prescribed;

**"purchase"** includes any purchase or acquisition of a security for valuable consideration, whether the terms of payment are on margin, instalment or otherwise, but does not include a transfer, pledge or encumbrance of securities for the purpose of giving collateral for a bona fide debt;

**"quotation and trade reporting system"** means a facility that disseminates price quotations for the purchase and sale of securities and reports of completed transactions in securities for the exclusive use of registrants, but does not include a securities exchange, ATS or a registrant;

**"rating organization"** means an organization that issues publicly available ratings that are current assessments of the creditworthiness of obligors with respect to specific securities;

"**recognised foreign jurisdiction**" means a foreign jurisdiction recognised under section 165;

"**recognised foreign securities exchange**" means a securities exchange located in a foreign jurisdiction recognised under section 165;

"**registrant**" means any person registered under Part VI of the Act or required to be so registered;

"**registered clearing facility**" means a clearing facility registered under Part V of the Act;

"**registered firm**" means a person registered under subsection 69(1) to carry on securities business in The Bahamas;

"**registered marketplace**" means a marketplace registered under Part V of the Act;

"**registered representative**" means an individual who is registered under subsection 69(4) to act on behalf of a registered firm;

"**registered securities exchange**" means a securities exchange registered under Part V of the Act;

"**registered self-regulatory organisation**" means a self-regulatory organisation registered under Part V of the Act;

"**regulated person**" means a registrant, a person registered under Part V of the Act, an investment fund or an investment fund administrator;

"**regulations**" means the regulations made under this Act and, unless the context otherwise indicates, includes the rules;

"**regulatory instrument**" means a by-law, rule or other similar instrument of a marketplace, clearing facility or self-regulatory organization;

"**representative**" means, when used in relation to a registrant, an individual who acts for or on behalf of the registrant in the carrying out of securities business and who is a director, officer, partner or employee of the registrant who performs any such securities business for the registrant;

"**reserve fund**" means the fund established by the Commission under section 21;

"**sale**" includes a sale or disposition of a security for valuable consideration, whether the terms of payment are on margin, instalment, or otherwise; but does not include a transfer, pledge or encumbrance of securities for the purpose of giving collateral for a bona fide debt;

"**securities**" means the assets, rights or interests specified in Part 1 of the First Schedule;

"**securities activity**" means an activity comprising securities business set out in Part 2 of the First Schedule;

**"securities business"** has the meaning assigned in section 7;

**"securities exchange"** means a marketplace, other than a quotation and trade reporting system or ATS, that maintains or provides —

    (a)    physical facilities where persons may meet to execute trades in securities; or

    (b)    a mechanical, electronic or other system that facilitates execution of trades in securities by matching offers of purchase and sale;

**"securities laws"** means this Act and the Investment Funds Act, 2003;

**"self-regulatory organization"** means a person, other than a marketplace, that sets standards for, or monitors the conduct of, its members or participants relating to trading in or advising on securities;

**"senior officer"** means an officer of an issuer whose responsibilities routinely provide the officer with access to inside information about the issuer;

**"significant security holder"** means, in relation to a person, a security holder that —

    (a)    owns or controls 10% or more of any class of the person's voting securities, excluding any securities that the security holder, if a registrant, holds in the course of a public distribution; or

    (b)    is able to affect materially the control of the person, whether alone or by acting in concert with another person;

**"spouse"** means a person who —

    (a)    is married to another person and is not living separate and apart from that person; or

    (b)    is living and cohabiting with another person in a marriage-like relationship;

**"subsidiary"** means an issuer that is controlled by another issuer;

**"subscriber"**, when used in relation to an ATS, means any person that has entered into a contractual agreement with an ATS to access such ATS for the purpose of effecting transactions in securities or submitting, disseminating or displaying orders on such ATS, including a client, member user or participant in the ATS;

**"surplus funds"** has the meaning given the term in section 20;

**"take-over bid"** has the prescribed meaning;

**"trade"** includes —

    (a)    any purchase or sale of a security for valuable consideration; or

     (b)    any participation as a registrant or agent in any transaction in a security;

**"underwriter"** means a person who —

     (a)    as principal, agrees to purchase a security for the purpose of a distribution;

     (b)    as agent, offers for sale or sells a security in connection with a distribution; or

     (c)    participates directly or indirectly in a distribution described in paragraph (a) or (b) for valuable consideration,

but does not include —

     (aa)    a person whose interest in the transaction is limited to receiving the usual and customary distribution or sales commission payable by an underwriter or issuer; or

     (bb)    an issuer that purchases shares of its own issue and resells them;

**"voting security"** means a security carrying voting rights —

     (a)    under all circumstances; or

     (b)    by reason of the occurrence of an event that has occurred and is continuing,

and includes a right to acquire such a security.

## 5.    Ownership and control of securities.

In this Act —

     (a)    a person owns a security if the security is beneficially owned by the person;

     (b)    a person controls a security if —

     (i)    the person, directly or indirectly, directs the trading or voting of the security;

     (ii)    the security is owned by an issuer that the person controls; or

     (iii)    the security is owned by an affiliate of the person or by an issuer that the person controls.

## 6.    Control of an issuer.

(1)    A person controls an issuer if the person, acting either alone or jointly or in concert with other persons, has the power to direct that the business and affairs of the issuer be conducted in accordance with the person's wishes.

(2)    Where the person or persons own or control more than fifty percent of the outstanding securities carrying voting rights in an issuer, such person or persons are deemed to control the issuer.

(3)     Where the person or persons own or control more than thirty percent of the outstanding securities carrying voting rights in an issuer, such person or persons are presumed to control the issuer.

(4)     The power under subsection (1) to direct the business and affairs of an issuer may arise through the ownership or control over securities of the issuer, or by virtue of any agreement, arrangement, commitment or understanding with any person or persons.

## 7.   Securities business.

(1)     For the purposes of this Act, a person carries on securities business if that person is engaged in the course of business in any one or more of the securities activities set out in the Part 2 of the First Schedule.

(2)     For the purposes of this Act, a person engages in securities business if that person enters or offers to enter into an agreement the making or performance of which by either party constitutes a securities activity.

(3)     The activities set out in Part 3 of the First Schedule do not constitute securities business for the purposes of this Act.

(4)     Without prejudice to the generality of subsection 149(1), the Commission may, by rule, amend the First Schedule by deleting or amending any of the provisions or adding new provisions.

## 8.   Carrying on business in The Bahamas.

(1)     For the purposes of this Act, a person carries on securities business in or from The Bahamas if such person —

(a)     is incorporated, established or registered under any law in The Bahamas;

(b)     carries on securities business from a place of business maintained by such person in The Bahamas; or

(c)     engages in an activity the doing of which constitutes the carrying on by such person of securities business in or from The Bahamas under an order made under subsection (2).

(2)     The Commission may make an order specifying the circumstances in which a person is to be regarded as —

(a)     carrying on securities business in or from The Bahamas; or

(b)     not carrying on securities business in or from The Bahamas.

(3)     An order under subsection (2) may be made so as to apply —

(a)     generally to all securities activities;

(b)     in relation to a specified category of securities activity; or

(c)     in relation to a particular securities activity.

(4)    An order made under subsection (2) may be made subject to conditions.

(5)    For the purpose of this section, a person maintains a place of business if the person carries on securities business from premises the person occupies, at which the person employs staff and pays salaries and other expenses in connection with that business.

## 9.   References.

Any reference in this Act —

      (a)    to "the Act" shall, unless expressly stated, include a reference to any regulations, rules, orders, notices and other subsidiary legislation made under this Act;

      (b)    to "securities laws" shall, unless expressly stated, include a reference to any regulations, rules, orders, notices and other subsidiary legislation made under a securities law; and

      (c)    to any other statute shall, unless expressly stated, include a reference to any regulations, rules, orders, notices and other subsidiary legislation made under that statute.

# PART II – THE SECURITIES COMMISSION

## 10.   Continuation of the Commission.

(1)    The Securities Commission of the Bahamas, a body corporate continued under the former Act, is continued.

(2)    The Second Schedule shall have effect with respect to the Commission.

(3)    The Members of the Commission shall consist of a Chairman, a Deputy Chairman and such number of other Members, not being more than seven, as the Minister may from time to time determine.

(4)    The Minister shall appoint all the Members and shall appoint one of their number to be its Chairman.

(5)    The Members shall be selected from among persons identified in the prescribed manner and who appear to the Minister to be qualified as having had experience of or shown capacity in matters relating to industry, commerce, law, finance or administration.

(6)    In addition to Members appointed in subsection (3) the Executive Director of the Commission, the Governor of the Central Bank and the Registrar of Insurance shall be ex-officio Members of the Commission.

(7)    The Chairman shall hold office for a term of five years and shall be eligible for re-appointment for one additional term only.

(8)     The Deputy Chairman and the other Members of the Commission shall hold office for such term, not exceeding four years, as the Minister may direct in the instrument appointing such Member, and shall be eligible for re-appointment.

(9)     A Member shall not be eligible for re-appointment, if, by reason of consecutive appointments to the Commission, he has been a Member for a continuous period of ten years or more.

(10)    The Minister shall, in setting the term of appointment or re-appointment of a Member, consider the terms of the other Members then in office and use the Minister's best efforts to provide that the terms of no more than one third of the Members expire in any twelve month period.

(11)    The Minister may, by instrument in writing, appoint some suitable person as a Member of the Commission to act temporarily in the place of any Member who is absent or otherwise unable to act.

(12)    The Minister shall appoint new Members of the Commission on the advice of the Commission and the securities and investment funds industries in The Bahamas.

(13)    A Member may at any time resign his Membership by notice in writing addressed to the Minister.

(14)    The Minister may terminate the appointment of the Chairman, the Deputy Chairman or a Member of the Commission if the Minister is satisfied that the person —

    (a)     has been absent from meetings of the Commission for more than three consecutive meetings without the permission of the Commission or without reasonable cause;

    (b)     has become bankrupt or made arrangements with his creditors;

    (c)     is incapacitated by physical or mental illness;

    (d)     has been, in The Bahamas or in any other jurisdiction, convicted of a criminal offence involving fraud or dishonesty, or found liable in a civil or regulatory action for activities involving fraud or dishonesty; or

    (e)     is otherwise unable or unfit to discharge the functions of the position to which that person was appointed.

(15)    A Member shall be paid such remuneration and allowances in respect of the Member's office as the Minister may determine from time to time.

(16)    The appointment, termination, death or resignation of any Member of the Commission shall be published promptly in the Gazette.

## 11.  Declaration of interest.

(1)  In carrying out the Member's duties and activities, the Member shall act honestly, fairly and with integrity and in the best interests of the Commission.

(2)  A Member who is in any way, whether directly or indirectly, interested in a matter before the Commission shall avoid any real or potential conflicts which a reasonable person may consider sufficiently material to affect a Member's judgement.

(3)  A Member with an interest in a matter shall not take part in any deliberations or vote on that matter and shall leave the room during such deliberations.

(4)  For the purposes of this section, a Member shall be deemed to have an interest in a matter if the Member, the Member's spouse or child, or any other relative that resides in the same dwelling as the Member, or the Member's nominee, is a security holder or partner in, or an officer or director of, an issuer having an interest or being involved in a matter before the Commission.

## 12.  Functions of the Commission.

(1)  The functions of the Commission are to —

   (a)  advise the Minister on all matters relating to the capital markets and its participants;

   (b)  maintain surveillance over the capital markets and ensure orderly, fair and equitable dealings in securities;

   (c)  foster timely, accurate, fair and efficient disclosure of information to the investing public and the capital markets;

   (d)  protect the integrity of the capital markets against any abuses arising from financial crime, market misconduct and other unfair and improper practices;

   (e)  promote an understanding by the public of the capital markets and its participants and the benefits, risks, and liabilities associated with investing;

   (f)  create and promote conditions that facilitate the orderly development of the capital markets; and

   (g)  perform any other function conferred or imposed on it by securities laws or Parliament.

(2)  In the exercise of its functions the Commission shall satisfy itself that the provisions of the Financial Transactions Reporting Act, 2000 and any other Act or regulation administered by the Commission are being complied with.

## 13.  Powers of the Commission.

For the purpose of the discharge of its functions the Commission has power, subject to this Act, to —

(a)     regulate and govern the capital markets and its participants;

(b)     deal with such matters as may be referred to it by any person from time to time;

(c)     authorize and regulate registrants, marketplaces, investment fund administrators and other market participants with a view to maintaining proper standards of conduct and professionalism in the capital markets;

(d)     monitor the solvency of regulated persons and take measures to protect the interests of clients and others where the solvency of any such person is in doubt;

(e)     regulate issuers offering their securities to the public, including public issuers and investment funds;

(f)     adopt measures to supervise and minimise any conflict of interests that may arise in the case of market participants;

(g)     regulate take-over bids;

(h)     take enforcement action against any person for failing to comply with securities laws;

(i)     recommend regulations to the Minister and formulate rules;

(j)     publish notices, guidelines, bulletins, and policies describing the views of the Commission regarding the interpretation, application, or enforcement of securities laws;

(k)     make any order which the Commission may make under securities laws; and

(l)     do all things, and take all actions, which may be necessary or expedient or are incidental to the discharge of any function or power given to the Commission.

## 14.  Delegation.

(1)     The Commission may, by order, delegate any responsibility, power or function conferred on it by securities laws, except the power to make rules and to hear appeals within its jurisdiction, to the Executive Director or any officer of the Commission.

(2)     The Executive Director may, by written order, sub-delegate to any employee of the Commission any responsibility, power or function delegated to the Executive Director by the Commission under subsection (1), unless the Commission delegation order specifically states that no sub-delegation is permitted.

### 15.   Executive Director.

The Minister shall appoint an Executive Director who shall —

(a)   hold office on such terms as the Minister shall approve; and

(b)   perform the duties assigned by the Commission or by any written law.

### 16.   Funds and Resources.

Subject to section 22, the funds and resources of the Commission shall consist of —

(a)   all sums provided by Parliament;

(b)   all fees and other sums from time to time paid to or received by the Commission from its operations;

(c)   all sums from time to time borrowed by or advanced to the Commission under this Part; and

(d)   all other sums or other property as from time to time may in any manner be lawfully paid to or vested in the Commission whether or not for any matter incidental to its functions.

### 17.   Borrowing powers.

(1)   Subject to this section, the Commission may borrow sums required by it to meet any of its obligations or discharge any of its functions and may, in respect of any borrowing, issue debentures in such forms as the Commission may determine.

(2)   Any borrowing of the Commission pursuant to subsection (1) shall be subject to the approval of the Minister as to the amount to be borrowed, the source of the borrowing and the terms on which the borrowing may be effected.

(3)   An approval given for the purposes of this section may be either general or limited to a particular borrowing or otherwise and may be either unconditional or subject to conditions.

### 18.   Advances and Guarantees.

(1)   Subject to subsection (3), the Minister may at the request of the Commission make advances to the Commission for the purposes of enabling the Commission to defray expenditures properly chargeable to its capital account, including provision of working capital;

(2)   Subject to subsection (3), the Minister may at the request of the Commission guarantee, in any such manner and on any such conditions as the Minister thinks fit, the repayment of the principal of, and the payment

of interest and other charges on, any authorised borrowings of the Commission made under this Part.

(3)   The prior approval of the House of Assembly in accordance with section 17 of the Financial Administration and Audit Act must be given to any guarantee under this section.

(4)   Where any sum is paid under a guarantee given under this section, the Minister shall as soon as practicable after the end of each financial year that there is any amount outstanding, lay before the House of Assembly a statement relating to that sum.

(5)   Any sums required by the Minister for making, advancing and discharging any guarantees under this section shall be charged on and issued out of the Consolidated Fund.

(6)   In this section and in this Part "financial year" means the period of twelve months beginning on 1st January in any year.

## 19.   Repayment of interest.

(1)   The Commission shall make to the Minister at such times and in such manner as the Minister may direct, payments on any amount as may be directed in or towards repayment of any sums issued in fulfilment of any guarantee given under this Part and payments of interest on any outstanding sums so issued at such rate as the Minister may direct, and different rates of interest may be directed for different periods.

(2)   The Minister shall lay before the House of Assembly a statement of any payment due from the Commission under subsection (1) that is not duly paid as required.

## 20.   Surplus funds.

(1)   Subject to subsection (2), all sums standing to the credit of the Commission and not required for any current purpose (in this Part referred to as "surplus funds") may from time to time either be carried to any reserve fund established under section 21 or be invested by the Commission in government securities approved by the Minister; and the Commission may from time to time, with the approval of the Minister, sell any or all of such securities.

(2)   No surplus funds are to be carried to the reserve fund or invested in securities under subsection (1) without the consent of the Minister.

## 21.   Reserve fund.

(1)   The Commission shall establish a reserve fund and may determine the management of the fund, the sum to be carried from time to time to the credit of the fund and the application of the fund.

(2)     No part of the reserve fund shall be applied otherwise than for the purposes of the Commission.

## 22.    Authority to set fees.

(1)     For the purpose of carrying out its powers or functions, the Commission may, by rule, prescribe the fees payable to the Commission for any function performed by the Commission or required under securities laws.

(2)     Despite the provisions of any other law —

(a)     the fees payable to the Commission under securities laws;

(b)     the revenue from the exercise of a power conferred or the discharge of a duty imposed on the Commission under securities laws; and

(c)     the investments held by the Commission,

do not form part of the Consolidated Fund and, subject to this section, shall be applied to carrying out the powers conferred and duties imposed on the Commission under securities laws.

(3)     Funds received by the Commission —

(a)     under subsection 135(1) or section 136; or

(b)     under a settlement of a matter relating to a contravention or alleged contravention of this Act, excluding an amount designated in the settlement as —

(i)      a cost recovery; or

(ii)     an allocation to or for the benefit of a third party,

may be expended only for the purpose of promoting public understanding of the financial system.

(4)     When ordered to do so by the Minister, the Commission shall pay into the Consolidated Fund such of its surplus or reserve funds as the Minister requires, other than an amount held pursuant to subsection (3).

(5)     In determining the amount of a payment to be made under subsection (4), the Minister shall allow reserves for the future needs of the Commission as the Minister considers appropriate, and shall ensure that the payment will not impair the Commission's ability to pay its liabilities, meet its obligations as they become due or fulfil its contractual commitments.

## 23.    Balancing revenue and surplus.

(1)     The Commission shall discharge its functions to ensure that its revenues are not less than sufficient to meet all sums properly chargeable to its revenue accounts and its funds under sections 20 and 21 taking one year with another.

(2) Any excess of the revenue of the Commission for any financial year over the sum properly chargeable to its revenue account and its funds under sections 20 and 21 for that year shall be applied by the Commission for the purposes of the Commission.

## 24. Secretary and other officers.

(1) The Commission —

    (a) shall appoint an employee to be the Secretary of the Commission, who shall be an officer of the Commission; and

    (b) may appoint other employees to be officers of the Commission as it considers necessary.

(2) The Commission may terminate the appointment of an officer at any time.

## 25. Commission staff.

(1) The Commission may employ any person the Commission considers necessary to perform its duties and exercise its powers under securities laws.

(2) Except as provided in any contract of employment with the Commission, the Minister may grant to any employee of the Commission in respect of his service with the Commission pensions, gratuities or other like allowances at the rate prescribed by and in accordance with the provisions of the Pensions Act *(Ch. 43)* as if reference in that Act to the "Governor-General", the "public service" and a "public officer" were references to the Commission acting with the approval of the Minister, service in the Commission and such employee, respectively.

(3) For the purpose of subsection (1) reference to the service of an employee of the Commission includes any continuous period of service of that employee with an approved authority immediately prior to his service with the Commission.

(4) In this section the expression "approved authority" has the same meaning as in section 2 of the Pensions Act *(Ch. 43)*.

(5) The pensions, gratuities or other like allowances which are payable under subsection (1) shall be charged on and paid out of the funds of the Commission or the Consolidated Fund.

## 26. Appointment of experts.

(1) The Commission may appoint, hire or retain, on such terms and conditions as it may approve, an expert to assist it in any manner that it considers necessary.

(2)     Where the Commission appoints an expert to advise it on the development of specific policies, rules or other regulatory proposals of the Commission, the expert shall formulate and report the expert's views to the Commission in writing and the Commission may. if it thinks fit. make the report available to the public.

## 27.  Indemnity.

(1)     No civil or criminal liability shall attach to the Commission, a Member, the Executive Director, an employee or an agent of the Commission for an act done in good faith in the performance of a duty or in the exercise of a function or power of the Commission under this Act or the Investment Funds Act, 2003 or the regulations made under either Act.

(2)     The Commission may indemnify a Member, the Executive Director, an employee or an agent of the Commission against the cost of defending his actions while so discharging his functions.

(3)     No civil or criminal liability shall attach to a registered securities exchange or registered self-regulatory organisation, or any director, officer, employee or an agent of the registered securities exchange or registered self-regulatory organisation, for any act done in good faith in the performance of a duty or in the exercise of —

        (a)     a function or power delegated by the Commission to the registered securities exchange or registered self-regulatory organisation under securities laws; or

        (b)     a regulatory function or power of the registered securities exchange or registered self-regulatory organisation exercised under its regulatory instruments.

## 28.  Confidentiality.

(1)     The Commission or any Member, officer, employee, agent or adviser of the Commission who discloses any information relating to —

        (a)     the affairs of the Commission;

        (b)     any application made to the Commission;

        (c)     the affairs of a market participant;

        (d)     a request for assistance from a domestic regulatory authority or an overseas regulatory authority; or

        (d)     the affairs of a client of a regulated person,

        that the person has acquired in the course of that person's duties or in the exercise of the Commission's functions under this or any other law, is guilty of an offence and shall be liable on summary conviction to a fine not exceeding $50,000 or to imprisonment for a term not exceeding three years.

(2)    Subsection (1) shall not apply to a disclosure —

    (a)    lawfully required or permitted by any court of competent jurisdiction within The Bahamas;

    (b)    for the purpose of assisting the Commission to exercise any function conferred on it by securities laws;

    (c)    in respect of the affairs of a market participant or of a client of a regulated person, with the consent of the market participant or client, as the case may be, which consent has been voluntarily given;

    (d)    where the information disclosed is or has been available to the public from any other source;

    (e)    where the information disclosed is in a manner that does not enable the identity of any market participant or of any client of a regulated person to which the information relates to be ascertained;

    (f)    to a person with a view to the institution of, or for the purpose of —

        (i)    criminal proceedings;

        (ii)    disciplinary proceedings, whether within or outside The Bahamas, relating to the exercise by a counsel and attorney, auditor, accountant, valuer or actuary of the person's professional duties;

        (iii)    disciplinary proceedings relating to the discharge by a public officer, or a Member or employee of the Commission, of that person's duties; or

    (g)    in any legal proceedings in connection with —

        (i)    the winding-up or dissolution of a regulated person; or

        (ii)    the appointment or duties of a receiver of a regulated person.

## 29.  Powers of Minister.

(1)    The Minister may give the Commission directions in writing for the discharge of its functions where the Minister is of the opinion that such directions are necessary or advisable to ensure that The Bahamas complies with its obligations under international treaties and agreements, and the Commission shall give effect to such directions.

(2)    The Commission shall promptly give the Minister any information about its activities, operations and financial affairs as the Minister requests.

(3)    The Minister may designate a person to examine any financial or accounting procedures, activities or practices of the Commission and the person designated shall report the results of the examination to the Minister.

(4)    The Members and employees of the Commission shall give the person designated by the Minister under subsection (3) all the assistance and co-operation necessary to enable that person to complete the examination.

## 30.  Accounts, auditor and audit.

(1)    The Commission shall keep proper accounts of all transactions and shall prepare annual financial statements in accordance with generally accepted accounting principles.

(2)    The financial statements prepared pursuant to subsection (1) shall present the financial position, results of operations and changes in the reserve fund and cash flow of the Commission for its most recent fiscal year.

(3)    The Commission shall appoint one or more approved auditors to audit the financial statements of the Commission for each fiscal year.

## 31.  Annual report.

(1)    The Commission shall, as soon as practicable after the end of each financial year and in any event not later than 30th June in any year, submit to the Minister a report containing —

    (a)    an account of its transactions throughout the preceding financial year in such detail as the Minister may direct; and

    (b)    the audited financial statement of the Commission accompanied by the auditor's report.

(2)    The Minister shall cause a copy of the report together with a copy of the audited financial statements and the auditor's report to be laid on the table of both Houses of Parliament.

(3)    Copies of an annual report shall be made available to the public no later than fourteen days after it is laid in Parliament under subsection (2).

## 32.  Commission procedures.

(1)    The Commission shall meet at such times as may be necessary or expedient for the transaction of business and such meetings shall be held at such places and time and on such days as the Chairman may determine.

(2)    The Chairman, or in his absence the Deputy Chairman, or in the absence of both of them, such other person as authorized by the Chairman, shall preside at all meetings of the Commission.

(3)    A quorum for a meeting of the Commission shall consist of the person authorized under subsection (2) to preside at the meeting of the Commission and three other members.

(4)    The decisions of the Commission shall be by a majority of votes and in any case in which the voting is equal, the Chairman or the Deputy

Chairman presiding at the meeting has a casting vote, in addition to an original vote.

(5)    The Commission may establish codes —

 (a)    respecting the calling of and conduct of business at meetings of the Commission;

 (b)    respecting procedures for the initiation and holding of hearings by the Commission;

 (c)    prescribing the procedure for appeals and review of decisions of —

  (i)    persons to whom the Commission's powers have been delegated; and

  (ii)    persons registered under Part V;

 (d)    with the approval of the Minister, establishing a code of conduct governing the activities of Members and the officers and employees of the Commission in order to avoid conflicts of interest and other practices that the Commission considers undesirable; and

 (e)    respecting any other matter, whether or not required by this Act, relating to the organization, procedure, administration or practice of the Commission.

## 33.   Panels of the Commission.

(1)    The Commission may establish one or more panels and, in matters referred to a panel by the Commission, the panel has the powers of the Commission delegated to it by Commission order.

(2)    A panel shall be composed of three or more persons appointed by the Commission, at least one of whom must be a Member.

(3)    The Commission may appoint one or more qualified person to a panel who is not a Member.

(4)    The Commission may —

 (a)    terminate appointments to a panel; and

 (b)    except for a panel that has commenced a hearing, fill a vacancy on a panel.

(5)    The Commission may refer a matter that is —

 (a)    before the Commission, to a panel; and

 (b)    before a panel, to the Commission or to another panel.

# PART III – ASSISTANCE TO DOMESTIC AND FOREIGN REGULATORY AUTHORITIES

## DIVISION 1 – INTERPRETATION

### 34.  Interpretation.

In this Part, unless the context otherwise requires —

"**designated third party**", in relation to a foreign jurisdiction, means —

    (a)  any person or body responsible for supervising the overseas regulatory authority in question;

    (b)  any authority of the foreign jurisdiction responsible for carrying out the supervision, investigation or enforcement in question; or

    (c )  any authority of the foreign jurisdiction, other than the requesting overseas regulatory authority, exercising a function that corresponds to a regulatory function of the Commission under this Act;

"**enforce**" means enforce through criminal, civil or administrative proceedings;

"**enforcement**" means the taking of any action to enforce a law or regulatory requirement against a specified person, where the law or regulatory requirement relates to the capital markets of the foreign jurisdiction of the regulatory authority concerned;

"**investigation**" means an investigation to determine if a specified person has contravened or is contravening a law or regulatory requirement, where the law or regulatory requirement relates to the capital markets of the foreign jurisdiction of the regulatory authority concerned;

"**material**" includes any information or document in any form and, in relation to information recorded otherwise than in legible form, the power to require its production includes the power to require the production of a copy of it in legible and intelligible form;

"**supervision**", in relation to an overseas regulatory authority, means the taking of any action for the supervision of —

    (a)  a marketplace or any other person regulated or supervised by the overseas regulatory authority; or

    (b)  the issue of or trading in securities in the foreign jurisdiction of the overseas regulatory authority.

## DIVISION 2 – ASSISTANCE TO DOMESTIC REGULATORY AUTHORITIES

### 35. Exercise of powers on behalf of domestic regulatory authorities.

(1) At the request of a domestic regulatory authority, the Commission may, where it considers appropriate, exercise its powers under securities laws for the purposes of assisting the performance by the domestic regulatory authority of its regulatory functions.

(2) Notwithstanding subsection 28(1), the Commission may provide information that it has acquired in the course of its duties or in the exercise of its functions under securities laws to any other domestic regulatory authority where the Commission considers such information may be relevant to the functions of such other domestic regulatory authority or as a necessary part of a framework for consolidated supervision, oversight or regulation of the financial services sector.

## DIVISION 3 – ASSISTANCE TO FOREIGN REGULATORY AUTHORITIES

### 36. Conditions for provision of assistance.

(1) The Commission may provide the assistance referred to in section 37 to an overseas regulatory authority if the Commission is satisfied that all of the following conditions are fulfilled —

    (a) the assistance is intended to enable the overseas regulatory authority, or any designated third party, to carry out the supervision, investigation or enforcement to which the request relates;

    (b) the overseas regulatory authority has given a written undertaking that any material obtained pursuant to its request shall not be used for any purpose other than a purpose that is specified at the time of the request or thereafter and is approved by the Commission;

    (c) the overseas regulatory authority has given a written undertaking not to disclose to a third party, other than a designated third party of the foreign jurisdiction in accordance with paragraph (d), any material received pursuant to the request;

    (d) the overseas regulatory authority has given a written undertaking to obtain the prior consent of the Commission before disclosing to a designated third party any material received pursuant to the request, and to make such disclosure only in accordance with such conditions as may be imposed by the Commission;

    (e) the material requested is of sufficient importance to the carrying out of the supervision, investigation or enforcement to which the request relates and cannot reasonably be obtained by any other means;

      (f)     the matter to which the request relates is of sufficient gravity; and

      (g)    the rendering of assistance will not be contrary to the public interest of The Bahamas or the interest of the investing public.

(2)    In deciding whether to grant a request for assistance referred to in section 37 from an overseas regulatory authority, the Commission may also have regard to the following —

      (a)    whether the act or omission that is alleged to constitute the contravention of the law or regulatory requirement to which the request relates would, if it had occurred in The Bahamas, have constituted a breach of securities laws;

      (b)    whether the overseas regulatory authority has given or is willing to give an undertaking to the Commission to comply with a future request by the Commission to the overseas regulatory authority for similar assistance; and

      (c)    whether the overseas regulatory authority has given or is willing to give an undertaking to the Commission to contribute towards the costs of providing the assistance that the overseas regulatory authority has requested.

(3)    Where an overseas regulatory authority fails to comply with a requirement of the Commission under subsection (1) or (2), the Commission may refuse to provide the assistance sought.

### 37.  **Assistance that may be rendered.**

(1)    Notwithstanding subsection 28(1), the provisions of any prescribed written law or any requirement imposed thereunder, or any rule of law, the Commission may, in relation to a request by an overseas regulatory authority for assistance —

      (a)    transmit to the overseas regulatory authority any material in the possession of the Commission that is requested by the authority;

      (b)    order any person to furnish to the Commission any material that is requested by the overseas regulatory authority, that the Commission may then transmit to that authority;

      (c)    order any person to give the Commission assistance in connection with a request made by an overseas regulatory authority; or

      (d)    order any person to make an oral statement to the Commission on any information requested by the overseas regulatory authority, record such statement, and transmit the recorded statement to the authority.

(2)    An order under subsection (1)(b), (c) or (d) shall have effect notwithstanding any obligations as to secrecy or other restrictions upon

the disclosure of information imposed by any prescribed written law or any requirement imposed thereunder, any rule of law, any contract or any rule of professional conduct.

(3)   A person shall not be required under this section to disclose information or to produce a document which the person would be entitled to refuse to disclose or to produce on the grounds of legal professional privilege in court proceedings.

(4)   For the purposes of this section, any information or other matter comes to a professional legal adviser in privileged circumstances if it is communicated or given to the legal adviser —

    (a)   by, or by a representative of, a client of the adviser in connection with the giving by the adviser of legal advice to the client;

    (b)   by, or by a representative of, a person seeking legal advice from the adviser; or

    (c)   by any person —

        (i)   in contemplation of, or in connection with, legal proceedings; and

        (ii)   for the purpose of those proceedings.

(5)   No information or other matter shall be treated as coming to a professional legal adviser in privileged circumstances if it is communicated or given with a view to furthering any criminal purpose.

(6)   Where the person in possession of any document required to be produced under this Part claims a lien on the document —

    (a)   the requirement to produce the document shall not be affected by the lien;

    (b)   no fees shall be payable for or in respect of the production; and

    (c)   the production shall be without prejudice to the lien.

## DIVISION 4 – GENERAL

**38.   Authority to enter into Memoranda of Understanding.**

(1)   The Commission may, in the exercise of its cooperative functions, enter into memoranda of understanding with overseas regulatory authorities for —

    (a)   the purpose of assisting an overseas regulatory authority, or any designated third party, to carry out its supervision, investigation or enforcement functions,

    (b)   the purpose of assisting in consolidated supervision with such overseas regulatory authority, or any designated third party; or

    (c)   such other purposes as the Commission may deem fit.

    (2)    No memorandum of understanding may call for assistance beyond that which is provided for under securities laws, or relieve the Commission of any of its obligations under this Part.

    (3)    The Commission shall notify the Ministry of Finance of each memorandum of understanding and promptly publish the memorandum of understanding in the Gazette.

## 39.   Offences under this Part.

    (1)    Any person who —

        (a)    without reasonable excuse, refuses or fails to comply with an order under this Part;

        (b)    in purported compliance with an order under this Part, furnishes to the Commission any material known to the person to be false or misleading in a material particular; or

        (c)    in purported compliance with an order made under this Part, makes a statement to the Commission that is false or misleading in a material particular,

    is guilty of an offence an offence and shall be liable on summary conviction to a fine not exceeding $100,000.

    (2)    If the offence of which the person is convicted under subsection (1) is continued after conviction, the person commits a further offence and shall be liable on summary conviction to a fine of $10,000 for every day on which the offence is continued.

## 40.   Immunities.

    (1)    No civil or criminal proceedings, other than proceedings for an offence under section 39, shall lie against any person for —

        (a)    furnishing to the Commission or transmitting any material to the Commission or an overseas regulatory authority, if the person had furnished or transmitted that material in good faith in compliance with an order made under this Part;

        (b)    making a statement to the Commission in good faith and in compliance with an order made under this Part; or

        (c)    doing or omitting to do any act, if the person had done or omitted to do the act in good faith and as a result of complying with such an order.

    (2)    Any person who complies with an order referred to in subsection (1)(a) or (b) shall not be treated as being in breach of any restriction upon the disclosure of information or material imposed by any prescribed written law or any requirement imposed thereunder, any rule of law, any contract or any rule of professional conduct.

# PART IV – INVESTIGATIONS AND INSPECTIONS

## DIVISION 1–INTERPRETATION

### 41. Interpretation.

For the purposes of this Part, "regulated person" includes a party related to an investment fund.

## DIVISION 2–INVESTIGATIONS

### 42. Power to investigate.

(1) The Commission may conduct such investigation as it considers necessary or expedient for any of the following purposes —

    (a) to determine whether any person has contravened, is contravening or is about to contravene securities laws;

    (b) for the administration of securities laws; or

    (c) to assist in the administration of the securities legislation of another jurisdiction.

(2) For the purposes of subsection (1), the Commission may conduct the investigation or may, in writing, appoint another person for that purpose.

(3) The Commission may, notwithstanding the provisions of any prescribed written law or any requirement imposed thereunder or any rule of law, exercise any of its powers under this Division for the purposes of conducting an investigation under subsection (1).

### 43. Powers to obtain information for investigation.

(1) Where the Commission considers that a person is or may be able to give information or produce a document which is or may be relevant to an investigation, it may —

    (a) require such person to attend before it at a specified time and place to answer questions, including under oath or affirmation that the statements that the person will make will be true;

    (b) enter, during reasonable hours, the business premises of such person for the purpose of —

        (i) inspecting and copying information or documents stored in any form on such premises; and

        (ii) removing from the premises any information or documents;

    (c) require such person to give, or procure the giving of, specified information or information of a specified description in such form as the Commission may reasonably require;

(d)    require such person to produce, or procure the production of, specified documents or documents of a specified description;

(e)    require such person to give an explanation of or further particulars regarding any information or document produced under paragraphs (c) and (d);

(f)    require such person to give the Commission all assistance in relation to the investigation that the person is reasonably able to give.

(2)    If a person, acting on behalf of the Commission, enters premises under subsection (1)(b), the person must present proof of his or her authority to do so.

(3)    Any information or document removed under subsection (1)(b) must be returned to the person from whom, or premises from which, it was taken as soon as practicable.

## 44.   Uncooperative witness liable for contempt.

On application by the Commission to the court, a person summoned under section 43 is liable to be committed for contempt, as if in breach of an order or judgement of the court, if the person neglects or refuses to —

(a)    attend;

(b)    give evidence; or

(c)    produce a document in the custody, possession or control of that person.

## DIVISION 3–INSPECTIONS

## 45.   Compliance inspections–regulated persons.

(1)    At any time, the Commission may conduct an on-site or off-site inspection of the business of a regulated person for the purpose of—

(a)    determining if the person is complying with —

(i)    securities laws;

(ii)    the Financial Transactions Reporting Act; 2003; or

(iii)    any other prescribed statute that is administered by the Commission; or

(b)    assisting in the administration of the securities legislation of another jurisdiction..

(2)    The Commission may, in writing, appoint another person to conduct the inspection under subsection (1).

(3)    The Commission may, by notice in writing, require a person under inspection to produce information or documents, or a class of information or documents, that reasonably relates to the inspection.

(4)    After receiving a notice under subsection (3), a person must, within a reasonable period as specified in the notice, provide to the Commission the information or document that is described in the notice and that is in the custody, possession or control of the person.

(5)    The Commission may enter, during reasonable hours, the business premises of a person under inspection for the purpose of —

(a)    inspecting and copying information or documents stored in any form on such premises; and

(b)    removing from the premises any information or documents.

(6)    The Commission may require a person under inspection to give an explanation of, or further particulars regarding, any information or document produced under subsection (4).

(7)    If a person, acting on behalf of the Commission, enters premises under subsection (5), the person must present proof of his or her authority to do so.

(8)    Any information or document removed under subsection (5) must be returned to the person from whom, or premises from which, it was taken as soon as practicable.

## 46.    Power to require reports.

(1)    The Commission may require a regulated person to provide the Commission with a report, in such form as may be specified in the notice, by the person's approved auditor, or by an accountant or other person with relevant professional skill, on, or on any aspect of, any matter about which the Commission has required or could require the regulated person to provide information under section 45.

(2)    The report referred to in subsection (1) shall be prepared at the expense of the regulated person.

(3)    The person appointed by a regulated person to make the report required under section (1) shall immediately give written notice to the Commission of any fact or matter of which that person becomes aware which indicates —

(a)    that any of the minimum criteria is not or has not been fulfilled, or may not be or may not have been fulfilled, in respect of the regulated person; and

(b)    that the matters are likely to be of material significance for the exercise, in relation to such person, of the Commission's functions under this Act.

(4)    The person appointed to make a report required under this section must be a person approved by the Commission.

## 47.  Compliance inspection of other market participants.

(1)    The Commission may inspect the business of a market participant, other than a regulated person, for the purpose of —

    (a)    determining if the person is complying with —

        (i)    securities laws;

        (ii)    the Financial Transactions Reporting Act; 2003; or

        (iii)    any other prescribed statute that is administered by the Commission; or

    (b)    assisting in the administration of the securities legislation of another jurisdiction.

(2)    For the purposes of subsection (1), the Commission may, in writing, appoint another person to conduct the inspection.

(3)    The Commission may, by notice in writing, require a person under inspection to produce information or documents, or a class of information or documents, that reasonably relates to the inspection.

(4)    After receiving a notice under subsection (3), a person must, within a reasonable period as specified in the notice, provide to the Commission the information or document that is described in the notice and that is in the custody, possession or control of the person.

## 48.  General.

(1)    After the conclusion of an inspection of a regulated person under section 45 or a market participant under section 47, a report shall be prepared setting out the findings of that inspection.

(2)    The Commission shall consider and make recommendations on any information or report prepared under this Division.

(3)    The Commission shall assess charges to recover the cost of any inspection performed under this Division.

(4)    Upon application, the Commission may grant an exemption regarding the payment of costs where the Commission considers it appropriate.

### 49. Participation of other regulatory authorities in inspections under this Part.

(1) Subject to subsection (2), the Commission may, upon the request of a domestic regulatory authority or an overseas regulatory authority, permit the authority to take part in a compliance inspection undertaken by the Commission.

(2) The Commission shall not permit an overseas regulatory authority to take part in a compliance inspection under subsection (1) unless it is of the opinion that the participation of the overseas regulatory authority is reasonably required —

    (a) for the effective supervision of a regulated person; or

    (b) for the purposes of the regulatory functions of the overseas regulatory authority.

(3) The Commission may, in deciding whether to permit an overseas regulatory authority to take part in a compliance inspection under subsection (1), take into account, in particular, whether the overseas regulatory authority is subject to adequate legal restrictions on further disclosure and whether it is likely, without the written permission of the Commission, —

    (a) to disclose information obtained or documents examined or obtained during the compliance inspection to any person other than an officer or employee of the authority engaged in supervision; or

    (b) to take any action on information obtained or documents examined or obtained during the compliance inspection.

(4) For the purposes of this section, "overseas regulatory authority" includes an authority in a foreign jurisdiction that exercises regulatory or supervisory functions over entities carrying on banking, insurance, securities or other financial services business.

## DIVISION 4–PROVISION OF INFORMATION RELATING TO TRANSACTIONS

### 50. Provision of information.

(1) The Commission may, for the purposes of assisting in the performance of any of its functions or the exercise of any of its powers under securities laws, require —

    (a) a person registered as the holder of securities in a register kept by or on behalf of an issuer;

    (b) a person that the Commission has reasonable cause to believe holds any securities;

(c)    a person that the Commission has reasonable cause to believe has acquired or disposed of any securities, whether directly or through a nominee, trustee or agent, and whether as beneficial owner, nominee, trustee, agent or otherwise; or

(d)    a regulated person through which the Commission has reasonable cause to believe any securities have been acquired, disposed of, dealt with or traded,

to furnish to the Commission any of the information specified in subsection (2) within the time and in the form specified.

(2)    The information specified for the purposes of subsection (1) consists of —

(a)    particulars that are reasonably capable of establishing the identity of the person on whose behalf, or by, from, to or through whom the securities in question are held, or have been acquired, disposed of, dealt with or traded, as the case may be;

(b)    the instructions given to or by the person referred to in paragraph (a) or any officer, employee or agent of such person, in relation to the holding, acquisition, disposal, dealing, or trading of or in respect of the securities;

(c)    the particulars of the securities and the consideration given or received; and

(d)    any other information in the possession of the person as the Commission may specify.

## DIVISION 5–GENERAL

**51.   Liens.**

Where the person in possession of any document required to be produced under this Part claims a lien on the document —

(a)    the requirement to produce the document shall not be affected by the lien;

(b)    no fees shall be payable for or in respect of the production; and

(c)    the production shall be without prejudice to the lien.

**52.   Information about documents not in person's possession.**

If a person who is required under this Part to produce a document fails to do so, the Commission may require the person to state to the best of that person's knowledge and belief —

(a)    where that document may be found; and

(b)    the identity of the person who last had custody of that document.

### 53. Secrecy.

An order under this Part shall have effect notwithstanding any obligations as to secrecy or other restrictions upon the disclosure of information imposed by any prescribed written law or any requirement imposed thereunder, any rule of law, any contract or any rule of professional conduct.

### 54. Exemption.

(1) Any person who complies with a requirement imposed by the Commission in the exercise of its powers under this Part shall not be treated as being in breach of any restriction upon the disclosure of information or material imposed by any prescribed written law or any requirement imposed thereunder, any rule of law, any contract or any rule of professional conduct.

(2) A person is neither liable to a proceeding, nor subject to a liability, merely because the person has complied, or proposes to comply, with a requirement made or purporting to have been made under any provision of this Part for the inspection, copying or production of information or documents.

### 55. Privilege.

(1) A person shall not be required under this Part to disclose information or to produce a document that the person would be entitled to refuse to disclose or to produce on the grounds of legal professional privilege in court proceedings.

(2) For the purposes of this Part, any information or other matter comes to a professional legal adviser in privileged circumstances if it is communicated or given to the legal advisor —

   (a) by, or by a representative of, a client of the adviser in connection with the giving by the adviser of legal advice to the client;

   (b) by, or by a representative of, a person seeking legal advice from the adviser; or

   (c) by any person —

       (i) in contemplation of, or in connection with, legal proceedings; and

       (ii) for the purpose of those proceedings.

(3) No information or other matter shall be treated as coming to a professional legal adviser in privileged circumstances if it is communicated or given with a view to furthering any criminal purpose.

**56.   Use of documents etc.**

Where information or documents are produced pursuant to this Part, the Commission may —

    (a)    take copies or extracts from them; and

    (b)    use or permit the use of any of the information or documents in any proceeding.

**57.   Offence of obstruction of investigations and inspections.**

    (1)    A person who without reasonable cause —

        (a)    fails to comply with a requirement of the Commission under this Part;

        (b)    with intent to avoid the provisions of this Part, falsifies, destroys, mutilates, defaces, hides or removes a document; or

        (c)    wilfully obstructs an inquiry by the Commission made in accordance with the provisions of this Part,

is guilty of an offence and shall be liable on conviction to a fine not exceeding $100,000.

    (2)    If the offence of which the person is convicted under subsection (1) is continued after conviction, the person commits a further offence and shall be liable —

        (a)    on summary conviction, to a fine of $10,000 for every day on which the offence is continued; or

        (b)    on conviction on information, to —

            (i)    a fine of $10,000 for every day on which the offence is continued;

            (ii)    imprisonment for five years; or

            (iii)    both fine and imprisonment.

    (3)    A person contravenes this section if the person knows or reasonably should know that a hearing, inspection or investigation is to be conducted and the person takes any action referred to in subsection (1) before the hearing, inspection or investigation.

# PART V – REGULATION OF MARKETPLACES, ETC

**58.   Registration.**

    (1)    No person shall carry on business as a marketplace or clearing facility in or from The Bahamas unless registered under this Part.

(2)  If the Commission considers it in the public interest to do so, the Commission may require a self-regulatory organisation or ancillary facility to register under this Part and may prescribe the requirements applicable to such persons.

(3)  An application for registration under this Part must be in the prescribed form.

(4)  The Commission may, on application, register the applicant if the Commission is satisfied that all prescribed requirements have been fulfilled and to do so would be in the public interest.

(5)  A registration is effective until —

(a)  it is revoked;

(b)  it expires;

(c)  the conditions for continuing the registration have not been met; or

(d)  the Director accepts a surrender of registration under section 63.

(6)  Where the Commission refuses to grant a registration under this Part, the applicant shall be provided with notice in writing of the reasons for the refusal and the applicant may file an appeal pursuant to section 157.

(7)  Any person registered as a securities exchange with the Commission on the date that this Part comes into force shall be deemed to be registered as a marketplace under this Part as of that date.

## 59.  Conditions and restrictions on registration.

(1)  The Commission may grant or renew a registration under this Part subject to such terms, conditions or restrictions as the Commission deems fit.

(2)  The Commission may, at any time, by notice in writing to the registered person, vary any term, condition or restriction or impose such further term, condition or restriction as the Commission deems fit.

## 60.  Approval of regulatory instruments.

If a person registered under this Part adopts, amends or repeals a regulatory instrument, the adoption, amendment or repeal is not effective until the Commission approves it.

## 61.  Commission powers.

(1)  If the Commission considers it in the public interest to do so, the Commission may make a decision about a person registered under this Part, including a decision about —

(a)  the person's regulatory instruments;

(b)  the person's procedures or practices;

    (c)    the business or regulatory services provided by the person;

    (d)    trading or quotation activity on a marketplace;

    (e)    a security or class of securities traded or quoted on a marketplace; or

    (f)    an issuer whose securities are traded or quoted on a marketplace.

(2)    No registered securities exchange may admit any person to membership on the securities exchange unless that person is registered under the Act.

(3)    No registered securities exchange may admit a person to become a security holder of the securities exchange unless that person is approved by the Commission.

(4)    The Commission shall have the authority to hear appeals of a person registered under this Part from any ruling, decision or order and may establish its own procedures for such proceedings.

## 62.   Delegation.

(1)    The Commission may delegate to a registered securities exchange or registered self-regulatory organisation, any of the powers conferred on it by this Act, including the authority to adopt and enforce rules for the conduct of their members and the responsibility to regulate their members' compliance with the provisions of those rules and of this Act.

(2)    Any order of delegation issued under subsection (1) shall be published.

(3)    The Commission may withdraw, add or vary any powers delegated under subsection (1) as it deems necessary.

(4)    Notwithstanding any delegation under subsection (1), the Commission shall continue to have full authority to regulate the activities of the registered securities exchange or registered self-regulatory organisation and any of its members.

## 63.   Voluntary surrender.

(1)    If a person registered under this Part applies to the Commission to surrender its registration, the Commission may accept the surrender unless the Commission considers it prejudicial to the public interest to do so.

(2)    The Commission may, on receiving an application under subsection (1), without providing an opportunity to be heard, suspend or impose any condition or restriction on the registration that the Commission deems appropriate.

## 64.   Auditors and audits.

(1)    Every person registered under this Part shall appoint an approved auditor who shall make an examination, in accordance with generally accepted

auditing standards, of the annual financial statements of the person and shall provide the Commission with the prescribed reports on the financial affairs of the person.

(2) The Commission may impose all or any of the following duties on the auditor of a person registered under this Part —

   (a) a duty to submit to the Commission such additional information in relation to the audit as the Commission considers necessary;

   (b) a duty to enlarge or extend the scope of the audit of the business and affairs of the person registered under this Part;

   (c) a duty to carry out any other examination or establish any procedure in any particular case;

   (d) a duty to submit a report to the Commission on any of the matters referred to in paragraphs (b) and (c),

   and the auditor shall carry out such additional duty or duties.

(3) The person registered under this Part shall remunerate the auditor in respect of the discharge of such additional duty or duties as the Commission may impose under subsection (2).

## 65. Reporting to the Commission.

Within the prescribed periods, a person registered under this Part shall deliver to the Commission —

   (a) annual financial statements in respect of the year along with the report of the auditor;

   (b) interim financial statements and other information as may be prescribed; and

   (c) all reports or other information and documents as the Commission may prescribe.

## 66. Notices.

(1) An applicant for registration under this Part and a person registered under this Part shall provide the Commission notice in writing of the occurrence of any prescribed event within the time periods prescribed.

(2) Upon receipt of a notice under subsection (1), the Commission may review the person's application or registration and may take any action that the Commission deems appropriate.

## 67. Keeping of records.

(1) A market participant shall —

   (a) make and keep such information and documents in such form and for such periods —

      (i)    as are reasonably necessary in the conduct of its business and operations, including to document compliance with all requirements imposed by statute or regulation on the market participant; and

      (ii)   as may be prescribed; and

  (b)    file with or deliver to the Commission any prescribed document or report.

(2)    The Commission may require a market participant to disseminate to the public any report filed with the Commission under paragraph (1)(b).

(3)    In addition to subsection (1), a registered marketplace shall keep a record of each trade executed through its facilities showing the time when it took place and any other prescribed information.

(4)    A market participant shall deliver to the Commission a copy of, or an extract from, any information or document kept under this section upon receipt of a request from the Commission.

## 68.  Offences.

(1)    No person may establish or maintain, or assist in establishing or maintaining, a marketplace or clearing facility in The Bahamas or conduct business on or with a marketplace or clearing facility in The Bahamas other than one registered in accordance with this Act.

(2)    Any person who contravenes subsection (1) is guilty of an offence and shall be liable on summary conviction to a fine of $150,000 or to imprisonment for two years or to both.

# PART VI – REGISTRATION OF PERSONS CARRYING ON SECURITIES BUSINESS

## 69.  Registration requirement.

(1)    No person may carry on any securities business in or from The Bahamas, or purport to do so, unless that person is —

  (a)    registered with the Commission to carry on that business and has received written notice of the registration; or

  (b)    exempt from registration.

(2)    The persons specified in Part 4 of the First Schedule are not required to register to conduct securities business.

(3)    For the purposes of subsection (1), a person may be considered to purport to carry on securities business where that person —

(a)   uses one or more words which connote securities business, either in English or in any other language, in the description or title under which the person carries on business;

(b)   makes a representation in a document or in any other manner that the person is carrying on securities business; or

(c)   otherwise holds itself out as carrying on securities business.

(4)   No individual shall act as a representative in respect of any securities business or hold himself or herself out as doing so unless —

(a)   that person has been registered with the Commission as a representative for that securities business; and

(b)   when so acting, the individual is doing so for the registered firm that sponsored that individual's application for, or for renewal of, registration as a representative.

(5)   Subsection (4) does not apply to —

(a)   an employee performing functions which are solely administrative in nature, including technology support, facilities support, human resources management and clerical support; or

(b)   any prescribed person.

(6)   The termination of the employment of registered representative with a registered firm shall operate as a suspension of the registration of that individual until notice in writing has been received by the Commission from another registered firm of the employment of the individual and the reinstatement of the registration has been approved by the Commission.

(7)   An application for registration under this Part must be in the prescribed form.

(8)   The Commission may, on application, register the person if the Commission is satisfied that all prescribed requirements have been fulfilled and to do so would be in the public interest.

(9)   The Commission may grant or renew a registration subject to such terms, conditions or restrictions as the Commission thinks fit.

(10)   The Commission may, at any time, by notice in writing to the registered firm or registered representative, vary any term, condition or restriction or impose such further term, condition or restriction as the Commission may think fit.

(11)   A registration is effective until —

(a)   it is revoked;

(b)   it expires;

(c)   the conditions for continuing the registration have not been met; or

        (d)    the Commission accepts a surrender of registration under section 71.

(12)    Where the Commission refuses to grant a registration under this Part, the applicant shall be provided with notice in writing of the reasons for the refusal and the applicant may appeal that decision.

## 70. Notices.

(1)    An applicant for registration and a registrant shall provide the Commission notice in writing of the occurrence of any prescribed event within the time periods prescribed.

(2)    Upon receipt of a notice under subsection (1), the Commission may review the person's application or registration and may take any action that the Commission deems appropriate.

## 71. Surrender of registration.

(1)    The Commission may, on application by a registrant, accept, subject to such terms and conditions as it may impose, the voluntary surrender of the registration of the registrant if the Commission is satisfied that the surrender of the registration would not be prejudicial to the public interest.

(2)    On receiving an application under subsection (1), the Commission may, without providing an opportunity to be heard, suspend or impose any condition or restriction on the registration that the Commission deems appropriate.

## 72. Criminal convictions.

(1)    Where a registrant is convicted in The Bahamas or elsewhere of a criminal offence involving fraud or dishonesty, such person shall cease to be registered under this Act with effect from the date of the conviction.

(2)    Where a registrant is convicted in The Bahamas of any criminal offence other than fraud or dishonesty under Bahamian law, or is convicted of any like criminal offence under any foreign law in any foreign jurisdiction, such person's registration shall be reviewed by the Commission and may be subject to revocation, suspension or other remedial action.

(3)    Where a registrant has been the subject of any disciplinary action by any domestic regulatory authority or overseas regulatory authority, such person's registration shall be reviewed by the Commission and may be subject to revocation, suspension or other remedial action.

## 73. Voluntary liquidation.

A registered firm shall not go into voluntary liquidation without the prior approval of the Commission and if proceedings for an involuntary liquidation

are commenced against a registered firm the Commission shall be immediately notified in writing by the affected registered firm or by one of its partners, directors or officers.

## 74. Offence.

(1) It is an offence —

    (a) for a registrant to carry on securities business or purport to do so otherwise than in accordance with the permission given to the registrant under this Part;

    (b) for a person to carry on securities business or purport to do so without having been registered to do so with the Commission under this Part; and

    (c) for person to make a misrepresentation in any filing, application, notification, or other document required to be filed, delivered or notified to the Commission under this Part.

(2) Any person or registrant who contravenes the provisions of subsection (1) is guilty of an offence and shall be liable on summary conviction to a fine of $150,000 or to imprisonment for two years or to both.

# PART VII – CONDUCT OF SECURITIES BUSINESS

## 75. Duties to clients.

A registered firm, its officers, directors, partners and employees and parties related to an investment fund shall —

    (a) act honestly and fairly in conducting its business activities in the best interests of its clients and the integrity of the market; and

    (b) act with due skill, care and diligence, in the best interests of its clients and the integrity of the market.

## 76. Auditor.

(1) A registered firm shall appoint an approved auditor.

(2) The auditor shall —

    (a) make an examination of the annual financial statements and other regulatory filings of the registered firm in accordance with generally acceptable auditing standards and shall prepare a report on the audit in accordance with generally accepted accounting principles; and

    (b) when requested to do so by the Commission, provide a report on whether or not the business of the registered firm has been

conducted in accordance with the provisions of this Act relating to the prescribed requirements and the financial affairs of registered firms.

(3)     The Commission may, where the report of the auditor required by subsection (2)(a) is qualified in any respect or the report required by subsection (2)(b) discloses that there are any material weaknesses or deficiencies in or non-compliance with any of the prescribed requirements, take any action that is deemed necessary until the matters giving rise to the qualified audit report are resolved or the matters giving rise to the weaknesses or deficiencies or non-compliance are rectified.

(4)     The auditor shall, where in the course of performing the duties required by subsection (2) he comes to the view that a matter that could give rise to a qualification in the audit report on the financial statements is present or that there is a material weakness or deficiency in or non-compliance with any of the prescribed requirements, provide notice to the Commission immediately in the prescribed form and a copy of the notice must be delivered promptly to the registered firm.

(5)     The Commission may require the auditor of a registered firm to —

    (a)     submit to the Commission such additional information in relation to the audit as the Commission considers necessary;

    (b)     enlarge or extend the scope of the audit of the business and affairs of the registered firm;

    (c)     carry out any other examination or establish any procedure in any particular case;

    (d)     submit a report to the Commission on any of the matters referred to in paragraphs (b) and (c),

and the auditor shall carry out such additional duty or duties.

(6)     The registered firm shall remunerate the auditor in respect of the discharge of such additional duty or duties as the Commission may impose under subsection (5).

## 77.   Reporting to the Commission.

Within the prescribed periods, a registered firm shall deliver to the Commission —

    (a)     the annual financial statements in respect of the year along with the report of the auditor;

    (b)     a copy of the annual report of the auditor on results of the procedures performed by the auditor as required by subsection 76(2)(b);

    (c)     interim financial statements and other information as may be prescribed; and

(d)    all reports or other information as the Commission may prescribe.

### 78. Responsibility for actions of persons acting on behalf of registered firm or party related to investment fund.

(1)    A registered firm shall be responsible for all acts and omissions of each partner, director, officer, representative, employee and agent acting on its behalf.

(2)    A party related to an investment fund shall be responsible for all acts and omissions of each partner, director, officer, representative, employee and agent acting on its behalf.

### 79. Keeping of records.

(1)    A registered firm shall —

    (a)    make and keep such information and documents in such form and for such periods —

        (i)    as are reasonably necessary in the conduct of its business and operations, including to document compliance with all requirements imposed by statue or regulation on the registrant; and

        (ii)    as may be prescribed; and

    (b)    file with or deliver to the Commission any prescribed document or report.

(2)    The Commission may require a registered firm to disseminate to the public any report filed with the Commission under paragraph (1)(b).

(3)    A registered firm shall deliver to the Commission a copy of, or an extract from, any information or document kept under this section upon receipt of a written request from the Commission.

### 80. Prohibition.

(1)    A registered firm, without the prior approval of the Commission, may not

    (a)    become a significant security holder of any issuer that is not a registered firm other than in the usual course of the business of trading in securities;

    (b)    acquire any shares, debentures or other interest in any other registered firm, except where the transaction involves acquiring all the voting securities of the other registered firm, or

    (c)    permit anyone to become a significant security holder of the registered firm.

(2)    Failure to comply with this section shall render the registration of the registered firm revocable by the Commission.

# PART VIII – COMPENSATION FUND

### 81.    Compensation funds.

The Commission may prescribe requirements regarding the establishment, maintenance and use of compensation funds for the protection of registrants and clients of registrants who may suffer loss as a result of the bankruptcy, insolvency or winding up of a registrant.

# PART IX – DISTRIBUTIONS AND PROSPECTUSES

### 82.    Interpretation.

(1)    In this Part —

"**communication**" means a notice, circular, letter or advertisement in any media;

"**foreign prospectus**" means a prospectus or other offering document to be used in connection with a distribution of securities that has become final for the purposes of a distribution in the recognised foreign jurisdiction and includes any supplement or amendment to the document.

(2)    For the purposes of this Part, a communication solicits the purchase or sale of securities if —

(a)    it invites a person to enter into an agreement for, or with a view to subscribing for, or otherwise acquiring or underwriting, any securities; or

(b)    it contains information reasonably calculated to lead, directly or indirectly, to a person entering into such an agreement.

(3)    This Part does not apply to securities that are equity interests in investment funds.

### 83.    Prospectus required.

(1)    No person shall trade in a security on the person's own account or on behalf of any other person where the trade would be a distribution of the security unless a preliminary prospectus and a prospectus have been filed with the Commission and the Commission has issued a receipt for each document.

(2)    A preliminary prospectus and a prospectus filed under this Part must disclose all material information about the issuer and the securities being offered and contain the prescribed information.

### 84.  Receipt for preliminary prospectus.

The Commission shall issue a receipt for a preliminary prospectus immediately upon the filing of the preliminary prospectus.

### 85.  Selling activities before issue of receipt for prospectus.

(1)    During the period between the filing of the preliminary prospectus and the issue of the receipt for the prospectus, provided the requirements of section 87 are met, it is permissible to —

    (a)    distribute a communication identifying the security proposed to be issued provided that the communication contains all prescribed information;

    (b)    distribute a preliminary prospectus; and

    (c)    solicit expressions of interest from prospective purchasers.

(2)    No binding agreement to purchase the securities may be entered into until the Commission issues the receipt for the prospectus.

### 86.  Defective preliminary prospectus.

The Commission may, without giving notice, if it appears to it that a preliminary prospectus does not substantially comply with the prescribed requirements, order that the activities permitted by section 85 shall cease until a revised preliminary prospectus satisfactory to the Commission is filed and forwarded to each recipient of the defective preliminary prospectus.

### 87.  Delivery of prospectus.

(1)    An issuer, selling security holder or registrant who solicits a sale of securities or receives an expression of interest, order or subscription from a person for a security offered in a distribution during the period before the issue of a receipt for the prospectus shall send to such person the preliminary prospectus or amended preliminary prospectus, as the case may be.

(2)    An issuer, selling security holder or registrant who receives an expression of interest, order or subscription for a security offered in a distribution shall, during the distribution period, send to such person a prospectus, or amended prospectus, as the case may be.

(3)    The documents required to be sent under subsections (1) and (2) shall be sent within two business days after the expression of interest, order or subscription is received.

(4)     An issuer or selling security holder that files a preliminary prospectus and prospectus with the Commission under this Part shall make copies of those documents available without charge upon request and shall furnish to a registrant a reasonable number of copies of the documents.

## 88.   Amendments.

(1)     The issuer shall, if there is a change in any material information after a receipt is obtained for a preliminary prospectus and before the receipt for the prospectus is obtained or during the distribution period, file with the Commission an amended preliminary prospectus or amended prospectus containing the particulars of the material information.

(2)     Every preliminary prospectus or prospectus thereafter sent or delivered to any person shall include the amended preliminary prospectus or amended prospectus.

(3)     Where an amended prospectus is required to be filed with the Commission under subsection (1), the distribution of securities under the prospectus shall cease until such time as the Commission has issued a receipt for the amended prospectus.

(4)     An issuer, selling security holder or registrant who sent a preliminary prospectus to a person under subsection 87(1) shall send to each such person an amended preliminary prospectus immediately after it has been filed.

(5)     An issuer, selling security holder or registrant who sent a prospectus to a purchaser under subsection 87(2) shall send to each purchaser an amended prospectus immediately after a receipt is issued by the Commission for the amended prospectus.

## 89.   Certificates.

A prospectus or amended prospectus filed with the Commission shall contain certificates in the prescribed form signed by the prescribed persons.

## 90.   Expert's consent.

The Commission shall not issue a receipt for a prospectus that includes an expert's report unless the prescribed requirements have been met regarding the expert's consent.

## 91.   Issue of receipt.

(1)     Subject to subsections (2), (3) and (4), the Commission shall issue a receipt for a prospectus within a reasonable time after the date of the filing of the prospectus.

(2)     The Commission shall refuse to issue a receipt for a prospectus —

(a)    if the Commission considers that the distribution would be prejudicial to the public interest; or

(b)    for any other prescribed reason.

(3)    Where the Commission refuses to issue a receipt for a prospectus, the Commission shall provide the issuer with notice in writing of the reasons for the refusal and the issuer may appeal that decision.

(4)    The Commission may, in connection with the issue of a receipt for a prospectus, impose any condition that in the opinion of the Commission is necessary for the protection of investors.

### 92.   Exempt distributions.

The requirement to file a prospectus under section 83 does not apply to a distribution —

(a)    of securities issued by the Government of The Bahamas;

(b)    of securities issued by a private company;

(c)    of securities of an investment fund licensed or registered under the Investment Funds Act, 2003 or exempt from licensing or registration under that Act;

(d)    by an issuer of its own securities that are distributed to holders of its securities as a dividend;

(e)    by an issuer of a security to holders of its securities incidental to a reorganization or winding up or to a distribution of its assets for the purpose of winding up its affairs;

(f)    by an issuer of a security that is exchanged by or for the account of the issuer with another issuer or the security holders of another issuer on —

(i)    a statutory amalgamation or arrangement; or

(ii)    a statutory procedure by which one issuer takes title to the assets of another issuer that loses its existence by operation of law or by which the existing issuers merge into a new issuer;

(g)    by an issuer pursuant to a prescribed take-over bid;

(h)    where the Commission, being satisfied that to do so would not be prejudicial to the public interest, makes an order exempting the distribution and such order may be subject to any condition the Commission considers appropriate; or

(i)    in such other prescribed circumstances.

### 93. Exemptions for approved foreign issuers.

(1) An issuer that is an approved foreign issuer may satisfy the requirements of sections 83, 87, 88  89 and 90 by —

    (a) filing with the Commission the prescribed documents; and

    (b) delivering to each purchaser in The Bahamas —

        (i) he foreign prospectus; and

        (ii) any other prescribed document.

(2) Where an approved foreign issuer files with the Commission the documents required under subsection (1), the Commission shall issue a receipt for such foreign prospectus unless the Commission determines it is not in the public interest to do so.

### 94. Distributions made outside The Bahamas.

(1) A distribution of securities issued, or to be issued, by an issuer that is incorporated in or established under the laws of The Bahamas that is made outside The Bahamas shall be made in accordance with the laws or rules of the country in which the distribution is made.

(2) For the purposes of subsection (1), "laws" included any subordinate legislation and "rules" includes any applicable listing rules or any rules issued by a marketplace to which the issuer is subject.

### 95. Resale restrictions.

The first trade in securities previously acquired pursuant to a prescribed exemption, other than a further trade exempted by this Act or the regulations, is deemed to be a distribution, unless the prescribed conditions are met.

### 96. Lapse date.

(1) Subject to subsection (2), in this section "lapse date" means in respect of a distribution to which section 83 or 93 applies, the date that is 12 months after the date the Commission issued the receipt for the prospectus or foreign prospectus.

(2) The Commission may order that the period specified in subsection (1) shall be reduced to not less than three months.

(3) No distribution of a security to which section 83 or 93 applies shall continue after the lapse date unless a new prospectus or foreign prospectus that complies with this Part is filed and the Commission issues a receipt for the document.

97. **Offence.**

If a distribution is carried out other than in compliance with this Part, the issuer and every person who is knowingly a party to the distribution is guilty of an offence and shall be liable to a fine of $1,000 for every day, or part thereof, from the date of the first solicitation in connection with the distribution until a receipt has been issued for a prospectus by the Commission and shall be further liable —

    (a)   on summary conviction to a fine of $30,000 or to imprisonment for six months, or to both;

    (b)   on conviction on information to a fine of $75,000 or to imprisonment for one year or to both.

# PART X – CONTINUING OBLIGATIONS OF PUBLIC ISSUERS

98. **Disclosure to the public.**

    (1)   A public issuer must disclose to the public the prescribed information about the business operations and securities of the issuer.

    (2)   A public issuer shall disclose to the public, as soon as practicable, any information relating to the public issuer, including information on any significant new developments in the issuer's business or affairs which is not public knowledge, which —

        (a)   is necessary to enable them and the public to appraise the position of the public issuer;

        (b)   is necessary to avoid the establishment of a false market in its securities;

        (c)   might reasonably be expected materially to affect market activity in and the price of its securities; or

        (d)   may significantly affect its ability to meet its commitments.

    (3)   Information disclosed to the public by a public issuer must —

        (a)   include all material information;

        (b)   not contain a misrepresentation; and

        (c)   present a balanced view of the issuer's activities.

    (4)   The Commission may prescribe the method to be used by the public issuer to disclose information to the public.

    (5)   A public issuer must treat its security holders in a fair and equitable manner.

(6)    Every director and officer of a public issuer, in exercising their powers and discharging their duties, shall —

      (a)    act honestly and in good faith with a view to the best interests of the issuer; and

      (b)    exercise the care, diligence and skill that a reasonably prudent person would exercise in comparable circumstances.

### 99.   Timely disclosure of material changes.

(1)    Subject to subsection (2), where a material change occurs in the affairs of a public issuer, the issuer shall —

      (a)    immediately, and in any event within one day of the material change, issue a press release that discloses the nature and substance of the material change; and

      (b)    within five days of the material change, file with the Commission a report in the prescribed form.

(2)    If the public issuer is of the opinion that the disclosure required by subsection (1) would be unduly detrimental to its interests, it must immediately advise the Commission in writing of the material change and the reasons why the issuer is of the opinion that public disclosure should be withheld.

(3)    Where the Commission is of the opinion that the disclosure of the material change would not be unduly detrimental to the interests of a public issuer, the Commission may, after giving the public issuer an opportunity to be heard —

      (a)    require disclosure to the public of the material change in accordance with subsection (1); or

      (b)    permit non-disclosure of the material change by the public issuer provided non-disclosure does not continue beyond the time set out in subsection (5).

(4)    A decision of the Commission under subsection (3) is final and no appeal from such a decision shall be available.

(5)    Notwithstanding any permitted non-disclosure under subsection (2) or (3) (b), the public issuer shall disclose such material change no later than the thirtieth day following the date on which the public issuer would have been required to issue a press release in respect of the material change under subsection (1).

(6)    The public issuer shall, notwithstanding a report has been given to the Commission under subsection (2), promptly disclose the material change in the manner referred to in subsection (1) upon the public issuer becoming aware, or having reasonable grounds to believe, that persons are

purchasing or selling securities of the issuer with knowledge of the undisclosed material change.

(7)     For the purposes of this section, a "material change" means any change in any material information regarding the public issuer.

## 100.  Auditors and audits.

Every public issuer shall appoint an approved auditor who shall make an examination, in accordance with generally accepted auditing standards, of the annual financial statements of the person and shall provide the Commission with the prescribed reports on the financial affairs of the person.

## 101.  Filing of annual audited financial statements.

(1)     Every public issuer shall, within 120 days after the end of the issuer's financial year or such other prescribed period, file with the Commission annual financial statements prepared and certified as prescribed.

(2)     Every financial statement referred to in subsection (1) shall be accompanied by a report of the auditor of the public issuer.

(3)     The Commission may, where the report of the auditor required by subsection (2) is qualified in any respect, take any action that it deems necessary until the matters giving rise to the qualified audit report are resolved.

(4)     The auditor shall, where in the course of performing the duties required by subsection (2) he comes to the view that a matter that could give rise to a qualification in the audit report on the financial statements is present, provide notice to the Commission immediately in the prescribed form and deliver a copy of the notice promptly to the public issuer.

(5)     Every public issuer shall file with the Commission interim financial statements, prepared and certified as prescribed, within the prescribed period after the end of the financial period to which it relates.

(6)     Every public issuer shall, within the prescribed period, file with the Commission —

(a)     a copy of its annual report containing the prescribed information; and

(b)     all reports or other information and documents as the Commission may prescribe.

## 102.  Delivery of continuous disclosure documents to security holders.

(1)     A public issuer shall, as soon as practicable after filing with the Commission, send to each security holder at the address provided to the public issuer as the preferred delivery address of the security holder, or at

the last address of the security holder shown on the securities register of the public issuer, and at no cost to the security holder, the —

    (a)    annual financial statements and the report of the auditor;

    (b)    interim financial statements;

    (c)    annual report; and

    (d)    any other prescribed report or document.

(2)    The obligation to send documents to security holders under subsection (1) does not apply —

    (a)    to documents published as prescribed; or

    (b)    if a security holder has informed the issuer that the security holder does not wish to receive the documents.

### 103. Proxies and proxy solicitation.

(1)    In this section "solicit" and "solicitation" includes —

    (a)    a request for a proxy, whether or not accompanied by or included in a form of proxy;

    (b)    a request to execute or not to execute a form of proxy or to revoke a proxy;

    (c)    the sending of a form of proxy or other communications to a security holder under circumstances reasonably calculated to result in the procurement, withholding or revocation of a proxy; and

    (d)    the sending of a form of proxy to a security holder under subsection (2),

but does not include —

    (i)    the sending of a form of proxy in response to an unsolicited request made by or on behalf of a security holder;

    (ii)    the performance of administrative acts or professional services on behalf of a person soliciting a proxy;

    (iii)    the sending by a registrant of documents to a beneficial owner;

    (iv)    the solicitation by a person in respect of securities of which the person is the beneficial owner; or

    (v)    other prescribed activities.

(2)    A public issuer shall, concurrently with the giving of notice of a meeting of its security holders, send a prescribed form of proxy and any other prescribed document to each holder of voting securities who is entitled to receive notice of the meeting at the latest address of the security holder shown on the securities register of the issuer.

(3)    A person shall not solicit proxies under subsection (2) unless each security holder whose proxy is solicited is sent all prescribed documents concurrently with the solicitation.

(4)    A person soliciting proxies shall, concurrently with sending the proxy material required in subsection (2), file with the Commission a copy of each document sent to security holders.

(5)    The Commission may —

    (a)    require a public issuer to file with the Commission, within such time limit as may be prescribed, draft copies of any documents that the issuer intends to send to security holders under this section prior to any sending; and

    (b)    may review any proxy materials or any other communications to security holders and require modifications to the documents or delay any mailing or security holder meeting as a result of its review.

## 104. Exemptions for certain foreign issuers.

A public issuer that is an approved foreign issuer is exempt from the requirements of this Part, other than section 103, provided that it —

    (a)    complies in all respects with the foreign disclosure requirements of its recognised foreign jurisdiction regarding —

        (i)    the disclosure of changes in material information on a timely basis;

        (ii)    the preparation, filing and delivery of annual audited financial statements; and

        (iii)    the preparation, filing and delivery of interim financial statements;

    (b)    files with the Commission all such documents which it files with the overseas regulatory authority in the recognised foreign jurisdiction in respect of the items described in paragraph (a); and

    (c)    delivers to each security holder resident in The Bahamas, at the latest address shown on the securities register of the public issuer and at no cost to the security holder, the documents that such security holder would be entitled to receive under securities laws of the recognised foreign jurisdiction if such security holder were resident in that foreign jurisdiction.

## 105. Offence.

A public issuer that contravenes this Part, or makes a misrepresentation in any document required to be filed with the Commission or sent to security holders under this Part, is guilty of an offence and is liable —

(a)     on summary conviction to a fine of $30,000 or to imprisonment for six months, or to both;

(b)     on conviction on information to a fine of $75,000 or to imprisonment for one year or to both.

# PART XI – GOVERNANCE OF PUBLIC ISSUERS

### 106. Governance of public issuers.

For the purposes of this Act and the regulations, a public issuer shall comply with all prescribed requirements regarding the governance of public issuers, including requirements relating to —

(a)     the composition of its board of directors and qualifications for membership on the board, including matters respecting the independence of members;

(b)     the establishment of specified types of committees of the board of directors, the mandate, functioning and responsibilities of each committee, the composition of each committee and the qualifications for membership on the committee, including matters respecting the independence of members;

(c)     the establishment and enforcement of a code of business conduct and ethics applicable to its directors, officers and employees and applicable to persons or companies that are in a special relationship with the public issuer, including the minimum requirements for such a code; and

(d)     procedures to regulate conflicts of interest between the interests of the public issuer and those of a director or officer of the public issuer.

# PART XII – TAKE-OVER BIDS

### 107. Take-over bids.

A person shall not make a take-over bid or issuer bid for a public issuer except in accordance with the prescribed requirements.

# PART XIII – MISCONDUCT

### 108. Application and definitions.

(1)     Sections 109, 110, 111, 114, 119 and 120 do not apply to conduct relating to securities issued by investment funds.

(2)    In this Part "dishonest" means —

    (a)    dishonest according to the standards of ordinary people; and

    (b)    known by the person to be dishonest according to the standards of ordinary people.

### 109. Market manipulation.

A person must not take part in or carry out, whether directly or indirectly and whether in The Bahamas or elsewhere, a transaction or series of transactions that has or is likely to have the effect of —

    (a)    creating an artificial price for trading in securities on a registered marketplace; or

    (b)    maintaining a price for trading in securities on a registered marketplace at a level that is artificial, whether or not it was previously artificial.

### 110. False trading and market rigging-creating a false or misleading appearance of active trading etc.

(1)    A person must not do, or omit to do, an act, whether in The Bahamas or elsewhere, if that act or omission has or is likely to have the effect of creating, or causing the creation of, a false or misleading appearance —

    (a)    of active trading in securities on a registered marketplace; or

    (b)    with respect to the market for, or the price for trading in, securities on a registered marketplace.

(2)    For the purposes of subsection (1), a person is taken to have created a false or misleading appearance of active trading in particular securities on a registered marketplace if the person —

    (a)    enters into, or carries out, either directly or indirectly, any transaction of purchase or sale of any of those securities that does not involve any change in the beneficial ownership of the products;

    (b)    makes an offer to sell any of those securities at a specified price and has made or proposes to make, or knows that an associate of the person has made or proposes to make, an offer to purchase the same number, or substantially the same number, of those securities at a price that is substantially the same as the price specified in the offer to sell; or

    (c)    makes an offer to purchase any of those securities at a specified price and has made or proposes to make, or knows that an associate of the person has made or proposes to make, an offer to sell the same number, or substantially the same number, of those securities at a price that is substantially the same as the price specified in the offer to purchase.

(3)     The circumstances in which a person creates a false or misleading appearance of active trading in particular securities on a securities exchange are not limited to the circumstances set out in subsection (2).

(4)     For the purposes of subsection (2)(a), a purchase or sale of securities does not involve a change in the beneficial ownership if a person —

(a)     who had an interest in the securities before the purchase or sale; or

(b)     an associate of such a person,

has an interest in the securities after the purchase or sale.

(5)     The reference in paragraph (2)(a) to a transaction of purchase or sale of securities includes —

(a)     a reference to the making of an offer to purchase or sell securities; and

(b)     a reference to the making of an invitation, however expressed, that expressly or impliedly invites a person to offer to buy or sell securities.

## 111.  False trading and market rigging–artificially maintaining etc. trading price.

(1)     A person must not, whether in The Bahamas or elsewhere, enter into, or engage in, a fictitious or artificial transaction or device if that transaction or device results in —

(a)     the price for trading in securities on a registered marketplace being maintained, inflated or depressed; or

(b)     fluctuations in the price for trading in securities on a registered marketplace.

(2)     In determining whether a transaction is fictitious or artificial for the purposes of subsection (1), the fact that the transaction is, or was at any time, intended by the parties who entered into it to have effect according to its terms is not conclusive.

## 112.  Misleading or deceptive conduct.

(1)     A person must not engage in conduct, in or from The Bahamas, in relation to securities business or a security that is misleading or deceptive or is likely to mislead or deceive.

(2)     The reference in subsection (1) to engaging in conduct in relation to a security includes any of —

(a)     trading in a security;

(b)     issuing a security;

(c)     publishing a notice in relation to a security;

(d)    making, or making an evaluation of, an offer under a take-over bid or a recommendation relating to such an offer; or

(e)    carrying on negotiations, or making arrangements, or doing any other act, preparatory to, or in any way related to, an activity covered by any of paragraphs (b) to (d).

## 113. Misleading the Commission.

A person must not, in purported compliance with any requirement imposed by or under securities laws, knowingly or recklessly provide the Commission or the public with information that —

(a)    is false;

(b)    is misleading in a material particular; or

(c)    fails to state a fact that is required to be stated or that is necessary to make the statement not misleading.

## 114. Dissemination of information about illegal transactions.

A person must not, whether in The Bahamas or elsewhere, circulate or disseminate, or be involved in the circulation or dissemination of, any statement or information to the effect that the price for trading in securities on a registered marketplace will, or is likely to, rise or fall, or be maintained, because of a transaction, or other act or thing done, in relation to those securities, if —

(a)    the transaction, or thing done, constitutes or would constitute a contravention of section 109, 110, 111 or 112; and

(b)    the person, or an associate of the person —

(i)    has entered into such a transaction or done such an act or thing; or

(ii)    has received, or may receive, directly or indirectly, a consideration or benefit for circulating or disseminating, or authorising the circulation or dissemination of, the statement or information.

## 115. False or misleading statements.

A person must not, whether in The Bahamas or elsewhere, make a statement, or disseminate information, if —

(a)    the statement or information is false in a material particular or is materially misleading;

(b)    the statement or information is likely —

(i)    to induce persons in The Bahamas to trade securities; or

        (ii)    to have the effect of increasing, reducing, maintaining or stabilising the price for trading in securities on a registered marketplace; and

    (c)    when the person makes the statement, or disseminates the information —

        (i)    the person does not care whether the statement or information is true or false; or

        (ii)    the person knows, or ought reasonably to have known, that the statement or information is false in a material particular or is materially misleading.

## 116. Inducing persons to deal.

A person must not, in or from The Bahamas, induce another person to trade in securities —

    (a)    by making or publishing a statement, promise or forecast if the person knows or is reckless as to whether the statement is misleading, false or deceptive;

    (b)    by a dishonest concealment of material information; or

    (c)    by recording or storing information that the person knows to be false or misleading in a material particular or materially misleading if —

        (i)    the information is recorded or stored in, or by means of, a mechanical, electronic or other device; and

        (ii)    when the information was so recorded or stored, the person had reasonable grounds for expecting that it would be available to others.

## 117. Dishonest conduct.

A person must not, in the course of carrying on a securities business in or from The Bahamas, engage in dishonest conduct in relation to securities business or a security.

## 118. Prohibited representations.

    (1)    Except as prescribed, no person, for the purpose of inducing another person to trade in a security, other than a security that carries an obligation of the issuer to redeem or purchase, or a right of the owner to require redemption or purchase, shall make any representation, written or oral, that any person —

    (a)    will resell or repurchase such security; or

    (b)    will refund all or any of the purchase price of such security.

(2)    No person, for the purpose of inducing another person to trade in a security, shall make any representation, written or oral, relating to the future value or price of such security.

(3)    Except as prescribed, no person, for the purpose of inducing another person to trade in a security, shall make any representation, written or oral, that such security will be listed on any securities exchange.

## 119. Prohibition on purchasing or selling of securities by certain persons.

(1)    In this section —

"**person in a special relationship**" means, in relation to a public issuer —

(a)    an insider, officer, employee, affiliate or associate of the public issuer;

(b)    an associate or affiliate of an insider;

(c)    a person that is making or proposing to make a take-over bid for the securities of the public issuer;

(d)    a person that is proposing to —

(i)    become a party to a reorganization or business combination with the public issuer; or

(ii)    acquire a substantial portion of the property of the public issuer;

(e)    a person engaging in or proposing to engage in any business or professional activity with or on behalf of the public issuer or with or on behalf of a person referred to in paragraph (c) or (d);

(f)    an insider, officer, employee, affiliate or associate of a person referred to in paragraph (c), (d) or (e);

(g)    a person with inside information, if the information was obtained at a time when the person was a person in a special relationship under paragraph (a), (b), (c), (d), (e) or (f); or

(h)    a person that obtained inside information from another person —

(i)    who, at the time, was a person in a special relationship under this definition, including this paragraph; and

(ii)    whom the person knew or reasonably should have known was a person in a special relationship;

(2)    A person that —

(a)    is in a special relationship with the public issuer; and

(b)    has inside information about the public issuer,

must not —

(c)   trade any security of the public issuer; or

(d)   enter into a transaction involving a security the value of which is derived from or varies materially with the value or market price of a security of the public issuer.

(3)   A public issuer, or a person in a special relationship with a public issuer, must not inform another person of inside information about the public issuer unless it is necessary in the course of the public issuer's or the person's business.

(4)   A public issuer, or a person in a special relationship with a public issuer, with inside information about the public issuer, must not recommend or encourage another person to —

(a)   trade a security of the public issuer; or

(b)   enter into a transaction involving a security the value of which is derived from or varies materially with the value or market price of a security of the public issuer.

## 120.  Front running.

(1)   In this section, **"material order information"** means information that —

(a)   relates to —

(i)   the intention of a person responsible for making decisions about an investment portfolio to trade a security on behalf of the investment portfolio;

(ii)   the intention of a registrant trading on behalf of an investment portfolio to trade a security on behalf of the investment portfolio; or

(iii)   an unexecuted order, or the intention of any person to place an order, to trade a security; and

(b)   if disclosed, would reasonably be expected to affect the market price of the security.

(2)   If a person knows of material order information, the person must not —

(a)   trade a security that is the subject of the information;

(b)   enter into a transaction involving a security the value of which is derived from or varies materially with the value or market price of the security referred to in paragraph (a);

(c)   inform another person of the material order information, unless it is necessary in the course of the person's business; or

(d)   recommend or encourage another person to —

(i)   trade the security referred to in paragraph (a); or

(ii) enter into a transaction involving a security the value of which is derived from or varies materially with the value or market price of the security referred to in paragraph (a).

## 121. Defence-belief that other party knows information.

(1) A person does not contravene subsection 119(2), 120(2)(a) or 120(2)(b) if, at the time the person trades the security, the person reasonably believes that the purchaser or seller of the security knows the inside information or material order information.

(2) A person does not contravene subsection 119(3), 119(4), 120(2)(c) or 120(2)(d) if, the person reasonably believes that the other person knows the information at the time the person —

(a) informs the other person of the inside information or material order information; or

(b) recommends or encourages the other person to trade the security.

## 122. Defence of automatic or predetermined trade.

A person does not contravene subsection 119(2), 120(2)(a) or 120(2)(b) if the person —

(a) trades the security under a written automatic dividend reinvestment plan, written automatic purchase plan or other similar written automatic plan, in which the person agreed to participate before obtaining the inside information or material order information; or

(b) trades the security as a result of a written legal obligation —

(i) imposed on the person; or

(ii) that the person entered into before obtaining the inside information or material order information.

## 123. Defences- trading as agent.

A person does not contravene subsection 119(2), 120(2)(a) or 120(2)(b) if the person trades —

(a) as agent under the specific unsolicited instructions of the principal;

(b) as agent under specific instructions that the agent solicited from the principal before obtaining the inside information or material order information;

(c) as agent or trustee for another person because of that other person's participation in a written automatic dividend reinvestment plan, written automatic purchase plan or other similar written automatic plan; or

(d)    as agent or trustee for another person to fulfil a written legal obligation of the other person.

## 124. Defences-trade or recommendation by individual with no inside or material order information.

A person does not contravene subsection 119(2), 119(4), 120(2)(a), 120(2)(b) or 120(2)(d) if —

(a)    the person is not an individual; and

(b)    the individual making the trade or recommendation on behalf of the person does not have inside information or material order information and is not acting on the advice or recommendation of an individual who does have that information.

## 125. Exemptions and modifications.

(1)    The Commission may prescribe that —

(a)    a person or class of persons is exempt from all or specified provisions of this Part; or

(b)    a security or a class of securities are exempt from all or specified provisions of this Part; or

(c)    this Part applies as if specified provisions were omitted, modified or varied as prescribed.

(2)    For the purpose of this section, the provisions of this Part include the definitions in the Act or regulations as they apply to references in this Part.

## 126. Offences.

(1)    Any person who contravenes a provision under this Part, other than under section 119, is guilty of an offence and shall be liable —

(a)    on summary conviction to a fine of $75,000, or to imprisonment for a term of one year, or to both;

(b)    on conviction upon information to a fine of $150,000, or to imprisonment for a term of two years or to both.

(2)    Any person who is guilty of an offence under this Part, other than under section 119, shall return any gains made or loss avoided from contravention of the sections, and if the court so directs, pay a penalty not to exceed twice the amount of such gains or loss avoided.

(3)    Any person who contravenes section 119 is guilty of an offence and shall be liable on conviction on information to a fine of $150,000 or to imprisonment for a term of two years or to both, and if the court so

directs, pay a penalty not to exceed twice the amount of the unlawful gains made or losses avoided by the person.

# PART XIV – REPORTING BY SECURITY HOLDERS OF PUBLIC ISSUERS

### 127. Application.

The provisions of this Part shall apply mutatis mutandis to partnerships, limited partnerships, trusts, joint ventures, syndicates, and other public issuers, as the case may be.

### 128. Initial insider report.

(1) An insider of a public issuer who —

    (a) owns or controls a security of the public issuer; or

    (b) owns or controls, or has entered into a transaction involving, a security the value of which is derived from or varies materially with the value or market price of a security of the public issuer,

must, within the prescribed time, file a report with the Commission in the prescribed form disclosing the insider's direct or indirect beneficial ownership or control of securities of the public issuer.

(2) No person is required to file a report under this section where the person does not beneficially own or control any securities of the public issuer.

(3) If an insider of a public issuer filed or was required to file a report under subsection (1) and —

    (a) there is a change in the insider's beneficial ownership or control of a security of the public issuer, or of a security the value of which is derived from, or varies materially with, the value or market price of a security of the public issuer;

    (b) the insider enters into a transaction involving a security of the public issuer or a security the value of which is derived from, or varies materially with, the value or market price of a security of the public issuer; or

    (c) there is a change in a transaction referred to in paragraph (b) or subsection (1)(b), or a change in the security involved in the transaction;

the insider must, within the prescribed time, file a report with the Commission in the prescribed form disclosing the change or transaction.

(4) Any person who files a report with the Commission under this section must immediately send a copy of that report to the public issuer.

(5)    For the purposes of this section, an insider shall be deemed to beneficially own securities that are beneficially owned by an affiliate or associate of that insider.

### 129. Disclosure of beneficial interest in share capital.

(1)    A public issuer may require any person that is a holder of its securities —

    (a)    to indicate in writing the capacity in which the person holds the securities of the public issuer; and

    (b)    if the person holds the securities otherwise than as beneficial owner, to indicate so far as it lies within the person's knowledge, any other person who has an interest in them, either by name and address or by other particulars sufficient to enable that other person to be identified, and the nature of that other person's interest.

(2)    Where a public issuer is informed, in response to a notice given under this section, that any other person has an interest in the securities of the public issuer, the public issuer may require that other person —

    (a)    to indicate the capacity in which that person holds that interest; and

    (b)    if that person holds it otherwise than as beneficial owner, to indicate so far as it lies within the person's knowledge, the person who has an interest in the issuer, either by name and address or by other particulars sufficient to enable that person to be identified, and the nature of that person's interest.

(3)    Any public issuer may require any holder of its securities to indicate whether any of the voting rights carried by any securities of the public issuer held by that person are the subject of an agreement or arrangement under which another person is entitled to control the exercise of the voting rights and, if so, to give, so far as it lies within the security holder's knowledge, particulars of the agreement or arrangement and the parties to it.

(4)    Where a public issuer is informed, in response to a notice given to any person under this section, that any other person is a party to an agreement or arrangement mentioned in subsection (3), the public issuer may require that other person to give, so far as it lies within that person's knowledge, particulars of the agreement or arrangement and the parties to it.

(5)    A public issuer shall keep a record of —

    (a)    each demand made under this section; and

    (b)    the information received in response to each demand.

(6)    The Commission may require that a public issuer deliver to the Commission a copy of the record kept by the public issuer under subsection (5).

(7)   All notices sent by a public issuer under this section may require that a response be returned within the period specified in the notice and, in all cases, this period shall be at least ten days after the date the notice was sent.

(8)   All notices and responses under this section shall be in writing.

### 130. Public issuer to keep register of its security holders.

A public issuer shall keep a register containing the prescribed information about its security holders.

### 131. Offence.

Any person who commits a breach of any section in this Part or, in complying with any section in this Part, makes a statement which the person knows to be false, or recklessly makes a statement which is false, or fails to supply any particulars which the person is required to supply, is guilty of an offence and shall be liable —

(a)   on summary conviction to a fine of $30,000 or to imprisonment for a term of six months, or to both;

(b)   on conviction on information to a fine of $75,000 or to imprisonment for a term of one year, or to both.

## PART XV – ENFORCEMENT

### 132. Compliance orders.

Without prejudice to any other action that may be instituted or taken against a person, if at any time it appears to the Commission that a person has failed to comply with any of the requirements under securities laws, the Commission may, by written notice, direct the person to comply with the requirement within such period and on such terms and conditions as the Commission may specify and the person shall comply with the notice.

### 133. Orders in the public interest.

(1)   If the Commission considers it in the public interest to do so, the Commission may, upon a settlement with the person or after a hearing —

(a)   order a person to comply with —

(i)   securities laws or a Commission decision, or

(ii)   the regulatory instruments or a decision of a person registered under Part V;

(b)    order a person, a class of persons or all persons to cease trading a security, a class of securities or all securities;

(c)    order that any or all of the exemptions in securities laws do not apply to a person;

(d)    prohibit a person from —

    (i)    acting as a partner, director or officer of another person;

    (ii)    acting as a registrant, or representative of a registrant;

    (iii)    acting as a party related to an investment fund;

    (iv)    acting as an auditor of a market participant;

    (v)    acting in a management or consultative capacity in connection with activities in the securities market; or

    (vi)    promoting the trading of a security or of securities generally;

(e)    issue a censure or reprimand;

(f)    impose conditions or restrictions on a registration, or suspend or revoke a registration;

(g)    restrict the trading or advising activities of a registrant or a person exempt from registration;

(h)    order a person to change a document;

(i)    order a person to publish information or a document;

(j)    order a person not to publish information or a document;

(k)    order a person that is a market participant to make changes to its practices and procedures;

(l)    appoint a person to advise a regulated person on the proper conduct of its affairs and to report to the Commission thereon;

(m)    appoint a person to assume control of a regulated person's affairs who shall, subject to necessary modifications, have all the powers of a person appointed as a receiver or manager of a business appointed under the law governing bankruptcy or winding up;

(n)    apply to the court for an order to take such action as it considers necessary to protect the interests of —

    (i)    clients or creditors of a registrant;

    (ii)    investors or creditors of an investment fund; or

    (iii)    investment funds administered by an investment fund administrator or creditors of an investment fund administrator;

(o)    apply to the court for an order that the person be wound up by the court;

(p)    order that a distribution of securities cease and that any subscription funds collected be repaid to subscribers;

(q)     order the disgorgement of profits or other unjust enrichment plus a penalty not to exceed twice the amount of such profits or unjust enrichment;

(r)     order restitution; or

(s)     impose any other sanctions or remedies as the justice of the case may require.

(2)    The Commission may make an order under subsection (1) (a) to (g) against a person, without a hearing, if the person —

(a)     has been convicted in any jurisdiction of a criminal offence arising from a transaction, business or course of conduct related to securities;

(b)     has been found by a court to have contravened the securities laws of any jurisdiction; or

(c)     has been found by an overseas regulatory authority to have contravened the securities laws of that jurisdiction.

(3)    If the Commission considers it necessary and in the public interest to do so, the Commission may, without providing an opportunity to be heard, make an order under subsection (1), other than an order under subsection (1)(h), (i) or (j), that is effective for not more than 15 days.

(4)    If the Commission considers it necessary and in the public interest to do so, the Commission may, without providing an opportunity to be heard, extend an order made under subsection (3) until the Commission makes a final decision after —

(a)     a hearing under subsection (1) is held; or

(b)     an opportunity to be heard under subsection (2) is provided.

(5)    If the Commission makes an order under this section, the Commission must send the order to each person named in the order.

(6)    If the Commission sends an order made under subsection (3) or (4), the Commission must send a notice of hearing, or a notice of opportunity to be heard, with the order.

(7)    A person appointed under subsection (1)(l) or (m) is appointed at the expense of the relevant regulated person and any expenses reasonably incurred by the Commission by virtue of the appointment is an amount due to the Commission payable by the regulated person.

(8)    A person appointed under subsection (1)(m) has all the powers necessary, to the exclusion of any other person, other than a liquidator or receiver, to administer the affairs of the relevant regulated person in the best interest of the clients, investors and creditors of the regulated person.

(9)    The powers referred to in subsection (8) include the power to terminate the business of the regulated person if it is judged to be insolvent.

(10)  A person appointed in respect of a regulated person under subsection (1) (l) or (m) shall —

    (a)  supply the Commission with such information in respect of the regulated person, when requested to do so by the Commission;

    (b)  within three months of the person's appointment, or within such other period as the Commission may specify, prepare and supply to the Commission a report on the affairs of the regulated person and where appropriate make recommendations in respect of the regulated person; and

    (c)  if the person's appointment is not terminated after supplying the report referred to in paragraph (b), subsequently supply to the Commission such other information, reports and recommendations as the Commission shall require.

(11)  If a person appointed under subsection (1)(l) or (m) —

    (a)  fails to comply with an obligation under subsection (10); or

    (b)  in the Commission's opinion, is not carrying out the person's obligations in respect of the relevant regulated person satisfactorily,

the Commission may revoke the appointment and appoint some other person in the person's place, and may assess the charges payable to such appointed person up to the date of the revocation of the appointment.

(12)  On receipt of any information or report pursuant to subsection (10) in respect of a regulated person, the Commission may —

    (a)  require the regulated person to reorganise its affairs in a manner specified by the Commission; or

    (b)  apply to the Court for an order to wind up, dissolve, liquidate or otherwise terminate, as appropriate, the regulated person upon such terms and conditions as the Court thinks fit;

    (c)  take such action in respect of the appointment or continued appointment of the person appointed under subsection (1)(l) or (m) as the Commission considers appropriate.

(13)  If the Commission takes action under subsection (12) it may —

    (a)  apply to the court for an order to take such other action as it considers necessary to protect the interests of the clients or creditors of, or investors in, the regulated person or

    (b)  take any other action provided for in subsection (1) or (2).

## 134. Application to court.

Notwithstanding any other provision, if the Commission considers it in the public interest to do so, the Commission may, at any time and without a hearing, apply to the court for an order to take any action as it considers necessary.

### 135. Administrative penalty.

(1) If the Commission considers it in the public interest to do so, the Commission may, upon a settlement or after a hearing, order a person that has breached any provision of securities laws to pay the Commission an administrative penalty of not more than $300,000 for each contravention.

(2) Any person in breach of any provision of a securities law solely by reason of failing to file with or deliver to the Commission a document within the required time period shall be subject to an automatic penalty of up to $1,000, or as prescribed, for every day from the day the document was required to be filed or delivered to the day the document was filed or delivered.

### 136. Removal of benefits.

If the Commission considers it in the public interest to do so, the Commission may, after a hearing, order a person to pay to the Commission any amount obtained, or payment or loss avoided, as a result of a contravention of securities laws, plus a penalty not to exceed twice the amount obtained or payment or loss avoided.

### 137. Payment of costs.

(1) The Commission shall order a person subject to a hearing to pay the costs of the Commission's investigation, the hearing and related costs.

(2) The Commission may grant an exemption regarding the payment of costs where the Commission considers it appropriate.

(3) For the purposes of this section, the costs that the Commission may order the person to pay include —

(a) costs incurred in respect of services provided by persons appointed or engaged under section 26 or subsection 42(2);

(b) costs of matters preliminary to the hearing;

(c) costs for time spent by the Commission or the staff of the Commission;

(d) any fee paid to and costs of a witness; and

(e) costs of legal services provided to the Commission.

### 138. Order to freeze property.

(1) If the Commission considers it in the public interest to do so, the Commission may, for the administration of securities laws or to assist in the administration of the securities legislation of another jurisdiction, by order for a period not to exceed five days, direct —

(a)    a person having on deposit, under control or for safekeeping any funds, securities or other property of the person named in the order to hold them; or

(b)    a person —

    (i)    not to withdraw any funds, securities or other property from any person having them on deposit, under control or for safekeeping; or

    (ii)    to hold all funds, securities or other property of a client of that person, or of others, in the person's possession or control in trust for a receiver, receiver-manager, trustee or liquidator appointed under an enactment of The Bahamas.

(2)    An aggrieved person may apply to a judge in chambers to discharge the order of the Commission under this section and shall serve notice on the Commission to join in the proceedings, but the Commission order shall remain in effect until the judge determines otherwise.

(3)    Unless expressly stated, an order made under subsection (1) does not apply to funds, securities or other property at a clearing facility, or to securities in the process of transfer by a transfer agent.

## 139. Hearings.

(1)    At a hearing the Commission shall provide a reasonable opportunity for each person directly affected to be heard and shall give reasonable notice to each such person and may give notice to any interested market participant, which notice shall include the prescribed information.

(2)    The Commission may —

(a)    issue a subpoena or other request or summons requiring a person to attend at a hearing, to testify to all matters relating to the subject of the hearing, and to produce all records relating to the subject of the hearing that are in the person's possession or under the person's control, whether they are located in or outside The Bahamas; and

(b)    compel a person to give evidence on oath orally or in writing.

(3)    Notwithstanding subsection (2), no persons giving evidence before the Commission shall be compelled to incriminate themselves, and every person shall be entitled to all privileges that a witness giving evidence before a court is entitled to in respect of the evidence given by the person to the Commission.

(4)    On application by the Commission to the court, a person summoned under subsection (1) is liable to be committed for contempt, as if in breach of an order or judgement of the court, if the person neglects or refuses to —

(a)    attend;

    (b)    give evidence; or

    (c)    produce a document in the custody, possession or control of the person.

(5)    A hearing under this section shall be open to the public unless the Commission directs otherwise.

(6)    A person who is entitled to notice of a hearing under subsection (1) may be represented by counsel and, subject to the procedural rules made by the Commission under this Act, may present evidence and argument and may cross-examine witnesses at the hearing.

(7)    Counsel may advise a witness at a hearing under subsection (1).

(8)    The Commission may admit as evidence any oral testimony or documentary exhibit that it considers relevant to the subject matter of the proceedings and may take notice of any fact that may be judicially noticed and of any generally recognised scientific or technical fact, information or opinion within its area of expertise.

(9)    The Commission shall make provision for all oral evidence presented at a hearing under subsection (1) to be transcribed.

(10)    The Commission shall —

    (a)    make a final decision in writing and state the findings of fact on which it is based and the reasons for it;

    (b)    send a copy of the final decision and reasons to each person given notice under subsection (1) and to each person who appeared at the hearing; and

    (c)    publish a copy of the final decision and reasons or a summary of the decision and reasons in a periodical published by the Commission, on its website or in a daily newspaper circulating in The Bahamas but the Commission may omit the name of an affected person from an decision so published.

## 140. Limitation periods.

No proceedings against any person for a breach of any of the provisions of securities laws, or for a failure to comply with any of their provisions, may be commenced after the expiration of six years from the day upon which the breach or non-compliance was or ought to have been discovered.

## 141. Directors and officers.

(1)    Notwithstanding any other provision of securities laws, where a person has been convicted of an offence under securities laws, any director or officer of the person who knowingly or recklessly authorised, permitted or

acquiesced in the offence is also guilty of the offence and liable to the penalty specified for it.

(2)    Reasonable reliance, including reliance on advice of counsel, an auditor or other expert, in good faith, is a defence in a proceeding under this section.

# PART XVI – CIVIL LIABILITY FOR MISREPRESENTATIONS

## 142. Interpretation

In this Part —

"**prospectus**" means a prospectus filed under section 84 or a foreign prospectus filed under section 93, together with any amendment those documents filed under Part IX.

## 143. Liability for misrepresentation in prospectus–damages.

(1)    Where a prospectus contains a misrepresentation, a purchaser who purchases a security offered by the prospectus during the distribution period has a right of action in damages against —

(a)    the issuer or the control block holder on whose behalf the distribution is made;

(b)    a person who is the chief executive officer, chief financial officer or a director of the issuer at the time the prospectus was filed;

(c)    a person who consented to be named in the prospectus as the chief executive officer, chief financial officer or director or as a proposed chief executive officer, chief financial officer or director of the issuer;

(d)    where the issuer is not a public issuer prior to the distribution, any person who was a promoter of the issuer within the prescribed period immediately preceding the date of filing of the prospectus;

(e)    a person whose consent has been filed as required by section 90 but only with respect to misrepresentations in a prospectus derived from or based on that expert's report; and

(f)    any other person who signed a certificate in the prospectus other than a person referred to in paragraphs (a) to (d).

(2)    No person, other than the issuer or the control block holder on whose behalf the distribution is made, is liable under subsection (1) —

(a)    who, having consented to become the chief executive officer, chief financial officer or a director of the issuer, withdrew the consent before the filing of the prospectus and the prospectus was filed without the person's authority or consent;

(b) who, when the prospectus was filed without the person's knowledge or consent, gave reasonable public notice of that fact immediately after becoming aware of it; or

(c) who, after the filing of the prospectus and before the sale of securities under it, became aware of a misrepresentation and withdrew the person's consent and gave reasonable public notice of the withdrawal of the consent and the reasons for it.

(3) No person is liable under subsection (1) —

(a) where the misrepresentation is contained in a part of the prospectus made on the authority of an expert or based on an expert's report, if the person had reasonable grounds to believe and did believe, up to the time the prospectus was filed, that —

  (i) there was no misrepresentation;

  (ii) the language in the prospectus fairly represented and was a correct and fair copy of, or extract from, the expert's report; and

  (iii) the expert making the statement or preparing the report, opinion, valuation —

    (A) was competent to make it;

    (B) had consented as required under section 90; and

    (C) had not withdrawn that consent; or

(b) where the misrepresentation is contained in what purports to be a statement made by a public official or a copy of, or extract from, a public official document, if the misrepresentation was a correct and fair representation of the statement or a copy of, or extract from, the document and the person had reasonable grounds for believing it to be true.

(4) The liability of all persons referred to in subsection (1) is joint and several as between themselves with respect to the same cause of action.

(5) A person who is found liable to pay a sum in damages may recover a contribution, in whole or in part, from a person who is jointly and severally liable under this section to make the same payment in the same cause of action unless, in all the circumstances of the case, a court is satisfied that it would not be just and equitable.

(6) Notwithstanding subsections (4) and (5), no underwriter is liable for more than the total public offering price represented by the portion of the distribution of securities underwritten, or sold by or to, the underwriter.

### 144. Action by security holders for rescission for misrepresentation in prospectus.

(1)   If a prospectus contains a misrepresentation, a purchaser of a security distributed under the prospectus has a right of action against the issuer, selling security holder or the underwriter that sold the securities to the purchaser under the prospectus for the rescission of the sale and the repayment to that purchaser of the price the person paid for that security.

(2)   If the purchaser elects to exercise a right of action for rescission against the issuer, selling security holder or underwriter under this section, such person shall have no right of action for damages against such issuer or underwriter under section 143.

(3)   The right of rescission also applies to securities sold under a prospectus that offers them for subscription in consideration of the transfer or surrender of other securities, whether with or without the payment of cash by or to the issuer, as though the issue price of the securities offered for subscription were the fair value, as ascertained by a court, of the securities to be transferred or surrendered, plus the amount of cash, if any, to be paid by the issuer.

### 145. Due diligence defence.

A person is not liable under section 143 for a misrepresentation in a prospectus if the person proves that the person —

(a)   made all inquiries that were reasonable in the circumstances; and

(b)   after doing so, believed on reasonable grounds that the statement was not a misrepresentation.

### 146. Commission may seek leave to bring action or appear or intervene in an action.

The Commission may apply to a court for leave to bring an action under this Part in the name and on behalf of an issuer or a security holder and the court may grant leave on any terms as to security for costs or otherwise that the court considers proper if it is satisfied that —

(a)   the Commission has reasonable grounds for believing that a cause of action exists under this Part;

(b)   the issuer or security holder has failed or is unable to commence an action; and

(c)   the Commission has given sixty days written notice to the issuer or security holder who has refused or failed to commence an action.

### 147. General.

(1) The rights of action for damages or rescission conferred by sections 143 and 144 shall be in addition to and without derogation from any other right the purchaser may have at law.

(2) In an action brought under section 143 or 144, the person bringing such action shall be deemed to have relied on the prospectus in making the investment decision and need not prove that the person was in fact influenced by the misrepresentation or that the person relied on the misrepresentation in purchasing the security.

(3) No person shall be liable under section 143 or 144 if the purchaser bringing the action knew of the misrepresentation at the time of the purchase.

(4) The amount recoverable under section 143 or 144 by a purchaser shall not exceed the aggregate price paid by that purchaser for the securities under the offering.

(5) In determining what constitutes reasonable investigation or reasonable grounds for belief for the purposes of this Part, the standard of reasonableness shall be that required of a prudent person in the circumstances of the particular case.

## PART XVII – GENERAL PROVISIONS

### 148. Regulations.

(1) The Minister may, after consultation with the Commission, make regulations necessary or expedient for carrying out the purposes of securities laws and giving effect to the functions and responsibilities of the Commission.

(2) Without limiting subsection (1), the Minister may make regulations —

   (a) regarding any matter in relation to which the Commission may make a rule;

   (b) specifying a provision of the regulations the contravention of which constitutes an offence;

   (c) governing the procedures that are to be followed by the Commission in making and repealing rules made by the Commission; and

   (d) repealing or amending a rule made by the Commission.

### 149. Rules.

(1)    In carrying out the purposes of securities laws and its functions and responsibilities under securities laws, the Commission may make rules providing for such matters as may be necessary or expedient for giving effect to such purposes, functions and responsibilities.

(2)    Rules may vary the provisions in securities laws generally or with respect to its application to —

    (a)    a person or class of persons;

    (b)    a security or class of securities; or

    (c)    a trade or class of trades.

### 150. Rule-making process.

(1)    The Commission shall publish, in a daily newspaper of general circulation in the Bahamas, in any regular periodical published by the Commission or on its website, at least sixty days before the proposed effective date thereof —

    (a)    a copy of any rule that it proposes to make; and

    (b)    a concise statement of the substance and purpose of the proposed rule.

(2)    After a proposed rule is published in accordance with subsection (1), the Commission shall give interested parties a reasonable opportunity to make written representations with respect to the proposed rule.

(3)    The Commission shall publish each final rule, with any amendments that the Commission deems appropriate to make as a result of the public comment process under this section, as prescribed on or before its effective date.

(4)    The Commission is not required to comply with subsections (1) and (2) if —

    (a)    all persons who will be subject to the rule are named and the information required by subsections (1)(a) and (b) is sent to each of them;

    (b)    the rule only grants an exemption or relieves a restriction and is not likely to have a substantial impact on the interests of persons other than those who benefit under it;

    (c)    the rule makes no material substantive change in an existing rule;

    (d)    the Commission for good cause finds that compliance with subsections (1) and (2) is impracticable or unnecessary and publishes the finding and a concise statement of the reasons for it; or

(e)    the Commission believes that there is an urgent need for the proposed rule and that the delay involved in complying with subsections (1) and (2) would be prejudicial to the public interest.

(5)    The Commission must give a copy of any final rule to the Minister without delay.

(6)    A rule, or any amendment to a rule, shall be effective if the Commission has provided the Minister with a copy of the rule or amendment and the Commission as not received an objection to the rule or amendment from the Minister within thirty days after the rule or amendment was delivered to the Minister.

(7)    Where the Minister objects to a rule or any amendment to a rule, the Commission shall be provided with notice in writing of the reasons for the objection.

(8)    A rule, or any amendment to a rule, shall be effective on the date it is published in the Gazette or such later date as may be specified in the rule or amendment.

(9)    If the Commission alters or revokes a rule, it must —

(a)    publish notice of the alteration or revocation; and

(b)    give written notice to the Minister without delay; and

(c)    include in such notices details of the alteration or revocation.

### 151. Regulation prevails over rule.

If a rule made by the Commission conflicts with a regulation made by the Minister, the regulation made by the Minister prevails.

### 152. Power to vary Commission rules.

If the Commission considers it not prejudicial to the public interest to do so, the Commission may by order vary a rule made under section 149 as it applies to a person, trade or security, or a class of persons, trades or securities.

### 153. Power to remove exemption contained in Commission rule.

If the Commission considers it in the public interest to do so, the Commission may order that an exemption in a rule made under section 149 does not apply to a person, trade or security, or a class of persons, trades or securities.

### 154. Guidelines.

The Commission may publish guidelines regarding any regulations or rules made pursuant to securities laws, or of any provisions of securities laws, provided however that such guidelines shall not be taken as having the force of law.

### 155. Administrative proceedings and reviews.

(1) Any person directly affected by a decision of the Executive Director or any employee exercising delegated authority from the Commission may, by notice in writing sent by registered mail to the Commission within thirty days after the mailing of the notice of the decision, request and be entitled to a hearing and review of that decision by the Commission.

(2) Upon a hearing and review, the Commission may by order confirm the decision under review or make such other decision as the Commission considers proper.

(3) Notwithstanding the fact that a person requests a hearing and review under subsection (2), the decision under review takes effect immediately but the Commission may grant a stay until disposition of the hearing and review.

### 156. Review of decisions of securities exchange etc.

(1) Any person who is aggrieved by any act or omission of a person registered under Part V may lodge a complaint in respect of that act or omission with the Commission.

(2) The Commission may investigate and adjudicate upon the complaint lodged under subsection (1).

(3) Sections 42 and 43 shall apply to any investigation conducted by the Commission under subsection (2).

(4) The Commission may, following receipt of a complaint made under subsection (1), make such order as it thinks just, including an order for the payment by the person registered under Part V of any sum by way of restitution or as compensation for any loss suffered by the complainant.

(5) Subject to subsection (6), the person who has lodged a complaint against a person registered under Part V shall, if the Commission proceeds to a judgement on the complaint, be precluded from pursuing the complaint or making it the basis of any suit, action or proceeding in any court of law.

(6) A person shall not be precluded under subsection (5) unless the person has, before the Commission proceeds to any hearing of and judgement upon the complaint, been informed in writing to that effect.

### 157. Appeals to court.

(1) A person directly affected by a final decision of the Commission, other than those stated not to be subject to appeal, may appeal to the Supreme Court in accordance with the rules of court within thirty days after the later of the making of the final decision or the issuing of the reasons for the final decision.

(2) Notwithstanding the fact that an appeal is taken under this section, the decision appealed from takes effect immediately but the Commission or the Supreme Court may grant a stay until disposition of the appeal.

(3) The Secretary shall certify to the Supreme Court —

    (a) the decision of the Commission, together with a statement of reasons for that decision;

    (b) the record of the proceedings before the Commission; and

    (c) all written submissions to the Commission or other material that is relevant to the appeal.

(4) The Minister is entitled to be heard by counsel or otherwise on the argument of an appeal under this section, whether or not the Minister is named as a party to the appeal.

(4) Where an appeal is taken under this section, the court may by its order direct the Commission to make such decision or to do such other act as the Commission is authorised and empowered to do under securities laws and as the court considers proper, having regard to the material and submissions before it and to securities laws, and the Commission shall make such decision or do such act accordingly.

(5) Despite an order of the court on an appeal, the Commission may make any further decision upon new material or where there is a significant change in the circumstances and every such decision is subject to this section.

## 158. Filing of documents and public availability.

(1) All documents or information required to be filed with, delivered to or provided to the Commission shall be submitted to the Commission in the prescribed manner.

(2) Subject to subsection (3), the Commission —

    (a) shall make all documents or information required to be filed with it available for public inspection; and

    (b) may make all documents or information filed with it available to the public by posting such documents to the Internet website of the Commission.

(3) The Commission may hold in confidence all or part of a document or information referred to in subsection (1) if it considers that —

    (a) a person whose information appears in the document or information would be unduly prejudiced by disclosure of the information; and

    (b) the person's privacy interest outweighs the public's interest in having the information disclosed.

(4) Where a document or information is not expressly required to be filed but is required to be delivered or provided to the Commission by securities

laws, the document or information shall not be disclosed under subsections (2) unless the Commission determines that such disclosure is in the public interest.

### 159. Verification.

The Commission may by notice in writing require the person furnishing any information to the Commission to verify, within a reasonable period as specified in the notice, the information by oath or affirmation.

### 160. Register as evidence.

Where it is provided in securities laws that a register be established and maintained or kept, or a book of accounts be kept, or a list be prepared or published, any entry in such register, book of account or list, or the production of any licence or certificate issued under securities laws, shall be prima facie evidence of the contents thereof.

### 161. Discretionary exemptions.

(1)   If the Commission considers it not prejudicial to the public interest to do so, the Commission may exempt a person, trade or security, or a class of persons, trades or securities, from a provision in Parts V, VI, VII, VIII, IX, X, XI, XII, XIII and XIV of this Act.

(2)   Exemptions granted under subsection (1) shall be published by the Commission on its website.

### 162. Designation orders.

(1)   If the Commission considers it not prejudicial to the public interest to do so, the Commission may, without providing an opportunity to be heard, order that —

(a)   an issuer, or an issuer within a class of issuers, is not a public issuer;

(b)   a person, or a person within a class of persons, is not a market participant or a marketplace; or

(c)   a right or obligation, or a right or obligation within a class of rights or obligations, is not a security.

(2)   If the Commission considers it in the public interest to do so, the Commission may, without providing an opportunity to be heard, order that —

(a)   an issuer, or an issuer within a class of issuers, is a public issuer; or

(b)   a person, or a person within a class of persons, is a market participant or a marketplace; or

(c)     a trade, or a trade within a class of trades, is a distribution.

## 163. Conditions on decisions.

The Commission may impose terms, conditions, requirements and restrictions in any decision it makes, as the Commission deems fit.

## 164. Discretion to revoke or vary decision.

The Commission may, at any time by notice in writing, vary any term, condition, requirement or restriction imposed in any Commission decision or may revoke a Commission decision as it deems fit.

## 165. Recognition of foreign jurisdictions and foreign securities exchanges.

For the purposes of securities laws, the Commission may, if it is in the public interest to do so, recognise a —

(a)     foreign jurisdiction, if the Commission is of the view that the jurisdiction meets the criteria prescribed; and

(b)     foreign securities exchanges established and operated in a recognised foreign jurisdiction, if the Commission is of the view that the securities exchange meets the criteria prescribed.

## 166. Commission to keep register.

(1)     The Commission shall maintain a register that shall contain the prescribed information about current and former regulated persons, public issuers and any other person required to be registered with or otherwise approved by the Commission under securities laws.

(2)     The Commission may make the register available to the public on the prescribed terms.

## 167. Stamp duty exemption.

Notwithstanding any provision of the Stamp Act (*Ch. 370*) or any other law to the contrary, stamp duty shall not be payable in respect of the transfer in The Bahamas of any securities listed on a registered securities exchange.

# PART XVIII – TRANSITION PROVISIONS AND REPEALS

## 168. Definitions.

In this Part —

"**effective date**" means the date when this Act comes into force;

"**relevant period**" means the period between the effective date and the transition date;

"**transition date**" means the day that is the first anniversary of the effective date.

## 169. Existing unregistered market participants.

A person who, immediately before the effective date, was carrying on securities business in or from The Bahamas and was not required to be registered, licensed or otherwise authorised under the former Act, shall be deemed not to be carrying on securities business without registration contrary to this Act by virtue of continuing to carry on that business —

    (a)    during the relevant period, or

    (b)    if the person applies for registration during the relevant period, on or from the effective date until the date that the application for registration is granted or refused by the Commission or is withdrawn by the applicant.

## 170. Securities exchanges registered under the former Act.

Every securities exchange registered with the Commission under the former Act is deemed to be registered as a securities exchange under section 58 of the Act with effect from the effective date.

## 171. Clearing facilities registered under the former Act.

Every clearing, settlement, depository and custody facility registered with the Commission under section 20 of the former Act is deemed to be registered as a clearing facility under section 58 of the Act with effect from the effective date.

## 172. Broker-dealers and securities investment advisors.

Every person or company registered with the Commission under the former Act as a broker-dealer or securities investment advisor is deemed to be registered under section 69 of the Act with effect from the effective date.

## 173. Registered individuals.

Every individual registered with the Commission under the former Act as a securities investment advisor, stockbroker, principal or associated person is deemed to be registered under subsection 69(4) of the Act as a representative with effect from the effective date.

## 174. Interim financial statement requirements for public issuers.

The obligations on a public issuer to prepare and file interim financial statements with the Commission under subsection 101(5) and to send interim financial

statements to the issuer's security holders under section 102 shall not take effect until the issuer's first financial year that begins after the transition date.

### 175. Insider reporting obligations.

The reporting obligations on insiders of public issuers under section 128 of the Act shall not take effect until the day that is ninety days after the effective date.

### 176. Savings.

Any authority, approval or exemption granted by the Commission under the former Act which is in force immediately before the effective date —

    (a)    shall be deemed to continue as if granted by the Commission under the Act; and

    (b)    in the case of a grant for a specific period, shall be deemed to remain in force for so much of that period as falls after the effective date.

### 177. Repeals.

    (1)    The Securities Industry Act *(Ch. 363)* is repealed.

    (2)    The enactments specified in the first column of the Third Schedule are repealed in the manner and to the extent indicated in the second column of that Schedule.

## FIRST SCHEDULE

### PART 1 – SECURITIES

**Shares**

1    Any of the following securities —

    (a)    shares and stock of any kind in the share capital of a company;

    (b)    interests in a limited partnership established under the Partnership Act *(Ch. 310)*;

    (c)    interests in an exempted limited partnership as defined in the Exempted Limited Partnership Act *(Ch. 312)*, as amended;

    (d)    interests in a limited partnership or an exempted limited partnership constituted under the laws of a jurisdiction other than The Bahamas; and

    (e)    equity interests in a regulated or unregulated investment fund as defined in the Investment Funds Act, 2003.

**Instruments creating or acknowledging indebtedness**

2.    Debentures, debenture stock, loan stock, bonds, certificates of deposit and any other instruments creating or acknowledging indebtedness other than —

    (a)    any instrument acknowledging or creating indebtedness for, or for money borrowed to defray, the consideration payable under a contract for the supply of goods or services;

    (b)    a cheque, promissory note or other bill of exchange under the Bills of Exchange Act *(Ch. 335)*;

    (c)    a bankers draft or a letter of credit;

    (d)    a bank note, a statement showing a balance in a current, deposit or savings account, a lease or other disposition of property;

    (e)    a contract of insurance;

    (f)    an instrument creating or acknowledging indebtedness and creating security for that indebtedness over land; and

    (g)    a debenture that specifically provides it is not transferable or negotiable.

**Instruments giving entitlements to securities**

3    Warrants and other instruments entitling the holder to subscribe for securities falling within section 1 or 2.

**Certificates representing certain securities**

4       Certificates or other instruments that confer contractual or proprietary rights —

    (a)    in respect of any security falling in sections 1, 2 or 3 being a security held by a person other than the person on whom the rights are conferred by the certificate or instrument; and

    (b)    the transfer of which may be effected without the consent of that person.

## Options

5       Options to acquire or dispose of —

    (a)    a security falling in any other section of this Part;

    (b)    any currency;

    (c)    any precious metal; or

    (d)    an option to acquire or dispose of a security falling within this section by virtue of subsection (a), (b) or (c) above.

## Futures

6       These are —

    (a)    Rights under a contract for the sale of a commodity or property of any other description under which delivery is to be made at a future date and at a price agreed upon when the contract is made, other than a contract made for commercial and not investment purposes.

    (b)    A contract is to be regarded as made for investment purposes if it is made or traded on a recognised securities exchange, or is made otherwise than on a recognised securities exchange but is expressed to be as traded on such an exchange or on the same terms as those on which an equivalent contract would be made on such an exchange.

    (c)    A contract not falling within paragraph (b) is to be regarded as made for commercial purposes if under the terms of the contract delivery is to be made within seven days.

    (d)    The following are indications that a contract not falling within paragraph (b) or (c) is made for commercial purposes and the absence of them is an indication that it is made for investment purposes —

        (i)    one or more of the parties is a producer of the commodity or other property or uses it in his business; or

        (ii)    the seller delivers or intends to deliver the property or the purchaser takes or intends to take delivery of it.

    (e)    It is an indication that a contract is made for commercial purposes that the prices, the lot, the delivery date or other terms are determined by the parties for the purposes of the particular contract

and not by reference, or not solely by reference, to regularly published prices, to standard lots or delivery dates or to standard terms.

(f)    The following are indications that a contract is made for investment purposes —

    (i)    it is expressed to be as traded on a securities exchange;

    (ii)    performance of the contract is ensured by a securities exchange or a clearing house; or

    (iii)    there are arrangements for the payment or provision of margin.

(g)    For the purposes of paragraph (a), a price is to be taken to be agreed on when a contract is made —

    (i)    notwithstanding that it is left to be determined by reference to the price at which a contract is to be entered into on a market or exchange or could be entered into at a time and place specified in the contact; or

    (ii)    in a case where the contract is expressed to be by reference to a standard lot and quality, notwithstanding that provision is made for a variation in the price to take account of any variation in quantity or quality on delivery.

## Contracts for differences

7.    These are —

(1)    Rights under —

    (a)    a contract for differences; or

    (b)    any other contract the purpose or pretended purpose of which is to secure a profit or avoid a loss by reference to fluctuations in —

        (i)    the value or price of property of any description; or

        (ii)    an index or other factor designated for that purpose in that contract.

(2)    Subsection (1) does not include rights under a contract —

    (a)    if the parties intend that the profit is to be secured or the loss is to be avoided by one or more of the parties taking delivery of any property to which the contract relates; or

    (b)    under which money is received by way of deposit on terms that any interest or other return to be paid on the sum deposited will be calculated by reference to fluctuations in an index or other factor.

## Rights and Interests in Securities

8       Rights to and interests in any security falling within any of the preceding sections of this Part.

## Foreign Exchange Contracts

9       A foreign exchange contract when carried out in connection with a transaction in securities that is not —

(a)     an option (currency options are covered by section 5) or

(b)     a contract to exchange one currency (whether Bahamian or not) for another that is to be settled immediately;

where "foreign exchange contract" means a contract —

(i)     to buy or sell currency (whether Bahamian or not); or

(ii)    to exchange one currency (whether Bahamian or not) for another (whether Bahamian or not).

## Prescribed Securities

10      Anything declared by the regulations or rules to be a security for the purposes of this Part.

### PART 2 - SECURITIES BUSINESS - REGULATED ACTIVITIES

The following activities are activities carried on in the course of securities business for the purposes of this Act —

## 1    Dealing in securities.

(a)     buying, selling, subscribing for or underwriting securities as an agent; or

(b)     buying, selling, subscribing for or underwriting securities as principal where the person entering into that transaction —

(i)     holds himself out as willing, as principal, to buy, sell or subscribe for securities of the kind to which the transaction relates at prices determined by him generally and continuously rather than in respect of each particular transaction;

(ii)    holds himself out as engaging in the business of underwriting securities of the kind to which the transaction relates; or

(iii)   regularly solicits members of the public with the purpose of inducing them, as principals or agents, to buy, sell, subscribe for or underwrite securities and such transaction is entered into as a result of such person having solicited members of the public in that manner;

(c)     For the purposes of this section, "members of the public" means any person other than a person —

      (i)     referred to in paragraphs 1 to 3 of Part 4;

      (ii)    regulated by the Commission;

      (iii)   regulated by a recognised overseas regulatory authority; or

      (iv)   as prescribed.

## 2    Arranging deals in securities.

Making arrangements with a view to —

      (a)    another person (whether as a principal or an agent) buying, selling, subscribing for or underwriting securities; or

      (b)    a person, who participates in the arrangements, buying, selling, subscribing for or underwriting securities.

## 3    Managing securities.

Managing securities belonging to another person in circumstances involving the exercise of discretion.

## 4    Advising on securities.

Advising a person on securities if the advice is —

      (a)    given to the person in his capacity as an investor or potential investor or in his capacity as agent for an investor or a potential investor; and

      (b)    advice on the merits of his doing any of the following (whether as principal or agent) —

           (i)    buying, selling, subscribing for or underwriting a particular security; or

           (ii)   exercising any right conferred by a security to buy, sell, subscribe for or underwrite a security.

### PART 3 – EXCLUDED ACTIVITIES

The activities specified in this Part are not considered securities business in the following circumstances —

## 1    Dealing in securities.

      (1)    Securities evidencing indebtedness —

Where a person as principal or agent buys, sells, subscribes for or underwrites securities and such securities create or acknowledge indebtedness in respect of any loan, credit, guarantee or other similar financial accommodation or assurance which such person or his principal has made, granted or provided.

(2)    Issuing, redeeming or repurchasing securities —

Where a company, partnership or trust issues, redeems or repurchases any of its securities falling within sections 1 to 3 of Part 1.

(3)    Risk management —

Where a person buys, sells, subscribes for or underwrites securities and —

(a)    the transaction relates to securities falling within section 5, 6(1), 7 or 9 of Part 1;

(b)    none of the parties to the transaction are individuals;

(c)    the sole or main purpose for which the person concerned enters into the transaction, either by itself or in combination with other such transactions, is to limit the extent to which a relevant business will be affected by any identifiable risk arising otherwise than as a result of the carrying on of any activities specified in Part 2 and which is not excluded by virtue of this Part; and

(d)    the relevant business is a business other than securities business carried on by —

(i)    the person entering into the transaction;

(ii)    a company within the same group of companies as such person; or

(iii)    another person who is or is proposing to become a participator in a joint enterprise with such person.

(4)    Disposal of goods or supply of services —

Where a person buys, sells, subscribes for or underwrites securities for the purposes of or in connection with the disposal of goods or supply of services or a related disposal or supply by a supplier to a customer and the supplier is acting —

(a)    as a principal; or

(b)    as an agent,

and the supplier does not hold himself out generally as engaging in the buying, selling, subscribing for or underwriting of securities and does not regularly solicit members of the public to buy, sell, subscribe for or underwrite securities.

(5)    Incidental activity —

Where a person buys, sells, subscribes for or underwrites securities in the course of carrying on any profession or business not otherwise constituting securities business and where such transaction is a necessary or incidental part of other services provided in the course of carrying on that profession or business and is not separately remunerated otherwise

than as part of any remuneration received in respect of such other services.

(6) Employee schemes —

Where an employer buys, sells, subscribes for or underwrites securities in connection with the operation of a share or pension scheme for the benefit of employees or former employees, or of their spouses, widows, widowers or children or step-children under the age of eighteen.

(7) Application of proprietary assets —

Where a company, partnership or trust, acting as principal and dealing only on its own behalf buys, sells or subscribes for securities by applying its proprietary assets, otherwise than as described in section 1 (b) of Part 2.

(8) Dealing in investment funds —

Where a person carries out those securities activities specified in section 1 of Part 2 solely with respect to securities described in section 1(e) of Part 1.

## 2 Arranging deals in securities.

(1) Arranging own deals —

Where a person makes arrangements relating to a transaction to which that person will himself be a party as principal or which will be entered into by that person as agent for one of the parties to the transaction.

(2) Incidental activities —

Where a person makes arrangements and such arrangements are made in the course of carrying on any profession or business not otherwise constituting securities business and where the making of the arrangements is a necessary or incidental part of other services provided in the course of carrying on that profession or business and is not separately remunerated otherwise than as part of any remuneration received in respect of such other services.

(3) Enabling parties to communicate —

Where a person makes arrangements to provide means by which one party to a transaction, or potential transaction, is able to communicate with other parties to the transaction or potential transaction.

(4) Arrangements in connection with securities evidencing indebtedness —

Where a person makes arrangements in respect of a transaction referred to in section 1(1).

(5) Provision of finance —

Where a person makes arrangements for the sole purpose of providing finance to enable a person, as principal or agent, to buy, sell, subscribe for or underwrite securities.

(6)    Introducing —

Where a person makes arrangements to introduce a person to another person and —

(a)    the person to whom introductions are to be made is a person referred to in Part 4; and

(b)    the introduction is made with a view to the provision of independent advice or the independent exercise of discretion in relation to securities generally or in relation to any class of securities to which the arrangements relate;

(7)    Arrangements for the issue of securities —

Where a person makes arrangements in respect of a transaction referred to in sections 1(1) and 1(7) of this Part.

(8)    Disposal of goods or supply of services —

Where a supplier makes arrangements made for, or with a view to, a transaction that is to be entered into by a customer for the purposes of or in connection with the disposal of goods or supply of services or a related disposal or supply.

(9)    Employee schemes —

Where a person makes arrangements in connection with the operation by an employer of a share or pension scheme for the benefit of employees or former employees, or of their spouse, widows, widowers or children or step-children under the age of eighteen.

(10)    Arranging deals in investment funds —

Where a person makes arrangements for, or with a view to, transactions in securities that are described in section 1(e) of Part 1.

## 3    Managing securities.

(1)    Disposal of goods or supply of services

Where a person manages securities that are or are to be managed for the purposes of or in connection with the disposal of goods or supply of services or a related disposal or supply by a supplier to a customer.

(2)    Managing investment funds

Where a person manages securities and —

(a)    is incorporated in The Bahamas; and

(b)     its sole securities business is the provision of management or advisory services to one or more investment funds licensed or registered by the Commission as a professional fund, SMART fund or standard fund as defined under and regulated by the Investment Funds Act, 2003.

## 4     Advising on securities.

(1)     Advising on investment funds

Where a person advises on securities and —

(a)     is incorporated in The Bahamas; and

(b)     its sole securities business is the provision of management or advisory services to one or more investment funds licensed or registered by the Commission as a professional fund, SMART fund or standard fund as defined under and regulated by the Investment Funds Act, 2003;

(2)     Disposal of goods or supply of services

Where a supplier gives advice to his customer for the purposes of or in connection with the disposal of goods or supply of services or a related disposal or supply.

(3)     Publications

Where a person gives advice in any communications media and —

(a)     the principal purpose of the publication, taken as a whole including the advertisements, is not to induce persons to buy, sell, subscribe for or underwrite particular securities; or

(b)     the person responsible does not derive any direct benefit from any such purchase, disposal, subscription or underwriting.

(4)     Incidental activities

Where a person gives legal, accounting or other advice and —

(a)     the securities related advice is given in the course of carrying on any profession or business not otherwise constituting securities business;

(b)      the giving of the advice is a necessary or incidental part of other services provided in the course of carrying on that profession or business; and

(3)     is not separately remunerated otherwise than as part of any remuneration received in respect of such other services.

### PART 4 - EXCLUDED PERSONS

The persons specified in this Part are not required to be registered under the Act in the following circumstances —

(1) A company carrying on securities business exclusively for one or more affiliated companies.

(2) A person participating in a joint enterprise (and, where that person is a company, any other affiliated company) with a person carrying on the securities business where the activities constituting such securities business are to be carried on for the purposes of or in connection with that joint enterprise. For the purposes of this paragraph "joint enterprise" means an enterprise into which two or more persons enter for commercial reasons related to a business or businesses, other than securities business, carried on by them.

(3) The following persons —

    (a) a registered marketplace;

    (b) the Commission;

    (c) the Government of The Bahamas;

    (d) the Central Bank of The Bahamas.

(4) A person carrying on securities business only in the course of acting in any of the following capacities —

    (a) director;

    (b) partner;

    (c) liquidator, including a provisional liquidator;

    (d) trustee in bankruptcy;

    (e) receiver of an estate or company;

    (f) executor or administrator of an estate; or

    (g) a trustee acting together with co-trustees in their capacity as such, or acting for a beneficiary under the trust;

Provided that in each case such person —

    (i) is not separately remunerated for any of the activities which constitute the carrying on of securities business otherwise than as part of any remuneration the person receives for acting in that capacity; and

    (ii) does not hold himself out as carrying on securities business other than as a necessary or incidental part of performing functions in that capacity, or

    (iii) is acting on behalf of a company, partnership or trust that is otherwise registered or exempted from registration under this Act.

## SECOND SCHEDULE

## THE COMMISSION

### 1.  Body corporate.

(1)   The Commission is a body corporate having perpetual succession and a common seal, with power to purchase, lease or otherwise acquire and hold and dispose of land and other property of whatsoever kind.

(2)   The Commission may sue and be sued in its corporate name and may for all purposes be described by such name, and service upon the Commission of any document of whatsoever kind must be made by delivering the document to, or sending it by registered post addressed to, the secretary of the Commission at the office of the Commission.

### 2.  Custody and affixing of seal etc.

(1)   The seal of the Commission must be kept in the custody of any officer of the Commission as the Commission may approve, and may be affixed to instruments pursuant to a resolution of the Commission and in the presence of the chairman or the deputy chairman and one other member.

(2)   The seal of the Commission must be authenticated by the signature of the chairman or deputy chairman and another member, and the seal shall be officially and judicially noticed.

(3)   All documents, other than those required by law to be under seal, made by, and all decisions of the Commission may be signified under the hand of the chairman or deputy chairman.

### 3.  Tax liability of Commission.

Nothing in this Act shall exempt the Commission from liability for any tax, duty, rate, levy or other charge whatsoever.

**THIRD SCHEDULE (Section 177)**

**REPEALS**

**SHORT TITLE**            **EXTENT OF AMENDMENT**

Investment Funds Act *(Ch. 369A)*    (a)    in section 2, repeal the definitions given for "Commission", "Executive Director" and in part (b) of "professional fund", respectively, and replace with the following —

"**"Commission"** means the Securities Commission of The Bahamas;

**"Executive Director"** means the person

appointed as such under the Securities Industry Act, 2010;

**"professional fund"** means...

(b)    any firm registered under Part VI of the Securities Industry Act, 2010 which maintains a minimum capital of $120,000 dollars of regulatory capital or is registered or licensed to carry on equivalent securities activities in a prescribed jurisdiction;";

(b)    repeal the whole of Parts VI; Part VII and IX respectively.

**MULTILATERAL MEMORANDUM OF UNDERSTANDING**

**CONCERNING CONSULTATION AND COOPERATION**

**AND THE EXCHANGE OF INFORMATION**



**INTERNATIONAL ORGANIZATION OF SECURITIES COMMISSIONS**

**MAY 2002 [version revised May 2012]**

## PURPOSE

The signatories to this IOSCO Multilateral Memorandum of Understanding:

Considering the increasing international activity in the securities and derivatives markets, and the corresponding need for mutual cooperation and consultation among IOSCO Members to ensure compliance with, and enforcement of, their securities and derivatives laws and regulations;

Considering the events of September 11, 2001, which underscore the importance of expanding cooperation among IOSCO Members;

Desiring to provide one another with the fullest mutual assistance possible to facilitate the performance of the functions with which they are entrusted within their respective jurisdictions to enforce or secure compliance with their laws and regulations as those terms are defined herein,

Have reached the following understanding:

## DEFINITIONS

For the purposes of this IOSCO Multilateral Memorandum of Understanding:

1.    "Authority" means those regulators listed in Appendix A, who, in accordance with the procedures set forth in Appendix B, have signed this Memorandum of Understanding.

2.    "Requested Authority" means an Authority to whom a request for assistance is made under this Memorandum of Understanding.

3.    "Requesting Authority" means an Authority making a request for assistance under this Memorandum of Understanding.

4.    "Laws and Regulations" mean the provisions of the laws of the jurisdictions of the Authorities, the regulations promulgated thereunder, and other regulatory requirements that fall within the competence of the Authorities, concerning the following:

a. insider dealing, market manipulation, misrepresentation of material information and other fraudulent or manipulative practices relating to securities and  derivatives, including solicitation practices, handling of investor funds and customer orders;
b. the registration, issuance, offer, or sale of securities and derivatives, and reporting requirements related thereto;
c. market intermediaries, including investment and trading advisers who are required to be licensed or registered, collective investment schemes, brokers, dealers, and transfer agents; and
d. markets, exchanges, and clearing and settlement entities.

    version revised May 2012

5.   "Person" means a natural or legal person, or unincorporated entity or association, including corporations and partnerships.


**MUTUAL ASSISTANCE AND THE EXCHANGE OF INFORMATION**

6.   **General Principles regarding Mutual Assistance and the Exchange of Information**

(a)   This Memorandum of Understanding sets forth the Authorities' intent with regard to mutual assistance and the exchange of information for the purpose of enforcing and securing compliance with the respective Laws and Regulations of the jurisdictions of the Authorities. The provisions of this Memorandum of Understanding are not intended to create legally binding obligations or supersede domestic laws.

(b)   The Authorities represent that no domestic secrecy or blocking laws or regulations should prevent the collection or provision of the information set forth in 7(b) to the Requesting Authority.

(c)   This Memorandum of Understanding does not authorize or prohibit an Authority from taking measures other than those identified herein to obtain information necessary to ensure enforcement of, or compliance with, the Laws and Regulations applicable in its jurisdiction.

(d)   This Memorandum of Understanding does not confer upon any Person not an Authority, the right or ability, directly or indirectly to obtain, suppress or exclude any information or to challenge the execution of a request for assistance under this Memorandum of Understanding.

(e)   The Authorities recognize the importance and desirability of providing mutual assistance and exchanging information for the purpose of enforcing, and securing compliance with, the Laws and Regulations applicable in their respective jurisdictions.  A request for assistance may be denied by the Requested Authority:

(i)   where the request would require the Requested Authority to act in a manner that would violate domestic law;

(ii)   where a criminal proceeding has already been initiated in the jurisdiction of the Requested Authority based upon the same facts and against the same Persons, or the same Persons have already been the subject of final punitive sanctions on the same charges by the competent authorities of the jurisdiction of the Requested Authority, unless the Requesting Authority can demonstrate that the relief or sanctions sought in any proceedings initiated by

      version revised May 2012

the Requesting Authority would not be of the same nature or duplicative of any relief or sanctions obtained in the jurisdiction of the Requested Authority.

(iii) where the request is not made in accordance with the provisions of this Memorandum of Understanding; or

(iv) on grounds of public interest or essential national interest.

Where a request for assistance is denied, or where assistance is not available under domestic law, the Requested Authority will provide the reasons for not granting the assistance and consult pursuant to paragraph 12.

7.    **Scope of Assistance**

(a)    The Authorities will, within the framework of this Memorandum of Understanding, provide each other with the fullest assistance permissible to secure compliance with the respective Laws and Regulations of the Authorities.

(b)    The assistance available under this Memorandum of Understanding includes, without limitation:

(i)  providing information and documents held in the files of the Requested Authority regarding the matters set forth in the request for assistance;

(ii) obtaining information and documents regarding the matters set forth in the request for assistance, including:
- contemporaneous records sufficient to reconstruct all securities and derivatives transactions, including records of all funds and assets transferred into and out of bank and brokerage accounts relating to these transactions;
- records that identify: the beneficial owner and controller, and for each transaction, the account holder; the amount purchased or sold; the time of the transaction; the price of the transaction; and the individual and the bank or broker and brokerage house that handled the transaction; and
- information identifying persons who beneficially own or control non-natural Persons organized in the jurisdiction of the Requested Authority.

(iii) In accordance with Paragraph 9(d), taking or compelling a Person's statement, or, where permissible, testimony under

oath, regarding the matters set forth in the request for assistance.

(c)    Assistance will not be denied based on the fact that the type of conduct under investigation would not be a violation of the Laws and Regulations of the Requested Authority.

## 8.    Requests For Assistance

(a)    Requests for assistance will be made in writing, in such form as may be agreed by IOSCO from time to time, and will be addressed to the Requested Authority's contact office listed in Appendix A.

(b)    Requests for assistance will include the following:

(i) a description of the facts underlying the investigation that are the subject of the request, and the purpose for which the assistance is sought;

(ii) a description of the assistance sought by the Requesting Authority and why the information sought will be of assistance;

(iii) any information known to, or in the possession of, the Requesting Authority that might assist the Requested Authority in identifying either the Persons believed to possess the information or documents sought or the places where such information may be obtained;

(iv) an indication of any special precautions that should be taken in collecting the information due to investigatory considerations, including the sensitivity of the information; and

(v) the Laws and Regulations that may have been violated and that relate to the subject matter of the request.

(c)    In urgent circumstances, requests for assistance may be effected by telephone or facsimile, provided such communication is confirmed through an original, signed document.

## 9.    Execution of Requests for Assistance

(a)    Information and documents held in the files of the Requested Authority will be provided to the Requesting Authority upon request.

version revised May 2012

(b)     Upon request, the Requested Authority will require the production of documents identified in 7(b)(ii) from (i) any Person designated by the Requesting Authority, or (ii) any other Person who may possess the requested information or documents.  Upon request, the Requested Authority will obtain other information relevant to the request.

(c)     Upon request, the Requested Authority will seek responses to questions and/or a statement (or where permissible, testimony under oath) from any Person involved, directly or indirectly, in the activities that are the subject matter of the request for assistance or who is in possession of information that may assist in the execution of the request.

(d)     Unless otherwise arranged by the Authorities, information and documents requested under this Memorandum of Understanding will be gathered in accordance with the procedures applicable in the jurisdiction of the Requested Authority and by persons designated by the Requested Authority.  Where permissible under the Laws and Regulations of the jurisdiction of the Requested Authority, a representative of the Requesting Authority may be present at the taking of statements and testimony and may provide, to a designated representative of the Requested Authority, specific questions to be asked of any witness.

(e)     In urgent circumstances, the response to requests for assistance may be effected by telephone or facsimile, provided such communication is confirmed through an original, signed document.

## 10.     Permissible Uses of Information

(a)     The Requesting Authority may use non-public information and non-public documents furnished in response to a request for assistance under this Memorandum of Understanding solely for:

(i) the purposes set forth in the request for assistance, including ensuring compliance with the Laws and Regulations related to the request; and

(ii) a purpose within the general framework of the use stated in the request for assistance, including conducting a civil or administrative enforcement proceeding, assisting in a self-regulatory organization's surveillance or enforcement activities (insofar as it is involved in the supervision of trading or conduct that is the subject of the request), assisting in a criminal prosecution, or conducting any investigation for any general charge applicable to the

> violation of the provision specified in the request where such general charge pertains to a violation of the Laws and Regulations administered by the Requesting Authority. This use may include enforcement proceedings which are public.

(b)    If a Requesting Authority intends to use information furnished under this Memorandum of Understanding for any purpose other than those stated in Paragraph 10(a), it must obtain the consent of the Requested Authority.

## 11.    Confidentiality

(a)    Each Authority will keep confidential requests made under this Memorandum of Understanding, the contents of such requests, and any matters arising under this Memorandum of Understanding, including consultations between or among the Authorities, and unsolicited assistance. After consultation with the Requesting Authority, the Requested Authority may disclose the fact that the Requesting Authority has made the request if such disclosure is required to carry out the request.

(b)    The Requesting Authority will not disclose non-public documents and information received under this Memorandum of Understanding, except as contemplated by paragraph 10(a) or in response to a legally enforceable demand. In the event of a legally enforceable demand, the Requesting Authority will notify the Requested Authority prior to complying with the demand, and will assert such appropriate legal exemptions or privileges with respect to such information as may be available. The Requesting Authority will use its best efforts to protect the confidentiality of non-public documents and information received under this Memorandum of Understanding.

(c)    Prior to providing information to a self-regulatory organization in accordance with paragraph 10(a)(ii), the Requesting Authority will ensure that the self-regulatory organization is able and will comply on an ongoing basis with the confidentiality provisions set forth in paragraphs 11(a) and (b) of this Memorandum of Understanding, and that the information will be used only in accordance with paragraph 10(a) of this Memorandum of Understanding, and will not be used for competitive advantage.

## 12.    Consultation Regarding Mutual Assistance and the Exchange of Information

(a)    The Authorities will consult periodically with each other regarding this Memorandum of Understanding about matters

of common concern with a view to improving its operation and resolving any issues that may arise. In particular, the Authorities will consult in the event of:

(i)   a significant change in market or business conditions or in legislation where such change is relevant to the operation of this Memorandum of Understanding;

(ii)  a demonstrated change in the willingness or ability of an Authority to meet the provisions of this Memorandum of Understanding; and

(iii) any other circumstance that makes it necessary or appropriate to consult, amend or extend this Memorandum of Understanding in order to achieve its purposes.

(b)   The Requesting Authority and Requested Authority will consult with one another in matters relating to specific requests made pursuant to this Memorandum of Understanding (e.g., where a request may be denied, or if it appears that responding to a request will involve a substantial cost). These Authorities will define the terms herein in accordance with the relevant laws of the jurisdiction of the Requesting Authority unless such definition would require the Requested Authority to exceed its legal authority or otherwise be prohibited by the laws applicable in the jurisdiction of the Requested Authority.  In such case, the Requesting and Requested Authorities will consult.

### 13.   Unsolicited Assistance

Each Authority will make all reasonable efforts to provide, without prior request, the other Authorities with any information that it considers is likely to be of assistance to those other Authorities in securing compliance with Laws and Regulations applicable in their jurisdiction.

## FINAL PROVISIONS

### 14.   Additional Authorities

Additional IOSCO members may become Authorities under this Memorandum of Understanding in accordance with the procedures set forth in Appendix B.  New Authorities may be added under this Memorandum of Understanding by signing Appendix A.

version revised May 2012

15.   **Effective Date**

Cooperation in accordance with this Memorandum of Understanding will begin on the date of its signing by the Authorities. The Memorandum of Understanding will be effective as to additional Authorities as of the date of that Authority's signing of Appendix A.

16.   **Termination**

(a)    An Authority may terminate its participation in this Memorandum of Understanding at any time by giving at least 30 days prior written notice to each other Authority.

(b)    If, in accordance with the procedures set forth in Appendix B, the Chairmen of the IOSCO Board, the Emerging Markets and the Monitoring Group (the "Committee of Chairmen") determine, following notice and opportunity to be heard, that there has been a demonstrated change in the willingness or ability of an Authority to meet the provisions of this Memorandum of Understanding, as set forth in paragraph 12(a)(ii), the Committee of Chairmen may, after consultation with the Chairman of the relevant Regional Committee, terminate that Authority's participation in this Memorandum of Understanding, subject to a possible review by the IOSCO Board.

(c)    In the event that an Authority decides to terminate its participation in this Memorandum of Understanding, cooperation and assistance in accordance with this Memorandum of Understanding will continue until the expiration of 30 days after that Authority gives written notice to the other Authorities of its intention to discontinue cooperation and assistance hereunder.  If any Authority gives a termination notice, cooperation and assistance in accordance with this Memorandum of Understanding will continue with respect to all requests for assistance that were made, or information provided, before the effective date of notification (as indicated in the notice but no earlier than the date the notice is sent) until the Requesting Authority terminates the matter for which assistance was requested.

(d)    In the event of the termination of an Authority's participation in the Memorandum of Understanding, whether under the provisions of 16(a) or 16(b), information obtained under this Memorandum of Understanding will continue to be treated confidentially in the manner prescribed under Article 11 and cooperation under this Memorandum of Understanding will continue among the other Authorities.

 version revised May 2012

## APPENDIX A

## IOSCO MMoU: List of Current Signatories

http://www.iosco.org/about/?subSection=mmou&subSection1=signatories

## APPENDIX B

# Procedures Under the Multilateral Memorandum of Understanding Concerning Consultation and Cooperation and the Exchange of Information

### I. Application to Become a Signatory to the MOU

(a) All governmental regulatory bodies that are Ordinary or Associate Members of IOSCO are eligible to apply to participate in the MOU at any time. Applications should be submitted to the IOSCO Secretary General.

(b) All applicants must provide a complete response to the questionnaire, which is included in Part IV of this Appendix B, and provide copies of their supporting laws, rules and regulations as indicated in the questionnaire. Responses should identify and explain the applicant's legal authority to meet the specific MOU provisions cited in the questionnaire, which are essential to mutual assistance and the exchange of information in order to successfully enforce securities and derivatives laws.

(c) Responses to the questionnaire will be verified by the Screening Group with administrative support provided by the Secretary General. The screening group will establish verification teams that include members with substantial expertise in enforcement of securities and derivatives laws, as well as expertise in cross border information sharing. The screening group has discretion to invite other IOSCO members to participate in the verification teams.

(d) The verification of the questionnaire responses will be limited to verification that the responses accurately reflect the legal authority of members to comply with the specific MOU provisions cited in the questionnaire based on the laws, rules and regulations cited in the responses. Based on their review of the questionnaire responses, the verification teams will make specific recommendations to the screening group concerning the ability of the applicant to comply with each MOU provision cited in the questionnaire.

(e) The screening group will make recommendations concerning its verification of applicant responses to a decision making group. Prior to making any negative recommendation on an application, the screening group will notify the applicant in writing, identifying the specific MOU provisions for which the applicant lacks legal authority. The applicant will have an opportunity, upon request, to be heard by the screening group.

(f) The decision-making group will be comprised of the Chairmen of the IOSCO Board, the Emerging Markets Committee, and the Monitoring Group ("Committee of Chairmen"). Together, this decision-making group, after consultation with the Chairman of the relevant Regional Committee, will decide whether to accept or reject applications to become an MOU signatory based on the screening group's recommendations. Prior to making any negative decision, the decision making group will notify the applicant in writing, identifying the specific MOU provisions for which the applicant lacks legal authority. The applicant will have an opportunity, upon request, to be heard by the decision-making group.

version revised May 2012

(g) Upon a decision by the decision-making group of the applicant's legal authority to meet the MOU provisions cited in the questionnaire, as described in I(f) above, the applicant will be invited by IOSCO to be a signatory.  Appendix A will contain the names and signatures of all Authorities to the MOU and will be maintained and updated by the IOSCO Secretary General. The responses of applicants that are so invited to be signatories will be posted on the IOSCO members-only website.

(h) Decisions of the Committee of Chairmen shall be made under the authority of the IOSCO Board.  However, an applicant dissatisfied with the decision of the Committee of Chairmen may, by written notice to the Secretary General, request that the decision be reviewed by the IOSCO Board.  Such request will be referred by the Secretary General to the next meeting of the IOSCO Board to be held at least thirty days following receipt of the request and shall be accompanied by such material and be dealt with under such procedures as the IOSCO Board may from time to time decide.  The IOSCO Board may confirm the original decision of the Committee of Chairmen or may substitute a new decision or otherwise deal with the request as it considers fit.

(i) An applicant notified of a negative decision pursuant to I(f) and I(h) above, may re-apply to become a signatory, in accordance with the procedures in Part II(e)-(g) below, once it obtains the legal authority that IOSCO has determined is lacking.


## II. Commitment to Become a Signatory

(a) Members that do not have the legal authority to meet all the MOU provisions cited in the questionnaire, may nonetheless complete the questionnaire, and voluntarily express in their responses, where appropriate, that they are committed to seeking the legal authority necessary to enable them to do so.

(b) All completed questionnaires will be reviewed in the same manner set forth in I(c) and (d) above. Such review will be limited to verification that the laws, rules, and regulations submitted support the member's legal authority to meet the MOU provisions cited in the questionnaire.

(c) The screening group will notify the members in writing of the specific MOU provisions for which the member lacks legal authority.

(d) Members that complete the questionnaire as provided for in Part II(a) above or that receive notification of a negative decision as provided for in Part I(f) above, may express to IOSCO their commitment to obtain the legal authority to meet all the MOU provisions cited in the questionnaire.  Such members will be listed in an attachment to this Appendix B.  This list will be maintained and updated by IOSCO's Secretary General. The responses of such members, with their consent, will be posted on the IOSCO members-only website.

(e) After obtaining the legal authority identified as lacking during the verification process, a member may apply to become a signatory to the MOU by: (1) submitting an updated response to the questionnaire identifying changes to the legal authority previously identified as lacking; and (2) confirming the continued accuracy of all other information previously submitted in response to the questionnaire.

version revised May 2012

(f) The legal authority submitted in accordance with II(e)(1) will be verified in accordance with the procedures referenced in I(c) to I(g).

(g) Upon verification of the legal authority submitted in accordance with II(e)(1), an applicant will be invited by IOSCO to be a signatory and to sign Appendix A of the MOU. The updated responses of such applicants will be posted on the IOSCO members-only website.

### III. Monitoring of the Operation of the MOU

(a) In order to ensure the effective monitoring of the operation of the MOU, signatories will update as appropriate their responses posted on the IOSCO members-only website.

(b) The MOU provides, in paragraph 12(a), for periodic consultation about certain significant, enumerated matters of common concern to the MOU signatories with a view to improving operation of the MOU. Such consultations will be conducted by the MOU signatories ("monitoring group"), with administrative support provided by the Secretary General. The monitoring group may establish procedures, in consultation with the IOSCO Board, to facilitate their periodic consultations. Such procedures will include written notice to signatories of the issues to be considered during consultations, and an opportunity to be heard and respond. The monitoring group may obtain the assistance of other IOSCO bodies in performing its consultation and recommendation functions.

(c) The monitoring group has discretion to consider and recommend a range of possible options to encourage compliance in the event that a signatory demonstrates a change in its willingness or ability to meet the standards of the MOU provisions. The options might include: providing a period of time for the signatory to comply; full peer review of a signatory that may not be in compliance; public notice of non-compliance; suspension of a signatory from MOU participation; or termination from MOU participation as provided in the MOU (section 16(b)).

(d) If further action is necessary as a result of such consultations, the monitoring group will forward recommendations to the decision-making group comprised of the Chairmen of the IOSCO Board, the Emerging Markets Committee, and the Monitoring Group (as defined in I(f) above). The decision-making group will consider the monitoring group's recommendations and, where appropriate, take action.

(e) If the IOSCO decision-making group determines, following notice and an opportunity to be heard, that there has been a demonstrated change in the willingness or ability of a signatory to meet the provisions of the MOU, as provided in paragraph 12(a)(ii) of the MOU, the decision-making group will notify the signatory of the determination and provide the signatory with a written explanation of the determination. The decision-making group will establish procedures to provide the signatory with an opportunity, upon request, to be heard and seek review of the determination. Upon a final determination, the decision-making group may take action to encourage the signatory's compliance with the MOU, or where appropriate, the decision-making group may terminate the signatory's participation in the MOU as provided in paragraph 16(b) of the MOU.

version revised May 2012

(f) Decisions of the decision-making group shall be made under the authority of the IOSCO Board.  In case of a decision of termination, if dissatisfied with the decision of the decision-making group, the member who is the subject of that decision may, by written notice to the Secretary General, request that the decision be reviewed by the IOSCO Board.  Such request will be referred by the Secretary General to the next meeting of the IOSCO Board to be held at least thirty days following receipt of the request and shall be accompanied by such material and be dealt with under such procedures as the IOSCO Board may from time to time decide.  The IOSCO Board may confirm the original decision of the decision-making group or may substitute a new decision or otherwise deal with the request as it considers fit.

(g) Any decision involving an amendment to the MOU requires a unanimous recommendation from the signatories to the MOU.

## IV. Questionnaire

GENERAL INSTRUCTIONS:

The responses and the accompanying material (including laws, rules and regulations) should be provided in one of the four official languages of IOSCO (English, French, Spanish or Portuguese).

The following questions ask for information indicating your ability to comply with the provisions of the IOSCO Multilateral Memorandum of Understanding cited below.  Please provide a complete response to each question, and copies of the laws, rules and regulations that support each response.

Responses to the questionnaire should be sent to the IOSCO Secretary General.

Completed questionnaires will be reviewed by in a manner authorized by IOSCO.

version revised May 2012

QUESTIONS:

1. Please identify and explain the general or specific provisions of your laws, rules and regulations (and provide copies of these provisions) that enable you, or a separate governmental body in your jurisdiction, to obtain:

    (a) contemporaneous records sufficient to reconstruct all securities and derivatives transactions, including records of all funds and assets transferred into and out of bank and brokerage accounts relating to those transactions; *(as required by Paragraph 7(b)(ii) of the MOU)*

    (b) records for securities and derivatives transactions that identify:
        (1) the client:
            i.  name of the account holder; and
            ii. person authorized to transact business;
        (2) the amount purchased or sold;
        (3) the time of the transaction;
        (4) the price of the transaction; and
        (5) the individual and the bank or broker and brokerage house that handled the transaction.
        *(as required by Paragraph 7(b)(ii) of the MOU)*

    (c) information located in your jurisdiction identifying persons who beneficially own or control non-natural persons organized in your jurisdiction. *(as required by Paragraph 7(b)(ii) of the MOU)*

2. Please identify and explain the general or specific provisions of your laws, rules and regulations (and provide copies of these provisions) that enable you, or a separate governmental body in your jurisdiction, to take or compel a person's statement, or, where permissible, testimony under oath. (*as required by Paragraph 7(b)(iii) of the MOU*)

3. Please identify and explain the general or specific provisions of your laws, rules and regulations (and provide copies of these provisions) that enable you to provide to foreign authorities:

    (a) the information identified in 1(a) above;

    (b) the information identified in 1(b) above;

    (c) the information identified in 1(c) above;

    (d) the information obtained through the powers described in 2 above;  and

    (e) information  and documents held in your files.
        *(as required by Paragraph 7(b)(i) of the MOU)*

4. Please identify and explain the general or specific provisions of your laws, rules and regulations (and provide copies of these provisions) that enable you to provide the information and documents referenced in 3 above to foreign authorities in response to requests concerning the following:

(a) insider dealing, market manipulation, misrepresentation of material information and other fraudulent or manipulative practices relating to securities and  derivatives, including solicitation practices, handling of investor funds and customer orders;

(b) the registration, issuance, offer, or sale of securities and derivatives, and reporting requirements related thereto;

(c) market intermediaries, including investment and trading advisers who are required to be licensed or registered, collective investment schemes, brokers, dealers, and transfer agents; and

(d) markets, exchanges, and clearing and settlement entities.
*(as required by Paragraph 7 of the MOU)*

5.  Please identify and explain the general or specific provisions of your laws, rules and regulations (and provide copies of these provisions) that enable you to provide assistance referenced in 4 above to a foreign authority, regardless of whether you have an independent interest in the matter.
*(as required by Paragraph 7 of the MOU)*

6.  Please identify and explain the general or specific provisions of your laws, rules and regulations (and provide copies of these provisions) that require maintenance of the following information and documents (including the period of time for which such information or documents are required to be maintained):

(a) information identified in 1(a) above;

(b) information identified in 1(b) above; and

(c) information identified in 1(c) above.
*(as required by Paragraph 7 of the MOU)*

7.  Please identify and explain (and provide copies of) any domestic secrecy or blocking laws, rules and regulations that relate to the collection for, or provision to, foreign authorities of:

(a) the information identified in 1(a) above;

(b) the information identified in 1(b) above;

(c) the information identified in 1(c) above;

(d) the information identified in 2 above; and

(e) the information identified in 3(e) above.
*(As required by Paragraph 6(b)of the MOU)*

8. Please identify and explain (and provide copies of) any specific or general provisions of your laws, rules and regulations which restrict or limit the following uses by foreign authorities of information and documents identified above in 1(a)-(c), 2 and 3(e) provided by you:

    (a) for the purpose of ensuring compliance with (including investigation of potential violations of) laws and regulations related to:
        (1) 4(a) above;
        (2) 4(b) above;
        (3) 4(c) above; and
        (4) 4(d) above.

    (b) for the purpose of conducting a civil or administrative enforcement proceeding, assisting in a self-regulatory organization's surveillance or enforcement activities or assisting in a criminal prosecution.
    *(As required by Paragraph 10(a) of the MOU).*

9. Please identify and explain (and provide copies of) any general or specific provisions of your laws, rules and regulations that provide for the confidentiality of:

    (a) requests for assistance made to you by foreign authorities, the contents of such requests, and any matters arising under such requests, including consultations between or among the authorities, and unsolicited assistance; and
    *(As required by Paragraph 11(a)of the MOU)*

    (b) documents and information received from foreign authorities.
    *(As required by Paragraph 11(b) of the MOU)*

———————————

A Ya  VYf g ˙@gh Y X˙]b ˙ʌ  Y˙ ‑C G7 C ˙A C I  ˙5 b b Yʌ  ˙6
˙

http://www.iosco.org/about/?subSection=mmou&subSection1=signatories ˙

**APPENDIX C**

| |
|---|
| **FORM FOR DRAFTING**<br>**REQUESTS FOR INFORMATION** |
| This request is being made pursuant to the provisions of the IOSCO MOU concerning consultation and cooperation and the exchange of information. |
| Description of the facts underlying the investigation:<br><br>   ➢ *entities/individuals involved and whether regulated or not by the Requesting Authority*<br><br>   ➢ *type of scheme*<br><br>   ➢ *location of investors*<br><br>   ➢ *location of affected markets and whether regulated or not by the Requesting Authority*<br><br>   ➢ *timeframe of the suspected misconduct*<br><br>   ➢ *nature of the suspected misconduct*<br><br>   ➢ *location of assets*<br><br>   ➢ *chronology of relevant events* |
| Describe how the information requested will assist in developing the investigation. |
| Description of uses for which assistance is sought, if other than in accordance with the provisions of the MOU. |
| Description of the information needed or assistance sought (*e.g., account opening documents, periodic account statements, trade confirmations, etc.*). |
| Time period for which documents should be gathered. |
| Information useful for identifying the relevant documents (*e.g., account number, name, address, date of birth of account holder, names of entities believed to control the accounts*). |
| Information useful for identifying the individual(s) from whom statements are needed (*e.g., name, address, date of birth of individual, telephone number*). |
| Sources of information (*e.g., regulated individuals and entities, investors, knowledgeable insiders*). |

| |
|---|
| Preferred form in which information should be gathered. |
| Indication of wish to participate in any interview. |
| Special precautions. |
| Dates of previous requests in this matter. |
| Laws and regulations:<br><br> ➢ *provisions of the securities or derivatives laws that may have been violated*<br><br> ➢ *brief description of the provisions*<br><br> ➢ *explanation of how the activities being investigated may have constituted violations of such provisions* |
| Responsibility for administering and enforcing the securities or derivatives laws. |
| Desired time for a reply. |
| Preferred manner in which information is to be transmitted (*e.g., telephone, courier, e-mail, computer disk and format*). |
| Contact information :<br><br> ➢ *name of contact*<br><br> ➢ *telephone and fax numbers*<br><br> ➢ *e-mail address* |
| Other relevant information. |



SECURITIES COMMISSION OF THE BAHAMAS

# 2021
# ANNUAL REPORT
www.scb.gov.bs



## Our Mission

To effectively oversee and regulate the activities of investment funds, securities and the capital markets, to protect investors while strengthening public and institutional confidence in the integrity of those markets.



SECURITIES COMMISSION OF THE BAHAMAS

# ANNUAL REPORT 2021

| | |
|---|---|
| **Transmittal Letter** | **5** |
| **Chairman's Message** | **6** |
| **Structure and Membership of the Commission** | **8** |
| **Executive Director's Remarks** | **10** |
| **Departments of the Commission** | **13** |
| **Management Team** | **14** |
| **Organizational Chart** | **15** |
| **Operations** | **16** |
| Policy, Research and Compliance | 17 |
| Investor Education | 22 |
| Project Management and International Relations | 23 |
| Human Resources | 26 |
| Administration | 29 |
| Information Technology | 29 |
| **Supervision, Risk Analytics and Examinations, and Enforcement** | **31** |
| Supervision | 32 |
| Risk Analytics and Examinations | 33 |
| Enforcement | 34 |
| Licensing, Registration, and Examinations Overview | 34 |
| **Legislation** | **44** |
| Legislative Updates | 45 |
| **Frequently Used Abbreviations and Terms** | **47** |
| **Financials** | **48** |
| Financial Summary | 49 |
| Audited Financial Statements | 50 |

Table of
CONTENTS



Poinciana House
North Building, 2nd Floor
31A East Bay Street
PO Box N-8347
Nassau, The Bahamas

30 June 2022

The Honourable Philip Davis, QC
Prime Minister and Minister of Finance
Ministry of Finance
Cecil Wallace-Whitfield Centre
West Bay Street
Nassau, NP
The Bahamas

Dear Prime Minister:

In accordance with Section 31(1) of the Securities Industry Act, 2011, I have the honour
of submitting to you, on behalf of the Members of the Securities Commission of The
Bahamas (the Commission), the Annual Report for the Commission for the year ended 31
December 2021. Included in this Report is the Annual Statement of Accounts of the
Commission for the year.

Yours sincerely,

Robert V. Lotmore
Chairman



## Chairman's Message

"The Commission remains a key driver in facilitating the transformation and innovation in the domestic financial services sector"

In recent years, the Securities Commission of The Bahamas has undergone significant changes allowing it to augment regulatory capacity and effectively adapt to market variations. The Commission continued on its trajectory of growth and development in 2021, as it evolved in tandem with domestic and international financial sectors.

### Transforming the Financial Services Sector

The Commission remains a key driver in facilitating the transformation and innovation in the domestic financial services sector. The Digital Assets and Registered Exchanges Act, 2020 (DARE) is the nexus to new markets and opportunities in financial and corporate services in the jurisdiction. Following the coming into effect of DARE in December 2020, the Commission began registering firms pursuant to the legislation in 2021. This signalled international recognition of the sound regulatory framework put forth by DARE and the beginning of the expansion of the jurisdiction's financial services sector into the digital space.

The Commission remains committed to being a leader and game-changer with regulation of the crypto space. In order to do this, the Commission will continue to build on the framework established by DARE. In alignment with international standards, the existing framework will evolve to ensure effective systems of monitoring and supervision.

The challenge for the Commission will be creating a well-regulated space that does not impede sector development and growth. The Commission will maintain a "Fintech Friendly" environment that continues to spur innovation. The Commission continues to develop ideas, recruit innovators and engage with investors to deepen the country's capital markets and improve employment opportunities. This has culminated in plans to host a Fintech Festival in 2023 to further promote the jurisdiction. With the DARE Act's place on the world stage and through its continual evolution, The Bahamas can be viewed as a harmonizer of the crypto space and enabler of growth of Fintech and digital asset markets.

The Commission continues to modernize its legislative regime to facilitate development in the capital markets. In July, the Securities Industry (Business Capital) Rules, 2021 came into effect. The Rules establish a regulatory framework for equity-based crowdfunding in The Bahamas. In alignment with key regulatory standards and practices, the Rules help to reduce the costs and barriers associated with raising capital for Small and Medium sized Enterprises. Traditionally, SMEs have experienced difficulty raising capital, which made expansion, and in some cases viability, challenging. With these Rules in effect, the Commission is helping to create an environment that supports diversity, innovation and inclusion of SMEs who now have more funding avenues and investment opportunities.

Corporate governance plays a pivotal role in the financial services industry. Good corporate governance is important to conducting business. With regard to corporate governance principles, the Commission is responsible for ensuring standards and practices are developed and applied. The Commission continues to work to ensure that these principles are enshrined in the legislative framework by reviewing and amending legislation to address corporate governance deficiencies highlighted by the World Bank. By doing so, we continue to develop an environment where good businesses can thrive and shareholder value is protected.

## Modernizing Operations

Throughout 2021, The Bahamas endeavoured to mitigate the negative socio-economic effects of the COVID-19 pandemic. The continuation of social conditions imposed by the pandemic highlighted the relationship between resilience and preparation. The Commission progressed ongoing efforts to further modernize its operations. This is instrumental in the Commission's ability to efficiently, and effectively execute its mandate. The Commission's ongoing efforts to augment technical capacity will make the Commission digital at its core.

The Commission's digital transformation, specifically the automation of current processes, will improve engagement with registrants and licensees and enhance the Commission's risk assessment capacity. Principally, the Commission seeks to improve the end-to-end user experience.

## Creation of Synergies with Other Regulatory Agencies

During 2021, the Commission continued its tradition of proactively seeking to create and enhance synergies with other domestic and international regulatory agencies. The task for regulatory agencies, in overseeing activities in globalized marketplaces, remains standardizing cooperation across jurisdictions. Information-sharing agreements underpin cross-border cooperation and strengthen enforcement and surveillance capacities within jurisdictions.

There must be balance in creating an environment for growth, while ensuring that there are frameworks in place to protect market participants.

Given the nuanced nature of digital assets and its underlying technology, regulators are seeking ways to promote growth, while allowing proper protections and having cross-border regulation is in place.

## Strengthening Operations Through Strategic Plan 2021-2024

Equipped with a reassessed SWOT analysis, the Board, along with management, progressed the planning of a comprehensive and bold strategic plan for the 2021-2024 period. Given the changing global environment, and the Commission's expanded regulatory scope, our strategic plan will align our objectives with identified priorities and an action plan so that we realize SCB's stated goals.

## In Closing

The Commission is a community of persons bounded by a vision of what a best-in-class Bahamian financial regulator ought to be. I am pleased and proud of the work done by the Commission. Truly, it was my privilege to serve at the helm of the Commission during these transformative years. On behalf of the Board, I thank the management team and staff, led by Executive Director Rolle, for their continuing steadfastness and commitment to the Commission's mandate.

It is my pleasure to present the 2021 Annual Report.

# Structure and Membership of the Commission

The Securities Commission of The Bahamas (the Commission) is a statutory body, established in 1995, pursuant to the Securities Board Act, 1995. The Act was repealed and replaced by the Securities Industry Act, 1999, and subsequent to that the Securities Industry Act, 2011 (SIA, 2011).

The Commission's membership, comprises a Chairman, Deputy Chairman, the Executive Director of the Commission (ex officio), and up to five members appointed by the Minister of Finance. The Minister appoints board members based on their experience or demonstrated capacity in matters relating to industry and the disciplines of commerce, law, finance, economics and administration.

SIA, 2011 provides for the Chairman to hold office for a period of five years, and the Deputy Chairman and other members to hold office for a period not to exceed four years. The Act also allows for all members, including the Chairman, to be eligible for reappointment. The Commission's Executive Director may hold office for a period of five years and to is eligible for a one-term reappointment on the recommendation of the Commission.

**Table 1**: Board of the Commission during 2021

| Name | Position | Appointment |
|------|----------|-------------|
| Robert V Lotmore | Chairman | 1 July 2017 |
| Michael Paton | Deputy Chairman | 1 July 2017 |
| Christina R Rolle | Ex officio Member | 26 January 2015 |
| Dawn Patton | Member | 1 July 2017 |
| Bede Sands | Member | 1 July 2017 |
| Deno Moss | Member | 1 July 2017 |
| Tonique Lewis | Member | 1 July 2017 to 1 October 2021 |
| Peter T Carey | Member | 1 October 2020 |

## Role of the Board

The Board is responsible for governance of the organization. The duties of the Board include overseeing the strategic focus; establishing rules and guidelines applicable to investment funds, securities and the capital market; and all policymaking with regard to the Commission. The Board has the authority to establish committees to assist it in the execution of its duties.

During 2021, the Board held **12** regular meetings and **1** extraordinary board meeting. There were **7** Audit Committee meetings, and **2** Human Resource Committee meetings.

No exceptional matters occurred in relation to the Board from a governance or structural perspective during the 2021 period. Operationally, during the pandemic the Board utilized Microsoft Teams to conduct virtual Board meetings and comply with COVID-19 protocols. Virtual meetings were held from January to December 2021.

# Board of Directors
As at 31 December 2021



Robert V Lotmore

Michael Paton

Christina R Rolle
Ex officio Member

Dawn Patton

Bede Sands

Deno Moss

Peter T Carey

## Committees of the Board
### Audit Committee
The Audit Committee (AC) advises and makes recommendations on matters relating to corporate governance, including internal financial controls, internal and external audits, and compliance with financial reporting requirements. It also assists the Commission in reviewing remuneration and other related policies for employees of the Commission. The AC held seven meetings during 2021.

The 2021 membership of the AC consisted of Dawn Patton (Chair), Derek Sands, Peter T Carey and Christina R Rolle. Secretary to the Board Mechelle Martinborough also attended AC meetings as well as Monique Sands, the Commission's Head of Finance, as a management representative.

### Human Resource Committee
The Human Resource Committee (HRC) assists the Commission in establishing and reviewing remuneration, benefits and policies for employees of the Commission including salary scales, pensions, bonuses, leave entitlement and any other benefit or incentives. The HRC also hears and considers formal complaints and grievances raised by staff. Its functions also include the periodic review of staff turnover and other human resources reports. The HRC held two meetings during 2021.

The 2021 membership of the HRC consisted of Michael Paton (Chair), Bede Sands, Deno Moss, Tonique Lewis and Christina R Rolle. Secretary to the Board Mechelle Martinborough also attended HRC meetings as well as Bernadette Gibson, Human Resources Senior Manager, as a management representative.

*"The registration in 2021 of the first licensee under DARE has catapulted The Bahamas into the limelight for regulation."*



## Executive Director's Remarks

For the Securities Commission of The Bahamas, 2021 was both a period of reflection on the Commission's recent regulatory accomplishments and an opportunity to strategically plan the path forward. Notwithstanding the ongoing COVID-19 pandemic and prevailing conditions, the Commission accomplished several noteworthy achievements during 2021.

### Digital Assets and Registered Exchanges Act, 2020 Developments

Just over one year ago, the Digital Assets and Registered Exchanges Act, 2020 (DARE Act or DARE) came into effect signalling the jurisdiction's eagerness to adapt to market changes and reap the benefits of market activity. The registration in 2021 of the first licensee under DARE has catapulted The Bahamas into the limelight for regulation. DARE established a regulatory framework for the digital asset space, facilitating the registration of digital token exchanges, initial token offerings as well as other digital asset businesses. Many of the provisions set out in DARE are based on capital markets as well as general consumer protection principles. They were designed to give the Commission broad regulatory powers and flexibility to address a very dynamic space. Naturally, the framework must evolve alongside market developments as new products and risks emerge.

In the first quarter of 2022, the Commission is scheduled to release the draft Digital Assets and Registered Exchanges (Amendment) Bill, 2022, which will establish a framework for the monitoring and sanctioning of persons carrying on or purporting to carry on digital asset business activities without the requisite registration pursuant to the DARE Act. The proposed amendments will strengthen the Commission's enforcement powers as it relates to Digital Assets Service Providers, including freezing powers and the authority to compel the production of information and evidence.

The Commission also intends to release the draft Digital Assets and Registered Exchanges (Anti-Money Laundering, Countering Financing of Terrorism, and Countering Financing

of Proliferation) Rules for public consultation, in the first quarter of 2022. The Rules will establish a legislative framework to address anti-money laundering (AML) and countering the financing of terrorism (CFT) and countering proliferation financing (CPF) in the digital assets market, in accordance with international standards and best practices, and The Bahamas' AML/CFT/CPF legislative suite.

With respect to other upcoming amendments to the regulatory framework for digital assets, the Commission anticipates addressing some of the emerging risks and concerns in the space. Among the Commission's focus areas for 2022 are: potential amendments to the regulatory treatment of, and specific requirements for, stable coins; consideration with respect to whether an appropriate regulatory framework is required for non-fungible tokens (NFTs); regulation and/or guidance with respect to the "staking" of clients' digital assets; and, addressing issues around how clients' digital assets are held by exchanges and custodians.

## Other Legislative Highlights

### Securities Industry (Business Capital) Rules, 2021

The promulgation of the Securities Industry (Business Capital) Rules, 2021 in July was another of the Commission's achievements. The Rules establish a regulatory framework for equity-based crowdfunding in The Bahamas. The Rules address easing access to capital for many entrepreneurs and providing an appropriate protection regime for retail investors, in keeping with key regulatory standards and best practices.

Small- and medium-sized enterprises have long lamented the cost of raising business capital in The Bahamas, which has limited their capacity to grow, and in some cases, to compete and survive. Simultaneously, investors continue to seek greater diversity of investment products to choose from, to grow their personal wealth in alignment with their investment principles and personal philosophies. They also want confidence and protection from unfair practices, market misconduct and other securities and investment fraud.

The Rules allow eligible small- or medium-sized businesses to raise up to $5 million BSD within a single 12-month period. They simultaneously reduce the regulatory burden otherwise associated with public offerings of securities. This is a typical example

of the Commission's embrace of its mandate for market development. It was our intention to provide alternative funding avenues for entrepreneurship which would then be a catalyst for growth in the broader Bahamian economy.

### Securities Industry Legislative Amendments

The Commission completed its drafting and public consultation work to enhance the regulatory capital framework for its registrants under the Securities Industry Act, 2011 (SIA, 2011). The draft Securities Industry (Amendment) Regulations, 2021 and draft Securities Industry (Financial Resources) Regulatory Rules, 2021 were issued for consultation in the first quarter of 2021. These legislative developments provide for a new framework and requirements with respect to the calculation of regulatory capital and will repeal and replace the Operational and Financial Report Form (Form 13). The proposed amendments to the SIA, 2011 strengthen enforcement tools of the Commission, including the power to revoke licenses and address the deficiencies highlighted in the World Bank Ease of Doing Business Survey.

## National Risk Assessment (NRA)

An important project for the Commission in 2021 was our participation in The Bahamas' National Risk Assessment (NRA) 2021. The NRA attempts to assess and risk-rate the country's anti-money laundering and countering the financing of terrorism regulatory framework as well as the country's progress with the implementation of that framework. For the NRA, the Commission was responsible for the Securities Module and contributed to the Financial Institutions and Designated Non-Financial Businesses and Professions Modules. In addition, the Commission took on the responsibility of performing risk assessments for virtual assets service providers and legal persons/legal arrangements. The Commission benchmarked and prepared surveys to determine the country's national risk assessment rating in practice, as The Bahamas is already largely compliant in terms of legislation and policy framework. The surveys were distributed to registrants and licensees of the Commission, other GFSR members, and industry stakeholders, as applicable. At year-end, the surveys were being analysed and the rating report prepared. The periodic conduct of an NRA is part of the Financial Action Task Force's (FATF) recommendations for the identification, assessment and understanding of ML/FT risks within the jurisdiction.

## Investor education

With a focus on investor protection and financial resilience, the Commission launched two successful video-based investor education initiatives in 2021 to engage the young adult demographic. The first was a Financial Resilience Video series, which was released in August 2021. The series highlighted well-known Bahamians giving pointers to improve financial resiliency and how to be financially prepared for unforeseeable life events. The videos were well received, with some 48,600 views registered between August and September. The second initiative was the "Starting Out? Start Right!" video competition launched in October as a part of the Commission's observance of World Investor Week 2021. The videos focused their messaging to young adults aged 18 to 25. Participants demonstrated their knowledge of investor education principles, and displayed praiseworthy creativity in crafting videos. The winning videos are scheduled to be announced in the first quarter of 2022.

## The Way Forward

During 2021, the Commission commenced the development of its Strategic Plan 2021-2024 with the completion of internal and external stakeholder meetings aimed at getting ideas and feedback from the management team as well as various industry and government stakeholder groups.

The 2021-2024 strategic plan is expected to be approved by the Commission's board in 2022. Some of its objectives and priorities include enhancing operational capabilities and performance, improving the regulatory framework, implementation of enhanced monitoring tools and supporting data driven decisions. Some of these priorities will result in the launch of significant operational projects as we are looking to use technology to expand our supervisory capabilities.

The Commission has also embarked on a project to review The Bahamas' domestic capital markets, including its regulation and functioning, specifically to determine barriers to growth and opportunities for expansion. Once our analysis is complete, the Commission will make strategic recommendations to the government for improvements.

## Conclusion

When I first came to the Commission in January 2015, I had two overarching concerns that drove my priorities, namely: 1) The Commission's influence amongst its addressees, stakeholders and colleagues; and, 2) Contraction in the financial services sector in The Bahamas. Through improvements in our regulatory framework, engagement with licensees, registrants and other stakeholders, engagement and active participation in the International Organization of Securities Commissions (IOSCO) and other regional and international bodies, I believe that we have done much to address those two concerns. I believe now that it is time to turn my attention inward with a view of focusing on the Commission's operational resilience. This will be one of the main themes underlying many of our objectives and projects for the next year or so and I look forward to engaging with our registrants and stakeholders as we engage on a journey to transform the Commission.

In concluding, I would be remiss if I did not thank the Commission's board (particularly Chairman Lotmore and other outgoing board members), and the management as well as staff for their dedication to the advancement of the work of the Commission. Despite the prolonged upheaval and disruptions faced due to the COVID-19 pandemic, the Commission remains set to emerge from the pandemic more resilient, with enhanced operational capacity and efficiency, better empowered to protect investors and consumers of financial services, and outfitted with tools to gather and analyse data and communicate with licensees and other constituents. We look forward to what is ahead for 2022 and beyond.

# Departments of the Commission

## Office of the Executive Director

The Office of the Executive Director (OED) supports the Executive Director in managing the day-to-day operations of the Commission. The office has three units. Policy, Research and Compliance has responsibility for collecting, analysing and reporting statistical data; supporting the development of research and policy papers; providing technical support in the development of legislation; maintaining compliance with the internal procedures and policies of the Commission; and maintaining the Fintech innovation hub SCB FITLink. Investor Education and Communications is responsible for managing the Commission's investor education programme, and overseeing public relations and communication. Project Management and International Relations oversees managing local and international stakeholder relationships; facilitating strategic planning; monitoring international standards setters and managing special projects.

## Supervision Department

The Supervision Department (SUD) processes applications for the licensing and registration of persons wishing to conduct registrable and licensable activities. It is responsible for offsite monitoring and supervision of market participants under legislation administered by the Commission, and the review and registration of prospectuses for public offerings and private placements. The Department is divided into two units: Securities and Investment Funds, and Financial and Corporate Service Providers and Digital Assets and Registered Exchanges.

## Risk Analytics and Examinations Department

The Risk Analytics and Examinations Department (RAED) consists of two complementary units: Risk Analytics and Examinations. The Risk Analytics Unit monitors solvency and operational and conduct risks of the Commission's licensees and registrants, which includes continuous AML/CFT monitoring. The unit's work informs the Examinations Unit's priorities. The Examinations Unit is responsible for on-site examinations of all registrants and licensees. This includes processing and recommending applicants to act as the Commission's agents for the on-site examination of financial and corporate service providers, and reviewing any examinations they conduct on behalf of the Commission.

## Office of Legal Counsel

The Office of Legal Counsel (OLC) provides legal advice to the Commission. OLC spearheads the review and development of laws related to securities, the capital markets, financial and corporate services and financial sector legislation generally, assisting in development and review of the Commission's guidelines and policies relating to the laws under the Commission's administrative remit, and managing matters of international cooperation.

## Enforcement Department

The Enforcement Department (END) primarily implements disciplinary actions pursuant to laws administered by the Commission. The department defends the Commission in litigation matters and, where deemed necessary, initiates litigation to enforce laws administered by the Commission. END also investigates operations or entities (involving companies and individuals) that are operating in The Bahamas without a license or registration as required by law.

## Office of Financial Controller

The Office of Financial Controller (OFC) is responsible for all aspects of the Commission's financial matters, including preparation and monitoring of annual budgets and the preparation of financial statements.

## Human Resources Department

Human Resources (HRD) is responsible for the daily management of the human resources of the Commission, which includes ensuring adequate human capital to facilitate the Commission's mandate, as well as implementing and enforcing staff regulations.

## Administration Department

Administration (ADD) plans and oversees general administrative support and office services including the Commission's document management systems. The department is also responsible for general safety requirements within the premises and maintenance of the Commission's equipment and vehicles.

## Information Technology Department

Information Technology (ITD) facilitates the information and electronic communications needs of the Commission.

# Management Team
## As at 31 December 2021



**CHRISTINA R ROLLE**
Executive Director



**CHRISTIAN ADDERLEY**
Deputy Executive Director
Head of Policy, Research & Compliance



**ALYSIA ARCHER-COLEBROOKE**
Senior Manager
Administration



**JOHN CLARKE**
Manager
Information Technology



**BERNADETTE GIBSON**
Senior Manager
Human Resources



**MECHELLE MARTINBOROUGH**
Deputy Executive Director
Senior Legal Counsel
Office of Legal Counsel



**STEWART MILLER**
Manager
Investor Education & Communications



**SHERINN MUNNINGS**
Deputy Manager
Project Management
& International Relations



**DANA MUNNINGS-GRAY**
Manager, Securities and
Financial & Corporate
Services Providers



**LESLEY PEARSON**
Senior Manager
Risk Analytics & Examinations



**MONIQUE SANDS**
Finance Director
Head of Finance
Office of Financial Controller



**MAGAN TAYLOR**
Manager
Investment Funds



**GAWAINE WARD**
Senior Manager
Enforcement

# Organizational Chart

As at 31 December 2021



**MEMBERS OF THE COMMISSION**
Robert V Lotmore
Chairman

**EXECUTIVE**
Christina R Rolle
Executive Director

**OFFICE OF LEGAL COUNSEL**
Mechelle Martinborough
Deputy Executive
Director/
Senior Legal Counsel

**OFFICE OF LEGAL COUNSEL**

**OFFICE OF THE FINANCIAL CONTROLLER**
Monique Sands
Finance Director/
Head of Finance

**OFFICE OF THE EXECUTIVE DIRECTOR**

POLICY, RESEARCH & COMPLIANCE
Christian Adderley
Deputy Executive Director/
Head of Policy and Research

INVESTOR EDUCATION/ COMMUNICATIONS
Stewart Miller
Manager

PROJECT MANAGEMENT/ INTERNATIONAL RELATIONS
Sherinn Munnings
Deputy Manager

**INFORMATION TECHNOLOGY DEPARTMENT**
John Clarke
Manager

**ADMINISTRATION DEPARTMENT**
Alysia Archer-Colebrooke
Senior Manager

**HUMAN RESOURCES DEPARTMENT**
Bernadette Gibson
Senior Manager

**ENFORCEMENT DEPARTMENT**
Gawaine Ward
Senior Manager

**SUPERVISION**

SECURITIES UNIT
Dana Munnings-Gray
Manager

FINANCIAL & CORPORATE SERVICES UNIT
Dana Munnings-Gray
Manager

INVESTMENT FUNDS UNIT
Magan Taylor
Manager

**RISK ANALYTICS & EXAMINATIONS**
Lesley Pearson
Senior Manager

EXAMINATIONS

RISK ANALYTICS



# Operations

# Policy, Research and Compliance

During 2021, the Commission focused its policy, research and compliance initiatives on the following areas:

- Assisting Financial Services Regulators with completing The Bahamas' National Risk Assessment (NRA);
- Additional research, disseminating policy guidelines and guidance notes to enhance the Commission's Digital Assets and Registered Exchanges Act, 2020 (DARE) framework;
- Facilitating the Commission's local, regional, and international financial innovation efforts, via the financial technology (Fintech) hub, SCB FITLink;
- Researching and recommending improvements to the types and quality of statistical information and reports produced by the Commission; and
- Ongoing policy development.

## National Risk Assessment (NRA) 2021

The Commission participated in The Bahamas' national risk assessment (NRA) exercise. To assist with this endeavour, the Policy, Research and Compliance (PRC) Unit prepared background research aimed at assisting the internal NRA team with preparing appropriate risk assessment surveys and a comprehensive and cohesive report. The surveys were disseminated to the Commission's registrants and licensees and allow The Bahamas to assess the risks posed by certain entities and the effectiveness of the mitigation measures to curtail those risks.

### NRA Research

The Commission drafted a research paper, which examined the NRA outcomes and methodologies of various jurisdictions that have improved their Financial Action Task Force (FATF) Mutual Evaluation risk ratings. The paper also provided recommendations to assist The Bahamas in improving its overall rankings.

The Commission reviewed two key tools used by these jurisdictions in conducting their national assessment – the World Bank National Risk Assessment Methodology and the FATF Methodology for Assessing Compliance with the FATF Recommendations. The World Bank and the FATF methodologies provide guidance on rating Money Laundering (ML) and Terrorist Financing (TF) risks in a jurisdiction and for assessing technical compliance with the FATF 40 Recommendations, respectively. The Commission's final recommendations reflected the outcomes and priority actions set out in the FATF Mutual Evaluations and relative sections of the examined risk assessment and informed the Commission's contribution to The Bahamas' NRA.

### Countering Proliferation Financing (CPF)

The Commission prepared an internal research paper that benchmarked the NRA outcomes and methodologies of various jurisdictions that have improved their Proliferation Financing (PF) risk ratings, as assessed by the World Bank. The paper also provides recommendations to assist The Bahamas in preparing for a national PF risk assessment.

### NRA Surveys

To further assist the Commission with the NRA preparation, the PRC Unit developed three industry risk assessment surveys that were disseminated in November 2021. The surveys focused primarily on money laundering threats and mitigation tools with key themes related to the following:

- Suspicious transaction reporting;
- Record-keeping;
- Monitoring client transactions;
- Employee training; and
- Internal controls and systems.

## Thematic Reviews – Digital Asset Service Providers (DASPs)

The Commission developed an industry thematic review related to digital asset service providers (DASPs) in an effort to robustly assess and understand the risks posed by this developing sector, and the mitigation measures that have been implemented by DASPs and other stakeholders (eg the government) to address those risks.

The thematic review was modelled after the International Organization of Securities Commissions (IOSCO) recommendations and the FATF Recommendations and requirements. To this end, the Commission produced and disseminated a DASP thematic review survey, which included the following themes:

- The FATF "Travel Rule" Requirements;
- Internal systems and controls;
- Transaction and client monitoring;
- Proposed future plans;
- Identification of other key risks and threats; and
- Identifying and assessing the quality of implemented mitigation measures.

Respondents to the survey were registrants and potential registrants of the DARE Act and the Financial and Corporate Service Providers Act, 2020 (FCSPA), think tanks, accelerators, and industry experts. The results will be analysed and included in the SCB's national sectoral risk assessment on virtual assets and virtual assets service providers (VASPs), which is expected to be completed by May 2022.

## Digital Assets and Registered Exchanges (DARE) Act, 2020

The DARE Act, regulates the issuance, sale and trade of digital assets in or from within The Bahamas. The Commission reviewed and assessed the emerging risks and concerns faced by the digital asset participants market, and aims to address such concerns with upcoming policy guidance for the digital asset sector. The purpose of the guidance is to create an environment that balances a suitable regulatory environment for digital assets while supporting market development. Policy guidance will address key issues such as the tokenization of securities, stable coin offerings, and the Commission's policy on filing audited financial statements.

## Ongoing Requirements Paper

The Commission is currently in the process of amending the DARE Act, and in efforts to provide recommendations, a research paper was completed that benchmarked the ongoing reporting requirements for digital asset businesses in each jurisdiction.

The key conclusions from the paper assisted the Commission in amending certain aspects of the DARE Act, to provide regulatory clarity for digital asset stakeholders with regard to the information that should be submitted to the Commission on a continuing basis. The updated reporting requirements are expected to be issued for public consultation in 2022.

## DARE Act Frequently Asked Questions (FAQs)

The FAQs were drafted to assist the industry with understanding and complying with the Commission's digital assets regulatory framework. The FAQs address the most commonly asked questions by the public on matters relating to both registering and continuing to comply with DARE and addressed key areas including:

- Physical presence requirements;
- Regulatory capital requirements;
- Application (registration and/or licensing) processes; and
- AML/CFT obligations.

## Creation of DARE Policy

The Commission will continue its review and, where necessary, amends to DARE, to ensure a globally competitive, appropriately regulated jurisdiction.

## Facilitating Financial Innovation

### SCB Fintech Policy Development

The Commission conducted a number of Fintech-related reviews and policy updates, including:

1. Drafting the "Risks and Challenges" section of IOSCO Fintech Network's Decentralized Finance Global Report, scheduled to be released in March 2022. The Commission contributed to the report by preparing the section on risks and challenges of DeFi (decentralized finance), some of which included:
   - Inherent risks/operational risks of DeFi;
   - Scalability limitations;

- Regulatory clarity;
- Customer abuse;
- Market abuse; and
- AML/CFT risks and threats.

2. Ongoing review and monitoring of DARE and the FCSPA, 2020 to ensure compliance with the FATF Recommendation 15 and other internationally accepted digital assets supervisory best practices. This included drafting a policy memorandum comparing the FATF 15 AML/CFT requirements with that of the FCSPA, 2020, which assisted in developing the Digital Assets and Registered Exchanges (Anti-Money Laundering and Countering the Financing of Terrorism) Rules, 2022.

3. Drafting and publicly disseminating a policy memorandum outlining the policy position with respect to Rule 13, Securities Industry (Business Capital) Rules, 2021 (crowdfunding).

## Progress of Statement of Intent (SOI) with US Commodities and Futures Trading Commission (CFTC)

The Commission and the US Commodities and Futures Trading Commission (CFTC) continued to progress development of a statement of intent (SOI), which commenced in 2020. The SOI commits SCB and the CFTC to enter into an agreement of cooperation and exchange of Fintech information. The agreement will facilitate more effective and efficient regulation, and oversight of the financial markets and market participants, in light of the emerging technology in financial markets and services. The expected finalization and sign off of the SOI, by the respective authorities, is during the second quarter of 2022.

## SCB FITLink

The Commission's Fintech hub, SCB FITLink, serves as the central point of contact for the SCB's engagement with the public on various issues related to Fintech, such as digital asset business, crowdfunding, distributed ledger technology, artificial intelligence and initial token offerings. Chart 1 and Chart 2 show categories of questions and percentage of questions by jurisdiction submitted to SCB FITLink in 2021.

## Industry Engagement and Meetings

A primary activity of the Commission is its engagement with both local and international stakeholders, via its Fintech hub, SCB FITLink. Between 1 January and year-end 31 December 2021, SCB FITLink had held either in-person or virtual meetings with 75 stakeholders.

SCB presented on the DARE Act to the International Financial Services Commission (IFSC) and the Financial Intelligence Unit of Belize authorities on subjects including:

- The case for digital asset regulation;
- SCB's digital asset regulatory philosophy;
- A review of the DARE Act;
- SCB's international initiatives; and
- SCB FITLink.

FITLink staff attended New York FinTech Week hosted by Empire Startups in April 2021. The conference brought together innovators in the Fintech sector to discuss risks, threats, opportunities and possible solutions in the financial services sector.

Other engagements included Global Financial Innovation Network (GFIN) membership meetings, and meetings with the Decentralized Finance Group formed to draft the IOSCO Fintech Network DeFi report.

**Chart 1:** Categories of Fintech questions submitted to SCB FITLink in 2021.



**Chart 2:** Fintech questions, by jurisdiction, submitted to SCB FitLink in 2021.



## Improvement of the Quality of Statistical Information

The Commission has committed to increasing the amount and improving the quality of statistical information publicly disseminated.

The Commission's goals of improving the amount and quality of statistical information are to:

- Enable the Commission to gain better understanding and insight of the securities and capital markets;
- Provide the public access to data about what are the securities and capital markets regulated sectors; and
- Ensure supranational bodies, such as IOSCO and the FATF, understand the industry, trends, opportunities, and risk mitigation efforts.

The PRC Unit prepared an internal whitepaper recommending the production of four additional reports, which should derive the following results:

- Greater levels of operational transparency;
- Ease of access to an aggregation of facts regarding the securities and capital markets; and
- Increased internal efficiency, such as identifying trends to determine regulatory updates and investor notices.

Recommendations stemming from the whitepaper encompasses the goals, benefits, and concerns voiced by industry participants.

## Ongoing Policy Development

### Suitability Requirements for Complex Financial Products

In the fourth quarter of 2019, the Board reviewed a policy paper reviewing IOSCO's Principles of Suitability for Complex Financial Products. The paper focused on consumer and investor protection and emphasized the importance of, and need for, the classification of investors according to both their financial net worth and knowledge of the products of services in which they are investing. As is consistent with international accepted best practices, the paper recommended that investments made on behalf of clients be suitable by considering investor needs, objectives and risk tolerance.

In 2021, the Commission began to address the findings of the paper with the release of the Elective Professional Recategorization Guidelines (EPC), in February 2021, which provides a framework for retail investors involved in Contracts for Differences (CFD) trading to recategorize to an elective professional (accredited investor). The Commission will continue its work on this topic, culminating with the adoption of the Suitability Rules for Complex Financial Products, in 2023.

### Carbon Credits

The Commission has commenced work on developing a regulatory framework for entities that intend to engage in a carbon credit initial offering and for exchanges that intend to facilitate the trading of carbon credits. The purpose of the new framework is to introduce a new category of registrant – a carbon credit exchange marketplace – that will facilitate the secondary trading of internationally transferred mitigation outcomes (carbon credits).

### Capital Markets

The Commission will produce a comprehensive report on the current state of The Bahamas' capital markets. The paper will provide a SWOT analysis of The Bahamas' capital markets, benchmark the capital markets of emerging market countries, and, ultimately, recommend updates/improvements to existing capital markets legislation, including amended laws and trading rules.

### Fintech Festival

The Commission is developing plans to host a Fintech Festival in 2023. Globally, Fintech festivals are becoming increasingly popular among regulators, as a means of promoting their jurisdiction as "Fintech friendly" and recruiting innovators and investors to deepen the country's capital markets and improve employment opportunities. The Commission avers that hosting a Fintech Festival will bring both the domestic and international Fintech stakeholders together to discuss risks, opportunities, and solutions. The potential benefits are that, The Bahamas will be considered a prime jurisdiction to invest in and to develop proof of concept projects. This will aid in the overall expansion, growth and development of the country's Fintech sector.

# Investor Education

Financially literate investors with access to reliable, current investment information are better empowered to grow their wealth and protect themselves from falling victim to investment frauds, scams, and other misconduct. This underlying principle drives the Commission's approach to investor education and the execution of its function to promote an understanding of the capital markets and its participants, and the benefits, risks and liabilities associated with investing.

During 2021, the Commission's investor education initiatives reinforced the need to be financially prepared for crises, and for financial resilience on a personal, community and national level. Due to enforced COVID-19 social distance protocols, the Commission advanced its investor education programme digitally.



S Rosel Moxey, president of Sunshine Finance, was a participant in the SCB's Financial Resilience Video Series.

## Financial Resilience Video Series

On 19 August, the Commission launched a series of short videos focusing on financial resilience which aimed to foster awareness of the importance of financial resilience and provide practical tips to help Bahamians on their financial journey. Another goal of the video series was to encourage viewers to commit to taking tangible steps to improve their financial resilience.

This video series was the culmination of the "I Will" social media campaign launched in tandem with the other members of the Caribbean Working Group of the Americas Chapter of the International Forum of Investor Education (IFIE) during World Investor Week (WIW) 2020. Like the video series, the "I Will" campaign encouraged persons to take action to be more financially resilient.

The video series' messaging included committing to develop and maintain a budget; setting long term financial goals and a plan to achieve them; tracking spending and eliminating unnecessary expenses; preparing financially for foreseeable and unforeseeable life events; and exploring alternative income streams. The videos featured well-known Bahamians and targeted the demographics of 25-40 and 41-60.

The videos were posted to the Commission's website, Facebook page and YouTube channel to ensure that the content was easily accessible. The videos ran on local cable networks during high viewership of local and international cable programming from 19 August to 30 September. During the period, the videos received more than 36,670 views. Facebook's data analytics indicate that during the period, the videos had a reach of 46,688 and a click to play rate of 10,200. Additionally, a 30-second advertisement for the videos ran on local cable networks during local and international news programmes. This culminated in views of more than 48,691, for the aforementioned period.

## World Investor Week 2021

The Commission observed WIW the week of the 11–17 October 2021. Activities focused on increasing awareness of the importance of investor education and reinforcement of fundamental investor education and financial literacy concepts. The Commission continued its efforts to ensure that retail investors were aware of the risks and benefits of investing in achieving financial resilience.

Prime Minister, the Honourable Philip Davis, QC, declared the month of October "Investor Education Month" in support of the Commission's celebration of WIW and as national recognition of the importance of financial literacy and investor education.

### "Starting Out? Start Right!" Video Competition

On 13 October, the Commission launched the "Starting Out? Start Right!" video competition for Bahamians and residents aged 18 and older. The competition was well received with 15 submissions. Contestants produced a video of 2 to 4 minutes on fundamental financial literacy and investor education concepts and were to target persons between the ages of 18 and 25. The Commission anticipates leveraging the competition through the first quarter 2022 with viewers' choice elements and special promotions with the winning entries. The videos are posted to the Commission's website, Facebook page and YouTube channel.

## Webinars

The Commission participated in the IFIE Caribbean Working Group Webinar on 28 October, under the theme: "Strengthening our Toolkit to Fight the Impact of Financial-Fraud during the COVID-19 Pandemic." This joint initiative forms a part of participating Caribbean securities regulators' WIW initiatives. Gawaine Ward the Senior Manager of Enforcement presented on the move to criminalize the promotion of fraudulent financial schemes through legislative provisions in the Financial and Corporate Service Providers Act, 2020. Stewart Miller the Manager of Investor Education and Communications moderated a segment on lessons learned about promoting investor education during a pandemic. Miller also presented on the Commission's lessons learned using video as a communications medium in recent years. The webinar's recording can be found on the Commission's website and Facebook page.

## Social Media Campaigns

The Commission posted daily informational posts under the theme "Be a smart investor" as one of its WIW celebration initiatives. The campaign focused on traditional investor education messaging with posts on the Commission's Facebook page throughout the month of October. The campaign culminated in a total reach of 1,792.

The Commission launched a WIW 2021 page: https://www.scb.gov.bs/investing/world-investor-week-2021/. The page centralized the Commission's financial literacy and investor education content related to its WIW 2021 theme, and other financial literacy and investment content, for ease of reference.

The Commission launched a social media influencer pilot programme during the week. The influencer generated and hosted investor education content and referenced the Commission's WIW activities and website. During the pilot, the influencer reached an audience of 2,410 persons with the article "Understanding the securities and capital markets – An Introduction", 200 people with "Due Diligence Tips for Investors" and another 217 with "Investment Red Flags: Spotting an investment scam".

### Harnessing Social Media

In October, the Commission launched Instagram and Twitter profiles to ensure that its financial literacy and investor education content is accessible to younger demographics including 18-24 and 25-40. Additionally, the Commission launched a LinkedIn profile to increase the various professional communities' accessibility to the regulator.

# Project Management and International Relations

## Affiliations and Memberships

The Commission maintains membership in various international, regional and local organizations to stay abreast of regulatory and standards developments, and rising risks and threats, among other things. Some of these memberships also allow the Commission to represent stakeholder concerns and regulatory considerations specific to the jurisdiction at international fora.

### International Organization of Securities Commissions (IOSCO)

The International Organization of Securities Commissions (IOSCO) is the global standard setter for securities and capital markets regulators. The Commission has been an ordinary member of IOSCO since September 1996, and became a signatory to Appendix A of its Multilateral Memorandum of Understanding Concerning Consultation and Cooperation and the Exchange of Information (MMoU) on 27 December 2012.

The Commission became an early adopter and signatory to Appendix A of the Enhanced Multilateral Memorandum of Understanding Concerning Consultation and Cooperation and the Exchange of Information (EMMoU) on 21 November 2018. The EMMoU was established "to keep pace with

technological, societal and market developments; to bolster deterrence; and to ensure that IOSCO continues to meet its objectives."

The IOSCO Board is the governing and standard setting body of IOSCO and comprises 34 securities regulators. The Commission is currently a Board member and a member of six IOSCO committees and a number of groups:

- Growth and Emerging Markets Committee (GEMC) seeks to promote the development and efficiency of emerging securities and futures markets.

- Inter-American Regional Committee (IARC) discusses regional issues to contribute a regional perspective to Board debates and policy work. The Commission's executive director currently serves as Vice-chair of IARC having been appointed in April 2020 first for the remainder of the term 2018-2020 and then for the term 2020-2022.

- Assessment Committee (AC) assesses implementation of IOSCO Principles and Standards across the IOSCO membership.

- MMoU Monitoring Group consists of all MMoU signatories and is tasked with monitoring the operation of the IOSCO MMoU.

- MMoU Monitoring Group Steering Committee (MMoU MG SC) serves to review problematic issues identified through use of the MMoU and make recommendations to the Monitoring Group as to how these should be addressed.

- MMoU Screening Group is tasked with reviewing MMoU applications to establish if applicants meet the requirements for becoming signatories to the MMoU.

- Committee on Enforcement and the Exchange of Information (Committee 4) aims to help prevent and detect the breaches of securities laws and regulations in global financial markets and seeks to implement global enforcement cooperation under the IOSCO MMoU.

- Committee on Regulation of Market Intermediaries (Committee 3) seeks to promote investor protection and market efficiency through its recommendations on issues relating to market intermediaries.

- Operational Resilience Group (ORG) was formed to examine the operational resilience of regulated entities during the COVID-19 pandemic and to identify any themes and gaps in existing IOSCO and other international organizations' principles and guidance on operational resilience.

## Caribbean Group of Securities Regulators (CGSR)

The Caribbean Group of Securities Regulators (CGSR), formed in 2002, aims to facilitate information sharing and collaboration between Caribbean securities regulators to enhance regional securities supervision.

## Council of Securities Regulators of the Americas (COSRA)

The Council of Securities Regulators of the Americas (COSRA), established in 1992 as a forum for securities regulators in North, South and Central America, and the Caribbean, focuses on investor protection, the maintenance of market integrity, regulatory cooperation and information-sharing. This regional group usually meets in conjunction with ISOCO's IARC due to their shared membership.

## Global Financial Innovation Network (GFIN)

The Global Financial Network (GFIN), launched in 2019, is an international network of financial services regulators and related organizations committed to supporting financial innovation. GFIN aims to create a framework for cooperation between financial services regulators on innovation topics and sharing of experiences and approaches. It also seeks to provide efficient ways for innovative firms to interact with regulators and navigate between countries. The Commission attained membership in December 2020.

## Group of Financial Services Regulators (GFSR)

The Group of Financial Service Regulators (GFSR) comprises domestic financial services regulators, the Central Bank of The Bahamas, the Compliance Commission of The Bahamas, the Financial Intelligence Unit, The Gaming Board of The Bahamas, the Insurance Commission of The Bahamas, and the Securities Commission of The Bahamas. The group serves as a medium for information sharing between its members and international financial services regulators. Members use this forum to discuss unique and shared regulatory challenges.

## International Forum for Investor Education (IFIE)

The International Forum for Investor Education (IFIE), formed in 2005, aims to unite and engage global organizations across sectors to help improve financial capability and investor education. The Bahamas has been a member since 2020. The IFIE Americas Chapter, formed in 2011, works on priority issues and needs of the Americas region, benefitting from the resources, programming and experience of the IFIE global network of partners and other global-regional chapters. The Bahamas is a founding member of the IFIE Americas Chapter Caribbean Working Group (CWG), whose focus is developing programmes on financial capability and investor education within the Caribbean context.

**Table 2:** Membership meetings and activities attended during 2021.

| Meeting/Conference/Date | Place | Theme/Topic |
|---|---|---|
| **International Organization of Securities Commissions (IOSCO)** | | |
| Annual Meeting of IOSCO<br>8-16 November | Virtual | No physical meeting due to the COVID-19 pandemic. Series of virtual meetings held in lieu of. |
| GEMC<br>11 November | Virtual | Discussions on recent work (published reports and projects), market developments and regulatory updates in member jurisdictions. |
| C3 (Committee on Regulation of Market Intermediaries)<br>23 March<br>13 April<br>25 May<br>14 June<br>18 November | Virtual | Information not available to the public. |
| C4 (Committee on Enforcement and the Exchange of Information) and Screening Group<br>26-27 January<br>25-26 May<br>28-29 September | Virtual | Information not available to the public. |
| Operational Resilience Group (ORG)<br>24 June<br>19 August<br>7 October | Virtual | Discussions on updates to IOSCO's BCP guidelines with respect to regulators and registrants. |
| **Inter-American Regional Committee (IARC)/Council of Securities Regulators of the Americas (COSRA)** | | |
| IARC/COSRA<br>29 March | Virtual | Discussions on regional priorities, status of global capital markets and their trends and vulnerabilities, survey findings on Fintech and regional cybersecurity and training issues. |
| IARC<br>9 November | Virtual | Discussions on updates to the Board, financial innovation, and mutual funds. |
| **Caribbean Group of Securities Regulators (CGSR)** | | |
| Annual Meeting<br>8 July | Virtual | Discussions on regional emerging challenges specifically COVID-19, its impact, members' responses, and the increase in fraudulent schemes observed. |

**Table 2** (continued)

Global Financial Innovation Network (GFIN)

| | | |
|---|---|---|
| Quarterly Meeting<br>22 June | Virtual | Discussions on workstream updates. |
| Regulatory Technology (RegTech) and Supervisory Technology (SupTech) Showcase<br>29 June 2021 | Virtual | Discussions to share RegTech and SupTech progress. |
| Annual Meeting<br>6 October | Virtual | Discussions on participation in working groups, review and analysis on Fintech surveys, and formulating strategic focus areas for 2022. |

# Human Resources

As at 31 December 2021, the Commission's staff complement stood at **91** consisting of **84** full-time employees and **7** temporary/contract employees.

## Staff Meetings

During 2021, the Commission held 4 (quarterly) staff meetings. All meetings were held virtually due to the COVID-19 pandemic.

## Staff Education and Training

During 2021, the Commission continued its incentive-based support of staff development in order to strengthen its capacity to execute its functions and ongoing priorities. The Commission continued to offer opportunities to employees including travel as permitted. However, due to the pandemic, the majority of training was restricted to online webinars, conferences and seminars only.

## Health and Wellness Initiatives

The Commission seeks to create a proactive environment for the health and wellness of the staff. In its effort to increase benefit offerings, improve employee health, and manage health plan costs, the Commission continues to facilitate its insurance provider's health program, with staff incentives and accommodation of initiatives on offer. Participants have the opportunity to increase their awareness of health and wellness, through a number of initiatives that provide the tools to make informed lifestyle choices. All continued virtually with several webinars during 2021.

**Table 3:** Number of employees by department



**Table 4:** Number of employees by position



\* Other represents **6** clerical workers and **1** investigations officer on contract.

**Table 5:** Qualifications of Commission employees across positions



**Table 6:** International, domestic and virtual training and capacity building opportunities afforded to Commission staff in 2021

| Meeting/Conference | Place | Staff Attended |
|---|---|---|
| Bahamas Business Outlook 2021 | Virtual | 2 |
| CPF Training for CFATF Member Jurisdictions | Virtual | 21 |
| CESRA Informational Webinar Session | Virtual | 1 |
| INVITATION TO GFSR: 2021 Empirical Research Conference on Approaches to AML and Financial Crime Suppression | Virtual | 13 |
| The London School of Economics and Political Science: Regulation: Theory, Strategy, and Practice | Virtual | 13 |
| FINTECH & Digital Tokens | Virtual | 3 |
| The Malta Workshops | Virtual | All employees of SUD and RAED |
| 2021 Bahamas Economic Outlook | Virtual | 1 |
| 5th IOSCO/PIFS-Harvard Law School Global Certificate Program for Regulators of Securities Markets | Virtual | 10 |
| IOSCO's Capacity Building Online Toolkit | Virtual | All employees of SUD and RAED |
| GFIN RegTech & SupTech Showcase | Virtual | 7 |
| CFA Institute Financial Regulatory Symposium 2021 | Virtual | All employees of SUD and RAED |
| SHRM21 Annual Conference & Expo | Virtual | 3 |
| 2021 EA Summit | Chicago, Il | 1 |
| Fraud Prevention | Virtual | 3 |
| STEP LATAM Conference | Riviera, Mexico | 4 |
| Bentac (OSINT) Training | Virtual | 25 |
| IFSCA Global Fintech Event Infinity Forum 2021 | Virtual | 2 |
| Offshore Alert Global 2021 Conference | Virtual | 2 |
| ACAMS Annual Caribbean Conference | Virtual | 9 |
| IOSCO/PIFS-HLS Global Certificate Programme-Phase II | Virtual | 10 |
| IOSCO SPAC Network Stakeholder Meeting | Virtual | 1 |

# Administration

## Business Continuity Plan (BCP)

Since 2020, the Commission has been engaged in an ongoing effort to augment its business continuity plan (BCP) to ensure that the Commission is able to prevent and withstand as many foreseeable and unforeseeable challenges as possible. This process has involved review of Commission-wide operating procedures and the resilience of those procedures. Moving forward, SCB will test the BCP annually. In June 2021, the Commission conducted a successful test, which focused on the Commission's information technology data backup and recovery processes.

## Efficiency Initiatives

The Commission remains committed to efficiency efforts that not only improve operations but also reduce inefficient spending. For 2021, the Commission continued to realize expense reductions in the overhead cost of operations. These reductions are a result of the Commission's staff working remotely.

## COVID-19 Cleaning and Safety

Throughout 2021, the Commission's premises were sanitized daily. On a quarterly basis, the Commission's premises underwent a comprehensive deep cleaning and sanitizing to ensure that the environment met the highest health standards for persons requiring access to the premises. In September 2021, the Commission introduced an alternating work team rotation to facilitate staff working on premises. Among other arrangements made to accommodate this transition, mandatory COVID-19 testing at the start of each work rotation ensured that persons working from the Commission's premises were not at increased risk of exposure to the coronavirus.

## Document Management Software Solution

In mid-2021, the Commission implemented a new Document Management Software Solution (DMSS), OnBase. The application, chosen in part because of the capability to allow users to easily create functional workflows, allows for greater efficiency as documents may be shared more efficiently. The workflows present opportunities for process enhancements as documents are funneled through various channels designed to increase efficiency. Completion of the initial phase of the implementation took place during the second half of the year, and included the transition of all data and documents from the previous DMSS, along with relevant workflows and other functionality. Phase two of the DMSS implementation was in progress at year-end and will provide additional software functionality and workflow efficiencies.

## Data Warehouse Solution RFP

In an effort to raise the level of automation and digitization within the Commission, an RFP for the implementation of a data warehouse was issued in November 2021. The SCB aims to select a candidate to provide the necessary services by the end of quarter one, 2022. The operational advantages of a data warehouse include reductions in task completion time, workflows that are more efficient and improvements in data quality. This implementation will also aid the Commission in making data-driven decisions based on the organizations' accrued business intelligence.

# Information Technology

## Compliance and Regulatory Interface (CoRI)

The major technological improvement for the Commission during the year was the Compliance and Regulatory Interface (CoRI). CoRI is a web-based filing portal, introduced in 2021, which allows registrants and licensees to electronically submit required filings to the Commission, safely, swiftly and conveniently. Although introduced in direct response to social distancing protocols during the pandemic, CoRI will be maintained and upgraded into the future, to continually improve regulatory filing convenience for constituents and help position the SCB for transition to a data-driven work environment.

## Server Infrastructure

The Commission made great strides toward future-proofing its digital capabilities by upgrading and enhancing the server infrastructure. The industry leading solution delivers increased redundancy, availability and responsiveness while allowing for the continued growth of the Commission's information processing needs.

## Other Updates

The Commission developed a progressive testing schedule as an integral part of the information security framework. The schedule includes routine testing of the internal and external network components by a third party security vendor to uncover and mitigate vulnerabilities. This will enhance future security efforts. The Commission continues to explore new and innovative ways to maintain a secure environment.

# Supervision,
# Risk Analytics & Examinations,
# and Enforcement



# Supervision

## Supervisory Approach

The Commission deploys a risk-based approach to the supervision of registrants, licensees and the markets, which in turn informs enforcement initiatives and strategies. Under this risk-based approach, supervisory, examinations and enforcement priority is given to the areas the Commission identifies as presenting the greatest risk to the public, the capital markets, the financial system, and the reputation of the jurisdiction as an international wealth management centre. The Commission publishes its priorities annually, which allows industry practitioners to review and improve their operations for compliance in the identified focus areas.

To determine supervisory and enforcement priorities, the Commission considers a number of factors, including:
- high-risk areas identified by global standards setters, such as IOSCO and CFATF;
- risk areas prioritized under the country's National Risk Assessment program, particularly with respect to anti-money laundering, the financing of terrorism and the proliferation of weapons of mass destruction;
- compliance and non-compliance trends of its constituents stemming from on-site and offsite reviews/examinations, including the findings of surveys, such as the desk-based thematic reviews conducted during 2020;
- global financial crime trends; and
- its own observations and experiences.

## Supervision Priorities 2021

### Corporate governance

Corporate governance is essential to the effective and efficient operation of any organization. Registrants and licensees may expose themselves to regulatory, legal and reputational risk where their corporate governance frameworks are not sufficiently comprehensive or adhered to, and may pose systemic risk to the financial services sector where frameworks are weak. Focus was given to the fitness and propriety of key personnel, oversight levels by the board and committees of the board, and the development of annual board confirmations. Corporate governance frameworks were reviewed to ensure they were sufficiently comprehensive and that they did not pose systemic risk to the financial services sector.

### Compliance with reporting obligations

Following the relaxing of reporting timelines in 2020 due to the pandemic, the Commission focused on fostering strict compliance with reporting obligations in an effort to mitigate risks arising from lack of regulatory monitoring. This effort was enhanced by the implementation of the Commission's recently launched compliance and regulatory interface, CoRI.

Particular attention was paid to compliance with the following obligations:
- Compliance with filing of self-risk assessment;
- Compliance with filing of Financial and Operational Report, and maintenance of regulatory capital requirements; and
- Statistical information and performance reports for investment funds.

### Enhanced Industry Outreach

In 2021, the Commission significantly increased its meetings with registrants and licensees, specifically to enhance the consultation process for the development and implementation of new laws and standards. While social distancing restrictions remained in place, these took the form of increased virtual meetings to focus constituents' attention on and encourage dialogue about the various regulatory issues and solutions being contemplated.

## Capital Markets Overview

The Bahamas International Securities Exchange (BISX) continued to serve as a crucial element in the Bahamian capital markets as the only registered securities exchange. As at 31 December 2021, the market comprised 37 primary market listings (2020: 37) which included 20 ordinary shares with a market capitalization of $4.84 billion (2020: $4.51 billion), 8 preference shares with a market capitalization of $249 million, 9 Bahamas Government Stock (BGS) and corporate bonds with a face value of $462 million, and 231 Bahamas Registered Stock (BRS) with a face value of $3.7 billion.

The volume of shares traded on BISX in 2021 was 12.045 million (valued at $108.438 million) in contrast to 2020 when the volume of shares traded was 5.558 million (valued at $27.886 million). Additionally, as at 31 December 2021 the BISX All-share index closed at 2,228.24 compared to 2,092.46 in 2020, which represented a 6.50% increase.

# Risk Analytics and Examinations

## Self-Risk Assessments

In accordance with Part II–Duty of Financial Institutions, Section 5–Conduct of Risk Assessment of the Financial Transactions Reporting Act (FTRA), 2018, the Commission requires licensees and registrants to self-assess their identified risk(s), inclusive of Money Laundering, Financing of Terrorism and Proliferation Financing risk (AML/CFT/PF), and develop a comprehensive risk management system in order to take appropriate measures to manage and mitigate those risks.

A major component of the risk assessment is identifying, assessing and understanding the risk in relation to its facility holders and the jurisdictions of origin and operation and its products, services, transactions and delivery channels. This assessment should be documented, kept up-to-date and approved by Senior Management. Further, the risk assessment must be updated if any of these events occur:

- prior to the launch of a new product or business practice;
- prior to the use of new or developing technologies; and
- when there is a major event or development in the management and operation of the group.

Self-risk assessments were due at the end of December 2021. A self-risk assessment template disseminated to licensees and registrants increased the compliance rate for submission of self-risk assessments to 100% for both SIA and IFA registrants and licensees and over 85% for FCSPA licensees.

## Examinations

The examinations conducted by the Commission are categorized as routine and "for cause". Routine examinations are performed with an average frequency of four years. Inspections for cause are based upon credible information coming to the Commission's attention and are performed on an "as needed" basis. In cases where banks and trust companies fall under the regulatory scope of both the Commission and the Central Bank of The Bahamas (CBOB) examinations may be conducted jointly with the CBOB.

## Resumption of On-site Examinations

On site hybrid examinations resumed February 2021. Examiners took COVID-19 PCR tests prior to on site file reviews. Additionally, Microsoft Teams folders were set up to allow licensees and registrants to submit required documents for review and limit the time on premises.

## Other Updates

In February, the Commission held its annual virtual Agent Training for BICA licensees interested in being approved agents to conduct FCSPA examinations on behalf of SCB. A virtual discussion was held in March on the SIA (Financial Resources) Rules, 2021 to assist firms with the Regulatory Capital Calculation. Moving forward the Commission intends to conduct more annual training sessions to engage licensees and registrants on their required reporting (Interims, Audited Financial Statements, Regulatory Capital) and speak to areas of concern noted during the period under review.

## Examinations Priorities 2021

### Common Reporting Standards (CRS) – Proper tax filing (tax evasion/avoidance)

Examinations included a review of whether entities potentially pose a risk to the jurisdiction due to improper, inadequate or non-existent tax reporting. Particular focus was given to complex structuring,

which may have the potential to confuse the reporting responsibilities of licensees and registrants. The Commission distributed, in 2021, a desk-based thematic review to all licensees and registrants on this topic.

### Business continuity planning/Disaster recovery (BCP/DR)

Examination programs included a review of disaster recovery plans to test the robustness of the securities sector in the aftermath of various disaster scenarios. Examinations focused on:

- operational capacity and contingency planning;
- record retention with emphasis on wireless restoration and client access to data during downtime;
- safeguards for clients' privacy with electronic security of client information, including encryption policies, data management and accessibility;
- data protection; and
- proper configuration of network storage devices.

### Advisory fees and valuations for investment funds

Examinations reviewed disclosures related to fees and valuation controls and practices. Emphasis was placed on the valuation of client assets, due diligence, the oversight of investment managers, and how fees are calculated, tested and monitored to ensure accurate reporting to investors.

# Enforcement

The Enforcement arm of the Commission was impacted by the implementation in early 2021 of the FCSPA, 2020, which criminalized "financial schemes". The definition covers, inter alia, pyramid and Ponzi schemes and makes them unlawful activities. The Commission previously investigated such activities, but could not address them administratively or via criminal prosecution. The Commission now has the authority to prosecute such schemes as now they attract criminal liability under the FCSPA, 2020.

## Enforcement Priorities

### Improved communication and coordination with stakeholders

The Enforcement Department (END) worked to improve communication and coordination with bodies essential to carrying out its functions, such as the Financial Crime Unit of the Royal Bahamas Police Force, when addressing securities-related matters and matters under the FCSPA, 2020 that carry criminal penalties. The END aimed to work to improve relations with the Department of Public Prosecutions to streamline the handling of indictable criminal matters.

### Streamlining of investigations into fraud schemes

Since late 2019, the Commission observed an upward trend in financial schemes, particularly involving online multi-level marketing internet-based Ponzi schemes as well as "Asue-branded" schemes. This trend appears to have steadily increased moving into 2021. As a result of the promulgation of the FCSPA, 2020, which criminalizes the launch or promotion of certain criminal financial schemes, and recent amendments to securities laws, the Commission has been actively investigating such matters, and plans to actively prosecute them.

# Licensing, Registration and Examinations Overview

## Securities Industry Act (SIA), 2011

### Firms under the SIA

In 2021, the Commission approved **10** new firms under the Securities Industry Act (SIA). **5** firms upgraded their license to conduct registrable securities business. **6** firms surrendered their license in 2021. As at 31 December 2021, there were **167** registered securities firms in the industry, which represents an increase of **4** firms when compared to 31 December 2020.

**Table 7:** Firms registered under the SIA

| Category | Registered Firms as at 31 December 2020 | Newly Approved Firms as at 31 December 2021 | Surrenders Completed** 2021 | Registered Firms as at 31 December 2021 |
|---|---|---|---|---|
| Dealing as principal or agent | 3 | 0 | 0 | 3 |
| Dealing as agent only | 9 | 0 | 0 | 9 |
| Arranging deals in securities only | 0 | 0 | 0 | 0 |
| Managing securities only | 12 | 1 | 0 | 13 |
| Advising on securities only | 9 | 0 | 1 | 8 |
| Dealing as agent only and Arranging deals in securities | 11 | 0 | 0 | 11 |
| Dealing as agent only and Advising on securities | 1 | 0 | 0 | 1 |
| Arranging deals in securities and Managing securities | 1 | 0 | 0 | 1 |
| Arranging deals in securities and Advising on securities | 0 | 1 | 0 | 1 |
| Managing securities and Advising on securities | 46 | 1 | 3 | 44 |
| Dealing as principal or agent and Advising on securities | 1 | 0 | 0 | 1 |
| Dealing as principal or agent, Arranging deals in securities | 12 | 3 | 0 | 15 |
| Dealing as principal or agent, Managing securities and Advising on securities | 4 | 0 | 0 | 4 |
| Dealing as principal or agent, Arranging deals in securities and Advising on Securities | 1 | 0 | 0 | 1 |
| Dealing as principal or agent, Arranging deals in securities and Managing Securities | 2 | 1 | 0 | 3 |
| Arranging deals in securities, Managing securities and Advising on securities | 2 | 1 | 0 | 3 |
| Dealing as principal or agent, Arranging deals in securities, Managing securities and Advising on securities | 18 | 1 | 2 | 17 |
| Dealing as agent only, Arranging deals in securities, Managing securities and Advising on securities | 29 | 0 | 0 | 29 |
| Clearing facilities | 1 | 0 | 0 | 1 |
| Marketplaces | 1* | 1 | 0 | 2 |
| **Total** | **163** | **10** | **6** | **167** |

*Figure revised from SCB Annual Report 2020
**The surrenders includes surrenders completed from previous years that had not been reported.

## Market breakdown by activity

The SIA provides for five categories of registrable activities.

**Table 8:** Firms by registrable activities

| Category | 2021 |
|---|---|
| Dealing as principal or agent | 46 |
| Dealing as agent only | 50 |
| Arranging deals in securities | 83 |
| Managing securities | 119 |
| Advising on securities | 115 |

## Individuals under the SIA

In 2021, **73** individuals were approved under the SIA. From the individuals recorded as registered at the end of 2020, a total of 588** individual registrations were surrendered or not renewed. As at 31 December 2021, there were **564** registered individuals under the SIA.

**Table 9:** Individuals registered under the SIA

| Category | Registered Individuals as at 31 December 2020 | Newly Approved Individuals as at 31 December 2021 | Registered Individuals as at 31 December 2021 |
|---|---|---|---|
| CEO | 163 | 5 | 157 |
| Compliance officer | 163 | 24 | 162 |
| Representative – Trading | 239 | 20 | 151 |
| Representative – Discretionary management | 118 | 2 | 147 * |
| Representative – Advising | 165 | 8 | 192 * |
| CEO and Representative – Trading | 8 | 3 | 7 |
| CEO and Representative – Discretionary management | 43 | 0 | 34 |
| CEO and Representative – Advising | 13 | 1 | 9 |
| Representative – Trading and Discretionary management | 17 | 1 | 13 |
| Representative – Trading and Advising | 29 | 6 | 24 |
| Representative – Discretionary management and Advising | 49 | 1 | 35 |
| CEO, Representative – Trading and Advising | 2 | 0 | 1 |
| CEO, Representative – Discretionary management and Advising | 32 | 0 | 27 |
| Representative – Trading, Discretionary management and Advising | 28 | 1 | 26 |
| CEO, Representative – Trading, Discretionary management and Advising | 10 | 1 | 9 |
| **Total** | **1,079** | **73** | **564** |

*The figures for Discretionary Management and Advising Representatives include approvals from previous years that had not been reported.
**The surrenders for individuals includes surrenders completed from previous years that had not been reported.

## Market breakdown by activity

The SIA provides for three categories of registrable activities for individuals. A single individual may be registered for a combination of these activities.

**Table 10:** Individuals by registrable activities

| Category | 2021 |
|---|---|
| Trading Representative | 200 |
| Discretionary management Representative | 291 |
| Advising Representative | 323 |

# Securities Industry Act (SIA), 2011 Examinations

## On-site Examinations of SIAs

During 2021, pursuant to the SIA, 2011, **15** on-site examinations for firms registered to conduct securities business were conducted. Of these, **14** were Routine and **1** was For Cause. There were no Joint On-Site examinations of licensees conducted with CBOB during 2021.

**Table 11:** Inspections by category of registration

| Category | 2021 |
|---|---|
| Dealing as agent only | 1 |
| Managing securities only | 1 |
| Dealing as agent only and Arranging deals in securities | 1 |
| Managing securities and Advising on securities | 1 |
| Dealing as principal or agent, Arranging deals in securities and Managing on securities | 1 |
| Arranging deals in securities, Managing securities and Advising on securities | 1 |
| Dealing as principal or agent, Arranging deals in securities, Managing securities and Advising on securities | 8 |
| Dealing as agent only, Arranging deals in securities, Managing securities and Advising on securities | 1 |
| **Total** | **15** |

## Investment Funds Act, 2019

On 1 September 2019, the Investment Funds Act, 2019 (IFA) came into force providing for the administration of a Bahamas-based fund by a foreign administrator (licensed or established in a prescribed jurisdiction), and removing the category of exempt* investment fund administrator.

### Investment Fund Administrators

During 2021, **3** investment fund administrators were licensed by the Commission including a previous exempt investment fund administrator that transitioned to a restricted investment fund administrator. As at 31 December 2021, there were **45** licensed investment fund administrators.

During 2021, **3** foreign fund administrators acted on behalf of Bahamas-based funds. At the end of December 2021, **26** licensed investment funds were being self-administered pursuant to section 8 of the IFA, 2019.

**Table 12:** Investment Fund Administrator Approvals

| Category | Licensed Administrators as at 31 December 2020 | Newly Approved Licensed Administrators as at 31 December 2021 | Surrenders as at 31 December 2021 | Licensed Administrators as at 31 December 2021 |
|---|---|---|---|---|
| Exempt* | 1 | 0 | 1 | N/A |
| Unrestricted | 33 | 1 | 2 | 32 |
| Restricted | 14 | 2 | 3 | 13 |
| **Total** | **47** | **3** | **5** | **45** |

## IFA, 2019 Examinations

### Investment Fund Administrators

A total of **8** examinations of licensed investment fund administrators were conducted during 2021.

### Investment Funds

In 2021, **77** investment funds were approved and licensed; of those, the Commission licensed **9**, and **68** were licensed by unrestricted investment fund administrators and filed with the Commission. During the 2021 period, **80** funds entered into liquidation or indicated a surrender of their license; additionally, **101** investment funds satisfactorily completed the process by year-end resulting in **683** licensed investment funds at year-end.

The Professional Fund and SMART fund model 007 continue to have new applications and approvals despite a net decrease in funds over the year.

**Table 13:** Investment Funds Registered Under IFA, 2019

| Category | Funds as at 31 December 2020 | Newly Approved Funds as at 31 December 2021 | Funds as at 31 December 2021 |
|---|---|---|---|
| Standard Funds | 32 | 1 | 29 |
| Professional Funds | 226 | 24 | 214 |
| SMART Fund Model 001 | 7 | 0 | 12 |
| SMART Fund Model 002 | 133 | 13 | 130 |
| SMART Fund Model 003 | 9 | 0 | 3 |
| SMART Fund Model 004 | 144 | 7 | 123 |
| SMART Fund Model 005 | 4 | 0 | 4 |
| SMART Fund Model 006 | 1 | 0 | 2 |
| SMART Fund Model 007 | 156 | 32 | 166 |
| Total | 712 | 77 | 683 |

**Table 14:** Investment Funds licensed during 2021 by category

| | Licensed and filed by UIFAs | Licensed by SCB |
|---|---|---|
| Standard Fund | N/A | 1 |
| Professional Funds | 18 | 6 |
| SMART Fund Model 001 | 0 | 0 |
| SMART Fund Model 002 | 13 | 0 |
| SMART Fund Model 003 | 0 | 0 |
| SMART Fund Model 004 | 6 | 1 |
| SMART Fund Model 005 | 0 | 0 |
| SMART Fund Model 006 | 0 | 0 |
| SMART Fund Model 007 | 31 | 1 |
| Total | 68 | 9 |

## Investment Funds Sector Net Asset Values (NAVs)

The Commission licenses investment funds in The Bahamas that invest in numerous underlying investments such as private equity, stocks, fixed income, real estate, ETFs, derivatives and cryptocurrency; in various structures, including hedge funds, fund of funds and feeder funds.

Total net asset value by all investment fund administrators at 31 December 2021 was $50.0 billion, compared to $49.8 billion for the period ending 31 December 2020, an increase of 0.6%.

## Financial and Corporate Service Providers Act (FCSPA), 2020

On 14 December 2020, the Financial and Corporate Service Providers Act (FCSPA), 2020 was promulgated enhancing the regulatory framework for the industry.

In 2021, post COVID-19 pandemic, emphasis was placed on transitioning licensees under the FCSP, 2000 to the new FCSPA, 2020. The transitional period was six months following the implementation of the new Act. The FCSPA, 2020 allowed licensees to be licensed in the category of Corporate Services, Financial Services or Financial and Corporate Services, based on their business activity. The FCSPA, 2020 now requires persons engaged in areas such as financial advisory/consultancy services, financial intermediation, financial leasing services, money broking, custody of digital assets and wallet providers to be licensed by the Commission.

During 2021, **102** financial and corporate service providers (FCSPs) were either newly licensed or transitioned under the new legislation, while **198** licenses were either surrendered or did not transition under the new legislation.

As at 31 December 2021, there were **246** licensed FCSPs. This comprised **184** licensees in the category of Corporate Service Provider, **28** licensees in the category of Financial Service Provider, and **34** licensees in the category of Financial and Corporate Service Provider.

**Table 15:** Registered Financial and Corporate Service Providers as at 31 December 2021

| Category | FCSPs as at 31 December 2020 | Approved/ Transitioned 2021 | Surrenders/ Non-Transitioned 2021 | FCSPs as at 31 December 2021 |
|---|---|---|---|---|
| Companies | 201 | 65 | 90 | 176 |
| Partnerships | 30 | 3 | 18 | 15 |
| Individuals/ Unincorporated Bodies | 111 | 34 | 90 | 55 |
| Total | 342 | 102 | 198 | 246 |

## FCSPA, 2020 Examinations

A total of **15** examinations of financial and corporate service providers were conducted during 2021; **8** were conducted by the Commission and **7** conducted by the Commission's appointed agents.

**Table 16:** Examinations by category of Financial and Corporate Service Providers during 2021

| Category | Conducted by SCB | Conducted by Agents |
|---|---|---|
| Corporate Services only | 8 | 4 |
| Financial Services only | 0 | 2 |
| Financial and Corporate Services | 0 | 1 |
| Total | 8 | 7 |

## Digital Assets and Registered Exchanges Act, 2020 (DARE)

Ever focused on innovation, the Commission enacted legislation that placed The Bahamas at the forefront of digital asset regulation. The Digital Assets and Registered Exchanges Act (DARE), 2020 came into force on 14 December 2020, providing for the regulation of digital asset business offered in or from within The Bahamas.

At 31 December 2021, there were **3** firms registered to conduct digital assets business. Of those, **1** was a new registrant licensed as a digital token exchange under DARE, and **2** were current licensees of the Commission, registered under other legislation, which added digital assets business to their portfolio.

## DARE, 2020 Examinations

Licensees were not registered under the DARE Act until the last quarter of 2021, thus would not have come up for routine examination in the 2021 period. However, the Commission's vigorous on-boarding process of all licensees and registrants includes a review of the systems and policies in place as well as Fit and Proper assessments of Key Personnel.

## Enforcement Matters

There were **12** enforcement matters brought forward from 2020. During 2021, there were no matters opened or closed. As at 31 December 2021, 12 enforcement matters remained open, of which 9 involved litigation and 3 were administrative matters. Administrative matters primarily concern non-compliance with filing obligations and client files/records under the Securities Industry Act and Regulations. During 2021, END continued to monitor the mentioned outstanding matters.

**Table 17:** The nature of enforcement matters in 2021

| Type of Matter | Matters brought forward from previous years into 2021 | New matters opened in 2021 | Matters closed in 2021 | Matters referred to another agency in 2021 | Matters that remained open as at 31 December 2021 |
|---|---|---|---|---|---|
| Litigation | 9 | 0 | 0 | 0 | 9 |
| Administrative | 3 | 0 | 0 | 0 | 3 |
| Criminal | 0 | 0 | 0 | 0 | 0 |
| Other | 0 | 0 | 0 | 0 | 0 |
| Total | 12 | 0 | 0 | 0 | 12 |

The Commission issued **10** enforcement-related notices in 2021. The full text of Public Notices, investor alerts and press releases issued by the Commission, along with copies of judgements, are available on SCB's website.

**Table 18:** Public Notices issued during 2021

| Notice | Issue Date | Description* |
|---|---|---|
| QUBITTECH | 19 March 2021 | **Public Notice No 3.** It was brought to the attention of the Commission that Qubittech may be carrying out activities that are registrable under one or more of the Acts. Enquiries determined that the entity was not registered with or licensed by the Commission. Therefore, a Notice was issued warning the public about doing business with this entity. |

**Table 18:** Public Notices issued during 2021 (continued)

| Notice | Issue Date | Description* |
|---|---|---|
| WISELING | 19 March 2021 | **Public Notice No 4.** It was brought to the Commission's attention that Wiseling may be carrying out activities that are registrable under one or more of the Acts. The Commission, in the course of its investigation, noted that the entity and/or its affiliates were not registered with the Commission. Therefore, a Notice was issued warning the public about doing business with this entity. |
| KARATBARS INTERNATIONAL GmbH aka KARATBARS INTERNATIONAL aka KARATBIT FOUNDATION or KARATBARS BAHAMAS KARATBIT | 19 March 2021 | **Public Notice No 5.** It was brought to the attention of the Commission that an entity called Karatbars International GmbH, aka Karatbars International, aka Karatbit Foundation, aka Karatbars Bahamas or Karatbit may be carrying out activities that are registrable under one or more of the Acts. An investigation was conducted and it was determined that the entity was not registered with or licensed by the Commission. Therefore, a Notice was issued warning the public about doing business with this entity. |
| ENTITIES NOT REGULATED BY THE SECURITIES COMMISSION OF THE BAHAMAS | 19 March 2021 | **Public Notice No 6.** It was brought to the attention of the Commission that Assetval PLC, EX97 PLC, Forex PLC, Ifxon PLC, Globalval PLC, Metaex PLC, Popsmart PLC, Profitpro Plc, Traderx Plc and Uniten-Ex Plc all provided a false statement on their website, claiming to be authorized and regulated by the Commission. Therefore, a Notice was issued warning the public about doing business with these entities and their agents/representatives. |
| TRADEVOLT | 19 March 2021 | **Public Notice No 7.** It was brought to the attention of the Commission that Tradevolt may be carrying out activities that are registrable under one or more of the Acts. An investigation was conducted and it was determined that the entity was not registered with or licensed by the Commission. Therefore, a Notice was issued warning the public about doing business with this entity. |
| ANS-AK.COM | 10 May 2021 | **Public Notice No 8.** It was brought to the attention of the Commission that ans-ak.com provided a false statement on their website, claiming to be authorized and regulated by the Commission. An investigation was conducted and it was determined that the entity was not registered with or licensed by the Commission. Therefore, a Notice was issued warning the public about doing business with this entity. |
| RUIMEI GLOBAL, aka RUIMEI GLOBAL GROUP, Aka RUIMEI GLOBAL ENTERPRISE GROUP or COOLCAT | 21 June 2021 | **Public Notice No 9.** It was brought to the attention of the Commission that an entity called Ruimei Global, aka Ruimei Global Group, aka Ruimei Global Enterprise Group or Coolcat provided a false statement on their website, claiming to be authorized and regulated by the Commission. An investigation was conducted and it was determined that the entity nor any affiliate was registered with or licensed by the Commission. Therefore, a Notice was issued warning the public about doing business with this entity and its affiliates. |

**Table 18:** Public Notices issued during 2021 (continued)

| Notice | Issue Date | Description* |
|---|---|---|
| RAY-E SECURITIES INVESTMENT COMPANY (RAY-E) | 22 July 2021 | **Public Notice No 10.** It was brought to the attention of the Commission that Ray-E Securities Investment Company aka Ray-E provided a false statement on their websites, claiming to be authorized and regulated by the Commission. An investigation was conducted and it was determined that the entity was not registered with or licensed by the Commission. Therefore, a Notice was issued warning the public about doing business with this entity. |
| ASUE MAXXED (ASM), aka ASUE MAXX, aka AMAXX, aka AMAXX FINANCIALS, aka AMAXX INVESTMENTS, aka AMAXX CASH MANAGEMENT or aka AMAXXED FINANCIAL INC. | 26 August 2021 | **Public Notice No 11.** It was brought to the attention of the Commission that that an entity called Asue Maxxed (ASM), aka Asue Maxx, aka Amaxx, aka Amaxx Financials, aka Amaxx Investments, aka Amaxx Cash Management or aka Amaxxed Financial Inc. may be carrying out activities that are registrable under one or more of the Acts. An investigation was conducted and it was determined that the entity was not registered with or licensed by the Commission. Therefore, a Notice was issued warning the public about doing business with this entity. |
| FX PRIMARY LTD or FXPRIMARY LLC (FX PRIMARY) | 27 August 2021 | **Public Notice No 12.** It was brought to the attention of the Commission that FX Primary Ltd or FX Primary LLC (FX Primary) provided a false statement on their websites claiming to be authorized and regulated by the Commission. An investigation was conducted and it was determined that the entity was not registered with or licensed by the Commission. Therefore, a Notice was issued warning the public about doing business with this entity. |

* The full text of Public Notices Investor Alerts and press releases issued by the Commission by law along with copies of judgements, are available on SCB's website

## Other Updates

The END underwent a one-week OSINT (Open Source Intelligence) training programme in December 2021. The training was centered on online investigations for purposes of identifying persons behind online unlawful activity with a view to bringing actions against those persons. Additional training will continue in 2022.

During 2021, the Commission formally sought the assistance of overseas regulators, using the IOSCO MMoU, with providing information to assist with the Commission's ongoing investigations. To date, the Enforcement Department continues to see the usefulness of this resource. The department sent two overseas requests for information during the course of the year. As at the 31 December 2021, the Commission had received responses to both requests, as well as the response to an outstanding overseas regulatory request sent in 2020.



# Legislation

# Legislative Updates

## Securities Industry (Business Capital) Rules, 2021
### Gazetted 23 June 2021

The Securities Industry (Business Capital) Rules, 2021 (the Business Capital Rules) are designed to allow small businesses to seek business capital (funding) in the capital markets without having to file a prospectus with the Commission.

The Business Capital Rules establish the standards and obligations for persons wishing to engage in crowdfund offerings, and relax various regulatory requirements, representing a lighter touch regulation of crowdfund offerings when compared with traditional initial public offerings. Overall, the Business Capital Rules make the capital raising process for small businesses less costly and burdensome, while still ensuring the level of investor protection that currently exists in securities laws.

The Business Capital Rules regulate "business funding" as an exempt distribution under section 92(i) of the Securities Industry Act 2011 to source or obtain business capital, and "crowdfunding" of a project or venture by raising money from the public through a crowdfund digital platform.

The Business Capital Rules apply to persons –
- sourcing business capital as an eligible person;
- operating or participating or intending to operate or participate in equity-based crowdfunding by distributing securities;
- investing in an eligible person; or
- registered or intending to be registered as an equity-based crowdfunding platform or restricted marketplace.

## Consultation Documents

A critical part of the development of legislation is the public consultation process. As a part of the process, draft documents are disseminated to Commission registrants, licensees and stakeholders and posted on SCB's website for comments and input.

## Securities Industry (Amendment) Bill, 2021

The Bill proposes to amend the Act to require disclosure where a material contract is entered into with a public issuer and a director of the issuer is a party or beneficiary to that contract; require a public issuer to cause its financial statements to be posted on the company's website or published in the newspaper; and make the provision of a register of public issuers mandatory.

The Bill also proposes to provide for the automatic revocation of a license, where a licensee fails to meet requirements to renew its license, submit its annual filings, or pay its annual fees.
Issue date: 23 April 2021

## Securities Industry (Amendment) Regulations, 2021

The proposed Securities Industry (Amendment) Regulations intend to provide for a new regulatory capital calculation, and repeal and replace the Operational and Financial Report form (Form 13) in the First Schedule to reflect proposed financial resource requirements.
Consultation period: 12 March – 7 May 2021

## Securities Industry (Financial Resources) Regulatory Rules, 2021

The proposed Rules intend to update the current regulatory capital requirements and calculations, as well as ensure initial and ongoing capital and other prudential requirements for registered firms to reflect the risks that they undertake.
Consultation period: 12 March – 7 May 2021

## International Obligations (Economic and Ancillary Measures) Act (IOEAMA)

The International Obligations (Economic and Ancillary Measures) Act (IOEAMA) operationalizes the international obligations of The Bahamas, and provides for the imposition of economic sanctions, and the application of counter measures as required.

In accordance with the requirements of IOEAMA and the Anti-Terrorism Act 2018, the Commission issues notices of United Nations Security Council Resolutions (UNSCRs), relevant annexes, schedules, and amendments thereto, to licensees and registrants for appropriate action. The Commission monitors the compliance of licensees and registrants with required actions through quarterly confirmations of compliance, and annual declarations of compliance, and as a component of onsite examinations.

The Commission disseminated **27** IOEAMA UNSC resolution related notices in 2021.

## Caribbean Financial Action Task Force (CFATF) Update

The CFATF mutual evaluation report provides a summary of the Anti-Money Laundering/Counter Financing of Terrorism and Proliferation Financing (AML/CFT/PF) measures in place within the country. The report also gives an analysis of the country's level of compliance with the FATF 40 Recommendations, the level of effectiveness of the AML/CFT/PF regime, and recommendations on how the regime could be strengthened.

The Bahamas has committed to implement and maintain an appropriate and effective AML/CFT/PF regime inclusive of implementation of a vigorous AML/CFT legislative framework, a National Risk Assessment framework, and AML/CFT Guidance Notes.

The National AML/CFT/CFP Risk Assessment (NRA) commenced in February 2021 with the assistance of an international risk assessment expert secured through the Group of Financial Services Regulators and is scheduled for completion in the first quarter of 2022.

In May 2021, The Bahamas applied for technical compliance rerating to the CFATF regarding its compliance with 10 of the FATF Recommendations. At this time, The Bahamas was rated as Compliant or largely compliant with 30 of the FATF 40 Recommendations. The rerating process significantly increased The Bahamas' technical compliance ratings, and the country is currently rated as Compliant or largely compliant with 38 of the FATF 40 Recommendations.

The application for rerating followed the delisting of The Bahamas from the FATF list of Jurisdictions Under Increased Monitoring, in December 2020, due to remediation efforts by The Bahamas regarding the effectiveness of its AML/CFT/CPF regime.

## International Cooperation

Pursuant to Sections 34 and 36 of the Securities Industry Act, 2011 (SIA), the Commission is authorized to exchange information with its international counterparts for administrative, supervisory and enforcement purposes including criminal proceedings related to securities laws.

The Commission is an 'A' signatory to IOSCO's Multilateral Memorandum of Understanding Concerning Consultation and Cooperation and the Exchange of Information (MMoU). Where the Commission receives a request from an international counterpart that is also an 'A' signatory to the MMoU, information is exchanged in accordance with the terms of the MMoU. Prior to exchanging information, the Commission evaluates every request received to ensure that it meets minimum information sharing requirements, as set out in legislation and the terms of the MMoU.

In 2021, **15** requests were received by The Commission and 23 requests were brought forward from previous periods. Of the **15** requests received, **4** originated from the United States, **5** from France, **1** from the United Kingdom, **3** from Italy, **2** from Canada (**1** from British Columbia and **1** from Quebec). During 2021, **13** requests were closed, **3** of those matters were from the **7** previously stayed matters brought over from 2020. At the end of 2021, **25** matters remained open. No new matters were stayed or denied in 2021.

During 2021, the Commission made requests of two Overseas Regulators pursuant to the IOSCO MMoU, namely: **1** to Cyprus Securities & Exchange Commission and **1** to Superintendencia del Mercado de Valores (Panama). At year's end, the Commission had received responses to all two of the requests made and received a response relative to a request made in 2020.

# Frequently Used Abbreviations and Terms

AC – Audit Committee
AML/CFT/PF – Anti-money laundering /Countering the financing of terrorism/Proliferation of weapons of mass destruction
ATA, 2018 – Anti-Terrorism Act, 2018
BCP – Business continuity plan
BICA – Bahamas Institute of Chartered Accountants
BISX – Bahamas International Securities Exchange
CBOB/Central Bank – The Central Bank of The Bahamas
CFD – Contracts for Differences
CFTC – Commodities and Futures Trading Commission
CFATF – Caribbean Financial Action Task Force
CGSR – Caribbean Group of Securities Regulators
CRS – Common Reporting Standard of the OECD
CWG – Caribbean Working Group
COSRA – Council of Securities Regulators of the Americas
DARE – Digital Assets and Regulated Exchanges Act, 2020
DASPs – Digital Asset Service Providers
DR – Disaster recovery
EPC – Elective Professional Recategorization Guildelines
Ex officio member – A member of the Board by virtue of the office he or she holds
FATF – Financial Action Task Force
FCSP – Financial and Corporate Service Provider
FCSP, 2000 – Financial and Corporate Service Providers Act, 2000
FCSPA, 2020 – Financial and Corporate Service Providers Act, 2020
GEMC – Growth and Emerging Markets Committee
GFSR – Group of Financial Services Regulators
HRC – Human Resource Committee
IARC – Inter-American Regional Committee
IFA, 2019 – Investment Funds Act, 2019
IFSC – International Financial Services Commission
IFIE – International Forum of Investor Education
IOEAMA – International Obligations (Economic and Ancillary Measures) Act
IOSCO – International Organization of Securities Commissions
IOSCO EMMoU – Enhanced Multilateral Memorandum of Understanding Concerning Consultation and Cooperation and the Exchange of Information
IOSCO MMoU – Multilateral Memorandum of Understanding Concerning Consultation and Cooperation and the Exchange of Information
MMoU MG SC – MMoU Monitoring Group Steering Committee
NAV – Net Asset Value
NRA – National Risk Assessment
ORG – Operational Resilience Group
OSINT – Open Source Intelligence
PF – Proliferation Financing
SCB – Securities Commission of The Bahamas
SIA, 2011 – Securities Industry Act, 2011
SMART Fund – Specific Mandate Alternative Regulatory Test Fund
SWOT – Strength, Weakness, Opportunity, Threat
The Commission – Securities Commission of The Bahamas
UIFA – Unrestricted Investment Fund Administrator
UNSC – United Nations Securities Council
UNSCR – United Nations Securities Council Resolution
VASP – Virtual Assets Service Providers

# Financials



# Financial Summary

The audited financial statements that appear on the following pages of this Annual Report represent the financial position of the Securities Commission of The Bahamas (the Commission) as at 31 December 2021 along with the Commission's financial performance and cash flows for the year then ended in accordance with International Financial Reporting Standards. Comparative figures for the year ended 31 December 2020 are shown.

The Commission's income is mainly generated from fees charged to licensees, registrants and applicants under the Securities Industry Act, 2011 (SIA), the Investment Funds Act, 2019 (IFA), and the Financial and Corporate Services Providers Act, 2020 (FCSPA) as well as funding from the Government of The Bahamas (the Government). The Financial and Corporate Service Providers (Fees) Rules, 2020 and the Securities Industry (Fee) Rules, 2020 both came into effect on 30 December 2020. The enactment of both pieces of legislation positively impacted the Commission's 2021 financial performance. The restructuring of the annual corporate service provider fee to account for the number of active international business companies administered by a registered agent/registered office, along with the establishment of fees for various other financial and corporate services, resulted in an increase in fees from FCSPA licensees in the amount of $1.45 million. Fees from SIA registrants increased by $1.43 million. While there was some contraction in the overall number of licensees and registrants supervised by the Commission, the new fee rules contributed to a $3.61 million increase in fee income, a 49% change over the prior year.

Overall, expenses remained relatively steady with a 2% increase of approximately $0.20 million. The fraud loss expense of $0.85 million (booked in 2020) was replaced in 2021 by increases in other expenses including salaries, wages and employee benefits as well as provisions for expected credit losses of $0.75 million and $0.19 million respectively. The changes to the fee structure combined with a relatively low increase in overall expenses led to net comprehensive income of $2.95 million.

Net assets grew by 57% from $5.15 million in 2020 to $8.10 million in 2021. Positive cash flows from operations was the major contributing factor to the $2.48 million increase in the Commission's most liquid asset, cash on hand and at banks. In the short to medium term, the Commission plans to utilize available cash to facilitate changes to its regulatory framework (including the SIA, IFA and digital assets) and increase investments in its technological infrastructure to improve operational efficiency and achieve strategic initiatives.



# Independent auditors' report

To the Members of the Securities Commission of The Bahamas

## Our opinion

In our opinion, the financial statements present fairly, in all material respects, the financial position of the Securities Commission of The Bahamas (the Commission) as at 31 December 2021, and its financial performance and its cash flows for the year then ended in accordance with International Financial Reporting Standards.

***What we have audited***

The Commission's financial statements comprise:

- the statement of financial position as at 31 December 2021;
- the statement of comprehensive income for the year then ended;
- the statement of changes in equity for the year then ended;
- the statement of cash flows for the year then ended; and
- the notes to the financial statements, which include significant accounting policies and other explanatory information.

## Basis for opinion

We conducted our audit in accordance with International Standards on Auditing (ISAs). Our responsibilities under those standards are further described in the *Auditors' responsibilities for the audit of the financial statements* section of our report.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our opinion.

***Independence***

We are independent of the Commission in accordance with the International Code of Ethics for Professional Accountants (including International Independence Standards) issued by the International Ethics Standards Board for Accountants (IESBA Code). We have fulfilled our other ethical responsibilities in accordance with the IESBA Code.

## Other information

Management is responsible for the other information. The other information comprises The Securities Commission of The Bahamas 2021 Annual Report  (but does not include the financial statements and our auditors' report thereon).

Our opinion on the financial statements does not cover the other information and we do not express any form of assurance conclusion thereon.

In connection with our audit of the financial statements, our responsibility is to read the other information identified above and, in doing so, consider whether the other information is materially inconsistent with

PricewaterhouseCoopers,  2 Bayside Executive Park, West Bay Street & Blake Road, P.O. Box N-3910, Nassau, Bahamas  T: + 1 242 302 5300, F: + 1 242 302 5350, www.pwc.com/bs



the financial statements or our knowledge obtained in the audit, or otherwise appears to be materially misstated.   If, based on the work we have performed, we conclude that there is a material misstatement of this other information, we are required to report that fact. We have nothing to report in this regard.

## Responsibilities of management and those charged with governance for the financial statements

Management is responsible for the preparation and fair presentation of the financial statements in accordance with International Financial Reporting Standards, and for such internal control as management determines is necessary to enable the preparation of financial statements that are free from material misstatement, whether due to fraud or error.

In preparing the financial statements, management is responsible for assessing the Commission's ability to continue as a going concern, disclosing, as applicable, matters related to going concern and using the going concern basis of accounting unless management either intends to liquidate the Commission or to cease operations, or has no realistic alternative but to do so.

Those charged with governance are responsible for overseeing the Commission's financial reporting process.

## Auditors' responsibilities for the audit of the financial statements

Our objectives are to obtain reasonable assurance about whether the financial statements as a whole are free from material misstatement, whether due to fraud or error, and to issue an auditors' report that includes our opinion. Reasonable assurance is a high level of assurance, but is not a guarantee that an audit conducted in accordance with ISAs will always detect a material misstatement when it exists. Misstatements can arise from fraud or error and are considered material if, individually or in the aggregate, they could reasonably be expected to influence the economic decisions of users taken on the basis of these financial statements.

As part of an audit in accordance with ISAs, we exercise professional judgment and maintain professional scepticism throughout the audit. We also:

- Identify and assess the risks of material misstatement of the financial statements, whether due to fraud or error, design and perform audit procedures responsive to those risks, and obtain audit evidence that is sufficient and appropriate to provide a basis for our opinion. The risk of not detecting a material misstatement resulting from fraud is higher than for one resulting from error, as fraud may involve collusion, forgery, intentional omissions, misrepresentations, or the override of internal control.

- Obtain an understanding of internal control relevant to the audit in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Commission's internal control.

- Evaluate the appropriateness of accounting policies used and the reasonableness of accounting estimates and related disclosures made by management.

- Conclude on the appropriateness of management's use of the going concern basis of accounting and, based on the audit evidence obtained, whether a material uncertainty exists related to events or conditions that may cast significant doubt on the Commission's ability to continue as a going concern. If we conclude that a material uncertainty exists we are required to draw attention in our auditors' report to the related disclosures in the financial statements or, if such disclosures are inadequate, to modify our opinion. Our conclusions are based on the audit evidence obtained up to the date of our



auditors' report. However, future events or conditions may cause the Commission to cease to continue as a going concern.

- Evaluate the overall presentation, structure and content of the financial statements, including the disclosures, and whether the financial statements represent the underlying transactions and events in a manner that achieves fair presentation.

We communicate with those charged with governance regarding, among other matters, the planned scope and timing of the audit and significant audit findings, including any significant deficiencies in internal control that we identify during our audit.

**Other matter**
This report, including the opinion, has been prepared for and only for the Members in accordance with the terms of our engagement letter and for no other purpose. We do not, in giving this opinion, accept or assume responsibility for any other purpose or to any other person to whom this report is shown or into whose hands it may come save where expressly agreed by our prior consent in writing.

*PricewaterhouseCoopers*
**Chartered Accountants**
**Nassau, Bahamas**

**22 June 2022**

**Securities Commission of The Bahamas**
**(Established under the laws of the Commonwealth of The Bahamas)**

**Statement of Financial Position**
**As at 31 December 2021**
**(Expressed in Bahamian dollars)**

|  | 2021<br>$ | 2020<br>$ |
|---|---:|---:|
| **ASSETS** | | |
| Cash on hand and at banks | 2,823,634 | 340,378 |
| Accounts receivable, net (Note 6) | 661,802 | 314,237 |
| Prepaid expenses and other assets | 30,955 | 105,741 |
| Investments in debt securities (Note 4) | 7,903,468 | 5,901,481 |
| Right-of-use assets (Note 5) | 2,914,240 | 3,504,836 |
| Property and equipment (Note 8) | 882,968 | 770,394 |
| **Total assets** | **15,217,067** | **10,937,067** |
| | | |
| **LIABILITIES** | | |
| Accounts payable and accrued expenses | 1,494,850 | 849,077 |
| Other liabilities | 298,991 | 444,902 |
| Lease liabilities (Note 5) | 3,287,531 | 3,798,956 |
| Deferred income (Note 9) | 2,032,007 | 692,747 |
| **Total liabilities** | **7,113,379** | **5,785,682** |
| | | |
| **NET ASSETS** | **8,103,688** | **5,151,385** |
| | | |
| **REPRESENTED BY:** | | |
| Surplus | 4,011,508 | 1,220,490 |
| Revaluation reserve (Note 10) | (197,820) | (189,105) |
| Reserve fund (Note 10) | 4,170,000 | 4,000,000 |
| Special purpose reserve (Note 10) | 120,000 | 120,000 |
| | **8,103,688** | **5,151,385** |

**APPROVED AND AUTHORISED FOR ISSUE BY THE MEMBERS OF THE SECURITIES COMMISSION OF THE BAHAMAS AND SIGNED ON THEIR BEHALF BY:**

_____                    _____
**Chairman**                                             **Director**

21 June 2022
**Date**

The accompanying notes are an integral part of these financial statements.

## Securities Commission of The Bahamas

### Statement of Comprehensive Income
### For the Year Ended 31 December 2021
### (Expressed in Bahamian dollars)

|  | 2021 $ | 2020 $ |
|---|---|---|
| **INCOME** | | |
| Fee income | | |
| Securities industry licensees and registrants | 5,050,322 | 3,624,131 |
| Investment funds | 2,446,498 | 2,074,334 |
| Investment fund administrators and managers | 1,124,973 | 1,013,813 |
| Financial and corporate service providers | 1,927,726 | 472,758 |
| Digital assets and registered exchanges | 48,976 | - |
| Penalties | 232,099 | 96,443 |
| Securities exchange | 46,406 | 13,500 |
| Other | 35,025 | 10,557 |
| | | |
| Total fee income | 10,912,025 | 7,305,536 |
| | | |
| Government subvention (Note 9) | 170,000 | 1,863,992 |
| Interest income | 308,995 | 264,466 |
| Other income | 1,349,935 | 336,948 |
| | | |
| **Total income** | **12,740,955** | **9,770,942** |

The accompanying notes are an integral part of these financial statements.

**Securities Commission of The Bahamas**

**Statement of Comprehensive Income**
**For the Year Ended 31 December 2021**
**(Expressed in Bahamian dollars)**
**(Continued)**

|  | 2021 $ | 2020 $ |
|---|---|---|
| **EXPENSES** | | |
| Salaries, wages and employee benefits (Note 11) | 6,445,865 | 5,698,868 |
| Fraud loss (Note 13) | - | 850,000 |
| Rent (Note 5) | 506,618 | 606,078 |
| Depreciation on right-of-use assets (Note 5) | 602,305 | 601,439 |
| Professional fees | 315,377 | 401,735 |
| Office | 376,595 | 332,761 |
| Depreciation on property and equipment (Note 8) | 416,464 | 296,294 |
| Training and conferences | 303,469 | 238,270 |
| Interest expense on lease liabilities (Note 5) | 196,234 | 224,015 |
| Utilities and property charges | 102,284 | 109,113 |
| Advertising and public relations | 25,476 | 69,648 |
| Repairs and maintenance | 53,975 | 45,586 |
| Membership fees | 46,736 | 41,426 |
| Printing and publications | 18,904 | 22,269 |
| Bank charges | 35,028 | 21,544 |
| Investor education | 124,149 | 13,383 |
| Provision for expected credit losses (Note 6) | 194,249 | - |
| Legislative initiatives | 8,742 | - |
| Miscellaneous | 7,467 | 9,408 |
| **Total expenses** | **9,779,937** | **9,581,837** |
| **Net income** | **2,961,018** | **189,105** |
| **Other comprehensive loss** | | |
| *Items that may be reclassified to net income* | | |
| Change in fair value of investments in debt securities at fair value through other comprehensive income | (8,715) | (189,105) |
| **Total comprehensive income** | **2,952,303** | **-** |

The accompanying notes are an integral part of these financial statements.

**Securities Commission of The Bahamas**

**Statement of Changes in Net Assets**
**For the Year Ended 31 December 2021**
**(Expressed in Bahamian dollars)**

|  | Surplus $ | Revaluation Reserve $ | Reserve Fund $ | Special Purpose Reserve $ | Total $ |
|---|---|---|---|---|---|
| **Balance as at 1 January 2020** | **1,031,385** | **-** | **4,000,000** | **120,000** | **5,151,385** |
| Net income | 189,105 | - | - | - | 189,105 |
| Other comprehensive loss | - | (189,105) | - | - | (189,105) |
| Total comprehensive income | 189,105 | (189,105) | - | - | - |
| **Balance as at 31 December 2020** | **1,220,490** | **(189,105)** | **4,000,000** | **120,000** | **5,151,385** |
| **Balance as at 1 January 2021** | **1,220,490** | **(189,105)** | **4,000,000** | **120,000** | **5,151,385** |
| Net income | 2,961,018 |  |  |  | 2,961,018 |
| Other comprehensive loss | - | (8,715) | - | - | (8,715) |
| Total comprehensive income/(loss) | 2,961,018 | (8,715) | - | - | 2,952,303 |
| Transfer to the reserve fund (Note 10) | (170,000) | - | 170,000 | - | - |
| Total transfers | (170,000) | - | 170,000 | - | - |
| **Balance as at 31 December 2021** | **4,011,508** | **(197,820)** | **4,170,000** | **120,000** | **8,103,688** |

The accompanying notes are an integral part of these financial statements.

**Securities Commission of The Bahamas**

**Statement of Cash Flows**
**For the Year Ended 31 December 2021**
**(Expressed in Bahamian dollars)**

|  | 2021 $ | 2020 $ |
|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | |
| Net income | 2,961,018 | 189,105 |
| Adjustments for: | | |
| Interest income | (308,995) | (264,466) |
| Depreciation on property and equipment (Note 8) | 416,464 | 296,294 |
| Depreciation on right-of-use assets (Note 5) | 602,305 | 601,439 |
| Interest expense on lease liabilities (Note 5) | 196,234 | 224,015 |
| Interest received | 298,293 | 242,293 |
| Changes in operating assets and liabilities: | | |
| Increase in accounts receivable, net | (347,565) | (28,902) |
| Decrease/(increase) in prepaid expenses and other assets | 74,786 | (22,467) |
| Increase/(decrease) in accounts payable and accrued expenses | 645,773 | (101,946) |
| Decrease in other liabilities | (145,911) | (49,381) |
| Increase in deferred income | 1,339,260 | 107,132 |
| **Net cash provided from operating activities** | **5,731,662** | **1,193,116** |
| | | |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | |
| Purchase of debt securities | (2,000,000) | (2,000,000) |
| Purchases of property and equipment (Note 8) | (529,038) | (226,511) |
| **Net cash used in investing activities** | **(2,529,038)** | **(2,226,511)** |
| | | |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | |
| Interest paid on lease liabilities | (196,234) | (224,015) |
| Principal paid on lease liabilities | (523,134) | (476,463) |
| **Net cash used in financing activities** | **(719,368)** | **(700,478)** |
| | | |
| **Net increase/(decrease) in cash and cash equivalents** | **2,483,256** | **(1,733,873)** |
| | | |
| Cash and cash equivalents as at beginning of year | **340,378** | **2,074,251** |
| | | |
| **Cash and cash equivalents as at end of year** | **2,823,634** | **340,378** |
| | | |
| **CASH AND CASH EQUIVALENTS:** | | |
| **Cash on hand and at banks** | **2,823,634** | **340,378** |

The accompanying notes are an integral part of these financial statements.

**Securities Commission of The Bahamas**

**Notes to the Financial Statements**
**31 December 2021**

1.    **General Information**

The Securities Commission of The Bahamas (the Commission) was established in 1995 and operates as a body corporate, under the Securities Industry Act, 2011 (the Act), of the Commonwealth of The Bahamas (The Bahamas). The Act establishes the structure, governance and funding of the Commission; accordingly, the Commission is not deemed to have a parent. The offices of the Commission are located at Poinciana House, East Bay Street, Nassau, Bahamas.

The functions of the Commission are to monitor and regulate the securities industry in The Bahamas, the participants of which include: entities and individuals dealing in securities, arranging deals in securities, managing securities and advising on securities; investment funds; and investment fund administrators.  The Commission regulates the industry in accordance with the Act; the Investments Funds Act, 2019; and the related rules and regulations.

In addition, the Commission has responsibility for regulating financial and corporate service providers in accordance with the Financial and Corporate Service Providers Act, 2020, and related regulations.

2.    **Significant Accounting Policies**

The principal accounting policies adopted in the preparation of the financial statements are set out below.  These policies have been consistently applied to all the years presented, unless otherwise stated.

(a)    **Basis of preparation**

The financial statements are prepared in accordance with International Financial Reporting Standards (IFRS) and interpretations issued by the IFRS Interpretations Committee (IFRS IC) applicable to companies reporting under IFRS. The financial statements comply with IFRS as issued by the International Accounting Standards Board (IASB). The financial statements are prepared under the historical cost convention, except as disclosed in the accounting policies below.

The preparation of financial statements in accordance with IFRS requires management to exercise judgment in the process of applying the Commission's accounting policies.  It also requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities as of the date of the financial statements and reported amounts of income and expenses during the reporting period.  Actual results could differ from those estimates.  The areas involving a higher degree of judgment or complexity, or areas where assumptions and estimates are significant to the financial statements, are disclosed in Note 3.

**Securities Commission of The Bahamas**

**Notes to the Financial Statements**
**31 December 2021**
**(Continued)**

2.    **Significant Accounting Policies (Continued)**

(b)    **Changes in applicable accounting policies**

i)    **New standards, amendments and interpretations adopted by the Commission**

Certain new accounting standards, amendments to accounting standards and interpretations to published standards that became effective for the Commission's financial year beginning on 1 January 2021 were not relevant or not significant to the Commission's operations and accordingly did not have a material impact on the Commission's accounting policies or financial statements.

ii)    **New standards and interpretations not yet adopted by the Commission**

Certain new accounting standards, amendments and interpretations to existing accounting standards that have been published but are not mandatory for the year ending 31 December 2021 have not been early adopted by the Commission. These standards, amendments or interpretations are not expected to have a material impact on the Commission in the current or future reporting periods and on foreseeable future transactions.

(c)    **Foreign currency translation**

The financial statements are presented in Bahamian dollars, which is the Commission's functional and presentation currency.  Foreign currency transactions are translated into the functional currency using the exchange rates prevailing at the dates of the transactions. Foreign exchange gains and losses resulting from settlement of such transactions and from translation of monetary assets and liabilities at year-end exchange rates are recognised in the statement of comprehensive income.

(d)    **Cash and cash equivalents**

For the purposes of the statement of cash flows, cash and cash equivalents comprise cash on hand, demand deposits with banks and term deposits with banks with original contractual maturities of three months or less from the date of acquisition.

**Securities Commission of The Bahamas**

**Notes to the Financial Statements**
**31 December 2021**
**(Continued)**

2.    **Significant Accounting Policies (Continued)**

(e)    **Financial instruments**

A financial instrument is any contract that gives rise to a financial asset of one entity and a financial liability or equity instrument of another entity.

i)    **Financial assets**

*Classification*

The Commission classifies its financial assets, at initial recognition in the following measurement categories: at amortised cost and at fair value through other comprehensive income (FVOCI). The classification of financial assets at initial recognition depends on the financial asset's contractual cash flow characteristics and the Commission's business model for managing them.

In order for a financial asset to be classified and measured at amortised cost or FVOCI, it needs to give rise to cash flows that are 'solely payments of principal and interest (SPPI)' on the principal amount outstanding. This assessment is referred to as the SPPI test and is performed at an instrument level.

The Commission's business model for managing financial assets refers to how it manages its financial assets in order to generate cash flows. The business model determines whether cash flows will result from collecting contractual cash flows, selling the financial assets, or both.

*Financial assets at amortised cost*
The Commission measures financial assets at amortised cost if both of the following conditions are met:

• The financial asset is held within a business model with the objective to hold financial assets in order to collect contractual cash flows; and
• The contractual terms of the financial asset give rise on specified dates to cash flows that are solely payments of principal and interest on the principal amount outstanding.

**Securities Commission of The Bahamas**

**Notes to the Financial Statements**
**31 December 2021**
**(Continued)**

2.    **Significant Accounting Policies (Continued)**

(e)    **Financial instruments (continued)**

i)    **Financial assets (continued)**

*Classification (continued)*

*Financial assets at FVOCI*
The Commission measures financial assets at FVOCI if both of the following conditions are met:

- The financial asset is held within a business model with the objective of both holding to collect contractual cash flows and selling the financial asset and;
- The contractual terms of the financial asset give rise on specified dates to cash flows that are solely payments of principal and interest on the principal amount outstanding.

The Commission reclassifies financial assets when and only when its business model for managing those assets changes.

*Recognition and Derecognition*

Purchases or sales of financial assets that require delivery of assets within a time frame established by regulation or convention in the marketplace (regular-way trades) are recognised on the trade date, which is the date that the Commission commits to purchase or sell the asset.

Financial assets are derecognised when the rights to receive cash flows from the financial assets have expired or have been transferred and the Commission has transferred substantially all risks and rewards of ownership. If the Commission has neither transferred nor retained substantially all the risks and rewards of ownership, an assessment is made whether the Commission has retained control of the financial assets.

Gains or losses arising from sales of financial assets are recognised in the statement of comprehensive income as a part of net income in the financial period in which they arise.

**Securities Commission of The Bahamas**

**Notes to the Financial Statements**
**31 December 2021**
**(Continued)**

2.    **Significant Accounting Policies (Continued)**

(e)    **Financial instruments (continued)**

i)    **Financial assets (continued)**

*Measurement*

At initial recognition, the Commission measures a financial asset at its fair value plus, in the case of financial assets not at fair value through profit or loss, transaction costs that are directly attributable to the acquisition of the financial asset.   Transaction costs of financial assets carried at fair value through profit or loss are expensed in profit or loss.

Financial assets at amortised cost are subsequently measured using the effective interest rate method and are subject to impairment. Gains and losses are recognised in net income in the statement of comprehensive income when the asset is derecognised, modified or impaired.

The Commission's financial assets at amortised cost includes 'cash on hand and at banks', 'accounts receivable' and other receivables included in 'prepaid expenses and other assets' in the statement of financial position.

For financial assets at FVOCI, interest income and impairment losses or reversals are recognised in net income in the statement of comprehensive income. The remaining fair value changes are recognised in other comprehensive income (OCI). Upon derecognition, the cumulative fair value change previously recognised in OCI is recycled to net income. Interest income from these financial assets is calculated using the effective interest rate method.

The Commission's financial assets at FVOCI includes 'investments in debt securities' in the statement of financial position.

**Securities Commission of The Bahamas**

**Notes to the Financial Statements**
**31 December 2021**
**(Continued)**

2.    **Significant Accounting Policies (Continued)**

(e)    **Financial instruments (continued)**

   i)    **Financial assets (continued)**

   *Impairment of financial assets*

   The Commission recognises an allowance for expected credit losses (ECLs) for all debt instruments not held at fair value through profit or loss and accounts receivable. For debt instruments, ECLs are based on the difference between the contractual cash flows due in accordance with the contract and all the cash flows that the Commission expects to receive, discounted at an approximation of the original effective interest rate.

   ECLs are recognised in a three-stage model. The ECL model includes the use of forward-looking information and classification of financial assets in three stages as summarized below and further explained in Notes 4, 6 and 14:

   - Stage 1 – 12-month ECL: represents the expected credit loss arising from default events possible within 12 months from the reporting date. This is applicable to financial assets that originated or were purchased without credit recovery issues and whose credit risk has not significantly increased since initial recognition;

   - Stage 2 – Lifetime ECL: considers all possible default events over the expected life of a financial instrument. A loss allowance is required for credit losses expected over the remaining life of the exposure, irrespective of the timing of default. This is applicable to financial assets that originated or were purchased without credit recovery issues and whose credit risk has increased significantly since initial recognition; and

   - Stage 3 – Lifetime ECL for credit-impaired assets: considers all possible default events over the expected life of a financial instrument. The measurement of assets classified in this stage is different from Stage 2 due to the recognition of interest income by applying the effective interest rate to the amortized cost (net of allowance for ECLs) rather than to the gross carrying amount.

**Securities Commission of The Bahamas**

**Notes to the Financial Statements**
**31 December 2021**
**(Continued)**

2.    **Significant Accounting Policies (Continued)**

(e)    **Financial instruments (continued)**

i)    **Financial assets (continued)**

*Impairment of financial assets (continued)*

A financial asset will migrate from a stage as its relative credit risk since initial recognition subsequently increases or decreases. Therefore, a financial asset that migrated to stages 2 and 3 may return to stage 1, unless it was originated or purchased with credit recovery issues.

Management determined that a significant increase in credit risk would result from, amongst others, a financial asset's credit rating migrating from investment grade to non-investment grade, and deterioration of credit ratings applicable to non-investment grade financial assets.

For accounts receivable, the Commission applies a simplified approach in calculating ECLs. Therefore, the Commission does not track changes in credit risk, but instead recognises a loss allowance based on lifetime ECLs at each reporting date. The Commission has established a provision matrix that is based on its historical credit loss experience, adjusted for forward-looking factors specific to the debtors and the economic environment.

The carrying amount of the financial asset is reduced through the use of an allowance account and the amount of the ECL is recognised in the statement of comprehensive income.  If in a subsequent period the amount of the ECL decreases, the previously recognised ECL is reversed by adjusting the allowance account.  The amount of the reversal is recognised in the statement of comprehensive income.

The Commission writes off financial assets, in whole or in part, when it has exhausted all practical recovery efforts and has concluded there is no reasonable expectation of recovery. The write offs represent a derecognition event. The uncollectible financial asset is written off against the related allowance account.  Recoveries of accounts previously written off are recognised directly in the statement of comprehensive income.

**Securities Commission of The Bahamas**

**Notes to the Financial Statements**
**31 December 2021**
**(Continued)**

2. **Significant Accounting Policies (Continued)**

(e) **Financial instruments (continued)**

ii) **Financial liabilities**

Financial liabilities are recognised initially at fair value and subsequently measured at amortised cost using the effective interest method.  The Commission's financial liabilities comprise accounts payable and other liabilities.

Financial liabilities are derecognised when they are extinguished (i.e. when the obligation specified in the contract is discharged, cancelled or expires).

(f) **Property and equipment**

Property and equipment are carried at historical cost, less accumulated depreciation and any accumulated impairment.  Historical cost includes expenditure that is directly attributable to the acquisition of the items.

Subsequent costs are included in the asset's carrying amount or are recognised as a separate asset, as appropriate, only when it is probable that future economic benefits associated with the item will flow to the Commission and the cost of the item can be measured reliably. Repairs and maintenance costs are charged to the statement of comprehensive income during the financial period in which they are incurred.

Depreciation is provided on a straight-line basis over the estimated useful lives of the assets as follows:

| | |
|---|---|
| Computer equipment | 3 years |
| Furniture and fittings | 3 – 5 years |
| Vehicles | 3 – 5 years |
| Leasehold improvements | Lesser of lease term and 3 – 5 years |

Assets' useful lives are reviewed, and adjusted if appropriate, at each date of the statement of financial position or when an event has occurred that indicates a need to re-evaluate useful lives.

**Securities Commission of The Bahamas**

**Notes to the Financial Statements**
**31 December 2021**
**(Continued)**

2.    **Significant Accounting Policies (Continued)**

(f)    **Property and equipment (continued)**

Assets subject to depreciation are reviewed for impairment whenever events or changes in circumstances indicate the carrying amount may not be recoverable.  An asset's carrying amount is written down immediately to its recoverable amount if the asset's carrying amount is greater than its estimated recoverable amount.  The recoverable amount is the higher of the asset's fair value less costs to sell and its value in use.

Gains and losses on disposals are determined by comparing proceeds with the carrying amounts and are included in the statement of comprehensive income.

(g)    **Income and expense recognition**

Fee income of the Commission is comprised of application fees, registration fees, annual renewal fees, filing fees and other administrative fees charged to its licensees. Revenue is recognised at a point in time upon the completion of the document evaluation process of each of the activities described above. There are no post-performance obligations after the completion of the document evaluation processes to which each fee relates. All licence fees are for fixed amounts.

Appropriations by Parliament (termed Government subvention) received to subsidise operating expenses and specific projects of the Commission, are deferred and recognised as income in the financial period in which any conditions attached to them has been satisfied and by reference to the financial period in which the Commission recognises as expenses the related costs that the Government subvention is intended to compensate.  These amounts are presented gross in the statement of comprehensive income.

Government subvention, received to subsidise capital acquisitions, is recorded as deferred income and recognised as income over the useful lives of the applicable assets.

Interest income is recognised using the effective interest method.  All other income and expenses are recognised on the accrual basis of accounting.

**Securities Commission of The Bahamas**

**Notes to the Financial Statements**
**31 December 2021**
**(Continued)**

2.    **Significant Accounting Policies (Continued)**

(h)    **Employee benefits**

The Commission has a defined contribution pension plan for all eligible employees, whereby the Commission makes contributions to a privately administered pension plan.    The Commission has no legal or constructive obligations to pay further contributions if the plan does not hold sufficient assets to pay all employees the benefits relating to employee service in the current or prior years.    The Commission's contributions to the defined contribution pension plan are recognised in the statement of comprehensive income in the financial period to which they relate.

Salaries, wages and other employee benefits are recognised on the accrual basis of accounting.

(i)    **Leases**

The Commission leases a property for its office use and vehicles for its employee use. Lease contracts are negotiated on an individual basis and contain a wide range of different terms and conditions.

Leases are recognised as a right-of-use asset and a corresponding lease liability at the date on which the leased asset is available for use by the Commission.

Assets and liabilities arising from a lease are initially measured on a present value basis.

Lease liabilities include the net present value of the following lease payments:

- Fixed payments less any lease incentives receivable;
- Variable lease payments that are based on an index or a rate, initially measured using the index or rate as at the commencement date.

Variable lease payments that do not depend on an index or a rate are recognised as expenses in the period in which the event or condition that triggers the payment occurs.

Lease payments to be made under reasonably certain extension options are also included in the measurement of the liability. Refer to Note 3 for how the Commission determines the lease term with extension and termination options.

**Securities Commission of The Bahamas**

**Notes to the Financial Statements**
**31 December 2021**
**(Continued)**

2.    **Significant Accounting Policies (Continued)**

(i)    **Leases (continued)**

The lease payments are discounted using the interest rate implicit in the lease. Where that rate is not readily determined, which is the case for the Commission's lease, the Commission's incremental borrowing rate is used, being the rate the Commission would have to pay to borrow the funds necessary to obtain an asset of similar value to the right-of-use asset in a similar economic environment with similar terms, security and conditions. Refer to Note 3 for how the Commission determines the incremental borrowing rate.

Lease payments are allocated between principal and finance cost. The finance cost is charged to the interest expense in the statement of comprehensive income over the lease period so as to produce a constant periodic rate of interest on the remaining balance of the liability for each period.

Right-of-use assets are measured at cost comprising the following:
- The amount of the initial measurement of the lease liability;
- Any lease payments made at or before the commencement date less any incentives received;
- Any initial direct costs; and
- Restoration costs.

Right-of-use assets are generally depreciated over the shorter of the asset's useful life and the lease term on a straight-line basis.

**Securities Commission of The Bahamas**

**Notes to the Financial Statements**
**31 December 2021**
**(Continued)**

2.    **Significant Accounting Policies (Continued)**

(j)    **Taxation**

The Commission is established under the laws of The Bahamas and therefore is not subject to income, capital gains or other corporate taxes.  The Commission's operations do not subject it to taxation in any other jurisdiction.

(k)    **Corresponding figures**

Where necessary, corresponding figures are adjusted to conform with changes in presentation in the current year.

3.    **Critical Accounting Estimates and Assumptions**

The information presented below provides an overview of the areas that involve a higher degree of judgement or complexity, and major sources of estimation uncertainty that have a significant risk of resulting in a material adjustment within the next financial year.  Detailed information about each of these estimates and judgements is included in the related notes together with information about the basis of calculation for each affected line item in the financial statements.

*Measurement of ECL allowance*

The measurement of the ECL allowance for financial assets measured at amortised cost and at FVOCI is an area that requires the use of a model and significant assumptions about future economic conditions and credit behaviour (e.g. the likelihood of licensees defaulting and the resulting losses). Explanation of the inputs, assumptions and estimation techniques used in measuring the ECLs are further detailed in Note 14.

A number of significant judgements are also required in applying the accounting requirements for measuring the ECLs, such as:

- Determining the criteria for significant increase in credit risk;
- Choosing appropriate models and assumptions for the measurement of ECLs;
- Establishing the number and relative weightings of forward-looking scenarios for each type of product and the associated ECLs;
- Establishing groups of similar financial assets for the purposes of measuring the ECLs.

**Securities Commission of The Bahamas**

**Notes to the Financial Statements**
**31 December 2021**
**(Continued)**

3.    **Critical Accounting Estimates and Assumptions (Continued)**

*Leases – lease term and incremental borrowing rate*

In determining the lease term, management considers all facts and circumstances that create an economic incentive to exercise an extension option, or not exercise a termination option. Extension options (or periods after termination options) are only included in the lease term if the lease is reasonably certain to be extended (or not terminated).

The Commission cannot readily determine the interest rate implicit in the lease, therefore, it uses its incremental borrowing rate (IBR) to measure lease liabilities. The IBR is the rate of interest that the Commission would have to pay to borrow over a similar term, and with a similar security, the funds necessary to obtain an asset of a similar value to the right-of-use asset in a similar economic environment. The IBR therefore reflects what the Commission 'would have to pay', which requires estimation when no observable rates are available or when they need to be adjusted to reflect the terms and conditions of the lease. The Commission estimates the IBR using observable inputs (such as market interest rates or internal) when available and is required to make certain entity-specific adjustments.

Detailed information about the judgements and estimates made by the Commission in the above areas is set out in Notes 5, 6 and 14.

4.    **Investments in Debt Securities**

The Commission ranks its investments in debt securities based on the hierarchy of valuation techniques required by IFRS, which is determined based on whether the inputs to those valuation techniques are observable or unobservable.  Observable inputs reflect market data obtained from independent sources; unobservable inputs reflect the Commission's market assumptions.  These two types of inputs lead to the following fair value hierarchy:

Level 1 – Quoted prices (unadjusted) in active markets for identical assets or liabilities.

Level 2 – Inputs other than quoted prices included within Level 1 that are observable for the asset or liability, either directly (that is, as prices) or indirectly (that is, derived from prices).

Level 3 – Inputs for the asset or liability that are not based on observable market data (unobservable inputs).

This hierarchy requires the use of observable market data when available.  The Commission considers relevant and observable market prices in its valuations where possible.

**Securities Commission of The Bahamas**

**Notes to the Financial Statements**
**31 December 2021**
**(Continued)**

4.      **Investments in Debt Securities (Continued)**

The level in the fair value hierarchy within which the fair value measurement is categorised in its entirety is determined on the basis of the lowest level input that is significant to the fair value measurement in its entirety.  For this purpose, the significance of an input is assessed against the fair value measurement in its entirety.  If a fair value measurement uses observable inputs that require significant adjustment based on unobservable inputs, that measurement is a Level 3 measurement.  Assessing the significance of a particular input to the fair value measurement in its entirety requires judgment, considering factors specific to the asset.

The determination of what constitutes 'observable' requires significant judgment by the Commission.  The Commission considers observable data to be that market data that is readily available, regularly distributed or updated, reliable and verifiable, not proprietary, and provided by independent sources that are actively involved in the relevant market.

The fair value of financial instruments traded in active markets is based on quoted market prices as of the reporting date.  A market is regarded as active if quoted prices are readily and regularly available from the exchange, dealer, broker, industry group, pricing service or regulatory agency, and those prices represent actual and regularly occurring market transactions on an arm's length basis.  These instruments are included in Level 1.

Financial instruments that trade in markets that are not considered to be active but are valued based on quoted market prices, dealer quotations or alternative pricing sources supported by observable inputs are classified within Level 2.

Investments classified within Level 3 have significant unobservable inputs, as they trade infrequently.

**Securities Commission of The Bahamas**

Notes to the Financial Statements
31 December 2021
(Continued)

4.      **Investments in Debt Securities (Continued)**

Investments in debt securities are as follows:

|  | 2021 $ | 2020 $ |
|---|---|---|
| Stage 2 - ECL | | |
| *Level 2* | | |
| Debt securities at FVOCI | 7,802,180 | 5,810,895 |
| Accrued interest | 101,288 | 90,586 |
| **Total investments in debt securities** | **7,903,468** | **5,901,481** |

*Bahamas Government Registered Stock*

| | | 2021 | | 2020 | |
|---|---|---|---|---|---|
| **Maturity Date** | **Interest Rate** | **Nominal Value** | **Fair Value $** | **Nominal Value** | **Fair Value $** |
| 29-Oct-22 | 3.10% | 2,000,000 | 2,002,424 | - | - |
| 25-Jul-25 | 4.40% | 3,000,000 | 3,056,137 | 3,000,000 | 3,054,874 |
| 15-Oct-38 | 5.00% | 1,000,000 | 917,885 | 1,000,000 | 912,376 |
| 21-Apr-40 | 5.30% | 425,900 | 397,733 | 425,900 | 399,005 |
| 21-Apr-50 | 5.69% | 1,574,100 | 1,428,001 | 1,574,100 | 1,444,640 |
| **Total investments in debt securities at FVOCI** | | | **7,802,180** | | **5,810,895** |

**Securities Commission of The Bahamas**

**Notes to the Financial Statements**
**31 December 2021**
**(Continued)**

5.  **Leases**

The Commission entered into a non-cancellable operating lease agreement for a fixed period of five years with Poinciana SPV Ltd., commencing 1 January 2019, with an option to renew for three years, which was assessed as reasonably certain to be exercised. The Commission also leases vehicles for employee use.

The statement of financial position shows the following amounts:

|  | 2021 $ | 2020 $ |
|---|---|---|
| **Right-of-use assets** | | |
| Office space | 2,914,240 | 3,497,090 |
| Vehicles | - | 7,746 |
| | **2,914,240** | **3,504,836** |

For the year ended 31 December 2021, there were no direct costs incurred by the Commission upon entering a lease.

|  | 2021 $ | 2020 $ |
|---|---|---|
| **Lease liabilities** | | |
| Current | 550,759 | 511,432 |
| Non-current | 2,736,772 | 3,287,524 |
| | **3,287,531** | **3,798,956** |

The IBRs applied to the lease liabilities of the office space and vehicles are 5.5% and 6.5%, respectively. Common area maintenance and other additional rent charges not included in the measurement of lease liabilities are presented under 'Rent' in the statement of comprehensive income.

The statement of comprehensive income shows the following amounts:

|  | 2021 $ | 2020 $ |
|---|---|---|
| Depreciation on right-of-use assets | 602,305 | 601,439 |
| Interest expense on lease liabilities | 196,234 | 224,015 |
| | **798,539** | **825,454** |

The total cash outflow for leases in 2021 was $719,368 (2020: $700,478).

**Securities Commission of The Bahamas**

**Notes to the Financial Statements**
**31 December 2021**
**(Continued)**

6.    **Accounts Receivable**

|  | 2021 $ | 2020 $ |
|---|---|---|
| Investment funds and investment fund administrators | 80,666 | 81,327 |
| Financial and corporate service providers | 399,790 | 191,373 |
| Securities industry licensees and registrants | 455,078 | 105,645 |
| Other | 92,769 | 163,144 |
|  | 1,028,303 | 541,489 |
| Allowance for expected credit losses | (366,501) | (227,252) |
| **Total accounts receivable, net** | **661,802** | **314,237** |

Movements in the allowance for expected credit losses comprise:

|  | 2021 $ | 2020 $ |
|---|---|---|
| As at 1 January | 227,252 | 1,056,734 |
| Provision for expected credit losses | 194,249 | - |
| Bad debts written off | (55,000) | (829,482) |
| **As at 31 December** | **366,501** | **227,252** |

**Securities Commission of The Bahamas**

Notes to the Financial Statements
31 December 2021
(Continued)

6.    **Accounts Receivable (Continued)**

The allowance for expected credit losses as at 31 December was determined as follows for accounts receivable:

| As at 31 December 2021 | 0 to 90 days | 91 to 180 days | 181 to 270 days | 271 to 360 days | Over 360 days | Total |
|---|---|---|---|---|---|---|
| | $ | $ | $ | $ | $ | $ |
| Gross carrying amount | 403,078 | 28,950 | 227,101 | 224,625 | 144,549 | 1,028,303 |
| Allowance for expected credit losses | 61,236 | 10,893 | 93,636 | 123,106 | 77,630 | 366,501 |

| As at 31 December 2020 | 0 to 90 days | 91 to 180 days | 181 to 270 days | 271 to 360 days | Over 360 days | Total |
|---|---|---|---|---|---|---|
| | $ | $ | $ | $ | $ | $ |
| Gross carrying amount | 85,101 | 112,305 | 11,077 | 75,661 | 257,345 | 541,489 |
| Allowance for expected credit losses | 2,298 | 27,948 | 736 | 60,007 | 136,263 | 227,252 |

7.    **Investment in SPV**

In September 2017, the Commission agreed to hold 100% of the shares of Poinciana SPV Ltd. (a special purpose vehicle (SPV) incorporated in The Bahamas) on behalf of the Government of The Bahamas (the Government).  The Commission's holding of the shares of Poinciana SPV Ltd. is expected to be temporary.

The Commission evaluated if it controls or exerts significant influence over Poinciana SPV Ltd. based on the guidance in IFRS 10 - *Consolidated financial statements* and IAS 28 - *Investments in associates and joint ventures* respectively and concluded that it does not have controlling power or significant influence over Poinciana SPV Ltd. (See Note 13 for further information).

There were no movements in the investment in the SPV in 2021 and 2020.

**Securities Commission of The Bahamas**

**Notes to the Financial Statements**
**31 December 2021**
**(Continued)**

7.    **Investment in SPV (Continued)**

Poinciana SPV Ltd. owns real estate located on East Bay Street, Nassau, Bahamas which is comprised of land and two Class A office buildings known as the Poinciana House North and South.

The following table summarises the unaudited financial information of Poinciana SPV Ltd. as at and for the year ended 31 December. The prior year corresponding figures have been amended to reflect reclassifications and ECL allowances.

| **Summary Statement of Financial Position** | **2021** | **2020** |
|---|---:|---:|
| | **$** | **$** |
| Current assets | 1,543,282 | 2,444,016 |
| Investment property | 19,915,454 | 20,695,836 |
| **Total assets** | **21,458,736** | **23,139,852** |
| | | |
| Current liabilities | 1,065,600 | 2,181,196 |
| Borrowings | 13,812,500 | 14,662,500 |
| **Total liabilities** | **14,878,100** | **16,843,696** |
| | | |
| Share capital | 2 | 2 |
| Contributed capital | 9,568,603 | 9,568,603 |
| Accumulated deficit | (2,987,969) | (3,272,449) |
| **Total equity** | **6,580,636** | **6,296,156** |
| | | |
| **Total liabilities and equity** | **21,458,736** | **23,139,852** |

| **Summary Statement of Comprehensive Income** | **2021** | **2020** |
|---|---:|---:|
| | **$** | **$** |
| Total income | 2,588,808 | 2,110,483 |
| Total expenses | (2,304,328) | (1,817,991) |
| **Net comprehensive income (loss)** | **284,480** | **292,492** |

**Securities Commission of The Bahamas**

**Notes to the Financial Statements**
**31 December 2021**
**(Continued)**

8.  **Property and Equipment**

| | Computer Equipment $ | Furniture and Fittings $ | Leasehold Improvements $ | Art Work $ | Total $ |
|---|---|---|---|---|---|
| **For the year ended 31 December 2021** | | | | | |
| **Cost** | | | | | |
| 1 January 2021 | 2,126,025 | 759,589 | 57,163 | 22,864 | 2,965,641 |
| Additions | 525,552 | 1,486 | - | 2,000 | 529,038 |
| Disposals | - | - | - | - | - |
| **31 December 2021** | **2,651,577** | **761,075** | **57,163** | **24,864** | **3,494,679** |
| **Accumulated depreciation** | | | | | |
| 1 January 2021 | 1,861,931 | 310,450 | 22,866 | - | 2,195,247 |
| Depreciation expense | 251,316 | 153,715 | 11,433 | - | 416,464 |
| Disposals | - | - | - | - | - |
| **31 December 2021** | 2,113,247 | 464,165 | 34,299 | - | 2,611,711 |
| **Net book value as at 31 December 2021** | **538,330** | **296,910** | **22,864** | **24,864** | **882,968** |
| **For the year ended 31 December 2020** | | | | | |
| **Cost** | | | | | |
| 1 January 2020 | 1,911,406 | 747,697 | 57,163 | 22,864 | 2,739,130 |
| Additions | 214,619 | 11,892 | - | - | 226,511 |
| Disposals | - | - | - | - | - |
| **31 December 2020** | **2,126,025** | **759,589** | **57,163** | **22,864** | **2,965,641** |
| **Accumulated depreciation** | | | | | |
| 1 January 2020 | 1,729,366 | 158,154 | 11,433 | - | 1,898,953 |
| Depreciation expense | 132,565 | 152,296 | 11,433 | - | 296,294 |
| Disposals | - | - | - | - | - |
| **31 December 2020** | 1,861,931 | 310,450 | 22,866 | - | 2,195,247 |
| **Net book value as at 31 December 2020** | **264,094** | **449,139** | **34,297** | **22,864** | **770,394** |

**Securities Commission of The Bahamas**

**Notes to the Financial Statements**
**31 December 2021**
**(Continued)**

9.    **Deferred Income**

|  | 2021<br>$ | 2020<br>$ |
|---|---|---|
| Government subvention | 2,000,000 | 678,065 |
| Securities industry licensee and registrant fees | 9,932 | 500 |
| Financial and corporate service provider fees | 22,075 | 14,182 |
| **Total deferred income** | **2,032,007** | **692,747** |

All deferred income is eligible to be recognised in the following year in the statement of comprehensive income.

Movements in Government subvention comprise:

|  | 2021<br>$ | 2020<br>$ |
|---|---|---|
| As at 1 January | 678,065 | 542,057 |
| Government subvention received | 2,000,000 | 2,000,000 |
| Government subvention utilised – transfer to reserve fund | (170,000) | - |
| Government subvention utilised – operations | - | (1,863,992) |
| Government subvention utilised – transfer to Consolidated fund | (508,065) | - |
| **As at 31 December** | **2,000,000** | **678,065** |

10.    **Reserves**

*Revaluation reserve*

The Commission's investments in debt securities are measured at FVOCI, as explained in note 2(e)(i).   Changes in fair value of these investments are accumulated within the revaluation reserve within equity. The accumulated changes in fair value are transferred to net income when the investment is derecognised or impaired.

**Securities Commission of The Bahamas**

**Notes to the Financial Statements**
**31 December 2021**
**(Continued)**

10.  **Reserves**

*Reserve fund*

Upon obtaining approval from the Ministry of Finance, the Commission established a reserve fund on 30 April 2018 in accordance with Section 20(2) of the Act. Section 21(1) of the Act enables the Commission to determine the management of the fund. This reserve fund will be used for the Commission's development with the approval of its members.  During the year, the Minister of Finance approved an addition of $170,000 (2020: $Nil) to the reserve fund. The reserve fund as at 31 December 2021 totaled $4,170,000 (2020: $4,000,000).

*Special purpose reserve*

Section 22(3) of the Act requires that administrative fines levied by the Commission be used for the sole purpose of promoting public understanding of the financial system.  Accordingly, the Commission established a special purpose reserve for this purpose. The special purpose reserve as of the year end, net of provision for ECLs is shown below:

|  | 2021 $ | 2020 $ |
|---|---|---|
| Balance of the special purpose reserve, gross | 120,000 | 175,000 |
| Provision for ECLs | - | (55,000) |
| **Balance of the special purpose reserve, net** | **120,000** | **120,000** |

11.  **Employee Benefits**

Pension costs recognised in the statement of comprehensive income in the current year totaled $367,315 (2020: $340,926).  The Commission's contributions to the pension plan vest 50% with employees upon completion of 5 years of employment, incrementally vesting annually, with full vesting upon completion of 10 years of service.

During the year, the Commission received reimbursements totaling $7,354 (2020: $38,349) representing the unvested portion of pension contributions relating to former employees of the Commission.  The unvested contributions were credited to salaries, wages and employee benefits in the statement of comprehensive income.

As of 31 December 2021, the Commission employed 91 (2020: 81) persons.

**Securities Commission of The Bahamas**

**Notes to the Financial Statements**
**31 December 2021**
**(Continued)**

12. **Related Party Balances and Transactions**

Related parties comprise: i) Government ministries and departments; ii) Government corporations and agencies; iii) entities controlled by the Government; iv) entities in which the Government has a significant ownership interest; and v) key management personnel, including members of the Commission.  Balances and transactions with related parties, not otherwise disclosed in the financial statements, include:

|  | 2021 $ | 2020 $ |
|---|---|---|
| *Assets* | | |
| Cash at banks | 846,634 | 69,961 |
| Accounts receivable | 11,000 | 140,347 |
| Prepaid expenses and other assets | 1,260 | 1,260 |
| Investments in debt securities | 7,903,468 | 5,901,481 |
| Right-of-use assets – SPV | 2,914,240 | 3,497,089 |
| | | |
| *Liabilities* | | |
| Accounts payable and accrued expenses | 3,119 | 24,907 |
| Other liabilities - due to the Compliance Commission | 289,991 | 444,901 |
| Lease liabilities – SPV | 3,287,526 | 3,790,537 |
| | | |
| *Income* | | |
| Interest income | 308,358 | 264,446 |
| Other income | 92,400 | 92,400 |
| | | |
| *Expenses* | | |
| Depreciation on right-of-use assets - SPV | 582,848 | 582,848 |
| Interest expense on lease liabilities - SPV | 195,841 | 222,780 |
| Utilities and property charges | 51,965 | 60,420 |

Compensation of key management personnel for the year ended 31 December 2021 comprised $667,823 (2020: $556,623) for salaries and other short-term benefits and $30,240 (2020: $28,840) for pension benefits.

**Securities Commission of The Bahamas**

**Notes to the Financial Statements**
**31 December 2021**
**(Continued)**

13. **Commitments and Contingencies**

*Other commitments*

During 2015, the Commission acted as executing agent on behalf of the Government in relation to a purchase agreement for land and buildings. Initial funding was provided by the Government. During 2016, the Ministry of Finance (the Ministry) decided to acquire that land and buildings through Poinciana SPV Ltd., the special purpose vehicle referred to in Note 7. The Ministry subsequently decided that the Commission would hold the shares of Poinciana SPV Ltd. The Commission expects that the holding of shares of Poinciana SPV Ltd. will be temporary.

*Contingencies*

The Commission is a defendant in several legal proceedings and would be liable for claims and legal costs in the event of an adverse finding by the courts. However, it is not possible to either predict the decision of the courts or estimate the amount of such awards. Management does not expect that the resolution of these matters will have a material impact on the Commission's financial position and accordingly, no provisions have been made in these financial statements relative to the legal proceedings.

In early February 2020, the Commission discovered that it had experienced a cash at bank fraud resulting in losses in the amount of B$850,000. No contingent asset has been recognised as receivable as at 31 December 2021 (2020: $Nil).

14. **Financial Risk Management**

The Commission engages in transactions that expose it to credit risk, liquidity risk and interest rate risk in the normal course of business. The Commission's financial performance is affected by its capability to understand and effectively manage these risks.

14.    **Financial Risk Management (Continued)**

(a)    **Credit risk**

Credit risk arises from the potential failure of a counterparty to perform according to the terms of the contract.  The Commission's exposure to credit risk is concentrated in its cash at banks, accounts receivable, other receivables included in prepaid expenses and other assets and investments in debt securities.  The Commission mitigates the risk associated with cash at banks by placing its deposits with domestic financial institutions in good standing with the Central Bank of The Bahamas, including a related party. The risk associated with accounts receivable is mitigated by the monitoring of payment history before continuing to extend credit to licensees.  Transactions in securities are conducted with brokers in good standing with the Commission. The investment in debt securities consists of debt securities issued by the Government which were downgraded to non-investment grade credit ratings during the prior year, indicating a significant increase in credit risk.  As a result, the investment securities were reclassified from stage 1 to stage 2, where a lifetime expected credit loss is recognised, for the purpose of assessing ECLs.

*Impairment*

The Commission has assessed the ECL for cash at banks, investments in debt securities and other receivables included in prepaid expenses and other assets.  The identified impairment losses based on the credit quality of the counterparties were determined to be immaterial and are not recorded in these financial statements.

Accounts Receivable
The Commission applies the IFRS 9 simplified approach to measuring expected credit losses which uses a lifetime expected loss allowance for all accounts receivable.

To measure the ECLs, accounts receivable have been grouped based on shared credit risk characteristics and the days past due. The Commission has therefore, concluded that the expected loss rates for accounts receivable are a reasonable approximation of the loss rates for the contract assets.

The expected loss rates are based on the payment profiles of licensing fees over a period of 24 months before 31 December 2021 (2020: 48 months before 31 December 2020) and the corresponding historical credit losses experienced within this period. The historical loss rates are adjusted to reflect current and forward-looking information on macroeconomic factors affecting the ability of the customers to settle the receivables. The Commission has identified the Gross Domestic Product (GDP) of The Bahamas to be the most relevant factor, and accordingly adjusts the historical loss rates based on expected changes in this factor. See Note 6 for the aged analysis of accounts receivable.

**Securities Commission of The Bahamas**

**Notes to the Financial Statements**
**31 December 2021**
**(Continued)**

14.    **Financial Risk Management (Continued)**

(b)    **Liquidity risk**

The objective of liquidity management is to ensure the availability of sufficient funds to honour all of the Commission's financial commitments as they become due.

As of 31 December 2021, all of the Commission's accounts payable and accrued expenses and other liabilities are due within one year.

(c)    **Interest rate risk**

Interest rate risk is the risk that the future cash flows or fair values of financial instruments will fluctuate because of changes in market interest rates. The Commission's exposure to cash flow interest rate risk is concentrated in cash at banks, which is not considered significant as amounts earned on these balances are minimal.

The Commission is exposed to fair value interest rate risk on its Bahamas Government Registered Stock (BGRS) investments, which are at fixed interest rates.

15.    **Fair Value of Financial Instruments**

Financial instruments utilised by the Commission include the recorded financial assets and liabilities disclosed in the financial statements.  Their estimated fair values approximate their carrying values due to the relatively short-term nature of the instruments or the instruments being carried at fair value.

The fair value hierarchy of financial instruments is principally Level 2.

16.    **Capital Management**

The capital of the Commission is represented by its net assets.  The Commission's objectives when managing capital are to safeguard its ability to continue as a going concern in order to support its regulatory powers and associated operations.

**Securities Commission of The Bahamas**

**Notes to the Financial Statements**
**31 December 2021**
**(Continued)**

17. **Subsequent Event**

Subsequent to 31 December 2021, the Commission received subvention of $2,000,000, to be utilised by the Commission for its general operations and capital expenditure.



Poinciana House
North Building, 2nd Floor
31A East Bay Street
P O Box N-8347
Nassau, NP, The Bahamas

www.scb.gov.bs

SECURITIES COMMISSION OF THE BAHAMAS

# The Bahamas' Approach to the Regulation of Digital Assets Businesses



Policy Statement: PS1/2022 (r)
Contact: FITLink@scb.gov.bs

Board Approval Date: 21 September 2022
Updated 28 September 2022

# Contents

1.    Definitions ................................................................................................................................5

2.    Introduction .............................................................................................................................7

  2.1.    Introduction to the Securities Commission of The Bahamas.........................................8

3.    The Bahamas' Digital Asset Business Regulatory Philosophy and Approach ......................8

  3.1.    Digital Assets Regulatory Vision ....................................................................................9

  3.2.    Digital Assets Regulatory Mission .................................................................................9

  3.3.    Objectives.....................................................................................................................10

  3.4.    Development of the DARE Act .....................................................................................10

    3.4.1.    Crypto Asset Working Group .................................................................................10

    3.4.2.    Initial Research and Benchmarking........................................................................11

    3.4.3.    First Draft of the DARE Bill ....................................................................................11

    3.4.4.    DARE Bill and FATF Recommendation 15 ............................................................11

4.    Digital Assets Sector - Regulatory Framework.....................................................................12

  4.1.    What Does the DARE Act Do?.....................................................................................12

    4.1.1.    Regulatory Capital..................................................................................................13

  4.2.    The Financial and Corporate Service Providers Act, 2020 - Licensing Regime for Wallet Service Providers and Custody Services .................................................................................13

  4.3.    Exemptions from the DARE Act ...................................................................................13

  4.4.    Digital Assets AML/CFT/CPF Provisions .....................................................................13

    4.4.1.    Activity-based registration by competent authority ...............................................14

    4.4.2.    Risk-based supervision and customer due diligence and prevention measures................14

  4.5.    Expectations of DARE Act Registrants.........................................................................14

    4.5.1.    Behavioural Standards ...........................................................................................14

    4.5.2.    Management and Operational Standards ...............................................................15

5.    Risks and Concerns...............................................................................................................15

6.    Mitigating Risks and Concerns .............................................................................................16

  6.1.    Digital Asset Sector National Risk Assessment ...........................................................16

  6.2.    Capacity Building Efforts ..............................................................................................16

    6.2.1.    Restructuring and Updating Supervisory Departments..........................................16

    6.2.2.    Creation of SCB FITLink ........................................................................................17

    6.2.3.    Staff Training .........................................................................................................19

6.2.4.    Collaboration with the University of The Bahamas ............................................... 19

6.2.5.    National Cooperation Efforts ........................................................................... 19

6.3.    International Cooperation and Agreements ..................................................... 20

7.    Additional Consumer and Investor Protection Measures .................................... 20

8.    Future Strategy and Next Steps for the Digital Asset Regime ............................ 21

Annex I: DARE Act Frequently Asked Questions ........................................................ 24

Annex II: DARE Application Process for a Digital Asset Business ............................... 32

## Questions or Comments

**Please send any questions or comments related to PS1/2022 to:**

Office of the Executive Director
Policy and Research Unit
2nd Floor, Poinciana House
31A East Bay Street
P.O. Box N-8347
Nassau, The Bahamas
242-397-4100

Email: info@scb.gov.bs or
FITLink@scb.gov.bs

# 1. Definitions

Key words and abbreviations used throughout this document.

| TERM | DEFINITION/INTERPRETATION |
| --- | --- |
| AML/CFT/CPF | Anti-Money Laundering/Countering the Financing of Terrorism/Countering Proliferation Financing |
| ATA | Anti-Terrorism Act, 2018 |
| CBOB | Central Bank of The Bahamas |
| CDD | Customer Due Diligence |
| DAB | Digital Asset Business has the same meaning as Virtual Asset Service Provider (VASP) as defined by the Financial Action Task Force |
| DARE ACT | Digital Assets and Registered Exchanges Act, 2020 |
| DARE RULES | Digital Assets and Registered Exchanges (Anti-Money Laundering, Countering Financing of Terrorism and Countering Financing of Proliferation) Rules |
| DEFI | Decentralised Finance |
| DPC | Digital Asset Policy Committee |
| FATF | Financial Action Task Force |
| FATF 15 | FATF's Recommendation 15 |
| FAQ | Frequently Asked Questions Toolkit |
| FCSPA | Financial and Corporate Service Providers Act, 2020 |
| FCSPA RULES | Financial and Corporate Service Providers (Anti-Money Laundering and Countering the Financing of Terrorism) Rules, 2019 |
| FINTECH | Financial Technology |
| FIU | Financial Intelligence Unit |
| FTRA | Financial Transactions Reporting Act, 2018 |
| IFA | Investment Funds Act, 2019 |
| ITO | Initial Token Offering |
| KYC | Know Your Customer |
| MLRO | Money Laundering Reporting Officer |
| ML/TF/PF | Money Laundering / Terrorist Financing / Proliferation Financing |
| NFT | Non-Fungible Token |
| POCA | Proceeds of Crime Act, 2018 |
| SIA | Securities Industry Act, 2011 |
| THE COMMISSION | Securities Commission of The Bahamas |

| VASP | Virtual Asset Service Provider |
|------|-------------------------------|
| **WIRE TRANSFERS REGULATIONS** | Financial Transactions Reporting (Wire Transfers) Regulations, 2018 |

## 2. Introduction

Digital assets, businesses, services, products, and technologies that utilise decentralised platforms[1] have the potential to foster financial innovation and inclusion, and to generate wealth and financial opportunities for investors and other stakeholders.  The products, technologies, and services are profound and have a unique potential to transform the financial services, securities and capital markets sector unlike ever before.  Cryptocurrencies such as Bitcoin, and other digital assets such as stablecoins, not only promise the potential to redefine what regulators and consumers once thought of as the functions of money, but also have created a new category of entrepreneur, whose existence is disrupting traditional financial services incumbents.   However, the cross-border nature and pseudo-anonymous features associated with these assets and activities create new opportunities for criminals to perpetrate illegal schemes, launder proceeds and finance illicit activities.

Given the development of – and inherent risks associated with –  these new digital assets and digital asset businesses ("DABs") in the financial services sector, the Securities Commission of The Bahamas ("the Commission"), as the statutory regulator of the securities and capital markets sector in The Bahamas, monitored the digital asset sector for several years.  The Commission observed the potential that DABs represented to the entire financial services sector to grow, and the threat represented if the sector was left behind.  Finally, consistent with our mandate of protecting investors, fostering market integrity and reducing systemic risks, the Commission saw the need to provide legal clarity for DABs in order to facilitate the orderly growth and development of this sector and to adopt an appropriately regulated and internationally compliant regulatory framework. Ultimately, the Commission's development of the regulatory framework for the digital assets sector in The Bahamas has been thoughtful and deliberate, culminating with the adoption of both the Digital Assets and Registered Exchanges Act, 2020 ("DARE Act") and the Financial and Corporate Service Providers Act, 2020 ("FCSPA").

 This Policy Statement ("the Statement") does the following:

- Explains the Commission's considerations in developing the digital asset regulatory framework, including examining the risks and threats associated with digital asset activities and the respective measures to mitigate those activities;
- Describes the Commission's philosophy regarding the regulation of DABs;
- Clarifies the registration and supervision process for DABs; and
- Outlines the Commission's future legal and regulatory considerations for the digital asset sector.

Finally, the Statement is intended to assist DABs and prospective DABs with both understanding and complying with the Commission's regulatory requirements, including registering with and adhering to the Commission's ongoing monitoring requirements.  To assist with this, the Statement, among other things, includes a DARE Act Frequently Asked Questions Toolkit ("the FAQ") in **Annex I**, which explains the Commission's policy position on the most frequently asked questions received from stakeholders since the adoption of the DARE Act.

---

[1] Such as distributed ledger technologies, inclusive of smart contracts, and layer 1 and layer 2 protocols, which facilitate the creation of smart contracts.

## 2.1.  Introduction to the Securities Commission of The Bahamas

The Commission is a statutory body established in 1995, under the Securities Board Act, 1995, which has since been repealed and replaced.  The Commission is the sole competent authority responsible for overseeing The Bahamas' securities, capital markets, investment funds, financial and corporate service providers, and digital asset businesses via the following legislation:

- Securities Industry Act, 2011;
- Investment Funds Act, 2019;
- Financial and Corporate Service Providers Act, 2020; and
- Digital Assets and Registered Exchanges Act, 2020.

The functions of the Commission are to[2]:

a. Advise the Minister (Finance) on all matters relating to the capital markets and it participants;
b. Maintain surveillance over the capital markets and ensure orderly, fair and equitable dealings in securities;
c. Foster timely, accurate, fair and efficient disclosure of information to the investing public and the capital markets;
d. Protect the integrity of the capital markets against any abuses arising from financial crime, market misconduct and other unfair and improper practices;
e. Promote an understanding by the public of the capital markets and its participants and the benefits, risks, and liabilities associated with investing;
f. Create and promote conditions that facilitate the orderly development of the capital markets; and
g. Perform any other function conferred or imposed on it by securities and digital asset laws or Parliament to support our statutory mandate and obligations.

As part of its functions, in recent years, the Commission has worked to ensure growth in its regulated sectors through innovative and necessary legislation and policies.  Some of the initiatives include:

- Update of the investment funds' regulatory regime;
- Expansion of the financial and corporate service providers' regulatory regime; and
- The expanded coverage in the securities and capital markets with the introduction of the:
    - Securities Industry (Contracts for Differences) Rules, 2020; and
    - Securities Industry (Business Capital) Rules, 2021.

# 3. The Bahamas' Digital Asset Business Regulatory Philosophy and Approach

The Commission recognizes the important opportunities that the digital assets sector presents to all stakeholders and we are cognizant of our role in creating and facilitating a regulatory environment that

---

[2] Securities Industry Act, available at: https://www.scb.gov.bs/wp-content/uploads/2019/04/Gazetted-Securities-Industry-Act-2011-1.pdf.

allows entrepreneurs to develop their commendable business activities, while ensuring that the market operates with fairness to and equity for all participants. We do not consider that regulation and innovation are mutually exclusive, but rather are equally necessary to ensure that markets perform at their optimum. The regulator should define the rules of engagement to operate in a jurisdiction and participants should be made aware of which DAB activities are allowed, which are excluded, and which can receive an exemption. A transparent regulatory framework presents no surprises both to entrepreneurs, who can be assured that they will not be subject to the capricious and arbitrary decisions of the regulator, and to consumers and investors, who will be afforded basic regulatory safeguards such as disclosure of information, recourse against bad actors and access to suitable financial products.

Our regulatory philosophy is that digital asset activity is a part of the capital markets in general, but we recognise that there are aspects, which do not fall within traditional capital markets activity, thus we created a bespoke framework for digital assets that addresses the peculiar nuances of this sector. The Commission's regulatory framework provides a holistic approach, giving digital assets their own space without boxing them in due to the many different forms and characteristics of DAs.

A key principle underlying our regulatory approach is that of technology-neutrality. Accordingly, our regulatory requirements apply regardless of the technological platform or the technology involved. As technology changes, evolves, and can become obsolete, our digital assets regulatory framework has sufficient flexibility to apply the framework to existing technologies as well as to evolving and emerging technologies, without requiring extensive revisions.

Finally, our philosophy is that an appropriate regulatory framework should be adopted to address regulatory gaps, not create tedious, frustrating and overlapping regulatory requirements among regulators. We believe that the DARE Act encourages innovative companies, while concurrently allowing for the protection of investors and the mitigation of consequential risks.

## 3.1. Digital Assets Regulatory Vision

The Commission's vision is to contribute to the establishment of The Bahamas as an international FinTech hub, through strategic collaboration and progressive and 'best-in-class' legislation and policies.

## 3.2. Digital Assets Regulatory Mission

To actualise its vision, the Commission's mission is to:

1. **Maintain honesty, integrity and fairness** by prescribing robust ethical and professional conduct requirements, and monitoring compliance with those standards.
2. **Facilitate** the orderly growth and development of the digital assets sector, through the legislative framework, supervisory function, enforcement actions, and using the FinTech hub, SCB FITLink, to develop rules, policy, guidance and codes of practice in connection with the conduct of DABs and other market participants.
3. **Promote Investor and Market Education** including digital asset risks, opportunities and AML/CFT/CPF obligations.
4. **Collaborate and engage** with industry stakeholders, including DABs, industry leaders, government agencies, market participants, think tanks, accelerators, and domestic and international regulators, to ensure an appropriately regulated digital asset sector that promotes

financial innovation and inclusion, while adhering to the traditional and effective regulatory tenets of investor protection and mitigating systemic risks.

## 3.3.  Objectives

The Commission's approach to developing an appropriate and robust digital asset framework is supported by five objectives:

1. **Consumer Investor Protection** – Digital assets are risky and many of the market participants in this sector are not necessarily familiar with establishing or adhering to appropriate investor and consumer protections, such as disclosure of information and product suitability.  A core objective of the Commission's regulatory framework was establishing an appropriate registration and supervision process to ensure the protection of investors and other stakeholders.
2. **Robust AML/CFT Framework** – DABs are obliged to have the same full set of AML/CFT obligations as traditional financial institutions and designated non-financial businesses and professions.  The framework requires DABs to examine and understand the ML/TF/PF risks associated with digital asset activities, to  design and implement a risk-based AML/CFT/CPF regulatory and supervisory framework for those activities, including the application of preventative measures such as customer due diligence, record-keeping and suspicious transaction reporting, and to take appropriate mitigating measures to address those risks.
3. **Manage Risks** – The framework aims to minimise risks, especially systematic and contagion risks, and requires DABs to demonstrate an understanding of the risks posed by digital asset activities and to take appropriate mitigating measures to address the identified risks.
4. **Growth and Innovation** – To facilitate the orderly growth and development of DAB activities and to promote financial innovation.
5. **Capacity Building** – To promote an understanding of the public of the various typologies of digital assets and DABs, and to ensure that the Commission's staff both understands and can apply consistent supervisory procedures to facilitate fair and equitable treatment of investors.

## 3.4.  Development of the DARE Act

As the sole competent authority for the securities and capital markets sector, in line with the Financial Action Task Force's ("FATF") Recommendation 15, the Commission noted the increasing popularity of and participation in the sale of digital assets[3] in other jurisdictions and also received and fielded multiple inquiries from a number of persons relevant to the digital asset market.  Many of these inquiries were from persons who were interested in either buying and selling digital assets or creating their own digital assets for sale in the Bahamian investment market.

### 3.4.1.  *Crypto Asset Working Group*

In March 2018, the Commission began an initiative with the purpose of initiating a collective regulatory review and analysis of digital tokens[4] and their potential offerings in The Bahamas.  As a result, in May 2018, a Crypto Asset Working Group (the "Working Group") was formed to comprehensively review the

---

[3] Note on terminology:  The Statement will interchangeably use the term "digital assets" and "crypto assets".
[4] Note on terminology:  "Digital tokens" is the Commission's generic term for all digital representations of value. Some digital tokens, such as asset tokens, are under the purview of the DARE Act.  Other digital tokens, such as non-fungible tokens, do not fall under the purview of the DARE Act.

considerations and requirements for the registration of DABs in or from within The Bahamas.  The Working Group comprised various governmental agencies and regulators that had a stake in the orderly growth and development of the financial technology and digital asset sector in The Bahamas.

### 3.4.2.   Initial Research and Benchmarking

In July 2018, the Commission conducted the initial benchmarking exercise to determine how other jurisdictions regulated DABs.  Later, we engaged a leading international consultant to support the research and development phase.    The consultant also performed benchmarking and, in all, thirteen (13) jurisdictions were benchmarked[5].  In addition to the jurisdictions benchmarked, the Commission also monitored industry expectations and evolving international regulatory standards, such as FATF's "Guidance for a Risk-Based Approach for Virtual Assets and Virtual Asset Service Providers", as outlined in their Recommendation 15.

### 3.4.3.   First Draft of the DARE Bill

After extensive research and benchmarking, considering the unique businesses, assets, technology, characteristics and risks associated with this nascent sector, the Commission determined that establishing customized legislation for this emerging sector was crucial to further the development of The Bahamas' financial services industry. Moreover, the bespoke legislation helps to ensure that market participants and stakeholders were robustly protected.

During the fourth quarter of 2018, the Commission commenced working on the first draft of the DARE Bill, which encompassed international best practices for digital asset regulation and considered the responsible development of The Bahamas' financial services industry. This draft served as the foundation for the current version of the DARE Act and was subsequently internally reviewed, analysed and amended.

The DARE Bill was issued to the public for consultation on 3 April 2019 to request input and comments from industry participants and other stakeholders.  The consultative process yielded significant response and comments, which were collected, reviewed, and taken into consideration for further amendment.

### 3.4.4.   DARE Bill and FATF Recommendation 15

In December 2019, the Commission initiated the process of updating the DARE Bill and the national AML/CFT/CPF legislative framework ("national framework") to comply with the updated recommendations set out in the FATF Guidance on Virtual Assets and Virtual Asset Service Providers ("FATF 15").

The most significant amendments to the national framework, as well as to the DARE Bill, were ensuring that DABs were incorporated under The Bahamas' national framework, including the Proceeds of Crime Act, 2018 ("POCA"), the Anti-Terrorism Act, 2018 ("ATA"), and the Financial Transactions and Reporting Act, 2018 ("FTRA"). The inclusion of the digital asset framework in the national AML/CFT/CPF regime ensures that, at a minimum:

- The competent authority is required to conduct a national risk assessment on all digital asset activities;
- A country-wide risk-based approach and coordination for all digital asset activities;

---

[5] Namely: Bermuda, Malta, Switzerland, Singapore, United States of America, Luxembourg, Jersey, Gibraltar, Thailand, Hong Kong, Abu Dhabi, United Kingdom, and Ireland.

- Requirement that DABs take action to identify the natural/legal persons that carry out digital asset activities;
- Enforcement and sanctions applicable to DABs for failure to comply;
- Timely access to material and accurate information about DAB activities; and
- Information exchange and cooperation between domestic and international competent authorities.

The DARE Act was adopted on 14 December 2020.

# 4. Digital Assets Sector - Regulatory Framework

The regulatory framework consists of the:

- DARE Act;
- FCSPA;
- Digital Assets and Registered Exchanges (Anti-Money Laundering, Countering Financing of Terrorism and Countering Financing of Proliferation) Rules, 2022;
- Financial and Corporate Service Providers (Anti-Money Laundering and Countering the Financing of Terrorism), Rules 2019; and
- Policy guidance.

## 4.1.  What Does the DARE Act Do?

The DARE Act regulates the issuance, sale and trade of digital assets, in or from within The Bahamas. Additionally, the DARE Act prescribes the registration process for any person that intends to be involved in a DAB in or from within The Bahamas. DABs include:

- A digital token exchange;
- Providing services related to a digital token exchange;
- Operating as a payment service provider business utilising digital assets;
- Operating as a digital asset service provider, including providing DLT platforms that facilitate:
  - o  the exchange between digital assets and fiat currencies;
  - o  the exchange between one or more forms of digital assets; and
  - o  the transfer of digital assets;
- Participation in and provision of financial services related to an issuer's offer or sale of a digital asset; and
- Any other activity that may be prescribed by regulations.

The DARE Act requires all persons carrying on or involved in digital assets business, operating in or from within The Bahamas, to be registered or licensed.  This includes companies, partnerships, trusts and any other legal entity. The Commission is the sole competent authority responsible for registering and licensing DABs.

The DARE Act also requires registrants to maintain professional conduct and to comply with all other aspects of the Act.  Examples of professional conduct requirements include duties to act honestly and fairly, to have effective corporate governance arrangements in place, to refrain from improper or illegal conduct, and to have effective arrangements in place to protect client assets and money.

### 4.1.1.  Regulatory Capital

Section 11 of the DARE Act requires DABs to meet all financial requirements that may be prescribed.  The Commission does not currently, but intends to prescribe regulatory capital for DABs.  As demonstration of its financial resources requirement, however, a DAB should satisfy the Commission that the company, at a Board of Directors' meeting, has reviewed and discussed the appropriate regulatory capital commitment, having regard to the size, nature and complexity of the digital asset business.

## 4.2.  The Financial and Corporate Service Providers Act, 2020 - Licensing Regime for Wallet Service Providers and Custody Services

The FCSPA applies to all persons engaged in the business of providing financial or corporate services as defined by this Act, in or from within The Bahamas.  The FCSPA provides a robust AML/CFT framework for persons wishing to license as these types of businesses, which includes conduct requirements, reporting requirements, and customer due diligence requirements.

 A license is required under the FCSPA to engage in two specific DAB activities: wallet service providers[6] and custody of digital assets[7], unless it is as an ancillary service to a digital token exchange registered under the DARE Act.

## 4.3.  Exemptions from the DARE Act

Generally, the DARE Act's remit encompasses the financial conduct or activity surrounding digital assets and how it poses money laundering and terrorism financing risks.  Consequently, the DARE Act does not seek to capture closed-loop tokens that are non-financial, non-exchangeable, non-transferable and non-fungible.  Accordingly, the DARE Act expressly exempts non-fungible tokens ("NFTs") [8] and other digital representations used within an online game, game platform or family of games sold by a publisher or offered on a gaming platform.[9]

Additionally, the DARE Act does not regulate electronic money (electronic representations of fiat currency), specifically Central Bank Digital Currencies ("CBDCs"), which for the purposes of the DARE Act, are defined as electronic representations of a fiat currency.  CBDCs are regulated by the Central Bank of The Bahamas, under the Central Bank of The Bahamas' Payment Act, 2012.

## 4.4.  Digital Assets AML/CFT/CPF Provisions

The digital asset regulatory framework includes robust AML/CFT/CPF provisions, which are embedded in various legislation including, POCA, ATA and the FTRA.

---

[6]Wallet Services Provider means a person who provides digital wallet services by use of a computer software or program that interfaces with fiat and virtual currencies and assets, stores private and public keys and interacts with distributed ledger technology to enable users to send, receive and monitor their digital assets.

[7] Custody of digital assets means any arrangement under which a person is authorized to hold directly or indirectly a customer's access keys, smart contracts or other forms of digital assets.

[8] A unique digital token for use in specific applications, which cannot be divided and is not interchangeable with any other type of digital token. The DARE Act is activity and functioned based, accordingly an "NFT" may be required to register under the DARE Act if its functions and characteristics are determined to be consistent with the Commission's definition of a digital asset.

[9] See Section 3(2), DARE Act.

Additionally, the Commission recently published both the Digital Assets and Registered Exchanges (Anti-Money Laundering, Countering Financing of Terrorism and Countering Financing of Proliferation) Rules, 2022 ("the DARE Rules")and the Financial and Corporate Service Providers (Anti-Money Laundering and Countering the Financing of Terrorism) Rules, 2019 ("the FCSPA Rules") (together, the "Rules").   In particular, the Rules were adopted to clarify how AML/CFT/CPF requirements apply specifically to digital asset activities and registered DABs, and to help entities seeking to engage in digital asset activities to better understand their AML/CFT/CPF obligations.

### 4.4.1.  *Activity-based registration by competent authority*

The DARE Act imposes specific activity-based AML/CFT/CPF requirements on DABs to ensure compliance with these obligations and includes both remedial and administrative sanctions for non-compliance.   The regime also establishes a risk-based approach for DABs, including registration and ongoing supervision requirements.

In accordance with internationally accepted best practices, the DARE Rules further prescribe risk-based preventative measures such as customer due diligence ("CDD"), record keeping, suspicious transaction reporting, enforcement measures and international cooperation and mandates that DABs have the same full set of AML/CFT/CPF obligations as financial institutions and designated non-financial businesses or professions.

### 4.4.2.  *Risk-based supervision and customer due diligence and prevention measures*

The DARE Rules prescribe risk-based preventative measures such as CDD processes that assist DAB in assessing the ML/TF/PF risks associated with digital activities, in either established business relationships or occasional transactions above a certain threshold.  CDD also comprises identifying the customer and verifying the customer's identity and using enhanced due diligence measures to mitigate potential higher risks.  The AML/CFT/CPF Rules also require that DABs:

- Have specific record keeping requirements (7 years);
- Have appropriate risk management systems in place, beyond normal CDD;
- Have internal controls in place with a view to establishing the effectiveness of AML/CFT/CPF policies;
- Appoint a compliance officer and a money laundering reporting officer with the requisite experience and education with digital asset activities;
- Report suspicious transactions to the Financial Intelligence Unit; and
- Comply with the FTRA.

## 4.5.  Expectations of DARE Act Registrants

DARE Act registrants are expected to conduct their business in accordance with behavioral, management, and AML/CFT/CPF standards that align with the legal and regulatory requirements of the DARE Act.

### 4.5.1.  *Behavioural Standards*

DARE Act registrants should conduct their business as follows:

- Business activities should be conducted with honesty, integrity, fairness, and professionalism;

- Exercise appropriate due care, regard, skill and diligence when conducting business on behalf of clients;
- Timely and proper communication with clients in a fair, clear and non-misleading manner;
- Special consideration of risks relating to its own business, those of its clients, and relevant exchanges when reviewing products and services;
- Have primary responsibility for the conduct of their employees;
- Uphold the integrity and reputation of The Bahamas; and
- Avoid conflicts of interest, where possible. When such conflicts occur,
    - customers are to be treated fairly; and
    - relevant conflicts of interest are disclosed.

### 4.5.2. *Management and Operational Standards*

DARE registrants are required to comply with the following:

- Uphold fit and proper management standards, which include:
    - Adequate educational requirements or other qualifications;
    - Have good reputation and character; and
    - The ability to conduct business competently and reliably.
- Ensure that the business has adequate processes and procedures in place in relation to:
    - Segregation of client's assets;
    - Digital asset purchases, sales, and transfers; and
    - Internal compliance and risk management systems and policies.
- Retention of full responsibility, liability and accountability for outsourced activities.
- Collection and maintenance of beneficial owner information.
- Proper policies and procedures in place for regulatory reporting.

# 5. Risks and Concerns

The digital asset sector has many potential benefits, inclusive of faster and cheaper transactions and the integration of disadvantaged individuals into the financial system.  However, it also presents material risks, challenges and concerns for participants and stakeholders, including regulators.  The digital asset regulatory framework was created in accordance with the Commission's core mandate and functions, including investor protection and mitigating systemic risks.  To accomplish this, the Commission identified key risks and concerns, inherent to the nature of digital assets and their underlying technologies, to ensure that the applicable legislation adequately addresses the identified risks and concerns and incorporates effective and proportional mitigation measures to address the risks.  The most significant risks identified are as follows:

**Fraud Risks** – Typically, consumers rely on the integrity and robust disclosures of the creator/coder in assessing whether a digital asset is as described or that proceeds raised will be utilised as disclosed. However, not all participants in this sector have operated honestly, ethically or with due care.  Generally, fraudulent schemes include front running, rug pulls and Ponzi schemes.

**Cybersecurity Risks** – Digital elements such as wallets, protocols, and smart contracts are susceptible to hacking; consequently, a responsible regulatory framework should require that

DABs have the appropriate data protection systems in place. Hacks can result in the leak of sensitive information and the loss of funds, often with no recourse.

**Market Abuse** – Digital assets activities can involve risks associated with traditional markets, such as speculative trading, pump and dump schemes, lending and borrowing, sometimes involving highly leveraged strategies. These risks include those caused by trading and price misinformation or manipulation and conflicts of interest.

**AML/CFT Risks** – Many jurisdictions have either not adopted or have inconsistently applied AML/CFT measures, presenting potentially significant cross-border, money laundering and terrorist financing risks. Further, there is the risk of illicit actors using sophisticated anonymity-enhancing technologies, such as anonymity-enhanced cryptocurrencies (AECs), mixers, tumblers and other technologies, to obfuscate the details of financial transactions. The result is that, under the cloak of anonymity, they can easily circumvent traditional AML/CFT frameworks and similar supervisory regimes, store proceeds of crime, elude sanctions, and launder money.

# 6. Mitigating Risks and Concerns

To supplement the legal and regulatory framework, the Commission has implemented a variety of initiatives to mitigate the risks posed by digital assets and DABs.

## 6.1.  Digital Asset Sector National Risk Assessment

In line with FATF's standards requiring countries to identify, assess and understand the country's exposure to DAB activities, the Commission engaged an international consultant to conduct a VASP national risk assessment ("VASP NRA"), which was completed in 2022.  As a part of that assessment, the international consultant, using the World Bank's VASP methodology, evaluated digital asset activities in The Bahamas to assess the risks these activities and businesses posed to The Bahamas.  After a thorough and robust VASP NRA, overall, The Bahamas was assessed as having a low risk rating.  The result of the VASP NRA indicates that there is a low threat of ML risks for VASPs in The Bahamas.

## 6.2.  Capacity Building Efforts

The Commission has increased its internal capacity building efforts to ensure that the appropriate departments and staff have sufficient knowledge and subject matter expertise to assess the types of DABs applying for registration, and to assess the potential risks posed to the market, the customer and the jurisdiction if those businesses are registered to engage in digital asset activities.  The following initiatives have been introduced in order to ensure proficiency in this regard:

1. Restructuring and updating Supervisory departments;
2. Establishment of SCB FITLink, the Commission's FinTech Hub;
3. Staff Training; and
4. Collaboration with the University of The Bahamas.

### 6.2.1.  *Restructuring and Updating Supervisory Departments*

Since the adoption of the DARE Act, the Commission has restructured and updated the following departments:

- Supervision; and
- Examinations.

The Supervision Department ("SUD") is responsible for processing applications for the licensing and registration of persons wishing to conduct registrable and licensable activities in The Bahamas, under the DARE Act, SIA, IFA, and FCSPA ("the Acts").  Additionally, SUD is responsible for the offsite monitoring and supervision of all of the Commission's registrants and licensees, including the review and registration of prospectuses for initial public offerings and private placements.

Upon the adoption of the DARE Act, the Commission created a new unit within SUD that is responsible for the review, registration and offsite monitoring of DABs, solely.  The committed resources for the new unit underscores the Commission's commitment to both protecting investors, facilitating the orderly growth and development of the digital asset sector, and establishing a progressive and internationally compliant registration and supervisory regime.  The DARE Application process is illustrated in **Annex II**.

The Examinations department ("ED") is responsible for the onsite examinations of all of the Commission's registrants and licensees.  Since the adoption of the DARE Act, the Commission has restructured and updated ED by creating a new onsite work plan customised for registrants under the DARE Act.  The 11 objectives of the DARE Act work plan are:

1. Ensure Corporate Governance rules are fulfilled;
2. Ensure AML/CFT/CPF Rules are being adhered to;
3. Ensure the registrant or licensee has effective policies and procedures, as well as adequate systems and/or software;
4. Determine whether the registrant has implemented an appropriate risk rating framework;
5. Ensure that the staff are appropriately qualified and experienced for the level of their responsibility;
6. Determine whether the registrant/licensee is carrying out proper customer and employee due diligence;
7. Certify that registrants obtain independent and reliable source documents, data and other information;
8. Determine whether transaction records are properly maintained and verify whether any suspicious transaction reports were reported to the FIU;
9. Determine the cross jurisdictional activity of the registrant;
10. Inspect, determine and document whether any client complaints et al were made during the year.l.

### 6.2.2.  *Creation of SCB FITLink*

SCB FITLink[10] (the "Hub") is the Commission's FinTech Hub, and was approved for launch in October 2019. The establishment of SCB FITLink is a proactive and clear signal that The Bahamas recognises the importance of FinTech and innovation in the financial services industry and is willing to collaborate with market participants to ensure a robust and appropriately regulated securities and capital markets sector.

---

[10] Financial Innovation and Technology Link.

SCB FITLink serves as the central point of contact for the Commission's engagement with the public on various issues related to FinTech, such as virtual asset business, crowdfunding, distributed ledger technology, artificial intelligence and initial token offerings. The duties of the Hub include:

- Assist FinTech innovators and incumbents with navigating the Commission's digital asset regulatory landscape;

## 7. Research, establish, and create policy, rules, and guidelines for FinTech-related products and services;

- Educate the Commission's staff about emerging FinTech trends, opportunities and risks;
- Provide website updates to assist industry participants with understanding FinTech policies; and
- Consult with domestic and overseas regulatory authorities regarding innovative technologies.

In addition to regulatory consultation, another primary activity of SCB FITLink is to engage with both local and international stakeholders. Between 1 January 2021 and year-end 31 December 2021, SCB FITLink held either in-person or virtual meetings with 75 stakeholders.

The ensuing pie chart depicts the most frequently asked questions that were submitted to the Commission, via SCB FITLink in 2021.[11]



The pie chart below shows both the various jurisdictions that met with SCB FITLink and the percentage of questions asked from each jurisdiction.

---

[11] All questions and the Commission's responses are attached as Annex I.



### 7.1.1.  *Staff Training*

With continued efforts to ensure proficiency in the digital assets sector, the Commission offers and fully subsidises training courses on cryptocurrency, blockchain technologies, decentralised finance, etc. to our staff.  Select courses that staff have participated in and have received certificates include:

- Cambridge FinTech and Regulatory Innovation;
- MIT Media Lab – Cryptocurrency Course;
- Wharton Economics of Blockchain and Digital Assets; and
- MIT Management Executive Education – Blockchain Technologies: Business Innovation and Application.

### 7.1.2.  *Collaboration with the University of The Bahamas*

As a part of its functions, the Commission promotes an understanding by the public of the capital markets, its participants and the benefits, risks, and liabilities associated with investing in digital assets.  To further this endeavour, the Commission intends to collaborate with the University of The Bahamas on three 8-week courses focused on the digital assets sector.  These courses will serve as professional continuing education courses and will provide the foundational knowledge needed to work with DAB and FinTech, and to understand The Bahamas' DAB regulatory framework.  Attendees will earn a certificate, upon successful completion of the course, which can be used to demonstrate to the Commission that the individual possesses the requisite education and knowledge to engage in DAB registrable activities in The Bahamas.

### 7.1.3.  *National Cooperation Efforts*

The Commission maintains that cooperation with domestic and international supervisory authorities is essential.  At the national level, the Government of The Bahamas ("GoB") is establishing a Digital Advisory Panel ("the Panel"), comprising digital asset experts, to continually monitor digital assets and related digital developments, emerging trends, and associated risks.  The Panel is primarily tasked with keeping

the GoB and the Digital Asset Policy Committee ("DPC") regularly updated, with the aim of solidifying The Bahamas as the preeminent digital asset jurisdiction.

Additionally, the Executive Director of the Commission is a member of the DPC, which is a committee formed by the GoB to ensure that The Bahamas' digital asset and FinTech policy objectives are implemented and that all branches of government and the private sector are aligned and working together to deliver desired outcomes.

## 7.2.  International Cooperation and Agreements

A primary tenet of effective DAB supervision is that international supervisors must exchange relevant information.  This is particularly important as, to date, there remains no uniform digital asset standards or typologies.  To mitigate against digital asset market fragmentation, the Commission has executed a number of international cooperation and agreements, and is a committee member of various international digital asset standards setting bodies.  A significant membership is with the International Organization of Securities Commissions ("IOSCO"), of which the Commission is also an "A signatory" of the Multilateral Memorandum of Understanding Concerning Consultation and Cooperation and the Exchange of Information ("MMoU") and a signatory of the Enhanced Multilateral Memorandum of Understanding ("EMMoU") Concerning Consultation and Cooperation and the Exchange of Information. According to IOSCO, the EMMoU "fosters greater cross-border enforcement cooperation and assistance among securities regulators, enabling them to respond to the risks and challenges posed by globalisation and advances in technology."

As a part of the IOSCO membership, the Commission sits on various committees, including the IOSCO FinTech Steering Group, which allows members to share and discuss opportunities, challenges, and experiences in all areas related to FinTech, including digital assets, initial token offerings, and FinTech regulation and solutions.

The Commission is also a member of the following:

- The Global Financial Innovation Network ("GFIN"), which is an organisation that was launched in January 2019, and currently consists of 57 members.  The United Kingdom's Financial Conduct Authority presently chairs GFIN.  The purpose of GFIN is to support financial innovation and protect investors and consumers on a global scale. On 22 January 2020, The Commission's application to become a member was approved.  The Commission is a member of one of GFIN's work streams.
- The Caribbean Group of Securities Regulators' ("CGSR") FinTech Group, which is the technology network comprising select Caribbean securities and capital markets regulators.  CGSR's mandate is to grow and regulate FinTech in the region.

# 8. Additional Consumer and Investor Protection Measures

As a key component of the Commission's mandate is to protect the interest of investors and consumers, the DARE Act has a number of embedded provisions aimed at protecting investors, specifically as it relates to the ITO process.  Moreover, the recently adopted DARE Rules assists with protecting against money laundering and fraud.  The Commission intends to release additional guidance on ongoing requirements for DARE Act registrants, as well.

The protections embedded in the DARE Act related to ITOs are the obligations of a token issuer to disclose, the purchaser's right to recession or damages, and the purchaser's right of withdrawal.

*Continuing obligations of an issuer to disclose*

Disclosure is important aspect of raising funds from the public as it encourages trust in the financial system. The Commission is adamant that purchasers should be able to make a sound and informed decision with proper disclosure mechanisms in place. The DARE Act has a number of disclosure requirements for ITOs that must be outlined in the offering memorandum for the benefit of investors. Through this process, there is complete transparency, which is a top priority to the Commission.

If an issuer fails to disclose in the time disclose relevant information specified in the DARE Act, the issuer might be subject to penalties and/or sanctions.

*Purchaser's right to rescission or damages*

If an issuer publishes an offering memorandum – or any amendments – which contains a material misrepresentation, a purchaser shall have a right of action against the issuer for the rescission of the subscription or damages.

*Purchaser's right of withdrawal*

A purchaser of a token offered under the provisions of the DARE Act is entitled to withdraw their purchase by written notice to the issuer within 72 hours.  Once a notice is made, an issuer has within two days of the purchaser's request to pay all funds to the purchaser.

*Commission's authority to investigate*

The Commission has the authority to conduct onsite or offsite inspections of the business of any DARE Act registrant to ensure that they are complying with the Commission's regulatory framework and that of any other relevant law.

# 9. Future Strategy and Next Steps for the Digital Asset Regime

Having met the minimum AML/CFT/CPF and regulatory thresholds currently required in the VASP sector, the Commission intends to monitor developments in this area for the immediate future, with a view to determining the appropriate regulatory response as the need arises, and to use these experiences to inform the establishment of a comprehensive digital asset regime as the industry develops.

In this regard, there are immediate plans to review and update the DARE Act, where necessary, to develop a regulatory approach for the following FinTech and digital asset trends.  Contemplated updates may include:

- **Regulatory accounting considerations and treatment of digital assets.**  As part of our objective to ensure the orderly growth and development of the digital asset sector and the protection of consumers and investors, the Commission is likely to prescribe rules requiring DABs to disclose the risks to investors from digital assets held on behalf of customers.
- **Segregation of client assets**. The Commission expects DABs to hold client assets "off balance sheet". The Commission will likely approve the use of a segregated omnibus account for this purpose.

- **Decentralised Finance ("DeFi")**. DeFi is an emerging FinTech that involves peer-to-peer financial services on public blockchains. Effectively, DeFi removes traditional financial services gatekeepers such as central securities depositories and traditional financial institutions. Proponents of DeFi assert that removing the gatekeepers allows for the faster, more efficient and cheaper execution of transactions. However, the gatekeepers perform essential market and investor protections that seek to, among other things, minimise fraud, reduce systemic risks and contribute to the fair and equitable treatment of investors. Further, DeFi protocols are becoming a popular alternative channel for financial crime, including fraud and money laundering. The Commission will review this area with a view to curtailing the risks associated with DeFi activities.

- **Staking.** Commonly used in proof of stake consensus mechanisms, staking is a process that involves committing participants' digital assets into a smart contract to support a blockchain network and confirm transactions. Participants pledge their digital assets to the protocol, the protocol chooses validators to confirm blocks of transactions from those participants, and then the validators are rewarded when a new block is added to the blockchain. Participants earn rewards with their staked digital assets, however, there are customer risks associated with staking activities. Though the Commission may not necessarily regulate staking, at a minimum, we will require that networks, including exchanges that offer staking services, must provide certain disclosures for participants in the staking program. Such disclosures will include, but are not limited to:
  - o How the staking program works?
  - o Validator selection process.
  - o Types of rewards offered (crypto/governance controls/etc.).
  - o How are the awards earned?
  - o Limitations to the size of the staking pool, if applicable.
  - o Server "uptime" for a prescribed period.
  - o Minimum lock up periods, if any.
  - o Reward limitations, if any.
  - o Process and length of unstaking process.
  - o Minimum and maximum staking investment, if applicable.

- **Yield Farming.** In this activity, a decentralised exchange is used to facilitate the lending and/or borrowing of digital assets. A purchaser can stake coins to earn interest on a digital asset by depositing them for a certain period. At a minimum, the Commission intends to prescribe a disclosure regime for this activity.

- **Advertising of Digital Assets to Investors**. The use of social media and internet platforms to advertise, sell and/or distribute products, particularly on a cross-border basis, has increased. The potential risks of this activity include the offering of unsuitable products to investors, data privacy issues and the potential to circumvent securities and capital markets laws (market surveillance and enforcement limitations). The Commission will consider what measures will be adopted to promote investor protection for retail investors in the internet environment.

- **Stablecoins.** Stablecoins are digital assets whose values are fixed to that of a currency, algorithm or basket of securities, with the purpose of reducing the inherent volatility of the digital assets. There are key considerations that the Commission will review, including customer protection, AML/CFT, and where digital currencies interact with traditional fiat currency the potential for contagion risks, in traditional financial markets. At a minimum, the Commission will aim to

introduce a regulatory regime that adheres to international principles and standards that are applicable to stablecoins, while ensuring financial and monetary stability.  To support the regulatory regime, the Commission will also introduce valuation and financial disclosure requirements, in particular prescribing that registrants disclose the nature/composition of the underlying assets, the basis for valuation of the underlying assets, outlining how reserves are held and mandating attestation/audit requirements.

- **Web3.**  An alternative version of the internet, built using decentralised blockchains, most often, the Ethereum blockchain.

- **NFTs.**  As mentioned in section 4.3, NFTs are currently exempt from the Commission's regulatory framework.  The Commission intends to examine and define the categories of NFTs, the characteristics, use and manner in which an NFT is offered and sold or resold, and the structure and rights attached to the NFT to determine whether the NFT is either a consumer asset or financial asset used to facilitate capital market activity.

Depending on the recommendations provided, as well as the Commission's own research and judgment, either amendments will be made to the respect legislation or additional policy statements will be issued by the Commission.  In the interim, the Commission will continue to actively engage in discussions with market participants and stakeholders to cultivate a regulatory environment that not only encourages innovation and economic growth, but also discourages and provides effective enforcement measures against bad actors.  We look forward to continued collaboration with all stakeholders during this very exciting period.

# Annex I: DARE Act Frequently Asked Questions

**I.  Overview**

1.  What is the role of the Securities Commission of The Bahamas (the "Commission") as it relates to the DARE Act?

    For the purposes of the DARE Act, the role of the Commission is to:

    a)  Regulate, monitor and supervise the issuance of digital assets and persons conducting digital asset business in or from within The Bahamas;
    b)  Develop rules, guidance and codes of practice in connection with the conduct of digital asset business and initial token offers;
    c)  Advise the Minister on all matters relating to digital asset business; and
    d)  Promote investor education and other conditions that facilitate innovation and development of digital asset business within The Bahamas.

2.  To whom does the DARE Act apply?

    The DARE Act applies to:

    a)  Any person who as organiser, issuer, founder, purchaser or investor participates in the formation, promotion, maintenance, organizsation, sale or redemption of an initial token offering (ITO); and
    b)  Any legal entity carrying on digital asset business in or from within The Bahamas, irrespective of the physical location from where the activity is carried out.

3.  What is a digital asset business?

    A digital asset business is defined as:

    a)  A digital token exchange;
    b)  Providing services related to a digital token exchange;
    c)  Operating as a payment service provider business utilising digital assets;
    d)  Operating as a digital asset service provider, including providing distributed ledger technology platforms that facilitate:
        i)  the exchange between digital assets and fiat currencies;
        ii)  the exchange between one or more forms of digital assets; and
        iii)  the transfer[12] of digital assets;
    e)  Participation in and provision of financial services related to an issuer's offer or sale of a digital asset; and
    f)  Any other activity which may be prescribed

4.  How does a digital token exchange differ from other digital asset businesses?

---

[12] As defined in Section 2, DARE Act.

A digital asset business is one of the businesses defined in question three.

A digital token exchange is a virtual platform, which uses distributed ledger technology, or other decentralised technology, for the sale, trade or exchange of digital tokens, whether for fiat currency or one or more digital assets (tokens).  Generally, digital token exchanges have more rigorous application requirements than that of other digital asset businesses.

## II.  Conduct and Compliance Requirements

5.  Can firms trade digital assets for its own account?

There are no restrictions from trading digital assets for a digital asset businesses' own account.

6.  What is the regulatory capital requirement for firms registered under the DARE Act?

The Commission does not currently, but intends to prescribe regulatory capital for DABs; however, registrants are required to have adequate resources to both meet the nature, scope and complexity of its business activities, to remain solvent and to meet its risks in the event of disruption, suspension or termination of its registration with the Commission.

As demonstration of its financial resources requirement, a DAB should satisfy the Commission that the company, at a Board of Directors' meeting, has reviewed and discussed the appropriate financial resources commitment, having regard to the nature, size and complexity of the business.

7.  Are digital asset businesses and digital token exchanges required to maintain a physical presence in The Bahamas?

The DARE Act does not explicitly address this issue.  The Commission's policy, however, requires digital token exchanges to establish a physical presence. For such approved digital asset businesses, the Commission expects that registrants adhere to the Commission's Securities Industry (Physical Presence) Rules, 2012, inclusive of ensuring that the CEO and the Compliance Officer/Money Laundering Reporting Officer are domiciled in The Bahamas.

8.  What are the ongoing requirements for digital asset businesses?

The annual update form and applicable fees. Moreover, the Commission is in the process of drafting policy documents that will outline the necessary requirements.

9.  What are the AML/CFT requirements for digital asset businesses?

In accordance with Section 26, DARE Act, and Section 23, FCSPA, all registrants must conduct periodic self-risk assessments, and to implement and maintain policies and procedures to ensure compliance with provisions of The Proceeds of Crime Act, 2018, Anti-Terrorism Act, 2018 and the Financial Transactions Reporting Act, 2018.

Further, the Commission has adopted and published the Digital Assets and Registered Exchanges (Anti-Money Laundering and Countering The Financing of Terrorism) Rules, 2022, which outline the AML/CFT requirements for registrants under DARE.

Licensees under the Financial and Corporate Service Providers Act, 2020, who engage in either custody of digital assets or wallet service providers, are required to comply with the Financial and Corporate Service Providers (Anti-Money Laundering and Countering the Financing of Terrorism) Rules, 2019.

10. Does the Commission maintain a register of all beneficial owners of digital assets?

No, the Commission does not maintain a register of all beneficial owners of digital assets.  As a part of its risk management systems and controls, however, DARE registrants must demonstrate to the Commission the ability to identify the ultimate beneficial owners of clients' transactions and client accounts.

11. Does the Commission accept digital submissions of documents to satisfy Know Your Client ("KYC")/due diligence requirements?

The Commission allows the initial digital submission of KYC documents, however, it is expected that the originals will be submitted shortly after such a submission.

12. Does the Commission allow digital asset businesses to maintain records via cloud service providers?

Yes.  The books, records and data must be maintained in compliance with the provisions of Section 15, Financial Transactions Reporting Act, 2018.

13. What is the Travel Rule and are Digital Asset Businesses (DABs) required to comply?

The Travel Rule refers to FATF's Recommendation 16 and its application to Virtual Asset Service Providers (VASPs).  Yes, DABs are required to comply, please review the Commission's upcoming Guidance Note on the Travel Rule.

14. Can DABs conduct business with persons in jurisdictions that have not enacted the Travel Rule?

Yes, however, they must comply with the Financial Transactions Reporting (Wire Transfers) Regulations, 2018 and the Financial Transactions Reporting (WIRE TRANSFERS) (Amendment) Regulations, 2022. Regulation 3A of the Amendment Regulations specifically addresses this issue.

## III.  Activities not explicitly covered under the DARE Act.

15. If a firm wants to provide digital asset business that are not explicitly outlined in the DARE Act, is registration required?

It depends on the type of activity or business that will be performed.  The DARE Act expressly exempts certain assets or businesses from its purview and, accordingly, such assets or businesses are not required to register with the Commission.  Please see Section 3(2), DARE Act, for the complete list of activities, tokens and transactions that are exempt from the Commission's legislative framework.

Under Section 6, DARE Act, the Commission reserves the right, however, to prescribe other activities as "digital asset businesses."  In such instances, registration with the Commission will be required.

Current registrants should seek the Commission's permission prior to conducting additional digital asset business.  Questions can be directed to the Commission's Supervision Department at supervisiondare@scb.gov.bs.

16. Which license would be required for a legal entity to engage in custody of digital assets or provide wallet services?

A legal entity, who as a means of business, only provides either custody of digital assets or wallet service providers (together, "providers"), must apply for a license under the Financial and Corporate Service Providers Act, 2020.

The Commission intends to amend the definition of 'digital asset business', however, to include both custody of digital assets and wallet service providers.  Because of this amendment, both activities will require registration under DARE.  Existing FCSPA licensees will be granted a 'grandfather' provision under DARE.

17. If a digital asset business wants to include custody/wallet services in their business model, will they require a separate license or registration with the Commission?

Generally, yes.  The exception is digital asset businesses registered with the Commission, under the DARE Act, as a digital token exchange, who provide either custody of digital assets or wallet services as an ancillary part of their digital token exchange business.

If you have any questions regarding digital asset business registration requirements, please reach out to the Commission's financial technology hub, SCB FITLink, at either (242) 397-4100 or FITLink@scb.gov.bs or the Supervision Department at supervisiondare@scb.gov.bs.

18. Does a firm need to be registered with the Commission to buy and sell non-fungible tokens (NFTs)?

No.  Currently, the DARE Act excludes non-fungible tokens from the Commission's regulatory purview.  Please note, however, that the Commission is reviewing the regulatory treatment of NFTs and, if necessary, will issue a new policy statement regarding NFTs.

19. Should a firm be licensed under the DARE Act or the Securities Industry Act (SIA), 2011 to trade derivatives of digital assets?

Firms are required to be registered under the appropriate legislation depending on the underlying asset of the derivative.  For example, a derivative that has a digital asset as the underlying asset is required to be registered under the DARE Act.  Alternatively, if the derivative comprises securities as the underlying asset, then the firm should be registered under the SIA.

20. Are mining services providers required to register under the DARE Act?

No.  Currently persons that engage exclusively in mining, or related, services are not required to either register with or obtain a license from the Commission.  If, however, a person is engaged in

a digital asset business, in addition to their mining activities, then that person is required to register under the DARE Act.

21. Which legislation covers digital asset investment funds?

Investment funds that comprise digital assets as a part of its overall portfolio are required to be licensed under the Investment Funds Act, 2020.

## IV. Registration

22. What is the timeline for the entire registration process?

The Supervision Department ("SUD") aims to complete the registration process within 30 days of receiving a completed application. This timeline may be affected, however, if SUD requires additional information that has not been provided in the initial application. The applicant may receive an 'In Principle Approval' if, at a minimum, the detailed business plan outlining the organizational structure and explaining how the operations will work in depth has been submitted.

23. What constitutes as a completed application?

A completed application refers to an application in which all aspects of the application and supporting documents have been submitted.

24. Who can register as a digital asset business?

Any legal entity formed/established in accordance with the Companies Act (Ch. 308), International Business Companies Act (Ch. 309), the Partnership Act (Ch. 310), the Partnership Limited Liability Act (Ch. 311), and the Exempted Limited Partnership Act (Ch. 312).

The above-mentioned entities must apply for registration (the DARE Act) by way of a formal application to SUD.  Completed applications should be submitted to supervisiondare@scb.gov.bs.

25. Is obtaining prior approval from The Bahamas Investment Authority (BIA) a requirement for a non-resident business that is considering registering under the DARE act?

No.  Approval from BIA is not a requirement for a non-resident business to set up a digital asset business in The Bahamas.  However, the digital asset business may need government approvals for other aspects of the business (e.g. work permits, etc.).

26. Can a legal entity formed/established in a foreign jurisdiction apply for registration under the DARE Act?

Yes. Such entities, however, may be required to incorporate/establish a legal entity in accordance with Bahamian laws.

27. Can existing registrants of the Commission (i.e. registered or licensed under the Securities Industry Act, 2011, Investment Funds Act, 2019 and Financial Corporate Service Providers Act, 2020) register as a digital asset business?

   Yes, existing registrants and licensees can register under the DARE Act.  Section 9, DARE Act outlines the registration requirements for all existing registrants and licensees.

28. If a person is registered under the DARE Act and would like to expand their existing business model to include other digital asset businesses activities, are they required apply to the Commission to receive a separate registration?

   Depending on the type of additional digital asset businesses, a separate registration may not be required, though at all times the digital asset business must notify the Commission of the additional business activity.

   Please note that in accordance with Section 13 of the DARE Act, existing DARE registrants cannot undertake new digital asset business without prior written approval of the Commission.

   If a separate registration is required, the digital asset business must comply with Section 9 of the DARE Act.

29. Is there an example available for the DARE application?

   At this time, there is no DARE application template; however, the following Forms are available as a guideline for application completion:

   - Part A – Form 1 – Application for Registration as Digital Asset Business;
   - Part A – Form 3 – Application for Registration as CEO or Compliance Officer;
   - Part B – Form 1 – Application by Registered Digital Asset Business, Registered Firm, or Financial and Corporate Service Provider to Carry on Digital Asset Business Services;
   - Part C – Form 1 – Application for Registration of Digital Token Exchange; and
   - Part D – Form 1 – Application for Registration of Initial Token Offering.

   The above Forms are located in the First Schedule of the DARE Act.

30. What are the necessary supporting documents for applying for digital asset business registration?

   Please refer to the First Schedule, Part A, Form 1 for a list of the necessary supporting documents.

31. Is there a record of all pending applications for digital asset businesses that is publicly available?

   No, due to the Commission's confidentiality provisions, pending application information is not available to the public.

32. Is there a record of all registered digital asset businesses that is publicly available?

   Yes, in accordance with Section 12, DARE Act, the Commission has established and currently maintains a public register of all approved digital asset businesses.

The register is available at https://www.scb.gov.bs/registrant-licensee-search/.

33. When and how often must a DARE registrant renew their registration?

In accordance with Section 8, DARE Act, on or before 31 January, all registrants are required to annually renew their registration with the Commission.

The registrant must submit the Annual Update and Declaration Form and, if applicable, a current copy of the registrant's insurance policy.  The Annual Update and Declaration Form is available at https://www.scb.gov.bs/wp-content/uploads/2022/01/Annual-Information-Update-Form-DARE.pdf.   The annual renewal fee, of $15,000 for digital token exchanges or $10,000 for all other digital asset businesses, must be remitted.

34. Can a registered digital asset business make changes to its business model post-registration?

Yes. Certain material changes, however, require the Commission's written approval prior to effecting the change (Section 13, DARE Act).

The registrant may also be required to include the changes in the Annual Update and Declaration Form and/or apply for additional registration under the DARE Act.

## V.  Initial Token Offerings (ITO)

35. Are organizers of an ITO required to register with the Commission?

Yes, in accordance with Section 3, DARE Act, any person who as an organiser participates in the formation, promotion, maintenance, sale or redemption of an ITO is required to register with the Commission.

In accordance with section 31(2), at a minimum, the following must be submitted:
i)        Completed Form 1 – Part D, First Schedule;
ii)       A written legal opinion concerning the classifications of the tokens;
iii)      A copy of the Offering Memorandum; and
iv)      Requisite application fee, as set out in the Third Schedule.

36. What is the application process for an ITO?

See Part IV, DARE Act, which outlines the requirements and application process to issue a digital token in or from within The Bahamas.

37. How many token offerings can take place in one year?

The DARE Act does not prescribe a maximum number of token offerings that can be conducted in one year.

38. What information must be included in an Offering Memorandum?

Sections 28 and 34, DARE Act, and the Second Schedule, outline what information must be included in an Offering Memorandum.

39. If an offering is over-subscribed, can we issue additional tokens under the same offering memorandum?

   No. The issuer must close the offering or obtain written permission from the Commission to amend the terms and conditions of the offering.

## VI. Other

40. To whom can applicants and prospective applicants submit questions related to the DARE Act?

   Questions or comments can be submitted to either the Supervision Department or the Commission's financial technology hub, SCB FITLink, via the below methods:

   Telephone: (242) 397-4100
   Email Addresses:
   - Supervision Department SupervisionDare@scb.gov.bs.
   - SCB FITLink: FITLink@scb.gov.bs.

   For more information, you can learn more about FITLink, here: https://www.scb.gov.bs/wp-content/uploads/2019/07/Securities-Commission-Launches-FinTech-Hub-Press-Release.pdf.

41. Does the Commission allow applicants to provide a demo of the business model prior to making an application?

   The Commission encourages applicants to set up an initial meeting in order to review their business proposal, and the application to be submitted. Once the application has been submitted, the Commission may request additional meetings to provide further explanation.

42. Does the Commission provide either banking or law firm recommendations?

   The Commission does not provide law firm recommendations. Please see a list of attorneys in good standing with The Bahamas Bar Association, here: https://bahamasbarassociation.com/service/members-directory/ .

   The Commission also does not provide commercial bank recommendations. Please see a list of banks in good standing with the Central Bank of The Bahamas, here: https://www.centralbankbahamas.com/faq-s.

   Please note that the Commission provides these link for information purposes only and neither endorses nor assumes responsibility for the professional ability or integrity of the persons or firms whose names appear on the websites.

# Annex II: DARE Application Process for a Digital Asset Business

*Figure 1: Flowchart of DARE Application Process*

**Step 1: Submission of Application Form**

Prospective DARE registrants may begin the application process by submitting their application forms and other supporting documents to the Supervision Department. For applicants, the necessary application forms and supporting documents are outlined in Sections 8, 9, and 15 of the DARE Act, and include:

- The completed requisite application form[13] for either:
  - A digital token exchange;
  - Other types of DABs; and
  - Existing registrants of the Commission wishing to register as a DAB.
- A copy of a detailed and current business plan with projections for the next three years;
- A certified copy of the Certificate of Incorporation, Memorandum and Articles of Association, Register of Directors and Officers, Register of shareholders or equivalent documents;
- A schedule of proposed fees;
- Rules of the exchange, if applicable;
- Information of the beneficial owners of the DAB; and
- Information on the DAB's Chief Executive Officer and Compliance Officer.

The Commission reserves the right to request additional information to aid in the decision making process during the application process. All applicants may submit the application and supporting documents to the Supervision Department either via email or physically at the Commission's premises.

Once the application form and supporting documents are submitted, the Supervision Department sends an acknowledgement email and assigns a Supervision Officer to begin the application review process.

Applicants that may have questions about the application process, including questions regarding the type of application they are to submit, are free to contact the Supervision Department to set up a meeting prior to submitting an application.

**Step 2: Revision of the Application**

The application review timeline officially commences once a **_completed_** application form is submitted. This means that the application and all supporting documents are complete and void of critical errors.

---

[13] Application forms are found in the Schedules to the DARE Act.

Once the review process begins, the Supervision Department may identify concerns with the application and/or supporting documents, and reserves the right to contact the applicant for clarification of the concerns/issues identified.

Once the Supervision Department is satisfied with submitted documents, the internal review process continues, which includes various checks, reviews, and internal approvals. The Supervision Department follows internal standard operating procedures and checklists to determine whether an application should be approved or denied. Some elements taken into consideration during the application process includes:

- Whether the DAB has appropriate and sufficient systems and controls to perform its functions and manage its risks;
- Whether the DAB has the ability to meet solvency standards and levels of capital; and
- Whether the DAB has designed a digital asset framework that addresses, but is not limited to:
  - Technology and security;
  - Governance;
  - Scalability;
  - Identified risk framework;
  - Data protection and storage.

**Step 3: Approval/Rejection**

Once the review process is complete, the applicant is sent a letter of approval or rejection. There are three types of approval that an applicant may receive:

1. Absolute Approval – The DAB may start business operations.
2. Conditional Approval – The DAB may start business operations, but all deficiencies must be rectified in the timeframe stipulated in the approval letter.
3. In Principle Approval – The DAB may not start business operations until all deficiencies have been rectified as stipulated in the approval letter, or they receive a Conditional Approval at a minimum.

**Process in case of a Rejection**

If an application has been denied by the Commission, the Supervision Department will contact the applicant to express concerns and allow them to make additional submissions. If the additional submissions are insufficient, the applicant will receive a letter of denial.

Upon receipt of the letter, the applicant has two courses to appeal:

1. The applicant may appeal to the Board of the Commission in the first instance; and
2. The applicant may apply for judicial review in the second instance. The judicial review will not overturn the Commission's decision, but it may ask the Commission to review its process in making the decision.



*EXTRAORDINARY*

# OFFICIAL GAZETTE

# THE BAHAMAS

PUBLISHED BY AUTHORITY

| NASSAU | 25th November, 2020 |
|---|---|

# DIGITAL ASSETS AND REGISTERED EXCHANGES ACT, 2020

## Arrangement of Sections

**Section**

### PART I – PRELIMINARY                                                                4

| 1.  | Short title and commencement.................................................................................4 |
| 2.  | Interpretation.............................................................................................................4 |
| 3.  | Application of Act......................................................................................................9 |

### PART II – ADMINISTRATION OF ACT                                            10

| 4.  | Securities Commission to administer Act.............................................................10 |
| 5.  | Functions and powers of Commission...................................................................10 |

### PART III – REGISTRATION AND REGULATION OF DIGITAL ASSET BUSINESSES                                                                                    11

**DIGITAL ASSETS BUSINESSES**                                                        11

| 6.  | Forms of digital asset businesses..........................................................................11 |
| 7.  | Prohibition to carry on unregistered digital asset business................................11 |
| 8.  | Registration of a digital asset business..................................................................11 |
| 9.  | Digital asset business as additional activity..........................................................13 |
| 10. | Duty to notify changes relating to application for registration............................14 |
| 11. | Financial requirements of digital asset businesses...............................................14 |
| 12. | Commission to maintain Register of digital asset businesses...............................14 |
| 13. | Commission's prior approval for certain changes...............................................15 |

**ADDITIONAL REQUIREMENTS FOR DIGITAL TOKEN EXCHANGES**    15

| 14. | Prohibition to operate unregistered digital token exchange................................15 |
| 15. | Application for registration of digital token exchange.........................................15 |
| 16. | Approval or refusal of application.........................................................................15 |
| 17. | Adequate systems and controls for digital token exchanges.................................16 |
| 18. | Digital exchange to satisfy ongoing requirements...............................................16 |

**SUSPENSION, REVOCATION OR SURRENDER OF REGISTRATION**    17

| 19. | Suspension or revocation of registration................................................................17 |
| 20. | Surrender of registration.........................................................................................18 |
| 21. | Process following surrender or revocation.............................................................19 |
| 22. | Winding up or dissolution.......................................................................................19 |

**DATA PROTECTION**                                                                      19

| 23. | Record keeping and prevention of unauthorized data access...............................19 |

| CONDUCT AND COMPLIANCE | | 20 |
|---|---|---|
| 24. | Duty to maintain professional conduct................................................. | 20 |
| 25. | General duty to comply and co-operate................................................ | 20 |
| | AML AND CFT PREVENTION MEASURES | 21 |
| 26. | Prevention of money laundering and terrorism financing..................... | 21 |

| **PART IV - INITIAL TOKEN OFFERING** | | **21** |
|---|---|---|
| 27. | Initial token offerings........................................................................ | 21 |
| 28. | The offering memorandum................................................................... | 21 |
| 29. | Offer period........................................................................................ | 22 |
| 30. | Classification of tokens....................................................................... | 22 |
| 31. | Registration of initial token offering................................................... | 23 |
| 32. | Approval of application....................................................................... | 23 |
| 33. | Advertisement of initial token offering................................................ | 23 |
| 34. | Powers of Commission in connection with initial token offering.......... | 23 |
| 35. | Token register..................................................................................... | 24 |
| 36. | Continuing obligations of an issuer to disclose.................................... | 24 |
| | PURCHASERS' RIGHTS | 24 |
| 37. | Purchaser's right to rescission or damages.......................................... | 24 |
| 38. | Purchaser's right of withdrawal.......................................................... | 25 |

| **PART V – INVESTIGATION AND COOPERATION** | | **25** |
|---|---|---|
| 39. | Power to inspect and investigate......................................................... | 25 |
| 40. | Agents to conduct inspections and investigations................................ | 25 |
| 41. | Co-operative power............................................................................. | 26 |

| **PART VI – OFFENCES, PENALTIES AND SANCTIONS** | | **29** |
|---|---|---|
| | OFFENCES AND PENALTIES | 29 |
| 42. | Offence................................................................................................ | 30 |
| 43. | Liability of officer, director, etc......................................................... | 30 |
| 44. | General penalty................................................................................... | 30 |
| 45. | Misrepresentations.............................................................................. | 30 |
| | SANCTIONS | 31 |
| 46. | Administrative sanction....................................................................... | 31 |

| **PART VII – MISCELLANEOUS** | | **32** |
|---|---|---|
| 47. | Appeals............................................................................................... | 32 |
| 48. | Administrative proceedings and reviews. ............................................ | 33 |
| 49. | Fees.................................................................................................... | 33 |
| 50. | Rules................................................................................................... | 33 |
| 51. | Regulations......................................................................................... | 34 |
| 52. | Guidelines........................................................................................... | 34 |
| 53. | Consequential amendments.................................................................. | 34 |

54.    Transitional............................................................................................................35

**FIRST SCHEDULE**                                                                                  36

**SECOND SCHEDULE**                                                                                 61

**THIRD SCHEDULE**                                                                                  67

**FOURTH SCHEDULE**                                                                                 69

**FIFTH SCHEDULE**                                                                                  70



No. 28 of 2020

# DIGITAL ASSETS AND REGISTERED EXCHANGES ACT, 2020

## AN ACT TO REGULATE THE ISSUANCE, SALE AND TRADE OF DIGITAL ASSETS IN OR FROM WITHIN THE BAHAMAS

[Date of Assent - 24th November, 2020]

**Enacted by the Parliament of The Bahamas**

## PART I – PRELIMINARY

### 1. Short title and commencement.

(1) This Act may be cited as the Digital Assets and Registered Exchanges Act, 2020.

(2) This Act shall come into operation on such date as the Minister may appoint by notice published in the *Gazette*.

### 2. Interpretation.

(1) In this Act —

"**accredited investor**" shall have the same meaning as in regulation 2 of The Securities Industry Regulations, 2012 *(S.I. No. 1 of 2012)*;

"**asset**" means movable and immovable property of any kind;

"**asset token**" means a digital asset that represents a claim against the issuer that —

    (a) is intended to represent an asset and is embedded with underlying assets; or

    (b) derives its value by reference to an underlying asset; or

    (c) is secured by an underlying asset; or

    (d)    is backed by assets held as collateral for the primary purpose of encouraging price stability;

**"The Bahamas Institute of Chartered Accountants"** means the Institute continued under section 3 of The Bahamas Institute of Chartered Accounts Act, 2015 *(No. 3 of 2015)*;

**"Bar Association"** refers to the Bar Association identified in section 3 of the Legal Profession Act *(Ch. 64)*;

**"beneficial owner"** has the same meaning assigned to it as in section 2 of the Proceeds of Crime Act, 2018 *(No. 4 of 2018)*;

**"blockchain"** means a digital distributed-ledger or database of transactions relating to digital assets which are recorded chronologically and capable of being audited;

**"compliance officer"** means a person appointed by a licensee and approved by the Commission as a compliance officer, and includes a person to whom compliance functions and obligations have been outsourced;

**"counsel and attorney"** has the same meaning assigned to it under section 2 of the Legal Profession Act *(Ch. 64)*;

**"digital asset"** means a digital representation of value distributed through a DLT Platform where value is embedded or in which there is a contractual right of use and includes without limitation digital tokens;

**"digital asset business"** has the meaning assigned to it as in section 7;

**"digital asset services provider"** means a person that —

    (a)    under an agreement as part of its business —

        (i)    can undertake a digital asset transaction on behalf of another person; or

        (ii)    has power of attorney over another person's digital asset; or

    (b)    operates as a market maker for digital assets;

**"digital token exchange"** or **"exchange"** means a marketplace in the form of a platform using distributed ledger technology for the sale, trade or exchange of digital tokens whether for fiat currency or one or more digital tokens;

**"digital token"** or **"token"** includes a —

    (a)    virtual currency token;

    (b)    asset token;

    (c)    utility token;

    (d)    non-fungible token; and

      (e)    any other digital representation of value designated by the Commission to be a digital token for the purposes of this Act;

"**Distributed Ledger Technology** or "**DLT**" means a digital public or private ledger in which data is recorded, shared and confirmed by consensus and synchronized across a network of multiple nodes which includes the DLT platform formally known as blockchain;

"**DLT platform**" means an online mechanism for the sale, trade or exchange of digital assets offered by a digital asset service provider to its clients;

"**fiat currency**" means coin and money of a jurisdiction that is designated by the government of that jurisdiction as legal tender;

"**founder**" means any person who beneficially owns or is entitled to a significant interest in the issuer or organizer;

"**identified risk framework**" has the same meaning assigned to under section 2 of the Proceeds of Crime Act, 2018 *(No. 4 of 2018)*;

"**initial token offering**" or "**ITO**" means an offer by an issuer to the public for the sale of a digital token in exchange for fiat currency or another digital asset;

"**issuer**" means the entity contractually responsible for issuing the digital token;

"**legal entity**" means an entity incorporated, registered, continued or otherwise established in accordance with —

      (a)    the Companies Act *(Ch. 308)*;

      (b)    the International Business Companies Act *(Ch. 309)*;

      (c)    the Partnership Act *(Ch. 310)*;

      (d)    the Partnership Limited Liability Act *(Ch. 311)*; and

      (e)    the Exempted Limited Partnership Act *(Ch. 312)*;

"**money laundering reporting officer**" or "**MLRO**" means the person appointed by a licensee and approved by the Commission as the Money Laundering Reporting Officer having responsibility for receiving and making reports concerning suspicious financial transactions;

"**non-fungible token**" means a unique digital token created for use in specific applications which cannot be divided and is not interchangeable with any other type of digital token and cannot be sold in a secondary market;

"**offering memorandum**" means a document, whether a notice, circular, advertisement, or whitepaper issued to the public or accessible electronically inviting applications or offers to subscribe for or purchase digital assets or offering digital assets for subscription or purchase;

"**organizer**" if different than the issuer, means a person who, acting alone or in conjunction with one or more other persons, procures the organization and formation of an issuer and the promotion and issuance of digital assets through an issuer;

"**person**" includes a natural person, company, partnership, trust, association and any other legal entity, whether corporate or incorporate;

"**regulatory decision**" means a decision taken by a Supervisory Authority or its recognised international equivalent, to impose a sanction, suspension, ban or other penalty as a result of misconduct, non-compliance with or breach of any supervisory law;

"**securities**" has the same meaning assigned to it in section 2 of the Securities Industry Act, 2011 *(No. 10 of 2011)*;

"**Securities Commission**" or "**Commission**" means the Securities Commission of The Bahamas continued under section 10 of the Securities Industry Act;

"**Securities Industry Act**" means the Securities Industry Act, 2011 *(No. 10 of 2011)*;

"**Securities Industry Regulations**" means the Security Industries Regulations, 2012 *(S.I. No.50 of 2012)*;

"**significant interest**" means beneficial interests cumulatively representing more than ten percent of the issued and outstanding equity interests of the organizer or issuer;

"**smart contract**" means a form of technology arrangement consisting of a computer protocol or an agreement concluded wholly or partly in an electronic form, which is automatable and enforceable by computer code, though some parts may require human input and control and which may be enforceable by ordinary legal methods or by a mixture of both;

"**transfer**" means to conduct a transaction on behalf of another person that moves a digital asset from one digital asset address or account to another;

"**Supervisory Authority**" has the same meaning assigned to it in section 2 of the Financial Transactions Reporting Act, 2018 *(No. 5 of 2018)*;

"**token holder**" means any entity or natural person who purchases, subscribes for or acquires a digital asset;

"**utility token**" means a right of access or a discount represented in binary format to an application, utility or service but which does not, directly or indirectly, provide the holders thereof with any of the following contractual or legal rights —

      (a)    ownership or equity interest in the issuer or in any person or pool of assets;

      (b)    entitlement to a share of profits, losses, assets or liabilities of the issuer or any other person or pool of assets, except in the event of the liquidation of the issuer, to receive a portion of the original subscription price paid at the time of the initial token offering;

      (c)    legal status as a creditor; or

      (d)    entitlement to receive distribution of profits, revenues, assets or other distributions from the issuer or any other person or pool of assets;

**"virtual currency token"** means a digital representation of value which can be digitally traded and functions as —

      (a)    a medium of exchange;

      (b)    a unit of account; or

      (c)    a store of value,

that is not a digital currency and does not have legal tender status or carry any security or guarantee in any jurisdiction;

(2)    For the purposes of this Act —

    (a)    in determining whether a person is fit and proper, in addition to considering any other relevant matter including a decision made in respect of the person by the Commission, or other regulator, court or tribunal wherever located, the Commission shall have regard to —

        (i)    financial status or solvency of the person;

        (ii)    the educational or other qualifications and experience of the person, having regard to the nature of the role or functions that, if the application is allowed or granted, the person will perform;

        (iii)    the ability of the person to carry on the regulated activity competently, honestly and fairly;

        (iv)    the ability of the person to ensure a satisfactory standard of governance organization and operational conduct; and

        (v)    the reputation and character of —

           (aa)    where the person is an individual, the individual himself; or

           (bb)    where the person is a legal entity, the legal entity and any director, shareholder, chief executive officer and any other officer.

    (b)    A person carries on digital asset business —

      (i)     in The Bahamas, if irrespective of physical location, the person offers digital asset business services to Bahamian residents from anywhere in the world; and

      (ii)    from within The Bahamas, if the person being a legal entity registered or incorporated under the laws of The Bahamas, offers digital asset business services to persons outside or within The Bahamas; and

   (c)    A person shall not be deemed to be carrying on digital asset business in or from within The Bahamas solely due to the presence of data servers or maintenance of other parts of a DLT platform in The Bahamas.

## 3. Application of Act.

   (1)    This Act shall apply to —

      (a)    any person who as organizer, issuer, founder, purchaser or investor participates in the formation, promotion, maintenance, organization, sale or redemption of an initial token offering; and

      (b)    any legal entity carrying on a digital asset business irrespective of the physical location from which the activity is carried out.

   (2)    This Act shall not apply to —

      (a)    a person only by reason of his acting in a professional capacity on behalf of persons engaged in procuring the organisation, promotion, issuance, sale or trade of digital assets; or

      (b)    security tokens which for the purpose of this Act is a token which when issued or traded has one or more of the same characteristics as a security as defined under Part I of the *First Schedule* of the Securities Industry Act;or

      (c)    transactions or digital assets in which a person grants a value as part of an affinity or rewards program, which value cannot be taken from or exchanged with the person for legal tender, bank credit or any digital asset; or

      (d)    a digital representation of value issued by or on behalf the publisher and used within an online game, game platform, or family of games sold by the same publisher or offered on the same game platform; or

      (e)    non-fungible tokens; or

      (f)    electronic representations of a fiat currency, security or any other financial asset.

# PART II – ADMINISTRATION OF ACT

## 4. Securities Commission to administer Act.

(1) This Act shall be administered by the Securities Commission of The Bahamas.

(2) Pursuant to section 5(1)(a), the Commission shall regulate and supervise the issuance of digital assets, digital asset businesses and their activities in The Bahamas for the purpose of ensuring the —

    (a) orderly development and continuation of digital asset activities in The Bahamas; and

    (b) development and maintenance of investor protection standards with respect to the digital asset business and initial token offers.

## 5. Functions and powers of Commission.

(1) For the purposes of this Act, the functions of the Commission are —

    (a) to regulate, monitor and supervise the issuance of digital assets and persons conducting digital asset business in or from within The Bahamas;

    (b) to develop rules, guidance and codes of practice in connection with the conduct of digital asset business and initial token offers;

    (c) to advise the Minister on all matters relating to digital asset business; and

    (d) to promote investor education and other conditions that facilitate innovation and development of digital asset businesses within The Bahamas.

(2) For the purpose of the discharge of its functions under subsection (1), the Commission shall have the power to —

    (a) approve and regulate a digital asset business;

    (b) regulate initial and subsequent token offers;

    (c) make and issue rules on the conduct of digital asset businesses and issuers;

    (d) take enforcement action against any person for failing to comply with this Act;

    (e) publish notices, guidelines, bulletins, and policies regarding the interpretation, application or enforcement of the Act and any rules or regulations issued under this Act;

    (f) prescribe fees payable to the Commission for the purposes of carrying out its functions under this Ac;

    (g) make recommendations to the Minister for regulations; and

(h)    do all things, and take all actions, which may be necessary or expedient or are incidental to the discharge of any function or power given to the Commission.

# PART III – REGISTRATION AND REGULATION OF DIGITAL ASSET BUSINESSES

## DIGITAL ASSETS BUSINESSES

### 6.   Forms of digital asset businesses.

A digital asset business includes the business of —

    (a)    a digital token exchange;

    (b)    providing services related to a digital token exchange;

    (c)    operating as a payment service provider business utilising digital assets;

    (d)    operating as a digital asset service provider, including providing DLT platforms that facilitates —

        (i)    the exchange between digital assets and fiat currencies;

        (ii)    the exchange between one or more forms of digital assets; and

        (iii)    the transfer of digital assets;

    (e)    participation in and provision of financial services related to an issuer's offer or sale of a digital asset; and

    (f)    any other activity which may be prescribed by regulations.

### 7.   Prohibition to carry on unregistered digital asset business.

No person shall carry on or shall be involved in a digital asset business in or from within The Bahamas, or purport to do so, unless that person is a legal entity registered under section 8 or 9.

### 8.   Registration of a digital asset business.

    (1)    Subject to subsection (4), a legal entity intending to provide or which is providing services as a digital asset business shall apply to be registered under the provisions of this Act by submitting to the Commission, the following –

        (a)    completed Form 1 set out under Part A of the *First Schedule* which application shall be accompanied by —

            (i)    a copy of a detailed and up to date business plan of the applicant, including financial and operational projections,

staffing requirements, and technological requirements, as applicable;

(ii)    evidence of the applicant's good standing in accordance with section 277 of the Companies Act *(Ch. 308)*;

(iii)   a certified copy of the applicant's Memorandum and Articles of Association, or equivalent constitutive documents;

(iv)   a schedule of proposed fees for services rendered by the business;

(v)    evidence of the applicant's registration with any other regulatory authority, if applicable; and

(vi)   any other information or document as may be required by the Commission;

(b)   completed Form 2 set out under Part A of the *First Schedule* in respect of each founder, beneficial owner, security holder, director and officer of the applicant digital asset business;

(c)   completed Form 3 set out under Part A of the *First Schedule* with respect to the Chief Executive Officer and the Compliance Officer; and

(d)   the application fee set out in the *Third Schedule*.

(2)   The Commission may grant or refuse an application made under subsection (1).

(3)   A person who intends to register a digital asset business operating as a digital token exchange, shall in addition to complying with subsection (1), also apply for registration in accordance with section 15.

(4)   All registrations shall be renewed annually by the 31st day of January of each year and for such renewal, a licensee shall —

(a)   pay the prescribed annual fee; and

(b)   submit the prescribed Annual Update and Declaration Form, and where applicable, a current copy of the registrant's insurance policy to the Commission.

(5)   Where a registration is not renewed by the annual renewal date, a registrant shall in addition to the outstanding annual fee pay an automatic penalty of ten percent of the prescribed annual fee to the Commission, which penalty shall not be set off against the prescribed annual fee.

(6)   A registration shall be automatically revoked where, more than thirty days have elapsed after the annual renewal date and a registrant has either failed to submit the prescribed Annual Update and Declaration Form or pay the prescribed annual fee.

(7) Where a registration has been revoked under subsection (6), the registration may be restored by the Commission if, within thirty days of the revocation date, the registrant —

   (a) applies to the Commission for restoration;

   (b) pays an administrative penalty of twenty percent of the annual fee due; and

   (c) as applicable, submits —

      (i) the annual update and declaration form; or

      (ii) a copy of the licensee's insurance policy or

   (d) pays the outstanding annual fee.

(8) For the purpose of subsection (6), and where a registrant has made no application for restoration under subsection (7), the Commission shall remove the registrant from the register required to be kept and maintained under section 12.

## 9. Digital asset business as additional activity.

(1) Where a person, who intends to provide services related to a digital asset business as an additional activity —

   (a) is either —

      (i) registered under the Securities Industry Act;

      (ii) licensed as an investment fund administrator under the Investment Funds Act; or

      (iii) licensed as a financial or corporate service provider under the Financial and Corporate Service Providers Act (*Ch. 369*),

   such person shall apply to be registered under this Act by submitting the completed Form 1 set out under Part B of the *First Schedule*; or

   (b) being a marketplace or registered firm, shall otherwise comply with regulations 27(1)(a) and 53(1)(a) of the Securities Industry Regulations.

(2) Where a person is registered under this Act with respect to one or more digital asset business activities, and intends to provide an additional digital asset business service, such person shall submit completed Form 1 under Part B of the *First Schedule* to the Commission no later than fourteen days prior to commencing the provision of such services, and shall also submit to the Commission —

   (a) a copy of a detailed and up to date business plan, including financial and operational projections, staffing qualifications and requirements, and technological requirements;

(b)   if the additional business is a digital token exchange, a copy of the rules of the exchange including rules for admission to listing of digital assets on the exchange;

(c)   a schedule of proposed fees for the services to be rendered by the digital asset business; and

(d)   the application fee set out in the *Third Schedule*.

## 10.   Duty to notify changes relating to application for registration.

A person registered under this Act shall immediately notify the Commission by filing the completed Form set out in the *Fourth Schedule* of any change relevant to its application for registration concerning —

(a)   address for service;

(b)   contact information, including email address and phone or fax numbers;

(c)   physical business address;

(d)    insurance coverage; or

(e)   attorneys and corporate officers;

(f)   compliance officer; or

(g)   a money laundering reporting officer.

## 11.   Financial requirements of digital asset businesses

Registrants shall meet all financial requirements as may be prescribed.

## 12.   Commission to maintain Register of digital asset businesses.

(1)   The Commission shall establish and maintain a register of digital asset businesses which shall —

(a)   be kept in electronic format and any other format as the Commission may determine;

(b)   include in respect of every digital asset business —

(i)   the name and address of the digital asset business;

(ii)   the regulatory licenses or registrations held by the business including any foreign licenses or registrations;

(iii)   the form of digital asset services business of the registrant;

(iv)   the name of its principals, directors or other person with management control;

(v)   any conditions imposed by the Commission; and

(vi)   any other information deemed relevant by the Commission; and

(c)   be accessible for viewing on the Commission's website.

(2)  Where the Commission considers it necessary, it may establish and maintain a separate register for any digital asset business, and the provisions of subsection (1)(a) and (b) shall apply *mutatis mutandis*.

## 13. Commission's prior approval for certain changes.

No registrant shall, without the prior written approval of the Commission —

(a)  expand the scope of its activities;

(b)  issue new tokens;

(c)  merge with another entity;

(d)  issue, transfer or otherwise dispose of its shares;

(e)  appoint a new director or partner;

(f)  appoint a compliance officer or money laundering reporting officer;

(g)  add to or reduce its shareholders;

(h)  change or modify its name; or

(i)  appoint any auditor.

## ADDITIONAL REQUIREMENTS FOR DIGITAL TOKEN EXCHANGES

## 14. Prohibition to operate unregistered digital token exchange.

No person shall offer services as a digital token exchange unless registered under this Act.

## 15. Application for registration of digital token exchange.

Subject to section 9, a legal entity intending to establish and operate a digital token exchange shall in addition to making an application in accordance with section 8 —

(a)  make application to the Commission by submitting Form 1 set out under Part C of the *First Schedule;*

(b)  provide to the Commission for its approval a copy of the rules of the exchange including rules for admission to listing of digital assets on the exchange; and

(c)  submit to the Commission —

(i)  the applicable fee set out in the *Third Schedule*; and

(ii)  any other document or information the Commission may require.

## 16. Approval or refusal of application.

(1)  The Commission shall approve or refuse an application under this Part in its discretion.

(2)    The Commission may approve an application for registration where satisfied that an applicant under this Part —

    (a)    is incorporated, established or registered under any law of the Commonwealth of The Bahamas;

    (b)    is fit and proper; and

    (c)    has sufficient capacity and resources to conduct an activity under this Act.

(3)    An applicant shall demonstrate to the Commission that it has —

    (a)    appropriate and sufficient systems and controls to perform its functions and manage its risks, including fraud and market abuse;

    (b)    the ability to meet solvency standards and levels of capital as may be prescribed by regulations; and

    (c)    has designed a digital asset framework which addresses but is not limited to the following —

        (i)    technology and security;

        (ii)    governance;

        (iii)    scalability;

        (iv)    identified risk framework; and

        (v)    data protection and storage.

## 17.  Adequate systems and controls for digital token exchanges.

A digital token exchange shall ensure that the systems and controls used in its activities are adequate and appropriate for the scale and nature of its business, including systems and controls which adequately and appropriately address —

    (a)    the recording, storing, protecting and transmission of information;

    (b)    the effecting and monitoring of transactions;

    (c)    the operation of the arrangements made for securing the timely discharge, whether by performance, compromise or otherwise, of the rights and liabilities of the parties to transactions;

    (d)    the safeguarding and administration of assets belonging to investors; and

    (e)    in the event of disruption, business continuity and planning.

## 18.  Digital exchange to satisfy ongoing requirements.

A digital token exchange shall satisfy any ongoing requirements as may be prescribed.

## SUSPENSION, REVOCATION OR SURRENDER OF REGISTRATION

### 19.   Suspension or revocation of registration.

   (1)   The Commission may suspend or revoke the registration of a digital asset business where —

   (a)   the digital asset business is unable to meet the requirements for continued operation or has failed to comply with the provisions of this Act or any regulations, rules or guidelines made and issued hereunder;

   (b)   suspension or revocation would be in the public interest;

   (c)   the digital asset business is being marketed or advertised in a manner that is fraudulent or misleading;

   (d)   any operator or issuer of the digital asset business is convicted of a criminal offence involving fraud or dishonesty;

   (e)   the digital asset business is declared bankrupt or goes into liquidation or makes a composition with its creditors or is otherwise dissolved; or

   (f)   at the written request of another competent regulatory authority which is carrying out regulatory functions in relation to the relevant registrant;

   (g)   the digital asset business is being conducted in breach of this Act or in breach of any other law of The Bahamas;

   (h)   any information furnished to the Commission to obtain registration and during the course of such registration is false or misleading;

   (i)   if the registration has been obtained by fraud; or

   (j)   in the case of a digital token exchange —

      (i)   the Commission considers that the person operating the exchange is no longer a fit and proper person to provide the service;

      (ii)   the Commission has been furnished with information by or on behalf of the exchange, which is false, inaccurate or misleading;

      (iii)   the exchange has not commenced the services it has been authorised to provide within twelve months from the date of issue of the registration; or

      (iv)   the exchange has ceased to provide digital exchange services.

   (2)   Subject to subsection (3), where a decision to suspend or revoke a registration has been made, the Commission may issue a notice of suspension to the registrant, which notice shall be issued at least fourteen days prior to the effective date of the suspension or revocation, and the

digital asset business shall have seven days from the receipt of such notice in which to respond.

(3) Notwithstanding subsection (2), the Commission may —

   (a) suspend the registration of the digital asset business without prior notice where the Commission deems that an immediate suspension of the registration of the digital asset business is necessary to protect the public; or

   (b) revoke the registration of a digital asset business —

      (i) without suspension, where the digital asset business has voluntarily surrendered its registration; or

      (i) without suspension where any of the matters referred to in section (1) (b) – (j) is of such a nature that it is in the best interest of the public to revoke the registration; or

      (ii) where, having had its registration suspended, the registrant has failed to comply with any conditions imposed or directions given by the Commission within the stipulated timeline.

(4) Where the Commission has suspended the registration of a digital asset business, the Commission may impose such conditions upon or give such directions to the registrant, including the timeline for compliance, with which conditions or directions the registrant must comply.

(5) The Commission may reinstate a suspended registration where satisfied that the digital asset business has met the conditions imposed or the directions given at the time of suspension.

(6) The Commission may reinstate a suspended registration with or without conditions in its discretion.

(7) Upon the revocation of a licence issued under the provisions of this Act, the Commission shall notify —

   (a) any relevant licensing or regulatory authority; and

   (b) members of the public, by notice posted on the Commission's website and published in the Gazette.

## 20. Surrender of registration.

(1) With the approval of the Commission, a registrant may voluntarily surrender its registration by written notice to the Commission at any time after the registration has been granted, and such surrender shall be irrevocable.

(2) Where the Commission approves a surrender of registration, the provisions of section 22 shall apply.

## 21.  Process following surrender or revocation.

(1)  Where –

    (a)    the Commission has issued a notice pursuant to section 20(2) without objection from a registrant; or

    (b)    registration has been voluntarily surrendered,

the registrant shall, within seven days of receiving the Commission's suspension or revocation notice, or submitting its written notice of surrender, prepare and submit a written plan to the Commission setting out the steps the registrant will follow to cease operations.

(2)  The plan required under subsection (1) shall stipulate and provide the details with respect to —

    (a)    the identity of the individual who will manage the licensee's cessation of business operations;

    (b)    the length of time required to cease business operations;

    (c)    the manner in which client files will[VD1] be closed and secured;

    (d)    client notification procedures; and

    (e)    client transfer procedures where applicable.

(3)  Upon the Commission's approval of a plan submitted by the licensee, the Commission —

    (a)    shall supervise the execution of the plan; and

    (b)    may give directions to the licensee to protect the interest of investors or purchasers, with which such directions the licensee shall comply.

## 22.  Winding up or dissolution.

Where the Commission has revoked a licence in any of the circumstances under section 20(1), the Commission may apply to the court for the —

    (a)    registrant to be wound up or dissolved; or

    (b)    court supervision of any application by the registrant for winding up or dissolution.

# DATA PROTECTION

## 23.  Record keeping and prevention of unauthorized data access.

(1)  A registrant shall implement and maintain where applicable record keeping measures for the accurate collection of information and documents related to the originator and beneficiary of digital assets.

(2)   Every registrant shall implement and maintain data protection measures consistent with the Data Protection (Privacy of Personal Information) Act *(Ch. 324A)* concerning the protection of personal data relative to its customers and as may be prescribed.

## CONDUCT AND COMPLIANCE

### 24.   Duty to maintain professional conduct.

Every digital asset business registered under this Act shall, in conducting its business activities —

(a)   act honestly and fairly;

(b)   act with due skill, care and diligence;

(c)   observe and maintain a high standard of professional conduct;

(d)   refrain from engaging in any improper or illegal conduct;

(e)   maintain adequate financial resources and solvency;

(f)   have effective arrangements in place for the protection of client assets and money;

(g)   have effective corporate governance arrangements consistent with guidelines issued by the Commission; and

(h)   have systems in place to prevent, detect and disclose money laundering, terrorist financing and suspicious transactions pursuant to the provisions of the Proceeds of Crime Act, 2018 *(No. 4 of 2018)* the Anti-Terrorism Act, *2018* and the Financial Transactions and Reporting Act, 2018 *(No. 5 of 2018)*.

### 25.   General duty to comply and co-operate.

(1)   Every digital asset business and issuer shall comply with this Act and shall

(a)   deal openly and honestly and co-operatively with the Commission;

(b)   duly provide information relevant to the operations of the digital asset business as the Commission may require; and

(c)   submit to on-site or off-site examinations of the digital asset business as required by the Commission in the exercise of its functions.

(2)   For the purpose of subsection (1), compliance with this Act shall be considered a part of the minimum criteria for continued registration.

## AML AND CFT PREVENTION MEASURES

### 26.   Prevention of money laundering and terrorism financing.

Where a digital asset business provides services involving the sale, exchange, or transfer of a digital asset, it shall, with respect to its own activities and such digital assets, for the purpose of risk management and the prevention of money laundering and terrorism financing —

- (a)   conduct a risk assessment;
- (b)   implement and maintain policies and procedures to ensure compliance with provisions of the Proceeds of Crime Act, *2018*, Anti-Terrorism Act, *2018* and the Financial Transactions Reporting Act, 2018 *(No. 5 of 2018)*; and
- (c)   comply with the rules, policies and guidelines made and issued by the Commission on risk management and the prevention of money laundering and terrorist financing.

# PART IV - INITIAL TOKEN OFFERING

### 27.   Initial token offerings.

- (1)   No issuer shall offer a digital token in or from within The Bahamas except in compliance with this Act.
- (2)   An issuer that intends to offer digital tokens for sale in or from within The Bahamas through an initial token offer —
  - (a)   shall be fit and proper;
  - (b)   shall prepare an offering memorandum in accordance with section 29; and
  - (c)   shall comply with any regulations, rules or guidelines made under this Act.

### 28.   The offering memorandum.

- (1)   For the purpose of preparing the offering memorandum, an issuer shall have a duty to provide full and accurate disclosure of all information which would allow potential purchasers to make an informed decision.
- (2)   Every offering memorandum published in connection with an initial token offering shall —
  - (a)   be signed by every founder and member of the issuer's board; and
  - (b)   address the matters specified in *Second Schedule*.

(3)     An issuer has a duty to publish the offering memorandum by posting a copy of the memorandum on a website operated and maintained by the issuer, which is readily accessible to and downloadable by potential purchasers for the duration of the offer period and for no less than fifteen days after the offer period ends.

(4)     Where any of the disclosures required under the *Second Schedule* cease to be accurate in a material particular prior to the end of the offer period for the initial token offering, the issuer shall —

    (a)     immediately and in any event within one day of becoming aware of the inaccuracy, notify the Commission of the initial token offering, providing —

        (i)     details of the inaccuracy; and

        (ii)     the appropriate amendment to the offering memorandum; and

    (b)     within five days of notifying the Commission of the inaccuracy, publish a notice on its website to notify subscribers to the memorandum, and and include in the published notice the issuer's amendment to the offering memorandum rectifying the inaccuracy

## 29.     Offer period.

(1)     Any token offered shall be distributed only during the offer period stipulated in the relevant offering memorandum.

(2)     For the purpose of subsection (1), no offer period shall exceed six months and where the offer period exceeds six months the Commission shall order the cancellation of any initial token offering and take enforcement action.

## 30.     Classification of tokens.

(1)     For the purpose of section 31, an issuer shall identify the class or classes of tokens which will be available for subscription in the offering memorandum.

(2)     No issuer shall change the class or classes of tokens to be offered except with prior written approval of the Commission.

(3)     Where the Commission has approved a change of class of tokens in accordance with subsection (2), the issuer shall amend the Offering Memorandum accordingly.

(4)     Every issuer shall obtain from a counsel and attorney, a written legal opinion concerning the classification of the issuer's tokens, which opinion shall be attached to the offering memorandum.

## 31.  Registration of initial token offering.

(1)   An issuer shall apply for registration of an initial token offering no later than forty-five days before the start of the offer period.

(2)   The application referred to in subsection (1), shall be —

(a)   submitted using Form 1 set out under Part D of the *First Schedule*;

(b) accompanied by —

  (i)   the written legal opinion obtained in accordance with section 30(3);

  (ii)   the offering memorandum; and

  (iii)   the application fee set out in the *Third Schedule*.

(3)   The Commission shall within thirty days from the receipt of the application, determine whether the application meets the requirements of this Act which determination shall include an assessment of the opinion on the assessment of the classification of the token.

(4)   Where the Commission's assessment is that a token is a security, an issuer shall withdraw its application for registration of the token and may proceed to have the token registered under the provisions of the Securities Industry Act.

## 32.  Approval of application.

Where, following a review of the application and documents submitted in relation to an initial token offering, the Commission does not object to the application for registration, the Commission shall thereafter approve the initial token offering.

## 33.  Advertisement of initial token offering.

Any advertisement relating to an initial token offering shall be —

(a)   accurate and not misleading;

(b)   clearly identifiable as an advertisement;

(c)   consistent with the information contained in the offering memorandum; and

(d)   compliant with any requirements prescribed by the Commission.

## 34.  Powers of Commission in connection with initial token offering.

The Commission may —

(a)   order the amendment of an offering memorandum to include supplementary information; or

(b)   suspend any initial token offering with notice in writing to the issuer if the Commission reasonably suspects that the offering is

being conducted in breach of this Act or in a manner that is injurious to the public; or

(c) require the amendment or removal of any advertisement, material or publication on the issuer's website concerning the offering which the Commission considers as inaccurate or misleading; and

(d) publish a notice advising the public of any action taken pursuant to this section.

## 35.  Token register.

The Commission shall keep a register of initial token offerings and shall include in respect of every initial token offering —

(a) the name and address of the issuer;

(b) the regulatory licenses or registrations held by the issuer including any foreign registrations;

(c) the name and symbol of the token created;

(d) the exchange or platform on which the token is traded;

(e) any condition imposed by the Commission, including conditions concerning the sale or redemption of the token;

(f) any other information deemed relevant by the Commission.

## 36.  Continuing obligations of an issuer to disclose.

(1) Where, after the offering memorandum has been issued but before the close of the offer period, an issuer becomes aware of any information which could affect the interests of purchasers, the issuer shall immediately notify the Commission and disclose that information by a supplement to the offering memorandum.

(2) Where an issuer fails to notify the Commission or make a disclosure in accordance with subsection (1), the issuer shall be subject to an administrative penalty of up to ten thousand dollars.

## PURCHASERS' RIGHTS

## 37.  Purchaser's right to rescission or damages.

Where an issuer publishes an offering memorandum or any amendment thereto which contains a material misrepresentation relating to any of the requirements set out in the *Second Schedule*, a purchaser shall have a right of action against the issuer —

(a) for the rescission of the subscription; or

(b) for damages.

### 38. Purchaser's right of withdrawal.

(1) A purchaser of a token offered under the provisions of this Act shall be entitled to withdraw his purchase by written notice to the issuer.

(2) A purchaser's notice of withdrawal shall be made no later than seventy-two hours after the date of the agreement to purchase the token.

(3) Where a purchaser has exercised the right of withdrawal, all funds paid by the purchaser shall be paid over by the issuer to the purchaser within two days of the purchaser's request.

# PART V – INVESTIGATION AND COOPERATION

### 39. Power to inspect and investigate.

(1) The Commission shall have power to conduct on-site or off-site inspections of the business of any registrant under this Act to determine whether such person is complying with —

    (a) the provisions of this Act or any regulations, rules or guidance issued in accordance with the provisions of this Act;

    (b) the Financial Transactions Reporting Act, 2018 *(No. 5 of 2018)* and any other anti- money laundering or counter-financing of terrorism laws; or

    (c) any other relevant law.

(2) Notwithstanding subsection (1), the Commission shall have power to conduct such investigation as it considers necessary for the purpose of satisfying itself that —

    (a) a person registered under this Act is complying with subsection (1) (a), (b), or (c); or

    (b) no unregistered persons are engaged in an activity regulated under the provisions of this Act.

### 40. Agents to conduct inspections and investigations.

(1) The Commission may engage a qualified person to conduct an inspection or investigation ("hereinafter referred to as an agent"), at the expense of the registrant, on behalf of and the direction of the Commission in accordance with section 39.

(2) The person engaged as an agent under subsection (1) shall, at the conclusion of an inspection or investigation, produce and submit to the Commission, a written report of the findings of the inspection or investigation.

## 41. Co-operative power.

(1) At the request of a domestic regulatory authority, the Commission may exercise its powers under this Act to assist with the performance by the domestic regulatory authority of its functions.

(2) Notwithstanding section 28(1) of the Securities Industry Act the Commission may provide information, documents or material it has acquired in the exercise of its functions under this Act to any other domestic regulatory authority where the Commission considers such information may be relevant to the functions of such other domestic regulatory authority or as a necessary part of a framework for consolidated supervision, oversight or regulation of the financial services sector.

(3) The Commission may provide assistance to an overseas regulatory authority where satisfied that —

    (a) such assistance may be relevant to the functions of the overseas regulatory authority and is intended to enable such authority to carry out the supervision, investigation or enforcement to which the request relates;

    (b) overseas regulatory authority has given a written undertaking that any material obtained pursuant to its request shall not, except with the approval or consent of the Commission be —

        (i) used for any purpose other than a purpose that is specified at the time of the request; and

        (ii) disclosed to any third party, other than a designated third party.

    (c) the material requested is of sufficient importance to the carrying out of the supervision, investigation or enforcement to which the request relates and cannot reasonably be obtained by any other means;

    (d) the matter to which the request relates is of sufficient gravity; and

    (e) the provision of the requested assistance will not be contrary to the national interest of The Bahamas or the interest of the investing public.

(4) The Commission may, in determining whether to provide assistance to an overseas regulatory authority, consider whether —

    (a) the act or omission that is alleged to have breached the law or regulatory requirement to which the request relates would, if it had occurred in The Bahamas, be enforceable under this Act;

    (b) the overseas regulatory authority has given or is willing to give an undertaking to the Commission to —

     (i)    comply with a future request by the Commission to the overseas regulatory authority for similar assistance; and

     (ii)   contribute towards the costs of providing the assistance that the overseas regulatory authority has requested.

(5)    Pursuant to subsection (3), and notwithstanding any obligations as to secrecy or restrictions on the disclosure of information by virtue of any written law, any rule of law, any contract or any rule of professional conduct, the Commission may in relation to a request from an overseas regulatory authority —

    (a)   transmit to the overseas regulatory authority any material in the possession of the Commission that is requested by the authority;

    (b)   order any person to furnish the Commission with any material that is requested by the overseas regulatory authority, that the Commission may then transmit to that authority;

    (c)   order any person to give the Commission assistance in connection with a request made by an overseas regulatory authority; or

    (d)   order any person to make an oral statement to the Commission on any information requested by the overseas regulatory authority, record such statement, and transmit the recorded statement to that authority.

(6)    A person shall not be required to disclose information or produce a document which that person would be entitled to refuse to disclose or produce on the grounds of legal professional privilege in court proceedings, and the information or documents shall be deemed to be privileged if it was given to the person as a professional legal advisor —

    (a)   by, or by a representative of, a client of the advisor in connection with the giving of legal advice to the client;

    (b)   by, or by a representative of, a person seeking legal advice from the advisor; or

    (c)   by any person —

       (i)   in contemplation of, or in connection with, legal proceedings; and

       (ii)   for the purpose of those proceedings.

(7)    Where a person in possession of any document required to be produced in response to an order made under subsection (5) claims a lien on the document —

    (a)   the requirement to produce the document shall not be affected by the lien;

    (b)   no fees shall be payable for or in respect of the production; and

    (c)   the production shall be without prejudice to the lien.

(8) No civil or criminal proceedings, except for an offence under subsection (9) shall lie against any person, who in compliance with an order made under subsection (4), —

    (a) furnishes the Commission with any information or material in any form, including any document or copy thereof;

    (b) makes a statement to the Commission in good faith; or

    (c) gives assistance to the Commission by doing or omitting to do any act, the doing or omission of the act is done in good faith.

(9) It shall be an offence, punishable on summary conviction to a fine not exceeding one hundred thousand dollars, for any person, in response to an order made under subsection (4), to —

    (a) without reasonable excuse, refuse or fail to comply with the order;

    (b) knowingly furnish the Commission with any false or misleading information or material in any form, including any document or copy thereof; or

    (c) knowingly make a statement to the Commission that is false or misleading in a material particular.

(10) In the exercise of its cooperative power under this section, the Commission shall have authority to enter into memoranda of understanding with overseas regulatory authorities subject to the following —

    (a) the memoranda of understanding shall be —

        (i) for the mutual and reciprocal assistance of an overseas regulatory authority, or any designated third party, in carrying out supervision, investigation or enforcement functions;

        (ii) related to the consolidated supervision with an overseas regulatory authority, or designated third party; or

        (iii) for the purpose of the Commission's supervision, investigation or enforcement functions under this Act, or any other lawful purpose;

    (b) the scope of the memoranda of understanding shall not exceed the Commission's powers under the provisions of this section; and

    (c) notice of the memoranda of understanding is issued to the Ministry of Finance and published on the Commission's website and in the *Gazette*.

For the purpose of this section –

**"designated third party"** includes —

    (a) a person or body responsible for supervising the relevant regulatory authority;

(b)    any authority responsible for carrying out the supervision, investigation or enforcement of laws alleged to have been breached; or

(c)    any authority of the foreign jurisdiction, other than the requesting overseas regulatory authority, exercising a function that corresponds to a regulatory function of the Commission under this Act;

**"domestic regulatory authority"** means the body or person in The Bahamas that exercises regulatory, supervisory, enforcement or similar functions as the Commission, and includes —

(a)    regulators supervising financial institutions;

(b)    securities exchanges;

(c)    Self –regulatory organisations;

(d)    law enforcement agencies; and

(e)    other governmental or regulatory agencies or Competent Authority; and

(f)    any other Bahamian authority, as prescribed.

**"enforce"** means to enforce through criminal, civil or administrative proceedings;

**"material"** means any document or information in any form;

**"overseas regulatory authority"** means an authority in a jurisdiction outside The Bahamas that exercises similar functions as the Commission regulating digital asset businesses and activities, and includes a designated third party.

**"supervision"** in relation to an overseas regulatory authority, means the taking of any action for the supervision of —

(a)    a digital exchange or any other person regulated or supervised by the overseas regulatory authority; or

(b)    the issue of or trading in digital assets in the foreign jurisdiction of the overseas regulatory authority.

# PART VI – OFFENCES, PENALTIES AND SANCTIONS

## OFFENCES AND PENALTIES

## 42. Offence.

(1) A person who fails to comply with the provisions of this Act commits an offence.

(2) Every digital asset business or any of its employees, managers, officers or other connection persons, who —

    (a) fails to cooperate with the Commission; or

    (b) obstructs or assaults any person appointed by or acting on behalf of the Commission in the conduct of an examination, inspection or an investigation,

commits an offence and is liable on summary conviction to a fine not exceeding five thousand dollars.

(3) For the purposes of subsection (2), it shall not be relevant whether the employee, manager, officer or connected person was acting on specific instruction of any individual having control or responsibility for the management or operation of the digital asset business.

## 43. Liability of officer, director, etc.

Where an offence under this Act has been committed and it is proved that the offence occurred with the consent or connivance or gross negligence of any officer, director, manager, partner, or person purporting to act in any such capacity, each such person shall also be guilty of the offence.

## 44. General penalty.

Any person who commits an offence under this Act for which no penalty is provided shall be liable on indictment or summary conviction to a fine not exceeding five hundred thousand dollars or imprisonment up to five years or both a fine and imprisonment.

## 45. Misrepresentations.

Any person who —

    (a) wilfully makes any misrepresentation in any document required to be filed or submitted under this Act;

    (b) wilfully makes any statement or gives any information required for the purpose of this Act which he knows to be materially false or misleading; or

    (c) knowingly fails to disclose any fact or information required to be disclosed for the purposes of this Act,

commits an offence and shall be liable on indictment or summary conviction to a fine not exceeding five hundred thousand dollars in respect of each instance or imprisonment up to ten years or to both fine and imprisonment.

## SANCTIONS

### 46. Administrative sanction.

(1) Notwithstanding any other action which may be taken by the Commission, where there has been a failure to comply with this Act, the Commission may impose an administrative sanction for such failure, which sanction may include but not be limited to —

    (a) issuing a public reprimand;

    (b) banning a registrant from carrying on certain activities or operations;

    (c) setting conditions or restrictions on a registrant;

    (d) issuing an order —

        (i) requiring that a registrant complies with a direction issued by the Commission;

        (ii) withdrawing an exemption or waiver;

        (i) prohibiting a person from acting as a director, partner, or officer of a legal entity;

        (iv) prohibiting a person from being appointed as auditor;

        (v) requiring a registrant to make changes to its practices and procedures;

        (vi) for restitution;

        (vii) for the registrant to temporarily suspend a manager;

        (viii) for the registrant to remove a director, officer or other senior manager of general partner; or

        (ix) for disgorgement of profits or unjust enrichment;

    (e) appointing a person, at the expense of the registrant, to —

        (i) oversee the affairs of the registrant and report to the Commission; or

        (ii) assume control of a registrant's affairs who shall, subject to necessary modifications, have all of the powers of a person appointed as a receiver or manager of a business appointed under the law governing bankruptcy or winding up.

    (f) applying to the court for an order to take such action as the Commission considers necessary to protect the interest of clients or creditors of a registrant;

    (g) with respect to subsection (1)(d)(ix), requiring a registrant to pay an administrative penalty not exceeding twice the amount of such profits or unjust enrichment;

    (h) revoking a licence pursuant to section 19; or

(i)   imposing any other penalties, sanctions, or remedies as the circumstances of the case may require.

(2)   The sanctions and actions under subsection (2) may be imposed by the Commission where satisfied that a registrant has —

    (a)   breached any provisions of this Act;

    (b)   failed to comply with the Financial Transactions Reporting Act, 2018 *(No. 5 of 2018)*; or

    (c)   failed to comply with any guidelines issued by the Financial Intelligence Unit pursuant to section 15 of the Financial Intelligence Unit Act *(Ch. 367)*.

(3)   Where the Commission imposes a sanction or takes action pursuant to subsection (1) —

    (a)   the order shall be in writing;

    (b)   the order shall specify the breach committed by the registrant and the sanction imposed by the Commission;

    (c)   a copy of the order shall be given to the registrant; and

    (d)   the order may be enforced in the same manner as an order of the court.

# PART VII – MISCELLANEOUS

### 47.   Appeals.

(1)   Any person aggrieved by a decision of the Commission may appeal that decision.

(2)   An appeal under this section shall be to the Supreme Court in accordance with rules of court within thirty days after the Commission's decision has been made.

(3)   Notwithstanding that an appeal has been filed with the court, such appeal shall not act as a stay of the Commission's decision unless the court grants a stay until the disposition of the appeal.

(4)   The Secretary to the Commission shall certify to the Supreme Court —

    (a)   the Commission's decision, together with a statement of reasons for that decision; and

    (b)   the record of correspondence or other material between the Commission that is relevant to the appeal.

(5)   A decision of the court shall not preclude the Commission from making any further decisions upon new material or significant change in the relevant circumstances.

### 48. Administrative proceedings and reviews.

(1) Any person directly affected by a decision of the Executive Director or any employee exercising delegated authority from the Commission shall be entitled to a hearing and review that decision.

(2) A request for the hearing and review of a decision shall be made by notice in writing to the Commission within thirty days after the date the decision was issued.

(3) Upon a hearing and a review, the Commission may by order confirm the decision under review or make such other decision as the Commission considers proper.

(4) Notwithstanding the fact that a person requests a hearing and review under subsection (3), the decision under review takes effect immediately but the Commission may grant a stay until disposition of the hearing and review.

### 49. Fees.

(1) The *Third Schedule* shall have effect for the fees payable in respect of the matters listed therein.

(2) The fees payable under this Act shall —

    (a) be payable to the Securities Commission of The Bahamas;

    (b) not form part of the Consolidated Fund; and,

    (c) be applied by the Commission for the purpose of exercising its powers and performing its functions and duties under this Act.

### 50. Rules.

(1) In carrying out the purposes of this Act, the Commission may make rules providing for such matters as may be necessary or expedient for giving effect to such purposes, functions and responsibilities.

(2) The Commission may make Rules to apply and disapply the application of this Act to —

    (a) a person or class of persons;

    (b) a digital token or class of digital tokens; or

    (c) a digital asset business or class of digital asset businesses.

(3) The Commission shall publish, in a daily newspaper of general circulation in The Bahamas and on its website, at least sixty days or some shorter period before the proposed effective date thereof –

    (a) a copy of any proposed rule; and

    (b) a concise statement of the substance and purpose of the proposed rule.

(4)    In publishing rules under this Act, the Commission shall give interested parties a reasonable opportunity to make representation with respect to the proposed rules.

(5)    Notwithstanding the requirement to publish and the time period set out in subsection (3), the Commission is not required to comply where –

    (a)    the rule makes no material substantive change in an existing rule;

    (b)    the rule only grants an exemption or relieves a restriction and is not likely to have substantial impact on the interests of person other than those who benefit under it;

    (c)    the Commission, for good cause finds that compliance is impracticable or unnecessary and publishes a concise statement of the reasons for it; or

    (d)    the Commission concludes that there is an urgent need for the proposed rule and compliance would be prejudicial to the public interest.

(6)    The Commission shall furnish the Minister with a copy of the final rule or amendment and where no objection to the rule is made by the Minister within thirty days after the rule was furnished, subsection (8) shall apply.

(7)    Where the Minister objects to a rule or any amendment to a rule, the Commission shall be provided with notice in writing of the reasons for the objection.

(8)    A rule, or any amendment thereof, shall be effective on the date it is published in the *Gazette* or such later date as may be specified in the rule or amendment.

## 51.    Regulations.

The Minister may, after consultation with the Commission, make regulations necessary or expedient for carrying out the purposes of this Act and giving effect to the functions and responsibilities of the Commission under this Act.

## 52.    Guidelines.

The Commission may publish guidelines regarding any regulations or rules made pursuant to this Act provided that such guidelines shall not be taken as having the force of law.

## 53.    Consequential amendments.

The Acts listed in the first column of the table in the *Fifth Schedule* are amended to the extent shown in the second column.

## 54. Transitional.

Notwithstanding the provisions of any other law, any person who immediately before the commencement of this Act was engaged in any activity or business regulated under this Act shall —

    (a)   be deemed to be engaged in such activity under the provisions of this Act; and

    (b)   apply to the Commission for registration within ninety days of the commencement of this Act.

## FIRST SCHEDULE

## PART A

### Form 1

### (Section 8)

### Application for Registration as Digital Asset Business

#### Item 1 – Name of Applicant

State full legal name of the Applicant.

#### Item 2 – Type of Registration Application

Indicate the digital asset business for which registration is sought —

- A payment service provider utilising digital assets ( )
- Provision of an exchange between digital assets and fiat currencies ( )
- Provision of an exchange between one or more forms of digital assets ()
- Providing the transfer of digital assets ( )
- Provision of financial services related to an issuer's offer or sale of a digital asset
- Other ( )

#### Item 3 – Full Business Contact Details of Applicant

State the applicant's principal business address, including website, and provide email address, telephone numbers and fax numbers. If the Applicant operates more than one address in The Bahamas, provide details for each office.

#### Item 4 – Full Details on Founders, Beneficial Owner, Significant Interests Holder, Directors, and Officers

Provide completed **Form 2** for each founder, beneficial owner or security holder[1], director, and officer of the Applicant.

If the digital tokens of the Applicant are traded on another digital token exchange in any jurisdiction, provide full details of listing.

Provide a list of all affiliates of the Applicant and indicate nature of relationship, businesses the affiliate is in, where incorporated, etc.

Page - 36

### Item 5 – Full Details on Persons to be Carrying on Digital Asset Business on Behalf of Applicant

Provide completed **Form 3** for each person who is to carry on digital asset business on behalf of the Applicant, including Founder, Chief Executive Officer Compliance Officer.

### Item 6 – Discipline History

State whether the applicant or any founder, director, officer or significant interest holder of the applicant has ever been –

    (a)    disciplined by any stock exchange, digital token exchange, regulatory authority or professional association in any jurisdiction or been denied admission, registration or renewal or had its membership or registration revoked;

    (b)    declared bankrupt, been convicted of a crime or been sued under any commercial law, securities law, companies law or law concerning fraud;

    (c)    involved with an application for regulatory approval in any jurisdiction where that application has been refused or withdrawn;

    (d)    dismissed from any office or employment or barred from entry to any profession or occupation; or

    (e)    compulsorily wound up or made any compromise or arrangement with its creditors or ceased trading in circumstances where its creditors did not receive or have not yet received full settlement of their claims.

If so, please provide full details.

### Item 7 – Operational Capabilities

Provide a detailed description of the applicant's operational capabilities, including the physical premises, cybersecurity protocols, data management systems, data protection systems, risk management systems, banking, digital clearing and digital custody arrangements, communication capabilities, as applicable.

Provide names and addresses of principal bankers, digital custodians, digital asset service providers and other service and technical providers, as applicable.

### Item 8 – Policies and Procedures

Provide a summary of the applicant's written supervisory, internal controls and risk management policies and procedures, including digital token management, cybersecurity operations, operational controls, AML/CFT policies and controls, reporting policies, code of conduct, etc. as applicable.

Attach a complete copy of these policies and procedures.

## Item 9 – Financial Statements

The following must be submitted:

Where the applicant has been established within six months of the date of the application and applicant has not commenced operations -

- (a) a statement from the Chief Executive Officer (or equivalent) of the applicant confirming that the applicant has not commenced trading since the date of establishment and that no financial statements have been produced or dividends declared;
- (b) statements of financial position, of the applicant from the establishment of the applicant to the current date; and
- (c) No more than three-year financial projections of the applicant.

For all other Applicants –

- (a) audited financial statements for the two financial years immediately prior to the date of the application or, if shorter, since the date of establishment;
- (b) the auditor's report accompanying the audited financial statements; and
- (c) the interim financial statements of the applicant for the prior two quarters, certified by the Chief Executive Officer (or equivalent) to be true and complete.

If the Applicant has any significant interests holders that are companies, the Applicant must also submit for each such security holder —

- (a) audited financial statements for the two financial years immediately prior to the date of the application or, if shorter, since the date of establishment;
- (b) the auditor's report accompanying the audited financial statements; and
- (c) the most recent interim financial statements signed by the Chief Executive Officer (or equivalent), and the Financial Controller (or equivalent) to be true and complete.

Page - 38

## Item 10 – Other Regulatory Approvals

If the applicant is registered, licensed or authorized by any other regulatory authority in The Bahamas or elsewhere, provide details of that status, including name of authority, type of registration, license or authorization, date of approval, registration number, etc.

## Item 11 – Business Plan

Provide a copy of the applicant's detailed and up to date business plan, inclusive of financial and operational projections, staffing requirements, a description of products and/or services offered, target market, and technological requirements, etc.

## Item 12 – Contact Person at Applicant

Give the name, business telephone number, and email address of a senior official of the Applicant who is knowledgeable about the application and who may be contacted to discuss it.

## Item 13 – Date the Application

## Item 14 – Certification and Signature

Include the signature of two senior officers certifying the following statement –

*"We, the undersigned, hereby affirm that to the best of our information, knowledge and belief that*

*a.     the Applicant is currently in compliance with all the applicable provisions of the Act; and*

*b.     the contents of this form and any attachments provided with this form are true, correct and not misleading."*

*WARNING: Intentional misstatement or failure to disclose information may constitute an offence.*

**Required attachments:**

1. Copy of the applicant's written supervisory, internal controls and risk management policies and procedures.

2. A copy applicant's detailed and up to date business plan, inclusive of financial and operational projections, staffing requirements, a description of products and/or services offered, target market, and technological requirements, etc.

3. Copies of required financial statements.

4. Evidence that the company has adequate insurance and regulatory capital.

5. An organizational chart for the firm together with job descriptions for each position. (Include total number of employees in the company).

6. Evidence of the applicant's good standing in accordance with section 277 of the Companies Act (*Ch. 308*).

7. A certified copy of the applicant's Memorandum and Articles of association, or equivalent incorporation documents.

8. A schedule of proposed fees for services rendered by the business.

9. Evidence of the applicant's registration with any other regulatory authority, if applicable.

10. Completed Form 2 of the *First Schedule* in respect of each founder, beneficial owner, significant interest holder, director and officer of the applicant digital asset business.

*[1] Note that where the Applicant is a publicly traded entity in The Bahamas or elsewhere, Form 2s are only required to be provided for significant interests holders of the Applicant.*

## FORM 2

**Personal Questionnaire for Director, Founder, Beneficial Owner, Officer, and Significant Interest Holder for persons registered under Part III of the Act**

**General Instructions:**

If insufficient space is provided, please attach a separate sheet of paper.

*WARNING: Intentional misstatement or failure to disclose information may constitute an offence.*

| A. Personal Details | |
| --- | --- |
| 1. Name of the registered person (firm, marketplace, etc.) in connection with which this questionnaire is being completed. | |
| 2. Full legal name of representative: Surname, Given names. | |
| 3. List any previous names of the | |

| Applicant. | |
|---|---|
| 4. Indicate role(s) in which representative will be acting | Director: ( )  Founder: ( )<br>Beneficial Owner: ( )  Officer: ( )<br>Significant Security Holder ( ) |
| 5. Home address | Previous Address 1:<br>Date at this Address:<br><br>Previous Address 2:<br>Date at this Address:<br><br>Additional as applicable |
| 6. Previous home addresses during the last ten years (With relevant dates) | |
| 7. Date of Birth Place of birth (including town, state and country) | |
| 8. Citizenship | Bahamas ( )<br>Other ( ), please specify |
| 9. Identification number (Passport No., Number: Voters Registration No., National Identification No., Social Security No., Type: Tax Identification No. or specify other type) | Identification No.:<br>Identification Type: |
| **B. Employment & Education History** | |
| 10. Present occupation or employment including:<br>i. the name and address of the employer<br>ii. the nature of business<br>iii. Title of position held; and<br>iv. relevant start date<br><br>Provide the name, position and telephone number of a reference | |
| 11. Prior occupations and employment during the last ten years, including:<br>i.the name and address of the employer<br>ii. the nature of business<br>iii. Title of position held, and<br>iv. relevant dates (leave no period unaccounted for) | |

| | |
|---|---|
| For each employer, provide the name, position and telephone number of a reference | |
| 12. List companies of which the Applicant (a) Current director or holding significant interest<br><br>(b) has been a director or significant held significant interest at any time during the last ten years<br><br>(Specify the name of the entity, the country of incorporation, and the nature of business in each case) | (a) Current director or holding significant interest<br><br>(b) has been a director or significant held a significant interest at any time during the last ten years |
| *Significant interest as defined in section 2 of the Act | |
| 13. Describe the formal education or training the Applicant has in digital asset business (including professional qualifications or degrees and year in which they were obtained). | Please provide evidence of status with any professional membership indicated. |
| 14. Are you or have you ever been a director, officer, held significant interest holder, or been an employee of any other entity registered with the Commission? | No ( )<br><br>Yes ( ) If yes, please provide full details. |
| 15. Have you been licensed or registered to work in a similar capacity in any other jurisdiction? | No ( )<br><br>Yes ( ) (if yes, attach full details, including copy of evidence of such registration or license) |
| **C. Discipline History** | |
| 16. Have you or any person with which you were associated as a director, manager, officer or significant interest holder, in any jurisdiction, been disciplined by any stock exchange, securities regulatory body or professional association or been denied admission, registration or renewal or had a membership or registration revoked? | No ( )<br><br>Yes ( ) (if yes, attach full details) |
| 17. Have you or any person with which | No ( ) |

| | |
|---|---|
| you were associated as a director, manager, officer or significant interest holder, in any jurisdiction, ever been declared bankrupt, been convicted of a crime or been sued under any commercial law, securities law, companies law or law concerning fraud? | Yes ( ) (if yes, attach full details) |
| 18. Have you at any time been involved with an application for regulatory approval in any jurisdiction where that application has been refused or withdrawn? | No ( ) Yes ( ) (if yes, attach full details) |
| 19. Have you, in any jurisdiction, been dismissed from any office or employment or barred from entry to any profession or occupation? | No ( ) Yes ( ) (if yes, attach full details) |
| 20. Has any person with which you were associated as a director, manager, officer or significant interest holder, in any jurisdiction been compulsorily wound up or made any arrangement with its creditors or ceased trading in circumstances where its creditors did not receive or have not yet received full settlement of their claims, either while you were associated with it or within one year after you ceased to be associated with it? | No ( ) Yes ( ) (if yes, attach full details) |
| 21. In carrying out your duties will you be acting on the directions or instructions of any other person? | No ( ) Yes ( ) (if yes, attach full details) |

*"I, the undersigned, hereby affirm that to the best of my information, knowledge and belief the contents of this form and any attachments provided with this form are true, correct and not misleading and that I am in compliance with all the applicable provisions of the Act. I undertake that as long as I continue to be a director, significant interest holder, manager, or officer of the registered person named in item 1, I will*

*i.    Continue to comply with all the applicable provisions of the Act, and*

*ii.    Notify the Commission immediately of any material changes affecting the completeness of the answers to any of the questions above.*

*"I also hereby authorize the Commission to make such enquiries and seek such further information as it thinks appropriate in verifying the information given in this Personal Questionnaire, or in any other documents submitted as part of this application, for the purposes of performing its due diligence and background checks. I understand that the results of these checks may be disclosed to the person who submitted this application."*

| Date: | Signature: |
|-------|------------|

**Other documents to be attached:**

1.  A copy of Work Permit or Permanent Residence Permit (for Non-Bahamian citizens).

2.  A copy of the applicant's passport.

3.  Applicant's current Police Certificate from applicant's home country (not more than three months old) or an affidavit in acceptable form, if the Police Certificate is not available and a current Bahamian police certificate (if residing in The Bahamas), or if not available, an affidavit in acceptable form.

4.  Two recent photographs of Applicant, individually signed on the back by the Applicant.

### Form 3

Application for Registration as CEO or Compliance Officer of Digital Asset Business

**General Instructions:**

If insufficient space is provided, please attach a separate sheet of paper.

WARNING: Intentional misstatement or failure to disclose information may constitute an offence.

| A. Personal Details | |
|---|---|
| 1. Name of the registered person (firm, marketplace, etc.) in connection with which this questionnaire is being completed. | |
| 2. Full legal name of representative: Surname, Given names. | |
| 3. List any previous names of the | |

Page - 44

| | |
|---|---|
| Applicant. | |
| 4. Indicate role(S) for which representative is applying | CEOl ( ) Compliance Officer: ( ) Other ( ) |
| 5. Indicate if this is an application for reinstatement of a previous registration | No ( )<br>Yes ( ) (if yes, attach full details) |
| 6. Home address | |
| 7. Previous home addresses during the last ten years (with relevant dates) | Previous Address 1:<br>Date at this Address:<br><br>Previous Address 2:<br>Date at this Address:<br><br>Additional as applicable |
| 8. Date of Birth Place of birth (including town, state and country) | |
| 9. Citizenship | Bahamas ( )<br>Other ( ), please specify: |
| 10. Identification number (Passport No., Number: Voters Registration No., National Identification No., Social Security No., Type: Tax Identification No. or specify other type_ | Identification No:<br>Identification Type: |
| **B. Employment & Education History** | |
| 11. Present occupation or employment including:<br>i. the name and address of the employer | |
| ii. the nature of business | |
| iii. title of position held, and | |
| iv. relevant start date | |
| For each employer, provide the name, position & telephone number of a reference | |
| 12. Prior occupations and employment during the last ten years, including: | |

| | |
|---|---|
| i. the name and address of the employer | |
| ii. the nature of business | |
| iii. title of position held, and | |
| iv. relevant dates (leave no period unaccounted for). | |
| For each employer, provide the name, position & telephone number of a reference | |
| 13. List companies of which the Applicant is: (a) Current director or holding significant interest holder | (a) Current director or holding significant interest |
| (b) has been a director or significant interest holder at any time during the last ten years | |
| (Specify the name of the entity, the country of incorporation, and the nature of business in each case) | (b) has been a director or significant interest holder at any time during the last ten years |
| *Significant interest as defined in section 2 of the Bill. | |
| 14. Describe the formal education or training the applicant has in digital asset business (including professional qualifications or degrees and year in which they were obtained). | Please provide evidence of status with any professional membership indicated. |
| 15. Are you or have you ever been a director, officer, held significant interest holder, or been an employee of any other entity registered with the Commission? | No ( )<br>Yes ( ) If yes, please provide full details. |
| 16. Have you been licensed or registered to work in a similar capacity in any other | No ( ) |

Page - 46

| jurisdiction? | |
| --- | --- |
| | Yes ( ) (if yes, attach full details, including copy of evidence of such registration or license) |

### C. Discipline History

| | |
| --- | --- |
| 17. Have you or any person with which you were associated as a director, manager, officer or significant interest holder, in any jurisdiction, been disciplined by any stock exchange, securities regulatory body or professional association or been denied admission, registration or renewal or had a membership or registration revoked? | No ( )<br><br>Yes ( ) (if yes, attach full details) |
| 18. Have you or any person with which you were associated as a director, manager, officer or significant interest holder, in any jurisdiction, ever been declared bankrupt, been convicted of a crime or been sued under any commercial law, securities law, companies law or law concerning fraud? | No ( )<br><br>Yes ( ) (if yes, attach full details) |
| 19. Have you at any time been involved with an application for regulatory approval in any jurisdiction where that application has been refused or withdrawn? | No ( )<br><br>Yes ( ) (if yes, attach full details) |
| 20. Have you, in any jurisdiction, been dismissed from any office or employment or barred from entry to any profession or occupation? | No ( )<br><br>Yes ( ) (if yes, attach full details) |
| 21. Has any person with which you were associated as a director, manager, officer or significant interest holder, in any jurisdiction been compulsorily wound up or made any arrangement with its creditors or ceased trading in circumstances where its creditors did not receive or have not yet received full settlement of their claims, either while | No ( )<br><br>Yes ( ) (if yes, attach full details) |

| you were associated with it or within one year after you ceased to be associated with it? | |
| --- | --- |
| 22. In carrying out your duties will you be acting on the directions or instructions of any other person? | No ( )<br>Yes ( ) (if yes, attach full details) |

| **Date:** | **Signature of applicant:** |
| --- | --- |

*"I, the undersigned, hereby affirm that to the best of my information, knowledge and belief the contents of this form and any attachments provided with this form are true, correct and not misleading and that I am in compliance with all the applicable provisions of the Act. I undertake that as long as I continue to be a director, significant interest holder, manager, or officer of the registered person named in item 1, I will*

    *i.    Continue to comply with all the applicable provisions of the Act, and*

    *ii.    Notify the Commission immediately of any material changes affecting the completeness of the answers to any of the questions above.*

*"I also hereby authorize the Commission to make such enquiries and seek such further information as it thinks appropriate in verifying the information given in this Personal Questionnaire, or in any other documents submitted as part of this application, for the purposes of performing its due diligence and background checks. I understand that the results of these checks may be disclosed to the person who submitted this application."*

| Provide Intended Date of Employment of the applicant: |
| --- |
| *Notice: The Registered Digital Asset Business is required to give immediate notice to the Commission if the Applicant does not commence employment with the Digital Asset Business on the date above.* |

| Authorisation from Chief Executive Officer (or equivalent) or Director of Registered Digital Asset Business | |
| --- | --- |
| **Date** | **Signature:**<br><br>**Title:** |

**Other documents to be attached:**

Page - 48

1. A copy of Work Permit or Permanent Residence Permit (for Non-Bahamian citizens).

2. A copy of the relevant pages of the applicant's passport (to include name, date of birth, nationality, signature, expiration date and photograph).

3. Applicant's current Police Certificate (not more than three months old) or an affidavit in acceptable form, from both applicant's home country and The Bahamas (if currently residing in The Bahamas) if the Police Certificate is not available.

4. Two recent photographs of Applicant, individually signed on the back by the Applicant.

5. Copy of any relevant degree, educational courses passed, and professional qualifications.

6. An application fee to be submitted with this application as prescribed.

## PART B
### Form 1
(Section 9)

Application by Registered Digital Asset Business, Registered Firm or Financial and
Corporate Service Provider to Carry on Digital Asset Business Services

Item 1: Full Name of Applicant:

Item 2: License/ Registration Number:

Item 3 – Current Registration

Indicate the category of business of which the applicant is currently registered,
and/or whether the applicant has either a Financial and Corporate Service
Providers license or an Investment Funds license:

| | |
|---|---|
| Dealing as agent only, including underwriting | |
| Dealing as agent or principal, including underwriting | |
| Dealing as agent or principal, including underwriting, restricted to CFDs | |
| Arranging deals in securities | |
| Managing securities on a discretionary basis | |
| Advising on securities | |
| Market Place or Clearing Facility | |
| Financial and Corporate Service Provider | |

If a Financial Service or Corporate Service Provider, list the licensed activities:

_____
_____
_____
_____

Page - 50

Item 4 – Types of Digital Asset Business Services

Indicate the type(s) of digital asset business service(s) the Applicant wishes to engage in:

| Digital Asset Business Services | Yes |
|---|---|
| Digital Token Exchange | |
| Provision of exchange between digital assets and fiat currencies | |
| Provision of exchange between one or more forms of digital assets | |
| Transferring of digital assets | |
| | |
| Payment service provider – using digital assets | |
| Digital asset service provider | |
| Participation in and provision of financial services related to an issuer's offer or sale of a digital asset | |
| Other (specify) | |

**Item 5 - Current Regulatory Capital**

  i.   Evidence that the applicant meets its current regulatory capital requirements calculated in accordance with the applicable rules.
  ii.  Evidence of how the applicant will meet the additional regulatory capital required for the Digital Asset Business services it intends to provide.

If the capital does not meet the minimum capital requirement for the proposed activity(s) under the law, the applicant must, prior to approval for the proposed digital asset business, provide evidence to the Commission as to how the applicant will increase its regulatory capital to satisfy the minimum capital requirement.

**Item 6 – Details of Information Security Officer**

For the proposed digital asset business (s), identify the Information Security Officer who will be responsible for overseeing and implementing the registrant's cybersecurity and data protection program. Include names, addresses, relevant experience, qualifications, rank in the organization, etc.

If the Information Security Officer is to be outsourced, provide the name(s), experience and contact information of the person and/or entity that will provide the outsourced service.

### Item 7 – Any Other Relevant Details

Include any other information relevant to the Commission's consideration of this application.

### Item 8 – Contact Person

Give the name, business telephone number and email address of a senior official (CEO or equivalent) of the applicant who is knowledgeable about the application and who may be contacted to discuss it.

### Item 9 – Date the Application

### Item 10 – Certification and Signature

Include the signature of the Chief Executive Officer and Treasurer certifying the following statement:

*"We, the undersigned, hereby affirm that to the best of our information, knowledge and belief that*

> *a.  the Applicant is currently in compliance with all the applicable provisions of the Securities Industry Act, the Investment Funds Act, 2020, and/or the Financial and Corporate Service Providers Act, 2000 under which they are registered, as well as the Digital Assets and Registered Exchanges Act, 2020; and*
>
> *b.  the contents of this form and any attachments provided with this form are true, correct and not misleading."*

### *WARNING: Intentional misstatement or failure to disclose information may constitute an offence.*

### Required attachments:

1. Copy of the Applicant's updated and detailed business plan, including financial and operational projections, staffing qualifications and requirements, and technological requirements.
2. A schedule for the proposed fees for the digital asset business services to be rendered.
3. An application fee must be submitted with this application. The appropriate fee can be found in the Fee Rule.

Where the Applicant intends to operate a digital token exchange, in addition to the attachments previously listed, the following must be provided:

4. Rules of the exchange, including rules for admission to listing of digital assets

on the exchange.

5. Evidence of the applicant's good standing in accordance with section 277 of the Companies Act (*Ch. 308*).

6. Certified copy of the applicant's Memorandum and Articles of Association, or equivalent constitutive documents.

7. Evidence of the applicant's registration with any other regulatory authority, if applicable.

8. Completed form with respect to each founder, beneficial owner, security holder, director and officer of the applicant's digital asset business.

## PART C

### Form 1
(Section 15)

### Application for Registration of Digital Token Exchange

**Item 1** - Name of Applicant
State the full legal name of the Applicant.

**Item 2** - Type of Application
State what category of digital asset business the Applicant is applying for registration in.

**Item 3** - Full Business Contact Details of Applicant
State the Applicant's principal business address and provide email addressees), telephone numbers and fax numbers. If the Applicant operates at more than one address in The Bahamas, provide details for each office.

**Item 4** - Full Details on Security Holders, Directors and Officers, the securities or digital assets of the applicant, securities or digital exchange in any jurisdiction.

Provide completed Form 2 of Part A for each security holder, director and officer of the Applicant.

If the securities of the Applicant are traded on a securities exchange in any jurisdiction, provide full details of the listing.

Provide a list of all affiliates of the Applicant and indicate nature of relationship, business the affiliate is in, where .it is incorporated etc.

**Item 5**- Discipline History
State whether the Applicant or any director, officer or significant security holder of the Applicant has ever been:

- (a) disciplined by any stock exchange, regulatory authority or professional association in any jurisdiction or been denied admission, registration or renewal or had its membership or registration revoked;
- (b) declared bankrupt, been convicted of a crime or been sued under any commercial law, securities law, companies law or law concerning fraud;
- (c) involved with an application for regulatory approval in any jurisdiction where that application has been refused or withdrawn;

Page - 54

(d)      dismissed from any office or employment or barred from entry to any profession or occupation; and

(e)      compulsorily wound up or made any arrangement with its creditors or ceased trading in circumstances where its creditors did not receive or have not yet received full settlement of their claims. If so, please provide full details.

**Item 6** - Operational Capabilities

Provide a detailed description of the Applicant's operational capabilities, including the physical premises, trading system, clearing and settlement systems, security, communication and market surveillance systems, and staff resources, as applicable.

**Item 7** - Policies and Procedures

Provide a summary of the Applicant's written Commission, internal controls and risk management policies and procedures. Attach a complete copy of these policies and procedures.

**Item 8** - Rules

Provide a summary of the Applicant's rules/proposed rules including rules regarding membership, listing, business conduct and clearing and settlement, as applicable. Attach a complete copy of these rules.

**Item 9** - Financial Statements

The following must be submitted:

Where the Applicant has been established within six months of the date of application and the Applicant has not commenced operations:

(a)      a statement from a senior officer of the Applicant confirming that the Applicant has not commenced trading since the date of establishment and that no financial statements have been produced or dividends declared; and

(b)      a statement of financial position, showing the minimum financial resources required as at a date not more than 21 days before the date of the application.

For all other Applicants:

(a)      financial statements for the two financial years immediately prior to the date of the application or, if shorter, since the date of establishment; and

(b)      the most recent interim financial statements certified by the Chief Executive Officer and the Treasurer to be true and complete.

If the Applicant has any significant security holders that are companies, the Applicant must also submit for each such security holder(a) financial statements for the two financial years immediately prior to the date of the application or, if shorter, since the date of establishment; and (b) the most recent interim financial statements certified by the Chief Executive Officer and the Treasurer to be true and complete.

### Item 10 - Proposed Fees
Provide a summary of the proposed fee schedule, including, as applicable, fees for membership, listing, execution of trades, clearing and settlement and any other charges. Attach a copy of the complete schedule.

### Item 11 - Other Regulatory Approvals
If the Applicant is registered, licensed or authorized by any other regulatory authority in The Bahamas or elsewhere, provide details of that status, including the name of the regulatory authority, type of registration, license or authorization, date of approval, registration number, etc.

### Item 12 - Business Plan
Provide a summary of the Applicant's business plan for the next three years, which shall include financial and operational projections, staffing requirements and listing projections, as applicable.

### Item 13 - Contact Person at Applicant
Give the name, business telephone number and email address of a senior official of the Applicant who is knowledgeable about the application and who may be contacted to discuss it.

### Item 14 - Date the Application

### Item 15 - Certification and Signature
Include the signature of the Chief Executive Officer and treasurer certifying the following statement

"We, the undersigned, hereby affirm that to the best of our information, knowledge and belief that:

    a.    The Applicant is currently in compliance with all the applicable provisions of the Act and these Regulations; and

    b.    The contents of this form and any attachments provided with this form are true, correct and not misleading."

WARNING: Intentional misstatement or failure to disclose information may constitute an offence.

---

Required attachments:
1. Copy of the Applicant's written Commission, internal controls and risk management policies and procedures.

2. Evidence of the Applicant's good standing with the Registrar of Companies.

3. Certified copy of the Applicant's Memorandum and Articles of Association, or equivalent incorporation documents.

4. Copies of required financial statements.

5. Copy of the rules of the marketplace or clearing facility, including rules regarding membership, listing, business conduct, and clearing and settlement, as applicable.

6. A schedule of the proposed fees, including fees for membership, listing,execution of trades, clearing and settlement and any other charges.

7. Evidence of the Applicant's registration with any other regulatory authority, if applicable.

8. Copy of the Applicant's detailed business plan for the next three years, including financial and operational projections, staffing requirements and listing projections, as applicable.

9. Completed Form 4s for each security holder, director and officer.

10. Application fee must be submitted with this application.

## PART D

### Form 1

(section 37)

### Application for Registration of Initial Token Offering

| | |
|---|---|
| General Information | |
| Name of the project | |
| Company name | |
| Type of entity | |
| Addresses of the company | |
| Email | |
| Website | |
| Names of the founders (attach CV/background) | |
| Addresses of the project operators | |
| Details of all persons involved: | |
| Founder | |
| Issuer | |
| Token seller | |
| Advisors | |
| Secondary trading participants (platform, ITO organiser, etc.) | |
| Person endorsing | |
| Offering Memorandum | |
| Regulatory licenses held by the Issuer, Founder, advisors and Exchanges (if any) | |
| Project Description | |
| Project name, goals and project plan/timeline-roadmap | |
| Key features of the service to be developed (industry) | |
| Profile of investors i.e. accredited vs nonaccredited | |

Page - 58

| | |
|---|---|
| Residence restrictions on investors (US, China, etc.) | |
| Project organization and planning (timing of the various ITO phases milestones, etc.) | |
| Technologies used (DLT, new techno, open source, etc.) | |
| Method of payment accepted: (types of digital assets and currencies) | |
| Projected raise total in fiat currencies and digital assets | |
| Please indicate whether the funds have been allocated to a specific project/operational investment and how will the surplus funds be allocated | |
| Issuance of Digital Asset | |
| Name/symbol of digital asset created | |
| Technological methods and standards for creation (ERC 20 etc) | |
| Wallet IS of the ITO (if already in existence) | |
| At which point by whom an in which manner will the token by transferred to the investors? Price of token during pre/public sale) and price setting mechanism | |
| Which functionalities will be embedded in the token/what will be the uses of the token? | |
| At which point will the functionalities planned apply? | |
| Will a regulated financial intermediary commissioned to meet the AML due diligence requirements? If so, according to which law. | |
| Provide detailed description on the KYC/AML processes applies (PEPs, sanction, high risk industries, etc.) | |

| Transfer and secondary market | |
|---|---|
| Describe how the token be transferred (compatible wallets, technical standards) | |
| Indicate whether the token is already functional at the time of the transfer and, if yes, to what extent | |
| Indicate where the token can be acquired or sold after the issuance (what are the secondary market platforms)? | |
| Will it be possible to use the tokens to buy goods or services or make payments to third parties? | |
| Are there plans for the project operator/issuer to buy back tokens? | |
| Vesting of Digital Assets (Utility Tokens) | |
| How can the token be transferred (Compatible wallets/technical standards)? | |
| Is the token already functional at the time of the transfer? If yes, to what extent? | |
| How and where can the token be acquired or sold after the issuance (what are the secondary market platforms)? | |
| Will it be possible to use the tokens to buy goods or services or make payments to third parties? | |
| Are there plans for the project operator/issuer to buy back tokens? | |

## SECOND SCHEDULE

### (Section 34)
### Contents of an Offering Memorandum

Matters to be specified in a offering memorandum of an issuer and requirements for its approval and publication.

General

1.  The Securities Commission of The Bahamas has not expressed any opinion of the merits of these digital tokens or determined that this offering memorandum is accurate or complete. It is illegal for anyone to make any representations in this regard.

2.  The offering memorandum shall contain the information which, according to the nature of the issuer and of the digital assets offered to the public, is necessary to enable investors to make an informed assessment of the prospects of the issuer, the proposed project and of the features of the digital asset. This information shall be presented in plain English with no over-reliance on technological terms unless such terms are clearly explained.

3.  Certain information specified in this Schedule may be omitted from the offering memorandum if:

    (a)  disclosure of such information would be seriously detrimental to the issuer, provided that the omission would not be likely to mislead the public with regard to facts and circumstances essential for an informed assessment of the prospects of the issuer, the proposed project and of the features of the digital assets to which the offering memorandum relates; or

    (b)  such information is largely irrelevant and would not taking into account reasonable factors influence an informed assessment of the prospects of the issuer, the proposed project and of the features of the digital assets to which the offering memorandum relates.

4.  The offering memorandum shall be drafted in the English language and any additional languages, at the issuer's discretion.

5.  The offering memorandum shall include a summary. The summary shall, in brief and in non- technical language, provide key information in relation to the offering. The format and content of the summary of the offering memorandum shall provide, in conjunction with the offering memorandum, appropriate information about essential elements of the digital assets concerned in order to aid investors consideration of whether

Page - 61

to invest in such digital assets. The summary shall also include a warning that:

(a) it should be read as an introduction to the offering memorandum;

(b) any decision to invest in the digital assets should be based on consideration of the offering memorandum as a whole by the investor;

(c) the offering of digital assets does not constitute an offer or solicitation to sell a digital asset which is an asset token that has been has been deemed by the Commission to be a security, and that any such offer of an asset token that is deemed by the Commission to be a security will be made only by means of a prospectus or other offering documentation as provided by the Securities Industry Act;

Specific matters to be included.

5. The persons responsible for the publication of the offering memorandum;

6. Names, functions and declarations by the persons responsible for the offering memorandum that:

*"I, the undersigned hereby affirm that to the best of my information knowledge and belief the contents of this form and any attachments provided with this form are true, correct and not misleading."*

7. Provided that the Commission shall have the power to waive or modify any of the above requirements within the context of a particular initial digital offering on application by the issuer, at least, and to the extent it is applicable, the following information on the offer shall be provided in the offering memorandum:

(a) description of the purpose for the initial token offering;

(b) detailed technical description of the protocol, platform and, or application, as the case may be, and the associated benefits;

(c) detailed description of any secondary platform where the token is either currently or will trade;

(d) disclosure and description of number and type of token held by each development team member and rights or protocols to receive tokens in the future;

(e) intended time frame for network to reach maturity;

(f) disclosure procedure when a team member sells five per centum or more of originally issued tokens;

(g)    detailed description of all intended efforts to create liquidity for subscribers once tokens are sold;

(h)    detailed description of the business' source code and transaction history;

(i)    detailed description of the sustainability and scalability of the proposed project;

(j)    associated challenges and risks as well as mitigating measures related to the issuer's business;

(k)    detailed description of the characteristics and functionality of the digital assets being offered;

(l)    detailed description of the issuer, development team, advisors and any other service providers that may be deployed for the realisation of the project;

(m)    detailed description of the issuer's wallet/s used;

(n)    description of the security safeguards against cyber threats to the underlying protocol, to any off-chain activities and to any wallets used by the issuer;

(o)    detailed description of the life cycle of the initial token offering and the proposed project;

(p)    detailed description of the past and future milestones and project financing;

(q)    detailed description of the targeted investor base;

(r)    exchange rate of the digital assets;

(s)    description of the underlying protocol's interoperability with other protocols;

(t)    description of the manner funds raised through the initial token offering will be allocated;

(u)    the amount and purpose of the issue;

(v)    the total number of digital assets to be issued and their features;

(w)    the distribution of digital assets;

(x)    the consensus algorithm, where applicable;

(y)    incentive mechanism to secure any transactions, transaction and/or any other applicable fees;

(z)    in the case of a new protocol, the estimated speed of transactions;

(aa)    any applicable taxes of the issuer;

(ab)    any set soft cap and hard cap for the offering;

(ac)    the period during which the offer is open;

(ad)    any person underwriting or guaranteeing the offer;

(ae) any restrictions on the free transferability of digital assets being offered and the DLT platform/s on which they may be traded, to the extent known by the issuer;

(af) methods of payment;

(ag) specific notice that investors participating in the initial token offering will be able to get their contribution back if the softcap is not reached at the end of the offering and detailed description of the refund mechanism, including the expected time-line of when such refund will be completed;

(ah) detailed description of the risks associated with the digital assets and the investment therein;

(ai) the procedure for the exercise of any right of pre-emption;

(aj) detailed description of the smart contract/s, if any, deployed including *inter alia* the adopted standards, its/their underlying protocol/s, functionality/-ies and associated operational costs;

(ak) if any smart contract/s is/are deployed by the issuer, details of the auditor who performed an audit on it/them;

(al) description of any restrictions embedded in the smart contract/s deployed, if any, including *inter alia* any investment and/or geographical restrictions;

(am) the program agents used to obtain data and verify occurrences from smart contracts (also known as 'oracles') used and detailed description of their characteristics and functionality thereof;

(an) bonuses applicable to early investors including *inter alia* discounted purchase price for digital financial assets;

(ao) the period during which voluntary withdrawals are permitted by the smart contract, if any;

(ap) description of the issuer's adopted white-listing and anti-money laundering and counter financing of terrorism procedures in terms of the Financial Transactions Reporting Act, 2018 *(No. 5 of 2018)* and the Anti-Terrorism Act, 2018;

(aq) intellectual property rights associated with the offering and protection thereof; and

(ar) the methods of and time-limits for delivery of the digital assets.

Details of the issuer

    8.    The following details of the issuer:-   Name;

Registered address and registration number; Date of registration;

The issuer's object(s);

Where applicable, the group of undertakings to which the issuer belongs;

Disclose at least the following information of any security holder who beneficially owns 10% or more of any class of shares of the issuer —

        (a)    name of the holder;
        (b)    class and number of any securities held;
        (c)    nationality or jurisdiction of incorporation or registration ; and

    9.    Where securities are held under a nominee name or trustee arrangement, state that fact and —

        (a)    the issuer's principal activities; and
        (b)    description of the issuer's principal activities including the disclosure of any legal proceedings having an important effect on the issuer's financial position.

The issuer's operators

    10.   Names, addresses and functions of operators.

Benefits for third parties and other expenditure

    11.   The amount or estimated amount of preliminary expenses and the persons by whom any of those expenses have been paid or are payable, and the amount or estimated amount of the expenses of the issue and the persons by whom any of those expenses have been paid or are payable.

    12.   Any amount or benefit intended to be paid or given to any person endorsing the offering, and the consideration for the payment or the giving of the benefit.

Issuer's financial track record

13. Where the issuer has been established for any period not exceeding three years, details of its financial track record for the period from the date the issuer was registered or established, otherwise, where the issuer has been established for a period of three years or more, annual financial statements shall be produced.

Validity of a Offering memorandum, Arrangements for Approval and Publication of an Offering memorandum

14. A offering memorandum shall be valid for 6 months after its approval for offers to the public.

15. (1) Significant new factors, material mistakes or inaccuracies

(1) Every material change, material mistake or inaccuracy relating to the information included in the offering memorandum which is reasonably capable of affecting the assessment of the digital assets and which arises or is noted between the time when the offering memorandum is approved and the final closing of the offer to the public, whichever occurs later, shall be mentioned in a supplement appended to the offering memorandum. Such a supplement shall be approved in the same way and published in accordance with at least the same arrangements as were applied when the original offering memorandum was published. The summary, and any translations thereof, shall also be supplemented, if necessary, to take into account the new information included in the supplement.

(2) Investors who have already agreed to purchase or subscribe for the digital assets before the supplement is published shall have the right to withdraw their acceptance within two working days after the publication of the supplement, provided that the material change, mistake or inaccuracy referred to in paragraph (1) arose before the final closing of the offer to the public and the delivery of the digital assets. That period may be extended by the issuer in which case the smart contract, if any, shall be updated accordingly. The final date of the right of withdrawal shall be stated in the supplement.

## THIRD SCHEDULE

(section 49)

### Fee Schedule

#### A. Fees for persons registered under Part III (Digital Asset Businesses)

|  | Fee Type |  |  |
| --- | --- | --- | --- |
| Category of Registration | Application Fee | Registration Fee | Annual Renewal Fee |
| a. Digital Token Exchange | $5,000.00 | $15,000.00 | $15,000.00 |
| b. All other digital asset businesses | $3,000.00 | N/A | $10,000.00 |

#### B. Table of Fees for the registration of natural persons

| Category of Registration | Application Fee | Annual |
| --- | --- | --- |
| a. Chief Executive Officer | $350.00 | $500.00 |
| b. Compliance Officer | $350.00 | $500.00 |

#### C. Filing Fees for person registered under Part IV (Initial Token Offerings)

| Description | Filing Fee |
| --- | --- |
| a. Filing of an Offering Memorandum (Application fee) | $6,000.00 |
| b. Filing of Interim Financial Statements | No Fee (if filed within prescribed time period) |
| x. Filing of Audited Financial Statements | No fee (if filed within prescribed time period) |

#### D. Administrative Fees

| | |
| --- | --- |
| a. Appointment or change in directors | $400.00 |
| b. Approval of issue, transfer, disposal or re-categorization of digital assets | $400.00 |
| c. Audit Confirmation Letters | $300.00 |
| d. Replacement Certificates | $300.00 |

| e. Name Change | $300.00 |
|---|---|
| f. Extension to file interim statements for a 3-month period (for a maximum of 2 extension requests) | $150.00 |
| g. Extension to file audited statements for a 3-month period (for a maximum of 2 extension requests) | $700.00 |
| h. Surrender of Registration Certificate | $300.00 |



*EXTRAORDINARY*

# OFFICIAL GAZETTE
# THE BAHAMAS

PUBLISHED BY AUTHORITY

| NASSAU | 20th May, 2022 |
|--------|----------------|

# DIGITAL ASSETS AND REGISTERED EXCHANGES (AMENDMENT) ACT, 2022

## Arrangement of Sections

### Section

| | | |
|---|---|---|
| 1. | Short title.............................................................................................................2 |
| 2. | Amendment of Part V of the principal Act............................................................2 |
| 3. | Amendment of section 39 of the principal Act......................................................2 |
| 4. | Insertion of new sections 40A and 40B into the principal Act..............................3 |
| 5. | Insertion of new sections 42A and 42B into the principal Act..............................3 |
| 6. | Insertion of new section 46A into the principal Act.............................................4 |



No. 10 of 2022

# DIGITAL ASSETS AND REGISTERED EXCHANGES (AMENDMENT) ACT, 2022

## AN ACT TO AMEND THE DIGITAL ASSETS AND REGISTERED EXCHANGES ACT TO PROVIDE FOR THE MONITORING AND SANCTION OF PERSONS CARRYING ON OR PURPORTING TO CARRY ON DIGITAL ASSET BUSINESS ACTIVITIES WITHOUT THE REQUISITE REGISTRATION

[Date of Assent – 20ᵗʰ May, 2022]

### Enacted by the Parliament of The Bahamas

**1.   Short title.**

This Act, which amends the Digital Assets and Registered Exchanges Act, 2020 (*No. 28 of 2020*) may be cited as the Digital Assets and Registered Exchanges (Amendment) Act, 2022.

**2.   Amendment of Part V of the principal Act.**

The subheading of Part V of the principal Act is deleted and substituted as follows –

"**PART V – INVESTIGATION, MONITORING AND COOPERATION**".

**3.   Amendment of section 39 of the principal Act.**

Section 39 of the principal Act is amended by the insertion immediately after subsection (2), of the following new subsection –

"(3)   The Commission shall implement systems to identify any person who is not registered under sections 8 or 9 of this Act and who —

(i)   is carrying on or involved in digital asset business activities; or

      (ii)   who purports to carry on or to be involved in digital asset business.".

## 4.   Insertion of new sections 40A and 40B into the principal Act.

The principal Act is amended by the insertion immediately after section 40 of the following new sections —

### "40A. Powers to compel.

Where the Commission considers that a person is or may be able to give information or produce a document, which is or may be relevant to an investigation, it may —

(a)   require such person to attend before it at a specified time and place to answer questions, including under oath or affirmation that the statements that the person will make will be true;

(b)   require such person to produce, or procure the production of specified documents or documents of a specified description;

(c)   require such person to give an explanation of or further particulars regarding any information or document produced under paragraphs (a) and (b).

### 40B. Uncooperative witness liable for contempt.

On application by the Commission to the court, a person summoned under section 40A is liable to be committed for contempt, as if in breach of an order or judgement of the court, if the person neglects or refuses to —

(a)   attend;

(b)   give evidence; or

(c)   produce a document in the custody, possession or control of that person.".

## 5.   Insertion of new sections 42A and 42B into the principal Act.

The principal Act is amended by the insertion immediately after section 42 of the following new sections –

### "42A. Compliance Orders.

Without prejudice to any action that may be instituted or taken against a person identified under section 39(3), if at any time it appears to the Commission that such person has failed to comply with any requirement under this Act, the Commission may by written notice —

(a)   direct that person to comply with the requirements within such period and on such terms and conditions as the Commission shall specify;

(b)   direct that the person cease and desist carrying on digital asset business or their involvement in digital asset business;

(c)   direct that the person cease and desist any activity which purports that the person is carrying on or is involved in digital asset business in or from within The Bahamas.

**42B. Penalty.**

(1)   Any person failing to comply with a directive of the Commission made under section 42A shall be subject to a penalty of up to $100,000 for each contravention.

(2)   The Commission shall not impose a penalty under subsection (1) unless the Commission notifies the person in writing of—

(a)   the directive or directives contravened;

(b)   the Commission's intention to impose a penalty, and invites the person to make a representation in writing within a period specified by the Commission, providing reasons why the Commission should not impose a penalty.

(3)   Where after considering the representation made or after the specified period for doing so has elapsed, the Commission imposes a penalty, it shall notify the person in writing of the Commission's decision and specify the period within which the penalty shall be paid.".

## 6.   Insertion of new section 46A into the principal Act.

The principal Act is amended by the insertion immediately after section 46 of the following new section —

**"46A Freeze Orders.**

(1)   If the Commission considers it in the public interest to do so, the Commission may, for the administration of digital asset laws or to assist in the administration of the digital assets legislation of another jurisdiction, by order for a period not to exceed five days, direct —

(a) a person having on deposit, under control or for safekeeping any funds, digital assets or other property of the person named in the order to hold them; or

(b) a person —

    (i) not to withdraw any funds, digital assets or other property from any person having them on deposit, under control or for safekeeping; or

    (ii) to hold all funds, digital assets or other property of a client of that person, or of others, in the person's possession or control in trust for a receiver, receiver-manager, trustee or liquidator appointed under an enactment of The Bahamas.

(2) An aggrieved person may apply to a judge in chambers to discharge the order of the Commission under this section and shall serve notice on the Commission to join in the proceedings, but the order of the Commission shall remain in effect until the judge determines otherwise.

(3) Unless expressly stated, an order made under subsection (1) does not apply to funds, digital assets or other property in the process of transfer.".



# Commonwealth of The Bahamas
## The International Business Companies Act

IBC 01

# Certificate of Incorporation

(SECTION 16)

**No. 207269 B**

### FTX Digital Markets Ltd.

**I, ELLICE SALLYANN LOCKHART-PRATT,** Registrar General of the Commonwealth of The Bahamas,

do hereby certify, pursuant to the International Business Companies Act 2000,

that all the requirements of the said Act in respect of incorporation have been satisfied, and that

### FTX Digital Markets Ltd.

is incorporated in the Commonwealth of The Bahamas as an International Business Company.

this **22nd day of July, 2021**

Authentication Code: aHVWEza6e4ec

**Commonwealth of Bahamas**
**Registrar General's Office**
I certify the foregoing to be a true copy of
the original deposited in this office.

*Sally Pratt*          **Registrar General**

July 22, 2021
Authentication Code: mSTDUFH6e4ee

Given under my hand and seal of office
at Nassau in the Commonwealth of The
Bahamas

*Sally Pratt*

**Registrar General**



DARE-DAB001

# SECURITIES COMMISSION OF THE BAHAMAS

## CERTIFICATE OF REGISTRATION

Pursuant to Part III Section 8 of the Digital Assets and Registered Exchanges Act, 2020.

### FTX Digital Markets Ltd.

is hereby registered as a

### Digital Asset Business

to carry on digital asset business activities in and from the Commonwealth of The Bahamas, subject to the terms and conditions specified in the Digital Assets and Registered Exchanges Act, 2020.

**Effective this 10th day of September 2021**

Signed: _____

Executive Director



DARE

DIGITAL ASSETS
& REGISTERED
EXCHANGES ACT

 

# REGISTER OF DIGITAL ASSET BUSINESSES

Registration information provided as at:  30 September 2022

Digital Asset Business:

## FTX DIGITAL MARKETS LTD.

| | |
|---|---|
| **Address** | Building 27<br>Veridian Corporate Centre<br>West Bay Street<br>P.O. Box N 7525<br>Nassau, The Bahamas |
| **Phone** | (242) 603-1336 |
| **Website** | www.ftx.com |
| **Principals** | Samuel Bankman-Fried |
| **Chairman** | Samuel Bankman-Fried |
| **Secretary** | Daniel Friedberg |
| **Directors/Members** | Ryan Salame, Samuel Bankman-Fried |
| **Chief Executive Officer** | Ryan Salame |
| **Compliance Officer** | Jessica Murray |
| **Money Laundering Reporting Officer** | Jessica Murray |
| **SCB Registration Details**<br>Pursuant to Section 6 of the Digital Assets and Registered Exchanges Act, 2021 | − Provision of an exchange between digital assets and fiat currency; and,<br>− Provision of an exchange between one or more forms of digital assets. |
| **Registration Type** | Digital Asset Business |
| **Registration Conditions** | None |
| **Sanctions** | None |
| **Other Registrations/<br>Licenses held outside of The Bahamas** | (i)  License: Australian Financial Services License<br>Entity Name: IFS Markets Party Limited<br>Jurisdiction : Australia<br>(ii)  License: Digital Ledger Technology Provider<br>Entity Name: Zubr Exchange Limited<br>Jurisdiction: Gibraltar |

**THIS PAGE HAS INTENTIONALLY BEEN LEFT BLANK**

**THIS PAGE HAS INTENTIONALLY BEEN LEFT BLANK**







# FTX Exchange Halts All Crypto Withdrawals

**Tracy Wang**

Tue, November 8, 2022 at 4:51 PM · 1 min read

💬 11



Alex Wong

Crypto exchange FTX has halted all non-fiat customer withdrawals, an FTX support employee confirmed in the company's official Telegram group Tuesday afternoon.

"Any transfers besides fiat are halted," wrote the FTX Support employee. The halt highlights the deteriorating condition of the exchange, which was previously still processing withdrawals, albeit at a slower pace.

Many FTX customers in Telegram posted that they had been waiting hours to withdraw their funds.

"It's been a full 11 hours since I've requested my withdrawal," one user wrote.

Just hours earlier, FTX co-founder Sam Bankman-Fried tweeted that FTX had reached a non-binding agreement to be acquired by crypto exchange rival, Binance. Bankman-Fried tweeted that "all assets will be covered 1:1."

**TRENDING**

1. FTX Latest: Junior Employees Try to Sell Assets With Boss Away
2. GLOBAL MARKETS-Wall St jumps, dollar slides as easing inflation fuels Fed abatement hopes
3. Where inflation is improving the most
4. REFILE-US STOCKS-Wall Street soars on sign of cooling inflation
5. California sues 3M, Dupont over toxic 'forever chemicals'



**yahoo!**finance

Search for news, symbols or companies

Sign in    Mail

Things have come full circle, and FTX.com's first, and last, investors are the same: we have come to an agreement on a strategic transaction with Binance for FTX.com (pending DD etc.).

> ftx.com
> FTX
> Cryptocurrency Derivatives Exchange

**SBF** ✔️
@SBF_FTX · Follow

2) Our teams are working on clearing out the withdrawal backlog as is. This will clear out liquidity crunches; all assets will be covered 1:1. This is one of the main reasons we've asked Binance to come in. It may take a bit to settle etc. -- we apologize for that.

11:03 AM · Nov 8, 2022    ⓘ

❤️ 4.9K    💬 Reply    🔗 Copy link

**Read 269 replies**

It appears customers can still withdraw their assets to fiat, although opting for the fiat option could see the funds take up to five business days for settlement.

Reuters reported FTX saw withdrawals totaling $6 billion in the past several days, citing an internal message to company employees sent by Bankman-Fried.

An FTX employee in the Telegram Support chat told panicked customers: "no eta for now, sorry."

Advertisement



Advertisement

**yahoo!**finance

Search for news, symbols or companies

Sign in     Mail

HOME   MAIL   NEWS   FINANCE   SPORTS   ENTERTAINMENT   LIFE   SEARCH   SHOPPING   YAHOO PLUS   MORE...

Finance   Watchlists   My Portfolio   Crypto   Yahoo Finance Plus   News   Screeners   Markets   Videos   Personal Finance   Industries   Contact



Dillard's (DDS) third quarter earnings on November 9 will be significant and insightful into the effects an economic downturn is having on the economy. Earnings estimate revisions trending higher is a good sign that the company may beat earnings...

2d ago



Zacks

**Dillard's (DDS) Beats Q3 Earnings and Revenue Estimates**

Dillard's (DDS) delivered earnings and revenue surprises of 125.05% and 3.61%, respectively, for the quarter ended October 2022. Do the numbers hold clues to what lies ahead for the stock?

6h ago



Ad • Dailysportx     •••

**20 Actors With Martial Arts Skills**

This list covers actors and celebs that are actually skilled in one or more martial arts disciplines, and some of the entries may surprise you...

   

Benzinga

**Dillard's Pops On Q3 Earnings Beat**

Dillard's Inc (NYSE: DDS) reported third-quarter FY22 sales growth of 4.1% year-on-year to $1.57 billion, beating the consensus of $1.48 million. Total retail sales increased by 3% for Q3. Sales in comparable stores increased by 3%. Stronger...

3h ago



CoinDesk

**FTX Blowup Puts Trove of Prized Bored Apes at Risk of Liquidation**

Yuga Labs, the NFT collective behind the majority of tokens held in the crypto empire's wallet, has previously raised capital from FTX Ventures, though Alameda Research is in control of the wallet.

22h ago



CoinDesk

**Top FTX Lawyer Orders Documents Preserved as Investigations Ramp Up**

FTX US General Counsel Ryne Miller called the turn of events "disappointing."

2h ago



Ad • Aeropost     •••

**The Bahama's biggest marketplace is here**

Millions of products at one fully landed price



Reuters

**Trading in crypto derivatives surges as investors hedge positions after FTX shock**

Trading volumes in bitcoin futures and exchange traded funds (ETFs) has exploded as investors scrambled to hedge their positions after this week's slump in digital tokens triggered by turmoil at crypto exchange FTX. CME bitcoin futures Novembe...

1h ago

CoinDesk

**FTX US Warns of Trading Halt Hours After Bankman-Fried Says It's '100% Liquid'**

FTX US warned that it might halt trading in a banner on its website Thursday.

1h ago

Yahoo Finance Video

**Crypto market facing chaos amid the collapse of FTX**

Yahoo Finance's David Hollerith explains what happened to crypto exchange FTX, the fallout across the crypto industry, and what it means for investors.

**yahoo!**finance

Search for news, symbols or companies

Sign in    Mail

Finance   Watchlists   My Portfolio   Crypto   Yahoo Finance Plus   News   Screeners   Markets   Videos   Personal Finance   Industries   Contact

HOME   MAIL   NEWS   FINANCE   SPORTS   ENTERTAINMENT   LIFE   SEARCH   SHOPPING   YAHOO PLUS   MORE...

I was all set for my trip, or so I thought. That's when my friend told me to place a crayon in my wallet when traveling. The...



**Bloomberg**

**How Binance, FTX Deal Rocked the Crypto World and Then Collapsed**

(Bloomberg) -- It's been a tumultuous few days in the largely unregulated cryptocurrency world, with mudslinging on Twitter, a shock exchange takeover bid — which then collapsed — and plunging token values.Most Read from BloombergSam...

21h ago



**CoinDesk**

**Bitcoin Miner Marathon Digital Misses Q3 Revenue Estimates, Lowers Hashrate Outlook for 2022**

The miner is targeting 9 EH/s for the end of the year, but maintains it will reach 23 EH/s by the middle of 2023.

2d ago



**CoinDesk**

**Tron's Justin Sun 'Putting Together Solution' for Troubled Crypto Exchange FTX**

Justin Sun, the founder of the Tron cryptocurrency network and Grenada's ambassador to the World Trade Organization, tweeted late Wednesday that he and his team were "putting together a solution" with beleaguered cryptocurrency...

4h ago



**Ad • AMD**

**20% Faster Performance. How Did They Do It?**

Mercedes-AMG Petronas F1 team raced to 20% better performance by using AMD processors. Read their story to find out how.



**CoinDesk**

**Tron's DAO to Purchase $1B USDT to 'Safeguard' Against Market Slump**

USDT slipped to as low as 93 cents in the European afternoon hours.

7h ago



**CoinDesk**

**Solana Blockchain Hit by FTX Tremors as Nearly $800M SOL Tokens Set to Be Unstaked**

The scheduled-to-be-unlocked SOL tokens represent around 15% of the token's circulating supply.

23h ago



**CoinDesk**

**FTX Website Experiences Temporary Outage, Warns Users Not to Make Deposits**

While the FTX US website remains operational, FTX.com is experiencing widespread outages.

22h ago



**Ad • Pro Sports Trivia**

**What Sport Should You Start Playing? Take The Quiz**

Answer These Personality Questions and We'll Tell You What Sport You Should Get Into Next!

**Forkast News**

**Binance buys FTX: Updates on what it means for the crypto industry**

The following is a running compilation of views and comments on Binance's takeover of the FTX exchange amid speculation of solvency problems at FTX.



HOME    MAIL    NEWS    FINANCE    SPORTS    ENTERTAINMENT    LIFE    SEARCH    SHOPPING    YAHOO PLUS    MORE...

 yahoo!finance    [Search for news, symbols or companies]    Sign in    Mail

Finance    Watchlists    My Portfolio    Crypto    Yahoo Finance Plus    News    Screeners    Markets    Videos    Personal Finance    Industries    Contact

exchange, turned to a rescue from its...

1d ago

**CoinDesk**

**FTX Balances Tumbled 87% in 5 Days in Epic Crypto Deposit Run, Data Shows**

A glance at data from Arkham Intelligence shows the behind-the-scenes operational reality that drove billionaire Sam Bankman-Fried's beleaguered FTX exchange to order a withdrawal halt this week.

3h ago

**Fortune**

**Sam Bankman-Fried quietly deletes his claim that FTX customer funds are safe**

The future of client assets locked on crypto exchange FTX remains uncertain, with a Binance deal that can bail out the company depending on a closer look at the books.

1d ago

**MarketWatch**

**Disney stock tumbles to worst day since 2001 after 'massive earnings downgrade'**

Walt Disney Co. has a profit problem, and that's helped send shares of the media giant to their worst daily performance in more than two decades.

18h ago

**Simply Wall St.**

**Increases to CEO Compensation Might Be Put On Hold For Now at Western Digital Corporation (NASDAQ:WDC)**

The underwhelming share price performance of Western Digital Corporation ( NASDAQ:WDC ) in the past three years would...

9h ago

Jessica

—

Jessica Murray



On November 8, 2022 at 11:37 AM EST crolle@scb.gov.bs wrote:

Good morning Sam / Jessica,

Please advise your availability to meet with the Securities Commission of The Bahamas to discuss recent press regarding liquidity issues as well as the potential acquisition of FTX by Binance.

We would appreciate to meet as soon as today, if possible. Let us know and we will set up a Zoom/Teams link for a call.

With kind regards,

**Christina Rolle** • Executive Director
e-mail: crolle@scb.gov.bs
telephone: (242) 397-4100          fax: (242) 356-7530          Web: www.scb.gov.bs

Poinciana House | North Building, 2nd Floor | 31A East Bay St | P. O. Box N-8347 | Nassau The Bahamas

Please consider the environment before printing this email message.

The information in this e-mail (including attachments) is confidential and may be legally privileged. It is intended solely for the addressee. Access to this e-mail by anyone else is unauthorized. If you are not the intended recipient, any review, disclosure, reproduction, distribution or any action taken or omitted to be taken in reliance on the e-mail message, is prohibited. If you have received this e-mail in error, please notify the sender by return e-mail and delete all parts of this message from your computer(s) and eventual service provider computer(s).

The Securities Commission of The Bahamas (the Commission) is neither liable for the proper and complete transmission of the information contained in this communication nor for any delay in its receipt. While the Commission has taken every reasonable precaution to ensure that any attachment to this e-mail message has been scanned for viruses, the Commission does not accept any liability for the presence of any viruses and/or any loss or damage suffered as a result. Any opinions expressed are those of the author and are not necessarily endorsed by the Commission.



**Christina Rolle**  Executive Director
e-mail: crolle@scb.gov.bs
telephone: (242) 397-4100          fax: (242) 356-7530          Web: www.scb.gov.bs

Poinciana House | North Building, 2nd Floor | 31A East Bay St | P. O. Box N-8347 | Nassau,
The Bahamas

Please consider the environment before printing this email message.

The information in this e-mail (including attachments) is confidential and may be legally privileged. It is intended solely for the addressee. Access to this e-mail by anyone else is unauthorized. If you are not the intended recipient, any review, disclosure, reproduction, distribution or any action taken or omitted to be taken in reliance on the e-mail message, is prohibited. If you have received this e-mail in error, please notify the sender by return e-mail and delete all parts of this e-mail from your computer(s) and eventual service provider computer(s).

The Securities Commission of The Bahamas (the Commission) is neither liable for the proper and complete transmission of the information contained in this communication nor for any delay in its receipt. While the Commission has taken every reasonable precaution to ensure that any attachment to this e-mail has been scanned for viruses, the Commission does not accept any liability for the presence of any viruses and/or any loss or damage suffered as a result. Any opinions expressed are those of the author and are not necessarily endorsed by the Commission.

Sent from my Galaxy


-------- Original message --------
From: Sam Bankman-Fried <sam@ftx.com>
Date: 11/8/22 2:48 PM (GMT-05:00)
To: Christina Rolle <crolle@scb.gov.bs>, jmurray@ftxdigitalmarkets.com
Cc: Ashley Poitier <apoitier@scb.gov.bs>, Renaldo Harding <rharding@scb.gov.bs>
Subject: Re: FTX Liquidity / Sale Rumours

Hey!  I'm pretty pressed for time but will make sure that we talk to you ASAP; I'll briefly say that, as of now, no sale has happened or been finalized although there are active talks.  We'll keep you updated about those.

—

Sam Bankman-Fried

> On November 8, 2022 at 8:43 PM GMT+3 crolle@scb.gov.bs wrote:
>
> Thanks for the acknowledgement, Jessica.
>
> I will be tied up from 13:00 to 15:00… it would be good it that call can take place today.
>
> With kind regards,
>
>
>
> **From:** Jessica Murray [mailto:jmurray@ftxdigitalmarkets.com]
> **Sent:** 08 November 2022 12:08 PM
> **To:** Christina Rolle <crolle@scb.gov.bs>; sam@ftx.com
> **Cc:** Ashley Poitier <apoitier@scb.gov.bs>; Renaldo Harding <rharding@scb.gov.bs>
> **Subject:** Re: FTX Liquidity / Sale Rumours
>
>
>
> Hello Ms. Rolle,
>
>
>
> Your email is well received. Let me confirm a day and time and revert.
>
>
>
> Kind Regards,

**From:** Christina Rolle
**Sent:** 09 November 2022 10:17 AM
**To:** sam@ftx.com; jmurray@ftxdigitalmarkets.com
**Cc:** 'ryan@ftxdigitalmarkets.com' <ryan@ftxdigitalmarkets.com>; Mechelle Martinborough <mmartinborough@scb.gov.bs>; Gawaine Ward <gward@scb.gov.bs>; Renaldo Harding <rharding@scb.gov.bs>; Ashley Poitier <apoitier@scb.gov.bs>
**Subject:** RE: FTX Liquidity / Sale Rumours

Good morning Sam,

Further to my note below, please see some initial queries from the Securities Commission of The Bahamas with respect to ongoing issues. Please advise as follows:

1. Number of clients registered on the FDM platform, total value of assets held for all FDM clients and whether those assets are held in a segregated account;
2. Total value of client withdrawals from FDM platform over the past week. Have there been any withdrawal requests that were unsatisfied or that remain outstanding?
3. The extent to which FDM clients' assets may have been invested, loaned, used as collateral or otherwise hypothecated or encumbered on behalf of FDM, Alameda, other related parties and/or third parties;

Please also provide an explanation with respect to the following:
1. Which FTX Group entity is party to the non-binding LOI with Binance? What are the terms of the LOI and what is the potential impact for clients of FDM;
2. Details of the connection between FDM and Alameda. Were there any services provided by Alameda to FDM or vice versa? Were there any related party or counterparty transactions between the entities.

Please also provide a sample of FDM's client agreement (including general terms and conditions).

Your urgent attention and response by end of day is needed. If you wish to discuss, please feel free to reach out to us.

With kind regards,

**From:** Christina Rolle
**Sent:** 08 November 2022 3:11 PM
**To:** sam@ftx.com; jmurray@ftxdigitalmarkets.com
**Cc:** Ashley Poitier <apoitier@scb.gov.bs>; Renaldo Harding <rharding@scb.gov.bs>
**Subject:** RE: FTX Liquidity / Sale Rumours

Thank you for your note, Sam
We are keen to understand the issues as they specifically relate to the regulated entity including potential impact for clients. Please get in touch soonest.
Due to the Tropical Storm alert, we will be working from home until the all clear is given but I will be reachable by email and by phone (422-4058).
Take care and kind regards,

**From:** Christina Rolle
**Sent:** 09 November 2022 10:17 AM
**To:** sam@ftx.com; jmurray@ftxdigitalmarkets.com
**Cc:** 'ryan@ftxdigitalmarkets.com' <ryan@ftxdigitalmarkets.com>; Mechelle Martinborough <mmartinborough@scb.gov.bs>; Gawaine Ward <gward@scb.gov.bs>; Renaldo Harding <rharding@scb.gov.bs>; Ashley Poitier <apoitier@scb.gov.bs>
**Subject:** RE: FTX Liquidity / Sale Rumours

Good morning Sam,

Further to my note below, please see some initial queries from the Securities Commission of The Bahamas with respect to ongoing issues. Please advise as follows:

1. Number of clients registered on the FDM platform, total value of assets held for all FDM clients and whether those assets are held in a segregated account;
2. Total value of client withdrawals from FDM platform over the past week. Have there been any withdrawal requests that were unsatisfied or that remain outstanding?
3. The extent to which FDM clients' assets may have been invested, loaned, used as collateral or otherwise hypothecated or encumbered on behalf of FDM, Alameda, other related parties and/or third parties;

Please also provide an explanation with respect to the following:
1. Which FTX Group entity is party to the non-binding LOI with Binance? What are the terms of the LOI and what is the potential impact for clients of FDM;
2. Details of the connection between FDM and Alameda. Were there any services provided by Alameda to FDM or vice versa? Were there any related party or counterparty transactions between the entities.

Please also provide a sample of FDM's client agreement (including general terms and conditions).

Your urgent attention and response by end of day is needed. If you wish to discuss, please feel free to reach out to us.

With kind regards,

**From:** Christina Rolle
**Sent:** 08 November 2022 3:11 PM
**To:** sam@ftx.com; jmurray@ftxdigitalmarkets.com
**Cc:** Ashley Poitier <apoitier@scb.gov.bs>; Renaldo Harding <rharding@scb.gov.bs>
**Subject:** RE: FTX Liquidity / Sale Rumours

Thank you for your note, Sam
We are keen to understand the issues as they specifically relate to the regulated entity including potential impact for clients. Please get in touch soonest.
Due to the Tropical Storm alert, we will be working from home until the all clear is given but I will be reachable by email and by phone (422-4058).
Take care and kind regards,

**335**

SECURITIES COMMISSION OF THE BAHAMAS

Poinciana House
North Building, 2nd Floor
31A East Bay Street
PO Box N-8347
Nassau, The Bahamas

**URGENT**

VIA EMAIL: CLAYTON.FERNANDER@OUTLOOK.COM

9th November 2022

Clayton Fernander
Commissioner of Police
**Royal Bahamas Police Force**
East Street,
Nassau, Bahamas

Dear Commissioner Fernander,

**RE: Request for Police Investigation - FTX Digital Markets Ltd**

The Securities Commission of The Bahamas **("the Commission")** hereby writes to request that the Royal Bahamas Police Force **("RBPF")** Financial Crimes Investigation Branch conducts an investigation relative to FTX Digital Markets Ltd **("FTX Digital")**.

FTX Digital is a company duly incorporated under the laws of The Bahamas and is registered as a digital asset business under the *Digital Assets and Registered Exchanges Act, 2020* **("the DARE Act")**. The Commission is the regulator of FTX Digital.

The RBPF may be aware of the reports in both the international and local media, which directly relates to and impacts FTX Digital, including the possible mishandling of clients' assets.

Regrettably, the Commission was informed today by Mr. Ryan Salame **("Mr. Salame")** who is the Chairman of FTX Digital that clients' assets which may have been held with FTX Digital were transferred to Alameda Research **("Alameda")**.  Alameda and FTX Digital are related companies, specifically, Mr. Samuel Bankman-Fried is a founder of both FTX Digital and Alameda.

The Commission understood Mr. Salame as advising that the transfer of clients' assets in this manner was contrary to the normal corporate governance and operations of FTX Digital. Put simply, that such transfers were not allowed and therefore may constitute misappropriation, theft, fraud or some other crime.

Mr. Salame further advised the Commission that there were only three **(3)** persons who had the necessary codes (or passwords) to transfer clients' assets to Alameda in this manner, that is, the founders of FTX Digital who are: (i) Mr. Samuel Bankman-Fried; (ii) Mr. Nishad Singh and (iii) Mr. Zixiao (Gary) Wang.

Given this possible unlawful activity and the ramifications associated with same, we wish for the RBPF to investigate this matter on an urgent basis

Clayton Fernander
Commission of Police
Re: Request for Police Investigation – FTX Digital Markets
9 November 2022


Based on the Commission's knowledge, Mr. Bankman-Fried, Mr. Nishad Singh and Mr. Zixiao (Gary) Wang are presently on the Island of New Providence and all normally reside at Albany. Mr. Salame is not in the jurisdiction and is reportedly in Washington, DC at present.

Please do not hesitate to contact me if you require further information from the Commission at this stage.


Yours sincerely,


Christina Rolle
**Executive Director**

**From:** Sam Bankman-Fried [mailto:sam@ftx.com]
**Sent:** 09 November 2022 9:27 PM
**To:** RYAN PINDER <ryanpinder@bahamas.gov.bs>
**Cc:** Joe Bankman <joebankman@gmail.com>; Can Sun <can@ftx.com>; rsalame@ftx.com; constance@ftx.com; Christina Rolle <crolle@scb.gov.bs>; allyson@clementmaynard.com
**Subject:** Re: FTX / Binance

Hi all,

I'm really sorry about the delayed responses here -- it's been a hectic week but that's on me.  Myself, and Joe (cc'ed), will be responsive going forward.

And I'm also deeply sorry for ending up in this position in the first place.

I'll give the answers I can give right now and try to get to the others ASAP.

1) Right now we are focused on one thing: making customers whole.  We are focusing exclusively on doing that this week.  We are ceasing all nonessential operations beyond that.  I am doing everything I can to try to do right by our customers.

2) I have not briefed the securities commission.  I would be more than happy to have a phone call with you, the PM, and the SCB in the next few days to give a thorough overview of the situation.

3) I am cautiously optimistic that we will be able to survive the turmoil and have enough liquidity for all customer withdrawals, and that is my sole focus this week.  I will keep you guys updated.

4) We are investigating a more thorough answer to this question; we did not intend to, but are concerned that poor risk management lead to a liquidity issue.

5) As you saw, Binance did not end up following through on their transaction.  However, we are in the middle of a separate process to make users whole; we will know within a week if that comes through.  So far, we have strong indications of interest that would be more than enough to cover all liquidity needs; we are working on confirming those.  I am cautiously optimistic that we will be able to.

6) We are deeply grateful for what The Bahamas has done for us, and deeply committed to it.  We are also deeply sorry about this mess.

As part of this: we have segregated funds for all Bahamian customers on FTX.  And **we would be more than happy to open up withdrawals for _all_ Bahamian customers on FTX, so that they can, _tomorrow, fully_ withdraw _all_ of their assets, making them fully whole**.  It's your call whether you want us to do this--but we are more than happy to and would consider it the very least of our duty to the country, and could open it up immediately if you reply saying you want us to.  If we don't hear back from you, we are going to go ahead and do it tomorrow.

—

Sam Bankman-Fried

**338**

Poinciana House
North Building, 2nd Floor
31A East Bay Street
PO Box N-8347
Nassau, The Bahamas

**BY MAIL AND EMAIL:** sam@ftx.com;

10th November 2022

Samuel Bankman-Fried
**CEO**
**FTX Digital Markets**
Veridian Corporate Centre
Building 27
Nassau, Bahamas

Dear Mr. Bankman-Fried,

### Re: Suspension of Registration for FTX Digital Markets Limited.

We refer to our letter to you dated 10 November 2022, and related communications, all concerning recent events surrounding the demise of FTX Digital Markets Ltd. **("FTX Digital")**.

The Securities Commission of the Bahamas ("the Commission") in the circumstances finds it necessary to, in the public interest, **suspend the registration of FTX Digital, effective immediately,** pursuant to section 19[i] of the Digital Assets and Registered Exchanges Act, 2020[ii] ("the Act").

Further note that in the given circumstances, the Commission will seek a court supervised provisional liquidation of **FTX Digital** to preserve the assets and ensure the protection of clients, investors and/or creditors in the process.

We look forward to your cooperation.

Yours sincerely,

Christina Rolle
**Executive Director**

cc:     Ryan Salame, **Chairman, FTX Digital**
        Allyson Maynard-Gibson, K.C. – Clement T. Maynard & Co.
        Brian Simms, K.C. – Lennox Paton

---

[i] **19. Suspension or revocation of registration.**

(1) The Commission may suspend or revoke the registration of a digital asset business where -

(a) the digital asset business is unable to meet the requirements for continued operation or has failed to comply with the provisions of this Act or any regulations, rules or guidelines made and issued hereunder;

(b) suspension or revocation would be in the public interest;

…

(3) Notwithstanding subsection (2), the Commission may -

(a) suspend the registration of the digital asset business without prior notice where the Commission deems that an immediate suspension of the registration of the digital asset business is necessary to protect the public;

(4) Where the Commission has suspended the registration of a digital asset business, the Commission may impose such conditions upon or give such directions to the registrant, including the timeline for compliance, with which conditions or directions the registrant must comply.

[ii] As amended by the **Digital Assets and Registered Exchanges (Amendment) Act, 2022**.

**340**

SECURITIES COMMISSION
OF THE BAHAMAS

Poinciana House
North Building, 2nd Floor
31A East Bay Street
PO Box N-8347
Nassau, The Bahamas

**URGENT**

VIA EMAIL: gowon.bowe@fidelitybahamas.com

10 November 2022

Gowon Bowe
CEO
Fidelity Bank (Bahamas) Limited
51 Frederick Street
Nassau, Bahamas

Dear Mr. Bowe,

**Re: Freeze of Accounts for and/or in the name of FTX Digital Markets Limited and Related Parties.**

We refer to the captioned entity, specifically, FTX Digital Markets Ltd. **("FTX Digital"),** which is a digital asset business registered under the *Digital Assets and Registered Exchanges Act, 2020* [i] **("the DARE Act").** The Securities Commission of The Bahamas ("the Commission") is the regulator for persons registered under the DARE Act.

Be advised that pursuant to section 46A [ii] of the DARE Act, the Commission is authorised to issue an order to freeze for five (5) days, accounts belonging to any person having on deposit, under control or for safekeeping any funds, digital assets or other property, for persons named in the order.

The Commission is reliably informed that Fidelity Bank (Bahamas) Limited ("Fidelity"), whether as custodian or otherwise, holds, has on deposit, controls or has for safekeeping, funds, digital assets or other property, held for and on behalf of FTX Digital.

**Accordingly, the Commission here orders Fidelity to freeze any and all accounts for FTX Digital and related parties, to begin immediately and to last no more than five (5) days.**

Should you have any questions or concerns please contact the undersigned or Mr. Gawaine Ward, Senior Manager, Enforcement Department.

Your cooperation in this matter is appreciated, particularly given the urgency associated with this matter.

Yours sincerely,

Christina Rolle
**Executive Director**

cc:     Samuel Bank-Fried – CEO, FTX Digital Markets
        Ryan Salame – Chairman, FTX Digital Markets

---

[i] As amended by the **Digital Assets and Registered Exchanges (Amendment) Act, 2022**.

[ii] **46A Freeze Orders**

(1) If the Commission considers it in the public interest to do so, the Commission may for the administration of digital asset laws or to assist in the administration of the digital assets legislation of another jurisdiction, by order for a period not to exceed five days, direct –

(a) a person having on deposit, under control or for safekeeping any funds. digital assets or other property of the person

named in the order to hold them; or

(b) a person -

(i) not to withdraw any funds, digital assets or other property from any person having them on deposit, under control or for safekeeping; or

(ii) to hold all funds, digital assets or other property of a client of that person, or of others, in the person's possession or control in trust for a receiver, receiver-manager, trustee or liquidator appointed under an enactment of The Bahamas.

(2) An aggrieved person may apply to a judge in chambers to discharge the order of the Commission under this section and shall serve notice on the Commission to join in the proceedings, but the order of the Commission shall remain in effect until the judge determines otherwise.

(3) Unless expressly stated, an order made under subsection (1) does not apply to funds, digital assets or other property in the process of transfer.

**342**

Poinciana House
North Building, 2nd Floor
31A East Bay Street
PO Box N-8347
Nassau, The Bahamas

<span style="color:red">URGENT</span>

VIA EMAIL: giancarlo@tether.to; michael@tether.to

10 November 2022

Jean-Louis Van der Velde
CEO
Tether International Limited
c/o SHRM Trustees (BVI) Limited
Trinity Chambers,
P. O. Box 4301
Road Town, Tortola
British Virgin Islands

**Attention: Giancarlo Devasini**

Dear Sir/Madam,

**Re: Freeze of Accounts for and/or in the name of FTX Digital Markets Limited and Related Parties.**

We refer to the captioned entity, specifically, FTX Digital Markets Ltd. **("FTX Digital"),** which is a digital asset business registered under the ***Digital Assets and Registered Exchanges Act, 2020***[i] **("the DARE Act").** The Securities Commission of The Bahamas ("the Commission") is the regulator for persons registered under the DARE Act.

Be advised that pursuant to section 46A[ii] of the DARE Act, the Commission is authorised to issue an order to freeze for five (5) days, accounts belonging to any person having on deposit, under control or for safekeeping any funds, digital assets or other property, for persons named in the order.

The Commission is reliably informed that Tether International Limited ("Tether"), whether as custodian or otherwise, holds, has on deposit, controls or has for safekeeping, funds, digital assets or other property, held for and on behalf of FTX Digital.

**Accordingly, the Commission here orders Tether to freeze and/or block, any and all accounts for FTX Digital and any transactions in Tether tokens across the FTX exchange being conducted directly by FTX Digital or any related parties, to begin immediately and to last no more than five (5) days.**

Should you have any questions or concerns please contact the undersigned or Mr. Gawaine Ward, Senior Manager, Enforcement Department.

Your cooperation in this matter is appreciated, particularly given the urgency associated with this matter.

Yours sincerely,

Christina Rolle
**Executive Director**

cc:    Samuel Bank-Fried – CEO, FTX Digital Markets
       Ryan Salame – Chairman, FTX Digital Markets

---

[i] As amended by the **Digital Assets and Registered Exchanges (Amendment) Act, 2022**.

[ii] **46A Freeze Orders**

(1) If the Commission considers it in the public interest to do so, the Commission may for the administration of digital asset laws or to assist in the administration of the digital assets legislation of another jurisdiction, by order for a period not to exceed five days, direct –

   (a) a person having on deposit, under control or for safekeeping any funds. digital assets or other property of the person

   named in the order to hold them; or

   (b) a person -

      (i) not to withdraw any funds, digital assets or other property from any person having them on deposit, under control or for safekeeping; or

      (ii) to hold all funds, digital assets or other property of a client of that person, or of others, in the person's possession or control in trust for a receiver, receiver-manager, trustee or liquidator appointed under an enactment of The Bahamas.

(2) An aggrieved person may apply to a judge in chambers to discharge the order of the Commission under this section and shall serve notice on the Commission to join in the proceedings, but the order of the Commission shall remain in effect until the judge determines otherwise.

(3) Unless expressly stated, an order made under subsection (1) does not apply to funds, digital assets or other property in the process of transfer.

COMMONWEALTH OF THE BAHAMAS

IN THE SUPREME COURT

COMMERCIAL DIVISION

SUPREME COURT

NOV 1 1 2022

NASSAU, BAHAMAS

2022

COM/com/

### IN THE MATTER OF the Digital Assets and Registered Exchanges Act, 2020 (as amended)

### AND IN THE MATTER OF the Companies (Winding Up Amendment) Act, 2011

### AND IN THE MATTER OF FTX DIGITAL MARKETS LTD.
(A Registered Digital Asset Business)

---

### ORDER FOR APPOINTMENT OF PROVISIONAL LIQUIDATOR

---

**Before His Lordship, the Honourable Mr. Chief Justice Ian Winder**

**Dated** the 10 day of **November, A.D., 2022**

**UPON THE APPLICATION** by an unfiled Summons for Directions dated 10th November 2022 on behalf of the Petitioner/Application, the Securities Commission of The Bahamas **("the Applicant")** for an Order that Mr. Brian Cecil Simms KC be appointed provisional liquidator of FTX Digital Markets Ltd. **("the Company")**.

**AND UPON HEARING** Mr. Gladstone Brown of Counsel for the Applicant, and Mrs. Sophia T. Rolle-Kapousouzoglou with Mr. Valdere J. Murphy of Counsel for the proposed liquidator.

**AND UPON** reading the unfiled Petition of the Applicant.

**AND UPON READING** the unfiled Affidavit of Christina Rolle, Executive Director of the Securities Commission of The Bahamas and the unfiled Affidavit of Brian Cecil Simms KC.

**AND UPON** the Applicant undertaking by its counsel to pay any damage suffered by the Company, as a result of this order and/or the appointment of a provisional liquidator in the event that the winding up petition is ultimately withdrawn or dismissed.

**AND UPON COUNSEL** for the Applicant giving an undertaking to file the aforementioned unfiled Petition, Summons for Directions, Affidavit of Christina Rolle and Affidavit of Brian Simms KC as soon as reasonably practicable.

**IT IS HEREBY ORDERED** that: -

1. Mr Brian Cecil Simms KC of 3 Bayside Executive Park, West Bay Street and Blake Road, Nassau, N.P., The Bahamas be appointed provisional liquidator of the Company **("the Provisional Liquidator").**

2. The Provisional Liquidator is hereby authorised to take any action that he considers fit under the Companies (Winding Up Amendment) Act 2011 **("the Act")**, section 199(4) to maintain the value of the assets owned or managed by the Company or to carry out the functions for which he was appointed including,

    a. with the sanction of the court, those powers contained in Part I of the Fourth Schedule of the Act; and

    b. with or without that sanction the exercise of the general powers specified in Part II of the Fourth Schedule of the Act.

3. For the avoidance of doubt, the above-mentioned powers include a power to dispense with the services of the directors and other management of the Company, but the exercise of that power is without prejudice to the duties of the directors and officers under section 230 of the Act.

4. Until further order the Company's directors have no further authority to act or exercise any functions for or on behalf of the Company unless expressly instructed to do so in writing by the Provisional Liquidator.

5. Until further order of this Court the Provisional Liquidator is directed to take all and any necessary steps that he considers fit to protect the assets of the Company wheresoever situate including any assets held on trust by the Company.

6. The remuneration and expenses of the Provisional Liquidator shall be paid out of the assets of the Company in any event.

7. The Winding-Up Petition shall be adjourned to the 10th February 2023 at 10:00am.

8. The Affidavits of Christina Rolle and Brian Cecil Simms KC and other documents to be filed herein save for the petition, and provisional liquidation order shall be sealed and kept confidential until the return date which is set for 10th February 2023 or until further Order.

## BY ORDER OF THE COURT

## REGISTRAR

*This Order was drawn up by the Securities Commission of The Bahamas, 2nd Floor Poinciana House, North Building, 31A East Bay Street, Nassau, N.P., The Bahamas, Attorneys for the Petitioner/Applicant*

## PENAL NOTICE

**IF YOU FTX DIGITAL MARKETS LTD., WHETHER BY ITSELF, ITS DIRECTORS, EMPLOYEES, SERVANTS, AGENTS OR OTHERWISE DISOBEY THIS ORDER YOU MAY BE HELD TO BE IN CONTEMPT OF COURT AND MAY BE IMPRISONED, FINED OR HAVE YOUR ASSETS SEIZED.**

**ANY OTHER PERSON WHO KNOWS OF THIS ORDER AND DOES ANYTHING WHICH HELPS OR PERMITS THE BREACH OF THE TERMS OF THIS ORDER MAY ALSO BE HELD TO BE IN CONTEMPT OF COURT AND MAY BE IMPRISONED, FINED OR HAVE THEIR ASSETS SEIZED.**

COMMONWEALTH OF THE BAHAMAS

IN THE SUPREME COURT

Commercial Division

IN THE MATTER OF the Digital Assets and
Registered Exchanges Act, 2020 (as
amended)

AND IN THE MATTER OF
FTX DIGITAL MARKETS LTD.
(A Registered Digital Asset Business)

AND IN THE MATTER OF the
Companies (Winding Up Amendment) Act, 2011

---

ORDER FOR APPOINTMENT OF
PROVISIONAL LIQUIDATOR

---

2022
COM/com

*Securities Commission of The Bahamas*

**Securities Commission of The Bahamas**
2nd Floor Poinciana House,
North Building
31A East Bay Street
Nassau, N.P., The Bahamas
*Attorneys for the Petitioner/Applicant*

Securities Commission of The Bahamas

Poinciana House
North Building, 2nd Floor
31A East Bay Street
P.O. Box N-8347
Nassau, The Bahamas

# MEDIA RELEASE

Contact: Executive Director                                        FOR IMMEDIATE RELEASE
Christina Rolle
242-397-4100

<u>Securities Commission of The Bahamas Freezes Assets of FTX</u>

*Nassau, The Bahamas, Thursday 10 November 2022* – Today, the Securities Commission of The Bahamas (the Commission) took action to freeze assets of FTX Digital Markets and related parties. The Commission also suspended the registration and applied to the Supreme Court of The Bahamas for the appointment of a provisional liquidator of FTX Digital Markets Ltd. (FDM).

Mr. Brian Simms, K.C. (Lennox Paton Counsel and Attorney-at Law) was appointed as provisional liquidator. Additionally, the powers of the directors of FDM have been suspended and no assets of FDM, client assets or trust assets held by FDM, can be transferred, assigned or otherwise dealt with, without the written approval of the provisional liquidator.

The Commission is aware of public statements suggesting that clients' assets were mishandled, mismanaged and/or transferred to Alameda Research. Based on the Commission's information, any such actions would have been contrary to normal governance, without client consent and potentially unlawful.

Since the unfolding of events involving FDM, the Commission has proactively dealt with the situation and continues to do so. The Commission determined that the prudent course of action was to put FDM into provisional liquidation to preserve assets and stabilize the company.

The Commission is committed to working with the provisional liquidator to endeavour to obtain the best possible outcome for the customers and other stakeholders of FTX.

###

Editor's Information:

1. The Securities Commission of The Bahamas (the Commission) is a statutory body established in 1995 pursuant to the Securities Board Act, 1995. That Act has since been repealed and replaced by new legislation.

2. The Commission's mandate is defined in the Securities Industry Act, 2011 (SIA, 2011).

3. The Commission is responsible for the administration of the SIA, 2011 and the Investment Funds Act, 2019 (IFA), which provides for the supervision and regulation of the activities of the investment funds, securities and capital markets.

4. The Commission is responsible for the administration of the Financial and Corporate Service Providers Act, 2020.

**5. The Commission is responsible for the administration of the Digital Assets and Registered Exchanges Act, 2020.**

**6. The Commission is responsible for the administration of the Carbon Credit Trading Act, 2022.**

**7. The functions of the Commission are to:**

- **advise the Minister on all matters relating to the capital markets and its participants;**
- **maintain surveillance over the capital markets and ensure orderly, fair and equitable dealings in securities;**
- **foster timely, accurate, fair and efficient disclosure of information to the investing public and the capital markets;**
- **protect the integrity of the capital markets against any abuses arising from financial crime, market misconduct and other unfair and improper practices;**
- **promote an understanding by the public of the capital markets and its participants and the benefits, risks, and liabilities associated with investing;**
- **create and promote conditions that facilitate the orderly development of the capital markets; and**
- **perform any other function conferred or imposed on it by securities laws or Parliament (SIA, 2011, s.12).**

**Securities Commission of The Bahamas**

**Poinciana House**
**North Building, 2nd Floor**
**31A East Bay Street**
**P.O. Box N-8347**
**Nassau, The Bahamas**

# MEDIA RELEASE

**Contact: Executive Director**
**Christina Rolle**
**242-397-4100**

**FOR IMMEDIATE RELEASE**

### Securities Commission Addresses FTX Statement on Bahamian Withdrawals

*Nassau, The Bahamas, Saturday 12 November 2022* – The Securities Commission of The Bahamas (the Commission) notes the statement made by representatives of FTX which advised "Per Bahamian HQ's regulation and regulators, we have begun to facilitate the withdrawals of Bahamian funds. As such, you may have seen some withdrawals processed by FTX recently as we complied with the regulators".

The Commission wishes to advise that it has not directed, authorized or suggested to FTX Digital Markets Ltd. the prioritization of withdrawals for Bahamian clients. The Commission further notes that such transactions may be characterized as voidable preferences under the insolvency regime and consequently result in clawing back funds from Bahamian customers. In any event, the Commission does not condone the preferential treatment of any investor or client of FTX Digital Markets Ltd. or otherwise.

###

**Editor's Information:**

**1. The Securities Commission of The Bahamas (the Commission) is a statutory body established in 1995 pursuant to the Securities Board Act, 1995. That Act has since been repealed and replaced by new legislation.**

**2. The Commission's mandate is defined in the Securities Industry Act, 2011 (SIA, 2011).**

**3. The Commission is responsible for the administration of the SIA, 2011 and the Investment Funds Act, 2019 (IFA), which provides for the supervision and regulation of the activities of the investment funds, securities and capital markets.**

**4. The Commission is responsible for the administration of the Financial and Corporate Service Providers Act, 2020.**

**5. The Commission is responsible for the administration of the Digital Assets and Registered Exchanges Act, 2020.**

**6. The Commission is responsible for the administration of the Carbon Credit Trading Act, 2022.**

7. The functions of the Commission are to:

- advise the Minister on all matters relating to the capital markets and its participants;
- maintain surveillance over the capital markets and ensure orderly, fair and equitable dealings in securities;
- foster timely, accurate, fair and efficient disclosure of information to the investing public and the capital markets;
- protect the integrity of the capital markets against any abuses arising from financial crime, market misconduct and other unfair and improper practices;
- promote an understanding by the public of the capital markets and its participants and the benefits, risks, and liabilities associated with investing;
- create and promote conditions that facilitate the orderly development of the capital markets; and
- perform any other function conferred or imposed on it by securities laws or Parliament (SIA, 2011, s.12).

**352**

Poinciana House
North Building, 2nd Floor
31A East Bay Street
PO Box N-8347
Nassau, The Bahamas

**URGENT**

VIA EMAIL: sam@ftx.com;

12 November 2022

Samuel Bankman-Fried
CEO
FTX Digital Markets
Veridian Corporate Centre
Building 27
Western Road
Nassau, Bahamas

Re:    Notice of Order – FTX Digital Markets Ltd **("FTXDM")**

1.  Reference is made to our earlier email message sent on 9 November 2022 to Mr. Sam Bankman-Fried and Ms. Jessica Murray of FTXDM at 10:17 a.m. in which The Securities Commission of The Bahamas ("the Commission") made a request for certain information respecting the assets and business operations of FTXDM to be provided to the Commission by on urgent basis, but no later than the end of the day on 9 November, 2022. Copies of the email message is enclosed for ease of reference. Specifically, the Commission made a request for the following information; namely –

    (i)    the number of clients registered on the FTXDM platform;

    (ii)   the total number of assets held for all FTXDM clients and whether those assets are held in a segregated account;

    (iii)  the total value of client withdrawal requests that were unsatisfied between 2 November 2022 and 9 November 2022 and how many, if any, of those withdrawal requests remain outstanding;

    (iv)   the extent to which FTXDM client assets may have been invested, loaned, used as collateral or otherwise hypothecated or encumbered by or on behalf of FTXDM, Alameda Capital, other related parties and/or third parties;

    (v)    which FTX Group entity is a party to the non-binding Letter of Intent with Binance, its terms and the potential impact on clients of FTXDM;

    (vi)   details of the connection, if any, between FTXDM and Alameda Capital and, in particular, whether any services where provided by Alameda Capital to FTXDM or vice versa and/or whether there were any related party or counterparty transactions between Alameda Capital to FTXDM

    (vii)  a sample of the client agreements, including General Terms and Conditions for the Commissions review.

2.  FTXDM failed to provide the information requested by the Commission.

Samuel Bankman-Fried
CEO – FTX Digital Markets
Re: Notice of Order
12 November 2022

3. By virtue of section 25 (1) of the Digital Assets and Registered Exchanges Act, 2020 ("DARE Act or the Act"), every digital asset business and issuer must comply with the requirements of the Act and (a) deal openly, honestly and co-operatively with the Commission; (b) duly provide information relevant to the operations of the digital asset business as the Commission may require; and (c) submit to on-site or off-site examinations of the digital asset business as required by the Commission in the exercise of its functions.

4. Under section 46 (1) of the Act, where a digital asset business has failed to comply with their obligations under the Act, the Commission may impose an administrative sanction for such failure, including but not limited, imposing conditions on a registrant, applying to the court for an order to take such action as the Commission considers necessary to protect the interest of clients or creditors and imposing any other remedies as the circumstances of the case may require.

5. In light of recent information within the public domain regarding the illiquidity of FTXDM, the Commission considers the failure of FTXDM to provide the information requested above, constitutes a serious failure by FTXDM to deal co-operatively with the Commission and a failure to provide information relevant to the business operations of FTXDM as required by the Commission in breach of their duty under section 25 (1) of the DARE Act.

6. In the circumstances, the Commission also considers it necessary to issue an order that FTXDM transfer to an account and/or digital wallet(s) established and maintained by the Commission all of the digital assets on the FTX.com platform within the possession, custody and/or under the control of FTXDM, its officers, directors, employees and/or agents, including any digital assets held upon trust, in order to protect the interests of clients and creditors of FTXDM.

7. Accordingly, the Commission HEREBY ISSUES THE FOLLOWING DIRECTIVE AND ORDER:

> FTX Digital Markets Ltd. is to transfer to an account and/or digital wallet(s) established and maintained by the Commission all of the digital assets on the FTX.com platform within the possession, custody and/or under the control of FTXDM, its officers, directors, employees and/or agents, including any digital assets held upon trust, in order to protect the interests of clients and creditors of FTXDM.

Yours sincerely,

Christina Rolle
**Executive Director**

2

**SUPREME COURT**

**COMMONWEALTH OF THE BAHAMAS**

**IN THE SUPREME COURT**

**COMMERCIAL DIVISION**

NOV 1 4 2022

**NASSAU, BAHAMAS**

2022/COM/com

**IN THE MATTER OF the Digital Assets and Registered Exchanges Act, 2020**

**(as amended)**

**AND IN THE MATTER OF FTX DIGITAL MARKETS LTD.**

**(A Registered Digital Asset Business)**

**SECURITIES COMMISSION OF THE BAHAMAS**

**Plaintiff**

**AND**

**FTX DIGITAL MARKETS LTD.**

**Defendant**

---

# ORDER

---

**Before The Honourable Justice Loren Klein**

**Dated the 12th day of November, A.D., 2022**

**UPON AN URGENT APPLICATION**, made orally and ex parte, on behalf of The Securities Commission of The Bahamas ("the Application").

**AND UPON HEARING** Mr. Robert K. Adams, KC and Edward J. Marshall II of Counsel for The Securities Commission of The Bahamas

**AND THE COURT,** being satisfied by Counsel appearing for The Securities Commission that the Provisional Liquidator of the FTX Digital Markets Ltd had been notified of the Application

**AND UPON THE UNDERTAKING** of Counsel for the Applicant to file herein an Originating Summons and Affidavit in support thereof on Monday, 14 November 2022

**IT IS HEREBY ORDERED THAT** The Securities Commission of The Bahamas, as regulator, do take the action of directing FTX Digital Markets Ltd, whether by its Provisional Liquidator or otherwise, to transfer forthwith to an account and/or digital wallet(s) established and maintained by The Securities Commission of The Bahamas all of the digital assets on the FTX.com platform within the possession, custody and/or under the control of FTX Digital Markets Ltd, its officers, directors, employees and/or agents, including any digital assets held upon trust by FTX Digital Markets Ltd, on the grounds that such action is necessary to protect the interests of clients and creditors of FTX Digital Markets Ltd and otherwise in the public interest to do so

**AND IT IS ORDERED** that the costs of and occasioned by this application are to be costs in the cause.

**THIS ORDER** shall remain in force until varied or discharged upon application being made on two clear days' notice **AND** the parties shall be at liberty to apply.

**BY ORDER OF THE COURT**

**REGISTRAR**

COMMONWEALTH OF THE BAHAMAS
IN THE SUPREME COURT
COMMERCIAL DIVISION

IN THE MATTER OF the Digital Assets and
Registered Exchanges Act, 2020
(as amended)

AND IN THE MATTER OF FTX DIGITAL
MARKETS LTD.
(A Registered Digital Asset Business)

SECURITIES COMMISSION OF THE
BAHAMAS

                                    **Plaintiff**

AND

FTX DIGITAL MARKETS LTD.

                                    **Defendant**

_____

# ORDER

_____

**2022/COM/com**

_Delaney Partners_
**DELANEY PARTNERS**
Lyford Manor (West Bldg)
Western Road, Lyford Cay
New Providence, The Bahamas

Attorneys for the Plaintiff

RKA/EJM/sjs

 

# REGISTER OF DIGITAL ASSET BUSINESSES

Registration information provided as at: 12 November 2022

Digital Asset Business:

## FTX DIGITAL MARKETS LTD.

| | |
|---|---|
| **Address** | Building 27<br>Veridian Corporate Centre<br>West Bay Street<br>P.O. Box N 7525<br>Nassau, Bahamas |
| **Phone** | (242) 603-1336 |
| **Website** | www.ftx.com |
| **Principals** | Samuel Bankman-Fried |
| **Chairman** | Ryan Salame |
| **Secretary** | Daniel Friedberg |
| **Directors/Members** | Ryan Salame, Samuel Bankman-Fried |
| **Chief Executive Officer** | Samuel Bankman-Fried |
| **Compliance Officer** | Vacant |
| **Money Laundering Reporting Officer** | Vacant |
| **SCB Registration Details**<br>Pursuant to Section 6 of the Digital Assets and Registered Exchanges Act, 2021 | − Provision of an exchange between digital assets and fiat currency; and,<br>− Provision of an exchange between one or more forms of digital assets. |
| **Registration Type** | Digital Asset Business |
| **Registration Conditions** | License Suspended |
| **Sanctions** | None |
| **Other Registrations/<br>Licenses held outside of The Bahamas** | (i)  License: Australian Financial Services License<br>Entity Name: IFS Markets Party Limited<br>Jurisdiction : Australia<br>(ii)  License: Digital Ledger Technology Provider<br>Entity Name: Zubr Exchange Limited<br>Jurisdiction: Gibraltar |

**THIS PAGE HAS INTENTIONALLY BEEN LEFT BLANK**

**THIS PAGE HAS INTENTIONALLY BEEN LEFT BLANK**

**THIS PAGE HAS INTENTIONALLY BEEN LEFT BLANK**

**THIS PAGE HAS INTENTIONALLY BEEN LEFT BLANK**

**Sherika Sands**

---

**Subject:**                    FW: AWS lockout


-------- Original message --------
From: Sam Bankman-Fried <sam@ftx.com>
Date: 11/13/22 4:56 PM (GMT-05:00)
To: Christina Rolle <crolle@scb.gov.bs>, bsimms@lennoxpaton.com
Cc: gary@ftx.com, '"zx.gary@gmail.com"' <zx.gary@gmail.com>, Sam Bankman-Fried
<11235813sam@gmail.com>
Subject: AWS lockout

Hey all,

I understand you guys moved almost all of the assets last night!

As of now, it looks like Gary has been locked out of AWS by the Delaware Chapter 11 team--we're looking into
details but it looks like he isn't able to transfer any of the remaining assets out because of that unless/until that
was reversed.

Sam


—

Sam Bankman-Fried

## Sherika Sands

**Subject:**                            FW: AWS lockout

On Sun, Nov 13, 2022 at 5:09 PM Christina Rolle <crolle@scb.gov.bs> wrote:

Thanks for letting us know, Sam,
Please provide details of the assets (type and number of tokens) that were remaining.
With kind regards,

Sent from my Galaxy

 **Christina Rolle** . Executive Director
e-mail: crolle@scb.gov.bs
telephone: (242) 397-4100         fax: (242) 356-7530        Web: www.scb.gov.bs



Poinciana House | North Building, 2nd Floor | 31A East Bay St | P. O. Box N-8347 | Nassau, The Bahamas

Please consider the environment before printing this email message.

The information in this e-mail (including attachments) is confidential and may be legally privileged. It is intended solely for the addressee. Access to this e-mail by anyone else is unauthorized. If you are not the intended recipient, any review, disclosure, reproduction, distribution or any action taken or omitted to be taken in reliance on the e-mail message, is prohibited. If you have received this e-mail in error, please notify the sender by return e-mail and delete all parts of this e-mail from your computer(s) and eventual service provider computer(s).

The Securities Commission of The Bahamas (the Commission) is neither liable for the proper and complete transmission of the information contained in this communication nor for any delay in its receipt. While the Commission has taken every reasonable precaution to ensure that any attachment to this e-mail has been scanned for viruses, the Commission does not accept any liability for the presence of any viruses and/or any loss or damage suffered as a result. Any opinions expressed are those of the author and are not necessarily endorsed by the Commission.

-------- Original message --------
From: Sam Bankman-Fried <sam@ftx.com>
Date: 11/13/22 4:56 PM (GMT-05:00)
To: Christina Rolle <crolle@scb.gov.bs>, bsimms@lennoxpaton.com
Cc: gary@ftx.com, "'zx.gary@gmail.com'" <zx.gary@gmail.com>, Sam Bankman-Fried <11235813sam@gmail.com>
Subject: AWS lockout

Hey all,

I understand you guys moved almost all of the assets last night!

As of now, it looks like Gary has been locked out of AWS by the Delaware Chapter 11 team--we're looking into details but it looks like he isn't able to transfer any of the remaining assets out because of that unless/until that was reversed.

Sam

—

Sam Bankman-Fried

COMMONWEALTH OF THE BAHAMAS

IN THE SUPREME COURT

COMMERCIAL DIVISION

SUPREME COURT

NOV 1 5 2022

NASSAU, BAHAMAS

2022

COM/com/

IN THE MATTER OF the Digital Assets and Registered Exchanges Act, 2020 (as amended)

AND IN THE MATTER OF the Companies (Winding Up Amendment) Act, 2011

AND IN THE MATTER OF FTX DIGITAL MARKETS LTD.
(A Registered Digital Asset Business)

---

## ORDER FOR APPOINTMENT OF ADDITIONAL PROVISIONAL LIQUIDATORS

---

Before His Lordship, the Honourable Mr. Chief Justice Ian Winder

Dated the 14th day of November, A.D., 2022

UPON THE APPLICATION by an Ex-Parte Summons filed herein on 14th November 2022 on behalf of Mr. Brian Cecil Simms KC, the Provisional Liquidation ("the **Provisional Liquidator**") of FTX Digital Markets Ltd. ("the Company").

AND UPON HEARING Mrs. Sophia T. Rolle-Kapousouzoglou with Mr. Valdere J. Murphy of Counsel for the Provisional Liquidator and Mr. Gawaine Ward with Mr. Gladstone Brown of Counsel for the Securities Commission of The Bahamas.

AND UPON reading the Affidavits of Brian Simms KC, Kevin Cambridge and Peter Greaves collectively filed herein on 14th November 2022.

IT IS HEREBY ORDERED that: -

1. **Messrs. Kevin G Cambridge** and Peter Greaves respectively of PricewaterhouseCoopers Advisory (Bahamas) Limited and **PricewaterhouseCoopers**

**Limited (incorporated in Hong Kong)** be appointed Joint Provisional Liquidators alongside Mr. Brian Cecil Simms KC **("the JPLs")**.

2. The appointment of Messrs. Kevin G. Cambridge and Peter Greaves will take effect on the same terms as paragraphs 2 to 5 of the Order for Appointment of Provisional Liquidator made by this Honourable Court 10 November 2022 (filed herein on 11th November 2022) pursuant to which Mr. Brian Cecil Simms KC was appointed a provisional liquidator by the Honourable Mr. Chief Justice Ian Winder, specifically:

   2.1. The JPLs are hereby authorised to take any action that they consider fit under the Companies (Winding Up Amendment) Act 2011 **("the Act")**, section 199(4) to maintain the value of the assets owned or managed by the Company or to carry out the functions for which they were appointed including,

      a. with the sanction of the court, those powers contained in Part I of the Fourth Schedule of the Act; and

      b. with or without sanction of the Court the exercise of the general powers specified in Part II of the Fourth Schedule of the Act.

   2.2. For the avoidance of doubt, the above-mentioned powers include a power to dispense with the services of the directors and other management of the Company, but the exercise of that power is without prejudice to the duties of the directors and officers under section 230 of the Act.

   2.3. Until further order the Company's directors have no further authority to act or exercise any functions for or on behalf of the Company unless expressly instructed to do so in writing by the JPLs.

   2.4. Until further order of this Court the JPLs are directed to take all and any necessary steps that they consider fit to protect the assets of the Company wheresoever situate including any assets held on trust by the Company.

3. The JPLs are authorized to act jointly and severally.

4. That the Affidavit of Brian Simms KC filed herein on 14ᵗʰ November 2022 relied on in support of this application be sealed.

5. The remuneration and expenses of the JPLs shall be paid out of the assets of the Company in any event.

6. The costs of and occasioned by this application be paid out of the assets of the Company.

## BY ORDER OF THE COURT

## REGISTRAR

*This Order was drawn up by Lennox Paton, Chambers, 3 Bayside Executive Park, West Bay Street and Blake Road, Nassau, The Bahamas, Attorneys for the Provisional Liquidator*

**COMMONWEALTH OF THE BAHAMAS**

**IN THE SUPREME COURT**

**Commercial Division**

**IN THE MATTER OF the Digital Assets and
Registered Exchanges Act, 2020 (as amended)**

**AND IN THE MATTER OF
FTX DIGITAL MARKETS LTD.**
(A Registered Digital Asset Business)

**AND IN THE MATTER OF the
Companies (Winding Up Amendment) Act, 2011**

---

**ORDER FOR APPOINTMENT OF
ADDITIONAL PROVISIONAL LIQUIDATORS**

---

2022
COM/com

**LENNOX PATON**
Chambers
No. 3 Bayside Executive Park
Blake Road and West Bay Street
Nassau, New Providence
The Bahamas
*Attorneys for the Provisional Liquidator*

Securities Commission of The Bahamas

**Poinciana House**
**North Building, 2nd Floor**
**31A East Bay Street**
**P.O. Box N-8347**
**Nassau, The Bahamas**

# MEDIA RELEASE

Contact: Executive Director                                    FOR IMMEDIATE RELEASE
Christina Rolle
242-397-4100

<u>**Securities Commission Update on FTX**</u>

*Nassau, The Bahamas, Monday 14 November 2022* – On 10 November 2022, the Securities Commission of The Bahamas ("the Commission") applied to the Supreme Court to appoint Mr. Brian Simms, KC as a court supervised provisional liquidator. Further, on 14 November 2022, Messrs. Kevin Cambridge and Peter Greaves of PricewaterhouseCoopers ("PwC") were approved by the Court as joint provisional liquidators.

Given the magnitude, urgency, and international implications of the unfolding events with regard to FTX, the Commission recognized that it had to, and moved swiftly to use its regulatory powers under the Digital Assets and Registered Exchanges Act, 2020 ("DARE Act") to further protect the interests of clients, creditors, and other stakeholders globally of FTX Digital Markets Ltd. (FDM).

Over the coming days and weeks, the Commission expects to engage with other supervisory authorities on a regulator-to-regulator basis as this event is multijurisdictional in nature.

The Commission is the lead authority in The Bahamas conducting the investigations into the events and parties, including, but not limited to, FTX Digital Markets Ltd. (a regulated entity), FTX Trading Ltd., Alameda Research Ltd. and other related entities whose centre of main interest, direction and management were purportedly located in The Bahamas. The investigations into these events are on-going, and the Commission will extend its full assistance to the police if and when required.


###

Editor's Information:

1. The Securities Commission of The Bahamas (the Commission) is a statutory body established in 1995 pursuant to the Securities Board Act, 1995. That Act has since been repealed and replaced by new legislation.

2. The Commission's mandate is defined in the Securities Industry Act, 2011 (SIA, 2011).

3. The Commission is responsible for the administration of the SIA, 2011 and the Investment Funds Act, 2019 (IFA), which provides for the supervision and regulation of the activities of the investment funds, securities and capital markets.

4. The Commission is responsible for the administration of the Financial and Corporate Service Providers Act, 2020.

**5. The Commission is responsible for the administration of the Digital Assets and Registered Exchanges Act, 2020.**

**6. The Commission is responsible for the administration of the Carbon Credit Trading Act, 2022.**

**7. The functions of the Commission are to:**

- **advise the Minister on all matters relating to the capital markets and its participants;**
- **maintain surveillance over the capital markets and ensure orderly, fair and equitable dealings in securities;**
- **foster timely, accurate, fair and efficient disclosure of information to the investing public and the capital markets;**
- **protect the integrity of the capital markets against any abuses arising from financial crime, market misconduct and other unfair and improper practices;**
- **promote an understanding by the public of the capital markets and its participants and the benefits, risks, and liabilities associated with investing;**
- **create and promote conditions that facilitate the orderly development of the capital markets; and**
- **perform any other function conferred or imposed on it by securities laws or Parliament (SIA, 2011, s.12).**

**Sherika Sands**

**Subject:**                          FW: AWS lockout

**From:** Christina Rolle
**Sent:** 15 November 2022 12:21 PM
**To:** zx.gary@gmail.com; Sam Bankman-Fried <11235813sam@gmail.com>
**Cc:** bsimms@lennoxpaton.com; Kevin Cambridge (BS) <kevin.cambridge@pwc.com>
**Subject:** RE: AWS lockout

Good afternoon Sam/Gary,

Are you able to provide details on any tokens which may have been moved (including value of same) since you received notice of the suspension of the registration on Thursday 10 November and the seizure of assets by the Commission on 12 November? Please include any assets which may have been moved by U.S. liquidators or others.

Thanks and kind regards,

**COMMONWEALTH OF THE BAHAMAS**

**IN THE SUPREME COURT**

**COMMERCIAL DIVISION**

SUPREME COURT

NOV 1 6 2022

**NASSAU, BAHAMAS**

2022/COM/com

IN THE MATTER OF the Digital Assets and Registered Exchanges Act, 2020

(as amended)

AND IN THE MATTER OF FTX DIGITAL MARKETS LTD.

(A Registered Digital Asset Business)

**BETWEEN**

SECURITIES COMMISSION OF THE BAHAMAS

**Plaintiff**

**AND**

FTX DIGITAL MARKETS LTD.

**Defendant**

---

# ORDER

---

**Before The Honourable Justice Loren Klein**

**Dated the 16th day of November, A.D., 2022**

**UPON THE URGENT APPLICATION** of the Plaintiff by Summons filed herein on 16 November 2022

**AND UPON HEARING** Mr. Robert K. Adams, KC and Edward J. Marshall II of Counsel for the Plaintiff

**AND THE COURT,** being satisfied by Counsel appearing for the Plaintiff that the Provisional Liquidator of the FTX Digital Markets Ltd had been notified of the Application

**IT IS ORDERED THAT** the Affidavit of Christina Rolle and other documents to be filed save for the Originating Notice of Motion and the Orders made herein on 12th November 2022 and filed on 14th and 15th November 2022, respectively, shall be sealed and kept confidential until further Order **AND IT IS ORDERED** that the costs of and occasioned by this application are to be costs in the cause.

**THIS ORDER** shall remain in force until varied or discharged upon application being made on two clear days' notice **AND** the parties shall be at liberty to apply.

**BY ORDER OF THE COURT**

**REGISTRAR**

COMMONWEALTH OF THE BAHAMAS
IN THE SUPREME COURT
COMMERCIAL DIVISION

IN THE MATTER OF the Digital Assets and
Registered Exchanges Act, 2020
(as amended)

AND IN THE MATTER OF FTX DIGITAL
MARKETS LTD.
(A Registered Digital Asset Business)

BETWEEN

SECURITIES COMMISSION OF THE
BAHAMAS

**Plaintiff**

AND

FTX DIGITAL MARKETS LTD.

**Defendant**

---

## ORDER

---

2022/COM/com

*Delaney Partners*
**DELANEY PARTNERS**
Lyford Manor (West Bldg)
Western Road, Lyford Cay
New Providence, The Bahamas

Attorneys for the Plaintiff

RKA/EJM/sjs 0833-2949

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Joint Administration Pending) |

## DECLARATION OF JOHN J. RAY III IN SUPPORT OF
## CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

I, John J. Ray III, hereby declare under penalty of perjury as follows:

1.      I am the Chief Executive Officer of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), having accepted this position in the early morning hours of November 11, 2022.  I am administering the interests and affairs of the Debtors from my offices in the United States.

2.      My first official act in these roles was to authorize the chapter 11 filings of the Debtors and the commencement of the above-captioned chapter 11 cases (the "Chapter 11 Cases").

3.      Since my appointment, I have worked around the clock with teams of professionals at Alvarez & Marsal, Sullivan & Cromwell, Nardello & Co., Chainalysis, Kroll and a confidential cybersecurity firm, to secure the assets of the Debtors wherever located, to identify reliable books and records, to assemble the information necessary to provide to this Court, and to respond to numerous inquiries from multiple regulators and government authorities including the

---

[1]     The last four digits of FTX Trading Ltd.'s tax identification number are 3288.  Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.ra.kroll.com/FTX.

U.S. Commodity Futures Trading Commission ("CFTC"), the U.S. Attorney's Office for the

Southern District of New York, the U.S. Securities and Exchange Commission ("SEC"), and the

U.S. Congress, among others.

4.      I have over 40 years of legal and restructuring experience.  I have been the

Chief Restructuring Officer or Chief Executive Officer in several of the largest corporate failures

in history.  I have supervised situations involving allegations of criminal activity and

malfeasance (Enron).  I have supervised situations involving novel financial structures (Enron

and Residential Capital) and cross-border asset recovery and maximization (Nortel and Overseas

Shipholding).  Nearly every situation in which I have been involved has been characterized by

defects of some sort in internal controls, regulatory compliance, human resources and systems

integrity.

5.      Never in my career have I seen such a complete failure of corporate

controls and such a complete absence of trustworthy financial information as occurred here.

From compromised systems integrity and faulty regulatory oversight abroad, to the concentration

of control in the hands of a very small group of inexperienced, unsophisticated and potentially

compromised individuals, this situation is unprecedented.

6.      These Chapter 11 Cases have five core objectives:

(a)      **Implementation of Controls**:  the implementation of accounting, audit,
         cash management, cybersecurity, human resources, risk management, data
         protection and other systems that did not exist, or did not exist to an
         appropriate degree, prior to my appointment;

(b)      **Asset Protection & Recovery**:  the location and security of property of
         the estate, a substantial portion of which may be missing or stolen;

(c)      **Transparency and Investigation**:  the pending, comprehensive,
         transparent and deliberate investigation into claims against Mr. Samuel
         Bankman-Fried, the other co-founders of the Debtors and third parties, in

-2-

coordination with regulatory stakeholders in the United States and around the world;

(d) **Efficiency and Coordination**:  cooperation and coordination with insolvency proceedings of subsidiary companies in other jurisdictions; and

(e) **Maximization of Value**:  the maximization of value for all stakeholders through the eventual reorganization or sale of the Debtors' complex array of businesses, investments and digital and physical property.

These proceedings in the District of Delaware are the appropriate means to accomplish each of these objectives.

7.      Except as otherwise indicated herein, all facts set forth in this declaration (the "Declaration") are based on my personal knowledge, my review of relevant materials in the Debtors' files or my opinion based on my experience, knowledge and information concerning the Debtors' operations and financial affairs.  I am over the age of 18 and authorized to submit this Declaration on behalf of each of the Debtors.

8.      For the reasons explained below, the Debtors expect to provide supplemental declarations as to the subject matter of this Declaration in connection with future motions as more information becomes available to the Debtors, stakeholders and the Court.

## I.        THE PREPETITION DEBTORS

### A.       Corporate Organization and Identification of Four Silos

9.      For purposes of managing the Debtors' affairs, I have identified four groups of businesses, which I refer to as "Silos."  These Silos include:  (a) a group composed of Debtor West Realm Shires Inc. and its Debtor and non-Debtor subsidiaries (the "WRS Silo"), which includes the businesses known as "FTX US," "LedgerX," "FTX US Derivatives," "FTX US Capital Markets," and "Embed Clearing," among other businesses; (b) a group composed of Debtor Alameda Research LLC and its Debtor subsidiaries (the "Alameda Silo"); (c) a group composed of Debtor Clifton Bay Investments LLC, Debtor Clifton Bay Investments Ltd., Debtor

-3-

Island Bay Ventures Inc. and Debtor FTX Ventures Ltd. (the "Ventures Silo"); and (d) a group composed of Debtor FTX Trading Ltd. and its Debtor and non-Debtor subsidiaries (the "Dotcom Silo"), including the exchanges doing business as "FTX.com" and similar exchanges in non-U.S. jurisdictions. These Silos together are referred to by me as the "FTX Group."

10.     Each of the Silos was controlled by Mr. Bankman-Fried.[2]  Minority equity interests in the Silos were held by Zixiao "Gary" Wang and Nishad Singh, the co-founders of the business along with Mr. Bankman-Fried.  The WRS Silo and Dotcom Silo also have third party equity investors, including investment funds, endowments, sovereign wealth funds and families. To my knowledge, no single investor other than the co-founders owns more than 2% of the equity of any Silo.[3]

11.     The diagram attached as Exhibit A provides a visual summary of the Silos and the indicative assets in each Silo.  Exhibit B contains a preliminary corporate structure chart. These materials were prepared at my direction based on information available at this time and are subject to revision as our investigation into the affairs of the FTX Group continues.

## B.     The WRS Silo

12.     The WRS Silo includes FTX US, an exchange for spot trading in digital assets and tokens.  FTX US was founded in January 2020.  FTX US is available to U.S. users

---

[2]     To my knowledge, Mr. Bankman-Fried owns (a) directly, approximately 53% of the equity in Debtor West Realm Shires Inc.; (b) indirectly, approximately 75% of the equity in Debtor FTX Trading Ltd.; (c) directly, approximately 90% of the equity in Debtor Alameda Research LLC; and (d) directly, approximately 67% of the equity in Clifton Bay Investments LLC.

[3]     Based on the information provided to me, the only Debtors that have received third party equity investments are Debtor FTX Trading Ltd. (Dotcom Silo) and Debtor West Realm Shires Inc. (WRS Silo).  To my knowledge, (a) approximately 25% of the equity in Debtor FTX Trading Ltd. is owned by a dispersed group of approximately 600 third party equity investors and (b) approximately 22.25% of the equity in Debtor West Realm Shires Inc. is owned by a dispersed group of approximately 570 third party equity investors.  FTX Trading Ltd also acquired 51% of Blockfolio, Inc. in 2020, with the remaining 49% of Blockfolio, Inc. owned by the original shareholders.

4892-0827-0654 v.2

and, according to statements by Mr. Bankman-Fried, had approximately one million users as of

August 2022.  FTX US's spot exchange is registered with the Department of the Treasury (via

the Financial Crimes Enforcement Network) as a money services business and holds a series of

state money transmission licenses in the United States.

13.     The WRS Silo also owns 100% of the equity interests in the LedgerX

business, which is operated by non-Debtor LedgerX LLC (d/b/a FTX US Derivatives)

("LedgerX").  LedgerX offers futures, options, and swaps contracts on digital assets and other

commodities to both U.S. and non-U.S. persons.  LedgerX operates with licenses from the

CFTC.  Based on the information that I have reviewed at this time, LedgerX is solvent.

14.     The WRS Silo also owns 100% of the equity interests in non-Debtor FTX

Capital Markets LLC, which is an SEC-registered broker-dealer.  Based on the information that I

have reviewed at this time, FTX Capital Markets LLC is solvent.

15.     The WRS Silo also owns 100% of the equity interests in non-Debtor

Embed Financial Technologies Inc., as well as its wholly-owned non-Debtor subsidiary Embed

Clearing LLC, which operates as a securities clearing firm and is an SEC-registered broker-

dealer.  Based on the information that I have reviewed at this time, each of these non-Debtor

entities is solvent.

16.     The WRS Silo also owns 100% of the equity interests in FTX Value Trust

Company, a South Dakota Trust Company, which provides custodial services.  Based on the

information that I have reviewed at this time, this non-Debtor company is solvent.

17.     The WRS Silo also owns 100% of other Debtor and non-Debtor

companies operating miscellaneous businesses, such as video game development and a market

place for trading non-fungible tokens.  Finally, the WRS Silo has made loans and investments,

-5-

including a loan of FTT tokens to BlockFi Inc. in a principal amount of FTT tokens valued at $250 million as of September 30, 2022.

18.     I have been provided with an unaudited consolidated balance sheet for the WRS Silo as of September 30, 2022, which is the latest balance sheet available.  The balance sheet shows $1.36 billion in total assets as of that date.  However, because this balance sheet was produced while the Debtors were controlled by Mr. Bankman-Fried, I do not have confidence in it, and the information therein may not be correct as of the date stated.

19.     The chart below summarizes certain information regarding the WRS Silo's consolidated assets as reflected in the September 30, 2022 balance sheet:

| WRS Silo Consolidated Assets as of September 30, 2022 | |
|---|---:|
| *Current Assets* | |
| Cash and Cash Equivalents | $144,207 |
| Restricted Cash | $267,738 |
| U.S. Dollar Denominated Stablecoins | $68,035 |
| Customer Custodial Funds | $102,225 |
| Accounts Receivable | $2,978 |
| Accounts Receivable, Related Party | $71,563 |
| Loans Receivable | $250,000 |
| Prepaid Expenses and Other Current Assets | $21,448 |
| Crypto Assets Held at Fair Value | $1,026 |
| **Total Current Assets** | **$929,220** |
| Property and Equipment, Net | $2,017 |
| Other Non-Current Assets | $429,428 |
| **Total Assets** | **$1,360,665** |

(1)     Amounts shown in thousands of U.S. Dollars.

(2)     In the above table, assets shown reflect the elimination of intercompany entries within and between the WRS Silo and Dotcom Silo.

(3)     Restricted cash at the WRS Silo is primarily comprised of approximately $250 million in restricted funds at non-Debtor LedgerX.

(4)     Customer custodial fund assets are comprised of fiat customer deposit balances.  **Balances of customer crypto assets deposited were not recorded as assets on the balance sheet and are not presented**.

(5)     Loans receivable of $250 million consists of a loan by Debtor West Realm Shires Inc. to BlockFi Inc. of $250 million in FTT tokens.

(6)     Intangible assets (in the amount of $229 million) are not reflected above.  These consist of values attributable to customer relationships and trade names.

(7)     Goodwill balance (in the amount of $135 million) is not reflected above.

20.     To my knowledge, the WRS Silo Debtors do not have any long-term or funded debt.  The WRS Silo Debtors are expected to have significant liabilities arising from crypto assets deposited by customers through the FTX US platform.  However, such liabilities are not reflected in the financial statements prepared while these companies were under the control of Mr. Bankman-Fried.  The chart below summarizes certain information regarding the WRS Silo's consolidated liabilities as reflected in the September 30, 2022 balance sheet:

| WRS Silo Consolidated Liabilities as of September 30, 2022 | |
| --- | --- |
| *Current Liabilities* | |
| Accounts Payable and Accrued Expenses | $6,014 |
| Accounts Payable, Related Party | $124,221 |
| Custodial Funds Due to Customers | $102,225 |
| Purchase Consideration Payable | – |
| Loan Payable | – |
| Lease Liability, Current | $1,672 |
| Crypto Asset Borrowings at Fair Value | $1,737 |
| **Total Current Liabilities** | **$235,869** |
| Lease Liability, Non-Current | $9,399 |
| Deferred Taxes | $20,185 |
| Contract Liability | $887 |
| SAFE Note, Related Party, Non-Current | $50,000 |
| Other Non-Current Liabilities | – |
| **Total Liabilities** | **$316,014** |

(1)     Amounts shown in thousands of U.S. Dollars.

(2)     In the above table, liabilities shown reflect the elimination of intercompany entries within and between the WRS Silo and Dotcom Silo.

(3)     Customer custodial fund liabilities are comprised of fiat customer deposit balances.  **Balances of customer crypto assets deposited are not presented.**

21.     All Debtors and non-Debtors in the WRS Silo are organized in the State of Delaware, other than non-Debtor FTX Vault Trust Company, which is a South Dakota Trust Company.

4892-0827-0654 v.2

## C.     The Alameda Silo

22.     The parent company and primary operating company in the Alameda Silo is Alameda Research LLC, which is organized in the State of Delaware.  Before the Petition Date (as defined below), the Alameda Silo operated quantitative trading funds specializing in crypto assets.  Strategies included arbitrage, market making, yield farming and trading volatility.  The Alameda Silo also offered over-the-counter trading services, and made and managed other debt and equity investments.  In short, the Alameda Silo was a "crypto hedge fund" with a diversified business trading and speculating in digital assets and related loans and securities for the account of its owners, Messrs. Bankman-Fried (90%) and Wang (10%).

23.     Alameda Research LLC prepared consolidated financial statements on a quarterly basis.  To my knowledge, none of these financial statements have been audited.  The September 30, 2022 balance sheet for the Alameda Silo shows $13.46 billion in total assets as of its date.  However, because this balance sheet was unaudited and produced while the Debtors were controlled by Mr. Bankman-Fried, I do not have confidence in it and the information therein may not be correct as of the date stated.

24.     The chart below summarizes certain information regarding the Alameda Silo's consolidated assets as reflected in the September 30, 2022 balance sheet:

| Alameda Silo Consolidated Assets as of September 30, 2022 | |
| --- | --- |
| *Current Assets* | |
| Cash and Cash Equivalents | $547,964 |
| Restricted Cash | - |
| U.S. Dollar Denominated Stablecoins | - |
| Customer Custodial Funds | - |
| Investments | $3,976,632 |
| Accounts Receivable | $10,845 |
| Accounts Receivable, Related Party | $427,323 |
| Loans Receivable | $41,607 |
| Loans Receivable, Related Party | $4,102,365 |
| Prepaid Expenses and Other Current Assets | $1,083 |
| Crypto Assets Held at Fair Value | $4,084,886 |

-8-

| | |
|---|---|
| **Total Current Assets** | **$13,192,706** |
| Property and Equipment, Net | $26,763 |
| Other Non-Current Assets | $239,696 |
| **Total Assets** | **$13,459,165** |

(1)     Amounts shown in thousands of U.S. Dollars.

(2)     In the above table, intercompany accounts receivable, accounts payable, loans payable, and loans receivable are not presented.

(3)     Related Party Loans Receivable of $4.1 billion at Alameda Research (consolidated) consisted primarily of a loan by Euclid Way Ltd. to Paper Bird Inc. (a Debtor) of $2.3 billion and three loans by Alameda Research Ltd.: one to Mr. Bankman-Fried, of $1 billion; one to Mr. Singh, of $543 million; and one to Ryan Salame, of $55 million.

25.     The chart below summarizes certain information regarding the Alameda

Silo's consolidated liabilities as reflected in the September 30, 2022 balance sheet:

| Alameda Silo Consolidated Liabilities as of September 30, 2022 | |
|---|---|
| *Current Liabilities* | |
| Accounts Payable and Accrued Expenses | $916,305 |
| Accounts Payable, Related Party | $75,900 |
| Custodial Funds Due to Customers | $309,634 |
| Purchase Consideration Payable | - |
| Loans Payable | - |
| Loans Payable, Related Party | $13,762 |
| Lease Liability, Current | - |
| Crypto Asset Borrowings at Fair Value | $3,773,979 |
| **Total Current Liabilities** | **$5,089,579** |
| Lease Liability, Non-Current | - |
| Deferred Taxes | - |
| Contract Liability | - |
| SAFE Note, Related Party, Non-Current | - |
| Other Non-Current Liabilities | - |
| **Total Liabilities** | **$5,089,579** |

(1)     Amounts shown in thousands of U.S. Dollars.

(2)     In the above table, intercompany accounts receivable, accounts payable, loans payable, and loans receivable are not presented.

26.     As mentioned above, Alameda Research LLC is organized in the State of

Delaware.  The other Debtors in the Alameda Silo are organized in Delaware, Korea, Japan, the

British Virgin Islands, Antigua, Hong Kong, Singapore, the Seychelles, the Cayman Islands, the

Bahamas, Australia, Panama, Turkey and Nigeria.

-9-

### D. The Ventures Silo

27.     The Debtors in the Ventures Silo make and manage private investments. The investments are held in Debtors Clifton Bay Investments, LLC, Clifton Bay Investments Ltd., FTX Ventures Ltd., Island Bay Ventures Inc. and, potentially, affiliated companies.

28.     To my knowledge, Debtors Clifton Bay Investments, LLC and FTX Ventures Ltd. prepared financial statements on a quarterly basis.  The September 30, 2022 balance sheet for Debtor Clifton Bay Investments LLC shows assets with a total value of $1.52 billion as of its date, and the September 30, 2022 balance sheet for FTX Ventures Ltd. shows assets with a total value of $493 million as of its date.  To my knowledge, none of these financial statements have been audited.  Because these balance sheets were unaudited and produced while the Debtors were controlled by Mr. Bankman-Fried, I do not have confidence in them, and the information therein may not be correct as of the date stated.

29.     I have not been able to locate financial statements for Island Bay Ventures Inc.

30.     The chart below summarizes certain information regarding the Ventures Silo's assets as reflected in the September 30, 2022 balance sheets, excluding any assets held by Island Bay Ventures Inc.

| Ventures Silo Consolidated Assets as of September 30, 2022 | | |
|---|---|---|
| | **Clifton Bay Investments LLC (consolidated)** | **FTX Ventures Ltd** |
| *Current Assets* | | |
| Cash and Cash Equivalents | $245 | $261 |
| Restricted Cash | - | - |
| U.S. Dollar Denominated Stablecoins | - | - |
| Customer Custodial Funds | - | - |
| Investments | $1,492,856 | $397,861 |
| Accounts Receivable | - | - |
| Accounts Receivable, Related Party | $10,200 | - |

-10-

| | | |
|---|---:|---:|
| Loans Receivable | $16,810 | - |
| Loans Receivable, Related Party | - | - |
| Prepaid Expenses and Other Current Assets | - | - |
| Crypto Assets Held at Fair Value | - | $95,337 |
| **Total Current Assets** | **$1,520,111** | **$493,459** |
| Property and Equipment, Net | - | - |
| Other Non-Current Assets | - | - |
| **Total Assets** | **$1,520,111** | **$493,459** |

(1)   Amounts shown in thousands of U.S. Dollars.

(2)   In the above table, intercompany accounts receivable, accounts payable, loans payable, and loans receivable are not presented.

31.    The chart below summarizes certain information regarding the Ventures

Silo's liabilities as reflected in the September 30, 2022 balance sheets excluding any liabilities of

Island Bay Ventures Inc.:

| Ventures Silo<br>Consolidated Liabilities as of September 30, 2022 | | |
|---|---:|---:|
| | **Clifton Bay Investments LLC (Consolidated)** | **FTX Ventures Ltd** |
| *Current Liabilities* | | |
| Accounts Payable and Accrued Expenses | $44 | - |
| Accounts Payable, Related Party | $1,519,283 | $129,518 |
| Custodial Funds Due to Customers | - | - |
| Purchase Consideration Payable | - | - |
| Loans Payable | - | - |
| Loans Payable, Related Party | - | $362,915 |
| Lease Liability, Current | - | - |
| Crypto Asset Borrowings at Fair Value | - | - |
| **Total Current Liabilities** | **$1,519,326** | **$492,432** |
| Lease Liability, Non-Current | - | - |
| Deferred Taxes | - | - |
| Contract Liability | - | - |
| SAFE Note, Related Party, Non-Current | - | - |
| Other Non-Current Liabilities | - | - |
| **Total Liabilities** | **$1,519,326** | **$492,432** |

(1)   Amounts shown in thousands of U.S. Dollars.

(2)   In the above table, intercompany accounts receivable, accounts payable, loans payable, and loans receivable are not presented.

(3)   Related Party Accounts Payable at Clifton Bay Investments LLC consists of four related-party balances: one with Debtor Alameda Research Ltd, of $1,400 million; one with Debtor Alameda Research LLC, of $68.6 million; one with Alameda Ventures Ltd, of $38.5 million; and one with Debtor West Realm Shires Services Inc. of $2.25 million.

(4)    Customer custodial fund liabilities are comprised of fiat customer deposit balances.  **Balances of customer crypto assets deposited are not presented**.

32.    All Debtors in the Ventures Silo are organized in the State of Delaware or the British Virgin Islands.

### E.    The Dotcom Silo

33.    The Dotcom Silo includes FTX.com, the trade name for the business conducted by the parent company in the Dotcom Silo, FTX Trading Ltd., which is organized in Antigua.  FTX.com is a digital asset trading platform and exchange.  It was founded by Messrs. Bankman-Fried, Wang and Singh and commenced operations in May 2019.  The Dotcom Silo also holds certain marketplace licenses and registrations in certain non-U.S. jurisdictions, including the European Union and Japan.  The FTX.com platform is not available to U.S. users.

34.    In addition to its core digital asset exchange, the Dotcom Silo offered an off-exchange portal that enabled users to connect and request quotes for spot digital assets and trade directly.  The portal enabled users to lend their digital assets to other users for spot trading and matched users wanting to borrow with those willing to lend.

35.    The FTX.com platform grew quickly since its launch to become one of the largest cryptocurrency exchanges in the world.  Mr. Bankman-Fried claimed that, by the end of 2021, around $15 billion of assets were on the platform, which according to him handled approximately 10% of global volume for crypto trading at the time.  Mr. Bankman-Fried also claimed that FTX.com, as of July 2022, had "millions" of registered users.  These figures have not been verified by my team.

36.    The Dotcom Silo's unaudited consolidated balance sheet as of September 30, 2022 is the latest balance sheet that was provided to me with respect to the Dotcom Silo.  It shows total assets of $2.25 billion as of September 30, 2022.  Because such balance sheet was

produced while the Debtors were controlled by Mr. Bankman-Fried, I do not have confidence in it, and the information therein may not be correct as of the date stated.

      37.    The chart below summarizes certain information regarding the Dotcom Silo's consolidated assets as reflected in the September 30, 2022 balance sheet:

| Dotcom Silo Consolidated Assets as of September 30, 2022 | |
|---|---:|
| *Current Assets* | |
| Cash and Cash Equivalents | $483,724 |
| Restricted Cash | $10,188 |
| U.S. Dollar Denominated Stablecoins | $1,140,795 |
| Customer Custodial Funds | – |
| Accounts Receivable | $9,459 |
| Accounts Receivable, Related Party | $188,155 |
| Loans Receivable | $103,949 |
| Prepaid Expenses and Other Current Assets | $42,661 |
| Crypto Assets Held at Fair Value | $659 |
| **Total Current Assets** | **$1,979,590** |
| Property and Equipment, Net | $256,996 |
| Other Non-Current Assets | $22,148 |
| **Total Assets** | **$2,258,734** |

(1)    Amounts shown in thousands of U.S. Dollars.

(2)    The balance sheet for non-Debtor FTX Digital Markets Ltd. is consolidated to Debtor FTX Trading Ltd.'s balance sheet. The September 30, 2022 Balance Sheet of non-Debtor FTX Digital Markets Ltd. reflects an asset position of $149,336, as follows: Cash and Cash Equivalents ($82,564), Restricted Cash ($10,000), U.S. Dollar Denominated Stablecoins ($63), Related Party Receivables ($45,944), Prepaid Expenses and Other Current Assets ($4,922), Property and Equipment, Net ($5,565) and Other Non-Current Assets ($278) (amounts in thousands of U.S. Dollars).

(3)    Non-debtor FTX Digital Markets Ltd. has a net intercompany accounts payable of $30 million due to entities controlled by Debtor FTX Trading Ltd.

(4)    In the above table, assets shown reflect the elimination of intercompany entries within and between the WRS Silo and Dotcom Silo.

(5)    Customer custodial fund assets are comprised of fiat customer deposit balances. **Balances of customer crypto assets deposited are not presented.**

(6)    Loans Receivable of $250 million at FTX US consists of a loan to BlockFi Inc. of $250 million in FTT tokens.

(7)    Intangible assets (in the amount of $343 million) are not reflected above. These consist of values attributable to customer relationships and trade names.

(8)    Goodwill balance (in the amount of $359 million) is not reflected above.

      38.    To my knowledge, the Dotcom Silo Debtors do not have any long-term or funded debt. The Dotcom Silo Debtors may have significant liabilities to customers through the

FTX.com platform.  However, such liabilities are not reflected in the financial statements prepared by these companies while they were under the control of Mr. Bankman-Fried.  The chart below summarizes certain information regarding the Dotcom Silo's consolidated liabilities as reflected in the September 30, 2022 balance sheet:

| Dotcom Silo Consolidated Liabilities as of September 30, 2022 | |
| --- | --- |
| *Current Liabilities* | |
| Accounts Payable and Accrued Expenses | $38,970 |
| Accounts Payable, Related Party | $125,626 |
| Custodial Funds Due to Customers | – |
| Purchase Consideration Payable | $26,970 |
| Loan Payable | $124,298 |
| Lease Liability, Current | $23 |
| Crypto Asset Borrowings at Fair Value | $149,723 |
| **Total Current Liabilities** | **$465,610** |
| Lease Liability, Non-Current | – |
| Deferred Taxes | – |
| Contract Liability | – |
| SAFE Note, Related Party, Non-Current | – |
| Other Non-Current Liabilities | $46 |
| **Total Liabilities** | **$465,656** |

(1)     Amounts shown in thousands of U.S. Dollars.

(2)     In the above table, liabilities shown reflect the elimination of intercompany entries within and between the WRS Silo and Dotcom Silo.

(3)     The balance sheet for non-Debtor FTX Digital Markets Ltd. is consolidated to Debtor FTX Trading Ltd.'s balance sheet.  The September 30, 2022 Balance Sheet of non-Debtor FTX Digital Markets Ltd. reflects total liabilities in the amount of $1,278, as follows: Accounts Payable and Accrued Expenses ($1,259), Accounts Payable, Related Party ($19) (amounts in thousands of U.S. Dollars).

(4)     Customer custodial fund liabilities are comprised of fiat customer deposit balances.  **Balances of customer crypto assets deposited were not recorded as assets on the balance sheet and are not presented.**

39.     The Debtors in the Dotcom Silo are organized in jurisdictions around the world, with the parent company FTX Trading Ltd. organized in Antigua. The Debtors in the Dotcom Silo also own 100% of the equity interests in over a dozen non-Debtor companies.

## II.     EVENTS LEADING TO CHAPTER 11 FILING

40.     The Debtors faced a severe liquidity crisis that necessitated the filing of these Chapter 11 Cases on an emergency basis on November 11, 2022, and in the case of Debtor

-14-

West Realm Shires Inc., on November 14, 2022 (collectively, the "Petition Date"). In the days

leading up to the Petition Date, certain of the circumstances described in Part III below became

known to a broader set of executives of the FTX Group beyond Mr. Bankman-Fried and

members of his inner circle. Questions arose about Mr. Bankman-Fried's leadership and the

handling of the Debtors' complex array of assets and businesses.

41.     As the situation became increasingly dire, Sullivan & Cromwell and

Alvarez & Marsal were engaged to provide restructuring advice and services to the Debtors.

42.     On November 10, 2022, the Securities Commission of the Bahamas (the

"SCB") took action to freeze assets of non-Debtor FTX Digital Markets Ltd., a service provider

to FTX Trading Ltd. and the employer of certain current and former executives and staff in the

Bahamas. Mr. Brian Simms, K.C. was appointed as provisional liquidator of FTX Digital

Markets Ltd. on a sealed record. The provisional liquidator for this Bahamas subsidiary has filed

a chapter 15 petition seeking recognition of the provisional liquidation proceeding in the

Bankruptcy Court for the Southern District of New York.

43.     In addition, in the first hours of November 11, 2022 EST, the directors of

non-Debtors FTX Express Pty Ltd and FTX Australia Pty Ltd., both Australian entities,

appointed Messrs. Scott Langdon, John Mouawad and Rahul Goyal of KordaMentha

Restructuring as voluntary administrators.

44.     At the same time, negotiations were being held between certain senior

individuals of the FTX Group and Mr. Bankman-Fried concerning the resignation of Mr.

Bankman-Fried and the commencement of these Chapter 11 Cases. Mr. Bankman-Fried

consulted with numerous lawyers, including lawyers at Paul, Weiss, Rifkind, Wharton &

Garrison LLP, other legal counsel and his father, Professor Joseph Bankman of Stanford Law

-15-

School.  A document effecting a relinquishment of control was prepared and comments from Mr. Bankman-Fried's team incorporated.  At approximately 4:30 a.m. EST on Friday, November 11, 2022, after further consultation with his legal counsel, Mr. Bankman-Fried ultimately agreed to resign, resulting in my appointment as the Debtors' CEO.  I was delegated all corporate powers and authority under applicable law, including the power to appoint independent directors and commence these Chapter 11 Cases on an emergency basis.

45.     Other than the proceedings in the Bahamas and Australia, to my knowledge, no other Debtor or non-Debtor subsidiary is subject to other insolvency proceedings at this time.

## III.     ACTION TAKEN SINCE MR. BANKMAN-FRIED'S DEPARTURE

### A.     New Governance Structure

46.     Many of the companies in the FTX Group, especially those organized in Antigua and the Bahamas, did not have appropriate corporate governance.  I understand that many entities, for example, never had board meetings.

47.     The following new independent directors (the "Directors") have been appointed as directors of the primary companies in the FTX Group:

(a)     **WRS Silo:  Mitchell I. Sonkin:**  Mitchell Sonkin is currently a Senior Advisor to MBIA Insurance Corporation in connection with the restructuring of the Firm's insured portfolio exposure of the Commonwealth of Puerto Rico's $72 billion of outstanding debt. He is also currently Chairman of the Board of the ResCap Liquidating Trust, successor to ResCap and GMAC Mortgage Corporations. Before joining MBIA, Mr. Sonkin was a senior partner at the international law firm, King & Spalding, where he was co-chair of King & Spalding's Financial Restructuring Group and a member of the firm's Policy Committee. He has over 40 years of experience in U.S. and international bond issuances, corporate reorganizations, bankruptcies and other debt restructurings and has served as a bankruptcy-court-appointed examiner. In particular, he has played a significant role in numerous municipal, utility, insurance, airline, healthcare debt and international debt restructurings including the Anglo/French Euro Tunnel debt reorganization.

-16-

(b)     **Alameda Silo:  Matthew R. Rosenberg:**  Mr. Rosenberg is a Partner at Lincoln Park Advisors, a financial advisory firm that he founded in 2014. He has more than 25 years of restructuring, corporate finance, principal investing, operating and board experience. Prior to founding Lincoln Park Advisors, he was a partner at the restructuring and investment banking firm Chilmark Partners, a partner in two private equity funds, the Zell/Chilmark Fund and Chilmark Fund II, the Chief Restructuring Officer of The Wellbridge Company and a member of multiple corporate boards. His restructuring advisory experience includes such companies as OSG, Supermedia, Nortel, Trinity Coal, USG Corporation, JHT Holdings, Inc., Covanta Energy, Sirva, Lodgian, Inc., ContiGroup Companies, Inc., Fruit of the Loom, Ltd. and Recycled Paper Greetings.

(c)     **Ventures Silo:  Rishi Jain:**  Mr. Jain is a Managing Director and Co-Head of the Western Region of Accordion, a financial and technology consulting firm focused on the private equity industry. He has more than 25 years of experience supporting management teams and leading finance and operations initiatives in both stressed and distressed environments. Prior to joining Accordion, Mr. Jain was part of Alvarez & Marsal's corporate restructuring and turnaround practice for over 10 years and served in a variety of senior financial operating roles. His most notable assignments have included helping lead the restructuring, liquidation and wind down of Washington Mutual and its predecessor entity, WMI Liquidating Trust. He also navigated the restructuring of Global Geophysical Services in its chapter 11 and eventually the liquidation and wind down in its second chapter 11 filing.

(d)     **Dotcom Silo:  The Honorable Joseph J. Farnan (Lead Independent Director):**  Mr. Farnan served as a United States District Judge for the District of Delaware from 1985 to 2010. He served as Chief Judge from 1997-2001. During his tenure, Mr. Farnan presided over numerous bench and jury trials involving complex commercial disputes. Prior to his appointment to the federal bench, Mr. Farnan was appointed to several positions in local, state and the federal government returning to private practice in 2010 with the formation of Farnan LLP, a law firm focused on complex commercial matters, including chapter 11 proceedings, securities litigation, antitrust litigation and patent litigation. Additionally, Mr. Farnan serves as an arbitrator, mediator, independent director and trustee of businesses contemplating or filing chapter 11 bankruptcy.

(e)     **Dotcom Silo:  Matthew A. Doheny:**  Mr. Doheny is President of North Country Capital LLC, an advisory and investment firm focused on challenging advisory assignments and investing private investment portfolios in special situation opportunities. He has held this position since January 2011. Mr. Doheny has served on the board of directors or as Chief Restructuring Officer of numerous stressed and distressed companies, including Yellow Corp., MatlinPatterson, GMAC Rescap and Eastman

-17-

Kodak. He was also Managing Director and Head of Special Situations Investing at HSBC Securities Inc. from 2015 to 2017. Previously, Mr. Doheny served as Portfolio Manager in Special Situations at Fintech Advisory Inc. from 2008 to 2010 and as Managing Director of the Distressed Products Group at Deutsche Bank Securities Inc. from 2000 to 2008.

48.     The appointment of the Directors will provide the FTX Group with appropriate corporate governance for the first time.

49.     The Directors intend to hold joint board meetings of the Debtors on matters of common interest, including (a) the implementation of controls, (b) asset protection and recovery, (c) the investigation into claims against the founders and third parties, (d) cooperation with insolvency proceedings of subsidiary companies in other jurisdictions and (e) the maximization of value for all stakeholders through the eventual reorganization or sale of the Debtors' complex array of businesses, investments and property around the world.  The Directors will implement appropriate procedures for the resolution of any conflicts of interest among the Silos and, if necessary, within the Silos as the case progresses, including the potential engagement of independent counsel to represent various Debtors in the resolution of intercompany claims against other Debtors.  I expect there to be a multitude of intercompany claims that will benefit from fair resolution under the rules and conventions of U.S. chapter 11 practice in the District of Delaware for complex, multi-Debtor cases.  For the time being, my belief is that all stakeholders are best served by a coordinated and centralized administration.

**B.     Cash Management**

50.     The FTX Group did not maintain centralized control of its cash.  Cash management procedural failures included the absence of an accurate list of bank accounts and account signatories, as well as insufficient attention to the creditworthiness of banking partners

-18-

around the world.  Under my direction, the Debtors are establishing a centralized cash management system with proper controls and reporting mechanisms.

51.      During these Chapter 11 Cases, cash that the Debtors are able to locate and transfer to the United States without adverse consequences, including substantially all proceeds of the global reorganization effort, will be deposited into financial institutions in the United States that are approved depository institutions in accordance with the U.S. Trustee Guidelines.  Each Silo will have a centralized cash pool, and the Debtors will implement appropriate arrangements for allocating costs across the various Silos and Debtors.  The Debtors expect to file promptly a Cash Management Motion that will describe the new cash management system in more detail.

52.      Because of historical cash management failures, the Debtors do not yet know the exact amount of cash that the FTX Group held as of the Petition Date.  The Debtors are working with Alvarez & Marsal to verify all cash positions.  To date, it has been possible to approximate the following balances as of the Petition Date based on available books and records:

| Entity | Unrestricted Cash | Custodial Cash | Other Restricted Cash | Total Cash |
|---|---|---|---|---|
| ***Debtor Entities*** | | | | |
| FTX EU Ltd | $1,250,848 | $47,925,646 | $175,832 | $49,352,327 |
| West Realm Shires Services Inc. | $32,233,606 | $14,596,119 | $1,270,700 | $48,100,425 |
| West Realm Shires Inc. | $35,411,619 | - | - | $35,411,619 |
| Paper Bird Inc | $7,906,893 | - | - | $7,906,893 |
| FTX Exchange FZE | $1,812,563 | - | $4,000,000 | $5,812,563 |
| Ledger Holdings Inc. | $4,098,480 | - | - | $4,098,480 |
| FTX TURKEY TEKNOLOJİ VE TİCARET ANONİM ŞİRKET | $36,682 | $3,069,526 | - | $3,106,208 |
| FTX Europe AG | $2,979,584 | - | - | $2,979,584 |
| FTX Trading Ltd | $375,726 | $2,600,324 | - | $2,976,050 |
| Maclaurin Investments Ltd. | $2,529,814 | - | - | $2,529,814 |
| Blockfolio, Inc. | $2,396,067 | - | - | $2,396,067 |
| Ledger Prime LLC | $2,230,765 | - | - | $2,230,765 |
| Crypto Bahamas LLC | $900,000 | - | - | $900,000 |
| FTX Ventures Ltd | $779,542 | - | - | $779,542 |
| West Realm Shires Financial Services Inc. | $576,831 | - | - | $576,831 |
| FTX Lend Inc. | $484,738 | - | - | $484,738 |
| FTX Trading GmbH | $146,059 | - | - | $146,059 |
| FTX Switzerland GmbH | $16,799 | - | - | $16,799 |

4892-0827-0654 v.2

| Entity | Unrestricted Cash | Custodial Cash | Other Restricted Cash | Total Cash |
|---|---|---|---|---|
| **Total Debtor Entities** | **$96,166,614** | **$68,191,615** | **$5,446,532** | **$169,804,762** |
| *Non-Debtor Entities* | | | | |
| LedgerX LLC | $13,644,269 | $24,103,085 | $265,603,056 | $303,350,409 |
| FTX Digital Markets Ltd | - | - | $49,999,600 | $49,999,600 |
| Embed Clearing LLC. | - | - | $29,978,776 | $29,978,776 |
| FTX Philanthropy Inc | $10,877,387 | - | - | $10,877,387 |
| Embed Financial Technologies Inc | $395,371 | - | - | $395,371 |
| **Total Non-Debtor Entities** | **$24,917,027** | **$24,103,085** | **$345,581,432** | **$394,601,543** |
| **Total** | **$121,083,641** | **$92,294,700** | **$351,027,964** | **$564,406,305** |

53.     The Debtors have been in contact with banking institutions that they believe hold or may hold Debtor cash.  These banking institutions have been instructed to freeze withdrawals and alerted not to accept instructions from Mr. Bankman-Fried or other signatories. Proper signature authority and reporting systems are expected to be arranged shortly.

54.     Effective cash management also requires liquidity forecasting, which I understand was also generally absent from the FTX Group historically.  The Debtors are putting in place the systems and processes necessary for Alvarez & Marsal to produce a reliable cash forecast as well as the cash reporting required for Monthly Operating Reports under the Bankruptcy Code.

## C.     Financial Reporting

55.     The FTX Group received audit opinions on consolidated financial statements for two of the Silos – the WRS Silo and the Dotcom Silo – for the period ended December 31, 2021.  The audit firm for the WRS Silo, Armanino LLP, was a firm with which I am professionally familiar.  The audit firm for the Dotcom Silo was Prager Metis, a firm with which I am not familiar and whose website indicates that they are the "first-ever CPA firm to officially open its Metaverse headquarters in the metaverse platform Decentraland."[4]

---

[4]     https://pragermetis.com/news/prager-metis-opens-first-ever-cpa-firm-metaverse/.

56. I have substantial concerns as to the information presented in these audited financial statements, especially with respect to the Dotcom Silo. As a practical matter, I do not believe it appropriate for stakeholders or the Court to rely on the audited financial statements as a reliable indication of the financial circumstances of these Silos.

57. The Debtors have not yet been able to locate any audited financial statements with respect to the Alameda Silo or the Ventures Silo.

58. The Debtors are locating and securing all available financial records but expect it will be some time before reliable historical financial statements can be prepared for the FTX Group with which I am comfortable as Chief Executive Officer. The Debtors do not have an accounting department and outsource this function.

### D. Human Resources

59. The FTX Group's approach to human resources combined employees of various entities and outside contractors, with unclear records and lines of responsibility. At this time, the Debtors have been unable to prepare a complete list of *who* worked for the FTX Group as of the Petition Date, or the terms of their employment. Repeated attempts to locate certain presumed employees to confirm their status have been unsuccessful to date.

60. Nevertheless, there is a core team of dedicated employees at the FTX Group who have stayed focused on their jobs during this crisis and with whom I have established appropriate lines of authority and working relationships. The Debtors continue to review personnel issues but I expect, based on my experience and the nature of the Debtors' business, that a large number of employees of the Debtors will need to continue to work for the Debtors for the foreseeable future in order to establish accountability, preserve value and maximize stakeholder recoveries after the departure of Mr. Bankman-Fried. As Chief Executive Officer, I am thankful for the extraordinary efforts of this group of employees, who despite difficult

-21-

personal circumstances, have risen to the occasion and demonstrated their critical importance to the Debtors.

61.    The Debtors are preparing one or more motions to address issues relating to continuing employees and contractors.  The Debtors also may hire new employees and officers with turnaround or other relevant experience in core functions where I determine that new leadership is required.  I anticipate that the Debtors will be able to file these motions in the coming days.

### E.    Disbursement Controls

62.    The Debtors did not have the type of disbursement controls that I believe are appropriate for a business enterprise.  For example, employees of the FTX Group submitted payment requests through an on-line 'chat' platform where a disparate group of supervisors approved disbursements by responding with personalized emojis.

63.    In the Bahamas, I understand that corporate funds of the FTX Group were used to purchase homes and other personal items for employees and advisors.  I understand that there does not appear to be documentation for certain of these transactions as loans, and that certain real estate was recorded in the personal name of these employees and advisors on the records of the Bahamas.

64.    The Debtors now are implementing a centralized disbursement approval process that reports to me as Chief Executive Officer.

### F.    Digital Asset Custody

65.    The FTX Group did not keep appropriate books and records, or security controls, with respect to its digital assets.  Mr. Bankman-Fried and Mr. Wang controlled access to digital assets of the main businesses in the FTX Group (with the exception of LedgerX, regulated by the CFTC, and certain other regulated and/or licensed subsidiaries).  Unacceptable

-22-

management practices included the use of an unsecured group email account as the root user to access confidential private keys and critically sensitive data for the FTX Group companies around the world, the absence of daily reconciliation of positions on the blockchain, the use of software to conceal the misuse of customer funds, the secret exemption of Alameda from certain aspects of FTX.com's auto-liquidation protocol, and the absence of independent governance as between Alameda (owned 90% by Mr. Bankman-Fried and 10% by Mr. Wang) and the Dotcom Silo (in which third parties had invested).

66.    The Debtors have located and secured only a fraction of the digital assets of the FTX Group that they hope to recover in these Chapter 11 Cases. The Debtors have secured in new cold wallets approximately $740 million of cryptocurrency that the Debtors believe is attributable to either the WRS, Alameda and/or Dotcom Silos. The Debtors have not yet been able to determine how much of this cryptocurrency is allocable to each Silo, or even if such an allocation can be determined. These balances exclude cryptocurrency not currently under the Debtors' control as a result of (a) at least $372 million of unauthorized transfers initiated on the Petition Date, during which time the Debtors immediately began moving cryptocurrency into cold storage to mitigate the risk to the remaining cryptocurrency that was accessible at the time, (b) the dilutive 'minting' of approximately $300 million in FTT tokens by an unauthorized source after the Petition Date and (c) the failure of the co-founders and potentially others to identify additional wallets believed to contain Debtor assets.

67.    In response, the Debtors have engaged forensic analysts to identify potential Debtor assets on the blockchain, cybersecurity professionals to identify the parties responsible for the unauthorized transactions on and after the Petition Date and investigators to begin the process of identifying what may be very substantial transfers of Debtor property in the

-23-

days, weeks and months prior to the Petition Date. The Debtors' team includes business, accounting, forensic, technical and legal resources that I believe are among the best in the world at these activities. It is my expectation that the Debtors will require assistance from the Court with respect to these matters as the investigation and these Chapter 11 Cases continue.

68.     Although the investigation has only begun and must run its course, it is my view based on the information obtained to date, that many of the employees of the FTX Group, including some of its senior executives, were not aware of the shortfalls or potential commingling of digital assets. Indeed, I believe some of the people most hurt by these events are current and former employees and executives, whose personal investments and reputations have suffered. These are many of the same people whose work will be necessary to ensure the maximization of value for all stakeholders going forward.

### G.    Custody of Other Assets and Investments

69.     The FTX Group had billions in investments other than cryptocurrency, as suggested above in the descriptions of the four Silos. However, the main companies in the Alameda Silo and the Ventures Silo did not keep complete books and records of their investments and activities.

70.     The Debtors are creating a balance sheet and other financial statements for the Alameda Silo and the Ventures Silo as of the Petition Date. The Debtors are doing so from the 'bottom-up' by using the records of cash transactions at the Debtors, and also are reviewing various third-party sources to locate investments.

### H.    Information and Retention of Documents

71.     One of the most pervasive failures of the FTX.com business in particular is the absence of lasting records of decision-making. Mr. Bankman-Fried often communicated

-24-

by using applications that were set to auto-delete after a short period of time, and encouraged employees to do the same.

72.     The Debtors are writing things down.  The investigative effort underway is led by myself and a team at Sullivan & Cromwell that reports directly to me, including a former Director of Enforcement at the SEC, a former Director of Enforcement at the CFTC, and a former Chief of the Complex Frauds and Cybercrime Unit of the United States Attorney's Office for the Southern District of New York.  I regard ensuring the comprehensiveness, professionalism and integrity of this investigation as an essential part of my job as Chief Executive Officer.

73.     Transparency with regulators around the world is an important objective for the Debtors.  Since Friday, the Debtors have been in contact with dozens of regulators throughout the United States and around the world, and will continue to be as these cases continue.

## I.     <u>Regulated and Licensed Subsidiaries</u>

74.     The FTX Group included regulated or licensed subsidiaries in many jurisdictions that may or may not have valuable going concern franchises.  The Debtors will soon be taking efforts to preserve these subsidiary businesses to the extent practicable under the circumstances.  The Debtors also are engaging a leading investment bank to assist the Debtors in valuing these businesses and potentially conducting sales efforts.

## J.     <u>Access to Data</u>

75.     The Debtors have cryptocurrency, digital assets and other critically sensitive data in repositories that have been the subject of unauthorized attempts to access.  The Debtors have implemented certain defensive measures.  The Debtors have been advised that attempts to access this property of the estate may create a risk of its loss to unauthorized persons.

4892-0827-0654 v.2

The Debtors expect to seek special relief from the Court to authorize measures to access this information as safely as possible. The Debtors are unable to create a list of their top 50 creditors that includes customers without access to the data repositories at issue, and may seek related relief from the Court as well if the problem cannot be promptly resolved.

## K. Corporate Communications

76. Finally, and critically, the Debtors have made clear to employees and the public that Mr. Bankman-Fried is not employed by the Debtors and does not speak for them. Mr. Bankman-Fried, currently in the Bahamas, continues to make erratic and misleading public statements. Mr. Bankman-Fried, whose connections and financial holdings in the Bahamas remain unclear to me, recently stated to a reporter on Twitter: "F*** regulators they make everything worse" and suggested the next step for him was to "win a jurisdictional battle vs. Delaware".

I declare under penalty of perjury that the foregoing is true and correct.

Dated: November 17, 2022

*/s/ John J. Ray III*
Name: John J. Ray III
Title: Chief Executive Officer

-26-

**Exhibit A**

**Summary of the Silos and Indicative Assets**

# FOUR SILOS FOR RECOVERY PURPOSES



**Exhibit B**

**Preliminary Corporate Structure Chart**

# PRELIMINARY ORGANIZATIONAL CHART
Last updated: Draft of November 17, 2022



\* Percentages directly held by each of Sam Bankman-Fried, Gary Wang and Nishad Singh in individual entities varies.

\*\* Indicates non-operational subsidiary entity.

Securities Commission of The Bahamas

**Poinciana House**
**North Building, 2nd Floor**
**31A East Bay Street**
**P.O. Box N-8347**
**Nassau, The Bahamas**

# MEDIA RELEASE

Contact: Executive Director
Christina Rolle
242-397-4100

**FOR IMMEDIATE RELEASE**

## Securities Commission of The Bahamas Assumes Control of Assets of FTX Digital Markets Ltd.

*Nassau, The Bahamas, Thursday 17 November 2022* - On 12 November 2022, the Securities Commission of The Bahamas ("the Commission"), in the exercise of its powers as regulator acting under the authority of an Order made by the Supreme Court of The Bahamas, took the action of directing the transfer of all digital assets of FTX Digital Markets Ltd. ("FDM") to a digital wallet controlled by the Commission, for safekeeping. Urgent interim regulatory action was necessary to protect the interests of clients and creditors of FDM.

Under the Digital Assets and Registered Exchanges Act, 2020 ("DARE Act"), the Commission has the authority to apply for a judicial order to protect the interests of clients or customers of a registrant of the Commission under the DARE Act.

It is not the understanding of the Commission that FDM is a party to the US Chapter 11 Bankruptcy proceedings.

Over the coming days and weeks, the Commission will engage with other regulators and authorities, in multiple jurisdictions, to address matters affecting the creditors, clients and stakeholders of FDM globally to obtain the best possible outcome.

###

Editor's Information:

1. The Securities Commission of The Bahamas (the Commission) is a statutory body established in 1995 pursuant to the Securities Board Act, 1995. That Act has since been repealed and replaced by new legislation.

2. The Commission's mandate is defined in the Securities Industry Act, 2011 (SIA, 2011).

3. The Commission is responsible for the administration of the SIA, 2011 and the Investment Funds Act, 2019 (IFA), which provides for the supervision and regulation of the activities of the investment funds, securities and capital markets.

4. The Commission is responsible for the administration of the Financial and Corporate Service Providers Act, 2020.

**5. The Commission is responsible for the administration of the Digital Assets and Registered Exchanges Act, 2020.**

**6. The Commission is responsible for the administration of the Carbon Credit Trading Act, 2022.**

**7. The functions of the Commission are to:**

- **advise the Minister on all matters relating to the capital markets and its participants;**
- **maintain surveillance over the capital markets and ensure orderly, fair and equitable dealings in securities;**
- **foster timely, accurate, fair and efficient disclosure of information to the investing public and the capital markets;**
- **protect the integrity of the capital markets against any abuses arising from financial crime, market misconduct and other unfair and improper practices;**
- **promote an understanding by the public of the capital markets and its participants and the benefits, risks, and liabilities associated with investing;**
- **create and promote conditions that facilitate the orderly development of the capital markets; and**
- **perform any other function conferred or imposed on it by securities laws or Parliament (SIA, 2011, s.12).**

SUPREME COURT

NOV 2 1 2022

NASSAU, BAHAMAS

**COMMONWEALTH OF THE BAHAMAS**                    2022/COM/com

**IN THE SUPREME COURT**

**COMMERCIAL DIVISION**

**IN THE MATTER OF the Digital Assets and Registered Exchanges Act, 2020**
**(as amended)**

**AND IN THE MATTER OF FTX DIGITAL MARKETS LTD.**
**(A Registered Digital Asset Business)**

**BETWEEN**

**SECURITIES COMMISSION OF THE BAHAMAS**

**Plaintiff**

**AND**

**FTX DIGITAL MARKETS LTD.**

**Defendant**

---

## SUMMONS

---

**LET ALL PARTIES CONCERNED** attend before The Honourable Chief Justice, in Chambers, at
The Supreme Court, situate at Bank Lane, in the City of Nassau, on the Island of New Providence,
one of the Islands in The Commonwealth of The Bahamas on Monday the 21st day of November,
A.D., 2022 at 12 o'clock noon on the hearing of an application by the Plaintiff, pursuant to the
terms of the Order made herein by The Honourable Justice Loren Klein on 12th November, 2022
granting the parties liberty to apply, for the following Supplemental Orders; namely, that –

1.  The digital assets transferred by FTX Digital Markets Ltd ("FTXDM") to digital
    wallet(s) established and maintained by the Securities Commission of The
    Bahamas ("the Commission") under the authority of the Order of The
    Honourable Justice Loren Klein made on 12th November 2022 to enable to
    regulatory and administrative action by the Commission to protect the assets of
    FTXDM in the interest of the clients and creditors of FTXDM, shall continue to
    be held in the custody of the Commission as regulator under the continuing
    direction of this Honourable Court and so long as held by the Commission, the
    Commission shall be regarded as acting as trustee in the administration of trust
    assets within the meaning of the Trustee Act Ch.176 for the benefit of the clients
    and/or creditors of FTXDM, pending directions for the continued safe custody

of the said assets issued by this Honourable Court to the joint provisional liquidators and/or the Commission in the proceeding for the winding-up of FTXDM or further order.

2. For the avoidance of doubt, the Commission is entitled to be indemnified as a trustee under the law, including without limitation, pursuant to The Trustee Act, Ch. 176.

3. Further, for the avoidance of doubt, the Commission is entitled to be reimbursed out of the said assets held upon trust, with respect to the expenses, costs and charges reasonably incurred in connection with, or by reason of, the action taken by the Commission under the authority of the said Order made on 12th November, 2022 to protect the said assets in the interest of the clients and/or creditors of FTXDM, including but not limited to, costs associated with establishing and maintaining the digital wallet(s).

4. The costs of and occasioned by this application are to be paid to the Commission as a trustee of the said assets.

5. The parties be at liberty to apply.

**DATED: The 18th day of November, A.D., 2022**

**REGISTRAR**

**To: Mr Brian K Simms, KC, Kevin Cambridge and Peter Greaves, by their counsel and attorneys, Messrs. Lennox Paton, 3 Bayside Executive Park, West Bay Street and Blake Road, New Providence, The Bahamas.**

COMMONWEALTH OF THE BAHAMAS

IN THE SUPREME COURT
COMMERCIAL DIVISION

IN THE MATTER OF the Digital Assets and
Registered Exchanges Act, 2020
(as amended)

AND IN THE MATTER OF FTX DIGITAL
MARKETS LTD.
(A Registered Digital Asset Business)

BETWEEN

SECURITIES COMMISSION OF THE BAHAMAS

**Plaintiff**

AND

FTX DIGITAL MARKETS LTD.

**Defendant**

---

# SUMMONS

---

**2022/COM/com**

*Delaney Partners*
DELANEY PARTNERS
Lyford Manor (West Bldg)
Western Road, Lyford Cay
New Providence, The Bahamas

Attorneys for the Plaintiff

RKA/EJM/sjs 0833-2949

COMMONWEALTH OF THE BAHAMAS SUPREME COURT                2022/COM/com

IN THE SUPREME COURT

COMMERCIAL DIVISION                    NOV 2 2 2022

IN THE MATTER OF the Digital Assets and Registered Exchanges Act, 2020

(as amended)


AND IN THE MATTER OF FTX DIGITAL MARKETS LTD.

(A Registered Digital Asset Business)


SECURITIES COMMISSION OF THE BAHAMAS

Plaintiff

AND

FTX DIGITAL MARKETS LTD.

Defendant

---

## SUPPLEMENTAL ORDER

---

**Before The Honourable Chief Justice Ian Winder**

**Dated the 21st day of November, A.D., 2022**


**UPON THE APPLICATION** of the Plaintiff, Securities Commission of The Bahamas, made by Summons dated 18th November and filed herein on 21st November, 2022.

**AND UPON HEARING** Mr. Robert K. Adams, KC and Mr. Edward J. Marshall II of Counsel for the Securities Commission of The Bahamas, and Mrs. Sophia T. Rolle-Kapousouzoglou with Mr Valdere J. Murphy of Counsel for the Joint Provisional Liquidators of FTX Digital Markets Ltd.

**AND UPON READING** the Second Affidavit of Christina R. Rolle sworn on 18th November, 2022 and filed herein on 21st November, 2022.

**IT IS HEREBY ORDERED THAT:**

1. The digital assets transferred by FTX Digital Markets Ltd ("FTXDM") to digital wallet(s) established and maintained by the Securities Commission of The Bahamas ("the Commission") under the authority of the Order of The Honourable Justice Loren Klein made on 12th November 2022 to enable to regulatory and administrative action by the Commission to protect the assets of FTXDM in the interest of the clients and creditors of FTXDM, shall continue to be held in the custody of the Commission as regulator under the continuing direction of this Honourable Court and so long as held by the Commission, the Commission shall be regarded as acting as trustee in the administration of trust assets within the meaning of the Trustee Act Ch.176 for the benefit of the clients and/or creditors of FTXDM, pending directions for the continued safe custody of the said assets issued by this Honourable Court to the joint provisional liquidators and/or the Commission in the proceeding for the winding-up of FTXDM or further order.

2. For the avoidance of doubt, the Commission is entitled to be indemnified as a trustee under the law, including without limitation, pursuant to The Trustee Act, Ch. 176.

3. Further, for the avoidance of doubt, the Commission is entitled to be reimbursed out of the said assets held upon trust, with respect to the expenses, costs and charges reasonably incurred in connection with, or by reason of, the action taken by the Commission under the authority of the said Order made on 12th November, 2022 to protect the said assets in the interest of the clients and/or creditors of FTXDM, including but not limited to, costs associated with establishing and maintaining the digital wallet(s).

4. Any indemnifying payment to be made under paragraph 2 herein and/or re-imbursement to be made under paragraph 3 herein to the Commission shall require prior approval of the Court.

5. The Second Affidavit of Christina Rolle and other documents filed herein (including counsel's skeleton argument) and the affidavits and documents filed herein in the future, save for the Originating Notice of Motion, Orders

of The Honourable Justice Klein made on 12th November and 16th November, 2022 and this Order, shall be sealed and kept confidential until further Order.

6. The costs of and occasioned by this application are to be paid to the Commission as a trustee of the said assets.

7. The parties be at liberty to apply.

**BY ORDER OF THE COURT**

**REGISTRAR**

**COMMONWEALTH OF THE BAHAMAS**

**IN THE SUPREME COURT**

**COMMERCIAL DIVISION**

**IN THE MATTER OF the Digital Assets and**

**Registered Exchanges Act, 2020**

**(as amended)**

**AND IN THE MATTER OF FTX DIGITAL**

**MARKETS LTD.**

**(A Registered Digital Asset Business)**

**SECURITIES COMMISSION OF THE**

**BAHAMAS**

                                                           **Plaintiff**

                            **AND**

**FTX DIGITAL MARKETS LTD.**

                                                           **Defendant**

_____

## SUPPLEMENTAL ORDER

_____

**2022/COM/com**

**DELANEY PARTNERS**
Lyford Manor (West Bldg)
Western Road, Lyford Cay
New Providence, The Bahamas

Attorneys for the Plaintiff

RKA/EJM/sjs 0833-2949

Securities Commission of The Bahamas

Poinciana House
North Building, 2nd Floor
31A East Bay Street
P.O. Box N-8347
Nassau, The Bahamas

# MEDIA RELEASE

Contact: Executive Director
Christina Rolle
242-397-4100

FOR IMMEDIATE RELEASE

### Securities Commission of The Bahamas Secures Court Order For Right of Indemnity and Reimbursement

*Nassau, The Bahamas, Monday 21 November 2022* - On 21 November 2022, the Securities Commission of The Bahamas ("the Commission") obtained an Order from the Supreme Court of The Bahamas (the "Order") to secure a right of indemnity and right to be reimbursed for expenses reasonably incurred by the Commission in connection with the regulatory action taken to safeguard the digital assets of FTX Digital Markets Ltd. ("FDM").

As previously reported, on 12 November 2022, under the authority of an Order by the Supreme Court of The Bahamas, the Commission determined urgent action to safeguard the digital assets of FDM for the benefit of its customers and creditors was needed, and directed the transfer of certain digital assets to a digital wallet controlled by the Commission. The Order secured today confirms the Commission is entitled to be indemnified under the law and FDM shall ultimately bear the costs the Commission incurs in safeguarding those assets for the benefit of FDM's customers and creditors, in a manner similar to other normal costs of administering FDM's assets for the benefit of its customers and creditors. No payment(s), however, may be made to the Commission without prior approval of the Supreme Court.

The Commission will continue to evaluate the situation and, in cooperation with the court supervised joint provisional liquidators of FDM and with other supervisory authorities globally, take such actions as needed to preserve the assets of FDM and to safeguard the interests of customers and creditors of FDM.

The Commission is continuing to investigate the facts and circumstances regarding FTX's liquidity crisis and its impact on the operations of FDM, a registered entity.  The Commission will hold accountable any companies or individuals found responsible for the violation of any laws administered by the Commission.

###

Editor's Information:

1. The Securities Commission of The Bahamas (the Commission) is a statutory body established in 1995 pursuant to the Securities Board Act, 1995. That Act has since been repealed and replaced by new legislation.

2. The Commission's mandate is defined in the Securities Industry Act, 2011 (SIA, 2011).

3. The Commission is responsible for the administration of the SIA, 2011 and the Investment Funds Act, 2019 (IFA), which provides for the supervision and regulation of the activities of the investment funds, securities and capital markets.

4. The Commission is responsible for the administration of the Financial and Corporate Service Providers Act, 2020.

5. The Commission is responsible for the administration of the Digital Assets and Registered Exchanges Act, 2020.

6. The Commission is responsible for the administration of the Carbon Credit Trading Act, 2022.

7. The functions of the Commission are to:

- advise the Minister on all matters relating to the capital markets and its participants;
- maintain surveillance over the capital markets and ensure orderly, fair and equitable dealings in securities;
- foster timely, accurate, fair and efficient disclosure of information to the investing public and the capital markets;
- protect the integrity of the capital markets against any abuses arising from financial crime, market misconduct and other unfair and improper practices;
- promote an understanding by the public of the capital markets and its participants and the benefits, risks, and liabilities associated with investing;
- create and promote conditions that facilitate the orderly development of the capital markets; and
- perform any other function conferred or imposed on it by securities laws or Parliament (SIA, 2011, s.12).

Securities Commission of The Bahamas

Poinciana House
North Building, 2nd Floor
31A East Bay Street
P.O. Box N-8347
Nassau, The Bahamas

# MEDIA RELEASE

Contact: Executive Director                                    **FOR IMMEDIATE RELEASE**
Christina Rolle
242-397-4100

### Securities Commission Statement on Transfer Motion
### In FTX Digital Markets Chapter 15 Proceedings

*Nassau, The Bahamas, Wednesday 23 November 2022* -  The Securities Commission of The Bahamas ("the Commission") issues the following statement with respect to certain remarks made by FTX Trading Ltd. and certain of its affiliates, in connection with their motion to transfer the venue (the "Transfer Motion") of the Chapter 15 proceedings of FTX Digital Markets Ltd. ("FDM") that were commenced to assist the provisional liquidators appointed by the Supreme Court of The Bahamas in the discharge of their duties with respect to FDM.

FDM was incorporated in the Commonwealth of The Bahamas on 22 July 2021; it was duly registered as a digital asset business under The Bahamas' Digital Assets and Registered Exchanges Act, 2020 (the "DARE Act").

Pursuant to Bahamas law, on 10 November 2022, the Commission determined that the customers and creditors of FDM were in need of the protection of the DARE Act, and suspended FDM's license to conduct business and subsequently filed a petition before the Bahamian Supreme Court to place FDM into provisional liquidation. This action – the first commenced globally against an FTX entity – placed FDM under the control of a court-appointed fiduciary and removed prior management from exercising any authority over FDM.

Given the nature of digital assets, and the risks associated with hacking and compromise, the Commission determined that placing FDM into liquidation was not sufficient to protect the customers and creditors of FDM. Accordingly, on 12 November 2022, the Commission sought an additional Order from the Supreme Court of The Bahamas for authority under the DARE Act to transfer all digital assets of FTX into digital wallets under the exclusive control of the Commission for the benefit of clients and creditors of FDM.

It is unfortunate that in Chapter 11 filings, the new CEO of FTX Trading Ltd. misrepresented this timely action through the intemperate and inaccurate allegations lodged in the Transfer Motion. It is also concerning that the Chapter 11 debtors chose to rely on the statements of individuals they have (in other filings) characterized as unreliable sources of information and potentially "seriously compromised."

Further, the statements made by the purported officers of FTX Trading Ltd. and the other purported Chapter 11 debtors – that they have suffered significant thefts, that their systems were compromised, and that they continue to face new hacking attempts – reinforces the wisdom of the Commission's prompt action to secure these digital assets.

The Commission will continue to evaluate the situation, continue to act in accordance with directions issued by the Supreme Court of The Bahamas, collaborate with other supervisory authorities and take such further actions as needed to preserve the assets of FDM and to safeguard the interests of customers and creditors of FDM.

In addition, the Commission will continue to investigate the facts and circumstances regarding FTX's liquidity crisis and any potential violations of Bahamian law and hold any responsible companies and individuals accountable, in cooperation with other regulatory agencies and law enforcement both in The Bahamas and in other affected countries in connection with their own investigations. The Commission also looks forward to continuing to cooperate with the authorities in other jurisdictions to ensure the cooperative and vigorous resolution of all necessary proceedings to effectuate those ends.

###

**Editor's Information:**

**1. The Securities Commission of The Bahamas (the Commission) is a statutory body established in 1995 pursuant to the Securities Board Act, 1995. That Act has since been repealed and replaced by new legislation.**

**2. The Commission's mandate is defined in the Securities Industry Act, 2011 (SIA, 2011).**

**3. The Commission is responsible for the administration of the SIA, 2011 and the Investment Funds Act, 2019 (IFA), which provides for the supervision and regulation of the activities of the investment funds, securities and capital markets.**

**4. The Commission is responsible for the administration of the Financial and Corporate Service Providers Act, 2020.**

**5. The Commission is responsible for the administration of the Digital Assets and Registered Exchanges Act, 2020.**

**6. The Commission is responsible for the administration of the Carbon Credit Trading Act, 2022.**

**7. The functions of the Commission are to:**

- **advise the Minister on all matters relating to the capital markets and its participants;**
- **maintain surveillance over the capital markets and ensure orderly, fair and equitable dealings in securities;**
- **foster timely, accurate, fair and efficient disclosure of information to the investing public and the capital markets;**
- **protect the integrity of the capital markets against any abuses arising from financial crime, market misconduct and other unfair and improper practices;**
- **promote an understanding by the public of the capital markets and its participants and the benefits, risks, and liabilities associated with investing;**

- **create and promote conditions that facilitate the orderly development of the capital markets; and**
- **perform any other function conferred or imposed on it by securities laws or Parliament (SIA, 2011, s.12).**



Our Ref: RKA/sjs 08363-2949

7 December 2022

***BY EMAIL*** jason.maynard@maynardlaw.com

**PETER D. MAYNARD & CO.**
Counsel and Attorneys At Law
Chambers
Bay & Deveaux Street
Nassau, New Providence
The Bahamas

Attention: Mr Jason Maynard

**Re: FTX Digital Markets Ltd.**

We represent Securities Commission of The Bahamas ("the Commission") in proceedings commenced before The Bahamas Supreme Court on 10 November, 2022, by way of a regulator's petition, for a winding-up order to be made in relation to FTX Digital Markets Ltd ("Digital Markets").

We also represent the Commission in the proceedings initiated on 12 November, 2022, with the court's permission, for the Commission to take necessary additional regulatory action in the interest of the clients and creditors of Digital Markets to safeguard the digital assets within the possession, custody and/or under the control of Digital Markets, or of its officers, directors, employees and agents, including any digital assets held by Digital Markets upon trust ("the digital assets").

We are given to understand that your Firm has been appointed Bahamas counsel to certain, but not, all affiliates of Digital Markets (The "US Debtors') as represented by their Chief Restructuring Officer, Mr. John J Ray, III ("your clients").

The Commission has received a copy of your clients' letter dated 1 December 2022 addressed to The Honourable Prime Minister and The Honourable Attorney-General of The Commonwealth of The Bahamas concerning the action taken by the Commission in relation to the digital assets. We have also reviewed a copy of the earlier letter dated 13 November, 2022 from US counsel for the

**COUNSEL & ATTORNEYS-AT-LAW | NOTARIES PUBLIC**

Lyford Manor, West Building, Lyford Cay, West Bay Street, P. O. Box CB -13007, Nassau, NP, The Bahamas
T. (242) 702-4500 | F. (242) 702-4524 | info@delaneypartners.com | www.delaneypartners.com
Member of The Bahamas Financial Services Board. *A list of the names of the Partners & Associates is available at the above address and website.*





US Debtors, Messrs Sullivan & Cromwell, LLP, addressed to the Commission and Mr. Brian Simms, K.C., provisional liquidator of Digital Markets.

On behalf of the Commission, we respond as follows:

1.  As noted above, the proceedings initiated by the Commission against Digital Markets before The Supreme Court of The Bahamas were commenced on 10 November, 2022. A copy of the Petition presented by the Commission on 10 November 2022 is enclosed for your reference.

2.  On 12 November 2022, pursuant to the exercise of its power as regulator under the Digital Assets and Registered Exchanges Act, the Commission made an urgent application to The Bahamas Supreme Court for permission to take further necessary action to protect the interest of clients and creditors in the digital assets.

3.  On the same day, under the authority of an Order made by The Bahamas Supreme Court, the Commission was granted permission to file additional proceedings against Digital Markets and, in the exercise of its regulatory authority, to cause the digital assets to be transferred to an account and/or digital wallet(s) established and maintained by the Commission, because such action was necessary to protect the interests of clients and creditors.. Copies of the Orders granting the Commission permission to commence the additional proceedings and to take the regulatory action described above are also enclosed.

4.  Thereafter, on 21 November, 2022, The Chief Justice of The Bahamas Supreme Court issued a 'Supplemental Order' that confirmed the digital assets are being held by the Commission as regulator and trustee. Accordingly, the rights of indemnity and re-imbursement accorded a trustee under the law, apply with equal force and effect to the action taken and the digital assets held by Commission under the authority of the earlier Order made on 12 November, 2022. A filed copy of the Supplemental Order is also enclosed. In these and all related respects, the digital assets, Digital Markets and its officers, directors, agents and employees, and the Commission, remain subject to the jurisdiction of the Bahamas Supreme Court.

5.  Importantly, it should also be noted that your clients' assertion that "… no documents in the FTX Digital Markets file are available to the public" is erroneous.

6.  The originating process and orders filed in the proceedings are available for inspection by the public in accordance with Order 60 Rule 3 of The Bahamas Rule of The Supreme Court, which provides –

    "(1) Any person shall, on payment of the prescribed fee, be entitled during office hours to search for, inspect and take a copy of any of the following documents filed in the Registry, namely –

    (a) the copy of any writ of summons or other originating process;

2



(b) any judgment or order given or made in court or the copy of any such judgment or order; and

(c) with leave of the Court, which may be granted on an application made ex parte, any other documents.

(2) Nothing in the foregoing provisions shall be taken as preventing any party to a cause or matter searching for, inspecting and taking or bespeaking a copy of any affidavit or other document filed in the Registry in that cause or matter, but made with a view to its commencement."

7. The affidavit evidence filed in the proceedings are subjected to a confidentiality order issued by court. We also enclose a copy of that Order for your reference.

8. The originating processes and orders filed in the proceedings, however, are not confidential documents.

9. The Commission's regulatory investigation into matters concerning Digital Markets and its businesses, operations, relationships, transfers and affairs continues. The regulatory investigation is not conducted in public.

10. The Commission, however, has communicated with, and will continue to communicate with, other regulatory authorities as appropriate, in confidence, and will continue to take such regulatory actions it deems appropriate to protect the public and any parties that may be directly affected by the failure of Digital Markets and its affiliates.

11. The Commission appreciates that, as a fiduciary for certain affiliates of Digital Markets in the Chapter 11 proceedings, your clients have certain duties and rights prescribed by the United States Bankruptcy Code. The Commission respects your clients' responsibilities and recognizes the important work ahead in all civil proceedings in The Bahamas, The United States of America, and possibly other jurisdictions. Respectfully, however, those duties and rights of your clients do not include the right to impede the Commission's due exercise of its regulatory powers, actions and investigation. Given the confidentiality of the Commission's investigation, it declines to provide certain information your clients seek as to the regulatory actions taken to date.

12. The Commission makes no comment on your suggestion that your clients and The Bahamian Joint Provisional Liquidators enter into one or more joint protocols to facilitate the efficient conduct and mutual respect for the pending insolvency proceedings, except to make clear that we do not speak for the Joint Provisional Liquidators.

13. To the extent the Commission is able to assist in the efficient and mutually respectful conduct of the several pending proceedings without impairing the conduct or confidentiality of its ongoing regulatory investigation, including by participating in a meeting with your clients, the Joint Provisional Liquidators and/or their respective counsel, they are prepared to do so.  An appropriate and necessary part of any arrangement reached during such meeting, would be your clients' assurance that they will take no



further action to interfere with the Commission's investigation and other regulatory measures.

We look forward to hearing from you.

Yours faithfully,
**DELANEY PARTNERS**

Robert K. Adams KC
Partner
Direct line: 242 702 4512
Email: radams@delaneypartners.com

cc. Securities Commission of The Bahamas

<u>Encls.</u>

4

COMMONWEALTH OF THE BAHAMAS

IN THE SUPREME COURT

COMMERCIAL DIVISION

SUPREME COURT

NOV 1 1 2022

NASSAU, BAHAMAS

2022

COM/com/

IN THE MATTER OF the Digital Assets and Registered Exchanges Act, 2020
(as amended)

AND IN THE MATTER OF the Companies (Winding Up Amendment) Act, 2011

AND IN THE MATTER OF FTX DIGITAL MARKETS LTD.
(A Registered Digital Asset Business)

---

## PETITION

---

TO: The Supreme Court of the Commonwealth of The Bahamas

The Humble Petition of **THE SECURITIES COMMISSION OF THE BAHAMAS ("the Commission"** or **"the Petitioner")** a statutory body continued pursuant to the Securities Industry Act, 2011 show as follows:

1.  This Petition relates to FTX Digital Markets Ltd **("FTX Digital")**.

2.  FTX Digital was incorporated in the Commonwealth of The Bahamas on 22 July 2021 as an International Business Company.

3.  The registered number of the FTX Digital is **No.207269B** and the principal address and office for FTX Digital is Building 27, Veridian Corporate Centre, West Bay Street, Nassau, N.P., The Bahamas.

4.  FTX Digital is registered as a digital asset business under the ***Digital Assets and Registered Exchanges Act, 2020* ("the DARE Act")**. FTX Digital is a subsidiary of FTX Trading Ltd, a company incorporated in Antigua and Barbuda (collectively referred to as **"FTX")**. Under the DARE Act, FTX Digital is registered to provide: (i) an exchange

between digital assets and fiat currency and (ii) an exchange between one or more forms of digital assets.

5.    To the best of the Petitioner's information and belief FTX Digital operates its business in Antigua and Barbuda and the United States of America.

6.    The ultimate beneficial owner of the company is Mr. Samuel Bankman-Fried **("SBF")**.

## The Grounds and Jurisdiction

7.    The grounds on which a winding up order by this Honourable Court is sought as follows:

   7.1.    FTX Digital is a company within the meaning of the Companies (Winding Up Amendment) Act 2011 **("the CWUA Act),** s.185 (b).

   7.2.    The Petitioner is a regulator within the meaning of the CWUA Act, s.183.

   7.3.    The Petitioner, in its capacity as regulator, may apply to wind up a company under CWUA Act, if the company is carrying on a regulated business in The Bahamas for any reason as provided under the regulatory laws or any other law: CWUA Act, s. 190(1)(d) and s.190(4).

   7.4.    Under the CWUA Act, this Honourable Court may make an order winding up a company on the application of the Petitioner if the company is insolvent and a company is insolvent if it is unable to pay its debts as they fall due or the value of the company's liabilities exceeds its assets: CWUA Act s. 186(c) and s.187.

   7.5.    Also, a company is deemed to be unable to pay its debts if it is proved to the satisfaction of the court that the company is unable to pay its debts: s.188(c).

   7.6.    The Petitioner believes that FTX Digital is insolvent for the reasons set out in the affidavit of Christina R. Rolle sworn on 10th November 2022.

8.    There are other additional or alternative grounds on which a winding up order is sought to be made by this Honourable Court as follows:

8.1.    On 10 November 2022 the Commission suspended FTX Digital's licence. The CWUA Act, s.186(4) authorises the Commission to petition for the winding up of a company over which it has regulatory authority and whose licence has been suspended.

8.2.    Further, the DARE Act, s.24 requires FTX Digital to act honestly and fairly, to act with due care and diligence, observe and maintain a high standard of professional conduct and maintain adequate financial resources and solvency. The affidavit of Christina R. Rolle evidences that these duties have been breached. The DARE Act, s.46(1)(f) permits the Commission to apply to this Honourable Court for an order to take such action as the Commission considers necessary to protect the interests of clients or creditors of a regulated company. The Commission considers that it is necessary to take action by presenting a winding up petition and obtaining the appointment of a provisional liquidator.  In light of the wide power afforded to the Commission by CWUA Act s.190(1)(d) and s.190(4), a petition can be presented where the DARE Act has been breached. The fact that FTX Digital is not complying with its duties under the DARE Act constitutes sufficient and alternative grounds for a winding up order to be made.

## Appointment of Provisional Liquidator

9.    The Petitioner also seeks an immediate order that a provisional liquidator be appointed in respect of FTX Digital, the order to continue until further order of this Honourable Court.

10.    The grounds for the appointment of a provisional liquidator as required by the CWUA Act, s.199 are:

10.1.    There is a prima facie case for making a winding up order: CWUA Act s.199(2)(a) and

10.2.    The appointment of a provisional liquidator is necessary: CWUA Act s.199(2)(b) –

(i)    To prevent the dissipation or misuse of the company's assets; and/or

(ii)    To prevent mismanagement or misconduct on the part of the company's directors; and/or

(iii)    In the public interest.

11.  It is proposed that Mr. Brian Cecil Simms KC of 3 Bayside Executive Park, Nassau, N.P., The Bahamas be appointed as a provisional liquidator of FTX Digital pending the determination of the Petition.

12.  The purpose of such an appointment is to protect the interests of investors and creditors of FTX Digital and the wider public interest in the orderly and secure management of the business of digital and crypto assets in the Commonwealth of the Bahamas pending the determination of the Petition

13.  For the reasons set out above the Petitioner makes this application for FTX Digital to be wound up on the following grounds:

   13.1.  That FTX Digital is insolvent: CWUA Act, s.186(b)

   13.2.  That it is just and equitable that FTX Digital be wound up: CWUA Act, s.186(e)

   13.3.  That FTX Digital's licence has been revoked: CWUA Act, s.186 (f)

**AND YOUR PETITIONER** therefore humbly prays that:

   i.  FTX Digital be wound up in accordance with the Companies (Winding Up Amendment) Act, 2011.

   ii.  Mr. Brian Simms KC of 3 Bayside Executive Park, Nassau, N.P., The Bahamas be appointed as provisional liquidator of FTX Digital forthwith pending the determination of the Petition.

   iii.  All costs incurred by Mr. Brian Simms KC, and his advisors to date, if any, shall be costs in the winding-up; and

   iv.  Such further Order or directions as the Court thinks fit.

**AND YOUR PETITIONER** will ever pray.


**DATED this 10th day of November A.D., 2022**


*Securities Commission of The Bahamas*
**Securities Commission of The Bahamas**
2nd Floor Poinciana House,
North Building
31A East Bay Street
Nassau, N.P., The Bahamas


**NOTE:** This petition is intended to be served on FTX Digital and Samuel Bankman-Fried whose last known address is Nassau, N.P., The Bahamas.

This Petition was presented by the Securities Commission of The Bahamas whose address for service is **Securities Commission of The Bahamas** 2nd Floor Poinciana House, North Building, 31A East Bay Street.

### NOTICE OF HEARING

**TAKE NOTICE THAT** the hearing of this petition will take place at the Supreme Court in the city of Nassau on the Island of New Providence one of the Islands of the Commonwealth of The Bahamas on the **10th** day of **February** A.D., 2023 at **10** o'clock in the fore-noon.


Any correspondence or communication with the Court relating to the hearing of this petition should be addressed to the Registrar of the Commercial Division of the Supreme Court at Nassau, The Bahamas.

**COMMONWEALTH OF THE BAHAMAS**

**IN THE SUPREME COURT**

**Commercial Division**

**IN THE MATTER OF the Digital Assets and
Registered Exchanges Act, 2020 (as amended)**

**AND IN THE MATTER OF
FTX DIGITAL MARKETS LTD.**
(A Registered Digital Asset Business)

**AND IN THE MATTER OF the
Companies (Winding Up Amendment) Act, 2011**

---

**PETITION**

---

2022
COM/com

*Securities Commission of The Bahamas*
**Securities Commission of The Bahamas**
2nd Floor Poinciana House,
North Building
31A East Bay Street
Nassau, N.P., The Bahamas

**COMMONWEALTH OF THE BAHAMAS**
**IN THE SUPREME COURT**
**COMMERCIAL DIVISION**

SUPREME COURT

NOV 15 2022

NASSAU, BAHAMAS

**2022/COM/com**

IN THE MATTER OF the Digital Assets and Registered Exchanges Act, 2020

(as amended)

AND IN THE MATTER OF FTX DIGITAL MARKETS LTD.

(A Registered Digital Asset Business)

SECURITIES COMMISSION OF THE BAHAMAS

**Plaintiff**

**AND**

FTX DIGITAL MARKETS LTD.

**Defendant**

---

## ORDER

---

**Before The Honourable Justice Loren Klein**
**Dated the 12th day of November, A.D., 2022**

**UPON AN URGENT APPLICATION**, made orally and ex parte, on behalf of The Securities Commission of The Bahamas ("the Application").

**AND UPON HEARING** Mr. Robert K. Adams, KC and Edward J. Marshall II of Counsel for The Securities Commission of The Bahamas

**AND THE COURT,** being satisfied by Counsel appearing for The Securities Commission that the Provisional Liquidator of the FTX Digital Markets Ltd had been notified of the Application

**AND UPON THE UNDERTAKING** of Counsel for the Applicant to file herein an Originating Summons and Affidavit in support thereof on Monday, 14 November 2022

**IT IS ORDERED THAT** The Securities Commission of The Bahamas is hereby granted leave to commence proceedings against FTX Digital Markets Ltd for relief under section 46 of the Digital Assets and Registered Exchanges Act, 2020.

**AND IT IS ORDERED** that the costs of and occasioned by this application are to be costs in the cause.


**BY ORDER OF THE COURT**


**REGISTRAR**

COMMONWEALTH OF THE BAHAMAS
IN THE SUPREME COURT
COMMERCIAL DIVISION

IN THE MATTER OF the Digital Assets and
Registered Exchanges Act, 2020
(as amended)

AND IN THE MATTER OF FTX DIGITAL
MARKETS LTD.
(A Registered Digital Asset Business)

SECURITIES COMMISSION OF THE
BAHAMAS
Plaintiff

AND

FTX DIGITAL MARKETS LTD.
Defendant

---

# ORDER

---

2022/COM/com

DELANEY PARTNERS
Lyford Manor (West Bldg)
Western Road, Lyford Cay
New Providence, The Bahamas

Attorneys for the Plaintiff

RKA/EJM/sjs

**SUPREME COURT**

**COMMONWEALTH OF THE BAHAMAS**

**IN THE SUPREME COURT**

**COMMERCIAL DIVISION**

NOV 1 4 2022

**NASSAU, BAHAMAS**

**2022/COM/com**

**IN THE MATTER OF the Digital Assets and Registered Exchanges Act, 2020**

**(as amended)**

**AND IN THE MATTER OF FTX DIGITAL MARKETS LTD.**

**(A Registered Digital Asset Business)**

**SECURITIES COMMISSION OF THE BAHAMAS**

**Plaintiff**

**AND**

**FTX DIGITAL MARKETS LTD.**

**Defendant**

---

# ORDER

---

**Before The Honourable Justice Loren Klein**

**Dated the 12th day of November, A.D., 2022**

**UPON AN URGENT APPLICATION**, made orally and ex parte, on behalf of The Securities Commission of The Bahamas ("the Application").

**AND UPON HEARING** Mr. Robert K. Adams, KC and Edward J. Marshall II of Counsel for The Securities Commission of The Bahamas

**AND THE COURT,** being satisfied by Counsel appearing for The Securities Commission that the Provisional Liquidator of the FTX Digital Markets Ltd had been notified of the Application

**AND UPON THE UNDERTAKING** of Counsel for the Applicant to file herein an Originating Summons and Affidavit in support thereof on Monday, 14 November 2022

**IT IS HEREBY ORDERED THAT** The Securities Commission of The Bahamas, as regulator, do take the action of directing FTX Digital Markets Ltd, whether by its Provisional Liquidator or otherwise, to transfer forthwith to an account and/or digital wallet(s) established and maintained by The Securities Commission of The Bahamas all of the digital assets on the FTX.com platform within the possession, custody and/or under the control of FTX Digital Markets Ltd, its officers, directors, employees and/or agents, including any digital assets held upon trust by FTX Digital Markets Ltd, on the grounds that such action is necessary to protect the interests of clients and creditors of FTX Digital Markets Ltd and otherwise in the public interest to do so

**AND IT IS ORDERED** that the costs of and occasioned by this application are to be costs in the cause.

**THIS ORDER** shall remain in force until varied or discharged upon application being made on two clear days' notice **AND** the parties shall be at liberty to apply.

**BY ORDER OF THE COURT**

**REGISTRAR**

**COMMONWEALTH OF THE BAHAMAS**

**IN THE SUPREME COURT**

**COMMERCIAL DIVISION**

**IN THE MATTER OF the Digital Assets and**

**Registered Exchanges Act, 2020**

**(as amended)**

**AND IN THE MATTER OF FTX DIGITAL**

**MARKETS LTD.**

**(A Registered Digital Asset Business)**

**SECURITIES COMMISSION OF THE**

**BAHAMAS**

                                                            **Plaintiff**

**AND**

**FTX DIGITAL MARKETS LTD.**

                                                            **Defendant**

---

# ORDER

---

**2022/COM/com**

*Delaney Partners*
**DELANEY PARTNERS**
Lyford Manor (West Bldg)
Western Road, Lyford Cay
New Providence, The Bahamas

Attorneys for the Plaintiff

RKA/EJM/sjs

COMMONWEALTH OF THE BAHAMAS SUPREME COURT | 2022/COM/com

IN THE SUPREME COURT

COMMERCIAL DIVISION          NOV 2 2 2022

IN THE MATTER OF the Digital Assets and Registered Exchanges Act, 2020
(as amended)

AND IN THE MATTER OF FTX DIGITAL MARKETS LTD.
(A Registered Digital Asset Business)

SECURITIES COMMISSION OF THE BAHAMAS

Plaintiff

AND

FTX DIGITAL MARKETS LTD.

Defendant

---

## SUPPLEMENTAL ORDER

---

**Before The Honourable Chief Justice Ian Winder**

**Dated the 21st day of November, A.D., 2022**

**UPON THE APPLICATION** of the Plaintiff, Securities Commission of The Bahamas, made by Summons dated 18th November and filed herein on 21st November, 2022.

**AND UPON HEARING** Mr. Robert K. Adams, KC and Mr. Edward J. Marshall II of Counsel for the Securities Commission of The Bahamas, and Mrs. Sophia T. Rolle-Kapousouzoglou with Mr Valdere J. Murphy of Counsel for the Joint Provisional Liquidators of FTX Digital Markets Ltd.

**AND UPON READING** the Second Affidavit of Christina R. Rolle sworn on 18th November, 2022 and filed herein on 21st November, 2022.

**IT IS HEREBY ORDERED THAT:**

1. The digital assets transferred by FTX Digital Markets Ltd ("FTXDM") to digital wallet(s) established and maintained by the Securities Commission of The Bahamas ("the Commission") under the authority of the Order of The Honourable Justice Loren Klein made on 12th November 2022 to enable to regulatory and administrative action by the Commission to protect the assets of FTXDM in the interest of the clients and creditors of FTXDM, shall continue to be held in the custody of the Commission as regulator under the continuing direction of this Honourable Court and so long as held by the Commission, the Commission shall be regarded as acting as trustee in the administration of trust assets within the meaning of the Trustee Act Ch.176 for the benefit of the clients and/or creditors of FTXDM, pending directions for the continued safe custody of the said assets issued by this Honourable Court to the joint provisional liquidators and/or the Commission in the proceeding for the winding-up of FTXDM or further order.

2. For the avoidance of doubt, the Commission is entitled to be indemnified as a trustee under the law, including without limitation, pursuant to The Trustee Act, Ch. 176.

3. Further, for the avoidance of doubt, the Commission is entitled to be reimbursed out of the said assets held upon trust, with respect to the expenses, costs and charges reasonably incurred in connection with, or by reason of, the action taken by the Commission under the authority of the said Order made on 12th November, 2022 to protect the said assets in the interest of the clients and/or creditors of FTXDM, including but not limited to, costs associated with establishing and maintaining the digital wallet(s).

4. Any indemnifying payment to be made under paragraph 2 herein and/or re-imbursement to be made under paragraph 3 herein to the Commission shall require prior approval of the Court.

5. The Second Affidavit of Christina Rolle and other documents filed herein (including counsel's skeleton argument) and the affidavits and documents filed herein in the future, save for the Originating Notice of Motion, Orders

of The Honourable Justice Klein made on 12th November and 16th November, 2022 and this Order, shall be sealed and kept confidential until further Order.

6. The costs of and occasioned by this application are to be paid to the Commission as a trustee of the said assets.

7. The parties be at liberty to apply.

**BY ORDER OF THE COURT**

**REGISTRAR**

COMMONWEALTH OF THE BAHAMAS
IN THE SUPREME COURT
COMMERCIAL DIVISION

IN THE MATTER OF the Digital Assets and
Registered Exchanges Act, 2020
(as amended)

AND IN THE MATTER OF FTX DIGITAL
MARKETS LTD.
(A Registered Digital Asset Business)

SECURITIES COMMISSION OF THE
BAHAMAS

                                                                    Plaintiff

AND

FTX DIGITAL MARKETS LTD.

                                                                    Defendant

---

## SUPPLEMENTAL ORDER

---

**2022/COM/com**

**DELANEY PARTNERS**
Lyford Manor (West Bldg)
Western Road, Lyford Cay
New Providence, The Bahamas

Attorneys for the Plaintiff

RKA/EJM/sjs 0833-2949

**COMMONWEALTH OF THE BAHAMAS**
**IN THE SUPREME COURT**
**COMMERCIAL DIVISION**

SUPREME COURT

NOV 1 6 2022

**NASSAU, BAHAMAS**

2022/COM/com

IN THE MATTER OF the Digital Assets and Registered Exchanges Act, 2020
(as amended)

AND IN THE MATTER OF FTX DIGITAL MARKETS LTD.
(A Registered Digital Asset Business)

BETWEEN

SECURITIES COMMISSION OF THE BAHAMAS

**Plaintiff**

AND

FTX DIGITAL MARKETS LTD.

**Defendant**

---

## ORDER

---

Before The Honourable Justice Loren Klein
Dated the 16th day of November, A.D., 2022

**UPON THE URGENT APPLICATION** of the Plaintiff by Summons filed herein on 16 November 2022

**AND UPON HEARING** Mr. Robert K. Adams, KC and Edward J. Marshall II of Counsel for the Plaintiff

**AND THE COURT,** being satisfied by Counsel appearing for the Plaintiff that the Provisional Liquidator of the FTX Digital Markets Ltd had been notified of the Application

**IT IS ORDERED THAT** the Affidavit of Christina Rolle and other documents to be filed save for the Originating Notice of Motion and the Orders made herein on 12th November 2022 and filed on 14th and 15th November 2022, respectively, shall be sealed and kept confidential until further Order **AND IT IS ORDERED** that the costs of and occasioned by this application are to be costs in the cause.

**THIS ORDER** shall remain in force until varied or discharged upon application being made on two clear days' notice **AND** the parties shall be at liberty to apply.

**BY ORDER OF THE COURT**

**REGISTRAR**

COMMONWEALTH OF THE BAHAMAS
IN THE SUPREME COURT
COMMERCIAL DIVISION

IN THE MATTER OF the Digital Assets and
Registered Exchanges Act, 2020
(as amended)

AND IN THE MATTER OF FTX DIGITAL
MARKETS LTD.
(A Registered Digital Asset Business)

BETWEEN

SECURITIES COMMISSION OF THE
BAHAMAS

**Plaintiff**

AND

FTX DIGITAL MARKETS LTD.

**Defendant**

_____

# ORDER

_____

2022/COM/com

*Delaney Partners*
**DELANEY PARTNERS**
Lyford Manor (West Bldg)
Western Road, Lyford Cay
New Providence, The Bahamas

Attorneys for the Plaintiff

RKA/EJM/sjs 0833-2949

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| | **Ref No. 199** |
| | **Objection Deadline: TBD**<br>**Hearing Date:  TBD** |

## DEBTORS' OBJECTION TO MOTION FOR ENTRY OF AN ORDER SHORTENING THE NOTICE AND OBJECTION PERIODS WITH RESPECT TO EMERGENCY MOTION (I) FOR RELIEF FROM AUTOMATIC STAY AND (II) TO COMPEL TURNOVER OF ELECTRONIC RECORDS UNDER SECTIONS 542, 1519(A)(3), 1521(A)(7) AND 1522 OF THE BANKRUPTCY CODE

FTX Trading Ltd. and its affiliated debtors and debtors-in-possession (collectively, the "Debtors") hereby submit this objection (this "Objection") to the *Motion of the Joint Provisional Liquidators of FTX Digital Markets Ltd. for Entry of an Order Shortening the Notice and Objection Periods* (the "Motion to Shorten") *with Respect to the Emergency Motion of the Joint Provisional Liquidators of FTX Digital Markets Ltd. (I) For Relief from the Automatic Stay and (II) To Compel Turnover of Electronic Records Under Sections* 542, 1519(A)(3), 1521(A)(7) and 1522 of the Bankruptcy Code [D.I. 199] (the "Motion to Compel"). In support of this Objection, the Debtors respectfully state as follows:

## PRELIMINARY STATEMENT

1.      The relief sought by the Joint Provisional Liquidators ("JPLs"), though couched in ordinary terms, is actually quite extraordinary.  It is not a request for information;

---

[1]     The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively.  Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

rather, it is a request for access—full and total access to all of Debtors' cloud-based systems. It is a request for live, dynamic access that would be provided immediately to the government of The Bahamas and to Messrs. Samuel Bankman-Fried and Gary Wang, who are located in The Bahamas and working closely with Bahamian officials. The Debtors simply cannot allow this to occur.

2. The JPLs have identified no exigency that would justify the Motion to Shorten and, in any event, the substantive relief is not warranted and presents massive and unjustifiable security risks to the Debtors, their assets, their customers and creditors. It is also inconsistent with the Debtors' cooperation with the many investigations by U.S. law enforcement and regulatory authorities now underway into the failure of the Debtors.

3. *First*, there is no emergency. To the extent there is any risk to the assets, documents, or information, the Debtors are taking all steps to ameliorate such risk. The JPLs can do nothing more to ameliorate any risk than is already being done by the Debtors. A month has passed since these Chapter 11 Cases (defined below) were filed on November 11, 2022. The JPLs' access to the Debtors' cloud-based environments was limited on November 12, 2022 following substantial and unauthorized access, at a minimum, by Messrs. Bankman-Fried and Wang at the direction of the JPLs and the Securities Commission of the Bahamas (the "Commission"). In the meantime, the Debtors have reached out repeatedly to the JPLs and the government of The Bahamas—the Prime Minister, the Attorney General and the Securities Commission of The Bahamas (the "Commission")—the true party in interest—about level setting the factual record and having frank conversations about a path forward. In response, the Debtors have received nothing other than a stone wall; a complete refusal to provide any information whatsoever, including an accounting of diverted assets. The JPLs know that this

stonewalling will continue. They admit as much in their papers. (Motion to Compel ¶ 19 ("[A]ny such protocol would be subject to authorization by the Bahamian Court and *it is not certain such relief will be granted*." (emphasis added)).)

4. *Second*, the JPLs fail to identify any basis that would justify their request for expedition, other than to protect FTX Digital Markets Ltd. ("FTX DM") assets supposedly at risk of dissipation. The JPLs simply state that such a risk exists, but provide no evidence to support it. They satisfy no burden to justify the relief. This is because no such risk exists. The Debtors are working day and night to secure all assets wherever located. If in the course of this exercise assets of FTX DM have been or are secured, those assets will remain secured. Likewise, all records have been backed up, saved and/or cloned, as appropriate. Nothing is at risk of disappearing so long as the relief requested by the JPLs is not granted.

5. The Debtors remain ready, willing, and able to sit down with the JPLs and the Commission to work out a mutually acceptable protocol that provides the Debtors, the JPLs, and the Commission with transparency as to asset identification, location, and value of all collected and secured assets, so long as this exercise is 100% reciprocal and provides iron-clad protections that the Debtors' records, assets, and systems will never again be subject to review or manipulation by Messrs. Bankman-Fried and Wang or anyone aligned with or associated with either of them.

6. There is no cause to shorten the notice and objection periods for their Motion to Compel. The Motion to Shorten must be denied.

## **BACKGROUND**

### A. **The Debtors and Their Chapter 11 Cases**

7. On November 11, 2022 and on November 14, 2022 (as applicable, the "Petition Date"), the Debtors filed with the Court voluntary petitions for relief under title 11 of

the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Joint administration of the Debtors' cases (the "Chapter 11 Cases") was authorized by the Court by entry of an order on November 22, 2022 [D.I. 128]. As of the date hereof, no creditors' committee, trustee, or examiner has been appointed in these Chapter 11 Cases.

8.       Additional factual background relating to the Debtors' businesses and the commencement of these Chapter 11 Cases is set forth in the *Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 24], the *Declaration of Edgar W. Mosley II in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 57], the *Supplemental Declaration of John J. Ray III in Support of First Day Pleadings* [D.I. 92], and the *Supplemental Declaration of Edgar W. Mosley II in Support of First Day Pleadings* [D.I. 93] (collectively, the "First Day Declarations").

**B.       Provisional Liquidation of FTX DM**

9.       During the week beginning Sunday, November 6, 2022, it became clear that the FTX Group was facing a liquidity crisis and that the ability of its constituent entities to operate as going concerns was in doubt. As a result, withdrawals were halted on November 8, 2022 for FTX.com (encompassing both FTX Trading Ltd. and FTX DM). Messrs. Bankman-Fried and Wang were in close and frequent contact with the Commission and the Attorney General throughout the week. As to FTX.com, on November 9, 2022, Mr. Bankman-Fried sent an email to the Attorney General in which he stated "we have segregated funds for all Bahamian customers" and "**would be more than happy to open up withdrawals for *all* Bahamian customers on FTX, so that they can, *tomorrow*, *fully* withdraw *all* of their assets, making**

**them fully whole.**" (Emphasis in original). (Ex. A.)[2] Debtors' investigation to date shows that Mr. Bankman-Fried did open withdrawals on the FTX.com exchange for certain customers for a period of approximately 25.5 hours, from 10:30 a.m. on November 10, 2022 to noon on November 11, 2022, during which time nearly $100 million in cryptocurrency was withdrawn by approximately 1,500 individuals and entities purporting to be Bahamian customers for know your customer ("KYC") purposes.

10. No other customers of FTX entities were given such an opportunity for preferential treatment. Notably, the opening of this window took place *after* the commencement of the provisional liquidation proceedings in The Bahamas and *after* U.S. counsel was engaged to begin contingency planning for Chapter 11. The Debtors continue to investigate the identities of those who received these withdrawals, including whether they actually satisfied applicable KYC and other legal requirements. The Debtors reserve all rights with respect to such withdrawals, including without limitation, the right to claw back any payments.

11. By order dated November 10, 2022, FTX DM was placed into provisional liquidation in the Commonwealth of the Bahamas (the "Bahamian Liquidation") by the Commission pursuant to its authority under the Digital Assets and Registered Exchanges Act (the "DARE Act"). On the same day, the Bahamian court overseeing the Bahamian Liquidation appointed Brian Cecil Simms as the then-sole provisional liquidator. The sworn declarations in support of the relief were filed under seal. The proceedings took place on an *ex parte* basis. The Debtors are not aware of what, if anything, was represented to the Bahamian court with respect to the opening of the exchanges for "Bahamian" customers.

---

[2] All exhibits are from the Declaration of James L. Bromley, dated December 12, 2022, submitted with this Objection.

12.     On November 11, 2022, John J. Ray, II was appointed as Chief Restructuring Officer and Chief Executive Officer of the Debtors pursuant to an omnibus corporate authority signed by Mr. Bankman-Fried.  (*See* Ray First Day Declaration ¶ 1.)  Prior to assuming those roles, Mr. Ray had no relationship of any sort with any FTX company, with Mr. Bankman-Fried, Mr. Wang, Mr. Singh, or any other officer or director of any FTX company. Shortly after his appointment, Mr. Ray provided corporate authority to commence the Chapter 11 Cases.  (*Id.* ¶ 2.)  Given that the Commission had commenced a provisional liquidation against FTX DM on November 10, 2022, no chapter 11 petition was filed with respect to FTX DM.  (*Id.* ¶ 42.)

### C.     Debtors' Cloud-Based Assets

13.     As the Chapter 11 Cases were being filed, Debtors and their representatives worked tirelessly through the night to secure assets, including two important systems belonging to the Debtors:  Amazon Web Services ("AWS"), which hosted the Debtors' FTX.com trading platform and holds Debtors' digital assets; and Google Cloud Platform ("GCP"), which holds a copy of the main data tables from AWS for analytics purposes.  Debtor Alameda Research, Ltd. ("Alameda") contracted for, pays for, and has the right to control access to, these web services.  The servers on which these web services are housed are located in the United States.

14.     On the evening of November 11, 2022, while Debtors were in the process of securing these assets and others, it became clear that the systems that control Debtors' digital wallets were being accessed by one or more unidentified and unauthorized actors.  The Debtors and their advisors worked through the night into the early morning hours of November 12, 2022 to block such access and move digital assets to secure cold wallets.  Also on November 12, 2022, the Debtors observed the minting of new FTT tokens.

15.     During this period—and subsequently—information emerged that Debtors' systems and assets were accessed from at least two sources.  (*See* Ray First Day Declaration ¶ 75.)  One source continues to be under investigation.  The second source, based on evidence collected by Debtors, shows without doubt that the Commission—after the filing and public announcement of the Chapter 11 Cases—instructed Messrs. Bankman-Fried and Wang to mint a substantial amount of new tokens and transfer hundreds of millions of dollars' worth of those new tokens and other digital assets to cold storage under the control of the Commission.  The Debtors' investigation of this unauthorized access is ongoing and is yielding new information by the day.

16.     Postpetition, on November 12, 2022—after these actions already had been undertaken—"the Commission sought an additional Order (the '<u>November 12 Order</u>') from the Supreme Court of The Bahamas for authority under the DARE Act to transfer *all digital assets of FTX* into digital wallets under the exclusive control of the Commission for the benefit of clients and creditors of [FTX DM]."  (Emphasis added.)  The existence of this Order was not revealed to Debtors until November 23, 2022, when the Commission issued a press release in response to Debtors' motion to transfer (discussed below).  (*See* Ex. B.)

17.     As with the November 10 proceedings, the proceedings leading to the November 12 Order were conducted on an *ex parte* basis and under seal.  The Debtors did not receive (i) notice that the Commission was seeking entry of the November 12 Order; (ii) an opportunity to be heard in respect of the November 12 Order; (iii) a copy of the pleadings filed by the Commission in support of the application for the November 12 Order; or (iv) a copy of the November 12 Order itself.  Moreover, despite repeated requests, Debtors have not received from

the JPLs any detail as to what assets the Commission seized, how they were transferred, or why they reference FTX assets as opposed to FTX DM assets.

18.     With knowledge of the Commission's unauthorized access to Debtors' systems, but no knowledge of the November 12 Order, Debtors' counsel wrote a letter to Christina Rolle, Executive Director of the Commission, and Mr. Simms, the then-sole provisional liquidator, informing each of the Chapter 11 Proceedings and the existence of the automatic stay of Section 362(a) of the Bankruptcy Code.  (Ex. C.)  Debtors have not received a response to that letter, which was sent on November 13, 2022.

19.     On November 14, 2022, Kevin G. Cambridge and Peter Greaves were also appointed as JPLs, to serve alongside Mr. Simms.  Again, no notice of these appointments was provided to Debtors.

### D.     The JPLs and Bahamian Government Ignore Debtors' Offers to Coordinate

20.     On November 15, 2022, lawyers from Holland & Knight LLP (then-counsel for the JPLs) requested an introductory call with Debtors' counsel.  During that call, Debtors' counsel proposed the development of a consensual protocol to facilitate coordination between the Chapter 11 Cases and the Bahamian Liquidation.  Then-counsel for the JPLs told Debtors' counsel that they would consider the proposal but never responded.

21.     On November 16, 2022—five days after the Petition Date and with no notice to Debtors—the JPLs filed a Chapter 15 Petition for Recognition of a Foreign Proceeding relating to FTX DM in the United States Bankruptcy Court for the Southern District of New York ("SDNY"), captioned *In re FTX Digital Markets Ltd. (in Provisional Liquidation)*, Case No. 22-BK-11516 (MEW) (the "Chapter 15 Case").  The JPLs sought entry of an order pursuant to chapter 15 of the Bankruptcy Code to, among other things, recognize the Bahamian Liquidation as a foreign main proceeding pursuant to 11 U.S.C. §§ 1502, 1517(a) and (b)(1), and

appointing the JPLs as FTX DM foreign representatives pursuant to 11 U.S.C. §§ 101(24), 1509 and 1517(a). Among other things, the JPLs alleged that some or all of the Chapter 11 Cases are illegitimate, that the center of main interests for the "FTX Group" and the "FTX Brand" is in the Bahamas, and strongly suggested that upon recognition the JPLs will seek to dismiss some or all of these Chapter 11 Cases.

22. On November 17, 2022, Debtors filed an emergency motion to transfer the Chapter 15 Case to this Court for coordinated proceedings with the Chapter 11 Cases [D.I. 22].

23. The first day hearing in the Chapter 11 Cases was conducted on November 22, 2022 (the "<u>First Day Hearing</u>"). At the First Day Hearing, the JPLs consented to the transfer of the Chapter 15 Case to this Court, subject to certain limitations and conditions, and the Court entered an order transferring the Chapter 15 Case to this Court on the same day [D.I. 131].

24. On November 27, 2022, Debtors wrote to the Prime Minister (the Honorable Philip Davis) and Attorney General (the Honorable Leo Ryan Pinder) of The Bahamas "to open a new line of communication so that [the Debtors and the Bahamian government] can collectively move forward on a coordinated basis" and offered "to speak with [them] at [their] earliest convenience about how the Government of the Bahamas can participate directly and meaningfully in the Chapter 11 Proceedings on behalf of itself and Bahamian citizens in general." (Ex. D.)

25. Later on the same day, November 27, 2022, the Attorney General of the Bahamas addressed the Bahamian nation on the so-called "current situation regarding FTX Digital Markets Limited" (the "<u>AG's Address</u>"). (Ex. E.) The AG's Address admits that the Commission's regulatory mandate only extends to FTX DM. Nevertheless, the AG's Address also makes clear that the Bahamian government wants to control all FTX bankruptcy

proceedings—not just those of FTX DM—by purporting to take steps to protect "the interests of *FTX's* customers and creditors." (Ex. E at 2 (emphasis added).) The AG's Address again called into question the legitimacy of these Chapter 11 Cases, asserting Debtors' counsel made "inaccurate allegations" in its filings before this Court and suggesting that Debtors' "legal strategy" is being driven by the "prospect of multi-million dollar legal and consultant fees." (Ex. E at 5.) The AG's Address acknowledged the Commission's involvement in the unauthorized access of Debtors' assets, stating that the Commission had "secured the assets of [FTX DM] to be held on behalf of and *for the benefit and restitution of clients and creditors of FTX*," (Ex. E at 2 (emphasis added)), but provided no details as to what occurred and omitted any reference to the ongoing collaboration with Messrs. Bankman-Fried and Wang.

26.     On December 1, 2022, following the AG's Address, Debtors wrote to the Prime Minister and the Attorney General, again offering "to discuss areas where cooperation would be mutually beneficial." The letter also set out a detailed summary of the facts known to the Debtors and requested again that the Bahamian authorities provide information to the Debtors as to what assets had been secured by the Commission. (Ex. F.)

27.     On December 7, 2022, Bahamian counsel for the Debtors, Peter D. Maynard and Co. ("Maynard"), received a letter from Bahamian counsel for the Commission, Delaney Partners ("Delaney"), that—for the first time—acknowledged Debtors' November 13 and December 1 Letters. (Ex. G.) Notably, the Commission's Letter "decline[d] to provide certain information [Debtors] seek as to" the assets seized. (Ex. G at 3.) Further, the letter stated that the Commission had "no comment on [Debtors'] suggestion that [they] and The Bahamian Joint Provisional Liquidators enter into one or more joint protocols to facilitate the efficient conduct and mutual respect for the pending insolvency proceedings." (*Id.*)

28.     At around 1:00 PM on December 7, 2022, Debtors' counsel received a letter from the JPLs' current counsel, White & Case LLP, that stated they "urgently require immediate access to [FTX DM's] electronic records that are contained on certain of the systems controlled by the Chapter 11 Debtors" and requested unfettered access to all of Debtors' systems, including Slack, Google Mail/Google Chat, Google Drive, AWS, and Google Cloud Platform BigQuery.  (Ex. H.)  The letter demanded that the JPLs be provided access "by no later than 5PM EST on Thursday, December 8, 2022"—just over 24 hours after Debtors' counsel received the request.  (Ex. H at 1.)

29.     On December 8, 2022, Debtors' counsel responded to the letter by email, offering "an in person meeting next Wednesday to see if we can take the temperature down." (Ex. I.)  The next morning, counsel for the JPLs responded, "[w]e'll discuss on our end and consider schedules/availability and will get back to you."  (Ex. I.)  The email said nothing about their intent to file the instant Motions.

30.     The interactions between the Debtors, the JPLs, and the Commission— which the JPLs largely omit from their Motions—are clear:  Debtors have made repeated overtures to JPLs and Commission to meet and those overtures were met with avoidance and obfuscation.  The JPLs and the Commission have refused to provide responses to Debtors' questions about the assets "secured" by the Commission.  Instead, the JPLs file baseless motions seeking extraordinary relief on an unnecessarily truncated timeframe.

31.     The Bahamas has an interest in the Chapter 11 Cases, and customers in The Bahamas will file claims against the Debtors.  The same can be said for many countries. The Debtors have established cooperative relationships with regulators and local insolvency

professionals appointed to oversee the resolution of subsidiary companies around the world.  The Debtors seek the same in The Bahamas.

## **ARGUMENT**

32.     Bankruptcy Rule 9006(c)(1) authorizes this Court to reduce the notice period required for a hearing, but only "for cause shown."  Although the Court has the discretion to shorten the notice and objection periods with respect to a motion, the moving party must specify "*the exigencies justifying shortened notice*."  Del. Bankr. L.R. 9006-1(e) (emphasis added).

33.     The JPLs have failed to identify any exigency that would justify a shortened notice and objection period.  These Chapter 11 Cases were filed on November 11 and, as they acknowledge in their Motions, the JPLs' access to the Debtors' cloud-based environments was limited on November 12.  For nearly a month, the JPLs have taken no action with regard to their access, despite having an opportunity to do so, and have largely ignored the attempts by Debtors' counsel to develop an information-sharing protocol.

34.     The JPLs assert that they "have made *many* attempts to obtain access" (Motion to Compel ¶ 15), but that is simply untrue.  In doing so, the JPLs claim to have instructed "employees to attempt to gain access" (*id.*) to the Debtors' systems.  In fact, the Debtors have received numerous requests from Mr. Bankman-Fried and others for passwords and access to the Debtors' systems.  Each one of these requests has been rejected.  These requests for access to the Debtors' systems cannot seriously be construed as an attempt by the JPLs to resolve this issue.  In fact, they highlight the recklessness with which the JPLs and the Bahamian authorities are approaching the security of the Debtors' assets and systems.  The last time these individuals had access to the Debtors' systems, they used such access to transfer assets belonging to the Debtors.  That the JPLs and the Commission state with zero specificity

that assets have been secured by the Commission gives no comfort that other assets were not transferred to non-secure locations or that going forward such access will not be used to attempt exactly the same thing.

35.     Setting those "attempts" to the side, the JPLs' current counsel cite to only two interactions with Debtors' counsel related to their so-called request for information (a December 1 Zoom call and a December 7 letter), both of which occurred less than a week before the JPLs filed this request for urgent relief.  To the extent any exigency does exist—it does not— it resulted entirely from the JPLs' failure to engage with Debtors' counsel on the issue.  The JPLs' dilatory behavior should not be rewarded by now having their Motions heard on an expedited basis.

36.     Still more, the JPLs' Motions belie any claim of exigency.  The JPLs submit that an expedited hearing is warranted because there is a "risk that the Joint Provisional Liquidators will be unable to identify, locate, and protect assets at risk of dissipation" and "there is an additional risk that critical information will be automatically purged and forever lost." (Motion to Compel ¶ 14.)  The JPLs acknowledge, however, that the Debtors have "created a recent 'clone' of the live database" in order to preserve the information sought.  (Motion to Compel, Ex. A.)  The JPLs fail to explain, nor could they, how information could be "purged and lost forever," when Debtors have already taken steps to preserve the information.  Similarly, the JPLs do not explain how access would help them to "protect assets at risk of dissipation."  These explanations are pretexts for the JPLs' true goal, to get access to the dynamic databases.  Indeed, if the JPLs had any serious concern about information being purged through automatic deletion, they would have identified the repositories as to which they are concerned and the date they believe such information would be purged.  They have not.

**CONCLUSION**

37.    The JPLs have not identified any exigencies justifying shortened notice

and the Motion to Shorten must be denied in all respects.

Dated: December 12, 2022          **LANDIS RATH & COBB LLP**
      Wilmington, Delaware

/s/ Adam G. Landis
Adam G. Landis (No. 3407)
Kimberly A. Brown (No. 5138)
Matthew R. Pierce (No. 5946)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
E-mail: landis@lrclaw.com
       brown@lrclaw.com
       pierce@lrclaw.com

-and-

**SULLIVAN & CROMWELL LLP**
Andrew G. Dietderich (admitted *pro hac vice*)
James L. Bromley (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Alexa J. Kranzley (admitted *pro hac vice*)
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
E-mail: dietdericha@sullcrom.com
       bromleyj@sullcrom.com
       gluecksteinb@sullcrom.com
       kranzleya@sullcrom.com

*Proposed Counsel for the Debtors*
*and Debtors-in-Possession*

Securities Commission of The Bahamas

**Poinciana House**
**North Building, 2nd Floor**
**31A East Bay Street**
**P.O. Box N-8347**
**Nassau, The Bahamas**

# MEDIA RELEASE

Contact: Executive Director                                                    **FOR IMMEDIATE RELEASE**
Christina Rolle
242-397-4100

## <u>Securities Commission of The Bahamas Addresses Misstatements</u>
## <u>In FTX's U.S. Bankruptcy Case</u>

*Nassau, The Bahamas, Tuesday 13 December 2022* – Regrettably, the Securities Commission of The Bahamas must once again correct key misstatements made by Mr. John J. Ray III, the representative of the U.S. FTX debtors, which do not appear to be concerned with facts but rather, appear intended only to make headlines and advance questionable agendas.

To be clear, the Securities Commission of The Bahamas was the first regulator in the world to take strong, decisive action to protect the customers and creditors of FTX – regardless of where they may be located. Every action taken by the Securities Commission of The Bahamas was in strict accordance with our country's legislation and with orders made by the Supreme Court of The Bahamas. These actions included securing the transfer of potentially commingled digital assets of FTX Digital Markets Ltd. and affiliates to a secure location under the authority of an Order issued by the Supreme Court of The Bahamas. The Commission holds those assets as trustee only (under Bahamian Law), and they will be ultimately distributed, to creditors and clients of FTX, wherever they may be located, in accordance with the court's direction.

Mr. Ray has referred to redacted email correspondence by and between Mr. Bankman-Fried and Bahamian officials. Those redactions were designed to create a false impression of communications between Mr. Bankman-Fried and the Commission. These redactions are disturbing as Mr. Ray is aware that the full email reveals Mr. Bankman-Fried's acknowledgement that he had "not briefed the Securities Commission." The Commission has previously addressed improper distributions to Bahamian citizens in its statement dated 12 November 2022. The Commission reaffirms its prior statement and notes that to the extent improper distributions were made to Bahamian citizens, such distributions will be subject to the appropriate claw back actions under the law.

The Commission also finds it disturbing that, either deliberately or through ignorance, Mr. Ray's filings and communications continue to wrongfully confuse as one, the actions of the Government of The Bahamas, the Securities Commission of The Bahamas and the Court Appointed/Court Supervised Joint Provisional Liquidators.

The Securities Commission continues to conduct a comprehensive and diligent investigation into the causes of FTX's failure, working in cooperation with law enforcement and regulatory authorities both in The Bahamas and other jurisdictions. The Securities Commission will make all appropriate findings and

recommendations, in the appropriate forum, at the conclusion of its investigation. Persons who are found to have engaged in misconduct will be held accountable in accordance with Bahamian law. Unfortunately, it has been necessary for the Securities Commission to make a request to Mr. Ray's representatives to not obstruct that investigation. Mr. Ray has not once reached out to the Securities Commission to discuss any of his concerns before airing them publicly. He, however, has been informed, by letter dated 7 December 2022 to his counsel, that –

*"… to the extent the Commission is able to assist in the efficient and mutually respectful conduct of the several pending proceedings without impairing the conduct or confidentiality of its ongoing regulatory investigation, including by participating in a meeting with your clients [i.e. FTX US Debtors represented by Mr. John J. Ray III], the Joint Provisional Liquidators and/or their respective counsel, they [i.e. the Commission] are prepared to do so. An appropriate and necessary part of any arrangement reached during such meeting, would be your clients' assurance that they will take no further action to interfere with the Commission's investigation and other regulatory measures."*
(Emphasis Added).

Mr. Ray has not responded to the Commission to date.

###

**Editor's Information:**

**1. The Securities Commission of The Bahamas (the Commission) is a statutory body established in 1995 pursuant to the Securities Board Act, 1995. That Act has since been repealed and replaced by new legislation.**

**2. The Commission's mandate is defined in the Securities Industry Act, 2011 (SIA, 2011).**

**3. The Commission is responsible for the administration of the SIA, 2011 and the Investment Funds Act, 2019 (IFA), which provides for the supervision and regulation of the activities of the investment funds, securities and capital markets.**

**4. The Commission is responsible for the administration of the Financial and Corporate Service Providers Act, 2020.**

**5. The Commission is responsible for the administration of the Digital Assets and Registered Exchanges Act, 2020.**

**6. The Commission is responsible for the administration of the Carbon Credit Trading Act, 2022.**

**7. The functions of the Commission are to:**

- **advise the Minister on all matters relating to the capital markets and its participants;**
- **maintain surveillance over the capital markets and ensure orderly, fair and equitable dealings in securities;**
- **foster timely, accurate, fair and efficient disclosure of information to the investing public and the capital markets;**

- **protect the integrity of the capital markets against any abuses arising from financial crime, market misconduct and other unfair and improper practices;**
- **promote an understanding by the public of the capital markets and its participants and the benefits, risks, and liabilities associated with investing;**
- **create and promote conditions that facilitate the orderly development of the capital markets; and**
- **perform any other function conferred or imposed on it by securities laws or Parliament (SIA, 2011, s.12).**

**COMMONWEALTH OF THE BAHAMAS**

**IN THE SUPREME COURT**

**COMMERCIAL DIVISION**

**IN THE MATTER OF the Digital Assets and Registered Exchanges Act, 2020 (as amended)**

**AND IN THE MATTER OF FTX DIGITAL MARKETS LTD. (A Registered Digital Asset Business)**

**BETWEEN**

**SECURITIES COMMISSION OF THE BAHAMAS**

**Plaintiff**

**AND**

**FTX DIGITAL MARKETS LTD.**

**Defendant**

---

**THIRD AFFIDAVIT OF CHRISTINA R. ROLLE**

---

**2022/COM/com**

**DELANEY PARTNERS**
Lyford Manor (West Bldg.)
Western Road, Lyford Cay
Nassau, New Providence
The Bahamas

Attorneys for the Plaintiff

RKA/EJM/sjs 0833-2949

# **EXHIBIT 17**

SUPREME COURT

DEC 2 9 2022

NASSAU, BAHAMAS

COMMONWEALTH OF THE BAHAMAS                                    2022/COM/com

IN THE SUPREME COURT

COMMERCIAL DIVISION

IN THE MATTER OF the Digital Assets and Registered Exchanges Act, 2020

(as amended)

AND IN THE MATTER OF FTX DIGITAL MARKETS LTD.

(A Registered Digital Asset Business)

SECURITIES COMMISSION OF THE BAHAMAS

Plaintiff

AND

FTX DIGITAL MARKETS LTD.

Defendant

# ORDER

*(On Application For Directions On US Debtors' Information Request)*

**Before The Honourable Chief Justice Ian R. Winder**

**Dated the 29th day of December, A.D., 2022**

**UPON THE APPLICATION** of Securities Commission of The Bahamas, the Plaintiff herein, made by Summons dated 23rd December and filed herein on 29th December, 2022.

**AND UPON HEARING** Mr. Robert K. Adams, KC and Mr. Edward J. Marshall II of Counsel for Securities Commission of The Bahamas, and Mrs. Sophia T. Rolle-Kapousouzoglou with Mr. Valdere J. Murphy of Counsel for the Joint Provisional Liquidators of FTX Digital Markets Ltd, on behalf of the Defendant herein.

**AND UPON READING** the Third Affidavit of Christina R. Rolle sworn on 28th December and filed herein on 29th December, 2022.

**IT IS HEREBY DECLARED AND DIRECTED THAT** the co-operative power vested in the Securities Commission of The Bahamas under section 41 of The Digital Assets and Registered Exchanges Act, 2022, as amended ("the DARE Act") enables the Securities Commission of The Bahamas to lawfully provide assistance to a domestic regulatory authority or overseas regulatory authority, or, its designated third party, as defined in section 41 (10) of the DARE Act

**AND IT IS FURTHER ORDERED AND DIRECTED THAT** the Securities Commission of The Bahamas may only lawfully provide assistance to the Debtors or their representatives in the pending US Chapter 11 bankruptcy proceedings; namely, *In re FTX Trading Ltd et al, Case No. 22-11068 (JTD) In The United States Bankruptcy Court For The District of Delaware*, including providing to the Debtors information respecting the digital assets being held in secure digital wallets established by, and under the control of, the Securities Commission ("the Digital Assets") in the event said Debtors or their representatives qualify as an 'overseas regulatory authority' or 'its designated third party' as defined in section 41 (10) of the DARE Act **PROVIDED HOWEVER**, nothing in this Order is intended to prohibit or restrict the Joint Provisional Liquidators of FTX Digital Markets Ltd from cooperating with, or providing information to, the Debtors or their representatives, upon such further order of this Court as the JPLs may wish to seek and on term(s) and condition(s) that (i) continue to fully preserve confidentiality, and any legal professional or other privilege applicable to communications, with respect to the security of the Digital Assets and (ii) do not in any way impair, or impede, the due exercise of the Securities Commission's regulatory function, duties and powers under the law.

**AND FOR AN ORDER THAT** the costs of this application are hereby reserved.

**BY ORDER OF THE COURT**

**REGISTRAR**

COMMONWEALTH OF THE BAHAMAS

IN THE SUPREME COURT

COMMERCIAL DIVISION

IN THE MATTER OF the Digital Assets and
Registered Exchanges Act, 2020
(as amended)

AND IN THE MATTER OF FTX DIGITAL
MARKETS LTD.
(A Registered Digital Asset Business)

SECURITIES COMMISSION OF THE BAHAMAS

Plaintiff

AND

FTX DIGITAL MARKETS LTD.

Defendant

---

# ORDER

*(On Application For Directions On US Debtors'
Information Request)*

---

**2022/COM/com**

**DELANEY PARTNERS**
Lyford Manor (West Bldg.)
Western Road, Lyford Cay
Nassau, New Providence
The Bahamas

Attorneys for the Plaintiff

RKA/EJM/SRB/sjs