## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
|  | **Hearing Date:** |
|  | **January 20, 2023, at 10:00 a.m. (ET)** |
|  | **Re: Docket No. 291** |

## BLOCKFI'S OBJECTION TO THE
## DEBTORS' MOTION TO ENFORCE THE AUTOMATIC STAY
## OR, IN THE ALTERNATIVE, EXTEND THE AUTOMATIC STAY[2]

BlockFi Inc. ("BlockFi Inc."), BlockFi Lending LLC ("BlockFi Lending"), and BlockFi International LLC ("BlockFi International," together with BlockFi Inc. and BlockFi Lending, "BlockFi"), hereby object (this "Objection") to the *Debtors' Motion to Enforce the Automatic Stay or, in the Alternative, Extend the Automatic Stay* [D.I. 291] (the "Motion") and supporting declaration[3] [D.I. 292 (the "Glueckstein Dec.")] filed by FTX Trading Ltd, ("FTX Trading"), Alameda Research Ltd. ("Alameda"), and their affiliated debtors and debtors-in-possession (collectively, the "FTX Debtors"). In support of the Objection, BlockFi relies on the attached declaration of Richard Anigian ("FTX Anigian Dec.")[4] and respectfully states as follows:

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification numbers are 3288 and 4063 respectively. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

[2] On January 4, 2022, BlockFi learned that collateral that is the subject of BlockFi's Turnover Motion has been seized by and transferred to the United States Department of Justice, pursuant to a warrant of seizure issued by United States Magistrate Judge Katherine H. Parker in the Southern District of New York.

[3] BlockFi is separately moving to strike certain portions of the Glueckstein Dec. contemporaneously herewith.

[4] For the Court's convenience, the declarations and associated evidence that BlockFi previously filed in the Emergent Lawsuit are attached to the FTX Anigian Dec. as exhibits A, B, D, E, and F. The Court may take judicial notice of matters of public record, including the filings in the BlockFi Chapter 11 Cases and the Emergent Lawsuit. *In re Washington Mut. Inc.*, 741 F. App'x 88, 89 n. 1 (3rd Cir. 2018).

## I.    **Preliminary Statement**[5]

1.      The principle underlying the Motion is, "what's mine is mine, and what's yours is mine too."  The FTX Debtors admit that they do not possess the Shares, documents show transfers of the Shares to a non-debtor (Emergent), publicly filed documents show the Shares belonged Emergent at the time they were pledged to BlockFi, and BlockFi has already filed the Emergent Lawsuit regarding the Shares in its bankruptcy case. Despite this, the FTX Debtors—ignoring all entity separateness, documented transfers, and public filings to the contrary—move this Court to find that the Shares actually belong to the FTX Debtors.  Why?  Because the FTX Debtors' admittedly untrustworthy and inadmissible records allegedly suggest some connection between Emergent and Alameda.

2.      Although Sam Bankman-Fried owns 90% of Emergent, the law respects entity separateness, documented transfers, and public filings until and unless proved otherwise.  And the FTX Debtors have not proved otherwise. Indeed, the Motion skips over these hard issues on which the FTX Debtors have a heavy burden and seeks to summarily find BlockFi violated the Stay by filing a suit in its own bankruptcy proceeding against a non-debtor—over property that is not part of the FTX Debtors' estate—that has no impact on the FTX Debtors' estates.  The requested relief is not supported by law, and the Motion cites no authority to support this end-run around multiple procedural requirements and issues.

3.      The Motion first argues that the Shares are part of the FTX Debtors' estates. Incorrect.  Black-letter law and section 541's text state that the property of a bankruptcy estate consists of the property the debtor owned *at the commencement of the case*.  All the evidence— including public filings and the FTX Debtors' submissions—shows that for months before the

---

[5] Capitalized terms used but not immediately defined shall have the meanings ascribed to them below.

commencement of these cases, the Shares belonged to non-debtor Emergent, subject to BlockFi's interest and claims. And contrary to the FTX Debtors' arguments, there is no legal basis for expanding the property of their estates to encompass any property in which the FTX Debtors merely allege they have "colorable" rights. The authority the FTX Debtors cite on this point is legally and factually distinguishable. Regardless, the FTX Debtors cannot pass even this low bar. And while the FTX Debtors may own *claims* to avoid or otherwise undo the purchase by or transfer of any Shares to Emergent, that does not make the Shares themselves part of the FTX Debtors' estates.

4.      Recognizing that this Court would likely conclude that the Shares are not part of their estates, the FTX Debtors alternatively ask this Court to extend the FTX Automatic Stay to cover BlockFi's interests in the Shares and the Emergent Lawsuit. There is no basis for this request either. *First*, the request is procedurally defective—stay extensions must be brought in adversary proceedings, not the main case. *Second*, the BlockFi Bankruptcy Court has already properly exercised jurisdiction over the Shares. Thus, under the *Princess Lida* doctrine, the BlockFi Bankruptcy Court has exclusive jurisdiction over the Shares. *Third*, this Court also lacks "related to" jurisdiction over the Emergent Lawsuit—a case between third-parties that are not debtors in these cases, over property outside the FTX Debtors' estates, pending before a different court, and that will have no effect on the FTX Debtors. *Last*, any extension of the FTX Automatic Stay to the Shares or the Emergent Lawsuit would violate the BlockFi Automatic Stay. The BlockFi Bankruptcy Court has a turnover proceeding currently pending before it regarding the Shares and has indicated that the Shares are properly before it.

5.      And there is no need to extend the FTX Automatic Stay to the Antiguan Liquidation Proceeding. The BlockFi Bankruptcy Court has already expressed that the BlockFi Worldwide

Stay Order applies to the Antiguan Liquidation Proceeding, and nothing indicates that the Antiguan Court will honor this Court's order while ignoring the BlockFi Worldwide Stay Order. The Motion should be denied in its entirety.

## II.    Relevant Background

### A.    BlockFi's Ownership Interest in the Shares.

6.      Between July 2019 and January 2022, Alameda borrowed over $600 million from BlockFi Lending and BlockFi International. [FTX Anigian Dec., Ex. D ("Prince Supp. Dec.") ¶¶ 13–14).]   In November 2022,[6] Alameda was in default of its obligations and owed BlockFi Lending and BlockFi International collectively over $600 million. [Id.] On November 9, 2022, BlockFi entered into an Amendment & Forbearance Agreement with Alameda to provide Alameda relief related to its defaults. [Prince Supp. Dec., Ex. D-4 ("Forbearance Agreement").]

7.      As a condition to the effectiveness of the Forbearance Agreement, BlockFi entered into a pledge agreement (the "Emergent Pledge Agreement") with Emergent Fidelity Technologies, LTD ("Emergent"). [Prince Supp. Dec., Ex. D-6.]   Under the Emergent Pledge Agreement, Emergent "guarant[ied], irrevocably, absolutely and unconditionally, as primary obligor and not merely as surety, to [BlockFi], the due and punctual payment" of Alameda's debts to BlockFi International and BlockFi Lending. [Emergent Pledge Agreement, § 3.] Emergent also pledged approximately 56 million shares of common stock (the "Shares") in Robinhood Markets, Inc. ("Robinhood") to BlockFi to secure Emergent's guaranty to BlockFi and as additional consideration for the Forbearance Agreement. [Id.]   On November 10, 2022, BlockFi filed a UCC-1 Financing Statement reflecting BlockFi's security interest in the Shares. [Prince Supp. Dec., Ex. D-7.]

---

[6] Unless otherwise indicated, all dates in this Objection are in 2022.

**B.**    **Emergent, a non-Debtor entity, owned the Shares prior to BlockFi exercising its rights.**

8.      In 2022, Samuel Bankman-Fried ("SBF") and Zixiao (Gary) Wang ("Wang") decided to invest in Robinhood. [FTX Anigian Dec., Ex. G ("12/12/22 SBF Affidavit").] SFB and Wang formed Emergent under the laws of Antigua and Barbuda to hold these investments in Robinhood. [*Id.* at ¶ 7; FTX Anigian Dec., Ex. E-1.]   According to Emergent's Articles of Incorporation and Notice of Directors, Emergent's sole director is SBF. [FTX Anigian Dec., Exs. E-3, E-5.]

9.      SBF and Wang borrowed approximately $540 million from Alameda and used the proceeds to capitalize Emergent. [12/12/22 SBF Affidavit ¶ 9.]  SBF and Wang owned 90% and 10% of Emergent, respectively, and contributed all the capital to Emergent. [12/12/22 SBF Affidavit ¶¶ 8, 11.]

10.     By May 2, Emergent had acquired a sufficient number of Robinhood Shares to trigger an obligation to file a Schedule 13D (the "Schedule 13D") with the United States Securities and Exchange Commission.  By the time the Schedule 13D was filed, Emergent indicated it owned 56,273,469 Shares:



[FTX Anigian Dec., Ex. E-6.]  The Schedule 13D states the following:

- Emergent purchased the Shares using its working capital (Item 3);

- Emergent may pledge all or part of the Shares as loan collateral (Item 3); and

- Emergent acquired the Shares as an attractive investment (Item 4).

[*Id.*] Emergent's only known assets are the Shares. [12/12/22 SBF Affidavit ¶ 8.]

11.     Since at least May 12, the FTX Debtors knew, or at least should have known, of Emergent's status, ownership, and control of the Shares.  The first page of Schedule 13D identifies Ryne Miller—the FTX Debtors' General Counsel at the time—as the person authorized to receive notices and communications from the SEC with respect the Schedule 13D. To BlockFi's knowledge, Mr. Miller has never disputed any of the information in the Schedule 13D.

**C.     BlockFi asserted its rights to the Shares.**

12.     After Alameda defaulted under the Forbearance Agreement, BlockFi immediately notified Emergent of the default and acceleration of its obligations under the Emergent Pledge Agreement. [FTX Anigian Dec., Ex. A ("Prince Declaration") ¶ 8–11, A-1.]  On November 14, BlockFi exercised its rights under a power of attorney contained in the Emergent Pledge Agreement and demanded that Emergent's broker, ED & F Man Capital Markets, Inc.—now Marex Capital Markets Inc. ("Marex")—transfer the Shares to BlockFi. [FTX Anigian Dec., Ex. B ¶ 5.]  Marex refused to comply with BlockFi's demand, but counsel for Marex represented that the broker would retain custody of the Shares until ordered otherwise by a court with proper jurisdiction. [*Id.* ¶¶ 6–7.]

**D.     In Antigua, an FTX creditor improperly attempted to sidestep the FTX bankruptcy and obtain control over the Shares.**

13.     On November 18, Yonatan Ben Shimon ("Shimon") applied (the "Shimon Application") to the Eastern Caribbean Supreme Court in the High Court of Justice Antigua and

Barbuda (the "<u>Antiguan Court</u>") and obtained an *ex parte* interim freezing order and appointment of receivers over Emergent (the "<u>Antiguan Receivership Action</u>"). [FTX Anigian Dec., Ex. F (A-1).]

14.     Shimon has no connection to Emergent—he is neither a customer nor a creditor. Instead, he claims to be a customer of debtor FTX Trading, and his receivership application is based on his supposition that the funds Emergent used to acquire the Shares might have been "improperly diverted from those invested by [Shimon] and others with FTX." [Shimon Application ¶ 9.]

15.     Notably, Shimon acknowledged in his affidavit submitted in support of the Shimon Application that he had ***no evidence*** to substantiate his claim, averring that Emergent:

> acquired a 7.6% shareholding in Robinhood for about US$650 million, possibly using funds improperly diverted from those invested by me and others with FTX. ***I know nothing regarding the source of the funds used to acquire the 7.6% interest in Robinhood*** beyond the fact that it was allegedly 'working capital.'

[FTX Anigian Dec., Ex. F (A-2) ¶ 30 ("<u>Shimon Affidavit</u>").]

16.     On November 18, the Antiguan Court issued a freezing injunction (the "<u>Antiguan Receivership Order</u>") that—by its own terms—had a limited reach. [FTX Anigian Dec., Ex. H.] The Antiguan Receivership Order expressly did "not affect or concern anyone outside" Antigua and Barbuda unless they had actual notice of the order and were subject to that court's jurisdiction. [*Id.* ¶ 20.]  The Antiguan Receivership Order also did not prevent parties from complying with their legal duties regarding any of Emergent's assets located outside of Antigua. [*Id.* ¶ 21.] BlockFi was not subject to the Antiguan Court's jurisdiction, was only advised of a BVI (not Antiguan) receivership action on December 2, and did not learn of the JPLs appointment in Antigua until December 7. [FTX Anigian Dec., Ex. F ¶ 8.]

**E.    The BlockFi Debtors filed for bankruptcy, placing the Shares under the BlockFi Bankruptcy Court's protection.**

17.    On November 28, BlockFi and its affiliated debtors and debtors-in-possession (collectively, the "BlockFi Debtors") each filed petitions for relief under Chapter 11 in the United States Bankruptcy Court for the District of New Jersey (the "BlockFi Bankruptcy Court"), which are jointly administered under case number 22-19361 (MBK) (the "BlockFi Chapter 11 Cases"). The BlockFi Chapter 11 Cases are pending before the Honorable Chief Judge, Michael B. Kaplan. BlockFi also immediately sought to protect and assert it rights to the Shares by commencing an Adversary Proceeding. [*BlockFi Inc., et al. v. Emergent Fidelity Techs. Ltd.*, Adv. Pro. No. 22-01382 (MBK) (D.N.J. 2022) ("Emergent Lawsuit").]

18.    In the Emergent Lawsuit, BlockFi filed a motion to preserve the Shares pending resolution of the Emergent Lawsuit on the merits (the "Turnover Motion"). [Emergent Lawsuit, D.I. 2.] BlockFi intentionally omitted details regarding the Shares in its public filings in an effort to protect the stock price from negative publicity. Unfortunately, a day later the Wall Street Journal published a story identifying the Shares as shares in Robinhood, after which (as of the filing of this Objection) the value of the Shares has decreased by more than $55 million.[7]

19.    On November 30, the BlockFi Bankruptcy Court entered its Order (I) Restating and Enforcing the Worldwide Automatic Stay, Anti-Discrimination Provisions, and Ipso Facto Protections of the Bankruptcy Code and (II) Granting Related Relief (the "Worldwide Stay Order"). [BlockFi Chapter 11 Cases, D.I. 56.] The Worldwide Stay Order acknowledged the

---

[7] Caitlin McCabe, *BlockFi Sues for Sam Bankman-Fried's Robinhood Shares*, WALL STREET JOURNAL, Nov. 29, 2022, https://www.wsj.com/livecoverage/stock-market-news-today-11-29-2022/card/blockfi-sues-for-sam-bankman-fried-s-robinhood-shares-sj4htah5lTOdPBBu9spq

automatic stay that arose upon the commencement of the BlockFi Chapter 11 Cases (the "BlockFi
Automatic Stay") and enjoined all persons from, among other things:

- "(a) commencing or continuing (including the issuance or employment of process) any judicial, administrative, or other action or proceeding against the Debtors that was or could have been commenced before the commencement of the Debtors' Chapter 11 Cases or recovering a claim against Debtors that arose before the commencement of the Debtors' Chapter 11 Cases";

- "(c) taking any action, whether inside or outside the United States, to obtain possession of property of the Debtors' estates, wherever located or to exercise control over property of the estates or interfere in any way with the conduct by the Debtors of their business, including, without limitation, attempts to arrest, seize or reclaim any assets in which the Debtors have legal or equitable interests"; and

- (i) precluding custodians of property of the Debtors' estates, including but not limited to common stock, the Debtors' interests in such property, and other collateral, from transferring estate assets from their existing location or otherwise taking any action that in anyway affects those assets or alienates them from the Debtors or their estates."[8]

[Worldwide Stay Order, BlockFi Chapter 11 Cases, D.I. 56.]

**F.      After the BlockFi Worldwide Stay Order was effective, the Antiguan receivers initiated a new Antiguan proceeding seeking control over the Shares.**

20.      On December 2, the receivers appointed *ex parte* under the Antiguan Receivership Order filed a new action in the Antiguan Court—Claim No. ANUHCV2022/0480. Not content to merely be receivers, they sought appointment as Emergent's joint provisional liquidators with extremely broad powers to investigate and wind up Emergent, including the right to sell the Shares. [FTX Anigian Dec., Ex. F (A-3) ("Antiguan Liquidation Petition").] The proposed liquidators acknowledged the BlockFi Chapter 11 Cases and the Emergent Lawsuit. [*Id.* ¶¶ 7-8.] Three days later, the Antiguan Court appointed the receivers as Emergent's Joint Provisional Liquidators (the "JPLs") and purported to award them sweeping powers, including, subject to approval from the

---

[8] The entry of the Worldwide Stay Order rendered Shimon's original fears moot.

Antiguan Court, the power to "***sell, realise and/or otherwise monetise [Emergent's] shares in Robinhood Markets, Inc.***" [FTX Anigian Dec., Ex. I  ("<u>Antiguan Liquidation Order</u>").] Since this appointment, the JPLs have continually tried to gain control over the Shares—in violation of the BlockFi Automatic Stay and the Worldwide Stay Order—to the likely detriment of the BlockFi Debtors.

21.     On December 27, the JPLs moved the BlockFi Bankruptcy Court to extend the January 9, 2023, hearing on the Turnover Motion (the "<u>Extension Motion</u>"). [Emergent Lawsuit, D.I. 19.] The next day, the BlockFi Bankruptcy Court held a hearing on the Extension Motion, denied the JPLs request to extend the January 9, 2023 hearing on the Turnover Motion, and stated that the "orders entered by the Antiguan Court with respect to the powers of the JPLs and their authority was subsequent to [the Worldwide Stay Order]." [FTX Anigian Dec., Ex. J, p. 20.]

22.     The BlockFi Bankruptcy Court also expressed concern about "the speed in which matters have and continue to proceed in Antigua with limited ability to place any controls."  [*Id.* at p. 20–21.]  Ultimately, the BlockFi Bankruptcy Court explained that its "intention is to limit [the January 9th hearing on the Turnover Motion] to the issue as to whether or not I should direct the current custodian, [Marex], to place the [S]hares in a third party, subject to [the BlockFi Bankruptcy] Court's jurisdiction and authority pending further—it's always pending further order of [the BlockFi Bankruptcy] Court." [*Id.* at p. 22.]

**G.     The FTX Debtors' attempt to create a "colorable claim" to the Shares.**

23.     The FTX Debtors assert that they have a "colorable claim" in and to the Shares. Yet the documents they rely on—including purported documents of Alameda—are untrustworthy, unreliable, and inadmissible.

24.     The FTX Debtors' new CEO John Ray described the FTX Debtors' record-keeping practices in clear terms: "Never in my [over 40 plus years of legal and financial restructuring

experience] career have I seen such a complete failure of corporate controls and such a complete absence of trustworthy financial information as occurred here." [FTX Chapter 11 Cases, D.I. 24, ¶ 5.]  Alameda's financial information was unaudited, and Mr. Ray confirmed he did "not have confidence in [Alameda's unaudited balance sheet] and the information therein may not be correct as of the date stated." [*Id.* at ¶ 23.]  Mr. Ray also elaborated on FTX's "lack of documentation" during his Congressional testimony [Glueckstein Dec., Ex. Q at 26.]:

- FTX had "an utter lack of record keeping" [*Id.* at 12.];

- "[L]iterally, there's no record keeping whatsoever [it's] the absence of record keeping" [*Id.* at 13.];

- "I don't trust a single piece of paper in this organization" [*Id.* at 31.]; and

- "The quality of the record keeping was very poor in the company." [*Id.* at 63.]

25.     To support the Motion, the FTX Debtors submitted a single declaration from one of their bankruptcy attorneys—the Glueckstein Declaration. Mr. Glueckstein does not claim to have personal knowledge of the FTX Debtors' record-keeping practices, instead basing his declaration on "the best of [his] knowledge." The lack of personal knowledge renders his declaration inadmissible as more fully described in BlockFi's contemporaneous motion to strike.[9]

### III.    Arguments and Authorities

26.     The Emergent Lawsuit does not violate the FTX Automatic Stay. Most basically, this is because the Shares are not property of the FTX Debtors' estates. Moreover, there is no legal basis for stretching the FTX Automatic Stay to include any property the FTX Debtors can lodge a claim of "colorable" rights to. And, regardless, no evidence supports the FTX Debtors' argument that they have "colorable" rights to the Shares—an issue on which they bear the burden. But even

---

[9] Contemporaneously with this Objection, BlockFi has filed a Motion to Strike Portions of the Glueckstein Declaration. BlockFi incorporates its Motion to Strike into this Objection fully by reference.

ignoring the FTX Debtors' legal, factual, and evidentiary failures, the Motion makes plain that—at best—the FTX Debtors may have an avoidance claims relating to the Shares. The FTX Debtors' attempt to transform a hypothetical, vague, unfiled avoidance action claim into a "colorable claim" to the Shares (or any of BlockFi's claims in the Emergent Lawsuit) is not legally sustainable. Such interpretation, if permitted, would expand the automatic stay to an undefinable, all-encompassing umbrella.

27.    Indeed, the Motion supposes this Court has already substantively consolidated all of the FTX Debtors and non-debtor Emergent—without actually moving for this relief, providing any evidence in support, or obtaining any required findings. *In re Owens Corning*, 419 F.3d 195, 211 (3d Cir. 2005) (holding "substantive consolidation is an "extreme," "imprecise," and "'rough justice' remedy [that] should be rare and, in any event, one of last resort after considering and rejecting other remedies"). As the Court knows, "respecting entity separateness is a '"fundamental ground rule,'" and substantive consolidation "may not be used offensively." *Id.* at 211; *see also Mar. Elec. Co., Inc. v. United Jersey Bank*, 959 F.2d 1194, 1205 (3d Cir. 1991) (holding that "formal distinctions between debtor-affiliated entities are maintained when applying the stay"). For these reasons, the law requires a proponent of consolidation to *prove* this extreme remedy is warranted. *Id.* at 211–12. The FTX Debtors simply assume substantive consolidation while bypassing the heavy burden and never seeking the relief.

28.    The Motion's request to extend the FTX Automatic Stay fares no better for four reasons. *First*, this Court lacks jurisdiction over the Shares and the Emergent Lawsuit. *Second*, the Motion is procedurally deficient because Bankruptcy Rule 7001 requires that injunctions or other equitable relief must be requested in an adversary proceeding. *Third,* extending the FTX Automatic Stay to the Shares and the Emergent Lawsuit would violate BlockFi's Automatic Stay.

*Last*, even if the Court reached the merits of the FTX Debtors' request, they failed to meet the elements.

29.     Additionally, the FTX Debtors failed to explain how the Emergent Lawsuit would cause them harm.  This is because the Emergent Lawsuit does not cause them any harm.  Neither the Shares nor the Emergent Lawsuit affect the FTX Debtors' estates.  And last, there is no reason to extend the FTX Automatic Stay to the Antiguan proceedings.  Accordingly, the Motion should be denied in its entirety.

**A.      BlockFi did not violate the FTX Automatic Stay.**

   *1.      The Shares are not property of the FTX Debtors' estates.*

30.     A bankruptcy estate consists of property the debtor held "as of the commencement of the case." 11 U.S.C. § 541; *In re Advanced Biomedical, Inc.*, 547 B.R. 337, 340 (Bankr. C.D. Cal. 2016) (holding estate did not include property that debtor transferred before commencement date).  The automatic stay does not extend to property that, on the commencement date, was indisputably owned by a non-debtor. *Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1662–63 (2019) (explaining that a debtor's bankruptcy "estate cannot possess anything more than the debtor itself did outside bankruptcy").[10]  Trying to expand their stay, the FTX Debtors primarily rely on section 362(a)(3), under which the FTX Automatic Stay applies to any "act to obtain possession of property of the estate or of property from the estate or exercise control over property of the estate." 11 U.S.C. § 362(a)(3).

31.     Ignoring the FTX Debtors' lack of admissible evidence supporting their alleged interest in the Shares, at best the FTX Debtors may have *once* had an interest in the Shares—which

---

[10] H.R. Rep. No. 95 595, 95th Cong., 1st Sess. 367–68 (1977) (Congress was clear that section 541(a)(1) of the Bankruptcy Code "is not intended to expand the debtor's rights against others more than they existed at the commencement of the case.").

does not make the Shares part of the estate. *In re Quade*, 482 B.R. 217, 225 (Bankr. N.D. Ill. 2012) ("To the extent that a debtor once had an interest in property but, as of the commencement of the bankruptcy case, no longer does, that interest does not become property of the estate."). Accordingly, BlockFi did not violate the FTX Automatic Stay.

>    **2.    *The FTX Debtors have not—and cannot—make a colorable claim to the Shares*.**

32.    The FTX Debtors argue they need only show a "colorable interest" in the Shares for the FTX Automatic Stay to encompass them.  But that is not the law. *In re Manley Toys Ltd.*, 2019 WL 3229301, at *3 (D.N.J. July 18, 2019).

33.    The court in *In re Manley Toys* noted that the Third Circuit had not adopted the "colorable interest" test and that other Circuits have criticized the test because "its expansive reading of the term 'property of the estate' is inconsistent with the plain language of that term's statutory definition." *Id.* at *3 n.3 (citing *In re Jahr*, 2012 WL 3205417, at *7 (B.A.P. 9th Cir. Aug. 1, 2012) (holding estate consisted of the "rights a debtor has in property at the commencement of the case continue in bankruptcy—no more, no less")).  The few non-binding cases adopting this test focus more on the *willfulness* of the violation than on the scope of the estate. *In re Chesnut*, 422 F.3d 298, 300 (5th Cir. 2005) (analyzing whether a stay violation was willful).[11]

34.    None of the authorities in the Motion hold differently.  In *In re ABC Learning Centers Ltd.*, No. 10-11711(KG), 2011 WL 4899789 (Bankr. D. Del. Oct. 13, 2011), this Court found that a third-party willfully violated the automatic stay when it sold property that was burdened by a *lis pendens* in the Debtor's name *after* a Nevada court had found the Debtor was

---

[11] In fact, several courts have noted that allowing a debtor to enjoin a third party's property rights based only on "colorable" allegations that the debtor may have an avoidance claim would create Due Process concerns. *See Rajala v. Gardner*, 709 F.3d 1031, 1039 (10th Cir. 2013); *see also*, *Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 135–36 (1962) (explaining that filing bankruptcy "simply does not authorize a [debtor] to distribute other people's property among a bankrupt's creditors . . . [S]uch property rights existing before bankruptcy in persons other than the bankruptcy must be recognized and respected in bankruptcy").

likely to prevail on a constructive-trust claim regarding that property. *Id.* at *2. The Court did not extend the stay to a non-debtor's property—it merely recognized another court's finding that the property already belonged to the debtor and found the third-party's violation was willful. Here, there is no order or other basis to believe the Shares belong to the FTX Debtors.

35.     The remaining authorities cited in the Motion are similarly distinguishable. *In re Nat. Century Fin. Enterprises, Inc.*, 423 F.3d 567, 575 (6th Cir. 2005) (holding that an account in debtor's name was part of estate); *In re Kaiser Aluminum Corp., Inc.*, 315 B.R. 655, 660 (D. Del. 2004) (holding that a third-party's suit was, "in all reality, directed against [the debtor], and [the debtor] [was] entitled to the protection of the automatic stay"); *In re Glob. Outreach, S.A.*, 2009 WL 1606769, *8 (Bankr. D.N.J. June 8, 2009) (holding that "Debtor's use, possession, management, and development of the properties coupled with the right to redeem and the right to excess proceeds provide sufficient and multiple interests in the Properties to constitute property of the estate"); *Denby-Peterson v. Nu2u Auto World*, 595 B.R. 184, 194 (D.N.J. 2018) (holding, in Chapter 13 case, that a vehicle repossessed pre-petition must be returned pursuant to the automatic stay once proof of insurance is provided).

36.     Even under the "colorable" interest test, the FTX Debtors fail to make a claim to the Shares for three reasons. *First*, as shown in BlockFi's contemporaneously filed Motion to Strike, the FTX Debtors failed to support the Motion with admissible evidence.[12] The law presumes that property in a non-debtor's possession is not part of the estate. *See In re Glob.*

---

[12] Notably, the FTX Debtors attempt to hedge their so-called colorable-claim argument by making several references to their ongoing investigation. Mot. ¶¶ 3, 50, 52, 66. This is another way of saying there is currently no evidence. The FTX Debtors do not—and cannot—cite any authority holding that the use of unquestionably incomplete, unreliable, and untrustworthy information can support a "colorable claim" to the Shares.

*Outreach, S.A.*, 2009 WL 1606769, *8.  It is a debtor's burden to show otherwise, and the FTX Debtors have failed.

37.    *Second*, the Schedule13D expressly states that "[t]he Shares reported herein were purchased by Emergent using working capital." [Schedule 13D, FTX Anigian Dec., Ex. E-6.]. The FTX Debtors argue that Emergent was not incorporated during some of the early transactions and that the Schedule13D states that "[a]ll such transactions were open-market purchases of Shares made through an affiliate."  So what?  Schedule13D unequivocally states that the affiliate "transferred such Shares to Emergent . . . at those Shares' respective purchase prices." [*Id.* at Schedule 13D's Exhibit 2.]  Thus, the Schedule 13D conclusively establishes that the Shares were transferred to Emergent and belonged to Emergent when the Emergent Pledge Agreement was executed.

38.    *Last*, to the extent the indemnity agreement between Marex, Alameda, and Emergent that is referenced in the Glueckstein Declaration is even considered, it further supports that, when the Emergent Pledge Agreement was executed, Emergent owned the Shares.  The FTX Debtors have no evidence reflecting that the purported transfer of any of the Shares from Alameda to Emergent was anything other than exactly what the existing documents reflect—a transfer of full title, rights, and privileges in and to the transferred Shares for value.

### 3. *Even if the FTX Debtors have one or more avoidance claims related to the Shares, the avoidance claims, but not the Shares themselves, may be property of the FTX Debtors' estates.*

39.    The Motion suggests that the FTX Debtors may have avoidance claims related to the transfer of the Shares. *E.g.*, Mot. ¶ 4 (stressing the short time before the FTX Petition Date); ¶ 11 (alleging the Shares were transferred "for no apparent consideration"); ¶ 25 (referring to "preferential treatment"); ¶ 50 (alleging "[t]here is no indication that Emergent paid Alameda any

consideration for this transfer"). Such unasserted avoidance claims—if they even exist—may be property of the FTX Debtors' estates.

40.    However, a potential avoidance claim concerning the Shares cannot transform the Shares themselves into property of the FTX Debtors' estates. *In re BMT-NW Acquisition, LLC*, 582 B.R. 846, 865–66 (Bankr. D. Del. 2018) ("Property of the estate does not apply to property which has been fraudulently or preferentially transferred before the bankruptcy filing, because such property does not become 'property of the estate until it has been recovered by the estate.'") (citing 5 Collier on Bankruptcy, § 542.03 (16th ed. 2010)); *Rajala v. Gardner*, 709 F.3d 1031, 1038 (10th Cir. 2013) (holding that "although § 541 is very broad, . . . it plainly does not include fraudulently transferred property until that property is recovered"); *FDIC v. Hirsch (In re Colonial Realty Co.)*, 980 F.2d 125, 130–31 (2d Cir. 1992) (holding that a fraudulently conveyed asset does not become property of the estate until it is recovered by the trustee).  The Third Circuit also recognizes this approach. *In re Allen*, 768 F.3d 274, 282 (3d Cir. 2014) (recognizing that the U.S. Bankruptcy Court for the District of New Jersey also agreed with the Second Circuit's approach in *Colonial Realty*).[13]  These avoidance claims, if any, are part of the FTX Debtors' estate—not the property subject to those potential claims that might be recovered in the indefinite future.

---

[13] This is the majority view. See *In re Jahr*, No. EW-11-1538-MkHJu, 2012 WL 3205417, at *7 (BAP 9th Cir. Aug. 1, 2012) (declining to hold that "property of the estate" included arguable property of the estate because that reading would be too "expansive" and "inconsistent" with the plain language of section 541); *Murrietta v. Fehrs (In re Fehrs)*, 391 B.R. 53, 71 (Bankr. D. Idaho 2008) (acknowledging that "[t]his is not a case where Trustee avoided a transfer and established a § 550 recovery"); *Moyer v. ABN Amro Mortg. Grp., Inc. (In re Feringa)*, 376 B.R. 614, 625 n. 10 (Bankr. W.D. Mich. 2007) (noting that "it is difficult to read Section 541(a)(1) so broadly as to include potential recoveries of fraudulent conveyances, especially in light of subparagraph[](a)(3)") (emphasis added); *Wagner v, Christiana Bank & Trust Co. (In re Wagner)*, 353 B.R. 106, 112–13 (Bankr. W.D. Pa. 2006) (where a chapter 7 trustee took no action to avoid an allegedly fraudulent transfer, the court noted that "for a claim to become 'property of the estate' a trustee must actually exercise her avoiding powers and make a tangible recovery of the property before it can be transformed into 'property of the estate' as envisioned by Section 541(a)(3)"); *Grossman v. Murray (In re Murray)*, 214 B.R. 271, 279 (Bankr. D. Mass. 1997) (finding the reasoning to be "particularly compelling where, as here, no affirmative action had been taken to recover the funds at the relevant time").

**B.    This Court should not extend the FTX Automatic Stay to the Shares or the Emergent Lawsuit.**

41.    Tacitly recognizing that the FTX Automatic Stay does not apply to the Shares or the Emergent Lawsuit, the FTX Debtors alternatively seek to extend the FTX Automatic Stay. This Court should decline this request.  *First*, this Court lacks jurisdiction to do so.  *Second*, the requested relief is procedurally improper.  *Third*, extending the FTX Automatic Stay to the Shares or the Emergent Lawsuit would violate the BlockFi Automatic Stay.  *Last*, no unusual or extraordinary circumstances warrant an extension.

*1.    This Court lacks jurisdiction to extend the FTX Automatic Stay to the Shares or the Emergent Lawsuit.*

42.    As a threshold question, this Court must determine whether it has subject matter jurisdiction to "freeze" the Shares or enjoin the Emergent Lawsuit (*i.e.*, extend the FTX Automatic Stay).[14]  BlockFi believes the answer is a "no."  The Third Circuit in *In re Continental Airlines* expressed its concern (in the context of a confirmation hearing) "that the Bankruptcy Court apparently never examined its jurisdiction" to release and enjoin a third party's claims against non-debtors."  203 F.3d 203, 214 n.12 (3d Cir. 2000).  This Court's jurisdiction is not unlimited, and the Court "cannot simply presume it has jurisdiction in a bankruptcy case to" enjoin property or the Emergent Lawsuit. *Id.*

43.    *First*, this Court lacks jurisdiction to extend the FTX Automatic Stay to encompass the Shares.  The Shares are not property of the FTX Debtors' estates. Section III.A.1, *supra*. Although the FTX Debtors may have an avoidance claim related to the Shares, that does not *ipso facto* give this Court jurisdiction over the Shares.

---

[14] Tellingly, the FTX Debtors' proposed order seeks to allow the Emergent Lawsuit to proceed in this Court. Yet there is no basis for this Court's jurisdiction or venue over the Emergent Lawsuit. Accordingly, the FTX Debtors have effectively requested an indefinite injunction against the Emergent Lawsuit without properly seeking such relief in the BlockFi Bankruptcy Court where there is both jurisdiction and venue over the Emergent Lawsuit.

44.     Under the *Princess Lida* doctrine, the first court to properly exercise jurisdiction over property obtains exclusive jurisdiction over that property.    In *Princess Lida,* the Court addressed the issue of two courts seeking to exercise jurisdiction over the same property and found, in such circumstances, "the court first assuming jurisdiction over property may maintain and exercise that jurisdiction to the exclusion of the other" court. *Princess Lida of Thurn and Taxis v. Thompson*, 305 U.S. 456, 465–66 (1939).    The *Princess Lida* doctrine "prevents a court in which an action is filed from exercising jurisdiction when a court in a previously filed action is exercising control over the property at issue and the second court must exercise control over the same property in order to grant the relief sought." *Dailey v. Nat'l Hockey League*, 987 F.2d 172, 175 (3d Cir. 1993).

45.     The *Princess Lida* doctrine applies to this Motion and precludes this Court from taking the Shares from the BlockFi Bankruptcy Court. BlockFi filed the Emergent Lawsuit before the FTX Debtors filed the Motion. [Emergent Lawsuit, Compl. [D.I. 1.]]; Mot. ¶ 35.    In such circumstances, "***the court first assuming jurisdiction over property may maintain and exercise that jurisdiction to the exclusion of the other" court***.    *Princess Lida*, 305 U.S. at 465–66 (emphasis added).

46.     The Third Circuit applies the *Princess Lida* doctrine mechanically. *Dailey*, 987 F.2d at 176 (describing the doctrine as a "mechanical rule").    Thus, this Court cannot exercise jurisdiction over the Shares. *Princess Lida*, 305 U.S. at 467–68 (holding that the second court was "without jurisdiction" to resolve the dispute and the parties "were properly enjoined from further proceeding in that court").    The court with the first-filed case—the BlockFi Bankruptcy Court— has exclusive jurisdiction over the Shares.

47.     *Second*, this Court lacks jurisdiction over the Emergent Lawsuit. 28 U.S.C. § 1134(b) grants bankruptcy courts subject matter jurisdiction over matters which "arise under," "arise in," or "relate to" proceedings under the Bankruptcy Code.  Litigation among parties that does *not* include any FTX Debtor cannot arise under or in proceedings under the Bankruptcy Code in the FTX Chapter 11 Cases. *See, e.g., Scott v. Aegis Mortg. Corp. (In re Aegis Mortg. Corp.)*, 2008 Bankr. LEXIS 1519, at *11–12 (Bankr. D. Del. May 22, 2008) (explaining that "arising under" refers to disputes invoking a substantive right under the Bankruptcy Code and "arising in" refers to disputes involving the administration of the bankruptcy estate).  Such litigation may only be a matter that "relates to" a proceeding under the Bankruptcy Code if it impacts the non-party debtor's ability to effectively reorganize. *In re Dreier LLP*, 429 B.R. 112, 131 (Bankr. S.D.N.Y. 2010) (finding that where the subject of the dispute against the non-debtor will impact the estate, the court has "related to" jurisdiction to enjoin the claim, assuming the other legal requirements are satisfied); *Steel Workers Pension Tr. v. Citigroup, Inc.*, 295 B.R. 747, 752–54 (E.D. Pa. July 17, 2003) (determining "related to" bankruptcy jurisdiction did not exist).

48.     Thus, for this Court to have "related to" subject matter jurisdiction, the Emergent Lawsuit must affect the FTX Debtors' estates.  It does not.  Section IV.B.4, *infra*. BlockFi's claims in the Emergent Lawsuit seeking relief and damages from non-debtors ***for their own independent liability*** are outside this Court's jurisdiction. *E.g.*, *Dreier*, 429 B.R. at 131 (holding that the requested injunction exceeded the bankruptcy court's jurisdiction because it involved claims that did not affect property of the estate or the administration of the estate).

### 2.     *The FTX Debtors' request to extend the FTX Automatic Stay is procedurally improper.*

49.     The FTX Debtors' extension request is also procedurally improper.  Although a court may extend an automatic stay to actions against non-debtors where "unusual circumstances"

exist, "extension of the stay to nonbankrupt parties is not automatic and must be requested affirmatively by the debtor." *In re Richard B. Vance & Co.*, 289 B.R. 692, 697 (Bankr. C.D. Ill. 2003); *Patton v. Bearden*, 8 F.3d 343, 349 (6th Cir. 1993) (finding that although a section 105(a) injunction is often referred to as extending the automatic stay, the court is actually issuing an independent injunction prohibiting something section 362(a) otherwise permits).

50.     The FTX Debtors' stay-extension request is a quintessential "action for injunctive relief." *In re Bora Bora Inc.*, 424 B.R. 17, 25 (Bankr. D.P.R. 2010); *In re Slabicki*, 466 B.R. 572, 2012 U.S. Dist. LEXIS 344, at *25 (1st B.A.P. Feb. 3, 2012). And a "proceeding to obtain an injunction or other equitable relief" requires the commencement of an adversary proceeding. FED. R. BANKR. PROC. 7001(7).

51.     Delaware bankruptcy courts have consistently held that requests to enjoin actions against non-debtors pursuant to section 105 or section 362(a) require the commencement of an adversary proceeding. *See, e.g.*, *In re Forever 21, Inc.*, 2020 WL 6817649 (Bankr. D. Del. Oct. 7, 2020) (holding that "in action to obtain equitable relief, including an injunction, generally requires an adversary proceeding"); *In re The Fairchild Corp.*, Bankr. No. 09-10899, 2009 WL 4546581, at *7 (Bankr. D. Del. Dec. 1, 2009) (stating that entry of injunctive relief requires initiation of an adversary proceeding).

52.     The FTX Debtors' improper effort to extend the FTX Automatic Stay and impose injunction-like relief without commencing an adversary proceeding must be denied.

***3.      The FTX Automatic Stay should not be extended because doing so would violate the BlockFi Automatic Stay.***

53.     The FTX Debtors' request to extend the FTX Automatic Stay also violates the Worldwide Stay Order under sections 362(a)(1) and 362(a)(3).

### a. Violation of Section 362(a)(1)

54.     The request to extend the FTX Automatic Stay to stay BlockFi's exercise of remedies against Emergent is a violation of section 362(a)(1).  Section 362 stays "commencement or continuation . . . of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title." 11 U.S.C. § 362(a)(1).  BlockFi unquestionably began enforcement of its interests in the Shares and exercising remedies against Emergent *before* the BlockFi Petition Date, and the FTX Debtors were aware of such actions. Mot. ¶ 2.

55.     Nothing stopped the FTX Debtors from seeking to stay BlockFi's enforcement of its interests in the Shares and its exercise of remedies against Emergent before the BlockFi Petition Date. The FTX Debtors did nothing.  Nor did the FTX Debtors seek any relief from the BlockFi Bankruptcy Court before asking this Court to extend the FTX Automatic Stay.

56.     Neither the FTX Debtors' intent nor characterization of their action as a response to the Emergent Lawsuit affects the analysis or the outcome that the FTX Debtors have violated the BlockFi Automatic Stay.  *In re Palmdale Hills Prop., LLC*, 423 B.R. 655, 665 (B.A.P. 9th Cir. 2009) (quoting *Parker v. Bain*, 68 F.3d 1131, 1137 (9th Cir. 1995)) (holding that although the second debtor sought its relief in defense of the motion for relief from stay, such requested affirmative relief violated the automatic stay of the first debtor seeking relief from the second debtor's stay).  Although BlockFi is not currently seeking a finding that the FTX Debtors' Motion violated the BlockFi Automatic Stay or Worldwide Stay, there is no question the FTX Debtors could have made these same arguments in the ongoing Emergent Lawsuit. 11 U.S.C. § 362(a)(1); *State Farm Fla. Ins. Co. v. Carapella (In re Gaime)*, 17 F.4th 1349, 1353 (11th Cir. 2021) (citing same).

57.     Moreover, BlockFi's filing of the Emergent Lawsuit was merely a continuation of BlockFi's prepetition efforts to exercise its rights and to obtain the Shares.  The FTX Debtors now seek to enjoin BlockFi from exercising its remedies against Emergent, Marex, and the Shares—all of which BlockFi undertakes to fulfill their fiduciary duties to their creditors.  Nothing barred the FTX Debtors from requesting an extension of the FTX Automatic Stay *before* the BlockFi Petition Date.  The FTX Debtors' failure to do just that cannot excuse the FTX's Debtors' self-help violation of the BlockFi Automatic Stay in filing their Motion.

### b.  Violation of Section 362(a)(3)

58.     Section 362(a)(3) also stays "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3).  Through the Emergent Lawsuit, BlockFi is pursuing valuable causes of action that are property of the BlockFi Debtors' estates. 11 U.S.C. § 541(a)(1).  Moreover, the Shares themselves are property of the BlockFi Debtors' estates pursuant to its rights under the Emergent Pledge Agreement.  Thus, BlockFi now owns the Shares, and extending the FTX Automatic Stay to the Shares or the Emergent Lawsuit would unquestionably impair and control property of the BlockFi Debtors' estates.

59.     As set forth above, property of the estate includes causes of action that exist on the petition date and that can be brought by the debtor on its own behalf. 11 U.S.C. § 541(a); *Emoral, Inc. v. Diacetyl (In re Emoral, Inc.)*, 740 F.3d 875, 879 (3d Cir. 2014) (holding that causes of action that existed at the time of the bankruptcy filing and could have been asserted by the debtor on its own behalf are property of the estate).  The claims and causes of action that BlockFi is pursuing in the Emergent Lawsuit existed at the time of the BlockFi Petition Date, and BlockFi brought those claims on its own behalf to enforce its own rights and remedies.  Thus, the claims

and causes of action that BlockFi is pursuing in the Emergent Lawsuit constitute property of the BlockFi Debtors' estates.

60.     Section 362(a)(3) applies to third-party actions affecting estate property, including causes of action, and specifically enjoins any act that "is deemed or construed to impair or usurp the bankruptcy estate's causes of action." *Kind Operations, Inc. v. Cadence Bank, N.A. (In re PA Co-Man, Inc.)*, 644 B.R. 553, 638 (Bankr. W.D. Pa. 2022) ("Section 362(a)(3) . . . expressly enjoins any act 'to obtain possession of property of the estate' or to 'exercise control over property of the estate.'   To the extent the [litigation] is deemed or construed to impair or usurp the bankruptcy estate's causes of action, such actions are void for violating the automatic stay.") (quoting 11 U.S.C. § 362(a)(3)).

61.     The FTX Debtors are attempting to control property of the BlockFi Debtors' estates.   Their requested relief would not only impair the BlockFi Debtors' ability to pursue the Emergent Lawsuit, but it would also restrain the BlockFi Debtors from fulfilling their fiduciary duties as debtors-in-possession.

### 4.     *The FTX Debtors have no identity of interest with the parties to the Emergent Lawsuit, and it poses no threat to the FTX Debtors.*

62.     The request to extend the FTX Automatic Stay also substantively fails.   To extend the FTX Automatic Stay, the FTX Debtors must show unusual or extraordinary circumstances.[15] Unusual or extraordinary circumstances occur when (i) there is an identity of interest between the debtor and the non-debtor party and (ii) the action against the non-debtor will have an immediate adverse economic consequence for the debtor's estate. *E.g.*, *A.J. Robins Co. v. Piccinin*, 788 F.2d 994, 999 (4th Cir. 1986).   Facts justifying extension of an automatic stay to actions among third

---

[15] Even a showing of unusual circumstances, however, would not overcome this Court's lack of jurisdiction as explained in Section III.B.1, *supra*.

parties are rare. *Panther Mountain Land Dev., LLC*, 686 F.3d 916, 921 (8th Cir. 2012) (citations omitted).  In fact, establishing unusual or extraordinary circumstances to extend a stay is not simple, and courts are reluctant to do so. *E.g.*, *id.* at 924 (recognizing "the possibility of expanding the automatic stay when presented with 'unusual,' 'rare,' or 'limited' circumstances, but [having] found these restrictive terms to have real meaning"); *C.H. Robinson Co. v. Paris & Sons, Inc.*, 180 F. Supp. 2d 1002, 1015 (N.D. Iowa 2001) (noting a "generalized reluctancy to expand the scope of the automatic stay provision of the Bankruptcy Code and to limit any expansion to truly extraordinary cases").

63.    The FTX Debtors have no identity of interest with Emergent or Marex, and the Emergent Lawsuit holds no adverse consequence for the FTX Debtors' estates.  As already set forth above, the Shares are not property of the FTX Debtors' estates, and the FTX Debtors' direct claims to the Shares are not colorable.

64.    Likewise, the FTX Debtors have no interests in BlockFi's claims in the Emergent Lawsuit. BlockFi possesses independent claims against Emergent and Marex for their own obligations under separate agreements and theories of liability, regardless of how BlockFi's claims against Alameda may be treated in the FTX Chapter 11 Cases. *E.g.*, *NCNB Tex. Nat'l Bank v. Johnson*, 11 F.3d 1260, 1266 (5th Cir. 1994) (holding that the modification and discharge of debt under a chapter 11 plan of reorganization did not affect the guarantor's liability).  Emergent's guaranty obligations became fixed upon the execution of the Emergent Pledge Agreement and no plan or treatment of BlockFi's claim against Alameda in the FTX Chapter 11 Case can change Emergent's obligations or liabilities.[16] 11 U.S.C. § 524(e).

---

[16] The purpose of a guaranty is to shift the risk of loss and delay from the creditor to the guarantor. *Johnson*, 11 F.3d at 1266 ("[A] lender obtains guaranties specifically to provide an alternative source of repayment. . . ."); *In re Phar-Mor Sec. Litig.*, 166 B.R. 57, 62 (W.D. Pa. 1994) ("[T]he Code was not intended to stay action . . . where the non-debtor's liability rests upon his own breach of duty.").

65.    The FTX Debtors' reference their potential liability under an indemnification claim from Marex.  This is a red herring.  The potential indemnification claim relates only to the transfer of the Shares from Alameda's Marex account to Emergent's Marex account.  That transfer has no bearing or import on the Emergent Lawsuit—it was completed months before anything relevant. When the Emergent Pledge Agreement was executed, Emergent owned the Shares. [Schedule 13D.]  Moreover, even if the Emergent Lawsuit implicated that potential indemnity claim, there is no immediate adverse economic consequence to the FTX Debtors' estates. *NJ Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*, 564 B.R. 192, 195 (Bankr. S.D.N.Y. 2016) (holding that the mere possibility of a future indemnification claim will not support extension of the automatic stay); *In re SDNY 19 Mad Park, LLC*, 2014 WL 4473873, at *2 (Bankr. S.D.N.Y. Sept. 11, 2014) (same).  This inter-brokerage transfer between Alameda and Emergent is irrelevant.

**C.    The FTX Debtors are not harmed by BlockFi continuing to prosecute the Emergent Lawsuit.**

66.    There is no basis for the FTX Debtors' assertion that Alameda must appear in the Emergent Lawsuit. Mot. ¶ 66.  Neither Alameda nor any of the other FTX Debtors are parties to the Emergent Lawsuit, and there is no potential indemnification claim against any of the FTX Debtors resulting from the Emergent Lawsuit.  The FTX Debtors' need for valuable assets does not create harm or "risk of an adverse impact on the [FTX] Debtors' ability to reorganize" simply because the Shares "represent *hundreds of millions of dollars* of relatively liquid assets" when the FTX Debtors have no direct right to the Shares. Mot. ¶ 66; *Pearlman*, 371 U.S. at 135–36 ("a [debtor cannot] distribute other people's property among [its] creditors").

67.    The FTX Debtors knew or should have known that there was no stay violation, yet they attempt to use the automatic stay to artificially create "harm" where none exists. *In re Scarborough St. James Corp.*, 535 B.R. 60, 67 (Bankr. D. Del. 2015) ("The [automatic] stay is not

meant . . . to be used by a debtor to pursue it creditors, as more litigation is hardly consistent with the concept of a breathing spell for the debtor. Instead, the stay is a shield, not a sword."); *In re Walton*, 158 B.R. 943, 947 (Bankr. N.D. Ohio 1993) ("The unnecessary consumption of judicial resources in administering Debtors' case will not be condoned" after finding the debtors' allegations of a stay violation meritless).

**D.      The Court should not enforce or extend the FTX Automatic Stay to the Antiguan Liquidation Proceeding.**

68.      There is no need to extend the FTX Automatic Stay to the Antiguan Action because the BlockFi Automatic Stay already applies to the Antiguan Action. [*See* FTX Anigian Dec., Ex. J, p. 20 (stating the "orders entered by the Antiguan Court with respect to the powers of the JPLs and their authority was subsequent to" the Worldwide Stay Order").]

**IV.      Statement Pursuant to Local Rule 9013-1(f)**

69.      Pursuant to Local Rule 9013-1(f), BlockFi does not consent to the entry of a final order by the Bankruptcy Court in connection with the Motion or this Objection to the extent that it is later determined that the Bankruptcy Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

**V.      Conclusion**

70.      For all of the foregoing reasons, BlockFi requests the Court sustain the Objection, deny the Motion, and grant such other and further relief as the Court deems just and appropriate.

Dated: January 5, 2023

**MORRIS NICHOLS ARSHIT & TUNNELL LLP**

*/s/ Derek C. Abbott*
Derek C. Abbott (No. 3376)
1201 North Market Street, Suite 1600
Wilmington, DE 19801
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
Email: dabbott@morrisnichols.com

and

**HAYNES AND BOONE, LLP**
Richard Kanowitz (admitted *pro hac vice*)
30 Rockefeller Plaza
26th Floor
New York, NY 10112
Telephone: (212) 659-7300
Facsimile: (212) 918-8989
Email: Richard.Kanowitz@haynesboone.com

Richard D. Anigian (admitted *pro hac vice*)
Charles M. Jones II (admitted *pro hac vice*)
2323 Victory Avenue
Suite 700
Dallas, TX 75219
Telephone: (214) 651-5000
Facsimile: (214) 651-5940
Email:  Rick.Anigian@haynesboone.com
         Charlie.Jones@haynesboone.com

*Counsel for BlockFi Inc. and its affiliates*