# Exhibit F

# Exhibit A

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq. (NJ Bar No. 014321986)
Warren A. Usatine, Esq. (NJ Bar No. 025881995)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
(201) 489-3000
(201) 489-1536 Facsimile
msirota@coleschotz.com
wusatine@coleschotz.com

*Proposed Attorneys for Debtors and*
*Debtors in Possession*

**HAYNES AND BOONE, LLP**
Richard S. Kanowitz, Esq. (NJ Bar No. 047911992)
Richard D. Anigian, Esq. (*pro hac vice*)
Charles M. Jones II, Esq. (*pro hac vice*)
30 Rockefeller Plaza, 26th Floor
New York, New York 10112
(212) 659-7300
richard.kanowitz@haynesboone.com
rick.anigian@haynesboone.com
charlie.jones@haynesboone.com

*Proposed Attorneys for Debtors and*
*Debtors in Possession*

---

In re:
BLOCKFI INC., *et al.*,

Debtors.[1]

---

BLOCKFI INC., BLOCKFI LENDING LLC AND
BLOCKFI INTERNATIONAL LLC,

Plaintiffs,

-against-

EMERGENT FIDELITY TECHNOLOGIES LTD.
AND ED&F MAN CAPITAL MARKETS, INC.,

Defendants.

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY**

Case No. 22-19361 (MBK)

(Jointly Administered)

Chapter 11

Adv. Pro. No. 22-01382 (MBK)

---

## DECLARATION OF RICHARD D. ANIGIAN IN SUPPORT OF BLOCKFI'S RESPONSE AND OBJECTION TO THE JOINT PROVISIONAL LIQUIDATORS OF EMERGENT FIDELITY TECHNOLOGIES, LTD.'S EMERGENCY MOTION FOR EXTENSION OF TIME TO RESPOND TO COMPLAINT AND TURNOVER MOTION AND FOR CONTINUANCE OF HEARING AND PRETRIAL CONFERENCE

I, Richard D. Anigian, hereby declare as follows under penalty of perjury:

1.    I am over eighteen and have never been convicted of a felony or other crime

---

[1] The Debtors in these chapter 11 cases (the "Debtors"), along with the last four digits of each Debtor's federal tax identification number, are:  BlockFi Inc. (0015); BlockFi Trading LLC (2487); BlockFi Lending LLC (5017); BlockFi Wallet LLC (3231); BlockFi Ventures LLC (9937); BlockFi International Ltd. (N/A)); BlockFi Investment Products LLC (2422); BlockFi Services, Inc. (5965) and BlockFi Lending II LLC (0154).  The location of the Debtors' service address is 201 Montgomery Street, Suite 263, Jersey City, NJ 07302.

involving moral turpitude, and do not suffer from any mental or physical disability that would render me incompetent to make this declaration.  I am able to swear, and I hereby do swear, that all of the statements in this declaration are true and correct and within my personal knowledge or are known to me by reason of my position and involvement in this proceeding and/or through counsel for BlockFi who has appeared in the actions described below in Antigua.

2.      I am an attorney licensed to practice in the State of Texas since November 1985.  I have at all times thereafter been a member in good standing with the State Bar of Texas.  I have been admitted *pro hac vice* to this Court to represent the Debtors in this Adversary Proceeding.

3.      I am a partner in the law firm of Haynes and Boone, LLP and have been a member of the law firm's litigation department since 1987.

4.      I submit this declaration in order to present documents relevant to and in support of *BlockFi's Response and Objection to the Joint Provisional Liquidators of Emergent Fidelity Technologies, Ltd.'s Emergency Motion for Extension of Time to Respond to Complaint and Turnover Motion and for Continuance of the Hearing and Pretrial Conference* (the "Objection"), on behalf of BLOCKFI INC. ("BlockFi Inc."), BlockFi Lending LLC ("BlockFi Lending") and BlockFi International LLC ("BlockFi International" and together with BlockFi Inc. and BlockFi Lending, "BlockFi").  If I were called upon to testify, I could and would competently testify to the facts set forth herein.

5.      Attached hereto as **Exhibit A-1** is a file-marked copy of Yonatan Ben Shimon's Notice of Application for an interim freezing order and interim receivership that appears to have been filed on November 18, 2022, with the Eastern Caribbean Supreme Court in the High Court of Justice, Antigua and Barbuda, claim number ANUHCV2022/0456.

6.      Attached hereto as **Exhibit A-2** is a file-marked copy of Shimon's Affidavit that

appears to have been filed on November 18, 2022, in support of his application that is attached hereto as **Exhibit A-1**.

7. Attached hereto as **Exhibit A-3** is a file-marked copy of Angela Barkhouse's and Toni Shukla's, as interim receivers of Emergent, Petition to be appointed Joint Liquidators of Emergent that appears to have been filed on December 2, 2022, in the Eastern Caribbean Supreme Court in the High Court of Justice, Antigua and Barbuda, claim number ANUHCV2022/0480.

8. On December 2, 2022, Therese M. Doherty, counsel with Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., who represents Marex in this Adversary Proceeding, informed me of the apparent appointment of interim receivers in the "BVI." On December 7, 2022, Ms. Doherty informed me that she has been in contact with U.S. lawyers representing the Joint Receivers of Emergent (Morgan Lewis) and that the Joint Receivers had apparently been appointed as Joint Provisional Liquidators of Emergent. Ms. Doherty also provided a copy of the Antigua court's December 5 Order. A true and correct copy of my email exchange with Ms. Doherty without a copy of the Order is attached hereto as **Exhibit A-4**.

9. On December 7, 2022, my partner and co-counsel for BlockFi, Charlie Jones, emailed the JPLs' U.S. counsel the following documents from this Adversary Proceeding: (1) BlockFi Adversary Complaint with Summons [Adv. Dkt. No.1], (2) BlockFi Turnover Motion with Exhibits [Adv. Dkt. No. 2], (3) BlockFi Adversary Summons [Adv. Dkt. No. 3], (4) Notice of Rescheduled Hearing until January 9, 2023, and (5) BlockFi Worldwide Stay [Bankr. Dkt. No. 56]. A true and correct copy of the Jones email is attached hereto as **Exhibit A-5**.

10. Attached hereto as **Exhibit A-6** is a file-marked copy of JPL Barkhouse's Third Affidavit that appears to have been filed on December 19, 2022, in the Eastern Caribbean Supreme Court in the High Court of Justice, Antigua and Barbuda, in claim number ANUHCV2022/0480.

To conserve space, only Ms. Barkhouse's affidavit has been attached hereto, and the approximately

576 pages of attachments to her affidavit have been omitted and can be supplied at the Court's

request.

*[Signature Page Follows]*

Pursuant to 28 U.S.C. Section 1746, I declare under penalty of perjury that the foregoing

statements are true and correct.

Executed on December 28, 2022    By: _____

Name: Richard D. Anigian
Title: Partner, Haynes and Boone, LLP

5

# Exhibit A-1

Case Number: ANUHCV2022/0456

FILED
HIGH COURT
ANTIGUA AND BARBUDA

THE EASTERN CARIBBEAN SUPREME COURT
IN THE HIGH COURT OF JUSTICE
ANTIGUA AND BARBUDA

**Submitted Date:17/11/2022 17:30**

CLAIM NO. ANUHCV 2022/

**Filed Date:18/11/2022 08:30**

BETWEEN:

**Fees Paid:42.00**

**YONATAN BEN SHIMON**

<u>Claimant / Applicant</u>

-and-

**(1) EMERGENT FIDELITY TECHNOLOGIES LTD**
**(2) SAMUEL BENJAMIN BANKMAN-FRIED**

<u>Defendants / Respondents</u>

_____

**NOTICE OF APPLICATION**

_____

The Applicant, Yonatan Ben Simon, of Zabutinski 8, Tel Aviv, Israel, applies to the Court under rules 7.3(1), 7.8A(1), 8.2(1) and 17.1(1) of the Eastern Caribbean Supreme Court Civil Procedure Rules, section 24(1) of the Eastern Caribbean Supreme Court Act (CAP. 143) and in the Court's inherent jurisdiction for the orders set out in the draft order attached hereto.

The grounds of the application are:

<u>Service out of the jurisdiction</u>

1. The Applicant should be granted permission under rule 7.3(1) of the Eastern Caribbean Supreme Court Rules (the "**CPR**") to serve the claim form on the Second Respondent out of the jurisdiction. The claim fits through the gateway in CPR rule 7.3(2) because:

    (a) The claim will be served on the First Respondent, which is a company incorporated in Antigua and Barbuda and which has its principal business address in Antigua;

    (b) There is between the Claimant and the First Respondent a real issue which it is reasonable for the Court to try; and

1

(c)  The Claimant now wishes to serve the claim on the Second Respondent, who is outside the jurisdiction and who is a necessary or proper party to the claim.

2.  There is a serious question to be tried on the merits because the Applicant has a good arguable case that:

(a)  Funds invested by the Applicant with FTX Trading Ltd ("**FTX**") (of which the Second Respondent was a founder and director) have been improperly diverted to the First Respondent (of which the Second Respondent is the sole director and majority owner) in circumstances which give rise to the Applicant having a proprietary tracing claim against those funds and/or claims against the First and/or Second Respondents in knowing receipt and/or dishonest assistance; and

(b)  The First and Second Respondents conspired to perform and did perform lawful and/or unlawful acts, involving the improper diversion of funds invested by the Applicant and other investors with FTX to the First Respondent, for the predominant purpose of injuring the Applicant and other investors by expropriating those funds to the personal benefit of the Second Respondent, and thereby causing loss to the Applicant.

3.  Antigua and Barbuda is clearly or distinctly the appropriate forum because it is the principal place of business of the First Respondent, which received the misappropriated funds. Insofar as the claim seeks non-monetary relief with respect to those funds, including declaratory relief and the taking of an account, such relief would not be enforceable against the First Respondent in its jurisdiction of incorporation at common law or under the Reciprocal Enforcement of Judgments Act (CAP. 369) if granted by a foreign court. Accordingly, to ensure the efficacy of the relief sought, the claim must be tried here.

Alternative service

4.  The Applicant should be granted permission under CPR rule 7.8A(1) for the claim to be served on the Second Respondent by the alternative method of delivery to his US counsel (Paul, Weiss, Rifkind, Wharton & Garrison LLP) as identified in the corporate authority signed by him and filed with FTX's Chapter 11 petition. Service under CPR rule 7.8 is impracticable

because it is unclear whether the Second Respondent is currently resident in or may be found in the United States or the Bahamas, and the urgency of the matter requires that notice of the claim be brought to his attention as soon as possible.

Permission to serve the claim without a statement of claim

5. In view of the urgency of the application for the interim relief sought below and the fast-moving situation that is unfolding across multiple jurisdictions, it is not practicable for the Applicant to prepare a statement of claim in the time available. Permission should be granted under CPR rule 8.2(1) to serve the claim form now without a statement of claim, so that there is a jurisdictional basis for that grant of that interim relief, with a direction that the statement of claim must be filed within 14 days.

6. Under rule 7.4 of the English Civil Procedure Rules, a claimant would ordinarily have 14 days from the service of a claim form to serve particulars of claim. A 14-day period in the present case would allow the Respondents sufficient time to prepare for the return date hearing to be fixed within 28 days of the making of the orders sought, in accordance with CPR rules 17.4(4) and (5).

Interim freezing order

7. The Court should issue an interim freezing order under CPR rule 17.1(1) and section 24(1) of the Eastern Caribbean Supreme Court Act (CAP. 143) directed to:

   (a) The First Respondent, in respect of its worldwide assets, up to the value of the Applicant's investment with FTX; and

   (b) The Second Respondent, in respect of his equity and/or debt interests in the First Respondent, up to the value of the Applicant's investment with FTX.

8. As stated above in paragraph 2, the Applicant has a good arguable case against for the relief claimed.

9. There is a real risk that a judgment against the First and Second Respondents will go unsatisfied unless a freezing order is made to prevent them from dissipating their assets in the interim. In May 2022, the First Respondent acquired a 7.6% shareholding in a NASDAQ-

3

listed company named Robinhood Markets, Inc ("**Robinhood**") for about US$650 million, possibly using funds improperly diverted from those invested by the Applicant and others with FTX. According to media reports, when FTX was placed into Chapter 11 bankruptcy in the United States on 11 November 2022, the Second Respondent was attempting to sell those Robinhood shares at about a 20% discount to their volume-weighted average price. Once liquidated, the sale proceeds may be impossible to recover.

10. In all the circumstances, it would be just and convenient to grant the freezing order sought. The First Respondent is not a trading company and there is no reason to believe that a freezing order would cause any disruption to any operating businesses. There is no reason to suppose that any other third parties would be adversely affected.

<u>Interim receivership</u>

11. In all the circumstances, it would further be just and convenient to appoint receivers over the Second Respondent's equity and/or debt interests in the First Respondent, and over the First Respondent's worldwide assets, to prevent their dissipation or encumbrance. The Second Defendant is outside the Court's territorial jurisdiction and the circumstances of FTX's collapse (as disclosed to date) are sufficiently concerning that there is a measurable risk that a freezing order alone may offer insufficient protection of the assets against which a judgment in favour of the Applicant may eventually be enforced.

The affirmation of Yonatan Ben Simon dated 17 November 2022 accompanies this application.

This application is made without notice to the Respondents.

Dated: 17 November 2022

_(signature)_

_____

Kendrickson Kentish

Lake, Kentish & Bennett Inc.

Legal Practitioners for the Claimant

**NOTICE:**

This application will be heard by the Judge on the          day of                    at

If you do not attend this hearing an order may be made in your absence.

The court office is located at the Registry of the Supreme Court, High Street, Parliament Drive, St John's, Antigua; telephone +1 268 462 0609; fax +1 268 462 3929. The office is open between 8:30 a.m. and 4:30 p.m. from Monday to Friday except on public holidays.

**THE EASTERN CARIBBEAN SUPREME COURT**
**IN THE HIGH COURT OF JUSTICE**
**ANTIGUA AND BARBUDA**

**CLAIM NO. ANUHCV 2022/**

**BETWEEN:**

**YONATAN BEN SHIMON**
**Claimant / Applicant**
-and-

**(1) EMERGENT FIDELITY TECHNOLOGIES LTD**
**(2) SAMUEL BENJAMIN BANKMAN-FRIED**
**Defendants / Respondents**

_____

**NOTICE OF APPLICATION**

_____

**Lake, Kentish & Bennett Inc.**
**Temple Chambers**
**36 Long St**
**St John's**
**Antigua**
**Tel: +1 268 462 1012**
**Fax: +1 268 462 2568**

**Legal Practitioners for the Claimant**

# Exhibit A-2

Case Number :ANUHCV2022/0456
Serial No : 37/2022

Case 22-11068-JTD Doc 681-1 Filed 02/08/23 Page 16 of 33   Desc
Exhibit A - Declaration of Richard D. Anigian in Support of BlockFi's Resp   Page 15 of 70

**Form No. 1**

**AUTHENTICATION OF SIGNATURE**

I, the undersigned **Shahar Ronen**

Notary holding license no **222437**

hereby certify that on **18.11.2022** appeared before me at my offices located at 4 Berkowitz St. Museum Tower, Floor 6, Tel Aviv 6423806, Israel.

Mr. / Ms.     **YONATAN BEN SHIMON**

☐ who is known to me personally

✔ whose identity has been proven to me by id (Israel) number **301757076**

issued on 15.02.2021 expiry date 14.02.2026

And I am convinced that the person standing before me understood fully the significance of the action and voluntarily signed the attached document marked with the letter **"A"**

In witness whereof, I hereby authenticate the signature of Mr. / Ms. **YONATAN BEN SHIMON** by my own signature and seal this day 18.11.2022

Notary fee 297NIS. Including VAT

Signature.........................................

Notary's seal

אימות חתימה

אני החתום מטה **שחר רונן**

נוטריון בעל רישיון מספר **222437**

מאשר כי ביום **18.11.2022**

ניצבת לפני במשרדי שבמגדל ברקוביץ 4 מגדל המוזיאון קומה 6 תל אביב 6423806, ישראל.

מרת **יהונתן בן שמעון**

☐ המוכרת לי באופן אישי

✔ שזהותה/זהותו הוכחה לי על פי תעודת זהות ישראלית מספר **301757076** שהונפקה ביום 15.02.2021 תוקף 14.02.2026

ושוכנעתי כי הניצבת בפני הבינה הבנה מלאה את משמעות הפעולה וחתמה מרצונו/ה החופשי על המסמך המצורף והמסומן באות **"א".**

לראיה אני מאמת את חתימתו/ה של מרת

**יהונתן בן שמעון**

חתימתי ידי ובחותמי, היום 18.11.2022

שכר נוטריון 297 ₪ כולל מע"מ.

חתימה.................................

חותם ה...............................

Scanned with CamScanner

A

Filed on behalf of: Claimant
Affidavit of: Yonatan Ben Shimon
Affidavit number: first
Exhibit reference: YBS-1
Date affirmed: 17 November 2022
Date filed: 17 November 2022

**THE EASTERN CARIBBEAN SUPREME COURT**
**IN THE HIGH COURT OF JUSTICE**
**ANTIGUA AND BARBUDA**

**CLAIM NO. ANUHCV2022/**

**BETWEEN:**

YONATAN BEN SHIMON

Claimant / Applicant

-and-

(1) EMERGENT FIDELITY TECHNOLOGIES LTD
(2) SAMUEL BENJAMIN BANKMAN-FRIED

Defendants / Respondents

---

### AFFIRMATION OF YONATAN BEN SHIMON

---

I, YONATAN BEN SHIMON, of Zabutinski 8, Tel Aviv, Israel, do solemnly and sincerely affirm and say as follows:

1. I make this affirmation in support of my application for:

    a. An urgent interim freezing injunction pending the determination of the claim;

    b. The appointment of interim receivers over the First Defendant's assets and over any equity and/or debt interests held by the Second Defendant in the First Defendant;

    c. Orders relating to service, including permission to serve the claim out of the jurisdiction on the Second Defendant.

1

2. Unless otherwise stated, the facts and matters deposed to in this affirmation are within my personal knowledge and I believe them to be true. Where such facts and matters are outside my personal knowledge, they are true to the best of my knowledge, information and belief and are derived from sources to which I refer.

3. There is produced to me, exhibited hereto and marked "YBS-1" a paginated bundle of true copies of documents to which I refer in this affirmation. Numbers appearing in square brackets in this affirmation are references to page numbers in that bundle.

## A. Background

4. I am an Israeli citizen and a cryptocurrency entrepreneur who has been active in this business since 2013.

5. FTX describes itself as a "crypocurrency exchange built by traders, for traders". It purports to offer "innovative products including industry-first derivatives, options, volatility products and leveraged tokens". According to its website, its founders are the Second Defendant and Gary Wang who also serve as FTX's Chief Operating Officer and Chief Technology Officer respectively.

6. The manner in which FTX's business is organised is opaque and unclear. I have reviewed the article published by the Financial Times on 10 November 2022 entitled "Untangling the knotty empire of Bankman-Fried and FTX", a copy of which may be found at pages 1-4 and I understand that the foundation company referred to in FTX's legal disclaimers is FTX Trading Ltd, duly incorporated in Antigua and Barbuda. The cryptocurrency business overseen by the Second Defendant is split into two parts:

   a. The FTX business (a cryptocurrency exchange); and

   b. Alameda Research Ltd, which is the Second Defendant's cryptocurrency trading firm.

7. According to filings with the US Securities and Exchange Commission ("**SEC**"), the First Defendant is a company incorporated in Antigua and Barbuda with its principal place of business at Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. Johns, Antigua and its principal business being the making of investments in securities and other assets.  In May

2

Scanned with CamScanner

2022, the First Defendant acquired 56,273,469 shares in Robinhood Markets, Inc. at a cost of US$648,293,886.33. This acquisition was sourced from "working capital". Robinhood Markets, Inc. is a company listed on NASDAQ (Ticker: HOOD) ("Robinhood"). The 56 million shares in question represent a 7.6% interest in Robinhood and at today's market prices have an approximate value of US$571,175,710 (56,273,469 at US$10.15 per share). In the SEC filing in question, the First and Second Defendants are described as the beneficial owners of the 56 million shares in Robinhood and the Second Defendant is described as the sole director and majority owner of the First Defendant. A copy of the SEC filing in question may be found at pages 5-13.

8.  The Second Defendant is a United States citizen with his principal business addresses at 27 Veridian Corporate Center, Western Road, New Providence, Nassau, Bahamas and 167 N Green St, Floor 11 Suite 2, Chicago, IL 60607. As outlined above, he is the co-founder of FTX and I understand that he owns and runs the cryptocurrency trading company, Alameda Research Ltd also.

9.  In and around 2021, I started using FTX, as I believed it to be a reputable exchange. On 13 October 2021, I deposited 3,000 Ethereum with FTX. As of today's date, my Ethereum has a market value of approximately US$3.5 million. Screenshots from my account with FTX evidencing my position and evidence of the current value of Ethereum may be found at pages 14-16. According to data provided by Coinmarketcap.com, the value of my 3,000 Ethereum at close of business on 13 October 2021 was US$10,818,600 (US$3,606.20 per Ethereum) [page 117].

## B. The Coinbase Article and Subsequent Events

10. On 2 November 2022, CoinDesk published an article entitled "Divisions in Sam Bankman-Fried's Crypto Empire Blur on His Trading Titan Alameda's Balance Sheet" which disclosed that the balance sheet of Alameda Research Ltd, the crypocurrency trading firm owned by Sam Bankman-Fried, is made up of FTT token which is a digital asset invented by its sister business, FTX. While the article noted that there was nothing "per se untoward or wrong" about this state of affairs, it added to evidence that the ties between the FTX business and Alameda Research Ltd were unusually close. A copy of the article in question may be found at pages 17-20.

3

11. On 6 November 2022, Zhao Changpeng, the Chief Executive Officer of Binance Holdings ("Binance") (a rival cryptocurrency exchange) took to Twitter to announce Binance's plans to sell its US$530 million holding of FTT Tokens in light of "recent revelations". A copy of the tweet in question may be found at page 21.

12. Mr Zhao's tweet precipitated both a fall in the price of FTT Tokens and a run on FTX's business with customers rushing to withdraw as much as US$6 billion over the course of three days according to a Financial Times article [pages 22-24] though the figure may, in fact, be larger. Mr Bankman-Fried has admitted that customers withdrew over US$5 billion on Sunday alone [page 50]. I understand from media reports that this financial crisis prompted Mr Bankman-Fried to request assistance from Mr Zhao which resulted in an announcement on 8 November by Mr Zhao that Binance had "signed a non-binding [letter of intent], intending to fully acquire FTX.com". A copy of the media report in question may be found at page 25.

13. However, Binance issued a statement on 9 November notifying the markets that it was abandoning the proposed acquisition of FTX in the following terms "[a]s a result of corporate due diligence, as well as the latest news reports regarding mishandled customer funds and alleged US agency investigations, we have decided that we will not pursue the potential acquisition of FTX.com". A copy of the article published by the Financial Times on 10 November 2022 which relayed this information may be found at pages 26-28.

14. I have tried to withdraw my 3,000 Etherium from FTX but my request was denied.

## C. Regulatory Investigations and Interventions

15. I believe that the 'agency investigations' referred to by Binance in its statement dated 9 November *pertained* to investigations by the US Securities and Exchange Commission and the US Justice Department. A copy of an article published by the Wall Street Journal on 9 November 2022 makes reference to the investigations in question, including to the expansion of the investigations to cover "*the relationship between FTX.US and the parent company, based in the Caribbean.*" [pages 29-31].

16. The regulatory investigations and interventions have not been limited to the US and have grown to include the suspension of FTX's EU licence by the Cypriot authorities, the appointment of provisional liquidators to FTX's business in the Bahamas, a direction issued by

Scanned with CamScanner

the Financial Services Agency of Japan to suspend all business pursuant to Japan's Payments Services Act and Financial Instruments and Exchange Act and regulatory action/investigations in Turkey, Australia, California, and New York. Media articles reporting on these regulatory actions/investigations may be found at pages 32-47. On Friday, 11 November, FTX Trading Ltd and 134 affiliated entities presented a bankruptcy petition pursuant to Chapter 11 of the US Bankruptcy Code in the United District Court for the District of Delaware. The Chapter 11 proceedings will be addressed further below at Section E.

### D. Chaos and Desperation

17. Following Binance's decision to withdraw from acquiring FTX, the Second Defendant scrambled to secure alternative funding. The desperation and chaos may be seen in a series of 22 tweets made on 10 November 2022 in which the Second Defendant states that:

        i. He "*fucked up, and should have done better.*"

        ii. "*FTX International currently has a total market value of assets/collateral higher than client deposits (moves with prices!). But that's different from liquidity for delivery – as you can tell from the state of withdrawals. The liquidity varies widely, from very to very little.*"

        iii. "*I fucked up twice. The first time, a poor internal labeling of bank-related accounts meant that I was substantially off on my sense of users' margin. I thought it was way lower.*"

        iv. "*We saw roughly US$5 billion of withdrawals on Sunday*".

        v. "*There are a number of players who [FTX is] in talks with, LOIs, terms sheets, etc.*"

Screenshots of the tweets in question may be found at pages 48-56.

18. Media outlets also reported that the Second Defendant had been desperately trying to secure fresh investment both prior to and after the filing of the bankruptcy petition on 11 November. A copy of the articles published by the Wall Street Journal and Financial Times in this regard may be found at pages 57-62. These efforts also purportedly extended to selling the 56 million shares in Robinhood which were described in the Financial Times article in the following terms:

    " *Bankman-Fried had been racing to raise emergency funding but was unable to persuade investors to rescue his collapsed business empire. The new investment materials show that he was seeking to raise $6bn-$10bn, including from a convertible*

5

Scanned with CamScanner

preferred stock paying a 10 per cent dividend that could later be converted into common equity in FTX international at a valuation of between $12bn-$15bn. "This is just a lower bound on the terms investors can get," the materials add. Until Friday afternoon, Bankman-Fried was looking to sell the $472mn of Robinhood shares, the largest liquid asset listed for FTX Trading, in privately negotiated deals he was arranging on the messaging app Signal, according to a person directly involved in the negotiations. The person noted that the Robinhood shares were held by an Antigua and Barbuda entity called Emergent Fidelity, which is personally controlled by Bankman-Fried, according to US securities filings. Emergent Fidelity is not among the entities listed in Friday's bankruptcy filing. Bankman-Fried was entertaining offers at an about 20 per cent discount to Robinhood's volume-weighted average price, or about $9 per share, said the investor, who ultimately declined to buy due to perceived legal risks."

A copy of the balance sheet referred to in the same article may be found at page 63.

19. I note that the 56 million shares in Robinhood are described as assets of FTX Trading in both the article identified above and the balance sheet found at page 63. I believe this to be an error as the SEC filing made in May 2022 clearly describes the shares in question as assets beneficially owned by the First and Second Defendants [page 9].

## E. Chapter 11 Bankruptcy Proceedings

20. On Friday, 11 November 2022, FTX Trading Ltd and 134 affiliated entities (the "**FTX Debtors**") presented a bankruptcy petition pursuant to Chapter 11 of the US Bankruptcy Code in the United States District Court for the District of Delaware. A copy of the petition may be found at pages 64-86.

21. I note that on page 75 Mr Bankman-Fried states that his personal US lawyers are Paul, Weiss, Rifkind, Wharton & Garrison LLP.

22. It is unclear whether FTX has filed its "first-day motions" to formally commence the Chapter 11 bankruptcy proceedings with one media publication stating that the "FTX bankruptcy c stalls as lawyers confront crypto chaos." [pages 87-89].

6

Scanned with CamScanner

23. The FTX Debtors have, however, filed a motion to modify certain creditor lists and authorizing the debtors to serve certain parties by email. A copy of this motion to modify may be found at pages 90-98.

24. Immediately following the presentation of the bankruptcy petition, FTX was the victim of a hack with experts estimating that in excess of US$600 million was siphoned from FTX's crypto wallets on Friday, 11 November 2022 [see pages 99-103].

25. As far as I am aware, the First Defendant is not an FTX Debtor.

### F. Revelations Following the Bankruptcy Proceedings

26. On Monday, 7 November 2022, the Second Defendant tweeted that "FTX has enough to cover all client holdings. We don't invest client assets (even in treasuries)." The tweet in question has since been deleted but it has been reproduced in an article published by the Wall Street Journal on 11 November 2022 [pages 104-108].

27. The statement made by the Second Defendant in his tweet on 7 November 2022 regarding client assets has since been shown to be incorrect. In the article published by the Wall Street Journal on 11 November 2022, it was revealed that FTX had loaned US$8 billion of client assets to Alameda for trading purposes [pages 60-62]. This represented half of all client assets (US$16 billion) held by FTX and this liability of US$8 billion can be seen in the balance sheet referred to above at paragraph 18 where it is described as the "hidden, poorly internally labled 'fiat@' account" (sic) [page 61]. In communications with the Financial Times, the Second Defendant has allegedly stated that the US$8 billion liability related to "funds "accidentally" extended to his trading firm, Alameda." [page 61].

28. It is not clear whether FTT was provided as collateral for these loans or whether those loans were unsecured. At this time, there is no clarity to ordinary customers such as myself regarding which customers' assets were, in fact, lent to Alameda. For the avoidance of doubt representatives of FTX never asked me whether I was willing to lend my 3,000 Ethereum and if so, on what terms I would be willing to do so. If it transpires that my 3,000 Ethereum ha been lent to Alameda for its trading activities, then that occurred without my knowledg permission.

7

Scanned with CamScanner

**F. Antiguan Proceedings**

29. In these proceedings, I claim against the First and Second Defendants on a proprietary basis, for breach of trust and dishonestly assisting breaches of trust and seek the following primary relief:

   i. A declaration that the First and/or Second Defendants hold funds which I invested with FTX Trading Ltd or their traceable proceeds on trust for me;

   ii. Such amount as the Court may assess on the basis that funds which I invested with FTX Trading Ltd were knowingly received by the First and/or Second Defendants in breach of trust and/or that the First and/or Second Defendants dishonestly assisted breaches of trust;

   iii. The taking of an account and consequential orders thereupon; and

   iv. Damages in tort for lawful and/or unlawful means conspiracy.

30. As for the interim relief, I seek the following, namely:

   *Interim Freezing Injunction*

   i. An interim freezing order directed to:

      a) The First Defendant, in respect of its worldwide assets, up to the value of my investment with FTX; and

      b) The Second Defendant, in respect of his equity and/or debt interests in the First Defendant, up to the value of my investment with FTX.

   ii. Without waiving privilege, I am advised that I have a good arguable case against the First and Second Defendants for the relief claimed.

   iii. There is a real risk that a judgment against the First and Second Defendants will unsatisfied unless a freezing order is made to prevent them from dissipating t assets in the interim. As outlined above at paragraph 7, the First Defendant acq a 7.6% shareholding in Robinhood for about US$650 million, possibly using

8

Scanned with CamScanner

improperly diverted from those invested by me and others with FTX. I know nothing regarding the source of the funds used to acquire the 7.6% interest in Robinhood beyond the fact that it was allegedly "working capital" [page 8]. According to media reports and as outlined at paragraph 18 above, when FTX was placed into Chapter 11 bankruptcy in the United States on 11 November 2022, the Second Defendant was attempting to sell those Robinhood shares at about a 20% discount to their volume-weighted average price. Once liquidated, the sale proceeds may be impossible to recover, particularly if they are converted into crypto currency and stored in a digital wallet (not another crypto exchange).

iv.  In all the circumstances, it would be just and convenient to grant the freezing order sought. The First Defendant is not a trading company and there is no reason to believe that a freezing order would cause any disruption to any operating businesses. There is no reason to suppose that any other third parties would be adversely affected.

### Interim Receivership

i.  The appointment of receivers over the Second Defendant's equity and/or debt interests in the First Defendant, and over the First Defendant's worldwide assets, to prevent their dissipation or encumbrance. The Second Defendant is outside the Court's territorial jurisdiction and the circumstances of FTX's collapse (as disclosed to date) are sufficiently concerning that there is a measurable risk that a freezing order alone may offer insufficient protection of the assets against which a judgment in favour of me may eventually be enforced.

31. I understand that I must give the Court, as the price of an injunction, an undertaking to pay any damages which the Defendants sustain which the Court considers that I should pay. I confirm that I will instruct my counsel to give the required undertaking on my behalf at the hearing.

32. In the meantime, if no injunction is granted, then there is a real risk that any future judgment will go unsatisfied.  The evidence suggests that the Second Defendant's efforts to sell the 56 million shares in Robinhood continued after the Chapter 11 bankruptcy filing and may be ongoing as part of his efforts to raise liquidity [pages 57-62]. Even if the Second Defendant's

9

Scanned with CamScanner

efforts in this regard are to provide cash to FTX, this is misguided. It is not open to the Second Defendant, in his capacity as sole director of the First Defendant, to gift the latter's assets to FTX. Those assets should be safeguarded for the benefit of those who have a claim to the assets, including myself.

33. A less charitable assessment of the Second Defendant's efforts to raise liquidity might focus on the potentially fraudulent aspect to this crypto platform collapse. The former US Treasury Secretary, Larry Summers, has compared the collapse of FTX to the Enron scandal stating that both were cases where people detected 'whiffs of fraud.' [pages 109-110]. The Second Defendant claims that US$8 billion was "accidentally" lent to his firm's cryptocurrency trading entity but this highly improbable and media reports have circulated that the Second Defendant has fled to Argentina though these reports have been denied by him [pages 111-112]. In the circumstances, the balance of convenience clearly lies in favour of granting the relief sought.

34. This application is proceeding *ex parte* to safeguard the assets held by the First Defendant and prevent the Second Defendant from executing a stock transfer form transferring the shares to a third party. Were the Defendants to be notified of these proceedings, it would most likely defeat the very purpose of the application.

35. The proposed receivers, Ms Angela Barkhouse of Quantuma (Cayman) Ltd, Suite N404, Flagship Building, 142 Seafarers Way, George Town, Grand Cayman and Ms Toni Shukla of Quantuma (BVI) Ltd, PO Box 4171, Road Town, Tortola, British Virgin Islands, VG110 have both consented to act. A copy of their respective consents to act and the curriculum vitae may be found at pages 113-116.

### F. Service out of the jurisdiction

36. The Second Defendant is not resident in Antigua and Barbuda. The SEC filing made by him in May 2022 suggests that he is either resident in Bahamas or the United States (see paragraph 8 above).



10

Scanned with CamScanner

37. Having taken legal advice, privilege in which is not waived, I believe that the claim against the Second Defendant has a realistic prospect of success and that the grounds on which the service out application is made are:

    a. The claim will be served on the First Defendant, which is a company incorporated in Antigua and Barbuda and which has its principal business address in Antigua;

    b. There is between me and the First Defendant a real issue which it is reasonable for the Court to try; and

    c. I wish to serve the claim on the Second Defendant, who is outside the jurisdiction and I am advised, without waiving privilege, that he is a necessary or proper party to the claim.

38. There is a serious question to be tried on the merits because I have a good arguable case that:

    a. Funds invested by me with FTX Trading Ltd (of which the Second Defendant was a founder and director) have been improperly diverted to the First Defendant (of which the Second Defendant is the sole director and majority owner) in circumstances which give rise to my having a proprietary tracing claim against those funds and/or claims against the First and/or Second Defendants in knowing receipt and/or dishonest assistance; and

    b. The First and Second Defendants conspired to perform and did perform lawful and/or unlawful acts, involving the improper diversion of funds invested by me and other investors with FTX to the First Defendant, for the predominant purpose of injuring me and other investors by expropriating those funds to the personal benefit of the Second Defendant, and thereby causing loss to me.

39. I am advised, without waiving privilege, that Antigua and Barbuda is clearly or distinctly the appropriate forum because it is the principal place of business of the First Defendant, which received the misappropriated funds. Insofar as the claim seeks non-monetary relief with respect to those funds, including declaratory relief and the taking of an account, such would not be enforceable against the First Defendant in its jurisdiction of incorpor... common law or under the Reciprocal Enforcement of Judgments Act (CAP. 369) if g...

11

a foreign court. Accordingly, to ensure the efficacy of the relief sought, the claim must be tried here.

40. In light of the urgency of this matter and the need to move the application seeking the freezing injunction and the appointment of receivers without delay to prevent dissipation of assets, it has not been possible, in the available time, to prepare a statement of claim. The application seeks an additional 14 days in which to do this.

41. The application also seeks permission to serve the claim by delivery to the Second Defendant's personal US lawyers as identified in the Chapter 11 filing (Paul, Weiss, Rifkind, Wharton & Garrison LLP).  The reason for this is that service through the ordinary channels would be impracticable in these circumstances because it is unclear whether the Second Respondent is currently resident in or may be found in the United States or the Bahamas, and the urgency of the matter requires that notice of the claim be brought to his attention as soon as possible. Effecting service on his personal US lawyers will doubtless have that effect.

## G. Full and frank disclosure

42. I understand that the First Defendant is not an FTX Debtor which is protected by the Chapter 11 worldwide moratorium. While my counsel has diligently checked the available US filings in this regard, there may be filings in the US bankruptcy of which I am unaware which would mean that the First Defendant is an FTX Debtor and, therefore, protected by the worldwide moratorium.

43. There is conflicting evidence regarding ownership of the 56 million Robinhood shares. The balance sheet produced at page 63 suggests that these shares are owned by FTX. However, the Second Defendant has stated in his SEC filing dated May 2022 that the shares are held by the First Defendant and they are beneficially owned by the First and Second Defendants. As far as I am aware, neither FTX nor any other entity has filed a further form SC 13-D with the SEC notifying it of any change in ownership. Moreover, the fact that the First Defendant was not included in the bankruptcy petition filing suggests that its assets do not form part of the bankruptcy estate.  However, I cannot entirely discount the possibility that FTX or authorised representatives may in future claim that these shares form part of its bankr... estate.

12

44. The First Defendant may claim that Antigua is not the appropriate forum. I understand that my lawyers will argue that it is clearly or distinctly the appropriate forum because it is the First Defendant's principal place of business, and also because non-monetary relief granted by a foreign court (if the claim were tried elsewhere) would not be enforceable against Emergent in Antigua.

45. In preparing this affirmation with the assistance of my legal counsel, it has been necessary to rely on articles published by the media. There may be errors in those articles. My lack of first-hand knowledge is due to the fact that I am an ordinary retail customer of FTX and it is not within my power to provide first-hand knowledge of what has occurred. I am not privy to that information.

46. The Defendants may argue that there is an innocent explanation for the collapse of FTX and that the working capital (US$648,293,886.33) used to acquire the 56 million shares in Robinhood is unrelated to the client funds unlawfully lent to Alameda Research Ltd. This may be the case.  It is too soon to tell.  However, the collapse of the trading platform and the discovery that over half of its assets were unlawfully lent to a related third party subject to the control of the Second Defendant undermines any argument that there could be an innocent explanation.

47. The Defendants may complain that they have not been provided with any notice of these proceedings nor the application to freeze their assets and have receivers appointed. This is by necessity.  Given the speed at which FTX has collapsed, the subsequent hack, the Second Defendant's facility with crypto currencies and the transfer of same and the disclosure that the Second Defendant continued to try to sell the 56 million Robinhood shares for his benefit or the benefit of FTX following the filing of the Chapter 11 bankruptcy proceedings and may be continuing in his efforts to dispose of the Robinhood shares, it is incumbent on claimants such as myself to move quickly and without notice.

48. According to the SEC filing made in May 2022, the Second Defendant is the majority owner of the First Defendant. The Second Defendant has not revealed, in any public filing of which I am aware, the identity of those who hold a minority interest in the First Defendant. Accordingly, I do not know who else may be affected by this application nor do I know how they may be affected.

13

49. Due to FTX's website having been taken down, I am not presently able to access the page that sets out the terms and conditions on which I made my investment in FTX. However, without waiving privilege, I have not been advised of any reason why these would affect my rights against the First or Second Defendants as pleaded in this claim as distinct from my rights against FTX.

## H. Conclusion

50. For the reasons set out above in this affidavit, I respectfully ask the Court to make the orders sought by me.

AFFIRMED by the within named          )
                                      )
YONATAN BEN SHIMON                    )
                                      )
This **18** day of November 2022      )
                                      )

At   TEL-AVIV ISRAEL

BEFORE ME:

SHAHAR RONEN NOTARY



14

Scanned with CamScanner

THE EASTERN CARIBBEAN SUPREME COURT
IN THE HIGH COURT OF JUSTICE
ANTIGUA AND BARBUDA

CLAIM NO. ANUHCV 2022/

BETWEEN:

YONATAN BEN SHIMON

Claimant / Applicant

-and-

(1) EMERGENT FIDELITY TECHNOLOGIES LTD
(2) SAMUEL BENJAMIN BANKMAN-FRIED

Defendants / Respondents

―――――――――――――――――

AFFIDAVIT OF YONATAN BEN SHIMON

―――――――――――――――――

Lake, Kentish & Bennett Inc.
Temple Chambers
36 Long St
St John's
Antigua
Tel: +1 268 462 1012
Fax: +1 268 462 2568

Legal Practitioners for the Claimant

15



Scanned with CamScanner

# Exhibit A-3

Case Number: ANUHCV2022/0480
Case 22-11068-JTD Doc 881-1 Filed 01/23/28 Page 32 of 70
Exhibit A - Declaration of Richard D. Anigian in Support of BlockFi Resp    Page 32 of 70
HIGH COURT
ANTIGUA AND BARBUDA
FILED

THE EASTERN CARIBBEAN SUPREME COURT
IN THE HIGH COURT OF JUSTICE
ANTIGUA AND BARBUDA

**Submitted Date:02/12/2022 12:35**

CLAIM NO. ANUHCV 2022/

**Filed Date:02/12/2022 12:35**

IN THE MATTER OF EMERGENT FIDELITY TECHNOLOGIES LTD
AND IN THE MATTER OF THE INTERNATIONAL BUSINESS CORPORATIONS ACT, Cap 222.00

**Fees Paid:222.00**

BETWEEN:

ANGELA BARKHOUSE AND TONI SHUKLA
(AS RECEIVERS OF SHARES IN EMERGENT FIDELITY TECHNOLOGIES LTD)

**Petitioners**

-and-

EMERGENT FIDELITY TECHNOLOGIES LTD

**Respondent**

---

**PETITION**

---

To the High Court of Antigua and Barbuda:

The Petition of Angela Barkhouse, of Quantuma (Cayman) Ltd, Suite N404, Flagship Building, 142 Seafarers Way, George Town, Grand Cayman, Cayman Islands, and Toni Shukla, of Quantuma (BVI) Ltd, Coastal Building, Wickhams Cay II, Road Town, Tortola, British Virgin Islands (as receivers of shares in Emergent Fidelity Technologies Ltd) (the "**Petitioners**"), shows that:

1. Emergent Fidelity Technologies Ltd, of Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St John's, Antigua (the "**Respondent**"), is a corporation incorporated under the International Business Corporations Act, Cap. 222 (the "**Act**").

2. On 18 November 2022, the Petitioners were appointed on an interim basis as joint receivers of the Respondent's worldwide assets, and of the equity and/or debt interests (including the majority shareholding) in the Respondent held by Samuel Benjamin Bankman-Fried ("**SBF**"). The order making the appointment (the "**Order**") was made in Claim No. ANUHVC2022/0456, in which a creditor of the Respondent and SBF, Yonatan Ben Shimon ("**Mr Ben Shimon**"), makes claims in equity and tort against the Respondent and SBF and proprietary claims in respect of their assets.

3. In broad terms, Mr Ben Shimon claims that:

1

a. He invested funds with FTX Trading Ltd ("**FTX**"), of which SBF was a founder and director, which were improperly diverted to Emergent (of which SBF is the sole director and majority owner) in circumstances which give rise to Mr Ben Shimon having a proprietary tracing claim in respect of those funds and/or claims against the Respondent and/or SBF in knowing receipt and/or dishonest assistance; and

b. The Respondent and SBF conspired to perform and did perform lawful and/or unlawful acts, involving the improper diversion of funds invested by Mr Ben Shimon and other investors with FTX to the Respondent, for the predominant purpose of injuring Mr Ben Shimon and other investors by expropriating those funds to the personal benefit of SBF, and thereby causing loss to Mr Ben Shimon.

4. The Respondent's sole known asset is its 7.6% shareholding in NASDAQ-listed Robinhood Markets, Inc ("**Robinhood**"), which it purchased for approximately US$650 million in May 2022. Mr Ben Shimon claims that funds which he and other investors invested with FTX, or their traceable proceeds, were used to purchase those shares.

5. On 21 November 2022, the Petitioners exercised the power granted to them in paragraph 24 of the Order by passing a written resolution of the Respondent's shareholders under s.119 of the Act, which removed the Respondent's incumbent directors (including SBF) and appointed the Petitioners in their place. The Order and the other court papers filed in Claim No. ANUHVC2022/0456 have been served on the Respondent, care of its resident agent, and on SBF, care of his attorneys, and those parties have been duly notified of the Petitioners' appointments as receivers and as directors.

6. However, the Respondent and SBF have not cooperated with the Petitioners or provided the Respondent's corporate documents, such as its registers of members and directors or its memorandum and articles of association. Without this cooperation or these documents, the Petitioners are unable to prove to the satisfaction of third parties in the United States (including to prospective legal representatives) their authority as the Respondent's directors or their rights as receivers of its assets. Consequently, the Petitioners have been unable to take control of the Respondent's shares in Robinhood. Additionally, the Respondent and SBF are in breach of their asset disclosure obligations under paragraph 10 of the Order.

7. On 28 November 2022, a cryptocurrency lender named BlockFi Inc. ("**BlockFi**") filed for Chapter 11 bankruptcy protection in the United States. The same day, BlockFi filed a

2

complaint in the bankruptcy proceedings against the Respondent, seeking to take possession and ownership of the Respondent's shares in Robinhood.

8. According to the complaint, on 9 November 2022 the Respondent (under SBF's directorship) allegedly agreed to pledge its shares in Robinhood to BlockFi in consideration for BlockFi forbearing from enforcing certain unspecified loans. Those loans were not made to Emergent but, rather, are understood to have been made to other parties associated with SBF, including his cryptocurrency trading firm, Alameda Research Ltd ("**Alameda**"). Having forborne for a single day, on 10 November 2022 BlockFi purported to exercise the security. The same day, the Supreme Court of the Bahamas appointed provisional liquidators to FTX. The following day (11 November 2022) SBF resigned from FTX, which immediately (under its new management) applied for Chapter 11 bankruptcy protection in the United States.

9. It is difficult to conceive of a more transparent fraud on the Respondent's creditors. FTX's financial difficulties were public knowledge when the alleged forbearance agreement was made. Despite this, it appears from the complaint that, on the eve of FTX's bankruptcy, SBF purported to encumber one of the few known valuable assets against which FTX's investors (such as Mr Ben Shimon) might seek to pursue recovery actions by way of claims against the Respondent as contingent creditors. This was done for no apparent consideration to or corporate benefit for the Respondent.

10. If this ploy succeeds, BlockFi will make a windfall from the Respondent at the expense of the Respondent's creditors. Without the appointment of liquidators to the Respondent, so that steps can be taken on the Respondent's behalf in the United States to contest BlockFi's complaint, the complaint is likely to succeed and the Respondent's creditors will be irremediably prejudiced.

11. The declaration made in support of FTX's Chapter 11 petition stated that "*Never in my career have I seen such a complete failure of corporate controls and such a complete absence of trustworthy financial information as occurred here. From compromised systems integrity and faulty regulatory oversight abroad, to the concentration of control in the hands of a very small group of inexperienced, unsophisticated and potentially compromised individuals, this situation is unprecedented.*" That statement was made by the man who was appointed to take control of Enron Corporation following its collapse in 2001, which was the largest bankruptcy reorganisation in United States history at that time and which saw several people convicted of criminal charges and sent to prison.

3

12. Additionally, SBF has admitted that US$8 billion of FTX's client assets (being half of all FTX's client assets) were loaned to Alameda. This is illustrative of (at minimum) a lack of probity on SBF's part. His behaviour with respect to BlockFi, as a director of the Respondent, demonstrates a similar lack probity and bears the indicia of fraud.

13. In the premises, the Respondent's business or affairs have been carried on or conducted in a manner that is oppressive or unfairly prejudicial to, and which disregards the interests of, the Respondent's creditors, such that liquidators should be appointed to the Respondent under s.301(1)(a) of the Act.

14. Alternatively, it is just and equitable for liquidators to be appointed to the Respondent under s.301(1)(b) of the Act.

15. Alternatively, liquidators should be appointed to the Respondent under the provisions of the Act on the Court's own motion, applying the principles in *Lancefield v Lancefield* [2002] BPIR 1108.

The Petitioners therefore humbly pray for Orders that:

1. Emergent Fidelity Technologies Ltd, of Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St John's, Antigua (the "**Respondent**") is put into liquidation under the provisions of the International Business Corporations Act, Cap. 222 (the "**Act**").

2. Angela Barkhouse, of Quantuma (Cayman) Ltd, Suite N404, Flagship Building, 142 Seafarers Way, George Town, Grand Cayman, Cayman Islands, and Toni Shukla, of Quantuma (BVI) Ltd, Coastal Building, Wickhams Cay II, Road Town, Tortola, British Virgin Islands (the "**Liquidators**") are appointed as joint liquidators of the Respondent.

3. The Liquidators have the powers of a liquidator under s.308 of the Act to:

   (a) retain solicitors, accountants, engineers, appraisers and other professional advisers;

   (b) bring, defend or take part in any civil, criminal or administrative action or proceeding in the name and on behalf of the Defendant;

   (c) carry on the business of the Defendant as required for all orderly liquidation;

   (d) sell by public auction or private sale any property of the Defendant;

(e)  do all acts and execute any documents in the name and on behalf of the Defendant;

(f)  borrow money on the security of the property of the Defendant;

(g)  settle or compromise any claims by or against the Defendant;

(h)  make financial provision in respect of tile custody of the documents and records of the Defendant after is dissolution; and

(i)  do all other things necessary for the liquidation of the Defendant and the distribution of its property.

4.  Without limitation, the powers of the Liquidators include the powers to:

(a)  Exercise any and all rights that the Respondent may have as a shareholder in any company, or any other rights that the Respondent may have in any other entity or business structure, including but not limited to exercising any voting rights in any subsidiary(ies) of the Respondent to appoint themselves or their nominee(s) as director(s) of any such subsidiary(ies);

(b)  Retain attorneys and act in any foreign jurisdiction on behalf of the Respondent as permitted by the applicable foreign law, including commencing legal proceedings in their own names or in the name and on behalf of the Respondent for the recognition of their appointment by this Court or for their appointment (whether or not with any co-appointee(s)) by the foreign court, or for orders in aid of the Respondent's liquidation or for the assistance of the foreign court in the carrying out of their duties as Liquidators, including but not limited to proceedings under Chapter 15 of the United States Bankruptcy Code;

(c)  Obtain funding on commercial terms for the performance of their duties, including in connection with any legal proceedings for which funding is permitted under the applicable law.

5.  The Liquidators are not required to give security for their appointment.

6.  The Liquidators are entitled to reasonable remuneration for their time spent in the performance of their duties, such remuneration to be assessed by the Court.

7. The Liquidators are entitled to be indemnified for their remuneration and expenses from the Respondent's assets in the order of priority set out in s.289 of the Act.

8. All claims brought against the Respondent in this jurisdiction are stayed, including Claim No. ANUHVC2022/0456, save that the orders made in those proceedings on 18 November 2022 granting a freezing injunction and appointing receivers shall continue in effect until further order. This is without prejudice to the right of any party to any such proceedings to apply to the Court to lift the stay in whole or in part.

9. The Petitioners' costs of this Petition are to be paid from the Respondent's assets as expenses of the Respondent's liquidation in the order of priority set out in s.289 of the Act.

**CERTIFICATE OF TRUTH**

I, Angela Barkhouse, certify on behalf of the Petitioners that I believe that the facts stated in this Petition are true.

Dated: 2 December 2022

Angela Barkhouse

NOTICE:

This Petition will be heard by the Judge on the          day of                          at

If you do not attend this hearing an order may be made in your absence.

The court office is located at the Registry of the Supreme Court, High Street, Parliament Drive, St John's, Antigua; telephone +1 268 462 0609; fax +1 268 462 3929. The office is open between 8:30 a.m. and 4:30 p.m. from Monday to Friday except on public holidays.

The Petitioners' address for service is C/- Lake, Kentish & Bennett Inc., Temple Chambers, 36 Long St, St John's, Antigua; telephone +1 268 462 1012; fax +1 268 462 2568.

THE EASTERN CARIBBEAN SUPREME COURT
IN THE HIGH COURT OF JUSTICE
ANTIGUA AND BARBUDA

CLAIM NO. ANUHCV 2022/

IN THE MATTER OF EMERGENT FIDELITY
TECHNOLOGIES LTD
AND IN THE MATTER OF THE INTERNATIONAL
BUSINESS CORPORATIONS ACT, CAP. 222

BETWEEN:

ANGELA BARKHOUSE AND TONI SHUKLA
(AS RECEIVERS OF SHARES IN EMERGENT
FIDELITY TECHNOLOGIES LTD)

**Petitioners**

-and-

EMERGENT FIDELITY TECHNOLOGIES LTD
**Respondent**

---

PETITION

---

Lake, Kentish & Bennett Inc.
Temple Chambers
36 Long St
St John's
Antigua
Tel: +1 268 462 1012
Fax: +1 268 462 2568

Legal Practitioners for the Petitioners

# Exhibit A-4

| From: | Doherty, Therese <TDoherty@mintz.com> |
|---|---|
| Sent: | Wednesday, December 7, 2022 3:46 PM |
| To: | Anigian, Rick |
| Cc: | Collins, LisaMarie; Walsh, Kaitlin; Jones, Charlie; Kanowitz, Richard; Asaro, Amanda; Taylor, Dallas; Baumstein, Douglas |
| Subject: | RE: BlockFi, et al. v. Emergent and EDFM |
| Attachments: | Order 12.5.2022.pdf |

---

**EXTERNAL:** Sent from outside Haynes and Boone, LLP

Rick-

I have finally been in contact with US lawyers representing the Joint Receivers of Emergent Fidelity Technologies Ltd.  They are represented by Matthew Ziegler at Morgan Lewis (contact info below).  Apparently, the Joint Receivers have now been appointed as Joint Provisional Liquidators of Emergent according to the attached order.

Best regards,
Therese

> Matthew C. Ziegler
> Morgan, Lewis & Bockius LLP
> 1701 Market Street | Philadelphia, PA 19103-2921
> Mobile: +1.314.707.4627 | Direct: +1.215.963.5064 | Fax: +1.215.963.5001
> 101 Park Avenue | New York, NY 10178-0060
> Direct: +1.212.309.6027 | Fax: +1.212.309.6001

---

**From:** Doherty, Therese
**Sent:** Friday, December 2, 2022 4:21 PM
**To:** 'Anigian, Rick' <Rick.Anigian@haynesboone.com>
**Cc:** Collins, LisaMarie <LCollins@mintz.com>; Walsh, Kaitlin <KRWalsh@mintz.com>; Jones, Charlie <Charlie.Jones@haynesboone.com>; Kanowitz, Richard <Richard.Kanowitz@haynesboone.com>; Asaro, Amanda <ABAsaro@mintz.com>; Taylor, Dallas <DGTaylor@mintz.com>
**Subject:** RE: BlockFi, et al. v. Emergent and EDFM

Rick-

I acknowledge receipt.   Please let me know if you know of any US or foreign lawyers who purport to be acting on behalf of Emergent Fidelity Technology Ltd.   I see that interim receivers apparently were appointed in BVI but we have been unable to confirm whether any lawyers are acting on behalf of the entity or the receivers.

Thank you
Therese

---

**From:** Anigian, Rick <Rick.Anigian@haynesboone.com>
**Sent:** Friday, December 2, 2022 4:17 PM
**To:** Doherty, Therese <TDoherty@mintz.com>

**Cc:** Collins, LisaMarie <LCollins@mintz.com>; Walsh, Kaitlin <KRWalsh@mintz.com>; Jones, Charlie <Charlie.Jones@haynesboone.com>; Kanowitz, Richard <Richard.Kanowitz@haynesboone.com>; Asaro, Amanda <ABAsaro@mintz.com>; Taylor, Dallas <DGTaylor@mintz.com>
**Subject:** BlockFi, et al. v. Emergent and EDFM

Therese,

Please see the attached World Wide Stay Order and document preservation notice we are sending on behalf of the BlockFi Debtors.

Let me know if you have any problems with the attachment.

Thanks,

Rick

**HAYNES BOONE**

**Rick Anigian** | Partner
rick.anigian@haynesboone.com | (t) +1 214.651.5633

CONFIDENTIALITY NOTICE: This electronic mail transmission is confidential, may be privileged and should be read or retained only by the intended recipient. If you have received this transmission in error, please immediately notify the sender and delete it from your system.

---

STATEMENT OF CONFIDENTIALITY:
The information contained in this electronic message and any attachments to this message are intended for the exclusive use of the addressee(s) and may contain confidential or privileged information. If you are not the intended recipient, or the person responsible for delivering the email to the intended recipient, be advised you have received this message in error and that any use, dissemination, forwarding, printing, or copying is strictly prohibited. Please notify the Mintz, Levin, Cohn, Ferris, Glovsky and Popeo sender immediately, and destroy all copies of this message and any attachments.

# Exhibit A-5

| | |
|---|---|
| **From:** | Jones, Charlie |
| **Sent:** | Wednesday, December 7, 2022 6:23 PM |
| **To:** | matthew.ziegler@morganlewis.com |
| **Cc:** | Anigian, Rick; Kanowitz, Richard; Ferris, Matt |
| **Subject:** | BlockFi v. Emergent, AP No. No. 22-01382-MBK, Bankr. D.N.J. |
| **Attachments:** | BlockFi Adversary Complaint w. Summons 22-01382-MBK (Dkt. 1).pdf; BlockFi Adversary Turnover Motion w. Exhibits 22-01382-MBK (Dkt. 2).pdf; BlockFi Adversary Summons 22-01382-MBK (Dkt. 3).pdf; Notice of Rescheduled Hr'g 1.9.2023 - Emergent (AP No. 22-01382-MBK Bankr. D.N.J.).pdf; In re BlockFi Inc. Worldwide Stay Order (Dkt. 56, 22-19361-MBK).pdf |

Matthew,

We represent BlockFi, Inc. and its related debtors in the US. We understand that you represent Emergent Fidelity Technologies, Ltd.

Please see the attached documents relevant to Emergent in BlockFi's bankruptcy cases pending in the District of New Jersey. We're happy to find time tomorrow to discuss if you have any questions.

Best,

HAYNES BOONE

**Charlie Jones**
Partner
charlie.jones@haynesboone.com

**Haynes and Boone, LLP**
2323 Victory Avenue
Suite 700
Dallas, TX 75219-7672

(t) +1 214.651.5073
(f) +1 214.200.0669
(m) +1 512.289.3360

vCard | Bio | Website

# Exhibit A-6

Case Number : ANUHCV2022/0480

Case 22-Case2211668506627-1 Doc-Filed1 12328FAed 01/05/8312Page246 of Bf 34 Desc
Exhibit A - Declaration of Richard D. Anigian in Support of BlockFis Resp Page 45 of 70

FILED
HIGH COURT
ANTIGUA AND BARBUDA

Submitted Date:19/12/2022 19:11
Filed Date: 20/12/2022 08:30
Fees Paid:22.00

Filed on behalf of the Petitioners
Third Affidavit of: Angela Barkhouse
Affidavit number: Third
Exhibit reference: AB-3
Date sworn: 19 December 2022
Date filed: 19 December 2022

THE EASTERN CARIBBEAN SUPREME COURT
IN THE HIGH COURT OF JUSTICE
ANTIGUA AND BARBUDA

CLAIM NO. ANUHCV2022/0480

BETWEEN:

**ANGELA BARKHOUSE AND TONI SHUKLA**
**(AS RECEIVERS AND PROVISIONAL LIQUIDATORS OF EMERGENT FIDELITY TECHNOLOGIES LTD)**

<u>Respondents / Petitioners</u>

-and-

**EMERGENT FIDELITY TECHNOLOGIES LTD**

<u>Respondent</u>

-and-

**SAMUEL BENJAMIN BANKMAN-FRIED**

<u>Applicant/Interested Party</u>

---

**THIRD AFFIDAVIT OF ANGELA BARKHOUSE**

---

I, **ANGELA BARKHOUSE**, of Quantuma (Cayman) Ltd, Suite N404, Flagship Building, 142 Seafarers Way, George Town, Grand Cayman, Cayman Islands, make oath and say as follows:

1. I make this Third Affidavit on behalf of myself and my co-petitioner, Ms Toni Shukla, and I am duly authorised by Ms Shukla to do so on her behalf. I am the same Angela Barkhouse who swore my First Affidavit on 2 December 2022 in support of (a) our Petition to wind up Emergent Fidelity Technologies Ltd ("**Emergent**"), and (b) our application to be appointed Provisional Liquidators of Emergent. This Third Affidavit is made in response to the application made by Samuel Bankman-

Fried for a stay of the Order made on 5 December 2022 by which order Toni Shukla and I were appointed as Provisional Liquidators of Emergent, which application has been ordered to be heard on 23 December 2022.    Together, the Provisional Liquidators oppose any stay of our appointment, or any inhibition of the exercise of our powers, as Provisional Liquidators.  For the reasons explained herein, it is critically important that the provisional liquidation continues in full force pending the hearing of the Petition.

2.    Unless otherwise stated, the facts and matters deposed to in this Affidavit are within my personal knowledge and I believe them to be true.  Where such facts and matters are outside my personal knowledge, they are true to the best of my knowledge, information and belief and are derived from sources to which I refer.  Nothing in this Affidavit or in the documents filed in opposition to this application is intended to be or should be treated as a waiver of any privilege.

3.    There is produced to me, exhibited hereto marked "**AB-3**", a paginated bundle of true copies of documents to which I refer in this Affidavit.  Page references in this Affidavit are references to page numbers in that exhibit bundle unless stated otherwise.

4.    I make this Third Affidavit in opposition to the application filed in this action by Mr Bankman-Fried (**"SBF"**), on 12 December 2022 ("**the Application**"), to stay the proceedings numbered **ANUHCV 2022/0480** (the "**PL Proceedings**") pending the determination of SBF's application for the discharge of Justice Colin Williams' order dated 18 November 2022, in the claim numbered **ANUHCV2022/0456** (Yonatan Ben Shimon v. Emergent Fidelity Technologies Ltd and Samuel Benjamin Bankman-Fried) (the "**Receivership Proceedings**").  It is my understanding that the only matter to be heard before the Court on 23 December 2023 is the question of whether there should be a stay of the PL Proceedings pending a proposed application on the part of the Applicant to discharge the receivership order in the Receivership Proceedings.

5.    No evidence was filed by SBF in support of his application dated 12 December 2022.  Neither were any evidential grounds identified in the Application as to why a stay was needed or desirable, nor what harm would be (or might be) faced by SBF by reason of the Order of 5 December 2022.  The only ground identified to support the Application was that the Applicant intended in the Receivership Proceedings to challenge the receivership order made therein.  I should make clear

2

that, until SBF was removed as director on 21 November 2022, he was the sole director of
Emergent and he is also the 90% shareholder of the company.

6.    The structure of this Affidavit is as follows:

   (1)   A summary of the evidence before the Court to support the Orders made on 18
         November 2022 and 5 December 2022 (respectively in the Receivership Proceedings
         and the PL Proceedings).

   (2)   Events since 5 December 2022.

   (3)   The necessity and desirability for the provisional liquidation to continue without a
         stay pending hearing of the Petition.

   (4)   The absence of relevant harm to SBF if the Order is not stayed.

   (5)   SBF's counsel's criticism of the Order of 18 November 2022.

7.    I have already placed two other affidavits before the Court, and I will refer to those affidavits in
      my response to the application to stay the Petition.  Several of the documents that are relevant
      to my objection to the Court ordering any stay are already before the Court.  A copy of my First
      Affidavit, together with exhibit AB-1, is exhibited at pages **1 to 405 of exhibit AB-3**.

   **(1)   A Summary of the Evidence Before the Court to Support the Orders made on 18 November
         2022 and 5 December 2022**

8.    Following an application made by Mr Shimon in claim number **ANUHCV2022/0465**, Toni Shukla
      and I were jointly appointed as receivers, for the purpose of preserving the value of the assets
      over which we were appointed, namely over:

   (a)   All of SBF's assets, whether in or outside Antigua and Barbuda; and

   (b)   All of SBF's equity and/or debt interests in Emergent, whether in or outside Antigua and
         Barbuda, including but not limited to any shares in Emergent registered in the name of
         SBF.

The basis of that application is set out in Mr Shimon's Affirmation dated 17 November 2022 together with exhibit YBS-1, a copy of which is exhibited at pages **29 to 163 of exhibit AB-3**. Mr Shimon's application was made ex parte to the Antigua Court, following his inability to access certain digital assets with a cryptocurrency exchange operated by FTX Trading Limited (**"FTX"**). The value of Mr Shimon's deposit was USD 10,818,600 on 13 October 2021 (albeit that value had reduced when the application was filed). Mr Shimon made his application following the denial of his request to remove his Ethereum from FTX and his becoming aware through news articles that there was (at minimum) an unhealthy and questionable relationship between FTX and Alameda Research Limited and other associated Alameda entities (collectively, **"Alameda"**), which companies were apparently owned or majority-owned by SBF. In addition, and as further set out in Mr Shimon's Affirmation, concerns were also being raised by US regulators more generally about FTX. Ultimately FTX and 134 other (apparently associated) entities filed (or apparently filed[1]) for bankruptcy under Chapter 11 of the United States Bankruptcy Code on 11 November 2022 in Delaware.

9.  After the filing of Chapter 11 bankruptcy proceedings, Mr Shimon became aware through various news articles that FTX had purportedly loaned up to USD 8 Billion (by value) of its clients' assets (or the proceeds thereof) to companies owned by SBF, in particular Alameda, and that, further, Alameda had purportedly lent approximately USD 1 Billion to SBF personally. Further, it appeared that there was a significant asset that was outside the scope of the estates of the entities which had filed for Chapter 11 bankruptcy, beneficially owned by SBF, which appeared to be in the form of an investment held by Emergent in a company called Robinhood Markets, Inc. ("**Robinhood**"), the funding for which investment, it was inferred by Mr Shimon, appeared likely to have derived from the assets SBF had appropriated from Alameda/FTX (and by extension, if the allegations made about SBF and FTX are true, from FTX's customers, including Mr Shimon). The shares were worth many hundreds of millions of US Dollars. Emergent was a company controlled and 90% owned by SBF. Mr Shimon did not provide FTX with consent to lend his Ethereum to Alameda (or anyone else). Moreover, FTX's Terms of Service purported expressly to prohibit such use of customer assets. Indeed, the sums involved, and lack of proper segregation of customer assets, suggested that these "loans" were not genuine arms-length transactions. Emergent itself was

---

[1] I understand that questions have been raised as to the authority of the persons making the filings (or some of them), but such questions are outside the scope of this Affidavit, and I express no views on them.

only established on 22 April 2022 (see page **527 of exhibit AB-3**, where I exhibit a copy of Emergent's Certificate of Incorporation).   In the last months before the implosion of FTX, Emergent had a nominal share capital of USD 5,000 (5,000 shares divided into 5,000 shares of USD 1 each) – see pages **533 to 535 of exhibit AB-3,** where I exhibit Emergent's Articles of Incorporation.  Although our inquiries are continuing, it appears that SBF was the sole director of Emergent.  I regret to inform the Court that SBF has yet to comply properly with the Court's orders in relation to information production, and – although I appreciate that he may have been preoccupied with other matters stemming from the collapse of FTX, his recent arrest and his pending extradition proceedings to the United States – we are nevertheless anxious to secure his cooperation to understand and secure Emergent's assets and records.   Notwithstanding the paucity of information, however, it seems to be the case that Emergent was an asset-holding company, not a trading entity.  The Robinhood shares appear to have been purchased on or about 13 May 2022.

10. Against this background, Mr Shimon was (and I understand remains) of the view that it was likely that SBF and Emergent were holding funds that included assets that FTX was supposed to be holding on his behalf, or their traceable proceeds, had knowingly received such assets, and had done so dishonestly and in breach of trust.  His application filed on 17 November 2022, granted by Justice Colin Williams on 18 November 2022, sought and obtained a freezing order over the assets of SBF and Emergent and the appointment of receivers over the assets of Emergent for the purpose of preserving the value of the assets of Emergent, whether in or outside Antigua and Barbuda and all of SBF's equity and/or debt interest in Emergent whether in or outside Antigua and Barbuda, including but not limited to any shares in Emergent registered in the name of SBF. A copy of that order is at pages **390 to 400 of exhibit AB-3**.

11. I set out in my First Affidavit, at paragraphs 16 to 25, the details of our efforts to enforce the order of Justice Colin Williams and the evidence of SBF'S and Emergent's non-compliance (see pages **6 to 8 of exhibit AB-3**).   By the Application, SBF apparently seeks to stay the Petition without addressing any of those issues (in respect of which non-compliance our position is expressly reserved).

12.  In the working week following the order of 17 November 2022 we made extensive attempts to enforce the order and carry out our role as receivers.  In addition, and set out at paragraphs 26 to 32 of my First Affidavit at pages **9 to 12 of exhibit AB-1**, BlockFi Inc. (and associated entities, "**BlockFi**"), a cryptocurrency business which had also filed for Chapter 11 bankruptcy protection in the United States (in New Jersey), commenced proceedings against Emergent seeking to enforce an alleged guarantee by Emergent and an alleged pledge of the Robinhood shares, said (by BlockFi) to have been provided to it as some form of security in return for its continued forbearance from enforcing obligations said to be owed by Alameda.  I note that the pledge was said to have been created on 9 November 2022, at a time when FTX had suspended any further withdrawals of funds by its customers.   The BlockFi complaint further contends that BlockFi accelerated the alleged obligations of Emergent and purportedly notified Emergent of an event of default on 10 November 2022 (i.e. the very next day), the day before the composite FTX/Alameda Chapter 11 bankruptcy filing.  A copy of the BlockFi complaint is exhibited at pages **369 to 383 of exhibit AB-3**.

13.  In addition to the failure to comply with the order of Mr Justice Williams and the BlockFi claim, there were several other bases for our appointment as Provisional Liquidators of Emergent, which are set out in paragraphs 34 to 39 of my First Affidavit, at pages **12 to 14 of exhibit AB-1**.  The grounds set out for the Court were (I suggest) compelling, and the application was made at a time where there was a strong and growing suspicion of fraud on a truly massive scale.  The grounds set out in the provisional liquidation application not only remain, but have been vindicated and fortified by subsequent events, as described below.  Furthermore, the Order of Justice Colin Williams has still not been complied with, BlockFi are still asserting a claim over the Robinhood shares (and have now appeared as an interested party in these proceedings), multiple creditors are making their interest known and are apparently considering their options against Emergent, and Emergent appears to be hopelessly insolvent on two fundamental bases: (i) if the BlockFi claim is valid, it has no known assets and vast liabilities; further or alternatively (ii) it appears in any event to have been used as a repository for assets (or their proceeds) wrongly appropriated by SBF and others.

**(2) Events since 5 December 2022**

14. Since the making of the Order appointing Provisional Liquidators on 5 December 2022, as outlined above, further information has come to light which both vindicates and fortifies the bases of the Court's Order. To a high degree of probability, based on the evidence now before the Court, it is now apparent that SBF has perpetrated a vast fraud within and between (*inter alia*) FTX, Alameda and Emergent. The interest of this Court is directly concerned with Emergent, an Antiguan company whose assets urgently need protection. It appears that SBF was the sole controlling mind of each of these entities from establishment (Alameda in 2017, FTX in 2019 and Emergent in April 2022) until the collapse into bankruptcy of FTX in November 2022. The fraud has been described by the US prosecutors as one of the biggest financial frauds in American history. I refer to **page 401 of exhibit AB-3** and to an article of the Financial Times dated 16 December 2022.

15. SBF was arrested on 12 December 2022 and is currently incarcerated in the Bahamas, pending extradition to the United States. An extradition hearing has been fixed for 8 February 2023. He was denied bail on the ground of him being a flight-risk, which is itself significant in the context of this application. At pages **403 to 404 of exhibit AB-3** I exhibit the article from the Financial Times dated 16 December 2022 confirming the position. This has been covered widely in the global press, as explained in my Second Affidavit. Following the hearing on 12 December 2022, I prepared a Second Affidavit to bring these matters to the attention of the Court. I exhibit a copy of my Second Affidavit at pages **406 to 498 of exhibit AB-3**.

16. On the evening of 12 December 2022, the US Securities and Exchange Commission (the "**SEC**") filed a civil complaint in the in the U.S. District Court for the Southern District of New York (the "**SEC Complaint**"). A copy of the SEC Complaint is exhibited to my Second Affidavit and appears at pages **430 to 457 of exhibit AB-3**.

17. On 13 December 2022, the United States Commodities Futures Trading Commission (the "**CFTC**") also filed a civil complaint in the US District Court for the Southern District of New York seeking injunctive and other equitable relief and for civil monetary penalties under the US Commodity Exchange Act and Commission Regulations (the "**CFTC Complaint**"). A copy of the CFTC Complaint appears is exhibited to my Second Affidavit and appears at **pages 458 to 497 of exhibit AB-3**.

18. On 13 December 2022, shortly after the conclusion of the recent first hearing of SBF's application to stay the Petition, it was announced that the United States Department of Justice (the **"DOJ"**) had issued a (hitherto sealed) indictment against SBF containing eight criminal charges including:

(i)    conspiracy to commit wire fraud on customers;

(ii)   wire fraud on customers;

(iii)  conspiracy to commit wire fraud on lenders;

(iv)   wire fraud on lenders;

(v)    conspiracy to commit commodities fraud;

(vi)   conspiracy to commit securities fraud;

(vii)  conspiracy to commit money-laundering; and

(viii) conspiracy to defraud the United States and violate the campaign finance laws.

A copy of the Indictment is exhibited to my Second Affidavit and appears at pages **416 to 429 of exhibit AB-3.**

19. The DOJ Indictment is a 14-page document, but it is worth highlighting certain issues that arise from it.  Under count 1 (conspiracy to commit wire fraud on customers) what is being alleged is that SBF, with others, misappropriated customer deposits and used the deposits to pay the expenses of Alameda and make investments: see pages **416 to 417 of exhibit AB-3.**  This was exactly the type of activity that Mr Shimon complained about in his application to the Court for a freezing order and the order appointing the receivers.  The same allegation is made with respect to count 2 – wire fraud on customers: see pages **417 to 418 of exhibit AB-1**.  Under count 5 – at pages **420 to 421 of exhibit AB-3**, conspiracy to commit commodities fraud, there is a further allegation relating to the misappropriation of customer deposits to satisfy loan obligations of Alameda.  It should also be noted that at paragraph 21 of the DOJ Indictment, at page **427 of exhibit AB-3**, there is mention of a claim to forfeiture.  If SBF is found guilty of the offences alleged in counts one, two, three and four, then it is claimed that he will be required to forfeit to the United States any and all property, real and personal, that constitutes or is derived from the proceeds traceable to the commission of those offences.  That would, on the DOJ's case, apparently extend to his interest in Emergent.

20. I also want to highlight points in the CFTC Complaint and bring them to the attention of the Court when considering the Application. The CFTC Complaint is 40 pages long, but I want to highlight paragraph 8, at page **460 of exhibit AB-3**. The CFTC say "SBF and other FTX executives also took hundreds of millions of dollars in poorly documented "loans" from Alameda that they used to purchase luxury real estate and property, make political donations, and for other unauthorized uses". In contrast, SBF in his affirmation of 11 December 2022, filed with the Court on 12 December 2022, in the Receivership Proceedings, exhibited at pages **499 to 514 of exhibit AB-3**, exhibits examples of these documents and goes on to say at paragraph 8 of his affirmation, page **500 of exhibit AB-3** – "In order to capitalize Emergent so that it could make the investments into Robinhood, Gary and I agreed to borrow funds from Alameda. These funds were capitalized into Emergent, and it used those funds to acquire the shares in Robinhood. The loans that were made by Alameda to use were evidenced by four promissory notes." Further, at paragraph 49, at **pages 470 to 471 of exhibit AB-3**, the CFTC goes on to say, "The use of customer funds by Alameda was not authorized by FTX customers, and FTX customers were not made aware that their funds were being used by Alameda. To the contrary, FTX's Terms of Service expressly prohibit such use of customer funds." SBF's contention that the funds flowed from FTX, to him via loans from Alameda, stand in contrast to the allegations of the CFTC, and his suggestion that the money used to buy the Robinhood shares comprised "legitimate loans" or "legitimate provision of working capital", is (to put it mildly) wholly contrary to the position of the US regulators.

21. We have not seen any accounting records with regards to Emergent, and therefore have not been fully able to understand the basis of the purchase of the Robinhood Shares and how the money was "capitalized" and made available to Emergent to allow it to make the purchase. There was no apparent increase in the share capital of the company, even according to the account given by SBF in the Affidavit he has filed. The only accounting summary I have seen appears to be that found at paragraph 19 of the CFTC compliant, at pages **462 and 463 of exhibit AB-3**, where it states "During the Relevant Period [paragraph 4 of the CTFC compliant – no later than May 2019 through to at least 11 November 2022], FTX Trading, Alameda Research, together with other entities under the majority ownership and control of SBF operated as a single, integrated common enterprise under the sole ultimate authority of SBF as their mutual owner. They are referred to collectively in this complaint as the "FTX Enterprise." SBF regularly exercised control over each of the component entities of the FTX Enterprise throughout the Relevant Period, including regularly

serving as signatory on core corporate agreements, as well as corporate bank accounts and trading accounts, many of which were held in the U.S.  The FTX Enterprise failed to observe corporate formalities, including the failure to segregate funds, operations, resources, and personnel, or to properly document intercompany transfers or funds and other resources.  The entities regularly shared office space, systems, accounts, and communications channels.  On information and belief, assets flowed freely between the FTX Enterprise entities, often without documentation or effective tracking."  I note that Emergent's formation and "capitalisation" took place within the "Relevant Period".

22. According to the CFTC Complaint, there were complete failures to segregate information and assets between FTX and Alameda, and wholesale misappropriation of customer funds.  Without wishing to restate the CFTC Complaint here, but for illustrative purposes, at paragraph 70 ("F. Misappropriation of Customer Funds") at page **477 of exhibit AB-3**, the CFTC says as follows – "By early 2022, Alameda had invested several billion dollars in directional, unhedged, illiquid, and/or long terms investments.  To fund these investment activities, Alameda had relied on billions of dollars of loans from digital asset lending platforms, traditional bank lines of credit, and its unlimited borrowing abilities on the FTX, including access to customer funds."  Both the SEC and the CFTC highlight that FTX customer funds were used, without the authorisation or the knowledge of the FTX customers (such as Mr Shimon), and in breach of FTX's own customer terms.  The CFTC Complaint at paragraph 3, at page **459 of exhibit AB-1**, says as follows – "On November 11, 2022, SBF'S empire abruptly collapsed.  FTX customers and the world at large discovered that FTX, through its sister-company Alameda, had been surreptitiously siphoning off customer funds for its own use – and over $8 billion customer deposits were now missing."  It is apparent that the CFTC and SEC believe that SBF, in accepting money from Alameda, would have known that the funds he was receiving from Alameda had been misappropriated from FTX's customers, and that the funds to "capitalise" Emergent were traceable proceeds.  Further, if the relief requested by the CFTC is considered realistic (at paragraph F, on page **495 of exhibit AB-3**) then (if CFTC were to obtain judgment against SBF) he will be required to "make full restitution by making whole each and every customer or investor whose funds were received or utilized by him in violation of the provisions of the Act as described herein, including pre-judgment interest."  In other words, if the CFTC makes out its claims, SBF will have to repay the money he has misappropriated.  That would potentially extend to the money that he received from Alameda for the capitalisation of

Emergent, which Emergent apparently used to purchase the Robinhood shares.  It follows that, absent his showing exactly how and where the CFTC and SEC have got it wrong, and that the BlockFi pledge is invalid, there does not appear to be any realistic scenario where SBF would (but for the receivership or provisional liquidation orders) personally retain the benefit of his equitable interest in Emergent.  His actions are difficult to explain and, given the very serious allegations of fraud, both his motivations and his explanations should obviously be treated with great caution.

**(3) The Critical Need and Desirability for the Order Appointing Provisional Liquidators to Continue Without a Stay Pending Hearing of Petition**

**The Urgent Work of the Provisional Liquidators in Securing the Robinhood Shares**

23. The central reason to appoint Provisional Liquidators is to preserve Emergent's assets and financial records such as they are.  That work must now be viewed in the context of what is now alleged to have been a massive fraud perpetrated by SBF and others.  When there is *prima facie* evidence of significant fraud, the Court will appreciate that this can only be achieved by the appointment of independent professionals, responsible to (and subject to the supervisions of) the Court.  Conversely, it would be extraordinary in such circumstances to hand the company back to the control of the alleged fraudster, whose interest in it (not only because of the alleged fraud, but also because of the alleged pledge and guarantee) is at best entirely unclear, and more likely illusory where there are plainly likely to be a significant number of creditors.

24. Following the provisional liquidation order, we continued with our work to protect the assets of Emergent and with our attempts to obtain its books and records, which remain materially incomplete.  That is particularly significant in relation to the Emergent / Robinhood / BlockFi transactions, which are of great interest to others (including but not limited to BlockFi).

25. The Court will obviously appreciate, but I should pause briefly to explain here that the powers of a provisional liquidator are wider than those of a receiver, and the nature of the office is different.  A provisional liquidator is typically appointed (and the Provisional Liquidators are in this case appointed) in a class proceeding regarding (in this case) an apparently insolvent company, and a provisional liquidator's responsibility is to preserve assets for all creditors.  A receiver, on the

other hand, is typically appointed to preserve an assets or class of assets so that there is something against which the claimant to the proceedings may enforce as a creditor having obtained judgment. As receivers, the powers that were granted to Ms Shukla and me pursuant to the order of 18 November 2022 were limited to those required to preserve the value of the assets over which we were appointed. By comparison, the powers conferred on us by the order of 5 December 2022 in our capacities as Provisional Liquidators are wider. They include the power to act in any foreign jurisdiction on behalf of Emergent as permitted by applicable foreign law, including commencing legal proceedings in our own names or in the name and on behalf of Emergent for the recognition of these insolvency proceedings, or for orders in aid of these insolvency proceedings, or for the assistance of the foreign court in the carrying out of our duties, including but not limited to recognition proceedings under Chapter 15 of the United States Bankruptcy Code. Such remedies are unavailable to receivers. Moreover, our powers as Provisional Liquidators include the powers to exercise any and all rights that SBF might have as a director of Emergent and the powers (exercisable with the prior approval of the court) to sell, realise and/or otherwise monetise Emergent's shares in Robinhood Markets Inc., and to obtain funding on commercial terms for the performance of our duties and the funding of these proceedings. These are powers of office holders of class action insolvency proceedings that are, pursuant to the principles of modified universalism, widely recognised by the courts here in Antigua and in (amongst other places) the United States. These powers have particular relevance in the present case, where it is necessary urgently to secure assets, financial records and defend (and potentially institute) legal proceedings to protect Emergent's interests for the benefit of its stakeholders. I enclose at pages **515 to 524 of exhibit AB-3**, copies of the exchanges of correspondence between our US counsel, Morgan Lewis and the lawyers acting for Marex Capital Markets Inc, formerly known as ED & F Man Capital Markets Inc (**MAREX**). The correspondence asserts our rights as Joint Liquidators and requests account information relating to the Robinhood shares. In response, Ms Doherty, a lawyer acting for MAREX, acknowledges the appointment order, mentions the BlockFi proceedings, confirms that they are holding the Robinhood shares and that the Emergent account was frozen, and seeks confirmation from Morgan Lewis if they intend to appear in the BlockFi adversary proceedings on behalf of the of the Provisional Liquidators. I also enclose the letter received from Corporate Trust Services dated 7 December 2022, who also reacted, following our appointment as Provisional Liquidators, and who finally provided certain corporate documents following our request as Provisional Liquidators, but who

did not do so when we sought the information as receivers.  I enclose a copy of that correspondence at pages **525 to 553 of exhibit AB-3**.

26. Our work as Provisional Liquidators needs to continue at pace.  If we are hindered or stopped from doing our work, then in my view it is very likely that both assets and key pieces of evidence may be lost to Emergent, and we will find it more difficult to deal with the creditors' claims.  For instance, one of the key documents caches that we need to recover are the electronic records of Emergent (such as they may exist), including emails, transactional records, telephone records etc. If there is a stay of our appointment then it is very possible that these records may be lost or deleted, which is potentially very detrimental to creditors of Emergent.

27. As set out below in detail at paragraphs 29 to 35, the most urgent task appears to be the defence (if appropriate) of the BlockFi action, in which BlockFi are seeking to take control of Emergent's only identified asset.  This has also been occupying a substantial amount of our time, and we have been liaising extensively with counsel in this regard.  If a defence is to be filed, I understand it is due by 29 December 2022, and it is therefore imperative that Emergent (and we as Provisional Liquidators) can participate in those adversary proceedings so that we can take such steps and deploy all the defences appropriately available to Emergent to protect the asset (should we be advised to do so).

28. Without waiving privilege, we have been advised that, as Antiguan Provisional Liquidators, we are in the best position to secure and protect that asset for the creditors of Emergent.  Conversely, SBF is currently in prison, and has not provided details of the guarantee and pledge, still less the assets and liabilities of Emergent.

**Potential Harm to Creditors if the Stay is Granted and Control Handed Back to SBF**

29. If the Provisional Liquidators are not permitted, on behalf of Emergent, to defend the BlockFi action (if so advised), using the full powers granted in the Provisional Liquidation Order dated 5 December, then there is a real risk that a substantial asset, which is perhaps its only asset, will be lost to Emergent and its creditors.

30. That cannot be right or fair. As set out in my First Affidavit, it is crucial that Emergent be permitted to engage with and respond to BlockFi, see paragraph 31 b, page **11 of exhibit AB-3**. The Court can then have confidence that – without BlockFi suffering any relevant prejudice – Emergent's interests will be properly protected for the benefit of its creditors. By way of update, Morgan Lewis, have informed me that the hearing initially scheduled for 5 January 2023 has been moved to 9 January 2023; however the deadline to file a Defence remains 29 December 2022.

31. In its action against Emergent and MAREX, BlockFi asserts that it is the owner of the Robinhood shares and seeks to have those shares turned over to it, in addition to asserting a claim for money damages in an unspecified amount. BlockFi's Debtors Adversary Complaint against Emergent is exhibited at pages **369 to 379 of exhibit AB-3.** All of BlockFi's claims are based on the allegation that on 9 November 2022, as set out on pages **372 to 374 of exhibit AB-3**, Emergent entered into a certain agreement with BlockFi in which Emergent, among other things, purportedly (i) guaranteed certain loan repayment obligations of Alameda to BlockFi, (ii) pledged the shares as security for such guarantee obligations, (iii) promised to deliver the shares to BlockFi, and (iv) granted BlockFi a power of attorney to act as Emergent's counsel to enforce the alleged pledge agreement. BlockFi asserts that the agreement was made in consideration for BlockFi entering into a certain Amendment & Forbearance Agreement (the **"Forbearance Agreement"**), dated 9 November 2022, by which BlockFi agreed to forbear from exercising certain rights and remedies under various loan documents with Alameda. A copy of the Complaint is exhibited at pages **328 to 365 of exhibit AB-3**.

32. BlockFi further alleges (at page **373 of exhibit AB-3)** that, on 10 November 2022 (the very next day), the forbearance period ended as Alameda defaulted under the Forbearance Agreement and Emergent failed both to deliver the shares and to honour its alleged guarantee of Alameda's obligations. BlockFi seeks to have the Robinhood shares turned over to its bankruptcy estate, as well as damages, and a declaratory judgment that it has a first priority security interest in the Robinhood shares.

33. BlockFi has also suggested to our US counsel, Morgan Lewis, that the appointment of receivers and of the Provisional Liquidators in Antigua "violates the automatic bankruptcy stay" that became effective upon BlockFi's US bankruptcy filing. That automatic stay, which arises under US

Bankruptcy Code section 362, prohibits, among other things, "any act to obtain possession of property of the estate or to exercise control over property of the estate" of the bankrupt debtor. The contention of BlockFi is, I believe, both factually and legally incorrect.  The receivership order made by Justice Williams was made on 18 November 2022.  BlockFi filed for Chapter 11 bankruptcy on 28 November 2022, at a time when the control of Emergent (and its assets) was already vested under the Antiguan court order.

34. Notwithstanding this, however, I confirm that the Provisional Liquidators have made no determinations as to BlockFi's legal rights, and that no assets will be distributed to any creditor before BlockFi has had an opportunity to have its rights heard and determined under applicable law.  At the moment, however, we do not have sufficient information about the facts said to underpin underlying BlockFi's claim.  We note, however, that the alleged pledge agreement (which Emergent is said to have guaranteed) is said to have been formed on November 9 and accelerated on November 10, the day before the pledgor filed for Chapter 11 bankruptcy protection on November 11.  All this happened at a time when FTX customers were unable to withdraw their own assets from the exchange, and there was no apparent corporate benefit to Emergent from this turn of events.  Indeed, the timing of the alleged contracts suggests that they were designed to transfer assets out of the estates of various companies (including Emergent) on the eve of planned events of insolvency, to the detriment of the creditors of the various companies.  The Court will obviously expect its officers to examine very carefully the circumstances in which these extraordinary transactions are said to have occurred.

35. Pending further information, we have instructed US counsel, Morgan Lewis, to take steps to defend the BlockFi action.  Morgan Lewis has filed its appearance in the action on behalf of Emergent and is preparing initial pleadings and motion papers to defend the case.  I understand that Emergent must file papers in the BlockFi action by 29 December 2022, both to answer BlockFi's complaint and to oppose BlockFi's motion to compel the turnover of the Robinhood shares, on which there is a hearing scheduled for 9 January 2023.  Quite aside that no such restriction would appear to be justified for any other reason, any restriction on our authority, as Provisional Liquidators, to act in the best interests of Emergent in the near future to secure its assets would impair Emergent's ability to defend against BlockFi's attempt to seize Emergent's identified assets, apparently worth hundreds of millions of dollars, without having any chance to

investigate Emergent's recent history, review any corporate or financial records of Emergent, or
determine the rights and obligations of Emergent vis-à-vis both BlockFi and the potentially wide
body of unsecured creditors of Emergent.  Because the Robinhood shares are located in New York
and claims to own the Robinhood shares are being asserted by chapter 11 debtors in proceedings
in New Jersey and Delaware, it is essential that the Provisional Liquidators have continued and
unfettered ability to engage lawyers and urgently to take such steps as they may be advised are
appropriate in order to preserve the assets of Emergent.  I confirm that such preservative steps
will not impair the ability of BlockFi, nor of other creditors of any class, to have their rights heard
and determined.

36.  If a stay was granted by the Court, on the other hand, there is a real and obvious risk that
Emergent would not be take such steps, that they would be unable appropriately to engage in the
US proceedings instigated by BlockFi, and the asset risks being lost.  Currently Emergent, under
the powers of the Provisional Liquidators, has the power to engage in those proceedings and
(subject to the production of BlockFi of information that justifies its claims) take steps to defend
the BlockFi proceedings, including the apparent defence that the alleged pledge and/or the
alleged guarantee were in fact designed to convey assets in fraud of creditors.  Whilst the
Provisional Liquidators have reached no conclusions, without waiving privilege we are informed
that such arguments are eminently available to Emergent given the timing and nature of the
alleged transactions.  In the meantime, it is essential that we can continue, unhindered, to gather
information and documents concerning the assets of Emergent, so that these assets may be
secured for the benefit of creditors.

37. To deny Emergent the right to defend claims against its assets running to hundreds of millions of
dollars, against the backdrop of allegations of very serious frauds and in circumstances where the
claims themselves appear to be (at best) tenuous, and indeed potentially grounded in the same
factual matrix as the frauds in respect of which SBF has now been charged and arrested, would
be an extraordinary and unjustified step, to the obvious detriment of Emergent's creditors.

38. Furthermore, the defence of BlockFi's claims arising from the alleged pledge and guarantee can
obviously not be placed in the hands of SBF.  Quite aside from the obvious difficulties he would
face in conducting any such defence (if indeed he were able to do so at all) from the confines of

his prison cell in the Bahamas, he would appear to be entirely conflicted in running the defence of fraudulent conveyance if and to the extent that it was a fraud in which he and his associates had connived, and (in any event) at constant risk of incriminating himself in relation to the wider criminal allegations of fraud which he is currently facing.  Given the apparent insolvent status of Emergent, the Court will have primary regard to the interests of its actual and putative creditors, and it is obvious that these interests, and the interests and motivations of SBF, are (to put it mildly) unaligned.  The only way the creditors' interests can be protected is if the provisional liquidation continues, and the Provisional Liquidators retain the unfettered ability to take such steps as they may be advised are appropriate to defend the BlockFi claim – steps it is wholly unrealistic to expect SBF personally to take.  On the other hand, if the BlockFi claims in respect of the alleged pledge and guarantee are not defended, there is a strong possibility that the Robinhood shares will be lost to Emergent's creditors, and that would be a loss to Emergent's estate of hundreds of millions of US dollars.

**(4)  No real harm to SBF if stay refused**

39. It is hard to see what conceivable prejudice SBF would suffer if his application to stay the provisional liquidation order is refused.  Nor would BlockFi suffer any relevant prejudice.  The Robinhood shares are claimed by BlockFi and others but are legally held by Emergent.  The issue of the validity of BlockFi's purported security interest in the Robinhood shares (and/or any other asset of Emergent) will need to be resolved but, whatever the outcome of any determination of this issue, SBF is unlikely to benefit in any material respect.  If it is determined that BlockFi's claim is valid, Emergent will lose what appears to be, on SBF's apparent case, its only asset.

40. If, on the other hand, it transpires that BlockFi does not have an admissible claim to Emergent's assets and/or that its alleged interests are void or avoidable, the Robinhood shares will belong to Emergent.  In such a situation, it is unlikely the Emergent shareholders would benefit in any way given the mounting claims against Emergent by the actual and contingent creditors of Emergent, SBF, FTX and Alameda.  Even in the unlikely event the shareholders retained an interest, moreover, any interest SBF had in the assets of Emergent *qua* shareholder would appear likely to become the target by the United States Department of Justice, which is seeking forfeiture of the proceeds of his alleged offences or of his own assets up to that same amount: see pages **427 to**

**429 of exhibit AB-3**.  Consequently, it can be said with some confidence that, even if the BlockFi share pledge is found to be invalid, it is implausible that at some point in the future SBF might be entitled to receive a dividend distribution from Emergent.  Further, if SBF is convicted on the SEC indictment, he would almost certainly have to forfeit the gains that he has made through his fraudulent activities, which apparently include his shareholding in Emergent.  Should the Court retain any lingering doubt as to SBF's interests, it will note that, in SBF's Affirmation, when reviewed against the SEC and CFTC Complaints, the way that he characterises and describes the capitalisation of Emergent appears to be remarkably close to the way in which the allegations of fraud are now pleaded against him.

41. Finally, as noted above, SBF's ability himself to conduct in the meantime any management or direction of Emergent from his prison cell must be discounted as unrealistic.  SBF was the sole director and principal shareholder of Emergent.  No other senior executive has been identified from Emergent's internal records that we have reviewed so far.  On 15 December 2022 a letter was written to SBF's lawyers asking how, in practical terms, SBF could contribute to the management of Emergent given his current circumstances.  I enclose a copy of that letter at pages **554 to 555 of exhibit AB-3**.  To date, no response has been received.

**(5) SBF's counsel's unwarranted criticism of the grant of the Orders of 5 December 2022 and 18 November 2022**

**Order Rightly Granted in the PL Proceedings**

42. From the Application and remarks made by counsel for SBF in Court on 14 December 2022, it seems that the application for a stay of the Order dated 5 December 2022 is almost entirely based upon the suggestion that the Order dated 5 December 2022 in the PL Proceedings was wrongly made because it is said to be derivative of the Order in the Receivership Proceedings dated 18 November 2022, which is in turn alleged to have been wrongly made or obtained.

43. Although I understand that some of these matters will be addressed further in the skeleton submissions and oral argument in Court on 23 December 2022, there is no proper foundation to any of these criticisms.

44.  First, the Order made on 5 December 2022 was properly made on the grounds set out in my First
Affidavit.   It was and remains both necessary and desirable in the interests of protection of the
assets of Emergent, and for the benefit of all its creditors, to appoint provisional liquidators
pending the hearing of the Petition to wind up Emergent.

45.  An order for provisional liquidation is justified when it is necessary for provisional liquidators to
take urgent steps to protect the assets of the company pending the hearing of a Petition.
Emergent is apparently insolvent (on any number of bases), and it is appropriate that a class action
is undertaken in the interest of all its creditors.   Furthermore, provisional liquidators have
remedies available to them, and abilities to act internationally (because of the nature of a class
action insolvency proceeding c.f a receivership proceeding) that are typically unavailable to
receivers.  Although the remedy is undoubtedly a drastic one, the courts of the Eastern Caribbean
routinely appoint provisional liquidators where the assets of a company are in jeopardy and/or
serious allegations of fraud are made concerning the management and affairs of a company, both
of which features are present in the case of Emergent.

46.  For the reasons outlined above, urgent steps need to be taken to protect Emergent's shareholding
in Robinhood, which is the subject of proceedings brought in New Jersey.   As has already been
made clear, the next hearing in New Jersey is scheduled for 9 January 2023.   I understand from
my US counsel that the nature of this hearing is to determine BlockFi's "Turnover Motion" (see
**pages 380 – 383 of exhibit AB-3**), and that, in order to participate, Emergent needs to have filed
a Defence.

47.  All this must plainly be done before there can be any disposal of SBF's opposition to the Petition
itself.

48.  Furthermore, there is every reason for the Court to conclude that the Petition has been properly
presented.   By the Petition, the appointment of liquidators to Emergent is sought on the grounds
that: (a)  Emergent's business and affairs have been carried on or conducted in a manner that is
oppressive or unfairly prejudicial to, and which disregards the interests of its creditors, such that
liquidators should be appointed under s.301(1)(b) of the International Business Corporations Act
(the "**Act**"); (b) it is just and equitable for liquidators to be appointed under s.301(1)(b) of the Act;

and/or (c) pursuant to the Court's inherent jurisdiction to wind up a company where the circumstances are so plain, and the inevitability, appropriateness and urgency of a winding up order are so clear, that it would be a denial of justice, and a waste of time and money, for the Court to refuse to make an order there and then.  Importantly, the ability of the Court to order the winding up of Emergent does not depend on the receivers being in office since, in the circumstances that have arisen, it additionally has both the jurisdiction and power to order the winding up of Emergent of its own motion.

49. No evidence has been adduced to indicate that any of the above grounds are unfounded.  If, moreover, there was a valid and binding pledge (by way of guarantee or otherwise) of the Robinhood shares two days before the bankruptcy of FTX, then there would appear to be little by way of assets in the hands of Emergent to meet all its creditors: SBF has not identified any such assets, although I daresay there may be potential choses in action which may need to be considered.  This would add and not detract from the grounds of the Petition, not least because nobody appears now to be contending that either (i) the company is in fact solvent, or (ii) the company's former director is either in any position to manage the company or a suitable person to do so.  While I appreciate that the criminal charges are yet to be tested, it appears to be SBF's position that he was overwhelmed by issues arising from his own inability to manage the entities of which he was a fiduciary.

50. I would add that removing myself and Toni Shukla as Provisional Liquidators and replacing us with different fiduciaries would in addition have the further effect of causing yet further monies to expended in the gathering in and securing of assets, and could seriously prejudice Emergent given the very short amount of time available to understand the issues that have arisen and prepare and file a defence to the BlockFi claim.  There is no suggestion (of which I am aware) that we have acted in any way improperly in seeking to secure Emergent's assets and in seeking to defend the New Jersey proceedings.  I estimate that we have spent (as Provisional Liquidators) circa 150 hours understanding and dealing with these issues so far, and our wider team of professional advisors has worked hard and to a very tight timeline to understand the issues and take steps to protect the interests of Emergent.   We are officers of this Court, and we remain under this Court's supervision.  If at any stage any interested person was concerned about the propriety or legitimacy of any work we have undertaken, then they are of course at liberty to raise such issues

with the Provisional Liquidators and/or to make an appropriate application to this Court, to whom we are always accountable.  No such suggestion or concern has been expressed.

**Order Rightly Granted in the Receivership Proceedings**

51.  I understand that SBF's counsel has made several unspecified criticisms as to the obtaining of the Orders on 18 November 2022.  I believe these criticisms are unfounded, but I would note that they are not in fact the subject of the Application.  The Receivership Proceedings have been stayed.  Moreover, it is doubtful that SBF has complied with paragraphs 10 and 11 of the Order dated 18 November 2022 in any event, and it is therefore unclear whether he would have any ability to move any application to lift the stay (without demonstrating compliance with those paragraphs), but that is beside the point: no such application has been made.

52.  Nevertheless, I would like briefly to address SBF's counsel's criticism made in Court on 14 December 2022 that there was allegedly culpable material non-disclosure on 18 November 2022, and that Mr Shimon allegedly had no valid cause of action against Emergent.

53.  As to the allegation of non-disclosure, it would appear from paragraphs [32] to [37] of the submissions filed by SBF's counsel on 12 December 2022 (exhibited at pages **556 to 574, and paragraphs 32 to 37 are at pages 568 to 570 of Exhibit AB-3)** that the complaint is that Mr Shimon's counsel failed to bring paragraph 30(iii) of Mr Shimon's affidavit (in particular, the statement: "*I know nothing about the source of the funds to acquire the 7.6% interest in Robinhood beyond the fact that it was allegedly 'working capital'*") expressly to the attention of the Judge at the hearing on 14 December 2022.  It is said this statement was highly material as it allegedly amounted to an admission that Mr Shimon had inadequate evidence to support his claim and, more significantly, had it been brought to the direct attention of the Judge, he would have concluded that Mr Shimon was unable to overcome the threshold hurdle of demonstrating a good arguable case for the purpose of obtaining injunctive relief.

54.  Although it will be a matter for legal submissions in due course, it seems to me that this complaint is misconceived because it is predicated on the erroneous assumption that Mr Shimon could only succeed on his claim (or demonstrate a good arguable case to the required standard for injunctive relief) if he had direct knowledge of the source of the funds to acquire the Robinhood shares.  I

do not accept that is correct given the nature of the claims being advanced by Mr Shimon, which is essentially that his assets were stolen by SBF and others and are traceable to Emergent via Alameda. Furthermore, it was a reasonable inference – which appears to be entirely borne out by the subsequent revelations - that Emergent was fixed with the same knowledge of the fraud as its former director SBF, and to that degree could be said to have participated in it with the same degree of culpability as SBF himself.

55. I politely suggest that this is amply sufficient to dispose of the Application for present purposes. If and to the extent SBF wishes to advance any such allegations further, however, I would contend that these should only be argued (a) after he has cured his breaches of the Order dated 18 November 2022; (b) after he has demonstrated he has standing to advance such a case in relation to Emergent; (c) after giving notice to the Provisional Liquidators of Emergent so that Emergent can respond to it; and (d) in the proper forum and in the relevant proceedings, namely after he has obtained leave of the Court (in the PL Proceedings, in which the stay was ordered) to lift the stay in the Receivership Proceedings, and in a subsequent application in the Receivership Proceedings. It does not arise in the Application before the Court on 23 December 2022.

56. As to the correctness of the Order made on 18 November 2022, the same remarks apply. The cause of action against Emergent has been misstated and mischaracterised by SBF in the papers filed by his counsel in the Receivership Proceedings.

57. Mr Shimon's case, in summary, is that he placed *his* assets (i.e., Ethereum assets) with FTX. His assets were taken unlawfully by SBF as part of a scheme to defraud Mr Shimon and, it is reasonably to be inferred, either they or their proceeds ended up in Emergent: see the affirmation of Yonaton Ben Shimon dated 17 November 2022 (paragraph 28, at page **36 of Exhibit AB-3**). Prior to the filing of the SEC Complaint and the unsealing of the criminal indictment on 12 December 2022, some of the steps in the chain may have been opaque. Hence the remarks made in his Affidavit in the Receivership Proceedings. The information gaps are now being filled, and they sadly appear to confirm Mr Shimon's worst fears, namely that he has been the victim of a massive fraud perpetrated by SBF and others. It is entirely to Mr Shimon's credit (i) that he immediately took the steps to act to secure assets when he did, and (ii) that he recognises the inevitability that there will be others (in all likelihood thousands of others) potentially in his

position, and that the preservative steps he has taken in respect of Emergent should proceed as a class action on behalf of all the creditors of Emergent.

58. Without wishing to be repetitive, SBF appears to have taken assets unlawfully from FTX's customers and transferred them to Alameda, a vehicle apparently owned by and controlled by SBF.  According to SBF's own testimony paragraphs 9 to 11 of the Affirmation of SBF dated 11 December 2022 filed in the Receivership Proceedings (at pages **500 to 501 of exhibit AB-3)** Alameda transferred monies to SBF.  SBF in turn transferred monies to Emergent.

59. There are two further matters to note.  First, SBF's case is that he injected what he contends was his own capital in Emergent which was then used to purchase the Robinhood shares (see paragraph 9 of the Affirmation of SBF dated 11 December 2022 filed in the Receivership Proceedings, at page **500 of exhibit AB-3)**.  However, there is no evidence whatsoever of any independent source of wealth of SBF of the magnitude that was transferred into Emergent on 30 April 2022 and 15 May 2022.  Indeed, if such independent wealth had existed, it would beg the question why he would conceivably need or want to "borrow" one billion dollars from Alameda.  Secondly, the suggestion that there was no such independent wealth is reinforced strongly by the both the SEC and CFTC Complaints and the SEC Indictment, which allege that, systematically, SBF had been unlawfully and dishonestly looting the assets of FTX's customers for his own use.  Although we are yet to receive and review his evidence, no documentation has been provided by SBF to us to demonstrate any source of funds other than what SBF had derived from the fraudulent conduct described by the SEC and CFTC.  Thirdly, there is no evidence that we have seen of a trading business of Emergent, let alone in April 2022, other than as a recipient of third-party funds to purchase and hold a valuable shareholding.

60. As regards the strength of the case against SBF, this is not actually relevant for the purposes of the Application to be heard on 23 December 2022, but it is pertinent to note the conclusions in the SEC Complaint filed on 12 December 2022 that SBF  "directed hundreds of millions more in FTX customer funds to Alameda, which he then used for additional venture investments and for "loans" to himself and other FTX executives" (see page **432 of exhibit AB-3**), and also the CFTC Complaint filed on 13 December 2022 that SBF and other FTX executives "took hundreds of millions of dollars in poorly documented "loans" from Alameda that they used to purchase luxury

real estate and property, making political donations, and for other unauthorized uses" and
"misappropriated customer funds for their own use and benefit" (see page **460 of exhibit AB-3**).

In addition, I make these observations from the SEC and the CTFC Complaints: -

SEC Complaint (pages **430 to 457 of exhibit AB-3**).

Para 18.  "Bankman-Fried remained the ultimate decision-maker at Alameda, even after Ellison
and Trabusco became co-CEOs in or around October 2021.  Bankman-Fried directed investment
and operational decisions, frequently communicated with Alameda employees, and had full
access to Alameda's records and databases."  Page **435 of exhibit AB-3**.

Para 21: "Bankman-Fried was the ultimate decision-maker at FTX from the platform's inception
in or around May 2019 until he resigned as CEO on or about November 11, 2022."  Page **436 of
exhibit AB-3**.

Para 26: "From the start, contrary to what FTX investors and trading customers were told,
Bankman-Fried continually diverted FTX customer funds to Alameda and then used those funds
to continue to grow his empire, using billions of dollars to make undisclosed private investments,
political contributions, and real estate purchases."  Page **437 of exhibit AB-3**.

Para 47: "Throughout the Relevant Period, Bankman-Fried was directly involved in soliciting
potential investors in FTX.  Bankman-Fried met, and otherwise communicated, with FTX investors
including investors based in the United States.  Along with another FTX employee, Bankman-Fried
was the point-person for investor relations at FTX."  Page **443 of exhibit AB-3**.

"Relevant Period" is defined as May 2019 until 11 November 2022.  Page **436 of exhibit AB-3**.

CFTC Complaint (pages **458 to 497 of exhibit AB-3**).

Para 4: "Beginning no later than May 2019 and continuing through at least November 11, 2022
("the Relevant Period"), Bankman-Fried owned, operated, and/or controlled FTX Trading, along

with its numerous subsidiaries and related entities around the world, all doing business as FTX.com.  He also owned, operated, and/or controlled Alameda and its various subsidiaries and related entities, as well as numerous other related entities in the digital asset industry." Page **459 of exhibit AB-3**.

Para 19: "During the Relevant Period, FTX Trading, Alameda Research, together with other entities under the majority ownership and control of Bankman-Fried operated as a single, integrated common enterprise under the sole ultimate authority of Bankman-Fried as their mutual owner. They are referred to collectively in this complaint as the "FTX Enterprise."  Bankman-Fried regularly exercised control over each of the component entities of the FTX Enterprise throughout the Relevant Period, including regularly serving as signatory on core corporate agreement, as well as corporate bank accounts and trading accounts, many of which we held in the U.S."  Pages **462 and 463 of exhibit AB-3**.

Para 29: "Even after stepping down as CEO of Alameda, Bankman-Fried continued to maintain control over Alameda.  For example, Bankman-Fried remained a signatory on Alameda Research's bank accounts and an authorized trader for Alameda's accounts with CFTC registered futures commission merchants.  Bankman-Fried also maintained direct decision-making authority over all of Alameda's major trading, investment, and financial decisions."  Page **465 of exhibit AB-3**.

61. I should re-emphasise that we are observing a picture that is fast-evolving and necessarily incomplete, but everything seen to date points to the same conclusion: a massive, extensive fraud orchestrated and perpetrated by SBF over the course of several years, including the time of Mr Shimon's use of the FTX platform and loss of his assets in the fraud.

62. In these circumstances it is imperative to safeguard the assets of Emergent, and it would be obviously inappropriate to allow SBF to be in control of Emergent, even for the short period before the hearing of the Petition.

**Provisional Liquidators are fit and proper persons**

63. The Provisional Liquidators are the officers of this Court.  We are both insolvency practitioners and directors of a respected international professional services provider, who are both personally regulated in the Caribbean, and who have significant experience in large scale, cross-border engagements.  Furthermore, the legal professionals we have engaged since our appointment are practitioners from highly respected law firms with, between them, decades of directly relevant experience of the use of complex offshore structures where there are allegations of fraud and misappropriation of assets.

64. I believe that our appointment and associated powers are crucial in this matter to safeguard the assets of Emergent for its creditors.  Given the extraordinary allegations that have, since our appointment, now been made against SBF in multiple fora, by a variety of agencies and by highly experienced professionals, the consequence that is apparently sought by SBF in his application to stay the provisional liquidation order, namely the return of Emergent to his control, simply does not bear countenancing.

**Conclusion**

65. For the reasons set out in this Affidavit the Court is invited to dismiss the Application.

| | |
|---|---|
| SWORN by the within named | ) |
| ANGELA BARKHOUSE | ) |
| | ) |
| This 19th day of December 2022 | ) |

At *New York, NY   USA.*

BEFORE ME:

*Deborah Pensaud*

DEBORAH PERSAUD
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01PE6204002
Qualified in Queens County
Commission Expires April 13, 2025

26