IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>FTX TRADING LTD., *et al.*,[1]<br><br>    Debtors. | Chapter 11<br><br>Case No. 22-11068 (JTD)<br><br>(Jointly Administered) |

**DECLARATION OF KEVIN M. COFSKY IN SUPPORT OF DEBTORS'
MOTION FOR ENTRY OF AN ORDER AUTHORIZING DEBTORS TO
REDACT OR WITHHOLD CERTAIN CONFIDENTIAL INFORMATION**

I, Kevin M. Cofsky, hereby declare under penalty of perjury:

1.  I am a Partner in the Advisory Group at Perella Weinberg Partners L.P. ("PWP"), a financial advisory firm that maintains an office at 767 5th Avenue, New York, New York 10153, and the Debtors' proposed investment banker. PWP is a full-service investment banking firm providing strategic and financial advisory services, including with respect to mergers and acquisitions, capital raising and restructuring transactions across a broad range of industries. PWP and its senior professionals have extensive experience with respect to the reorganization and restructuring of distressed companies, both out of court and in Chapter 11 proceedings.

2.  I have been employed by PWP since January 2007 and have been a Partner of PWP since December 2015. I received a Bachelor of Science degree in Economics with a concentration in Finance from the Wharton School of Business at the University of

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

Pennsylvania, a Juris Doctor from the University of Pennsylvania Law School and a Masters of Government Administration from the Fels Center of Government at the University of Pennsylvania.

3. I started my career in investment banking as an Analyst with Houlihan Lokey Howard & Zukin. Thereafter, I was an Associate with The Beacon Group and, prior to joining PWP, I was a Managing Director with Evercore Partners in its Capital Structure Advisory and Restructuring group. I have also clerked for Chief Justice Portiz in the New Jersey Supreme Court and was an associate with Cravath, Swaine and Moore.

4. In addition to working with the Debtors in the above-captioned cases (the "Chapter 11 Cases"), my restructuring and financial advisory engagements have included representations of debtors and creditors in the following chapter 11 cases: *In re PG&E Corp.*, No. 19-30088 (Bankr. N.D. Cal.); *In re Energy Future Holdings Corp.*, No. 14-10979 (Bankr. D. Del.); *In re R.E. Gas Development, LLC*, No. 18-22032 (Bankr. W.D. Pa.); *In re Bonanza Creek Energy, Inc.*, No. 17-10015 (Bankr. D. Del.); *In re Memorial Production Partners LP*, No. 17-30262 (Bankr. S.D. Tex.); *In re EV Energy Partners, L.P.*, No. 18-10814 (Bankr. D. Del.); *In re Atlas Resource Partners, L.P.*, No. 16-12149 (Bankr. S.D.N.Y.); and *In re Edison Mission Energy*, No. 12-49219 (Bankr. N.D. Ill.).

5. I submit this declaration (this "Declaration") in support of the Debtors obtaining final relief with respect to the *Motion of Debtors for Entry of Interim and Final Orders (i) Authorizing the Debtors to Maintain a Consolidated List of Creditors In Lieu of Submitting a Separate Matrix for Each Debtor, (ii) Authorizing the Debtors to Redact or Withhold Certain Confidential Information of Customers and Personal Information of Individuals and (iii) Granting Certain Related Relief*. I am not being compensated separately for this testimony other

than through payments received by PWP as the investment banker proposed to be retained by the Debtors. Except as otherwise indicated herein, all of the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by PWP professionals involved in advising the Debtors in these Chapter 11 Cases or information provided to me by the Debtors. If called upon to testify, I could and would testify to the facts set forth herein on that basis. I am authorized to submit this Declaration on behalf of the Debtors.

6. The Debtors, with the assistance of PWP, have commenced an extensive outreach effort as part of marketing the Debtors' businesses and assets for potential sale. While these Chapter 11 Cases are in their early stages, I anticipate that the sale of businesses and assets are a potential source of significant value for the Debtors' estates.

7. The lists of the Debtors' customers, including both names and contact information, are a key asset of the Debtors. A hallmark feature of cryptocurrency is a holder's ability to remain anonymous to the public. There is limited to no publicly available information as to the identity of individuals or institutions holding cryptocurrency on exchanges. I understand that it is therefore expensive and time consuming for companies that operate crypto asset management platforms to identify potential customers, attract and enroll them, and ultimately establish them as customers. It is likewise generally difficult for a crypto asset management platform to identify customers on a competitor's platform and seek to poach those customers.

8. My understanding is that the Debtors have more than 9 million aggregate customers for whom the Debtors have valuable and sensitive personal identifying information. The Debtors have expended significant resources to build the customer base over time, and I

believe third parties will attribute value to those lists. For those reasons, I believe the Debtors' customer lists, including names and contact information for individual and institutional customers, are an important asset of the Debtors and a potential source of value for the Debtors' estates.

9.   Further, except for individual customers with the most common or generic names, I believe that the names of the Debtors' customers are themselves valuable because a competitor could identify who such customers are and how to contact them through internet searches or otherwise. This is likewise true for institutional customers, who would be easily identifiable by name alone. I do not believe that it would be difficult to look up and, in the case of the Debtors' competitors, poach the Debtors' customers if their names were to be made public. The publication of this information will substantially harm the value of the Debtors' assets and undermine the Debtors' ability to obtain the highest and best value for their assets.

10.   Crypto asset management platforms, and businesses in general, regularly expend significant value for new customers in the ordinary course of business. In fact, leading cryptocurrency exchanges that competed with the Debtors, including Binance, Coinbase, Kraken and KuCoin, all maintain a referral and/or affiliate program to incentivize members to market the respective platform to new users. Binance offers affiliate partners "*up to 50% of commissions*;"[2] Coinbase offers the referrer and user referred each a bonus varying "from time to time and by country";[3] Kraken's affiliate program offers "*20% of the trading fees collected from clients [the customer] refer[s] . . . for the lifetime of the client with Kraken*;"[4] and KuCoin offers "*up to 50%*

---

[2]   BINANCE, https://www.binance.com/en/activity/affiliate (last visited Jan. 6, 2023).

[3]   *The Coinbase Referral Program*, COINBASE, https://help.coinbase.com/en/coinbase/other-topics/other/the-coinbase-referral-program (last visited Jan. 6, 2023).

4860-5286-0226 v.7

*of . . . trading fees as a commission*" in its own affiliate program.[5]

11. I believe the fact that companies regularly pay commissions and fees for a referral to a new user is evidence that the identity of a new customer is inherently valuable. Further, the fact that businesses in the ordinary course go to great lengths to protect the identity of their customers is common knowledge, and demonstrative of the fact that the identity of customers is a very important value component to most businesses. Notably, if one of the cryptocurrency exchanges above obtained fulsome lists of high-target potential customers containing names and contact information, the desire to pay for a referral to those customers would greatly diminish, since the potential customer is now known. Similarly, potential buyers of the Debtors' assets will likely ascribe material value to the Debtors' customer lists. If customer information is made public, I believe the value of the Debtors' businesses, and the ability to realize that value, could be materially harmed, diminished or dissipated.

12. Additionally, it is well established that customer information such as names and contact information are separately valued intangible assets of an entity. The accounting standard-setting body, the *Financial Accounting Standards Board* (FASB), provides guidance related to the recognition of different categories of customer-related intangible assets acquired in a business combination in Accounting Standard Codification (ASC) 805. The guidance in ASC 805-20-25-31 states: "Customer-related intangible assets that would meet that criterion for recognition under this accounting alternative are those that are capable of being sold or licensed independently from the other assets of a business. . . . **Customer-related intangible assets that may meet that criterion for recognition include but are not limited to: . . .**

---

[4] *Kraken Affiliate Program*, KRAKEN, https://support.kraken.com/hc/en-us/articles/360027545252-Kraken-Affiliate-program (last visited Jan. 6, 2023).

[5] KUCOIN, https://www.kucoin.com/affiliate (last visited Jan. 6, 2023).

4860-5286-0226 v.7

**Customer information (for example, names and contact information).**"[6] The idea that a customer list is a separable asset with inherent and potentially significant value is further supported in financial valuation literature. Notably, a customer list's value is suggested to be diminished the moment part or all of this information is disclosed. Valuation expert Jeffrey Cohen says in *Intangible Assets: Valuation and Economic Benefit*: "Trade secrets are types of assets that result from a proprietary technology or way of doing business. Generally speaking, they exist because they provide some competitive advantage. . . . **A customer list . . . might qualify as trade secrets**, **provided that there is value in the fact they remain unknown to the competition**—that is, that **they provide independent economic value**, and that there is some evidence that their owners actually try to keep them secret." [7] The Debtors have indeed sought to keep their customer lists private.

13. These Chapter 11 Cases are in the early stages. A key focus of the Debtors is to maximize the value of the estates by preserving asset value where possible and pursuing the sale of certain assets to obtain highest and best value. I believe an important component of that strategy is maintaining the confidentiality of customers' identities and personal identifying information. Disclosing those customer lists would therefore jeopardize the Debtors' ability to maximize value.

---

[6]   FASB ASC 805-20-25-31, *available at* https://asc.fasb.org/1943274/2147480013/805-20-25-31 (last visited Jan. 6, 2023) (emphasis added).

[7]   JEFFREY A. COHEN, INTANGIBLE ASSETS: VALUATION AND ECONOMIC BENEFIT 17 (2005) (emphasis added).

4860-5286-0226 v.7

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information and belief.

Dated: January 8, 2023

*/s/ Kevin M. Cofsky*
Kevin M. Cofsky
Perella Weinberg Partners
Partner