1          UNITED STATES BANKRUPTCY COURT
            DISTRICT OF DELAWARE

2

3  IN RE:             .  Chapter 11
                   .  Case No. 22-11068 (JTD)
4  FTX TRADING LTD., *et al.,*  .
                   .
5                   .  Courtroom No. 5
                   .  824 Market Street
6          Debtors.    .  Wilmington, Delaware 19801
                   .
7                   .  Wednesday, January 11, 2023
  . . . . . . . . . . . . . . . .  9:00 a.m.
8
               TRANSCRIPT OF HEARING
9        BEFORE THE HONORABLE JOHN T. DORSEY
        CHIEF UNITED STATES BANKRUPTCY JUDGE
10
  APPEARANCES:
11
  For the Debtor:        Adam Landis, Esquire
12                   LANDIS RATH & COBB LLP
                   919 Market Street, Suite 1800
13                  Wilmington, Delaware 19801

14                   Andrew G. Dietderich, Esquire
                   James L. Bromley, Esquire
15                  Brian D. Glueckstein, Esquire
                   Alexa J. Kranzley, Esquire
16                   SULLIVAN & CROMWELL LLP
                   125 Broad Street
17                  New York, NY 10004

18

19  (APPEARANCES CONTINUED)

20  Audio Operator:        Jermaine Cooper

21  Transcription Company:  Reliable
                   The Nemours Building
22                   1007 N. Orange Street, Suite 110
                   Wilmington, Delaware 19801
23                   Telephone: (302)654-8080
                   Email:  gmatthews@reliable-co.com
24

  Proceedings recorded by electronic sound recording,
25  transcript produced by transcription service.

1 | APPEARANCES (CONTINUED):

2 | For the U.S. Trustee:      Juliet Sarkessian, Esquire
                              OFFICE OF THE UNITED STATES TRUSTEE
3 |                           844 King Street, Suite 2207
                              Lockbox 35
4 |                           Wilmington, Delaware 19801

5 | For the Movants:          David Finger, Esquire
                              FINGER & SLANINA, LLC
6 |                           1201 North Orange Street
                              Wilmington, Delaware 19801
7 |
    For the Committee:        Kris Hansen, Esquire
8 |                           Erez Gilad, Esquire
                              PAUL HASTINGS LLP
9 |                           MetLife Building
                              200 Park Avenue
10 |                          New York, New York 10166

11 | For the Ad Hoc
     Committee of Non-US
12 | Customers:               Matthew Harvey, Esquire
                              MORRIS, NICHOLS, ARSHT & TUNNELL LLP
13 |                          1201 North Market Street
                              Suite 1600
14 |                          Wilmington, Delaware 19801

15 | For Paradigm
     Operations:              Sidney Levinson, Esquire
16 |                          DEBEVOISE & PLIMPTON LLP
                              919 3rd Avenue
17 |                          New York, New York 10022

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

1                              INDEX

2  MOTIONS:                                              PAGE

3
   Agenda
4  Item 20:  Motion of Debtors for Entry of Interim and     16
             Final Orders (I) Authorizing the Debtors to
5            Maintain a Consolidated List of Creditors in
             Lieu of Submitting a Separate Matrix for Each
6            Debtor, (II) Authorizing the Debtors to Redact
             Or Withhold Certain Confidential Information
7            Of Customers and Personal Information of
             Individuals And (III) Granting Certain Related
8            Relief [D.I. 45; Filed 11/19/22]

9
             Court's Ruling:                              102
10
   Agenda
11 Item 22:  Motion for Entry of Interim and Final Orders   109
             (A) Authorizing the Debtors, in Their Sole
12           Discretion, to Provide Indemnification and
             Exculpation to Certain Individuals, (B)
13           Authorizing Certain Actions Pursuant to Section
             363 of the Bankruptcy Code, and (C) Granting
14           Certain Related Relief
             [D.I. 94; Filed 11/22/22]
15
             Court's Ruling:                              113
16
   Agenda
17 Item 21:  Motion of Debtors for Entry of Interim and Final 113
             Orders (I) Authorizing the Debtors to (A)
18           Operate a Post-Petition Cash Management System,
             (B) Maintain Existing Business Forms, and (C)
19           Perform Intercompany Transactions, (II) Granting
             A partial Waiver of the Deposit Guidelines Set
20           Forth in Section 345(b), and (III) Granting
             Related Relief
21           [D.I. 47; Filed 11/19/22]

22
             Court's Ruling:                              139
23

24

25

1                                    INDEX

2    MOTIONS:                                                    PAGE

3    Agenda
4    Item 24: Motion of Debtors for Entry of Orders (I)(A)        140
                Approving Bid Procedures, Stalking Horse
5               Protections and the Form and Manner of Notices
                For the Sale of Certain Businesses; (B)
6               Approving Assumption and Assignment Procedures
                And (C) Scheduling Auction(s) and Sale Hearings
7               And (II)(A) Approving the Sale(s) Free and Clear
                Of Liens, Claims, Interests, and Encumbrances
8               And (B) Authorizing Assumption and Assignment
                Of Executory Contracts and Unexpired Leases
9               [D.I. 233; Filed 12/15/22]

10              Court's Ruling:                                   162

11

12   STATUS CONFERENCE:                                          PAGE

13   Agenda
     Item 30: Motion of the United States Trustee for Entry      163
14              Of an Order Directing the Appointment of an
                Examiner [D.I. 176; Filed 12/1/22]

15

16

17   WITNESSES CALLED
     BY THE DEBTOR:                                              PAGE
18
          KEVIN COFSKY
19        Direct examination by Mr. Glueckstein                   21
          Cross-examination by Ms. Sarkessian                     33
20        Cross-examination by Mr. Finger                         41
          Redirect examination by Mr. Glueckstein                 51
21

22   EXHIBITS:                                                   PAGE

23
     Declaration of Brian Glueckstein                            140
24

25

1    (Proceedings commence at 9:03 a.m.)

2    (Call to order of the Court)

3         THE COURT:  Good morning, everyone.  Thank you.

4    Please be seated.

5         So, before we begin, let me just remind everyone

6    about proper decorum, both in the courtroom and for those who

7    are appearing online through the Zoom call.  It's important

8    that we maintain proper courtroom decorum.

9         If you are on the Zoom call, please leave your

10   camera off and your line muted, unless you wish to be heard

11   regarding one of the matters that are before the Court today.

12   And disruptions won't be tolerated; anyone disrupting on the

13   Zoom call will be removed immediately and not allowed back

14   in.

15        Before we begin, I also want to address -- excuse

16   me -- a letter that I received from four U.S. Senators.  It's

17   an inappropriate *ex parte* communication, number one.  And

18   number two, I want to make perfectly clear that I will make

19   my decisions on the matters referred to in the letter based

20   only upon admissible evidence and the arguments of parties-

21   in-interest presented in open court.

22        I'm not going to docket -- I am going to docket the

23   letter; in fact, I did that this morning.  But it will have

24   no impact whatsoever in my decisions in this case, which will

25   only be based upon the facts and law presented by the

1  parties.

2          So, with that, we'll proceed.

3          MR. LANDIS:  Good morning, Your Honor, and may it

4  please the Court.  Adam Landis from Landis, Rath & Cobb,

5  counsel to FTX Trading Limited and its affiliated debtors.

6          We're here today, Your Honor, on second-day relief.

7  We filed an amended agenda.  It's 27 pages long, Your Honor,

8  with 30 items on it.  But thanks to the very hard work of

9  many people in this room and lots of people out of it, I'm

10  pleased to say that we have a limited number of matters that

11  Your Honor is going to have to hear and decide today.

12          But before we get into the agenda, I'd like to cede

13  the podium to Mr. Dietderich, who will give the Court and

14  parties-in-interest an update as to activities that have been

15  going on since we were last before you.

16          THE COURT:  All right.  Thank you.

17          MR. DIETDERICH:  Thank you, Mr. Landis.

18          Good morning, Your Honor.  May it please the Court,

19  I have a short case update for the record.

20          The debtors filed for Chapter 11 60 days ago and

21  the level of activity since has been extraordinary.  We've

22  identified over 9 million customer accounts with about 120

23  billion in associated transactions.  We are engaged in a

24  complex effort now to recreate petition date claim values for

25  every customer.

1          We are building financial statements from the
2   ground up using the general ledger and bank transaction
3   records, rather than the previous incomplete and unreliable
4   financial statements of the debtors.  This will put us in the
5   position to describe the financial results of the debtors
6   accurately for the first time.

7          We have located over $5 billion of cash, liquid
8   cryptocurrency, and liquid investment securities, measured at
9   petition date value.  This does not describe any value to
10  holdings of dozens of illiquid cryptocurrency tokens, where
11  our holdings are so large relative to the total supply that
12  our positions cannot be sold without substantially affecting
13  the market for the token.

14         The 5 billion in liquid assets also does not
15  include approximately 425 million of crypto at petition date
16  values in the custody of the Securities Commission of the
17  Bahamas.  That position was valued at about 170 million at
18  the end of 2020.  It contains a large amount of FTT and is
19  highly volatile.

20         We have started a strategic review process for our
21  assets.  We have established data rooms and solicited
22  interest for the four operating subsidiaries subjecting to
23  the bidding procedures motion today.

24         We also are well underway on plans to monetize over
25  300 other nonstrategic investments with a book value of over

1  $4.6 billion.

2       We have established, Your Honor, cooperative

3  relationships with the joint provisional liquidators in our

4  only subsidiaries that are subject to separate proceedings,

5  Australia and the Bahamas.

6       Our recently announced cooperation agreement with

7  the JPL in the Bahamas is an important first step to align

8  incentives and maximize joint recoveries.  The principle of

9  that agreement is simple:  It does not matter who collects a

10 dollar for customers, as long as the customers get it.

11      We've established a task force with the Official

12 Committee of Creditors and the Bahamas JPL to explore

13 alternatives for the sale or reorganization of the

14 international platform.

15      We have cooperated and spent countless hours

16 providing information to law enforcement.

17      These 60 days have already seen Mr. Bankman-Fried

18 indicted, arrested, extradited, released on bail, and plead

19 not guilty, with a trial date set.

20      We have seen Ms. Ellison and Mr. Wang plead guilty,

21 make public plea statements, and cooperate with law

22 enforcement.

23      And we have learned about what happened.  We know

24 how Sam Bankman-Fried instructed Gary Wang to create the

25 Alameda backdoor, a secret way for Alameda to borrow from

1  customers on the exchange without permission.  Mr. Wang

2  created this backdoor by inserting a single number into

3  millions of lines of code for the exchange, creating a line

4  of credit from customers to Alameda, to which customers did

5  not consent.  And we know the size of that line of credit, it

6  was $65 billion.

7       We know what Alameda did with the money.  It bought

8  planes, houses, threw parties, made political donations.  It

9  made personal loans to its founders.  It sponsored the FTX

10  Arena in Miami, a Formula One team, the League of Legends,

11  Cochella, and many other businesses, events, and

12  personalities.

13       It gambled on cryptocurrency investments, often

14  unsuccessfully.  And it made debt and equity investments in

15  diverse businesses, many at prices that greatly exceeded

16  market value at the time of the investment.

17       We know that all this has left a shortfall in value

18  to repay customers and creditors.  The amount of the

19  shortfall is not yet clear.  It will depend on the size of

20  the claims pool and our recovery efforts.  But every week, we

21  come closer to completing the work necessary to estimate

22  recoveries for the purposes of a plan of reorganization.

23       We also have begun to engage on the central legal

24  issues in the case.  These include the nature of customer

25  entitlements, are they property or claims, and how to close

1  out derivatives to calculate petition date claim amounts.

2          Finally, we have established great working

3  relationships with the U.S. Trustee, our new Official

4  Committee of Creditors -- welcome -- and regulatory

5  stakeholders around the world.  Many people and many

6  institutions have worked hard to get us here today.  Chapter

7  11 is a fish bowl and we welcome that, in this case more than

8  most.

9          And as a result of the effort by so many, we stand

10  before you with only limited open issue on our second-day

11  relief.  This is despite the volume and the unique nature of

12  many of the issues everyone has faced together.

13          Unless you have questions for me, Your Honor, I

14  propose we move directly to the agenda.  As Mr. Landis

15  mentioned, it is an extremely long agenda, but it is mostly

16  matters that have either been adjourned or reflected in

17  orders that have been either entered or in agreed form.

18          For our point today, Your Honor -- maybe -- I'll

19  cede -- also, Mr. Hansen is raising his hand.  I'll cede the

20  podium to him, if he would like to make some preliminary

21  remarks.

22          THE COURT:  Okay.  Thank you.

23          Mr. Hansen.

24          MR. HANSEN:  Good morning, Your Honor.  Kris Hansen

25  with Paul Hastings, proposed counsel to the official

1  committee.  Just quick introductions.  My partners Erez Gilad

2  and Gabe Sasson are here with me today, as are Mr. Lunn and

3  Mr. Poppiti, with our proposed co-counsel at Young Conaway.

4         The committee has also selected FTI Consulting as

5  it's financial advisor and Jefferies as its investment

6  banker.

7         Your Honor, the committee worked very hard behind

8  the scenes with the debtors and the United States Trustee to

9  try to make this hearing as consensual as it could be, and we

10 appreciate the willingness of both parties to approach the

11 motions on for today in a constructive manner.

12        With this being the committee's first formal

13 appearance before the Court since its formation, I wanted to

14 just take a moment to share a little bit of information about

15 the committee and provide the Court with the committee's

16 perspective on the cases at this time, if that would be okay.

17        THE COURT:  That's fine.  Thank you.

18        MR. HANSEN:  Thank you, Your Honor.

19        Your Honor, first, the committee is comprised of

20 nine members, including three individuals and six entities

21 from eight different jurisdictions, spanning from Singapore

22 to California.  The committee members have broad exposure

23 across the FTX exchange platforms and, sadly, share the

24 moniker of "victim" with the millions of other customers who

25 were defrauded by FTX.

1          The committee members understand the seriousness of

2    their task to serve as fiduciaries for all creditors in these

3    cases.  And to that end, they will check the debtors at every

4    step of these cases and take independent actions and generate

5    their own initiatives to recover assets and maximize the

6    distribution to creditors as rapidly as they can.

7          To date, the committee members have been active,

8    engaged, and hard at work with the committee professionals in

9    helping to resolve near-term issues, inserting itself in the

10   investigation and asset tracing efforts that are underway by

11   the debtors, and pushing the analysis of larger issues, such

12   as whether the exchanges can be restarted and a restructuring

13   path can be pursued as a complement to the asset recovery,

14   monetization, and distribution efforts.  And it's important

15   to note that it's not too soon to start that exercise.

16         The committee also believes strongly in the

17   principles noted at the outset of our reservation of rights

18   on the debtors' motion to approve the bidding procedures.

19   These cases need to be transparent, credibility needs to be

20   restored, and creditors need to know that they can trust the

21   Chapter 11 process.

22         As part of this effort, the committee is preparing

23   a multifaceted approach for communicating with the global

24   creditor community in these cases, which will include

25   dissemination of information, not only through the standard

1  committee website, but through various forms of social media.

2  The committee is aware of the disappointment of customers and

3  creditors with the information-sharing efforts in some of the

4  large, crypto-related cases, and we're trying to learn from

5  that to do better here.

6       The magnitude and complexity of the global fraud

7  and the lack of the corporate controls and recordkeeping

8  present significant challenges to the realization of the

9  committee's objectives, but the committee will work

10  tirelessly to make its goals a reality.

11       We appreciate the few minutes, Your Honor, and the

12  committee looks forward to working through these cases with

13  you, the United States Trustee, the Department of Justice,

14  the Bahamian liquidators, and the other parties-in-interest.

15  And you'll hear more from us as we go through each motion

16  today.

17       Do you have any questions for me, Your Honor?

18       THE COURT:  No, no questions.  Thank you very much.

19  Appreciate the --

20       MR. HANSEN:  Thank you.

21       THE COURT:  -- introductions and the update.

22       I may institute something that I did during the

23  Mallinckrodt bankruptcy, when I have dozen-page agendas with

24  a lot of items that are moved off.  I know the local rule

25  says you have to list everything in them.  What I did in

1  Mallinckrodt was say, if an item has been adjourned or has

2  been resolved -- well, if it's been adjourned, specifically,

3  you don't have to list everything out in that.  Just put in

4  the motion and that it's been adjourned to a different date.

5          MR. LANDIS:  Thank you, Your Honor.  For the

6  record, Adam Landis.  I see that you're directing that at me,

7  and we will --

8          THE COURT:  Yes.

9          MR. LANDIS:  -- absolutely take our cues from what

10  we were involved with in Mallinckrodt.

11          And I also would be remiss if I didn't extend some

12  appreciation to chambers for the patience with which everyone

13  has dealt with us as we've tried to get matters --

14          THE COURT:  Sure.

15          MR. LANDIS:  -- on the agenda.  So thank you for

16  that and we will take that advice.

17          THE COURT:  All right.  Thank you.  Okay.

18          MS. KRANZLEY:  Thank you, Your Honor.  Good

19  morning.  For the record, Alexa Kranzley from Sullivan &

20  Cromwell, proposed counsel for the debtors.

21          Your Honor, if acceptable to you, I will cover the

22  matters that are listed on the agenda that have been

23  resolved, so I'll go slightly out of order.

24          THE COURT:  Okay.

25          MS. KRANZLEY:  I'll start with Item Number 19 on

1   the agenda.

2          THE COURT:  Well, let me interrupt you first, Ms.

3   Kranzley.  I did see the three additional COCs this morning,

4   and I did enter those right before I came on the bench --

5          MS. KRANZLEY:  Oh --

6          THE COURT:  -- so those are entered, as well.

7          MS. KRANZLEY:  Great.  So then I think I only have

8   one agenda item to address with you, which is Item Number 25

9   and 26, which is actually the motion of North American League

10  of Legends to compel rejection or, in the alternative, relief

11  from the automatic stay to terminate the sponsorship

12  agreement.

13         Your Honor, while this is a third-party motion, the

14  debtors had filed a motion to reject contracts on December

15  30th at Docket Number 333, which includes the sponsorship

16  agreement that's the subject of this.  We have been working

17  with the counterparties.  We have an agreed-to stipulation.

18  And I understand from counsel that there will -- they will be

19  filing a certification of counsel with the stipulation later

20  today.

21         THE COURT:  Okay.  I remember that from the last

22  hearing.

23         MS. KRANZLEY:  Yes.

24         THE COURT:  Yeah.

25         MS. KRANZLEY:  So I think, with that, I'll hand the

1  podium to Mr. Glueckstein.

2          THE COURT:  Okay.  Thank you.

3          MR. GLUECKSTEIN:  Good morning, Your Honor.

4          THE COURT:  Good morning.

5          MR. GLUECKSTEIN:  Brian Glueckstein, Sullivan &

6  Cromwell, on behalf of the debtors.

7          Your Honor, the first contested matter on the

8  agenda today is listed at Agenda Item Number 20, which is the

9  debtors' motion for final relief, asking the Court to

10  authorize consolidated creditor matrix and to redact certain

11  customer and creditor information.

12          Your Honor, we filed a declaration at Docket Number

13  411, the declaration of Kevin Cofsky, in support of the

14  relief requested today.  Mr. Cofsky is here in the courtroom

15  and available.  We would like to admit Mr. Cofsky's

16  declaration into evidence in support of this motion at this

17  time.

18          THE COURT:  Okay.  Is there any objection?

19          MR. FINGER:  Yes, Your Honor.

20          THE COURT:  Step forward.

21          MR. FINGER:  Good morning, Your Honor.

22          THE COURT:  Good morning.

23          MR. FINGER:  David Finger for the media objectors.

24          Actually, I was going to file -- I was going to ask

25  -- request -- make a motion to strike Mr. Cofsky's

1  declaration.  I'm not sure if he's testifying as a fact

2  witness, which I don't think he is, but to the extent he is,

3  there's no indication that he has firsthand knowledge of the

4  matters about which he's testifying.  And if he's testifying

5  as an expert, he has not established his expertise.  There is

6  nothing indicating that he has any experience in the

7  cryptocurrency market.

8          He testifies at a couple of paragraphs, Paragraph 7

9  and 8, of his "understanding," in quotes, but does not

10  identify the source of his understanding, so that the Court

11  can determine the credibility of those understandings.

12          He also testifies repeatedly as to his "belief,"

13  again in quotes, as to certain conclusions.  That's in

14  Paragraphs 8, 9, 11, and 13.  He does not offer any objective

15  support for his subjective belief.

16          Now the U.S. Supreme Court in --

17          THE COURT:  Hold on one second, Mr. Finger.  I

18  don't know if we're -- can we -- he -- it's kind of -- I

19  don't know if the people in the back of the courtroom can

20  hear.  I think those microphones needs to be turned up maybe

21  a little bit.

22          MR. FINGER:  I can try to talk louder.

23          THE COURT:  Or you can lift them.  And talking

24  louder would be helpful, too, yes.

25          MR. FINGER:  All right.  The Supreme Court in

1  Daubert said, to satisfy the requirement of specialized

2  knowledge to qualify as an expert, there must be more than a

3  subjective belief or unsupported speculation.

4          As Mr. Cofsky did not provide support for his

5  beliefs and understandings, he does not meet the requirements

6  for an expert and his declaration should, therefore, be

7  stricken.

8          THE COURT:  All right.  Mr. Glueckstein?

9          MS. SARKESSIAN:  Your Honor, I have a similar

10  objection.

11          THE COURT:  Oh, go ahead --

12          MS. SARKESSIAN:  Could I --

13          THE COURT:  -- Ms. Sarkessian.

14          MS. SARKESSIAN:  Thank you, Your Honor.  If it

15  pleases the Court, Juliet Sarkessian on behalf of the U.S.

16  Trustee.

17          I thought it might make sense for me to --

18          THE COURT:  Yes.

19          MS. SARKESSIAN:  -- give my objection now, so that

20  debtors' counsel can address everything at the same time.

21          So, in -- I -- first of all, the U.S. Trustee does

22  agree that some of the testimony in Mr. Cofsky's declaration

23  appears to be of the nature of an expert witness and his

24  expertise in this area has not been established.

25          And in particular, in paragraph -- well, I have

1  questions to ask Mr. Cofsky about the statements in Paragraph

2  7 of his declaration, depending -- as to whether that's based

3  on personal knowledge.  So, depending on his answers, I may

4  object to that.

5  　　　　　But with respect to Paragraph 11, he has statements

6  like "it is common knowledge."

7  　　　　　And then later in the paragraph:

8  　　　　　"-- potential buyers of the debtors' assets will

9  likely ascribe material value to the debtors' customer lists"

10 　　　　　That's speculation.

11 　　　　　And then I also object, in Paragraph 12, at the

12 end, he cites a valuation expert that is somebody other than

13 himself and quotes out of, I guess it's a book.  So we object

14 to that as hearsay.

15 　　　　　And again, I do have some questions with respect to

16 some of the information in Paragraph 7, to determine if

17 that's based on his personal knowledge, and then I also have

18 cross-examination for the witness, as well.

19 　　　　　THE COURT:  All right.

20 　　　　　MS. SARKESSIAN:  Thank you, Your Honor.

21 　　　　　THE COURT:  Any other objections?

22 　　　(No verbal response)

23 　　　　　THE COURT:  All right.  Mr. Glueckstein.  I'll tell

24 you up front, Mr. Glueckstein.  If I have an objection to the

25 admissibility of a declaration, I usually just allow -- or

1  require that the witness just testify live, and maybe we can

2  resolve some of these issues by testimony.  But go ahead, if

3  you have anything else.

4          MR. GLUECKSTEIN:  That's fine, Your Honor.  Mr.

5  Cofsky is the debtors' proposed investment banker.  He's

6  offering his opinions in the declaration with respect to

7  matters that are raised by the motion today.  We think it is

8  admissible.

9          But if it's Your Honor's preference, I'm happy to

10  call Mr. Cofsky and walk through the issues in his

11  declaration live.

12          THE COURT:  All right.  Let's do that.  Let's call

13  Mr. Cofsky to the stand and we'll do it live and deal with

14  any objections as they come.

15      (Participants confer)

16          THE COURT:  Mr. Cofsky, please take the stand and

17  remain standing for the oath.

18          THE COURT OFFICER:  Please raise your right hand.

19  Please state your full name and spell your last name for the

20  Court.

21          THE WITNESS:  Kevin Michael Cofsky, C-o-f-s-k-y.

22  KEVIN COFSKY, WITNESS FOR THE DEBTORS, AFFIRMED

23          THE COURT OFFICER:  You may be seated.

24          MR. GLUECKSTEIN:  Your Honor, may I approach the

25  witness and give him a copy of his declaration?

1          THE COURT:  Yes.  Could you hand me --

2          MR. GLUECKSTEIN:  Yes.

3          THE COURT:  I can't seem to find it.  I usually

4   have these things --

5          MR. GLUECKSTEIN:  I --

6          THE COURT:  -- electronically, but I can't --

7          MR. GLUECKSTEIN:  I have --

8          THE COURT:  -- find it.

9          MR. GLUECKSTEIN:  -- a copy for you, as well, Your

10  Honor.

11         THE COURT:  Okay.  Thank you.  Thank you.

12                    DIRECT EXAMINATION

13  BY MR. GLUECKSTEIN:

14  Q    Good morning, Mr. Cofsky.

15  A    Good morning.

16  Q    Mr. Cofsky, can you provide a little bit of background

17  about your experience to the Court this morning?

18  A    Yes.  Would you like me to go through education or --

19  Q    Just a little --

20  A    -- professional --

21  Q    -- bit about --

22  A    -- experience?

23  Q    -- your work experience and qualifications in the --

24  yeah, in the area and scope in which you are performing

25  services for the debtors.

1        THE COURT:  Mr. Cofsky, can you please move the

2   microphone closer to you, so we can --

3        THE WITNESS:  Yes, sir.

4        THE COURT:  -- make sure we hear you?  Thank you.

5        THE WITNESS:  I studied finance at the Wharton

6   School of Business as an undergraduate.  I was a financial

7   analyst at Houlihan Lokey for two years, from 1992 to 1994.

8        After law school and practicing law for a period of

9   time, I returned to investment banking in 2001.  I was with a

10  firm called the Beacon Group, as well as Evercore Partners,

11  where I was a managing director in the restructuring group.

12       I joined a small firm that merged into Perella

13  Weinberg Partners upon its founding in 2006, and I have been

14  with the firm since that time.  I've been a partner with the

15  firm since 2015.

16  BY MR. GLUECKSTEIN:

17  Q    And can you describe for the Court just generally the

18  scope of work which yourself and your colleagues at Perella

19  are proposed to assist the debtors with in these cases?

20  A    Yes.  We are the proposed investment banker for the

21  debtors.  We've been working with the other professionals and

22  with the management team and the board on a wide range of

23  issues, including understanding the assets of the debtors,

24  evaluating potential for reorganization of some of the

25  businesses, as well as potential sales of the businesses.

1   And in general, our mandate is to explore different potential

2   avenues to maximize the value of the debtors' assets through

3   this process.

4   Q    In your experience, Mr. Cofsky, have -- prior to this

5   case, have you been involved in situations where the

6   monetization of businesses includes the monetization of

7   things such as customer assets or customer lists?

8   A    Yes, I have been.

9   Q    Can you elaborate on that at all, in terms of the types

10  of work you've done in that area?

11  A    Yes.  Most recently, we've been involved in the Celsius

12  bankruptcy case, pursuant to which the customer -- the value

13  and the potential value of the customers has been at issue.

14  But we've also seen -- while we are not running the sale

15  process, we have been evaluating that.  And we appreciate the

16  extent to which potential acquirers of that business have

17  evaluated the value of the customers and their various

18  positions on that platform.

19  Q    Are there other examples that you can recall where the

20  question of customer assets or customer lists have been at

21  issue in transactions that you or your team have been

22  involved in, in the past?

23  A    Yes.  The -- the identity and value of customers are

24  often considered to be quite valuable in the context of

25  retail businesses, consumer-facing businesses --

1           MS. SARKESSIAN:  Your Honor, I'm going to object.

2           THE COURT:  Basis?

3           MS. SARKESSIAN:  I think he's testifying about what

4   potential buyers look for, and he does not have personal

5   knowledge about that.

6           THE COURT:  Well, he's an investment banker.  He

7   buys and sells companies, right?

8           MS. SARKESSIAN:  I think, Your Honor, if he could

9   be more specific about the basis of that knowledge and

10  exactly who he's talking about.

11          THE COURT:  Well, is that a foundation for his

12  knowledge, Mr. Glueckstein?

13  BY MR. GLUECKSTEIN:

14  Q    Mr. Cofsky, can you back up a half-step and explain to

15  the Court your role in your transactions that you can recall

16  that have involved customer assets in the past?

17  A    Yes.  I want to try to be specific because this is a

18  unique situation.  And I would refer most specifically to, in

19  my declaration, I think, the other exchanges the other crypto

20  companies and the extent to which they clearly have indicated

21  that they value the identity of customers.  And they have --

22  all of the other crypto companies that we have evaluated have

23  programs in place to compensate for the provision of that

24  information.

25      We have also been a party to situations, as I indicated,

1  most recently in the Celsius case, where we have seen that

2  bids have explicitly provided incremental value for each

3  customer that is acquired.

4  Q    Have you, Mr. Cofsky, considered as part of your work as

5  proposed investment banker in this case the debtors' customer

6  list that they have available to them here?

7  A    I'm sorry.  Can you repeat that question, please?

8  Q    In the context of -- in the context of the work that

9  you've done -- that you're doing as the debtors' proposed

10  investment banker in this case, have you considered the

11  debtors' customer list as part of the strategic review that

12  you've undertaken?

13  A    Yes, we have.

14  Q    With respect to the ongoing strategic review, have you,

15  as the debtors' investment banker, formed a view as to

16  whether there is value in the debtors' customer list?

17  A    Yes, we have, and we do believe that there's value in

18  those assets.

19  Q    And can you explain for the Court the basis for that

20  conclusion?

21  A    Yes.  We believe that, whether the exchanges are

22  reorganized or whether they are sold in connection with our

23  process, both the exchanges that we're currently marketing,

24  as well as the core business that we're currently evaluating,

25  we believe that the value of the business is maintained and

1  maximized by ensuring that competitors are not able to

2  solicit those customers and onboard them onto their platforms

3  in a manner which would result in a reduction in the value of

4  the estate.

5       So, for example, if other businesses that compete with

6  FTX had the identity and were able to locate these customers,

7  solicit them, put them on their platform while FTX is in

8  bankruptcy and not currently operating in the ordinary

9  course, that would reduce the value of the estate.

10      Whether the estate, ultimately, is able to reorganize

11 its core business or whether third parties are evaluating the

12 acquisition of those exchanges, they will place, in our view,

13 a greater value on those exchanges if all of the customers

14 are maintained on that platform and have not found another

15 exchange on which to transact.

16 Q    Mr. Cofsky, with respect to -- we've been talking about

17 the customer information, do you view it important to

18 maintain, during your strategic review process, the anonymity

19 of both names, in addition to contact information, or are

20 contact information alone sufficient?

21 A    We -- it's a very good question and we -- we looked into

22 that.  We -- we reviewed the customer lists.  There are a

23 number of -- excuse me -- customers whose names are unique.

24 And we were able to, very quickly, locate them through

25 searches on social media, as well as other professional

1  relationship databases.  And we came to the conclusion that

2  it would be quite easy to locate, identify, and contact those

3  customers, even starting with only the customer names.  And

4  that relates to individuals, as well as businesses.

5  Q    Mr. Cofsky, if you could look at the declaration that

6  you submitted in this case that's in front of you.

7  A    Yes, I have it.

8  Q    And it's filed at Docket Number 411, entitled:

9         "Declaration of Kevin M. Cofsky in Support of the

10 Debtors' Motion for Entry of an Order Authorizing the Debtors

11 to Redact or Withhold Certain Customer Information."

12      Mr. Cofsky, were you involved in preparing the

13 declaration that was submitted to the Court at Docket Number

14 411?

15 A    I was.

16 Q    And do you believe, to the best of your knowledge, that

17 the information presented in that -- in your declaration

18 reflects your views, again, to the best of your knowledge?

19 A    Yes, I do.

20 Q    Okay.  If you can go to Paragraph 12 of your

21 declaration.  You state in the first sentence there:

22         "Additionally, it is well established that customer

23 information such as names and contact information are

24 separately valued intangible assets of an entity."

25      Do you see that?

1  A     I do.

2  Q     Can you explain to the Court the basis for the

3  statements that you made there in Paragraph 12 and beyond

4  that sentence in Paragraph 12?

5  A     Yes.  I'd answer that in a number of ways:

6        First, as indicated further in this particular

7  paragraph, in the context of a "business combination," as

8  that's designed by Accounting Standard Codification 805,

9  intangible assets are valued and allocated in a certain

10 manner, and customer-related assets, customer lists are a

11 component of that.  We thought that that was significant.

12       I also indicated in the paragraph, having reviewed some

13 academic literature, the -- in particular, the book by

14 Jeffrey Cohen, Intangible Assets:  Valuation and Economic

15 Benefit, again, the value ascribed to customer lists,

16 particularly the economic value that is indicated

17 particularly by instances where companies choose to keep that

18 information secret, to the extent that they can.

19       In addition, as I had indicated in the prior paragraphs,

20 it was very relevant, in our view, significant as we

21 evaluated this particular situation and the landscape -- the

22 competitive landscape within which this company operates,

23 that all of its competitors value this information.  This is

24 a new and expanding field.  And it's not entirely clear to

25 businesses that are seeking to expand their asset base and

1  their customer list exactly who they should be targeting.

2      And so all of the competitors that we looked at

3  indicated that they provide economic -- that they ascribe

4  economic value to these customers.  And the indication, the

5  evidence of that was -- I won't read through the words on the

6  page, but Binance and Coinbase and Kraken and Kucoin all

7  provide financial incentives for the referral of customers

8  and the retention of customers.

9      We also reviewed the bids that had been submitted in the

10  Voyager case and in the Celsius case and took note of the

11  fact that, not only were customer assets and lists being

12  acquired in -- and a value ascribed to the business itself,

13  but that there were actually incremental elements of value

14  which would be allocated to each customer that went onto the

15  acquirers platform.  And in the initial case of the prior bid

16  from FTX to Voyager, to the extent that customers maintained

17  their accounts on the platform for a period of time, they

18  would -- they would receive incremental value.  And so there

19  was specific value acscribed to each customer -- the name,

20  the identity, the assets -- as they moved onto the platform

21  of the buyer.

22  Q    Thank you.

23      With respect, Mr. Cofsky, if you look at Paragraph 13 of

24  your declaration, the last paragraph there.

25  A    Yes.

1  Q    You wrote in the declaration in the last sentence:

2         "I believe an important component of that strategy

3  is maintaining the confidentiality of customers' identities

4  and personal identifying information."

5       And then you end by saying:

6         "Disclosing those customer lists would therefore

7  jeopardize the debtors' ability to maximize value."

8       Do you see that there?

9  A    I do.

10  Q    Do you stand by that testimony this morning?

11  A    I do.

12  Q    And can you elaborate for the Court your view as to why

13  disclosing the customer lists would jeopardize the abilitiy

14  to maximize value?

15  A    Yes.  As I indicated, whether we reorganize, are able to

16  reorganize the businesses, or whether there will be an

17  acquisition of the core business and the other exchanges, we

18  believe that the business itself is comprised of a number of

19  components, and a significant component of the business is

20  the customers themselves.

21       The customer assets are obviously important.  But what

22  the customers choose to do going forward will be a

23  significant driver of value.  And we think that third parties

24  will place significant value on that in a sale process.  So,

25  to the extent that those customer lists, the identity of the

1  customers are able to be maintained without broad disclosure,

2  that will give buyers confidence that what they are buying is

3  actually of value, and that they alone will be able to

4  maximize the value of putting those customers onto their

5  platform.

6      I think the same logic holds for a reorganized entity.

7  To the extent that the exchange is able to be rehabilitated

8  and reorganized, it will, in our view, have more value if

9  those customers have not been poached and are -- by

10  competitors, and are, therefore, not transacting on another

11  exchange.

12 Q   Mr. Cofsky, Paragraph 6 of your declaration you

13  submitted to the Court, if you'd turn there.  It says -- you

14  write in the first sentence:

15          "The debtors, with the assistance of PWP, have

16  commenced an extensive outreach effort as part of marketing

17  the debtors; businesses and assets for potential sale."

18      Do you see that?

19 A   Yes, I do.

20 Q   And that sentence is accurate --

21 A   Yes.

22 Q   -- correct?

23 A   Yes, that's correct.

24 Q   Do you have any sense, at this time, how long the

25  process of outreach and monetization of assets and

1  reorganization is likely to take?

2  A    We have filed the bidding procedures for the four

3  exchanges, as you know, and have a time frame enumerated in

4  the bidding procedures.  We've had significant interest in

5  those assets to date.  We would expect that we will be in a

6  position to evaluate those potential -- if the Court approves

7  the bidding procedures and if we move forward with that

8  process, we would be in a position to evaluate those bids

9  relative to a standalone reorganization of those exchanges in

10 a matter of months.  I don't want to be too specific because

11 we're at the earlier stages of that process and there's a lot

12 of work that needs to be done.

13           Similarly, the core exchange, as the UCC counsel

14 indicated earlier, it's not too soon, and we have already

15 initiated a review of a reorganization of the core exchange

16 and that process is ongoing.  We, as you know, have not

17 launched a sale process with respect to the core exchange,

18 but we expect to run a simultaneous reorganization, as well

19 as sale process for that exchange.

20           I -- it's difficult to say with too much

21 specificity at this point, given the -- given the work that

22 will need to be done and the collaboration with the UCC on --

23 on the broader exchange process, the sale as well as the

24 reorganization efforts.  But I would expect that we'll be

25 talking a matter of months before that type of a sale and

1  evaluation of a reorganization will be initiated robustly.

2  Q    Thank you, Mr. Cofsky.

3          MR. GLUECKSTEIN:  No further direct, Your Honor.

4          THE COURT:  Okay.  Thank you.

5          Cross.

6          MS. SARKESSIAN:  Thank you, Your Honor.  For the

7  record, Juliet Sarkessian on behalf of the U.S. Trustee.

8          Your Honor, I just have a question, a

9  clarification.  Debtors' counsel asked the witness, you know,

10  did you participate the declaration, is it true and correct

11  to the best of your knowledge, information, and belief.  I

12  just want to be clear that the affidavit itself is not coming

13  into evidence and it is only the witness' testimony that is

14  coming into evidence.

15          THE COURT:  That's correct.

16          MS. SARKESSIAN:  Thank you.

17                     CROSS-EXAMINATION

18  BY MS. SARKESSIAN:

19  Q    Mr. Cofsky, you spoke about doing a search using just

20  the names of a number of the debtors' customers to see if you

21  could find other contact information based on their names,

22  correct?

23  A    Yes.

24  Q    And by "contact information," I assume, you know, an

25  email address, a street address, something -- telephone

1  number, something of that nature?

2  A    Yes, as well as information on social media platforms

3  and ability to identify the individual -- we believe identify

4  the individuals and their interest in crypto.

5  Q    And identify them in a way that you could communicate

6  with them?

7  A    Yes.

8  Q    How many names did you do that search for?

9  A    I directed my team to evaluate that.  I believe, of the

10  9 million customers, it was not close to 9 million, more than

11  a dozen, dozens, I believe; enough that, once we had a

12  sufficiently high probability of hit rate, we believed that

13  was indicative of our ability to identify these customers.

14  Q    So let me try to pinpoint this down.  Are you saying a

15  dozen, a few dozen?  What's the correct number?

16  A    I -- I don't have a specific number.  I believe it was

17  in the high teens.

18  Q    In the high teens.

19  A    Yes.

20  Q    Okay.  So less than 20 people.

21  A    I believe that we chose to search for under 20, and our

22  hit rate on those names was very high.  In other words, we

23  were able to, based on the names, locate information and be

24  able to correspond with -- we didn't correspond with, but we

25  believe we would be able to correspond with customers over 50

1 percent of the names that we searched on.

2 Q    Okay.  So you searched less than 20; and, out of those

3 20 names, about 50 percent you would have been able to -- you

4 were able to get some type of con -- some type of contact

5 information or some way to contact those individuals.

6 A    It was over 50 percent.  I don't know the specific

7 probability.  But yes, I think that generally characterizes

8 my comments.

9 Q    Okay.  And you did not run any of these searches

10 yourself.

11 A    I actually did run one or two.  But -- but in general, I

12 asked my team to do that, yes.

13 Q    And the names you picked, did you say that they were

14 unusual names, as compared to a Sue Brown or something like

15 that?

16 A    Yeah.  It's a good question because, to the extent that

17 there are generic names -- John Smith, Mary Jones -- yes, we

18 agreed that would be difficult to identify the specific

19 person.  We looked at names that were not of that type.

20      And in general, I was also very interested, I reviewed

21 the customer list myself to -- to assure myself that this was

22 an accurate assessment and to evaluate, to your point,

23 whether I thought that these names, in and of themselves,

24 were meaningful.  And there were -- again, I didn't do a

25 search of the 9 million customer names to give -- and I can't

1   give you a specific probability or percentage.  But a

2   significant -- the vast majority of the names were not of

3   that type, were not of the John Smith/Mary Jones type.

4   Q    Meaning the vast majority of the names that you searched

5   or the vast majority of the 9 million names are not --

6   A    I can't say the 9 million names.  I -- I looked through

7   the database and scrolled through the first several hundred

8   largest, so I went through in customer size order.  And the

9   vast majority of the names I saw were of a unique type that I

10  believed were not of the John Smith/Mary Jones type, where it

11  would not necessarily be useful to do a search for those.

12  Q    Were a good number of those names not, I guess I would

13  say common, say American names?  Were they names that might

14  be names of people living in other countries or names with --

15  you know, not a Sue Brown, that -- Sue Brown is a very

16  American name.  You know, we have customers, right?  All over

17  the world, right?

18  A    Yes.

19  Q    And so a name that might sound a little unusual in the

20  United States might not be that unusual in India or China.

21  Isn't that true?

22  A    I -- I think I understand your question.  In my

23  experience, there's a wide variety of names in the United

24  States.  We didn't place a lot of value in whether the name

25  sounded western or sounded Asian, for example.  We did a --

1 we tried to have a -- just an unbiased perspective as we did

2 the search.

3 Q    Are you personally familiar or knowledgeable about how

4 common a particular name might be in China or India?

5 A    I -- I -- I'm not sure how to answer that question.

6 What I can tell you is that, when we did the searches, to the

7 extent that there was a -- if there had been a large result

8 set from a particular search, such that we didn't believe

9 that we would actually be able to locate and contact and

10 correspond with a customer, then that would have put that

11 name, regardless of the reason, in the category of names that

12 we did not believe we could actually contact through a

13 search, again, regardless of whether it was a common name or

14 for any other reason; they didn't have a social media

15 presence, they protected their identification.  I -- I didn't

16 speculate.

17 Q    Thank you.

18       Now, with respect to non-individuals, institutional

19 customers -- and I understand that it would probably be

20 pretty easy to locate contact information for an

21 institutional customer, right?  You agree with that, right?

22 A    Depending on the institution, it may be easier, yes.

23 Institutions generally have more of a footprint.

24 Q    Although, there are -- I guess there are some

25 institutional customers that might not be that easy to find

1  contact information for.  You're saying smaller institutional

2  customers -- I -- institute -- I shouldn't use

3  "institutional."

4       Non-individuals.  Are there some non-individual

5  customers that might be harder to find contact information

6  for, with just the name and nothing else?

7  A    I -- I'm -- can you repeat the question?  I'm not sure

8  exactly what you're --

9  Q    Okay.  I'll move on.

10 A    -- asking.

11 Q    I'll move on to a different question.

12      With respect to non-individual customers -- I'm trying

13 to think of the best way to put this.  Companies that are

14 looking for -- competitors of the debtors, the people -- the

15 competitors you're concerned might poach customers.  With

16 respect to non-individual customers, institutional customers,

17 aren't there sources that those competitors could go to, to

18 find potential institutional customers that are interested in

19 cryptocurrency or keeping accounts on cryptocurrency

20 exchanges, other than looking at a customer list of a

21 particular -- of the debtors', for example?

22 A    I'm sure, if there are places where businesses that are

23 seeking to acquire customers -- I'm sure, if there are

24 indicators of interest in crypto, those businesses that are

25 seeking customers have already utilized those external

1   sources.  I don't know how that -- I guess I understand your

2   question, but I'm trying to be careful about how I answer it

3   only because I -- I -- I don't want to inadvertently share

4   information about the customers.  But there are a number of

5   institutional customers that are unique, and the names of

6   those -- excuse me -- institutions may not be widely known to

7   the public or to the competitors in this industry.

8        And so I don't know -- I don't believe that simply --

9   that the existence of other information sources materially

10  changes my testimony here.  I think the -- the critical

11  element here is that these institutions and individuals have

12  indicated by their activity on the exchange that they

13  participate in this particular activity and that they would

14  be valuable to a competitor or someone interested in

15  acquiring this business in the future precisely because they

16  have participated in this activity.

17  Q    Now, Mr. Cofsky, is it your understanding that, prior to

18  the bankruptcy filing, that all of the accounts of the

19  debtors' customers were frozen?

20  A    Yes, I believe that's correct.

21  Q    And they've been frozen since that time, correct?

22  A    To the best of my knowledge, yes.

23  Q    Are you aware that there are allegations of billions of

24  dollars of customer -- funds in customer accounts were

25  effectively raided to make loans to Alameda; are you aware of

1  those allegations?

2        MR. GLUECKSTEIN:  Objection, Your Honor.  I think

3  we're pretty outside of the scope of the testimony for this

4  motion.

5        THE COURT:  What's the relevance to his testimony,

6  Ms. Sarkessian?

7        MS. SARKESSIAN:  I believe that this witness'

8  testimony is that these customer names should not be

9  disclosed because they could be subject to poaching.  My

10  point is that I want to ask this witness to sort of develop

11  what the situation was coming into the bankruptcy with

12  respect to these customers and whether these customers might

13  be interested in moving their funds out of the debtors'

14  accounts for reasons that have absolutely nothing to do with

15  potentially being contacted by some other competitor.

16        I mean, this is not a regular case where, you know,

17  a business is having some financial trouble, they file for

18  bankruptcy, they might be able to reorganize.  They could be

19  able to keep the customers; or, if they sell the business,

20  the customers may want to go with it.

21        I would suspect that these customers may be rather

22  upset about the current situation; and, therefore, I don't

23  think poaching is the real problem here.  If the concern is

24  that these customers are going to leave the platform, I think

25  they may be leaving the platform for reasons that don't have

1   to do with poaching.  So that was my -- what I was trying to

2   develop with the witness.  But I guess I can save that for

3   oral argument --

4              THE COURT:  Okay.

5              MS. SARKESSIAN:  -- if we want to do it that way.

6              THE COURT:  Yeah, I think it is outside the scope

7   of his direct testimony, so ...

8              MS. SARKESSIAN:  Thank you, Your Honor.  I think

9   that finishes my cross-examination --

10             THE COURT:  Okay.

11             MS. SARKESSIAN:  -- of this --

12             THE COURT:  Thank you.

13             MS. SARKESSIAN:  -- of this witness on this

14  particular motion.  I will have cross on one of the other

15  motions.

16             THE COURT:  Understood.  Thank you.

17             Mr. Finger.

18             MR. FINGER:  Thank you, Your Honor.

19                       CROSS-EXAMINATION

20  BY MR. FINGER:

21  Q    Good morning, Mr. Cofsky.

22  A    Good morning.

23  Q    Just a couple of preliminary questions, if I may, before

24  we get into heavier stuff.

25       In your affidavit, you say you're a partner at Perella

1  Weinberg Partners, LP, correct?

2  A    Correct.

3  Q    And that is the debtors' proposed investment banker.  I

4  don't know if the Court (indiscernible) to that effect --

5           UNIDENTIFIED:  I'm sorry.

6  Q    -- but --

7           UNIDENTIFIED:  Could I just --

8           THE COURT:  Yeah.  We're having a hard time hearing

9  you, Mr. Finger.  You're going to have to speak up and --

10          UNIDENTIFIED:  Maybe move the mic.

11          MR. FINGER:  Yeah, I'm sorry, Your Honor.

12          THE COURT:  All right.

13          MR. FINGER:  Age has done its number on my voice.

14 BY MR. FINGER:

15 Q    You -- Perella is the proposed investment banker for the

16 debtors, correct?

17 A    Correct.

18 Q    Okay.  When were you asked to make this declaration, to

19 the best of your recollection?

20 A    I -- I don't recall if it was before the New Year --

21 Q    Okay.

22 A    -- or somewhere thereabouts.  Over the holidays, I

23 believe.

24 Q    So sometime in December.  Is that fair?

25 A    Yes, I believe that's correct.

1  Q    At Paragraph 4 of your affidavit -- declaration, you

2  identify a number of matters you've worked on.  Do you see

3  that?

4  A    I do.

5  Q    Which of those involved cryptocurrency?

6  A    None of those involved cryptocurrency.

7  Q    Okay.  Page -- at Paragraph 7 of your declaration, you

8  say that -- in the second sentence:

9        "A hallmark feature of cryptocurrency is a holder's

10 ability to remain anonymous to the public."

11      Do you see that?

12 A    Yes, I do.

13 Q    Okay.  Do you know whether -- are you familiar with

14 Bitcoin?

15 A    I am.

16 Q    Okay.  Do you know whether Bitcoin can be traced to the

17 holder?

18 A    I wouldn't put it in quite those terms.  When you say

19 "traced to the holder," I know that Bitcoin can be traced on

20 the blockchain and it can be traced to the wallet.  And so,

21 to the extent that one is able to identify the owner of the

22 wallet, one can trace to a particular user.  But tracing to

23 the wallet is not necessarily the same as tracing the -- it -

24 - identifying the owner of the wallet.

25 Q    Well, do you agree -- strike that.

1       Are you familiar with circumstances where authorities

2   have recovered Bitcoin or other type of cryptocurrency --

3   A    I'm --

4   Q    -- by --

5   A    -- generally --

6   Q    -- tracing it to the holder?

7   A    I'm generally aware of that, yes.

8   Q    Okay.  Now I want to turn to the statement you make in

9   Paragraph 9:

10          "I do not believe that it would be difficult to

11  look up and, in the case of the debtors' competitors, poach

12  the debtors' customers if their names were to be made

13  public."

14       Now the U.S. Trustee has asked you some questions on

15  that, and I'll try not to duplicate.

16       First, practically, the names you get, do they include a

17  middle initial?

18  A    In some cases, yes.

19  Q    Okay.  Would you agree that it might be harder to trace

20  someone, to find someone absent a middle initial?

21  A    I think it -- you say "harder."  Than what?

22  Q    If you --

23  A    Harder than what?

24  Q    I'm sorry.  I apologize.

25       If you have two names, Joe Smith, let's say, and one

1  says Joe Smith, and the other one says Joseph R. -- Joe R.

2  Smith.  Would the "R" be an identifier that could make it

3  easier to locate, track down the owner?

4  A    If your question is -- if you don't mind, I'm trying to

5  be helpful here.  The greater the lever of the identifying

6  information, as a logical matter, I would agree the easier it

7  would be to identify that particular user.

8  Q    Okay.

9  A    In this case, we -- we didn't look at the customer list

10 and simply speculate about whether we would be able to locate

11 and potentially correspond with users.

12 Q    Uh-huh.

13 A    We actually did the searches to determine whether that

14 would be the case.  So I -- I don't disagree with the logic

15 of incremental information being more useful than less

16 information, but we didn't rely upon the logic alone.

17 Q    Thank you.

18      Now, in response to questions from the U.S. Trustee, you

19 discussed the methodology your team used and the results they

20 recovered, correct?

21 A    Generally, yes, although I didn't go into too much

22 detail about the methodology.

23 Q    Have you made any documentation during that process to

24 either the U.S. Trustee or me?

25 A    You're asking have we provided any documentation with

1  respect to those searches and the results of those searches.

2  Q    Well perhaps I'm being presumptuous, so let me step

3  back.

4       In the course of that procedure were there written

5  notes, or reports, or results that were represented to you?

6  A    I did not review any written reports.  I don't know if

7  they exist.  I had conversations with my team.

8  Q    Okay.  So you are reporting to us statements made by

9  your team, correct?

10 A    That is correct.

11 Q    Do you know whether there was any documentation, be it

12 email, be it written findings, regarding this process and the

13 results -- and/or the results.

14 A    Yeah, I don't know.  As I said, I specifically recall

15 that I spoke with the team and directed them to undertake

16 these searches and then we followed up with a physical

17 conversation regarding the results.  I don't know if there

18 was any correspondence among the team members, but I don't

19 recall having reviewed a report on this question.

20 Q    So do you -- as best as you can recall, did your team

21 report back to you orally?

22 A    Yes.  That is correct.

23 Q    So there is no way -- strike that.

24      You would agree with me there is no way anyone, the

25 U.S. Trustee, me, or the Court, can validate what your team

1  did, is that correct, independently?

2  A    I think it would be -- it shouldn't be particularly

3  difficult to independently validate.  I think it would be --

4  I don't think you need to have this customer list in order to

5  undertake your own assessment of whether given a particular

6  set of individuals' contact information or names you would be

7  able to locate those individuals online and be able to find

8  enough information to be able to contact them.

9  Q    But I think you agreed, in response to questions from

10 the U.S. Trustee, that the degree of difficulty depends on

11 the degree of commonality of the name, correct?

12 A    I don't think that is exactly what I said.

13 Q    I am paraphrasing.  I agree.

14 A    Yeah, I want to be clear that to the extent that there

15 are names of the John Smith, Mary Jones type it would be very

16 difficult to identify -- it would be more difficult to ensure

17 that identification of that particular individual would be

18 the individual on the customer list just given the common

19 nature of the name.

20      So when we reviewed the customer lists I personally

21 reviewed the customer list to determine and evaluate the

22 extent to which the predominance were of that type of not and

23 my conclusion was that they were substantially not of that

24 type.  But, yes, I would agree that to the extent that there

25 is a very common name it would be more difficult to locate

1  that particular individual.

2  Q     Let me make sure I understand; did you review -- how

3  did you select the names?

4  A     I reviewed the customer lists to ensure -- to assure

5  myself, in the first instance, that -- I wanted to understand

6  the relative size, concentration. I wanted to understand the

7  extent to which the names of the institutions or the

8  individuals were unique or general in nature.

9      I then asked my team, whose more technologically savvy

10  then I am, to see if they would be able to locate these

11  individuals or institutions by using generally available

12  search technologies.  And the response was relatively quick

13  that there was a high hit rate in being able to locate these

14  individuals.

15      To be clear, the information that we were able to

16  locate was of a type that gave us a relatively high degree of

17  confidence that these were the right individuals.  We didn't

18  correspond with them and so we can't say with absolute

19  certainty, but their social media footprint indicated that

20  they had a significant interest in crypto.  And we evaluated

21  their postings on various social media platforms, etc., which

22  gave us a high level of confidence that the individual who we

23  were searching for was actually the individual that we had

24  located.

25  Q     Again, I am going to bear dance a little bit; you said

1  you reviewed the client list, correct?

2  A    The customer list, that's correct, yes.

3  Q    How many customers are on that list?

4       (No verbal response)

5  Q    I'll make it a little easier; as the opening today

6  counsel for the debtors used the number 9 million.  Does that

7  seem about right?

8  A    I have seen the number 9 million.  I did not search

9  through 9 million.

10 Q    How many did you search through?

11 A    Hundreds.  I -- so I had an Excel spreadsheet with that

12 information and it had the identifying information and the

13 entitlement amount.  I scrolled down, I can't say

14 specifically, but several hundred because I was interested to

15 know exactly -- again, as I indicated, I don't want to take

16 up too much time repeating myself, but I wanted to make sure

17 that, again, these would be unique names and identifiers.

18 Q    And what did you -- what methodology did you use to

19 determine that the 100 or 200 that you looked at were, in

20 terms of commonality, the names were representative of the

21 list as a whole?

22          MR. GLUECKSTEIN:  Your Honor, I'm just going to

23 object.  This was all asked and answered by the United States

24 Trustee.

25          THE COURT:  I think we did go through this

1  already, Mr. Finger.

2        MR. FINGER:  We did, but I don't think that --

3  maybe I'm wrong, but I don't think there was any specific

4  question regarding how the determination was made as to

5  whether this sampling is a representative sampling.

6        THE COURT:  I will give you some leeway, go ahead.

7  Let's not retread ground we have already been through.

8        THE WITNESS:  I didn't have a sophisticated

9  methodology. I used my judgment that after having gone

10 through page after page, after page, after page and seeing

11 relatively the same type of information that that would be

12 consistent.  I knew I wasn't going to search through

13 millions.

14        So after I scrolled through I believe that I also

15 asked my team to do a sampling. I didn't want to just focus

16 on the largest 20 customers, for example, but to be clear I

17 just exercised my judgment and I didn't have a specific

18 rubric or algorithm.

19 BY MR. FINGER:

20 Q    Did you have any guidelines in determining how common

21 or uncommon a given name would be other than your instinct?

22 A    Yeah, again, I did not have anything other than my own

23 judgment and my team's judgment to base that decision on.

24        MR. FINGER:  Thank you.  I have no other

25 questions.

1        THE COURT:  Thank you.

2        Anyone else wish to cross?

3     (No verbal response)

4        THE COURT:  Redirect?

5                    REDIRECT EXAMINATION

6   BY MR. GLUECKSTEIN:

7   Q    Mr. Cofsky, just very briefly.

8        Counsel just pointed you to Paragraph 4 of your

9   declaration.  That reflects certain experience.  Do you see

10  that?

11  A    Yes.

12  Q    Outside of what is listed there in Paragraph 4 can you

13  just state for the Court -- I believe you addressed this in

14  your overview at the beginning, but can you state for the

15  Court experience you have specifically in the area of

16  cryptocurrency in related companies?

17  A    Yes.  I have been involved in a number of other crypto

18  related situations including several capital raises for

19  bitcoin minors and other crypto companies; not specifically

20  focused on bitcoin, but other cryptocurrencies and other

21  business models as well, including IPO advisory and liability

22  management, both representing the company as well as

23  representing creditor groups.

24        MR. GLUECKSTEIN:  Thank you.

25        No further questions, Your Honor.

1        THE COURT:  Thank you.

2        Thank you, sir.  You may step down.

3        THE WITNESS:  Thank you.

4     (Witness excused)

5        THE COURT:  Any further evidence, Mr. Glueckstein?

6        MR. GLUECKSTEIN:  No, Your Honor.  We are prepared

7  to move to argument.

8        THE COURT:  Let me ask if the other objecting

9  parties have any evidence they wish to introduce.

10       MR. FINGER:  No, Your Honor.

11       MS. SARKESSIAN:  No, Your Honor.

12       THE COURT:  Thank you.  Go ahead.

13       MR. GLUECKSTEIN:  Thank you, Your Honor.  Again,

14  Brian Glueckstein for the debtors.

15       Your Honor, with respect to this motion most, but

16  not all, as we have just heard, of the relief requested in

17  the motion to protect the debtor's customer list and their

18  creditors and to streamline disclosures is uncontested this

19  morning.  The purpose of the debtor's request to redact

20  sensitive personal information of customers and other

21  stakeholders is to protect the value to the debtor's customer

22  list as an asset and to protect sensitive personal

23  identifying information of creditors.

24       There is no objection to redacting the addresses

25  of individual customers and other individual creditors.  That

1  information, subject to the Court's approval today, would

2  remain redacted.

3          The U.S. Trustee and the media objectors do object

4  to the debtor's redacting customer and creditor names.  And

5  with respect to the U.S. Trustee's objection the addresses of

6  non-individuals.

7          The objectors cite the general principals of the

8  right to public access to records and bankruptcy disclosure

9  requirements.  They do not articulate any specific harm being

10 suffered that requires disclosure today of the names and

11 institutional addresses on an immediate basis.  Nor do the

12 objectors recognize, in our view, the Court's role in

13 modifying those requirements for cause shown.

14         Your Honor, the debtors have been working hard to

15 strike the correct balance on this difficult issue

16 particularly in the still early stages of these Chapter 11

17 cases to ensure the protection of their assets and customer

18 information, but understanding the need for disclosure and

19 transparency.

20         Your Honor, these Chapter 11 cases, as we have

21 been hearing from when we first stood in front of you, are

22 unprecedented.  The debtors recognize that they have

23 generated significant public interest.  These cases also

24 present unprecedented challenges, but the relief requested,

25 including the redaction of customer names, has precedent in

1  this Court.

2         In Your Honor's well-reasoned opinion in <u>Cred</u>

3  where redaction of both names and identifying information of

4  a crypto currency platform's customers was permitted.  The

5  Court's reasoning applies here, but we submit the facts and

6  the evidence before the Court here are overwhelming against

7  immediate disclosure given the debtor's customer lists have

8  more than 9 million names and addresses on them.

9         The U.S. Trustee invites the Court to rip-up

10 precedent in this district and instead to simply adopt the

11 conclusions reached in the <u>Celsius</u> case by Judge Glenn in New

12 York.  We submit, Your Honor, that decision is an outlier and

13 certainly should not be wholesale adopted here, and it

14 doesn't need to be.

15        In order to strike an appropriate balance as to

16 the disclosure while providing the debtors and other parties

17 more time to evaluate options and ensure all restructuring

18 options for the debtor's assets, the debtors and their assets

19 remain available.  We are limiting our request today, as

20 reflected in our reply papers, with the support of the

21 creditors committee, to the redaction of names in the debtors

22 -- of the debtor's customers and addresses of institutional

23 customers for an additional six months subject to the right

24 to request further extensions of the redaction authority.

25        These redactions are appropriate and necessary to

1  protect the debtor's commercial information pursuant to

2  Section 107(b) of the Bankruptcy Code.  Section 107(b), as

3  the Court is aware, of course, permits the Court to protect

4  for cause the debtor's confidential information.

5       Mr. Cofsky's testimony before the Court makes

6  clear that the debtor's customer list, in his opinion as the

7  debtor's proposed investment banker charged with maximizing

8  the value of assets in such a process, including both names

9  and contact information are a key asset and a source of

10  value, potential source of value, at a minimum, for the

11  debtors.

12       Mr. Cofsky's testimony this morning explained the

13  companies that operate crypto asset management platforms work

14  to identify new customers, attract, and enroll them, and

15  establish them as customers.  Mr. Cofsky concluded that the

16  debtors would be harmed by the disclosure of customer names

17  even with the redaction of addresses.

18       We heard on cross-examination questions about

19  exactly how hard it would be, and is it easier or harder with

20  the middle initial to identify these customers and contact

21  them.  We would submit, Your Honor, that the level -- the

22  question before the Court today is not whether every one of

23  the debtor's customers could be or even would be immediately

24  contacted by competitors.

25       Mr. Cofsky's testimony and the positon of the

1  debtors is that we believe there is significant evidence that

2  that is likely to happen, at least with respect to

3  significant customers, with respect to customers that are not

4  known, as Mr. Cofsky testified this morning, in his view are

5  not widely known to be customers in the crypto currency and

6  digital asset space.

7        We would submit, Your Honor, that the conclusion

8  of the debtor's proposed investment banker is highly

9  probative of the limited question that is before the Court.

10  The Court's conclusion in Cred overruled a similar objection

11  from the U.S. Trustee on similar grounds.  The Court

12  concluded there that the debtor's customer list had some

13  "intrinsic value."  We believe here that is clear.  Where

14  we're talking about more than 9 million customers compared to

15  the 6,500 or so that were at issue in Cred.

16        Importantly, as I noted, while the case to keep

17  customer names and -- customer names confidential is, in our

18  view, compelling the debtors are seeking this relief today

19  only for a limited period of six months with the right to

20  reserve to seek extensions.

21        Your Honor, I also want to briefly address the

22  U.S. Trustee's arguments that granting this relief for any

23  period of additional time would somehow hinder the

24  administration of these cases?  We believe that is not true

25  at all.  All of the necessary information, Your Honor, is

1  being served, will continue to be served, and provided to

2  parties in interest as required.  The debtors have worked

3  when other parties have needed to serve documents to take on

4  that responsibility and to serve documents on the debtor's

5  creditor list where that, as I say, is necessary.

6          As in the interim order the proposed final order

7  that we submitted includes the Court's language that was

8  developed in Cred making clear that all parties in interest

9  retain the right to seek copies of any redacted documents

10  from the debtors or, if necessary, from the Court.

11          Your Honor, importantly, we believe that this

12  balance is appropriate for today.  If the redactions are

13  granted on this basis to preserve the debtor's assets, to

14  allow the strategic review process that is discussed, that's

15  at issue -- I'm sorry, before the Court in connection with

16  the bidding procedures today, the discussions that are

17  underway that Mr. Dietderich referred to in his opening

18  remarks, to allow all of that work to continue, and to

19  mature, to hopefully a plan or sale process that benefits all

20  stakeholders.

21          We're asking for the limited relief to maintain

22  that customer list in confidence for a period of six months.

23  If redactions are granted today on that basis the debtors are

24  not asking the Court, and we submit the Court doesn't need to

25  reach the issue at this time, of the propriety of redacting

1  customer names more permanently on the basis of Section

2  107(c)(1).  We reserve the rights on that issue, of course,

3  ands to come back to the Court, but we don't believe that

4  that issue needs to be adjudicated and we understand that

5  that question presents some difficult issues for not only the

6  Court, but for the debtors and other parties in interest.

7          Lastly, Your Honor, the debtors do request that

8  the Court authorize the redaction of individual non-customer

9  creditor and equity holder names to comply with the GDPR.

10  It's briefed in our papers.  That relief has historically,

11  from what we see, been relatively routinely granted by

12  Court's in this district.  The U.S. Trustee did not object to

13  that relief with respect to the interim order, but has

14  objected to it on a final basis.

15          We believe that the U.S. Trustee is taking that

16  position which seems to be a significant departure based on

17  the Courts' reasoning in <u>Celsius</u>.  We submit, Your Honor,

18  that that position is somewhat short-sided.  Citizens of the

19  covered countries have a heightened expectation of privacy as

20  a result of local law.  And as detailed in our reply papers

21  we do not believe there is a basis for the Court to conclude

22  that the GDPR does not apply to the debtors, and regardless

23  there is really no need to subject the debtors to potential

24  fines for violations which would only harm all stakeholders.

25          So with that additional relatively modest piece we

1  are limiting the relief today to the question around

2  maintaining the redactions with respect to the debtor's

3  customer list in its entirety including names and addresses

4  of institutional customers for a period of six months for

5  entry to the order with all parties rights reserved.

6             Thank you.

7             THE COURT:  Let me ask you a couple questions.

8  Does it matter that the customers here are not the exclusive

9  customers of the debtors?

10            MR. GLUECKSTEIN:  I don't think so, Your Honor,

11  because from our perspective, of course, there are customers

12  that probably, and I assume with 9 million if these are

13  people active in crypto, have investments on different

14  platforms.  And to the extent that those customers are

15  accessible through other sources, of course, they can be

16  contacted.

17            The question though before the Court, and that Mr.

18  Cofsky was testifying about this morning, is whether or not

19  we should put on the docket of this Court, effectively, 9

20  million names that allow the debtor's competitors and

21  potential acquirers of the debtor's assets and businesses

22  giving them the roadmap to say these are the folks, here are

23  the significant customers, they seek claim entitlement

24  amounts, let me try to contact those people.

25            So it's not a question of exclusivity, it's a

1  question of exclusivity with respect to the list that the

2  debtors have complied over time, you know, spending its own

3  resources to put this together, whether that asset should be

4  preserved.  We submit that it is, that it should.

5         THE COURT:  Why six months?  What is the

6  significance of asking for six months?

7         MR. GLUECKSTEIN:  There isn't a significance, Your

8  Honor, other then, I would say, a couple of things.

9         First, we want to try to be reasonable here and

10 take this incrementally.  We are not -- based on this we're

11 not asking for a permanent authority to redact on the basis

12 of preservation of the assets, again, with rights on 107(c)

13 reserved.

14        We looked at how long we think it will take to

15 move forward with a process to make, at least, a

16 determination as to whether the customer lists are part of a

17 sale process, are integral to a reorganization plan.  Are we

18 going to be standing here in six months and be able to -- can

19 I say definitively that in six months all of these issues

20 will be worked through?  I can't, but we think it's a

21 reasonable period of time where our thinking will be

22 substantially advanced from where it is today.  Is there a

23 magic to six versus eight or five, no, but we thought it was

24 a reasonable period of time.

25        The other piece, Your Honor, there are some

1  complications.  We know.  We discussed them at the first day

2  hearing with Your Honor around claims.  You know, once we set

3  a bar date and how the claims reconciliation process is

4  effected by these redactions.  Those are issues we are still

5  working through.

6         We don't believe, for a number of reasons,

7  including because of the SOFAs and schedules extension that

8  is before Your Honor today that we are going to be in a

9  position to set an early bar date in this case so that the

10  six month period factors into that to.  We don't think we're

11  going to be up against having to address some of the issues

12  that we discussed back in November around what happens after

13  we filed a bar date and all those claims remain.

14         THE COURT:  Well the bid procedure motion that you

15  have on that's for purposes of seeking to sell -- I think Mr.

16  Cofsky actually testified that the entities that are sought

17  to be sold pursuant to those procedures are exchanges,

18  correct?

19         MR. GLUECKSTEIN:  They are.

20         THE COURT:  So -- and that -- what is the --

21  remind me the proposed timeline for the sale of those assets

22  or, at least, the bidding is supposedly done by the end of

23  the month, right?

24         MR. GLUECKSTEIN:  I believe its -- I believe the

25  process in the bid procedures as contemplated -- I will refer

1 to Mr. Dietderich on the schedule.

2            MR. DIETDERICH:  Your Honor, Andrew Dietderich,

3 Sullivan & Cromwell.

4            It's a staggered schedule for the different

5 businesses, but it will take a couple of months, at least, to

6 get done.

7            THE COURT:  Okay.  And by then we will have some

8 understanding, at least from that process, as to whether or

9 not the creditor lists are going to be important to potential

10 purchasers.

11            MR. GLUECKSTEIN:  We will have some indication,

12 Your Honor.  As Mr. Cofsky testified this morning the main --

13 what I would call the main exchanges, right, so FTX.com, FTX

14 US, the main exchanges are not subject to the current

15 process.  We will be informed by the localized exchange in

16 Japan, for example, as to the relevance there, but I think

17 Mr. Cofsky testified this morning that the process for the

18 main exchanges will take longer because that process is not

19 yet formally underway as far as bidding procedures.  There

20 are lots of discussions that are ongoing.

21            I do think it is a good observation.  We are going

22 to start to be able to be informed by the different data

23 points.  The work that the professionals are doing, the

24 strategic review that is underway, and the sale process of

25 these other exchanges to have an understanding as to the

1  customer list.

2          So for all those reasons, Your Honor, we developed

3  six months as a proposal because we thought it was a very

4  reasonable next step.

5          THE COURT:  Thank you.

6          MR. DIETDERICH:  Your Honor, may I give you --

7  sorry to speak out of order, but Mr. Dietderich again.  May I

8  give you the actual proposed dates; now these are the

9  earliest possible sale hearing dates for the various

10 businesses, but they range from February 27th to March 27th.

11         The other point that may be factually relevant for

12 your consideration is we did, in the cooperation agreement

13 with the JPL in the Bahamas, commit to them that we would

14 work during a six month period on our project to consider a

15 potential reorganization of the international platform.  And

16 this customer information and data would, of course, be

17 important in connection with that work with them.

18         THE COURT:  Thank you.

19         Anything further?

20         MR. GLUECKSTEIN:  No.  Absent any other questions

21 from Your Honor I will cede the podium.

22         THE COURT:  Mr. Hansen.

23         MR. HANSEN:  Good morning, Your Honor.  Kris

24 Hansen with Paul Hastings, proposed counsel for the official

25 committee once again, Your Honor.

1            So, Your Honor, the official committee joins in

2    the debtor's arguments.  We filed a joinder to that effect on

3    the docket as well.  I wanted to add a couple of points for

4    the Court with respect to this issue.

5            Regarding the six months we collaborated on that.

6    We talked about how you create value associated with the

7    assets that the debtors are thinking about selling or

8    reorganizing.  And as you heard from Mr. Cofsky's testimony,

9    there is inherent value within the customer list associated

10   with these businesses.  And as the Court is, obviously, well

11   aware in connection with non-crypto businesses sometimes

12   parties will pay for customer list alone, sometimes the

13   customer list goes with those assets.

14           So the purchase and sale of customer information

15   is a vital component of any type of a retail oriented entity

16   and business.  And, obviously, from an exchange perspective

17   there were an awful lot of retail investors here.  And so

18   there is inherent value within those lists.  I think that is

19   uncontroverted.  I think everyone here agrees with that.

20           So in balancing that we looked at it and said

21   we've got two major tasks here.  One is to assess the value

22   associated with these assets from a sale perspective.  Two is

23   to assess the value associated with these assets from a

24   potential "reboot" is how we've been referring to it on our

25   side.

1          The reboot is complicated.  There are global

2    regulatory issues associated with rebooting the exchanges.

3    Everywhere that the exchanges operate there are regulatory

4    requirements that have to be met including the United States

5    and globally.  So it takes time to think through how that

6    works.  So it can't just simply be restarted in its existing

7    or prior form because there were issues associated with it

8    which, in some ways, we're here dealing with.

9          So it's a complicated exercise among many

10   professionals on all sides to be able to figure out exactly

11   what the steps are that are necessary to be able to think

12   about the reboot, but that reboot may unlock incredible value

13   for creditors and customers in connection with these cases

14   because it may open the ability to have something that is a

15   going concern, that could be sold, or could be distributed

16   from an equitization standpoint in connection with a more

17   fundamental plan of reorganization.

18          Then, obviously, with respect to the sales you

19   have the four assets that the debtor is seeking to sell at

20   the moment.  We have more to say about that later when we

21   come to the bidding procedures, but with respect to Embed,

22   LedgerX, FTX Europe, and FTX Japan, as Your Honor noted, two

23   of them are -- so LedgerX and Embed are non-debtors and those

24   are currently operating.

25          So the customers of those entities and the

1  information associated with those entities, to the extent

2  that they overlap with the information that debtor is seeking

3  to protect here those are ongoing businesses which are

4  interacting every day.  There could be damage done to the

5  value of those businesses by disclosure of those customers.

6          Similarly with respect to FTX Europe and FTX

7  Japan, from the committee's perspective, we're just rolling

8  up our sleeves. We are trying to understand what it is that

9  is being sold here and what the value is.  And tracking back

10  to Mr. Cofsky's testimony and the point I made a moment ago

11  there is inherent value in the customer list.  And so when we

12  look at it and say if that information was disclosed today

13  without the opportunity to do more diligence to determine the

14  inherent value in them that could do damage and it could

15  seriously reduce the amount of distributable assets to

16  creditors in connection with the cases.  That would be a bad

17  thing.

18          From our perspective, Your Honor, in a situation

19  where there has been a global fraud and no one yet knows what

20  the recoveries in these cases are going to be we need to make

21  sure that we preserve the assets as best as we possibly can.

22  We understand the competing interests that the media and the

23  United States Trustee have noted with respect to

24  transparency, but we just don't believe that there is a true

25  interest in the media for in the broader universe of parties

1  -- potential party's interest in the cases of understanding

2  who the customers were.

3          You have to think about like what is the purpose

4  behind that versus the very clear and articulated purpose of

5  trying to preserve value.  So when we come back to that six

6  month window and we ourselves, on the committee side, with

7  our professionals have said it's going to take a significant

8  period of time to really understand the reboot and really

9  understand the asset sales.

10          To Your Honor's point, the earliest dates, which

11  we think are too early, come up on February 27th and March

12  27th with respect to the assets that are currently being

13  sold.  We will get a better look at the real interest of

14  parties associated with the customer lists within that

15  window, but we probably won't have the (indiscernible)

16  because we think those are coming on too quickly.

17          So, again, Your Honor, and I would echo Mr.

18  Glueckstein's point with respect to 107(c).  107(c) we do

19  believe that -- and at a further hearing we can get into with

20  the Court, to the extent that the Court wants us to, that

21  there are real risks to customers in connection with the

22  disclosure of identities.  There are news stories and

23  information that demonstrates that there have been

24  kidnappings, there have been thefts, there have been other

25  types of violent acts committed against people within the

1  crypto community and that is a very real risk and a very real

2  concern.

3          With respect to the information that we're talking

4  about today and the reason to protect it under 107(b) it's

5  absolutely crystal clear that this is commercial information

6  of the debtors and that it has value, and that there is a

7  very clear case to be made that Your Honor can protect that

8  information for the temporal period that we've asked under

9  107(b).  We reserve rights on 107(c) and if the Court would

10  like further briefing on that and testimony on that we can do

11  that, but we think you have enough of a record to cover it

12  from a 107(b) perspective today.

13          So, Your Honor, if you had questions for me I

14  would be happy to answer them.

15          THE COURT:  No, no questions.  Thank you.

16          MR. HANSEN:  Thank you.

17          THE COURT:  Could we turn up the microphones on

18  the stand.  It's as high as it will go.  Everybody has got to

19  keep your voices up.  I mean I can barely hear some of it and

20  I'm sure the people in the back probably can't hear it very

21  well.

22          Anyone else want to speak in support before we go

23  to the objectors?

24      (No verbal response)

25          MR. HARVEY:  Excuse me, Your Honor, and may I

1  please the Court Matthew Harvey from Morris, Nichols, Arsht &

2  Tunnell on behalf of an ad hoc committee of non-US customers

3  of FTX.com.

4          We filed a joinder in this motion of the debtors,

5  Your Honor.  We support the debtors in their efforts to seal

6  this.  I think from the customer's perspective they have the

7  107(c) issue which is not going forward today in terms of

8  their own interest and protecting their own information, but

9  also the debtors and the committee have identified, I think

10  rightly, the customer list and the potential value in either

11  a sale or restart of the platform as an avenue for recovery

12  for members of our ad hoc

13          We do think it's important, particularly for the

14  preliminary matter, the debtors have requested for six months

15  to protect this information to allow the process to play out

16  and allow the debtors to determine the best path forward with

17  this customer list.

18          THE COURT:  Thank you.

19          MR. HARVEY:  Thank you, Your Honor.

20          THE COURT:  Ms. Sarkessian.

21          MS. SARKESSIAN:  Your Honor, would it be possible

22  to have a five minute break?

23          THE COURT:  Certainly.  Well let's make it --

24  let's make it 10 minutes just so everybody has -- well we got

25  a lot of people here, let's make it 15 minutes so everybody

1  has time to use the facilities.

2            So we will recess for 15 minutes.

3            MS. SARKESSIAN:  Thank you.

4       (Recess taken at 10:39 a.m.)

5       (Proceedings resumed at 10:58 a.m.)

6            THE COURTROOM DEPUTY:  All rise.

7            THE COURT:  Please be seated.

8            Ms. Sarkessian.

9            MS. SARKESSIAN:  Your Honor, Mr. Finger asked if

10  he could go first.

11           THE COURT:  Okay.

12           MR. FINGER:  Your Honor, at the outset of my

13  comments I move to strike the debtors reply because it

14  introducing new material which should have been included in

15  his opening brief, and has been raised for the first time.

16  For example, Paragraph 17 debtors invoke Japanese law.  Two

17  laws, the acclimate protection of personal information and

18  the Financial Instruments and Exchange Act.  They should be

19  waived; however, because they have raised them to protect my

20  client.

21           The first one, the APPI Section 17(3) allows the

22  use of such information when doing so is necessary to

23  cooperate with a "national government organ" of a foreign

24  company.  Now there can be a debate back and forth as to what

25  that means.  Usually when Courts deal with foreign nation's

1   law expert testimony is required.

2            The point here is that --

3            THE COURT:  Not always.

4            MR. FINGER:  Not always.  I --

5            THE COURT:  I can look it up in Martindale-Hubbell

6   and that is sufficient.

7            MR. FINGER:  I don't -- I never mean to -- but

8   there has been nothing provided to this Court showing that

9   this article section does not apply.  And as for the

10  Financial Instruments and Exchange Act that law applies to

11  securities trading.  Most crypto is not deemed a security and

12  so it's outside FIEA's jurisdiction.  Some tokens are, but

13  debtors have not established that their crypto falls within

14  the jurisdiction of the FIEA.

15           Similarly, for the same reasons --

16           THE COURT:  Well this isn't just their crypto,

17  right?

18           MR. FINGER:  I understand.  Yes, Your Honor.  The

19  crypto involved -- I will make a -- crypto involved in this

20  matter.

21           THE COURT:  It doesn't mean the debtors in this

22  case have more than just their own crypto on the exchange.

23  They were in exchange for all types of crypto, right.

24           MR. FINGER:  But the point being that if it is not

25  -- if the crypto involved, be it their own or their

1  customers, is not within that limited categories then it is

2  outside the jurisdiction of FTI.  This is a red herring.

3          For similar reasons, Your Honor, we want to strike

4  the testimony of Mr. Cofsky.  His testimony -- first, his

5  affidavit was provided three days ago with no real

6  opportunity to test it.  Not even in this Court we've had no

7  opportunity to depose Mr. Cofsky or his staff who worked on

8  this thing.  His testimony was very general.  They looked

9  through social media, they picked certain names.  We had no

10 opportunity to test that.  They were obligated to provide

11 this information in their opening motion.

12         But now let's turn to the justifications given for

13 sealing.

14         THE COURT:  Just to close the loop on this, Mr.

15 Finger, I will deny both of those motions.

16         MR. FINGER:  All right. Thank you, Your Honor.

17         The justification for sealing, they claim the risk

18 of identity theft and cyber scams.  Think about all of the

19 creditor's lists that have been publicly identified in

20 bankruptcies over the decades.  Let's just even limit it to

21 when Pacer came along.  With all of that there is absolutely

22 no evidence presented to this Court that there are any

23 identity theft or scams occurred as a result of those

24 creditor lists being made public.  It's no counter to say

25 this case is different because it involves crypto currency.

1          THE COURT:  I think they're not pursuing the

2    107(c) basis for sealing the customer list at this point.

3          MR. FINGER:  Not the customer list, but this is

4    also a list of creditors.

5          THE COURT:  Well I guess there's a question, are

6    they creditors, or are they customers, or are they both.  It

7    could be both, but I don't know.  At this point in the case I

8    don't know.

9          MR. FINGER:  The fact that that is not established

10   -- well, never mind I will withdraw that.

11         The fact is identity thieves don't care what the

12   nature of the business is, they just want names to use.

13         Your Honor heard some testimony about commonality

14   of names.  In fact, Your Honor, I did an experiment last

15   night through a website called TruthFinder.com.  I put in

16   Your Honor's name and came back with 58 people who share your

17   name; 57, I'm sorry.  Now, in candor, that lists the

18   differentiation because it included middle names and middle

19   initials.

20         We have no objection to redaction of middle names

21   or middle initials, but there is nothing before the Court

22   that tells the Court how many of the names that have been on

23   the list do not have multiple people with those names. Its, I

24   think, a stretch to say, well, if we're able to go through

25   five or six people of the same name and we come up with them.

1 Even Mr. Cofsky testified that it becomes harder if it's a

2 common name.  To extrapolate from that is harder when there

3 are numerous people sharing the same name, but that is

4 shooting in the dark and that is not enough of a threat.

5        Of course, using identity theft as a justification

6 for sealing leads to the conclusion that all creditors or

7 customer lists in every bankruptcy can be sealed to protect

8 the creditors.  Your Honor will be creating a per say rule.

9 Debtors have not provided any polling of a random sampling of

10 their customers to assess their fears of disclosure for cyber

11 bullying or cyber scamming and identity theft.  None of the

12 debtor's customers here is claiming concerns.

13        THE COURT:  I think you had one ad hoc group that

14 came forward and was supportive of the debtors.

15        MR. FINGER:  The ad hoc group, as I understand it,

16 were claiming their concern is not under cyber scamming, but

17 as to their rights under foreign law to confidentiality.

18        Turning to the poaching and reducing the

19 commercial value of the list, again, this goes back to how

20 common the names are, and there's been no effort to try to

21 segregate; it's the baby in the bath water.  William Smith,

22 Maria Garcia, James Johnson, Daniel Brown, Thomas Miller.

23 Again, the Google search said that these are examples of

24 common names of the most common name combination in the

25 United States.

1           So the potential for poaching, I respectfully

2   submit, is not enough. Its high evidentiary standard they

3   have to meet and the fact we provided cases to Your Honor --

4   in responses to Your Honor which says that.  A statement that

5   something could happen and in the absence of evidence showing

6   it is likely to happen or will happen does not satisfy the

7   first amendment evidentiary standard.

8           As for the GDPR I would draw the Court's attention

9   to a case In Re Avandia Marketing Sales Practices & Products

10  Liability, it's an Eastern District of Pennsylvania case in

11  2020, 484 F. Supp 2d, 249.  The Court ruled that applying

12  principles of comity, denial of public access based upon a

13  foreign law would be contrary or prejudicial to the interests

14  of the United States, but even apart from that Section 49.1

15  of the GDPR says there is an exception to the requirements of

16  that law for "the establishment, exercise or defense of legal

17  claims."  Defendants have not even mentioned this, but

18  certainly not have established that the exception is

19  (indiscernible).

20          Debtors argue at Paragraph 3 of their reply that

21  the objectors did not articulate any bonafides reason for

22  disclosure at this time; however, this confuses the burden.

23  Judicial documents are presumptively public and the public is

24  entitled to see them as soon as their filed and they become

25  part of the judicial record.  The purpose of public access is

1  to ensure public confidence in our Courts and their rulings.

2  The burden is on the debtor to explain why sealing is

3  appropriate and not vice versa.

4         We also believe it's inappropriate to ask for a

5  six month stay or delay with no assurances -- certainly no

6  assurances that that will be the end of it, but even in the

7  event that there are assurances I quote from the Supreme

8  Court case Elrod v. Burns:

9         "The loss of first amendment freedoms, even for

10  minimal periods of time, unquestionably constitutes

11  irreparable injury."

12         Public access is derived from the first amendment

13  as does Section 107.

14         Paragraph 16 of their reply debtors reiterate that

15  the customers are identified the value of the business "could

16  be materially harmed, diminished or disputed."  As I

17  mentioned earlier, we cited cases in our brief which they did

18  not respond to in their reply, our brief in the opposition

19  stating that speculating as to what could happen as opposed

20  to showing with evidence what will happen is insufficient to

21  meet their evidentiary burden.  There is a case out of

22  California we cited in our brief, but also the Celsius case

23  out of New York states the same thing.

24         As to the In Re Cred case I was not involved, Your

25  Honor was.  I will not presume to imagine Your Honor's

1  considerations in that case.  But an objective reading of

2  Your Honor's opinion seems to think that the Court was not

3  necessarily focusing on evidentiary requirements or the

4  argument that there was no evidence supporting sealing.

5  Since then the Celsius case has come out and while if another

6  Court and is not binding on Your Honor, Your Honor is free to

7  consider it as persuasive precedent in reassessing the Cred

8  case.

9       At Paragraph 28 of their reply the debtors cite to

10 a number of cases where this Court has allowed redacting

11 names pursuant to GDPR; however, defendants fail to point out

12 that with the exception of the last one of those cases listed

13 those motions were granted as unopposed which there was no

14 opposition.  And unopposed -- orders based on unopposed

15 motions have no precedential value.

16      The last one was proposed by the trustee and there

17 was no new analysis in it.  So it lacked persuasive force.

18      So in sum there is no competent evidence that any

19 of the evils asserted by the debtors, identity theft,

20 devaluation of the customer list by poaching, violations of

21 international law, present a genuine or substantial risk.

22 All the debtors have presented to the Court are speculation

23 unsupported by competent evidence; however, to the extent

24 that redaction is required it must be limited, as limited as

25 possible, to meet the goals.

1          Redacting the addresses allows this and I throw in

2    redacting middle names and initials.  This is sufficient and

3    if the Court is inclined to redact that should be the limit

4    of it.

5          Unless Your Honor has any questions I yield the

6    podium.

7          THE COURT:  Thank you, Mr. Finger.

8          MS. SARKESSIAN:  Thank you, Your Honor.  Again,

9    for the record, Juliet Sarkessian on behalf of the U.S.

10   Trustee.

11         Your Honor, the bankruptcy process operates like

12   the rest of the Court system on the bedrock principle of

13   American jurisprudence that the public has a right to access

14   of judicial records and only under very limited circumstances

15   may a Federal Court restrict of deny that access.  Here, the

16   debtors are seeking a very wholesale redaction of a lot of

17   information on any papers to be filed.  That is what they

18   say, any papers to be filed in this Court or may, otherwise,

19   made publicly available in the Chapter 11 cases.

20         They are looking to redact names, addresses, email

21   addresses of all customers whether they be individuals or

22   entities, the names, addresses and email addresses of all

23   non-customer individual creditors or equity holders if they

24   are citizens of the UK or member nations of the EU, and maybe

25   now Japan. I am not quite clear about that.  And then also

1  the addresses and email addresses of all other creditor or

2  equity holders who are individuals regardless of their

3  citizenship.  Of course, the U.S. Trustee has said we do not

4  object to the redaction of addresses residential or any

5  addresses with respect to individuals; whether they be

6  citizens of the EU, the United States, or anywhere else.

7           Now the debtor's counsel started out stating that

8  bankruptcy is a fishbowl.  We have heard this many times.

9  And, in fact, that the debtors welcome that.  The committee

10 said the cases need to be transparent.  We agree with that;

11 however, that is not what has happened in this case.

12          In the interim order entered on this motion the

13 debtors -- excuse me, the Court allowed the debtors to file a

14 creditor matrix under seal with a redacted version then to be

15 filed.  It's been two months.  There is no creditor matrix on

16 file, not under seal, not redacted, nothing.  I double

17 checked last night, I sent an inquiry to debtor's counsel to

18 make sure I had not missed it, it's my understanding, and

19 they can correct me if I'm wrong, that is still not on file.

20          So we don't know who any of the creditors are in

21 this case, be it customers or anybody else.  We don't know

22 who the top 50 creditors are because that was all redacted.

23 We don't have any monthly operating reports.  The first ones

24 were due December the 21st.  I don't know when we're going to

25 see any monthly -- actual monthly operating reports.  The

1  debtors have proposed to file some type of aggregated report

2  of some kind that is not a monthly operating report and then

3  later at some point in time, we don't know when, they will

4  start filing proper monthly operating reports.

5          We don't have schedules, we don't have statement

6  of financial affairs, we don't have Rule 2015.3 reports.

7  Yes, we have now come to an agreement about when those are

8  going to be filed, but the majority of them will not be filed

9  until March the 15th.  The debtors have reserved the right to

10 ask for further extensions.

11         So we have very little information here. This is

12 the opposite of a fishbowl.  And redacting customer and other

13 creditor information to the extent that the debtors are

14 seeking is only going to add to that lack of transparency.

15 And here what we are talking about is we're talking about

16 redaction as very essential documents that are part of the

17 bankruptcy case; the creditor matrix, the schedules, the

18 statement of financial affairs, professional disclosures they

19 have been redacted as well to the extent that there was a

20 reference to a customer name or an individual creditor.

21 Those were redacted.

22         So these are all really critical documents that

23 are part of the bankruptcy process.  And there needs to be --

24 the case law says, that we have cited, there needs to be a

25 showing of extraordinary circumstances and compelling need

1   for these types of redactions, before any type of redactions,

2   but especially on such fundamental documents that are part of

3   the core of the bankruptcy case.

4          Here the debtor has really nothing more than some

5   vague statements, and I will get it into, in a minute, Mr.

6   Cofsky's testimony, but very, very limited testimony or

7   evidence about something that requires a showing of

8   extraordinary circumstances.  We do not believe they have met

9   their burden and it is the debtor's burden here to establish

10  that the information can be sealed under either 107(b) or

11  107(c).

12         If Your Honor could bear with me for a moment,

13  please.

14         So 107(b)(1) talks about confidential commercial

15  information.  Now the debtors and the committee keep

16  referring to a customer list.  It's not a customer list, it's

17  a list of creditors.  It's the creditor matrix, it's the list

18  of creditors in the schedules, in a professional disclosure,

19  and it's a reference to somebody who is a creditor.  They may

20  also be a customer, but we're not talking about a separate

21  document that is a customer list.

22         I suppose what the debtors would say was, well, we

23  have so many customers who were creditors that if you looked

24  at the creditor matrix, whenever it may be filed, that one

25  could assume that most of those people are customers and not

1  other kinds of creditors.  There is not going to be any

2  distinction, there is not going to be like a separate section

3  that these are customer creditors and these are other

4  creditors.  It's a creditor matrix.  Same thing with the

5  schedules, there is no distinction -- I mean there is a

6  distinction based on priority if it's a general unsecured

7  claim, but there is not a distinction between creditor

8  customers and creditors who are some other kind of creditor.

9         With respect to -- even assuming that the debtors

10  would be correct in making that argument that competitors

11  will just assume that everybody on that list is as customer,

12  Your Honor made the point that many of these customers may

13  not be exclusive customers, they may already dealing with

14  competitors.

15         With respect to -- I think the point is very

16  important in terms of poaching.  Again, all we are talking

17  about for individuals are their names and no other

18  information.  Yes, for institutional or non-individual

19  creditors the U.S. Trustee believes that it is appropriate to

20  include their addresses as well as their names, but for the

21  individuals it would just be their names.

22         Mr. Cofsky's testimony that, well, just a name

23  alone, just a customer name alone would give you an ability

24  to find information to contact them.  That was based on not

25  even any work he personally did.  He had a staff look at less

1   than 20 names on the -- out of the 9 million names less than

2   20, there was no methodology that was explained as to how

3   they picked the names, although he indicated -- I believe he

4   indicated they looked for names that were not extremely

5   common; although, again, I would make the point that there

6   are names that might be uncommon in the US, that look

7   uncommon to us because we're not familiar with them, that

8   might be very common in other parts of the world.  I am

9   always surprised I see names and I think, oh, that is an

10  unusual name and then find out, oh, that's actually very

11  common in Japan, China, or whatever the country might be.

12          So we don't have any methodology.  There was less

13  than 20, that's nothing.  And out of the less than 20 he

14  said, well, more than 50 percent we could get information on.

15  So it wasn't even out of the 20 or less then 20, you know, we

16  were able to get information on all of them.  That's a very,

17  very slender thread, based on hearsay evidence, but even if

18  it wasn't, a very slender thread to say, all right, because

19  of less than 20, 50 percent of those, you were able to find

20  some contact information, whether that's the same person or

21  not, who knows, but potentially, it could be the same

22  customer.  That's a very, very slender thread to say,

23  therefore, you may redact all customer names from every

24  single document that's going to be filed in the case.

25          Now, let's talk for a moment about this six-month

1   restriction.  Six months is a really long time in the

2   bankruptcy world; as Your Honor is aware, a lot happens.  In

3   this case, during these six months, we are hopefully, going

4   to have schedules and statements filed.  This information is

5   relevant to that.  Sales will be taking place.  Hopefully, a

6   creditors matrix will be filed at some point.  A lot happens

7   in six months.

8           And then, of course, at six months, they're going

9   to come back and they may still ask for another extension.

10  But even if it's only six months, that information is

11  important information to be out there, and, again, we're

12  going to be getting schedules and statements that have so

13  much redacted, they're probably going to be next to worthless

14  for anybody who doesn't see the unredacted version.

15          And, Your Honor, I would also like to make the

16  point that I was trying, very ineffectively, to make with

17  Mr. Cofsky.  This is not a situation where you're coming in,

18  where the customers of the debtor, you know, are likely to be

19  happy with the situation.  Well, maybe that's true in all

20  bankruptcy cases, but you have a very extraordinary situation

21  here.  You have a situation where the customer accounts were

22  frozen prior to the bankruptcy filing and have been frozen

23  since then.  These customers, the online customers cannot get

24  access to cash, coin, whatever might be in those accounts.

25  No access.

1          At the same time, they learned that there were

2  allegations of a massive fraud, that customer accounts were

3  raided and the funds were transferred to Alameda in the

4  amount of $10 billion of customer funds.  So, it's probably

5  reasonable to think that these individuals, these customers

6  with all of this happening, if they're going to other

7  platforms.  Well, they can't have access to their funds yet,

8  but when the time comes when they have access to their

9  accounts, they may be looking for competitors or they may be

10  looking to transfer this to traditional banks.

11          So, you know, it's not a situation where you have

12  a customer base that might be relatively happy, the debtor

13  files for bankruptcy, and now you're worried, you know, they

14  would be happy, but now you have competitors coming and

15  poaching them.  I would say, you know, I think it's

16  reasonable to assume that these customers, many of them, are

17  very unhappy with the current situation and are probably, you

18  know, very well may, on their own, be looking to transfer

19  when they can or maybe, like, I would say ripe for the

20  poaching if any competitor came along.  So, I think the

21  situation is different than other types of cases.

22          Then I want to talk a minute about the 107(c)

23  argument.  So, if I understand correctly, the debtors are now

24  saying that they want to hold off that argument until another

25  time.  Their motion made an argument under 107(c).  They

1    cited that statute.  We responded.  Our objection was filed

2    on December the 12th.  They've had, virtually, a month.

3    They've had plenty of time.  The Committee addressed it.

4              I don't understand this.  Like, if they had any

5    evidence to put on that point, today was the day to put on

6    the evidence and there was no evidence that in name alone,

7    could subject an individual to any type of harm, be it by --

8    I don't know if it was the Ad Hoc Committee's counsel,

9    somebody talked about kidnapping with a name.  We don't even

10   know what country these people live in.  There's no evidence

11   of that.  There's no evidence of identity theft, based upon a

12   name and nothing else.  There's no evidence presented that a

13   customer's accounts could be hacked with just a name.  No

14   evidence on that.  Or that the person's safety could be

15   compromised.

16             And the Ad Hoc Committee, of course, cited to Your

17   Honor's ruling in Cred, also cited to Judge Owens' ruling in

18   Clover, and they attached the transcript.  Clover had to do

19   with residential addresses, not, you know, names.  Not names

20   alone.  I think there were 10 members of the European Union

21   in there and there wasn't much discussion of that, but apart

22   from those 10, they were talking about residential addresses;

23   again, we are not objecting to that.

24             And, frankly, Your Honor, if you get to the point

25   where you are redacting individual creditor's names, not the

1   addresses, but their names, as well, with the idea that,

2   otherwise, there could be identity theft, the amount of

3   sealed filings in this court would be enormous, I mean, every

4   single, including Chapter 7 and Chapter 13 cases.  Debtor's

5   name, the individual creditors, all those -- proofs of claim

6   filed by individual creditors, is all of this going to be

7   filed under seal?  It's not a workable -- it's not workable

8   and there's nothing under 107(c) that would support redacting

9   names based on the idea that, otherwise, there could be

10  identity theft.  But, again, there's been no evidence and if

11  there was, this was the day to put on the evidence on that

12  point.

13          So, to recite an issue on the burden of proof, we

14  cited the Third Circuit case, Cendant Corp., that the debtors

15  have the burden of proof on 107(b), as well as 107(c).  And

16  under 107(b), again, the debtors must establish and

17  demonstrate an extraordinary circumstance and compelling need

18  to obtain protection.  That's from Food Management, which I

19  believe is actually from the Southern District.

20          I'll also mention that, you know, in Mr. Mosley's

21  declaration, which came -- that was filed in support of the

22  initial motion, he used the term, he said public

23  dissemination of customer lists could give the debtors'

24  competitors unfair advantage.  He didn't say, "would"; he

25  said, "could."  So, that's a very low level of argument to

1  meet an extraordinary-circumstances test.

2         So, let's speak a little bit about foreign law.

3  First of all, as we stated in our objection, we're in a

4  United States Federal Court.  United States federal law

5  controls over foreign law.  We cited a Supreme Court case on

6  that point.  Not in this exact connection, but with regard to

7  a French blocking statute.  But beyond that, as Mr. Finger

8  made the point, and we made the point in our objection, that

9  this does fall within the exception of the GDPR because this

10  is a legal proceeding and there's a legal claims exception

11  for that.

12         Now, the debtors, in their reply -- in their

13  initial motion, the debtors' discussion of the GDPR was in

14  one paragraph, paragraph 20.  It references the GDPR.  It

15  doesn't even provide a citation as to where to find it.  It

16  doesn't quote from it.  It says the GDPR may apply to the

17  debtors -- may -- and it doesn't even say what it is that the

18  GDPR protects, other than it says home addresses of

19  individuals, which again, not an issue -- we're not objecting

20  to that.  So, obviously, we spent a lot of our objection

21  going into the details of the GDPR.

22         But I want to look at in the reply, the debtors

23  did make two arguments, with respect to the GDPR, that I

24  would like to address.  So, the first one, in paragraph 25 of

25  their reply, the debtors argue that while the U.S. Trustee

1  notes that processing of personal data is lawful if it is,

2  "necessary for compliance with the legal obligation to which

3  the controller is subject," the U.S. Trustee ignores that any

4  such legal obligation, "should have a basis in union or

5  member-state law," not in U.S. law.  And they cite

6  Article 40 -- excuse me -- Recital 45 of the GDPR.

7            Recital 45 of the GDPR says, for the debtors to

8  process information, meaning, to collect information, code

9  it, transform it to a usable format, the processing has to be

10 legal under the laws of the EU or its individual member

11 states.  The recital does not say anything about compliance

12 with laws outside of the EU.

13           And Recital 45 is not relevant to what we're

14 talking about.  It's a different issue.  It's not talking

15 about an exception for when this information can be

16 disclosed; it's talking about the way in which the

17 information is processed.  It must be processed under the law

18 of the applicable EU state.

19           The second argument that the debtors make in

20 paragraph 26 of their reply says that the U.S. Trustee is

21 conflating transferring of information with processing of

22 information.  They -- so, they -- I believe the argument is

23 that the exception in Article 45 [sic] that allows the

24 disclosure in connection with legal proceedings, applies only

25 to the transfer of personal data, not the processing of

1   personal data, and that what the -- that the disclosure would

2   be processing, not transferring.

3           There's no authority cited for this position.

4   We -- you know, I can't say that I can cite any authority for

5   the contrary position, but they cite no authority to say that

6   there's some distinction here and that or the exception in

7   Article 49 [sic] only applies to processing and not actually

8   disclosing in connection with a legal proceeding.

9           With respect to Japanese law, I mean, that was not

10  raised.  It was not mentioned that their motion.  We saw it

11  for the first time, Sunday at 4:00 p.m.  I have not been able

12  to reach an expert in Japanese law since Sunday.  There was

13  not any official translation of these Japanese statutes that

14  were provided.  They do not -- the debtor does not quote the

15  operative provisions.  There's obviously no expert witnesses

16  to testify about Japanese law.  They just put in their reply,

17  This law -- these two statutes apply and these statutes do

18  not have any exception for legal proceedings.

19          So, I, really, I am not in a position to say

20  anything about Japanese law, other than the fact that this

21  was something that was -- should have been brought up in the

22  initial motion and that would have given us more time to

23  respond to that.

24          So, Your Honor, another point I want to bring up

25  that we mentioned in our objection that is significant is

1   that if you shall determines that to whatever degree Your

2   Honor would grant the motion for file information under

3   seal -- I'm sorry -- to whatever degree Your Honor would

4   allow the debtors to redact information from the court

5   filings, the unredacted versions of those documents must be

6   filed under seal with the Court.

7          Now, the debtors in their reply said, Well, of

8   course we'll do that, but the proposed order only states that

9   the creditor matrix must be filed under seal.  That was a

10  compromise when we were discussing it at the interim stage.

11         The order, I would request, to the degree that

12  anything is allowed to be redacted, that the order provide

13  that the unredacted version must be filed with the Court.

14  And I would also ask --

15         THE COURT:  That's a requirement of the Local

16  Rules, isn't it?

17         MS. SARKESSIAN:  Yes, it is, Your Honor.

18         But I don't want anybody to say, Well, the order

19  doesn't say it has to be done.  The order only talks about

20  redaction, it doesn't talk about sealing, and therefore, the

21  order somehow trumps the rule.

22         So, I just want that to be clear that those

23  filings will be made.  And it would also be nice to know when

24  the creditor matrix is going to be filed, both, in a -- if it

25  is to be sealed, in a sealed version, and in a redacted

1  version, as well.

2         If Your Honor could just give me a moment to make

3  sure that I've covered everything.

4      (Pause)

5         MS. SARKESSIAN:  So, Your Honor, unless Your Honor

6  has any questions for me, my argument is concluded.

7         THE COURT:  Thank you.

8         MR. GLUECKSTEIN:  Your Honor, for the record,

9  Brian Glueckstein for the debtors.  Just a couple points very

10  briefly.

11        Just to take the last point first, the debtors, of

12  course, will file any documents in this case that need to be

13  filed under seal, under seal, according to the Local Rules

14  and I will make that representation that Ms. Sarkessian has

15  asked for.  That's not an issue.

16        With respect to --

17        THE COURT:  Of the creditor matrix, you mean?

18        MR. GLUECKSTEIN:  With respect to the creditor

19  matrix, Your Honor, the creditor -- we're conflating a couple

20  of issues.  As has been well-documented, and we have

21  disclosed to the Court, there are significant issues with us

22  filing the entirety of the customer list, from a timing

23  perspective, access to data and information.  The Court may

24  recall we required additional time and we had to come up with

25  a creative process to get our top-50 list done in order to

1  view information that we couldn't fully access in terms of

2  the informational databases.

3          Those lists are on file in redacted form.  The

4  unredacted forms have been filed.  We sealed the top-50

5  lists.  Ms. Sarkessian and the U.S. Trustee's Office, of

6  course, has them.

7          With respect to the timing of the full creditor

8  matrix, that issue, Your Honor, you know, we're trying to,

9  you know, we're trying to get kind of clarity on the timing.

10 It's the volume of the nine-million-plus names and contact

11 information, accessing the systems is taking time.  We are

12 working as hard as we can to get that on file and we will

13 file that, if we're authorized to redact the information

14 we've asked for today for the six-month period.  That, of

15 course, will be filed, the full nine-plus-million names under

16 seal as soon as we're in a position to do so, which we hope

17 is very soon.

18         What we will do, and what we can undertake to do,

19 Your Honor, is file what we have now and what we've been

20 using for service, file that, and then update it as we get

21 the full nine-million-plus names into the matrix.  So, we're

22 happy to do that, Your Honor.

23         THE COURT:  So, let me ask you this, you're not

24 proposing that you would redact from filings?  One of the

25 things Ms. Sarkessian raises is that you want to redact not

1   just the creditor matrix or the customer lists, but also any

2   reference to any customer or creditor in any other filing in

3   the court.  And I'm assuming you're not proposing to do that

4   if that particular customer has already self-identified.

5           MR. GLUECKSTEIN:  We have not, Your Honor, and

6   that's another issue that Ms. Sarkessian raised, right, this

7   idea that there are customers who want to go to competitors

8   or want to move their accounts, which, of course, we

9   understand.  And they're not in the position, certainly, to

10  take their account at FTX at this point because of the

11  Chapter 11 process, but they're certainly free to go to a

12  competitor, self-identify themselves to a competitor, and

13  open an account somewhere else if they haven't already.

14          And, of course, we did as this issue some at the

15  first day hearing, any creditor or customer is free to come

16  forward and participate in this case, identify themselves

17  publicly, identify themselves in the docket of this court.

18  The documents -- and we have, of course, no issue with that

19  and wouldn't seek to restrict that -- from the perspective of

20  the documents that Ms. Sarkessian was reflecting -- was

21  commenting on this morning, the creditor matrix, the top-50

22  list, the SOFAs, the schedules, these are all documents that

23  we are required to file, right.  Those are documents the

24  debtors are required to compile and provide and would result

25  in us affirmatively, with or without their consent, as part

1  of the bankruptcy process, and we understand there are

2  obligations of the bankruptcy process, to identify the names

3  of those customers.

4         Ms. Sarkessian referenced the idea, well, nobody

5  would know.  You have all these names.  It's a creditor list.

6  It's not a customer list.

7         Our top-50 list, even the redacted versions that

8  are on file publicly, do delineate between customers and non-

9  customer creditors -- trade creditors and customers.  And so,

10 that information, if it were to be unredacted today, people

11 could see very easily of the top-50 creditors, which of those

12 are customers, meaning customers who hold accounts on the

13 various exchanges at FTX.

14        So, the distinction that Your Honor references, we

15 agree with.  Obviously, there's nothing in what Your Honor

16 would be ordering that would prevent any party from self-

17 identifying if they so choose.

18        THE COURT:  So, is there a -- excuse me -- a way

19 to delineate between -- you refer to the top-50 creditor

20 list.  That's been sealed in its entirety or redacted in its

21 entirety, right?

22        MR. GLUECKSTEIN:  It has not been redacted in its

23 entirety, Your Honor.  It has been filed in a redacted form

24 that redacts the information that we asked, and that the

25 Court authorized, pursuant to the interim order.  So, we have

1 redacted names and addresses of individuals and of

2 institutions who are customers, pursuant to the Court's

3 interim order and it's reflected as such.  But those

4 documents are on file in redacted form under seal.

5         THE COURT:  So, what I'm trying to get at is, is

6 there a way to delineate on the creditor lists, between who

7 is a creditor, who is a customer, and who is both, and be

8 able to disclose those who are solely creditors, publicly,

9 without disclosing those who are customers and creditors?

10        MR. GLUECKSTEIN:  You know, it goes to the

11 question, it's a question of what information for the full

12 nine million, of whether that's a meaningful field that

13 exists or that would have to be kind of independently

14 reviewed and populated, and I'm not sure of the answer to

15 that, Your Honor.  We'd have to look into that.

16        I think the number, from a volume perspective, is

17 very small, comparative -- in relative comparison to the

18 customers.  What we've been talking about here, by and large,

19 and why we've been seeking to protect, when we talk about the

20 customer list, the customers at the main debtors, at the

21 exchanges, are where the volume is and that's where we

22 believe the value is, and that's what Mr. Cofsky testified

23 about this morning.

24        So, you know, that does implicate, of course,

25 the 107(c) issues, which we are not pressing today.  But I

 1  think, you know, we would have to see -- honestly, Your

 2  Honor, we would have to see whether we could make that

 3  delineation for all, kind of non-customer creditors.  I

 4  suspect that we could, but I think that would take some work,

 5  but I suspect that we could.

 6          THE COURT:  Well, in the top-50 lists --

 7          MR. GLUECKSTEIN:  Certainly, in the top-50 lists,

 8  we have that information.

 9          THE COURT:  -- are there those who now have been

10  disclosed, who are solely creditors, not customers?

11          MR. GLUECKSTEIN:  Not by name, Your Honor, because

12  the interim order had the 107(c) relief in it.

13          THE COURT:  Okay.

14          MR. GLUECKSTEIN:  So, at this point, all of the

15  names are redacted from that customer list that are subject

16  to the interim order.  So, the relief that we asked for in

17  the interim order, because it did include the 107(c) relief,

18  is broader than what we're talking about now.

19          THE COURT:  Okay.

20          MR. GLUECKSTEIN:  You know, I think on the GDPR

21  issues, Your Honor, those are certainly secondary here.  We

22  do think it's relevant.  We did brief the appropriate

23  sections.  You know, absent questions, we're happy to stand

24  on the briefing on that issue and, otherwise, I'm happy to

25  answer any other questions that the Court may have.

1            THE COURT:  Thank you, no questions.

2            MR. HANSEN:  Your Honor, Kris Hansen with Paul

3    Hastings, on behalf of the Committee.

4            Just quickly, to address the one point that

5    Ms. Sarkessian raised regarding 107(c), we do believe those

6    issues are real and to the extent that the Court wanted to

7    hear further evidence with respect to 107(c), we would ask

8    for a continuance of the hearing on that basis, so that we

9    could come back and provide more robust information to you.

10   It would consist of information that's available from a

11   public perspective, so newspaper articles, et cetera, that

12   you could take judicial notice of, but we, also, would

13   probably seek to put witnesses on, as well, to talk about

14   what has happened with respect to criminal and other type of

15   activity within the crypto space.

16           I don't know, today, whether we would be able to

17   link that to the disclosure of a name from a bankruptcy case,

18   but I think we could link it to disclosure of names,

19   otherwise, that people are able to find out through social

20   media and other avenues.  But I wanted to make sure the Court

21   understood, procedurally, where from the Committee stands, if

22   you need information and more information on 107(c), we would

23   like to have a continuance on that basis.

24           We think the record is very clear on 107(b) that

25   you have what you need in order to grant the relief that the

1  debtors and the Committee are jointly seeking.

2        THE COURT:  Thank you.

3        MR. HANSEN:  Thank you, Your Honor.

4        MR. GLUECKSTEIN:  Your Honor, if I could just

5  clarify one point?

6        THE COURT:  Go ahead.

7        MR. GLUECKSTEIN:  I might have misspoke.

8        So, just to be clear, Your Honor has pointed out

9  to me in an answer to Your Honor's question, currently, on

10 our top-50 lists, we have disclosed non-customer names.  So,

11 for example, there are certain vendors at the non-exchange

12 entities, because we have filed silos -- filed siloed top-50

13 lists.  So, if there was, for example, a vendor providing

14 services who is a non-customer, that information has already

15 been disclosed and would be under the relief asked for today.

16        THE COURT:  Is that for all creditors, solely

17 creditors, or just some?

18        MR. GLUECKSTEIN:  Yes.

19        THE COURT:  For all?

20        MR. GLUECKSTEIN:  All.

21        THE COURT:  Okay.  Thank you.

22        MS. SARKESSIAN:  Your Honor, can I just --

23        THE COURT:  Go ahead.

24        MS. SARKESSIAN:  Your Honor, with that -- for the

25 record, Juliet Sarkessian on behalf of the U.S. Trustee --

1   Your Honor's questions made me think of something with

2   respect to the top-50 lists.  Of course, you know, we formed

3   a Committee and I believe all the members of the Committee

4   were on that top-50 list.  Their names were redacted because,

5   at the time, it was subject to Your Honor's order.

6           Your Honor did indicate at the first -- or one of

7   the hearings that if somebody is going to be on the

8   Committee, they have to be willing to have their name

9   disclosed, and we did file the notice of the appointment with

10  their names.  Since that is now -- and I understood that that

11  was -- we discussed it with all the Committee members.

12  Nobody had an issue with that.  That has been disclosed.

13          Can the top-50 list be revised, in terms of

14  redaction, to now unredact the information, with respect to

15  those particular creditors, whose names have been disclosed?

16          THE COURT:  Well, it certainly makes

17  servicemembers to me.  I don't see why it can't be done.

18          MR. GLUECKSTEIN:  That can be done, Your Honor.

19  Frankly, once we have clarity around the scope of what's

20  staying or not being redacted, we will update the documents,

21  as appropriate.

22          THE COURT:  Okay.

23          MR. GLUECKSTEIN:  But we certainly understand that

24  point.

25          THE COURT:  Okay.  Thank you.

1       MS. SARKESSIAN:  Your Honor, the only other thing

2  I, again, would emphasize, I am confused about why there

3  would be another hearing about 107(c).  That was in the

4  initial motion.  Everybody knew today was the day of the

5  hearing on these issues.  If they had evidence to present,

6  they should have presented it, so I would object to a

7  continuance on that basis.  We were ready, willing, and able

8  to go forward today.  Nobody told us in advance that they

9  wanted a continuance.

10      THE COURT:  Well, I understand that and ordinarily

11 I would say, Yes, today was the day and you need to put on

12 your evidence.  I'm not going to grant any continuances.

13      But we're talking about individuals here who are

14 not present, individuals who may be at risk if their name and

15 information is disclosed.  And if that is the case, I want to

16 make sure I'm doing the right thing by those people.

17      MS. SARKESSIAN:  I understand, Your Honor.

18      THE COURT:  So --

19      MS. SARKESSIAN:  Again, I would stress, we are not

20 objecting to their addresses, email addresses, telephone

21 numbers being redacted; we're only talking about names.

22      THE COURT:  I understand.

23      MS. SARKESSIAN:  Thank you, Your Honor.

24      THE COURT:  Mr. Hansen?

25      MR. HANSEN:  Yes, Your Honor.  Again, Kris Hansen,

1  with Paul Hastings on behalf of the Committee.

2          Your Honor, with respect to the individual

3  creditor names that are on the Committee, the notice that the

4  U.S. Trustee filed for individuals does not include their

5  addresses or their information; it just has their names.  For

6  the institutions, it obviously includes their addresses.

7          So, when the debtors make their disclosure with

8  respect to the top 50 for those parties, we would ask,

9  consistent with the notice that was filed from the U.S.

10  Trustee, with respect to their appointment, that we do

11  maintain that information under seal.

12          THE COURT:  Is that an issue?

13          MS. SARKESSIAN:  The U.S. Trustee has no

14  objection.  We're in complete agreement.

15          THE COURT:  Okay.  Thank you.

16          Anyone else?

17      (No verbal response)

18          THE COURT:  All right.  Well, this case certainly

19  presents extraordinary circumstances just by the nature of

20  the case itself.  The fact that we have a list of people who

21  may be customers, may be creditors, may be both, and I don't

22  know who -- which is which, and they are -- there are nine

23  million of them, I'm reluctant at this point to say I'm going

24  to require the disclosure.

25          I think the debtor did put on sufficient evidence

1  to show that customer lists -- and I think it goes without

2  saying that a customer list in any bankruptcy case is

3  something that is protected by 107(b) as a trade secret.

4  Companies hold those things very closely and don't want them

5  disclosed.

6          The difficulty here is I don't know who's a

7  customer and who's not, who's just a regular creditor.  So,

8  at this point, I'm going to overrule the objections and allow

9  them to remained sealed at this point, but I'm not going to

10 leave it open for six months.  I'm going to -- I would

11 approve an order that extended it for three months.  By then,

12 I think, based on the testimony and the arguments of counsel,

13 we'll have a better sense of whether or not the customer

14 lists is something that purchasers of these assets find value

15 in and whether they are interested in making sure that they

16 remain anonymous at this point.

17         On the 107(c) issue, as I already indicated, I do

18 want more on that because I do want to make sure I'm

19 protections the interests of these individuals.  And it's

20 interesting, because if you look at 107(a) and -- or excuse

21 me -- 107(c), it refers to protecting information and

22 refer -- and -- excuse me -- in defining what identification

23 means, it refers to the Criminal Code 18 -- Title 18,

24 Section 128(d).  And if you look at 128(d), it says that the

25 information includes names, numbers, or any combination of

1  those two that would allow the identification of an

2  individual.  So, certainly, the Criminal Code recognizes that

3  disclosure of a name could result in the identification of an

4  individual and if that individual needs protecting, we need

5  to make sure that that is happening.

6            I don't have enough on the record today to say

7  that 107(c) applies, but I want to make sure that I'm doing

8  the right thing.  So, I will, in connection with any

9  further -- I guess the question, then, is do I hold that

10 hearing before the three months is up?  And I think in order

11 to make sure that we have a fulsome record and that the

12 parties have the opportunity to engage in discovery, if

13 necessary, to identify people who might come in and testify,

14 I want to make sure that they have the opportunity.  So,

15 we'll schedule a further hearing on the 107(c), in connection

16 with the 107(b) follow-up in three months.

17            I do want to make sure that the debtors are, in

18 compiling the nine million names, if there is a way to

19 identify them if they are just a creditor and not a customer,

20 I expect that to be done.  And I would like to have a status

21 conference on that question, alone, within the next -- I

22 think we have another hearing scheduled on the 20th.  So,

23 let's have a status conference on the 20th on the question of

24 how difficult it would be for the debtors to provide a list

25 of creditors and/or customers and distinguish between

1  creditors and customers.  And if you can just identify just

2  customers on the list or, excuse me, just creditors on the

3  list, I would expect that those names would be disclosed;

4  again, not disclosing for individual's names -- excuse me --

5  addresses or telephone numbers or other identifying

6  information.

7           But if there is -- if there are customers who

8  are -- I keep confusing these two -- if there are creditors

9  on that list of nine million who are institutions or

10  corporations and they are only creditors, then their full

11  identifying information should be disclosed, as required by

12  the Code.

13           So, with that, I'm going to ask the parties to

14  meet-and-confer and come up with a form of order that

15  reflects what my rulings are today.

16           Are there any questions or did I miss anything

17  that the parties want me to make sure that I've addressed?

18           MR. GLUECKSTEIN:  From the debtors' perspective,

19  no, Your Honor, that's very clear.  Thank you.

20           THE COURT:  Okay.  Ms. Sarkessian or Mr. Finger,

21  any concerns, other than the fact that I ruled against you?

22           MR. FINGER:  I'll take judicial notice.

23      (Laughter)

24           MR. FINGER:  Nothing more, Your Honor.

25           THE COURT:  Okay.  Thank you.

1         MS. SARKESSIAN:  And, Your Honor, I apologize if I

2    missed it.  Did you make a particular ruling regarding

3    individual creditors who are not customers, but are members

4    of the U.K. or European Union or Japan?

5         THE COURT:  No, I did not address that.  That's

6    another question and that's a difficult one.  I don't

7    think -- I don't have any evidence on that.  All I have is

8    the arguments of counsel.

9         Let's include that when we talk in three months,

10   because I would like further evidence on that and maybe have

11   someone come in and testify about the foreign law and how it

12   affects, but I think, you know, I understand Mr. Finger and

13   Ms. Sarkessian have pointed out that they don't believe that

14   the European Code would apply here, but I think even

15   Mr. Finger recognized that could be argued either way.  So,

16   it's a question, so I'd like to know what the answer to that

17   question is.  Would this actually prejudice the debtors

18   somehow?  If it would subject the debtors to large fines,

19   and, you know, we've seen all this in the press where

20   companies in Europe have had large fines imposed against

21   them.  It's certainly not something that I want to have

22   happen to the debtors here.  And it raises questions about

23   whether I could even stop that.  Does the automatic stay

24   apply to the European Union seeking to impose a fine against

25   the debtors for violating disclosures?  I don't know.  So,

1  those are all open issues I need to have further -- might

2  need further briefing, too, on those issues.

3         MS. SARKESSIAN:  And, Your Honor, just for

4  clarity, so between now and the three months, do those names

5  remain sealed?

6         THE COURT:  Yes, until we -- when we get to the

7  status conference next Friday, if the debtors can come in and

8  say, We can provide a list of the nine million names and

9  identify those that are solely creditors, then I might revise

10 my order to say that those people's names and identifying

11 information should be disclosed, except for individuals, at

12 least with the constitutional creditors.

13        MS. SARKESSIAN:  And, Your Honor, maybe another

14 thing that we maybe could discuss at that status conference

15 would be to the degree that the debtors aren't able to cull

16 out which individuals are, in fact, citizens of the U.K., the

17 EU, and potentially Japan?

18        THE COURT:  If that's possible, that would be

19 helpful, if we know how many people.  From my -- I think from

20 the first day hearing, I think I recollect there was some

21 testimony in the declaration about how many of these people

22 are not U.S. citizens; they're foreign citizens.  So, it may

23 be most, if not all of them.  I don't think all of them would

24 be, but at least most of them might be foreign citizens.  I

25 don't know.

1       MS. SARKESSIAN:  And, Your Honor, they may be

2  foreign citizens, but they might be citizens of India or

3  someplace that's not controlled.

4       THE COURT:  Right.

5       MS. SARKESSIAN:  I just -- I'm not sure that we've

6  heard testimony about the debtors' ability to determine

7  citizenship of its customers.  So, again, maybe that's

8  something that can be discussed at the status conference, do

9  they have the ability to determine what the citizenship is so

10  that they can know whether or not to redact the name.

11       THE COURT:  Right.  I think that's right, yes.

12       MS. SARKESSIAN:  Thank you, Your Honor.

13       MR. GLUECKSTEIN:  That's fine, Your Honor.  We'll

14  be happy to address that issue at that point.

15       THE COURT:  Okay.  All right.

16       All right.  Well, thank you.  Anything else?  So,

17  I'll look forward to the certification of counsel to the

18  order so far.

19       MR. GLUECKSTEIN:  No, I think on that issue, that

20  is it, Your Honor.  We're happy to move forward with the

21  agenda unless Your Honor would like to address any other

22  issues?

23       THE COURT:  Let me see.  Mr. Finger?

24       MR. FINGER:  May I be excused?

25       THE COURT:  Yes, thank you.

1          All right.  Let's go forward.

2          MR. GLUECKSTEIN:  All right.  Thank you, Your

3    Honor.

4          I'm going to take one item, if I may, if it

5    pleases the Court, just Agenda Item 22, slightly out of

6    order, and then I will turn things over to Mr. Dietderich.

7    Agenda Item 22, Your Honor, is the debtors' motion to

8    authorize, provide indemnification, and exculpation on a

9    final basis to certain individuals taking actions to secure

10   at-risk cryptocurrency and cash.  The motion was filed under

11   seal prior to -- in connection to the first day hearing at

12   Docket 95.  An interim order was entered at Docket 140 and

13   subsequently unsealed after a discussion with the Court

14   recently at Docket 323.

15         Your Honor, there have been no objections filed

16   with regard to the motion.  The debtors have received

17   informal comments and have had discussions at length with the

18   United States Trustee and the official Committee.

19         In response to those comments received, the

20   debtors did file a revised, proposed order last night.  The

21   motion, Your Honor, was filed, as the Court will recall, on

22   an emergency basis when it became clear in the initial days

23   of these cases that certain of the debtors' cryptocurrency

24   and cash assets were at significant risk of being hacked,

25   stolen, lost, or compromised, if not immediately moved and

1   secured.   This required individuals to act quickly, on behalf

2   of the debtors, to take actions in a difficult environment.

3           Those assets included crypto and other digital

4   assets that were held or maintained on third-party exchanges,

5   or in so-called hot wallets, that are not maintained on

6   third-party exchanges.   There were cash assets held in bank

7   accounts around the world and in certain cases, on third-

8   party brokerages, where securities and other assets were

9   being held.

10          I am pleased to report to the Court that very

11  significant progress, and Mr. Dietderich alluded to this,

12  this morning, has been made on the work that was done and

13  necessary for which this motion and an interim order has been

14  integral, but the work to locate and secure assets remains

15  ongoing.   Transfers of cryptocurrency are subject to certain

16  inherent risks.   Some of those risks are very amplified, here

17  in these cases, due to the inadequacy of prior controls

18  before the debtors' current management team got in and put

19  them in place.

20          As a result, the protection for a limited number

21  of individuals on the frontline of this work remains

22  critically important.   I do want to note for the record,

23  based on discussions with the Committee, that the debtors are

24  okay with the requests from them to be sure that to the

25  extent there are indemnification payments that ultimately

1  need to be made under the order, that the debtors will seek

2  payment from any applicable insurance policies and that the

3  debtors retain all rights of subrogation with respect to

4  obligations that might arise under this order.

5          I think the Committee is going to want to be heard

6  on this, as well, but from the debtors' perspective, Your

7  Honor, we would ask that the order be entered.

8          THE COURT:  Okay.  Thank you.

9          Mr. Hansen?

10          MR. HANSEN:  Yes, Your Honor.  Again, Kris Hansen

11  with Paul Hastings, on behalf of the Committee.

12          Your Honor, that was really our main point, with

13  respect to the indemnification motion, which is that if

14  indemnification payments are going to be made, that the

15  debtor use its best efforts, first, to look to applicable

16  insurance, which is not only D&O insurance, it's other

17  professional liability insurance, as well.  As the motion

18  makes clear, they look to include parties in connection with

19  that who may be covered by their own insurance.  And so, we

20  want to make sure that insurance assets are used to make

21  those payments, if at all possible, and that if the debtor

22  needs to advance payments first, that it has subrogation

23  rights to move against that insurance.

24          Ideally, we would include that in the order so

25  that it's clear.  Obviously, we've all stated it here on the

1   record, so if we could include it in the order, that would be

2   the Committee's favored approach.

3                THE COURT:  Okay.  Is there any objection to

4   revising the order, Mr. Glueckstein?

5                MR. GLUECKSTEIN:  No, Your Honor.  We're happy to

6   sit back down the Committee and discuss the order further and

7   submit an agreed-upon form of order.

8                THE COURT:  Okay.  Thank you.

9                Was the Committee the only objection on that?

10               MR. GLUECKSTEIN:  Yeah, I don't know if the U.S.

11  Trustee has anything further on this motion.

12               MS. SARKESSIAN:  Yes, Your Honor.  Again, for the

13  record, Juliet Sarkessian on behalf of the U.S. Trustee.

14               I believe we have worked out all of our issues

15  with the debtors on this.  I think the only thing I just want

16  to make clear on the record is the proposed final order will

17  have an exhibit.  The exhibit needs to be filed under seal,

18  but the order itself, once it gets entered, should -- the

19  order itself should not be under seal.  The exhibit is a list

20  of people's names that are going to be covered by the order

21  getting the indemnification and exculpation.

22               We've had some trouble with -- a seal order in the

23  past got entered under seal, so I just want to make sure that

24  it's clear that the order, itself, is not under seal, but the

25  exhibit will be, I guess, right?  I think that's what we

1  need.

2         MR. GLUECKSTEIN:  That's correct, Your Honor.

3  We're not looking to seal the order.  We've unsealed, now,

4  with the Court's permission, the interim order.

5         Ms. Sarkessian is correct, we will, and we have,

6  in fact, filed under seal, already, the list of names that's

7  contemplated -- that is contemplated to be attached to the

8  order.  And so, when we submit the final order for Your

9  Honor's review and signature, the order, then, would be on

10  the docket, but the exhibit to that order would remain filed

11  under seal.

12         THE COURT:  Okay.  That's fine.  I did see that

13  list already.  I saw it this morning.

14         MR. GLUECKSTEIN:  Thank you, Your Honor.

15         THE COURT:  All right.  So that one, again, will

16  be submitted under COC?

17         MR. GLUECKSTEIN:  Yes, once we agree on the

18  additional language with the Committee, we'll submit that

19  under COC.

20         THE COURT:  Okay.  Thank you.

21         MR. GLUECKSTEIN:  And with that, Your Honor, I

22  will cede the podium to Mr. Dietderich to address cash

23  management.

24         THE COURT:  Okay.

25         MR. DIETDERICH:  Hello, again, Your Honor.  For

1  the record, Andy Dietderich, Sullivan & Cromwell, for the

2  debtors.

3         I have Docket 21, the cash management order.  Your

4  Honor, on this one, all objections have been resolved, in our

5  view, other than one objection from the U.S. Trustee.  Before

6  addressing that objection, I wanted to -- I have a sentence

7  to read into the record and a couple general points to the

8  Court.  I also want to talk about the evidentiary record here

9  for just a moment.

10        From the debtors' perspective, we believe the U.S.

11 Trustee has an objection that's a pure point of law, which is

12 about whether or not the Court has authority to grant

13 superpriority status to claims against the cash management

14 system.  I do not believe her objection goes to the

15 reasonableness of that decision and we do have a record, of

16 course, for the reasonableness of the cash management system

17 from Mr. Mosley's prior declaration, which is on the docket

18 from the interim hearing.

19        So, I'd like to go ahead and proceed on that

20 assumption, but to the extent that Ms. Sarkessian does have

21 an objection to the reasonableness of the cash management

22 procedure, we do reserve the right to call Mr. Mosley, put

23 him on the stand, and ask him a few questions.

24        THE COURT:  Why don't we find out before we go?

25        MS. SARKESSIAN:  Your Honor, it's a pure legal

1   argument.  I'm not making any argument about the

2   reasonableness of any decision that the debtors have made in

3   this regard, just whether it's permissible under the Code.

4          THE COURT:  Okay.  Thank you.

5          MR. DIETDERICH:  Okay.  Thank you, Ms. Sarkessian.

6          On that basis, Your Honor, the evidentiary record

7   here is we're relying on is the declaration of Mr. Mosley in

8   support of first day relief, Docket 57; his supplemental

9   declaration, Docket 93; and although we're not relying on it

10  for evidence, for the Court's information, there is a second

11  supplemental declaration of Mr. Mosley, last evening, which

12  is generally applicable with the 13-week cash forecast, and

13  that's at Docket 460.

14         So, Your Honor, we have, in order to resolve the

15  objection from Evolve Bank, which is one of the banks where

16  we have accounts that are nominally recorded as FBO accounts,

17  we have a little bit of language to read into the record.

18  So, in paragraph 13 of the form of order, where it speaks

19  about the rules for closing FBO accounts, we have committed

20  with Evolve that we will not close the accounts at their bank

21  without notice and a further order of the Court.  And so, we

22  will be submitting a revised form of order where the language

23  that will make that clear and we have text that we've worked

24  out with counsel to Evolve.

25         Second, Your Honor, we have some objections from

1  shareholders.  So, a couple of shareholders have surfaced,

2  represented by our friends at Debevoise, and they've reviewed

3  this order.  They have, I believe, an objection or a

4  reservation of rights, one or the other, one file.  And we've

5  worked out with them that we've made some commitments to them

6  to share information informally, that they've accepted, and

7  on that basis, I believe their objection is resolved.

8        With respect to the overall motion, Your Honor,

9  this is really the same cash management system that we

10  proposed earlier, so there's been no substantial change to

11  the management system we're proposing going forward, with one

12  exception.  During the interim period, we had some gates on

13  the ability to move, to make advances from silo to silo.

14  There was a hard cap on the movement of money from silo to

15  silo.

16        We've had a number of discussions with the

17  Committee about what the right approach is to this case, in

18  terms of movement of money in the cash management system

19  across silos and we've agreed with them on a flexible

20  procedure where we will use a budgeting and projection

21  process and involve them periodically in that process.  And

22  to the extent that we agree that it's appropriate and prudent

23  to move money from the silos, we're permitted to do that

24  under the cash management system and our business judgment

25  with the committee's involvement.

1        However, to the extent that the Committee

2   disagrees, either with the projections about amount of silo

3   movement or we have variances from time to time that are

4   larger than beyond a certain cap, in that circumstance, the

5   Committee can come back to Your Honor on an accelerated

6   schedule with an objection.

7        And we think that's an appropriate basis.  You

8   know, we will be moving money between the silos, only to the

9   extent that we think this obviously creates a reliable,

10  administrative claim.  We have substantial, unencumbered

11  asset value at all of the silos.  The question might just be,

12  really, a question of working capital, until we're able to

13  monetize some of the assets and some of the pockets that we

14  have.

15       There's been no objection, Your Honor, that goes

16  to that mechanism.  The objections that we've resolved went

17  to more of question, should we charge interest and how should

18  the mechanics of the details work?

19       So, with that, Your Honor, I'll turn to the

20  remaining objection that we have, which is the objection of

21  the U.S. Trustee on the legal question of whether or not Your

22  Honor has the authority to grant superpriority status to

23  advances under a cash management system.  There's not a lot

24  of case law that will be helpful to us on this point.  I

25  think we have a reading of the Bankruptcy Code that says that

1  which is not prohibited by the Bankruptcy Code, and we have

2  an evidentiary basis of reasonableness for, Your Honor can

3  award under 105.

4        We also think for the reasons that we put in the

5  papers, which I don't need to rehearse, that the proper

6  allocation of risk in a system with many debtors between

7  administrative creditors, so it's really a question of

8  allocation of risks among different administrative creditors

9  in a common system, that if the advances by the cash

10 management pool are given the superpriority status, the

11 consequence of doing so is that the first loss if there was a

12 problem, and heaven forbid, we don't expect there to be a

13 problem, but if there ever was a problem anywhere in part of

14 our system, the superpriority protects the cash management

15 system and the other debtors against a localized problem and

16 it allocates, first, administrative loss to the

17 administrative creditors of that particular debtor.

18        The converse rule, a rule that says it was an

19 ordinary administrative advance, the problem with that rule

20 in our mind is that it, then, socializes any loss, any

21 administrative loss among administrative creditors in our

22 case, all over the world.  And so, this superpriority status

23 for administrative advances, we believe, is consistent with

24 the approach that had been taken by the debtors that have

25 really thought it through in the complicated cases, in

1  particular, cross-border cases.  It's consistent with the

2  way -- and, again, without evidence on this, Your Honor, but

3  from -- I'll speak, just informally, from personal

4  experience -- it's the way international companies think

5  about cash management, making sure the system is protected,

6  as opposed to any particular arm of the organization, and we

7  believe it's the reasonable approach, you know, on the facts

8  of our particular case.

9         In terms of the pure legal issue, we see nothing

10  in the Code that prohibits Your Honor from doing it.  The

11  U.S. Trustee, in respect to the argument, says there's only

12  two circumstances where superpriority expense can be awarded

13  by a debtor and we think those are two circumstances --

14  excuse me -- where the Code contemplates it, but it -- it's

15  not otherwise permitted.  And to the extent we do so on the

16  record, so that all of our administrative creditors know that

17  the advances have superpriority status, we think there's

18  adequate notice to do it.  In some ways, the greater power

19  implies the lesser.  We should be able to incur

20  administrative debt at one of our subsidiaries on the

21  understanding that the person we're dealing with knows that

22  advances against the cash management system do have a

23  priority.

24         Now, the last thing I'll say, Your Honor, is this

25  doesn't come up super often because of DIP financing and the

 1  arrangements of DIP financing often supercede this, and it's

 2  embedded in the cash management system that's somewhat

 3  connected, at least, to the DIP loan.  Here, we don't have a

 4  DIP loan, so there's a little bit more attention on the

 5  question, but those are my remarks on it and I'm happy to

 6  cede the podium to Ms. Sarkessian and she can give you the

 7  contrary view.  Thank you.

 8              THE COURT:  Thank you.

 9              I think the Committee wants to weigh in first.

10  Hold on one second.  We have a -- I want to make sure --

11         (Pause)

12              THE COURT:  The Zoom video went out?  They can

13  still hear me, though?

14         (Pause)

15              THE COURT:  That means everybody else has to dial

16  back in?

17         (Pause)

18              THE COURT:  A technical glitch.

19              MR. DIETDERICH:  I hope it's nothing I said.

20              THE COURT:  It happened when you stood up.  I

21  don't know.

22         (Laughter)

23              THE COURT:  All right.  Unfortunately, we have to

24  have IT come up and take a look at what's happening here.

25  So, let's take a recess until we can get this resolved,

1  hopefully, pretty quickly.  Just let me know when we're

2  ready.

3          All right.  We'll recess until we get this fixed.

4  Thank you.

5       (Recess taken at 12:17 p.m.)

6       (Proceedings resumed at 12:40 p.m.)

7          THE COURT:  Okay.  Ready to go.

8          MR. GILAD:  Good afternoon, Your Honor.  Erez

9  Gilad, Paul Hastings, LLP, proposed counsel to the official

10 Creditors' Committee.

11         Your Honor, I rise only to make some comments,

12 with respect to the cash management motion.  We, as a

13 Committee, support the cash management and wanted to describe

14 to the Court that we have spent a fair amount of time

15 negotiating and improving the terms of the cash management

16 order.

17         Our approach to the cash management system in the

18 proposed form of order was to facilitate the use of a

19 centralized cash management system, which all else being

20 equal, is rather common to complex corporations of this size,

21 but at the same time, reflecting the realities of the case,

22 preserving parties' rights, with respect to assets of the

23 debtors, offering visibility into movement of cash, and

24 enacting appropriate safeguards for the benefit of the

25 debtors' estates.

1            To that end, as counsel indicated earlier, we did

2    negotiate an extensive regime of reporting, that is weekly

3    and monthly reporting, delivery of monthly budgets of various

4    tests, intercompany reconciliation reports as well,

5    consultation rights, and opportunities for the Committee to

6    step in and seek relief before the Court, if there are

7    certain objections to either, to the budget or any

8    disbursements that sought in excess of a 10 percent variance.

9    There's also a negotiated result with respect to imposing a

10   cap on transfers to nondebtors.

11           We think, all in, these provisions strike the

12   appropriate balance between assuring the proper movement of

13   cash and the efficient administration of the case, which,

14   frankly, benefits all constituents, but also affords

15   appropriate protection to the debtors' estates.  And it's

16   important to note that as part of the negotiated result, we

17   did incorporate language into the cash management order which

18   provides a fulsome reservation of rights for the benefit of

19   parties, with respect to entitlements regarding customer

20   funds, and also a fulsome reservation of rights with respect

21   to the rights to assert whatever rights or remedies they

22   have, notwithstanding the silo creation, and notwithstanding

23   the movement of cash between accounts and between silos.  So,

24   we thought that that was similarly important for the benefit

25   of constituents in the case both, customers and creditors

1  alike.

2          From the perspective of the legal issue that's

3  been presented in terms of the admin priority versus

4  superpriority, obviously, the debtors' intent here is to

5  ensure that to the extent that there is movement of cash,

6  that the appropriate estates are protected.  In terms of the

7  superpriority status, again, our perspective there is that

8  the debtors' view is that it's simply additive protection for

9  the benefit of the transferor estate.

10          It's my understanding that from a process and

11  notice perspective, at least, I believe that the interim form

12  of order included the establishment of a superpriority claim,

13  with respect to the transferor estate, so I view it from that

14  perspective, I think it's been on notice now, for purposes of

15  the second day hearing, that that relief would be requested.

16  So, I think that notice, coupled with the comments made by

17  counsel that we don't believe that there's any prohibition

18  against the Court affording superpriority status, we support

19  the relief requested by the debtors.

20          Unless Your Honor has any questions, I believe

21  that's all I have to say.

22          THE COURT:  All right.  Thank you.  No questions,

23  thank you.

24          MR. GILAD:  Thank you, Your Honor.

25          THE COURT:  Okay.  Let's see.  We have another

1  speaking in support of?

2          MR. LEVINSON:  In support, yes, Your Honor.

3          THE COURT:  Okay.  Go ahead.

4          MR. LEVINSON:  Good morning.  Sidney Levinson,

5  Debevoise & Plimpton, for Paradigm operations.

6          Paradigm is a substantial stakeholder in these

7  bankruptcy cases, including about 280 million of equity

8  investments in two of the silos, West Realm Shires and FTX

9  Trading Ltd.

10          We've heard Mr. Gray and others take aim at the

11  poor recordkeeping of the debtors prior to the bankruptcy

12  filing, and we recognize that the process of identifying the

13  assets and the liabilities of each debtor, as well as the

14  prepetition intercompany claims and relationships that exist

15  among them is very much a work in progress.  I mean, it's

16  fair to say none of us really know at this moment how all of

17  that is going to shake out, but given that state of affairs,

18  it's absolutely vital for all stakeholders to be able to

19  preserve the status quo as of the petition date to the

20  fullest extent possible and to maintain the separateness of

21  the various debtor entities to the fullest extent possible so

22  that each of the individual debtors and their respective

23  stakeholders aren't prejudiced by anything that's going to be

24  happening during the bankruptcy cases.

25          The cash management order, obviously, has some

1  impact on that status quo and, accordingly, there need to be

2  protections implemented to minimize that threat.

3       We engaged in informal discussions, we did also

4  file a limited objection, but those informal discussions have

5  been ongoing with the debtors for several weeks to address

6  our concerns and in fact the revised form of order includes

7  many of the suggestions that we had made with respect to the

8  form of order.  And given that, as well as the commitments

9  that Mr. Dietderich referred to in his comments, Paradigm is

10 withdrawing its remaining objections.

11      I would, if I may, Your Honor, just like to be

12 heard briefly on the United States Trustee's limited legal

13 objection because the inclusion of super-priority claims is

14 fundamental to our support of the current cash management

15 order in its current form.

16      Now, contrary to their position, I would submit

17 that the Bankruptcy Court does in fact authorize, expressly

18 authorize the grant of the super-priority claim and I think

19 that express authority can be found in Section 363(e), which

20 governs the use of property in which an entity has an

21 interest.  If I can indulge Your Honor just to read from

22 363(e):  "Notwithstanding any other provision of this

23 section, at any time, on request of an entity that has an

24 interest in property used, sold, or leased, or proposed to be

25 used, sold, or leased, by the trustee, the Court, with or

1  without a hearing, shall prohibit or condition such use,

2  sale, or lease as is necessary to provide adequate protection

3  of such interests."

4        Now, here, the debtors and non-debtors whose funds

5  are being used have an interest in these proceeds and are

6  entitled to request a grant of adequate protection from the

7  debtors that are in fact receiving those proceeds or the

8  benefit of those proceeds.  Section 361 authorizes the grant

9  of adequate protection in many forms, including the

10 realization of the indubitable equivalent of an interest in

11 such funds.

12       And one thing that 361 makes clear is that a mere

13 administrative expense priority is not sufficient by itself

14 to provide adequate protection.  Thus, we would submit a

15 super-priority claim is the bare minimum that would be

16 required to provide adequate protection and, indeed, if it

17 turns out that any form of adequate protection turns out to

18 be insufficient, the entity advancing such funds would be

19 entitled to a super-priority claim under Section 507(b).

20       So we think the United States Trustee's limited

21 objection is misplaced not only for all the reasons outlined

22 by the debtors in their paper and by Mr. Dietderich today,

23 but also by that provision as well, and that this Court does

24 in fact have the authority to grant super-priority claims and

25 we respectfully request that Your Honor approve that

1   provision.

2           Unless Your Honor has any questions --

3           THE COURT:  No questions.  Thank you, Mr.

4   Levinson.

5           MR. LEVINSON:  Thank you.

6           MR. WORALDEIN:  Good afternoon, Your Honor, Elie

7   Woraldein, Debevoise & Plimpton, a separate Debevoise &

8   Plimpton team, on behalf of certain Lightspeed Funds, here

9   together with our co-counsel Cole Schotz.

10          I'll be very brief, Your Honor, because I don't

11  want to repeat a lot of the points that were raised by

12  Paradigm, as well as the committee.  Our interests and the

13  concerns that Paradigm Lightspeed had are very similar to the

14  concerns of the committee, as well as the concerns of

15  Paradigm.

16          But, very briefly, as noted in our reservation of

17  rights, which is Docket Number 389, Lightspeed Funds are

18  substantial equity holders in several of the debtor entities.

19  Based upon the debtors' public filings and statements thus

20  far in the case, the debtors have acknowledged that certain

21  FTX entities in the WRS silo, as well as certain other

22  entities, are solvent.

23          So, as noted in our brief, Lightspeed -- the

24  Lightspeed Funds' concerns were that it's imperative in this

25  case to preserve the status quo, for all of the reasons noted

1  by Paradigm's counsel just a moment, that it's imperative to

2  maintain corporate formalities and preserve the status quo,

3  especially at this early stage of the Chapter 11 case, and we

4  must do that to the greatest extent possible in order to

5  ensure that the rights of legitimate stakeholders are

6  preserved.  Lightspeed was concerned that the original motion

7  and proposed order as originally drafted -- the debtors were

8  able to transfer funds from debtor entities to non-debtor

9  entities and vice versa and that's how they were intending to

10 fund these Chapter 11 cases, the concern of Lightspeed was

11 that those initial proposals didn't have sufficient

12 safeguards to protect the interests of those solvent debtor

13 entities, as well as the various stakeholders of those debtor

14 entities and, therefore, the original proposed order left a

15 substantial risk that solvent FTX entities will be funding --

16 seeing their cash being used to the benefit of other debtor

17 entities.

18          And this wasn't only a concern of the Lightspeed

19 Funds, this is a concern that all stakeholders -- as, you

20 know, the committee noted as well that it's important that

21 different stakeholders, obviously, have different claims

22 against different legal entities, so it's imperative to

23 preserve and maintain corporate formalities in order to

24 ensure that each stakeholder against the individual debtor

25 entity could preserve the status quo of whatever cash or

1  rights or assets they have.

2          As noted earlier, we're happy to report we have,

3  in light of the revisions to the proposed order, most

4  importantly, the grant of the super-priority claim, as

5  discussed earlier -- and I won't repeat those legal arguments

6  that were already mentioned -- we believe that they will

7  satisfy Lightspeed Funds' concerns at this time and we're

8  going to withdraw our reservation of rights and any

9  outstanding concerns in light of the extensive back-and-forth

10  arm's length discussions we've had with FTX's counsel over

11  the last few weeks.

12          However, we will note just for the record that

13  we'll continue to monitor these cases carefully, especially

14  in light of the reservation of rights for the various issues

15  in the proposed order, namely interest, allocation of

16  expenses, and some of the other points, which are all issues

17  that are reserved for later in the Chapter 11 case, but the

18  Lightspeed Funds will maintain careful monitoring of the case

19  just to ensure that the debtor entities are maintaining

20  corporate formalities, transparency, as we heard earlier in

21  the hearing, the key of tracing and monitoring all the cash

22  flows during the Chapter 11 case just to ensure that no

23  specific debtor entities and their various stakeholders are

24  prejudiced at the expense of other debtor entities.

25          So, unless the Court has any questions, that's all

1  I intended to add to the record.

2          THE COURT:  Okay.  Thank you --

3          MR. WORALDEIN:  Thank you.

4          THE COURT:  -- no questions.

5          Anyone else in support?

6      (No verbal response)

7          THE COURT:  Okay.  Ms. Sarkessian?

8          MS. SARKESSIAN:  Again, Juliet Sarkessian on

9  behalf of the U.S. Trustee.

10          Your Honor, the -- as Your Honor is of course well

11  aware, the priority scheme of the Bankruptcy Code is a key

12  part of the Bankruptcy Code, it is crucial and it's set forth

13  under 507.  There are only two grounds in the Code where

14  super -- we call it super priority, it's an administrative

15  claim that has priority over all other administrative claims,

16  there's only two places in the Code that provide for that,

17  one is under 364(c) in connection with DIP financing and the

18  other is under 507(b) for adequate protection of prepetition

19  liens.

20          So now Counsel for Paradigm had just argued that

21  super priority could be granted under 3 --

22          THE COURT:  You might need to lower the microphone

23  some.

24          MS. SARKESSIAN:  Oh, I'm sorry, yeah.  Thank you,

25  Your Honor.

1           On the super priority, it could be allowed under

2   363(e), but if you -- and it does talk about adequate

3   protection there, but if you turn back to 507(b) -- and

4   507(b) does reference 363 -- it says, if under 362, 363, or

5   364 of this title, if the trustee provides -- or, of course,

6   debtor-in-possession -- provides adequate protection of an

7   interest of a holder of a claim secured by a lien on property

8   of the debtor.  So it is limited to that, there must be a

9   lien.  So I don't think that -- it's my understanding that

10  the transfers we're talking about here between debtors or

11  between non-debtor affiliates to debtors are not going to be

12  secured by a lien and certainly not on a prepetition lien.

13          So the debtors' argument -- and other parties have

14  argued that, well, just because the Code points out two

15  places that allow for super priority claims does not mean

16  that super priority claims are otherwise prohibited.

17          The priority -- again, the priority of claims

18  under the Bankruptcy Code is a key portion of the Code.  And

19  so when the Code says there's two places where you get a

20  super priority claim and there's no other provision where you

21  could say, all right, well, this -- you know, maybe under

22  this one, and that's it, that is it.  Otherwise, what you

23  come up with is, well, then what's the standard for super

24  priority claims?  I mean, we know it would of course have to

25  be a post-petition claim, but then what's the standard?  Is

1  it just whatever the debtor thinks should be a super priority

2  claim?

3          I've heard talk about, well, there was plenty of

4  notice.  If there's no statutory authority to grant something

5  under the Code, then giving people notice about it doesn't

6  resolve that problem.  It's great to give parties notice, but

7  you have to have a statutory provision to hang your hat on.

8          Again, what are the parameters, who decides and

9  what are the parameters of other super priority claims that

10 are not referenced in the Code?  You know, here, what the

11 debtor is saying is it's basically elevating claims between

12 themselves and non-debtor affiliates into the debtor, that

13 those claims are being elevated over claims of ordinary post-

14 petition vendors and service providers.  They're the ones

15 that are being effectively -- they're having their claims

16 subordinated, effectively, without, again, there being

17 anything in the Code to provide for that.

18         And the other problem is, is when you start

19 expanding super priority to cover other things that are not

20 specified in the Code, eventually, it becomes meaningless

21 because, you know, everybody is going to get super priority.

22 I mean, for example, if you say, well, maybe you view these

23 transfers between the debtors as post-petition DIP financing,

24 in which case please file a motion to get that approved, but,

25 well, then one could say that a vendor -- if a vendor is

1 selling goods on 30-day terms, that's giving the debtors

2 post-petition credit, do they get a super priority claim?  I

3 mean, where does it stop?  Because if everybody gets super

4 priority, then super priority is completely meaningless.

5         And, you know, somebody had said this is usually

6 not an issue because usually there's DIP financing, under the

7 Code, they get super priority, and that's the end of it.

8 They're not going to share super priority with, you know,

9 inter-debtor transfers, you know, we don't have that here,

10 but that doesn't mean -- just because we don't have a DIP

11 financer, it does not mean a super priority status can be

12 given without authority under the Code just because it's

13 convenient for the debtors or because they gave notice to

14 parties.

15         And, you know, as we mentioned in our objection, I

16 mean, here there is -- I guess I would say it's somewhat

17 ironic that -- you know, I've been told by debtors' counsel

18 that the majority of these transfers between debtors are

19 going to be loans from the Alameda Silo to the dot.com silo.

20 That is not in the motion.  The motion actually has very

21 little information about what these transfers are and why

22 they're needed or the amounts or anything.  That's what I was

23 told, I assume that's true.  And, of course, we have no

24 prepetition allegations of money from customer accounts in

25 the dot.com silo being rated and sent to Alameda.  Now,

1  Alameda is going to be lending money to the dot.com silo and

2  getting super priority status.  There's something that's, I'd

3  say, troubling about that.

4           And I understand that there's reservation of

5  rights, you know, put in the order so that if later on it's

6  determined that money that's -- that Alameda has really

7  belongs to customers of other debtors, you know, that those

8  rights are reserved, but, again, elevating those types of

9  transfers from the Alameda silo to the dot.com silo over

10 ordinary course professionals -- not professionals, excuse me

11 -- well, actually, they are elevated over ordinary course

12 professionals as well.  And the professionals are here and if

13 they want to voluntarily subordinate their claims, then

14 that's fine, they can do that, somebody can consent to that,

15 but there's certainly no evidence that the numerous -- I'm

16 assuming numerous vendors and service providers to these

17 debtors post-petition have agreed to have their claims

18 subordinated to claims between the debtors or claims from

19 non-debtor affiliates to the debtors that take place after

20 the petition date.

21           THE COURT:  Well, isn't there protections built in

22 to avoid the issue of Alameda loaning money to the dot.coms

23 and the question being, well, is the money that Alameda is

24 loaning belong to somebody else, and that's being preserved,

25 right?  I mean, the only thing that the super priority claim

1  will do is make sure that any money loaned goes back to

2  Alameda and then the question of whether that money actually

3  belongs to Alameda, or some of the other debtors or customers

4  or whatever the case may be, is something that can be decided

5  at a later time?

6          MS. SARKESSIAN:  Yes, Your Honor, it is my

7  understanding that that is being preserved, but it does not

8  -- it doesn't address the issue of not having statutory

9  authority to expand super priority claims beyond what is

10  specified under the Code.

11         THE COURT:  Okay, I understand your point.

12         MS. SARKESSIAN:  Unless Your Honor has any further

13  questions, that concludes my argument.

14         THE COURT:  Okay.  Thank you, Ms. Sarkessian.

15         MR. DIETDERICH:  Thank you, Ms. Sarkessian.

16         Very briefly, Your Honor, Andy --

17         THE COURT:  You might need to raise the

18  microphones back up again just to make sure --

19         MR. DIETDERICH:  Sure, sorry.  Understood,

20  understood.  We should leave one low and one high, maybe.

21         Your Honor, just very, very briefly.  One factual

22  correction is we're talking about liabilities to the cash

23  management system, under no circumstances are we granting

24  super priority status to a claim by a non-debtor.  So even a

25  non-debtor subsidiary won't have super priority status under

1  the cash management system; this is for inter-debtor advances

2  only.

3           The only other thing I'd say is that there's lots

4  -- you know, practical arguments about this.  I think the

5  question before the Court is whether Your Honor has authority

6  to grant super priority status.  And, again, I submit that,

7  with respect to Ms. Sarkessian's position, there's no case

8  cited that you don't have the authority, there's no case

9  cited for the reading of the Bankruptcy Code that says that,

10 in the absence of a specific reference to super priority, you

11 can't grant super priority status, and there's no case cited

12 for her particular reading of 105, despite lots of

13 jurisprudence about how 105 is applied to circumstances where

14 the Code is, as it is in so many things in our practice,

15 silent on a particular practical issue.

16          Congress did not think about the question of how

17 to run intercompany cash management systems in a multi-

18 jurisdictional debtor.  I can assure you without having to

19 look to it, we're not going to find that in the legislative

20 history of the Bankruptcy Code.  But what it did do is it

21 gave the debtors discretion, put a creditors committee in

22 charge to oversee us, and gave Your Honor the authority

23 where, if something is not prohibited by the Code under 105

24 and consistent with what needs to be done in a case, to issue

25 the relief on that basis.

1           I think there is an interesting argument whether

2     you would have authority under 363(e) to do it as adequate

3     protection for a use of property of one debtor by another

4     debtor, and whether a debtor is an entity within the meaning

5     of 363(e).  We didn't make that argument; I think it's an

6     interesting argument.  I think we're just standing under

7     basic 105 authority and we think that's sufficient.

8           THE COURT:  Okay.  Thank you.

9           MS. SARKESSIAN:  Your Honor, if I could just

10    address this one factual issue.  I'm looking at the proposed

11    final order that was given to me last night that I'm not sure

12    if it's been filed yet, but the language says the net post-

13    petition liabilities at any time, from any debtor to any

14    other debtor -- and then they go silo pooling account -- and

15    then they have from any non-debtor affiliate to any debtor

16    under the post-petition cash management system shall be

17    entitled to super priority.  That's paragraph 5.

18          So, if that's wrong, we can change that, but I'm

19    reading that to say transferred from a non-debtor affiliate

20    to a debtor gets super priority.

21          MR. DIETDERICH:  Ms. Sarkessian, thank you.  Let

22    me look, a quick look.

23        (Pause)

24          MR. DIETDERICH:  I think that's correct, I think

25    that is wrong.  That speaks to an obligation nonsensically

1  from a non-debtor to the system having super priority status,

2  which is an overdraft.  Obviously, you can't award super

3  priority status to the obligations of a non-debtor because

4  you don't have authority over the non-debtor.

5              So that can be -- that's --

6              MS. SARKESSIAN:  That can be taken out?

7              MR. DIETDERICH:  -- an excellent catch and we can

8  fix that in the form of the order, and thank you very much

9  for that.

10             MS. SARKESSIAN:  At least my work is worth

11 something.

12             MR. DIETDERICH:  It's worth a great deal.

13        (Laughter)

14             MR. DIETDERICH:  And that's not -- and, for the

15 record, that is by far not Ms. Sarkessian's only very good

16 catch in our documentation.

17             THE COURT:  Oh, I know.  She catches a lot of

18 stuff.

19             MS. SARKESSIAN:  Thank you, Your Honor.  Well, I'm

20 glad we were able to say that.

21             THE COURT:  All right.  Okay.  Well, the only

22 question is whether I have the authority to grant super

23 priority status under 105 and I think that I do.  It's not an

24 issue that has, obviously, come up in the past because there

25 is no case law on it, but a number of courts have entered

1  them in situations such as this.

2          And, again, we have an unusual situation here.

3  There's no DIP financing, the debtors are operating on their

4  -- whatever cash they have available, and some might not have

5  the cash to do it.  And so I think this is consistent with

6  105, to the extent that 105 is intended to provide the Court

7  with the ability to fashion resolutions where the Code might

8  not provide a specific resolution, but it's necessary to

9  protect the interests of the constituencies involved in the

10  case.  And, here, I have all of the constituencies agreeing

11  that this is good for the case and good for their individual

12  constituencies.

13          So I will overrule the objection and will enter

14  the order subject to the revisions.  And you can work with

15  Ms. Sarkessian and, again, submit this under COC once you

16  have a revised form of order.

17          MR. DIETDERICH:  Thank you, Your Honor.

18          I think the last -- not the last -- I'm sorry, if

19  you could just give me a second.

20      (Pause)

21          MR. DIETDERICH:  The last motion for Your Honor to

22  consider today is the bidding procedures motion, Docket 24.

23  I was going to say last, but we also of course have the

24  status conference on schedule -- or the scheduling

25  conference.

1              THE COURT:  Okay.

2              MR. DIETDERICH:  So, Your Honor, the bidding

3    procedures motion, before we start here, we do have an

4    evidentiary record on bidding procedures today.  There are

5    two declarations to move into evidence.  The first is a

6    declaration of my partner Brian Glueckstein at Docket 412.

7    This is simply putting in front of the Court the privacy

8    policies for the various debtors.  And, again, Ms. Sarkessian

9    can confirm, but I do not believe we have an objection on

10   anything that goes to the consumer ombudsman issue -- if I'm

11   saying that correctly, ombudsman, I've always had trouble

12   with that word.

13             THE COURT:  Ombudsman, I believe.

14             MR. DIETDERICH:  Ombudsman.  The -- I believe that

15   the consensus is that no ombudsman is required in the case,

16   but Ms. Sarkessian can confirm.

17             And so I would just ask to move the declaration of

18   Mr. Glueckstein into evidence.

19             THE COURT:  Okay.  Is there any objection?

20        (No verbal response)

21             THE COURT:  It's admitted without objection.

22        (Glueckstein declaration received in evidence)

23             MR. DIETDERICH:  The second is the declaration of

24   Kevin Cofsky, who we heard from earlier, at Docket 413, and

25   I'd like to move that into evidence at this time as well.

1          I think Ms. Sarkessian may have a comment about

2   that declaration.

3          THE COURT:  Okay.

4          MS. SARKESSIAN:  For the record, Juliet Sarkessian

5   on behalf of the U.S. Trustee.

6          I object to the provision -- well, the statements

7   in paragraph 17 of Mr. Cofsky's declaration concerning bid

8   protections.  He addresses -- you know, he gives an opinion

9   that certain bid protections are, you know, common, et

10  cetera.  No -- the Court is not -- nobody is asking the Court

11  to approve bid protections at this time.  This is not

12  relevant.  We would ask that this -- there may be something

13  else in paragraph 17 that doesn't relate to bid protections

14  and I don't object to that, but anything relating to his

15  opinion or his testimony about bid protections, we would ask

16  that it be stricken at this time, you know, without prejudice

17  if they want to submit that, if later on the debtors are

18  requesting bid protections, and there is a procedure --

19  within the proposed bid procedures order, there is a

20  procedure whereby they can do that if they find a stalking

21  horse.  At that time, if they want to put in -- and, in fact,

22  we would say they would need to put in evidence to support it

23  -- they can do that at that time.

24         THE COURT:  Okay.  Mr. Dietderich?

25         MR. DIETDERICH:  Your Honor, Andy Dietderich.  We

1   disagree.  We think Mr. Cofsky's paragraph has actually been

2   drafted with respect to the basic situation, which is that we

3   are neither approving a sale nor the grant of stalking horse

4   protections today.  However, we are publicly announcing to

5   the world that bidding protections, stalking horse

6   protections are available.  And, in addition, we're

7   shortening the notice period for people to object to those

8   stalking horse protections.

9           So Mr. Cofsky's declaration is not intended to

10  prejudice anybody's ability to argue that bidding protections

11  given to a particular bidder in any circumstance are

12  unreasonable or inappropriate.  What they say is that, based

13  on his experience with bidding procedures generally, bidding

14  protections, as reflected in what we're doing publicly, are

15  appropriate and customary for sale transactions of this type

16  and in amounts that are reasonably and generally consistent

17  with such amounts in comparable circumstances.  He's not

18  saying that as applied to the facts of any particular bidder

19  or situation that they will be reasonable, but they're

20  reasonable generally.

21          In addition, he's saying that having this publicly

22  helps, quote, the ability to attract a prospective stalking

23  horse bidder by offering the bidding protections.

24          So it helps us as the debtor to have a banker who

25  has expertise in this area be able to say to anybody who

1  might be interested in putting forth a stalking horse bid

2  that, generically, this kind of stalking horse protection is

3  reasonable and customary for the circumstances.  We will not

4  be making any assurances to a bidder that bidding protections

5  will be granted to them in the particular facts of their

6  circumstances, nor do we mean to prejudice in any way the

7  ability of Ms. Sarkessian or the committee or any other

8  stakeholder to argue that the bidding protections as applied

9  to a particular bidder are unreasonable.

10         On that basis, we'd like to have the evidentiary

11  record that we were proposing.

12         THE COURT:  All right.  I'll overrule the

13  objection and take the testimony for what it is,

14  Ms. Sarkessian.  It certainly is not intended to indicate

15  that these bid protections will, in fact, be granted and

16  everyone's rights are reserved to object in the future, once

17  we have potential bidders lined up and are asking for bid

18  protections.

19         MS. SARKESSIAN:  Your Honor, will my ability to

20  cross-examine the witness later, if there are bid protections

21  being sought, will that be preserved or do I need to cross-

22  examine him now?

23         THE COURT:  Oh, no, absolutely preserved.  You

24  can -- you'll be able to cross him on anything when we get to

25  that point.

1              MS. SARKESSIAN:  Thank you, Your Honor.

2              MR. DIETDERICH:  Your Honor, the other concerns --

3    so, as we move down to the merits of the bidding procedures

4    order, Your Honor, I believe that all concerns have been

5    addressed and objections resolved, other than the objections

6    of the U.S. Trustee and Mr. Mallon (phonetic), the Mallon

7    objection that's on the docket.

8              Before I address the specifics of those, I'd like

9    to make a few general points for the Court and for the

10   record.  The first is, by far, the most important.  We have

11   not made a decision to sell anything and we're not asking you

12   permission to sell anything today.  This effort is part of a

13   process to look at all of our options across the very

14   complicated set of assets.  These particular businesses have

15   been identified earlier, because they are less integrated,

16   and sometimes not integrated at all, into the operations of

17   FTX.

18             Ledger X is a separately regulated exchange, a

19   derivative exchange with a different business model,

20   regulated by the CFDC.  It has regulatory capital

21   requirements, a relationship with its regulators, et cetera.

22   Embed (phonetic) is not regulated to the same -- in the same

23   way, but is separate.

24             Japan is in Japan, subject to pretty intense

25   regulation by the Japanese authorities.  The Japanese rules

1  for cryptocurrency are totally different than our rules.

2  Japan requires, for a cryptocurrency business, the

3  segregation in cold wallets, of all of the cryptocurrency

4  responding to customer entitlements and it has very strict

5  rules about entrust relationships that are established under

6  law and segregation rules that are established under law for

7  cryptocurrency and cash.  A completely different profile from

8  what's happening in any other exchange transactions.

9          And Europe, of course, has a Cyprus exchange that

10 has been run independently with a different customer base.

11 All of these businesses were actually recently acquired by

12 FTX; they weren't originally developed as part of the

13 development of the international platform.  They were all

14 recent acquisitions that have not been fully folded in to

15 FTX's operations, which is one of the primary reasons that we

16 believe there may be independent value.

17          But again, this is price discovery.  This is the

18 ability to create an option to sell if the debtors and the

19 consulting professionals believe it's appropriate under the

20 circumstances.  And I just want to assure everyone that there

21 has been no decision.  Our Board hasn't decided to sell

22 anything and we would need to present the business case to

23 our Board, based on the facts and circumstances.

24          The second is related, that we don't know if we're

25 going to sell the businesses, how we're going to sell the

1  businesses.  So, there's a comment from the U.S. Trustee that

2  we should have a form of asset purchase agreement.  We don't

3  have a form of asset purchase agreement, because we don't

4  know if it's an asset purchase.  It might be a stock sale.

5  It might be a merger.  We might sell one of the businesses in

6  combination with one of the other businesses.

7           What will determine this will be indications of

8  interest that we have not received and our sense, again,

9  working with the consulting professionals on how to make the

10 most money to return to creditors and customers.

11          There is a question whether some of these

12 businesses have synergies with businesses that we are looking

13 at retaining or possibly reorganize or selling separately,

14 for example, the international platform, or even the U.S.

15 exchange.  The question on synergies, of course, is not that

16 you wouldn't sell something because they're synergies, but on

17 whether or not the buyer is paying you enough to compensate

18 for the loss of those synergies if you kept the asset.  These

19 are synergistic to other buyers, just as they might be

20 synergistic to us, and so we're going to look at the price

21 determine -- that determines out of the marketing process in

22 order to make decisions.  We do have substantial interest so

23 far in all of these assets.

24          The other thing I'd note is just that -- and I

25 mentioned this in my preliminary remarks about this motion,

1  that we do have a shortened procedure for relief, a shortened

2  objection period for stalking horse protections, and so Your

3  Honor should just be aware of that.

4         I'd like to turn to the objection for the U.S.

5  Trustee.  As I mentioned, the first objection was that we

6  should have a form of asset purchase agreement.  Again, we

7  don't know that we're going to be using that particular form

8  of a transaction.  We might.  We're highly likely to for some

9  of these assets, and when we have a form of asset purchase

10 agreement, we've committed to put that in front of people,

11 well in advance of any auction.

12        Obviously, if we have a stalking horse, the

13 stalking horse will have an important role to play in what's

14 in the asset purchase agreement.  And there's many bidders in

15 many auctions where we run the auction off the back of a

16 specific asset purchase agreement or structure that our

17 stalking horse believes is important to the stalking horse.

18        A related objection is a request that we commit to

19 the U.S. Trustee now to preserve "all books and records."  We

20 absolutely intend to retain copies of books and records for

21 the businesses we're selling for a long list of reasons.  And

22 any standard form asset purchase agreement, there's a set of

23 covenants about records retention.  We're not able to retain

24 records in most circumstances for any purpose whatsoever;

25 generally, there's a purpose limit on our ability to retain

1  records when we sell a company.  One of those purposes is

2  always our ability to investigate or our ability to relate to

3  regulators, our ability to do our taxes.  And so, the debtors

4  are not going to lose access to anything that has to do with

5  causes of action or investigations in connection with an

6  asset purchase agreement, but again, with respect, I think

7  the objection is premature, until we have an asset purchase

8  agreement to show to stakeholders so they can review this

9  provision and determine whether or not it's adequate.

10         We're not going to commit today.  We're not

11 willing to commit today to simply preserve all books and

12 records with such simple language.

13         The other objection from the U.S. Trustee is that

14 we are not agreeing now that we will never release claims

15 against the employees.  So, we have committed, because it's

16 obvious and easy to do, that we are not releasing claims

17 against Sam Bankman-Fried, Gary Wang, Caroline Ellison,

18 Nishad Singh, or I believe we have some language, any of

19 their family or related persons.  But releases of employees

20 are sometimes an important part of the disposition of a

21 business when you're the buyer because the value of some of

22 these businesses is in the people, and as the buyer, you want

23 the people protected.  The last thing you want to do if you

24 buy a business is to have rank-and-file employees sued by the

25 person you just bought the business from.

1          Now, this raises a related point and it's

2   important to say, I think, for the record, as a more broad --

3   as a more -- something more for Your Honor to understand,

4   based on the review of Mr. Ray and his team so far, we have

5   no indication that rank-and-file employees of the debtors,

6   generally, were complicit in fraudulent activity.  Neither

7   the indictment of Mr. Bankman-Fried, nor the pleas of

8   Ms. Ellison or Mr. Wang, include criminal charges against the

9   debtors as enterprises.  Indeed, from my initial remarks,

10  Your Honor, I explained that at least the core part of the

11  fraud could be implemented with a single number in the Code

12  for the platform put in by programmers.

13          The nature of this is still under investigation to

14  be decided, but, you know, for the sake of all of the

15  employees of FTX, we have no indication that this was the

16  kind of problem that results in a which will charge against

17  an enterprise, as opposed to against individuals at the top.

18          MS. SARKESSIAN:  Your Honor, I have to object.  I

19  feel like there's testimony, factual testimony being given

20  here.

21          THE COURT:  I agree and I take no note of it.

22  It's not in evidence.

23          MS. SARKESSIAN:  Thank you.

24          MR. DIETDERICH:  And that is exactly my point, and

25  my point is that this is a sale objection and that when we

1 have a sale transaction, and if that sale transaction

2 involves the release of employees, we will have to make an

3 evidentiary showing that we have a business judgment for that

4 release.  But right now, it's a sale objection; it's not

5 before the Court.  And we would submit, respectfully, it's

6 not appropriate to restrict our ability to solicit interest

7 in these companies on a basis that we have to commit now for

8 what's going to be in our sale order or in our asset purchase

9 agreement.

10          THE COURT:  Okay.  Thank you.

11          MR. DIETDERICH:  One other thing, Your Honor,

12 before I leave -- sorry -- Mr. Mallon, his objection --

13          THE COURT:  Yes?

14          MR. DIETDERICH:  -- alleges a security interest

15 arising, as best I can understand it, under Swiss law.  That

16 objection, obviously, can be resolved by its sale objection,

17 but in addition, we're able to attach a lien to the extent he

18 had a security interest on the proceeds of the sale, that

19 will, of course, resolve in connection with a sale.  So, we

20 think that objection should be overruled and the matter

21 reserved for the sale hearing.  Thank you.

22          THE COURT:  Thank you.

23          MR. HANSEN:  Your Honor, Kris Hansen with Paul

24 Hastings, on behalf of the Committee.

25          Just before Ms. Sarkessian goes, I wanted to note

1  our reservation of rights.  I'll be brief.  I know we're

2  running long today.

3          Your Honor, the Committee is taking a very

4  cautious approach to this bidding procedures motion.  It's

5  early days in the case and as I mentioned before, we have a

6  lot of concerns about value preservation and value

7  maximization.  And so, we support the debtors' view that this

8  is a "wait and see" process.  We have a number of issues that

9  we've identified in our reservation of rights from timing to

10  access to information, to be able to make decisions for the

11  debtors and the Committee and for the Court, but also for

12  bidders to be able to make those decisions.  And I won't go

13  through them all individually here, I would just, again,

14  refer the Court to our reservation of rights, but I did want

15  to make sure that the Court understood from the Committee's

16  perspective, we may be back, to the extent the debtor seeks

17  to sell an asset and Committee disagrees with that, we may

18  raise an objection at that point in time.

19          And it's about value maximization and it's about

20  alternatives.  One of the things that Mr. Dietderich alluded

21  to is the connectivity of these businesses or maybe the lack

22  thereof, to the broader platform.  And as I mentioned earlier

23  to the Court, the Committee is hard at work with the debtors

24  to try to understand what the parameters are for potentially

25  restarting the exchanges and reorganizing this enterprise.

1  And when we move quickly to sell off pieces of the business,

2  we need to understand their connectedness.

3         And so, yes, Ledger X, from a factual perspective,

4  Embed, and others were purchased more recently, but we don't

5  know if they're entirely severable, (indiscernible) if that

6  severance of them from the broader platform will have a

7  deleterious effect on the value of the enterprise as a whole.

8  So, that's something that we're keeping an eye on.  We

9  recognize this process is moving quite quickly, so we're

10 doing our work quickly, as well, but we just wanted to note

11 our reservation for the Court.

12         THE COURT:  Okay.  Thank you.

13         MR. HANSEN:  Thank you, Your Honor.

14         MR. HARVEY:  Good afternoon, Your Honor.  May I

15 please the Court?  Matthew Harvey from Morris, Nichols, Arsht

16 & Tunnell, on behalf of the Ad Hoc Committee of non-U.S.

17 customers of FTX.com.

18         I rise, Your Honor, only to say a couple of

19 sentences of our resolution with the debtors.  Your Honor, we

20 filed a limited objection to the sale.  We discussed our

21 limited objection with the debtors in connection with, excuse

22 me, a larger role of the Ad Hoc Committee -- with the larger

23 role of the Ad Hoc Committee as serving and ensuring that

24 FTX.com customers have access to information and an

25 opportunity to be heard, whether there may be conflicts --

1   and maybe "conflicts" isn't even the right word -- with the

2   debtors or the official Committee.

3            We were pleased with the debtors' acknowledgment

4   and discussion with us of the group's role in the cases and

5   representations regarding further cooperation going forward

6   and, accordingly, we're withdrawing our objection.  Thank

7   you.

8            THE COURT:  Okay.  Thank you.

9            Anyone else?  Ms. Sarkessian?

10           Your Honor, our objection set forth, I would say,

11  four categories of objections.  We have resolved two of them.

12  So the first objection was going ahead with the sale without

13  having adequate information and that included both -- I guess

14  I may have used the form asset purchase agreement -- any type

15  of sale agreement, whether it be stock sale, asset sale,

16  there is no form of sale agreement and, of course, there is

17  no schedules and statements or Rule 2015.3 reports.

18           We have resolved that.  The debtors are going to

19  be filing forms of whether it be asset purchase agreements,

20  stock purchase agreement, whatever it is, at least two weeks

21  before the sale date of any sale.  They are also going to

22  give the U.S. Trustee and the committee, even before that,

23  before its uploaded to the data room, they are going to give

24  the forms to us.

25           With respect to the schedules and statements an

1  order has been -- a proposed order has been submitted, maybe

2  Your Honor has already signed it, where the schedules and

3  statements will be filed for the asset sales, at least, two

4  weeks prior to the sale which will give my office enough time

5  to take a 341.  Then the same will be done for the Rule

6  2015.3 reports for those debtors who are selling stock in

7  non-debtor subsidiaries.  They would be filing that report,

8  at least, two weeks.  So I will still have to do two 341

9  Meetings on those, but at least I won't have to do three.  So

10 that is definitely an improvement.  So that has been

11 resolved.

12          The other thing was, essentially, a reservation of

13 rights regarding the ombudsman because there was nothing in

14 the record about the debtor -- the privacy policies for these

15 particular businesses and now they have put in that evidence.

16 They have attached all the privacy policies.  I think there

17 is an even an official translation of the Japanese one.  And

18 based on our review of that we believe that the debtor has

19 established that a consumer privacy ombudsman would not be

20 required with respect to these particular sales.  So we are

21 not pursuing that objection.

22          So what remains, and -- so there's two issues that

23 remain.  I think on the records retention, you know, we just

24 want to make sure nothing is lost that the debtors are

25 retaining all records that could potentially be relevant in

1  any civil criminal proceeding.  You know, we will look to see

2  what the wording is when we see if there is a sale agreement,

3  but, you know, we are glad that they are willing to do that

4  and we think that that is very important.

5        We just want to make sure that everything is

6  preserved and there is not some type of discretion, I guess I

7  would say, from the debtor's viewpoint of -- and we

8  understand that the original records will be transferred, we

9  are just talking about copies here.  But we don't want them

10  to say, well, we're not going to keep a copy of this because

11  the debtor makes the determination that it doesn't think it's

12  going to be relevant down the line in some proceeding.

13        Well a regulator might have a different view of

14  that.  So we think the widest -- I mean, again, we're talking

15  about saving copies of documents almost all of which, I am

16  going to guess, are electronic.  So I don't think it would be

17  any burden on the debtor.  I don't think that needs to be

18  addressed now.  I agree with that.  I just wanted to put it

19  on the radar.

20        The issue does need to be addressed now is we are

21  very concerned about the possibility that the debtor is going

22  to be selling or welcoming offers to purchase causes of

23  action against current or former -- it's not just rank and

24  file employees, its directors, its officers, or employees.

25  That specifically is mentioned in the bid procedures that if

1  someone is interested in purchasing it they have to indicate

2  that.  So I think they're welcoming that type of thing.

3          Yes, after we made our objection or we -- after we

4  conveyed our objection to the debtors on this regard they put

5  in a paragraph in the order that said, okay, with respect to

6  Mr. Bankman-Fried and three other top officers we agree, we

7  will not sell any causes of action against them or their

8  family members.  And that is a good first step, but I think

9  that it seems that the debtors have concluded, at this very

10  early stage of the case, before there has been an

11  investigation, an examination by an independent entity into

12  possible causes of action arising out of the debtors -- the

13  events that cause the debtor to file for bankruptcy.

14          Before that has taken place they have reached the

15  conclusion that there is only four people at the top that

16  were responsible for all of this and that out of the hundred

17  plus companies of the debtors that there was nobody else, be

18  it other officers or other employees, that either assisted

19  them in wrongdoing, or aiding and abetting, or were negligent

20  and missed something they should have seen, turned a blind

21  eye maybe nobody else was, maybe it was only four people that

22  committed this, allegedly, massive fraud involving billions

23  of dollars and nobody else in the organization and none of

24  their professionals and nobody else knew about it.

25          There needs to be an investigation before those

1  causes of action are sold.  You know, okay, there's a

2  business in Japan.  Where is the evidence that nobody in

3  Japan was involved with any wrongdoing?  Where is the

4  evidence that nobody in Japan knew about any of this?  We

5  don't know.  It's too early.

6          So we feel that given the situation that there

7  should be added to that list, you know, not just four names;

8  any officers or directors, any employees, any family members

9  of officers, directors, any companies that are controlled by

10  officers or directors, again former or current, or controlled

11  among an officer and their family members.  I mean there is a

12  wide range here.

13          These causes of action should not be sold at this

14  point in time.  Now the debtors say, oh, well, you know, we

15  can deal with that at the sale.  Here is the problem: right

16  now we have no purchase agreement to look at.  We have no

17  idea what they are proposing in this regard.  We are going to

18  be getting, potentially, if there's stalking horses, seeing a

19  stalking horse asset purchase agreement or a stock purchase

20  agreement.  We are going to have seven days to review it and

21  make an objection; it's a very small period of time.

22          There is going to be schedules.  There will be

23  schedules about which causes of action are going to be

24  purchased.  There might be placeholders in those schedules.

25  I mean we have seen this many a time.  Schedules aren't

1  filed, they're not ready yet.  Then we go to the auction

2  maybe somebody else or another stalking horse wins.  Now you

3  have a tiny window of a few days between the auction and the

4  sale hearing where they're negotiating the purchase

5  agreement; that gets filed, you know, maybe a day before the

6  sale hearing.

7          Again, a lot of times, oh, the schedules aren't

8  attached, they're not finished, or here they are, but they

9  can be amended.  They can be amended up until the time of the

10  closing or even after the closing.  So we're going to be

11  scrambling trying to figure out its hidden somewhere in there

12  are they selling causes of action.  I mean it's not going to

13  be like there is a bright shining light on it.

14          That is a real concern. It's going to be a very

15  small period of time to look at it and we might not see it.

16  It might not even be included or, again, they could amend

17  later after the sale hearing.  That is typically said, oh, we

18  have the right to amend the schedules.

19          So in this case, given what the situation is, this

20  early on, before an independent investigation we think it is

21  just completely inappropriate to be selling -- to be even

22  considering selling these types of claims. If the debtors are

23  willing to have a prohibition against claims against the top

24  four they should be willing to expand that to all directors,

25  officers, employees, again, companies that are controlled by

1  them, and professionals, prepetition professionals; no claims

2  against them should be sold.

3          So that is what we think is appropriate at this

4  point in time.  And if the debtors cannot do that, if they

5  say we're not able to do that then maybe the sale should be

6  put off.  Maybe it's too early to do the sales if that is the

7  situation because we don't have the information, we don't

8  have the investigation, and you are going ahead with a sale.

9  So either that has to be carved out of the sale or you have

10 to wait to do the sale until that investigation is complete.

11 That is what the U.S. Trustee thinks one choice or the other.

12 You cannot move forward at this stage of the case without an

13 independent investigation selling causes of action against

14 directors, officers, employees or professionals.

15          THE COURT:  Well isn't there a way -- I mean, I

16 certainly would consider any requests from the U.S. Trustee

17 if the debtors were trying to jam the Trustee at the time of

18 a sale hearing that you didn't have time to conduct whatever

19 review you needed to do, to raise whatever objections you

20 needed to raise at the time of the sale hearing.

21          We don't even know yet whether the debtors are

22 even going to sell these assets.  And we don't know whether

23 it's going to be an APA, a merger, a stock purchase; we don't

24 know at this point.  I think they're -- I think the debtors

25 are trying to dip their toe into the water to see what

1  happens, see what kind of interest they receive.  I think

2  it's important to be allowed to do that.

3         We always have -- we have a lot of cases where

4  there's an expedited sale process for one reason or another.

5  I understand your concerns about whether there is other

6  people who might have been at fault other than these four

7  executives that have been specifically named.  And I would

8  also, perhaps, say to the debtors that if they do receive a

9  stalking horse bid that includes the purchase of causes of

10 action that they immediately notify the U.S. Trustee so that

11 its not hidden in a gigantic sale agreement, that you have

12 some advanced notice that the issue is live. It might not be.

13 They might not want to buy the causes of action.  They might

14 just want to buy the platform or the assets and leave the

15 employees behind, I don't know at this point.

16        MS. SARKESSIAN:  Your Honor, could we -- I mean

17 following up on that idea, I think it should be -- we would

18 appreciate it if it was more than just letting us know. Of

19 course, we would like to know.  We think this is important

20 enough that there be a filing that highlights so that

21 everybody can see if the debtors were selling causes of --

22        THE COURT:  I agree, that should be done.  It can

23 be done like we do with a motion to approve a DIP.  You know,

24 we have certain requirements that certain things have to be

25 highlighted in that motion so that everyone knows that it's

1  in there so we can fashion a form of order that includes that

2  when they file -- when they receive a stalking horse bid and

3  they file it they include in that filing something that

4  highlights for everybody that they're proposing to sell the

5  causes of action.

6         That helps alleviate some of the time issues for

7  you and for others who might want to object.  And I am

8  certain that Mr. Hansen and his colleagues, on behalf of the

9  committee, are going to be investigating whether there are

10 causes of action against any of these other employees.  And

11 hopefully we will have some understanding of that as well

12 before we get to the point where the sales are being sought

13 to be approved.

14        MS. SARKESSIAN:  Your Honor, thank you.  I

15 appreciate that.  I think, again, it could also come up,

16 again, assuming if the stalking horse bidder is either not

17 the winning bidder or is the winning bidder, but the

18 agreement gets amended, which is possible, right, I mean

19 after the auction, okay, we agree to pay more, but then we

20 want these causes of action.  Again, at whatever stage if

21 causes of action are being sold that they be highlighted.  So

22 whether it's a stalking horse stage, whether it's the winning

23 bidder at the auction, and now they're filing their purchase

24 agreement to highlight that.

25        THE COURT:  I agree.

1      MS. SARKESSIAN:  Specifically, not just we're
2  selling causes of action, what causes of action.

3      THE COURT:  I agree.

4      MS. SARKESSIAN:  Thank you, Your Honor.

5      THE COURT:  That makes sense.

6      MR. DIETDERICH:  Thank you, Your Honor.  Andy
7  Dietderich.

8      We can confirm that is a great approach to the
9  solution.  In fact, that is exactly why we actually had it
10  called out in the solicitation of indications of interest
11  because we knew we had a special process to run for any
12  bidder that wanted to do the release.

13      THE COURT:  Okay.

14      MR. DIETDERICH:  So thank you, Your Honor.  With
15  that I don't think there is any other comments on the sale
16  order.  So I would respectfully ask the Court to enter the
17  order.

18      THE COURT:  Well we need to revise the order.

19      MR. DIETDERICH:  Revise the order, of course.

20      THE COURT:  Then submit it under COC and we will
21  get it entered.

22      MR. DIETDERICH:  All right.  Thank you.

23      With that I think the only business -- the only
24  remaining business is the scheduling matter.

25      THE COURT:  Okay.

1          Mr. Bromley, go ahead.

2          MR. BROMLEY:  Good afternoon.  May I please the

3  Court, Jim Bromley of Sullivan & Cromwell on behalf of the

4  debtors, Your Honor.

5          This is the time that we need to deal with the

6  scheduling of the motion for the appointment of an examiner.

7  The motion has been filed by the U.S. Trustees Office.  We

8  have consulted with the Office of the U.S. Trustee and the

9  creditor's committees counsel.  And the view of the debtors

10 and the creditor's committee's counsel is that the hearing

11 that has been reserved on the 8th of February, which is an

12 omnibus hearing date, is the appropriate date to go forward

13 with the motion for the examiner.

14         We, the debtors, are cognizant that the motion has

15 been filed for some time, but the date has been held in

16 abeyance.  We do have certain limited discovery requests to

17 make of the U.S. Trustees Office.  We will have submissions

18 ourselves that we will be making, both evidentiary and legal.

19 Our suggestion is that the papers and our declarations in

20 support of our papers be filed on Monday, January 30th.  That

21 would give the U.S. Trustees Office time to respond and to

22 seek to depose any witnesses that we have.

23         We would suggest, as well, that the U.S. Trustees

24 Office, and the committee, and we consult for a pretrial

25 order that would be submitted to the Court no later than

1  Friday the 3rd of February.

2          THE COURT:  Ms. Sarkessian, any -- well, let me

3  ask Mr. Hansen first.  Now that we have a committee we need

4  to know your view as well.

5          MR. HANSEN:  Exactly, Your Honor.  So we agree

6  with Mr. Bromley.  Again, its Kris Hansen with Paul Hastings

7  on behalf of the committee.  We agree with Mr. Bromley in

8  terms of the dates.

9          I just wanted to point out for the Court that we

10  also may have evidence to present.  We will make that

11  decision in enough time to let Ms. Sarkessian know so that

12  she can similarly take discovery of our witness as well if we

13  have that.

14          THE COURT:  Well I currently have an omnibus

15  hearing on the 8th scheduled at one for this case, and I have

16  two other matters on that morning.  So if we're going to have

17  an extensive evidentiary presentation I may need to move the

18  date or if I can't I will move the other matters and move

19  this one up for the full day.  It sounds like we may need a

20  full day for this hearing.

21          MR. HANSEN:  I think between argument and

22  potential evidence I don't know that it would take a full

23  day, but I think you should reserve that, Your Honor.

24          THE COURT:  Okay.

25          MR. HANSEN:  Jim, I'm not sure if you have a

1  different view.

2          MR. BROMLEY:  I agree with that, Your Honor.

3          THE COURT:  All right.  Let me hear from Ms.

4  Sarkessian.

5          MS. SARKESSIAN:  Thank you, Your Honor.  For the

6  record Juliet Sarkessian on behalf of the U.S. Trustee.

7          Your Honor, we understand from the last hearing

8  that Your Honor had the February 20th date that is scheduled

9  in this case that Your Honor has the entire day for this case

10 if I am correct about that.

11         THE COURT:  February 20th?

12         MS. SARKESSIAN:  I'm sorry, January 20th.  I don't

13 know why I keep saying February.  January 20th.

14         THE COURT:  That's a holiday, Court holiday.

15         MS. SARKESSIAN:  January 20th.  Friday, January

16 20th which I believe had been scheduled primarily for a

17 hearing -- well, there's a few things:

18         There's a hearing in connection with the Robinhood

19 stock which has been seized.  And I believe last time around

20 debtor's counsel indicated that might be moot because of the

21 seizure.  There were also fi

22         The U.S. Trustee believes that that would be the

23 best date for the hearing on the examiner, in part, because

24 we do have issues with certain of the retention applications

25 that are scheduled for hearing on January the 20th that the

1   scope of the retentions encompasses work that might be done

2   by an examiner.  So we think that argument, sort of,

3   dovetails with the examiner motion and it makes sense to have

4   them both heard at the same time.

5          Our examiner motion has been on file since

6   December the 2nd.  So, obviously, has had more than enough

7   time to address that.  We recognize that committee counsel

8   has not been -- was retained on, I believe, December the

9   20th, but nevertheless, you know, there has been a good

10   amount of time to respond.  So we would ask for that.

11          Absent in the alternative we would ask if Your

12   Honor has a date.  We too were concerned about February the

13   8th not being adequate time with it being scheduled at 1 p.m.

14   So we were wondering if Your Honor has a date between the

15   20th, January 20th and the February the 8th that would have

16   more time available then the 8th.

17          The other thing I would say is that, you know, the

18   U.S. Trustee would need to get the reply on file three days -

19   - three business days prior to the hearing.  So we would --

20   given how long parties have had our motion we would like to

21   have, at least, a week between when the objections are filed

22   and when our reply is due.

23          If, for example, Your Honor was to say put the

24   hearing on the 8th since our reply would be due February the

25   3rd we would want objections filed to January the 27th to

1  give us one week.

2          THE COURT:  Okay.  All right.  I do think I need

3  to -- the 20th doesn't work, I don't think, for this.  It's

4  too soon.  There is outstanding discovery.  If it hasn't

5  already been issued it will be issued, I assume.

6          Are you taking any discovery?

7          MS. SARKESSIAN:  I have received no discovery. I

8  am trying to imagine what possible discovery there could be

9  against the U.S. Trustee, but I have not received any.

10          We have not seen an objection, so we don't know

11  who their witnesses are.  We have no idea if they're, in fact

12  -- Your Honor, the U.S. Trustees position is that this is

13  mandatory under the code and, therefore, there is not a need

14  to have any evidence.  It's legally mandatory.  Nevertheless,

15  we understand that the parties may want to put on evidence,

16  but we don't know who they plan to put on, what they plan to

17  put on; we have no idea.

18          THE COURT:  I think you're familiar with my

19  position on the mandatory nature of the appointment of an

20  examiner.

21          MS. SARKESSIAN:  Yes, Your Honor.

22          THE COURT:  For the record, I do not believe it's

23  mandatory.

24          MS. SARKESSIAN:  Yes.

25          THE COURT:  Let's do this: I think the 8th -- I

1  want to make sure we have a full day. I am going to

2  reschedule this for February 6th which is Monday of that

3  week.  We will start at 9:30 a.m. The debtors and the

4  committee's responses will be due by the 25th.  Then the

5  Trustee will have until the 1st.

6          So you have a week, Ms. Sarkessian, for your

7  reply.

8          MS. SARKESSIAN:  Yes, Your Honor.  Thank you.

9          THE COURT:  Then we will have the hearing on the

10  6th.  If there is a -- pretrial orders are always helpful for

11  me.  So if there is -- if we're going to have an evidentiary

12  hearing on the 6th let's have a pretrial order by close of

13  business on the 3rd.  So 5 p.m. on the 3rd.

14          Mr. Bromley and Mr. Hansen, one, if you are going

15  to take discovery of the U.S. Trustee, please, do that

16  immediately so that Ms. Sarkessian knows that she needs to do

17  some discovery work.

18          Ms. Sarkessian, in light of my view on the

19  mandatory nature of the appointment of an examiner I don't

20  know if that now opens up for you your desire to take

21  discovery of the debtors, but if you do you should do that,

22  obviously, as soon as possible.

23          MS. SARKESSIAN:  Understood, Your Honor.

24          THE COURT:  Did I miss anything?  Did I cover all

25  of the issues?  Do I have all of the dates that we need for

1  everybody?

2          MR. BROMLEY:  I think that is all of the dates

3  that we need, Your Honor.  Thank you very much.

4          THE COURT:  Okay.  Ms. Sarkessian, anything else?

5          MS. SARKESSIAN:  I don't -- I think those are all

6  the dates in connection with the examiner motion.

7          THE COURT:  Okay.  Thank you.

8          All right.  Are we done?  Oral argument 12

9  minutes.

10         MR. GLUECKSTEIN:  30 seconds.

11     (Laughter)

12         MR. GLUECKSTEIN:  We really appreciate the Court

13  indulging us for such a long hearing today.

14         The only other scheduling matter I wanted to

15  raise, Your Honor -- Brian Glueckstein for the debtor.  There

16  was reference to the January 20th hearing.  We did elude to

17  this in the status conference a week ago, we have been in

18  touch with counsel for BlockFi and we are asking to adjourn

19  the hearing on the 20th with respect to our motion to enforce

20  the automatic stay with respect to the Robinhood issues.

21  BlockFi has a related motion, an evidentiary motion, that is

22  part and parcel of that hearing.

23         We are asking at this time that that hearing be

24  adjourned to a date to be determined.  We will come back to

25  the Court in light of the Government seizure of the shares.

1  There was a proceeding in the BlockFi bankruptcy case earlier

2  this week and that parties are continuing to talk about next

3  steps there with respect to all of the issues involving the

4  Robinhood shares.  We would benefit from some time.

5          So we would ask, with Your Honor's permission,

6  that we adjourn that hearing on those two issues.  There are

7  other things, of course, scheduled that day, the retention

8  motions and status conference that Your Honor ordered this

9  morning on the redaction issues.  But with respect to the

10  debtor's motion and related evidentiary issue we ask that

11  that be adjourned.

12          THE COURT:  What is BlockFi's position on the

13  continuance of their motion?

14          MR. GLUECKSTEIN:  They represented to me -- they -

15  - we had an email exchange this morning where they said they

16  were okay with us so representing.

17          THE COURT:  Okay.  We will take that off then for

18  the 20th; both of those off for the 20th.

19          Anything else before we adjourn?

20      (No verbal response)

21          THE COURT:  All right.  Thank you all very much.

22  We are adjourned.  I will see everybody on the 20th.

23          (Proceedings concluded at 1:48 p.m.)

24

25

1                          CERTIFICATION

2          We certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of our

5    knowledge and ability.

6

7    /s/ William J. Garling                January 12, 2023

8    William J. Garling, CET-543

9    Certified Court Transcriptionist

10   For Reliable

11

12   /s/ Tracey J. Williams                January 12, 2023

13   Tracey J. Williams, CET-914

14   Certified Court Transcriptionist

15   For Reliable

16

17   /s/ Mary Zajaczkowski                 January 12, 2023

18   Mary Zajaczkowski, CET-531

19   Certified Court Transcriptionist

20   For Reliable

21

22   /s/ Coleen Rand                       January 12, 2023

23   Coleen Rand, CET-341

24   Certified Court Transcriptionist

25   For Reliable