## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| | **Ref. No. 270** |

**SUPPLEMENTAL DECLARATION OF ANDREW G. DIETDERICH
IN SUPPORT OF DEBTORS' APPLICATION FOR AN ORDER
AUTHORIZING THE RETENTION AND EMPLOYMENT OF
SULLIVAN & CROMWELL LLP AS COUNSEL TO THE DEBTORS AND
DEBTORS-IN-POSSESSION *NUNC PRO TUNC* TO THE PETITION DATE**

I, Andrew G. Dietderich, under penalty of perjury, declare as follows:

1.        I am admitted to practice law in the State of New York and the Southern District of New York.  I am a partner in the law firm of Sullivan & Cromwell LLP ("S&C" or the "Firm"), which maintains an office at 125 Broad Street, New York, NY 10004-2498.  On December 21, 2022, I submitted a declaration (the "Original Declaration") in support of the *Debtors' Application for an Order Authorizing the Retention and Employment of Sullivan & Cromwell LLP as Counsel to the Debtors and Debtors-in-Possession* Nunc Pro Tunc *to the Petition Date* [D. I. 270] (the "Application").[2]  I submit this supplemental declaration (this "Supplemental Declaration") in further support of the Application.  Unless otherwise stated in this declaration, I have personal knowledge of the facts set forth herein.

---

[1]    The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively.  Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

[2]    Capitalized terms not otherwise defined herein are to be given the meanings ascribed to them in the Application or the Original Declaration, as applicable.

2.	I have reviewed the *Amended Objection to Debtors' Application for an Order Authorizing the Retention and Employment of Sullivan & Cromwell LLP as Counsel to the Debtors and Debtors-in-Possession* Nunc Pro Tunc *to the Petition Date* [D.I. 459] (the "Winter Objection"), the *Objection of the United States Trustee to Debtors' Application for an Order Authorizing the Retention and Employment of Sullivan & Cromwell LLP as Counsel to the Debtors and Debtors in Possession* Nunc Pro Tunc *to the Petition Date* [D.I. 496] (the "UST Objection") and the Joinder to the Winter Objection by Richard L. Brummond [D.I. 502] (the "Brummond Objection").

3.	This Supplemental Declaration provides additional information about S&C's relationships with FTX before the Chapter 11 cases and certain matters requested by the U.S. Trustee as well as describes my personal involvement with FTX in the events that led to the Chapter 11 Cases.

## Events Leading to the Appointment of John Ray

4.	In the Winter Objection, Mr. Winter repeats public allegations attributed to Sam Bankman-Fried concerning the events immediately prior to the commencement of these chapter 11 cases, including that Mr. Bankman-Fried was "put under extreme pressure to file for Chapter 11" by S&C.  Winter Objection, ¶ 8.

5.	This is false.  Mr. Bankman-Fried decided to appoint John Ray as Chief Executive Officer after consultation with his father, Joseph Bankman, a Stanford law professor, and three personal lawyers:  another Stanford law professor, a leading criminal defense lawyer and a leading international bankruptcy lawyer.  Mr. Ray, not Mr. Bankman-Fried, subsequently decided to file the Debtors for chapter 11 protection.

6. Every engagement of S&C for the Debtors is described later in this Supplemental Declaration.

7. The following is a short description of my recollection of the events that led to the appointment of Mr. Ray.

8. My first matter for the Debtors related to the chapter 11 filing of Voyager Digital Holdings, Inc. and its debtors affiliates (collectively, "Voyager"), in July 2022. On the Voyager matter, S&C replaced the Latham law firm as the prior counsel on the file after an introduction by Ryne Miller, an S&C alumnus who was the General Counsel of FTX US, to Can Sun, the General Counsel of FTX International. S&C reported on the Voyager matter to Mr. Sun, Ramnik Arora, the Head of Product at FTX,[3] and Rahul Sharma, the Deputy General Counsel of LedgerX, who had prior chapter 11 expertise.

9. Mr. Sun and Mr. Arora also engaged S&C on the three other restructuring matters, which are detailed in paragraphs 48-50 below. On all of these matters, S&C reported to one or more of Mr. Sun, Mr. Arora or Mr. Sharma on a day-to-day basis.

10. On November 8, 2022, there were rumors that FTX.com had stopped processing customer withdrawals. At 8:44 a.m., I received an email from Mr. Sun asking me to join a videoconference with him and Mr. Miller. In that videoconference I was informed by Mr. Sun that he had learned FTX International could not cover customer liabilities. Mr. Sun and Mr. Miller were visibly distressed and appeared surprised and upset by these developments. After a discussion, Mr. Sun engaged S&C and Mr. Sun instructed S&C to take steps to begin to prepare FTX International for chapter 11 in the event that a rescue financing

---

[3] Source: https://www.bloomberg.com/news/articles/2022-12-14/ftx-us-planned-miami-headquarters-move-before-bankruptcy.

or other transaction was not forthcoming or, if forthcoming, could not be consummated without court supervision. Mr. Sun asked us to work with Fenwick & West LLP ("Fenwick & West") on this matter with Fenwick & West acting as corporate counsel.

11. Mr. Sun and Mr. Miller approved an initial retainer for S&C and we began work on chapter 11 preparation immediately in coordination with Fenwick & West. S&C had not been regular counsel to the Debtors. Fenwick & West provided S&C with the corporate documents, organizational charts or other materials relating to the Debtors that were required to prepare the Chapter 11 petitions and related pleadings.

12. At that time, I was told by Mr. Sun that Mr. Bankman-Fried was attempting to arrange a rescue financing or M&A transaction, and that Fenwick & West would handle any such transaction.

13. Given the exigent situation, I advised Mr. Sun and Mr. Miller that it was common to immediately identify candidates to serve as a Chief Restructuring Officer. Mr. Sun and Mr. Miller decided that identifying potential candidates was prudent. They asked S&C to consider possible recommendations and make confidential approaches as to availability. Four candidates were considered, each with experience in cases of substantial magnitude and complexity. Two candidates were not available. S&C provided the other two names and resumes to Mr. Sun and Mr. Miller, including John Ray's.

14. I also advised Mr. Sun and Mr. Miller that it was common for organizations facing similar challenges to engage a financial advisor that could assist them with chapter 11 preparation and the management of the financial affairs of the Debtors if a chapter 11 filing occurred. After discussion with colleagues at S&C, we recommended to Mr. Sun and Mr. Miller, Alvarez & Marsal North America, LLC ("A&M") and another leading

firm.  Mr. Sun and Mr. Miller selected A&M and arrangements were made for A&M to begin work immediately.

15.     In the late evening of the same day, November 8, 2022, at 11:06 p.m., Mr. Miller emailed to inform me that Mr. Sun had resigned.  I was unsure of the status of Daniel Friedberg, who I had understood to be the senior legal officer of the FTX group.  Mr. Friedberg had not been involved in the chapter 11 planning work.  Mr. Sun's resignation and Mr. Friedberg's continuing absence, left Mr. Miller as the senior legal officer of the FTX group and Mr. Tim Wilson, who had reported to Mr. Sun, as the senior legal officer of FTX International.  I learned the next day, on November 9, 2022, that Mr. Friedberg had resigned.

16.     On November 9, 2022, Mr. Miller advised me that he had informed state regulators of prudential problems reconciling entitlements and digital assets on the FTX US exchange.  S&C attorneys in our Criminal Defense & Investigations Group, in consultation with Mr. Miller, reported the concern to federal authorities, including the United States Attorney's Office for the Southern District of New York, the Securities and Exchange Commission and the Commodity Futures Trading Commission.  At this point, Mr. Miller and I discussed the inclusion of the FTX US business in any chapter 11 filing.

17.     On November 10, 2022, Mr. Wilson, who I understood to be in The Bahamas, informed me that Mr. Bankman-Fried was meeting with the Securities Commission of The Bahamas and that they either had, or were soon going to, initiate provisional liquidation proceedings against FTX Digital Markets Ltd. in The Bahamas.  Later in the day, on November 10, 2022, I received a copy of a press release issued by the Securities Commission of The Bahamas stating that a provisional liquidation had been commenced against FTX Digital Markets Ltd. in The Bahamas and that a provisional liquidator had been appointed.

18.     In the afternoon of November 10, 2022, I was asked by Mr. Miller and Mr. Wilson to join a videoconference with Mr. Bankman-Fried to discuss a chapter 11 filing for the FTX group.  This was the first direct interaction I had with Mr. Bankman-Fried since our engagement by Mr. Sun two days previously.  It also was only the second direct interaction I ever had with Mr. Bankman-Fried, the first of which was a short videoconference in the context of the Voyager transaction.

19.     On the November 10, 2022 afternoon videoconference, Mr. Bankman-Fried was in a room that I was told by Mr. Wilson was in The Bahamas.  In the room with Mr. Bankman-Fried were Joseph Bankman, and Mr. Wilson.  Also on the videoconference was David Mills, a professor of law at Stanford Law School who told me he represented Mr. Bankman-Fried in his personal capacity.  In addition to me and other lawyers from S&C and Fenwick & West, on the videoconference remotely were Martin Flumenbaum of Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul Weiss"), a criminal defense lawyer; and Ken Ziman of Paul Weiss, a leading U.S. restructuring lawyer familiar with complex, international chapter 11 cases.  Messrs. Flumenbaum and Ziman also told me they represented Mr. Bankman-Fried in his personal capacity.  I informed Mr. Bankman-Fried I represented the Debtors, not him, and would speak to him in his capacity as an officer and fiduciary of the Debtors.  The call lasted approximately two hours.  Mr. Bankman-Fried was lucid and engaged in the discussion.

20.     After the videoconference, I informed the S&C and A&M teams that I believed a chapter 11 filing in the United States was imminent.  I also alerted my colleagues at S&C in our Criminal Defense & Investigations Group as to the substance of my conversation.

21.     I never spoke with Mr. Bankman-Fried again.

22.     I consulted internally and with A&M about the situation of the Debtors as we understood it at the time.  In discussions with Mr. Miller and Mr. Wilson, I advised that a chapter 11 filing in the U.S. was the best option to preserve global value and ensure transparency and fairness to stakeholders.  I also advised, based on my consultation with the other professionals, that any delay in seeking chapter 11 protection risked involuntary insolvency filings of subsidiary companies all over the world, the dissipation of assets and the loss of valuable information and records.

23.     Because there was not time to hold over 100 board meetings for companies whose records were both incomplete and unfamiliar to S&C, I recommended and prepared a draft of the Omnibus Corporate Authority (the "Omnibus Authority").  The Omnibus Authority appointed Mr. Ray CEO of all of the Debtors, transferred to him all of Mr. Bankman-Fried's corporate authority and authorized Mr. Ray to decide if and when the Debtors should commence chapter 11 proceedings.

24.     I provided a draft of the Omnibus Authority to Mr. Ziman, as counsel to Mr. Bankman-Fried, at 8:04 p.m. on November 10, 2022.

25.     I negotiated the terms of the Omnibus Authority with Messrs. Mills, Flumenbaum and Ziman as counsel to Mr. Bankman-Fried over the next few hours.  At no time did I negotiate directly with Mr. Bankman-Fried about the terms of the Omnibus Authority.

26.     At no time in my negotiations with counsel to Mr. Bankman-Fried did counsel express a view, whether their own or on behalf of Mr. Bankman-Fried, that the appointment of Mr. Ray or that a chapter 11 filing in the United States was contrary to the interests of customers or creditors.  Counsel to Mr. Bankman-Fried expressed some hesitation on the grounds that they were not familiar with Mr. Ray.  Mr. Mills also expressed a concern

that a chapter 11 filing could expose Mr. Bankman-Fried to more inquiries from U.S. authorities than if proceedings were commenced in other jurisdictions. I explained Mr. Ray's background and provided his resume. I also informed counsel of my view that the second consideration was inappropriate for Mr. Bankman-Fried, as an officer of and fiduciary to the entities involved, to consider as material to his decision.

27.     During negotiations concerning the Omnibus Authority, counsel to Mr. Bankman-Fried requested that the Omnibus Authority be revised to replace Mr. Ray with a different Chief Executive Officer candidate chosen by Mr. Bankman-Fried or his counsel. I discussed with Mr. Miller and Mr. Wilson, and they declined to make that revision.

28.     While waiting for Mr. Bankman-Fried to discuss the Omnibus Authority with counsel and make a decision, I was in contact with Zach Dexter, the Chief Executive Officer of LedgerX, officers of the Debtors, Mr. Miller and Mr. Wilson. Mr. Dexter, Mr. Miller and Mr. Wilson each reported to me that they had personal communications with Mr. Bankman-Fried requesting that he sign the Omnibus Authority and appoint John Ray as CEO. I understood from them that other officers and employees of the Debtors were in communication with Mr. Bankman-Fried and requesting him to do the same.

29.     At approximately 1:00 a.m. on November 11, 2022, I learned that a voluntary liquidation had been commenced by the subsidiaries of FTX in Australia. I feared that other subsidiary filings were imminent as the business day began in other jurisdictions, and informed Mr. Miller and Mr. Wilson of my concern.

30.     Later in the early morning hours of November 11, 2022, counsel to Mr. Bankman-Fried called me on the telephone concerning the Omnibus Authority. Counsel informed me that Mr. Bankman-Fried's lawyers would recommend to him that he agree to the

appointment of Mr. Ray as Chief Executive Officer and the general terms of the Omnibus Authority, provided that Stephen Neal, the Chair Emeritus of Cooley LLP ("Cooley"), be appointed Chairman of the Board of Directors. I collected information about Mr. Neal and discussed with Mr. Miller and Mr. Wilson the urgency of the situation and the merits of the request. They agreed to the request on certain conditions, including that Mr. Neal was not conflicted and ready to serve. Mr. Bankman-Fried's counsel informed me that Mr. Neal was in California, where it was the middle of the night, and I did not speak with Mr. Neal personally.

31.     I made revisions to the Omnibus Authority to reflect these conversations and provided a revised copy for execution to Mr. Bankman-Fried's counsel. At approximately 3:00 a.m. on November 11, I was informed that Mr. Bankman-Fried would sign the revised document.

32.     At 4:24 a.m. I received a signed copy of the Omnibus Authority from Mr. Ziman. Mr. Ray began work immediately upon appointment and since that time has taken primary responsibility for overseeing S&C's work for and advice to the Debtors.

33.     Mr. Ray made the decision to file the Debtors for chapter 11 protection and the first filings began at approximately 7:30 a.m.

34.     In the late morning of November 11, 2022, after the commencement of the first chapter 11 cases, a spokesperson from the Cooley law firm reported that Mr. Neal was "unable to serve… for reasons having nothing to do with FTX or its former CEO."

35.     Mr. Ziman and Mr. Mills, as counsel to Mr. Bankman-Fried, contacted me on November 11, 2022, after the chapter 11 filings with suggestions for other board candidates. I reported these contacts to Mr. Ray, and he declined to engage with Mr. Bankman-Fried or his counsel on such matters.

36.     Mr. Mills, as counsel to Mr. Bankman-Fried, contacted me on November 11, 2022, after the chapter 11 filings with an indication of interest from a rescue capital investor arranged by Mr. Bankman-Fried.  I described to him the process for soliciting such investments in chapter 11, advised that an investment banker would likely be appointed, and referred the matter to Mr. Ray.

37.     Mr. Bankman-Fried has attempted to contact Mr. Ray, myself and other S&C lawyers several times subsequent to the chapter 11 filings.  We have not responded directly to him.

38.     Contrary to public statements by Mr. Bankman-Fried, at no time did Mr. Bankman-Fried or his counsel inform me that Mr. Bankman-Fried attempted to revoke the Omnibus Authority after he signed it.

39.     At the direction of Mr. Ray, S&C provided substantial information to government prosecutors prior to Mr. Bankman-Fried's arrest, Ms. Ellison's plea and Mr. Wang's plea.  At Mr. Ray's direction, S&C continues to work closely with state and federal regulators and prosecutors, providing information and responding to requests on a daily or near daily basis.

### S&C's Prior Work for the Debtors

40.     No FTX entity was ever a "regular client" of S&C at any time.  S&C does have clients with whom it has a standing relationship and that S&C classifies as regular clients.  A partner generally may open a matter for a regular client without prior approval of S&C's client selection committee, subject to a conflicts check and other procedures.

41.     All other clients of S&C are classified as "particular matter clients."  A partner may not open a matter for a particular matter client without the prior approval of S&C's client selection committee.

42.     Matters for particular matter clients often include matters that are very significant to the client or involve substantial fees; the distinction between a regular and particular matter client does not depend on the size of the matter, but on the nature of the firm's relationship with the specific client.

43.     S&C opened specific matters for certain of the Debtors and their affiliates as particular matter clients only.  Our work involved a series of special, discrete and particular matter clients.

44.     Although our financial statements for our fiscal year 2022 are not yet complete, S&C estimates that fees paid by the Debtors and their affiliates will be less than 1.0% of the total revenues of S&C for 2022.

45.     I understood that the Debtors had relationships with a number of other law firms and that their principal relationship on corporate, operational and corporate governance matters was with Fenwick & West LLP.  I am aware of prior work for FTX by Latham & Watkins LLP and Hogan Lovells LLP, among others.

46.     The first matter that S&C worked on for any Debtor was the acquisition of non-Debtor LedgerX LLC ("LedgerX"), a matter for Debtor West Realm Shires Inc. ("WRS") that began July 22, 2021.  S&C was introduced to the Debtors for this matter by Mr. Miller, who was leaving S&C to join WRS as the General Counsel of FTX US.  Mr. Miller, who had been a partner of the firm from January 2019 gave notice of his departure to join WRS on July 1, 2021 and after a brief transition period formally resigned as a partner at the

end of July 2021. S&C had no client relationship with the Debtors (or any non-Debtor affiliates) before Mr. Miller's introduction and the LedgerX matter.

47.     S&C worked on 20 particular matters for the Debtors and affiliates prior to being engaged to provide chapter 11 advice. Three matters involved fees and expenses over USD $1 million. Seven of those matters involved fees and expenses between USD $100,000 and USD 1,000,000. Ten of those matters involved fees and expenses of less than USD $100,000. Measured by fees, the majority of S&C's prior work for the Debtors consisted of M&A and third party bankruptcy matters.

48.     The three matters involving fees and expenses over USD $1,000,000 were the following, ranked by aggregate amount of fees and expenses:

- S&C was bankruptcy and M&A counsel to Debtor West Realm Shires Services Inc. ("WRSS"), the proposed asset purchaser, and Debtor Alameda Research LLC ("Alameda"), as a prepetition creditor and counterparty, in connection with a proposed acquisition by WRSS of the business of Voyager pursuant to a chapter 11 plan of reorganization. The transaction is no longer proceeding. S&C also assisted Alameda in filing a proof of claim and appearing in bankruptcy court on behalf of WRSS and Alameda. S&C did not represent the Debtors in connection with Voyager prior to Voyager's chapter 11 filing – this work was performed by Latham & Watkins LLP. Total fees and expenses received for this matter were approximately USD $3,128,000. The primary client contacts were Can Sun, Ramnik Arora and Rahul Sharma.

- S&C advised WRS in the acquisition of LedgerX. Total fees and expenses received for this matter were approximately USD $1,513,000. The primary client contact was Dan Friedberg.

- S&C advised Debtor FTX Trading ("FTX Trading") in responding to information requests from the Commodity Futures Trading Commission ("CFTC") regarding the availability of FTX Trading's cryptocurrency exchange to persons in the United States and Know Your Customer policies and procedures. Total fees and expenses received for this matter were approximately USD

$1,405,000.  The primary client contacts were Dan Friedberg and Ryne Miller.

49.    The seven matters involving fees and expenses between USD $100,000 and USD $1,000,000 were the following, ranked by aggregate amount of fees and expenses:

- S&C advised WRS in connection with a formal request to the CFTC to modify WRS's registration as a derivatives clearing organization to allow it to offer margined products directly to participants.  Total fees and expenses received for this matter were approximately $662,000.

- S&C advised Alameda and WRS in connection with their due diligence activities concerning potential transactional opportunities arising out of Celsius Network's chapter 11 proceedings.  This matter did not result in any corporate action by the Debtors.  Total fees and expenses received for this matter were approximately $421,000.

- S&C advised FTX Trading in responding to information requests from U.S. regulatory authorities regarding certain customer information relating to a third party cryptocurrency business.  Total fees and expenses received for this matter were approximately $220,000.

- S&C advised FTX Trading in responding to information requests from U.S. regulatory authorities regarding certain customer information relating to the May 2022 Terra/Luna cryptocurrency crash.  Total fees and expenses received for this matter were approximately $218,000.

- S&C advised WRS in connection with its acquisition of non-Debtor Digital Custody Trust.  Total fees and expenses received for this matter were approximately $154,000.

- S&C advised FTX Trading in responding to information requests from U.S. regulatory authorities regarding an investigation into a third party cryptocurrency exchange.  Total fees and expenses received for this matter were approximately $148,000.

- S&C advised WRS in connection with specific U.S. regulatory questions relating to staking, securities futures registration, beneficial ownership reporting, antitrust compliance and other matters.  Total fees and expenses received for this matter were approximately $113,000.

50.     The ten matters involving fees and expenses below USD $100,000 were

the following, ranked by aggregate amount of fees and expenses:

- S&C advised WRS in connection with information requests from the House Oversight and Reform Subcommittee on Economic and Consumer Policy to WRS regarding the risk of crypto-related scams and fraud on the FTX US exchange and its vetting policies to investigate, flag and remove potentially fraudulent digital assets and accounts.  Total fees and expenses received for this matter were approximately $80,000.

- S&C advised FTX Trading in responding to information requests from U.S. regulatory authorities regarding an investigation into a company behind a popular NFT.  Total fees and expenses received for this matter were approximately $68,000.

- S&C advised WRSS in connection with one intellectual property matter, a lawsuit filed by Jack in the Box alleging trademark dilution and copyright infringement of its Jack mascot.  Total fees and expenses received for this matter were approximately $55,500.

- S&C advised FTX Trading in connection with preparing a white paper concerning a new potential legislative approach for stronger customer protections upon digital asset insolvency in The Bahamas.  The project did not advance beyond an initial draft. Total fees and expenses received for this matter were approximately $49,000.

- S&C advised WRSS on a number of miscellaneous strategic inquiries, including transaction and bank regulatory matters.  Total fees and expenses received for this matter were approximately $46,000.

- S&C opened a matter for Debtor FTX Ventures Ltd. ("FTX Ventures") in connection with the possible restructuring or work-out of its investment in a potentially distressed public company.  S&C did not represent the Debtors in their original investment, which work was performed by another law firm.  Total fees and expenses received for this matter were approximately $30,000.

- S&C advised WRS in connection with information requests from the CFTC to non-Debtor LedgerX's recordkeeping obligations.

Total fees and expenses received for this matter were approximately $22,000.

- S&C advised WRS in connection with the application of securities laws to a possible cryptocurrency staking program structure. Total fees and expenses received for this matter were approximately $16,000.

- S&C advised FTX Trading in responding to information requests from U.S. regulatory authorities regarding certain customer accounts and transactions relating to a third-party cryptocurrency exchange. Total fees and expenses received for this matter were approximately $7,000.

- S&C advised FTX Trading in responding to information requests from U.S. regulatory authorities regarding trading on the FTX US exchange, including potential insider trading activity. The matter was principally handled by FTX Trading internally and S&C lawyers did not record substantial time on the matter and total fees and expenses received for this matter were approximately $1,000.

51.      In addition to the foregoing matters, under the supervision of Mr. Sun, General Counsel to FTX International, S&C provided U.S. legal advice to Nishad Singh concerning U.S. tax matters and estate planning. The work was primarily performed out of the S&C London office and supervised by a partner resident in London. The representation started December 16, 2021 and ceased on August 8, 2022. The work was arranged, and paid for, by Alameda. Total fees and expenses received for this matter were approximately $22,000.

52.      Under the supervision of Dan Friedberg, the senior legal officer of the FTX group, and Ryne Miller, General Counsel of FTX US, S&C advised Mr. Sam Bankman-Fried in connection with Hart-Scott-Rodino compliance and public reporting obligations arising out of a position that had been established in the stock of Robinhood Markets, Inc. This representation commenced on April 14, 2022 and ceased August 5, 2022. This matter was arranged, and paid for, by Alameda. Total fees and expenses received for this matter were approximately $195,000.

53.     Other than these specific representations of Nishad Singh and Mr.
Bankman-Fried, S&C has never represented or performed services for any of the Debtors'
current or former officers or directors.

54.     In addition to the foregoing matters, on November 7, 2022, S&C also
opened a matter for FTX Trading Ltd. for strategic matters relating to potential capital raises,
sales, out-of-court restructuring matters or similar transactions arising out of liquidity concerns
following press reports of a large liquidation of FTT.  This work was quickly superseded by the
chapter 11 matter.

### S&C's Rates and Prepetition Fees

55.     For work billed to the Debtors prior to the Petition Date, S&C used the
hourly rates in effect at the applicable time to prepare estimates of fees under its normal billing
procedures for non-bankruptcy engagements.  S&C had no discount or other arrangements with
the Debtors.  The applicable rates in 2022 were $1,495-$2,225 per hour for special counsel and
partners, $735-$1,525 per hour for associates and $395-$595 per hour for paralegals.  S&C's
proposed rates for these Chapter 11 Cases ($1,575-$2,165 per hour for special counsel and
partners, $810-$1,475 per hour for associates and $425 to $595 per hour for paralegals) for the
most senior timekeepers in each class (partners and special counsel, associates and legal
assistants) represent a discount from the rates currently used by S&C when preparing estimates
of fees under its normal billing procedures for non-bankruptcy engagements.

56.     S&C is not currently retained under section 327 or 1103 in any other
bankruptcy cases in the country.

57.     A $4 million retainer was funded by WRSS to S&C on November 9,
2022 in advance of its chapter 11 filing and an $8 million retainer was funded by WRS to S&C

on November 14, 2022 in advance of its chapter 11 filing (but after the chapter 11 of the other Debtors). The retainers and amounts were approved by the Debtors' internal legal team and subsequently by John Ray. S&C was told that Mr. Sam Bankman-Fried was informed of—and may have approved—the initial $4 million retainer, received before the appointment of John Ray and the decision to file for chapter 11, but S&C did not discuss the matter with Sam Bankman-Fried and dealt directly with internal counsel and, after his appointment, John Ray.

58.     $2,471,597.89 of the $4 million retainer was used to pay down prepetition invoices. An additional $556,741 was used for unbilled prepetition time for chapter 11 contingency work identified by S&C. S&C discussed with, and received approval from, Mr. Ray to apply such amounts against the retainer.

59.     No payments set forth in paragraph 5 of the Original Declaration were part of either retainer. An *In re Pillowtex, Inc.* analysis of the amounts received by S&C for the one year period prior to the Petition Date is set forth below. 304 F.3d 246 (3d Cir. 2022).

| Payment Date | Payment Amount | Invoice Date | Invoice Amount | Date range of services | Payment by Retainer? | Retainer Balance | Days to Payment |
|---|---|---|---|---|---|---|---|
| 12/20/2021 | $ 370,036.69 | 11/12/2021 | $ 7,055.00 | 10/4/2021 - 10/26/2021 | N | $ - | 38 |
| | | 11/30/2021 | $ 135,648.44 | 9/1/2021 - 9/30/2021 | N | $ - | 20 |
| | | 11/30/2021 | $ 220,055.75 | 10/1/2021 - 10/31/2021 | N | $ - | 20 |
| | | 12/15/2021 | $ 7,277.50 | 11/4/2021 - 11/30/2021 | N | $ - | 5 |
| 12/16/2021 | $ 1,560.00 | 12/13/2021 | $ 1,560.00 | 11/16/2021 - 11/18/2021 | N | $ - | 3 |
| 2/17/2022 | $ 3,590.00 | 2/11/2022 | $ 3,590.00 | 12/1/2021 - 12/20/2021 | N | $ - | 6 |
| 2/3/2022 | $ 55,526.25 | 1/20/2022 | $ 55,526.25 | 12/14/2021 - 12/31/2021 | N | $ - | 14 |
| 3/29/2022 | $ 690,976.03 | 2/25/2022 | $ 133,871.25 | 11/1/2021 - 11/30/2021 | N | $ - | 32 |
| | | 2/25/2022 | $ 283,978.00 | 12/1/2021 - 12/31/2021 | N | $ - | 32 |
| | | 2/25/2022 | $ 273,126.78 | 1/1/2022 - 1/31/2022 | N | $ - | 32 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 5/6/2022 | $ 21,885.00 | 4/26/2022 | $ 21,885.00 | 2/1/2022 - 3/22/2022 | N | $ - | 9 |
| 6/13/2022 | $ 1,995.00 | 5/19/2022 | $ 1,995.00 | 4/4/2022 - 4/14/2022 | N | $ - | 25 |
| 6/30/2022 | $ 14,422.50 | 6/21/2022 | $ 2,562.50 | 4/5/2022 - 4/12/2022 | N | $ - | 9 |
| | | 6/21/2022 | $ 11,860.00 | 4/7/2022 - 4/27/2022 | N | $ - | 9 |
| 7/21/2022 | $ 47,970.00 | 7/14/2022 | $ 47,970.00 | 6/27/2022 - 6/30/2022 | N | $ - | 7 |
| 7/21/2022 | $ 29,389.79 | 7/14/2022 | $ 29,389.79 | 5/2/2022 - 5/31/2022 | N | $ - | 7 |
| 7/25/2022 | $ 59,522.69 | 7/21/2022 | $ 59,522.69 | 5/18/2022 - 5/31/2022 | N | $ - | 4 |
| 8/26/2022 | $ 23,882.50 | 3/23/2022 | $ 23,882.50 | 12/16/2021 - 2/16/2022 | N | $ - | 156 |
| 9/6/2022 | $ 81,655.00 | 8/17/2022 | $ 81,655.00 | 7/1/2022 - 7/29/2022 | N | $ - | 20 |
| 10/5/2022 | $ 142,611.53 | 9/20/2022 | $ 42,797.10 | 7/13/2022 - 7/27/2022 | N | $ - | 15 |
| | | 9/20/2022 | $ 21,461.25 | 8/2/2022 - 8/30/2022 | N | $ - | 15 |
| | | 9/20/2022 | $ 78,353.18 | 8/2/2022 - 8/31/2022 | N | $ - | 15 |
| 10/19/2022 | $ 195,484.33 | 10/18/2022 | $ 195,484.33 | 4/14/2022 - 8/5/2022 | N | $ - | 1 |
| 10/20/2022 | $ 166,493.75 | 10/18/2022 | $ 107,611.25 | 9/1/2022 - 9/28/2022 | N | $ - | 1 |
| | | 10/18/2022 | $ 58,882.50 | 9/19/2022 - 9/30/2022 | N | $ - | 1 |
| 10/20/2022 | $ 555,030.05 | 10/13/2022 | $ 7,327.50 | 9/1/2022 - 9/30/2022 | N | $ - | 7 |
| | | 10/13/2022 | $ 114,152.06 | 8/1/2022 - 8/31/2022 | N | $ - | 7 |
| | | 10/13/2022 | $ 234,473.58 | 7/1/2022 - 7/31/2022 | N | $ - | 7 |
| | | 10/13/2022 | $ 199,076.91 | 6/1/2022 - 6/30/2022 | N | $ - | 7 |
| 11/3/2022 | $ 2,253,670.77 | 10/18/2022 | $ 2,253,670.77 | 7/6/2022 - 9/27/2022 | N | $ - | 16 |

## S&C's Engagement as Debtors' Counsel

60.     As discussed above, on November 8, 2022, Mr. Sun, who worked with us on the Voyager and Celsius bankruptcy matters, engaged S&C to advise the Debtors with respect to contingency planning for one or more chapter 11 filings.  The contingency planning assignment began immediately, in coordination with a team of lawyers from corporate counsel Fenwick & West LLP.

61.     On November 11, Sam Bankman-Fried executed the Omnibus Authority appointing Mr. Ray as Chief Executive Officer.  Mr. Ray instructed S&C to file the chapter 11 petitions as proposed bankruptcy counsel after assuming his role.  Mr. Ray confirmed his selection of S&C as proposed counsel to the Debtors for these Chapter 11 Cases promptly after filing.  Copies of the engagement letters are attached hereto as <u>Exhibit A</u>.

<u>**S&C's Relationship with Internal Lawyers of the Debtors**</u>

62.     Ryne Miller, the General Counsel of FTX US, was a partner of S&C from January 2019 through July 2021 and an associate for several years before being elected partner.  Mr. Miller introduced S&C to WRS in connection with the LedgerX acquisition and supervised certain of S&C's work on non-bankruptcy matters for WRS and its affiliates prior to the Petition Date.  I understood that Mr. Miller was the General Counsel for the U.S. businesses, was based in the U.S. and reported to Mr. Friedberg, who was the senior legal officer for the FTX group.  I also understood that Mr. Sun was the General Counsel of the businesses outside of the U.S., was based in The Bahamas and also reported to Mr. Friedberg.  Neither Mr. Friedberg nor Mr. Sun had any relationship with S&C.

63.     Tim Wilson, a member of the FTX Trading legal team but not the general counsel of FTX Ventures, was a former associate of S&C from September 2019 to April 2021, before joining Fenwick & West.  I understood that Mr. Wilson was an internal lawyer for the international business who reported to Mr. Sun, who in turn reported to Mr. Friedberg.

64.     Ms. T'Shae Cooper, a former member of the Alameda legal team, was a former associate of S&C from September 2015 to June 2018, before joining Covington & Burling LLP.

65. Ms. Kelly Yamashita, a former Alameda employee in Hong Kong, was an associate of S&C from September 2015 to September 2018.

66. I am not aware of any other current or former in-house attorneys to the Debtors having been an attorney at S&C.

67. I have informed John Ray that S&C will not be involved in any investigation into any potential causes of action, if any, against Mr. Miller, Mr. Wilson or Ms. Cooper. I understand that the team at Quinn Emanuel Urquhart & Sullivan LLP ("Quinn") is available to advise the Debtors in connection with any such investigation.

### S&C's Relationship with John Ray

68. S&C worked with Mr. Ray on one prior restructuring matter, DiTech Holding Corporation, where Mr. Ray served as a director. James Bromley, a partner of S&C, also worked with Mr. Ray on two matters (the bankruptcy of Nortel Networks Inc. and certain of its affiliates and the bankruptcy of Overseas Shipholding Group, Inc. and certain of its affiliates) while Mr. Bromley was a partner of the Cleary Gottlieb Steen & Hamilton LLP law firm.

69. S&C was not involved in the recommendation or appointment of RLKS Executive Solutions or Quinn.

### Discussions with Ms. Sarkessian Concerning Supplemental Disclosure

70. I have reviewed the objection of the U.S. Trustee to the retention of S&C. S&C has been working with Juliet Sarkessian of the Office of the U.S. Trustee on supplemental disclosure since January 7, 2022. At no point in any discussion with Ms. Sarkessian has there been a substantive disagreement with Ms. Sarkessian on what information should be disclosed.

71.     I informed Ms. Sarkessian of the Office of the U.S. Trustee on November 10, 2022, that S&C would not be involved in any investigation with respect to Ryne Miller to the extent one is required.

**S&C's Disinterestedness**

72.     S&C does not own any debt or equity securities of the Debtors, and does not hold any accounts on any of the Debtors' exchanges.  None of the connections with the parties listed on Schedule 2 or 3 of the Original Declaration is directly related to the Debtors or involves S&C advising on any matter adverse to the Debtors.[4]  S&C does not hold or represent an interest adverse to the Debtors' estates.

73.     S&C lawyers generally are not permitted to serve as corporate officers or directors.  S&C sent a firm wide email to confirm that no S&C attorney or their spouse or other close family member are officers or board members of any of the Debtors.

74.     S&C also sent a firm wide email to confirm that no S&C attorney (i) owns any debt or equity securities of the Debtors or their affiliates, (ii) holds any account on the Debtors' exchanges, and (iii) has a connection to any of the following categories of parties-in-interest:  (a) current and former directors and officers of the Debtors, (b) holders of 5% or more of the equity of any Debtor, (c) non-Debtor affiliates, (d) the joint provisional liquidators, (e) members of the Official Committee of Unsecured Creditors, or (f) significant competitors of the Debtors.  With respect to accounts on the Debtors' exchanges, three S&C attorneys stated that they opened accounts on FTX exchanges but did not deposit any funds or transact.

---

[4]     Schedule 1 of the Original Declaration only included, among other things, the largest 179 customers and all joint ventures of Debtors and non-Debtor affiliates based on available information at the time.  As the Debtors obtain additional access to books and records and information and additional customers and parties are identified, S&C will review, run the necessary searches, and make any further disclosures as necessary.

75.     Approximately less than 3%, 5% and 2% of S&C's revenues for the fiscal year ending December 31, 2021 was accountable to the ultimate parent of Allianz Insurance, Aptos, a retail technology company, and Wells Fargo, respectively.

76.     S&C advised BlockFi International Ltd and BlockFi, Inc. (together, "BlockFi") on regulatory matters including the publicly-announced settlement with the securities regulators in early 2021 clarifying regulatory questions surrounding their cryptocurrency lending practices.  These matters are substantially complete and BlockFi has filed for chapter 11.  S&C does not expect that it will work on these matters for BlockFi during its chapter 11 case.

77.     Certain S&C partners are included in the professionals covered by the *Final Order (A) Authorizing the Debtors, in Their Sole Discretion, to Provide Indemnification and Exculpation to Certain Individuals (B) Authorizing Certain Actions Pursuant to Section 363 of the Bankruptcy Code and (C) Granting Certain Related Relief.*

78.     Mr. Ray and the independent directors will determine whether S&C, Quinn or another firm investigate whether the Debtors have potential causes of actions against professional services firms, based on such factors as Mr. Ray and the directors determine appropriate.

79.     I am not aware of any allegation by any employee of the Debtors that S&C violated any duty to the Debtors at any time or that any FTX Debtor has any claim or cause of action against S&C.  I have informed John Ray that S&C will not be involved in any investigation into causes of action against S&C.  I understand that the team at Quinn is available to the Debtors in connection with any such investigation.

80.     Based on the conflict procedures conducted to date and described in the Original Declaration and herein, to the best of my knowledge and insofar as I have been able to ascertain, S&C, and all attorneys of S&C, are "disinterested" within the meaning of section 101(14) of the Bankruptcy Code.

81.     I am authorized to submit this Supplemental Declaration on behalf of S&C, and if called upon to testify, I would testify competently to the facts set forth herein.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: January 17, 2023                    By: */s/ Andrew G. Dietderich*
New York, New York                         Andrew G. Dietderich
                                           Sullivan & Cromwell LLP

# **Exhibit A**

## **Engagement Letters**

# SULLIVAN & CROMWELL LLP

TELEPHONE: 1-212-558-4000
FACSIMILE: 1-212-558-3588
WWW.SULLCROM.COM

*125 Broad Street*
*New York, New York 10004-2498*

LOS ANGELES • PALO ALTO • WASHINGTON, D.C.

BRUSSELS • FRANKFURT • LONDON • PARIS

BEIJING • HONG KONG • TOKYO

MELBOURNE • SYDNEY

November 20, 2022

John J. Ray III
    Chief Executive Officer,
        FTX Trading Ltd. and its affiliated debtors-in-possession,
            c/o Sullivan & Cromwell LLP
                New York, New York 10004
                    ATTN: FTX Mail Room

            Re:    Chapter 11 Cases

Dear John:

          Reference is made to our engagement letter with FTX Trading Ltd. (the "*Company*"), dated November 9, 2022 (the "*Engagement Letter*"), and also to the chapter 11 petitions you authorized us to file as your choice of proposed counsel to the debtors-in-possession in Case No. 22-11068 (JTD) and related cases in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Cases"). The Engagement Letter references an advance payment retainer of $4,000,000. This confirms that you authorized, and we received, an additional advance payment retainer of $8,000,000 prior to the filing of a chapter 11 petition of West Realm Shires, Inc. As contemplated by the Engagement Letter, we applied $2,471,597.89 of the amount we received to pay in the ordinary course our invoices nos. 0696743, 0696744, 0696745, 0696746, 0696747, 0696748, 0696749, 0696750, 0696751, 0696752, 0696753, 0696754, 0696757, 0696758, 0696759, 0696760, 0696761, and 0696762 for periods prior the November 11, 2011 (the "Petition Date"). As of the Petition Date, we hold $9,528,402.11 as an advance payment retainer as contemplated by the Engagement Letter. We are not a prepetition creditor of any debtor in the Bankruptcy Cases.

It is an honor to be chosen by you for this important matter.

Very truly yours,

Andrew G. Dietderich

Accepted:

FTX Trading Ltd., on behalf of itself and its affiliated debtors

By: John J. Ray, III
     Chief Executive Officer

DocuSign Envelope ID: 744DA390-BE86-45B8-ADF8-55C428059751

# SULLIVAN & CROMWELL LLP

TELEPHONE: 1-212-558-4000
FACSIMILE: 1-212-558-3588
WWW.SULLCROM.COM

*125 Broad Street*
*New York, New York 10004-2498*

LOS ANGELES • PALO ALTO • WASHINGTON, D.C.

BRUSSELS • FRANKFURT • LONDON • PARIS

BEIJING • HONG KONG • TOKYO

MELBOURNE • SYDNEY

November 9, 2022

FTX Trading Ltd.,
    Unit #3B, Bryson's Commercial Complex
    Friars Hill Road
    St. John's, Antigua

        Re:    <u>Corporate Restructuring Matters</u>

Ladies and Gentlemen:

        We are pleased that FTX Trading Ltd. ("*FTX.com*" or the "*Company*") has retained us for the matter described below. While your representatives and we have discussed the work that you and we envision, we are required by applicable rules to establish a common understanding about the terms and conditions of our engagement. Unless you and we otherwise agree in writing, the terms of this letter (other than the definition of scope of services below) will govern any future engagement that we undertake for you. We look forward to working with you.

        *Scope of Services.* We anticipate that we will be providing legal advice and assistance to the Company and its affiliates in connection with a potential Chapter 11 restructuring proceeding of FTX.com and one or more of its affiliates (a "*Chapter 11 Proceeding*"). Our work will include coordination of the work of various advisors, preparation of Court papers and assistance with related discussions with stakeholders, evaluation of claims, disposition of assets and such other related services that may be called for or requested as the work progresses. Although it is your and our expectation that we will be proposed to represent the Company and its affiliates in connection with any Chapter 11 Proceeding, our engagement in Chapter 11 is subject to court approval.

        *Fees and Expenses.* Our billing practices take into consideration a variety of factors, which may include our contribution to the matter, the responsibility assumed, the results achieved, the difficulty and complexity of the matter, the amount involved, the time and labor required, the experience of, and demands on, the lawyers involved, and the

4858-1327-4174 v.1

DocuSign Envelope ID: 744DA390-BE86-45B8-ADF8-55C428059751

fees customarily charged for such matters. For your reference, I have enclosed our statement of billing practices, which discusses our approach in more detail. If withholding taxes, VAT or other charges apply, our fees are to be grossed up so that such taxes or charges do not reduce the amount received by us.

We customarily receive a retainer in matters of this nature. We have discussed and you have agreed to a retainer in the amount of $4,000,000, as an advance payment of our fees and disbursements. The advance payment retainer shall be deemed to be our property upon receipt and not available to attachment by your creditors. The advance payment retainer shall not be used to pay any fees and expenses for periods prior to the date of its receipt, which fees and expenses we will continue to bill and pay in the ordinary course.

Upon receipt of the advanced payment retainer, we may render statements to you showing the amounts deducted from the retainer and the balance of the retainer. Any such statements will be deemed to be accepted and final 30 days after they are rendered, and you agree to replenish the retainer as fees and disbursements are drawn from it. We will return any unearned portion of the retainer at the end of this engagement (or at the later end of any other engagement that we accept from you that you and we agree will be subject to this retainer arrangement).

To the extent that the Company and its affiliates commence a Chapter 11 Proceeding, some fees, charges and disbursements incurred before the filing of a bankruptcy petition on this matter and other matters for the Company and its affiliates may remain unpaid as of the date of a bankruptcy filing. Immediately prior to the filing, we will prepare one or more estimated invoices for fees and expenses so incurred and these invoices are to be paid in cash without deduction from the retainer. After the filing of any Chapter 11 case, subject to court approval, the remaining retainer will be held as security for the payment of post-petition fees and expenses in accordance with Bankruptcy Rule 2016 or other applicable laws and rules. Post-petition fees and expenses are to be paid by the Company and its affiliates as and when approved by the Court and are not intended to be set off against the retainer until the conclusion of our work for the Company.

*Waivers and Confidentiality.* Because of the types of clients Sullivan & Cromwell LLP (referred to herein, together with its affiliated firms,[1] as "Sullivan & Cromwell," "we" or "us") advises and the types of engagements in which we are

---

[1]     *Sullivan & Cromwell LLP's affiliated firms are Sullivan & Cromwell MNP LLP, which practices in England and Wales; Sullivan & Cromwell (Hong Kong) LLP, which practices in Hong Kong; Sullivan & Cromwell (Australia) LLP, which practices in Australia; and Sullivan & Cromwell (Belgium) LLP, which practices in Belgium.*

DocuSign Envelope ID: 744DA390-BE86-45B8-ADF8-55C428059751

involved, we may be requested to act for other persons on other matters where the interests of the other persons may be adverse to the Company or its affiliates in this or other matters. As you and I have discussed, we are undertaking this engagement for the Company based upon the Company's agreement that, to the extent permitted by law, this engagement, and any other engagements we may accept from the Company, will not preclude us from acting for others on matters (including mergers and acquisitions matters, commercial negotiations, restructurings and reorganizations, bankruptcy litigation proceedings or other litigation) that are not substantially related to this or such other engagements, even though the interests of such persons may be adverse to the Company or its affiliates in this matter or in other matters.

Of course, this letter does not relieve us from our professional obligation to retain in confidence any confidential information obtained from the Company and to refrain from using or disclosing such information in connection with any other representation we may undertake. Provided that we adhere to these obligations, you agree that the Company will not assert that our possession of such information, even though it may relate to or be relevant to a matter in which we represent another client, prevents Sullivan & Cromwell from representing another of its clients. By the same token, to the extent permitted by applicable law or rules, you acknowledge that Sullivan & Cromwell may possess information derived from other client engagements that may be relevant or material to this engagement but that we will be prohibited by the rules in the applicable jurisdiction from disclosing to the Company, using for the Company's benefit or using to inform our advice to the Company.

This will also confirm that we are acting solely for FTX.com and those affiliates of FTX.com that become debtors-in-possession in a jointly-administered Chapter 11 Proceeding or we otherwise agree constitute clients of Sullivan & Cromwell. This engagement does not create an attorney-client or other relationship between Sullivan & Cromwell and any other entity or individual.

The waivers in this section shall survive the termination of our engagement on this and any other matters for which you retain us.

*Payment of Fees and Expenses in Related Proceedings.* The Company agrees to pay, to the extent permitted by law, our fees, and costs and expenses incurred, in connection with any inquiry, investigation, claim, action or other proceeding (other than any board-approved claim, action or proceeding brought by the Company against us) arising from or relating to this engagement or any other engagement we may accept from the Company, including compensating Sullivan & Cromwell in accordance with our ordinary billing practices for time spent and expenses incurred in, for example, investigating claims, collecting and providing documents and information, or appearing

DocuSign Envelope ID: 744DA390-BE86-45B8-ADF8-55C428059751

as a witness pursuant to subpoena or otherwise. This clause is without prejudice to any rights to indemnification or contribution we may otherwise have.

*Data Protection.* It is the policy of Sullivan & Cromwell to deal with personal information responsibly and in accordance with the requirements of applicable data protection laws. Our data protection policy can be found at www.sullcrom.com/privacy-policy.

*Document Retention.* At the completion of this engagement, the Company may request (subject to any attorney's lien to which we may be entitled) the return of any documents, discovery materials or other property obtained from The Company that are in our possession and the delivery to the Company of the client file generated in the course of the work. In the absence of such a request, we will generally retain in paper or electronic form important materials for a limited period of time that will vary based on the nature of the matter and materials and on the likelihood that the Company or we will need further access to them. When we decide not to retain materials relating to our engagement, we may destroy them without further notice to the Company. In general, we will feel free to destroy the client file beginning six years after our engagement on a particular matter ends and other materials sooner. For these purposes, the "client file" consists of all files, records and other written materials (excluding our internal communications) generated in the course of the engagement that are stored in our centralized records department, and does not include documents stored in individual lawyers' files, litigation discovery material and general email or other electronic correspondence files. If the Company requests that we deliver the client file or other materials to the Company, the Company agrees to pay our fees and costs incurred in gathering, reviewing and producing the requested materials. If you would like to discuss special retention needs, please contact me.

*Termination.* The Company is free to terminate our representation at any time (unless judicial approval is required for us to withdraw) by valid corporate action permitted by law. Subject to any applicable court rules, we may terminate our representation if the Company fails to honor the terms of our representation, including those terms set forth in this letter, or where termination is permitted or required by applicable rules. Our attorney-client relationship otherwise will end upon completion of the matter to which this engagement letter applies, or at such time as it reasonably appears that the need for our services in connection with the matter has ended, unless we agree to continue the representation on other matters. The Company will remain liable to pay all fees and disbursements incurred up to the date of termination.

*Choice of Law.* This agreement shall be governed by and interpreted in accordance with the laws of the State of New York.

DocuSign Envelope ID: 744DA390-BE86-45B8-ADF8-55C428059751

*Arbitration.* Any controversy or claim arising out of or relating to this agreement or our representation of the Company in this or any future matter, including but not limited to any fee dispute[2] or claim for malpractice, negligence, breach of fiduciary duty, or breach of contract, shall be settled by arbitration in New York administered by the American Arbitration Association. The arbitration shall be conducted in English. The designated arbitrator(s) shall have the authority to award any and all relief that would otherwise be available in a court of law, and judgment on any award may be entered in any court of competent jurisdiction. The parties shall keep any such arbitration confidential and shall not disclose to any person, other than those necessary to the proceedings, the existence of the arbitration, any information, testimony or documents submitted during the arbitration or received from the other party, a witness or the arbitrator(s) in connection with the arbitration, and any award, unless and to the extent that disclosure is required by law or is necessary for permitted court proceedings, such as proceedings to recognize or enforce an award.

This arbitration clause means that the Company is forgoing its right to have any disputes that the clause covers resolved in a court of law and that the Company is forgoing any right to a jury. There are other differences between arbitration and court proceedings, and we encourage you to consult with separate counsel if you have any questions concerning this clause or any other matters in this letter.

In order to memorialize our understanding, please sign and return the duplicate copy of this letter that I have provided for that purpose. However, please note that your continuing to work with us on this matter or future matters that we may undertake for you will constitute your acceptance of the terms of this letter.

---

[2]    You and we intend to have this clause construed broadly to cover all disputes, including fee disputes, that can be submitted to arbitration by such a clause and to have only a single proceeding to resolve all such disputes. Notwithstanding this clause, however, some fee disputes may be subject instead to arbitration under Part 137 of the Rules of the Chief Administrator of the New York Courts. While that provision is unlikely to be applicable to this engagement, if it were the Company might be entitled to invoke the Part 137 arbitration procedure.

DocuSign Envelope ID: 744DA390-BE86-45B8-ADF8-55C428059751

Again, we are very pleased to have the opportunity to act for The Company on this matter.

Very truly yours,

Andrew G. Dietderich

(Enclosure)

Accepted:

FTX Trading Ltd.,

By: Timothy Wilson

Title: Authorized Signatory

DocuSign Envelope ID: 744DA390-BE86-45B8-ADF8-55C428059751

## SULLIVAN & CROMWELL LLP

### Billing Practices

1.     Our objective in billing is to set fees that are fair and reasonable, competitive and satisfactory to the client.

2.     Our fees are based upon an appraisal of the value of the professional advice and services rendered, giving appropriate consideration to the following factors:

    (a) The contribution made, responsibility assumed, amount involved and results achieved.

    (b) The novelty, complexity and difficulty of the questions presented and the skills required.

    (c) Any extraordinary efforts required to meet time constraints or other requirements imposed by the client or the circumstances.

    (d) The time and labor required and the experience of those performing the services.

    (e) The fees customarily charged by similar firms for similar legal services.

3.     We believe that it is not only the time spent, but what is accomplished during the time, that has value. We believe the determination of a fee requires a weighing of all of the factors mentioned above, which include those specified in the Model Rules of Professional Conduct.

4.     Bills normally are submitted periodically, or in the case of some transactions at the conclusion of the matter. They identify the period and the matters covered, and may include, if the client desires, a description of the work covered by the fee. If withholding taxes, VAT or similar charges apply, our fees are to be grossed up so that such taxes or charges do not reduce the amount received by us. Our services are provided as a firm, utilizing our total personnel, experience, precedents and other resources.

5.     Clients are billed for disbursements made by the Firm with respect to matters undertaken for their account.

DocuSign Envelope ID: 744DA390-BE86-45B8-ADF8-55C428059751

The Firm does NOT charge for:

- The use of Lexis, Westlaw or other standard electronic databases;

- Incidental telephone calls or faxes; or

- Routine word processing or copying.

The Firm DOES charge for:

- Amounts paid to third parties, such as for travel expenses;

- Temporary law clerks and other temporary staff engaged to assist in, for example, responding to discovery requests; and

- Large copying, printing, scanning and binding jobs, typically in litigation.

Overall, disbursement charges are designed to recover significant costs and do not include any profit element. If our clients have obtained more significant discounts for disbursements from vendors than what we have negotiated, we would be pleased to coordinate with them.