## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>FTX Trading Ltd., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 22-11068 (JTD)<br><br>(Jointly Administered) |

**DECLARATION OF DANIEL FRIEDBERG IN SUPPORT OF AMENDED OBJECTION OF WARREN WINTER TO DEBTORS[1]' APPLICATION FOR AN ORDER AUTHORIZING THE RETENTION AND EMPLOYMENT OF SULLIVAN & CROMWELL LLP AS COUNSEL TO THE DEBTORS AND DEBTORS IN-POSSESSION *NUNC PRO TUNC* TO THE PETITION DATE**

I, Daniel Friedberg, under penalty of perjury, declare as follows:

1.           I am a citizen and permanent resident of the United States. I am over 18 and am competent to make this Declaration.

2.           I am admitted to practice law in the State of Washington. I served as chief compliance officer of West Realm Shires Services, Inc. ("FTX.US") and chief regulatory officer of FTX Trading Ltd. ("FTX International") until I resigned as further described below.

3.           I submit this Declaration in support of Mr. Warren Winter's *Amended Objection to Debtors' Application for an Order Authorizing the Retention and Employment of Sullivan & Cromwell, LLP as Counsel to the Debtors and*

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification numbers are 3288 and 4063 respectively. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

*Debtors-in-Possession* Nunc Pro Tunc *to the Petition Date* [Dkt. 459]. Except where otherwise noted, I have personal knowledge of the facts stated herein.

4.        This Supplemental Declaration provides additional information about potential claims that the Debtors have against S&C, false statements made by S&C, as well as other misconduct as described below.

## I.        My Standing as a Creditor

5.        I purchased a total of 25 bitcoin relatively early on in the growth of bitcoin, at about $300 or less. Like most employees for the Debtors, I transferred my bitcoin to the FTX.US cryptocurrency exchange, in reliance on the FTX.US disclosures that FTX.US customer assets were fully backed 1:1 and that cryptocurrency held by FTX.US on behalf of customers was owned by those customers and not FTX.US. As of the date of this Declaration, this bitcoin would have been worth in excess of $500,000.

6.        I purchased about $400,000 of Solana on the FTX.US cryptocurrency exchange months before the bankruptcy filing, in reliance on the FTX.US disclosures that FTX.US customer assets were fully backed 1:1 and that cryptocurrency held by FTX.US on behalf of customers was owned by those customers and not FTX.US. I don't have a record of the number of Solana coins purchased and held on the FTX.US exchange, but the value of Solana has gone down tremendously in value since date of purchase.

7.        I have been unable to login to the FTX.US exchange since I returned my computer to FTX.US after my resignation, and therefore lack access to documentation of the above.  I have been included on US Trustee correspondence as a creditor in this matter.

## II.        My Role with the Debtors

8.        I was introduced to Samuel Bankman-Fried ("Sam") by his father who is a prominent tax professor at Stanford. I represented Alameda Research

LLC ("Alameda") and then FTX International as outside counsel when I served as Chair of the Fintech group at an outside law firm since about the time that Sam left Jane Street to form his own trading firm.

9.        In early 2020, when Sam decided to form FTX.US, I left my law firm to work full time for certain of the Debtors (including FTX.US, FTX International, and Alameda). My primary role was to focus on licensing and to help hire a legal staff including general counsels for the various companies owned or controlled by Sam.

10.        Ultimately, the Debtors hired over a dozen lawyers including the general counsel for FTX.US (Ryne Miller), the general counsel for FTX International (Can Sun), the general counsel for FTX Ventures (Tim Wilson), as well as counsel for the Europe, Australia, and Japan operations, and Bahamian counsel.

11.        The goal was for the general counsels to report directly to Sam where possible in the case of FTX International, the President of FTX.US in the case of FTX.US, and to the CEO of Alameda in the case of FTX Ventures, and we made a lot of progress towards this, but I did oversee all lawyers as needed to efficiently deliver legal services to the organization.

**III. Hiring of Ryne Miller**

12.        In 2021, the then President of FTX.US made the decision to hire Ryne Miller ("Mr. Miller") as general counsel of FTX.US and counsel for Alameda, and FTX International. Mr. Miller's salary was paid by FTX.US and Alameda, but services were also performed by Mr. Miller for FTX International in addition to FTX.US and Alameda.

13.        Mr. Miller was a partner at Sullivan and Cromwell LLP, and his background was with CFTC licensing and SEC matters.  Mr. Miller positioned himself as being the answer to the licensing efforts of LedgerX, and an expert on CFTC matters.  Mr. Miller also emphasized his familiarity with SEC officials, often

referring to the SEC Commissioner as "Gary", and explaining to the FTX personnel what "Gary" would or wouldn't do.  Indeed, Mr. Miller had previously worked for the SEC Commissioner and emphasized his close relationship with him at every possible opportunity.

14.         After being hired, Mr. Miller came to me and asked if he could engage Sullivan & Cromwell, LLP ("S&C") as counsel for the Debtors. I responded that as general counsel, it was his role to generally approve outside counsel for FTX.US.

15.         Mr. Miller informed me that it was very important for him personally to channel a lot of business to S&C as he wanted to return there as a partner after his stint at the Debtors. This bothered me very much and I told him that his job was to only hire the best outside counsel for the job, and that his allegiance was now to the Debtors and not S&C. This continued to be a problem throughout his work at the Debtors as further described below.

16.         Mr. Miller quickly engaged S&C on many matters for FTX.US and S&C acted as primary counsel for FTX.US, FTX Derivatives (formerly Ledger X) which was a subsidiary of FTX.US ("LedgerX"), and Emergent (an entity owned by Sam that invested in Robinhood shares).  S&C also acted as personal counsel to Nishad and Sam.

17.         Mr. Miller often reminisced that his mentors at S&C were partners Andrew G. Dietderich and  Mitchell Eitel, and that he would do anything to help those partners, and looked forward to returning as a partner to S&C after his stint at the Debtors.

### IV. Explanation of the Different Debtor Entities

18.         From the filings to date, it is clear that there is confusion that all entities acted as one group. This is not the case. Instead, there are three separate corporate groups amongst the debtors – the FTX International Group, the FTX.US

Group, and the Alameda Group. The following descriptions of these groups are based on my knowledge of the entities prior to the uncovering of any fraudulent activity of the groups.

19.     FTX International Group operated a crypto-derivatives exchange and did not accept US customers. FTX International Group operated from Bahamas and the Bahamian Securities Division was its primary regulator through its FDM subsidiary. FTX International Group had its own set of outside investors, and had raised significant sums (over $1 billion) in various stock sales.

20.     The FTX.US Group operated a cryptocurrency exchange, a derivatives platform through LedgerX, and a stock brokerage.  FTX.US operated from the United States and did accept US customers.  The FTX.US Group had a set of outside investors different from FTX International Group, and had raised hundreds of millions in various stock sales.

21.     The Alameda Group was beneficially owned 90% by Sam and 10% by the Chief Technology Officer ("Gary"). The Alameda Group was understood by me and the lawyers as Sam's company. The Alameda Group engaged in proprietary trading and venture investments.  The Alameda Group had no outside investors but significant lenders.

22.     Based on advice of counsel, each of these groups were intended to be separated. For example, the FTX International exchange was operated from a server housed in Japan, while the FTX.US exchange was operated from a server in Virginia. The wallets and assets of FTX International and FTX.US were separated in these different instances.

23.     There are conflicting claims that arise between each of these entities as set forth below, and each of these groups deserve separate independent counsel as described in the chart below. Note that the chart below raises just a few of the myriad of conflicts between the group entities requiring separate counsel.

|  | **Alameda Group** | **FTX International Group** | **FTX.US Group** |
|---|---|---|---|
| **Alameda Group** |  | FTX International Group will likely assert a claim against Alameda Group for stealing assets from FTX International Group. | FTX.US Group creditors will likely assert a claim that funds from FTX.US are wrongfully being used to pay for Alameda Group bankruptcy expenses. |
| **FTX International Group** | Alameda Group has various creditors who loaned substantial funds to Alameda Group. These debtors will likely claim that the FTX International Group loaned funds to Alameda but that their security interests have priority over the security interest of FTX International Group. |  | FTX.US Group creditors will likely assert a claim that funds from FTX.US are wrongfully being used to pay for FTX International Group bankruptcy expenses. |
| **FTX.US Group** | Alameda Group has loaned substantial funds to Sam, Gary and Nishad Singh ("Nishad"), who used those funds to capitalize FTX.US. Alameda Group creditors will likely argue that these transfers need to be clawed back. | FTX International creditors will likely assert a claim against FTX.US that funds loaned from Alameda to FTX.US to capitalize FTX.US originated from funds stolen from FTX International. |  |

24.      Each of these groups have different creditor classes which each deserve separate legal representation as well as separate creditor committees.

25.        S&C represented all of these groups simultaneously without proper conflict waiver.  S&C also represented Sam and Nishad personally. The lawyers in this important bankruptcy proceeding should be independent and not have a history of representing all of the various groups and the principals at one time.

**V. Discovery of the Customer Deficit**

26.        On November 7, 2023, certain FTX personnel including Sam informed certain executives in the Bahamas of the existence of an $8 billion customer deficit with respect to FTX International.

27.        The FTX International general counsel contacted me by zoom to inform me of this shocking development.

28.        Prior to this disclosure, I had no idea of any customer deficit.  It was not my job as regulatory counsel to conduct a customer proof of reserves; indeed, I would have no idea how to do this.  I relied on the executives, the finance team, and the auditors, and believed that the customer assets were fully funded on a 1:1 basis as advertised to the customers.

29.        I was in the New York office of FTX.US at the time and went to Ryne Miller to inform him of the development.  Mr. Miller was already aware of the development and said that he was busy contacting "all the billionaires that he knew" to provide emergency financing to cover the customer deficit.

30.        I explained to Mr. Miller that he had to review his ethical obligations before continuing to represent FTX.US under such circumstances, and soliciting financing under the circumstances might conflict with his ethical duties. He dismissed my concerns and remained optimistic about helping Sam get future financing.

31.        I reviewed my ethical obligations that evening and felt that there was substantial risk that I would be used to further additional fraud in connection with the additional investment efforts if I stayed on.  In addition, I no longer trusted

Sam, Gary, or Nishad, and did not think that I could proceed under such circumstances.

32.        I therefore tendered my resignation the following day.

**VI. Final Discussion with Ryne Miller**

33.        A day or two later, I had a final call with Ryne Miller as I was concerned about the direction of the companies.  This was after CZ of Binance had announced that he was abandoning the purchase of the Debtors and it looked like bankruptcy was the only answer for the FTX International Group and the Alameda Group.

34.        On that call, I first informed Mr. Miller that we had been counseled by all our other law firms that the bankruptcy filings of FTX International Group and the Alameda Group should occur outside the United States, and likely in Bahamas or Europe.  This was in part because of the unnecessary expense of the US bankruptcy system, the situs of the primary regulator, as well as the fact that creditors of the FTX International Group were outside the United States, amongst other legal issues.

35.        Mr. Miller told me that the bankruptcy filings of FTX International Group, the Alameda Group, and the FTX.US Group had to be in the United States because otherwise S&C couldn't do the job.

36.        I then told Mr. Miller that FTX.US should not file bankruptcy at all until it was certain that there were insufficient assets at FTX.US.  Indeed, the tech team checked the wallets and had told the FTX International general counsel at the time of the disclosure of the customer deficit that FTX.US was not affected.  I told Mr. Miller that the FTX.US crypto exchange needed to be retained if at all possible and sold as a going concern to allow the preferred shareholders to be paid back.  Mr. Miller stated that he needed to include FTX.US as part of the bankruptcy because FTX.US had the cash to pay S&C its retainer.  Without this retainer from FTX.US,

S&C wouldn't file. I told him that it wasn't proper for FTX.US to pay for the expenses of the bankruptcy of FTX International Group or the Alameda Group.

37.     Mr. Miller informed me that S&C was installing "S&C's guy" to run all the companies.

38.     I told Mr. Miller that S&C was not the proper law firm to select because of the claims and conflicts, as well as the exorbitant costs of the firm.  Mr. Miller told me that there was over $200 million cash in LedgerX and that he was going to send these funds to S&C, and that bankruptcy legal costs were therefore not a problem.

39.     I was horrified at this response and started to try to remind him of his ethical obligations and that he was stealing further funds from customers, but he hung up the phone on me and terminated the call.

**VII. Inappropriate Conduct of S&C After Bankruptcy Filings**

40.     I have had several disturbing interactions with S&C following the bankruptcy filing.

41.     In my first call with an S&C female partner who specialized in white collar crime (I forget her name), I asked who S&C was representing in this matter.  She indicated that S&C was representing all the companies and that all the assets were being combined.  I started to explain to her that there were unwaivable conflicts considering the bankruptcy (as described above) between the entities.  She told me that the conflict rules do not apply in the bankruptcy context.  I was later told by other counsel that this was not correct.  This was a knowingly false statement made to me in violation of the New York ethical rules that prohibits a lawyer from making a false statement of fact or law made to third persons in the course of representation.

42.     Then that same S&C lawyer told me that I should personally hire a lawyer at the Covington law firm that was representing FTX personnel in this

matter.  I spoke to the lawyer at Covington who informed me that he had received assurances from S&C that they would foot his bill through indemnification.

43.         I asked how much he would charge me for this personal representation and he said it would likely be in the hundreds of thousands and under $1 million but that I could rest assured that he would get the Debtors to pay because the "lawyers are always paid first".

44.         I was horrified of the thought that customer assets were being used to frivolously pay lawyers at the behest of S&C.  I did not hire this lawyer.

45.         Finally, I approached S&C and asked them to waive my attorney-client privilege solely for the purpose of aiding the FBI, the SEC, the CFTC and the regulators in their investigations.  S&C has repeatedly refused this request and attempted to muzzle me in an effort to avoid me raising issues adverse to S&C.  I think this is totally inappropriate and I should be allowed to freely help law enforcement under these circumstances.

46.         In addition, from Bahamian regulators, I was told that S&C refuses to communicate with the Bahamas on this important matter.  This is attributed to the fact that the bankruptcies of the FTX International Group and the Alameda Group should have been made in the Bahamas, and the Bahamas were the appropriate place of jurisdiction, notwithstanding that S&C couldn't represent those groups in such a proceeding.

## VIII. Claims that the Debtors have against S&C

47.         The Debtors have at least four significant claims against S&C arising from their past work and also related to the bankruptcy.  Under any reasonable reading, these potential claims are sufficient to disqualify S&C from acting as a lawyer at all for the Debtors in this proceeding.

48.        The first claim involves a breach of ethical obligations and overbilling by S&C during their representation of Alameda in its credit bid in the Voyager bankruptcy.

49.        At the time that this Voyager credit bid matter commenced, S&C sent me their retention letter which I signed with respect to that particular matter. Regretfully, I did not fully read the exhibit to the letter. S&C was our prior counsel and I did not imagine that they would try to slip something in the engagement letter. I was proved to be wrong.

50.        S&C represented Alameda for a few months on this matter without tendering a bill. I saw that there were an unnecessary number of S&C lawyers working on the matter, and assumed that it would be a high bill, and expected a cost of $500,000. This sounds like a shocking fee but this would be normal for S&C.

51.        Andrew Dietrich sent me a bill for $6.5 million as a flat fee for the entire matter and stated that the engagement letter I had signed provided for "value billing" and this was a $1 billion transaction. I was absolutely shocked and told him that we only pay by the hour.

52.        To be clear, Alameda engaged S&C to place a bid on assets in a bankruptcy that took a few months and they charged $6.5 million for the matter!

53.        I told Ryne Miller to fix the problem and Mr. Miller told me that we should help Andy on this as he needed the bankruptcy work. I angrily told Mr. Miller to get them to bill us by the hour or I would have to involve Sam. Mr. Miller told me not to tell Sam and promised to fix the matter.

54.        I later learned that Ryne Miller authorized payment of $2.5 million to S&C for the matter.

55.        This was a significant amount more than the work performed and the fees were not reasonable. The overbilling is unethical and needs to be recouped

by the Debtors.  In addition, if this really were "value billing", the Debtors received no value for the work performed in light of the circumstances, and the entire amount should be recouped.

56.        The second incident giving rise to a claim from the Debtors against S&C involved the investment of the Alameda Group into Blockfi.

57.        An entity in the Alameda Group invested I believe $200 million in a loan into Blockfi which included an option to purchase Blockfi.  I did not work on the loan but worked on regulatory diligence on whether the Alameda Group or FTX.US should exercise the option.

58.        S&C acted as SEC counsel to Blockfi and they also provided Alameda advice with respect to diligence on whether the option should be exercised. I was concerned because Blockfi had kept dodging my questions as to what the exemption under the Securities Act of 1933, as amended (the "Securities Act") was for Blockfi's continuing offering of their "BPY" product.  The normal exemption (Regulation D for accredited investors) could not be relied upon as Blockfi was disqualified from using this exemption under the "bad boy" provisions.

59.        Eventually I straight out asked this by email to the S&C team. They ultimately responded with a cryptic message that they had not looked at this. This was not credible as they were Blockfi's SEC counsel and had helped Blockfi enter into an SEC consent whereby Blockfi promised not to violate the Securities Act, amongst other requirements.

60.        I was furious at S&C and at a follow-up call, the partner for S&C said that he could not deliver anything in writing on this as there was no exemption under the Securities Act.  I told Ryne Miller that it was unethical for S&C to represent a company as SEC counsel that was violating the Securities Act, and that they were furthering and aiding and abetting the securities fraud.

61.          The response of Blockfi was that it was unlikely that the SEC would look at this matter because the minimum investment for the product was $4 million and because the SEC hadn't brought it up yet.  I explained that a client could not make a business decision to violate the Securities Act, and that a lawyer was not permitted to aid and abet a client in violating the Securities Act.

62.          I ultimately told Sam and the team that Alameda couldn't exercise the option to purchase Blockfi without first getting Blockfi to comply with the Securities Act.

63.          If S&C had told us of this problem, the Alameda Group would not have entered into the loan agreement with Blockfi in the first place.  Accordingly the Debtors have a claim of $200 million (or the amount of the loan) against S&C with respect to this matter.

64.          The third claim that the Debtors have against S&C is filing for bankruptcy for FTX.US when the group appears to have been solvent.  This resulted in the destruction of an ongoing exchange which was worth at least $500 million in fire sale value.  I note that LedgerX, a subsidiary of FTX.US, had I believe over $200 million in cash to cover any shortfall.  I understand that these LedgerX funds have now been channeled by S&C and the liquidator to cover costs of the other entities which is improper.  This potentially premature bankruptcy filing cost the FTX.US preferred shareholders a substantial return.

65.          I further note that after the disclosure of the existence of the $8 billion shortfall to the legal team, I was told by the general counsel of FTX International that the tech team told the legal team in Bahamas that FTX.US customers were not affected and covered.

66.          The fourth claim involves the unexplainable decision to leave open withdrawals at FTX.US for several days and not secure the crypto assets of the entities *after* filing bankruptcy.  If FTX.US were insolvent, how could withdrawals

been left open? How could the crypto of the Debtors not be secured upon filing the bankruptcy? This points to potential malpractice and certainly negligence of those in charge upon filing the bankruptcy. The value of this claim appears to be above $400 million.

## IX.    False Statements of S&C

67.        S&C has made numerous false statements in addition to the one described in paragraph 41 above.

68.        Reference is made to the *Supplemental Declaration of Andrew G. Dietderich in Support of Debtors' Application for an Order Authorizing the Retention and Employment of Sullivan & Cromwell LLP as Counsel to the Debtors and Debtors-in-Possession* Nunc Pro Tunc *to the Petition Date* [Dkt. 510] (the "Dietderich Supplemental Declaration").

69.        In paragraph 5 of the Dietderich Supplemental Declaration, Mr. Dietderich states that Mr. Ray was the one who decided to file the Debtors for Chapter 11 protection. As stated above, S&C and Ryne Miller selected this route and chose "their guy" to run it.

70.        In paragraphs 15 and 63 of the Dietderich Supplemental Declaration, Mr. Dietderich states that Tim Wilson, former S&C counsel, was not the general counsel of FTX Ventures and instead worked for the FTX Trading legal team. This is false. Tim Wilson's title was the general counsel of FTX Ventures. I have been told that there is recent S&C correspondence between S&C and certain of the portfolio companies that confirms their knowledge of his title. Tim Wilson was hired for the purpose of venture investments and his title was general counsel of FTX Ventures.

71.        In paragraph 40 of the Dietderich Supplemental Declaration, Mr. Dietderich states that no "FTX entity was ever a regular client of S&C at any time. This is false. S&C acted as primary counsel for FTX.US, LedgerX, as well as the

Emergent entity.   The significant entities of the Debtors were certainly regular clients of S&C as demonstrated by the substantial fees charged.

72.        In the congressional hearing, Mr. Ray stated that about 2% of the FTX International customers were US persons.  This is false to my knowledge.  There was continued ongoing review and efforts to bar US customers from the FTX International exchange.  Mr. Ray's assertion would mean that there are about 20,000 US customers of FTX International.  S&C told the CFTC in their information requests in their representation of FTX International that FTX International had no known continuing US customers.  The reason for this false statement likely was to try to create a jurisdictional argument to substantiate the bankruptcy filing of FTX International in the US.

73.        In court filings, it was stated that FTX Digital Markets, the Bahamian subsidiary of FTX International ("FDM") had no revenue.  This is false.  Substantially all customers of FTX International were migrated to FDM in May or June of 2023 and all associated revenue moved to FDM at that time.  This statement was likely made to diminish the importance of the Bahamian entity and again attempt to establish jurisdiction in the US bankruptcy court.

74.        S&C claims to never have served as primary outside counsel of the FTX entities.  This is false.  S&C was primary outside counsel of FTX.US, LedgerX, and the Emergent entity.

75.        S&C has stated publicly that there was an enormous line of credit from FTX International to Alameda of about $60 billion.  For there to be a line of credit or legal indebtedness, there are numerous required factors including a promise to repay and interest.  In this case I know of no promise to repay and no interest paid.  This to my knowledge was misappropriation and not a line of credit.

## X.    Retaliation of S&C Feared

76.        I am not the only former FTX employee who has serious concerns about S&C.  Both former employees and current employees are scared to raise these issues because S&C might take adverse action against them.

77.        Any reputable law firm would withdraw from this matter and commence an internal investigation on the above issues.  Instead, I expect S&C to take adverse action against me and disparage me publicly.

## XI.    Apologies for Late Filing

78.        I apologize for having to file this at the last moment but there wasn't time as the Dietderich Supplemental Declaration was just filed.

79.        I note that the US Trustee in the *Objection of the United States Trustee to Debtors' Application for an Order Authorizing the Retention and Employment of Sullivan & Cromwell LLP as Counsel to the Debtors and Debtors in Possession* Nunc Pro Tunc *to the Petition Date* [Dkt 496] in paragraph 9 asked for a meaningful opportunity for the public to review the Dietderich Supplemental Declaration. I had assumed this would be granted.

80.        However, the decision was made to proceed on this matter without providing meaningful opportunity so I felt I needed to file as it appeared that S&C had set the matter up to be "rubber stamped" by the Court without opportunity for the public to respond to the Dietderich Supplemental Declaration.

81.        If called upon to testify, I would testify competently to the facts set out in this Declaration.

82.     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: January 19, 2023

*/s/ Daniel Friedberg*
Daniel Friedberg
Declarant