```
 1                    UNITED STATES BANKRUPTCY COURT
                          DISTRICT OF DELAWARE
 2

 3   IN RE:                      .  Chapter 11
                                 .  Case No. 22-11068 (JTD)
 4   FTX TRADING LTD., et al.,   .
                                 .
 5                               .  Courtroom No. 5
                                 .  824 Market Street
 6            Debtors.           .  Wilmington, Delaware 19801
                                 .
 7                               .  Friday, January 20, 2023
     . . . . . . . . . . . . . . .  10:00 a.m.
 8
                            TRANSCRIPT OF HEARING
 9              BEFORE THE HONORABLE JOHN T. DORSEY
                    UNITED STATES BANKRUPTCY JUDGE
10
     APPEARANCES:
11
     For the Debtor:          Adam Landis, Esquire
12                            LANDIS RATH & COBB LLP
                              919 Market Street, Suite 1800
13                            Wilmington, Delaware 19801

14                            Andrew G. Dietderich, Esquire
                              James L. Bromley, Esquire
15                            Brian D. Glueckstein, Esquire
                              SULLIVAN & CROMWELL LLP
16                            125 Broad Street
                              New York, NY 10004
17

18

19   (APPEARANCES CONTINUED)

20   Audio Operator:          Jermaine Cooper

21   Transcription Company:   Reliable
                              The Nemours Building
22                            1007 N. Orange Street, Suite 110
                              Wilmington, Delaware 19801
23                            Telephone: (302)654-8080
                              Email:  gmatthews@reliable-co.com
24
     Proceedings recorded by electronic sound recording,
25   transcript produced by transcription service.
```

1  APPEARANCES (CONTINUED):

2  For the U.S. Trustee:        Juliet Sarkessian, Esquire
                                OFFICE OF THE UNITED STATES TRUSTEE
3                               844 King Street, Suite 2207
                                Lockbox 35
4                               Wilmington, Delaware 19801

5  For the Committee:           Kris Hansen, Esquire
                                PAUL HASTINGS LLP
6                               MetLife Building
                                200 Park Avenue
7                               New York, New York 10166

8  For Warren Winter, and
   Richard Brummond:            John McLaughlin, Jr., Esquire
9                               FERRY JOSEPH, P.A.
                                1521 Concord Pike, Suite 202
10                              Wilmington, Delaware 19803

11                              Marshal Hoda, Esquire
                                THE HODA LAW FIRM, PLLC
12                              12333 Sowden Road
                                Suite B, PMB 51811
13                              Houston, Texas 77080

14

15

16

17

18

19

20

21

22

23

24

25

1

INDEX

2

MOTIONS:                                                          PAGE

3

Agenda

4  Item 3: Debtors' Application for an Order Authorizing         5
                The Retention and Employment of Sullivan &
5               Cromwell LLP as Counsel to the Debtors and
                Debtors-in-Possession *Nunc Pro Tunc* to the
6               Petition Date
                [D.I. 270; Filed December 21, 2022]
7
                    Court's Ruling:                              47
8

9

STATUS CONFERENCE:                                                PAGE

10

Agenda

11  Item 8: Motion of Debtors for Entry of Interim and           51
                Final Orders (I) Authorizing the Debtors to
12              Maintain a Consolidated List of Creditors in
                Lieu of Submitting a Separate Matrix for
13              Each Debtor, (II) Authorizing the Debtors to
                Redact or Withhold Certain Confidential
14              Information of Customers and Personal
                Information of Individuals and (III) Granting
15              Related Relief
                [D.I. 45; Filed on November 19, 2022}
16

17

EXHIBITS:                                                         PAGE

18

Declarations of Andrew Dietderich                                26

19

Declarations of John J. Ray III                                  26

20

21

22

23

24

25

1     (Proceedings commence at 10:04 a.m.)

2         THE COURTROOM DEPUTY:  All rise.

3         THE COURT:  Good morning, everyone.  Thank you.

4  Please be seated.

5         Mr. Landis.

6         MR. LANDIS:  Good morning, Your Honor, and may I

7  please the Court.  For the record Adam Landis from Landis

8  Rath & Cobb, Delaware co-counsel to the debtors in FTX

9  Trading Ltd., and the companion cases.

10        Your Honor, we filed this morning a second amended

11  agenda at Docket No. 547.  The amended agenda reflects a

12  number of matters that have been consensually resolved and

13  orders have been entered.

14        Matter No. 4 on the agenda is the Alvarez & Marsal

15  application for retention.  An order has been entered on

16  that.

17        Matter No. 5 is the AlixPartners application.  A

18  certification of counsel has been filed and the parties are

19  in agreement with respect to the form of order.

20        Matter No. 6 is the Kroll retention for which an

21  order has been entered.

22        Matter No. 7 is the Quinn Emanuel application for

23  retention for which a certification of counsel has been

24  filed.  Those matters --

25        THE COURT:  I did enter those both, the

1  AlixPartners and the Quinn Emanuel, before the hearing.

2           MR. LANDIS:  Thank you, Your Honor.

3           Really, it's through the good offices of the

4  United States Trustee, back and forth negotiations and

5  discussions on a very cooperative basis.  The creditor's

6  committee is weighing in for which are grateful on those

7  efforts.  And we don't have a need to go forward with respect

8  to those.

9           There is a status conference at the end of the

10 agenda that we will, but the only item that is on the agenda

11 that will need to be heard today is the Sullivan & Cromwell

12 retention application.  For that I will cede the podium to

13 Mr. Bromley.

14          THE COURT:  Thank you.

15          Before you begin, Mr. Bromley, let me just remind

16 those on the zoom call that this is a formal Court proceeding

17 even though you are participating by zoom, so please leave

18 your audio turned off, and your video turned off unless you

19 are recognized to speak.

20          With that, Mr. Bromley, go ahead.

21          MR. BROMLEY:  Good morning, Your Honor.  May I

22 please the Court, Jim Bromley of Sullivan & Cromwell on

23 behalf of the FTX debtors.

24          Your Honor, thank you very much for taking time

25 today.  I want to first describe the resolution that we have

1  achieved with the Office of the United States Trustee.

2          The Office of the United States Trustee had two

3  objections to the retention of Sullivan & Cromwell.  The

4  first was that there was an inadequate disclosure and the

5  second had to do with the scope of the services that Sullivan

6  & Cromwell, as well as Quinn Emanuel and AlixPartners, would

7  provide.

8          We have been in conversations with the Office of

9  the U.S. Trustee for three weeks.  We received a first

10  inquiry with respect to our application on the 27th of

11  December.  The application was filed on the 21st of December.

12  And as is common in large Chapter 11 cases we have been in

13  constant contact with the Office of the United States Trustee

14  going back and forth with questions and answers, and focusing

15  on issues that the U.S. Trustee had identified with respect

16  to disclosure.

17          I am happy to report, Your Honor, that,

18  notwithstanding the fact that when we sat here last time we

19  were not yet in agreement with the U.S. Trustee, we have been

20  able to bring that across the finish line.  We have also been

21  able to bring across the finish line a resolution with the

22  Office of the United States Trustee to take the scope issue,

23  which related to the three applications that were originally

24  on today, and to move them off and to reserve rights with

25  respect to scope, and, effectively, deal with any issues

1  after the examiner motion which is scheduled for the 6th of

2  February.

3         In connection with the disclosure issues with the

4  Office of the United States Trustee we have filed, in the

5  past couple of days, two supplemental declarations of Mr.

6  Andrew Dietderich, one of my partners, at Sullivan &

7  Cromwell:

8         Mr. Dietderich had submitted the original

9  declaration supporting the Sullivan & Cromwell application.

10         And the second very fulsome declaration, which was

11  filed a couple days ago, was the product of conversations

12  that we had been having with the Office of the U.S. Trustee.

13  When we filed that we were able to get on the phone with the

14  U.S. Trustee, Ms. Sarkessian, and answer a few additional

15  questions which we then submitted a further supplemental

16  declaration of Mr. Dietderich yesterday.

17         So, with that, Your Honor, we have been able to

18  resolve any issues that the Office of the U.S. Trustee had

19  with respect to Sullivan & Cromwell's disclosures.

20         I would like to note in the context of that, Your

21  Honor, that one of the first things that we did when we were

22  talking to Ms. Sarkessian was discuss the fact that Mr. Ryne

23  Miller, a former partner at ours at Sullivan & Cromwell, is

24  employed at FTX US as the general counsel.  That is West

25  Realm Shires is the entity.  And that was not called out

1  specifically in the original declaration; it is now called

2  out. Mr. Miller was listed as a party in Schedule One to Mr.

3  Dietderich's original declaration, but we had called that

4  with very clear specificity in his supplemental declaration.

5  Mr. Miller as well as Mr. Wilson, a former associated of

6  ours, who also has a role at FTX.

7          With those call-outs the Office of the U.S.

8  Trustee is satisfied with the disclosure with respect to Mr.

9  Miller and Mr. Wilson.  And in retrospect, Your Honor, we

10 should have gone further in the original declaration, but the

11 fact is we were engaged in conversations with Ms. Sarkessian

12 from December 27th with respect to this.

13         So, there was also in the context of our recent

14 filing a statement that the declaration of Ms. Kranzley,

15 another one of my partners, with respect to back and forth

16 between the U.S. Trustees Office and Sullivan & Cromwell.  In

17 the context of that Ms. Sarkessian wanted me to clarify that

18 there was a set of emails that were provided as exhibits in

19 Ms. Kranzley's declaration and that what was not noted in

20 those emails, because it didn't appear in the emails, was

21 that there was not a response to an email that Ms. Sarkessian

22 had sent earlier; just as a matter of clarification.

23         So, with these statements and the declarations,

24 the two supplemental declarations that have been filed, it is

25 our understanding that the U.S. Trustees Office is satisfied

1  with the disclosures.  That is reflected in the form of order

2  that has been submitted to the Court.

3           THE COURT:  Before you move on, Ms. Sarkessian, do

4  you want to --

5           MS. SARKESSIAN:  Thank you, Your Honor.  For the

6  record Juliet Sarkessian on behalf of the U.S. Trustee.

7           We are resolved with Sullivan & Cromwell.  I just

8  want to clarify that the application and the initial

9  declaration of Mr. Dietderich did not mention any connection

10 with Mr. Miller.  Yes, he was listed as a party in interest

11 on a, you know, 15-page party in interest list, but there was

12 no disclosure whatsoever about Sullivan & Cromwell having any

13 connection with him, let alone that he was the individual who

14 actually brought Sullivan & Cromwell to the attention of the

15 debtors.

16          When Mr. Miller had been a partner at Sullivan &

17 Cromwell he left and he went in-house to FTX US, and at that

18 point introduced Sullivan & Cromwell.  That is in the

19 supplemental declaration, but there was no information at all

20 about Mr. Miller in the original.  So we certainly appreciate

21 Sullivan & Cromwell recognizing that that is something that

22 absolutely should have been included in the original

23 declaration.

24          I also want to clarify that was certainly not the

25 only additional disclosure we asked for.  There was quite a

1  bit more and you will see that the first supplemental

2  declaration that was filed, I think, was 81 paragraphs,

3  something of that nature.  Some of that was in response to, I

4  think, with respect to other objectors, but a good piece of

5  that was disclosure that we asked for.  So, it was not just

6  that one piece, it was quite a bit, and we did work with

7  them, and we're glad that they made those additional

8  disclosures and we were able to resolve that issue.

9          THE COURT:  Thank you, Ms. Sarkessian.

10         THE COURT:  Mr. McLaughlin has stood up.

11         Do you have anything with regard to the resolution

12 with the U.S. Trustee?

13         MR. MCLAUGHLIN:  No, Your Honor.

14         THE COURT:  Okay.  Why don't we wait.

15         Mr. Bromley, why don't you go ahead and then I

16 will turn to Mr. McLaughlin.

17         MR. BROMLEY:  Thank you, Your Honor.

18         Now that we have resolved the issues with the

19 Office of the U.S. Trustee and noting that the unsecured

20 creditors committee has filed a statement in support the only

21 objection that is -- well, there are two objections that are

22 remaining from a Mr. Winter and Mr. Brummond.  They are

23 represented by counsel here today.

24         I would just like to, before we get going on that,

25 Your Honor, just give a short preview of the issues, and then

1  I understand that they have certain things that they would

2  like to say.

3           Your Honor, with respect to the matter before you

4  today we have two witnesses.  We have Mr. Ray and Mr.

5  Dietderich.  They have both submitted declarations and

6  supplemental declarations; in Mr. Dietderich's case a second

7  supplemental declaration.  We believe that the disclosure

8  issues have been fully resolved.

9           We have been, as I noted, in constant contact with

10 the Office of the U.S. Trustee and exchanged voluminous

11 amounts of information.  We believe that the disclosure that

12 has been filed, a supplemental disclosure, is fully

13 sufficient.

14          As Mr. Ray mentions in his declaration, what we

15 are talking about here, Your Honor, is a need to move on.

16 One of the things that the debtors have been facing,

17 generally in these cases, is assault by Twitter.  It is very

18 difficult, Your Honor, to cross-examine a tweet, particularly

19 tweets that are being issued by individuals who are under

20 criminal indictment and whose travel is restricted so to

21 speak.

22          THE COURT:  I have the benefit of not being on

23 Twitter, so I have no idea what people are saying on Twitter

24 about this case.

25          MR. BROMLEY:  Well, Your Honor, to a certain

1  extent you are brought into it because of the objections that

2  reference those things.  And it is, frankly, difficult in

3  these circumstances to try to respond to all of those things

4  all at once.  So, we have decided not to do so.  Our view is

5  that the issue should be addressed in Court in a formal

6  manner, and that those who have things to say should come to

7  Court and say those things; subject to cross-examination,

8  subject to the rules of the Court, and that is the way that

9  we intend to proceed.

10         With respect to the application, Your Honor, I do

11 note that there was a declaration, something, a document

12 filed on the Court's docket last night that is characterized

13 as a declaration by an individual who is a former legal

14 officer within the FTX Group.  I know that Mr. Winter and Mr.

15 Brummond's counsel have requested that this hearing be

16 adjourned as a result of that filing.

17         Your Honor, we are opposed to any such

18 adjournment.  We have already gone 70 days into these cases.

19 An enormous of work has been done.  There has already been an

20 adjournment of these retention applications.  We believe,

21 Your Honor, that it is imperative that we put this stage of

22 the case, the retention of professionals, aside, complete

23 that, and move onto the next stage.

24         Now we do know that we have an examiner motion

25 that has been filed by the U.S. Trustee and we will deal with

1  that on February 6th, but the fact is, Your Honor, if there

2  was an adjournment made as a result of the filing by Mr.

3  Friedberg, which followed hot on the heels of two very long

4  and rambling tweets that were filed by Mr. Bankman-Fried --

5  not filed, sorry, Your Honor, but posted and cited by

6  objectors.  I think its virtually certain that such activity

7  is going to continue and that if we simply agree to adjourn

8  something today or Your Honor decided that it was appropriate

9  we would simply be faced by additional attacks on Twitter and

10  additional random things that are filed.

11          Now with respect to Mr. Friedberg's filing that

12  filing is not on behalf of any particular party.  Mr.

13  Friedberg claims to be a creditor, but he doesn't style it as

14  an objection.  It was filed late.  It was filed -- frankly,

15  it's a little bizarre if you sit down and read it, but, Your

16  Honor, our view is that it has no place in the Court, it

17  should be stricken from the record, and the hearing should go

18  forward with the two witnesses that we have to the extent

19  that counsel for Mr. Winter and Mr. Brummond have any

20  questions.

21          THE COURT:  Let me hear from Mr. McLaughlin. It

22  was his motion to continue the hearing.

23          MR. MCLAUGHLIN:  Good morning, Your Honor.  For

24  the record Jack McLaughlin of Ferry Joseph on behalf of

25  Warren Winter and Richard Brummond, two objecting creditors.

1       Your Honor, if I may introduce to the Court my co-

2 counsel.  With me today in Court is Marshal Hoda of the Hoda

3 Law Firm of Houston, Texas, and Patrick Yarborough of Foster

4 Yarborough also of Houston.  They are lead counsel in this

5 matter.

6       Mr. Hoda will be speaking on behalf of our

7 position today.  First, with regard to the emergency *ex parte*

8 motion to continue the hearing vis-à-vis the Sullivan

9 Cromwell application, and then on any argument the Court will

10 take on the application proffer.

11       THE COURT:  Okay.  Thank you.

12       MR. MCLAUGHLIN:  Thank you, Your Honor.  By the

13 way, both have been admitted *pro hac vice*.

14       MR. HODA:  Good morning, Your Honor.  May I please

15 the Court.  My name is Marshal Hoda, I represent the

16 individual objectors in this matter, Mr. Warren Winter and

17 Mr. Richard Brummond.  I appreciate the privilege of being

18 able to appear before this Court *pro hac vice* today.

19       I'd like to first address the emergency motion for

20 an adjournment that we filed yesterday.  Your Honor, I am

21 here on behalf of two individual depositors on the FTX and

22 FTX US exchanges who collectively lost access to

23 approximately $400,000 in assets as a result of the FTX

24 collapse.  My clients have objected to the appointment of

25 Sullivan & Cromwell as the debtors lead counsel because they

1  have grave concerns about the firm's lack of transparency in

2  its mandatory disclosures, and its ability to lead an

3  objective investigation into the FTX Group's prepetition

4  activities.

5         Yesterday we filed an emergency motion for

6  adjournment of the hearing on Sullivan & Cromwell's

7  application that is set to go forward this morning.  And so

8  that is what I will speak about first.

9         I'd like to start with a brief statement of the

10 chronology, which is helpful for context here.  Sullivan &

11 Cromwell filed its application to be appointed under Section

12 327 on December 21st, 2022.  As we point out in our papers,

13 and as Ms. Sarkessian noted a moment ago, the original

14 declaration of Mr. Dietderich that accompanied that

15 application said, essentially, nothing about Sullivan &

16 Cromwell's prepetition work, legal work, for the FTX Group

17 entities.

18        It disclosed that Sullivan & Cromwell had, in

19 fact, performed $8 and a half million approximately of legal

20 work for the FTX Group entities that said only, and I quote,

21 that that work had been "With respect to acquisition

22 transactions and specific regulatory inquiries relating to

23 certain U.S. business lines;" nothing more.

24        Further, Mr. Dietderich's declaration did not

25 disclose numerous other connections between Sullivan &

1  Cromwell, and the debtors, and the debtors' attorneys as

2  expressly required under Bankruptcy Rule 2014, including that

3  a former Sullivan & Cromwell partner, Mr. Ryne Miller, was

4  the general counsel at FTX US and one of the highest ranking

5  legal officers in the FTX Group before its collapse.

6          Accordingly, we filed an objection on behalf of

7  Mr. Winter on January 4th and later filed an amended

8  objection that set out additional information about Sullivan

9  & Cromwell's relationship with the debtors, available on the

10  public record, that was not reflected in Sullivan &

11  Cromwell's disclosures.

12          The U.S. Trustee also filed an objection at that

13  time pointing out that Sullivan & Cromwell's disclosures were

14  "Wholly and sufficient to evaluate whether Sullivan &

15  Cromwell satisfies the bankruptcy code's conflict free and

16  disinterestedness standards."  As you heard today, that has

17  apparently been resolved, but that was the U.S. Trustees

18  opinion, as well as ours, at the time of the filing of the

19  original Dietderich declaration.

20          On January 17th, less then 72 hours ago, Mr.

21  Dietderich submitted his supplemental declaration in support

22  of Sullivan & Cromwell's retention.  That declaration sets

23  out 34 pages of additional disclosures and exhibits relating

24  to Sullivan & Cromwell's connections with the debtors;

25          Yesterday, less then 24 hours ago, Mr. Dietderich

1  submitted his second supplemental declaration adding more

2  facts to the mix;

3              Finally, last night, Sullivan & Cromwell submitted

4  a revised proposed order changing the details of its proposed

5  retention in this case.

6              Your Honor, we submit that this chronology shows

7  gamesmanship. As both my clients and the U.S. Trustee

8  recognize, Mr. Dietderich's original declaration was wholly-

9  inadequate to satisfy Sullivan & Cromwell's disclosure

10  obligations.  There is no excuse for a firm, with the

11  resources available to Sullivan & Cromwell, to wait until

12  less then 72 hours before the hearing on its application to

13  make any substantive disclosures about its prepetition work

14  for the debtors, and crucial disclosures concerning its own

15  former partner's employment as one of the top legal officers

16  of the FTX Group.

17              Nevertheless, Your Honor, we were prepared to go

18  ahead with the hearing today and make our arguments based on

19  the facts available to us.  Then yesterday afternoon, around

20  2 p.m., a bombshell was lobbed into the docket in the form of

21  the Friedberg declaration that you have heard about.

22              Mr. Friedberg, described in Mr. Dietderich's

23  supplemental declaration as "The senior legal officer of the

24  FTX Group," submitted a 17-page declaration setting out what

25  he described as "Additional information about potential

1  claims that the debtors against Sullivan & Cromwell, false

2  statements made by Sullivan & Cromwell, as well as other

3  misconduct."

4        To be clear, Your Honor, as we stated in our

5  emergency motion, we had absolutely nothing to do with this

6  declaration.  I have confirmed that my clients did not

7  either.  Although styled as being offered in support of the

8  amended agenda we submitted, the declaration was prepared and

9  submitted without any solicitation or input from us

10  whatsoever.  We were as surprised by it as anyone else.

11        That said, the allegations in the Friedberg

12  declaration are as relevant as they are explosive.  The

13  declaration outlines several claims that Mr. Friedberg

14  believes the bankruptcy estate has against Sullivan &

15  Cromwell. It also outlines what the declaration characterizes

16  as false statements in the Dietderich declarations and

17  inappropriate conduct, alleged inappropriate conduct, by

18  former Sullivan & Cromwell partner and high-ranking FTX Group

19  legal officer Ryne Miller.  Crucially, the Friedberg

20  declaration also says that its author would testify

21  competently to the facts set out there if given the

22  opportunity.

23        Your Honor, we don't purport to vouch for the

24  accuracy of any of the facts, allegations I should say, set

25  out in Mr. Friedberg's declaration.  Frankly, like everyone

1   else we hardly had time to process them.

2          What's clear is that the matters raised in the

3   Friedberg declaration are central to the question of whether

4   Sullivan & Cromwell meets the standard for retention under

5   Section 327 and has made the appropriate disclosures under

6   Bankruptcy Rule 2014.  We believe it is in the best interest

7   of our clients and all stakeholders to have additional time

8   to arrange testimony, secure a deposition and, otherwise, get

9   to the bottom of this unexpected development.

10          To sum-up on the emergency motion, I will note

11  that as the Court is, of course, aware the bankruptcy system

12  depends on the self-policing conduct of lawyers in making

13  robust timely disclosures.  The failure to get this right at

14  the outset can result in a lot of pain down the road.  We

15  believe the chronology we have laid out is sufficient reason

16  for an adjournment, that there will be no prejudice to anyone

17  by adjourning the hearing on Sullivan & Cromwell's

18  application for a brief period, as the Court sees fit,

19  perhaps to the February 6th omnibus hearing only a few weeks

20  from now.  Surely, Sullivan & Cromwell can continue its work

21  in the meantime and no harm will come to the estate.

22          With that, Your Honor, I have concluded my

23  argument on the emergency motion.  I would be happy to take

24  any questions the Court has.

25          THE COURT:  No questions.

1          Mr. Bromley, any response?

2          MR. BROMLEY:  Yes, Your Honor. I take issue with

3    much of what Mr. Hoda says.  The exercise that Sullivan &

4    Cromwell went through in crafting the supplemental disclosure

5    is exactly the exercise that large firms who are debtor's

6    counsel go through in every large case, right.  We sat down

7    with the Office of the U.S. Trustee for weeks going through

8    information requests, supplementing the disclosure.

9          The disclosure issues that were raised by Mr. Hoda

10   in his objection were all addressed in the supplemental

11   disclosures from Mr. Dietderich.  We took Mr. Hoda's

12   objection into account, his original objection, and his

13   amended objection and every single one of the issues that he

14   raised was addressed in the supplemental disclosure.  So,

15   from a disclosure perspective the issues that were raised by

16   his clients have been fully addressed.

17          The question, though, is, well, what is happening

18   really with respect to this random filing that is made by Mr.

19   Friedberg.  Who is Mr. Friedberg and why is he making that?

20          Well, one of the issues that we're facing, Your

21   Honor, is that Sullivan & Cromwell is front and center in

22   connection with what has been going on with the FTX Chapter

23   11 proceedings. And if you are part of the inner circle at

24   FTX, and that would include Mr. Friedberg, then you have

25   concern about the exercise that is going on.

1          On a daily basis Sullivan & Cromwell is

2 cooperating with and providing information to federal

3 criminal authorities and regulatory authorities.  The

4 individuals who were at, and running, and making the

5 decisions that have brought this company to its knees are

6 rightly concerned that the information that is being provided

7 to authorities could lead back to their doorstep.

8          So what we have here, Your Honor, is a gentleman

9 who ran this company into the ground, Mr. Bankman-Fried,

10 sitting in his parent's home in Palo Alto, California with an

11 ankle bracelet on, extradited from the Bahamas, and charged

12 with multiple crimes by the Southern District of New York

13 U.S. Attorneys Office.

14          And when the U.S. Attorney for the Southern

15 District announced that indictment what did he say?  One of

16 the greatest frauds in history is what he said.  He also

17 announced that two of the founders, Mr. Wang and Ms. Ellison,

18 had been indicted, plead guilty, and agreed to cooperate.

19          So, if you're Mr. Bankman-Fried or, frankly, Mr.

20 Friedberg there is a concern about what is going on and what

21 could happen to them.  They can't throw stones at the U.S.

22 Attorney's Office, but they can throw stones at debtor's

23 counsel that is providing information to the prosecutors and

24 the regulators; that is exactly what is happening.

25          Mr. Hoda failed to note that he had sent me an

 1  email saying that he had planned to call Mr. Bankman-Fried

 2  here as a testifying witness today.  We, the debtors, and

 3  Sullivan & Cromwell are fighting a ghost when we have these

 4  accusations that are being made and no opportunity to cross-

 5  examine Mr. Bankman-Fried.

 6          Mr. Ray, who is here to testify, gave an interview

 7  to the Wall Street Journal this week.  Mr. Bankman-Fried is

 8  immediately online criticizing what has been said.  We

 9  provided a fulsome presentation to the official committee of

10  unsecured creditors this week and for disclosure purposes

11  posted that on the Court's docket.  Mr. Bankman-Fried takes

12  it, marks it up, and posts it criticizing everything that we

13  have done.  Mr. Bankman-Fried is behind all of this and

14  whenever we move -- if we were to move this, wherever we

15  moved it to there is, in my mind, an absolute certainty that

16  he is going to try to do something to get in the way.  He is

17  lashing out.

18          Now as to Mr. Friedberg, I have to say, he has got

19  a checkered past.  It takes a lot of guts for him to put

20  something in writing that says I was the chief compliance

21  officer at FTX.  But if you read the declaration it's a

22  rambling declaration.  Mr. Frieberg is not here.  We would

23  oppose him testifying, but this is simply an incendiary

24  device to be thrown into the process.

25          With our -- from our perspective, Your Honor,

1  everything that needs to be done in terms of disclosure has

2  been done --

3           THE COURT:  Go ahead.

4           MR. BROMLEY:  -- and what we need to do now is to

5  proceed with the evidence that is ready to be presented.  If

6  Mr. Hoda has any cross-examination for Mr. Ray or Mr.

7  Dietderich then we should do that.  But we shouldn't be

8  pushing this off anymore to invite other folks to be filing

9  things at the last moment and disrupting this exercise.

10          This is a Court of law.  We should be following

11 the rules.  Our application has been on file.  If anyone else

12 wanted to file an objection they could do so.

13          There are two things that I would note, Your

14 Honor, in terms of numbers.  There are almost nine million

15 creditors in this case.  Two have objected.  The creditors

16 committee is on board.  The U.S. Trustees Office is on board

17 after an extensive interaction with the debtors.

18          I would also note, as my son said last night, he

19 sent me the statistics of Mr. Bankman-Fried's sub-stack

20 postings 12 million views, 1,300 likes.  That is like one

21 person at Lincoln Field sitting in the top right corner

22 saying go team and the entire rest of the stadium being

23 empty.

24          THE COURT:  All right. I am going to deny the

25 motion for a continuance.  The declaration was filed, but it

1  -- Mr. Friedberg didn't file a motion.  He didn't even file a

2  joinder to a motion.  He just filed a declaration saying that

3  he was submitting a declaration in support of somebody else's

4  motion.  That is not an appropriate -- procedurally it's not

5  appropriate.

6          So -- and I have read the declaration and,

7  frankly, its full of hearsay, innuendo, speculation, rumors;

8  certainly not something I would allow to be introduced into

9  evidence in any event.  So, I will deny the motion for a

10 continuance and we will go forward with the application.

11         MR. HODA:  Your Honor, if I could just make a note

12 for the record.  I think I would be remiss if I didn't --

13         THE COURT:  You need to come up to the microphone.

14         MR. HODA:  I think I would be remiss if I did not

15 note for the record that as Your Honor was speaking just then

16 Mr. Friedberg appeared twice on the zoom screen here and

17 waived his hand. He is apparently in virtual attendance at

18 this meeting.

19         Again, I feel as though I should apologize for

20 the, kind of, circus aspect of his showing up in this way

21 again. I am surprised as anyone by this development, but I

22 just feel that is a fact that I should note for the record so

23 that its preserved.

24         THE COURT:  I understand.  I did see him and I did

25 not recognize him intentionally because, as I said, he has

1  not filed a motion.  He has not joined any motion.  He is

2  simply trying to be a witness, I suppose, but witnesses are

3  not allowed unless there here live.

4          MR. HODA:  Understood, Your Honor.  As I said,

5  purely noting for the record we are prepared to go ahead with

6  argument on the application, the objection.  So, with that I

7  will take my seat once again.

8          THE COURT:  Thank you, Mr. Hoda.

9          MR. BROMLEY:  Your Honor, if I may just clarify

10  for a moment that, Mr. Hoda, you said you are ready to

11  proceed with argument.  Are you intending to cross-examine

12  any witnesses?

13          MR. HODA:  Yes.  With the Court's permission I

14  would ask to cross-examine Mr. Friedberg.  He's here on zoom.

15          THE COURT:  No.  He can't testify if he's not here

16  in person.

17          MR. HODA:  With that clarification we do not

18  intend to call any witnesses.  We will be making arguments on

19  the declarations that are in the record and the arguments

20  that we have made in amended objection.

21          THE COURT:  So, you're not calling any witnesses,

22  not putting in any evidence?

23          MR. HODA:  No.  Just making our arguments based on

24  --

25          THE COURT:  So, you are going to move the

1  introduction of the declarations?

2         MR. BROMLEY:  Yes, Your Honor.  I would like to

3  move the admission of Mr. Dietderich's original declaration,

4  his first supplemental declaration, and his second

5  supplemental declaration as well as the first declaration of

6  John J. Ray III, and the supplemental declaration of John J.

7  Ray III.

8         THE COURT:  Is there any objection?

9         MR. HODA:  No objection, Your Honor.

10        THE COURT:  Those declarations are admitted

11  without objection.

12     (Declarations received into evidence)

13        MR. BROMLEY:  Thank you, Your Honor.

14        Your Honor, I will proceed to argument then and

15  reserve the right to respond to Mr. Hoda's arguments as well.

16        Your Honor, these cases were filed 70 days ago.

17  The circumstances of the filing are well-known at this point.

18  Mr. Ray's declaration, the so-called first day declaration,

19  that was filed in connection with the hearings that were held

20  on November 22nd is probably the most quoted first day

21  declaration I have ever seen in my 33 years of practice.

22  Indeed, Mr. Ray's first day declaration included language

23  which was quoted in the New York Times top 25 quotes of 2022.

24        What we have here in the FTX situation is a, as

25  Mr. Ray said in his supplemental declaration, a dumpster

1   fire.  The founders of this company left the company abruptly

2   in early November in a state of Chaos.  What has happened as

3   a result of that is that an army of advisors have had to come

4   in and bring order.  That army has been under the direction,

5   on a daily basis, by Mr. Ray.  As Mr. Ray has said in his

6   declaration, as he said in his testimony before Congress, as

7   he said in his prepared remarks before Congress, Mr. Ray is a

8   very hands-on leader.

9         We are in meetings on a regular basis.  Mr. Ray

10  digs deep into the details and he relies on his advisors.

11  The advisors that are leading that charge on the legal front

12  are Sullivan & Cromwell, supplemented by Quinn Emanuel and

13  the Landis Law Firm here in Delaware.  We have recently been

14  joined on the scene by Mr. Hansen and the Paul Hastings Firm,

15  and we have been doing an enormous amount of work.

16        Among the work that we have been doing is to

17  recreate or, frankly, create from scratch the structure that

18  should have been there from the beginning.  The work that has

19  been done has yielded enormous results.  When we were here on

20  November 22nd it was fair to say that Mr. Ray and the

21  advisors were still in the earliest stages of trying to

22  develop the information necessary to move these cases

23  forward.

24        Now that we are 70 days into the case we are much,

25  much further along.  And as Mr. Ray says in his declaration

1  that could not have been done were it not for the efforts of

2  all the advisors, but in particular Sullivan & Cromwell as

3  lead debtors' counsel.

4        Mr. Ray makes very clear in his supplemental

5  declaration that any limitation or denial of retention with

6  respect to Sullivan & Cromwell would be extraordinarily

7  detrimental to the interest of creditors and stakeholders in

8  these cases.  And one of the things that we have done, as I

9  noted earlier, is lead the interaction with the regulatory

10  and criminal authorities.

11        I have been doing this a long time, Your Honor,

12  but I have not been involved in a situation where the debtor,

13  itself, has been treated as a crime scene.  We are inundated

14  on a regular basis by demands from multiple regulatory

15  authorities, federal and state, as well as criminal

16  authorities for all sorts of information on an expedited

17  basis.  The number of priority emails that we get from

18  regulatory and criminal authorities is phenomenal.

19        In close coordination with Mr. Ray, we have been

20  responding on an expedited basis to every one of those

21  requests.  Frankly, Your Honor, I think if it were not for

22  that type of prompt and immediate response, we would not have

23  seen the indictments and the plea agreements that we have

24  seen to date.  There is a lot more to do and the next stage

25  of the case is about to begin.  With us being joined by the

1  creditor's committee we're ready to move on to that next

2  stage.  So, I think that the justification for the

3  continuance of the status quo with respect to Sullivan &

4  Cromwell is manifest.

5          The real question comes down to the legal

6  standard.  Disinterestedness and the holding of an adverse

7  interest.  The disclosure that we have filed, in my

8  experience, is the most fulsome disclosure that I have ever

9  seen any debtor's counsel make in any case.  We have gone

10 down to extraordinary levels of detail to matters that are

11 simply of $1,000; we have listed every one of them out.

12         The concerns that have been raised have said,

13 okay, Ryne Miller, he was a partner at Sullivan & Cromwell

14 and he left the firm and took on the role as general counsel

15 of FTX US.  And that is West Realm Shires as a corporate

16 name. Mr. Wilson was a former associated at Sullivan &

17 Cromwell.  He did not leave Sullivan & Cromwell to go to FTX,

18 he left to go to the Fenwick & West Law Firm.  Fenwick & West

19 is the law firm that served as general outside counsel to

20 FTX.  From Fenwick & West he then left and went to FTX

21 Ventures.

22         It is true that the firm has done work for certain

23 FTX entities prior to the petition date, but that in and of

24 itself, as case law is clear, is not in and of itself not

25 disqualifying.  Indeed, its virtually unheard of for a major

1  law firm who can handle the type of matters that are raised

2  in a case of this complexity to not have a pre-existing

3  relationship.

4        I have been debtor's counsel in multiple cases

5  over 30 years. I have never been debtor's counsel in a

6  situation where my firm did not have an existing, pre-

7  existing relationship with the debtors. So, the mere fact

8  that Sullivan & Cromwell had done work is irrelevant.

9        The question is whether or not any of that work

10 goes to any of the issues that we're facing and if so, how

11 would it go to those issues. Is there anything about the work

12 that we have done in the past or the relationships that we

13 have that would be disqualifying, and the answer to that is

14 no.

15       As Mr. Dietderich makes clear in his declaration

16 Sullivan & Cromwell has two types of clients.  Our system,

17 when you fill-out a conflicts check and a client comes in, is

18 you have to decide whether or not is this a regular client or

19 is it a particular matters client.  Why is there that

20 distinction?

21       Well a regular client is a client that we have a

22 long-standing and broad based relationship with where we do

23 lots of different work for that client over a broad spectrum

24 of matters.  And in most circumstances those clients have

25 been clients of the firm for years, in many circumstances for

1  decades.

2        On the other hand, we have particular matters

3  clients.  A particular matters client is somebody who comes

4  in with a particular matter who asks for advice on a specific

5  matter.  Now why is there that distinction?  Well in our

6  intake system a regular client doesn't have to go through the

7  same type of rigorous review that a particular matters client

8  comes in because if we are dealing with one of those major

9  clients, and even though we're a firm with a long history,

10 believe me, there's not all that many.  You know that that

11 big name client, and I'm not going to disclose them, but you

12 can imagine who they might be, we know, we don't have to

13 focus as hard on that because it's a big and existing client.

14       Particular matters are different.  They are folks

15 who come in, they ask for assistance on a particular matter,

16 it then goes to our intake committee and the intake committee

17 looks at that particular matter, we look at everything that

18 it might touch on and relate to, and we make a decision with

19 respect to that particular matter.  Every single matter that

20 came in from FTX, any FTX entity, was a particular matter.

21       Now, one of the things Sullivan & Cromwell excels

22 in is transactional work and regulatory work.  The majority

23 of the work that we did here for FTX fell into those

24 categories.

25       Now, it's also important to look at the timeline

1   of Sullivan & Cromwell's work with FTX.  FTX, as we've told

2   Your Honor, is not an entity that had a long history.  The

3   FTX world started in 2017 with the creation of Alameda, the

4   hedge fund.  Our work with FTX, any FTX entity, started in

5   the summer of 2021.  We had nothing to do with the

6   establishment of Alameda; we had nothing to do with any of

7   Alameda's operations.  We had one matter that Mr. Dietderich

8   was involved in with respect to the Voyager bankruptcy that

9   Alameda was involved in, but we were not there when Alameda

10  was established, we were not general corporate counsel to

11  Alameda; we didn't have that type of relationship with

12  Alameda, we had a particular-matters relationship.

13          FTX.com, the international exchange.  Well, that

14  entity is FTX Trading Limited.  It was established in 2019,

15  two years before Sullivan & Cromwell even came in contact

16  with FTX.

17          FTX U.S., established in 2019; again, two years

18  before Sullivan & Cromwell got involved with FTX.  We did not

19  have anything to do with the creation of these entities, we

20  didn't structure them, we didn't incorporate them, we didn't

21  act as secretary on board meetings; we were not general

22  outside counsel with respect to those entities.

23          We never represented any of FTX entities in a

24  capital race, we never represented them in issuing debt; we

25  represented them in specific transactional situations, none

1  of which touch on any of the issues that have been raised to

2  date.

3         Now, to the extent that anything comes out that

4  there's a transaction that we may have been involved in might

5  have an issue that needs to be investigated, we of course

6  will not be involved in that.  The Quinn firm is here, the

7  Landis firm is here, and Paul Hastings is here.  This is the

8  standard way that large firms deal with these types of issues

9  in cases of this magnitude.

10         It is not surprising that creditors who are

11  inexperienced with dealing with large corporate bankruptcies

12  might say is that the way it really works, but, Your Honor,

13  we know that is the way it works.

14         It was very clear to Mr. Ray when he decided, one,

15  to file these Chapter 11 cases and, two, to retain Sullivan &

16  Cromwell as 327(a) counsel that there would be a need for

17  conflicts counsel.  And so he immediately, the first day or

18  two of his occupying the office of chief executive officer,

19  he reached out to Quinn Emanuel, he interviewed them and he

20  hired them.

21         Now, we all know the reputation of Quinn Emanuel.

22  This is not a firm that is a walk in the park.  Quinn Emanuel

23  is a well known, high profile and successful law firm.  It is

24  not all that common, frankly, to have large cases where

25  there's a firm like Sullivan & Cromwell and a firm next to it

1  like Quinn Emanuel, and Mr. Ray recognized that this was a

2  special case and that he needed to have that type of support.

3          So when you're looking at the question of whether

4  or not there is -- we hold an interest adverse to the estate,

5  the disclosure makes clear that we do not.  There's nothing

6  in the record that indicates that Sullivan & Cromwell holds

7  an interest adverse to the estate and all of the disclosure

8  demonstrates that we are a disinterested person.

9          Another thing that is raised by the objectors as a

10 problem is the fact that Sullivan & Cromwell was paid for its

11 work before the petition date and that, therefore, it somehow

12 constituted -- the payments, therefore, somehow constituted

13 preferences that are challengeable under the Pillowtex case.

14 But we make clear in Mr. Dietderich's declaration, every

15 payment that was received within the 90 days, the amount of

16 the payment, and the number of days that the bill remained

17 outstanding.  We reviewed all that with the Office of the

18 United States Trustee.  Your Honor, every one of those

19 payments it's clear it was made in the ordinary course.

20         There was no antecedent debt that was paid off

21 just prior to the filing because that's what the Pillowtex

22 case is about.  In that case, the Jones Day firm -- Your

23 Honor, is there a way to -- it's kind of distracting to have

24 -- thank you, I appreciate that.

25         THE COURT:  You can turn your screen off too, if

1  you want.

2          MR. BROMLEY:  Oh, can I?  Oh, that's good.  That's

3  much better, thank you.  I was wondering if that was the

4  Jones Day firm -- but in the Pillowtex case, the

5  circumstances were all about an acceleration of payments on

6  overdue bills that were made -- where payments were made on

7  the eve of bankruptcy.  That's not what happened here, as Mr.

8  Dietderich's declaration shows in detail every amount, the

9  number of days the amounts were outstanding -- or the bills

10  were outstanding.  So there's no preference issue here, Your

11  Honor.

12          From our perspective, the objections of Mr. Winter

13  and Mr. Brummond are resolved.  There are disclosure

14  questions; every one of those questions has been answered.

15  The main thing that they indicate was a lack of clarity with

16  respect to Mr. Miller and Mr. Wilson; we have given absolute

17  clarity with respect to both of them.

18          A question with respect to the preference amounts

19  or the amounts that are payable within the preference -- that

20  were paid within the preference period, we go through every

21  single payment, including the time of the invoices were

22  outstanding, making it clear that none of them are

23  preferences.

24          And with respect to -- just generally, with

25  respect to the matters that -- a lack of disclosure with

1   respect to the description of the matters, Mr. Dietderich

2   goes very carefully through each of the matters and describes

3   them.

4          So we feel that we have made an enormous amount of

5   disclosure, more than is generally done in these cases.  We

6   recognize that the exercise with the Office of the U.S.

7   Trustee took longer than we would have liked, but we think it

8   was a fulsome and successful exercise.  I've had few

9   adversaries -- and I say this respectfully -- as relentless

10  as Ms. Sarkessian and I am tired of having dealt with her.

11      (Laughter)

12          MR. BROMLEY:  And I say that with the greatest

13  amount of respect.  We feel that everything that we have put

14  in our disclosure satisfies -- now clearly satisfies the

15  Office of the U.S. Trustee and, in my mind, that is the

16  highest standard.

17          So, Your Honor, our view is that we have satisfied

18  the disclosure requirements, that there's a clear and

19  convincing argument for the retention of Sullivan & Cromwell,

20  and we ask that the Court enter the order.

21          THE COURT:  Thank you, Mr. Bromley.

22          Does anyone else wish to speak in support before

23  we go to the objectors?

24          MR. HANSEN:  Good morning, Kris Hansen with Paul

25  Hastings, proposed counsel to the Official Committee.

1          Your Honor, we just briefly would say that the

2     committee stands by the statement that it filed with respect

3     to the Sullivan & Cromwell retention application.  The

4     committee is satisfies with the disclosures that they've

5     made.  We believe that an order should be entered today

6     approving their retention and we believe that the failure to

7     do so would be extremely detrimental to these cases for many

8     reasons and absolutely not in the best interests of the

9     estates.

10          As we also said in our statement, Your Honor, the

11    committee intends to do the job that it's authorized to do

12    under Section 1103(c)(2) of the code, which is to investigate

13    all of the financial affairs of the debtors, including all of

14    the fraudulent allegations, and that also includes the

15    evaluation of all professionals who were involved with the

16    debtors on a prepetition basis, but that investigation

17    doesn't need to preclude the retention of Sullivan & Cromwell

18    here today.  As we noted in our statement, a retention

19    doesn't grant a release, it allows the cases to move forward

20    with the debtor's chosen counsel and it brings some

21    credibility and structure to the process, and that's what we

22    believe is necessary here.

23          Thank you, Your Honor.

24          THE COURT:  Thank you.

25          Anyone else?

1    (No verbal response)

2         THE COURT:  Ms. Sarkessian, do you want to give

3    one last shot to Mr. Bromley before we --

4         (Laughter)

5         MS. SARKESSIAN:  Your Honor, I will say, I take

6    relentless as a compliment.

7         (Laughter)

8         THE COURT:  Okay, all right.

9         All right, let me hear from the objectors.

10        MR. HODA:  Thank you, Your Honor.  Again, Marshal

11   Hoda here on behalf of the objectors, Mr. Warren Winter and

12   Mr. Richard Brummond.

13        Your Honor, our amended objection sets out four

14   reasons why Sullivan & Cromwell should not be approved under

15   Section 327 and Rule 2014.  I'll provide a brief statement of

16   those reasons here and point you to what we believe is good

17   authority on which those reasons are based.

18        For clarity, Your Honor, I'll group our four

19   objections into two buckets.  First is what I'd call the

20   investigative conflicts bucket.  These objections turn,

21   ultimately, on the nature of the FTX Group's prepetition

22   activities and the effect that context has on the decision to

23   retain Sullivan & Cromwell in this matter.

24        The debtors CEO, John Ray III, Mr. John Ray III,

25   respectfully, confirmed in his congressional testimony and in

1  his supplemental declaration that the FTX Group was engaged

2  in, quote, "old fashioned embezzlement, just taking money

3  from customers and using it for your own purposes," close

4  quote.

5         This included massive misappropriation of customer

6  funds that were used for improper purposes, including what

7  Mr. Ray described as a $5 billion, quote, "spending binge,"

8  close quote.  The FTX Group went on in 2021 and 2022.

9         Given these facts, of course, every prepetition

10 transaction must be investigated and every potential estate

11 claim considered.  This includes the actions of the debtors'

12 current and former executives, and the third party

13 professionals and firms who advised them as this spending

14 spree played itself out.

15        We know from Sullivan & Cromwell's own disclosures

16 that the firm advised the FTX Group in several of the large

17 transactions it made during this spending binge.  We also

18 know that two former Sullivan & Cromwell lawyers were amongst

19 the FTX Group's top-ranking legal officers.  Finally, we know

20 that a number of current and former Sullivan & Cromwell

21 clients were amongst the FTX Group's business partners.

22        With this background in mind, the thrust of the

23 investigative objections comes into view.  Sullivan &

24 Cromwell has extensive actual and potential conflicts created

25 by the necessity of investigating its own role in the FTX

1  Group's prepetition activities, the activities of former

2  Sullivan & Cromwell lawyers at the top of the FTX Group's

3  internal legal structure, and the activities of various of

4  Sullivan & Cromwell's own current and former clients.

5          I'll just briefly point out some of the

6  authorities we cite on these points, Your Honor; in

7  particular, the Bohack case and the Get-N-Go case.

8          In Bohack, a Second Circuit decision, the question

9  was whether a lawyer who was, quote, "close personal friends

10  and business associates," close quote, with the board

11  chairman of the bankrupt entity could serve as counsel when

12  there were questions about the chairman's liability for

13  prepetition participation in fraudulent transactions.  The

14  court held that he could not because, quote, "an attorney who

15  has been closely related by professional, business, and

16  personal ties to those whose conduct may now be suspect is

17  evidently in no position to make any objective appraisal of

18  the nature and extent of their involvement."

19          Similarly, in Get-N-Go the question was whether a

20  law firm that had advised the debtor in various prepetition

21  corporate transactions that had come under suspicion could be

22  appointed as bankruptcy counsel under Section 327.  The court

23  denied the firm's application, writing that having counseled

24  some of the parties in the very transactions that, quote,

25  "deserved examination," the firm could not, quote, "provide

1   the objective and independent advice regarding the validity

2   or propriety of these transactions as is required for the

3   debtor's performance of its fiduciary obligations."

4           Your Honor, we believe these cases dictate the

5   result here.  Just as the firms seeking to be retained in

6   Bohack and Get-N-Go were found to be unable to objectively

7   investigate and advise about transactions in which they had

8   personally participated, or about the actions of persons with

9   whom they had deep personal and professional ties, Sullivan &

10  Cromwell will not be able to objectively advise the debtors

11  as to the issues raised by the FTX Group's spending binge and

12  the conduct of former Sullivan & Cromwell lawyers.

13          Next, Your Honor, I'll turn to the other bucket,

14  which is the preference claim.  Mr. Dietderich's original

15  declaration revealed a pattern of payments by the FTX Group

16  to Sullivan & Cromwell that showed a marked jump on November

17  3rd, 2022, just after the FTX crisis began and shortly before

18  the FTX Group declared bankruptcy.

19          In light of the additional disclosures that were

20  offered in the supplemental declaration, some of those

21  concerns have been ameliorated.  We would note that we did

22  not have the benefit of those supplemental disclosures at the

23  time the objection deadline passed.  Nevertheless, Mr.

24  Dietderich's supplemental declaration continues to show

25  inconsistencies that we believe require a ruling on the

1  preference issue.  It notes, for instance, that Sullivan &

2  Cromwell received a $4 million retainer from the FTX Group on

3  November 9th, more than 2.4 million of which was used to pay

4  down unspecified prepetition invoices.

5          Finally, in the Friedberg declaration, for which

6  we have made an offer of proof today -- or at least an offer

7  to investigate further -- allegations were made that these

8  payments were improperly taken from solvent entities in what

9  can only be described as unusual circumstances.

10          Your Honor, briefly on this point, the cases make

11  clear that the Court takes all facts and circumstances into

12  account when considering whether a payment in the preference

13  period was made in the ordinary course of business.  Courts

14  consider factors such as the timing of the payment and

15  whether it constituted a deviation from the pattern of prior

16  payments where there was an ongoing relationship.  The First

17  Jersey Securities case, with which the Court will certainly

18  be familiar, is an archetypical example.

19          It is also the case, under Pillowtex, that the

20  preference analysis must be carried out before retention of a

21  firm under Section 327.  Accordingly, we request that the

22  Court issue a ruling on the preference issue as part of its

23  consideration of Sullivan & Cromwell's application.

24          That is the sum and substance of our arguments.  I

25  would leave the Court with one last point before closing.  In

1    its reply and in counsel's argument today and various

2    arguments that have been offered, and Mr. Ray's declaration

3    and supplemental declaration in support of the retention of

4    Sullivan & Cromwell, many have pointed to the practical

5    benefits of retaining Sullivan & Cromwell because of its

6    existing familiarity with the business and the work it has

7    already done.

8             With due respect to the work that has been done

9    and due respect to those who have done it, I would point out

10   that the Third Circuit has expressly rejected such arguments

11   as relevant under Section 327.

12            The important case here is <u>Pricewaterhouse</u>.

13   There, the debtors sought to retain Pricewaterhouse as their

14   accountant and financial adviser.  They selected the firm

15   precisely because it had provided them with prepetition

16   services and, thus, developed expertise regarding their

17   financial affairs and needs.  At the same time, the debtors

18   and Pricewaterhouse acknowledged that the firm was a creditor

19   of the debtors and, thus, *prima facie*, ineligible for

20   appointment under Section 327.

21            Writing for the Third Circuit, then Judge Alito

22   noted that the debtors had, quote, "stressed the practical

23   benefits," close quote, of employing Pricewaterhouse, but

24   rejected that argument as inconsistent with the plain

25   language of Section 327, which of course, as Your Honor

1   knows, requires disinterestedness in all cases.

2           The court held that all professionals must meet

3   the disinterestedness standard and noted, quote, "Bankruptcy

4   Courts cannot use equitable principles to disregard

5   unambiguous statutory language," close quote.

6           We would also note, practically speaking, that we

7   do respect the work that has been done.  Given the

8   availability of other large firms, that it is not impossible

9   to conceive that Sullivan & Cromwell would be replaced as

10  counsel in this case.  I was told once that, when you find

11  yourself in a hole, stop digging, and perhaps that is what

12  should be done here.

13          Finally, we would note that, in response to many

14  of the objections we have raised, Sullivan & Cromwell has

15  noted that it will use conflicts counsel to investigate

16  certain matters in which the firm itself may have been

17  involved or former partners of the firm may have been

18  involved, or in which current and former clients of Sullivan

19  & Cromwell's may have been involved.  I would note, Your

20  Honor, that that limitation appears nowhere in the proposed

21  order as it was originally submitted or as it was resubmitted

22  last night, and that those representations were only made

23  after our objection essentially forced the firm to go on the

24  record about these matters.

25          So we would urge the Court, for all those reasons,

1   to reject Sullivan & Cromwell's application and, in the event

2   that the Court does approve the application, we would urge

3   the Court to add language making explicit that in those

4   certain categories that there should be carveouts in which

5   Sullivan & Cromwell will not be involved in investigation.

6           With that, Your Honor, I would conclude my

7   argument and would be happy to take any questions.

8           THE COURT:  No questions.  Thank you.

9           Mr. Bromley, any response?

10          MR. BROMLEY:  Your Honor, I just have a couple of

11  minor points in response.

12          With all due respect to Mr. Hoda, it's clear that

13  he has not practiced in Bankruptcy Court and understands the

14  way things work here.  We have from the very beginning of

15  this case had, from the very moment that Quinn Emanuel was

16  hired, made it clear that they are available to do matters

17  that Sullivan & Cromwell, for one reason or another, might

18  not be able to do.  And to the extent that Sullivan &

19  Cromwell and Quinn Emanuel and the Landis firm are able to do

20  it and Paul Hastings is unable to do it, there are other

21  firms that would be available to Mr. Ray to do it.

22          So the mere fact -- I know he'd like to take

23  credit for the concept of conflicts counsel in bankruptcy

24  cases, but that's been something that's been going on for

25  decades.

1          With respect to the two cases that he cited,

2  Bohack and Get-N-Go, first of all, they are so fundamentally

3  different that it bears repeating -- or noting.  First of

4  all, they're not Third Circuit controlling precedent, but the

5  Get-N-Go case, which is a Bankruptcy Court in the Northern

6  District of Oklahoma case from 2004, basically the -- what

7  the court noted was that the debtor's relationship with a

8  client of the proposed debtor's counsel permeates every --

9  almost every aspect of the case, issues of characterization

10  of debt and equity, of allocation of resources, of the

11  validity and sufficiency of consideration, and the court goes

12  on.  This is a small case with a small firm that had an

13  extraordinarily large client that was a counter-party to the

14  debtor, that is not the situation that is faced here.

15          The Bohack case is an interesting one as well

16  because facts make the law, right, Your Honor?  And this,

17  while being a Second Circuit case from 1979, notes that among

18  other connections, that the partner in the law firm and the

19  individual who controlled the debtor are the only remaining

20  officers of the debtor.  Even the law firm conceded that of

21  the personal ties with the individual who controlled the

22  debtor and the financial stake in the company are unusual.

23          This is not a situation where anyone from Sullivan

24  & Cromwell is on the board of directors or controls this

25  company or had any role in that way, shape, or form.  So,

1   with all due respect, Your Honor, we believe the <u>Bohack</u> and

2   <u>Get-N-Go</u> cases are inapposite in this situation.

3           We believe, Your Honor, that we have satisfied all

4   of the requirements of Section 327(a), disinterestedness, of

5   being a disinterested person and not holding an interest

6   adverse to the debtors.  We believe that the extensive work

7   that we did with the U.S. Trustee's Office to cure problems

8   that they had with respect to the disclosure is an obvious

9   indication that that work has been done and been done

10  successfully.

11          So, Your Honor, we ask that the Court enter an

12  order approving the retention of Sullivan & Cromwell.

13          THE COURT:  Thank you.

14          All right, I'm going to take a short recess.  I'll

15  come back and I'll give you my ruling.  Let's take a 30-

16  minute recess.

17       (Recess taken at 11:12 a.m.)

18       (Proceedings resumed at 11:51 a.m.)

19          THE COURT:  All right.  Well, the issue before me

20  is the motion to retain Sullivan & Cromwell as counsel for

21  the debtors in these cases.

22          Section 327(a) provides that a debtor may retain

23  professionals that do not hold or represent an interest

24  adverse to the estate and that are disinterested persons.

25  Mr. Winter and Mr. Bremmer -- excuse me, Brummond, have

1   objected to the retention of Sullivan & Cromwell as counsel

2   to the debtors based on several issues.  For the reasons I'll

3   discuss in a moment, I'm going to overrule those objections

4   and approve the retention.

5            First, the objectors argue that because Sullivan &

6   Cromwell represented debtors prepetition there's a potential

7   conflict of interest with any of the matters with which

8   Sullivan & Cromwell was involved that might require an

9   investigation.  Of course, 1107(b) of the code tells us that

10  just because a professional is sought to be retained who may

11  have done work for the debtor prepetition is not

12  automatically disqualifying.

13           In addition, they argue that because two former

14  Sullivan & Cromwell attorneys worked for the debtors

15  prepetition and because clients of Sullivan & Cromwell may be

16  creditors of the debtors in these cases that they have a

17  conflict of interest and cannot be retained.

18           As a preliminary matter, there's nothing in the

19  record before me to indicate that any of the -- any

20  investigation would be required of those transactions with

21  which Sullivan & Cromwell might have been involved.

22  Moreover, even if they were, debtors have retained conflict

23  counsel to conduct any investigation that might touch on

24  those issues.  There's no evidence of any actual conflict

25  here.

1          To the extent there may be a potential conflict,

2   requiring an investigation, for example, of one of the

3   transactions they were involved, or an investigation of the

4   attorneys who were former Sullivan & Cromwell attorneys,

5   those are ameliorated -- those are only potential conflicts

6   and the Third Circuit has said that a potential conflict is

7   not per se disqualifying.  That's In re Boy Scouts of

8   America, 35 F.4th 149 and 157, a 2022 case.

9          Here, any potential conflicts are ameliorated by

10  the fact that there's conflicts counsel in place.  And that's

11  something that happens in every large bankruptcy case.  It

12  would be almost impossible to find a case of this size or

13  even -- well, this is what we call a super-mega case -- even

14  in a mega case you would find -- or a large case, it would be

15  difficult to find debtor's counsel that didn't have other

16  clients who might be clients of the debtor's counsel, but

17  that's why we have conflicts counsel.  It happens all the

18  time and not something that is disqualifying.

19         The objectors point me to the Bohack and the Get-

20  N-Go cases to show that where there is a significant

21  relationship with persons involved -- and, in this case, it

22  would be the two counsel who were -- previously worked for

23  S&C -- that there's a disqualifying conflict.  Those cases

24  are significantly different than this case.  Small firms, big

25  cases, where it represents a huge amount of their case, for

1  example -- or, excuse me, a huge amount of their income, for
2  example.

3          And this case is significantly different because
4  here I have Mr. Ray and four independent directors appointed
5  by Mr. Ray who are all consummate professionals, who were not
6  involved in the company's collapse, and there's no evidence
7  that Mr. Miller or Mr. Wilson are involved in the management
8  of the debtors at this time.  There's simply nothing in the
9  record that would lead me to believe that Mr. Ray and the
10 independent directors would not -- and, by the way, they're
11 the ones running the debtors here, not Sullivan & Cromwell;
12 Mr. Ray is the one who runs the debtors, he makes the
13 decisions with his board.

14         So I have no concerns about any potential
15 conflicts of interests that would require me to disqualify
16 Sullivan & Cromwell in this case.

17         The second basis for the objectors request that I
18 deny the retention is the potential for a preference.  And
19 they point to a $4 million retainer, a portion of which was
20 used to pay prepetition invoices that was given to Sullivan &
21 Cromwell prior to the filing of the bankruptcy.  The
22 objectors argue this creates a Pillowtex issue, showing that
23 Sullivan & Cromwell holds an interest adverse to the debtors.

24         Mr. Dietderich's testimony through his
25 declaration, which was unchallenged, clearly shows that,

1 | based upon the payment history between the debtors and
2 | Sullivan & Cromwell, the payments were made -- the payments
3 | made within the 90-day preference period constitute ordinary
4 | course payments and, therefore, would not constitute
5 | preferences that would be recoverable by the debtors in these
6 | cases.

7 | With that, as I said, I'm going to overrule the
8 | objection and I will enter the order appointing -- or, excuse
9 | me, approving the retention of Sullivan & Cromwell.

10 | Are there any questions?

11 | MR. BROMLEY:  None from the debtors, Your Honor.

12 | MR. HODA:  Thank you for hearing us here today,
13 | Your Honor.

14 | THE COURT:  Thank you.

15 | All right, anything else today before we adjourn?
16 | I thought I was going to get out of here.

17 | MR. GLUECKSTIEN:  Good morning, Your Honor.  We
18 | can, I think, very briefly.  For the record --

19 | THE COURT:  Oh, we have the status conference.

20 | MR. GLUECKSTIEN:  -- Brian Glueckstein, Sullivan &
21 | Cromwell, for the debtors.

22 | The only other item on the agenda, Your Honor, is
23 | just the status conference that the Court requested, I think
24 | just more by way of update after the second day hearing last
25 | week with respect to the redaction and creditor matrix-

1  related issues that were addressed at that hearing.  The

2  Court -- and we thank the Court -- did enter an order this

3  morning approving that motion on a final basis, including the

4  three-month authorization to redact information with respect

5  to all customers of the FTX debtors.

6           I did want to just address very briefly, there

7  were, I believe, three questions that Your Honor had asked

8  about that we provide an update on today, the first of which

9  was whether -- confirmation whether the debtors providing

10 their creditor matrix and related, you know, filings with the

11 Court can distinguish between customers and other creditors.

12 The answer to that, Your Honor, is yes.  Our top 50 creditor

13 list that's on file had done that with respect to non-

14 customer creditors.

15          We did file an amended creditor top 50 list last

16 evening for the dot com silo that's un-redacted, as we

17 discussed at the hearing last week, the publicly disclosed

18 information about the members of the Official Committee of

19 Unsecured Creditors, in addition to any information about the

20 non-customer, non-individual creditors on that list.

21          But let me address very briefly the creditor

22 matrix.  And I know that the Office of the U.S. Trustee is --

23 it's an issue that they're focused on as well.  I think

24 that's where this distinction and the redaction issues is

25 most relevant, at least immediately.

1          Your Honor, the debtors have now assembled a full

2   creditor matrix that has more than 9.7 million potential

3   creditors on it, including customers.  There are still some

4   potential names being identified.  We do expect, Your Honor,

5   to file with -- in accordance with the Court's order, a

6   redacted version of the creditor matrix very early next week,

7   we're targeting Monday, now that we have that information.

8          There are a relatively small number of non-

9   customer creditors across the debtor silos, approximately

10  7,000 or so.  So, of the number we're talking about here,

11  it's a very small percentage that are non-customers, but

12  there are some such creditors, of course, who are vendors,

13  employees, contract counterparties (indiscernible)

14  counterparties, and other creditors who are not customers.

15  Even within that 7,000, however, there is some significant

16  overlap between what we're calling our customer list and

17  creditors who have relationships with the debtors in other

18  capacities, including vendors -- I'm sorry, employees,

19  contract counterparties, who are also customers of the

20  debtors.

21          So anybody who is a customer at all is being

22  redacted and, obviously, the terms that are set forth in your

23  order will be complied with.

24          Your Honor, one thing I do want to note with

25  respect to the creditor matrix -- and I know this is

1  important and this is a practical issue -- the debtors are

2  going to file -- are intending to file and, as set forth in

3  the order, are required to file un-redacted versions under

4  seal of documents where redactions have been made and to

5  provide those un-redacted copies to the Office of the United

6  States Trustee, the committee, and others as provided for in

7  the order, and we are going to do that.  The issue with

8  respect to the creditor matrix, however, Your Honor, is a

9  practical one that I want to just put on the record.

10      The 9.5-plus million entries on the creditor

11  matrix makes it pretty close to impossible.  And I'm informed

12  by the technical experts that the full matrix, if we were put

13  it into kind of a PDF document form, would be something like

14  150,000 pages and would need to be filed as many dozens of

15  separate files due to size limitations and things like that

16  to file it under seal with the Court.

17      As a result, what we are able to do is to provide

18  the matrix in links to about 18 to 20 maxed-out Excel files

19  containing about 500,000 rows each to the U.S. Trustee and to

20  the Court so that they can be accessible, and those files are

21  hosted -- will be hosted by Kroll, our claims agent.  So we

22  will be able to access the full creditor matrix, but I think,

23  as a practical matter, it's not really possible to put the

24  entirety of that nine million names under seal on the docket

25  per se, but we will be able to make it available to the Court

1  by just linking on the files.

2       All the other documents that we are redacting

3  names from, customer names from, certainly we will file full,

4  un-redacted copies under seal.

5       The second question the Court asked and we just

6  briefly addressed was just to confirm whether -- you know,

7  full identifying information for the non-individual, non-

8  GDPR, non-customer creditors.  So, for the institutions who

9  are not customers, will that information be un-redacted and

10 fully provided as required by the Bankruptcy Rules, and the

11 answer to that is yes.  As I stated, we will do that with

12 respect to the creditor matrix and all the filings, we are in

13 the process of doing that.

14      The third issue Your Honor raised that came up in

15 the discussion at the end of the hearing on this motion last

16 week was what the debtors are able to do in terms of

17 identifying non-customer creditors who need to be redacted

18 under the current order, under the portion of that order

19 permitting redactions to comply with the GDPR.  And on that,

20 Your Honor, I can report that the debtors do have some

21 ability to identify those non-customer individual creditors

22 who are protected by the GDPR from their books and records,

23 but certainly not all.

24      For a number of the non-customer individual

25 creditors, the debtors do not have physical addresses on file

1   that would allow us to, you know, identify whether people are

2   located in one jurisdiction versus another.  And what we're

3   intending to do, Your Honor, is to address this in two ways:

4   identifying from a combination of the debtors' books and

5   records where we can those individual non-customers that

6   under the current order need to have their names redacted,

7   and we are also intending to give notice to the affected non-

8   customer individual creditors -- it's only about 2,000

9   people, which, you know, it's not insignificant, but compared

10  to the nine and a half million at this time since we're

11  redacting in full all of the customers -- notice that and an

12  opportunity to contact the debtors to provide information to

13  us to effectively self-verify that they are protected by the

14  GDPR and should be redacted.

15         We expect that process to only take a short period

16  of time, at which point anybody who is not identified and

17  otherwise covered by the order would be un-redacted from

18  filings going forward.

19         Lastly, Your Honor, I just want to address

20  briefly, there was -- I mentioned that we filed the revised

21  top 50 list with respect to the committee members last

22  evening, we are also evaluating the docket as to any other

23  customers who have appeared in this case who have self-

24  identified as such to redact those names from redacted

25  filings going forward.  There was a letter that was submitted

1  to the Court by counsel for the media objectors on January

2  18th suggesting, as I read it, that the debtors go much

3  further than that and somehow look to social media and

4  Twitter and third party websites for statements that would

5  identify customers publicly.  We submit, Your Honor, that

6  that would be impractical and not appropriate.

7          We think that the way to proceed on this, as we

8  said, if people are free to self-identify, if customers

9  identify themselves and appear in this case, identify

10 themselves as customers, there would be no need, obviously,

11 for us to redact them any longer, but we don't think it would

12 be appropriate to have us go out into, you know, sources

13 other than this Court's docket to identify those customers

14 and un-redact them.

15         So those were the points I had to address, Your

16 Honor, in response to the questions that the Court raised at

17 the hearing last week.  I'm happy to answer any questions.

18         THE COURT:  Okay, thank you.  No questions at this

19 time.

20         Let me hear -- Ms. Sarkessian, anything?  Nothing

21 from the U.S. Trustee?

22         Then I'm going to turn to -- I received a letter

23 from Mr. Finger, who represents the media parties, who had a

24 conflict with another hearing downstate today and he asked to

25 participate by video conference.  And since he's only

1  participating in the status conference portion of this, which

2  according to my chambers procedures can be done virtually, I

3  gave him permission to appear virtually.  So, with that -- I

4  just want to make sure that everyone understands why I'm

5  doing that.

6           MS. SARKESSIAN:  Yes, Your Honor, Juliet

7  Sarkessian for the U.S. Trustee.  I guess the only question I

8  would -- I appreciate the explanation debtors' counsel has

9  provided on these issues, the only question I would have is

10  what they're proposing with respect to the links for the

11  Court.  I don't know if that's satisfactory to the Court or

12  the Clerk's Office, but as far as being provided to the U.S.

13  Trustee -- I mean, I'm willing to try it, hopefully that that

14  will work, but I don't know if that's -- in terms of what the

15  Court record is for the creditor matrix, whether having those

16  links are sufficient or whether something more is needed --

17  or different is needed.

18           THE COURT:  Yeah, I might need to discuss that

19  with the Clerk's Office to see the best way to handle that.

20  A hundred and fifty thousand page PDF is a bit too much, I

21  think, but I'll check with the Clerk and see what

22  recommendation they can make about how to deal with that.

23           MS. SARKESSIAN:  Thank you, Your Honor.

24           THE COURT:  I appreciate you pointing that out.

25           Mr. Finger, are you on the line?

1        (No verbal response)

2             THE COURT:  He's not on the line, okay.

3             On the issue Mr. Glueckstein raised about the

4   requirement for the debtor to go out and scour social media

5   to see whether or not some customer has self-identified, I

6   think that is a bridge too far.  I don't think you need to

7   undertake that as a part of your obligation to disclose these

8   names.  If someone self-identifies on the record by filing

9   something on the docket, that's obviously a different story,

10  but I'm not going to make you scour through millions of

11  Tweets and whatever else is out there to see if you can find

12  people who self-identified as a customer of FTX.

13            MR. GLUECKSTIEN:  Thank you, Your Honor, I

14  appreciate that clarification.  And with respect to the

15  creditor matrix, we're happy to speak with the Clerk's Office

16  and make sure they understand what we're proposing and that

17  it works for the Court.  And if there are other solutions,

18  we're happy to do them, but it's simply up -- it's just a

19  practical issue given the volume here we're talking about of

20  what's effectively 9.7 million rows that, you know, can't be

21  just exported to a PDF.

22            THE COURT:  Yes, I understand.

23            MR. GLUECKSTIEN:  Thank you, Your Honor.

24            THE COURT:  Okay, thank you.

25            Anything else before we adjourn?

1          MR. LANDIS:  Your Honor, for the record, Adam
2  Landis from Landis Rath & Cobb.  We have uploaded to chambers
3  the form of order for the Sullivan & Cromwell retention --
4          THE COURT:  Okay.
5          MR. LANDIS:  -- in a form that's acceptable to the
6  parties.
7          THE COURT:  All right, we'll get that entered
8  right away.
9          All right, thank you all very much.  We're
10 adjourned.
11         COUNSEL:  Thank you, Your Honor.
12      (Proceedings adjourned at 12:10 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25

1                           CERTIFICATION

2              We certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of our

5    knowledge and ability.

6

7    /s/ Tracey J. Williams                  January 20, 2023

8    Tracey J. Williams, CET-914

9    Certified Court Transcriptionist

10   For Reliable

11

12   /s/ Mary Zajaczkowski                   January 20, 2023

13   Mary Zajaczkowski, CET-531

14   Certified Court Transcriptionist

15   For Reliable

16

17

18

19

20

21

22

23

24

25