**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| | **Ref No. 176** |
| | **Hearing Date:  February 6, 2023 at 9:30 a.m. (ET)** |
| | **Objection Deadline:  January 25, 2023 at 4:00 p.m. (ET)** |

**DEBTORS' OBJECTION TO MOTION**
**OF THE UNITED STATES TRUSTEE FOR ENTRY OF**
**ORDER DIRECTING THE APPOINTMENT OF AN EXAMINER**

FTX Trading Ltd. and its affiliated debtors and debtors-in-possession (collectively, the "Debtors") hereby submit this objection (this "Objection") to the *Motion of the United States Trustee for Entry of an Order Directing the Appointment of an Examiner* [D.I. 176] (respectively, the "U.S. Trustee" and the "Motion" or "Mot."). Two joinders to the Motion have been filed:  on December 21, 2022, the State of Wisconsin Department of Financial Institutions ("Wisconsin") filed a joinder [D.I. 263] (the "Wisconsin Joinder"), and on January 3, 2022, the Vermont Department of Financial Regulation ("Vermont") filed a joinder [D.I. 339] (the "Vermont Joinder"). In support of the Objection, the Debtors rely upon the *Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 24] (the "Ray First Day Declaration"), the *Declaration of Edgar W. Mosley II in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 57], the *Supplemental Declaration of John J. Ray III in Support of First Day Pleadings* [D.I. 92] (the "Ray Supplemental First Day Declaration"), and

---

[1]     The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively.  Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

the *Supplemental Declaration of Edgar W. Mosley II in Support of First Day Pleadings* [D.I. 93] (the "<u>Mosley First Day Declaration</u>" and collectively with the Ray First Day Declaration and the Ray Supplemental First Day Declaration, the "<u>First Day Declarations</u>"); the *Supplemental Declaration of Andrew G. Dietderich in Support of Debtors' Application for an Order Authorizing the Retention and Employment of Sullivan & Cromwell LLP as Counsel to the Debtors and Debtors-in-Possession Nunc Pro Tunc to the Petition Date* [D.I. 510] (the "<u>Dietderich Supplemental Declaration</u>"); the *Supplemental Declaration of John J. Ray III in Support Of Debtors' Applications For Orders Authorizing The Retention And Employment Of Sullivan & Cromwell LLP, Alix Partners LLP And Quinn Emanuel Urquhart & Sullivan, LLP* [D.I. 511] (the "<u>Ray Supplemental Declaration</u>"); the *Declaration of James L. Bromley in Support of Debtors' Objection to Motion of the United States Trustee for Entry of Order directing the Appointment of an Examiner* submitted contemporaneously herewith; and evidence to be introduced at the hearing.

In support of this Objection, the Debtors respectfully state as follows:

## PRELIMINARY STATEMENT

1.      There is no debate that these cases are complex.  There is no debate that these cases present issues of fraud, dishonesty, incompetence, misconduct, mismanagement, and irregularity in the affairs of the Debtors by past, and not current, management.  But this does not lead to the inevitable conclusion that an examiner should or must be appointed in these cases. Instead, precedent is clear that the appointment of an examiner is not mandatory as a matter of law—as this Court has repeatedly concluded.  The decision to appoint an examiner lies in the sound discretion of the Court.  In exercising that discretion, the question for the Court is whether the appointment of an examiner is *appropriate* in these cases; whether the appointment of an

examiner in these cases is *in the interests of creditors, equity holders, or other interests of the estates*. The answer to this question is no.

2. In the First Day Declarations and at the hearing before the court on November 22, 2022 (the "First Day Hearing"), the Debtors described the circumstances surrounding the abrupt failure of the FTX Group and the appointment of Mr. Ray as CEO and Chief Restructuring Officer of each of the Debtors as well as the appointment of an independent board of directors comprised of Matthew Doheny, Rishi Jain, Matthew Rosenberg, Mitchell Sonkin, and Joseph P. Farnan, Jr. (collectively, the "Board"). The evidence is uncontradicted that Mr. Ray and the Board are both qualified and independent. The Court noted that fact: "Mr. Ray is the one who runs the debtors, he makes the decisions with his board," and they "are all consummate professionals, who were not involved in the company's collapse." (Bromley Decl. Ex. 1 at 50:3–7, 12–13.) Indeed, it is difficult to imagine an examiner candidate whose qualifications exceed those of Mr. Ray.

3. In the Ray First Day Declaration, Mr. Ray set forth the five core objectives of the Chapter 11 Cases: (a) Implementation of Controls; (b) Asset Protection & Recovery; (c) Transparency and Investigation; (d) Efficiency and Coordination; and (e) Maximization of Value (the "Core Objectives"). Since their appointment, Mr. Ray and the Board have directed the Debtors and their advisors to make material progress on each of the Core Objectives. They have done so—substantial investigations are well underway in respect of each objective. Following the appointment of the Official Committee of Unsecured Creditors (the "Committee"), appointed by the U.S. Trustee on December 15, 2022, the Debtors have welcomed the Committee, another fiduciary to the Debtors' estates, and their advisors into this exercise, and the Debtors are coordinating their efforts with the Committee.

{1368.001-W0069800.}                                    -3-

4.      Surprisingly, the U.S. Trustee does not in the Motion propose the scope of mandate for the examiner it seeks to appoint.  Instead, the U.S. Trustee asks that an examiner be appointed and that once such examiner is identified, that individual will define the scope of her or his mandate.  This request, premised entirely on the faulty argument that the appointment of an examiner is mandatory, fails on its face.  In order for the Court to answer the question whether an examiner is appropriate and whether an examiner would benefit these estates, the scope of the mandate must be known.  Both the decision to appoint an examiner, and the scope of any such examination, are within the sole discretion of the Court.

5.      To buttress its argument that an examiner is mandatory, the U.S. Trustee also posits two positions that are inconsistent with the express language of 11 U.S.C. § 1104 ("Section 1104"), controlling precedent and logic.  First, the U.S. Trustee states that an examiner need be a "true neutral," (Mot. at ¶ 40 ("[Mr. Ray] cannot act as true neutral")), who should take into account the interests of "parties whose objectives may conflict with those of the Debtors," (*id*.).  The U.S. Trustee then states, with no evidence or support other than citation to a single law review article, that examiner reports are superior to investigations by committees or trustees (which presumably include debtors in possession) concluding that "examiner reports in bankruptcy cases with potentially broad economic implications serve the public interest as well as those of the economic stakeholders." (Mot. at ¶ 43.)  These arguments also fail.  Section 1104 does not authorize the use of substantial estate assets to satisfy an undefined public interest or for a "true neutral," however that may be defined, to conduct an investigation that benefits potential defendants or wrongdoers.  This is simply not the law.

6.      The pieces of the FTX corporate puzzle are day by day being put back together under the supervision of new and independent management with the participation of the

statutorily mandated Committee. The appointment of an examiner would be duplicative of the efforts of Mr. Ray, the Board, the Debtors, their advisors, and the Committee and their advisors. This duplication of effort would come at an enormous cost and provide no benefit to the creditors, equity holders, or other interests of the Debtors' estates. The Debtors respectfully request that the Court deny the Motion.

## **BACKGROUND**

### I.    **THE DEBTORS AND THEIR CHAPTER 11 CASES**

7.    On November 11 and November 14, 2022 (as applicable, the "Petition Date"), the Debtors filed with the Court voluntary petitions for relief under title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*. (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Joint administration of the Debtors' cases (the "Chapter 11 Cases") was authorized by the Court by entry of an order on November 22, 2022 [D.I. 128]. On December 15, 2022, the U.S. Trustee appointed the Committee pursuant to section 1102 of the Bankruptcy Code [D.I. 231].[2]

### II.    **THE DEBTORS' NEW MANAGEMENT**

8.    In the early morning hours of November 11, 2022, Samuel Bankman-Fried executed an Omnibus Corporate Authority (the "Omnibus Authority") in which he surrendered all powers and authority he had related to the Debtors. [D.I. 1 at 12.] In the Omnibus Authority, Mr. Ray was appointed CEO and Chief Restructuring Officer of each of the Debtors. (*Id.*) Mr. Bankman-Fried executed the Omnibus Corporate Authority after consultation with his father, Joseph Bankman, a Stanford law professor, and three personal lawyers: another Stanford

---

[2]    Additional factual background relating to the Debtors' businesses and the commencement of these Chapter 11 Cases is set forth in in the First Day Declarations and the Supplemental Dietderich Declaration.

law professor, a leading criminal defense lawyer, and a leading international bankruptcy lawyer.[3] It was Mr. Ray, not Mr. Bankman-Fried, who ultimately decided for the Debtors to file for chapter 11 protection.  (*Id.* ¶ 5.)

9.     While Mr. Bankman-Fried and his counsel asked to be consulted on director appointments, and indeed offered candidate suggestions, Mr. Ray declined to engage with Mr. Bankman-Fried or his counsel.  (Dietderich Supplemental Decl. ¶ 35.)  Instead, Mr. Ray contacted, vetted, and appointed the members of the Board.  (Ray First Day Declaration ¶¶ 47, 49.)  Mr. Bankman-Fried and the other wrongdoers have no ongoing role with the Debtors.  The record is clear that neither Mr. Ray nor the Board was hand-picked by Mr. Bankman-Fried.  The record is also clear that subsequent to their appointment, Mr. Ray and the Board have provided full cooperation to criminal and regulatory authorities investigating FTX's collapse.

10.     Mr. Ray has over 40 years of legal and restructuring experience.  (*Id.* ¶¶ 4, 6.)  He has been the Chief Restructuring Officer or Chief Executive Officer in several of the largest corporate restructurings in history.  (*Id.*)  He has supervised situations involving allegations of criminal activity and malfeasance (*Enron*).  (*Id.*)  He has supervised situations involving novel financial structures (*Enron* and *Residential Capital*) and cross-border asset recovery and maximization (*Nortel* and *Overseas Shipholding*).  (*Id.*)  Nearly every situation in which Mr. Ray has been called to lead had previously been characterized by defects of some sort in internal controls, regulatory compliance, human resources, and systems integrity, including defects that gave rise to criminal prosecutions.  (*Id.*)  Notably, in two of Mr. Ray's prior engagements, Enron and Residential Capital, substantial examiner reports were prepared at a

---

[3]     Dietderich Supplemental Declaration ¶ 5.

collective cost of over $150 million.  As Mr. Ray will testify at trial, the benefit of such reports to stakeholders are redundant with the debtor's independent examination and minimal at best given their inherent limitations.

## III.    TWO COMPREHENSIVE INVESTIGATIONS

11.    The Motion fails to recognize the import of the fact that two comprehensive investigations are well underway.  The first, being conducted by the Debtors and the Committee, is multifaceted and by and large corresponds to the Core Objectives announced by Mr. Ray and the Board at the outset of these Chapter 11 Cases.  This investigation is focused, as it should be, on supporting the goals of accumulating the information necessary to create the basic corporate structures that the Debtors were lacking, identifying and securing assets, recovering assets, uncovering and pursuing claims against third parties and insiders, and maximizing the value of the Debtors' assets.  The pursuit of these goals is in the interest of all stakeholders.  Mr. Ray has testified before this Court and Congress with regard to the Debtors' progress with respect to the Core Objectives and the Debtors will continue to provide the Court and the public with updates as the case progresses.

12.    The second, being conducted by law enforcement and regulatory authorities, is about finding out whether crimes were committed in connection with the collapse of FTC and prosecuting those crimes.  That investigation, with cooperation from the Debtors and their advisors, has already yielded substantial results in the form of one indictment, two plea deals, and a trial scheduled for October, with numerous publicly available announcements and updates from the prosecutors.  To the extent that the public interest in implicated by these Chapter 11 Cases, the public interest is being ably represented by the law enforcement and regulatory agencies investigating the circumstances of FTX's collapse and bringing those responsible to justice.

A.      **The Debtors and Committee Investigation**

13.      Immediately after their appointment, Mr. Ray and the Board identified the Core Objectives and instructed their advisors to identify teams to take responsibility for each. The Debtors' pursuit of each of the Core Objectives necessarily involves substantial investigative efforts, which began on the Petition Date.  Moreover, since the appointment of the Committee, the Debtors and their advisors have been working diligently to bring the Committee up to speed on the work that has taken place and are coordinating with them moving forward.  The appointment of an examiner would duplicate this work and provide zero benefit to the creditors, shareholders, or the estates in general.

14.      The first objective, ***Implementation of Controls***, involves building accounting, audit, cash management, cybersecurity, human resources, risk management, and other systems that did not exist—or did not exist to an appropriate degree—prior to the Petition Date.  To this end, the Debtors hired a new Chief Financial Officer, a new Head of Human Resources and Administration, and a new Head of Information Technology, all of whom are free from the taint that infected former management, have deep experience in their areas of core competency, and have managed other large-scale corporate failures.  In addition, Mr. Ray engaged a team of third-party professionals in the areas of restructuring, forensic accounting, tax disciplines, and cybersecurity, including Sullivan & Cromwell, Quinn Emanuel, Landis Rath & Cobb, Alvarez & Marsal, AlixPartners, Ernst & Young, and a leading cybersecurity firm.

15.      The second objective, ***Asset Protection & Recovery***, involves working to locate and secure property of the estate.  This includes assets that may be missing, misappropriated, or not readily traceable due to the lack of proper record-keeping.  To this end, under the direction of Mr. Ray and the Board, the Debtors and their advisors have developed a detailed account of money flows and movements of assets from FTX's founding to the Petition

Date.  Approximately nine million customer accounts have been identified so far, with about 120 billion associated transactions.  Over $5 billion of cash, liquid cryptocurrency, and liquid investment securities, measured at Petition Date value, have been located to date.  The Debtors and their advisors continue to find more.  The investigative process supporting asset protection and recovery includes a comprehensive review of hot and cold digital wallets, with associated blockchain analysis.  This involves identifying and analyzing communications, financial transactions (including deposits and withdrawals), and relevant agreements and contracts around the world, aided by experts in forensic accounting.

16.    The Debtors and their advisors are also conducting a cybersecurity investigation utilizing experts in blockchain and cryptocurrency, cybersecurity, software engineering, information technology, and incident response.  The security of Debtors' information technology resources and computing environment—which was lacking in reasonable information security controls and governance—has been enhanced to defend against the risk of insider and external threats, and continues to be assessed as a result of the ongoing cybersecurity review and investigation.  Locating and securing assets and systems is highly technical work.  As a result of these efforts, hundreds of millions of dollars' worth of assets have been located and successfully transferred to cold storage.  By the same token, the analysis of possible claims is not just a simple matter of identifying wrongdoers who were siphoning customer funds.  Rather, the exercise requires the integration of technical, forensic, and legal expertise to deconstruct transactions and trace assets.

17.    The third objective, ***Transparency and Investigation***, involves piecing together the components of FTX Group's collapse on a historical, transactional, and systems basis.  The Debtors' investigative and cybersecurity teams are in the advanced stages of

gathering and reviewing all relevant material.  In doing so, as described in more detail below, they are coordinating closely with U.S. and foreign regulatory and law enforcement authorities. The review conducted to date has involved collecting dozens of terabytes of transaction records, deal documentation, communications and other data, reviewing hundreds of thousands of documents, and creating forensic images of dozens of computers and phones located around the world.

18.     The Debtors' investigation, which is now proceeding in consultation and coordination with the Committee and its advisors, will take into account all possible claims that the estates may have against third parties as well as against insiders who, whether through intentional malfeasance, gross negligence, or negligence, violated their duties to the Debtors. Among other things, potential avoidance claims are being investigated, including but not limited to claims relating to:  (1) pre-petition withdrawals from the FTX.com and FTX US exchanges, including withdrawals by insiders and certain individuals designated as VIPs; (2) purported investments made in the days and weeks preceding the Chapter 11 filings; (3) political donations and charitable grants, including more than $150 million in political spending during the first nine months of 2022 alone; (4) nearly $100 million of cryptocurrency withdrawals from FTX.com on November 10 and 11 by individuals purporting to be Bahamian residents, including withdrawals of funds originating with non-Bahamians; (5) hundreds of venture capital investments, including investments in entities affiliated with or controlled by insiders; (6) real estate and other assets purchased for use by insiders and their friends and family; and (7) purported debt repayments or asset pledges made during the period leading up to the Chapter 11 filings.

19.     The fourth objective, ***Efficiency and Coordination***, is focused on coordination with non-US jurisdictions.  The most extensive exercise to date has been the

situation involving FTX Digital Markets, Ltd. ("FTX DM"), which on November 10, 2022, was placed into provisional liquidation in The Commonwealth of The Bahamas ("The Bahamas") by the Securities Commission of the Bahamas ("SCB"). On November 10 and November 14, 2022, the Supreme Court of The Bahamas appointed three individuals to serve as joint provisional liquidators in respect of FTX DM (the "JPLs"). A substantial investigation was conducted by the Debtors and their advisors with respect to FTX DM and the actions of the SCB and JPLs with respect to Debtors' assets from and after November 10, 2022. Notwithstanding some initial litigation, the Debtors have been able to reach a cooperation agreement with the JPLs that will be heard by this Court on February 15, 2023. This accord would not have been possible if not for the investigation that preceded it.

20. The fifth and final objective, *Maximization of Value*, relates to realizing value from the Debtors' assets. This exercise dovetails with the other objectives. Assets that are identified and recovered must be analyzed to determine their highest and best value and the means by which such value is best realized. Claims relating to prepetition transactions that are identified must be balanced against the value, if any, received as part of those transaction. Central to this exercise are the investment banking advisors retained by the Debtors and the Committee. To date, the Debtors have sought and obtained permission to begin sale processes for certain businesses and have announced the creation of a task force to review the feasibility of restarting the Debtors' exchanges. This work is substantial and is ongoing.

## B. Criminal Investigations

21. The Debtors have provided materials in response to hundreds of individual requests from the U.S. Attorney's Office for the Southern District of New York ("USAO SDNY"), the Securities and Exchange Commission ("SEC"), the Commodity Futures Trading

Commission ("CFTC"), the U.S. House of Representatives, and numerous state and foreign regulatory and enforcement authorities.

22.     Within a month of the Petition Date, the USAO SDNY indicted Mr. Bankman-Fried and filed criminal informations against Ms. Ellison and Mr. Wang, alleging various crimes, including, among others, wire fraud and conspiracy to commit wire fraud.  While Mr. Bankman-Fried has pleaded not guilty and a trial date has been set for October 2023, Ms. Ellison and Mr. Wang pleaded guilty and entered into cooperation agreements with the USAO SDNY.  The USAO SDNY has made it clear in its public statements that its investigations continue.

23.     The existence of this major criminal investigation and prosecution presents a material obstacle to any examiner that would be appointed if the Motion were to be granted.  As a practical matter, the pending criminal proceedings will limit materially, if not entirely, access by an examiner to Mr. Bankman-Fried, Ms. Ellison and Mr. Wang.

24.     In addition, the USAO SDNY is pursuing its own asset recovery efforts given that the victims of the criminal offenses investigated by USAO SDNY are coextensive with many of the Debtors' creditors.  In particular, assets comprised of publicly traded stock and bank accounts have been seized by the USAO SDNY as being proceeds of the crimes with which Mr. Bankman-Fried has been charged.  Under the criminal and civil asset forfeiture laws, USAO SDNY has the ability to forfeit the proceeds of the criminal offenses and to utilize the forfeited assets to compensate the victims of the crime.  *See* 18 U.S.C. §§ 981, 982; 28 C.F.R. § 9.8.

25.     As bankruptcy laws and asset forfeiture laws provide for alternative mechanisms to recover the same assets that are both proceeds of a criminal offense and property of the Debtors' estate, the Debtors and their advisors are working with the USAO SDNY to

coordinate efforts to maximize the recoveries to the Debtors' creditors and the victims of the fraud, and to minimize unnecessary expenses in doing so.

*      *      *

26.     All of the foregoing has required the dedication of enormous resources, all for the benefit of the Debtors' creditors, shareholders, and estates in general.  The Debtors' resources, however, are not unlimited.  The appointment of an examiner, with a mandate to be determined, can be expected to cost these estates in the tens of millions of dollars.  Indeed, if history is a guide, the cost could near or exceed $100 million.  This sort of exercise is neither appropriate, nor beneficial to the Debtors' creditors, shareholders, or estates in general.

## IV.     THE U.S. TRUSTEE'S MOTION TO APPOINT AN EXAMINER

27.     On December 1, 2022, the U.S. Trustee filed the instant Motion seeking an order appointing an examiner pursuant to section 1104(c) of the Bankruptcy Code.  (Mot. at 1.)

28.     On December 21, 2022, the State of Wisconsin Department of Financial Institutions filed the Wisconsin Joinder.   [D.I. 263.]   On January 3, 2022, the Vermont Department of Financial Regulation filed the Vermont Joinder.  [D.I. 339.]

<u>ARGUMENT</u>

## I.     APPOINTMENT OF AN EXAMINER IS NOT MANDATORY.

29.     The U.S. Trustee asserts that the "the appointment of an examiner under [Section 1104(c) of the Bankruptcy Code] to investigate the affairs of the Debtors is mandatory." (Mot. ¶ 33.)  Not so.  To the contrary, "this Court has repeatedly held that Section 1104(c)'s inclusion of the phrase 'as is appropriate' gives the Court discretion" to deny an examiner motion even if the dollar threshold of 1104(c)(2) is met.  *In re Mallinckrodt PLC*, No. 20-12522, Hr'g Tr. at 40:5–7 (Bankr. D. Del. Nov. 23, 2021) (Dorsey, J.) (Bromley Decl. Ex. 2).  In fact, this Court *sua sponte* confirmed its position on the non-mandatory nature of Section 1104(c)

during the omnibus January 11 hearing—"I do not believe it's mandatory."  (Bromley Decl. Ex. 3 at 167:22–23.)

30.     Section 1104(c) of the Bankruptcy Code states, in relevant part, that:  "the court shall order the appointment of an examiner to conduct such an investigation of the debtor *as is appropriate* . . . if – (1) such an appointment is in the interests of creditors, and equity security holders, and other interests of the estate; or (2) the debtor's fixed, liquidated unsecured debtors, other than debts for goods, services, or taxes or owing to an insider, exceed $5,000,000." 11 U.S.C. § 1104(c) (emphasis added).

31.     As Judge Sontchi explained in *EV Energy Partners*, in every examiner motion, the movant bears the "burden of proof of establishing . . . some reason that it would be helpful to appoint an examiner."  Hr'g Tr. at 197:3–5, *In re EV Energy Partners*, No. 18-10814 (Bankr. D. Del. May 16, 2018) (Bromley Decl. Ex. 4).  Indeed, the movant must demonstrate that there is "an actual examination that needs to be done, an *appropriate* inquiry that needs to be pursued."  *Id*. at 197:1–2 (emphasis added).

32.     In that case, certain equity holders moved for the appointment of an examiner to investigate, *inter alia*, "[s]ignificant and material conflicts of interest relating to a number of prepetition transfers," "related-party sales and transactions," and "[r]epeated failures to disclose items that may be required by the Securities and Exchange Commission or the Bankruptcy Code."  Mot. ¶ 4, *In re EV Energy Partners*, No. 18-10814 (Bankr. D. Del. May 7, 2018).  Judge Sontchi ultimately exercised the discretion afforded under Section 1104(c) and denied the request because the equity holders' proposed examination was not "an appropriate inquiry that need[ed] to be pursued."  *Id.* at Hr'g Tr. at 197:3–5; *see also* Hr'g Tr. at 7:16–17, *In re Paddock Ents., LLC*, No. 20-10028 (Bankr. D. Del. June 17, 2020) (Silverstein, J.) ("[T]his

court has consistently ruled that Section 1104(c) is not mandatory.") (Bromley Decl. Ex. 5); *In re Spansion, Inc.*, 426 B.R. 114, 127 (Bankr. D. Del. 2010) (Carey, J.) (denying examiner appointment, despite satisfaction of dollar threshold, because it was "neither warranted nor appropriate, and would cause undue cost to the estate, which would be harmful to the Debtors and would delay the administration of this chapter 11 case"); Hr'g Tr. at 170:16–20, *In re Visteon Corporation*, No. 09-11786 (Bankr. D. Del. May 12, 2010) (Sontchi, J.) ("I think it would be an absurd result to find that in every case where the financial criteria is met and a party-in-interest asks, the Court must appoint an examiner.  There has to be an appropriate investigation that needs to be done.") (Bromley Decl. Ex. 6).

33.    The U.S. Trustee ignores the weight of authority in the District of Delaware, including from this Court, holding that a bankruptcy court has discretion to deny appointment of an examiner even where the statutory debt threshold has been met.  Instead, the U.S. Trustee relies solely on a handful of decisions outside of this Circuit.  (Mot. ¶¶ 33–34.) Those cases, however, are inconsistent with this Court's precedent and are in no way binding. Indeed, even courts in the districts to which the U.S. Trustee points do not uniformly find that Section 1104(c) is mandatory when the statutory threshold is met.  For example, bankruptcy courts in the Southern District of New York have routinely held that they "retain[] the discretion to deny a motion for appointment of an examiner," even where the statutory threshold has been met.  *In re Dewey & LeBoeuf LLP*, 478 B.R. 627, 639 (Bankr. S.D.N.Y. 2012) (Glenn, J.).

## II.    APPOINTMENT OF AN EXAMINER IS NEITHER WARRANTED NOR APPROPRIATE.

34.    In exercising its discretion, including when the dollar threshold of 1104(c)(2) is met, this Court asks whether there is an appropriate investigation for an examiner to conduct, based on whether appointment:  (1) "is in the best interest of creditors," *Paddock*

*Ents.*, Hr'g Tr. at 9:7–8; (2) "would be harmful to the Debtors" or "would cause undue cost to the estate," *Spansion*, 426 B.R. at 128; and (3) "would delay the administration of [the] chapter 11 case," *id.*  As the moving party, the U.S. Trustee bears the burden to prove that an examiner should be appointed under Section 1104(c).  *Mallinckrodt*, Hr'g Tr. at 40:13–18 (Bromley Decl. Ex. 2).

35.     Here, the U.S. Trustee has failed to carry that burden.  Indeed, all factors weigh in favor of denying the request for an examiner.

**A.     Appointment of an Examiner Would Not Be in the Best Interest of Creditors.**

36.     The U.S. Trustee wrongly argues that the appointment of an examiner "would be in the best interests of the Debtors' estate, their creditors, and equity security holders," (Mot. ¶ 35), because "the questions at stake here are simply too large and too important to be left to an internal investigation," (Mot. ¶ 40).  This *ipse dixit* argument fails.  The U.S. Trustee continues, without judicial support that a mere "internal investigation" cannot be "neutral," (*id.*), or "public and transparent," (Mot. ¶ 42).  In so stating, the U.S. Trustee understates and misapprehends the breadth of the investigations into FTX that have been undertaken.

37.     While the Debtors—which are under entirely new management—are conducting their own investigation, they are also providing assistance to numerous government investigations, including, among others, investigations by USAO SDNY, the SEC, and the CFTC, as well as the U.S. House of Representatives.  Moreover, as the Creditors' Committee has stated, "[c]onsistent with its mandate, the Committee is working tirelessly to uncover the fraud in its entirety, recover as many assets as possible and is working with the Debtors to move as expeditiously as they can under the circumstances to make full and fair distributions to the Debtors' creditors, including its customers."  [D.I. 508 ¶ 1.]  All of these investigators are

aligned on the same mission:   recovering the assets of the Debtors' estate and holding
wrongdoers accountable for their harms to the Debtors and creditors alike.

38.    This Court has found appointment of an examiner to be inappropriate
where the examiner's role would be duplicative of other ongoing investigations.  *See Paddock
Ents.*, Hr'g Tr. at 8:9–9:8 (Bromley Decl. Ex. 5.).   In fact, in *Paddock Enterprises*, Judge
Silverstein denied the U.S. Trustee's examiner motion because the relevant parties in the case
"ha[d] already begun . . . diligence" on the subject of the proposed examination.  *Id.*, 8:12–13.
Judge Silverstein explained that there would not "be anything gained by appointing an
examiner," when there were two existing investigations being conducted by parties with the
requisite "corporate and bankruptcy expertise."  *Id.*  Ultimately, Judge Silverstein concluded that
it would not be "in the best interest of creditors to appoint" an examiner to duplicate the efforts
of the preexisting investigations.  *Id.* at 8:13–9:8.  Similarly, Judge Sontchi has also rejected a
U.S. Trustee request to appoint an examiner, reasoning that giving an examiner "carte blanche"
to look into an issue already being examined by a creditors' committee, government regulators,
and Congress would not be "appropriate."  Hr'g Tr. at 76:25–77:8, *Am. Home Mortg. Holdings,
Inc.*, No. 07-11047 (Bankr. D. Del. Oct. 31, 2007) (Sontchi J.) (Bromley Decl. Ex. 7).

39.    Here, like in *Paddock Enterprises* and *American Home Mortgage
Holdings*, the creditors would not benefit from an examiner investigation that would be
duplicative of the investigations by the Debtors, Creditors' Committee, law enforcement
agencies, and Congress.  To the contrary, an examiner's investigation would impede those
ongoing investigations by forcing investigators to compete with the examiner for access to
witnesses and straining the capacity of the Debtors' management and workforce.  Given that the
U.S. Trustee "does not question the qualifications, competence, or good faith of Mr. Ray" (Mot.

at 3), and admits that Mr. Ray has selected advisors with the requisite "corporate and bankruptcy expertise," there will not "be anything gained by appointing an examiner," *Paddock Ents.*, Hr'g Tr. at 8:13–9:7 (Bromley Decl. Ex. 5).   Indeed, the Wisconsin Joinder acknowledges that the Debtors' internal investigation alone "has been able to confirm" key facts even "[]though this is early days in the bankruptcy process."  (Wisconsin Joinder ¶¶ 10, 14.)

40.    Moreover, any examiner investigation is likely to be ineffectual as a tool for locating and recovering the assets of the estate—the most important investigative priority today.   The U.S. Trustee does not contend otherwise.   Not once in the Motion does the U.S. Trustee suggest that an examiner would assist creditors or the Debtor by empowering the estate to locate its assets.   Indeed, there is no contention that creditors will receive another penny if an examiner is appointed and, given the substantial costs, an examiner will if anything cause creditor distributions to be reduced.

41.    Meanwhile, even if an examiner's investigation could navigate around the dozens of ongoing investigations into the Debtors, the examiner's investigation would still fall short on its own terms because key witnesses—Messrs. Bankman-Fried and Wang, and Ms. Ellison—are likely unavailable as a result of the criminal charges against them.   These witnesses, even those who have already pled guilty, likely have Fifth Amendment rights to withhold testimony from an examiner.  *See In re Wilmington Tr. Sec. Litig.*, 2017 WL 9619319, at *2 (D. Del. Sept. 25, 2017) (upholding Fifth Amendment right not to testify in deposition where "[d]espite the plea agreement, [witness] could face criminal prosecution for possible other crimes revealed by the deposition testimony which were not the subject of the plea agreement").   Moreover, there is no evidence that an examiner could succeed in getting information from these witnesses that the Debtors, the Committee, and federal prosecutors cannot obtain themselves.

42.     Unable to otherwise demonstrate that appointing an examiner will serve the creditors, the U.S. Trustee raises the specter of conflicts of interest between the Debtors and "other interested parties" (Mot. at 3), and further argues that there may be interdebtor claims between "FTX Trading Ltd. and Alameda Research," (Mot. ¶ 37).  Again, it is mistaken.  The U.S. Trustee does not identify any actual conflict of interest between the Debtors and other parties, or amongst the Debtors, that would be resolved by the wide-ranging examination contemplated in the Motion.  (*See* Mot. ¶ 30 (listing potential avenues for investigation).)  That is because there is no such conflict:  the Debtors are focused on conducting a massive asset recovery and monetization effort for the benefit of *all* creditors of the FTX group and other stakeholders, including by developing a factual record to support litigation claims, if appropriate.  Accordingly, the interests of the bankruptcy estate and creditors are aligned.

43.     Furthermore, the possibility of interdebtor claims in a jointly administered bankruptcy is not itself enough to bar a single trustee—here, the Debtors as debtors-in-possession—from serving as fiduciary to all debtors.  *See In re BH & P*, Inc., 949 F.2d 1300, 1312 (3d Cir. 1991) ("[W]e are not prepared to say that interdebtor claims mandate disqualification of the trustee in every instance.").  In this case, the very exercise of tracking the estate's assets will necessarily develop the factual record for interdebtor claims, if any, and the possibility of such claims does not make an examiner appropriate.  Judge Sontchi recently denied an examiner motion that complained of "[s]ignificant and material conflicts of interest relating to a number of prepetition transfers."  Mot. ¶ 4, *In re EV Energy Partners*; *see id.* at Hr'g Tr. at 197:3–5 (Bromley Decl. Ex. 4); *see also Mallinckrodt*, Hr'g Tr. at 41:14-18 ("disagree[ing]" that "only an independent examiner can force the discovery that is needed to sort [] through the

morass of potential conflicts of interest . . ." and emphasizing role of the Court) (Bromley Decl. Ex. 2).

**B.      An Examination Would Be Harmful to Debtors and Result in Undue Cost.**

44.     Crucially, the U.S. Trustee completely ignores the harm to the Debtors—and ultimately the creditors—that would result from appointing an examiner.

45.     An examiner is particularly inappropriate here because of the fraught cybersecurity environment the Debtors face.  The Debtors' assets have already been targeted by hackers.  The more activity and actors there are in the Debtors' virtual environment, the greater the risk to the assets and sensitive data there.  Adding an examiner, who would certainly demand access to the cybersecurity environment, into the mix would risk substantial harm to the Debtors.

46.     Even if an examiner were appointed, the Debtors' investigation will continue:  "attorney[s] for a debtor-in-possession [are] obligated to investigate matters affecting the estate." *In re Grasso*, 506 B.R. 626, 642 (Bankr. E.D. Pa. 2014), *vacated on other grounds*, 2014 WL 3389119 (E.D. Pa. July 11, 2014).  The last thing the Debtor and creditors need is another party competing with them for time and resources—especially given the cybersecurity perils the estate faces.

47.     In addition, history suggests that the cost of an examiner's investigation into a corporate crisis of this magnitude would diminish the Debtors' limited estate.   The examiner in the *Lehman* bankruptcy cost the estate over $100 million; *ResCap*'s examiner cost nearly $90 million; *Caesars*', nearly $60 million; and *Enron*'s, over $90 million.  The U.S. Trustee is not shy about the scale of the investigation it seeks:  the Motion characterizes the Debtors' efforts to date as "preliminary work," surgical in the face of "questions at stake [that] are simply too large and too important," to pass up a "robust investigation[]."  (Mot. ¶¶ 40, 43); *see also Am. Home Mortg. Holdings*, Hr'g Tr. at 76:25–77:13 (noting that a comprehensive

examiner's report would be "a $20 million report, and I'm not sure what it would accomplish") (Bromley Decl. Ex. 7).  Moreover, when Debtors asked the U.S. Trustee about the proposed scope of an examiner, the U.S. Trustee refused to describe an appropriate scope for any examiner's investigation, stating in response to interrogatories from the Debtor that "[t]he scope of work is typically established at a hearing subsequent to the examiner's appointment." *Cf. Am. Home Mortg. Holdings*, Hr'g Tr. at 76:20–77:1 (denying examiner motion where "no real articulation of what it was that the movants wanted to be investigated by an examiner, and even if one were to sort of assume . . . I don't think that at this time giving someone sort of carte blanche to look into that issue will be appropriate") (Bromley Decl. Ex. 7).

48.     While the U.S. Trustee suggests that this Court may appoint an examiner but limit its budget (Mot. ¶ 45), this Court has observed that "appointing an examiner and then giving that examiner no budget and no duties is tantamount to not appointing an examiner," *Am. Home Mortg. Holdings*, Hr'g Tr. at 75:22-24 (denying examiner motion rather than appointing and constraining examiner) (Bromley Decl. Ex. 7).  Furthermore, budgets and information sharing protocols themselves entail transaction costs that are a further drain on the estate. Another bankruptcy court has denied an examiner motion given "the expense of an examiner and the delay required to complete the examiner investigation and report," and "the precarious financial situation present in th[e] case." *Dewey & LeBoeuf*, 478 B.R. at 639.  This Court should likewise preserve the limited assets of the estate by denying the Motion.

### C.     An Examination Would Delay the Administration of this Case.

49.     Appointing an examiner at this stage would introduce significant delays— realistically, it would take weeks if not months for an examiner to get appointed, retain the necessary staffing to conduct an investigation of this size and complexity, negotiate a workplan and budget, and get up to speed on the facts of this case.  These problems are particularly

compounded because of the cybersecurity obstacles that an examiner will need to surmount. Those delays would ultimately disadvantage creditors.  It is neither feasible, nor appropriate, to suggest that the efforts of the Debtors and the Committee should be halted and put on a shelf until such time as an examiner is retained, its mandate is negotiated and approved, it gets up to speed, conducts its investigation, and delivers its report.

50.     Where an examiner would be unable to match "the speed with which the case is progressing and the work" of other parties, an examiner motion should be denied.  Hr'g Tr. at 46:4–6, *In re IdleAire Techs. Corp.*, No. 08-10960 (Bankr. D. Del. June 13, 2008) (Bromley Decl. Ex. 8).  The Debtors' and other investigators' investigations, detailed above, have already been extraordinary undertakings.  Those accomplishments distinguish this case from *In re Cred. Inc.*, No. 20-12836, Hr'g Tr. 97:11–98:24 (Bromley Decl. Ex. 9), in which this Court found an appropriate scope for an examiner's investigation.  In *Cred*, untainted new management had not been fully installed, the debtor was not conducting any investigation, and the creditors' committee's purported investigation "must [have] be[en] in its very early stages" when the examiner was appointed.  *Id.* at 97:19–98:7.  Preferring to have only one investigation, this Court pulled funding from the creditors' committee's investigation to avoid "duplication of effort" between the creditor's committee and the examiner.  *Id.* at 98:19–24.  This case is also unlike *In re Celsius Network LLC*, in which the debtors, U.S. Trustee, and unsecured creditors committee all agreed on a "scope for the investigation of the Debtors by the examiner that is likely to avoid unnecessary duplication of efforts, costs, and delay."  *Debtors' Response and Limited Objection to the Motion of the United States Trustee for Entry of an Order Directing the Appointment of an Examiner* ¶¶ 4–5, *In re Celsius Network LLC*, No. 22-110964 (Bankr. S.D.N.Y. Sept. 8, 2022).

51.     Here, the best way to avoid unnecessary duplication of efforts, costs, and delay is to let the investigation by the Debtor—and coordinated investigations by the Creditors' Committee, law enforcement agencies, and Congress—proceed apace, without the interference of an examiner.  The Debtors are not only better situated than a third-party examiner to locate their own assets, but better positioned together with the Committee to timely act on information uncovered.  By contrast, the Debtors could not act on an examiner's findings to recover assets of the estate until the examiner disclosed those findings to the Debtors.  There is no appropriate investigation for an examiner to conduct that comports with "the speed with which th[is] case is progressing." *IdleAire*, Hr'g. Tr. at 46:4–5 (Bromley Decl. Ex. 8).

## CONCLUSION

The U.S. Trustee has not carried its burden of proving that an examiner should be appointed at this time, and the Motion must be denied.

Dated:  January 25, 2023
   Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Adam G. Landis*
Adam G. Landis (No. 3407)
Kimberly A. Brown (No. 5138)
Matthew R. Pierce (No. 5946)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
Email: landis@lrclaw.com
   brown@lrclaw.com
   pierce@lrclaw.com

-and-

**SULLIVAN & CROMWELL LLP**
Andrew G. Dietderich (admitted *pro hac vice*)
James L. Bromley (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Alexa J. Kranzley (admitted *pro hac vice*)
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
E-mail: dietdericha@sullcrom.com
   bromleyj@sullcrom.com
   gluecksteinb@sullcrom.com
   kranzleya@sullcrom.com

*Counsel for the Debtors*
*and Debtors-in-Possession*