# EXHIBIT 1

```
1                    UNITED STATES BANKRUPTCY COURT
                        DISTRICT OF DELAWARE
2

3   IN RE:                        .  Chapter 11
                                  .  Case No. 22-11068 (JTD)
4   FTX TRADING LTD., et al.,     .
                                  .
5                                 .  Courtroom No. 5
                                  .  824 Market Street
6            Debtors.            .  Wilmington, Delaware 19801
                                  .
7                                 .  Friday, January 20, 2023
    . . . . . . . . . . . . . . .  10:00 a.m.
8
                            TRANSCRIPT OF HEARING
9             BEFORE THE HONORABLE JOHN T. DORSEY
                    UNITED STATES BANKRUPTCY JUDGE
10
    APPEARANCES:
11
    For the Debtor:         Adam Landis, Esquire
12                          LANDIS RATH & COBB LLP
                            919 Market Street, Suite 1800
13                          Wilmington, Delaware 19801

14                          Andrew G. Dietderich, Esquire
                            James L. Bromley, Esquire
15                          Brian D. Glueckstein, Esquire
                            SULLIVAN & CROMWELL LLP
16                          125 Broad Street
                            New York, NY 10004
17

18

19  (APPEARANCES CONTINUED)

20  Audio Operator:         Jermaine Cooper

21  Transcription Company:  Reliable
                            The Nemours Building
22                          1007 N. Orange Street, Suite 110
                            Wilmington, Delaware 19801
23                          Telephone: (302)654-8080
                            Email:  gmatthews@reliable-co.com
24
    Proceedings recorded by electronic sound recording,
25  transcript produced by transcription service.
```

1   APPEARANCES (CONTINUED):

2   For the U.S. Trustee:      Juliet Sarkessian, Esquire
                               OFFICE OF THE UNITED STATES TRUSTEE
3                              844 King Street, Suite 2207
                               Lockbox 35
4                              Wilmington, Delaware 19801

5   For the Committee:         Kris Hansen, Esquire
                               PAUL HASTINGS LLP
6                              MetLife Building
                               200 Park Avenue
7                              New York, New York 10166

8   For Warren Winter, and
    Richard Brummond:          John McLaughlin, Jr., Esquire
9                              FERRY JOSEPH, P.A.
                               1521 Concord Pike, Suite 202
10                             Wilmington, Delaware 19803

11                             Marshal Hoda, Esquire
                               THE HODA LAW FIRM, PLLC
12                             12333 Sowden Road
                               Suite B, PMB 51811
13                             Houston, Texas 77080

14

15

16

17

18

19

20

21

22

23

24

25

1                                    INDEX

2   MOTIONS:                                                    PAGE

3   Agenda
4   Item 3:  Debtors' Application for an Order Authorizing       5
            The Retention and Employment of Sullivan &
5            Cromwell LLP as Counsel to the Debtors and
            Debtors-in-Possession *Nunc Pro Tunc* to the
6            Petition Date
            [D.I. 270; Filed December 21, 2022]
7
            Court's Ruling:                                    47
8

9   STATUS CONFERENCE:                                         PAGE

10  Agenda
11  Item 8:  Motion of Debtors for Entry of Interim and         51
            Final Orders (I) Authorizing the Debtors to
12           Maintain a Consolidated List of Creditors in
            Lieu of Submitting a Separate Matrix for
13           Each Debtor, (II) Authorizing the Debtors to
            Redact or Withhold Certain Confidential
14           Information of Customers and Personal
            Information of Individuals and (III) Granting
15           Related Relief
            [D.I. 45; Filed on November 19, 2022}
16

17  EXHIBITS:                                                  PAGE

18  Declarations of Andrew Dietderich                          26

19  Declarations of John J. Ray III                            26
20

21

22

23

24

25

1          (Proceedings commence at 10:04 a.m.)

2                    THE COURTROOM DEPUTY:  All rise.

3                    THE COURT:  Good morning, everyone.  Thank you.

4    Please be seated.

5                    Mr. Landis.

6                    MR. LANDIS:  Good morning, Your Honor, and may I

7    please the Court.  For the record Adam Landis from Landis

8    Rath & Cobb, Delaware co-counsel to the debtors in FTX

9    Trading Ltd., and the companion cases.

10                   Your Honor, we filed this morning a second amended

11   agenda at Docket No. 547.  The amended agenda reflects a

12   number of matters that have been consensually resolved and

13   orders have been entered.

14                   Matter No. 4 on the agenda is the Alvarez & Marsal

15   application for retention.  An order has been entered on

16   that.

17                   Matter No. 5 is the AlixPartners application.  A

18   certification of counsel has been filed and the parties are

19   in agreement with respect to the form of order.

20                   Matter No. 6 is the Kroll retention for which an

21   order has been entered.

22                   Matter No. 7 is the Quinn Emanuel application for

23   retention for which a certification of counsel has been

24   filed.  Those matters --

25                   THE COURT:  I did enter those both, the

1   AlixPartners and the Quinn Emanuel, before the hearing.

2           MR. LANDIS:  Thank you, Your Honor.

3           Really, it's through the good offices of the

4   United States Trustee, back and forth negotiations and

5   discussions on a very cooperative basis.  The creditor's

6   committee is weighing in for which are grateful on those

7   efforts.  And we don't have a need to go forward with respect

8   to those.

9           There is a status conference at the end of the

10  agenda that we will, but the only item that is on the agenda

11  that will need to be heard today is the Sullivan & Cromwell

12  retention application.  For that I will cede the podium to

13  Mr. Bromley.

14          THE COURT:  Thank you.

15          Before you begin, Mr. Bromley, let me just remind

16  those on the zoom call that this is a formal Court proceeding

17  even though you are participating by zoom, so please leave

18  your audio turned off, and your video turned off unless you

19  are recognized to speak.

20          With that, Mr. Bromley, go ahead.

21          MR. BROMLEY:  Good morning, Your Honor.  May I

22  please the Court, Jim Bromley of Sullivan & Cromwell on

23  behalf of the FTX debtors.

24          Your Honor, thank you very much for taking time

25  today.  I want to first describe the resolution that we have

1  achieved with the Office of the United States Trustee.

2          The Office of the United States Trustee had two

3  objections to the retention of Sullivan & Cromwell.  The

4  first was that there was an inadequate disclosure and the

5  second had to do with the scope of the services that Sullivan

6  & Cromwell, as well as Quinn Emanuel and AlixPartners, would

7  provide.

8          We have been in conversations with the Office of

9  the U.S. Trustee for three weeks.  We received a first

10  inquiry with respect to our application on the 27th of

11  December.  The application was filed on the 21st of December.

12  And as is common in large Chapter 11 cases we have been in

13  constant contact with the Office of the United States Trustee

14  going back and forth with questions and answers, and focusing

15  on issues that the U.S. Trustee had identified with respect

16  to disclosure.

17          I am happy to report, Your Honor, that,

18  notwithstanding the fact that when we sat here last time we

19  were not yet in agreement with the U.S. Trustee, we have been

20  able to bring that across the finish line.  We have also been

21  able to bring across the finish line a resolution with the

22  Office of the United States Trustee to take the scope issue,

23  which related to the three applications that were originally

24  on today, and to move them off and to reserve rights with

25  respect to scope, and, effectively, deal with any issues

1   after the examiner motion which is scheduled for the 6th of

2   February.

3            In connection with the disclosure issues with the

4   Office of the United States Trustee we have filed, in the

5   past couple of days, two supplemental declarations of Mr.

6   Andrew Dietderich, one of my partners, at Sullivan &

7   Cromwell:

8            Mr. Dietderich had submitted the original

9   declaration supporting the Sullivan & Cromwell application.

10            And the second very fulsome declaration, which was

11   filed a couple days ago, was the product of conversations

12   that we had been having with the Office of the U.S. Trustee.

13   When we filed that we were able to get on the phone with the

14   U.S. Trustee, Ms. Sarkessian, and answer a few additional

15   questions which we then submitted a further supplemental

16   declaration of Mr. Dietderich yesterday.

17            So, with that, Your Honor, we have been able to

18   resolve any issues that the Office of the U.S. Trustee had

19   with respect to Sullivan & Cromwell's disclosures.

20            I would like to note in the context of that, Your

21   Honor, that one of the first things that we did when we were

22   talking to Ms. Sarkessian was discuss the fact that Mr. Ryne

23   Miller, a former partner at ours at Sullivan & Cromwell, is

24   employed at FTX US as the general counsel.  That is West

25   Realm Shires is the entity.  And that was not called out

1   specifically in the original declaration; it is now called

2   out. Mr. Miller was listed as a party in Schedule One to Mr.

3   Dietderich's original declaration, but we had called that

4   with very clear specificity in his supplemental declaration.

5   Mr. Miller as well as Mr. Wilson, a former associated of

6   ours, who also has a role at FTX.

7          With those call-outs the Office of the U.S.

8   Trustee is satisfied with the disclosure with respect to Mr.

9   Miller and Mr. Wilson.  And in retrospect, Your Honor, we

10  should have gone further in the original declaration, but the

11  fact is we were engaged in conversations with Ms. Sarkessian

12  from December 27th with respect to this.

13         So, there was also in the context of our recent

14  filing a statement that the declaration of Ms. Kranzley,

15  another one of my partners, with respect to back and forth

16  between the U.S. Trustees Office and Sullivan & Cromwell.  In

17  the context of that Ms. Sarkessian wanted me to clarify that

18  there was a set of emails that were provided as exhibits in

19  Ms. Kranzley's declaration and that what was not noted in

20  those emails, because it didn't appear in the emails, was

21  that there was not a response to an email that Ms. Sarkessian

22  had sent earlier; just as a matter of clarification.

23         So, with these statements and the declarations,

24  the two supplemental declarations that have been filed, it is

25  our understanding that the U.S. Trustees Office is satisfied

1    with the disclosures.  That is reflected in the form of order

2    that has been submitted to the Court.

3          THE COURT:  Before you move on, Ms. Sarkessian, do

4    you want to --

5          MS. SARKESSIAN:  Thank you, Your Honor.  For the

6    record Juliet Sarkessian on behalf of the U.S. Trustee.

7          We are resolved with Sullivan & Cromwell.  I just

8    want to clarify that the application and the initial

9    declaration of Mr. Dietderich did not mention any connection

10   with Mr. Miller.  Yes, he was listed as a party in interest

11   on a, you know, 15-page party in interest list, but there was

12   no disclosure whatsoever about Sullivan & Cromwell having any

13   connection with him, let alone that he was the individual who

14   actually brought Sullivan & Cromwell to the attention of the

15   debtors.

16         When Mr. Miller had been a partner at Sullivan &

17   Cromwell he left and he went in-house to FTX US, and at that

18   point introduced Sullivan & Cromwell.  That is in the

19   supplemental declaration, but there was no information at all

20   about Mr. Miller in the original.  So we certainly appreciate

21   Sullivan & Cromwell recognizing that that is something that

22   absolutely should have been included in the original

23   declaration.

24         I also want to clarify that was certainly not the

25   only additional disclosure we asked for.  There was quite a

1  bit more and you will see that the first supplemental

2  declaration that was filed, I think, was 81 paragraphs,

3  something of that nature.  Some of that was in response to, I

4  think, with respect to other objectors, but a good piece of

5  that was disclosure that we asked for.  So, it was not just

6  that one piece, it was quite a bit, and we did work with

7  them, and we're glad that they made those additional

8  disclosures and we were able to resolve that issue.

9          THE COURT:  Thank you, Ms. Sarkessian.

10         THE COURT:  Mr. McLaughlin has stood up.

11         Do you have anything with regard to the resolution

12 with the U.S. Trustee?

13         MR. MCLAUGHLIN:  No, Your Honor.

14         THE COURT:  Okay.  Why don't we wait.

15         Mr. Bromley, why don't you go ahead and then I

16 will turn to Mr. McLaughlin.

17         MR. BROMLEY:  Thank you, Your Honor.

18         Now that we have resolved the issues with the

19 Office of the U.S. Trustee and noting that the unsecured

20 creditors committee has filed a statement in support the only

21 objection that is -- well, there are two objections that are

22 remaining from a Mr. Winter and Mr. Brummond.  They are

23 represented by counsel here today.

24         I would just like to, before we get going on that,

25 Your Honor, just give a short preview of the issues, and then

1   I understand that they have certain things that they would

2   like to say.

3           Your Honor, with respect to the matter before you

4   today we have two witnesses.  We have Mr. Ray and Mr.

5   Dietderich.  They have both submitted declarations and

6   supplemental declarations; in Mr. Dietderich's case a second

7   supplemental declaration.  We believe that the disclosure

8   issues have been fully resolved.

9           We have been, as I noted, in constant contact with

10  the Office of the U.S. Trustee and exchanged voluminous

11  amounts of information.  We believe that the disclosure that

12  has been filed, a supplemental disclosure, is fully

13  sufficient.

14          As Mr. Ray mentions in his declaration, what we

15  are talking about here, Your Honor, is a need to move on.

16  One of the things that the debtors have been facing,

17  generally in these cases, is assault by Twitter.  It is very

18  difficult, Your Honor, to cross-examine a tweet, particularly

19  tweets that are being issued by individuals who are under

20  criminal indictment and whose travel is restricted so to

21  speak.

22          THE COURT:  I have the benefit of not being on

23  Twitter, so I have no idea what people are saying on Twitter

24  about this case.

25          MR. BROMLEY:  Well, Your Honor, to a certain

1  extent you are brought into it because of the objections that

2  reference those things.  And it is, frankly, difficult in

3  these circumstances to try to respond to all of those things

4  all at once.  So, we have decided not to do so.  Our view is

5  that the issue should be addressed in Court in a formal

6  manner, and that those who have things to say should come to

7  Court and say those things; subject to cross-examination,

8  subject to the rules of the Court, and that is the way that

9  we intend to proceed.

10         With respect to the application, Your Honor, I do

11 note that there was a declaration, something, a document

12 filed on the Court's docket last night that is characterized

13 as a declaration by an individual who is a former legal

14 officer within the FTX Group.  I know that Mr. Winter and Mr.

15 Brummond's counsel have requested that this hearing be

16 adjourned as a result of that filing.

17         Your Honor, we are opposed to any such

18 adjournment.  We have already gone 70 days into these cases.

19 An enormous of work has been done.  There has already been an

20 adjournment of these retention applications.  We believe,

21 Your Honor, that it is imperative that we put this stage of

22 the case, the retention of professionals, aside, complete

23 that, and move onto the next stage.

24         Now we do know that we have an examiner motion

25 that has been filed by the U.S. Trustee and we will deal with

1  that on February 6th, but the fact is, Your Honor, if there

2  was an adjournment made as a result of the filing by Mr.

3  Friedberg, which followed hot on the heels of two very long

4  and rambling tweets that were filed by Mr. Bankman-Fried --

5  not filed, sorry, Your Honor, but posted and cited by

6  objectors.  I think its virtually certain that such activity

7  is going to continue and that if we simply agree to adjourn

8  something today or Your Honor decided that it was appropriate

9  we would simply be faced by additional attacks on Twitter and

10 additional random things that are filed.

11         Now with respect to Mr. Friedberg's filing that

12 filing is not on behalf of any particular party.  Mr.

13 Friedberg claims to be a creditor, but he doesn't style it as

14 an objection.  It was filed late.  It was filed -- frankly,

15 it's a little bizarre if you sit down and read it, but, Your

16 Honor, our view is that it has no place in the Court, it

17 should be stricken from the record, and the hearing should go

18 forward with the two witnesses that we have to the extent

19 that counsel for Mr. Winter and Mr. Brummond have any

20 questions.

21         THE COURT:  Let me hear from Mr. McLaughlin. It

22 was his motion to continue the hearing.

23         MR. MCLAUGHLIN:  Good morning, Your Honor.  For

24 the record Jack McLaughlin of Ferry Joseph on behalf of

25 Warren Winter and Richard Brummond, two objecting creditors.

1          Your Honor, if I may introduce to the Court my co-

2   counsel.  With me today in Court is Marshal Hoda of the Hoda

3   Law Firm of Houston, Texas, and Patrick Yarborough of Foster

4   Yarborough also of Houston.  They are lead counsel in this

5   matter.

6          Mr. Hoda will be speaking on behalf of our

7   position today.  First, with regard to the emergency *ex parte*

8   motion to continue the hearing vis-à-vis the Sullivan

9   Cromwell application, and then on any argument the Court will

10  take on the application proffer.

11          THE COURT:  Okay.  Thank you.

12          MR. MCLAUGHLIN:  Thank you, Your Honor.  By the

13  way, both have been admitted *pro hac vice*.

14          MR. HODA:  Good morning, Your Honor.  May I please

15  the Court.  My name is Marshal Hoda, I represent the

16  individual objectors in this matter, Mr. Warren Winter and

17  Mr. Richard Brummond.  I appreciate the privilege of being

18  able to appear before this Court *pro hac vice* today.

19          I'd like to first address the emergency motion for

20  an adjournment that we filed yesterday.  Your Honor, I am

21  here on behalf of two individual depositors on the FTX and

22  FTX US exchanges who collectively lost access to

23  approximately $400,000 in assets as a result of the FTX

24  collapse.  My clients have objected to the appointment of

25  Sullivan & Cromwell as the debtors lead counsel because they

1   have grave concerns about the firm's lack of transparency in

2   its mandatory disclosures, and its ability to lead an

3   objective investigation into the FTX Group's prepetition

4   activities.

5          Yesterday we filed an emergency motion for

6   adjournment of the hearing on Sullivan & Cromwell's

7   application that is set to go forward this morning.  And so

8   that is what I will speak about first.

9          I'd like to start with a brief statement of the

10  chronology, which is helpful for context here.  Sullivan &

11  Cromwell filed its application to be appointed under Section

12  327 on December 21st, 2022.  As we point out in our papers,

13  and as Ms. Sarkessian noted a moment ago, the original

14  declaration of Mr. Dietderich that accompanied that

15  application said, essentially, nothing about Sullivan &

16  Cromwell's prepetition work, legal work, for the FTX Group

17  entities.

18         It disclosed that Sullivan & Cromwell had, in

19  fact, performed $8 and a half million approximately of legal

20  work for the FTX Group entities that said only, and I quote,

21  that that work had been "With respect to acquisition

22  transactions and specific regulatory inquiries relating to

23  certain U.S. business lines;" nothing more.

24         Further, Mr. Dietderich's declaration did not

25  disclose numerous other connections between Sullivan &

1  Cromwell, and the debtors, and the debtors' attorneys as

2  expressly required under Bankruptcy Rule 2014, including that

3  a former Sullivan & Cromwell partner, Mr. Ryne Miller, was

4  the general counsel at FTX US and one of the highest ranking

5  legal officers in the FTX Group before its collapse.

6         Accordingly, we filed an objection on behalf of

7  Mr. Winter on January 4th and later filed an amended

8  objection that set out additional information about Sullivan

9  & Cromwell's relationship with the debtors, available on the

10  public record, that was not reflected in Sullivan &

11  Cromwell's disclosures.

12         The U.S. Trustee also filed an objection at that

13  time pointing out that Sullivan & Cromwell's disclosures were

14  "Wholly and sufficient to evaluate whether Sullivan &

15  Cromwell satisfies the bankruptcy code's conflict free and

16  disinterestedness standards."  As you heard today, that has

17  apparently been resolved, but that was the U.S. Trustees

18  opinion, as well as ours, at the time of the filing of the

19  original Dietderich declaration.

20         On January 17th, less then 72 hours ago, Mr.

21  Dietderich submitted his supplemental declaration in support

22  of Sullivan & Cromwell's retention.  That declaration sets

23  out 34 pages of additional disclosures and exhibits relating

24  to Sullivan & Cromwell's connections with the debtors;

25         Yesterday, less then 24 hours ago, Mr. Dietderich

1  submitted his second supplemental declaration adding more

2  facts to the mix;

3          Finally, last night, Sullivan & Cromwell submitted

4  a revised proposed order changing the details of its proposed

5  retention in this case.

6          Your Honor, we submit that this chronology shows

7  gamesmanship. As both my clients and the U.S. Trustee

8  recognize, Mr. Dietderich's original declaration was wholly-

9  inadequate to satisfy Sullivan & Cromwell's disclosure

10  obligations.  There is no excuse for a firm, with the

11  resources available to Sullivan & Cromwell, to wait until

12  less then 72 hours before the hearing on its application to

13  make any substantive disclosures about its prepetition work

14  for the debtors, and crucial disclosures concerning its own

15  former partner's employment as one of the top legal officers

16  of the FTX Group.

17          Nevertheless, Your Honor, we were prepared to go

18  ahead with the hearing today and make our arguments based on

19  the facts available to us.  Then yesterday afternoon, around

20  2 p.m., a bombshell was lobbed into the docket in the form of

21  the Friedberg declaration that you have heard about.

22          Mr. Friedberg, described in Mr. Dietderich's

23  supplemental declaration as "The senior legal officer of the

24  FTX Group," submitted a 17-page declaration setting out what

25  he described as "Additional information about potential

1  claims that the debtors against Sullivan & Cromwell, false

2  statements made by Sullivan & Cromwell, as well as other

3  misconduct."

4          To be clear, Your Honor, as we stated in our

5  emergency motion, we had absolutely nothing to do with this

6  declaration.  I have confirmed that my clients did not

7  either.  Although styled as being offered in support of the

8  amended agenda we submitted, the declaration was prepared and

9  submitted without any solicitation or input from us

10  whatsoever.  We were as surprised by it as anyone else.

11          That said, the allegations in the Friedberg

12  declaration are as relevant as they are explosive.  The

13  declaration outlines several claims that Mr. Friedberg

14  believes the bankruptcy estate has against Sullivan &

15  Cromwell. It also outlines what the declaration characterizes

16  as false statements in the Dietderich declarations and

17  inappropriate conduct, alleged inappropriate conduct, by

18  former Sullivan & Cromwell partner and high-ranking FTX Group

19  legal officer Ryne Miller.  Crucially, the Friedberg

20  declaration also says that its author would testify

21  competently to the facts set out there if given the

22  opportunity.

23          Your Honor, we don't purport to vouch for the

24  accuracy of any of the facts, allegations I should say, set

25  out in Mr. Friedberg's declaration.  Frankly, like everyone

1  else we hardly had time to process them.

2          What's clear is that the matters raised in the

3  Friedberg declaration are central to the question of whether

4  Sullivan & Cromwell meets the standard for retention under

5  Section 327 and has made the appropriate disclosures under

6  Bankruptcy Rule 2014.  We believe it is in the best interest

7  of our clients and all stakeholders to have additional time

8  to arrange testimony, secure a deposition and, otherwise, get

9  to the bottom of this unexpected development.

10          To sum-up on the emergency motion, I will note

11  that as the Court is, of course, aware the bankruptcy system

12  depends on the self-policing conduct of lawyers in making

13  robust timely disclosures.  The failure to get this right at

14  the outset can result in a lot of pain down the road.  We

15  believe the chronology we have laid out is sufficient reason

16  for an adjournment, that there will be no prejudice to anyone

17  by adjourning the hearing on Sullivan & Cromwell's

18  application for a brief period, as the Court sees fit,

19  perhaps to the February 6th omnibus hearing only a few weeks

20  from now.  Surely, Sullivan & Cromwell can continue its work

21  in the meantime and no harm will come to the estate.

22          With that, Your Honor, I have concluded my

23  argument on the emergency motion.  I would be happy to take

24  any questions the Court has.

25          THE COURT:  No questions.

1          Mr. Bromley, any response?

2          MR. BROMLEY:  Yes, Your Honor. I take issue with

3   much of what Mr. Hoda says.  The exercise that Sullivan &

4   Cromwell went through in crafting the supplemental disclosure

5   is exactly the exercise that large firms who are debtor's

6   counsel go through in every large case, right.  We sat down

7   with the Office of the U.S. Trustee for weeks going through

8   information requests, supplementing the disclosure.

9          The disclosure issues that were raised by Mr. Hoda

10  in his objection were all addressed in the supplemental

11  disclosures from Mr. Dietderich.  We took Mr. Hoda's

12  objection into account, his original objection, and his

13  amended objection and every single one of the issues that he

14  raised was addressed in the supplemental disclosure.  So,

15  from a disclosure perspective the issues that were raised by

16  his clients have been fully addressed.

17          The question, though, is, well, what is happening

18  really with respect to this random filing that is made by Mr.

19  Friedberg.  Who is Mr. Friedberg and why is he making that?

20          Well, one of the issues that we're facing, Your

21  Honor, is that Sullivan & Cromwell is front and center in

22  connection with what has been going on with the FTX Chapter

23  11 proceedings. And if you are part of the inner circle at

24  FTX, and that would include Mr. Friedberg, then you have

25  concern about the exercise that is going on.

1          On a daily basis Sullivan & Cromwell is

2   cooperating with and providing information to federal

3   criminal authorities and regulatory authorities.  The

4   individuals who were at, and running, and making the

5   decisions that have brought this company to its knees are

6   rightly concerned that the information that is being provided

7   to authorities could lead back to their doorstep.

8          So what we have here, Your Honor, is a gentleman

9   who ran this company into the ground, Mr. Bankman-Fried,

10  sitting in his parent's home in Palo Alto, California with an

11  ankle bracelet on, extradited from the Bahamas, and charged

12  with multiple crimes by the Southern District of New York

13  U.S. Attorneys Office.

14         And when the U.S. Attorney for the Southern

15  District announced that indictment what did he say?  One of

16  the greatest frauds in history is what he said.  He also

17  announced that two of the founders, Mr. Wang and Ms. Ellison,

18  had been indicted, plead guilty, and agreed to cooperate.

19         So, if you're Mr. Bankman-Fried or, frankly, Mr.

20  Friedberg there is a concern about what is going on and what

21  could happen to them.  They can't throw stones at the U.S.

22  Attorney's Office, but they can throw stones at debtor's

23  counsel that is providing information to the prosecutors and

24  the regulators; that is exactly what is happening.

25         Mr. Hoda failed to note that he had sent me an

 1  email saying that he had planned to call Mr. Bankman-Fried

 2  here as a testifying witness today.  We, the debtors, and

 3  Sullivan & Cromwell are fighting a ghost when we have these

 4  accusations that are being made and no opportunity to cross-

 5  examine Mr. Bankman-Fried.

 6           Mr. Ray, who is here to testify, gave an interview

 7  to the Wall Street Journal this week.  Mr. Bankman-Fried is

 8  immediately online criticizing what has been said.  We

 9  provided a fulsome presentation to the official committee of

10  unsecured creditors this week and for disclosure purposes

11  posted that on the Court's docket.  Mr. Bankman-Fried takes

12  it, marks it up, and posts it criticizing everything that we

13  have done.  Mr. Bankman-Fried is behind all of this and

14  whenever we move -- if we were to move this, wherever we

15  moved it to there is, in my mind, an absolute certainty that

16  he is going to try to do something to get in the way.  He is

17  lashing out.

18           Now as to Mr. Friedberg, I have to say, he has got

19  a checkered past.  It takes a lot of guts for him to put

20  something in writing that says I was the chief compliance

21  officer at FTX.  But if you read the declaration it's a

22  rambling declaration.  Mr. Frieberg is not here.  We would

23  oppose him testifying, but this is simply an incendiary

24  device to be thrown into the process.

25           With our -- from our perspective, Your Honor,

1  everything that needs to be done in terms of disclosure has

2  been done --

3              THE COURT:  Go ahead.

4              MR. BROMLEY:  -- and what we need to do now is to

5  proceed with the evidence that is ready to be presented.  If

6  Mr. Hoda has any cross-examination for Mr. Ray or Mr.

7  Dietderich then we should do that.  But we shouldn't be

8  pushing this off anymore to invite other folks to be filing

9  things at the last moment and disrupting this exercise.

10             This is a Court of law.  We should be following

11  the rules.  Our application has been on file.  If anyone else

12  wanted to file an objection they could do so.

13             There are two things that I would note, Your

14  Honor, in terms of numbers.  There are almost nine million

15  creditors in this case.  Two have objected.  The creditors

16  committee is on board.  The U.S. Trustees Office is on board

17  after an extensive interaction with the debtors.

18             I would also note, as my son said last night, he

19  sent me the statistics of Mr. Bankman-Fried's sub-stack

20  postings 12 million views, 1,300 likes.  That is like one

21  person at Lincoln Field sitting in the top right corner

22  saying go team and the entire rest of the stadium being

23  empty.

24             THE COURT:  All right. I am going to deny the

25  motion for a continuance.  The declaration was filed, but it

1    -- Mr. Friedberg didn't file a motion.  He didn't even file a

2    joinder to a motion.  He just filed a declaration saying that

3    he was submitting a declaration in support of somebody else's

4    motion.  That is not an appropriate -- procedurally it's not

5    appropriate.

6             So -- and I have read the declaration and,

7    frankly, its full of hearsay, innuendo, speculation, rumors;

8    certainly not something I would allow to be introduced into

9    evidence in any event.  So, I will deny the motion for a

10   continuance and we will go forward with the application.

11            MR. HODA:  Your Honor, if I could just make a note

12   for the record.  I think I would be remiss if I didn't --

13            THE COURT:  You need to come up to the microphone.

14            MR. HODA:  I think I would be remiss if I did not

15   note for the record that as Your Honor was speaking just then

16   Mr. Friedberg appeared twice on the zoom screen here and

17   waived his hand. He is apparently in virtual attendance at

18   this meeting.

19            Again, I feel as though I should apologize for

20   the, kind of, circus aspect of his showing up in this way

21   again. I am surprised as anyone by this development, but I

22   just feel that is a fact that I should note for the record so

23   that its preserved.

24            THE COURT:  I understand.  I did see him and I did

25   not recognize him intentionally because, as I said, he has

1   not filed a motion.  He has not joined any motion.  He is

2   simply trying to be a witness, I suppose, but witnesses are

3   not allowed unless there here live.

4          MR. HODA:  Understood, Your Honor.  As I said,

5   purely noting for the record we are prepared to go ahead with

6   argument on the application, the objection.  So, with that I

7   will take my seat once again.

8          THE COURT:  Thank you, Mr. Hoda.

9          MR. BROMLEY:  Your Honor, if I may just clarify

10  for a moment that, Mr. Hoda, you said you are ready to

11  proceed with argument.  Are you intending to cross-examine

12  any witnesses?

13          MR. HODA:  Yes.  With the Court's permission I

14  would ask to cross-examine Mr. Friedberg.  He's here on zoom.

15          THE COURT:  No.  He can't testify if he's not here

16  in person.

17          MR. HODA:  With that clarification we do not

18  intend to call any witnesses.  We will be making arguments on

19  the declarations that are in the record and the arguments

20  that we have made in amended objection.

21          THE COURT:  So, you're not calling any witnesses,

22  not putting in any evidence?

23          MR. HODA:  No.  Just making our arguments based on

24  --

25          THE COURT:  So, you are going to move the

1  introduction of the declarations?

2         MR. BROMLEY:  Yes, Your Honor.  I would like to

3  move the admission of Mr. Dietderich's original declaration,

4  his first supplemental declaration, and his second

5  supplemental declaration as well as the first declaration of

6  John J. Ray III, and the supplemental declaration of John J.

7  Ray III.

8         THE COURT:  Is there any objection?

9         MR. HODA:  No objection, Your Honor.

10        THE COURT:  Those declarations are admitted

11 without objection.

12     (Declarations received into evidence)

13        MR. BROMLEY:  Thank you, Your Honor.

14        Your Honor, I will proceed to argument then and

15 reserve the right to respond to Mr. Hoda's arguments as well.

16        Your Honor, these cases were filed 70 days ago.

17 The circumstances of the filing are well-known at this point.

18 Mr. Ray's declaration, the so-called first day declaration,

19 that was filed in connection with the hearings that were held

20 on November 22nd is probably the most quoted first day

21 declaration I have ever seen in my 33 years of practice.

22 Indeed, Mr. Ray's first day declaration included language

23 which was quoted in the New York Times top 25 quotes of 2022.

24        What we have here in the FTX situation is a, as

25 Mr. Ray said in his supplemental declaration, a dumpster

1  fire.  The founders of this company left the company abruptly

2  in early November in a state of Chaos.  What has happened as

3  a result of that is that an army of advisors have had to come

4  in and bring order.  That army has been under the direction,

5  on a daily basis, by Mr. Ray.  As Mr. Ray has said in his

6  declaration, as he said in his testimony before Congress, as

7  he said in his prepared remarks before Congress, Mr. Ray is a

8  very hands-on leader.

9        We are in meetings on a regular basis.  Mr. Ray

10  digs deep into the details and he relies on his advisors.

11  The advisors that are leading that charge on the legal front

12  are Sullivan & Cromwell, supplemented by Quinn Emanuel and

13  the Landis Law Firm here in Delaware.  We have recently been

14  joined on the scene by Mr. Hansen and the Paul Hastings Firm,

15  and we have been doing an enormous amount of work.

16        Among the work that we have been doing is to

17  recreate or, frankly, create from scratch the structure that

18  should have been there from the beginning.  The work that has

19  been done has yielded enormous results.  When we were here on

20  November 22nd it was fair to say that Mr. Ray and the

21  advisors were still in the earliest stages of trying to

22  develop the information necessary to move these cases

23  forward.

24        Now that we are 70 days into the case we are much,

25  much further along.  And as Mr. Ray says in his declaration

1  that could not have been done were it not for the efforts of

2  all the advisors, but in particular Sullivan & Cromwell as

3  lead debtors' counsel.

4        Mr. Ray makes very clear in his supplemental

5  declaration that any limitation or denial of retention with

6  respect to Sullivan & Cromwell would be extraordinarily

7  detrimental to the interest of creditors and stakeholders in

8  these cases.  And one of the things that we have done, as I

9  noted earlier, is lead the interaction with the regulatory

10  and criminal authorities.

11        I have been doing this a long time, Your Honor,

12  but I have not been involved in a situation where the debtor,

13  itself, has been treated as a crime scene.  We are inundated

14  on a regular basis by demands from multiple regulatory

15  authorities, federal and state, as well as criminal

16  authorities for all sorts of information on an expedited

17  basis.  The number of priority emails that we get from

18  regulatory and criminal authorities is phenomenal.

19        In close coordination with Mr. Ray, we have been

20  responding on an expedited basis to every one of those

21  requests.  Frankly, Your Honor, I think if it were not for

22  that type of prompt and immediate response, we would not have

23  seen the indictments and the plea agreements that we have

24  seen to date.  There is a lot more to do and the next stage

25  of the case is about to begin.  With us being joined by the

1  creditor's committee we're ready to move on to that next

2  stage.  So, I think that the justification for the

3  continuance of the status quo with respect to Sullivan &

4  Cromwell is manifest.

5          The real question comes down to the legal

6  standard.  Disinterestedness and the holding of an adverse

7  interest.  The disclosure that we have filed, in my

8  experience, is the most fulsome disclosure that I have ever

9  seen any debtor's counsel make in any case.  We have gone

10 down to extraordinary levels of detail to matters that are

11 simply of $1,000; we have listed every one of them out.

12         The concerns that have been raised have said,

13 okay, Ryne Miller, he was a partner at Sullivan & Cromwell

14 and he left the firm and took on the role as general counsel

15 of FTX US.  And that is West Realm Shires as a corporate

16 name. Mr. Wilson was a former associated at Sullivan &

17 Cromwell.  He did not leave Sullivan & Cromwell to go to FTX,

18 he left to go to the Fenwick & West Law Firm.  Fenwick & West

19 is the law firm that served as general outside counsel to

20 FTX.  From Fenwick & West he then left and went to FTX

21 Ventures.

22         It is true that the firm has done work for certain

23 FTX entities prior to the petition date, but that in and of

24 itself, as case law is clear, is not in and of itself not

25 disqualifying.  Indeed, its virtually unheard of for a major

1  law firm who can handle the type of matters that are raised

2  in a case of this complexity to not have a pre-existing

3  relationship.

4         I have been debtor's counsel in multiple cases

5  over 30 years. I have never been debtor's counsel in a

6  situation where my firm did not have an existing, pre-

7  existing relationship with the debtors. So, the mere fact

8  that Sullivan & Cromwell had done work is irrelevant.

9         The question is whether or not any of that work

10  goes to any of the issues that we're facing and if so, how

11  would it go to those issues. Is there anything about the work

12  that we have done in the past or the relationships that we

13  have that would be disqualifying, and the answer to that is

14  no.

15         As Mr. Dietderich makes clear in his declaration

16  Sullivan & Cromwell has two types of clients.  Our system,

17  when you fill-out a conflicts check and a client comes in, is

18  you have to decide whether or not is this a regular client or

19  is it a particular matters client.  Why is there that

20  distinction?

21         Well a regular client is a client that we have a

22  long-standing and broad based relationship with where we do

23  lots of different work for that client over a broad spectrum

24  of matters.  And in most circumstances those clients have

25  been clients of the firm for years, in many circumstances for

1   decades.

2          On the other hand, we have particular matters

3   clients.  A particular matters client is somebody who comes

4   in with a particular matter who asks for advice on a specific

5   matter.  Now why is there that distinction?  Well in our

6   intake system a regular client doesn't have to go through the

7   same type of rigorous review that a particular matters client

8   comes in because if we are dealing with one of those major

9   clients, and even though we're a firm with a long history,

10  believe me, there's not all that many.  You know that that

11  big name client, and I'm not going to disclose them, but you

12  can imagine who they might be, we know, we don't have to

13  focus as hard on that because it's a big and existing client.

14          Particular matters are different.  They are folks

15  who come in, they ask for assistance on a particular matter,

16  it then goes to our intake committee and the intake committee

17  looks at that particular matter, we look at everything that

18  it might touch on and relate to, and we make a decision with

19  respect to that particular matter.  Every single matter that

20  came in from FTX, any FTX entity, was a particular matter.

21          Now, one of the things Sullivan & Cromwell excels

22  in is transactional work and regulatory work.  The majority

23  of the work that we did here for FTX fell into those

24  categories.

25          Now, it's also important to look at the timeline

1    of Sullivan & Cromwell's work with FTX.  FTX, as we've told

2    Your Honor, is not an entity that had a long history.  The

3    FTX world started in 2017 with the creation of Alameda, the

4    hedge fund.  Our work with FTX, any FTX entity, started in

5    the summer of 2021.  We had nothing to do with the

6    establishment of Alameda; we had nothing to do with any of

7    Alameda's operations.  We had one matter that Mr. Dietderich

8    was involved in with respect to the Voyager bankruptcy that

9    Alameda was involved in, but we were not there when Alameda

10   was established, we were not general corporate counsel to

11   Alameda; we didn't have that type of relationship with

12   Alameda, we had a particular-matters relationship.

13           FTX.com, the international exchange.  Well, that

14   entity is FTX Trading Limited.  It was established in 2019,

15   two years before Sullivan & Cromwell even came in contact

16   with FTX.

17           FTX U.S., established in 2019; again, two years

18   before Sullivan & Cromwell got involved with FTX.  We did not

19   have anything to do with the creation of these entities, we

20   didn't structure them, we didn't incorporate them, we didn't

21   act as secretary on board meetings; we were not general

22   outside counsel with respect to those entities.

23           We never represented any of FTX entities in a

24   capital race, we never represented them in issuing debt; we

25   represented them in specific transactional situations, none

1  of which touch on any of the issues that have been raised to

2  date.

3        Now, to the extent that anything comes out that

4  there's a transaction that we may have been involved in might

5  have an issue that needs to be investigated, we of course

6  will not be involved in that.  The Quinn firm is here, the

7  Landis firm is here, and Paul Hastings is here.  This is the

8  standard way that large firms deal with these types of issues

9  in cases of this magnitude.

10        It is not surprising that creditors who are

11  inexperienced with dealing with large corporate bankruptcies

12  might say is that the way it really works, but, Your Honor,

13  we know that is the way it works.

14        It was very clear to Mr. Ray when he decided, one,

15  to file these Chapter 11 cases and, two, to retain Sullivan &

16  Cromwell as 327(a) counsel that there would be a need for

17  conflicts counsel.  And so he immediately, the first day or

18  two of his occupying the office of chief executive officer,

19  he reached out to Quinn Emanuel, he interviewed them and he

20  hired them.

21        Now, we all know the reputation of Quinn Emanuel.

22  This is not a firm that is a walk in the park.  Quinn Emanuel

23  is a well known, high profile and successful law firm.  It is

24  not all that common, frankly, to have large cases where

25  there's a firm like Sullivan & Cromwell and a firm next to it

1  like Quinn Emanuel, and Mr. Ray recognized that this was a

2  special case and that he needed to have that type of support.

3         So when you're looking at the question of whether

4  or not there is -- we hold an interest adverse to the estate,

5  the disclosure makes clear that we do not.  There's nothing

6  in the record that indicates that Sullivan & Cromwell holds

7  an interest adverse to the estate and all of the disclosure

8  demonstrates that we are a disinterested person.

9         Another thing that is raised by the objectors as a

10  problem is the fact that Sullivan & Cromwell was paid for its

11  work before the petition date and that, therefore, it somehow

12  constituted -- the payments, therefore, somehow constituted

13  preferences that are challengeable under the Pillowtex case.

14  But we make clear in Mr. Dietderich's declaration, every

15  payment that was received within the 90 days, the amount of

16  the payment, and the number of days that the bill remained

17  outstanding.  We reviewed all that with the Office of the

18  United States Trustee.  Your Honor, every one of those

19  payments it's clear it was made in the ordinary course.

20         There was no antecedent debt that was paid off

21  just prior to the filing because that's what the Pillowtex

22  case is about.  In that case, the Jones Day firm -- Your

23  Honor, is there a way to -- it's kind of distracting to have

24  -- thank you, I appreciate that.

25         THE COURT:  You can turn your screen off too, if

1 you want.

2          MR. BROMLEY:  Oh, can I?  Oh, that's good.  That's

3 much better, thank you.  I was wondering if that was the

4 Jones Day firm -- but in the Pillowtex case, the

5 circumstances were all about an acceleration of payments on

6 overdue bills that were made -- where payments were made on

7 the eve of bankruptcy.  That's not what happened here, as Mr.

8 Dietderich's declaration shows in detail every amount, the

9 number of days the amounts were outstanding -- or the bills

10 were outstanding.  So there's no preference issue here, Your

11 Honor.

12          From our perspective, the objections of Mr. Winter

13 and Mr. Brummond are resolved.  There are disclosure

14 questions; every one of those questions has been answered.

15 The main thing that they indicate was a lack of clarity with

16 respect to Mr. Miller and Mr. Wilson; we have given absolute

17 clarity with respect to both of them.

18          A question with respect to the preference amounts

19 or the amounts that are payable within the preference -- that

20 were paid within the preference period, we go through every

21 single payment, including the time of the invoices were

22 outstanding, making it clear that none of them are

23 preferences.

24          And with respect to -- just generally, with

25 respect to the matters that -- a lack of disclosure with

1 respect to the description of the matters, Mr. Dietderich

2 goes very carefully through each of the matters and describes

3 them.

4         So we feel that we have made an enormous amount of

5 disclosure, more than is generally done in these cases.  We

6 recognize that the exercise with the Office of the U.S.

7 Trustee took longer than we would have liked, but we think it

8 was a fulsome and successful exercise.  I've had few

9 adversaries -- and I say this respectfully -- as relentless

10 as Ms. Sarkessian and I am tired of having dealt with her.

11     (Laughter)

12         MR. BROMLEY:  And I say that with the greatest

13 amount of respect.  We feel that everything that we have put

14 in our disclosure satisfies -- now clearly satisfies the

15 Office of the U.S. Trustee and, in my mind, that is the

16 highest standard.

17         So, Your Honor, our view is that we have satisfied

18 the disclosure requirements, that there's a clear and

19 convincing argument for the retention of Sullivan & Cromwell,

20 and we ask that the Court enter the order.

21         THE COURT:  Thank you, Mr. Bromley.

22         Does anyone else wish to speak in support before

23 we go to the objectors?

24         MR. HANSEN:  Good morning, Kris Hansen with Paul

25 Hastings, proposed counsel to the Official Committee.

1          Your Honor, we just briefly would say that the

2     committee stands by the statement that it filed with respect

3     to the Sullivan & Cromwell retention application.  The

4     committee is satisfies with the disclosures that they've

5     made.  We believe that an order should be entered today

6     approving their retention and we believe that the failure to

7     do so would be extremely detrimental to these cases for many

8     reasons and absolutely not in the best interests of the

9     estates.

10          As we also said in our statement, Your Honor, the

11    committee intends to do the job that it's authorized to do

12    under Section 1103(c)(2) of the code, which is to investigate

13    all of the financial affairs of the debtors, including all of

14    the fraudulent allegations, and that also includes the

15    evaluation of all professionals who were involved with the

16    debtors on a prepetition basis, but that investigation

17    doesn't need to preclude the retention of Sullivan & Cromwell

18    here today.  As we noted in our statement, a retention

19    doesn't grant a release, it allows the cases to move forward

20    with the debtor's chosen counsel and it brings some

21    credibility and structure to the process, and that's what we

22    believe is necessary here.

23          Thank you, Your Honor.

24          THE COURT:  Thank you.

25          Anyone else?

1    (No verbal response)

2         THE COURT:  Ms. Sarkessian, do you want to give

3    one last shot to Mr. Bromley before we --

4         (Laughter)

5         MS. SARKESSIAN:  Your Honor, I will say, I take

6    relentless as a compliment.

7         (Laughter)

8         THE COURT:  Okay, all right.

9         All right, let me hear from the objectors.

10        MR. HODA:  Thank you, Your Honor.  Again, Marshal

11   Hoda here on behalf of the objectors, Mr. Warren Winter and

12   Mr. Richard Brummond.

13        Your Honor, our amended objection sets out four

14   reasons why Sullivan & Cromwell should not be approved under

15   Section 327 and Rule 2014.  I'll provide a brief statement of

16   those reasons here and point you to what we believe is good

17   authority on which those reasons are based.

18        For clarity, Your Honor, I'll group our four

19   objections into two buckets.  First is what I'd call the

20   investigative conflicts bucket.  These objections turn,

21   ultimately, on the nature of the FTX Group's prepetition

22   activities and the effect that context has on the decision to

23   retain Sullivan & Cromwell in this matter.

24        The debtors CEO, John Ray III, Mr. John Ray III,

25   respectfully, confirmed in his congressional testimony and in

1   his supplemental declaration that the FTX Group was engaged

2   in, quote, "old fashioned embezzlement, just taking money

3   from customers and using it for your own purposes," close

4   quote.

5           This included massive misappropriation of customer

6   funds that were used for improper purposes, including what

7   Mr. Ray described as a $5 billion, quote, "spending binge,"

8   close quote.  The FTX Group went on in 2021 and 2022.

9           Given these facts, of course, every prepetition

10  transaction must be investigated and every potential estate

11  claim considered.  This includes the actions of the debtors'

12  current and former executives, and the third party

13  professionals and firms who advised them as this spending

14  spree played itself out.

15          We know from Sullivan & Cromwell's own disclosures

16  that the firm advised the FTX Group in several of the large

17  transactions it made during this spending binge.  We also

18  know that two former Sullivan & Cromwell lawyers were amongst

19  the FTX Group's top-ranking legal officers.  Finally, we know

20  that a number of current and former Sullivan & Cromwell

21  clients were amongst the FTX Group's business partners.

22          With this background in mind, the thrust of the

23  investigative objections comes into view.  Sullivan &

24  Cromwell has extensive actual and potential conflicts created

25  by the necessity of investigating its own role in the FTX

1  Group's prepetition activities, the activities of former

2  Sullivan & Cromwell lawyers at the top of the FTX Group's

3  internal legal structure, and the activities of various of

4  Sullivan & Cromwell's own current and former clients.

5          I'll just briefly point out some of the

6  authorities we cite on these points, Your Honor; in

7  particular, the Bohack case and the Get-N-Go case.

8          In Bohack, a Second Circuit decision, the question

9  was whether a lawyer who was, quote, "close personal friends

10  and business associates," close quote, with the board

11  chairman of the bankrupt entity could serve as counsel when

12  there were questions about the chairman's liability for

13  prepetition participation in fraudulent transactions.  The

14  court held that he could not because, quote, "an attorney who

15  has been closely related by professional, business, and

16  personal ties to those whose conduct may now be suspect is

17  evidently in no position to make any objective appraisal of

18  the nature and extent of their involvement."

19          Similarly, in Get-N-Go the question was whether a

20  law firm that had advised the debtor in various prepetition

21  corporate transactions that had come under suspicion could be

22  appointed as bankruptcy counsel under Section 327.  The court

23  denied the firm's application, writing that having counseled

24  some of the parties in the very transactions that, quote,

25  "deserved examination," the firm could not, quote, "provide

1  the objective and independent advice regarding the validity

2  or propriety of these transactions as is required for the

3  debtor's performance of its fiduciary obligations."

4       Your Honor, we believe these cases dictate the

5  result here.  Just as the firms seeking to be retained in

6  Bohack and Get-N-Go were found to be unable to objectively

7  investigate and advise about transactions in which they had

8  personally participated, or about the actions of persons with

9  whom they had deep personal and professional ties, Sullivan &

10 Cromwell will not be able to objectively advise the debtors

11 as to the issues raised by the FTX Group's spending binge and

12 the conduct of former Sullivan & Cromwell lawyers.

13      Next, Your Honor, I'll turn to the other bucket,

14 which is the preference claim.  Mr. Dietderich's original

15 declaration revealed a pattern of payments by the FTX Group

16 to Sullivan & Cromwell that showed a marked jump on November

17 3rd, 2022, just after the FTX crisis began and shortly before

18 the FTX Group declared bankruptcy.

19      In light of the additional disclosures that were

20 offered in the supplemental declaration, some of those

21 concerns have been ameliorated.  We would note that we did

22 not have the benefit of those supplemental disclosures at the

23 time the objection deadline passed.  Nevertheless, Mr.

24 Dietderich's supplemental declaration continues to show

25 inconsistencies that we believe require a ruling on the

 1 preference issue.  It notes, for instance, that Sullivan &

 2 Cromwell received a $4 million retainer from the FTX Group on

 3 November 9th, more than 2.4 million of which was used to pay

 4 down unspecified prepetition invoices.

 5          Finally, in the Friedberg declaration, for which

 6 we have made an offer of proof today -- or at least an offer

 7 to investigate further -- allegations were made that these

 8 payments were improperly taken from solvent entities in what

 9 can only be described as unusual circumstances.

10          Your Honor, briefly on this point, the cases make

11 clear that the Court takes all facts and circumstances into

12 account when considering whether a payment in the preference

13 period was made in the ordinary course of business.  Courts

14 consider factors such as the timing of the payment and

15 whether it constituted a deviation from the pattern of prior

16 payments where there was an ongoing relationship.  The First

17 Jersey Securities case, with which the Court will certainly

18 be familiar, is an archetypical example.

19          It is also the case, under Pillowtex, that the

20 preference analysis must be carried out before retention of a

21 firm under Section 327.  Accordingly, we request that the

22 Court issue a ruling on the preference issue as part of its

23 consideration of Sullivan & Cromwell's application.

24          That is the sum and substance of our arguments.  I

25 would leave the Court with one last point before closing.  In

1  its reply and in counsel's argument today and various

2  arguments that have been offered, and Mr. Ray's declaration

3  and supplemental declaration in support of the retention of

4  Sullivan & Cromwell, many have pointed to the practical

5  benefits of retaining Sullivan & Cromwell because of its

6  existing familiarity with the business and the work it has

7  already done.

8          With due respect to the work that has been done

9  and due respect to those who have done it, I would point out

10  that the Third Circuit has expressly rejected such arguments

11  as relevant under Section 327.

12          The important case here is <u>Pricewaterhouse</u>.

13  There, the debtors sought to retain Pricewaterhouse as their

14  accountant and financial adviser.  They selected the firm

15  precisely because it had provided them with prepetition

16  services and, thus, developed expertise regarding their

17  financial affairs and needs.  At the same time, the debtors

18  and Pricewaterhouse acknowledged that the firm was a creditor

19  of the debtors and, thus, *prima facie*, ineligible for

20  appointment under Section 327.

21          Writing for the Third Circuit, then Judge Alito

22  noted that the debtors had, quote, "stressed the practical

23  benefits," close quote, of employing Pricewaterhouse, but

24  rejected that argument as inconsistent with the plain

25  language of Section 327, which of course, as Your Honor

1  knows, requires disinterestedness in all cases.

2          The court held that all professionals must meet

3  the disinterestedness standard and noted, quote, "Bankruptcy

4  Courts cannot use equitable principles to disregard

5  unambiguous statutory language," close quote.

6          We would also note, practically speaking, that we

7  do respect the work that has been done.  Given the

8  availability of other large firms, that it is not impossible

9  to conceive that Sullivan & Cromwell would be replaced as

10  counsel in this case.  I was told once that, when you find

11  yourself in a hole, stop digging, and perhaps that is what

12  should be done here.

13          Finally, we would note that, in response to many

14  of the objections we have raised, Sullivan & Cromwell has

15  noted that it will use conflicts counsel to investigate

16  certain matters in which the firm itself may have been

17  involved or former partners of the firm may have been

18  involved, or in which current and former clients of Sullivan

19  & Cromwell's may have been involved.  I would note, Your

20  Honor, that that limitation appears nowhere in the proposed

21  order as it was originally submitted or as it was resubmitted

22  last night, and that those representations were only made

23  after our objection essentially forced the firm to go on the

24  record about these matters.

25          So we would urge the Court, for all those reasons,

1   to reject Sullivan & Cromwell's application and, in the event

2   that the Court does approve the application, we would urge

3   the Court to add language making explicit that in those

4   certain categories that there should be carveouts in which

5   Sullivan & Cromwell will not be involved in investigation.

6           With that, Your Honor, I would conclude my

7   argument and would be happy to take any questions.

8           THE COURT:  No questions.  Thank you.

9           Mr. Bromley, any response?

10           MR. BROMLEY:  Your Honor, I just have a couple of

11   minor points in response.

12           With all due respect to Mr. Hoda, it's clear that

13   he has not practiced in Bankruptcy Court and understands the

14   way things work here.  We have from the very beginning of

15   this case had, from the very moment that Quinn Emanuel was

16   hired, made it clear that they are available to do matters

17   that Sullivan & Cromwell, for one reason or another, might

18   not be able to do.  And to the extent that Sullivan &

19   Cromwell and Quinn Emanuel and the Landis firm are able to do

20   it and Paul Hastings is unable to do it, there are other

21   firms that would be available to Mr. Ray to do it.

22           So the mere fact -- I know he'd like to take

23   credit for the concept of conflicts counsel in bankruptcy

24   cases, but that's been something that's been going on for

25   decades.

1         With respect to the two cases that he cited,

2 Bohack and Get-N-Go, first of all, they are so fundamentally

3 different that it bears repeating -- or noting.  First of

4 all, they're not Third Circuit controlling precedent, but the

5 Get-N-Go case, which is a Bankruptcy Court in the Northern

6 District of Oklahoma case from 2004, basically the -- what

7 the court noted was that the debtor's relationship with a

8 client of the proposed debtor's counsel permeates every --

9 almost every aspect of the case, issues of characterization

10 of debt and equity, of allocation of resources, of the

11 validity and sufficiency of consideration, and the court goes

12 on.  This is a small case with a small firm that had an

13 extraordinarily large client that was a counter-party to the

14 debtor, that is not the situation that is faced here.

15         The Bohack case is an interesting one as well

16 because facts make the law, right, Your Honor?  And this,

17 while being a Second Circuit case from 1979, notes that among

18 other connections, that the partner in the law firm and the

19 individual who controlled the debtor are the only remaining

20 officers of the debtor.  Even the law firm conceded that of

21 the personal ties with the individual who controlled the

22 debtor and the financial stake in the company are unusual.

23         This is not a situation where anyone from Sullivan

24 & Cromwell is on the board of directors or controls this

25 company or had any role in that way, shape, or form.  So,

1 with all due respect, Your Honor, we believe the <u>Bohack</u> and

2 <u>Get-N-Go</u> cases are inapposite in this situation.

3       We believe, Your Honor, that we have satisfied all

4 of the requirements of Section 327(a), disinterestedness, of

5 being a disinterested person and not holding an interest

6 adverse to the debtors.  We believe that the extensive work

7 that we did with the U.S. Trustee's Office to cure problems

8 that they had with respect to the disclosure is an obvious

9 indication that that work has been done and been done

10 successfully.

11       So, Your Honor, we ask that the Court enter an

12 order approving the retention of Sullivan & Cromwell.

13       THE COURT:  Thank you.

14       All right, I'm going to take a short recess.  I'll

15 come back and I'll give you my ruling.  Let's take a 30-

16 minute recess.

17     (Recess taken at 11:12 a.m.)

18     (Proceedings resumed at 11:51 a.m.)

19       THE COURT:  All right.  Well, the issue before me

20 is the motion to retain Sullivan & Cromwell as counsel for

21 the debtors in these cases.

22       Section 327(a) provides that a debtor may retain

23 professionals that do not hold or represent an interest

24 adverse to the estate and that are disinterested persons.

25 Mr. Winter and Mr. Bremmer -- excuse me, Brummond, have

1  objected to the retention of Sullivan & Cromwell as counsel

2  to the debtors based on several issues.  For the reasons I'll

3  discuss in a moment, I'm going to overrule those objections

4  and approve the retention.

5           First, the objectors argue that because Sullivan &

6  Cromwell represented debtors prepetition there's a potential

7  conflict of interest with any of the matters with which

8  Sullivan & Cromwell was involved that might require an

9  investigation.  Of course, 1107(b) of the code tells us that

10  just because a professional is sought to be retained who may

11  have done work for the debtor prepetition is not

12  automatically disqualifying.

13           In addition, they argue that because two former

14  Sullivan & Cromwell attorneys worked for the debtors

15  prepetition and because clients of Sullivan & Cromwell may be

16  creditors of the debtors in these cases that they have a

17  conflict of interest and cannot be retained.

18           As a preliminary matter, there's nothing in the

19  record before me to indicate that any of the -- any

20  investigation would be required of those transactions with

21  which Sullivan & Cromwell might have been involved.

22  Moreover, even if they were, debtors have retained conflict

23  counsel to conduct any investigation that might touch on

24  those issues.  There's no evidence of any actual conflict

25  here.

1          To the extent there may be a potential conflict,

2   requiring an investigation, for example, of one of the

3   transactions they were involved, or an investigation of the

4   attorneys who were former Sullivan & Cromwell attorneys,

5   those are ameliorated -- those are only potential conflicts

6   and the Third Circuit has said that a potential conflict is

7   not per se disqualifying.  That's In re Boy Scouts of

8   America, 35 F.4th 149 and 157, a 2022 case.

9          Here, any potential conflicts are ameliorated by

10  the fact that there's conflicts counsel in place.  And that's

11  something that happens in every large bankruptcy case.  It

12  would be almost impossible to find a case of this size or

13  even -- well, this is what we call a super-mega case -- even

14  in a mega case you would find -- or a large case, it would be

15  difficult to find debtor's counsel that didn't have other

16  clients who might be clients of the debtor's counsel, but

17  that's why we have conflicts counsel.  It happens all the

18  time and not something that is disqualifying.

19         The objectors point me to the Bohack and the Get-

20  N-Go cases to show that where there is a significant

21  relationship with persons involved -- and, in this case, it

22  would be the two counsel who were -- previously worked for

23  S&C -- that there's a disqualifying conflict.  Those cases

24  are significantly different than this case.  Small firms, big

25  cases, where it represents a huge amount of their case, for

1  example -- or, excuse me, a huge amount of their income, for

2  example.

3         And this case is significantly different because

4  here I have Mr. Ray and four independent directors appointed

5  by Mr. Ray who are all consummate professionals, who were not

6  involved in the company's collapse, and there's no evidence

7  that Mr. Miller or Mr. Wilson are involved in the management

8  of the debtors at this time.  There's simply nothing in the

9  record that would lead me to believe that Mr. Ray and the

10 independent directors would not -- and, by the way, they're

11 the ones running the debtors here, not Sullivan & Cromwell;

12 Mr. Ray is the one who runs the debtors, he makes the

13 decisions with his board.

14        So I have no concerns about any potential

15 conflicts of interests that would require me to disqualify

16 Sullivan & Cromwell in this case.

17        The second basis for the objectors request that I

18 deny the retention is the potential for a preference.  And

19 they point to a $4 million retainer, a portion of which was

20 used to pay prepetition invoices that was given to Sullivan &

21 Cromwell prior to the filing of the bankruptcy.  The

22 objectors argue this creates a Pillowtex issue, showing that

23 Sullivan & Cromwell holds an interest adverse to the debtors.

24        Mr. Dietderich's testimony through his

25 declaration, which was unchallenged, clearly shows that,

1  based upon the payment history between the debtors and

2  Sullivan & Cromwell, the payments were made -- the payments

3  made within the 90-day preference period constitute ordinary

4  course payments and, therefore, would not constitute

5  preferences that would be recoverable by the debtors in these

6  cases.

7           With that, as I said, I'm going to overrule the

8  objection and I will enter the order appointing -- or, excuse

9  me, approving the retention of Sullivan & Cromwell.

10          Are there any questions?

11          MR. BROMLEY:  None from the debtors, Your Honor.

12          MR. HODA:  Thank you for hearing us here today,

13  Your Honor.

14          THE COURT:  Thank you.

15          All right, anything else today before we adjourn?

16  I thought I was going to get out of here.

17          MR. GLUECKSTIEN:  Good morning, Your Honor.  We

18  can, I think, very briefly.  For the record --

19          THE COURT:  Oh, we have the status conference.

20          MR. GLUECKSTIEN:  -- Brian Glueckstein, Sullivan &

21  Cromwell, for the debtors.

22          The only other item on the agenda, Your Honor, is

23  just the status conference that the Court requested, I think

24  just more by way of update after the second day hearing last

25  week with respect to the redaction and creditor matrix-

1    related issues that were addressed at that hearing.  The

2    Court -- and we thank the Court -- did enter an order this

3    morning approving that motion on a final basis, including the

4    three-month authorization to redact information with respect

5    to all customers of the FTX debtors.

6           I did want to just address very briefly, there

7    were, I believe, three questions that Your Honor had asked

8    about that we provide an update on today, the first of which

9    was whether -- confirmation whether the debtors providing

10   their creditor matrix and related, you know, filings with the

11   Court can distinguish between customers and other creditors.

12   The answer to that, Your Honor, is yes.  Our top 50 creditor

13   list that's on file had done that with respect to non-

14   customer creditors.

15          We did file an amended creditor top 50 list last

16   evening for the dot com silo that's un-redacted, as we

17   discussed at the hearing last week, the publicly disclosed

18   information about the members of the Official Committee of

19   Unsecured Creditors, in addition to any information about the

20   non-customer, non-individual creditors on that list.

21          But let me address very briefly the creditor

22   matrix.  And I know that the Office of the U.S. Trustee is --

23   it's an issue that they're focused on as well.  I think

24   that's where this distinction and the redaction issues is

25   most relevant, at least immediately.

1          Your Honor, the debtors have now assembled a full

2    creditor matrix that has more than 9.7 million potential

3    creditors on it, including customers.  There are still some

4    potential names being identified.  We do expect, Your Honor,

5    to file with -- in accordance with the Court's order, a

6    redacted version of the creditor matrix very early next week,

7    we're targeting Monday, now that we have that information.

8          There are a relatively small number of non-

9    customer creditors across the debtor silos, approximately

10   7,000 or so.  So, of the number we're talking about here,

11   it's a very small percentage that are non-customers, but

12   there are some such creditors, of course, who are vendors,

13   employees, contract counterparties (indiscernible)

14   counterparties, and other creditors who are not customers.

15   Even within that 7,000, however, there is some significant

16   overlap between what we're calling our customer list and

17   creditors who have relationships with the debtors in other

18   capacities, including vendors -- I'm sorry, employees,

19   contract counterparties, who are also customers of the

20   debtors.

21          So anybody who is a customer at all is being

22   redacted and, obviously, the terms that are set forth in your

23   order will be complied with.

24          Your Honor, one thing I do want to note with

25   respect to the creditor matrix -- and I know this is

1  important and this is a practical issue -- the debtors are

2  going to file -- are intending to file and, as set forth in

3  the order, are required to file un-redacted versions under

4  seal of documents where redactions have been made and to

5  provide those un-redacted copies to the Office of the United

6  States Trustee, the committee, and others as provided for in

7  the order, and we are going to do that.  The issue with

8  respect to the creditor matrix, however, Your Honor, is a

9  practical one that I want to just put on the record.

10        The 9.5-plus million entries on the creditor

11 matrix makes it pretty close to impossible.  And I'm informed

12 by the technical experts that the full matrix, if we were put

13 it into kind of a PDF document form, would be something like

14 150,000 pages and would need to be filed as many dozens of

15 separate files due to size limitations and things like that

16 to file it under seal with the Court.

17        As a result, what we are able to do is to provide

18 the matrix in links to about 18 to 20 maxed-out Excel files

19 containing about 500,000 rows each to the U.S. Trustee and to

20 the Court so that they can be accessible, and those files are

21 hosted -- will be hosted by Kroll, our claims agent.  So we

22 will be able to access the full creditor matrix, but I think,

23 as a practical matter, it's not really possible to put the

24 entirety of that nine million names under seal on the docket

25 per se, but we will be able to make it available to the Court

1  by just linking on the files.

2        All the other documents that we are redacting

3  names from, customer names from, certainly we will file full,

4  un-redacted copies under seal.

5        The second question the Court asked and we just

6  briefly addressed was just to confirm whether -- you know,

7  full identifying information for the non-individual, non-

8  GDPR, non-customer creditors.  So, for the institutions who

9  are not customers, will that information be un-redacted and

10 fully provided as required by the Bankruptcy Rules, and the

11 answer to that is yes.  As I stated, we will do that with

12 respect to the creditor matrix and all the filings, we are in

13 the process of doing that.

14       The third issue Your Honor raised that came up in

15 the discussion at the end of the hearing on this motion last

16 week was what the debtors are able to do in terms of

17 identifying non-customer creditors who need to be redacted

18 under the current order, under the portion of that order

19 permitting redactions to comply with the GDPR.  And on that,

20 Your Honor, I can report that the debtors do have some

21 ability to identify those non-customer individual creditors

22 who are protected by the GDPR from their books and records,

23 but certainly not all.

24       For a number of the non-customer individual

25 creditors, the debtors do not have physical addresses on file

1  that would allow us to, you know, identify whether people are

2  located in one jurisdiction versus another.  And what we're

3  intending to do, Your Honor, is to address this in two ways:

4  identifying from a combination of the debtors' books and

5  records where we can those individual non-customers that

6  under the current order need to have their names redacted,

7  and we are also intending to give notice to the affected non-

8  customer individual creditors -- it's only about 2,000

9  people, which, you know, it's not insignificant, but compared

10  to the nine and a half million at this time since we're

11  redacting in full all of the customers -- notice that and an

12  opportunity to contact the debtors to provide information to

13  us to effectively self-verify that they are protected by the

14  GDPR and should be redacted.

15       We expect that process to only take a short period

16  of time, at which point anybody who is not identified and

17  otherwise covered by the order would be un-redacted from

18  filings going forward.

19       Lastly, Your Honor, I just want to address

20  briefly, there was -- I mentioned that we filed the revised

21  top 50 list with respect to the committee members last

22  evening, we are also evaluating the docket as to any other

23  customers who have appeared in this case who have self-

24  identified as such to redact those names from redacted

25  filings going forward.  There was a letter that was submitted

1  to the Court by counsel for the media objectors on January

2  18th suggesting, as I read it, that the debtors go much

3  further than that and somehow look to social media and

4  Twitter and third party websites for statements that would

5  identify customers publicly.  We submit, Your Honor, that

6  that would be impractical and not appropriate.

7          We think that the way to proceed on this, as we

8  said, if people are free to self-identify, if customers

9  identify themselves and appear in this case, identify

10  themselves as customers, there would be no need, obviously,

11  for us to redact them any longer, but we don't think it would

12  be appropriate to have us go out into, you know, sources

13  other than this Court's docket to identify those customers

14  and un-redact them.

15          So those were the points I had to address, Your

16  Honor, in response to the questions that the Court raised at

17  the hearing last week.  I'm happy to answer any questions.

18          THE COURT:  Okay, thank you.  No questions at this

19  time.

20          Let me hear -- Ms. Sarkessian, anything?  Nothing

21  from the U.S. Trustee?

22          Then I'm going to turn to -- I received a letter

23  from Mr. Finger, who represents the media parties, who had a

24  conflict with another hearing downstate today and he asked to

25  participate by video conference.  And since he's only

1  participating in the status conference portion of this, which

2  according to my chambers procedures can be done virtually, I

3  gave him permission to appear virtually.  So, with that -- I

4  just want to make sure that everyone understands why I'm

5  doing that.

6          MS. SARKESSIAN:  Yes, Your Honor, Juliet

7  Sarkessian for the U.S. Trustee.  I guess the only question I

8  would -- I appreciate the explanation debtors' counsel has

9  provided on these issues, the only question I would have is

10 what they're proposing with respect to the links for the

11 Court.  I don't know if that's satisfactory to the Court or

12 the Clerk's Office, but as far as being provided to the U.S.

13 Trustee -- I mean, I'm willing to try it, hopefully that that

14 will work, but I don't know if that's -- in terms of what the

15 Court record is for the creditor matrix, whether having those

16 links are sufficient or whether something more is needed --

17 or different is needed.

18         THE COURT:  Yeah, I might need to discuss that

19 with the Clerk's Office to see the best way to handle that.

20 A hundred and fifty thousand page PDF is a bit too much, I

21 think, but I'll check with the Clerk and see what

22 recommendation they can make about how to deal with that.

23         MS. SARKESSIAN:  Thank you, Your Honor.

24         THE COURT:  I appreciate you pointing that out.

25         Mr. Finger, are you on the line?

1      (No verbal response)

2          THE COURT:  He's not on the line, okay.

3          On the issue Mr. Glueckstein raised about the

4  requirement for the debtor to go out and scour social media

5  to see whether or not some customer has self-identified, I

6  think that is a bridge too far.  I don't think you need to

7  undertake that as a part of your obligation to disclose these

8  names.  If someone self-identifies on the record by filing

9  something on the docket, that's obviously a different story,

10  but I'm not going to make you scour through millions of

11  Tweets and whatever else is out there to see if you can find

12  people who self-identified as a customer of FTX.

13          MR. GLUECKSTIEN:  Thank you, Your Honor, I

14  appreciate that clarification.  And with respect to the

15  creditor matrix, we're happy to speak with the Clerk's Office

16  and make sure they understand what we're proposing and that

17  it works for the Court.  And if there are other solutions,

18  we're happy to do them, but it's simply up -- it's just a

19  practical issue given the volume here we're talking about of

20  what's effectively 9.7 million rows that, you know, can't be

21  just exported to a PDF.

22          THE COURT:  Yes, I understand.

23          MR. GLUECKSTIEN:  Thank you, Your Honor.

24          THE COURT:  Okay, thank you.

25          Anything else before we adjourn?

1          MR. LANDIS:  Your Honor, for the record, Adam

2 Landis from Landis Rath & Cobb.  We have uploaded to chambers

3 the form of order for the Sullivan & Cromwell retention --

4          THE COURT:  Okay.

5          MR. LANDIS:  -- in a form that's acceptable to the

6 parties.

7          THE COURT:  All right, we'll get that entered

8 right away.

9          All right, thank you all very much.  We're

10 adjourned.

11          COUNSEL:  Thank you, Your Honor.

12      (Proceedings adjourned at 12:10 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          CERTIFICATION

2              We certify that the foregoing is a correct

3   transcript from the electronic sound recording of the

4   proceedings in the above-entitled matter to the best of our

5   knowledge and ability.

6

7   /s/ Tracey J. Williams              January 20, 2023

8   Tracey J. Williams, CET-914

9   Certified Court Transcriptionist

10  For Reliable

11

12  /s/ Mary Zajaczkowski               January 20, 2023

13  Mary Zajaczkowski, CET-531

14  Certified Court Transcriptionist

15  For Reliable

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 2

1

<pre>
 1                    UNITED STATES BANKRUPTCY COURT
                         DISTRICT OF DELAWARE
 2

 3                                    .   Chapter 11
     IN RE:                           .
 4                                    .   Case No. 20-12522 (JTD)
     MALLINCKRODT PLC, et al.,        .
 5                                    .
                                      .   Courtroom No. 5
 6                                    .   824 North Market Street
                                      .   Wilmington, Delaware 19801
 7                                    .
                       Debtors.       .   Monday, November 22, 2021
 8   . . . . . . . . . . . . . . . .      3:00 P.M.

 9                      TRANSCRIPT OF HEARING
               BEFORE THE HONORABLE JOHN T. DORSEY
10                 UNITED STATES BANKRUPTCY JUDGE

11   APPEARANCES:

12   For the Debtors:        Michael Merchant, Esquire
                             RICHARDS, LAYTON & FINGER LLP
13                           920 North King Street
                             Wilmington, Delaware 19801
14

15                           - and -

16                           Betsy Marks, Esquire
                             LATHAM & WATKINS LLP
17                           1271 Avenue of the Americas
                             New York, New York 10020
18

19

20   Audio Operator:         Jermaine Cooper

21   Transcription Company:  Reliable
                             1007 N. Orange Street
22                           Wilmington, Delaware 19801
                             (302)654-8080
23                           Email: gmatthews@reliable-co.com

24   Proceedings recorded by electronic sound recording,
     transcript produced by transcription service.
25
</pre>

1   been quite active.  We asked for two hours to the debtors'

2   five, so that the time could be split between me and Mr.

3   Ciardi.  The debtors didn't want to agree to that, but as

4   Your Honor is thinking about the order, we would like to get

5   closure on that.

6           I wanted to agree with the debtors that we could

7   wait until the end of the evidence to measure that, but I

8   don't think at this stage in this 13-month proceeding, that

9   two hours is unreasonable.  Thank you.

10          THE COURT:  Ms. Marks?

11          MS. MARKS:  Your Honor, we believe that this

12  should be addressed at the end of evidence.  There are a lot

13  of objecting parties in this case.  They may not all want to

14  put on evidence, but there are parties who want to make legal

15  arguments and it just seems like a better idea.  Let's

16  address this when the evidence is closed, we see where we

17  are, we see how long it's been, and everyone knows what

18  evidence has been put in.  I don't think we need to decide

19  today.

20          THE COURT:  I agree.  We'll decide it at the end

21  of evidence.

22          All right.  Anything else on pretrial?

23      (No verbal response)

24          THE COURT:  Okay.  So, we'll go into the ruling on

25  the motion to appoint an examiner and to designate ballots.

1   The Ad Hoc Acthar Group moved for an order directing the

2   appointment of an examiner and to designate ballots.  While

3   the precise grounds for the motion are less than clear, the

4   ad hoc group appears to identify three areas that it believes

5   requires investigation by an examiner:  one, the propriety of

6   certain asbestos claims and the ballots cast with respect to

7   those claims; two, the propriety of a settlement with the

8   asbestos claimants; and three, the need for re-solicitation

9   of the debtors' plan.

10          The motion also seeks to have the ballots of all

11   asbestos claimants designated, pursuant to Section 1126(e) of

12   the Code.

13          The debtors, the UCC, and the OCC oppose the

14   motion.  They argue that an examiner is neither necessary,

15   nor appropriate under the circumstances of this case, and

16   that designation of any votes is inappropriate.

17          For the reasons I'll explain, the motion is

18   denied.  On the appointment of an examiner, Section 1104(c)

19   of the Bankruptcy Code says that:

20          "The Court shall order the appointment of an

21   examiner to conduct such an investigation of the debtor as is

22   appropriate if:  one, such appointment is in the interests of

23   creditors, any equity security holders and other interests of

24   the estate; or two, the debtors' fixed, liquidated, unsecured

25   debts exceed $5 million."

1          That's 11 U.S.C. Section 1104(c).

2          While there is some debate among courts outside of

3     Delaware regarding whether Section 1104(c) mandates the

4     appointment of an examiner, in any case where the five-

5     million-dollar debt threshold is met, this Court has

6     repeatedly held that Section 1104(c)'s inclusion of the

7     phrase "as is appropriate" gives the Court discretion.  See

8     Spansion, 526 B.R. 114,128 (Bankr. D. Del. 2010); In Re

9     Visteon Corporation, 09-11786, (Bankr. D. Del. May 12, 2010),

10    hearing transcript at 170, lines 16 through 20; In re

11    Washington Mutual, Inc., 08-12229 (Bankr. D. Del. May 5,

12    2010), hearing transcript 97, 10 through 13.

13         I see no reason to depart from these rulings here.

14    As the moving party, the ad hoc group bears the burden to

15    demonstrate that an examiner is appropriate under the

16    circumstances of this case.  See In re Allied Nevada Gold,

17    15-10503 (Bankr. D. Del. September 11, 2015), hearing

18    transcript at 90 to 91.

19         It has not done so.  The ad hoc group's first

20    argument is that an examiner is needed to determine whether

21    the amendments made to the plan after solicitation were

22    significantly material in nature to require re-solicitation

23    of the plan.  The ad hoc group does not explain why the Court

24    cannot adequately address this issue, as it is a simple

25    question of law that the parties will be free to argue during

1  confirmation, and which I can resolve in connection with

2  confirmation.  As all the relevant facts on this issue are

3  already known, appointing an examiner to further investigate

4  this issue would be inappropriate.

5          The ad hoc group next used that an examiner is

6  needed to investigate the debtors and the UCC settlement with

7  the asbestos claims for $18 million, which they assert is

8  more than any other litigation creditor group and they argue

9  more than the asbestos claimants would receive if the general

10 unsecured trusts were allocated on a proportional basis.

11 They argue that since the settlement was announced, the

12 debtors and the UCC have been avoiding discovery into the

13 settlement and allocation of proceeds and that, quote:

14         "Only an independent examiner can force the

15 discovery that is needed to sort of through the morass of

16 potential conflicts of interest and issues surrounding the

17 UCC settlement."

18         I disagree.  The Court is given broad discretion

19 to handle discovery disputes and to fashion remedies for

20 violations of discovery rules and procedures.  To the extent

21 the ad hoc group believes the debtors or the UCC are not

22 complying with those rules, they are free to file a motion to

23 compel.

24         Further, the matter of whether a settlement with

25 the UCC or any allocation in connection with that settlement

1  is appropriate is a matter to be considered at confirmation.

2  The ad hoc group is free to raise it then in the form of a

3  confirmation objection.  Appointing an examiner to explore

4  this issue would, therefore, also be inappropriate.

5         Lastly, the ad hoc group argues that an examiner

6  is necessary to investigate the propriety of certain asbestos

7  claims and the ballots cast with respect to those claims.

8  This issue involves the conduct of counsel to one of the

9  members of the Unsecured Creditors Committee, attorney Thomas

10 Bevan, who is the subject of a recent opinion issued by

11 another member of this Court, Judge Silverstein, in the

12 Imerys bankruptcy case, Case Number 19-10289.

13        In that case, Judge Silverstein was presented with

14 a motion by Mr. Bevan's firm, Bevan & Associates, to change

15 its vote on the plan, pursuant to Bankruptcy Rule 3018.

16 Following a hearing on the motion, Judge Silverstein denied

17 Mr. Bevan's request to change his votes and held that the

18 master ballot he filed would, instead, be considered

19 withdrawn because, quote:

20        "The evidence raises significant questions as to

21 whether any of Bevan & Associates' clients have a claim

22 against any debtor."

23        She went on to state:

24        "What is crystal clear is that, one, Bevan &

25 Associates has a database of clients built up over the past

1   30 years; two, prior to voting, Bevan & Associates performed

2   zero diligence to discern which of its clients, if any, had

3   been exposed to talc, much less to debtors' talc; and, three,

4   Bevan & Associates submitted this master ballot, without

5   regard to whether any of its 15,713 clients had a talc

6   personal injury claim, as required to vote on the plan.  In

7   other words, Bevan & Associates simply printed out its list

8   of clients in an Excel spreadsheet format and slapped it

9   behind the master ballot."

10          Judge Silverstein then discussed the use of master

11  ballots, generally, which she observed has become commonplace

12  in mass-tort bankruptcies.  Expressly noting that she was not

13  commenting on whether master ballots should be commonplace,

14  she stated, quote:

15          "In order for master ballots to work, great trust

16  is placed in the Plaintiff's bar.  With respect to Bevan &

17  Associates, the evidence shows that such trust was not well-

18  placed.  It is true that direct talc personal injury claims

19  will be channeled to a trust for liquidation, but a lawyer

20  filing the master ballot still has the obligation to ensure

21  that he only votes on behalf of clients who have a claim

22  against the debtors."

23          That's In re Imerys Talc, Inc., 2021 Bankr. LEXIS

24  2852, *2728, (Bankr. D. Del. October 13, 2021).

25          The ad hoc group argues that discovery in this

1  case has revealed that Mr. Bevan undertook the same process

2  in submitting master ballots here as it did in Imerys.

3  Specifically, the ad hoc group cites to Mr. Bevan's

4  deposition, which he states that he submitted a master ballot

5  on behalf of his entire client group; the same, roughly,

6  15,000 claimants as in the Imerys case, without conducting

7  any inquiry into whether those clients, in fact, held claims

8  against the debtors.

9         The debtors argue that there is a significant

10  difference between the facts in Imerys and the facts in this

11  case, with the main one being that in Imerys, there was no

12  bar date for asbestos claims, and so there were no proofs of

13  claim filed.  Here, by contrast, every vote was connected

14  back to a timely filed proof of claim.

15         No objections to the asbestos proofs of claim were

16  filed prior to the voting deadline.  The debtors assert that

17  they did not have any obligation to inquire into the validity

18  of the claims, prior to the voting deadline.  They argue that

19  the claims are only being allowed at the present time for

20  voting purposes and that the validity of the claims and

21  whether claimants are entitled to payment are both still

22  undetermined.

23         I agree.  At this stage in the proceedings, the

24  only inquiry that was necessary for the debtors to conduct

25  was whether the votes cast were cast on behalf of people or

1  entities that held claims.  As Judge Silverstein acknowledged

2  in Imerys, when proofs of claim are filed and no objections

3  have been made, holders of those claims are entitled to vote,

4  Imerys, 2021 Lexis 2852, *29, Footnote 95, citing 11 U.S.C.

5  Section 1126(a).

6       The ad hoc group argues, however, that because

7  many of their claims were held to be invalid, as

8  unsubstantiated, that the same standard should apply to the

9  asbestos claims, which they assert are also unsubstantiated.

10  While it is true that the validity or invalidity, as the case

11  may be, of some claims has been determined in this case,

12  there's no requirement that the debtors determine the

13  validity of all claims by the time the voting takes place.

14       There remains time for the validity of all the

15  asbestos claims to be determined.  The ad hoc group has since

16  filed objections to the Bevan claims; however, that objection

17  was well past the voting deadline.

18       Appointing an examiner here would be inappropriate

19  and the request could fairly be denied for that reason alone;

20  however, it is also worth noting that appointing an examiner

21  to investigate these matters would be improper for the

22  additional reason that Section 1104(c) very clearly provides

23  for the appointment of an examiner to conduct an

24  investigation of the debtor.

25       While the ad hoc group goes to great lengths to

1  attempt to connect the complaint of conduct back to the

2  debtors, what it is really concerned with is the conduct of

3  counsel to a member of a creditors' committee member.

4  Accordingly, appointing an examiner under 1104(c) to

5  investigate those concerns would not be appropriate.

6            For all of these reasons, the motion to appoint an

7  examiner is denied.

8            I turn now to the motion request for an order

9  designating and striking all ballots submitted by asbestos

10 claimants, pursuant to Section 1126(e) of the Code.  Section

11 1126(e) provides that the Court may, quote:

12           "May designate any entity whose acceptance or

13 rejection of a plan was not in good faith or was not

14 solicited or procured in good faith or in accordance with the

15 provisions of this title."

16           As Judge Silverstein stated in _Imerys_, quote:

17           "Designating a vote is a drastic entity and the

18 burden on the movant is a heavy one."

19           That's 2021 Bankr. LEXIS 2852, *37.

20           She went on to explain that, quote:

21           "Over the years, courts have developed several

22 badges of bad faith," that might just justify

23 disqualification, including, quote:

24           "Creditor votes designed to, one, assume control

25 of the debtor; two, put the debtor out of business or

**EXHIBIT 3**

1

```
 1                    NITED STATES BANKRUPTCY COURT
                        DISTRICT OF DELAWARE
 2

 3   IN RE:                      .  Chapter 11
                                 .  Case No. 22-11068 (JTD)
 4   FTX TRADING LTD., et al.,   .
                                 .
 5                               .  Courtroom No. 5
                                 .  824 Market Street
 6              Debtors.         .  Wilmington, Delaware 19801
                                 .
 7                               .  Wednesday, January 11, 2023
     . . . . . . . . . . . . . . .  9:00 a.m.
 8
                        TRANSCRIPT OF HEARING
 9            BEFORE THE HONORABLE JOHN T. DORSEY
              CHIEF UNITED STATES BANKRUPTCY JUDGE
10
     APPEARANCES:
11
     For the Debtor:          Adam Landis, Esquire
12                            LANDIS RATH & COBB LLP
                              919 Market Street, Suite 1800
13                            Wilmington, Delaware 19801

14                            Andrew G. Dietderich, Esquire
                              James L. Bromley, Esquire
15                            Brian D. Glueckstein, Esquire
                              Alexa J. Kranzley, Esquire
16                            SULLIVAN & CROMWELL LLP
                              125 Broad Street
17                            New York, NY 10004

18

19   (APPEARANCES CONTINUED)

20   Audio Operator:          Jermaine Cooper

21   Transcription Company:   Reliable
                              The Nemours Building
22                            1007 N. Orange Street, Suite 110
                              Wilmington, Delaware 19801
23                            Telephone: (302)654-8080
                              Email:  gmatthews@reliable-co.com
24
     Proceedings recorded by electronic sound recording,
25   transcript produced by transcription service.
```

1 | <u>APPEARANCES (CONTINUED)</u>:

2 | For the U.S. Trustee:     Juliet Sarkessian, Esquire
  OFFICE OF THE UNITED STATES TRUSTEE
3 | 844 King Street, Suite 2207
  Lockbox 35
4 | Wilmington, Delaware 19801

5 | For the Movants:     David Finger, Esquire
  FINGER & SLANINA, LLC
6 | 1201 North Orange Street
  Wilmington, Delaware 19801

7 |

  For the Committee:     Kris Hansen, Esquire
8 | Erez Gilad, Esquire
  PAUL HASTINGS LLP
9 | MetLife Building
  200 Park Avenue
10 | New York, New York 10166

11 | For the Ad Hoc
   Committee of Non-US
12 | Customers:     Matthew Harvey, Esquire
   MORRIS, NICHOLS, ARSHT & TUNNELL LLP
13 | 1201 North Market Street
   Suite 1600
14 | Wilmington, Delaware 19801

15 | For Paradigm
   Operations:     Sidney Levinson, Esquire
16 | DEBEVOISE & PLIMPTON LLP
   919 3rd Avenue
17 | New York, New York 10022

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

1                                    <u>INDEX</u>

2   <u>MOTIONS</u>:                                                    <u>PAGE</u>

3   Agenda

4   Item 20: Motion of Debtors for Entry of Interim and          16
             Final Orders (I) Authorizing the Debtors to
5            Maintain a Consolidated List of Creditors in
             Lieu of Submitting a Separate Matrix for Each
6            Debtor, (II) Authorizing the Debtors to Redact
             Or Withhold Certain Confidential Information
7            Of Customers and Personal Information of
             Individuals And (III) Granting Certain Related
8            Relief [D.I. 45; Filed 11/19/22]

9            Court's Ruling:                                     102

10  Agenda
11  Item 22: Motion for Entry of Interim and Final Orders        109
             (A) Authorizing the Debtors, in Their Sole
12           Discretion, to Provide Indemnification and
             Exculpation to Certain Individuals, (B)
13           Authorizing Certain Actions Pursuant to Section
             363 of the Bankruptcy Code, and (C) Granting
14           Certain Related Relief
             [D.I. 94; Filed 11/22/22]
15
             Court's Ruling:                                     113
16

17  Agenda
    Item 21: Motion of Debtors for Entry of Interim and Final 113
18           Orders (I) Authorizing the Debtors to (A)
             Operate a Post-Petition Cash Management System,
19           (B) Maintain Existing Business Forms, and (C)
             Perform Intercompany Transactions, (II) Granting
20           A partial Waiver of the Deposit Guidelines Set
             Forth in Section 345(b), and (III) Granting
21           Related Relief
             [D.I. 47; Filed 11/19/22]
22
             Court's Ruling:                                     139
23

24

25

<u>INDEX</u>

<u>MOTIONS</u>:                                                        <u>PAGE</u>

Agenda
Item 24: Motion of Debtors for Entry of Orders (I)(A)        140
         Approving Bid Procedures, Stalking Horse
         Protections and the Form and Manner of Notices
         For the Sale of Certain Businesses; (B)
         Approving Assumption and Assignment Procedures
         And (C) Scheduling Auction(s) and Sale Hearings
         And (II)(A) Approving the Sale(s) Free and Clear
         Of Liens, Claims, Interests, and Encumbrances
         And (B) Authorizing Assumption and Assignment
         Of Executory Contracts and Unexpired Leases
         [D.I. 233; Filed 12/15/22]

         Court's Ruling:                                    162


<u>STATUS CONFERENCE</u>:                                         <u>PAGE</u>

Agenda
Item 30: Motion of the United States Trustee for Entry      163
         Of an Order Directing the Appointment of an
         Examiner [D.I. 176; Filed 12/1/22]




WITNESSES CALLED
<u>BY THE DEBTOR</u>:                                             <u>PAGE</u>

     <u>KEVIN COFSKY</u>
     Direct examination by Mr. Glueckstein                  21
     Cross-examination by Ms. Sarkessian                    33
     Cross-examination by Mr. Finger                        41
     Redirect examination by Mr. Glueckstein                51


<u>EXHIBITS</u>:                                                  <u>PAGE</u>

Declaration of Brian Glueckstein                            140

1      (Proceedings commence at 9:03 a.m.)

2      (Call to order of the Court)

3           THE COURT:  Good morning, everyone.  Thank you.

4  Please be seated.

5           So, before we begin, let me just remind everyone

6  about proper decorum, both in the courtroom and for those who

7  are appearing online through the Zoom call.  It's important

8  that we maintain proper courtroom decorum.

9           If you are on the Zoom call, please leave your

10  camera off and your line muted, unless you wish to be heard

11  regarding one of the matters that are before the Court today.

12  And disruptions won't be tolerated; anyone disrupting on the

13  Zoom call will be removed immediately and not allowed back

14  in.

15           Before we begin, I also want to address -- excuse

16  me -- a letter that I received from four U.S. Senators.  It's

17  an inappropriate *ex parte* communication, number one.  And

18  number two, I want to make perfectly clear that I will make

19  my decisions on the matters referred to in the letter based

20  only upon admissible evidence and the arguments of parties-

21  in-interest presented in open court.

22           I'm not going to docket -- I am going to docket the

23  letter; in fact, I did that this morning.  But it will have

24  no impact whatsoever in my decisions in this case, which will

25  only be based upon the facts and law presented by the

1 │ parties.

2 │         So, with that, we'll proceed.

3 │         MR. LANDIS:  Good morning, Your Honor, and may it

4 │ please the Court.  Adam Landis from Landis, Rath & Cobb,

5 │ counsel to FTX Trading Limited and its affiliated debtors.

6 │         We're here today, Your Honor, on second-day relief.

7 │ We filed an amended agenda.  It's 27 pages long, Your Honor,

8 │ with 30 items on it.  But thanks to the very hard work of

9 │ many people in this room and lots of people out of it, I'm

10 │ pleased to say that we have a limited number of matters that

11 │ Your Honor is going to have to hear and decide today.

12 │         But before we get into the agenda, I'd like to cede

13 │ the podium to Mr. Dietderich, who will give the Court and

14 │ parties-in-interest an update as to activities that have been

15 │ going on since we were last before you.

16 │         THE COURT:  All right.  Thank you.

17 │         MR. DIETDERICH:  Thank you, Mr. Landis.

18 │         Good morning, Your Honor.  May it please the Court,

19 │ I have a short case update for the record.

20 │         The debtors filed for Chapter 11 60 days ago and

21 │ the level of activity since has been extraordinary.  We've

22 │ identified over 9 million customer accounts with about 120

23 │ billion in associated transactions.  We are engaged in a

24 │ complex effort now to recreate petition date claim values for

25 │ every customer.

1          We are building financial statements from the

2  ground up using the general ledger and bank transaction

3  records, rather than the previous incomplete and unreliable

4  financial statements of the debtors.  This will put us in the

5  position to describe the financial results of the debtors

6  accurately for the first time.

7          We have located over $5 billion of cash, liquid

8  cryptocurrency, and liquid investment securities, measured at

9  petition date value.  This does not describe any value to

10  holdings of dozens of illiquid cryptocurrency tokens, where

11  our holdings are so large relative to the total supply that

12  our positions cannot be sold without substantially affecting

13  the market for the token.

14          The 5 billion in liquid assets also does not

15  include approximately 425 million of crypto at petition date

16  values in the custody of the Securities Commission of the

17  Bahamas.  That position was valued at about 170 million at

18  the end of 2020.  It contains a large amount of FTT and is

19  highly volatile.

20          We have started a strategic review process for our

21  assets.  We have established data rooms and solicited

22  interest for the four operating subsidiaries subjecting to

23  the bidding procedures motion today.

24          We also are well underway on plans to monetize over

25  300 other nonstrategic investments with a book value of over

1  $4.6 billion.

2        We have established, Your Honor, cooperative

3  relationships with the joint provisional liquidators in our

4  only subsidiaries that are subject to separate proceedings,

5  Australia and the Bahamas.

6        Our recently announced cooperation agreement with

7  the JPL in the Bahamas is an important first step to align

8  incentives and maximize joint recoveries.  The principle of

9  that agreement is simple:  It does not matter who collects a

10  dollar for customers, as long as the customers get it.

11        We've established a task force with the Official

12  Committee of Creditors and the Bahamas JPL to explore

13  alternatives for the sale or reorganization of the

14  international platform.

15        We have cooperated and spent countless hours

16  providing information to law enforcement.

17        These 60 days have already seen Mr. Bankman-Fried

18  indicted, arrested, extradited, released on bail, and plead

19  not guilty, with a trial date set.

20        We have seen Ms. Ellison and Mr. Wang plead guilty,

21  make public plea statements, and cooperate with law

22  enforcement.

23        And we have learned about what happened.  We know

24  how Sam Bankman-Fried instructed Gary Wang to create the

25  Alameda backdoor, a secret way for Alameda to borrow from

1  customers on the exchange without permission.  Mr. Wang

2  created this backdoor by inserting a single number into

3  millions of lines of code for the exchange, creating a line

4  of credit from customers to Alameda, to which customers did

5  not consent.  And we know the size of that line of credit, it

6  was $65 billion.

7         We know what Alameda did with the money.  It bought

8  planes, houses, threw parties, made political donations.  It

9  made personal loans to its founders.  It sponsored the FTX

10  Arena in Miami, a Formula One team, the League of Legends,

11  Cochella, and many other businesses, events, and

12  personalities.

13         It gambled on cryptocurrency investments, often

14  unsuccessfully.  And it made debt and equity investments in

15  diverse businesses, many at prices that greatly exceeded

16  market value at the time of the investment.

17         We know that all this has left a shortfall in value

18  to repay customers and creditors.  The amount of the

19  shortfall is not yet clear.  It will depend on the size of

20  the claims pool and our recovery efforts.  But every week, we

21  come closer to completing the work necessary to estimate

22  recoveries for the purposes of a plan of reorganization.

23         We also have begun to engage on the central legal

24  issues in the case.  These include the nature of customer

25  entitlements, are they property or claims, and how to close

1   out derivatives to calculate petition date claim amounts.

2          Finally, we have established great working

3   relationships with the U.S. Trustee, our new Official

4   Committee of Creditors -- welcome -- and regulatory

5   stakeholders around the world.  Many people and many

6   institutions have worked hard to get us here today.  Chapter

7   11 is a fish bowl and we welcome that, in this case more than

8   most.

9          And as a result of the effort by so many, we stand

10  before you with only limited open issue on our second-day

11  relief.  This is despite the volume and the unique nature of

12  many of the issues everyone has faced together.

13          Unless you have questions for me, Your Honor, I

14  propose we move directly to the agenda.  As Mr. Landis

15  mentioned, it is an extremely long agenda, but it is mostly

16  matters that have either been adjourned or reflected in

17  orders that have been either entered or in agreed form.

18          For our point today, Your Honor -- maybe -- I'll

19  cede -- also, Mr. Hansen is raising his hand.  I'll cede the

20  podium to him, if he would like to make some preliminary

21  remarks.

22          THE COURT:  Okay.  Thank you.

23          Mr. Hansen.

24          MR. HANSEN:  Good morning, Your Honor.  Kris Hansen

25  with Paul Hastings, proposed counsel to the official

1  committee.  Just quick introductions.  My partners Erez Gilad

2  and Gabe Sasson are here with me today, as are Mr. Lunn and

3  Mr. Poppiti, with our proposed co-counsel at Young Conaway.

4          The committee has also selected FTI Consulting as

5  it's financial advisor and Jefferies as its investment

6  banker.

7          Your Honor, the committee worked very hard behind

8  the scenes with the debtors and the United States Trustee to

9  try to make this hearing as consensual as it could be, and we

10  appreciate the willingness of both parties to approach the

11  motions on for today in a constructive manner.

12          With this being the committee's first formal

13  appearance before the Court since its formation, I wanted to

14  just take a moment to share a little bit of information about

15  the committee and provide the Court with the committee's

16  perspective on the cases at this time, if that would be okay.

17          THE COURT:  That's fine.  Thank you.

18          MR. HANSEN:  Thank you, Your Honor.

19          Your Honor, first, the committee is comprised of

20  nine members, including three individuals and six entities

21  from eight different jurisdictions, spanning from Singapore

22  to California.  The committee members have broad exposure

23  across the FTX exchange platforms and, sadly, share the

24  moniker of "victim" with the millions of other customers who

25  were defrauded by FTX.

1          The committee members understand the seriousness of

2    their task to serve as fiduciaries for all creditors in these

3    cases.  And to that end, they will check the debtors at every

4    step of these cases and take independent actions and generate

5    their own initiatives to recover assets and maximize the

6    distribution to creditors as rapidly as they can.

7          To date, the committee members have been active,

8    engaged, and hard at work with the committee professionals in

9    helping to resolve near-term issues, inserting itself in the

10   investigation and asset tracing efforts that are underway by

11   the debtors, and pushing the analysis of larger issues, such

12   as whether the exchanges can be restarted and a restructuring

13   path can be pursued as a complement to the asset recovery,

14   monetization, and distribution efforts.  And it's important

15   to note that it's not too soon to start that exercise.

16         The committee also believes strongly in the

17   principles noted at the outset of our reservation of rights

18   on the debtors' motion to approve the bidding procedures.

19   These cases need to be transparent, credibility needs to be

20   restored, and creditors need to know that they can trust the

21   Chapter 11 process.

22         As part of this effort, the committee is preparing

23   a multifaceted approach for communicating with the global

24   creditor community in these cases, which will include

25   dissemination of information, not only through the standard

1  committee website, but through various forms of social media.

2  The committee is aware of the disappointment of customers and

3  creditors with the information-sharing efforts in some of the

4  large, crypto-related cases, and we're trying to learn from

5  that to do better here.

6          The magnitude and complexity of the global fraud

7  and the lack of the corporate controls and recordkeeping

8  present significant challenges to the realization of the

9  committee's objectives, but the committee will work

10 tirelessly to make its goals a reality.

11         We appreciate the few minutes, Your Honor, and the

12 committee looks forward to working through these cases with

13 you, the United States Trustee, the Department of Justice,

14 the Bahamian liquidators, and the other parties-in-interest.

15 And you'll hear more from us as we go through each motion

16 today.

17         Do you have any questions for me, Your Honor?

18         THE COURT:  No, no questions.  Thank you very much.

19 Appreciate the --

20         MR. HANSEN:  Thank you.

21         THE COURT:  -- introductions and the update.

22         I may institute something that I did during the

23 Mallinckrodt bankruptcy, when I have dozen-page agendas with

24 a lot of items that are moved off.  I know the local rule

25 says you have to list everything in them.  What I did in

1  Mallinckrodt was say, if an item has been adjourned or has

2  been resolved -- well, if it's been adjourned, specifically,

3  you don't have to list everything out in that.  Just put in

4  the motion and that it's been adjourned to a different date.

5          MR. LANDIS:  Thank you, Your Honor.  For the

6  record, Adam Landis.  I see that you're directing that at me,

7  and we will --

8          THE COURT:  Yes.

9          MR. LANDIS:  -- absolutely take our cues from what

10 we were involved with in Mallinckrodt.

11         And I also would be remiss if I didn't extend some

12 appreciation to chambers for the patience with which everyone

13 has dealt with us as we've tried to get matters --

14         THE COURT:  Sure.

15         MR. LANDIS:  -- on the agenda.  So thank you for

16 that and we will take that advice.

17         THE COURT:  All right.  Thank you.  Okay.

18         MS. KRANZLEY:  Thank you, Your Honor.  Good

19 morning.  For the record, Alexa Kranzley from Sullivan &

20 Cromwell, proposed counsel for the debtors.

21         Your Honor, if acceptable to you, I will cover the

22 matters that are listed on the agenda that have been

23 resolved, so I'll go slightly out of order.

24         THE COURT:  Okay.

25         MS. KRANZLEY:  I'll start with Item Number 19 on

1  the agenda.

2  　　　　　THE COURT:  Well, let me interrupt you first, Ms.

3  Kranzley.  I did see the three additional COCs this morning,

4  and I did enter those right before I came on the bench --

5  　　　　　MS. KRANZLEY:  Oh --

6  　　　　　THE COURT:  -- so those are entered, as well.

7  　　　　　MS. KRANZLEY:  Great.  So then I think I only have

8  one agenda item to address with you, which is Item Number 25

9  and 26, which is actually the motion of North American League

10  of Legends to compel rejection or, in the alternative, relief

11  from the automatic stay to terminate the sponsorship

12  agreement.

13  　　　　　Your Honor, while this is a third-party motion, the

14  debtors had filed a motion to reject contracts on December

15  30th at Docket Number 333, which includes the sponsorship

16  agreement that's the subject of this.  We have been working

17  with the counterparties.  We have an agreed-to stipulation.

18  And I understand from counsel that there will -- they will be

19  filing a certification of counsel with the stipulation later

20  today.

21  　　　　　THE COURT:  Okay.  I remember that from the last

22  hearing.

23  　　　　　MS. KRANZLEY:  Yes.

24  　　　　　THE COURT:  Yeah.

25  　　　　　MS. KRANZLEY:  So I think, with that, I'll hand the

1  podium to Mr. Glueckstein.

2            THE COURT:  Okay.  Thank you.

3            MR. GLUECKSTEIN:  Good morning, Your Honor.

4            THE COURT:  Good morning.

5            MR. GLUECKSTEIN:  Brian Glueckstein, Sullivan &

6  Cromwell, on behalf of the debtors.

7            Your Honor, the first contested matter on the

8  agenda today is listed at Agenda Item Number 20, which is the

9  debtors' motion for final relief, asking the Court to

10  authorize consolidated creditor matrix and to redact certain

11  customer and creditor information.

12            Your Honor, we filed a declaration at Docket Number

13  411, the declaration of Kevin Cofsky, in support of the

14  relief requested today.  Mr. Cofsky is here in the courtroom

15  and available.  We would like to admit Mr. Cofsky's

16  declaration into evidence in support of this motion at this

17  time.

18            THE COURT:  Okay.  Is there any objection?

19            MR. FINGER:  Yes, Your Honor.

20            THE COURT:  Step forward.

21            MR. FINGER:  Good morning, Your Honor.

22            THE COURT:  Good morning.

23            MR. FINGER:  David Finger for the media objectors.

24            Actually, I was going to file -- I was going to ask

25  -- request -- make a motion to strike Mr. Cofsky's

1  declaration.  I'm not sure if he's testifying as a fact

2  witness, which I don't think he is, but to the extent he is,

3  there's no indication that he has firsthand knowledge of the

4  matters about which he's testifying.  And if he's testifying

5  as an expert, he has not established his expertise.  There is

6  nothing indicating that he has any experience in the

7  cryptocurrency market.

8         He testifies at a couple of paragraphs, Paragraph 7

9  and 8, of his "understanding," in quotes, but does not

10  identify the source of his understanding, so that the Court

11  can determine the credibility of those understandings.

12         He also testifies repeatedly as to his "belief,"

13  again in quotes, as to certain conclusions.  That's in

14  Paragraphs 8, 9, 11, and 13.  He does not offer any objective

15  support for his subjective belief.

16         Now the U.S. Supreme Court in --

17         THE COURT:  Hold on one second, Mr. Finger.  I

18  don't know if we're -- can we -- he -- it's kind of -- I

19  don't know if the people in the back of the courtroom can

20  hear.  I think those microphones needs to be turned up maybe

21  a little bit.

22         MR. FINGER:  I can try to talk louder.

23         THE COURT:  Or you can lift them.  And talking

24  louder would be helpful, too, yes.

25         MR. FINGER:  All right.  The Supreme Court in

1  Daubert said, to satisfy the requirement of specialized

2  knowledge to qualify as an expert, there must be more than a

3  subjective belief or unsupported speculation.

4  As Mr. Cofsky did not provide support for his

5  beliefs and understandings, he does not meet the requirements

6  for an expert and his declaration should, therefore, be

7  stricken.

8  THE COURT:  All right.  Mr. Glueckstein?

9  MS. SARKESSIAN:  Your Honor, I have a similar

10  objection.

11  THE COURT:  Oh, go ahead --

12  MS. SARKESSIAN:  Could I --

13  THE COURT:  -- Ms. Sarkessian.

14  MS. SARKESSIAN:  Thank you, Your Honor.  If it

15  pleases the Court, Juliet Sarkessian on behalf of the U.S.

16  Trustee.

17  I thought it might make sense for me to --

18  THE COURT:  Yes.

19  MS. SARKESSIAN:  -- give my objection now, so that

20  debtors' counsel can address everything at the same time.

21  So, in -- I -- first of all, the U.S. Trustee does

22  agree that some of the testimony in Mr. Cofsky's declaration

23  appears to be of the nature of an expert witness and his

24  expertise in this area has not been established.

25  And in particular, in paragraph -- well, I have

1  questions to ask Mr. Cofsky about the statements in Paragraph

2  7 of his declaration, depending -- as to whether that's based

3  on personal knowledge.  So, depending on his answers, I may

4  object to that.

5          But with respect to Paragraph 11, he has statements

6  like "it is common knowledge."

7          And then later in the paragraph:

8          "-- potential buyers of the debtors' assets will

9  likely ascribe material value to the debtors' customer lists"

10         That's speculation.

11         And then I also object, in Paragraph 12, at the

12 end, he cites a valuation expert that is somebody other than

13 himself and quotes out of, I guess it's a book.  So we object

14 to that as hearsay.

15         And again, I do have some questions with respect to

16 some of the information in Paragraph 7, to determine if

17 that's based on his personal knowledge, and then I also have

18 cross-examination for the witness, as well.

19         THE COURT:  All right.

20         MS. SARKESSIAN:  Thank you, Your Honor.

21         THE COURT:  Any other objections?

22     (No verbal response)

23         THE COURT:  All right.  Mr. Glueckstein.  I'll tell

24 you up front, Mr. Glueckstein.  If I have an objection to the

25 admissibility of a declaration, I usually just allow -- or

1  require that the witness just testify live, and maybe we can

2  resolve some of these issues by testimony.  But go ahead, if

3  you have anything else.

4         MR. GLUECKSTEIN:  That's fine, Your Honor.  Mr.

5  Cofsky is the debtors' proposed investment banker.  He's

6  offering his opinions in the declaration with respect to

7  matters that are raised by the motion today.  We think it is

8  admissible.

9         But if it's Your Honor's preference, I'm happy to

10  call Mr. Cofsky and walk through the issues in his

11  declaration live.

12        THE COURT:  All right.  Let's do that.  Let's call

13  Mr. Cofsky to the stand and we'll do it live and deal with

14  any objections as they come.

15     (Participants confer)

16        THE COURT:  Mr. Cofsky, please take the stand and

17  remain standing for the oath.

18        THE COURT OFFICER:  Please raise your right hand.

19  Please state your full name and spell your last name for the

20  Court.

21        THE WITNESS:  Kevin Michael Cofsky, C-o-f-s-k-y.

22  KEVIN COFSKY, WITNESS FOR THE DEBTORS, AFFIRMED

23        THE COURT OFFICER:  You may be seated.

24        MR. GLUECKSTEIN:  Your Honor, may I approach the

25  witness and give him a copy of his declaration?

1          THE COURT:  Yes.  Could you hand me --

2          MR. GLUECKSTEIN:  Yes.

3          THE COURT:  I can't seem to find it.  I usually

4  have these things --

5          MR. GLUECKSTEIN:  I --

6          THE COURT:  -- electronically, but I can't --

7          MR. GLUECKSTEIN:  I have --

8          THE COURT:  -- find it.

9          MR. GLUECKSTEIN:  -- a copy for you, as well, Your

10  Honor.

11          THE COURT:  Okay.  Thank you.  Thank you.

12                     DIRECT EXAMINATION

13  BY MR. GLUECKSTEIN:

14  Q    Good morning, Mr. Cofsky.

15  A    Good morning.

16  Q    Mr. Cofsky, can you provide a little bit of background

17  about your experience to the Court this morning?

18  A    Yes.  Would you like me to go through education or --

19  Q    Just a little --

20  A    -- professional --

21  Q    -- bit about --

22  A    -- experience?

23  Q    -- your work experience and qualifications in the --

24  yeah, in the area and scope in which you are performing

25  services for the debtors.

1          THE COURT:  Mr. Cofsky, can you please move the

2    microphone closer to you, so we can --

3          THE WITNESS:  Yes, sir.

4          THE COURT:  -- make sure we hear you?  Thank you.

5          THE WITNESS:  I studied finance at the Wharton

6    School of Business as an undergraduate.  I was a financial

7    analyst at Houlihan Lokey for two years, from 1992 to 1994.

8          After law school and practicing law for a period of

9    time, I returned to investment banking in 2001.  I was with a

10   firm called the Beacon Group, as well as Evercore Partners,

11   where I was a managing director in the restructuring group.

12         I joined a small firm that merged into Perella

13   Weinberg Partners upon its founding in 2006, and I have been

14   with the firm since that time.  I've been a partner with the

15   firm since 2015.

16   BY MR. GLUECKSTEIN:

17   Q    And can you describe for the Court just generally the

18   scope of work which yourself and your colleagues at Perella

19   are proposed to assist the debtors with in these cases?

20   A    Yes.  We are the proposed investment banker for the

21   debtors.  We've been working with the other professionals and

22   with the management team and the board on a wide range of

23   issues, including understanding the assets of the debtors,

24   evaluating potential for reorganization of some of the

25   businesses, as well as potential sales of the businesses.

1  And in general, our mandate is to explore different potential

2  avenues to maximize the value of the debtors' assets through

3  this process.

4  Q    In your experience, Mr. Cofsky, have -- prior to this

5  case, have you been involved in situations where the

6  monetization of businesses includes the monetization of

7  things such as customer assets or customer lists?

8  A    Yes, I have been.

9  Q    Can you elaborate on that at all, in terms of the types

10 of work you've done in that area?

11 A    Yes.  Most recently, we've been involved in the Celsius

12 bankruptcy case, pursuant to which the customer -- the value

13 and the potential value of the customers has been at issue.

14 But we've also seen -- while we are not running the sale

15 process, we have been evaluating that.  And we appreciate the

16 extent to which potential acquirers of that business have

17 evaluated the value of the customers and their various

18 positions on that platform.

19 Q    Are there other examples that you can recall where the

20 question of customer assets or customer lists have been at

21 issue in transactions that you or your team have been

22 involved in, in the past?

23 A    Yes.  The -- the identity and value of customers are

24 often considered to be quite valuable in the context of

25 retail businesses, consumer-facing businesses --

1           MS. SARKESSIAN:  Your Honor, I'm going to object.

2           THE COURT:  Basis?

3           MS. SARKESSIAN:  I think he's testifying about what

4  potential buyers look for, and he does not have personal

5  knowledge about that.

6           THE COURT:  Well, he's an investment banker.  He

7  buys and sells companies, right?

8           MS. SARKESSIAN:  I think, Your Honor, if he could

9  be more specific about the basis of that knowledge and

10 exactly who he's talking about.

11          THE COURT:  Well, is that a foundation for his

12 knowledge, Mr. Glueckstein?

13 BY MR. GLUECKSTEIN:

14 Q   Mr. Cofsky, can you back up a half-step and explain to

15 the Court your role in your transactions that you can recall

16 that have involved customer assets in the past?

17 A   Yes.  I want to try to be specific because this is a

18 unique situation.  And I would refer most specifically to, in

19 my declaration, I think, the other exchanges the other crypto

20 companies and the extent to which they clearly have indicated

21 that they value the identity of customers.  And they have --

22 all of the other crypto companies that we have evaluated have

23 programs in place to compensate for the provision of that

24 information.

25     We have also been a party to situations, as I indicated,

1  most recently in the Celsius case, where we have seen that

2  bids have explicitly provided incremental value for each

3  customer that is acquired.

4  Q    Have you, Mr. Cofsky, considered as part of your work as

5  proposed investment banker in this case the debtors' customer

6  list that they have available to them here?

7  A    I'm sorry.  Can you repeat that question, please?

8  Q    In the context of -- in the context of the work that

9  you've done -- that you're doing as the debtors' proposed

10  investment banker in this case, have you considered the

11  debtors' customer list as part of the strategic review that

12  you've undertaken?

13  A    Yes, we have.

14  Q    With respect to the ongoing strategic review, have you,

15  as the debtors' investment banker, formed a view as to

16  whether there is value in the debtors' customer list?

17  A    Yes, we have, and we do believe that there's value in

18  those assets.

19  Q    And can you explain for the Court the basis for that

20  conclusion?

21  A    Yes.  We believe that, whether the exchanges are

22  reorganized or whether they are sold in connection with our

23  process, both the exchanges that we're currently marketing,

24  as well as the core business that we're currently evaluating,

25  we believe that the value of the business is maintained and

1 maximized by ensuring that competitors are not able to

2 solicit those customers and onboard them onto their platforms

3 in a manner which would result in a reduction in the value of

4 the estate.

5      So, for example, if other businesses that compete with

6 FTX had the identity and were able to locate these customers,

7 solicit them, put them on their platform while FTX is in

8 bankruptcy and not currently operating in the ordinary

9 course, that would reduce the value of the estate.

10      Whether the estate, ultimately, is able to reorganize

11 its core business or whether third parties are evaluating the

12 acquisition of those exchanges, they will place, in our view,

13 a greater value on those exchanges if all of the customers

14 are maintained on that platform and have not found another

15 exchange on which to transact.

16 Q    Mr. Cofsky, with respect to -- we've been talking about

17 the customer information, do you view it important to

18 maintain, during your strategic review process, the anonymity

19 of both names, in addition to contact information, or are

20 contact information alone sufficient?

21 A    We -- it's a very good question and we -- we looked into

22 that.  We -- we reviewed the customer lists.  There are a

23 number of -- excuse me -- customers whose names are unique.

24 And we were able to, very quickly, locate them through

25 searches on social media, as well as other professional

1  relationship databases.  And we came to the conclusion that

2  it would be quite easy to locate, identify, and contact those

3  customers, even starting with only the customer names.  And

4  that relates to individuals, as well as businesses.

5  Q    Mr. Cofsky, if you could look at the declaration that

6  you submitted in this case that's in front of you.

7  A    Yes, I have it.

8  Q    And it's filed at Docket Number 411, entitled:

9         "Declaration of Kevin M. Cofsky in Support of the

10 Debtors' Motion for Entry of an Order Authorizing the Debtors

11 to Redact or Withhold Certain Customer Information."

12      Mr. Cofsky, were you involved in preparing the

13 declaration that was submitted to the Court at Docket Number

14 411?

15 A    I was.

16 Q    And do you believe, to the best of your knowledge, that

17 the information presented in that -- in your declaration

18 reflects your views, again, to the best of your knowledge?

19 A    Yes, I do.

20 Q    Okay.  If you can go to Paragraph 12 of your

21 declaration.  You state in the first sentence there:

22        "Additionally, it is well established that customer

23 information such as names and contact information are

24 separately valued intangible assets of an entity."

25      Do you see that?

1  A    I do.

2  Q    Can you explain to the Court the basis for the

3  statements that you made there in Paragraph 12 and beyond

4  that sentence in Paragraph 12?

5  A    Yes.  I'd answer that in a number of ways:

6       First, as indicated further in this particular

7  paragraph, in the context of a "business combination," as

8  that's designed by Accounting Standard Codification 805,

9  intangible assets are valued and allocated in a certain

10  manner, and customer-related assets, customer lists are a

11  component of that.  We thought that that was significant.

12       I also indicated in the paragraph, having reviewed some

13  academic literature, the -- in particular, the book by

14  Jeffrey Cohen, Intangible Assets:  Valuation and Economic

15  Benefit, again, the value ascribed to customer lists,

16  particularly the economic value that is indicated

17  particularly by instances where companies choose to keep that

18  information secret, to the extent that they can.

19       In addition, as I had indicated in the prior paragraphs,

20  it was very relevant, in our view, significant as we

21  evaluated this particular situation and the landscape -- the

22  competitive landscape within which this company operates,

23  that all of its competitors value this information.  This is

24  a new and expanding field.  And it's not entirely clear to

25  businesses that are seeking to expand their asset base and

1 their customer list exactly who they should be targeting.

2      And so all of the competitors that we looked at

3 indicated that they provide economic -- that they ascribe

4 economic value to these customers.  And the indication, the

5 evidence of that was -- I won't read through the words on the

6 page, but Binance and Coinbase and Kraken and Kucoin all

7 provide financial incentives for the referral of customers

8 and the retention of customers.

9      We also reviewed the bids that had been submitted in the

10 Voyager case and in the Celsius case and took note of the

11 fact that, not only were customer assets and lists being

12 acquired in -- and a value ascribed to the business itself,

13 but that there were actually incremental elements of value

14 which would be allocated to each customer that went onto the

15 acquirers platform.  And in the initial case of the prior bid

16 from FTX to Voyager, to the extent that customers maintained

17 their accounts on the platform for a period of time, they

18 would -- they would receive incremental value.  And so there

19 was specific value acscribed to each customer -- the name,

20 the identity, the assets -- as they moved onto the platform

21 of the buyer.

22 Q    Thank you.

23      With respect, Mr. Cofsky, if you look at Paragraph 13 of

24 your declaration, the last paragraph there.

25 A    Yes.

1  Q    You wrote in the declaration in the last sentence:

2        "I believe an important component of that strategy

3  is maintaining the confidentiality of customers' identities

4  and personal identifying information."

5        And then you end by saying:

6        "Disclosing those customer lists would therefore

7  jeopardize the debtors' ability to maximize value."

8        Do you see that there?

9  A    I do.

10  Q    Do you stand by that testimony this morning?

11  A    I do.

12  Q    And can you elaborate for the Court your view as to why

13  disclosing the customer lists would jeopardize the abilitiy

14  to maximize value?

15  A    Yes.  As I indicated, whether we reorganize, are able to

16  reorganize the businesses, or whether there will be an

17  acquisition of the core business and the other exchanges, we

18  believe that the business itself is comprised of a number of

19  components, and a significant component of the business is

20  the customers themselves.

21        The customer assets are obviously important.  But what

22  the customers choose to do going forward will be a

23  significant driver of value.  And we think that third parties

24  will place significant value on that in a sale process.  So,

25  to the extent that those customer lists, the identity of the

1  customers are able to be maintained without broad disclosure,

2  that will give buyers confidence that what they are buying is

3  actually of value, and that they alone will be able to

4  maximize the value of putting those customers onto their

5  platform.

6      I think the same logic holds for a reorganized entity.

7  To the extent that the exchange is able to be rehabilitated

8  and reorganized, it will, in our view, have more value if

9  those customers have not been poached and are -- by

10  competitors, and are, therefore, not transacting on another

11  exchange.

12  Q   Mr. Cofsky, Paragraph 6 of your declaration you

13  submitted to the Court, if you'd turn there.  It says -- you

14  write in the first sentence:

15          "The debtors, with the assistance of PWP, have

16  commenced an extensive outreach effort as part of marketing

17  the debtors; businesses and assets for potential sale."

18      Do you see that?

19  A   Yes, I do.

20  Q   And that sentence is accurate --

21  A   Yes.

22  Q   -- correct?

23  A   Yes, that's correct.

24  Q   Do you have any sense, at this time, how long the

25  process of outreach and monetization of assets and

1  reorganization is likely to take?

2  A    We have filed the bidding procedures for the four

3  exchanges, as you know, and have a time frame enumerated in

4  the bidding procedures.  We've had significant interest in

5  those assets to date.  We would expect that we will be in a

6  position to evaluate those potential -- if the Court approves

7  the bidding procedures and if we move forward with that

8  process, we would be in a position to evaluate those bids

9  relative to a standalone reorganization of those exchanges in

10  a matter of months.  I don't want to be too specific because

11  we're at the earlier stages of that process and there's a lot

12  of work that needs to be done.

13        Similarly, the core exchange, as the UCC counsel

14  indicated earlier, it's not too soon, and we have already

15  initiated a review of a reorganization of the core exchange

16  and that process is ongoing.  We, as you know, have not

17  launched a sale process with respect to the core exchange,

18  but we expect to run a simultaneous reorganization, as well

19  as sale process for that exchange.

20        I -- it's difficult to say with too much

21  specificity at this point, given the -- given the work that

22  will need to be done and the collaboration with the UCC on --

23  on the broader exchange process, the sale as well as the

24  reorganization efforts.  But I would expect that we'll be

25  talking a matter of months before that type of a sale and

1  evaluation of a reorganization will be initiated robustly.

2  Q    Thank you, Mr. Cofsky.

3        MR. GLUECKSTEIN:  No further direct, Your Honor.

4        THE COURT:  Okay.  Thank you.

5        Cross.

6        MS. SARKESSIAN:  Thank you, Your Honor.  For the

7  record, Juliet Sarkessian on behalf of the U.S. Trustee.

8        Your Honor, I just have a question, a

9  clarification.  Debtors' counsel asked the witness, you know,

10  did you participate the declaration, is it true and correct

11  to the best of your knowledge, information, and belief.  I

12  just want to be clear that the affidavit itself is not coming

13  into evidence and it is only the witness' testimony that is

14  coming into evidence.

15        THE COURT:  That's correct.

16        MS. SARKESSIAN:  Thank you.

17                    CROSS-EXAMINATION

18  BY MS. SARKESSIAN:

19  Q    Mr. Cofsky, you spoke about doing a search using just

20  the names of a number of the debtors' customers to see if you

21  could find other contact information based on their names,

22  correct?

23  A    Yes.

24  Q    And by "contact information," I assume, you know, an

25  email address, a street address, something -- telephone

1  number, something of that nature?

2  A    Yes, as well as information on social media platforms

3  and ability to identify the individual -- we believe identify

4  the individuals and their interest in crypto.

5  Q    And identify them in a way that you could communicate

6  with them?

7  A    Yes.

8  Q    How many names did you do that search for?

9  A    I directed my team to evaluate that.  I believe, of the

10  9 million customers, it was not close to 9 million, more than

11  a dozen, dozens, I believe; enough that, once we had a

12  sufficiently high probability of hit rate, we believed that

13  was indicative of our ability to identify these customers.

14  Q    So let me try to pinpoint this down.  Are you saying a

15  dozen, a few dozen?  What's the correct number?

16  A    I -- I don't have a specific number.  I believe it was

17  in the high teens.

18  Q    In the high teens.

19  A    Yes.

20  Q    Okay.  So less than 20 people.

21  A    I believe that we chose to search for under 20, and our

22  hit rate on those names was very high.  In other words, we

23  were able to, based on the names, locate information and be

24  able to correspond with -- we didn't correspond with, but we

25  believe we would be able to correspond with customers over 50

1  percent of the names that we searched on.

2  Q    Okay.  So you searched less than 20; and, out of those

3  20 names, about 50 percent you would have been able to -- you

4  were able to get some type of con -- some type of contact

5  information or some way to contact those individuals.

6  A    It was over 50 percent.  I don't know the specific

7  probability.  But yes, I think that generally characterizes

8  my comments.

9  Q    Okay.  And you did not run any of these searches

10  yourself.

11  A    I actually did run one or two.  But -- but in general, I

12  asked my team to do that, yes.

13  Q    And the names you picked, did you say that they were

14  unusual names, as compared to a Sue Brown or something like

15  that?

16  A    Yeah.  It's a good question because, to the extent that

17  there are generic names -- John Smith, Mary Jones -- yes, we

18  agreed that would be difficult to identify the specific

19  person.  We looked at names that were not of that type.

20      And in general, I was also very interested, I reviewed

21  the customer list myself to -- to assure myself that this was

22  an accurate assessment and to evaluate, to your point,

23  whether I thought that these names, in and of themselves,

24  were meaningful.  And there were -- again, I didn't do a

25  search of the 9 million customer names to give -- and I can't

1  give you a specific probability or percentage.  But a

2  significant -- the vast majority of the names were not of

3  that type, were not of the John Smith/Mary Jones type.

4  Q    Meaning the vast majority of the names that you searched

5  or the vast majority of the 9 million names are not --

6  A    I can't say the 9 million names.  I -- I looked through

7  the database and scrolled through the first several hundred

8  largest, so I went through in customer size order.  And the

9  vast majority of the names I saw were of a unique type that I

10  believed were not of the John Smith/Mary Jones type, where it

11  would not necessarily be useful to do a search for those.

12  Q    Were a good number of those names not, I guess I would

13  say common, say American names?  Were they names that might

14  be names of people living in other countries or names with --

15  you know, not a Sue Brown, that -- Sue Brown is a very

16  American name.  You know, we have customers, right?  All over

17  the world, right?

18  A    Yes.

19  Q    And so a name that might sound a little unusual in the

20  United States might not be that unusual in India or China.

21  Isn't that true?

22  A    I -- I think I understand your question.  In my

23  experience, there's a wide variety of names in the United

24  States.  We didn't place a lot of value in whether the name

25  sounded western or sounded Asian, for example.  We did a --

1  we tried to have a -- just an unbiased perspective as we did

2  the search.

3  Q    Are you personally familiar or knowledgeable about how

4  common a particular name might be in China or India?

5  A    I -- I -- I'm not sure how to answer that question.

6  What I can tell you is that, when we did the searches, to the

7  extent that there was a -- if there had been a large result

8  set from a particular search, such that we didn't believe

9  that we would actually be able to locate and contact and

10  correspond with a customer, then that would have put that

11  name, regardless of the reason, in the category of names that

12  we did not believe we could actually contact through a

13  search, again, regardless of whether it was a common name or

14  for any other reason; they didn't have a social media

15  presence, they protected their identification.  I -- I didn't

16  speculate.

17  Q    Thank you.

18       Now, with respect to non-individuals, institutional

19  customers -- and I understand that it would probably be

20  pretty easy to locate contact information for an

21  institutional customer, right?  You agree with that, right?

22  A    Depending on the institution, it may be easier, yes.

23  Institutions generally have more of a footprint.

24  Q    Although, there are -- I guess there are some

25  institutional customers that might not be that easy to find

1  contact information for.  You're saying smaller institutional

2  customers -- I -- institute -- I shouldn't use

3  "institutional."

4       Non-individuals.  Are there some non-individual

5  customers that might be harder to find contact information

6  for, with just the name and nothing else?

7  A    I -- I'm -- can you repeat the question?  I'm not sure

8  exactly what you're --

9  Q    Okay.  I'll move on.

10  A    -- asking.

11  Q    I'll move on to a different question.

12       With respect to non-individual customers -- I'm trying

13  to think of the best way to put this.  Companies that are

14  looking for -- competitors of the debtors, the people -- the

15  competitors you're concerned might poach customers.  With

16  respect to non-individual customers, institutional customers,

17  aren't there sources that those competitors could go to, to

18  find potential institutional customers that are interested in

19  cryptocurrency or keeping accounts on cryptocurrency

20  exchanges, other than looking at a customer list of a

21  particular -- of the debtors', for example?

22  A    I'm sure, if there are places where businesses that are

23  seeking to acquire customers -- I'm sure, if there are

24  indicators of interest in crypto, those businesses that are

25  seeking customers have already utilized those external

1  sources.  I don't know how that -- I guess I understand your

2  question, but I'm trying to be careful about how I answer it

3  only because I -- I -- I don't want to inadvertently share

4  information about the customers.  But there are a number of

5  institutional customers that are unique, and the names of

6  those -- excuse me -- institutions may not be widely known to

7  the public or to the competitors in this industry.

8       And so I don't know -- I don't believe that simply --

9  that the existence of other information sources materially

10  changes my testimony here.  I think the -- the critical

11  element here is that these institutions and individuals have

12  indicated by their activity on the exchange that they

13  participate in this particular activity and that they would

14  be valuable to a competitor or someone interested in

15  acquiring this business in the future precisely because they

16  have participated in this activity.

17  Q    Now, Mr. Cofsky, is it your understanding that, prior to

18  the bankruptcy filing, that all of the accounts of the

19  debtors' customers were frozen?

20  A    Yes, I believe that's correct.

21  Q    And they've been frozen since that time, correct?

22  A    To the best of my knowledge, yes.

23  Q    Are you aware that there are allegations of billions of

24  dollars of customer -- funds in customer accounts were

25  effectively raided to make loans to Alameda; are you aware of

1   those allegations?

2          MR. GLUECKSTEIN:  Objection, Your Honor.  I think

3   we're pretty outside of the scope of the testimony for this

4   motion.

5          THE COURT:  What's the relevance to his testimony,

6   Ms. Sarkessian?

7          MS. SARKESSIAN:  I believe that this witness'

8   testimony is that these customer names should not be

9   disclosed because they could be subject to poaching.  My

10  point is that I want to ask this witness to sort of develop

11  what the situation was coming into the bankruptcy with

12  respect to these customers and whether these customers might

13  be interested in moving their funds out of the debtors'

14  accounts for reasons that have absolutely nothing to do with

15  potentially being contacted by some other competitor.

16         I mean, this is not a regular case where, you know,

17  a business is having some financial trouble, they file for

18  bankruptcy, they might be able to reorganize.  They could be

19  able to keep the customers; or, if they sell the business,

20  the customers may want to go with it.

21         I would suspect that these customers may be rather

22  upset about the current situation; and, therefore, I don't

23  think poaching is the real problem here.  If the concern is

24  that these customers are going to leave the platform, I think

25  they may be leaving the platform for reasons that don't have

1    to do with poaching.  So that was my -- what I was trying to

2    develop with the witness.  But I guess I can save that for

3    oral argument --

4              THE COURT:  Okay.

5              MS. SARKESSIAN:  -- if we want to do it that way.

6              THE COURT:  Yeah, I think it is outside the scope

7    of his direct testimony, so ...

8              MS. SARKESSIAN:  Thank you, Your Honor.  I think

9    that finishes my cross-examination --

10             THE COURT:  Okay.

11             MS. SARKESSIAN:  -- of this --

12             THE COURT:  Thank you.

13             MS. SARKESSIAN:  -- of this witness on this

14   particular motion.  I will have cross on one of the other

15   motions.

16             THE COURT:  Understood.  Thank you.

17             Mr. Finger.

18             MR. FINGER:  Thank you, Your Honor.

19                      CROSS-EXAMINATION

20   BY MR. FINGER:

21   Q    Good morning, Mr. Cofsky.

22   A    Good morning.

23   Q    Just a couple of preliminary questions, if I may, before

24   we get into heavier stuff.

25        In your affidavit, you say you're a partner at Perella

1  Weinberg Partners, LP, correct?

2  A    Correct.

3  Q    And that is the debtors' proposed investment banker.  I

4  don't know if the Court (indiscernible) to that effect --

5          UNIDENTIFIED:  I'm sorry.

6  Q    -- but --

7          UNIDENTIFIED:  Could I just --

8          THE COURT:  Yeah.  We're having a hard time hearing

9  you, Mr. Finger.  You're going to have to speak up and --

10          UNIDENTIFIED:  Maybe move the mic.

11          MR. FINGER:  Yeah, I'm sorry, Your Honor.

12          THE COURT:  All right.

13          MR. FINGER:  Age has done its number on my voice.

14  BY MR. FINGER:

15  Q    You -- Perella is the proposed investment banker for the

16  debtors, correct?

17  A    Correct.

18  Q    Okay.  When were you asked to make this declaration, to

19  the best of your recollection?

20  A    I -- I don't recall if it was before the New Year --

21  Q    Okay.

22  A    -- or somewhere thereabouts.  Over the holidays, I

23  believe.

24  Q    So sometime in December.  Is that fair?

25  A    Yes, I believe that's correct.

1  Q    At Paragraph 4 of your affidavit -- declaration, you

2  identify a number of matters you've worked on.  Do you see

3  that?

4  A    I do.

5  Q    Which of those involved cryptocurrency?

6  A    None of those involved cryptocurrency.

7  Q    Okay.  Page -- at Paragraph 7 of your declaration, you

8  say that -- in the second sentence:

9       "A hallmark feature of cryptocurrency is a holder's

10  ability to remain anonymous to the public."

11       Do you see that?

12  A    Yes, I do.

13  Q    Okay.  Do you know whether -- are you familiar with

14  Bitcoin?

15  A    I am.

16  Q    Okay.  Do you know whether Bitcoin can be traced to the

17  holder?

18  A    I wouldn't put it in quite those terms.  When you say

19  "traced to the holder," I know that Bitcoin can be traced on

20  the blockchain and it can be traced to the wallet.  And so,

21  to the extent that one is able to identify the owner of the

22  wallet, one can trace to a particular user.  But tracing to

23  the wallet is not necessarily the same as tracing the -- it -

24  - identifying the owner of the wallet.

25  Q    Well, do you agree -- strike that.

1       Are you familiar with circumstances where authorities

2    have recovered Bitcoin or other type of cryptocurrency --

3    A    I'm --

4    Q    -- by --

5    A    -- generally --

6    Q    -- tracing it to the holder?

7    A    I'm generally aware of that, yes.

8    Q    Okay.  Now I want to turn to the statement you make in

9    Paragraph 9:

10           "I do not believe that it would be difficult to

11   look up and, in the case of the debtors' competitors, poach

12   the debtors' customers if their names were to be made

13   public."

14       Now the U.S. Trustee has asked you some questions on

15   that, and I'll try not to duplicate.

16       First, practically, the names you get, do they include a

17   middle initial?

18   A    In some cases, yes.

19   Q    Okay.  Would you agree that it might be harder to trace

20   someone, to find someone absent a middle initial?

21   A    I think it -- you say "harder."  Than what?

22   Q    If you --

23   A    Harder than what?

24   Q    I'm sorry.  I apologize.

25       If you have two names, Joe Smith, let's say, and one

1  says Joe Smith, and the other one says Joseph R. -- Joe R.

2  Smith.  Would the "R" be an identifier that could make it

3  easier to locate, track down the owner?

4  A    If your question is -- if you don't mind, I'm trying to

5  be helpful here.  The greater the lever of the identifying

6  information, as a logical matter, I would agree the easier it

7  would be to identify that particular user.

8  Q    Okay.

9  A    In this case, we -- we didn't look at the customer list

10 and simply speculate about whether we would be able to locate

11 and potentially correspond with users.

12 Q    Uh-huh.

13 A    We actually did the searches to determine whether that

14 would be the case.  So I -- I don't disagree with the logic

15 of incremental information being more useful than less

16 information, but we didn't rely upon the logic alone.

17 Q    Thank you.

18     Now, in response to questions from the U.S. Trustee, you

19 discussed the methodology your team used and the results they

20 recovered, correct?

21 A    Generally, yes, although I didn't go into too much

22 detail about the methodology.

23 Q    Have you made any documentation during that process to

24 either the U.S. Trustee or me?

25 A    You're asking have we provided any documentation with

1  respect to those searches and the results of those searches.

2  Q    Well perhaps I'm being presumptuous, so let me step

3  back.

4       In the course of that procedure were there written

5  notes, or reports, or results that were represented to you?

6  A    I did not review any written reports.  I don't know if

7  they exist.  I had conversations with my team.

8  Q    Okay.  So you are reporting to us statements made by

9  your team, correct?

10 A    That is correct.

11 Q    Do you know whether there was any documentation, be it

12 email, be it written findings, regarding this process and the

13 results -- and/or the results.

14 A    Yeah, I don't know.  As I said, I specifically recall

15 that I spoke with the team and directed them to undertake

16 these searches and then we followed up with a physical

17 conversation regarding the results.  I don't know if there

18 was any correspondence among the team members, but I don't

19 recall having reviewed a report on this question.

20 Q    So do you -- as best as you can recall, did your team

21 report back to you orally?

22 A    Yes.  That is correct.

23 Q    So there is no way -- strike that.

24      You would agree with me there is no way anyone, the

25 U.S. Trustee, me, or the Court, can validate what your team

1  did, is that correct, independently?

2  A    I think it would be -- it shouldn't be particularly

3  difficult to independently validate.  I think it would be --

4  I don't think you need to have this customer list in order to

5  undertake your own assessment of whether given a particular

6  set of individuals' contact information or names you would be

7  able to locate those individuals online and be able to find

8  enough information to be able to contact them.

9  Q    But I think you agreed, in response to questions from

10 the U.S. Trustee, that the degree of difficulty depends on

11 the degree of commonality of the name, correct?

12 A    I don't think that is exactly what I said.

13 Q    I am paraphrasing.  I agree.

14 A    Yeah, I want to be clear that to the extent that there

15 are names of the John Smith, Mary Jones type it would be very

16 difficult to identify -- it would be more difficult to ensure

17 that identification of that particular individual would be

18 the individual on the customer list just given the common

19 nature of the name.

20      So when we reviewed the customer lists I personally

21 reviewed the customer list to determine and evaluate the

22 extent to which the predominance were of that type of not and

23 my conclusion was that they were substantially not of that

24 type.  But, yes, I would agree that to the extent that there

25 is a very common name it would be more difficult to locate

1  that particular individual.

2  Q    Let me make sure I understand; did you review -- how

3  did you select the names?

4  A    I reviewed the customer lists to ensure -- to assure

5  myself, in the first instance, that -- I wanted to understand

6  the relative size, concentration. I wanted to understand the

7  extent to which the names of the institutions or the

8  individuals were unique or general in nature.

9       I then asked my team, whose more technologically savvy

10  then I am, to see if they would be able to locate these

11  individuals or institutions by using generally available

12  search technologies.  And the response was relatively quick

13  that there was a high hit rate in being able to locate these

14  individuals.

15       To be clear, the information that we were able to

16  locate was of a type that gave us a relatively high degree of

17  confidence that these were the right individuals.  We didn't

18  correspond with them and so we can't say with absolute

19  certainty, but their social media footprint indicated that

20  they had a significant interest in crypto.  And we evaluated

21  their postings on various social media platforms, etc., which

22  gave us a high level of confidence that the individual who we

23  were searching for was actually the individual that we had

24  located.

25  Q    Again, I am going to bear dance a little bit; you said

1  you reviewed the client list, correct?

2  A     The customer list, that's correct, yes.

3  Q     How many customers are on that list?

4        (No verbal response)

5  Q     I'll make it a little easier; as the opening today

6  counsel for the debtors used the number 9 million.  Does that

7  seem about right?

8  A     I have seen the number 9 million.  I did not search

9  through 9 million.

10  Q     How many did you search through?

11  A     Hundreds.  I -- so I had an Excel spreadsheet with that

12  information and it had the identifying information and the

13  entitlement amount.  I scrolled down, I can't say

14  specifically, but several hundred because I was interested to

15  know exactly -- again, as I indicated, I don't want to take

16  up too much time repeating myself, but I wanted to make sure

17  that, again, these would be unique names and identifiers.

18  Q     And what did you -- what methodology did you use to

19  determine that the 100 or 200 that you looked at were, in

20  terms of commonality, the names were representative of the

21  list as a whole?

22         MR. GLUECKSTEIN:  Your Honor, I'm just going to

23  object.  This was all asked and answered by the United States

24  Trustee.

25         THE COURT:  I think we did go through this

1  already, Mr. Finger.

2          MR. FINGER:  We did, but I don't think that --

3  maybe I'm wrong, but I don't think there was any specific

4  question regarding how the determination was made as to

5  whether this sampling is a representative sampling.

6          THE COURT:  I will give you some leeway, go ahead.

7  Let's not retread ground we have already been through.

8          THE WITNESS:  I didn't have a sophisticated

9  methodology. I used my judgment that after having gone

10  through page after page, after page, after page and seeing

11  relatively the same type of information that that would be

12  consistent.  I knew I wasn't going to search through

13  millions.

14          So after I scrolled through I believe that I also

15  asked my team to do a sampling. I didn't want to just focus

16  on the largest 20 customers, for example, but to be clear I

17  just exercised my judgment and I didn't have a specific

18  rubric or algorithm.

19  BY MR. FINGER:

20  Q    Did you have any guidelines in determining how common

21  or uncommon a given name would be other than your instinct?

22  A    Yeah, again, I did not have anything other than my own

23  judgment and my team's judgment to base that decision on.

24          MR. FINGER:  Thank you.  I have no other

25  questions.

1      THE COURT:  Thank you.

2      Anyone else wish to cross?

3      (No verbal response)

4      THE COURT:  Redirect?

5                    REDIRECT EXAMINATION

6  BY MR. GLUECKSTEIN:

7  Q    Mr. Cofsky, just very briefly.

8      Counsel just pointed you to Paragraph 4 of your

9  declaration.  That reflects certain experience.  Do you see

10 that?

11 A    Yes.

12 Q    Outside of what is listed there in Paragraph 4 can you

13 just state for the Court -- I believe you addressed this in

14 your overview at the beginning, but can you state for the

15 Court experience you have specifically in the area of

16 cryptocurrency in related companies?

17 A    Yes.  I have been involved in a number of other crypto

18 related situations including several capital raises for

19 bitcoin minors and other crypto companies; not specifically

20 focused on bitcoin, but other cryptocurrencies and other

21 business models as well, including IPO advisory and liability

22 management, both representing the company as well as

23 representing creditor groups.

24      MR. GLUECKSTEIN:  Thank you.

25      No further questions, Your Honor.

1          THE COURT:  Thank you.

2          Thank you, sir.  You may step down.

3          THE WITNESS:  Thank you.

4       (Witness excused)

5          THE COURT:  Any further evidence, Mr. Glueckstein?

6          MR. GLUECKSTEIN:  No, Your Honor.  We are prepared

7    to move to argument.

8          THE COURT:  Let me ask if the other objecting

9    parties have any evidence they wish to introduce.

10          MR. FINGER:  No, Your Honor.

11          MS. SARKESSIAN:  No, Your Honor.

12          THE COURT:  Thank you.  Go ahead.

13          MR. GLUECKSTEIN:  Thank you, Your Honor.  Again,

14    Brian Glueckstein for the debtors.

15          Your Honor, with respect to this motion most, but

16    not all, as we have just heard, of the relief requested in

17    the motion to protect the debtor's customer list and their

18    creditors and to streamline disclosures is uncontested this

19    morning.  The purpose of the debtor's request to redact

20    sensitive personal information of customers and other

21    stakeholders is to protect the value to the debtor's customer

22    list as an asset and to protect sensitive personal

23    identifying information of creditors.

24          There is no objection to redacting the addresses

25    of individual customers and other individual creditors.  That

1  information, subject to the Court's approval today, would

2  remain redacted.

3          The U.S. Trustee and the media objectors do object

4  to the debtor's redacting customer and creditor names.  And

5  with respect to the U.S. Trustee's objection the addresses of

6  non-individuals.

7          The objectors cite the general principals of the

8  right to public access to records and bankruptcy disclosure

9  requirements.  They do not articulate any specific harm being

10  suffered that requires disclosure today of the names and

11  institutional addresses on an immediate basis.  Nor do the

12  objectors recognize, in our view, the Court's role in

13  modifying those requirements for cause shown.

14          Your Honor, the debtors have been working hard to

15  strike the correct balance on this difficult issue

16  particularly in the still early stages of these Chapter 11

17  cases to ensure the protection of their assets and customer

18  information, but understanding the need for disclosure and

19  transparency.

20          Your Honor, these Chapter 11 cases, as we have

21  been hearing from when we first stood in front of you, are

22  unprecedented.  The debtors recognize that they have

23  generated significant public interest.  These cases also

24  present unprecedented challenges, but the relief requested,

25  including the redaction of customer names, has precedent in

1  this Court.

2          In Your Honor's well-reasoned opinion in Cred

3  where redaction of both names and identifying information of

4  a crypto currency platform's customers was permitted.  The

5  Court's reasoning applies here, but we submit the facts and

6  the evidence before the Court here are overwhelming against

7  immediate disclosure given the debtor's customer lists have

8  more than 9 million names and addresses on them.

9          The U.S. Trustee invites the Court to rip-up

10 precedent in this district and instead to simply adopt the

11 conclusions reached in the Celsius case by Judge Glenn in New

12 York.  We submit, Your Honor, that decision is an outlier and

13 certainly should not be wholesale adopted here, and it

14 doesn't need to be.

15          In order to strike an appropriate balance as to

16 the disclosure while providing the debtors and other parties

17 more time to evaluate options and ensure all restructuring

18 options for the debtor's assets, the debtors and their assets

19 remain available.  We are limiting our request today, as

20 reflected in our reply papers, with the support of the

21 creditors committee, to the redaction of names in the debtors

22 -- of the debtor's customers and addresses of institutional

23 customers for an additional six months subject to the right

24 to request further extensions of the redaction authority.

25          These redactions are appropriate and necessary to

1  protect the debtor's commercial information pursuant to

2  Section 107(b) of the Bankruptcy Code.  Section 107(b), as

3  the Court is aware, of course, permits the Court to protect

4  for cause the debtor's confidential information.

5          Mr. Cofsky's testimony before the Court makes

6  clear that the debtor's customer list, in his opinion as the

7  debtor's proposed investment banker charged with maximizing

8  the value of assets in such a process, including both names

9  and contact information are a key asset and a source of

10  value, potential source of value, at a minimum, for the

11  debtors.

12          Mr. Cofsky's testimony this morning explained the

13  companies that operate crypto asset management platforms work

14  to identify new customers, attract, and enroll them, and

15  establish them as customers.  Mr. Cofsky concluded that the

16  debtors would be harmed by the disclosure of customer names

17  even with the redaction of addresses.

18          We heard on cross-examination questions about

19  exactly how hard it would be, and is it easier or harder with

20  the middle initial to identify these customers and contact

21  them.  We would submit, Your Honor, that the level -- the

22  question before the Court today is not whether every one of

23  the debtor's customers could be or even would be immediately

24  contacted by competitors.

25          Mr. Cofsky's testimony and the positon of the

1  debtors is that we believe there is significant evidence that

2  that is likely to happen, at least with respect to

3  significant customers, with respect to customers that are not

4  known, as Mr. Cofsky testified this morning, in his view are

5  not widely known to be customers in the crypto currency and

6  digital asset space.

7          We would submit, Your Honor, that the conclusion

8  of the debtor's proposed investment banker is highly

9  probative of the limited question that is before the Court.

10  The Court's conclusion in Cred overruled a similar objection

11  from the U.S. Trustee on similar grounds.  The Court

12  concluded there that the debtor's customer list had some

13  "intrinsic value."  We believe here that is clear.  Where

14  we're talking about more than 9 million customers compared to

15  the 6,500 or so that were at issue in Cred.

16          Importantly, as I noted, while the case to keep

17  customer names and -- customer names confidential is, in our

18  view, compelling the debtors are seeking this relief today

19  only for a limited period of six months with the right to

20  reserve to seek extensions.

21          Your Honor, I also want to briefly address the

22  U.S. Trustee's arguments that granting this relief for any

23  period of additional time would somehow hinder the

24  administration of these cases?  We believe that is not true

25  at all.  All of the necessary information, Your Honor, is

1  being served, will continue to be served, and provided to

2  parties in interest as required.  The debtors have worked

3  when other parties have needed to serve documents to take on

4  that responsibility and to serve documents on the debtor's

5  creditor list where that, as I say, is necessary.

6        As in the interim order the proposed final order

7  that we submitted includes the Court's language that was

8  developed in Cred making clear that all parties in interest

9  retain the right to seek copies of any redacted documents

10  from the debtors or, if necessary, from the Court.

11        Your Honor, importantly, we believe that this

12  balance is appropriate for today.  If the redactions are

13  granted on this basis to preserve the debtor's assets, to

14  allow the strategic review process that is discussed, that's

15  at issue -- I'm sorry, before the Court in connection with

16  the bidding procedures today, the discussions that are

17  underway that Mr. Dietderich referred to in his opening

18  remarks, to allow all of that work to continue, and to

19  mature, to hopefully a plan or sale process that benefits all

20  stakeholders.

21        We're asking for the limited relief to maintain

22  that customer list in confidence for a period of six months.

23  If redactions are granted today on that basis the debtors are

24  not asking the Court, and we submit the Court doesn't need to

25  reach the issue at this time, of the propriety of redacting

1  customer names more permanently on the basis of Section

2  107(c)(1).  We reserve the rights on that issue, of course,

3  ands to come back to the Court, but we don't believe that

4  that issue needs to be adjudicated and we understand that

5  that question presents some difficult issues for not only the

6  Court, but for the debtors and other parties in interest.

7          Lastly, Your Honor, the debtors do request that

8  the Court authorize the redaction of individual non-customer

9  creditor and equity holder names to comply with the GDPR.

10  It's briefed in our papers.  That relief has historically,

11  from what we see, been relatively routinely granted by

12  Court's in this district.  The U.S. Trustee did not object to

13  that relief with respect to the interim order, but has

14  objected to it on a final basis.

15          We believe that the U.S. Trustee is taking that

16  position which seems to be a significant departure based on

17  the Courts' reasoning in <u>Celsius</u>.  We submit, Your Honor,

18  that that position is somewhat short-sided.  Citizens of the

19  covered countries have a heightened expectation of privacy as

20  a result of local law.  And as detailed in our reply papers

21  we do not believe there is a basis for the Court to conclude

22  that the GDPR does not apply to the debtors, and regardless

23  there is really no need to subject the debtors to potential

24  fines for violations which would only harm all stakeholders.

25          So with that additional relatively modest piece we

1  are limiting the relief today to the question around

2  maintaining the redactions with respect to the debtor's

3  customer list in its entirety including names and addresses

4  of institutional customers for a period of six months for

5  entry to the order with all parties rights reserved.

6          Thank you.

7          THE COURT:  Let me ask you a couple questions.

8  Does it matter that the customers here are not the exclusive

9  customers of the debtors?

10          MR. GLUECKSTEIN:  I don't think so, Your Honor,

11  because from our perspective, of course, there are customers

12  that probably, and I assume with 9 million if these are

13  people active in crypto, have investments on different

14  platforms.  And to the extent that those customers are

15  accessible through other sources, of course, they can be

16  contacted.

17          The question though before the Court, and that Mr.

18  Cofsky was testifying about this morning, is whether or not

19  we should put on the docket of this Court, effectively, 9

20  million names that allow the debtor's competitors and

21  potential acquirers of the debtor's assets and businesses

22  giving them the roadmap to say these are the folks, here are

23  the significant customers, they seek claim entitlement

24  amounts, let me try to contact those people.

25          So it's not a question of exclusivity, it's a

1  question of exclusivity with respect to the list that the

2  debtors have complied over time, you know, spending its own

3  resources to put this together, whether that asset should be

4  preserved.  We submit that it is, that it should.

5       THE COURT:  Why six months?  What is the

6  significance of asking for six months?

7       MR. GLUECKSTEIN:  There isn't a significance, Your

8  Honor, other then, I would say, a couple of things.

9       First, we want to try to be reasonable here and

10 take this incrementally.  We are not -- based on this we're

11 not asking for a permanent authority to redact on the basis

12 of preservation of the assets, again, with rights on 107(c)

13 reserved.

14      We looked at how long we think it will take to

15 move forward with a process to make, at least, a

16 determination as to whether the customer lists are part of a

17 sale process, are integral to a reorganization plan.  Are we

18 going to be standing here in six months and be able to -- can

19 I say definitively that in six months all of these issues

20 will be worked through?  I can't, but we think it's a

21 reasonable period of time where our thinking will be

22 substantially advanced from where it is today.  Is there a

23 magic to six versus eight or five, no, but we thought it was

24 a reasonable period of time.

25      The other piece, Your Honor, there are some

1  complications.  We know.  We discussed them at the first day

2  hearing with Your Honor around claims.  You know, once we set

3  a bar date and how the claims reconciliation process is

4  effected by these redactions.  Those are issues we are still

5  working through.

6          We don't believe, for a number of reasons,

7  including because of the SOFAs and schedules extension that

8  is before Your Honor today that we are going to be in a

9  position to set an early bar date in this case so that the

10 six month period factors into that to.  We don't think we're

11 going to be up against having to address some of the issues

12 that we discussed back in November around what happens after

13 we filed a bar date and all those claims remain.

14         THE COURT:  Well the bid procedure motion that you

15 have on that's for purposes of seeking to sell -- I think Mr.

16 Cofsky actually testified that the entities that are sought

17 to be sold pursuant to those procedures are exchanges,

18 correct?

19         MR. GLUECKSTEIN:  They are.

20         THE COURT:  So -- and that -- what is the --

21 remind me the proposed timeline for the sale of those assets

22 or, at least, the bidding is supposedly done by the end of

23 the month, right?

24         MR. GLUECKSTEIN:  I believe its -- I believe the

25 process in the bid procedures as contemplated -- I will refer

1  to Mr. Dietderich on the schedule.

2         MR. DIETDERICH:  Your Honor, Andrew Dietderich,

3  Sullivan & Cromwell.

4         It's a staggered schedule for the different

5  businesses, but it will take a couple of months, at least, to

6  get done.

7         THE COURT:  Okay.  And by then we will have some

8  understanding, at least from that process, as to whether or

9  not the creditor lists are going to be important to potential

10  purchasers.

11         MR. GLUECKSTEIN:  We will have some indication,

12  Your Honor.  As Mr. Cofsky testified this morning the main --

13  what I would call the main exchanges, right, so FTX.com, FTX

14  US, the main exchanges are not subject to the current

15  process.  We will be informed by the localized exchange in

16  Japan, for example, as to the relevance there, but I think

17  Mr. Cofsky testified this morning that the process for the

18  main exchanges will take longer because that process is not

19  yet formally underway as far as bidding procedures.  There

20  are lots of discussions that are ongoing.

21         I do think it is a good observation.  We are going

22  to start to be able to be informed by the different data

23  points.  The work that the professionals are doing, the

24  strategic review that is underway, and the sale process of

25  these other exchanges to have an understanding as to the

1  customer list.

2          So for all those reasons, Your Honor, we developed

3  six months as a proposal because we thought it was a very

4  reasonable next step.

5          THE COURT:  Thank you.

6          MR. DIETDERICH:  Your Honor, may I give you --

7  sorry to speak out of order, but Mr. Dietderich again.  May I

8  give you the actual proposed dates; now these are the

9  earliest possible sale hearing dates for the various

10  businesses, but they range from February 27th to March 27th.

11          The other point that may be factually relevant for

12  your consideration is we did, in the cooperation agreement

13  with the JPL in the Bahamas, commit to them that we would

14  work during a six month period on our project to consider a

15  potential reorganization of the international platform.  And

16  this customer information and data would, of course, be

17  important in connection with that work with them.

18          THE COURT:  Thank you.

19          Anything further?

20          MR. GLUECKSTEIN:  No.  Absent any other questions

21  from Your Honor I will cede the podium.

22          THE COURT:  Mr. Hansen.

23          MR. HANSEN:  Good morning, Your Honor.  Kris

24  Hansen with Paul Hastings, proposed counsel for the official

25  committee once again, Your Honor.

1        So, Your Honor, the official committee joins in

2   the debtor's arguments.  We filed a joinder to that effect on

3   the docket as well.  I wanted to add a couple of points for

4   the Court with respect to this issue.

5        Regarding the six months we collaborated on that.

6   We talked about how you create value associated with the

7   assets that the debtors are thinking about selling or

8   reorganizing.  And as you heard from Mr. Cofsky's testimony,

9   there is inherent value within the customer list associated

10  with these businesses.  And as the Court is, obviously, well

11  aware in connection with non-crypto businesses sometimes

12  parties will pay for customer list alone, sometimes the

13  customer list goes with those assets.

14        So the purchase and sale of customer information

15  is a vital component of any type of a retail oriented entity

16  and business.  And, obviously, from an exchange perspective

17  there were an awful lot of retail investors here.  And so

18  there is inherent value within those lists.  I think that is

19  uncontroverted.  I think everyone here agrees with that.

20        So in balancing that we looked at it and said

21  we've got two major tasks here.  One is to assess the value

22  associated with these assets from a sale perspective.  Two is

23  to assess the value associated with these assets from a

24  potential "reboot" is how we've been referring to it on our

25  side.

1          The reboot is complicated.  There are global

2  regulatory issues associated with rebooting the exchanges.

3  Everywhere that the exchanges operate there are regulatory

4  requirements that have to be met including the United States

5  and globally.  So it takes time to think through how that

6  works.  So it can't just simply be restarted in its existing

7  or prior form because there were issues associated with it

8  which, in some ways, we're here dealing with.

9          So it's a complicated exercise among many

10  professionals on all sides to be able to figure out exactly

11  what the steps are that are necessary to be able to think

12  about the reboot, but that reboot may unlock incredible value

13  for creditors and customers in connection with these cases

14  because it may open the ability to have something that is a

15  going concern, that could be sold, or could be distributed

16  from an equitization standpoint in connection with a more

17  fundamental plan of reorganization.

18          Then, obviously, with respect to the sales you

19  have the four assets that the debtor is seeking to sell at

20  the moment.  We have more to say about that later when we

21  come to the bidding procedures, but with respect to Embed,

22  LedgerX, FTX Europe, and FTX Japan, as Your Honor noted, two

23  of them are -- so LedgerX and Embed are non-debtors and those

24  are currently operating.

25          So the customers of those entities and the

1 information associated with those entities, to the extent

2 that they overlap with the information that debtor is seeking

3 to protect here those are ongoing businesses which are

4 interacting every day.  There could be damage done to the

5 value of those businesses by disclosure of those customers.

6         Similarly with respect to FTX Europe and FTX

7 Japan, from the committee's perspective, we're just rolling

8 up our sleeves. We are trying to understand what it is that

9 is being sold here and what the value is.  And tracking back

10 to Mr. Cofsky's testimony and the point I made a moment ago

11 there is inherent value in the customer list.  And so when we

12 look at it and say if that information was disclosed today

13 without the opportunity to do more diligence to determine the

14 inherent value in them that could do damage and it could

15 seriously reduce the amount of distributable assets to

16 creditors in connection with the cases.  That would be a bad

17 thing.

18         From our perspective, Your Honor, in a situation

19 where there has been a global fraud and no one yet knows what

20 the recoveries in these cases are going to be we need to make

21 sure that we preserve the assets as best as we possibly can.

22 We understand the competing interests that the media and the

23 United States Trustee have noted with respect to

24 transparency, but we just don't believe that there is a true

25 interest in the media for in the broader universe of parties

1    -- potential party's interest in the cases of understanding

2    who the customers were.

3           You have to think about like what is the purpose

4    behind that versus the very clear and articulated purpose of

5    trying to preserve value.  So when we come back to that six

6    month window and we ourselves, on the committee side, with

7    our professionals have said it's going to take a significant

8    period of time to really understand the reboot and really

9    understand the asset sales.

10          To Your Honor's point, the earliest dates, which

11   we think are too early, come up on February 27th and March

12   27th with respect to the assets that are currently being

13   sold.  We will get a better look at the real interest of

14   parties associated with the customer lists within that

15   window, but we probably won't have the (indiscernible)

16   because we think those are coming on too quickly.

17          So, again, Your Honor, and I would echo Mr.

18   Glueckstein's point with respect to 107(c).  107(c) we do

19   believe that -- and at a further hearing we can get into with

20   the Court, to the extent that the Court wants us to, that

21   there are real risks to customers in connection with the

22   disclosure of identities.  There are news stories and

23   information that demonstrates that there have been

24   kidnappings, there have been thefts, there have been other

25   types of violent acts committed against people within the

1  crypto community and that is a very real risk and a very real

2  concern.

3           With respect to the information that we're talking

4  about today and the reason to protect it under 107(b) it's

5  absolutely crystal clear that this is commercial information

6  of the debtors and that it has value, and that there is a

7  very clear case to be made that Your Honor can protect that

8  information for the temporal period that we've asked under

9  107(b).  We reserve rights on 107(c) and if the Court would

10  like further briefing on that and testimony on that we can do

11  that, but we think you have enough of a record to cover it

12  from a 107(b) perspective today.

13           So, Your Honor, if you had questions for me I

14  would be happy to answer them.

15           THE COURT:  No, no questions.  Thank you.

16           MR. HANSEN:  Thank you.

17           THE COURT:  Could we turn up the microphones on

18  the stand.  It's as high as it will go.  Everybody has got to

19  keep your voices up.  I mean I can barely hear some of it and

20  I'm sure the people in the back probably can't hear it very

21  well.

22           Anyone else want to speak in support before we go

23  to the objectors?

24       (No verbal response)

25           MR. HARVEY:  Excuse me, Your Honor, and may I

1  please the Court Matthew Harvey from Morris, Nichols, Arsht &

2  Tunnell on behalf of an ad hoc committee of non-US customers

3  of FTX.com.

4           We filed a joinder in this motion of the debtors,

5  Your Honor.  We support the debtors in their efforts to seal

6  this.  I think from the customer's perspective they have the

7  107(c) issue which is not going forward today in terms of

8  their own interest and protecting their own information, but

9  also the debtors and the committee have identified, I think

10 rightly, the customer list and the potential value in either

11 a sale or restart of the platform as an avenue for recovery

12 for members of our ad hoc

13          We do think it's important, particularly for the

14 preliminary matter, the debtors have requested for six months

15 to protect this information to allow the process to play out

16 and allow the debtors to determine the best path forward with

17 this customer list.

18          THE COURT:  Thank you.

19          MR. HARVEY:  Thank you, Your Honor.

20          THE COURT:  Ms. Sarkessian.

21          MS. SARKESSIAN:  Your Honor, would it be possible

22 to have a five minute break?

23          THE COURT:  Certainly.  Well let's make it --

24 let's make it 10 minutes just so everybody has -- well we got

25 a lot of people here, let's make it 15 minutes so everybody

1  has time to use the facilities.

2          So we will recess for 15 minutes.

3          MS. SARKESSIAN:  Thank you.

4      (Recess taken at 10:39 a.m.)

5      (Proceedings resumed at 10:58 a.m.)

6          THE COURTROOM DEPUTY:  All rise.

7          THE COURT:  Please be seated.

8          Ms. Sarkessian.

9          MS. SARKESSIAN:  Your Honor, Mr. Finger asked if

10 he could go first.

11          THE COURT:  Okay.

12          MR. FINGER:  Your Honor, at the outset of my

13 comments I move to strike the debtors reply because it

14 introducing new material which should have been included in

15 his opening brief, and has been raised for the first time.

16 For example, Paragraph 17 debtors invoke Japanese law.  Two

17 laws, the acclimate protection of personal information and

18 the Financial Instruments and Exchange Act.  They should be

19 waived; however, because they have raised them to protect my

20 client.

21          The first one, the APPI Section 17(3) allows the

22 use of such information when doing so is necessary to

23 cooperate with a "national government organ" of a foreign

24 company.  Now there can be a debate back and forth as to what

25 that means.  Usually when Courts deal with foreign nation's

1  law expert testimony is required.

2          The point here is that --

3          THE COURT:  Not always.

4          MR. FINGER:  Not always.  I --

5          THE COURT:  I can look it up in Martindale-Hubbell

6  and that is sufficient.

7          MR. FINGER:  I don't -- I never mean to -- but

8  there has been nothing provided to this Court showing that

9  this article section does not apply.  And as for the

10 Financial Instruments and Exchange Act that law applies to

11 securities trading.  Most crypto is not deemed a security and

12 so it's outside FIEA's jurisdiction.  Some tokens are, but

13 debtors have not established that their crypto falls within

14 the jurisdiction of the FIEA.

15         Similarly, for the same reasons --

16         THE COURT:  Well this isn't just their crypto,

17 right?

18         MR. FINGER:  I understand.  Yes, Your Honor.  The

19 crypto involved -- I will make a -- crypto involved in this

20 matter.

21         THE COURT:  It doesn't mean the debtors in this

22 case have more than just their own crypto on the exchange.

23 They were in exchange for all types of crypto, right.

24         MR. FINGER:  But the point being that if it is not

25 -- if the crypto involved, be it their own or their

1  customers, is not within that limited categories then it is

2  outside the jurisdiction of FTI.  This is a red herring.

3        For similar reasons, Your Honor, we want to strike

4  the testimony of Mr. Cofsky.  His testimony -- first, his

5  affidavit was provided three days ago with no real

6  opportunity to test it.  Not even in this Court we've had no

7  opportunity to depose Mr. Cofsky or his staff who worked on

8  this thing.  His testimony was very general.  They looked

9  through social media, they picked certain names.  We had no

10 opportunity to test that.  They were obligated to provide

11 this information in their opening motion.

12        But now let's turn to the justifications given for

13 sealing.

14        THE COURT:  Just to close the loop on this, Mr.

15 Finger, I will deny both of those motions.

16        MR. FINGER:  All right. Thank you, Your Honor.

17        The justification for sealing, they claim the risk

18 of identity theft and cyber scams.  Think about all of the

19 creditor's lists that have been publicly identified in

20 bankruptcies over the decades.  Let's just even limit it to

21 when Pacer came along.  With all of that there is absolutely

22 no evidence presented to this Court that there are any

23 identity theft or scams occurred as a result of those

24 creditor lists being made public.  It's no counter to say

25 this case is different because it involves crypto currency.

1          THE COURT:  I think they're not pursuing the

2    107(c) basis for sealing the customer list at this point.

3          MR. FINGER:  Not the customer list, but this is

4    also a list of creditors.

5          THE COURT:  Well I guess there's a question, are

6    they creditors, or are they customers, or are they both.  It

7    could be both, but I don't know.  At this point in the case I

8    don't know.

9          MR. FINGER:  The fact that that is not established

10   -- well, never mind I will withdraw that.

11          The fact is identity thieves don't care what the

12   nature of the business is, they just want names to use.

13          Your Honor heard some testimony about commonality

14   of names.  In fact, Your Honor, I did an experiment last

15   night through a website called TruthFinder.com.  I put in

16   Your Honor's name and came back with 58 people who share your

17   name; 57, I'm sorry.  Now, in candor, that lists the

18   differentiation because it included middle names and middle

19   initials.

20          We have no objection to redaction of middle names

21   or middle initials, but there is nothing before the Court

22   that tells the Court how many of the names that have been on

23   the list do not have multiple people with those names. Its, I

24   think, a stretch to say, well, if we're able to go through

25   five or six people of the same name and we come up with them.

1  Even Mr. Cofsky testified that it becomes harder if it's a

2  common name.  To extrapolate from that is harder when there

3  are numerous people sharing the same name, but that is

4  shooting in the dark and that is not enough of a threat.

5          Of course, using identity theft as a justification

6  for sealing leads to the conclusion that all creditors or

7  customer lists in every bankruptcy can be sealed to protect

8  the creditors.  Your Honor will be creating a per say rule.

9  Debtors have not provided any polling of a random sampling of

10 their customers to assess their fears of disclosure for cyber

11 bullying or cyber scamming and identity theft.  None of the

12 debtor's customers here is claiming concerns.

13          THE COURT:  I think you had one ad hoc group that

14 came forward and was supportive of the debtors.

15          MR. FINGER:  The ad hoc group, as I understand it,

16 were claiming their concern is not under cyber scamming, but

17 as to their rights under foreign law to confidentiality.

18          Turning to the poaching and reducing the

19 commercial value of the list, again, this goes back to how

20 common the names are, and there's been no effort to try to

21 segregate; it's the baby in the bath water.  William Smith,

22 Maria Garcia, James Johnson, Daniel Brown, Thomas Miller.

23 Again, the Google search said that these are examples of

24 common names of the most common name combination in the

25 United States.

1    So the potential for poaching, I respectfully

2  submit, is not enough. Its high evidentiary standard they

3  have to meet and the fact we provided cases to Your Honor --

4  in responses to Your Honor which says that.  A statement that

5  something could happen and in the absence of evidence showing

6  it is likely to happen or will happen does not satisfy the

7  first amendment evidentiary standard.

8    As for the GDPR I would draw the Court's attention

9  to a case In Re Avandia Marketing Sales Practices & Products

10 Liability, it's an Eastern District of Pennsylvania case in

11 2020, 484 F. Supp 2d, 249.  The Court ruled that applying

12 principles of comity, denial of public access based upon a

13 foreign law would be contrary or prejudicial to the interests

14 of the United States, but even apart from that Section 49.1

15 of the GDPR says there is an exception to the requirements of

16 that law for "the establishment, exercise or defense of legal

17 claims."  Defendants have not even mentioned this, but

18 certainly not have established that the exception is

19 (indiscernible).

20    Debtors argue at Paragraph 3 of their reply that

21 the objectors did not articulate any bonafides reason for

22 disclosure at this time; however, this confuses the burden.

23 Judicial documents are presumptively public and the public is

24 entitled to see them as soon as their filed and they become

25 part of the judicial record.  The purpose of public access is

1  to ensure public confidence in our Courts and their rulings.

2  The burden is on the debtor to explain why sealing is

3  appropriate and not vice versa.

4        We also believe it's inappropriate to ask for a

5  six month stay or delay with no assurances -- certainly no

6  assurances that that will be the end of it, but even in the

7  event that there are assurances I quote from the Supreme

8  Court case Elrod v. Burns:

9        "The loss of first amendment freedoms, even for

10 minimal periods of time, unquestionably constitutes

11 irreparable injury."

12       Public access is derived from the first amendment

13 as does Section 107.

14       Paragraph 16 of their reply debtors reiterate that

15 the customers are identified the value of the business "could

16 be materially harmed, diminished or disputed."  As I

17 mentioned earlier, we cited cases in our brief which they did

18 not respond to in their reply, our brief in the opposition

19 stating that speculating as to what could happen as opposed

20 to showing with evidence what will happen is insufficient to

21 meet their evidentiary burden.  There is a case out of

22 California we cited in our brief, but also the Celsius case

23 out of New York states the same thing.

24       As to the In Re Cred case I was not involved, Your

25 Honor was.  I will not presume to imagine Your Honor's

1   considerations in that case.  But an objective reading of

2   Your Honor's opinion seems to think that the Court was not

3   necessarily focusing on evidentiary requirements or the

4   argument that there was no evidence supporting sealing.

5   Since then the Celsius case has come out and while if another

6   Court and is not binding on Your Honor, Your Honor is free to

7   consider it as persuasive precedent in reassessing the Cred

8   case.

9          At Paragraph 28 of their reply the debtors cite to

10   a number of cases where this Court has allowed redacting

11   names pursuant to GDPR; however, defendants fail to point out

12   that with the exception of the last one of those cases listed

13   those motions were granted as unopposed which there was no

14   opposition.  And unopposed -- orders based on unopposed

15   motions have no precedential value.

16          The last one was proposed by the trustee and there

17   was no new analysis in it.  So it lacked persuasive force.

18          So in sum there is no competent evidence that any

19   of the evils asserted by the debtors, identity theft,

20   devaluation of the customer list by poaching, violations of

21   international law, present a genuine or substantial risk.

22   All the debtors have presented to the Court are speculation

23   unsupported by competent evidence; however, to the extent

24   that redaction is required it must be limited, as limited as

25   possible, to meet the goals.

1          Redacting the addresses allows this and I throw in

2    redacting middle names and initials.  This is sufficient and

3    if the Court is inclined to redact that should be the limit

4    of it.

5          Unless Your Honor has any questions I yield the

6    podium.

7          THE COURT:  Thank you, Mr. Finger.

8          MS. SARKESSIAN:  Thank you, Your Honor.  Again,

9    for the record, Juliet Sarkessian on behalf of the U.S.

10   Trustee.

11         Your Honor, the bankruptcy process operates like

12   the rest of the Court system on the bedrock principle of

13   American jurisprudence that the public has a right to access

14   of judicial records and only under very limited circumstances

15   may a Federal Court restrict of deny that access.  Here, the

16   debtors are seeking a very wholesale redaction of a lot of

17   information on any papers to be filed.  That is what they

18   say, any papers to be filed in this Court or may, otherwise,

19   made publicly available in the Chapter 11 cases.

20         They are looking to redact names, addresses, email

21   addresses of all customers whether they be individuals or

22   entities, the names, addresses and email addresses of all

23   non-customer individual creditors or equity holders if they

24   are citizens of the UK or member nations of the EU, and maybe

25   now Japan. I am not quite clear about that.  And then also

1  the addresses and email addresses of all other creditor or

2  equity holders who are individuals regardless of their

3  citizenship.  Of course, the U.S. Trustee has said we do not

4  object to the redaction of addresses residential or any

5  addresses with respect to individuals; whether they be

6  citizens of the EU, the United States, or anywhere else.

7           Now the debtor's counsel started out stating that

8  bankruptcy is a fishbowl.  We have heard this many times.

9  And, in fact, that the debtors welcome that.  The committee

10 said the cases need to be transparent.  We agree with that;

11 however, that is not what has happened in this case.

12          In the interim order entered on this motion the

13 debtors -- excuse me, the Court allowed the debtors to file a

14 creditor matrix under seal with a redacted version then to be

15 filed.  It's been two months.  There is no creditor matrix on

16 file, not under seal, not redacted, nothing.  I double

17 checked last night, I sent an inquiry to debtor's counsel to

18 make sure I had not missed it, it's my understanding, and

19 they can correct me if I'm wrong, that is still not on file.

20          So we don't know who any of the creditors are in

21 this case, be it customers or anybody else.  We don't know

22 who the top 50 creditors are because that was all redacted.

23 We don't have any monthly operating reports.  The first ones

24 were due December the 21st.  I don't know when we're going to

25 see any monthly -- actual monthly operating reports.  The

1  debtors have proposed to file some type of aggregated report

2  of some kind that is not a monthly operating report and then

3  later at some point in time, we don't know when, they will

4  start filing proper monthly operating reports.

5         We don't have schedules, we don't have statement

6  of financial affairs, we don't have Rule 2015.3 reports.

7  Yes, we have now come to an agreement about when those are

8  going to be filed, but the majority of them will not be filed

9  until March the 15th.  The debtors have reserved the right to

10 ask for further extensions.

11        So we have very little information here. This is

12 the opposite of a fishbowl.  And redacting customer and other

13 creditor information to the extent that the debtors are

14 seeking is only going to add to that lack of transparency.

15 And here what we are talking about is we're talking about

16 redaction as very essential documents that are part of the

17 bankruptcy case; the creditor matrix, the schedules, the

18 statement of financial affairs, professional disclosures they

19 have been redacted as well to the extent that there was a

20 reference to a customer name or an individual creditor.

21 Those were redacted.

22        So these are all really critical documents that

23 are part of the bankruptcy process.  And there needs to be --

24 the case law says, that we have cited, there needs to be a

25 showing of extraordinary circumstances and compelling need

1  for these types of redactions, before any type of redactions,

2  but especially on such fundamental documents that are part of

3  the core of the bankruptcy case.

4       Here the debtor has really nothing more than some

5  vague statements, and I will get it into, in a minute, Mr.

6  Cofsky's testimony, but very, very limited testimony or

7  evidence about something that requires a showing of

8  extraordinary circumstances.  We do not believe they have met

9  their burden and it is the debtor's burden here to establish

10  that the information can be sealed under either 107(b) or

11  107(c).

12       If Your Honor could bear with me for a moment,

13  please.

14       So 107(b)(1) talks about confidential commercial

15  information.  Now the debtors and the committee keep

16  referring to a customer list.  It's not a customer list, it's

17  a list of creditors.  It's the creditor matrix, it's the list

18  of creditors in the schedules, in a professional disclosure,

19  and it's a reference to somebody who is a creditor.  They may

20  also be a customer, but we're not talking about a separate

21  document that is a customer list.

22       I suppose what the debtors would say was, well, we

23  have so many customers who were creditors that if you looked

24  at the creditor matrix, whenever it may be filed, that one

25  could assume that most of those people are customers and not

1  other kinds of creditors.  There is not going to be any

2  distinction, there is not going to be like a separate section

3  that these are customer creditors and these are other

4  creditors.  It's a creditor matrix.  Same thing with the

5  schedules, there is no distinction -- I mean there is a

6  distinction based on priority if it's a general unsecured

7  claim, but there is not a distinction between creditor

8  customers and creditors who are some other kind of creditor.

9          With respect to -- even assuming that the debtors

10  would be correct in making that argument that competitors

11  will just assume that everybody on that list is as customer,

12  Your Honor made the point that many of these customers may

13  not be exclusive customers, they may already dealing with

14  competitors.

15          With respect to -- I think the point is very

16  important in terms of poaching.  Again, all we are talking

17  about for individuals are their names and no other

18  information.  Yes, for institutional or non-individual

19  creditors the U.S. Trustee believes that it is appropriate to

20  include their addresses as well as their names, but for the

21  individuals it would just be their names.

22          Mr. Cofsky's testimony that, well, just a name

23  alone, just a customer name alone would give you an ability

24  to find information to contact them.  That was based on not

25  even any work he personally did.  He had a staff look at less

1  than 20 names on the -- out of the 9 million names less than

2  20, there was no methodology that was explained as to how

3  they picked the names, although he indicated -- I believe he

4  indicated they looked for names that were not extremely

5  common; although, again, I would make the point that there

6  are names that might be uncommon in the US, that look

7  uncommon to us because we're not familiar with them, that

8  might be very common in other parts of the world.  I am

9  always surprised I see names and I think, oh, that is an

10  unusual name and then find out, oh, that's actually very

11  common in Japan, China, or whatever the country might be.

12          So we don't have any methodology.  There was less

13  than 20, that's nothing.  And out of the less than 20 he

14  said, well, more than 50 percent we could get information on.

15  So it wasn't even out of the 20 or less then 20, you know, we

16  were able to get information on all of them.  That's a very,

17  very slender thread, based on hearsay evidence, but even if

18  it wasn't, a very slender thread to say, all right, because

19  of less than 20, 50 percent of those, you were able to find

20  some contact information, whether that's the same person or

21  not, who knows, but potentially, it could be the same

22  customer.  That's a very, very slender thread to say,

23  therefore, you may redact all customer names from every

24  single document that's going to be filed in the case.

25          Now, let's talk for a moment about this six-month

1   restriction.  Six months is a really long time in the

2   bankruptcy world; as Your Honor is aware, a lot happens.  In

3   this case, during these six months, we are hopefully, going

4   to have schedules and statements filed.  This information is

5   relevant to that.  Sales will be taking place.  Hopefully, a

6   creditors matrix will be filed at some point.  A lot happens

7   in six months.

8          And then, of course, at six months, they're going

9   to come back and they may still ask for another extension.

10  But even if it's only six months, that information is

11  important information to be out there, and, again, we're

12  going to be getting schedules and statements that have so

13  much redacted, they're probably going to be next to worthless

14  for anybody who doesn't see the unredacted version.

15          And, Your Honor, I would also like to make the

16  point that I was trying, very ineffectively, to make with

17  Mr. Cofsky.  This is not a situation where you're coming in,

18  where the customers of the debtor, you know, are likely to be

19  happy with the situation.  Well, maybe that's true in all

20  bankruptcy cases, but you have a very extraordinary situation

21  here.  You have a situation where the customer accounts were

22  frozen prior to the bankruptcy filing and have been frozen

23  since then.  These customers, the online customers cannot get

24  access to cash, coin, whatever might be in those accounts.

25  No access.

1            At the same time, they learned that there were

2    allegations of a massive fraud, that customer accounts were

3    raided and the funds were transferred to Alameda in the

4    amount of $10 billion of customer funds.  So, it's probably

5    reasonable to think that these individuals, these customers

6    with all of this happening, if they're going to other

7    platforms.  Well, they can't have access to their funds yet,

8    but when the time comes when they have access to their

9    accounts, they may be looking for competitors or they may be

10   looking to transfer this to traditional banks.

11           So, you know, it's not a situation where you have

12   a customer base that might be relatively happy, the debtor

13   files for bankruptcy, and now you're worried, you know, they

14   would be happy, but now you have competitors coming and

15   poaching them.  I would say, you know, I think it's

16   reasonable to assume that these customers, many of them, are

17   very unhappy with the current situation and are probably, you

18   know, very well may, on their own, be looking to transfer

19   when they can or maybe, like, I would say ripe for the

20   poaching if any competitor came along.  So, I think the

21   situation is different than other types of cases.

22           Then I want to talk a minute about the 107(c)

23   argument.  So, if I understand correctly, the debtors are now

24   saying that they want to hold off that argument until another

25   time.  Their motion made an argument under 107(c).  They

1  cited that statute.  We responded.  Our objection was filed

2  on December the 12th.  They've had, virtually, a month.

3  They've had plenty of time.  The Committee addressed it.

4         I don't understand this.  Like, if they had any

5  evidence to put on that point, today was the day to put on

6  the evidence and there was no evidence that in name alone,

7  could subject an individual to any type of harm, be it by --

8  I don't know if it was the Ad Hoc Committee's counsel,

9  somebody talked about kidnapping with a name.  We don't even

10 know what country these people live in.  There's no evidence

11 of that.  There's no evidence of identity theft, based upon a

12 name and nothing else.  There's no evidence presented that a

13 customer's accounts could be hacked with just a name.  No

14 evidence on that.  Or that the person's safety could be

15 compromised.

16        And the Ad Hoc Committee, of course, cited to Your

17 Honor's ruling in Cred, also cited to Judge Owens' ruling in

18 Clover, and they attached the transcript.  Clover had to do

19 with residential addresses, not, you know, names.  Not names

20 alone.  I think there were 10 members of the European Union

21 in there and there wasn't much discussion of that, but apart

22 from those 10, they were talking about residential addresses;

23 again, we are not objecting to that.

24        And, frankly, Your Honor, if you get to the point

25 where you are redacting individual creditor's names, not the

1  addresses, but their names, as well, with the idea that,

2  otherwise, there could be identity theft, the amount of

3  sealed filings in this court would be enormous, I mean, every

4  single, including Chapter 7 and Chapter 13 cases.  Debtor's

5  name, the individual creditors, all those -- proofs of claim

6  filed by individual creditors, is all of this going to be

7  filed under seal?  It's not a workable -- it's not workable

8  and there's nothing under 107(c) that would support redacting

9  names based on the idea that, otherwise, there could be

10  identity theft.  But, again, there's been no evidence and if

11  there was, this was the day to put on the evidence on that

12  point.

13          So, to recite an issue on the burden of proof, we

14  cited the Third Circuit case, <u>Cendant Corp.</u>, that the debtors

15  have the burden of proof on 107(b), as well as 107(c).  And

16  under 107(b), again, the debtors must establish and

17  demonstrate an extraordinary circumstance and compelling need

18  to obtain protection.  That's from <u>Food Management</u>, which I

19  believe is actually from the Southern District.

20          I'll also mention that, you know, in Mr. Mosley's

21  declaration, which came -- that was filed in support of the

22  initial motion, he used the term, he said public

23  dissemination of customer lists could give the debtors'

24  competitors unfair advantage.  He didn't say, "would"; he

25  said, "could."  So, that's a very low level of argument to

1  meet an extraordinary-circumstances test.

2          So, let's speak a little bit about foreign law.

3  First of all, as we stated in our objection, we're in a

4  United States Federal Court.  United States federal law

5  controls over foreign law.  We cited a Supreme Court case on

6  that point.  Not in this exact connection, but with regard to

7  a French blocking statute.  But beyond that, as Mr. Finger

8  made the point, and we made the point in our objection, that

9  this does fall within the exception of the GDPR because this

10  is a legal proceeding and there's a legal claims exception

11  for that.

12          Now, the debtors, in their reply -- in their

13  initial motion, the debtors' discussion of the GDPR was in

14  one paragraph, paragraph 20.  It references the GDPR.  It

15  doesn't even provide a citation as to where to find it.  It

16  doesn't quote from it.  It says the GDPR may apply to the

17  debtors -- may -- and it doesn't even say what it is that the

18  GDPR protects, other than it says home addresses of

19  individuals, which again, not an issue -- we're not objecting

20  to that.  So, obviously, we spent a lot of our objection

21  going into the details of the GDPR.

22          But I want to look at in the reply, the debtors

23  did make two arguments, with respect to the GDPR, that I

24  would like to address.  So, the first one, in paragraph 25 of

25  their reply, the debtors argue that while the U.S. Trustee

1  notes that processing of personal data is lawful if it is,

2  "necessary for compliance with the legal obligation to which

3  the controller is subject," the U.S. Trustee ignores that any

4  such legal obligation, "should have a basis in union or

5  member-state law," not in U.S. law.  And they cite

6  Article 40 -- excuse me -- Recital 45 of the GDPR.

7             Recital 45 of the GDPR says, for the debtors to

8  process information, meaning, to collect information, code

9  it, transform it to a usable format, the processing has to be

10  legal under the laws of the EU or its individual member

11  states.  The recital does not say anything about compliance

12  with laws outside of the EU.

13             And Recital 45 is not relevant to what we're

14  talking about.  It's a different issue.  It's not talking

15  about an exception for when this information can be

16  disclosed; it's talking about the way in which the

17  information is processed.  It must be processed under the law

18  of the applicable EU state.

19             The second argument that the debtors make in

20  paragraph 26 of their reply says that the U.S. Trustee is

21  conflating transferring of information with processing of

22  information.  They -- so, they -- I believe the argument is

23  that the exception in Article 45 [sic] that allows the

24  disclosure in connection with legal proceedings, applies only

25  to the transfer of personal data, not the processing of

1    personal data, and that what the -- that the disclosure would

2    be processing, not transferring.

3            There's no authority cited for this position.

4    We -- you know, I can't say that I can cite any authority for

5    the contrary position, but they cite no authority to say that

6    there's some distinction here and that or the exception in

7    Article 49 [sic] only applies to processing and not actually

8    disclosing in connection with a legal proceeding.

9            With respect to Japanese law, I mean, that was not

10   raised.  It was not mentioned that their motion.  We saw it

11   for the first time, Sunday at 4:00 p.m.  I have not been able

12   to reach an expert in Japanese law since Sunday.  There was

13   not any official translation of these Japanese statutes that

14   were provided.  They do not -- the debtor does not quote the

15   operative provisions.  There's obviously no expert witnesses

16   to testify about Japanese law.  They just put in their reply,

17   This law -- these two statutes apply and these statutes do

18   not have any exception for legal proceedings.

19           So, I, really, I am not in a position to say

20   anything about Japanese law, other than the fact that this

21   was something that was -- should have been brought up in the

22   initial motion and that would have given us more time to

23   respond to that.

24           So, Your Honor, another point I want to bring up

25   that we mentioned in our objection that is significant is

1  that if you shall determines that to whatever degree Your

2  Honor would grant the motion for file information under

3  seal -- I'm sorry -- to whatever degree Your Honor would

4  allow the debtors to redact information from the court

5  filings, the unredacted versions of those documents must be

6  filed under seal with the Court.

7           Now, the debtors in their reply said, Well, of

8  course we'll do that, but the proposed order only states that

9  the creditor matrix must be filed under seal.  That was a

10 compromise when we were discussing it at the interim stage.

11          The order, I would request, to the degree that

12 anything is allowed to be redacted, that the order provide

13 that the unredacted version must be filed with the Court.

14 And I would also ask --

15          THE COURT:  That's a requirement of the Local

16 Rules, isn't it?

17          MS. SARKESSIAN:  Yes, it is, Your Honor.

18          But I don't want anybody to say, Well, the order

19 doesn't say it has to be done.  The order only talks about

20 redaction, it doesn't talk about sealing, and therefore, the

21 order somehow trumps the rule.

22          So, I just want that to be clear that those

23 filings will be made.  And it would also be nice to know when

24 the creditor matrix is going to be filed, both, in a -- if it

25 is to be sealed, in a sealed version, and in a redacted

1  version, as well.

2          If Your Honor could just give me a moment to make

3  sure that I've covered everything.

4      (Pause)

5          MS. SARKESSIAN:  So, Your Honor, unless Your Honor

6  has any questions for me, my argument is concluded.

7          THE COURT:  Thank you.

8          MR. GLUECKSTEIN:  Your Honor, for the record,

9  Brian Glueckstein for the debtors.  Just a couple points very

10 briefly.

11         Just to take the last point first, the debtors, of

12 course, will file any documents in this case that need to be

13 filed under seal, under seal, according to the Local Rules

14 and I will make that representation that Ms. Sarkessian has

15 asked for.  That's not an issue.

16         With respect to --

17         THE COURT:  Of the creditor matrix, you mean?

18         MR. GLUECKSTEIN:  With respect to the creditor

19 matrix, Your Honor, the creditor -- we're conflating a couple

20 of issues.  As has been well-documented, and we have

21 disclosed to the Court, there are significant issues with us

22 filing the entirety of the customer list, from a timing

23 perspective, access to data and information.  The Court may

24 recall we required additional time and we had to come up with

25 a creative process to get our top-50 list done in order to

 1  view information that we couldn't fully access in terms of

 2  the informational databases.

 3          Those lists are on file in redacted form.  The

 4  unredacted forms have been filed.  We sealed the top-50

 5  lists.  Ms. Sarkessian and the U.S. Trustee's Office, of

 6  course, has them.

 7          With respect to the timing of the full creditor

 8  matrix, that issue, Your Honor, you know, we're trying to,

 9  you know, we're trying to get kind of clarity on the timing.

10  It's the volume of the nine-million-plus names and contact

11  information, accessing the systems is taking time.  We are

12  working as hard as we can to get that on file and we will

13  file that, if we're authorized to redact the information

14  we've asked for today for the six-month period.  That, of

15  course, will be filed, the full nine-plus-million names under

16  seal as soon as we're in a position to do so, which we hope

17  is very soon.

18          What we will do, and what we can undertake to do,

19  Your Honor, is file what we have now and what we've been

20  using for service, file that, and then update it as we get

21  the full nine-million-plus names into the matrix.  So, we're

22  happy to do that, Your Honor.

23          THE COURT:  So, let me ask you this, you're not

24  proposing that you would redact from filings?  One of the

25  things Ms. Sarkessian raises is that you want to redact not

1    just the creditor matrix or the customer lists, but also any

2    reference to any customer or creditor in any other filing in

3    the court.  And I'm assuming you're not proposing to do that

4    if that particular customer has already self-identified.

5           MR. GLUECKSTEIN:  We have not, Your Honor, and

6    that's another issue that Ms. Sarkessian raised, right, this

7    idea that there are customers who want to go to competitors

8    or want to move their accounts, which, of course, we

9    understand.  And they're not in the position, certainly, to

10   take their account at FTX at this point because of the

11   Chapter 11 process, but they're certainly free to go to a

12   competitor, self-identify themselves to a competitor, and

13   open an account somewhere else if they haven't already.

14          And, of course, we did as this issue some at the

15   first day hearing, any creditor or customer is free to come

16   forward and participate in this case, identify themselves

17   publicly, identify themselves in the docket of this court.

18   The documents -- and we have, of course, no issue with that

19   and wouldn't seek to restrict that -- from the perspective of

20   the documents that Ms. Sarkessian was reflecting -- was

21   commenting on this morning, the creditor matrix, the top-50

22   list, the SOFAs, the schedules, these are all documents that

23   we are required to file, right.  Those are documents the

24   debtors are required to compile and provide and would result

25   in us affirmatively, with or without their consent, as part

1  of the bankruptcy process, and we understand there are

2  obligations of the bankruptcy process, to identify the names

3  of those customers.

4         Ms. Sarkessian referenced the idea, well, nobody

5  would know.  You have all these names.  It's a creditor list.

6  It's not a customer list.

7         Our top-50 list, even the redacted versions that

8  are on file publicly, do delineate between customers and non-

9  customer creditors -- trade creditors and customers.  And so,

10 that information, if it were to be unredacted today, people

11 could see very easily of the top-50 creditors, which of those

12 are customers, meaning customers who hold accounts on the

13 various exchanges at FTX.

14        So, the distinction that Your Honor references, we

15 agree with.  Obviously, there's nothing in what Your Honor

16 would be ordering that would prevent any party from self-

17 identifying if they so choose.

18        THE COURT:  So, is there a -- excuse me -- a way

19 to delineate between -- you refer to the top-50 creditor

20 list.  That's been sealed in its entirety or redacted in its

21 entirety, right?

22        MR. GLUECKSTEIN:  It has not been redacted in its

23 entirety, Your Honor.  It has been filed in a redacted form

24 that redacts the information that we asked, and that the

25 Court authorized, pursuant to the interim order.  So, we have

1   redacted names and addresses of individuals and of

2   institutions who are customers, pursuant to the Court's

3   interim order and it's reflected as such.  But those

4   documents are on file in redacted form under seal.

5           THE COURT:  So, what I'm trying to get at is, is

6   there a way to delineate on the creditor lists, between who

7   is a creditor, who is a customer, and who is both, and be

8   able to disclose those who are solely creditors, publicly,

9   without disclosing those who are customers and creditors?

10          MR. GLUECKSTEIN:  You know, it goes to the

11  question, it's a question of what information for the full

12  nine million, of whether that's a meaningful field that

13  exists or that would have to be kind of independently

14  reviewed and populated, and I'm not sure of the answer to

15  that, Your Honor.  We'd have to look into that.

16          I think the number, from a volume perspective, is

17  very small, comparative -- in relative comparison to the

18  customers.  What we've been talking about here, by and large,

19  and why we've been seeking to protect, when we talk about the

20  customer list, the customers at the main debtors, at the

21  exchanges, are where the volume is and that's where we

22  believe the value is, and that's what Mr. Cofsky testified

23  about this morning.

24          So, you know, that does implicate, of course,

25  the 107(c) issues, which we are not pressing today.  But I

1  think, you know, we would have to see -- honestly, Your

2  Honor, we would have to see whether we could make that

3  delineation for all, kind of non-customer creditors.  I

4  suspect that we could, but I think that would take some work,

5  but I suspect that we could.

6           THE COURT:  Well, in the top-50 lists --

7           MR. GLUECKSTEIN:  Certainly, in the top-50 lists,

8  we have that information.

9           THE COURT:  -- are there those who now have been

10  disclosed, who are solely creditors, not customers?

11          MR. GLUECKSTEIN:  Not by name, Your Honor, because

12  the interim order had the 107(c) relief in it.

13          THE COURT:  Okay.

14          MR. GLUECKSTEIN:  So, at this point, all of the

15  names are redacted from that customer list that are subject

16  to the interim order.  So, the relief that we asked for in

17  the interim order, because it did include the 107(c) relief,

18  is broader than what we're talking about now.

19          THE COURT:  Okay.

20          MR. GLUECKSTEIN:  You know, I think on the GDPR

21  issues, Your Honor, those are certainly secondary here.  We

22  do think it's relevant.  We did brief the appropriate

23  sections.  You know, absent questions, we're happy to stand

24  on the briefing on that issue and, otherwise, I'm happy to

25  answer any other questions that the Court may have.

1            THE COURT:  Thank you, no questions.

2            MR. HANSEN:  Your Honor, Kris Hansen with Paul

3    Hastings, on behalf of the Committee.

4            Just quickly, to address the one point that

5    Ms. Sarkessian raised regarding 107(c), we do believe those

6    issues are real and to the extent that the Court wanted to

7    hear further evidence with respect to 107(c), we would ask

8    for a continuance of the hearing on that basis, so that we

9    could come back and provide more robust information to you.

10   It would consist of information that's available from a

11   public perspective, so newspaper articles, et cetera, that

12   you could take judicial notice of, but we, also, would

13   probably seek to put witnesses on, as well, to talk about

14   what has happened with respect to criminal and other type of

15   activity within the crypto space.

16           I don't know, today, whether we would be able to

17   link that to the disclosure of a name from a bankruptcy case,

18   but I think we could link it to disclosure of names,

19   otherwise, that people are able to find out through social

20   media and other avenues.  But I wanted to make sure the Court

21   understood, procedurally, where from the Committee stands, if

22   you need information and more information on 107(c), we would

23   like to have a continuance on that basis.

24           We think the record is very clear on 107(b) that

25   you have what you need in order to grant the relief that the

1  debtors and the Committee are jointly seeking.

2           THE COURT:  Thank you.

3           MR. HANSEN:  Thank you, Your Honor.

4           MR. GLUECKSTEIN:  Your Honor, if I could just

5  clarify one point?

6           THE COURT:  Go ahead.

7           MR. GLUECKSTEIN:  I might have misspoke.

8           So, just to be clear, Your Honor has pointed out

9  to me in an answer to Your Honor's question, currently, on

10  our top-50 lists, we have disclosed non-customer names.  So,

11  for example, there are certain vendors at the non-exchange

12  entities, because we have filed silos -- filed siloed top-50

13  lists.  So, if there was, for example, a vendor providing

14  services who is a non-customer, that information has already

15  been disclosed and would be under the relief asked for today.

16           THE COURT:  Is that for all creditors, solely

17  creditors, or just some?

18           MR. GLUECKSTEIN:  Yes.

19           THE COURT:  For all?

20           MR. GLUECKSTEIN:  All.

21           THE COURT:  Okay.  Thank you.

22           MS. SARKESSIAN:  Your Honor, can I just --

23           THE COURT:  Go ahead.

24           MS. SARKESSIAN:  Your Honor, with that -- for the

25  record, Juliet Sarkessian on behalf of the U.S. Trustee --

1  Your Honor's questions made me think of something with

2  respect to the top-50 lists.  Of course, you know, we formed

3  a Committee and I believe all the members of the Committee

4  were on that top-50 list.  Their names were redacted because,

5  at the time, it was subject to Your Honor's order.

6          Your Honor did indicate at the first -- or one of

7  the hearings that if somebody is going to be on the

8  Committee, they have to be willing to have their name

9  disclosed, and we did file the notice of the appointment with

10 their names.  Since that is now -- and I understood that that

11 was -- we discussed it with all the Committee members.

12 Nobody had an issue with that.  That has been disclosed.

13          Can the top-50 list be revised, in terms of

14 redaction, to now unredact the information, with respect to

15 those particular creditors, whose names have been disclosed?

16          THE COURT:  Well, it certainly makes

17 servicemembers to me.  I don't see why it can't be done.

18          MR. GLUECKSTEIN:  That can be done, Your Honor.

19 Frankly, once we have clarity around the scope of what's

20 staying or not being redacted, we will update the documents,

21 as appropriate.

22          THE COURT:  Okay.

23          MR. GLUECKSTEIN:  But we certainly understand that

24 point.

25          THE COURT:  Okay.  Thank you.

1          MS. SARKESSIAN:  Your Honor, the only other thing

2    I, again, would emphasize, I am confused about why there

3    would be another hearing about 107(c).  That was in the

4    initial motion.  Everybody knew today was the day of the

5    hearing on these issues.  If they had evidence to present,

6    they should have presented it, so I would object to a

7    continuance on that basis.  We were ready, willing, and able

8    to go forward today.  Nobody told us in advance that they

9    wanted a continuance.

10          THE COURT:  Well, I understand that and ordinarily

11   I would say, Yes, today was the day and you need to put on

12   your evidence.  I'm not going to grant any continuances.

13          But we're talking about individuals here who are

14   not present, individuals who may be at risk if their name and

15   information is disclosed.  And if that is the case, I want to

16   make sure I'm doing the right thing by those people.

17          MS. SARKESSIAN:  I understand, Your Honor.

18          THE COURT:  So --

19          MS. SARKESSIAN:  Again, I would stress, we are not

20   objecting to their addresses, email addresses, telephone

21   numbers being redacted; we're only talking about names.

22          THE COURT:  I understand.

23          MS. SARKESSIAN:  Thank you, Your Honor.

24          THE COURT:  Mr. Hansen?

25          MR. HANSEN:  Yes, Your Honor.  Again, Kris Hansen,

1  with Paul Hastings on behalf of the Committee.

2           Your Honor, with respect to the individual

3  creditor names that are on the Committee, the notice that the

4  U.S. Trustee filed for individuals does not include their

5  addresses or their information; it just has their names.  For

6  the institutions, it obviously includes their addresses.

7           So, when the debtors make their disclosure with

8  respect to the top 50 for those parties, we would ask,

9  consistent with the notice that was filed from the U.S.

10  Trustee, with respect to their appointment, that we do

11  maintain that information under seal.

12           THE COURT:  Is that an issue?

13           MS. SARKESSIAN:  The U.S. Trustee has no

14  objection.  We're in complete agreement.

15           THE COURT:  Okay.  Thank you.

16           Anyone else?

17      (No verbal response)

18           THE COURT:  All right.  Well, this case certainly

19  presents extraordinary circumstances just by the nature of

20  the case itself.  The fact that we have a list of people who

21  may be customers, may be creditors, may be both, and I don't

22  know who -- which is which, and they are -- there are nine

23  million of them, I'm reluctant at this point to say I'm going

24  to require the disclosure.

25           I think the debtor did put on sufficient evidence

1  to show that customer lists -- and I think it goes without

2  saying that a customer list in any bankruptcy case is

3  something that is protected by 107(b) as a trade secret.

4  Companies hold those things very closely and don't want them

5  disclosed.

6           The difficulty here is I don't know who's a

7  customer and who's not, who's just a regular creditor.  So,

8  at this point, I'm going to overrule the objections and allow

9  them to remained sealed at this point, but I'm not going to

10 leave it open for six months.  I'm going to -- I would

11 approve an order that extended it for three months.  By then,

12 I think, based on the testimony and the arguments of counsel,

13 we'll have a better sense of whether or not the customer

14 lists is something that purchasers of these assets find value

15 in and whether they are interested in making sure that they

16 remain anonymous at this point.

17          On the 107(c) issue, as I already indicated, I do

18 want more on that because I do want to make sure I'm

19 protections the interests of these individuals.  And it's

20 interesting, because if you look at 107(a) and -- or excuse

21 me -- 107(c), it refers to protecting information and

22 refer -- and -- excuse me -- in defining what identification

23 means, it refers to the Criminal Code 18 -- Title 18,

24 Section 128(d).  And if you look at 128(d), it says that the

25 information includes names, numbers, or any combination of

1  those two that would allow the identification of an

2  individual.  So, certainly, the Criminal Code recognizes that

3  disclosure of a name could result in the identification of an

4  individual and if that individual needs protecting, we need

5  to make sure that that is happening.

6          I don't have enough on the record today to say

7  that 107(c) applies, but I want to make sure that I'm doing

8  the right thing.  So, I will, in connection with any

9  further -- I guess the question, then, is do I hold that

10 hearing before the three months is up?  And I think in order

11 to make sure that we have a fulsome record and that the

12 parties have the opportunity to engage in discovery, if

13 necessary, to identify people who might come in and testify,

14 I want to make sure that they have the opportunity.  So,

15 we'll schedule a further hearing on the 107(c), in connection

16 with the 107(b) follow-up in three months.

17         I do want to make sure that the debtors are, in

18 compiling the nine million names, if there is a way to

19 identify them if they are just a creditor and not a customer,

20 I expect that to be done.  And I would like to have a status

21 conference on that question, alone, within the next -- I

22 think we have another hearing scheduled on the 20th.  So,

23 let's have a status conference on the 20th on the question of

24 how difficult it would be for the debtors to provide a list

25 of creditors and/or customers and distinguish between

1  creditors and customers.  And if you can just identify just

2  customers on the list or, excuse me, just creditors on the

3  list, I would expect that those names would be disclosed;

4  again, not disclosing for individual's names -- excuse me --

5  addresses or telephone numbers or other identifying

6  information.

7           But if there is -- if there are customers who

8  are -- I keep confusing these two -- if there are creditors

9  on that list of nine million who are institutions or

10  corporations and they are only creditors, then their full

11  identifying information should be disclosed, as required by

12  the Code.

13           So, with that, I'm going to ask the parties to

14  meet-and-confer and come up with a form of order that

15  reflects what my rulings are today.

16           Are there any questions or did I miss anything

17  that the parties want me to make sure that I've addressed?

18           MR. GLUECKSTEIN:  From the debtors' perspective,

19  no, Your Honor, that's very clear.  Thank you.

20           THE COURT:  Okay.  Ms. Sarkessian or Mr. Finger,

21  any concerns, other than the fact that I ruled against you?

22           MR. FINGER:  I'll take judicial notice.

23      (Laughter)

24           MR. FINGER:  Nothing more, Your Honor.

25           THE COURT:  Okay.  Thank you.

1          MS. SARKESSIAN:  And, Your Honor, I apologize if I

2    missed it.  Did you make a particular ruling regarding

3    individual creditors who are not customers, but are members

4    of the U.K. or European Union or Japan?

5          THE COURT:  No, I did not address that.  That's

6    another question and that's a difficult one.  I don't

7    think -- I don't have any evidence on that.  All I have is

8    the arguments of counsel.

9          Let's include that when we talk in three months,

10   because I would like further evidence on that and maybe have

11   someone come in and testify about the foreign law and how it

12   affects, but I think, you know, I understand Mr. Finger and

13   Ms. Sarkessian have pointed out that they don't believe that

14   the European Code would apply here, but I think even

15   Mr. Finger recognized that could be argued either way.  So,

16   it's a question, so I'd like to know what the answer to that

17   question is.  Would this actually prejudice the debtors

18   somehow?  If it would subject the debtors to large fines,

19   and, you know, we've seen all this in the press where

20   companies in Europe have had large fines imposed against

21   them.  It's certainly not something that I want to have

22   happen to the debtors here.  And it raises questions about

23   whether I could even stop that.  Does the automatic stay

24   apply to the European Union seeking to impose a fine against

25   the debtors for violating disclosures?  I don't know.  So,

1  those are all open issues I need to have further -- might

2  need further briefing, too, on those issues.

3          MS. SARKESSIAN:  And, Your Honor, just for

4  clarity, so between now and the three months, do those names

5  remain sealed?

6          THE COURT:  Yes, until we -- when we get to the

7  status conference next Friday, if the debtors can come in and

8  say, We can provide a list of the nine million names and

9  identify those that are solely creditors, then I might revise

10  my order to say that those people's names and identifying

11  information should be disclosed, except for individuals, at

12  least with the constitutional creditors.

13          MS. SARKESSIAN:  And, Your Honor, maybe another

14  thing that we maybe could discuss at that status conference

15  would be to the degree that the debtors aren't able to cull

16  out which individuals are, in fact, citizens of the U.K., the

17  EU, and potentially Japan?

18          THE COURT:  If that's possible, that would be

19  helpful, if we know how many people.  From my -- I think from

20  the first day hearing, I think I recollect there was some

21  testimony in the declaration about how many of these people

22  are not U.S. citizens; they're foreign citizens.  So, it may

23  be most, if not all of them.  I don't think all of them would

24  be, but at least most of them might be foreign citizens.  I

25  don't know.

1           MS. SARKESSIAN:  And, Your Honor, they may be

2   foreign citizens, but they might be citizens of India or

3   someplace that's not controlled.

4           THE COURT:  Right.

5           MS. SARKESSIAN:  I just -- I'm not sure that we've

6   heard testimony about the debtors' ability to determine

7   citizenship of its customers.  So, again, maybe that's

8   something that can be discussed at the status conference, do

9   they have the ability to determine what the citizenship is so

10  that they can know whether or not to redact the name.

11          THE COURT:  Right.  I think that's right, yes.

12          MS. SARKESSIAN:  Thank you, Your Honor.

13          MR. GLUECKSTEIN:  That's fine, Your Honor.  We'll

14  be happy to address that issue at that point.

15          THE COURT:  Okay.  All right.

16          All right.  Well, thank you.  Anything else?  So,

17  I'll look forward to the certification of counsel to the

18  order so far.

19          MR. GLUECKSTEIN:  No, I think on that issue, that

20  is it, Your Honor.  We're happy to move forward with the

21  agenda unless Your Honor would like to address any other

22  issues?

23          THE COURT:  Let me see.  Mr. Finger?

24          MR. FINGER:  May I be excused?

25          THE COURT:  Yes, thank you.

1           All right.  Let's go forward.

2           MR. GLUECKSTEIN:  All right.  Thank you, Your

3  Honor.

4           I'm going to take one item, if I may, if it

5  pleases the Court, just Agenda Item 22, slightly out of

6  order, and then I will turn things over to Mr. Dietderich.

7  Agenda Item 22, Your Honor, is the debtors' motion to

8  authorize, provide indemnification, and exculpation on a

9  final basis to certain individuals taking actions to secure

10 at-risk cryptocurrency and cash.  The motion was filed under

11 seal prior to -- in connection to the first day hearing at

12 Docket 95.  An interim order was entered at Docket 140 and

13 subsequently unsealed after a discussion with the Court

14 recently at Docket 323.

15          Your Honor, there have been no objections filed

16 with regard to the motion.  The debtors have received

17 informal comments and have had discussions at length with the

18 United States Trustee and the official Committee.

19          In response to those comments received, the

20 debtors did file a revised, proposed order last night.  The

21 motion, Your Honor, was filed, as the Court will recall, on

22 an emergency basis when it became clear in the initial days

23 of these cases that certain of the debtors' cryptocurrency

24 and cash assets were at significant risk of being hacked,

25 stolen, lost, or compromised, if not immediately moved and

1    secured.  This required individuals to act quickly, on behalf

2    of the debtors, to take actions in a difficult environment.

3            Those assets included crypto and other digital

4    assets that were held or maintained on third-party exchanges,

5    or in so-called hot wallets, that are not maintained on

6    third-party exchanges.  There were cash assets held in bank

7    accounts around the world and in certain cases, on third-

8    party brokerages, where securities and other assets were

9    being held.

10           I am pleased to report to the Court that very

11   significant progress, and Mr. Dietderich alluded to this,

12   this morning, has been made on the work that was done and

13   necessary for which this motion and an interim order has been

14   integral, but the work to locate and secure assets remains

15   ongoing.  Transfers of cryptocurrency are subject to certain

16   inherent risks.  Some of those risks are very amplified, here

17   in these cases, due to the inadequacy of prior controls

18   before the debtors' current management team got in and put

19   them in place.

20           As a result, the protection for a limited number

21   of individuals on the frontline of this work remains

22   critically important.  I do want to note for the record,

23   based on discussions with the Committee, that the debtors are

24   okay with the requests from them to be sure that to the

25   extent there are indemnification payments that ultimately

1  need to be made under the order, that the debtors will seek

2  payment from any applicable insurance policies and that the

3  debtors retain all rights of subrogation with respect to

4  obligations that might arise under this order.

5          I think the Committee is going to want to be heard

6  on this, as well, but from the debtors' perspective, Your

7  Honor, we would ask that the order be entered.

8          THE COURT:  Okay.  Thank you.

9          Mr. Hansen?

10         MR. HANSEN:  Yes, Your Honor.  Again, Kris Hansen

11  with Paul Hastings, on behalf of the Committee.

12         Your Honor, that was really our main point, with

13  respect to the indemnification motion, which is that if

14  indemnification payments are going to be made, that the

15  debtor use its best efforts, first, to look to applicable

16  insurance, which is not only D&O insurance, it's other

17  professional liability insurance, as well.  As the motion

18  makes clear, they look to include parties in connection with

19  that who may be covered by their own insurance.  And so, we

20  want to make sure that insurance assets are used to make

21  those payments, if at all possible, and that if the debtor

22  needs to advance payments first, that it has subrogation

23  rights to move against that insurance.

24         Ideally, we would include that in the order so

25  that it's clear.  Obviously, we've all stated it here on the

1   record, so if we could include it in the order, that would be

2   the Committee's favored approach.

3            THE COURT:  Okay.  Is there any objection to

4   revising the order, Mr. Glueckstein?

5            MR. GLUECKSTEIN:  No, Your Honor.  We're happy to

6   sit back down the Committee and discuss the order further and

7   submit an agreed-upon form of order.

8            THE COURT:  Okay.  Thank you.

9            Was the Committee the only objection on that?

10            MR. GLUECKSTEIN:  Yeah, I don't know if the U.S.

11   Trustee has anything further on this motion.

12            MS. SARKESSIAN:  Yes, Your Honor.  Again, for the

13   record, Juliet Sarkessian on behalf of the U.S. Trustee.

14            I believe we have worked out all of our issues

15   with the debtors on this.  I think the only thing I just want

16   to make clear on the record is the proposed final order will

17   have an exhibit.  The exhibit needs to be filed under seal,

18   but the order itself, once it gets entered, should -- the

19   order itself should not be under seal.  The exhibit is a list

20   of people's names that are going to be covered by the order

21   getting the indemnification and exculpation.

22            We've had some trouble with -- a seal order in the

23   past got entered under seal, so I just want to make sure that

24   it's clear that the order, itself, is not under seal, but the

25   exhibit will be, I guess, right?  I think that's what we

1   need.

2          MR. GLUECKSTEIN:  That's correct, Your Honor.

3   We're not looking to seal the order.  We've unsealed, now,

4   with the Court's permission, the interim order.

5          Ms. Sarkessian is correct, we will, and we have,

6   in fact, filed under seal, already, the list of names that's

7   contemplated -- that is contemplated to be attached to the

8   order.  And so, when we submit the final order for Your

9   Honor's review and signature, the order, then, would be on

10  the docket, but the exhibit to that order would remain filed

11  under seal.

12         THE COURT:  Okay.  That's fine.  I did see that

13  list already.  I saw it this morning.

14         MR. GLUECKSTEIN:  Thank you, Your Honor.

15         THE COURT:  All right.  So that one, again, will

16  be submitted under COC?

17         MR. GLUECKSTEIN:  Yes, once we agree on the

18  additional language with the Committee, we'll submit that

19  under COC.

20         THE COURT:  Okay.  Thank you.

21         MR. GLUECKSTEIN:  And with that, Your Honor, I

22  will cede the podium to Mr. Dietderich to address cash

23  management.

24         THE COURT:  Okay.

25         MR. DIETDERICH:  Hello, again, Your Honor.  For

1  the record, Andy Dietderich, Sullivan & Cromwell, for the

2  debtors.

3          I have Docket 21, the cash management order.  Your

4  Honor, on this one, all objections have been resolved, in our

5  view, other than one objection from the U.S. Trustee.  Before

6  addressing that objection, I wanted to -- I have a sentence

7  to read into the record and a couple general points to the

8  Court.  I also want to talk about the evidentiary record here

9  for just a moment.

10          From the debtors' perspective, we believe the U.S.

11 Trustee has an objection that's a pure point of law, which is

12 about whether or not the Court has authority to grant

13 superpriority status to claims against the cash management

14 system.  I do not believe her objection goes to the

15 reasonableness of that decision and we do have a record, of

16 course, for the reasonableness of the cash management system

17 from Mr. Mosley's prior declaration, which is on the docket

18 from the interim hearing.

19          So, I'd like to go ahead and proceed on that

20 assumption, but to the extent that Ms. Sarkessian does have

21 an objection to the reasonableness of the cash management

22 procedure, we do reserve the right to call Mr. Mosley, put

23 him on the stand, and ask him a few questions.

24          THE COURT:  Why don't we find out before we go?

25          MS. SARKESSIAN:  Your Honor, it's a pure legal

1   argument.  I'm not making any argument about the

2   reasonableness of any decision that the debtors have made in

3   this regard, just whether it's permissible under the Code.

4           THE COURT:  Okay.  Thank you.

5           MR. DIETDERICH:  Okay.  Thank you, Ms. Sarkessian.

6           On that basis, Your Honor, the evidentiary record

7   here is we're relying on is the declaration of Mr. Mosley in

8   support of first day relief, Docket 57; his supplemental

9   declaration, Docket 93; and although we're not relying on it

10  for evidence, for the Court's information, there is a second

11  supplemental declaration of Mr. Mosley, last evening, which

12  is generally applicable with the 13-week cash forecast, and

13  that's at Docket 460.

14          So, Your Honor, we have, in order to resolve the

15  objection from Evolve Bank, which is one of the banks where

16  we have accounts that are nominally recorded as FBO accounts,

17  we have a little bit of language to read into the record.

18  So, in paragraph 13 of the form of order, where it speaks

19  about the rules for closing FBO accounts, we have committed

20  with Evolve that we will not close the accounts at their bank

21  without notice and a further order of the Court.  And so, we

22  will be submitting a revised form of order where the language

23  that will make that clear and we have text that we've worked

24  out with counsel to Evolve.

25          Second, Your Honor, we have some objections from

1   shareholders.  So, a couple of shareholders have surfaced,

2   represented by our friends at Debevoise, and they've reviewed

3   this order.  They have, I believe, an objection or a

4   reservation of rights, one or the other, one file.  And we've

5   worked out with them that we've made some commitments to them

6   to share information informally, that they've accepted, and

7   on that basis, I believe their objection is resolved.

8           With respect to the overall motion, Your Honor,

9   this is really the same cash management system that we

10  proposed earlier, so there's been no substantial change to

11  the management system we're proposing going forward, with one

12  exception.  During the interim period, we had some gates on

13  the ability to move, to make advances from silo to silo.

14  There was a hard cap on the movement of money from silo to

15  silo.

16          We've had a number of discussions with the

17  Committee about what the right approach is to this case, in

18  terms of movement of money in the cash management system

19  across silos and we've agreed with them on a flexible

20  procedure where we will use a budgeting and projection

21  process and involve them periodically in that process.  And

22  to the extent that we agree that it's appropriate and prudent

23  to move money from the silos, we're permitted to do that

24  under the cash management system and our business judgment

25  with the committee's involvement.

1        However, to the extent that the Committee

2   disagrees, either with the projections about amount of silo

3   movement or we have variances from time to time that are

4   larger than beyond a certain cap, in that circumstance, the

5   Committee can come back to Your Honor on an accelerated

6   schedule with an objection.

7        And we think that's an appropriate basis.  You

8   know, we will be moving money between the silos, only to the

9   extent that we think this obviously creates a reliable,

10  administrative claim.  We have substantial, unencumbered

11  asset value at all of the silos.  The question might just be,

12  really, a question of working capital, until we're able to

13  monetize some of the assets and some of the pockets that we

14  have.

15       There's been no objection, Your Honor, that goes

16  to that mechanism.  The objections that we've resolved went

17  to more of question, should we charge interest and how should

18  the mechanics of the details work?

19       So, with that, Your Honor, I'll turn to the

20  remaining objection that we have, which is the objection of

21  the U.S. Trustee on the legal question of whether or not Your

22  Honor has the authority to grant superpriority status to

23  advances under a cash management system.  There's not a lot

24  of case law that will be helpful to us on this point.  I

25  think we have a reading of the Bankruptcy Code that says that

1  which is not prohibited by the Bankruptcy Code, and we have

2  an evidentiary basis of reasonableness for, Your Honor can

3  award under 105.

4          We also think for the reasons that we put in the

5  papers, which I don't need to rehearse, that the proper

6  allocation of risk in a system with many debtors between

7  administrative creditors, so it's really a question of

8  allocation of risks among different administrative creditors

9  in a common system, that if the advances by the cash

10  management pool are given the superpriority status, the

11  consequence of doing so is that the first loss if there was a

12  problem, and heaven forbid, we don't expect there to be a

13  problem, but if there ever was a problem anywhere in part of

14  our system, the superpriority protects the cash management

15  system and the other debtors against a localized problem and

16  it allocates, first, administrative loss to the

17  administrative creditors of that particular debtor.

18          The converse rule, a rule that says it was an

19  ordinary administrative advance, the problem with that rule

20  in our mind is that it, then, socializes any loss, any

21  administrative loss among administrative creditors in our

22  case, all over the world.  And so, this superpriority status

23  for administrative advances, we believe, is consistent with

24  the approach that had been taken by the debtors that have

25  really thought it through in the complicated cases, in

1  particular, cross-border cases.  It's consistent with the

2  way -- and, again, without evidence on this, Your Honor, but

3  from -- I'll speak, just informally, from personal

4  experience -- it's the way international companies think

5  about cash management, making sure the system is protected,

6  as opposed to any particular arm of the organization, and we

7  believe it's the reasonable approach, you know, on the facts

8  of our particular case.

9          In terms of the pure legal issue, we see nothing

10 in the Code that prohibits Your Honor from doing it.  The

11 U.S. Trustee, in respect to the argument, says there's only

12 two circumstances where superpriority expense can be awarded

13 by a debtor and we think those are two circumstances --

14 excuse me -- where the Code contemplates it, but it -- it's

15 not otherwise permitted.  And to the extent we do so on the

16 record, so that all of our administrative creditors know that

17 the advances have superpriority status, we think there's

18 adequate notice to do it.  In some ways, the greater power

19 implies the lesser.  We should be able to incur

20 administrative debt at one of our subsidiaries on the

21 understanding that the person we're dealing with knows that

22 advances against the cash management system do have a

23 priority.

24          Now, the last thing I'll say, Your Honor, is this

25 doesn't come up super often because of DIP financing and the

 1  arrangements of DIP financing often supercede this, and it's

 2  embedded in the cash management system that's somewhat

 3  connected, at least, to the DIP loan.  Here, we don't have a

 4  DIP loan, so there's a little bit more attention on the

 5  question, but those are my remarks on it and I'm happy to

 6  cede the podium to Ms. Sarkessian and she can give you the

 7  contrary view.  Thank you.

 8          THE COURT:  Thank you.

 9          I think the Committee wants to weigh in first.

10  Hold on one second.  We have a -- I want to make sure --

11      (Pause)

12          THE COURT:  The Zoom video went out?  They can

13  still hear me, though?

14      (Pause)

15          THE COURT:  That means everybody else has to dial

16  back in?

17      (Pause)

18          THE COURT:  A technical glitch.

19          MR. DIETDERICH:  I hope it's nothing I said.

20          THE COURT:  It happened when you stood up.  I

21  don't know.

22      (Laughter)

23          THE COURT:  All right.  Unfortunately, we have to

24  have IT come up and take a look at what's happening here.

25  So, let's take a recess until we can get this resolved,

1  hopefully, pretty quickly.  Just let me know when we're

2  ready.

3          All right.  We'll recess until we get this fixed.

4  Thank you.

5      (Recess taken at 12:17 p.m.)

6      (Proceedings resumed at 12:40 p.m.)

7          THE COURT:  Okay.  Ready to go.

8          MR. GILAD:  Good afternoon, Your Honor.  Erez

9  Gilad, Paul Hastings, LLP, proposed counsel to the official

10 Creditors' Committee.

11         Your Honor, I rise only to make some comments,

12 with respect to the cash management motion.  We, as a

13 Committee, support the cash management and wanted to describe

14 to the Court that we have spent a fair amount of time

15 negotiating and improving the terms of the cash management

16 order.

17         Our approach to the cash management system in the

18 proposed form of order was to facilitate the use of a

19 centralized cash management system, which all else being

20 equal, is rather common to complex corporations of this size,

21 but at the same time, reflecting the realities of the case,

22 preserving parties' rights, with respect to assets of the

23 debtors, offering visibility into movement of cash, and

24 enacting appropriate safeguards for the benefit of the

25 debtors' estates.

1          To that end, as counsel indicated earlier, we did

2     negotiate an extensive regime of reporting, that is weekly

3     and monthly reporting, delivery of monthly budgets of various

4     tests, intercompany reconciliation reports as well,

5     consultation rights, and opportunities for the Committee to

6     step in and seek relief before the Court, if there are

7     certain objections to either, to the budget or any

8     disbursements that sought in excess of a 10 percent variance.

9     There's also a negotiated result with respect to imposing a

10    cap on transfers to nondebtors.

11         We think, all in, these provisions strike the

12    appropriate balance between assuring the proper movement of

13    cash and the efficient administration of the case, which,

14    frankly, benefits all constituents, but also affords

15    appropriate protection to the debtors' estates.  And it's

16    important to note that as part of the negotiated result, we

17    did incorporate language into the cash management order which

18    provides a fulsome reservation of rights for the benefit of

19    parties, with respect to entitlements regarding customer

20    funds, and also a fulsome reservation of rights with respect

21    to the rights to assert whatever rights or remedies they

22    have, notwithstanding the silo creation, and notwithstanding

23    the movement of cash between accounts and between silos.  So,

24    we thought that that was similarly important for the benefit

25    of constituents in the case both, customers and creditors

1  alike.

2          From the perspective of the legal issue that's

3  been presented in terms of the admin priority versus

4  superpriority, obviously, the debtors' intent here is to

5  ensure that to the extent that there is movement of cash,

6  that the appropriate estates are protected.  In terms of the

7  superpriority status, again, our perspective there is that

8  the debtors' view is that it's simply additive protection for

9  the benefit of the transferor estate.

10          It's my understanding that from a process and

11  notice perspective, at least, I believe that the interim form

12  of order included the establishment of a superpriority claim,

13  with respect to the transferor estate, so I view it from that

14  perspective, I think it's been on notice now, for purposes of

15  the second day hearing, that that relief would be requested.

16  So, I think that notice, coupled with the comments made by

17  counsel that we don't believe that there's any prohibition

18  against the Court affording superpriority status, we support

19  the relief requested by the debtors.

20          Unless Your Honor has any questions, I believe

21  that's all I have to say.

22          THE COURT:  All right.  Thank you.  No questions,

23  thank you.

24          MR. GILAD:  Thank you, Your Honor.

25          THE COURT:  Okay.  Let's see.  We have another

1   speaking in support of?

2           MR. LEVINSON:  In support, yes, Your Honor.

3           THE COURT:  Okay.  Go ahead.

4           MR. LEVINSON:  Good morning.  Sidney Levinson,

5   Debevoise & Plimpton, for Paradigm operations.

6           Paradigm is a substantial stakeholder in these

7   bankruptcy cases, including about 280 million of equity

8   investments in two of the silos, West Realm Shires and FTX

9   Trading Ltd.

10          We've heard Mr. Gray and others take aim at the

11  poor recordkeeping of the debtors prior to the bankruptcy

12  filing, and we recognize that the process of identifying the

13  assets and the liabilities of each debtor, as well as the

14  prepetition intercompany claims and relationships that exist

15  among them is very much a work in progress.  I mean, it's

16  fair to say none of us really know at this moment how all of

17  that is going to shake out, but given that state of affairs,

18  it's absolutely vital for all stakeholders to be able to

19  preserve the status quo as of the petition date to the

20  fullest extent possible and to maintain the separateness of

21  the various debtor entities to the fullest extent possible so

22  that each of the individual debtors and their respective

23  stakeholders aren't prejudiced by anything that's going to be

24  happening during the bankruptcy cases.

25          The cash management order, obviously, has some

1   impact on that status quo and, accordingly, there need to be

2   protections implemented to minimize that threat.

3            We engaged in informal discussions, we did also

4   file a limited objection, but those informal discussions have

5   been ongoing with the debtors for several weeks to address

6   our concerns and in fact the revised form of order includes

7   many of the suggestions that we had made with respect to the

8   form of order.  And given that, as well as the commitments

9   that Mr. Dietderich referred to in his comments, Paradigm is

10  withdrawing its remaining objections.

11           I would, if I may, Your Honor, just like to be

12  heard briefly on the United States Trustee's limited legal

13  objection because the inclusion of super-priority claims is

14  fundamental to our support of the current cash management

15  order in its current form.

16           Now, contrary to their position, I would submit

17  that the Bankruptcy Court does in fact authorize, expressly

18  authorize the grant of the super-priority claim and I think

19  that express authority can be found in Section 363(e), which

20  governs the use of property in which an entity has an

21  interest.  If I can indulge Your Honor just to read from

22  363(e):  "Notwithstanding any other provision of this

23  section, at any time, on request of an entity that has an

24  interest in property used, sold, or leased, or proposed to be

25  used, sold, or leased, by the trustee, the Court, with or

1  without a hearing, shall prohibit or condition such use,

2  sale, or lease as is necessary to provide adequate protection

3  of such interests."

4         Now, here, the debtors and non-debtors whose funds

5  are being used have an interest in these proceeds and are

6  entitled to request a grant of adequate protection from the

7  debtors that are in fact receiving those proceeds or the

8  benefit of those proceeds.  Section 361 authorizes the grant

9  of adequate protection in many forms, including the

10  realization of the indubitable equivalent of an interest in

11  such funds.

12         And one thing that 361 makes clear is that a mere

13  administrative expense priority is not sufficient by itself

14  to provide adequate protection.  Thus, we would submit a

15  super-priority claim is the bare minimum that would be

16  required to provide adequate protection and, indeed, if it

17  turns out that any form of adequate protection turns out to

18  be insufficient, the entity advancing such funds would be

19  entitled to a super-priority claim under Section 507(b).

20         So we think the United States Trustee's limited

21  objection is misplaced not only for all the reasons outlined

22  by the debtors in their paper and by Mr. Dietderich today,

23  but also by that provision as well, and that this Court does

24  in fact have the authority to grant super-priority claims and

25  we respectfully request that Your Honor approve that

1  provision.

2          Unless Your Honor has any questions --

3          THE COURT:  No questions.  Thank you, Mr.

4  Levinson.

5          MR. LEVINSON:  Thank you.

6          MR. WORALDEIN:  Good afternoon, Your Honor, Elie

7  Woraldein, Debevoise & Plimpton, a separate Debevoise &

8  Plimpton team, on behalf of certain Lightspeed Funds, here

9  together with our co-counsel Cole Schotz.

10          I'll be very brief, Your Honor, because I don't

11  want to repeat a lot of the points that were raised by

12  Paradigm, as well as the committee.  Our interests and the

13  concerns that Paradigm Lightspeed had are very similar to the

14  concerns of the committee, as well as the concerns of

15  Paradigm.

16          But, very briefly, as noted in our reservation of

17  rights, which is Docket Number 389, Lightspeed Funds are

18  substantial equity holders in several of the debtor entities.

19  Based upon the debtors' public filings and statements thus

20  far in the case, the debtors have acknowledged that certain

21  FTX entities in the WRS silo, as well as certain other

22  entities, are solvent.

23          So, as noted in our brief, Lightspeed -- the

24  Lightspeed Funds' concerns were that it's imperative in this

25  case to preserve the status quo, for all of the reasons noted

1   by Paradigm's counsel just a moment, that it's imperative to

2   maintain corporate formalities and preserve the status quo,

3   especially at this early stage of the Chapter 11 case, and we

4   must do that to the greatest extent possible in order to

5   ensure that the rights of legitimate stakeholders are

6   preserved.  Lightspeed was concerned that the original motion

7   and proposed order as originally drafted -- the debtors were

8   able to transfer funds from debtor entities to non-debtor

9   entities and vice versa and that's how they were intending to

10  fund these Chapter 11 cases, the concern of Lightspeed was

11  that those initial proposals didn't have sufficient

12  safeguards to protect the interests of those solvent debtor

13  entities, as well as the various stakeholders of those debtor

14  entities and, therefore, the original proposed order left a

15  substantial risk that solvent FTX entities will be funding --

16  seeing their cash being used to the benefit of other debtor

17  entities.

18          And this wasn't only a concern of the Lightspeed

19  Funds, this is a concern that all stakeholders -- as, you

20  know, the committee noted as well that it's important that

21  different stakeholders, obviously, have different claims

22  against different legal entities, so it's imperative to

23  preserve and maintain corporate formalities in order to

24  ensure that each stakeholder against the individual debtor

25  entity could preserve the status quo of whatever cash or

1  rights or assets they have.

2         As noted earlier, we're happy to report we have,

3  in light of the revisions to the proposed order, most

4  importantly, the grant of the super-priority claim, as

5  discussed earlier -- and I won't repeat those legal arguments

6  that were already mentioned -- we believe that they will

7  satisfy Lightspeed Funds' concerns at this time and we're

8  going to withdraw our reservation of rights and any

9  outstanding concerns in light of the extensive back-and-forth

10  arm's length discussions we've had with FTX's counsel over

11  the last few weeks.

12         However, we will note just for the record that

13  we'll continue to monitor these cases carefully, especially

14  in light of the reservation of rights for the various issues

15  in the proposed order, namely interest, allocation of

16  expenses, and some of the other points, which are all issues

17  that are reserved for later in the Chapter 11 case, but the

18  Lightspeed Funds will maintain careful monitoring of the case

19  just to ensure that the debtor entities are maintaining

20  corporate formalities, transparency, as we heard earlier in

21  the hearing, the key of tracing and monitoring all the cash

22  flows during the Chapter 11 case just to ensure that no

23  specific debtor entities and their various stakeholders are

24  prejudiced at the expense of other debtor entities.

25         So, unless the Court has any questions, that's all

1  I intended to add to the record.

2          THE COURT:  Okay.  Thank you --

3          MR. WORALDEIN:  Thank you.

4          THE COURT:  -- no questions.

5          Anyone else in support?

6      (No verbal response)

7          THE COURT:  Okay.  Ms. Sarkessian?

8          MS. SARKESSIAN:  Again, Juliet Sarkessian on

9  behalf of the U.S. Trustee.

10          Your Honor, the -- as Your Honor is of course well

11 aware, the priority scheme of the Bankruptcy Code is a key

12 part of the Bankruptcy Code, it is crucial and it's set forth

13 under 507.  There are only two grounds in the Code where

14 super -- we call it super priority, it's an administrative

15 claim that has priority over all other administrative claims,

16 there's only two places in the Code that provide for that,

17 one is under 364(c) in connection with DIP financing and the

18 other is under 507(b) for adequate protection of prepetition

19 liens.

20          So now Counsel for Paradigm had just argued that

21 super priority could be granted under 3 --

22          THE COURT:  You might need to lower the microphone

23 some.

24          MS. SARKESSIAN:  Oh, I'm sorry, yeah.  Thank you,

25 Your Honor.

1       On the super priority, it could be allowed under

2   363(e), but if you -- and it does talk about adequate

3   protection there, but if you turn back to 507(b) -- and

4   507(b) does reference 363 -- it says, if under 362, 363, or

5   364 of this title, if the trustee provides -- or, of course,

6   debtor-in-possession -- provides adequate protection of an

7   interest of a holder of a claim secured by a lien on property

8   of the debtor.  So it is limited to that, there must be a

9   lien.  So I don't think that -- it's my understanding that

10  the transfers we're talking about here between debtors or

11  between non-debtor affiliates to debtors are not going to be

12  secured by a lien and certainly not on a prepetition lien.

13      So the debtors' argument -- and other parties have

14  argued that, well, just because the Code points out two

15  places that allow for super priority claims does not mean

16  that super priority claims are otherwise prohibited.

17      The priority -- again, the priority of claims

18  under the Bankruptcy Code is a key portion of the Code.  And

19  so when the Code says there's two places where you get a

20  super priority claim and there's no other provision where you

21  could say, all right, well, this -- you know, maybe under

22  this one, and that's it, that is it.  Otherwise, what you

23  come up with is, well, then what's the standard for super

24  priority claims?  I mean, we know it would of course have to

25  be a post-petition claim, but then what's the standard?  Is

1    it just whatever the debtor thinks should be a super priority

2    claim?

3                I've heard talk about, well, there was plenty of

4    notice.  If there's no statutory authority to grant something

5    under the Code, then giving people notice about it doesn't

6    resolve that problem.  It's great to give parties notice, but

7    you have to have a statutory provision to hang your hat on.

8                Again, what are the parameters, who decides and

9    what are the parameters of other super priority claims that

10   are not referenced in the Code?  You know, here, what the

11   debtor is saying is it's basically elevating claims between

12   themselves and non-debtor affiliates into the debtor, that

13   those claims are being elevated over claims of ordinary post-

14   petition vendors and service providers.  They're the ones

15   that are being effectively -- they're having their claims

16   subordinated, effectively, without, again, there being

17   anything in the Code to provide for that.

18               And the other problem is, is when you start

19   expanding super priority to cover other things that are not

20   specified in the Code, eventually, it becomes meaningless

21   because, you know, everybody is going to get super priority.

22   I mean, for example, if you say, well, maybe you view these

23   transfers between the debtors as post-petition DIP financing,

24   in which case please file a motion to get that approved, but,

25   well, then one could say that a vendor -- if a vendor is

1  selling goods on 30-day terms, that's giving the debtors

2  post-petition credit, do they get a super priority claim?  I

3  mean, where does it stop?  Because if everybody gets super

4  priority, then super priority is completely meaningless.

5         And, you know, somebody had said this is usually

6  not an issue because usually there's DIP financing, under the

7  Code, they get super priority, and that's the end of it.

8  They're not going to share super priority with, you know,

9  inter-debtor transfers, you know, we don't have that here,

10  but that doesn't mean -- just because we don't have a DIP

11  financer, it does not mean a super priority status can be

12  given without authority under the Code just because it's

13  convenient for the debtors or because they gave notice to

14  parties.

15         And, you know, as we mentioned in our objection, I

16  mean, here there is -- I guess I would say it's somewhat

17  ironic that -- you know, I've been told by debtors' counsel

18  that the majority of these transfers between debtors are

19  going to be loans from the Alameda Silo to the dot.com silo.

20  That is not in the motion.  The motion actually has very

21  little information about what these transfers are and why

22  they're needed or the amounts or anything.  That's what I was

23  told, I assume that's true.  And, of course, we have no

24  prepetition allegations of money from customer accounts in

25  the dot.com silo being rated and sent to Alameda.  Now,

1  Alameda is going to be lending money to the dot.com silo and

2  getting super priority status.  There's something that's, I'd

3  say, troubling about that.

4          And I understand that there's reservation of

5  rights, you know, put in the order so that if later on it's

6  determined that money that's -- that Alameda has really

7  belongs to customers of other debtors, you know, that those

8  rights are reserved, but, again, elevating those types of

9  transfers from the Alameda silo to the dot.com silo over

10 ordinary course professionals -- not professionals, excuse me

11 -- well, actually, they are elevated over ordinary course

12 professionals as well.  And the professionals are here and if

13 they want to voluntarily subordinate their claims, then

14 that's fine, they can do that, somebody can consent to that,

15 but there's certainly no evidence that the numerous -- I'm

16 assuming numerous vendors and service providers to these

17 debtors post-petition have agreed to have their claims

18 subordinated to claims between the debtors or claims from

19 non-debtor affiliates to the debtors that take place after

20 the petition date.

21         THE COURT:  Well, isn't there protections built in

22 to avoid the issue of Alameda loaning money to the dot.coms

23 and the question being, well, is the money that Alameda is

24 loaning belong to somebody else, and that's being preserved,

25 right?  I mean, the only thing that the super priority claim

1  will do is make sure that any money loaned goes back to

2  Alameda and then the question of whether that money actually

3  belongs to Alameda, or some of the other debtors or customers

4  or whatever the case may be, is something that can be decided

5  at a later time?

6          MS. SARKESSIAN:  Yes, Your Honor, it is my

7  understanding that that is being preserved, but it does not

8  -- it doesn't address the issue of not having statutory

9  authority to expand super priority claims beyond what is

10  specified under the Code.

11          THE COURT:  Okay, I understand your point.

12          MS. SARKESSIAN:  Unless Your Honor has any further

13  questions, that concludes my argument.

14          THE COURT:  Okay.  Thank you, Ms. Sarkessian.

15          MR. DIETDERICH:  Thank you, Ms. Sarkessian.

16          Very briefly, Your Honor, Andy --

17          THE COURT:  You might need to raise the

18  microphones back up again just to make sure --

19          MR. DIETDERICH:  Sure, sorry.  Understood,

20  understood.  We should leave one low and one high, maybe.

21          Your Honor, just very, very briefly.  One factual

22  correction is we're talking about liabilities to the cash

23  management system, under no circumstances are we granting

24  super priority status to a claim by a non-debtor.  So even a

25  non-debtor subsidiary won't have super priority status under

1  the cash management system; this is for inter-debtor advances

2  only.

3         The only other thing I'd say is that there's lots

4  -- you know, practical arguments about this.  I think the

5  question before the Court is whether Your Honor has authority

6  to grant super priority status.  And, again, I submit that,

7  with respect to Ms. Sarkessian's position, there's no case

8  cited that you don't have the authority, there's no case

9  cited for the reading of the Bankruptcy Code that says that,

10  in the absence of a specific reference to super priority, you

11  can't grant super priority status, and there's no case cited

12  for her particular reading of 105, despite lots of

13  jurisprudence about how 105 is applied to circumstances where

14  the Code is, as it is in so many things in our practice,

15  silent on a particular practical issue.

16         Congress did not think about the question of how

17  to run intercompany cash management systems in a multi-

18  jurisdictional debtor.  I can assure you without having to

19  look to it, we're not going to find that in the legislative

20  history of the Bankruptcy Code.  But what it did do is it

21  gave the debtors discretion, put a creditors committee in

22  charge to oversee us, and gave Your Honor the authority

23  where, if something is not prohibited by the Code under 105

24  and consistent with what needs to be done in a case, to issue

25  the relief on that basis.

1          I think there is an interesting argument whether

2   you would have authority under 363(e) to do it as adequate

3   protection for a use of property of one debtor by another

4   debtor, and whether a debtor is an entity within the meaning

5   of 363(e).  We didn't make that argument; I think it's an

6   interesting argument.  I think we're just standing under

7   basic 105 authority and we think that's sufficient.

8          THE COURT:  Okay.  Thank you.

9          MS. SARKESSIAN:  Your Honor, if I could just

10  address this one factual issue.  I'm looking at the proposed

11  final order that was given to me last night that I'm not sure

12  if it's been filed yet, but the language says the net post-

13  petition liabilities at any time, from any debtor to any

14  other debtor -- and then they go silo pooling account -- and

15  then they have from any non-debtor affiliate to any debtor

16  under the post-petition cash management system shall be

17  entitled to super priority.  That's paragraph 5.

18         So, if that's wrong, we can change that, but I'm

19  reading that to say transferred from a non-debtor affiliate

20  to a debtor gets super priority.

21         MR. DIETDERICH:  Ms. Sarkessian, thank you.  Let

22  me look, a quick look.

23      (Pause)

24         MR. DIETDERICH:  I think that's correct, I think

25  that is wrong.  That speaks to an obligation nonsensically

1  from a non-debtor to the system having super priority status,

2  which is an overdraft.  Obviously, you can't award super

3  priority status to the obligations of a non-debtor because

4  you don't have authority over the non-debtor.

5          So that can be -- that's --

6          MS. SARKESSIAN:  That can be taken out?

7          MR. DIETDERICH:  -- an excellent catch and we can

8  fix that in the form of the order, and thank you very much

9  for that.

10          MS. SARKESSIAN:  At least my work is worth

11 something.

12          MR. DIETDERICH:  It's worth a great deal.

13      (Laughter)

14          MR. DIETDERICH:  And that's not -- and, for the

15 record, that is by far not Ms. Sarkessian's only very good

16 catch in our documentation.

17          THE COURT:  Oh, I know.  She catches a lot of

18 stuff.

19          MS. SARKESSIAN:  Thank you, Your Honor.  Well, I'm

20 glad we were able to say that.

21          THE COURT:  All right.  Okay.  Well, the only

22 question is whether I have the authority to grant super

23 priority status under 105 and I think that I do.  It's not an

24 issue that has, obviously, come up in the past because there

25 is no case law on it, but a number of courts have entered

1  them in situations such as this.

2          And, again, we have an unusual situation here.

3  There's no DIP financing, the debtors are operating on their

4  -- whatever cash they have available, and some might not have

5  the cash to do it.  And so I think this is consistent with

6  105, to the extent that 105 is intended to provide the Court

7  with the ability to fashion resolutions where the Code might

8  not provide a specific resolution, but it's necessary to

9  protect the interests of the constituencies involved in the

10 case.  And, here, I have all of the constituencies agreeing

11 that this is good for the case and good for their individual

12 constituencies.

13         So I will overrule the objection and will enter

14 the order subject to the revisions.  And you can work with

15 Ms. Sarkessian and, again, submit this under COC once you

16 have a revised form of order.

17         MR. DIETDERICH:  Thank you, Your Honor.

18         I think the last -- not the last -- I'm sorry, if

19 you could just give me a second.

20     (Pause)

21         MR. DIETDERICH:  The last motion for Your Honor to

22 consider today is the bidding procedures motion, Docket 24.

23 I was going to say last, but we also of course have the

24 status conference on schedule -- or the scheduling

25 conference.

1          THE COURT:  Okay.

2          MR. DIETDERICH:  So, Your Honor, the bidding

3  procedures motion, before we start here, we do have an

4  evidentiary record on bidding procedures today.  There are

5  two declarations to move into evidence.  The first is a

6  declaration of my partner Brian Glueckstein at Docket 412.

7  This is simply putting in front of the Court the privacy

8  policies for the various debtors.  And, again, Ms. Sarkessian

9  can confirm, but I do not believe we have an objection on

10  anything that goes to the consumer ombudsman issue -- if I'm

11  saying that correctly, ombudsman, I've always had trouble

12  with that word.

13          THE COURT:  Ombudsman, I believe.

14          MR. DIETDERICH:  Ombudsman.  The -- I believe that

15  the consensus is that no ombudsman is required in the case,

16  but Ms. Sarkessian can confirm.

17          And so I would just ask to move the declaration of

18  Mr. Glueckstein into evidence.

19          THE COURT:  Okay.  Is there any objection?

20      (No verbal response)

21          THE COURT:  It's admitted without objection.

22      (Glueckstein declaration received in evidence)

23          MR. DIETDERICH:  The second is the declaration of

24  Kevin Cofsky, who we heard from earlier, at Docket 413, and

25  I'd like to move that into evidence at this time as well.

1          I think Ms. Sarkessian may have a comment about

2  that declaration.

3          THE COURT:  Okay.

4          MS. SARKESSIAN:  For the record, Juliet Sarkessian

5  on behalf of the U.S. Trustee.

6          I object to the provision -- well, the statements

7  in paragraph 17 of Mr. Cofsky's declaration concerning bid

8  protections.  He addresses -- you know, he gives an opinion

9  that certain bid protections are, you know, common, et

10  cetera.  No -- the Court is not -- nobody is asking the Court

11  to approve bid protections at this time.  This is not

12  relevant.  We would ask that this -- there may be something

13  else in paragraph 17 that doesn't relate to bid protections

14  and I don't object to that, but anything relating to his

15  opinion or his testimony about bid protections, we would ask

16  that it be stricken at this time, you know, without prejudice

17  if they want to submit that, if later on the debtors are

18  requesting bid protections, and there is a procedure --

19  within the proposed bid procedures order, there is a

20  procedure whereby they can do that if they find a stalking

21  horse.  At that time, if they want to put in -- and, in fact,

22  we would say they would need to put in evidence to support it

23  -- they can do that at that time.

24          THE COURT:  Okay.  Mr. Dietderich?

25          MR. DIETDERICH:  Your Honor, Andy Dietderich.  We

1  disagree.  We think Mr. Cofsky's paragraph has actually been

2  drafted with respect to the basic situation, which is that we

3  are neither approving a sale nor the grant of stalking horse

4  protections today.  However, we are publicly announcing to

5  the world that bidding protections, stalking horse

6  protections are available.  And, in addition, we're

7  shortening the notice period for people to object to those

8  stalking horse protections.

9        So Mr. Cofsky's declaration is not intended to

10  prejudice anybody's ability to argue that bidding protections

11  given to a particular bidder in any circumstance are

12  unreasonable or inappropriate.  What they say is that, based

13  on his experience with bidding procedures generally, bidding

14  protections, as reflected in what we're doing publicly, are

15  appropriate and customary for sale transactions of this type

16  and in amounts that are reasonably and generally consistent

17  with such amounts in comparable circumstances.  He's not

18  saying that as applied to the facts of any particular bidder

19  or situation that they will be reasonable, but they're

20  reasonable generally.

21        In addition, he's saying that having this publicly

22  helps, quote, the ability to attract a prospective stalking

23  horse bidder by offering the bidding protections.

24        So it helps us as the debtor to have a banker who

25  has expertise in this area be able to say to anybody who

1  might be interested in putting forth a stalking horse bid

2  that, generically, this kind of stalking horse protection is

3  reasonable and customary for the circumstances.  We will not

4  be making any assurances to a bidder that bidding protections

5  will be granted to them in the particular facts of their

6  circumstances, nor do we mean to prejudice in any way the

7  ability of Ms. Sarkessian or the committee or any other

8  stakeholder to argue that the bidding protections as applied

9  to a particular bidder are unreasonable.

10          On that basis, we'd like to have the evidentiary

11  record that we were proposing.

12          THE COURT:  All right.  I'll overrule the

13  objection and take the testimony for what it is,

14  Ms. Sarkessian.  It certainly is not intended to indicate

15  that these bid protections will, in fact, be granted and

16  everyone's rights are reserved to object in the future, once

17  we have potential bidders lined up and are asking for bid

18  protections.

19          MS. SARKESSIAN:  Your Honor, will my ability to

20  cross-examine the witness later, if there are bid protections

21  being sought, will that be preserved or do I need to cross-

22  examine him now?

23          THE COURT:  Oh, no, absolutely preserved.  You

24  can -- you'll be able to cross him on anything when we get to

25  that point.

1           MS. SARKESSIAN:  Thank you, Your Honor.

2           MR. DIETDERICH:  Your Honor, the other concerns --

3  so, as we move down to the merits of the bidding procedures

4  order, Your Honor, I believe that all concerns have been

5  addressed and objections resolved, other than the objections

6  of the U.S. Trustee and Mr. Mallon (phonetic), the Mallon

7  objection that's on the docket.

8           Before I address the specifics of those, I'd like

9  to make a few general points for the Court and for the

10  record.  The first is, by far, the most important.  We have

11  not made a decision to sell anything and we're not asking you

12  permission to sell anything today.  This effort is part of a

13  process to look at all of our options across the very

14  complicated set of assets.  These particular businesses have

15  been identified earlier, because they are less integrated,

16  and sometimes not integrated at all, into the operations of

17  FTX.

18           Ledger X is a separately regulated exchange, a

19  derivative exchange with a different business model,

20  regulated by the CFDC.  It has regulatory capital

21  requirements, a relationship with its regulators, et cetera.

22  Embed (phonetic) is not regulated to the same -- in the same

23  way, but is separate.

24           Japan is in Japan, subject to pretty intense

25  regulation by the Japanese authorities.  The Japanese rules

1  for cryptocurrency are totally different than our rules.

2  Japan requires, for a cryptocurrency business, the

3  segregation in cold wallets, of all of the cryptocurrency

4  responding to customer entitlements and it has very strict

5  rules about entrust relationships that are established under

6  law and segregation rules that are established under law for

7  cryptocurrency and cash.  A completely different profile from

8  what's happening in any other exchange transactions.

9          And Europe, of course, has a Cyprus exchange that

10 has been run independently with a different customer base.

11 All of these businesses were actually recently acquired by

12 FTX; they weren't originally developed as part of the

13 development of the international platform.  They were all

14 recent acquisitions that have not been fully folded in to

15 FTX's operations, which is one of the primary reasons that we

16 believe there may be independent value.

17          But again, this is price discovery.  This is the

18 ability to create an option to sell if the debtors and the

19 consulting professionals believe it's appropriate under the

20 circumstances.  And I just want to assure everyone that there

21 has been no decision.  Our Board hasn't decided to sell

22 anything and we would need to present the business case to

23 our Board, based on the facts and circumstances.

24          The second is related, that we don't know if we're

25 going to sell the businesses, how we're going to sell the

1  businesses.  So, there's a comment from the U.S. Trustee that

2  we should have a form of asset purchase agreement.  We don't

3  have a form of asset purchase agreement, because we don't

4  know if it's an asset purchase.  It might be a stock sale.

5  It might be a merger.  We might sell one of the businesses in

6  combination with one of the other businesses.

7          What will determine this will be indications of

8  interest that we have not received and our sense, again,

9  working with the consulting professionals on how to make the

10 most money to return to creditors and customers.

11         There is a question whether some of these

12 businesses have synergies with businesses that we are looking

13 at retaining or possibly reorganize or selling separately,

14 for example, the international platform, or even the U.S.

15 exchange.  The question on synergies, of course, is not that

16 you wouldn't sell something because they're synergies, but on

17 whether or not the buyer is paying you enough to compensate

18 for the loss of those synergies if you kept the asset.  These

19 are synergistic to other buyers, just as they might be

20 synergistic to us, and so we're going to look at the price

21 determine -- that determines out of the marketing process in

22 order to make decisions.  We do have substantial interest so

23 far in all of these assets.

24         The other thing I'd note is just that -- and I

25 mentioned this in my preliminary remarks about this motion,

1  that we do have a shortened procedure for relief, a shortened

2  objection period for stalking horse protections, and so Your

3  Honor should just be aware of that.

4           I'd like to turn to the objection for the U.S.

5  Trustee.  As I mentioned, the first objection was that we

6  should have a form of asset purchase agreement.  Again, we

7  don't know that we're going to be using that particular form

8  of a transaction.  We might.  We're highly likely to for some

9  of these assets, and when we have a form of asset purchase

10  agreement, we've committed to put that in front of people,

11  well in advance of any auction.

12           Obviously, if we have a stalking horse, the

13  stalking horse will have an important role to play in what's

14  in the asset purchase agreement.  And there's many bidders in

15  many auctions where we run the auction off the back of a

16  specific asset purchase agreement or structure that our

17  stalking horse believes is important to the stalking horse.

18           A related objection is a request that we commit to

19  the U.S. Trustee now to preserve "all books and records."  We

20  absolutely intend to retain copies of books and records for

21  the businesses we're selling for a long list of reasons.  And

22  any standard form asset purchase agreement, there's a set of

23  covenants about records retention.  We're not able to retain

24  records in most circumstances for any purpose whatsoever;

25  generally, there's a purpose limit on our ability to retain

1   records when we sell a company.  One of those purposes is

2   always our ability to investigate or our ability to relate to

3   regulators, our ability to do our taxes.  And so, the debtors

4   are not going to lose access to anything that has to do with

5   causes of action or investigations in connection with an

6   asset purchase agreement, but again, with respect, I think

7   the objection is premature, until we have an asset purchase

8   agreement to show to stakeholders so they can review this

9   provision and determine whether or not it's adequate.

10         We're not going to commit today.  We're not

11   willing to commit today to simply preserve all books and

12   records with such simple language.

13         The other objection from the U.S. Trustee is that

14   we are not agreeing now that we will never release claims

15   against the employees.  So, we have committed, because it's

16   obvious and easy to do, that we are not releasing claims

17   against Sam Bankman-Fried, Gary Wang, Caroline Ellison,

18   Nishad Singh, or I believe we have some language, any of

19   their family or related persons.  But releases of employees

20   are sometimes an important part of the disposition of a

21   business when you're the buyer because the value of some of

22   these businesses is in the people, and as the buyer, you want

23   the people protected.  The last thing you want to do if you

24   buy a business is to have rank-and-file employees sued by the

25   person you just bought the business from.

1          Now, this raises a related point and it's

2    important to say, I think, for the record, as a more broad --

3    as a more -- something more for Your Honor to understand,

4    based on the review of Mr. Ray and his team so far, we have

5    no indication that rank-and-file employees of the debtors,

6    generally, were complicit in fraudulent activity.  Neither

7    the indictment of Mr. Bankman-Fried, nor the pleas of

8    Ms. Ellison or Mr. Wang, include criminal charges against the

9    debtors as enterprises.  Indeed, from my initial remarks,

10   Your Honor, I explained that at least the core part of the

11   fraud could be implemented with a single number in the Code

12   for the platform put in by programmers.

13         The nature of this is still under investigation to

14   be decided, but, you know, for the sake of all of the

15   employees of FTX, we have no indication that this was the

16   kind of problem that results in a which will charge against

17   an enterprise, as opposed to against individuals at the top.

18         MS. SARKESSIAN:  Your Honor, I have to object.  I

19   feel like there's testimony, factual testimony being given

20   here.

21         THE COURT:  I agree and I take no note of it.

22   It's not in evidence.

23         MS. SARKESSIAN:  Thank you.

24         MR. DIETDERICH:  And that is exactly my point, and

25   my point is that this is a sale objection and that when we

1  have a sale transaction, and if that sale transaction

2  involves the release of employees, we will have to make an

3  evidentiary showing that we have a business judgment for that

4  release.  But right now, it's a sale objection; it's not

5  before the Court.  And we would submit, respectfully, it's

6  not appropriate to restrict our ability to solicit interest

7  in these companies on a basis that we have to commit now for

8  what's going to be in our sale order or in our asset purchase

9  agreement.

10         THE COURT:  Okay.  Thank you.

11         MR. DIETDERICH:  One other thing, Your Honor,

12  before I leave -- sorry -- Mr. Mallon, his objection --

13         THE COURT:  Yes?

14         MR. DIETDERICH:  -- alleges a security interest

15  arising, as best I can understand it, under Swiss law.  That

16  objection, obviously, can be resolved by its sale objection,

17  but in addition, we're able to attach a lien to the extent he

18  had a security interest on the proceeds of the sale, that

19  will, of course, resolve in connection with a sale.  So, we

20  think that objection should be overruled and the matter

21  reserved for the sale hearing.  Thank you.

22         THE COURT:  Thank you.

23         MR. HANSEN:  Your Honor, Kris Hansen with Paul

24  Hastings, on behalf of the Committee.

25         Just before Ms. Sarkessian goes, I wanted to note

1  our reservation of rights.  I'll be brief.  I know we're

2  running long today.

3        Your Honor, the Committee is taking a very

4  cautious approach to this bidding procedures motion.  It's

5  early days in the case and as I mentioned before, we have a

6  lot of concerns about value preservation and value

7  maximization.  And so, we support the debtors' view that this

8  is a "wait and see" process.  We have a number of issues that

9  we've identified in our reservation of rights from timing to

10  access to information, to be able to make decisions for the

11  debtors and the Committee and for the Court, but also for

12  bidders to be able to make those decisions.  And I won't go

13  through them all individually here, I would just, again,

14  refer the Court to our reservation of rights, but I did want

15  to make sure that the Court understood from the Committee's

16  perspective, we may be back, to the extent the debtor seeks

17  to sell an asset and Committee disagrees with that, we may

18  raise an objection at that point in time.

19        And it's about value maximization and it's about

20  alternatives.  One of the things that Mr. Dietderich alluded

21  to is the connectivity of these businesses or maybe the lack

22  thereof, to the broader platform.  And as I mentioned earlier

23  to the Court, the Committee is hard at work with the debtors

24  to try to understand what the parameters are for potentially

25  restarting the exchanges and reorganizing this enterprise.

 1  And when we move quickly to sell off pieces of the business,

 2  we need to understand their connectedness.

 3          And so, yes, Ledger X, from a factual perspective,

 4  Embed, and others were purchased more recently, but we don't

 5  know if they're entirely severable, (indiscernible) if that

 6  severance of them from the broader platform will have a

 7  deleterious effect on the value of the enterprise as a whole.

 8  So, that's something that we're keeping an eye on.  We

 9  recognize this process is moving quite quickly, so we're

10  doing our work quickly, as well, but we just wanted to note

11  our reservation for the Court.

12          THE COURT:  Okay.  Thank you.

13          MR. HANSEN:  Thank you, Your Honor.

14          MR. HARVEY:  Good afternoon, Your Honor.  May I

15  please the Court?  Matthew Harvey from Morris, Nichols, Arsht

16  & Tunnell, on behalf of the Ad Hoc Committee of non-U.S.

17  customers of FTX.com.

18          I rise, Your Honor, only to say a couple of

19  sentences of our resolution with the debtors.  Your Honor, we

20  filed a limited objection to the sale.  We discussed our

21  limited objection with the debtors in connection with, excuse

22  me, a larger role of the Ad Hoc Committee -- with the larger

23  role of the Ad Hoc Committee as serving and ensuring that

24  FTX.com customers have access to information and an

25  opportunity to be heard, whether there may be conflicts --

1  and maybe "conflicts" isn't even the right word -- with the

2  debtors or the official Committee.

3          We were pleased with the debtors' acknowledgment

4  and discussion with us of the group's role in the cases and

5  representations regarding further cooperation going forward

6  and, accordingly, we're withdrawing our objection.  Thank

7  you.

8          THE COURT:  Okay.  Thank you.

9          Anyone else?  Ms. Sarkessian?

10          Your Honor, our objection set forth, I would say,

11  four categories of objections.  We have resolved two of them.

12  So the first objection was going ahead with the sale without

13  having adequate information and that included both -- I guess

14  I may have used the form asset purchase agreement -- any type

15  of sale agreement, whether it be stock sale, asset sale,

16  there is no form of sale agreement and, of course, there is

17  no schedules and statements or Rule 2015.3 reports.

18          We have resolved that.  The debtors are going to

19  be filing forms of whether it be asset purchase agreements,

20  stock purchase agreement, whatever it is, at least two weeks

21  before the sale date of any sale.  They are also going to

22  give the U.S. Trustee and the committee, even before that,

23  before its uploaded to the data room, they are going to give

24  the forms to us.

25          With respect to the schedules and statements an

1  order has been -- a proposed order has been submitted, maybe

2  Your Honor has already signed it, where the schedules and

3  statements will be filed for the asset sales, at least, two

4  weeks prior to the sale which will give my office enough time

5  to take a 341.  Then the same will be done for the Rule

6  2015.3 reports for those debtors who are selling stock in

7  non-debtor subsidiaries.  They would be filing that report,

8  at least, two weeks.  So I will still have to do two 341

9  Meetings on those, but at least I won't have to do three.  So

10  that is definitely an improvement.  So that has been

11  resolved.

12          The other thing was, essentially, a reservation of

13  rights regarding the ombudsman because there was nothing in

14  the record about the debtor -- the privacy policies for these

15  particular businesses and now they have put in that evidence.

16  They have attached all the privacy policies.  I think there

17  is an even an official translation of the Japanese one.  And

18  based on our review of that we believe that the debtor has

19  established that a consumer privacy ombudsman would not be

20  required with respect to these particular sales.  So we are

21  not pursuing that objection.

22          So what remains, and -- so there's two issues that

23  remain.  I think on the records retention, you know, we just

24  want to make sure nothing is lost that the debtors are

25  retaining all records that could potentially be relevant in

1 any civil criminal proceeding.  You know, we will look to see

2 what the wording is when we see if there is a sale agreement,

3 but, you know, we are glad that they are willing to do that

4 and we think that that is very important.

5 　　　　We just want to make sure that everything is

6 preserved and there is not some type of discretion, I guess I

7 would say, from the debtor's viewpoint of -- and we

8 understand that the original records will be transferred, we

9 are just talking about copies here.  But we don't want them

10 to say, well, we're not going to keep a copy of this because

11 the debtor makes the determination that it doesn't think it's

12 going to be relevant down the line in some proceeding.

13 　　　　Well a regulator might have a different view of

14 that.  So we think the widest -- I mean, again, we're talking

15 about saving copies of documents almost all of which, I am

16 going to guess, are electronic.  So I don't think it would be

17 any burden on the debtor.  I don't think that needs to be

18 addressed now.  I agree with that.  I just wanted to put it

19 on the radar.

20 　　　　The issue does need to be addressed now is we are

21 very concerned about the possibility that the debtor is going

22 to be selling or welcoming offers to purchase causes of

23 action against current or former -- it's not just rank and

24 file employees, its directors, its officers, or employees.

25 That specifically is mentioned in the bid procedures that if

1  someone is interested in purchasing it they have to indicate

2  that.  So I think they're welcoming that type of thing.

3         Yes, after we made our objection or we -- after we

4  conveyed our objection to the debtors on this regard they put

5  in a paragraph in the order that said, okay, with respect to

6  Mr. Bankman-Fried and three other top officers we agree, we

7  will not sell any causes of action against them or their

8  family members.  And that is a good first step, but I think

9  that it seems that the debtors have concluded, at this very

10  early stage of the case, before there has been an

11  investigation, an examination by an independent entity into

12  possible causes of action arising out of the debtors -- the

13  events that cause the debtor to file for bankruptcy.

14         Before that has taken place they have reached the

15  conclusion that there is only four people at the top that

16  were responsible for all of this and that out of the hundred

17  plus companies of the debtors that there was nobody else, be

18  it other officers or other employees, that either assisted

19  them in wrongdoing, or aiding and abetting, or were negligent

20  and missed something they should have seen, turned a blind

21  eye maybe nobody else was, maybe it was only four people that

22  committed this, allegedly, massive fraud involving billions

23  of dollars and nobody else in the organization and none of

24  their professionals and nobody else knew about it.

25         There needs to be an investigation before those

1  causes of action are sold.  You know, okay, there's a

2  business in Japan.  Where is the evidence that nobody in

3  Japan was involved with any wrongdoing?  Where is the

4  evidence that nobody in Japan knew about any of this?  We

5  don't know.  It's too early.

6          So we feel that given the situation that there

7  should be added to that list, you know, not just four names;

8  any officers or directors, any employees, any family members

9  of officers, directors, any companies that are controlled by

10 officers or directors, again former or current, or controlled

11 among an officer and their family members.  I mean there is a

12 wide range here.

13         These causes of action should not be sold at this

14 point in time.  Now the debtors say, oh, well, you know, we

15 can deal with that at the sale.  Here is the problem: right

16 now we have no purchase agreement to look at.  We have no

17 idea what they are proposing in this regard.  We are going to

18 be getting, potentially, if there's stalking horses, seeing a

19 stalking horse asset purchase agreement or a stock purchase

20 agreement.  We are going to have seven days to review it and

21 make an objection; it's a very small period of time.

22         There is going to be schedules.  There will be

23 schedules about which causes of action are going to be

24 purchased.  There might be placeholders in those schedules.

25 I mean we have seen this many a time.  Schedules aren't

1  filed, they're not ready yet.  Then we go to the auction

2  maybe somebody else or another stalking horse wins.  Now you

3  have a tiny window of a few days between the auction and the

4  sale hearing where they're negotiating the purchase

5  agreement; that gets filed, you know, maybe a day before the

6  sale hearing.

7         Again, a lot of times, oh, the schedules aren't

8  attached, they're not finished, or here they are, but they

9  can be amended.  They can be amended up until the time of the

10  closing or even after the closing.  So we're going to be

11  scrambling trying to figure out its hidden somewhere in there

12  are they selling causes of action.  I mean it's not going to

13  be like there is a bright shining light on it.

14         That is a real concern. It's going to be a very

15  small period of time to look at it and we might not see it.

16  It might not even be included or, again, they could amend

17  later after the sale hearing.  That is typically said, oh, we

18  have the right to amend the schedules.

19         So in this case, given what the situation is, this

20  early on, before an independent investigation we think it is

21  just completely inappropriate to be selling -- to be even

22  considering selling these types of claims. If the debtors are

23  willing to have a prohibition against claims against the top

24  four they should be willing to expand that to all directors,

25  officers, employees, again, companies that are controlled by

1 them, and professionals, prepetition professionals; no claims

2 against them should be sold.

3          So that is what we think is appropriate at this

4 point in time.  And if the debtors cannot do that, if they

5 say we're not able to do that then maybe the sale should be

6 put off.  Maybe it's too early to do the sales if that is the

7 situation because we don't have the information, we don't

8 have the investigation, and you are going ahead with a sale.

9 So either that has to be carved out of the sale or you have

10 to wait to do the sale until that investigation is complete.

11 That is what the U.S. Trustee thinks one choice or the other.

12 You cannot move forward at this stage of the case without an

13 independent investigation selling causes of action against

14 directors, officers, employees or professionals.

15          THE COURT:  Well isn't there a way -- I mean, I

16 certainly would consider any requests from the U.S. Trustee

17 if the debtors were trying to jam the Trustee at the time of

18 a sale hearing that you didn't have time to conduct whatever

19 review you needed to do, to raise whatever objections you

20 needed to raise at the time of the sale hearing.

21          We don't even know yet whether the debtors are

22 even going to sell these assets.  And we don't know whether

23 it's going to be an APA, a merger, a stock purchase; we don't

24 know at this point.  I think they're -- I think the debtors

25 are trying to dip their toe into the water to see what

1  happens, see what kind of interest they receive.  I think

2  it's important to be allowed to do that.

3        We always have -- we have a lot of cases where

4  there's an expedited sale process for one reason or another.

5  I understand your concerns about whether there is other

6  people who might have been at fault other than these four

7  executives that have been specifically named.  And I would

8  also, perhaps, say to the debtors that if they do receive a

9  stalking horse bid that includes the purchase of causes of

10  action that they immediately notify the U.S. Trustee so that

11  its not hidden in a gigantic sale agreement, that you have

12  some advanced notice that the issue is live. It might not be.

13  They might not want to buy the causes of action.  They might

14  just want to buy the platform or the assets and leave the

15  employees behind, I don't know at this point.

16        MS. SARKESSIAN:  Your Honor, could we -- I mean

17  following up on that idea, I think it should be -- we would

18  appreciate it if it was more than just letting us know. Of

19  course, we would like to know.  We think this is important

20  enough that there be a filing that highlights so that

21  everybody can see if the debtors were selling causes of --

22        THE COURT:  I agree, that should be done.  It can

23  be done like we do with a motion to approve a DIP.  You know,

24  we have certain requirements that certain things have to be

25  highlighted in that motion so that everyone knows that it's

1  in there so we can fashion a form of order that includes that

2  when they file -- when they receive a stalking horse bid and

3  they file it they include in that filing something that

4  highlights for everybody that they're proposing to sell the

5  causes of action.

6         That helps alleviate some of the time issues for

7  you and for others who might want to object.  And I am

8  certain that Mr. Hansen and his colleagues, on behalf of the

9  committee, are going to be investigating whether there are

10  causes of action against any of these other employees.  And

11  hopefully we will have some understanding of that as well

12  before we get to the point where the sales are being sought

13  to be approved.

14         MS. SARKESSIAN:  Your Honor, thank you.  I

15  appreciate that.  I think, again, it could also come up,

16  again, assuming if the stalking horse bidder is either not

17  the winning bidder or is the winning bidder, but the

18  agreement gets amended, which is possible, right, I mean

19  after the auction, okay, we agree to pay more, but then we

20  want these causes of action.  Again, at whatever stage if

21  causes of action are being sold that they be highlighted.  So

22  whether it's a stalking horse stage, whether it's the winning

23  bidder at the auction, and now they're filing their purchase

24  agreement to highlight that.

25         THE COURT:  I agree.

1        MS. SARKESSIAN:  Specifically, not just we're

2   selling causes of action, what causes of action.

3        THE COURT:  I agree.

4        MS. SARKESSIAN:  Thank you, Your Honor.

5        THE COURT:  That makes sense.

6        MR. DIETDERICH:  Thank you, Your Honor.  Andy

7   Dietderich.

8        We can confirm that is a great approach to the

9   solution.  In fact, that is exactly why we actually had it

10  called out in the solicitation of indications of interest

11  because we knew we had a special process to run for any

12  bidder that wanted to do the release.

13        THE COURT:  Okay.

14        MR. DIETDERICH:  So thank you, Your Honor.  With

15  that I don't think there is any other comments on the sale

16  order.  So I would respectfully ask the Court to enter the

17  order.

18        THE COURT:  Well we need to revise the order.

19        MR. DIETDERICH:  Revise the order, of course.

20        THE COURT:  Then submit it under COC and we will

21  get it entered.

22        MR. DIETDERICH:  All right.  Thank you.

23        With that I think the only business -- the only

24  remaining business is the scheduling matter.

25        THE COURT:  Okay.

1          Mr. Bromley, go ahead.

2          MR. BROMLEY:  Good afternoon.  May I please the

3    Court, Jim Bromley of Sullivan & Cromwell on behalf of the

4    debtors, Your Honor.

5          This is the time that we need to deal with the

6    scheduling of the motion for the appointment of an examiner.

7    The motion has been filed by the U.S. Trustees Office.  We

8    have consulted with the Office of the U.S. Trustee and the

9    creditor's committees counsel.  And the view of the debtors

10   and the creditor's committee's counsel is that the hearing

11   that has been reserved on the 8th of February, which is an

12   omnibus hearing date, is the appropriate date to go forward

13   with the motion for the examiner.

14         We, the debtors, are cognizant that the motion has

15   been filed for some time, but the date has been held in

16   abeyance.  We do have certain limited discovery requests to

17   make of the U.S. Trustees Office.  We will have submissions

18   ourselves that we will be making, both evidentiary and legal.

19   Our suggestion is that the papers and our declarations in

20   support of our papers be filed on Monday, January 30th.  That

21   would give the U.S. Trustees Office time to respond and to

22   seek to depose any witnesses that we have.

23         We would suggest, as well, that the U.S. Trustees

24   Office, and the committee, and we consult for a pretrial

25   order that would be submitted to the Court no later than

1  Friday the 3rd of February.

2          THE COURT:  Ms. Sarkessian, any -- well, let me

3  ask Mr. Hansen first.  Now that we have a committee we need

4  to know your view as well.

5          MR. HANSEN:  Exactly, Your Honor.  So we agree

6  with Mr. Bromley.  Again, its Kris Hansen with Paul Hastings

7  on behalf of the committee.  We agree with Mr. Bromley in

8  terms of the dates.

9          I just wanted to point out for the Court that we

10  also may have evidence to present.  We will make that

11  decision in enough time to let Ms. Sarkessian know so that

12  she can similarly take discovery of our witness as well if we

13  have that.

14          THE COURT:  Well I currently have an omnibus

15  hearing on the 8th scheduled at one for this case, and I have

16  two other matters on that morning.  So if we're going to have

17  an extensive evidentiary presentation I may need to move the

18  date or if I can't I will move the other matters and move

19  this one up for the full day.  It sounds like we may need a

20  full day for this hearing.

21          MR. HANSEN:  I think between argument and

22  potential evidence I don't know that it would take a full

23  day, but I think you should reserve that, Your Honor.

24          THE COURT:  Okay.

25          MR. HANSEN:  Jim, I'm not sure if you have a

1  different view.

2          MR. BROMLEY:  I agree with that, Your Honor.

3          THE COURT:  All right.  Let me hear from Ms.

4  Sarkessian.

5          MS. SARKESSIAN:  Thank you, Your Honor.  For the

6  record Juliet Sarkessian on behalf of the U.S. Trustee.

7          Your Honor, we understand from the last hearing

8  that Your Honor had the February 20th date that is scheduled

9  in this case that Your Honor has the entire day for this case

10  if I am correct about that.

11          THE COURT:  February 20th?

12          MS. SARKESSIAN:  I'm sorry, January 20th.  I don't

13  know why I keep saying February.  January 20th.

14          THE COURT:  That's a holiday, Court holiday.

15          MS. SARKESSIAN:  January 20th.  Friday, January

16  20th which I believe had been scheduled primarily for a

17  hearing -- well, there's a few things:

18          There's a hearing in connection with the Robinhood

19  stock which has been seized.  And I believe last time around

20  debtor's counsel indicated that might be moot because of the

21  seizure.  There were also fi

22          The U.S. Trustee believes that that would be the

23  best date for the hearing on the examiner, in part, because

24  we do have issues with certain of the retention applications

25  that are scheduled for hearing on January the 20th that the

1   scope of the retentions encompasses work that might be done

2   by an examiner.  So we think that argument, sort of,

3   dovetails with the examiner motion and it makes sense to have

4   them both heard at the same time.

5          Our examiner motion has been on file since

6   December the 2nd.  So, obviously, has had more than enough

7   time to address that.  We recognize that committee counsel

8   has not been -- was retained on, I believe, December the

9   20th, but nevertheless, you know, there has been a good

10  amount of time to respond.  So we would ask for that.

11         Absent in the alternative we would ask if Your

12  Honor has a date.  We too were concerned about February the

13  8th not being adequate time with it being scheduled at 1 p.m.

14  So we were wondering if Your Honor has a date between the

15  20th, January 20th and the February the 8th that would have

16  more time available then the 8th.

17         The other thing I would say is that, you know, the

18  U.S. Trustee would need to get the reply on file three days -

19  - three business days prior to the hearing.  So we would --

20  given how long parties have had our motion we would like to

21  have, at least, a week between when the objections are filed

22  and when our reply is due.

23         If, for example, Your Honor was to say put the

24  hearing on the 8th since our reply would be due February the

25  3rd we would want objections filed to January the 27th to

1    give us one week.

2            THE COURT:  Okay.  All right.  I do think I need

3    to -- the 20th doesn't work, I don't think, for this.  It's

4    too soon.  There is outstanding discovery.  If it hasn't

5    already been issued it will be issued, I assume.

6            Are you taking any discovery?

7            MS. SARKESSIAN:  I have received no discovery. I

8    am trying to imagine what possible discovery there could be

9    against the U.S. Trustee, but I have not received any.

10           We have not seen an objection, so we don't know

11   who their witnesses are.  We have no idea if they're, in fact

12   -- Your Honor, the U.S. Trustees position is that this is

13   mandatory under the code and, therefore, there is not a need

14   to have any evidence.  It's legally mandatory.  Nevertheless,

15   we understand that the parties may want to put on evidence,

16   but we don't know who they plan to put on, what they plan to

17   put on; we have no idea.

18           THE COURT:  I think you're familiar with my

19   position on the mandatory nature of the appointment of an

20   examiner.

21           MS. SARKESSIAN:  Yes, Your Honor.

22           THE COURT:  For the record, I do not believe it's

23   mandatory.

24           MS. SARKESSIAN:  Yes.

25           THE COURT:  Let's do this: I think the 8th -- I

1   want to make sure we have a full day. I am going to

2   reschedule this for February 6th which is Monday of that

3   week.  We will start at 9:30 a.m. The debtors and the

4   committee's responses will be due by the 25th.  Then the

5   Trustee will have until the 1st.

6          So you have a week, Ms. Sarkessian, for your

7   reply.

8          MS. SARKESSIAN:  Yes, Your Honor.  Thank you.

9          THE COURT:  Then we will have the hearing on the

10  6th.  If there is a -- pretrial orders are always helpful for

11  me.  So if there is -- if we're going to have an evidentiary

12  hearing on the 6th let's have a pretrial order by close of

13  business on the 3rd.  So 5 p.m. on the 3rd.

14         Mr. Bromley and Mr. Hansen, one, if you are going

15  to take discovery of the U.S. Trustee, please, do that

16  immediately so that Ms. Sarkessian knows that she needs to do

17  some discovery work.

18         Ms. Sarkessian, in light of my view on the

19  mandatory nature of the appointment of an examiner I don't

20  know if that now opens up for you your desire to take

21  discovery of the debtors, but if you do you should do that,

22  obviously, as soon as possible.

23         MS. SARKESSIAN:  Understood, Your Honor.

24         THE COURT:  Did I miss anything?  Did I cover all

25  of the issues?  Do I have all of the dates that we need for

1  everybody?

2          MR. BROMLEY:  I think that is all of the dates

3  that we need, Your Honor.  Thank you very much.

4          THE COURT:  Okay.  Ms. Sarkessian, anything else?

5          MS. SARKESSIAN:  I don't -- I think those are all

6  the dates in connection with the examiner motion.

7          THE COURT:  Okay.  Thank you.

8          All right.  Are we done?  Oral argument 12

9  minutes.

10          MR. GLUECKSTEIN:  30 seconds.

11      (Laughter)

12          MR. GLUECKSTEIN:  We really appreciate the Court

13  indulging us for such a long hearing today.

14          The only other scheduling matter I wanted to

15  raise, Your Honor -- Brian Glueckstein for the debtor.  There

16  was reference to the January 20th hearing.  We did elude to

17  this in the status conference a week ago, we have been in

18  touch with counsel for BlockFi and we are asking to adjourn

19  the hearing on the 20th with respect to our motion to enforce

20  the automatic stay with respect to the Robinhood issues.

21  BlockFi has a related motion, an evidentiary motion, that is

22  part and parcel of that hearing.

23          We are asking at this time that that hearing be

24  adjourned to a date to be determined.  We will come back to

25  the Court in light of the Government seizure of the shares.

1   There was a proceeding in the BlockFi bankruptcy case earlier

2   this week and that parties are continuing to talk about next

3   steps there with respect to all of the issues involving the

4   Robinhood shares.  We would benefit from some time.

5           So we would ask, with Your Honor's permission,

6   that we adjourn that hearing on those two issues.  There are

7   other things, of course, scheduled that day, the retention

8   motions and status conference that Your Honor ordered this

9   morning on the redaction issues.  But with respect to the

10  debtor's motion and related evidentiary issue we ask that

11  that be adjourned.

12          THE COURT:  What is BlockFi's position on the

13  continuance of their motion?

14          MR. GLUECKSTEIN:  They represented to me -- they -

15  - we had an email exchange this morning where they said they

16  were okay with us so representing.

17          THE COURT:  Okay.  We will take that off then for

18  the 20th; both of those off for the 20th.

19          Anything else before we adjourn?

20      (No verbal response)

21          THE COURT:  All right.  Thank you all very much.

22  We are adjourned.  I will see everybody on the 20th.

23          (Proceedings concluded at 1:48 p.m.)

24

25

1                              CERTIFICATION

2              We certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of our

5    knowledge and ability.

6

7    /s/ William J. Garling                    January 12, 2023

8    William J. Garling, CET-543

9    Certified Court Transcriptionist

10   For Reliable

11

12   /s/ Tracey J. Williams                    January 12, 2023

13   Tracey J. Williams, CET-914

14   Certified Court Transcriptionist

15   For Reliable

16

17   /s/ Mary Zajaczkowski                     January 12, 2023

18   Mary Zajaczkowski, CET-531

19   Certified Court Transcriptionist

20   For Reliable

21

22   /s/ Coleen Rand                           January 12, 2023

23   Coleen Rand, CET-341

24   Certified Court Transcriptionist

25   For Reliable

# EXHIBIT 4

1

<pre>
 1                      unitUNITED STATES BANKRUPTCY COURT
                            DISTRICT OF DELAWARE
 2
                                      .  Chapter 11
 3     IN RE:                         .
                                      .  Case No. 18-10814 (CSS)
 4     EV ENERGY PARTNERS, et al.,    .
                                      .  Courtroom No. 6
 5                                    .  824 North Market Street
                                      .  Wilmington, Delaware 19801
 6                                    .
 7              Debtors.             .  May 16, 2018
       . . . . . . . . . . . . . . . .  10:00 A.M.
 8
                            TRANSCRIPT OF HEARING
 9           BEFORE THE HONORABLE CHRISTOPHER S. SONTCHI
                     UNITED STATES BANKRUPTCY JUDGE
10
       APPEARANCES:
11
12     For the Debtors:        Brad Weiland, Esquire
                               Jeffrey Zeiger, Esquire
13                             William Arnault, Esquire
                               Casey McGushin, Esquire
14                             Travis Bayer, Esquire
                               KIRKLAND & ELLIS
15                             300 North LaSalle
                               Chicago, Illinois 60654
16
                               - and -
17
                               Laura Davis Jones, Esquire
18                             PACHULSKI STANG ZIEHL & JONES
                               919 North Market Street
19                             Wilmington, Delaware 19801
20
       Audio Operator:         Al Lugano
21
       Transcription Company:  Reliable
22                             1007 N. Orange Street
                               Wilmington, Delaware 19801
23                             (302)654-8080
                               Email:  gmatthews@reliable-co.com
24
25     Proceedings recorded by electronic sound recording,
       transcript produced by transcription service.
</pre>

1  priority rule, because the unsecured creditors are not

2  receiving more than they're entitled to.  And I think it was

3  definitely filed in good faith and none of the arguments,

4  numerous arguments made in support, to say it wasn't filed in

5  good faith, don't hold any water.

6          On 1126, I think the debtors are correct that they

7  did not have to solicit equity in this case because equity is

8  not receiving a distribution under the plan on account of its

9  interests, because they're not entitled to anything.  And the

10  cases that deal with class-skipping, et cetera, aren't

11  applicable, and there have been numerous cases in this

12  district and, otherwise, that have allowed just this

13  behavior.

14          What would have been accomplished by having the

15  equity be a vote here?  They probably would have voted "no."

16  Almost certainly would have voted "no," and we would have

17  been in a cram down, and we would have had a valuation

18  hearing, and they would have found to be out of the money,

19  and the absolute priority rule, with regard to equity, would

20  have been satisfied, so it would have been fair and

21  equitable, so it's just a waste of time.

22          With regard to the disclosure statement, I think,

23  frankly, there's an argument to be made that equity that's

24  not in the money doesn't have standing to object to a

25  disclosure statement, because the whole point of the

1  disclosure statement isn't to generally inform the world of

2  the facts of the case; it's to provide the investors with the

3  information they need to know how to vote.  If you don't

4  vote, a disclosure statement is really irrelevant.

5          But even throwing that aside, I still think the

6  disclosure statement contains more than enough information.

7  It's already a telephone book, for those of us who remember

8  what telephone books are, and, you know, there has to be a

9  limit on what you have to put in a disclosure statement.  I'd

10  like to see shorter confirmation orders, shorter DIP orders,

11  and shorter disclosure statements, all of which would be to

12  the benefit of society as a whole.  So, I'm not -- I think

13  the disclosure statement here is more than adequate.

14          And, you know, there's really no reason to go back

15  into transactions that occurred in 2014 and 2015 that just

16  aren't relevant to the plan that's before the voters.  This

17  is a little -- kind of all over the place, but there's a lot

18  of cover.  There's a lot I didn't mention, but in all those

19  instances and in all those arguments, I reject the equity

20  holders' position and affirm the debtors'.

21          Real quick, on appointment of the examiner -- and

22  this goes to the "there's no there there" -- you don't -- I

23  don't believe, and I've said this in numerous cases and my

24  colleagues have said it, that it's just mandatory to appoint

25  an examiner, as long as someone asks for one.  I think there

1  has to be an actual examination that needs to be done, an

2  appropriate inquiry that needs to be pursued and I think the

3  Movant in a motion to appoint an examiner has the burden of

4  proof of establishing something, some reason that it would be

5  helpful to appoint an examiner and I just -- I don't see

6  anything here whatsoever to appoint an examiner.

7            Now, all this, of course, you know, it would

8  certainly be better if there was more value here for the

9  unsecured creditors, as well as equity.  We can't -- the

10  Court is powerless to create value out of thin air, and all I

11  can do in connection with determining value is weigh the

12  evidence as it's presented to me and do the best I can.  And

13  I may be wrong, and it may be a situation here where equity

14  is entitled to more, but based on the evidence I have, I am

15  sorry to say that I don't believe they are, and that they are

16  fortunate to be getting the 5 percent that they're getting.

17            And it's interesting even though -- talking about

18  fiduciary duties -- I mean, even though all the evidence

19  indicated to the Board that this -- that equity was out of

20  the money, this Board fought very, very hard to get some

21  return to its equity holders, perhaps even breaching their

22  fiduciary duties to their creditors in the process.  But I

23  think that that speaks volumes to the integrity of the Board

24  in this situation and is another reason that it's clear to me

25  that they have acted with robust corporate governance and

# **EXHIBIT 5**

<pre>
 1                    UNITED STATES BANKRUPTCY COURT
                         DISTRICT OF DELAWARE
 2

 3                                     .   Chapter 11
       IN RE:                          .
 4                                     .   Case No. 20-10028 (LSS)
       PADDOCK ENTERPRISES, LLC,       .
 5                                     .   Courtroom No. 2
                                       .   824 North Market Street
 6                                     .   Wilmington, Delaware 19801
                                       .
 7                     Debtor.         .   June 17, 2020
       . . . . . . . . . . . . . . . . .   3:30 P.M.
 8

 9                  TRANSCRIPT OF TELEPHONIC RULING
            BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
10                 UNITED STATES BANKRUPTCY JUDGE

11     TELEPHONIC APPEARANCES:

12
       For the Debtor:          Michael Merchant, Esquire
13                              John Knight, Esquire
                                Brendan Schlauch, Esquire
14                              Sarah Silveira, Esquire
                                RICHARDS LAYTON FINGER, P.A.
15                              920 N. King Street
                                Wilmington, Delaware 19801
16

17
       Audio Operator:          Ginger Mace
18
       Transcription Company:   Reliable
19                              1007 N. Orange Street
                                Wilmington, Delaware 19801
20                              (302)654-8080
                                Email: gmatthews@reliable-co.com
21
       Proceedings recorded by electronic sound recording;
22     transcript produced by transcription service.

23

24

25
</pre>

```
 1  TELEPHONIC APPEARANCES (Continued):

 2  For the Debtors:          Jeffrey Bjork, Esquire
                              Amy Quartarolo, Esquire
 3                            Christina Craige, Esquire
                              Helena Tseregounis, Esquire
 4                            Lisa Lansio, Esquire
                              LATHAM & WATKINS
 5                            355 South Grand Avenue
                              Los Angeles, California 90071
 6
                              - and -
 7
                              Richard Levy, Esquire
 8                            330 North Wabash Avenue, Suite 2800
                              Chicago, Illinois 60611
 9
                              - and -
10
                              George Davis, Esquire
11                            885 Third Avenue
                              New York, New York 10022
12
    For the U.S. Trustee:     Richard Schepacarter, Esquire
13                            OFFICE OF THE UNITED STATES TRUSTEE
                              844 King Street
14                            Wilmington, Delaware 19801

15

16

17

18

19

20

21

22

23

24

25
```

1          (Telephonic hearing commenced at 3:46 p.m.)

2          THE COURT:  Good afternoon, counsel.  This is

3    Judge Silverstein. We're here in Paddock Enterprises; Case

4    No. 20-11028.

5          I apologize for my tardiness, but I'm going to get

6    right into my ruling and I will be reading it.

7          On May 20th of this year I held a combined

8    evidentiary hearing on three motions; debtor's motion to

9    appoint James L. Patton, Jr., as the legal representative for

10   future asbestos claimants, the United States Trustees motion

11   to appoint a legal representative for future asbestos

12   claimants, and the United States Trustees motion for an

13   examiner.  Testimony was adduced from four witnesses and

14   numerous documents were submitted into evidence.  On May 21st

15   I heard argument and took the motions under advisement.

16          Having considered the evidence and argument I am

17   granting debtor's motion to appoint Mr. Patton as the future

18   claims representative and consequently denying the U.S.

19   Trustees motion to appoint a legal representative for future

20   asbestos claimants.  I am also denying the United States

21   Trustees motion to appoint an examiner.

22          First addressing the two motions to appoint a

23   legal representative.  I recently addressed the standard for

24   approval of a legal representative under Section 524.  In the

25   Imerys Talc America case I concluded that a legal

1 representative must be independent of the debtors and other

2 parties in interest in the case, and must be able to act with

3 undivided loyalty to demand holders.  In _Imerys_, however, I

4 only had one candidate for the legal representative.  Here I

5 have two.

6        After considering the evidence I have determined

7 that Mr. Patton is the best choice for this particular case.

8 I do so for multiple reasons including that Mr. Patton meets

9 the standard I established in _Imerys_, he is independent of

10 the debtors and other parties in interest in the case, and is

11 able to act with undivided loyalty to demand holders.

12        As in _Imerys_, I do not view Mr. Patton's selection

13 by Paddock's predecessor in interest to represent future

14 claimants prepetition as an impediment to selection.  Mr.

15 Patton's engagement letter with Paddock's predecessor is

16 clear that in his prepetition capacity Mr. Patton's sole

17 responsibility and loyalty was to the future claimants, and

18 the engagement letter is also clear that Mr. Patton could be

19 adverse to the company that was paying for his services.

20        Mr. Patton has no other connection to Paddock or

21 Owens-Illinois.  Mr. Patton has significant experience as a

22 future claims representative and representing future claims

23 representatives.  Mr. Patton proposes to retain a team that

24 is experienced in representing future claim representatives

25 and performing the types of services necessary in an asbestos

1  mass tort case.

2         Mr. Patton can conduct an investigation into the

3  corporate monetization transaction.  As I already concluded,

4  his prepetition engagement specifically contemplated that he

5  could be adverse to Owens-Illinois, and the evidence was

6  clear that Mr. Patton did not advise Owens-Illinois with

7  respect to the transaction.  Indeed, he had input whatsoever

8  into the transaction.

9         As Mr. Whitely, Mr. Whitley also meets the

10  standard I established in Imerys.  Mr. Whitley is independent

11  of the debtors and other parties in interest in the case, and

12  is able to act with undivided loyalty to demand holders.  It

13  is also evident that he has had a distinguished career in

14  both government service and private practice.  I have no

15  doubt Mr. Whitley understands the role of a future claims

16  representative, that he would be an aggressive advocate for

17  future claimants, and would bring all his professional

18  experience to bear on the position, but he lacks any

19  experience as future claims representative.

20         There was no evidence from which I can conclude

21  that the team Mr. Whitley proposes to put in place around him

22  has experience in representing future claims representatives

23  or any significant experience in mass tort bankruptcy cases.

24  Further, his firm, which would lead the team, represented

25  Owens-Illinois in asbestos lawsuits from the mid-1990's until

1  the early 2000's.

2         While a previous engagement dating back two

3  decades may not be a significant retention issue generally,

4  here the asbestos claims that debtor seeks to resolve by the

5  bankruptcy filing date back to a product manufactured between

6  1948 and 1958.  It is not certain that the law firms previous

7  representation of Owens-Illinois would manifest itself as an

8  issue in the bankruptcy case, but the United States Trustee,

9  in the examiner motion, takes the position that an issue in

10 this case is whether there is, as debtors suggest, a

11 disparity between claims historically managed or settled by

12 Owens-Illinois and those currently being asserted, and

13 whether the amount of asbestos liability the debtor should be

14 required to pay is more accurately reflected by historical or

15 current  litigation trends.

16         Considering all of the above I conclude that Mr.

17 Patton is the best choice for this case.

18         With respect to the motion to appoint an examiner

19 in his motion the United States Trustee requests that the

20 examiner be directed to investigate ten separate questions or

21 areas of inquiry.  These ten questions can be broadly placed

22 into three areas: the legality and effect of the corporate

23 monetization, and the role of debtor's officers, directors

24 and professionals in the corporate monetization; a claims

25 analysis of the historical claims and current claim; and

1    whether debtor can propose a confirmable plan.

2          The examiner motion is opposed by debtors, the

3    official committee of asbestos personal injury claimants, the

4    then proposed and now appointed future claims representative,

5    as well as O-I Glass.  The examiner motion is supported by

6    the United States on behalf of the Environmental Protection

7    Agency and Department of Interior, as well as various state

8    environmental agencies.

9          The United States Trustee first argues that an

10   appointment of an examiner is mandatory under Section 1104(c)

11   in that the debtors fixed, liquidated, unsecured debts exceed

12   $5 million dollars.  The United States Trustee argues that

13   based on debtor's filed schedules it is likely that these

14   liabilities will exceed that level.

15         As to this position, as I indicated at argument,

16   this court has consistently ruled that Section 1104(c) is not

17   mandatory.  I will not deviate from that holding even

18   assuming that the level of fixed liquidated unsecured debt

19   exceeds $5 million dollars.

20         The United States Trustee also argues that the

21   appointment of an examiner is in the best interest of

22   creditors.  The United States Trustee believes that having an

23   independent third-party conduct an investigation is the most

24   efficient way to approach the issues that need to be

25   explored, in the case and will provide the court and other

1   parties with an independent analysis that all can rely on.

2         The United States and the various state

3   environmental agencies assert various environmental claims

4   against debtor and are concerned that the bankruptcy,

5   preceded by the corporate monetization, not be used to evade

6   compliance with environmental laws.  Their focus is that the

7   corporate monetization and the sufficiency of the support

8   agreement be investigated.

9         It has been evidenced since the first day of this

10  case that the corporate monetization transaction will be the

11  subject of diligence.  The evidence is that both the asbestos

12  personal injury claimants committee and the FCR have already

13  begun that diligence.  Young Conaway Stargatt & Taylor has

14  the corporate and bankruptcy expertise to perform an analysis

15  of the corporate monetization, what issues, if any, arise

16  from it, and any necessary remedies.  The committee has

17  retained Winston & Strawn as special litigation and corporate

18  counsel to examine the corporate monetization.

19        As for a claims analysis both the committee and

20  the FCR will be required, as part of their role and in

21  conjunction with the plan, to review the asbestos claims

22  asserted against the estate.  The disparity issue raised by

23  debtors and the United States Trustee can be reviewed with

24  the committee and the FCR.

25        Further, debtor asserts that it is solvent and

1  that this is a 100 percent case.  Debtor asserts that it will

2  need a consensual plan in order for it to be confirmed under

3  524(g) and that it will need to comparably treat holders of

4  environmental claims.

5          Considering the evidence and arguments I do not

6  believe at this time that there would be anything gained by

7  appointing an examiner.  And, thus, I cannot conclude that it

8  is in the best interest of creditors to appoint one.  I will

9  give the debtor, the committee and the FCR an opportunity to

10  negotiate a 100 percent plan for the holders of all claims

11  against debtor.  All creditors will have an opportunity to

12  weigh-in on the plan, take any appropriate discovery at that

13  time or seek any relief.

14          So, for those reasons I am denying that motion.

15  And that concludes my rulings.

16          I need to take a look at the order appointing Mr.

17  Patton.  I know in the Imerys case there were some -- I think

18  there were some adjustments to the order.  So, I am not

19  certain if that has already been done here or it's even

20  needed here.  I would ask the debtor to let my Chambers know

21  where on the docket the current form of order, proposed form

22  of order appointing Mr. Patton is.  Then as for the examiner

23  motion we will just enter a simple order, for the reasons

24  stated on the record, the motion is denied.

25          Are there any questions?

1   MR. SCHEPACARTER:  Your Honor, this is Richard

2   Schepacarter from the United States Trustee.  Can you hear

3   me?

4   THE COURT:  Yes, Mr. Schepacarter.

5   MR. SCHEPACARTER:  We don't have Zoom, so now I

6   feel a little disconnected.

7   With respect to the order that denied the United

8   States Trustees motion for the appointment of the FCR did you

9   want us to prepare an order and circulate it or was it your

10  intention that your Chambers would draft an order and then

11  just enter it.  That was, I think, the last one that wasn't

12  addressed.

13  THE COURT:  Thank you.  I did not address that.

14  We will do a simple one there as well just for the reasons

15  stated on the record.

16  MR. SCHEPACARTER:  Okay.  Thank you, Your Honor.

17  THE COURT:  Thank you.

18  MR. BJORK:  Your Honor, this is Jeff Bjork with

19  Latham & Watkins for the debtor.

20  We have no questions.  We will contact your

21  Chambers.  I believe the Young Conaway order mirrors the

22  Imerys order.  So, we will confirm that.

23  THE COURT:  Okay.  I appreciate that.

24  Anyone else?

25  (No verbal response)

1     THE COURT: Okay. Thank you, counsel, very much.
2  Again, I apologize for my tardiness. We're adjourned.
3     COUNSEL: Thank you, Your Honor.
4     (Proceedings concluded at 4:00 p.m.)
5
6                        CERTIFICATE
7
8     I, MARY ZAJACZKOWSKI, certify that the foregoing is a
9  correct transcript from the electronic sound recording of the
10 proceedings in the above-entitled matter.
11
   /s/Mary Zajaczkowski              June 18, 2020
12 Mary Zajaczkowski, CET**D-531
13
14
15
16
17
18
19
20
21
22
23
24
25

# EXHIBIT 6

1

UNITED STATES BANKRUPTCY COURT

DISTRICT OF DELAWARE

Case No. 09-11786-CSS

- - - - - - - - - - - - - - - - - - - - -x

In the Matter of:


VISTEON CORPORATION, et al.


          Debtors.


- - - - - - - - - - - - - - - - - - - - -x


          United States Bankruptcy Court

          824 North Market Street

          5th Floor

          Wilmington, Delaware


          May 12, 2010

          10:05 AM


B E F O R E:

HON. CHRISTOPHER S. SONTCHI

U.S. BANKRUPTCY JUDGE

ECR OPERATOR:  LESLIE MURIN

1    this phrase -- some judge did -- but this really is "crying

2    examiner in a crowded room", and it should be denied.  Thanks,

3    Your Honor.

4              THE COURT:  All right, anyone else?  Mr. Bienenstock,

5    reply?

6              MR. BIENENSTOCK:  Yes, Your Honor.  I'm delighted

7    with what I heard, because the creditors' committee apparently

8    feels that they can rewrite the Bankruptcy Code and argue to

9    Your Honor that because the equity holders have competent

10   counsel and financial advisors, they said, that's a defense to

11   an examiner motion.  No, that's a defense, perhaps, to a motion

12   to establish a statutory committee.  The Code doesn't have any

13   balancing test, any defense that if parties are adequately

14   represented, that that's a defense to the appointment of an

15   examiner.

16             Similarly, Mr. Willett has asked the Court, what will

17   the world think.  What will others think?  It doesn't matter.

18   The Code doesn't say appoint an examiner when there's five

19   million dollars of debt unless other people will think bad

20   thoughts.  We have a right.  I'm tickled pink that my

21   adversaries have felt the need to construct out of the clear

22   blue sky defenses that don't exist.  And I think what that

23   tells the Court is that we're entitled to an examiner to

24   investigate the things we asked for, and we hope the Court will

25   grant them.

1          THE COURT:  Thank you.  Excuse me.  All right, the

2     issue, of course, before the Court, is whether to appoint an

3     examiner, pursuant to the motion in front of the Court.  And

4     the statute which is applicable, of course, is 1104(c).  "If

5     the Court does not order the appointment of a trustee," which I

6     have not, "then at any time before the confirmation ... on

7     request of a party in interest ... and after notice and a

8     hearing, the court shall order the appointment of an examiner

9     to conduct such an investigation of the debtor as is

10     appropriate, including" and then it goes on, "if such

11     appointment is in the interests of creditors" equity holders,

12     et cetera, "or the debtor's fixed, liquidated, unsecured debts

13     ... exceed $5,000,000."  It's a troubling -- well, troubling,

14     it's a somewhat ambiguous statute notwithstanding the fact that

15     it says "shall", because it immediately limits the scope of

16     that "shall".  I don't think it's true, and I think it would be

17     an absurd result to find that in every case where the financial

18     criteria is met and a party-in-interest asks, the Court must

19     appoint an examiner.  There has to be an appropriate

20     investigation that needs to be done.

21          Now, it's -- until someone does an investigation, of

22     course, you don't know whether an investigation really needed

23     to be done or not.  But at some point there has to be a level

24     of smoke, if you will -- not a lot but more than none, more

25     than just a whiff of smoke -- but some sort of indication, some

1    sort of allegation or facts that make the Court think in a

2    whole that, hmm, somebody needs to look into this independently

3    and tell the Court what's going on.  It's easy in Lehman or

4    Revco to figure out that somebody's got to figure this out.

5    But not every case that has over five million dollars of

6    nontrade needs an examiner.

7            This case does not need an examiner.  We are in a

8    good old fashioned brawl, all right?  We all know it.  And the

9    prize is an automobile company -- excuse me, a parts -- well,

10   an automobile manufacturer of parts -- with a nice healthy

11   client.  Kind of a rarity, but it's nice to have.  And we're

12   going to fight.  There's going to be a fight.  Well, let's get

13   to it.  And I don't think there's any reason to keep tiptoeing

14   around it.  Equity thinks they're in the money.  They're going

15   to come to confirmation and they're going to try to prove it.

16   Mr. Willett's clients have an issue with what's on the table.

17   They're going to come in and litigate it.  The bondholders like

18   what's on the table or support it; they're going to come in and

19   litigate it.  There are no hidden motivations, here.  There are

20   hidden agendas, here.  I think this is just a good old

21   fashioned fight over a debtor that has some value, if it's

22   restructured.  It's a good company with a bad balance sheet.

23   That's what it looks like.  Maybe that's wrong.  Maybe it's a

24   good company with a good balance sheet.  But that's what

25   confirmation is going to tell us.

**EXHIBIT 7**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                                  .    Chapter 11
                                        .
AMERICAN HOME MORTGAGE                  .    Case. No. 07-11047(CSS)
HOLDINGS, INC., a Delaware              .    (Jointly Administered)
corporation, *et al.*,                  .
                                        .    Oct. 31, 2007 (10:09 a.m.)
          Debtors.                      .    (Wilmington)


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE CHRISTOPHER S. SONTCHI
UNITED STATES BANKRUPTCY COURT JUDGE


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

1    budget. Her view was that if the Code required the

2    appointment of an examiner, she would appoint one and have

3    the examiner ready to go if an issue arose later in the case

4    that required an examination, but because there was no

5    examination required at that time, she would merely put the

6    examiner in place to satisfy some reading of 1004©)(2) and

7    keep that examiner in place until or unless an issue arose in

8    the case that required some examination. So, we've seen

9    through the treatises and case law and largely this is

10   unreported in how courts have dealt with this, courts

11   applying a practical approach to 1104©)(2) because again,

12   Your Honor, burdening this estate with an examiner where

13   there is no apparent need or no established need for an

14   examination would simply waste the creditors' money. So with

15   that, we would ask that the Court deny the request.

16        THE COURT: All right. Thank you, Mr. Brady. You

17   read from the elements of Colliers that I have actually up

18   here on the bench and marked, and I think it's important -

19   Clearly, and I'm dealing here with the narrow issue of

20   1104©)(2) because I don't think the appointment of an

21   examiner would be in the best interest of the creditors or

22   the equity security holders or the interests of the estate.

23   So, I would deny, as I said earlier, I would deny the motion

24   for appointment of an examiner under ©)(1), and I'd like to

25   pick up before I sort of speak more on, I think, Mr. Brady's

1    comment earlier in connection with the trustee motion and I

2    think it's equally applicable to the examiner motion, I

3    didn't see any real factual allegations contained in the

4    motion when it came to these issues. I felt that the movants

5    basically parroted the language of the statute and sort of

6    said, Because I just said what the statute says, a trustee or

7    an examiner should be appointed, and obviously, you need to

8    do more than that. The problem of course is that shall means

9    shall, and the courts require, when I see something like that

10   it obviously means the court's required to appoint an

11   examiner if the criteria are met. I think it's important to

12   look at ©)(2) though as – not on its own, but as it relates

13   to the rest of the sentence. So, the Court shall order the

14   appointment of an examiner to conduct such an investigation

15   of the debtor as is appropriate if the financial criteria are

16   met. The problem isn't so much shall, it's that if and

17   whether if means, you know, if the financial criteria are met

18   you have to appoint an examiner. Well, if you read it that

19   way, the first part of the sentence doesn't make any sense.

20   So I think you have to read it as a whole, and I think – I

21   have tons of respect for Judge Fitzgerald, but I think, you

22   know, appointing an examiner and then giving that examiner no

23   budget and no duties is tantamount to not appointing an

24   examiner, and having one ready to go, I mean, the process of

25   appointing an examiner is not particularly onerous, it

1    doesn't take a ton of time.  So - and I'm sensitive to this

2    issue and I know the Office of the United States Trustee is

3    sensitive, and I understand their position in connection with

4    shall meaning shall, and I think that's true, but I think in

5    order for - I would draw a bit of a distinction between what

6    Judge Walsh and Judge Balick have appeared to rule which is

7    simply that it's a best interest test.  I don't think that's

8    correct.  The best interest is in ©)(1).  It's not in ©)(2).

9    I think the financial criteria are important, and obviously,

10   they're met in this case, but that's only one piece of the

11   puzzle, and the other piece of the puzzle is that there has

12   to be an investigation to perform that's appropriate.  I

13   think the cases cited in the Colliers treatise discuss that.

14   I think that's a more nuance approach than sort of saying it

15   is what it is, and if you cry "examiner" in a crowded case,

16   you get one.  In this case, reading the motion carefully, I

17   really didn't see a request for any investigation.  There was

18   a complaint about practices.  A 2004 request for information

19   about individual loan files that we've already discussed, but

20   no real articulation of what it was that the movants wanted

21   to be investigated by an examiner, and even if one were to

22   sort of assume, okay, they want someone to examine the

23   debtors' practices in connection with loan origination and

24   servicing that may be violations of state or federal law, I

25   don't think that at this time giving someone sort of carte

1   blanche to look into that issue will be appropriate.  Again,

2   the Committee is extremely involved in this case.  There are

3   ongoing investigations, possibly by other governmental

4   entities.  There's obviously a lot of issues going on in

5   Congress right now in connection with these types of

6   practices that allegedly the debtor participated in, so I'm

7   not - I don't think in this case there would be anything to

8   be gained by appointing an examiner and giving that examiner

9   a budget and saying, I'd like you to investigate the debtors'

10  loan origination and servicing policies in connection with

11  whether it may have violated state or federal law.  I think

12  that's asking for a $20 million report, and I'm not sure what

13  it would accomplish.  So, with regard to the temporal

14  requirement, again, I'm not - I understand there are those

15  cases.  I think it would be more appropriate to deny the

16  motion without prejudice than to sort of say, Okay, I'm

17  granting the motion, but I'm not at this point going to

18  appoint an examiner.  Again, I think that's just tantamount

19  to denying the motion.  So, I'm going to do that.  I'm going

20  to deny the motion without prejudice to be brought again if

21  new facts arise or if the status of the case changes.  And

22  just an aside, I mean, I don't know what this case ultimately

23  ends up with, whether we end up in with a liquidating plan,

24  whether we convert to 7.  I mean, I know - I'm sure there are

25  discussions that I'm very happy to not be participating in

1   that may be focused on that, but my instincts tell me that to

2   the extent there's some real issues out here, that they are

3   going to be investigated by somebody in the future, and if

4   turns out that that's not the case, I'm certainly open to

5   hearing someone ask me to appoint someone to do that on

6   behalf of the debtors' estate at the appropriate time.  All

7   right?  Are there any other issues?  I'm going to - So, I

8   think we've addressed the issues raised by - Oh, there was

9   the issue of the injunction.  I think that's very easily

10  dealt with.  You can't get an injunction by filing a motion.

11  I've said it many times before.  You have to file an

12  adversary proceeding under Rule 7001, and you need to meet

13  the criteria to get an injunction and you have to support it

14  by evidence, and without that, I'll deny that.  So I'm going

15  to deny - For the foregoing reasons, I'm going to deny all

16  three motions, and I'd ask the debtors to submit a form of

17  order, please, under certification of counsel.

18          MR. BRADY: Your Honor, we will prepare forms of

19  order for each motion.

20          THE COURT: I think that turns me to cash

21  collateral.  I don't have those papers.  I know they came

22  over yesterday in connection with the motion to shorten,

23  which I granted, but I didn't actually save them, so -

24          MR. WAITE: Your Honor, I can hand up - I have a

25  copy of the motion and a copy of the order; is that helpful

# EXHIBIT 8

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                        .    Case No. 08-10960 (KG)
                              .
IDLEAIRE TECHNOLOGIES         .
CORPORATION,                  .    824 North Market Street
                              .    Wilmington, DE  19801
                              .
                              .
          Debtor.             .    June 13, 2008
. . . . . . . . . . . . . .    .    4:03 p.m.


TRANSCRIPT OF EXAMINER MOTION
BEFORE HONORABLE KEVIN GROSS
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:          Sullivan Hazeltine Allinson, LLC
                         By:  WILLIAM D. SULLIVAN, ESQ.
                         4 East 8th Street, Suite 400
                         Wilmington, DE  19801

                         Holland & Knight, LLP
                         By:  JOHN J. MONAGHAN, ESQ.
                         10 St. James Avenue
                         Boston, MA  02116


Audio Operator:          Leslie Murin


Proceedings recorded by electronic sound recording, transcript
               produced by transcription service

J&J COURT TRANSCRIBERS, INC.
268 Evergreen Avenue
Hamilton, New Jersey 08619
E-mail:  jjcourt@optonline.net

(609) 586-2311    Fax No. (609) 587-3599

1          THE COURT:  Good afternoon.

2          MS. CHRISTIAN:  Good afternoon.  We are counsel for

3   Wells Fargo Bank National Association as Indenture Trustee and

4   Collateral Agent for the debtors' 13 percent senior secured

5   notes.

6          THE COURT:  Yes.

7          MS. CHRISTIAN:  Your Honor, we join in the Majority

8   Secured Noteholder Group's objection, and respectfully request

9   that the U.S. Trustee's motion for appointment of an examiner

10  be denied or, alternatively, that the motion be adjourned until

11  a sale process is complete.

12         THE COURT:  Thank you.

13         MS. CHRISTIAN:  Thank you.

14         THE COURT:  Thank you for that.  Well, I have read

15  all of the submissions, a lot of the underlying cases.  We have

16  a very and unusually, I think, complete record in this case at

17  this point.  I even went back and read legislative history, and

18  I am going to deny the motion for the appointment of the

19  examiner.

20         I do take note of the fact that on the first day of

21  this case Mr. Buchbinder stood here all alone virtually and

22  heroically, I think, argued the points that have made the way

23  now for a Creditors' Committee to step in and continue, I don't

24  want to say necessarily the fight, but certainly, the

25  investigation, and I think the one thing that's clear is it's

45

1  somewhat unclear whether or not from the cases Section

2  1104(c)(2) of the Code mandatorily requires the appointment of

3  an examiner whereas here the debts exceed $5 million.  There

4  are some persuasive decisions on both sides.

5       In fact, in one case that I read I thought that was

6  particularly well written, Judge Wedoff of the Northern

7  District of Illinois in the In re:  UAL case found that it was

8  mandatory.  But in this district the cases have almost

9  consistently held otherwise.  Judge Walsh in S.A.

10 Telecommunications found that the provision is not mandatory.

11 I don't think that it is mandatory based upon my reading of the

12 legislative history, and just as the parties have pointed out,

13 the language of the statute itself  and, particularly, the as

14 appropriate clause.

15      And I also noted that in another case we had a

16 visiting judge, Judge Newsome, it was the AC&S case in which

17 Judge Newsome, although he found that the appointment of an

18 examiner in these circumstances is mandatory, he told the

19 examiner that he wasn't going to do any work, and, in fact, I

20 think he used the expression not a penny for the examiner.

21      So I'm not about to really undertake a futile act or

22 appointment someone who is not going to be taking action,

23 because we have, I think, highly competent counsel, and now

24 I've learned a financial advisor -- highly competent financial

25 advisor representing the Creditors' Committee and doing the

1   very investigation that an examiner would be doing under these

2   circumstances, and I'm similarly persuaded by the fact that not

3   only is an examiner appropriate here, but it probably would be

4   inappropriate given the speed with which the case is

5   progressing and the work that's already been done by the

6   Committee, and the fact that negotiations are about to begin.

7   I just think the record is just full, replete with evidence

8   that the Committee's doing a very, very capable job.

9         In addition, I will also note that the Court

10   recently, at the request of the debtor, appointed counsel for

11   outside directors, and I think that may have some significance,

12   and perhaps the Court will hear from the outside directors as

13   to their views on the transactions.

14         And the bottom line is this. We're going to have a

15   sale hearing. It's going to be a strenuous sale hearing, I

16   suspect. And to the extent the Committee and any other

17   interested parties have not been provided cooperation in their

18   investigation, to the extent there hasn't been a very

19   significant shopping of this, marketing of this company, all of

20   that is going to make it much more difficult for the Court to

21   approve a sale, and the Court's agenda, speaking of agendas, in

22   this case is that there be a complete record upon which the

23   Court is able to make a determination that the sale is fair.

24   That will be happening, and, obviously, the more cooperation

25   that there is with the Committee and the United States Trustee

1  and between the debtor and the bondholders, on the one hand,

2  and them on the other, I think the more likely it may be that

3  the Court is in a position upon reviewing all of the facts to

4  approve a sale.

5         So the expense of an examiner is unwarranted here,

6  and I will, therefore, deny the motion with great respect for

7  the United States Trustee's Office and its maintenance really

8  of the integrity of the bankruptcy system here, and -- but all

9  in all, I think the motion has to be denied under these

10 circumstances and will be. And I will enter an order denying

11 the motion. Mr. Minuti, anything further, sir?

12        MR. MINUTI: Your Honor, if I could, just one

13 housekeeping matter.

14        THE COURT: Yes.

15        MR. MINUTI: Counsel for the noteholders had touched

16 on this, and I wanted to put it on the record and get Your

17 Honor's approval. Your Honor, in light of Your Honor's denial,

18 we will be preparing a stipulation that increases the carve out

19 as --

20        THE COURT: Yes.

21        MR. MINUTI: -- as well as changes some of the dates

22 in the interim financing order subject to us having further

23 negotiations before the final. But there were two dates, Your

24 Honor, that we were concerned of, and we wanted to put on the

25 record the continuance of those and ask Your Honor to so order

1  them, if you're inclined to do that.

2        The first date, Your Honor, in the interim order was

3  the deadline -- well, it's called the investigation termination

4  date.  Under the interim order it's June 20th.

5        THE COURT:  Yes.

6        MR. MINUTI:  We've agreed, Your Honor, to extend that

7  to July 1 --

8        THE COURT:  Okay.

9        MR. MINUTI:  -- and so I would -- we will include

10 that in the stipulation, but I would ask that Your Honor also

11 so order that, because it is an order, and we'd like that

12 extended, so we don't have the pressure of having that deadline

13 upon us.

14       The other deadline, Your Honor, that's important to

15 extend is there's a deadline by which the final DIP order needs

16 to be entered, and because we had pushed the final DIP to the

17 24th, the dates are a little bit off.  So we need to change

18 that deadline by which the final order needs to be entered to

19 June 24th, which is the final DIP hearing.

20       And then there's a further deadline by which that

21 order has to become final, and it would be -- it would be ten

22 business -- ten days, but I think that falls on the July 4th

23 weekend, so I think we'd go to the 7th.  So we need to extend

24 those dates.  If Your Honor could so order the record, and then

25 we'll submit the stipulation.  I'm looking at the bondholders

# **EXHIBIT 9**

1
             UNITED STATES BANKRUPTCY COURT
2
                DISTRICT OF DELAWARE

3
                   .   Chapter 11
   IN RE:                 .
4
                   .   Case No. 20-12836 (JTD)
   CRED INC., *et al.*,       .
5
                   .   Courtroom No. 5
                   .   824 North Market Street
6
                   .   Wilmington, Delaware 19801
                   .
7
            Debtors.   .   December 18, 2020
  . . . . . . . . . . . . . . . . . .  9:30 A.M.
8
9
        TRANSCRIPT OF TELEPHONIC SECOND DAY HEARING
          BEFORE THE HONORABLE JOHN T. DORSEY
10
            UNITED STATES BANKRUPTCY JUDGE

11
  TELEPHONIC APPEARANCES:

12
  For the Debtors:       Scott Cousins, Esquire
                   COUSINS LAW LLC
13
                   Brandywine Plaza West
                   1521 Concord Pike, Suite 301
14
                   Wilmington, Delaware 19803

15
                   - and -

16
                   James Grogan, Esquire
                   Mack Wilson, Esquire
17
                   PAUL HASTINGS LLP
                   600 Travis Street, Fifty-Eight Floor
18
                   Houston, Texas 77002

19
  Audio Operator:        Jason Spencer
20
  Transcription Company:  Reliable
21
                   1007 N. Orange Street
                   Wilmington, Delaware 19801
22
                   (302)654-8080
                   Email:  gmatthews@reliable-co.com
23
24
  Proceedings recorded by electronic sound recording, transcript
  produced by transcription service.
25

```
 1   TELEPHONIC APPEARANCES (Continued):

 2   For the Debtors:          G. Alexander Bongartz, Esquire
                               Derek Cash, Esquire
 3                             PAUL HASTINGS LLP
                               200 Park Avenue
 4                             New York, New York 10166

 5                             - and -

 6                             Austin Prouty, Esquire
 7                             PAUL HASTINGS LLP
                               1117 S. California Avenue
 8                             Palo Alto, California 94304

 9   For Jaime Shiller:        David Silver, Esquire
                               SILVER MILLER
10                             11780 W Sample Road
                               Coral Springs, Florida 33065
11
12   For the U.S. Trustee:     Hannah McCollum, Esquire
                               Joseph McMahon, Jr., Esquire
13                             John Schanne, Esquire
                               UNITED STATES DEPARTMENT OF JUSTICE
14                             OFFICE OF THE UNITED STATES TRUSTEE
                               844 King Street, Suite 2207
15                             Lock Box 35
                               Wilmington, Delaware 19801
16
17   For UpgradeYa:            Matthew Pierce, Esquire
                               LANDIS, RATH & COBB LLP
18                             919 Market Street, Suite 1800
                               Wilmington, Delaware 19801
19
     For Krzysztof Majdak,     Joseph Sarachek, Esquire
20   and Philippe Godineau:    THE SARACHEK LAW FIRM
                               101 Park Avenue, 27th Floor
21                             New York, New York 10178

22   For the Committee:        Joseph Evans, Esquire
                               Timothy Walsh, Esquire
23                             Darren Azman, Esquire
                               MCDERMOTT WILL & EMERY LLP
24                             340 Madison Avenue
                               New York, New York 10173
25
```

TELEPHONIC APPEARANCES (Continued):

For Thomas Arehart:      Hollace Cohen, Esquire
                         Carl Neff, Esquire
                         FISHERBROYLES LLP
                         445 Park Avenue, Ninth Floor
                         New York, New York 10022

For Maple Partners LLC:  Lucian Murley, Esquire
                         SAUL EWING ARNSTEIN & LEHR LLP
                         1201 North Market Street, Suite 2300
                         Wilmington, Delaware 19801

MATTERS GOING FORWARD:

**Cash Management.**  Motion to Debtors to (A) Continue to Operate their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Continue to Perform Intercompany Transactions; (II) Granting Administrative Expense Status to Post Petition Intercompany Balances; (III) Waiving Requirements of Section 345(b) of the Bankruptcy Code; and (IV) Granting Related Relief [Docket No. 7, 11/08/20]

**Ruling:  Order Entered**

**Employee Wages.**  Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Pay Employee Obligations and (B) Continue Employee Benefit Programs, and (II) Granting Related Relief [Docket No. 11, 11/08/20]

**Ruling:  Order Entered**

**Motion to Extend.**  Debtors' Motion for Entry of Order Extending Time to File Schedules and Statements of Financial Affairs [Docket No. 67, 11/18/20]

**Ruling:  Order Entered**

**Bar Date Motion.**  Motion of Debtors, Pursuant to Bankruptcy Code Sections 105(a), 502, and 503 and Bankruptcy Rule 2002, for Entry of an Order (I) Fixing Deadline for Filing Proofs of Claim and (II) Approving Form and Manner of Notice Thereof [Docket No. 52, 11/17/20]

**Ruling:  128**

**Bid Procedures Motion.**  Debtors' Motion for Entry of Orders (I) (A) Approving Bidding Procedures, (B) Scheduling an Auction and Sale Hearing and Approving Form and Manner of Notice Thereof, and (C) Approving Assumption and Assignment Procedures and Form and Manner of Notice Thereof; and (II) Authorizing (A) the Sale(s), Free and Clear of all Liens, Claims, Interests, and Encumbrances, and (B) Assumption and Assignment of Executory Contracts and Unexpired Leases [Docket No. 65, 11/18/20]

**Ruling:  Order Entered**

**MACCO Retention Application.**  Debtors' Application for Entry of an Order Authorizing Employment and Retention of MACCO Restructuring Group LLC as Financial Advisor for Debtors, Effective Nunc Pro Tunc to Petition Date [Docket No. 57, 11/17/20]

**Ruling:  Order Entered**

**Teneo Retention Application.**  Debtors' Application for Entry of an Order Authorizing Employment and Retention of Teneo Capital LLC as Investment Banker for Debtors, Effective Nunc Pro Tunc to November 16, 2020 [Docket No. 63, 11/18/20]

**Ruling:  Order Entered**

**Paul Hastings Retention Application.**  Debtors' Application for Entry of an Order Authorizing Employment and Retention of Paul Hastings LLP as Counsel to Debtors, Effective as of Petition Date [Docket No. 64, 11/18/20]

**Ruling:  Taken Under Advisement**

**Sonoran Capital Retention Application.**  Debtors' Motion for Entry of an Order (I) Authorizing Employment and Retention of Sonoran Capital Advisors, LLC to Provide Debtors a Chief Restructuring Officers and Certain Additional Personnel and (II) Designating Matthew Foster as Debtors' Chief Restructuring Officer [Docket No. 95, 12/1/20]

**Ruling:  Taken Under Advisement**

**Creditor List.**  Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to File a Consolidated List of Debtors' 30 Largest Unsecured Creditors, (II) Authorizing Debtors to Serve Certain Parties by E-Mail, (III) Authorizing Debtors to Redact or Withhold Publication of Certain Personal Identification Information, and (IV) Granting Related Relief [Docket No. 6, 11/08/20]

**Motion to Seal.**  Motion to File Under Seal Certain Confidential Information Pursuant to Order (I) Authorizing Debtors to File A Consolidated List of Debtors 30 Largest Unsecured Creditors, (II) Authorizing Debtors to Serve Certain Parties by E-Mail, (III) Authorizing Debtors to Redact or Withhold Publication of Certain Personal Identification Information On An Interim Basis, And (IV) Granting Related Relief [Docket No. 61, 11/18/20]

**Ruling:  Orders Entered**

**Motion to Convert.**  Motion of Krzysztof Majdak and Philippe Godineau for Entry of an Order Pursuant to 11 U.S.C. § 1112(b) (I) Dismissing the Cases; (II) Converting the Cases to a Chapter 7 Liquidation; or (III) Appointing a Chapter 11 Trustee [Docket No. 62, 11/18/20]

**Ruling:  94**

DEBTORS' WITNESS(s)

**CHRISTOPHER WU**

Direct examination by Mr. Grogan      10

Cross-examination by Mr. McMahon      15

Cross-examination by Mr. Sarachek      15

Cross-examination by Mr. Peirce      22

Redirect examination by Mr. Grogan      24

**PABLO BONJOUR**

Direct examination by Mr. Grogan      26

Cross-examination by Mr. McMahon      36

Cross-examination by Mr. Sarachek      41

Cross-examination by Mr. Pierce      43

Cross-examination by Mr. Silver      51

Redirect examination by Mr. Grogan      54

**MATTHEW FOSTER**

Direct examination by Mr. Grogan      57

Cross-examination by Mr. McMahon      61

Cross-examination by Mr. Pierce      63

Redirect examination by Mr. Grogan      65

Redirect examination by Mr. Cousins      66

EXHIBITS:          ID    Rec'd

Declaration of Daniel Schatt          10

Declaration of Christopher Wu          15

Declaration of Pablo Bonjour                                35

Debtor's Exhibit 38 - Thirteen Week Cash Forecast          41

Declaration of Matthew Foster                              56

Declaration of Joshua Segall                              106

Declaration of Mark Friedler                              106

Trustee's Exhibit - Alexander Motion to Dismiss           144
                    Alexander Complaint

1        (Proceedings commenced at 9:34 a.m.)

2            OPERATOR:  The record has begun and we are now

3   live.

4            THE COURT:  Thank you.

5            Good morning, everyone.  This is Judge Dorsey.

6   We're on the record in Cred, Inc.; Case No. 20-12836.

7            Before we begin this morning, I just want to let

8   everybody know that we have until noon today and then I will

9   have to stop.  So, we will get as far as we can today.

10  Hopefully we can get through, at least, the current motions

11  we have been talking about; the motions to convert or to

12  appoint a Chapter 11 Trustee.

13           Also, a reminder for people in the waiting room,

14  you have to use your proper name and it has to be able to be

15  compared to the CourtCall sheet or we do not let you in, in

16  order to avoid people trying to gain access to disrupt the

17  proceedings.

18           Also, we have fifty-one people on the call, on the

19  Zoom today.  So, if you want to be heard on an issue please

20  us the raise your hand function on Zoom which you can access

21  by clicking on "Participants" on the bottom of the Zoom

22  screen, it brings up the dialog box and one of the options is

23  "Raise Your Hand" and then I can identify who wants to speak.

24  It also moves you to the top left corner of my screen so it

25  makes it easier for me to identify who is talking.

1           So with that, yesterday we were in the middle of

2   the debtor's case in chief.  I believe we finished the

3   examination of Mr. Lyon.  And I will go ahead and turn it

4   over to Mr. Grogan.  Are you going to handle the next

5   witness?

6           MR. GROGAN:  Yes, Your Honor.  Thank you very

7   much.  James Grogan from Paul Hastings on behalf of the

8   debtors for the record.

9           Your Honor, before we call the first witness I did

10  want to let the court know that overnight we reached

11  agreement with the U.S. Trustee on how to proceed with Mr.

12  Schatt's testimony.

13          First, I do apologize that we were unable to get

14  him to testify live; that is on us, and I just apologize to

15  the court.  I'm sorry that happened.

16          The accommodation we have reached is that we're

17  going to submit his deposition transcript in full.  I think

18  that Mr. McMahon was okay with that. I will let him respond.

19          THE COURT:  Mr. McMahon?

20          MR. MCMAHON:  Your Honor, good morning.  Joseph

21  McMahon for the United States Trustee.

22          That is acceptable to the U.S. Trustee, Your

23  Honor.

24          THE COURT:  Okay.  So, I will admit the deposition

25  transcript of Mr. Schatt in its entirety.  What was the

1   exhibit number for that one, Mr. McMahon?

2          MR. MCMAHON:  One moment, Your Honor.  I believe

3   it was -- it's Exhibit U.S. Trustee 18, Your Honor.

4          THE COURT:  All right.  U.S.T. Exhibit 18 is

5   admitted.

6       (Declaration of Daniel Schatt, received into evidence)

7          MR. MCMAHON:  Thank you, Your Honor.

8          MR. GROGAN:  Thank you, Your Honor.

9          Your Honor, our first live witness, then, will be

10  Christopher Wu from Teneo.

11         THE COURT:  Okay.  Mr. Wu, are you on Zoom?

12         MR. WU:  Yes, I am.

13         THE COURT:  There we go.  Mr. Wu, can you place

14  your -- raise your right hand and state your full name for

15  the record, and spell your last name please.

16         MR. WU:  My name is Christopher Wu.  My last name

17  is spelled W-U.

18          CHRISTOPHER WU, DEBTOR WITNESS, SWORN

19         THE COURT:  Mr. Grogan, you may proceed.

20         MR. GROGAN:  Thank you.

21                    DIRECT EXAMINATON

22  BY MR. GROGAN:

23  Q    Mr. Wu, can you tell the court, you know, where you

24  work and what your experience is?

25  A    My name is Chris Wu.  I serve as president and senior

1    managing director of Teneo Capital.  And I run the

2    restructuring group at my firm.  I have been in my capacity

3    at Teneo for the last four years.  I have been an investment

4    banker for twenty-five years.  The first six years of my

5    career were with JPMorgan in the M&A group.  And the last

6    nineteen were focused on distress and restructuring

7    investment banking.  For fourteen years I worked at a mid-

8    market boutique by the name of Carl Marks where I served as

9    co-manager and member of the management committee of Carl

10   Marks Advisors before coming to Teneo four years ago.

11   Q    Thank you.

12        How many Section 363 sales have you run, if you have an

13   estimate?

14   A    Well, I personally managed over a hundred restructuring

15   engagements of which about half, around fifty, have been in-

16   court 363 sales or plan sales on behalf of both debtors and

17   creditors.  On behalf of debtors I have certainly run over

18   twenty.

19   Q    And have you handled DIP financings, post-petition

20   financings?

21   A    I have.  I have originated and structured numerous DIP

22   financings; too many for me to recall.

23   Q    I understand.

24        So what was the -- can you tell the court a little bit

25   about the purpose of your engagement in this case?

1   A      Yes.  I was engaged in order to market the debtor's

2   business as a going concern and canvass the market for

3   strategic interest principally.  Working with me on this

4   engagement are some colleagues from my firm; notably, experts

5   in FinTech as well as a subject matter expert in crypto.  And

6   we have solicited interest from a variety of different spaces

7   including crypto, as well as FinTech, as well as asset

8   managers and brokerages in order to elicit interests for

9   credit as a going concern.  I was also engaged in order to

10  obtain DIP financing as well as exit financing.

11  Q      Thank you.

12         How is the asset sale process going?  Have you started

13  and where does it stand currently?

14  A      So we were retained by the debtor's mid-November and it

15  became clear to me, personally, immediately that this was an

16  urgent situation in which we needed to run a very expedited

17  sale process for a variety of different reasons.

18         So, you know, within my own field of experience I can

19  certainly testify that we're running a more expedited process

20  then I can recall in my career.  That being said, there were

21  already four companies that had solicited Cred as we were

22  being retained and we immediately engaged with those four

23  parties.  And we were in the market, maybe a week, soliciting

24  other interests.

25         So, you know, in my view we had a fairly active process

1  of interested parties.  We had reached out to over eighty

2  parties of whom twelve have signed non-disclosure engagements

3  and we are -- we have a data room in which bidders are

4  actively involved in.  And, you know, obviously, the deadline

5  to submit an offer to serve as a stalking horse is fairly

6  imminent.  It's early in the new year.  So, we are actively

7  in a stalking horse identification/selection process.

8  Q     Thank you.

9        What do you think the appointment of a trustee would be

10 on that process?

11 A     In my opinion the appointment of a Chapter 11 Trustee

12 would delay things.  It's hard to predict, but I would think

13 that a Chapter 11 Trustee would still want to, you know, reap

14 whatever benefits we may produce as a result of the sale

15 process in any case.  So, we would want to continue with that

16 process, but it would be up to, obviously, the trustee to

17 determine the best course of action at that point in time.

18 Q     And you testified earlier that you're running an

19 expedited process here.  Why is that?

20 A     Well I have had some experience with FinTech

21 (indiscernible).  I have had some experience with people

22 intensive, IP intensive businesses.  And it's important to

23 hold the business together in order to attract interest as a

24 going concern.  You know, in my own view strategic bidders

25 (indiscernible) this on or create such a platform on its own

1 | it would take time, money and knowledge.

2 | So, I think that is part of what we are marketing in

3 | addition to a framework of operating in the United States

4 | with licenses (indiscernible) operating framework to learn

5 | crypto which is still (indiscernible) industry. And the

6 | utility, clearly, of learning crypto. A lot of investors are

7 | very much of a buying mentality. So, getting it done in

8 | crypto is still viewed as an important function as the market

9 | develops.

10 | Q    Has the -- are prospective bidders aware of the motions

11 | that are pending to appoint a trustee?

12 | A    Certainly the bidders and certainly the lenders most

13 | certainly are aware. I have not asked everyone if they are

14 | watching the courtroom proceedings, but I have been asked on

15 | many of them, you know, what, in my opinion, is happening.

16 | And they are observing these proceedings. In some cases I

17 | believe it's led to some delay in terms of galvanizing their

18 | activity.

19 | I sense that there is a little bit of wait and see

20 | approach in some of the comments by other witnesses have not

21 | necessarily been helpful to the process.

22 | MR. GROGAN:  Thank you, Mr. Wu.

23 | Your Honor, that is all the questions I have for

24 | Mr. Wu in terms of live testimony. I also would like to move

25 | to introduce his declaration which was filed at Docket No.

1  109-4

2           THE COURT:  Is there any objection?

3      (No verbal response)

4           THE COURT:  Okay.  It's admitted without

5  objection.

6      (Declaration of Christopher Wu, received into evidence)

7           MR. GROGAN:  I will yield the witness.

8           THE COURT:  Mr. McMahon, any cross?

9           MR. MCMAHON:  Very briefly, Your Honor.

10                    CROSS EXAMINATION

11  BY MR. MCMAHON:

12  Q    Mr. Wu, good morning.

13       The Chapter 11 Trustee, if appointed, would have the

14  option of continuing the sale process, correct?

15  A    I think that would be up to the Chapter 11 Trustee.

16  Certainly, we would avail ourselves to the extent that our

17  services are needed and deemed relevant for the debtors.

18           MR. MCMAHON:  No further questions, Your Honor.

19           THE COURT:  Thank you, Mr. McMahon.

20           Mr. Sarachek, any cross?

21           MR. SARACHEK:  Yes.

22                    CROSS EXAMINATION

23  BY MR. SARACHEK:

24  Q    Mr. Wu, good morning.

25       Are you familiar with Celsius, BlockFi, and Genesis?

1  A     I'm familiar with them.

2  Q     How does this debtor -- are they competitors to this

3  debtor?

4           MR. GROGAN:  Objection; outside the scope of

5  direct.

6           THE COURT:  Overruled.  You can answer, Mr. Wu.

7           THE WITNESS:  I am certainly not an expert in each

8  of those companies, so I am not qualified to comment on the

9  nature of those companies and how they engage business.  My

10  general understanding is that there are most certainly areas

11  of overlap with the debtors.

12 BY MR. SARACHEK:

13  Q     What is the unique IP that this debtor has that

14  Celsius, BlockFi, and Genesis don't have?

15  A     I think that is also out of the scope of my expertise

16  and I'm not in a position to differentiate business models.

17  You know, I do think that there are elements of the business

18  that are interesting to such party, but beyond that I really

19  can't speculate as to what would be in such party's -- you

20  know, what is in their mind.

21  Q     You're running the sale process, correct?

22  A     Correct.

23  Q     What are you marketing then?

24  A     Well, we're marketing approximately (indiscernible)

25  employees.  Seven or eight of them are in the engineering

1   functions and technical functions.  Several of them are in

2   the product and operations.  As I testified earlier there is,

3   you know, a scope of operations in which the lender lends

4   crypto, has the license to lend in three states.  They have

5   customers that are over 100,000.  They have KYC

6   (indiscernible).  They have a number of active users and they

7   have their own future of in terms of utility tokens.  So, it

8   certainly was a leader in crypto lending amongst a handful of

9   companies.  And (indiscernible).

10  Q     But the debtor isn't lending now, right?

11  A     The debtor is not lending now.

12  Q     So there is really no -- you said one of the things

13  you're marketing is these licenses which, presumably, require

14  state approval and there is no ongoing lending operations

15  going on right now, correct?

16  A     Correct.

17  Q     Are any of the parties that you are talking to

18  creditors of the debtor?

19  A     Not to my knowledge, but even if they were I wouldn't

20  be in a position to disclose that.

21         MR. SARACHEK:  I do think it's relevant, Your

22  Honor.

23  BY MR. SARACHEK:

24  Q     Are any of the parties that you're talking to insiders

25  of the debtor?

1      (No verbal response)

2 Q    Do you know what the word "insider" means?

3 A    Yes, I do.  I'll go with the same response which is the

4 truth.  Not to my knowledge, but even if they were I wouldn't

5 be in a position to disclose that to you.

6           MR. SARACHEK:  Your Honor, I think it's relevant.

7           THE COURT:  I think what Mr. Wu is saying is he's

8 not aware whether any of them are insiders or whether any of

9 them are competitors, but he is not in a position -- even if

10 he did know that they were he's not in a position to disclose

11 who they are because its confidential at this time because

12 they're trying to market the company.  We don't want to

13 disclose who the potential bidders are publicly.

14 BY MR. SARACHEK:

15 Q    Mr. Wu, have you worked with Chapter 11 Trustees

16 before?

17 A    I have not.

18 Q    Do you have any reason to believe that a Chapter 11

19 Trustee wouldn't do what's in the best interest of the

20 debtor?

21 A    I don't, but my knowledge isn't based on personal

22 experience.  As I just said I have not worked with a Chapter

23 11 Trustee.

24 Q    Are you aware with respect to Cred Capital that James

25 Alexander has raised the issue that the assets of Cred

1   Capital are not the debtors and that the debtor did not have

2   authority to file?

3          MR. GROGAN:  Objection, Your Honor; outside the

4   scope of direct.

5          THE COURT:  Overruled.

6          MR. EVANS:  This is Joe Evans from the committee.

7   Objection; hearsay, Your Honor.

8          THE COURT:  I don't see how there is any hearsay.

9   He's asking him if he has knowledge of it.

10          Go ahead, Mr. Wu, you can answer.

11          THE WITNESS:  All right.  Can you repeat the

12   question, Mr. Sarachek?

13   BY MR. SARACHEK:

14   Q    Sure, Mr. Wu.

15        Are you aware that James Alexander has raised in court

16   pleadings, in filings, that Cred Capital -- that the debtor

17   did not have authority -- the debtor's directors did not have

18   authority to file Cred Capital and, thus, those assets,

19   arguably, are not property of the estate if the court so

20   rules?

21   A    I'm aware of the issue.

22   Q    Have any parties -- have any prospective buyers raised

23   this issue to you as a reason that the debtor's assets might

24   be less?

25   A    No, none have.

1  Q    Are you aware of the fraud allegations that have been

2  raised by the debtor in the bankruptcy case?

3  A    I'm aware.

4  Q    Have any parties raised the fraud issues to you with

5  respect to the lending licenses?

6  A    None have.

7  Q    I'm sorry?

8  A    None have.

9  Q    Are you aware of the motion filed by UpgradeYa with

10 respect to the Bitcoin collateral that they assert is their

11 property?

12 A    I have not reviewed their motion.  So, I am not

13 specifically informed.

14 Q    So you are not aware that collateral -- that the debtor

15 is asserting may not be theirs?

16 A    I have no idea --

17          MR. GROGAN:  Objection. It misstates -- excuse me.

18 Objection; misstates his earlier testimony.

19          THE COURT:  Sustained.

20 BY MR. SARACHEK:

21 Q    How will effect a sale, Mr. Wu, if UpgradeYa is

22 successful in their lift stay motion?

23          MR. GROGAN:  Objection; lack of foundation.

24          THE WITNESS:  I told you --

25          THE COURT:  Hold on, Mr. Wu.  Don't respond.  You

 1  have an objection from your counsel.

 2          Mr. Grogan?

 3          MR. GROGAN:  Objection; lack of foundation, Your

 4  Honor.

 5          THE COURT:  Sustained.

 6  BY MR. SARACHEK:

 7  Q    Mr. Wu, are you aware that UpgradeYa has asserted an

 8  interest in Bitcoin that is in the debtor's possession?

 9  A    I actually wasn't.  So, I'm repeating my answer again.

10  Q    Are the parties that you're talking to proposing to buy

11  all assets of the debtor including any Bitcoin or other

12  cryptocurrencies that the debtor has in its wallets?

13  A    I'm not in a positon to disclose that to you.

14          MR. SARACHEK:  No further questions, Your Honor.

15          THE COURT:  Thank you.

16          Redirect, Mr. Grogan?

17          MR. GROGAN:  Thank you, Your Honor.

18          MR. PIERCE:  Your Honor, I have --

19          THE COURT:  Hold on a second.

20          MR. PIERCE:  Your Honor, Matthew Pierce with

21  Landis, Rath & Cobb on behalf of UpgradeYa.

22          We have a few cross examination questions for Mr.

23  Wu if we may.

24          THE COURT:  Do they relate to your motion to lift

25  the stay or to the motions that are currently pending before

1    me?

2           MR. PIERCE:  The motions that are currently

3    pending as UpgradeYa joined in the U.S. Trustee and the

4    movants Chapter 7 conversion motion.

5           THE COURT:  All right.  Go ahead.

6                    CROSS EXAMINATION

7    BY MR. PIERCE:

8    Q    Mr. Wu, the sale doesn't contemplate continuation of

9    past business of the debtors, correct?

10   A    The marketing is the platform in terms of past business

11   practices or go-forward business practices, that would be up

12   to the discretion of the bidder.

13   Q    And if you're selling a platform that could be sold

14   through a Chapter 7 process, correct?

15   A    Anything can be sold through a Chapter 7 process.

16   Q    And are you --

17   A    (Indiscernible) --

18   Q    -- the debtors need to sell any --

19          THE COURT:  Hold on.  He wasn't finished

20   answering.

21          Go ahead, Mr. Wu.

22          THE WITNESS:  I said anything can be sold through

23   a Chapter 7 process if there's a (indiscernible) values or

24   outcomes.

25   BY MR. PIERCE:

1   Q     But it is possible that they could be sold through a

2 Chapter 7 process?

3   A     Of course.

4   Q     And are you seeking to sell any of UpgradeYa's assets

5 or claims against the estate?

6   A     As I testified before I haven't read your client's

7 motion, so I am not familiar with the nature of UpgradeYa's

8 claims.

9   Q     And are the debtors -- sorry, continue.

10   A     It hasn't come up.

11   Q     And just to clarify, are the debtors marketing any

12 claims against the estate?

13   A     The debtor's assets certainly are available.  You know,

14 principally, we are focused on marketing the platform, but as

15 I mentioned before we are also soliciting interest for

16 financing as well.

17   Q     I just want to clarify, is it your testimony that the

18 estate could be or is marketing the estate's affirmative

19 claims against third parties?

20   A     No.  Obviously, our job as debtor's representatives are

21 to maximize value for the estate/

22   Q     Which means that --

23   A     So --

24   Q     -- it could include claims that the estate has against

25 third parties, correct?

1  A     They may or may not.  (Indiscernible) in the process to

2  determine that.

3  Q     And are any of the targets of those potential claims

4  prospective purchasers in the debtor's sale process?

5  A     Not that I'm aware of, but, again, even if I was I

6  wouldn't be in a position to disclose that.

7  Q     But they could be, correct?

8  A     Anything is possible.

9          MR. PIERCE:  Your Honor, I don't have any further

10  questions.

11          Just one point that I would like to clarify for

12  the record before I cede the virtual podium is that Mr.

13  Sarachek does not represent UpgradeYa.  We are counsel to

14  UpgradeYa and his testimony was not coordinated in any way --

15  his questioning was not coordinated in any way with

16  UpgradeYa.  I just wanted to clarify that for the record.

17          With that, Your Honor, I'd cede the virtual

18  podium.

19          THE COURT:  All right.  Mr. Grogan, any redirect?

20          MR. GROGAN:  Yes, Your Honor, very quickly.

21                    REDIRECT EXAMINATION

22  BY MR. GROGAN:

23  Q     Mr. Wu, are you currently negotiating with Daniel

24  Schatt to sell the business to Mr. Schatt?

25  A     I am not.

1  Q      Are you currently negotiating with Lu Hua, H-U-A, to

2  sell the business to Mr. Hua?

3  A      I am not.

4  Q      Are you currently negotiating with Mr. Daniyal

5  Inamullah to sell the business to Mr. Inamullah?

6  A      No.

7  Q      Are you currently negotiating with Mr. James Alexander

8  to sell the business to Mr. Alexander?

9  A      No.

10 Q      In your experience would you expect to get a better

11 value in Chapter 11 then Chapter 7 for these assets?

12 A      I would.  I would expect so.

13             MR. GROGAN:  Your Honor, no further questions.

14             THE COURT:  Thank you.

15             Mr. Wu, you are excused.  You may step down from

16 the virtual witness stand.

17        (Witness excused)

18             THE COURT:  Mr. Grogan, your next witness.

19             MR. GROGAN:  Thank you, Your Honor.

20             Your Honor, I call Pablo Bonjour to the witness

21 stand.

22             THE COURT:  Mr. Bonjour, do you want to take --

23 are you on the Zoom?  I see you there, yes.  Can we --

24             MR. BONJOUR:  Yes.  Can you hear me okay, Judge?

25             THE COURT:  I can.  Mr. Bonjour, would you please

1 | raise your right hand, state your full name for the record

2 | and spell your last.

3 | MR. BOUNJOUR: My name is Pablo Bonjour. Last

4 | name is spelled B-O-N-J-O-U-R.

5 | PABLO BONJOUR, DEBTOR WITNESS, SWORN

6 | THE COURT: Mr. Grogan?

7 | MR. GROGAN: Thank you.

8 | DIRECT EXAMINATION

9 | BY MR. GROGAN:

10 | Q Mr. Bonjour, can you tell the court where you work and

11 | what your job description is?

12 | A Sure. So I am a managing director at MACCO

13 | Restructuring Group. We are an interim management services

14 | company. We specialize in financial advisory services

15 | primarily to middle market companies who find themselves in

16 | either a combination of financial or operational distress.

17 | Q And how long have you been working in the distressed

18 | restructuring space?

19 | A So I've got about thirty years of business experience,

20 | half of that is in investment banking. I was at Oppenheimer,

21 | Lehman Brothers. At one time I owned my own propriety

22 | interest and brokerage firm, that was (indiscernible) FTC

23 | Brokerage Operation. The other half has been in consulting,

24 | starting off with advising commodities companies, turning

25 | them around eventually led me to Chapter 11's, liquidations,

1 | and Chapter 7's.

2 | Q     And have you worked with cryptocurrency before?

3 | A     I have, yes.  So, I also owned a business called

4 | SouthCoast Management Group.  I was (indiscernible) at the

5 | time; however, for about the ten years that I ran that

6 | company we had multiple clients who engaged us in consulting

7 | for Bitcoin.  We had a client out of Canada that was

8 | installing or trying to win contracts through Canada to

9 | implement, essentially, Bitcoin ATM machines at airports.

10 |      About three years ago I took over a company called

11 | American Financial Holdings that owns or developed its own

12 | cryptocurrency.  We trademarked it.  And with that entity I

13 | have applied for an international financial entity license

14 | through Puerto Rico and that's currently through the second

15 | half -- there's two parts to that process.  I'm at the tail

16 | end of the first half of that.

17 | Q     So what have you been doing for the debtor since the

18 | case was filed?

19 | A     So the first thing that we did is we got in there and,

20 | you know, obviously, wanted to understand the business model,

21 | interviewed everybody, looked at the financials.  To

22 | summarize what we have been doing we built a thirteen week

23 | cash-flow model.  We have developed the first draft of the

24 | schedules and statements.  We have also been working on MR's

25 | this week, they're almost done.  We attended the IDI

1  interview.  We testified there.  When the CRO was appointed

2  we also transitioned all the information that we had learned

3  over to him, also to the independent director, Grant Lyon.

4  Q    So is it fair to say that at this point you have a

5  somewhat of an understanding of Cred's financial condition?

6  A    Yes.  We have -- so we have a pretty good thirteen week

7  forecast that outlines everything fairly accurately.  We also

8  have a good understanding of where the assets or what assets

9  they have right now.

10 Q    And have you done any investigations into the

11 prepetition financial status of the debtor?

12 A    Yes.  With regard to that, so when we went into a

13 company we were waiting for them to give us their financials.

14 After a couple of weeks of delays we actually asked for

15 access to their online systems which they, you know, gave to

16 us.  We then realized at that point that the company had not

17 reconciled their books throughout the year.  They had

18 actually taken all their transactions and booked them to sub-

19 ledgers, and they did not run it up through their internal

20 accounting system.

21      So, the debtor continues to reconcile their books.  We

22 have helped them with that.  We're not reconciling it for

23 them.  What we're doing is helping them to characterize

24 transactions properly.  We then hand it over to them.  They

25 review it and then they certify that it's accurate under

1   penalty of perjury.

2   Q    And who are you working wiht on that process?

3   A    The lead on that, at our firm, is Paul Maniscalco.

4   He's an MD with twenty-five years of experience as a CPA.

5   He's a forensic accountant.  And we have three or four other

6   people on our team.  And they coordinated that effort with

7   the controller at Cred, two or three of their staff, and the

8   CFO, and COO.

9   Q    And who is the current CFO at Cred?

10  A    The current CFO is Scott Wiley who was recently

11  appointed after Joe Podulka, the previous Cred CFO, was let

12  go.  He is with Scott (indiscernible) Capital.

13  Q    And have you investigated any of the prepetition

14  cryptocurrency trades that the company engaged in?

15  A    Yes.  So, one of the biggest challenges that we had

16  here is really kind of a lack of information.  So, part of

17  our process was to request as much information, try to find

18  as much as possible.  So, that was a big part of our efforts.

19       I was able to get their 2019 trades and also some of

20  the trades for January, February, March.  And we have been

21  contacted with JSP-Systems on a weekly basis and they are

22  moments away from delivering to us the most important

23  documents that we have been asking for and have been working

24  with us for the last two weeks which is all the

25  (indiscernible) which kind of show exactly what went into JSP

1  and what went out of JSP because there was, kind of, a

2  triangular relationship between Cred, JSP, MoCredit and those

3  three.

4  Q    You heard Mr. Inamullah testify yesterday, didn't you?

5  A    Yes.

6  Q    Can you tell the court what your views are on the JST

7  trade and the financial impact it had on the debtor's balance

8  sheet?

9  A    Sure.  Yeah, so this is kind of a -- I mean there are a

10  lot of things going on here.  This is kind of the crux of the

11  case and the part that for whatever reason most people have a

12  difficult understanding.  So, I just want to give a really

13  brief background as to the business model and then what

14  happened in March.

15      So, in summary throughout 2019 Cred, essentially, would

16  take in Cryptocurrency from their customers Bitcoin,

17  (indiscernible), et cetera, and what they would do is, in

18  turn, take that crypto and either send it directly to an

19  asset manager or more than likely what they did instead is

20  they actually sold it first, about seventy, eighty percent of

21  it, they converted it to fiat USD and they sent it to their

22  primary lender at the time which was MoCredit.  MoCredit was

23  paying them sixteen percent rate of interest.

24      So, that was pretty much their business model for most

25  of 2019 as they went into 2020.  It was really during 2020

1   where they started to expand with other asset managers.  The

2   problem comes in is that while that strategy worked out

3   pretty well for them in 2019 and beginning of 2020, the issue

4   came in that when they would sell their crypto, about

5   seventy, eighty percent of it, they would keep the other

6   twenty or thirty percent and they would use that portion to

7   buy future's contracts to hedge against that sale.

8          So to give you an example is they brought in one

9   Bitcoin from a customer, they would then buy the equivalent

10  of one Bitcoin future's contract.  It's a simplistic way to

11  explain it.  And as long as they did that then, you know,

12  when Bitcoin prices went up or down it would have been tandem

13  with it.  So, they were able to, kind of, hedge any potential

14  liability risk.

15         The problem came in, in March.  So from about February

16  15th to mid-March the price of Bitcoin and other

17  cryptocurrencies, which follows suit, dropped from 10,000 to

18  5,000.  And when it did that the hedges that (indiscernible)

19  through JST, the future's contracts, was essentially

20  protecting them.  They got calls that they were, essentially,

21  sold out of those positions.

22         Conversely, they also ate up the equity that they were

23  using to actually buy those future's contracts.  So,

24  effectively, as of March 17th, 2020 Cred was, effectively,

25  short crypto.  In other words they owed their customers back

1   cryptocurrency and they didn't have the other side, the
2   future's contracts to hedge against.  The price had gone up.
3   So, they are, essentially, making the market and based on
4   your report that we have seen from JST on March 17th, 2020.
5   They were, effectively, according to JST, short the market
6   approximately $25 million dollars' worth of cryptocurrency.
7   Q      Did Cred take steps following that to implement new
8   hedges?
9   A      So the first thing that they tried to do is they
10  reached out to MoCredit and MoCredit at the time  had, you
11  know, a substantial bulk of their assets that they
12  transferred and they were getting paid sixteen percent rate
13  of interest approximately.  And it was at that time that
14  MoCredit announced that because they're a Chinese company,
15  they make micro loans to Chinese gamers, and they actually
16  experienced the COVID-19 virus a few months before the United
17  States, that the Chinese regulators had, essentially,
18  provided to Chinese citizens and other businesses the, I
19  guess, more or less temporary reprieve from having to pay
20  back loans and no interest.  Some of that was short term,
21  some of that was supposed to go through 2020.

22      So that was the reason for, at least what Lu Hua
23  claimed at the time as to why he couldn't return any
24  principal.  There is some truth to that.  I mean we haven't
25  verified that.  We have done a little bit of research.  Yes,

1  that was kind of the case in China, but we don't know that

2  much about MoCredit.  What Lu Hua did instead is he sent over

3  300 Bitcoin, I believe, on March 14th.  And so that was, kind

4  of, his contribution to try to help Cred.

5  Q     And do you know what happened with that 300 Bitcoin?

6  A     So it looked like internally Cred Capital may have

7  spent about seventy-five of it, sixty-five or seventy-five

8  Bitcoin and then the remaining 225 Bitcoin was sent to James

9  Alexander and he took it to, I guess, one of his own wallets

10 or somewhere else; I'm not sure where it went, but it left

11 the Cred eco system.

12 Q     And do you know what Cred did with James Alexander

13 after that?

14 A     I believe they fired him and they engaged in litigation

15 to try to get that Bitcoin back.

16 Q     And are you familiar with a company called Quantocoin?

17 A     Yes.  So there is a legitimate company out there called

18 Quantocoin and at some point, I believe, either during 2019

19 or early 2020, I'm not sure when, Cred opened an account with

20 what they thought was Quant Coin or Quantocoin.  And they

21 sent them 800 Bitcoin.  And they had that relationship for

22 about six months.

23       Quantocoin would send them monthly statements showing

24 them here's your 800 Bitcoin, it's now worth 817 Bitcoin.

25 So, you are making money.  When they needed money they

1 reached out to that entity and the emails began to bounce at

2 that point when they were requesting principal back. After a

3 couple of weeks of not getting a response they reached out to

4 Quantocoin and it was then that they realized that they had

5 actually given the 800 Bitcoin to, effectively, an imposter

6 because they had never heard of Cred and the imposter

7 actually once of the legitimate employees names as their

8 name. So at that point I believe they realized that that 800

9 Bitcoin was gone and they never had it.

10 Q     And are you able to roughly quantify the financial

11 impact of the losses of the hedges, the transfer of the

12 Bitcoin to James Alexander and the loss of the 800 Bitcoin to

13 the fake Quantocoin on the company's balance sheet?

14 A     Yes. So -- well, yeah, I mean if we take the current

15 price -- is it okay if I use a calculator?

16 Q     Sure.

17 A     Okay. So the 800 Bitcoin today would be worth 18

18 million. The biggest one, of course, is the JST conversion.

19 The problem there is that when they converted that crypto and

20 sent to MoCredit we know there's $39 million at MoCredit that

21 they received, at least, in US dollar or stablecoin.

22     So, the price range when they converted that was around

23 3,500 Bitcoin to about 8 or 9,000 Bitcoin. So, if you take a

24 multiple of that, it may be twofold that exposure liability

25 cap would be probably $60, $70 or $80 million which is

1  probably one of the biggest liability caps.  The 300 Bitcoin

2  would be worth almost 7 million.

3  Q    Okay.  These -- is there anything in that set of facts,

4  though, other than the fact that Mr. Alexander

5  misappropriated assets that is nefarious or, you know,

6  outside the scope of normal business activity?

7  A    Your saying not including the 800 Quantocoin?

8  Q    Well let me rephrase it.

9  A    Okay.

10 Q    Was the JST trade an ordinary business decision by the

11 company to effectuate?

12 A    Yes.

13 Q    And in your experience is it possible for companies to

14 be defrauded by imposters who steal from them?

15 A    Yes.

16          MR. GROGAN:  Your Honor, I'd like to move, at this

17 point, for the introduction of Mr. Bonjour's declaration into

18 evidence.  It was filed on the docket at No. 109-3.

19          THE COURT:  Any objection?

20      (No verbal response)

21          THE COURT:  Its admitted without objection.

22      (Declaration of Pablo Bonjour, received into evidence)

23          MR. GROGAN:  Your Honor, I have no further

24 questions for Mr. Bonjour.

25          THE COURT:  Thank you.

1    Mr. McMahon?

2    MR. MCMAHON:  Thank you, Your Honor.

3                   CROSS EXAMINATION

4  BY MR. MCMAHON:

5  Q    Mr. Bonjour, good morning.

6  A    Good morning.

7    MR. MCMAHON:  Could we pull-up Debtor Exhibit 38?

8    MR. PROUTY:  Your Honor, this is Austin Prouty

9  with Paul Hastings.  Can I request screen sharing permission?

10    THE COURT:  Yes, we will get that for you.

11    MR. PROUTY:  Thank you, Your Honor.

12  BY MR. MCMAHON:

13  Q    Mr. Bonjour, did your firm prepare this thirteen week

14  cash forecast?

15  A    Yes, we did.

16  Q    Okay.  Could we scroll down to the actual sheet?

17    Thank you.  And I don't know if there is a way to make

18  those numbers a bit bigger.

19    All right.  Mr. Bonjour, I just have some questions

20  regarding this for you.

21  A    Sure.

22  Q    First, the term in-flows as opposed to income is used

23  on this exhibit.  Can you tell me why?

24  A    Well the in-flows we wanted to capture knowing that we

25  were going to get in turn of capital and that the business

1  was technically not an operation.  We wanted to properly

2  quantify any incoming either revenue or money of inflows.

3  Q    Okay.  And if we go to -- I want to take a look at the

4  in-flows column for a second.

5  A    Sure.

6  Q    The term "asset management redemption" what does that

7  mean?

8  A    Where are you seeing that?  Which line?

9  Q    Line Number 1 under in-flows.

10  A    Oh, okay.  So, these are the asset managers that are

11  returning or due to return cryptocurrency and/or fiat

12  currency back to Cred.

13  Q    So, we're talking about assets that were estate

14  property as of the petition date being returned to the

15  debtor's control?

16  A    Yes.  Correct.

17  Q    All right.  And the line that's labeled cryptocurrency

18  conversions in (purchased).  Can you explain to the court

19  what that line means?

20  A    One second.  Cryptocurrency conversions?

21  Q    Correct.

22  A    Okay.  Can we come back to that one?

23  Q    I guess.  Sure.

24  A    I don't want to give the wrong answer.  I know from a

25  10,000 foot level, but I don't want to guess.  So, if we can

1   keep going I will -- when it comes I will give you the

2   answer.

3   Q    Okay.  But if we go to the totals column all the way on

4   the right of the screen, basically, the debtor's source of

5   operating during these bankruptcy cases primarily comes from

6   those conversions, correct, as a primary matter?

7   A    Yes.  Correct.

8   Q    And then, you know, the asset management redemptions

9   are also a big category, but they are the third largest in

10  that range.  Then if we take a look for the --

11  A    Yes, I'm sorry.  Go ahead.

12  Q    The third largest category for the inflows is the

13  interest earned from MoCredit and Elivar [phonetic].  Those

14  are loan repayments, right?

15  A    Correct.  Those are interest payments on MoCredit and

16  Elivar.

17  Q    And they're subject to, I guess, customary commercial

18  risk, right?

19  A    Correct.

20  Q    I mean the estates have already, I guess, indicated to

21  Mr. Hua that there is a potential for litigation involving

22  MoCredit, correct?

23  A    Correct.

24  Q    And there's a possibility to Mr. Hua, basically, stops

25  paying interest, correct?

 1  A    That's a possibility.

 2  Q    Let's take a look at the in-flows -- strike that.

 3       I want to take a look at the operating disbursement

 4  Lines 5, 6 and 7.

 5  A    Okay.

 6  Q    Now would it be fair to say, sir, that these lines,

 7  basically, reflect the cost of maintaining the platform?

 8  A    Yes.  Correct.

 9  Q    Okay.  And they're projected out as if the debtors will

10  be carrying the platform through March 5th, correct?

11  A    Yes.

12  Q    All right.  And if they were to do that, sir, if I

13  understand correctly the -- its $1,955,040 figure there would

14  be the cost of doing so, correct?

15  A    Yes.  I mean I can't really see it, but I'm taking your

16  word for it.

17  Q    Okay.

18  A    That sounds about right.

19  Q    So let's now go to the professional fees --

20  A    Okay.

21  Q    -- section.

22  A    Okay.

23  Q    So, first, your firm put together these numbers?

24  A    Yes.

25  Q    All right.  And is there a series of like, I guess,

1  assumptions -- strike that.

2     Let me ask a first question.  Do they include both the

3  debtors and the professional -- and the committee's

4  professionals?

5  A    I believe they do.

6  Q    Okay.  And with respect to that, the numbers that are

7  here, if we go all the way over to the right you see the

8  number at the end there it's projected the professional fees

9  will be $5,587,081, correct?

10 A    Yes, that is correct.

11 Q    And is there any, like, from the next section down

12 which is the accruals, are there any accruals that are not

13 reflected in that number?

14 A    Let me take a look.  In the professional fees?

15 Q    Correct.

16 A    So if we're looking at the total I think that is the

17 final total is the $6.5.

18 Q    Correct.  Yes.

19 A    There are no accruals.

20 Q    So when we get to the ending cash-flow at the end of

21 this thirteen week forecast how much cash do the debtors

22 anticipate having at the end of the thirteen week process?

23 A    Whatever that number is right there.  It's hard for me

24 to see it on the -- is that 192?

25 Q    Okay.

1    MR. MCMAHON:  Thank you, Mr. Bonjour.  I have no

2  further questions.

3    To the extent that, Your Honor, Exhibit 38 is not

4  in evidence I would move for its admission.

5    THE COURT:  Any objection?

6    MR. GROGAN:  No, Your Honor.

7    THE COURT:  Its admitted without objection.

8    (Debtor's Exhibit 38, received into evidence)

9    THE COURT:  Mr. Sarachek?

10    CROSS EXAMINATION

11  BY MR. SARACHEK:

12  Q    Good morning, Mr. Bonjour.  Just a few questions.

13    So you testified that in March of 2020 the debtors had

14  a major catastrophic event, correct?

15  A    Yes.

16  Q    How did the debtors fund their operations after March

17  of 2020?

18  A    I'm assuming they had cash on hand and other accounts,

19  other crypto as well.

20  Q    In your investigation, which you testified that you

21  have stared or are undergoing did you see that the debtors

22  were taking customer collateral to fund their operations?

23  A    Well as a general business  model they would take in

24  the cryptocurrency from all customers equally and then

25  immediately comingle that into one large omnibus account

1  which would then immediately go out to other asset managers

2  like MoCredit and the like.

3  Q     Are you familiar, Mr. Bonjour, with the Cred borrow

4  program?

5  A     I am.

6  Q     Are you aware of UpgradeYa?

7  A     I am.

8  Q     Are you aware that certain customers like UpgradeYa who

9  participated in the Cred borrow program assert that the

10  debtor is currently holding its collateral?

11  A     Yes.

12  Q     Does the debtor currently have in its possession enough

13  cryptocurrency collateral to repay all of the Cred borrow

14  lenders?

15  A     No, it does not.

16  Q     You testified that you and your team were responsible

17  for managing the debtors operations.  At the first day

18  hearing the court was provided with a number on the Bitcoin

19  that the debtors had and subsequently the court was provided

20  with a different number.  Why was that?

21  A     Okay.  So a couple of things.  First, we were not -- we

22  haven't managed anything, we're just advisors.  To your

23  second question the crypto, the amount of Bitcoin that was

24  filed on the petition date I believe was around like 90 or 94

25  Bitcoin from memory.  And subsequent to that one of the asset

1 | managers on the in-flows turned back to us some of that

2 | capital which came in the form of 75 additional Bitcoin

3 | units.  So we actually have right now 164 Bitcoin total,

4 | approximately.

5 | Q    But that is less than the amount of collateral that the

6 | Cred borrowers assert, right?

7 | A    Right.  When you asked me that question earlier I had

8 | the 164 in mind, not the lesser amount.

9 | Q    Up until December 7th, 2020 Mr. Schatt, Mr. Dan Schatt

10 | was CEO of the company.  What did he do in his capacity as

11 | CEO?

12 |           MR. GROGAN:  Objection, Your Honor; lack of

13 | foundation.

14 |           THE COURT:  Sustained.

15 |           MR. SARACHEK:  I have no further questions.

16 |           THE COURT:  Thank you.

17 |           Anyone else?

18 |           MR. PIERCE:  Your Honor, Matthew Pierce on behalf

19 | of UpgradeYa.  We have a few questions.

20 |           THE COURT:  Go ahead, Mr. Pierce.

21 |                    CROSS EXAMINATION

22 | BY MR. PIERCE:

23 | Q    You're the financial advisor, correct?

24 | A    Yes.

25 | Q    And you were responsible for creating these thirteen

1  week forecasts, correct?

2  A    Yes.

3  Q    And it's your testimony here today that you understand

4  the debtor's cryptocurrency conversion in-flows from a 10,000

5  foot level, correct?

6  A    Yes.

7  Q    And you don't know -- that means you don't know what

8  the in-flows consist of, correct?

9  A    No.  I do, I just look at the total where it says total

10 in-flows.  I trust my team.

11 Q    You can't tell me today what the constituent parts of

12 those total in-flows are, correct?

13 A    I can.

14 Q    Then what do the cryptocurrency conversion in-flows

15 consist of?

16 A    Those are cryptocurrency that are, essentially, being

17 converted to generate cash-flow.

18 Q    Can we bring up Debtor's Exhibit 38 please?

19      So I would just like to put your attention to the

20 cryptocurrency conversions purchase line.  Do you see that?

21 A    Yes.

22 Q    And five minutes ago when you were testifying with Mr.

23 McMahon you couldn't tell us what that consisted of, is that

24 correct?

25 A    I wasn't sure.

1  Q      What's changed in that five minutes?

2  A      I pulled up the spreadsheet and I clicked on the cell

3  to see where it went and it went to the next -- I couldn't

4  see it on the laptop, its tiny.

5  Q      So you --

6  A      I can see the listing though.

7  Q      Did you refer to Exhibit 38 as its shown here?

8  A      I can't really see the exhibit here.  That is why I was

9  relying on Mr. McMahon to read off the numbers.  I can't see

10 it so I pulled up a like cash-flow model to refer to.

11 Q      So you weren't referring to this document, correct?

12 A      Well its almost the exact same thing.

13          MR. PIERCE:  But it's different.  You know, we're

14 going to ask that the debtors produce that, what you referred

15 to, and we're going to ask that that be introduced into

16 evidence.

17          THE COURT:  Mr. Grogan?

18          MR. GROGAN:  Your Honor, I don't think this is an

19 appropriate document request.  We have already responded to

20 all of their discovery in connection with their motion to

21 lift the stay.  And actually --

22          THE COURT:  The witness referred to a document

23 during his testimony to refresh his recollection.  So that

24 makes that document discoverable.  So I am going to order you

25 to turn it over.

1         MR. GROGAN:  Okay, Your Honor.

2  BY MR. PIERCE:

3  Q    All right.  I am going to direct your attention to week

4  thirteen and I will stay focused there and just have a few

5  questions on the numbers set out there.

6       At the end of week thirteen the debtors estimate that

7  they will have an ending cash balance of $192,088, correct?

8  A    Yes.

9  Q    And at the end of week thirteen the cash balance does

10  not reflect or is not net of the $970,000 of accrued

11  professional fees in week thirteen, correct?

12  A    Correct.

13  Q    And if I direct you towards the bottom you see the line

14  that says net liquidity?

15  A    Yes.

16  Q    And net liquidity is calculated as the ending cash

17  available plus liquid cryptocurrency asset value less post-

18  petition accrued payables, right?

19  A    Okay.  The net liquidity equals the ending cash plus

20  the liquid crypto.  That's right.

21  Q    Okay.  So we're in agreement on what net liquidity is,

22  correct?

23  A    Yes.

24  Q    Okay.  So going back to the forecast week thirteen the

25  net --

1    A      One second.  I'm sorry.  Minus the post-petition

2    payables accrued.

3    Q      Right.  So in week thirteen the debtors estimate that

4    they will have a net liquidity shortfall of $699,585,

5    correct?

6    A      Is that the number on the sheet right there?  I can't

7    really see it.

8    Q      Can we zoom in so Mr. Bonjour can see that in week

9    thirteen please?

10             UNIDENTIFIED SPEAKER:  Is that better, Mr. Pierce?

11             MR. PIERCE:  Yes, it is.

12             THE WITNESS:  And that is the liquidity, yeah.

13   BY MR. PIERCE:

14   Q      Just to make sure that I understand this, even if the

15   debtors start receiving payments from MoCredit January 2021

16   and the debtors sell all of their liquid cryptocurrency

17   assets the debtors still estimate that they are going to have

18   a liquidity shortfall of almost $700,000 by March 5th.  Is

19   that correct?

20   A      I believe that is correct.

21   Q      And this forecast is based on estimated operating

22   professional -- operating costs and professional fee costs,

23   right?

24   A      Yes.

25   Q      And those operational costs and professional fee costs

1  they could be greater than the estimates reflected in this

2  thirteen week forecast, correct?

3  A     Correct, yeah.

4  Q     And all of that has to be paid in full to confirm a

5  plan, correct?  And when I say that -- let me withdraw that

6  question and as it a different way.

7  A     Okay.

8  Q     All of the post-petition accrued professional fee

9  payments or accrued professional fee costs and post-petition

10  operating accrued payables all that has to be paid to confirm

11  a plan, correct?

12  A     Yes.

13  Q     So by March 5th it's possible that the debtor's net

14  liquidity shortfall far exceeds what is estimated in this

15  forecast, right?

16  A     That's possible. Now since you requested the one that I

17  was referring to we made some additional adjustments on that

18  one.  So when you see it, it's actually -- that negative

19  number that you have here, the negative 699, on the latest

20  one that we have is 450.

21  Q     I want to correct the testimony.  This isn't my number.

22  This is your number, correct?

23  A     Sure.   Yeah.

24  Q     This is the debtor's exhibit, correct?

25  A     Right.  We --

1  Q     And the debtor's financial advisors --

2          THE COURT:  Hold on.  Let's not talk over each

3  other.

4          Mr. Pierce, let's not talk over the witness

5  please.

6          Do you wat to finish your response?

7          THE WITNESS:  Yes.  Thank you, Your Honor.

8          As I was saying, we try to update it -- I mean we

9  update it once a week officially, but we work on it daily and

10 especially recently with the significant increase in Bitcoin

11 we see substantial increase in valuation.  So, that number

12 and a few other adjustments that we've made have reversed

13 that negative 699 number that you referenced to a positive

14 450.  So it's about a million dollars better right now.

15 BY MR. PIERCE:

16 Q    I just want to clarify, this is the debtor's document,

17 correct?

18 A     Sure.

19 Q     And this --

20 A     It's a moving part.

21 Q     -- $699,585 liquidity shortfall in week five was put

22 together by the debtors, correct?

23 A     In week thirteen you mean?

24 Q     Yes.

25 A     You said week five.

1    Q      Excuse me.

2    A      You said week five.

3    Q      Sorry.  Let me withdraw that question and ask it again.

4    A      Okay.

5    Q      In this exhibit the debtor's calculated that they will

6    have a net liquidity shortfall of $699,585 in week thirteen,

7    correct?

8    A      Yes.  That is correct.

9           MR. PIERCE:  No further questions, Your Honor.

10          THE COURT:  Thank you.

11          I see Mr. Silver has his hand up.  Mr. Silver?

12          MR. SILVER:  Yes, Your Honor.  David Silver of

13   Silver Miller.  I represent several of the individual

14   investors including Jaime Shiller.  We were the counsel who

15   did the motion to compel about a week and a half, two weeks

16   ago.

17          THE COURT:  Okay.

18          MR. SILVER:  I have very few questions for Mr.

19   Bonjour.

20          THE COURT:  Are you a party to any of the

21   currently pending motions before me?

22          MR. SILVER:  Yes.  We filed a partial joinder in

23   the motion.

24          THE COURT:  Which one?

25          MR. SILVER:  The motion to appoint the trustee

1 with Mr. Sarachek.

2          THE COURT:  All right.  Go ahead.

3                    CROSS EXAMINATION

4 BY MR. SILVER:

5 Q     Mr. Bonjour, I just want to make sure I understood.

6 You testified you did an analysis into Cred's financials,

7 correct?

8 A     Yes.

9 Q     And you spoke with and the debtor provided you all the

10 documents you requested, is that correct?

11 A     Yes and no.  So the challenge is that the debtor has

12 not properly reconciled their books throughout the year.  So,

13 what we had to work with is the terminal value on the balance

14 sheet.  So we took, you know, current bank statements.  We

15 logged in, we looked at what they had.  And then we, of

16 course, took their expenses, we looked at that and we used

17 that to put this together.

18 Q     Do you know what a transactional ID as it relates to

19 cryptocurrency is?

20 A     You're referring to the hash?

21 Q     Yes.

22 A     Yes.

23 Q     Okay.  Were you provided the transactional ID's or hash

24 for the transactions in 2019 and 2020 for the debtor?

25 A     There -- I have seen some spreadsheets that contained

1   data.  I don't know if it extends to 2019.  I have seen 2020.

2   Q    Did that data come from the data or did that data come

3   from information that was provided for the motion to compel

4   that was filed in this case?

5   A    Well the spreadsheets that I have seen are from the

6   company.

7   Q    Okay.  Have you been provided or have you looked into -

8   - has your company, as part of its analysis for Cred's

9   financial condition which you predicate your projections on,

10  done a -- have you done an investigation into where the

11  cryptocurrencies that relate to the transactional ID's for

12  Cred currently sit?

13           MR. EVANS:  Joe Evans for the committee.

14  Objection; outside the scope.

15           THE COURT:  Overruled.

16           THE WITNESS:  So, you know, we are not doing any

17  forensic analysis.  That is not our role.  Our role was as an

18  advisor.  Also, part of the challenges in their

19  reconciliation they, essentially, downloaded their

20  transactions into sub ledgers which are also not reconciled

21  through 2020 and that is what the debtor is working on as we

22  speak.

23  BY MR. SILVER:

24  Q    Well are you aware of any private wallets or any

25  wallets that are related to Cred that hold in excess of 5,000

1  Bitcoin with the present value over $110 million?

2  A     No.

3          MR. EVANS:  Objection, Your Honor.  Joe Evans from

4  the committee.  It assumes facts not in evidence.

5          THE COURT:  Overruled.

6          THE WITNESS:  No.

7  BY MR. SILVER:

8  Q     When you questioned the employees to determine Cred's

9  financial condition did you ask the individual employees

10  about wallets that were associated with Cred?

11  A     Yes.  We asked them to deliver to us any and all

12  information related to any current holdings of

13  cryptocurrency, whether liquid or non-liquid.

14  Q     But to date there has been no transactional analysis

15  done related to the transactional ID's that were provided by

16  the creditor to -- I'm sorry, provided by the debtor to you

17  to reconcile that with the actual investment of my clients

18  who invested 3,500 Bitcoin or the present value of $77

19  million?

20  A     Correct.

21          MR. SILVER:  Thank you.  That is all I have.

22          THE COURT:  Thank you.

23          Mr. Grogan, redirect?

24          MR. GROGAN:  Thank you, Your Honor.

25                    REDIRECT EXAMINATION

1  BY MR. GROGAN:

2  Q    So, I want to take you back to Exhibit 38.  Can we pull

3  that back up?

4       Mr. Bonjour, I just want to make sure the record is

5  clear.  You're testimony is that in terms of the current

6  cash-flow forecast you show a positive ending balance at the

7  end of the thirteen weeks?

8  A    Yes.

9  Q    And that's based upon an updated version of this cash-

10  flow forecast?

11            MR. EVANS:  Objection.

12            THE COURT:  Basis?

13            MR. EVANS:  Your Honor, the basis is that they are

14  questioning him on Exhibit 38 and asking about a document

15  that he referred to that has not yet been produced or is in

16  evidence about an updated cash-flow that he is referring to.

17            THE COURT:  Well he already testified to it when

18  you were cross-examining him.  So, overruled.  I mean he

19  testified to the fact that the forecast has been updated and

20  that there is now a positive cash-flow balance at the end of

21  the thirteen weeks.  He already testified to that.

22  BY MR. GROGAN:

23  Q    Mr. Bonjour, you can answer the question.

24  A    To clarify at the end of the thirteen week the ending

25  cash is -- the cash-flow is 92,000 and the ending cash is

1 | 192,000 on the thirteen week.

2 | Q     Okay.  Thank you.

3 |       Mr. Bonjour, would you expect that a Chapter 11 Trustee

4 | would hire professionals?

5 | A     Yes.

6 | Q     And so if you were doing a thirteen week cash-flow for

7 | a Chapter 11 Trustee there would be a line item here for

8 | professional fees?

9 | A     Yes.  Correct.

10 | Q    Also in terms of the cash-flow forecast here have you

11 | taken into account a sale of the business at any point during

12 | this thirteen weeks?

13 | A    No.

14 | Q    And if the business were sold what impact would that

15 | have on the thirteen week cash-flow?

16 | A    That would provide a tremendous amount of liquidity.

17 | Q    Would it have any effect on the operating costs?

18 | A    If you sold it, no.  I mean you would not increase your

19 | operating costs if you sold it.  It would just be --

20 | Q    Would you --

21 | A    You would decrease, correct, because you're,

22 | essentially -- with that sale you are transferring over,

23 | fifteen to eighteen employees that currently operate that

24 | platform.  So you would decrease your operating.

25 | Q    Thank you.

1   A      It would almost practically go away.

2          MR. GROGAN:  Understood.  Thank you, Mr. Bonjour.

3   No further questions.

4          THE COURT:  Thank you.

5          Mr. Bonjour, you are excused. Thank you.

6          THE WITNESS:  Okay.  Thank you.

7      (Witness excused)

8          THE COURT:  Next witness, Mr. Grogan.

9          MR. GROGAN:  Thank you, Your Honor.

10         The next witness we call is Matthew Foster.

11         THE COURT:  Mr. Foster, are you on Zoom?

12         MR. FOSTER:  I am.  Can you hear me?

13         THE COURT:  I can.  Thank you.

14         Can you raise your right hand?  State your full

15  name for the record and spell your last.

16         MR. FOSTER:  Matthew Foster, F-O-S-T-E-R.

17          MATTHEW FOSTER, DEBTOR WITNESS, SWORN

18         THE COURT:  Mr. Grogan, go ahead.

19         MR. GROGAN:  Thank you, Your Honor.  Your Honor,

20  initially I would like to move to introduce Mr. Foster's

21  declaration into evidence which was filed at Docket No. 109-

22  2.

23         THE COURT:  Any objection?

24      (No verbal response)

25         THE COURT:  Its admitted without objection.

1    (Declaration of Matthew Foster, received into evidence)

2    DIRECT EXAMINATION

3  BY MR. GROGAN:

4  Q    Mr. Foster, can you introduce yourself to the court and

5  give the court a little description of your background?

6  A    Sure.  I am -- this is Matthew Foster.  I am a managing

7  director and co-founder of Sonoran Capital Advisors, a

8  distressed advisory group.  Most recently I spend most of my

9  time as a chief restructuring officer for various debtors.

10  This is my fifth appointment as a chief restructuring officer

11  in the last two or three years, most of which end up in some

12  sort of 363 sale and a liquidating plan.  The following

13  pattern, basically, has been outlined for this debtor.

14    Before getting into restructuring, which I have done

15  since 2009, I worked for a private equity on Citizens Bank

16  which has some distressed investments.  That is where I kind

17  of cut my teeth in the distressed world.  I really got into

18  the Chapter 11 aspects starting in 2009 and, as I mentioned

19  before, formed my own firm in 2017 with a partner.

20  Q    And when did you get involved with Cred?

21  A    I was hired on November 30th.

22  Q    So in your -- so about two weeks ago, right?  What did

23  --

24  A    A little bit more than two weeks.

25  Q    What have you done in the last two weeks to get up to

1  speed?

2  A     Well we rely heavily on what MACCO has done.  They have

3  been phenomenal in getting us up to speed on everything that

4  is going on.  Most importantly, as CRO, when you get in these

5  situations particularly there are some accusations going back

6  and forth is really gain control over the assets of the

7  company, particularly bank accounts, those sorts of things,

8  and making sure that we can show to all of the constituencies

9  that there is an independent party that's been trusted by

10  courts before that knows what he's doing and could oversee

11  what is going on.

12 Q     And are you running Cred at this point?

13 A     For all intents and purposes, yes.  There is no CEO

14 anymore.  The CFO, the new CFO, obviously, reports to me and

15 overseeing this whole process, obviously, under the direction

16 of Mr. Lyon.

17 Q     Do you answer to anybody other than Mr. Lyon?

18 A     No.

19 Q     Are you familiar with the debtor's efforts to sell

20 their business?

21 A     Yes.

22 Q     And what involvement have you had in that process?

23 A     Well, obviously, we get updates from Mr. Wu and other

24 individuals at Teneo.  So, they report back to me on a

25 frequent basis and ask for insight as to my recommendations,

1  or thoughts, or any sort of proposals that I would eventually

2  make to Mr. Lyon as is typical.  And in this process I work

3  with investment bankers all the time.  They report to me and

4  we work to maximize the sale value so we can return as much

5  as we possibly can to the creditors.

6  Q     And have you seen any term sheets yet?

7  A     I have.

8  Q     And so at this point you are reviewing term sheets and

9  working through that effort?

10 A     Yes.

11 Q     Are you familiar with the plan support agreement

12 between the debtors and the committee?

13 A     I am.

14 Q     And what is your understanding of the plan support

15 agreement?

16 A     Well one of the important pieces that Mr. Lyon

17 mentioned yesterday is we understand our fiduciary duty here.

18 I understand that the unsecured creditors are out of the

19 money and that they have a committee that has been formed and

20 we're going to take their advice and thoughts very, very

21 seriously because we understand their responsibilities and

22 understand our responsibilities.  So, we wanted to work in

23 lock step with the committee to get to an outcome that

24 benefits their constituents as well as, obviously, the entire

25 estate.  And the plan support agreement is the best way to do

1  that.

2  Q    And if we're allowed to proceed with that plan support

3  agreement what kind of a plan do you anticipate proposing for

4  the debtors?

5  A    You mean as a plan in general or as in like a plan of

6  liquidation from a Chapter 11 plan prospective?

7  Q    Yeah, the latter.  What kind of a Chapter 11 plan are

8  you going to propose?

9  A    It would be a plan of liquidation or liquidating trust

10 to be appointed.  A liquidating trustee would be appointed.

11 This is, again, very -- most of the cases that I have worked

12 in ended up in the same way where we do a 363 sale, do it as

13 a going concern because that is the best way to maximize the

14 value and then if there are particularly where there are

15 causes of action like this case where they should be pursued

16 and we want to make sure that we preserve those rights from

17 the trustee.  So we will do everything we can to make sure

18 that gets handed over to whoever the trustee is.

19 Q    And are you going to have any say over who that trustee

20 is?

21 A    I don't believe so, no.

22 Q    Who is going to make that decision?

23 A    Typically it's the committee that makes the

24 recommendation. I think sometimes the debtors have some

25 recommendations, but typically it's the committee that

1  chooses that.

2  Q     And that is the case in this plan support agreement?

3  A     Yes.

4  Q     Are you aware of any current discussions between the

5  debtors and insiders of the debtor to give those insiders a

6  release?

7  A     No.

8  Q     Will you give anybody a release?

9  A     No.

10          MR. GROGAN:  Your Honor, no further questions for

11  this witness.

12          THE COURT:  Thank you.

13          Mr. McMahon?

14          MR. MCMAHON:  Very briefly, Your Honor.

15                          CROSS EXAMINATION

16  BY MR. MCMAHON:

17  Q     Mr. Foster, you testified that you managed to get up to

18  speed in a couple of weeks, correct?

19  A     It's like drinking from a firehose.  Yes, we're getting

20  there.

21  Q     And the committee was able to be appointed and get up

22  to speed as well?

23  A     Yes.  We're helping them along as well.

24  Q     And you have heard -- you know Mr. Lyon, correct?

25  A     Correct.

1  Q     And you know he's previously served as the Chapter 11

2  Trustee, correct?

3  A     Yes.

4  Q     And you are confident that, you know, Mr. Lyon is a guy

5  who can get up to speed in a situation like this pretty

6  quickly, correct?

7  A     Yes.

8  Q     So its -- the power to get up to speed, you know,

9  doesn't leave Mr. Lyon regardless of whether he is serving as

10  Chapter 11 Trustee or not, correct?

11  A     I am not sure I understand the question.

12  Q     Sure.  I mean Mr. Lyon is capable of getting up to

13  speed whether he's got his Chapter 11 Trustee hat or not,

14  correct?

15  A     Yes.  It depends on the individual for sure.

16             MR. MCMAHON:  Great.  Thank you, Your Honor.  I

17  have no further questions.

18             THE COURT:  Thank you.

19             Mr. Sarachek?

20             MR. SARACHEK:  I have no questions, Your Honor.

21             THE COURT:  Okay.  Mr. Pierce?

22             MR. PIERCE:  Just a few questions, Your Honor.

23  Thank you.

24                     CROSS EXAMINATION

25  BY MR. PIERCE:

1  Q     Good morning, Mr. Foster.  How are you?

2  A     Good.  How are you?

3  Q     Good.  You testified that this is a going concern sale,

4  correct?

5  A     Correct.

6  Q     But this isn't really a going concern sale, is it?

7  A     I would argue that it is.  The reason I say that is I

8  actually -- the last case that I did in Delaware where I was

9  CRO for a drug company that had a failed cancer drug, it

10 didn't pass FDA approval, we sold the IP assets at three or

11 four times what the stalking horse bid was and there was

12 still a few employees with that company that the buyer took

13 with them.

14      So, I think it depends on your definition of going

15 concern.  So you may want to specific that, but that is based

16 on my opinion; their employees are a going concern from my

17 perspective.

18 Q     Well let me just clarify because Mr. Wu testified

19 earlier that the debtors are selling a platform.  Is that all

20 they're selling?

21 A     He also mentioned that there are employees that the

22 buyers are interested in.

23 Q     Do the debtors have any current operations today?

24 A     Well we have employees that are doing work on a day to

25 day basis including engineers, accountants.  So from that

1  perspective, yes.  It was mentioned earlier we're not out

2  making loans like the company previously was.  So, again, it

3  depends on your definition of operations.

4  Q    You can't sell people, can you?

5  A    Not exactly sure what you mean by that.

6  Q    Well the company doesn't have any operations, correct?

7  A    Again it would depend on your definition of operations.

8  I'm not trying to be difficult.  I'm trying to get where you

9  want me to go.

10  Q    So let me try to be more clear.

11  A    Okay.

12  Q    Is the debtor currently engaged in any lending

13  activity?

14  A    No.

15  Q    Are the debtors currently operating the Cred earn

16  program?

17  A    No.

18  Q    Are the debtors currently operating their Cred borrow

19  program?

20  A    No.

21         MR. PIERCE:  No further questions, Your Honor.

22         THE COURT:  Okay.  Mr. Silver, do you have any

23  questions?

24     (No verbal response)

25         THE COURT:  We lost Mr. Silver.

1    Mr. Grogan, back to you.

2    MR. GROGAN:  Thank you, Your Honor.  I have a

3  short redirect.  After my redirect, if Your Honor will permit

4  us, Mr. Cousins got disconnected briefly, but he had a couple

5  of follow-up questions for this particular witness and with

6  your permission I'd like to give him an opportunity to ask

7  those.

8    THE COURT:  All right.

9    REDIRECT EXAMINATION

10 BY MR. GROGAN:

11 Q    Mr. Foster, when your -- in your role as a CRO is it

12 important to you to preserve jobs?

13 A    Yeah. I mean there's two reasons for that.  One is,

14 obviously, employees are part of the constituency and that is

15 why I got into this line of work because I want to save jobs.

16 The second is companies are more valuable with the employees.

17 People have value.  Their intelligence.  They add value to a

18 process.

19    So, it is my experience that selling a company as a

20 going concern with employees is the best way to maximize

21 value in these circumstances.

22 Q    Also, you heard the United States Trustee ask you a

23 couple of questions about getting up to speed.  Was MACCO an

24 important component of getting up to speed?

25 A    Absolutely. I couldn't have gotten this much

1   information this quickly without them.

2   Q    And was Paul Hastings important to you in terms of

3   getting up to speed?

4   A    Absolutely.

5        MR. GROGAN:  Your Honor, at this point I would

6   like to turn the witness over to Mr. Cousins for a brief Q&A.

7        THE COURT:  All right.  Well, Mr. Cousins is also

8   debtor's counsel.  So I am not sure of the propriety of

9   having two of the -- two lawyers on the same side asking

10  questions.  I am going to have to re-open it again for cross

11  examination.  So, I will allow it, but it's unusual.

12       Go ahead, Mr. Cousins.

13       MR. COUSINS:  Thank you, Your Honor.  Just with

14  respect to (indiscernible) there was an exhibit.

15                    REDIRECT EXAMINATION

16  BY MR. COUSINS:

17  Q    Mr. Foster, do you recall Exhibit 13 from Mr. McMahon

18  yesterday?  (Indiscernible) testimony.

19       THE COURT:  Mr. Cousins, you're very --

20       THE WITNESS:  I --

21       THE COURT:  Hold on, Mr. Foster.

22       MR. COUSINS:  I'll pick-up, Your Honor.

23       THE COURT:  That's better.  Thank you.

24       MR. COUSINS:  I'm so sorry.

25       THE COURT:  Mr. Foster heard it, but I couldn't

1    hear the question.

2             MR. COUSINS:  Let me restate it.

3    BY MR. COUSINS:

4    Q    Mr. Foster, do you recall the exhibits that Mr.

5    McMahon, Exhibit 13, showed Mr. Inamullah during his direct

6    testimony regarding the relationship with Uphold.  Do you

7    recall that?

8    A    I remember there -- is that the one that was a letter

9    of release from Uphold talking about Cred and individuals

10   there?  Is that the one you are referring to?

11   Q    Right.  It referenced their plan to sue Cred.  Do you

12   recall that now?

13   A    Yeah.

14   Q    Can you just briefly explain what is the relationship

15   between Cred and Uphold?

16   A    So there are a couple things.  One, Uphold had on their

17   platform the ability for their customers.  This is based on

18   my understanding of what I have been told.  I haven't gone

19   through and clicked the buttons myself.  Uphold had the

20   ability of their customers today we're going to go and

21   participate in this Cred program.  So they could click a

22   button, much like Mr. Inamullah said yesterday, saying we're

23   going to participate in this CD like certificate of deposit

24   like program.  So, those customers could say I'm going to use

25   Cred and those cryptocurrencies will get transferred to Cred

1  and go through the programs that have been mentioned before.

2  The other thing is that Uphold is holding assets of the

3  debtors.  So, there are various cryptocurrencies that are at

4  Uphold right now.

5  Q    And Uphold hasn't sued Cred to your knowledge, is that

6  correct?

7  A    That is correct.

8  Q    And what is the relationship now?  How would you

9  describe the relationship with respect to the tokens that are

10 owed back and forth between Cred and Uphold?

11 A    It's actually very cordial.  I have interacted with

12 their general counsel along with Mr. Cousins, you, and as

13 well as their outside counsel.  I think its BakerHostetler is

14 the name of the firm.  So we are currently in the process of

15 working on a stipulation for them to transfer those assets to

16 the debtor.

17          MR. COUSINS:  Thank you very much.  Your Honor,

18 thank you for -- I know that was unusual and I'm sorry I got

19 disconnected just immediately prior to the end of his direct.

20          THE COURT:  Thank you, Mr. Cousins.

21          Let me go back then down the cross list.  Mr.

22 McMahon, does that generate any new questions for you?

23          MR. MCMAHON:  It does not, Your Honor.

24          THE COURT:  Mr. Sarachek?

25          MR. SARACHEK:  No, Your Honor.

1          THE COURT:  Mr. Pierce?

2          MR. PIERCE:  No, Your Honor.

3          THE COURT:  And I will ask Mr. Silver again.

4          MR. SILVER:  No, Your Honor.  I'm good.  I

5    apologize for being on mute before.

6          THE COURT:  All right.  Then Mr. Foster, you are

7    excused.

8          THE WITNESS:  Thank you.

9      (Witness excused)

10          THE COURT:  Any other witnesses?

11          MR. GROGAN:  Your Honor, that is the end of the

12    debtor's testimonial presentation.

13          THE COURT:  All right.  So where are we?  Are we

14    going into closing or does anybody else have any other

15    evidence they intend to introduce?

16      (No verbal response)

17          THE COURT:  No takers on the evidence.  So I guess

18    we're going to closings.  We're already at 11:20.  How long

19    do the parties thing they will need for closings?  Mr.

20    Grogan?

21          MR. GROGAN:  Your Honor, I probably need ten

22    minutes.

23          THE COURT:  All right.  Mr. McMahon?

24          MR. MCMAHON:  About the same, Your Honor.

25          THE COURT:  Okay.  Mr. Pierce?

1          MR. PIERCE:  About the same, Your Honor.

2          THE COURT:  Mr. Sarachek?

3          MR. SARACHEK:  I will be briefer then that.

4          THE COURT:  All right.  Mr. Silver?

5          MR. SILVER:  I am with Mr. Sarachek.  I will be

6   briefer then that.

7          THE COURT:  All right.  So maybe we can get done,

8   but I do need to take a very short break because we've been

9   going for a while now.  So let's take a five minute recess.

10  We will reconvene at 11:25.

11         MR. EVANS:  Your Honor, Joe Evans for the

12  committee.  We intend to argue as well.

13         THE COURT:  All right.  How long do you need?

14         MR. EVANS:  The same as everyone else, about ten

15  minutes or less.

16         THE COURT:  All right.  So, we're -- all right.

17  We will see if we can get it done.  We will reconvene at

18  11:25.

19      (Resume taken at 11:20 a.m.)

20      (Proceedings resumed at 11:25 a.m.)

21         THE COURT:  We'll start with the movants.  Mr.

22  McMahon.

23         MR. MCMAHON:  Your Honor, good morning.  Joseph

24  McMahon for the United States Trustee.

25         At his deposition this past Monday Dan Schatt

1  testified regarding his appointment of Grant Lyon to Cred's

2  board in November of 2020 after Lu Hua resigned as the

3  director of Cred Inc.  He indicated that it was important to

4  have a so-called "independent" director on the board.  And I

5  asked him, independent from what?  His answer was,

6  "Independent from any connection between Cred and MoCredit"

7  was his response.

8  The United States Trustee respectfully submits

9  that the record establishes that there is a basis for

10  appointing either a Chapter 11 Trustee and examiner or a

11  Chapter 7 Trustee in these cases.

12  First, the Chapter 11 Trustee.  Section 1104(a)

13  provides two basis for appointment of a Chapter 11 Trustee.

14  First, for cause under Section 1104(a)(1).  Second, if it's

15  in the interest of creditors any equity security holders or

16  other interests of the estate under Section 1104(a)(2).

17  In In Re Marvel Entertainment Group, case citation

18  140 F.3d 463, the United States Court of Appeals for the

19  Third Circuit observed that the presumption against

20  appointing a trustees is tied to two things.  First,

21  management, which brought the debtor to bankruptcy, must be

22  honest, experienced and familiar with the business.  Second,

23  there has to be a reorganization; otherwise, we don't need

24  management's operational investment.

25  I want to quote from the Third Circuit's opinion

1   with respect to this point so that the record is clear.  In

2   the usual Chapter 11 proceeding the debtor remains in

3   possession throughout reorganization because, and this is an

4   internal quote,

5           "Current management is generally best suited to

6   orchestrate the process of rehabilitation for the benefit of

7   creditors and other interests of the estate."

8           Thus, the basis for the strong presumption against

9   appointing an outside trustee is that there is often no need

10  for one.  Quote again,

11          "The debtor-in-possession is a fiduciary of the

12  creditors and as a result has an obligation to refrain from

13  acting in a manner which could damage the estate or hinder a

14  successful reorganization."

15          The strong presumption also finds its basis in the

16  debtor-in-possessions usual familiarity with the business it

17  already had been managing at the time of the bankruptcy

18  filing often making it the best party to conduct operations

19  during the reorganization.

20          In short, the Third Circuit tells us that if unfit

21  prepetition management when faced with a bankruptcy filing or

22  a trustee motion in a bankruptcy case engages in a game of

23  musical chairs and appoints shiny new current management that

24  doesn't eviscerate or forward a trustee motion.  Rather, it

25  removes the presumption that the debtor-in-possession should

1  remain in control.  What the statutory language is

2  descriptive of is the code's expectation that longstanding

3  competent and honest prepetition management is the only

4  management who gets the benefit of operating during a

5  reorganization.

6          THE COURT:  Mr. McMahon, let me ask you a

7  question.

8          MR. MCMAHON:  Sure.

9          THE COURT:  Is there any evidence that's been

10  presented to me that Mr. Lyon and the other individuals who

11  have been retained by Mr. Lyon to assist him in this case are

12  anything other than independent of Cred or MoCredit?

13          MR. MCMAHON:  Well we would argue, Your Honor,

14  that the answer is they're not independent of Mr. Schatt and

15  Mr. Hua.  I can explain.

16          THE COURT:  Is that going to be because they are

17  still the equity owners and could remove them if they choose

18  to do so?

19          MR. MCMAHON:  Correct.  And also the factual

20  record is clear as to how the current corporate structure

21  came about meaning, you know, debtor's counsel contacted Mr.

22  Lyon who then contacted Mr. Schatt.  Mr. Lyon was put into a

23  position of authority.

24          THE COURT:  I understand that, but that, in and of

25  itself, doesn't indicate that he's not independent.  I mean

1  there is no evidence that I have seen to indicate that Mr.

2  Lyon is not anything other than completely independent of the

3  debtors or anybody connected to the debtors.

4       MR. MCMAHON:  And, Your Honor, that -- the facts

5  are what they in so far as the record has been established.

6       THE COURT:  So my question then becomes if Mr.

7  Lyon is independent of the debtors and anybody connected to

8  the debtors, including the insiders of the company, what

9  would a Chapter 11 Trustee bring to the table that Mr. Lyon's

10 doesn't?

11      MR. MCMAHON:  Your Honor, again, I think we have

12 to -- its -- I think we have to -- again, the record

13 establishes that Mr. Lyon was put into place by Mr. Schatt.

14 He is subject to being removed by a vote of Mr. Hua and Mr.

15 Schatt.  The debtors -- they are the two equity shareholders

16 who are both targets of estate claims and causes of action

17 based upon the record of this motion.

18      THE COURT:  Well what if I was to include in --

19 what if I was to include in an order that Mr. Lyon cannot be

20 removed by either of the equity holders without an order of

21 this court?

22      MR. MCMAHON:  Well I think the issue is under 1104

23 the court is actually obligated with the word "shall" to

24 appoint a trustee in two circumstances where there is, you

25 know, under (a)(1) where there is cause for doing so by

1 | current management.  Then second under the (b) section where
2 | it's in the interest of the estates and creditors to do so.
3 | Your Honor, the record yesterday with respect to
4 | the prepetition activities associated with the debtor's
5 | estates.  The fact that Mr. Schatt and Mr. Hua are in
6 | connection with the MoCredit related issues.  I mean I can
7 | get right into the, I guess, discussion of the prepetition
8 | activities.
9 | THE COURT:  There is no doubt in my mind that
10 | there was shenanigans going on prepetition, that there was
11 | mismanagement of the debtors, but we don't have a situation
12 | where those people who are managing the company at that time
13 | are still in charge.  The only issue is can Mr. Schatt or Mr.
14 | Hua remove Mr. Lyon as the independent director.  And I am
15 | saying why can't I enter an order that simply says they can't
16 | do that without my permission --
17 | MR. MCMAHON:  Because --
18 | THE COURT:  -- instead of bringing in a whole
19 | other Chapter 11 Trustee who is going to have to start all
20 | over again.
21 | MR. MCMAHON:  Well there is a couple of points to
22 | be made there, Your Honor.
23 | First, Section 1104(a) the language is mandatory.
24 | It just says "shall" meaning that --
25 | THE COURT:  If I find cause, but I don't know that

1   there is cause at this point because we have new management

2   and nobody has shown me that there is any mismanagement going

3   on post-petition.

4          MR. MCMAHON:  Again, Your Honor, you have in

5   addition to Section 1104(a)(1) and we would, I guess, contest

6   the suggestion that this current management, whatever the

7   professionals that have been inserted by Mr. Schatt and Mr.

8   Hua, are independent of them.  But beyond that under

9   1104(a)(2), you know, there is also grounds where it's in the

10  best interest of creditors meaning it's fairly clear that the

11  situation is such where the circumstances would warrant the

12  appointment of a trustee.

13         So, there is two basis there under Section 1104

14  and the mere fact that, you know, the professionals would

15  believe that, you know, they can sell the assets or whatever.

16  What the Chapter 11 Trustee in response to Your Honor's

17  question is going to do is going to add the independence

18  factor completely removed from the situation that, you know,

19  Mr. Lyon and the other professionals just do not have.  And

20  it's the only code based solution to a situation like the

21  factual patterns that the court has been presented with.

22         THE COURT:  Well, again, I don't think there is

23  any evidence that Mr. Lyon and the other professionals are

24  beholding to any of the insiders of this company.  So the

25  question is then you would go to 1104(a)(2) which is

1   discretionary if it's in the best interest of the creditors

2   and how could it be in the best interest of the creditors if

3   the only thing we're going to do is remove somebody who is

4   currently independent of the owners of the company and the

5   insiders of the company, and replace them with someone else

6   who is also independent of the insiders and who would have to

7   start over and delay the process.

8          MR. MCMAHON:  Your Honor, first, we are like just

9   a mere matter of days into these bankruptcy cases.  So,

10  therefore, I don't know if there is going to be like a real -

11  - I don't believe there is going to be real delay to the

12  process.  Our office can interview candidates and insert one

13  quickly in order to address the concern.

14         Beyond that, you know, with respect to the going

15  forward, Your Honor, in light of the testimony you heard with

16  respect to the prepetition shenanigans we're talking about

17  claims and causes of action.  And their claims and causes of

18  action where Mr. Schatt and Mr. Hua are going to be targets

19  with respect to them.  And with respect to this process, Your

20  Honor, again, the record is clear that Mr. Lyon was placed

21  there by the insiders who would be the subject of those

22  claims and causes of action in addition to their affiliated

23  companies.

24         So, if there is anything that would be wrong in

25  light of this record, Your Honor, it will be leaving Mr. Lyon

1  in as director and, frankly, it would be rudderless.  The

2  court under the bankruptcy code has a clear directive in

3  circumstances like this where the insiders, basically, have

4  conducted themselves in a way such that in order to ensure

5  protection of the creditors the court has to step in and

6  appoint a trustee.

7          So, it's basically from a standpoint of the way

8  the code works Mr. Schatt and Mr. Hua put Mr. Lyon there.

9  That is a positional conflict that in light of the record

10  that was developed yesterday requires someone completely

11  independent and removed from the process in order to move it

12  forward.

13          Your Honor, we've heard some testimony about the

14  sale process to a degree.  Your Honor has also heard about,

15  you know, I guess, some large numbers regarding claims and

16  causes of action the $40 million line of credit for MoCredit

17  which is outstanding.  So in terms of the value in the case

18  it certainly looks like in the longer term the claims and

19  causes of action case that needs someone independent,

20  completely independent, from Mr. Schatt and Mr. Hua in order

21  to move it forward.  That is what is required by the record

22  that was developed yesterday.

23          THE COURT:  All right.  Thank you, Mr. McMahon.

24          I'm going to move onto Mr. Sarachek.

25          MR. SARACHEK:  Your Honor, I am going to try to

1  address what you're getting at.  I do think that the

2  professionals in the case have the best intentions, but if

3  you're not going to -- and I echo Mr. McMahon's argument, but

4  if you're not going to appoint a trustee in a case where

5  after March of 2020 investor money was taken in a Ponzi like

6  manner to pay the expenses of the company, if you're not

7  going to appoint a trustee in a situation like this I'm not

8  sure that there is any situation where a trustee can't be

9  subverted by professionals.

10       What happened here, just too really address this

11  at its core, is that Mr. Schatt was the brains of this

12  operation and he only resigned because of the pressure that

13  Mr. McMahon and my motion put on him.  And he only resigned

14  post-petition on December 7th and Mr. Podulka as well.  Quite

15  frankly, it's wrong that -- and that was post-petition. It's

16  wrong for professionals to be able to subvert what Congress

17  drafted which was a provision in the bankruptcy code that

18  required the appointment of a Chapter 11 Trustee.

19       I understand the practical implications of all of

20  this, I do.  Nevertheless, and in our motion we did move for

21  a Chapter 7 Trustee, but nevertheless the bankruptcy code

22  requires the appointment of a trustee when you have post-

23  petition management and really the person who is calling the

24  shots he's the guy who signed the first day declaration.  If

25  you notice even though MACCO did submit a declaration first

1   day it was devoid -- it basically was devoid of any

2   responsibility and any recognition of the inter-workings of

3   the operations.

4           Your Honor, you have --

5           THE COURT:  Let me ask you, Mr. Sarachek, I'm

6   going back to the same thing.  We now -- Mr. Schatt is now

7   out.  We have an independent director who is running the

8   company.  We have independent professionals who are engaging

9   in a sale process.  It's nothing different then what a

10  Chapter 11 Trustee would do if I were to appoint one.  I have

11  no evidence before me that there is any post-petition

12  misconduct by the debtors.  I have no evidence before me that

13  Mr. Lyon or any of the professionals that he has retained are

14  anything other than completely independent.

15          So what is the cause that would allow me to

16  appoint a Chapter 11 Trustee?  Yes, there was prepetition

17  misconduct, but that's prepetition and that is not relevant

18  at this point because we have new management.

19          MR. SARACHEK:  Your Honor, respectfully, you do

20  have evidence that there was post-petition misconduct.  The

21  bottom line is with respect to UpgradeYa the 478 Bitcoin that

22  they reported they had in collateral on the petition date is

23  really only 160.  And presumably the debtors and its

24  professionals should know what collateral they have.

25  Furthermore --

1    THE COURT:  Well there is no evidence that that

2    occurred post-petition.  That is just the way it is now.  So

3    how did it go from 470 to 164?  I don't know.  There was no

4    evidence introduced about that.

5    MR. SARACHEK:  I believe it's in Mr. Inamullah's -

6    - well, I believe it is -- Mr. Inamullah testified also with

7    respect to the value of the supposed 14 million value that

8    the debtor reported as their collateral, their specific

9    Bitcoin, but that Bitcoin was virtually worthless.

10    THE COURT:  Again that all occurred prepetition.

11    MR. SARACHEK:  It was information that was filed,

12    you know, in the first day.  So that is post-petition.  I do

13    think that an independent trustee -- by the way, Your Honor,

14    I want to call the court attentions to the fact that the

15    largest creditors here don't sit on the creditor's committee.

16    Mr. Silver and I represent the largest creditors here.  And

17    none of them sit on the creditor's committee.

18    The bottom line is you're hearing from the largest

19    creditors that we would like the appointment of an

20    independent trustee to investigate these causes of action.

21    That is our position.

22    THE COURT:  Thank you, Mr. Sarachek.

23    I'm going to move onto Mr. Pierce.

24    MR. PIERCE:  Thank you, Your Honor.  Matthew

25    Landis with Landis, Rath & Cobb on behalf of UpgradeYa

1    Investments.

2           Your Honor, UpgradeYa joins in the conversion

3    motion on a limited basis to support the conversion from

4    these cases from Chapter 11 to Chapter 7.  I acknowledge that

5    converting these cases to Chapter 7 is a difficult decision

6    for this court to make.  It's also a very difficult decision

7    for a creditor to support conversion to Chapter 7.  Here

8    UpgradeYa along with numerous other creditors have joined in

9    that request.

10          Your Honor, quite simply, there's some cases that

11   do not belong in Chapter 11 and this is one of them.  The

12   debtors and the committee assert that to the extent cause to

13   convert existed those issues have been resolved and they

14   resolved those through extraordinary steps to justify keeping

15   these cases in Chapter 11.

16          To name a few of the steps that have been taken,

17   the chief executive officer has been removed, the chief

18   financial officer has been terminated, a chief restructuring

19   officer has been installed, an interim chief financial

20   officer has been appointed, and a professional from one of

21   the proposed advisors to the debtors has been employee of

22   that proposed professional has been installed and is acting

23   as the debtor's controller.  All of these steps have taken

24   place after the petition date.

25          I don't think it's questioned that the debtors

1 entered the Chapter 11 with serious management and governance

2 issues. Some of those governance issues and the authority to

3 file these Chapter 11 cases on behalf of at least one of the

4 debtors has not been resolved yet. The solution the debtors

5 have presented and the committee is to strip the company on a

6 post-petition basis to a non-operating shell and install

7 Chapter 11 professionals as employees and officers of the

8 company.

9 I don't say that as a knock on the professionals'

10 qualifications. This is the highlight that Cred is not a

11 debtor-in-possession with a legitimate going concern to

12 operate and sell in a Chapter 11 process.

13 THE COURT: Well the evidence that I have form the

14 witnesses, as Mr. Wu testified, they are in a sale process.

15 They have already got people who are interested in buying the

16 company on a going concern basis and is there any scenario in

17 which the creditors of this company would do better if I were

18 to convert this to a Chapter 7 and we liquidate the pieces

19 rather than selling a going concern.

20 MR. PIERCE: Absolutely, Your Honor. Absolutely.

21 What --

22 THE COURT: You're seriously telling me that in

23 any circumstance a company that is liquidated in a Chapter 7

24 is going to do better than a Chapter 11 being sold as a going

25 concern?

1      MR. PIERCE:  Well to be clear I say that because

2  if you look at the proposed thirteen week cash-flow forecast,

3  yes, there will be more assets available at the end of those

4  thirteen weeks if we convert this to a Chapter 7.  The

5  debtors, what they propose and the evidence shows, is that by

6  the time we get to March 5th there will be a net liquidity

7  shortfall of $700,000.  That is after and it assumes that the

8  debtors sell all of the cryptocurrency currently in their

9  possession.

10      So what the debtors propose to this court as a go-

11  forward plan here is that they will sell all of their

12  cryptocurrency liquid assets, that they will deplete all cash

13  on hand and that there will still be a liquidity shortfall of

14  nearly $700,000 and that is based on go-forward estimates

15  that Mr. Bonjour testified and acknowledged could exceed what

16  is in that forecast.  That shortfall could be substantially

17  greater.

18      It is also dependent on the price of Bitcoin or

19  their other cryptocurrencies on any given day if the price of

20  that cryptocurrency is --

21      THE COURT:  Which is why the debtors want to sell

22  this company as quickly as possible.  If I convert this to a

23  seven and have to have a Chapter 7 Trustee appointed you

24  think this company is going to get sold quicker than it would

25  be under the current circumstances?

1    MR. PIERCE:  Well, Your Honor, if we look at the

2  Chapter 13 budget the debtors are not proposing to sell any

3  of their cryptocurrency.  They are using their cryptocurrency

4  to fund these cases and even doing that they still have a

5  shortfall.  They do not reach any scenario in which they can

6  confirm a plan.

7    THE COURT:  Well how is a Chapter 7 Trustee going

8  to sell the cryptocurrency if it belongs to other people?

9    MR. PIERCE:  Your Honor, that is a situation that

10  would have to be, you know, decided in a different context.

11  Even if we take out -- I think what Mr. Wu did not testify

12  that the debtors are seeking to sell their cryptocurrency

13  they're seeking to sell the platform.

14    THE COURT:  Exactly.  That is the Chapter 11 sale

15  process to sell the platform with the employees who know how

16  to run it as a going concern as opposed to liquidating it in

17  which case now we're having fights over, well, is it

18  someone's collateral, is it the debtor's Bitcoin, is it

19  somebody else's Bitcoin.  And it gets into a morass of how to

20  deal with that situation.  That seems more difficult to me

21  than the current process proposed by the debtors.

22    MR. PIERCE:  Your Honor, Mr. Wu testified that

23  there is no difference in selling the platform by a Chapter 7

24  Trustee or a Chapter 11.  There is not something that a

25  Chapter 7 Trustee can't do.  It sounds to me that the process

1  and sale of the assets that they're proposing is intellectual

2  property and there may be employees that go with the debtors

3  for -- that go over to a potential purchaser or not.

4          We don't know, but what we do know is that the

5  cash-flow shows under a scenario in which they sell all their

6  cryptocurrency they can't get to a confirmable plan and they

7  don't get to the liquidating trust or litigation trust that

8  they propose under the plan support agreement.  Then we end

9  up in Chapter 7 and we end up in Chapter 7 on March 5th after

10 over $6.5 million have been paid to professionals.

11         THE COURT:  All right.  I understand your

12 position. Let me move onto Mr. Silver because we have to

13 finish this up.

14         MR. SILVER:  Thank you, Your Honor.  I'll be

15 brief.

16         First, it's my client's position that Mr. Schatt

17 is not out of the company.  He's still actively involved and

18 he's still being paid $10,000 dollars a month presumably for

19 something.

20         And we request that he be put out.  He is not out.

21 We have worked with debtors' counsel and counsel for the

22 committee.  So from or perspective that answers your question

23 as to whether or not there's true independence. We don't

24 believe so, because they kept Mr. Schatt.  He's still there

25 and he's being compensated.

1          And as --

2          THE COURT:  Well, do you think a Chapter 11

3 trustee wouldn't want to keep on Mr. Schatt because he's the

4 one who knows where all this stuff is buried?  I mean he has

5 all the information -- how is a Chapter 11 trustee going to

6 come in, in a vacuum and take this company over.  He's going

7 to have to have somebody there who has the history of it.

8          MR. SILVER:  So, you're answering my own question

9 I was about to state next.

10          The problem we have with the actual independence,

11 the second part, is there's a $100 million dollars missing

12 from all these reports and analysis. And Mr. Bonjour made

13 that point.  They have not looked into -- and this is not a

14 typical bankruptcy because of the crypto assets.  So, there's

15 a hundred million dollars and no one is jumping up and down

16 on the table except for the actual creditors.

17          As Mr. Sarachek pointed out, the largest creditors

18 are not on the committee. The largest creditors of which,

19 again, my clients lost 3500 bitcoin and 12,000 each for a

20 near total value of over $90 million dollars right now.  That

21 money is missing and the people -- and this is, again, the

22 unsecured creditors committee just came in last week.  But

23 for the last six weeks when you say don't you need Mr.

24 Schatt?  The answer is no.

25          The way this forensic analysis works is very

1  simply the transactional ideas just need to be analyzed and

2  then you simply follow that.  This is no different than if

3  there were serial numbers involved.  Mr. Schatt has been --

4  alleged that Mr. Schatt is involved in some of this.

5        The insider trading between MoCredit and Cred, I

6  mean our position is that Mr. Schatt still being in the

7  company is and of itself a dispositive disqualification for

8  true independence.  And, therefore, we strongly support the

9  trustee's motion to install a trustee because we believe true

10  independence is needed.

11        It needs to be someone who is uniquely qualified

12  to actually discover where the missing cryptocurrency is.

13  That is publicly available information on the block chain.

14  It's what sets apart cryptocurrencies from U.S. dollar fiat

15  and we strongly encourage that be putting in the trustee for

16  that reason.

17        THE COURT:  Thank you, Mr. Silver.

18        Let me turn to the debtors. Who's going to do the

19  closing, Mr. Grogan, Mr. Cousins?

20        MR. GROGAN:  Yes, Your Honor.  James Grogan from

21  Paul Hastings on behalf of the debtors.

22        Your Honor, you've raised some of the points I

23  would have raised, so I think I might be able to be shorter

24  than ten minutes.

25        I think we need to just go back to the

1  (indiscernible) requirements here.  So, let's start with the
2  request to convert the case to a Chapter 7.

3          One of the requirements if you're looking at
4  1112(b)(4)(a) is the absence of a reasonable likelihood of
5  rehabilitation.  We have a plan support agreement in place
6  for a consensual plan supported by our committee.

7          I would also point out that that plan support
8  agreement immediately grants consent from the debtor to the
9  committee to control causes of action against the insiders
10 which is another reason why Mr. Lyon is independent.

11         THE COURT:  Hold on, Mr. Grogan.  Hold on, Mr.
12 Grogan, let me ask you a question.

13         So, we have a situation here according to the
14 other creditors that I've heard from that say that the
15 creditors on the creditors committee don't represent the
16 majority of the holders of the bitcoin in this case.  And
17 they are all opposed to having Mr. Lyon continue in his
18 position.  They want a Chapter 11 trustee.

19         And isn't the, you know, an irreconcilable
20 conflict between the committee or, excuse me, between
21 creditors and the debtors; doesn't that provide a basis for
22 appointing a Chapter 11 trustee?

23         MR. GROGAN:  Well, I think that actually was not
24 accurate.  Mr. Sarachek's client, I don't even think we're on
25 the top thirty list.  I don't know where he's getting that

1   information that they're the largest creditors.  They're not.

2          The members of the committee, and the committee

3   can speak up on this as well.  But I know that several of

4   them were top ten on the top thirty list, so.  I just don't

5   think that's accurate.  And there's no evidence to suggest

6   that the committee is not representing the larger creditors.

7          Putting that aside, I mean we do have a path

8   forward for a quick efficient Chapter 11 plan process which

9   is confirmable within a short amount of time.  There's also

10  as the court has already noted no evidence of gross

11  mismanagement of the estate.  There just isn't.

12          The company is being well managed currently and

13  so, there's just no statutory predicate here for conversion.

14          Second on the Chapter 11 Trustee cause that goes

15  to current management.  Again, Mr. Inamullah testified that

16  he left the company November 6th.  He has zero evidence of

17  what's going on post-petition.  There's no evidence that

18  anybody has done anything wrong since the petition date.

19          We're not here to sprinkle holy water on what the

20  debtors did prepetition.  Nobody on my side thinks that this

21  company was well run or, you know, as a model for business

22  schools.  But, you know, we are doing the right thing today.

23  We will get this company sold quickly and we will confirm a

24  plan before March.

25          So, there's just no cause here to displace Mr.

1  Lyon and Mr. Foster so that we -- and prevent them from

2  running what will be the most effective successful outcome

3  possible here for all of the unsecured creditors.

4           And with that, I'll turn it over to the committee.

5           THE COURT:  Thank you.  Let me hear from committee

6  counsel.

7           MR. WALSH:  Good morning, Your Honor. Tim Walsh

8  from (indiscernible).

9           THE COURT:  Mr. Walsh.  I thought I hear Mr.

10  Walsh.  I don't --

11          MR. WALSH:  That is correct.

12          THE COURT:  I'm having a hard time hearing you.

13  Can you get closer to your speaker or?

14          MR. WALSH:  How is that, Your Honor?

15          THE COURT:  That's better.  Thank you.

16          MR. WALSH:  So committee in this represents

17  approximately 6500 unsecured creditors, Your Honor. And on

18  the committee, I think we have the third, fourth, sixth and

19  seventh largest holders as creditors.

20          And, Your Honor, you should know that this

21  committee, and we're very lucky to have it, is a highly

22  sophisticated committee.  It's comprised of individuals with

23  a deep understanding of cryptocurrency and block chain.

24  Notably, about half of the committee members are law school

25  trained.

1        And this committee has told me they have faith in

2    the independence of both Mr. Lyons and Mr. Foster, so I think

3    the court should be aware of.

4        We believe that it's the committee and not a

5    Chapter 7 trustee or Chapter 11 trustee that's best suited to

6    investigate these claims with the debtor.  The committee has

7    (indiscernible) expertise and the financial motivations to do

8    so.  And as Your Honor points out installing a new

9    independent person at this stage of the case would only lead

10   to another layer of administration which we don't think is

11   warranted.

12       With respect to the U.S. Trustee's motion, Your

13   Honor, I'm not really sure who they're fighting for.  The

14   committee made it pretty clear in its papers, we've executed

15   a PSA.  We see a way out of this case. We see a sale process

16   that can be accomplished and we see a plan of liquidation

17   that transfers all these claims to a trust that can be

18   investigated and prosecuted by the committee. That's the way

19   out.

20       The committee does not want a trustee.  The

21   committee wants this process to go forward.  Again, I'm not

22   sure who the U.S. Trustee is fighting for at this point

23   because my constituents have made it clear, they do not

24   (indiscernible) a trustee.  They think it's a waste

25   (indiscernible).

1    THE COURT:  Mr. Walsh, you're kind of breaking up

2 a little bit.

3    MR. WALSH:  Your Honor, I think you've hit upon

4 the other points with respect to what is in evidence and what

5 is not, so I won't go through that.

6    But just for the record, the committee does not

7 want a trustee appointed in this case and wants to go forward

8 with the PSA.

9    THE COURT:  Thank you, Mr. Walsh, I appreciate it.

10    All right, we are at -- Mr. McMahon, very briefly.

11    MR. MCMAHON:  Your Honor, I just want to note for

12 the record that we also requested an examiner under 1104(c)

13 provision which is mandatory because (indiscernible) that in

14 this case. So, I just want to note that for the record.

15    THE COURT:  All right, understood.

16    Here's what we're going to do.  I have another

17 hearing -- I have a meeting and then I have a hearing.  My

18 hearing is at one o'clock.  I'm hoping it does not take more

19 than an hour. So, I'm going to -- let's reconvene at three

20 o'clock.  I'll give you my ruling on these motions that are

21 pending and we'll see how far we can get into the rest of the

22 agenda, and we'll go from there.

23    So, let's -- we'll say we're standing in recess

24 until 3:00 p.m.  All right.

25    (A Chorus of "Thank you, Your Honor")

1        THE COURT:  Thank you.

2        UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

3     (Recess at 12:02 p.m.)

4     (Proceedings resumed at 3:05 p.m.)

5        THE OPERATOR:  Recordings have begun and we are

6  now live.

7        THE COURT:  Thank you.  Good afternoon, everyone.

8  This is Judge Dorsey.  We're back on the record in Cred,

9  Inc., Case Number 20-12836.

10        Before we get back into the agenda, I'll go ahead

11  and give you my ruling on the motions to convert the case to

12  Chapter 7, appoint a Chapter 11 Trustee, and/or appoint an

13  examiner.

14        Before converting a case to chapter -- a Chapter

15  11 case to Chapter 7, the Court must first determine whether

16  cause exists to do so under 1112, Subsection (b).  "Cause" is

17  defined as including a substantial or continuing loss to or

18  diminution in the estate and the absence of a reasonable

19  likelihood of rehabilitation.  See Section 1121(b)(4).

20        The conduct leading to the decision to convert

21  must be post-petition conduct.  See In Re Sagecrest II, LLC,

22  2010 WL 537246, at Page 3 (Bankr. D. Conn. 2010).

23        Here, I have no evidence before me that would show

24  the debtors are incurring any substantial or continuing loss,

25  and certainly none that relates to post-petition conduct.

 1  Moreover, debtors did not present evidence -- excuse me.

 2  Moreover, debtors did present evidence that they have a

 3  viable path forward to a potential confirmation of a plan of

 4  reorganization that can be accomplished in the very near

 5  term.  Therefore, the conversion to Chapter 7 is not

 6  appropriate, and I will deny that relief.

 7        Appointment of a Chapter 11 Trustee is governed by

 8  Section 1104 of the Code.  1104(a)(1) allows appointment for

 9  cause, including fraud, dishonesty, incompetence, or gross

10  mismanagement of the affairs of the debtor by current

11  management, either before or after commencement of the case.

12  1104(a)(2) provides that appointment can be made, if it's in

13  the best interests of the creditors, equity security holders,

14  or other interests.

15        In this case -- in -- determining the existence of

16  cause is made on a case-by-case basis at the discretion of

17  the Court.  See In Re Sharon Steel, 871 F.2d 1217, at 1226

18  (3d. Cir. 1989).

19        Courts generally consider the following factors in

20  determining whether to appoint a trustee:

21        One, the trustworthiness of the debtor.

22        Two, the debtor's past and present performance and

23  prospects for the debtor's rehabilitation.

24        Three, confidence or lack thereof of the business

25  community and the creditors in the present management.

1    And four, the benefits derived by the appointment

2 of a trustee, balanced against the costs of that appointment.

3    See In Re Reserves Resorts Spa and Country Club,

4 LLC, Case Number 12-13316, nineteen -- a 2013 decision by

5 Judge Gross.

6    The evidence presented was that -- the evidence

7 presented before me in this case raises serious questions

8 about the conduct of the debtors' affairs pre-petition.

9 However, the debtor has removed the pre-petition management

10 of the company and replaced them with independent

11 professionals, including an independent member of the board

12 and the only board member, Mr. Lyons, having heard -- and

13 appointed Mr. Lyons as the only board member.

14    Having heard the testimony of Mr. Lyons and the

15 other professionals retained to run the debtors and market

16 the company for sale, I am convinced of their independence.

17 Although retained initially by prior management and equity

18 holders, no evidence was established to question that they

19 are, indeed, independent.  Moreover, the Official Committee

20 of Unsecured Creditors appointed in these cases have entered

21 into a plan support agreement setting out a valid proposal

22 for moving these cases forward.

23    Certain creditors and the U.S. Trustee, however,

24 still express reservations about allowing these independent

25 professionals to conduct the debtors' affairs, as they move

1  forward with a proposed plan.  I disagree with those

2  concerns.

3         However, I want to be perfectly clear that, if the

4  two equity security holders take any actions to either

5  replace Mr. Lyons as the independent director or try to

6  dilute his control of the board by appointing additional

7  members of the board without first seeking permission from

8  the Court, I will immediate appoint a Chapter 11 Trustee.

9  Therefore, for these reasons, I find that it would be

10 inappropriate at this time to appoint a Chapter 11 Trustee.

11        As for the appointment of an examiner, this is a

12 more difficult question.  I disagree with the UST's position

13 that the appointment of a -- of an examiner is mandatory.

14 The language of -- the language of 1104(c) provides the Court

15 with some discretion.  The Court -- it says that the Court

16 shall appoint an examiner to conduct such an investigation if

17 the -- of the debtor as is appropriate.  So the question

18 becomes:  Is it appropriate in this case?

19        The creditors' committee has taken the position

20 that they are conducting an investigation, although I will

21 note that they have just been appointed, and any

22 investigation must be in its very early stages of this case.

23 I'm also mindful of the fact that the -- some of the

24 creditors of the company are distrustful of the situation and

25 have concerns about the conduct of the previous management of

1  this company.

2         Therefore, I'm going to agree with Judge Glenn in

3  In Re Residential Capital, LLC, 474 B.R. 112, 119-120

4  (S.D.N.Y. 2012), in which he recognized that, quote:

5         "The only dispute as to whether the creditors'

6  committee should be permitted to conduct an investigation

7  without an examiner being appointment" --

8         The creditors' committee is ably represented in

9  these cases and no party questions the creditors' committee's

10  professionals' ability to competently and expeditiously

11  complete an investigation.  Nonetheless, Judge Glenn

12  determined in that case that appointment of an examiner was

13  appropriate, and I will do the same here.  I think

14  appointment of an examiner to conduct an investigation of the

15  pre-petition conduct of the debtors is appropriate.

16         And therefore, I will enter an order requiring

17  that that be done.  The parties should confer and submit an

18  appropriate form of order.

19         And in the form of order, I want to make clear, I

20  do not want any duplication of effort.  Since I'm appointing

21  an examiner to conduct an investigation, there's no need for

22  the creditors' committee to conduct a parallel investigation.

23  So I would not approve any fees associated with the

24  creditors' committee conducting that investigation.

25         Are there any questions?

1           (No verbal response)

2                THE COURT:  All right.  Let's move on to the rest

3    of the agenda.  What's next up, Mr. Cousins?

4                UNIDENTIFIED:  Your Honor --

5                MR. COUSINS:  Good afternoon, Your Honor --

6                THE COURT:  Go ahead, Mr. Cousins.

7                UNIDENTIFIED:  Your Honor --

8                THE COURT:  I hear "Your Honor."  Use the raise

9    your hand, so I can know who's talking.  I can't -- I've got

10   a screen full of faces here, I don't know who's talking.

11   Nobody.  Okay.

12               Back to you, Mr. Cousins.  Go ahead.

13               MR. COUSINS:  Thank you, Your Honor.  Good

14   afternoon.  Scott Cousins on behalf of the debtors.

15               I do have one update I wanted to inform the Court

16   because I know we've taken up a lot of time.  We've conferred

17   with UpgradeYa about their motion, which is I think the

18   second-to-last item on the agenda.  They have agreed to

19   adjourn their motion, the debtor doesn't object.

20               The next hearing we have is in connection with --

21   excuse me -- the adversary that we filed against James

22   Alexander and Alexander's motion to dismiss the case on

23   January 6th.  So, with the Court's permission, the debtors

24   would be comfortable, along with UpgradeYa, to move that

25   motion to January 6th.

1          THE COURT:  Remind me what that motion is.

2          MR. COUSINS:  That's the motion to reclaim

3   collateral that they believe that is in the possession of the

4   debtors.  That's Mr. Pierce's client.

5          THE COURT:  Okay.  Yes, we can move that to the

6   January 6th hearing.

7          MR. PIERCE:  And Your Honor --

8          MR. COUSINS:  (Indiscernible)

9          MR. PIERCE:  -- I'd just like to confirm what Mr.

10  Cousins was saying on behalf of UpgradeYa.  And this is

11  Matthew Pierce with Landis, Rath & Cobb for the record.

12          You know, given the late hour and the time that

13  the Court has spent the last two days and the evidentiary

14  issues that relate to our motion, we do not want to take any

15  more of the Court's time and try to get that heard today just

16  because of the time it will take.  So we are agreeable with

17  the debtors to adjourn that.

18          THE COURT:  Okay.  I appreciate that.  Thank you,

19  Mr. Pierce.

20          MR. COUSINS:  Your Honor, for ministerial action,

21  I think there may be some members of the debtors'

22  professionals who were waiting around for that motion.  I'm

23  not sure if they need to stick around any further, but one or

24  more might drop off with that adjourned.

25          THE COURT:  That's fine.  Anyone who does not need

1   to remain on the call may certainly drop off.

2           MR. COUSINS:  Thank you, Your Honor.

3           There are several now uncontested matters at the

4   beginning of the agenda.  We certainly understand why the

5   Court did not enter any proposed orders with respect to the

6   motion to reject the headquarters, the insurance policies

7   motion, the motion to -- the application to retain my firm,

8   the procedures for interim comp, the ordinary course

9   professionals and Donlin.

10          Your Honor, we've been working with the committee

11  and the U.S. Trustee.  We have produced blacklines, we've

12  filed them and uploaded appropriate orders.  And to my

13  understanding, Your Honor, I don't think there's any

14  objections to any of those, but I can certainly go through

15  the blacklines and the changes that we made in response to

16  the committee and (indiscernible)

17          THE COURT:  No, I did review those that are under

18  COC and CNO.  I was waiting to see what happened with the

19  motions to dismiss -- or the motion to appoint a trustee or

20  convert.  So I will go ahead and enter those orders for you.

21          MR. COUSINS:  Thank you very much, Your Honor.

22          And I think that brings us to Agenda Item Number

23  7, which is -- Mr. Bongartz from Paul Hastings is going to

24  handle that.

25          THE COURT:  All right. Mr. Bongartz?

1        MR. BONGARTZ:  Yes.  Good afternoon.  This is Alex

2   Bongartz of Paul Hastings.

3        So we're going to continue now with Agenda Item 7.

4   And if it pleases the Court, we would like to consider Agenda

5   Item 7 together with Agenda Item 12, which is the motion to

6   seal, which is essentially covers the same ground that is

7   left over from the motion on Agenda Item 7; i.e., the motion

8   to approve the redaction or withholding of publication of

9   certain personal identification information of the debtors'

10  customers.

11       So we -- if the -- as Your Honor will recall --

12       THE COURT:  Hold on one second --

13       MR. BONGARTZ:  -- at the first day --

14       THE COURT:  -- Mr. Bongartz.  Hold on one second.

15       I think someone else has their line open, I'm

16  getting feedback on the phone.  If you're other than Mr.

17  Bongartz, please mute your phone.  Thank you.

18       Go ahead, Mr. Bongartz.

19       MR. BONGARTZ:  Thank you.

20       As Your Honor will recall, you had granted the

21  relief as it relates to the redaction of personal

22  identification information on an interim basis at the first-

23  day hearing, that was at Docket Number 34.  And we are now

24  requesting approval of that relief on a final basis.

25       I wanted to note that we had attached to our reply

1  -- which is filed at Docket Number 187 -- a declaration of

2  Chris Wu of Teneo, and we would like to introduce that into

3  evidence in support of the motion and both -- to be clear,

4  both the motion to redact, as well as the motion to seal.

5  And that was my first request, to introduce that into

6  evidence.

7           THE COURT:  Is there any objection?

8           MR. SCHANNE:  We have a limited objection, Your

9  Honor.

10          THE COURT:  Who's speaking?  Mr. Schanne?

11          MR. SCHANNE:  Schanne.

12          THE COURT:  Schanne.

13          MR. SCHANNE:  May it please the Court, good

14  afternoon.  John Schanne, also on behalf of the Office of the

15  United States Trustee.

16          Just a limited hearsay objection to the second

17  sentence of the sixth paragraph of the Wu declaration.  And

18  that is Mr. Wu informing the Court of what potential buyers

19  are informing Mr. Wu.  If we want testimony of what the

20  buyers are saying, they need to be here to say it.

21          THE COURT:  Mr. Bongartz?

22          MR. BONGARTZ:  Well, I think the Court can take

23  notice of the fact that this is what the buyers have told Mr.

24  Wu, whether the buyer --

25          THE COURT:  How can I do that?  I can't do that,

1  take notice of it.  I mean, they've either told him or they

2  haven't.  And if he's the one telling me they told him, it's

3  hearsay.

4          MR. GROGAN:  Your Honor, James Grogan.  May I be

5  heard for just one second on this?

6          THE COURT:  Quickly.

7          MR. GROGAN:  Your Honor, Mr. Wu, I think, is an

8  expert, he's been our retained as our -- or is proposed to be

9  retained as our investment banker, and an expert can rely on

10 hearsay.

11         THE COURT:  Well, he's not testifying as an expert

12 on this motion, so I'm going to sustain the objection.

13         MR. GROGAN:  Okay.

14         MR. SCHANNE:  Thank you, Your Honor.

15     (Redacted Wu Declaration received in evidence)

16         MR. BONGARTZ:  All right.  As to the merits of the

17 motion, I think we've laid our arguments out in our reply,

18 but I'm just going to recap them briefly.

19         As Mr. Wu's declaration substantiates, the

20 customer list has value here, but it only has value as long

21 as it's not disclosed.  In fact, Mr. Wu's declaration -- as

22 for his declaration, he is attempting to sell the business as

23 a going concern, which includes the customer list.  And to

24 release or reveal the names on that list would materially

25 diminish the value of that list.

1       Now he also testified that -- or sorry, he didn't

2   testify.  In his declaration, he declared that the -- he is

3   marketing the customer lists.  I'm not going to mention what

4   the buyer said in response, but he -- it's definitely part of

5   the assets, the key assets that are being marketed for sale.

6   And in his opinion, the -- if that information were to be

7   disclosed, it would materially diminish its value.

8       I would also note that one of the key features of

9   cryptocurrency -- as is not just evidenced by Mr. Wu's

10  declaration, but it's now been repeated on multiple occasions

11  -- is that the holders of such currency, they are generally

12  anonymous.  It's certainly possible that a cryptocurrency

13  holder can raise his hand, as has happened even in this case,

14  and identify himself.  But without the customer doing so

15  voluntarily, it is generally not in the public domain who

16  holds cryptocurrency.  And to be clear, this is not just

17  limited to individuals; it is also the case for corporate

18  entities.  And I believe one evidence is -- in support of

19  that is -- we'll get to that, and the committee has

20  evidentiary support in that regard.

21      So, with that in mind, we would like to reiterate

22  our request, as we've done at the first-day hearing, that the

23  Court keep the customer names, as well as addresses,

24  confidential; that the debtors be permitted to redact

25  customer names and address information both from schedules,

1  as well as the creditors' list, and as well as -- and that

2  the claims agent be permitted to redact name and address

3  information from claims filed by customers.  That would --

4  that's it.

5          THE COURT:  All right.

6          MR. BONGARTZ:  And I understand that the committee

7  -- committee's counsel would like to be heard on this, as

8  well.

9          THE COURT:  All right.  Let me hear from the

10  committee's counsel, and then I'll go to the trustee.

11          MR. AZMAN:  Hi, Your Honor.  Good afternoon.

12  Darren Azman, McDermott, Will & Emery, counsel -- proposed

13  counsel to the committee.

14          Before I begin, we do have two declarations that

15  we submitted with our joinder, one from Mr. Segall, and the

16  second from Mr. Friedler.  And so I'd ask the Court to move

17  both of those into evidence.  Both Mr. Segall and Mr.

18  Friedler are on the line and available for cross.

19          THE COURT:  Is there any objection?

20      (No verbal response)

21          THE COURT:  Okay.  They're admitted without

22  objection.

23      (Segall Declaration received in evidence)

24      (Friedler Declaration received in evidence)

25          MR. AZMAN:  Thank you, Your Honor.

1        Your Honor, the sealing motion is of significant

2   importance to the committee, as I'm sure came through on our

3   joinder and the declarations.  This is not as simple as

4   creditors just wanting to remain anonymous, it's much more

5   than that.

6        The cryptocurrency space is one that is ripe with

7   fraud.  Of course, there's fraud everywhere today, but the

8   risk is far more acute for holders of cryptocurrency.  And I

9   think there are really three reasons for that, all of which

10  were laid out in Mr. Friedler's declaration.

11       The first is that cryptocurrency assets are ideal

12  targets for theft because it's incredibly difficult to trace

13  and can be easily liquidated.

14       Second is that cryptocurrency is decentralized.

15  There is no bank.  There are few, if any, procedural

16  safeguards that are in place to stop or unwind a fraudulent

17  transaction if it occurs.  It's not like a credit card

18  purchase, Your Honor, or a wire transfer, where, if a bank

19  suspects fraud, you're going to get a notification on your

20  phone.  Once the crypto is gone, it's gone.

21       And then third, Your Honor, for those two reasons,

22  the debtors' customers in these cases are essentially what we

23  would call "pre-qualified," in terms of being target victims

24  because they naturally hold cryptocurrency.

25       There is a -- I'll be clear, Your Honor.  There is

1   a small (indiscernible) in the case, probably around two

2   percent of the unsecured creditor pool, in terms of dollars,

3   who -- you know, for example, the convertible noteholders,

4   who probably don't fall into that bucket.  And quite frankly,

5   I don't think we have any objection to those names being made

6   public.  We're speaking only about the debtors' customers who

7   are customers are of the debtors, who naturally have held and

8   probably continue to hold cryptocurrency.

9          Your Honor, the second declaration that we

10  submitted is from Mr. Segall, who is a representative for one

11  of the committee members, Maple Partners.  The individuals

12  who formed Maple were so concerned about the risks that I

13  just outlined shortly after the bankruptcy filing -- and to

14  be clear, before the committee's appointment, but shortly

15  after the bankruptcy filing -- that they formed a new LLC to

16  hold their crypto, so that, if they were appointed to the

17  committee, and maybe for other reasons, but if their -- they

18  did not want their names to be disclosed.

19         I'm sure there are others out there who have done

20  that, but I'm sure that also a majority of the debtors' 6,500

21  creditors likely don't have the means to do that.  And I

22  think it's also noteworthy that a significant portion of the

23  debtors' customers don't even speak English, they're all over

24  the world.  So they have no idea that their names may be

25  publicized in these cases.

1            Now, Your Honor, these concerns are not only

2    coming directly from our committee members, but the unsecured

3    creditor body at large, who have been very vocal about many

4    aspects of this case online in various forums.  They are

5    scared, not just because they've lost a lot of money, but now

6    because their names may be made public.

7            Your Honor, that's all I have.  I don't want to

8    repeat the rest of the argument from our joinder.  But I

9    think that the declarations and the argument warrant

10   withholding that information.  Thank you.

11           THE COURT:  All right.  Thank you.

12           Mr. Schanne, before I come back to you, I see Mr.

13   Murley has raised his hand.  Do you want to be heard, Mr.

14   Murley?

15           MR. MURLEY:  Thank you, Your Honor.  Luke Murley

16   of Saul, Ewing, Arnstein & Lehr, on behalf of Maple Partners.

17   We are the committee member Mr. Azman referred to.  We join

18   the debtors' motion and the committee's joinder for the

19   reasons stated, and those pleadings and Mr. Azman's

20   presentation.  Thank you, Your Honor.

21           THE COURT:  All right.  Thank you.

22           Mr. Schanne.

23           MR. SCHANNE:  Thank you, Your Honor.  Again, may

24   it please the Court, John Schanne on behalf of the Office of

25   the United States Trustee.

1          Your Honor, the debtors seek authorization to

2    redact the names and all associated information identifying

3    all the debtors' creditors.  Bankruptcy process is founded on

4    principles of transparency and disclosure, limited

5    exceptions, and it's the debtors' burden to meet those

6    exceptions.

7          107(b)(1) permits the Court to protect trade

8    secrets and confidential information.  The debtors here

9    assert that the creditor list is potentially a value in

10   marketing the company.  That's no doubt accurate for many

11   businesses engaged in a 363 sale, I don't think that's

12   unique.  Notably, there's no evidence from any buyer

13   ascribing any value to that list, there's no stalking horse

14   agreement.  Should the agreement here, as postured, be

15   sufficient to satisfy (b)(1), we'll have an exception that

16   swallows the rule.

17          I think the real concern, though -- and you heard

18   it in the committee's presentation -- is privacy.  I think

19   that's the real focus here, is that people are concerned

20   about their information getting out.  And 107(c)(1) allows

21   the Bankruptcy Court to protect individuals.  (c)(1)

22   incorporates 1028(d) of Title 18, which, again, protects

23   individuals.  The plain language of neither of them apply to

24   protect entities.

25          So what are we talking about here?  We're talking

1    about individuals.  And with respect to those individuals, we

2    are sensitive to the concerns.  We understand.  The

3    Bankruptcy Rules, the local rules, they require complete

4    disclosure.  The debtors, the committee, they've offered

5    evidence that, if you identify all of that information, there

6    are real concerns there.  We're not asking for that.  We're

7    asking just for submission of the creditor names.  We have

8    not opposed redaction with respect to individuals of any

9    other identifying information, just the names.  The Friedler

10   declaration itself admits that just the names may not be

11   sufficient with respect to common names, right?

12           So we have here a hypothesis in evidence that, if

13   all of this information is provided, these bad things may

14   happen.  And we're sensitive to that and we understand that

15   and, in fact, you know, we don't oppose that.  It's just the

16   names of individuals who are looking to be disclosed.  And

17   with respect to entities, I don't believe (c)(1) applies.

18           We saw, during the trustee appointment motion

19   earlier today, disagreement between the committee and Mr.

20   Sarachek about where his creditors fall in the top 30 list.

21   Normally, that would have been easily resolved by looking on

22   the docket and seeing where they fall.  Of course, that

23   information is not available here.

24           So debtors assert that the UST has not

25   demonstrated why this information should be public, but that

1    flips the burden.  They have to demonstrate why the exception

2    applies here, to where even just the names themselves of

3    individuals cannot be disclosed.

4            So, for that reason, we respectfully request that

5    the motion be denied in its entirety with respect to

6    entities, and granted, for the most part, with respect to

7    individuals that just allow the names to be disclosed.  Thank

8    you, Your Honor.

9            THE COURT:  All right.  Thank you.

10           Mr. Bongartz, any reply?

11           MR. BONGARTZ:  Yes.  Thank you, Your Honor.

12           I wanted to just make two quick points.  This is

13   not comparable to a customer list of a, you know, run-of-the-

14   mill business.  I mean, the customer information, because of

15   the anonymity intrinsic in holding Bitcoin, is costly to

16   build.  It's costly and expensive to develop a customer

17   database because you don't know who out there holds the

18   cryptocurrency.  So that's what makes it an attractive asset

19   or may make it an attractive asset for a potential buyer.

20           The second point I wanted to make is the issue

21   with names is that it's just happenstance.  If you have a

22   common name, then maybe you're protected; and if you don't

23   have a common name, you're not.  That -- I think we should

24   apply a process that is fair to everyone.  And to just have

25   it by sheer luck that you have a common name and, you know,

1   then you're protected is not in the interest of protecting

2   customers, generally.  Thank you, Your Honor.

3           THE COURT:  Okay.  Has the list of names been

4   disclosed to the trustee?

5           MR. BONGARTZ:  I believe that it has.

6           THE COURT:  Do you have all of the information

7   about the holders of the Bitcoin, Mr. Schanne?

8           MR. SCHANNE:  Your Honor, we have been provided

9   the top 30 lists.  The schedules and statements have not been

10  prepared, so we do not have that information yet.

11          THE COURT:  All right.  And is there -- I -- it's

12  been a while since I took a look at this proposed order.  Is

13  there anything in this proposed order that provides a

14  mechanism that, if someone can come forward and have a

15  legitimate reason why they need to have access to that list,

16  they can seek to get it?

17          MR. BONGARTZ:  Yeah, that mechanism was in the

18  interim order and we've carried it over into the proposed

19  final order.

20          THE COURT:  Okay.  All right.  Then, based on the

21  evidence, I think there is at least some credible argument

22  that the creditor list -- which his, also, in this case, the

23  customer list of the -- of the debtors is -- has some

24  intrinsic value, and that disclosure of that list could

25  affect the ability of the debtors to market and sell that

1  list as a part of their going toward a plan of reorganization

2  here.

3           So I will overrule the objection, so long as the

4  U.S. Trustee is provided with all of the information

5  regarding every single one of the Bitcoin holders, and that

6  there is a mechanism in the final order that allows for

7  someone who can come forward and seek to obtain that list for

8  a legitimate purpose can do so.

9           I think the goal here is to keep this out of the

10 hands of competitors.  And so I would expect that, obviously,

11 someone -- or the competitor of the debtor and came forward

12 and said, well, we want to see the list, you're not going to

13 give it to them.  But there may be others who have a

14 legitimate reason for why they need that information.  And so

15 I want to make sure there's a way for someone who has a

16 legitimate reason to get it, can get it.

17           MR. BONGARTZ:  Yes, understood, Your Honor.  And

18 just to pinpoint the relevant paragraph, it's Paragraph 3 of

19 the proposed order.  But we'll be submitting that --

20           THE COURT:  All right.

21           MR. BONGARTZ:  -- after the hearing.

22           THE COURT:  Okay.  Yeah, please confer with the

23 U.S. Trustee and come up with an order that you can submit

24 under COC.

25           MR. AZMAN:  Thank you, Your Honor.

1         MR. BONGARTZ:  Thank you.

2         THE COURT:  Thank you.

3         MR. BONGARTZ:  Okay.  Moving on, the next item is

4 Item 8 on the agenda.  That is the cash management motion;

5 i.e., the motion to authorize the debtor to continue to

6 operate their cash management system, among other things.

7 That was Docket Number 7.  Your Honor had granted the cash

8 management order on an interim basis on November 10th.

9         We -- I am aware of two limited objections.  One

10 was filed by Jaime Schiller and other customers.  I believe

11 that that objection is moot, as a result of Your Honor's

12 ruling earlier this afternoon.  They had sought an

13 adjournment of a decision until after Your Honor had ruled on

14 the trustee motion.  But I don't -- again, in light of your

15 ruling, I don't think that objection has any -- you know,

16 it's still alive.

17         The other limited objection was filed by the U.S.

18 Trustee.  I should note that we did incorporate a series of

19 comments, informal comments, that the U.S. Trustee provided

20 to us, and we have attached a blackline to our reply at

21 Docket Number 215.  And if Your Honor would like, I can walk

22 you through those changes.  But my understanding is that

23 these changes are acceptable to the U.S. Trustee, and I don't

24 know if he has any further issues outstanding, but I believe

25 that we're in agreement on the form of order.

1          THE COURT:  Okay.  Mister --

2          MR. BONGARTZ:  And the only issue with the U.S.

3   Trustee that is remaining is whether Section 345(b) requires

4   the debtor here to essentially sell all their cryptocurrency.

5   On that point, I should -- I would like to make a few

6   comments.

7          The first one is -- and we've mentioned this in

8   our reply -- is that we do not believe that cryptocurrency

9   constitutes, quote, "estate money" for purposes of Section

10  345, so we don't believe it applies.  Cryptocurrency has been

11  held by other courts to be a commodity, not money, it's not

12  legal tender, it's not accepted as currency by the

13  Government; and so, therefore, we don't believe that 345(b)

14  applies.  But in any event, even if it does, we believe that,

15  in this instance, a waiver should be granted.

16          This is a -- cryptocurrency is the lifeblood of

17  this company.  It's comparable to the oil or other commodity

18  -- or commodities businesses.  And to require the debtors to

19  sell out -- sell down all its cryptocurrency would

20  essentially deprive it of one of its key assets.

21          I should also note that, in addition, as a result

22  of the plan support agreement that the debtors have entered

23  into with the committee, the committee has oversight over the

24  debtors' cryptocurrency positions.  The debtors have agreed t

25  provide weekly reporting.  And the committee has consent

1  rights if the debtors wanted to sell cryptocurrency beyond

2  what is permitted under the budget.  And in light of all of

3  the foregoing, we request that the Court approve the proposed

4  waiver of Section 345(b), which is in Paragraph 10 of our

5  proposed form of order.  Thank you.

6            THE COURT:  Mr. Schanne, are your objections all

7  resolved?

8            MR. MCMAHON:  Your Honor, if I may, Mr. McMahon

9  again.

10            THE COURT:  Oh, go ahead, Mr. McMahon.

11            MR. MCMAHON:  Your Honor, good afternoon.  With

12  respect to the cash management order, just one note.

13  Debtors' counsel I don't think characterized our position

14  correctly.  Because of the presence of the cryptocurrency in

15  e-wallets, which the debtors are holding, the motion turns

16  out to be a hybrid Section 345/363 motion.

17            There's risk with maintaining the position in

18  cryptocurrency.  With the understanding now that the

19  committee has been appointed since the last order was entered

20  and they are not objecting to holding the crypto, as the case

21  may be, we are okay with the revised proposed form of order

22  and we're not maintaining an objection to the motion going

23  forward.

24            THE COURT:  Okay.  Thank you, Mr. McMahon.

25            Anyone else wish to be heard?

1          MR. AZMAN:  Your Honor, it's Darren Azman again,

2     from McDermott, proposed counsel to the committee.

3          The only thing I'd add is this is an issue that we

4     are very much focused on, as Mr. Bongartz mentioned.  It's a

5     line item in the PSA and it's something that we're going to

6     be looking at even more closely over the next few days and

7     coming weeks, to determine whether there's sufficient

8     liquidity and what needs to be done with the crypto, but

9     there is no decision that's been made yet.

10          THE COURT:  Okay.  Thank you.

11          Anyone else?

12          MR. SILVER:  Your Honor, it's David Silver of

13     Silver Miller, representing Jaime Schiller.

14          As stated previously, just for the record, our

15     limited objection is mooted by the earlier decision, and we

16     withdraw it.

17          THE COURT:  Okay.  Thank you.

18          All right.  Then, based on the record presented,

19     I'm satisfied the relief requested is appropriate, including

20     the waiver of Section 345(b) in the order, and I will enter

21     that order.

22          MR. BONGARTZ:  Thank you, Your Honor.

23          Moving on to the next item on the agenda, that is

24     the employee wage motion, which is filed -- sorry, I

25     (indiscernible) -- Docket Number 11.  Again, Your Honor will

1  recall that you had granted that motion on an interim basis

2  at the November 10 first-day hearing.

3        We, again, have a limited objection by Jaime

4  Schiller and other customers.  And for the same reasons I've

5  stated earlier, I believe that that objection is mooted by

6  Your Honor's earlier ruling.

7        We have also received a number of informal

8  comments from the U.S. Trustee, which I believe we have

9  incorporated, although I don't know for certain whether the

10  U.S. Trustee is signed off on the form of order.  So I'd be

11  happy to walk Your Honor through the proposed order.

12        There's actually one point I wanted to make --

13  sorry, I just saw it in my notes -- and one change that we do

14  need to make in the form of order that was submitted.  And I

15  don't know -- I don't know if Your Honor has a copy of that

16  handy.  It was attached -- it was -- sorry.  It was filed at

17  Docket Number 214.  And this is in Paragraph 4 of that

18  proposed order, this was a -- this is a glitch that crept in

19  because we were trying to incorporate both comments we've

20  received from the committee, as well as comments we've

21  received from the U.S. Trustee.

22        I just wanted to make absolutely clear -- and

23  we'll reflect that in the draft -- in the form we'll submit

24  to chambers -- is that, if the debtors want to make any bonus

25  or incentive payments to non-insiders, or want to make bonus,

1  incentive, or severance payments to insiders, they will have

2  to come -- or we will have to come back and obtain an order

3  from this Court, and we'll have to do so on notice to

4  parties-in-interest.  I wanted to make absolutely clear we're

5  not going to move forward with that solely with the consent

6  of the committee.  We will come back to Your Honor, and we

7  will, if the chooses to make any such -- make any such

8  payments, we'll come back and seek entry of an order.

9         And obviously --

10        THE COURT:  Okay.

11        MR. BONGARTZ:  -- that is what we had agreed to

12  with the U.S. Trustee.  And I just wanted to make clear that

13  that is still the agreement and that will be reflected in the

14  form of order.

15        THE COURT:  Okay.  Thank you.

16        Mr. McMahon, are your issues resolved?

17        MR. MCMAHON:  They are, Your Honor.  No further

18  comments.

19        THE COURT:  Okay.  Thank you.

20        Anybody else wish to be heard?

21     (No verbal response)

22        THE COURT:  All right.  I'm satisfied, based on

23  the record, that the requested relief is appropriate.

24  Subject to submitting the final form of order under

25  certification of counsel, we'll get that order entered.

1           MR. BONGARTZ:  Thank you, Your Honor.

2           So the next item on the agenda is the bar date

3    motion.  With Your Honor's permission, I would actually

4    propose that we go slightly out of order because it -- I

5    think it logically makes more sense to first consider the

6    motion to extend time to file schedules, and then we can look

7    at the bar date motion, which sort of -- which flows from

8    that.  So I would, with Your Honor's permission, jump to Item

9    17 on the agenda.

10          THE COURT:  That's fine.

11          MR. BONGARTZ:  Okay.  Thank you.

12          So I know that there has been a little bit of a --

13   you know, that there's been two motions filed, an original

14   motion and an amended motion, and then we filed a revised

15   proposed order.  This was primarily the result of learning

16   what the situation on the ground is and getting new

17   management in place.  We had initially anticipated that the

18   schedules would be completed by December, late December.

19          But in light of having to replace -- or having to

20   replace management, including putting in a new CRO, replacing

21   the CFO, and the controller going on maternity leave, and in

22   light of the vast amount of information -- as Your Honor will

23   recall, there are more than 6,000 customers -- that December

24   deadline or -- that we had initially proposed was no longer

25   feasible.

1          We had then filed an amended motion, asking to

2     push that deadline to January 22nd.  And then, after

3     discussions with the committee and after further, you know,

4     analysis of what needed to be done in order to complete the

5     schedules, we're comfortable with only asking for an

6     extension to January 7th.  So that cuts it back by 15 days

7     from what we had proposed in our amended motion.  That -- so

8     that's our current request.

9          I should also note that that date is consistent

10    with the deadline or the milestones set forth in the plan

11    support agreement with the committee, and I understand that

12    the committee supports the extension to -- the extension of

13    the deadline to January 7th.  Thank you.

14          THE COURT:  Thank you.

15          Is there anyone else who wishes to be heard?  Mr.

16    McMahon?

17          MR. MCMAHON:  Your Honor, again, good afternoon.

18    Very quickly.

19          Initially, this motion was going to be tabled

20    because, in the normal scheme of things, Your Honor, bar date

21    motions don't go out until the debtors complete this task.

22    So, in light of the revised, I guess, proposal with the

23    committee for January 7th, our office is not objecting to

24    that date now, in light of the, you know, two-week concession

25    over what was originally proposed.

1          But I was expecting the bar date motion to be

2     continued.  I would like to be heard on that item, Your

3     Honor, when we get to it momentarily.

4          THE COURT:  Okay.

5          MR. MCMAHON:  But no objection --

6          THE COURT:  No objection on the motion to extend

7     the date to file schedules, though, right?

8          MR. MCMAHON:  Correct.

9          THE COURT:  Okay.  Thank you.

10         Anyone else?

11      (No verbal response)

12         THE COURT:  All right.  I'm satisfied that relief

13    is appropriate.  I will grant that order.

14         MR. BONGARTZ:  Thank you, Your Honor.

15         And now we -- I'm going to turn to the bar date

16    motion, which was at -- it's filed at -- it's on -- sorry --

17    it's Agenda Item 10.

18         So we are requesting that the general bar date be

19    set for February 10th.  That date is driven, in large part,

20    by the milestones under the plan support agreement.  We need

21    to have a bar date before solicitation can begin.  And it is

22    crit -- absolutely critical in this case, given the limited

23    resources available, that these cases move forward as

24    expeditiously as possible.

25         We submit that a period of 30 days, plus or minus,

1  between the date on which the schedules will be filed -- and

2  they may actually get filed sooner than January 7th, but

3  that's the outside date -- and the proposed bar date of

4  February 10 is appropriate under the circumstances.

5        But I'm -- I should also note that the committee

6  supports the bar date of February 10, and I don't -- I

7  understand the U.S. Trustee has a -- objects to the motion

8  going forward, but I'll let him present that argument.

9        THE COURT:  Okay.  Mr. McMahon?

10       MR. MCMAHON:  Very quickly, Your Honor.

11       The way things typically work in a case that

12  appears before this Court is schedules are filed, creditors

13  get to see how their claims are scheduled -- you know,

14  whether they're contingent, unliquidated, or disputed -- such

15  that, when the proof of claim bar date does come, perhaps

16  they don't have to file a proof of claim if they agree with

17  what's scheduled.

18       Second, Your Honor, it also gives the parties-in-

19  interest an opportunity to pressure-check the schedules.

20  There is a potential for abuse -- and I'm not suggesting that

21  it's going to occur here.  But sometimes, you'll have

22  situations where, you know, every creditor is marked

23  contingent, unliquidated, or disputed, and the debtors don't

24  do their diligence with respect to accurately preparing the

25  schedules.

1    What I've said to debtors' counsel is a couple of

2  things:

3        First, I'm prepared to act within 48 hours of the

4  January 7th schedules deadline to take a look at them and to

5  advise them whether or not we have any issues with respect to

6  what's been assembled.  If there are, we can contact the

7  Court and perhaps have a teleconference.  If we don't have

8  issues, Your Honor, then the bar date notice can go out

9  immediately on the heels of our making that determination.

10        So, you know, I'm going by the way, you know,

11  things are typically done.  And they things are typically

12  done do not involve the bar date notice going out in advance

13  of the schedules being filed.

14        MR. AZMAN:  Your Honor, may the committee be heard

15  briefly?

16        THE COURT:  Go ahead.

17        MR. AZMAN:  Darren Azman again for the committee.

18        What Mr. McMahon proposes would effectively extend

19  the life of these Chapter 11 cases by three to four weeks, so

20  that's another month of professional fees and U.S. Trustee

21  quarterly operating fees.

22        I hear Mr. McMahon that, in many cases -- maybe

23  most -- that's not the -- necessarily the exact order things

24  go in.  But there's nothing in the Bankruptcy Rules or the

25  Bankruptcy Code that prevents it, on the one hand.  And

1    moreover, creditors are going to have an opportunity to see

2    the schedules.  January 7th is when the schedules will be

3    filed; the bar date will be a month later.  We're just

4    talking about the notice of the bar date going out now, so

5    that we can expedite these cases.

6          And so I don't really follow Mr. McMahon's logic.

7    They will see the bar date notice.  And if they want to file

8    a proof of claim before the schedules are filed, that's up to

9    creditors.  Alternatively, they can wait until they see them

10   on January 7th.  Thank you.

11         THE COURT:  Mr. Bongartz, does the bar date notice

12   that you're proposing to send out indicate that the schedules

13   will be filed no later than January 7th?

14         MR. BONGARTZ:  I believe it does.  But if it

15   doesn't, we will make sure to add it.

16         THE COURT:  Okay.

17         MR. BONGARTZ:  When -- I think --

18         THE COURT:  Yeah.

19         MR. BONGARTZ:  -- there is a provision in there

20   that the schedules have been filed.  But I will absolutely

21   make clear that the January 7th deadline is mentioned.

22         THE COURT:  All right.  Well, I think, if we send

23   out the bar date notice with a date of -- I've lost my notes

24   here -- of February 10th for the bar date, and we've sent out

25   a notice that says a schedule will be filed by January 7th,

1  and you don't have to file your proof of claim until after

2  the schedules are filed, that should take care of the

3  situation.  Does that resolve your issue, Mr. McMahon?

4          MR. MCMAHON:  Yeah, I --

5          MR. BONGARTZ:  Your Honor, I think --

6          MR. MCMAHON:  Your Honor --

7          MR. BONGARTZ:  -- I've actually -- I should note

8  one more thing.  I believe that the way we've set this up is

9  that the notice goes out -- there will be a customized proof

10 of claim form, which will include the scheduled amounts on

11 the front page.  So what will go out to the customers will

12 inform them directly, on the proof of claim form that they

13 would -- can submit themselves, what the scheduled amount of

14 the claim is.

15         THE COURT:  Well, how are you going to do that

16 before the schedules are filed?

17      (Participants speak simultaneously)

18         THE COURT:  Hold on.  One at a time.  Mr.

19 Bongartz?

20         MR. BONGARTZ:  The way this works -- and I

21 apologize for -- if I misspoke earlier -- the notice will go

22 out after the schedules have been filed.

23         THE COURT:  So notice will go out on what, what

24 day are you proposing?

25         MR. BONGARTZ:  I think we will do this within five

1 business days after the schedules have been filed.  I think

2 there's a -- yeah, five business days.

3           THE COURT:  That puts you at January 14th.  And

4 the bar date is what?

5           MR. BONGARTZ:  February 10th.

6           THE COURT:  That's almost four weeks, Mr. McMahon.

7           MR. AZMAN:  Your Honor, may the committee be heard

8 briefly?  Because this is not consistent with -- I think this

9 is a mistake, and the committee would not support that.  Our

10 understanding, as is laid out in the -- there is no way to

11 comply with the PSA time line if that is when the bar date

12 notice is going to go out.

13           THE COURT:  All right.  So I --

14           MR. AZMAN:  I mean, there's -- I guess.  Sorry.

15 I'm sorry.  Technically, you can still comply with the time

16 line.  But the committee is concerned, there are a lot of

17 international creditors in this case who will probably need

18 more time than three to four weeks to get a proof of claim

19 in.  And we had asked the committee to push back the bar date

20 to February 10th for that purpose.

21           And so, effectively, if we're now saying the bar

22 date notices are going to go out right after the schedules

23 are filed, on or around January 7th, we basically -- we don't

24 have what we negotiated for.  And I apologize if this is a

25 mistake that wasn't -- you know, we didn't see this before we

1 came to the hearing today.  But that's not what the goal of

2 the negotiated settlement was.  We think that (indiscernible)

3 more than the three or four weeks.  And so --

4           THE COURT:  All right.

5           MR. AZMAN:  -- we would want --

6           THE COURT:  So --

7           MR. AZMAN:  -- the bar date notice to go out now.

8           THE COURT:  All right.  I think the -- I think we

9 need to continue this motion, and hopefully the parties will

10 confer and submit a form of under -- a form of order under

11 COC.  But in my view, that form of order, as long as -- if

12 the notice is going to go out now or in the next few days,

13 and it contains a description of when the bar date will be

14 and when the schedules are going to be filed, and explaining

15 that the creditor does not have to file a proof of claim

16 until after the schedules are filed, that would resolve the

17 issues that I would have with the motion.

18           So I'm going to ask the parties to -- I'm going to

19 continue this motion and let the parties confer and come back

20 to me.  If you can't resolve it, contact chambers, and we'll

21 get another hearing scheduled for you -- well, either Monday,

22 Tuesday, or Wednesday next week.

23           MR. BONGARTZ:  Thank you, Your Honor.

24           MR. AZMAN:  Thank you, Your Honor.

25           THE COURT:  All right?  Anything else for today?

1      MR. BONGARTZ:  I think we're moving on to the next

2  agenda item, and I believe that is a retention application.

3  I don't have the agenda in front of me right now, but one --

4  excuse me one second.

5      MR. GROGAN:  Your Honor, yes.  We have the

6  debtors' professionals' retention applications.

7      THE COURT:  All right.  Okay.

8      MR. GROGAN:  If Mr. Bongartz is done, I will

9  handle those.

10      THE COURT:  Are they --

11      MR. BONGARTZ:  There's one other motion that I was

12  tasked with handling, that's the bidding procedures motion.

13  I don't know if you want to take that out of sequence.  I'm

14  happy to do it either one.

15      THE COURT:  Let's go ahead and do bidding

16  procedures and then move on to retention.

17      MR. BONGARTZ:  Okay.  Okay.  So the bidding

18  procedures, that is Item Number 16 on the agenda.

19      Here, I just wanted to lay out real briefly the

20  proposed time line, which includes a January 12th deadline to

21  designate a stalking horse.  The final bid deadline would be

22  January 15.  An auction, if necessary, would be held on

23  January 18th.  The objection deadline for the sale would be

24  January 22nd, and then a sale hearing would happen in early

25  February, subject to Your Honor's availability.  We have

1  filed a blackline and a proposed order at Docket Number 225.

2          I understand that there are a couple of objections

3  that have been filed.  The first one is the limited objection

4  of Jaime Schiller and other customers.  Again, for the same

5  reasons as stated earlier, we believe that that objection is

6  mooted by Your Honor's ruling earlier today.

7          The second objection that was filed was filed by

8  Mr. Arehart.  And he had raised a concern that there were

9  certain assets that Mr. Arehart believes are his property,

10 and that there should be a provision in the proposed order

11 that precludes -- in effect, precludes the sale of his

12 alleged assets.

13         I would note that, at this point, we believe that

14 his concerns are premature.  There is no buyer lined up at

15 this time.  We don't know which contracts such buyer -- such

16 hypothetical buyer would want to assume, what cure amounts

17 would get paid.  And so there's no -- and as a result, no one

18 is currently proposing to purchase any cryptocurrency under

19 the -- a bid procedures at this time.  It is possible that

20 that may be the case.

21         But I should also note that -- and one of the

22 comments that the committee has made and that we have

23 accepted is that, if cryptocurrency is to be sold through the

24 sale process, that would require the consent of the

25 committee.

1          And my final note on this is that Mr. Arehart's

2    ability to object to the sale is when it happens.  And to the

3    extent it includes property that he believes is his property,

4    he certainly has the ability to object to that at a later

5    time.

6          THE COURT:  Thank you, mister --

7          MR. BONGARTZ:  And then the last -- the third

8    objection which I wanted to address briefly is the objection

9    -- the general objection by the U.S. Trustee.  He has raised

10   two issues, the first one is with respect to timing.  Again,

11   we believe that that is mooted by Your Honor's ruling

12   earlier.

13         So I think we can move on to the second point, and

14   that is the stalking horse protections.  We believe that we

15   have put in appropriate safeguards that should address the

16   U.S. Trustee's concerns.  There is a cap on any breakup fee

17   of three percent.  The committee's consent is required.  And

18   most certainly the U.S. Trustee's rights to object to the

19   winning bid are fully preserved.  So, to the extent that he

20   disagrees with the selection of the stalking horse as --

21   which, if he -- if that entity prevails at an auction and

22   becomes a successful bid, the U.S. Trustee can object to that

23   selection at that point, as well.

24         So, with that, we have submit -- submitted a

25   revised proposed order that does reflect a few other comments

1  from the U.S. Trustee, including the addition in Paragraph 32

2  of the appointment of an ombudsman if a sale -- if a sale

3  does go forward.  And we submit that, with these changes, the

4  bid procedures order should be entered.

5           THE COURT:  All right.  Thank you.

6           Is Mr. Arehart's counsel on the call?

7           MR. NEFF:  Yes, Your Honor.  This is Carl Neff

8  from FisherBroyles on behalf of Mr. Arehart.  And I

9  apologize, I'm not in Zoom -- oh, it looks like I'm

10  connecting right now.  I -- with me on the call is my

11  colleague Hollace Cohen of FisherBroyles, who has been

12  admitted *pro hac vice* in this action and will be addressing

13  the Court.

14           THE COURT:  Okay.  Ms. Cohen?

15      (No verbal response)

16           THE COURT:  Ms. Cohen, you're on mute.

17           MS. COHEN:  This is Hollace Cohen, Your Honor.

18  And we accept the debtors' view that the issues raised by

19  both Mr. Arehart in the limited objection and by the debtor

20  in their reply to the limited objection are premature, and

21  that -- and also, the debtors' acknowledgment that Mr.

22  Arehart will have the opportunity to object to any sale or

23  sales on or prior to the sale objection deadline, so we're

24  fine with that.

25           THE COURT:  Okay.  Thank you.  I appreciate that,

1   Ms. Cohen.

2          MS. COHEN:  Yes.

3          THE COURT:  Mr. McMahon, are the U.S. Trustee's

4   issues resolved, or do you have still have objections?

5          MR. MCMAHON:  Your Honor, I have one point to

6   raise, which is that having to do with the bid protections.

7          THE COURT:  Okay.  Go ahead.

8          MR. MCMAHON:  There's a controlling Third Circuit

9   case called environmental -- O'Brien Environmental Energy,

10  which provides that bid protections are subject to

11  administrative expense review.  We -- first, we don't have a

12  bidder here, so we'd have to know who the bidder is.  And

13  then, after notice and a hearing, once we have an agreement,

14  then we can assess whether or not that person, that stalking

15  horse is entitled to protection.

16         So -- and the case is very clear, Your Honor.

17  There are some bidders who are naturally inclined to bid, say

18  Michelin tires would theoretically buy -- you know, be a

19  bidder for Goodyear.  And therefore, you wouldn't need to

20  incentivize a bidder with bid protections.  So this entire

21  construct, we don't go along with the -- you know, what I

22  call a "putting money on the street" approach, where we --

23  you know, we basically just authorize the debtors and the

24  committee to hand out bid procedures like they're some form

25  of candy.

1    You know, this Court controls the process.  We

2  don't know who the prospective bidder is that would be

3  receiving the protections.  At that point, the issue will be

4  ripe and the Court can decide it.  That's our concern, Your

5  Honor.  Thank you.

6    THE COURT:  Well, is there anything in the order

7  that says that these bid protections will be provided to

8  anyone who bids, or is it -- because I agree with you, Mr.

9  McMahon; O'Brien does say that there is the possibility that

10  bid protections are not appropriate for certain bidders.  So

11  how can I provide providing bid protections to somebody

12  before I even know who's doing it?  Mr. Bongartz?

13    MR. BONGARTZ:  Yes, Your Honor.  We believe that

14  the -- well, the first point I should note that is that the

15  bid -- I'm sorry -- the stalking horse will be designated, so

16  we will be filing a notice.  This won't be, you know, kept in

17  secret, who the stalking horse is.

18    The second point I would note is that we're not

19  going to select or designate a stalking horse that's not

20  fully supported by the committee, so that should provide, I

21  think, an appropriate safeguard.

22    THE COURT:  Well, do we need to put anything in

23  this order, at this time, about what bid protections will be

24  provided to an as-yet-undisclosed stalking horse bidder?  Why

25  don't we just wait and see what the stalking horse bidder

1   asks for?

2            MR. BONGARTZ:  If that's Your Honor's ruling,

3   we'll -- we will accept that, of course.

4            THE COURT:  Okay.  I think that's appropriate.  I

5   don't think it's appropriate, at this point, to put into an

6   order, before we even know who the stalking horse bidder is

7   going to be, that they are entitled to bid protections.

8   That's something we can deal with once we get to the sale.

9            MR. BONGARTZ:  Okay.  We will revise the proposed

10  order accordingly and submit it under certification of

11  counsel.

12           THE COURT:  Okay.  Anyone else wish to be heard on

13  this motion?

14       (No verbal response)

15           THE COURT:  All right.  So I will wait to see the

16  revised order under COC, and once we get that, we can get it

17  entered for you.

18           MR. BONGARTZ:  Thank you.

19           THE COURT:  All right.  All right.  Mr. Grogan,

20  you were going to do the retentions?

21           MR. GROGAN:  Yes, Your Honor.  Thank you very

22  much.

23           THE COURT:  Okay.

24           MR. GROGAN:  James Grogan from Paul Hastings on

25  behalf of the debtors.

1    Your Honor, Agenda Item Number 11 is the debtors'

2  application for entry of an order authorizing the employment

3  of MACCO -- M-A-C-C-O -- Restructuring Group as financial

4  advisor.  That was supported by the declaration of Drew

5  McManigle.

6    We did have a couple of objections, neither of

7  which I think is material.

8    The first one, the U.S. Trustee had included the

9  MACCO retention application in a general objection, which I

10  believe is now moot.  Basically, the issue was we need to

11  wait and see whether a trustee is appointed before retaining

12  the advisors.

13    We also received an objection from Mr. Inamullah.

14  And I -- it was -- my interpretation of it was that he took

15  issue with the conflicts list that was -- or the parties-in-

16  interest list that was attached to the application, which

17  listed him as one of the debtors' officers.  You know, I

18  don't think we're making any rulings on that list in this

19  particular application, but I did want to note that that was

20  out there.

21    Unless the U.S. Trustee had any further comments,

22  I think this one is essentially uncontested.

23    THE COURT:  Mr. McMahon, any objections to the

24  retention?

25    MR. MCMAHON:  No, Your Honor.  The revised

1  proposed form of order is acceptable.

2          THE COURT:  All right.  Is Mr. Billion on the

3  phone?  I believe he was counsel to Mr. Inamullah.

4      (No verbal response)

5          THE COURT:  No.  Okay.  So, to the extent he still

6  had an objection, I'll overrule it and I will enter the

7  order.

8          MR. GROGAN:  Thank you, Your Honor.

9          If I might go out of order just a little bit, save

10 Teneo for last.  The next one would be the application to

11 retain Paul Hastings as counsel to the debtors.

12         Your Honor, since the application was filed at

13 Docket Number 64, we have filed two additional declarations

14 in support of -- one was filed at Docket Number 182 and the

15 second one was filed at Docket Number 233.

16         The U.S. Trustee had taken issue with several

17 items in the application.  In conferring with Mr. McMahon, I

18 believe we have resolved one of those issues at this point.

19 Mr. McMahon has objected based on Pillowtex with respect to a

20 couple of invoices that were paid prepetition.

21         To resolve that, we have agreed that we would

22 return $313,330.40 to the trust account for the debtors and

23 waive the associated prepetition fees, if we are retained by

24 the court.  As a result of that, the debtors' retainer

25 account would increase to $349,477.26.

1          However, I don't think that resolves all of the

2     issues.  The U.S. Trustee had also objected to a couple of

3     additional issues.  One was the prepetition work that Paul

4     Hastings performed for the debtors and -- let me just sort of

5     explain my interpretation and then, you know, I guess, we'll

6     hear from Mr. McMahon.

7          So our view is that this should be governed, our

8     disinterestedness, should be governed by Marvel Entertainment

9     Group, the Third Circuit decision from 1998.  It's reported

10    at 140 F.3d 463.

11        The Marvel case holds that if a professional has an

12    actual conflict, it cannot be employed.  If a professional

13    has a potential conflict, its employment is within the

14    discretion of the court.  And the court may not disqualify a

15    professional on the appearance of a conflict alone.

16         Apologies, Your Honor.  Choked up.  It was a

17    moving decision.

18         Since Marvel was decided as, you know, bankruptcy

19    court in Delaware has issued a lot of interpretative

20    decisions, one of which was relatively recent -- Art Van

21    Furniture.  Chief Judge Sontchi decided that.  That -- the

22    Art Van Decision was reported at 617 B.R. 509 B.R. Del 2020.

23         I think the situation here is relatively similar

24    to Art Van.  One of the issues that Mr. McMahon has taken

25    issue with is that we have an existing client relationship

1  with a company called Uphold.  Uphold is another

2  cryptocurrency business.

3        We are currently representing -- and we discussed

4  this in all three of the declarations I filed in support of

5  our application.

6        We represent Uphold in matters unrelated to Cred.

7  Prepetition, we had one matter that involved both Cred and

8  Uphold.  And it was a -- we agreed to advise Uphold and Cred

9  jointly on some litigation that was filed in the state of

10  Washington by a company called Decrypt Capital.  And there

11  were some additional plaintiffs related to Decrypt.

12        Our representation was very short and actually the

13  Cred entity, which was Cred (US) LLC.  It's one of the

14  subsidiary debtors here, was dropped from the case.  So a

15  debtor is no longer an actual party in that litigation.  At

16  this point, it's purely a litigation between Decrypt and

17  third parties, including Uphold, but we are not representing

18  Uphold.

19        We're not representing any of the individual

20  plaintiffs or, I should say, individual defendants.  We have

21  no role in the case at all.  And the debtors have no role in

22  the case.  Other than that, all the other representations

23  with Uphold have nothing to do with Cred.

24        In terms of whether there is an actual conflict

25  there, there just isn't.  Uphold has a claim against Cred

1  which, as the testimony earlier today shows, is being

2  resolved.

3        Mr. Cousins, whose been handling that on behalf of

4  the debtors, ably.  Mr. Foster is in active negotiations with

5  them. As he testified earlier, we expect to be filing a

6  stipulation regarding the return of a very small amount of

7  bitcoin.  I think it's literally 2.4 bitcoin plus some

8  additional forms of cryptocurrency that was held in an

9  account with Uphold.

10        But there's no evidence that Paul Hastings is

11  anything but disinterested in what happens with Uphold in

12  this case.  Uphold, as I put in my most recent declaration,

13  represents .05 percent of Paul Hastings revenues over the

14  last twelve months.

15        This exact same situation was litigated in Art Van

16  Furniture.  And in that case, the proposed debtors' counsel,

17  which was ultimately approved for retention, had represented

18  Wells Fargo which was actually a secured lender in the case

19  and Wells Fargo represented .5 percent or ten times as much

20  of the firm's avenue revenues.

21        Nevertheless, Judge Sontchi held that there was no

22  actual conflict.  I would also add that we received

23  reciprocal waivers when the Decrypt engagement letters were

24  signed.  I have shared those with Mr. McMahon and his office.

25  And, you know, there's just no actual conflict.  There's not

1  even a potential conflict.

2       In addition, Mr. McMahon has taken issue with some

3  of the other prepetition work that we did for Cred.  In the

4  first instance, we had advised Cred on the private placement

5  convertible notes which were issued in the amount of $2.6

6  million dollars.  And nobody has raised any issues regarding

7  our advice on those private placement convertible notes.

8       One of the noteholders is actually a member of the

9  creditors committee.  In fact, it's the largest noteholder

10  and the committee does not object to our retention in this

11  case.  Nobody has ever raised a single issue regarding that

12  advice.

13       We also had advised Cred on some litigation

14  against Mr. Alexander and what we did prepetition was we

15  filed a lawsuit against Mr. Alexander in the state of

16  California to get injunctive relief after it came to light

17  that Mr. Alexander had taken 225 bitcoin as the court heard

18  earlier today.

19       Not only has nobody questioned the quality of the

20  work, as I attached the orders from the California court to

21  the declaration that we filed at Docket Number 233, the

22  California court granted both a TRO against Mr. Alexander and

23  a preliminary injunction specifically finding that Cred was

24  likely to succeed on the merits.

25       There is zero evidence that anything we did in

1 connection with that litigation was anything but flawless.

2 There are no conflicts here at all.  And so, we would request

3 that the court approve our retention.

4 　　　　　Thank you very much.

5 　　　　　THE COURT:  Thank you.

6 　　　　　Mr. McMahon.

7 　　　　　MR. MCMAHON:  Your Honor, I'll be brief.  Before I

8 begin, I would like to start with just establishing what the

9 record is, from our perspective.

10 　　　　　The Grogan declaration, the supplemental

11 declaration, will be the first two items. Third, we would

12 like to submit certain of Mr. Shatt's testimony with respect

13 to Uphold, specifically that Uphold's platform was the source

14 of approximately 30 to 40 percent of the debtors' business.

15 That's part of his deposition transcript, page 116, lines 10

16 to 12.

17 　　　　　Next, three U.S. Trustee exhibits relating to

18 Decrypt which were part of the exhibits that we submitted to

19 the court yesterday in connection with the hearing.  There's

20 two engagement letters, one for Cred, one for Uphold, that

21 Paul Hastings has with those respective clients.  And then,

22 separately, the Decrypt amended complaint which is the third

23 exhibit.

24 　　　　　Finally, Your Honor, there are also two judicial

25 notice documents we'd like to take notice of -- the Alexander

1   motion to dismiss and the Alexander complaint; provided that

2   those are submitted or admitted in evidence, I'll proceed

3   with my argument.

4            THE COURT:  Any objection?

5            MR. GROGAN:  Well, I do object to the admission of

6   Alexander's motion if it's for the purpose of establishing

7   the truth of the matters asserted.  We disagree with it,

8   obviously.  If it's just for the purpose of establishing that

9   a motion was filed, that's fine.

10           THE COURT:  I will accept it only for that purpose

11  and the other exhibits are either admitted or I will take a

12  judicial notice of them.

13        (Trustee's Exhibit, Alexander Motion to Dismiss,

14  Alexander complaint, received into evidence)

15           MR. MCMAHON:  Thank you, Your Honor.

16           As stated in our objection, Section 327(a) of the

17  Bankruptcy Code provides that counsel to a debtor-in-

18  possession has to meet two requirements.  It can neither hold

19  nor represent an interest adverse to the estate and, second,

20  it must be a disinterested person.

21           And that definition is in the Code.  I'm not going

22  to repeat it (indiscernible) that.  It provides that -- Your

23  Honor, may I have one moment?

24           THE COURT:  Sure.

25           MR. MCMAHON:  I'm sorry.  Thank you.

1          THE COURT:  Yes, go ahead.

2      (Pause)

3          MR. MCMAHON:  I'm sorry for the interruption, Your

4   Honor.

5          THE COURT:  That's all right.

6          MR. MCMAHON:  A disinterested person is a person

7   that does not have an interest materially adverse to the

8   interest of the estate or any class of creditors or equity

9   security holders by reason of any direct or indirect

10   relationship to connection with or interest in the debtor or

11   for any other reason.

12          In our objection, we point out four areas of

13   concern.  First, the convertible note representation.

14   Second, the representation of the debtors in connection with

15   the response and in the corporate fix with respect to

16   corporate governance issues involving Cred Capital. Third,

17   the Uphold issues with respect to these cases.  And then,

18   fourth, the Pillowtex related issues.

19          I'll take each concern in turn.

20          The convertible note placement, the sheer timing

21   of same within ninety-days prior to the debtors' bankruptcy

22   filings means that the placement is going to be subject to a

23   level of scrutiny in connection with these cases, certainly

24   after the examiner has been appointed by Your Honor.

25          Next, the court for governance issues involving

1   Cred Capital.  The issue here is such where if the court

2   agrees with Alexander's view of the legal fact of the steps

3   that Cred took with Paul Hastings' counsel which allegedly

4   included a reorganization of Cred's equity structure at the

5   expense of the sole voting class of equity and Cred Capital,

6   then the bankruptcy filing by Cred Capital was not

7   authorized.

8          Next, Paul Hastings was retained by Uphold and

9   Cred in connection with the Decrypt litigation in mid-

10  September that predates Paul Hastings retention by the

11  debtors in connection with the bankruptcy which didn't occur

12  until later in October.

13         With reference to Uphold, Your Honor, Paul

14  Hastings has what we believe to be an actual conflict of

15  interest.  Paul Hastings represented to Cred and Uphold

16  entities jointly, then at the point at which the debtors

17  filed for bankruptcy protection, Your Honor is going to hear

18  about this, the past couple of days.

19         Their interest clearly diverged.  Uphold will be

20  asserting claims against the debtors in connection with these

21  bankruptcy cases and Uphold's claims against the debtors

22  stemming from the uniform protocol token offering which is

23  the subject of the litigation, the Decrypt litigation, are

24  going to be part of those claims.

25         Standing here today, Your Honor, Paul Hastings

1  cannot represent the debtor with respect to those claims.  In

2  fact, Your Honor got a flavor for it earlier today when Mr.

3  Cousins handled, you know, the Uphold related issues.  That's

4  an actual conflict of interest.  And --

5          THE COURT:  Does that resolve the issue?  I Mr.

6  Cousins can represent any claims from Uphold, can he deal

7  with those and how does that affect then the retention of

8  Paul Hastings?

9          MR. MCMAHON:  Your Honor, because it doesn't

10  change the fact that the firm, whatever they have, the actual

11  conflict of interest.  It certainly addresses the need for

12  Uphold's, I guess, ability to have un-conflicted counsel, but

13  the law firm, it doesn't address any issues with respect to

14  the law firm itself.

15          THE COURT:  Well don't we appoint conflict's

16  counsel all the time in cases when the bankruptcy counsel has

17  a conflict, we appoint a conflict counsel to deal with any

18  issues involving that particular party.

19          MR. MCMAHON:  And, Your Honor, again, that, you

20  know, understood that that does occur with respect to certain

21  types of matters.  I mean this is a situation where Mr.

22  Schatt testified that he estimates that Uphold's platform was

23  the source of approximately 30 to 40 percent of the debtors'

24  business.  Uphold and its customers are a significant part of

25  these bankruptcy cases.

1        This is not like a bit proof of claim issue.

2   Uphold has got a significant relationship with the debtors.

3        For the record, Your Honor, the proposed Pillowtex

4   resolution by Paul Hastings involved in what Mr. Grogan

5   described would resolve our issues with respect to that

6   point.

7        So, Your Honor, we view the Uphold issues here as

8   presenting an issue of actual conflict which is disqualifying

9   under the language.  But, you know, with respect to Your

10  Honor the representations of the debtors in connection with

11  the Cred Capital situation and the convertible note placement

12  while there's a potential, they are also troubling meaning

13  that, you know, because of the nature of the work that was

14  performed, they very well could become ripe at some point and

15  this court has a discretion to do something about them at

16  this juncture with respect to that.

17        So, you know, Your Honor, we raised a point about

18  Rule 2014 disclosures here.  If the court compares its

19  understanding of Paul Hastings' services before and after,

20  reading the supplemental declaration that was submitted, that

21  filing makes the U.S. Trustee's point, meaning that all of

22  the information contained in the supplement was available to

23  the firm at the time it followed its initial employment

24  application.

25        The entire point of that rule is that parties in

1  interest shouldn't have to ask for the information that was

2  provided in the supplement.

3          So, Your Honor, we believe that there are certain

4  potential conflicts in play here where the Uphold issue is

5  significant and it's different.  And for that reason, Your

6  Honor, we ask the court to deny the application.

7          THE COURT:  Mr. Grogan, any rebuttal?

8          MR. GROGAN:  Your Honor, do you want to hear from

9  me?  I think committee counsel might have wanted to be heard

10  on this as well.

11          THE COURT:  Oh okay.  Let me hear from committee's

12  counsel.

13          If you're speaking, you're on mute.

14          Committee's counsel has decided not to be heard on

15  this issue.

16          MR. WALSH:  Your Honor, it's (indiscernible)

17  again.  I need to upgrade a little bit.

18          You know, we've gone through, we've looked at the

19  objections raised by the U.S. Trustee and the responses by

20  debtors' counsel.  And just for what it's worth, Your Honor,

21  we don't see it as an impediment and it definitely hasn't

22  been an impediment, to date, with respect to the activities

23  we've been engaged in with the debtors.

24          So, we support their retention, Your Honor.

25          THE COURT:  Thank you, Mr. Walsh.

1          MR. GROGAN:  Your Honor, there cannot be an

2    imagined actual conflict. The Uphold Decrypt litigation does

3    not involve a debtor.  There is no way that we have a

4    conflict related to litigation among third parties where we

5    literally represent none of those parties.  That is what is

6    actually happening in Decrypt.  The debtor was dropped from

7    the case.  I am representing non-parties at this point of

8    that litigation.

9          With respect to the other issues with Uphold.  You

10   know, it's no different than Wells Fargo.  Wells Fargo in the

11   Art Van Furniture case was the secured lender with an all-

12   asset lien.  It was a big deal in the case.  Frankly, I don't

13   think Uphold comes anywhere close to, you know, having the

14   same status as the secured lender with an all-asset lien.

15         Sure, they may have referred some customers to us.

16   Sure, we had a small position of cryptocurrency that they

17   were holding on the petition date.  But that doesn't rise to

18   the level of an actual conflict where all the matters that we

19   have with Uphold currently as a firm have nothing to do with

20   (indiscernible).  And there is zero evidence that we have not

21   diligently and aggressively represented this company

22   throughout the Chapter 11 cases.

23         So, I think we're disinterested.  I think the

24   record shows it. We've worked around the clock to represent

25   the debtors' interest in every situation.  And, you know, as

1  a firm we sometimes defer to conflicts counsel to avoid the,

2  you know, the difficulty of dealing with your own clients in

3  bankruptcy but that's why Mr. Cousins is handling it.

4  THE COURT:  All right. Well, obviously,

5  allegations of conflicts of interest of counsel is a serious

6  issue and I want to take a little bit of time to go back and

7  look at the affidavits and the other evidence that the

8  parties have submitted, so I'm going to take it under

9  advisement.

10  Off the top of my head, at this point, I don't see

11  an actual conflict of interest, but I just want to look at it

12  again myself to make sure that I'm comfortable with that

13  before I give you a ruling, but I will do that as quickly as

14  possible.

15  MR. GROGAN:  Thank you, Your Honor.

16  Next on our agenda is the debtors' application for

17  entry of an order authorizing the retention of Teneo Capital.

18  Your Honor, we received an objection to this

19  application from the U.S. Trustee's office.  It really falls

20  into two categories.  One, the U.S. Trustee objected to the

21  tail fee.

22  Essentially, what Teneo -- the terms of Teneo's

23  application would entitle it to a transaction fee if a

24  transaction is consummated within twelve months after

25  termination.  We view this as a standard within market

 1  provision.  It protects Teneo from doing a lot of work.  And

 2  if for some reason this case does not work out as we hope it

 3  will and a subsequent trustee takes advantage of the work

 4  that they've done to line up buyers, they're entitled to some

 5  benefit from that, and that's what the tail fee provides.

 6          The U.S. Trustee also objected to some of the

 7  disclosures.  Let me explain the situation there.

 8          One of the --

 9          THE COURT:  If you are -- yeah, someone is not

10  muted.  Operator, if you can identify that person, would you

11  disconnect them, please?

12          MR. GROGAN:  So one of the professionals that's

13  working on the Teneo team is a fellow named Matt Shapiro.

14          THE COURT:  Hold on one second. We still have it.

15          Operator, can you identify who that is with an

16  open line who's speaking?

17          Operator, can you hear me?

18          OPERATOR:  Yes, I can.

19          THE COURT:  Can you identify who that is and

20  disconnect them from the call?

21          OPERATOR:  I'm trying.

22          THE COURT:  Okay.  Thank you.

23          MR. GROGAN:  Thank you, Your Honor.

24          Would you like me to continue or wait?

25          THE COURT:  Let's wait a second and see if we are

1  clear of this.

2          OPERATOR:  I've identified the line.

3          THE COURT:  Okay.  Thank you, operator.  I

4  appreciate it.

5          All right, go ahead, Mr. Grogan.

6          MR. GROGAN:  Thank you.

7          So the issue is that Teneo has contracted with a

8  cryptocurrency specialist to work with the team on this

9  particular engagement.  His name is Matthew Shapiro.  He

10 works at a firm called Multicoin.  And he has a tremendous

11 amount of cryptocurrency experience which we think will be

12 invaluable in terms of identifying perspective buyers and

13 also addressing the issues that will likely come up during

14 the sale process.

15         There were connections that Teneo identified that

16 have to do with Mr. Shapiro's employment with Multicoin.

17 Those connections have been shared with the U.S. Trustee's

18 office; however, the U.S. Trustee has requested that we file

19 a supplemental declaration making these disclosures public.

20         That would be a violation of Mr. Shapiro's

21 employment agreement with Multicoin; however, he has

22 disclosed that these are -- these investors in Multicoin do

23 hold amounts that are less than one million dollars and I

24 think the U.S. Trustee has all of the information to evaluate

25 whether or not there's any concerns there.  It just comes

1    down to whether or not it would become public.

2          And on that front, you know, we just -- Mr.

3    Shapiro cannot be put into a position where he would have to

4    publish confidential information that would likely result in

5    the termination of his employment with Multicoin.

6          So, for that reason, we would request that the

7    court give us some grace on that, just given the facts that

8    we're having to deal with.  And it's not a lack of disclosure

9    to the trustee.  It's just does the public need to know who

10   investors in Multicoin happen to be.  We don't think that

11   that's necessary.

12         He has made every disclosure that he can,

13   including the fact that he has this relationship with

14   Multicoin.  It's just, you know, how deep do we have to dive.

15         We also have received some comments, informal

16   comments, to the application from the committee.  And to

17   resolve that, the form of order has been revised.

18         Teneo has agreed to modify the compensation and if

19   the sale proceeds exceed $10 million dollars, Teneo would

20   agree to credit one half of the monthly fees that they earned

21   presale, preclosing against the ten plus -- against the

22   transaction fee that they would earn on a transaction for

23   more than $10 million dollars.  If the sale proceeds are less

24   than ten million, there would be no crediting.  And I believe

25   that resolves the committee's issues.

1          With that, Your Honor, we would request that you

2    approve the retention of Teneo.

3          THE COURT:  Okay.  Let me hear from Mr. McMahon.

4          MR. MCMAHON:  Your Honor, very briefly.

5          First, the revised proposed form of order is

6    acceptable to us.

7          Second with respect to the disclosure issue, we've

8    offered to Teneo and the debtors, you know, to the option of

9    filing, proposing to file the disclosure under seal, pursuant

10   to Rule 2014, just so that what it is that is of import to

11   the disclosure requirements of the Code are filed of record.

12         So that's our key concern there just meaning that

13   it's part of the court's record.  So, if they don't want to

14   disclose it publicly, seeking to file it under seal is an

15   option.  And that's our argument.

16         Thank you.

17         THE COURT:  Mr. Grogan, any issue with filing it

18   under seal?

19         MR. GROGAN:  Yes.  Unfortunately, Mr. Shapiro was

20   unable to do that because an order sealing a document can be

21   eventually unsealed.  And he could not take that risk.

22         THE COURT:  Well, I'm not sure there's a legal

23   basis for me to say that because he is afraid it might get

24   unsealed sometime in the future, he's not obligated to

25   provide the information that's required by the Code.

1      MR. GROGAN:  Well, I don't -- I mean I know that

2  the U.S. Trustee wants this disclosure, I don't think there's

3  anything in the Code that requires it.  What we're talking

4  about are investors in Multicoin.  And Mr. Shapiro has

5  disclosed that he has an employment relationship with

6  Multicoin.  It's just, you know, do we need to go that extra

7  step of disclosing who owns Multicoin.

8      THE COURT:  Mr. McMahon, why do we have to

9  disclose who the owners of an entity are that Mr. Shapiro

10 works for?

11     MR. MCMAHON:  Because, Your Honor, the link to

12 these bankruptcy cases is that that's the connection that's

13 germane.  Like, in other words, that's the critical

14 information is to why we even need to have to the disclosure

15 in the first place.

16     So, again, you know, Rule 2014 says what it says,

17 full disclosure of connections.  And the more opaque these

18 documents get, owners, you know -- a couple of owners in my

19 employer are customers and claimants of Cred.  Well, what

20 does that really tell me?  And if you can come out and say

21 that publicly, but it tells me nothing.  It keeps me

22 guessing.

23     So, you know, all I want is an accurate statement

24 of what the connection is as part of the court's record and,

25 again, sealing is not an issue.

1           THE COURT:  Well, I think if Mr. Shapiro wants to

2    be involved, we need to have a disclosure but I'm not sure

3    that it's necessary to disclose who the principals are of an

4    entity that you work for.

5           If we were to take that to its full extent, you'd

6    have to do that in every case for every entity.  That if

7    someone says they work for IBM, do they have to disclose

8    every shareholder of IBM because they might be a creditor in

9    the case?  I don't think that's the case.

10          And I think as long as Mr. McMahon has received

11   the information that he needs to satisfy himself that there

12   is no potential connection.  And we have disclosed that he

13   works for Multicoin, I think that's sufficient at this point.

14   So, I'm not going to order him to disclose who the owners of

15   Multicoin are.

16          So with that, I'll overrule the objection then and

17   enter the order.

18          MR. GROGAN:  Thank you, Your Honor.

19          Okay.  The last retention is the motion under

20   Section 363 for engaging a chief restructuring officer, and

21   additional employees from Sonoran Capital.  This is Matt

22   Foster's firm.

23          I think that the -- Mr. McMahon can correct me if

24   I'm wrong, but I think that the only issue there was the

25   possibility of duplication of effort between Sonoran Capital

1    and MAACO. I think Mr. Foster has filed a supplemental

2    disclosure which provides additional information regarding

3    the allocation of responsibilities, as well as the disclosure

4    of any additional employees that will be working for him

5    through Sonoran Capital.

6            I'll leave it to Mr. McMahon to weigh in, but that

7    may be sufficient.

8            THE COURT:  Mr. McMahon.

9            MR. MCMAHON:  Your Honor, with respect to where

10   we're at with this, clearly, I think that -- we made a point

11   with respect to J. Alix Protocol which we kind of closely

12   guard because it provides a set of rules regarding these

13   types of retentions under 363 as to what, you know, should

14   happen.

15           Immediately before the hearing, I did, this one,

16   just because there's been such a volume of issues in

17   connection with these cases, I forwarded certain, I guess,

18   cleanup comments to the proposed order that I think would be

19   agreeable to Sonoran and would finally address our concerns

20   in full.

21           So, I don't know if debtors' counsel is willing to

22   do this, but if we could possibly adjourn that briefly with

23   the intention of submitting a revised order under

24   certification of counsel as early as Monday, that would be

25   our preferred way of handling this.

1             THE COURT:  Mr. Grogan?

2             MR. GROGAN:  You know, if we can get it resolved

3    that would be great.  I'm going to rely on Mr. Bongartz a

4    little bit.  Did you get -- Mr. Bongartz, do you have the

5    cleanup comments?

6             MR. BONGARTZ: I do.  We need to -- I just want to

7    have a chance to talk to Matt Foster and Sonoran to make sure

8    that they are acceptable for them as well, but in principle I

9    think we can get there.

10            MR. GROGAN:  Okay.  Great.

11            So, we'll adjourn that one, I guess, to January

12   6th in case we can't resolve it.

13            THE COURT:  Okay. That's fine.

14            MR. COUSINS:  Your Honor, it's Scott Cousins

15   again.  This is one heck of an agenda.  I think the two

16   motions have been addressed for Trustee examiner Chapter 11

17   trustee.

18            As we mentioned at the beginning of the

19   afternoon's hearing, UpgradeYa is pushing and the debtors are

20   in agreement, their motion until January 6th.  So, unless

21   someone else is picking up something that I missed, I think

22   that's it for today.

23            THE COURT:  All right.  Anybody else have any

24   other issues then before we adjourn?

25        (No verbal response)

1          THE COURT:  All right.  Well thank you all very

2    much.  As I said, I will -- I'm going to take a look at the

3    Paul Hastings retention issue and I'll wait to see the

4    uploaded forms of order and, otherwise, I will guess I'll see

5    everybody on January 6th for our next hearing, unless

6    something else pops up unexpectedly.

7          I'll wish everybody happy holidays and a happy New

8    Year and I'll see you in 2021.

9          UNIDENTIFIED SPEAKER:  Likewise, Your Honor. Thank

10   you.

11       (A Chorus of "Thank you, Your Honor")

12          THE COURT:  All right, we're adjourned.  Thank

13   you.

14       (Proceedings conclude at 4:45 p.m.)

15

16

17                        CERTIFICATE

18

19     I certify that the foregoing is a correct transcript

20   from the electronic sound recording of the proceedings in the

21   above-entitled matter.

22
     /s/Mary Zajaczkowski            December 21, 2020
23   Mary Zajaczkowski, CET**D-531

24
     /s/Coleen Rand                  December 21, 2020
25   Coleen Rand, AAERT Cert. No. 341