## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| *In re* | : | Chapter 11 |
|  | : |  |
| FTX TRADING LTD., *et al.*,[1] | : | Case No. 22-11068 (JTD) |
|  | : | (Jointly Administered) |
| Debtors. | : | **Hearing Date:  February 6, 2023 at 9:30 a.m.** |
|  | : | **Objection Deadline:  January 25, 2023 at 4 p.m.** |
|  | : |  |

## UNITED STATES TRUSTEE'S OMNIBUS REPLY TO OBJECTIONS TO MOTION FOR ENTRY OF AN ORDER DIRECTING THE APPOINTMENT OF AN EXAMINER

Andrew R. Vara, United States Trustee for Regions Three and Nine (the "U.S. Trustee"), through his counsel, files this Omnibus Reply to the objections to the U.S. Trustee's Motion (the "Motion") for the entry of an order directing the appointment of an examiner pursuant to 11 U.S.C. § 1104(c).  In further support of the Motion, the U.S. Trustee respectfully represents:

## I.     PRELIMINARY STATEMENT

1.     Examiners have an important role in the Bankruptcy system.  Both in high-profile large bankruptcy cases—like Enron, WorldCom, and Lehman Brothers—and in smaller cases examiners have exposed misconduct and helped bankruptcy estates maximize recoveries for creditors.  By statute, examiners are objective and non-adversarial.  They can investigate debtors' acts, conduct, assets, liabilities, financial condition, business operations, and any other matter relevant to the case.  11 U.S.C. §§ 1106(a)(3), 1106(b).  Examiners often produce tangible benefits

---

[1]    The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification numbers are 3288 and 4063, respectively.  Due to the large number of debtor entities in these chapter 11 cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

for creditors by identifying causes of action and other assets that can yield significant recoveries for the creditor body.  And relevant to this case—the subject of so much public attention and interest—examiners also file public reports of the result of their investigation, which benefit the court and all parties in interest while also enhancing the integrity of the bankruptcy system by exposing misconduct and fostering public confidence that the system is operating efficiently and fairly.

2.      In these cases, an examiner is mandated as a matter of law under section 1104(c)(2) of the Bankruptcy Code because a court "shall" order appointment of an examiner where "the debtor's fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes, or owing to an insider, exceed $5,000,000."  The Debtors[2] and the other parties objecting to the Motion (collectively, the "Objectors") have stipulated that the $5 million threshold of section 1104(c)(2) is satisfied for the following three Debtors: West Realm Shires Inc.; FTX Trading Ltd.; and Alameda Research LLC.  As to the other Debtors, the Objectors do not admit that the $5 million threshold has been met because they are not currently in a position to make that determination.  But they have informed the U.S. Trustee that they are not contesting the Motion on the basis that the $5 million threshold of section 1104(c)(2) has not been met for those Debtors.  It is also uncontested that all other requirements of section 1104(c)(2) of the Bankruptcy Code have been met: (i) the U.S. Trustee has requested the appointment of an examiner; (ii) no trustee has been appointed in the case; and (iii) no chapter 11 plan has been confirmed.

3.      As discussed below, the majority of courts that have addressed the issue in published opinions—including the only court of appeals decision and all of the district court decisions—have ruled that the appointment of an examiner is mandatory under section 1104(c)(2).

---

[2]   Capitalized terms not defined herein have the definition set forth in the Motion.

There is no binding Third Circuit precedent on this issue, and although this Court has reached the opposite conclusion in prior, unpublished rulings, the proper statutory construction supports section 1104(c)(2)'s mandate.  Notwithstanding the purported "law of the district" advanced by the Objectors, there is no such thing.  Accordingly, this Court should consider the issue anew and grant the Motion.

4.    Objectors wrongly contend that the statutory language of "such an investigation of the debtor as is appropriate" allows the Court to deny the appointment even in circumstances when the Code makes the appointment mandatory.  But this reading is grammatically and contextually wrong because "as is appropriate" modifies the word "investigation."  That language allows the Court to determine the scope of the investigation but not refuse the appointment altogether.

5.    Finally, even if an examiner were not mandated under section 1104(c)(2), this Court should direct the appointment of an examiner under section 1104(c)(1) because the appointment would be in the best interests of the Debtors' estates, their creditors, and equity security holders. There is no question that an investigation is necessary here; the only dispute lies in who will investigate.  Given the conflicts and contentiousness between the Debtors' current and former principals as well as some of the Debtors themselves, the wide-ranging creditor body, and the overwhelming public interest in and attention on these cases, the best interests of all parties in interest would be served by ordering the appointment of a neutral, disinterested examiner with clear authority to review the Debtors' financial and business operations, untangle the mess, and file a public report that will provide transparency to all parties in interest.

## II.    <u>RESPONSES RECEIVED TO MOTION</u>

6.    The Debtors, the Committee, and the Joint Provisional Liquidators of FTX Digital Markets Ltd. (the "JPLs") objected to the Motion.  D.I. 571, 572 & 573.  Responses of the Debtors and the Committee were labeled objections, whereas the JPLs' response was titled a Limited Objection and Response.  D.I. 572.

7.    The Objectors do not challenge the necessity of an investigation of the events leading up to the Debtors' chapter 11 filing.  As the Committee states in its objection, "[t]hese Chapter 11 Cases, all agree, require a thorough investigation into a variety of issues, including 'the substantial and serious allegations of fraud, dishonesty, incompetence, misconduct, and mismanagement by the Debtors, the circumstances surrounding the Debtors' collapse, the apparent conversion of exchange customers' property, and whether colorable claims and causes of action exist to remedy losses.'" Committee Obj., ¶ 1 (quoting from Mot. at 2).

8.    The issue in dispute is who should investigate.  An independent examiner must investigate because that is what the Code requires.  In contrast, the Debtors and the Committee argue that the Code does not mandate the appointment of an examiner and that they—the Debtors and the Committee—should conduct the investigation.  The JPLs are somewhat equivocal, arguing against the appointment of an examiner, but then stating the following:

> The question, however, of ***who*** knew of or participated in the conduct remains unclear given the implausibility of the notion that only four people in the world – Messrs. Bankman-Fried, Wang, and Singh and Ms. Ellison – had any knowledge of what was going on. Thus, if an examiner is appointed, that examiner should be charged with vetting the Chapter 11 Debtors' current fiduciaries to ensure that all are not, in the Chapter 11 Debtors' words, 'compromised individuals.'. . . ***Indeed, an examiner may be in the best position to reach those conclusions***, as the order appointing an examiner can expressly provide that the examiner has the power to access and, if necessary,

4

waive privileges as to all documents and information relevant to the
investigation.

JPL Obj., ¶ 9 (emphasis in original in first line, emphasis added elsewhere).[3]

### III.  REPLY TO OBJECTIONS

**A.  The Plain Language of 11 U.S.C. § 1104(c)(2) Mandates the Appointment of an Examiner Whenever a Debtor Meets the Statutory Debt Threshold if One is Requested by the U.S. Trustee or a Party in Interest**

9.      Section 1104(c)[4] of the Bankruptcy Code provides as follows:

> If the court does not order the appointment of a trustee [], then at any time before the confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court ***shall*** order the appointment of an examiner to conduct such an investigation of the debtor as is appropriate, including an investigation of any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor ***of or by current or former management of the debtor***,[5] if—
>
> (1) such appointment is in the interests of creditors, any equity security holders, and other interests of the estate; ***or***
>
> (2) the debtor's fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes, or owing to an insider, exceed $5,000,000.

---

[3]  It is not entirely clear whether an examiner has the authority to waive the DIP's privileges, and the U.S. Trustee reserves the right to address this tangential question later, when and if it becomes ripe.

[4]  Some earlier case law refers to this subsection as section 1104(b), because it was originally codified in the 1978 Bankruptcy Code as 11 U.S.C. § 1104(b). Subsections (b) and (c) of section 1104 were redesignated as subsections (c) and (d), respectively, by the Bankruptcy Reform Act of 1994, which added a new subsection (b), authorizing trustee elections in Chapter 11 cases.  *See* Bankruptcy Reform Act of 1994, Pub. L. No. 103-394 (enacted October 22, 1994, and effective in cases filed after that date).

[5]  That section 1104(c) specifies that the purpose of an examiner is to investigate acts by a debtor's current *or* former management negates the Objectors' arguments that the replacement of certain members of former management is relevant to this Court's determination of the Motion.

11 U.S.C. § 1104(c) (emphasis added).

10.    This statute contains two broad filters and one very specific filter, which ultimately narrow the cases to which it applies into two categories, each of which is treated differently.  The broad filters require that (1) no trustee has been appointed and (2) no chapter 11 plan has been confirmed.  The specific filter then divides all chapter 11 cases into two categories:  (i) cases in which "the debtor's fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes, or owing to an insider, exceed $5,000,000" (referred to herein as "$5 million threshold cases"); and (ii) every other case. [6]

11.    Depending on which category a case falls into, section 1104(c) applies as follows:

**<u>In $5 million threshold cases</u>**, "the court shall order the appointment of an examiner to conduct such an investigation of the debtor as is appropriate[.]"

**<u>In every other case</u>**, "the court shall order the appointment of an examiner to conduct such an investigation of the debtor as is appropriate . . . , *if [ ] such appointment is in the interests of creditors, any equity security holders, and other interests of the estate*[.]"

11 U.S.C. § 1104(c) (emphasis added).

12.    In these cases, all of the requirements of section 1104(c)(2) are uncontested: (i) no trustee has been appointed; (ii) no chapter 11 plan has been confirmed; (iii) the U.S. Trustee has requested the appointment of an examiner; and (iv) no party contests—and the Debtors admit— that the Debtors have fixed, liquidated, unsecured debts, other than debts for goods, services, or

---

[6]    Section 1104(c)(2) does not provide for the appointment of an examiner in every case in which a debtor has debt of over $5 million.  Rather, the scope of 1104(c)(2) is much more limited.  To be counted towards the $5 million threshold, the debt must meet the following criteria: it must be unsecured, fixed, and liquidated; it must be for debts *other than* those for goods, services, or taxes; and it must not be owing to an insider.  Those requirements are much more stringent than merely requiring over $5 million in debt.  Here, the Objectors concede that multiple debtors satisfy these criteria.

taxes, or owing to an insider, exceeding $5 million.  Accordingly, the appointment of an examiner to investigate the affairs of the Debtors is mandatory under section 1104(c)(2).

13.     The Objectors argue that section 1104(c)(2) affords a court discretion to refuse to appoint an examiner even when all the requirements of that section are met.  That argument is contrary to the explicit and unambiguous language of section 1104(c)(2) that the court "shall" order the appointment of an examiner in every case that meets that subsection's requirements.

### 1.   The Word "Shall" is Mandatory, and Any Other Reading Would Render Section 1104(c)(2) Superfluous.

14.     The Supreme Court has held that Congress's use of the term "shall" in a statute makes Congress's command mandatory and "creat[es] an obligation impervious to judicial discretion." *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998) (citing *Anderson v. Yungkau*, 329 U.S. 482, 485 (1947)).  Indeed, "Congress could not have chosen stronger words to express its intent that [the specified action] be mandatory[.]"  *United States v. Monsanto*, 491 U.S. 600, 607 (1989); *see also* 7 *Collier on Bankruptcy* ¶ 1104.03[2][b] (16th ed. 2022) ("Section 1104(c)(2) does not leave any room for the court to exercise discretion about whether an examiner should be appointed").

15.     Circuit courts, including the Third Circuit, agree.  *See, e.g.*, *Dessouki v. Attorney General of the United States*, 915 F.3d 964, 966 (3d Cir. 2019) ("[T]he word 'shall' imposes a mandatory requirement."); *Barbieri v. RAJ Acquisition Corp. (In re Barbieri)*, 199 F.3d 616, 619 (2d Cir. 1999) ("The term 'shall,' as the Supreme Court has reminded us, generally is mandatory and leaves no room for the exercise of discretion by the trial court."); *Hall Fin. Grp., Inc. v. DP Partners L.P. (In re DP Partners L.P.)*, 106 F.3d 667, 670-71 (5th Cir.), *cert. denied*, 522 U.S. 815 (1997) ("Use of the word 'shall' connotes a mandatory intent."); *Plaut v. Spendthrift Farm, Inc.*, 1

F.3d 1487, 1490 (6th Cir. 1993), *aff'd*, 514 U.S. 211 (1995) ("Where the word 'shall' appears in a statutory directive, 'Congress could not have chosen stronger words to express its intent that [the specified action] be mandatory[.]'") (quoting *Monsanto*, 491 U.S. at 607).

16.     If Congress had intended the appointment of an examiner to be discretionary in cases that meet the $5 million threshold, it certainly knew how to draft a statute that says that.  *See* 7 *Collier on Bankruptcy*, ¶ 1104.03[2][b] ("If Congress intended to subject the appointment issue to the court's discretion, it could have said so.").  Indeed, subsection 1104(c)(1) is replete with discretionary language, as it tempers section 1104(c)'s "shall" with "[if] such appointment is in the interests of creditors, any equity security holders, and other interests of the estate."   If Congress had also intended the appointment of an examiner in cases that meet the $5 million threshold to be left to the court's discretion, Congress would have said so in subsection (c)(2).  *See, e.g.*, *Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 501 (6th Cir. 1990) (holding that the contrast between subsection (1) and subsection (2) "could not be more striking"); *Walton v. Cornerstone Ministries Invs., Inc.*, 398 B.R. 77, 82 (N.D. Ga. 2008) (holding that "the mandatory nature of § 1104(c)(2) is particularly clear when compared with the discretionary nature of § 1104(c)(1)").

17.     If the appointment of an examiner is not mandatory under section 1104(c)(2), that subsection "becomes indistinguishable  from § 1104([c])(1)." *Revco*, 898 F.2d at 501.  "Indeed, if paragraph (c)(2) were not mandatory, then § 1104(c) would have the following meaning: 'If specified debt  is  less  than  $5 million, it is in the court's discretion to appoint an examiner; and if specified debt is more than $5 million, it is in the court's discretion to appoint an examiner.'" *In re UAL Corp.*, 307 B.R. 80, 84  n.2 (Bankr. N.D. Ill. 2004).  As such an interpretation would render section 1104(c)(2) superfluous, it cannot be legitimate. *See National*

8

*Endowment for the Arts v. Finley*, 524 U.S. 569, 609 (1998) ("Statutory interpretations that render superfluous other provisions in the same enactment are strongly disfavored.") (internal quotation omitted).

> **2.  Every Court of Appeals and District Court *Published* Decision Has Ruled That Section 1104(c)(2) Is Mandatory, and Objectors' Reliance on Inapposite or Unpublished and Non-Binding Bankruptcy Court Decisions Is Misplaced.**

18.     There is no binding precedent in this Circuit regarding section 1104(c)(2).  Most published opinions that have addressed the issue, including the only court of appeals decision and all district court opinions, have agreed that section 1104(c)(2) is mandatory and must be enforced according to its plain terms.  *See Revco*, 898 F.2d at 500-01 (reversing district court's dismissal of appeal of bankruptcy court's denial of U.S. Trustee's motion to appoint an examiner in case in which the $5 million threshold had been met, and holding that "[t]he provision plainly means that the bankruptcy court 'shall' order the appointment of an examiner when the total fixed, liquidated, unsecured debt exceeds $5 million, if the U.S. trustee requests one"); *Walton v. Cornerstone Ministries*, 398 B.R. at 83-84 (reversing bankruptcy court's denial without prejudice of U.S. Trustee's request to appoint an examiner, holding that appointment of an examiner under section 1104(c)(2) is mandatory); *Loral Stockholders Protective Comm. v. Loral Space & Commc'ns Ltd. (In re Loral Space & Commc'ns, Ltd.)*, No. 04 Civ. 8645RPP, 2004 WL 2979785 at *4 (S.D.N.Y. Dec. 23, 2004) (reversing bankruptcy court's decision denying appointment of examiner when $5 million debt threshold was met and parties seeking appointment had standing to do so, stating that "Section 1104(c)(2) does not leave any room for the court to exercise discretion about whether an examiner should be appointed, as long as the $5,000,000 threshold is met and a motion for appointment of an examiner is made by a party in interest") (internal quote omitted); *In re Vision*

*Dev. Group of Broward Co., LLC*, No. 07-17778-BKC-RBR, 2008 WL 2676827 at *3 (Bankr. S.D.

Fla. June 30, 2008); *UAL Corp.*, 307 B.R. at 84; *In re Big Rivers Elec. Corp.*, 213 B.R. 962, 965-66

(Bankr. W.D. Ky. 1997); *Mechem Fin. of Ohio, Inc.*, 92 B.R. 760, 761 (Bankr. N.D. Ohio 1988); *In*

*re The Bible Speaks*, 74 B.R. 511, 514 (Bankr. D. Mass. 1987); *In re 1243 20th St., Inc.*, 6 B.R.

683, 685 n.3 (Bankr. D.C. 1980); *In re Lenihan*, 4 B.R. 209, 211 (Bankr. D.R.I. 1980).

19.     The Objectors argue that section 1104(c)(2) silently affords discretion under certain

circumstances, citing three reported bankruptcy court opinions and a number of unreported bench

rulings.  The reported decisions cited are *U.S. Bank Nat'l Assoc. v. Wilmington Trust Co.* (*In re*

*Spansion, Inc.)*, 426 B.R. 114 (Bankr. D. Del. 2010); *In re Residential Capital, LLC*, 474 B.R. 112

(Bankr. S.D.N.Y. 2012); and *In re Dewey & LeBoeuf LLP*, 478 B.R. 627 (Bankr. S.D.N.Y. 2012).

But only one of those cases actually declined to appoint an examiner in a circumstance where

section 1104(c)(2) makes one mandatory.  Not only did these decisions wrongly interpret section

1104(c)(2), the facts and circumstances of those cases were very different.

20.     In *Spansion*, the motion to appoint an examiner was part of a motion to vacate an

order approving the disclosure statement.  426 B.R. at 126.  The court viewed such belated

allegations as "a classic confirmation dispute, rather than grounds for an investigation by an

examiner."  *Id*. at 128.  Even if timing were statutorily relevant under the Code, which it is not

(except the case benchmarks specified in the Code itself), the Debtors have yet to file their

schedules of assets and liabilities, statements of financial affairs, Rule 2015.3 reports, or monthly

operating reports.[7]  These cases are in their infancy.

---

[7]     Based on the testimony provided at the initial section 341(a) meeting in these cases, the
Debtors have hundreds of millions of dollars of fiat currency in bank accounts in the U.S. and
abroad, apart from any customer funds they are holding.

21.     In *In re Dewey & LeBoeuf LLP*, the court determined that the parties seeking an examiner had failed to meet their burden that the $5 million threshold had been met.  478 B.R. at 639.  *Id.*

22.     The Objectors also rely on *Residential Capital.*  There, as here, "no party really dispute[d] that an investigation and report should be done in this case."  474 B.R. at 114.  Rather, the court indicated that "the only issue is whether the Creditors Committee should perform the investigation, or whether an examiner must be appointed to conduct the investigation."  *Id.*  The court ultimately held that an examiner had to be appointed because the requirements of section 1104(c)(2) were met and because the court determined that "an investigation [was] appropriate."  *Id*. at 121.

23.     The *Residential Capital* court, however, was mistaken in its view that "the appointment of an examiner is not mandatory in *all* cases satisfying subsection (c)(2), because the phrase 'such an investigation of the debtor as is appropriate' provides a limitation on the requirement for appointment of an examiner under either subsection (1) or (2)."  *Id*. at 116-17 (emphasis in original).  The interpretation of the "as is appropriate" statutory language embraced by the *Residential Capital* court, and by the Objectors, violates the "last antecedent" rule of statutory construction, "according to which a limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows . . . ."  *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003).  Thus, the "as is appropriate" clause in section 1104(c) only lends meaning to the statute as a modifier of "an investigation of the debtor."  *Walton v. Cornerstone Ministries*, 398 B.R. at 83 ("In the provision, 'as is appropriate' modifies 'investigation.'") (internal quotation omitted);  *In re Schepps Food Stores, Inc.*, 148 B.R. 27, 30 (S.D. Tex. 1992) (in holding that section 1104(c)(2)'s predecessor section 1104(b)(2) was mandatory, the court explained, "This

11

reasoning [*i.e.*, that 'as is appropriate' modifies 'shall'] is both grammatically and contextually wrong.  In the provision, 'as is appropriate' modifies 'investigation.'  The statute allows the court to determine the scope, length, and conduct of the investigation, rather than the appointment itself.").  The discretion that section 1104(c) provides courts to determine the investigation's scope cannot be used to eviscerate a statute that unambiguously does not afford courts the discretion to refuse to appoint an examiner in cases that meet the $5 million threshold.

24.     Although the Objectors do not discuss the many reported decisions on whether section 1104(c)(2) mandates the appointment of an examiner, they do cite several bench rulings. Bench rulings have, at most, persuasive value, but are not binding precedent.  *See, e.g.*, *In re Dura Automotive Sys., Inc.*, 379 B.R. 257, 269, n.9 (Bankr. D. Del. 2007) (Court indicated it attributed no precedential value to its own bench decisions and would not rely on an unreported bench decision of S.D.N.Y Bankruptcy Judge Gerber); *In re Charter Behavioral Health Systems, LLC*, 292 B.R. 36, 39, n.5 (Bankr. D. Del. 2003) (refusing to consider a brief that relied on a bench decision, and an unpublished affirmation of that decision by the District Court, stating, "[w]e have consistently refused to consider bench rulings (even ones we make ourselves in other cases) because bench rulings often do not have the benefit of reflection and many times do not articulate all of the reasons behind the decision").

25.     The Debtors incorrectly suggest there is "law of the District" on whether section 1104(c)(2) is mandatory.  *See, e.g.*, Debtors' Obj., ¶ 33 (referring to "the weight of authority in the District of Delaware").  But the Court of Appeals for the Third Circuit has made it clear that "there is no such thing as 'the law of the district.'"  *Threadgill v. Armstrong World Indus., Inc*., 928 F.2d 1366, 1371 (3d Cir. 1991); *see also In re Berley Assocs., Ltd*., 492 B.R. 433, 441 n.4 (Bankr.

D.N.J. 2013) (citing *Threadgill* and holding that prior decisions of other bankruptcy courts within the district are not binding authority).

26.     Given that the majority of reported decisions, including the only circuit court decision and all district court decisions, recognize section 1104(c)(2) as mandatory, the U.S. Trustee respectfully requests that the reasoning of the bench decisions in this District ruling to the contrary be reconsidered.

27.     Although wholly irrelevant to whether section 1104(c)(2) is mandatory, there are also significant factual differences between the cases at bar and this Court's bench decisions cited by the Objectors.[8]

---

[8]   Because the rulings cited are bench decisions, there is no easy way to gather all the relevant facts.  In addition, with the exception of the transcript in *In re CRED Inc.*, the Objectors attached only excerpts from the bench decisions on which they rely, making it that much more difficult to gather all facts that might have influenced the Court's decision.  Nevertheless, some factual distinctions between those cases and the debtors' cases can be discerned.

For example, in *In re Mallinckrodt PLC*, No. 20-12522 (Bankr. D. Del. Nov. 23, 2021) (Dorsey, J.), an examiner was sought shortly before confirmation to investigate legal issues relating to plan confirmation, including some arising from the conduct of counsel to a member of the creditors' committee, not the debtor, and thus beyond the scope of an examiner's statutory duties.  Hr'g Tr. 39:1-9, 40:19-42:4, 45:18-46:5, Exh. 2 to Bromley Dec. (D.I. 576).  Similarly, in *In re Washington Mutual Inc.*, No. 08-12229 (Bankr. D. Del. May 5, 2010) (Walrath, J.), parties sought an examiner to determine whether the plan and global settlement proposed by the debtor were appropriate.  Hr'g Tr. 98:5-11, attached as Exh. D. to Committee Obj., D.I. 571.  But the Court denied the request because resolving what assets the debtor owns, their value, and conflicting ownership claims to those assets was the Court's duty to determine through the adversarial process.  *Id.*, Tr. 100:14-21.

In *In re Visteon Corporation*, No. 09-11786 (Bankr. D. Del. May 12, 2010) (Sontchi, J.), from the limited transcript provided, it appears there were no allegations of any wrongdoing: "at some point there has to be a level of smoke, if you will – not a lot but more than none, more than just a whiff of smoke – but some sort of . . . allegation or facts that make the Court think . . . someone needs to look into this independently and tell the Court what's going on."  Hr'g. Tr. at 170:23-171:3, Ex. 6 to Bromley Dec.  And in *In re American Home Mortgage Holdings, Inc.*, No. 07-11-47 (Bankr. D. Del. Oct. 31, 2007) (Sontchi, J.), the Court stated that,

28.     Although the Objectors rely on excerpts of bench decisions that fail to fully set forth

the factual bases for the Court's decisions, they did provide the full transcript in *In re CRED Inc.*

*See* Exh. 9 to Bromley Dec.  That case is somewhat like the present cases in that all deal with

debtors in the cryptocurrency arena.  Although this Court disagreed with the U.S. Trustee's

position that the appointment of an examiner is mandatory under section 1104(c)(2), it nevertheless

determined that the appointment of an examiner "to conduct an investigation of the pre-petition

conduct of the debtors," was appropriate even though, like here, the creditors committee stated it

had commenced an investigation.  *In re CRED Inc.*, No. 20-12836 (Bankr. D. Del. Dec. 18, 2020)

(Dorsey, J.), Hr'g. Tr. at 97:12-18 & 97:19-98:15, Ex. 9 to Bromley Dec.

**B.   The Legislative History of 11 U.S.C. § 1104(c)(2) Supports the Interpretation of the Statute as Mandating the Appointment of an Examiner in Cases Meeting the $5 Million Threshold**

29.     There is nothing ambiguous in the language of section 1104(c)(2).  But "[t]o the

extent that the language of § 1104(c)(2) could be seen as ambiguous, the subsection's

legislative history forcefully indicates that appointment of an examiner was intended to be

mandatory in cases exceeding the debt threshold." *UAL Corp.*, 307 B.R. at 85.  The *UAL*

court summarized the legislative debate that gave rise to the provision as follows:

> [T]he focus of the debate over § 1104 was whether appointment of a
> trustee should be mandatory for public companies (as it was under
> Chapter X of the former Bankruptcy Act), or whether the debtor should remain
> in possession in all cases unless a trustee was appointed for cause.   The
> enacted language of § 1104 resolved a disagreement between the Senate
> and the House of Representatives on this question. The compromise rejected
> mandatory appointment of a trustee, but, as its sponsors explained,  it
> provided for mandatory appointment of an examiner in large cases as an
> alternative form of protection against corporate mismanagement.

_____

in "reading the motion carefully, I really didn't see a request for any investigation."  Hr'g. Tr. at 76:16-21, Ex. 7 to Bromley Dec.

14

*Id.* at 86 (citing Leonard L. Gumport, *The Bankruptcy Examiner*, 20 Cal. Bankr. J. 71, 83-95 (1992)).  Accordingly, the court concluded, "the weight of precedent, the language of § 1104, and the legislative history all indicate that appointment of an examiner is mandatory" under conditions set forth in section 1104(c)(2).  *Id.*  This analysis is unassailably correct.

30.      In their objection to the Motion, the JPLs wrongly quote the legislative history of the statute—as debated, but not actually enacted—as follows: "The standards for the appointment of an examiner are the same as those for the appointment of a trustee; the protection must be needed, and the cost and expense must not be disproportionately high."  JPL Obj., ¶ 2 (quoting H.R. Rep. No. 95-595, at 402 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6359).  The *Residential Capital* decision included this same quote and others from the same House Report.  *See* 474 B.R. at 120.  Wrongly identifying this as "the legislative history of section 1104(c)," that court determined that section 1104(c) merely "expresses a Congressional preference for appointment of an examiner," but that "the facts and circumstances of the case may permit a bankruptcy court to deny the request for appointment of an examiner even in cases with more than $5 million in fixed debts."  *Id.* at 121.

31.      But H.R. Rep. No. 595 described a ***predecessor*** of section 1104(c)—not the bill as it was enacted into law.  The unenacted prior bill described in H.R. Rep. No. 595 read as follows:

> If the court does not order the appointment of a trustee under this section, then at any time before the confirmation of a plan, on request of a party in interest or the United States trustee, after notice and a hearing, the court may order the appointment of an examiner to conduct such an investigation of the debtor as is appropriate, including an investigation of any allegations of fraud, dishonesty, incompetence, or gross mismanagement of the debtor or by current or former management of the debtor if –
>
> (1) ***the protection afforded by an examiner is needed***; and

15

(2)  ***the costs and expenses of an examiner would not be disproportionately higher than the value of the protection afforded.***

H.R. 8200, 95th Cong., 1st Sess., as reported by the House Committee on the Judiciary, Sept. 8, 1977, *reprinted in Collier on Bankruptcy*, App. Pt. 4(d) (16th ed. 2022) (emphasis added).

32.    The bill described in H.R. Rep. No. 595 had no mandatory aspect whatsoever and had no separate subsection regarding cases with $5 million in certain debts.  Instead, it used the discretionary word "may" and had two subsections that allowed for further discretionary determinations regarding the need for an examiner and the cost of an examiner.

33.    The legislative history of the bill that Congress *actually* passed and the President signed into law tells a very different tale.  The language ultimately enacted replaced "may" with "shall" and added subsections (1) and (2) as we have them today, thus resolving a disagreement between the House of Representatives and the Senate regarding whether appointment of a trustee should be mandatory for all public companies, or whether debtors should remain in possession in all cases unless a trustee is appointed for cause.  *See UAL Corp.*, 307 B.R. at 86; *cf. Siegel v. Fitzgerald*, 142 S. Ct. 1770, 1777 (2022) (holding that Congress' change of "may" to "shall" in 28 U.S.C. § 1930(a)(7) changed statute from discretionary to mandatory).  Although the compromise that became section 1104(c) rejected the mandatory appointment of a trustee, the sponsors of the compromise explained that it "provided for mandatory appointment of an examiner in large cases as an alternative form of protection against corporate mismanagement," and it provided that "***an examiner is required to be appointed***" in large cases.  *UAL Corp.*, 307 B.R. at 86 (quoting 124 Cong. Rec. H11, 100 (daily ed. Sept. 28, 1978), *reprinted in* 1978 U.S.C.C.A.N. 6465 (statement of Rep. Edwards) and 124 Cong. Rec. S17, 417 (daily ed. Oct. 6, 1978), *reprinted in* 1978 U.S.C.C.A.N. 6456 (statement of Sen. DeConcini)) (emphasis in original).

34.     The legislative history reflects that the public interest was taken into consideration by Congress in approving section 1104(c)(2).  *See Collier on Bankruptcy* App. Pt. 4(f), Senate Debate on Compromise Bill, 124 Cong. Rec. S17417 (daily ed. Oct. 6, 1978) (Sen. DeConcini); *id.* at S17404 (Sen. DeConcini:  "In the business reorganization chapter the Senate succeeded in obtaining special protection for the ***large cases having great public interest***. ***There will be automatically appointed an examiner in those cases***, but not a trustee as in the Senate passed bill. I am convinced that debtor and creditor interests, ***as well as the public interest***, will be preserved and enhanced by these provisions.") (emphasis added).

35.     In light of the foregoing, the legislative history of section 1104(c) shows that the version finally enacted was drafted expressly to require mandatory examiners in cases meeting the $5 million threshold.

**C.  Appointment of an Examiner is Also in the Best Interests of Creditors, Equity Security Holders, and Other Interests of the Debtors' Estates.**

36.     Even if an examiner were not mandated under section 1104(c)(2), this Court should direct the appointment of an examiner under section 1104(c)(1) because the appointment would be in the best interests of the Debtors' estates, their creditors, and equity security holders.  As set forth in the Motion, there are more than reasonable grounds to suspect that management of the Debtors participated in actual fraud, dishonesty, or criminal conduct that led to the collapse of the Debtors. There is no real argument even among the Objectors that an investigation is necessary—the argument is merely over the appropriate party to investigate.  But equally important is the party who *controls* the investigation.  It remains unclear how many of the Debtors' other officers who were in place prepetition—and who may have participated in or failed to detect the alleged fraud, dishonesty, or mismanagement—remain at the Debtors.  Moreover, there are serious conflicts

17

among the Debtors' former and current principals and among the Debtors themselves. Any internal investigation is subject to at least the perception that it is being controlled by at least some of those who may have played a role in the Debtors' collapse.

37. All this leads to the conclusion that an independent investigation by a section 1104 examiner would best serve the interests of the Debtors' estates and their creditors by providing a neutral, disinterested person with clear authority to review the Debtors' financial and business operations, untangle the mess, and file a public report that will provide transparency to all parties in interest. That transparency is especially critical in these cases, given the large and varied creditor body that has suffered significant financial losses, the immense public interest in these cases, and the wider implications that FTX's collapse may have for the crypto industry and those in the public who either have or intend to invest in the industry. Ordering the appointment of an examiner in these cases will vindicate the congressional interest in providing "special protection" to "large cases having great public interest," discussed *supra*, III.B., and help maintain public confidence in the fairness and integrity of the bankruptcy system as a whole.

**D. The Objectors' Remaining Arguments Should Be Rejected.**

**1. Not Only Is an Examiner Required, But an Investigation by an Independent Examiner Is Preferable In This Case.**

38. Finally, the Objectors make various other arguments against the Motion, but these arguments should be rejected because, as set forth above; (1) ordering the appointment of an examiner is mandatory in these cases, and (2) even if it were not, ordering the appointment of an examiner is in the best interests of all parties.

39. First, the Objectors argue against the Motion because the necessary investigations can be conducted by the Debtors and the Committee, as well as various law enforcement and

regulatory authorities.  This ignores that section 1104(c)(2) provides that an *examiner* must be appointed if the requirements of that section of the statute are met and makes no exception for cases in which a committee or the debtors investigate.  Even the *Residential Capital* decision, on which the Objectors rely, holds that if the requirements of section 1104(c)(2) are met (which that court erroneously believed included a determination that the appointment is "appropriate"), an examiner must be appointed, "[n]otwithstanding the ability of any other party to effectively and expeditiously investigate the Debtors."  *Residential Capital*, 474 B.R. at 121.  Moreover, section 1106(b) requires an examiner to investigate the debtor, while the Committee's investigatory powers under section 1103(c)(2) are discretionary,[9] and investigation is specifically removed from the list of a debtor in possession's duties.  *See* 11 U.S.C. § 1107(a).[10]

40.    In addition, the Committee's fiduciary duty is only to unsecured creditors.  Although a debtor in possession's management has a fiduciary duty to the bankruptcy estate, it also has a fiduciary duty to its shareholders, at least some of whom will be subjects of the investigation required by section 1104(c)(2).  In contrast, an examiner is an independent fiduciary that has no obligation or allegiance to any particular constituency in these cases.  As stated by the court in *In re Fibermark*, *Inc*., 339 B.R. 321 (Bankr. D. Vt. 2006), an examiner is objective and independent:

---

[9]    Section 1103(c)(2) provides in part that "a committee appointed under section 1102 of this title *may*. . . (2) investigate the acts, conduct, assets, liabilities, and financial condition of the debtor . . .", while section 1106(b) provides in part that "an examiner appointed under section 1104(d) of this title *shall* perform the duties specified in paragraphs (3) and (4) of subsection (a) of this section."  11 U.S.C. §§ 1103(c)(2) (emphasis added); 1106(b) (emphasis added).

[10]    11 U.S.C. § 1107(a) provides, "Subject to any limitations on a trustee serving in a case under this chapter, and to such limitations or conditions as the court prescribes, a debtor in possession shall have all the rights, other than the right to compensation under section 330 of this title, and powers, and shall perform all the functions and duties, except the duties specified in sections 1106(a)(2), (3), and (4) of this title, of a trustee serving in a case under this chapter."

> The benefit of appointing an independent examiner is that he or she will act as an objective nonadversarial party who will review the pertinent transactions and documents, thereby allowing the parties to make an informed determination as to their substantive rights. . . . In essence, an examiner's report paints a picture, his or her image of what happened in the case, and ends with that expert's opinion of what that story means, in legal terms. The report puts the story on paper and provides a context for debate.

*Id.* at 325 (citations omitted).

### 2. Although Cost Is Irrelevant to Whether an Examiner Is Required, Courts Have Ample Tools to Manage and To Mitigate Professional Costs and Potential Duplication of Effort.

41.     The Objectors also raise considerations of cost, delay, and duplication of efforts. Although such considerations could be factored into a section 1104(c)(1) determination of whether the examiner appointment is in the best interests of all parties in interest, Congress has written a statute that does not allow parties to evade the appointment of mandatory examiners on such grounds in cases that meet the $5 million threshold.  Factors such as cost, delay, and duplication can be considered in determining the *scope* of investigation but have no bearing whatsoever on the issue of whether section 1104(c)(2) is mandatory.  Congress must have known that the appointment of an examiner might add to the cost of a case—after all, examiners are expressly referenced in section 330(a)(1) of the Code—and that examiners in bigger cases would cost more than examiners in smaller cases, but Congress still determined that the appointment of an examiner is mandatory when the $5 million threshold is met.  As stated by the district court in *Walton v. Cornerstone Ministries*:

> The court shares the bankruptcy court's and appellees' concerns for efficiency and preserving the bankruptcy estate. Nonetheless, the statute is clear, and, "[w]hile Congress may not have foreseen the problems that arise when discretion over an appointment of an examiner is missing, that is not sufficient grounds for refusing to give effect to the plain meaning of the statute."

398 B.R. at 84 (quoting *Schepps Food Stores*, 148 B.R. at 30 (citing *Union Bank v. Wolas*, 502 U.S. 151 (1991))).

42.    Nevertheless, even were the examiner not mandatory, there are ways that the potential costs, delay, and duplication can be mitigated.  The Code provides for review and approval of compensation and expenses of the examiner under section 330(a).  Budgets and information sharing protocols can be established.  The examiner can coordinate with the Debtors and the Committee to ensure that no party is duplicating the work of the other.  The Court could also impose a requirement that the examiner periodically report to the Court and parties in interest on his or her progress.

43.    In addition, there is no reason to believe that an investigation conducted by an examiner will be more costly than one conducted by the Debtors' professionals or the Committee. Sullivan & Cromwell, whom the Debtors' CEO, John J. Ray III, has identified as leading the investigation into the circumstances of the Debtors' collapse,[11] recently filed a list of the professionals from their firm who worked on these cases in November 2022.  The list consisted of *over 150 individuals,* of which *30 have billing rates over $2,000/hour*.  D.I. 553, Exh. 1.[12]  The Debtors have also retained other professionals, such as AlixPartners LLP and Quinn Emanuel Urquhart & Sullivan, LLP, whose hourly rates are also significant, and who will be conducting or assisting in the Debtors' internal investigations.  *See* D.I. 277, ¶¶ 11, 16 & Exh. B at 2

---

[11]  On December 13, 2022, John J. Ray III, testified before Congress that "[o]ur investigative and cyber security teams, led by the law firm Sullivan & Cromwell, are already well into the process of gathering the evidence that will provide us with an understanding of what led to this collapse. . . . The scope of the investigation underway is enormous."  D.I. 371 Exh. A at 4-5.

[12]  The U.S. Trustee is not yet aware of the number of hours or total fees billed by the Sullivan & Cromwell professionals for November or any later month, as the professionals in these cases have not yet filed fee applications.

(AlixPartners); D.I. 280, ¶¶ 5 & 22 (Quinn).  The Committee has also retained professionals with

not insignificant hourly rates whose tasks may include undertaking or assisting in investigations of

the Debtors' affairs.  *See, e.g.*, D.I. 481 (FTI); D.I. 518 (Paul Hastings); D.I. 552 (Young

Conaway).

      **3.**      **The Scope of the Examiner's Duties is Irrelevant to Whether an Examiner Must Be Appointed.**

      44.      The Objectors further complain that the U.S. Trustee has not set forth what he

believes the scope of the examiner's duties should be.   But the scope of the examiner's duties is

irrelevant to whether section 1104(c)(2) mandates the appointment of an examiner. A court,

however, may not appoint an examiner with *no* duties.  If a court could do that, section 1104(c)(2)

would be meaningless.  In any event, even were the examiner not mandatory, the court in

*Residential Capital* agreed with the U.S. Trustee's view that the "scope, timing and budget" of the

examiner would be "decided after the examiner is appointed and confers with other parties in

interest."  *Id.*

      45.      Accordingly, none of the arguments raised by the Objectors constitute legal bases

for this Court to split with the holding of the Sixth Circuit in *Revco* or with the majority of

published decisions that holds that mandatory examiners under section 1104(c)(2) are indeed

mandatory, nor do they supply any reason for this Court to find anything other than that ordering

appointment of an examiner would be in the best interests of creditors, equity security holders, and

all other interests of the Debtors' estates.  The Motion therefore should be granted.

## IV.   <u>CONCLUSION</u>

      Section 1104(c)(2) mandates the appointment of an examiner in this case because: (1) the

U.S. Trustee requested such relief; (2) no trustee has been appointed in the case; (3) no chapter 11

plan has been confirmed; and (4) no party contests that the $5 million debt threshold has been met. The requirements of section 1104(c)(1) have also been met because the appointment of an examiner is in the best interest of creditors, and all other interests of the estates, for the reasons set forth in the Motion.

WHEREFORE the U.S. Trustee respectfully requests that this Court enter an order directing the appointment of an examiner and granting such other and further relief as the Court finds just and appropriate.

Dated: February 1, 2023
        Wilmington, Delaware

Respectfully submitted,

**ANDREW R. VARA**
**UNITED STATES TRUSTEE,**
**REGIONS 3 and 9**

By: */s/ Juliet M. Sarkessian*
Juliet M. Sarkessian
Trial Attorney
Benjamin A. Hackman
Trial Attorney
United States Department of Justice
Office of the United States Trustee
J. Caleb Boggs Federal Building
844 King Street, Suite 2207, Lockbox 35
Wilmington, DE 19801
(302) 573-6491 (Phone)
(302) 573-6497 (Fax)
juliet.m.sarkessian@usdoj.gov
benjamin.a.hackman@usdoj.gov

-and-

David Gerardi
Trial Attorney
Robert J. Schneider, Jr.
Trial Attorney
One Newark Center
1085 Raymond Boulevard
Suite 2100
Newark, NJ  07102
(973) 645-3014 (Phone)
(973) 645-5993 (Fax)
david.gerardi@usdoj.gov
robert.j.schneider@usdoj.gov