**EXHIBIT A**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| | **Ref. Nos. 275, 524 & ___** |

**ORDER AUTHORIZING THE RETENTION AND EMPLOYMENT OF PERELLA
WEINBERG PARTNERS LP AS INVESTMENT BANKER TO THE DEBTORS *NUNC
PRO TUNC* TO NOVEMBER 16, 2022 AND (II) WAIVING CERTAIN REPORTING
REQUIREMENTS PURSUANT TO LOCAL RULE 2016-2(H)**

Upon the application (the "Application")[2] of FTX Trading Ltd. and its affiliated debtors

and debtors-in-possession (collectively, the "Debtors"), for entry of an order (this "Order"),

authorizing the Debtors to retain and employ Perella Weinberg Partners LP (and together with its

corporate advisory affiliates, "PWP") as their investment banker *nunc pro tunc* to November 16,

2022, pursuant to the amended and restated engagement letter dated as of January 31, 2023 (the

"Amended Engagement Agreement") and attached hereto as **Exhibit 1** and (b) modifying the time

---

[1]    The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively.  Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

[2]    The Application shall refer to the (a) *Debtors' Application for an Order (I) Authorizing the Retention and Employment of Perella Weinberg Partners LP as Investment Banker to the Debtors* nunc pro tunc *to November 16, 2022 and (II) Waiving Certain Reporting Requirements Pursuant to Local Rule 2016-2(h)* and (b) *Debtors' Supplement to Application for an Order (I) Authorizing the Retention and Employment of Perella Weinberg Partners LP as Investment Banker to the Debtors* nunc pro tunc *to November 16, 2022 and (II) Waiving Certain Reporting Requirements Pursuant to Local Rule 2016-2(h),* collectively. Capitalized terms not herein defined shall have the meanings ascribed to them in the Application.

13793145

keeping requirements of Local Rule 2016-2 and the guidelines (the "U.S. Trustee Guidelines") established by the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") in connection with PWP's proposed engagement by the Debtors; and this Court having jurisdiction to consider the Application pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012; and this Court being able to issue a final order consistent with Article III of the United States Constitution; and venue of these Chapter 11 Cases and the Application in this district being proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this matter being a core proceeding pursuant to 28 U.S.C. § 157(b); and this Court having found that proper and adequate notice of the Application and the relief requested therein has been provided in accordance with the Bankruptcy Rules and the Local Rules, and that, except as otherwise ordered herein, no other or further notice is necessary; and objections (if any) to the Application having been withdrawn, resolved or overruled on the merits; and a hearing having been held to consider the relief requested in the Application and upon the record of the hearing and all of the proceedings had before this Court, and this Court having found and determined that the relief set forth in this Order is in the best interests of the Debtors and their estates; and that the legal and factual bases set forth in the Application establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor;

**IT IS HEREBY ORDERED THAT:**

1.      The Application is GRANTED as set forth herein.

2

2.      The Debtors are authorized to retain and employ PWP as their investment banker in these Chapter 11 Cases *nunc pro tunc* to November 16, 2022, in accordance with the terms set forth in the Amended Engagement Agreement and the Application, as modified herein, and PWP is authorized to perform the services described in the Amended Engagement Agreement, as modified herein.

3.      Notwithstanding anything to the contrary herein, the fees and expenses payable to PWP pursuant to the Amended Engagement Agreement shall be subject to review only pursuant to the standard set forth in section 328(a) of the Bankruptcy Code and shall not be subject to the standard of review set forth in section 330 of the Bankruptcy Code; *provided, however*, that notwithstanding any provision to the contrary in the Engagement Agreement, the U.S. Trustee shall retain the right, and be entitled to, object to all of PWP's request(s) for compensation and reimbursement based on the reasonableness standard provided for in section 330 of the Bankruptcy Code, and shall not be limited to objections based on section 328(a) of the Bankruptcy Code. This Order and the record relating to the Court's consideration of the Application shall not prejudice or otherwise affect the rights of the U.S. Trustee to challenge the reasonableness of PWP's compensation and expense reimbursement under sections 330 and 331 of the Bankruptcy Code. Accordingly, nothing in this Order or the record shall constitute a finding of fact or conclusion of law binding on the U.S. Trustee, on appeal or otherwise, with respect to the reasonableness of PWP's compensation and reimbursement requests.

13793145

4.      None of the fees payable to PWP shall constitute a "bonus" or fee enrichment under applicable law.

5.      The terms of the Amended Engagement Agreement, including, without limitation, the compensation, reimbursement, indemnification and contribution provisions, are hereby approved pursuant to section 328(a) of the Bankruptcy Code and the Debtors are authorized to perform their payment, reimbursement, contribution, and indemnification obligations and their non-monetary obligations, in accordance with the terms and conditions and at the times specified, in the Amended Engagement Agreement, as modified herein.

6.      Notwithstanding anything to the contrary in this Order, the Application, the Amended Engagement Agreement or the Mendelsohn Declarations[3], PWP shall comply with all requirements of Bankruptcy Rule 2016(a), Local Rule 2016-2, including all information and time keeping requirements of Local Rule 2016-2(d), and the fee guidelines established by the U.S. Trustee Guidelines, except that PWP shall be permitted to keep professional time records in half-hour increments, and PWP's professionals shall not be required to provide or conform with any schedule of hourly rates.

---

[3]     The Mendelsohn Declarations means the (a) *Declaration of Bruce Mendelsohn in Support of Debtors' Application for an Order (I) Authorizing the Retention and Employment of Perella Weinberg Partners LP as Investment Banker to the Debtors Nunc Pro Tunc to November 16, 2022 and (II) Waiving Certain Reporting Requirements Pursuant to Local Rule 2016-2(h)* and (b) *Supplemental Declaration of Bruce Mendelsohn in Support of Debtors' Application for an Order (I) Authorizing the Retention and Employment of Perella Weinberg Partners LP as Investment Banker to the Debtors Nunc Pro Tunc to November 16, 2022 and (II) Waiving Certain Reporting Requirements Pursuant to Local Rule 2016-2(h)* (including any amendments thereto), collectively.

4

7.      In the event that, during the pendency of the Chapter 11 Cases, PWP seeks reimbursement for any attorneys' fees and/or expenses pursuant to the Application and the Amended Engagement Agreement, the invoices supporting time records from such attorneys shall be included in PWP's own fee applications and such invoices and time records shall be in compliance with Local Rule 2016-2(f), except that such attorneys shall not be required to prepare a motion or application to accompany such invoices, and shall be subject to the U.S. Trustee Guidelines and approval of this Court under the standards of sections 330 and 331 of the Bankruptcy Code, without regard to whether such attorney has been retained under section 327 of the Bankruptcy Code and without regard to whether such attorney's services satisfy section 330(a)(3)(C) of the Bankruptcy Code; provided however, that PWP shall not seek reimbursement of any attorneys' fees or attorney expenses or any other fees or expenses incurred in defending PWP's fee applications filed with this Court.

8.      Notwithstanding anything in the Application or any supporting declaration to the contrary, PWP shall seek reimbursement from the Debtors' estates for its engagement-related expenses at PWP's actual cost paid.

9.      Notwithstanding anything in the Application or the Mendelsohn Declarations to the contrary, to the extent PWP uses the services of contract attorneys or any other independent contractors or subcontractors (collectively, the "Contractors") in these cases, PWP shall (i) pass through the cost of such Contractors to the Debtors at the same rate that PWP pays the Contractors; (ii) seek reimbursement for actual costs only; (iii) ensure that the Contractors are subject to the

same conflicts checks as required for PWP; and (iv) file with this Court such disclosures required by Bankruptcy Rule 2014(a) with respect to such Contractors. For the avoidance of doubt, PWP shall neither share fees with existing or future Contractors who provide services to the Debtors nor enter into fee sharing arrangements with such Contractors.

10.     Within fourteen (14) days after any qualified bid deadline in these cases, PWP will disclose through a supplemental declaration the identities of all qualified bidders not disclosed prior to entry of this Order and the connections of PWP to such potential counterparties, if any.

11.     The Indemnification Provisions attached as Annex A to the Amended Engagement Agreement are approved, subject during the pendency of the Chapter 11 Cases to the following:

(a)     No Indemnified Person (as that term is defined in the Amended Engagement Agreement) shall be entitled to indemnification, contribution, or reimbursement pursuant to the Amended Engagement Agreement for services, unless such services and the indemnification, contribution, or reimbursement therefor are approved by this Court;

(b)     The Debtors shall have no obligation to indemnify any Indemnified Person, or provide contribution or reimbursement to any Indemnified Person, for any claim or expense to the extent it is: (i) judicially determined (the determination having become final and no longer subject to appeal) to have arisen from the Indemnified Person's gross negligence, bad faith, intentional fraud or willful misconduct; (ii) for a contractual dispute in which the Debtors allege breach of an Indemnified Person's contractual obligations, unless this Court determines that indemnification, contribution, or reimbursement would be permissible pursuant to applicable law; or (iii) settled prior to a judicial determination as to the exclusions set forth in clauses (i) and (ii) above, but determined by this Court, after notice and a hearing pursuant to subparagraph (c) hereof to be a claim or expense for which the Indemnified Person should not receive indemnity, contribution, or reimbursement under the terms of the Amended Engagement Agreement, as modified by this Order;

(c)     If, before the earlier of (i) the entry of an order or orders confirming a chapter 11 plan in the Chapter 11 Cases (that order or orders having become final orders no longer subject to appeal) and (ii) the entry of an order or orders closing the Chapter

13793145

11 Cases, an Indemnified Person believes that it is entitled to the payment of any amounts by the Debtors on account of the Debtors' indemnification, contribution, and/or reimbursement obligations under the Amended Engagement Agreement, including, without limitation, the advancement of defense costs, the Indemnified Person must file an application therefor in this Court, and the Debtors may not pay any such amounts to the Indemnified Person before the entry of an order by this Court approving the payment. This subparagraph (c) is intended only to specify the period of time under which the Court shall have jurisdiction over any request for fees and expenses by any Indemnified Person for indemnification, contribution, or reimbursement, and not a provision limiting the duration of the Debtors' obligation to indemnify, or make contributions or reimbursements to, the Indemnified Person. All parties-in-interest shall retain the right to object to any demand by any Indemnified Person for indemnification, contribution, or reimbursement.

(d)     During the course of the bankruptcy case, any limitation of liability provisions in the Application, the Mendelsohn Declarations or the Amended Engagement Agreement shall have no force or effect.

12.     Except as otherwise expressly set forth in this Order, PWP shall apply for compensation for professional services rendered and reimbursement of expenses incurred in connection with the Debtors' Chapter 11 Cases in accordance with sections 330 and 331 of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules of this Court and U.S. Trustee Guidelines, and such other procedures as may be fixed by order of this Court.  Notwithstanding anything to the contrary in this Order, the Application, the Mendelsohn Declarations, or the Amended Engagement Agreement, no compensation or reimbursement of expenses shall be paid to PWP absent an order of this Court approving a fee application, except that the Debtors are authorized to pay the Monthly Fee to PWP on the first day of each month without a prior fee application; *provided*, *however*, that PWP shall file monthly fee statements with time entries and requests for reimbursement that comply with Local Rule 2016-2 pursuant to the deadlines and other procedures set forth in any order entered by this Court in the Chapter 11 Cases allowing for

7

interim compensation for fee applications (the "Interim Compensation Order"), for monthly fee statements, as well as interim and final fee applications in accordance with the requirements of the Interim Compensation Order. All fees paid to PWP are subject to disgorgement unless and until they are approved by the Court on a final basis, after submission of PWP's final fee application.

13.     Notwithstanding anything to the contrary in this Order, the Application, the Mendelsohn Declarations or the Amended Engagement Agreement, the Debtors shall have no obligation to pay PWP for any fees other than those accrued as of the termination date, if the Debtors terminate the Amended Engagement Agreement due to gross negligence, bad faith, intentional fraud or willful misconduct of PWP.

14.     To the extent the Debtors and PWP enter into any supplemental agreements, engagement letters, or statements of work for additional services, the Debtors will file any such supplemental agreements, engagement letters, or statements of work, and any additional disclosures required by Bankruptcy Rule 2014 not previously disclosed, with the Court and serve the same upon the applicable notice parties.  Absent any objection filed within 14 days after the filing and service of any such supplemental engagement letter or statement of work PWP shall be deemed authorized and approved to provide and be compensated for such additional services pursuant to this Order and the terms of such supplemental engagement letter or statement of work, with the terms of this Order governing to the extent there is any conflict between its terms and the terms of the supplemental engagement letter or statement of work.  To the extent any such parties object to such proposed supplemental engagement letter or statement of work, the Debtors will

13793145

promptly schedule a hearing before the Court within 10 days of receipt of any such objection or as soon thereafter as is practicable.  All additional services shall be subject to the provisions of this Order.

15.    Notwithstanding anything in the Amended Engagement Agreement, PWP shall not trade or otherwise effect transactions for PWP's own account in debt or equity securities (or related derivative securities) or other financial instruments (including bank loans or other obligations) of the Debtors.

16.    Notwithstanding anything to the contrary in the Application, the Amended Engagement Agreement, or the Mendelsohn Declarations, during the course of the Chapter 11 Cases, PWP shall have whatever fiduciary duty is imposed upon it by applicable law.

17.    To the extent this Order is inconsistent with the Application, the Mendelsohn Declarations, or the Amended Engagement Agreement, the terms of this Order shall govern.

18.    PWP shall use its best efforts not to duplicate any of the services provided to the Debtors by any of its other retained professionals.

19.    The Debtors and PWP are authorized and empowered to execute and deliver such documents, and to take and perform all actions necessary to implement and effectuate the relief granted in this Order.

20.    All fees and expenses incurred by PWP and approved by the Court shall be treated as administrative expenses under section 503 of the Bankruptcy Code.

13793145

21.    The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

22.    This Court shall retain exclusive jurisdiction with respect to any matters, claims, rights or disputes arising from or related to the Application, the implementation of this Order, or the Debtors' engagement of PWP during the course of these bankruptcy cases.

Dated: _____
          Wilmington, Delaware                    _____
                                                   The Honorable John T. Dorsey
                                                   United States Bankruptcy Judge

10

## **EXHIBIT 1**

**Amended Engagement Agreement**

**P / W / P**

/ PERELLA WEINBERG
/ PARTNERS

767 Fifth Avenue
New York, NY 10153

T  212.287.3200
F  212.287.3201
pwpartners.com

As of January 31, 2023

PERSONAL AND CONFIDENTIAL

FTX Trading Ltd.
10-11 Mandolin Place
Friar Hill Road
St. John's, AG-04
Attention: John J. Ray, Chief Executive Officer

Dear Mr. Ray:

   This letter agreement ("Agreement") amends and restates the agreement between FTX Trading Ltd. and each of its affiliated debtors-in-possession (collectively, the "Company") in Chapter 11 Case No. 22-11068 (JTD) in the United States Bankruptcy Court for the District of Delaware (the "Chapter 11 Case" and the "Bankruptcy Court," as applicable) and Perella Weinberg Partners LP (together with its corporate advisory affiliates, "Perella Weinberg Partners," "we" or "us"), dated November 19, 2022, and confirms the terms under which the Company has engaged Perella Weinberg Partners as its lead financial advisor.  For purposes hereof, the term "Company" includes the Debtor affiliates and subsidiaries of the Company and any entity that the Company or its affiliates or subsidiaries may form or invest in that are also Debtors in the Chapter 11 Case, and shall also include any successor to or assignee of all or a portion of the assets and/or businesses of the Company.  The matters referred to in this letter constitute our " Engagement."  This Agreement shall be effective as of November 16, 2022 (" Engagement Date").

   1. Services to be Rendered.  The financial advisory services to be provided by Perella Weinberg Partners shall include the following:

   *General Financial Advisory and Investment Banking Services*.  To the extent requested by the Company, we shall:

    (a) Familiarize ourselves with the business, operations, properties, financial condition and prospects of the Company and its assets;

    (b) Review the Company's financial condition and outlook and assist in analyzing the range of options available to the Company;

    (c) Assist in the development of financial data, analysis and presentations to the Company's Board of Directors, various creditors, and other parties;

13793081v1

(d)    Analyze the Company's financial liquidity and evaluate alternatives to improve such liquidity;

(e)    Evaluate the Company's debt capacity, if any, and alternative capital structures;

(f)    Participate in negotiations among the Company and its vendors, creditors, suppliers, lessors and other interested parties with respect to any of the transactions contemplated by this Agreement;

(g)    Advise the Company and negotiate with lenders with respect to potential waivers or amendments of any credit facilities; and

(h)    Participate in hearings before the Bankruptcy Court and provide such testimony and expert reports in respect of the foregoing and on matters mutually agreed upon in good faith by the Company and Perella Weinberg Partners; and

(i)    Provide such other advisory services as are customarily provided in connection with the analysis and negotiation of any of the transactions contemplated by this Agreement, as requested and mutually agreed.

*Restructuring Services*.  To the extent requested by the Company, we shall:

(a)    Analyze various Restructuring (as defined below) scenarios and the potential impact of these scenarios on the value of the Company and the recoveries of those stakeholders impacted by the Restructuring;

(b)    Provide strategic advice with regard to restructuring or refinancing the Company's obligations;

(c)    Provide financial advice and assistance to the Company in developing a Restructuring and / or asset monetization process;

(d)    In connection therewith, provide financial advice and assistance to the Company in structuring any new securities to be issued under a Restructuring; and

(e)    Assist the Company and/or participate in negotiations with entities or groups affected by the Restructuring.

For purposes of this Agreement, the term "Restructuring" means the effectiveness of a plan of reorganization (a "Plan") of the Company under Chapter 11 or any other transaction implemented as an alternative to a plan of reorganization involving any recapitalization, modification or restructuring (including, but not limited to, through any exchange, conversion, cancellation, forgiveness, structured resolution or settlement,

2

retirement, refinancing, purchase or repurchase, and/or material modification or amendment to the terms, conditions or covenants thereof, whether or not effectuated through a Plan) of the Company's equity and/or debt securities and/or other indebtedness, obligations or liabilities (including, but not limited to, partnership interests, lease obligations, trade credit facilities, customer claims and/or entitlements, and contract or tort obligations).  For the avoidance of doubt, this Agreement specifically contemplates, and the parties anticipate, only one Restructuring.

For purposes of this Agreement, the term "Venture Portfolio" shall mean all funded investments made by the Company in equity, debt, fund, token and other instruments. As of the date hereof, it is believed that there are over 342 investments, however the actual number of investments may be higher or lower than this amount.

*Financing Services*.  To the extent requested by the Company, we shall:

(a)    Provide financial advice to the Company in structuring and effecting a Financing (as defined below), identify potential Investors (as defined below) and, at the Company's request, contact and solicit such Investors; and

(b)    Assist in the arranging of a Financing, including identifying potential sources of capital, assisting in the due diligence process, and negotiating the terms of any proposed Financing, as requested.

For purposes of this Agreement, the term "Financing" shall mean a private issuance, sale or placement of the equity, equity-linked or debt securities, instruments or obligations of the Company with one or more lenders and/or investors, or any loan or other financing, or a rights offering (each such lender or investor, an "Investor").

It is understood that nothing contained herein shall constitute an express or implied commitment by us to act in any capacity or to underwrite, place or purchase any financing or securities, which commitment shall only be set forth in a separate underwriting, placement agency or other appropriate agreement relating to the Financing. There may be no Financing, one Financing or multiple Financings as part of the engagement.

*Sale Services*.  To the extent requested by the Company, we shall:

(a)    Provide financial advice to the Company in structuring, evaluating and effecting a Sale (as defined below), including a monetization of individual or multiple assets, identify potential acquirers and, at the Company's request, contact and solicit potential acquirers; and

(b)    Assist in the arranging and executing of a Sale, including identifying potential buyers or parties in interest, assisting in the due diligence process and marketing process, and negotiating the terms of any

13793081v1

proposed Sale.

For purposes of this Agreement, the term "Sale" shall mean the disposition in one or a series of related transactions (i) of all or a significant portion of the equity securities of the Company, any subsidiary of the Company, or any affiliate of the Company, or of the Company's equity interests or investment interest or position in any other company, investment vehicle, partnership, joint venture, business, entity or asset, by the security holders of the Company, any subsidiary of the Company, or any affiliate of the Company or (ii) of all or a significant portion of the assets, businesses, investment interests or positions, partnership interests, joint venture interests or other interests of or held by the Company, any affiliate of the Company or any subsidiary of the Company or affiliates, in any case, including through a sale or exchange of capital stock, options or assets, a lease of assets with or without a purchase option, a merger, consolidation or other business combination, a tender offer, the formation of a joint venture, partnership or similar entity, or any similar transaction (other than a Restructuring) including through a sale pursuant to Section 363 of the Bankruptcy Code (defined below), provided that, for the avoidance of doubt, a transaction shall not constitute a Sale to the extent of the amount of  cash, cash equivalents, cryptocurrency or cryptocurrency derivatives, or digital assets, securities or other investments to the extent that such a transaction is effected on a liquid market and occurs without Perella Weinberg Partners' facilitating such transaction with the counterparties thereto. For the avoidance of doubt, this Agreement specifically contemplates, and the parties anticipate, multiple Sales.

*Generally*.  Notwithstanding anything contained in this Agreement to the contrary, we shall have no responsibility for designing or implementing any initiatives to improve the Company's operations, profitability, cash management or liquidity or to provide any fairness, valuation or solvency opinions or to make any independent evaluation or appraisal of any assets or liabilities of the Company or any other party.  We make no representations or warranties about the Company's ability to (i) successfully improve its operations, (ii) maintain or secure sufficient liquidity to operate its business, or (iii) successfully complete a Restructuring, Financing or Sale. We are retained under this Agreement solely to provide advice and services regarding the transactions contemplated by this Agreement.  Our Engagement does not encompass providing "crisis management."

The advisory services and compensation arrangements set forth in this Agreement do not encompass other investment banking services or transactions that may be undertaken by us at the request of the Company, or any other specific services not set forth in this Agreement.  The terms and conditions of such investment banking services, including compensation and arrangements, would be set forth in a separate written agreement between us and the Company.

This Agreement is not intended to conflict with the engagement letters previously executed by the Company with Alvarez & Marshall, Sullivan & Cromwell LLP, or any other firm, and fees and expenses payable by the Company pursuant to those

4

letters.  Notwithstanding that, however, the Company agrees to pay the Fees and Expenses (each as defined below) to which we are entitled hereunder for any transactions or events, even if fees are payable to such other firms in respect of the same transactions or events.

2.    <u>Compensation</u>.  As compensation for our services, the Company agrees to pay us in cash, by wire transfer of immediately available funds when due, the following fees (individually or collectively, "<u>Fees</u>"):

(a)  a monthly financial advisory fee of $450,000 (the "<u>Monthly</u> <u>Fee</u>"), due and payable on the first day of each month (the "<u>Payment Date</u>") during the Engagement, provided that such Monthly Fee shall be on a prorated basis from the Engagement Date through the end of the month in which this Agreement is dated, provided further that, such Monthly Fee shall be reduced to (i) $375,000 per month upon disposition of fifty percent (50%) of the Venture Portfolio (by count / number of investments) and (ii) $300,000 per month upon disposition of seventy-five (75%) of the Venture Portfolio (by count / number of investments), but, in either case, beginning no earlier than month 25, provided further that fifty percent (50%) of the Monthly Fee for each of the months following the ninth (9th) Monthly Fee to the extent such Monthly Fees have actually been paid or are paid, to Perella Weinberg Partners, whether before or after payment of the Consummation Fee, shall be creditable, without duplication, against the Consummation Fee (for the avoidance of doubt, no such credit shall be applied for the first nine (9) Monthly Fees); plus

(b) a "<u>Sale Fee</u>" based on a percentage of the Transaction Value (as defined below), determined in accordance with the table set forth below, provided that in the event of multiple Sales, each Sale Fee for each respective Sale will be calculated independently of any other Sale Fee, and payable promptly upon consummation of each respective Sale:

| Transaction Value ($MM) | Fee Percentage |
|---|---|
| Less than $10 million | 0.00% |
| Equal to $10 but less than $100 million | 2.50% |
| Equal to $100 but less than $250 million | 2.25% |
| Equal to $250 but less than $500 million | 2.00% |
| Equal to $500 but less than $1,000 million | 1.75% |
| Equal to $1,000 but less than $2,000 million | 1.25% |
| Equal to or greater | 1.00% |

5

than $2,000 million

In no event shall the Sale Fee be less than Perella Weinberg Partners would have received in the immediately lower Transaction Value range. For the avoidance of doubt, this Agreement contemplates, and the parties anticipate, multiple Sale Fees. Notwithstanding anything to the contrary in this clause (b), with respect to any Sale Fees actually received by Perella Weinberg Partners exceeding $10 million in the aggregate, whether before or after payment of the Consummation Fee, twenty-five percent (25%) of any such additional Sale Fees shall be credited, without duplication, against the Consummation Fee, provided further that, for the avoidance of doubt, no portion of the first $10 million of aggregate Sale Fees shall be credited against the Consummation Fee. Additionally, with respect to any Sale Fees actually received by Perella Weinberg Partners exceeding $30 million in the aggregate, whether before or after payment of the Consummation Fee, fifty percent (50%) of any such additional Sale Fees shall be credited, without duplication, against the Consummation Fee, and shall be reduced by amounts already reflected by the crediting of Sales Fees in excess of $10 million. .

For the purpose of calculating a Sale Fee, "Transaction Value" shall include without limitation: (i) all cash (including escrowed amounts, and other withheld amounts) paid or payable to the Company or its owners by the purchaser in the transaction; (ii) the fair market value of all notes, securities and other property issued or delivered or to be issued or delivered to the Company or its securityholders (including holders of the Company's or any of its subsidiaries' common stock, preferred stock, options and warrants) by the purchaser in the Sale; (iii) the fair value of liabilities, including all debt, pension liabilities and guarantees, outstanding as of the closing date of the Sale or directly or indirectly assumed, refinanced, extinguished or consolidated; (iv) the amount of all installment payments to be made to the Company's securityholders; (v) amounts paid or payable to the Company's direct or indirect security holders and management under consulting, non-compete or similar agreements; and (vi) the net present value of any contingent payments (whether or not related to future earnings or operations) mutually determined by the Company and Perella Weinberg Partners in good faith (based on the expected value of such contingent payments as of the date of consummation of the Sale). For the avoidance of doubt, in connection with the sale of an exchange, cash, cash equivalents, negotiable securities, cryptocurrency or cryptocurrency derivative assets and customer property held on such exchange shall be excluded from the calculation of Transaction Value. For purposes of computing Transaction Value hereunder, non-cash consideration shall be valued as follows: (a) publicly traded securities shall be valued at the average of their closing prices (as reported in The Wall Street Journal or other reputable source reasonably designated by us if The Wall Street Journal does not publish such closing prices) for the five trading days prior to the closing of the transaction, (b) options shall be valued using the treasury stock method without giving effect to tax implications, and (c) any other non-cash consideration shall be valued at the fair market value thereof as determined in good faith by us and the Company. For

6

the avoidance of doubt, in the event of a Sale involving multiple assets, the Transaction Value for such assets shall be calculated on an aggregated basis.

(c)     A "Financing Fee" payable promptly upon consummation of any Financing in an amount equal to the sum of (i) 1.00% of all gross proceeds from the issuance of secured debt financing, plus (ii) 2.50% of all gross proceeds from the issuance of unsecured debt financing, plus (iii) 5.00% of all gross proceeds from the issuance of equity or equity-linked financing; plus

(d)     A "Consummation Fee", payable promptly upon consummation of any Restructuring, equal to $25,000,000. For the avoidance of doubt, this Agreement specifically contemplates, and the parties anticipate, only one Consummation Fee.

Our Fees and Expenses are quoted and are payable in United States dollars net of any withholding, value added or other taxes which may be assessed in jurisdictions outside the United States.  In the event you must pay any such tax, please forward to us for our records an official receipt or other document specifically evidencing such payment by you.

3.     Expenses.  In addition to our fees for professional services, the Company agrees that it will periodically, at our request, reimburse us for all of our expenses ("Expenses"), including, but not limited to, professional and legal fees, charges and disbursements of our legal counsel, any sales, use or similar taxes (including additions to such taxes, if any) arising in connection with any matter referred to in this letter, travel and hotel expenses, printing costs, data processing and communication charges, research expenses and courier and postage services, provided that Expenses in connection with the preparation of the Engagement and the approval of the Engagement by the Bankruptcy Court shall not exceed $100,000 without the consent of the Company (not to be unreasonably withheld).  The Company's obligation to reimburse expenses incurred by us in connection with the Engagement will survive the completion or termination of the Engagement.

4.     Indemnification.  The Company acknowledges that we have been retained hereunder solely as an independent contractor and that nothing in this Agreement or the nature of our services shall be deemed to create a fiduciary or agency relationship between us and the Company or its equity holder(s), employees or creditors.  In order to induce us to accept the Engagement, the Company agrees to the indemnity, exculpation provisions and other matters set forth in Annex A, which forms a part of and is incorporated by reference into the Agreement. Prior to entering into any agreement or arrangement with respect to, or effecting, any proposed sale, exchange, dividend or other distribution or liquidation of all or a significant portion of its assets in one or a series of transactions or any significant recapitalization or reclassification of its outstanding securities that does not directly or indirectly provide for the assumption of the obligations of the Company set forth in Annex A (in each case, other than in connection with a Chapter 11 plan of reorganization), the Company will notify us in writing thereof (if not previously so notified) and, if requested by us, shall arrange in connection therewith

1379308 1v 1

alternative means of providing for the obligations of the Company set forth in Annex A, including the assumption of such obligations by another party, insurance, surety bonds or the creation of an escrow, in each case, in an amount and upon terms and conditions reasonably satisfactory to us and the Company.  The terms and provisions of this Section 4 and of Annex A shall survive the completion or termination of the Engagement.

5.      Bankruptcy Court Approval.  The Company shall use its reasonable efforts to seek an order authorizing our employment pursuant to the terms of this Agreement, as a professional person pursuant to, and subject to the standard of review of, Section 328(a) of title 11 of the United States Code (the "Bankruptcy Code"), the applicable Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and applicable local rules and orders and not subject to any other standard of review under Section 330 of the Bankruptcy Code.  In so agreeing to seek our retention under Section 328(a) of the Bankruptcy Code, the Company acknowledges that it believes that our general restructuring experience and expertise, our knowledge of the capital markets and our merger and acquisition capabilities will inure to the benefit of the Company in pursuing any Restructuring, Sale or Financing, that the value to the Company of our services derives in substantial part from that expertise and experience and that, accordingly, the structure and amount of the contingent Fees are reasonable regardless of the number of hours to be expended by our professionals in the performance of the services to be provided hereunder.  The Company shall submit our employment application as soon as practicable following the Company's filing of a voluntary Chapter 11 case, or the entry of an order for relief in any involuntary case filed against the Company, and use its reasonable efforts to cause such application to be considered on the most expedited basis, provided that our initial employment application shall not seek approval of a Consummation Fee.  The employment application and the proposed order authorizing our employment shall be provided to us as much in advance of any Chapter 11 filing as is practicable, and must be acceptable to us in our sole discretion.  Following entry of the order authorizing our employment, the Company shall pay all Fees and Expenses due pursuant to this Agreement, as approved by the court having jurisdiction of the bankruptcy case involving the Company (the "Bankruptcy Court"), as promptly as possible in accordance with the terms of this Agreement and the order of such Bankruptcy Court, the Bankruptcy Code, the Bankruptcy Rules and applicable local rules and orders, and will work with us to promptly file any and all necessary applications regarding such fees and expenses with the Bankruptcy Court.  We shall have no obligation to provide services under this Agreement unless our retention under this Agreement is approved under Section 328(a) of the Bankruptcy Code by final order of the Bankruptcy Court which is acceptable to us and which approves this Agreement in all material respects.  If the order authorizing our employment is not obtained, or is later reversed, modified or set aside for any reason, we may terminate this Agreement, and the Company shall promptly reimburse us for all Fees and Expenses due hereunder, including any Fees due or to become due under the Tail Period (as defined below).  The terms of this Section are solely for our benefit, and may be waived, in whole or in part, only by us. In addition, the Company shall seek Bankruptcy Court approval of a Consummation Fee promptly when agreed following the identification and preliminary qualification of the

8

Company's assets and liabilities.  No Consummation Fee shall be due unless subsequently agreed in writing by both parties to this Agreement and approved by the Bankruptcy Court.

      6.    <u>Expertise</u>.  The Company acknowledges and agrees that Perella Weinberg Partners' restructuring expertise as well as its capital markets knowledge, financing skills and mergers and acquisitions capabilities, some or all of which may be required by the Company during the term of our Engagement hereunder, were important factors in determining the amount of the various fees set forth herein, and that the ultimate benefit to the Company of our services hereunder could not be measured merely by reference to the number of hours to be expended by our professionals in the performance of such services.  The Company also acknowledges and agrees that the various fees set forth herein have been agreed upon by the parties in anticipation that a substantial commitment of professional time and effort will be required of us and our professionals hereunder over the life of the Engagement, and in light of the fact that such commitment may foreclose other opportunities for us and that the actual time and commitment required of us and our professionals to perform their services hereunder may vary substantially from week to week or month to month, creating "peak load" issues for the firm.  In addition, given the numerous issues which we may be required to address in the performance of our services hereunder, our commitment to the variable level of time and effort necessary to address all such issues as they arise, and the market prices for our services for engagements of this nature in an out-of-court context, the Company agrees that all of the fee arrangements specified herein are commercially reasonable.

      7.    <u>Information; Cooperation</u>.  In connection with the Engagement, the Company will provide us with access to the Company's officers, directors, employees, accountants, legal advisors, and other representatives (collectively, "<u>Representatives</u>"), and will furnish us and cause its Representatives to furnish us with such information as we believe appropriate for the Engagement (all such information so furnished being the "<u>Information</u>").  The Company recognizes and confirms that we (i) will use and rely primarily on the Information and on information available from generally recognized public sources in performing its services without having independently verified the same and (ii) do not assume responsibility for the accuracy or completeness of the Information and such other information or have any liability therefore.  The Company will promptly notify us if it learns of any material inaccuracy or misstatement in, or material omission from, any Information theretofore delivered to us.

      The Company agrees to cooperate with us in the performance of our services under this Agreement and shall provide us with timely access to and use of personnel, facilities, equipment, data and information to the extent necessary to permit us to perform services under this Agreement.  In order to coordinate effectively the Company's and our activities to effect a Restructuring, Financing and/or Sale, or other transaction, the Company will promptly inform us of any pending or future discussions, negotiations or inquiries regarding a possible Restructuring, Financing and/or Sale (including any such discussions, negotiations or inquiries that have occurred in the six-

month period prior to the date of this Agreement) of which the Chief Executive Officer is or becomes aware.

8.    <u>Work Product</u>.  All documents, materials or information of any kind created by us in connection with this engagement, including, without limitation, any written reports, memoranda, analyses, work papers or status summaries, whether or not delivered to the Company, are work product (collectively, "<u>Work Product</u>").  All Work Product shall be owned and maintained by us.  You agree not to use any Work Product except in connection with any transaction contemplated by this Agreement or otherwise within the scope of the Engagement, and not for any other purpose.  Our Work Product may not be relied upon by any other person including, but not limited to, any security holder, or employee or creditor of the Company, and may not be used or relied upon for any other purpose.  You may not publicly disclose, summarize, excerpt from or otherwise refer to any Work Product rendered by us, whether formal or informal, without our prior written consent.

9.    <u>Confidentiality</u>.  The Company may not publicly disclose, summarize, excerpt from or otherwise refer to any advice rendered by us, whether formal or informal, without our prior written consent.  In addition, the Company may not refer to our name or the terms of our Engagement without our prior written consent.  The Company's obligations under this section will survive the completion or termination of the Engagement.

We will not be providing the Company with, and the Company will not look to us for, tax, legal, accounting or other similar advice and we agree that nothing in this Agreement is intended to impose any conditions of confidentiality within the meaning of Section 6111 of the Internal Revenue Code of 1986, as amended, or US Treasury Regulation Section 1.6011-4.  The Company may disclose to any and all persons, without limitation of any kind, the United States tax treatment (federal, state and local) and tax structure of any transaction and all materials of any kind relating to such tax treatment and tax structure.

10.    <u>Termination</u>.  Our services hereunder may be terminated by providing 30 days prior written notice by either party hereto with or without cause by you or by us at any time and without liability or continuing obligation to you or to us.  No termination of our Engagement or this Agreement shall modify or affect (i) the Company's obligation to pay our Fees and to pay or reimburse Expenses through the effective date of termination under Sections 2 and 3 of this Agreement, respectively, and (ii) the Company's obligations under Sections 4, 5, 8, 9, 10, 13, 14, 15, 16 and 17, all of which shall survive the termination of our Engagement; <u>provided</u>, <u>however</u>, that in the case of termination by you, we shall be entitled to be paid the full amount of our Restructuring, Financing or Sale Fees if, during the term or within one year of such termination (the "<u>Tail Period</u>"), (x) any Restructuring, Financing and/or Sale is effected, or (y) the Company agrees to a Restructuring, Financing and/or Sale which is subsequently effected, at any time.  Notwithstanding any other provision of this Agreement, the obligations of the Company with respect to the Tail Period shall not bind

10

any purchaser in a transaction approved by the Bankruptcy Court or any successor entity of the Company after the effectiveness of a Chapter 11 plan of reorganization.

11.    <u>Other Perella Weinberg Partners Activities</u>.  Perella Weinberg Partners is a financial services firm engaged directly and through its affiliates in investment banking, financial advisory services, investment management, asset management and other advisory services and sponsors special purpose acquisition vehicles.  The Company understands and acknowledges that in performing the Engagement we will not be under any duty to disclose to the Company, or use for the benefit of the Company, any confidential or non-public information obtained by us or our affiliates in the course of providing services to any other person or engaging in any other transaction (including as principal) or business activities.  In the ordinary course of business activities, Perella Weinberg Partners LP or its affiliates or their respective personnel may at any time hold long or short positions, and may trade or otherwise effect transactions, for its or their own accounts or the accounts of customers, in debt or equity or other securities (or related derivative securities) or financial instruments (including bank loans or other obligations) of the Company or any other party to a transaction or any of their respective affiliates. Subject to applicable confidentiality obligations, Perella Weinberg Partners agrees to disclose in a declaration to the Company certain information concerning Perella Weinberg Partners' material business relationships that it determines, in accordance with its internal policies and procedures (including its internal conflict of interest policies), are applicable to the Engagement, in accordance with its ordinary course connections check process. Notwithstanding anything contained herein, during the term of this agreement, Perella Weinberg Partners shall not become engaged to act as financial advisor to any party (other than the Company) in connection with a Sale, Financing or Restructuring.

12.    <u>Governing Law</u>.  All aspects of the relationship created by this Agreement (including Annex A) shall be governed by and construed in accordance with the laws of the State of New York, applicable to agreements made and to be performed entirely in such State.  All actions and proceedings arising out of or relating to this Agreement shall be heard and determined exclusively in any New York state or federal court sitting in the Borough of Manhattan of the City of New York, to whose jurisdiction the Company hereby irrevocably submits; provided however, that for so long as the Company's chapter 11 cases are pending, any actions or proceedings shall be commenced and adjudicated by the Bankruptcy Court.  The Company hereby irrevocably waives any defense or objection to the New York forum designated above.  The Company will appoint and provide us with the name and address of an agent for the service of process in New York, and if the Company fails to do so, the Company hereby consents to allow us to appoint, in our sole discretion, an agent for the service of process on the Company in New York.  The Company further agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit or in another manner provided by law, and consents to the service of process upon it by the mailing or delivering such service to its agent and authorizes and directs its agent to accept such service.  Perella Weinberg Partners and the Company (on its own behalf and,

1379308 1v 1

to the extent permitted by law, on behalf of its equity holders) waives all right to trial by jury in any action, suit, proceeding or counterclaim (whether based upon contract, tort or otherwise) related to or arising out of the Engagement or the performance by us of the services contemplated by this Agreement.

13.     <u>Assignment; Severability</u>.  No party hereto may assign, transfer or delegate any of its rights or obligations without the prior written consent of the other parties, such consent not to be unreasonably withheld.  In the event that any term or provision of this Agreement shall be held to be invalid, void or unenforceable by a court of competent jurisdiction (not subject to further appeal), then the remainder of this Agreement shall not be affected, and each such term and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

14.     <u>Public Announcements</u>.  The Company acknowledges that we may, at our option and expense and after public announcement of a Restructuring, Financing and/or Sale, place announcements and advertisements or otherwise publicize such Restructuring, Financing and/or Sale and our role in it (which may include the reproduction of the Company's logo and a hyperlink to the Company's website) on our internet website, social media, and in such financial and other newspapers and journals as we may choose, stating that we acted as financial advisor to the Company in connection with the Restructuring, Financing and/or Sale.

15.     <u>Regulation Relating to Client Identification</u>.  Federal law and regulations require financial institutions to obtain, verify and record information that identifies each person with whom they do business prior to doing such business and to provide reasonable notice to such persons that the financial institution is verifying such person's identity.  Accordingly, the Company will provide us, as necessary and upon request, certain identifying information, including, but not limited to, a government-issued identification number (e.g., a U.S. taxpayer identification number) and certain other information or documents necessary to verify the Company's identity, such as certified corporate documentation, partnership agreement or trust instrument.

16.     <u>Co-Advisors</u>.  It is understood that no Indemnified Person, as defined herein in Annex A, shall have any responsibility or liability to the Company or its affiliates or any other party in connection with the advice, opinions or actions of any other advisors engaged by the Company, and further, no Indemnified Person or any such other advisor shall have any responsibility or liability to each other in connection with the advice or opinions rendered by such party in connection with the Engagement.

17.     <u>Limitation on Actions</u>.  No action, regardless of form, arising out of or relating to the Engagement, may be brought by you more than one year after the cause of action has accrued.

18.     <u>Entire Agreement; Amendments</u>.  This Agreement, including Annex A, constitutes the entire agreement between us and the Company with respect to the Engagement and supersedes all other oral and written representations, understandings

12

or agreements relating to this Engagement.   No alteration, waiver, amendment, change or supplement hereto shall be binding or effective unless the same is set forth in writing signed by a duly authorized representative of each party.

You acknowledge the Company's agreement with the terms stated herein, and acknowledge that you have reviewed and agreed to be bound by the terms of this Agreement, and that you have all requisite power and authority to enter into this Agreement on behalf of the Company, and have been duly and validly authorized to do so, as evidenced by your signature below.  Facsimile and electronic signatures shall be deemed original, binding signatures.

*[Signature page follows.]*

13
13793081v 1

We are delighted to accept the Engagement and look forward to working with you on this assignment.  Please confirm your agreement to the foregoing by signing and returning to us the enclosed duplicate of this letter.

Very truly yours,

PERELLA WEINBERG PARTNERS LP

By:_____
Name:      Bruce Mendelsohn
Title:       Partner

Agreed and accepted as of
the date set forth above:

FTX TRADING LTD.

By:_____
Name:      John J. Ray III
Title:       Chief Executive Officer

14
1379308 1v 1

We are delighted to accept the Engagement and look forward to working with you on this assignment.  Please confirm your agreement to the foregoing by signing and returning to us the enclosed duplicate of this letter.

Very truly yours,

PERELLA WEINBERG PARTNERS LP

By:_____
    Name:    Bruce Mendelsohn
    Title:     Partner

Agreed and accepted as of
the date set forth above:

FTX TRADING LTD.

By:_____
   Name:    John J. Ray III
   Title:    Chief Executive Officer

## Annex A

The Company agrees to indemnify and hold harmless Perella Weinberg Partners and its affiliates and its and their respective officers, directors, partners, members, employees, consultants and agents and each other person, if any, controlling Perella Weinberg Partners or any of its affiliates (Perella Weinberg Partners and each such other person being an " *Indemnified Person* ") from and against any losses, claims, damages or liabilities related to, or arising out of or in connection with our engagement or any matter referred to in this letter (the "*Engagement* "), and will reimburse each Indemnified Person for all reasonable and documented out-of-pocket expenses (including fees, charges and disbursements of counsel) as they are incurred in connection with investigating, preparing, pursuing or defending any action, claim, suit, investigation or proceeding related to, arising out of or in connection with the Engagement, whether or not pending or threatened and whether or not any Indemnified Person is a party; provided, however, that the Company will not be responsible for any losses, claims, damages or liabilities (or expenses relating thereto) that are finally judicially determined to have resulted primarily from the gross negligence, bad faith, intentional fraud or willful misconduct of any Indemnified Person. The Company also agrees that no Indemnified Person shall have any liability (whether direct or indirect, in contract or tort or otherwise) to the Company for or in connection with the Engagement, except for any such liability for losses, claims, damages or liabilities incurred by the Company that are finally judicially determined to have resulted primarily from the gross negligence, bad faith, intentional fraud or willful misconduct of such Indemnified Person. Notwithstanding the foregoing, the indemnity obligations herein shall not extend to Actions (as defined below) initiated or brought by or on behalf of any Indemnified Person against the Company or any other Indemnified Person that, in each case, is not initiated or brought in connection with or in any way related to an Action brought by a third party or by the Company or the Client (or any person acting on their behalf) against a third party, in each case in which such Indemnified Person becomes involved in a capacity otherwise covered by this Annex A.

Promptly after receipt by an Indemnified Person of notice of the commencement of any claim, action, suit, investigation or proceeding for which it is entitled to indemnification hereunder (an "*Action*"), such Indemnified Person shall notify the Company of such Action, provided, however, that no delay on the part of any Indemnified Person in providing such notice shall relieve the Company of its obligations hereunder, except to the extent the Company is materially prejudiced thereby. If any Indemnified Person is entitled to indemnification hereunder with respect to any Action that is also brought against the Company or its affiliates, upon written notice by the Company acknowledging its indemnification obligations hereunder, the Company shall be entitled to assume the defense of any such matter and appoint legal counsel reasonably satisfactory to such Indemnified Person; provided, however, that the Company shall not be entitled to assume the defense of any Action that (i) relates to, or arises out of, any criminal proceeding or (ii) involves an Action seeking injunctive or equitable relief against any Indemnified Person or their affiliates. Upon assumption by the Company of the defense of any such Action in accordance with the foregoing, the Indemnified Person shall have the right to participate in such Action and to retain its own counsel but the Company shall not be liable for any legal expenses of such counsel unless the Indemnified Person shall have been advised by counsel that there are (x) actual or potential conflicting interests between the Company and its affiliates, on the one hand, and the Indemnified Person, on the other hand or (y) additional legal defenses available to the Indemnified Person, in which case the Company shall only be liable for legal expenses for one counsel acting collectively for all such Indemnified Persons, unless additional legal counsels are required in connection with local law or applicable jurisdictional requirements, in which case the Company will also be liable for the legal expenses of such additional legal counsel.

The Company, or any of its affiliates, will not, without Perella Weinberg Partners' prior written consent, settle, compromise, consent to the entry of any judgment in or otherwise seek to terminate any action, claim, suit, investigation or proceeding in respect of which indemnification, reimbursement or contribution may be sought hereunder (whether or not any Indemnified Person is a party thereto), nor will the Company or any of its affiliates participate in or facilitate any such settlement, compromise, consent or termination on behalf of the Company's board of directors (or similar governing body) unless such settlement, compromise, consent or termination includes a full release of each Indemnified Person from any and all liabilities arising out of such action, claim, suit, investigation or proceeding. No Indemnified Person seeking indemnification,

*reimbursement or contribution under this Annex A will, without the Company's prior written consent, settle, compromise, consent to the entry of any judgment in or otherwise seek to terminate any action, claim, suit, investigation or proceeding referred to in the preceding paragraph.*

*If the indemnification provided for in the first paragraph of this Annex A is, for any reason not available to an Indemnified Person or is insufficient to hold an Indemnified Person harmless in respect of any losses, claims, damages or liabilities referred to herein, then, in lieu of indemnifying such Indemnified Person hereunder, the Company shall contribute to the amount paid or payable by such Indemnified Person as a result of such losses, claims, damages or liabilities (and expenses relating thereto) (a) in such proportion as is appropriate to reflect the relative benefits to Perella Weinberg Partners, on the one hand, and the Company, on the other hand, of the Engagement or (b) if the allocation provided by clause (a) above is not available, in such proportion as is appropriate to reflect not only the relative benefits referred to in such clause (a) but also the relative fault of each of Perella Weinberg Partners and the Company, as well as any other relevant equitable considerations; provided, however, to the extent permitted by applicable law, in no event shall Perella Weinberg Partners' aggregate contribution to the amount paid or payable exceed the aggregate amount of fees actually received by Perella Weinberg Partners under this letter.  For the purposes of this Annex A, the relative benefits to Perella Weinberg Partners and the Company of the Engagement shall be deemed to be in the same proportion as (i) the fees paid or to be paid to Perella Weinberg Partners under this letter, bears to (ii) the total value paid or contemplated to be paid to or received or contemplated to be received by the Company or its stockholders, as the case may be, in the transaction or transactions that are the subject of the Engagement, whether or not any such transaction is consummated. The indemnity, contribution, and other obligations and agreements of the Company set forth in this Annex A and the engagement letter to which it is attached shall apply to any services provided by Perella Weinberg Partners in connection with this Engagement prior to the date hereof.*

16