# Exhibit B

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------- x
                            :

In re:                          :        Chapter 11
                            :

ENRON CORP., *et al.*,        :        Case No. 01-16034 (AJG)
                            :

              Debtors.     :        Jointly Administered
                            :
------------------------------------------------------- x

# FIRST INTERIM REPORT OF NEAL BATSON,
# COURT-APPOINTED EXAMINER

**September 21, 2002**

TABLE OF CONTENTS

I.     INTRODUCTION ...................................................................................... 1
       A.    Enron Prior to Events of Fall of 2001 ......................................... 1
       B.    Fall 2001 Events ........................................................................... 2
       C.    The Bankruptcy Filings and Subsequent Events ......................... 9
       D.    Appointment of Examiner ............................................................ 9

II.    EXECUTIVE SUMMARY ....................................................................... 13
       A.    The Selected Transactions .......................................................... 13
       B.    Ongoing Investigation ................................................................ 19

III.   INTERIM REPORT ON SELECTED SPE TRANSACTIONS ......................... 22
       A.    Introduction ................................................................................. 22
       B.    Story of the NewPower Warrants ............................................... 24
       C.    Selected Transactions .................................................................. 36
       D.    Legal and Accounting Principles ................................................ 37
       E.    Typical Enron FAS 140 Transactions ........................................ 58
       F.    The Cerberus Transaction ........................................................... 67
       G.    The Nikita Transaction ............................................................... 91
       H.    The Hawaii Transaction ............................................................ 101
       I.     The Backbone Transaction ........................................................ 117
       J.     The SO$_2$ Transaction ............................................................... 135
       K.    The Destec Transaction ............................................................. 147
       L.    Interim Nature of Report ........................................................... 157

IV.    FUTURE REPORTS .............................................................................. 158

## I.    INTRODUCTION

### A.    <u>Enron Prior to Events of Fall of 2001</u>

Until the fall of 2001, Enron Corp. ("Enron") was one of the largest companies in

the world.[1] It was also considered to be one of the most innovative and successful.[2] It

grew from a traditional energy production and transmission company in the mid-1980s to

a global enterprise that was an industry leader in the purchase, transportation, marketing

and sale of natural gas and electricity, as well as other energy sources and related

financial instruments, and in the development, construction and operation of pipelines

and various types of power facilities.[3] Enron reported revenues for the fiscal year ended

December 31, 2000 in excess of $100 billion.[4] In the fall of 2001, however, Enron made

a series of financial disclosures and restatements of its financial statements pertaining in

large part to certain related-party transactions that ultimately led to its bankruptcy filing.[5]

---

[1] According to the 2001 Fortune 500 Rankings, Fortune magazine ranked Enron as the seventh largest corporation in the world, based upon revenues. *The 500 Largest U.S. Corporations,* Fortune, Apr. 16, 2001, at F-1.

[2] For example, Fortune magazine named Enron as the "*Most Innovative Company in America*" for five consecutive years. *See America's Most Admired Companies,* Fortune, Feb. 19, 2001, at 104; *America's Most Admired Companies,* Fortune, Feb. 21, 2000, at 110; *America's Most Admired Companies,* Fortune, Mar. 1, 1999, at 70; *America's Most Admired Companies,* Fortune, Mar. 2, 1998, at 86; *America's Most Admired Companies,* Fortune, Mar. 3, 1997, at 73.

[3] Enron was also engaged in other types of businesses, including, among other things, broadband management and communications and operation of water, renewable energy and clean fuel plants.

[4] Enron Form 10-K filed with the SEC for the Year ended Dec. 31, 2000 (the "10-K for 2000").

[5] On December 2, 2001 (the "Petition Date") and on certain dates thereafter, Enron and certain of its affiliates (collectively, the "Debtors") filed voluntary petitions for relief under Chapter 11, Title 11, of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the Southern District of New York (the "Court") (collectively, the "Bankruptcy Case"). The Debtors have continued to operate their businesses and manage their affairs as debtors in possession pursuant to 11 U.S.C. §§ 1107 and 1108.

## B.    Fall 2001 Events

*Enron's October 16, 2001 Earnings Release*

On October 16, 2001, Enron announced "recurring earnings per diluted share of $0.43 for the third quarter of 2001, compared to $0.34" for the third quarter of 2000.[6] In the next paragraph of the Earnings Release, Kenneth Lay, Enron's Chairman and CEO, stated that "[o]ur 26 percent increase in recurring earnings per diluted share shows the very strong results of our core wholesale and retail energy businesses and our natural gas pipelines" and that Enron is "very confident in our strong earnings outlook."

Yet in the paragraph following Mr. Lay's expressions of strength and confidence, Enron advised the public of "after-tax non-recurring charges" of $1.01 billion in the quarter. These "non-recurring charges" resulted in a net loss for the third quarter of $618 million (versus a reported net income of $404 million for the preceding quarter) and reported net income of $292 million. Enron identified the components of this charge as:

- $287 million from the write down of its investment in the Azurix Corp. water systems business;

- $180 million from "restructuring" its Broadband Services business; and

- $544 million "related to losses associated with certain investments, principally Enron's interest in The New Power Company,[7] broadband

---

[6] Enron Press Release, "Enron Reports Recurring Third Quarter Earnings of $0.43 Per Diluted Share; Reports Non-Recurring Charges of $1.01 Billion After-Tax; Reaffirms Recurring Earnings Estimates of $1.80 for 2001 and $2.15 for 2002; And Expands Financial Reporting," Oct. 16, 2001 (the "Earnings Release") [ELIB00002783]. Enron's third quarter ended September 30th. Certain footnotes in this Report will include brackets containing a letter prefix and a series of numbers and/or letters. For example, in the preceding sentence, there are brackets listing: [ELIB00002783]. These legends are known as Bates Stamp cites and are used to ensure internal tracking of the documents.

[7] The New Power Company ("New Power Company") owned what was formerly the residential retail portion of Enron's Energy Services business. New Power Company was a wholly owned subsidiary of NewPower Holdings, Inc., formerly known as TNPC, Inc. ("NewPower Holdings"). As discussed below, NewPower Holdings consummated an initial public offering on October 5, 2000 at $21 per share (the "NewPower IPO"). NewPower Holdings and New Power Company filed for protection under Chapter 11

and technology investments, and early termination during the third quarter of certain structured finance arrangements with a previously disclosed entity."

The "previously disclosed entity" was LJM2 Co-Investment, L.P. ("LJM2"), a private investment limited partnership funded in December 1999. LJM2 was run by Andrew S. Fastow, Enron's CFO, and Michael J. Kopper,[8] an Enron employee, and had as its limited partners a significant number of institutional and individual investors.[9] LJM2 and Enron created four special purpose entities in structures known as Raptor I, II, III and IV (the "Raptor SPEs").[10] Enron entered into hedging transactions with the Raptor SPEs under which the Raptor SPEs agreed to pay to Enron the amount of the decline in the value of various Enron investments and other assets. As a result of these hedging transactions with the Raptor SPEs, Enron was able to offset or "hedge" for financial statement purposes a $954 million decline in the value of a number of Enron's investments during 2000 and the first three quarters of 2001.[11] The Raptor SPEs' principal asset was common stock of Enron, or in the case of Raptor SPE III, warrants to purchase stock in NewPower Holdings. Thus, the Raptor SPEs' ability to satisfy their

---

of the Bankruptcy Code on June 11, 2002 in the United States Bankruptcy Court for the Northern District of Georgia, Newnan Division, Case No. 02-10835.

[8] On August 21, 2002, Mr. Kopper pled guilty in a criminal information filed in the United States District Court for the Southern District of Texas alleging one count of conspiracy to commit wire fraud in violation of 18 U.S.C. § 371 and one count of conspiracy to engage in monetary transactions in property derived from specified unlawful activity (money laundering), in violation of 18 U.S.C. §§ 1956(h) and 1957. As part of his cooperation agreement (and to settle a related civil action filed by the United States Securities & Exchange Commission ("SEC")), Mr. Kopper agreed to surrender $12 million in assets and to cooperate fully with the Department of Justice.

[9] Enron Form 10-Q filed with the SEC for the Quarter ended Sept. 30, 2001 (the "10-Q for 3Q/2001"), at 18-19, Note 4 to Consolidated Financial Statements in connection with related party transactions.

[10] Report of Investigation by the Special Investigative Committee of the Board of Directors of Enron Corp. released February 1, 2002 (the "Powers Report"), at 125-33. LJM2 and another partnership, LJM Cayman, L.P. ("LJM1"), as well as other investment partnerships, were the principal focus of the Powers Report.

[11] See 10-Q for 3Q/2001, supra note 9, at 24, Note 4 to Consolidated Financial Statements in connection with related party transactions.

hedging obligations to Enron was dependent upon the value of the Enron stock or warrants to purchase NewPower Holdings common stock they held. By the end of the third quarter of 2001, the hedging obligations of the Raptor SPEs exceeded the value of the assets available to satisfy those obligations. Enron terminated the structures by purchasing LJM2's interest in the Raptor SPEs for $35 million. As a result of this termination, Enron recognized the $544 million after-tax charge to net income for the third quarter 2001.[12] Enron also disclosed, on October 16, 2001, that it would record a $1.2 billion reduction in shareholder equity as of the end of the third quarter.[13]

*Other Events in October*

On October 24, 2001, Enron announced that Mr. Fastow had been placed on leave of absence.[14]

On or about October 25, 2001, and continuing through the Petition Date, a number of the senior managers of various Enron operating companies requested, and received, accelerated distributions of certain deferred compensation payments. Those distributions totaled in excess of $50 million.[15]

On October 31, 2001, Enron announced that its Board of Directors had formed a Special Investigative Committee (the "Powers Committee"), headed by William Powers, Jr., Dean of the University of Texas Law School, to examine and recommend actions

---

[12] The pre-tax charge was $710 million. *Id.*

[13] October 16, 2001, 9:00 a.m. C.T., Enron Corp. Conference Call regarding Third Quarter 2001 Earnings Release, Moderator: Mark Koenig [INT1450741-INT1450767].

[14] Enron Press Release, "Enron Names Jeff McMahon Chief Financial Officer," Oct. 24, 2001 [ELIB00001788].

[15] Enron's Statement of Financial Affairs Exhibit 3b.2 and certain supporting schedules provided to the Examiner's professionals by Enron's financial professionals (Docket No. 4500, as amended, Docket No. 5823).

with respect to transactions between Enron and entities connected with related parties (the "Related-Party Transactions").[16]

*Enron's November 8, 2001 Restatement and Third Quarter 2001 Form 10-Q*

On November 8, 2001, Enron announced its intention to restate its financial statements for 1997 through 2000 and the first and second quarters of 2001 to reduce previously reported net income by an aggregate of $586 million.[17]  Enron attributed the restatement to transactions involving three entities: Chewco Investments, L.P. ("Chewco"), a limited partnership run by Mr. Kopper; Joint Energy Development Investment Limited Partnership, an investment partnership between Chewco and Enron ("JEDI"); and LJM1, an investment partnership that had two institutional investors as limited partners and whose general partner was a limited partnership wholly owned by Mr. Fastow.  In a federal securities filing on that date, Enron disclosed certain details about the various transactions involving LJM1, LJM2 and JEDI that had resulted in the largest portion of the third quarter "non-recurring charges" and the restatement.[18]  Finally, Enron revealed its belief that four of its employees had invested in a subsidiary partnership of LJM1 in 2000.

Enron filed its third quarter Form 10-Q, including interim financial statements on November 19, 2001.[19]  These financial statements gave effect to the previously announced "non-recurring charges" and restatement of prior financial statements.  In the filing, Enron explained that although its accounting firm, Arthur Andersen LLP

---

[16] Enron Form 8-K filed with the SEC on Nov. 8, 2001 (the "Nov. 8th 8-K").  Additional information surrounding the Related-Party Transactions can be found in the Nov. 8th 8-K.

[17] The third quarter financial statements had not been filed, but a loss of $618 million had been announced in the Earnings Release.

[18] Nov. 8th 8-K, *supra* note 16.

("Andersen"), had been unable to finalize its review of the third quarter financial statements in accordance with applicable professional standards and SEC rules, Enron management believed the third quarter statements were compiled in accordance with generally accepted accounting principles ("GAAP") and fairly depicted the financial condition and results of operations of Enron, including adjustments designed to reflect the anticipated restatements. The third quarter 10-Q also contained management's conclusion that the Earnings Release and the subsequent decrease in Enron's stock price and credit ratings had resulted in a loss of investor confidence and had significantly affected the company's ability to raise capital. On its third quarter 2001 balance sheet, Enron reported total debt of $12.978 billion.[20]

*Enron's November 19, 2001 Bank Presentation*

On November 19, 2001, the same day Enron filed its third quarter financial statements, senior Enron executives met with certain of Enron's bankers at the Waldorf Astoria in New York City. Enron's objectives for the meeting were to restore creditor confidence, relieve its liquidity crisis and discuss its proposed merger with Dynegy, Inc. ("Dynegy").[21] During this meeting, Enron informed its bankers that while the debt reflected on its third quarter 2001 balance sheet under GAAP was $12.978 billion,

---

[19] 10-Q for 3Q/2001, *supra* note 9.

[20] *Id.* The debt consisted of $6.434 billion of short-term debt and $6.544 billion of long-term debt.

[21] The proposed merger was ultimately abandoned by Dynegy, allegedly because of undisclosed liabilities of Enron. Enron sued Dynegy in this Bankruptcy Case (Adversary Proceeding No. 01-03626) (Docket No. 1) on the Petition Date, seeking more than $10 billion in damages arising from Dynegy's alleged breach of contract for wrongful termination of the merger. On August 15, 2002, the parties announced they had settled the litigation. By motion dated August 19, 2002, Enron and its wholly owned subsidiary CGNN Holding Company, Inc. ("CGNN"), among others, sought approval of the settlement with Dynegy (Docket No. 5902). The settlement involved releases as between the Enron Parties (as defined in the settlement agreement) and the Dynegy parties and the payment of $25 million to Enron (pursuant to an escrow agreement). The settlement also provided for the release of $63 million, including accrued interest, from an escrow account to CGNN. The Court approved the settlement by Order dated and entered August 29, 2002. An appeal has been taken from the Order approving the settlement.

Enron's "debt" (as set forth in the presentation) was \$38.094 billion.[22]  Thus, as Enron

noted, \$25.116 billion of debt was "off balance sheet," or in some cases, on the balance

sheet as a liability, but classified as something other than debt.  Approximately \$13

billion of this \$25.116 billion of additional "debt" was incurred through structured

finance transactions involving the use of SPEs.  The Bank Presentation[23] divided the

additional "debt" into the following eight categories: FAS 140 Transactions;[24] Minority

Interest Financings;[25] Commodity Transactions with Financial Institutions;[26] Share

---

[22] Enron Corp. PowerPoint Bank Presentation, Waldorf Astoria, New York, N.Y., Nov. 19, 2001 (the "Bank Presentation"), at 42 [EC16320B0162606–EC16320B0162677].

[23] The Bank Presentation is discussed in this Report because the Examiner believes it is useful in order to place the Examiner's investigation of the various SPEs in the overall context of Enron's financial affairs. The Examiner has formed no opinion concerning the appropriateness of prior management's classification or categorization of Enron's indebtedness in the Bank Presentation. Accordingly, references to "debt" should not infer that such obligations are or are not properly classified as debt under GAAP.

[24] These transactions were structured finance transactions that were intended to comply with Financial Accounting Standard 125, "Accounting for Transactions and Servicing of Financial Assets and Extinguishment of Liabilities," which is the accounting standard that governed securitization of financial assets. FAS 125 was replaced by FAS 140 effective April 1, 2001 and effective for certain disclosures for periods ending after December 15, 2000. This Report will discuss several FAS 125 and FAS 140 transactions, all referred to hereafter as FAS 140 Transactions.

[25] It appears that in these transactions Enron or an affiliate would form a majority-owned subsidiary entity that was consolidated for financial accounting purposes with Enron. The remaining minority interest in the consolidated subsidiary was owned by another entity that was not consolidated for financial accounting purposes with Enron, but that contributed cash to the consolidated subsidiary in exchange for its minority interest in the subsidiary and held no assets other than that minority interest. Of the cash contributed to the consolidated subsidiary, 3% represented funding that was characterized as equity and the remaining 97% was borrowed from third party lenders. The shares of the subsidiary sold to the minority interest shareholder would contain a provision requiring distributions to the shareholder. The consolidated Enron subsidiary in turn loaned the funds received from the minority interest shareholder to other Enron-controlled entities that were consolidated for financial statement purposes with Enron. Because these intercompany loans represented indebtedness of one consolidated entity to another, they were not shown as loans on Enron's consolidated financial statements, but rather reflected in "minority interests" in Enron's balance sheet. The Examiner has not concluded his investigation of these transactions.

[26] These so-called "prepay" transactions involved what the Counsel and Chief Investigator of the Permanent Subcommittee on Investigations of the Senate Governmental Affairs Committee has characterized as loans from J.P. Morgan Chase Bank ("JPMorgan") and Citibank, N.A. ("Citibank") to Enron, but the transactions were structured as prepaid forward contracts for the future delivery of natural gas, crude oil or electric power. *See The Role of Financial Institutions In Enron's Collapse, Hearing before the Permanent Subcomm. on Investigations, Senate Comm. on Governmental Affairs*, 107th Cong. (July 23, 2002) (statement of Robert Roach, Chief Investigator) (the "Financial Institutions Hearing") (available at http://www.senate.gov/~gov_affairs/072302roachindex.htm).  The Examiner has not concluded his investigation of these transactions. One such prepay, known as the "Mahonia" transaction, is the subject of litigation. *JPMorgan Chase v. Liberty Mut. Ins. Co.*, No. 01-CV-11523 (S.D.N.Y. Filed Dec.

Trusts;[27] Equity Forward Contracts;[28] Structured Assets;[29] Unconsolidated Affiliates;[30]

and Leases, as shown in the following table:

| Category of Additional "Debt" | Amount at 9/30/01 in billions |
|---|---|
| FAS 140 Transactions | $2.087 |
| Minority Interest Financings | $1.690 |
| Commodity Transactions with Financial Institutions | $4.822 |
| Share Trusts | $3.352 |
| Equity Forward Contracts | $.304 |
| Structured Asset | $1.532 |
| Subtotal | $13.787 |
| Unconsolidated Affiliates | $10.733 |
| Leases | $.596 |
| **Total** | **$25.116** |

18, 2001). JP Morgan Chase ("JPMC"), on behalf of Mahonia Limited and Mahonia Natural Gas Limited, sued eleven insurance companies that issued almost $2 billion in surety bonds guaranteeing certain obligations of Enron Natural Gas Marketing Corp. and Enron North America Corp. ("ENA") under forward sales contracts with the Mahonia entities. In December of 2001, shortly before the litigation was filed and around the time Enron filed bankruptcy, JPMC demanded approximately $1.2 billion from the insurers, who declined to make payment. The insurers denied, among other things, that they would ever have issued the bonds had they known the "Mahonia" transactions were simply disguised loans to Enron.

[27] These transactions involved the issuance of preferred stock by Enron to a trust. Enron entered into agreements that provided for the sale of the preferred stock (or the common stock into which it was convertible) to satisfy indebtedness incurred by entities that were not consolidated with Enron. The agreements also provided that if the proceeds of the sale of the initial stock were not sufficient to satisfy that indebtedness, subject to certain limitations, Enron would issue additional stock to be sold for that purpose. The agreements also provided for cash settlement of Enron's obligations in certain circumstances. *See* 10-Q for 3Q/2001, *supra* note 9, at Notes 2 and 8 for a description of these obligations. The Examiner has not concluded his investigation of these transactions.

[28] Under a typical equity forward contract, an issuer will sell equity securities to a counterparty for cash equal to the current price and agree to repurchase the same number of equity securities from the counterparty in the future for the original price plus a premium. Enron internal documents indicate that on September 30, 2000, Enron had obligations to Credit Suisse First Boston ("CSFB") and Lehman Brothers Inc. for "Enron Equity Forward Purchase Settlements" aggregating $304 million maturing from December 31, 2001 through March 12, 2002 [EC03520A0190481-EC03520A0190491]. The Examiner has not concluded his investigation of these transactions.

[29] The Destec Transaction is an example of what Enron classified as a "structured asset" transaction in the Bank Presentation. *See infra* Section III.K.

[30] This represents the amount of debt owed by entities that Enron does not consolidate, but accounts for under the equity method of accounting, such as Azurix Corp. (water system), Dabhol Power Company (power plant in India) and certain investment partnerships. According to Enron internal documents reviewed by the Examiner's counsel, much of this debt was nonrecourse to Enron, but if the unconsolidated equity affiliate was unable to pay the debt, Enron's investment would be lost.

## C.    The Bankruptcy Filings and Subsequent Events

Less than one month after its meeting with its bankers, Enron and certain of its affiliates filed for bankruptcy.

The public disclosure of the Related-Party Transactions may have been the event that precipitated the crisis in confidence that led to the bankruptcy filings. However, information that became publicly available shortly before the bankruptcy filings and thereafter suggests that the Related-Party Transactions may have been the tip of the iceberg. In the months immediately following Enron's disclosures, allegations surfaced of securities fraud, accounting irregularities, energy market price manipulation, money laundering, breach of fiduciary duties, misleading financial information, ERISA violations, insider trading, excessive compensation and wrongdoing by certain of Enron's bankers.[31] There are many unanswered questions being investigated by Congress, various governmental agencies (including, without limitation, the SEC, the Federal Energy Regulatory Commission and the Department of Justice) and others relating to the activities of the Debtors, its management, directors, lenders, bankers, consultants and professionals in connection with Enron's precipitous collapse.

## D.    Appointment of Examiner

After the bankruptcy filings, several motions were filed in the Bankruptcy Case requesting the appointment of a trustee or an examiner. A number of creditors and

---

[31] Numerous Congressional Committees are investigating aspects of Enron's business activities or practices. In addition, there have been several class action lawsuits filed on behalf of shareholders and employees which are still pending naming the Debtors, certain of their directors, Andersen, certain other professionals, and others as defendants. These include: *Newby v. Enron Corp.*, No. 01-CV-3624 (S.D. Tex. Filed Oct. 22, 2001), a lawsuit alleging, among other things, violations of securities laws (the "Newby Class Action); *Severed Enron Employees Coalition v. N. Trust Co.*, No. 02-CV-267 (S.D. Tex. Filed Jan. 24, 2002), a lawsuit alleging, among other things, breach of fiduciary duty under ERISA; and *Tittle v. Enron Corp.*, No. 01-CV-3193 (S.D. Tex. Filed Nov. 13, 2001), a lawsuit alleging, among other things, breach of fiduciary duty under ERISA.

parties in interest filed motions seeking, among other things, the appointment of a

Chapter 11 Trustee, the appointment of an examiner and the sequestration of documents

pending further investigations.

The Court entered an Order on April 8, 2002 (the "April 8th Order") authorizing

and directing the appointment of an examiner pursuant to 11 U.S.C. § 1104(c) to:

> inquire into, *inter alia,* all transactions (as well as all entities as
> defined in the Bankruptcy Code and prepetition professionals
> involved therein): (i) involving special purpose vehicles or entities
> created or structured by the Debtors or at the behest of the Debtors
> (the "SPEs"), that are (ii) not reflected on the Enron Corp. balance
> sheets, or that (iii) involve hedging using the Enron Corp. stock, or
> (iv) as to which the Enron Examiner has the reasonable belief are
> reflected, reported or omitted in the relevant entity's financial
> statements not in accordance with generally accepted accounting
> principles, or that (v) involve potential avoidance actions against
> any prepetition insider or professional of the Debtors.

The April 8th Order further provides that the Examiner shall:

> if appropriate, include in a report (taking into account the absolute
> priority rule, the financial condition of the Debtors' estates and the
> need not to waste value available to creditors) whether or not there
> is a legal mechanism for holders (except entities affiliated with
> Debtors) of any equity interest in the Debtors to share in the
> Debtors' estate.

The April 8th Order also provides that, to the extent possible, the Examiner shall

avoid duplication of efforts of the Debtors and any official committee appointed in the

Bankruptcy Case in connection with investigations to be pursued.[32]    To date, there are

---

[32] The Examiner contacted the major parties in interest in the Bankruptcy Case to, among other things,
coordinate to avoid duplication of work. In that regard, the Examiner and/or his professionals have met
with a number of parties, including officers and employees of the Debtors; the Debtors' restructuring
lawyers, Weil, Gotshal & Manges LLP ("Weil"); PricewaterhouseCoopers LLP ("PWC"), accountants to
the Debtors in the Bankruptcy Case; Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden, Arps"),
special counsel to the Debtors; Milbank, Tweed, Hadley & McCloy LLP ("Milbank") and Squire, Sanders
& Dempsey L.L.P. ("SSD"), co-counsel to the Creditors' Committee; Ernst & Young LLP ("E&Y"),
accountants for the Creditors' Committee; Wilmer, Cutler & Pickering ("Wilmer Cutler"), counsel to the
Powers Committee; Deloitte & Touche LLP ("D&T"), accountants to the Powers Committee; several of the
Debtors' major lenders; the ENA Examiner (as defined *infra* note 34); and counsel for the plaintiffs in the

- 10 -

two official committees appointed in the Bankruptcy Case: (i) the Official Committee of Unsecured Creditors, which was initially formed on December 12, 2001 (the "Creditors' Committee") and (ii) the Employment Related Issues Committee which was formed on March 27, 2002 (the "ERIC").[33]

Under the terms of the April 8th Order, the Examiner is required to file his initial report within 120 days of the entry of the order approving his appointment and shall file interim reports every 120 days thereafter or as otherwise ordered by the Court.

On May 22, 2002, the United States Trustee appointed Neal Batson (the "Examiner") as the examiner contemplated by the April 8th Order. The Court, by Order dated May 24, 2002, approved the United States Trustee's appointment of the Examiner.[34] The Examiner selected Alston & Bird LLP (a law firm in which he is a

---

Newby Class Action, Milberg Weiss Bershad Hynes & Lerach LLP and its bankruptcy counsel, Genovese Joblove & Battista, P.A.

[33] On June 14, 2002, the Debtors, the Creditors' Committee and the ERIC, along with the AFL-CIO and the Rainbow/Push Coalition, filed a joint motion to resolve certain severance claims asserted by former employees. A part of the proposed settlement involves the assignment of what were designated as the 90-day Bonus Avoidance Actions (as defined in the joint motion) to the ERIC for investigation and prosecution. Counsel for the ERIC will bear the expense of the litigation, and the proceeds, if any, from the assertion of the 90-day Bonus Avoidance Actions will inure to the benefit of the class of former employees. By Order dated and entered June 24, 2002, the Court preliminarily approved the settlement reflected in the joint motion. The Court heard arguments relative to the joint motion in August 2002, and by Order dated and entered August 28, 2002, approved the proposed settlement. As a result, the ERIC is now authorized to investigate and prosecute the so-called 90-day Bonus Avoidance Actions. To the extent that the investigation and prosecution of the 90-day Bonus Avoidance Actions overlaps with the Examiner's investigation, the Examiner will not review those particular transfers. Moreover, by Order dated May 8, 2002 (Docket No. 3587), the Court has directed the Examiner to investigate whether insider participants in the Debtors' Key Employee Retention Program (the "KERP") should be released with respect to the 90-day Bonus Avoidance Actions. In addition, on September 9, 2002, the Debtors filed with the Court a proposed Order that would defer the release of insiders with respect to the 90-day Bonus Avoidance Actions until the Examiner completes his investigation (Docket No. 6301).

[34] By an Order dated February 21, 2002 (the "February 21st Order") and an Order dated March 6, 2002 (the "March 6th Order"), the Court appointed an examiner for ENA pursuant to Section 1106(b) of the Bankruptcy Code to investigate and file an interim report on, *inter alia*, (i) the adequacy of Enron's assets to repay certain inter-company transfers between ENA and its parent, Enron, and (ii) the allocation of certain overhead expenses to ENA. By Order dated March 12, 2002, Harrison J. Goldin (the "ENA Examiner") was appointed the examiner of ENA. In addition to the requirement that he prepare an interim report, the March 6th Order also directed the ENA Examiner to participate in all meetings of the Cash Management Committee and the Bankruptcy Transaction Review Committee, report any expenditure that

- 11 -

partner) as attorneys to the Examiner ("A&B"). The Examiner also selected Plante & Moran, LLP ("Plante & Moran") as the primary accounting firm to assist in his examination, supported by George Benston and Al Hartgraves, professors of accounting at the Goizueta Business School at Emory University. The Examiner filed an application with the Court on May 28, 2002, seeking an order authorizing the employment of A&B. On June 17, 2002, the Court entered an order approving the appointment of A&B. The Examiner submitted an application for the employment of each of Plante & Moran and Professors Benston and Hartgraves on July 30, 2002. On September 13, 2002, the Court entered an order approving the retention of Plante & Moran, and on September 16, 2002, the Court entered an order approving the retention of Professors Benston and Hartgraves.

This First Interim Report of Neal Batson, Court-Appointed Examiner, constitutes the Examiner's first report (the "Report").[35]

---

the ENA Examiner deems improper, file with the Court weekly reports relative to the Debtors' cash management and file a monthly report regarding the status of the ENA cash. The ENA Examiner's role has been expanded, to some extent, in the course of the subsequent months, to include a plan facilitation role with respect to the ENA case.

[35] Any references in this Report to meetings, communications, contacts and actions between the Examiner and third parties are intended to refer to the office of the Examiner, which shall include the Examiner and his professionals. Therefore, references to any meetings, communications, contacts, and actions taking place between the Examiner and a third party should not be construed as indicating that Neal Batson was present personally for such meetings, communications, contacts or actions.

## II.    EXECUTIVE SUMMARY

### A.    The Selected Transactions

In this Report, the Examiner provides his preliminary conclusions regarding six Enron transactions involving special purpose entities ("SPEs") (the "Selected Transactions"). These transactions were selected based on the Examiner's determination that they are representative of some of the types of transactions employed by Enron and the Examiner's belief that meaningful and supportable preliminary conclusions about the Selected Transactions could be reached in the time available to prepare this Report.

The Selected Transactions consist of: (i) three FAS 140 transactions, known within Enron as Hawaii 125-0 (the "Hawaii Transactions"), Cerberus (the "Cerberus Transaction") and Nikita (the "Nikita Transaction") (the Nikita Transaction, together with the Hawaii Transactions and Cerberus Transaction, are collectively referred to as the "FAS 140 Transactions");[36] (ii) one similar transaction known as Backbone (the "Backbone Transaction"); (iii) one transaction involving the purported sale of emissions credits through an SPE, known as $SO_2$ (the "$SO_2$ Transaction") and (iv) one securitization involving payments under mining leases known as Destec (the "Destec Transaction").[37]

*The Economic Impact of the Selected Transactions on Enron*

As a prelude to a detailed analysis of the six Selected Transactions, it may be helpful to look at them from the perspective of their economic impact on Enron—without considering whether Enron used these transactions to sell assets, to borrow money, or for other purposes. In the aggregate, the Selected Transactions provided Enron with

---

[36] There are additional FAS 140 structures that will be addressed in subsequent reports.

[37] The Examiner will refer to each of these structures as a particular transaction (*e.g.,* "Destec Transaction"). In fact, there are in many cases several transactions that were contained within a structure. For example, the Hawaii Transaction included at least 22 separate transactions within that structure.

- 13 -

approximately $1.383 billion of cash. The first $150 million was received in 1997 from the closing of the Destec Transaction. The Hawaii Transaction (which actually consists of two separate financing structures that include a total of 22 transactions) produced a total of $353 million from March of 2000 through the fall of 2001. The Cerberus Transaction, which was originally closed in late November 2000, and was restructured in January 2001, produced the largest single amount—$517 million. The Backbone Transaction promptly followed in December 2000, providing Enron with another $113 million. The Nikita and $SO_2$ Transactions happened more recently: Nikita in September 2001 produced $80 million, $SO_2$ in September 2001 produced $138 million and $SO_2$ again in October 2001 produced an additional $29 million.

*Enron's Repayment Obligations*

In most of these transactions, an Enron entity purported to sell an asset to an SPE in exchange for cash and other consideration. That cash was most often obtained through a loan to the SPE or an affiliated SPE. However, unlike most transactions in which a person sells an asset, in most of the Selected Transactions Enron or its affiliate agreed to repay the amount of debt the SPE incurred to finance the purchase price. Furthermore, Enron or its affiliate would continue to control the "sold" asset and would receive the upside benefit if the asset ultimately generated proceeds in excess of the costs of the financing. The contractual obligations that led from the borrower SPEs to Enron or its affiliate's treasury were clear. In the FAS 140 Transactions and the Backbone Transaction, Enron or a subsidiary (most often ENA) would enter into a financial arrangement that Enron refers to as a "Total Return Swap." Through a Total Return Swap, the Enron entity: (i) agreed to make payments to its counterparty (usually an SPE

created for the transaction or the lenders to the SPE) equal to the scheduled payments

(and interest thereon) on the amounts borrowed by the SPE under its credit facility

(which was roughly equal to the purchase price of the transferred asset) and (ii) remained

entitled to all amounts produced by the transferred asset (whether by sale of the asset or

otherwise), except, in some transactions, for amounts used to satisfy the small portion of

the purchase price that the SPE funded through the sale of equity rather than borrowings

(typically at least 3% of the purchase price of the asset) and a specified return on that

equity.[38]   In those transactions where there was an equity investor, the Total Return Swap

typically provided that any proceeds of the underlying asset were distributed first to the

Enron entity in amounts up to the amounts payable on the related debt financing, then to

the equity holder up to the specified return and finally, all remaining amounts to the

Enron entity.[39]

### Nature of the Assets Financed

The characteristics of the assets in the Selected Transactions, with the possible

exception of the asset in the Destec Transaction, suggest that these transactions could not

have occurred without Enron's credit.  Enron's credit was necessary because the assets in

---

[38] In some of the Selected Transactions, the parties treated a portion of the financing as "debt" and a portion as "equity" in the SPE that obtained the financing.  Typically, amounts outstanding under "notes" are treated as debt and amounts outstanding under "certificates" are treated as equity.  The Examiner has not yet determined whether the characterization given to any particular funding as debt or equity is correct for accounting or other purposes.

[39] The terms and effects of these Total Return Swaps are explained in greater detail in the sections of this Report describing the FAS 140 Transactions and the Backbone Transaction.  Typically, such financial arrangements were made pursuant to the terms of a master agreement promulgated by the International Swaps and Derivatives Association, Inc. ("ISDA").  While for ease of discussion, the Examiner refers to this type of an arrangement as a "Total Return Swap" in this Report, the Examiner expressly reserves the right to conclude as to the proper characterization of such contractual arrangements in future reports, and the use of the nomenclature used by Enron and its affiliates should not be construed to be any conclusion by the Examiner on any of these issues.  Furthermore, the Examiner has not formed any conclusion regarding whether the Total Return Swap, or any other swap or derivative discussed in this Report, meets the definitional requirements for a "swap agreement" under the Bankruptcy Code.  11 U.S.C. § 101(53B).

five of the six Selected Transactions produced insufficient cash flow to support the financing or may have been difficult to sell to third parties on acceptable terms. In the Cerberus Transaction, the asset was a block of stock in a company with a dividend stream that would not support any significant debt. Moreover, the stock was subject to an agreement that restricted Enron's ability to sell the stock. The Hawaii Transactions financed (i) common stock in companies, (ii) warrants to purchase common stock in new companies, (iii) membership interests in limited liability companies, (iv) interests in a trust that had a right to receive payments on a swap that were to be made by Enron, and (v) interests in a trust that held a note upon which the maker could defer paying interest until maturity, which assets did not generate sufficient cash to service any significant debt. The Nikita Transaction financed partnership units in a master limited partnership. The Backbone Transaction financed dark fiber—optical fiber that had been installed but was not in use. The $SO_2$ Transaction financed emission credits for which there was a market, but which generated no cash flow. Only in the Destec Transaction, where the asset financed consisted of a stream of payments on coal leases from a creditworthy source, was there an asset that generated cash flow sufficient to support the related transaction.

In sum, all six of the Selected Transactions involved significant commitments of Enron's credit. In five of the six, Enron's credit played what appears to be a substantial—if not the decisive—role in making the SPEs creditworthy.[40] The documentation for all six of the transactions characterizes them as sales. Whether such transactions should be recharacterized as loans is one of the subjects of this Report.

*Recharacterization*

Each of the Selected Transactions involves a purported sale of one or more assets

by Enron or an Enron affiliate to an SPE. Therefore, certain parties to the transactions

likely will argue that the asset is not part of the Debtors' estates. If all of these purported

sales are recharacterized as loans, then the assets, currently valued in the range of $500

million, would be added to the Debtors' estates.[41] Unless the parties that made the loan

obtained a properly perfected and unavoidable security interest in such assets, they will

have, at best, an unsecured claim against the Debtors' estates.

None of these transactions can be fully understood unless viewed in their totality.

When so viewed, each of the Selected Transactions (with the possible exception of the

Destec Transaction) appears to be, from both an economic and risk allocation

perspective, a loan rather than a sale of an asset. As such, these transactions, in varying

degrees, are susceptible to recharacterization as loans based upon the factors developed

under applicable law.

Four of the six Selected Transactions include a Total Return Swap pursuant to

which Enron or one of its subsidiaries is obligated. It is the Examiner's view that the

existence of a Total Return Swap would be a compelling factor supporting

---

[40] Whether the parties to these transactions intended to rely primarily on Enron's credit, and not on the value of the underlying assets, may be revealed through the discovery the Examiner has initiated. *See infra* note 48.

[41] Some, but not all, of the Enron entities that transferred the assets are also debtors in the Bankruptcy Case. Where a non-debtor transferor is involved in a transaction that is recharacterized as a loan, the most expeditious method to permit the transferor to recover such assets may be for Enron to cause the transferor to file a voluntary petition as part of the Bankruptcy Case. The Examiner has not analyzed the avenues for similar relief in litigation pursued in either state or other federal courts. For purposes of this Report, any references to assets being added to or otherwise available to the Debtors' estates shall be deemed to include any transferor of an asset, regardless of whether such transferor is actually a current debtor in the Bankruptcy Case. Furthermore, certain of the subject assets that are potentially recoverable by part of the Debtors' estates have been sold after the Petition Date, with the proceeds being held in escrow subject to

recharacterization where the Enron party to the Total Return Swap was the same entity that transferred the asset in the putative true sale. An issue that may arise is whether a Total Return Swap entered into by an *affiliate* of the asset transferor, rather than the asset transferor itself, can be a factor relied upon to support a recharacterization of the purported sale as a loan. The Examiner believes that, even where the Enron party to the Total Return Swap is the parent or other affiliate of the asset transferor, rather than the asset transferor itself (as is the case in a number of the Selected Transactions), the existence of the Total Return Swap is a relevant factor in determining whether there was a true sale.[42] To conclude otherwise and disregard the existence of these rights and obligations, whether held by the asset transferor or its affiliate, would ignore the economic reality of the transaction.

### *Accounting and Related Disclosures*

Independent of any recharacterization challenge, there is a substantial basis for concluding that Enron's obligations under the Total Return Swaps entered into in connection with the FAS 140 Transactions were not properly disclosed in Enron's 2000 financial statements as required by GAAP.[43]

### *Ability of SPEs to Enhance Financial Statements*

It is apparent from the structured finance transactions discussed in this Report that SPEs had dramatic effects on both the balance sheet and income statement portions of Enron's financial statements. For example, in part by the use of its SPEs, Enron reported debt on its September 30, 2001 balance sheet under GAAP as $12.978 billion even

---

further order from the Court. For purposes of the Report, references to assets being added to or otherwise available to the estate shall be deemed to include the proceeds of any asset sale.

[42] *See infra* notes 111-21 and accompanying text.

though Enron's "debt" as reported to its bankers on November 19, 2001 in the Bank Presentation included an additional $13 billion attributable to structured finance transactions involving the use of SPEs.[44]

Enron also used the SPEs to assist in its income statement presentation. In an example described below in Section III.B (*Story of the NewPower Warrants*), during 2000 Enron used warrants to purchase NewPower Holdings stock in a series of complicated structures (including several "monetizations") and:[45]

- reported $370 million of income in 2000 (almost 15% of Enron's total IBIT[46] for the year);

- received $167 million of cash, approximately 96% of which was financed with debt (and which Enron was obligated to repay even though this obligation did not appear as debt on its balance sheet); and

- nevertheless retained the economic benefit of the warrants, except for approximately $6 million of equity that one of the lenders acquired in connection with the financing (and which carried a fixed rate of return capped at 15%).

**B.    Ongoing Investigation**

The Examiner's investigation has begun to examine in detail a number of significant questions.[47] These include:

- Are the SPE structures subject to legal challenge? Are there any assets that were purportedly transferred from the Debtors' estates that should properly be considered part of the Debtors' estates?

---

[43] *See infra* Section III.D, *Were the Accounting Treatment and Financial Statement Disclosure Proper?*.

[44] Except for some accounting aspects of certain specific transactions covered by this Report, the Examiner does not yet conclude whether those "off balance sheet" obligations should have been classified as debt under GAAP or whether the disclosure of such obligations, or lack thereof, was appropriate.

[45] The term "monetized" refers to the manner in which Enron was able to generate cash immediately from an asset through the use of a structured finance transaction involving an SPE.

[46] IBIT means income before interest and taxes.

[47] There will be additional questions to be addressed as the examination continues.

- What was the role of the SPEs in the collapse of Enron?

- Did Enron use SPEs to manipulate its financial statements in violation of GAAP or applicable laws?

- Was there proper disclosure to the public of these SPE transactions under applicable disclosure standards?

- If it is determined that wrongful acts were committed in connection with the SPE transactions (including manipulation of Enron's financial statements in violation of GAAP or applicable laws), are the officers, directors, professionals or other third parties involved in such transactions liable under applicable legal standards?

The Examiner is mindful of the need to reach conclusions with respect to this investigation as soon as practicable. The Examiner also appreciates the magnitude and complexity of the issues presented in this investigation. As a result, the Examiner will reach final conclusions only after reviewing the evidence and analyzing the applicable legal and accounting standards.[48] Given the short duration of the Examiner's tenure in this Bankruptcy Case and the fact that there are numerous SPE structures and multiple transactions within structures that are currently being reviewed, the Examiner has not

---

[48] Because conclusions on many of the issues presented in this investigation can be reached only after a careful review of facts and circumstances, the Examiner has been proceeding as quickly as possible to obtain this necessary information. In this regard, on August 1, 2002, the Examiner filed a motion in the Bankruptcy Case pursuant to Federal Rule of Bankruptcy Procedure 2004 for authorization to issue comprehensive subpoenas to more than 200 financial institutions, former officers, directors, and employees and other entities who may have had some connection to one or more SPE transactions involving the Debtors or otherwise related to the matters to be examined into under the provisions of the April 8th Order. The Court granted this motion, in part, on September 13, 2002, and the Examiner, individually or jointly with the Creditors' Committee, has served subpoenas on these parties. The Examiner did not request the authority to subpoena Milbank, co-counsel to the Creditors' Committee. Instead, given its status as counsel to a fiduciary and a professional retained at the expense of the estates, the Examiner requested the same information from Milbank. In addition, in connection with the motion to disqualify Milbank filed by EXCO Resources, Inc. (Docket No. 2243), as supplemented by a motion filed April 2, 2002 (Docket No. 2637), certain issues were raised with respect to potentially preferential payments made to Milbank by Enron and/or certain Enron affiliates. The Examiner has received information from Milbank with respect to its relationship with Enron and its affiliates in order to make a determination as to whether the transfers were voidable preferences under Section 547 of the Bankruptcy Code. These issues will be addressed in a subsequent report.

reached any final conclusions with respect to these questions.[49]  In the next part of this Report, the Examiner presents his findings and, where possible, his preliminary conclusions, on the Selected Transactions.

---

[49] The Examiner has identified at least fifty SPE structures and hundreds of transactions contained within these structures.

## III.    INTERIM REPORT ON SELECTED SPE TRANSACTIONS

### A.    Introduction

Off-balance sheet financing techniques are widely used and accepted in the United States. Transactions range from relatively straightforward sale-leaseback transactions to highly complex one-of-a-kind transactions. They encompass many different structures including synthetic and leveraged lease transactions, mortgage-backed securities transactions, asset-backed securities transactions, collateralized debt and loan obligations known as "CDOs" and "CLOs," and various derivatives-based synthetic transactions. Often, these transactions are efficient means of obtaining funding for their participants while simultaneously achieving accounting, tax and regulatory benefits of various types. They are well understood by the marketplace and reflect the innovation for which the U.S. capital markets are known. Off-balance sheet financing techniques have many legitimate uses and comprise a significant part of our capital markets. For example, total outstanding mortgage-backed and asset-backed securities in the United States alone exceed $6 trillion.[50]

Enron was prolific in its use of highly complex structured finance transactions using SPEs, with the result that billions of dollars of recourse obligations were not disclosed as debt in Enron's balance sheet, and the proceeds of these recourse obligations were reported as revenue and cash flow. Types of transactions that Enron used included: the Related-Party Transactions, the "prepays," the FAS 140 Transactions, the "Share Trust" transactions, minority interest transactions, other structured financings of various types, synthetic leases and other transactions of varying size and complexity.

---

[50] Alexander Dill & Letitia Hanson, Moody's Investor Service, *Structured Finance Special Report: True Sale Assailed: Implications of In re LTV Steel for Structured Finance* (April 27, 2001).

Accordingly, as called for by the terms of the April 8th Order, the Examiner has begun to review Enron's structured finance transactions.

## B.    Story of the NewPower Warrants

Before turning to the legal and accounting analysis of the Selected Transactions, it may be helpful to provide a specific example of how Enron was able to utilize one of the Selected Transactions (specifically, the Hawaii Transaction)[51] to achieve significant financial statement benefits.  This example traces a series of transactions involving four blocks of warrants to purchase common stock of NewPower Holdings[52] through several financing structures.  This example also describes the impact these transactions had on Enron's 2000 financial statements.[53]  As will be explained in detail below, over a one-year period, Enron used these warrants in a series of complicated structures and:

- reported $370 million of income in 2000 (almost 15% of Enron's total IBIT for the year);

- received $167 million of cash, approximately 96% of which was financed with debt (and which Enron was obligated to repay even though this obligation did not appear as debt on its balance sheet); and

- nevertheless retained the economic benefit of the warrants, except for approximately $6 million of equity that one of the lenders acquired in connection with the financing (and which carried a fixed rate of return capped at 15%).

*Background*

On November 17, 1999, Enron Energy Services, LLC ("EES"), a subsidiary of Enron, incorporated NewPower Holdings.[54]  On January 6, 2000, NewPower Holdings

---

[51] A more detailed description of the Hawaii Transaction is set forth below.  *See infra* Section III.H.

[52] *See supra* note 7 for further background information on NewPower Holdings.

[53] The Examiner has not reached any conclusions regarding the accounting treatment of the transactions described in this Section III.B.  Rather, this Section III.B is intended to illustrate the complexity of Enron's SPE structures and their financial impact on Enron.

[54] TNPC, Inc. Prospectus filed with the SEC pursuant to Rule 424(b)(1) on Oct. 4, 2000 (the "IPO Prospectus") at F-2.  The IPO Prospectus relates to the sale of 24 million shares of common stock.  EES

engaged in a private placement of its equity securities in which: (i) EES contributed retail electricity and gas customer contracts and entered into certain agreements with NewPower Holdings in exchange for 14.8 million shares of common stock and warrants to purchase 45 million shares of common stock for $0.05 per share, and (ii) other unrelated investors contributed $100 million in cash in exchange for five million shares of common stock, warrants to purchase 15 million shares of common stock for $0.05 per share and warrants to purchase 10.3 million shares of common stock at $9.69 per share.[55] The retail gas and electricity business that EES contributed to NewPower Holdings had never earned a profit, and for 1999, the last full year of reported operations before the NewPower IPO (which occurred in October 2000), NewPower Holdings had a net loss of $25 million on approximately $7.8 million of gross revenue.[56]

The ways that Enron "monetized" the NewPower Holdings warrants and "hedged" against a decrease in their value over the next four fiscal quarters are described below.

*First Quarter 2000*

On March 31, 2000, Enron (i) caused EES to contribute warrants to purchase 6.766 million shares of common stock of NewPower Holdings to a limited liability company named McGarret I, L.L.C. ("McGarret I") in exchange for a voting membership

---

was issued 200,000 shares of NewPower Holdings common stock when NewPower Holdings was incorporated.

[55] *Id.* at 57 and F-15. Share numbers reflect a 200 for one stock split in connection with the initial public offering of NewPower Holdings stock. *Id.* at 4. NewPower Holdings' private equity investors included California Public Employees Retirement System, Ontario Teachers' Pension Plan, GE Capital Equity Investments, Inc. and DLJMB Partners.

[56] As noted above, NewPower Holdings and its wholly owned subsidiaries, TNPC Holdings, Inc. and New Power Company, each filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Georgia (Case No. 02-10835). *See supra* note 7.

interest, (ii) caused McGarret I's 99.9% membership interest (the "McGarret I Class B Interest") to be transferred to the Hawaii II Trust, a Delaware business trust formed on March 28, 2000, in exchange for $20 million in cash, and (iii) caused McGarret I to distribute the $20 million so received to EES.[57]  The transaction was financed with an $18.023 million loan (the "McGarret A Loan") to the Hawaii II Trust from a syndicate of lenders led by Canadian Imperial Bank of Commerce ("CIBC"), and $1.976 million that was contributed to the Hawaii II Trust by an affiliate of CIBC in exchange for a certificate of beneficial interest in the Hawaii II Trust's Series McGarret A (the "McGarret A Certificate").  As a part of the financing, Enron entered into a Total Return Swap (the "McGarret A Swap")[58] with the Hawaii II Trust pursuant to which Enron agreed to pay to the Hawaii II Trust an amount equal to all of the interest and principal when due under the McGarret A Loan,[59] and the Hawaii II Trust agreed to pay to Enron all of the money received by the Hawaii II Trust with respect to the McGarret I Class B Interest other than amounts distributable with respect to the McGarret A Certificate.[60]

On its financial statements, Enron reported the $20 million received in this transaction as gain in its income statement, and as cash flow from investing activities on

---

[57] The Class B Interest was issued initially to Big Island I, L.L.C., a wholly owned subsidiary of EES, and then immediately sold to the Hawaii II Trust. *See infra* Section III.H., *The Hawaii Transaction.*

[58] The McGarret A Swap was evidenced by an ISDA Master Agreement (Multicurrency – Cross Border) between Enron Corp. and the Hawaii 125-0 Trust (ISDA Master Agreement, Mar. 31, 2000 [AB000029505-AB000029523]) and a schedule modifying and supplementing that Master Agreement (Schedule to the ISDA Master Agreement, Mar. 31, 2000 [AB000029529-AB000029540]) (the ISDA Master Agreement and the Schedules thereto are collectively referred to as the "Master Agreement"), together with a letter agreement between Enron and the Hawaii 125-0 Trust (Total Return Swap Confirmation between Enron Corp. and the Hawaii 125-0 Trust, Mar. 31, 2000 (the "McGarret A Swap Confirmation") [AB000032066-AB000032075]).

[59] Enron also agreed to pay transaction and other expenses.

[60] The Certificate holder was entitled to monies received by the trust in excess of amounts due under the loan, but not greater than the face amount of the Certificate plus a 15% per year return on the face amount. Section 2.2, McGarret A Swap Confirmation, *supra* note 58.

its statement of cash flows.[61]    The conclusion of Enron, concurred in by Andersen, concerning recognition of income was based on its determination that the transaction qualified for "gain on sale" treatment under the accounting rules then governing securitizations known as FAS 125.[62]    This $20 million represented 3.2% of the $624 million IBIT reported by Enron for that quarter.[63]    Enron did not disclose its obligations under the McGarret A Swap as a liability on its balance sheet or in the related footnotes.[64]

*Second Quarter 2000*

On June 29, 2000, Enron "monetized" warrants to acquire an additional 8.458 million shares of common stock of NewPower Holdings through a structure substantially identical to the one it used at the end of the first quarter.  This time it transferred a Class B Interest (the "McGarret II Class B Interest") in a new subsidiary named McGarret II, L.L.C. ("McGarret II") to the Hawaii II Trust.  In exchange, it received $25 million from the Hawaii II Trust, 96.9% of which was borrowed by the Hawaii II Trust (the "McGarret B Loan").  Pursuant to a Total Return Swap (the "McGarret B Swap")[65] with the Hawaii II Trust, Enron agreed to provide funds sufficient to repay the McGarret B Loan.  The Hawaii II Trust obtained the remaining portion of the $25 million through the sale to the

[61] Enron Interoffice Memorandum to Files from G. Wade Stubblefield regarding Total Return Swap Valuation Adjustment, June 30, 2000 (the "Stubblefield 6/30/00 Memo") [AB000373730-AB000373733]; Enron Interoffice Memorandum to Kevin Hughes from Transaction Accounting regarding Raptor III Note Monetization, Mar. 28, 2001 (the "Hughes 3/28/01 Memo") [AB000123274-AB000123275].

[62] Although Enron took the position that it had sold the Class B Interests in McGarret I, II and III for financial reporting and commercial law purposes, it was still viewed as having the beneficial ownership of the warrants under SEC rules.  Thus, the IPO Prospectus attributes to Enron the beneficial ownership of the warrants held by McGarret I, McGarret II and McGarret III.  *See* IPO Prospectus, *supra* note 54, at 58.

[63] Enron Form 10-Q filed with the SEC for the Quarter ended Mar. 31, 2000 (the "10-Q for 1Q/2000") at Consolidated Condensed Income Statement.

[64] *See infra* Section III.D., *Legal and Accounting Principles –The Total Return Swaps.*

[65] The McGarret B Swap was evidenced by the Master Agreement and a letter agreement between Enron and the Hawaii 125-0 Trust.  *See* Total Return Swap Confirmation between Enron Corp. and the Hawaii 125-0 Trust, June 29, 2000 (the "McGarret B Swap Confirmation") [AB000032473-AB000032482].

affiliate of CIBC of a certificate of beneficial interest in the Hawaii II Trust's Series McGarret B (the "McGarret B Certificate").

As before, Enron recognized the $25 million as gain and cash flow from investing activities on its second quarter financial statements.[66]

Enron used yet another technique to recognize revenue from these structures, by "marking to market"[67] the value of Enron's rights to receive monies under the McGarret A Swap in excess of the value of the amounts payable by it under the McGarret A Swap, thereby recognizing $52 million of additional revenue.[68]  Similarly, Enron recognized another $66 million of revenue by "marking to market" the McGarret B Swap.[69]  Enron, with Andersen's concurrence, justified recognition of this $118 million as revenue by treating the McGarret A Swap and the McGarret B Swap as derivative instruments entered into by Enron as a part of providing "price risk management services" to its "customers" in connection with its "trading" business.[70]  The valuation chosen by Enron for the mark to market was based on a second private placement by NewPower Holdings that was completed in late July 2000, after the close of the second quarter.[71]

---

[66] Enron Interoffice Memorandum to files from G. Wade Stubblefield regarding 2d Quarter 2000 Monetization of NewPower Warrants, July 22, 2000 (the "Stubblefield 7/22/00 Memo") [AB000123152-AB000123153]; Hughes 3/28/01 Memo, *supra* note 61.

[67] When the terms "mark to market," "marking to market" or similar terms are used in this Report, they mean marking to fair value based on quoted market prices or other valuation methods.

[68] Stubblefield 6/30/00 Memo, *supra* note 61; Hughes 3/28/01 Memo, *supra* note 61; Enron Corp. Spreadsheet, Aug. 29, 2002 (the "Enron 8/29/02 Spreadsheet") (delivered to the Examiner on Aug. 29, 2002) [EC001908302].

[69] Stubblefield 7/22/00 Memo, *supra* note 66; Hughes 3/28/01 Memo, *supra* note 61; Enron 8/29/02 Spreadsheet, *supra* note 68.

[70] *See* 10-K for 2000, *supra* note 4, at Financial Statement Note 3, "Price Risk Management Activities and Financial Instruments."

[71] Stubblefield 7/22/00 Memo, *supra* note 66. Any transfers of the McGarret I and McGarret II Class B Interests by Hawaii II Trust were subject to restrictions. In addition, any transfer of the warrants held by McGarret I and McGarret II were subject to restrictions on transfer, including securities law restrictions and restrictions set forth in a stockholders agreement among certain stockholders of NewPower Holdings. *See,*

The $143 million recognized by Enron as income in the second quarter as a result

of these activities ($25 million gain from the securitization and $118 million mark to

market revenue) was 23.5% of the total $609 million of IBIT Enron reported for the

quarter.[72]

*Third Quarter 2000*

On August 31, 2000, Enron "monetized" warrants to acquire an additional 2.791

million shares of NewPower Holdings common stock through a substantially identical

structure as the one used in the first two monetizations.  This time, Enron created

McGarret III, L.L.C. ("McGarret III").  Enron received $30 million from the Hawaii II

Trust, 96.7% of which was borrowed (the "McGarret C Loan").  Pursuant to a Total

Return Swap with the Hawaii II Trust, Enron obligated itself to provide funds to the

Hawaii II Trust sufficient to repay the McGarret C Loan (the "McGarret C Swap").[73]

The remainder of the $30 million was obtained through the sale of a certificate of

beneficial interest in the Hawaii II Trust's Series McGarret C to an affiliate of CIBC.  As

before, Enron recognized the $30 million as gain and as cash from investing activities.[74]

---

*e.g.*, Section 11, TNPC, Inc. Warrant for the Purchase of Shares of Non-Voting Common Stock, Dec. 20, 2000 (the "McGarret I Warrant") (issued after the date of the NewPower Holdings initial public offering reflecting the post-stock split numbers) [AK0024093].  Moreover, the warrants by their own terms did not become exercisable until the earlier of December 31, 2000, six months after the NewPower IPO or upon a sale of the company.  *See, e.g.*, Section 10, McGarret I Warrant, *supra* (definition of "Initial Exercise Date") [AK0024087].  The valuations do not appear to consider these or any other potential limitations on the ability of Hawaii II Trust to realize cash for the Class B Interest.

[72] Enron Form 10-Q filed with the SEC for the Quarter ended June 30, 2000 (the "10-Q for 2Q/2000"), at Consolidated Condensed Income Statement.

[73] The McGarret C Swap was evidenced by the Master Agreement and a letter agreement between Enron and the Hawaii Trust dated August 31, 2000.  *See* Total Return Swap Confirmation between Enron Corp. and the Hawaii 125-0 Trust, Aug. 31, 2000 (the "McGarret C Swap Confirmation") [AB000033038-AB000033047].

[74] Enron Interoffice Memorandum to files from G. Wade Stubblefield, regarding 3d Quarter 2000 Monetizations of TNPC Warrants & Re-issuance, Sept. 30, 2000 (the "Stubblefield 9/30/00 Memo") [AB000123156-AB000123157]; Hughes 3/28/01 Memo, *supra* note 61.

Enron also recognized an additional $184 million of revenue by "marking to market" the value of its rights to receive monies from the Hawaii II Trust under the three swaps in effect at the end of the quarter in excess of the amounts payable by it under these swaps.[75]  The valuation was based on the $21 per share price in the NewPower IPO that was priced on October 5, 2000.

On September 29, 2000, Enron obtained additional cash from these same structures in a new way, by transferring the McGarret II Class B Interest from the Hawaii II Trust's Series McGarret B to its Series McGarret D.  Following the typical pattern, 95.6% of the $90.9 million purchase price was borrowed by the Hawaii II Trust (the "McGarret D Loan") (which Enron agreed to repay under a new Total Return Swap (the "McGarret D Swap")).[76]  The remainder was obtained through the sale of a certificate of beneficial interest in the Hawaii II Trust's Series McGarret D to an affiliate of CIBC.  Of the $90.9 million received by the Hawaii II Trust, $25.1 million was used to repay the McGarret B Loan and the McGarret B Certificate, and $65.9 million was paid to Enron under the McGarret B Swap.  Enron treated the $65.9 million as cash flow from operating activities.[77]

The $214 million recognized by Enron as income in the third quarter as a result of these transactions ($30 million gain from the McGarret III securitization and $184

---

[75] Enron 8/29/02 Spreadsheet, *supra* note 68.

[76] The McGarret D Swap was evidenced by the Master Agreement and a letter agreement between Enron and the Hawaii 125-0 Trust.  *See* Total Return Swap Confirmation between Enron Corp. and the Hawaii 125-0 Trust, Sept. 29, 2000 (the "McGarret D Swap Confirmation") [AB000033758-AB000033767].

[77] Stubblefield 9/30/00 Memo, *supra* note 74; Hughes 3/28/01 Memo, *supra* note 61.

million revenue from marking the three McGarret Swaps to market) was 32.1% of the total $666 million of IBIT Enron reported for the quarter.[78]

*Fourth Quarter 2000*

Just prior to year-end, Enron obtained cash by engaging in a "trust to trust" sale of the McGarret I Class B Interest.  Specifically, on December 14, 2000, the Hawaii II Trust transferred the McGarret I Class B Interest from its Series McGarret A to the Series McGarret G of the recently created Hawaii I 125-0 Trust (the "Hawaii I Trust") for $46.5 million.  Following the typical pattern, 97% of the purchase price was borrowed by the Hawaii I Trust (which ENA agreed to repay under a new Total Return Swap (the "McGarret G Swap")).[79]  The remainder of the purchase price was obtained through the sale of a certificate of beneficial interest in the Hawaii I Trust's Series McGarret G to an affiliate of CIBC.  Of the $46.5 million received by the Hawaii I Trust, $20.1 million was used to pay the McGarret A Loan and the McGarret A Certificate, and $26.4 million was paid to Enron under the McGarret B Swap.  Enron treated the $26.4 million as cash flow from operating activities.[80]

---

[78] Enron Form 10-Q filed with the SEC for the Quarter ended Sept. 30, 2000 (the "10-Q for 3Q/2000"), at Consolidated Condensed Income Statement.

[79] The McGarret G Swap was evidenced by an ISDA Master Agreement (Multicurrency – Cross Border) between Enron North America Corp. and the Hawaii I 125-0 Trust  (ISDA Master Agreement, Dec. 14, 2001 [AB000034767-AB000034792]) and a schedule modifying and supplementing that Master Agreement (Schedule to the Master Agreement, Dec. 14, 2000 [AB000034793-AB000034813]), together with a letter agreement between Enron North America Corp. and the Hawaii I 125-0 Trust (Total Return Swap Confirmation, Dec. 14, 2000 (the "McGarret G Swap Confirmation") [AB000034814-AB000034824]).  Enron guaranteed ENA's obligations under the McGarret G Swap.

[80] Enron Interoffice Memorandum to files from Alan C. Quaintance, Jr., Corporate Transactions Support, regarding Resecuritization of First Quarter Resco Warrant Monetization (McGarret G), Dec. 14, 2000 [AB000373734-AB000373736].

*The Raptor III Hedges and the NewPower Warrants*

On October 5, 2000, NewPower Holdings closed its initial public offering of common stock in which it sold 24,000,000 shares for $21 per share.[81]  As noted above, that $21 per share value had been used to mark up the McGarret A, C and D swaps, and that mark up generated $184 million in revenue for the prior quarter.  If the $21 per share value declined, Enron would now have to recognize a loss on these swaps.  In three swap agreements[82] between  Pronghorn I LLC ("Pronghorn")[83] and  Porcupine I LLC ("Porcupine"),[84] each dated the day before the NewPower IPO, Enron "hedged" against this possibility.[85]

Under the hedging arrangement, Porcupine agreed to pay Pronghorn the amount of any decline in the value of the three McGarret swaps that would result from any decline in value of the NewPower Holdings common stock below $21.  Porcupine was not included in Enron's consolidated financial statements, but Pronghorn was.  Thus, the

---

[81]  NewPower Holdings, Inc. Form 10-K filed with the SEC for the Year ended Dec. 31, 2001, at 2.

[82]  Letter from Pronghorn I, LLC to Porcupine I, LLC (Attention of LJM2 Co-Investment, LP) regarding Swap Transaction, Oct. 4, 2000 [AB000061122-AB000061126]; Letter from Pronghorn I, LLC to Porcupine I, LLC (Attention LJM2 Co-Investment, LP) regarding Swap Transaction, Oct. 4, 2000 [AB000061128-AB000061132]; Letter from Pronghorn I, LLC to Porcupine I, LLC (Attention LJM2 Co-Investment, LP) regarding Swap Transaction, Oct. 4, 2000 [AB000061116-AB000061120].    These confirmations were more consistent with a typical Equity Swap Agreement under the ISDA definitions than the confirmations used in the Hawaii transactions because the documentation provided for payments based on the changes in price of the NewPower Holdings stock.

[83]  Pronghorn was a subsidiary of Enron and included in its consolidated financial statements.

[84]  Porcupine was formed for the purpose of engaging in the hedging transaction and was owned by the Enron subsidiary, Pronghorn, and LJM2.  Porcupine's principal asset was an economic interest (through a trust called the EES Warrant Trust and an LLC called Desert I LLC) in 24.1 million of the 45 million warrants that EES received at the initial private placement by NewPower Holdings in January 2000.  Thus, of warrants to acquire 45 million shares of NewPower Holdings common stock received by EES in January 2000, warrants to acquire approximately 24.1 million shares were owned economically by Porcupine and warrants to acquire approximately 18 million shares were in the Hawaii structure.

[85]  The Porcupine structure was known as "Raptor III" and is discussed in the Powers Report.  *See* Powers Report, *supra* note 10, at 114-20.  The Examiner has not completed his investigation of Raptor III and includes this discussion only to illustrate the intersection of the Raptor III structure and the Hawaii transactions during 2000.

amount due from Porcupine to Pronghorn would serve to offset losses recognized by Enron occasioned by the mark down of the McGarret swaps, assuming Porcupine had the ability to meet its obligations.

The only significant asset that supported Porcupine's hedge obligation was Porcupine's interest in warrants to purchase 24.1 million shares of NewPower Holdings that Porcupine had acquired from Enron (through Pronghorn) in exchange for Porcupine's delivery of a $259 million promissory note.[86] Based on the $21 per share IPO offering price, those warrants had a theoretical value of about $246 million in excess of the related debt. [87] The ability of Porcupine to meet its obligations under the hedge, however, would rapidly erode if the value of NewPower Holdings declined because a decline would both *increase* Porcupine's obligation to pay Pronghorn and *diminish* its ability to satisfy the obligation.

Under the hedging agreements, Porcupine was entitled to the upside benefit should the price of NewPower Holdings common stock increase.[88] Because Pronghorn was entitled to all distributions of income from Porcupine (after LJM2 received a return equal to the greater of $39.5 million or a 30% annualized return on its $30 million investment),[89] any additional upside (in excess of LJM2's return) would inure to Enron. Thus, Enron's economic position was not substantially altered by the hedging transactions: the risk of a decline in the value of the NewPower Holdings warrants was

---

[86] Pronghorn I, LLC Financial Statements for the period ended Dec. 31, 2000 (the "Pronghorn Financial Statements") (unaudited) [AB000165065-AB000165072].

[87] The computation is: 24,118,000 NewPower warrants x ($21 initial public offering price – .05 exercise price) = $505,272,100; this amount minus the $259,000,000 debt represented by the note equals $246,272,100.

[88] *See* the letters cited *supra* note 82.

[89] Section 5.1, Limited Liability Company Agreement of Porcupine I, LLC, Sept. 27, 2000 [AB000180475-AB000180506].

not economically hedged but the economic reward of a price increase (subject to the payments owed to LJM2) was retained.

In hindsight, Enron's hedging of the financial statement risk against a decline in the value of the NewPower Holdings common stock appears to have been prescient, because by December 31, 2000, the NewPower Holdings stock traded at $9.8125.[90] This caused Enron to write down the value of the three McGarret swaps by over $200 million.[91] Porcupine, however, was insolvent because it lacked assets of sufficient value to satisfy its note and hedge obligation.[92] Nevertheless, in a letter dated December 22, 2000, Enron and LJM2 agreed for a period of forty-five days to the cross collateralization of the assets of each of the four Raptor SPEs for the benefit of the creditors of each such entity.[93] Based on this letter, despite the fact that Porcupine itself was insolvent, Enron concluded, with Andersen's concurrence, that on its 2000 financial statements it could offset the loss it had suffered (due to the decline in value of the NewPower Holdings warrants and the resulting write down of the value of its rights under the McGarret swaps) against Porcupine's obligation to Pronghorn under its hedges.

---

[90] NewPower Holdings, Inc. Form 14A Proxy Statement filed with the SEC on Apr. 18, 2001, at 14.

[91] 18,016,400 x (21 – 9.8125) = $201,558,475.  Enron 8/29/02 Spreadsheet, *supra* note 68.

[92] The approximate value of the warrants held by Porcupine (again ignoring the inability to sell them for the spread) was $14,100,000 x (9.8125 - .05) = $137,651,250.  Porcupine still owed the $259 million note to Pronghorn, plus accrued interest, and was thus insolvent.  Pronghorn Financial Statements, *supra* note 86.

[93] Letter from LJM2 to Enron Corp., Dec. 27, 2000 (agreed to by EES) [AB000059924].

*The Results of the Structure*

In summary, the financial accounting results discussed above can be illustrated in the following table (for the purposes of this chart, "MTM" refers to marking to market):

| Underlying NewPower Warrants | Transaction description | Income Recognized (in millions) | | | | |
|---|---|---|---|---|---|---|
| | | Q1 2000 | Q2 2000 | Q3 2000 | Q4 2000 | 2000 Total |
| McGarret I 6,766,400 | Initial monetization (resulted in $20 cash flow from investing activities) | 20 | | | | 20 |
| | MTM of McGarret A/G Swaps ($26 received in cash via transfer of Class B Interest from Series McGarret A to Series McGarret G reflected as cash flow from operations in Q4) | | 52 | 69 | (76) | 45 |
| | Raptor III hedge | | | | 73 | 73 |
| McGarret II 8,458,200 | Initial monetization (resulted in $25 cash flow from investing activities) | | 25 | | | 25 |
| | MTM of McGarret B/D Swaps ($66 received in cash via transfer of Class B Interest from Series McGarret B to Series McGarret D reflected as cash flow from operations in Q3) | | 66 | 87 | (95) | 58 |
| | Raptor III hedge | | | | 92 | 92 |
| McGarret III 2,791,800 | Initial monetization (resulted in $30 cash flow from investing activities) | | | 30 | | 30 |
| | MTM of McGarret C Swap | | | 28 | (31) | (3) |
| | Raptor III hedge | | | | 30 | 30 |
| | Total income recognized from structure | 20 | 143 | 214 | (7) | 370 |
| | Total Enron Income Before Interest and Taxes ("IBIT")[94] | 624 | 609 | 666 | 583 | 2,482 |
| | % of income from structure to total Enron IBIT | 3.2% | 23.5% | 32.1% | (1.2)% | 14.9% |

---

[94] Consolidated Condensed Income Statement of Enron appearing in each of 10-Q for 1Q/2000, *supra* note 63; 10-Q for 2Q/2000, *supra* note 72; 10-Q for 3Q/2000, *supra* note 78; and 10-K for 2000, *supra* note 4.

C.    **Selected Transactions**

This portion of the Report provides a legal and, in some cases, accounting analysis of the Selected Transactions. The Selected Transactions, each of which is described in detail below, consist of (i) FAS 140 Transactions known as the Cerberus Transaction, the Nikita Transaction and the Hawaii Transactions, (ii) one similar transaction known as the Backbone Transaction, (iii) one transaction involving the purported sale of emissions credits through an SPE known as the $SO_2$ Transaction and (iv) one securitization involving payments under mining leases known as the Destec Transaction.

What follows is a discussion of some of the legal principles that may be used to analyze these Selected Transactions as a group and a discussion of the accounting standards that apply to certain of these transactions. These legal principles and accounting standards are then discussed in the context of the specific Selected Transactions.

## D.    Legal and Accounting Principles

*Legal Principles*

Each of the Selected Transactions involves a financing for the benefit of Enron
and its affiliates through an off-balance sheet structure.  In most of these transactions,
specific assets are placed and held in SPEs.  Debt financing is then obtained by that SPE
or another Enron affiliated SPE (which serves as the financing vehicle) under various
credit facilities (each, a "Credit Facility" and collectively, the "Credit Facilities") from
one or more lenders (the "Lenders").  In some of the transactions, a small amount of
equity financing is also obtained.

From a legal perspective, these transactions purport to separate the assets and the
related financing from Enron such that the assets will be available to the creditors that
provide the financing to the SPE.  Nevertheless, in many of these transactions, Enron
continued to have significant control of the asset purportedly transferred and retained the
economic benefits of the asset as well as the ultimate responsibility to repay the
financings used to purchase the asset through arrangements such as the Total Return
Swaps described above.  As a result, various legal theories may support a conclusion that
the asset purportedly transferred to the SPE should be included in Enron's bankruptcy
estates.[95]

*True Sale*

Specifically, many of these transactions, including most notably the FAS 140
Transactions, involved a purported sale of an asset by an Enron entity (the "Sponsor") to

---

[95] There are other theories by which these assets or other entities that hold these assets, could be brought
into the Debtors' estates.  Such theories are beyond the scope of this first Report and include substantive
consolidation, piercing the corporate veil, reverse veil piercing and the like.  These remedies, which are

an SPE.  Whether these "sales" should be disregarded and the transactions recharacterized as loans by the Court may significantly affect the rights of the parties in the Bankruptcy Case.  If these transactions are upheld as "true sales" of the assets under applicable law, and no other legal basis exists for challenging the transactions, then the Lenders may have a claim on the underlying asset for their recovery.  If, on the other hand, these transactions are recharacterized and determined to be disguised loans, then it is likely that the underlying assets also will be included as assets of the Debtors' estates.[96] Because, in many cases, it appears that the parties in these transactions did not take a "back-up" security interest in the underlying assets, these assets then would be available to be shared generally by the Debtors' unsecured creditors.[97]

It seems clear from the documents governing most of the Selected Transactions that Enron intended the transfers of assets to be sales for financial reporting purposes.[98]

---

discussed briefly *infra* note 121, require the Court to review facts and circumstances that can be developed only through further investigation.

[96] The Lenders may, because of the existence of the Total Return Swaps, put rights, and guaranties, have an unsecured claim against Enron.

[97] The Lenders, through the Trust in the FAS 140 Transactions, may have an unsecured claim against the Debtors for the amounts of the unpaid financing.  Notably, the documents for the $SO_2$ and Destec Transactions provide for a backup security interest in at least some of the assets.

[98] For example, it was clear that Enron was vitally interested in structuring the FAS 140 Transactions to take advantage of the accounting rules under FAS 140 that permit transfers of financial assets to be accounted for as sales, and thus remove those assets from the consolidated balance sheet of the seller, upon the satisfaction of certain conditions.  While a detailed description of the technical requirements of FAS 140 is beyond the scope of this Report, one central requirement is that the asset being transferred be legally isolated from the transferor or any consolidated affiliate of the transferor such that their creditors could not reach the asset in the event of a bankruptcy of the transferor or any such affiliate.  *See* FAS 140 at ¶ 9(a). In other words, the asset must be transferred in a "true sale" to a non-consolidated, non-affiliated entity. Applicable auditing guidance issued by the American Institute of Certified Public Accountants provides that certain legal opinions constitute acceptable evidence of whether the legal isolation criteria of FAS 140 have been satisfied.  Enron, therefore, needed to provide Andersen with two key opinions from its outside counsel in order for Andersen to approve the accounting treatment.  The first, known as a "true sale" opinion, addresses whether a bankruptcy court would find the transferred asset to be part of the bankruptcy estate of one or more of the various entities participating in the transaction in the event one of those entities were to become a debtor in a bankruptcy case.  The second, known as a "nonconsolidation" or "non-substantive consolidation" opinion concerns whether the assets and liabilities of certain entities participating in the transaction, which assets could include the transferred asset, would not, in the event of a

- 38 -

On the other hand, the economic consequences to Enron of these transactions were substantially similar to loans. In addition, while the Examiner is still in the process of obtaining information from the various Lenders involved in these transactions, the Lenders may have viewed the entire arrangement principally as unsecured Enron credit rather than a financing dependent upon the financial performance of the underlying assets.[99]

The accounting analysis will not ultimately determine the rights of the parties in these transactions under applicable law.[100] These rights should be determined by a court's legal and factual analysis, involving a detailed consideration of numerous factors, with emphasis on the economic substance of the transaction[101] and the intent of the

---

bankruptcy of Enron or certain of its subsidiaries, or one or more of the various entities participating in the transaction, be substantively consolidated with the assets and liabilities of any of those entities. Enron generally, but not always, obtained these legal opinions in connection with most of the Selected Transactions. The opinions, of course, are not dispositive as to whether a true sale actually occurred and, as discussed below, the accounting treatment does not dictate the legal conclusion.

[99] The Examiner has recently served subpoenas to the Lenders for production of documents and is awaiting receipt of documents. *See supra* note 48. Therefore, the Examiner has not reached any conclusion as to the Lenders' intent. As noted below, there are some particular aspects about transactions evident from the transaction documents that may be relevant to this inquiry.

[100] *See In re PSINet Inc.*, 268 B.R. 358, 369 (Bankr. S.D.N.Y. 2001) (considering accounting treatment by the parties as but one factor relative to the analysis of whether a "true sale" took place); *see also Burford-Toothaker Tractor Co. v. United States*, 262 F.2d 891, 894-95 (5th Cir. 1959) (same); *E. Coast Equip. Co. v. Comm'r*, 222 F.2d 676, 677 (3d Cir. 1955) (noting that the purported buyer treated the transaction like a sale on its books); *Cohen v. Army Moral Support Fund (In re Bevill, Bresler & Schulman Asset Mgmt. Corp.)*, 67 B.R. 557, 590-96 (D.N.J. 1986) (same); Committee on Bankruptcy and Corporate Reorganization of the Association of the Bar of the City of New York, *New Developments in Structured Finance*, 56 Bus. Law. 95, 145 & n.191 (Nov. 2000) (citing cases).

[101] The key to a true sale analysis is "the substance of the relationship" between the parties to the transaction, "and not simply the label attached to the transaction." *Endico Potatoes, Inc. v. CIT Group/Factoring, Inc.*, 67 F.3d 1063, 1069 (2d Cir. 1995); *see also Neb. Dep't of Revenue v. Loewenstein*, 513 U.S. 123, 134 (1994) (in tax cases, the court will focus on the "substance and economic realities of the transaction" to determine if there was a loan or a sale of an asset); *Liona Corp. v. PSH Assocs. (In re PCH Assocs.)*, 949 F.2d 585, 597 (2d Cir. 1991) ("It is well established that a bankruptcy court, as a court of equity, may look through form to substance when determining the true nature of a transaction as it relates to the rights of parties against a bankrupt's estate); *Bear v. Cohen (In re Golden Plan of Cal., Inc.)*, 829 F.2d 705, 709 (9th Cir. 1986) ("Whether the parties intended outright sales or loans for security is determined from all the facts and circumstances surrounding the transactions at issue.") (citation omitted).

parties.[102]    The language of the transaction documents is the starting point for this analysis, but it is not dispositive; courts have had "little difficulty in piercing through the shell of words" to determine the true nature of a transaction.[103]

*State of the Law of True Sale*

Whether a transaction is to be characterized as a sale or a financing is a matter of applicable state law as developed through judicial decisions.[104]    Few states have any statutory provisions that bear on this determination.[105]

---

[102] *Goldstein v. Madison Nat'l Bank*, 89 B.R. 274, 276 (D.D.C. 1988) ("To determine whether the agreement at issue was a security or absolute assignment, the Court must search for the intent of the parties. This intent is to be discerned from the contents of the document, the testimony of the contracting parties, and the circumstances surrounding the transaction.") (citations omitted); *People v. Serv. Inst., Inc.*, 421 N.Y.S.2d 325, 327 (Sup. Ct. 1979) (in determining whether a sale or loan took place, "[t]he entire document and the course of conduct of the parties must be examined to determine their intent."); *A.B. Lewis Co. v. Nat'l Inv. Corp.*, 421 S.W.2d 723, 727 (Tex. Civ. App. 1967) ("The courts will look through the form of the transaction used by the parties to determine their real intent.").

[103] *In re Winston Mills, Inc.*, 6 B.R. 587, 598 (Bankr. S.D.N.Y. 1980); *Levin v. City Trust Co. (In re Joseph Kanner Hat Co.)*, 482 F.2d 937, 940 (2d Cir. 1973) ("[T]he courts will determine the true nature of a security transaction, and will not be prevented from exercising their function of judicial review by the form of words the parties may have chosen.") (quotations omitted); *see also Major's Furniture Mart, Inc. v. Castle Credit Corp.*, 602 F.2d 538, 543 (3d Cir. 1979) ("Courts will not be controlled by the nomenclature the parties provide to their relationship" in determining whether a transaction is a sale or a loan.); *In re Criimi Mae, Inc.*, 251 B.R. 796, 802 (Bankr. D. Md. 2000) (despite language in the governing documents indicating the parties intended a sale, where other provisions of the documents indicated that the buyer was merely taking a security interest, those provisions must be given equal weight in determining whether there was a true sale); *In re Coronet Capital Co.*, 142 B.R. 78, 82 (Bankr. S.D.N.Y. 1992); *Hassett v. Sprague Elec. Co. (In re OPM Leasing Servs., Inc.)*, 30 B.R. 642, 646-47 (Bankr. S.D.N.Y. 1983); *In re Evergreen Valley Resort, Inc.*, 23 B.R. 659, 661 (Bankr. D. Me. 1982) (same); *Hillcrest State Bank v. Bankers Leasing Corp.*, 544 S.W.2d 727, 728 (Tex. Civ. App. 1976) ("[M]erely because an assignment is absolute on its face does not prevent a court from treating it as security for a debt if it was so intended. This intent may be shown by parol evidence or by a separate written instrument.") (citations omitted); *Schwartzentruber v. Stephens*, 133 N.E.2d 33, 36 (Ill. 1956) ("[E]very fact or circumstance tending to illustrate the purpose and intent of the parties is admissible."); Peter V. Pantaleo et al., *Rethinking the Role of Recourse in the Sale of Financial Assets*, 52 Bus. Law. 159, 164 (1996) ("Recharacterization cases are centuries old.    They illustrate that the law may not treat a transaction as a sale just because the buyer and seller labeled it a sale. If the buyer later attempts to enforce its rights as a buyer and someone (usually the seller or its creditors) then challenges the sale as a loan, a court, under certain circumstances, could recharacterize the sale as a loan.") (footnote omitted).

[104] *See, e.g.*, *Nobelman v. Am. Sav. Bank*, 508 U.S. 324, 329 (1993) ("In the absence of a controlling federal rule, we generally assume that Congress has 'left the determination of property rights in the assets of a bankrupt's estate to state law' since such 'property interests are created and defined by state law.'") (quoting *Butner v. United States*, 440 U.S. 48, 54-55 (1979)); *Dewhirst v. Citibank (Ariz.) (In re Contractors Equip. Supply Co.)*, 861 F.2d 241, 244 (9th Cir. 1988) ("Whether a debtor in possession has an interest in property is determined by state law."); *In re Rosenshien*, 136 B.R. 368, 372 (Bankr. S.D.N.Y.

The reported decisions typically address a comparatively simple fact pattern in which the transferor/debtor provides an interest in property to a transferee/lender. Then, often because of an intervening bankruptcy, a court must determine whether the *ownership* interest in the property was transferred (that is, whether the transaction was a "true sale") or whether a loan transaction was intended, with the transferee receiving only a lien or similar interest in the subject property and ownership of the property remaining vested in the debtor/purported transferor. None of the reported decisions involved transactions of the complexity found in the Selected Transactions — a multi-tiered seller/borrower structure, multiple, contemporaneous transfers down the corporate chain and the existence of various derivatives, including swaps and complex arrangements consisting of various puts and calls.

The cases provide three important principles for analyzing the legal characterization of a transaction in this context. First, the accounting treatment of a

---

1992) ("After the debtor's property interest is determined under state law, federal bankruptcy law will dictate to what extent that interest is property of the estate.").

[105] Four states appear to have enacted statutes bearing on this determination. *See* Del. Code. Ann. Tit. 6 §§ 2702A, 2703A; Ala. Code §§ 7-9A-623.1, 7-9A-623.2; 2002 N.C. Sess. Laws 88; Ohio Rev. Code Ann. § 1109.75. It does not appear that any of these statutes will apply to the analysis required in the Bankruptcy Case. First, no transaction reviewed to date appears to implicate these states' laws, other than those of Delaware. Second, the Delaware statute was signed into law in January 2002, after the transactions in question were completed. Delaware (as well as the remainder of the states having these statutes) follows the general rule that statutes only apply prospectively unless the statute provides otherwise or the legislature intended otherwise, and in none of these statutes does there appear any retroactive language or intent. *See Tyler v. Dworkin*, 747 A.2d 111, 125 (Del. Super. Ct. 1999) ("Courts will not infer a retrospective application of an act absent a clear and unmistakable expression in the law itself that it is to receive such application."); *Ex parte East Alabama Health Care Auth.*, 814 So. 2d 260, 262 (Ala. 2001) (noting retrospective application of an act is disfavored unless: (1) the act expressly states that it is to be applied retrospectively; (2) the legislature clearly intended the act to have retrospective application; or (3) the act is of a remedial nature); *Springer-Eubank Co. v. Four County Elec. Membership Corp.*, 543 S.E.2d 197, 200 (N.C. Ct. App. 2001) (noting a statute is presumed to have prospective effect only and should not be construed to have a retroactive application unless such intent is clearly expressed or arises by necessary implication from terms of legislation); *Bielat v. Bielat*, 721 N.E.2d 28, 33-34 (Ohio 2000) (noting if there is no express indication of legislative intent to apply a statute retroactively, the "substantive" versus "remedial" issue is never reached, and the statute must be presumed, and applied, prospectively). Accordingly, despite the existence of these statutes, the Examiner believes that the common law will guide the analysis of Enron's transactions.

transaction does not dictate the legal result.[106]  Second, the economic realities of the

transaction and the intent of the parties will determine whether a transaction was a sale,

or should be recharacterized as a loan.[107]  Third, as noted above, a court's analysis will

not be controlled by the parties' choice of language in the transaction documents.  The

parties can characterize the transaction as they wish, but the labels used will not prevent a

court from determining the true nature of the transaction.[108]

Thus, whether a court will ultimately determine that any of the Selected

Transactions were sales or loans will depend on a complete analysis of all of the facts and

circumstances.  This analysis focuses on the intent of the parties and the economic

substance of the transaction.  While each transaction must be analyzed on its own facts,[109]

---

[106] *See* cases cited at note 100, *supra.*

[107] The cases cited at notes 101-02, *supra*, are but recent pronouncements on this point.  One early example is *Twyne's Case*, a fraudulent transfer case in which the English bench refused to countenance an insolvent shepherd's efforts to "donate" his flock to his favored party and frustrate the legitimate rights of another creditor.  *See Twyne's Ca*se, 76 Eng. Rep. 809 (K.B. 1601).  It remains the law today, and the use of modern or creative corporate structures does not render the law superfluous – the economic realities of the transaction and the actual intent of the parties will determine whether there was a sale.

[108] *See* cases cited at note 103, *supra*.  However, parties seeking to uphold a challenged sale will often assert that the analysis turns exclusively or predominantly on the intent of the parties to the transaction as determined by the language of the transaction documents.  That is, if the parties make sufficient, unambiguous declarations of intent at the time of the transaction, the substance of the relationship becomes a secondary inquiry.  *See, e.g.*, Brief of the New York Clearing House Assoc. LLC as Amicus Curiae in Opposition to Debtor's Emergency Motion for an Order Granting Authority to Use Cash Collateral, *In re LTV Steel Co.*, (Case No. 00-43866), Docket No. 507-1, at 12-13 (Feb. 20, 2001, Bankr. N.D. Ohio) ("Some courts give presumptive effect to the parties' contemporaneously expressed intentions and require *clear and convincing evidence that the substantive terms of the transaction negate that intention.*") (citations omitted).  The cases from the Second Circuit cited in the notes above, and other cases as well, indicate that courts examine many facts in a "true sale" analysis.  Language of the transaction documents cannot be ignored and should be given weight, but the true nature of the transaction remains the touchstone of the analysis.  *See also Cohen v. Army Moral Support Fund (In re Bevill, Bresler & Schulman Asset Mgmt. Corp.)*, 67 B.R. 557, 590-96 (D.N.J. 1986) (District Court examined not only the terms of the documents but also extrinsic evidence of intent, including the parties' books and records, accounting and regulatory treatment of the transactions, trade custom and usage, and treatment of the transactions by other courts).  Moreover, where the transaction at issue may have mislead creditors, a more rigorous scrutiny is warranted.  *Cf. Chicoine v. OMNE Partners II (In re OMNE Partners II)*, 67 B.R. 793, 796 (Bankr. D.N.H. 1986) ("Obviously, the [transaction document] was on record, for all interested parties to see . . . .  No misleading of creditors dealing with the debtor . . . is involved in the present case.").

[109] In the sections that follow, the Examiner will analyze each of the Selected Transactions individually.

and the burden of proof is upon the party seeking to recharacterize a transaction,[110] the Examiner believes that many of the Selected Transactions have characteristics that are inconsistent with a true sale.

One of the more important considerations in this analysis that is common to many of the Selected Transactions is the existence of one or more instruments, such as the Total Return Swaps, equity–linked swaps, commodity swaps or put and call options that had the economic effect of transferring both the obligation to repay the financing and the economic risks and rewards of the "sold" asset back to Enron. Under these agreements either Enron or another Enron entity (usually ENA)[111] obligated itself to repay the financing borrowed by the SPE and retained the benefits of the risks of the asset.[112]

Many transactions discussed in the cases contain provisions that allocate partial or full recourse or risk of loss to the purported sellers of assets. Some cases treat recourse as a key indicator that a buyer was really a lender.[113] Others indicate that recourse, standing

---

[110] See Sarf v. Leff (In re Candy Lane Corp.), 38 B.R. 571, 577 (Bankr. S.D.N.Y. 1984) ("[I]t is incumbent upon the party challenging the assignment to show by clear and convincing proof that only a security interest was intended.") (citing Cross v. A.G.V. Assocs., Inc. (In re 716 Third Ave. Holding Corp.), 340 F.2d 42, 44 (2d Cir. 1964)); see also Amdura Nat'l Distribution Co. v. Amdura Corp. (In re Amdura Corp.), 75 F.3d 1447, 1551 (10th Cir. 1996); In re Grand Union Co., 219 F. 353, 357 (2d Cir. 1914); Schwartzentruber v. Stephens, 133 N.E.2d 33, 35 (Ill. 1956) ("The burden of proof rests upon the one asserting a deed absolute in form to be a mortgage to show that fact by clear, satisfactory and convincing proof.") (citations omitted).

[111] When an Enron entity other than Enron was the counterparty to the Total Return Swap, Enron itself typically guaranteed the timely payment when due of all obligations of that Enron entity.

[112] See, e.g., infra Section III.E., Allocation of Risk in a Typical Enron FAS 140 Transaction.

[113] See Ratto v. Sims (In re Lendvest Mortgage, Inc.), 119 B.R. 199, 200 (B.A.P. 9th Cir. 1990) ("Where the risk of loss is shifted from the investor to the debtor through a contractual guarantee of repayment by the debtor, the transaction is a loan and not a sale."); Burford-Toothaker Tractor Co. v. United States, 262 F.2d 891, 894-96 (5th Cir. 1959) (transferor assigned customers' installment contracts to bank, but assignment was with full recourse, and bank required periodic payments to be made to the bank by the transferor, whether or not the customers had paid on the installment contracts; court held that no sale of the installment contracts took place, on these facts).

alone, is insufficient to recharacterize a sale as a loan.[114]  To reconcile these cases, it is important to distinguish between types of recourse.  In many transactions, the seller will warrant that the buyer is receiving assets of a certain type, and if the assets do not satisfy the terms of the warranty, the buyer has a breach of warranty claim, including a right to return the defective asset.  This can be true for purchases of many types of assets, as with a standard warranty provided in a sale of machinery, or a sale of a negotiable instrument or chattel paper where the seller warrants that the underlying obligor will make the payments to the buyer.[115]  This also can be true in account receivable securitization transactions in which the seller may make various representations, such as that the receivables purchased are not excessively aged, or were not generated by the sale of defective goods.  If the seller breaches the warranty, the buyer is entitled to sell or "put" the receivables back to the seller, and such recourse is not inconsistent with a sale.[116]  In

---

[114] *See Major's Furniture Mart, Inc. v. Castle Credit Corp.*, 602 F.2d 538, 544 (3d Cir. 1979) ("The comments to [Uniform Commercial Code] § 9-502(2) (and in particular comment 4) make clear to us that the presence of recourse in a sale agreement without more will not automatically convert a sale into a security interest."); *Stratford Fin. Corp. v. Finex Corp. (In re Startford Fin. Corp.)*, 367 F.2d 569, 571 (2d Cir. 1966) (seller's guarantee of certain checks sold to buyer would not require the transaction to be recharacterized as a loan, where there were other indicia of a sale); *Goldstein v. Madison Nat'l Bank*, 89 B.R. 274, 277-78 (D.D.C. 1988) (finding an assignment of a receivable took place, where recourse language in a sale agreement was the only indication that a sale may not have been intended and all other facts tended to show a sale was the goal of the parties).

[115] *See E. Coast Equip. Co. v. Comm'r*, 222 F.2d 676, 677 (3d Cir. 1955) ("Somehow or other it is thought that the fact that the transferor had an obligation to make good if the principal debtor defaulted is incompatible with the sale. It is very easy to prove the contrary to this contention. Consider the obligation of the seller of a chattel whose sale is accompanied by a warranty. He certainly must make good if the warranty fails. Consider, likewise, the obligation of the endorser of a negotiable promissory note. He warrants to all subsequent holders in due course 'that on due presentment, it shall be . . . paid . . . according to its tenor, and that if it be dishonored . . . he will pay the amount thereof to the holder . . . .'. If the holder of a note sells it, endorsing it to the purchaser as he does so, it could hardly be seriously argued that the fact that he has this contingent liability makes the transaction a loan and not a sale."); *A.B. Lewis Co. v. Nat'l Inv. Corp.*, 421 S.W.2d 723, 728 (Tex. Civ. App. 1967).

[116] *In re Grand Union Co.*, 219 F. 353 (2d Cir. 1914) (seller of accounts agreed that if the accounts were of poor quality, it would repurchase them or pay buyer so as to guarantee a certain rate of return for the buyer); Committee on Bankruptcy and Corporate Reorganization of the Association of the Bar of the City of New York, *Structured Financing Techniques*, 50 Bus. Law. 527, 543-44 (1995) (describing forms of recourse that may be permissible in structured finance transactions).

the case of many of the Selected Transactions, however, the Total Return Swaps and

other instruments provided much more – that the Lenders were assured (through Enron's

obligation to fund the SPEs' obligations to repay the amount of the financing) of

receiving a guaranteed payment of principal and interest on the funds lent to buy the

underlying assets regardless of the quality or value of the assets. A guarantee by the

seller not only of asset quality, but also of one's return on an investment, is indicative of

a loan, not a sale.[117]

The Total Return Swaps and other financial instruments found in most of the

Selected Transactions contain terms that provided Enron with essentially all of the

economic benefits of the assets in exchange for its obligation to fund the SPEs'

obligations to repay the amount of the debt. Where the risk of ownership of an asset is

not transferred to a buyer, and the seller retains the benefits of the appreciation of the

asset, then the transaction is likely to be viewed as a loan, rather than a sale.[118] Likewise,

---

[117] *See Fireman's Fund Ins. Cos. v. Grover (In re Woodson Co.)*, 813 F.2d 266, 271 (9th Cir. 1987) (holding there was no true sale where investors with the debtor, who were alleged to own mortgages originated by the debtor, "were paid interest monthly regardless of whether the original borrower paid [the debtor]. In the event of default, [the debtor] paid the investor the interest and the principal owing on the investor's" original deposit); *Ryan v. Zinker (In re Sprint Mortgage Bankers Corp.)*, 164 B.R. 224, 228-29 (Bankr. E.D.N.Y. 1994) ("The existence of a guarantee [as part of an alleged sale transaction] seems to result in a finding of a debtor-creditor relationship in most cases.") (quotation omitted); *European Am. Bank. v. Sackman Mortgage Corp. (In re Sackman Mortgage Corp.)*, 158 B.R. 926, 933-35 (Bankr. S.D.N.Y. 1993) (where the party allegedly buying the asset had no risk of nonpayment or loss from the asset, and could look to the seller for recourse, a loan was likely intended); *Ables v. Major Funding Corp. (In re Major Funding Corp.)*, 82 B.R. 443, 445 (Bankr. S.D. Tex. 1987); *Castle Rock Indus. Bank v. S.O.A.W. Enters., Inc. (In re S.O.A.W. Enters., Inc.)*, 32 B.R. 279 (Bankr. W.D. Tex. 1983) (seller originated mortgages, sold certain interests in them to buyer, guaranteed the buyer's recovery on the mortgages and the buyer's rate of return on its investment, indicating the transaction was a loan for security as opposed to a sale); *see also Merchants' Transfer & Storage Co. v. Rafferty (In re Gotham Can Co.)*, 48 F.2d 540, 541-42 (2d Cir. 1931) ("The obligation of [the seller] to repay [the buyer] all advances [on accounts allegedly sold] in full and to pay certain percentages for the use of the money, shows that the transactions were essentially collateral loans, and not sales . . . ."); Peter V. Pantaleo *et al.*, *Rethinking the Role of Recourse in the Sale of Financial Assets*, 52 Bus. Law. 159 (1996).

[118] *See, e.g., Endico Potatoes, Inc. v. CIT Group/Factoring, Inc.*, 67 F.3d 1063, 1069 (2d Cir. 1995) ("The root of all of these factors [considered in a sale/loan analysis] is the transfer of risk."); *Major's Furniture Mart, Inc. v. Castle Credit Corp.*, 602 F.2d 538, 545 (3d Cir. 1979) (noting that "[i]t appear[ed] that [buyer] required [seller] to retain all conceivable risks of uncollectibility of those accounts," and thus holding there

if the seller has an ability to re-acquire the asset transferred, then courts are more likely to call the transaction a loan, as opposed to a sale.[119]  In essence, the Total Return Swaps and similar instruments permitted Enron or its affiliates to receive any surplus value in the assets being transferred, over and above the amount necessary to repay the original purchase price plus the financing costs of the transaction.  Courts examining transactions with similar characteristics often conclude that they are loans, not sales.[120]

---

was no sale of the accounts, but instead, a loan on them); *Burford-Toothaker Tractor Co. v. United States*, 262 F.2d 891, 894-96 (5th Cir. 1959) (transferor assigned customers' installment contracts to bank, but assignment was with full recourse, and bank required periodic payments to be made to the bank by the transferor, whether or not the customers had paid on the installment contracts; court held there was no sale of the installment contracts). *In re PSINet Inc.*, 268 B.R. 358, 374 (Bankr. S.D.N.Y. 2001) (where debtor retained the risks associated with certain equipment, including the risk that the equipment's value would fall far below the amount of the money the debtor borrowed to buy the equipment, an intercompany transfer of the equipment to a subsidiary of the debtor was not perceived as a sale). As a leading article on structured finance notes:

> Risk of loss is considered the single most important element in a true sale analysis of third-party receivables. Both the nature and extent of recourse must be evaluated. If there is excessive recourse, direct or indirect, against the transferor covering credit losses, an issue may exist as to whether the risk of loss has been sufficiently transferred for there to be a "true sale." For example, full recourse in the form of a put or similar obligation to repurchase assets at a fixed price and date (without regard to asset performance) would likely be viewed as a loan, not a sale.

Committee on Bankruptcy and Corporate Reorganization of the Association of the Bar of the City of New York, *Structured Financing Techniques*, 50 Bus. Law. 527, 543 (1995); *see also In re Carolina Utilities Supply Co.*, 118 B.R. 412, 416 (Bankr. D.S.C. 1990) (where alleged seller of accounts retained the rights and benefits of all payments on the accounts after the alleged buyer recovered its initial advance of funds, the transaction would be characterized as a loan, and not a sale).

[119] *See Endico Potatoes, Inc. v. CIT Group/Factoring, Inc.*, 67 F.3d 1063, 1069 (2d Cir. 1995) (where alleged seller of receivables had the right to pay all outstanding sums owed to the alleged buyer, and in so doing eliminate the alleged buyer's interests in the receivables, a loan transaction was almost certainly intended); *First Nat'l Bank of Louisville v. Hurricane Elkhorn Coal Corp. II (In re Hurricane Elkhorn Coal Corp. II)*, 19 B.R. 609, 617 (Bankr. W.D. Ky. 1982); *see also* Committee on Bankruptcy and Corporate Reorganization of the Association of the Bar of the City of New York, *Structured Financing Techniques*, 50 Bus. Law. 527, 546 (1995) ("[A]ny arrangement by which the seller could reacquire the transferred assets (such as through a put or a call mechanism) could result in the transaction being recharacterized as something other than an absolute transfer. These have to be considered on a case-by-case basis.").

[120] *Levin v. City Trust Co. (In re Joseph Kanner Hat Co.)*, 482 F.2d 937, 940 (2d Cir. 1973) (purported assignee admitted that if it received more than it was originally owed by the assignor from certain assets allegedly assigned to it, it would remit the surplus to the assignee, which made it highly unlikely that the assignment was an absolute transfer, but rather, a transfer as security); *Dewhirst v. Citibank (Arizona) (In re Contractors Equip. Supply Co.)*, 861 F.2d 241, 245 (9th Cir. 1988) (same); *United States v. MidPac Lumber Co.*, 976 F. Supp. 1310, 1317 (D. Haw. 1997) (same); *Stephenson v. First Union Nat'l Bank (In re Berry)*, 189 B.R. 82, 88 (Bankr. D.S.C. 1995) (same); *Hassett v. Sprague Elec. Co. (In re OPM Leasing*

In those instances where the presence of a Total Return Swap is necessary for recharacterization of the transaction, the fact that the Enron counterparty to the Total Return Swap is not the Sponsor may be relevant to the Court's analysis.[121]

---

*Servs., Inc.)*, 30 B.R. 642, 647 (Bankr. S.D.N.Y. 1983) (same); *In re Evergreen Valley Resort, Inc.*, 23 B.R. 659, 662 n.9 (Bankr. D. Me. 1982) (same).

[121] Parties that may have an interest in the legal conclusion that the asset sales were "true sales" rather than part of a loan may argue that the presence of a Total Return Swap should not be considered in the true sale/loan analysis, because the Total Return Swap was not between the Sponsor (that "sold" the asset) and the SPE that purchased the asset (or its Lenders), but between a third party (typically, Enron or ENA) and the SPE that purchased the asset (or its Lenders). Accordingly, it would be argued, in those portions of the overall transaction in which the Sponsor participated, the Sponsor parted with all incidents of ownership in the asset; thus, the "sale" must be a true sale. The Examiner recognizes that the identity of the party to the Total Return Swap may be relevant to the Court's analysis. For instance, had the Total Return Swap been between the Sponsor and the SPE that purchased the asset (or its Lenders), the Examiner's view is that it would be very difficult to argue successfully that a "true sale" existed. The Examiner believes that, even where the Enron party to the Total Return Swap is the parent or other affiliate of the Sponsor, rather than the Sponsor itself, the existence of the Total Return Swap is a relevant factor in determining whether there was a true sale. To conclude otherwise and disregard the existence of these rights and obligations, whether held by the Sponsor or its affiliate, would ignore the economic reality of the transaction.

In a variety of contexts, the courts have not hesitated to consider the impact on one part of a transaction, even when among different parties, on another part of a transaction, in the process of determining the true nature or impact of the transaction. In each case, the court's analysis is dependent on the facts before it. *See, e.g., In re Best Prods. Co., Inc.*, 157 B.R. 222, 228 (Bankr. S.D.N.Y. 1993) (in determining nature of transaction, court rejected one party's position that "would have me don blinders, confining my analysis of the economic substance of what occurred here to the sublease . . . ." and, after considering entire transaction, concluded that a loan, rather than a true lease, was the substance of the transaction); *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 934 (S.D.N.Y. 1995) (Where an LBO was challenged as a fraudulent conveyance, the court stated, "If each transfer of assets that takes place is viewed in isolation, the result may well be different than if the transaction is treated as an integrated whole. In general, courts will look past the form of a transaction to its substance. Thus, an allegedly fraudulent conveyance must be evaluated in context; where a transfer is only a step in a general plan, the plan must be viewed as a whole with all its composite implications. It is well established that multilateral transactions may under appropriate circumstances be 'collapsed' and treated as phases of a single transaction for analysis under the [fraudulent conveyance statutes].") (internal quotes and citations omitted); *Wyle v. C.H. Rider & Family (In re United Energy Corp.)*, 944 F.2d 589 (9th Cir. 1991) (in a case involving a Ponzi scheme, the trustee sought to recover "power payments" made by one debtor, RPC, as constructively fraudulent, and the defendants asserted that they gave value in return for those payments, in the form of a credit against their restitution claim against a related debtor, UEC. "The Trustee contends that even if the investors' right to restitution could be considered a 'debt,' the power payments were not transferred in exchange for such a debt. On one level, the Trustee is, of course, correct. The investors signed two separate contracts—one with UEC . . . and another with RPC . . . . UEC and RPC were separate entities. On this basis the Trustee argues RPC received nothing in exchange for the power payments it made, and therefore the Trustee should have been allowed to avoid these payments as fraudulent transfers. We reject this argument. Bankruptcy courts are courts of equity. As such, they possess the power to delve behind the form of transactions and relationships to determine the substance.").

In addition, other doctrines, such as principal-agent; corporate instrumentality; veil piercing, reverse veil piercing, or substantive consolidation, could be used to defeat the assertion that the use of an Enron affiliate, rather than the Sponsor, as the counterparty to the Total Return Swap, immunized the sale of the asset from recharacterization as a loan. It may also be possible for a court to conclude that the

In summary, applicable decisions have identified several factors relevant to a loan characterization. These factors, as evidenced by the conduct of the parties that appear in one or more of the Selected Transactions, include:

1. <u>Control Over Asset</u>. Enron and the Sponsor continued to exercise significant control over the transferred asset,[122] as well as control over the proceeds of the asset.[123]

2. <u>Benefits and Risks</u>. Enron continued to have the risks of the performance of the assets, as well as the true economic benefits of the underlying asset through various arrangements, including Total Return Swaps or other agreements.[124]

3. <u>Lenders' Intent</u>. Based upon the limited information available in the investigation thus far, it appears that the principal credit basis for most of these financings was Enron's creditworthiness and not the value or anticipated cash flow of the subject asset.[125] Many of the assets were

---

economic effect of the transaction was to make the counterparty to the Total Return Swap (typically Enron or ENA) the owner of the asset sold by the Sponsor.

[122] *Cf. generally* Committee on Bankruptcy and Corporate Reorganization of the Association of the Bar of the City of New York, *Structured Financing Techniques*, 50 Bus. Law. 527, 541 (1995) ("An absolute transfer is a complete divestiture of ownership -- the transferor no longer retains any right, title or interest in the property.").

[123] *See, e.g., Neb. Dep't of Revenue v. Loewenstein*, 513 U.S. 123 (1994) (where alleged buyer of securities did not have the right to receive interest on such securities, with interest instead paid to seller until seller could repurchase securities, buyer was not, for tax purposes, the owner of the securities); *In re Am. Fibre Reed Co.*, 206 F. 309, 317 (E.D. Ky. 1913) (seller of accounts had the responsibility of collecting the accounts for the buyer, at no cost, such facts being indicative of a loan on the accounts, not a sale of them).

[124] *See supra* notes 118-20 for cases discussing the impact of this factor.

[125] That the Lenders relied principally on the credit of Enron for repayment may be confirmed by the fact that the Lenders and the equityholders required legal opinions from outside counsel to the effect that Enron's obligations under the Total Return Swaps would be enforceable against it but tellingly did not require a backup security interest in the underlying asset or delivery of true sale, non-substantive consolidation or security interest opinions as would be expected if the Lenders had been relying on the asset for repayment.

illiquid or difficult to sell. In most of the transactions, it appears that the
Lenders did not take a back up security interest nor did they require
delivery to them of legal opinions on true sale and non-substantive
consolidation. However, the amount of diligence performed on behalf of
the Lenders with respect to the underlying assets[126] and whether the "sale"
price paid for the transfer of the asset was of secondary importance to the
Lenders must await further examination.[127]

4. <u>Loan Pricing</u>. The interest rate on the debt financing provided by the
Lenders appears to have been based on Enron's credit through the Total
Return Swap and other instruments, rather than the financial performance
of the underlying asset.[128]

---

[126] *See Burford-Toothaker Tractor Co. v. United States*, 262 F.2d 891, 894 (5th Cir. 1959) (noting that while most of transferor's notes were for large sums, the bank acquiring an interest in the notes made no credit inquiry of the financial responsibility of any such customers; for these and other reasons, holding there was no sale of the notes, but rather, a secured loan); *A.B. Lewis Co. v. Nat'l Inv. Corp.*, 421 S.W.2d 723, 728 (Tex. Civ. App. 1967) (holding that the transactions at issue were indeed sales, and emphasizing the buyer's due diligence efforts and its refusal to purchase similar assets from the seller in other transaction where its research revealed poor asset quality). *But see Bear v. Cohen (In re Golden Plan of California, Inc.)*, 829 F.2d 705, 710 & n.6 (9th Cir. 1986) (noting that buyers performed no due diligence on the *res* purchased, tending to indicate there was not a sale, but still holding, where all other factors supported the parties' intent to convey the res, that a sale did take place).

[127] In a true sale analysis, a court will examine the purchase price or other consideration provided to the purported seller. If the purchase price reflects the terms of a sale made at arm's length to a third party, based in part upon valuation evidence (such as opinions) or other market data, a court will be much more likely to find a true sale took place. *Cf. Official Comm. of Unsecured Creditors of Interstate Cigar Co. v. Bambu Sales, Inc. (In re Interstate Cigar Co.)*, 182 B.R. 675, 679 (Bankr. E.D.N.Y. 1995) (in determining whether an insider's pre-petition transfer was a loan to the debtor or a capital contribution, the court will consider evidence as to whether a disinterested lender would have made the same investment at the same time); *see also Conway's Executors & Devisees v. Alexander*, 11 U.S. (7 Cranch) 218, 241 (1812) (adequacy of price a relevant consideration as to whether the transaction was a loan or a sale); *Grodt & McKay Realty, Inc. v. Comm'r*, 77 T.C. 1221, 1240-41 (1981) ("Since a normal attribute of a true arm's-length sale is a purchase price at least approximately equal to fair market value, the totally disproportionate purchase price in this instance strongly militates against petitioners' contention that a true sale has taken place.") (citation omitted).

[128] *See Fireman's Fund Ins. Cos. v. Grover (In re The Woodson Co.)*, 813 F.2d 266, 271 (9th Cir. 1987) (analyzing alleged buyer's expected return on the underlying asset to determine whether there was a true sale).

5. Enron's Intent. Enron itself viewed the Selected Transactions as something less than final sales.[129]

6. Tax Treatment. Enron treated some of the transactions as loans for tax purposes.[130]

The courts also will examine how the alleged buyer and seller act with respect to the asset(s) in question after the transaction is complete.[131] As additional information is obtained regarding the actions of the parties after the closing of the transactions, it will be incorporated into subsequent reports.

In contrast, the only common characteristics in most of the Selected Transactions that support a sale characterization are the express terms of the documents that, among

---

[129] See cases supra notes 101-03 for the importance of the parties' actual intent. Internal Enron correspondence and other documents indicate that Enron viewed the FAS 140 Transactions as something less than final sales. In the Bank Presentation Enron stated that its rationale for the FAS 140 Transaction was for a "bridge for ulimate sale of non-core assets" and to generate "cash flow for reinvestment" See Bank Presentation, supra note 22, at 59. Enron also described the Hawaii Transaction as "a vehicle for Enron to fund assets off-balance sheet and better time asset sales." Enron Corp. Hawaii 125-0 Trust Presentation, June 3, 2002 (the "Enron Hawaii Presentation"), at 3 [AB000350414-AB000350427]. This indicates that Enron was using the Hawaii Transaction to acquire funds in the short term using certain assets, while retaining the opportunity to subsequently re-acquire those assets and sell the assets to a third party for further gain. The economic reality of this transaction may thus be viewed as a bridge loan, as opposed to a sale.

[130] Tax treatment is a factor to be taken into account in the analysis of these transactions. See Uni-Rty Corp. v. Guandong Bldg., Inc. (In re Uni-Rty Corp.), 96 Civ. 4573 (DAB), 1998 U.S. Dist. LEXIS 8426 (S.D.N.Y. June 9, 1998) (noting that the alleged buyer of the property at issue took tax deductions on the property, tending to show the transaction was a sale, not a loan). However, the parties' tax treatment is not dispositive, for it is not uncommon in transactions of this type for the transactions to be characterized differently for tax and accounting purposes.

[131] See Levin v. City Trust Co. (In re Joseph Kanner Hat Co.), 482 F.2d 937 (2d Cir. 1973); In re PSINet Inc., 268 B.R. 358, 369 (Bankr. S.D.N.Y. 2001) (alleged "seller" continued to insure property at issue, and based on this and other facts, held there was no sale); In re 48th St. Steakhouse, Inc., 61 B.R. 182, 184-85 (Bankr. S.D.N.Y. 1986) (post-closing actions by the parties to a lease assignment will determine whether there was an absolute assignment or the assignment was only collateral for a loan); Hassett v. Sprague Elec. Co. (In re OPM Leasing Servs., Inc.), 30 B.R. 642, 647 (Bankr. S.D.N.Y. 1983) (the seller continued to pay taxes on the allegedly transferred property, indicating that a sale did not take place); Schwartzentruber v. Stephens, 133 N.E.2d 33, 35 (Ill. 1956) (after the alleged sale of certain realty, the seller did not pay taxes or pay for insurance on the realty, and did not pay for upkeep of the realty, tending to show there was a sale of the realty, as opposed to a financing transaction under which title to the realty was not to change).

other things, state that the relevant transfers are sales, and that in some cases Enron accounted for most of these transactions as sales.

### Avoidance Powers with Respect to the Selected Transactions

As provided by the April 8th Order, the Examiner has commenced the analysis of potentially voidable transfers with respect to the Debtors' insiders and professionals. However, bankruptcy avoidance actions and other claims and causes of action that may arise out of the Debtors' bankruptcy also are implicated in the context of the Examiner's investigations of the SPEs and related transactions. For example, each SPE transaction involves numerous transfers and obligations that may implicate bankruptcy avoidance powers.

Section 547 of the Bankruptcy Code provides that certain transfers made within ninety days of the petition date of a debtor may be avoided as a preference. In addition, transfers made or obligations incurred for less than reasonably equivalent value, while the transferor or obligor was insolvent, may be avoided as a constructively fraudulent transfer, under Section 548 of the Bankruptcy Code. [132]

The reach back period for a preferential transfer is ninety days; however, under Section 547(b)(4)(B) of the Bankruptcy Code, in the case of a transfer made to or for the benefit of an insider, the reach back period is extended for one year. In addition, some state laws may provide for avoiding preferential transfers made more than one year prior to the petition date. The reach back period under Section 548 of the Bankruptcy Code for

---

[132] As a general matter, to the extent that one could establish that the transferor had an actual intent to defraud in connection with a transfer of property or the execution of an obligation, the transfer or obligation may be avoided under Section 548(a)(1). In addition, under Section 544 of the Bankruptcy Code, the bankruptcy trustee may also assert state law theories to avoid fraudulent transfers (and, in some states, preferential transfers). Most states have now enacted the Uniform Fraudulent Transfer Act or the Uniform Fraudulent Conveyance Act, both of which are similar to Section 548 of the Bankruptcy Code.

a fraudulent transfer is one year. Under Section 544(a) of the Bankruptcy Code, the debtor in possession or bankruptcy trustee (or any successor under a plan under Section 1129 of the Bankruptcy Code) may assert certain state law fraudulent transfer causes of action which would, potentially, extend the reach back period with respect to such fraudulent transfers up to four (and perhaps as long as six) years.

Finally, in addition to the avoidance powers, under the Bankruptcy Code, a trustee or debtor in possession will also have the ability to affect distributions pursuant to the provisions of Section 502(d) (which requires disgorgement of voidable transfers prior to allowance of the claim) or the subordination of a claim under either Section 510(b) (dealing with certain securities claims) or Section 510(c) (dealing with equitable subordination) of the Bankruptcy Code. These issues will be analyzed and addressed by the Examiner in future reports.[133]

This Report will not discuss in any significant detail the potentially voidable transfers in connection with the Selected Transactions described herein. However, the Examiner notes that with respect to the $SO_2$ Transaction, *potential* preference and fraudulent transfer claims appear from a review of the documents. Approximately five weeks before the Petition Date, Enron pledged and transferred $59.5 million dollars to Barclays Bank PLC ("Barclays") as security for obligations owing to Barclays or those entities in which Barclays "has an interest." Subsequent to the Petition Date, Barclays terminated certain swap agreements and applied the $59.5 million to "satisfy" alleged

---

[133] Many of the avoidance actions have, as one of their essential elements, the requirement that the transferor or obligor be insolvent at the time of the transfer. Given that this Report is the Examiner's initial report, the Examiner can express no conclusion as to the solvency of Enron or any of its affiliates at any particular time. However, he will be analyzing the insolvency of Enron and its affiliates in coordination with the Debtors and the Creditors' Committee.

claims against Enron.[134] Thus, it appears that this transfer may be subject to *potential* preference or fraudulent transfer actions.

In any event, the Examiner is aware that many of the underlying aspects of each of the Selected Transactions may be subject to challenge pursuant to the avoidance powers contained within the Bankruptcy Code. Moreover, the claims that may be asserted against the Debtors may be subject to disallowance or subordination by virtue of the provisions of the Bankruptcy Code. Those issues will be addressed in more detail in future reports.

*Accounting Treatment and Financial Statement Disclosure*

Enron accounted for each of the FAS 140 Transactions in the following three ways. First, in most cases Enron recognized gain on sale of the asset ("Gain on Sale"). Enron recognized the difference, if any, between the cash proceeds received by the Sponsor as a special distribution from a newly formed limited liability company that purchased the asset (the "Asset LLC") (in other words, the consideration received for the transfer of the asset) and the carrying value of that asset as gain that was included in IBIT.[135] Second, depending upon the asset involved, Enron recognized cash flow from these activities as cash flow from operating activities or cash flow from investing

---

[134] The actions of Barclays will be the subject of subsequent reports. The Examiner notes that there may be certain defenses available to voidable transfer claims by the swap participants. *See* 11 U.S.C. §§ 101(53B), 546(g) and 560. As discussed elsewhere in this Report, the Examiner, by using the nomenclature "swap" does not conclude that any particular contractual arrangement with a nondebtor counterparty is, in fact, a swap as defined or contemplated by Section 101(53B). Rather, the Examiner is simply using the nomenclature utilized by Enron in connection with certain of these transactions without prejudice to the Examiner's ultimate conclusions (or the conclusion of the Court) on these issues. Moreover, the termination of the swap obligations may or may not be subject to the protections of Section 546(g) of the Bankruptcy Code. *See Interbulk, Ltd. v. Louis Dreyfus Corp. (In re Interbulk, Ltd.),* 240 B.R. 195, 202 (Bankr. S.D.N.Y. 1999). Finally, the post-petition setoff effected by Barclays may implicate the automatic stay. *See* 11 U.S.C. § 362(a)(7). *But see* 11 U.S.C. § 362(b)(17).

activities. Third, in periods subsequent to the sale, Enron would "mark to market" the Total Return Swap or similar instrument entered into in connection with that sale, based upon Enron's valuation of the underlying assets compared to the payments required to be made by Enron to satisfy principal and interest due under the underlying Credit Facility and amounts due under the equity certificate. If Enron's valuation of the assets exceeded the amounts due under the Credit Facility and to the holder of the equity certificate, Enron would reflect the excess as part of its price risk management assets. On the other hand, if payments to be made by Enron under the Credit Facility exceeded Enron's valuation of the assets, Enron would reflect the deficit as part of its price risk management liabilities.[136]

### Were the Accounting Treatment and Financial Statement Disclosure Proper?

Based upon the review by his legal counsel and accounting experts of certain Andersen workpapers prepared in connection with its audit of Enron's 2000 financial statements, the Examiner believes there is a substantial basis for concluding that Enron's obligations under the Total Return Swaps were not properly disclosed as required by GAAP. As discussed above, under the Total Return Swaps Enron was obligated, among other things, to make (typically through payments to the Trust SPE in the case of the FAS 140 Transactions) payments equal to principal plus interest owing under the Credit

---

[135] The Examiner understands that in some cases, the Gain on Sale was significant, but in other cases, in which the asset itself had been marked to market prior to the sale, there was little or no Gain on Sale. The financial statement impact of each transaction under review in this Report is set forth below.

[136] "From time to time, Enron sells interests in certain of its financial assets. Some of these sales are completed in securitizations, in which Enron concurrently enters into swaps associated with the underlying assets that limits the risks assumed by the purchaser. Such swaps are adjusted to fair value using quoted market prices, if available, or estimated fair value based on management's best estimate of the present value of future cash flow. These swaps are included in Price Risk Management activities above as equity investments." 10-K for 2000, *supra* note 4, at Financial Statements, Note 3, "Price Risk Management Activities and Financial Instruments."

Facility in connection with these monetizations. Where did Enron disclose this obligation? In Note 3 to Enron's 2000 audited, annual financial statements, Enron "disclosed" its off-balance sheet debt obligations related to all of its FAS 140 transactions as part of its disclosure on derivative instruments used in trading activities.[137] This reference and its significance may have been apparent only to persons who understood financial accounting for securitization transactions and derivatives and the details of Enron's FAS 140 Transactions. Specifically, in Note 3 ("Price Risk Management Activities and Financial Instruments"), Enron states that it (bold emphasis added):

> offers price risk management *services to* wholesale, commercial and industrial *customers* through a variety of financial and other instruments including forward contracts involving physical delivery, *swap agreements*, which require payment to (or receipt of payments from) counterparties based on the difference between a fixed and variable price for the commodity, options and other arrangements.

The note then sets forth the following table (bold emphasis added):

> *Notional Amounts and Terms.* The notional amounts and terms of these instruments at December 31, 2000 are shown below (dollars in millions):

| | Fixed Price Payor | Fixed Price Receiver | Maximum Terms in Years |
|---|---|---|---|
| Commodities [(a)] | | | |
|   Natural gas | 7,331 | 6,910 | 23 |
|   Crude oil and liquids | 3,513 | 1,990 | 6 |
|   Electricity | 2,424 | 2,388 | 24 |
|   Metals, coal, and | | | |
|     Pulp and paper | 368 | 413 | 9 |
|   Bandwidth | 167 | 325 | 11 |
| Financial products | | | |
|   Interest rate [(b)] | $4,732 | $3,977 | 29 |
|   Foreign currency | $ 79 | $ 465 | 22 |
|   *Equity investments* [(c)] | *$2,998* | $3,768 | 13 |

(footnotes to table omitted).

---

[137] *See id.* at Note 3, "Price Risk Management Activities: Trading Activities: Notional Amounts and Terms."

The note then contains the following statement:

> Notional amounts reflect the volume of transactions but do not represent the amounts exchanged by the parties to the financial instruments. Accordingly, notional amounts do not accurately measure Enron's exposure to market or credit risks.

Based on the review of Enron's accounting documents by his legal counsel and accounting experts, the Examiner believes that in connection with certain of the FAS 140 Transactions discussed in this Report, more than $744 million of the $2.998 billion identified above as the notional principal amount of derivatives contracts entered into with its "customers" in fact represented amounts that Enron was obligated to pay under Total Return Swaps or similar arrangements.[138] Thus, in substance, Enron's obligation to pay this amount is disclosed only as the notional[139] amount of derivative instruments that it issued as a part of the ***price risk management services***" it offers to its "***customers***."

---

[138] Enron's accounting documents indicate that $2.367 billion of the $2.998 billion disclosed as notional principal amount of derivative contracts in footnote 3 to Enron's 2000 Financial Statements was the notional principal amount of Enron's total return swaps. Of this $2.367 billion, $744 million represents obligations incurred under Total Return Swaps entered into by Enron in certain of the FAS 140 Transactions discussed in this Report. If the remaining total return swaps contain obligations similar to these FAS 140 Transaction Total Return Swaps, then the amount of Enron's undisclosed liabilities would increase from $744 million to $2.367 billion. These additional total return swaps are under investigation and the Examiner's findings will be included in future reports.

[139] In the majority of derivative transactions, the "notional" amount is an assumed amount on which calculations of payments are based but which itself is not either paid or received. For example, in a typical interest rate swap, one counterparty ("Party A") may agree to pay a fixed interest rate of 6% on a notional principal amount of $100,000 to the other counterparty ("Party B") during the term of the swap. In return, Party B may agree to pay to Party A a floating interest rate, such as the prime rate, on that same notional amount on the same payment dates. In most cases, these payment obligations will be netted so that Party A will pay to Party B any amount by which interest on the notional principal amount, calculated at the fixed rate, exceeds interest calculated on the notional principal amount at the floating rate and vice versa. The $100,000 notional amount is never paid or repaid. In contrast, under the Total Return Swaps discussed in this Report, Enron is obligated to pay amounts equal to both principal and interest on the related financing, even though they are labeled as "notional amounts."

The Examiner's accounting experts have advised the Examiner that, in their opinion, this disclosure was not in accordance with GAAP.[140]

The Examiner's accounting experts have also advised the Examiner that accounting issues exist concerning whether recognition of Gain on Sale, the characterization of cash flows and the consolidation or non-consolidation of entities were appropriate in the context of the FAS 140 Transactions covered in the Report. However, neither the Examiner nor his accounting experts have reached any final conclusions on these issues. These questions will be addressed in future reports.

Finally, the Examiner and his professionals have not yet had an opportunity to examine fully the accounting treatment and related financial statement disclosure in connection with the Backbone Transaction, the Destec Transaction or the $SO_2$ Transaction. As a result, the Examiner will not report at this time with respect to such issues. The Examiner will continue to review these issues and report his findings to the Court in future reports.

---

[140] The Examiner's accounting experts have also advised that FAS 105 required disclosure of the face, contract or notional amount of the Total Return Swap (with additional disclosure if the instruments have leverage features), and the terms and nature of the instruments, including cash requirements with respect thereto. FAS 105 also required disclosure of the accounting loss Enron would incur if the Total Return Swap counterparty failed completely to perform according to the swap agreement and the collateral, if any, securing the swap proved to be of no value. Furthermore, although Enron is entitled to payments under Total Return Swaps, which could potentially offset its payment obligations under the Total Return Swaps, such payments are dependent upon the financial performance of the underlying asset whereas Enron's obligations to pay under the Total Return Swaps were not conditional.

### E.    Typical Enron FAS 140 Transactions

*Purpose of a Typical Enron FAS 140 Transaction*

Through numerous transactions that were intended by Enron to comply with FAS 140, Enron "monetized" a variety of otherwise illiquid assets, removing those assets from its balance sheet while at the same time retaining control over them with a view to time better the final sale of those assets.[141] Enron began engaging in FAS 140 transactions as early as 1998 and completed its last FAS 140 transactions in the months immediately preceding the filing of the Bankruptcy Case.[142]

When Enron monetized an asset in a FAS 140 Transaction, the Sponsor that transferred the asset received a payment equal to the amount financed through the structure,[143] and Enron recognized as income on its financial statements all, or its share of, the difference between those cash proceeds and the carrying value of the asset.[144] Despite the "sale" of these assets, Enron continued to treat them as part of its own holdings.[145] Then, through the Total Return Swaps entered into in connection with many of the transactions, Enron, though purportedly engaging in a sale by an affiliate to an unrelated third party, obligated itself to repay amounts equal to both the principal amount of, and the interest payable on, the loans used to fund the purchase, thereby retaining the

---

[141] *See* Enron Hawaii Presentation, *supra* note 129.

[142] For example, the Nikita Transaction was completed in September 2001. *See infra* Section III.G.

[143] *See, e.g.*, Section 5.03, Amended and Restated Limited Liability Company Agreement of McGarret VI, L.L.C., Dec. 7, 2000 (the "McGarret F Asset LLC Agreement") (entered into in connection with the McGarret F Hawaii transaction) [AB000034302-AB000034343].

[144] *See supra* Section III.D., *Accounting Treatment and Financial Statement Disclosure.*

[145] *See The Role of the Board of Directors in Enron's Collapse, Report of the Permanent Subcomm. on Investigations, Senate Comm. on Governmental Affairs*, 107th Cong. (July 8, 2002) (the "Permanent Subcommittee on Investigations Report"), at 7 and Exhibit 39 (available at http://www.senate.gov/~gov_affairs/070902enronboardreport.pdf); *see also* Bank Presentation, *supra* note 22, at 59.

risk of a decrease in the value of the asset below the amount due on the loan. This aspect of the transaction makes it more closely resemble in practical consequence a loan to Enron rather than a sale of that asset. The Total Return Swaps were marked to market by Enron with the result that Enron, in fact, reported on its balance sheet, and in its income statement, the effects of subsequent decreases or increases in the value of the financed asset.[146]

Enron viewed these transactions as "balance sheet management" efforts rather than as irrevocable and final dispositions of the assets.[147] As part of these management efforts, Enron monetized several types of assets in the FAS 140 Transactions, including shares of common stock or warrants to purchase common stock of both publicly traded and private companies, partnership interests, membership interests in limited liability companies formed in connection with relationships between Enron and third parties and interests in trusts formed in connection with other financial transactions undertaken by Enron.

*Structure of a Typical Enron FAS 140 Transaction*

A typical Enron FAS 140 Transaction began with the contribution by the Sponsor of an asset to an Asset LLC.[148] In exchange for this contribution, which was treated as a capital contribution of the asset, the Sponsor received a Class A Interest in the Asset LLC, representing all of the voting power[149] and an insignificant portion of the economic

---

[146] *See supra* Section III.D, *Accounting Treatment and Financial Statement Disclosure.*

[147] Permanent Subcommittee on Investigations Report, *supra* note 145, at 22 and Exhibit 17.

[148] *See, e.g.*, Section 4.01, Third Amended and Restated Limited Liability Company Agreement of McGarret VI, L.L.C., Oct. 17, 2001 (the "McGarret V Asset LLC Agreement") (entered into in connection with the McGarret V Hawaii transaction) [AB000043281-AB000043337].

[149] *See, e.g.*, *id.* Section 6.01.

interests[150] in the Asset LLC. In addition, the Sponsor was entitled to a special cash distribution from the Asset LLC in the amount at which the asset was valued by Enron.[151]

The Asset LLC sold its Class B Interest, entitled to no voting rights[152] and substantially all of the economic interests in the Asset LLC,[153] to a special purpose entity, generally a trust (the "Trust"), in exchange for a payment in the amount of the special distribution to be made by the Asset LLC to the Sponsor.[154]

The Trust financed the purchase price of the Class B Interest by selling an equity interest in itself to a third party, often an affiliate of one of its Lenders, and by borrowing under a Credit Facility provided by those Lenders. The equity was generally entitled to be repaid the amount of its investment plus an annual rate of return.[155] Generally, the amount of the equity was equal to at least 3% of the purchase price for the Class B Interest,[156] plus the amount of fees due to the Lenders. The right of the equityholder to receive payment with respect to its equity was subordinated to the right of the Lenders to

---

[150] *See, e.g., id.* Section 5.02 and Exhibit A.

[151] *See, e.g.,* Section 5.03, Amended and Restated Limited Liability Company Agreement of McGarret II, L.L.C., June 29, 2000 (the "McGarret B Asset LLC Agreement") (entered into in connection with the McGarret B Hawaii transaction) [AB000032510-AB000032553], and the Asset Notice, May 31, 2000 [AB000032450-AB000032455].

[152] *See, e.g.,* Section 3.01, McGarret V Asset LLC Agreement, *supra* note 148.

[153] *See, e.g., id.* Section 5.02 and Exhibit A.

[154] In some transactions, such as the Hawaii Transaction and the Cerberus Transaction, the Asset LLC issued its Class B Interest to another limited liability company of which the Sponsor was the sole member (the "Transferor LLC") in return for a promissory note in the same amount as the amount of the special distribution that was to be made to the Sponsor by the Asset LLC. The Transferor LLC then sold the Class B Interest to the Trust in exchange for a payment in the same amount as that of the promissory note issued by the Transferor LLC to the Asset LLC (and, therefore, in the same amount as the special distribution to be made by the Asset LLC to the Sponsor). *See, e.g., infra,* Section III.H., *The Hawaii Transaction – Structure of the Hawaii Transaction,* and Section III.F., *The Cerberus Transaction – Structure of the Cerberus Transaction.*

[155] *See, e.g.,* Section 1.01, Second Amended and Restated Hawaii II 125-0 Trust Agreement, as amended, Nov. 20, 2000 (the "Hawaii II Trust Agreement") (definition of "Certificate Yield," which is set at 15% per annum yield) (entered into in connection with the Hawaii Transaction) [AB000030744-AB000030805].

receive payment with respect to the related advance under the Credit Facility.[157]    It appears that the amounts due to the equityholder were not supported by the Total Return Swaps.[158]    In some transactions, the Trust was intended to be a "qualifying" special purpose entity under FAS 140 and only a nominal equity interest was held by a third party.[159]

At the closing of the FAS 140 transaction, upon payment of the purchase price for the Class B Interest by the Trust, the Asset LLC[160] would typically use those funds to make the special distribution to the Sponsor,[161] thus immediately conveying the full proceeds of the transaction to the Sponsor.

---

[156] *See, e.g.*, Section 1(b)(iii), Subscription Agreement between CIBC Inc. and Hawaii II 125-0 Trust, Nov. 20, 2000 (the "Hawaii II Subscription Agreement")[AB000030838-AB000030868].

[157] *See, e.g.*, Series Certificate of Beneficial Ownership for Series McGarret V, Oct. 17, 2001 (the "McGarret V Series Certificate") (issued in connection with the McGarret V Hawaii transaction) [AB000043256-AB000043263].

[158] *See, e.g.*, Section 2, Total Return Swap Confirmation between ENA and Hawaii II Trust, Oct. 17, 2001 (the "McGarret V Swap Confirmation") [AB000043270-AB000043280].

[159] *See, e.g.*, *infra* Section III.F., *The Cerberus Transaction*.

[160] In transactions that involved a Transferor LLC, the Transferor LLC would receive the purchase price from the Trust and use those funds to repay its note (in that same amount) to the Asset LLC.  After receipt and payment of the funds, the Transferor LLC played no substantial further role in the transaction.  *See infra* Section III.H., *The Hawaii Transaction – Structure of the Hawaii Transaction*.

[161] *See, e.g.*, Section 5.03, McGarret B Asset LLC Agreement, *supra* note 151.

Below is a simplified diagram of a typical Enron FAS 140 Transaction.



After giving effect to the transactions completed at the closing, the Asset LLC

held the asset,[162] and the Sponsor, through its Class A Interest, and the Trust, through its

Class B Interest, owned the Asset LLC.[163]  A third party (typically an affiliate of one of

the Lenders) owned the equity interest in the Trust (which was nominal in the case of

Trusts structured as "qualifying" special purpose entities),[164] and was entitled to receive a

specified yield (often 15% per annum) on that equity interest.[165]  The Trust also owed to

its Lenders the amount advanced under the Credit Facility plus interest.  As a condition of

the Credit Facility, Enron, ENA or one of Enron's other affiliates would enter into a Total

---

[162] *See, e.g.*, Section 6.01, McGarret V Asset LLC Agreement, *supra* note 148.

[163] *See, e.g., id.* Section 3.01.

[164] *See, e.g., infra* Section III.F., *The Cerberus Transaction*.

[165] *See, e.g.*, Section 1.01, Hawaii II Trust Agreement, *supra* note 155 (definition of "Certificate Yield").

Return Swap with the Trust or the Lenders, thereby providing a creditworthy source of funds for the repayment of amounts due under the Credit Facility to the Lenders, all as described below under the heading *Allocation of Risk in a Typical Enron FAS 140 Transaction*.

Although the Class A Interest gave the Sponsor all voting control over the Asset LLC, and therefore apparent control over the asset owned by that Asset LLC, and the Sponsor was typically designated the managing member of the Asset LLC with exclusive power to manage the business and affairs of the Asset LLC,[166] it did not have complete control over the Asset LLC. For example, the Sponsor could not sell the asset held by the Asset LLC without the consent of the Trust as the holder of the Class B Interest.[167] Moreover, the business of the Asset LLC was generally limited to holding the asset and making the payments contemplated by its limited liability company agreement.[168] In some cases, an independent manager of the Asset LLC must also consent to certain major actions by the Asset LLC, such as declaring bankruptcy or dissolving or selling all or substantially all of its assets.[169] The Certificate Holder could instruct the Trust to sell the Class B Interest, but most sales were subject to an auction procedure and to certain rights of first refusal and rights of first offer in favor of the Sponsor.[170]

---

[166] *See, e.g.*, Section 6.01, McGarret V Asset LLC Agreement, *supra* note 148.

[167] *See, e.g.*, Section 6.01, Amended and Restated Limited Liability Company Agreement of Timber I, L.L.C., Sept. 27, 2001 (the "Timber 1 LLC Agreement") (entered into in connection with the Nikita Transaction) [AB000322025-AB000322085].

[168] *See, e.g., id.* Section 2.04.

[169] *See, e.g., id.* Section 6.06.

[170] *See, e.g.*, Section 3.03, McGarret V Asset LLC Agreement, *supra* note 148.

*Accounting Treatment of a Typical Enron FAS 140 Transaction*

Enron accounted for the FAS 140 Transactions as described under the section of this Report entitled *Accounting Treatment and Financial Statement Disclosure.*

*Allocation of Risk in a Typical Enron FAS 140 Transaction*

*The Total Return Swaps.*  The FAS 140 Transactions contain several features that allocate benefits and risks in a manner that more closely resemble a loan than a commercial sale of an asset to a third party.  One of the more important features is the Total Return Swap.  In general, the Trusts are responsible for making payments due with respect to their Credit Facilities.  As a condition of the Credit Facility, Enron or one of its affiliates would enter into a Total Return Swap with the Trust or the Lenders.[171]  Through the Total Return Swaps:

- Enron (or its affiliate) agreed to make payments when due of amounts sufficient to pay principal, interest and other amounts payable by the Trust under the Credit Facility; and

- Enron (or its affiliate) was entitled to amounts received with respect to the Class B Interest (whether proceeds of a sale of the Class B Interest or distributions from the Asset LLC as a result of the sale of the underlying asset or other income produced by the Class B Interest) in amounts payable by Enron on the related debt financing, then to the equity holder up to its specified return, and finally, all remaining amounts.[172]

In other words, although the Sponsor, a subsidiary of Enron, was "selling" the asset to a purportedly unrelated third party, Enron or ENA[173] was responsible for providing the

---

[171] *See, e.g.*, Section 2, McGarret V Swap Confirmation, *supra* note 158; Section 4.2(a)(i)(E), Facility Agreement of Hawaii II 125-0 Trust, Nov. 20, 2000 (the "Hawaii II Credit Facility") [AB000030869-AB000031162].

[172] *See, e.g.*, Section 2, McGarret V Swap Confirmation, *supra* note 158.

[173] Where ENA was the counterparty to a Total Return Swap, Enron was often the guarantor of its obligations under that Total Return Swap. *See, e.g.*, Enron Guaranty between Enron Corp. and Hawaii II Trust, Dec. 7, 2000 (the "McGarret F Guaranty") [AB000034268-AB000034276].

Trust with sufficient cash to repay the debt financing obtained by the Trust in order to make the purchase, thereby retaining the risk of a decrease in the value of that asset below the amount of the debt. It simultaneously acquired or retained control of the asset (through the Class A Interest) and the contractual right to receive the eventual proceeds from the Class B Interest, thereby retaining substantially all of the benefits or appreciation in value of the asset. In short, substantially all of the risks and rewards of the asset remained with Enron or ENA.

*The Asset LLC Put Option.* Another structural element by which Enron (through the Sponsor) assumed or retained the risk of the transaction is the put option incorporated in several of the FAS 140 Transactions, pursuant to which the Sponsor granted to the Asset LLC the right to require the Sponsor to repurchase a portion of the contributed asset at a fixed price on any date on which a payment was due under the Credit Facility.[174] These funds would then be distributed by the Asset LLC to the Trust and applied to make the payment due on that date.[175] The Asset LLC assigned to the Trust the right to deliver notices of exercise of the put to the Sponsor.[176] If the put were exercised on any payment date, then no payment under the Total Return Swap on that

---

[174]*See e.g.,* Sections 2 and 3, Put Option Agreement between EAH and Aeneas, Nov. 29, 2000 (the "Put Option Agreement") (entered into in connection with the Cerberus Transaction) [AB000113196-AB000113204].

[175] *See, e.g.,* Section 5.02, Amended and Restated Limited Liability Company Agreement of Aeneas L.L.C., Nov. 29, 2000 (the "Aeneas LLC Agreement") [AB000113227-AB000113225]; Section 5.01, Trust Agreement between Wilmington Trust, as Owner Trustee, and GSS Holdings, as the Certificate Holder, Nov. 29, 2000 (the "Heracles Trust Agreement") [AB000293293-AB000293336].

[176] *See, e.g.,* Put Option Assignment between Aeneas and the Heracles Trust, Nov. 29, 2000 (the "Put Option Assignment") (entered into in connection with the Cerberus Transaction) [AB000113196-AB000113197].

payment date would be made.[177]    In some transactions, a demand note was issued by Enron to the Sponsor, which the Sponsor could draw upon to obtain funds necessary to satisfy its obligations under the put in the event the put was exercised.[178]

The existence of the put option creates a package of economic benefits and risks for the Lenders and the Sponsors that are very similar to those that would be created by a loan transaction. Essentially, the Sponsor received funds from the Lenders through the Trust and its purchase of the Class B Interest. In exchange, the Sponsor remains liable through the puts to make payments that will be sufficient to repay those loans. Because the exercise of the put is at fixed prices that are sufficient to repay the loans, the Lenders have credit risk with respect to the Sponsor, but no risk with respect to the value of the underlying asset. The Lenders' true credit risk was the creditworthiness of Enron in that the funding for payments under the puts would be made through a payment under the Enron demand note mentioned above.

There is, however, one distinction between the FAS 140 Transactions with only a Total Return Swap and FAS 140 Transactions where the Sponsor puts exist. In the latter cases, the risks associated with the transferred asset were retained by the Sponsor transferor itself, rather than by an affiliated entity.

---

[177] *See* Section 2.5, Total Return Swap Confirmation between EAH and the Heracles Trust, Nov. 29, 2000 (the "Original Total Return Swap Confirmation") (entered into in connection with the Cerberus Transaction) [AB000113136-AB000113144].

[178] *See, e.g.*, Demand Note issued by Enron to EAH, Nov. 29, 2000 (the "Demand Note") (entered into in connection with the Cerberus Transaction) [AB000113311-AB000113312].

### F.    The Cerberus Transaction

*Introduction and Overview of the Cerberus Transaction*

The Cerberus Transaction involved the monetization of a block of 11.5 million

shares of common stock (the "EOG Block") of EOG Resources, Inc. ("EOG"), a former

subsidiary of Enron previously known as Enron Oil and Gas Company.  EOG's shares

are publicly traded on the New York Stock Exchange under the symbol "EOG."  As of

February 15, 2002, the EOG Block represented 9.9% of EOG's outstanding common

stock.[179]

The closing price of EOG common stock on November 28, 2000, the day before

the closing of the Cerberus Transaction, was $45.25 per share,[180] so that the aggregate

value (without any adjustment for transfer restrictions or volume) of the EOG Block was

approximately $520.4 million.  The closing price of EOG common stock on September

12, 2002 was $35.07 per share,[181] so that the aggregate value of the EOG Block on the

same basis was approximately $403.3 million.

The Cerberus Transaction consisted of an initial closing on November 29, 2000

and a restructuring on January 31, 2001 (the "Cerberus Restructuring").

*Overview of the First Cerberus Transaction*

On November 29, 2000 Enron Asset Holdings, LLC ("EAH"), an Enron

subsidiary and the "Sponsor" in this transaction, transferred the EOG Block to Aeneas,

L.L.C. ("Aeneas"), the "Asset LLC" in this transaction.  In exchange, Aeneas issued to

EAH its Class A Interest entitling EAH to 100% voting power and .01% economic

---

[179] EOG Proxy Statement on Schedule 14A filed with the SEC on Mar. 28, 2002, at "Security Ownership of Certain Beneficial Owners on February 15, 2002."

[180] Stock Quotations, Wall St. J., Nov. 29, 2000, at C6.

interest in Aeneas. Aeneas issued its Class B Interest (entitled to a 99.99% economic interest but no voting power) to Psyche, L.L.C. ("Psyche"), an Enron subsidiary, which immediately transferred the Class B Interest to the Heracles Trust (the "Heracles Trust").

The Heracles Trust purchased the Class B Interest with the proceeds of a $517.5 million loan, the ultimate holder of which was Royal Bank of Canada ("RBC"). The proceeds of the loan were paid to Aeneas and ultimately distributed to EAH.

As a condition to the transaction, EAH entered into a Total Return Swap with the Heracles Trust, pursuant to which, EAH was obligated to pay the Heracles Trust all payments due on the indebtedness of the Heracles Trust to RBC. In the other Selected Transactions that had Total Return Swaps, it was Enron or another Enron entity (other than the Sponsor) that was the entity that entered into the swap. Like the other Total Return Swaps, however, the effect of the swap in the Cerberus Transaction was that EAH, the Sponsor, retained the risk of any decline in the value of the EOG Block and retained the benefit of any appreciation in the value of the EOG Block. Moreover, the Total Return Swap obligations of EAH were guaranteed by Enron. As additional credit enhancements, EAH granted a put option to Aeneas that required EAH to repurchase shares of the EOG Block from Aeneas to the extent necessary to pay the amounts due from the Heracles Trust to RBC. The put option was backed by a demand note from Enron to EAH.

The EOG Block transferred by EAH was subject to restrictions under a Share Exchange Agreement between Enron and EOG. EOG consented to the transfer of the EOG Block to Aeneas, which consent included as part of its terms the commitment by

---

[181] Stock Quotations, Wall St. J., Sept. 13, 2002, at C3.

Enron to maintain the sole management control of Aeneas during the time it held the EOG Block.

In addition to the legal restrictions on Enron's transfer of the EOG Block, Enron also had obligations arising under its 7% Exchangeable Notes issued in 1999 (due July 2002, and still outstanding), which are mandatorily covertible into 11.5 million shares of EOG common stock.

As discussed in the sections *Economics and Allocation of Risk in the Cerberus Transaction* and *Recharacterization of the Cerberus Transaction* that follow, the retention of the risks and benefits of the EOG Block by EAH through the Total Return Swap and the Put Option, the retention of control over the EOG Block (a necessity resulting from the restrictions on Enron's right to transfer the EOG Block), and Enron's interest in having the ability to meet its obligations to provide up to 11.5 million shares of EOG stock to the holders of the 7% Exchangeable Notes, among other factors discussed below, strongly suggest that there was not a true sale of the EOG Block in the first Cerberus transaction.

*Overview of the Cerberus Restructuring*

On January 31, 2001, two months after the original closing, the Cerberus Transaction was restructured. The details of that restructuring are described in the *Restructuring of the Cerberus Transaction* section that follows. A major change accomplished by the restructuring was the substitution of Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A. ("Rabobank") for RBC. This substitution was not accomplished by an assumption of the RBC loan by Rabobank, but by a total return swap between Rabobank and RBC that had the same basic economic effect as a loan

assignment. At the same time Rabobank and ENA (whose obligations were guaranteed by Enron) entered into an equity-linked swap with a strike price of $45 per share of EOG stock (the "Equity-Linked Swap").

While the Cerberus Transaction after the Cerberus Restructuring presents several factors suggesting characterization as a loan, an issue presented is whether the changes made cured any deficiencies in the original transaction. The effects of the Cerberus Restructuring will be discussed in the sections *Economics and Allocation of Risk in the Cerberus Transaction* and *Recharacterization of the Cerberus Transaction* that follow.

*Structure of the Cerberus Transaction*

Prior to the Cerberus Transaction, Enron had engaged in certain other transactions involving shares of EOG – namely the offering of 7% Exchangeable Notes, which were due July 31, 2002 (the "7% Exchangeable Notes"), for gross proceeds of approximately $250 million in July 1999. The 7% Exchangeable Notes are mandatorily convertible into up to 11.5 million shares of common stock of EOG and are currently outstanding.[182]

By a letter dated November 22, 2000, Enron instructed EOG's stock transfer agent to effect a sequence of transfers of the EOG Block: (1) from Enron to Enron Finance Partners, LLC; (2) from Enron Finance Partners, LLC to Enron Intermediate Holdings, LLC, and, finally, (3) from Enron Intermediate Holdings, LLC to EAH, the "Sponsor" in the Cerberus Transaction.[183] EAH became the holder of record of the EOG

---

[182] Enron Prospectus on Form 424(b) filed with the SEC on Aug. 11, 1999 (relating to the offering of the 7% Exchangeable Notes); *see also* 10-K for 2000, *supra* note 4, at 66.

[183] Letter from Clifford Baxter, Vice Chairman, Enron, to First Chicago Trust Company of New York, Nov. 22, 2000 (with attachments) [AB000113219-AB000113223].

Case 22-11068-JTD   Doc 613-2   Filed 02/03/23   Page 74 of 161
01-16034-alg   Doc 6615   Filed 09/21/02   Entered 09/21/02 05:09:47   Main Document
Pg 73 of 160

Block.[184]  In connection with these transfers, EAH and Enron filed a fifth amendment to

Enron's Schedule 13D regarding its ownership of EOG.[185]  In that filing, Enron indicated

EAH was holding the EOG Block in its affiliate, Aeneas, the entity that was created to

serve as the "Asset LLC" in the Cerberus Transaction.  Additionally, Enron reported each

of the transfers not as sales of the EOG Block, but as contributions made as part of an

"internal reorganization of certain assets of Enron."[186]

In fact, Enron's ability to sell the EOG Block was limited by certain transfer

restrictions contained in a Share Exchange Agreement between Enron and EOG (the

"EOG Share Exchange Agreement").[187]  Accordingly, before Enron transferred the EOG

Block in order to initiate the Cerberus Transaction, Enron negotiated the EOG Consent

Agreement with EOG pursuant to which:[188]

- Enron agreed to maintain, directly or indirectly, sole management control of Aeneas during the periods of time when Aeneas holds any shares of the EOG Block;[189]

- Enron continued to be subject to certain standstill provisions contained in the EOG Share Exchange Agreement;[190]

---

[184] Interviews with Enron employees by the Examiner revealed that these entities through which the EOG Block was transferred are part of an Enron structure known as "Tammy" that was used by Enron for certain tax purposes.

[185] Enron Schedule 13D/A filed with the SEC on Dec. 1, 2000.

[186] *Id.* at 4.

[187] Section 6.2, EOG Share Exchange Agreement between Enron and EOG, July 19, 1999, filed as Exhibit 2 to EOG Form S-3 filed with the SEC on July 23, 1999. *See also* Section 1.2, EOG Consent Agreement among EOG, Enron, Enron Finance Partners, LLC, Enron Intermediate Holdings, LLC, EAH, and Aeneas, Nov. 28, 2000, filed as Exhibit 10.4(d) to EOG Form 10-K filed with the SEC for the Year ended Dec. 31, 2001 (the "EOG Consent Agreement").  The sale of the EOG Block is now governed by the Court's Order on June 21, 2002. *See* Stipulation and Order Partially Resolving RBC/Rabobank's Cross-Motion for Order Granting Adequate Protection or Alternatively, Compelling Debtor Enron Energy Services Operations, Inc. to Take Certain Actions (Docket No. 4640) (the "RBC/Rabobank Stipulation and Order").

[188] EOG Consent Agreement, *supra* note 187.

[189] *Id.* Section 1.3(a).  Aeneas also executed an Adoption Agreement, Nov. 21, 2000 [AB000113226]. Under the Adoption Agreement, Aeneas adopts the provisions of the EOG Share Exchange Agreement governing its ownership and sale of the EOG Block.

[190] *Id.* Section 1.8.

- EOG consented to the sequential transfers of the EOG Block and to the contemplated transfer from the Sponsor to Aeneas, subject to certain limitations;[191] and

- Enron forgave up to $1 million in obligations owed by EOG to Enron.[192]

On November 29, 2000, the day after the EOG Consent Agreement was executed, EAH contributed the EOG Block to Aeneas.[193]  In exchange, Aeneas issued EAH its Class A Interest, which entitled EAH to 100% of the voting power and 0.01% of the economic interests in Aeneas.[194]  In addition, the Class A Interest was entitled to special distributions from Aeneas in the aggregate amount of approximately $517.5 million,[195] the approximate value of the EOG Block, if the shares were free from restrictions or requirements (which they were not) at the time they were contributed to Aeneas.

On the same date, Aeneas issued its Class B Interest, which entitled the holder to 99.99% of the economic interests but no voting rights in Aeneas,[196] to Psyche, a limited liability company of which EAH was the sole member.[197]  In return, Psyche issued to Aeneas a promissory note in the amount of approximately $517.5 million, the same

---

[191] *Id.* Section 1.2.

[192] *Id.* Section 1.4.

[193] Article 4 and Exhibit A, Aeneas LLC Agreement, *supra* note 175.  *But see*, Stock Power from EAH to Aeneas for the EOG Block, Nov. 21, 2000 [AB000113224-AB000113225].  In this stock power, EAH commits to pay over to Aeneas all the distributions made to EAH on the EOG Block.  In interviews with the Examiner, Enron employees have stated that Enron failed to deliver this stock power to EOG's stock transfer agent, and that Aeneas did not become the holder of record of the EOG Block until over one year later in December 2001, the time at which the stock power was, in fact, delivered.

[194] Section 5.02 and Section 6.01, Aeneas LLC Agreement, *supra* note 175.

[195] *Id.* Section 5.03.

[196] *Id.* Section 3.01(b), Section 5.02 and Exhibit A.

[197] Section 3.01, Amended and Restated Limited Liability Company Agreement of Psyche,  Nov. 20, 2000 [AB000113270-AB000113290].

amount of the special distribution that was to be made by Aeneas to EAH.[198]    Pysche

immediately sold the Class B Interest to the Heracles Trust[199] in exchange for a payment

in the amount of approximately $517.5 million.[200]

In order to finance the purchase of the Class B Interest, the Heracles Trust

obtained a $517.5 million loan pursuant to a Credit Facility (the "Cerberus Credit

Facility") from RBC and Psyche as the initial lenders, RBC, as the administrative agent

and RBC Dominion Securities Corp. as arranger.[201]    Psyche initially acted as a lender

under the Cerberus Credit Facility not to advance additional cash, but rather to provide

"seller financing" in the amount of approximately $87.5 million to the Heracles Trust for

its purchase of the Class B Interest in Aeneas.[202]    Psyche immediately assigned its rights

as lender under the Cerberus Credit Facility to Aeneas,[203] and the amount of the

obligation from the Heracles Trust to Aeneas was eventually funded either by RBC or

---

[198]    Promissory Note from Psyche to Aeneas, Nov. 29, 2000 in the amount of $517.5 million [AB000113212-AB000113213]; *see also* Section 5.03, Aeneas LLC Agreement, *supra* note 175.

[199]    The Heracles Trust was created on November 29, 2000 with GSS Holdings II, Inc. ("GSS Holdings") as the registered owner of its beneficial interest. *See* Certificate of Beneficial Ownership of Heracles Trust, Nov. 29, 2000 [AB000112995-AB000113000].

[200]    This payment consisted of approximately $430 million in cash and a note for approximately $87.5 million from the Heracles Trust. *See* Section 3.02, Transfer and Auction Agreement among Psyche, EAH and the Heracles Trust, Nov. 29, 2000 (the "Transfer and Auction Agreement") [AB000113160-AB000113195], and B Interest Assignment Agreement between Psyche and the Heracles Trust, Nov. 29, 2000 (the "B Interest Assignment") [AB000113214-AB000113218].

[201]    *See* Cerberus Credit Facility, Nov. 29, 2000 [AB000113012-AB000113078].

[202]    *See* Promissory Note from the Heracles Trust to Psyche, Nov. 29, 2000 in the amount of $87.5 million [AB000113087-AB000113089]. At an interview with Enron employees, the Examiner was told the reason for the cash funding plus the note was due to RBC's inability to commit to loaning the more than $500 million Enron believed it could achieve in the financing until just days before the scheduled closing; therefore, a two part closing - of $430 million on November 29th and $70 million the following day - was scheduled to avoid breakage fees. *See infra* note 204.    Apparently, the level to which RBC could commit leading up to the initial closing of the loan on November 29, 2000 was a moving target. *See* Direction Letter from GSS Holdings to the Heracles Trust, Nov. 29, 2000 (provided as part of the closing documentation for the Cerberus Transaction) (the "Direction Letter") [AB000113303-AB000113305].    The Direction Letter refers to an anticipated loan amount from RBC of only $350 million.

[203]    *See* Section 5, Advances Agreement among the Heracles Trust, Psyche, Aeneas and RBC, Nov. 29, 2000 (the "Advances Agreement") [AB000113154-AB000113159].

syndicated to other lenders after the closing.[204]    Amounts generated by the Heracles

Trust's ownership of the Class B Interest (dividends on, and proceeds from any sale of,

the EOG Block) were intended to pay principal, interest and expenses when due under

the Cerberus Credit Facility; however, the historic quarterly dividend of the EOG Block

(approximately $400,000) was not sufficient to meet the quarterly interest payments due

on the $517.5 million principal balance under the Cerberus Credit Facility.[205]

Consequently, EAH supported the Heracles Trust's ability to repay this loan by

entering into a Total Return Swap (the "Original Total Return Swap") with the Heracles

Trust pursuant to which EAH agreed to make all payments owed by the Heracles Trust

under the Cerberus Credit Facility[206] as described below in the section *Economics and*

*Allocation of Risk in the Cerberus Transaction*.    Enron guaranteed EAH's obligations

under the Original Total Return Swap.[207]

---

[204] On the day after the closing, RBC advanced an additional $70 million to the Heracles Trust pursuant to the Cerberus Credit Facility. *See* Instrument of Assignment among Aeneas, RBC Dominion Securities Corp., the Heracles Trust and RBC, Nov. 30, 2000 [AB000113577-AB000113586]. On the same date, the Heracles Trust issued a $500 million note to RBC and a $17.5 million note to Aeneas. *See* Promissory Note from the Heracles Trust to RBC, Nov. 30, 2000 in the amount of $500 million [AB000113590-AB000113592]; Promissory Note from the Heracles Trust to Aeneas, Nov. 30, 2000 in the amount of $17.5 million [AB000113587-AB000113589]. On December 29, 2000, RBC syndicated the final $17.5 million note under the Cerberus Credit Facility to Lehman Brothers Commercial Paper Inc. *See* Instrument of Assignment between Aeneas and Lehman Commercial Paper Inc., Dec. 29, 2000 [AK0063845-AK0063856].

[205] The quarterly dividend rate per share of EOG stock in the quarters prior to the Cerberus Transaction was, at most, $0.035 per share for an aggregate quarterly dividend for the EOG Block of $402,500. EOG Website, Investors – Dividend History (the "EOG Dividend History"), available at *http://www.eogresources.com/investors/div_history.html*.

[206] Section 2.3(i), Original Total Return Swap Confirmation, *supra* note 177. The Original Total Return Swap for the Cerberus Transaction consists of an entire three-part agreement between EAH and the Heracles Trust, Nov. 29, 2000, which parts consist of (i) an ISDA Master Agreement (Multicurrency - Cross Border) [AB000113096-AB000113114]; (ii) a Schedule modifying and supplementing that Master Agreement [AB000113115-AB000113135]; and (iii) the Original Total Return Swap Confirmation, *supra* note 177, further modifying and supplementing the Master Agreement and the Schedule.

[207] Enron Guaranty in favor of the Heracles Trust, Nov. 29, 2000 [AB000113145-AB000113153].

To summarize, on November 29, 2000, the Heracles Trust borrowed approximately $517.5 million under the Cerberus Credit Facility[208] and used the funds to purchase the Class B Interest from Psyche.[209] Psyche applied these funds to repay its $517.5 million promissory note to Aeneas, which in turn applied these funds to make a special distribution to EAH.[210]

At the closing of the Cerberus Transaction, Aeneas held the EOG Block, and EAH, through its Class A Interest, controlled Aeneas. The Heracles Trust, through its Class B Interest, held substantially all of the economic interest in Aeneas. GSS Holdings owned a nominal equity interest in the Heracles Trust,[211] and the Heracles Trust owed $517.5 million to the lenders under the Cerberus Credit Facility (the "Cerberus Lenders"), which funds were transferred to Aeneas (and eventually distributed to EAH) in exchange for the Class B Interest.

As a condition to the Cerberus Credit Facility, EAH was required to execute the Original Total Return Swap with the Heracles Trust[212] and to provide a put option to Aeneas that required EAH, if necessary, to purchase shares of the EOG Block from Aeneas to the extent the proceeds of a purchase were necessary to pay amounts due under

---

[208] *See* Drawdown Request from Heracles Trust to RBC, Nov. 29, 2000 [AB000113093-AB000113095]. The funding was initially made in the form of $430 million in cash and a $87.5 million note. *See* Promissory Note from Heracles Trust to Aeneas, Nov. 29, 2000 in the amount of $87.5 million [AB000113090-AB000113092].

[209] *See* B Interest Assignment, *supra* note 200.

[210] *See* Payment Direction Letter from the Heracles Trust, Nov. 29, 2000. [AB000113306-AB000113310]. Section 5.03 of the Aeneas LLC Agreement, *supra* note 175, contemplates that the special distribution was to be made in separate payments based upon when the $87.5 million note from the Heracles Trust was funded. Based on interviews with Enron personnel, the Examiner has confirmed two cash distributions were made to EAH under the Aeneas LLC Agreement—$500 million was made as of November 30, 2000 and the remaining $17.5 million was made as of December 31, 2000.

[211] The total equity investment in the Heracles Trust was $100. *See* Certificate of Beneficial Ownership of Heracles Trust, *supra* note 199. Under certain circumstances, there are no minimum requirements regarding equity capital investment for "qualifying" special purpose entities.

the Cerberus Credit Facility (the "Put Option").[213]  Enron guaranteed or funded both of these obligations.[214]  As described above under *Allocation of Risk in a Typical Enron FAS 140 Transaction*, the Original Total Return Swap and the Put Option resulted in EAH and Enron assuming the obligation to provide the Heracles Trust with funds sufficient to repay the amounts it borrowed (plus interest) in order to purchase the Class B Interest in Aeneas.  In return, Enron retained substantially all economic benefits and risks of ownership of the EOG Block through the Original Total Return Swap.

Although the Class A Interest gave EAH all voting control over Aeneas – and thus over the EOG Block – and EAH was designated the managing member of Aeneas with exclusive power to manage the business and affairs of Aeneas,[215] EAH's ability to direct the sale of the EOG Block was limited in three respects.  First, by the restrictions imposed by the EOG Share Exchange Agreement and related EOG Consent Agreement discussed above.  Second, under the Aeneas LLC Agreement, EAH could not direct Aeneas to sell the EOG Block (except pursuant to the Put Option)[216] unless it had express written consent of the Cerberus Lenders and of GSS Holdings, as the equity holder in the Heracles Trust.[217]  Third, as is standard practice with this type of special purpose entity, the Aeneas LLC Agreement states that EAH could not direct the sale of substantially all

---

[212] Original Total Return Swap, *supra* note 206.

[213] Put Option Agreement, *supra* note 174.  Aeneas assigned the right to deliver the notices regarding the exercise of the Put Option to the Heracles Trust.  *See* Put Option Assignment, *supra* note 176.

[214] Enron Guaranty, *supra* note 207; Demand Note, *supra* note 178.

[215] Section 6.01, Aeneas LLC Agreement, *supra* note 175.

[216] Under the Cerberus Credit Facility, before the Heracles Trust could deliver a notice to exercise the Put Option, it needed the unanimous consent of the Cerberus Lenders (with the exception of Aeneas).  Section 24.1(f), Cerberus Credit Facility, *supra* note 201.  Aeneas waived its right to give such a consent.  Section 6, Advances Agreements, *supra* note 203.

[217] Section 6.01, Aeneas LLC Agreement, *supra* note 175.

of Aeneas' assets without the affirmative consent of its independent manager.[218] Furthermore, as an SPE, Aeneas' business purpose is expressly limited to the terms of its LLC Agreement – namely performing functions necessary for the completion of the Cerberus Transaction.[219] Under the Aeneas LLC Agreement, transfers by the Heracles Trust of the Class B Interest may only be conducted through an auction procedure.[220]

---

[218] *Id.* Section 6.06. The Court has nevertheless determined that the independent manager's consent is not required under the circumstances considered in the RBC/Rabobank Stipulation and Order. *See* RBC/Rabobank Stipulation and Order, *supra* note 187, at Section 6.4(c).

[219] *Id.* Section 2.04.

[220] The documentation of the Cerberus Transaction incorporates a mandatory auction of the Class B Interest (the "Class B Auction"), which was scheduled to close on or about June 28, 2002. Section 3.03, Aeneas LLC Agreement, *supra* note 175. The Class B Auction required at least two offers from non-affiliates of Enron, but Enron was eligible to participate in the Class B Auction. Section 3.03(b)(A)(i), Aeneas LLC Agreement, *supra* note 175. In the event the Put Option was exercised for a payment date following the scheduled closing date of the Class B Auction, the Class B Auction was extended for two months. Section 3.03(b)(iii), Aeneas LLC Agreement, *supra* note 175. The proceeds from the sale of the Class B Interest would be paid to the Heracles Trust and would be distributed according to its Trust Agreement: *first* to pay costs, principal and interest due on the Cerberus Credit Facility; *second*, to pay amounts due to EAH under the Original Total Return Swap, which amounts would equal all proceeds received by the Heracles Trust from the Class B Interest in excess of the amount due under the Cerberus Credit Facility. *See* Section 5.01, Heracles Trust Agreement, *supra* note 175; Section 2.2, Original Total Return Swap Confirmation, *supra* note 177.

The structure of the Cerberus Transaction, as of November 30, 2000, is shown in the following diagram:



*Restructuring of the Cerberus Transaction*

On January 31, 2001, the Cerberus Transaction was restructured to substitute Rabobank for RBC as the primary lender under the Cerberus Credit Facility.[221]    This

---

[221] As part of the transaction, Lehman Commercial Paper Inc., assigned its $17.5 million note from the Heracles Trust to RBC. *See* Instrument of Assignment between Lehman Comercial Paper Inc. and RBC, Jan. 31, 2001 [AB000359306-AB000359314].   Enron employees have informed the Examiner that for several months before the closing, Enron had been exploring a financing transaction involving the EOG Block.  Concerned that the bank market might not be a good one at that time for that financing, Enron negotiated with RBC to explore both the bank market and, as an alternative, the insurance market. Interviewees informed the Examiner that Enron's management had set a target date of December 1, 2000 for the completion of the Cerberus Transaction and, as that date approached, the business persons at Enron became concerned that it would not be feasible to complete a transaction involving the insurance market. The interviewees indicated that Enron had negotiated the transaction with Gen Re, AIG and Rabobank.

substitution was achieved through the execution of a total return swap between Rabobank and RBC (the "RBC/Rabobank Total Return Swap") that had the economic effect of substituting Rabobank for RBC as lender under the Cerberus Credit Facility.[222] Additionally, Rabobank entered into the Equity-Linked Swap with ENA, guaranteed by Enron, that had a strike price of $45 per share pursuant to which ENA was required to pay to Rabobank amounts by which the market price of a share of EOG common stock fell below $45 per share, and Rabobank was required to pay to ENA amounts by which the market price of shares of EOG common stock exceeded $45 per share.[223] These swaps are further described below under *Economics and Allocation of Risk in the Cerberus Transaction.*

In connection with the Cerberus Restructuring, additional changes were made to the Cerberus structure. First, EAH assigned to Psyche its right to distributions on its Class A Interest in Aeneas.[224] EAH also assigned to RBC (which in turn assigned to

---

The Examiner was told that due to the time constraints, Enron decided to proceed with a transaction with RBC as the principal lender and agent bank.

[222] Under the RBC/Rabobank Total Return Swap, RBC agreed to pay Rabobank the amounts it actually received from the Heracles Trust as payments of principal and interest under the Cerberus Credit Facility, and Rabobank agreed to pay to RBC the amounts that were actually due to RBC under the terms of the Cerberus Credit Facility with an interest rate adjustment. *See* Sections 2.2 and 2.3, RBC/Rabobank Total Return Swap Confirmation between RBC and Rabobank, Jan. 31, 2001 [AB000113669-AB000113674]. The RBC/Rabobank Total Return Swap consists of an entire three part agreement entered into in connection with the Cerberus Restructuring, which parts consists of (i) an ISDA Master Agreement (Multicurrency-Cross Border); (ii) a Schedule modifying and supplementing the Master Agreement and (iii) a Total Return Swap Confirmation, further modifying and supplementing the Master Agreement and Schedule. *Id.*

[223] The Equity-Linked Swap consists of an entire three-part agreement between ENA and Rabobank, Jan. 31, 2001, which parts consists of (i) an ISDA Master Agreement (Multicurrency - Cross Border) [AB000113675-AB000113693]; (ii) a Schedule modifying and supplementing that Master Agreement of which the Examiner has been provided only a draft and continues to request a final version and (iii) an Equity-Linked Swap Confirmation (the "Equity-Linked Swap Confirmation"), further modifying and supplementing the Master Agreement and the Schedule [AB000113700-AB000113706]. Enron Guaranty in favor of Rabobank, Jan. 31, 2001 (the "Second Enron Guaranty") [AB000113700-AB000113706].

[224] Section 1(b), Assignment, Waiver and Amendment Agreement among EAH, Aeneas, Psyche, the Heracles Trust, GSS Holdings, RBC, Rabobank, Enron, and Enron Energy Services Operations, Inc. ("EESO"), Jan. 31, 2001 (the "Waiver and Amendment Agreement") [AB000113648-AB000113668].

Rabobank) the right to distributions on its 100% interest in Psyche,[225] which distributions include Psyche's right to receive proceeds from the Heracles Trust pursuant to distributions made under the Heracles Trust Agreement.[226] EAH sold its membership interests in Psyche and Aeneas (which included the right to control these entities, but not the right to any economic interests) to EESO, a debtor in the Bankruptcy Case.[227]

The Heracles Trust agreed not to enforce its rights under the Original Total Return Swap with EAH and not to deliver any notices to exercise the Put Option executed in the original Cerberus Transaction.[228] Additionally, Rabobank paid to RBC a premium of $569,793 that reflected, at least in part, the accrued interest due to RBC, as of that date, pursuant to the Cerberus Credit Facility.[229]

As of the Petition Date, approximately $517.5 million was outstanding as principal under the Cerberus Credit Facility.[230]

---

[225] *Id.* Section 1(c).

[226] After the Cerberus Restructuring, this potential distribution to Psyche represents the excess value, if any, of the EOG Block (or Class B Interest) over the amounts due under the Cerberus Credit Facility and the *de minimis* amount payable to GSS Holdings as the equity holder in the Heracles Trust. *See* Section 5.01, Heracles Trust Agreement, *supra* note 175. Apparently, Rabobank was willing to participate in the Cerberus Restructuring without the Put Option and Original Total Return Swap in exchange for this distribution under the Heracles Trust Agreement. Rabobank wanted to be the recipient of the excess proceeds from the sale by the Heracles Trust of the Class B Interest. *See* Enron Interoffice Memorandum to File from Bill Bowes regarding Restructuring of the EOGR Monetization, Apr. 16, 2001 (the "Bill Bowes Memo"), at 2  [AB000351737-AB000351744].

[227] Sections 1(e) and (f), Waiver and Amendment Agreement, *supra* note 224.

[228] *Id.* Section 1(a)(i).  The Examiner was told by Enron employees that this approach was followed instead of canceling the Original Total Return Swap and the Put Option because the Heracles Trust was a qualifying SPE without the power to enter into any new agreements.

[229] Section 2.4, RBC/Rabobank Total Return Swap Confirmation, *supra* note 222.

[230] Enron Spreadsheet, Revolving Promissory Note – Heracles Trust Owes RBC [EC001827981].  The Examiner has confirmed with Enron personnel that this is the amount outstanding.

After giving effect to the *Cerberus Restructuring,* the structure is shown in the

following diagram:



*Economics and Allocation of Risk in the Cerberus Transaction*

While the Cerberus Transaction was intended to be a sale of the EOG Block for accounting purposes, the retention of the risks and benefits by Enron through the Original Total Return Swap, the Equity-Linked Swap, and the Put Option as well as the other features discussed below, indicate that the Cerberus Transaction is more appropriately viewed as a loan rather than as a sale of the EOG Block from a risk allocation perspective.

In the Cerberus Transaction, an important feature supporting this conclusion is the ultimate risk retained by EAH under the Original Total Return Swap and Put Option. Under these arrangements, EAH provided credit support to the Heracles Trust in the event that the EOG Block failed to yield funds or value sufficient to pay the amounts due under the Cerberus Credit Facility.[231]  The Original Total Return Swap, however, also entitled EAH to payments from the Heracles Trust of amounts by which any funds or value derived from the Class B Interest exceeded the amount due from the Heracles Trust under the Cerberus Credit Facility.  In other words, although Enron "sold" its economic interest in the EOG Block, Enron kept the downside risk of an investment in the EOG Block by obligating itself to repay the funds borrowed by the Heracles Trust in order to purchase the Class B Interest (representing the economic interest in the EOG Block). Enron simultaneously kept the benefits of an investment in the EOG Block by maintaining the right to the "total return" on its increase in value.

EAH also retained the risk of the EOG Block by means of the Put Option, pursuant to which EAH granted to Aeneas, which then assigned the right to the Heracles

Trust,[232] the right to require EAH to buy shares of the EOG Block at a price of $50.56 per

share on any payment date under the Cerberus Credit Facility.  The Put Option was

exercisable to the extent the proceeds of such sale were necessary to pay the amount due

under the Cerberus Credit Facility on a payment date.[233]  The value of the Put Option was

approximately $581.4 million, and according to Enron employees, was intended to reflect

the $517.5 million advanced under the Cerberus Credit Facility plus a floating rate of

interest on the principal through maturity.  The Total Return Swap and the Put Option

were intended to be alternative means by which Enron guaranteed or funded repayment

of advances made under the Cerberus Credit Facility.  If the Put Option was exercised for

any payment date, then no payment under the Original Total Return Swap as to that

payment date would be made.[234]  To provide funds to EAH to purchase shares of the

EOG Block in the event the Put Option was exercised, Enron issued EAH a Demand

Note in the amount of $581.4 million.[235]

Under the Cerberus Restructuring, the Heracles Trust's rights under both the

Original Total Return Swap and the Put Option were essentially extinguished,[236] and, as a

result, Enron no longer directly supported the Heracles Trust's obligations under the

Cerberus Credit Facility.  Nonetheless, because ENA was a party to the Equity-Linked

---

[231] This was very likely to be the case as the amount of dividends likely to be distributed on the EOG Block was not sufficient to pay the interest due under the Cerberus Credit Facility.  *See* EOG Dividend History information, *supra* note 205; *see also* Second Enron Guaranty, *supra* note 228.

[232] Aeneas actually assigned to the Heracles Trust the right to deliver put notices to EAH under the Put Option, which assignment had essentially the same affect.  *See* Put Option Assignment, *supra* note 176.

[233] Sections 2 and 3, Put Option Agreement, *supra* note 174.

[234] Section 2.5, Original Total Return Swap Confirmation, *supra* note 177.

[235] Demand Note, *supra* note 178.

[236] In the Waiver and Amendment Agreement, the Heracles Trust and EAH each irrevocably elect not to enforce their rights under the Original Total Return Swap.  Also, under the Waiver and Amendment

Swap, Enron maintained essentially the same benefits and risks as it had after the original closing. Enron accomplished this maintenance of risks and benefits under the Equity-Linked Swap with Rabobank, pursuant to which payments were based on the market price of a share of EOG at $45 (the approximate value of a share of EOG on November 29, 2000, resulting in an aggregate value of the EOG Block of $517.5 million). In the Equity-Linked Swap, ENA was obligated to make quarterly payments to Rabobank that were the equivalent of interest on a $517.5 million loan.[237] Likewise, Rabobank was obligated to make quarterly payments to ENA of the amount of all dividends made on the EOG Block. On the final payment date, scheduled for June 28, 2002,[238] ENA was entitled to receive payments from Rabobank equal to the amount by which the market price of a share in EOG aggregated for the 11.5 million shares in the EOG Block rose above $45 per share. ENA was obligated to pay to Rabobank an amount that reflected the shortfall of the market price of the shares below $45 per share. Thus, through the Equity-Linked Swap, Enron retained all of the benefits and risks of the EOG Block,

---

Agreement, the Heracles Trust elects not to deliver or cause to be delivered any notice exercising the Put Option. *See* Section 1(a)(i), Waiver and Amendment Agreement, *supra* note 224.

[237] The amount of the interest due from ENA to Rabobank under the Equity-Linked Swap was equal to LIBOR plus 89.3 basis points based on a principal amount equal to $517.5 million plus, on the final equity payment date, an amount equal to any shortfall in value of the EOG Block under $45 per share on that date. *See* Equity-Linked Swap Confirmation, *supra* note 223.

[238] The documentation of the Cerberus Restructuring maintains the basic structure of the Class B Auction, discussed *supra* note 220, which was scheduled to close on or around June 28, 2002. *See* Section 3.03, Aeneas LLC Agreement, *supra* note 175, as amended by Section 9(iii)-(vii), Waiver and Amendment Agreement, *supra* note 224. Both Enron and Rabobank and each of their affiliates were eligible to bid in the Class B Auction. If Enron or an independent third party won the Class B Auction, the proceeds would be paid to the Heracles Trust, which would use the proceeds first, to pay principal and interest to RBC under the Cerberus Credit Facility and after *de minimis* payments to GSS Holdings, then, to pay Psyche the excess of any amount owed thereunder. *See* Section 5.01, Heracles Trust Agreement, *supra* note 175. If the Class B Auction fails (for instance, if there were not at least two non-Enron bidders) or if Rabobank is the winning bidder, Rabobank may invoke its right under a Sales Agency Agreement to have RBC sell the EOG Block on behalf of Aeneas. *See* Section 2, Sales Agency Agreement between RBC and Aeneas, Nov. 29, 2000 (the "Sales Agency Agreement") [AB000114071-AB000114078], as amended by Section 4(i), Waiver and Amendment Agreement, *supra* note 224. Disputes with regard to the application of all the

including specifically the risk that the price of the EOG Block would always be sufficient to repay the principal and interest of the Cerberus Credit Facility. In addition, through the Equity-Linked Swap, it retained the right to receive from Rabobank an amount equal to the dividends on and appreciations of the EOG Block.

Finally, Enron continued to retain control of the EOG Block, and in fact, was required to retain control of Aeneas (and thus the EOG Block) under the terms of the EOG Consent Agreement[239] as well as through its control of the managing member of Aeneas, EAH and eventually EESO.

*Recharacterization of the Cerberus Transaction*

There are several factors present in the Cerberus Transaction that support the recharacterization of the transaction as a loan. Before the Cerberus Restructuring, these included (i) Control Over Asset;[240] (ii) Benefits & Risks;[241] (iii) Lender's Intent;[242] (iv)

---

various methods for sale of the EOG Block (directly or indirectly) are resolved in the RBC/Rabobank Stipulation and Order, *supra* note 187.

[239] Section 1.3(a), EOG Consent Agreement, *supra* note 187.

[240] Even though Enron was no longer the record holder of the EOG Block, Enron never relinquished effective control over the EOG Block. Enron has maintained control of the EOG Block through its control of EAH (the managing member of Aeneas in the original closing of the Cerberus Transaction) and through its control of EESO (the managing member of Aeneas after the Cerberus Restructuring). More importantly, Enron's control over the EOG Block is evidenced by the EOG Consent Agreement requiring Enron to maintain control of Aeneas so long as Aeneas held any shares of the EOG Block. *See* Section 1.3(a), EOG Consent Agreement, *supra* note 187. Finally, it is evident from Enron's internal memoranda regarding the Cerberus Transaction and the Cerberus Restructuring that Enron had not intended to relinquish control over the EOG Block. *See* Bill Bowes Memo, *supra* note 226, at 3-5.

[241] Under the Original Total Return Swap, the Put Option and related Enron guarantees described in the text, Enron assumed the obligation to repay or fund the $517.5 million borrowed by the Heracles Trust. In return, Enron retained all economic benefits and risks of ownership of the EOG Block. *See* Sections 2.2 and 2.3, Original Total Return Swap Confirmation, *supra* note 177. Enron also retained the risk of the EOG Block and the entire principal and interest due under the Cerberus Credit Facility by means of the Put Option, pursuant to which the Heracles Trust had the right to require EAH to buy shares of EOG Block at a fixed price of $50.56 per share to the extent the proceeds of such a sale were necessary to pay the amount required under the Cerberus Credit Facility. *See* Sections 2 and 3, Put Option Agreement, *supra* note 174. Enron guaranteed that EAH could purchase these shares by issuing EAH a Demand Note equal to the principal amount plus interest due under the Cerberus Credit Facility. *See* Demand Note from Enron, *supra* note 178.

Enron's Intent;[243] (v) Tax Treatment;[244] and (vi) Loan Pricing.[245]  Because the Total

Return Swap and the Put Option were from EAH, the original transferor, the Examiner

believes that there was no true sale of the EOG Block to Aeneas at that time.

---

[242] The interest, or lack thereof, of the lender in the legal isolation opinions given in the transaction are an indicia of the lender's intent regarding the treatment of the asset.  In the Cerberus Transaction, the legal isolation opinion is addressed to only Enron and Aeneas and explicitly entitles Andersen to rely on it.  Opinion from Andrews & Kurth LLP to Enron and Aeneas, Nov. 29, 2000 [AK0026112-AK0026150].  RBC did not require this opinion, and Enron employees have indicated that RBC did not ask to see it or engage in discussions about it.  Enron employees indicated RBC was looking to the creditworthiness of Enron through the Original Total Return Swap as the support for payment of the loan made under the Cerberus Credit Facility and not to the EOG Block or the Class B Interest.  Enron employees indicated that typically these legal isolation opinions were more a matter of importance to Enron and to Andersen for accounting purposes, but were generally not a condition to closing the financing.  As discussed above, it appears from these circumstances that it was Enron that was seeking comfort on these issues in order to satisfy the requirements of FAS 125.  Unlike more typical securitizations, RBC did not seem to need comfort that the EOG Block had been isolated from EAH and would be available to satisfy the Heracles Trust's obligations in the event of a problem.  Instead, it relied on EAH's and Enron's future ability to repay its obligations under the Original Total Return Swap and, indirectly, the Put Option.  Its reliance on this source of repayment is further confirmed by the fact that it required and received traditional legal opinions from Enron's outside counsel providing comfort as to EAH's and Enron's obligations under the Original Total Return Swap.  Opinion from Andrews & Kurth LLP to the Heracles Trust, Enron, EAH, Aeneas, Psyche, RBC and RBC Dominion Securities Corp., Nov. 29, 2000 [AB000113568-AB000113576].  As discussed above, these circumstances evidence that the parties to the Cerberus Transaction, other than Enron, viewed this transaction as the functional equivalent of a loan transaction supported by Enron credit and not as a typical asset securitization supported by the EOG Block.  Had RBC been relying on the EOG Block itself, RBC likely would have insisted on the right to rely on the legal isolation opinion.

[243] Enron's intent to retain control over the EOG Block and not to dispose of the benefits and risks of ownership is evidenced by those factors discussed *supra* note 240.  This intention continued in the Cerberus Restructuring in which the replacement of the Original Total Return Swap with an Equity-Linked Swap between ENA and Rabobank continued the retention of the benefits and risks of ownership of the EOG Block in an Enron entity.  It is the Examiner's understanding that Rabobank, rather than Enron, required the restructuring to more closely resemble a market securitization, performing some due diligence on the EOG Block and requiring that both the earlier and the current legal isolation opinions be available for reliance by Rabobank.  Nevertheless, ENA was still a party to the Equity-Linked Swap providing it with the risks and benefits of ownership of the EOG Block. *See also supra* note 241.

[244] A number of the documents entered into in connection with the Cerberus Transaction and Cerberus Restructuring contain statements regarding the purported tax treatment, acknowledging that the treatment of the transactions for tax purposes is different than the treatment for other purposes.  For example, the Heracles Trust Agreement states "It is the intention of the parties hereto, for purposes of federal, state and local income and franchise taxes and any other tax imposed on or measured by income, on and after the Closing Date, that the Trust was formed for the purpose of securing financing with the Class B Interest and constitutes a security device for the repayment of amounts due to the Finance Parties and the Certificate Holder, that the Notes and the Certificate constitute indebtedness of the Sponsor, and that the Class B Interest is pledged to secure the payment of such indebtedness." *See* Section 2.06, Heracles Trust Agreement, *supra* note 175.

[245] It is the understanding of the Examiner, based on discussions with representatives of Enron, that the interest rate on the loan under the Cerberus Credit Facility was based on the rate that would be charged to

In this regard, it is possible that proponents of a sale characterization for this transaction will argue that, even if one assumes that the Cerberus Transaction was not a true sale upon the first closing because EAH, the Sponsor, retained all material benefits and risks of ownership of the EOG Block, these benefits and risks were removed as an integral part of the Cerberus Restructuring, and thus the transaction is transformed to a sale as of that date. However, the issue of whether a sale that is apparently defective in the first closing can become a true sale by subsequent events and agreements is not addressed in any published case law or treatise that has come to the attention of the Examiner. It is the view of the Examiner, however, that the following key elements suggesting continued recharacterization of the transaction as a loan remained after the Cerberus Restructuring: (i) Control Over Asset;[246] (ii) Benefits and Risk;[247] (iii) Lenders' Intent;[248] (iv) Enron's Intent;[249] and (v) Tax Treatment.[250]

*Accounting and Disclosure of the Cerberus Transaction*

In its accounting for the Cerberus Transaction, Enron: (i) recognized approximately $31 million of gain on its 2000 income statements;[251] (ii) recognized on its relevant financial statements the approximately $517 million "sale" price as cash flow

---

Enron for an unsecured loan, plus a premium for complexity of the structure, rather than on the value of the underlying asset.

[246] *See supra* note 240.

[247] *See supra* note 240. EAH's obligations under the Put Option and the Original Total Return Swap were extinguished in connection with the Cerberus Restructuring. Nevertheless, Enron continued to have substantially all of the economic benefits and risks of the EOG Block under the Equity-Linked Swap. *See* text *supra* notes 237-38.

[248] While there is evidence that Rabobank placed additional reliance on the underlying asset (*see supra* Note 243), the existence of the Equity-Linked Swap and other evidence indicate that Enron's creditworthiness may have been the primary credit basis for Rabobank's participation in the transaction.

[249] *See supra* note 243.

[250] *See supra* note 244.

from operating activities;[252] and (iii) as of year end 2000, disclosed its obligations under the Original Total Return Swap in the same manner as described above in the section entitled *Accounting Treatment and Financial Statement Disclosure*.

The Examiner's accounting experts have advised the Examiner that, in their opinion, Enron's disclosure of its obligations under the Total Return Swap was not in accordance with GAAP for the reasons set forth above in the section entitled *Were the Accounting Treatment and Financial Statement Disclosure Proper?*

The Examiner's accounting experts also have advised the Examiner that accounting issues exist concerning whether Enron's characterization of cash flows and the consolidation or non-consolidation of entities for accounting purposes were appropriate in the Cerberus Transaction. However, neither the Examiner nor his accounting experts have reached any final conclusions on this issue. These questions will be addressed in future reports.

*Examiner's Conclusions with Respect to Cerberus Transaction*

The Cerberus Transaction and the Cerberus Restructuring both involve a purported sale to an SPE of the EOG Block by EAH, an Enron subsidiary. Therefore, certain parties to the transaction possibly will argue that the asset is not part of the Debtors' estates. If, however, the Cerberus Transaction, after completion of the Cerberus Restructuring, was recharacterized as a loan, then the EOG Block with an approximate value of $400 million would be added to the Debtors' estates. Since there is no evidence

---

[251] EAH, General Ledger, Jan. 5, 2001 (showing a mark-to-market gain of $31,573,250 on EOG Block as of Nov. 2000) [EC001827973].

[252] Enron Spreadsheet, 2000 Transaction Summary [AA000000500].

to date that any party to the transaction obtained a properly perfected and unavoidable security interest in such assets, any such party would have, at best, an unsecured claim.

The Cerberus Transaction, both before and after the Cerberus Restructuring, can only be understood when viewed in its totality. When so viewed, the Cerberus Transaction appears to be, from both an economic and risk allocation perspective, a loan rather than a sale of assets. As such, the Cerberus Transaction (both before and after the Cerberus Restructuring) is susceptible to recharacterization as a loan based upon the factors discussed above, including (i) Control Over Asset; (ii) Benefits and Risks of ownership of the asset; (iii) Loan Pricing; (iv) Lenders' Intent; (v) Enron's Intent; and (vi) Tax Treatment.

In the original Cerberus Transaction, the Original Total Return Swap was with EAH, the Sponsor that transferred the EOG Block in the putative true sale. As a result, it is the Examiner's view that the existence of this Original Total Return Swap is a compelling factor supporting recharacterization, except for any effect given to the Cerberus Restructuring.

The Cerberus Transaction after giving effect to the Cerberus Restructuring, includes an Equity-Linked Swap that results in an allocation of risks and benefits between Enron and Rabobank that are similar to those that would result from a Total Return Swap. The Equity-Linked Swap was entered into by the Enron subsidiary, ENA, and guaranteed by Enron. It is the Examiner's view that the existence of this Equity-Linked Swap would be a compelling factor supporting continued recharacterization if the Enron party to the Equity-Linked Swap were EAH, the same entity that transferred the asset in the putative sale. Because this Equity-Linked Swap was entered into by an

*affiliate* of the asset transferor, an issue may arise regarding whether the Equity-Linked Swap can still be considered as a factor to support recharacterization of the purported sale as a loan. The Examiner believes that, even where the Enron party to the Equity-Linked Swap is the parent or other affiliate of the asset transferor, rather than the asset transferor itself, the existence of the Equity-Linked Swap is a relevant factor in determining whether there was a true sale. To conclude otherwise and disregard the existence of these rights and obligations, whether held by the asset transferor or its affiliate, would ignore the economic reality of the transaction.

### G.    The Nikita Transaction

*Introduction and Review of the Nikita Transaction*

The Nikita Transaction closed on September 28, 2001, approximately two months

prior to the Petition Date.  The stated purpose of the transaction was to monetize all of

Enron's limited partnership interests in EOTT Energy Partners, LP, a publicly held

Master Limited Partnership ("EOTT").  These interests consisted of different classes of

partnership interests.  EOTT is "engaged in the purchasing, gathering, transporting,

trading, storage and resale of crude oil, refined petroleum products and natural gas

liquids."[253]  EOTT's Common Units are traded on the New York Stock Exchange under

the symbol "EOT."  The contributed partnership interests consisted of 3.276 million

Common Units, 7 million Subordinated Convertible Equity Units[254] and certain

Additional Partnership Interests (the "APIs") (all such conveyed limited partnership

interests are referred to collectively as the "EOTT Partnership Units").  These interests

comprised 36% of the total outstanding limited partnership interests in EOTT.[255]

---

[253] Enron Interoffice Memorandum to the Files from Transaction Accounting regarding Project Nikita, Oct. 1, 2001 (the "Nikita Accounting Memorandum"), at 1 [AB000123311-AB000123316].

[254] The Subordinated Convertible Equity Units were to be converted, at a rate of .45 for 1, into approximately 3.35 million Common Units.  EOTT Section 14(a) Preliminary Proxy Statement filed with the SEC, Sept. 7, 2001, at 1.

[255] *See* Enron Global Markets Project Nikita Bank Presentation, at 3 [AB000343529-AB000343539]. EOTT had announced its intention to make distributions to the holders of Common Units each quarter at the rate of $0.475 per Common Unit.  *See* EOTT Form 10-Q filed with the SEC for the Quarter ended Mar. 31, 2002, at 12.  The APIs were received by Enron in exchange for $9.3 million in advances pursuant to an agreement to fund up to $29 million to allow EOTT to make these distributions to the extent cash was otherwise unavailable to EOTT.  *Id.*  Enron defaulted on this obligation in the fourth quarter of 2001, and no EOTT distributions are expected prior to the fourth quarter of 2002.  *Id.* at 12-13.  As of September 18, 2002, the market price for the Common Units of EOTT, which has been steadily falling since September 2001, was approximately $1.00 per unit; as a result, the Common Units were worth approximately $3.3 million without giving effect to trading volume discounts.  Information regarding the value of the Subordinated Convertible Equity Units and the APIs is not available.  EOTT has had a close business relationship with Enron and has suffered as a result of its failed business dealings with Enron.  *See* EOTT Press Release, "EOTT Energy Reports Second Quarter Results," Aug. 14, 2002 [ELIB00001877-00001-3]. EOTT is also in technical default with respect to its loan from Standard Chartered Bank.  *Id.*  Standard

As with the other FAS 140 Transactions, the Nikita Transaction raises the legal question whether the characterization of the transfers in the relevant documents should be respected as sales or whether the transactions, taken as a whole, should be recharacterized as loans.

### Structure of the Nikita Transaction

In the Nikita Transaction, Nikita, LLC ("Nikita"), a wholly owned subsidiary of Enron, acted as the Sponsor.[256] Nikita contributed the EOTT Partnership Units to Timber I LLC ("Timber"), which acted as the Asset LLC in this transaction.[257] In exchange for the EOTT Partnership Units, Nikita received a Class A Interest in Timber, entitled to 100% of the voting power and 0.01% of the economic interests in Timber.[258] The Class A Interest was entitled to a special distribution from Timber in the amount of $80 million upon the sale of the Class B Interest to Besson Trust, a Delaware trust.[259] Timber sold its Class B Interest, entitled to 99.99% of the economic interests but no voting rights in

---

Chartered Bank has agreed to forbear from taking enforcement action until October 31, 2002. *See* EOTT Press Release, "EOTT Energy Extends Credit Facilities," Aug. 27, 2002 [ELIB00001876-00001].

[256] Enron owns Nikita through its wholly owned subsidiary, EOTT Energy Corp. ("EOTT Energy"). *See, e.g.*, Nikita Structure Chart (the "Nikita Structure Chart") [AB000343502].

[257] Enron, through EOTT Energy, is the sole general partner of EOTT. Enron also owned certain of the EOTT Partnership Units. Both Enron and EOTT Energy contributed EOTT Partnership Units to the Sponsor; Enron contributed the Common Units and APIs and EOTT Energy contributed the Subordinated Convertible Equity Units. Nikita Structure Chart, *supra* note 256. In return for the contribution of the EOTT Partnership Units to the Sponsor, Enron and EOTT Energy received 53% and 47%, respectively, of the membership interests of the Sponsor. *Id.* As an initial step in the transaction, Enron obtained these Common Units from another of its subsidiaries, Enron Northwest Assets (an entity involved in other Enron transactions that is sometimes referred to as Tammy II) in exchange for a note in the amount of approximately $64.5 million. *Id.*; *see also* Enron Global Finance Tax Memorandum regarding Nikita, L.L.C. (the "Enron Nikita Tax Memorandum"), at 1 [AB000343503-AB000343505].

[258] *See* Section 3.01(b) and Exhibit A, Timber I LLC Agreement, *supra* note 167.

[259] *See id.* Section 5.03.

- 92 -

Timber,[260] to Besson Trust for $80 million – the same amount as the special distribution to be made by Timber to Nikita.[261]

Besson Trust financed the purchase price of the Class B Interest by issuing a certificate of beneficial interest to CSFB for approximately $8.1 million[262] and borrowing approximately $71.9 million from Barclays.[263] Besson Trust's ability to repay this loan was supported through a Total Return Swap with ENA,[264] guaranteed by Enron,[265] pursuant to which ENA (and ultimately Enron) was obligated to pay to Besson Trust an amount equal to the amounts payable on the Barclays loan in exchange for Besson Trust's commitment to pay to ENA all amounts received by Besson Trust with respect to the Class B Interest (reflecting the economic characteristics of the underlying EOTT Partnership Units).[266] The principal amount of the loan, $71.9 million, remains unpaid.

---

[260] *See id.* Section 5.02 and Exhibit A.

[261] *See* Receipt of Asset LLC, Sept. 28, 2001 [AB000050507-AB000050508].

[262] *See* Receipt of Trust, Sept. 28, 2001 [AB000051509-AB00005150910]. This amount is more than 3% of the amount of the initial funding. Enron had intended for the Nikita Credit Facility to provide up to $235 million of funding. *See* Email from Jodi Coulter, Enron, to Randy Peterson and Bill W. Brown, Enron, Sept. 15, 2001 (the "Coulter Email") [AB000393506]; Enron Interoffice Memorandum from John Sullivan, Enron, to Kelly Boots, et al., Enron, Sept. 18, 2001 (the "Sullivan Memorandum") [AB000343540]. Andersen concluded that 3% of this entire amount would need to be paid at the outset of the transaction. *See* Nikita Accounting Memorandum, *supra* note 253. The parties also had discussed a return of a portion of this amount should the entire facility not be used. *See* Sullivan Memorandum, *supra*. No evidence suggests that any portion of the amount paid by CSFB has been returned.

[263] *See* Promissory Note from Besson Trust to Barclays Bank, Sept. 28, 2001 in the amount of $176,865,000 (the "Besson Trust Note") [AB000051361-AB000051363]. Barclays was the lead bank in a syndicate that had agreed to make up to $235 million available in connection with the Nikita Transaction. *See* Sullivan Memorandum, *supra* note 262.

[264] Total Return Swap Confirmation between Besson Trust and Enron North America, Sept. 28, 2001 (the "Nikita Total Return Swap") [AB000051400-AB000051410].

[265] Enron Guaranty between Enron Corp. and Besson Trust, Sept. 28, 2001 (the "Enron Nikita Guaranty") [AB000051411-AB000051419].

[266] Section 2, Nikita Total Return Swap, *supra* note 264.

The certificate of beneficial interest entitles CSFB to receive its face amount plus a return of 15% per year.[267] The right of CSFB to receive payment with respect to the certificate of beneficial interest is subordinated to the right of Barclays to receive payment with respect to the loan,[268] and such amounts due to CSFB are not supported by the Total Return Swap.[269] Upon payment of the $80 million purchase price for the Class B Interest by Besson Trust, Timber made the special distribution (in the same amount) to Nikita.[270] Nikita applied those funds to make a special distribution in the same aggregate amount to its members in accordance with their ownership interests, distributing $42.1 million to Enron and $37.9 million to EOTT Energy.[271]

After giving effect to the transactions completed at the closing, Timber held the EOTT Partnership Units,[272] and Nikita, through its Class A Interest, and Besson Trust, through its Class B Interest, owned Timber.[273] CSFB owned the certificate of beneficial interest in Besson Trust and Besson Trust owed to Barclays the amount borrowed to purchase the Class B Interest.[274] Besson Trust had the benefit of the Total Return Swap from ENA and the related Enron guarantee for repayment of the Barclays loan.[275]

---

[267] See Section 5.01, Trust Agreement between Wilmington Trust Company and The Holders of Certificates, Sept. 28, 2001 (the "Besson Trust Agreement") [AB000051211-AB000051244]. There is no obligation to pay current yield on the certificate of beneficial interest; however, the certificate does accrue interest. See id. Section 5.01(a)(iii).

[268] See Section 5.01, Besson Trust Agreement, supra note 267.

[269] See Section 2.3, Nikita Total Return Swap, supra note 264.

[270] See Section 5.03, Timber I LLC Agreement, supra note 167.

[271] Nikita Structure Chart, supra note 256. This payment to EOTT Energy "was immediately swept to Enron Corp." See Email from Traci Rainbow, Enron, to Essie Locklear, Enron, Apr. 10, 2002 [AB000343542].

[272] See Section 2.04, Timber I LLC Agreement, supra note 167.

[273] See id. Section 3.01.

[274] See Besson Trust Note, supra note 263.

[275] See Nikita Total Return Swap, supra note 264; Enron Nikita Guaranty, supra note 265.

The structure of the Nikita Transaction is shown in the following diagram:



As with many of the other FAS 140 Transactions, although the Class A Interest gave to Nikita all voting control over Timber – and thus over the EOTT Partnership Units – and Nikita was designated the managing member of the Asset LLC with exclusive power to manage the business and affairs of Timber,[276] Nikita could not sell the EOTT Partnership Units without the consent of Besson Trust, as the holder of the Class B Interest.[277] As a special purpose entity, Timber's business is limited to holding the EOTT Partnership Units and making the payments contemplated by its limited liability company agreement.[278] It cannot engage in any other activities,[279] and an independent manager of Timber must consent to certain major actions involving Timber, such as declaring bankruptcy or dissolving.[280] Notably, the Besson Trust may sell the Class B Interest, but this right is subject to a complex notice, auction and right of first refusal procedure.[281]

*Economics and Allocation of Risk in the Nikita Transaction*

As with the other FAS 140 Transactions, the Nikita Transaction contains several features that allocate the risks and rewards of the transaction so that the transaction more closely resembles a loan than a sale of assets. One of the most important factors is the ultimate risk retained by ENA and Enron through the Total Return Swap. The Total

---

[276] *See* Section 6.01, Timber I LLC Agreement, *supra* note 167.

[277] *See id.* Section 6.01.

[278] *See id.* Section 2.04.

[279] *See id.*

[280] *See id.* Section 6.06(b).

[281] If the Certificate Holder desires to dispose of the Class B Interest it must first notify the Sponsor (Nikita LLC). Section 3.03(b)(iii)(A), Timber I LLC Agreement, *supra* note 167. The Sponsor is then given a Right of First Offer, which allows the Sponsor five days to make an offer to the Certificate Holder. *Id.* If the Certificate Holder does not accept the Sponsor's offer (or if the Sponsor fails to make an offer), the Class B Interest is put up for auction. *Id.* Section 3.03(b)(iii)(B). Should the auction fail to attract bidders, the Class B Interest may then be sold to any other person pursuant to the parties' Sales Agency Agreement. *Id.* Section 3.03(b)(iii)(E). Also, if a bona fide third-party offer to buy the Class B Interest is received by Besson Trust or the Certificate Holder, the Sponsor (Nikita LLC) is entitled to notice and holds a Right of First Refusal to buy the Class B Interest on the same terms. *See id.* Section 3.03(e).

Return Swap entitled ENA to the amount by which any eventual sales or other proceeds produced by the asset exceeded the financing costs of the Besson Trust, including interest on the Besson Trust's loans and payment of the purchase price of Besson Trust's certificate of beneficial interest (plus a specified return). Thus, although Enron was "selling" the asset to a purportedly unrelated third party, Enron and ENA obligated themselves to repay the funds borrowed by that third party in order to make the purchase, thereby retaining the risk of a decrease in the value of that asset. At the same time, Enron and ENA had the contractual right to receive the "total return" of the asset, thereby retaining the benefits of any appreciation of the asset after the payment of the debt, the equity, and equity's 15% per annum specified return.

### *Recharacterization of the Nikita Transaction*

There are several factors present in the Nikita transaction that support the recharacterization of the transaction as a loan. These include (i) Control Over Asset;[282] (ii) Benefits and Risks; [283] (iii) Loan Pricing;[284] (iv) Lenders' Intent; [285] (v) Enron's Intent; [286] and (vi) Tax Treatment. [287]

---

[282] *See supra* notes 258 and 276-281 and accompanying text for a discussion regarding the Timber I A Share. Nikita's voting control over Timber effectively gives it primary control over the EOTT Partnership Units. Moreover, the notice, auction and first refusal provisions effectively gave Enron the ability to maintain control of the sale of EOTT Partnership Units. Accordingly, it appears Enron and its affiliates never relinquished control of the EOTT Partnership Units.

[283] Pursuant to the Total Return Swap, Enron assumed the obligation to repay the funds borrowed by Besson Trust (together with interest) which, with amounts contributed under the certificate of beneficial interest, were used to purchase the EOTT Partnership Units and, in return, Enron received (or retained) the economic benefits and risks of ownership of the EOTT Partnership Units, except to the extent attributable to the equity. Section 2, Nikita Total Return Swap, *supra* note 264.

[284] Enron employees have indicated in interviews that the interest rate applicable to the Nikita indebtedness was an "Enron rate," increased slightly to account for the complexity of the transaction.

[285] Legal isolation opinions were to have been given for both the transfer of the EOTT Partnership Units to Timber and the transfer of the Class B Interest to Besson Trust. *See* Project Nikita 140 Schematic [AB000343543]. Enron employees have indicated that Enron managers were unwilling to provide certifications as to factual matters recited in the opinions. Accordingly, no opinions were ever delivered. *See* Email from Deborah Sylvan on behalf of David Barbour, Partner, Andrews & Kurth to Gareth

*Accounting and Disclosure of the Nikita Transaction*

In its accounting for the Nikita Transaction, Enron recognized approximately $10 million of Gain on Sale on third quarter 2001 income statements.[288]

The Examiner's accounting experts have advised the Examiner that accounting issues exist concerning whether Enron's recognition of Gain on Sale, the characterization of cash flows and the consolidation or non-consolidation of entities for accounting purposes were appropriate in the Nikita Transaction. However, neither the Examiner nor his accounting experts have reached any final conclusions on this issue. These questions will be addressed in future reports.

*Examiner's Conclusions with Respect to Nikita Transaction*

The Nikita Transaction involves a purported sale of EOTT Partnership Units by an Enron affiliate to an SPE. Therefore, certain parties to the transaction possibly will argue that this asset is not part of the Debtors' estates. If, however, the purported sale is recharacterized as a loan, then EOTT Partnership Units, currently trading in excess of $3

---

Bahlmann, in-house counsel, Enron, Nov. 1, 2001 [AK0075293]. While the absence of these opinions, in and of itself, does not prove that the transfers in the Nikita Transaction were not true sales, these circumstances certainly indicate an absence of interest by Barclays in the asset, its legal isolation, and its ability to be used to satisfy the indebtedness. Further support for Barclays' apparent lack of interest in the underlying asset is found in the statements from Enron employees who have indicated that Barclays took no security interests in the EOTT Partnership Units. The Examiner has found no such interest. Thus, the structure and pricing of the Nikita indebtedness were that of an Enron credit. One factor supporting characterization of the transaction as a sale is the substantial equity contribution made to Besson Trust by CSFB. This payment of $8,135,000 constituted more than 10% of the total capital contributed to Besson Trust. This entire amount is at risk in the transaction – the Equity Holder will receive a return on this certificate only if the cash flows from Timber exceed the amount due to Barclays. *See* Section 5.01, Besson Trust Agreement, *supra* note 267.

[286] *See supra* notes 282-83. Enron intended to retain beneficial ownership of the EOTT Partnership Units. Documents filed with the Securities and Exchange Commission indicate that Enron remained the "beneficial owner" of the units. *See* Enron Form 4 filed with the SEC, Oct. 10, 2001, fn 2 [AB000256578].

[287] Transaction documents indicate that for tax purposes the transaction was treated as a loan to ENA. *See, e.g.,* Section 7.02, Timber I LLC Agreement, *supra* note 167; Section 2.06, Besson Trust Agreement, *supra* note 267; Section 3.2, Nikita Total Return Swap, *supra* note 264.

[288] *See* Nikita Accounting Memorandum, *supra* note 253, at 5; Coulter Email, *supra* note 262.

million[289] would be added to the Debtors' estates. Because there is no evidence to date that any party obtained a properly perfected and unavoidable security interest in such assets, any such party will have, at best, an unsecured claim.

The Nikita Transaction can only be understood when viewed in its totality. When so viewed, the transaction appears to be, from both an economic and risk allocation perspective, a loan rather than a sale of an asset. As such, the Nikita Transaction is susceptible to recharacterization as a loan based upon the factors discussed above, including (i) Control Over Asset; (ii) Benefits and Risks; (iii) Loan Pricing; (iv) Lenders' Intent; (v) Enron's Intent; and (vi) Tax Treatment.

The Nikita Transaction includes a Total Return Swap entered into by the Enron subsidiary, ENA, and guaranteed by Enron. It is the Examiner's view that the existence of this Total Return Swap would be a compelling factor supporting recharacterization if the Enron party to the Total Return Swap were the same entity that transferred the asset in the putative sale. Because this Total Return Swap was entered into by an *affiliate* of the asset transferor, an issue may arise regarding whether the Total Return Swap can still be relied on to support a recharacterization of the purported sale as a loan. The Examiner believes that, even where the Enron party to the Total Return Swap is the parent or other affiliate of the asset transferor, rather than the asset transferor itself, the existence of the Total Return Swap is a relevant factor in determining whether there was a true sale. To conclude otherwise and disregard the existence of these rights and obligations, whether

---

[289] The 3.276 million Common Units of EOTT are currently traded in the open market for approximately $1.00 per unit. Wall St. J., Sept. 18, 2002. The value of the subordinated convertible Equity Units and APIs has not been determined. As stated earlier, the price of EOTT Common Units has fallen steadily since September 2001. *See supra* note 255. In May 2002, for example, the units traded in the range of approximately $5.00 per unit. A $5.00 per unit price made the EOTT Partnership Units worth in excess of $15 million.

held by the asset transferor or its affiliate, would ignore the economic reality of the

transaction.

## H.    **The Hawaii Transaction**

*Background of the Hawaii Transaction*

After completing several FAS 140 transactions, each of which used a separate Trust to monetize a single asset, Enron created the two Hawaii Trusts,[290] each of which could monetize multiple assets using the same structure and documents and involving the same lenders, much as a borrower can use a revolving credit facility to purchase assets from time to time through borrowings, repayments and reborrowings. Enron expected this structure to reduce transaction costs and provide for a smoother execution process.[291]

Between March 2000 and October 2001, at least 22 transactions, or "Series," were completed by the two Hawaii Trusts.[292] In these 22 transactions, a total of 11 assets[293]

---

[290] Enron created one Hawaii Trust in March 2000 and added the second in November 2000.

[291] *See* Enron Hawaii Presentation, *supra* note 129, at 3.

[292] Hawaii transactions that closed more than one year prior to the Petition Date closed on March 31, 2000, June 15, 2000, June 29, 2000, August 31, 2000 and September 29, 2000. Hawaii transactions that closed nearly one year prior to the Petition Date closed on December 7, 2000, December 14, 2000 and December 22, 2000. Three transactions closed on March 29, 2001 (approximately nine months prior to the Petition Date). Additional transactions also closed on June 14, 2001, June 22, 2001 and June 28, 2001 (approximately six months prior to the Petition Date). Two transactions closed on September 7, 2001 (approximately three months prior to the Petition Date) and six transactions closed on October 17, 2001 (the day after the Earnings Release and 47 days prior to the Petition Date).

[293] Definition of "Asset" in Section 1.01 of each of: Amended and Restated Limited Liability Company Agreement of Danno II, L.L.C., June 15, 2000 (the "Danno B Asset LLC Agreement") [AB000028475-AB000028515]; Amended and Restated Limited Liability Company Agreement of McGarret I, LLC, Mar. 31, 2000 (the "McGarret A Asset LLC Agreement") [AB000032101-AB000032140]; McGarret B Asset LLC Agreement, *supra* note 151; Amended and Restated Limited Liability Company Agreement of McGarret III, LLC, Aug. 31, 2000 (the "McGarret C Asset LLC Agreement") [AB000033074-AB000033114]; Second Amended and Restated Limited Liability Company Agreement of McGarret II, LLC, Sept. 29, 2000 [AB000033785-AB000033818]; McGarret F Asset LLC Agreement, *supra* note 143; Second Amended and Restated Limited Liability Company Agreement of McGarret I, LLC, Dec. 14, 2000 [AB000034854-AB000034894]; Amended and Restated Limited Liability Company Agreement of McGarret VIII, L.L.C., Dec. 22, 2000 (the "McGarret H Asset LLC Agreement") [AB000035487-AB000035530]; Second Amended and Restated Limited Liability Company Agreement of McGarret VIII, LLC, Mar. 29, 2001 [AB000036025-AB000036060]; Amended and Restated Limited Liability Company Agreement of McGarret X, L.L.C., June 14, 2001 (the "McGarret J Asset LLC Agreement") [AB000036573-AB000036630]; Amended and Restated Limited Liability Company Agreement of McGarret XI, L.L.C., Mar. 29, 2001 (the "McGarret K Asset LLC Agreement") [AB000037104-AB000037146]; Amended and Restated Limited Liability Company Agreement of McGarret XII, L.L.C., Mar. 29, 2001 (the "McGarret L Asset LLC Agreement") [AB000037689-AB000037732]; Amended and Restated Limited Liability Company Agreement of McGarret XIII, L.L.C., Mar. 29, 2001 (the "McGarret

were conveyed by the following subsidiaries or unconsolidated equity affiliates of Enron:

Enron Broadband Services, Inc., Enron Energy Services, LLC, Enron European Power

---

M Asset LLC Agreement") [AB000038335-AB000035393]; Amended and Restated Limited Liability Company Agreement of McGarret XIV, L.L.C., June 28, 2001 (the "McGarret N Asset LLC Agreement") [AB000038963-AB000039020]; Second Amended and Restated Limited Liability Company Agreement of McGarret VI, LLC, Sept. 7, 2001 [AB000039497-AB000039550]; Third Amended and Restated Limited Liability Company Agreement of McGarret I, LLC, Sept. 7, 2001 [AB000040007-AB000040063]; Second Amended and Restated Limited Liability Company Agreement of McGarret III, L.L.C., Oct. 17, 2001 (the "McGarret Q Asset LLC Agreement") [AB000040573-AB000040628]; Third Amended and Restated Limited Liability Company Agreement of McGarret II, LLC, Oct. 17, 2001 (the "McGarret R Asset LLC Agreement") [AB000041089-AB000041144]; Fourth Amended and Restated Limited Liability Company Agreement of McGarret I, L.L.C., Oct. 17, 2001 (the "McGarret S Asset LLC Agreement") [AB000041597-AB000041644]; Second Amended and Restated Limited Liability Company Agreement of McGarret XI, LLC, Oct. 17, 2001 [AB000042040-AB000042096]; Second Amended and Restated Limited Liability Company Agreement of McGarret XIII, LLC, Oct. 17, 2001 [AB000042614-AB000042673]; and McGarret V Asset LLC Agreement, *supra* note 148. Of the nine assets that remain in the Hawaii entities, the asset that appears to have the most value is 32,355 shares of common stock of CGas, Inc. ("CGas"), a privately-held company whose business, at the time these shares were conveyed in a Hawaii transaction, consisted primarily of exploration, development and acquisition of natural gas. Asset Notice, Mar. 30, 2001 (the "McGarret K Asset Notice") [AB000037049-AB000037054]. The Examiner has been advised by Enron personnel that the approximate value of these shares is currently between $30 million to $40 million. Five of the Hawaii assets derive their value from the common stock of NewPower Holdings. The value of the common stock of NewPower Holdings is uncertain at this time. *See supra* note 7. Three of the assets are blocks of warrants to acquire an aggregate of approximately 18 million shares of common stock of NewPower Holdings and are discussed *supra* Section III.B., *The Story of the NewPower Warrants. See* Definition of "Asset" in Section 1.01 of the following documents: McGarret Q Asset LLC Agreement, *supra*; McGarret R Asset LLC Agreement, *supra*; McGarret S Asset LLC Agreement, *supra*. The other two assets are interests in Tahiti Trust, an entity that is the assignee of the $259 million note payable by Porcupine to Pronghorn, which is also discussed *supra* Section III.B., *The Story of the NewPower Warrants. See* Asset Notice, Mar. 20, 2001 (the "McGarret L Asset Notice") [AB000037640-AB000037645]; Asset Notice, June 15, 2001 [AB000038301-AB000038306]. The ability of the maker to pay the note is dependent on the value of the common stock of NewPower Holdings. Prior to the date on which this note was to become due in 2005, an affiliate of Enron was to purchase certain warrants to purchase common stock of NewPower Holdings from a trust, and the funds from that purchase would have eventually reached the obligor of this note. The purchase price for these warrants was to have been determined by reference to the market price of the NewPower Holdings common stock that, as indicated above, is uncertain at this time. McGarret L Asset Notice, *supra*. Two additional assets are membership interests in limited liability companies. One of these, EBS Content Systems, L.L.C. ("EBS Content Systems"), was assigned all of Enron Broadband Services, Inc.'s interest in certain contracts, including the 20-year exclusive worldwide agreement to distribute movies on demand with Blockbuster, Inc. that was subsequently terminated. Asset Notice, Dec. 15, 2000 [AB000035429-AB000035435]; Enron Press Release, "Enron Expanding Entertainment On-Demand Service: Terminates Exclusive Relationship with Blockbuster, Inc.," Mar. 9, 2001 [ELIB00001734-00001-2]. The other, LE Heston Energy, LLC, was formed by Enron Energy Services Operations, Inc. and Eli Lilly Company in February 2001 and was a party to a 15-year, $1.3 billion agreement to provide certain services to Eli Lilly Company. Asset Notice, June 4, 2001 [AB000036534-AB000036539]; Press Release, "Enron and Lilly Announce Long-Term Energy Management Agreement," Feb. 26, 2001 [ELIB00001732-00001-2]. The Examiner has been advised by Enron personnel that these assets currently have no value. Finally, an interest in European Power Limited Company, a trust with the right to receive the proceeds from the floating leg of a swap whose counterparty is Enron, is also an asset in one of the Hawaii transactions. The floating leg of the swap is indexed to operating benchmarks of three of Enron's European power assets: Sarlux in Italy,

Investor LLC, Enron Energy Services Operations, Inc., JEDI and Pronghorn I LLC, each

of which acted as a "Sponsor" for such transaction. The Sponsors received an aggregate

of approximately $353 million in cash for these assets.[294] Two of the transactions were

subsequently unwound (in each case, the applicable Sponsor purchased the equity interest

associated with that transaction from its holder and caused the associated advance under

the Credit Facility to be repaid[295]); the assets associated with those transactions are no

longer in the Hawaii structures. The loans and equity investments related to the other

Series that are no longer outstanding were repaid with the proceeds of a subsequent

Hawaii transaction; in some cases a payment was made by Enron or ENA under the

Hawaii Swap (defined below) associated with the Series being repaid.[296]

As with the other FAS 140 Transactions discussed herein, the Hawaii Transaction

raises the question whether, as a legal matter, the characterization of the transfers in the

---

Trakya in Turkey and Nowa Sarzyna in Poland.  Asset Notice, Nov. 30, 2000 [AB000034198-AB000034203].  The Examiner has been advised by Enron personnel that this asset currently has no value.

[294] Section 5.03, McGarret A Asset LLC Agreement, *supra* note 293; Section 5.03, McGarret B Asset LLC Agreement, *supra* note 151; Section 5.03, Danno B Asset LLC Agreement, *supra* note 293; Section 5.03, McGarret C Asset LLC Agreement, *supra* note 293; Section 5.03, McGarret F Asset LLC Agreement, *supra* note 143; Section 5.03, McGarret H Asset LLC Agreement, *supra* note 293; Section 5.03, McGarret J Asset LLC Agreement, *supra* note 293; Section 5.03, McGarret K Asset LLC Agreement, *supra* note 293; Section 5.03, McGarret L Asset LLC Agreement, *supra* note 293; Section 5.03, McGarret M Asset LLC Agreement, *supra* note 293; Section 5.03, McGarret N Asset LLC Agreement, *supra* note 293.

[295] The McGarret N transaction was one of the two Hawaii transactions unwound.  To effect this unwinding, the Sponsor, JEDI, entered into a Certificate Purchase Agreement with CIBC Inc. pursuant to which it purchased from CIBC, Inc. the Series Certificate associated with the McGarret N transaction.  *See* Section 2.1, Certificate Purchase Agreement between JEDI and CIBC Inc., Aug. 1, 2001 [AB000039421 – AB000039434].  Having acquired the Series Certificate, JEDI then contributed funds to the Hawaii I Trust sufficient to repay the amounts advanced under Hawaii I's Credit Facility to purchase the Class B Interest transferred to the Hawaii I Trust in the McGarret N transaction.  *See* Section 1(a), Dissolution Agreement among JEDI, McGarret XIV, L.L.C. ("McGarret XIV"), Big Island XIV, L.L.C. and Hawaii I Trust, Aug. 1, 2001 (the "McGarret N Dissolution Agreement") [AB000039443-AB000039450].  Once such funds were repaid, the Series of the Hawaii I Trust created in connection with the McGarret N transaction was to be cancelled and the property of that Series, consisting of the Class B Interest in McGarret XIV, would be distributed to JEDI as the holder of the Series Certificate.  Section 1(b), McGarret N Dissolution Agreement, *supra*.  Following this action, JEDI would be the sole owner of McGarret XIV.

[296] *See supra* Section III.B., *The Story of the NewPower Warrants* (discussion of the refinancings of Series McGarret A and Series McGarret B).

relevant documents should be respected as true sales or the transactions, taken as a whole, should be recharacterized as loans. Should these transactions be so recharacterized, assets that now appear to have a current value of $30 million to $40 million could be returned to the Debtors' estates.

### Structure of the Hawaii Transaction

Each Hawaii transaction involved one of two trusts, Hawaii I 125-0 Trust ("Hawaii I Trust") or Hawaii II 125-0 Trust ("Hawaii II Trust").[297] A typical Hawaii transaction began with the contribution by the Sponsor of an asset[298] to a limited liability company of which the Sponsor was the sole member,[299] which would serve as the Asset LLC in such transaction. In exchange for this asset, the Sponsor received a Class A Interest in the Asset LLC, entitled to 100% of the voting power[300] and 0.01% of the economic interests[301] in the Asset LLC. In addition, each Class A Interest had a right to receive a special distribution from the Asset LLC.[302]

The Asset LLC issued its Class B Interest, entitled to no voting rights[303] and 99.99% of the economic interests in the Asset LLC,[304] to another limited liability

---

[297] Subsequent to the March 2000 creation of the original Hawaii 125-0 Trust (now the Hawaii II Trust) and the execution of its original Credit Facility, several changes were made to the original terms and provisions of the Hawaii Transaction. Some of the more significant amendments were made in May 2001, which were to be effective with respect to any Series created on or after April 1, 2001. *See, e.g.*, Section 1, Amendment No. 1 to Second Amended and Restated Trust Agreement of the Hawaii II 125-0 Trust, May 31, 2001 [AB000029723-AB000029746]. Unless otherwise indicated, the discussion below is of the terms of those Hawaii transactions completed after April 1, 2001.

[298] *See, e.g.*, Section 4.01, McGarret V Asset LLC Agreement, *supra* note 148.

[299] *See, e.g.*, *id.* Section 3.01.

[300] *See, e.g.*, *id.* Section 6.01.

[301] *See, e.g.*, *id.* Section 5.02 and Exhibit A.

[302] *See, e.g.*, Section 5.03, McGarret B Asset LLC Agreement, *supra* note 151.

[303] *See, e.g.*, Section 3.01, McGarret V Asset LLC Agreement, *supra* note 148.

[304] *See, e.g.*, *id.* Section 5.02 and Exhibit A.

company of which the Sponsor was the sole member (the "Transferor LLC")[305] in return for a promissory note.[306] The promissory note was in the same amount as the amount of the special distribution that was to be made to the Sponsor by the Asset LLC[307] (and also in the same amount as that at which Enron valued the asset). The Transferor LLC sold the Class B Interest to one of the Hawaii Trusts in exchange for a payment in the same amount as that of the promissory note issued by Transferor LLC to the Asset LLC[308] (and, therefore, in the same amount as the special distribution to be made by the Asset LLC to the Sponsor).

Each Hawaii Trust financed the purchase price of a Class B Interest by selling a certificate of beneficial ownership (a "Series Certificate") to CIBC Inc., an affiliate of Canadian Imperial Bank of Commerce, and making a borrowing under its Credit Facility (the Credit Facilities are described below). Hawaii I Trust Series Certificates with an aggregate invested amount of $6 million and Hawaii II Trust Series Certificates with an aggregate invested amount of approximately $12.8 million were outstanding as of the Petition Date.[309] Each Series Certificate entitles CIBC Inc. to receive the face amount

---

[305] See, e.g., Section 3.01, McGarret B Asset LLC Agreement, supra note 151.

[306] See, e.g., id. Section 4.01.

[307] See, e.g., id. Section 5.03 and Exhibit A.

[308] See, e.g., Section 2.01, Transfer and Auction Agreement, June 28, 2001 (the "McGarret N Auction Agreement") (entered into in connection with the McGarret N Hawaii transaction) [AB000039055-AB000039091].

[309] Series Certificate of Beneficial Ownership for Series McGarret I, Mar. 29, 2001 [AB000035983-AB000035990]; Series Certificate of Beneficial Ownership for Series McGarret J, June 14, 2001 [AB000036540-AB000036547]; Series Certificate of Beneficial Ownership for Series McGarret L, Mar. 29, 2001 [AB000037646- AB000037653]; Series Certificate of Beneficial Ownership for Series McGarret Q, Oct. __, 2001 (day omitted in original) [AB000040547- AB000040554]; Series Certificate of Beneficial Ownership for Series McGarret R, Oct. 17, 2001 [AB000041064- AB000041071]; Series Certificate of Beneficial Ownership for Series McGarret S, Oct. __, 2001 (day omitted in original) [AB000041573-AB000041580]; Series Certificate of Beneficial Ownership for Series McGarret T, Oct. __, 2001 (day omitted in original) [AB000042016- AB000042023]; Series Certificate of Beneficial Ownership for Series McGarret U, Oct. __, 2001 (day omitted in original) [AB000042592- AB000042599]; McGarret V Series Certificate, supra note 157.

plus interest at a capped rate of return of 15% per year.[310]  Generally, the face amount of
a Series Certificate is equal to at least 3% of the purchase price for the Class B Interest
with which it was associated.[311]  The right of CIBC Inc. to receive payment with respect
to a Series Certificate is subordinated to the right of the lenders to receive payment with
respect to the related advance under the Credit Facility.[312]  The amounts due to CIBC
Inc., pursuant to the Series Certificate, are not supported by the Hawaii Swaps.[313]

Each of the two Hawaii Trusts is party to a separate Credit Facility.  Hawaii I
Trust's Credit Facility provides for aggregate borrowings of up to $165 million,[314] and as
of the Petition Date, approximately $162.4 million of principal was outstanding
thereunder.  Hawaii II Trust's Credit Facility provides for aggregate borrowings of up to
$385 million,[315] and as of the Petition Date, approximately $274 million of principal was
outstanding thereunder.  Each Hawaii Trust entered into Total Return Swaps (each, a
"Hawaii Swap" and collectively, the "Hawaii Swaps") with Enron or ENA (guaranteed
by Enron).  As described above under the heading *Allocation of Risk in a Typical Enron
FAS 140 Transaction*, these swaps resulted in Enron assuming the obligation to provide
funds to the Hawaii Trust in an amount sufficient to repay the funds borrowed in order to
purchase a Class B Interest in an Asset LLC from one of Enron's affiliates.  In return,
Enron received substantially all of the economic benefits of the asset.

---

[310] *See, e.g.*, Section 1.01, Hawaii II Trust Agreement, *supra* note 155 (definition of "Certificate Yield").

[311] *See, e.g.*, Section 1(b)(iii), Hawaii II Subscription Agreement, *supra* note 156.

[312] *See, e.g.*, McGarret V Series Certificate, *supra* note 157.

[313] *See, e.g.*, Section 2, McGarret V Swap Confirmation, *supra* note 158.

[314] Section 1.1 and Section 3.3, Facility Agreement of Hawaii I 125-0 Trust, Nov. 20, 2000 (definition of "Commitments") [AB000030115-AB000030407].

[315] Section 1.1 and Section 3.3, Hawaii II Credit Facility, *supra* note 171 (definition of "Commitments").

At the closing of a Hawaii transaction, upon payment of the purchase price for the Class B Interest by the Hawaii Trust, the Transferor LLC was required to repay its note (in that same amount) to Asset LLC.[316]  Asset LLC would then make the special distribution (again, in that same amount) to the Sponsor.[317]

In certain transactions, an existing Series was prepaid and the related Class B Interest transferred from one Hawaii Trust to the other or from one Series of a Hawaii Trust to another Series of the same Hawaii Trust.  An asset that had previously been contributed to an Asset LLC would remain in that entity,[318] and the only transfer would be that of the Class B Interest in that Asset LLC.[319]  No further payment would be made to the Sponsor.[320]  Instead, cash from a borrowing under the relevant Credit Facility and proceeds from the sale of a Series Certificate were used to repay the amounts initially borrowed by the Hawaii Trust to purchase the Class B Interest.  Payments were made under the relevant Hawaii Swap by Enron or ENA in situations where the aggregate amount of the debt and equity of the new Series was less than the amounts being paid with respect to the debt and equity of the old Series, or to Enron or ENA where the amount of the new Series exceeded that amount.[321]

---

[316] *See, e.g.*, Section 3.02(b), McGarret N Auction Agreement, *supra* note 308.

[317] *See, e.g.*, Section 5.03, McGarret B Asset LLC Agreement, *supra* note 151.

[318] *See, e.g.*, Section 4.01, McGarret V Asset LLC Agreement, *supra* note 148.

[319] *See, e.g.*, B Interest Assignment Agreement, Oct. 17, 2001 (entered into in connection with the McGarret V Hawaii transaction) [AB000043383-AB000043386].

[320] *See, e.g.*, Section 5.03, McGarret V Asset LLC Agreement, *supra* note 148.

[321] *See, e.g.*, Payment Direction Letter, Oct. 17, 2001 (in connection with the McGarret V Hawaii transaction) [AB000043512-AB00043515].

After giving effect to the transactions completed at each closing, the Asset LLC held the asset,[322] and the Sponsor, through its Class A Interest, and the Hawaii Trust, through its Class B Interest, owned the Asset LLC.[323] The Hawaii Trust held the Class B Interest as the property of the Series created in the transaction.[324] CIBC Inc. owned the Series Certificate associated with that Series and the Hawaii Trust owed to the lenders under its Credit Facility the amount borrowed which, with amounts contributed under the Series Certificate, was used to purchase the Class B Interest. The Hawaii Trust and either Enron or ENA were counterparties in a Hawaii Swap with the Hawaii Trust.

---

[322] *See, e.g.*, Section 6.01, McGarret V Asset LLC Agreement, *supra* note 148.

[323] *See, e.g., id.* Section 3.01.

[324] *See, e.g.*, Section 3.02, Hawaii II Trust Agreement, *supra* note 155.

The structure of a typical Hawaii transaction after completion is shown in the following diagram:



The Class A Interest gave the Sponsor all voting control over the Asset LLC, and therefore over the asset in the Asset LLC, and the Sponsor was designated the managing member of the Asset LLC with exclusive power to manage the business and affairs of the Asset LLC,[325] however, the Sponsor did not have complete control over the Asset LLC. For example, the Sponsor could not sell the assets held by the Asset LLC without the consent of the Hawaii Trust, as the holder of the Class B Interest.[326] Moreover, as a special purpose entity, the Asset LLC's business is limited to holding the asset and

---

[325] See, e.g., Section 6.01, McGarret V Asset LLC Agreement, supra note 148.

making the payments contemplated by its limited liability company agreement. It cannot engage in any other activities,[327] and the independent manager of Asset LLC is also required to consent to certain major actions of the Asset LLC, such as declaring bankruptcy, or dissolving or selling all or substantially all of its assets.[328] The Hawaii Trust had the right to sell the related Class B Interest, but this right is subject to a complex notice, auction and right of first refusal procedure.[329]

*Economics and Allocation of Risk in the Hawaii Transaction*

The Hawaii transactions were structured as sales of the underlying assets for accounting purposes, but the Hawaii Swaps and other features lead the Examiner to conclude that the transactions are appropriately viewed, from an economic and risk allocation perspective, as loans rather than as sales. One of the most important features is that substantially all risks and rewards of ownership of the underlying assets were retained by Enron while Enron assumed responsibility to provide funds to the Hawaii Trusts in the amount necessary for them to pay the amounts due under the Hawaii Trusts' Credit Facilities. As with the other FAS 140 Transactions, Enron or ENA entered into a Total Return Swap with the relevant Hawaii Trust each time it financed an asset and issued a Series of notes under its Credit Facility.[330] If ENA acted as the counterparty in a Hawaii Swap, Enron guaranteed ENA's obligations under that Hawaii Swap.[331]

---

[326] *See, e.g., id.* Section 6.01.

[327] *See, e.g., id.* Section 2.03.

[328] *See, e.g., id.* Section 6.05.

[329] *See, e.g., id.* Section 3.03.

[330] Section 4.2(a)(i)(E), Hawaii II Credit Facility, *supra* note 171.

[331] *See, e.g., id.* Section 4.1(ii)(H); Section 1(A), McGarret F Guaranty, *supra* note 173.

As in the Cerberus Transaction and the Nikita Transaction, the Hawaii Swaps entitled Enron (or ENA) to the amount by which any eventual sales or other proceeds produced by the asset exceeded the amount borrowed by the Trust, plus interest, plus specified returns on the small portion of the purchase price that the Trust funded through the sale of the Series Certificates rather than borrowings. In other words, although Enron was "selling" the asset, Enron or ENA obligated itself to provide funds to repay amounts borrowed in order to make the purchase, thereby retaining the risk of a decrease in the value of that asset. At the same time, it had the contractual right to receive the "total return" of the asset, thereby retaining the benefits of any increase in such value that would result in proceeds of the asset exceeding the costs of the financing.

The Hawaii Transactions completed prior to April 2001 had a put option, another risk allocation feature. The Sponsor granted a put option to the Asset LLC, providing it with the right to require the Sponsor to buy a portion of that Asset LLC's asset at a fixed price on any payment date under the related Credit Facility to the extent necessary to pay the amount required on that payment date.[332] The Asset LLC assigned the right to exercise the put to the related Hawaii Trust.[333] If the put were exercised at any payment date, then no payment under the Hawaii Swap as to that payment date would be made.[334]

---

[332] *See, e.g.*, Sections 2 and 3, Put Option Agreement between Pronghorn I, LLC and McGarret XII, LLC, Mar. 29, 2001 (entered into in connection with the Series McGarret L transaction) [AB000037671-AB000037677].

[333] *See, e.g.*, Put Option Assignment between McGarret XII, LLC and the Hawaii II Trust, Mar. 29, 2001 (entered into in connection with the Series McGarret L transaction) [AB000037678-AB000037680].

[334] *See, e.g.*, Section 2.5, Total Return Swap Confirmation between ENA and Hawaii II Trust, Mar. 29, 2001 (entered into in connection with the Series McGarret L Hawaii transaction) [AB000037660-AB000037670].

In some transactions, Enron issued a demand note to the Sponsor in an amount calculated to provide the funds needed to pay the put obligation.[335]

### Recharacterization of the Hawaii Transaction

There are several factors present in the Hawaii Transaction that support the recharacterization of the transactions as loans. These include (i) Control Over Asset;[336] (ii) Benefits and Risks;[337] (iii) Lender's Intent;[338] (iv) Loan Pricing;[339] (v) Enron's Intent;[340] and (vi) Tax Treatment.[341]

---

[335] *See, e.g.*, Demand Note between EES and Pronghorn I, LLC, Mar. 29, 2001 (issued in connection with the Series McGarret L Hawaii transaction) [AB000037685-AB000037686].

[336] Several characteristics of the Hawaii transactions operated to give Enron and the Sponsor control over the transferred asset. As discussed *supra* Section III.H., *Structure of the Hawaii Transaction*, upon completion of a Hawaii transaction the transferred asset was held not by the Hawaii Trust, as would be common in many securitization transactions, but by the Asset LLC. The Sponsor's Class A Interest in the Asset LLC gave it all voting control over the Asset LLC, and therefore over the asset in the Asset LLC. The Sponsor also served as the managing member of the Asset LLC. Some limits exist on the Sponsor's right to take certain actions; however, the Sponsor is not free, for example, to dispose of the transferred asset. The Sponsor also had both a right of first refusal and a right of first offer in connection with certain dispositions by the Trust of the Class B Interest, *see, e.g.*, Section 3.03, McGarret V Asset LLC Agreement, *supra* note 148; should the Sponsor acquire the Class B Interest it would then have complete control over the Asset LLC and consequently over the asset. Pursuant to the Sales Agency Agreement entered into in connection with many of the later Hawaii transactions, the Enron entity that acted as the counterparty to the Trust pursuant to the Hawaii Swap could, in certain situations, be appointed agent with the power to dispose of the transferred asset. *See, e.g.*, Sales Agency Agreement, Oct. 17, 2001 (entered into in connection with the McGarret V transaction) [AB000043516-AB000043524]. Further, in at least one circumstance where Enron was required to make a filing with the SEC regarding its transfer of common stock comprising an asset to an Asset LLC, Enron stated in that filing that it "may from time to time transfer such shares among its subsidiaries and controlled affiliates, with Enron retaining sole voting and dispositive power with respect to all of such shares." Enron Corp. Amendment No. 1 to Schedule 13G filed with the SEC on July 9, 2001. The most compelling evidence of Enron's control over the transferred assets in the Hawaii transaction is found in the refinancings and unwindings of some of the Hawaii transactions. When Enron wanted to move a Class B Interest from one Hawaii Trust to the other, it did so. According to Enron employees, in one situation where Enron had found a purchaser for one of the Hawaii assets that did not want to purchase them from the Asset LLC, Enron simply unwound the applicable Hawaii transaction so that the asset could be sold by a party other than the Asset LLC.

[337] All of the Hawaii transactions involved Swaps with the characteristics described *supra* Section III.E., *Allocation of Risk in a Typical Enron FAS 140 Transaction*, through which Enron retained essentially all of the risks and benefits of ownership of the transferred assets. *See, e.g.*, McGarret V Swap Confirmation, *supra* note 158. In addition, as described *supra* Section III.H., *Economics and Allocation of Risk in the Hawaii Transaction*, those Hawaii transactions completed prior to April 1, 2001 also included a put option and, in some cases, a demand note that allowed the Sponsor to turn to Enron to provide the funds necessary for the Sponsor to perform its obligations under the put option. It is also noteworthy that although the Total Return Swaps in the Hawaii Transaction do not provide support for the equity holders, in situations where a Series was repaid with the proceeds of a subsequent Series that were not sufficient to repay both the debt and equity associated with the earlier Series, a payment was made by Enron or ENA pursuant to the

applicable Hawaii Swap that allowed funds to be paid to the equity holder. For example, the McGarret K transaction was completed in April 2001 with an initial principal amount of debt of $30.270 million and equity of $946,502. *See* Drawdown Request, Mar. 26, 2001 [AB000037066–AB000037068]. Series McGarret K was repaid with the proceeds of Series McGarret T. The $31.296 million of proceeds of the McGarrret T transaction were combined with a payment of $50,184.45 by Enron under the Hawaii Swap entered into in connection with the McGarret K transaction to repay principal and interest of $30.320 million and to pay $1.026 million to the equity holder. *See* Payment Direction Letter, Oct. 17, 2001 [AB000042154–AB000042157].

[338] CIBC Inc., as holder of the Series Certificates, and Canadian Imperial Bank of Commerce, which acted as the Agent under the Hawaii Credit Facilities, had limited approval rights for assets that were to be sold to an Asset LLC. *See, e.g.*, Section 5.02(a), Hawaii II Credit Facility, *supra* note 171. To date the Examiner has not found any indication that CIBC Inc. declined any asset. The Examiner has also learned through discussions with representatives of Enron that, subject to certain exceptions, the lenders under the Hawaii Trust's Credit Facility and CIBC Inc. in its role as equity holder generally did not engage in extensive negotiations as to the value of the transferred assets, suggesting that these parties were looking to the credit of Enron rather than the value of the asset. Other evidence of this lack of interest in the assets can be found in that each of the nine legal isolation opinions delivered in the Hawaii Transaction (these opinions are described *supra* note 98) is addressed only to Enron and to the Asset LLC or the Sponsor in the applicable transaction – not to the lenders. Conversely, in some cases, the lenders under the Hawaii Credit Facility received legal opinions providing comfort as to the enforceability of Enron's obligations under the Hawaii Swaps. Legal Opinion regarding the Facility Agreement and related documents, Nov. 20, 2000 [AB000031987-AB000031992]. As discussed above, these circumstances suggest that the parties other than Enron to the Hawaii Transaction viewed these transactions as the functional equivalent of loan transactions supported by Enron credit and not as typical asset securitizations supported by the underlying assets themselves.

[339] It is the understanding of the Examiner, based on discussions with representatives of Enron, that the interest rates on the loans pursuant to the Hawaii Credit Facilities were based on the rate that would be charged to Enron for a senior unsecured loan, rather than on the value of the underlying asset.

[340] For example, there is evidence that despite the "sale" of these assets, Enron continued to treat them as part of its own holdings. Permanent Subcommittee on Investigations Report, *supra* note 147, at 7 and Exhibit 39. In addition, Enron has referred to these transactions as a "bridge" for the sale of non-core assets that were scheduled to be sold. Bank Presentation, *supra* note 22, at 59. In addition, one Enron employee described Hawaii as a "vehicle established to dispose of 'financial assets' from a GAAP perspective utilizing FAS 140 . . . Accordingly, for book purposes, assets put into Hawaii are viewed as being sold by the relevant Enron 'Sponsor' to an unrelated third party . . . From a tax perspective (and from an objective, pure economic standpoint), the Hawaii structure is simply a two-tranche, revolving credit facility with a $458MM capacity." With respect to the Series McGarret N transaction, this employee states that "[t]o secure the loan, [JEDI] pledged ('sold' from a book perspective) 1.748 million shares of common stock of Hanover Compressor Co." Email from Bill Bowes, Enron, to Jerry Seade, July 23, 2001 [AB000350412-AB000350413].

[341] A number of the documents entered into in connection with the Hawaii Transaction contain statements regarding the purported tax treatment, acknowledging that the treatment of the transactions for tax purposes is different than the treatment for other purposes. For example, the Trust Agreement of each of the Hawaii Trusts states that: "It is the intention of the parties hereto, for purposes of federal, state and local income and franchise taxes and any other tax imposed on or measured by income, on and after the Closing Date, that the Trust was formed for the purpose of securing financing with the Class B Interest for each Series and constitutes a security device for the repayment of amounts due to the Finance Parties and the Certificate Holders, that the Tranche with respect to a Series and the Certificates of such Series constitutes indebtedness of the Sponsor for such Series, and that the Class B Interest for such Series is pledged to

*Accounting and Disclosure of the Hawaii Transaction*

In its accounting for the Hawaii Transaction, Enron: (i) recognized Gain on Sale on the applicable income statements; (ii) recognized on its relevant financial statements the "sale" price as cash flow from operating activities (in the case of both remonetizations and some initial monetizations) or investing activities (in the case of some initial monetizations); and (iii) as of year end 2000, disclosed its obligations under the Hawaii Swaps in the same manner as described above in the section entitled *Accounting Treatment and Financial Statement Disclosure.*

The Examiner's accounting experts have advised the Examiner that, in their opinion, Enron's disclosure of its obligations under the Hawaii Swaps was not in accordance with GAAP for the reasons set forth above in the section entitled *Were the Accounting Treatment and Financial Statement Disclosure Proper?*

The Examiner's accounting experts also have advised the Examiner that accounting issues exist concerning whether Enron's recognition of Gain on Sale, the characterization of cash flows and the consolidation or non-consolidation of entities for accounting purposes were appropriate in the Hawaii Transaction. However, neither the Examiner nor his accounting experts have reached any final conclusions on this issue. These questions will be addressed in future reports.

*Examiner's Conclusions with Respect to the Hawaii Transaction*

The Hawaii Transactions involve purported sales of various assets by Enron affiliates to the Asset LLCs. Therefore, certain parties to the transactions likely will argue that these assets are not part of the Debtors' estates. If, however, these purported

---

secure the payment of such indebtedness." *See, e.g.*, Section 2.06(a), Hawaii II Trust Agreement, *supra* note 155.

sales are recharacterized as loans, then the assets, that now appear to have a current value of $30 million to $40 million, would be added to the Debtors' estates. Unless the parties that made the loans obtained properly perfected and unavoidable security interests in such assets, they will have, at best, unsecured claims. There is no evidence at this stage in the investigation that any such security interest exists.

None of these transactions can be fully understood unless viewed in its totality. When so viewed, each of the Hawaii Transactions appears to be, from both an economic and risk allocation perspective, a loan rather than a sale of an asset. As such, these transactions are susceptible to recharacterization as loans based upon the factors discussed above, including (i) Control Over Asset; (ii) Benefits and Risks; (iii) Loan Pricing; (iv) Lenders' Intent; (v) Enron's Intent; and (vi) Tax Treatment.

Each of the Hawaii Transactions includes a Total Return Swap pursuant to which Enron or one of its subsidiaries is obligated to make payments equal to the amounts due on the related financing. It is the Examiner's view that the existence of these Total Return Swaps would be a compelling factor supporting recharacterization if the Enron party to the Total Return Swap was the same entity that transferred the asset in the putative true sale. Because each Total Return Swap was entered into by an *affiliate* of the asset transferor, rather than the asset transferor itself, an issue may arise regarding whether the Total Return Swap can still be relied on as a factor to support a recharacterization of the purported sale as a loan. The Examiner believes that, even where the Enron party to the Total Return Swap is the parent or other affiliate of the asset transferor, rather than the asset transferor itself, the existence of the Total Return Swap is a relevant factor in determining whether there was a true sale. To conclude otherwise and

disregard the existence of these rights and obligations, whether held by the asset transferor or its affiliate, would ignore the economic reality of the transaction.

## I.    **The Backbone Transaction**

*Introduction and Overview of the Backbone Transaction*

The Backbone Transaction consists of three distinct sub-transactions involving certain "indefeasible rights to use" 40 strands of dark[342] fiber optic cable stretching from Salt Lake City to Houston (the "Backbone IRUs"). The Backbone IRUs were owned by Enron Broadband Services, Inc. ("EBS") and formed a portion of the so-called "backbone" of a fiber optic network that EBS was attempting to develop with the goal of eventually achieving nationwide coverage.[343]

In the first Backbone transaction ("Backbone 1"), EBS transferred the Backbone IRUs in mid-2000 to LJM2-Backbone II, LLC ("LJM-B2"), an entity controlled by LJM2,[344] which was created by Andrew Fastow.[345] Slightly less than six months later, LJM-B2 chose to exit the dark fiber business, ostensibly because of delays and other issues arising from transactions involving sales of IRUs of dark fiber.[346] This exit was

---

[342] Optical fiber is referred to as "dark fiber" when it is first laid and is not being utilized. It becomes "lit fiber" when it begins to be used to transmit. There was a practice in the industry that acquisitions of fiber may be made by acquiring an indefeasible right to use the fiber (somewhat like a lease), called IRUs, for an extended period of time, sometimes up to twenty years with certain renewal rights, prior to obtaining actual title to the fiber. Because many strands of fiber are contained in one conduit, there would also be agreements on common usage of some equipment and a need for someone to provide operation and maintenance services to the entities utilizing the network.

[343] As it worked to develop its fiber optic network, EBS installed significant excess fiber optic cable capacity. This excess capacity, combined with the potential for obsolescence that exists with any technology service, put pressure on EBS to seek to realize a return on its investment in its fiber optic network as promptly as possible.

[344] Signature lines for the IRU Agreement between EBS and LJM2-Backbone II, LLC, June 30, 2000 (the "IRU Agreement"), at 25-26 [AB000019194-AB000019312], show LJM2 Co-Investment, L.P. ("LJM2") as the managing member of LJM-B1 (hereinafter defined), which is shown as the managing member of LJM-B2. As part of its public disclosure regarding this transaction, Enron also states that LJM2 was the purchaser of the IRUs in the fiber. 10-Q for 3Q/2001, *supra* note 9, at 22.

[345] Powers Report, *supra* note 10, at 2.

[346] Sales of dark fiber typically include provisions allowing the potential purchaser of IRUs some considerable period of time, at least several months, in which to test the fiber. No such provision is contained in the first phase of the Backbone Transaction. *See* IRU Agreement, *supra* note 344. The Powers Report indicates that Andrew Fastow intervened at the last minute in the negotiations between EBS

accomplished through the second Backbone transaction ("Backbone 2"), in which LJM-B2 and Enron caused the Backbone IRUs to be transferred to Backbone Trust I, an entity created by Enron for this purpose. This transfer was financed through a transaction that included many of the features of the FAS 140 Transactions, such as a Total Return Swap by which Enron supported the repayment of the majority of the related financing. In the third Backbone transaction ("Backbone 3"), EBS itself began to exit the dark fiber business through a transaction in which it repurchased the Backbone IRUs and then sold them to Qwest Communications Corporation ("Qwest") in exchange for lit fiber.[347]

While these transactions are complex and involve numerous steps, there is evidence that Enron, through subsidiaries, maintained control and substantially all of the benefits and risks of the Backbone IRUs throughout these transactions. As a result, these transactions appear to be better characterized as loans. If so, the proceeds of the previously sold IRUs, held by Backbone Trust I, with an aggregate value of approximately $47.5 million would be added to the Debtors' estates.

*Backbone 1 – Transfer from EBS to LJM-B2*

In May 2000, under pressure to meet its financial targets for the second quarter of 2000, EBS sought to sell the Backbone IRUs by the end of that quarter. As the end of the

---

and LJM-B2 because he was angry that LJM-B2 was being asked to purchase dark fiber that was not certified as usable and that it might take as long as a year for it to be certified. *See* Powers Report, *supra* note 10, at 144. The Powers Report states that this transaction is also notable as the only LJM transaction where Kenneth Lay signed the DASH and LJM2 Approval Sheet. Powers Report, *supra* note 10, at 145.

[347] EBS's business plan, which in addition to the development of the fiber optic network, included creating a trading market in bandwidth capacity similar to the existing trading market in power and providing content such as video entertainment to be transmitted on the network, continued to deliver such poor results that by the end of the third quarter of 2001, Enron ceased treating EBS as a core business. *See* 10-Q for 3Q/2001, *supra* note 9, at 10.

quarter approached without a sale arranged, EBS management decided that the only alternative was to sell the Backbone IRUs to LJM2.[348]

EBS and LJM2 accomplished the sale on June 30, 2000[349] through an IRU Agreement (the "IRU Agreement") between EBS and LJM-B2 pursuant to which EBS transferred the Backbone IRUs to LJM-B2.[350] The purchase price was $1,105 per mile, resulting in an aggregate purchase price of approximately $100 million.[351] Approximately $30 million was paid in cash[352] at closing and approximately $70 million was paid by delivery of a promissory note (the "LJM-B2 Note").[353] LJM2-Backbone LLC ("LJM-B1"), the holder of LJM-B2's equity, guaranteed the LJM-B2 Note[354] and pledged its interest in LJM-B2 to secure this guaranty.[355] The IRU Agreement's initial term was seven years.[356] At the end of the term, unless extended, EBS was to convey title to the fibers to LJM-B2.[357]

LJM-B2 intended to repay the amounts due under the LJM-B2 Note with the proceeds of sales of the Backbone IRUs to be arranged by EBS pursuant to an Agency

---

[348] Powers Report, *supra* note 10, at 143-44.

[349] The precise date of the transfer is uncertain because certain of the signature pages indicate a telecopy transmission date of July 5, 2000. *See* IRU Agreement, *supra* note 344, at 25-26 (the signature pages for the IRU Agreement).

[350] IRU Agreement, *supra* note 344.

[351] *Id.* Section 2.2.

[352] The documents do not indicate any allocation of the cash paid at closing between the purchase price for the Backbone IRUs pursuant to the IRU Agreement and the prepayment of the maintenance fees pursuant to the Operation, Maintenance and Repair Agreement. IRU Agreement, *supra* note 344. Further investigation is required to determine whether the prepayment of maintenance fees was made.

[353] Promissory Note from LJM-B2 to EBS, June 30, 2000 in the amount of $70 million [AB000019356-AB000019363].

[354] Limited Guaranty from LJM-B1 in favor of EBS, June 30, 2000 [AB000019365-AB000019371].

[355] Pledge Agreement by LJM-B1 in favor of EBS, June 30, 2000 [AB000019373-AB000019385].

[356] Section 6.1, IRU Agreement, *supra* note 344.

[357] *Id.* Section 6.2.

and Marketing Agreement with LJM-B2 entered into at this time (the "Agency and Marketing Agreement").[358]  In fact, LJM-B2 represented and warranted to EBS that LJM-B2 was acquiring the Backbone IRUs "solely for resale."[359]  EBS was named the sole and exclusive agent to market the Backbone IRUs, subject to LJM-B2 approval of the terms of any sale.[360]  Any sale of IRUs by LJM-B2 was subject to approval by EBS.[361]

The Agency and Marketing Agreement also governs the manner in which EBS and LJM-B2 would share in any sale proceeds and in which the LJM-B2 Note was to be repaid.[362]  Under this structure, LJM-B2 would receive its return and equity investment back at about the same time that EBS would receive the principal and interest on the LJM-B2 Note.[363]

Because LJM-B2's return is capped at a specified yield,[364] EBS had the right to receive most of the benefit of sales at prices yielding amounts in excess of the amounts

---

[358] Agency and Marketing Agreement between EBS and LJM-B2, June 30, 2000 [AB000019314-AB000019323].

[359] Section 24.1.7, IRU Agreement, *supra* note 344.

[360] Sections 3 and 4, Agency and Marketing Agreement, *supra* note 358.  Until March 31, 2001, EBS was free to sell either its other IRUs or the Backbone IRUs, but after March 31, 2001, EBS was required to provide LJM-B2 with notice of any proposed sale of IRUs along the Salt Lake City to Houston route, and LJM-B2 could elect to sell its Backbone IRUs to that purchaser instead, so long as the Backbone IRUs were of the same type and segment required.  *Id.* Section 4(d).  By a letter dated November 17, 2000, EBS and LJM-B2 agreed that EBS would not sell IRUs in its other fiber on the same route until the Backbone IRUs had been sold in a sale proposed in December 2000.  Letter Agreement between EBS and LJM-B2, Nov. 17, 2000 [AB000359294-AB000359295].

[361] *See* Section 4(b), Agency and Marketing Agreement, *supra* note 358.

[362] *Id.* Section 3 to 6.

[363] Pursuant to the Agency and Marketing Agreement, the proceeds of any sale of IRUs were to be distributed as follows: (i) first, to LJM to pay certain tax liabilities; (ii) second, to EBS for expenses primarily related to operation and maintenance of the Backbone IRUs; (iii) third, to make payments then due or due within 90 days on the LJM-B2 Note; (iv) fourth, to LJM-B2 with respect to its preferred return; (v) fifth, 70% to EBS with respect to the LJM-B2 Note and 30% to LJM-B2 as a return of its capital; (vi) sixth, 70% to EBS with respect to the LJM-B2 Note and 30% to LJM-B2 to complete payment of its preferred return; and (vii) finally, to EBS (with respect to certain sales of fiber, a portion of these proceeds would also be paid to LJM-B2).  Section 5, Agency and Marketing Agreement, *supra* note 358.

[364] LJM-B2's return was generally capped at 18% or 25% depending on the financial performance of LJM-B2.  In addition, LJM-B2 had a right to receive 5% of the proceeds of all sales occurring after June 30,

due to LJM-B2. LJM-B2's risk was that the cash proceeds from sales of IRUs would not be sufficient to pay LJM-B2 in full. This risk was not realized, however, as LJM-B2 received the amount of its full investment, plus its specified return through the Backbone 2 transaction in December 2000.

In summary, upon the consummation of Backbone 1, EBS effectively controlled any disposition of the Backbone IRUs through the Agency and Marketing Agreement. In addition, except for the limited amounts payable to LJM-B2, EBS retained all of the potential benefits from any appreciation of the Backbone IRUs. Finally, because the LJM-B2 Note would, as a practical matter, only be repaid with the proceeds of a resale by EBS of the Backbone IRUs, EBS effectively retained all of the reasonably anticipated risk associated with the Backbone IRUs. All of these factors provide support for the position that Backbone 1 did not constitute a true sale of the assets to LJM-B2.

In addition, because of LJM2's close relationship with Enron primarily through Andrew Fastow, further investigation may reveal facts that would support a conclusion that LJM-B2 was acting as the agent of Enron in this transaction or that they should be viewed as one entity for purposes of the analysis. Such a conclusion also could lead to a determination that there was no true sale of the Backbone IRUs from EBS to LJM-B2.

---

2002, provided that the Note and LJM-B2's capped return had been paid in full. *See* Sections 5 and 10, Agency and Marketing Agreement, *supra* note 358.

The structure of Backbone 1 is shown in the following diagram.

Backbone 1 Transaction<br/>June 30, 2000



*Backbone 2 – Transfer from LJM-B2 to Backbone Trust I*

In December 2000, less than six months after completing Backbone 1, and after completing only one disposition of dark fiber optic cable to a third party, LJM-B2 decided to exit the dark fiber business. EBS and LJM-B2 therefore completed Backbone 2, with the result that LJM-B2 transferred its interest in the Backbone IRUs to Backbone Trust I,[365] a special purpose trust established for this purpose,[366] in a structure that is very similar to the FAS 140 Transactions described above.

---

[365] Assignment of IRU Agreement between LJM-B2 and Backbone Trust I, Dec. 21, 2000 (the "Assignment of IRU Agreement") [AB000018697-AB000018892].

[366] Trust Agreement of Backbone Trust I between Wilmington Trust Company, as Owner Trustee, and the Holder of Certificates thereunder, Dec. 20, 2000 (the "Backbone I Trust Agreement") [AB000017925-AB000017989].

While the Backbone 2 transaction involves several steps and multiple trusts, as completed, it is very similar to the FAS 140 Transactions in that Backbone Trust I obtained financing that was used to acquire the Backbone IRUs, and a majority of this financing was supported by a Total Return Swap from EBS Broadband Services, L.P. ("EBS LP"), an affiliate of EBS, and guaranteed by Enron. Backbone Trust I also entered into an Agency and Marketing Agreement with EBS that continued EBS's significant control over the Backbone IRUs. Consequently, after consummation of the Backbone 2 transaction, Enron, through its subsidiaries, continued to retain control of the Backbone IRUs and to have all of the reasonably anticipated benefits and risks[367] associated with ownership of the IRUs.

Two Delaware business trusts, Backbone Trust I[368] and Backbone Trust II,[369] were formed for purposes of this transaction. Backbone Trust I was formed to purchase the IRU Agreement and an agreement (the "360networks Agreement") for a pending sale arranged by EBS for the sale of some of the Backbone IRUs to 360networks (USA) inc., for an aggregate price of approximately $113.4 million. In order to obtain the funds for this purchase, Backbone Trust I issued its Class A Beneficial Interest to ABN AMRO Bank N.V. ("ABN") in exchange for $3.6 million[370] and its Class B Beneficial Interest to

---

[367] The aggregate proceeds from these transactions received by Backbone Trust I exceeds the amount paid to LJM-B2 by $1.4 million. This amount was invested in an Enron note receivable. Enron, Backbone Trust Presentation, Mar. 15, 2002 (the "Backbone Trust Presentation"), at 7 (PowerPoint presentation materials) [AB000359285-AB000359292].

[368] Backbone I Trust Agreement, *supra* note 366.

[369] Trust Agreement of Backbone Trust II between Wilmington Trust Company, as Owner Trustee, and the Holder of Certificates thereunder, Dec. 20, 2000 (the "Backbone II Trust Agreement") [AB00018054-AB00018099].

[370] Backbone Trust I Class A Beneficial Interest Certificate of Beneficial Ownership to ABN, Dec. 20, 2000 (in the base amount of $3.6 million) [AB000017992-AB000017996].

Backbone Trust II in exchange for approximately $64.5 million.[371]   In addition, Backbone Trust I borrowed an aggregate of $46.7 million (the "A Loan"),[372] half of which was provided by Fleet National Bank ("Fleet")[373] and the other half of which was provided by ABN.[374]

Backbone Trust II was formed solely to provide funding for Backbone Trust I. To obtain the funding provided to Backbone Trust I, Backbone Trust II issued its only beneficial interest to BSCS XXIII, Inc., an entity owned and operated by Lord Securities, a well-known provider of corporate and special purpose entity management services, in exchange for $1,000.[375]   Lord Securities, as beneficial owner, was entitled to receive a return capped at 10% per annum on its $1,000 investment.[376]   Backbone Trust II also entered into a loan agreement (the "B Loan"),[377] pursuant to which it borrowed a total of approximately $64.5 million from ABN and Fleet.[378]   Backbone Trust II's obligations are secured by a security interest in Backbone Trust II's Class B Beneficial Interest in

---

[371] Class B Beneficial Interest Certificate of Backbone Trust I, Dec. 1, 2000 (in the base amount of $64.5 million) [AB000017999-AB000018003].

[372] Backbone Trust I Term Loan Credit Agreement among Backbone Trust I, as borrower, Fleet, as Syndication Agent, and ABN as Sole Lead Arranger and Book Runner, Dec. 20, 2000 (the "A Loan Agreement") [AB000018116-AB000018165].

[373] Promissory Note from Backbone Trust I to Fleet, Dec. 20, 2000 in the amount of $23.35 million [AB000018200-AB000018202].

[374] Promissory Note from Backbone Trust I to ABN, Dec. 20, 2000 in the amount of $23.35 million [AB000018203-AB000018204].

[375] Backbone Trust II Form of Beneficial Interest Certificate of Beneficial Interest to BSCS XXIII, Inc., Dec. 20, 2000 (in the amount of $1000) [AB000018102-AB000018106]; *see also* Backbone Trust Presentation, *supra* note 367, at 4.

[376] Article 5.01(a)(iii), Backbone II Trust Agreement, *supra* note 369.

[377] Backbone Trust II Term Loan Credit Agreement among Backbone Trust II, as borrower, Fleet, as Syndication Agent, and ABN as Sole Arranger and Book Runner, Dec. 20, 2000 (the "B Loan Agreement") [AB000018209-AB000018258].

[378] Promissory Note from Backbone Trust II to Fleet, Dec. 20, 2000 in the amount of $32.26 million [AB000018308-AB000018310]; *see also* Promissory Note from Backbone Trust II to ABN, Dec. 20, 2000 in the amount of $32.26 million [AB000018311-AB000018313].

Backbone Trust I.[379] Backbone Trust II also is a party to a Total Return Swap with EBS LP,[380] which is guaranteed by Enron.[381]  This Total Return Swap is described below under the section *Economics and Allocation of Risk in the Backbone Transaction.*

Backbone 2 closed on December 21, 2000.  LJM-B2 transferred its interest in the dark fiber business to Backbone Trust I by assigning the IRU Agreement in exchange for a payment of approximately $113.4 million.  Of this amount, $86.2 million[382] represented payment for the rights under the IRU Agreement, and the remainder represented consideration for the assignment by LJM-B2 to Backbone Trust I of the 360networks Agreement.[383]  LJM-B2 used a portion of the proceeds to repay in full the LJM-B2 Note.[384]

---

[379] Pledge Agreement between Backbone Trust II, as pledgor, and ABN, as Administrative Agent, Dec. 20, 2000 [AB000018365-AB000018383].

[380] This Total Return Swap consists of an entire three-part agreement between Backbone Trust II and EBS LP, Dec. 20, 2000 (the "Backbone Total Return Swap"), which parts consists of (i) an ISDA Master Agreement (Multicurrency - Cross Border) [AB000018316-AB000018334]; (ii) a Schedule modifying and supplementing that Master Agreement [AB000018335-AB000018346]; and (iii) a Total Return Swap Confirmation, further modifying and supplementing the Master Agreement and the Schedule [AB000018347-AB000018356].  Nevertheless, because the A Loan was entitled to receive payments before the B Loan, the value of the Backbone IRUs ($86.2 million) would have to fall to less than $46.7 million before the A Loan would truly be at risk.  Because Enron was ultimately responsible for providing funds to pay the B Loan under the Total Return Swap, it is likely that Enron retained substantially all of the anticipated risk of the Backbone IRUs at the time of the Backbone 2 closing.  This analysis is confirmed by the fact that the A Loan was repaid in full, apparently within thirty (30) days of the closing.

[381] Enron Performance Guaranty in favor of Backbone Trust II, Dec. 20, 2000 [AB000018357-AB000018364].

[382] Section 1(b) and Schedule II, Assignment of IRU Agreement, *supra* note 365.

[383] Section 1(b) and Schedule I, Assignment of Pending Assignment Agreement between LJM-B2 and Backbone Trust I, Dec. 21, 2000 [AB000018994-AB000019135].

[384] Section 1(c) and Schedule III, Assignment of IRU Agreement, *supra* note 365.  In its 10-Q, Enron describes the first two phases of the Backbone Transaction as follows: "Sales of Assets.  In June 2000, LJM2 purchased dark fiber optic cable from Enron for a purchase price of $100 million.  LJM2 paid Enron $30 million in cash and the balance in an interest-bearing note for $70 million.  Enron recognized $67 million in pre-tax earnings in 2000 related to the asset sale.  Pursuant to a marketing agreement with LJM2, Enron was compensated $20 million for marketing the fiber to others and other fees for providing operation and maintenance services to LJM2 with respect to the fiber.  This arrangement gave Enron profit potential in proceeds received after LJM2 achieved a specified return level.  LJM2 sold a portion of the fiber to industry participants for $40 million.  LJM2 sold the remaining dark fiber assets for $113 million in December 2000 to an SPE that was formed to acquire the fiber.  In December 2000, LJM2 used a portion of

Backbone Trust I, as assignee of the IRU Agreement and the 360networks Agreement, retained EBS as the sole and exclusive agent to market the Backbone IRUs at a flat fee of $2.50 per fiber mile sold pursuant to an Agency and Marketing Agreement.[385]  Backbone Trust I kept a right of approval as to the sales, but only if the sales price per fiber mile was less than $1,175 in cash.[386]

Upon completion of Backbone 2: (1) LJM-B2 had repaid the $70 million LJM-B2 Note and (2) LJM-B2 had received its full contractual return of $2.4 million[387] and apparently exited the dark fiber business.[388]

A diagram of the Backbone Transaction after completion of the second phase appears below.

---

the proceeds to pay in full the note and accrued interest owed to Enron. At the time of LJM2's sale of the fiber to the SPE, Enron entered into a derivative contract, which served as credit support for the benefit of some of the debt holders of a third-party investor in the SPE. This credit support provided the lender with a specified rate of return. As a result, Enron's credit exposure under the $70 million note was replaced with $61 million in remaining exposure under the derivative contract. LJM2 earned $2.4 million on its resale of the fiber." 10-Q for 3Q/2001, *supra* note 9, at 22.

[385] Section 3, Agency and Marketing Agreement between EBS and Backbone Trust I, Dec. 21, 2000 (the "2d Agency and Marketing Agreement") [AB000018975-AB000019002].

[386] *Id.* Section 5.

[387] *See* 10-Q for 3Q/2001, *supra* note 9, at 22.

[388] In addition, EBS had recognized earnings contemporaneously with fiber swaps, and EBS had reduced its weighted average cost of capital. EBS, Backbone Restructure Overview Presentation, Oct. 31, 2000, at 3 (PowerPoint presentation materials) [AB000359282-AB000359284].



Backbone 2 Transaction
December 20-21, 2000

### Backbone 3 – Cross Purchases with Qwest

In the Backbone 3 transaction, EBS and Qwest entered into complex cross purchases of fiber on or about September 30, 2001. In broad terms, EBS sold dark fiber to Qwest in exchange for lit fiber from Qwest. For the purposes of this Report, however, Backbone 3 is included only because, as a result of this transaction, Backbone Trust I terminated the IRU Agreement with EBS, thereby transferring the Backbone IRUs (that

were first sold to LJM-B2 in Backbone 1) back to EBS, which were then transferred to Qwest.

In Backbone 3, EBS agreed to pay to Backbone Trust I $47.4 million to terminate the IRU Agreement.[389] EBS made this payment not in cash, but with a $47.4 million Promissory Note from Qwest to EBS payable on April 1, 2002 (the "Qwest Note").[390] The Qwest Note was guaranteed by Qwest's parent company, Qwest Communications International ("Qwest International").[391] The Qwest Note also was supported by an Irrevocable Letter of Credit issued by the Bank of America, N.A. for the benefit of Backbone Trust I for $47.4 million payable on April 1, 2002 (the "Backbone Letter of Credit").[392] Payment to Backbone Trust I under the Backbone Letter of Credit was deemed to be payment under the Qwest Note.[393]

Under the Backbone Letter of Credit on April 1, 2002, $47.4 million was paid to Backbone Trust I. These proceeds are being held in escrow pursuant to order of the Court.

*Economics and Allocation of Risk in the Backbone Transaction*

Notwithstanding the complexity and number of steps involved in the Backbone Transaction, features of each of Backbone 1, 2 and 3 provide evidence that Enron,

---

[389] Termination Agreement between Backbone Trust I and EBS, Sept. 30, 2001 [AB000352035-AB000352039].

[390] Promissory Note from Qwest to EBS, Sept. 30, 2001 (the "Qwest Note") in the amount of $47.4 million [AB000244565-AB000244566]. It is the Examiner's understanding that it was EBS's intention to assign the Qwest Note to Backbone Trust I, but that assignment was never made. In the closing documents for Backbone 3, there is an Assignment of Promissory Note among Bank of America, N.A., EBS and Qwest, Sept. 30, 2001 [AB000224577-AB000224578], relating to the Qwest Note, but only Qwest has executed the Assignment.

[391] Section 1, Guaranty Agreement of Qwest International, Sept. 30, 2001 [AB000244765-AB000244772].

[392] Irrevocable Letter of Credit from Bank of America, N.A. to Backbone Trust I, Oct. 1, 2001 [AB0000244579].

[393] Section 5, Qwest Note, *supra* note 390.

through its subsidiaries, maintained the benefits and risks of the Backbone IRUs and maintained control of the Backbone IRUs at all relevant times. As a result, one or more of these transactions may be subject to recharacterization as a loan, thereby resulting in the Backbone IRUs and the $47.4 million held by Backbone Trust I being included in the Debtors' estates.

Specifically, Backbone 1 involved a purported sale of the Backbone IRUs by EBS to LJM-B2. While documented as a sale, this transaction may be recharacterized as a loan for the following reasons. First, EBS appears to have retained effective control of the disposition of the Backbone IRUs and other assets through the Agency and Marketing Agreement. In addition, LJM-B2 was entitled to receive (and in fact did receive) only a limited return on the Backbone IRUs, while EBS retained the right to receive the economic benefits of the Backbone IRUs. Similarly, because the LJM-B2 Note would likely only be repaid with the proceeds of the sale of the Backbone IRUs, EBS retained the ultimate risks of the assets. The terms of the Backbone 2 transaction confirm that this was, in fact, the risk and reward allocation experienced by the parties. LJM-B2 received its capped return and EBS controlled the disposition of the Backbone IRUs.

Further, while additional facts will need to be developed through the Examiner's investigation, because of the close relationship between LJM2 (the ultimate parent of LJM-B2) and Enron, it may be that LJM-B2 acted as the agent of EBS for purposes of holding these assets or that EBS and LJM-B2 should be viewed as the same entity for purposes of this transaction under another applicable legal principle.[394] Once again, such a conclusion could lead to a determination that no sale of the assets occurred.

---

[394] See discussion supra note 121.

As in the FAS 140 Transactions, Backbone 2 was structured to be a purported sale of the Backbone IRUs, but includes a Total Return Swap and other features such that the transaction may be more appropriately characterized as a loan.    One of the most important features is that the ultimate benefits and risks are retained by Enron through the Total Return Swap and Enron's guarantee thereof.    The Total Return Swap provided Enron the right to receive substantially all of the economic benefits of the Backbone IRUs[395] while making Enron responsible to provide funds for repayment of the amounts advanced to Backbone Trust II under the B Loan Agreement.    Once again, it was a condition to the participation of the lenders in this transaction that Enron enter into a Total Return Swap with Backbone Trust II.[396]

In other words, although EBS was "selling" the asset to a purportedly unrelated third party, Enron obligated itself to pay amounts equal to the funds borrowed by Backbone Trust II and transferred to Backbone Trust I in order to purchase the Backbone IRUs.   It thereby retained the risk of a decrease in the value of that asset.   At the same time, it had the contractual right to receive the "total return" of the asset, thereby retaining the benefits of any excess proceeds of the asset over the costs of the financing.

*Recharacterization of the Backbone Transaction*

The analysis of the potential for recharacterization of the Backbone Transaction is somewhat complicated by the multiple transfers of the underlying asset, the Backbone

---

[395] Under the Total Return Swap, Enron is entitled to payment of all amounts received by Backbone Trust II with respect to the Backbone Trust I Class B interest.   This Class B interest, in turn, represents the right to receive the proceeds of any sale of the Backbone IRUs after payment of the A Loan and subject to the rights of ABN to payment with respect to its equity investment.   Backbone Total Return Swap, *supra* note 378.

[396] Section 3.1, B Loan Agreement, *supra* note 377.

IRUs, in Backbone 1 and 2. Therefore, the consequences of both transactions may need to be addressed.

With respect to Backbone 1, the terms of the transaction and the subsequent conduct of the parties appear to support a determination that no true sale occurred. These include (i) Control Over Asset,[397] (ii) Benefits and Risks,[398] (iii) Enron's Intent and (iv) Lender's Intent.[399] Further, the Examiner believes that additional investigation and the development of additional facts may lead to a conclusion that LJM-B2 was acting as EBS's agent for purposes of holding the Backbone IRUs. In either case, if the transfer to LJM-B2 in Backbone is recharacterized as a loan, Backbone 2 would then need to be

---

[397] For example, as noted above, LJM-B2 represented it was holding the Backbone IRUs solely for resale, and further, EBS was responsible for operation and maintenance of the fibers, which in the abstract would be inconsistent with a sale. However, LJM-B2 had agreed to pay EBS $4.1 million for this role. While it is not yet clear if this sum was in fact paid at closing, it is possible that under the Agency and Marketing Agreement these fees might be paid from any future sales of the Backbone IRUs, after LJM-B2 covered any tax obligations. The seller's retention of a servicing role upon the sale of an asset is not unusual, either in securitization transactions or in the context of IRUs, and if the seller is paid a market rate for its servicing duties, no suspicions about a disguised financing should be raised by that arrangement. The Examiner is investigating whether the maintenance and operation fees here are typical and at a market rate and whether it is customary to defer such fees until a later sale if that is in fact what happened here. In addition, LJM-B2 retained EBS to arrange for the sale of the Backbone IRUs through the Agency and Marketing Agreement, although such sales were subject to LJM-B2 approval. Although it is not customary, occasionally buyers assume this role. The fact that LJM-B2 retained the right to approve any sale is consistent with its purported ownership rights, although EBS' right to approve (or disapprove) of a sale arranged by LJM-B2 requires further inquiry into the principals of both EBS and LJM-B2.

[398] Pursuant to the Agency and Marketing Agreement, to the extent the Backbone IRUs proved highly valuable, the majority of that return would flow to EBS. Section 5, Agency and Marketing Agreement, *supra* note 358. Typically, a buyer, and not a seller, enjoys this benefit, and as such, the presence of this fact renders the transaction suspect as a sale. Further, EBS would most likely have suffered the economic consequences if the Backbone IRUs proved worthless. In such an event, it is unlikely that LJM-B2 would be able to pay the $70 million note.

[399] It is difficult to determine the extent to which LJM-B2 performed due diligence on the Backbone IRUs. As noted above, a purported buyer that performs little due diligence prior to a transaction is more likely to be viewed under applicable law as a lender. On the one hand, the IRU Agreement did not provide for LJM-B2 to test the fibers subject to the Backbone IRUs prior to paying the purchase price, which would seem to be unusual in transactions of this type, and makes it appear less like a sale. On the other hand, the Powers Report indicated that the principals in LJM-B2 were highly concerned about whether the fibers had been certified, and that the negotiations between EBS and LJM-B2 were indeed affected by that. Powers Report, *supra* note 10, at 144. Accordingly, further investigation is required to determine the amount and type of diligence performed by LJM-B2, and the role it played in pricing negotiations, to evaluate this factor more fully.

analyzed as a transfer of the Backbone IRUs and related assets by EBS to Backbone Trust I.

As noted above, there are also several factors present in Backbone 2 that support the recharacterization of this transaction as a loan.[400] These include (i) Control Over Asset;[401] (ii) Benefits and Risks;[402] and (iii) Enron's Intent. If Backbone 1 is recharacterized as a loan, EBS still owned the Backbone IRUs at the time of Backbone 2. If Backbone 2 is then recharacterized as a loan because of the Total Return Swap and other factors discussed above, the escrowed proceeds of the sale to EBS of the Backbone IRUs in the Backbone 3 transaction will be property of the Debtors' estates.

---

[400] Some may argue that the resolution of the question of whether the second phase of the Backbone Transaction should be recharacterized as a loan may be affected by the fact that the transfers were from LJM-B2. In this regard, if no sale occurred in Backbone 1, then it follows that EBS is the transferor in Backbone 2. If, on the other hand, it were determined that a sale to LJM-B2 did occur in Backbone 1, the Examiner believes that a court may determine, based on all the facts and circumstances, that there is no meaningful distinction between EBS repurchasing the Backbone IRUs and the 360networks Agreement directly and transferring them to the Backbone Trust I and, as the documents provide, causing Backbone Trust I to acquire the assets directly from LJM-B2.

[401] EBS was named the sole and exclusive agent to market the Backbone IRUs and was required to seek approval from Backbone I for sales only if the price fell below a minimum or was not all cash. Section 5, 2d Agency and Marketing Agreement, *supra* note 385.

[402] EBS LP entered into a Total Return Swap with Backbone Trust II, and Enron guaranteed the obligations of EBS LP thereunder. The Total Return Swap required EBS LP and Enron to repay the B Loan if the value of the Backbone IRUs was not sufficient to allow Backbone Trust II to repay it. After Backbone 2, EBS LP and Enron through the Total Return Swap had $64 million of risk, and LJM-B2 had also recovered its initial investment and its maximum return. If Backbone 1 had in fact been intended to be a true sale, several questions arise, such as why EBS through EBS LP (and Enron, through its guarantee) assumed such risks and why the transaction was structured to provide LJM-B2 with its full return. Under the Trust Agreement for Backbone Trust I, monies received by Backbone Trust I – including from the sales of Backbone IRUs – were to be distributed, after maintaining certain reserves, as follows: (i) first, to EBS to pay certain expenses; (ii) second, $2.50 per fiber mile to EBS as an agency fee pursuant to the 2d Agency and Marketing Agreement; (iii) third, to make any payments then due on the B Loan; (iv) fourth, to pay the A Loan; (v), fifth, to pay certain other expenses; (vi) sixth, to pay a return, capped at 25% per year, to ABN, as the holder of its Class A Beneficial Interest; (vii) seventh, to repay the investments of ABN and Backbone Trust II, as the holders of its Class A Beneficial Interest and its Class B Beneficial Interest, respectively, on a pro rata basis; and (viii) finally, to Backbone Trust II, as the holder of its Class B Beneficial Interest. Section 5.01, Backbone I Trust Agreement, *supra* note 366. In addition, ABN, the holder of the Class A Beneficial Interest in Backbone Trust I, agreed to cap its return on the value of the Backbone IRUs, which is also inconsistent with an ownership stake.

If Backbone 1 is not recharacterized as a loan and Backbone 2 is found to be a
sale of the Backbone IRUs by LJM-B2 to Backbone Trust I, it may still be possible to
conclude that the Backbone 2 transaction, when considered in its entirety and in light of
its actual economic effect, is a loan.  One potential analysis would be that EBS, by
directing LJM-B2 to transfer the Backbone IRUs to Backbone Trust I, effectively
repurchased the assets and transferred them to Backbone Trust I.  This transfer would
then be analyzed in the same fashion as the other transfers discussed above and, because
Enron retained the benefits and risks of the asset, as well as control of the asset (and the
other factors mentioned above), the transfer may be subject to recharacterization as a
loan.

*Accounting and Disclosure of the Backbone Transaction*

As noted above, the Examiner's accounting experts have come to no conclusions
regarding Enron's accounting treatment of this transaction.

*Examiner's Conclusions with Respect to Backbone Transaction*

The Backbone Transaction involves a purported sale of the Backbone IRUs first
to LJM-B2 and then by LJM-B2 to Backbone Trust I, an SPE.  Therefore, certain parties
to the transaction will likely argue that these assets are not part of the Debtors' estates.
If, however, the Backbone 2 transaction is recharacterized as a loan, then the $47.4
million in proceeds of the sale of the Backbone IRUs held by Backbone Trust I would be
added to the Debtors' estates.  Since there is no evidence to date that any party to the
transaction obtained a properly perfected and unavoidable security interest in such assets,
any such party will have, at best, an unsecured claim.

The Backbone Transaction can only be understood when viewed in its totality. When so viewed, both the Backbone 1 transaction and the Backbone 2 transaction appear to be, from both an economic and risk allocation perspective, loans rather than sales of assets. As such, the Backbone 2 transaction is susceptible to recharacterization as a loan based upon the factors discussed above, including (i) Control Over Asset; (ii) Benefits and Risks; and (iii) Enron's Intent.

The Backbone 2 transaction includes a Total Return Swap entered into by the Enron subsidiary, EBS LP, and guaranteed by Enron, pursuant to which EBS LP and Enron are obligated. It is the Examiner's view that the existence of this Total Return Swap would be a compelling factor supporting recharacterization if the Enron party to the Total Return Swap were EBS, the same entity that transferred the asset in the putative true sales. Because this Total Return Swap was entered into by an *affiliate* of the asset transferor, an issue may arise regarding whether the Total Return Swap can still be considered as a factor to support a recharacterization of the purported sale as a loan. The Examiner believes that, even where the Enron party to the Total Return Swap is the parent or other affiliate of the asset transferor, rather than the asset transferor itself, the existence of the Total Return Swap is a relevant factor in determining whether there was a true sale. To conclude otherwise and disregard the existence of these rights and obligations, whether held by the asset transferor or its affiliate, would ignore the economic reality of the transaction.

J.    **The SO₂ Transaction**

*Background of the SO₂ Transaction*

The $SO_2$ Transaction is comprised of transfers by ENA of interests in sulfur dioxide emission credits[403] (the "Emission Credits") and a complex structure of put and call options, commodity swaps and guaranties. When viewed in the aggregate, these transfers, options, swaps and guarantees combine to create an economic result very similar to—if not indistinguishable from—a borrowing by Enron secured by the Emission Credits. While the $SO_2$ Transaction is not structurally similar to the other Selected Transactions discussed in this Report, it raises similar questions as to whether, as a legal matter, the characterization of the transfers in the relevant documents should be respected or whether the transactions, taken as a whole, should be recharacterized as loans.

*Structure of the SO₂ Transaction*

In two separate transactions, ENA transferred the Emission Credits to Colonnade Limited, a Guernsey company ("Colonnade"), for an aggregate sale price of approximately $167.6 million. The first sale of 757,975 Emission Credits (for approximately $138.5 million) occurred at the end of September 2001,[404] and the second sale of 166,607 Emission Credits (for approximately $29.1 million) occurred at the end of

---

[403] An emssion credit (referred to as an "allowance" in the industry) represents authorization by the Administrator of the Environmental Protection Agency under the Clean Air Act Amendments of 1990, 42 U.S.C. §§ 7401 et seq. (1990), to emit one ton of sulfur dioxide during or after a specified year, which is often referred to as a "vintage" year.

[404] Confirmation (SO₂ Emission Allowance Purchase & Sale Transaction) between Enron North America Corp. and Colonnade Limited, Sept. 28, 2001 (the "September Sale Confirmation") [AB000119870-AB000119871].

October 2001.[405]    In both transactions, wholly owned subsidiaries of Enron simultaneously entered into various put and call arrangements with Colonnade.[406]  The calls provided the Enron subsidiary with an option to purchase from Colonnade an amount of Emission Credits up to the number of Emission Credits sold by ENA, while the puts gave Colonnade the right to require the Enron subsidiary to purchase from Colonnade an amount of Emission Credits up to the number of Emission Credits ENA sold to Colonnade.

In the September transaction, Herzeleide, LLC ("Herzeleide"), a wholly owned subsidiary of Enron[407] formed a few days prior to the sale,[408] acquired call rights from Colonnade for the same amount and same vintage years of Emission Credits sold by ENA in the September transaction in exchange for the payment to Colonnade of a premium of $426,656.37.[409]  In addition, Herzeleide sold put rights to Colonnade for the same amount and vintage years of Emission Credits in exchange for the nominal premium of $500.[410]

---

[405] Sale Notice executed by Enron North America Corp. and agreed to by Colonnade Limited, Oct. 30, 2001 (the "October Sale Confirmation") [AB000120465-AB000120468].

[406] Option Agreement between Herzeleide, LLC and Colonnade Limited, Sept. 24, 2001 (the "September Option Agreement") [AB000119872-AB000119903]; Call Option Agreement between Herzeleide, LLC and Colonnade Limited, Oct. 30, 2001 (the "October Call Agreement") [AB000120141-AB000120179]; Put Option Agreement between Grampian LLC and Colonnade Limited, Oct. 30, 2001 (the "October Put Agreement") [AB000120181-AB000120214].

[407] Certificate of Assistant Secretary of Enron Corp., Sept. 28, 2001 (in which Enron Corp. is identified as the sole member of Herzeleide, LLC) [AB000119949].

[408] Certificate of Formation for Herzeleide, LLC certified by the Delaware Secretary of State, Sept. 18, 2001 (stating that Herzeleide, LLC was formed on Sept. 17, 2001) [AB000120016].

[409] Confirmation of Granted Call Option between Herzeleide, LLC and Colonnade Limited, Sept. 24, 2001 [AB000119904-AB000119905].

[410] Confirmation of Granted Put Option between Herzeleide, LLC and Colonnade Limited, Sept. 24, 2001 [AB000119906-AB000119907].

The exercise prices for both the calls and puts were to be the market prices prevailing at the time of exercise.[411]

In the October transaction, the puts and calls were divided between two subsidiaries of Enron. Herzeleide acquired call rights from Colonnade for the same amount and same vintage years of Emission Credits sold in both the September and October transactions in exchange for the payment to Colonnade of an aggregate premium of approximately $3.3 million.[412] Grampian LLC ("Grampian"), another wholly owned subsidiary of Enron[413] formed just prior to the October sale,[414] sold put rights to Colonnade for the same amount and same vintage years of Emission Credits sold in both transactions in exchange for an aggregate nominal premium of $300.[415] As in the September transaction, the exercise prices for the puts and calls in the October transaction were the market prices prevailing at the time of exercise.[416] In the September and October transactions, the calls were "American" (exercisable at any time during their term),[417] while the puts were "European" (exercisable only upon their expiration date, or,

---

[411] Section 1.1, September Option Agreement, *supra* note 406 (definitions of "Call Option Settlement Amount" and "Put Option Settlement Amount").

[412] Because the initial puts and calls covering the amount of Emission Credits sold in the September transaction expired near the end of October, puts and calls covering the amount of Emission Credits sold in the September transaction were combined with the puts and calls entered into in connection with the October transaction. Call Option Notice Letters from James C. Lewis on behalf of Herzeleide, LLC to Colonnade Limited, Oct. 30, 2001 [AB000120174-AB000120179].

[413] *See* Certificate of Assistant Secretary of Enron Corp., Oct. 30, 2001 (in which Enron Corp. is identified as the sole member of Grampian LLC) [AB000120277].

[414] *See* Certificate of Formation for Grampian LLC certified by the Delaware Secretary of State, Oct. 25, 2001 (stating that Grampian LLC was formed on Oct. 17, 2001) [AB000120381].

[415] Put Option Notice Letters from Jane Duchemin, Director, and Simon Bougourd, Alt. Director, on behalf of Colonnade Limited to Grampian LLC, Oct. 30, 2001 [AB000120208-AB000120214].

[416] Section 1.1, October Call Agreement and October Put Agreement, *supra* note 406 (definitions of "Call Option Settlement Amount" and "Put Option Settlement Amount").

[417] Section 5.1.1, September Option Agreement, *supra* note 406; *see also* Section 6.1.1, October Call Agreement, *supra* note 406.

in the case of the October transaction, upon a default).[418]    In both transactions, Enron

provided a guaranty of Grampian's and Herzeleide's obligations in respect of the puts

and calls, limited in each case to $100 million.[419]

In connection with the closing of the September transaction, ENA and Barclays

entered into a swap confirmation under an existing ISDA Master Agreement dating back

to 1994.[420]   Enron guaranteed ENA's obligations under the ISDA Master Agreement on a

limited basis.[421]    Under the confirmation, ENA agreed to pay to Barclays fixed price

amounts (exactly equal to the prices paid by Colonnade for the Emission Credits), and

Barclays agreed to pay to ENA floating price amounts, in respect of a notional amount of

Emission Credits exactly equal to, and having vintage years exactly the same as, those

sold by ENA to Colonnade.[422]   In the October transaction, ENA and Barclays terminated

the September swap (ENA paid Barclays $10.103 million as a result of this

termination[423]) and entered into three new swap confirmations (the "$SO_2$ Swaps") under

the existing ISDA Master Agreement, also with ENA as the fixed payor and Barclays as

---

[418] Section 6.2, September Option Agreement, *supra* note 406; *see also* Section 6.1, October Put Agreement, *supra* note 406.

[419] Section 1, Guaranty from Enron Corp. in favor of Colonnade Limited, Sept. 24, 2001 (the "September Guaranty") [AB000119908-AB000119912]; *see also* Section 1, Guaranty from Enron Corp. in favor of Colonnade Limited, Oct. 30, 2001 (the "October Guaranty") [AB000120271-AB000120276].

[420] ISDA Master Agreement between Enron North America Corp. (formerly known as Enron Capital & Trade Resources Corp.) and Barclays Bank PLC, Jan. 13, 1994, as amended [AB000349045-AB000349114].

[421] Guaranty from Enron Corp. in favor of Barclays Bank PLC, Jan. 13, 1994 (the "Swap Guaranty") [AB000349101-AB000349105].

[422] Confirmation of Swap between Enron North America Corp. and Barclays Bank PLC, Sept. 28, 2001 (the "September Swap Confirmation") [AB000119941-AB000119944].

[423] Termination Agreement between Enron North America Corp. and Barclays Bank PLC, Oct. 30, 2001 [AB000120469-AB000120470].

the floating payor.[424]  The notional amount of Emission Credits and related vintage years

covered by the $SO_2$ Swaps were the same as the combined Emission Credits sold in the

September and October transactions.[425]  Finally, in connection with the October

transaction, Barclays required Enron to deposit $59.5 million[426] with Barclays as security

for all obligations owing by Enron and its subsidiaries to Barclays and any other person

in "which Barclays Bank PLC has an interest."[427]

The structure of the $SO_2$ Transaction is shown in the following diagram:



---

[424] Confirmation of Swaps between Enron North America Corp. and Barclays Bank PLC, Oct. 30, 2001 (the "October Swap Confirmations") [AB000120259-AB000120270].

[425] *Compare id., with* September Sale Confirmation, *supra* note 404, and October Sale Confirmation, *supra* note 405.

[426] According to Enron employees, this amount was intended to reflect the net amount of Barclays' credit exposure to ENA under the ISDA Master Agreement and was not necessarily reflective of Barclays' credit exposure to ENA under the $SO_2$ Swaps.

[427] Section 1.1, Charge on Cash between Enron Corp. and Barclays Bank PLC, Oct. 30, 2001 (definition of "Secured Person") [AB000120215-AB000120230].

*Economics and Allocation of Risk in the SO$_2$ Transaction*

After giving effect to the SO$_2$ Transaction, Enron had received, either directly or indirectly through its subsidiaries, approximately \$93.4 million[428] (net of expenses and cash collateral) from the sale of Emissions Credits to Colonnade, while, as a practical matter, Enron retained significant control over the Emission Credits sold through the calls acquired from Colonnade. A clearer understanding of the economic significance of the SO$_2$ Transaction to Enron can be gained by viewing the transactions with Colonnade and Barclays sequentially. The proceeds from the sale of the Emission Credits to Colonnade provided Enron with what could be viewed as the principal amount of a loan. Colonnade could require this "loan" to be repaid at maturity or upon default by exercise of the put rights. The calls gave Enron rights analogous to prepayment rights and the right to require return of equivalent Emission Credits. The premium paid to Colonnade for the calls gave it revenues that would be the equivalent of prepaid "interest" on the "loan" (assuming Colonnade were repaid if the calls were exercised) at an effective rate of LIBOR plus 0.65% per annum.[429]

---

[428] This amount is equal to the \$167.6 million of aggregate sale proceeds from the Emission Credits, less \$10.1 million from the termination of the September swap, less \$59.5 million of cash pledged to Barclays, less \$426,656 for the American call option with Herzeleide (call date of 11/7/01), less \$3.3 million for the three separate American call options with Herzeleide (call dates of 6/26/02, 7/25/02 and 8/23/02), less a \$850,000 fee paid to Barclays.

[429] According to the Examiner's accountants, the Call Option Premium (*see* Section 1.1, September Option Agreement and October Call Agreement, *supra* note 406 (definition of "Call Option Premium")) is based on LIBOR plus a margin of 0.65%, times the "sale" price of the Emission Credits, for the period outstanding. If a call is exercised during the period, there is a Cost of Carry Refund (*see* Section 1.1, September Option Agreement and October Call Agreement, *supra* note 406 (definition of "Cost of Carry Refund")), which is based on the proportion of the Emission Credits called to the total Emission Credits originally transferred. In short, the unearned prepaid interest is refunded. The refund computation also effectively provides for a recalculation of the interest cost for the remaining amount outstanding, for the remaining period, based on LIBOR at the time of the call. The refund calculation also provides for a 0.125% downward adjustment in computing the amount of the refund (presumably a fee to compensate Barclays for the extra work it must perform because of the call). In addition, the LIBOR interest rate used to compute the refund is the current rate rather than the rate used in the original computation of the call premium. This effectively gives the reinvestment risk to ENA. *See also* Email from James Lewis to

If the analysis stopped at this point, a significant difference between the economic effect of this transaction and that of a loan would exist because both the puts and the calls are subject to market risk. Because the purchase price of the Emission Credits under the puts and calls is the market price at the time of exercise, if there were significant swings in the market value of the Emission Credits, Enron could reap a windfall and Colonnade suffer a loss, or vice versa, depending on the direction of the price change. Moreover, each party would take the risk of the other party's creditworthiness regarding performance of the put or call.[430] Without hedging the market and credit risks, the transaction would be speculative because neither party could predict potential risks or rewards. Results would be determined by the vagaries of the markets. Under normal circumstances a lender would not enter into such a transaction.

The $SO_2$ Swaps allowed Enron to protect itself against these market and credit risks.[431] Taking into account the effect of the $SO_2$ Swaps on Enron's position, the loan

---

Jeffrey Shankman, Raymond Bowen, Louise Kitchen, Larry Lawyer, Bill Brown, William Bradford and Debbie Brackett, Nov. 7, 2001 (in summarizing the terms of the facility Mr. Lewis states "the upfront fee was 50bp on $170 mm for the year (though we really have 13 months) and the spread is 65bp.") [AB000359462].

[430] The Examiner has not obtained financial information concerning Colonnade; however, he has learned that Colonnade was created on September 4, 2001, just before the September transaction. Given the coincidence of its creation with the timing of the $SO_2$ Transaction, it is reasonable to assume that it is a special purpose entity created for the purpose of the transaction. Moreover, it is not unreasonable to assume that the funds it used in the September and October transactions were provided by one or more financial institutions who knew the monies would be advanced to Enron and backed by an Enron credit. Barclays itself provides a strong indication of such a relationship in a term sheet provided by Barclays to Enron in June of 2001 entitled "Off-Balance Sheet Inventory Monetization Facility" (which facility expressly contemplates transactions in Emission Credits) in which Barclays proposes a transaction where "an 'orphaned' vehicle, acting out of an insolvency remote cell (Swap Co.) and funded by Barclays Bank PLC ('Barclays'), acquires on a true sale basis clear title to the inventory and pays the True Sales Price to the Client . . . . At the time Swap Co. acquires the commodity inventory, it eliminates all price exposure by entering into a hedge with Barclays." Letter and Term Sheet from Benoit de Vitry, Managing Director, Barclays Capital to Soma Ghosh, Enron Global Markets, dated "Monday, 11 2001" and bearing a fax stamp dated June 12, 2001 (the "Barclays Term Sheet Letter") [AB000341439-AB000341444]. Whether these assumptions are correct will be reported on in a later report.

[431] Because Colonnade would have had similar concerns, it may have done the same, but the Examiner has been unable to find any direct evidence to support this conclusion (note that Barclays does propose such a

features of the transactions come into clearer focus. In essence, the $SO_2$ Swaps required

Enron to pay Barclays the original purchase price for the Emission Credits and Barclays

to pay Enron the then current market price for the credits. Any change in Enron's

exposure under the puts caused by the changes in the market price of Emission Credits

was mitigated by an opposite change in the amount payable by Barclays under the $SO_2$

Swaps. The combined result was that Enron had hedged its market risk, with the net

effect that it only had to repay an amount equal to the original purchase price for the

Emission Credits. Moreover, it had, in effect, substituted Barclays' credit/performance

risk for Colonnade's.

### Recharacterization of the $SO_2$ Transaction

As with the other transactions reviewed in this Report, the Examiner has

concentrated on the economic realities and intent of the parties in considering whether the

$SO_2$ Transaction might be subject to recharacterization as a loan rather than a sale of the

Emission Credits.[432] There are several factors present in the $SO_2$ Transaction that support

---

Colonnade and Barclays swap in the Barclays Term Sheet Letter, *supra* note 430). There is some indirect evidence that Enron and Barclays went to some lengths not to link the Barclays transaction with the Colonnade transaction. *See, e.g.*, Email from Alan Quaintance to James Lewis and Joseph Deffner, Oct. 26, 2001 (declines Barclays request for "extra margin to cover a concern of Colonnade (that ENA won't fulfill its obligations under the put)" because it would "link the Barclays leg with the Colonnade leg.") [AB000359452].

[432] While the Environmental Protection Agency (the "EPA") maintains a tracking system for ownership of $SO_2$ allowances, this tracking system does not serve as conclusive proof of ownership, nor does it render a traditional "true sale" analysis superfluous. The governing regulations do not explicitly preclude challenges to the ownership of the allowances. *See* 40 C.F.R. § 72 *et seq.* Moreover, cases dealing with the ownership of allowances have not used the EPA's tracking system as the means to resolve the dispute. In *Ormet Corp. v. Ohio Power Co.*, 98 F.3d 799 (4th Cir. 1996), two parties were disputing ownership of $SO_2$ and $NO_X$ allowances issued by the EPA under the same regulatory structure as used with the above-described transaction. The *Ormet* court held that "the EPA will not resolve private disputes regarding parties' entitlement to allowances," and that "Congress intended for disputes among allowance holders to be resolved in the same manner as are other private commercial disputes." *Id.* at 804. Accordingly, any dispute over ownership of allowances would be resolved in a court, not through administrative action. Moreover, the *Ormet* court held "routine transactional questions about the sale and transfer of allowances are to be resolved through application of standard principles of commercial law." *Id.* at 807. Thus, the EPA's regulations governing record of ownership of the allowances will not determine actual ownership;

the recharacterization of the transaction as a loan. These include (i) Benefits and Risks;[433] (ii) Control Over the Asset;[434] (iii) Loan Pricing[435] and (iv) Enron's Intent.[436] However, Enron treated the $SO_2$ Transaction as a sale for tax purposes. Thus, the tax treatment would support a true sale characterization. The Examiner has insufficient evidence at this stage of his investigation to reach any conclusion with respect to Barclays' and Colonnade's intent.

---

rather, common law of true sale will be the touchstone of this analysis, as with the other transactions discussed in this Report.

[433] The existence of Colonnade's puts exposed ENA (through its affiliation with Grampian) to, among other things, price risk associated with the sold Emission Credits. More directly, the puts assigned price risk squarely to ENA.

[434] The calls gave ENA the right (through its affiliation with Herzeleide) to prepay the "loan" and recover the Emission Credits should the market price exceed the "principal amount" outstanding. Enron employees discuss this transaction in those very terms in their internal correspondence. *See, e.g.*, Email from Soma Ghosh to Robert Bruce, James Lewis, Rahul Kumar, Alan Quaintance, Jr., Jerry Seade, and Brent Hendry, Oct. 20, 2001 [AB000359443-AB000359444].

[435] As discussed above, if recharacterized, the interest rate on the transaction would approximate LIBOR plus 0.65% per annum.

[436] It appears that Enron always intended this transaction to be a financing with only the indicia of a "true sale" necessary for accounting and tax treatment. *See* Enron Interoffice Memoranda to EGM Global Finance regarding EGM Inv. Fin. U.S. Federal Tax Issues Memo, Oct. 14, 2001, at 4 (stating "[a]lthough this Monetization was intended to be a financing, ENA transferred an indicia of benefits and burdens of ownership in the Credits to create from a U.S. federal income tax perspective a sale of such Credits.") [AB000352363-AB000352370]. In addition, several Enron email messages referring to the transactions, both before and after closing, refer to "collateral" and "financing" and to the transactions as a whole as a "facility" (almost certainly meaning a loan facility) as to which Enron had already "used" certain funds. *See, e.g.*, Email from Joel Ephross, Assistant General Counsel, Enron Corp., to Soma Ghosh, Alan Quaintance, Jr., and Michael Robinson, July 26, 2001 [AB000359389]; Email from James Lewis to Jeffrey Shankman, Raymond Bowen, Jr., Louise Kitchen, Larry Lawyer, Bill Brown, William Bradford, and Debbie Brackett, Nov. 7, 2001 [AB000359462]. Several email messages also discuss the structure of the transaction so that it may receive "off-balance sheet treatment," *see, e.g.*, Email from Soma Ghosh to Joel Ephross, July 26, 2001 [AB000359387]; Email from James Lewis to Jeffrey Shankman, Raymond Bowen, Louise Kitchen, Larry Lawyer, Bill Brown, William Bradford, and Debbie Brackett, November 7, 2001 [AB000359462]; and "derecognition of the $SO_2$ inventory on the balance sheet," *see* Email from Soma Ghosh to Ying Liu, Rahul Kumar, James Lewis, Ethan Schultz, Joel Ephross, and others, Sept. 29, 2001 [AB000359435]. At the closing of the transaction, ENA paid a fee to Barclays for arranging the transactions and paid Barclays' and Colonnade's legal fees, as is typical in loan transactions. *See* Fee Letter Agreement between Enron North America and Barclays Bank PLC, Oct. 30, 2001 (the "October Fee Agreement") [AB000120231-AB000120232]. The premium on the call options paid at closing can be viewed as pre-paid interest. Section 1.1, October Call Agreement, *supra* note 406 (definition of "Call Option Premium") (in computing the call option premium, the interest rate is effectively based on the net amount Enron received, i.e., the sales price of the $SO_2$ credits less the call option premium; therefore, the calculation is a simple interest calculation based on the net cash Enron actually received). In addition, if a

If the Enron-related parties to these transactions (ENA, Grampian and Herzeleide) are viewed as one party with one identity of interest, and the parties opposite them (Barclays and Colonnade) are viewed similarly, then the Examiner believes there would be little doubt that these transactions would properly be characterized as loans. The transaction documents contain a number of indications suggesting an affiliation between Colonnade and Barclays. For example, in the indicative term sheet provided by Barclays to Enron setting forth the basic terms of the off-balance sheet inventory monetization facility (which term sheet expressly contemplated transactions in Emission Credits), Barclays indicates that it will create an insolvency remote entity to acquire the monetized inventory.[437] In addition, one document to which Colonnade is a party was signed by a Barclays entity on Colonnade's behalf.[438] Further, in a fee letter between ENA and Barclays entered into in connection with the October transaction, ENA agreed to pay to Barclays $850,000 in consideration of Barclays arranging the "extension and restatement of the transactions under which Enron North America Corp. has sold certain $SO_2$ Emission Allowances to Colonnade Limited."[439] In addition to indications in the documents, the very nature of the transactions suggest an affiliation with Colonnade. Most notably, Barclays would have no apparent business reason or need to enter into the

---

call was exercised before the termination date, a portion of the option premium, the pre-paid interest, would be refunded (another element common in loan transactions). *See generally supra* note 429.

[437] Barclays Term Sheet Letter, *supra* note 430, at 3.

[438] Signature block, Sale Agreement between Enron North America Corp. and Colonnade Limited, Oct. 30, 2001 (the "October Sale Agreement") [AB000120115-AB000120140]. In addition, correspondence from ENA was occasionally sent to Colonnade in care of Barclays Physical Trading Limited. *See, e.g.*, Sale Notice between Enron North America Corp. and Colonnade Limited, Oct. 30, 2001 [AB000120465-AB000120468].

[439] October Fee Agreement, *supra* note 436, at 1.

$SO_2$ Swaps absent an affiliation with Colonnade.[440]    Finally, a review of the $SO_2$ Allowance Tracking System maintained by the Environmental Protection Agency failed to reveal any sales or purchases of Emission Credits by Colonnade to or from any party other than ENA and Barclays Metals Limited.[441]

The documents governing the purported sale of the Emission Credits from ENA to Colonnade provide that if it were to be determined that the transactions contemplated by such documents are not properly characterized as sales, then ENA shall be deemed to have granted Colonnade a security interest in the Emission Credits.[442]    In the event of such a recharacterization, the Court will then be required to determine whether Colonnade holds a valid security interest in the Emission Credits and if so, whether such security interest could be effectively challenged.    If no valid security interest exists or if one does exist but such security interest can be defeated, then the Emission Credits would be property of ENA and, therefore, unencumbered property of the Debtors' estates.

*Accounting and Disclosure of the SO2 Transaction*

As noted above, the Examiner's accounting experts have come to no conclusions at this time regarding Enron's accounting treatment of this transaction.

---

[440] If Barclays did have a legitimate business transaction warranting a hedge apart from any affiliation with Colonnade, the odds of the terms of that transaction having terms identical to those of the transactions at hand seem remote.

[441] A search of the U.S. Environmental Protection Agency website's allowance tracking system (*www.epa.gov/airmarkets/transfer*) failed to disclose any purchases by Colonnade of Emission Credits other than the 924,582 Emission Credits purchased in the September and October transactions. Additionally, the EPA web site indicates that Colonnade sold all 924,582 Emission Credits to Barclays Metals Limited in six separate sales transactions from December 20, 2001 through February 22, 2002.  In fact, some evidence suggests that Colonnade had so little experience in the $SO_2$ allowance trading market that ENA agreed to help Colonnade re-sell the Emission Credits at the end of the option terms. Email from Alan Quaintance, Jr. to Jennifer Stevenson, Arthur Andersen, Sept. 20, 2001 [AB000359425].

[442] Section 5.4 of Annex A, September Sale Confirmation, *supra* note 404; *see also* Section 5, October Sale Agreement, *supra* note 438.

*Examiner's Conclusions with Respect to the $SO_2$ Transaction*

The $SO_2$ Transaction can only be understood when viewed in its totality. When so viewed, the $SO_2$ Transaction appears to be, from both an economic and risk allocation perspective, a loan rather than a sale of assets. As such, the $SO_2$ Transaction is susceptible to recharacterization as a loan based upon the factors discussed above, including (i) Control Over Asset; (ii) Benefits and Risks; (iii) Loan Pricing; and (iv) Enron's Intent. If the transaction is recharacterized and there is a determination that no true sale of the Emission Credits occurred, then the value of the assets transferred could be returned to the Debtors' estates, subject to the validity and extent of any unavoidable perfected security interests in such assets.

## K.  **The Destec Transaction**

*Introduction and Overview of the Destec Transaction*

The Destec Transaction monetized a stream of royalty payments payable by Houston Lighting & Power Company ("HL&P"), a Texas corporation (now doing business under the name Reliant Energy HL&P), under coal and lignite mining leases originally entered into with The Dow Chemical Company ("Dow") in the late 1970's.[443] The successor to Dow's rights under the leases was a limited partnership known as Destec Properties Limited Partnership ("DPLP"). In August 1997, one month prior to the monetization, Enron acquired all of the general and limited partnership interests in DPLP.[444] By that time, HL&P was committed to pay for at least 3.5 million tons of coal and lignite per year under a "take or pay" arrangement regardless of whether the commodities were actually taken, creating a fixed stream of payments suitable for securitization.[445]

*Structure of the Destec Transaction*

As noted, the principal asset underlying this transaction is a stream of royalty payments owed to DPLP under coal and lignite mining leases.[446] Because of this cash

---

[443] Exhibit I and II, Option and Agreement between The Dow Chemical Company and Houston Lighting & Power Company, May 1, 1979, as amended (the "Option Agreement") (listing the applicable coal and lignite mining leases) [AB000128362-AB000128441].

[444] This statement is based on information provided by Enron to A&B during interviews on June 19, 2002. The limited partnership interests were held by HGK Enterprises LP, Inc. and the general partnership interest was held by HGK Enterprises GP, Inc. On September 30, 1997, both HGK Enterprises LP, Inc. and HGK Enterprises GP, Inc. were subsidiaries of Enron Capital & Trade Resources Corp., a subsidiary of Enron Corp. *See* Opinion Letter of Mark E. Haedicke, Managing Director and General Counsel, Enron Capital & Trade Resources Corp., to State Street Bank and Trust Company, National Association, as Trustee, Citibank, N.A., et al., Sept. 30, 1997 (the "Haedicke Opinion"), at 1 [AB000128905-AB000128910].

[445] Section 6.01, Option Agreement, *supra* note 443.

[446] HL&P pays a quarterly "Overriding Royalty Payment" equal to $1.04 (adjusted for inflation during the life of the agreement) per ton of coal and lignite mined. *Id.* Section 5.01(ii). Per the Option Agreement, after January 1, 1985, HL&P is "firmly obligated" to make Overriding Royalty Payments on a minimum of

flow stream, the Destec Transaction stands in vivid contrast to the other transactions described in this report. In each of the others, the securitized asset produced insufficient cash to service the debt in full. Instead, the primary source of cash for debt service (barring the sale of the asset) was Enron. The cash flow stream in the Destec Transaction is the type of "self liquidating" asset that is frequently the subject of securitization transactions in the United States' capital markets. Indeed, based on the facts that the Examiner has been able to develop to date, the Destec Transaction appears to be a relatively traditional securitization transaction.

In a typical securitization transaction, the parties seek to legally isolate underlying assets to be securitized from the Sponsor. To achieve this legal isolation, most transactions are structured as "two-tier" transactions under which (i) the Sponsor transfers the asset to an Asset LLC in a true sale, and (ii) the Asset LLC then transfers the asset to the issuer of the asset-backed securities in a transaction that may be either a sale or a security interest.[447] The Destec Transaction involved three steps. In the first step, DPLP distributed its right to receive the royalty payments to its partners (subsidiaries of Enron) in a transaction the parties denominated by the parties as a "true distribution."[448] In the second step, these partners assigned the right to receive royalty payments to ECT

---

100 million tons of coal and lignite regardless of whether such coal and lignite is mined. After January 1, 1985, Overriding Royalty Payments are to be based on the greater of (a) the actual amount of coal and lignite mined and (b) 2.5 million tons during the calendar years 1985 through 1996 or 3.5 million tons during the calendar years 1997 through 2016 (referred to as "Minimum Annual Overriding Royalty"). *Id.* Section 6.01.

[447] *See* Committee on Bankruptcy and Corporate Reorganization of the Association of the Bar of the City of New York, *Structured Finance Techniques*, 50 Bus. Law. 527, 533, 555 (Feb. 1995).

[448] Assignment Agreement (DPLP) between Destec Properties Limited Partnership and HGK Enterprises GP, Inc. and HGK Enterprises LP, Inc., Sept. 30, 1997 (the "DPLP Assignment") [AB000128781-AB000128787].

Coal Company No. 1 ("CoalCo"), a subsidiary of Enron[449] formed just prior to the transaction,[450] in consideration of CoalCo's payment to these partners of $110 million.[451] In the third and final step, in exchange for $110 million, CoalCo assigned the right to receive royalty payments to a trust (the "Destec Trust") formed by the parties for the benefit of purchasers of Notes (the "Destec Notes") issued by the Destec Trust.[452] There were no equity holders of the Destec Trust.

The Destec Trust raised a total of $150 million by the issuance of the Destec Notes and (i) as noted above, paid $110 million of the proceeds to CoalCo (as consideration for the assignment of the right to receive the royalty payments)[453] and (ii) paid the remaining $40 million to ENA (at the time known as Enron Capital & Trade Resources Corp.) in consideration of obligations undertaken by ENA under a swap agreement (the "Destec Swap") between ENA and the Destec Trust.[454]

---

[449] Haedicke Opinion, *supra* note 444, at 1.

[450] Certificate of Incorporation for ECT Coal Company No. 1 certified by the Delaware Secretary of State, Sept. 22, 1997 (stating that such Certificate of Incorporation was filed with the Delaware Secretary of State on September 19, 1997) [AB000129124-AB000129133]

[451] Assignment Agreement (DPLP Partners) between HGK Enterprises GP, Inc. and HGK Enterprises LP, Inc. and ECT Coal Company No. 1, Sept. 30, 1997 (the "DPLP Partners Assignment") [AB000128810-AB000128815].

[452] *See* Section 2.02(a), Contractual Asset Sale Agreement among ECT Coal Company No. 1, State Street Bank and Trust Company of Connecticut, National Association, as Trustee, Citibank, N.A., as Administrative Agent and Syndication Agent, Société Générale, Southwest Agency, as Syndication Agent, and Purchasers named therein, Sept. 30, 1997 [AB000128649-AB000128751], as amended and restated by First Amended and Restated Contractual Asset Sale Agreement among ECT Coal Company No. 1, L.L.C. (successor to ECT Coal Company No. 1), State Street Bank and Trust Company of Connecticut, National Association, as Trustee, Citibank, N.A., as Administrative Agent and Syndication Agent, Société Générale, Southwest Agency, as Syndication Agent, The Bank of Nova Scotia, as Co-Agent, and Purchasers named therein, Dec. 30, 1997 (the "Contractual Asset Sale Agreement") [AB000128279-AB000128452].

[453] *Id.*

[454] Swap Agreement between Enron Capital & Trade Resources Corp. (now known as Enron North America Corp.) and State Street Bank and Trust Company of Connecticut, National Association, Sept. 30, 1997 (the "Destec Swap") [AB000128816-AB000128840].

The Destec Swap has an interest rate component as well as an inflation component. The interest rate component is designed to protect the Destec Trust against mismatches between the fixed royalty payments it would receive and the floating interest rate that it would have to pay pursuant to the Destec Notes.[455] Under the inflation component, ENA is obligated to pay the Destec Trust an amount based on the quantity of coal and lignite covered by royalty payments if the inflation adjusted price set in the take or pay contract is less than a fixed price set in the Destec Swap.[456] Conversely, if the inflation adjusted price set in the take or pay contract is greater than the fixed price set in the Destec Swap, the Destec Trust must make a payment to ENA.[457] This arrangement effectively hedged the Destec Trust against reduced royalty payments in a deflation environment (in exchange for ENA credit risk).

The payment of the interest rate component of the Destec Swap differs from the more typical periodic exchange of a fixed rate payment for a floating rate payment. The Destec Swap provides that ENA is to pay to the Destec Trust a floating payment equal in amount to the accrued and unpaid interest due and payable on the Destec Notes. In return, the Destec Trust paid to ENA the $40 million up-front payment.[458] In addition, Enron was obligated to pay a premium under the interest rate component of the Destec Swap if Enron's credit rating was below investment grade.[459]

---

[455] *Id.* Article II.

[456] *Id.* Section 2.3; *see also id.* Section 1.1 (definition of "CPI Portion").

[457] *Id.* Section 2.3; *see also id.* Section 1.1 (definition of "CPI Portion").

[458] *Id.* Section 2.4.

[459] *Id.* Section 2.2. The interest rate component of the Destec Swap bears some resemblance to the so-called "Prepay Transactions" that Enron entered into with certain of its banks and alleged affiliates of those banks, and as such may be deemed to be a loan to Enron. The Destec Swap will be considered in more detail in a subsequent report of the Examiner that deals with Prepay Transactions.

At closing, Enron guaranteed the payment and performance of all obligations of CoalCo, ENA, DPLP and its partners under these transactions.[460]  Enron's guaranty, however, did not cover any of the notes issued by the Destec Trust.

The transaction was restructured approximately three months after the initial closing to fund Destec Notes through CXC Incorporated, a commercial paper conduit managed by Citibank.[461]

---

[460] Performance Guaranty by Enron Corp. in favor of Citibank, N.A., Société Générale, Southwest Agency, State Street Bank and Trust Company of Connecticut, National Association and Purchasers named therein, Sept. 30, 1997 (the "Enron Guaranty") [AB000128841-AB000128854].

[461] *See* Letter from CXC Incorporated to Coal Capital Corporation, Dec. 30, 1997 (letter agreement establishing $150,000,000 credit facility) [AB000128456-AB000128465]; Asset Purchase Agreement between Coal Capital Corporation, CXC Incorporated, the APA Purchasers named therein, Citibank, N.A., as agents for the Purchasers, and Citicorp North America, Inc., as administrative agent, Dec. 30, 1997 (the "CXC Asset Purchase Agreement") (agreement providing back-up liquidity for uncommitted facility) [AB000128474-AB000128536].

- 151 -

The following is a diagram of the basic structure of the Destec Transaction:



*Economics and Allocation of Risk in the Destec Transaction*

As a result of the closing of the Destec Transaction, Enron (through ENA and Enron's subsidiaries that are the partners of DPLP) received $150 million of cash proceeds (net of certain transaction costs) from the assignment of the royalty payments and the issuance of the Destec Swap. The Destec Trust received assets consisting of the right to receive the HL&P royalty payments and payments under the Destec Swap, and Enron guaranteed that DPLP, its partners, ENA and CoalCo would fulfill their respective obligations under the transaction documents. Enron, which had an investment grade rating at the time, protected the Destec Trust against interest rate and deflation risk in exchange for payments made to it by the Destec Trust under the Destec Swap.

As is the case in most traditional securitization transactions, the holders of the Destec Notes issued by the Destec Trust are entitled to payment from cash flows generated by the transferred assets, in this case the HL&P royalty payments. If these assets perform as the noteholders anticipate, they will be paid in full over the expected life of the transaction. If the underlying assets do not pay as anticipated, the noteholders will either experience delays in payments or, in a worst case situation, will suffer losses. Thus, in contrast to some of the other transactions discussed in this Report, the risk of loss on these assets appears to have been transferred to the holders of the notes issued by the Destec Trust.[462]

The investors in the Destec asset-backed notes appear to have taken additional steps to protect their rights to the underlying assets that were to generate funds to pay the

---

[462] One exception to this general statement is that the Destec Swap did contemplate the payment by ENA to the Destec Trust of amounts equal to accrued interest on the Destec Notes.

obligations of the Destec Trust. As a condition to closing the Destec Transaction, the transaction documentation required true sale and nonconsolidation opinions in favor of the Destec Trust regarding the transfer of the assets to the Destec Trust,[463] enforceability opinions with respect to all relevant documents[464] and, significantly, back up security interest provisions and opinions with respect to these assets.[465]

### Recharacterization of the Destec Transaction

While it may be possible to argue that the sale of the royalty payments in the Destec Transaction should be recharacterized as a loan, at this stage in the Examiner's investigation, the Examiner believes that the grounds for such an argument are less compelling than those in the other transactions discussed in this Report. With the possible exception of ENA's obligations under the Destec Swap (discussed below), it appears that Enron's credit did not provide any significant support in the event of non-performance of the assets, or for payment of principal of the Destec Notes. Also, the Destec Trust obtained legal opinions regarding the enforceability of the documents against the parties under applicable law, the true sale of the underlying assets to the Destec Trust, the validity of the backup security interest and related matters.

However, Enron's Intent and Tax Treatment may be factors in favor of recharacterization.[466] Other arguments for recharacterization may be available as well.

---

[463] Letter from Vinson & Elkins L.L.P. to Enron Corp., Sept. 30, 1997 (the "True Sale Legal Opinion") [AB000128911-AB000128953].

[464] Letter from Vinson & Elkins L.L.P. to State Street Bank and Trust Company of Connecticut, National Association, Purchasers from time to time, Citibank, N.A., Société Générale, Southwest Agency, Sept. 30, 1997 (the "Enforceability Legal Opinion") [AB000128954-AB000128965].

[465] *Id.*

[466] The Contractual Asset Sale Agreement states that "it is the intention of the parties that the conveyance of the Contractual Assets from COALCo to the Trust pursuant to the provisions of this Agreement be treated as a true sale for all purposes, except that the parties intend to treat the conveyance of the Contractual Assets as a loan for purposes of federal, state, and local income tax, franchise taxes, or any

- 154 -

Certainly, because of the Destec Swap, Enron (through ENA) is effectively responsible for interest payments on the Destec Notes. Further, the Destec Trust's rights to future royalty payments terminate after the Trust's securities have been paid in full.[467] Thereafter, the payments are made to CoalCo, an Enron subsidiary. The Destec Trust has the right to redeem the Destec Notes at any time at the direction of CoalCo.[468] In addition, the transaction appears to have been treated as indebtedness of Enron in its consolidated tax returns.[469] Nevertheless, these features may be insufficient to overcome the other aspects of this transaction that are consistent with a sale characterization, including what appears to be the reliance of the investors on the underlying asset and the transfer of risk of loss on the assets to the investors.

A final determination of whether recharacterization may be appropriate may well turn on facts that are not available at this time. For example, if it were determined that the up-front payment made to ENA in connection with the Destec Swap was far less than the reasonable present value of the payment obligations undertaken by ENA or that the Destec Swap was in fact an indirect means of protecting the Destec Trust against all reasonably anticipated losses on the transferred assets, then a conclusion that a sale of the asset had not occurred may be appropriate. It would be imprudent to reach a final conclusion on this issue at this early stage in the examination.

---

other tax imposed on or measured by income." Section 2.02(e), Contractual Asset Sale Agreement, *supra* note 450.

[467] Section 8.01, Declaration of Trust for DPLP Asset Monetization Trust I by State Street Bank and Trust Company of Connecticut, National Association, as Trustee, Sept. 30, 1997 (the "Declaration of Trust") [AB000128855-AB000128887].

[468] *Id.* Section 6.07.

[469] Vinson & Elkins L.L.P. Legal Memorandum to Enron Corp. regarding tax consequences of the DPLP Asset Monetization Trust I, July 28, 1998, at 1 [AB000352063-AB000352089].

However, as noted above, the Destec Trust, on behalf of the investors in the asset-backed notes, took steps to perfect a security interest in the Destec assets under applicable law. If these steps were in fact properly taken under applicable law and are unavoidable (a matter not yet fully investigated by the Examiner), even if the sale characterization of the transaction were to be rejected, the Destec Trust may have the status of a secured creditor with a perfected security interest in the underlying assets. Thus, there may be little value to the Debtors' estates in pursuing such a course of action.

*Accounting and Disclosure of the Destec Transaction*

Based on the structure of the transaction as a securitization to a third-party trust, Enron treated the transaction as a sale of the royalty payments and excluded the debt represented by the Destec Notes from its financial statements. Also, when Enron transferred the royalty payments and the other assets to the Destec Trust, it recognized a Gain on Sale to the extent that the proceeds exceeded the basis in those royalty rights.[470] ENA also received $40 million from the Destec Trust for the Destec Swap. The Examiner's accounting experts have come to no conclusions at this time regarding Enron's accounting treatment of this transaction.

*Examiner's Conclusions with Respect to the Destec Transaction*

Based on information available at this time, the Examiner has not identified facts that would support a strong legal challenge to this transaction or that a challenge would be likely to create value for the Debtors' estates.

---

[470] Enron Capital & Trade Resources, Inc. general ledger format entry form, Sept. 16, 1999 (general ledger entry reflecting "record gain on monetization and FMV on lignite properties") [AB000367643-AB000367645].

L.    **Interim Nature of Report**

This Report is an interim report. The Examiner's conclusions contained herein with respect to the Selected Transactions are preliminary. To the extent these preliminary conclusions change based upon additional information obtained during the course of his investigation, the Examiner will report such changes to the Court in future reports.

Given the limited time to conduct his investigation, this Report is not intended to provide a complete analysis on every facet of the Selected Transactions. Issues with respect to the Selected Transactions that may be addressed in future reports include: (a) appropriate treatment of a claim of an SPE or any Lender; (b) appropriateness of substantive consolidation of any SPE with any of the Debtors; (c) the impact of any avoiding power causes of action; (d) appropriateness of the valuation of any asset transferred to an SPE; (e) the impact of related party investors and issues related thereto; (f) corporate governance issues; and (g) the liability under applicable legal standards of any person (including third parties) involved in a transaction or who was charged with disclosing or approving the transaction.

## IV.    FUTURE REPORTS

In future reports, the Examiner intends to report on the remainder of the SPE transactions (including several transactions structured with SPEs which had significant tax benefits for the Debtors) and the other matters identified in the April 8th Order.

Dated:  September 21, 2002

Respectfully submitted,

/s/ Neal Batson
Neal Batson
Examiner

ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, Georgia 30309
404 881-7000