# Exhibit C

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------ x
                                             :

In re:                                    :            Chapter 11
                                             :

ENRON CORP., *et al.*,                :            Case No. 01-16034 (AJG)
                                             :

                       Debtors.          :            Jointly Administered
                                             :
------------------------------------------------------ x

## SECOND INTERIM REPORT OF NEAL BATSON, COURT-APPOINTED EXAMINER

**January 21, 2003**

# TABLE OF CONTENTS

I.     INTRODUCTION .................................................................................. 1

II.   BACKGROUND ................................................................................... 5
     A.  Enron Prior to Events of Fall 2001 .............................................. 5
     B.  Fall 2001 Events ........................................................................... 5
     C.  The Bankruptcy Filings and Subsequent Events ........................ 11

III.  EXAMINER'S INVESTIGATION AND THIS REPORT ................. 12
     A.  Ongoing Investigation ................................................................ 12
     B.  Matters Covered in This Report ................................................. 12
     C.  How to Read This Report ........................................................... 14

IV.  ENRON'S USE OF SPEs .................................................................. 15
     A.  Overview..................................................................................... 15
     B.  Why Did Enron Manage its Financial Statements?.................... 15
     C.  Enron's Six Accounting Techniques .......................................... 36
     D.  The Impact of Enron's Six Accounting Techniques.................... 46
     E.  Enron's Misuse of its Six Accounting Techniques..................... 49
     F.  Interim Report on Enron's SPE Transactions............................. 57

V.    PREPAY TRANSACTIONS............................................................... 58
     A.  Overview of Prepay Transactions .............................................. 58
     B.  Background of Prepay Transactions........................................... 59
     C.  Examiner's Conclusions Regarding Prepay Transactions........... 66

VI.  SHARE TRUST TRANSACTIONS ................................................... 67
     A.  Overview of Share Trust Transactions ....................................... 67
     B.  Background of Share Trust Transactions .................................... 68
     C.  Marlin ........................................................................................ 70
     D.  Whitewing................................................................................... 73
     E.  Examiner's Conclusions Regarding the Share Trust Transactions.............. 76

VII.  MINORITY INTEREST TRANSACTIONS ..................................... 79
     A.  Overview of Minority Interest Transactions............................... 79
     B.  Background of Minority Interest Transactions........................... 80
     C.  Project Rawhide......................................................................... 83
     D.  Examiner's Conclusions Regarding Project Rawhide ................ 85

VIII. TAX TRANSACTIONS ..................................................................... 87
     A.  Overview of Tax Transactions .................................................... 87
     B.  General Nature of Tax Transactions ........................................... 89
     C.  Aggregate Income Effect of Tax Transactions........................... 93
     D.  Examiner's Conclusions Regarding Tax Transactions................ 94

IX.    FOREST PRODUCTS TRANSACTIONS ...................................................... 95
      A.   Overview of Forest Products Transactions.................................................. 95
      B.   Fishtail and Bacchus ........................................................................... 96
      C.   Sundance Industrial and Slapshot......................................................... 100
      D.   Examiner's Conclusions Regarding Forest Products Transactions ............ 102

X.     RELATED PARTY TRANSACTIONS............................................................ 104
      A.   Overview of Related Party Transactions .................................................. 104
      B.   Examiner's Conclusions Regarding Related Party Transactions .............. 105

XI.    FAS 140 TRANSACTIONS......................................................................... 107
      A.   Overview of FAS 140 Transactions ........................................................ 107
      B.   Background of FAS 140 Transactions...................................................... 109
      C.   Examiner's Conclusions Regarding FAS 140 Transactions....................... 111

XII.   BAMMEL TRANSACTIONS...................................................................... 113
      A.   Overview of Bammel Transactions .......................................................... 113
      B.   Background of Bammel Transactions ....................................................... 114
      C.   Examiner's Conclusions Regarding Bammel Transactions ...................... 116

XIII.  JEDI II TRANSACTIONS ........................................................................... 118
      A.   Overview of JEDI II Transactions........................................................... 118
      B.   Background of JEDI II Transactions ........................................................ 118
      C.   Examiner's Conclusions Regarding JEDI II Transactions ........................ 120

XIV.  MISCELLANEOUS TRANSACTIONS ....................................................... 122
      A.   Overview of Miscellaneous Transactions.................................................. 122
      B.   Background of Miscellaneous Transactions .............................................. 123
      C.   Examiner's Conclusions Regarding Miscellaneous Transactions.............. 127

XV.   AVOIDANCE ACTIONS ............................................................................ 129
      A.   Overview of Avoidance Actions .............................................................. 129
      B.   Avoidance Actions in SPE Transactions .................................................. 130
      C.   Selected Insider Avoidance Actions ......................................................... 130
      D.   Selected Professional Avoidance Actions ................................................. 132

XVI.  INTERIM NATURE OF REPORT ................................................................ 133

XVII. FUTURE REPORTS ................................................................................. 134

Appendix A  —  Certain Defined Terms
Appendix B  —  Accounting Standards
Appendix C  —  Legal Standards
Appendix D  —  Enron's Disclosure of Its SPEs
Appendix E  —  Prepay Transactions
Appendix F  —  Miscellaneous Transactions
Appendix G  —  Whitewing Transaction
Appendix H  —  Marlin Transaction
Appendix I  —  Minority Interest Transactions
Appendix J  —  Tax Transactions
Appendix K  —  Forest Products Transactions
Appendix L  —  Related Party Transactions
Appendix M  —  FAS 140 Transactions
Appendix N  —  Bammel Transactions
Appendix O  —  JEDI II Transactions
Appendix P  —  Avoidance Actions
Appendix Q  —  Schedules Depicting Impact of Enron's Six Accounting Techniques

## I.    INTRODUCTION

On December 2, 2001 (the "Petition Date") and on certain dates thereafter, Enron

Corp. ("Enron") and certain of its affiliates (collectively, the "Debtors") filed voluntary

petitions for relief under Chapter 11, Title 11, of the United States Code (the "Bankruptcy

Code") with the United States Bankruptcy Court for the Southern District of New York

(the "Court") (collectively, the "Bankruptcy Case").

This Court entered an Order on April 8, 2002 (the "April 8th Order") authorizing

and directing the appointment of an examiner pursuant to 11 U.S.C. § 1104(c).[1]   On

May 22, 2002, the United States Trustee appointed Neal Batson (the "Examiner") as the

examiner. The Court, by Order dated May 24, 2002, approved the appointment.

On September 21, 2002, the Examiner filed the First Interim Report of Neal

Batson, Court-Appointed Examiner (the "September Report").[2]   This Second Interim

Report of Neal Batson, Court-Appointed Examiner, constitutes the Examiner's second

---

[1]   Among other things, the April 8th Order authorized the examiner to:

> inquire into, *inter alia*, all transactions (as well as all entities as defined in the Bankruptcy Code and prepetition professionals involved therein): (i) involving special purpose vehicles or entities created or structured by the Debtors or at the behest of the Debtors (the "SPEs"), that are (ii) not reflected on the Enron Corp. balance sheets, or that (iii) involve hedging using the Enron Corp. stock, or (iv) as to which the Enron examiner has the reasonable belief are reflected, reported or omitted in the relevant entity's financial statements not in accordance with generally accepted accounting principles, or that (v) involve potential avoidance actions against any prepetition insider or professional of the Debtors.

[2]   The Examiner appreciates the efforts of several current Enron employees who have been helpful in providing data and explanations to the Examiner during the course of the investigation.  When the September Report and this Report refer to these individuals in this capacity, the Examiner does not intend by these references to suggest any wrongdoing by the named individuals.  In addition, any references in the September Report and this Report to meetings, communications, contacts and actions between the Examiner and third parties are intended to refer to the office of the Examiner, which shall include the Examiner and his professionals.  Therefore, references to any meetings, communications, contacts, and actions taking place between the Examiner and a third party should not be construed as indicating that Neal Batson was present personally for such meetings, communications, contacts or actions.

report (the "Report").[3]

The Examiner has been authorized to investigate all transactions involving special purpose vehicles created or structured by the Debtors or at the behest of the Debtors (the "SPEs") and those individuals, institutions and professionals involved therein.[4]

Six SPE transactions were examined in the September Report, and the Examiner concluded that the transactions were, in varying degrees, susceptible of being

---

[3] The Second Interim Report of Neal Batson, Court-Appointed Examiner was submitted to the Court, the Debtors and the Creditors' Committee (which was authorized to disseminate such report to its members) and their legal professionals on January 21, 2003 pursuant to the Court's Order Amending and Supplementing the Order of April 8th Pursuant to 11 U.S.C. § 1104(b) and § 1106(b) Directing the Appointment of Enron Corp. Examiner entered on January 10, 2003 [Docket No. 8667]. This Report reflects changes resulting from the: (i) correction of certain typographical and grammatical errors, (ii) resolution of certain privilege issues with the Debtors and (iii) clarification and amplification of certain statements in the Report based, in part, on discussions with representatives of and legal professionals for the Debtors and a member of the Creditors' Committee, J.P. Morgan Chase & Co. ("JPMorgan"). Notwithstanding these changes, the Examiner believes this Report does not contain any material changes to the Examiner's conclusions set forth in the Second Interim Report of Neal Batson, Court-Appointed Examiner submitted to the Court, the Debtors and the Creditors' Committee on January 21, 2003. In addition, pursuant to the Court's Second Order Further Amending and Supplementing the Order of April 8th Pursuant to 11 U.S.C. § 1104(b) and § 1106(b) Directing the Appointment of Enron Corp. Examiner, entered on February 14, 2003 [Docket No. 9246], this Report was submitted to the Department of Justice and the Office of the United States Trustee on or about February 27, 2003. No changes were made to the Report as a result of this submission.

Finally, in certain instances in this Report, the evidentiary reference is to a "Stipulation of Debtors." In such cases, the Examiner and the Debtors have entered into a stipulation as a method for establishing a fact in lieu of using a potentially privileged document.

[4] The April 8th Order also provides that, to the extent possible, the Examiner shall avoid duplication of efforts of the Debtors and any official committee appointed in the Bankruptcy Case in connection with investigations to be pursued. The Examiner contacted the major parties in interest in the Bankruptcy Case, including, without limitation, the Debtors and the Official Committee of Unsecured Creditors (the "Creditors' Committee") to, among other things, coordinate to avoid duplication of work. In that regard, the Examiner and/or his professionals have met with a number of parties, including officers and employees of the Debtors; the Debtors' restructuring lawyers, Weil, Gotshal & Manges LLP ("Weil"); PricewaterhouseCoopers LLP ("PWC"), accountants to the Debtors in the Bankruptcy Case; Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden, Arps"), special counsel to the Debtors; Milbank, Tweed, Hadley & McCloy LLP ("Milbank") and Squire, Sanders & Dempsey L.L.P. ("Squire, Sanders"), co-counsel to the Creditors' Committee; Ernst & Young LLP ("E&Y"), accountants for the Creditors' Committee; Wilmer, Cutler & Pickering ("Wilmer Cutler"), counsel to the Powers Committee (as defined below); Deloitte & Touche LLP ("D&T"), accountants to the Powers Committee; several of the Debtors' major lenders; Harrison J. Goldin (the "ENA Examiner"), the court-appointed examiner in the bankruptcy case of Enron North America Corp. (f/k/a Enron Capital & Trade Resources Corp.) ("ENA"); and counsel for the plaintiffs in the Newby Class Action, Milberg Weiss Bershad Hynes & Lerach LLP and its bankruptcy counsel, Genovese Joblove & Battista, P.A.

recharacterized under a "true sale" challenge. If this were to occur, the remaining assets

in these structures, having a value of approximately $500 million, would be restored to

the Debtors' estates.

This Report focuses on substantially all of Enron's material SPE transactions

identified to date. The Examiner provides his preliminary views of the role of the SPEs

in the collapse of Enron, including a discussion of how Enron used the SPEs in

conjunction with six accounting techniques to impact dramatically its financial

statements. For example, in the year 2000, with respect to the SPE transactions the

Examiner has considered, 96% of Enron's reported net income and 105% of its reported

funds flow from operations were attributable to these six accounting techniques.

Moreover, were it not for the use of these six accounting techniques, Enron's reported

debt at December 31, 2000, would have been $22.1 billion rather than $10.2 billion.

This Report also sets forth the Examiner's conclusions that many of these

transactions are, in varying degrees, susceptible of "true sale" or substantive

consolidation challenges which, if successful, would result in assets having an estimated

aggregate value[5] between $1.7 billion and $2.1 billion being restored to the Debtors'

estates.[6] Furthermore, the Examiner has identified potential avoidable transfers in the

---

[5] Statements in this Report about estimated values of various assets or portfolios of assets are derived primarily from information provided to the Examiner by employees of the Debtors. In addition, the estimates typically are not based upon any independent valuation analysis and may not reflect the Debtors' current beliefs about the value of the assets. The Examiner has reflected estimated asset values in this Report primarily for the purpose of providing an indication of the general magnitude of the value of the assets remaining in various structures. Therefore, many of these values may not reflect the actual current fair market value of the assets.

[6] Some, but not all, of the Enron entities that transferred the assets are Debtors in the Bankruptcy Case. Where a non-Debtor transferor is involved in a transaction that is recharacterized as a loan, the most expeditious method to permit the transferor to recover such assets may be for Enron to cause the transferor to file a voluntary petition as part of the Bankruptcy Case. The Examiner has not analyzed the avenues for similar relief in litigation pursued in either state or other federal courts. For purposes of this Report (as

face amount of approximately $2.9 billion that, to varying degrees, may be recovered by the Debtors' estates.[7]

To assist the reader in understanding the context in which the Examiner's investigation is being conducted, the next section of this Report will briefly summarize certain events leading up to and surrounding Enron's bankruptcy filing.

---

well as the September Report), any references to assets being added to or otherwise available to the Debtors' estates shall be deemed to include any transferor of an asset, regardless of whether such transferor is actually a current debtor in the Bankruptcy Case. Furthermore, certain of the subject assets that are potentially recoverable as part of the Debtors' estates have been sold after the Petition Date, with the proceeds being held in escrow subject to further order from the Court. For purposes of the Report (as well as the September Report), references to assets being added to, restored to or otherwise available to the Debtors' estates shall be deemed to include the proceeds of any asset sale. In addition, as noted in the September Report, in a "true sale" analysis, when credit support is provided by an *affiliate* of the asset transferor, rather than the asset transferor itself, an issue may be raised as to whether the presence of such credit support is a factor that can be relied upon to support a recharacterization of the purported sale as a loan. The Examiner believes that, even where the Enron party providing the credit support is the parent or other affiliate of the asset transferor, rather than the asset transferor itself, the existence of the credit support is a relevant factor in determining whether there was a "true sale." A discussion of this issue is contained in Appendix C (Legal Standards).

[7] The ability of the Debtors to realize on certain of these avoidance actions is subject to (i) affirmative defenses of any transferee, (ii) valuation evidence (particularly in the case of constructively fraudulent transfers) and (iii) collectability. In this Report, the Examiner has sought to identify the likely affirmative defenses and, if possible, assess the likelihood of success of the action and defenses. As to valuation, both the Debtors and the Creditors' Committee have engaged investment bankers or other valuation experts. In order to avoid duplication of efforts, and because the Examiner does not have authority to prosecute actions on behalf of the Debtors' estates, the Examiner has not sought to retain such an expert. To the extent an action is pursued by the Debtors or the Creditors' Committee, investment bankers retained by such party may provide valuation advice.

Finally, the Examiner expresses no views as to collectability. The Examiner notes that many of the transferees of potentially voidable transfers are affiliates of Enron. For example, in Appendix I (Minority Interest Transactions), the Examiner identifies and discusses approximately $859 million of preference claims against Ponderosa Assets, L.P., a wholly owned subsidiary of Enron. Appendix G (Whitewing Transaction) identifies and discusses preference claims in excess of $900 million against Whitewing Associates, LLC, a partially owned subsidiary of Enron, and certain subsidiaries or affiliates of Whitewing Associates. As a result, affirmative relief against these affiliates may be of limited value, and in the event of substantive consolidation, all or part of such claims may not be recoverable. However, to the extent that these SPEs (or entities claiming through them) hold claims against Enron (or other Debtors), the Debtors may be able to utilize Section 502(d) of the Bankruptcy Code to disallow those claims. The result of such disallowance would be to limit or preclude recovery by investors in the SPE.

- 4 -

## II.    BACKGROUND

### A.    <u>Enron Prior to Events of Fall 2001</u>

Until the fall of 2001, Enron was one of the largest companies in the world.[8]  It was also considered to be one of the most innovative and successful.[9]  It grew from a traditional energy production and transmission company in the mid-1980s to a global enterprise that was an industry leader in the purchase, transportation, marketing and sale of natural gas and electricity, as well as other energy sources and related financial instruments, and in the development, construction and operation of pipelines and various types of power facilities.[10]  Enron reported revenues for the fiscal year ended December 31, 2000 in excess of $100 billion.[11]

### B.    <u>Fall 2001 Events</u>

In the fall of 2001, however, Enron made a series of financial disclosures and restatements of its financial statements pertaining in large part to certain related party transactions that triggered a chain of events culminating in its bankruptcy filing.[12]

---

[8] According to the 2001 Fortune 500 Rankings, Fortune magazine ranked Enron as the seventh largest corporation in the world, based upon revenues. *The 500 Largest U.S. Corporations,* Fortune, Apr. 16, 2001, at F-1.

[9] For example, Fortune magazine named Enron as the "*Most Innovative Company in America*" for five consecutive years. *See America's Most Admired Companies,* Fortune, Feb. 19, 2001, at 104; *America's Most Admired Companies,* Fortune, Feb. 21, 2000, at 110; *America's Most Admired Companies,* Fortune, Mar. 1, 1999, at 70; *America's Most Admired Companies,* Fortune, Mar. 2, 1998, at 86; *America's Most Admired Companies,* Fortune, Mar. 3, 1997, at 73.

[10] Enron was also engaged in other types of businesses, including, among other things, broadband management and communications and operation of water, renewable energy and clean fuel plants.

[11] Enron Form 10-K filed with the SEC for the Year ended Dec. 31, 2000 (the "10-K for 2000").

[12] Perhaps prophetically, in a presentation at a joint meeting of the Audit and Compliance and Finance Committees of the Enron Board of Directors held in August 2001, Enron management and Committee members discussed various "stress scenarios."  One scenario discussed included the following:

　　　　　(i)　　　　a warning that Enron would miss a quarterly earnings target,
　　　　　(ii)　　　which would lead to a stock sell-off,

*October 16th Earnings Release*

In an earnings release on October 16, 2001, Kenneth Lay ("Lay"), Enron's Chairman and CEO, while expressing confidence in Enron's "strong earnings outlook," announced, among other things, that Enron was taking "after-tax non-recurring charges" of $1.01 billion in the third quarter. These "non-recurring charges" resulted in a net loss for the third quarter of $618 million compared to reported net income of $404 million for the preceding quarter and $292 million for the third quarter of 2000. Although there were several components to the charge,[13] one component related to Enron's "early termination during the third quarter of certain structured finance arrangements with a previously disclosed entity."

---

(iii)   which would lead to the collapse of Enron's balance sheet because its off balance sheet vehicles capitalized with Enron stock would have to unwind,

(iv)   which would lead to a credit downgrade,

(v)   which would trigger a "material adverse change" event in the great majority of Enron's price risk management agreements with counterparties,

(vi)   which would result in margin calls and the requirement that collateral be posted,

(vii)   which would result in loss of investor confidence, loss of liquidity and loss of intellectual capital.

Materials for Joint Meeting of the Audit and Compliance and Finance Committees of the Enron Board of Directors, Aug. 13, 2001, Appendix II – Extracts from Market Risk Discussion Items from February 2001 Finance Committee Meeting, at II-7 [AB000204103-AB000204117] and Appendix III, at III-3 – Stress Scenarios [AB000204119-AB000204126].

[13] Enron identified the components of this charge as:

- $287 million from the write down of its investment in the Azurix Corp. water systems business;

- $180 million from "restructuring" its Broadband Services business; and

- $544 million "related to losses associated with certain investments, principally Enron's interest in The New Power Company ("New Power Company"), broadband and technology investments, and early termination during the third quarter of certain structured finance arrangements with a previously disclosed entity."

Enron Press Release, "Enron Reports Recurring Third Quarter Earnings of $0.43 Per Diluted Share; Reports Non-Recurring Charges of $1.01 Billion After-Tax; Reaffirms Recurring Earnings Estimates of $1.80 for 2001 and $2.15 for 2002; And Expands Financial Reporting," Oct. 16, 2001 [ELIB00002783]. Enron's third quarter ended September 30th.

The "previously disclosed entity" was LJM2 Co-Investment, L.P. ("LJM2"), a private investment limited partnership funded in December 1999. LJM2 was run by Andrew S. Fastow ("Fastow"), Enron's CFO, and Michael J. Kopper ("Kopper"),[14] an Enron employee, and had as its limited partners a significant number of institutional and individual investors.[15] The charge related to Enron's termination of four SPEs known as Raptor I, II, III and IV (the "Raptor SPEs") pursuant to which Enron had entered into certain hedging transactions.[16] As a result of this termination, Enron recognized the $544 million after-tax charge to net income for the third quarter 2001.[17] Enron also disclosed,

---

[14] On August 21, 2002, Kopper pled guilty in a criminal information filed in the United States District Court for the Southern District of Texas alleging one count of conspiracy to commit wire fraud in violation of 18 U.S.C. § 371 and one count of conspiracy to engage in monetary transactions in property derived from specified unlawful activity (money laundering), in violation of 18 U.S.C. §§ 1956(h) and 1957. As part of his cooperation agreement (and to settle a related civil action filed by the United States Securities & Exchange Commission ("SEC")), Kopper agreed to surrender $12 million in assets and to cooperate fully with the United States Department of Justice.

[15] Enron Form 10-Q filed with the SEC for the Quarter ended Sept. 30, 2001 (the "10-Q for 3Q/2001"), at 18-19, Note 4 to Consolidated Financial Statements in connection with related party transactions. Several of the Related Party Transactions are discussed below in Section X.

[16] Enron entered into hedging transactions with the Raptor SPEs under which the Raptor SPEs agreed to pay to Enron the amount of the decline in the value of various Enron investments and other assets. As a result of these hedging transactions with the Raptor SPEs, Enron was able to offset or "hedge" for financial statement purposes a $954 million decline in the value of a number of Enron's investments during 2000 and the first three quarters of 2001. See 10-Q for 3Q/2001, at 24, Note 4 to Consolidated Financial Statements in connection with related party transactions. The Raptor SPEs' principal asset was common stock of Enron, or in the case of Raptor SPE III, warrants to purchase stock in NewPower Holdings, Inc. ("NewPower Holdings"), the parent company of New Power Company. Thus, the Raptor SPEs' ability to satisfy their hedging obligations to Enron was dependent upon the value of the Enron stock or warrants to purchase NewPower Holdings common stock they held. By the end of the third quarter of 2001, the hedging obligations of the Raptor SPEs exceeded the value of the assets available to satisfy those obligations. Enron terminated the structures by purchasing LJM2's interest in the Raptor SPEs for $35 million. As a result of this termination, Enron recognized the $544 million after-tax charge to net income for the third quarter 2001. The pre-tax charge was $710 million. See also Report of Investigation by the Special Investigative Committee of the Board of Directors of Enron Corp. released February 1, 2002 (the "Powers Report"), at 125-33. LJM2 and another partnership, LJM Cayman, L.P. ("LJM1"), as well as other investment partnerships, were the principal focus of the Powers Report.

[17] The pre-tax charge was $710 million. 10-Q for 3Q/2001.

on October 16, 2001, that it would record a $1.2 billion reduction in shareholders' equity

as of the end of the third quarter.[18]

*Other October Events*

During this period, several other events occurred:

- On October 24, 2001, Enron announced that Fastow had been placed on leave of absence.[19]

- On or about October 30, 2001, and continuing through the Petition Date, a number of the senior managers of various Enron operating companies requested, and received, accelerated distributions of certain deferred compensation payments. Those distributions totaled in excess of $50 million.[20]

- On October 31, 2001, Enron announced that its Board of Directors had formed a Special Investigative Committee, headed by William Powers, Jr., Dean of the University of Texas Law School (the "Powers Committee"), to examine and recommend actions with respect to transactions between Enron and entities connected with related parties.[21]

*Enron's November 8, 2001 Restatement and Third Quarter 2001 Form 10-Q.*

On November 8, 2001, Enron announced its intention to restate its financial

statements for 1997 through 2000 and the first and second quarters of 2001 to reduce

previously reported net income by an aggregate of $586 million.[22] Enron attributed the

---

[18] October 16, 2001, 9:00 a.m. C.T., Enron Corp. Conference Call regarding Third Quarter 2001 Earnings Release, Moderator: Mark Koenig (the "Earnings Release") [AB025204603–AB025204629].

[19] Enron Press Release, "Enron Names Jeff McMahon Chief Financial Officer," Oct. 24, 2001 [ELIB00001788].

[20] Enron's Statement of Financial Affairs Exhibit 3b.2 (Docket No. 4500, as amended, Docket No. 5823) and certain supporting schedules provided to the Examiner's professionals by Enron's financial professionals. These transfers are discussed in Appendix P (Avoidance Actions) attached hereto.

[21] Enron Form 8-K filed with the SEC on Nov. 8, 2001 (the "Nov. 8th 8-K"). Additional information surrounding the Related Party Transactions can be found in the Nov. 8th 8-K.

[22] At the time of the announced restatement, the third quarter 2001 financial statements had not been filed, but a loss of $618 million had been announced in the Earnings Release.

restatement to transactions involving three entities: Chewco Investments, L.P. ("Chewco"), a limited partnership run by Kopper; Joint Energy Development Investments Limited Partnership ("JEDI"), an investment partnership between Chewco and Enron; and LJM1, an investment partnership that had two institutional investors as limited partners and whose general partner was a limited partnership wholly owned by Fastow.

Enron filed its third quarter Form 10-Q, including interim financial statements, on November 19, 2001.[23] These financial statements gave effect to the previously announced "non-recurring charges" and restatement of prior financial statements.[24] In addition, in its third quarter 2001 balance sheet, Enron reported total debt under generally accepted accounting principles ("GAAP") of $12.978 billion.[25]

*Enron's November 19, 2001 Bank Presentation*

On November 19, 2001, the same day Enron filed its third quarter financial statements, senior Enron executives met with certain of Enron's bankers at the Waldorf Astoria hotel in New York City. Enron's objectives for the meeting were to restore creditor confidence, relieve its liquidity crisis and discuss its proposed merger with Dynegy, Inc. ("Dynegy").[26] During this meeting, Enron informed its bankers that, while

---

[23] 10-Q for 3Q/2001.

[24] Due to the pending investigation by the Powers Committee and the previously announced restatement, Enron's accounting firm, Arthur Andersen LLP ("Andersen"), was unable to finalize its review of these quarterly statements as required by SEC Rule 10-01(d) of Regulation S-X.

[25] 10-Q for 3Q/2001. The debt consisted of $6.434 billion of short-term debt and $6.544 billion of long-term debt.

[26] The proposed merger was ultimately abandoned by Dynegy, allegedly because of undisclosed liabilities of Enron. Enron sued Dynegy in this Bankruptcy Case (Adversary Proceeding No. 01-03626) (Docket No. 1) on the Petition Date, seeking more than $10 billion in damages arising from Dynegy's alleged breach of contract for wrongful termination of the merger. On August 15, 2002, the parties announced they had settled the litigation. By motion dated August 19, 2002 filed in the Bankruptcy Case, Enron and its wholly

the debt reflected on its third quarter 2001 balance sheet under GAAP was $12.978 billion, Enron's "debt" (as described in the presentation (the "Bank Presentation")) was $38.094 billion.[27] Thus, as Enron noted, $25.116 billion of debt was "off balance sheet," or in some cases, reflected on the balance sheet, but classified as something other than debt. Approximately $14 billion of this $25.116 billion of additional "debt" was incurred through structured finance transactions involving the use of SPEs. The Bank Presentation[28] divided the additional "debt" into the following eight categories: FAS 140 Transactions;[29] Minority Interest Financings;[30] Commodity Transactions with Financial Institutions;[31] Share Trusts;[32] Equity Forward Contracts;[33] Structured Assets;[34] Unconsolidated Affiliates;[35] and Leases, as shown in the following table:

---

owned subsidiary CGNN Holding Company, Inc. ("CGNN"), among others, sought approval of the settlement with Dynegy (Docket No. 5902). The settlement involved releases between the Enron Parties (as defined in the settlement agreement) and the Dynegy parties and the payment of $25 million to Enron (pursuant to an escrow agreement). The settlement also provided for the release of $63 million, including accrued interest, from an escrow account to CGNN. The Court approved the settlement by Order dated August 29, 2002 (Docket No. 6202). Certain parties appealed the Order approving the settlement. *See Ann C. Pearl v. Enron Corp.*, No. 02-CV-8489 (S.D.N.Y. filed Oct. 24, 2002).

[27] Enron Corp. PowerPoint Bank Presentation, Waldorf Astoria, New York, N.Y., Nov. 19, 2001 (the "Bank Presentation"), at 42 [AB000321534-AB000321605].

[28] The Bank Presentation is discussed in this Report because the Examiner believes it is useful in order to place the Examiner's investigation of the various SPEs in the overall context of Enron's financial affairs.

[29] Several of Enron's FAS 140 Transactions were discussed in the September Report. Additional discussion about those FAS 140 Transactions is included below in Section XI.

[30] Enron's minority interest transactions are discussed below in Section VII.

[31] Enron's prepay transactions are discussed below in Section V. These transactions involved what the Counsel and Chief Investigator of the Permanent Subcommittee on Investigations of the Senate Governmental Affairs Committee has characterized as loans from JPMorgan and Citibank, N.A. ("Citibank") to Enron, but the transactions were structured as prepaid forward contracts for the future delivery of natural gas, crude oil or electric power. *See The Role of Financial Institutions In Enron's Collapse, Hearing before the Permanent Subcomm. on Investigations, Senate Comm. on Governmental Affairs*, 107th Cong. (July 23, 2002) (statement of Robert Roach, Chief Investigator) (the "Financial Institutions Hearing") (*available at* http://www.senate.gov/~gov_affairs/072302roachindex.htm). One such prepay, known as the "Mahonia" transaction, has been the subject of litigation between JPMorgan, on behalf of Mahonia Limited and Mahonia Natural Gas Limited, and 11 insurance companies, which litigation was recently settled. *JPMorgan Chase Bank v. Liberty Mut. Ins. Co.*, No. 01-CV-11523 (S.D.N.Y. filed Dec. 18, 2001).

| Category of Additional "Debt" | Amount at 9/30/01 in billions |
|---|---|
| FAS 140 Transactions | $2.087 |
| Minority Interest Financings | $1.690 |
| Commodity Transactions with Financial Institutions | $4.822 |
| Share Trusts | $3.352 |
| Equity Forward Contracts | $.304 |
| Structured Asset | $1.532 |
| Unconsolidated Affiliates | $10.733 |
| Leases | $.596 |
| **Total** | **$25.116** |

## C.    The Bankruptcy Filings and Subsequent Events

Less than one month after its meeting with its bankers, Enron and certain of its affiliates filed for bankruptcy. In the months immediately following Enron's disclosures, allegations surfaced of securities fraud, accounting irregularities, energy market price manipulation, money laundering, breach of fiduciary duties, misleading financial information, ERISA violations, insider trading, excessive compensation and wrongdoing by certain of Enron's bankers.[36]

---

[32] Enron's share trust transactions are discussed below in Section VI.

[33] Under a typical equity forward contract, an issuer will sell equity securities to a counterparty for cash equal to the current price and agree to repurchase the same number of equity securities from the counterparty in the future for the original price plus a premium.

[34] The Destec Transaction (as described in the September Report) is an example of what Enron classified as a "structured asset" transaction in the Bank Presentation. *See also* Section XIV below.

[35] This category represents the amount of debt owed by entities that Enron did not consolidate, but accounted for under the equity method of accounting, such as Azurix Corp. (water system), Dabhol Power Company (power plant in India) and certain investment partnerships. According to Enron internal documents reviewed by the Examiner's counsel, much of this debt was non-recourse to Enron, but if the unconsolidated equity affiliate was unable to pay the debt, Enron's investment would be lost.

[36] Numerous Congressional Committees are investigating aspects of Enron's business activities or practices. In addition, there have been several class action lawsuits filed on behalf of shareholders and employees, which are still pending, naming the Debtors, certain of their directors, Andersen, certain other professionals, and others as defendants. These include *Newby v. Enron Corp.*, No. 01-CV-3624 (S.D. Tex. filed Oct. 22, 2001), a lawsuit alleging, among other things, violations of securities laws (the "Newby Class Action"). On December 19, 2002, the Court issued its Memorandum and Order Re Secondary Actors' Motions to Dismiss in which it denied Credit Suisse First Boston's motion to dismiss, granted in part and denied in part Bank of America Corporation's motion to dismiss, denied Merrill Lynch & Co.'s motion to dismiss, provided the lead plaintiff supplements its complaint, granted in part and denied in part Lehman

## III. EXAMINER'S INVESTIGATION AND THIS REPORT

### A. Ongoing Investigation

As discussed in the September Report, the Examiner's investigation continues to examine in detail a number of significant questions.[37] These include:

- Are the SPE structures subject to legal challenge such that assets that were purportedly transferred from the Debtors' estates should properly be considered part of the Debtors' estates?

- What was the role of the SPEs in the collapse of Enron?

- Did Enron use SPEs to manipulate its financial statements in violation of GAAP or applicable laws?

- Was there proper disclosure to the public of these SPE transactions under applicable disclosure standards?

- If it is determined that wrongful acts were committed in connection with the SPE transactions (including manipulation of Enron's financial statements in violation of GAAP or applicable laws), are the officers, directors, professionals or other third parties involved in such transactions liable under applicable legal standards?

### B. Matters Covered in This Report

In this Report the Examiner provides: (i) his views on the role of the SPEs in the collapse of Enron, and particularly, how the SPEs were used to engineer its reported financial position and results without providing adequate disclosure; (ii) an interim report on substantially all of Enron's material SPE transactions identified to date; and (iii) his

---

Brothers Holdings, Inc.'s motion to dismiss, granted Deutsche Bank AG's motion to dismiss, granted Kirkland & Ellis's motion to dismiss, denied Vinson & Elkins L.L.P.'s ("Vinson & Elkins") motion to dismiss, denied Andersen's motion to dismiss, and dismissed certain of the lead plaintiff's claims relating to the 7% Exchangeable Notes and 8.375% Notes. Docket No. 1194. Other class actions include *Severed Enron Employees Coalition v. The Northern Trust Co.*, No. 02-CV-267 (S.D. Tex. filed Jan. 24, 2002), a lawsuit alleging, among other things, breach of fiduciary duty under ERISA; and *Tittle v. Enron Corp.*, No. 01-CV-3913 (S.D. Tex. filed Nov. 13, 2001), a lawsuit alleging, among other things, breach of fiduciary duty under ERISA.

[37] There will be additional questions to be addressed as the examination continues.

initial conclusions regarding certain avoidance actions available to the Debtors' estates

against Lay, certain Enron employees who received accelerated deferred compensation

payments on the eve of the Petition Date and certain professionals currently providing

legal services to the Debtors and the Creditors' Committee.

This Report concludes that SPE assets and other transfers having substantial value

could potentially be recovered or restored to the Debtors' estates.[38]  Specifically, this

Report concludes that:

- certain of the SPE structures are subject to legal challenge through "true sale" challenges or substantive consolidation of the SPEs involved in the structure;

- certain transfers made in connection with the SPE transactions can be avoided as constructively fraudulent or preferential; and

- certain transfers made to Lay, certain other Enron employees and certain professionals can be avoided as constructively fraudulent transfers and preferential transfers.

This Report will not discuss other potential legal issues, which include principles

of equitable subordination, third-party culpability (including culpability of any officer,

director, professional or financial institution) or other potential affirmative claims of the

Debtors' estates.  The Examiner is in the process of gathering and analyzing the evidence

necessary to report on these matters in subsequent reports.[39]

---

[38] *See supra* notes 6 and 7.

[39] The Examiner has requested, and in some cases has not yet received, documents from certain parties involved in the transactions discussed in this Report and is in the process of reviewing those documents already produced, seeking to obtain documents not yet produced, and conducting other means of discovery.

## C.    How to Read This Report

This Report (including its Appendices) exceeds 2,000 pages. Because of the volume of information, the remaining Sections of this Report provide an overview of the Examiner's conclusions with respect to the matters identified above. More detailed analyses and supporting evidence are set forth in the Appendices to this Report. Therefore, the reader should review the applicable Appendices (and any attached Annexes) for a more complete understanding of the issues raised in the summaries below.

In addition, the first three Appendices to this Report – Appendix A (Certain Defined Terms), Appendix B (Accounting Standards)[40] and Appendix C (Legal Standards)[41] – are designed to provide the reader with background helpful to understanding the other Appendices to the Report.

---

[40] Accounting issues addressed in Appendix B (Accounting Standards) include consolidation, sale accounting, balance sheet classification and reporting of cash flows.

[41] Legal issues addressed in Appendix C (Legal Standards) include true sale, substantive consolidation, and avoidance actions under the Bankruptcy Code.

- 14 -

## IV.    ENRON'S USE OF SPEs

### A.    Overview

The Examiner has concluded that, through pervasive use of structured finance techniques involving SPEs and aggressive accounting practices, Enron so engineered its reported financial position and results of operations that its financial statements bore little resemblance to its actual financial condition or performance.  This financial engineering in many cases violated GAAP and applicable disclosure laws, and resulted in financial statements that did not fairly present Enron's financial condition, results of operations or cash flows.

### B.    Why Did Enron Manage its Financial Statements?

Two key factors drove Enron's management of its financial statements: (i) its need for cash and (ii) its need to maintain an investment grade credit rating.  Enron was reluctant to issue equity to address these needs for fear of an adverse effect on its stock price and was reluctant to incur debt because of a possible adverse effect on its credit ratings.[42]  Moreover, Enron's use of mark-to-market ("MTM") accounting created a large gap between net income and funds flow from operations.  This "quality of earnings" problem made it particularly challenging for Enron to raise cash without issuing equity while maintaining its credit rating.

---

[42]  In mid-1998, a DLJ analyst commenting on the recently announced acquisition of Wessex Water noted:

> Combining this acquisition with the recently announced acquisition of a Brazilian electric utility for $1.5 billion shows that Enron Corp. has "spent" about $3.5 billion in recent weeks.  To date, Enron Corp.'s debt ratings have been reaffirmed based upon the operating fundamentals of the acquisitions and unspecified plans to sell assets or take other actions to reduce debt.  No additional equity is required by Enron Corp. to maintain its balance sheet ratios and credit ratings.

Donaldson, Lufkin & Jenrette *Comment* on Enron Corp., "Acquisition of U.K. Water Company Adds to EPS and Opportunities for Growth," July 24, 1998, at 3 [ELIB00000544-00001 to ELIB00000544-00006].

- 15 -

*Enron's Need for Cash*

By the mid-1990s, Enron's business and business model changed dramatically. Starting out as a company that had a concentration in natural gas pipelines, it became over time a company that depended less on pipelines and transportation and more on energy trading and investing in new technologies and businesses.[43]  In its 2000 Annual Report, Enron described its four business segments: Wholesale Services, Energy Services, Broadband Services and Transportation Services.  Enron Wholesale Services was highlighted as its "largest and fastest growing business."[44]  Wholesale Services created trading markets in gas, oil, electricity and other energy products and provided price risk management and other related services.  The second segment was Enron Energy Services, the retail arm designed to serve users of energy in the commercial and industrial markets.  Enron Broadband Services was the third segment.  This segment, newly minted in 2000, was in the "hot" telecommunications sector.  Its objectives, typical of the hype of the times, were to "deploy the most open, efficient global broadband network, . . . be the world's largest marketer of bandwidth and network services [and] be

---

[43]  In March 1998, Merrill Lynch commented on Enron as follows:

> [O]nly 42% (and dropping) of its EBIT[43] comes from regulated pipeline and power assets. . . .  About 48% of its *normalized* 1997 EBIT came from foreign operations. . . . North America is currently a $300 billion/year energy market with gas 100% deregulated at the wholesale market and perhaps 20% at retail.  Power is maybe 20% unbundled at wholesale and 10% at retail.  *In five year's time, it will all be commoditized*, with only pipelines, LDC and transmission infrastructure still regulated.  ENE will be one of perhaps 10-15 energy conglomerates with $30-$40 billion of assets expecting to flourish in this coming trading and arbitrage market.

Merrill Lynch *Comment* on Enron Corp., Mar. 31, 1998, at 2 (emphases added) [ELIB00000544-00001 to ELIB00000544-00004].

[44]  Enron 2000 Annual Report, at 9.

- 16 -

the world's largest provider of premium content delivery services."[45]  Relegated to last in the 2000 Annual Report's narrative was Enron Transportation Services, the newly renamed segment that housed the pipelines and Portland General.[46]

Enron's expansion during this time made Enron a voracious consumer of cash.[47] Enron's management made it clear to the investment community that it was aware of the issues posed by its expansion and gave assurances that Enron could manage its way through these risks without upsetting investor expectations.  For example, in the analysts' conference call following the earnings release for the third quarter of 2000, Jeff Skilling ("Skilling"), then Enron's Chief Operating Officer, remarked in response to a question about Enron's capital needs over the next two years:

> We have been running about $2.5 billion capital expenditures, and I would imagine that that sort of expenditure number will keep up.  As I have mentioned in the past, we are working extremely hard to find places where we can monetize assets, increase the velocity of capital through Enron and you will be seeing a lot of that over the next couple of quarters.  So, in aggregate, we would expect, not only expect, we are pretty certain, no new

---

[45] Perhaps also typical of the times, Enron Broadband Services lost $60 million on revenues of $408 million for 2000.

[46] Enron 2000 Annual Report, at 18.  The Enron Transportation Services segment produced reported earnings of $732 million on revenues of $2.9 billion for 2000.

[47] In mid–1999, an analyst at JPMorgan noted:

> Unlike the typical domestic electric utility, ENE is not a cash flow story.  It has not invested in infrastructure during the past 100 years in order to rest on its depreciation laurels.  It is investing vigorously in its future.  As such, operating cash flow is eaten up by the need for working capital and capital expenditures.  Beyond that, ENE's equity investments need to be funded via bank debt, debt and equity capital markets, and asset divestitures. . . .

> Although cash from operations should exceed $2 billion per year, Enron's appetite for expansion and pipeline of projects won't allow those funds to sit on the balance sheet.

J.P. Morgan Securities, Inc. Company Report on Enron Corp., June 9, 1999 (the "JP Morgan June 1999 Report"), at 7  [ELIB00000751-00001 to ELIB00000751-00048].

- 17 -

equity issues and in fact I think it is going in the other direction. We expect to see enhanced liquidity over the next couple of quarters.[48]

*Importance of Enron's Credit Ratings*

Enron considered its credit ratings critical to its success. As indicated in the "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A") in Enron's 1999 Annual Report:

> Enron's senior unsecured long-term debt is currently rated BBB+ by Standard & Poor's Corporation and Baa2 by Moody's Investor Services. Enron's *continued investment grade status is critical to the success of its wholesale business as well as its ability to maintain adequate liquidity.* Enron's management believes it will be able to maintain or improve its credit rating.[49]

By 1999, Enron's Wholesale Services was by far the most significant of Enron's business segments, accounting for 66% of its 1999 income before interest, minority interests and income taxes ("IBIT"), and exceeding by almost a factor of two the combined IBIT from its interstate gas pipelines and Portland General electric utility businesses.[50] In order to continue the growth of this business, Enron needed to trade with

---

[48] Enron Q3/2000 Conference Call, Oct. 17, 2000, at 29 [ELIB00001903-00001 to ELIB00001903-00031].

[49] "Financial Review--Management's Discussion and Analysis of Financial Condition and Results of Operations—Capitalization," Enron 1999 Annual Report, at 37 (emphasis added). The same statement was repeated in Enron's 2000 Annual Report, except that the Moody's rating was listed as Baa1 and the words "or improve" in the last sentence did not appear. "Financial Review--Management's Discussion and Analysis of Financial Condition and Results of Operations—Capitalization," Enron 2000 Annual Report, at 27.

[50] 1999 IBIT from Enron's five business segments is summarized as follows (dollars in millions):

other market participants without being required to post collateral. Thus, the continued success of Enron's entire business was dependent upon the continued success of its Wholesale Services business segment, which in turn was dependent upon Enron's credit ratings for its senior unsecured long-term debt.

Analysts expressed concerns about Enron's ability to finance both its operations and its expansion plans and maintain its credit rating.[51] The credit rating depended on achieving certain financial ratios. The five key credit ratios consisted of:[52] funds flow interest coverage;[53] pre-tax interest coverage;[54] funds flow from operations to total obligations; total obligations to total obligations plus shareholders' equity and certain

| Business Segment | 1999 IBIT | % of Total |
|---|---|---|
| Transportation and Distribution: | | |
| Transportation Services (interstate gas pipelines) | $380 | 19% |
| Portland General | 305 | 15% |
| Wholesale Services | 1,317 | 66% |
| Retail Energy Services | (68) | (3%) |
| Broadband Services (new business segment in 2000) | - | - |
| Exploration & Production (discontinued Aug 1999 with sale of EOG) | 65 | 3% |
| Corporate and Other (Azurix, wind farms, methanol, MTBE) | (4) | (0)% |
| Total IBIT | $1,995 | 100% |

*See* "Financial Review--Management's Discussion and Analysis of Financial Condition and Results of Operations—Results of Operations-Consolidated Net Income," Enron 2000 Annual Report, at 21.

[51] In March of 1999, a Merrill Lynch analyst reported:

> ENE's ratings have been Baa2/BBB+ for several years, and both rating agencies [S&P and Moody's] currently maintain stable outlooks. The rating agencies cite ENE's strong market position and diversified assets, mitigated partly by the risks associated with its aggressive expansion plans and related effects on the company's credit measures. Moody's specifically stated in its latest ratings review (December 21, 1998) that ENE's rating is *pressured* in its rating category.

Merrill Lynch *Comment* on Enron Corp., Mar. 31, 1999, at 5 (emphasis added) [ELIB00000651-00001 to ELIB00000651-00007].

[52] *See* Enron 2000 Annual Report, at 52.

[53] Funds flow from operations plus interest incurred and estimated lease expense, divided by interest incurred and estimated lease expense.

[54] Adjusted earnings for credit analysis divided by interest incurred and estimated lease expense.

other items; and debt to total capital. As indicated in its 2000 Annual Report, the

components of these key credit ratios were:[55]

- *Funds flow from operations*, defined as net cash provided by operating activities (from the cash flow statement) less cash provided from decreases in working capital (or plus cash used for increases in working capital).

- *Balance Sheet Debt*, defined as short-term and long-term debt appearing on the face of the balance sheet.

- *Total Obligations*, defined as Balance Sheet Debt, plus guarantees of debt of third parties and guarantees of lease residual values, plus any excess of price risk management liabilities over price risk management assets. Guaranteed debt was reduced by the value Enron attributed to the assets supporting the underlying debt. Debt of unconsolidated equity affiliates was not included because (unless guaranteed) it was non-recourse to Enron.

- *Shareholders' Equity and certain other items*, defined as shareholders' equity, plus the "mezzanine" items, minority interests and company-obligated preferred securities of subsidiaries.

- *Adjusted Earnings for credit analysis*, defined as IBIT, less gain on sale of non-merchant assets and the excess of earnings from equity method investees over distributions from those investees, plus impairment losses.

- *Interest Expense*, defined as interest incurred, less interest capitalized, plus estimated lease interest expense.

Enron's need to maintain its credit rating was known throughout the institution,

from its Board of Directors (the "Enron Board") to its mid-level management. The

former Chairman of the Finance Committee of Enron's Board recently described

---

[55] *See* "Financial Review—Selected Financial and Credit Information (Unaudited)," Enron 2000 Annual Report, at 52.

management's system for assuring that Enron remained focused not only on generating

cash, but also on generating funds flow from operations:

> Yes, sir, each business unit would have had an income target and a funds
> flow target and so that business unit would have been looking at its
> portfolio of assets and considering do I sell a minority interest, do I
> deconsolidate it by selling it to an SPE, do I sell it outright, what do I do
> with it to achieve the overall goals I am trying to achieve?[56]

When asked whether the income and funds flow targets would put undue pressure

on management to achieve the targets, the former Finance Chairman noted the

relationship between Enron's credit rating and its ability to balance MTM earnings with

funds flow:

> Well, the company as a whole had these debt ratios, rating agencies ratios
> to which we referred, so everybody knew that to maintain the investment
> grade rating and to make sure the mark to market earnings and the funds
> flow didn't get too far out of balance, that whatever people were doing
> they had to make sure the two stayed reasonably in sync.

> Certainly to the extent anybody, either because their assets aren't doing as
> well or more likely the case is because they had lots more assets
> opportunities would always be trying to find ways to generate funds flow
> to match up with the mark to market earnings. . . .[57]

An Enron manager who actively participated in the design and implementation of

many of Enron's structured finance transactions confirmed how well he appreciated the

importance of financial engineering in a self-evaluation memorandum prepared sometime

after the close of the 2000 fiscal year. He began that memorandum by pointing out his

own contribution to Enron's funds flow and its balance sheet from 1995 through 2000:

---

[56] Volume 2, Deposition of Herbert S. Winokur, Jr., former Director of Enron Corp. and Chairman of the Board's Finance Committee, by John L. Latham, Partner, Alston & Bird LLP ("A&B"), Nov. 21, 2002 ("Winokur 2"), at 122-23. The Examiner's counsel has not received the executed errata sheet from Mr. Winokur but has no reason to believe that the quoted testimony is inaccurate.

[57] Winokur 2, at 123-24.

Funds Flow

One key metric that I have been intimately involved with has been the generation and measurement of Enron's funds flow objectives. "Funds flow" is the "net operating cash flow" that is used to pay debt service and is probably the single most critical metric and difficult metric for Enron to achieve to maintain its BBB+ rating. . . . [He then noted that of the aggregate $9.686 billion of operating cash flow reported by Enron for 1995 through 2000, he had led or had significant participation in SPE transactions that accounted for 56% of it.]

Balance Sheet

While the funds flow metric allows Enron to maintain its current debt rating assuming a certain balance sheet capital structure, of equal importance is the maintenance of that capital structure and maintaining debt ratios which have been generally in the 40% range over the past five years. To maintain our credit rating, if Enron were to finance itself primarily or solely through simpler, on-balance sheet reported structures, 40% of each transaction would be funded by the issuance of new debt and 60% through retained earnings or new equity. . . .

. . .

For 2000, I was responsible for the Global Finance team that generated approximately $5.5 billion of overall off-balance sheet financing which, at a 60% equity allocation, would have required $3.3 billion of new equity capital in 2000 to support a BBB+ credit rating. The value of avoiding $6.11 billion of equity dilution is difficult for me to quantify although, as a shareholder, I know it's reflected in the valuation given the avoided dilution of earnings per share.[58]

*Enron's MTM Accounting and Quality of Earnings Problem*

*The Genesis and Evolution of Enron's MTM Accounting.* On June 11, 1991,

Enron wrote to the SEC Office of Chief Accountant to inform the SEC that Enron

---

[58] Enron Interoffice Memorandum to David Delainey from Joe Deffner, regarding Year End Accomplishments and Overall Past Enron Accomplishments, undated [AB025204029-AB025204052].

intended to use MTM accounting for its gas trading business, Enron Gas Services.[59]
Under MTM accounting, assets are carried at their "fair value," based upon publicly
quoted prices, or if there are none available, based upon management's estimate using the
best information available to determine the fair value of the assets. Changes in values
from quarter-to-quarter are recorded as gains or losses in the income statement.[60]

In a letter dated January 30, 1992, then SEC Chief Accountant Walter P. Schuetze
informed Enron that, based upon Enron's representations, the SEC accounting staff
would not object to Enron's use of MTM accounting for its natural gas trading activities
beginning in 1992 (the "Schuetze Letter").[61]

From this modest beginning in 1992, MTM accounting spread throughout Enron
so that by December 31, 2000, approximately $22.8 billion of Enron's assets were
accounted for using MTM accounting,[62] representing 35% of its $65.5 billion of total

---

[59] Letter from Jack L. Tompkins, Senior Vice President and Chief Financial Officer, Enron Corp., and
George W. Posey, Vice President, Finance & Accounting, Enron Gas Services, to George H. Diacont,
Acting Chief Accountant, SEC, and Robert Bayless, Associate Director, Office of Chief Accountant, SEC,
June 11, 1991 [AB000516897-AB000516898]. Enron's letter contained a lengthy memorandum
supporting Enron's position, as well as letters from accounting firms Andersen and E&Y in support. The
letter cites changes in the natural gas industry, including price deregulation, and the emergence of spot
trading and creation of a forward market for natural gas as reasons for Enron's decision to change from the
historical cost method of accounting. Enron stated that its gas business was operated independently of
Enron's other businesses and consisted of contracts and financial instruments (rather than fixed assets such
as pipelines). Enron analogized its gas trading operations to securities trading activities of broker/dealers.
During the balance of 1991, Enron and the SEC had a series of meetings and telephone calls during which
Enron answered numerous questions posed by the SEC accounting staff and provided significant additional
support for its position.

[60] In some cases, changes are recorded directly to shareholders' equity through other comprehensive
income. *See* FAS 115, *Accounting for Certain Investment Debt and Equity Securities*.

[61] Letter from Walter P. Schuetze, Chief Accountant, SEC, to Jack L. Tompkins, Senior Vice President and
Chief Financial Officer, Enron Corp., Jan. 30, 1992 [AB000516971-AB000516972].

[62] Price Risk Management Assets ($21 billion), interests in equity affilates using MTM ($1.2 billion),
merchant investments ($0.6 billion). Enron 2000 Annual Report.

- 23 -

assets. A mere 5% fluctuation in value of these assets would have resulted in gain or loss

of $1.1 billion, an amount greater than Enron's 2000 net income of $979 million.[63]

Enron's MTM accounting evolved after the Schuetze Letter as follows:[64]

- Enron (apparently without soliciting the SEC's further advice) extended the use of MTM accounting for its gas trading business to trading in other commodities, including electric power, pulp and paper, and coal.

- In 1996, Enron extended its MTM accounting to JEDI, an investment partnership between Enron and the California Public Employees' Retirement System ("CalPERS"), by analogizing JEDI's activities to

---

[63] A large loss as a result of changes in commodity or equity prices was not statistically likely to occur, at least according to Enron's description of its risk profile. Balancing its $22.8 billion of MTM assets were $19.9 billion of MTM price risk management liabilities. Thus, if the value of its assets declined, much of the decline should have been offset with a decline in the value of these liabilites. If the $4 billion of prepay liabilities that existed on December 31, 2000, were eliminated from Enron's MTM liabilities, Enron's MTM "book" would appear to be approximately $6.9 billion out of balance. According to Enron's 2000 Annual Report, however, Enron took this into account in computing its value at risk. Specifically, Enron states that it had performed an entity-wide value-at-risk analysis on virtually all of its financial instruments, including its price risk management assets and liabilites. Enron 2000 Annual Report, at 28. As a result of this analysis, Enron reported that its commodity price plus equity price risk aggregated $125 million based on a one-day holding period and at a 95% confidence level. This means that after running sophisticated and highly regarded statistical modeling techniques (i.e., Monte Carlo simulation) Enron had concluded that in 95 days out of every 100, it should not lose more than $125 million based upon the movements of commodity and equity prices. Although the Examiner has not investigated whether this analysis was actually and properly performed, or whether Monte Carlo simulation can accurately quantify price risk of assets for which there is no public market, his investigation has revealed no reason to believe that Enron's reporting of its value at risk was inaccurate.

Moreover, although the Examiner has not evaluated Enron's trading assets and liabilites, the valuation techniques Enron used, or the movements in commodity and equity prices during the period prior to Enron's bankruptcy, nothing has come to the Examiner's attention that suggests that the collapse of Enron was related to changes in commodity or equity prices. While the downgrading of its credit rating obviously adversely impacted the value of its trading operations when counterparties required collateral to be posted and exercised other remedies available to them under their contractual arrangements, the Examiner has found no evidence to suggest that the downgrading was the result of shifting commodity prices.

Enron's value at risk has little to do with its MTM accounting. It would have had the same risk had it accounted for these assets and liabilites based on historical cost. In fact, the proper use of MTM accounting for assets and liabilites subject to frequent price fluctuation, and related disclosures of value at risk, arguably provides more relevant and reliable financial information than would historical cost. Setting aside valuation abuses, the problem was not that Enron used MTM accounting, but rather that Enron resorted to financial engineering to address the effects of MTM accounting.

[64] See "Application of Mark-to-Market and Fair Value Accounting," Oct. 11, 1999, presented to a meeting of the Enron Board's Audit Committee on that date by Richard A. Causey, Enron's Chief Accounting Officer [AB024601353-AB024601361].

that of an investment company and applying the specialized accounting treatment applicable to investment companies. Enron accounted for JEDI under the equity method of accounting and included its 50% share of JEDI's MTM gains and losses in Enron's financial statements.[65]

- In 1997, the JEDI investment company analogy spread to Enron itself, when Enron decided to adopt MTM accounting for its "merchant banking business," and thus began marking-to-market its merchant investments.[66]

- In 1998, the rest of the energy-trading world caught up with Enron when the EITF reached a consensus in EITF 98-10[67] "that energy trading contracts should be marked to fair value (that is, measured at fair value determined as of the balance sheet date) with gains and losses included in earnings and separately disclosed in the financial statements or footnotes thereto."[68]

- In 1999-2000, Enron sought to extend EITF 98-10 by analogy to non-energy commodities.

*The "Quality of Earnings" Problem Caused by MTM Accounting.* Enron's use of MTM accounting for energy-related contracts, and its extension of this concept by analogy to other commodities and financial instruments, was a potent generator of earnings. This was particularly true when applied to such things as (i) Enron's energy

---

[65] Enron Form 10K filed with the SEC for the year ended Dec. 31, 1999.

[66] The treatment of its merchant investments as MTM assets was an exception to FAS 115, *Accounting for Certain Investments in Debt and Equity Securities*, which requires companies generally to mark to fair value equity securities only if prices or bid-and-ask quotations are available on recognized exchanges that provide reliable trading data. When marking securities to market, FAS 115 requires unrealized gains or losses for equity investments held in "trading" portfolios to be included in current income, but requires such gains or losses for investments held in "available-for-sale portfolios" to be included in stockholders' equity without being reported in net income.

[67] EITF 98-10, *Accounting for Contracts Involved in Energy Trading and Risk Management Activities*.

[68] Energy contracts for this purpose were "contracts entered into (or indexed to) the purchase or sale of electricity, natural gas, natural gas liquids, crude oil, refined products, coal, and other hydrocarbons (collectively, *energy*)," and included energy-related contracts, such as capacity contracts, requirements contracts and transportation contracts. EITF 98-10.

contracts with power plants in which it had an interest,[69] (ii) Enron's energy outsourcing contracts from Enron's Energy Services business segment,[70] (iii) Enron's pulp and paper contracts[71] and (iv) Enron's contract with Blockbuster, Inc. ("Blockbuster") to jointly develop the capability to deliver video on demand.[72]

Through MTM accounting, Enron often recognized earnings long before these activities generated any cash. Acceleration of earnings caused by its MTM accounting was noticed by analysts and led to a "quality of earnings" problem, as described in this note from a JPMorgan analyst's report issued in June 1999:

Financial Engineering Accelerates Earnings

[ENA] has significant flexibility in structuring contracts and hence booking earnings. It is primarily a financial business and hence uses "mark to market" accounting. As such, contracts can be structured to recognize the economic value of projects long before they are operational and cash is coming in the door. For example, Sutton Bridge, a power plant that will start operations in the second quarter of 1999, hit ENE's bottom line in 1997. Its output is the backstop for a swap agreement, the present value of which has already been marked to market and booked by [ENA]. This has two effects: front-end-loaded earnings that bias the denominator in the P/E ratio and a timing disconnect between projects' cash and earnings effects.[73]

---

[69] For example, the Cuiaba Transaction was designed to deconsolidate a Brazilian power plant in order to recognize MTM gain of $84 million over seven quarters resulting from an energy contract between the plant and Enron. *See* Annex 3 to Appendix L (Related Party Transactions).

[70] For example, the Eli Lilly transaction discussed below.

[71] *See* Appendix K (Forest Products Transactions).

[72] *See* discussion below under "MTM Valuation -- The Blockbuster Transaction."

[73] JPMorgan June 1999 Report, at 4. Later in the same report, JPMorgan elaborated on the impact of mark-to-market accounting as follows:

Enron structures financial products and uses "mark to market" accounting. This limits the comparability of financial statements, as a project's bottom-line effect is bound only by [ENA's] financial engineering skills.

*Id.* at 6.

*Solving the Quality of Earnings Problem – Project Nahanni.* Enron's quality of earnings problem – the gap between net income and funds flow from operations – was apparently a serious problem by the end of 1999. With the help of Citibank, in December 1999, Enron closed a slightly modified minority interest financing known as Project Nahanni, that appears to have been designed solely to permit Enron to record $500 million in cash flow from operating activities for the year then ended.

In Project Nahanni, Citibank loaned $485 million to Nahanni Investors L.L.C. ("Nahanni") and equity participants contributed $15 million. In a typical minority interest financing, the funds obtained would have been invested by Nahanni in a consolidated subsidiary of Enron, which in turn, would have loaned the funds to Enron. In project Nahanni, however, Nahanni used the $500 million to purchase Treasury securities, which it contributed to an Enron subsidiary ("Marengo") in exchange for a 50% limited partnership interest. Marengo immediately sold the Treasury securities and loaned the resulting $500 million in proceeds to Enron.

Enron extended the MTM accounting that it applied to its merchant investment venture capital activities to cover the sale of the Treasury securities that Nahanni contributed to Marengo. As a result, Enron's 1999 financial statements reflected (i) Nahanni's $500 million contribution to Marengo as a minority interest rather than debt, (ii) the receipt of the $500 million contribution as cash flows from financing activities - issuance of subsidiary equity, and (iii) the proceeds from the sale of the $500 million of Treasury securities as net cash provided by operating activities. This cash flow represented 41% of the total of $1.2 billion of operating cash flow reported by Enron for 1999. Having achieved this significant impact on its 1999 financial statements, Enron

- 27 -

repaid the Nahanni debt on January 14, 2000, less than one month after the transaction was consummated.

Thus, through Project Nahanni, Enron borrowed $500 million, bought Treasury securities with it, sold the Treasury securities, recognized $500 million of operating cash flow, and repaid the loan—all within 30 days straddling its 1999 year end—and without reflecting the loan as debt on its financial statements.[74]

The seeds for this financial engineering were sown in 1997, when Enron determined that it should use MTM accounting for its "merchant investments" because at the time it analogized what it called its "merchant banking activities" to those of venture capital investment companies, which under GAAP are permitted to use MTM accounting.[75] That analogy itself seems aggressive. Enron's position that *venture capital investment companies* trade in Treasury securities, or that trading in Treasury securities was a regular part of Enron's venture capital business, illustrates Enron's and Andersen's elasticity in addressing Enron's quality of earnings problem.

---

[74] The Nahanni transaction was one of Enron's clearest violations of GAAP. For a complete discussion of Project Nahanni, *see* Annex 3 to Appendix I (Minority Interest Transactions).

[75] Enron Corp. Fair Value Memorandum, Aug. 28, 1997 [AB02092250-AB02092268].

*MTM Valuation*[76]

Two examples of how Enron valued assets for which there were no quoted market prices are (i) the "Blockbuster" transaction, Enron's monetization of its video on demand ("VOD") contract with Blockbuster, and (ii) the "Eli Lilly" transaction, Enron's monetization of its interests in future cash flows resulting from anticipated energy savings under a contract with Eli Lilly and Company ("Lilly").[77]

*The Blockbuster Transaction.* On July 19, 2000, Enron announced that it had entered into "a 20-year, exclusive agreement to deliver a Blockbuster entertainment service, initially featuring movies-on-demand, via the Enron Intelligent Network."[78] This agreement reflected nothing more than an aspiration. Enron did not have the technology to deliver VOD on a commercially viable basis and Blockbuster did not have rights to movies to be delivered. Nevertheless, Enron contributed this contract to a subsidiary, EBS Content Systems, LLC ("EBS"), and then sold a 45% interest in EBS to the Hawaii

---

[76] As noted above, the Examiner has not engaged valuation experts or otherwise undertaken to determine whether Enron properly valued the assets subject to its MTM accounting. Under MTM accounting, assets for which there are not publicly quoted prices are to be valued by management based upon the best information available to determine the fair value of the assets. Many of Enron's assets were in this category, including most of its merchant investments and all of the Total Return Swaps it entered into in connection with the FAS 140 transactions (and treated as price risk management assets or liabilities). In addition, the Examiner has not considered the propriety of Enron's extension of its MTM accounting to commodities not covered by EITF 98-10, or, other than the Prepays, whether contracts that Enron claimed were "energy trading contracts" or "energy-related contracts" under EITF 98-10 were in fact those types of contracts.

[77] The appraisals discussed in the Blockbuster and Eli Lilly transactions were technically performed to support the amount of gain to be recognized in the FAS 140 transfers of the LLC interests involved in those transactions, rather than to support MTM accounting gain or loss. Regardless of whether the valuation is to support FAS 140 gain or MTM accounting, if no quoted market price exists, fair value must be determined by management based on the best information available. *See* EITF 00-17; AICPA Audit and Accounting Guide, Audits of Investment Companies; and FAS 140 ¶ 43.

[78] Enron Press Release, "Enron and Blockbuster to Launch Entertainment On-Demand Service Via the Enron Intelligent Network," July 19, 2000, at AB025203626 [AB025203626-AB025203629].

- 29 -

FAS 140 securitization structure[79] for $57 million, recognizing a $53 million gain and $57 million in funds flow from operations.

In order to recognize this gain, applicable GAAP required that it be practical to measure the fair value of the asset.[80] Andersen appraised the value of this contractual arrangement at between $120 million and $150 million, even though the anticipated business did not have the technology to deliver its product or any rights to the product it proposed to deliver. In arriving at this valuation, Andersen made the following assumptions:

- The LLC would begin commercial operations of its VOD business in 10 metro areas, each with a population of 1.6 million, within the next 12 months;

- The LLC would add eight additional metro areas per year until 2010 and these metro areas would grow at 1% per year;

- Digital subscriber lines (DSLs) would run to 5% of the households in these metro areas in 2001 growing to 32% by 2010 (this based on a Morgan Stanley report);

- The number of these DSL lines that would have sufficient speed to carry VOD would be 5% in 2001 growing to 80% in 2010;

- The percentage of eligible DSL subscribers using VOD would be 5% in 2001 and grow to 70% by 2010; and

- EBS would garner 50% of this market (this based on "research" performed by EBS and McKinsey & Co.).[81]

---

[79] The Hawaii FAS 140 transaction was discussed in detail in the September Report and is discussed in Appendix M (FAS 140 Transactions).

[80] FAS 125, *Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities* ("FAS 125") ¶ 45.

[81] Andersen Memorandum to Roger Willard, Andersen, from Warren White, Andersen, and Brent Dickey, Andersen, regarding FMV of EBS Content Systems LLC, Jan. 19, 2001 [PSI00028563-PSA00028575]; Andersen Memorandum to Roger Willard, Andersen, from Warren White, Andersen, and Brent Dickey, Andersen, regarding FMV of EBS Content Systems LLC, Mar. 15, 2001 [PSI00020764-PSA00020777].

Using these assumptions, Andersen projected future cash flows and discounted the cash flows to present value using discount rates ranging from 31% to 34%. While a venture capitalist might find the analysis informative in assessing whether to make a seed investment in a speculative start-up situation, given the underlying facts, the Examiner questions whether it was appropriate for a public company to transfer this contract to a structured finance vehicle, assign it a speculative value and recognize that amount currently as income and cash flow from operating activities. Of the $63 million of revenue that Enron reported as earned by its Broadband Services business segment in the fourth quarter of 2000,[82] $53 million was attributable to this monetization transaction, code-named "Braveheart."

On March 9, 2001, Enron announced that it had terminated its exclusive relationship with Blockbuster.[83] The press release stated that:

> Enron intends to initiate discussions with various content providers for delivering their content over the Enron platform. In addition to streaming movies to the television, Enron is working on agreements to deliver games, television programming and music via the Enron Intelligent Network.[84]

Apparently, Enron's intention "to initiate discussions" was even more valuable than its "exclusive relationship with Blockbuster," because in the first quarter of 2001, after this announcement, Enron marked to market the Total Return Swap (as defined below) it used in the fourth quarter Blockbuster monetization and monetized the Total

---

[82] Enron Press Release, "Enron Reports Recurring Annual Earnings of $1.47 per Diluted Share in 2000 and Fourth Quarter Earnings of $0.41," Jan. 22, 2001, at AB025203633 [AB025203630-AB025203634].

[83] Enron Press Release, "Enron Expanding Entertainment On-Demand Service: Terminates Exclusive Relationship With Blockbuster Inc.," Mar. 9, 2001 [AB025203639].

[84] *Id.*

Return Swap within the Hawaii structure, writing up the value by approximately $58 million. As a result, Enron recognized approximately $58 million of revenue and funds flow. To date, the Examiner has not located any executed contracts for EBS to deliver games, television programming or music.

By late summer 2001, Enron recognized that EBS, earlier valued at $115 million, did not have a viable business. It considered several options, and ultimately elected to shut EBS down. Thus, within a span of about one year this investment, which resulted in Enron reporting $111 million of gain and $115 million of funds flow from operations in the fourth quarter of 2000 and first quarter of 2001, proved to be worthless. One of the components of the "non-recurring charge" of $1.01 billion that Enron announced in its October 16, 2001 earnings release was a $180 million charge for "restructuring" its Broadband Services business, the business that Enron had described so effusively in its 2000 Annual Report.

*The Eli Lilly Transaction.* The Eli Lilly transaction provides a good example of how Enron used its FAS 140 accounting technique, together with a questionable appraisal, to generate income through the sale of anticipated cash flows generated by its interest in a long-term energy management agreement. Enron achieved this result even though, as in other transactions using the FAS 140 technique, Enron retained control and the economic benefits and risks of those cash flows.

On February 26, 2001, Enron announced a "$1.3 billion, 15-year energy management agreement" it had reached with Lilly.[85] This agreement (the "Services

---

[85] Enron Press Release, "Enron and Lilly Announce Long Term Energy Management Agreement," Feb. 26, 2001 [ELIB00001732-00001 to ELIB00001732-00002].

Agreement") was actually between Lilly and L. E. Heston LLC ("Heston"), which was jointly owned by Enron and Lilly. Heston was to provide (by subcontracting with Enron) energy management services to five Lilly plants in Indiana. Lilly was to pay Heston for energy cost savings achieved as a result of Heston's services. The payments made to Heston were to be shared between Enron and Lilly – 30% going to Enron's Class A interest in Heston, and 70% to be divided between Lilly's Class B interest and Enron's Class C interest.[86]

Enron obtained from a third-party consulting firm an appraisal of the anticipated cash flows from its 30% Class A interest in Heston at $39.7 million (the "Heston Appraisal").[87] Enron then promptly transferred its Class A interest into the Hawaii FAS 140 structure in exchange for $38 million of financing proceeds, which it recognized as income. As in other FAS 140 Transactions, Enron retained control of the Class A interest, as well as substantially all of its risks and benefits, through a Total Return Swap and the other transaction documents.

On April 17, 2001, Enron released its first quarter 2001 earnings and reported that its Enron Energy Services segment had $40 million of IBIT on $693 million of revenue,[88] of which $38 million was attributable to the transfer of Enron's Class A interest in Heston.

---

[86] Enron contributed $50 million to Heston in exchange for its Class C interest, and Heston immediately distributed the $50 million to Lilly.

[87] Appraisal by KPMG Consulting, Inc. of 30% Economic Interest in LE Heston Energy LLC for Enron Energy Services Operations, Inc., a subsidiary of Enron Corp., Mar. 22, 2001 [AB025204630-AB025204658].

[88] Enron Press Release, "Enron Reports Record First Quarter Recurring Earnings of $0.47 Per Diluted Shares," Apr. 17, 2001 [ELIB00001744-00001 to ELIB00001744-00005].

The Heston Appraisal arrived at a value by discounting to present value the expected cash flows from the 30% Class A interest. The cash flows were derived from the energy savings that Lilly was projected to achieve and pay to Heston over the 15-year term of the Services Agreement.

According to the Heston Appraisal, Enron provided Lilly's estimated energy cost savings from projects that were expected to be implemented in the first three years of the Services Agreement.

> The cash flow streams were then subjected to Monte Carlo simulation analysis which is a statistical tool utilized to simulate probable outcomes given a set of variables. Through multiple iterations of the simulation, the probable outcomes will cluster around a normal bell curve distribution table. Management of [Enron] has represented to, and KPMG Consulting, has accepted these level [sic] of expected cash flow savings are reasonable without further due diligence.[89]

The Heston Appraisal then applied discount rates of 8.25% and 8.50% to these cash flows, based on the determination that the rate should be higher than the 6.2% yield on Lilly's AA bonds and the 7.78% yield on Enron's BBB bonds, but lower than the 9.16% yield on BB+ bonds. Using this method, the Class A interest was appraised at $39.7 million.

Discount rates used in cash flow appraisals reflect the risk inherent in receiving the future cash flows. To apply a discount rate based on investment grade bonds to account for the risk inherent in achieving anticipated energy savings over a 15-year period indicates the appraiser accepted as "reasonable without further due diligence" that

---

[89] *Id.* at 10.

- 34 -

the application of Monte Carlo simulation to anticipated energy savings removes all but the credit risk from the transaction.[90]

This questionable method for determining the cash flows and discount rates illustrates the creativity of Enron's valuation methodologies, as applied to assets for which there was no readily available market price.

The subjective determination of value evidenced by the Blockbuster and Eli Lilly transactions contrasts with certain other situations in which Enron apparently avoided subjective determinations that would have resulted in less MTM income. For example, as discussed in Appendix L (Related Party Transactions), in the second quarter of 1999, Enron recognized approximately $342 million of MTM income by writing up the value of its 5,393,258 shares of Rhythms NetConnections, Inc. ("Rhythms"), based upon publicly quoted market prices. This block was equal to approximately 50% of the outstanding stock of Rhythms held by the public and eligible for sale, and was subject to an underwriters lock-up that did not expire until November 9, 1999. It is difficult to understand why Enron did not apply an illiquidity discount to its MTM valuation of this stock in light of its stated valuation policy with regard to Listed Securities:

> Regardless of the valuation method utilized, the fair value should be reduced by an appropriate illiquidity discount,[91]

and its policy with regard to "Over-the-Counter" securities:

---

[90] The Heston Appraisal does not mention or discuss the statistical confidence level for the determination of energy savings cash flows using the Monte Carlo simulation.

[91] Enron Corp. Fair Value Memorandum, Aug. 28, 1997, at 17 [AB02092250-AB02092268].

> If a security has been sold infrequently or if the market in the security is thin, the reliability of market quotations should be considered and an appropriate illiquidity discount should be taken.[92]

Enron's explanation is that Andersen would not permit Enron to discount the value because to do so would render the MTM accounting valuation too subjective.[93]

## C.      Enron's Six Accounting Techniques

Enron managed (i) its need for cash, (ii) its reluctance to issue equity, (iii) its credit ratings and (iv) the quality of earnings problem created by MTM accounting, by relying upon the use of SPEs and aggressive accounting techniques.  Although Enron consummated hundreds of SPE transactions, the Examiner believes that Enron relied on six accounting techniques, each dependent on the use of SPEs, to manage these issues, and particularly, the components of its key credit ratios.  Based upon the Examiner's investigation of the various SPE transactions thus far, it appears that at least by 1999, and perhaps earlier, Enron's continued success was dependent on its ability to deploy these accounting techniques to manage these key credit ratios.

Most of the Enron SPE transactions investigated by the Examiner involve one of these six accounting techniques.  The transactions employing a particular technique

---

[92] *Id.*

[93] In person meeting in Houston, Tex. between Barry Schnapper, Joe Deffner, Joel Ephross, Tricia Shannon, Brenda Funk, Julia Murray, Mike Patrick and other Enron employees and Bryan Ives and Bill Plybon, Partners, A&B, Dec. 19-20, 2002.

Publicly traded equity securities that are marked to market pursuant to FAS 115, *Accounting for Certain Investment in Debt and Equity Securities*, cannot be discounted due to blockage, *see* FAS 107, *Disclosures about Fair Value of Financial Instruments*, or due to restrictions that will terminate within one year, FAS 115, Note 2.  Enron's Rhythms stock, however, was not marked to market under FAS 115, but under the AICPA *Audit and Accounting Guide, Audits of Investment Companies* MTM rules that apply to venture capital investment companies.  Had FAS 115 applied to the Rhythms stock, any gain would have been required to be carried directly to equity and not recognized as income on the income statement.  The venture capital company rules permit illiquidity discounts and discounts due to restrictions, if the company had a policy to claim such discounts in effect for financial statements issued on or before March 31, 2000.

- 36 -

resulted in common accounting treatment based on Enron's interpretation and application of various GAAP rules. The transaction structures employing the six accounting techniques are:

- FAS 140 Transactions[94]

- Tax Transactions[95]

- Non-Economic Hedges[96]

- Share Trust Transactions[97]

- Minority Interest Transactions[98]

- Prepay Transactions[99]

These techniques, described below, were carefully designed to comply with GAAP to produce highly favorable financial statement results. In many cases, these six techniques were applied in combination with others.[100]

*The FAS 140 Transactions*

Enron's FAS 140 Transactions were essentially bridge financings of illiquid assets that Enron intended to sell. Although it treated these transactions as sales for

---

[94] *See* Section XI of this Report and Appendix M (FAS 140 Transactions).

[95] *See* Section VIII of this Report and Appendix J (Tax Transactions).

[96] *See* Section X of this Report and Appendix L (Related Party Transactions).

[97] *See* Section VI of this Report and Appendix G (Whitewing Transaction) and Appendix H (Marlin Transaction).

[98] *See* Section VII of this Report and Appendix I (Minority Interest Transactions).

[99] *See* Section V of this Report and Appendix E (Prepay Transactions).

[100] For example, as discussed in the September Report, by applying the FAS 140 technique, the Non-Economic Hedging technique and MTM accounting, in conjunction with one another, to a portion of its equity ownership in New Power Company, Enron was able to increase its reported IBIT in 2000 by $370 million, or 14.9% of its total reported IBIT for that year of $2.482 billion. Of this $370 million, $75 million resulted from recognizing gain on sale under the FAS 140 technique, $195 million resulted from the Non-Economic Hedging technique, and $100 million resulted from marking to market the Total Return Swaps used as credit support in the FAS 140 bridge financings.

accounting purposes, Enron (i) had the obligation to repay substantially all of the financing regardless of the value of the underlying assets and (ii) retained substantially all of the future appreciation in value and cash flows from the underlying asset. In 2000, by applying its FAS 140 technique to report bridge financings as sales, Enron: (i) increased its reported net income by $351.6 million (36% of its total reported net income); (ii) increased its reported funds flow from operations by $1.2 billion (38% of its total reported funds flow from operations); and (iii) kept $1.4 billion of debt off its balance sheet.[101]

As described in Section XI of this Report and the September Report, the FAS 140 technique involved the purported sale of an asset by Enron through several steps to an SPE that was not consolidated in Enron's financial statements. In most cases, the SPE financed its acquisition of the asset by borrowing 97% of the purchase price and issuing equity for the remaining 3%. Enron obligated itself to repay the loan through a Total Return Swap.[102] Through the Total Return Swap and the other agreements employed in

---

[101] The amounts include the transactions discussed in Appendix M (FAS 140 Transactions), Project Bacchus discussed in Appendix K (Forest Products Transactions) and Enron's monetization of its stock in another FAS 140 transaction known as Avici.

[102] Through a "Total Return Swap," the Enron entity: (i) agreed to make payments to its counterparty (usually an SPE created for the transaction or the lenders to the SPE) equal to the scheduled payments (and interest thereon) on the amounts borrowed by the SPE under its credit facility (which was usually equal to 97% of the purchase price of the transferred asset) and (ii) remained entitled to all amounts produced by the transferred asset (whether by sale of the asset or otherwise), except, in some transactions, for amounts used to satisfy the small portion of the purchase price that the SPE funded through the sale of equity rather than borrowings (typically at least 3% of the purchase price of the asset) and a specified return on that equity. In those transactions where there was an equity investor, the Total Return Swap typically provided that any proceeds of the underlying asset were distributed first to the Enron entity in amounts up to the amounts payable on the related debt financing, then to the equity holder up to the specified return and, finally, all remaining amounts to the Enron entity. The terms and effects of these Total Return Swaps are explained in greater detail in Section XI of this Report describing the FAS 140 Transactions. Typically, such financial arrangements were made pursuant to the terms of a master agreement promulgated by the International Swaps and Derivatives Association, Inc. ("ISDA"). While for ease of discussion, the Examiner refers to this type of an arrangement as a "Total Return Swap" in this Report, the Examiner expressly reserves the right to conclude as to the proper characterization of such contractual arrangements in future reports, and

this technique, Enron retained substantially all of the economic benefits and risks of ownership of the asset, notwithstanding the purported sale to the SPE.

Enron carefully designed its FAS 140 technique with advice from Andersen and Enron's lawyers, with the goal that the asset transfer would qualify for sale treatment under GAAP despite the fact that sale treatment did not reflect the economic substance of the transaction. In fact, Andersen discussed the basic template for the FAS 140 technique with SEC staff accountants in 1999, who indicated that nonconsolidation of the SPE and sale treatment were consistent with existing GAAP.[103] The Examiner concluded in the September Report, however, that Enron's failure to disclose the nature of its obligations to repay principal and interest under the debt associated with the transactions was not in compliance with GAAP.

The success of the technique in achieving the desired accounting treatment, however, depended upon obtaining evidence through acceptable legal opinions delivered by Enron's counsel that the transferred asset had been "legally isolated" from the transferor in the event of its bankruptcy. Enron frequently obtained the legal opinions Andersen required. These opinions, however, were limited in scope and analyzed only certain steps and specific entities, rather than the transaction in its entirety. In many of the FAS 140 Transactions, the Examiner believes that legal isolation was not achieved and, consequently, Enron's accounting treatment was improper for that reason as well.

---

the use of the nomenclature used by Enron and its affiliates should not be construed to be any conclusion by the Examiner on any of these issues. Furthermore, Appendix C (Legal Standards) sets forth the Examiner's analysis regarding whether the Total Return Swap, or any other swap or derivative discussed in this Report, meets the definitional requirements for a "swap agreement" under the Bankruptcy Code. *See* 11 U.S.C. § 101(53B).

[103] *See* 1999 Andersen/SEC Minutes discussed in Appendix B (Accounting Standards).

- 39 -

*The Tax Transactions*

Eleven of these transactions were first made public in a May 21, 2002 article in the *Washington Post.* The Tax Transactions had no business purpose other than to increase reported earnings by, among other things, (i) decreasing reported current income tax expense by amounts many times greater than the present value of any anticipated actual tax benefit that might be achieved in the future and (ii) creating "negative goodwill" in artificial business combinations that was amortized in pre-tax income. In 2000, these techniques accounted for $269.1 million, or 27%, of Enron's reported net income. Many of these transactions were suggested to Enron by Bankers Trust, a predecessor of Bankers Trust/Deutsche Bank AG ("BT/Deutsche"), which received over $40 million in fees for advising Enron on these transactions.[104] These transactions are discussed below in Section VIII of this Report.

Unlike four of Enron's six accounting techniques, the Tax Transactions did not generally involve financings in the sense that they raised no significant cash for Enron.[105] In these transactions, Enron frequently acquired assets that it did not need and that were not part of its business operations, such as airplane leases and interests in mortgage loans, to take advantage of the application of GAAP for accounting for income taxes in combination with GAAP governing business acquisitions.

---

[104] *See* Appendix J (Tax Transactions).

[105] In the Tammy and Apache transactions, minority interest financings were used in combination with a Tax Transaction to raise a total of $1 billion of debt that was reflected as minority interests on Enron's 2000 balance sheet. However, appending the tax structure to the Tammy minority interest financing did not meaningfully facilitate the financing. *See* Annex 4 to Appendix I (Minority Interest Transactions). The Condor transaction was similarly appended to the Whitewing share trust transaction. *See* Appendix G (Whitewing Transaction). In the Apache transaction, the tax structure was somewhat more integral to the financing. *See* Annex 2 to Appendix I (Minority Interest Transactions).

- 40 -

*The Non-Economic Hedges*

These transactions, which include the Raptor SPEs, were discussed extensively in the Powers Report and are discussed below in Section X of this Report.[106] Using this technique, Enron "hedged" the decrease in value of certain of its investments that it had marked to market by entering into derivative contracts with counterparties that were related to Enron. As the value of the hedged asset fell, Enron recorded offsetting increases in the value of the hedge. In the case of the Raptor SPEs, the counterparties were SPEs formed as LLCs owned indirectly by Enron and LJM2. Although third parties unrelated to Enron made significant investments in LJM2, LJM2 had no meaningful economic interest in the Raptor SPEs that were the counterparties to the hedges. Moreover, because LJM2 was a related party to Enron under applicable GAAP rules,[107] the SPEs that were the counterparties to the derivative contracts should have been consolidated with Enron under GAAP (which would have eliminated the GAAP result Enron sought from its use of this technique). Enron used this flawed accounting technique to increase its 2000 reported net income by $346 million, or 35%, of its total reported net income of $979 million.

*The Share Trusts*

Enron first used the powerful share trust technique, which is discussed below in Section VI,[108] in the Marlin Transaction to refinance approximately $900 million of debt it incurred to acquire the water systems business that it operated through Azurix Corp.

---

[106] *See* Appendix L (Related Party Transactions).

[107] *See* Appendix B (Accounting Standards) for discussion of FAS 57, which addresses related parties.

[108] *See* Appendix G (Whitewing Transaction) and Appendix H (Marlin Transaction).

("Azurix"). Enron formed a holding company for Azurix that was jointly owned by Enron and Marlin Water Trust ("Marlin"), a Delaware business trust that was funded primarily by debt and a small amount of equity raised from third parties. The proceeds of the debt and equity were contributed to the holding company and used to repay a portion of Enron's acquisition debt. Enron indirectly guaranteed Marlin's debt by agreeing to sell Enron stock for proceeds sufficient to repay the debt, and if sufficient proceeds could not be raised from the sale of the Enron stock, then to repay the debt with cash.

Although Enron held the controlling financial interest in the holding company, by bestowing upon Marlin the right to replace half of the directors of the holding company and certain of its subsidiaries, Enron contended, and Andersen agreed, that the holding company did not have to be consolidated with Enron. This technique, using GAAP rules that were approved only weeks before the structure was implemented, was designed by Enron and Andersen to remove the $900 million acquisition debt and the Azurix assets from Enron's balance sheet. While in this instance a narrow application of the GAAP rules may have permitted off-balance-sheet treatment of the debt, Enron failed to properly disclose its contingent liability to provide funds to repay the debt. Although Enron described the arrangements in general in notes to its financial statements, it was not until it filed its third quarter 2001 Form 10-Q just prior to its bankruptcy that Enron clearly disclosed the amount of its obligation and revealed that it could be called upon to satisfy that amount in cash under certain clearly foreseeable circumstances.

Enron adapted a variation of the Marlin structure to a multi-asset structure in September 1999 when it implemented Whitewing. Enron used the Whitewing structure to finance on a revolving basis the purchase from Enron of at least $1.6 billion of assets,

- 42 -

including $545 million of assorted merchant investments in 2000 that it "monetized" through its projects Velocity I and Velocity II. In its implementation of the share trust technique in the case of Whitewing, however, Enron violated GAAP. Enron retained the ability to exercise significant control of the investments held in the Whitewing subsidiaries, notwithstanding the rights of Osprey, the outside investor in the Whitewing structure, to appoint 50% of the board that controlled Whitewing Associates and to consent to certain acquisitions and dispositions of assets. Thus, Whitewing should have been consolidated with Enron, which would have precluded Enron's desired accounting treatment.

Nevertheless, using its share trust accounting technique, Enron increased its 2000 funds flow from operations by $418 million (14%) and kept approximately $4.178 billion of assets and approximately $4.871 billion of debt and liabilities off its balance sheet as of December 31, 2000.

*The Minority Interest Financings*

Enron used this technique in several transaction structures discussed below in Section VII.[109] The technique allowed Enron to borrow money for use in its business while showing the loan as a "minority interest" on the liabilities/equity side of the balance sheet between liabilities and equity. The significance of this placement was crucial—the rating agencies treated minority interests as a hybrid form of equity rather than debt.[110]

---

[109] *See* Appendix I (Minority Interest Transactions).

[110] *Compare* the ratio component "total obligations" *with* ratio component "Shareholders' equity and certain other items" as set forth in Enron's 2000 financial statements under the heading "Selected Financial and Credit Information (Unaudited)."

- 43 -

This technique was structured similarly to the share trust technique in that it used a holding company jointly owned by Enron and another entity, with the other entity funding its investment by issuing debt and a small amount of equity to third parties. The proceeds of these financings were then contributed to the holding company. Unlike the share trust structure, however, the holding companies in the minority interest structures were consolidated with Enron and the proceeds of the third-party debt and equity were loaned (or otherwise transferred) from the holding company structure to Enron, permitting Enron to repay other debt.

Because the holding company and its subsidiaries were consolidated with Enron, these loans were eliminated from Enron's consolidated financial statements, leaving only the cash received and the minority investor interest on Enron's balance sheet. Through this technique, Enron was able to show $1.74 billion of debt as "minority interests" on its December 31, 2000 balance sheet.

*The Prepays*

Through this technique, discussed below in Section V,[111] Enron typically received payment in advance from SPEs established and maintained by banks in exchange for Enron's promise to make future delivery of oil or gas to the SPE (a prepaid forward contract). The SPE received the funds from the bank on account of its own prepaid forward contract with the bank. Enron and the bank would simultaneously enter into derivative contracts pursuant to which Enron would agree to pay a fixed price for the amount of the commodity it had agreed to deliver to the SPE, plus an interest factor, in

---

[111] *See* Appendix E (Prepay Transactions).

exchange for the bank's agreement to pay the market price for the commodity at the times of scheduled deliveries under Enron's prepaid forward contract with the SPE.

Neither Enron, the bank nor the SPE had the risk of price fluctuation on the commodity. Enron was exposed to a floating price risk, having agreed to deliver the commodity to the SPE at specified times in the future, but had eliminated that risk by agreeing to receive the floating price from the bank in exchange for a fixed price. The bank had no commodity risk because, while it was to receive the floating commodity price from the SPE, it had eliminated that risk by agreeing to receive a fixed price (plus an interest element) from Enron in exchange for giving Enron the floating price. The SPE had no commodity price risk because it simply passed what it received from Enron to the bank.

The accounting treatment Enron desired depended on viewing the three steps of the transaction as separate and distinct from each other, rather than recognizing the economic substance and viewing the transaction as a whole. Perhaps more than any of the six techniques, prepays were the quarter-to-quarter cash flow lifeblood of Enron. Through their use, Enron recorded a total of $4.016 billion in borrowings at December 31, 2000 as liabilities from price risk management activities rather than debt. But perhaps more importantly, the prepays accounted for $1.527 billion, or over 50%, of Enron's reported 2000 funds flow from operations. While the prepays were shown as liabilities on Enron's balance sheet, because they were not shown as debt and because the increase in the outstanding prepay balance from one period to the next served to increase funds flow from operations, Enron's key credit ratios were enhanced significantly.

### D.    <u>The Impact of Enron's Six Accounting Techniques</u>

Perhaps the single most important distinguishing characteristic of Enron's use of SPEs to manage its financial statements is the magnitude of the impact that these efforts had on Enron's financial statements. To illustrate this impact, the Examiner has considered the impact of each of these six accounting techniques, to the extent they involved Enron's SPE transactions investigated by the Examiner, on (i) Enron's 2000 financial statements, (ii) the components of Enron's key credits ratios as of December 31, 2000, and (iii) the key credit ratios themselves as of December 31, 2000.

Four of the six accounting techniques involved financing transactions – in essence borrowings by Enron structured to result in favorable accounting treatment. To assess the impact of the four financing-related accounting techniques, the Examiner assumed that the financings would have occurred, but adjusted the year 2000 accounting for the financings to reflect their economic substance. Two of the accounting techniques, the Non-Economic Hedges and the Tax Transactions, did not involve financings. In the case of the Non-Economic Hedges, the Examiner's presentation simply reversed the effect of the hedges. In many cases, the Tax Transactions involved the acquisition of assets unrelated to Enron's business (such as airplanes and interests in mortgage loans) for no business purpose other than to increase Enron's reported net income. To assess the impact of these transactions, the Examiner simply reversed the effects of the transactions on year 2000 net income and cash flow and eliminated the deferred tax asset created by the transactions.

The Examiner's analysis does not seek to reverse the effects of MTM accounting, except to the extent that the technique itself was based on MTM accounting.[112] This analysis is set forth on Appendix Q (Schedules Depicting Impact of Enron's Six Accounting Techniques) attached hereto.[113] These results are summarized below.[114]

For the year 2000, with respect to the SPE transactions that the Examiner has considered, 96% of Enron's reported net income and 105% of its reported funds flow from operations were attributable to these six accounting techniques. Moreover, were it not for the use of these six accounting techniques, Enron's debt at December 31, 2000, would have been $22.1 billion rather than $10.2 billion as reported. As illustrated below, the application of these six accounting techniques on Enron's 2000 financial statements was dramatic (dollars in millions):

---

[112] For example, the Examiner's analysis of the impact of the FAS 140 technique does not eliminate either the positive or negative MTM adjustments to the Total Return Swaps used as credit support in those bridge financings, but it does eliminate the effect of the non-economic hedges, the entire effect of which was dependent on marking-to-market the derivative instruments used for the hedge.

[113] The Examiner selected the year 2000 as the basis for this illustration because (i) 2000 was the last year for which Enron issued audited financial statements (and, thus, Andersen's audit workpapers are available from which to collect and verify various data), (ii) many of the SPE transactions (but not all) affected the financial results in 2000, and (iii) a limited analysis of the year 2000 could be performed in an efficient manner.

[114] Neither the summary below nor Appendix Q (Schedules Depicting Impact of Enron's Six Accounting Techniques) is intended to illustrate how GAAP would have required the transactions to be reported. As discussed in detail in many of the other Sections of this Report, in many cases, Enron's reported treatment was not supported by applicable GAAP, and in other cases it was. Thus, the Examiner's analysis of the effects of the six enumerated accounting techniques on the year 2000 financial statements is not intended to be a restatement of Enron's 2000 financial statements in accordance with GAAP or to provide comprehensive data from which such a restatement could be prepared. As described above, it is not possible to fully understand Enron's use of structured finance transactions involving SPEs without consideration of the very purpose of those transactions—to manage Enron's financial statements. Accordingly, the analysis was undertaken solely to illustrate in a general way the extraordinary impact that Enron's use of structured finance involving SPEs had on Enron's reported results of operations, cash flows and financial position, and the attendant effects on the financial components of its key credit ratios and on the key credit ratios themselves.

| | Net Income | Funds Flow from Operations | Total Assets | Debt |
|---|---|---|---|---|
| **As reported** | $979.0 | $3,010.0 | $65,503.0 | $10,229.0 |
| **Adjustments for:** | | | | |
| 1. FAS 140 Transactions | (351.6) | (1,158.3) | 812.5 | 1,353.4 |
| 2. Tax Transactions | (269.1) | (60.6) | - | - |
| 3. Non-Economic Hedges | (345.7) | - | (867.0) | (150.0) |
| 4. Share Trusts | 29.7 | (418.0) | 4,178.0 | 4,871.0 |
| 5. Minority Interests | - | - | - | 1,740.0 |
| 6. Prepays | - | (1,527.0) | - | 4,016.3 |
| Total adjustments | (936.7) | (3,163.9) | 4,123.5 | 11,830.7 |
| **Total after adjustments** | $42.3 | ($153.9) | $69,626.5 | $22,059.7 |
| **Adjustment as % of amount originally reported** | (96%) | (105%) | 6% | 116% |

The effects of Enron's use of the six accounting techniques on the components of Enron's key credit ratios as of December 31, 2000 are summarized as follows (dollars in millions):

| Credit Ratio Component | As reported | As adjusted | % Change |
|---|---|---|---|
| Funds flow from operations | $3,010.0 | ($153.9) | (105%) |
| Debt | $10,229.0 | $22,059.7 | 116% |
| Total Obligations | $10,466.0 | $22,297.0 | 113% |
| Shareholders' equity and other items | $14,788.0 | $10,342.0 | (31%) |
| Earnings for credit analysis | $2,492.0 | $1,793.0 | (28%) |
| Interest | $944.0 | $1,567.0 | 66% |

Finally, the effects of Enron's use of the six accounting techniques on Enron's key credit ratios as of December 31, 2000 are summarized as follows (dollars in millions):

| Key Credit Ratio | As reported | As adjusted | % Change |
|---|---|---|---|
| Funds flow interest coverage | 4.07 | 0.90 | (78%) |
| Pretax interest coverage | 2.54 | 1.11 | (56%) |
| Funds flow from operations/Total obligations | 28.8% | (0.7%) | (102%) |
| Total obligations/Total obligations plus Total shareholders' equity and certain other items | 41.4% | 68.3% | 65% |
| Debt/Total Capital | 40.9% | 68.1% | 67% |

## E.     Enron's Misuse of its Six Accounting Techniques

*Background*

Managing a corporation's business affairs in order to achieve, and then to report, steady earnings growth, healthy cash flow and a strong balance sheet is what good business managers are expected to do. These efforts, of course, must be consistent with GAAP and applicable disclosure standards under the securities laws.[115] There are many tools that business managers have at their disposal to achieve and report earnings and other financial results. Among those tools are structured finance transactions using SPEs. There is nothing improper about the use of structured finance and SPEs to achieve and

---

[115] "Managing earnings" using techniques not in accordance with GAAP, such as maintaining reserves for use in down quarters or washing out bad results through "non-recurring" restructure or impairment charges or recognizing revenue through so-called "round trip" deals, is not appropriate, as the SEC's accounting staff made clear in a series of staff accounting bulletins issued in late 1999. SEC Staff Accounting Bulletin No. 99 (Materiality), Aug 12, 1999; SEC Staff Accounting Bulletin No. 100 (Restructuring and Impairment Charges), Nov. 24, 1999; SEC Staff Accounting Bulletin No. 101 (Revenue Recognition in Financial Statements), Dec. 3, 1999.

report business results. Enron, however, used structured finance to report results it had not achieved.

As the Examiner noted in the September Report, structured finance transactions using SPEs are often an efficient means of obtaining funding while simultaneously achieving accounting, tax and regulatory benefits.[116] Indeed, achieving these benefits is why companies engage in structured finance transactions. In the vast majority of Enron's SPE transactions investigated by the Examiner, Enron sought to achieve financial accounting benefits.[117] The Examiner has analyzed the financial accounting results that Enron reported through those transactions and has analyzed whether Enron's reporting of those results was proper.[118]

To determine whether Enron properly reported the financial accounting results of its SPE transactions, the Examiner considered:

- whether Enron complied with GAAP as it existed at the time Enron reported its various SPE transactions;

- whether Enron's financial statements reflecting its accounting for its SPE transactions "fairly presented" Enron's financial position, results of operations and cash flows in accordance with GAAP; and

---

[116] September Report, at 22.

[117] A principal purpose of a few of the SPE transactions investigated thus far was to achieve regulatory benefits. Although there is a category of transactions that the Examiner has labeled "Tax Transactions," these transactions had as their principal purpose financial accounting results, which were attainable (if at all) by seeking to achieve future tax benefits.

[118] Any failure by Enron to report properly the financial accounting results of its SPE transactions could have implications for Enron, its officers, directors, accountants, lawyers, investment bankers and others who were involved in the transactions. One implication that could benefit the Debtors' estates is the possible equitable subordination of claims of those persons or entities involved with the improper financial accounting and reporting. The Examiner intends to report on these and other consequences of his conclusions on Enron's reporting of the financial accounting results of the SPE transactions investigated by the Examiner in future reports.

- 50 -

- whether Enron reported the financial results of its SPE transactions in compliance with the disclosure standards under the federal securities laws, rules and regulations.

In order to analyze these questions, it is helpful to understand the relationship between (i) rules-based GAAP, (ii) the principle of "fairly presents" under GAAP, (iii) disclosure under applicable securities laws and (iv) the principle of substance over form.

*Rules-Based GAAP.* Enron devoted substantial time and resources to engineering its SPE transactions to satisfy the complex GAAP rules. In many cases, Enron created arguments to support its GAAP position through aggressive extensions of the existing GAAP rules or application of these rules by creative analogy. Enron and its accounting firm Andersen were also aggressive participants in the GAAP standard setting process.[119] Enron's goal was to report the financial accounting results of its SPE transactions in the most favorable manner, which frequently was inconsistent with the economic substance of the transactions. GAAP arguably lends itself to this type of financial engineering. In fact, it is now widely acknowledged by the GAAP standard setters themselves that "[t]he development of rule-based accounting standards has resulted in the employment of financial engineering techniques designed solely to achieve accounting objectives rather than to achieve economic objectives."[120] While the primary GAAP rule maker in the United States, the Financial Accounting Standards Board ("FASB"), has adopted certain

---

[119] *See* Appendix B (Accounting Standards).

[120] Testimony of Harvey L. Pitt, Chair, SEC, before the U.S. Senate Committee on Banking, Housing and Urban Affairs, Mar. 21, 2002; *see also* "Proposal: Principles-Based Approach to U.S. Standard Setting," Financial Accounting Standards Board, Oct. 21, 2002 (the "FASB Principles Proposal").

statements of broad principle,[121] these statements are not GAAP[122] and the FASB has acknowledged that these principles have "not provided all the requisite tools for resolving accounting and reporting problems . . . because certain aspects . . . are incomplete, internally inconsistent, and ambiguous."[123] As one might expect, the broad principles embody the fundamental concept that transactions should be reported in accordance with their economic substance rather than their legal form.[124] Under the current system of GAAP, however, these broad concepts have given way to rules-based, bright-line tests under which the financial accounting for a transaction often depends on the form of the transaction rather than its economic substance. In fact, in many cases the very purpose of designing a structured finance transaction to comply with the literal GAAP rules is to report the transaction in accordance with its form rather than its economic substance.

In Appendix B (Accounting Standards) to this Report, the Examiner summarizes the nature of GAAP and how it is promulgated. That discussion focuses on certain specific GAAP rules, organized under four major subject matter areas, that are particularly applicable to many of the SPE transactions described in this Report. The

---

[121] The FASB has adopted a series of Statements of Financial Accounting Concepts ("FAC"), which have as their stated purpose "to establish the objectives and concepts that the Financial Accounting Standards Board will use in developing standards of financial accounting and reporting...." FAC No. 1.

[122] "[A] Statement of Financial Accounting Concepts does not establish generally accepted accounting principles and therefore is not intended to invoke the application of Rule 203 of the Rules of Conduct of the Code of Professional Ethics of the American Institute of Certified Public Accountants (or successor rule or arrangement of similar scope and intent)." FAC No. 1. Rule 203 is the rule that requires accountants to certify financial statements only if the accountant has determined that they fairly present the financial position, results of operations and cash flows in accordance with GAAP.

[123] FASB Principles Proposal, at 6.

[124] FASB Concepts Statement No. 2, *Qualitative Characteristics of Accounting Information,* provides at ¶ 160 that "[s]ubstance over form is an idea that also has its proponents, but it is not included [in this concepts statement] because it would be redundant. The quality of reliability and, in particular, of representation faithfulness leaves no room for accounting representations that subordinate substance to form."

Appendices to this Report address the facts and economic substance of specific transactions and analyze the transactions against the GAAP rules in order to determine Enron's desired accounting treatment and whether Enron's actual accounting treatment was proper. As discussed in detail in certain of these Appendices, despite Enron's extraordinary efforts to comply with the GAAP rules, in many cases the Examiner has been unable to find a sufficient basis under even the rules-based GAAP standards to support Enron's reported financial accounting.[125]

*Fairly Presents.* Although broad principles such as "substance-over-form" are frequently subjugated to the GAAP rules-based approach, even in those cases for which there is some authority under a GAAP rule for a particular accounting position that is inconsistent with the transaction's economic substance, both the accounting profession[126] and the courts[127] have acknowledged that compliance with the GAAP rules alone is not sufficient if the resulting financial statements do not "fairly present in all material respects" the financial position, results of operations and cash flows in accordance with GAAP. Based upon the Examiner's investigation thus far, it appears that Enron designed many of its SPE transactions to be reported in a manner inconsistent with the economic substance of the underlying transaction. These transactions had a material impact on Enron's financial statements. The divergence of Enron's reported financial position,

---

[125] Enron has acknowledged that a number of its SPE transactions were not reported in accordance with applicable GAAP. *See* 10-Q for 3Q/2001.

[126] *See* SAS 69, The Meaning of "Present Fairly in Conformity with Generally Accepted Accounting Principles" in the Independent Auditor's Report; AICPA Code of Professional Conduct R. 203, Accounting Principles, *available at* http://www.aicpa.org/about/code/et203.htm.

[127] *See, e.g., U.S. v. Simon*, 425 F.2d 796 (2d Cir. 1969), *cert. denied*, 397 U.S. 1006 (1970) ("critical test" is whether financial statements as a whole "fairly present" the financial position and results of operations of the company for the period under review; compliance with GAAP "persuasive" but not "conclusive" that the facts as certified were not materially false or misleading).

results of operations and cash flows from the economic substance of the SPE transactions raises substantial questions regarding whether Enron's financial statements were "fairly presented," even assuming technical compliance with GAAP. Regardless of the outcome of that analysis, however, the Examiner has concluded that Enron's reporting of many of the SPE transactions did not comply with applicable GAAP rules in the first instance. This failure resulted in Enron's financial statements during the periods it engaged in these transactions not fairly presenting in all material respects its financial position, results of operations and cash flows in accordance with GAAP.

*Disclosure.* A public company like Enron, in addition to complying with the literal GAAP rules and publishing financial statements that fairly present its financial position, results of operations and cash flows in accordance with GAAP, must also comply with the federal securities laws mandating additional financial disclosure. One of the primary financial disclosures for any public company is its MD&A. The SEC described the purpose of the MD&A requirement as follows:

> The [SEC] has long recognized the need for a narrative explanation of the financial statements, because a numerical presentation and brief accompanying footnotes alone may be insufficient for an investor to judge the quality of earnings and the likelihood that past performance is indicative of future performance. MD&A is intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company. [Item 303 of Regulation S-K] asks management to discuss the dynamics of the business and to analyze the financials.[128]

Financial disclosure in general, and the MD&A in particular, act as a backstop to GAAP and the requirement of fair presentation in accordance with GAAP. Whereas the

---

[128] SEC Interpretation: Management's Discussion and Analysis of Financial Condition and Results of Operations; Certain Investment Company Disclosures, Rel. Nos. 33-6835, 34-26831, IC-16961, FR-36 (May 18, 1989), *available at* http://www.sec.gov/rules/interp/33-6835.htm, at § III.A.

rules-based approach to GAAP may permit certain structured transactions to be reported

in accordance with their form rather than economic substance, if MD&A is to serve its

stated purpose of enabling investors to judge the quality of earnings through the eyes of

management, the economic substance and impact of a company's material transactions

would have to be revealed in MD&A. As set forth in Appendix D (Enron's Disclosure of

Its SPEs) attached hereto, the Examiner concludes that, quite apart from questions of

whether its accounting for particular SPE transactions was proper, Enron failed in several

key respects to provide adequate disclosure to the marketplace of facts and circumstances

that were critical to an understanding of its financial condition, operating results and cash

flows.[129] In particular, in his analysis of Enron's public disclosures taken as a whole, the

Examiner has concluded:

- Enron's disclosures concerning its SPE transactions in the notes to the consolidated financial statements and MD&A did not adequately convey the nature and extent of Enron's dependence on these off-balance sheet arrangements for its liquidity and capital resources or Enron's continuing obligations and commitments under these arrangements and their potential effect on its liquidity and capital resources. There were substantial risks in Enron's ability to maintain its liquidity through these off-balance sheet arrangements or otherwise, and those risks were not adequately disclosed.

- Enron went to great lengths in attempting to satisfy technical rules-based disclosure principles under GAAP and the SEC's line-item disclosure requirements. As noted in this Report, Enron failed in that effort in several respects. In contrast, Enron gave scant attention to the principles-based disclosure requirements of MD&A in its SEC filings.

---

[129] This Report does not address the merits of the disclosure-related claims brought against Enron and others in the Newby Class Action and in other litigation. These claims are the subject of ongoing litigation, with discovery pending, and require proof of several elements that this Report does not address. The Examiner does not intend to address the merits of these claims as part of his investigation.

- Enron's aggressive use of SPEs, supported in many cases by the market value of Enron's own securities, made Enron particularly vulnerable to a weakening economy and less able to weather economic and market turbulence. Enron's disclosures, however, did not reflect this vulnerability.

- Enron's related party disclosures seem calculated to disclose as little as possible about its dealings with various related party entities. Enron used aggressive interpretations of SEC rules and regulations to arrive at a series of proxy statement and footnote disclosures that were incomplete and uninformative.

- Finally, Enron cannot persuasively claim that its non-SEC disclosures or other information available to the marketplace cured the deficiencies noted above. The total mix of information available about Enron—while sprinkled (particularly in hindsight) with omens of what was to come—was not such that Enron can effectively claim that "everyone knew" what it was doing.[130]

*Substance Over Form.* The principle that financial statements should reflect the economic substance of transactions rather than their strict legal form has been subjugated to some extent to the rules-based approach of GAAP. Nevertheless, it is doubtful that a company's financial position can be "fairly presented," or that its MD&A narrative and other required financial disclosures can comply with the federal securities laws, if, through pervasive use of structured finance and aggressive accounting practices, a public company has so engineered its reported financial position and results of operation that its financial statements bear little resemblance to the economic substance of its actual financial condition or performance. The Examiner has found that Enron used SPEs to engineer its financial statements so that they diverged materially from Enron's actual economic condition and performance.

---

[130] In Appendix D (Enron's Disclosure of Its SPEs) the Examiner also considers whether the "total mix" of publicly available information about Enron's use of SPE transactions was such that any deficiencies in Enron's SEC disclosures may have been cured or mitigated to some extent by its non-SEC disclosures and by information publicly disseminated by third parties.

**F.** **Interim Report on Enron's SPE Transactions**

In the following ten Sections, the Examiner provides his summary on substantially all of Enron's material SPE transactions identified to date. The SPE transactions are grouped as follows:

- Prepay Transactions

- Share Trust Transactions

- Minority Interest Transactions

- Tax Transactions

- Forest Products Transactions

- Related Party Transactions

- FAS 140 Transactions

- Bammel Transactions

- JEDI II Transactions

- Miscellaneous Transactions

## V. PREPAY TRANSACTIONS

### A. <u>Overview of Prepay Transactions</u>

Enron engaged in a number of structured commodity transactions commonly referred to as "prepay transactions" that had an extraordinary effect on Enron's reported cash flows from operating activities and financial statements. In fact, from 1992 through 2001, Enron obtained at least $8.6 billion of cash through these transactions.[131]

Enron's prepay transactions involved a series of contracts to sell commodities such as oil and gas, with Enron receiving the sales price in advance, or as a "prepayment" for future periodic deliveries of the commodity. The transactions resulted in Enron receiving large upfront payments in return for its obligation to repay the amounts over time, together with additional amounts comparable to interest. Enron also agreed to deliver commodities (or payments in lieu of deliveries) at specified future times and places, and as a result, Enron appeared to have assumed the market risk of the commodities. These delivery requirements went from party to party around a circle with the result that the apparent assumption of price risk was illusory.[132] Thus, the transactions were in substance debt, funded by either large financial institutions or institutional investors.

Pursuant to eleven of these transactions, entered into between 1997 and 2001 and still outstanding on the Petition Date (collectively, the "Prepay Transactions"), Enron

---

[131] *The Role of Financial Institutions in Enron's Collapse (Day One): Hearings before the Permanent Subcomm. on Investigations of the Senate Comm. of Governmental Affairs*, 107th Cong., July 23, 2002 (the "PSI Prepay Report") (testimony of Robert Roach, Counsel & Chief Investigator, PSI) [AB000359469-AB000359509].

[132] In the Mahonia Transactions, some limited commodity market risk remained. *See* Report, Annex 1 to Appendix E (Prepay Transactions).

borrowed approximately $5 billion.[133]  The Prepay Transactions are reviewed in detail in Appendix E (Prepay Transactions) to this Report, which should be reviewed in its entirety for a more complete understanding of these transactions.  This Section V is intended to provide an overview of the Prepay Transactions and the Examiner's conclusions with respect to certain legal and accounting issues arising out of such transactions.

As discussed below, the Examiner has concluded that Enron should have accounted for the Prepay Transactions as debt rather than as price risk management activities, and that Enron should have reported the cash received as cash flows from financing activities instead of from operating activities.  As a result, the Examiner has concluded that, pursuant to the Prepay Transactions, Enron:

- understated its debt by approximately $5 billion on its June 30, 2001 balance sheet; and

- incorrectly reported the cash obtained through the Prepay Transactions as cash flows from operating activities rather than cash flows from financing activities.

## B.  **Background of Prepay Transactions**

The Prepay Transactions include four transactions facilitated by Citibank and seven transactions facilitated by JPMorgan, all of which were outstanding on the Petition Date.  The Citibank transactions are referred to as Yosemite I, II, III and IV (collectively, the "Yosemite Transactions").  The JPMorgan transactions are referred to collectively as the "Mahonia Transactions" and individually by the names "Chase VI" through "Chase

---

[133] Enron entered into other prepay transactions during this period of time, some of which may have still been outstanding on the Petition Date, that are not described in this Report.

XII," referring to the chronological order in which they were completed. The following chart summarizes certain general information about the Prepay Transactions:

| Name of Transaction | Date of Closing | Approximate Gross Proceeds Received by Enron Affiliate* | Date of Maturity |
|---|---|---|---|
| Chase VI | Dec. 18, 1997 | $300 million | Dec. 2001 |
| Chase VII | June 26, 1998 | $250 million | June 2002 |
| Chase VIII | Dec. 1, 1998 | $250 million | Dec. 2002 |
| Chase IX | June 28, 1999 | $500 million | June 2004 |
| Yosemite I | Dec. 22, 1999 | $800 million | Oct. 2004 |
| Yosemite II | Feb. 23, 2000 | $331.8 million[134] | Jan. 2007 |
| Chase X | June 28, 2000 | $650 million | June 2005 |
| Yosemite III | Aug. 25, 2000 | $475 million | July 2005 |
| Chase XI | Dec. 28, 2000 | $330.4 million | Nov. 2005 |
| Yosemite IV ($) | May 24, 2001 | $475 million | Apr. 2006 |
| Yosemite IV (£) | May 24, 2001 | $154.4 million[135] | Apr. 2006 |
| Yosemite IV (€) | May 24, 2001 | $145.7 million[136] | Apr. 2006 |
| Chase XII | Sept. 28, 2001 | $350 million | Mar. 2002 |

* Note that these amounts do not reflect net increases in the prepay balances, as some later prepay transactions replaced earlier prepay transactions.

*Financial Statement Impact*

The Prepay Transactions had a material effect on Enron's financial statements. As discussed below, the Prepay Transactions produced operating cash flow equal to virtually all of Enron's net operating cash flow in 1999 and 32% of its net operating cash flow in 2000. Yet, of the $5 billion Enron received from the Prepay Transactions, Enron

---

[134] In Yosemite II, this amount was actually denoted in British pounds as approximately £206.75 million. The amount converts to approximately $331,771,725 using an exchange rate of $1.6047 per British Pound on February 23, 2000. Federal Reserve Board, Federal Reserve Statistical Release: United Kingdom Historical Rates (available at http://federalreserve.gov/releases/h10/Hist/dat00_uk.htm).

[135] In Yosemite IV, this amount was actually denoted in British pounds as approximately £109.5 million. The amount converts to approximately $154,427,850 using an exchange rate of $1.4103 per British Pound on May 24, 2001. *Id.*

[136] In Yosemite IV, this amount was actually denoted in Euros as approximately €170 million. The amount converts to approximately $145,690,000 using an exchange rate of $0.8570 per Euro on May 24, 2001. Federal Reserve Board, Federal Reserve Statistical Release: United Kingdom Historical (available at http://federalreserve.gov/releases/h10/Hist/dat00_eu.htm).

reflected only $148.2 million as debt on its balance sheet.[137] This method of accounting

significantly understated Enron's true debt obligations. This also had a significant

positive effect on Enron's key financial ratios used by the Rating Agencies to establish

Enron's credit ratings.

According to a report by Fastow in August 2001 (the "Aug. 2001 Fastow

Report"), the balance of outstanding prepays ballooned from $1.258 billion at the end of

1998 to over $5 billion by June 2001.[138] For Enron, prepay transactions were simply a

means of obtaining significant amounts of cash pursuant to a structure that allowed it to

report favorable financial statement results. Enron used prepay transactions as a tool to

manage its reported financial condition and satisfy Rating Agency expectations. These

transactions typically closed toward the end of a financial quarter.[139]

The following table illustrates the dramatic effect on Enron's cash flows from

operating activities for 1999 and 2000 as reported in its 2000 Annual Statement:[140]

|  | **2000** | **1999** |
|---|---|---|
| Total Cash Flows | $4.779 billion | $1.228 billion |
| Cash Flows from Prepays[141] | $1.527 billion | $1.231 billion |
| Cash Flows without Prepays | $3.252 billion | ($.003 billion) |
| Percentage Decrease | 32% | 100% |

The related impact on liabilities is also striking. If Enron had accounted for the

liabilities associated with the Prepay Transactions as debt rather than liabilities from price

---

[137] This is the aggregate amount of the "magic notes" issued by Enron in the Yosemite Transactions, as described in Annexes 2 through 5 to Appendix E (Prepay Transactions).

[138] Enron Corp. Chief Financial Officer Report, Aug. 13, 2001 (the "Aug. 2001 Fastow Report"), at 5 [AB000204725-AB000204736].

[139] Eight of these Prepay Transactions closed within 30 days of the end of a financial quarter.

[140] 10-K for 2000.

[141] Aug. 2001 Fastow Report, at 5.

risk management activities, its reported debt levels and its debt to capitalization ratio (the

percentage of total capitalization represented by debt) would have looked remarkably

different:

| | **2000** | **1999** |
|---|---|---|
| Debt excluding Prepays | $10.229 billion | $8.152 billion |
| Amount of Prepays | $4.016 billion | $2.489 billion |
| Debt including Prepays | $14.245 billion | $10.641 billion |
| Percentage Increase | 39% | 31% |
| Debt to Cap Ratio (w/o Prepays) | 40.9% | 38.5% |
| Debt to Cap Ratio (w/ Prepays) | 49.1% | 45% |

Reduced operating cash flow and increased debt levels in these amounts would

almost certainly have resulted in credit ratings lower than those enjoyed by Enron at the

applicable times.[142]

The prepay technique was a powerful tool employed by Enron to maintain its

investment grade credit rating. William Brown, the Enron officer charged with lead

responsibility for Yosemite I and II, and who at the time managed Enron's corporate

finance group, stated that he understood the amount of any given prepay transaction was

determined by the targeted cash flow Enron wanted to show the Rating Agencies.[143] Ben

Glisan, former treasurer of Enron, explained to representatives from JPMorgan that

Enron needed to find ways to raise money through prepays and other forms of financing

because the Rating Agencies' evaluations depended on Enron's cash flow matching more

---

[142] Testimony of John C. Diaz, Managing Director, Power & Energy Group, Moody's Investors Service, and Pamela M. Stumpp, Managing Director, Chief Credit Officer, Corporate Finance Group, Moody's Investors Service, before PSI, July 23, 2001, at ¶ 4 [AB000359566-AB000359568]; Testimony of Ronald M. Barone, Managing Director, Standard & Poor's Ratings Services, before PSI, July 23, 2001, at 13 [AB000359524-AB000359542].

[143] Telephone interview with William Brown, Enron, by H. Sadler Poe, Partner, A&B, et al., Dec. 4, 2002 (the "Brown Interview").

closely Enron's MTM earnings.[144]  According to handwritten notes on a copy of the Aug. 2001 Fastow Report, Fastow apparently explained that prepay transactions were used to "bring cash forward to match earnings."[145]  A Managing Director at Salomon Smith Barney ("Salomon"), a Citibank affiliate, described this matching as giving "oomph to revenues."[146]

*Typical Prepay Transaction Structure*

While each of the Prepay Transactions was different, the following diagram illustrates the circular nature of a typical prepay transaction:

**Basic Prepay Structure**



---

[144] Email from Charles G. Freeman, JPMorgan, to Robert Traband and James Ballentine, JPMorgan, Nov. 4, 2001 [JPMBKR0007935-JPMBKR0007942].

[145] *See* Aug. 2001 Fastow Report, at 5 (quoting from handwritten notes appearing on the copy of the Aug. 2001 Fastow Report – writer unknown).

[146] Email from Steve Wagman, Citibank, to Azfar Hashmi, Citibank, Sept. 28, 2000 [AB000153284].

The typical Enron prepay transaction involved one Enron affiliate (usually ENA), a financial institution such as Citibank or JPMorgan, and a conduit entity[147] usually formed by or at the direction of the financial institution.

- *Financial Institution/Conduit.* As the first step in the circular transaction, the financial institution and the conduit entity entered into a forward contract for the delivery of a commodity. Under the forward contract, the financial institution made a prepayment to the conduit entity equal to the amount Enron desired to borrow. In exchange, the conduit entity agreed to deliver to the financial institution a specified quantity of commodities at specified times in the future.

- *Conduit/Enron Affiliate.* As the second step, the conduit entity paid the same prepayment amount to the Enron affiliate, in exchange for the Enron affiliate's agreement to deliver to the conduit entity commodities under a forward contract with terms identical to the forward contract between the financial institution and the conduit.

- *Enron Affiliate/Financial Institution.* As the final step, the financial institution agreed to deliver to the Enron affiliate the commodity on the same terms as the forward contracts in the preceding steps. In exchange, the Enron affiliate agreed to pay to the financial institution fixed amounts for the commodity in the future, equal in the aggregate to the prepayment amount the Enron affiliate received from the conduit entity plus an additional amount that effectively would be interest. This third step, which is a type of hedging transaction, would typically be documented by a swap agreement.

The net effect of the three steps of the transaction is that, at the closing, the Enron affiliate received a prepayment from the financial institution by way of the conduit entity. On the future commodity delivery dates (i) the circular delivery obligations of the parties under the forward agreements and the swap would effectively eliminate one another and (ii) the Enron affiliate would pay directly to the financial institution the amount of the

---

[147] The Examiner's use of the term "conduit" is for descriptive purposes only. The Examiner has not formed any conclusions as to whether these entities were conduits under the Bankruptcy Code.

upfront payment plus an additional agreed upon amount for the use of the funds.[148]  In economic substance, the financial institution made a loan to the Enron affiliate that the Enron affiliate repaid with interest.  Because of the circular deliveries and payments with respect to the commodities, no party assumed any additional material risk or had any potential for gain with respect to any fluctuations in the price of the underlying commodity.

With the price risk of the commodity effectively eliminated as a result of the circular nature of the structure, the only risk remaining in a typical prepay transaction was the risk that a party would not perform or be able to pay its obligations.  Thus, Enron's prepay transactions included some type of credit enhancement or security to support the obligations of the Enron affiliate.  Enron typically guaranteed those affiliate obligations.  In addition, third parties often provided credit support for the obligations of Enron and/or the Enron affiliate.  This credit support typically took the form of a letter of credit provided by one or more commercial banks or surety bonds issued by one or more insurance companies.

The financial institutions—specifically, Citibank and JPMorgan—played significant roles in facilitating the Prepay Transactions.  They helped Enron structure the transactions, providing the funding either directly or indirectly, and assisted in forming the conduit entities Andersen and Enron deemed necessary to the transactions.  Both Citibank and JPMorgan knew that Enron accounted for its obligations under the Prepay Transactions as liabilities from price risk management activities rather than debt.  They

---

[148] Sometimes this payment flowed indirectly to the financial institution through a third party, as was the case in the prepay transactions involving CSFB and Toronto Dominion.  *See* Appendix E (Prepay Transactions).

also believed that Enron reported the cash as cash flow from operating activities rather than financing activities. Nevertheless, both lenders recognized that the Prepay Transactions were essentially loans.

## C. **Examiner's Conclusions Regarding Prepay Transactions**

Collectively, the Prepay Transactions may have been Enron's single largest source of cash during the four-year period prior to the Petition Date, providing Enron with $5 billion of cash. Yet, Enron's accounting, cash flow reporting and disclosure of the transactions were inappropriate.

Enron's obligations in respect of the Prepay Transactions were effectively debt. Although the transactions were structured to include commodity sales contracts, Enron never transferred any price risk of the commodities to any third parties. The offsetting movements of the price risk around the circular structure of each transaction essentially eliminated the price risk. Thus, the upfront cash payments to Enron designed to be prepayments for the commodity sales were in effect debt, loaned to Enron by Citibank, JPMorgan or entities established and funded with the facilitation of those banks.

Enron's accounting for the Prepay Transactions did not comply with GAAP. Enron recorded its obligations in the Prepay Transactions as price risk management liabilities rather than debt. Pursuant to an application of existing GAAP, the commercially interdependent steps in the transactions should have been viewed together, and Enron should have recorded the proceeds of these borrowings as cash flow from financing activities and its repayment obligations as debt. As a result of its accounting for the Prepay Transactions, Enron materially (i) understated its debt, (ii) overstated its cash flow from operating activities and (iii) overstated its price risk management liability.

- 66 -

## VI.    SHARE TRUST TRANSACTIONS

### A.    Overview of Share Trust Transactions

In the Marlin transaction (the "Marlin Transaction") and the Whitewing transaction (the "Whitewing Transaction"; together with the Marlin Transaction, the "Share Trust Transactions"),[149] Enron employed a "Share Trust" structure in which Enron created entities that raised, in the aggregate, $3.8 billion in off-balance-sheet financing using support provided by Enron's preferred stock, related contractual obligations of Enron, and Enron notes.   Appendices G (Whitewing Transaction) and H (Marlin Transaction) to this Report contain the Examiner's detailed analysis of these transactions and should be reviewed in their entirety for a more complete understanding of the Share Trust Transactions.   This Section VI is intended to provide an overview of the Share Trust Transactions and the Examiner's conclusions with respect to certain legal and accounting issues arising out of those transactions.

As discussed below, the Examiner has concluded that the Whitewing Transaction is susceptible of being collapsed under a "true sale" or substantive consolidation challenge.  If this occurs, the remaining assets in the Whitewing structure, which have an estimated aggregate value between $700 million and $1 billion, would become part of the Debtors' estates.  The Marlin Transaction also is susceptible of being collapsed under a substantive consolidation challenge, although such a challenge may not have as great a likelihood of success as a challenge to the Whitewing Transaction.  If the substantive

---

[149]  A third Share Trust transaction, referred to as Firefly, was consummated by Enron in December 1998. The Firefly transaction, like the Marlin transaction, was used to refinance and remove from Enron's balance sheet a business that Enron had recently acquired.  The Firefly transaction was repaid in 2000 with the proceeds of a transaction entered into by a subsidiary in the Whitewing structure and is briefly described in Annex 2 to Appendix G (Whitewing Transaction).

consolidation of the Marlin Transaction occurs, the remaining assets in the Marlin

structure, estimated to have a value in excess of $100 million, would become part of the

Debtors' estates.

Through the Share Trust Transactions, Enron:

- overstated cash flow from operating activities by at least $1.1 billion through December 31, 2000 and understated cash flow from financing activities by $2.1 billion during such period; and

- failed to adequately disclose more than $3.3 billion of contingent obligations on its December 31, 2000 financial statements.

## B. Background of Share Trust Transactions

In each Share Trust Transaction, Enron created a Delaware statutory business

trust (the "Issuer") that sold notes and certificates of beneficial interest to the institutional

private placement market. The Issuer then contributed the proceeds from the sale of its

securities to another entity (the "Holding Entity") and Enron (directly or through

subsidiaries) contributed other assets to the Holding Entity. The Holding Entity (i) used a

portion of the cash received from the Issuer and the assets contributed by Enron to

establish a reserve fund to support the payment of the Issuer's securities and (ii) used the

remaining cash received to purchase assets or to repay existing financing.

The linchpin of Enron's Share Trust Transactions was Enron's obligations with

respect to its stock. These obligations (collectively, the "Share Trust Obligations")

consisted of the following:

- Enron issued preferred stock to a trust (the "Share Trust").

- Enron agreed to cause the Enron preferred stock (or Enron common stock into which the Enron preferred stock was convertible) to be sold in amounts sufficient to repay the Issuer's notes when due.

- In the event that the Enron stock in the Share Trust was not sufficient to generate the amounts necessary to repay the Issuer's notes, Enron agreed to issue additional shares that, when sold, would make up the shortfall.

- If sufficient Enron shares could not be sold to raise the necessary funds, or Enron breached its obligations to issue and sell the Enron shares, Enron was obligated to provide the funds needed to repay the notes.[150]

Enron retained practical control of the assets owned by the Holding Entities and their subsidiaries and retained substantially all of the anticipated economic risks and rewards of these assets and the Enron stock held in the Share Trusts.

The Issuers and the Holding Entities were not consolidated in Enron's financial statements. As a result, these off-balance-sheet structures enabled Enron to obtain financing based on Enron's stock and credit (without reflecting the financing on Enron's consolidated balance sheet), to reduce the assets shown on Enron's consolidated balance sheet, and to achieve other financial reporting goals.

---

[150] The Issuer's certificates were to be paid with any assets remaining in the reserve fund, other assets held by the related Holding Entity and, in the Whitewing Transaction, any Enron shares remaining in the Share Trust.

The following is a simplified diagram of a typical Share Trust Transaction:



The Marlin Transaction and the Whitewing Transaction, are discussed below.

**C.**    **Marlin**

Unlike the Whitewing structure (discussed below), which appears to have been

used as an ongoing financial statement management tool by Enron, the Marlin structure

was used to move one business – Enron's water business, Azurix and its subsidiaries –

off Enron's balance sheet. It was not used to acquire other assets from Enron but resembled a term financing used for an acquisition.

In the Marlin Transaction, Marlin is the Issuer, Atlantic Water Trust ("Atlantic") is the Holding Entity, Bristol Water Trust ("Bristol") is the reserve fund and the Preferred Voting Trust (the "Preferred Share Trust") is the Share Trust.

In November 1998, Enron, through its wholly owned indirect subsidiary, Azurix, completed the acquisition of all of the outstanding stock of Wessex Water Plc, a publicly held water company in England ("Wessex"). Enron and its consolidated subsidiaries incurred approximately $1.9 billion of debt to finance the acquisition.

In December 1998, Enron completed the initial Marlin Transaction. Marlin issued $1.024 billion of notes (the "Marlin I Notes") and $125 million of certificates (the "Marlin Certificates") and contributed the $1.15 billion of proceeds to Atlantic in exchange for a beneficial interest in Atlantic. In exchange for its beneficial interests in Atlantic, Enron contributed various assets to Atlantic, including (i) ownership of Azurix and related entities (including Wessex) and (ii) a £73 million debt obligation (the "AEL Debt") issued by Azurix Europe Ltd. (a subsidiary of Azurix) ("Azurix Europe").

Atlantic used $900 million of the Marlin contribution to repay a portion of the indebtedness incurred to acquire Wessex. Atlantic contributed the remaining $249 million in cash and all of the AEL Debt to Bristol as the reserve fund to support the repayment of the Marlin securities. Bristol invested the cash that it received in an Enron note. Enron contributed 204,800 shares of its preferred stock (convertible into 17.2 million shares of Enron common stock) to the Preferred Share Trust and undertook its Share Trust Obligations.

In August 2001, Enron used Marlin Water Trust II ("Marlin II") to refinance the outstanding Marlin I Notes. Upon completion of this refinancing, the Marlin structure and the Enron support for the notes issued by Marlin II (the "Marlin II Notes") and Marlin Certificates were generally the same as the initial Marlin Transaction; however, because it was not certain that the sale of Atlantic assets or equity in Atlantic or Azurix could support the payment of the Marlin II Notes and Marlin Certificates, reliance on Enron's support appears to have been greater than in the Marlin I Transaction.[151]

Azurix and its subsidiaries have sold most of their assets (including Wessex in a transaction approved by the Court in May 2002). The current value of Azurix is uncertain because the value depends on resolving several legal proceedings and on determining Azurix's exposure for certain contingent obligations. To the extent that there is value in Azurix, as discussed in the Marlin Appendix, Enron may have a claim to that value through its ownership of Azurix preferred stock.[152] In addition, $107 million

---

[151] Offering Memorandum relating to notes issued by Marlin Water Trust II and Marlin Water Capital Corp. II, July 12, 2001, at 12-14 [AB000045790-AB000045970]. *See also* Fitch Press Release, "Fitch Rts Marlin Water Trust II Sr. Secured Notes Due 2003, 'BBB,'" July 18, 2001, at 1 (noting that "primary credit support is derived from the Enron obligation to remarket mandatorily convertible preferred stock") [AB025202126-AB025202127]; Moody's Investors Service Press Release, "Moody's Assigns Baa1 Rating to Marlin Water Trust II and Marlin Water Capital Corp. II," July 12, 2001, at 1 (citing importance of Enron preferred stock) [AB025202167-AB025202168].

[152] In March 2001, prior to the consummation of the Marlin II Transaction, Azurix and Enron (through a wholly owned subsidiary) effected a "going-private" transaction in which Enron acquired the Azurix common stock that had been sold in the initial public offering of Azurix's common stock. At the time of the going-private transaction, Enron also converted Azurix debt that Enron held into Azurix preferred stock. Enron now holds all of the outstanding Azurix preferred stock, one-third of the outstanding Azurix common stock and, through its beneficial interest in Atlantic, an interest in the remaining two-thirds of the outstanding Azurix common stock. *See* Azurix Form 8-K filed with the SEC, Mar. 16, 2001 [AB000380722-AB000380726]; Azurix Schedule 14A Information, Proxy Statement, filed with the SEC, Dec. 21, 2000, at 54 [AB000380291-AB000380408].

in cash is held in the Marlin structure and is the subject of a proceeding before the Court.[153]

### D.     Whitewing

The Whitewing Transaction, in contrast to the Marlin Transaction, appears to have been used as an ongoing financial statement management tool by Enron.  Over a two-year period, the Whitewing structure (i) purchased multiple assets involved in different types of businesses from Enron in transactions that removed the assets from Enron's consolidated balance sheet, (ii) entered into other transactions that benefited Enron and (iii) entered into loans and other transactions with Enron and parties such as LJM1 and LJM2.[154]   The Whitewing Transaction functioned more like a revolving facility with the aggregate amount of advances made by Whitewing entities to Enron over a two-year period exceeding $2.7 billion.

In the Whitewing Transaction, Osprey Trust ("Osprey") was the Issuer, Whitewing Associates L.P. ("Whitewing Associates") was the Holding Entity, and the Share Trust and reserve fund were combined in the Condor Share Trust (the "Condor Share Trust").

The Whitewing structure was created on September 24, 1999 when Osprey issued $100 million of certificates (together with subsequent issuances, the "Osprey Certificates") and $1.4 billion of notes (together with subsequent issuances, the "Osprey

---

[153] *See* Complaint for Declaratory Relief, *Bank of New York v. Enron Corp.*, No. 02-02380 (AJG) (Bankr. S.D.N.Y. filed May 9, 2002), at ¶ 35; Answer of the Official Comm. Of Unsecured Creditors to the Complaint for Declaratory Relief, *Bank of New York v. Enron Corp.*, No. 02-02380 (AJG) (Bankr. S.D.N.Y. filed Nov. 18, 2002).

[154] For example, LJM1 and LJM2 (directly or indirectly) held certificates issued by the Issuer in the Whitewing structure, Osprey Trust. One Whitewing subsidiary made loans totaling $38.5 million to LJM2.

Notes"). Osprey used the $1.5 billion in total proceeds to acquire an interest in Whitewing

Associates and in Whitewing Management LLC ("Whitewing Management"), the general

partner of Whitewing Associates. Enron (through subsidiaries) held the remaining

interests in Whitewing Associates and Whitewing Management.

Enron contributed to Whitewing Associates, and Whitewing Associates

contributed to the Condor Share Trust, 250,000 shares of Enron preferred stock

(convertible into 50 million shares of Enron common stock) and $139.2 million of Enron

notes to support repayment of the Osprey Notes and the Osprey Certificates. In addition,

Enron undertook its Share Trust Obligations.

Of the $1.5 billion in cash raised through Osprey in September 1999 and

contributed to Whitewing Associates, Whitewing Associates used $578 million to repay

an earlier Minority Interest financing, known as Nighthawk, to which Whitewing

Associates had been a party, contributed to the Condor Share Trust $115.7 million in cash

for the reserve fund (which was invested in Enron notes), and retained $807 million to be

used by Whitewing Associates to make investments.

Osprey subsequently completed two additional financings and contributed the

proceeds to Whitewing Associates: (i) in July 2000 Osprey raised an additional

$70 million through the sale of additional Osprey Certificates and (ii) in October 2000

Osprey raised an additional $1.08 billion through the sale of $50 million of additional

Osprey Certificates and $1.03 billion of additional Osprey Notes. In addition, in

July 2000, Whitewing Associates received an additional $339.3 million capital

contribution (consisting of $280 million in cash and a $59.3 million Enron note) and in

October 2000, Whitewing Associates received a capital contribution of an additional

$42.7 million Enron note, in each case from one of the Enron subsidiary limited partners in Whitewing Associates.

Like the Marlin Transaction, the Whitewing Transaction was supported by Enron credit through the Share Trust Obligations. The combination of dividends on the Enron preferred stock, interest payments on the Enron notes and principal payments on a portion of the Enron notes in the Condor Share Trust was structured to generate funds sufficient to pay the interest on the $2.43 billion of Osprey Notes and the yield on the $220 million of Osprey Certificates.

Principal of the $2.43 billion of Osprey Notes was expected to be paid from (i) the sale of Enron preferred stock held in the Condor Share Trust and/or other equity securities and (ii) liquidation of Osprey's interest in Whitewing Associates (including Whitewing Associates' assets).

Whitewing Associates invested the funds contributed by Osprey and Enron subsidiaries in various assets (the "Whitewing Investments"), including paying $1.6 billion to purchase assets from Enron. These investments were made through wholly owned subsidiaries of Whitewing Associates (the "Whitewing Investment Entities"). Enron retained practical control over the Whitewing Investment Entities and substantially all of the anticipated risks and rewards of the Whitewing Investments. Enron recorded the proceeds of its sales of assets to the Whitewing Investment Entities as cash flow from operating activities. The Whitewing Investment Entities hold assets with an estimated aggregate value between $700 million and $1 billion.

### E. Examiner's Conclusions Regarding the Share Trust Transactions

The Examiner has reached the following conclusions regarding the Share Trust Transactions:

*Legal Issues*

*True Sale and Substantive Consolidation.* For the reasons set forth in detail in the applicable Appendices, the Examiner concludes that, in the event of a "true sale" challenge, the transfers of assets by the Debtors to the various subsidiaries of Whitewing Associates would likely be recharacterized as loans. The Examiner also concludes that under a substantive consolidation analysis, Enron would likely be substantively consolidated with Whitewing Associates and, among others, the Whitewing Investment Entities. Either of these theories, if successful, would result in assets with an estimated aggregate value of between $700 million and $1 billion being restored to the Debtors' estates.

Many of the facts that support a substantive consolidation challenge in the Whitewing Transaction are also present in the Marlin Transaction. However, the Marlin Transaction differs from the Whitewing Transaction in several important respects. Accordingly, while the Examiner believes that the entities in the Marlin Transaction are susceptible to a substantive consolidation challenge, the evidence currently available to the Examiner supporting such a challenge is not as compelling as the evidence in the Whitewing Transaction. The Marlin Transaction likely cannot be challenged successfully under a "true sale" theory.

*Avoidance Actions.* Potential avoidable transfers arising in connection with the Share Trust Transactions are described in Appendix G (Whitewing Transaction) and Appendix H (Marlin Transaction).

*Accounting Issues*

The Examiner concludes that it is likely that certain aspects of Enron's accounting treatment of the Whitewing Transaction did not comply with GAAP. In particular, the Examiner believes that Whitewing Associates should have been consolidated with Enron for accounting purposes. While there is significant evidence to indicate that Osprey should also have been consolidated with Enron, the evidence available at this time is not sufficient for the Examiner to conclude that Enron should have consolidated Osprey for accounting purposes. The consolidation of Whitewing Associates would have resulted in the inclusion on Enron's consolidated balance sheet of all of the assets and liabilities of the Whitewing Investment Entities and the presentation of Osprey's interest in Whitewing Associates as company-obligated preferred stock ("COPS"). Further, had Whitewing Associates been consolidated, any cash flow that Enron recorded as a result of Enron's (or its consolidated subsidiaries') transferring assets to the Whitewing structure would have been eliminated in consolidation.

The Examiner also concludes that Enron was not required to consolidate Marlin for accounting purposes. In addition, while there is significant evidence to indicate that Atlantic should have been consolidated with Enron, the evidence at this time is not sufficient for the Examiner to conclude that Enron should have consolidated Atlantic.

Enron's footnote disclosures, however, with respect to the Whitewing Transaction and the Marlin Transaction did not comply with GAAP, as they failed to disclose the

- 77 -

amount of Enron's contingent obligation to provide cash to repay the Osprey and Marlin

notes.

## VII. MINORITY INTEREST TRANSACTIONS

### A. <u>Overview of Minority Interest Transactions</u>

In simplest terms, a minority interest financing is one in which the amount financed is reflected on the balance sheet as a minority interest rather than as debt or as a debt/equity hybrid. Through its minority interest financings (the "Minority Interest Transactions"), Enron was able to replace on-balance-sheet debt with minority interests, thereby improving its key credit ratios. Appendix I (Minority Interest Transactions) to this Report contains the Examiner's detailed analysis of the Minority Interest Transactions and should be reviewed in its entirety for a more complete understanding of these transactions.[155] This Section VII is intended to provide an overview of Enron's Minority Interest Transactions and the Examiner's conclusions with respect to certain legal and accounting issues arising out of such transactions, focusing primarily on one particular minority interest structure - Project Rawhide.[156]

As discussed below, the Examiner has concluded that Project Rawhide is susceptible of being collapsed under either a "true sale" or substantive consolidation challenge. If this occurs, the remaining assets in the structure, valued at $400 to $500 million, would be restored to the Debtors' estates. Furthermore, the Examiner has concluded that, through the Minority Interest Transactions, Enron:

- received cash flow of $2.75 billion, $500 million of which it incorrectly recorded as cash flow from operating activities; and

---

[155] Enron's "minority interests" footnote to its consolidated financial statements includes minority interests other than those analyzed in Appendix I (Minority Interest Transactions). The projects analyzed by the Examiner in this Report are those determined by the Examiner to constitute financing arrangements rather than simply third-party minority interest investments in Enron subsidiaries.

[156] In addition to Project Rawhide, Appendix I (Minority Interest Transactions) addresses Projects Nighthawk, Choctaw, Nahanni and Zephyrus.

- failed properly to reflect $740 million of debt on its December 31, 2000 balance sheet.

## B. **Background of Minority Interest Transactions**

The following diagram reflects the typical Enron minority interest financing structure:



Note:    Entities in bold included in Enron's consolidated financial statements.

In these financings, Enron or an affiliate formed a majority owned subsidiary (a "Majority Owned Subsidiary") that was consolidated with Enron for financial accounting purposes. The minority interest in the Majority Owned Subsidiary was owned by another entity (the "Minority Shareholder") that was not consolidated with Enron for financial accounting purposes. This unconsolidated Minority Shareholder generally held no assets

other than the minority interest in the Majority Owned Subsidiary. Of the amount contributed by the Minority Shareholder to the Majority Owned Subsidiary, 3% was obtained from funding that was characterized as equity in the Minority Shareholder, and the remaining 97% was borrowed by the Minority Shareholder from third-party lenders. The Majority Owned Subsidiary, in turn, typically loaned the funds received from the Minority Shareholder to Enron or to other Enron-controlled entities that were also consolidated with Enron for financial accounting purposes (with the intercompany loans then eliminated in consolidation).

Distributions by the Majority Owned Subsidiary to the Minority Shareholder were required to be made in the amounts and at the times necessary to enable the Minority Shareholder to satisfy its obligations to its lenders and make distributions to its equity investors.

The assets that Enron and its subsidiaries contributed to minority interest financing structures varied significantly from project to project. The contributed assets ranged from merchant investments in various global energy-related products, to short-term gas-related receivables, preferred stock of a subsidiary, convertible preferred stock of Enron and, in every structure, demand notes issued by Enron. Regardless of the assets contributed, however, Enron or Enron-controlled entities maintained substantial control over the assets and their proceeds.

The minority interest financings undertaken by Enron, particularly the progression of Citibank-led financings, from Nighthawk, to Rawhide, to Nahanni, illustrate one of the patterns the Examiner has observed in Enron's use of its other major financing techniques. As Enron grew more familiar with the capabilities and limitations of a

particular structure, it would attempt to achieve more and more accounting benefits from the structure.

Enron began with Nighthawk,[157] arguably the least aggressive of the structures due, in part, to the support provided by Enron's stock and the associated array of put options, call options and other derivatives included within it. Nighthawk was a five-year minority interest financing that was designed (absent a dramatic decline in the value of Enron's stock) to be repaid from the proceeds of future sales of Enron stock in, or supporting, the structure. Ultimately, Nighthawk was redeemed in the Whitewing Transaction.[158]

Rawhide was a two-year minority interest financing (which was potentially pre-payable after one year) originally structured to be repaid from the proceeds of sales of merchant investments. Certain of the sale proceeds were intended to be temporarily invested in Enron demand loans. The amount of Enron demand loans in the structure quickly grew to exceed the amount owed on the minority interest financing itself, however, so Enron amended the operative agreements to (i) permit it not to pre-pay, but to extend, the financing and (ii) remove all limitations on the amount of Enron demand loans in the structure. The direct recourse Enron demand loans then became the principal source of repayment for the minority interest financing.

In Nahanni,[159] Enron went further by completing a 30-day year-end minority interest financing to replace debt, where Enron demand loans were always intended to

---

[157] *See* Annex 1 to Appendix I (Minority Interest Transactions).

[158] *See* Appendix G (Whitewing Transaction).

[159] *See* Annex 3 to Appendix I (Minority Interest Transactions).

serve as the principal source of repayment of the minority interest financing. Also, Enron reported $500 million of operating cash flow by extending the MTM accounting that it applied to its merchant investment venture capital activities to cover sales of U.S. Treasury Securities that had been contributed to the structure.

Although the two JPMorgan-led minority interest financings, Choctaw[160] and Zephyrus,[161] bracketed Nahanni and the amended Rawhide transaction in time, the business purpose requirements of the larger tax-motivated transactions of which those financings were a part may have limited Enron's flexibility to experiment with those structures.

### C.    Project Rawhide

Project Rawhide is particularly noteworthy. Formed in December 1998, Project Rawhide was a $750 million Citibank-led monetization of $2.4 billion of Enron's and its subsidiaries' merchant investments.[162] Through Project Rawhide, Enron was able to raise $750 million in cash in a series of transactions beginning with a loan from an affiliate of Citibank to Rawhide Investors L.L.C. ("Rawhide"), without including that financing as debt in Enron's consolidated financial statements. Approximately $690.7 million of Rawhide's original investment in the structure remains outstanding.[163]

Rawhide is the minority limited partner (i.e., the Minority Shareholder) in Sundance Assets, L.P. ("Sundance Assets") (i.e., the Majority Owned Subsidiary), a limited partnership. The majority general partner interest in Sundance Assets is held by

---

[160]  *See* Annex 2 to Appendix I (Minority Interest Transactions).

[161]  *See* Annex 4 to Appendix I (Minority Interest Transactions).

[162]  Executive Summary, Rawhide Confidential Memorandum, at I-1 [AB000211749–AB000211783].

[163]  Enron Form 10-Q filed with the SEC for the Quarter ended Sept. 30, 2001.

Ponderosa Assets, L.P. ("Ponderosa"), a limited partnership wholly owned by Enron. Enron, ENA and several other Enron-controlled entities "transferred" the $2.4 billion in assets in the form of "capital contributions" to Ponderosa. Ponderosa then contributed approximately $858 million of those assets to Sundance Assets in exchange for its general partner interest in Sundance Assets. Rawhide contributed $750 million in cash for its limited partner interest in Sundance Assets. Of the amount contributed by Rawhide to Sundance Assets, 3% was obtained from funding that was characterized as equity in Rawhide and the remaining 97% was borrowed by Rawhide. Sundance Assets then loaned the funds received from Rawhide to Ponderosa, which, in turn, loaned those funds to ENA.

Notwithstanding the numerous capital contributions and loans, the economic benefits and risks of the contributed assets remained, not with Ponderosa or Sundance Assets, and certainly not with Rawhide, but with Enron and the contributing Enron entities. Beyond this, the entire structure and the financing established within it were implemented for the benefit of Enron, which from inception assumed a significant and ever-increasing role in the repayment of the indebtness.

Apart from the Enron demand loans, Enron also provided significant credit support for the loan transactions in Project Rawhide through a series of guaranties, indemnities and other undertakings.[164] The benefits of these undertakings ran directly or indirectly to Rawhide, and Rawhide, in turn, pledged these rights as collateral to its lender.

---

[164] *See* Enron Agreement by Enron Corp. in favor of Rawhide, dated as of Dec. 18, 1998 [AB000064524-AB000064572]; Guaranty Agreement by Enron Corp. in favor of Ponderosa, Dec. 18, 1998 [AB000064499-AB000064507].

- 84 -

### D.   Examiner's Conclusions Regarding Project Rawhide

The Examiner has reached the following conclusions regarding Project Rawhide:

*Legal Issues*

*True Sale*.  The Examiner has concluded that it is likely that "true sale" concepts may be appropriately applied to Project Rawhide and that the purported "sale" or transfer of merchant investments for value (albeit in the form of a limited partner interest rather than cash) to Ponderosa and Sundance Assets may be challenged.  The Examiner believes that such transfers do not meet the requirements of a "true sale" or "true contribution" under applicable law and has determined that the purported transfers or contributions of assets by Enron, ENA and other Enron-controlled entities to Ponderosa and Sundance Assets were ineffective.  Accordingly, to the extent the original contributors of such assets are Debtors in the Bankruptcy Case, the Examiner has determined that those assets should be available to those Debtors' estates.  Similarly, to the extent the original contributors of such assets are wholly owned subsidiaries of the Debtors, the Examiner has determined that those assets should revert to their original contributors and provide additional value to those Debtors' estates.

*Substantive Consolidation*.  Based on the nature of the relationships among the Debtors, Ponderosa and Sundance Assets, the Examiner believes it is likely that these relationships justify, as an alternative to the "true sale" analysis, substantively consolidating the non-debtor entities of Ponderosa and Sundance Assets and their related assets into the Debtors' estates under applicable bankruptcy principles.

*Avoidance Actions*.   Potential avoidable transfers arising in connection with Project Rawhide are described in Appendix I (Minority Interest Transactions).

- 85 -

*Accounting Issues*

The Examiner has concluded that it is likely that Enron's determination not to consolidate Rawhide at its inception did not comply with GAAP, particularly in light of the 3% Equity Test[165] in the SPE Accounting Consolidation Analysis.[166]  In any event, the determination not to consolidate Rawhide following LJM2's acquisition of equity in Rawhide in March 2000 did not comply with GAAP.  Accordingly, at least from and after March 2000, Rawhide should have been consolidated in Enron's consolidated financial statements.

The Examiner also believes that it is arguable that, in substance, the "minority interest" of Rawhide in Sundance Assets was, from inception, actually a $750 million loan and, therefore, should have been accounted for as debt on Enron's consolidated balance sheet.  At a minimum, however, Rawhide's interest should have been treated as COPS and not minority interest.

---

[165] This term is defined in Appendix B (Accounting Standards).

[166] *Id.*

## VIII. TAX TRANSACTIONS

### A. <u>Overview of Tax Transactions</u>

In the years prior to Enron's bankruptcy, Enron's senior management encouraged and pressured the managers of Enron's corporate tax planning group ("Enron's Tax Group")[167] to help increase the reported net income of Enron for financial accounting purposes. The response of Enron's Tax Group went beyond normal tax savings techniques, and even beyond typical corporate "tax shelter" transactions, to a new genre of transactions aimed largely at "generating" accounting income from projections of future tax savings.[168] The tax department managed to create approximately $800 million of reported income over a six-year period.[169] To achieve this financial statement benefit,

---

[167] Robert J. Hermann headed Enron's corporate tax department from the 1980s through the Petition Date. In 1997, Enron formed a Corporate Tax Planning Group within the corporate tax department headed by R. Davis Maxey. In-Person Interview with Robert J. Hermann, former Vice President Tax, Enron Corp., by Philip C. Cook, Partner, A&B, Aug. 8, 2002.

[168] In many of the Tax Transactions, the tax opinion from the independent tax advisor engaged by Enron for the transaction explicitly recited the generation of financial accounting income as a "business purpose" for the transaction that was intended to support tax recognition of the form of the transaction. *See, e.g.,* Tax Opinion from Akin, Gump, Strauss, Hauer & Feld, L.L.P to R. Davis Maxey, Enron Corp., Dec. 16, 1997 ("The Company and the Enron Subsidiaries undertook the [Steele] Transaction for the principal purpose of generating financial accounting benefits to the Company's financial accounting group. . ."), at 7 [AB000151677-AB000151714]; Tax Opinion from McKee Nelson Ernst & Young LLP to R. Davis Maxey, Enron Corp., Mar. 21, 2001 (the "most important purposes of members of the Enron Affiliated Group for participating in [the Cochise Transaction]" included "increas[ing] the pre-tax financial accounting income and the net earnings on the Enron consolidated financial statements as a result of the Transactions"), at 12 [AB000151794-AB000151878]; Tax Opinion from King & Spalding LLP to R. Davis Maxey, Senior Director Tax Research, Corporate Tax, Enron Corp., July 29, 1997 ("The predominant purpose of Enron and its Affiliates for participating in the [Teresa Transaction] was to generate income for financial accounting purposes."), at 4 [AB000151584-AB000151628]. *See* Appendix J (Tax Transactions).

[169] In an interview with the Washington Post, Mr. Hermann claimed that transactions originating in Enron's corporate tax department "provided nearly $1 billion in profits from 1995 through September 2001." April Witt and Peter Behr, *Enron's Other Strategy: Taxes,* Washington Post, May 21, 2002, at A1. Based on numerous interviews of current and former employees of Enron's corporate tax department, and other information obtained in the examination, the Examiner has concluded that Mr. Hermann's claim was substantially accurate. In the words of Mr. Hermann, Enron found the transactions originating in the corporate tax department "kind of like cocaine—they got kind of hooked on it." In-Person Interview with Robert J. Hermann, former Vice President Tax, Enron Corp., by Philip C. Cook, Partner, A&B, Aug. 8,

Enron used the advice and expertise of many outside professionals[170] and also was willing to make significant outlays of cash.[171] Appendix J (Tax Transactions) to this Report contains the Examiner's detailed analysis of certain of the Tax Transactions and should be reviewed in its entirety for a more complete understanding of the Examiner's views. This Section VIII is intended to provide an overview of the Tax Transactions and the Examiner's conclusions with respect to certain legal and accounting issues arising out of such transactions.

As discussed below, the Examiner disagrees with the tax or accounting treatment of many of the Tax Transactions. Five of the Tax Transactions, which the Examiner refers to as the "REMIC Carryover Basis Transactions"[172] and the "Tax Basis Step-Up Transactions," are the most egregious in the manipulation of the rules of FAS 109[173] to create a misleading portrayal of Enron's income for GAAP purposes.[174] The Examiner

---

2002; *see also* Sworn Statement of R. Davis Maxey, former Vice President Tax, Enron Corp., to Philip C. Cook, Partner, A&B, Dec. 11, 2002 (the "Maxey Sworn Statement"), at 148-49.

[170] Enron agreed to pay significant fees to its promoters and third party advisors for the development and implementation of the Tax Transactions, with the known fees approximating $73 million.

[171] For example, by implementing the Teresa Transaction (which was projected to yield about $229 million of income) Enron incurred and paid $131 million of federal income tax for the 1997-2001 taxable years that would not otherwise have been paid.

[172] A Real Estate Mortgage Investment Conduit ("REMIC") is any entity (i) to which an election to be treated as a REMIC applies for the taxable year and all prior taxable years; (ii) in which all of the security interests are "Regular Interests" or "Residual Interests;" (iii) which has only one class of Residual Interests; (iv) for which substantially all of the assets of which consist of qualified mortgages and permitted investments; (v) which has a taxable year that is a calendar year; and (vi) which has certain arrangements in place regarding the ownership of and income relating to Residual Interests. I.R.C. § 860D; *see also* I.R.C. §§ 860A-860C and 860E-860G.

[173] Accounting for Income Taxes, Statement of Financial Accounting Standards No. 109 (Financial Accounting Standards Bd. 1992) ("FAS 109"). *See* Appendix J (Tax Transactions).

[174] *See* Appendix J (Tax Transactions). The REMIC Carryover Basis Transactions include the Steele and Cochise Transactions, which closed in October 1997 and January 1999, respectively. *Id.; see also* Report, Annexes 1-3 to Appendix J (Tax Transactions). The Tax Basis Step-Up Transactions include the Teresa, Condor, and Tammy I Transactions, which closed in March 1997, November 1999, and July 2000, respectively. *See also* Annexes 4-6 to Appendix J (Tax Transactions).

- 88 -

has concluded that Enron's accounting for these transactions did not comply with GAAP. In addition, the Examiner has identified numerous instances in which substantial questions are raised as a result of Enron's tax or accounting treatment of most of the other Tax Transactions.[175]

## B.    General Nature of Tax Transactions

Under FAS 109, generally Enron was required to recognize income tax expense based on the amount of pre-tax income reported for GAAP purposes, and not the amount of income reflected on Enron's consolidated federal income tax return. As a result, Enron reported large annual tax expenses for GAAP purposes. However, due primarily to book-tax differences arising from the use of MTM accounting for its trading operations and compensation deductions from the exercise of employee stock options, Enron had large tax net operating losses from 1996 onward. Thus, the purpose of Enron's Tax Transactions was not to reduce the amount of current tax payable to the IRS on Enron's operating income.[176]

Instead, Enron's Tax Transactions generally were crafted to create tax deductions in future years, yet generate publicly reported financial accounting income in current

---

[175] The other six Tax Transactions addressed in Appendix J include the Renegade Transaction (January 1999), the Valhalla Transaction (May 2000), the Tomas Transaction (September 1998), the Apache Transaction (May 1999), the Tanya Transaction (December 1995), and the Valor Transaction (December 1996).

[176] On its consolidated federal income tax returns, Enron reported ordinary loss of $399 million in 1996, $581 million in 1997, $813 million in 1999, and $3.023 billion in 2000. In 2000, Enron engineered the "NOLy Transaction" to generate a $5.6 billion capital gain for the sole purpose of creating sufficient taxable income to utilize all net operating losses ("NOLs") and credit carryovers so that a tax audit of the years 1996-2000 could be settled. The NOLy Transaction was "reversed" in 2001 with the "NOLy Unwind Transaction."

periods by recording "Deferred Tax Assets"[177] that reflected the projected benefit of those tax deductions at some time in the future, often years or decades hence. The Tax Transactions were, for the most part, artificial transactions involving the transfer of substantial assets and liabilities, often stock or debt of Enron or a subsidiary, to an SPE. In many cases, the SPE was formed as a partnership with a BT/Deutsche affiliate or a third-party investor.

By way of illustration, Enron used an SPE in each of the two REMIC Carryover Basis Transactions to acquire "REMIC Residual Interests"[178] from BT/Deutsche. By acquiring the REMIC Residual Interests, Enron planned to deduct hundreds of millions of dollars of "Phantom Losses"[179] on its federal consolidated tax returns in future years.

---

[177] A Deferred Tax Asset or Liability is recognized for the estimated future tax effects attributable to "Temporary Differences" and carryforwards. FAS 109, ¶ 8. A Temporary Difference, which eventually reverses, results from differences between (i) the amount of taxable income or expense reported on a company's income tax returns and the amount reported on its income statements and (ii) the tax basis in assets or liabilities and the reported amounts of such assets or liabilities in the company's financial statements. *Id.* ¶¶ 10-13. A Temporary Difference that will result in taxable income in future years when the related asset or liability is recovered or settled is a taxable Temporary Difference. *Id.* ¶ 13. On the other hand, a Temporary Difference that will result in deductible amounts in future years is a deductible Temporary Difference. *Id.* A Deferred Tax Asset or Liability must be recorded for all Temporary Differences. *Id.* ¶ 16. A Deferred Tax Asset, for example, is recognized if an asset has a lower book basis than tax basis. A Deferred Tax Liability, on the other hand, is recognized if an asset has a higher book basis than tax basis.

[178] A REMIC is a pool of mortgage securities that is taxed on a flow-through basis somewhat like a partnership. Debt obligations secured by the mortgages in the REMIC are sold to investors and are called "REMIC Regular Interests." Every REMIC also must have a single class of "REMIC Residual Interests," which are transferable interests that are akin to an "equity" ownership of the mortgage pool. The holder of the "Residual Interest," who initially is usually the sponsor of the mortgage pool, must report for tax purposes all of the residual items of taxable income and loss related to the pool.

[179] In the early years of the life of the mortgage pool, the REMIC usually generates interest income that exceeds the REMIC's deductions for interest paid to the holders of the REMIC Regular Interests. This excess income is commonly referred to as "Phantom Income," and it is allocated to the holder of the REMIC Residual Interest. Later in the life of the mortgage pool, the REMIC's deductions for interest paid to the holders of the REMIC Regular Interests typically exceeds its interest income from the mortgages. The excess deductions are referred to as "Phantom Losses," and also are allocated to the holder of the Residual Interest. *See* James M. Peaslee & David Z. Nirenberg, The Federal Taxation of Mortgage Backed Securities, ch 7E and App. A (Rev. Ed. 1994); Preamble to Prop. Reg. §§ 1.475(a)-1, 1.475(a)-2, and 1.475(b)-3.

The REMIC Carryover Basis Transactions did not reduce Enron's tax liability for the years in which the transactions closed, but Enron did record current Deferred Tax Assets to reflect the anticipated tax benefit of deducting the Phantom Losses in future years. Because the amount of the Deferred Tax Assets plus the REMIC Residual Interests recorded exceeded the purchase price of the REMIC Residual Interests, Enron created a "Deferred Credit."[180] The Deferred Credit was used to reduce the book basis of other acquired assets or was amortized into income over an artificially short period. Both techniques had the effect of portraying future tax losses as current "pre-tax" income.

In the Cochise Transaction, for example, the value of the Deferred Tax Assets exceeded the purchase price of the REMIC Residual Interests by more than $70 million. Enron's purchase price allocations absorbed most of the excess by reducing the book basis of two commercial aircraft purchased on the same day from their purchase price of approximately $46.7 million to zero. Approximately one year later, the aircraft were sold indirectly to an affiliated entity for an aggregate purchase price of approximately $36.5 million. Notwithstanding the fact that the aircraft had declined in value during the intervening year by about $10 million, Enron reported the entire $36.5 million of sale proceeds as "gain from sale of assets" because the aircraft had a book basis of zero. When the stock of the affiliated entity that purchased the aircraft was later distributed to

---

[180] Under *Business Combinations*, Accounting Principles Board Opinion No. 16, ¶¶ 68, 87 (Financial Accounting Standards Bd. 1970) ("APB 16"), assets and liabilities acquired are recorded at their fair market values and, if the purchase price exceeds the sum of the fair value of the net assets acquired, the premium is recorded as goodwill. If the sum of the net assets exceeds the purchase price, GAAP requires this "negative" goodwill (the presumed discount or bargain on net assets acquired) to be treated as a proportionate reduction in non-current assets other than long-term investments in marketable securities. *Id.* ¶ 91. When the book value of these assets is less than the negative goodwill, the remainder is reported as a "Deferred Credit" in the liability section of the balance sheet. *Id.* ¶ 87. Subsequently, it is amortized into net income over the period estimated to be benefited, not to exceed 40 years. *Id.* ¶ 91.

an Enron subsidiary, Enron again reported the value of the aircraft, reflected in the value of the stock, as gain on the distribution.[181] Ultimately, Enron sustained a substantial economic loss related to the investment in the aircraft. Despite the economic loss, however, Enron reported substantial aggregate gain ($74 million) from the transactions with the aircraft.

Enron also used the Tax Basis Step-Up Transactions to generate financial accounting income. In the Tax Basis Step-Up Transactions, Enron affiliates transferred assets to a partnership SPE in order to achieve a future increase (or "step-up") of approximately $1 billion in the tax basis of a depreciable asset. In the Teresa Transaction, for example, the designated asset was the Enron North Building, which is Enron's corporate headquarters in Houston, Texas. The Tax Basis Step-Up Transactions did not reduce Enron's current federal income tax liability, and indeed, the deductions arising from the tax basis step-ups were not expected to occur for many years. For financial accounting purposes, however, Enron recorded large reductions in current tax expense during 1997-2001, and corresponding increases in after-tax net income, by booking Deferred Tax Assets related to the Tax-Basis Step-Up Transactions. Through September 2001, Enron recorded an aggregate increase in after-tax net income of $460 million from the Tax Basis Step-up Transactions, even though it did not deduct a single dollar of increased depreciation from any of the designated assets.

---

[181] Memorandum from Dave Maxey, Enron, and Trey Cash, Enron, regarding Deal Memo – Tomas Unwind, Nov. 2000, at 3 [AB000187182-AB000187184].

The Tax Transactions relied upon aggressive interpretations of both the Internal Revenue Code and GAAP.[182]  The Examiner has specifically concluded that two of the Tax Transactions were not likely to achieve the future tax deductions sought.  In many of the others, there are substantial issues as to whether Enron would have been entitled to the expected tax deductions.  The Examiner also has concluded that some of Enron's GAAP interpretations were incorrect and that its accounting treatment was inappropriate.

### C.  Aggregate Income Effect of Tax Transactions

The reported overall effect of the Tax Transactions on Enron's consolidated financial statements on a transaction-by-transaction basis, in closing date order, is as follows:

| Transaction | Closing Date | Projected Net Income Benefit Through September 2001 | Aggregate Projected Net Income Benefit |
|---|---|---|---|
| Tanya | December 1995 | $69.5 million | $69.5 million |
| Valor | December 1996 | 83.7 million | 83.7 million |
| Teresa | March 1997 | 229.0 million | 229.0 million |
| Steele | October 1997 | 61.0 million | 121.8 million |
| Tomas | September 1998 | 36.0 million | 36.0 million |
| Renegade | December 1998 | 1.3 million | 1.3 million |
| Cochise | January 1999 | 97.0 million | 154.0 million |
| Apache | May 1999 | 70.0 million | 268.0 million |
| Condor | November 1999 | 81.0 million | 333.0 million |
| Valhalla | September 2000 | 8.0 million | 60.0 million |
| Tammy I | November 2000 | 150.0 million | 431.0 million |
| | | | |
| Aggregate Balances | | $886.5 million | $1,787.3 million |

---

[182]  In the words of Mr. Hermann, the "word on the street was if Enron wasn't interested, no one would be and you might as well throw it in the can."  In-Person Interview with Robert J. Hermann, former Vice President Tax, Enron Corp., by Philip C. Cook, Partner, A&B, Aug. 8, 2002; *see also* Appendix J (Tax Transactions).

**D.    Examiner's Conclusions Regarding Tax Transactions**

At considerable effort and expense, Enron used the Tax Transactions to exploit the intersection of tax and accounting rules to generate GAAP income.    In doing so, Enron transgressed both sets of rules.    The result was to inflate Enron's income in its public financial statements by significant amounts.

## IX.    FOREST PRODUCTS TRANSACTIONS

### A.    <u>Overview of Forest Products Transactions</u>

Projects Fishtail, Bacchus, Sundance Industrial[183] and Slapshot are related transactions that arose from Enron's foray into the forest products industry (collectively, the "Forest Products Transactions").[184]   These transactions occurred over a six-month period, from December 2000 through June 2001, with a subsequent partial unwinding in November 2001.   Appendix K (Forest Products Transactions) to this Report contains the Examiner's detailed analysis of these transactions and should be reviewed in its entirety for a more complete understanding of the Forest Products Transactions.  This Section IX is intended to provide an overview of the Forest Products Transactions and the Examiner's conclusions with respect to certain legal and accounting issues arising out of those transactions.

Through the Forest Products Transactions, Enron:

- recorded approximately $132 million of income from gain on sales of assets ($112 million in 2000 and $20 million in 2001) which should not have been recorded;

- received cash flow from financings of $208 million at year-end 2000, $200 million of which it erroneously recorded as cash flow from operating activities;

- failed to reflect $375 million of debt in its June 30, 2001 balance sheet; and

---

[183] Enron used the name "Sundance" for two limited partnerships, Sundance Industrial Partners, L.P. and Sundance Assets L.P.  The latter is involved in the Minority Interest Transaction nicknamed Rawhide, which is discussed above in Section VII.

[184] These transactions are the subject of a report issued by the PSI.  *See* PSI Report on Fishtail, Bacchus, Sundance and Slapshot: Four Enron Transactions Funded and Facilitated by U.S. Financial Institutions, Jan. 2, 2003.

- sought to realize between $100-$150 million of income tax savings in Canada in a transaction that Enron's tax counsel advised would be challenged as a tax avoidance scheme.[185]

## B.     Fishtail and Bacchus

Projects Fishtail and Bacchus were completed on successive days at year-end 2000 as short-term interim financings done solely to allow Enron to record $112 million of income from a purported asset sale that never truly took place, and to record cash flow from operating activities of $200 million that was actually received from a financing.

With year-end fast approaching, Enron was "scrambling" to meet its 2000 earnings target.[186]  In December, Enron turned to LJM2, JPMorgan and Citibank to help form a temporary ownership structure that would move Enron's pulp and paper trading business off its balance sheet and allow it to record the gain it had determined existed in that asset.[187]

---

[185] Legal Opinion Letter from Blake, Cassels & Graydon LLP to Enron and CPS, June 22, 2001 [AB025201706-AB025201729.1].

[186] Memorandum to Enron Files from Steve Rosen, Wilmer Cutler, regarding Interview of Michael Patrick, Dec. 18, 2001, at 4 [AB000000641-AB000000647].

[187] Enron pursued this transaction only after other efforts to transfer the asset had failed.  During the second half of 2000, Enron sought a venture partner for its developing forest products business.  *See* Confidential Private Placement Memorandum prepared by Enron and Chase Securities, adviser, regarding Enron Net Works Partners, L.P., July 26, 2000 (the "Net Works CIM") [PSI00457258-PSI00457317]. Enron planned to contribute its pulp and paper trading business and a New Jersey paper mill to a new partnership called Net Works, with the venture partner contributing cash.  *Id.*  In connection with this venture, Chase Securities provided Enron with a valuation of the forest products business, valuing the pulp and paper trading business as a going concern in the range of $225-$300 million.  *See* Enron NetWorks Partners Valuation – Valuation Analysis of Contributed Assets, by Chase Securities, Nov. 20, 2000 (the "Chase Valuation"), at 9 [AB000452190-AB000452211].  The existing pulp and paper trading contracts had a marked-to-market value of $82 million at the time of the Chase Valuation, *Id.* at 13, and Enron concluded, therefore, that the trading business represented unrecognized gain.  In October and November 2000, while Enron was still negotiating with at least one possible venture partner, Enron, JPMorgan and Chase Securities planned an interim transaction, called Project Boomerang by Enron and Project Tammy by JPMorgan, pursuant to which Enron would have transferred the trading business to an SPE funded with $250 million from JPMorgan.  *See* "Project Boomerang," Description of Transaction, undated [PSI00420394-PSI00420397]; Structuring Summary, Project Tammy, prepared by Josh Rogers and Kevin Utsey, JPMorgan Global Syndicated Finance, Oct. 30, 2000 [PSI00420416].  Enron would have treated the transfer of the trading business as a "true sale," recognizing the gain and recording it as income, but then

- 96 -

The final deal structure included two parts: Project Fishtail and Project Bacchus. In Project Fishtail, Enron attempted to form an unconsolidated entity that owned certain rights to the trading business. In Project Bacchus, Enron then securitized those rights and recognized gain by selling certain of the Fishtail equity in a FAS 125 transaction. However, both of these transactions were flawed.

*Project Fishtail*

In Project Fishtail, which closed on December 19, 2000, Enron formed a limited liability company called Fishtail LLC ("Fishtail"), with LJM2 as the minority equity owner, with the intention of Enron treating Fishtail as an unconsolidated investee. In exchange for its majority equity interest in Fishtail, Enron agreed to pay to Fishtail all profits from the existing and future trading contracts. Enron would pay these profits for so long as Fishtail existed, which the limited liability company agreement stated would be no more than five years. The parties appear to have valued this right to receive profits at $200 million, with Enron taking the position that it had transferred its trading business to Fishtail. However, Enron did not actually transfer to Fishtail the trading contracts or any assets used in the trading business.[188]

---

would have repurchased the asset two weeks later pursuant to a put and call agreement it would have executed with the JPMorgan SPE. *Id.* That would have returned the asset to Enron so that Enron could contribute it to the Net Works partnership. *Id.* However, negotiations with the possible venture partner terminated, and Enron never consummated either Project Boomerang or the Net Works partnership.

[188] The Examiner has not yet found any evidence explaining Enron's determination that $200 million was the appropriate value for the profit stream it conveyed to Fishtail. It is difficult to see how this value was derived from the Chase Valuation, since Chase Securities valued the business at $225-$300 million, and that range was for a going concern, not a profit stream limited to no more than five years. However, $200 million is the amount Enron obtained in the follow-on Bacchus financing, raising the question of whether the amount Citibank was willing to loan might have influenced Enron's determination of value. In addition, there is evidence calling into question the reliability of the Chase Valuation. According to an email from Robert Traband, Chase Securities, to Gary K. Wright, Chase Securities, regarding Project Boomerang, Oct. 31, 2000 [PSI00420406-PSI00420407], Chase Valuation was assisting Enron in Project Boomerang in defining "fair market value in such a way that it always turns out to be equal to the value at which the SPE purchased the business" (referring to the SPE that JPMorgan would fund in Project

LJM2, in exchange for its equity in Fishtail, contributed $8 million of cash and agreed to make additional capital contributions of up to $42 million if Fishtail were to experience net realized losses of more than $208 million.[189]

Andersen advised that Enron's interest in Fishtail could be monetized in a FAS 125 transaction only if Fishtail engaged in a "business" and was an unconsolidated equity affiliate of Enron rather than a consolidated subsidiary. Enron sought to avoid consolidation by granting rights to LJM2 to participate in Fishtail's management. For reasons discussed in Appendix K (Forest Products Transactions), including LJM2's lack of independence from Enron, it was not appropriate for Enron to account for Fishtail on an unconsolidated basis.

*Project Bacchus*

Despite the flaws with the Fishtail structure as they related to accounting consolidation, on December 20, 2000, the day after the Fishtail closing, Enron completed the second part of its plan. In Project Bacchus, Enron transferred substantially all of its economic interest in Fishtail, represented by the Class C Fishtail equity, to an SPE named Sonoma I, L.L.C. ("Sonoma"), receiving in exchange $200 million in cash. Sonoma

---

Boomerang). According to Mr. Traband, Chase Securities was proposing a narrow definition of "fair market value" that would "do two things for us: 1) EBITDA won't change because we won't cross a statement date. 2) Comparable transaction will be so narrowly defined that the only comp. will be the sale of the business to SPE. . . . Even if there are counter party defaults, outside events, rogue traders, etc., the value as defined in the definition of FMV won't change." *Id.* It is unclear if the Chase Valuation was affected by Project Boomerang.

[189] Enron had agreed to absorb the first $208 million of losses from the trading business with Fishtail then being required to absorb the next $50 million, with the losses going back to Enron above that. JPMorgan provided a line of credit to LJM2, agreeing to fund the $42 million if Fishtail made a capital call on LJM2 within six months after the closing, which was highly unlikely in light of the short time frame and the Enron-provided cushion.

obtained the $200 million by selling its 99.99% economic interest to an SPE named Caymus Trust.

Citibank had formed Caymus Trust and funded it with $6 million of "equity"[190] and $194 million of debt. Enron guaranteed Caymus Trust's obligation to repay the debt to Citibank by entering into a Total Return Swap with Caymus Trust. Enron treated the transfer of the Fishtail Class C equity as a sale to Sonoma and recorded income equal to the $112 million of gain it believed existed in the trading business.[191] The Examiner believes that this transaction did not constitute a "true sale" and, therefore, should have been recorded as a loan.

Because of the consolidation of Fishtail and the failure of the transfer of its equity to Sonoma to qualify as a sale, Enron overstated its income in its financial statements by $112 million and understated its debt by $200 million. It also received $208 million of year-end cash flow, $200 million of which it recorded as cash flow from operating activities rather than financing activities.

---

[190] According to a Citibank internal approval memorandum, Enron, through Fastow, provided Citibank with "verbal support" for the equity component. *See* Citibank Global Loans Approval Memorandum, dated Dec. 6, 2000, approval dated Dec. 11, 2000, at 2 [CITI-SPSI00015991-CITI-SPSI0016017]; Executive Summary, prepared by Citibank, regarding several pending transactions with Enron, undated (the "Citibank Executive Summary") ("The Certificates are supported by verbal support obtained by Bill Fox from Andy Fastow, Enron Corp.'s Chief Financial Officer.") [PSI00457491-PSI00457492]; Email from William Fox, Managing Director, Citibank, to Thomas Scott, Citibank, regarding Enron Credit Approval, Apr. 18, 2001 (the "Citibank Fox Email") ("$200mm – Bacchus: SPV where we have a total return swap from Enron for $180mm and verbal support for the balance.") [PSI00319453-PSI00319454].

[191] By the time of the December Fishtail and Bacchus closings, the existing trading contracts had a MTM value of $88 million, supporting Enron's computation of the $112 million gain. *See* Enron Interoffice Memorandum to the Files from Transaction Support, Enron NetWorks Accounting Department, regarding Accounting Enron's Investment in Fishtail LLC, Oct. 1, 2000, at 1 [AB000170813-AB000170818].

## C.    **Sundance Industrial and Slapshot**

*Project Sundance Industrial*

In the spring of 2001, Enron began negotiating with Citibank to take a more permanent role in the financing of Enron's forest products business so that Enron could repay the short-term Fishtail and Bacchus financings. Citibank agreed to participate and, on June 1, 2001, Enron and a Citibank subsidiary, Salomon Brothers Holding Company ("Salomon Holdings"), formed Sundance Industrial Partners, L.P. ("Sundance").

In exchange for its partnership interest, Enron contributed the Garden State paper mill, the Stadacona paper mill and the Maine timberland. Enron also contributed $208.5 million in cash, which Sundance used to purchase the Fishtail Class C interest from Caymus Trust, repaying Citibank in full. At the same time, Fishtail redeemed LJM2's investment in full, using the cash LJM2 had contributed to Fishtail in December 2000, which Fishtail had loaned to Enron on an interim basis. In exchange for its partnership interest, Salomon Holdings contributed to Sundance $28.5 million of cash and an unfunded commitment to make up to $160 million of additional capital contributions. These amounts were designed to allow Enron to take the position that Salomon Holdings, as an independent third party, had substantive equity at risk in the venture, permitting Enron to treat Sundance as an unconsolidated entity. However, Salomon Holdings did not assume any meaningful risk of the business, its Sundance interest had many more indicia of debt than equity, and its unfunded commitment was designed not to be at risk.[192]

---

[192] Citibank acknowledged this character of its investment, stating in an internal approval memorandum that "[t]he investment has been structured to act like debt in substance." *See* Salomon Smith Barney Interoffice Memorandum to Barbara Yastine, Salomon Smith Barney, from Jim Forese, Rick Caplan and

Thus, the Sundance Industrial transaction enabled Enron to unwind the Fishtail and Bacchus financings and to place the forest products business in an unconsolidated partnership. This allowed Enron to leverage the forest products assets, with the debt remaining off Enron's balance sheet. In addition, Enron added a questionable twist to the transaction that allowed it to recognize another $20 million of gain related to a purported "sale" to Salomon Holdings of the residual Fishtail interest held by Sonoma.[193]

*Project Slapshot*

Having moved the forest products assets into an unconsolidated partnership, quickly thereafter, on June 22, 2001, Enron closed on a five-year financing that brought in $375 million of off-balance sheet debt (the "Slapshot Loan"). JPMorgan and a group of other lenders made the Slapshot Loan to a Sundance subsidiary in Canada with a guaranty provided by Enron pursuant to a complicated structure of a warrant, put rights and a Total Return Swap.

This transaction, however, enabled Enron to accomplish more than just the off-balance sheet financing. Enron nicknamed the deal Project Slapshot, which is descriptive of the many quick and circuitous cash movements that were effected among Enron

---

Doug Warren, all of Salomon Smith Barney, regarding Enron Corp. – Project Sundance, May 29, 2001, at 3 [PSI00367058-PSI0037062]. In an internal email communication, a Citibank employee wrote "Still an equity investment of sorts (acctg and tax basis for partnership) but is structured in such a way that the 670 bps is guaranteed or we blow the deal. Also our 'invest' is so subordinated and controlled that it is 'unimaginable' how our principal is not returned." *See* Email from Timothy Leroux, Citibank, to Andrew P. Lee, Citibank, regarding Enron/Sundance, May 25, 2001 [PSI00457096].

[193] In Project Bacchus, Enron had retained a .01% economic interest in Fishtail. Rather than contribute that equity directly to Sundance, Enron requested that Salomon Holdings use part of its $28.5 million cash investment to purchase the equity from Enron and then contribute the equity to Sundance. Salomon Holdings agreed to this aspect of the structure and, despite there being no apparent business reason for Salomon Holdings to take ownership of that small interest in Fishtail separate from the rest of Sundance, Enron obtained a "true sale" opinion from Vinson & Elkins and recorded the income from the gain. *See* Enron Interoffice Memorandum to The File from Mark Lian, Enron Industrial Market Department, regarding Sundance, dated on or about Nov. 1, 2001, at 3-4 [AB025200850-AB025200855].

entities comprising this deal structure. The transaction was designed to net Enron an estimated $100-150 million of Canadian income tax savings.

The tax savings portion of the transaction, which JPMorgan had designed and considered to be a proprietary product, would be achieved by Enron entities in Canada deducting for tax purposes both the principal and interest payments of the $375 million debt. On paper, Enron appears to have borrowed $1.414 billion, which was calculated so that interest on this amount equaled exactly the amount needed to repay the $375 million principal plus associated interest. However, $1.039 billion, which was the difference between the grossed up loan amount and the real loan amount, was never really borrowed by Enron. JPMorgan advanced the funds at the beginning of the closing date, and they were returned to JPMorgan on the same day after making the trip through the transaction structure. Only the $375 million was actually still owed by Enron at close of business on June 22, 2001, even though the loan documents show the $1.414 billion as still outstanding. A series of offset rights ensured Enron would not have to pay the $1.039 billion a second time.

On November 29, 2001, just three days before the Petition Date, Enron redeemed Salomon Holdings' $28.5 million partnership interest in Sundance with interest. As a result, there is no longer any third-party equity ownership in any of the Sundance assets. On the Petition Date, aggregate unpaid debt owing under the Slapshot Loan was approximately $358 million.

### D. Examiner's Conclusions Regarding Forest Products Transactions

The Examiner has reached the following conclusions regarding the Forest Products Transactions:

*Legal Issues*

Potential avoidable transfers arising in connection with the Forest Products Transactions are described in Appendix K (Forest Products Transactions).

*Accounting Issues*

Fishtail should have been consolidated into Enron's financial statements because, among other reasons, LJM2, the minority equity owner, was a FAS 57 Related Party[194] and did not have its equity at risk.

Enron's improper accounting treatment of Fishtail contributed to Project Bacchus failing to be a valid FAS 125 transaction. The transfer of Fishtail's Class C equity to Sonoma was not a "true sale," thus Enron did not satisfy FAS 125 for that reason as well.

Consequently, in its 2000 financial statements, Enron (i) should not have recognized $112 million of income as a result of Project Bacchus, (ii) should have included $200 million it received from Citibank on its balance sheet as debt and (iii) should have reflected the $200 million as cash flow from financing activities, rather than cash flow from operating activities.

Furthermore, in its 2001 financial statements, Enron (i) should have accounted for Sundance as a consolidated subsidiary, (ii) should not have recognized $20 million of income from gain on the purported sale of Sonoma's residual Fishtail interest,[195] and (iii) should have reported the $375 million under the Slapshot Loan on its balance sheet as debt.

---

[194] This term is defined in Appendix B (Accounting Standards).

[195] Even if the valuation of the Sonoma interest could be substantiated, there was no "true sale" under the circumstances, where the substance of the transaction was that Salomon Holdings contributed $28.5 million of cash to Sundance and had no business purpose for owning the Sonoma interest separate from the rest of the Sundance assets.

- 103 -

## X.    RELATED PARTY TRANSACTIONS

### A.    <u>Overview of Related Party Transactions</u>

From 1997 until mid-2001, Enron engaged in a number of transactions with entities created by Enron in which Fastow and other Enron employees, including Kopper, participated (collectively, the "Related Party Transactions").  Appendix L (Related Party Transactions) to this Report contains the Examiner's detailed analysis of these transactions and should be reviewed in its entirety for a more complete understanding of the Related Party Transactions.  This Section X is intended to provide an overview of the Related Party Transactions and the Examiner's conclusions with respect to certain legal and accounting issues arising out of such transactions.

Through the Related Party Transactions, Enron:

- overstated its income by nearly $1.5 billion from 1997 through June 30, 2001;

- overstated its equity by $1.5 billion at December 31, 2000 and by $1.9 billion at June 30, 2001; and

- understated its indebtedness by $885 million at December 31, 1999 and $828 million at December 31, 2000.

These entities included Chewco, LJM1 and LJM2 and affiliated entities (collectively, the "Related Parties").  The most important purpose for, and effect of, the Related Party Transactions was the enormous increase in Enron's reported GAAP income for these periods.

Another aspect of the Related Party Transactions is that several Enron officers and employees received substantial personal benefits in connection with these transactions.  Fastow and Kopper received the largest portion of such benefits.  To date, the Examiner has determined that Fastow received at least $60.6 million, and Kopper and

Dodson received approximately $33.4 million collectively from the Related Party Transactions.

Given the ongoing criminal investigations of both Fastow and Kopper and the fact that the Examiner has been unable to interview them and other key Enron insiders involved in the Related Party Transactions, the Examiner's investigation of the Related Party Transactions is continuing. Nonetheless, as a result of his examination to date, the Examiner has reached three general conclusions about the Related Party Transactions:

- the Related Party Transactions had no valid business purpose from Enron's perspective, other than to achieve desired financial statement reporting;

- in many of the Related Party Transactions, Enron temporarily "warehoused" underperforming assets until Enron repurchased them, or in two cases, until the Related Party sold them to third parties; and

- Enron insiders, including Fastow and Kopper, received significant cash payments in connection with the Related Party Transactions.

### B.     **Examiner's Conclusions Regarding Related Party Transactions**

The Examiner has reached the following conclusions regarding the Related Party Transactions:

*Legal Issues*

Potential avoidable transfers arising in connection with the Related Party Transactions are described in Appendix L (Related Party Transactions).

*Accounting Issues*

The Examiner believes that Enron accounted for many of the Related Party Transactions inappropriately. In the third quarter of 2001, Enron corrected the accounting for both Chewco and LJM Swap Sub L.P. ("Swap Sub"), a limited partnership owned by LJM1, that engaged in the Rhythms hedging transactions, and retroactively

- 105 -

consolidated each of these SPEs with Enron. It did not, however, correct other Related Party errors, like, for example, those associated with the Raptor SPEs. In October 2001, Enron did unwind the Raptor transactions, taking a $710 million pre-tax charge against earnings. However, it did not correct the errors caused by the failure to consolidate the Raptor SPEs from the outset. This failure to consolidate the Raptors from their inception, resulted in Enron's improperly recognizing approximately $1.1 billion of income.

## XI.    FAS 140 TRANSACTIONS

### A.    Overview of FAS 140 Transactions

In its FAS 140 transactions,[196] Enron monetized a variety of otherwise illiquid assets, removing those assets from its balance sheet while at the same time retaining control over them with a view toward better timing the final sales of those assets. The four FAS 140 transactions discussed in this Report, known within Enron as Cerberus (the "Cerberus Transaction"), Nikita (the "Nikita Transaction"), Hawaii 125-0 (the "Hawaii Transaction") and Backbone (the "Backbone Transaction") (collectively, the "FAS 140 Transactions"), were initially discussed by the Examiner in the September Report. Appendix M (FAS 140 Transactions) to this Report contains the Examiner's detailed analysis of these transactions and should be reviewed in its entirety for a more complete understanding of the FAS 140 Transactions. This Section XI is intended to provide an overview of the FAS 140 Transactions and the Examiner's conclusions with respect to certain legal and accounting issues arising out of such transactions.

In the September Report, the Examiner concluded that each of these transactions appears to be, from both an economic and risk allocation perspective, a loan to Enron

---

[196] With one exception, these transactions are structured finance transactions that were intended to comply with either Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities, Statement of Financial Accounting Standards No. 125 (Financial Accounting Standards Bd. 1996) ("FAS 125"), or its successor, Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities, Statement of Financial Accounting Standards No. 140 (Financial Accounting Standards Bd. 2000) ("FAS 140"). The Backbone Transaction, although similar in structure, was not intended to comply with either FAS 125 or FAS 140. FAS 125 was the accounting standard that governed securitizations of financial assets from January 1, 1997 until it was replaced by FAS 140, which became effective with respect to transactions closing on or after April 1, 2001. Although this Report discusses some transactions that were governed by FAS 125 and others that were governed by FAS 140, all of these transactions and other similar transactions are generally referred to as FAS 140 transactions. Enron began engaging in FAS 140 transactions as early as 1998 and completed its last FAS 140 transactions in the months immediately preceding the filing of the Bankruptcy Case. This Report does not describe all FAS 140 transactions undertaken by Enron, but rather examines those that, as of the Petition Date, contained assets with significant value that could potentially be returned to the Debtors' estates.

rather than a sale of assets. Accordingly, the Examiner has concluded that the FAS 140 Transactions are in varying degrees susceptible of being recharacterized under a "true sale" analysis. If this were to occur, the remaining assets in the structures, valued at approximately $500 million, would be restored to the Debtors' estates.

This Report presents additional evidence that reinforces these conclusions and addresses questions raised in the September Report regarding the accounting for the FAS 140 Transactions. The Examiner concludes that each of the FAS 140 Transactions should be recharacterized as a loan from an accounting perspective and discusses the effect this recharacterization would have on Enron's financial statement presentation. The Examiner also presents evidence of an unwritten understanding between Enron and the equity holder in one of the FAS 140 Transactions that may further undermine both "true sale" treatment and Enron's accounting for that FAS 140 Transaction. In this Report, the Examiner further concludes that, through the FAS 140 Transactions, Enron:

- recorded approximately $350 million of income from gain on sales of assets which should not have been recorded;

- received cash flow from financings of $1.2 billion, $1.1 billion of which it erroneously recorded as cash flow from operating activities and the remainder of which was erroneously recorded as cash flow from investing activities;

- failed to adequately disclose more than $857 million of its contingent obligations under the Total Return Swaps in its December 31, 2000 balance sheet; and

- failed to reflect $894 million of debt in its December 31, 2000 financial statements.

- 108 -

## B.     Background of FAS 140 Transactions

When Enron monetized an asset in a FAS 140 Transaction, the "Sponsor" (generally a subsidiary or unconsolidated equity affiliate of Enron) that transferred the asset received a payment equal to the amount financed through the structure, and Enron recognized as income on its financial statements all, or its share of, the difference between those cash proceeds and the carrying value of the asset. Despite the "sale" of these assets, Enron continued to treat them as part of its own holdings. Then, through a Total Return Swap, Enron: (i) agreed to make payments to its counterparty (usually an SPE created for the transaction or the lenders to the SPE) equal to the scheduled payments (and interest thereon) on the amounts borrowed by the SPE under a credit facility (a "Credit Facility"), which was roughly equal to the purchase price of the transferred asset; and (ii) remained entitled to all amounts produced by the transferred asset (whether by sale of the asset or otherwise), except, in some transactions, for amounts used to satisfy the small portion of the purchase price that the SPE funded through the sale of equity rather than borrowings (typically at least 3% of the purchase price of the asset) and a capped return thereon. In those transactions where there was an equity investor, the Total Return Swap typically provided that the proceeds of the underlying asset were distributed first to the Enron party to the swap in an amount equal to the related debt financing, then to the equity holder up to a capped return and, finally, all remaining amounts to that Enron party.

The following is a simplified diagram of a typical FAS 140 Transaction:



The Total Return Swaps were marked-to-market by Enron. As a result, Enron reported the effects of subsequent decreases or increases in the value of the financed asset on its balance sheet and in its income statement. The Total Return Swaps made Enron's FAS 140 Transactions more closely resemble loans to Enron rather than sales of an asset.

Enron viewed these transactions as "balance sheet management" efforts, rather than as irrevocable and final dispositions of the assets. As part of these management efforts, Enron monetized several types of assets in the FAS 140 Transactions, including shares of common stock or warrants to purchase common stock of both publicly traded and private companies, partnership interests, membership interests in limited liability

companies formed between Enron and unrelated third parties, and interests in trusts formed in connection with other financial transactions undertaken by Enron.

### C.    Examiner's Conclusions Regarding FAS 140 Transactions

The Examiner has reached the following conclusions regarding the FAS 140 Transactions.

*Legal Issues*

The Examiner concluded in the September Report that each of the four FAS 140 Transactions is susceptible to recharacterization as a loan for legal purposes. In this Report, the Examiner reaffirms that conclusion based upon further evidence. Recharacterizing the FAS 140 Transactions as loans results in assets with a current value of approximately $500 million being restored to the Debtors' estates.

*Accounting Issues*

Recharacterizing these transactions as loans would also affect Enron's accounting for these transactions. First, approximately $350 million of gain recognized by Enron in these transactions during the period beginning with the first quarter of 2000 and ending with the third quarter of 2001 would not have been recognized. Second, the amounts borrowed during this same period by the SPEs in these transactions, of which approximately $1.1 billion was outstanding as of the Petition Date, would be reflected as debt on Enron's balance sheet. Third, the approximately $1.2 billion of cash flows from these transactions, of which approximately $1.1 billion was classified as cash flow from operating activities and approximately $75 million was classified as cash flow from investing activities, would be reclassified as cash flow from financing activities. Finally, as discussed in the September Report, the Examiner determined that Enron failed to

adequately disclose more than $857 million of its contingent obligations under the Total

Return Swaps as of December 31, 2000.

## XII. BAMMEL TRANSACTIONS

### A. Overview of Bammel Transactions

Appendix N (Bammel Transactions) addresses a series of three transactions (the "Bammel Transactions") involving the Bammel Gas Storage Facility (the "Bammel Facility"), 80 million MMBtus of "storage gas" (the "Storage Gas") located in the Bammel Facility, and related pipeline assets that were owned and operated by Enron's wholly owned subsidiary, Houston Pipe Line Company ("HPLC").[197] Appendix N (Bammel Transactions) to this Report contains the Examiner's detailed analysis of these transactions and should be reviewed in its entirety for a more complete understanding of the Bammel Transactions. This Section XII is intended to provide an overview of the Bammel Transactions and the Examiner's conclusions with respect to certain legal and accounting issues arising out of such transactions.

As discussed below, the Examiner has concluded that the Bammel Transactions are, in varying degrees, susceptible of being recharacterized. If this occurs, the remaining Storage Gas in the structures, valued at approximately $289 million (subject to third-party rights), would be restored to the Debtors' estates. Furthermore, through the Bammel Transactions, Enron:

- recorded approximately $232 million of revenue from sales of assets which should not have been recorded;

- received cash flow from financings of $232 million, which it erroneously recorded as cash flow from operating activities; and

- failed to reflect $232 million of liabilities on its balance sheet at December 31, 2000.

---

[197] Until it was sold in May 2001, HPLC owned and operated Enron's south Texas natural gas pipeline and storage business.

## B.    Background of Bammel Transactions

The first of the Bammel transactions occurred in 1997, when Enron "monetized" the Storage Gas through a purported sale for $232 million to an SPE created for that purpose. Through this monetization device, Enron generated operating revenue and cash flow, but did not record the SPE's debt on Enron's balance sheet. The second transaction occurred two years later in November 1999, when Enron included the Bammel Facility and related assets in a contribution-leaseback as part of the tax-driven Project Condor.[198] The final transaction occurred eighteen months later in May 2001, when Enron sold HPLC and its pipeline business to an unrelated third party.

Enron structured the monetization of the Storage Gas in an effort to keep the financing off its balance sheet. Enron also generated revenue and cash flow from operating activities from the purported sale to the SPE, while at the same time retaining control, use and the economic benefit and risk of ownership of the Storage Gas. The Examiner believes that the purported sale should be recharacterized as a financing rather than as a "true sale" which would result in assets valued at approximately $289 million being restored to the Debtors' estates.[199] The Examiner also believes that Enron's accounting treatment of the monetization did not comply with GAAP. As a result, Enron

---

[198] *See* Annex 5 (Condor Transaction) to Appendix J (Tax Transactions) for the Examiner's analysis of the structure of the Condor Transaction and his conclusion concerning the tax treatment thereof and the related impact on Enron's financial statements. *See also* Appendix G (Whitewing Transaction) for the Examiner's analysis of various transactions that resulted in Whitewing Associates owning the entity that purportedly took title to the Bammel Facility *and related assets.*

[199] The approximate value of the Storage Gas as of January 6, 2003 would be approximately $288.75 million (55 million MMBtus at $5.25 per MMBtu), determined from January 6, 2003 prices for delivery on February 1, 2003 at Henry Hub, Tailgate, Louisiana. *See* www.nymex.com. The gas would remain subject to a Right to Use Agreement, if not rejected, discussed further in Appendix N (Bammel Transactions).

overstated its revenue and cash flow from operating activities by $232 million over the course of 1997 and 1998, and understated its liabilities by $232 million at the end of 1998, 1999 and 2000. Of those amounts, Enron recorded revenue and cash flows from operating activities in 1997 of $152 million, representing only 0.75% of 1997 revenue but 72.04% of Enron's 1997 cash flow from operating activities.

*Bammel Gas Monetization.* On December 30, 1997, HPLC monetized the Storage Gas, most of which was necessary to the structural support and pressurization of the Bammel Facility and thus not readily marketable as inventory. Enron monetized the Storage Gas by a purported sale for $232 million to an SPE financed 94% by secured debt from third parties and 6% by equity financing, including a 3% equity portion from an Enron subsidiary. Through a series of complex arrangements, however, the economic benefits and risks of the Storage Gas remained with HPLC and other Enron affiliates, with Enron providing credit support through a guaranty of its affiliates' performance. These arrangements included (i) "pressurization" and other fees paid by HPLC to the SPE for use of the Storage Gas, which the parties structured to cover precisely the SPE's interest and equity yield on its debt and equity financing, and (ii) an obligation of ENA to market and sell the Storage Gas on behalf of the SPE in a manner designed to generate funds to the SPE in the exact amount needed to satisfy its financing commitments, with Enron retaining any excess and covering any deficiency through an additional "demand" charge for use of the gas. Enron did not consolidate the SPE or reflect the SPE's debt on Enron's balance sheet.

*Project Condor.* On November 11, 1999, as part of Enron's Project Condor tax-driven restructuring, HPLC contributed to and leased back from ENA Asset Holdings

L.P. ("Asset Holdings"), a financially consolidated affiliate, various pipeline assets, including the Bammel Facility. Enron sought to achieve a stepped-up tax basis and new depreciable life for these assets. HPLC took in return a substantial ownership interest in Asset Holdings and a leaseback of the assets for 18 years at roughly $84 million per year. The Examiner believes that the contribution-leaseback transaction lacked economic substance because HPLC retained dominion and control over the assets.

*Project Triple Lutz.* Finally, in May 2001, to prepare HPLC for sale, Enron repositioned the ownership of certain of the pipeline assets and rights from HPLC to another affiliate, BAM Lease Company ("LeaseCo"). This preliminary step resulted in LeaseCo stepping into HPLC's shoes under the arrangements with the SPE and the lease from Asset Holdings. Enron then sold HPLC to a third party, AEP Energy Services Gas Holding Company ("AEP") for $728.7 million. As part of the sale, HPLC took from LeaseCo a long-term lease of the Bammel Facility and other assets and a long-term right to use the Storage Gas.

### C. Examiner's Conclusions Regarding Bammel Transactions

The Examiner has reached the following conclusions regarding the Bammel Transactions:

*Legal Issues*

*True Sale.* The Examiner concludes that "true sale" and recharacterization concepts apply to the Storage Gas monetization with the SPE and that the purported sale to the SPE may be challenged. The Examiner believes that the transfer does not meet the requirements of a "true sale" under applicable law because it lacked economic substance. Accordingly, the Examiner has concluded that the remaining Storage Gas can be restored

as an asset of the estate of the Debtor LeaseCo, as successor to HPLC's interest. The Examiner notes that AEP's "right to use" the Storage Gas limits LeaseCo's freedom to dispose of the gas and therefore negatively affects its value.

The Examiner has also reviewed the contribution leaseback that resulted from Project Condor, which was repositioned from HPLC to LeaseCo, and has determined that principles of "true contribution" and recharacterization also apply to that transaction. The Examiner believes that the Project Condor contribution-leaseback is susceptible of being recharacterized. If this occurs, the remaining assets in that structure would be restored to LeaseCo. However, the value of these assets is unknown and the assets are subject to a long-term lease in favor of AEP.

*Avoidance Actions*. Potential avoidable transfers arising in connection with the Bammel Transactions are described in Appendix N (Bammel Transactions).

### Accounting Treatment

The Examiner concludes that Enron's accounting treatment of the monetization of the Storage Gas with the SPE did not comply with GAAP. Due to the significant obligations retained by Enron, which effectively covered the SPE's financing obligations, Enron should have recorded the proceeds from the purported sale by HPLC to the SPE as a liability or financing and, in any event, should have consolidated the SPE for financial reporting purposes. As a result, Enron overstated its revenue and cash flow from operating activities by $232 million over 1997 and 1998, and understated its liabilities by $232 million at year-end 1998, 1999 and 2000.

## XIII.  JEDI II TRANSACTIONS

### A.    Overview of JEDI II Transactions

Joint Energy Development Investments II Limited Partnership ("JEDI II") is an investment partnership that is owned on a 50/50 basis by Enron and CalPERS, an unrelated third party.[200]  JEDI II was the second investment partnership between Enron and CalPERS.  CalPERS' earlier investment in JEDI was redeemed and, shortly thereafter, Chewco purchased an interest in JEDI.[201]  Appendix O (JEDI II Transactions) to this Report contains the Examiner's detailed analysis of these transactions and should be reviewed in its entirety for a more complete understanding of the JEDI II Transactions.  This Section XIII is intended to provide an overview of the JEDI II Transactions and the Examiner's conclusions with respect to certain legal and accounting issues arising out of those transactions.

The Examiner concludes that Enron's decision not to consolidate JEDI II likely complied with GAAP.  However, the Examiner has concluded that, through the JEDI II Transactions, Enron erroneously reported a $61 million gain in 1997 (which represented 58% of Enron's reported net income for that year) when it should have reported gains of approximately $20 million in each of 1997, 1998 and 1999.

### B.    Background of JEDI II Transactions

Enron accounted for its interest in JEDI II as an investment in an unconsolidated equity affiliate, which allowed Enron to reflect on its balance sheet the carrying value of

---

[200]  CalPERS is a unit of the State and Consumer Services Agency of the State of California.  It claims to be the nation's largest public pension fund and second largest in the world, reporting assets totaling $132.6 billion at Oct. 31, 2002.  *See* http://www.calpers.org/invest/invest.htm (visited Dec. 27, 2002).

[201]  *See* Annex 1 to Appendix L (Related Party Transactions).

its investment in JEDI II, but none of JEDI II's considerable assets or debt. Had Enron consolidated JEDI II, its debt – $500 million, $352.7 million and $96.54 million as of December 31, 1998, 1999 and 2000, respectively – would have been reflected on Enron's balance sheet.

JEDI II differs in two significant ways from Whitewing and Marlin, the larger unconsolidated equity affiliates analyzed elsewhere in this Report.[202] First, an unrelated third party, CalPERS, rather than an Enron-sponsored off-balance-sheet financing vehicle, provided JEDI II's outside equity. Second, as a consequence of the involvement of an unrelated third party, JEDI II's partnership agreement expressly prohibits JEDI II from investing in many of the types of assets common to other structures analyzed elsewhere in this Report, including assets held by Enron affiliates and investments in entities used to monetize or securitize assets. As a result, Enron's ability to use JEDI II to purchase assets from and make investments in Enron affiliates, or for other self-dealing transactions, was significantly limited in comparison to many of the other structures analyzed in this Report.

However, despite those limitations, JEDI II was party to transactions with, or had other direct or indirect relationships with, many of the Enron structures and related parties discussed in this Report. Although certain of these interactions resulted from the requirement in JEDI II's partnership agreement that an Enron entity co-invest in every JEDI II investment, JEDI II also purchased assets from JEDI,[203] invested in Enron Energy Services, LLC ("EES") and later resold that investment to Enron, and sold assets

---

[202] *See* Appendix G (Whitewing Transaction) and Appendix H (Marlin Transaction).

[203] *See* Report, Annex 1 to Appendix L (Related Party Transactions).

- 119 -

to ENA CLO I Holding Company I L.P.[204]  In addition, Enron created other relationships between its investment in JEDI II and Rawhide, Whitewing, Tammy I, and one of the Raptor SPEs.[205]  Although JEDI II's role in many of these transactions appears to have been benign, the transactions illustrate the extent of the interactions that Enron coordinated among its various structures.

## C. Examiner's Conclusions Regarding JEDI II Transactions

The Examiner has reached the following conclusions regarding the JEDI II Transactions:

*Legal Issues*

It appears unlikely that a strong factual foundation exists to support the substantive consolidation of JEDI II with any Debtor.  Nor has the Examiner's investigation revealed evidence likely to support avoidance claims with respect to JEDI II.

*Accounting Issues*

The Examiner believes that Enron's decision not to consolidate JEDI II likely complied with GAAP.  Nonconsolidation was one of the significant benefits Enron received from the JEDI II structure, as it enabled Enron to build and control a large portfolio of merchant investments without exposing its balance sheet to the significant debt associated with the investments.

JEDI II and an unrelated third party, Ontario Teachers' Pension Plan Board ("Ontario Teachers"), invested directly in EES, a subsidiary formed by Enron to conduct

---

[204] *See* Report, Annex 4 to Appendix L (Related Party Transactions).

[205] *See* Report, Annex 5 to Appendix L (Related Party Transactions).

its retail energy business. As a result of the investments, Enron reported a $61 million gain in 1997, which represented 58% of Enron's reported net income in 1997. The Examiner believes that Enron failed to comply with GAAP in its recognition and reporting of this gain, because Enron improperly reported the gain based not only on the proceeds received in 1997, but also on the related unpaid subscription amounts. Had Enron reported the gain in compliance with GAAP, it would have reported gains of approximately $20 million in each of 1997, 1998 and 1999, rather than reporting the entire $61 million gain in 1997. This error caused Enron to overstate its net income for 1997 by approximately 63%.

## XIV. MISCELLANEOUS TRANSACTIONS

### A. Overview of Miscellaneous Transactions

There are several transactions that the Examiner has categorized as miscellaneous transactions (collectively, the "Miscellaneous Transactions"). Although these transactions have different structures, they illustrate the range of transactions that Enron used under its price risk management umbrella to report beneficial financial statement results.[206] These transactions consist of the Destec Transaction,[207] the Cash 6 Transaction and the $SO_2$ Transaction.[208] The Destec Transaction and the $SO_2$ Transaction are reviewed in more detail in Appendix F (Miscellaneous Transactions) to this Report which should be reviewed in its entirety for a more complete understanding of these transactions. This Section XIV is intended to provide an overview of these Miscellaneous Transactions and the Examiner's conclusions with respect to certain legal and accounting issues raised by those transactions.

As discussed below, the Examiner has concluded that the $SO_2$ Transaction is susceptible to a "true sale" challenge. If such a challenge were to succeed, the underlying assets, which have an estimated aggregate value of $125 million, would be included in the Debtors' estates.[209] More generally, through the Miscellaneous Transactions, Enron:

---

[206] The Examiner also reviewed two transactions known as the Brazos and KStar VPP transactions. Oil and gas producers can sell volumetric production payments, or VPPs, for a lump sum prepayment. The purchaser of a VPP acquires a right to a quantified share of the production of oil or gas from a well. Enron used SPE structures to finance its acquisition of VPPs from producers. The Examiner has concluded that Enron's accounting for the VPP transactions as sales to unconsolidated SPEs complied with GAAP.

[207] The September Report contained a preliminary report on the Destec Transaction.

[208] The September Report contained a preliminary report on the $SO_2$ Transaction.

[209] $102 million of these assets appear to be subject to a backup security interest in favor of Colonnade Limited, a Guernsey company.

- received cash flow of $223 million, all of which it erroneously recorded as cash flow from operating activities; and

- failed to reflect $223 million as debt on its balance sheet.

**B.** **Background of Miscellaneous Transactions**

The Miscellaneous Transactions satisfied two of Enron's financial statement objectives – avoiding balance sheet debt and generating cash, which Enron classified as operating cash flow.

*The Destec Transaction*[210]

The Destec Transaction is an example of how Enron used its price risk management techniques to monetize a stream of payments from a coal lease by transferring, for the most part, the credit risk of the lessee to the lenders that financed the monetization. Shortly before closing this transaction, Enron had purchased a limited partnership that owned a coal lease under which a third-party utility had agreed to purchase at least 3.5 million tons of coal and lignite per year at a price specified in the lease. The price of the coal and lignite was fixed for each year except for an inflation adjustment that could result in either an increase or decrease in the price. The lease produced a predictable minimum flow of royalty payments subject to inflation adjustment and the utility's ability to pay. Through a number of intermediate steps, Enron transferred the right to receive the royalty payments for the fuel to a trust that was created for that purpose. The trust raised $150 million from loans and paid $110 million to Enron in return for the right to receive the royalty payments. The trust (and the lenders that had advanced the $110 million) looked only to the stream of royalty payments for the

---

[210] *See* Report, Annex 2 to Appendix F (Miscellaneous Transactions).

funds necessary to repay the $110 million. Accordingly, Enron transferred the utility's credit risk (i.e., the risk that the utility would not perform under the lease) to the lenders.

The trust paid the remaining $40 million in loan proceeds to an Enron subsidiary in return for that subsidiary's assumption of certain market risks associated with the coal lease. Because the royalty payments would fluctuate either upward or downward by the inflation adjustment, there was no certainty that the payment stream would match the debt repayment schedule. Moreover, the loans carried a floating rate of interest, while the payment stream was constant apart from the inflation adjustment. Therefore, Enron caused a subsidiary to enter into a swap agreement with the trust under which the subsidiary assumed the inflation and interest rate risk. In return for a single upfront payment of $40 million, the subsidiary agreed to pay all of the interest on the $150 million of loans and the difference between the contract royalty payment and the inflation-adjusted payment if the payment were reduced. The subsidiary would receive the adjustment if there was an increase in the contract royalty payment.

*The Cash 6 Transaction*

But for an arithmetic error by Enron, the Cash 6 Transaction would have been simply another example of Enron's use of its price risk management skills to monetize the value of an "in-the-money" swap transaction. In the Cash 6 Transaction, ENA and Nuclear Electric Limited ("NEL"), an electric utility in the United Kingdom, were parties to a swap transaction that Enron had estimated was "in-the-money" in favor of Enron in the amount of $56 million.

NEL had originally entered into the swap transaction with an Enron subsidiary in order to stabilize NEL's costs for power purchased in the spot market. The swap

- 124 -

provided that if the spot price declined below a specified price, NEL would pay the difference to the Enron subsidiary. On the other hand, if the spot price exceeded the specified price, ENA would pay the difference to NEL. Payments under the swap were to be made monthly. By the early summer of 1998, the spot price was well below the referenced fixed price. Enron initially calculated the value of the resulting monthly payments from NEL over the remaining term of the swap to be $56 million.

Enron arranged to sell the payment stream to a trust that was formed for the benefit of Barclays Bank PLC ("Barclays"), the initial lender to the trust. As in the Destec transaction, Enron transferred its rights to the payment stream to the trust through a series of intermediate steps. Barclays looked to the payment stream for repayment.

Barclays, however, did not want to assume various market risks associated with the payment stream. Therefore, Enron, through subsidiaries, entered into four swaps (the "Enron Cash 6 Swaps") pursuant to which it retained or assumed the related power rate risk, the interest rate risk, the currency conversion risk and the inflation risk. In lending to the trust and accepting the Enron Cash 6 Swaps, Barclays was taking NEL credit risk and Enron performance risk.[211]

Shortly before the closing of the transaction, Enron discovered an error in its valuation and reduced the value of the swap from $56 million to $24 million.[212] Notwithstanding the error, Enron and Barclays closed the transaction at the original value

---

[211] Of course, performance risk and credit risk are closely related. For example, if the power market shifted against Enron, it would have had to pay amounts that serviced the trust's debt, in which case the credit risk of the transaction would have appeared to shift to Enron. On the other hand, the performance risks inherent in the swaps provided by the Enron subsidiary were fundamental parts of Enron's price risk management business.

[212] In-Person Interview with Joe Deffner, Enron North America, by Daniel R. Weede, Partner, A&B and W. Hunter Holliday, Partner, A&B, Nov. 13, 2002.

of $56 million. The $32 million valuation error was addressed by "tilting"[213] the payment terms of the Enron Cash 6 Swaps so that they would be "out-of-the-money" by $32 million at inception. In effect, Enron was able to use its price risk management skills and credit to salvage the transaction. Effectively, $24 million of NEL's credit risk was transferred to the lenders and the remaining $32 million of proceeds received were advanced on the basis of Enron's own credit.

Although accounted for as price risk management activities, the $32 million advanced based on Enron's credit in the Cash 6 Transaction was in substance a loan. Nevertheless, Enron treated the entire $56 million of proceeds as operating cash flow. Enron eliminated a $24 million price risk management asset and recorded a $32 million price risk management liability. Enron recorded no debt as a result of the transaction. The Examiner has concluded that Enron's accounting for the Cash 6 Transaction was incorrect.[214]

*The SO₂ Transaction*[215]

As reported in the September Report, Enron and Barclays consummated two transactions that collectively comprise the $SO_2$ Transaction in September and October 2001, respectively. These transactions were ostensibly sales by Enron subsidiaries of sulfur dioxide emissions credits to Colonnade Limited ("Colonnade"), an entity

---

[213] In other words, if there were no changes in any of the market risks hedged by the Enron Cash 6 Swaps during the term of the transaction, Enron would have been required to make payments to the trust sufficient to pay the principal and interest on $32 million of the loans to the trust.

[214] This conclusion is based upon Enron's failure to comply with FAS 125 because Enron (through a subsidiary) retained a beneficial interest in the assigned payment stream by entering into the Enron Cash 6 Swaps with the trust (rather than the trust entering into similar swaps with a third party). Accordingly, the assignment of the payment stream does not meet the second criterion of FAS 125, and thus Enron should not have accounted for the Cash 6 Transaction as a sale.

[215] *See* Annex 1 to Appendix F (Miscellaneous Transactions).

associated with Barclays. The second of the two transactions refinanced the first and provided Enron with proceeds of almost $168 million. At the time of the sale of the emissions credits, however, Enron, through subsidiaries, entered into a series of puts and calls with Colonnade that resulted in the transaction, taken as a whole, having the substance of a loan.

Nevertheless, Enron accounted for the transaction as a sale. Since the emission credits were MTM assets, it treated the proceeds as operating cash flow. Enron recorded no debt as a result of the $SO_2$ Transaction. The Examiner has concluded that Enron's accounting for the transactions as sales was incorrect and that the transactions should have been accounted for as loans.

### C.    Examiner's Conclusions Regarding Miscellaneous Transactions

The Examiner has reached the following conclusions regarding the Miscellaneous Transactions:

*Legal Issues*

*True Sale.* The Examiner concluded in the September Report that the $SO_2$ Transaction was susceptible to being recharacterized as a secured loan. If so, assets with a current approximate value of $125 million could be restored to the Debtors' estates. It is likely, however, that approximately $102 million of those assets are encumbered with perfected "back-up" security interests.[216]

With respect to the Destec Transaction, although it may be possible to argue that the sale of the royalty payments for the fuel should be recharacterized as a loan, the

---

[216] A lien securing a claim that is equitably subordinated pursuant to Section 510(c)(1) of the Bankruptcy Code may be transferred to the estate pursuant to Section 510(c)(2) of the Bankruptcy Code. The Examiner has not reached any conclusion regarding the possible equitable subordination of any claims.

- 127 -

Examiner believes that the grounds for such an argument are less compelling than in many of the other transactions discussed in this Report. In addition, the Destec Trust (as defined below) appears to have a perfected security interest in the underlying assets so that even if the recharacterization of the transaction as a loan were successful, there would be little value to the Debtors' estates in pursuing such a course of action.[217]

*Avoidance Actions*. Potential avoidable transfers arising in connection with the Miscellaneous Transactions are described in Appendix F (Miscellaneous Transactions).

*Accounting Issues*

Enron accounted for the $SO_2$ Transaction and the Cash 6 Transactions as sales rather than financing activities. Enron's accounting for these transactions was incorrect. Under applicable GAAP, Enron should have recorded its obligations in these transactions as debt and the proceeds as cash flow from financing activities rather than operating activities.

---

[217] *Id.*

## XV.  AVOIDANCE ACTIONS

### A.  <u>Overview of Avoidance Actions</u>

The "avoidance actions" that are covered by this Report are potential claims of the Debtors to avoid, as constructively fraudulent transfers or preferential transfers, payments of money or transfers of property, and to recover the amount avoided.  The transfers analyzed by the Examiner as potentially avoidable: (i) arose in connection with the SPE transactions; (ii) were made in connection with a line of credit to Lay from Enron; (iii) were payments of accelerated deferred compensation made to certain Enron employees on the eve of the Petition Date; or (iv) were paid to certain professionals providing legal services to the Debtors or to the Creditors' Committee.

Appendix C (Legal Standards) to this Report reviews the law applicable to such avoidance actions, including affirmative defenses to such claims.  For the purposes of the analysis of such claims, the Examiner has assumed the insolvency of Enron and its affiliated Debtors under 11 U.S.C. § 101(32) at the time of any subject transfer.[218]

The Creditors' Committee and the Debtors are jointly conducting an analysis as to whether substantive consolidation should be pursued in the jointly-administered cases.  Substantive consolidation may affect the underlying preference analysis as it relates to determining the applicable "petition date" for the analysis.

The Examiner's investigation is ongoing, and the Examiner intends upon reporting on, at a future date, additional challenges, if any, to transfers made prior to the Petition Date.

---

[218] The Examiner has received assurances from the professionals for the Debtors and the Creditors' Committee to the effect that the Debtors, in coordination with the Creditors' Committee, will undertake to complete a solvency analysis with respect to the Debtors.

## B.   Avoidance Actions in SPE Transactions

As part of the Examiner's investigation of the SPE transactions, he has uncovered certain transfers that are potentially avoidable by the Debtors as preferences or as constructively fraudulent transfers.  These claims are analyzed in the Appendices that discuss the particular SPE transactions.  The Examiner has concluded that the Debtors have causes of action to avoid transfers with an aggregate face value of approximately $2.9 billion in connection with the SPE transactions.  The Examiner notes that many of the transferees of potentially voidable transfers are affiliates of Enron.  For example, in Appendix I (Minority Interest Transactions), the Examiner identifies and discusses approximately $859 million of preference claims against Ponderosa, a wholly owned subsidiary of Enron.   Appendix G (Whitewing Transaction) identifies and discusses preference claims in excess of $900 million against Whitewing Associates, a subsidiary of Enron, and certain subsidiaries or affiliates of Whitewing Associates.  As a result, affirmative relief against these affiliates may be of limited value, and in the event of substantive consolidation, all or part of such claims may not be recoverable.  However, to the extent that these SPEs (or entities claiming through them) hold claims against Enron (or other Debtors), the Debtors may be able to utilize Section 502(d) of the Bankruptcy Code to disallow those claims.  The result of such disallowance would be to limit or preclude recovery by investors in the SPE.  Certain of those causes of actions will be more difficult to sustain than others, as discussed in the respective Appendices.

## C.   Selected Insider Avoidance Actions

The Examiner has also begun his investigation of transactions that involve potential avoidance actions against pre-petition insiders of the Debtors.  Generally, those

- 130 -

insiders include individuals (as defined in the Bankruptcy Code) who were (and in some cases still are) insiders to the Debtors by virtue of their status as officers. This analysis is not yet completed as the Examiner has been unable to obtain from the Debtors all of the records and information necessary to complete the review of potentially voidable transfers to the officers. Moreover, the Examiner is in the process of analyzing whether Enron's law firms, accounting firms, banks, investment advisors and others may be considered insiders for the purposes of the application of the avoidance provisions of the Bankruptcy Code. Notwithstanding these limitations, the Examiner has determined that the Debtors have claims against certain insiders and employees to recover certain pre-petition transfers (as preferences or as constructively fraudulent transfers) exceeding $127 million. The Examiner's preliminary conclusions are as follows:

- Enron has a cause of action under Section 548(a)(1)(B) of the Bankruptcy Code (i.e., constructively fraudulent conveyance) against Lay to recover transfers in excess of $74 million made in the year prior to the Petition Date arising out of certain loans made by Enron to Lay and which Lay repaid Enron with Enron stock at a time when Enron was presumed to be insolvent.[219]

- Enron has a cause of action under Section 547 of the Bankruptcy Code (i.e., preference) against certain employees of the Debtors arising out of Enron's accelerated payments, totaling $53 million, under two deferred compensation plans, made within a 30-day period (commencing on October 30, 2001, and ending on approximately November 30, 2001), at a time when Enron was presumptively insolvent.

The Examiner's conclusions with respect to such claims are set forth in Annexes 1 and 2 to Appendix P (Avoidance Actions).

---

[219] Subsequent reports will address whether such transfers: (i) constitute actually fraudulent transfers or (ii) give rise to any other claims. In addition, the Debtors have a claim against Lay for approximately $7.5 million of outstanding loan obligations.

- 131 -

### D.    Selected Professional Avoidance Actions

The Examiner has also begun his investigation of transactions that involve potential avoidance actions against pre-petition professionals of the Debtors. The Examiner has endeavored to identify the professionals rendering services to the pre-petition Debtors. The Examiner has utilized, for the purpose of this analysis, the definition of "professional" under Section 327 of the Bankruptcy Code and the cases construing such section. The Examiner has focused, at this stage, on certain professionals providing legal services to the Debtors post-petition and to the Creditors' Committee. The Examiner's conclusions with respect to such claims are set forth in Annex 3 to Appendix P (Avoidance Actions).

## XVI. INTERIM NATURE OF REPORT

This Report is an interim report.  The Examiner's conclusions with respect to the matters in this Report (and in the Appendices hereto) are preliminary.  This Report is not intended to provide a complete analysis on every facet of the transactions discussed herein.  Issues that may be addressed in future reports include: (a) appropriate treatment of a claim of an SPE or any lender and (b) the liability under applicable legal standards of any person (including third parties) involved in a transaction or who was charged with disclosing or approving the transaction.

## XVII.   FUTURE REPORTS

In future reports, the Examiner intends to report on the other matters identified in the April 8th Order, including, without limitation, possible equitable subordination of claims, third party culpability, potential affirmative claims of the Debtors' estates arising out of the SPE transactions, and avoidance actions available to the Debtors' estates.

Dated:   January 21, 2003

Respectfully submitted,

/s/ Neal Batson
Neal Batson
Examiner

ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, Georgia 30309
404 881-7000