# Exhibit D

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------ x
                                                 :
In re:                                           :     Chapter 11
                                                 :
ENRON CORP., et al.,                             :     Case No. 01-16034 (AJG)
                                                 :
                    Debtors.                     :     Jointly Administered
                                                 :
------------------------------------------------ x
```

## THIRD INTERIM REPORT OF NEAL BATSON, COURT-APPOINTED EXAMINER

**June 30, 2003**

TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................ 1
        A.      Background ............................................................................. 1
        B.      Prior Reports .......................................................................... 2
        C.      Summary of Conclusions........................................................ 3
        D.      Standard Adopted by the Examiner ....................................... 6
        E.      How to Read This Report ....................................................... 7

II.     BACKGROUND .................................................................................. 8
        A.      Events of Fall 2001 ................................................................ 8
        B.      The Bankruptcy Filings and Subsequent Events ..................... 10

III.    ROLE OF OFFICERS IN SPE TRANSACTIONS AND POTENTIAL
        LIABILITY...................................................................................... 11
        A.      Overview................................................................................ 11
        B.      Why Did Enron Officers Engage in the SPE Transactions?..... 14
        C.      Officers Involved in SPE Transactions................................... 19
        D.      Potential Breaches of Fiduciary Duties.................................. 24
        E.      Potential Defenses Available to Officers................................. 30

IV.     ROLE OF FINANCIAL INSTITUTIONS IN ENRON'S SPE TRANSACTIONS
        AND THEORIES OF LIABILITY .................................................... 34
        A.      Theories of Potential Liability ............................................... 34
        B.      Potential Defenses to Aiding and Abetting Claims and Equitable
                Subordination........................................................................ 36
        C.      Potential Additional Defenses to Aiding and Abetting Claims ................ 48

V.      SPECIFIC ROLES OF FINANCIAL INSTITUTIONS AND POTENTIAL
        LIABILITY...................................................................................... 51
        A.      Citigroup ............................................................................... 51
        B.      JPMorgan Chase .................................................................... 61
        C.      Barclays................................................................................. 65
        D.      BT/Deutsche .......................................................................... 72
        E.      CIBC ..................................................................................... 76
        F.      Merrill Lynch ......................................................................... 81

VI.     AVOIDANCE ACTIONS .................................................................. 86
        A.      Overview of Avoidance Actions............................................. 86
        B.      Preference Actions in SPE Transactions.................................. 86
        C.      Selected Professional Avoidance Actions ............................... 87
        D.      Selected Insider Avoidance Actions ....................................... 88

VII.    INTERIM NATURE OF REPORT ..................................................... 89

VIII.   FINAL REPORT ............................................................................... 89

Appendix A  —  Certain Defined Terms
Appendix B  —  Legal Standards
Appendix C  —  Role of Enron's Officers
Appendix D  —  Role of Citigroup and its Affiliates
Appendix E  —  Role of JPMorgan Chase and its Affiliates
Appendix F  —  Role of Barclays and its Affiliates
Appendix G  —  Role of BT/Deutsche and its Affiliates
Appendix H  —  Role of CIBC and its Affiliates
Appendix I  —  Role of Merrill Lynch and its Affiliates
Appendix J  —  Avoidance Actions

I.    **INTRODUCTION**

A.    <u>**Background**</u>

On December 2, 2001 (the "Petition Date") and on certain dates thereafter, Enron Corp. ("Enron"), an Oregon corporation, and certain of its affiliates (collectively, the "Debtors") filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the Southern District of New York (the "Court") (collectively, the "Bankruptcy Case").

This Court entered an Order on April 8, 2002 (the "April 8th Order") authorizing and directing the appointment of an examiner pursuant to 11 U.S.C. § 1104(c).[1]  On May 22, 2002, the United States Trustee appointed Neal Batson (the "Examiner") as the examiner.  The Court, by Order dated May 24, 2002, approved the appointment.

On September 21, 2002, the Examiner filed the First Interim Report of Neal Batson, Court-Appointed Examiner (the "First Interim Report").  On January 21, 2003, the Examiner submitted to the Court the Second Interim Report of Neal Batson, Court-Appointed Examiner (the "Second Interim Report"; together with the First Interim Report, the "Prior Reports").[2]  This Third Interim Report of Neal Batson, Court-Appointed Examiner, constitutes the Examiner's

---

[1]  Among other things, the April 8th Order authorized the examiner to:

> inquire into, *inter alia,* all transactions (as well as all entities as defined in the Bankruptcy Code and prepetition professionals involved therein): (i) involving special purpose vehicles or entities created or structured by the Debtors or at the behest of the Debtors (the "SPEs"), that are (ii) not reflected on the Enron Corp. balance sheets, or that (iii) involve hedging using the Enron Corp. stock, or (iv) as to which the Enron examiner has the reasonable belief are reflected, reported or omitted in the relevant entity's financial statements not in accordance with generally accepted accounting principles, or that (v) involve potential avoidance actions against any prepetition insider or professional of the Debtors.

[2]  Any references in the Prior Reports and in this Report to meetings, communications, contacts and actions between the Examiner and third parties are intended to refer to the office of the Examiner, which shall include the Examiner and his professionals.  Therefore, references to any meetings, communications, contacts and actions taking place between the Examiner and a third party should not be construed as indicating that Neal Batson was present personally for such meetings, communications, contacts or actions.

third report (the "Report").

The Examiner has been authorized to investigate all transactions involving special purpose vehicles created or structured by the Debtors or at the behest of the Debtors (the "SPEs") and those individuals, institutions and professionals involved therein.

### B.   Prior Reports

Six SPE transactions were examined in the First Interim Report, and the Examiner concluded that the transactions were, in varying degrees, susceptible of being recharacterized under a "true sale" challenge.  If this recharacterization were to occur, the remaining assets in these structures, having a value of approximately $500 million, would be restored to the Debtors' estates.[3]

The Second Interim Report focused on substantially all of Enron's material SPE transactions identified to date.  The Examiner provided his preliminary views of the role of the SPEs in the collapse of Enron, including a discussion of how Enron used the SPEs in conjunction with six accounting techniques to impact dramatically its financial statements.  The Examiner concluded that Enron manipulated its financial statements in violation of GAAP and failed to make appropriate disclosures to the public of its SPE transactions under applicable disclosure standards.  Furthermore, the Second Interim Report also set forth the Examiner's conclusions that many of these transactions were, in varying degrees, susceptible of "true sale" or substantive consolidation challenges which, if successful, would result in assets having an estimated

---

[3] Statements in this Report and in the Prior Reports about estimated values of various assets or portfolios of assets are derived primarily from information provided to the Examiner by employees of the Debtors.  In addition, the estimates typically are not based upon any independent valuation analysis and may not reflect the Debtors' current beliefs about the value of the assets.  The Examiner has reflected estimated asset values in this Report primarily for the purpose of providing an indication of the general magnitude of the value of the assets remaining in various structures.  Therefore, many of these values may not reflect the actual current fair market value of the assets.

aggregate value between $1.7 billion and $2.1 billion being restored to the Debtors' estates.[4]

Finally, the Examiner identified potential avoidable transfers in the face amount of approximately $2.9 billion that, to varying degrees, may be recovered by the Debtors' estates.[5]

## C.    Summary of Conclusions

The primary focus of this Report is on certain persons and entities that may have responsibility under applicable legal standards for the Debtors' misuse of its SPE structures.[6]

---

[4] Some, but not all, of the Enron entities that transferred the assets are Debtors in the Bankruptcy Case. Where a non-Debtor transferor is involved in a transaction that is recharacterized as a loan, the most expeditious method to permit the transferor to recover such assets may be for Enron to cause the transferor to file a voluntary petition as part of the Bankruptcy Case. The Examiner has not analyzed the avenues for similar relief in litigation pursued in either state or other federal courts. For purposes of this Report (as well as the Prior Reports), any references to assets being added to or otherwise available to the Debtors' estates shall be deemed to include any transferor of an asset, regardless of whether such transferor is actually a current debtor in the Bankruptcy Case. Furthermore, certain of the subject assets that are potentially recoverable as part of the Debtors' estates have been sold after the Petition Date, with the proceeds being held in escrow subject to further order from the Court. For purposes of this Report (as well as the Prior Reports), references to assets being added to, restored to or otherwise available to the Debtors' estates shall be deemed to include the proceeds of any asset sale. In addition, as noted in the First Interim Report, in a "true sale" analysis, when credit support is provided by an *affiliate* of the asset transferor, rather than the asset transferor itself, an issue may be raised as to whether the presence of such credit support is a factor that can be relied upon to support a recharacterization of the purported sale as a loan. The Examiner believes that, even where the Enron party providing the credit support is the parent or other affiliate of the asset transferor, rather than the asset transferor itself, the existence of the credit support is a relevant factor in determining whether there was a "true sale." A discussion of this issue is contained in Appendix C (Legal Standards) to the Second Interim Report.

[5] As noted in the Second Interim Report, the ability of the Debtors to realize on certain of these avoidance actions is subject to: (i) affirmative defenses of any transferee; (ii) valuation evidence (particularly in the case of constructively fraudulent transfers); and (iii) collectability. As to valuation, both the Debtors and the Official Committee of Unsecured Creditors (the "Creditors' Committee") have engaged investment bankers or other valuation experts. In order to avoid duplication of efforts, and because the Examiner does not have authority to prosecute actions on behalf of the Debtors' estates, the Examiner has not sought to retain such an expert. To the extent an action is pursued by the Debtors or the Creditors' Committee, investment bankers retained by such party may provide valuation advice.

Finally, the Examiner expresses no views as to collectability. The Examiner notes that many of the transferees of potentially voidable transfers are affiliates of Enron. As a result, affirmative relief against these affiliates may be of limited value, and in the event of substantive consolidation, all or part of such claims may not be recoverable. However, to the extent that these SPEs (or entities claiming through them) hold claims against Enron (or other Debtors), the Debtors may be able to utilize Section 502(d) of the Bankruptcy Code to disallow those claims. The result of such disallowance would be to limit or preclude recovery by investors in the SPE.

[6] The scope of the Examiner's investigation is limited by the terms of the April 8th Order. Generally this Report does not address any potential causes of action that may arise as a result of any transactions or arrangements that do not involve the Debtors' use of SPEs or other matters specifically identified in the April 8th Order. For example, many of the financial institutions discussed in this Report were involved in transactions and arrangements with Enron that are not related to subjects listed in the April 8th Order and, as a consequence, the Examiner expresses no

Specifically, the Examiner in this Report concludes that:

- There is sufficient evidence from which a fact-finder could conclude[7] that: (i) certain senior officers[8] of Enron breached their fiduciary duties under applicable law by causing the Debtors to enter into SPE transactions that were designed to manipulate the Debtors' financial statements and that resulted in the dissemination of financial information known by these officers to be materially misleading; and (ii) these wrongful acts caused direct and foreseeable harm to Enron itself, and resulting harm to innocent parties that dealt with Enron, including creditors in the Bankruptcy Case.

- There is sufficient evidence from which a fact-finder could conclude that: (i) certain financial institutions that were involved in Enron's SPE transactions[9] had *actual knowledge* of the wrongful conduct of these officers; (ii) these financial institutions gave *substantial assistance* to the officers by participating in the structuring and closing of the SPE transactions; and (iii) injury to the Debtors was the direct or reasonably foreseeable result of such conduct. As a result, a fact-finder could conclude that certain of these Financial Institutions aided and abetted these officers in breaching their

---

opinion as to whether there are potential causes of action that may arise as a result of such other transactions or arrangements.

[7] *See* Section I.D. below for a discussion of the standard adopted by the Examiner in this Report.

[8] The Examiner has not concluded his investigation of other senior Enron executives, including Lay, Skilling and Enron's in-house lawyers and will report on these persons in his next report.

[9] The financial institutions discussed in this Report (collectively, the "Financial Institutions") are: (i) Citigroup, Inc. and its affiliates and predecessors (collectively, "Citigroup"); (ii) JPMorgan Chase & Co. (formerly Chase Manhattan Bank) and its affiliates and predecessors (collectively, "JPMorgan Chase"); (iii) Barclays Bank, PLC and its affiliates and predecessors (collectively, "Barclays"); (iv) Deutsche Bank AG and its affiliates and predecessors (collectively, "BT/Deutsche"); (v) Canadian Imperial Bank of Commerce and its affiliates and predecessors (collectively, "CIBC"); and (vi) Merrill Lynch and Co., Inc. and its affiliates and predecessors (collectively, "Merrill Lynch"). The order of presentation of each Financial Institution is based upon the apparent size of the Financial Institution's claims in the Bankruptcy Case (as measured by the proofs of claim filed by the Financial Institution or on its behalf), from the largest to the smallest claims.

In the Prior Reports, the Examiner analyzed and reported on certain legal, structural and accounting issues that arose from Enron's SPE transactions. In the course of that analysis, the Examiner identified a number of financial institutions whose relationships with Enron appeared to warrant further investigation given the scope of the April 8th Order. Generally, these institutions were the ones that had the most significant involvement in Enron's SPE transactions and the most substantial claims against the Debtors' estates. In this Report, the Examiner reports on the relationship between Enron and six of those financial institutions. The Examiner expects to report on additional financial institutions in his Fourth Interim Report in October. Due to conflicts disclosed at the outset of the Examination, the decision as to whether to investigate three other financial institutions and two accounting firms, and if so, the investigation of those institutions and firms, will be made by Harrison J. Goldin (the "ENA Examiner"), the court-appointed examiner in the bankruptcy case of Enron North America Corp. (f/k/a Enron Capital & Trade Resources Corp.) ("ENA"). Order Expanding the Duties of Harrison J. Goldin, the Court-Appointed Examiner in the Enron North America Corp. Bankruptcy Proceeding, to Include the Investigation of Certain Entities Involved in Transactions Pertaining to Special Purpose Entities, June 2, 2003, Docket No. 10993.

fiduciary duties.[10]   However, because Enron's officers participated in the wrongful conduct, the Financial Institutions may assert either that Enron lacks standing to assert any such claim or that the doctrine of *in pari delicto* is a defense to defeat a claim by Enron.

- There is sufficient evidence of inequitable conduct by certain Financial Institutions in connection with the SPE transactions for a court to determine that the claims of such Financial Institutions, totaling in excess of $5 billion,[11] may be equitably subordinated to the claims of other creditors.

The Examiner also considers whether Section 548(a)(1)(A) of the Bankruptcy Code, which allows the avoidance of obligations *and* transfers made with the intent to hinder, delay or defraud creditors, can be applied to the SPE transactions.   If it does, and if a fact-finder determined that Enron entered into an SPE transaction with actual intent to hinder, delay or defraud its creditors, *obligations* incurred in that SPE transaction would be unenforceable. Either as a result of such a finding or if the fact-finder also determined that the *transfers* made in connection with such SPE transactions were made with intent to hinder, delay or defraud, such transfers could be recovered by the Debtors' estates.   Any transferee that entered into that

---

[10] As set forth more fully in this Report (including its Appendices), the weight of evidence, availability of defenses and other mitigating factors differ among the Financial Institutions.

[11] This amount could be significantly greater. As discussed in Appendix B (Legal Standards), published case law is unclear as to what happens if the "tainted" claim of a financial institution is purchased by another entity. That is, if a financial institution engaged in inequitable conduct such that equitable subordination was warranted, and if that financial institution then sold all or a portion of its claim (or syndicated a portion of the loan to other financial institutions after the closing of the transaction), would the claims of these purchasing financial institutions be subject to equitable subordination on the basis of the transferor's conduct?  If the answer to that question is yes, then an analysis of what claims, if any, were sold (or syndicated post-closing) by the financial institution that engaged in misconduct should be undertaken.  The Examiner did not undertake this analysis given the expense involved and the uncertainty of the case law.

This amount does, however, include the claims of certain entities (primarily trusts) that filed proofs of claim in certain transactions under which a Financial Institution is the beneficial holder of the debt.

obligation or received such payments in good faith, however, would have a defense to this claim to the extent value was given the Debtors.[12]

In addition, this Report addresses the investigation of certain specific avoidance actions, and concludes that: (i) certain transfers (made in connection with the SPE transactions not previously reviewed for avoidance actions) totaling approximately $368 million could be recovered by the Debtors' estates as constructively fraudulent or preferential transfers; (ii) certain transfers made to insiders (not previously discussed by the Examiner) could be recovered by the Debtors' estates as constructively fraudulent transfers; and (iii) certain transfers made to professionals totaling approximately $70 million could be recovered by the Debtors' estates as preferential transfers.

**D.    Standard Adopted by the Examiner**

The Examiner is not the ultimate decision maker on these matters.  The Examiner has analyzed the evidence he has gathered to date against the legal standards applicable to the issues identified in this Report.  The Examiner has considered both direct evidence and the reasonable inferences that can be drawn therefrom.  If there are sufficient facts to support a claim, even though there is evidence to the contrary, then a court would submit that claim to a fact-finder. Where the Examiner reaches the conclusion that there is *sufficient evidence for a fact-finder to conclude* that a claim (or an element of a claim) is satisfied, the Examiner has determined that in a legal proceeding regarding such matter, the proposition would be submitted to the fact-finder

---

[12] While the Examiner has not made a case-by-case analysis pursuant to this theory of the facts available to him, there is sufficient evidence for a fact-finder to conclude that, with respect to Enron's overall use of SPEs, Enron entered into these transactions with the intent to hinder, delay or defraud its creditors. The Examiner also notes that the facts applicable to the potential claims of aiding and abetting a breach of fiduciary duty, or the potential equitable subordination of certain financial institutions' claims, are facts that would be relevant to the good faith defense.

for decision. In most cases, the fact-finder would be a jury, although in equitable subordination actions the bankruptcy court serves as the fact-finder. The decision of the fact-finder would be made after evaluating the documentary evidence, the testimony and credibility of witnesses, and the reasonable inferences that may be drawn from this evidence.

**E.     How to Read This Report**

The remaining Sections of this Report provide an overview of the Examiner's conclusions with respect to the matters identified above. More detailed analyses and supporting evidence are set forth in the Appendices to this Report. Therefore, the reader should review the applicable Appendices (and any Annex attached thereto) for a more complete understanding of the issues addressed in the summaries below.

The first two Appendices to this Report – Appendix A (Certain Defined Terms) and Appendix B (Legal Standards)[13] – are designed to provide the reader with background helpful to understanding the other Appendices.

---

[13] Legal issues addressed in Appendix B (Legal Standards) include, among other things, fiduciary duties of officers, aiding and abetting liability, equitable subordination and transfers made with actual intent to hinder, delay or defraud creditors.

- 7 -

## II.    BACKGROUND

### A.    <u>Events of Fall 2001</u>

Until the fall of 2001, Enron was one of the largest companies in the world and was considered to be one of the most innovative and successful.[14]  In the fall of 2001, however, Enron made a series of financial disclosures and restatements of its financial statements that triggered a chain of events culminating in its bankruptcy filing.

In an earnings release issued on October 16, 2001,[15] Kenneth Lay ("Lay"), Enron's Chairman and CEO, announced that Enron was taking "after-tax non-recurring charges" of $1.01 billion in the third quarter.[16]  Enron also disclosed that it would record a $1.2 billion reduction in shareholders' equity as of the end of the third quarter.[17]  On November 8, 2001, Enron announced its intention to restate its financial statements for 1997 through 2000, and the first and

---

[14] According to the 2001 Fortune 500 Rankings, Fortune magazine ranked Enron as the seventh largest corporation in the world, based upon revenues. *The 500 Largest U.S. Corporations*, Fortune, Apr. 16, 2001, at F-1.  On February 19, 2001, Fortune magazine named Enron as the "*Most Innovative Company in America*" for the fifth consecutive year. *America's Most Admired Companies*, Fortune, Feb. 19, 2001, at 104.

[15] Enron Press Release, "Enron Reports Recurring Third Quarter Earnings of $0.43 Per Diluted Share; Reports Non-Recurring Charges of $1.01 Billion After-Tax; Reaffirms Recurring Earnings Estimates of $1.80 for 2001 and $2.15 for 2002; And Expands Financial Reporting," Oct. 16, 2001 [ELIB00001783].  Enron's third quarter ended September 30th.

[16] Although there were several components to the charge, one component related to Enron's "early termination during the third quarter of certain structured finance arrangements with a previously disclosed entity." The "previously disclosed entity" was LJM2 Co-Investment, L.P. ("LJM2"), a private investment limited partnership founded in December 1999. LJM2 was run by Andrew S. Fastow ("Fastow"), Enron's CFO, and Michael J. Kopper ("Kopper"), an Enron employee, and had as its limited partners a significant number of institutional and individual investors. Enron Form 10-Q filed with the SEC for the Quarter ended Sept. 30, 2001 (the "10-Q for 3Q/2001"), at 18-19, Note 4 to Consolidated Financial Statements in connection with related party transactions. The charge related to Enron's termination of four SPEs known as Raptor I, II, III and IV (the "Raptor SPEs") pursuant to which Enron had entered into certain hedging transactions.  As a result of this termination, Enron recognized the $544 million after-tax charge to net income for the third quarter 2001. The pre-tax charge was $710 million. *Id.*

[17] October 16, 2001, 9:00 a.m. C.T., Enron Corp. Conference Call regarding Third Quarter 2001 Earnings Release, Moderator: Mark Koenig (the "Earnings Release") [AB0252 04603–AB0252 04629].

second quarters of 2001, to reduce previously reported net income by an aggregate of $586 million.[18]

On November 19, 2001, Enron filed its third quarter Form 10-Q, including interim financial statements, that gave effect to the previously announced "non-recurring charges" and restatement of prior financial statements.[19]  In addition, in its third quarter 2001 balance sheet, Enron reported total debt under generally accepted accounting principles ("GAAP") of $12.978 billion.[20]  On the same day, senior Enron executives informed certain of its bankers that, while the debt reflected on its third quarter 2001 balance sheet under GAAP was $12.978 billion, Enron's "debt" (as described in the presentation) was $38.094 billion.[21]  Thus, as Enron noted, $25.116 billion of debt was "off balance sheet," or in some cases, reflected on the balance sheet, but classified as something other than debt.  Approximately $14 billion of this $25.116 billion of additional "debt" was incurred through structured finance transactions involving the use of SPEs. Enron's presentation to the banks divided the additional debt into the eight categories shown in the following table:

---

[18] Enron Form 8-K filed with the SEC on Nov. 8, 2001.  This filing also contained additional information surrounding the related party transactions.  At the time of the announced restatement, the third quarter 2001 financial statements had not been filed, but a loss of $618 million had been announced in the Earnings Release.  On October 31, 2001, Enron announced that its Board of Directors (the "Enron Board" or "Enron's Board of Directors") had formed a Special Investigative Committee, headed by William Powers, Jr., Dean of the University of Texas Law School (the "Powers Committee"), to examine and recommend actions with respect to transactions between Enron and entities connected with related parties.  *Id.*  LJM2 and another partnership, LJM Cayman, L.P. ("LJM1"), as well as other investment partnerships, were the principal focus of the Report of Investigation by the Special Investigative Committee of the Board of Directors of Enron Corp., released February 1, 2002 (the "Powers Report").

[19] 10-Q for 3Q/2001. These financial statements gave effect to the previously announced "non-recurring charges" and restatement of prior financial statements.  Due to the pending investigation by the Powers Committee and the previously announced restatement, Enron's accounting firm, Arthur Andersen LLP ("Andersen"), was unable to finalize its review of these quarterly statements as required by SEC Rule 10-01(d) of Regulation S-X.

[20] *Id.* The debt consisted of $6.434 billion of short-term debt and $6.544 billion of long-term debt.

[21] Enron Corp. PowerPoint Bank Presentation, Waldorf Astoria, New York, N.Y., Nov. 19, 2001 (the "Bank Presentation"), at 48-62 [AB0000321534-AB000321605].

| Category of Additional "Debt" | Amount at 9/30/01 in billions |
|---|---|
| FAS 140 Transactions | $2.087 |
| Minority Interest Financings | $1.690 |
| Commodity Transactions with Financial Institutions | $4.822 |
| Share Trusts | $3.352 |
| Equity Forward Contracts[22] | $.304 |
| Structured Assets | $1.532 |
| Unconsolidated Affiliates | $10.733 |
| Leases | $.596 |
| Total | $25.116 |

## B.    The Bankruptcy Filings and Subsequent Events

Less than one month after its meeting with its bankers, Enron and certain of its affiliates

filed for bankruptcy.    In the months immediately following Enron's disclosures, allegations

surfaced of securities fraud, accounting irregularities, energy market price manipulation, money

laundering, breach of fiduciary duties, misleading financial information, ERISA violations,

insider trading, excessive compensation and wrongdoing by certain of Enron's bankers.[23]

---

[22] In footnote 28 of the First Interim Report and footnote 33 of the Second Interim Report, the Examiner described a typical equity forward contract as a sale by an issuer of equity securities to a counterparty coupled with the issuer's obligation to repurchase the equity securities from the counterparty in the future for the original purchase price plus a premium. In its simplest terms, an equity forward contract is a contract to exchange an equity or equity basket at a set price at a future date. *See* Board of Governors of the Federal Reserve System, Instructions for Semiannual Report of Derivatives Activity, June 2003, at 13, *available at* http://www.federalreserve.gov/boarddocs/reportforms/ forms/FR_243620030624_i.pdf. Thus, only the second portion of the transaction described in the referenced footnotes is an equity forward. The Examiner is continuing his investigation of equity forward transactions entered into by Enron and has made no determination as to the facts surrounding these transactions.

[23] Numerous Congressional Committees have investigated aspects of Enron's business activities or practices. In addition, there have been several class action lawsuits filed on behalf of shareholders and employees, which are still pending, naming the Debtors, certain of their directors, Andersen, certain other professionals, and others as defendants. These include *Newby v. Enron Corp.*, No. 01-CV-3624 (S.D. Tex. filed Oct. 22, 2001), a lawsuit alleging, among other things, violations of securities laws (the "Newby Class Action"). Other class actions include *Severed Enron Employees Coalition v. The Northern Trust Co.*, No. 02-CV-267 (S.D. Tex. filed Jan. 24, 2002), a lawsuit alleging, among other things, breach of fiduciary duty under ERISA, and *Tittle v. Enron Corp.*, No. 01-CV-3913 (S.D. Tex. filed Nov. 13, 2001), a lawsuit alleging, among other things, breach of fiduciary duty under ERISA. Another lawsuit, *Chao v. Enron Corp.*, No. 03-CV-2257 (S.D. Tex. filed June 26, 2003), alleges that Enron, its directors and certain employees did not manage the assets of Enron's pension plans consistent with the standards set forth in ERISA. The Examiner expresses no opinion as to the merits of any of these lawsuits.

## III.    ROLE OF OFFICERS IN SPE TRANSACTIONS AND POTENTIAL LIABILITY

### A.    Overview

In his Second Interim Report, the Examiner concluded that through the pervasive use of structured finance techniques involving SPEs and aggressive accounting practices, Enron so engineered its reported financial position and results of operations that its financial statements bore little resemblance to its actual financial condition or performance. Although evidence suggests that Enron's financial engineering began years earlier, the Examiner focused on 2000, the last year for which Enron issued audited financial statements.[24] That year, Enron's use of six accounting techniques produced 96% of its reported net income and 105% of its reported funds flow from operating activities, and enabled it to report $10.2 billion of debt rather than $22.1 billion of debt. The six accounting techniques are summarized as follows:

- *FAS 140 Transactions.*[25]  Enron's FAS 140 Transactions were essentially bridge financings of illiquid assets. Although Enron treated these transactions as sales to SPEs for accounting purposes, Enron assumed liability for repayment of the debt incurred and retained substantially all of the economic benefits and risks of ownership of the asset.[26]

- *Tax Transactions.*[27]  Enron's Tax Transactions were, for the most part, artificial transactions lacking a bona fide business purpose other than the

---

[24] The financial impact of Enron's use of its six accounting techniques to produce and disseminate materially misleading financial information is not limited to its 2000 annual financial statements. The effect of these techniques on the 2000 annual financial statements is presented only as an illustration. The Examiner has concluded that use of these techniques caused the 1999 annual financial statements and earlier financial statements to be misleading as well.

[25] *See* Second Interim Report, at 107-12; Second Interim Report, Appendix M (FAS 140 Transactions).

[26] With one exception, these transactions are structured finance transactions that were intended to comply with either Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities, Statement of Financial Accounting Standards No. 125 (Financial Accounting Standards Bd. 1996) ("FAS 125"), or its successor, Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities, Statement of Financial Accounting Standards No. 140 (Financial Accounting Standards Bd. 2000) ("FAS 140"). FAS 125 was the accounting standard that governed securitizations of financial assets from January 1, 1997 until it was replaced by FAS 140, which became effective with respect to transactions closing on or after April 1, 2001. Although this Report discusses some transactions that were governed by FAS 125 and others that were governed by FAS 140, this Report refers to this type of transaction and other similar transactions generally as a "FAS 140 Transaction."

[27] *See* Second Interim Report, at 87-94; Second Interim Report, Appendix J (Tax Transactions).

creation of accounting income for Enron. The Tax Transactions were designed to allow Enron to record the potential benefit of speculative future tax deductions as current income on its financial statements and, in some cases, as pre-tax income rather than as after-tax income resulting from reduced tax expense in the tax provision of Enron's income statement.

- *Non-Economic Hedges.*[28]   Through these transactions, which include the Raptor SPEs and the LJM1 Rhythms hedges, Enron "hedged" the decrease in value of certain of its investments that it had marked to market by entering into derivative contracts with counterparties that were related to Enron. These transactions were accounting hedges and did not provide economic protection to Enron.

- *Share Trust Transactions.*[29]   Enron's Share Trust Transactions were off-balance sheet financing structures through which an issuing entity would issue notes and equity certificates in the institutional private placement market. The proceeds would be used, in part, to fund the purchase or refinancing of assets owned by Enron or its affiliates. Repayment of the notes and certificates was supported by Enron stock and ultimately by Enron's promise to pay.

- *Minority Interest Transactions.*[30]   Enron's Minority Interest Transactions allowed Enron to obtain funds while showing the proceeds as a "minority interest" on the balance sheet between liabilities and equity, rather than as debt.

- *Prepay Transactions.*[31]   In the Prepay Transactions, Enron obtained financing through a combination of offsetting commodity trades and swaps. Although the transactions were loans in economic substance, Enron reported its obligations as price risk management liabilities rather than debt. Moreover, the increase in the outstanding prepay balance from one period to the next served to increase cash flow from operating activities. As a consequence, Enron's reported financial condition and results of operations were materially misleading and its key credit ratios were improperly enhanced.

---

[28] *See* Second Interim Report, at 104-06; Second Interim Report, Appendix L (Related Party Transactions).

[29] *See* Second Interim Report, at 67-68; Second Interim Report, Appendix G (Whitewing Transaction); Second Interim Report, Appendix H (Marlin Transaction). This Report refers to these transactions as "Share Trust Transactions," or individually as "Whitewing" or "Marlin."

[30] *See* Second Interim Report, at 79-86; Second Interim Report, Appendix I (Minority Interest Transactions). This Report refers to these transactions as "Minority Interest Transactions."

[31] *See* Second Interim Report, at 58-66; Second Interim Report, Appendix E (Prepay Transactions). This Report refers to these transactions as a "Prepay" or a "Prepay Transaction." As discussed in the Second Interim Report, Enron engaged in billions of dollars of Prepay Transactions. While Enron had a common goal in all its Prepays – reporting price risk management liabilities rather than debt, and cash flow from operating activities rather than from financing activities – there are structural differences in the various Prepay Transactions. Enron's Prepay Transactions can be divided into two general categories – the "SPE Prepays" and the "Third Party Bank Prepays."

- 12 -

The last two weeks of 1999 illustrate the extent to which Enron relied on the SPE transactions to reach certain financial statement results. During this two week period, Enron closed at least eleven transactions. In the aggregate, these eleven transactions generated reported net income of $114 million and contributed more than $1.2 billion of cash flow from operating activities while keeping the repayment obligations off balance sheet or recorded on the balance sheet as something other than debt.[32]  The following timeline indicates the date that each transaction closed, as well as the financial institution, or related party, primarily involved in the transaction:



| 12-14 | 12-21 | 12-22 | 12-27 | 12-28 | 12-29 | 12-31 |
|---|---|---|---|---|---|---|
| Nixon Prepay Citigroup | Ghost FAS 140 Transaction CIBC | CLO Trust Bear Stearns | Alchemy FAS 140 Transaction CIBC | Bob West Treasure Royal Bank of Canada | Discovery FAS 140 Transaction CIBC | 1999 Electricity Trades Merrill Lynch |
| | Nowa Sarzyna Sale to Whitewing West LB | | | | Nigerian Barge Merrill Lynch | |
| | | | | | Nahanni Minority Interest Citigroup | |
| | | | | | Pluto LJM2 | |

Enron's officers knew that in order to approve Enron's desired prepay accounting treatment, Andersen required, among other things, that a substantive third party be involved as one of the counterparties in the transaction in addition to Enron and the lender. In-Person Interview with John E. Stewart, former Partner, Andersen, by H. Bryan Ives, III, and John E. Stephenson, Jr., A&B, June 12, 2003 (the "Stewart Interview"). In the SPE Prepay Transactions, this third party was an entity that a Financial Institution caused to be created for the purpose of participating in transactions such as the Prepay Transactions. JPMorgan Chase caused Mahonia to be formed to participate in the SPE Prepays that are referred to as the Mahonia Prepay Transactions. Citigroup caused Delta to be formed to participate in SPE Prepays such as those referred to in this Report as the Yosemite Prepay Transactions and the June 2001 Citigroup Prepay. The evidence suggests that Mahonia and Delta were SPEs for a number of reasons, including that they were owned by charitable trusts, had no employees or operations and had only minimal assets. In a Third Party Bank Prepay, on the other hand, the third party was not formed to facilitate Prepay Transactions, but was a substantive entity, usually another financial institution.

[32] *See* Appendix C (Role of Enron's Officers).

### B.   Why Did Enron Officers Engage in the SPE Transactions?

In the Second Interim Report, the Examiner discussed two key factors that drove Enron's

management of its financial statements:  (i) its need for cash; and (ii) its need to maintain an

investment grade credit rating.  Enron was reluctant to issue equity to address these needs for

fear of an adverse effect on its stock price and was reluctant to incur debt because of a possible

adverse effect on its credit ratings.[33]  Moreover, Enron's use of mark-to-market ("MTM")

accounting created a timing gap between recognition of net income and the receipt of associated

cash.  This "quality of earnings" problem made it particularly challenging for Enron to raise cash

without issuing equity while maintaining its credit rating.  Another factor that appears to have

motivated Enron officers' manipulation of Enron's financial statements was the need to mask

Enron's business failures.

At the Bank Presentation on November 19, 2001, Jeff McMahon ("McMahon"), who was

then Enron's Chief Financial Officer, identified a "series of bad investments" as the first cause of

Enron's problems.[34]  The investments he listed were Azurix,[35] Broadband,[36] Elektro,[37] Dabhol[38]

---

[33] In mid-1998, a DLJ analyst commenting on the recently announced acquisition of Wessex Water, the largest asset in Enron's Azurix structure, noted as follows:

> Combining this acquisition with the recently announced acquisition of a Brazilian electric utility for $1.5 billion shows that Enron Corp. has "spent" about $3.5 billion in recent weeks.  To date, Enron Corp.'s debt ratings have been reaffirmed based upon the operating fundamentals of the acquisitions and unspecified plans to sell assets or take other actions to reduce debt.  No additional equity is required by Enron Corp. to maintain its balance sheet ratios and credit ratings.

Donaldson, Lufkin & Jenrette, Comment: "Acquisition of U.K. Water Company Adds to EPS and Opportunities for Growth," July 24, 1998, at 3 [ELIB00000544-00001-ELIB00000544-00006].

[34] Bank Presentation, at 5.  Similarly, in contemporaneous meetings with employees, Enron Vice Chairman Mark Frevert ("Frevert") informed employees that the problems started in the early 1990s with international assets including India, South America and Asia, which were intended to build a merchant portfolio in these areas.  "It didn't pan out that way."  Although Enron had been trying to sell them, most of the international asset sales were small and the major assets had not been sold.  Eric Thode, Enron Net Works, Typed Notes entitled "Enron Net Works Employee Meetings," Oct. 31, 2001 (the "October 2001 Net Works Meeting Notes"), at AB0786 02863 (notes record statements of Frevert, who led the meeting) [AB0786 02859-AB0786 02868].

[35] In November 1998, Azurix was an Enron subsidiary that acquired Wessex, a publicly-held water utility, for approximately $2.4 billion.  Enron used SPEs in the Marlin transaction to deconsolidate Azurix and repay part of the

- 14 -

and merchant investments.[39]   Elektro and Dabhol in particular were major consumers of capital.[40]

Although Enron's merchant investments were fifth on McMahon's list of bad investments, these investments often found their way into Enron's SPE transactions. There is considerable evidence that Enron's senior management had a difficult task in controlling the size and management of its merchant portfolio, which contained a relatively high percentage of poorly performing and illiquid assets.[41]   A July 7, 1999 presentation by Fastow and McMahon to a meeting of Enron's Management Executive Committee indicates that Enron's year-to-date merchant investments were $3.6 billion, or $2.5 billion more than previously planned.[42]   At the same time, Enron was beginning to recognize and track the poor performance of its investment

---

debt it incurred in acquiring Wessex. In the ensuing period prior to the Petition Date, Azurix became a publicly-held company only to be taken private at Enron's expense approximately eighteen months after the public offering as a result of its poor performance. In its 2000 fiscal year, Enron took a charge of $326 million to reflect impairment by Azurix in the carrying value of its Argentine assets. Enron Form 10-K filed with the SEC for the Year ended Dec. 31, 2000, at 39. That same year, it also recognized a $428 million loss from its equity in Azurix under the equity investee method of accounting. *Id.* at 76.

[36] The Braveheart transaction, which dealt with one failed investment of Enron's Broadband operations, was described in the Second Interim Report. *See* Second Interim Report, at 29-32. Another failed investment, certain dark fiber that was the subject of the Backbone transaction, was described in the First Interim Report. *See* First Interim Report, at 118.

[37] Elektro is a large Brazilian electric utility, the financing for which is largely beyond the scope of the examination. For further information, see Second Interim Report, Annex 2 to Appendix G (Whitewing Transaction).

[38] Dabhol is a large electric generating plant located in India.

[39] Enron's merchant investments were composed of the capital that it provided, generally, to energy and technology businesses seeking debt or equity. These merchant investments were carried at fair value (sometimes referred to as mark-to-market accounting). They included both public and private enterprises.

[40] Enron's Risk Assessment and Control Group ("RAC") analyzed Enron's value in its international assets after Project Summer (an effort to sell all the international assets) failed. Its analysis determined that Enron's June 30, 2001 carry value was $10.119 billion, while RAC's valuation range for these assets was only $4.480 billion to $6.927 billion.

[41] Frevert told Enron employees that "[w]e may have been 'smoking our own dope' as we continued to build the asset portfolio domestically and we pushed a lot into off-balance sheet vehicles." October 2001 Net Works Meeting Notes, at AB0786 02863; *see also* Deposition of Mark A. Frevert, former Vice Chairman, Enron, by William C. Humphreys, Jr., A&B, May 7, 2003, at 220.

[42] Enron Capital Management Executive Committee Presentation, July 7, 1999 (the "Executive Committee Presentation"), at 7 [AB0786 02835-AB0786 02858].

portfolio. In January of 1999, it commenced a bi-weekly Watch List Report to monitor troubled assets.[43] The minutes of the May 3, 1999 meeting of the Finance Committee of Enron's Board of Directors reflect the first mention of a review of the top ten and bottom ten performing assets.[44]

In the first quarter of 2000, Enron's merchant investments problem was of sufficient concern to shift management responsibility for such investments from the business units that originated the investments to a newly created Special Assets Group led by Richard Lydecker ("Lydecker").[45] Simultaneously, planning for the Raptor SPE hedging vehicles began in earnest.[46] By the fall of 2000, many of the assets in Lydecker's Special Assets Group were hedged by the Raptor SPEs, and later were transferred into the Whitewing structure.[47]

In November 2000, members of Enron's Risk Assessment and Control Group ("RAC") made a presentation to other RAC team members[48] entitled "Investment Portfolio Lessons Learned November 2000," reporting that:

- 59% of originally expended capital is not meeting expectations;

- Enron has $3.8 [billion] of earnings exposure on assets performing below expectations; and

- 81 out of 167 equity transactions are underperforming.[49]

---

[43] Enron PowerPoint Presentation, "Investment Portfolio, Lessons Learned," Nov. 2000 (the "Lessons Learned Presentation"), at AB0971 00205 [AB0971 00195-AB0971 00226].

[44] Minutes of the Enron Finance Committee Meeting, May 3, 1999, at 3 [AB000196881-AB000196883].

[45] Sworn Statement of Richard Lydecker, Chief Accounting Officer, Enron, to William C. Humphreys, Jr., A&B, Mar. 18, 2003 (the "Lydecker Statement"), at 26-28.

[46] Email from Ronald T. Astin, Vinson & Elkins, to Scott Sefton, *et al.*, Enron, Feb. 3, 2000 [AB000536958-AB000536964].

[47] Lydecker Statement, at 154-80.

[48] David Gorte ("Gorte"), an Enron Managing Director in the RAC, testified that he did not recall whether the presentation was ever delivered to Enron employees outside the RAC Group. Sworn Statement of David B. Gorte, Managing Director, Enron, to William C. Humphreys, Jr., A&B, Apr. 9, 2003, at 131-33.

[49] Lessons Learned Presentation, at AB0971 00198.

The presentation also reported on the performance of loans included in Enron's merchant investment portfolio:

- 43% of originally expended debt capital is not performing or has [credit] issues;

- Enron has $315 MM of earnings exposure on debt that is non-performing or has [credit] issues;

- 31 out of 55 debt transactions are non-performing or have [credit] issues.[50]

Another report apparently prepared in 2000[51] begins with a series of questions for a hypothetical investment survey:

How about recommending that your mother invest her IRA into a fund of ninety investments where 84 of the investments average less than a 5% rate of return?

Would [you] feel comfortable investing in a portfolio where 51% of the transactions are "troubled" or considered not meeting expectations?

The report then identifies the investment portfolio as Enron's.

The reports list a number of reasons for the poor performance of Enron's investment portfolio, including the lack of investment banking experience of Enron's deal originators,[52] investments in industries in which Enron had little experience,[53] failure to partner with other investors as a way to obtain corroboration of investment potential,[54] and improper incentives and

---

[50] *Id.* at AB0971 00199.

[51] Enron Executive & Dealmakers Survey, undated (the "Investment Survey") [AB0911 1279-AB0911 1295]. The version of this report reviewed by the Examiner's attorneys appears to be a draft as there are blank spaces in some of the materials. Although the report is undated, the statistics relate to the 1999 fiscal year, indicating that the report was prepared during 2000.

[52] Investment Survey, at AB0911 1284; Lessons Learned Presentation, at AB0971 00209.

[53] Investment Survey, at AB0911 1284.

[54] Lessons Learned Presentation, at AB0971 00208.

- 17 -

accountability.[55]   When addressing the issues of incentives and accountability, one report indicates that "[c]ommercial personnel are rewarded for deals closed now not how deals perform in the long term."[56]

Whatever the reason, in addition to a quality of earnings problem, Enron appeared to be experiencing a "quality of investments" problem that resulted in the need for cash to fund the investments and the need to avoid losses if the investments did not work out.  Both of these needs could be addressed by following an aggressive strategy of selling the investments.  In the July 7, 1999 Executive Committee presentation discussed above, an action plan was proposed that called for a review of all "non-strategic assets" and a liquidation of $750 million of additional merchant assets.[57]

Beginning in the fall of 1999, Enron began a major program of selling and hedging assets.[58]   Many of these sales, however, were not to unrelated parties but to SPEs in transactions in which Enron retained the risk of ownership of the asset and the recourse obligation to repay

---

[55]  Investment Survey, at AB0911 1284; Lessons Learned Presentation, at AB0971 00204-AB0971 00205.

[56]  Investment Survey, at AB0911 1284 (emphasis in original).  The report elaborates by pointing to MTM as one of these reasons:

> Immediate recognition of MTM earnings, assuming flawless execution, has not incentivized commercial personnel to aggressively manage deal execution through exit for value.  Incentives to assure that actual performance meets projections have been inadequate. . . .

> The fact that as much as $304 million in MTM income was credited to [thirty-one troubled investments] causes concern that proper incentives for long term execution are absent from our current structure and that execution risk has been inadequately modeled and priced by RAC.

*Id.; see also* Lessons Learned Presentation, at AB0971 00204-AB0971 00205.

[57]  Executive Committee Presentation, at AB0786 02853.  The plan noted that merchant asset sales resulted in funds flow, improved financial returns, liquidation and increased return on equity.

[58]  For instance, by the end of 1998, an effort was underway at ENA to resolve numerous issues within the merchant portfolio.  It had been assembled in a sporadic fashion over many years, tied up a significant amount of capital and contained volatile investments.  The portfolio manager determined that one of the best ways to reduce the volatility and risk of the portfolio was to begin to sell it.  Enron Syndication of Merchant Portfolio Presentation, Dec. 13, 1998 [AB0786 02869-AB0786 02872]; Sworn Statement of Raymond M. Bowen, Jr., Executive Vice President, Chief Financial Officer and Treasurer, Enron, to William C. Humphreys, Jr., A&B, Mar. 23, 2003, at 202-03.

the "sales proceeds." In the same transactions, sales proceeds were recorded as cash flow from operating activities. In the case of hedges, the providers of the hedges were related parties of Enron, and the hedges were backed primarily by Enron stock contributed by Enron in the first instance. Accordingly, these were mere accounting hedges, not true economic hedges.

In the simplest terms, as Enron's poor investments began to decline in value and to require additional cash, Enron masked the problem by borrowing money against those investments and using various combinations of its SPE transactions to (i) disguise its obligation to repay the amounts borrowed, (ii) report the proceeds as cash flow from operating activities and, in some cases, as revenue, and (iii) hide the decline in value in its MTM merchant investment portfolio.

### C.  Officers Involved in SPE Transactions

Much of Enron's financial statement manipulation was through the use of its SPE transactions. Enron's SPE transactions were designed and administered under the leadership of Enron's Global Finance and Transaction Support groups in consultation with Andersen's Houston engagement team of accountants and Andersen's Chicago Professional Standards Group ("PSG") of GAAP experts. The SPE transactions themselves were then negotiated and implemented by large, sophisticated teams of senior Enron accounting, financial and legal personnel.

*Overall Organization*

In general, the Enron officers responsible for its SPE transactions were at two levels within the organization:

- at Enron "corporate" (or headquarters) operations centered in the Accounting and Global Finance areas; or

- within one of Enron's business units.[59]

The nerve center for SPE transaction activity was Enron's corporate operations. However, the business units quickly learned that the aggressive use of SPEs was a potent tool for them to achieve quarterly profit and operating cash flow goals.[60] For much of the period under investigation by the Examiner, the Enron corporate officers responsible for the SPE transactions reported through two lines of authority: (i) the treasury and finance groups reporting to Fastow; and (ii) the accounting and tax groups reporting to Rick Causey ("Causey"), Executive Vice President and Chief Accounting Officer.

*The Fastow Group.*  The groups of officers ultimately reporting to Fastow (the "Fastow Group") included: (i) the treasury function headed by McMahon (an Andersen alumnus), and beginning in early 2000, by Ben Glisan ("Glisan") (another Andersen alumnus); (ii) the Corporate Finance Group headed by Bill Brown and later by Barry Schnapper; (iii) the Special Projects Group headed by Kopper; and (iv) the head finance officers of each of the business units who reported to both the Treasurer and the head of their business unit.[61]

*The Causey Group.*  This group of officers, which ultimately reported to Causey (the "Causey Group") and had a role in Enron's SPE transactions, included the following groups: (i)

---

[59] At December 31, 2000, the Enron business segments for GAAP accounting purposes, which roughly corresponded with how Enron viewed its business units operationally, were Wholesale Services, Transportation and Distribution, Enron Energy Services, Enron Broadband Services and "Corporate and Other," which housed the Azurix water system business, Enron's wind-generated power projects and methanol and MTBE plants.

[60] *See, e.g.*, Second Interim Report, at 29-32 (discussing the Blockbuster Transaction).

[61] *See* Enron Global Finance Organization Chart, May 23, 2000 (the "Enron Global Finance Chart of May 23, 2000") [AB0786 02833]; Enron Global Finance Organization Chart, June 1, 2001 (the "Enron Global Finance Chart of June 1, 2001") [AB0971 02175]; Enron Global Functions Organization Chart, July 26, 1999 [AB0971 02177].

the Transaction Support Group; (ii) the Tax Group; and (iii) the Corporate Accounting & Financial Reporting Group (the "Financial Reporting Group").

- *Transaction Support.* As the name implies, these licensed certified public accountants, many of whom came from management positions at Andersen, were at the very heart of Enron's SPE transactions. This group, headed by Rodney Faldyn, not only designed many of the SPE transaction templates and constantly refined them for newer, larger and more aggressive applications, but also worked side-by-side with officers in the Fastow Group and within the business units to ensure that SPE transactions complied with the accounting templates they had designed. Moreover, because of the lack of adequate understanding of the transactions by the Financial Reporting Group, the Transaction Support Group in fact determined the disclosures in the financial statements and in the notes thereto.[62] These determinations dictated the disclosure (or lack thereof) in Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") section of Enron's annual report.[63] These accountants were the only people (in addition to Causey) who, under Enron's "Rules of Engagement,"[64] were authorized to discuss the sensitive SPE transactions with Andersen.[65] Under these rules, it was the job of the Transaction Support experts to spot accounting issues; Andersen was to be used only to help resolve those issues. Thus, the Transaction Support experts served a critical fact-filtering role between Enron and Andersen. These accounting executives, many of whom came from Andersen, were themselves the primary designers and refiners of the accounting techniques.

- *Tax Group.* In the years prior to Enron's bankruptcy, Enron's senior management encouraged and pressured Managing Director Robert Hermann ("Hermann"), the head of Enron's tax department, to help increase the reported net income of Enron for financial accounting purposes.[66] Over time,

---

[62] Sworn Statement of Kevin Jordan, Director, Enron Net Works, to William C. Humphreys, Jr., A&B, Apr. 25, 2003 (the "Jordan Sworn Statement"), at 31; Email from Ryan Siurek, Senior Director in Transaction Support, Enron, to Davis Maxey, Vice President of Finance, Enron, *et al.*, Feb. 6, 2001, at 1 (discussing the appropriateness of the disclosure for the Nahanni transaction) [AB0500 00712-AB0500 00714]; Memorandum from Ryan Siurek, Senior Director in Transaction Support, Enron, to the Files, and copies to Richard Causey, Executive Vice President and Chief Accounting Officer, Enron, Rodney Faldyn, Vice President of Financial Accounting, Enron, *et al.*, Apr. 3, 2001, at 5 [AB0971 00319-AB0971 00324].

[63] These determinations were passed along to another Causey subgroup, Corporate Accounting & Financial Reporting, for presentation in Enron's financial statements and related financial disclosure.

[64] Enron Accounting Transaction Group Presentation, "Rules of Engagement," undated [AB0633 2526-AB0633 2527].

[65] Sworn Statement of John Clinton Walden, Senior Director, Enron, to William T. Plybon, A&B, Mar. 28, 2003, at 95; Jordan Sworn Statement, at 16-17.

[66] *See* Second Interim Report, Appendix J (Tax Transactions); *see also* Appendix C (Role of Enron's Officers).

Enron's management came to rely on the tax department and, more specifically, its structured transactions group under the direction of Vice President (Planning) R. Davis Maxey ("Maxey"), to fill the annual "stretch" to produce additions to net income that could not be accomplished by other business units through ordinary operations.[67]  Enron's tax department managed to create $886.5 million of net income from 1995 through September 2001 through the use of the Tax Transactions.[68]

- *Financial Reporting Group.*  The name of this group implies that it had the leadership role in financial statement reporting and disclosure.  However, with the possible exception of its leader, Managing Director Bob Butts ("Butts"),[69] this group's role seems to have been largely that of compiling financial statements and reports based on information and instructions from Transaction Support.[70]

The Fastow Group, previously known as Enron Capital Markets, became Enron Global Finance in August 1999.  While mainly charged with the treasury and capital raising function, it nonetheless had its own set of lawyers and accountants.  By March 2000, the Office of the Chair of Enron Global Finance was composed of three people – Fastow, Glisan and Causey (as an ex officio or of counsel member).[71]  Glisan replaced McMahon as Treasurer in February 2000, when McMahon moved to Enron Industrial Markets.

---

[67]  *See* Appendix C (Role of Enron's Officers).

[68]  Second Interim Report, Appendix J (Tax Transactions), at 8-9.

[69]  Butts invoked his Fifth Amendment rights and did not give testimony to the Examiner.

[70]  Sworn Statement of Gary Peng, Senior Director, Enron, to John L. Latham, A&B, Apr. 17, 2003, at 27; Sworn Statement of Jan Johnson, former Director in Corporate Financial Reporting, Enron, to Oni A. Holley, A&B, May 20, 2003, at 142.

[71]  Enron Global Finance Chart of May 23, 2000; Enron Global Finance Chart of June 1, 2001.

Set forth below is an organizational chart of the primary officer groups involved in the Enron SPE transactions as of June 30, 2000.[72]



\* Officers who have exercised their Fifth Amendment rights against self-incrimination; Quaintance's invocation was limited to the Nigerian Barge transaction.

The individuals listed under the various business units do not compose the total population of that unit.

---

[72] The information on this chart was compiled from various sources available to the Examiner.

The Examiner believes that there is sufficient evidence from which a fact-finder could conclude that Fastow, Causey, Glisan and McMahon, among others, breached their fiduciary duties to Enron by causing Enron to enter into certain SPE transactions that were designed to manipulate the Debtors' financial statements and that resulted in the dissemination of financial information known to be materially misleading.[73]  That is, they engaged in a course of conduct through the use of SPE transactions that resulted in the false and misleading presentation of the financial condition of Enron by overstating its cash flow from operating activities, overstating its earnings and understating its obligations from these transactions.[74]

**D.    Potential Breaches of Fiduciary Duties**

In this Report, the Examiner evaluates the conduct of Enron's officers against their fiduciary duties owed to Enron.  An officer of a corporation has fiduciary duties of

---

[73] Because Fastow, Causey, Glisan and McMahon exercised their Fifth Amendment rights, the Examiner's conclusions are based on a review of documentary evidence and the testimony of others.  *See* Appendix C (Role of Enron's Officers) for a full review of this evidence.  The Examiner subpoenaed or otherwise requested the opportunity to take the testimony of a number of witnesses who responded by asserting the privilege against self incrimination contained in the Fifth Amendment to the United States Constitution (the "Self-Incrimination Clause") (U.S. Const. amend. V, cl. 2).  Where a witness asserted the Self-Incrimination Clause in writing, the Examiner took no further steps to compel any examination of that witness.  At least one of those witnesses had either testified in other proceedings, or had produced documents in this bankruptcy proceeding.  The Examiner concluded that either of those actions created, at best, only a small chance that the Self-Incrimination Clause had been waived with respect to testimony compelled by the Examiner and as a result, the Examiner did not pursue this waiver argument.  *See United States v. Balsys*, 524 U.S. 666, 672 (1998); *United States v. Miranti*, 253 F.2d 135 (2d Cir. 1958); *United States v. Housand*, 550 F.2d 818, 821 n.3 (2d Cir. 1977); *Poretto v. United States*, 196 F.2d 392 (5th Cir. 1952); *United States v. Wilcox*, 450 F.2d 1131, 1141-42 (5th Cir. 1971); *Marcello v. United States*, 196 F.2d 437 (5th Cir. 1952).

[74] It is also a breach of fiduciary duty for officers to derive improper personal benefits at the expense of the corporation through self-dealing.  *See* Appendix B (Legal Standards).  As set forth in Appendix C (Role of Enron's Officers), the Examiner believes there is sufficient evidence from which a fact-finder can conclude that breaches of the fiduciary duty of loyalty occurred in connection with certain of the Related Party Transactions, most notably in the case of Fastow and other officers in the LJM2 transactions.  In addition, if it can be demonstrated that certain officers entered into other SPE transactions for their own personal benefit at the expense of Enron, then additional breaches of loyalty may be present outside of the Related Party Transaction context.

- 24 -

good faith, due care and loyalty. Whenever corporate fiduciaries communicate publicly or directly with stockholders, they must do so honestly, candidly and completely in all material respects.[75] Knowing dissemination of false information about the financial condition of the company is a breach of these fiduciary duties.

Although its SPE structures were complex, Enron's primary objective was simple: (i) borrow money on what the Financial Institutions required to be essentially a recourse basis without recording debt and (ii) record the loan proceeds as cash flow from operating activities. Thus, Enron used its SPE structures to disseminate financial information that was fundamentally misleading.

---

[75] In *Malone v. Brincat*, 722 A.2d 5 (Del. 1998), the plaintiffs alleged that the defendant directors "knowingly and intentionally breached their fiduciary duty of disclosure because the SEC filings made by the directors and every communication from the company to the shareholders since 1994 [were] materially false" and that "as a direct result of the false disclosures . . . the Company has lost all or virtually all of its value (about $2 billion)." The Court of Chancery granted the defendant directors' motion to dismiss the claims on the grounds that the directors did not have a fiduciary duty of disclosure in the absence of a request for shareholder action. In essence, the Court of Chancery construed the shareholders' complaint in state court as an attempt to characterize what is properly a federal securities law claim as a state corporate law claim. The Delaware Supreme Court disagreed. The Delaware Supreme Court found, in essence, an implied duty of accurate and honest disclosure whenever directors communicate publicly on behalf of the corporation, stating:

> Whenever directors communicate publicly or directly with shareholders about the corporation's affairs, with or without a request for shareholder action, directors have a fiduciary duty to shareholders to exercise due care, good faith and loyalty. It follows *a fortiori* that when directors communicate publicly or directly with shareholders about corporate matters the *sine qua non* of directors' fiduciary duty to shareholders is honesty.

*Id.* at 13. Recharacterizing the complaint to address the issue as the court thought it should have been raised, the court stated "[t]he issue in this case is not whether [the corporation's] directors breached their duty of disclosure. It is whether they breached their more general fiduciary duty of loyalty and good faith by knowingly disseminating to the stockholders false information about the financial condition of the company." *Id.* at 14.

Enron is an Oregon corporation. Oregon courts, as well as federal courts applying Oregon law, have in the past relied upon Delaware law for guidance regarding corporation law issues. *See, e.g., Stringer v. Car Data Sys., Inc.,* 841 P.2d 1183 (Or. 1992); *Chiles v. Robertson,* 767 P.2d 903 (Or. Ct. App. 1989), *modified,* 744 P.2d 500 (Or. Ct. App. 1989); *Kahn v. Sprouse,* 842 F. Supp. 423 (D. Or. 1993). In addition, Oregon courts have referred to the fiduciary duties of officers and directors interchangeably. *See, e.g., Klinicki v. Lundgren,* 695 P.2d 906 (Or. 1985); *Haines Mercantile Co. v. Highland Gold Mines Co.,* 88 P. 865, 866 (Or. 1907) ("It is common learning that the directors and officers of a corporation act in a representative and fiduciary capacity. . . ."); *Chiles v. Robertson,* 767 P.2d at 912.

- 25 -

Enron's financial reporting of the transactions discussed in this Report resulted in the materially misleading presentation of Enron's financial condition by failing to disclose the substance of such transactions, regardless of whether the accounting was technically correct. Examples include:

- In the Prepay Transactions and transactions such as SO₂, Enron obtained financing and accounted for its obligations as price risk management liabilities rather than debt. Moreover, the increase in the outstanding prepay balance from one reporting period to the next served to increase Enron's reported cash flow from operating activities. In substance, however, these transactions were loans because Enron transferred no commodity price risk, and the proceeds it received had to be repaid with interest at fixed maturity dates. The amounts due, interest rates accrued on the unpaid balances, schedule of maturities and portion of operating cash flow attributable to the transactions could not be discerned from Enron's financial statements or MD&A. As a result, Enron's disclosure was materially misleading. Enron used the Prepay Transactions to record a total of $4 billion in borrowings as liabilities from price risk management activities rather than debt and increase cash flow from operating activities by $1.5 billion in its 2000 financial statements.

- In the FAS 140 Transactions, Enron often recorded a gain from the "sale" of financial assets to SPEs and typically reported the proceeds as cash flow from operating activities. However, Total Return Swaps[76] or similar agreements obligated Enron to repay the proceeds with interest. Neither this repayment obligation nor the related interest rates and maturities were apparent in the financial statements or MD&A. As a result, Enron's disclosure was materially misleading. In 2000, through the use of FAS 140 Transactions, Enron reported over $350 million of net income, over $1.15 billion of reported cash flow

---

[76] As used in this Report, the term "Total Return Swap" refers to a swap transaction, documented by standard agreements published by ISDA, where one party agrees to pay the other the "total return" (e.g., dividends, interest and any appreciation in value) of a defined underlying asset (which may be an equity interest, a debt obligation or another asset), usually in return for a fixed payment stream, typically tied to an interest rate index. In the case of certain of Enron's SPE transactions, notably the FAS 140 Transactions, the term refers to a swap transaction pursuant to which Enron was entitled to receive the total return of an asset transferred by Enron to an SPE (whether by sale of the asset or otherwise) and agreed to make payments to its counterparty (usually the SPE holding the referenced asset or the lenders to the SPE) equal to the scheduled principal and interest payments on the amounts borrowed by the SPE under a credit facility to acquire the asset. In these instances, the Total Return Swap was the functional equivalent of a guaranty of the loan to the SPE.

from operations and masked over $1.3 billion of repayment obligations.

- The Tax Transactions were designed to allow Enron to record the potential benefit of speculative future tax deductions as current income on its financial statements, and in some cases as pre-tax rather than after-tax income. Through the Tax Transactions, Enron reported $886.5 million of additional income from 1995 through September 2001 in a manner that was materially misleading.

In many of these transactions, the terms required by certain of the Financial Institutions violated GAAP rules and precluded the desired accounting treatment. The evidence suggests that Enron officers nonetheless achieved the desired accounting treatment by entering into undisclosed side agreements, arrangements with no business purpose and "hardwired"[77] transactions in an attempt to circumvent GAAP. Examples include:

*Undisclosed Side Agreements and Understandings:*

- In substantially all of the FAS 140 Transactions,[78] and in other SPE transactions such as the J.T. Holdings Transaction, there were verbal assurances (memorialized in the Financial Institutions' records) made by Fastow and Glisan that Enron would repay the Financial Institutions the face amount and yield on the required 3% equity investment in SPEs regardless of the value of the assets held by the SPEs. These agreements violated the 3% Equity Test under GAAP. Evidence suggests these agreements were not disclosed to Andersen.[79]

---

[77] As used in this Report, a "hardwired transaction" is one in which the transaction documents are drafted to achieve indirectly an economic result that would have violated applicable GAAP had it been provided for directly.

[78] There is evidence of these assurances in substantially all of the FAS 140 Transactions with CIBC, in the Bacchus Transaction with Citigroup and the Nikita Transaction with Barclays. *See* Appendix H (Role of CIBC and its Affiliates); Appendix D (Role of Citigroup and its Affiliates); Appendix F (Role of Barclays and its Affiliates).

[79] In this Report, the Examiner draws certain inferences that Enron did not disclose information to Andersen. In such instances, the primary affirmative support for the inference is testimony provided by current or former Andersen employees and the Examiner's review of Andersen's work papers. The Examiner's investigation of Andersen, including the fact or extent of its knowledge of or involvement in any potential wrongdoing by Enron officers, is ongoing. Accordingly, the Examiner has reached no final conclusions regarding the credibility of this evidence. Nevertheless, the testimony of these witnesses and

The failure to satisfy this test would have resulted in the consolidation of the SPE. In 2000 alone, this would have reduced cash flow from operating activities, and increased debt, by more than $1 billion.

- In the Nigerian Barge transaction and in connection with a sale of airplanes obtained in a Tax Transaction known as Cochise, there were verbal understandings between certain Financial Institutions and Fastow and McMahon (Nigerian Barge) and Maxey (Cochise Planes) that Enron would reacquire or assure the repurchase of the assets that had been purportedly "sold" in the transaction.[80] This would have prevented the transactions from qualifying as bona fide sales of the assets under GAAP. Evidence suggests these understandings were not disclosed to Andersen. Enron improperly reported $48.5 million of income as a result of these transactions.

*Other Undisclosed Arrangements:*

- In connection with the Prepay Transactions with Citigroup known as Yosemite I and II, which were funded by the issuance of Enron credit linked notes, Enron officers knew that equity certificate holders in the SPEs that issued the notes had entered into Total Return Swaps with respect to their equity interests. As a result of these Total Return Swaps, the SPEs did not have independent 3% equity at risk as required under GAAP and should have been consolidated with Enron. Evidence suggests that these agreements were not disclosed to Andersen. By not making such consolidation, Enron failed to report an additional $1.1 billion of debt on its balance sheet.

- In a Related Party Transaction known as Chewco, Enron officers knew, but may not have disclosed to Andersen, that reserve accounts created for the benefit of Barclays violated the 3% Equity Test. These reserve accounts, revealed to Andersen in 2001, caused a restatement of Enron's financial statements for the period 1997 through September 2001, resulting in a $400 million reduction of income, an $800 million reduction of equity and a $600 million increase in debt in that period.[81]

---

the evidence identified through the Examiner's review of the work papers create a genuine issue of fact regarding whether Enron officers withheld material information from Andersen.

[80] These examples relate to the promise made to Merrill Lynch to take out its year-end 1999 investment in certain offshore power barges within six months and the understanding with BT/Deutsche that the Cochise planes would be returned to an Enron affiliate within thirty days after Enron had "sold" them to a BT/Deutsche affiliate.

[81] Second Interim Report, Annex 1 to Appendix L (Related Party Transactions); *see also* Memorandum from Thomas H. Bauer, Andersen, to the Files, regarding Chewco Investigation, Nov. 2, 2001 (the "Andersen Chewco Memorandum") [AB000535339-AB000535344].

*Hardwired Transactions*:

- In a Minority Interest Transaction known as Nahanni that closed in December 1999, an SPE acquired a minority interest in an Enron subsidiary, contributing $500 million of U.S. Treasury securities. Enron changed its reported definition of "merchant investments" to include Treasury securities, immediately sold the securities, and reported $500 million of cash flow from operating activities. A letter of credit (that was a condition to the financing) expired within thirty days after closing, ensuring that $485 million of the SPE's investment would be repaid shortly after the year-end 1999 financial reporting date.[82] As a result, Enron improperly reported $500 million of cash flow from operating activities.

- In the Forest Products Transaction known as Sundance, Citigroup agreed to provide the 3% independent equity that was necessary for Enron to avoid consolidating its forest products joint venture.[83] For Enron to achieve the desired accounting under GAAP, Citigroup's equity had to be at risk. The documents reveal, however, a number of debt-like protections for Citigroup's equity, including Citigroup's unilateral right to dissolve the joint venture and receive repayment from a cash reserve that the joint venture was required to maintain. Accordingly, Citigroup's equity was not at risk. Enron should have consolidated the joint venture and reported the associated debt on its balance sheet (including $375 million borrowed in the Slapshot transaction).[84]

*Transactions Lacking Any Business Purpose*:

- In two Related Party Transactions known as the Rhythms and Raptor Transactions, Enron entered into hedges for many of its merchant investments, enabling Enron to conceal more than $1 billion of losses incurred during a one-year period. The hedges were provided by SPEs, controlled by Fastow through LJM1 or LJM2, and provided no economic benefit to Enron because the only assets available to the SPEs had been provided by Enron, and Enron's investment in the SPEs would absorb substantially all of the losses suffered by the

---

[82] *See* Second Interim Report, Annex 3 to Appendix I (Minority Interest Transactions).

[83] *See* Second Interim Report, Appendix K (Forest Products Transactions).

[84] In addition, Enron structured Citigroup's investment so that Citigroup "purchased" a 0.01% interest in an Enron SPE that Citigroup immediately contributed to the joint venture. Based on this "sale," which had no business purpose, Enron reported $20 million of income. *Id.*

SPEs.[85]   Thus, the economic risk of the merchant investments remained with Enron.  The only benefit of the hedges to Enron was favorable accounting treatment.

- In the 1999 Electricity trades, Enron and Merrill Lynch simultaneously entered into two electricity trading contracts that were mirror images of each other and, as a result, there was no commodity risk to either Enron or Merrill Lynch.[86]  The transaction was a sham that had no purpose other than to allow Enron to report $50 million of income at year-end 1999.

- The Tax Transactions, which created reported income of $885 million, were effectively artificial transactions lacking a significant business purpose other than the creation of accounting income for Enron.[87]

### E.   Potential Defenses Available to Officers

A fact-finder charged with analyzing the evidence to determine whether an officer breached his or her fiduciary duty would also consider the defenses available to the officers.  These defenses are summarized here and considered in more detail in Appendix C (Role of Enron's Officers).

The Examiner has reviewed a substantial amount of evidence, including documentary and testimonial evidence, and has noted the reasonable inferences that could be drawn from the evidence.  A fact-finder may draw alternative or contrary inferences from the same evidence.  Moreover, there are defenses to a breach of fiduciary duty claim available to the officers.  Whether an officer will succeed on one or more of these defenses will depend upon the fact-finder's resolution of these facts.

The elements most likely to present issues of material fact for consideration by the fact-finder are the degree of an officer's knowledge of whether the reporting of these

---

[85] *See* Second Interim Report, Appendix L (Related Party Transactions).

[86] *See* Appendix I (Role of Merrill Lynch and its Affiliates).

[87] *See* Second Interim Report, Appendix J (Tax Transactions).

transactions would result in a materially misleading presentation of Enron's financial condition. As part of this determination, the fact-finder may consider, among other things, an officer's knowledge that the economic substance of these transactions was inconsistent with the disclosure, knowledge that Enron's accounting for a transaction was likely incorrect, and the officer's claimed reliance on Andersen and the reasonableness of that reliance.

When many of the officers were asked whether Enron's disclosure of the results of the SPE transactions was misleading, reliance on Andersen's approval of Enron's accounting for those transactions was a common response.[88]

It is clear that in addition to (i) consulting with the officers on accounting issues during transaction negotiations and (ii) auditing Enron's financial statements, Andersen also reviewed Enron's MD&A.[89] Thus, Andersen was thoroughly involved in Enron's financial disclosures.

The applicable law, as noted in Appendix B (Legal Standards),[90] gives an officer the right to rely on public accountants with respect to matters the officer reasonably believes to be within the accountants' professional competence. Thus, reliance on Andersen for accounting and disclosure of the financial results of the SPE transactions

[88] *See, e.g.,* Deposition of Charles Delacey, Vice President of Finance, Enron, by William T. Plybon, A&B, Apr. 3, 2003, at 94-96, 98, 99; Sworn Statement of Ron E. Baker, Manager, Enron, to William T. Plybon, A&B, Mar. 20, 2003, at 71, lines 3-11, 79, lines 6-11, 88, lines 16-22. Fastow, Causey, McMahon and Glisan invoked their privilege against self-incrimination under the Fifth Amendment, and did not give testimony to the Examiner.

[89] Sworn Statement of Rex R. Rogers, Vice President and Associate General Counsel, Enron, to Rebecca M. Lamberth, A&B, May 28, 2003, at 73.

[90] *See* Appendix B (Legal Standards), *An Officer's Fiduciary Duties.*

provides the officers with a potential defense to a breach of fiduciary duty claim for knowing dissemination of misleading financial information.[91]

In order to avail themselves of this defense, however, such reliance must not be unwarranted.[92] The defense fails if the officers (i) possess actual knowledge of facts that would render reliance unwarranted or (ii) have a measure of knowledge that would cause another person in a similar position and under similar circumstances to make reasonable inquiry that would lead to information rendering reliance unwarranted.[93] The degree of knowledge required to prevent reliance is not necessarily actual knowledge of facts that would render reliance unwarranted (although actual knowledge of such facts would certainly be sufficient). That knowledge would include an awareness that the disclosure approved by Andersen nevertheless resulted in the presentation of false and materially misleading financial statements. An intentional presentation of a materially misleading picture of the financial condition of a company is not absolved because accountants have opined that the financial statements are GAAP compliant.

Claimed reliance would also be unreasonable if material facts were concealed from Andersen that would have precluded the accounting treatment sought by Enron in those transactions. As is described in Appendix C (Role of Enron's Officers), evidence suggests that certain officers entered into side agreements with Financial Institutions that they knew would have precluded the desired accounting and concealed the existence of these agreements from Andersen.[94]

---

[91] Oregon Business Corporation Act, Or. Rev. Stat. § 60.377(2)(b); Appendix B (Legal Standards).

[92] Or. Rev. Stat. § 60.377(3).

[93] Appendix B (Legal Standards), *An Officer's Fiduciary Duties*.

[94] *See* Appendix C (Role of Enron's Officers), *Potential Breach of Fiduciary Duty by Officers*, at n.173.

The evidence also suggests that certain officers concealed from Andersen particular aspects of transactions that the officers knew would have an adverse effect on the desired accounting treatment. In other instances, evidence suggests that certain Enron officers had actual knowledge that Andersen's advice regarding the accounting for SPE transactions was based on a mischaracterization of material facts or that the transactions lacked any business purpose.[95] In these circumstances, a fact-finder could conclude that any alleged reliance on Andersen would be unreasonable.

The evidence also reflects numerous instances in which Enron officers carefully controlled the flow of information to Andersen in order to achieve a specific accounting result.[96] In an email to Kopper regarding Chewco, Shirley Hudler of ENA states, "I don't know how we are going to 'manage' the Arthur Andersen questions re[garding] Chewco's ability to repay – will work with Clint Walden ([accounting] support) to craft a story."[97]

---

[95] *See* Appendix C (Role of Enron's Officers), *"Hardwired" Transactions* and *Transactions Lacking Any Business Purpose.*

[96] *See, e.g.*, Email from Shirley A. Hudler, ENA, to Michael Kopper, ENA, Mar. 14, 2001 (the "Hudler-Kopper Mar. 14, 2001 Email"), at 1 [AB0971 00229]; Email from Clint Walden, Enron, to Shirley A. Hudler, ENA, *et al.*, Mar. 26, 2001 [AB0971 00228]; Sherman-Vargas Aug. 1, 2001 Email; Email from Debra A. Cash, Andersen, to Rodney Faldyn, Enron, Mar. 19, 2001, at 1 [PSI00290987-PSI00290988]; Email from Joseph Deffner, Enron, to Julia Chin, Enron, *et al.*, July 31, 2000, at 1 ("[D]isclosure [regarding this transaction] as blatant as this would not likely sit well with Arthur Anderson (sic)") [AB0888 00105-AB0888 00106]; Email from Ryan Siurek, Senior Director in Transaction Support, Enron, to Rodney Faldyn, Enron, Oct. 22, 2001, at 1 ("I have already requested that Vince [Kaminski] not have further discussions with AA. How do you want to move forward regarding these issues?") [AB0971 01879-AB0971 01881]; *see also* Email from James Richardson, Enron, to Luitgard Fischer, Enron, *et al.*, Oct. 16, 2001 ("I understand your concern over the valuations and NOTHING about valuations will be shown to anyone outside of Enron") (emphasis in original) [AB0971 02158]. It is important to note that evidence suggests that in some instances Andersen was, in fact, aware of key transaction details and issues. Email from Kent Castleman, Enron, to Gustavo Junqueira, Enron Development, *et al.*, Jan. 13, 1999, at 1 [AB0971 00141-AB0971 00144]; Email from Vince J. Kaminski, Enron, to Rakesh Bharati, Enron, Oct. 22, 2001, at 1 [AB0971 01882-AB0971 01884].

[97] Hudler-Kopper Mar. 14, 2001 Email.

IV.   **ROLE OF FINANCIAL INSTITUTIONS IN ENRON'S SPE TRANSACTIONS AND THEORIES OF LIABILITY**

A.   <u>**Theories of Potential Liability**</u>

Enron's officers did not, and could not, consummate these SPE transactions on their own.   In this Report, the Examiner reports on the participation of six Financial Institutions in Enron's SPE transactions and measures each Financial Institution's conduct against two legal theories:

- *Aiding and abetting a breach of fiduciary duty* – whether there is sufficient evidence for a fact-finder to conclude that a Financial Institution aided and abetted wrongful conduct of Enron's officers that constituted a breach of fiduciary duty such that, assuming Enron has standing, the Financial Institution may be liable for damages to Enron; and

- *Equitable subordination* – whether there is sufficient evidence for a court to conclude that the claims of that Financial Institution against the Debtors should be equitably subordinated to the claims of other creditors.

*Aiding and Abetting*

For a Financial Institution to be liable for aiding and abetting, a fact-finder must first determine that there has been a breach of fiduciary duty by one or more Enron officers.   If the fact-finder concludes there has been such a breach, the fact-finder may then conclude that a Financial Institution is liable to Enron for aiding and abetting such a breach if the evidence shows that (i) the Financial Institution had *actual knowledge* of the wrongful conduct giving rise to the breach, (ii) the Financial Institution gave *substantial assistance* to the wrongdoer, and (iii) injury to the Debtors was the direct or reasonably foreseeable result of such conduct.   While there is some authority to the contrary, the actual knowledge standard is strict—"should have known" or "suspicion" will not suffice.   Also, "routine" services provided by a Financial Institution will not constitute

- 34 -

substantial assistance. With regard to injury to the Debtors, a fact-finder could conclude that Enron suffered damages as a result of the officers' improper use of the SPE transactions, consisting of, among other things, the cost of governmental investigations, the administrative costs of a bankruptcy proceeding and other losses caused by Enron's "deepening insolvency."[98]

*Equitable Subordination*

A Financial Institution's claims filed in the Bankruptcy Case may be equitably subordinated to the payment of other claims filed in the case if (i) the Financial Institution engaged in inequitable conduct and (ii) that conduct resulted in harm to other creditors. In the case of creditors that are not insiders or fiduciaries of the debtor, the standard of inequitable conduct is high and has been said to require a breach of a recognized duty. Several cases stand for the proposition that a creditor's participation in the debtor's misrepresentation of its financial condition to other creditors may constitute inequitable conduct that will justify the equitable subordination of the creditor's claim.[99]

If a Financial Institution engaged in inequitable conduct by participating in Enron's misrepresentation of its financial condition, a fact-finder could conclude that other creditors were injured by this conduct because they relied on this information in extending (or continuing to extend) credit to Enron.

*Application of Traditional Legal Principles to Unusual Facts*

The legal principles of aiding and abetting and equitable subordination are not new or novel and have been applied in many different contexts, as described in more

---

[98] *See* Appendix B (Legal Standards).

[99] *Id.*

- 35 -

detail in Appendix B (Legal Standards). Although Enron's use of SPE transactions to manipulate its financial statements is unprecedented in scale and complexity, the legal principles of aiding and abetting and equitable subordination have been applied by courts in analogous circumstances. Thus, a fact-finder's determination as to whether a particular Financial Institution is liable to Enron need not be based on novel theories of law, but rather on application of established legal principles to Enron's facts.

**B.     Potential Defenses to Aiding and Abetting Claims and Equitable Subordination**

In assessing whether a fact-finder could determine that a Financial Institution has any liability under an aiding and abetting theory or should have its claims equitably subordinated, the Examiner has considered defenses available to the Financial Institutions. In this section, the Examiner has considered potential defenses by reference to the elements of aiding and abetting. The Examiner believes it is useful to consider the same issues when analyzing equitable subordination. The facts and circumstances surrounding each Financial Institution must be considered independently, and Appendices D through I analyze these issues in more detail. The Examiner has reviewed a substantial amount of evidence, including documentary and testimonial evidence, and has noted the reasonable inferences that could be drawn from the evidence. A fact-finder may draw alternative or contrary inferences from the same evidence. Whether a Financial Institution will succeed on one or more defenses to any of these causes of action will depend upon the fact-finder's resolution of the facts.

The elements most likely to present issues of material fact for consideration by the fact-finder are:

- The degree of a Financial Institution's *knowledge* of the acts giving rise to the breaches of fiduciary duty.

- The degree of *assistance* provided by a Financial Institution to Enron's officers.

- Whether it was *reasonably foreseeable* to a Financial Institution that its transactions would cause injury to Enron and/or its creditors.

*No Duty*

The Financial Institutions may contend that they owed no duty to Enron with respect to Enron's accounting decisions, financial statements and related disclosure. In their view, the preparation of Enron's financial statements and the accompanying notes, as well as the MD&A and related securities law disclosures, were the responsibility of Enron's senior management. Enron employed a large and sophisticated corps of accountants in its Transaction Support Group, which was composed primarily of Andersen alumni. Andersen audited Enron each year and provided an unqualified opinion certifying that Enron's annual financial statements, including the accompanying notes, fairly presented in all material respects Enron's financial position, results of operations and cash flows. Andersen also reviewed Enron's proposed MD&A for its annual reports. Moreover, Enron's officers actively consulted with Andersen regarding the individual SPE transactions and typically received Andersen's approval of the proposed accounting for the transactions as a part of the deal structuring process. Under the circumstances, the Financial Institutions would likely defend any claim for aiding and abetting the breach of fiduciary duty by Enron officers by asserting: (i) the absence of any affirmative duty to prepare or verify the accuracy of Enron's financial statements and

- 37 -

related disclosures; and (ii) their belief that Enron received appropriate advice from competent professionals regarding the GAAP treatment of its SPE transactions and presentation of the results of those transactions in its financial statements and related disclosures.

An aiding and abetting claim does not impose liability on a Financial Institution simply because Enron's accounting or disclosure was incorrect or misleading, however. Furthermore, this theory of liability does not impose liability because a Financial Institution "should have known" that Enron's accounting or financial statement presentation was inappropriate. Rather, it imposes liability on a Financial Institution if the Financial Institution: (i) knew that Enron's officers were engaging in the SPE transactions with the Financial Institution in order to mislead the public about Enron's financial condition; (ii) substantially assisted the officers' conduct; and (iii) injury to Enron was reasonably foreseeable.

As discussed more fully below and in Appendices D through I, there is evidence from which a fact-finder could conclude that certain Financial Institutions, assisting Enron officers: (i) participated in or were aware of side agreements or undisclosed understandings that they knew would invalidate Enron's desired accounting treatment if known by Andersen; (ii) participated in or were aware of misrepresentation of facts to Andersen that they knew would have invalidated Enron's desired accounting treatment if known by Andersen; (iii) participated in or were aware of specific aspects of the SPE transaction that they knew would invalidate Enron's desired accounting treatment if known by Andersen; (iv) knew, based upon their own independent analysis, that Enron's desired accounting treatment was improper; or (v) knew that Enron's disclosure of the

SPE transaction in which they participated was materially misleading to third party creditors, investors and other users of Enron's financial statements, regardless of technical compliance with GAAP.

*Knowledge of Wrongful Conduct*

An aiding and abetting claim requires knowledge of officer misconduct by the Financial Institution. If a fact-finder determines that Enron officers breached their fiduciary duty in a manner that will support aiding and abetting liability, it is likely that in most cases the breach would relate to the misleading financial information that resulted from the SPE transactions in question.[100] Thus, in many cases, a Financial Institution's liability will depend on whether a Financial Institution knew that Enron's reporting of these transactions would result in a materially misleading presentation of Enron's financial condition. A fact-finder could conclude that a Financial Institution did not know of the wrongful conduct by certain of Enron's officers in presenting its financial statements. A Financial Institution could also claim that, at most, it should have known of the conduct constituting a breach of fiduciary duty, and therefore it did not have actual knowledge of the necessary wrongful conduct.

To resolve this issue, the fact-finder may consider, among other things:

- Whether a Financial Institution had knowledge that the economic substance of a transaction was inconsistent with Enron's disclosure.

- Whether a Financial Institution had knowledge that Enron's accounting for a transaction was likely incorrect.

---

[100] In some cases, it is possible that a Financial Institution may have aided and abetted a breach of the fiduciary duty of loyalty that relates to the receipt by an officer of improper personal benefit at the expense of the Debtors, which conduct may not be associated with misleading financial statements.

- The impact, if any, of an agreement or assurance received by a Financial Institution on its equity investment in a transaction, or an agreement or assurance that Enron would reacquire assets that had been purportedly sold.

- Whether there was any reliance by the Financial Institution on accounting representations by Enron or from Andersen, and if so, whether this reliance was reasonable.

In addition, many of the Financial Institutions are among the largest creditors in the Bankruptcy Case, some of which continued to lend to Enron until the Petition Date. A fact-finder may consider their continued extension of credit to Enron as evidence of a lack of knowledge that Enron's financial statements were materially misleading. A fact-finder could conclude that a Financial Institution acting prudently would not continue to extend hundreds of millions of dollars of credit to a business it knew was engaging in wrongful conduct. On the other hand, it is also possible that a fact-finder would determine that this evidence supports different conclusions. For example, a fact-finder could determine that those Financial Institutions that continued to lend were less concerned about the published financial statements and disclosures because they had a unique understanding of the financial statements (especially the impact of the deals in which they participated) by virtue of their special relationship with Enron. A fact-finder may also conclude that, by syndicating, purchasing credit derivatives, securing letters of credit, obtaining surety bonds or otherwise arranging third party coverage with respect to newly extended Enron credit, the Financial Institutions were focused on third-party credit support and not on Enron's financial condition. Finally, a fact-finder may conclude that so long as the evidence shows that the Financial Institution was aware of the materially misleading financial statements as a result of its transaction with Enron, the fact that the financial statements may have been more misleading than the Financial Institution

believed (as a result of other misleading transactions in which the Financial Institution was not involved) would not preclude liability.

*Impact of Agreements or Assurances on Equity at Risk*

As discussed in Appendix B (Accounting Standards) of the Second Interim Report, under the SPE Accounting Consolidation Analysis, an SPE must be consolidated with its sponsor for accounting purposes unless independent third parties make an equity investment in the SPE equal to at least 3% of the fair value of the entity's assets, which investment is "at risk" during the entire term of the SPE. Applicable GAAP provides that the equity is not "at risk" if the owners "obtained a residual guarantee in an amount that would ensure recovery of their equity investment."[101]

In several of Enron's SPE transactions, including the Yosemite I and Yosemite II Prepays, and the Bacchus and Nikita FAS 140 Transactions, it appears that holders of the equity interests in SPEs eliminated their economic risks with respect to those interests by entering into Total Return Swaps with other parties with respect to their SPE equity interests.[102] It also appears that in many other SPE transactions, including substantially all of the FAS 140 Transactions when the 3% Equity Test applied, Enron officers promised the holders of the SPE's equity that Enron would repay their equity investment

---

[101] Implementation Issues in Accounting for Leasing Transactions Involving Special Purpose Entities, 2 EITF Abstracts (FASB) 96-21 (Sept. 18-19, 1996) ("EITF 96-21"), at 896. EITF 96-21 also suggests that whether the equity is "at risk" requires consideration of both the form and the substance of the risk. In this regard, it provides that funds obtained to make an at-risk equity investment can be borrowed, but only if both (a) the borrowings are fully recourse to the borrower (a consideration going to both the form and substance of the risk) and (b) the borrower has sufficient assets (in addition to the equity interest in the SPE) to repay the borrowing (a consideration going to the substance of the risk). *Id.*

[102] In these cases, as discussed below, the equity is not at risk under GAAP. *See* Appendix D (Role of Citigroup and its Affiliates); Appendix F (Role of Barclays and its Affiliates).

regardless of the value of the underlying asset in the SPE.[103] These promises between Enron officers and Financial Institutions are often described in the evidence with phrases such as "minuted verbal assurances,"[104] "strongest assurance,"[105] "senior Enron officers'…affirmation that Enron will ensure repayment,"[106] and the like.

As to the latter circumstances, the Financial Institutions often memorialized these promises in their contemporaneous records about the transactions.[107] There is evidence to suggest that Enron did not disclose these arrangements to Andersen,[108] and an inference can be drawn that both Enron and the Financial Institutions knew that the agreements would not, and could not, be disclosed to Andersen without invalidating Enron's desired accounting result.[109] If Enron had disclosed these agreements or assurances to Andersen, current and former Andersen accountants have stated that they would have found the equity not to be "at risk,"[110] requiring the SPEs to be consolidated with Enron, in which case the transactions would have been disclosed as loans.

---

[103] See, e.g., Appendix D (Role of Citigroup and its Affiliates); Appendix F (Role of Barclays and its Affiliates); Appendix H (Role of CIBC and its Affiliates).

[104] See Appendix H (Role of CIBC and its Affiliates).

[105] Id.

[106] See Appendix F (Role of Barclays and its Affiliates).

[107] See, e.g., Appendix D (Role of Citigroup and its Affiliates); Appendix F (Role of Barclays and its Affiliates); Appendix H (Role of CIBC and its Affiliates).

[108] In-Person Interview with Kimberly Scardino, former Partner, Andersen, by H. Bryan Ives, III, and William T. Plybon, A&B, May 29, 2003 (the "Scardino Interview"); Sworn Statement of Carl E. Bass, former Partner, Andersen, to H. Bryan Ives, III, and William T. Plybon, A&B, June 4, 2003 (the "Bass Sworn Statement"), at 31-32; Sworn Statement of Debra A. Cash, former Partner, Andersen, to H. Bryan Ives, III, and William T. Plybon, A&B, June 5, 2003, at 139-42; Stewart Interview; In-Person Interview with Benjamin Neuhausen, former Partner, Andersen, by H. Bryan Ives, III, and John E. Stephenson, Jr., A&B, June 13, 2003 (the "Neuhausen Interview").

[109] See Appendix C (Role of Enron's Officers); Appendix D (Role of Citigroup and its Affiliates); Appendix F (Role of Barclays and its Affiliates); Appendix H (Role of CIBC and its Affiliates).

[110] Scardino Interview; Bass Sworn Statement, at 44-46; Stewart Interview; Neuhausen Interview.

Certain of the Financial Institutions maintain that their 3% equity investments in these FAS 140 Transactions were at risk, notwithstanding any "verbal assurances" or "understandings," because the promises by Enron senior management did not constitute "guarantees" or "enforceable agreements" as a matter of both fact and law.[111]   Rather, they suggest that the discussions between the Financial Institutions and Enron senior officers were ordinary course discussions between a commercial bank and its customer that were designed to provide a certain level of comfort regarding the senior officers' awareness of and commitment to the transactions, but were clearly understood by the parties not to constitute enforceable obligations.[112]

The Examiner has considered whether these verbal assurances or understandings are enforceable as a matter of law and a matter of fact.  Under applicable New York and Texas law, agreements that are "oral" or "unwritten"[113] are legally enforceable contracts.[114]  Sufficient evidence exists for a fact-finder to conclude either that (a) Enron

---

[111] See Appendix D (Role of Citigroup and its Affiliates); Appendix F (Role of Barclays and its Affiliates); Appendix H (Role of CIBC and its Affiliates).  This testimony is inconsistent with much of the documentary evidence.

[112] See Appendix D (Role of Citigroup and its Affiliates); Appendix F (Role of Barclays and its Affiliates); Appendix H (Role of CIBC and its Affiliates).  This testimony is also inconsistent with much of the documentary evidence.

[113] In several instances these purportedly "oral" assurances were "minuted" and "recorded."  See, e.g., Appendix F (Role of Barclays and its Affiliates); Appendix H (Role of CIBC and its Affiliates).

[114] In addition, even if enforceability of these agreements were an issue, a fact-finder could conclude that such side agreements satisfy the three requirements for an enforceable contract - offer, acceptance and consideration.  Had one or more of the Financial Institutions brought an action against Enron to enforce such an agreement, Enron might have defended such a claim by asserting that there was no meeting of the minds (no contract) or that the oral agreement, if a contract, fell within the scope of the Statute of Frauds (which requires certain categories of contracts to be in writing in order to be enforceable).  To do so, however, Enron would have had to take the position that the 3% equity was debt, and that its oral agreement was a promise to pay the debt of another.  If a court had held that the oral agreement did fall within the Statute of Frauds, a Financial Institution bringing such a claim could have asserted that either the doctrine of partial performance or the doctrine of promissory estoppel applied, both of which are exceptions to the Statute of Frauds.  As a general rule, in order to satisfy these exceptions, the action of purchasing the 3% equity would have to be explainable only with reference to the oral agreement, and it would be insufficient to show that the oral agreement merely provided "some motivation" for such action.

and the Financial Institutions entered into an enforceable agreement for the Financial Institutions to purchase the 3% equity certificates in exchange for Enron's promise to repay the certificate plus yield at maturity in the event the underlying asset value was insufficient to pay out the equity or (b) the Financial Institutions relied to their detriment by purchasing the equity certificates based upon Enron's promise that the equity investment would be repaid. Thus, a fact-finder could determine that the equity was not "at risk" as required by GAAP pursuant to traditional contract law or under theories of promissory estoppel or detrimental reliance.[115]

In addition, regardless of the enforceability of the verbal assurances provided by Enron, a fair reading of the applicable GAAP suggests that the "at risk" rule of the 3% Equity Test requires that the equity be at risk not just as a matter of strict legal form, but as a matter of substance as well.[116] Thus, the intentions of the parties must be considered in determining whether the equity is truly at risk. Witnesses from the Financial Institutions and from Enron have testified that the discussions described as "verbal assurances," or "minuted assurances" or "representations" of "absolute repayment" were not intended to and, in fact, did not constitute an agreement or enforceable obligation regarding the repayment of the equity.[117]

Nevertheless, evidence suggests that the Financial Institutions sought and obtained these verbal assurances, and relied upon them in purchasing the equity interests,

---

[115] EITF 96-21, at 896.

[116] *Id.*

[117] *See* Appendix D (Role of Citigroup and its Affiliates); Appendix F (Role of Barclays and its Affiliates); Appendix H (Role of CIBC and its Affiliates); Appendix C (Role of Enron's Officers).

fully expecting Enron to honor them.[118] Indeed, the promises often were obtained by the Financial Institutions as a necessary precondition to their approval of the credit.[119] Moreover, the evidence suggests that Enron honored its commitment by repurchasing the equity certificates at face value plus stated yield in circumstances where the value of the underlying asset was insufficient to repay the certificate holder.[120] Thus, although there is some conflict in the evidence, a fact-finder could determine that the Financial Institutions were in fact looking to Enron for the repayment of their equity, and in substance the equity was not at risk.

The Financial Institutions that sought and benefited from these verbal assurances may have had other bases for concluding that their equity would be repaid in full at maturity and may therefore assert that they were not relying on the verbal assurances. For example, the Financial Institutions apparently believed that Enron's Total Return Swap obligation on the 97% debt portion of the transaction increased the likelihood that Enron would also pay the 3% equity even if the asset value was insufficient to cover the equity. They expected that Enron, already liable for 97%, would pay off the 3% in order to maintain good working relationships with the Financial Institutions that bought the equity certificates and to prevent a competitor from purchasing the asset at auction. These expectations, considered in isolation, were based on economic realities and were entirely consistent with the accounting rules.

---

[118] Contrary evidence exists, including denials from certain fact witnesses associated with the Financial Institutions. *See* Appendix H (Role of CIBC and its Affiliates); Appendix F (Role of Barclays and its Affiliates).

[119] *See* Appendix D (Role of Citigroup and its Affiliates); Appendix H (Role of CIBC and its Affiliates); Appendix F (Role of Barclays and its Affiliates).

[120] *See* Appendix H (Role of CIBC and its Affiliates).

These normal commercial expectations, however, did not arise, and should not be considered, in isolation. They arose in the context of Enron's specific assurances regarding the repayment of the 3% equity. Thus, a fact-finder could determine that the verbal assurances provided, and the circumstances of their delivery, evidence expectations by the Financial Institutions of recovery from Enron of their 3% equity investment due to Enron's promise of repayment rather than the economic imperatives of the transaction or the probability that Enron's commercial interests would be served by such repayment. Accordingly, there is sufficient evidence for the fact-finder to conclude that Enron's verbal assurances were in fact and substance "residual guarantees" under the applicable GAAP. If so, the equity investments are not "at risk" as required by the 3% Equity Test.

*Degree of Assistance*

There were significant differences in the level of participation by the Financial Institutions in Enron's SPE transactions. Even among those Financial Institutions considered by Enron to be "Tier 1" banks,[121] the evidence reviewed by the Examiner

---

[121] Enron reviewed and ranked its Financial Institutions on an annual or bi-annual basis and placed each of its major banks in various tiers. The highest ranking a Financial Institution could receive was to achieve "Tier 1" status. During the relationship reviews, Enron addressed all aspects of its relationships with each of its Tier 1 and Tier 2 banks, including the relative success or failure of transactions and syndications, appetite for and participation in deals, willingness to extend credit, total credit exposure to Enron, creativity, responsiveness, and the continuation of Tier 1 or Tier 2 status in the upcoming year. In July 1999, Enron's stated criteria for Tier 1 status were:

- Underwrite $1 billion in short period of time
- Ability to lead/structure complex, mission-critical deals
- Deliver balance sheet for non-agented deals when needed
- Relationship-driven philosophy vs. transactional
- Account officer capable of delivering institution
- Strong senior management contacts
- Well-developed distribution capabilities
- Limited execution risk

indicates that there was a wide divergence in their involvement in the SPE transactions as well as the breadth of participation in the number of SPE transactions. For example, during a five-year period ending in 2001, Citigroup, playing a wide array of roles in assisting Enron, completed over sixty transactions with Enron, an average of more than one per month. Other Financial Institutions, such as JPMorgan Chase, CIBC and BT/Deutsche, although participating in many transactions with Enron over a number of years, were most prolific in one type of SPE transaction - the Prepay Transactions in the case of JPMorgan Chase, the FAS 140 Transactions in the case of CIBC and the Tax Transactions in the case of BT/Deutsche. Barclays participated in several different types of SPE transactions in various roles, and Merrill Lynch, despite having a significant relationship with Enron, did not participate in as many SPE transactions.

*Materiality*

Materiality of individual SPE transactions and series of SPE transactions is a relevant factor in the Examiner's analysis. The SPE transactions vary in amount and in their impact on financial results, such as earnings per share. Some were completed shortly before the Petition Date and after Enron's last public financial statements were prepared and may, therefore, have caused comparatively less harm to Enron and its creditors. Financial Institutions may assert that where an SPE transaction is found to be immaterial for one or more of these reasons, the transaction should not form a basis for aiding and abetting liability.

---

Enron Relationship Review Mid-Year 1999, July 1999 (the "Enron Relationship Review, July 1999"), at AB0252 01559 (emphasis omitted) [AB0252 01557-AB0252 01601].

### C.    Potential Additional Defenses to Aiding and Abetting Claims

There are other defenses possibly available to a Financial Institution that are unrelated to its knowledge or conduct.   These are potential defenses to aiding and abetting liability, but they should not apply to equitable subordination.  They include: (i) standing and *in pari delicto* issues and (ii) the impact of any exculpatory language in its engagement letter with the Debtors.

*Standing and In Pari Delicto*

A threshold question is whether the wrongful conduct of Enron's officers should bar any claim by Enron against a Financial Institution for aiding and abetting that wrongful conduct.  Depending on choice of law determinations one of two legal theories will apply – either that Enron has no standing to assert such a claim or that the Financial Institution has a defense to such claim under the doctrine known as *in pari delicto*.

*Standing*.  In cases where a corporation's officers have breached their fiduciary duties to the corporation (and a third party is alleged to have aided and abetted that breach), some courts have found that the creditors of the corporation, rather than the corporation, suffered virtually all of the damages.  A corporation lacks standing to bring a claim for damages suffered by the creditors.  Even where damage to the corporation has been alleged, courts have imputed the officers' conduct to the corporation and have concluded that only creditors, not the corporation, have standing to assert such claims. Under this line of cases, Enron would not have standing to bring such claims unless (i) the officer that breached his or her fiduciary duty acted solely for his or her own interest and without regard for the interests of Enron, or (ii) there was a relevant, innocent decision maker at Enron that, had he or she known of the wrongful conduct, could have

- 48 -

or would have prevented it from occurring. If neither is true, the wrongful conduct may form the basis for claims in favor of creditors of Enron, rather than Enron.

*In Pari Delicto.* Corporations act through their officers, and the conduct of the officers is ordinarily imputed to the corporation. In certain cases, wrongful conduct by an officer is also attributed to the corporation, and in such cases the corporation may be found to be *in pari delicto* (which is Latin for "in equal fault") with the party that aided and abetted the corporate officer in bringing about the harm. Wrongful conduct of an officer, however, will not be imputed to the corporation when the officer acts with sufficient adverse interest to the corporation. Under this line of cases, when the wrongful conduct of the officer is imputed to the corporation, the defendant can assert this defense to defeat the claim.

Under either approach courts require that the wrongful act cause damage to the corporation for it to assert a claim. Courts have found that a corporation has suffered damages as a result of a breach of fiduciary duty, even though the same conduct also resulted in damages to the creditors. Damages recognized as being suffered by the corporation have included costs of governmental investigations, administrative costs of a bankruptcy proceeding, and losses caused by the "deepening insolvency" of the corporation that occurred while its true financial condition was disguised. The Examiner believes that a fact-finder could conclude that Enron suffered and continues to suffer damages as a result of the breaches of fiduciary duty by its officers.

*Limitations of Liability Under Engagement Letters*

Another possible defense to a claim of aiding and abetting breach of fiduciary duty is a contractual limitation on a Financial Institution's liability through an

- 49 -

exculpation provision in an engagement letter, fee letter or the like. These contractual provisions are unlikely to provide an effective defense against an aiding and abetting claim, however, because the terms of such provisions typically carve out an exception for claims arising from the Financial Institution's own gross negligence, recklessness or willful misconduct. Because actual knowledge of wrongdoing and substantial assistance are elements of an aiding and abetting claim, the exculpation provisions are inapplicable by their own terms. In addition, under applicable law, regardless of the language in the contract, the courts will impose exceptions to enforcement in the case of bad faith, breach of trust, dishonesty, self-dealing and willful, reckless or grossly negligent misconduct.[122] Therefore, if it is shown that the Financial Institution aided and abetted the breach of fiduciary duty, the exculpation provisions of agreements between Enron and the Financial Institutions are unlikely to block such a claim.

---

[122] *See Gold Connection Disc. Jewelers, Inc. v. Am. Dist. Tel. Co.*, 622 N.Y.S.2d 740, 741 (N.Y. 1995) (holding that limitation of liability clauses cannot preclude recovery where the losses are the result of gross negligence); *cf. Johnson v. Fargo*, 90 N.Y.S. 725, 730 (N.Y. 1904) (holding that exculpatory clauses are generally disfavored and must be strictly construed). Thus, even if the contractual terms did not expressly except grossly negligent, reckless, and willful conduct, New York law would not enforce such a clause to prevent an aiding and abetting breach of fiduciary duty claim. To the extent Texas law applies (which would not be expected, given the overwhelming preference for New York law in the choice of law provisions of the agreements at issue), and to the extent the contractual language does not include specific exceptions, the exculpation provisions would not be enforced to prevent an aiding and abetting claim as a matter of public policy. *See Solis v. Evins*, 951 S.W.2d 44, 50 (Tex. Ct. App. 1997) ("We find no authority for the proposition that a party may prospectively contractually exculpate itself with respect to intentional torts. That would be contrary to public policy."); *cf. Stine v. Marathon Oil Co.*, 976 F.2d 254, 260 (5th Cir. 1993) ("In Texas, exculpatory clauses are not favored and are strictly construed.").

## V.   SPECIFIC ROLES OF FINANCIAL INSTITUTIONS AND POTENTIAL LIABILITY

### A.   Citigroup

Citigroup had as close a relationship with Enron as any Financial Institution discussed in this Report. Citigroup's relationship with Enron began over twenty years ago, and for at least the five years immediately preceding the Petition Date, Enron considered Citigroup to be a Tier 1 bank. During that five-year period, Citigroup completed over sixty transactions with Enron, an average of more than one per month. In connection with these transactions, Citigroup played a wide variety of roles in assisting Enron. These roles included lender, arranger, syndicator, underwriter, financial adviser and investor, among others. The transactions included term loans and revolving lines of credit, syndications, debt and equity offerings, mergers and acquisitions, and many types of structured financings. Citigroup received approximately $188 million in revenue related to Enron transactions during the period 1997 through 2001.

Citigroup helped Enron implement—and in some cases Citigroup also designed— a number of the SPE transactions reviewed by the Examiner. These SPE transactions include:

- Four Prepay Transactions referred to as Yosemite I through Yosemite IV in the Second Interim Report;[123]

---

[123] In these Prepay Transactions, Citigroup's SPE, Delta, served as the conduit entity. The funds ultimately loaned to Enron, which totaled approximately $2.4 billion, were raised in private placements of credit linked notes. In Yosemite I and II, a trust or similar entity issued the notes and loaned the proceeds to Delta, and Delta transferred the cash to Enron (or one of its affiliates) as a prepayment under a commodity swap agreement. In Yosemite III and Yosemite IV, the applicable trust transferred the note proceeds to Citigroup in exchange for certificates of deposit, Citigroup transferred the funds to Delta via a commodity swap agreement, and Delta transferred the funds to Enron via another commodity swap agreement.

- 51 -

*w/ Barclay's involvement*

- Five additional Prepay Transactions between 1997 and 2001;[124]

- Two Minority Interest Transactions called Nighthawk and Nahanni;[125] and

- Two Forest Products Transactions called Bacchus (a FAS 140 Transaction) and Sundance Industrial.

*Citigroup's Appropriateness Test*

Not only was Citigroup sophisticated in structured finance, it understood that structured finance could be misused. At the time many of these transactions were being completed, Citigroup's Global Capital Structuring group applied an "appropriateness test" to help determine whether the bank should engage in a particular transaction. Transaction Execution Approval packages were required to include a written questionnaire that set out ten areas of review.[126] These questions went beyond the objective financial criteria such as the client's credit risk and focused on the more subjective features of the transaction.

For example, the questionnaire focused on such matters as whether the client had a legitimate business purpose for entering into the transaction, and whether the true

---

[124] These Prepay Transactions included: (i) Roosevelt for $500 million, in which Citigroup provided all of the funding and Delta and Barclays served as the two counterparties to Enron; (ii) Truman for $500 million, in which Citigroup funded $250 million and Toronto Dominion Bank ("TD Bank") funded $250 million, with each of Citigroup and TD Bank serving as the other's conduit entity; (iii) Jethro for $675 million, which refinanced and extended Truman and had the same parties and structure, with each of Citigroup and TD Bank funding $337.5 million; (iv) Nixon for $324 million, in which Barclays funded $110 million, Royal Bank of Scotland funded $110 million, and Citigroup funded $104 million, with TD Bank serving as the conduit entity; and (v) a Prepay Transaction completed in June 2001 for $250 million, in which Citigroup provided all of the funding and Delta served as the conduit entity.

[125] Citigroup also assisted Enron in a Minority Interest Transaction called Rawhide, which is discussed in Appendix D (Role of Citigroup and its Affiliates). Although the Examiner concluded in the Second Interim Report that Enron's accounting for and disclosures of Rawhide were flawed, the evidence does not appear sufficient at this time to support a conclusion that Citigroup acted wrongfully with respect to Rawhide.

[126] It is not clear whether any group within Citigroup other than Global Capital Structuring used this formal appropriateness test questionnaire. However, Citigroup employees testified that other groups considered similar matters when deciding whether to engage in transactions.

economic substance of the transaction was apparent. These were circumstances that could create reputational risk for Citigroup.

The ten areas, which had to be addressed and approved by the "Designated Responsible Senior" for each transaction, were as follows:

1.  Lack of transparency (Business Objective) – The true economic substance of the transaction cannot be determined from the structure without significant analysis.

2.  Secrecy of identity of true party – The true identity of a party to the transaction cannot be determined because of the use of SPVs or charitable trusts in offshore tax havens or bank secrecy jurisdictions.

3.  Circularity – The transaction is essentially circular with the customer being both the ultimate lender and borrower and/or ultimate buyer and seller.

4.  Fragmentation – The transaction is constructed so that no one document describes the whole transaction, making it possible for a reader to review documents for a segment of the transaction and not understand that it is part of a larger transaction.

5.  Unusual terms – The transaction is off-market or contains terms which are significantly different from what one would expect.

6.  Absence of rules/guidance – The applicable regulatory/ legal/accounting/tax systems lack developed rules or guidance for complex products.

7.  Event risk in regulatory/legal/accounting systems – The rules governing the transaction are not predictable and could be subject to sudden application of tighter standards, or heightened prosecution because of political or social developments.

8.  Multiple jurisdictions – Multiple jurisdictions are involved with internal approvals sought individually in each making the process harder to manage and the risk of oversight of the entire transaction greater.

9.  Lack of confirmation of customer assurances – The absence of third party confirmations (e.g., regulators, auditors, appraisers) of customer assurances on sensitive issues.

- 53 -

10.     Disproportionate impact – The transaction will have a significant impact on the customer's financial condition or results, and will not be required to be disclosed.[127]

*Examiner's Conclusions*

As set forth in Appendix C (Role of Enron's Officers), the Examiner has concluded that there is sufficient evidence for a fact-finder to determine that certain of Enron's officers breached their fiduciary duty when they caused the Debtors to enter into certain SPE transactions with Citigroup that were designed to manipulate the Debtors' financial statements and that resulted in the dissemination of financial information they knew to be materially misleading.

In Appendix D (Role of Citigroup and its Affiliates), the Examiner discusses Citigroup's involvement in these SPE transactions. In participating in many of Enron's SPE transactions, Citigroup appears to have violated or ignored its own guidelines for appropriateness. In addition, there is evidence that: (i) Citigroup had actual knowledge of the wrongful conduct in these transactions giving rise to the breaches of fiduciary duty; (ii) Citigroup gave substantial assistance to certain of the Debtors' officers by participating in the structuring and closing of such transactions; and (iii) injury to the Debtors was the direct or reasonably foreseeable result of such conduct. This evidence is sufficient for a fact-finder to conclude that Citigroup aided and abetted certain of the Debtors' officers in breaching their fiduciary duties. In addition, there is sufficient evidence of inequitable conduct that Citigroup's claims, totaling approximately $2.4 billion, may be equitably subordinated to the claims of other creditors.

---

[127] Project Nighthawk Transaction Approval Package, Dec. 1997, at CITI-B 00375913-CITI-B 00375914 (containing the Nighthawk Appropriateness Test Questionnaire) [CITI-B 00375890-CITI-B 00375914].

The Examiner's conclusions are based upon a review of testimony and documentary evidence that is set forth in Appendix D (Role of Citigroup and its Affiliates), which the reader should review for a more complete understanding. Transactions considered by the Examiner in which Citigroup participated include the following:

*Prepay Transactions.* The nine Prepay Transactions that Citigroup completed with Enron between 1997 and 2001 (the "Citigroup Prepays") totaled over $4.6 billion.[128] Citigroup knew that, pursuant to these transactions, Enron did not transfer any commodities or any associated price risk, and that the transactions were effectively debt. Citigroup also knew that Enron reported the transactions as cash flows from operating activities, responding to Rating Agency pressure to better match cash flows with net income. Citigroup also knew that Enron's accounting for the Citigroup Prepays, with no disclosure in the financial statement footnotes or MD&A, did not provide an investor with any understanding of the amount of Enron's repayment obligations or the terms of such obligations. The Citigroup Prepays had a material effect on Enron's financial statements, representing, for example, 76% of Enron's net reported cash flows from operating activities in 1999.

In July 2001, Paul Deards, the head of Citigroup's Derivatives group, which handled the Citigroup Prepays, compared his group's involvement with that of Citigroup's Commodities group:

---

[128] The proceeds of certain of the Citigroup Prepays were used to repay outstanding Citigroup Prepays that were maturing. For example, the $675 million Jethro Prepay Transaction refinanced and extended the $500 million Truman Prepay Transaction. *See* Global Loans Approval Memorandum, regarding Truman, Sept. 19, 1999 [CITI-B 0035882-CITI-B 0035888]. The $4.6 billion total represents the gross amount of the nine Citigroup Prepays.

if as you say, much of what you do does not involve management of
commodity exposures at all, but is simply manipulating cash flows, there
may be a much greater overlap in our businesses than i had been led to
believe.[129]

On October 25, 2001, after Skilling's resignation in August and Enron's

devastating earnings release on October 16, 2001, Mr. Deards asked a colleague:

also want to get your confirmation that (apart from the fact we put deals
together for enron which we knew confused the ratings agencies) there is
no skellington in the closet.[130]

In addition to loaning its own funds in many of the Citigroup Prepays, Citigroup

facilitated Enron's desired accounting treatment of six of the Citigroup Prepays by

providing its SPE, Delta, to serve as the conduit entity or other swap counterparty.

Andersen had told Enron that each prepay needed to involve three parties, each with a

substantive business purpose for entering into the commodity purchase and sale

transactions. Nevertheless, Delta was an SPE owned by a Cayman Islands charitable

trust and established at the direction of Citigroup for the purpose of entering into that

type of transaction.[131]

With respect to the credit linked notes portions of Yosemite I and II, which

Citigroup had designed, there is evidence that Citigroup knew Enron's accounting was

---

[129] Email from Paul B. Deards, Citigroup, to Christopher Fehon, Citigroup, July 5, 2001, at CITI-
B 00694155 (capitalization omitted from original email) [CITI-B 00694153-CITI-B 00694155].

[130] Email from Paul Deards, Citigroup, to Rick Caplan, Citigroup, Oct. 25, 2001 (capitalization omitted
from original email) [CITI-B 00910235]. Deards testified that "skellington" may have been a pun referring
to Jeff Skilling. He also testified that the entire email was a joke. Sworn Statement of Paul Deards,
Citigroup, to Steven M. Collins, A&B, June 9, 2003, at 38-39.

[131] In connnection with two of the Citigroup Prepays, Citigroup caused Delta to make representations to
Andersen that did not disclose the reality of Delta's formation and use. For example, Delta represented that
it had unencumbered assets that would be available to the Yosemite lenders upon a default. However, a
Citigroup employee testified that Delta had only about $1,000 in net assets, representing the prefunding of
directors fees, and its initial capital. Sworn Statement of Richard J. Caplan, Citigroup, to Steven M.
Collins, A&B, Apr. 22, 2003 (the "Caplan Sworn Statement"), at 261.

not in compliance with GAAP. A senior accountant at Citigroup concluded that Enron should consolidate the entity that issued the notes,[132] which would have resulted in Enron having to report as debt on its balance sheet the $1.1 billion of note proceeds in Yosemite I and II. Despite knowing this conclusion was inconsistent with Enron's desired accounting and thus at odds with the purpose of the entire structure, Citigroup elected to proceed anyway, stating that the issue was "the customer's risk to accept or reject."[133]

Another Citigroup accountant expressed concern about this course of action:

> [I]f we have structured a transaction to help a client avoid consolidation, how can we turn around and take the position that they should be consolidating? I'm not suggesting that we are responsible for their accounting, but I am afraid that if we ever had to defend this we would either (a) embarrass the client or (b) lose the accounting argument.[134]

*Bacchus (FAS 140 Transaction).* In Bacchus, Enron effectively borrowed $200 million over the 2000 year-end from Citigroup, recognized $112 million of gain and reported $200 million of cash flow from operating activities. Citigroup received a Total

---

[132] Email from Saul Bernstein, Citigroup, to Frederick Battline, Citigroup, regarding Project Yosemite, Nov. 3, 1999 (the "Bernstein 11/03/99 Email") [CITI-B 0129860–CITI-B 0129861]; Memorandum from Saul Bernstein, Citigroup, to Rick Caplan and Adam Kulick, Citigroup, regarding Project Yosemite – Yosemite Co. Structured Credit Derivative Transactions, Oct. 29, 1999 (the "Bernstein 10/29/99 Memo") [CITI-B 0003517-CITI-B 0003522]. Bernstein concluded that the Yosemite I trust was an SPE that did not satisfy the 3% Equity Test because the independent equity holder had entered into a Total Return Swap with a Citigroup entity with respect to its equity contribution, and therefore the equity was not at risk. Bernstein 10/29/99 Memo, at 4. Because of the lack of a "real" independent equity holder, and because Enron was the primary beneficiary of the funds raised by the trust through the trust's issuance of the credit linked notes, Bernstein concluded that Enron should consolidate the trust. *Id.*; Bernstein 11/03/99 Email. The Yosemite II Prepay Transaction used the same structure and, thus, had the same issue with respect to the note issuer's equity. In the Yosemite III and Yosemite IV Prepay Transactions, Citigroup consolidated the trust entities that issued the notes, and so those transactions did not present the same concerns for Enron.

[133] Bernstein 11/03/99 Email, at CITI-B 0129861. There is evidence that Citigroup discussed some aspect of this conclusion with Enron. *Id.* at CITI-B 0129860; Caplan Sworn Statement, at 154-55. The Examiner has not found any evidence to date that this issue was discussed within Enron, and there is evidence that Andersen was not informed of the facts relating to this issue.

[134] Email from Frederick Battline, Citigroup, to Saul Bernstein, Citigroup, regarding Project Yosemite, Nov. 3, 1999, at CITI-B 0129860 [CITI-B 0129860-CITI-B 0129862].

Return Swap from Enron for $194 million of the debt and obtained verbal support from Fastow that Enron would repay the remaining $6 million, which was designed to represent the requisite 3% independent equity. Andersen has testified that it was not aware of any such verbal support and that such support would have invalidated Enron's accounting. In completing Bacchus, Citigroup's officers apparently overcame "key concerns" about the "appropriateness" of the "earnings dimensions to this deal."[135] Referring to transaction terms that Citigroup likely would not have accepted absent the verbal support, Citigroup Director Steve Wagman wrote:

> Sounds like we made a lot of exceptions to our standard policies. I am sure we have gone out of our way to let them know that we are bending over backwards for them . . . let's remember to collect this iou when it really counts.[136]

*Sundance Industrial.* Enron completed Sundance Industrial in order to move all its forest products assets into a nonconsolidated partnership, thus keeping those assets and their associated debt off its balance sheet. The evidence indicates that Citigroup knew its $28.5 million, 3% equity investment in Sundance needed to be at risk in order for Enron to accomplish this objective, but that the investment was structured with so many protections that it was actually debt. There is also evidence that Citigroup believed its obligation to fund up to an additional $160 million, which Enron also needed in order to satisfy Andersen's nonconsolidation accounting requirements, was not at risk. The transaction documents were "hardwired" to require that the partnership lose almost $750 million—the full value of the assets in the partnership—before it could draw on

---

[135] Email from Steve Baillie, Citigroup, to William Fox, Citigroup, *et al.*, Nov. 24, 2000 [CITI-B 0289702-CITI-B 0289703].

[136] Email from Steve Wagman, Citigroup, to Rick Caplan and Amanda Angelini, Citigroup, Dec. 27, 2000 [CITI-B 0281946].

Citigroup's funding commitment.  Citigroup believed that, from Enron's perspective, Sundance was "a funky deal (accounting-wise)"[137] and wrote "[t]he GAAP accounting is aggressive and a franchise risk to us if there is publicity (a la Xerox)."[138]

Citigroup also facilitated Enron's objective of recording $20 million of income via the Sundance transaction, by using $20 million of its $28.5 million investment to purchase a .01% interest in an Enron SPE called Sonoma, despite having no business purpose for owning that equity, and then immediately contributing the equity to the partnership.  Enron needed to have the right to put the Sonoma equity back to Citigroup in order to get a "true sale" legal opinion, but Citigroup refused to have any risk of owning the asset.  Thus, the parties "hardwired" the transaction agreements so that Citigroup could dissolve the partnership prior to having to honor the put.

*Nahanni (Minority Interest Transaction).*   In Nahanni, Enron completed a Minority Interest Transaction in which the minority investor contributed $500 million of Treasury securities to an Enron subsidiary, Enron classified these securities as "merchant investments," and Enron promptly sold them and reported the proceeds as cash flow from operating activities.  Enron completed the transaction in December 1999 and repaid the debt in mid-January 2000.

The Nahanni transaction had no rational business purpose, including no business purpose related to any temporary need for cash. The Debtors' officers caused Enron to engage in this transaction solely to inflate Enron's reported cash flow from operating

---

[137] Email from Lynn Feintech, Citigroup, to Rick Caplan and copy to Timothy Leroux, Citigroup, regarding cmac memo, May 15, 2001 [CITI-B 0299613].

[138] Memorandum from Dave Bushnell, Citigroup, to Mike Carpenter, Citigroup, regarding Enron-Project Sundance Transaction, May 30, 2001 [CITI-B 0302091-CITI-B 0302092].

activities. Citigroup knew that it was critical for Enron to report healthy operating cash flow in order to maintain its credit ratings, and Citigroup knew Enron's desire to include this transaction in its year-end 1999 financial statements. Citigroup designed the Nahanni Minority Interest Structure and recommended that Enron use Treasury securities in the transaction. Nahanni represented 41% of Enron's total reported cash flow from operating activities for 1999.[139]

In a review of its exposure to Enron, Citigroup acknowledged that "Enron has used Nahanni only for year-end window dressing . . . ."[140] Jim Reilly, one of Citigroup's key relationship managers for Enron, described Nahanni as: "essentially, an insurance policy for YE 'balancing.'"[141]

*Nighthawk (Minority Interest Transaction).* Nighthawk was a year-end 1997 Minority Interest Transaction that raised $500 million for Enron. A senior Citigroup accountant evaluated Nighthawk before it closed in late 1997 and concluded that, because the equity of the minority interest investor was not at risk, Enron would be required to

---

[139] In Citigroup's Execution Approval Memorandum for Nahanni, it states that Citigroup "has relied on advice from Ben Neuhausen from the Standards Practices Group at Arthur Andersen's Chicago Headquarters as to important accounting matters relating to the transaction." Execution Approval Memorandum from Otto Jager, *et al.*, Citigroup, to the GCS Execution Approval Committee, regarding Project Nahanni Execution Approval, Dec. 14, 1999, at 9 [CITI-B 00313808-CITI-B 00313817]. Mr. Neuhausen was the member of Andersen's Professional Standards Group in Chicago who reviewed and approved certain aspects of the Nahanni structure for Enron. Memorandum from Debra A. Cash, *et al.*, Andersen, to the Files, regarding Non-Cash Activity, Dec. 7, 1999 [AAWP 0100424-AAWP 0100425]. Mr. Nauhausen has told the Examiner that he was not aware that the Nahanni transaction documents were "hardwired" to ensure that, for all practical purposes, the proceeds resulting from the year-end sale of the Treasury securities contributed to the minority interest vehicle would be distributed to the Nahanni lenders within thirty days. Although Mr. Neuhausen did consult with Citigroup on its minority interest structures, he told the Examiner that it was his arrangement with Citigroup that Citigroup would inform him if they were seeking his advice on transactions involving a client of Andersen. He does not recall discussing the Nahanni transaction with Citigroup, nor any minority interest transaction involving a similar use of Treasury securities. Neuhausen Interview.

[140] Citigroup Exposure Spreadsheet, undated, at 28 [CITI-B 0137997-CITI-B 0138003].

[141] Email from James F. Reilly, Citigroup, to Michael Nepveux and copy to Joseph J. Mackiewicz, regarding Enron deals, July 24, 2001, at 1 [CITI-B 0289597-CITI-B 0289598].

- 60 -

consolidate the investor entity, thus requiring that Enron present the $500 million of financing as debt rather than as a minority interest investment.[142]   Citigroup knew that minority interest treatment was critical because it had designed the Minority Interest Transaction structure in consultation with the Rating Agencies in order to achieve "equity credit" for the $500 million of proceeds raised through the transaction.

### B.    JPMorgan Chase

Until its bankruptcy, Enron was one of JPMorgan Chase's most important clients. Enron consistently achieved highest-priority "Blue" client status under JPMorgan Chase's internal client classification system – a select status reserved for accounts that could "prospectively generate $5 million or more in deal revenues over an 18-month period."[143]   As early as 1995, JPMorgan Chase considered Enron to be a "bonanza in terms of deal flow." By 1999, Enron had become "the most significant corporate finance relationship of the Global Oil and Gas Group [of JPMorgan Chase], generating annual fees in excess of $15 million and total revenues of $17 million."[144]   In 2000, the "relationship revenues" to JPMorgan Chase totaled $29.8 million.[145]

Just as Enron was one of JPMorgan Chase's most important clients, JPMorgan Chase was one of Enron's most important banks, gaining a detailed understanding of Enron's finances as a result.  JPMorgan Chase considered itself to be "Enron's major

---

[142] Memorandum to File, regarding Project Nighthawk, Enron Monetization and Accounting Treatment, Dec. 15, 1997, at CITI-B 00395282 [CITI-B 00395280-CITI-B 00395283].

[143] JPMorgan Chase Memorandum, regarding "Blue" and "Green" Account Classifications, undated [JPMBKR-E 0515593].

[144] Memorandum from Josh Rogers, JPMorgan Chase, to Balance Sheet Committee, and copy to Robert Traband, JPMorgan Chase, Nov. 22, 1999 (date marked as "Approved") [SEC00336911-SEC00336914].

[145] Memorandum from Rick Walker, JPMorgan Chase, to Don Layton and Marc Shapiro, JPMorgan Chase, regarding Enron, Jan. 18, 2001, at 2 [JPMCBKR0017784-JPMCBKR0017789].

financing firm."[146] JPMorgan Chase consistently achieved and maintained Tier 1 status among Enron's banks.[147] As Fastow expressed to a JPMorgan Chase officer in October 2001, when Enron's financial difficulties were beginning to be publicly known: "I think you know the credit and the businesses as well as (and better) than anyone in the world, so I'm counting on you to lead the way."[148]

Although JPMorgan Chase participated in many of Enron's transactions over the years, the most significant SPE transactions are a series of Prepay Transactions known as the Mahonia Transactions which took place from 1992 through 2001. Through the Mahonia Transactions, JPMorgan Chase provided Enron with an aggregate of $3.717 billion in financing.[149] Approximately $1.5 billion of the $1.8 billion in claims that JPMorgan Chase has asserted against the Debtors relates to the Mahonia Transactions.

*Examiner's Conclusions*

As set forth in Appendix C (Role of Enron's Officers), the Examiner has concluded that there is sufficient evidence for a fact-finder to determine that certain of Enron's officers breached their fiduciary duty when they caused the Debtors to enter into

---

[146] Email from Richard S. Walker, JPMorgan Chase, to Joanna Gibb, JPMorgan Chase, Jan. 5, 1999 [JPMBKR-E 0016225-JPMBKR-E 0016226].

[147] *See, e.g.*, Enron Debt Investor Relationship Review, Aug. 2001, at 20 [AB0252 01291-AB0252 01348]; Enron Debt Investor Relationship Review, Jan. 2001, at 10 [AB0452 01721-AB0452 01813]; Enron Mid-Year Debt Investor Relationship Review, July 2000, at 6 [AB0252 01443-AB0252 01538]; Enron Relationship Review, Jan. 2000, at 14 [AB000538536-AB000538624]; Enron Relationship Review, 1999, at 7 [AB000538675-AB000538736]; Enron Relationship Review Mid-Year 1999, July 1999, at 5 [AB0252 01557-AB0252 01601].

[148] Email from Richard S. Walker, JPMorgan Chase, to Eric Fornell, JPMorgan Chase, Oct. 23, 2001 (forwarding a message from Andy Fastow, Enron, to Richard S. Walker, JPMorgan Chase) [JPMBKR-E 0164513].

[149] The proceeds of certain of the Mahonia Transactions were used to repay other Prepay Transactions that were maturing. The $3.7 billion total represents the gross amount of the Prepay Transactions facilitated by JPMorgan Chase.

certain SPE transactions with JPMorgan Chase that were designed to manipulate the Debtors' financial statements and that resulted in the dissemination of financial information they knew to be materially misleading.

In Appendix E (Role of JPMorgan Chase and its Affiliates), the Examiner discusses JPMorgan Chase's involvement in these SPE transactions. The Examiner concludes that there is evidence that: (i) JPMorgan Chase had actual knowledge of the wrongful conduct in these transactions giving rise to the breaches of fiduciary duty; (ii) JPMorgan Chase gave substantial assistance to certain of the Debtors' officers by participating in the structuring and closing of such transactions; and (iii) injury to the Debtors was the direct or reasonably foreseeable result of such conduct. This evidence is sufficient for a fact-finder to conclude that JPMorgan Chase aided and abetted certain of the Debtors' officers in breaching their fiduciary duties. In addition, there is sufficient evidence of inequitable conduct that JPMorgan Chase's claims, totaling $1.8 billion, may be equitably subordinated to the claims of other creditors.

The Examiner's findings are based upon a review of testimony and documentary evidence that is set forth in Appendix E (Role of JPMorgan Chase and its Affiliates), which the reader should review for a more complete understanding. The transactions considered by the Examiner in which JPMorgan Chase participated include the following:

*Mahonia Prepay Transactions.*   JPMorgan Chase created the Mahonia Transaction structure and sold $3.717 billion of Prepay Transactions to Enron from December 1992 through September 2001. The evidence indicates JPMorgan Chase knew that:

- In economic substance, the Mahonia Transactions were loans to Enron;

- Enron would report its obligations under the Mahonia Transactions as price risk management liabilities rather than as debt, and would report the proceeds it received as cash provided by operating activities rather than as cash provided by financing activities;

- Enron's accounting treatment was not in accordance with the economic substance of the transaction;

- Enron would not provide disclosures in its financial statements or related securities law disclosures that would enable the reader of its financial statements to determine the economic substance of the Mahonia Transactions; and

- Enron's failure to provide adequate disclosure of the Mahonia Transactions was material and was critical to the maintenance of its credit rating.

There is also evidence from which a fact-finder could determine that JPMorgan Chase actively assisted Enron in making misleading representations to Andersen about the independence of Mahonia.[150]

Internal emails from JPMorgan Chase evidence a detailed understanding of Enron's accounting and disclosure objectives:

- "These transactions are balance-sheet advantaged and are used as a year-end management tool.  Enron is thus enticed to pay a premium for these transactions."[151]

- "The transaction provides a mechanism for Enron to replace long term debt with a trade payable."[152]

---

[150] *See* Appendix C (Role of Enron's Officers).

[151] Email from George Serice, JPMorgan Chase, to Susan F. Stevens, *et al.*, JPMorgan Chase, Oct. 29, 1997 [JPMBKR-E 0063399].

[152] Memorandum from Mitchell Taylor, JPMorgan Chase, to Steve Thorington, JPMorgan Chase, Dec. 22, 1992 [JPMBKR 0002200].

- "Enron loves these deals as they are able to **hide funded debt from their equity analysts** because they (at the very least) book it as deferred rev or (better yet) bury it in their trading liabilities."[153]

- "[U]nlike Enron, [redacted entity's] use of a prepay would be more identifiable and likely cannabize [sic] debt capacity on a $ for $ basis. I suggested that there is still a pickup with the agencies given the accounting treatment and my belief that the agencies haven't figured out prepays."[154]

- "I think what we're trying to gauge is how, how aggressive they are to pay for this stuff now, which is discreetly get, you know, several hundred million dollars and have no market knowledge of what's going on . . . ."[155]

## C.    Barclays

Barclays became one of Enron's Tier 1 banks around 1993, and maintained that position up to Enron's bankruptcy. During that time, Barclays was involved in a wide variety of Enron transactions in a wide range of capacities. Among others, Barclays participated in the following SPE transactions:

- The SO$_2$ Transaction.

- The Chewco Transaction.

- The J.T. Holdings Transaction.

- The Nikita FAS 140 Transaction.

- Three Prepay Transactions.

---

[153] Email from George Serice, JPMorgan Chase, to Karen Simon, and copy to Jeffrey Dellapina, JPMorgan Chase, Nov. 25, 1998 (emphasis in original) [JPMCBKR0017536-JPMCBKR0017551].

[154] Email from Rick Walker, JPMorgan Chase, to Jeffrey Dellapina, JPMorgan Chase, Oct. 18, 2001 [JPMBKR-E 0241185].

[155] Transcript of Taped Telephone Call among JPMorgan Chase personnel, Sept. 13, 2001, at 2-3 (transcript prepared by the PSI) [AB000523499-AB000523525].

While Barclays did not usually take the lead in structuring these SPE transactions, it often played vital roles in them, including, on at least two occasions, taking the equity risk required by the SPE structures. Before doing so, however, Barclays required and received from Enron's officers' verbal assurances covering that equity risk. In other transactions, Barclays worked with Enron to structure an SPE so that the requisite 3% equity was not actually at risk, and structured and closed a transaction despite being put on notice that Enron's accounting for the transaction was incorrect.

*Examiner's Conclusions*

As set forth in Appendix C (Role of Enron's Officers), the Examiner concludes that there is sufficient evidence for a fact-finder to determine that certain of Enron's officers breached their fiduciary duty when they caused the Debtors to enter into these SPE transactions with Barclays that were designed to manipulate the Debtors' financial statements and that resulted in the dissemination of financial information they knew to be materially misleading.

In Appendix F (Role of Barclays and its Affiliates), the Examiner discusses Barclays' involvement in certain SPE transactions. The Examiner concludes that there is evidence that: (i) Barclays had actual knowledge of the wrongful conduct in these transactions giving rise to the breaches of fiduciary duty; (ii) Barclays gave substantial assistance to certain of the Debtors' officers by participating in the structuring and closing of such transactions; and (iii) injury to the Debtors was the direct or reasonably foreseeable result of such conduct. This evidence is sufficient for a fact-finder to conclude that Barclays aided and abetted certain of the Debtors' officers in breaching their fiduciary duties. In addition, there is sufficient evidence of inequitable conduct that

- 66 -

Barclays's claims, totaling $371 million, may be equitably subordinated to the claims of other creditors.

The Examiner's findings are based upon a review of testimony and documentary evidence that is set forth in Appendix F (Role of Barclays and its Affiliates), which the reader should review for a more complete understanding. The transactions considered by the Examiner in which Barclays participated include the following:

*SO$_2$ Transaction.* This transaction, which closed on September 28, 2001 (for approximately $138.5 million) and was refinanced on October 30, 2001 (adding approximately $29.1 million), provided Enron with proceeds of approximately $167.6 million. The SO$_2$ Transaction ostensibly dealt with the sale by an Enron subsidiary of SO$_2$ emission credits to a Barclays' sponsored SPE, Colonnade Limited, a Guernsey company ("Colonnade"). However, both Enron and Colonnade entered into derivative transactions with Barclays, and the resulting circular transaction became in economic effect (if not in appearance) a secured loan.[156]

Barclays helped to structure Colonnade, the SPE used in SO$_2$, to meet the requirements of what Barclays referred to as an Andersen "smell test,"[157] including manufacturing a trading history for Colonnade. For example, an internal Barclays memorandum reveals:

---

[156] Second Interim Report, Annex 1 to Appendix F (Miscellaneous Transactions).

[157] Email from Martin Woodhams, Director, Barclays, to Martin Woodhams, Director, Barclays, Apr. 25, 2001 (regarding Enron Structure, SPV's and USGAAP) [BRC 000096518].

Recent tightening of US GAAP regulations with regard to SVP's, [sic] has led to the need of incorporating an SVP [sic] that closely resembles an operating company. To this end, the SVP [sic] will before it transacts with Enron, undertake a small number of short dated FX, mutual funding and murabaha transactions. This diverse transactional trading history is crucial to the success of achieving off-balance sheet treatment for our client.[158]

Barclays then closed the $SO_2$ Transaction, despite being told by its own outside accountants that Enron likely could not account for the transaction as Enron intended to.

As PricewaterhouseCoopers LLP ("PWC") informed Barclays:

- I am still worried about whether this works for your client. It looks risky for them from an accounting perspective.[159]

- We had a meeting yesterday with PWC (Richard Oldfield) to discuss the accounting treatment for Project Noosa. . . . One issue raised at the meeting was that although [Barclays] would not need to consolidate the SPV, it is highly likely that client would need to consolidate the SPV under both UK and US GAAP. This is because the potential upside and downside of the SPV assets continue to remain with the client and hence they have a beneficial interest in the SPV.[160]

*idea is that risk never really shifted to the SPE's... it stayed w/ Enron & should have been consolidated.*

*J.T. Holdings and Nikita Transactions.* Barclays requested and relied on verbal assurances from Enron covering the requisite 3% equity risk in at least two SPE transactions.

Barclays provided one-half of the requisite 3% equity in the J.T. Holdings Transaction, which was a synthetic lease transaction that closed in December 2000. However, in order to address its concerns about the residual value of the assets

---

[158] Memorandum from Martin Woodhams, Director, Barclays, to New Products Committee, regarding Commodities – Structuring Group Product Extension for Colonnade Limited, Sept. 6, 2001, at 2-3 [BRC 000082621-BRC 000082629].

[159] Email from Richard Oldfield, PWC, to Pritesh Pankhania, Barclays, Sept. 10, 2001 [BSX 01212-BSX 01215].

[160] Email from Pritesh Pankhania, Barclays, to Frank McGarahan, Barclays, July 13, 2001, at 1 (regarding FW: Project Noosa – Accounting Note) [BSX 01216-BSX 01217].

underlying the transaction, Barclays sought and received verbal assurances from Glisan,

Enron's Treasurer, covering the equity risk in the structure:

> We have had a number of conversations with Enron about the [J.T.
> Holdings] transaction risks and have agreed to go forward on the basis of
> explicit verbal support from the company's Treasurer. Specifically, Ben
> Glisan will commit to us that under all circumstances Enron will execute
> its purchase option at a price sufficient to repay in full the holders of the B
> Notes and Certificates.[161]

In a FAS 140 Transaction known as Nikita, Barclays intended to provide the 3%

equity to the SPE.[162] However, shortly before closing, Barclays and/or Enron realized

that Barclays, for regulatory reasons, could not hold the certificate of beneficial interest.

As a result, another financial institution, CSFB, provided the SPE's equity funding,

subject to one critical condition. CSFB required Barclays to enter into a Total Return

Swap, essentially guaranteeing to CSFB return of its equity investment in the SPE. Thus,

the certificate risk CSFB nominally assumed was swapped back to Barclays.[163] Barclays

was willing to assume the equity risk via the Total Return Swap only because it

demanded and received from Enron officer Glisan verbal assurances covering that 3%

equity. Barclays' internal records reveal:

> Barclays ultimately conditioned sanction for the transaction on "written
> recording of senior Enron officers' (at least Treasurer and/or CFO)
> affirmation that Enron will ensure repayment of [the] certificate
> investment."[164]

---

[161] Richard Williams, Director, Barclays, Transaction Comment regarding $110MM Synthetic Lease of
MTBE Assets, Nov. 14, 2000 [BRC 000046269].

[162] Email from Dave Mradula, Barclays, to Richard Pattinson, Barclays, *et al.*, Sept. 27, 2001
[BRC 000036045].

[163] Appendix F (Role of Barclays and its Affiliates).

[164] Email from John Meyer, Director, Barclays, to John Sullivan, Director, Barclays, Richard Williams,
Director, Barclays, Eric Chilton, Managing Director, Barclays, *et al.*, Sept. 26, 2001 [BRC 000035918].

Although unable to be the nominal holder of the equity certificate in Nikita, Barclays did provide debt funding to the SPE. Enron entered into a Total Return Swap with the SPE, obligating itself to provide the SPE with sufficient funds to repay the principal and interest due on the Barclays loan.[165]   Barclays understood that this Total Return Swap represented a direct payment obligation of Enron, but knew that this obligation could not be determined by reference to Enron's financial statements.[166]

The Examiner has concluded that the verbal assurances from Enron that Barclays demanded and relied on led directly to the failure of the 3% Equity Test in the J.T. Holdings and Nikita Transactions. Apart from the verbal assurance, the Total Return Swap in Nikita resulted in the misrepresentation of that transaction in Enron's financial statements.

*Chewco Transaction.* At the end of 1997, Enron formed Chewco to invest in JEDI, with the intention of keeping both structures off Enron's financial statements. JEDI's requisite equity was to come from Chewco. Chewco's requisite equity was to come from entities controlled by Enron officer Kopper (and his friend Dodson). Nearly all of the money contributed by these entities to Chewco – approximately $11.4 million – came from Barclays under so-called "funding agreements." While Enron took the lead in structuring the Chewco Transaction, Barclays required that the repayment of its loans, which were used to fund the Chewco equity, be protected by reserve accounts in the

---

[165] *See* First Interim Report, Section III—*The Nikita Transaction*; Second Interim Report, Annex 2 to Appendix M (FAS 140 Transactions).

[166] Sworn Statement of John Meyer, Director, Barclays, to David Givelber, A&B, Apr. 22, 2003, at 166, 207-08.

amount of $6.6 million.[167]  Accordingly, the equity contribution to Chewco that was "at risk" totaled only a "net $5 million which would be significantly below the 3% required."[168]  Revelation of the reserve account credit support played an important part in forcing Enron to restate its income, equity and debt to reflect that Chewco and JEDI should have been consolidated with Enron from Chewco's inception.

*Prepay Transactions.*  Barclays participated in three Enron Prepay Transactions in several different roles, including acting as a commodity swap counterparty for Enron (ECT) and Delta in a December 1998, $500 million, three year crude oil and natural gas prepay;[169] advancing $110 million in a December 1999, $324 million crude oil prepay;[170] and acting as a commodity swap counterparty for Enron and CSFB in a September 2001, $150 million, one year crude oil prepay.[171]

Barclays understood that Enron booked its obligations in the Prepay Transactions in price risk management liabilities and, at least since 2000, that it recorded the cash received as cash flow from operating activities.  There is also evidence from which a fact-finder could conclude that Barclays understood that Enron's disclosure of such transactions would result in misleading financial presentation.

In June 1999, the credit officer in charge of the Enron relationship explained the purpose of the prepays and Enron's accounting for them as follows:

---

[167] *See* Appendix F (Role of Barclays Bank and its Affiliates).

[168] Andersen Chewco Memorandum, at 2.

[169] *See* Appendix D (Role of Citigroup and its Affiliates).

[170] *Id.*

[171] *See* Appendix F (Role of Barclays and its Affiliates).

Prepaid Crude Oil and Natural Gas – *Don't for a second think that Enron is satisfying an operating need by selling these commodities forward.* Although notionally they are agreeing to deliver the commodities in satisfaction of an obligation established at the time the banks pay for the commodities, *in actual fact they are only borrowing money.* Their accountant will credit the Revenue account, debit cash, debit Revenue and credit Deferred Revenue. In other words he sees a sale but sets up a liability that is satisfied only as the commodities are delivered. *When calculating the amount of debt Enron has incurred, [Barclays' credit function] (and any analyst who wasn't born yesterday) will take any balance in the deferred revenue account and add it one-for-one to debt.* The only problem, and it's a practical one, is that Enron's Deferred Revenue (of late) has not been substantial enough to be disclosed separately. It has been lumped in with Other Liabilities for the last two or three years.

. . .

[The fact that the Prepay volumes are too large for physical delivery] should make it painfully obvious that the transaction's essence is not about deferred revenue but rather about *plain ol' debt.*"[172]

## D. **BT/Deutsche**

Over time, Enron's management came to rely on the tax department and, more specifically, its structured transactions group to fill the annual "stretch" to produce additions to net income that could not be accomplished by other business units through ordinary operations.[173] BT/Deutsche played a major role in six of the eleven Tax Transactions that originated in Enron's tax department during the period from 1995 to 2000.[174] BT/Deutsche designed, promoted and participated in the Teresa, Steele, Tomas and Cochise Transactions (the "BT/Deutsche Tax Transactions"). BT/Deutsche

---

[172] Email from John Meyer, Director, Barclays, to Jonathan Taylor, Barclays, and copies to Robert Clemmens, Chief Credit Officer, Barclays, Henry Pullman, Director, Barclays, Richard Williams, Director, Barclays, and George McKean, Barclays, *et al.*, June 24, 1999, at 1-2 (emphases in original) [BRC 000106893-BRC 000106895].

[173] *See* Appendix C (Role of Enron's Officers).

[174] *See* Second Interim Report, Appendix J (Tax Transactions).

developed the basic tax and accounting structures of the BT/Deutsche Tax Transactions, promoted them to Enron, and participated in the transactions, often as the only party other than Enron affiliates. BT/Deutsche received approximately $43 million in fees associated with the BT/Deutsche Tax Transactions from 1997 until the Petition Date.

*Examiner's Conclusions*

As set forth in Appendix C (Role of Enron's Officers), the Examiner has concluded that there is sufficient evidence for a fact-finder to determine that certain of Enron's officers breached their fiduciary duty by causing the Debtors to enter into BT/Deutsche Tax Transactions that were designed to manipulate the Debtors' financial statements and that resulted in the dissemination of financial information known to be materially misleading.

In Appendix G (Role of BT/Deutsche and its Affiliates), the Examiner discusses BT/Deutsche's involvement in the BT/Deutsche Tax Transactions.[175]  The Examiner concludes that there is evidence that:  (i) BT/Deutsche had actual knowledge of the wrongful conduct in these transactions giving rise to the breaches of fiduciary duty; (ii) BT/Deutsche gave substantial assistance to certain of the Debtors' officers by

---

[175] In addition to these issues, on November 29, 2001, BT/Deutsche purported to setoff its obligations to Enron under a $1.95 billion note and under the settlement of an interest rate swap against Enron's obligation to BT/Deutsche under a guaranty agreement. Both the note and the guaranty were entered into in connection with the Valhalla Transaction, one of the two Tax Accommodation Transactions in which Enron participated as an accommodation party to BT/Deutsche. Although BT/Deutsche made a decision prior to the Petition Date to effectuate the setoff, the steps necessary to effect the setoff may not have been accomplished prior to the Petition Date. In the event the purported setoff was not effected prior to the Petition Date, any later effecting of the setoff could be a violation of the automatic stay. The Court could decide not to permit the setoff, and if the doctrine of recoupment did not apply and BT/Deutsche's claims against the Debtors were equitably subordinated, Enron could be entitled to collect the approximate amount of the Deutsche/Enron Note ($1.95 billion, plus accrued interest) from BT/Deutsche and BT/Deutsche would be left with a claim for the amount owed by Enron under the guaranty, which may itself be subject to subordination. These setoff issues are discussed at length in Appendix G (Role of BT/Deutsche and its Affiliates).

participating in the structuring and closing of such transactions; and (iii) injury to the Debtors was the direct or reasonably foreseeable result of such conduct. This evidence is sufficient for a fact-finder to conclude that BT/Deutsche aided and abetted certain of the Debtors' officers in breaching their fiduciary duties. In addition, there is sufficient evidence of inequitable conduct that BT/Deutsche's claims, totaling more than $227 million, may be equitably subordinated to the claims of other creditors.

The Examiner's findings are based upon a review of testimony and documentary evidence that is set forth in Appendix G (Role of BT/Deutsche and its Affiliates), which the reader should review for a more complete understanding.

The BT/Deutsche Tax Transactions were, for the most part, artificial transactions lacking a bona fide business purpose other than the creation of accounting income for Enron. The Teresa Transaction, for example, was not intended to save Enron taxes on a present value basis.[176] Instead, the purpose of the Teresa Transaction was to create accounting income, taking advantage of the fact that the rules of FAS 109 ignore the time value of money.[177]

The lack of a bona fide business purpose is also evident in the Steele and Cochise Transactions, which each involved Enron's acquisition of REMIC Residual Interests and

---

[176] Tax Opinion from King & Spalding to R. Davis Maxey, Senior Director, Tax Research, Corporate Tax, Enron, July 29, 1997 (the "July 29 Teresa Tax Opinion"), at 40 ("Neither Enron nor any affiliate of Enron will take any action that results in a net tax benefit. . . .") [AB000151584-AB000151628]; Sworn Statement of Thomas Finley, former Managing Director, Deutsche Bank, to Philip C. Cook, A&B, Apr. 30, 2003, at 82.

[177] July 29 Teresa Tax Opinion, at 4 ("The predominant purpose of Enron and its Affiliates for participating in the Purchase was to generate income for financial accounting purposes."); Memorandum from Thomas Finley, Bankers Trust, et al., to Paul Nelson, Bankers Trust, regarding Network Committee Approval for Investment in Partnership Transaction - Enron Corp., Mar. 10, 1997, at 1 ("create significant amounts of future accounting income") [DBC 012906-DBC 012909].

- 74 -

a limited amount of Facilitating Assets from BT/Deutsche.[178]  Enron did not have a separate business purpose of investing in REMIC Residual Interests or low-yielding Facilitating Assets.  Instead, even the tax opinions obtained by Enron in the Steele and Cochise Transactions, like the tax opinion in the Teresa Transaction, explicitly recognize the generation of financial accounting income as a "business purpose" for the transactions that was intended to support tax recognition of the form of the transaction.[179]

The Steele and Cochise Transactions, moreover, were designed to allow Enron to record the potential benefit of speculative future tax deductions as pre-tax income on its financial statements rather than as after-tax income resulting from reduced tax expense in the tax provision of Enron's income statement.[180]  The characterization of those items as pre-tax income was misleading because readers of Enron's financial statements were unaware that those amounts arose from a tax-related transaction.

---

[178] *See* Second Interim Report, Appendix J (Tax Transactions), *Enron's REMIC Carryover Basis Transactions; see also* Second Interim Report, Annexes 1 and 2 to Appendix J (Tax Transactions).

[179] Tax Opinion from Akin Gump to R. Davis Maxey, Enron, Dec. 16, 1997, at 7 ("The Company and the Enron Subsidiaries undertook the [Steele] Transaction for the principal purpose of generating financial accounting benefits to the Company's financial accounting group . . . .") [AB000151677-AB000151714]; Tax Opinion from McKee Nelson Ernst & Young LLP to R. Davis Maxey, Enron, Mar. 21, 2001, at 12 (purposes for participating in the Cochise Transaction included "to increase the pre-tax financial accounting income and the net earnings on the Enron consolidated financial statements as a result of the Transactions.") [AB000151794-AB000151878].

[180] Letter from Bill Boyle, Vice President, Bankers Trust, to William McKee, King & Spalding, June 2, 1997, at AB000187758-AB000187759 ("[T]he accounting benefits of the transaction are derived from treating the transaction as a 'bargain purchase' of assets for accounting purposes, even though there is no bargain purchase from an economic perspective . . . the transaction is a deal driven by the accounting benefits.") [AB000187758-AB000187776].

In addition, a portion of Enron's pre-tax gain from the Cochise Transaction was triggered in the second quarter of 2000 by a "sale" of the Cochise Planes.[181] The purported sale, however, was not a bona fide sale to a third party but "an internal (Enron and BT) distribution"[182] to BT/Deutsche, who transferred the Cochise Planes to another Enron SPE structure within thirty days. By acting as a conduit for the sale of the Cochise Planes, BT/Deutsche enabled Enron to erroneously report $36.5 million of gain on the sale, an amount equal to more than 10% of Enron's reported net income for the quarter.

### E.    CIBC

Although it engaged in a variety of transactions with Enron, ranging from traditional commercial loans to swap transactions to securities offerings, CIBC distinguished itself among Enron's financial institutions, and likely earned Tier 1 status, through its role in Enron's FAS 140 Transactions. During the period from June 1998 until October 2001, CIBC engaged in at least eleven of these deals, earning over $14 million in fees. In all of these deals that involved 3% equity, CIBC served as the equity holder in the SPE.

*Examiner's Conclusions*

As set forth in Appendix C (Role of Enron's Officers), the Examiner has concluded that there is sufficient evidence for a fact-finder to determine that certain of

---

[181] The "Cochise Planes" are the beneficial interests in two commercial aircraft that were leased to Continental Airlines, Inc. and United Air Lines, Inc., transferred from a BT/Deutsche affiliate to the Cochise structure in January 1999, transferred from the Cochise structure to a BT/Deutsche affiliate in June 2000, and transferred from that BT/Deutsche affiliate to the Tomas structure in July 2000. *See* Second Interim Report, Appendix J (Tax Transactions), at 33-34, 84-85; Second Interim Report, Annex 2 to Appendix J (Tax Transactions), at 11-12.

[182] Email from Sarah Kight, Akin Gump, to Trey Cash, Corporate Tax, Enron, May 11, 2000 (regarding Cochise Asset Sale) [AGS36053]; Email from Sarah Kight, Akin Gump, to Trey Cash, Corporate Tax, Enron, May 23, 2000 (recommending that Enron obtain consent to the "double transfer" at one time) [AGS36058-AGS36059].

- 76 -

Enron's officers breached their fiduciary duty by causing the Debtors to enter into certain SPE transactions with CIBC that were designed to manipulate the Debtors' financial statements and that resulted in the dissemination of financial information they knew to be materially misleading.

In Appendix H (Role of CIBC and its Affiliates), the Examiner discusses CIBC's involvement in these SPE transactions. The Examiner concludes that there is evidence that: (i) CIBC had actual knowledge of the wrongful conduct in these transactions giving rise to the breaches of fiduciary duty; (ii) CIBC gave substantial assistance to certain of the Debtors' officers by participating in the transactions; and (iii) injury to the Debtors was the direct or reasonably foreseeable result of such conduct. This evidence is sufficient for a fact-finder to conclude that CIBC aided and abetted certain of the Debtors' officers in breaching their fiduciary duties. In addition, there is sufficient evidence of inequitable conduct that CIBC's claims, totaling $205 million, may be equitably subordinated to the claims of other creditors.

The Examiner's findings are based upon a review of testimony and documentary evidence that is set forth in Appendix H (Role of CIBC and its Affiliates), which the reader should review for a more complete understanding. Transactions considered by the Examiner in which CIBC participated include the following:

*FAS 140 Transactions.* CIBC knew that some of Enron's net income after tax was "financial engineering sourced."[183] There is evidence that CIBC knew the accounting results Enron sought to achieve in the FAS 140 Transactions; namely, that

---

[183] CIBC Credit Committee Agenda, Dec. 4, 1998 (the "CIBC Credit Committee Agenda, Dec. 4, 1998"), at 2 [CIBC S 00199-CIBC S 00205].

- 77 -

Enron was seeking to meet the requirements for sale treatment under FAS 140 and that it was seeking to avoid consolidating the borrower-SPEs so that it could recognize gain from the transaction, reflect the proceeds as cash flow from operating activities and remove the debt from its balance sheet. The FAS 140 Transactions that Enron and CIBC closed between 1998 and 2001 accounted for over $1.7 billion of operating cash flow, hid over $1 billion of debt from Enron's balance sheet and generated $585 million of income based upon "gain on sale" of the assets purportedly transferred.

As early as May 1998, it appears that CIBC understood Enron's reliance on SPE structures to generate earnings. In a May 1998 Credit Application, a CIBC official stated:

> Monetizations that [Enron] has undertaken in recent years, Cash I, II, III, etc., will have no impact on future years' earnings or cash flows. The concept [Enron] employs is that the profit stream of a particular contract is recognized in current period earnings, regardless of tenor. By monetizing their expected future cash flow under a contract they are matching up the recognition of income with cash. Consequently, there is no future income or cash impact of the monetizations, other than the fact that [Enron] must generate new transactions every year for earnings purposes (i.e., there is 'nothing in the cupboard').[184]

The minutes of a 1998 credit committee meeting at CIBC regarding Pilgrim (one of the FAS 140 Transactions), provide:

> [w]e understand that approximately 15% of [Enron's] current year's [net income after tax] is attributable to similar investment monetization transactions, and we supported [Pilgrim] on the understanding that we would validate our understanding with the Company to ensure that the current and next year's profitability is primarily operations driven as distinct from financial engineering sourced.[185]

---

[184] Credit Application, submitted by Paul A. Jordan, Executive Director, Credit Management, CIBC, *et al.*, to Vice President – Risk Management Operations Office, May 12, 1998, at CIBC 1044266 [CIBC 1044249-CIBC 1044268].

[185] CIBC Credit Committee Agenda, Dec. 4, 1998, at 2.

Another CIBC internal memo discussing approval of Pilgrim indicated that approval was subject to the conditions:

> (i) that we will ask the Company how much of fiscal 1998 earnings are being generated by transactions such as Riverside and Pilgrim, and they will confirm to us that the majority of the Company's fiscal 1998 profit is "real" profit i.e. generated by the ongoing Enron businesses, and that earnings are not entirely reliant on [FAS 140] transactions such as Pilgrim and the Riverside deals; and (ii) that we will be comfortable with the analysis around the gain which is being realized on both projects involved in the Pilgrim transaction.[186]

CIBC asserts that its equity was at risk as required by the 3% Equity Test,[187] but the evidence suggests a contrary conclusion.  For example, a June 1999 Credit Application expresses this risk, but then describes the assurances from Enron as to its repayment:

> Like in the Project Leftover transaction . . . this represents true equity risk. Note, however, executive management at Enron has represented that this money (as with the Project Leftover equity money) will absolutely be repaid.[188]

---

[186] Memorandum from R.M. Abra, General Manager, CIBC, to Executive Director, Credit Management – Houston, regarding Enron credit application, Dec. 4, 1998 [CIBC 1043860].

[187] *See* Appendix H (Role of CIBC and its Affiliates), *Arguments Against the Imposition of Aiding and Abetting Liability and Equitable Subordination*.

[188] Credit Application, submitted by Mark H. Wolf, Executive Director, Credit Management, CIBC, to Vice President – Risk Management Operations Office, June 14, 1999, at CIBC 1045206 [CIBC 1045193-CIBC 1045208].

A similar statement was included in the Credit Applications for Alchemy[189] and Discovery,[190] each of which was a FAS 140 Transaction in which CIBC held the outside equity.

Likewise, the June 1999 agenda from the meeting at which Nimitz was approved includes the following statement:

> [i]n order to comply with accounting opinions, 3% of [Leftover] had to be structured without the guarantee of Enron Corp. and is formally supported only by the project interest itself though we have also been provided with the minuted verbal assurances of Enron's senior staff that the Company will ensure that this section is fully retired . . . at its . . . maturity.[191]

In an October 23, 2000 email written in connection with the November 2000 restructuring of Hawaii, Ian Schottlaender wrote:

> I met with Andy Fastow . . . to discuss . . . his assurance of support for our structured equity commitments. He is very aware of our commitments, acknowledges their importance to Enron and fully accepts our expectation of full repayment. While he cannot, for obvious reasons, guarantee repayment – he fully anticipates our repayment as scheduled.[192]

Similarly, in a statement in a Credit Application regarding amendments to Hawaii, a CIBC employee stated:

> Enron is Not permitted to ASSURE a repurchase of our equity (though this is our undocumented 'understanding' with the CFO).[193]

---

[189] Credit Application, submitted by Mark H. Wolf, Executive Director, Credit Capital Markets, CIBC, *et al.*, to Vice President – Risk Management Operations Office, Dec. 7, 1999, at CIBC 1045068 [CIBC 1045057-CIBC 1045074].

[190] Credit Application, submitted by Mark H. Wolf, Executive Director, Credit Capital Markets, CIBC, to Vice President – Risk Management Operations Office, Dec. 15, 1999, at CIBC 1048541 [CIBC 1048529-CIBC 1048549].

[191] CIBC Credit Committee Agenda, June 15, 1999, at 3 [CIBC S 00228-CIBC S 00234].

[192] Email from Ian Schottlaender, CIBC, to Lorne Robbins, CIBC, *et al.*, Oct. 23, 2000 [CIBC 1 469893].

[193] Credit Application, submitted by Mark Wolf, Executive Director, Leveraged Finance Group, CIBC, *et al.*, to Vice President – Risk Management Operations Office, May 21, 2001, at CIBC 1044979 (emphasis in original) [CIBC 1044967-CIBC 1044980].

Finally, in an email responding to questions from another CIBC employee about the Hawaii structure, Mercedes Arango wrote:

> Unfortunately there can be no <u>documented</u> means of guaranteeing the equity or any shortfall or the sale accounting treatment is affected. We have a general understanding with Enron that any equity loss is a very bad thing. They have been told that if we sustain any equity losses, we will no longer do these types of transaction with them. . . . We have done many "trust me" equity transactions with Enron over the last 3 years and have sustained no losses to date. If there has been a case where the value of the asset has been in question, Enron has repurchased the asset at par plus our accrued yield.[194]

## F.   Merrill Lynch

Merrill Lynch entered into approximately thirty-five transactions with Enron, including underwritings, structured finance, derivative and lending transactions, although many of these transactions were not SPE related.[195] Perhaps no period of time in the Enron/Merrill Lynch relationship was more critical, however, than the last days of December 1999. During that period, Merrill Lynch entered into two transactions with Enron that Enron used to substantially inflate and misstate its reported financial performance for the year, allowing Enron to meet its 1999 earnings targets.

*Examiner's Conclusions*

As set forth in Appendix C (Role of Enron's Officers), the Examiner has concluded that there is sufficient evidence for a fact-finder to determine that certain of Enron's officers breached their fiduciary duty when they caused the Debtors to enter into transactions with Merrill Lynch that were designed to manipulate the Debtors' financial

---

[194] Email from Mercedes Arango, CIBC, to Gerry Beauclair, CIBC, *et al.*, June 21, 2001, at AB000470387 (emphasis in original) [AB000470387-AB000470389].

[195] *See* Appendix I (Role of Merrill Lynch and its Affiliates).

- 81 -

statements and that resulted in the dissemination of financial information they knew to be materially misleading.

In Appendix I (Role of Merrill Lynch and its Affiliates), the Examiner discusses Merrill Lynch's involvement in the Nigerian Barge and 1999 Electricity Trade Transactions. The Examiner concludes that there is evidence that: (i) Merrill Lynch had actual knowledge of the wrongful conduct in these transactions giving rise to the breaches of fiduciary duty; (ii) Merrill Lynch gave substantial assistance to certain of the Debtors' officers by participating in the transactions; and (iii) injury to the Debtors was the direct or reasonably foreseeable result of such conduct. This evidence is sufficient for a fact-finder to conclude that Merrill Lynch aided and abetted certain of the Debtors' officers in breaching their fiduciary duties. In addition, there is sufficient evidence of inequitable conduct that Merrill Lynch's claims, totaling $53 million, may be equitably subordinated to the claims of other creditors.

The Examiner's findings are based upon a review of testimony and documentary evidence that is set forth in Appendix I (Role of Merrill Lynch and its Affiliates), which the reader should review for a more complete understanding. The transactions considered by the Examiner in which Merrill Lynch participated include the following:

*The Nigerian Barge Transaction.* In this transaction, which closed on December 29, 1999, Merrill Lynch purported to purchase a portion of Enron's interest in future cash flows to be generated from three power-producing barges anchored off the coast of Nigeria. Although Enron structured the transaction to look like a sale, in reality the transaction was a short-term loan from Merrill Lynch to Enron. The risks of ownership of the barges never passed to Merrill Lynch: Fastow committed in an undisclosed, side

- 82 -

deal to take Merrill Lynch out of the transaction within six months at an agreed rate of return. In accordance with this verbal agreement, Enron arranged for LJM2 to take Merrill Lynch out of the transaction six months later. Enron reported, as Merrill Lynch knew it would, $12 million in earnings from this transaction at the end of 1999.[196]

*1999 Electricity Trades.* At the same time as the Nigerian Barge Transaction, Merrill Lynch entered into two electricity derivative transactions with Enron. These transactions were back-to-back call options in which the material terms of the transactions were mirror images. Thus, the transactions were structured to be virtually off-setting. Enron used the 1999 Electricity Trade Transactions solely to achieve financial statement results, much like the Nigerian Barge Transaction.[197] Despite concerns over Enron's intended accounting for these transactions, Merrill Lynch entered into these transactions knowing that Enron intended to book $50-60 million in earnings from these virtually off-setting transactions and that those earnings would assist Enron in achieving its earnings targets for 1999.[198] Enron terminated the 1999 Electricity Trade Transactions just six months later, before the first call options could be exercised.

Merrill Lynch was aware of the importance of its deals to Enron. An internal Merrill Lynch email regarding the 1999 Electricity Trade Transactions states:

> We were clearly helping them make earnings for the quarter and year (which had a great value in their stock price, not to mention personal compensation).[199]

---

[196] *Id.*

[197] This intent is underscored by the fact that Enron terminated the electricity trade transactions shortly after year-end and before the first trades under the transactions were scheduled to begin.

[198] *See* Appendix I (Role of Merrill Lynch and its Affiliates).

[199] Email from Schuyler Tilney, Merrill Lynch, to Dan Gordon, Merrill Lynch, and copy to Rick Gordon, Merrill Lynch, May 30, 2000, at MLBE 0370956 [MLBE 0370956-MLBE 0370957].

- 83 -

Merrill Lynch was also aware that its participation in the Nigerian Barge Transaction posed a "reputational risk, i.e. aid/abet Enron income stmt. manipulation"[200] because of Enron's intended accounting for the transactions. In testimony provided to the Examiner, James Brown ("Brown"), the Merrill Lynch executive that raised this concern at the Merrill Lynch committee meeting convened to consider the Nigerian Barge Transaction, recalled the following discussion on this point:

> Well, I raised the matter, you know, if Enron ever in the future fell apart from a credit – just like a credit meltdown or something, and we had been involved in this transaction, in light of the fact that I had these accounting concerns about the transaction, would that somehow create reputational risk for us? Would we have our name in the press?[201]

Brown's concerns with the propriety of Enron's accounting for the transaction stemmed from the side agreement that Enron had made to take Merrill Lynch out of the transaction within six months at an agreed rate of return. Such an agreement, if disclosed to Enron's auditors, would have precluded Enron from accounting for the transaction as a sale.

A Merrill Lynch Credit Flash Report for the week ending December 23, 1999, regarding the Nigerian Barge Transaction references this agreement: "[m]ost unusual transaction of the week was IBK [investment banking] request to approve Enron

---

[200] *See* Facsimile from Robert Furst, Merrill Lynch, to Jim Brown, Merrill Lynch, Dec. 21, 1999, at MLBE 0111739 (containing a description of the proposed Nigerian Barge transaction) [MLBE 0111739-MLBE 0111763].

[201] Sworn Statement of James A. Brown, Merrill Lynch, to Robb E. Hellwig, A&B, Apr. 28, 2003, at 77-78.

Corporation 'relationship' loan – ML asked to invest $7mm equity in Nigerian power project."[202] The document goes on to describe the Nigerian Barge transaction, stating:

> The transaction will allow Enron to move assets off-balance sheet and book future cash flows currently as 1999 earnings (approximately $12mm) . . . IBK was supportive based on Enron relationship (approx. $40mm in annual revenues) and assurances from Enron management that we will be taken out of our $7mm investment within next 3-6 months.[203]

Furthermore, an email Brown authored following the Nigerian Barge Transaction described the transaction and verbal assurances received from Fastow as follows:

> We had a similar precedent with Enron last year, and we had Fastow get on the phone with Bayly and the lawyers and promise to pay us back no matter what. Deal was approved and all went well.[204]

---

[202] Email from Vincent J. DiMassimo, Merrill Lynch, to Kevin Cox, Merrill Lynch, Jan. 22, 2002, at MLBE 0016558 (email attachment - Americas Credit Flash Report: Week ending 12/23/99) [MLBE 0016557-MLBE 0016559].

[203] *Id.*

[204] Email from James Brown, Merrill Lynch, to Robert Lyons, Merrill Lynch, Mar. 2, 2001 [MLBE 0242936].

## VI.    AVOIDANCE ACTIONS

### A.    Overview of Avoidance Actions

The "avoidance actions" covered by this Report are potential claims of the Debtors' estates to avoid certain transfers of money or property as preferences or constructively fraudulent conveyances.  These potentially avoidable transfers, set forth in Appendix J (Avoidance Actions), either arose in connection with Enron's SPE transactions, were made to certain insiders or were paid to certain of the Debtors' professionals.

The law applicable to these avoidance actions, as well as affirmative defenses to those actions, is set forth in Annex 4 (Legal Standards Applicable to Avoidance Actions) to Appendix J.  In analyzing such claims, where insolvency is an element of the claim, the Examiner has assumed the insolvency of Enron and its affiliated Debtors under 11 U.S.C. § 101(32) at the time of any subject transfer.[205]

### B.    Preference Actions in SPE Transactions

As of the filing of the Second Interim Report, the Examiner had not yet completed his preference analysis of (i) the Prepay Transactions and (ii) the FAS 140 Transactions. Annex 1 to Appendix J to this Report contains the Examiner's preference analysis with respect to those transactions.  As set forth therein, the Examiner has identified $368.43 million in voidable preferences resulting from the Prepay Transactions and the FAS 140 Transactions.  This amount takes into account defenses that the defendants to such

---

[205] The Examiner has received assurances from the professionals for the Debtors and the Creditors' Committee to the effect that the Debtors, in coordination with the Creditors' Committee, will undertake to complete a solvency analysis with respect to the Debtors.

actions may raise, although certain of the preference claims discussed in Annex 1 to Appendix J will be more difficult to sustain than others.

Moreover, to the extent the recipients of transfers avoidable as preferences have filed claims against the Debtors (and, as set forth in Appendix J, those claims exceed $4.766 billion), the Debtors' estates may be able to utilize Section 502(d) of the Bankruptcy Code to disallow those claims. The result of such disallowance would be to limit or preclude recovery by investors in many of Enron's SPEs.

**C.    Selected Professional Avoidance Actions**

The Examiner has completed his investigation of potential preference claims against certain professionals of the Debtors. The Second Interim Report identified certain of those claims.[206] With respect to professionals that are currently providing services to the Debtors' estates as special counsel, the Examiner has identified an additional $6.1 million in preference claims after taking into account their affirmative defenses. With respect to professionals that are not providing services to the Debtors' estates (or that are providing only "ordinary course" services), the Examiner has identified approximately $63.7 million in transfers which are potentially avoidable as preferences. However, as more fully described in the Second Interim Report, based on subsequent orders of this Court and after consultation with the Debtors and the United States Trustee, the Examiner has not analyzed the affirmative defenses that may exist with respect to these potential preference claims.

---

[206] One of the parties subject to examination in the Second Interim Report, Milbank, has returned $215,716 to the Debtors, which was the amount of the preference claim identified by the Examiner against that entity, net of any defenses.

**D.    Selected Insider Avoidance Actions**

The Second Interim Report described the following avoidance actions with respect to insiders: (i) a claim to recover approximately $81.5 million arising out of a series of loans made by Enron to Lay, which Lay repaid with Enron stock at a time when Enron was presumed insolvent; and (ii) preference claims totaling approximately $53 million against certain employees of Enron arising out of accelerated payments under two deferred compensation plans.[207]   Annex 2 to Appendix J to this Report describes two additional potential avoidance actions against certain insiders of the Debtors.

---

[207] The Creditors' Committee has filed suit on account of the Lay transfers. *See Official Comm. of Unsecured Creditors of Enron Corp. v. Lay,* filed Jan. 31, 2003, Adv. Pro. No. 03-02075-AJG (Bankr. S.D.N.Y. filed Jan. 31, 2003) (asserting $84 million in fraudulent transfer claims against Lay and his wife, Linda Lay). In addition, on May 16, 2003, the Official Employment-Related Issues Committee filed a motion to assert preference claims on behalf of the accelerated deferred compensation payments. *See* Motion of the Official Employment-Related Issues Committee for an Order, Pursuant to Sections 105(a), 1103(c) and 1109(b) of the Bankruptcy Code, Expanding Scope and Mandate and Granting Standing and Authority to Commence Certain Avoidance Actions on Behalf of Debtors' Estates, May 16, 2003, Docket No. 10759.

## VII.   INTERIM NATURE OF REPORT

This Report is an interim report. The Examiner's conclusions with respect to the matters in this Report (and in Appendices hereto) are preliminary.

## VIII.   FINAL REPORT

In the next report, which the Examiner believes will be his final report, the Examiner intends to report on other matters identified in the April 8th Order, including: (i) the role of other financial institutions in connection with the SPE transactions and whether there are potential affirmative claims of the Debtors' estates against such financial institutions or grounds for equitable subordination of their claims; (ii) the role of Lay, Skilling and Enron's Board of Directors in connection with the SPE transactions and potential liability resulting therefrom; and (iii) the role of certain professionals in connection with the SPE transactions and any potential liability resulting therefrom.

Dated: June 30, 2003

Respectfully submitted,

/s/ Neal Batson
Neal Batson
Examiner

ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, Georgia 30309
404 881-7000

# TAB F

This tab separator sheet was placed in the document by the Records Imaging team so that tab separated sheets will be more easily identifiable in the thumbnail view of Acrobat.

SCI:85433.1

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------- x
                  :

In re:                  :     Chapter 11
                  :

ENRON CORP., *et al.*,     :     Case No. 01-16034 (AJG)
                  :

         Debtors.    :     Jointly Administered
                  :

---------------------------------------------------- x

## APPENDIX F

### (Role of Barclays and its Affiliates)

to

## THIRD INTERIM REPORT OF NEAL BATSON, COURT-APPOINTED EXAMINER

      Reference is made to the preceding Third Interim Report of Neal Batson, Court-Appointed Examiner (the "Report"). This Appendix constitutes an integral part of the Report. All capitalized terms not otherwise defined herein shall have the meanings set forth in the Report.

TABLE OF CONTENTS

I.      INTRODUCTION AND OVERVIEW ..................................................................1

II.     HISTORY AND DEVELOPMENT OF BARCLAYS' RELATIONSHIP WITH
        ENRON...................................................................................................................5
        A.      Relationship Between Barclays and Enron..................................................5
        B.      Barclays' Exposure to Enron ....................................................................15

III.    BARCLAYS' ROLES IN SELECTED ENRON SPE TRANSACTIONS...........20
        A.      Obtaining Verbal Assurances from Enron in the J.T. Holdings
                and Nikita Transactions ............................................................................20
        B.      Structuring and Closing the $SO_2$ and Chewco Transactions.....................30
        C.      Participating in Prepays and Nikita............................................................48

IV.     POTENTIAL LIABILITY OF BARCLAYS .......................................................53
        A.      Arguments Supporting the Imposition of Aiding and Abetting
                Liability and Equitable Subordination.......................................................53
        B.      Arguments Against the Imposition of Aiding and Abetting
                Liability and Equitable Subordination.......................................................61
        C.      Conclusions................................................................................................70

## I.    INTRODUCTION AND OVERVIEW

In Appendix C (Role of Enron's Officers), the Examiner concludes that there is sufficient evidence for a fact-finder to determine that certain of the Debtors' officers breached their fiduciary duties under applicable law by causing the Debtors to enter into certain SPE transactions that were designed to manipulate the Debtors' financial statements and that resulted in the dissemination of financial information known to be materially misleading. These wrongful acts caused direct and foreseeable harm to Enron itself, and resulting harm to innocent parties that dealt with Enron, including certain creditors in the Bankruptcy Case.

This Appendix considers the role of Barclays in certain of the Debtors' SPE transactions. Barclays acted in several different capacities in these SPE transactions, including: (i) helping to structure and purportedly take the requisite equity risk in the Chewco, J.T. Holdings and Nikita FAS 140 Transactions; (ii) creating and "seasoning" (including creating a trading history for) the SPE used in the $SO_2$ Transaction and then closing that transaction; and (iii) acting either as a swap counterparty or providing funding for at least three Enron Prepay Transactions. In Appendix C (Role of Enron's Officers), the Examiner concludes that there is sufficient evidence for a fact-finder to determine that certain of the Debtors' officers breached their fiduciary duties by causing Enron to enter into these transactions.

In this Appendix, the Examiner discusses evidence indicating that: (i) Barclays had actual knowledge of the wrongful conduct giving rise to breaches of fiduciary duty by the Debtors' officers; (ii) Barclays gave substantial assistance to the Debtors' officers by participating in the structuring and closing of the transactions; and (iii) injury to the

Debtors was the direct or reasonably foreseeable result of this conduct. The evidence reviewed by the Examiner, and the reasonable inferences that may be drawn from that evidence, are sufficient for a fact-finder to conclude[1] that Barclays aided and abetted certain Enron officers in breaching their fiduciary duties. In addition, there is sufficient evidence of inequitable conduct by Barclays in connection with these transactions for a court to conclude that Barclays' claims should be equitably subordinated to the claims of other creditors.

Barclays' conduct in respect of the Chewco Transaction, the J.T. Holdings Transaction, the Nikita FAS 140 Transaction, the SO₂ Transaction and the three Prepays enabled Enron to: (i) record approximately $410 million of income that should not have been recorded; (ii) receive cash flow from financings of approximately $1 billion, all of which Enron erroneously recorded as cash flow from operating activities; and (iii) erroneously omit almost $1.77 billion of debt in its 1997, 1998, 1999, 2000 and 2001 financial statements.[2]

The evidence would allow a fact-finder to conclude that Barclays:

- Obtained verbal assurances from Enron in which Enron promised to cover Barclays' equity risk positions in two SPEs, likely knowing that the assurances would not be disclosed to Enron's auditors and that, had they been disclosed, Enron could not have accounted for the transactions as it did;

---

[1] See Report, *Standard Adopted by the Examiner*.

[2] Enron erroneously omitted approximately $685 million in debt between 1997 and 2001 as a result of failing to consolidate Chewco (and JEDI); approximately $106.2 million in 2000 as a result of the J.T. Holdings Transaction; approximately $71.9 million in 2001 as a result of the Nikita Transaction; approximately $138.5 million in 2001 as a result of the SO₂ Transactions; and a total of approximately $760 million as a result of its participation in Prepay Transactions, of which $500 million occurred in 1998, $110 million in 1999, and $150 million in September of 2001. *See also* Report, Appendix F (Role of Barclays and its Affiliates); First Interim Report, Section III, *The Nikita Transaction*; Second Interim Report, Annex 2 to Appendix M (FAS 140 Transactions); First Interim Report, Section III, *The SO₂ Transaction*; Second Interim Report, Annex 1 to Appendix F (Miscellaneous Transactions); Second Interim Report, Annex 1 to Appendix L (Related Party Transactions); and Report, Appendix D (Role of Citigroup and its Affiliates).

- structured and closed the $SO_2$ Transaction knowing the transaction was not a "true sale," that it was designed to manipulate the Debtors' financial statements, and that it resulted in the dissemination of financial information known to be materially misleading;

- caused Enron to structure a transaction involving an SPE such that Enron covered 60% of the equity risk position in the SPE, knowing that would prevent Enron from properly giving the structure off-balance sheet accounting treatment; and

- participated in three Prepay Transactions and one monetization transaction that Barclays knew were designed to manipulate the Debtors' financial statements and did result in the dissemination of financial information known to be materially misleading.

The Examiner has reviewed a substantial amount of evidence, including documentary and testimonial evidence, and has noted reasonable inferences that could be drawn from the evidence. A fact-finder may draw alternative or contrary inferences from the same evidence. Moreover, there are certain defenses to aiding and abetting liability and equitable subordination available to Barclays. Whether Barclays will succeed on one or more of these defenses will depend upon the fact-finder's resolution of the facts.

The elements most likely to present issues of material fact for consideration by the fact-finder are:

- The degree of Barclays' *knowledge* of the acts giving rise to the breaches of fiduciary duty. In particular, whether Barclays knew that Enron's reporting of these transactions would result in materially misleading presentation of Enron's financial condition because: (i) the transactions were disclosed in a manner that disguised the economic substance of these transactions so as to mislead rating agencies, creditors and investors; and/or (ii) the accounting for the transactions was incorrect. As part of this determination, the fact-finder may consider, among other things: (i) Barclays' knowledge that the economic substance of these transactions was inconsistent with the disclosure; (ii) its knowledge that Enron's accounting for the Chewco, J.T. Holdings, Nikita and $SO_2$ Transactions was likely incorrect; (iii) the impact, if any, of verbal assurances on the equity risk Barclays purportedly assumed in the J.T. Holdings and Nikita transactions; as

well as (iv) whether there was any reliance on accounting representations from Andersen through Enron, and if so, whether this reliance was reasonable.

- The degree of *assistance* provided by Barclays to Enron's officers. As part of this determination, the fact-finder may consider whether Barclays designed the transaction, structured the transaction, assisted in the disclosure process, consummated the transaction or took any action that would invalidate the desired accounting.

- Whether it would have been *reasonably foreseeable* to Barclays that these transactions would cause injury to Enron and/or its creditors. As part of this analysis, a fact-finder may consider whether the transaction had a material impact on Enron's financial statements.

Barclays' claims in the Bankruptcy Case totaling approximately $371 million are susceptible of being equitably subordinated to the claims of other creditors. This subordination would be in addition to any affirmative recovery that may be available to the Debtors against Barclays for aiding and abetting the officers' breaches of fiduciary duty, assuming the Debtors have standing to pursue such a claim.

**II.    HISTORY AND DEVELOPMENT OF BARCLAYS' RELATIONSHIP WITH ENRON**

    **A.    Relationship Between Barclays and Enron**

    *Barclays' Involvement in Enron Transactions*

Headquartered in London, Barclays is an international financial services group engaged primarily in the business of banking, investment banking and asset management.[3]  In terms of assets employed, Barclays is one of the largest financial services groups in the UK.[4]  As of December 31, 2002, loans and advances to customers totaled approximately $420 billion[5] and Barclays had $649 billion in total assets.[6] Barclays operates in many countries around the world and is a leading provider of coordinated global financial services to multinational corporations and financial institutions in the world's main financial centers.[7]  Barclays conducts its investment banking business through its Barclays Capital division.[8]  Among other things, Barclays Capital's activities include origination, sales, trading and research related to loans, debt capital markets and structured capital markets.[9]

Throughout the 1990's and up through 2001, Enron increasingly became a very important client to Barclays.  By the late 1990's, Enron had become Barclays' "top Oil &

---

[3]  Barclays Form 20-F filed with the SEC for the Year ended Dec. 31, 2002 (the "20-F for 2002"), at 60.

[4]  *Id.*

[5]  Barclays Annual Report to Shareholders for the Year ended Dec. 31 2002 (the "2002 Annual Report"), at 59 (£261 billion converted to dollars based on the Bank of Canada conversion rate of £1 = $1.61, Dec. 31, 2002) [AB0786 02269-AB0786 02516].

[6]  20-F for 2002, at 81; 2002 Annual Report, at 89 (£403.1 billion converted to dollars based on the Bank of Canada conversion rate of £1 = $1.61, Dec. 31, 2002).

[7]  20-F for 2002, at 60.

[8]  2002 Annual Report, at 93.

[9]  *Id.*

Gas client globally" and remained in this "top" position at least through 2000.[10] Barclays became one of Enron's Tier 1 banks in approximately 1993, and maintained that position up to Enron's bankruptcy.[11] Barclays believed its status as a Tier 1 bank would ensure a steady stream of fees and new issue opportunities from Enron.[12] By the late 1990's, Barclays had become one of Enron's top three banks.[13] By Enron's count, in October 1998, Enron had total obligations to Barclays of over $1.5 billion.[14]

From the end of 1996 through 2001, Barclays (through both its US and London offices) acted as the lead bank, agent or sole lender on at least 33 financing transactions and participated as a lender in an additional 16 financing transactions.[15] During this same period, Barclays either proposed to Enron or considered entering into at least an additional 27 financing transactions with Enron.[16] From those completed financing transactions between 1997 and 2001, Enron and its affiliates paid Barclays over $40 million in fees (in addition to the interest that Enron and its affiliates paid Barclays in connection with the financings).[17] The following timeline illustrates when most of these transactions were completed, and highlights the specific transactions that are the focus of this Appendix.

---

[10] *See* Richard Williams, Director, Barclays, Transaction in Discussion report, Feb. 21, 2001, at 3 (regarding the Brazos VPP Trust) [BRC 000041867-BRC 000041869].

[11] *See id.*

[12] *See id.*

[13] Memorandum from Kelly Boots, Enron, to Andrew Fastow, CFO, Enron, regarding Barclays Bank, Oct. 16, 1998 [AB0911 1159].

[14] *Id.*

[15] Statement of Barclays in Response to Queries of Examiner, Mar. 2003 (the "Barclays Responses").

[16] *Id.*

[17] *See id.*

| | |
|---|---|
| December 1996 | Co-lead arranger and agent of refinancing of UK Power project |
| January 1997 | |
| February 1997 | |
| March 1997 | |
| April 1997 | |
| May 1997 | Joint book runner for offering of secured bonds guaranteed by Enron's subsidiary |
| June 1997 | Cash 5 SPE transaction |
| July 1997 | |
| August 1997 | |
| September 1997 | |
| October 1997 | |
| November 1997 | Chewco bridge financing |
| December 1997 | *Chewco transaction* |
| January 1998 | |
| February 1998 | |
| March 1998 | |
| April 1998 | |
| May 1998 | |
| June 1998 | Cash 6 QSPE transaction |
| July 1998 | |
| August 1998 | Bridge financing for acquisition of UK Water Company |
| September 1998 | |
| October 1998 | Sole placement agent for notes issued by JEDI SPV1 |
| November 1998 | Administrative agent and co-arranger of term loan facility to JEDI |
| | *Delta Commodity swaps (Prepay) ("Roosevelt")* |
| December 1998 | Lead private placement of monetization of a power contract |
| January 1999 | |
| February 1999 | |
| March 1999 | Joint book runner on bond issue |
| April 1999 | |
| May 1999 | |
| June 1999 | |
| July 1999 | Placement agent for private placement of notes |
| August 1999 | |
| September 1999 | Agent for syndicated financing to monetize a service contract |
| | Agent for credit facility to fund construction project |
| October 1999 | |
| November 1999 | |
| | *Yosemite Crude Oil swap (Prepay) ("Nixon")* |
| December 1999 | Agent for syndicated revolving credit facility and agent for financing of UK Power project |
| January 2000 | |
| February 2000 | |
| March 2000 | |
| April 2000 | Loan to Enron SPE (with total return swap) |
| May 2000 | |

- 7 -



A bold line indicates the end of a quarterly or yearly reporting period.

A number of the financing transactions between Enron and its affiliates, on the one hand, and Barclays, on the other hand, were "structured finance" transactions. Of particular relevance to the Examiner's analysis are: the 1997 transaction that bought out CalPERS' interest in a limited partnership via an Enron SPE (the "Chewco Transaction"); the December 2000 $110 million refinancing of a synthetic lease transaction (the "J.T. Holdings Transaction"); the September 2001 FAS 140 Transaction known as Nikita whereby Enron monetized its interests in the EOTT limited partnership (the "Nikita Transaction"); a September 2001 asset monetization transaction involving the transfer by Enron of interests in sulfur dioxide emission credits (the "SO₂ Transaction"); and

- 8 -

participation in three Enron Prepays in December 1998, December 1999 and September 2001.

Unlike many Financial Institutions discussed in this report, Barclays did not have a significant number of subsidiaries involved in the transactions discussed. Most of the relevant involvement was with the various divisions of Barclays Bank PLC.[18] The Examiner uses the term "Barclays" to refer generally to the institution as a whole. Similarly, the Examiner refers to "Enron" generally rather than identifying the specific Enron affiliate involved, as the specific affiliate is often not relevant to the subject matter of this Appendix.

*Barclays' Knowledge of Enron's Use of Structured Financings*

At least since 1996, Barclays understood that Enron used a myriad of financing structures that made an analysis of Enron's actual financial condition very difficult.[19] Barclays generally understood the reasons Enron entered into structured financings, and Barclays further generally understood the effect that such structures could have on Enron's financial statements.[20] Barclays believed that one could, with some work, at least estimate the balance sheet effect of some of the structures Enron used, such as

---

[18] Sworn Statement of Robert Clemmens, Chief Credit Officer, Barclays, to David Givelber, A&B, June 4, 2003 (the "Clemmens Sworn Statement"), at 11-12, 39-40.

[19] Sworn Statement of John Meyer, Director, Barclays, to David Givelber, A&B, Apr. 22, 2003 (the "Meyer Sworn Statement"), at 160-65. Robert Clemmens, Chief Credit Officer, Barclays, and John Meyer, Director, Barclays, Executive Summary of Enron Annual Review, July 2, 1999, at 2 (Ex. 9 to Clemmens Sworn Statement) [BRC 000105211-BRC 000105213].

[20] Meyer Sworn Statement, at 154-57, 160-65; Email from John Meyer, Director, Barclays, to Jonathan Taylor, Director, Barclays, and copies to Robert Clemmens, Chief Credit Officer, Barclays, Henry Pullman, Director, Barclays, Richard Williams, Director, Barclays, and George McKean, Director, Barclays, *et al.*, June 24, 1999 (the "1999 Meyer/Taylor Email"), at 1 (Ex. 8 to Clemmens Sworn Statement) [BRC 000106893-BRC 000106895]; Thomas Connor, Barclays, Enron Annual Review, Dec. 1, 1998 (the "Enron Annual Review, Dec. 1, 1998") [BRC 000107074-BRC 000107082]; John Meyer, Director, Barclays, Enron Interim Review, Barclays, Mar. 10, 1997 (the "Enron Interim Review, Mar. 10, 1997") (typewritten 1996 date is incorrect as evidenced by the substance of the document and a handwritten note next to the signatures "3/11/97") (Ex. 1 to Sworn Statement of Richard B. Williams, Director, Barclays, to James Grant, A&B, May 19-20, 2003) [BRC 000106700-BRC 000106704].

company-obligated preferred securities, minority interest financings, firm transportation agreements, synthetic leases and guarantees of unconsolidated entities. According to Barclays, these structures were either found on the balance sheet itself or within the footnotes to Enron's financial statements.[21] Barclays agrees, however, that no outsider could reasonably evaluate the magnitude or effect of some of Enron's other financing structures, such as its inventory financings, Prepay Transactions and Total Return Swap obligations incurred in connection with the FAS 140 transactions.[22] Such structures and obligations were either completely hidden or the extent of these structures and obligations were combined with other obligations, making it impossible to separate the effects of these financings from those of Enron's actual operations.[23]

Barclays was not an average user of Enron's financial statements. Barclays was one of Enron's Tier 1 banks and had significantly more access to Enron's management and financial information than most others. Barclays formally reviewed Enron's finances and creditworthiness annually.[24] Every two years, as a part of the annual review, Barclays had face-to-face meetings with Enron executives to ask them about, among other things, Enron's structured financing activities in order to properly evaluate Enron's creditworthiness.[25] During the years that Barclays did not meet with Enron regarding Enron's financial condition, Barclays had a telephone conference with Enron management to explore these issues.[26]

---

[21] Meyer Sworn Statement, at 194-96.

[22] *Id.* at 195-96.

[23] *Id.* at 194-95, 203, 207.

[24] *Id.* at 152-53.

[25] *Id.* at 167-68.

[26] *Id.* at 168.

At least since 1997, Barclays began deconstructing Enron's balance sheet to try and reclassify as "debt equivalents" various Enron obligations; these obligations eventually grew to include synthetic leases, minority interests, crude oil and natural gas prepays, take or pay transportation agreements, Total Return Swaps and the guarantees of unconsolidated affiliates' obligations, among other things.[27]    Access to Enron management, however, did not always appear to equate to accurate information from Enron management.  In late 1999, Barclays met with Phil Sisneros, an Enron officer, to discuss the 1998 year-end amount of Enron's prepay obligations.[28]    According to Barclays, Sisneros reported that Enron had only $500 million in outstanding prepay obligations.  In a late 2000 phone conference with Enron's management, Bill Brown, Enron's Deputy Treasurer, reportedly stated that Enron had no prepay obligations whatsoever.[29]  Enron's actual prepay obligations as of year end 1998 and 1999 were approximately $1.26 billion and 2.5 billion, respectively.[30]

By the end of 1998, Barclays senior management expressed concern about quantifying the amount of Enron's off-balance sheet liabilities — not only Enron's debt but Enron's "debt equivalents"[31] — and Barclays had concluded that Enron's increasing reliance on structured financing activities was having a material impact on Enron's financial statements.[32]  By early 1999, Barclays' top credit committee was making similar

---

[27] John Meyer, Director, Barclays, Enron Interim Review, July 18, 1997 (the "Enron Interim Review, July 18, 1997"), at 4 (Ex. 4 to Sworn Statement of Richard B. Williams, Director, Barclays, to James Grant, A&B, May 19-20, 2003) [BRC 000106659-BRC 000106664]; *see also* Meyer Sworn Statement, at 154-56.

[28] Meyer Sworn Statement, at 171-73.

[29] *Id.* at 173-74.

[30] Enron Corp. Chief Financial Officer Report, Aug. 13, 2001, at 2-11 [AB0247 02299-AB0247 02310].

[31] Meyer Sworn Statement, at 154-56.

[32] *Id.* at 154-57; Email from Henry Pullman, Director, Barclays, to Richard Williams, Director, Barclays, copies to John Meyer, Director, Barclays, *et al.*, and blind copy to Robert Clemmens, Chief Credit Officer,

inquiries.[33]   In investigating these concerns, Barclays concluded that Enron's material

structured financings added $4.6 billion to Enron's reported 1998 year-end debt of $7.4

billion,[34] increasing Enron's claimed debt to total capitalization ratio from 41.9% to 63%:

> [T]otal Enron year-end debt is therefore closer to $11,926 million than the
> year-end balance sheet's $7,357 million.  This compares to $7,048 million
> of book net worth at year-end, for an effective debt to total capitalization
> ratio of 63% versus Enron's claim (page 41 of the annual report) of
> 41.9%.[35]

The 1998 annual review described in detail the nature and amounts of Enron's

off-balance sheet debt and obligations:

### 4.    Financing Vehicles

> The preceding sections estimated equivalent interest expense and debt
> equivalents without providing much detail on how the vehicles work and
> why they may or may not be equivalent to borrowing money on the
> balance sheet.
>
> 1.    *Synthetic Leases* — The bank participates in one of Enron's
> synthetic leases. . . . Briefly, lenders extend a term loan to a trust which
> purchases the equipment from the company.  There are usually three debt
> tranches.  The first is essentially a corporate credit as it is totally amortized
> by rental payments from the corporate [sic].  The remaining two tranches
> rely on the value of the asset for full recovery. . . . This structure has been
> common place in the US market for about eight years.  Enron was among
> the first companies to utilize it.  Financial accountants treat the underlying
> asset as being sold and leased back; tax authorities see through it,
> recharacterize it as a loan and do not pass depreciation benefits onto to the
> lessor.   As noted above, Enron's minimum lease obligations have a

---

Barclays, Dec. 23, 1998 (noting "Enron's creativity in arranging interesting and highly structured financings, many of which are off balance sheet and may tend to present a challenge to financial analysts (ourselves included) to understand and appreciate the full picture of Enron's financial condition.") (Ex. 9 to Sworn Statement of Richard B. Williams, Director, Barclays, to James Grant, A&B, May 19-20, 2003) [BRC 000107039].

[33] Email from Henry Pullman, Director, Barclays, to Ian Jefferson, Barclays, and copy to Richard Williams, Director, Barclays, John Meyer, Director, Barclays, *et al.*, Mar. 10, 1999, at 1 [BRC 000106931-BRC 000106932]; Meyer Sworn Statement, at 154-57.

[34] Minutes of the Barclays Group Credit Committee Meeting, July 7, 1999 (the "July 1999 Group Credit Committee Minutes"), at 2 [BRC 000083254-BRC 000083256].

[35] John Meyer, Director, Barclays, Enron Annual Review, July 2, 1999 (the "Enron Annual Review, July 2, 1999"), at 10 [BRC 000106836-BRC 000106849].

present value of $1.5 billion, though not all of it comprises synthetic operating leases.

2.     *Company-Obligated Preferred Shares of Subsidiary Companies ([COP]s)* — This structure allows debt to "masquerade" as preferred equity on a company's balance sheet. . . . As noted earlier, Enron has $1.0 billion of [COP]s outstanding.

3.     *Deferred Revenue Financing* — A company will sell a given one-to three-year stream of production at a fixed price. Lenders will discount the proceeds. The company will group the item on the balance sheet under Other Liabilities or, in the event the amounts are material enough, will report it as Deferred Revenue Obligations. The company had $500 million of Deferred Revenue Obligations outstanding at year-end under Other Liabilities. Barclays provided the requisite swaps.

4.     *Minority Interest Financing* — Enron had two such structures outstanding at year-end: Rawhide and Nighthawk. They totaled $1.3 billion. In the structure, debt masquerades as a limited partnership interest and is therefore included in Minority Interest. . . . The structure has been in the market for about seven to eight years . . . .

5.     *Structured Sale of Equity Interest* — Enron executed two transactions at year-end that raised $1.0 billion and $600 million in the bank market to fund the purchase of 50% of the Azurix/Wessex Water Group and 49% of the Elektro Group by the Marlin and Firefly trusts, respectively. . . .

6.     *Nonrecourse Asset Sales* — It should be noted that Enron has monetized its in-the-money position with regard to long-term gas supply contracts, swaps and other price risk management instruments. . . . The transactions have been treated as true sales for accounting purposes and there is scant recourse to Enron. In some instances, Enron has provided liquidity support but not to any significant extent. [36]

The annual review of Enron's financial performance for 1999 was presented on August 16, 2000 and recommended setting total exposure limits at $749 million with an "'expandable' exposure policy, to be applied 'judiciously.'"[37]   Like the 1998 annual

---

[36] *Id.* at 11-12.

[37] John Meyer, Director, Barclays, Enron Annual Review, Aug. 16, 2000 (the "Enron Annual Review, Aug. 16, 2000"), at 1, 13 [BRC 000107402-BRC 000107414].

review, the 1999 annual review went into great detail about the nature and extent of

Enron's growing off-balance sheet obligations:[38]

<u>Off the Balance Sheet</u>

1. Not included on the balance sheet are:

    (i)   operating lease commitments with a present value of $710 million;
    (ii)  take or pay transportation commitments with a present value of $626 million;
    (iii) guarantees of unconsolidated subsidiaries totalling $1,804 million;
    (iv) forward contracts to buy 10.6 million Enron shares at $41.52/share;
    (v)  forward contracts to buy 6.4 million Enron shares for $19.59/share;
    (vi) forward contracts to buy 12 million Enron shares from JEDI at $41.52/share;
    (vii) a $420 million lease guarantee covering the Buckton Gas Storage facility sold years ago to KN Energy; and
    (viii) up to $500 million in letters of credit that must be posted or unfunded equity commitments that must be funded in the event Enron's credit ratings were to drop below investment grade.

. . .

After adding (1) the above $675 million off balance sheet, debt-like obligations, (2) $1,773 million of minority interest financings, (3) $899 million of cops, and (4) $11,697 million of balance sheet debt, and then subtracting $718 million of cash on hand, Enron's debt plus debt equivalents at the end of the first half are therefore closer to $14,326 million. This compares to $10,769 million of book net worth, for an effective debt to total capitalization ratio of 57.1%, versus Enron's calculation (on page 24 of their second quarter 10Q report) of 46.3%. The debt to market capitalization ($60.1 billion) ratio is 23.8%.

As a result of this review, Barclays' most senior credit committee stated that "it

could not shed the belief that Enron was paddling underneath the surface to hold on to its

investment grade status as it became harder and harder to replicate the previous years'

strong performances."[39]

Right before Enron collapsed, Barclays acknowledged internally at least part of

the role it played in Enron's financial statement obfuscation:

We are also aware that [Enron] enters into off-balance sheet transactions
whereby it sells and subsequently has the option to repurchase the assets.
(Barclays has currently purchased assets to a value of USD 1.5bn). These

---

[38] *Id.* at 10-11.

[39] July 1999 Group Credit Committee Minutes, at 3.

transactions have the effect of significantly under-stating the debt level and assets on the balance sheet.[40]

Despite Barclays' purported concerns regarding the extent of Enron's off-balance sheet activities and the difficulty they presented to an accurate analysis of Enron's true financial condition, Barclays continued to execute those types of transactions with Enron.

**B.    Barclays' Exposure to Enron**

Like many of the Financial Institutions that served Enron, Barclays continuously monitored its total credit exposure to Enron and its available credit capacity for additional Enron transactions.

As part of Barclays' annual review process, Barclays would review recently completed transactions, proposed transactions, total credit exposures, and remaining credit capacity. The Barclays credit officer responsible for Enron would then recommend the total exposure limits for Enron for the upcoming year and make a policy recommendation about whether to expand, decrease, or hold constant Barclays' Enron exposure.[41]

Barclays Credit Risk Management Department Credit Committee (the "CRMDCC") would review the proposed exposure limits and policy and, if warranted, recommend them to another Barclays' committee, the Group Credit Committee (the "GCC"), for final approval.[42] In addition, Barclays also conducted interim reviews on an

---

[40] Memorandum from Paul Le Versha, Barclays, to the Barclays Group Credit Committee, regarding a request to increase the loan sanction and commodities trading limits, Oct. 24, 2001, at 2 [BRC 000082893-BRC 00082895]. The $1.5 billion asset sale/repurchase arrangement referred to in the memorandum is the London Metals Exchange (LME) Warrant and Physical Metals Facility. *See* Barclays Responses, at 31. The Examiner has not fully examined this transaction (which did not involve a traditional SPE).

[41] *See, e.g.*, Enron Annual Review, July 2, 1999, at 1.

[42] *See* Sworn Statement of Richard B. Williams, Director, Barclays, to James Grant, A&B, May 19-20, 2003 (the "Williams Sworn Statement"), at 150; Meyer Sworn Statement, at 53-56.

as-needed basis. These interim reviews were often triggered by the proposal of an Enron transaction that exceeded Barclays' existing Enron credit capacity, and generally followed the same recommendation and approval process as the formal annual reviews.[43]

Barclays increased its total Enron Group exposure limits over the late 1990s. On July 22, 1998, continuing its upward trend, Barclays' total exposure limits for the Enron Group spiked to $2.187 billion in connection with Barclays' underwriting of more than $1 billion of the $3 billion of debt Enron raised to purchase Wessex Water PLC. At the same time, the bank adopted a "reduce" exposure policy.[44]

As the following chart demonstrates, beginning in late 1998, Barclays began to reduce or attempt to limit its total exposure to Enron:[45]

---

[43] *See, e.g.*, Enron Interim Review, Mar. 10, 1997.

[44] Enron Annual Review, Dec. 1, 1998, at 1.

[45] John Meyer, Director, Barclays, Enron Interim Review, Apr. 18, 1997, at 1 [BRC 000106680-BRC 000106687]; Enron Interim Review, July 18, 1997, at 1; John Meyer, Director, Barclays, *et al.*, Enron Annual Review, Oct. 22, 1997, at 1 [BRC 000106535-BRC 000106536]; John Meyer, Director, Barclays, *et al.*, Enron Interim Review, July 22, 1998, at 1 [BRC 000107156-BRC 000107160]; Enron Annual Review, Dec. 1, 1998; Minutes of Barclays GCC Meeting, Dec. 3, 1998 (the "December 1998 GCC Minutes") [BRC 000107016-BRC 000107018]; Enron Annual Review, July 2, 1999, at 1; Enron Annual Review, Aug. 16, 2000, at 1; John Meyer, Director, Barclays, Enron Annual Review, Oct. 29, 2001, at 1 (the "Enron Annual Review, Oct. 29, 2001") [BRC 000107822-BRC 000107834]; Memorandum regarding Enron Exposure, Nov. 9, 2001 (the "Enron Exposure Memorandum, Nov. 9, 2001"), at 1 [BRC 000107787-BRC 000107788].



In December of 1998, Barclays conducted its annual review of Enron's financial performance for 1998 and current exposure. Barclays recommended and adopted total Enron Group exposure limits of $1.489 billion and a "reduce" to $1.132 billion policy.[46] In this review, the GCC expressed concern over Barclays' due diligence regarding the extent of Enron's contingent liabilities.[47]  Nevertheless, on January 21, 1999, Barclays' GCC approved increasing limits to $1.523 billion in connection with two commodity prepay swaps totaling $500 million.[48]

Barclays' annual review of Enron's financial performance for 1998 was presented on July 2, 1999 after "the Bank had met with the company to discuss (i) the extent of their off-balance sheet financings and (ii) [Enron's] market and credit risk management

---

[46] Enron Annual Review, Dec. 1, 1998, at 1; December 1998 GCC Minutes, at 1.

[47] December 1998 GCC Minutes, at 3; Minutes of BarCap Credit Committee Meeting, Dec. 2, 1998 [BRC 000107069-BRC 000107070].

[48] Minutes of Barclays GCC Meeting, Jan. 21, 1999 [BRC 000106864-BRC 000106865].

controls . . . ."[49]  In this review, the Barclays credit officer recommended that Enron exposure be reduced to $785 million, excluding $180 million of exposure related to Azurix/Wessex Water PLC which would be kept separate from Enron going forward, and suggested a policy of "maintain."[50]

Barclays' participation in a string of transactions shortly before Enron's financial collapse triggered multiple exposure management discussions during the fall of 2001.  On September 24, 2001, Barclays GCC approved a loan of $160 million and trading limits of $25 million related to Colonnade, Ltd. in connection with the $SO_2$ Transaction.[51] However, the concerns of GCC members also increased during this time.  For example, "[t]he committee asked whether the [$SO_2$] deal was primarily for accounting/reporting reasons" and noted that "[t]he values of Barclays Bank suggest that we would be reluctant to do a deal that was done for solely accounting reasons."[52]  Nevertheless, the committee agreed to support the $SO_2$ Transaction and, on the following day, Barclays' Exposures Committee approved a loan of $235 million to Besson Trust in connection with the Nikita Transaction.[53]

On October 29, 2001, a draft annual review for the year 2000 was prepared which referenced existing Enron exposure limits of $696 million.[54]  However, the formal year

---

[49]  Enron Annual Review, July 2, 1999, at 1.

[50]  *Id.*

[51]  Minutes of Barclays GCC Meeting, Sept. 24, 2001 (the "GCC Meeting Minutes, Sept. 24, 2001") [BRC 000127899-BRC 000127901].

[52]  *Id.* at 2.

[53]  Minutes of Barclays Exposures Committee, Sept. 25, 2001 (the "September 2001 Exposures Committee Minutes") (Ex. 23 to Williams Sworn Statement) [BRC 000035922-BRC 000035923].

[54]  Enron Annual Review, Oct. 29, 2001, at 1 [BRC 000107822-BRC 0001077834].

2000 review never occurred because of Enron's collapse.   On November 9, 2001,

Barclays estimated that it had exposure limits to Enron of $728.9 million.[55]

---

[55] Enron Exposure Memorandum, Nov. 9, 2001, at 1.

### III.   BARCLAYS' ROLES IN SELECTED ENRON SPE TRANSACTIONS

Barclays played significant roles in a number of Enron SPE Transactions. This section focuses on Barclays' involvement in seven such transactions: J.T. Holdings, Nikita, Chewco, SO₂, and three Prepays. In J.T. Holdings and Nikita, Barclays requested, required and obtained from Enron verbal assurances covering the 3% equity risk required in the involved SPEs. The verbal assurances caused the SPEs to fail the 3% Equity Test and resulted in Enron improperly accounting for the transactions off balance sheet and inadequately disclosing their impact. Barclays helped structure and close SO₂, including creating and "seasoning" an SPE designed to meet Enron's accounting-driven requirements, despite knowing that the transaction could not properly be accounted for as an off-balance sheet "true sale." Barclays worked with Enron in structuring Chewco's equity with the result that the requisite amount was not at risk, thereby precluding Enron's ability to properly account for Chewco and JEDI off balance sheet. Finally, Barclays participated in the Nikita and three Prepay Transactions, despite understanding that the actual impacts of these transactions would not be discernable from Enron's financial statements.

### A.   Obtaining Verbal Assurances from Enron in the J.T. Holdings and Nikita Transactions

*J.T. Holdings*

In 1991, Citigroup arranged $381 million in financing to an Enron SPE for the purchase of five energy assets from Tenneco. Enron and Citigroup created a synthetic lease structure[56] pursuant to which the Enron SPE leased those assets to an Enron

---

[56] In a properly structured synthetic lease, the lessee is treated as the owner of the asset in question for federal income tax purposes (and thus entitled to both interest and depreciation deductions), but as the lessee under an operating lease for accounting purposes (and thus entitled to off-balance sheet accounting

affiliate.[57] In 1995, the parties to the transaction separated the synthetic lease structure

into four distinct synthetic lease transactions (one of the assets had already been disposed

of) and by 2000, only two assets remained: a methanol plant subject to $74 million of

debt and a storage facility subject to $36 million of debt.[58] Enron wanted to amend and

extend the synthetic lease structure to keep the financing off balance sheet and, in the fall

of 2000, Enron approached Barclays about participating in the new structure.

Enron proposed a five–year synthetic lease structure with two tranches of debt

and a certificate class of equity: A Notes in an initial principal amount of $86.9 million

(79% of the financing); B Notes in an initial principal amount of $19.8 million (18% of

the financing); and Certificates in the principal amount of $3.3 million (3% of the

financing). The A Notes were supported directly by Enron through a residual value

guarantee. The B Notes and Certificates were supported by the asset values of the

methanol plant and the storage facility.[59]

At the time Barclays was considering participation in the 2000 refinancing of J.T.

Holdings, Barclays understood that in order for the synthetic lease structure to work as

---

treatment). Most synthetic leases represent 100%, fully leveraged financings for the lessees, generally at a lower net occupancy cost than asset ownership or a traditional lease would provide. In order for the SPE to qualify for nonconsolidation accounting treatment, the SPE must comply with the provisions of EITF 90–15. Impact of Nonsubstantive Lessors, Residual Value Guarantees, and Other Provisions in Leasing Transactions, 1 EITF Abstracts (FASB) 90-15, at 623 (July 11, 1991). A party unrelated to the lessee must make a substantive investment (generally, at least a 3% equity contribution) in the SPE which remains at risk during the term of the lease. Under EITF 96-21, a guaranty of such equity by any other party (whether or not the lessee, an affiliate of the lessee, or another third party) would vitiate the "at risk" requirement of EITF 90-15, and mandate consolidation. Implementation Issues in Accounting for Leasing Transactions Involving Special-Purpose Entities, 2 EITF Abstracts (FASB) 96-21, at 891 (Sept. 19, 1996).

[57] Lease between State Street Bank and Trust Company of Connecticut and Enron Gas Processing Company, Dec. 31, 1999 [AB000117541-AB000117607, AB000117874-AB000118049].

[58] JT Holdings, Inc. Financing Issues presentation, Oct. 2000 (the "JT Holdings Presentation"), at 2 [AB0786 02056-AB0786 02062].

[59] Transaction Completed report, $110MM Synthetic Least of MTBE Assets, Dec. 11, 2000, at 2 [BRC 000052803-BRC 000052804].

intended by Enron, the assets had to be owned by an SPE that had to be capitalized with at least 3% independent, at risk equity so that the SPE would not be consolidated into Enron's financial statements.[60]    Barclays generally understood the 3% Equity Test for nonconsolidation of SPEs:

> Q.    And do you understand that that equity needs to be actually at risk to the entity that is providing the equity?. . . For non consolidation purposes?
>
> A.    At least at risk on the downside.  Downside risk, yes.  Upside risk, not necessarily.
>
> Q.    That equity portion can be structured so that the equity holder upside appreciation is limited?
>
> A.    That's correct.
>
> Q.    But the downside loss has to be all the entities that are providing the equity?
>
> A.    That's correct.
>
> Q.    How long have you had that understanding of the requirement for three percent at risk equity in order for the SPV not to be consolidated in the synthetic lease situation?
>
> A.    Going back to the early '90s.[61]

By the end of October 2000, Barclays was considering whether to participate in this new synthetic lease structure and, in particular, whether to provide financing for the B Notes and half of the Certificates.[62]    Barclays, however, was concerned about the residual value of the assets underlying the transaction.[63]    Repayment of the B Notes and

---

[60]  Meyer Sworn Statement, at 18-20.

[61]  *Id.* at 20-21 (objections of counsel omitted).

[62]  Email from George McKean, Director, Barclays, to Richard Williams, Director, Barclays, Oct. 30, 2000 [AB0786 02055].

[63]  Richard Williams, Director, Barclays, Transaction Comment regarding $110MM Synthetic Lease of MTBE Assets, Nov. 14, 2000 (the "Williams Transaction Comment, Nov. 14, 2000") (Ex. 26 to Williams

Certificates relied on residual asset values, either via Enron exercising the option to purchase the assets or via the SPE selling the assets to a third party at the termination of the lease.[64] In order to address the asset risk related to the B Notes and Certificates, Barclays sought and received verbal assurances from Ben Glisan, Enron's Treasurer, that Enron would assure repayment of the B Notes and the Certificates:

> We [Barclays] have had a number of conversations with Enron about the transaction risks and have agreed to go forward on the basis of explicit verbal support from the company's Treasurer. Specifically, Ben Glisan will commit to us that under all circumstances Enron will execute its purchase option at a price sufficient to repay in full the holders of the B notes and Certificates.[65]

Barclays confirmed that it required the verbal assurance in order to participate in the J.T. Holdings Transaction:

> Q.   Was a condition of Barclays' participation in the J.T. Holdings financing securing a verbal assurance?
>
> A.   Yes.[66]



---

Sworn Statement, duplicate with different Bates range) [BRC 000046269]; John Meyer, Director, Barclays, and Graham McGahen, Managing Director, Barclays, JT Holdings, Inc. Headroom Allocation, Nov. 7, 2000, at 2 (Ex. 5 to Meyer Sworn Statement) [BRC 000046255-BRC 000046256]. Meyer Sworn Statement, at 105-06.

[64] JT Holdings Presentation. If Enron exercised the lessee purchase section, it was required to do so at a price sufficient to cover the B Notes and Certificates. *See* Sworn Statement of George McKean, III, to David Givelber, A&B, Apr. 29, 2003 (the "McKean Sworn Statement"), at 150-53.

[65] Williams Transaction Comment, Nov. 14, 2000 (Ex. 26 to Williams Sworn Statement, duplicate with different Bates range). This assurance was communicated to Graham McGahen and Eric Chilton (Managing Director of Barclays' loan functions) on November 14, 2000. Email from Richard Williams, Director, Barclays, to Graham McGahen, Managing Director, Barclays, and Eric Chilton, Managing Director, Barclays, Nov. 14, 2000 (the "Williams/McGahen Assurance Email, Nov. 14, 2000") [BRC 000107369].

[66] Williams Sworn Statement, at 446-47. *See also* Minutes of the Barclays IBD Americas Committee Meeting, Nov. 13, 2000 (the "IBD Americas Committee Minutes, Nov. 13, 2000") ("agreement to proceed with this transaction [J.T. Holdings] is going to require confirmation directly from Enron that they stand behind this deal especially the B and C notes") [BRC 000052801].

Barclays ultimately held approximately $9 million of the B Notes, and approximately $1.3 million of the Certificates.[67]

The verbal assurance Barclays requested, required and obtained as a condition of participating in the J.T. Holdings Transaction caused Barclays' equity interest in the Certificates not to be at risk, thus requiring consolidation of the synthetic lease structure.[68]

*The Nikita Transaction*

The Nikita Transaction was a FAS 140 Transaction whereby Enron monetized all of its limited partnership interests and other ownership interests in EOTT Energy Partners, LP ("EOTT").[69] Besson Trust, the SPE that purchased (through Timber LLC) Enron's economic interests in EOTT in the Nikita Transaction, financed this purchase by issuing a Certificate of Beneficial Interest to Credit Suisse First Boston, Inc. ("CSFB") for approximately $8.1 million[70] and borrowing approximately $71.9 million from Barclays.[71]  Besson Trust's ability to repay this loan was supported through a Total

---

[67] Series B Trust Note, Dec. 7, 2000 [AB0069 01120-AB0069 01123]; Series C Trust Certificate, Dec. 7, 2000 [AB069 01128-AB069 01131].

[68] *See* In-Person Interview with Kimberly Scardino, former Manager, Andersen, by H. Bryan Ives III and William T. Plybon, A&B, May 29, 2003 (indicating that had verbal assurances from Enron covering the requisite 3% equity been revealed to Andersen, Andersen would have required the borrower-SPEs to be consolidated with Enron). *See also* In-Person Interview with John Stewart, former Manager, Andersen, by H. Bryan Ives III, A&B, June 12, 2003 (noting that the effect of a verbal assurance of repayment of the equity would be to require Enron to consolidate the borrower-SPE).

[69] The prior two Interim Reports discuss in detail the Nikita Transaction, and this Section should be read in conjunction with those Reports. First Interim Report, Section III, *The Nikita Transaction*; Second Interim Report, Annex 2 to Appendix M (FAS 140 Transactions).

[70] *See* Receipt of Trust, Sept. 28, 2001 (the "2001 Receipt of Trust") [AB000051509-AB00005150910].

[71] *See* Promissory Note in the Amount of $176,865,000 by Besson Trust in favor of Barclays, Sept. 28, 2001 (the "Besson Promissory Note") [AB000051361-AB000051363]. Barclays was the lead bank in a contemplated syndicate that had agreed to make up to $235 million available through the Nikita Transaction. *See* Enron Interoffice Memorandum from John Sullivan, Enron, to Kelly Boots, Enron, *et al.*, Sept. 18, 2001 (the "Sullivan/Boots Enron Memorandum") [AB000343540].

- 24 -

Return Swap with Enron North America,[72] which was guaranteed by Enron.[73]   The

Certificate entitles CSFB to receive its face amount plus a capped return of 15% per

year.[74]

Up until the day before the September 28, 2001 closing, Barclays intended to

purchase the Certificate, representing the equity investment in Besson Trust.[75]  Barclays,

however, was concerned about the value of the EOTT interests that were the subject of

the Nikita Transaction, the income generation and residual value of which were crucial to

the Certificate holder's recouping its investment and expected returns.[76]  Securing

assurance from Enron for the repayment of the Certificate interest was a priority for

Barclays:

> Q.   A condition of Barclays' participation in the Besson [Nikita] deal
>       was receipt of a verbal assurance; correct?
>
> A.   Correct.[77]

---

[72] This Total Return Swap was evidenced by an ISDA Master Agreement (Multicurrency-Cross Border) between Besson Trust and ENA, Sept. 28, 2001 [AB000051366-AB000051384], a Schedule, Sept. 28, 2001 between Besson Trust and ENA, modifying and supplementing that Master Agreement [AB000051385-AB000051399], and a Total Return Swap Confirmation between Besson Trust and ENA, Sept. 28, 2001 [AB000051400-AB000051410].

[73] Enron Guaranty between Enron and Besson Trust, dated effective as of Sept. 28, 2001 [AB000051411-AB000051419].

[74] See Section 5.01, Trust Agreement between Wilmington Trust Company and The Holders of Certificates, Sept. 28, 2001 [AB000051211-AB000051244]. There is no obligation to pay current yield on the certificate of beneficial interest; however, the certificate does accrue interest.  See id. Section 5.01(a)(iii).

[75] Email from Dave Mradula, Barclays, to Richard Pattinson, Barclays, et al., Sept. 27, 2001 [BRC 000036045]. The $8.1 million certificate represents more than 3% of Besson Trust's initial capitalization. Enron believed the equity position had to be at least 3% of the total planned capitalization of Besson, which was anticipated to be $235 million. Memo from John Meyer, Director, Barclays, regarding Monetization of EOTT Partnership Interest, Sept. 25, 2001 (Ex. 9 to Meyer Sworn Statement) [BRC 000035919-BRC 000035921].

[76] Meyer Sworn Statement, at 41-45.

[77] Williams Sworn Statement, at 428; see also Email from John Meyer, Director, Barclays, to John Sullivan, Director, Barclays, Richard Williams, Director, Barclays, Eric Chilton, Managing Director, Barclays, et al., Sept. 26, 2001 (the "2001 Meyer/Sullivan Email") (Ex. 8 to Meyer Sworn Statement) [BRC 000035918].

While Barclays would have preferred a written guarantee, it knew that a written guarantee likely would have precluded the off-balance sheet accounting treatment that Barclays understood was a principal purpose of the transaction from Enron's point of view.[78]

Ultimately, Barclays conditioned approval of the Nikita Transaction on obtaining the verbal assurance of repayment from a senior Enron officer.[79]

---

[78] Meyer Sworn Statement, at 122; Williams Sworn Statement, at 431.

Barclays was aware of the possibility that a verbal assurance, even if not legally binding, may have had an impact on Enron's accounting for the Nikita Transaction: "Q. Did you discuss with anyone internally whether or not the existence of a verbal assurance would undermine Enron's hoped-for accounting of the transaction? A. John Meyer and I had discussions in connection with verbal assurance. Q. Along the lines I just asked about? A. Yes. Q. What did you all say, what did you talk about, what was the discussion? A. John brought up the topic of verbal assurances and whether they may or may not have an impact on accounting and asked for my view. Q. And what was your view? A. That I did not have a specific knowledge of accounting treatment, but that I recognized these were not legal binding agreements." *Id.* at 428-29.

The Examiner has not been able to determine whether Barclays took any additional steps to determine whether the verbal assurance in Besson would undermine Enron's intended (and actual) accounting for the transaction: "Q. Was it your belief that because the verbal assurance was unenforceable as a legal matter, that because of that fact, it did not -- its existence did not undermine Enron's intended accounting treatment of the transaction? A. That was my layman's view, yes. Q. Did you consult with anybody about the correctness of your view that you reached? A. No." *Id.* at 431.

[79] 2001 Meyer/Sullivan Email (Ex. 8 to Meyer Sworn Statement). Barclays was even concerned about the effect of the survival of "verbal assurances from the CFO as support for the Trust's equity if the CFO's tenure was at all at risk." September 2001 Exposures Committee Minutes, at 2 (Ex. 23 to Williams Sworn Statement).



Sanction is conditioned on:

(1) confirmation of senior IBD support for the underlying transactions on relationship and risk/return grounds;

(2) written recording of senior Enron officers' (at least Treasurer and/or CFO) affirmation that Enron will ensure repayment of certificate investment; and,

(3) Global Loans using its best endeavors to reduce the agreed $40 million hold both in respect of the senior note and certificate component.

Barclays indicated that Enron's verbal assurance to make it whole was acceptable,

"[g]iven Enron's impeccable record in this regard to date."[80]

At the eleventh hour, Barclays and/or Enron realized that Barclays, due to regulatory reasons, could not hold the Certificate.[81]   In an effort to salvage the transaction, on September 27, 2001, Enron contacted Osmar Abib of CSFB[82] to request that CSFB provide the Besson Trust's equity funding as its certificate holder.[83]   CSFB

---

[80] Graham McGahen, Managing Director, Barclays, Managing Director's Comments regarding Enron – EOTT Monetization, Oct. 1, 2001 (the "McGahen EOTT Monetization Comments") (Ex. 10 to Meyer Sworn Statement) [BRC 000035915].

[81] Barclays claimed the reason it was not able to take the certificate position was because it legally could not hold equity interests. Williams Sworn Statement, at 433-34.  See also Email from James Moran, CSFB, to Robert Healey, CSFB, et al., Oct. 15, 2001 [CSFBCO 000097185-CSFBCO 000097186].

[82] Deposition of James Moran, CSFB, by Frank Smith, A&B, Apr. 16, 2003, at 102, lines 24-25 (the "Moran Deposition").

[83] Memorandum from Transaction Accounting, to the Project Nikita File, regarding the Nikita Transaction closing on Friday, September 28, 2001, Oct. 5, 2001, at 5 (discussing the accounting issues related to the proposed transaction) [AB000123311-AB000123316].

- 27 -

agreed to take the $8.135 million[84] Certificate in Besson Trust at the September 28, 2001 closing.[85]

As a condition of taking the Certificate, CSFB required Barclays to enter into a Total Return Swap, guaranteeing to CSFB the return of its investment in the Certificate:

> Q.   Was a condition of CSFB taking the certificates Barclays executing the total return swap with it?
>
> A.   Yes.[86]

Under the swap, Barclays agreed to pay to CSFB its investment in and the maximum return permitted by the Besson Trust Certificate and CSFB agreed to pay to Barclays the actual return it received from CSFB's interest in the Besson Trust Certificate.[87] Thus, the risk CSFB assumed associated with the Certificate was swapped back to Barclays.[88] Barclays did not hold the Certificate, but did, via the Total Return Swap, take the financial risk of the Certificate from CSFB. Thus, Barclays was the *de facto* equity holder in the Nikita Transaction.

Even though Barclays did not hold the Certificate, the verbal assurance from Enron covering the Certificate risk (risk that Barclays assumed via the Total Return

---

[84] Email from James Moran, CSFB, to Robert Healey, CSFB, *et al.*, Oct. 25, 2001 (Ex. 64 to Moran Deposition) [CSFBCO 000102521].

[85] *See* 2001 Receipt of Trust.

[86] Williams Sworn Statement, at 436, lines 4-8.

[87] Meyer Sworn Statement, at 150-52.

[88] Williams Sworn Statement, at 435, lines 10-19. This swap appears to have been (at least initially) an oral agreement between CSFB and Barclays – the Total Return Swap between Barclays and CSFB was not even drafted until the middle of October, 2001, several weeks after the Nikita transaction closed. *See* Email from James Moran, Director, CSFB, to Robert Healey, CSFB, Oct. 15, 2001 [CSFBCO000097185-000097186]. The Examiner has not been able to locate the executed Total Return Swap between Barclays and CSFB, but Barclays has confirmed it is honoring the swap agreement. Clemmens Sworn Statement, at 132-37.

Swap) survived the closing and served to cover Barclays' Certificate risk as the *de facto* equity holder:

> Q.    Verbal assurances still ran, whatever nature it took still ran to Barclays, who ultimately bore the risk on the certificates; right?
>
> A.    Yes.[89]

The verbal assurance from Glisan was the key to the failure of Enron's accounting treatment of the Nikita Transaction. Without the verbal assurance, Barclays would not have entered into the Total Return Swap with CSFB — after all, Barclays was unwilling to accept that same risk by taking the Certificate position directly, absent verbal assurance from Enron. And without the Total Return Swap, CSFB would not have agreed to hold the Certificate.[90]

Barclays knew that the Total Return Swap "[r]esult[ed] in CSFB having no risk of repayment on the certificates."[91] Similarly, Barclays knew that although it was the *de facto* equity holder, it did not have any equity risk either, because of Enron's verbal assurance to Barclays to cover that risk. Barclays knew the Besson Trust structure had to include at least 3% equity at risk, yet understood that neither the nominal nor *de facto* holder of the equity interest in fact bore any such risk. The elimination of the Besson Trust Certificate risk prevented Enron from properly giving the Nikita Transaction off-balance sheet treatment.[92] Thus, the verbal assurance Barclays demanded and received from Enron led directly to the failure of the 3% Equity Test.[93]

---

[89] Williams Sworn Statement, at 435-36

[90] *Id.*

[91] *Id.*

[92] *See* Second Interim Report, Appendix B (Accounting Standards), at 35-39.

[93] The Total Return Swap with CSFB itself likely caused the full amount of the Certificate investment to fail the 3% Equity Test, although the Examiner does not have evidence that Barclays understood the Total

B.    **Structuring and Closing the SO₂ and Chewco Transactions**

*The SO₂ Transaction*

*Summary of the Transaction.* The SO₂ Transaction (sometimes referred to by Barclays as "Noosa"), which closed on September 28, 2001 (for approximately $138.5 million) and was refinanced on October 30, 2001 (adding approximately $29.1 million), provided Enron with proceeds of approximately $167.6 million.[94] The SO₂ Transaction ostensibly dealt with the sale by an Enron subsidiary of SO₂ emission credits (the "Emission Credits") to a Barclays'-sponsored SPE, Colonnade Limited, a Guernsey company ("Colonnade"). However, both Enron and Colonnade entered into derivative transactions with Barclays, and the resulting circular transaction became in economic effect (if not in appearance) a secured loan.[95]

At the time of the sale of the Emission Credits, an Enron subsidiary bought a call option from Colonnade that allowed the subsidiary to purchase an identical number and vintage years of Emission Credits from Colonnade at any time at their then-current market price.[96] This Enron subsidiary also sold a put option to Colonnade that allowed Colonnade to require the subsidiary to purchase the same number and vintage years of Emission Credits at specified times, roughly 8, 9 and 10 months after the closing of the SO₂ Transaction, or upon the occurrence of specified conditions that approximate events

---

Return Swap, standing alone, would impair Enron's ability to properly account for Nikita off-balance sheet. *See* Second Interim Report, Appendix B (Accounting Standards).

[94] The Examiner previously reported on the SO₂ Transaction in each of the prior Reports. This Section should be read in conjunction with the SO₂ Transaction sections of those Reports. *See* First Interim Report, Section III, *The SO₂ Transaction*; Second Interim Report, Annex 1 to Appendix F (Miscellaneous Transactions).

[95] Second Interim Report, Annex 1 to Appendix F (Miscellaneous Transactions).

[96] *Id.*

of default in loan transactions.[97]   If the price of the Emission Credits did not change, the transaction would look very much like a loan:   Enron had transferred the Emission Credits for $167.6 million; it could reverse the transaction at any time (i.e., prepay the loan) by exercising the call option; and Colonnade could also reverse the transaction (i.e., collect the loan) by exercising the put option.[98]

The apparent intent of the parties was to structure a financing transaction that shared the economic characteristics of a loan but would permit Enron to record the proceeds of the borrowing as cash flow from operating activities.   To accomplish this end, it was necessary to eliminate, or at least manage, the market price risk of the Emission Credits.   Accordingly, both Enron and Colonnade entered into swap agreements with Barclays.[99]   The parties used swaps and the put option, combined with the security arrangements between Barclays and Colonnade, to accomplish this objective through a circular transaction.   If the price of the Emission Credits increased, Barclays would pay the increase to Enron under the swap; Enron would pass it on to Colonnade under the put; and Colonnade would pay it back to Barclays under the other swap.   If the price declined, the amount of the decline flowed the other way.   Either way, Barclays, which was the source of Colonnade's money, would have been repaid.   Enron would have repaid the original purchase price and would have the Emission Credits back no matter what their market value might be.   In short, the market risk of the Emission Credits would have

---

[97] For the October 2001 refinance, another Enron subsidiary was added as the obligor on the put option held by Colonnade. *Id.*

[98] *Id.*

[99] *Id.*

stayed with Enron in spite of the purported sale.[100]    Enron's bankruptcy intervened,

however, to prevent these intended results.

    *Barclays Structures Colonnade.*  The final form of the $SO_2$ Transaction appears to

have been the result of close collaboration between Enron and Barclays.    Most

significantly, Barclays set up and "seasoned" Colonnade for the $SO_2$ Transaction.

Barclays attempted to do so according to requirements provided by Andersen via Enron,

even pushing two short-dated commodity trades through Colonnade in order to establish

a trading history for the SPE.

    Enron told Barclays that Andersen had come up with a US GAAP off-balance

sheet "smell test" for SPEs in order to obtain off-balance sheet treatment:[101]

---

**Fanor, Patricia:BS (NY)**

| | |
|---|---|
| From: | Woodhams, Martin: Commodities (LDN) |
| Sent: | 25 April 2001 14:52 |
| To: | Woodhams, Martin: Commodities (LDN) |
| Subject: | Enron Structure SPV'S AND USGAAP |

    Arthur Andersen have applied a US GAAP smell test on SPV's stating that any financing structure that uses a run of the mill SPV will not be given off-balance sheet treatment.

    Enron have successfully used a structure that is an orphan SPV with a few twists that passes the smell test.

    Key characteristics :
        Entity is not called an SPV, they referred it to as a swapco
        Bank is the sponsor of the swapco but has zero equity holding, the swapco does not consolidate up on to the banks balance sheet..
        Swapco has a been established for some number of years.
        Swapco has had a history of multiple transactions pushed through it.
        Swapco directors are the lawyers who set it up.
        Costs for setting up the swapco are not seen to be paid by Enron.
        In the case where swapco has no transaction history, the bank will state to Enron that the swapco will in the future do different transactions.

---

    Despite knowledge of these requirements, Colonnade failed to pass the Andersen

smell test.    First, Colonnade was not established for "some number of years"; rather, it

---

[100] *Id.*

[101] Email from Martin Woodhams, Director, Barclays, to Martin Woodhams, Director, Barclays, Apr. 25, 2001 (regarding Enron structure, SPV's and US GAAP) (Ex. 5 to Sworn Statement of Martin Woodhams, to James Grant, A&B, Apr. 16, 2003) [BRC 000096518].

was established only a few weeks before the $SO_2$ Transaction closed.[102]  Next, Colonnade

did not have a legitimate history of engaging in multiple transactions.  In an attempt to

create this history, Barclays planned and ultimately executed two short-dated trades[103]

that Barclays believed would meet the "multiple transactions" requirement:[104]

| 2. Business Proposal description | The monetization receives off balance sheet accounting treatment by fulfilling the following two conditions. a) Occurrence of an inventory true sale, whereby legal title and beneficial ownership passes from the client to another party. b) A true sale and resulting hedge that is transacted between three independent parties, necessitating an SVP. Recent tightening of US GAAP regulations with regard to SVP's, has led to the need of incorporating an SVP that closely resembles an operating company. To this end the SVP will before it transacts with Enron, undertake a small number of short dated FX, metal funding and murabaha transactions. This diverse transactional trading history is crucial to the success of achieving off-balance sheet treatment for our client. Once the Enron transaction closes it is not intended that any further transactions will be entered into by the SPV. |
| --- | --- |

---

[102] Second Interim Report, Annex 1 to Appendix F (Miscellaneous Transactions), *Economics and Allocation of Risk in the $SO_2$ Transaction*; First Interim Report, Section III, *The $SO_2$ Transaction*.

[103] Memorandum from Martin Woodhams, Director, Barclays, to New Products Committee, regarding Commodities – Structuring Group Product Extension for Colonnade Limited, Sept. 6, 2001 (the "Woodhams Colonnade Memorandum, Sept. 6, 2001"), at 2-3 [BRC 000082621-BRC 000082629]; Sworn Statement of Martin Woodhams, to James Grant, A&B, Apr. 16, 2003 (the "Woodhams Sworn Statement"), at 141.

[104] Memorandum from Martin Woodhams, Director, Barclays, regarding NOOSA:    Inventory Monetization New Product Proposal, Aug. 30, 2001 (the "Woodhams NOOSA Memorandum, Aug. 30, 2001"), at 2 (Ex. 16 to Woodhams Sworn Statement) [BRC 000082646-BRC 000082650].

In an apparent desire to ensure that Colonnade met every requirement Enron identified, Barclays merely highlighted its practical control of the purportedly independent entity. Barclays gave assurances to Enron regarding Colonnade's intended transactional history, business limitations, business partners and unencumbered assets, months before Colonnade was created (or even named). Email from Martin Woodhams, Director, Barclays, to Soma Gosh, Enron, June 22, 2001 (Ex. 13 to Woodhams Sworn Statement) [BRC 000096428-BRC 000096429]. In addition, Barclays arranged and made a number of loans to and arranged trades on behalf of Colonnade prior to receiving any such authority or instructions from Colonnade itself. *See* Woodhams Sworn Statement, at 35-46; Services Deed between Colonnade and Barclays Physical Trading Limited, Sept. 28, 2001 [AB000497808-AB000497832]; Email from Martin Woodhams, Director, Barclays, to Benoit de Vitry, Managing Director, Barclays, Sept. 20, 2001 (confirming a $40,000 nine month working capital loan and $2 million three month committed money market facility to Colonnade and a $700,000 authorization to Westpac for collateral) [BSX 01407]; Email from Martin Woodhams, Director, Barclays, to Simon Klimt, Product Head Commodities, Westpac Institutional Bank, Sept. 20, 2001 (regarding commodity trades) (Ex. 19 to Woodhams Sworn Statement) [BSX 01393].

In addition to the "smell test" criteria, Enron also told Barclays the SPE had to have a substantive business purpose:[105]



```
-----Original Message-----
From: Williams, Richard: IBD (NYK)
To: Woodhams, Martin: Commodities (LDN)
Sent: 25/06/01 18:31
Subject: Noosa

I spoke again with Joe Deffner and he reiterated that he is confident of
our ability to execute and close. The concern he has is with the
demonstration of a substantive business purpose for the SPV vehicle.
Otherwise, the accounting treatment may be jeopardized.
```

Barclays denies that the short-dated trades were an attempt to demonstrate such a substantive business purpose for Colonnade; rather, Barclays states that the trades were to establish the requisite trading history.[106] Finally, Barclays acknowledged the fact that the costs for setting up Colonnade were paid by Enron in its engagement letter for the $SO_2$ Transaction, which specifies that Enron "will pay all out of pocket expenses (including legal fees) which are incurred by Barclays Capital in connection with the creation of an insolvency remote cell for Swap Co."[107]

---

[105] Email from Richard Williams, Director, Barclays, to Martin Woodhams, Director, Barclays, June 25, 2001 (regarding Noosa) (Ex. 14 to Woodhams Sworn Statement) [BRC000096528].

[106] Woodhams Sworn Statement, at 177.

[107] Letter from Benoit de Vitry, Managing Director, Barclays, to Soma Ghosh, Enron, June 6, 2001, at 1 [BRC 000096431-BRC 000096436]; Email from Soma Ghosh, Enron, to Martin Woodhams, Director, Barclays, and Richard Firth, In-House Counsel, Barclays, June 8, 2001 (acknowledging that "the engagement letter is absolutely fine.") (Ex. 9 to Woodhams Sworn Statement) [BRC 000096117].

Despite all of Barclays' efforts to ensure that Colonnade would act as a legitimate purchaser of the Emission Credits, the Examiner has previously concluded that Colonnade did not, in fact, obtain the beneficial interests in those credits in the $SO_2$ Transaction, that a "true sale" did not occur, and that Enron improperly failed to account for the transaction as a secured borrowing.[108]  Barclays also appears to have suspected that its efforts to establish Colonnade as something other than an Enron SPE were not entirely successful – in November 2001, when Enron was forced to consolidate Chewco, Barclays expressed relief that Colonnade was not also identified as needing to be consolidated: "[t]he upside in this report is that there is no mention of Colonnade!"[109]

*Barclays' Marketing Materials.*    Beginning in April 2001, Barclays began creating general marketing materials to try and sell to other clients Barclays' off-balance sheet inventory monetization facilities.[110]  In these marketing materials, Barclays noted that in order for the inventory monetization facility to achieve off-balance sheet treatment, the inventory seller (Barclays' client) must not be required to repurchase the inventory, either as a function of the structure or due to economic imperatives.[111]

---

[108] Second Interim Report, Annex 1 to Appendix F (Miscellaneous Transactions); First Interim Report, Section III, *The SO₂ Transaction.*

[109] Email from Martin Woodhams, Director, Barclays, to Jason Tudor, Barclays, Nov. 8, 2001 (regarding Enron having to consolidate 3 entities) [BRC 000095889].

[110] *See, e.g.,* Barclays Capital Commodities Off-Balance Sheet Inventory Monetization Facility Presentation, Apr. 2001 (the "Barclays Off-Balance Sheet Presentation, Apr. 2001") (received in email from Martin Woodhams, Director, Barclays, to Brian Smith, Director, Barclays, May 16, 2001) [BRC 000096465-BRC 000096487]; Barclays Capital Commodities Off-Balance Sheet Inventory Monetization Facility Presentation, June 19, 2001 (the "Barclays Off-Balance Sheet Presentation, June 19, 2001"), at 7-27 (received in email from Martin Woodhams, Director, Barclays, to James Ritchie, Barclays, June 19, 2001) [BRC 000095948-BRC 000095974].

[111] *See, e.g.,* Barclays Off-Balance Sheet Presentation, Apr. 2001, at 11; Barclays Off-Balance Sheet Presentation, June 19, 2001, at 13; Barclays Capital Commodities Off-Balance Sheet Inventory Monetization Facility Presentation (the "Barclays Off-Balance Sheet Presentation, undated"), at 9, (regarding "[a] very large discount creates an overwhelming economic imperative for the client to take material back but is likely to prevent the structure providing [sic] off-balance sheet accounting treatment as a true sale has not occurred.") (Ex. 1 to Woodhams Sworn Statement) [BRC 000095925-BRC 000095942].

Barclays, however, knew that the $SO_2$ structure and pricing created an incentive for Enron to repurchase the $SO_2$ inventory, and that the structure itself gave Colonnade the ability to force Enron to repurchase the inventory:

> [W]ithin the structure Barclays is repaid by either Enron exercising their call option over the inventory (the expected route) or by Colonnade exercising its put option (written by Enron) over the same inventory. . . . This key feature compels Enron (whilst solvent) to always repurchase the entire monetized inventory. [112]

The existence of the put option means that Enron can be compelled to repurchase the entire monetized inventory. None of Barclays' marketing materials for its inventory monetization facilities reflect the existence of the put option feature, perhaps because Barclays correctly concluded that such a feature would undermine the off-balance sheet accounting goals. [113]

Finally, Barclays' internal analysis suggests that Barclays knew that the $SO_2$ Transaction could not qualify as a "true sale" (and thus be accounted for off balance sheet) because the beneficial interests in the assets remained with Enron in the $SO_2$ structure: "[T]he economic risk and rewards of the commodity assets held by the SPV will remain with the client by virtue of the back-to-back hedging transactions."[114]

*Barclays' External Accountants.* Barclays consulted with PricewaterhouseCoopers ("PWC") regarding whether Barclays had to consolidate Colonnade in its financial statements. PWC told Barclays that Barclays did not have to

---

[112] Email from Martin Woodhams, Director, Barclays, to Hugh Finlay, Barclays, Oct. 24, 2001 (the "Woodhams/Finlay Sox Email, Oct. 24, 2001"), at 3 (Business case update to Enron Sox monetization) [BRC 000095599-BRC 000095601].

[113] *See, e.g.,* Barclays Off-Balance Sheet Presentation, Apr. 2001; Barclays Off-Balance Sheet Presentation, June 19, 2001, at 7-27.

[114] Email from Pritesh Pankhania, Barclays, to Martin Woodhams, Director, Barclays, *et al.,* July 13, 2001 (the "Pankhania/Woodhams Noosa Email, July 13, 2001"), at 2 (regarding Project Noosa – Accounting Note) (Ex. 15 to Woodhams Sworn Statement) [BSX 01216-BSX 01217].

consolidate Colonnade, but on at least three occasions, PWC told Barclays that Enron

likely would have to consolidate Colonnade:

- "First thoughts are that the energy company is likely to be the sponsor of the SPV and hence will be required to consolidate that SPV . . . ."[115]

- "Looks okay – I'm concerned about whether this works for your client."[116]

- "I am still worried about whether this works for your client. It looks risky for them from an accounting perspective."[117]

Barclays understood that PWC had identified "true sale" defects in the $SO_2$

structure that would require Enron to consolidate Colonnade:[118]

---

[115] Email from James Hewer, PWC, to Martin Woodhams, Director, Barclays, Sept. 3, 2001 (the "Hewer/Woodhams Email, Sept. 3, 2001") [BSX 01538].

[116] Email from Richard Oldfield, PWC, to Pritesh Pankhania, Barclays, Sept. 7, 2001 (the "Oldfield/Pankhania Email, Sept. 7, 2001") [BSX 01229].

[117] Email from Richard Oldfield, PWC, to Pritesh Pankhania, Barclays, Sept. 10, 2001 (the "Oldfield/Pankhania Email, Sept. 10, 2001") [BSX 01212-BSX 01215].

[118] Email from Pritesh, Barclays, to Frank McGarahan, Barclays, *et al.*, July 13, 2001 (the "Pankhania/McGarahan Noosa Email, July 13, 2001") (Ex. 15 to Woodhams Sworn Statement) [BSX 01216-BSX 01217].

----Original Message----
From: Parikhanta, Pritesh: Finance (LDN)
Sent: 13 July 2001 14:59
To: McGarraIuan, Frank: Barclays Capital
Cc: LaRocca, Gerard: Operations (LDN); Blackbum, Michael: Finance (LDN) .
Subject: FW: Project Noose - Accounting note

Frank

We had a meeting yesterday with PWC (Richard Oldfield) to discuss the accounting treatment for Project Noose. Based on this I have set out the appropriate accounting treatment in the note below.

From our side we had representatives from the business (Martin Woodhams), Legal (Richard Firth & Rod Smith) and Regulatory (John Shone).

One issue raised at the meeting was that although BBPLC would not need to consolidate the SPV, it is highly likely that client would need to consolidate the SPV under both UK and US Gaap. This is because the potential upside and downside of the SPV assets continue to remain with the client and hence they have a beneficial interest in the SPV. It was agreed that when marketing this product, the client should be advised

78 ·

that it would need to obtain its own independent professional advice on whether this structure works for them from an accounting point of view.

Please call me if you need any further information.

Regards

Pritesh

On September 25, 2001, three days before the $SO_2$ Transaction was to close, Barclays notified Enron that PWC had concerns about whether Enron could account for the $SO_2$ Transaction off-balance sheet.[119]  Barclays summarized this call as follows: [120]

---

[119]  Email from Martin Woodhams, Director, Barclays, to Richard Firth, In-House Counsel, Barclays, Sept. 26, 2001 (the "Woodhams/Firth Email, Sept. 26, 2001") (regarding File Note: Soma Ghosh/Martin Woodhams PWC Accounting Issue) [BSX 01318].

[120]  Id.

Dzikowski, Bart:BK3 (NY)

From:           Woodhams, Martin: Commodities (LDN)
Sent:           26 September 2001 15:21
To:             Firth, Richard: Legal (LDN)
Subject:        File Note : Soma Ghosh/Martin Woodhams PWC Accounting Issue


          Date : Tuesday Sept 25th      Time: 9.35pm          Location: MW's desk (taped phone)         Call
Duration :12 minutes

          Soma Ghosh, lead Enron person on the Noosa transaction was expressly called to discuss the PWC accounting
issue.
          Richard Firth overheard both MW and Soma's entire conversation.
          MW stated that a positive PWC opinion on the structure from BBPLC's perspective had been received.
          This opinion made reference that PWC did not understand how the client would get their auditors to allow off-
balance sheet treatment for the structure.
          Soma stated that:         Enron had worked very closely with Arthur Andersen to achieve off-balance sheet
treatment.
                                   The structure was "aggressive" in accounting terms, but had received internal signoff
from both the structuring and accounting departments.
                                   Enron fully recognised that the legal and accounting risk of the structure succeeding was
Enron's.


          Martin

Barclays claims that Enron's explanation was sufficient, and Barclays proceeded

with the transaction as a result.[121]  However, Barclays' continuing documentation of the

issue suggests there was still concern at Barclays as to whether Enron would be able to

use its intended accounting for the transaction:

> As at 27th September, [Richard Firth, Barclays' counsel,] confirmed that
> although a draft paper had been circulated, there was still an issue with the
> proposed transaction regarding whether it qualifies as a true sale.  A
> solution was being sought with Enron, with the intention of still getting
> sign off from [New Product Committee] members and the [Global Credit
> Committee] and proceeding with the transaction by COB Friday 28th
> September.[122]

The Examiner has found no evidence to suggest that Barclays was told or given

anything by Enron rebutting PWC's analysis or explaining why the $SO_2$ structure could

properly be accounted for off-balance sheet.

---

[121]  Woodhams Sworn Statement, at 95.

[122]  Minutes of the Barclays Capital Global New Product Committee Meeting, Sept. 24, 2001 (the
"September 2001 New Product Committee Minutes"), at 4 [BSX 01198-BSX 01201].

*Accounting Impact.* Barclays understood the effect that the off-balance sheet reporting would have on Enron's financial statements. In trying to market its own inventory monetization facility, Barclays touted the off-balance sheet benefits of such a facility: [123]



In addition, given that Barclays understood that Enron was going to treat the $SO_2$ Transaction as an off-balance sheet "true sale," it can be inferred that Barclays understood that Enron intended to book a gain and cash flow from operating activities from the "sale" of the $SO_2$ emission credits.

Of course, if the transaction were improperly accounted for off-balance sheet, the aforementioned benefits would be improperly reflected in Enron's financial statements.

---

[123] *See* Barclays Off-Balance Sheet Presentation, June 19, 2001, at 10.

That is, the financial statements would incorrectly reflect decreased assets, interest expense and debt, Enron's gearing ratios[124] would look significantly better than they should have, and Enron would have improperly booked a gain and cash flow from operating activities from the transaction.

Barclays also understood that Enron was looking to the $SO_2$ Transaction as a third quarter reporting boost: "The urgency of this deal arises because of the approaching quarter-end reporting date."[125]

As late as a week before $SO_2$ closed, Barclays highest credit committee expressed concern about Enron's motivation for the transaction:

> The committee asked whether the deal was primarily for accounting/reporting reasons. The values of Barclays Bank suggest that we would be reluctant to do a deal that was done for solely accounting reasons.[126]

The committee apparently accepted the proffered explanations — "It was argued that the purpose of the loans was for liquidity management rather than just an accounting transaction"[127] — and agreed to support the transaction.

*The Chewco Transaction*

In the spring of 1997, Enron was trying to find a way to buy out CalPERS' 50%

---

[124] The financial ratios, such as debt-to-capitalization, that analysts look at to evaluate a company's performance or creditworthiness.

[125] Minutes of Barclays GCC, Sept. 24, 2001 (the "September 2001 GCC Minutes"), at 2 (Ex. 3 to Woodhams Sworn Statement, duplicate with different Bates range) [BRC 000127899-BRC 000127901]. *See also* Woodhams Sworn Statement, at 116 ("Q. Did anyone at Enron ever inform you they wanted it done by September 30[th] so it could be in their quarter-ending financial statements, or the results of the transaction could be in the quarter-ending financial statements? A. Yes. . . .").

[126] September 2001 GCC Minutes, at 2.

[127] *Id.* This explanation neither addresses the need to close by quarter-end (even if that meant that the deal would only be for one month) nor does it suggest the substance of the deal involves a "true sale," where Enron would give up its beneficial interests in the Emission Credits, rather than a financing.

interest in the JEDI investment partnership.[128]    Enron had treated JEDI as an unconsolidated affiliate, and it wanted to keep JEDI unconsolidated even after the redemption of CalPERS' interest.[129]    With this goal in mind, Enron formed Chewco Investments, L.L.C. ("Chewco") to acquire CalPERS' interest in JEDI.[130]    In November 1997, Chewco indirectly acquired CalPERS' 50% interest[131] in JEDI in a transaction financed by JPMorgan Chase and Barclays and guaranteed by Enron.[132]    In December 1997, Chewco Investments, L.L.C. was converted into a limited partnership[133] with SONR #1 as its general partner and Big River as its limited partner.[134]    SONR #1 had an obligation to contribute $114,900 to Chewco,[135] and Big River had an obligation to contribute $11.4 million,[136] for a total initial equity in Chewco of approximately $11.5 million, exactly 3% of its total assets as of December 30, 1997.

---

[128] The Second Interim Report discussed the Chewco Transaction and this Appendix should be read in conjunction with the *Chewco Transactions* Annex of that Report. *See* Second Interim Report, Annex 1 to Appendix L (Related Party Transactions), *Economics and Allocation of Risk in Chewco*.

[129] Agenda for Enron Board Executive Committee Meeting, Nov. 5, 1997, at 3 (slide presentation "Project Chewco") [AB000001745-AB000001751].  *See also* Minutes of Enron Board Executive Committee Meeting, Nov. 5, 1997, at 2 [AB000001740-AB000001743].

[130] *See* Chewco Presentation Memorandum to the JEDI team from Vinson & Elkins, regarding the proposed structure of a CalPERS Redemption/Chewco purchase transaction, Sept. 3, 1997, at 5, 13 [AB000001831-AB000001900].

[131] Subscription Agreement among JEDI and Chewco Investments, L.L.C., Nov. 6, 1997 [AB000465779-AB000465802]; Redemption Agreement between JEDI and CalPERS, Nov. 6, 1997 [AB000465831-AB000465837].

[132] Project Chewbacca Closing Documents, by and between Chewco, *et al.*, as Borrowers, Enron Corp., as Guarantor for Borrowers, and Chase, as the Bank, Nov. 6, 1997 [AB000465841-AB000465843]; Project Chewbacca Closing Documents, by and between Chewco, *et al.*, as Borrowers, Enron, as Guarantor for Borrowers, and Barclays, as the Bank, Nov. 6, 1997 [AB000465838-AB000465840].

[133] Chewco Investments, LLC Certificate of Conversion to Limited Partnership, Dec. 16, 1997 [AB000465803]; Certificate of Limited Partnership of Chewco Investments, L.P., Dec. 16, 1997 [AB000465804].

[134] Section 3.1, Agreement of Limited Partnership of Chewco Investments, L.P., Dec. 19, 1997 (the "Chewco Limited Partnership Agreement"), at 7 [AB000001800-AB000001827].

[135] *Id*. Signature Page (showing each entity's capital contributions).

[136] *Id*.

Barclays was involved in the original financing for JEDI and, in March of 1996, was approached by Enron to come up with potential restructuring ideas for CalPERS' interest in JEDI.[137] From the beginning of the project, Barclays knew that Enron's goal in the restructuring was "to maintain the off-balance sheet, non-recourse status achieved under the contingent equity structure of the existing JEDI deal."[138] Indeed, Barclays later described off-balance sheet treatment as "JEDI's raison d'être."[139]

While it appears that Enron took the lead in structuring the Chewco Transaction, Barclays played a crucial role in structuring the equity investment portion of the transaction. Ultimately, Barclays' requirement that its equity investment in Chewco, via Big River and Little River (Big River's sole member and manager), be protected[140] was fatal to Enron's known requirement that Chewco and JEDI not be consolidated into Enron's financial statements.

Initially, Barclays was considering a $5 to $10 million "quasi-equity" investment in Chewco that Barclays was trying to structure and record as debt.[141] In order to ensure that this "quasi-equity" investment would be repaid to Barclays, Barclays and Enron initially contemplated a structure wherein Chewco would enter into an advisory arrangement with Barclays, through which Barclays would receive an annual advisory fee

---

[137] Memorandum from George McKean, Associate, Barclays, regarding restructuring of JEDI, Mar. 12, 1996 (the "1996 McKean JEDI Memorandum"), at 1 [BRC 000012568-BRC 000012569].

[138] *Id.* at 2. *See also* Meyer Sworn Statement, at 59-66.

[139] Email from Henry Pullman, Director, Barclays, to Robert Clemmens, Chief Credit Officer, Barclays, Oct. 14, 1998, at 1 [BRC 000001931-BRC 000001932].

[140] McKean Sworn Statement, at 116-17; Letter from George McKean, Director, Barclays, Sal Esposito, Director, Barclays, and Richard Williams, Director, Barclays, to Bill Brown, Enron and Michael Kopper, Enron, Nov. 20, 1997 (the "McKean Letter to Bill Brown and Michael Kopper, Nov. 20, 1997"), at 1 (Ex. 4 to McKean Sworn Statement) [BRC000003411-BRC000003412].

[141] Minutes of the Barclays Operations Committee Meeting, Oct. 20, 1997 (the "October 1997 Operations Committee Minutes"), at 2 (Ex. 3 to McKean Sworn Statement) [BRC 000004670-BRC 000004675].

- 43 -

from Chewco.[142]  The total fees due under the advisory arrangement were contemplated to equal the amount of Barclays' equity investment.  For example, if Barclays made a $5 million investment with a five year term, it would receive a $1 million per annum fee.[143] The advisory fee would be counted as an existing commitment of JEDI.  Because JEDI would have $105 million available under its revolver and it could draw from that revolver to fund existing commitments, Barclays knew at least some of the advisory fee would be paid.[144]

Barclays understood that the advisory fee arrangement would "essentially limit the equity investment's down side to an IRR of -0-,"[145] – in other words, eliminate the risk of Barclays losing its principal investment.[146]  Indeed, Barclays intended to characterize the equity investment as a loan, primarily by limiting the risk of loss on the principal.[147]

As the Chewco deal evolved, the structure changed; deriving a mutually acceptable structure was a "joint effort" between Barclays and Enron.[148]  Enron told Barclays that the proposed advisory fee structure "didn't work for accounting reasons."[149] The advisory fee concept was ultimately replaced with reserve accounts, which were

---

[142] McKean Sworn Statement, at 87-88; Memorandum from John Meyer, Director, Barclays, to Helen Calvelli, Director, Barclays, Richard Williams, Director, Barclays, and John Sullivan, Director, Barclays, regarding proposed structure for buyout of CalPERS interest in Chewco, Sept. 10, 1997, at 2 (Ex. 4 to Meyer Sworn Statement) [BRC 000003598-BRC 000003599].

[143] October 1997 Operations Committee Minutes, at 2 (Ex. 3 to McKean Sworn Statement).

[144] *Id.*; McKean Sworn Statement, at 89-90.

[145] John Meyer, Director, Barclays, JEDI Annual Review, Sept. 17, 1997 (the "JEDI Annual Review, Sept. 17, 1997"), at 1 [BRC 000003577-BRC 000003581].

[146] In internal presentations Barclays described its goals for securing the "equity": "Enron will be limiting our downside to a 0% return by paying us fees guaranteeing our return of capital." *Id.* at 4.

[147] *Id.* at 1.

[148] McKean Sworn Statement, at 67-68.

[149] *Id.* at 92.

- 44 -

designed to guarantee the repayment of at least some of the funds Barclays supplied for the equity investment in Chewco.[150]

Big River obtained virtually all of its equity contribution by way of loans called "funding agreements" made by Barclays to Big River and Little River.[151] Barclays understood that the money it loaned via the funding agreements was going to be passed directly through Big River and Little River to fund most of Chewco's equity component.[152]

Barclays also understood that Big River and Little River had to rely on distributions from Chewco in order to repay the funding agreements:

> Q.    And the only source of repayment of those loans had to be the money that Chewco distributed to Big River and Little River, right?
>
> A.    Correct.[153]

In order to ensure the repayment of the funding agreements, Barclays and Enron structured the transaction to require the following pledges as security for the loans: (1) Big River's pledge of its limited partnership interest in Chewco and bank accounts containing cash reserves; and, (2) Little River's pledge of its interest in Big River to Barclays.[154] Barclays advanced a total of $11.4 million to Big River and Little River,

---

[150] Id. at 116-17. See also Email from George McKean, Associate, Barclays, to Henry Pullman, Director, Barclays, Dec. 22, 1997 (the "McKean/Pullman Email, Dec. 22, 1997") (Ex. 6 to McKean Sworn Statement) [BRC 000005328].

[151] See Funding Agreement among Little River Funding, L.L.C., Borrower, and Barclays, Purchaser, Dec. 30, 1997 [AB000001959-AB000002021]; Funding Agreement among Big River Funding, L.L.C., Borrower, and Barclays, Purchaser, Dec. 30, 1997 [AB000002023-AB000002085].

[152] Meyer Sworn Statement, at 73; McKean Sworn Statement, at 140-41.

[153] McKean Sworn Statement, at 141.

[154] See Securities Account Control Agreement among Big River Funding, L.L.C. (the "Debtor"), Barclays, (in its capacity as the "Secured Party"), and Barclays (in its capacity as the "Securities Intermediary"), Dec. 30, 1997 (the "Big River Funding Securities Account Control Agreement") [AB000468782-AB000468787]. The Chewco structure also contained additional credit support features to guarantee the

- 45 -

while the aggregate reserve amounts were approximately $6.6 million. The reserve amounts, which secured, in part, the repayment of the funding agreements and interest thereon, were placed in the reserve accounts that Barclays controlled and were, therefore, beyond the control of Big River and Little River:[155]

> Q.    Do you know if Big River/Little River had any discretion with respect to the money that came into it, or did they have to pay that money to Barclays to repay the loans?
>
> A.    . . . My recollection is that the funds had to first be used to repay the loans.[156]

In negotiating the structuring of the reserve accounts, Barclays pushed Enron to fund the accounts at closing, rather than setting up a delayed funding mechanism.[157] Barclays believed that waiting for the reserve accounts to build up represented a measure of asset risk that Barclays did not want to assume.[158] Ultimately, Barclays concluded that the final form of the Chewco transaction, which provided for the reserve accounts to be funded at closing, "effectively gives [Barclays] close to 60% cash collateral from day

---

repayment of the money Barclays advanced towards the Chewco equity. The JEDI partnership agreement and the JEDI Revolver also contained features that served as credit support for Barclays' advances under the funding agreements. All Chewco distributions to Big River were to be added to the base reserve amount or the yield reserve amount, up to $7 million and $4 million, respectively. Section 5.2(a), Chewco Limited Partnership Agreement. The yield and the principal were payable out of these reserves. At least 3% of all distributions to Chewco were to be paid to Big River. Sections 5.2 and 1.1, Chewco Limited Partnership Agreement, with such distributions to be used to fund the base reserve amount. Moreover, Chewco was obligated to borrow under the JEDI Revolver to the extent necessary to make distributions to Barclays as provided in the funding agreements and the Chewco partnership agreement. Section 5.2(a), Chewco Limited Partnership Agreement.

[155] Section 1, Big River Funding Securities Account Control Agreement.

[156] McKean Sworn Statement, at 141.

[157] Id. at 117-19. See also Letter from George McKean, Associate, Barclays, to Michael Kopper, Enron, Dec. 5, 1997 (the "McKean Letter to Michael Kopper, Dec. 5, 1997") (Ex. 5 to McKean Sworn Statement) [BRC 000003409-BRC 000003410]; McKean Letter to Bill Brown and Michael Kopper, Nov. 20, 1997, at 1 (Ex. 4 to McKean Sworn Statement).

[158] McKean Letter to Bill Brown and Michael Kopper, Nov. 20, 1997 (Ex. 4 to McKean Sworn Statement). See also McKean Sworn Statement, at 121-23.

one."[159]

Barclays understood that the 3% equity component of Chewco had to be at risk in order to avoid the consolidation of Chewco and JEDI into Enron's financial statements:

> Q. And if the three percent equity in Chewco was ultimately guaranteed by Enron to be repaid, then that in fact would destroy the non-consolidation of Chewco?
>
> A. I am not an accountant. I am not qualified to categorically answer that question. You can see from my background that I had three accounting courses in the 1970s, and, therefore, don't consider myself capable of answering that question with any accuracy.
>
> Q. But you did work with SPEs throughout your tenure at Barclays, right?
>
> A. Yes.
>
> Q. And it was always your understanding that in order for an SPE not to be consolidated, it had to have three percent equity at risk. Correct?
>
> A. Yes, that's correct.
>
> Q. And its also your understanding that if Enron guaranteed repayment of that three percent equity, that three percent equity wouldn't be at risk, right?
>
> A. Yes.
>
> Q. So, to sort of complete the loop, if you need three percent equity to be at risk, to not consolidate, and an Enron guarantee would make that three percent equity not at risk, then isn't your conclusion that if the three percent equity isn't at risk, the SPE wouldn't be consolidated, or would have to be consolidated?
>
> A. Yes.[160]

Barclays also understood that the funded reserve accounts meant that at least part of the equity investment in Chewco would be repaid:

---

[159] McKean/Pullman Email, Dec. 22, 1997.

[160] Meyer Sworn Statement, at 84-85 (objections of counsel omitted).

Q.    Was it your understanding that reserve account was to secure the repayment of that equity investment?

A.    To partially secure it, yes.[161]

Evidence exists from which it could be inferred that Barclays knew that by giving Barclays close to 60% cash collateral at closing, the Chewco structure eliminated close to 60% of the necessary equity risk in Chewco and therefore failed the 3% Equity Test.[162] Eventually, even Enron acknowledged that the Chewco equity was not sufficiently at risk and on November 19, 2001 restated its financial statements back to 1997, when Chewco and JEDI first should have been consolidated with Enron.[163]

### C.    Participating in Prepays and Nikita

*Prepays*

Barclays participated in at least three of Enron's Prepay Transactions:  Barclays acted as a commodity swap counterparty for Enron (ECT) and Delta in a December 1998 $500 million, three year crude oil and natural gas Prepay known as Roosevelt;[164] Barclays advanced $110 million in a December 1999 $324 million crude oil Prepay known as Nixon;[165] and Barclays acted as a commodity swap counterparty for Enron and CSFB in a September 2001 $150 million, one year crude oil Prepay.[166]

---

[161] *Id.* at 75.

[162] Second Interim Report, Annex 1 to Appendix L (Related Party Transactions), *Economics and Allocation of Risk in Chewco.*

[163] *See* Enron Form 10-Q filed with the SEC for the Quarter ended Sept. 30, 2001 (the "Enron Form 10-Q filed with the SEC for the 3rd Quarter 2001") (filed with the SEC on Nov. 19, 2001). Enron received a filing extension from the SEC. *See* Enron Form 12B-25, Notification of Late Filing, filed with the SEC on Nov. 15, 2001.

[164] *See* Report, Appendix D (Role of Citigroup and its Affiliates); Barclays Responses.

[165] *See* Report, Appendix D (Role of Citigroup and its Affiliates); Barclays Responses.

[166] In early December 2000, CSFB set up a prepay transaction (the "CSFB Prepay") involving CSFB, Morgan Stanley Capital Group Inc. (later replaced by Barclays) and ENA. Under the CSFB Prepay, ENA received $150 million up front from CSFB and was required to repay approximately $158 million in

Although Barclays' involvement in Enron's Prepay Transactions was more limited than other Financial Institutions discussed in this Report, Barclays' understanding of the economic substance of the Prepay Transactions and their effect on Enron's financial statements was detailed. Barclays understood that the Prepay Transactions were "essentially circular in nature,"[167] eliminating all commodity price risk in the transactions.

Barclays also understood that the matched swaps that caused the commodity price risk to remain with Enron could not be cross-defaulted to each other because that would negatively impact Enron's intended accounting for the transactions:

> Q.   What did Mr. Deffner tell you about the accounting impact of having cross-defaults in the swaps?
>
> A.   As best I recall, the response was that it would not permit the structure to achieve the accounting objective that Enron was trying to accomplish.[168]

In June 1999, the credit officer in charge of the Enron relationship explained the purpose of the Prepay Transactions and Enron's accounting for them as follows:[169]

---

September 2001. *See* Fixed Amount Details section, Confirmation (Swap) between ENA and CSFB, Dec. 15, 2000 (the "Original ENA/CSFB Swap"), at 2 [AB0971 01961-AB0971 01964]; Fixed Amount Details section, Confirmation (Swap) between ENA and Morgan Stanley Capital Group, Inc., Dec. 18, 2000 (the "Original ENA/MS Swap"), at 2 [AB0252 00881-AB0252 00884]. The swaps composing the original CSFB Prepay were financially settled. *See* Original ENA/CSFB Swap; Confirmation (Swap) between CSFB and Morgan Stanley Capital Group, Inc., Jan. 9, 2001 (attached to March 14, 2001 facsimile from David Haines, Morgan Stanley Capital Group, Inc., to Ben Johnson, CSFB, correcting the earlier swap confirmation) [CSFBCO 000047683-CSFBCO 000047687]; Original ENA/MS Swap.

Rather than repay these original swaps, Enron caused the original swaps to be amended, restated and extended in September 2001. The day before the refinancing closed, Barclays also replaced Morgan Stanley, which was apparently dissatisfied with the fees it had received as the third party in the transaction. Email from James Moran, Director, CSFB, to Janelle Matharoo, Managing Director, CSFB, Sept. 26, 2001 [PSI00056338]; *see also* Confirmation (Swap) between ENA and Barclays, Sept. 27, 2001 [BRC 000005129-BRC 000005132].

[167]   Meyer Sworn Statement, at 190.

[168]   Williams Sworn Statement, at 216.

[169]   1999 Meyer/Taylor Email, at 1 (Ex. 8 to Clemmens Sworn Statement).

| Clemmens, Bob: CRMD (NYK) | |
|---|---|
| From: | Meyer, John: CRMD (NYK) |
| Sent: | Thursday, June 24, 1999 10:40 AM |
| To: | Taylor, Jonathan: Commodities (LDN) |
| Cc: | Smith, Brian: Commodities (LDN); Binstead, Carl: CRMD (LDN); Clemmens, Bob: CRMD (NYK); Pullman, Henry: CRMD (NYK); Williams, Richard: IBD (NYK); McKean, George: IBD (NYK) |
| Subject: | RE: Enron credit risk |

3. Prepaid Crude Oil and Natural Gas – Don't for a second think that Enron is satisfying an operating need by selling these commodities forward. Although notionally they are agreeing to deliver the commodities in satisfaction of an obligation established at the time the banks pay for the commodities, in actual fact they are only borrowing money. Their accountant will credit the Revenue account, debit Cash, debit Revenue and credit Deferred Revenue. In other words he sees a sale but sets up a liability that is satisfied only as the commodities are delivered. When calculating the amount of debt Enron has incurred, CRMD (and any analyst who wasn't born yesterday) will take any balance in the deferred revenue account and add it one-for-one to debt. The only problem, and it's a practical one, is that Enron's Deferred Revenue (of late) has not been substantial enough to be disclosed separately. It has been lumped in with Other Liabilities for the last two or three years. We asked the company when we last met with them for the amount of deferred revenue included in other liabilities. The number at year-end was $500 million.

The credit officer also noted that because the volumes to be delivered at the maturity of the deal being discussed were too large for physical delivery, it is "painfully obvious that the transaction's essence is not about deferred revenue but rather about plain ol' debt."[170]

Barclays also understood, at least by 2000, that while the Prepay Transactions were a form of financing for Enron,[171] Enron booked the cash it received from the Prepay Transactions as cash flow from operating activities:

> Q.    Do you know how Enron booked the cash it received in connection with the prepays, how it booked that cash on its cash flow statement?
>
> A.    I think so.

---

[170]  *Id.* at 1-2 (Ex. 8 to Clemmens Sworn Statement).

[171]  Meyer Sworn Statement, at 191.

Q.      As we sit here today, what is your understanding of how they booked that cash?

A.      Under the operating cash flow section -- cash flow from operations section of the cash flow statement, you would have seen it as a change in assets and liabilities from price risk management.

     . . .

Q.      When do you think you did develop an appreciation for how Enron was booking that cash?

A.      Certainly by 2000 and 2001.[172]

Even though Barclays knew how and where the Prepay Transactions were reflected on Enron's financial statements, Barclays also understood that the actual impact of the Prepay Transactions could not be determined without direct access to Enron's management:

Q.      For the prepays, how would you determine the magnitude of the prepays?

A.      There was no way for me to tell the amount of crude oil and natural gas prepays on Enron's balance sheet, as I related to ECT or Enron North America, 'cause the balance sheet would not provide enough detail for me to be able to ascertain that number.

Q.      You couldn't figure that number out by looking at the balance sheet?

A.      No.

Q.      Did you have access to Enron to try and answer those questions for you?

A.      At certain points we did, yes.[173]

---

[172] *Id.* at 191-92.

[173] *Id.* at 164.

- 51 -

Thus, Barclays participated in the Prepay Transactions knowing that they resulted in the misrepresentation of Enron's financial statements, that Enron inadequately disclosed the transactions and that the true effects of the Prepay Transactions could not be determined from Enron's published financial statements.

*Nikita*

The Nikita Transaction, though structured to appear as a sale of Enron's interests in EOTT, was in substance a loan from Barclays to Enron.[174] This disconnect between the financial statement presentation of the transaction and its economic substance was accomplished via the use of a Total Return Swap between Besson Trust and Enron, whereby Enron obligated itself to repay Barclays the loan made to Besson Trust.

Barclays understood that the Total Return Swap represented a direct payment obligation of Enron to pay the principal and interest due on the loan made to the SPE.[175] Finally, Barclays understood that Total Return Swaps were booked on Enron's financial statements as Equity Derivatives but that they were not broken out separately so the actual amount of Enron's Total Return Swap obligations could not be accurately determined from Enron's financial statements.[176] Despite understanding that the Nikita Transaction would create a direct payment obligation of Enron that could not be determined by reference to Enron's financial statements, Barclays helped structure and close the transaction.

---

[174] First Interim Report, Section III, *The Nikita Transaction*; Second Interim Report, Annex 2 to Appendix M (FAS 140 Transactions).

[175] Meyer Sworn Statement, at 166 ("Q. And back in 1999, did you understand that the total return swaps obligated Enron — were direct payment obligations on Enron's behalf? A. There was a time I did not understand that, but I caught on. . . . Q. Was that as early as 1998? A. '98? Yes, it may have been.").

[176] *Id.* at 207-08.

IV.    POTENTIAL LIABILITY OF BARCLAYS

A.    Arguments Supporting the Imposition of Aiding and Abetting
Liability and Equitable Subordination

*Aiding and Abetting Liability*

As described in Appendix C (Role of Enron's Officers), there is evidence
sufficient for a fact-finder to conclude that certain of the Debtors' officers breached their
fiduciary duties under applicable law by causing the Debtors to enter into certain SPE
transactions, including the J.T. Holdings, Nikita, Chewco, Prepay and $SO_2$ SPE
transactions, that were designed to manipulate the Debtors' financial statements and that
resulted in the dissemination of financial information known to be materially misleading.
Barclays participated in significant ways in these transactions. As set forth more fully in
Appendix B (Legal Standards), assuming the Debtors have standing, an affirmative claim
against Barclays for aiding and abetting these breaches of fiduciary duty will exist if: (i)
Barclays had actual knowledge of the wrongful conduct giving rise to these breaches of
fiduciary duty; (ii) Barclays gave substantial assistance to the primary wrongdoers; and
(iii) injury to the Debtors was the direct or reasonably foreseeable result of Barclays'
conduct.

*Verbal Assurances.* There is sufficient evidence from which a fact-finder could
conclude that Barclays had knowledge of conduct giving rise to an Enron officer's breach
of fiduciary duty in connection with the verbal assurances Barclays obtained and relied
upon in the J.T. Holdings and Nikita Transactions. Further, there is evidence sufficient to
find that Barclays gave substantial assistance in connection with such breach.

Barclays knew that Enron intended to account for the J.T. Holdings and Nikita Transactions off balance sheet.[177]    Barclays also understood the requirement that the SPEs in J.T. Holdings and Nikita have at least 3% equity at risk in order for Enron properly to account for the structures off balance sheet,[178] yet Barclays sought and received from Enron verbal assurances covering the equity risk in those transactions.

There is evidence from which a fact-finder could conclude that Barclays understood the verbal assurances in the J.T. Holdings and Nikita Transactions impaired Enron's ability to properly account for those transactions' structures off balance sheet. Barclays knew the assurances, if reduced to writing and made known to Enron's auditors, would have made Enron unable to account for the transactions off balance sheet.[179] Instead of requiring written guarantees, Barclays accepted verbal assurances, securing what Barclays knew Enron could not put in writing.   These verbal assurances were not part of the deal documents.  Further, Barclays was on notice that the verbal assurances might still impair Enron's intended accounting treatment.[180] These facts could give rise to an inference that Barclays understood that the verbal assurances were not going to be communicated to Enron's auditors, because to do so would have defeated Enron's intended accounting.

---

[177]  *Id.* at 19, 128-29; Williams Sworn Statement, at 428-31 (Nikita) and 453-54 (J.T. Holdings).

[178]  Meyer Sworn Statement, at 20-21; 132-33.

[179]  *Id.* at 82 ("Q. Are you aware of any reason that, in this case [Chewco], Enron would be less willing to provide a written guarantee rather than a verbal assurance?  A. It might jeopardize the treatment, the accounting treatment of the three percent equity."), 122 ("Q. Well, do you believe that a written guarantee [in Nikita] would have destroyed that at risk requirement?  A. I believe it would have put it in jeopardy."); Williams Sworn Statement, at 431.

[180]  Williams Sworn Statement, at 428-29.

- 54 -

Although Barclays denies that it believed the verbal assurances were legally enforceable,[181] there is evidence from which a fact-finder could infer that Barclays did believe the assurances were enforceable. Barclays explicitly relied on the assurances – Barclays acknowledges it would not have agreed to enter into either transaction without the verbal assurances.[182]

Thus, the evidence would support a finding that Barclays entered into a verbal agreement with Enron knowing that such agreement would not be disclosed to Enron's auditors and the agreement would invalidate Enron's intended accounting treatment.

*Barclays Participated in Structures It Knew Enron Intended to Account for Improperly.* There is sufficient evidence for a fact-finder to conclude that Barclays impermissibly assisted Enron's officers in structuring and closing the $SO_2$ Transaction, knowing that the transaction was designed to manipulate the Debtors' financial statements and that it would and did result in the dissemination of financial information known to be materially misleading. First, Barclays formed and "seasoned" Colonnade to make it appear to meet the requirements Enron told Barclays were necessary for Enron to treat Colonnade as an off-balance sheet vehicle, including pushing two short-dated trades

---

[181] *See id.* at 419-21; Clemmens Sworn Statement, at 116-17.

[182] Email from John Sullivan, Director, Barclays, to Doug Bernegger, Barclays, *et al.*, Nov. 14, 2000 ("Enron's 'verbal assurances' will speak to the B Notes and Certificates, and it is on this exceptional basis that CRMD [Barclays' credit function] has sanctioned the transaction . . . .") [BRC000107347]; IBD Americas Committee Minutes, Nov. 13, 2000 ("Agreement to proceed with this transaction is going to require confirmation directly from Enron that they [sic] stand behind this deal especially the B and C Notes."); 2001 Meyer/Sullivan Email ("Sanction [for the Nikita Transaction] is conditioned on: . . . (2) written recording of senior Enron officers' (at least Treasurer and/or CFO) affirmation that Enron will ensure repayment of certificate investment . . . .") (Ex. 8 to Meyer Sworn Statement); Williams Sworn Statement, at 428; Meyer Sworn Statement, at 127; Williams Transaction Comment, Nov. 14, 2000 (Ex. 26 to Williams Sworn Statement, duplicate with different Bates range). This assurance was communicated to Graham McGahen and Eric Chilton (Managing Director of Barclays' loan functions) on November 14, 2000. Williams/McGahen Assurance Email, Nov. 14, 2000; IBD Americas Committee Minutes, Nov. 13, 2000; September 2001 Exposures Committee Minutes, at 2 (Ex. 23 to Williams Sworn Statement); McGahen EOTT Monetization Comments (Ex. 10 to Meyer Sworn Statement).

through the SPE in order to create a trading history for it.[183]  Second, Barclays helped

structure and close the $SO_2$ Transaction despite evidence that Barclays knew, based on its

own marketing materials[184] and advice from its external accountants,[185] that Enron could

not properly account for the transaction as an off balance sheet "true sale."[186]  Finally,

there is evidence Barclays closed the $SO_2$ Transaction despite being concerned that "the

deal was primarily for accounting/reporting reasons."[187]

   The evidence is sufficient for a fact-finder to conclude that Barclays knew the

Enron officers in charge of the $SO_2$ Transaction were breaching their fiduciary duty to

Enron.  Barclays had evidence the transaction could not be accounted for off balance

sheet and expressed concerns to Enron that its accounting was not going to be proper, but

Enron closed the transaction and gave it off-balance sheet treatment anyway.

---

[183]  Woodhams NOOSA Memorandum, Aug. 30, 2001, at 2  (Ex. 16 to Woodhams Sworn Statement).

[184]  *See, e.g.,* Barclays Off-Balance Sheet Presentation, Apr. 2001; Barclays Off-Balance Sheet Presentation, June 19, 2001, at 7-27; Barclays Off-Balance Sheet Presentation, undated, at 9, (noting that "[a] very large discount creates an overwhelming economic imperative for the client to take material back but is likely to prevent the structure providing [sic] off-balance sheet accounting treatment as a true sale has not occurred.") (Ex. 1 to Woodhams Sworn Statement); Woodhams/Finlay Sox Email, Oct. 24, 2001, at 3 (Business case update to Enron Sox monetization) ("[w]ithin the structure Barclays is repaid by either Enron exercising their call option over the inventory (the expected route) or by Colonnade exercising its put option (written by Enron) over the same inventory. . . . This key feature compels Enron (whilst solvent) to always repurchase the entire monetized inventory."); Pankhania/Woodhams Noosa Email, July 13, 2001, at 2 (regarding Project Noosa – Accounting Note) ("[T]he economic risk and rewards of the commodity assets held by the SPV will remain with the client by virtue of the back to back hedging transactions.") (Ex. 15 to Woodhams Sworn Statement).

[185]  Hewer/Woodhams Email, Sept. 3, 2001 ("First thoughts are that the energy company is likely to be the sponsor of the SPV and hence will be required to consolidate that SPV . . ."); Oldfield/Pankhania Email, Sept. 7, 2001 ("Looks OK – I am concerned about whether this works for your client."); Oldfield/Pankhania Email, Sept. 10, 2001, at 1 ("I am still worried about whether this works for your client. It looks risky for them from an accounting perspective."); Pankhania/McGarahan Noosa Email, July 13, 2001, at 1 (regarding Project Noosa – Accounting Note) ("We had a meeting yesterday with PWC (Richard Oldfield) to discuss the accounting treatment for Project Noosa. . . . One issue raised at the meeting was that although BBPLC would not need to consolidate the SPV, it is highly likely that client would need to consolidate the SPV under both UK and US Gaap [sic].  This is because the potential upside and downside of the SPV assets continue to remain with the client and hence they have a beneficial interest in the SPV.") (Ex. 15 to Woodhams Sworn Statement).

[186]  September 2001 New Product Committee Minutes, at 4.

[187]  September 2001 GCC Minutes, at 2 (Ex. 3 to Woodhams Sworn Statement, duplicate with different Bates range).

There is also evidence sufficient to find that Barclays knew Enron's officers were breaching their fiduciary duties to Enron in connection with the Chewco Transaction and that Barclays gave substantial assistance in connection with that breach.  Barclays understood that (1) Enron intended to account for the Chewco Transaction (and by extension, JEDI) off balance sheet[188] and (2) the 3% independent equity had to be "at risk" in order for Enron to keep JEDI off balance sheet.[189]  Nevertheless, Barclays, in a "joint effort"[190] with Kopper of Enron,[191] structured the transaction to include funded reserve accounts, knowing the reserve accounts would eliminate almost 60% of the equity risk in the transaction structure.[192]

Giving Chewco and JEDI off-balance sheet treatment misrepresented Enron's true financial position and represented a breach of the involved Enron officers' fiduciary duties to Enron.  Barclays gave substantial assistance to Kopper in creating this misrepresentation; indeed, there is evidence that Barclays' requirements caused Kopper

---

[188] 1996 McKean JEDI Memorandum, at 2. *See also* McKean Sworn Statement, at 58-59; Meyer Sworn Statement, at 63-65.

[189] Meyer Sworn Statement, at 26-27, 84-85 (objections of counsel omitted).

[190] McKean Sworn Statement, at 68, lines 6-13.

[191] *Id.* at 105-14, 125-30; McKean Letter to Bill Brown and Michael Kopper, Nov. 20, 1997 (Ex. 4 to McKean Sworn Statement); McKean letter to Michael Kopper, Dec. 5, 1997 (Ex. 5 to McKean Sworn Statement).

[192] McKean/Pullman Email, Dec. 22, 1997; Meyer Sworn Statement, at 74-76. The Examiner concluded in the Second Interim Report that Chewco and JEDI should have been consolidated with Enron from Chewco's inception in 1997. This conclusion is based primarily on, among other things, the failure of any outside investors in Chewco to supply 3% of equity at risk, as required by EITF 90-15. Chewco did not have sufficient equity because $6.6 million of its purported equity was not at risk, having been protected through the reserve accounts, leaving only $4.8 million of the Barclays' advances potentially at risk in Chewco. As a result, only $4.8 million was potentially at risk and was equal to less than 2% of Chewco's total assets, too little to meet the applicable accounting requirements for nonconsolidation. Enron reached the same conclusion in its Third Quarter 10-Q, which acknowledged Enron's error in failing to consolidate JEDI and Chewco from Chewco's inception in 1997. Enron Form 10-Q filed with the SEC for the third Quarter 2001, at 15.

to structure the transaction in a way that resulted in the structure failing the 3% Equity Test.

    *Barclays Participated in Transactions It Knew Would Lead to Misleading Financial Presentation on the Part of Enron.* There is also evidence sufficient for a fact-finder to conclude that Barclays knew Enron's officers entered into the Prepay Transactions to manipulate Enron's financial statements. Although the transactions were designed to appear to be part of Enron's business operations, Barclays knew that Enron was just borrowing money through the Prepay Transactions.[193]  Further, Barclays understood that the obligations from the Prepay Transactions were being lumped in with "Other Liabilities," causing the Prepay Transactions not to be identifiable from Enron's financial statements. [194]  Finally, Barclay's acknowledges understanding, at least by the year 2000, that Enron booked the cash received from the Prepay Transactions as cash flow from operating activities, despite the fact that the Prepay Transactions were essentially financings.[195]

    From these facts it can be inferred that Barclays knew that Enron's officers were breaching their fiduciary duty to Enron.  Barclays knew Enron's purpose in executing the Prepay Transactions, and from its knowledge of Enron's financial statements, knew that Enron had achieved its purpose. Indeed, Barclays knew that one could not determine from Enron's financial statements the actual amount of Enron's prepay obligations.[196]

---

[193]  1999 Meyer/Taylor Email (Ex. 8 to Clemmens Sworn Statement).

[194]  *Id.*; Meyer Sworn Statement, at 163-65.

[195]  Meyer Sworn Statement, at 191-92.

[196]  *Id.* at 164.

Similarly, Barclays understood that the Nikita Transaction would result in the dissemination of materially misleading financial statements. The stated purpose of the Nikita Transaction was for Enron to monetize its interests in EOTT. However, Enron entered into a Total Return Swap with the Besson Trust, obligating Enron to pay to Besson Trust the funds necessary for Besson Trust to repay the Barclays loan used for the purchase of the EOTT interests. Thus, through the Total Return Swap, Enron was obligated to repay the funds it received for the "sale" of the EOTT interests.

Barclays understood that the Total Return Swap represented a direct payment obligation of Enron,[197] and understood that this obligation was booked in Enron's financial statements under Equity Derivatives,[198] but still knew it was unable, without asking Enron management, to determine the actual amount of Enron's Total Return Swap obligations.[199] Enron told Barclays that the Total Return Swap obligations were only an element of Equity Derivatives,[200] and thus the actual amount of Total Return Swap obligations could not be determined by reference to the financial statements.

Given the size of the Prepays in which Barclays was involved (ranging from $110 million to $500 million), and their material impact on Enron's financial statements, any one of the Prepay Transactions would support a finding that Barclays gave substantial assistance to Enron's officers in their breach of fiduciary duty. Each had an impact on Enron's reported financial performance. While not as large as the Prepays, the Nikita

---

[197] *Id*. at 166.

[198] *Id*. at 165.

[199] *Id*. at 207-08.

[200] *Id*.

Transaction was still significant, and timed directly to affect Enron's 2001 third quarter earnings.

*The Harm Caused by Barclay's Conduct Was Foreseeable.* Under the applicable law of aiding and abetting, courts often include, as part of the element of substantial assistance, that the harm caused must be a reasonably foreseeable result of the actions of the aider and abettor. In the case of the SPE Transactions discussed above there is evidence of this element. Each of these transactions was structured to enable Enron to produce materially misleading financial statements, which were disseminated to the public. Enron suffered damages by virtue of the preparation and dissemination of these materially misleading financial statements, including incurring the costs of governmental investigations, the administrative costs of Enron's bankruptcy proceeding, and losses caused by the "deepening insolvency" of Enron that occurred while its true financial condition was disguised. A fact-finder could determine that damages such as these were a reasonably foreseeable result of the above-described conduct of Barclays in connection with the SPE transactions described.

*Equitable Subordination*

*Claims Made in the Bankruptcy Case.* Barclays' proofs of claim in the Bankruptcy Case, excluding duplicate and disallowed claims, total approximately $371 million.[201]

---

[201] *See* Proof of Claim of Barclays filed against Enron in the amount of $727,233.86 [Claim No. 0000007915]; Proof of Claim of Barclays filed against Enron in an unliquidated amount [Claim No. 0000010803]; Proof of Claim of Barclays filed against Enron Capital & Trade Resources International Corp. [Claim No. 0000010907]; Proof of Claim of Barclays filed against Enron in an unliquidated amount [Claim No. 0000010908]; Proof of Claim of Barclays filed against Enron Power Marketing, Inc. in the amount of $68,590,538.24 [Claim No. 0000010909]; Proof of Claim of Barclays filed against Enron in the amount of $68,590,538.24 [Claim No. 0000010910]; Proof of Claim of Barclays filed against Enron in the amount of $1,184,000 [Claim No. 0000011301]; Proof of Claim of Barclays filed against Enron in the amount of $207,480.42 [Claim No. 0000011302]; Proof of Claim of Barclays filed against Enron in the

*Analysis.* As set forth more fully in Appendix B (Legal Standards), Barclays' claims against the Debtors may be equitably subordinated if Barclays engaged in inequitable conduct and such conduct resulted in an injury to creditors or an unfair advantage to Barclays. The evidence discussed above supports a finding that Barclays engaged in inequitable conduct that allowed Enron to produce materially misleading financial statements. Enron's other creditors were injured because such financial results were publicly reported and disseminated by Enron. Therefore, sufficient evidence exists for a court to equitably subordinate the claims of Barclays to those of other creditors.

**B.** **Arguments Against the Imposition of Aiding and Abetting Liability and Equitable Subordination**

The Examiner recognizes that there are defenses to the imposition of aiding and abetting liability and/or to the equitable subordination of claims. Among the potential defenses the Examiner has considered are:

- The verbal assurances Barclays received in the J.T. Holdings and Nikita Transactions did not prevent Enron from giving off-balance sheet treatment to those structures;

- Barclays reasonably relied on Enron's or Enron's outside accountants' expertise to properly account for and disclose the SPE Transactions;

- Barclays reasonably relied on Enron's outside legal advisors to properly determine whether there was a "true sale" in the $SO_2$ Transaction;

- No material harm resulted from Barclays' participation in the SPE Transactions;

- Barclays' involvement in the Prepays was too limited to warrant imposition of affirmative relief against Barclays or equitable subordination of Barclays' claims; and

---

amount of $15,000,000 [Claim No. 0000011303]; Proof of Claim of Barclays filed against Enron in the amount of $14,949,000 [Claim No. 0000011304]; Proof of Claim of Barclays against Enron in the amount of $190,000 [Claim No. 0000011493].

- Barclays is a separate corporate entity from Besson Trust, and any Barclays conduct should not be imputed to Besson Trust.

All of these potential defenses may be considered by the fact-finder along with any affirmative claims against Barclays or any consideration of equitably subordinating any of Barclays' bankruptcy claims. These defenses are discussed in more detail below.

*Verbal Assurances Do Not Prevent Enron From Giving Structures Off-balance Sheet Accounting Treatment*

The Examiner has considered the defense that the verbal assurances Barclays requested and received from Enron in the JT Holdings and Nikita Transactions were not binding and enforceable, and therefore did not preclude Enron's intended accounting treatment.[202] While the Barclays' subjective belief regarding the enforceability of the verbal assurances is a factor that should be considered by the fact-finder, there is significant evidence militating against this defense.

As discussed above in the Report, the fact assurances were verbal is not dispositive on the question of whether they were binding and enforceable. Sufficient evidence exists for a fact-finder to determine either that (a) Enron and Barclays entered into an enforceable agreement for Barclays to assume the SPE equity risk in exchange for Enron's promise to repay the Certificate plus yield at maturity in the event the underlying asset value was insufficient to pay out the equity or (b) alternatively, that Barclays relied to its detriment by taking the equity risk based upon Enron's promise that the equity risk

---

[202] Meyer Sworn Statement, at 116-18; Williams Sworn Statement, at 419-21; Clemmens Sworn Statement, at 118-21. Barclays has even suggested Glisan did not have authority to bind Enron. Meyer Sworn Statement, at 116-17. If Barclays genuinely believed that one of Enron's top executives could not verbally commit Enron to cover the equity risk in the J.T. Holdings and Nikita structures, then Barclays intentionally relied on the assurance of an Enron officer that Barclays believed to be violating his fiduciary duties to Enron by attempting to commit Enron to an unauthorized transaction. If, on the other hand, Barclays believed Enron's Treasurer did have that authority (*i.e.*, that Glisan's verbal assurance was enforceable), Barclays still aided Glisan's misrepresentation, because Barclays would then have no argument to support Enron's nonconsolidation of the J.T. Holdings or Nikita structures.

- 62 -

would be covered. Thus, the fact-finder could determine that the verbal assurances were enforceable (and thus that the equity was not at risk as required by GAAP) pursuant to traditional contract law or under theories of promissory estoppel or detrimental reliance.[203] Further, there is evidence for a fact-finder to conclude that Barclays' actions regarding the verbal assurances are inconsistent with the defense that the assurances were not binding and enforceable. In particular, Barclays specifically conditioned approval for its involvement in both the J.T. Holdings and Nikita Transactions (in which it committed millions of dollars to equity risk positions) upon obtaining the verbal assurances.[204]

A related defense the Examiner has considered is that there is no direct evidence that Barclays knew Enron's officers would not disclose the verbal assurances to Enron's auditors. It is not the verbal assurance itself, but rather Enron's officers' failure to report the assurance to Enron's auditors, and the ensuing inadequate financial statement disclosure, that represents the breach of fiduciary duty.[205] There is, however, circumstantial evidence of this knowledge. First, Barclays knew the assurances, had they been put in writing and disclosed to Enron's auditors, would have defeated Enron's intended accounting. Second, the fact that the assurances were essential to the transactions but not made part of the deal documentation gives rise to an inference that Barclays knew Enron did not intend to communicate the assurances to its auditors.

---

[203] *Id.*

[204] Williams Transaction Comment, Nov. 14, 2000 (Ex. 26 to Williams Sworn Statement, duplicate with different Bates range). This assurance was communicated to Graham McGahen and Eric Chilton (Managing Director of Barclays' loan functions) on November 14, 2000. Williams/McGahen Assurance Email, Nov. 14, 2000; IBD Americas Committee Minutes, Nov. 13, 2000; 2001 Meyer/Sullivan Email (Ex. 8 to Meyer Sworn Statement); September 2001 Exposures Committee Minutes, at 2 (noting that "[t]he rather lucrative 15% certificate yield was needed to meet the Company's auditors' requirements for provision of an opinion that the certificate holding was true equity."); McGahen EOTT Monetization Comments (Ex. 10 to Meyer Sworn Statement); Meyer Sworn Statement, at 138-40; Williams Sworn Statement, at 428.

[205] Report, Appendix B (Legal Standards).

- 63 -

*Reliance on Enron or Enron's Accountants and Auditors*

The Examiner has considered whether Barclays reasonably relied on Enron and Enron's accountants and auditors' expertise in Enron's accounting for and disclosure of the $SO_2$ Transaction. Barclays explicitly raised its accounting concerns with Enron and was told that Enron had already cleared the off-balance sheet treatment of the $SO_2$ Transaction with its internal and external accountants and auditors.[206]

However, as discussed above, sufficient evidence exists for a fact-finder to conclude that any reliance by Barclays on Enron or Enron's accountants and auditors was not reasonable. Barclays knew that Colonnade failed to meet the requirements of Andersen's "smell test" and knew, based on its own marketing materials and the advice of its outside accountants, that Enron could not account for the $SO_2$ Transaction as an off-balance sheet "true sale."

The Examiner has also considered reliance on the expertise of Enron and/or Enron's accountants and auditors as a defense in connection with the Chewco Transaction. The Barclays individual most involved in the structuring of the Chewco Transaction has testified that he did not fully understand the requirement that the 3% equity investment in Chewco be "at risk" and that Enron confirmed with its auditors that the final form of the structure would allow Enron to account for the structure off balance sheet. In addition, the reserve accounts (that caused the Chewco accounting to fail) were in writing and thus more likely, from Barclays' perspective, to have actually been considered by Enron's auditors.[207]

---

[206] Woodhams/Firth Email, Sept. 26, 2001.

[207] *See* McKean Sworn Statement, at 91-107. *See also* McKean/Pullman Email, Dec. 22, 1997 (where Barclays indicates it believes Enron got Enron's accountants comfortable that the pledge of the Chewco reserve accounts at closing versus some months after closing was not material).

However, there is also evidence that any reliance on Enron or Enron's accounting expertise in Chewco would not have been justified.  The credit approval function at Barclays has acknowledged having familiarity, at the relevant times, with the requirement that equity in SPEs be at risk, and Barclays' documentation of the Chewco Transaction reflects that it understood that almost 60% of the risk otherwise associated with the Chewco equity was no longer actually at risk by virtue of the funded reserve accounts.[208]

Finally, the Examiner has considered whether Barclays could have reasonably relied on Enron to make sure that the J.T. Holdings and Nikita Transactions were properly structured, accounted for and disclosed.

However, Barclays' participation in verbal assurances covering the equity components of those transactions cuts against this defense.  It can be inferred that Barclays secured the verbal assurances to cover the equity risks in the J.T. Holdings and Nikita Transactions precisely because Barclays understood that Enron could not enter into written agreements with Barclays to that effect.  Given that the assurances were vital to Barclays' participation but could not be put in writing, a fact-finder could infer that Barclays did not believe Enron intended to disclose the existence of the assurances to its outside accountants and auditors.  Further, as discussed above, there is evidence from which a fact-finder can infer that Barclays understood the verbal assurances to be enforceable and disruptive to Enron's intended accounting.

*Reliance on Opinions of Legal Counsel*

The Examiner has also considered the defense that Barclays relied on legal counsel in the $SO_2$ Transaction.  Linklaters provided Enron with a "true sale" opinion

---

[208] Williams Sworn Statement, at 414-20; McKean/Pullman Email, Dec. 22, 1997 (Ex. 6 to McKean Sworn Statement).

dated September 28, 2001, regarding the sale of the Emission Credits to Colonnade (the "Linklaters Opinion") which concluded that the transfer of the credits would qualify as a "true sale."[209] The Examiner has considered whether Barclays could have reasonably relied on this opinion, assuming that Barclays had access to it.[210]

The main problem with Barclays' reliance on the Linklaters Opinion is that Barclays knew to be inaccurate the primary basis on which Linklaters concluded that the $SO_2$ structure would produce a "true sale": that the price risk would be effectively transferred to Colonnade.[211] Barclays understood that the back-to-back swaps among Colonnade, Barclays and Enron effectively kept the price risk with Enron.[212] While the Linklaters Opinion discusses the ENA/Barclays swaps and the Enron/Colonnade swaps and options, it does not make any reference to the third leg of the triangle — the parallel swaps between Barclays and Colonnade.[213] Accordingly, Barclays was on notice that the Linklaters' Opinion was not based on the actual economic effect of the $SO_2$ Transaction — that the price risks stayed with Enron — and reliance on the "true sale" opinion would not have been justified.

---

[209] Letter from Linklaters & Alliance, to Enron Corp., Sept. 28, 2001 (the "Linklaters Opinion Letter"), at 16 [AB000120093 – AB000120108].

[210] See Memorandum from Paul Le Versha, Barclays, to NBFI, Oct. 19, 2001, at 3 (Three weeks after the first $SO_2$ Transaction closed, Barclays indicates that a "[l]egal opinion in respect of the True Sale, in form and substance satisfactory to Barclays and its external legal advisors, has been obtained.") (Ex. 18 to Woodhams Sworn Statement, duplicate with different Bates range) [BSX 01130-BSX 01132]. The Examiner is not aware of any other "legal opinion" relating to the $SO_2$ Transaction and assumes for the purposes of discussion that Barclays did receive a copy of the Linklaters Opinion.

[211] Linklaters Opinion Letter, at 11, 13.

[212] Woodhams Colonnade Memorandum, Sept. 6, 2001, at 3 ("BBPLC enters into a hedge with Colonnade. At the same time, BBPLC enters into 'back to back' arrangements with certain Enron companies. The effect of these arrangements is that the Enron group takes the risk of price/valuation changes in the inventory.").

[213] See Linklaters Opinion Letter.

*No Harm to Enron or Disadvantage to Other Creditors*

The Examiner has considered the defense that, at least with respect to the J.T. Holdings, Nikita, $SO_2$ and September 2001 Prepay Transactions, the harm to Enron required in an aiding and abetting action and the advantage to Barclays or disadvantage to other creditors required to equitably subordinate Barclays' bankruptcy claims may be insufficient.

With respect to the J.T. Holdings Transaction, the structure, while off balance sheet, was more transparent to users of Enron's financial statements than the structures in certain other SPE Transactions. Indeed, Barclays routinely accounted for all of Enron's operating leases as debt equivalents, probably overestimating the debt-equivalent effect of these structures,[214] and believed the rating agencies did the same.[215] In addition, while the J.T. Holdings Transaction resulted in the misstatement of Enron's balance sheet debt, this misstatement, standing alone, probably was not material, given the size of the transaction as compared to Enron's overall debt levels. Further, because J.T. Holdings was the refinancing of a synthetic lease, it did not significantly impact Enron's cash flows. Nevertheless, the effect of the J.T. Holdings Transaction, like Barclays' role in the transaction, is ultimately an issue for the fact-finder to resolve.

The Examiner has also considered that the Nikita, $SO_2$ and September 2001 Prepay Transactions, all of which closed at the end of September 2001, did not materially harm Enron, advantage Barclays or disadvantage other creditors. The effect of these

---

[214] Meyer Sworn Statement, at 195-96. *See, e.g.,* Enron Annual Review, July 2, 1999, at 9, 11; Enron Annual Review, Aug. 16, 2000, at 10-11; Enron Annual Review, Oct. 29, 2001, at 8.

[215] *See* Email from Richard Williams, Director, Barclays, to Henry Pullman, Director, Barclays, John Meyer, Director, Barclays and copy to Robert Clemmens, Chief Credit Officer, Barclays, Nov. 8, 1999, at 1 ("One element of Enron's rating agency presentation is a ' consolidation ' [sic] case that adds back all off-balance sheet obligations and adjusts liabilities and shareholders equity accordingly.") [BRC 000103683-BRC 000103686].

transactions would not have been publicly reported until Enron's 3rd quarter 10Q was released on November 19, 2001, just 13 days before Enron filed for bankruptcy.[216] By this time, any harm to Enron may have been minimal and other creditors were on notice of irregularities with Enron's accounting and disclosures and knew to approach any financing opportunities with extreme caution. While this is a small window in which to establish harm to Enron, advantage Barclays or disadvantage to other creditors, the Examiner finds it likely is sufficient to raise an issue for the fact-finder.

*Limited Involvement in Prepays*

While Barclays had a thorough understanding of how the Prepay Transactions worked from a risk perspective (the transactions were circular, so that there was no commodity price risk), from a balance sheet perspective (the repayment obligation was buried in "Other Liabilities," making determination of the amount of outstanding prepay obligations impossible), and from a cash flow statement perspective (cash from prepays was booked as cash flow from operating activities, rather than from financings), Barclays' involvement in the Prepay Transactions was considerably smaller than that of certain other Financial Institutions discussed in this Report. The Examiner has considered that an argument can be made that Barclays' conduct in the Prepay Transactions does not rise to a level supporting a claim for aiding and abetting or equitable subordination.

Barclays did not structure, design or market any Prepay Transactions. It did not create an SPE for use in any of the Prepay Transactions.[217] While Barclays understood

---

[216] Enron Form 10-Q filed with the SEC for the 3rd Quarter 2001.

[217] *Compare* Report, Appendices D (Role of Citigroup and its Affiliates) and E (Role of JPMorgan Chase and its Affiliates).

the balance sheet effect of the Prepay Transactions early, the Examiner has not been able to determine that Barclays understood, prior to 2000, how Enron booked the cash it received in connection with the Prepay Transactions. Finally, Barclays participated in only three Prepay Transactions totaling approximately $760 million over three years, and appears not to have appreciated the magnitude of Enron's reliance on prepays.

*Corporate Separateness*

The Examiner has considered whether the inequitable conduct of Barclays, if any, can properly be attributed to the Besson Trust. Besson Trust filed the proof of claim in the Bankruptcy Case against ENA,[218] as the counterparty under the Total Return Swap, and against Enron,[219] as the guarantor of ENA's obligations under the Total Return Swap, in the approximate amount of Barclays' Nikita Transaction debt outstanding at the Petition Date.

The Examiner believes the claims of Besson Trust should be susceptible to equitable subordination to the same extent that claims by Barclays would be. As set forth more fully in Appendix B (Legal Standards), courts have approached the question of whether the inequitable conduct of one party can serve as the basis for the equitable subordination of another party's claim in different ways.

In circumstances that are analogous to the immediate situation, the Fifth Circuit held that the inequitable conduct of one party may be imputed to another party for purposes of equitable subordination where the second party was "intimately connected" to the underlying transactions but was not guilty of any overt acts of inequitable

---

[218] *See* Proof of Claim of Besson Trust filed against ENA in the amount of $61,701,414.00 [Claim No. 0000011308].

[219] *See* Proof of Claim of Besson Trust filed against Enron in the amount of $61,701,414.00 [Claim No. 0000011307]

conduct.[220]  Like the creditor who was not guilty of any overt acts in that case, Besson

Trust is "intimately connected with the transactions that gave rise to"[221] the debt – in fact,

Besson Trust was created for no other reason than to engage in the very transaction that

gave rise to that debt.[222]

Besson Trust is also connected to Barclays.  Barclays provided the vast majority

of Besson's capital,[223] and assumed the Certificate risk via the Total Return Swap with

CSFB.[224]  The subordination of the claims of Besson Trust can be supported on the basis

of the "identifiable inequitable conduct"[225] on the part of Barclays discussed in this

Appendix.[226]

In the end, all of these defenses will go to the fact-finder for consideration.

## C.    Conclusions

There is sufficient evidence for a fact-finder to conclude that:  (i) Barclays had

actual knowledge of the wrongful conduct giving rise to breaches of fiduciary duty by

certain of the Debtors' officers; (ii) Barclays gave substantial assistance to the Debtors'

officers by participating in the structuring and closing of the transactions; and (iii) injury

---

[220]  *Wilson v. Huffman (In re Missionary Baptist Found. of Am.)*, 818 F.2d 1135 (5th Cir. 1987).

[221]  *Id.* at 1146.

[222]  *See, e.g.*, Besson Promissory Note; Sullivan/Boots Enron Memorandum; Second Interim Report, Annex 2 to Appendix M (FAS 140 Transactions), *Introduction and Overview of the Nikita Transaction*.

[223]  *See* Besson Promissory Note; Barclays was the lead bank in a syndicate that had agreed to make up to $235 million available in connection with the Nikita Transaction. Sullivan/Boots Enron Memorandum.

[224]  Meyer Sworn Statement, at 150-52. Williams Sworn Statement, at 436.

[225]  *Missionary Baptist*, 818 F.2d at 1146 (emphasis omitted).

[226]  Although another court later refused to extend the rationale of *Missionary Baptist Foundation* in another case *Bartl v. Walsh (In re Claxton)*, 76 B.R. 539 (Bankr. E.D. Va. 1987), it distinguished that case by noting that in *Missionary Baptist*, the court imputed the past proven improprieties of one person to another person involved in the same improper transactions, which was not the case in *Claxton*. *Id.* at 544-45. It is, however, precisely the case with respect to role of Besson Trust in the Nikita transaction.

to the Debtors was the direct or reasonably foreseeable result of such conduct. The evidence reviewed by the Examiner, and the reasonable inferences that may be drawn from that evidence, are sufficient for a fact-finder to conclude that Barclays aided and abetted certain Enron officers in breaching their fiduciary duties. There is also sufficient evidence of inequitable conduct by Barclays in connection with these transactions for a court to conclude that Barclays' claims should be equitably subordinated to the claims of other creditors. As a result, Barclays' claims in the Bankruptcy Case totaling approximately $371 million are susceptible of being equitably subordinated to the claims of other creditors. This subordination would be in addition to any affirmative recovery that may be available to the Debtors against Barclays for aiding and abetting the officers' breaches of fiduciary duty, assuming the Debtors have standing to pursue such a claim.