# Exhibit E

Enron Creditors Recovery Corp., et al, Docket No. 1:01-bk-16034 (Bankr. S.D.N.Y. Dec 02, 2001), Court Docket

## Multiple Documents

| Part | Description |
|------|-------------|
| 1 | Document 0 |
| 2 | Document 1 |
| 3 | Document 2 |
| 4 | Document 3 |
| 5 | Document 4 |
| 6 | Document 5 |
| 7 | Document 6 |
| 8 | Document 7 |
| 9 | Document 8 |

© 2023 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------ x
                                      :

In re:                          :         Chapter 11
                                        :

ENRON CORP., *et al.*,           :         Case No. 01-16034 (AJG)
                                        :

               Debtors.     :         Jointly Administered
                                        :
------------------------------------------------------ x

# FINAL REPORT OF NEAL BATSON,
# COURT-APPOINTED EXAMINER

**November 4, 2003**

## TABLE OF CONTENTS

I. INTRODUCTION ................................................................ 1
   A. Background ............................................................. 1
   B. Prior Reports ......................................................... 2
   C. Summary of Conclusions ................................... 6
   D. Standard Adopted by the Examiner ............... 13
   E. How to Read This Report .............................. 14

II. BACKGROUND ............................................................. 15
   A. Events of Fall 2001 ......................................... 15
   B. The Bankruptcy Filings and Subsequent Events ............... 17

III. ROLES OF ENRON'S PROFESSIONALS, EXECUTIVE OFFICERS
AND OUTSIDE DIRECTORS IN SPE TRANSACTIONS AND
THEORIES OF LIABILITY ................................................ 18
   A. Overview ............................................................. 18
   B. Persons and Entities Involved in Enron's Use of SPEs ........... 22
   C. Theories of Potential Liability and Defenses .............. 23

IV. SPECIFIC ROLE OF ANDERSEN AND POTENTIAL LIABILITY ....... 39
   A. Role of Andersen in Enron's SPE Transactions .......... 39
   B. Potential Liability ........................................... 46

V. SPECIFIC ROLES OF ATTORNEYS AND POTENTIAL LIABILITY ...... 48
   A. Overview ............................................................. 48
   B. Outside Law Firms ......................................... 48
   C. Enron's In-House Attorneys ........................... 52

VI. SPECIFIC ROLES OF LAY, SKILLING AND OUTSIDE DIRECTORS
AND POTENTIAL LIABILITY ........................................... 56
   A. Roles of Lay, Skilling and Outside Directors in Enron's SPE
Transactions ......................................................... 56
   B. Potential Liability ........................................... 60
   C. Lay's and Skilling's Use of Enron Stock to Repay Corporate Loans ....... 61

VII. ROLE OF FINANCIAL INSTITUTIONS IN ENRON'S SPE
TRANSACTIONS AND THEORIES OF LIABILITY ................... 63
   A. Theories of Potential Liability ........................ 63
   B. Potential Defenses to Aiding and Abetting Claims and Equitable
Subordination ..................................................... 64

VIII. SPECIFIC ROLES OF FINANCIAL INSTITUTIONS AND
POTENTIAL LIABILITY ................................................... 66
   A. RBS ..................................................................... 66
   B. CSFB .................................................................. 74
   C. Toronto Dominion ........................................... 78

IX.   HOW COULD THIS HAVE HAPPENED?........................................................ 82
      A.   Overview................................................................................................. 82
      B.   Why Did Enron Officers Behave This Way? ........................................ 83
      C.   Methods Used by Officers to Implement Strategy ................................ 93
      D.   Failure of Professionals to Provide Checks and Balances.................... 110
      E.   Failure of Lay and Skilling to Provide Checks and Balances................ 117
      F.   Failure of Enron Board to Provide Checks and Balances...................... 119

X.    FINAL REPORT ............................................................................................ 137


Appendix A  —   Certain Defined Terms
Appendix B  —   Role of Andersen
Appendix C  —   Role of Enron's Attorneys
Appendix D  —   Roles of Lay, Skilling and Outside Directors
Appendix E  —   Role of RBS and its Affiliates
Appendix F  —   Role of CSFB and its Affiliates
Appendix G  —   Role of Toronto Dominion and its Affiliates

## I.    INTRODUCTION

### A.    **Background**

On December 2, 2001 (the "Petition Date") and on certain dates thereafter, Enron

Corp. ("Enron"), an Oregon corporation, and certain of its affiliates (collectively, the

"Debtors") filed voluntary petitions for relief under Chapter 11 of Title 11 of the United

States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the

Southern District of New York (the "Court") (collectively, the "Bankruptcy Case").[1]

This Court entered an Order on April 8, 2002 (the "April 8th Order") authorizing

and directing the appointment of an examiner pursuant to 11 U.S.C. § 1104(c).[2]  On

May 22, 2002, the United States Trustee appointed Neal Batson (the "Examiner") as the

examiner.  The Court, by Order dated May 24, 2002, approved the appointment.

The Examiner has been authorized to investigate all transactions involving special

purpose vehicles created or structured by the Debtors or at the behest of the Debtors (the

"SPEs") and those individuals, institutions and professionals involved therein.[3]

---

[1] On July 11, 2003, the Debtors filed their Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the
United States Bankruptcy Code.  Docket Number 11698.  On September 18, 2003, the Debtors filed their
Amended Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code
(the "Debtors' Joint Plan").  Docket Number 12822.  The hearing on the adequacy of the disclosure
statement with respect to the Debtors' Joint Plan is presently scheduled for November 18, 2003.

[2] Among other things, the April 8th Order authorized the Examiner to:

> investigate all transactions (as well as all entities as defined in the Bankruptcy Code and
> pre-petition professionals involved therein): (i) involving special purpose vehicles or
> entities created or structured by the Debtors or at the behest of the Debtors (the "SPEs"),
> that are (ii) not reflected on the Enron Corp. balance sheets, or that (iii) involve hedging
> using the Enron Corp. stock, or (iv) as to which the Enron Examiner has the reasonable
> belief are reflected, reported or omitted in the relevant entity's financial statements not in
> accordance with generally accepted accounting principles, or that (v) involve potential
> avoidance actions against any pre-petition insider or professional of the Debtors.

[3] The April 8th Order contained the provision that authorized the Examiner, if appropriate (taking into
account the absolute priority rule, the financial condition of the Debtors' estates and the need not to waste
value available to creditors), to review possible legal mechanisms pursuant to which the equity holders of
Enron could share in the value of the Debtors' estates.  There are legal mechanisms that could be used that

On September 21, 2002, the Examiner filed the First Interim Report of Neal

Batson, Court-Appointed Examiner (the "First Interim Report").   On January 21, 2003,

the Examiner submitted to the Court the Second Interim Report of Neal Batson, Court-

Appointed Examiner (the "Second Interim Report").   On June 30, 2003, the Examiner

submitted to the Court the Third Interim Report of Neal Batson, Court-Appointed

Examiner (the "Third Interim Report"; together with the First Interim Report and the

Second Interim Report, the "Prior Reports").   This Final Report of Neal Batson, Court-

Appointed Examiner, constitutes the Examiner's fourth and final report (the "Report";

together with the Prior Reports, the "Reports").[4]

### B.   Prior Reports

Six SPE transactions were examined in the First Interim Report, and the Examiner

concluded that the transactions were, to varying degrees, susceptible of being

recharacterized under a "true sale" challenge.   If this recharacterization were to occur, the

remaining assets in those structures, having a value of approximately $500 million, would

be restored to the Debtors' estates.

---

would enable the equity holders to share in the value of the Debtors' estates, including plan provisions that
provide that equity holders share in a portion of the proceeds of any allowed claim of any party-in-interest,
including the Securities and Exchange Commission (the "SEC").   Based upon:   (i) the status of ongoing
negotiations regarding the Debtors' Joint Plan; (ii) the information contained in the Debtors' amended
schedules; (iii) the insolvency analysis undertaken by the Debtors and the Official Committee of Unsecured
Creditors (the "Creditors' Committee"); (iv) the comments of the Court regarding the ability of the equity
holders to recover in these cases based upon the apparent amount of claims in the cases; and (v) the desire
not "to waste value available to creditors," the Examiner has not undertaken an extensive analysis of these
legal mechanisms or their viability.

[4] Any references in the Reports to meetings, communications, contacts and actions between the Examiner
and third parties are intended to refer to the office of the Examiner, which shall include the Examiner and
his professionals.   Therefore, references to any meetings, communications, contacts and actions taking
place between the Examiner and a third party should not be construed as indicating that Neal Batson was
present personally for such meetings, communications, contacts or actions.

The Second Interim Report focused on substantially all of Enron's material SPE transactions identified to date. The Examiner provided his views on the role of the SPEs in the collapse of Enron, including a discussion of how Enron used the SPEs in conjunction with six accounting techniques to impact dramatically its financial statements. The Examiner concluded that Enron manipulated its financial statements in violation of GAAP and failed to make appropriate disclosures of its SPE transactions to the public under applicable disclosure standards. Furthermore, the Second Interim Report sets forth the Examiner's conclusions that many of these transactions were, to varying degrees, susceptible of "true sale" or substantive consolidation challenges which, if successful, would result in assets having an estimated aggregate value between $1.7 billion and $2.1 billion being restored to the Debtors' estates. Finally, the Examiner identified potential avoidable transfers in the face amount of approximately $2.9 billion that may be recovered by the Debtors' estates.[5]

---

[5] As noted in the Prior Reports, the ability of the Debtors to realize on certain of these avoidance actions is subject to: (i) affirmative defenses of any transferee; (ii) valuation evidence (particularly in the case of constructively fraudulent transfers); and (iii) collectability. As to valuation, both the Debtors and the Creditors' Committee have engaged investment bankers or other valuation experts. In order to avoid duplication of effort, and because the Examiner does not have authority to prosecute actions on behalf of the Debtors' estates, the Examiner has not sought to retain such an expert. To the extent an action is pursued by the Debtors or the Creditors' Committee, investment bankers retained by such party may provide valuation advice.

As set forth in the Prior Reports, the Examiner received assurances from the professionals for the Debtors and the Creditors' Committee to the effect that the Debtors, in coordination with the Creditors' Committee, would undertake to complete an insolvency analysis with respect to the Debtors. Accordingly, for the purposes of the Examiner's analysis of potential avoidance actions as well as for other purposes, the Examiner has assumed insolvency of the Debtors under Section 101(32) of the Bankruptcy Code at the time of any subject transfer. The professionals for the Debtors recently have advised the Examiner that the Debtors' professionals have concluded that Enron and certain of its Debtor affiliates were insolvent as of December 31, 1999, under the tests articulated under the Uniform Fraudulent Transfer Act and/or the Uniform Fraudulent Conveyance Act, as those acts may be applicable. Accordingly, and as discussed in the Prior Reports, there may be additional voidable transfer claims that may inure to the benefit of the Debtors' estates by virtue of the application of Section 544(a) of the Bankruptcy Code and the use of state law fraudulent transfer theories to challenge transfers made, or obligations incurred, more than one year prior to the Petition Date. The Examiner has been advised that the Debtors and the Creditors' Committee are investigating these claims. The Examiner also has been advised that the Debtors are investigating

The primary focus of the Third Interim Report was on certain persons and entities that, under applicable legal standards, may have responsibility for the Debtors' misuse of its SPE structures. The Examiner concluded that there was sufficient evidence from which a fact-finder could conclude that certain senior officers of Enron, including Andrew Fastow ("Fastow"), Rick Causey ("Causey"), Ben Glisan ("Glisan") and Jeff McMahon ("McMahon"), breached their fiduciary duties under applicable law by causing the Debtors to enter into SPE transactions that were designed to manipulate the Debtors' financial statements and that resulted in the dissemination of financial information known by these officers to be materially misleading. In addition, the Examiner concluded that there was sufficient evidence from which a fact-finder could conclude that certain financial institutions involved in Enron's SPE transactions: (i) aided and abetted these officers in breaching their fiduciary duties; and (ii) engaged in inequitable conduct such that a court could determine that the claims of such financial institutions, totaling in excess of $5 billion,[6] should be equitably subordinated to the claims of other creditors. This would be in addition to any affirmative recovery that may be available to the

---

possible avoidance actions arising out of Enron's equity forward transactions (as described in foonote 22 of the Third Interim Report).

[6] This amount could be significantly greater. As discussed in Appendix B (Legal Standards) to the Third Interim Report, published case law is unclear as to what happens if the "tainted" claim of a financial institution is purchased by another entity. That is, if a financial institution engaged in inequitable conduct such that equitable subordination was warranted, and if that financial institution then sold all or a portion of its claim (or syndicated a portion of the loan to other financial institutions after the closing of the transaction), would the claims of these purchasing financial institutions be subject to equitable subordination on the basis of the transferor's conduct? If the answer to that question is "yes," then an analysis of what claims, if any, were sold (or syndicated post-closing) by the financial institution that engaged in misconduct should be undertaken. The Examiner did not undertake this analysis given the expense involved and the uncertainty of the case law.

This amount does, however, include the claims of certain entities (primarily trusts) that filed proofs of claim relating to or based on certain transactions in which a financial institution is the beneficial holder of the debt.

Debtors against these financial institutions for aiding and abetting the officers' breach of fiduciary duty, assuming that the Debtors have the requisite standing to pursue such a claim.[7]

The Examiner also considered whether Section 548(a)(1)(A) of the Bankruptcy Code, which allows the avoidance of obligations and transfers made with the intent to hinder, delay or defraud creditors, could be applied to the Debtors' SPE transactions. If such a theory is applicable, and if a fact-finder determined that the Debtors entered into an SPE transaction with actual intent to hinder, delay or defraud its creditors, then the *obligations* incurred in that SPE transaction would be unenforceable. Either as a result of such a finding or if the fact-finder determined that the *transfers* made in connection with such SPE transactions were made with intent to hinder, delay or defraud, such transfers could be recovered by the Debtors' estates. Any transferee that entered into such an obligation or received such payments in good faith, however, would have a defense to this claim to the extent value was given to the Debtors.[8]

---

[7] On September 24, 2003, Enron and Enron North America Corp. (f/k/a Enron Capital & Trade Resources Corp.) ("ENA") filed the Debtors' Complaint for the Avoidance and Return of Preferential Payments and Fraudulent Transfers, Equitable Subordination, and Damages, Together With Objections and Counterclaims to Creditor Defendants' Claims with the Court against certain of these financial institutions and their affiliates. *Enron Corp. v. Citigroup Inc.*, No. 03-09266 (AJG) (Bankr. S.D.N.Y. filed Sept. 24, 2003). In this complaint, the Debtors seek, among other things, to: (i) equitably subordinate the financial institutions' claims; (ii) recover in excess of $3 billion from these financial institutions as alleged avoidable transfers or obligations; and (iii) recover unstated damages resulting from alleged aiding and abetting on the part of these financial institutions.

[8] While the Examiner has not made a case-by-case analysis pursuant to this theory, there is sufficient evidence for a fact-finder to conclude that, with respect to Enron's overall use of SPEs, Enron entered into these transactions with the intent to hinder, delay or defraud its creditors. The Examiner also notes that the facts applicable to the potential claims of aiding and abetting a breach of fiduciary duty, or the potential equitable subordination of certain financial institutions' claims, are facts that would be relevant to the good faith defense.

Finally, the Examiner identified additional potential avoidable transfers in the face amount of approximately $438 million that, to varying degrees, may be recovered by the Debtors' estates.[9]

### C.   Summary of Conclusions

Enron's officers, directors, accountants, attorneys and financial institutions had different roles and duties in the SPE transactions.  As discussed in the Third Interim Report and in this Report, certain of these persons and entities may be liable to Enron or others for their roles in these transactions.  Regardless of their respective legal liability, these parties are included within a circle of responsibility for Enron's financial demise.

In the Third Interim Report, the Examiner reported on the role and potential liability of Enron's officers and certain financial institutions.  The primary focus of this

---

[9] The Examiner's analysis, for the most part, has not addressed the inter-estate avoidance action issues that may be implicated by the various SPE transactions discussed in the Reports.  For example, in a number of transactions, ENA was the financial counterparty to an SPE, such as Delta or Mahonia – the SPEs used in certain of the Prepay Transactions.  To the extent that ENA paid those obligations, and its obligations were guaranteed by Enron, ENA may be able to assert a preference claim against both the transferee (Delta or Mahonia) or against Enron under Sections 547 and 550 of the Bankruptcy Code.  There also may be fraudulent transfer or obligation actions available to some estates against other estates by virtue of the SPE transactions.  For example, as noted by the Examiner in the Third Interim Report, where ENA made certain payments in respect of the Mahonia transactions on behalf of its affiliate, ENG, the bankruptcy estate of ENA may be able to assert a fraudulent transfer claim with respect to those transfers to the extent that the subsidiary was insolvent at that time.  *See* Third Interim Report, Annex 1 to Appendix J (Avoidance Actions), at 22 n.56.  In addition, because Enron guaranteed many of the obligations of ENA under commodity swaps, total return swaps and similar derivative instruments in connection with the SPEs, if both Enron and ENA were insolvent at the time of the execution of the guaranty, the Enron estate may be able to assert that it did not receive reasonably equivalent value as a result of the incurrence of the obligation under the guaranty.  The success of this type of avoidance claim would require, among other things, a finding of insolvency on the part of Enron and the applicable subsidiary as well as a finding that the value of the bundle of rights received by Enron in connection with the transaction was less than reasonably equivalent value for the obligations incurred.  That bundle of rights could include, among other things, cash received by Enron by virtue of Enron's cash management system (although upon Enron's receipt of such funds, an intercompany debt to the subsidiary was created) as well as a contingent claim against the subsidiary for indemnification, contribution or subrogation in the event Enron was required to honor the guaranty, even if that claim was subject to a standstill provision.

Report is on additional persons and entities that may have liability under applicable legal
standards for the Debtors' misuse of its SPE structures.[10]

Specifically, in this Report the Examiner concludes that:

### Andersen

- There is sufficient evidence from which a fact-finder could conclude
  that Andersen: (i) committed professional negligence in the rendering
  of accounting services to Enron; and (ii) aided and abetted certain
  Enron officers in breaching their fiduciary duties to Enron by causing
  Enron to enter into SPE transactions that were designed to manipulate
  the Debtors' financial statements and that resulted in the dissemination
  of financial information known by these officers to be materially
  misleading. Because Enron's officers participated in the wrongful
  conduct, however, Andersen may assert that the actions by the Enron
  officers should be imputed to Enron and consequently, that claims by
  Enron should be barred or reduced under comparative fault rules.[11]

### In-house Attorneys

- There is sufficient evidence from which a fact-finder could conclude
  that certain Enron in-house attorneys committed legal malpractice by:
  (i) failing to advise Enron adequately regarding the disclosure of its
  SPE transactions, including the related party transactions; (ii) failing to

---

[10] The scope of the Examiner's investigation is limited by the terms of the April 8th Order. Generally, the
Reports do not address any potential causes of action that may arise as a result of any transactions or
arrangements that do not involve the Debtors' use of SPEs or other matters specifically identified in the
April 8th Order. For example, many of the financial institutions discussed in the Reports were involved in
transactions and arrangements with Enron that are not related to subjects listed in the April 8th Order and, as
a consequence, the Examiner generally expresses no opinion as to whether there are potential causes of
action that may arise as a result of such other transactions or arrangements.

In the Prior Reports, the Examiner analyzed and reported on certain legal, structural and accounting issues
that arose from Enron's SPE transactions. In the course of that analysis, the Examiner identified a number
of third parties whose relationships with Enron appeared to warrant further investigation given the scope of
the April 8th Order. Generally, these parties had the most significant involvement in Enron's SPE
transactions and the most substantial claims against the Debtors' estates. Furthermore, the Examiner
analyzed and discussed various causes of action that may be available to the Debtors in each of the Reports.
Neither the identified third parties nor causes of action are necessarily exhaustive. In many cases, there
may be alternative theories or claims that could be available to the Debtors against the parties identified in
the Reports or others, which the Debtors may or may not elect to pursue.

[11] As used in this report, "comparative fault rules" include Texas' "Proportionate Responsibility" statute,
Tex. Civ. Prac. & Rem. Code Ann. §§ 33.001-002, and the equitable principle of *in pari delicto*. The legal
standards applicable to Andersen, including comparable fault rules, are discussed in detail in Annex 2 to
Appendix B (Role of Andersen). It is possible that choice of law determinations could require
consideration of similar doctrines that impact Enron's standing to bring such claims.

advise adequately Enron's Board of Directors (the "Board" or the "Enron Board") and certain of its committees with respect to legal and corporate governance issues raised by certain related party transactions; and (iii) failing to advise the Enron Board of material facts surrounding Enron's use of SPEs.[12] There is also sufficient evidence from which a fact-finder could conclude that certain in-house attorneys breached their fiduciary duties by assisting certain officers who breached their fiduciary duties to Enron by causing the Debtors to enter into SPE transactions that were designed to manipulate the Debtors' financial statements and that resulted in the dissemination of financial information known to be materially misleading. Because Enron's officers participated in the wrongful conduct, however, these attorneys may assert that the actions by the Enron officers should be imputed to Enron and consequently, that claims by Enron should be barred or reduced under comparative fault rules.

*Outside Attorneys*

- There is sufficient evidence from which a fact-finder could conclude that certain of Enron's outside attorneys:[13] (i) committed legal malpractice in connection with their legal services provided to Enron with respect to the SPE transactions; or (ii) aided and abetted certain Enron officers in breaching their fiduciary duties.[14] Because Enron's officers participated in the wrongful conduct, however, these attorneys may assert that the actions by the Enron officers should be imputed to Enron and consequently, that claims by Enron should be barred or reduced under comparative fault rules.

---

[12] As set forth more fully in this Report (including its Appendices), the types of claims, weight of evidence, availability of defenses and other mitigating factors differ among the in-house attorneys.

[13] Enron's outside law firms discussed in this Report are: (i) Vinson & Elkins L.L.P. ("Vinson & Elkins"); and (ii) Andrews & Kurth L.L.P. ("Andrews & Kurth"). As set forth more fully in this Report (including its Appendices), the types of claims, weight of evidence, availability of defenses and other mitigating factors differ among the outside attorneys.

[14] As set forth in Annex 1 to Appendix C (Role of Enron's Attorneys), there is a lack of consensus among the courts as to whether a cause of action by a corporate client against its attorney based upon aiding and abetting a fiduciary duty breach is a separate cause of action or is subsumed within a malpractice cause of action. The Examiner expresses no view on this issue. For purposes of this Report, the Examiner's analysis of the attorneys' conduct includes consideration of the elements of an aiding and abetting cause of action, regardless of which label may ultimately attach to any potential cause of action.

*Lay and Skilling*[15]

- There is sufficient evidence from which a fact-finder could conclude that Kenneth Lay ("Lay"), Enron's Chairman and Chief Executive Officer, and Jeffrey Skilling ("Skilling"), Enron's President and Chief Operating Officer, in their capacities as officers, breached their fiduciary duties under applicable law by failing to provide adequate oversight of Enron's use of SPEs because they failed to respond appropriately to the existence of "red flags" indicating that certain senior officers were misusing SPE transactions to disseminate materially misleading financial information. If a fact-finder so concludes, the director exculpation provision in Enron's articles of incorporation would not protect Lay and Skilling from such a claim because this failure occurred in their capacity as officers.[16]

- There is sufficient evidence from which a fact-finder could conclude that Lay and Skilling, in their capacities as members of the Enron Board, breached their fiduciary duty of good faith under applicable law in approving the LJM1/Rhythms non-economic hedging transaction (the "LJM1/Rhythms Hedging Transaction") and certain LJM2/Raptors non-economic hedging transactions (the "LJM2/Raptors Hedging Transactions") because there is evidence that they were in possession of facts necessary to conclude that these

---

[15] Lay appeared for a one-day interview with the Examiner that was not conducted under oath, and he has provided no sworn testimony to any party in connection with any examination of Enron conducted after the Petition Date. Skilling invoked his Fifth Amendment privilege and did not provide the Examiner with either testimony or an interview. Skilling, however, provided sworn testimony to the SEC and a subcommittee of the House of Representatives Energy and Commerce Committee (the "HEC"). Both Lay and Skilling apparently were infrequent users of email and produced little relevant written material in response to the Examiner's subpoenas. As a result, the evidence available to the Examiner with respect to Lay and Skilling consisted primarily of: (i) Lay's one-day interview by the Examiner; (ii) Skilling's sworn testimony to the SEC and the HEC; (iii) Lay's and Skilling's interviews with the Powers Committee; (iv) interviews with and testimony of others, including members of Enron's Board and certain Enron officers; and (v) documentary evidence produced by Enron and others.

[16] Enron's articles of incorporation contain an exculpation provision that provides that a director of Enron shall not be personally liable to Enron or its shareholders for monetary damages for conduct as a director, except for liability: (i) for any breach of the director's duty of loyalty to Enron or its shareholders; (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law; (iii) for any unlawful distribution under Or. Rev. Stat. § 60.367; or (iv) for any transaction from which the director derived an improper personal benefit. *See* Article VII, Section A, Articles of Incorporation of Enron Corp. [AB0785 03888-AB0785 04147]. As set forth more fully in this Report (including its Appendices), the weight of evidence, availability of defenses and other mitigating factors differ between Lay and Skilling.

transactions lacked any rational business purpose.[17]  If a fact-finder so concludes, the director exculpation provision in Enron's articles of incorporation would not protect Lay and Skilling from such a claim because it involves acts or omissions not in good faith.

- There is sufficient evidence from which a fact-finder could conclude that Skilling, in his capacity as an officer, breached his fiduciary duties under applicable law by failing adequately to inquire into red flags with respect to the transactions between LJM1 and Enron and LJM2 and Enron, including red flags relating to the compensation that Fastow received in connection with LJM1 and LJM2.  Because this failure occurred in Skilling's capacity as an officer, the director exculpation provision in Enron's articles of incorporation would not apply to such a claim.

- There is sufficient evidence from which a fact-finder could conclude that:  (i) Lay's repayment to Enron of more than $94 million of loans with Enron stock was not duly authorized or approved by the Enron Board under applicable corporate law; and (ii) the repayment is voidable by Enron, which would result in Lay being obligated to repay in excess of $94 million to Enron and Enron returning the stock to Lay.[18]

- There is sufficient evidence from which a fact-finder could conclude that:  (i) Skilling's repayment to Enron of more than $2 million of loans with Enron stock was not duly authorized or approved by the Enron Board under applicable corporate law; and (ii) the repayment is voidable by Enron, which would result in Skilling being obligated to repay in excess of $2 million to Enron and Enron returning the stock to Skilling.

---

[17] As discussed below, the LJM1/Rhythms Hedging Transaction and the LJM2/Raptors Hedging Transactions were non-economic hedges.  That is, they were accounting hedges (with the sole purpose of providing financial statement benefits) and did not provide economic protection to Enron because the assets used to support the hedge were Enron's own assets.

[18] The Examiner concluded in the Second Interim Report that Enron has an alternative claim against Lay for $74.025 million of this amount under Section 548(a)(1)(B) of the Bankruptcy Code.  *See* Second Interim Report, Appendix P (Avoidance Actions).  The Creditors' Committee is currently prosecuting a suit against Lay on account of these transfers.  *Official Comm. of Unsecured Creditors of Enron Corp. v. Lay*, No. 03-02075-AJG (Bankr. S.D.N.Y. filed Jan. 31, 2003).

*Outside Directors*[19]

- Although the oversight of the SPE transactions by the Enron Board, the Audit and Compliance Committee of the Enron Board (the "Audit Committee") and the Finance Committee of the Enron Board (the "Finance Committee") may be criticized, the Examiner has not discovered sufficient evidence from which a fact-finder could conclude that members of the Enron Board who served during the period 1997 to the Petition Date, other than Lay and Skilling (the "Outside Directors") and these committees either (i) abdicated or displayed sustained inattention to their monitoring responsibilities or (ii) consciously disregarded red flags indicating Enron officers were misusing the SPE transactions to disseminate materially misleading financial information. In the absence of this type of conduct, because of the director exculpation provision in Enron's articles of incorporation, the Outside Directors would not have liability to Enron arising out of their duty of oversight.

- There is sufficient evidence from which a fact-finder could conclude that certain of the Outside Directors breached their fiduciary duty of good faith under applicable law in approving the LJM1/Rhythms Hedging Transaction and certain of the LJM2/Raptors Hedging Transactions because there is evidence that they were in possession of facts necessary to conclude that these transactions lacked any rational business purpose. If a fact-finder so concludes, the director exculpation provision in Enron's articles of incorporation would not

---

[19] Under certain circumstances, the courts have held that the fiduciary duties of a board to the corporation and to its shareholders may expand to include fiduciary duties to creditors. The more recent decisions in the area find that upon the corporation's insolvency (or when the corporation is within the "zone of insolvency"), the board of directors must manage the corporation in a manner consistent with the interests of creditors (and, potentially, shareholders as well). Certain courts have recognized the standing of creditors (and, in certain cases, bankruptcy trustees as the representative of creditors) to initiate litigation against directors to recover damages for the breach of the fiduciary duty to creditors. These cases typically involve situations where the directors have breached their duty of loyalty (such as preferring themselves). Other courts have held that claims of this sort are individual or personal creditor claims, which a trustee or debtor in possession does not have standing to assert. Ultimately, the law of the state of incorporation should govern these types of claims and the law in Oregon is not fully developed on this particular set of issues. Accordingly, individual creditors and/or the Debtors (in their capacity as debtors in possession and representatives of the estates) may be able to state a claim against the Enron Board in connection with certain decisions made by the Enron Board while Enron was insolvent. One aspect of that litigation may be the ability of the plaintiff to take the position that the director exculpation provision in Enron's articles of incorporation does not apply to the plaintiff (suing on behalf of the creditors) and, potentially, that the so-called business judgment rule does not apply. The Examiner has analyzed the conduct of the Enron Board under the assumption that the director exculpation provision contained in Enron's articles of incorporation and the business judgment rule would apply. If, and to the extent, litigation were brought by a plaintiff with standing (be that the debtor in possession, a litigation trustee appointed under the terms of the Debtors' Joint Plan or an individual creditor), the conduct of the Enron Board may be subject to review without consideration of these doctrines.

-11-

protect the Outside Directors from such a claim because it involves acts or omissions not in good faith.[20]

*Additional Financial Institutions*[21]

- There is sufficient evidence from which a fact-finder could conclude that certain financial institutions not previously discussed in the Prior Reports (the "Financial Institutions") that were involved in Enron's SPE transactions[22] aided and abetted certain Enron officers who breached their fiduciary duty by causing Enron to enter into SPE transactions that were designed to manipulate the Debtors' financial statements and that resulted in the dissemination of financial information known by these officers to be materially misleading. However, because Enron's officers participated in the wrongful conduct, the Financial Institutions may assert the actions by the Enron officers should be imputed to Enron and consequently, either that Enron lacks standing to assert any such claim or that the doctrine of *in pari delicto* is a defense to defeat a claim by Enron.[23]

- There is sufficient evidence from which a fact-finder could conclude that: (i) certain of the Financial Institutions that were involved in the LJM1/Rhythms Hedging Transaction had *actual knowledge* of the wrongful conduct of Fastow in this transaction, which resulted in Fastow breaching his fiduciary duty of loyalty; (ii) these Financial Institutions gave *substantial assistance* to Fastow by participating in transactions designed to circumvent restrictions imposed by the Enron Board (as reflected in LJM1's partnership agreement) in connection with the LJM1/Rhythms Hedging Transaction; and (iii) injury to the Debtors was the direct or reasonably foreseeable result of such

---

[20] As set forth more fully in this Report (including its Appendices), the weight of evidence, availability of defenses and other mitigating factors differ among the Outside Directors. The Examiner has not assessed the potential liability of individual Outside Directors.

[21] As set forth more fully in this Report (including its Appendices), the weight of evidence, availability of defenses and other mitigating factors differ among the Financial Institutions.

[22] The financial institutions discussed in this Report (collectively, the "Financial Institutions") are: (i) The Royal Bank of Scotland plc and its affiliates and predecessors (collectively, "RBS"); (ii) Credit Suisse First Boston, Inc. and its affiliates and predecessors (collectively, "CSFB"); and (iii) Toronto Dominion Bank and its affiliates and predecessors (collectively, "Toronto Dominion"). The order of presentation of each Financial Institution is based upon the apparent size of the Financial Institution's claims in the Bankruptcy Case (as measured by the proofs of claim filed by the Financial Institution or on its behalf), from the largest to the smallest claims.

[23] See Third Interim Report, Appendix B (Legal Standards) for a discussion of principles of standing and *in pari delicto* under New York law. If Texas law governs, comparative fault rules, discussed above, would apply.

conduct. As a result, a fact-finder could conclude that these Financial Institutions aided and abetted Fastow in breaching his fiduciary duties.

- There is sufficient evidence of inequitable conduct by the Financial Institutions in connection with the SPE transactions for a court to determine that the claims of such Financial Institutions, totaling in excess of $1 billion,[24] may be equitably subordinated to the claims of other creditors.[25]

Finally, in Section IX of this Report, the Examiner addresses the question that many people have asked: how could this have happened?

### D. Standard Adopted by the Examiner

The Examiner is not the ultimate decision maker on these matters. The Examiner has analyzed the evidence he has gathered to date against the legal standards applicable to the issues identified in this Report. The Examiner has considered direct evidence and the reasonable inferences that can be drawn therefrom. If there are sufficient facts to support a claim, even though there is evidence to the contrary, then a court would submit that claim to a fact-finder. Where the Examiner reaches the conclusion that there is *sufficient evidence for a fact-finder to conclude* that a claim exists, the Examiner has determined that in a legal proceeding regarding such matter, the proposition would be submitted to

---

[24] This amount could be significantly greater. *See supra* n.6.

[25] In addition, if Section 548(a)(1)(A) of the Bankruptcy Code, which allows the avoidance of obligations incurred and transfers made with the intent to hinder, delay or defraud creditors, can be applied to the SPE transactions to which these Financial Institutions were parties, and a fact-finder determined that Enron entered into these SPE transactions with actual intent to hinder, delay or defraud its creditors, obligations incurred in these SPE transactions would be unenforceable. Either as a result of such a finding or if the fact-finder determined that the transfers made in connection with such SPE transactions were made with intent to hinder, delay or defraud, such transfers made to the Financial Institutions could be recovered by the Debtors' estates. The Financial Institutions that entered into the transaction giving rise to such an obligation or received such payments in good faith, however, would have a defense to this claim to the extent value was given to the Debtors. *See* Third Interim Report, Appendix B (Legal Standards), at 114-33.

-13-

the fact-finder for decision.[26]   In most cases, the fact-finder would be a jury, although in equitable subordination actions the bankruptcy court serves as the fact-finder.   The decision of the fact-finder would be made after evaluating the documentary evidence, the testimony and credibility of witnesses and the reasonable inferences that may be drawn from this evidence.

### E.   How to Read This Report

The remaining Sections of this Report provide an overview of the Examiner's conclusions with respect to the matters identified above.   More detailed analyses and supporting evidence are set forth in the Appendices to this Report.   Therefore, the reader should review the applicable Appendices (and any Annex attached thereto) for a more complete understanding of the issues addressed in the summaries below.

The first appendix to this Report – Appendix A (Certain Defined Terms) – is designed to provide the reader with certain definitions used throughout this Report.

---

[26] In connection with any claims against a professional that are based on malpractice, the plaintiff would generally be required to produce a qualified expert to give his or her competent opinion as to, among other things, whether the defendant satisfied the applicable standard of care.   Where the Examiner reaches the conclusion *that there is sufficient evidence for a fact-finder to conclude* that these types of negligence claims exist, the Examiner has determined that the plaintiff would be able to produce a qualified expert to express such an opinion.   The Examiner's conclusion does not mean that the defendant would be unable to produce a qualified expert who would give a competent opinion contrary to that expressed by the plaintiff's expert.   As noted in Appendix C (Role of Enron's Attorneys), Vinson & Elkins has offered certain opinions of law school professors and practitioners on several matters as to which the Examiner took testimony.

-14-

## II.    BACKGROUND

### A.    Events of Fall 2001

Until the fall of 2001, Enron was one of the largest companies in the world and was considered to be one of the most innovative and successful.[27]  In the fall of 2001, however, Enron made a series of financial disclosures and restatements of its financial statements that triggered a chain of events culminating in its bankruptcy filing.

In an earnings release issued on October 16, 2001,[28] Lay announced that Enron was taking "after-tax non-recurring charges" of $1.01 billion in the third quarter.[29]  On that same day, although not disclosed as part of its earnings release, Enron disclosed that it would record a $1.2 billion reduction in shareholders' equity as of the end of the third quarter.[30]  On November 8, 2001, Enron announced its intention to restate its financial

---

[27] According to the 2001 Fortune 500 Rankings, Fortune magazine ranked Enron as the seventh largest corporation in the world, based upon revenues.  *The 500 Largest U.S. Corporations,* Fortune, Apr. 16, 2001, at F-1.  On February 19, 2001, Fortune magazine named Enron as the Most Innovative Company in America for the fifth consecutive year.  *America's Most Admired Companies,* Fortune, Feb. 19, 2001, at 104.

[28] Enron Press Release, "Enron Reports Recurring Third Quarter Earnings of $0.43 Per Diluted Share; Reports Non-Recurring Charges of $1.01 Billion After-Tax; Reaffirms Recurring Earnings Estimates of $1.80 for 2001 and $2.15 for 2002; And Expands Financial Reporting," Oct. 16, 2001, at ELIB00001783-00003 [ELIB00001783-00001-ELIB00001783-00005].  Enron's third quarter ended September 30th.

[29] Although there were several components to the charge, one component related to Enron's "early termination during the third quarter of certain structured finance arrangements with a previously disclosed entity."  The "previously disclosed entity" was LJM2 Co-Investment, L.P. ("LJM2"), a private investment limited partnership founded in December 1999.  LJM2 was run by Fastow and Michael J. Kopper ("Kopper"), an Enron employee, and had as its limited partners a significant number of institutional and individual investors.  Enron Form 10-Q filed with the SEC for the Quarter ended Sept. 30, 2001 (the "10-Q for 3Q/2001"), at 18-19, Note 4 to Consolidated Financial Statements in connection with related party transactions.  The charge related to Enron's termination of four SPEs known as Raptor I, II, III and IV (the "Raptor SPEs") pursuant to which Enron had entered into the LJM2/Raptors Hedging Transactions.  As a result of this termination, Enron recognized a $544 million after-tax charge to net income for the third quarter 2001.  The pre-tax charge was $710 million.  *Id.*

[30] October 16, 2001, 9:00 a.m. C.T., Enron Corp. Conference Call regarding Third Quarter 2001 Earnings Release, Moderator:  Mark Koenig (the "Earnings Release"), at AB0252 04610 [AB0252 04603-AB0252 04629].

statements for 1997 through 2000, and the first and second quarters of 2001, to reduce previously reported net income by an aggregate of $586 million.[31]

On November 19, 2001, Enron filed its third quarter Form 10-Q, including interim financial statements that gave effect to the previously announced "non-recurring charges" and restatement of prior financial statements.[32] In addition, in its third quarter 2001 balance sheet, Enron reported total debt under generally accepted accounting principles ("GAAP") of $12.978 billion.[33] On the same day, senior Enron executives informed certain of its bankers that, while the debt reflected on its third quarter 2001 balance sheet under GAAP was $12.978 billion, Enron's "debt" (as described in the presentation) was $38.094 billion.[34] Thus, as Enron noted, $25.116 billion of debt was "off-balance sheet," or in some cases, reflected on the balance sheet, but classified as something other than debt. Approximately $14 billion of this $25.116 billion of additional "debt" was incurred through structured finance transactions involving the use

---

[31] Enron Form 8-K filed with the SEC on Nov. 8, 2001. This filing also contained additional information surrounding the related party transactions. At the time of the announced restatement, the third quarter 2001 financial statements had not been filed, but a loss of $618 million had been announced in the Earnings Release. On October 31, 2001, Enron announced that its Board of Directors had formed a Special Investigative Committee, headed by William Powers, Jr., Dean of the University of Texas Law School (the "Powers Committee"), to examine and recommend actions with respect to transactions between Enron and entities connected with related parties. *Id.* LJM2 and another partnership, LJM Cayman, L.P. ("LJM1"), as well as other investment partnerships, were the principal focus of the Report of Investigation by the Special Investigative Committee of the Board of Directors of Enron Corp., released February 1, 2002 (the "Powers Report").

[32] 10-Q for 3Q/2001. These financial statements gave effect to the previously announced "non-recurring charges" and restatement of prior financial statements. Due to the pending investigation by the Powers Committee and the previously announced restatement, Andersen was unable to finalize its review of these quarterly statements as required by SEC Rule 10-01(d) of Regulation S-X.

[33] *Id.* The debt consisted of $6.434 billion of short-term debt and $6.544 billion of long-term debt.

[34] Enron Corp. PowerPoint Bank Presentation, Waldorf Astoria, New York, N.Y., Nov. 19, 2001 (the "Bank Presentation"), at 48-62 [AB000321534-AB000321605].

of SPEs. Enron's presentation to the banks divided the additional debt into eight categories, shown in the following table:

| Category of Additional "Debt" | Amount at 9/30/01 in billions |
|---|---|
| FAS 140 Transactions | $2.087 |
| Minority Interest Financings | $1.690 |
| Commodity Transactions with Financial Institutions | $4.822 |
| Share Trusts | $3.352 |
| Equity Forward Contracts | $.304 |
| Structured Assets | $1.532 |
| Unconsolidated Affiliates | $10.733 |
| Leases | $.596 |
| **Total** | **$25.116** |

## B.     The Bankruptcy Filings and Subsequent Events

Less than one month after meeting with its bankers, Enron and certain of its affiliates filed for bankruptcy. In the months immediately following Enron's disclosures, allegations surfaced of securities fraud, accounting irregularities, energy market price manipulation, money laundering, breach of fiduciary duties, misleading financial information, ERISA violations, insider trading, excessive compensation and wrongdoing by certain of Enron's bankers.[35]

---

[35] Numerous Congressional Committees have investigated aspects of Enron's business activities or practices. In addition, there have been several class action lawsuits filed on behalf of shareholders and employees, which are still pending, naming the Debtors, certain of their directors, Andersen, certain other professionals, and others as defendants. These include *Newby v. Enron Corp.*, No. 01-CV-3624 (S.D. Tex. filed Oct. 22, 2001), a lawsuit alleging, among other things, violations of securities laws (the "Newby Class Action"). Other class actions include *Severed Enron Employees Coalition v. Northern Trust Co.*, No. 02-CV-267 (S.D. Tex. filed Jan. 24, 2002) and *Tittle v. Enron Corp.*, No. 01-CV-3913 (S.D. Tex. filed Nov. 13, 2001), lawsuits alleging, among other things, breach of fiduciary duty under ERISA. (Shortly after it was filed, the *Severed Enron Employees Coalition* case was administratively closed and consolidated with the *Tittle* case.) Another lawsuit, *Chao v. Enron Corp.*, No. 03-CV-2257 (S.D. Tex. filed June 26, 2003), alleges that Enron, its directors and certain employees did not manage the assets of Enron's pension plans in accordance with the standards set forth in ERISA. The Examiner expresses no opinion as to the merits of any of these lawsuits.

## III. ROLES OF ENRON'S PROFESSIONALS, EXECUTIVE OFFICERS AND OUTSIDE DIRECTORS IN SPE TRANSACTIONS AND THEORIES OF LIABILITY

### A. <u>Overview</u>

In his Second Interim Report, the Examiner concluded that, through the pervasive use of structured finance techniques involving SPEs and aggressive accounting practices, Enron so engineered its reported financial position and results of operations that its financial statements bore little resemblance to its actual financial condition and performance. As an example, the Examiner used 2000, the last year for which Enron issued audited financial statements, to illustrate the impact of these techniques.[36] That year, Enron's use of six accounting techniques produced 96% of its reported net income and 105% of its reported funds flow from operating activities and enabled it to report $10.2 billion of debt rather than $22.1 billion of debt. The six accounting techniques are summarized as follows:

- *FAS 140 Transactions.*[37] Enron's FAS 140 Transactions were essentially bridge financings of illiquid assets. Although Enron treated these transactions as sales to SPEs for accounting purposes, Enron assumed liability for repayment of the debt incurred and retained substantially all of the economic benefits and risks of ownership of the asset.[38]

---

[36] The financial impact of Enron's use of its six accounting techniques to produce and disseminate materially misleading financial information is not limited to its 2000 annual financial statements. The effect of these techniques on the 2000 annual financial statements is presented only as an illustration. The Examiner has concluded that use of these techniques caused the 1999 annual financial statements and earlier financial statements to be misleading as well.

[37] *See* Second Interim Report, at 107-12; Second Interim Report, Appendix M (FAS 140 Transactions).

[38] These transactions are structured finance transactions that were intended to comply with either Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities, Statement of Financial Accounting Standards No. 125 (Financial Accounting Standards Bd. 1996) ("FAS 125"), or its successor, Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities, Statement of Financial Accounting Standards No. 140 (Financial Accounting Standards Bd. 2000) ("FAS 140"). FAS 125 was the accounting standard that governed securitizations of financial assets from January 1, 1997, until it was replaced by FAS 140, which became effective with respect to transactions closed on or after April 1, 2001. Although this Report discusses some transactions that were governed by FAS 125 and

- *Tax Transactions.*[39] Enron's Tax Transactions were, for the most part, artificial transactions lacking a bona fide business purpose other than the creation of accounting income for Enron. The Tax Transactions were designed to allow Enron to record the potential benefit of speculative future tax deductions as current income on its financial statements and, in some cases, as pre-tax income rather than as after-tax income resulting from reduced tax expense in the tax provision of Enron's income statement.

- *Non-Economic Hedges.*[40] Through these transactions, which include the LJM1/Rhythms Hedging Transaction and the LJM2/Raptors Hedging Transactions, Enron "hedged" the decrease in value of certain of its investments that it had marked-to-market by entering into derivative contracts with counterparties that were related to Enron. These transactions were accounting hedges and did not provide economic protection to Enron because the assets used to support the hedge were Enron's own assets.[41]

- *Share Trust Transactions.*[42] Enron's Share Trust Transactions were off-balance sheet financing structures through which an issuing entity would issue notes and equity certificates in the institutional private placement market. The proceeds would be used, in part, to fund the purchase or refinancing of assets owned by Enron or its affiliates.

---

others that were governed by FAS 140, this Report refers to this type of transaction and other similar transactions generally as a "FAS 140 Transaction."

[39] *See* Second Interim Report, at 87-94; Second Interim Report, Appendix J (Tax Transactions).

[40] These transactions were part of a group of transactions among Enron and its related parties (collectively, the "Related Party Transactions") described in Appendix L (Related Party Transactions) of the Second Interim Report.

[41] In explaining that the LJM2/Raptors Hedging Transactions did not transfer any of Enron's economic risk, the head of Enron's research group, Wincenty Kaminski ("Kaminski"), gave the following example: "So you have—you have a mortgage, and the mortgage company insists that you insure your house, but if you go to a -- but if you go to your wife and buy insurance from her, there's a chance that the mortgage company will object to this insurance because there's no effective risk transfer to a third party." Sworn Statement of Wincenty Kaminski, Managing Director, Enron Wholesale Services, to William C. Humphreys, Jr., A&B, May 9, 2003, at 184. Kaminski, a Ph.D. in economics, also testified that he "thought [the LJM2/Raptors Hedging Transactions] were terrible, terrible economic hedges." *Id.* at 183. He testified that these transactions "were poorly structured and they created a huge reputational risk for the company . . . ." *Id.; see also* Memorandum from Steven Rosen, Wilmer Cutler, to Enron Files, regarding Interview of Wincenty Kaminski, Dec. 19, 2001, at 2 (describing Kaminski's background) [AB000000462-AB000000470].

[42] *See* Second Interim Report, at 67-78; Second Interim Report, Appendix G (Whitewing Transaction); Second Interim Report, Appendix H (Marlin Transaction). This Report refers to these transactions as "Share Trust Transactions," or individually as "Whitewing" or "Marlin."

-19-

Repayment of the notes and certificates was supported by Enron stock and ultimately by Enron's promise to pay.

- *Minority Interest Transactions.*[43]  Enron's Minority Interest Transactions allowed Enron to obtain funds while showing the proceeds as a "minority interest" on the balance sheet between liabilities and equity, rather than as debt.

- *Prepay Transactions.*[44]  In the Prepay Transactions, Enron obtained financing through a combination of offsetting commodity trades and swaps.  Although the transactions were loans in economic substance, Enron reported its obligations as price risk management liabilities rather than debt.  Moreover, the increase in the outstanding prepay balance from one period to the next served to increase cash flow from operating activities.

In the Third Interim Report, the Examiner concluded that there is sufficient evidence from which a fact-finder could conclude that Fastow, Causey, Glisan and McMahon, among others, breached their fiduciary duties to Enron by causing Enron to enter into certain SPE transactions that were designed to manipulate the Debtors' financial statements and that resulted in the dissemination of financial information known to be materially misleading.[45]  That is, they engaged in a course of conduct, through the

---

[43] *See* Second Interim Report, at 79-86; Second Interim Report, Appendix I (Minority Interest Transactions). This Report refers to these transactions as "Minority Interest Transactions."

[44] *See* Second Interim Report, at 58-66; Second Interim Report, Appendix E (Prepay Transactions). This Report refers to these transactions as a "Prepay" or a "Prepay Transaction." As discussed in the Second Interim Report, Enron engaged in billions of dollars of Prepay Transactions.

[45] Because Fastow, Causey, Glisan and McMahon exercised their Fifth Amendment rights, the Examiner's conclusions are based on a review of documentary evidence and the testimony of others. See the Third Interim Report, Appendix C (Role of Enron's Officers) for a full review of this evidence. The Examiner subpoenaed or otherwise requested the opportunity to take the testimony of a number of witnesses who responded by asserting the privilege against self-incrimination contained in the Fifth Amendment to the United States Constitution (the "Self-Incrimination Clause") (U.S. Const. amend. V). *See* Third Interim Report, at 23 (identifying Enron employees that had asserted their privilege against self-incrimination). Where a witness asserted the Self-Incrimination Clause in writing, the Examiner took no further steps to compel any examination of that witness. At least one of those witnesses had either testified in other proceedings, or had produced documents in this bankruptcy proceeding. The Examiner concluded that either of those actions created, at best, only a small chance that the Self-Incrimination Clause had been waived with respect to testimony compelled by the Examiner and, as a result, the Examiner did not pursue this waiver argument. *See United States v. Balsys*, 524 U.S. 666, 672 (1998); *United States v. Housand*, 550 F.2d 818, 821 n.3 (2d Cir. 1977); *United States v. Miranti*, 253 F.2d 135 (2d Cir. 1958); *United States*

use of SPE transactions, that resulted in the false and misleading presentation of the financial condition of Enron by overstating its cash flow from operating activities, overstating its earnings and understating its obligations. In addition, the Examiner concluded that there is sufficient evidence from which a fact-finder could conclude that breaches of the fiduciary duty of loyalty occurred in connection with certain of the Related Party Transactions, most notably the involvement of Fastow and other officers in the LJM1 and LJM2 transactions.

As stated in the Third Interim Report, an officer of a corporation has fiduciary duties of good faith, due care and loyalty. Whenever corporate fiduciaries communicate publicly or directly with shareholders, they must do so honestly, candidly and completely in all material respects. Knowing dissemination of false information about the financial condition of the company is a breach of these fiduciary duties.

Although its SPE structures were complex, Enron's objectives were simple: (i) borrow money on what the financial institutions required to be essentially a recourse basis without recording debt; and (ii) record the loan proceeds as cash flow from operating activities.[46] Enron's financial reporting of the transactions discussed in the Reports resulted in the materially misleading presentation of Enron's financial condition by failing to disclose the substance of such transactions, regardless of whether the accounting was technically correct. Furthermore, in many of these transactions, the terms

---

*v. Wilcox*, 450 F.2d 1131, 1141-42 (5th Cir. 1971); *Marcello v. United States*, 196 F.2d 437 (5th Cir. 1952); *Poretto v. United States*, 196 F.2d 392 (5th Cir. 1952).

[46] The Tax Transactions were designed to allow Enron to produce reported income but did not generate any cash flow. The Non-Economic Hedges in the LJM1/Rhythms Hedging Transaction and the LJM2/Raptors Hedging Transactions were designed to allow Enron to record income that would offset any decline in the value of certain fair value assets, so that Enron could avoid recording a charge to earnings. The Non-Economic Hedges did not generate any cash flow.

required by certain of the financial institutions violated GAAP rules and precluded the desired accounting treatment.  The evidence suggests that Enron officers nonetheless achieved the desired accounting treatment by entering into undisclosed side agreements, arrangements with no business purpose and "hardwired"[47] transactions in an attempt to circumvent GAAP.

### B.    Persons and Entities Involved in Enron's Use of SPEs

Given the magnitude of Enron's misuse of its SPEs, it is clear that Enron's officers could not have acted alone.  Instead, these officers received assistance, in varying degrees and through different means, from a number of third parties.  Under the terms of the April 8th Order, the Examiner is authorized to investigate, among other things, persons and entities involved in Enron's use of SPEs.

Enron's officers, directors, accountants, attorneys and financial institutions had different roles and duties in the SPE transactions.  Regardless of their respective legal liability, these parties are included within a circle of responsibility for Enron's financial demise.  In the Third Interim Report, the Examiner reported on potential liability for certain officers and financial institutions.  In this Report, the Examiner considers the specific roles of other persons and entities that were involved in aspects of Enron's development, use, approval, oversight and disclosure of the SPEs.  These persons and entities include:  (i) Andersen; (ii) Enron's attorneys; (iii) Lay and Skilling; and (iv) the Outside Directors.  Specifically, with respect to each of these persons and entities, the Examiner considered:

---

[47]  As used in the Reports, a "hardwired transaction" is one in which the transaction documents are drafted to achieve indirectly an economic result that would have violated applicable GAAP had it been provided for directly.

- The role of the person or entity in Enron's SPE transactions, including whether the person or entity assisted Enron in its misuse of SPEs or was responsible for the monitoring of the SPEs, or both.

- Whether the conduct of the person or entity could give rise to potential liability under applicable legal standards.

- If the person or entity assisted Enron in the misuse of Enron's SPEs or failed to monitor adequately Enron's use of SPEs, the factors that may have caused (or contributed) to this failure.

## C.    **Theories of Potential Liability and Defenses**

*Andersen*

Although Andersen was Enron's auditor, its professionals were certified *public* accountants. The SEC has noted the CPA's public duty and described the critical importance of auditor independence in fulfilling that duty:

> Independent auditors have an important public trust. Investors must be able to rely on issuers' financial statements. It is the auditor's opinion that furnishes investors with critical assurance that the financial statements have been subjected to a rigorous examination by an objective, impartial, and skilled professional, and that investors, therefore, can rely on them.[48]

Aside from its duty to the public, Andersen owed a direct duty to the Audit Committee. Statement of Auditing Standards No. 61 ("SAS 61") "requires the auditor to ensure that the audit committee receives additional information regarding the scope and results of the audit that may assist the audit committee in overseeing the financial

---

[48] Revision of the Commission's Auditor Independence Requirements, Securities Act Release No. 33-7919 [2000-2001 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 86,406 at 83,990. Additionally, the American Institute of Certified Public Accountants ("AICPA") has stated that "[i]ndependent auditors should not only be independent in fact; they should avoid situations that may lead outsiders to doubt their independence." Independence, Statement on Auditing Standards No. 1 (American Institute of Certified Public Accountants 1972) ("SAS 1"), at § 3 (AU § 220.03). As late as August 2001, Andersen advised the Enron Audit Committee that "AA believed independence was not only the cornerstone of its profession, but the only sound basis to its continued success." Minutes of Enron Audit Committee Meeting, Aug. 13, 2001 (the "Audit Committee 08/13/01 Minutes"), at 2 [AB000203966- AB000203968].

reporting and disclosure process for which management is responsible."[49]   Under

SAS 61, the matters required to be communicated include:

> The initial selection of and changes in significant accounting policies or
> their application.   The auditor should also determine that the audit
> committee is informed about the methods used to account for significant
> unusual transactions and the effect of significant accounting policies in
> controversial or emerging areas for which there is a lack of authoritative
> guidance or consensus.  For example, significant accounting issues may
> exist in areas such as revenue recognition, off-balance-sheet financing,
> and accounting for equity investments.[50]

In addition, SAS 90 (effective for Enron's 2000 financial statements) required

Andersen to have "open and frank" discussions on the "quality and not just the

acceptability" of Enron's use of accounting principles, and on "items that have a

significant impact on the representational faithfulness of the financial statements."[51]

In this Report, the role of Andersen in Enron's SPEs is considered against two

legal theories:

- *Accounting Malpractice* – whether there is sufficient evidence for a
  fact-finder to conclude that Andersen breached the standard of care
  that an accountant owes to its client such that Andersen may be liable
  for damages to Enron, assuming that the claim is not barred by the
  conduct of Enron's officers.

- *Aiding and Abetting a Breach of Fiduciary Duty* – whether there is
  sufficient evidence for a fact-finder to conclude that Andersen aided
  and abetted the wrongful conduct of Enron's officers that constituted
  breaches of fiduciary duty such that Andersen may be liable for

---

[49] Communication with Audit Committees, Statement on Auditing Standards No. 61 (American Institute of
Certified Public Accountants 1988) ("SAS 61"), at § 2 (AU § 380.02).  Statements on Auditing Standards,
normally cited as "SAS (statement number)," were also codified, as issued, into the Codification of
Statements on Auditing Standards by the AICPA (cited as "AU (section number)").  Where a SAS is cited,
a short citation to the related AU codification is provided for ease of reference.

[50] *Id.* at § 7 (AU § 380.07).

[51] Audit Committee Communications, Statement on Auditing Standards No. 90 (American Institute of
Certified Public Accountants 1989) ("SAS 90"), at § 1 (amending SAS 61, at § 11) (effective for audits of
financial statements for periods ending on or after December 15, 2000) (AU § 380.11).

damages to Enron, assuming that the claim is not barred by the
conduct of Enron's officers.

*Accounting Malpractice.* Whether Andersen exercised the degree of care, skill

and competence that reasonably competent members of the profession would exercise

under similar circumstances is determined by reference to GAAP and generally accepted

auditing standards ("GAAS"). An accountant satisfies his or her professional duties by

complying with GAAP and GAAS.[52] "GAAP are those principles recognized as

appropriate in the recording, reporting, and disclosing of financial information."[53] GAAP

"includes not only broad guidelines of general application, but also detailed practices and

procedures."[54] GAAP is a technical term: it includes the conventions, rules and

procedures that define acceptable accounting practices. GAAP provides the standards for

determining a company's assets, liabilities, revenues, expenses, net income or net loss

and sources and uses of cash. The ultimate goal of GAAP is to set out financial

information that is relevant, reliable and useful.[55] Similarly, GAAS sets forth the

accepted standards of practice for auditors in planning and performing audits.[56] An

---

[52] *But see Goss v. Crossley (In re Hawaii Corp.)*, 567 F. Supp. 609, 617 (D. Haw. 1983) ("Compliance with GAAP and GAAS, however, will not immunize an accountant when he consciously chooses not to disclose on a financial statement a known material fact.") (citations omitted).

[53] *Id.* at 618.

[54] The Meaning of *Present Fairly in Conformity With Generally Accepted Accounting Principles* in the Independent Auditor's Report, Statement on Auditing Standards No. 69, at § 2 (American Institute of Certified Public Accountants 1992) ("SAS 69") (AU § 411.02).

[55] Second Interim Report, Appendix B (Accounting Standards), at 3-5; *Goss*, 567 F. Supp. at 620 ("Economic substance should prevail over legal form if there is a difference.").

[56] *United States v. Arthur Young & Co.*, 465 U.S. 805, 811 (1984); *Monroe v. Hughes*, 31 F.3d 772, 774 (9th Cir. 1994); *Greenstein, Logan & Co. v. Burgess Mktg., Inc.*, 744 S.W.2d 170, 185 (Tex. App. 1987); *see also Bankr. Servs., Inc. v. Ernst & Young (In re CBI Holding Co.)*, 247 B.R. 341 (Bankr. S.D.N.Y. 2000).

auditor's good faith compliance with GAAS generally discharges the auditor's professional duty to act with reasonable care in planning and performing an audit.[57]

*Aiding and Abetting.* For Andersen to be liable to Enron for aiding and abetting, a fact-finder must first determine that there has been a breach of fiduciary duty by one or more Enron officers. If a fact-finder concludes that there has been such a breach, the fact-finder may then conclude that Andersen is liable to Enron for aiding and abetting such breach if the evidence shows that: (i) Andersen had actual knowledge of the wrongful conduct giving rise to the breach; (ii) Andersen gave substantial assistance to the wrongdoer; and (iii) injury to the Debtors was the direct or reasonably foreseeable result of such conduct. While there is some authority to the contrary, the actual knowledge standard is strict – "should have known" or "suspicion" will not suffice.

*Defenses Available to Andersen.* The facts and circumstances surrounding Andersen must be considered independently, and Appendix B to this Report analyzes these issues in more detail. The Examiner has reviewed a substantial amount of evidence, including documentary and testimonial evidence, and has noted the reasonable inferences that could be drawn from the evidence. A fact-finder may draw alternative or contrary inferences from the same evidence. Whether Andersen will succeed on one or more defenses to any of these causes of action will depend upon the fact-finder's resolution of the facts.

Andersen may contend that the evidence is not sufficient to establish one or more essential elements of these claims (e.g., a breach of the standard of care, or Andersen's

---

[57] *Monroe,* 31 F.3d at 774; *In re CBI Holding Co.,* 247 B.R. at 362; *Greenstein, Logan & Co.,* 744 S.W.2d at 185.

knowledge of wrongful acts by Enron's officers). Andersen also may assert that the wrongful acts committed by Enron's officers should be imputed to Enron so as to defeat such claims. There are few Texas cases that address the circumstances under which the wrongful conduct of a corporation's officers would be imputed to the corporation to defeat such claims, but it appears that imputation is a factual matter. If the officers' wrongful conduct is imputed to Enron, then Andersen could assert that Enron's wrongful conduct was greater than Andersen's wrongful conduct, and therefore claims by Enron should be barred or reduced under comparative fault rules.

*Attorneys*

Enron's attorneys – whether in the role of in-house counsel or outside counsel – owed professional duties to their corporate client, Enron,[58] which included the duty to provide competent legal advice on the matters on which the attorneys were hired to work,[59] and, in so doing, to "exercise independent professional judgment and render candid advice."[60] Unlike accountants, attorneys generally owe their professional duties to their client, rather than to any third party or to the public, as a whole.[61] Ordinarily, Enron's attorneys had to "abide by [Enron's] decisions," as communicated by Enron's officers and employees, and could not substitute their own judgment or objectives for those of Enron.[62]

---

[58] *See generally* Texas Disciplinary Rules of Prof'l Conduct (available following Tex. Gov't Code Ann. § 84.004) (the "Texas Rules").

[59] Texas Rule 1.01.

[60] Texas Rule 2.01.

[61] *See, e.g., Schatz v. Rosenberg*, 943 F.2d 485 (4th Cir. 1991).

[62] Texas Rule 1.02(a) and 1.12(a).

Attorneys who represented Enron on many of the SPE transactions or in regard to related public disclosures at times between 1997 and the Petition Date were confronted with instructions from certain Enron officers, including Fastow, Causey, Kopper and Glisan, that, if carried out, constituted a breach of a legal duty to Enron (such as a breach of fiduciary duty) or a violation of law (such as inadequate disclosure). As discussed more fully in this Report, these circumstances potentially altered the attorneys' duties such that they had to determine whether they were required to take "reasonable remedial actions," that potentially included "asking reconsideration" of instructions received or "referring the matter to higher authority [at Enron], including, if warranted by the seriousness of the matter, referral" to the Enron Board.[63] In short, Enron's attorneys in numerous situations were required to balance all information available to them in order to determine whether their usual role – of abiding by decisions of Enron's officers – had been materially altered to require that those attorneys take information over the heads of these Enron officers and call into question the appropriateness of the officer's conduct.

The role of certain of Enron's in-house attorneys, and certain of its outside counsel, in Enron's SPEs is considered against two legal theories:[64]

---

[63] Texas Rule 1.12(a).

[64] In the case where a law firm has filed a claim against the Debtors, this Report also considers whether there is sufficient evidence for a court to conclude that such claims should be equitably subordinated to the claims of the other creditors. An attorney's claim filed in the Bankruptcy Case may be equitably subordinated to the payment of other claims filed in the case if (i) the attorney engaged in inequitable conduct and (ii) that conduct resulted in harm to other creditors. In the case of creditors that are not insiders or fiduciaries of the debtor, the standard of inequitable conduct is high and has been said to require a breach of a recognized duty. Several cases stand for the proposition that a creditor's participation in the debtor's misrepresentation of its financial condition to other creditors may constitute inequitable conduct that will justify the equitable subordination of the creditor's claim. If an attorney engaged in inequitable conduct by participating in Enron's misrepresentation of its financial condition, a fact-finder could conclude that other creditors were injured by this conduct because they relied on this information in extending (or continuing to extend) credit to Enron.

-28-

- *Legal Malpractice* – whether there is sufficient evidence for a fact-finder to conclude that an attorney breached the standard of care owed to his client such that the attorney may be liable for damages to Enron, assuming that the claim is not barred by the conduct of Enron's officers.

- *Aiding and Abetting a Breach of Fiduciary Duty* – whether there is sufficient evidence for a fact-finder to conclude that an attorney aided and abetted Enron's officers' breaches of fiduciary duty such that the attorney may be liable for damages to Enron, assuming that the claim is not barred by the conduct of Enron's officers.

*Legal Malpractice.* An attorney (whether in-house counsel or outside counsel) may become liable to his or her client as a result of a failure to exercise the competence and diligence normally exercised by attorneys in similar circumstances. Such a failure, as well as reckless or knowing conduct that constitutes a breach of an attorney's duty to his or her client, is usually referred to as legal malpractice. To prevail on a claim for legal malpractice, Enron must prove: (i) the attorney owed a duty to Enron; (ii) the attorney breached his or her duty; (iii) there is a causal link between the breach and Enron's injury; and (iv) damages resulting from the breach. To establish an attorney's breach of his professional duty, Enron must show that the attorney failed to act as an attorney of reasonable prudence would have in a similar situation. As a general rule, a plaintiff must rely upon competent, admissible expert testimony to establish the relevant standard of care, the corresponding breach and causation.

A relevant provision of the Texas Disciplinary Rules of Professional Conduct (the "Texas Rules") may be considered by a fact-finder in understanding and applying the standard of care for malpractice when that rule is designed for the protection of persons in the position of the plaintiff. Texas Rule 1.12 addresses the attorney's role when the attorney represents an organization (such as a corporation), and learns that a

-29-

representative of the organization has committed or intends to commit a violation of a

legal obligation to the organization (such as a breach of fiduciary duty) or a violation of

law that reasonably might be imputed to the organization (such as the dissemination of

misleading financial information). Ordinarily, an attorney must comply with the

directives received from the officers of the client. In the circumstances set forth in Texas

Rule 1.12(b), however, the attorney "must take reasonable remedial actions" that are in

the best interest of the organization. Those circumstances are:

> whenever the lawyer learns or knows that:
>
> (1) an officer . . . has committed or intends to commit a violation of a legal obligation to the organization or a violation of law that reasonably might be imputed to the organization;
>
> (2) the violation is likely to result in substantial injury to the organization; and
>
> (3) the violation is related to a matter within the scope of the lawyer's representation of the organization.

Remedial action may include "referring the matter to higher authority in the

organization," which, "if warranted by the seriousness of the matter," may mean the

board of directors.[65] In some circumstances, the attorney may be required to withdraw

from the representation.[66] An analogous rule provides that a lawyer may not participate

in a client's fraudulent conduct.[67]

Thus, an attorney for Enron who knew that (i) an officer was engaging in

wrongful conduct, (ii) substantial injury to Enron was likely to occur as a result of that

---

[65] Texas Rule 1.12(c)(3).

[66] *See* Annex 1 to Appendix C (Role of Enron's Attorneys).

[67] Texas Rule 1.15(a)(1) and 1.02, cmt. 8.

conduct and (iii) the violation was within the attorney's scope of representation, but failed to take appropriate affirmative steps to cause reconsideration of the matter — including referral of the matter to a higher authority in the company, including, if appropriate, the Enron Board — would not have acted as an attorney of reasonable prudence would have in a similar situation.

*Aiding and Abetting.* For an attorney to be liable to Enron for aiding and abetting, a fact-finder must first determine that there has been a breach of fiduciary duty by one or more Enron officers. If a fact-finder concludes that there has been such a breach, the fact-finder may then consider whether an attorney is liable to Enron for aiding and abetting that breach if the evidence shows that: (i) the attorney had actual knowledge of the wrongful conduct giving rise to the breach; (ii) the attorney gave substantial assistance to the wrongdoer; and (iii) injury to the Debtors was the direct or reasonably foreseeable result of such conduct. While there is some authority to the contrary, the actual knowledge standard is strict — "should have known" or "suspicion" will not suffice. Although the legal standards applicable to outside attorneys are also applicable to in-house attorneys, in light of the fiduciary duties that an in-house attorney who is also an officer owes to the corporation as an officer, it is more appropriate to evaluate the actions of an in-house attorney on the basis of his or her fiduciary duties as an officer of the corporation rather than from the perspective of aiding and abetting.

*Defenses Available to Enron's Attorneys.* The facts and circumstances surrounding Enron's attorneys must be considered independently, and Appendix C (Role of Enron's Attorneys) to this Report analyzes these issues in more detail. The Examiner has reviewed a substantial amount of evidence, including documentary and testimonial

evidence, and has noted the reasonable inferences that could be drawn from the evidence. A fact-finder may draw alternative or contrary inferences from the same evidence. Whether an attorney will succeed on one or more defenses to any of these causes of action will depend upon the fact-finder's resolution of the facts.

All of the defenses available to Andersen, including defenses based upon comparative fault rules, would be available to the attorneys defending against these claims.

*Outside Directors*

The role of a corporate director includes two principal functions: a decision-making function and an oversight function.[68] The decision-making function generally involves action taken at a particular point in time, while the oversight function generally involves ongoing monitoring of the corporation's business and affairs over a period of time. As a result, the role of the Outside Directors in Enron's SPEs is considered against two legal theories:

- *Decision-Making* – whether there is sufficient evidence for a fact-finder to conclude that the Outside Directors breached their fiduciary duties by approving any of the SPE transactions; and

- *Oversight* – whether there is sufficient evidence for a fact-finder to conclude that the Outside Directors breached their fiduciary duties by failing to provide adequate oversight with respect to the SPE transactions and related matters.

*Decision-Making.* As explained more fully in Appendix B (Legal Standards) to the Third Interim Report, when directors of a corporation make business decisions on

---

[68] 2 *ABA Model Bus. Corp. Act Ann.* (3d ed. 2000 & Supp. 2002) § 8.31 Official cmt. at 8-204.

behalf of the corporation, they must satisfy their fiduciary duty of care.[69]  A doctrine

known as the "business judgment" rule focuses the legal scrutiny of business decisions on

the process by which the decision was reached (e.g., was all material information

reasonably available taken into consideration), as opposed to the substance of the

decision itself (e.g., was a reasonably careful, or risk free, course of action selected).[70]

Accordingly, where the business judgment rule applies, the duty of care may be

characterized as a duty to exercise informed business judgment.  Under Oregon law, the

adequacy of the decision-making process (i.e., whether the business decision was

sufficiently informed) likely would be measured by concepts of ordinary negligence.

There is a limit, however, on the amount of judicial deference afforded to the

substance of a business decision under the business judgment rule.  Even if a director

makes a business decision in a manner that satisfies the duty of process due care, the

business judgment rule will not protect a decision that cannot be attributed to any rational

business purpose.[71]  Moreover, a business decision that lacks any rational business

---

[69] Directors also must satisfy their fiduciary duties of good faith and loyalty, each of which is discussed in Appendix B (Legal Standards) to the Third Interim Report.

[70] See Brehm v. Eisner, 746 A.2d 244, 264 (Del. 2000) ("Courts do not measure, weigh or quantify directors' judgments.  We do not even decide if they are reasonable in this context.  Due care in the decisionmaking context is *process* due care only.") (emphasis in original).

[71] The limited substantive review contemplated by this outer limit of the business judgment rule may be thought of as a manifestation of the fiduciary duty of good faith.  *See, e.g., Parnes v. Bally Entm't Corp.*, 722 A.2d 1243, 1246 (Del. 1999) ("The presumptive validity of a business judgment is rebutted in those rare cases where the decision under attack is 'so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith.'") (quoting *West Point – Pepperell, Inc. v. J.P. Stevens & Co. (In re J.P. Stevens & Co.)*, 542 A.2d 770, 780-81 (Del. Ch. 1988)); *In re RJR Nabisco, Inc. S'holders Litig.*, No. 10389, 1989 WL 7036, at *22 n.13 (Del. Ch. Jan. 31, 1989) (stating that the limited substantive review contemplated in the business judgment rule (i.e., whether the decision is irrational or egregious or so beyond reason) is really a way of inferring bad faith), *appeal refused*, 556 A.2d 1070 (Del. 1989).

purpose may be evidence of a breach of the duty of good faith. Violations of the duty of good faith are not protected by a director exculpation provision.

*Oversight.* A board of directors' oversight responsibility has two principal components: a duty to monitor corporate affairs and a duty to inquire into circumstances, or "red flags," indicating that potential problems exist within the corporation. A director who negligently fails to fulfill his or her duty of oversight, but who does not (i) abdicate his or her monitoring responsibilities, (ii) exhibit a conscious disregard for known risks, or (iii) otherwise fail to act in good faith, may be protected from liability to a corporation and its shareholders, if the corporation has adopted a director exculpation provision in its charter, as Enron has done. A director exculpation provision, however, does not protect a director who is also an officer of the corporation from liability for negligence when acting in his or her capacity as an officer.

*Lay and Skilling*

As explained in Appendix B (Legal Standards) to the Third Interim Report, although officers and directors are generally held to the same standards of conduct, the roles and responsibilities of officers present a different context in which to apply those standards and may subject officers to a higher degree of scrutiny than that of directors.[72] For example, "full-time officers will generally be expected to be more familiar with the affairs of a corporation than outside directors."[73] Similarly, "[o]fficers will be expected

---

[72] *See* Third Interim Report, Appendix B (Legal Standards), at 6-8; *see also Mixon v. Anderson (In re Ozark Rest. Equip. Co.),* 41 B.R. 476 (Bankr. W.D. Ark. 1984), *rev'd on other grounds,* 61 B.R. 750 (W.D. Ark. 1986); *Bynum v. Scott,* 217 F. 122 (E.D.N.C. 1914); *Taylor v. Alston,* 447 P.2d 523 (N.M. Ct. App. 1968); *Raines v. Toney,* 313 S.W.2d 802 (Ark. 1958).

[73] American Law Institute, *Principles of Corporate Governance: Analysis & Recommendations* § 4.01 cmt. a (1994).

to be more familiar with business affairs under their direct supervision than officers who do not have such responsibility."[74]   Oregon's statutory standard of care for corporate directors allows for these differing circumstances to be taken into account by requiring directors to exercise the care of an ordinarily prudent person "in a like position . . . under similar circumstances."[75]   Indeed, the drafters of the Model Act observe that the phrase "in a like position . . . under similar circumstances" is intended to recognize, among other things, that the "management responsibilities of a particular director may be relevant in evaluating that director's compliance with the standard of care."[76]   Finally, when an inside director acts (or fails to act) in his or her capacity as an officer, he or she does not enjoy the protections of a director exculpation provision.

In summary, due to the inapplicability of Enron's director exculpation provision to officers, liability for the failure of an inside director of Enron to recognize and respond to red flags that arise in an area for which he or she has management responsibility as an officer likely would be evaluated under standards of ordinary negligence.   Moreover, due to an inside director's greater role in and responsibility for the corporation's day-to-day affairs, he or she has more occasion to encounter red flags and, correspondingly, more responsibility for responding to them in the exercise of ordinary care.

*Defenses Available to Lay, Skilling and Outside Directors*

The facts and circumstances surrounding Lay, Skilling and the Outside Directors must be considered independently, and Appendix D to this Report analyzes these issues

---

[74] *Id.*

[75] Or. Rev. Stat. § 60.357(1).

[76] 2 *ABA Model Bus. Corp. Act Ann.* § 8.30 Official cmt. at 8-170.

in more detail. The Examiner has reviewed a substantial amount of evidence, including documentary and testimonial evidence, and has noted the reasonable inferences that could be drawn from the evidence. A fact-finder may draw alternative or contrary inferences from the same evidence. Whether Lay, Skilling and the Outside Directors will succeed on one or more defenses to any of these causes of action will depend upon the fact-finder's resolution of the facts.

*Reliance on Officers.* Under Oregon law, officers and directors are entitled to rely on information provided or presented by other officers or employees of the corporation whom the officers or directors reasonably believe to be reliable and competent in the matters presented.[77] Lay, Skilling and the Outside Directors may assert that they relied on information provided to them by senior officers of Enron. Lay and Skilling may also assert that as CEO and COO, they could not have possessed complete information about all aspects of Enron's operations and, therefore, necessarily relied on their subordinate officers. This reliance by Lay, Skilling and the Outside Directors must be reasonable, however, and it would not be reasonable if they were aware of facts or circumstances concerning the matter in question that rendered such reliance unwarranted. An officer or director does not act in good faith if he or she is aware of facts or circumstances concerning the matter in question that render reliance on such information, opinions, reports or statements unwarranted.[78]

*Reliance on Professionals.* In addition to relying on Enron officers who were experienced accountants and lawyers, Lay, Skilling and the Outside Directors may assert

---

[77] Or. Rev. Stat. § 60.357(2)(a) and Or. Rev. Stat. § 60.377(2)(a).

[78] Or. Rev. Stat. § 60.357(3).

that they relied on an array of highly qualified professionals, including Andersen and Enron's attorneys. Oregon law expressly permits a director or an officer to rely on information provided by "[l]egal counsel, public accountants or other persons as to matters the [director or officer] reasonably believes are within the person's professional or expert competence."[79] A fact-finder would have to decide whether Lay, Skilling and the Outside Directors actually relied on these professionals and, if so, whether their reliance was reasonable. The reasonableness of their reliance will be considered in light of any facts that Lay, Skilling and the Outside Directors may have known that rendered such reliance unwarranted. A fact-finder would also likely consider circumstances where the professionals may not have been candid with management or the Board, and also circumstances where officers at the company failed to provide the professionals with all relevant information about Enron's transactions.

*Reliance on Board Committees.* A director is also entitled to rely on information and reports provided by a committee of the board if the director reasonably believes the committee merits confidence.[80] For example, certain SPE transactions were presented to the Finance Committee, which then recommended them to the Board for approval. In some instances, important details about the transaction were provided to the Finance Committee but not to the Board. Members of the Board who approved the transactions, but who were not present at the Finance Committee meetings, might argue that they had a right to rely on the recommendations of the Finance Committee. However, such reliance

---

[79] Or. Rev. Stat. § 60.357(2)(b) and Or. Rev. Stat. § 60.377(2)(b).

[80] Or. Rev. Stat. § 60.357(2)(c).

must be reasonable and, therefore, the directors who assert such reliance must not have known facts that would make such reliance unwarranted.

*Exculpation and Indemnity.* Consistent with applicable Oregon law, Enron's articles of incorporation provide that a director shall not be personally liable to Enron or its shareholders for monetary damages for conduct as a director except for liability for, among other things, "acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law."[81] This director exculpation provision likely will apply to any claim by Enron or its shareholders against the Outside Directors alleging breach of fiduciary duty, so long as the Outside Directors acted in good faith. This director exculpation provision is not available to Lay or Skilling acting (or failing to act) in their capacities as officers because, by its terms, the provision does not extend to officers.[82]

---

[81] Article VII, Section A, Articles of Incorporation of Enron Corp. [AB0785 03888-AB0785 04147].

[82] *Id.* Under certain circumstances, directors and officers of Oregon corporations can be entitled to indemnification from the corporation with respect to claims made against them in their capacity as directors or officers. *See* Annex 2 to Appendix D (Roles of Lay, Skilling and Outside Directors); Third Interim Report, Appendix B (Legal Standards), at 32-34. However, such claims may be subject to disallowance pursuant to Section 502(e)(1)(B) of the Bankruptcy Code. An officer's or director's right of indemnification would not, however, provide relief from, or alter the liability standard for, any claims brought by the company against such officer or director. *See* Annex 2 to Appendix D (Roles of Lay, Skilling and Outside Directors), *Exculpation and Indemnity.*

## IV.  SPECIFIC ROLE OF ANDERSEN AND POTENTIAL LIABILITY

### A.  <u>Role of Andersen in Enron's SPE Transactions</u>

Enron was described by Andersen as "the largest client of our firm by a wide margin in Fiscal 1999."[83]  Fees paid by Enron to Andersen totaled $26.5 million in 1998, $46.4 million in 1999 and $47.9 million in 2000.  The majority of these fees came from services related to Andersen's attestation of Enron's internal controls and financial statements, and from accounting consultation on the design and implementation of Enron's SPE transactions.  From 1989 through 2000, at least eighty-six Andersen accountants left Andersen to become employed by Enron, some of whom became key executives in Enron's accounting and treasury functions.

As discussed in the Prior Reports, Enron's financial statements and related disclosures were materially misleading.  For example, virtually all of Enron's $979 million of net income and $3 billion of funds flow from operating activities for the year 2000, and approximately $8.6 billion of fully recourse indebtedness not reflected on Enron's balance sheet as of December 31, 2000, were attributable to six accounting techniques used by Enron.  Each of these accounting techniques was implemented with Andersen's assistance and approval.  Each also was designed so that Enron could report the SPE transactions in a manner that was materially more favorable than their economic substance.

---

[83] Email from James D. Edwards, Andersen, to Thomas H. Bauer, Andersen, *et al.*, Oct. 13, 1999 ("Congratulations to you and the entire Enron team for the unbelievable results of service to this client in Fiscal 1999.  With $47 million in fees and a growth rate of 88%, Enron became the largest client of our firm by a wide margin in Fiscal 1999.") [AB0971 02377].

As set forth in Appendix B (Role of Andersen), the evidence reviewed by the Examiner indicates that Andersen provided extensive guidance and assistance to Enron in planning and executing numerous SPE transactions for which the Examiner has determined that Enron's accounting treatment and disclosures were materially misleading. In particular, the evidence reviewed by the Examiner is sufficient to permit a fact-finder to conclude that:

- Andersen assisted Enron's abuse of rules-based GAAP by helping Enron design accounting techniques or "models"[84] that Enron could use to report income, cash flow and financial position more favorably than if the financial statements and related disclosures faithfully represented the economic substance of the transactions.[85]

- Andersen failed to exercise due care in auditing whether the third party entities used by Enron in its Prepay Transactions were SPEs,[86] and

---

[84] These "models" include each of the six accounting techniques described in the Examiner's Second Interim Report. *See generally* Second Interim Report; *see also* Appendix B (Role of Andersen).

[85] "Representational faithfulness" is a concept found in Financial Accounting Concept No. 2, ("FAC 2"), and stands for the proposition that the accounting for a transaction should "faithfully represent" the substance of the underlying transaction. The FACs are not a part of the "GAAP hierarchy" described in SAS 69. Thus it is perhaps possible, at least under the standards that accountants have adopted for themselves, that financial statements could "fairly present in accordance with GAAP" the financial condition, results of operations and cash flow of an entity, but still not faithfully represent the economic substance of the entity's financial condition, results of operations and cash flow. That does not mean, however, that GAAP statements cannot be materially misleading. *See United States v. Simon*, 425 F.2d 796 (2d Cir. 1969) ("critical test" is whether financial statements as a whole "fairly present" the financial position and results of operations of the company for the period under review; compliance with GAAP "persuasive" but not "conclusive" that the facts as certified were not materially misleading). The work of the Blue Ribbon Committee, as evidenced in SAS 90, amending SAS 61 effective for financial statements issued after December 15, 2000, sought to clarify the accountant's responsibility in this regard: if an entity is using rules-based GAAP to report financial information that does not faithfully represent the economic substance of the entity's financial condition, results of operations and cash flow, the accountant must report this to the audit committee. *See* SAS 90. In responding to one of his colleagues who suggested that a particular accounting result might violate Financial Accounting Concepts, John Stewart of the Andersen Professional Standards Group ("PSG") stated, "The conceptual framework has little to do with how we in practice respond to day to day questions. . . . As you know, the FASB's conceptual framework was developed primarily to help the FASB itself as it developed new standards not so much to aid practice on a day to day basis." Email from John E. Stewart, Andersen, to Kieva M. Skinner, Andersen, and copy to H. Ronald Weissman, *et al.*, Andersen, regarding ANZ Transaction, Aug. 9, 1999, at 1 [AB0633 2448-AB0633 2456].

[86] *See* Appendix B (Role of Andersen), *Accepting Questionable Audit Evidence*.

whether the 3% equity investments in the SPEs utilized by Enron in its FAS 140 Transactions were at risk.[87]

- Andersen failed to discharge its duty under applicable auditing standards to "determine that the audit committee is informed about the methods used to account for significant unusual transactions and the effect of significant accounting policies in controversial or emerging areas for which there is a lack of authoritative guidance or consensus."[88]

Without Andersen's certification of Enron's financial statements and various other approvals provided by Andersen, Enron would not have been able to employ those transactions to distort Enron's reported financial condition, results of operations and cash flow. The evidence suggests that Andersen approved Enron's SPE transactions in an environment that permitted literal, or often no more than arguable, compliance with GAAP, despite the fact that the result often was financial presentation inconsistent with economic substance. The Examiner has concluded, however, that Enron's accounting for many of its significant SPE transactions did not comply with GAAP.

As noted in the Third Interim Report and as discussed in Appendix B (Role of Andersen), evidence suggests that, in numerous instances, Enron officers concealed material transaction information from Andersen. For example, Andersen accountants have indicated that they were unaware that Enron officers had entered into side agreements guaranteeing repayment of equity that was supposedly "at-risk" in SPE

---

[87] *See* Appendix B (Role of Andersen), *Evidence of Enron's Deception of Andersen.*

[88] SAS 61, at § 7 (AU § 380.07). Similarly, the evidence suggests that Andersen failed to discharge its duty under applicable auditing standards to have an "open and frank" discussion with Enron's Audit Committee concerning the "quality, not just the acceptability, of [Enron's] accounting principles as applied in its financial reporting" and by failing to discuss "items that have a significant impact on the representational faithfulness . . . of the accounting information included in the financial statements, which include related disclosures." SAS 90, at § 1 (amending SAS 61, at § 11) (AU § 380.11); *see also* Appendix B (Role of Andersen), *Andersen's Interaction with Enron's Audit Committee.*

-41-

transactions.[89] Andersen accountants also indicate that, had they known this information, they would not have approved Enron's accounting for those transactions.[90] While these facts demonstrate that Enron officers were deceiving Andersen, a fact-finder could conclude that, under the circumstances, Andersen overlooked obvious risks that such activities were occurring and should have implemented an audit plan designed to detect them.

The evidence reviewed by the Examiner also indicates that Andersen failed to discharge its duty under applicable auditing standards to "determine that the audit committee is informed about the methods used to account for significant unusual transactions and the effect of significant accounting policies in controversial or emerging areas for which there is a lack of authoritative guidance or consensus."[91] Many of Enron's significant SPE transactions fell squarely within the foregoing description, but Andersen consistently failed to determine whether Enron's Audit Committee was informed about the "effect" of Enron's SPE transactions and other significant accounting policies on its financial statements.

For example, Andersen quantified and summarized for its internal analysis the effect on Enron's 1999 and 2000 income statements of Enron's FAS 140 Transactions,

---

[89] In-Person Interview with Kimberly Scardino, Andersen, by H. Bryan Ives, III and William T. Plybon, A&B, May 29, 2003 (the "Scardino Interview"); Sworn Statement of Debra A. Cash, Andersen, to H. Bryan Ives, III, A&B, June 5, 2003, at 139-42; Sworn Statement of Carl E. Bass, Andersen, to H. Bryan Ives, III, A&B, June 4, 2003 (the "Bass Sworn Statement"), at 31-32; In-Person Interview with Benjamin S. Neuhausen, Andersen, by H. Bryan Ives, III, A&B, June 13, 2003; In-Person Interview with John E. Stewart, Andersen, by H. Bryan Ives, III, A&B, June 12, 2003 (the "Stewart Interview"); Sworn Statement of Patricia Grutzmacher, Andersen, to H. Bryan Ives, III, A&B, June 11, 2003 (the "Grutzmacher Sworn Statement"), at 106-07.

[90] Scardino Interview; Stewart Interview; Bass Sworn Statement, at 44-46.

[91] SAS 61, at § 7 (AU § 380.07).

mark-to-market accounting and fair value accounting.[92]  Andersen also quantified and summarized for its internal analysis the effect of the related party transactions with LJM and Whitewing on Enron's 2000 income and cash flow.[93]  However, Andersen did not share this quantitative summary analysis with the Enron Audit Committee.  There is evidence that in his oral presentation Andersen partner David Duncan may have warned the Audit Committee of the risk that others could have a different view of Enron's aggressive accounting and disclosure.  Such comments were, however, accompanied by assurances that "[we] are on board with the company's positions or you would hear about them."[94]  Evidence suggests that Andersen failed to determine that the Audit Committee was informed about the effect of these transactions on Enron's financial statements or the specific aspects of the transactions that introduced the risk or the impact of these transactions on the representational faithfulness of Enron's financial statements.  Indeed, multiple Audit Committee members have stated that they were not informed by Andersen of the magnitude of the transactions that involved "high risk" accounting judgments.[95]

---

[92] Enron Client Retention Meeting Presentation (the "Retention Meeting Presentation"), at 5 [AA-EX00269472-AA-EX00269499].

[93] *Id.*

[94] David Duncan, Handwritten Notes on Audit Update Presentation entitled, "Selected Observations – 1999 Financial Reporting" (the "Duncan Notes on 1999 Selected Observations") (presentation slide attached to Audit Committee 2/7/00 Minutes) [AB0911 2265].

[95] *See, e.g.,* Sworn Statement of Ronnie C. Chan, Enron, to William C. Humphreys, Jr., A&B, Aug. 9, 2003 (the "Chan Sworn Statement"), at 57, 243, 247-49; Sworn Statement of Paulo V. Ferraz Pereira, Enron, to William C. Humphreys, Jr., A&B, Sept. 12, 2003, at 179-80; Sworn Statement of Wendy L. Gramm, Enron, to William C. Humphreys, Jr., A&B, Aug. 20, 2003 (the "Gramm Sworn Statement"), at 111-13, 131-33, 156; Sworn Statement of John Mendelsohn, Enron, to William C. Humphreys, Jr., A&B, Sept. 9, 2003, at 84, 85, 94-97, 99, 103-04; Sworn Statement of Joe H. Foy, Enron, to William C. Humphreys, Jr., A&B, Aug. 26, 2003 (the "Foy Sworn Statement"), at 138-39, 143; Sworn Statement of Lord John Wakeham, Enron, to John L. Latham, A&B, Dec. 5, 2002, at 52, 73-78, 99-100, 120-22, 140-42, 203-04.

In an internal February 2001 Andersen meeting regarding whether Enron should be retained as a client, the Engagement Team presented a slide prepared for its anticipated presentation to the Audit Committee that disclosed that the application of GAAP to Enron's structured transactions often requires "extreme" judgment.[96] When Andersen made the actual presentation to the Audit Committee a week later, however, the word "extreme" was replaced with the word "significant" on that slide.[97] The evidence suggests that Andersen took a similar approach in other aspects of its presentations to Enron's Audit Committee, in which "accounting risk" and "disclosure risk" were described as a product of the complexity of Enron's business, when in fact that risk arose from the aggressive accounting techniques that Enron employed with Andersen's support, to enhance Enron's financial presentation.[98]

There were other occasions on which Andersen failed to advise the Audit Committee and the Enron Board of its concerns regarding the SPE transactions. For example, in an internal email dated May 28, 1999, one senior Andersen accountant discussing the LJM1/Rhythms Hedging Transaction noted:

> Setting aside the accounting, idea of a venture entity managed by CFO is terrible from a business point of view. Conflicts of interest galore. Why would any director in his or her right mind ever approve such a scheme?

---

[96] Retention Meeting Presentation, at 23 (presentation slide entitled, "Selected Observations – 2000 Financial Reporting").

[97] *Compare* Audit Update Presentation entitled, "2000 Audit Update: Selected Observations - 2000 Financial Reporting," at AB000204304 (attached to the Audit Committee 2/12/01 Minutes) [AB000204301-AB000204305] (handwriting redacted to improve legibility), *with* the Retention Meeting Presentation, at 23. Notes related to that meeting suggest that in his oral presentation, David Duncan may have described the risks as "extreme." David Duncan, Typed Notes entitled, "Financial Comments," undated [AB0911 2292].

[98] *See, e.g.*, Audit Update Presentation entitled, "Selected Observations – 1999 Financial Reporting," at AB000201144 (attached to Audit Committee 2/7/00 Minutes) (stating that "[s]ophistication of Company's Business Practices Introduced A High Number of Accounting Models and Applications Requiring Complex Interpretations and Judgement [sic].") [AB000201141-AB000201144].

> Plus, even if all the accounting obstacles below are overcome, it's a
> related party, which means FAS 57 disclosures of all transactions. Would
> Enron want these transactions disclosed every year as related party
> transactions in their financial statements?[99]

While accountants are not responsible for their client's business decisions, there is

no evidence that Andersen raised the nature or degree of its internally expressed concerns

over these structures. Evidence indicates that Enron officers persuaded Andersen to

acquiesce in the aggressive presentation of Enron's transactions, and that Enron officers

sometimes failed to heed more conservative advice from Andersen. For example,

Andersen suggested, prior to Enron's issuance of both its 1999 and 2000 financial

statements, that Enron disclose the impact of the Prepay Transactions on the financial

statements. Management refused to make the disclosures, however, and Andersen

determined that Enron's financial presentation would not be materially misleading absent

the disclosures. The Prepay Transactions accounted for all of Enron's $1.2 billion of

operating cash flow in 1999, and $1.5 billion of Enron's $4.8 billion of operating cash

flow in 2000. Yet, without additional disclosure, it was not possible, without some

independent knowledge of the Prepay Transactions, to determine from Enron's financial

presentations that such a large amount of operating cash flow was actually the proceeds

of borrowings through the Prepay Transactions. Putting aside whether Andersen's

judgment as to the materiality of these transactions was appropriate, applicable

professional standards reserved for the Audit Committee, in the exercise of its duties, the

determination of whether it was appropriate for Enron to be taking these accounting and

disclosure risks. When Andersen failed to inform the Audit Committee about the nature

---

[99] Email from Benjamin S. Neuhausen, Andersen, to David B. Duncan, Andersen, May 28, 1999, at 1 (the
"Neuhausen/Duncan 5/28/99 Email") [ELIB00003903-00001-ELIB00003903-00002].

and magnitude of these risks, Andersen omitted a critical step in the financial disclosure process.

**B.   Potential Liability**

The evidence reviewed by the Examiner is sufficient for a fact-finder to conclude that Andersen breached its professional duty of care and was negligent as to certain portions of the work it performed for Enron. In public statements and testimony, Andersen has acknowledged that it made material accounting and auditing errors. The Examiner has discovered facts that suggest additional acts of negligence beyond those previously acknowledged, including evidence indicating a failure to inquire about facts that were critical to Andersen's understanding of the transactions.

Beyond instances of negligence, there is also evidence from which a fact-finder could conclude that Andersen gave substantial assistance to Enron's officers who breached their fiduciary duties to Enron by causing it to disseminate materially misleading financial information, by:

- providing consultation services with respect to the SPE transactions necessary for Enron's accounting and other financial officers to design and implement the accounting techniques they used to manipulate Enron's reported financial condition, results from operations, cash flow, and MD&A;

- agreeing with Enron's accounting and financial officers that full disclosure regarding the SPE transactions was not necessary despite the requirement that the financial presentations not be materially misleading; and

- failing to ensure that the Audit Committee was informed about the effects of these accounting and disclosure decisions by management and Andersen before the Audit Committee approved Enron's financial statements for issuance to the public.

Based on Andersen's substantial assistance to Enron's accounting and financial officers described above, as well as a clear understanding of the effects of these efforts on Enron's public financial information, a fact-finder could conclude that Andersen had actual knowledge of the breaches of fiduciary duty by these officers. As a result, a fact-finder could conclude that Andersen aided and abetted the officers' breaches of fiduciary duty.

## V.    SPECIFIC ROLES OF ATTORNEYS AND POTENTIAL LIABILITY

### A.    <u>Overview</u>

Enron employed over 250 in-house attorneys and retained hundreds of law firms. Certain of these attorneys were involved in providing legal advice and assistance to Enron in the SPE transactions that have been the subject of Prior Reports. Some of these same attorneys advised Enron on disclosures, which the Examiner has concluded in Prior Reports were materially misleading.

### B.    <u>Outside Law Firms</u>

*Vinson & Elkins*

Vinson & Elkins was Enron's primary outside law firm. Enron paid fees to Vinson & Elkins of $18.6 million, $26.6 million, $37.8 million, $42.8 million, and $36.4 million in 1997, 1998, 1999, 2000 and 2001, respectively. Vinson & Elkins represented Enron in a wide variety of matters, including approximately sixty-six SPE transactions consummated by the Debtors between 1997 and the Petition Date, many of which have been criticized in Prior Reports. This work included rendering legal opinions in many transactions, including certain FAS 140 Transactions, which opinions were required by Andersen to allow Enron to obtain the accounting treatment that it sought for these transactions. Vinson & Elkins also served as Enron's outside counsel in many of the Related Party Transactions that were discussed in the Second Interim Report. In addition, Vinson & Elkins advised Enron on certain disclosure matters.

The Examiner concludes that there is sufficient evidence from which a fact-finder could determine that Vinson & Elkins committed malpractice based on Texas Rule 1.12, aided and abetted breaches of fiduciary duty by Enron officers, or committed malpractice

based on negligence in connection with several transactions. The events or transactions

where such liability may be found include Vinson & Elkins' representation of Enron with

respect to:

- The delivery of true issuance opinions in connection with certain FAS 140 Transactions in light of Vinson & Elkins' knowledge that (i) these opinions did not address the critical issues under FAS 140, as Vinson & Elkins understood those issues, (ii) Andersen was using its opinions to support Enron's financial reporting, and (iii) these transactions were significant to Enron's earnings.

- Project Nahanni, a transaction that had no business purpose except to create cash flow from operating activities at year-end 1999 through a loan that was "hardwired"[100] to be repaid within one month after closing.

- The LJM1/Rhythms Hedging Transaction, which was a hedge for financial statement purposes only and lacked any economic substance or rational business purpose, but was intended by certain of Enron's officers to manipulate Enron's financial statements.

- The LJM2/Raptors Hedging Transactions from January 2000 through their restructuring in early 2001, which provided hedges for financial statement purposes only, and lacked any economic substance or rational business purpose, but were intended by certain of Enron's officers to manipulate Enron's financial statements.

- The delivery of a true sale opinion in the Sundance Industrial transaction that enabled Enron to book a $20 million gain, even though Vinson & Elkins knew that there was no valid business purpose for this feature of the transaction and that a valid business purpose was essential to a true sale opinion.

- Enron's related party transaction disclosure for the proxy statement filed in 2001, for which Vinson & Elkins rendered advice regarding the non-disclosure of the amount of Fastow's interest in LJM without knowing the amount of that interest, even though Vinson & Elkins knew that Fastow wanted to prevent the Enron Board from learning how much he was making from the LJM transactions with Enron.

---

[100] *See* Third Interim Report, Appendix C (Role of Enron's Officers), at 61-66 (defining "hardwired").

- The Watkins' Investigation, without making full disclosure of Vinson & Elkins' role in the transactions being investigated, including the concerns Vinson & Elkins had about the transactions, some of which were similar to those raised by Watkins.

- The delivery of tax opinions in connection with certain Tax Transactions which enabled Enron to "generate" accounting income from projection of future tax savings.

*Andrews & Kurth*

Over time, Andrews & Kurth became Enron's firm of choice for its FAS 140 Transactions. This work generated fees of $1 million, $2.4 million, $6.7 million, $9.7 million and $9.3 million in 1997, 1998, 1999, 2000 and 2001, respectively. From November 1998 through October 2001, Andrews & Kurth provided legal services to Enron in connection with twenty-eight FAS 140 Transactions. Andrews & Kurth assisted Enron with fifteen related transactions whereby Enron caused the initial FAS 140 Transaction to be prepaid, thereby unwinding fifteen of the twenty-eight initial FAS 140 Transactions. Andrews & Kurth delivered at least twenty-four legal opinions regarding true issuance or true sale and substantive consolidation in the FAS 140 Transactions. Andrews & Kurth was concerned about several terms in these transactions that created questions about whether a sale had occurred. In an early transaction, this included concerns about the ability of Enron to prepay at any time and get the asset back.[101] There

---

[101] On December 21, 1999, in the midst of closing the Discovery transaction, Andrews & Kurth asked Enron:

> Assuming a buyer is found for the FirstWorld Interests, ENA may desire to unwind the FASB 125 transaction by prepaying the facility during the first two months of 2000. Would prepayment and sale so soon after the FASB 125 sale by ENA jeopardize the FASB 125 treatment of the transaction? Does it matter if ENA *intends* to arrange such a sale and prepay the facility at the time of entering into the FASB 125 transaction?

Memorandum from Mike Blaney and David Grove, Andrews & Kurth, to Project Discovery and Enron Communications FirstWorld Working Groups, regarding Project Discovery Issues List, Dec. 21, 1999, at 2 (12/21/99 draft) (emphasis in original) [AKED00083764-AKED00083767]. The Examiner has not

is evidence suggesting that Andrews & Kurth knew that these planned early unwinds were a problem for the intended accounting of the transactions both from a legal and an accounting standpoint. For example, an Enron memo that Andrews & Kurth revised at Enron's request states:

> Keep in mind that the Auction-related mechanisms will come into play ONLY if the indebtedness is not prepaid by the Sponsor, which is always Global Finance's planned means of unwind and has been, with one exception I'm aware of, the actual means of unwind. Nonetheless, because this prepayment plan is not memorialized in any deal documentation (and cannot be for financial accounting and legal opinion purposes), these mechanisms still must be analyzed from a tax perspective.[102]

The Examiner concludes that there is sufficient evidence from which a fact-finder could determine that Andrews & Kurth committed malpractice based on Texas Rule 1.12, aided and abetted a breach of fiduciary duty or committed malpractice based on negligence in connection with these FAS 140 Transactions. A fact-finder could determine that Andrews & Kurth knew that Enron had no intention to relinquish control over, or the risks and rewards of, the assets transferred in certain of the FAS 140

---

discovered any evidence that Andrews & Kurth received an answer to this question. Andrews & Kurth appeared to think that the answer required an accounting judgment, but the question called for a legal conclusion.

[102] Email from Bill Bowes, Enron, to Tom Popplewell, Andrews & Kurth, May 22, 2001, at 1 (emphasis in original) [AK 0067236-AK 0067238]. Bowes' email to Popplewell stated, "I would appreciate your thoughts and comments on the accuracy of my description. . . ." *Id.* at 1. Popplewell's reply stated: "Here are our comments." Email from Tom Popplewell, Andrews & Kurth, to Bill Bowes, Enron, May 24, 2001, at 1 [AK 0067236-AK 0067238]. As early as November 1998, in connection with the first FAS 140 Transaction that Andrews & Kurth handled for Enron, Andrews & Kurth was aware that Enron did not intend to transfer the monetized asset to a third party. "GB [Gareth Bahlmann, former Assistant General Counsel, Enron Global Finance] did not want to mention the auction in the consent. I said this was okay as long as Enron were [sic] absolutely confident that there would never in practice be a sale to a third party. GB said that this was correct . . . ." Memorandum from Danny Sullivan, Andrews & Kurth, to File, regarding Enron/Sarlux, Nov. 19, 1998 [AK 0073331].

-51-

Transactions and therefore was engaging in the FAS 140 Transactions to produce materially misleading financial statements.

### C.  **Enron's In-House Attorneys**

*Derrick*

From 1991 until after the Petition Date, James V. Derrick ("Derrick"), a former partner at Vinson & Elkins, served as General Counsel to Enron. Although Derrick attended meetings of the Enron Board, his participation was generally limited to making presentations regarding litigation matters, and it appears that he rarely provided any legal advice to the Enron Board. The Examiner concludes there is sufficient evidence from which a fact-finder could determine that Derrick committed malpractice based on negligence in connection with the performance of his duties as General Counsel of Enron with respect to:

- Derrick's failure to inform himself and then the Enron Board with respect to the Related Party Transactions, or to confirm that those to whom he had delegated the responsibility were taking adequate steps to do so.

- Derrick's failure to become familiar with the facts of the LJM1/Rhythms Hedging Transaction and the conflict of interest issues presented by that transaction and governing law, so as to enable proper execution of his responsibilities as legal advisor to the Enron Board.

- Derrick's failure to inform himself about (i) the content of the "anonymous letters" delivered to Lay in August 2001 or (ii) the extent of Vinson & Elkins' involvement in the transactions criticized by the "anonymous letters," which meant that he was unable to advise Lay properly with respect to the investigation or the propriety of retaining Vinson & Elkins to conduct that investigation.

*Rogers*

As Associate General Counsel, Rex Rogers ("Rogers") was the in-house lawyer primarily responsible for disclosure in Enron's periodic SEC filings. The Examiner

concludes that there is sufficient evidence from which a fact-finder could determine that Rogers failed to inform himself about the SPE transactions so that he could advise Enron with respect to the related disclosure issues and accordingly, committed malpractice based on negligence. A fact-finder could determine that Rogers committed malpractice based on Texas Rule 1.12 or breached his fiduciary duties, or both, in connection with his failure to inform the Enron Board of the restructuring of the Raptors SPEs in early 2001, which involved, among other things, Enron's infusion of 12 million additional shares of its stock, valued in excess of $600 million.

*Mordaunt*

Kristina Mordaunt ("Mordaunt") served as a senior in-house attorney within Enron Global Finance and its predecessor on several SPE transactions. The Examiner concludes that there is sufficient evidence from which a fact-finder could determine that Mordaunt committed malpractice based on Texas Rule 1.12, committed malpractice based on negligence or breached her fiduciary duties with respect to:

- The Chewco transaction, because she was aware of the conflict of interest created by Kopper's role as general partner of Chewco but did not take steps to analyze the Code of Ethics with respect to his conflict of interest or to inform the Enron Board of the related party nature of the Chewco transaction when it was asked to approve that transaction.

- The LJM1/Rhythms Hedging Transaction, which was a hedge for financial accounting purposes only, lacking any economic substance or rational business purpose, but was intended by certain Enron officers to manipulate Enron's financial statements.

The Examiner concludes that there is sufficient evidence from which a fact-finder could determine that Mordaunt committed malpractice and breached her fiduciary duties in connection with her investment of $5,826 in Southampton and her receipt of more than $1 million as a return on that investment without advising Derrick or the Office of the

Chairman of the investment and without receiving the necessary approval as required by the Code of Ethics and rules of professional conduct.

*Sefton*

Scott Sefton ("Sefton") served as General Counsel of Enron Global Finance for one year, between September 1999 and early October 2000. The Examiner concludes that there is sufficient evidence from which a fact-finder could determine that Sefton committed malpractice based on Texas Rule 1.12, committed malpractice based on negligence, or breached his fiduciary duties with respect to:

- Project Nahanni, a transaction that had no business purpose except to create cash flow from operating activities at year-end 1999 through a loan that was "hardwired" to be repaid within one month after closing.

- The LJM2 transactions, where he failed to advise (or make appropriate efforts to have Derrick or another Enron attorney advise) the Enron Board of numerous significant conflict of interest issues relevant to LJM2 matters.

- Two of the four LJM2/Raptors Hedging Transactions, all of which were non-economic hedges, lacking any economic substance or valid business purpose, but which were intended by certain Enron officers to manipulate Enron's financial statements.

*Mintz*

Jordan Mintz ("Mintz") was Sefton's successor as General Counsel to Enron Global Finance. The Examiner concludes that there is sufficient evidence from which a fact-finder could determine that Mintz committed malpractice based on Texas Rule 1.12, committed malpractice based on negligence or breached his fiduciary duties with respect to:

- Certain matters pertaining to LJM2, including (i) his knowledge that the Enron Audit and Finance Committees had not been informed of Enron's repurchases of certain assets from LJM2 during 2000, (ii) his knowledge that Enron employees (in addition to Fastow) were acting

in furtherance of the interests of LJM2 in a manner contrary to Enron's interests and (iii) his knowledge that Fastow wanted to prevent the Board from learning how much money he was making from the LJM transactions with Enron.

- Enron's related party transaction disclosure in the proxy statement filed in early 2001, and its failure to disclose the amount of Fastow's interest in the LJM transactions.

- Enron's tax indemnity payment to Chewco, demanded by Kopper in the Chewco unwind, despite the fact that Mintz knew the documents as originally drafted did not require that payment.

## VI. SPECIFIC ROLES OF LAY, SKILLING AND OUTSIDE DIRECTORS AND POTENTIAL LIABILITY

### A. Roles of Lay, Skilling and Outside Directors in Enron's SPE Transactions

During the period 1997 through the Petition Date, Lay and Skilling held the top two officer positions at Enron. Lay was Chairman and CEO, and Skilling was President and COO, and both men served on Enron's Board. For a six-month period, from February through August 2001, Skilling held the position of CEO and Lay continued as Chairman. In August 2001, when Skilling abruptly resigned all his positions with Enron, Lay resumed the role of CEO.

Lay joined the predecessor of Enron in 1984, and Skilling joined Enron in 1990. Both hold advanced degrees: Lay has a Ph.D. in economics, and Skilling received an MBA from Harvard where he was in the top 5% of his class. Together, they led Enron during its steep climb to become the seventh largest public company in America, and, during its dramatic plummet to become, in December 2001, the world's then-largest bankruptcy petitioner.

The Enron Board for the five years from 1997 through 2001 was comprised of between fifteen and nineteen directors, including Lay and Skilling. The Outside Directors[103] included a group of men and women who were highly successful in their

---

[103] In addition to Lay and Skilling, there were three directors who had other roles at Enron including Rebecca Mark-Jusbasche ("Mark-Jusbasche"), Ken Harrison ("Harrison") and John Urquhart ("Urquhart"). Harrison and Mark-Jusbasche were full-time Enron employees, and Urquhart provided full-time consulting services for Enron for a period of time. For purposes of this Report, however, the term "Outside Directors" includes all of the members of Enron's Board who served during the period 1997 to the Petition Date other than Lay and Skilling. Although Harrison, Mark-Jusbasche and Urquhart were employed or engaged by Enron, based on the evidence available to the Examiner, their positions with the company were such that they would have had effectively no involvement with the SPE transactions beyond that of the non-officer and non-employee directors.

professional careers. Most had advanced degrees, many held senior leadership positions in U.S. and international businesses, and many served on the boards of other for-profit U.S. corporations. Enron's Outside Directors included, for example, four people who held Ph.D.s and one with an honorary doctorate, two medical doctors who each served as president of one of the world's leading cancer treatment centers, and two law school graduates. The group also included twelve people who had served as CEOs, a Dean of the Stanford University School of Business, a member of Great Britain's House of Lords who served under then Prime Minister Margaret Thatcher, and a former chair of the Commodity Futures Trading Commission.

The evidence available to the Examiner regarding the roles of Lay, Skilling and the Outside Directors in Enron's SPE transactions was limited. Lay submitted to a one-day interview with the Examiner, but Skilling invoked his Fifth Amendment privilege and refused to provide either testimony or an interview. Skilling has provided some sworn testimony to other parties investigating Enron, but Lay has not. None of the Outside Directors invoked a Fifth Amendment privilege in response to the Examiner's request for testimony, but many of the officers at Enron who worked with Lay and Skilling and who attended virtually all of the Board meetings have invoked their Fifth Amendment privileges. Also, with respect to documentary evidence, both Lay and Skilling were infrequent users of email, and they also apparently did not retain many documents. They produced very little relevant written material in response to the Examiner's subpoenas.

Although limited by the lack of sworn testimony from certain key officers, and by the small amount of relevant documents, the evidence is sufficient to show that Lay,

Skilling and the Outside Directors were actively engaged in performing their monitoring functions. Lay and Skilling were hands-on managers involved in the daily operation of Enron's business. The Outside Directors on the Board and its committees were not involved in the day-to-day operations, but they were generally engaged in activities designed to fulfill their supervisory roles.

The evidence shows that, as a result of their day-to-day involvement at the company, Lay and Skilling knew or should have known their subordinate officers misused the SPE transactions in a manner that resulted in the dissemination of materially misleading financial information. Both Lay and Skilling failed to respond to indications of potential problems related to the use of SPE transactions. For example, Lay and Skilling apparently ignored repeated inclusions of the Prepay Transactions on interest rate exposure charts presented by Fastow, even though, as Lay admitted in his interview with the Examiner, a prepay that was a commodity transaction would not cause Enron to have interest rate exposure. Had Lay and Skilling inquired as to why the Prepay Transactions were included on those charts, they may have been told that Enron was engaging in circular Prepay Transactions that were substantively debt, with no disclosure of that fact in the company's published financial statements. There were similar indications of problems with other SPE transactions.

With respect to the SPE transactions that Enron entered into with LJM1 and LJM2, entities in which Fastow had a personal interest and from which he received substantial compensation, there is evidence that Skilling ignored red flags regarding the

lack of arm's length negotiation of those transactions and regarding Fastow's compensation.[104]

The Outside Directors, however, may not have recognized the same red flags regarding the SPE transactions as indicators of the wrongful conduct of the senior officers. They did not have the intimate knowledge of Enron's day-to-day operations that Lay and Skilling shared. In addition, although Enron officers often provided voluminous information to the Outside Directors, helping the Outside Directors understand fully the financial activities at Enron apparently was not a high priority for Enron management. The officers often presented information to the Board and its committees in ways that obfuscated the facts, and there are several instances of apparent intentional misrepresentations by officers.

The Outside Directors, however, together with Lay and Skilling, authorized Enron to enter into the LJM1/Rhythms Hedging Transaction and certain of the LJM2/Raptors Hedging Transactions, none of which had a rational business purpose. In these transactions, Enron transferred substantial value for non-economic hedges, meaning the value of each hedge to Enron was based solely on the value of securities and cash that Enron itself had transferred to the hedging vehicles, providing Enron no economic value but only a financial statement benefit. There is evidence that Lay, Skilling and the Outside Directors were in possession of facts necessary to conclude that the transactions lacked a rational business purpose before approving the transactions.

---

[104] There is also evidence that in connection with a transaction called Chewco, Skilling failed to disclose to the Board that an Enron employee, Kopper, was involved, which might have been a material fact to the Board because it created a conflict of interest. Thus, there is evidence that Skilling breached his duty of candor. *See* Report, Appendix D (Roles of Lay, Skilling and Outside Directors), *Actions of Lay, Skilling and Outside Directors Regarding SPE Transactions – Duty of Candor*.

## B.    Potential Liability

The evidence available to the Examiner regarding the roles of Lay and Skilling in Enron's SPE transactions, and the reasonable inferences that may be drawn from such evidence, is sufficient for a fact-finder to conclude that Lay and Skilling knew or should have known that the senior officers were misusing the SPE transactions to disseminate materially misleading financial information.   Thus, the evidence and the reasonable inferences that may be drawn therefrom are sufficient for a fact-finder to conclude that Lay and Skilling, as officers, were at least negligent in fulfilling their duty of oversight. Lay and Skilling, acting in their capacities as officers of Enron, are not entitled to exculpation from liability for their breach of fiduciary duty.

The Outside Directors, because they had less knowledge of and involvement in Enron's day-to-day operations, may not have recognized the same red flags regarding the SPE transactions as indicators of the wrongful conduct of the senior officers.  Although the Outside Directors may properly be criticized for failing to inquire about aspects of Enron's financing activities that might have led them to more knowledge of the senior officers' wrongful conduct, the evidence does not support a conclusion that the Outside Directors failed to act in good faith, or acted with a conscious disregard for known risks, in failing to recognize and respond to red flags.  Thus, based on the evidence available to the Examiner, and the reasonable inferences that may be drawn from such evidence, the Examiner cannot conclude that there is sufficient evidence from which a fact-finder could conclude that the Outside Directors failed to fulfill their duty of oversight.

Lay, Skilling and the Outside Directors, however, approved the LJM1/Rhythms Hedging Transaction and certain LJM2/Raptors Hedging Transactions.  None of those

transactions had a rational business purpose, which means the approval decisions are not protected from judicial scrutiny by the business judgment rule. There is evidence that Lay, Skilling and the Outside Directors were in possession of facts necessary to conclude that the transactions lacked a rational business purpose and that they acted in bad faith in approving the transactions. Thus, the evidence, and the reasonable inferences that may be drawn from such evidence, is sufficient for a fact-finder to conclude that Lay, Skilling and the Outside Directors breached their fiduciary duty of good faith in approving the LJM1/Rhythms Hedging Transaction and certain LJM2/Raptors Hedging Transactions. Enron's director exculpation provision does not protect a director from liability for actions not taken in good faith.

### C.   Lay's and Skilling's Use of Enron Stock to Repay Corporate Loans

Between May 1999 and October 2001, Lay repeatedly borrowed the full amount of his $4 million Enron line of credit and repaid it with shares of his Enron stock. In total, he borrowed and repaid with stock over $94 million. Skilling had a $4 million term loan from Enron, and in May 1999, he repaid $2 million of that amount with shares of his Enron stock. The Compensation and Management Development Committee (the "Compensation Committee") of the Board granted each officer the right to make the repayments with stock, but Enron's Board apparently never approved the repayments or ratified the approval granted by the Compensation Committee.[105] It does not appear that

---

[105] Outside Director John Duncan testified about a conversation he had with Lay after the Petition Date, after he had learned about Lay's use of the line of credit:

> Now I get a call from Ken Lay. And how are you doing? I said not – something like, Not doing too well.
>
> And why?
>
> And I said, The magnitude of the trades of stock against your credit.

any of the Outside Directors were aware of Lay's repeated borrowings and repayments, or the substantial aggregate amount that Lay borrowed and repaid, until the fall of 2001.

As described in Annex 1 to Appendix D (Roles of Lay, Skilling and Outside Directors) to this Report, the Compensation Committee did not have authority under Oregon law to approve the repayments of these loans with Enron stock, which were effectively the same as Enron repurchasing the shares. Because the Board apparently neither approved nor ratified the approval of the repayments by Lay and Skilling, such repayments are voidable at the election of Enron. Upon such event: (i) Enron would return to Lay 2,131,282 shares of common stock, and Lay would be liable to repay loans in the amount of $94,267,163, plus any applicable interest; and (ii) Enron would return to Skilling 26,425 shares of common stock, and Skilling would be liable to repay his loan in the amount of $2,000,042, plus any applicable interest.

---

And he said, Well, something like you know, my contract permitted that.

And I said, Ken, in the nuances of life, I don't think any lawyer's been born that can write all the variables, so even if your contract said that, do you think in your wildest dreams that the compensation committee would have approved that loan if you would have said what you could do with it and maybe would do with it?

Then I added, Especially in the light of the company finding out it's [sic] in financial trouble, and may be aiming for bankruptcy?

And his reply was: Bankruptcy is not in the contract.

And the conversation was over, because there wasn't too much to talk about at that point.

Sworn Statement of John H. Duncan, former Director, Enron, to John L. Latham, A&B, Nov. 26, 2002, at 90.

## VII. ROLE OF FINANCIAL INSTITUTIONS IN ENRON'S SPE TRANSACTIONS AND THEORIES OF LIABILITY

### A. Theories of Potential Liability

In this Report, the Examiner analyzes the participation of three Financial Institutions in Enron's SPE transactions and measures each Financial Institution's conduct against two legal theories:

- *Aiding and abetting a breach of fiduciary duty* – whether there is sufficient evidence for a fact-finder to conclude that a Financial Institution aided and abetted wrongful conduct of Enron's officers that constituted a breach of fiduciary duty such that the Financial Institution may be liable for damages to Enron, assuming Enron has standing to pursue such a claim; and

- *Equitable subordination* – whether there is sufficient evidence for a court to conclude that the claims of that Financial Institution should be equitably subordinated to the claims of other creditors.

*Aiding and Abetting*

For a Financial Institution to be liable for aiding and abetting, a fact-finder must first determine that there has been a breach of fiduciary duty by one or more Enron officers. If the fact-finder concludes there has been such a breach, the fact-finder may then conclude that a Financial Institution is liable to Enron for aiding and abetting such a breach if the evidence shows that: (i) the Financial Institution had *actual knowledge* of the wrongful conduct giving rise to the breach; (ii) the Financial Institution gave *substantial assistance* to the wrongdoer; and (iii) injury to the Debtors was the direct or reasonably foreseeable result of such conduct. While there is some authority to the contrary, the actual knowledge standard is strict – "should have known" or "suspicion" will not suffice. Also, "routine" services provided by a Financial Institution will not constitute substantial assistance. With regard to injury to the Debtors, a fact-finder could

-63-

conclude that Enron suffered damages as a result of the officers' improper use of the SPE

transactions, consisting of, among other things, the cost of governmental investigations,

the administrative costs of a bankruptcy proceeding and other losses caused by Enron's

"deepening insolvency."[106]

*Equitable Subordination*

A Financial Institution's claims filed in the Bankruptcy Case may be equitably

subordinated to the payment of other claims filed in the case if (i) the Financial

Institution engaged in inequitable conduct and (ii) that conduct resulted in harm to other

creditors.  In the case of creditors that are not insiders or fiduciaries of the debtor, the

standard of inequitable conduct is high and has been said to require a breach of a

recognized duty.  Several cases stand for the proposition that a creditor's participation in

the debtor's misrepresentation of its financial condition to other creditors may constitute

inequitable conduct that will justify the equitable subordination of the creditor's claim.[107]

If a Financial Institution engaged in inequitable conduct by participating in

Enron's misrepresentation of its financial condition, a court could conclude that other

creditors were injured by this conduct because they relied on this information in

extending (or continuing to extend) credit to Enron.

**B.**    **Potential Defenses to Aiding and Abetting Claims and Equitable Subordination**

In assessing whether a fact-finder could determine that a Financial Institution has

any liability under an aiding and abetting theory or should have its claims equitably

---

[106] *See* Third Interim Report, Appendix B (Legal Standards), at 75-78.

[107] *Id.* at 85-95.

subordinated, the Examiner has considered defenses available to the Financial

Institutions.  The Examiner has considered potential defenses to equitable subordination

by reference to the elements of aiding and abetting.    The facts and circumstances

surrounding each Financial Institution's potential liability must be considered

independently, and Appendices E through G to this Report analyze these issues in more

detail.    The Examiner has reviewed a substantial amount of evidence, including

documentary and testimonial evidence, and has noted the reasonable inferences that could

be drawn from the evidence.  A fact-finder may draw alternative or contrary inferences

from the same evidence.  Whether a Financial Institution will succeed on one or more

defenses to any of these causes of action will depend upon the fact-finder's resolution of

the facts.

Parts B and C of Section IV of the Third Interim Report set forth a discussion of

the various defenses available to the financial institutions reported on in the Third Interim

Report.[108]    All of those defenses, including those based on the wrongful conduct of

Enron's officers, such as standing issues and *in pari delicto* defenses,[109] would be

available to the Financial Institutions.

---

[108]  Third Interim Report, at 36-50.

[109]  Third Interim Report, Appendix B (Legal Standards), at 54-79.

## VIII. SPECIFIC ROLES OF FINANCIAL INSTITUTIONS AND POTENTIAL LIABILITY

### A. RBS

RBS and its predecessor, National Westminster Plc ("NatWest"), had extensive dealings with Enron prior to RBS's takeover of NatWest in March 2000. Prior to the takeover, NatWest was one of Enron's Tier 1 banks. After the March 2000 takeover, RBS became a Tier 1 bank, and the merged bank continued to work closely with Enron until the Petition Date. NatWest and RBS participated in Enron transactions known as:

- the LJM1/Rhythms Hedging Transaction;[110]

- the Sutton Bridge FAS 140 Transaction;

- the ETOL I, II and III FAS 140 Transactions; and

- the Nixon Prepay Transaction.

*Examiner's Conclusions*

As set forth in Appendix C (Role of Enron's Officers) to the Third Interim Report, the Examiner has concluded that there is sufficient evidence for a fact-finder to determine that certain of Enron's officers breached their fiduciary duties by causing the Debtors to enter into the LJM1/Rhythms Hedging Transaction and certain other SPE transactions, including the RBS FAS 140 Transactions and the Nixon Prepay Transaction, that were designed to manipulate the Debtors' financial statements and resulted in the dissemination of financial information they knew to be materially misleading. In addition, the LJM1/Rhythms Hedging Transaction and other transactions

---

[110] In addition to the LJM1/Rhythms Hedging Transaction, RBS assisted certain Enron officers with other transactions involving LJM1 and affiliated entities.

relating thereto present facts sufficient to support the conclusion that Fastow and other Enron officers engaged in self-dealing in violation of their duty of loyalty.

In Appendix E (Role of RBS and its Affiliates), the Examiner discusses RBS's involvement in the SPE transactions. The Examiner concludes that there is evidence that: (i) RBS had actual knowledge of the wrongful conduct in these transactions giving rise to the breaches of fiduciary duties; (ii) RBS gave substantial assistance to certain of the Debtors' officers by participating in the transactions; and (iii) injury to the Debtors was the direct or reasonably foreseeable result of such conduct. This evidence is sufficient for a fact-finder to conclude that RBS aided and abetted certain of the Debtors' officers in breaching their fiduciary duties. In addition, there is sufficient evidence of inequitable conduct that RBS's claims, totaling approximately $537 million, may be equitably subordinated to the claims of other creditors.

The Examiner's findings are based upon a review of testimony and documentary evidence that is set forth in Appendix E (Role of RBS and its Affiliates), which the reader should review for a more complete understanding. Transactions considered by the Examiner in which RBS participated include the following:

*The LJM1/Rhythms Hedging Transaction.* A fact-finder could conclude that RBS's conduct in the formation and funding of LJM1 assisted Enron in the formation of the LJM1/Rhythms Hedging Transaction, through which Enron inappropriately recognized $95 million of income in 1999, representing 10.6% of its originally reported net income for that year. A fact-finder could also conclude that RBS's conduct in the LJM1/Rhythms Hedging Transaction and other transactions related thereto enabled Fastow improperly to enrich himself and other Enron officers in violation of their

-67-

fiduciary duties to Enron. The evidence would allow a fact-finder to conclude that RBS, as a result of the restructuring of LJM1, including a series of Total Return Swaps between RBS and American International Group ("AIG"), assisted Fastow in investing and profiting from approximately $25 million, which circumvented (i) restrictions in the LJM1 partnership agreement, (ii) Fastow's representations to the Enron Board and (iii) transfer and hedging restrictions placed on the Enron shares transferred to LJM1 upon which PricewaterhouseCoopers LLP ("PWC") relied in issuing its fairness opinion in connection with the formation of LJM1.

Fastow formed LJM1, with the approval of the Enron Board, to engage in transactions with Enron, including the LJM1/Rhythms Hedging Transaction. Fastow, as the owner of the general partner of LJM1, controlled LJM1, and RBS and CSFB, through their affiliates, were the only limited partners.[111] The RBS affiliate purchased its partnership interest for $7.5 million (the same price paid by CSFB's affiliate for its partnership interest) and Fastow contributed $1 million, for total capital contributions of $16 million.

Enron transferred to LJM1 6,755,394 shares of Enron stock, with an aggregate stock price of $276 million, in exchange for the LJM1/Rhythms Hedging Transaction and two promissory notes totaling $64 million.

The Enron Board approved the LJM1/Rhythms Hedging Transaction with the understanding that Fastow could not profit from or have any direct pecuniary interest in the Enron stock held by LJM1. Instead, Fastow could only profit from the capital contributions from LJM1's partners and proceeds from LJM1's other investments. In

---

[111] *See* Second Interim Report, Appendix L (Related Party Tranasctions).

addition, the Enron Board understood that a fairness opinion would be obtained with respect to the consideration received by Enron in exchange for the Enron stock. A fairness opinion was obtained from PWC, but only after hedging and transfer restrictions were placed on the Enron stock transferred to LJM1, thereby permitting Enron to assign a value to the stock that was significantly below its aggregate stock price.

When Enron first presented RBS with the opportunity to participate in LJM1, a senior RBS manager who was the lead banker on the proposed transaction, characterized it as follows:

> The fact is that a two bit LLC called Martin [the original name for LJM1], owned by a couple of Enron employees, will all of a sudden be **gifted** $220m of Enron stock. It could never bother about the borrowing base, sell the stock in the market, pack up [its] bag and disappear off to Rio. If you owned it, wouldn't you? Now I'm beginning to understand why these guys are so keen to get in on it. . . .
>
> What am I missing???????
>
> There needs to be consideration given to the Enron group.[112]

KPMG Audit Plc, engaged by RBS to analyze the bank's internal accounting for the transaction, noted that:

> the nature of the transaction is highly unusual. The role of the CFO of Enron and the use of its own shares, raises significant concerns as to the potential reputational risk to the bank if the transaction is not disclosed appropriately by Enron or shareholders claim to have been disadvantaged.[113]

---

[112] Email from David Bermingham, RBS, to Kevin Howard and Mike Ellison, RBS, May 28, 1999 (emphasis in original) [RBS 4016410]. Ironically, Bermingham ultimately was indicted and charged with wire fraud for his role in allegedly improperly profiting from LJM1 and allegedly is evading authorities. Indictment, *United States v. Bermingham*, Cr. No. H-02-0597 (S.D. Tex. filed June 27, 2002) (the "RBS Bankers Indictment"); *see also* Criminal Docket, *United States v. Bermingham*, No. 02-CR-0597-ALL (S.D. Tex. filed June 27, 2002) (claiming David Bermingham is a "fugitive").

[113] Letter from Iain Cummings, KPMG Audit Plc, to Chris Learmonth, RBS, *et al.*, June 23, 1999 (the "KPMG Letter, June 23, 1999"), at RBS 3030570 [RBS 3030569-RBS 3030570]; *see also* Memorandum from P.E. Commons, Head of Credit Risk, RBS, to William Martin, Group Risk Director, RBS, regarding

Besides the prohibition against Fastow sharing in any value from the transferred Enron stock, the hedging and transfer restrictions on the Enron shares transferred to LJM1 were set forth in a "lock-up agreement." RBS took actions that circumvented these restrictions and, as a result, generated substantial profits for each of the partners, including Fastow. It did so through the Total Return Swaps with AIG, despite recognizing that the effect of the Total Return Swaps was to produce results counter to the conditions upon which LJM1 was approved. RBS noted in internal correspondence that a competing CSFB proposal was aimed at providing Fastow with "[l]iquidity of (net) $66m, which is entirely windfall (it was NEVER the intention in the original deal)."[114]

While continuing to derive substantial profits from its interest in LJM1, RBS in March 2000 sold its interest in a subsidiary of LJM1 to a number of Enron insiders. The sale allegedly was planned by Fastow, Kopper and three RBS bankers and timed so as to allow these and other insiders to profit personally from an imminent termination fee to be paid by Enron to the LJM1 subsidiary. RBS did not, however, receive the full sale price of $20 million that Enron was told would be paid to RBS for its interest in the subsidiary. Instead, RBS received $1 million because its three key bankers on the transaction allegedly siphoned off the remaining $19 million of the represented purchase price for themselves personally, Fastow, Kopper and the other Enron insiders who were invited to contribute to the purchase of the subsidiary.[115]

---

Project LJM, June 29, 1999 (the "Project LJM Memorandum"), at RBS 3030461 [RBS 3030461-RBS 3030463].

[114] Email from David Bermingham, RBS, to Kevin Howard, *et al.*, RBS, Aug. 6, 1999, at RBS 4016350 (emphasis in original) [RBS 4016350-RBS 4016351].

[115] *See* RBS Bankers Indictment.

RBS profited considerably from its participation in LJM1. One of the means by which it did so was by completing the Total Return Swaps with AIG. It also profited through receipt of distributions declared by Fastow and through proceeds of Enron's repurchase (at a premium) from LJM1 of its interest in a Brazilian electric generation facility. On August 31, 2001, with no assets remaining in LJM1, RBS calculated that it had received in the aggregate from the LJM1 transactions, "a total return on our $7.5m investment of approx [sic] $22.7m or in excess of 1200% IRR. This is a most satisfactory result and underlines the way Enron supports its Tier 1 banks."[116]

*The FAS 140 Transactions.* RBS repeatedly received verbal assurances from top Enron officials, including Fastow, of repayment of the bank's equity investment in each of the FAS 140 Transactions.[117] RBS understood this equity needed to be "at risk" and understood that these verbal assurances could neither be "formally documented for accounting reasons"[118] nor publicly disclosed[119] if Enron was to derive the accounting

---

[116] Email from Kevin Howard, RBS, to Iain Robertson, *et al.,* RBS, Aug. 31, 2001, at RBS 6021378 [RBS 6021378-RBS 6021379].

[117] Credit Application, Sept. 18, 2000 (the "ETOL I Credit Application"), at RBS 3141124 and RBS 3141129-RBS 3141130 [RBS 3141118-RBS 3141165]; Credit Recommendation by Chris Clarke, Senior Manager, RBS, Sept. 19, 2000 (the "ETOL I Credit Recommendation"), at RBS 3141116 [RBS 3141115-RBS 3141117]; Memorandum from Konrad Kruger, Chief Executive, *et al.,* Greenwich NatWest, regarding Enron Sutton Bridge Ltd., undated, at RBS 3038535 (referencing the handwritten comments) [RBS 3038532-RBS 3038535]; RBS CBFM Credit Committee Minutes, Sept. 20, 2000 (the "CBFM Credit Committee Minutes, Sept. 2000"), at RBS 3121434 [RBS 3121434-RBS 3121436]; RBS Group Credit Committee Minutes, Sept. 22, 2000 (the "Group Credit Committee Minutes, Sept. 2000"), at RBS 3121150 [RBS 3121150-RBS 3121151]; Credit Application, Mar. 15, 2001, at RBS 3124939 [RBS 3124926-RBS 3124949]; Credit Recommendation by Chris Clarke, Senior Manager, RBS, Mar. 16, 2001, at RBS 3124953 [RBS 3124952-RBS 3124953]; RBS Group Credit Committee Minutes, Mar. 20, 2001, at RBS 3120874 [RBS 3120874-RBS 3120875].

[118] ETOL I Credit Recommendation, at RBS 3141116 ("We are therefore looking to verbal undertakings (they cannot be formally documented for accounting reasons) from Enron that they will ensure that RBS is kept whole through the exit strategy.").

[119] ETOL I Credit Application, at RBS 3141124; ETOL I Credit Recommendation, at RBS 3141116; The Royal Bank of Scotland: Proposed Transaction with Enron, Author unknown, undated, at 1 [RBS 3104222-RBS 3104226]; *see also* Sworn Statement of Susan Milton, Director, RBS, to John E. Stephenson, Jr., A&B, Sept. 9, 2003, at 73, lines 7-13, and at 163, lines 22-25.

benefits that it sought from these transactions. RBS also knew that Enron booked accounting gains not permitted in view of the existence of such assurances.[120] In each of the FAS 140 Transactions, RBS placed "significant reliance" on Enron's verbal assurance to "make the Bank whole" regardless of the cash generated by the underlying asset in the transaction.[121] RBS did not disclose the existence of these verbal assurances of repayment of the equity plus stated yield, which RBS referred to as its "required return," to any third party. Within the bank, however, RBS officials characterized the FAS 140 structure through which RBS facilitated Enron's booking of purported gains on sales and cash flow from operations as "21st Century Alchemy."[122]

*Nixon Prepay*. The Nixon Prepay, which also involved Citigroup, Barclays and Toronto Dominion (as a conduit between each of the three other banks and Enron), provided Enron with $110 million of funding from RBS in December 1999, which Enron improperly recorded as cash flow from operating activities. The RBS credit committees were informed by an RBS senior research analyst that the proposed transaction was "effectively a window dressing request" that Enron would employ "to reduce [its] reported year-end net debt position."[123] RBS also recognized that the transaction's "whole structure [was] set up to remove the commodity risk for all parties, [so] all

---

[120] Memorandum from Nicola Goss, RBS, to Peter Whitby, RBS, *et al.*, regarding ETOL equity purchase, Sept. 6, 2000, at RBS 3141015 [RBS 3141015-RBS 3141017]; Memorandum from Janis Wallis, Associate Director, RBS, regarding ETOL, Sept. 26, 2001, at RBS 3089524 [RBS 3089524-RBS 3089527]; ETOL I Credit Application, at RBS 3141124; Memorandum from Nicola Goss, Associate Director, Project and Export Finance, RBS, to Iain S. Robertson, *et al.*, RBS, regarding additional ETOL funding, Mar. 1, 2001, at RBS 3141241 [RBS 3141241-RBS 3141243]; *see also* Email from Chris Clarke, Senior Manager, Structured & Specialised Credit, RBS, to Thomas Hardy, *et al.*, RBS, Mar. 9, 2001 [RBS 3141245].

[121] CBFM Credit Committee Minutes, Sept. 2000, at RBS 3120874.

[122] Group Credit Committee Minutes, Sept. 2000, at RBS 3121150.

[123] ARD Memorandum from A.W. McAlister, Senior Analyst, RBS, Dec. 6, 1999 (the "ARD Memorandum, Dec. 6, 1999"), at RBS 3118972 [RBS 3118972-RBS 3118973].

payments against commodity price moves are exactly off-set by receipts from the party
on the other side."[124]   Indeed, RBS personnel believed that the Nixon Prepay "raise[d]
issues over the absolute level of manipulation undertaken by Enron in its financial
statements."[125]   RBS understood that Enron accounted for proceeds from transactions
such as the Nixon Prepay as cash flow from operating activities.[126]   RBS nonetheless
provided Enron with the funding that it sought, then extended the maturity date at
Enron's request, having internally noted in connection with another Enron transaction in
the same time period that "[b]ecause this is balance sheet management, it pays better than
straight Enron corporate risk."[127]   RBS agreed to the extension of the Nixon Prepay
maturity date despite an internal credit analysis at the time of the proposed extension that
reflected increasing alarm regarding "financial period manipulation" by Enron:

> [t]he scale of financial period manipulation [by Enron] is exceedingly
> worrying and I don't yet understand it, nor am I sure that anyone in the
> bank does. . . . Such concern has been a theme of all our discussions for a
> while. We have twice increased exposure since doing this deal, [including]
> another manipulation when we joined in the JM Trust [i.e., Ghost] 18
> month bridge. . . .
>
> I can see from a relationship/business perspective that there is a temptation
> to write another income generating transaction on the basis of the comfort
> we are drawing from it being very short term, but the concern must
> obviously be that if lots of counterparties are doing this then any bad news
> (or shortage for whatever reason of counterparty capacity) will cut
> refinance ability dramatically and/or end Enron's ability to manipulate

---

[124] Application for Facilities Requiring Credit Committee/Board Approval, Dec. 6, 1999, at RBS 3118966 [RBS 3118960-RBS 3118984].

[125] ARD Memorandum, Dec. 6, 1999, at RBS 3118973.

[126] Email from Wilson McAlister, RBS, to Derek Weir, et al., RBS, Feb. 1, 2000, at 1 ("Other income includes unrealised gains and losses from price risk management activities . . . . These activities are reported as part of operational cash flow, boosting the reported position by $550M over the last two years . . . and representing 30% of reported operating cash flow in that period.") [RBS 3112211-RBS 3112213].

[127] Email from Derek Weir, RBS, to Alan Dickinson, RBS, and copy to Brian McInnes, Relationship Manager, RBS, et al., Jan. 31, 1999, at RBS 3112212 [RBS 3112211-RBS 3112213].

thus leading to a horrendous on-balance sheet position which would further exacerbate the position. The question is when do we stop . . . .[128]

**B.    CSFB**

CSFB was one of Enron's most valued investment banks and by mid-1999 consistently achieved Tier 1 status. CSFB regarded Enron as "one of [its] top accounts, if not the number one relationship."[129] Enron paid CSFB more in fees in 1999 – over $23 million – than any other of its Tier 1 banks.[130] In early 2001, Enron rated CSFB its "Best Bank" in North America, and recognized, in particular, CSFB's strength in debt capital markets.[131]

CSFB played important roles in several of Enron's SPE transactions, including the following:

- the LJM1/Rhythms Hedging Transaction;[132]

- the CSFB Prepay Transaction; and

- the Nile FAS 140 Transaction.

*Examiner's Conclusions*

As set forth in Appendix C (Role of Enron's Officers) to the Third Interim Report, the Examiner has concluded that there is sufficient evidence for a fact-finder to

[128] Email from Alex Sinclair, RBS, to Brian McInnes, *et al.*, RBS, Mar. 10, 2000 [RBS 3118862].

[129] Email from James Moran, Director, CSFB, to Geoff Smailes, CSFB, Dec. 14, 2000 [CSFBCO 000044034]; *see also* Memorandum from James Moran, Director, CSFB, to David Maletta, Managing Director, and Ed Devine, Managing Director, CSFB, Dec. 11, 2000, at 3 (describing Enron as a "Priority 1 client") [CSFBCO 000044755-CSFBCO 000044758]; Sworn Statement of Osmar Abib, Managing Director, CSFB, to Frank G. Smith, A&B, May 6-7, 2003, at 299, lines 18-19 ("Enron was a priority one client.").

[130] Enron Relationship Review January 2000, at AB000538544 [AB000538536-AB000538624].

[131] Enron Debt Investor Relationship Review Highlights January 2001, at AB0911 1958, AB0911 1962 [AB0911 1956-AB0911 1964].

[132] In addition to the LJM1/Rhythms Hedging Transaction, CSFB assisted certain Enron officers with other transactions involving LJM1 and affiliated entities.

determine that certain of Enron's officers breached their fiduciary duties by causing the

Debtors to enter into the LJM1/Rhythms Hedging Transaction and certain other SPE

transactions that were designed to manipulate the Debtors' financial statements and

resulted in the dissemination of financial information that such officers knew to be

materially misleading. In addition, the LJM1/Rhythms Hedging Transaction and other

transactions related thereto present facts sufficient to support the conclusion that Fastow

and other Enron officers engaged in self-dealing in violation of their duty of loyalty.

In Appendix F (Role of CSFB and its Affiliates), the Examiner discusses CSFB's

involvement in the SPE transactions. The Examiner concludes that there is evidence that:

(i) CSFB had actual knowledge of the wrongful conduct in these transactions giving rise

to the breaches of fiduciary duties by certain Enron officers; (ii) CSFB gave substantial

assistance to certain of the Debtors' officers by participating in the transactions; and

(iii) injury to the Debtors was the direct or reasonably foreseeable result of such conduct.

This evidence is sufficient for a fact-finder to conclude that CSFB aided and abetted

certain of the Debtors' officers in breaching their fiduciary duties. In addition, there is

sufficient evidence of inequitable conduct that CSFB's claims, totaling at least $417

million, may be equitably subordinated to the claims of other creditors.

The Examiner's findings are based upon a review of testimony and documentary

evidence that is set forth in Appendix F (Role of CSFB and its Affiliates), which the

reader should review for a more complete understanding. Transactions considered by the

Examiner in which CSFB participated include the following:

*The LJM1/Rhythms Hedging Transaction.* A fact-finder could conclude that

CSFB's conduct in the formation and funding of LJM1 assisted Enron in entering into the

LJM1/Rhythms Hedging Transaction, described above in connection with RBS's participation in that transaction, and through which Enron inappropriately recognized $95 million of income in 1999 (10.6% of its originally reported net income for that year). A fact-finder could also conclude that CSFB's conduct in the LJM1/Rhythms Hedging Transaction and other transactions related thereto enabled Fastow improperly to enrich himself and other Enron officers in violation of their fiduciary duties to Enron.

For example, through a transaction known as the SAILS transaction, CSFB effectively monetized its interest in the Enron shares held by LJM1 and then contributed $45.1 million in cash to LJM1. The parties treated the proceeds of the transaction as an additional capital contribution to LJM1, from which Fastow could profit, rather than proceeds resulting from the Enron stock, from which he could not profit, pursuant to representations made to the Enron Board in connection with its approval of LJM1. LJM1's other limited partner made a similar contribution. A fact-finder could conclude that, as a result of these transactions, an additional $25 million was contributed to LJM1 and recharacterized by the parties so that Fastow could profit directly from these funds. CSFB was aware of this restriction on Fastow's ability to profit from the Enron stock because certain terms of LJM1's Partnership Agreement, to which CSFB's affiliate was a party, provided that distributions and allocations with respect to the shares of Enron stock transferred to LJM1 were to be made only to the limited partners and not the general partner.

From LJM1's formation in June 1999 through its dissolution just over two years later in October 2001, CSFB received distributions and other payments on its LJM1 investment in excess of $38 million.

*CSFB Prepay.* In the CSFB Prepay Transaction, CSFB loaned funds to Enron in the amount of $150 million. As in other Prepays, and as acknowledged by a CSFB employee at the time, the transaction was "an obvious loan transaction,"[133] which Enron accounted for as a commodity transaction. As Enron officers were aware, a $150 million Prepay Transaction would enable Enron to improperly record $150 million of cash flows from operating activities and understate the debt by the same amount on its December 31, 2000 balance sheet. The evidence would allow a fact-finder to conclude that CSFB assisted Enron in completing the CSFB Prepay Transaction, even though CSFB knew that Enron's accounting for this transaction, with no other meaningful related disclosure, would contribute to materially misleading financial presentation.

*FAS 140 Transactions.* CSFB also funded a FAS 140 Transaction known as Nile in the aggregate amount of $25 million. The Nile transaction monetized shares of common stock in an Enron subsidiary called ServiceCo Holdings, Inc. CSFB funded the debt portion of the transaction and provided the 3% equity necessary for Enron to take the position that it was not required to include that debt on its balance sheet. CSFB's equity investment was, however, supported by Enron's agreement to repurchase the equity at par, thereby precluding the accounting treatment that Enron adopted. As reflected in a contemporaneous internal CSFB memorandum, Enron's agreement resulted in CSFB's credit risk on its equity investment in Nile being "100% Enron via put."[134]

---

[133] Email from Ian Emmett, CSFB, to Steven Wootton, Director, CSFB, Dec. 12, 2000 ("Is it ok for us to be entering into such an 'obvious' loan transaction?") [AB0507 00064].

[134] Memorandum from Brian McCabe, Vice President, David Koczan, Assistant Vice President, and James Moran, Director, CSFB, *et al.*, to Robert O'Brien, Chief Credit Officer, David Maletta, Managing Director, and Ed Devine, Managing Director, CSFB, Sept. 24, 2001, at 5 [CSFBCO 000043589-CSFBCO 000043609].

## C.   Toronto Dominion

Although it engaged in a variety of transactions with Enron, ranging from traditional commercial loans to underwritings, Toronto Dominion's most prominent role was in Enron's Prepay Transactions.  From December 1998 through December 2000, Toronto Dominion participated in six Prepay Transactions with Enron, with total proceeds of approximately $2 billion.

*Examiner's Conclusions*

As set forth in Appendix C (Role of Enron's Officers) to the Third Interim Report, the Examiner has concluded that there is sufficient evidence for a fact-finder to determine that certain of Enron's officers breached their fiduciary duties when they caused the Debtors to enter into certain SPE and related transactions, including the Prepay Transactions, that were designed to manipulate the Debtors' financial statements and that resulted in the dissemination of financial information such officers knew to be materially misleading.

In Appendix G   (Role of Toronto Dominion and its Affiliates), the Examiner discusses Toronto Dominion's involvement in the Prepay Transactions.  The Examiner concludes that there is evidence that: (i) Toronto Dominion had actual knowledge of the wrongful conduct in connection with these transactions giving rise to the breaches of fiduciary duty by certain Enron officers; (ii) Toronto Dominion gave substantial assistance to certain of the Debtors' officers by participating in such transactions; and (iii) injury to the Debtors was the direct or reasonably foreseeable result of such conduct. This evidence is sufficient for a fact-finder to conclude that Toronto Dominion aided and abetted certain of the Debtors' officers in breaching their fiduciary duties.  In addition,

-78-

there is sufficient evidence of inequitable conduct such that Toronto Dominion's claims, totaling approximately $57.8 million, may be equitably subordinated to the claims of other creditors.

The Examiner's conclusions are based upon a review of testimony and documentary evidence that is set forth in Appendix G (Role of Toronto Dominion and its Affiliates), which the reader should review for a more complete understanding. Transactions considered by the Examiner include the following:

*Prepay Transactions.* The six Prepay Transactions that Toronto Dominion completed with Enron between December 1998 and December 2000 (the "Toronto Dominion Prepays") totaled approximately $2 billion. Toronto Dominion knew that Enron did not transfer any commodity or any associated price risk in the Toronto Dominion Prepays and that the transactions were effectively debt. Toronto Dominion also knew that Enron did not report the Toronto Dominion Prepays as debt. Evidence exists from which a fact-finder could conclude that Toronto Dominion understood Enron reported the proceeds from the Toronto Dominion Prepays as cash flow from operating activities. Finally, Toronto Dominion knew that Enron's accounting for the Toronto Dominion Prepays, with no disclosure in the financial statement footnotes or MD&A, did not provide an investor with any understanding of the amount of Enron's repayment obligations or the terms of such obligations.

Toronto Dominion was concerned that Enron used these transactions to manipulate its balance sheet:

- "To address head office's concern regarding balance sheet manipulation, we have discussed the use of this structure with Enron."[135]

- "[W]e've been warned about the balance-sheet games at least twice in the last few months . . . ."[136]

- "Enron has approached us again to help them manage their balance sheet for the rating agencies and the analysts. The Company is coming to TD as we have demonstrated the ability to deliver, on a short-time frame, the same prepaid structured transaction."[137]

Toronto Dominion was also aware that Rating Agency pressure was an important part of Enron's motivation in doing Prepay Transactions. In the credit approval request for the December 1998 prepay, it was noted that:

Based on conversations with Enron, the sole purpose of this facility is to satisfy promises made to the rating agencies early this year about reducing leverage.[138]

Despite this knowledge, and despite the knowledge that Enron did not adequately disclose its prepay obligations, Toronto Dominion executed the Toronto Dominion Prepays, likely because the Prepay Transactions were "highly profitable" for Toronto Dominion.[139] During the two year period in which Toronto Dominion entered into Prepay Transactions with Enron, Toronto Dominion's Risk Adjusted Return on Capital for the Enron relationship was 39%, nearly twice the return of 20% that Toronto

---

[135] Toronto Dominion Corporate Credit Review for Enron, Firefly Trust and ENA, Dec. 10, 1999, at 20 [TDB-EX 002319-TDB-EX 002345].

[136] Email from Cori Novellino, Toronto Dominion, to Robyn Zeller, Toronto Dominion, Nov. 7, 2000 [TDB-EX 001266].

[137] Toronto Dominion Speedy Review, June 22, 1999, at TDB-EX 000040 [TDB-EX 000033-TDB-EX 000042].

[138] Toronto Dominion USA Division Speedy Review, Dec. 17, 1998, at TDB-EX(1) 015115 (emphasis in original) [TDB-EX(1) 015111-TDB-EX(1) 015120].

[139] Toronto Dominion Corporate Credit Review, Nov. 8, 2000, at 29 ("These Swaps are highly profitable for us and well received by [Enron].") [TDB-EX(1) 000054-TDB-EX(1) 000090].

Dominion targeted for its corporate customers.  This 39% return stands in sharp contrast to the return of 12% that the Enron relationship provided Toronto Dominion in 1997, just prior to the period in which the Toronto Dominion Prepays were executed.

## IX. HOW COULD THIS HAVE HAPPENED?

### A. Overview

The Examiner has previously reported on: (i) the role of the SPEs in the collapse of Enron; (ii) those SPE structures that are subject to legal challenge; (iii) Enron's use of SPEs to manipulate the financial information it reported to the public in violation of GAAP and applicable law; and (iv) officers, directors, accountants, attorneys and financial institutions involved in such transactions who may have liability under applicable legal standards.

The Examiner previously concluded that a group of senior officers at Enron adopted a strategy of using complex SPE transactions in order to manipulate Enron's financial statements. Specifically, through the use of six accounting techniques and hundreds of transactions, these officers distorted Enron's reported financial condition, results of operations and cash flows. The "tangled web" created by the complexity and magnitude of these structures was extraordinary.[140] .

The Examiner now addresses the question that many people have asked: how could this have happened?[141] That is, how could the seventh largest company in the

---

[140] "Oh what a tangled web we weave When first we practice to deceive!" Sir Walter Scott, *Marmion*, Canto vi, Stanza 17 (1808).

[141] The Examiner's views concerning this question are limited by the scope of the April 8th Order and by the refusal of over 20 witnesses, including several senior Enron officers, to provide testimony to the Examiner by exercising their privilege against self-incrimination under the Fifth Amendment.

world, which had been a darling of Wall Street,[142] fall so quickly and disastrously?[143] To answer this question, the Examiner: (i) identifies certain factors that may have caused Enron's officers to adopt their fraudulent and ultimately unsuccessful strategy; (ii) identifies several methods that appear to have been used by these officers to implement their strategy; and (iii) discusses the checks and balances that could have been provided by Enron's professionals and the Enron Board, which, had they been present, might have limited the misconduct.

### B.   Why Did Enron Officers Behave This Way?

At least two factors may explain the officers' misuse of SPEs to manipulate Enron's financial statements. First was the inherent tension between two apparent Enron goals: (i) seeking a high price/earnings multiple for its stock that was typical of high growth company stocks; and (ii) seeking to maintain an investment grade credit rating that was typical of mature companies with stable, recurring earnings. Second was

---

[142] *See, e.g.*, Hillary Durgin, *Enron: Huge Growth from Unregulated Power*, Fin. Times, Dec. 8, 1999, at 3 ("'Today more than three-quarters of Enron's earnings come from unregulated businesses,' says Raymond Niles, electric power analyst at Schroder & Co in New York. 'They're growing like wildfire.'"); David Kirkpatrick, *Enron Takes its Pipeline to the Net*, Fortune, Jan. 24, 2000, at 127 ("Says Steven Parla, an energy securities analyst at Credit Suisse First Boston: 'For Enron to say we can do bandwidth trading is like Babe Ruth's saying, I can hit that pitcher. You tell him to get up there and take three swings. The risk is staggeringly low, and the potential reward is staggeringly high.'"); Rebecca Smith, *Enron Net Nearly Tripled in 1st Period, Beating Estimate, as Revenue Rose 72%*, Wall St. J., Apr. 13, 2000, at A4 ("'The real story isn't the earnings,' said utilities analyst David Fleisher at Goldman, Sachs & Co. 'It's what lies ahead. This isn't your father's natural-gas company.'"); David Rynecki, *10 Stocks to Last the Decade*, Fortune, Aug. 14, 2000, at 114 (identifying Enron as one of a "buy-and-forget portfolio" of "stocks that we think will be winners over the coming decade"); *Business Center: Five Big-Cap Stocks Near Their 52-Week Lows* (CNBC television broadcast, June 18, 2001) (Cohn: "[Enron's] stock price is down 37 percent over the last year. . . . Energy analyst Raymond Niles at Salomon Smith Barney says California's energy woes and the risk of re-regulation growing out of federal energy hearings may make investors nervous, but he says Enron's future is bright." Raymond Niles (Salomon Smith Barney): "We're pretty much pounding the table on Enron right now today. It's a company with the best fundamentals in the industry. But right now we think it also has compelling valuation at these levels.").

[143] Enron Corporation Stock Price History Report, undated (providing historical stock prices from January 1, 1996 to June 26, 2002) (showing Enron's stock price growing from $40 per share in late 1999 to almost $90 per share in late 2000, then falling to the $50s by April 2001, to the $30s by August 2001, and then rapidly to less than $1 when Enron filed its bankruptcy petition) [AB000499873-AB000499904].

Enron's compensation system which, coupled with readily accessible SPE transactions, provided a tempting incentive to distort Enron's reported financial results. Combined, these factors fueled a competitive, deal-driven corporate culture that valued outward appearances more than actual results. As Lay's Chief of Staff observed in an August 2001 email to Lay, Enron would have been better served by focusing less on managing financial statement presentation and more on getting economic results:

> We should do the economically rational thing in every transaction and business and let the chips fall where they may. Instead of tying ourselves in a knot about managing earnings or write downs or avoiding an asset sale because it's on the books for more than the market, we should just make the rational economic decision. . . . If we make the economically rational decisions over and over, the stock price will come along.[144]

*Impact of Conflicting Business Goals*

Enron's conflicting business goals are evident in two quotes from Enron's 2000 Annual Report:

- "Enron is laser-focused on earnings per share, and we expect to continue strong earnings performance."[145]

- "Enron's continued investment grade status is critical to the success of its wholesale businesses as well as its ability to maintain adequate liquidity."[146]

Focusing on earnings performance, Enron's 2000 Annual Report touted four businesses with "tremendous opportunities for growth":

- Wholesale services;

- Retail energy services;

---

[144] Email from Steven J. Kean, Enron, to Kenneth Lay, Enron, Aug. 17, 2001 (the "Kean Email"), at 1 [AB0911 2880-AB0911 2881].

[145] Enron Annual Report for 2000, at 2.

[146] *Id.* at 27.

- Broadband services; and

- Transportation services.[147]

Transportation services housed the pipeline business, which was perceived as a slower-growth business.[148] Wholesale services was a major driver of Enron's growth in revenues, but actually produced relatively modest margins.[149] Retail energy services and broadband services were two of the start-up or speculative investments that Enron hoped would provide growth opportunities. Enron's prior experience with high growth/high risk investments, however, had not been successful.

In prior years, Enron said that its investments in foreign power plants, water systems and other ventures provided growth opportunities,[150] only to have those investments result in significant losses. For example, in its 1998 Annual Report, Enron highlighted its Dabhol power project in India by noting that "[u]pon achieving full commercial operation in 2001, the 2,450 megawatt facility . . . will be the largest independent power project in the world."[151] By September 30, 2001, Enron had spent $1.2 billion on this investment and work on the project ceased following several major setbacks.[152]

---

[147] Id. at 2.

[148] IBIT from transportation services increased 8% from 1988 to 1999 and 3% from 1999 to 2000. Id. at 21.

[149] Wholesale services had operating income of 1.8% on revenues of $93.3 billion in 2000 and 2.5% on revenues of $35.5 billion in 1999. Id. at 51.

[150] Enron Annual Report for 1998, at 4, 14-16 and 20.

[151] Id. at 16.

[152] See Notes to Enron Corp. and Subsidiaries Consolidated Financial Statements, 10-Q for 3Q/2001, at Note 6 (Litigation and Other Contingencies) (noting that due to disputes with various India governmental agencies, the project's contractors had ceased work on Phase II of the construction, and the project's lenders had stopped funding and had assumed control of the project's bank accounts).

Also, in its 1998 Annual Report, Enron stated that its Azurix water system business "is poised to become a major global water company in a $300 billion market that is ripe for third-party investment. . . ."[153] By September 30, 2001, however, Enron had spent over $1.2 billion on this investment and had been forced to take several significant writedowns.[154]

Enron also sought earnings growth because it wanted its stock to trade at high multiples similar to the high returns enjoyed by venture capital funds in the mid to late 1990s. Enron sought to apply its knowledge of certain energy trading markets to profit from trading markets in other sectors. But, in order to gain the requisite knowledge to create and profit from those other trading markets, in some instances Enron acquired businesses, which also required capital.

For all these reasons, Enron made substantial capital investments. Although Enron established a capital budget at the beginning of each year, it consistently exceeded that budget by significant margins. For example, in 1998, Enron spent over $5.8 billion on capital investments (compared to a budget of $772.5 million); in 1999, it spent $5 billion (compared to a budget of $1.1 billion); and in 2000, it spent $4.4 billion (compared to a budget of just over $2 billion).[155]

---

[153] Enron Annual Report for 1998, at 20.

[154] Enron suffered impairment charges related to Azurix of $326 million in 2000 and $287 million in the Third Quarter of 2001. This does not reflect recognition of its recourse liability in the Share Trust structure of approximately $915 million of debt. *See* Notes to Enron Corp. and Subsidiaries Consolidated Financial Statements, 10-Q for 3Q/2001, at Note 2 (Recent Events).

[155] *See* Appendix D (Roles of Lay, Skilling and Outside Directors), *Actions of Lay, Skilling and Outside Directors Regarding SPE Transactions – Duty to Inquire*.

Enron could have financed its significant expenditures by issuing stock, but it was reluctant to do so for fear that the dilution would harm its stock price.[156] Enron could not have financed its capital expenditures with earnings because its reported earnings were largely mark-to-market earnings, which generated little current cash flow.[157] Another option would have been to sell merchant assets. However, Enron's merchant portfolio contained a relatively high percentage of poorly performing and illiquid assets.[158] Accordingly, the only viable option remaining was to finance these capital investments with debt.

Debt, however, would have been harmful to Enron's investment grade credit rating, and the credit rating was key to wholesale services, Enron's largest business. Without an investment grade credit rating, Enron would have been required to post collateral in favor of counterparties in its wholesale services business. Enron's solution was to obtain financing through SPE transactions without disclosing Enron's obligation to repay the amounts financed. In addition, in some of these transactions, Enron took the position that it could treat the proceeds of the financings as cash flow from operations.

---

[156] *See* Second Interim Report, at 15.

[157] This quality of earnings problem not only precluded Enron from financing its investments from earnings, but drove it to use its Prepay Transactions and FAS 140 Transactions to generate operating cash flow to address the focus on operating cash flow by the Rating Agencies. *See* Second Interim Report.

[158] Enron Vice Chairman Mark Frevert ("Frevert") told Enron employees that "[w]e may have been 'smoking our own dope' as we continued to build the asset portfolio domestically and we pushed a lot into off-balance sheet vehicles." Eric Thode, Enron Net Works, Typed Notes entitled "Enron Net Works Employee Meetings," Oct. 31, 2001 (the "October 2001 Net Works Meeting Notes"), at AB0786 02863 (notes record statements of Frevert, who led the meeting) [AB0786 02859-AB0786 02868]; *see also* Deposition of Mark A. Frevert, former Vice Chairman, Enron, by William C. Humphreys, Jr., A&B, May 7, 2003, at 220. Similarly, in meetings with employees, Frevert informed employees that the problems started in the early 1990s with international assets including India, South America and Asia, which were intended to build a merchant portfolio in these areas. "It didn't pan out that way." Although Enron had been trying to sell them, most of the international asset sales were small and the major assets had not been sold. October 2001 Net Works Meeting Notes, at AB0786 02863.

One of Enron's first uses of SPE transactions appears to have been the Prepay Transactions. Structured to be part of Enron's energy trading activities, the Prepay Transactions generated cash and addressed the gap between mark-to-market earnings and operating cash flow.[159] Enron next turned to the FAS 140 Transactions. These were initially used to "monetize" European power plant investments.[160] Enron then began using Minority Interest Transactions to show debt as "minority interest" in the mezzanine section of its balance sheet.[161] In 1998, Enron used its first Share Trust Transaction, known as Marlin, to finance the acquisition of the Azurix water system.

In 1999, when Enron's merchant portfolio produced a big success, Enron officers again turned to SPE transactions to create a desired financial statement presentation. Enron's $10 million investment in the stock of Rhythms NetConnections, Inc. ("Rhythms") skyrocketed in value to approximately $500 million following the public offering of the stock. The stock price was volatile, however, and Enron knew that mark-to-market accounting would result in the increase being reported as current earnings. Enron also knew that a later decline in the value of the investment would result in mark-to-market losses, which Enron wanted to avoid. Due to the large percentage of Rhythms' total equity represented by Enron's investment – approximately 50% of Rhythms' publicly traded shares – and the volatility of the stock price in the market, Enron was

---

[159] See Second Interim Report, Appendix E (Prepay Transactions).

[160] See Second Interim Report, Appendix M (FAS 140 Transactions). After a change in the accounting rules in 1998, Enron could no longer finance power plants through FAS 140 Transactions. See Appendix B (Role of Andersen).

[161] See Second Interim Report, Appendix I (Minority Interest Transactions). In 1999, Enron also used the Nahanni Minority Interest Transaction to recognize operating cash flow. See Second Interim Report, at 27-28.

unlikely to find a third party willing to enter into a hedge on economic terms acceptable to Enron.[162]

Consequently, Enron employed its non-economic hedging technique (in the LJM1/Rhythms Hedging Transaction) to mask the earnings impact of a decline in the value of its investment. In 2000, when faced with a decline in value of many of its other investments, rather than take charges against income, Enron again turned to its non-economic hedging technique. In this instance, Enron used the Raptor SPEs (in the LJM2/Raptors Hedging Transactions) to offset for financial statement purposes the decline in value of a group of underperforming assets selected by the various business units. Shortly thereafter, Enron confronted a major problem on several of these hedge transactions – the decline in its own stock price and the continued devaluation of assets that were being hedged. Because the assets providing credit capacity for the hedges were falling in value, Enron ultimately terminated the Raptor hedging structure. This termination, together with substantial write downs in its failed broadband and water systems businesses, resulted in the $1.01 billion earnings charge on October 16, 2001. Less than two months later, Enron filed for bankruptcy.

*Compensation*

The incentives created by Enron's compensation system may also help explain the behavior of certain of its officers. The combination of (i) readily accessible, highly-structured, accounting-driven transactions that could be used to manipulate reported financial results and (ii) a compensation system that was tied to Enron's reported

---

[162] *See* Appendix C (Roles of Lay, Skilling and Outside Directors).

financial results, likely provided a strong influence on officer conduct. Lay's Chief of

Staff described the effects of Enron's compensation system on candor:

> A near mercenary culture which encourages organizations to hide
> problems (until those problems have become very big), discourages
> cooperation and teamwork, and drives off people who demand at least a
> modicum of civility in their work environment.[163]

Enron's system of compensation placed the highest emphasis on reported

financial results. Simply put, the higher Enron's reported earnings or funds flow, or

the higher its stock price, the higher an officer's compensation was likely to be.

Officers and employees understood this important nexus and emphasized their

involvement in transactions, even those that lacked economic substance, as they

lobbied for higher compensation.[164]

It is common for businesses to look to these financial metrics in setting officer

compensation as a means of aligning the interests of management with those of

shareholders. However, by using readily accessible, highly structured, accounting-

driven SPE transactions that produced reported results inconsistent with their

substance, Enron officers manipulated Enron's reported net income and funds flow,

---

[163] *See* Kean Email, at 1.

[164] *See generally* Memorandum from Joe Deffner, Enron, to Dave Delainey, Enron, regarding Year End Accomplishments and Overall Past Enron Accomplishments, undated [AB0971 00154-AB0971 00177]; Email from Schuyler Tilney, Merrill Lynch, to Dan Gordon, Merrill Lynch, *et al.*, May 30, 2000, at 1 [MLBE 0370956-MLBE 0370957]. In addition, the Structured Transactions Group within Enron's tax department, led by R. Davis Maxey, prepared various PowerPoint presentations touting the net income generated by his group, including one discussing pre-tax income from the Steele Transaction entitled "Show Me the Money! Project Steele Earnings Benefits." *See* Third Interim Report, Appendix C (Role of Enron's Officers), at 21 n.85. In the words of another Enron employee, Robert Hermann, Enron found the transactions originating in the corporate tax department "kind of like cocaine—they got kind of hooked on it." In-Person Interview with Robert J. Hermann, former Vice President Tax, Enron Corp., by Philip C. Cook, Partner, A&B, Aug. 8, 2002; *see also* Sworn Statement of R. Davis Maxey, former Vice President Tax, Enron Corp., to Philip C. Cook, Partner, A&B, Dec. 11, 2002 (the "Maxey Sworn Statement"), at 148-49.

factors that traditionally have had favorable influences on a company's market value. The evidence suggests that the compensation system provided what proved to be an overpowering motivation for implementing SPE transactions that distorted Enron's reported financial results. Evidence further shows that flawed or aggressive accounting for the SPE transactions enabled the Enron officers to obtain greatly inflated bonuses and to realize substantial proceeds from the sale of Enron stock they received as part of their compensation packages.[165] In fact, during a three-year period from 1998 through 2000, a group of twenty-one officers received in excess of $1 billion in the form of salary, bonus and gross proceeds from sales of Enron stock.[166] Lay and Skilling received substantial compensation from Enron under effectively the same system as the other senior officers, with Lay receiving compensation valued at over $33 million and Skilling over $17 million in the year 2000 alone.[167] A significant amount of that compensation was based on Enron's reported financial results.

The Compensation Committee had responsibility for establishing and implementing Enron's executive compensation philosophy and strategy. The expressed purpose of executive compensation at Enron was to reward performance that created

---

[165] *See* Email from Peter E. Weidler, Enron, to Ray Alvarez, Transredes, *et al.*, Mar. 27, 2000, at 1 [AB0971 01871-AB0971 01878].

[166] See Forms 4 and 5 filed by Enron's officers with the SEC from 1998 to 2000. The stock proceeds figure does not take into account the officers' cost of such shares or any resulting tax liability arising from such sales. Many of the shares included in these sales were obtained as part of long-term incentive awards to these officers in 1998-2000. To avoid duplication, the $1 billion figure does not include the grant-date value of such incentive awards, which would normally be considered part of an officer's total direct compensation for a given year.

[167] *See* Enron Schedule 14A filed with the SEC on Mar. 27, 2001, at 19-21. This compensation was in addition to proceeds from stock sales. For the four-year period from 1998 through 2001, Lay had gross proceeds of over $209 million from selling shares of his Enron stock, and Skilling had gross proceeds of over $96 million from his Enron stock sales. See transaction report filings made by Lay and Skilling with the SEC during 1998 through 2001 pursuant to Section 16(a) of the Securities Exchange Act of 1934, as amended; *see also* Appendix D (Roles of Lay, Skilling and the Outside Directors).

long-term shareholder value and to promote teamwork by tying a significant portion of compensation to business unit and Enron performance.[168]

Like many public companies, Enron's compensation program for its senior management team included three primary elements: base salary; annual incentive awards; and long-term incentive pay. Base salaries of all employees, including officers, were targeted at the median of competitive levels, thereby placing emphasis on variable pay based on performance. According to the Compensation Committee's report to shareholders appearing in the proxy statement for the 1999 annual shareholders meeting, approximately 75% of total executive compensation was "at risk" with a strong weighting on long-term performance. Clearly, the Enron compensation structure depended heavily on the reported financial performance of the company, with particular emphasis on the achievement of goals for net income and cash flow.[169]

Overall, the Enron compensation program was not atypical in scope or design as compared to programs of other large public companies at the time. If anything, it was

---

[168] "Report from the Compensation and Management Development Committee regarding Executive Compensation" appearing in Enron's Schedule 14A filed with the SEC on Mar. 24, 1998, Mar. 30, 1999, Mar. 21, 2000, and Mar. 27, 2001.

[169] Enron's annual incentive bonus plan was funded as a percentage of net income. Individual bonus payments were approved by the Compensation Committee based on Enron's performance against pre-established goals, as well as business unit and individual performance. Key performance criteria considered by the Compensation Committee reportedly included funds flow, return on equity, debt reduction and earnings per share improvements, among others. *See* "Report from the Compensation and Management Development Committee regarding Executive Compensation," appearing in Enron's Schedule 14A filed with the SEC on Mar. 21, 2000 and Mar. 27, 2001. Long-term incentive compensation was provided through a variety of awards. Beginning in 1999, long-term awards were made one-half in market-priced non-qualified stock options and one-half in restricted stock that generally cliff vested in four years, with a performance accelerated vesting feature based on Enron's annual cumulative shareholder return relative to the S&P 500. *See* "Report from the Compensation and Management Development Committee regarding Executive Compensation" appearing in Enron's Schedule 14A filed with the SEC on Mar. 30, 1999, Mar. 21, 2000 and Mar. 27, 2001. Stock options typically had a five-year term and time-vested over three years, but in some cases they had performance accelerators based on Enron's achievement of target levels of compounded growth in earnings per share.

remarkable in the degree of "process" employed to design and implement the program

and to continually reassess it for market competitiveness.[170]  However conventional the

Enron compensation program may have been for its time, it nevertheless motivated the

officers to post continually higher income and stock price targets and, in so doing,

provided a powerful incentive to manipulate earnings and cash flows to achieve these

results.   Against this backdrop, it is not difficult to understand the allure of the SPE

transactions, which provided a powerful tool to report enhanced financial statement

results.     Among other things, these readily accessible transactions generated

instantaneous earnings and cash flows that were not dependent upon the results of

operating businesses.  One banker's comments made in a 1999 email to a colleague are

insightful: "running a pipeline business can't take much time – Enron seems to spend all

its available man hours on various, convoluted financing schemes."[171]

### C.      Methods Used by Officers to Implement Strategy

As noted in the Second Interim Report, the officers utilized six accounting

techniques designed to distort Enron's financial statements.   Through many of these

techniques, Enron took advantage of GAAP rules and ignored its obligation to make

transparent disclosures.   In addition, in many of the SPE transactions, the terms required

by the financial institutions would have precluded Enron's desired accounting treatment

under applicable GAAP rules.   In these transactions, Enron officers continued to reflect

---

[170] For example, in addition to its five regularly scheduled meetings per year, the Compensation Committee met frequently in special session, for a total of fourteen meetings in 2001, ten meetings in 2000, eight meetings in 1999 and seven meetings in 1998.  The Compensation Committee relied heavily on third-party executive compensation experts to assist with program design and market competitiveness analysis. Towers Perrin provided at least nine written reports to the Compensation Committee during 2000 and 2001.

[171] Email from Carmen Marino, Managing Director, CSFB, to Tim Bock, Managing Director, CSFB, July 28, 1999 [CSFBCO 000019283].

desirable, but incorrect, accounting treatment by entering into undisclosed side agreements, arrangements with no business purpose and "hardwired" transactions that violated GAAP.[172]

The Examiner now focuses on several methods used by these officers to facilitate their use of the six accounting techniques. These methods include:

- *Justification of Desired Results.* In many cases, Enron officers were less concerned about making the correct or best decision, and more concerned with justifying a desired result. Evidence suggests that Enron officers: (i) used accounting rules that did not directly address the accounting question at issue but provided an argument to justify an aggressive position; (ii) searched for reasons to avoid public disclosure; and (iii) obtained professional opinions or advice merely as a necessary procedural step.

- *Use of Economic Leverage on Third Parties.* Evidence suggests that by using Enron's economic power, Enron officers were able to pressure third parties, such as financial institutions and Enron's professionals, to accommodate Enron's financial statement objectives. In many instances, this economic pressure appears responsible for overcoming concerns about reputational risk or other reservations by these third parties.

- *Lack of Candor.* There are many examples of incomplete disclosure by these officers to the Enron Board and the public. In some cases, it appears that officers provided hints or glimpses of facts suggesting possible misuse of SPEs to the Enron Board. In other cases, Enron officers' frequent use of misleading terms and jargon in connection with Enron's SPE transactions appears to have obscured their economic substance. Finally, evidence indicates that when information was presented by the officers to the Enron Board, the information was delivered in a manner not conducive to a full understanding of the SPEs.

*Justification of Desired Results*

In many cases, the Enron officers appeared less concerned about making the correct or best decision, and more focused on finding some justification for their desired

---

[172] *See* Third Interim Report, at 27-30.

result. That is, their primary concern seems to have been to ensure that they had an explanation if someone challenged their position, rather than to determine whether their decision was correct or was justified in light of the risks assumed. Examples of this strategy include: (i) using accounting rules that did not directly address the accounting question at issue but simply provided an argument to justify an aggressive position; (ii) searching for ways to avoid public disclosure; and (iii) obtaining professional opinions or advice merely as a necessary procedural step.

*Search for Plausible Accounting Support.* Evidence suggests that Enron officers often took aggressive accounting positions with little direct GAAP support. Rather than using accounting principles to achieve a fair presentation of Enron's financial condition, both as a means of fulfilling their disclosure obligations and as an effective management tool, it appears that Enron officers (often with the support of Andersen) focused their efforts on using hyper-technical and strained accounting judgments to justify aggressive and misleading financial presentation. For example:

- *Prepay Transactions.* Recognizing that Andersen required three substantive parties to participate in Enron's Prepay Transactions to support Enron's desired GAAP result, Enron employed Mahonia and Delta, shell entities set up by JPMorgan Chase and Citigroup for use in these transactions, or sometimes used a second bank as the accommodation party. Enron's officers knew that they were using Mahonia, Delta and the accommodation banks as intermediaries in order to satisfy Andersen. Andersen recognized that relevant GAAP authority required that the separate legs of Enron's Prepay Transactions be collapsed and that the related obligations be reported as debt if one of the parties was an SPE or an intermediary.[173] Therefore, it required Enron to obtain representation letters from Delta and Mahonia and accepted the letters as evidence that Delta and

---

[173] The relevant GAAP authority was Fair Value Hedges: Concurrent Offsetting Matching Swaps and Use of One as Hedging Instrument, Derivatives Implementation Group Issue No. F6 (Financial Accounting Standards Bd. 2000), an interpretation issued by the Derivatives Implementation Group of the FASB, which had the force of GAAP.

Mahonia were substantive businesses, even though the facts as represented were insufficient to support that conclusion. It may have been Andersen's discomfort with this approach that caused Andersen to suggest that the Prepay Transactions be disclosed in Enron's 1999 and 2000 financial statements. When management refused, Andersen dropped the issue and did not take it to the Audit Committee.

- *Nahanni Minority Interest Transaction*. Enron officers and Andersen knew that the primary purpose of the Nahanni Minority Interest Transaction was to "[i]ncrease Funds Flows through the sale of Merchant Investments held by a newly formed consolidated subsidiary."[174] Andersen also knew that this objective could not be achieved through the Nahanni transaction unless Enron was permitted to classify U.S. Treasury securities as "Merchant Investments."[175] Accommodating Enron's accounting objectives, Andersen determined that Enron could classify U.S. Treasury securities as Merchant Investments – even though Enron had never before sought to hold U.S. Treasury securities as Merchant Investments – provided that Enron modified its Merchant Activities footnote to reflect this expanded definition of Merchant Investments.[176]

*Searching for Reasons to Avoid Disclosure*. The evidence suggests that in numerous instances Enron's officers and professionals worked to interpret facts in a manner that avoided transparent public disclosure of its SPE transactions. Examples include:

---

[174] Nahanni Memo, at 1.

[175] *See* Grutzmacher Sworn Statement, at 162; *see also* Sworn Statement of Debra A. Cash, Andersen, to H. Bryan Ives, III, A&B, June 5, 2003 (the "Cash Sworn Statement"), at 94-96.

[176] Nahanni Memo, at 1. Gary Peng (a member of the Corporate Accounting and Financial Reporting Group who was familiar with the circumstances surrounding the Nahanni disclosure) said: "From a company perspective, Project Nahanni is very sensitive – it has not been discussed in detail with any outside parties. The disclosure found in the Annual Report, Footnote 6 and 8 were as much as management was willing to disclose." Email from Gary Peng, Enron, to Clint Freeland, Enron, May 8, 2000 [AB0971 01859].

01-16034-aig Case Doc 32-11068-JTP Filed Doc 61235 Filed 02/03/22 Pg 102 of 1137 Entered 03/24/03 Page 102 of Main Document

Pg 100 of 140

*SPE Transactions in General*

- *Swaps and Guarantees.* Using a Total Return Swap rather than a guarantee was one of Enron's favorite techniques to avoid disclosure.[177] For example:

  o When comparing the benefits of a Total Return Swap to a guarantee in connection with a FAS 140 Transaction, Kevin Jordan informed others that "[g]uarantees require additional unwanted footnote disclosure."[178]

  o Charles DeLacey explained that: "The answer is that there is a [sic] obligation of ENE on the swap for $30.2MM but it is not on the balance sheet. The total return swaps are buried in the footnotes under price risk management activities . . . ."[179]

  o Joel Ephross, an in-house attorney, described a Total Return Swap as "in essence a guaranty that is phrased as a swap. It has the benefit to Enron of being reported by our accountants under price risk management, and footnote disclosure."[180]

  o Causey's concern about disclosure is captured in this email from Cassandra Schultz who explained that: "Causey's position on the issue of whether we should bother with a swap if there is potential it will be treated as a guarantee is we should still structure it as a swap so we have more flexibility in how and where the support mechanism/guarantee is ultimately disclosed – maybe in the derivative footnote with a blurb about sovereign risk or something."[181]

---

[177] In the "Price Risk Management Activities and Financial Instruments" footnote to its 2000 financial statements, Enron described the Total Return Swaps used as guarantees as "price risk management services to . . . customers," and buried the obligation in a table depicting the "notional" amount of derivative investments, and even stated that "notional amounts . . . do not represent the amounts exchanged by the parties to the financial instruments," when in fact the notional amount represented the amount loaned to the SPE and paid to Enron, which Enron was liable to repay in full. Enron Annual Report for 2000, at 38.

[178] Email from Kevin D. Jordan, Enron, to Jas Somrah, Enron, and copies to Philippe Penet, Matthew Landy, Treasa Kirby and Stephen Dwyer, Enron, Feb. 26, 2001, at AB0971 00234 [AB0971 00233-AB0971 00236].

[179] Email from Charles Delacey, Enron, to Steve Pruett, Enron, May 2, 2001, at 1 [AB0971 02304-AB0971 02305].

[180] Email from Joel Ephross, Enron, to Truman Bidwell and Mary Ward, Linklaters, Sept. 27, 2001 [AB0252 00913-AB0252 00914].

[181] Email from Cassandra Schultz, Enron, to Raymond Bowen and David Chang, Enron, and copies to Bob Butts, *et al.,* Enron, Dec. 1, 1998, at AB0971 00432 [AB0971 00432-AB0971 00434].

- *Prepay Transactions.* Enron's officers decided against using the proposed disclosure on the Prepay Transactions recommended by Andersen that would have made the nature of Enron's Prepay Transactions ascertainable by a user of Enron's financial statements.[182]

*Related Party SPE Transactions*

- *Fastow's Compensation/LJM2.* Enron's in-house attorneys, with assistance from Vinson & Elkins, decided that Enron did not have to disclose the amount of Fastow's interest in LJM2 in the proxy statement filed in 2001. That decision was based on the position that it was not "practicable" to quantify Fastow's interest, even though Fastow had said that the amounts were so large that LJM2 would be shut down if those amounts were told to Skilling.[183]

- *Kopper/Chewco.* Enron's in-house attorneys decided that Enron did not have to disclose Kopper's involvement as the general partner in Chewco. That decision was based on the position that Kopper, who was a vice president, was not an "executive officer" of Enron as defined under applicable SEC rules.

- *Kopper/LJM.* In considering the disclosure of Fastow's sale of his interest in LJM1 and LJM2 to Kopper (who resigned so he could buy Fastow's interest in LJM1 and LJM2 in the summer of 2001), Fastow's preference was for Enron to avoid mentioning that the purchaser of these interests was a former Enron employee.[184] Gary Peng, another Enron employee, agreed with Fastow. "How critical to the disclosure is the phrase '. . . to a former employee of Enron . . .'? The transformation of LJM to a true third-party would seem to be

---

[182] Another Andersen client, Aquila Energy Corporation, included such a disclosure in its SEC filing, and Andersen proposed that Enron include a similar disclosure in its financial statements. Aquila Energy Corporation Form S-1 filed with the SEC on Dec. 13, 2000 (the "Aquila Form S-1"), at 42-43.

[183] Sworn Statement of Ronald T. Astin, Vinson & Elkins, to Rebecca M. Lamberth, A&B, Aug. 12, 2003, at 106-07. In a memorandum to Fastow regarding the obligation to disclose Fastow's financial interests in the LJM entities, Jordan Mintz ("Mintz") indicated that the decision not to disclose "was a close call; arguably, the more conservative approach would have been to disclose the amount of [Fastow's] interest." Memorandum from Jordan Mintz, Enron, to Andy Fastow, Enron, regarding Related-Party Proxy Disclosures, Apr. 6, 2001 (the "Mintz 4/6/01 Memo"), at AB0971 00646 [AB0971 00645-AB0971 00646]. As set forth in the Second Interim Report, Mintz placed enormous technical reliance on the word "practicable" contained in the relevant SEC regulation. *See* Second Interim Report, Appendix D (Enron's Disclosure of Its SPEs), at 58-59. Going forward, Mintz observed, "[t]his disclosure issue will continue to be a challenge as transactions entered into between Enron and LJM2 settle and, as such, it becomes 'practicable' to quantify and, therefore, be required to disclose the amount of [Fastow's] financial interest." Mintz 4/6/01 Memo, at AB0971 00646.

[184] Email from Jordan Mintz, Enron, to Ron Astin, Vinson & Elkins, *et al.*, Aug. 7, 2001 (the "Mintz-Astin 8/7/01 Email"), at 1 [EVE 543273-EVE 543274].

more complete if we could exclude the phrase."[185]  Jordan Mintz, an
Enron attorney, suggested "that we provide the more 'generic'
description."[186]   When asked about including a phrase describing
Kopper as a former Enron employee, Mark Koenig, Executive Vice
President of Investor Relations, replied, "If [it is] not absolutely
required – no."[187]

- *October 16th Disclosures.*  Even as late as fall 2001, in the October
16th earnings release, Enron described its $1.01 billion charge to
earnings as "non-recurring," and did not disclose Enron's $1.2 billion
write-down of shareholder equity primarily related to an earlier
accounting error for the LJM2/Raptors Hedging Transactions.  The
reason given by Enron for not mentioning this write-down was that it
was a "balance sheet item" as opposed to an income statement item.

*Using Professional Opinions Merely as Justification.*  Many times Enron officers
appear to have obtained opinions or advice from professionals merely as a necessary step
to justify questionable decisions rather than as a tool to assist them in reaching a
considered business decision based upon the risks.  In these circumstances, it appears that
the fact that an opinion or advice was obtained was more critical to the officers than
whether the opinion or advice actually addressed the fundamental question at issue.
Examples include:

- *LJM1/Rhythms Hedging Transaction Fairness Opinion.*  Enron's
officers represented to the Board that a fairness opinion would be
delivered in connection with the LJM1/Rhythms Hedging Transaction.
The analysis underlying the opinion logically arrived at the result that
the value given by Enron on day one was approximately equal to the
value received.  The analysis did not, however, address the non-
economic nature of the hedge (i.e., the only assets used to support the
hedge were Enron's own assets) and the officers did not address this
issue with the Board.[188]

---

[185] Email from Gary Peng, Enron, to Ronald T. Astin, Vinson & Elkins, *et al.*, Aug. 5, 2001, at 1 [EVE 543322-EVE 543325].

[186] Mintz-Astin 8/7/01 Email, at 2.

[187] Email from Mark Koenig, Enron, to Gary Peng, Enron, Aug. 7, 2001, at 1 [EVE 543273-EVE 543274].

[188] *See* Appendix B (Role of Andersen), *Andersen's Role in Enron's SPE Transactions – Andersen's Role in the Non-economic Hedges – Rhythms.*

- *True Issuance Opinions.* In nearly all of the FAS 140 Transactions, Enron obtained opinions from its outside law firms that certain equity interests issued by an SPE were legally isolated from Enron (i.e., a "true issuance" opinion). No opinion was obtained as to whether the assets transferred to that SPE (and which were the only source of any value of the equity interest) were legally isolated from the transferor (i.e., a "true sale" opinion). The "true issuance" opinion appears to have had no significance unless a true sale opinion could also be given – which was not always the case – but Enron presented the opinions to Andersen to justify treating the transfer of the asset as a sale.[189]

- *Steele Tax Opinion.* To obtain a tax opinion on the Steele Transaction, Enron officers represented that Enron undertook the transaction for the principal purpose of generating financial accounting benefits. In contrast, Andersen's audit team noted that Enron needed to demonstrate a business purpose that did not involve the transaction's financial reporting impact. Despite the fact that Enron's representations in connection with the tax opinion, and the economic substance of the Steele Transaction, were inconsistent with demonstrating a business purpose apart from financial reporting consequences, Andersen eventually accepted a representation from Enron officers that recognition of the deferred credit arising from the

---

[189] In notes from a meeting held on June 8, 1998, between Joe Dilg, a partner in Vinson & Elkins, and Jim Derrick, General Counsel of Enron, Mr. Dilg expresses his concern about the true issuance opinion letters:

1. True Issuance opinions. We a [sic] unsure of how opinion rendered satisfies requirements of FASB125. We are not asked to render accounting advice but qualification we had to take in opinion could be inconsistent with 125 requirements. We have not had direct contact with senior accounting personal [sic]. During Cornhusker we pointed out the qualification to junior AA representative and discussed with (Lance Schuler?) and they said OK. In connection with MidTexas David Keyes raised opinion issue with Lance Schuler again last week. Lance reported back that he had discussed with Ben Glissen [sic] and Ben said opinion in Cornhusker had been reviewed by top levels of AA and they were satisfied. Point out qualification in opinion and difference from Linx opinion in Sutton Bridge and discuss pg 67 of AA field directive.

Concerns: 1. Similar opinion in MidTexas may get focused upon by other accounting types and if asked to remove qualification we cannot. Don't want deal to blow up at last moment and cause earnings surprise.

2. Possible review in context of MidTexas may cause AA to relook at Cornhusker and cause issues.

3. Have raised issue with Lance and apparently everything is OK. Since we have not had contact with AA don't understand the reasoning.

Document entitled, "Notes for meeting with Jim Derrick," undated, at EVE 1250750 [EVE 1250750-EVE 1250751].

transaction, in advance of the recognition of tax benefits, was not Enron's sole reason for entering into the Steele Transaction.[190]

- *Watkins Investigation.* In connection with the investigation of accounting and related issues raised by Enron employee Sherron Watkins ("Watkins") in August 2001, Enron so limited the scope of the investigation that it may have been more a matter of ensuring that Enron's corporate compliance policies were followed rather than a genuine inquiry into whether any of the potential problems identified in Watkins' letters were true.[191]

*Economic Leverage on Third Parties*

Through the use of Enron's economic power, it appears that Enron officers frequently applied significant pressure on third parties to accommodate Enron's financial statement objectives. Examples include:

- In at least two instances, Enron officers made it clear to a financial institution that its securities analyst covering Enron was not sufficiently supportive of Enron. In these cases, these analysts were either terminated or given the clear message that their analysis should take into account the relationship between the financial institution and Enron.[192]

---

[190] *See* Third Interim Report, Appendix C (Role of Enron's Officers), at 73-75. The former head of the Structured Transactions Group within Enron's tax department testified that "representations with respect to the tax opinions were written from the standpoint of the Internal Revenue Code and, as a result, may not have reflected management's intent." Maxey Sworn Statement, at 163-66.

[191] *See* Appendix C (Role of Enron's Attorneys), *Attorneys' Role in the Watkins Investigation.*

[192] For instance, in April of 1998, Enron excluded Merrill Lynch as a manager for an upcoming $750 million common stock offering because Enron's senior management was angry with the reports and comments of John Olson ("Olson"), Merrill Lynch's equity analyst covering Enron. Merrill Lynch's Chief Executive Officer, Herb Allison, intervened with a call to Lay, and Enron then added Merrill Lynch as a manager for the offering. One month later, Merrill Lynch fired Olson and replaced him with an analyst with a better opinion of Enron's stock. At the same time, Merrill Lynch's revenues from Enron increased from $3 million in 1998 to $40 million in 1999. *See* Third Interim Report, Appendix I (Role of Merrill Lynch and its Affiliates), at 19-22. In addition, Jill Sakol ("Sakol"), a CSFB fixed income analyst assigned to cover Enron's debt securities in April 2001, testified that she perceived pressure from her superiors not to issue negative public comments on Enron due to the importance of Enron as an investment banking client of CSFB. Sakol also documented instances in which she was discouraged from publishing her negative research on Enron to the investing public while CSFB bond traders were using that information to their advantage. *See* Appendix F (Role of CSFB and its Affiliates), *Role of CSFB's Equity and Fixed-Income Analysts.*

-101-

- In early 2001, Andersen was informed by an Andersen senior executive that Enron's Chief Accounting Officer, Causey, had requested that Andersen remove Andersen partner Carl Bass from further participation in the Enron engagement, and that Andersen senior executives had agreed to that request.[193] A different Andersen partner later testified:

  > [I] thought it was unprofessional for Enron to make such a request or demand or whatever it was, and I was upset that the firm had agreed to it. . . . [I] can't speak for the whole firm in terms of defining moments, but it was a defining moment to me and me as part of the PSG and our relationship [with Enron]. . . .[194]

- Commenting on Enron's ability to exert pressure on Andersen, one Enron in-house attorney commented:

  > We originally thought that Condor would be the source for equity. However, a very junior person at AA in London said no, that will not work. So, now we have LJM, which is not in any way related to Enron (except that one of its investors is an executive, but we will not talk about that) making the equity investment. This will satisfy AA. We will see if the junior person who has made this trouble is employed with AA after January 1st; however, very few people here are betting on that.[195]

- There are several examples of financial institutions participating in Enron transactions even though they acknowledged that these transactions exposed them to "reputational risk," including:

  o Citigroup completed a FAS 140 Transaction in December 2000 called Project Bacchus. Despite concerns over "appropriateness" of the transaction, "since there is now an earnings dimension to

---

[193] *United States v. Arthur Andersen, LLP*, Crim. A. No. H-02-121 (S.D. Tex. 2002), Transcript of the Proceedings, May 6, 2002-June 5, 2002, at 1163 (testimony of Carl Bass, May 9, 2002). Even though he moved from the Engagement Team to the PSG in December 1999, Mr. Bass spent considerable time as a member of the PSG consulting with the Engagement Team on Enron matters in 2000. *Id.* at 1123-24 (testimony of Carl Bass, May 9, 2002). Moreover, even after Andersen agreed to his removal from Enron matters in early 2001, he continued to consult on Enron. *Id.* at 1175 (testimony of Carl Bass, May 9, 2002).

[194] *Id.* at 5537-38 (testimony of John Stewart, May 31, 2002).

[195] *See, e.g.*, Email from Joel Ephross, Assistant General Counsel, Enron, to Fernando Tovar, Attorney, Vinson & Elkins, *et al.*, Dec. 3, 1999 [EVE 522635].

this deal, which was not there before,"[196] Citigroup "made a lot of exceptions to our standard policies" and closed the transaction.[197] A Citigroup employee wrote: "I am sure we have gone out of our way to let them know that we are bending over backwards for them . . . let's remember to collect this iou when it really counts."[198] Later, in June 2001, Citigroup participated in the Sundance Industrial transaction that, in part, unwound the Bacchus FAS 140 Transaction. A Citigroup senior executive was concerned about Enron's accounting for Sundance Industrial: "The GAAP accounting is aggressive and a franchise risk to us if there is publicity (a la Xerox)."[199]

o  Merrill Lynch had concerns of reputational risk arising out of its participation in the Nigerian Barge Transaction. This concern was expressed in one Merrill Lynch employee's notes indicating that the transaction posed a "reputational risk, i.e., aid/abet Enron income stmt. manipulation."[200] Another Merrill Lynch employee testified:

> Well, I raised the matter of, you know, if Enron ever in the future fell apart from a credit – just like a credit meltdown or something, and we had been involved in this transaction, in light of the fact that I had these accounting concerns about [the Nigerian Barge Transaction], would that somehow create a reputational risk for us? Would we have our name in the press?[201]

o  RBS's concern about its participation in the LJM1/Rhythms Hedging Transaction is illustrated in one of its internal memoranda:

---

[196] Email from Steve Baillie, Citigroup, to William Fox, Citigroup, *et al.*, Nov. 24, 2000 [CITI-B 0289702-CITI-B 0289703].

[197] Email from Steve Wagman, Citigroup, to Amanda Angelini and copy to Rick Caplan, Citigroup, regarding Enron/Bacchus, Dec. 27, 2000 [CITI-B 0279252].

[198] *Id.*

[199] Memorandum from Dave Bushnell, Citigroup, to Mike Carpenter, Citigroup, regarding Enron-Project Sundance Transaction, May 30, 2001, at 2 [CITI-B 0302091-CITI-B 0302092].

[200] Facsimile from Rob Furst, Merrill Lynch, to Jim Brown, Merrill Lynch, Dec. 21, 1999 [MLBE 0111739].

[201] Sworn Statement of James A. Brown, Merrill Lynch, to Robb E. Hellwig, A&B, Apr. 28, 2003, at 77-78.

The fundamental issue from my perspective is one I raised when this transaction was first discussed [internally] and which has, I know, been exercising the minds of everyone concerned over the last two weeks. This is the potential reputational risk given that Enron assets are being transferred into the control of (and for the future benefit of) third-parties, where the third-parties are not necessarily valid 'arms length' counterparties, given the shareholding and control exercised by Andy Fastow.[202]

RBS's concern was shared by its accounting professionals, who noted:

the nature of the transaction is highly unusual. The role of the CFO of Enron and the use of its own shares, raises significant concerns as to the potential reputational risk to the bank if the transaction is not disclosed appropriately by Enron or [if] shareholders claim to have been disadvantaged.[203]

o CSFB, trying to mitigate any reputational risk, decided to include in the documentation for the CSFB Prepay the firm's standard representations for accounting-driven transactions.[204]

o Barclays also noted its concerns about "reputational issues" associated with refinancing and extending the $SO_2$ transaction.[205]

*Lack of Candor*

Enron's approach to incomplete disclosure also appears to have existed in certain officers' dealings with the Enron Board, its committees and the public. There are many examples where these officers provided hints or glimpses of the possible misuse of SPEs,

---

[202] Project LJM Memorandum, at RBS 3030461.

[203] KPMG Letter, June 23, 1999.

[204] Sworn Statement of Steven Wootton, Director, CSFB, to M. Russell Wofford, Jr., A&B, May 28, 2003, at 42, lines 17-22 and 46, lines 17-23.

[205] Minutes of Barclays Group Credit Committee Meeting, Oct. 26, 2001, at BRC000083218 (discussing "reputational issues" associated with refinancing and extending the $SO_2$ transaction) [BRC 000083217-BRC 000083219]; *see also generally* First Interim Report, at 135-46.

but the information provided appears not to have been presented in a manner that was conducive to a full understanding of the SPEs. Furthermore, the use of misleading terms and confusing jargon by Enron officers when they described SPE transactions exacerbated their complexity. On many occasions, it appears that several groups of persons, including the Enron Board and Rating Agencies, understood the meaning of these terms and phrases in a materially different way than the meaning ascribed to them by the Enron officers. Examples include:

*SPE Transactions in General*

- *Total Debt Obligations.* In an August 13, 2001 presentation to the Enron Board, Fastow presented an analysis of $36.4 billion in "Outstanding Financings and Debt" of Enron, including the nature and extent of off-balance sheet financings. Since at least 1997, this information had not been presented in this fashion to the Enron Board or to any of its committees.[206]

- *Tax Strategy.* The Enron Board was not informed that a critical function of Enron's tax department was to book earnings and that it was customary for the tax department to generate the "stretch" at the end of the year to meet Enron's earnings targets.[207]

- *Monetized Assets.* Enron officers used the term "monetize" in numerous presentations to the Enron Board. Enron also used this term in its public filings.[208] For example, Enron's officers referred to its

---

[206] Ironically, Fastow's report actually overstated Enron's outstanding financings and debt by double counting $1.9 billion of Enron's Yosemite Prepays. The Finance Committee received information, never clearly explained or presented, showing that from August 2000 through August 2001, Enron's interest bearing obligations increased from $22.3 billion to $36.3 billion – a $14 billion increase in one year. *Compare* Materials from Enron Finance Committee Meeting, Aug. 7, 2000, at AB0247 01363 (slide from the CFO Report) [AB0247 01347-AB0247 01520] *with* Materials from Enron Finance Committee Meeting, Aug. 13, 2001 (the "8/13/01 Finance Committee Materials"), at AB0247 02302 (slide from the CFO Report) [AB0247 02285-AB0247 02359].

[207] *See* Second Interim Report, Appendix J (Tax Transactions); *see also* Third Interim Report, Appendix C (Role of Enron's Officers), at 16-23.

[208] *See, e.g.,* Enron Form 10-Q filed with the SEC for the Quarter ended Sept. 30, 2001, at 22 ("Between September 1999 and December 2000, LJM1 or LJM2 purchased equity or debt interests in nine Enron-sponsored SPEs. LJM1 and LJM2 invested $175 million in the nine SPEs. These transactions enabled Enron to monetize assets and generated pre-tax earnings to Enron of $2 million in 1999."); EOG Resources, Inc. Schedule 13D/A filed by Enron with the SEC, Apr. 5, 1999, at 4 ("Enron is currently

FAS 140 Transactions as "monetizations" of the underlying assets and to its Prepay Transactions as "monetizations" of its price risk management assets. Despite its widespread use by Enron, the term does not have a precise definition.[209] It could mean a sale of the asset with perhaps some limited retained recourse to Enron, or perhaps a borrowing with assets serving as collateral but which is otherwise nonrecourse or limited recourse to Enron. The FAS 140 Transactions, however, were fully recourse borrowings in which the asset was in substance not transferred at all since Enron retained at least 97% of the risks and rewards as well as effective control over the asset. The Prepay Transactions were fully recourse borrowings and involved no assets at all. There is substantial evidence that the members of the Enron Board had unclear or conflicting understandings of the meaning of this term.[210] In addition, Standard & Poor's analysts informed the

---

evaluating a number of alternatives [with respect to its EOG stake], including without limitation, whether Enron should . . . monetize all or a portion of Enron's investment pursuant to a leverage capitalization or similar transaction.") (Enron's EOG shares were later the subject of a FAS 140 transaction known as Cerberus, which the Examiner concluded in Prior Reports was likely not a "true sale").

[209] The testimony of several Vinson & Elkins attorneys demonstrates the vague and uninformative nature of the word "monetize." *See, e.g.*, Sworn Statement of Joseph Dilg, Managing Partner, Vinson & Elkins, to Rebecca M. Lamberth, A&B, Sept. 24, 2003, at 70 ("I recall in discussion that we had . . . some conversations about the term monetization, whether anybody really knew what monetization meant. . . ."); Sworn Statement of Scott Wulfe, Vinson & Elkins, to Rebecca M. Lamberth, A&B, Aug. 22, 2003, at 149 ("The word monetizing, to me in that context, would be a very broad term that would effectively be probably any type of transaction in which funds are obtained through some transaction involving an asset. Now, whether or not he [Baird] meant it in a more narrow case, I mean, he may have, but I don't know."), at 150 ("I believe in the summer of '98, as best as I recall, my views about these terms was sort of evolving, not having spent that much time thinking about it, so I think I, at different points, had different views about monetization. I think that ultimately -- well, I think I believed that it encompassed a transaction in which funds were obtained, but if you ask -- I'm not sure that I immediately had a definitive reaction to that term."), and at 151 ("I think -- synonymous with sale? I'm not -- I think, generally speaking, monetization is probably a broader term, but could it -- certainly could encompass a sale. Is it synonymous? I'm not sure I ever got to that fine of thinking about it.").

[210] For example, Chan, who was a Finance Committee member, testified that he believed "asset monetizations" meant "just selling outright." Chan Sworn Statement, at 169. LeMaistre, who often attended Finance Committee meetings, testified that if an asset were underperforming, the company could "monetize it in order to free up the money to reinvest it elsewhere at a better rate of return," which would "in most instances" mean selling or disposing of the asset in some fashion. Sworn Statement of Charles A. LeMaistre, former Director, Enron, to William C. Humphreys, Jr., A&B, July 17, 2003 (the "LeMaistre Sworn Statement"), at 142-43. Foy and Willison testified that "monetization" could include either selling or borrowing against an asset. Foy Sworn Statement, at 113 ("In general it means either selling an asset or borrowing up to its full market value."); Sworn Statement of Bruce G. Willison, former Director, Enron, to Jenna L. Moore, A&B, Sept. 3, 2003, at 88 ("Q. [Is monetization] different from a sale? A. No. I think usually it probably is a sale, but in some cases, perhaps you might borrow against a commodity . . . ."). Urquhart, a Finance Committee member, testified that "monetization" was "converting hard assets to several vehicles." Sworn Statement of John A. Urquhart, former Director, Enron, to Steven M. Collins, A&B, Sept. 5, 2003 (the "Urquhart Sworn Statement"), at 57.

Examiner that they believed, based on discussions with Enron, that the Prepay Transactions were sales of price risk management assets.[211]

- *Off-Balance Sheet Debt.* Through the use of various techniques (including Total Return Swaps, share trusts, puts and calls and side agreements) Enron incurred substantial so-called "off-balance sheet" debt. However, off-balance sheet debt did not equate to non-recourse debt.[212] Again, there is substantial evidence that the members of the Enron Board had unclear or conflicting understandings of the meaning of this term.[213]

- *Cash Flow from Operations.* Enron's "cash flow from operations" included significant amounts of cash flow generated through financings that Enron was obligated to repay.[214]

- *Trading Activities.* Certain of Enron's "trading activities" (i.e., price risk management activities) consisted of transactions where no risk was ever transferred (or ever intended to be transferred) with respect to the assets being traded.[215]

---

[211] Interview of Ronald Baron and Todd Shipman, S&P, by H. Bryan Ives, III, Oct. 8, 2003.

[212] As noted in Prior Reports, through the use of a Total Return Swap, Enron or one of its affliates would maintain substantially all of the risks and rewards of an asset even though the asset was purportedly "sold" to a third party. *See* First Interim Report, at 58-59. Under the share trusts, Enron was the ultimate guarantor of debt supporting assets that were transferred into the Whitewing structure. *See, e.g.*, Second Interim Report, Appendix G (Whitewing Transaction), at 54-55.

[213] For example, Urquhart testified that the terms were synonymous, "because once you stop your balance sheet, there is no recourse. Your debt is off your balance sheet, not something they have recourse to." Urquhart Sworn Statement, at 80; *see also* Sworn Statement of Frank Savage, former Director, Enron, to Steven M. Collins, A&B, Aug. 13, 2003 and Sept. 4, 2003 (the "Savage Sworn Statement"), at 73 (stating that "typically" off-balance sheet means non-recourse, with some exceptions). Belfer testified that "non-recourse" financings would refer to outright dispositions, whereas "off-balance sheet" financings would refer to structured financings in which Enron had continuing involvement. Sworn Statement of Robert A. Belfer, former Director, Enron, to Steven M. Collins, A&B, July 31, 2003 (the "Belfer Sworn Statement"), at 132. Chan testified that sometimes off-balance sheet debt was non-recourse, but that sometimes it was recourse, depending on the situation. Chan Sworn Statement, at 53-54. Harrison said that he "most of the time would equate" the terms off-balance sheet with non-recourse, but believed that there was a "technical accounting difference" between the two. Sworn Statement of Ken L. Harrison, former Director, Enron, to Steven M. Collins, A&B, Aug, 27, 2003 at 101.

[214] *See* Second Interim Report, Appendix Q (Schedules Depicting Impact of Enron's Six Accounting Techniques), at 1 (showing that over $3 billion in Enron's reported funds flow from operations during 2000 should not have been characterized as such, and that Enron should have reported over $4.5 billion more in cash flow from financing activities during 2000).

[215] *See, e.g.*, Second Interim Report, Appendix E (Prepay Transactions), at 20-22.

- *True Sales.* Enron reported that "true sales" occurred even though the transferor (or its affiliate) of the asset retained control and substantially all of the risks and rewards of the asset conveyed to the purchaser.[216]

*Related Party SPEs*

- *Asset Repurchases from LJM2.* In a 2001 presentation to the Enron Board regarding transactions between Enron and LJM2, Enron officers did not disclose to the Enron Board transactions where Enron repurchased assets from LJM2. Several directors have testified that such transactions would have raised their suspicions.[217] The officers intentionally deleted the transactions from a draft of the Audit Committee presentation, with the assistance of Enron in-house attorneys.[218]

- *Raptor Restructurings.* In the spring of 2001, Enron restructured the Raptor SPEs with the infusion of an additional twelve million shares of Enron stock. The restructuring was consummated to cover a shortfall in the credit capacity of the Raptor SPEs that arose because the value of the hedged assets declined, as did the price of Enron's stock that constituted the primary asset providing the credit capacity. Rather than seeking Board approval for this significant transaction, Enron officers, working with the Enron in-house attorneys, reasoned that this transaction fit within a previous Board resolution that provided management with blanket authority to execute and settle equity derivative transactions up to a specified share amount (fifty million shares in the aggregate at any given time).[219]

---

[216] *See, e.g.*, First Interim Report, at 67-146 (concluding that the Cerberus Transaction, the Nikita Transaction, the Hawaii Transaction, the Backbone Transaction, and the $SO_2$ Transaction, were likely not "true sales").

[217] *See, e.g.*, Foy Sworn Statement, at 100; Sworn Statement of Norman P. Blake, Jr., former Director, Enron, to John L. Latham, A&B, Dec. 13, 2002, at 174.

[218] Email from Jordan Mintz, Enron, to Ron Baker, Enron, Feb. 2, 2001 [AB0911 2838-AB0911 2840]; Email from Jordan Mintz, Enron, to Tod A. Lindholm, Enron, and copy to George McKean, Gordon McKillop, Ryan Siurek, Enron, Feb. 2, 2001 [AB0911 2841-AB0911 2843]; Email from Jordan Mintz, Enron, to Ron Baker, Enron, Feb. 2, 2001 [AB0911 2838-AB0911 2840].

[219] *See* Sworn Statement of Joel Ephross, Assistant General Counsel, Enron, to Rebecca M. Lamberth, A&B, Sept. 19, 2003, at 133-34 ("I recall conversations about the authority to execute a derivative on Enron common stock. I recall that the conclusion was reached that an existing board resolution allowing for derivative transactions on Enron common stock was available to be used and that a decision was that the derivative could be written utilizing the existing resolution, the standing resolution, on derivative transactions."). An email on this subject, dated March 22, 2001, began with a message from another Enron attorney to Enron attorneys Joel Ephross and Rex Rogers, stating, "Per my voicemail to you, and Rex's request, here are the resolutions which were adopted by the Board relating to derivatives such as forwards" and attaching a copy of such previously-adopted resolutions. Ephross forwarded the email and stated: "George, as I read the attached, it is exactly what we are looking for, except that the capacity looks short,

- *LJM2/Raptors Hedging Restriction.* Certain officers failed to inform the Enron Board that the Raptor SPE in Raptor I would not provide its hedge until LJM2 received $41 million for its $30 million investment in Talon, thereby leaving only Enron stock to hedge the notional amount of $734 million.[220] Likewise, Enron in-house attorneys who knew of Glisan's and Kopper's involvement appear to have taken no action to advise the Enron Board of that fact.

- *Other Enron Officer Involvement in LJM2.* The Board was not advised at its meeting discussing LJM2 that Glisan and Kopper (in addition to Fastow) were involved in the management of LJM2.[221]

- *Independent Third Party.* Although it was the "independent" third party in many of the SPE transactions, LJM2 was actually an entity controlled and managed by senior officers of Enron.[222] In addition, the "special purpose vehicle not affiliated with the Company" that was approved by the Executive Committee for the Chewco/CalPERS transaction was known by the officers and in-house attorneys to be controlled and managed by Kopper, who was present at that Executive Committee meeting.[223]

- *Arm's Length Transactions.* Enron reported "arm's length transactions" between Enron and LJM2[224] even though in many

---

even if 100% of the shares are available." Email from Joel Ephross, Enron, to George McKean, Enron, Mar. 22, 2001 [EN01647576-EN01647580]; *see also* Appendix B (Role of Andersen); Appendix C (Role of Enron's Attorneys); Second Interim Report, Annex 5 to Appendix L (Related Party Transactions).

[220] *See* Second Interim Report, Annex 5 to Appendix L (Related Party Transactions). Enron's transaction support accountant with responsibility for the Raptors also apparently concealed this fact from Andersen. *See* Appendix B (Role of Andersen).

[221] *See* LJM2 Co-Investment, L.P. Private Placement Memorandum, Oct. 13, 1999, at 2 [MLBE 0006895-MLBE0006915].

[222] LJM2 was involved in no less than twenty-one of Enron's SPE transactions. Fastow and Kopper controlled and managed LJM2. *See* Second Interim Report, Appendix L (Related Party Transactions).

[223] *See* Minutes of Enron Executive Committee Meeting, Nov. 5, 1997, at 2 [AB000456818-AB000456821]. The only public discussion of Chewco and Kopper is in the Related Party Transactions section of Enron's 1999 10-K which stated "In addition, an officer of Enron has invested in the limited partner of JEDI and from time to time acts as agent on behalf of the limited partner's management." Enron Form 10-K filed with the SEC for the Year ended Dec. 31, 1999 (the "10-K for 1999"), Notes to Consolidated Financial Statements, Note 16.

[224] Minutes of Enron Audit Committee Meeting, Feb. 7, 2000 (the "2/7/00 Audit Committee Minutes"), at 3-4 (Causey "stated that in his opinion all of the transactions had been negotiated on an arms-length basis") [AB000201248-AB000201251]. Enron also made similar representations to the public. *See* 10-K for 1999, Notes to Consolidated Financial Statements, Note 16; *see also* Enron Form 10-K filed with the SEC for the Year ended Dec. 31, 2000, Notes to Consolidated Financial Statements, Note 16.

instances the negotiations were chilled by senior Enron officers who
managed LJM2 and were in a position to exert influence over other
Enron officers who were negotiating on behalf of Enron.[225]

*Conclusion*

Through the use of these and other methods, certain Enron officers implemented

their use of the six accounting techniques to distort Enron's reported financial results. In

the following sections, the Examiner analyzes how Enron's system of checks and

balances failed to prevent this misconduct.

## D.     Failure of Professionals to Provide Checks and Balances

Enron's professionals could have provided a check against the officers'

misconduct. To varying degrees, these professionals were involved in the structuring,

documentation and disclosure of these transactions. It appears that they had opportunities

to prevent or limit this misconduct at several points in time.

*Andersen*

As previously discussed, Andersen's certification of Enron's financial statements

was indispensable to Enron in accessing the capital markets. Andersen's audits of

Enron's financial statements should have provided a check against Enron's misuse of the

SPEs. Moreover, Andersen had obligations under GAAS to alert the Audit Committee to

any material accounting and disclosure risks arising out of the SPE transactions. This

---

[225] These issues were noted in testimony of McMahon, when describing his views of the LJM conflict
issues in March 2000 as follows:

> [T]he LJM situation had gotten to basically a point that was just untenable for myself and
> my group. We found ourselves negotiating against people who represented LJM. They
> were Enron employees. Andy Fastow was the ultimate senior person that all those people
> reported to. He set compensation and promotion.

*Financial Collapse of Enron: Hearing before the Subcommittee on Oversight and Investigations*, 107th
Cong. (Feb. 7, 2002), at 55 (testimony of Jeffrey J. McMahon, President and Chief Operating Officer,
Enron), *available at* http://energycommerce.house.gov/107/action/107-88.pdf.

was especially critical for Enron's Audit Committee because of the risks presented by the company's highly structured accounting-driven SPE transactions. Technical and undeveloped GAAP relevant to the accounting for SPE transactions significantly increased the risk of accounting mistakes and the divergence of the economic substance of a transaction from its accounting treatment and disclosure. Andersen's compliance with GAAS might have enabled the Audit Committee to serve as a more effective check.

Perhaps the primary explanation for Andersen's failure was that it simply lost sight of its duties. Andersen owed duties to the investing public,[226] as well as a direct duty to the Audit Committee. SAS 61 "requires the auditor to ensure that the audit committee receives additional information regarding the scope and results of the audit that may assist the audit committee in overseeing the financial reporting and disclosure process for which management is responsible."[227] Despite these fundamental precepts, on many occasions, it appears that Andersen acted in a manner inconsistent with its duties. Examples include:

- *SAS 61 Violations.* Under GAAS, Andersen was required to determine whether the Enron Audit Committee was informed about the "effect of significant accounting policies in controversial or emerging areas for which there is a lack of authoritative guidance or consensus" and to discuss "items that have a significant impact on the representational

---

[226] Chief Justice Burger, writing for an unanimous Supreme Court in *United States v. Arthur Young & Co.*, 465 U.S. 805, 817-18 (1984) (emphasis in original), explained this duty as follows:

> By certifying the public reports that collectively depict a corporation's financial status, the independent auditor assumes a *public* responsibility transcending any employment relationship with the client. The independent public accountant performing the special function owes ultimate allegiance to the corporation's creditors and stockholders, as well as to the investing public. This 'public watchdog' function demands that the accountant maintain total independence from the client at all times and requires complete fidelity to the public trust. To insulate from disclosure a certified public accountant's interpretation of the client's financial statements would be to ignore the significance of the accountant's role as a disinterested analyst charged with public obligations.

[227] SAS 61, at § 2 (AU § 380.02).

faithfulness, verifiability and neutrality of the accounting information included in the financial statements."[228] The evidence would permit a fact-finder to conclude that Andersen failed to perform this important duty. For example, when evaluating the risks of retaining Enron as a client in February 2001, Andersen analyzed the effect of Enron's mark-to-market accounting, fair value accounting, FAS 140 Transactions, LJM Transactions and Whitewing transactions on Enron's financial statements.[229] One week later, Andersen met with the Enron Audit Committee without sharing this type of clear quantitative analysis with the Audit Committee concerning the effect of these transactions on Enron's financial statements.[230]

- *Related Party Risks.* There were numerous occasions where Andersen failed to advise the Audit Committee and the Enron Board of its concerns regarding the Related Party Transactions. For example:

  o *LJM1/Rhythms Hedging Transaction.* In an email dated May 28, 1999, one senior Andersen officer noted: "Setting aside the accounting, idea of a venture entity managed by CFO is terrible from a business point of view. Conflicts of interest galore. Why would any director in his or her right mind ever approve such a scheme? Plus, even if all the accounting obstacles below are overcome, it's a related party, which means FAS 57 disclosure of all transactions. Would Enron want these transactions disclosed every year as related party transactions in their financial statements?"[231]

  o *Raptors.* In an email dated February 4, 2000, one senior Andersen partner who was a member of the PSG noted in connection with the development of what became the Raptor hedging structure: "I believe this SPE is nonsubstantive."[232] In an email dated February 6, 2001, one senior Andersen partner who was a member of the PSG noted: "Significant [internal Andersen] discussion was held regarding the related party transactions with LJM including the materiality of such amounts to Enron's income statement and the amount retained 'off balance sheet.'. . . Ultimately the conclusion

---

[228] *Id.* at § 7; SAS 90, at § 1 (amending SAS 61, at § 11) (AU § 380.11).

[229] Retention Meeting Presentation, at 5.

[230] Minutes of Enron Audit Committee Meeting, Feb. 12, 2001 (the "Audit Committee 02/12/01 Minutes") [AB000204423-AB000204428].

[231] Neuhausen/Duncan 5/28/99 Email, at ELIB00003903-00001.

[232] *See* Email from John E. Stewart, Andersen, to Carl E. Bass, Andersen, regarding Enron Derivative Transaction, Feb. 4, 2000, at 1 [ELIB00003646-00001-ELIB00003646-00002].

was reached to retain Enron as a client. . . .  Take away To Do's . . . .  Suggest that a special committee of the BOD be established to review the fairness of LJM transactions (or alternative comfort that the transactions are fair to Enron, e.g., competitive bidding)."[233]

○ *General Considerations*. While an accountant is not responsible for its client's business decisions, there is no evidence that Andersen ever discussed with the Audit Committee the extent of its internally expressed concerns over these SPE structures.

• *Audit Committee Communications*.  Andersen may have affirmatively misled the Audit Committee regarding the reason why certain of Enron's accounting and disclosure judgments had a high "risk profile."[234]  Specifically, there is evidence that Andersen's presentations to the Audit Committee were designed to and did have the effect of creating the impression that Enron's risky accounting judgments and disclosure judgments were the natural result of Enron's "sophisticated business practices,"[235] when in fact these risky judgments were the result of the intentional use of SPE transactions designed to manipulate Enron's reported financial condition, results of operations and cash flows.

• *Prepay Transactions*.  Andersen was aware of the type of disclosure necessary to make the nature of Enron's Prepay Transactions visible to a user of Enron's financial statements.  Another Andersen client, Aquila Energy Corporation, included such a disclosure in an SEC filing,[236] and Andersen proposed that Enron include a similar disclosure in its financial statements.[237]  When the officers refused, Andersen acquiesced.

• *FAS 140 Transactions*.  Andersen understood that the Total Return Swaps constituted unconditional promises to pay principal and interest.[238]  However, Andersen was content to accept the Enron

---

[233] Email from Michael D. Jones, Andersen, to David B. Duncan and Thomas H. Bauer, Andersen, regarding Enron retention meeting, Feb. 6, 2001, at PSI00004467 [PSI00004467-PSI00004468].

[234] Materials from Enron Audit Committee Meeting, Feb. 7, 1999, at AB0246 01067 [AB0246 01057-AB0246 01167].

[235] 2/7/00 Audit Committee Minutes, at 2.

[236] *See* Aquila Form S-1, at 42-43.

[237] Cash Sworn Statement, at 70-75; Scardino Interview.

[238] *See, e.g.*, Memorandum from Kimberly R. Scardino, Andersen, to The Files, regarding Project Generic - Sale of Enron's Sub's Financial Asset (a Hawaii 125-O transaction), Apr. 9, 2000 [AB0911 1938-AB0911 1943].

officers' classification of these obligations as "derivatives," even though FAS 105 required that "the face, contract, or notional principal amount"[239] of these obligations be separately disclosed, and FAS 140 specifically required that the recourse nature of the Total Return Swaps be disclosed.[240]

- *Nahanni.* Andersen was aware that in the Nahanni transaction Enron obtained loan proceeds in the form of Treasury securities, sold those securities before year-end and repaid the loan – all within a period of days straddling year-end 1999.[241] Despite this knowledge, Andersen permitted the officers to report the proceeds of the Treasury securities' sale as cash flow from operating activities.

*Attorneys*

By analyzing the structure of the SPE transactions and documenting them, and by providing opinions in various transactions, Enron's attorneys also played a vital role in Enron's access to the capital markets. These attorneys could have provided a check and balance against the Enron officers' wrongdoing. Among other things, these attorneys could have apprised Derrick or the Enron Board when they knew of conduct that could result in Enron disseminating materially misleading financial information, or they could have refused to render legal services in connection with SPE transactions when they had concerns about their propriety.

---

[239] Disclosure of Information About Financial Instruments with Off-Balance-Sheet Risk and Financial Instruments with Concentrations of Credit Risk, Statement of Financial Accounting Standards No. 105 (Financial Accounting Standards Bd. 1990).

[240] FAS 140, ¶ 17(f)(2).

[241] *See* Nahanni Memo, at 1 ("Objective[:] Increase Funds flow through the sale of Merchant Investments held by a newly formed consolidated subsidiary."); Email from Derek Claybrook, Andersen, to Patricia Grutzmacher, Andersen, Dec. 6, 1999, at 1 (identifying purpose of transaction to "liquidate[] T-bills over time resulting in an increase in Operating Cash Flow for Enron") [PSI00006799-PSI00006800]. The Nahanni Memo reflects Andersen's awareness that the Treasury securities were sold prior to the end of 1999 and of the payment of the related debt in early 2000. It is noteworthy in that it contains information that could not have existed as of the date of the memo, i.e., information regarding payment of the debt subsequent to year-end 1999.

-114-

One explanation for the attorneys' failure may be that they lost sight of the fact that the corporation was their client. It appears that some of these attorneys considered the officers to be their clients when, in fact, the attorneys owed duties to Enron. Another explanation may be that some of these attorneys saw their role in very narrow terms, as an implementer, not a counselor. That is, rather than conscientiously raising known issues for further analysis by a more senior officer or the Enron Board or refusing to participate in transactions that raised such issues, these lawyers seemed to focus only on how to address a narrow question or simply to implement a decision (or document a transaction). Examples include:

- *LJM1/Conflict of Interests.* Although Derrick, Enron's General Counsel, advised the Enron Board on the conflict of interest issue presented by Fastow's involvement in the LJM1/Rhythms Hedging Transaction, his advice was limited to whether Enron's Code of Ethics applied and whether it could be waived. No advice or discussion appears to have taken place about risks, areas of concern, or ways to minimize risks.

- *Hiding Fastow's LJM2-Related Compensation.* Enron's attorneys worked to avoid disclosure of Fastow's LJM-related compensation. According to Mintz, the General Counsel of Enron Global Finance: "I think the number one item on our list is to resolve the 'where practicable' language in connection with AF's interest in the transactions engaged in with Enron by LJM1 and 2. I spoke, again, with Andy about this earlier today and he believes (perhaps rightly so) that Skilling will shutdown LJM if he knew how much Andy earned with respect to the Rhythms transaction. . . . We need to be 'creative' on this point within the contours of Item 404 so as to avoid any type of stark disclosure, if at all possible."[242]

- *Chewco/Tax Indemnification.* Following Enron's repurchase of Chewco's interest in JEDI, Mintz, then General Counsel of Enron Global Finance, recognized that there was no contractual basis for Enron to pay Chewco a $2.6 million tax indemnification payment.

---

[242] Email from Jordan Mintz, Enron, to Ron Astin, Vinson & Elkins, and Rex Rogers, Enron, *et al.*, Jan. 16, 2001, at 1-2 [AB0911 1156-AB0911 1158].

However, at the instruction of Fastow, Mintz had an amendment to the agreement drafted to provide for the payment and never raised the issue with Enron's General Counsel, Derrick.[243]

In other cases, Enron's in-house attorneys knew that the Enron Board did not have all relevant facts before it, but took no action to correct that problem:

- *Other Enron Officer Involvement in LJM2.* Enron in-house attorneys knew that the Enron Board was not informed that Glisan and Kopper, in addition to Fastow, were involved in the management of LJM2.[244]

- *LJM2 Concerns.* Enron in-house attorneys never shared with the Enron Board their concerns that there was no substantiation for the conclusion that the Enron/LJM2 deals were "at arms-length" or that Enron got the best price from the LJM2 transactions.[245]

- *Kopper's Role in Chewco.* Fastow characterized Chewco as an "unaffiliated" entity to the Enron Board even though Kopper was the managing partner. Enron in-house attorneys knew of Kopper's role in Chewco but never raised the issue with the Enron Board.[246]

- *Raptor Manipulation Concerns.* Enron in-house attorneys never discussed their concerns about the Raptor SPEs with the Enron Board. In a memorandum prepared by an in-house attorney, Stuart Zisman, to several senior Enron in-house attorneys, Zisman stated:

> **Overall Book Manipulation.** The Raptor structure is very cleverly designed to reduce earnings volatility resulting from the rules of fair value accounting. Our original understanding of this transaction was that all types of assets/securities would be introduced into this structure (including both those that are viewed favorably and those that are viewed as being poor investments). As it turns out,

---

[243] *See* Appendix C (Role of Enron's Attorneys), *Attorneys' Role in Related Party SPE Transactions – Chewco – Attorneys' Roles in Connection with Chewco Unwind and Tax Indemnity Issue.*

[244] *Compare* Email from Bob Baird, Vinson & Elkins, to Scott Sefton and Rex Rogers, Enron, Oct. 4, 1999 [AB0472 01453-AB0472 01455] *with* Minutes of Enron Board Special Meeting, June 28, 1999 (the "6/28/99 Board Special Meeting Minutes") [AB000196728-AB000196740].

[245] *See* Memorandum from Jordan Mintz, Enron, to Rick Buy and Rick Causey, Enron, regarding "LJM Approval Process – Transaction Substantiation," Mar. 8, 2001 [AB0472 01933-AB0472 01937].

[246] Facsimile from Carol St. Clair, Assistant General Counsel, Enron, to Richard McGee and Mark Spradling, Vinson & Elkins, regarding Project Chewco Transaction Structure, Oct. 31, 1997 [AB000465826-AB000465830]; *see also* Appendix C (Role of Enron's Attorneys), *Attorneys' Role in Related Party SPE Transactions – Chewco.*

we have discovered that a majority of the investments being introduced into the Raptor Structure are bad ones. This . . . might lead one to believe that the financial books at Enron are being "cooked" in order to eliminate the drag on earnings that would otherwise occur under fair value accounting. . . .[247]

- *Raptor Restructurings*.   In March 2001, Enron contributed an additional 12 million shares of Enron stock, then worth in excess of $600 million, to the Raptor SPEs.  The contribution was necessitated by the decrease in the value of the Enron stock initially contributed to the Raptor SPEs and the decrease in the value of the assets that were hedged.  Enron's in-house attorneys searched to find a way to avoid having to obtain Board approval of this contribution.  They concluded that no Board approval was required because this transfer was authorized by a previous resolution of the Enron Board that provided management with blanket authority to execute and settle equity derivative transactions up to a specified share amount.[248]

### E.    Failure of Lay and Skilling to Provide Checks and Balances

During the five years leading up to the Petition Date, Enron's organization was structured with the Office of the Chairman, which Lay and Skilling shared, as the top management position.  Thus, the senior officers who misused the SPE transactions to disseminate materially misleading financial information reported either directly or indirectly to Lay and Skilling.  For example, Fastow and Causey reported directly to the Office of the Chairman, and McMahon and Glisan reported to Fastow.

Lay and Skilling, as the CEO and COO of Enron, respectively, should have been an important check in preventing or minimizing the impact of the subordinate officers' conduct.  Lay and Skilling were both actively involved in Enron's day-to-day operations and met at least weekly with the senior officers of the company.  Lay and Skilling

---

[247] Memorandum from Stuart Zisman, Enron, to Mark Haedicke and Julia Murray, Enron, regarding Project Raptor, Aug. 31, 2000, at 1 (emphasis in original) [AB0417 03120-AB0417 03121].

[248] *See* Appendix C (Role of Enron's Attorneys), *Attorneys' Role in Related Party SPE Transactions – Raptors – Attorney Role in Raptors and Board Approval.*

participated meaningfully in Enron's annual budgeting process, and they regularly monitored the financial performance of Enron. Before the end of each quarter, they met with Causey to discuss an estimate of Enron's performance and help allocate resources to complete transactions that would help Enron meet Wall Street's expectations.

Given Lay's and Skilling's intimate knowledge of and involvement with Enron's affairs, it is reasonable to infer that they understood the widespread use of the SPE transactions and the significant impact of those transactions on Enron's publicly-reported financial condition. There is evidence with respect to certain of the SPE transactions, including the LJM1/Rhythms Hedging Transaction and the LJM2/Raptors Hedging Transactions, that at least Skilling met with and encouraged officers and other employees of the company to complete those transactions. In addition, Fastow, Causey, McMahon, Glisan and others routinely provided detailed information about Enron's financing activities at meetings of the Finance Committee, which Lay and Skilling always attended.

Lay and Skilling should have used their knowledge of the company to help the Outside Directors understand the information being presented. Lay and Skilling had the opportunity to provide meaningful interpretation of the presented information, as they attended almost every meeting of the Enron Board and its committees. They also set the agendas for the meetings and reviewed and helped shape in advance the presentations that other Enron managers would provide. However, the senior officers continued to provide information to the Outside Directors, particularly the Finance Committee, using misleading terms and confusing jargon, resulting in obfuscation rather than clarity.

There is evidence that Lay and Skilling sometimes participated with their subordinate officers in providing information to the Outside Directors about SPE

transactions.[249]   There is also evidence showing that at least Skilling failed to tell the Outside Directors important information about SPE transactions that might have changed the outcome of Board decisions, even though he was present at the Board or committee meetings during which these matters were reviewed.[250]

While the justification for their actions is not clear from the evidence, it is clear that Lay and Skilling failed to respond to red flags that, had they inquired, would have led them to the knowledge that senior officers were misusing SPE transactions and disseminating materially misleading financial information.  It also appears that Lay and Skilling did little to help the Outside Directors serve effectively as a check on the wrongful conduct.

**F.      Failure of Enron Board to Provide Checks and Balances**

The Enron Board could have been the ultimate check in preventing or minimizing the impact of the officers' misconduct.   The Board had the authority to stop the misconduct by, for example, terminating the employment of these officers, refusing to approve Enron's financial statements, and other disclosures in its 10-Ks and other public filings or notifying the SEC of wrongdoing.   In practice, however, particularly in circumstances involving complex matters and obfuscation by officers of a company, there

---

[249] For example, with respect to the LJM1/Rhythms Hedging Transaction, both Lay and Skilling "answer[ed] questions from the Directors regarding Mr. Fastow's involvement in the partnership and the economics of the transaction." 6/28/99 Special Board Meeting Minutes, at 6.

[250] For example, in December 1997, Skilling failed to tell the Enron Board that Kopper was involved in Chewco.  In addition, despite several opportunities at Board and committee meetings in which LJM2 transactions were discussed, he failed to disclose that he was not receiving information about Fastow's LJM2 compensation.

are limitations to a board serving as an effective check in the area of oversight.[251] This

may help to explain why director liability for breach of the duty of oversight is rare

absent egregious facts.[252]

The Enron Board did not serve as an effective check on the officers' misuse of

Enron's SPE transactions. There are several factors that might explain this failure. Some

of these factors were not within the control of the Enron Board. Other factors, however,

were within the control of the Enron Board and, if handled differently, might have

resulted in the Board limiting the harm caused to Enron.

The Enron Board generally was not asked to, and did not, approve Enron's SPE

transactions other than the LJM1/Rhythms Hedging Transaction, certain LJM2/Raptors

Hedging Transactions and a few other SPE transactions involving Enron stock (such as

---

[251] Courts have acknowledged that actively engaged boards will not always be able to detect and prevent misconduct occurring within the corporation. *See, e.g., In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 970 (Del. Ch. 1996) ("And obviously too, no rationally designed information and reporting system will remove the possibility that the corporation will violate laws or regulations, or that senior officers or directors may nevertheless sometimes be misled or otherwise fail reasonably to detect acts material to the corporation's compliance with the law.").

[252] As noted in Annex 2 to Appendix D (Roles of Lay, Skilling and Outside Directors), the law regarding board oversight divides oversight responsibility into two principal components: a duty to monitor and a duty to inquire. A failure to discharge the duty to monitor, where found actionable by the courts, has typically been characterized by abdication or sustained inattention, while actionable failures (assuming they are not barred by an exculpation provision) to satisfy the duty to inquire (i.e., failing to recognize and respond to red flags) occur in cases of ordinary negligence. If a director exculpation provision applies, however, as it would in Enron's case, a director's failure to satisfy either component of oversight must amount to conduct "not in good faith" or must involve "intentional misconduct" or "a knowing violation of law" in order to establish liability. Thus, director liability in the oversight area is rare absent egregious facts. There have been several policy reasons advanced by commentators and courts supporting a high threshold for liability. These include: (i) the desire by companies to attract qualified directors; (ii) the need to provide incentives for boards to permit the corporation to take considered risks as opposed to taking the most conservative approach; and (iii) the expense of a different legal framework, whether such expense results from increased insurance premiums for D&O insurance coverage or from the resources a director would require to fulfill a more proactive oversight role. *See generally In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959 (Del. Ch. 1996); American Law Institute, *Principles of Corporate Governance: Analysis & Recommendations* § 7.19 cmt. c (1994). Despite a high threshold for the imposition of liability, the Examiner believes that understanding the Enron Board's role and conduct is essential in addressing the question of how Enron's financial demise could have happened.

the Share Trust Transactions).  As a result, the Board's role for most of these transactions

consisted primarily of providing oversight and being alert for signals or red flags of

wrongdoing.  The following discusses Enron's policies relating to its transaction approval

process and the conduct of the two committees most responsible for monitoring the SPEs:

the Finance Committee and the Audit Committee.

*Enron Board's Transaction Approval Policies*

The Enron Board did not approve most of the SPE transactions.  There were

several policies established by the Enron Board that were relevant to determining whether

a transaction could be consummated without Board approval.  These included:  (i)

Enron's Risk Management Policy;[253] (ii) Enron's Guaranty Policy;[254] and (iii) Enron's

asset divestiture policy.[255]  Because of the way in which many of the SPE transactions

---

[253] Enron's risk management policy set authorized limits on net open position, maturity gaps and value-at-risk for activities Enron designated as being within its commodity groups.  Under this policy for most periods, there were generally no value-at-risk limits on the merchant portfolio commodity group.  *See* Enron Corp. Risk Management Policy, Oct. 1, 1996, as amended through May 2, 2000 (the "Risk Management Policy") [AB0247 01276-AB0247 01283].  There is evidence that there may have been a value-at-risk limit applicable to the merchant portfolio when it first received separate designation under the Risk Management Policy in 1998.  Draft Enron Corp. Risk Management Policy, Dec. 8, 1998 (the "Draft 12/8/98 Risk Management Policy"), at Appendix II [AB0245 03302-AB0245 03322].  However, subsequent versions of the Risk Management Policy do not reflect a value-at-risk limit for the merchant portfolio.  Under the Risk Management Policy, "value-at-risk" or "VAR" meant Enron's potential exposure, using statistical methods for measuring likely outcomes.  "Potential exposure" meant change in value resulting from changes in market prices, interest rates, currency rates, counterparty credit risk, liquidity risk, etc.  Because VAR limits were set based on a statistical degree of confidence, they were expected to be breached and the Risk Management Policy required that breaches be reported to different levels of management and eventually to the Board, depending upon the size and other circumstances of the breach.

[254] Enron's guaranty policy permitted Enron, among other things, to guarantee debt or enter into Non-Debt Support Arrangements for the obligations of a subsidiary that was at least 75% owned by Enron upon approval by the Office of the Chairman, Chief Financial Officer, Treasurer or (for certain guaranties and certain periods) a Deputy Treasurer, regardless of amount (the "Guaranty Policy").  *See, e.g.,* Exhibit "A" to Enron Board Minutes of Aug. 10, 1999, "Amended Policy for Approval of Guarantees, Letters of Credit, Letters of Indemnity, and Other Support Arrangements" [AB000473946-AB000473951].

[255] Enron's asset divestiture policy required that the divestiture of merchant assets valued at "$75 million or more, raised to $500 million by May 2000, had to be approved by the Board.  "*See* Enron Corp. Transaction Approval Process, revised Feb. 1, 1999 and May 2, 2000 (collectively, the "Transaction Approval Process") [AB000193935-AB000193936, AB0247 01266]."

were structured, these policies effectively permitted Enron's officers to incur a virtually unlimited amount of debt through the SPE transactions, without prior approval of the Enron Board. For example, on September 30, 2001, Enron had $4.8 billion of Prepay Transaction debt and $2.1 billion of FAS 140 Transaction debt.[256] It does not appear that the Enron Board approved any of the transactions in which this debt was incurred. The way these policies worked in the context of Enron's SPE transactions can be illustrated through their application to Enron's Prepay Transactions and its FAS 140 Transactions.

Enron's Prepay Transactions primarily involved Enron's Risk Management Policy and Guaranty Policy. Under the Risk Management Policy, Enron and any entity directly or indirectly controlled by Enron could enter into a Prepay Transaction in any amount so long as the limits on Enron's net trading positions and exposure risk (including value-at-risk) set under its Risk Management Policy were not breached. A Prepay Transaction with a creditworthy bank did not increase Enron's net trading position or create any material exposure risk because the commodity risk and delivery times under the forward contract pursuant to which Enron received the financing proceeds were exactly mirrored by the commodity swap into which Enron entered to eliminate the commodity risk. Thus, under the Risk Management Policy, Enron or any of its subsidiaries could engage in a virtually unlimited amount of Prepay Transactions, and under the Guaranty Policy, if the Prepay Transactions were executed by a 75% owned subsidiary, the subsidiary's obligations could be guaranteed by Enron, all without obtaining Board approval.[257]

---

[256] Bank Presentation, at 42.

[257] The Board received periodic reports on the credit ratio components relevant to Enron's credit rating. If Prepay Transactions caused price risk management liabilities to exceed price risk management assets, the

Enron's FAS 140 Transactions involved the Risk Management Policy, the Guaranty Policy and the Transaction Approval Process. A typical FAS 140 Transaction included three fundamental features: (i) a "sale" by an Enron subsidiary of a merchant investment to an SPE that had borrowed 97% of the purchase price to fund the purchase (the "Loan"); (ii) an Enron subsidiary's obligation, through a Total Return Swap, to pay the principal and interest due under the Loan; and (iii) Enron's guarantee of its subsidiary's obligations under the Total Return Swap.

With respect to the "sale" of a merchant investment, although there is a question of whether "sales" in these transactions constituted asset divestitures requiring Board approval,[258] as a practical matter there were very few FAS 140 Transactions in which an asset sold had a value in excess of the threshold amounts.[259]

Under Enron's Risk Management Policy, while the Total Return Swap provided by the subsidiary may have technically been considered an asset in Enron's merchant portfolio commodity group, there were no value-at-risk or other limits on the merchant portfolio commodity group applicable to FAS 140 Transactions.[260] In addition, under the

---

excess would be treated as debt for credit rating purposes. *See* Second Interim Report. Thus, this was the only practical limitation on the Enron officers in incurring debt related to Prepay Transactions.

[258] Enron's asset divestiture policy required "divestitures" of merchant assets valued at "$75 million or more, raised to $500 million by May 2000, had to be approved by the Board. *See* Transaction Approval Process. Because a FAS 140 Transaction may be viewed as simply converting one asset in Enron's merchant portfolio "commodity group" into another asset – the Total Return Swap in the same "commodity group" – FAS 140 Transactions may not have been viewed as divestitures for this reason (except perhaps to the extent of 3% of the purchase price).

[259] The Cerberus FAS 140 Transaction was valued at approximately $517 million but, for reasons not clear in the evidence, this transaction was not presented to the Enron Board for review and approval. *See* First Interim Report.

[260] *See* Risk Management Policy. In addition to the value-at-risk limit for the merchant portfolio under the 1998 version of the policy noted above, the 1998 version also contained a net open position limit for the merchant portfolio. *Compare* Draft 12/8/98 Risk Management Policy *with* Risk Management Policy. The net open position limit may also have been eliminated as to the merchant portfolio as it does not appear in numerical form in subsequent versions of the Risk Management Policy. In any event, net open position

Guaranty Policy, the Enron Board had delegated to officers the ability to approve Enron's guarantee of the Total Return Swap. Accordingly, no Board approval was required.

The Enron Board apparently devoted significant attention to these policies, as evidenced by seven amendments to the Risk Management Policy from December 1998 through May 2000. Given the broad parameters of the Guaranty Policy, the Enron Board apparently put significant emphasis on its ability to manage risk under the Risk Management Policy. While these controls may work well in managing true trading activities involving assets that have publicly quoted prices and substantial market liquidity,[261] they did not allow the Board the opportunity to prevent the incurrence of debt through SPE transactions (structured as trading activities).[262]

---

limits did not provide a meaningful constraint on management's ability to enter into FAS 140 Transactions because FAS 140 Transactions would not increase the net open position in the merchant portfolio.

[261] *See* Office of the Comptroller of the Currency, Risk Management of Financial Derivatives, Comptroller's Handbook (Jan. 1997).

[262] Testimony from Herbert Winokur, Chair of the Finance Committee, with particular reference to the Prepay Transactions, illustrates his view of how these controls operated:

> A. Well, my understanding of the transactions was that the other party was paying us and we were agreeing to deliver something and we had a number of controls in place. We had the RAC group looking at the value-at-risk exposures and measuring them. We had the four debt ratios we discussed yesterday where we were looking at where were we and where would we be including funds flow obligations. So we had other controls; we just didn't need the transaction approval control on top of the other controls that we had.
>
> Q. That's fine. And the reason was from your perspective as the Finance Committee member what?
>
> A. The reason was because once we were monitoring the finance plan, including funds flow, and once we knew that these transactions would be picked up in the value-at-risk control and the price risk management book, we believed that those were the only controls that would be required on those.
>
> And as for issuance of debt, again, the controls related to our looking at the ratios that related to balance sheet debt coverage.

Sworn Statement of Herbert S. Winokur, Jr., former Director, Enron, to John L. Latham, A&B, Nov. 21, 2002 (the "Winokur 11/21/02 Sworn Statement"), at 73-74 (second day of testimony).

*Finance and Audit Committees*

*Finance Committee.* In the area of SPE transactions and off-balance sheet finance transactions, the Finance Committee failed to serve as an effective check. It should be noted that in the area in which its members had an interest and concern, e.g., the value-at-risk status reports about the trading activities (to the extent they related to true trading activities), the Finance Committee appears to have performed well in its oversight function. Perhaps because of this interest and attention on the part of the Finance Committee, this process worked effectively to prevent trading losses at Enron.

The Finance Committee did not do as well in the SPE transactions and the structured finance areas. In its presentation to the banks on November 19, 2001, Enron listed the debt maturities of its on and off-balance sheet financing activities through 2002. Obligations maturing in the last quarter of 2001 and during 2002 totaled $11.1 billion, with $2.5 billion due in the last quarter of 2001 and the first quarter of 2002. From at least 1997 until August 2001, the Finance Committee apparently neither requested nor received a schedule of the total amount and maturities of Enron's on- and off-balance sheet obligations. Although the Audit and Finance Committees were provided a list of all obligations (without maturities) of Enron as of September 1997, at a meeting on February 9, 1998, they apparently did not see or ask for any similar list again until August 2001. In August 2001, lists of Prepay Transactions and FAS 140 Transactions were provided to the Finance Committee without discussion.[263]

---

[263] 8/13/01 Finance Committee Materials, at AB0247 02309-AB0247 02310 (part of CFO Report).

The Finance Committee Charter required that this committee:

> review and monitor [the Company's] liquidity, including debt maturities, and its contingent liabilities, including its counterparty and currency risk, exposure under outstanding letters of indemnity, letters of credit and corporate guarantees, and review and approve for recommendation to the Board of Directors, if appropriate, the Company's policies with regard thereto.[264]

Instead of monitoring the amounts and maturities of Enron's obligations, however, the Finance Committee focused on the ratios that guided the credit agency ratings. The problems with relying solely on this system of monitoring Enron's obligations were twofold. First, Enron's use of many of its SPE transactions was designed to have no adverse impact on the ratios. For example, $5 billion of Prepay Transactions did not adversely impact these key financial metrics. Second, the maturities of these SPE off-balance sheet transactions were not apparent from those ratios. Therefore, the $11 billion of obligations coming due from October 2001 through December 2002 were not disclosed in the ratios. Liquidity analyses were presented to the Finance Committee, but not in juxtaposition to the maturities or amount of the obligations. Equally important, these liquidity reports always included a significant amount of funds that could be raised through "merchant portfolio monetizations."[265] As the Prior Reports regarding the FAS 140 Transactions demonstrate, these "monetizations" were merely financing activities that produced more obligations for Enron.

---

[264] Enron Finance Committee Charter, undated (the "Finance Committee Charter"), at 1 [AB1114 00003-AB1114 00004].

[265] *See, e.g.*, Materials of the Enron Finance Committee Meeting, May 1, 2000, at 34 (part of Treasurer Report) (listing $8.4 billion of liquidity, of which $3.98 billion is from "merchant portfolio monetizations") [AB0247 01210-AB0247 01327].

Management failed to present clearly Enron's SPE transactions and the total amount and maturities of its off-balance sheet debt to the Finance Committee. Similarly, management failed to disclose these transactions adequately in its financial statements.[266] The Finance Committee, however, is subject to criticism for failing to recognize that they were not getting adequate information from management on this increasingly important part of Enron's financial structure. This criticism is not meant to imply that there was not any information being supplied to the Board. In fact, in some circumstances it appears that there was so much information presented that it inhibited any meaningful discussion. For example, some of the reports provided to the Finance Committee were so detailed that, according to one director's description of a 1998 capital status report, "the level of detail is numbing rather than elucidating."[267]

The Finance Committee received hints and signals of the magnitude of Enron's SPE transactions, including:

- $2.8 billion of financing transactions at the end of 1999 including a "$300mm structured prepay."

- four "monetizations" of assets and investments totaling $1.6 billion and the Nahanni minority interest transaction totaling $400 million.[268]

- a report proclaiming that major finance initiatives for 1999 included executing over $21 billion of funding transactions and over $5 billion of "balance sheet management activities."[269]

---

[266] *See* Second Interim Report, Appendix D (Enron's Disclosure of Its SPEs).

[267] Belfer Sworn Statement, at 123. The chart Belfer referred to was a list that identified many types of Enron's on- and off-balance sheet liabilities, listing Prepays under the heading "Debt Classified as Non-Debt Liabilities." Draft Enron Capital Management Capital Activity Report, Jan. 27, 1998, at AB0246 00815 [AB0246 00725-AB0246 00846]; Agenda for Joint Audit and Finance Committee Meeting, Feb. 9, 1998 [AB000473540].

[268] Materials from Enron Finance Committee Meeting, Dec. 13, 1999 (the "12/13/99 Finance Committee Materials"), at 26 (part of Treasurer Report) [AB0247 00947-AB0247 01075].

[269] *Id.* at 18 (part of CFO Report).

- a list of the largest financing transactions between June and December 2000 including a $500 million Chase prepay, a $1 billion add on to Osprey described as an "off-balance sheet acquisition vehicle, allows for positive funds flow."

It is not the use of SPE off-balance sheet transactions *per se* that should have concerned the Finance Committee. As the Examiner has observed,[270] their use is acceptable if accounted for and disclosed properly. The question is whether these presentations to the Finance Committee should have caused its members to ask additional questions. A full discussion of questions as simple as the following may have elicited some useful information:

- How many transactions?

- How much cash was raised?

- What are Enron's obligations under these transactions?

- When are these obligations due?

- How is Enron reporting them?

- Why don't these transactions adversely affect Enron's investment grade credit rating ratios?

*Audit Committee.* The Audit Committee also did not serve as an effective check. It had many items to watch and devoted too little time to watching them. The Audit Committee meetings in February 2000 and 2001 illustrated the shortcomings. In each of these meetings, the committee had three major items to consider. First, it received, and should have had a full discussion and consideration of, Andersen's SAS 61 report. Second, it was to discuss and approve the annual financial statements for the preceding

---

[270] *See, e.g.,* First Interim Report, at 22; Second Interim Report, at 49-50.

year. Third, it was to review the LJM transactions and make any comments it had on them to the full Board. In addition to these three items, it was to consider any other matters brought before it. In February 2000, these other matters included: (i) a report on final New York Stock Exchange and SEC rules regarding audit committees; (ii) a report on the 2000 Internal Audit Plan; (iii) a report on the significant reserves in the financial statements; (iv) a report on market risk including the 1999 profit and loss and value-at-risk by commodity group; (v) an executive session to consider the appointment of independent auditors for 2000; and (vi) an executive session with Andersen to discuss any problems or disagreements with management. The February 2000 Audit Committee meeting lasted one hour and ten minutes.[271] That amount of time does not appear to be sufficient for meaningful reports, much less full and complete questions and discussion of those matters presented.

There was little discussion of the three major items. The committee received a list of LJM transactions with amounts involved, and assurances by Causey that the transactions were negotiated at arm's length. However, there were no explanations of what those transactions were or why they were done or whether efforts were made to sell the assets to a third party.

Andersen reported that "the Company's sophisticated business practices introduced a high number of accounting models and applications requiring complex interpretations and judgments and that the broadness of the SEC business-related disclosure requirements added to the complexity of the Company's financial

---

[271] 2/7/00 Audit Committee Minutes, at 1.

reporting."[272] Again, a full discussion of questions as simple as the following may have elicited some helpful information:

- What were some of the disclosure issues in the financial statements that are before us and that we are being asked to approve at this meeting?

- What are some of the areas on the financial statements that required complex interpretations and accounting judgments so that I can see how much is at stake if others were to reach different judgments than you?

- Is there anything we should be doing to make those accounting judgments easier or the disclosures more transparent and complete?

- What is the likelihood that these judgments could be incorrect? If so, what are the consequences?

- What alternative accounting treatments exist and why did management select and you concur in the treatments used in these financial statements?

There is no record of whether or to what extent any meaningful discussion took place in which Andersen was asked to explain the accounting and disclosure judgments or the magnitude of their impact on Enron's financial statements. In the Audit Committee's defense, however, it did not have the benefit of the concerns that Andersen had expressed internally and it was told that a "clean" opinion would be delivered. Nonetheless, asking questions like those described above may have provoked meaningful discussion of some of these issues.

In February 2001, the Audit Committee meeting lasted one hour and thirty-five minutes plus an additional ten minutes the following morning when the Audit Committee went into executive session to recommend the approval of Andersen as the company's

---

[272] Materials from Enron Audit Committee Meeting, Feb. 12, 2001 [AB0246 01755-AB0246 01881].

independent accountants for the following year. In addition to the three major items the
Audit Committee was to consider and discuss – Andersen's SAS 61 report, approval of
the 2000 financial statements and the LJM transactions – there were six other items: (i) a
presentation by Enron's General Counsel, Derrick, on the legal matters in the footnotes to
the financial statements; (ii) the required report of the committee to be included in the
proxy statement; (iii) the revised Audit and Compliance Committee Charter; (iv) the
annual report on executive and director use of company aircraft; (v) a report on the 2001
Internal Control Audit Plan; and (vi) a report on the company's polices and practices for
management's communications with analysts.[273]

The minutes of the meeting do not indicate the time spent on individual issues.
The length of the meeting, however, raises a question as to whether there could have been
meaningful consideration and discussion on any of them. Andersen reminded the Audit
Committee, although somewhat obliquely, that "the Company continued to utilize highly
structured transactions, such as securitizations and syndications, in which there was
significant judgement required in the application of GAAP. [Enron also used] mark-to-
market and fair value model accounting in the areas of trading and derivative contracts
and stated that these also required significant judgement regarding the applicability of
certain models to specific products or transactions."[274] Yet again, a full discussion of
questions as simple as the following may have elicited some helpful information:

- What transactions?

- How much money is involved?

---

[273] *Id.*

[274] Audit Committee 02/12/01 Minutes, at 2.

- Should we consider other products and transactions?

- Should we consider alternative accounting treatments or models?

- What happens if these judgments are wrong?

- Which transactions or judgments are the most risky and what are the primary issues?

*Possible Explanations for the Enron Board's Failure*

Many of Enron's Outside Directors had skills and talents that likely were beneficial to Enron in the operation of its business, and these contributions should not be underestimated. It appears from the evidence, however, that the Outside Directors did not understand important aspects about Enron's use of SPE transactions.

There may be several possible explanations for the Board's failure to understand these transactions. As discussed above, Enron officers often used misleading terms and confusing jargon, and they presented information to the Enron Board and its committees in a manner that obfuscated the substance of the SPE transactions. In addition, the length of Board and committee meetings, given the complexity and the number of agenda items covered, raises questions of whether sufficient time was devoted to allowing the Outside Directors to understand the transactions. Finally, Enron's Board was unusually large, which may have increased the tendency for individual directors not to feel personally responsible for understanding complex matters. Despite the large number of directors, however, the Board did not appear to have sufficient expertise in the kinds of complicated structured financings in which Enron engaged.

*Time.* In addition to being large and complex, Enron changed its business strategy dramatically during the late 1990s, requiring the Outside Directors to learn and

adjust to the company's transition from a "pipeline company" to a "trading company."[275] Board meetings typically lasted a total of about four to five hours, and committee meetings were generally not more than ninety minutes each. With the large number of significant agenda topics presented at each meeting, these circumstances raise questions of whether the Outside Directors had sufficient time to discuss and understand the matters fully. Although none of the Outside Directors admitted in testimony that they felt the Board or committee meetings were too short,[276] several directors provided such criticism in a Board self-assessment they completed in 2001 (the "2001 Board Assessment"):

- "This is a great board (in my opinion). And, if anything, more meeting time (especially committees) would be nice. It is a working board and lots going on in the company!"[277]

- "We may need to meet beyond noon more often, to allow for in-depth briefings, and to leave sufficient time for the special reports to present risks, hurdles, alternative scenarios, and requests for specific advice."[278]

- "I think I would support a move to six meetings a year (but not too strongly.)"[279]

---

[275] *See, e.g.*, Enron 2000 Annual Report, at 2-5; Savage Sworn Statement, at 61-62; Urquhart Sworn Statement, at 13.

[276] *See, e.g.*, Sworn Statement of Jerome J. Meyer, former Director, Enron, to Steven M. Collins, A&B, Aug. 29, 2003, at 45-46 ("Q. With respect to the board meetings, did you feel that the time that was allotted to the board meetings was sufficient for you to have all your questions answered about the matters that were brought before the board? A. Yes. I never felt like we were without time to address everything that needed to be addressed. I'm comfortable with that. Again, time is a commodity you'd always like more of.").

[277] Materials from Enron Nominating Committee Meeting, Feb. 12, 2001 (the "2/12/01 Nominating Committee Materials"), at AB000467840 (part of 2001 Board Assessment) (emphasis in original) [AB000467834-AB000467851].

[278] *Id.*

[279] *Id.*

*Reliance on Other Board Members.* The Enron Board was unusually large. A recent survey of public companies reported an average board size of 9.4 total directors, with an average of 6.9 "independent" or outside directors,[280] less than Enron's 15 to 19 directors.[281] A consequence of the large size can be a tendency for the individual directors not to feel personal responsibility for understanding complex matters. Several of the Outside Directors testified that they might not have understood an area of the company's operations or a particular matter, but they were not concerned because they expected that someone else on the Board did. For example, Chan, who served on both the Audit and Finance Committees, testified that he relied on other Audit Committee members Jaedicke, Gramm and John Duncan to understand whether it was appropriate for Andersen to provide both external and internal audit functions at Enron: "For something like that, I do rely on my colleagues at the audit committee – such as Bob Jaedicke was much more qualified in this regard, and certainly he has, you know, mentioned about – these concepts, and that's how I learned about it."[282]

---

[280] Financial Executives International Survey of Corporate Governance Best Practices, May 2002, *available at* http://www.fei.org/download/feigovsur.pdf#xml=http:/fei.org.master.com/texis/master/search/mysite.txt?q=corporate+governance&order=r&id=3860184834ad7a56&cmd=xml (last visited October 24, 2003).

[281] Several of the directors noted that the Board was too large in the "2001 Board Assessment." *See* 2/12/01 Nominating Committee Materials. Comments in the 2001 Board Assessment included: "Board too large"; "Need to reduce the size of the board. . . ."; "Board slightly too big." 2/12/01 Nominating Committee Materials, at AB000467839.

[282] Chan Sworn Statement, at 208. Chan also testified that he considered the Audit Committee to have "experts on this field" and said John Duncan and Gramm were "very qualified" when asked to name those experts. Chan Sworn Statement, at 210. Gramm, however, testified:

> A. I took accounting in, one accounting course in undergraduate school.
>
> Q. Other than that course and just sort of a normal knowledge you picked up reading financial statements and balance sheets, did you have any other particular expertise in dealing, or knowledge, I should say, about accounting and auditing issues?
>
> A. No.

Gramm Sworn Statement, at 34.

*Lack of Structured Finance Expertise.* The Board did not include a large number of Outside Directors who had hands-on experience in the types of sophisticated financings employed by Enron. In the 2001 Board Assessment, the directors acknowledged this lack of depth on the Board. A summary of the self-assessment responses quoted the directors' responses, but without attributing the quotes to individual directors. Regarding this lack of financial expertise, the directors wrote:

- "Board is too large, but missing skills in technology and very sophisticated finance."[283]

- "Need more technology/risk management and finance skills."[284]

- "Add expertise in derivatives/hedging/trading."[285]

- "Another person with strong background on financial derivatives may also help."[286]

- "Need to reduce the size of the board and add more expertise in finance, technology and possibly entertainment/media."[287]

Enron's use of securitizations and derivatives was so significant that the Enron Board may have been a more effective check if it had considered some of the oversight guidance applicable to U.S. banks. Much has been written about the importance of effective board of director and senior management oversight of securitization and derivatives activities from the standpoint of U.S. banks, because banks have been among the most active participants in these markets. U.S. bank regulatory agencies have issued

---

[283] 2/12/01 Nominating Committee Materials, at AB000467839 (part of 2001 Board Assessment) [AB000467834-AB000467851].

[284] *Id.*

[285] *Id.*

[286] *Id.*

[287] *Id.*

detailed guidance on effective risk management of securitization and derivatives activities and continued to refine this guidance over the years. This guidance requires the board to have a general understanding of the risks that these complex activities create for their institutions and, where necessary, to obtain access to auditors and experts external to the organization, including independent legal advice.[288]

*Conclusions*

For several reasons, the Enron Board did not function as an effective check and balance. This failure may have resulted from (i) a carefully orchestrated strategy of Enron's senior officers, (ii) the failure of Lay and Skilling, in their capacities as executive officers, to assist the Outside Directors, (iii) inadequate assistance from Enron's professionals,[289] (iv) inattention by the Enron Board to its oversight function or (v) insufficient understanding of how the SPE transactions were being used by Enron's officers.

---

[288] *See* Board of Governors of the Federal Reserve System, Evaluating the Risk Management and Internal Controls of Securities and Derivative Contracts Used in Nontrading Activities, SR 95-17 (Mar. 28, 1995); Board of Governors of the Federal Reserve System, Rating the Adequacy of Risk Management Processes and Internal Controls at State Member Banks and Bank Holding Companies, SR 95-51 (Nov. 14, 1995).

[289] For example, Mintz, General Counsel of Enron's Global Finance Group, testified regarding the decision of Enron officers, including him, not to tell the Audit Committee of the Board in February 2001 about transactions in which Enron had repurchased assets from LJM2. When Mintz was asked why the officers did not disclose those transactions, he said: "I felt that there was a substantial opportunity for the board to ask questions, perhaps as we as lawyers are trained, Is there anything else that we should be aware of, and I don't recall them doing that . . . ." Deposition of Jordan Mintz, former Vice President and General Counsel, Enron Global Finance, by Rebecca M. Lamberth, A&B, Sept. 29, 2003, at 130. However, Outside Director Herbert Winokur testified, when asked if he had been interested in learning the identity of the person who purchased Fastow's interest in LJM1 and LJM2: "[I]t's management's responsibility to tell me what I should know . . . . I didn't inquire because I assumed somebody would tell me if I needed to know." Winokur 11/21/02 Sworn Statement, at 240.

## X.   FINAL REPORT

This Report is the Examiner's final report under the terms of the April 8th Order. Absent further order of the Court, the Examiner has completed his investigation.

The Examiner acknowledges the assistance provided by certain of Enron's officers and employees throughout the course of the investigation. They have provided the Examiner with a substantial amount of documents and information and have been helpful in arranging for interviews of numerous witnesses. The Examiner appreciates their efforts in support of the examination.

Dated:  November 4, 2003

                                    Respectfully submitted,


                                    /s/ Neal Batson
                                    Neal Batson
                                    Examiner


ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, Georgia 30309
404 881-7000

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------ x
                                 :

**In re:**                           :        **Chapter 11**
                                   :

**ENRON CORP.,** *et al.,*          :        **Case No. 01-16034 (AJG)**
                                   :

              **Debtors.**      :        **Jointly Administered**
                                   :
------------------------------------------------------ x

# APPENDIX A

## (Certain Defined Terms)

### to

## FINAL REPORT OF NEAL BATSON,
## COURT-APPOINTED EXAMINER

      Reference is made to the preceding Final Report of Neal Batson, Court-Appointed Examiner (the "Report" or the "Final Report"). This Appendix constitutes an integral part of the Final Report.

## CERTAIN DEFINED TERMS

Certain terms utilized in this Final Report are defined as follows:

"*3% Equity Test,*" as further described in the Accounting Standards Appendix, means the primary test utilized under the SPE Accounting Consolidation Analysis to determine whether independent equity interests owned in an SPE are sufficient to indicate that the SPE should not be consolidated with its sponsor or other person benefiting from the SPE.

"*A&B*" means Alston & Bird LLP, attorneys to the Examiner.

"*AICPA*" means American Institute of Certified Public Accountants.

"*APB*" refers to Opinion of the Accounting Principles Board.

"*ARB*" refers to Accounting Research Bulletin.

"*ASR*" means SEC Accounting Series Release.

"*Accounting Standards Appendix*" refers to Appendix B to the Second Interim Report.

"*Andersen*" means Arthur Andersen LLP, Enron's former accounting firm, and its affiliates.

"*Andrews & Kurth*" means Andrews & Kurth L.L.P.

"*April 8th Order*" refers to the Order of the Court, dated April 8, 2002, authorizing and directing the appointment of an examiner pursuant to 11 U.S.C. § 1104(c).

"*Audit Committee*" refers to the Audit and Compliance Committee of the Enron Board responsible for reviewing Enron's accounting and compliance programs, and liaising with Andersen in connection with the audits of Enron's financial statements.

"*BT/Deutsche*" means Deutsche Bank AG and its affiliates and predecessors.

"*BT/Deutsche Tax Transactions*" means the transactions referred to as Cochise, Teresa, Steele and Tomas in Appendix G (Role of BT/Deutsche and its Affiliates) to the Third Interim Report.

"*Back Levering*" or "*Back Leveraging*" means the practice of borrowing against or otherwise financing the purchase of an equity investment in an SPE.

"*Bank Presentation*" refers to the presentation made by senior Enron executives to certain of Enron's bankers on November 19, 2001, at a meeting held at the Waldorf Astoria in New York, New York.

"*Bankruptcy Case*" refers collectively to the Debtors' Chapter 11 cases currently pending before the Court.

"*Bankruptcy Code*" means Title 11 of the United States Code.

"*Barclays*" means Barclays Bank PLC and its affiliates and predecessors.

"*Basic Accounting Consolidation Analysis,*" as further described in the Accounting Standards Appendix, means the analysis employed to determine whether a person that owns a controlling financial interest in an entity should consolidate that entity's financial statements with its own.

"*CIBC*" means Canadian Imperial Bank of Commerce and its affiliates and predecessors.

"*CIBC World Markets*" means CIBC World Markets Corp. and its affiliates and predecessors.

"*COPS*" means company obligated preferred stock.

"*CSFB*" means Credit Suisse First Boston Inc. and its affiliates and predecessors.

"*CalPERS*" means California Public Employees' Retirement System, a unit of the State and Consumer Services Agency of the State of California.

"*Causey*" means Richard A. Causey, Enron's former Chief Accounting Officer.

"*cash flow[s] from operating activities*," "*Net Cash Provided by Operating Activities*," "*cash flow[s] from operations*," "*operating cash flow[s]*" and similar terms and phrases all refer to "Net Cash Provided by Operating Activities" as shown in Enron's audited Consolidated Statement of Cash Flows and the equivalent concept on interim unaudited financial statements. This concept differs from "Funds Flow from Operations," defined below.

"*Chase Securities*" means Chase Securities Inc. and its affiliates and predecessors.

"*Chewco*" means Chewco Investments, L.P., a limited partnership owned and managed by Kopper.

"*Citibank*" means Citibank, N.A. and its affiliates and predecessors.

"*Citigroup*" means Citigroup, Inc. and its affiliates and predecessors.

"*Court*" means the United States Bankruptcy Court for the Southern District of New York.

"*Creditors' Committee*" means the Official Committee of Unsecured Creditors appointed in the Bankruptcy Case.

"*D&T*" means Deloitte & Touche LLP, accountants engaged to advise the Powers Committee.

"*DLJ*" means Donaldson, Lufkin & Jenrette, Inc. and its affiliates and predecessors.

"*Debtors*" refers to Enron and all of its affiliates that have filed voluntary petitions for relief under the Bankruptcy Code with the Court.

"*Derrick*" means James Derrick, Enron's former General Counsel.

"*Dodson*" means William D. Dodson, an investor in certain Related Party Transactions.

"*Duff & Phelps*" means Duff & Phelps Credit Rating Co.

"*E&Y*" means Ernst & Young LLP, accountants engaged to advise the Creditors' Committee.

"*EITF*" refers to Consensus Positions of the Emerging Issues Task Force.

"*ENA*" means Enron North America Corp. (f/k/a Enron Capital & Trade Resources Corp.).

"*ENA Examiner*" means Harrison J. Goldin, appointed as the examiner of ENA in its bankruptcy case by Order of the Court dated March 12, 2002.

"*Enron*" means Enron Corp.

"*Enron Board*," "*Enron Board of Directors*" or "*Board*" refers to the Board of Directors of Enron.

"*Examiner*" means Neal Batson, appointed by the United States Trustee on May 22, 2002 as the examiner contemplated by the April 8th Order and approved by the Court by Order dated May 24, 2002.

"*FAC*" means FASB Statement of Financial Accounting Concept.

"*FAS*" refers to FASB Statement of Financial Accounting Standard.

"*FAS 57 Related Party*," as further described in the Accounting Standards Appendix, means an individual or entity deemed to be related to another person as

- 4 -

defined in FAS 57.  A FAS 57 Related Party is subject to certain disclosure rules, its equity is not considered to be "independent" when applying the 3% Equity Test, and its participating rights may be deemed nonsubstantive under the Participating Rights Test.

"*FAS 140 Transactions*" means those sales of financial assets by Enron to an SPE, intended to comply with either Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities, Statement of Financial Accounting Standards No. 125 or its successor, Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities, Statement of Financial Accounting Standards No. 140.

"*FASB*" refers to Financial Accounting Standards Board.

"*FIN*" refers to FASB Interpretation.

"*FTB*" refers to FASB Technical Bulletin.

"*Fastow*" means Andrew S. Fastow, Enron's former Executive Vice President and Chief Financial Officer.

"*Final Report*" or "*Report*" refers to the Final Report of Neal Batson, Court-Appointed Examiner dated November 4, 2003.

"*Finance Committee*" refers to the Finance Committee of the Enron Board responsible for approving major transactions, overseeing Enron's risk management efforts and providing guidance on Enron's financial decisions and policies.

"*First Interim Report*" means the First Interim Report of Neal Batson, Court-Appointed Examiner dated September 21, 2002.

"*Fitch*" means FitchRatings, Inc. and its affiliates and predecessors, including Duff & Phelps.

"*Fleet*" means Fleet National Bank and its affiliates and predecessors.

"*Forest Products Transactions*" means four transactions completed by Enron relating to its forest products business, including: (i) transactions referred to as Fishtail and Bacchus, each of which closed in December 2000; (ii) a transaction referred to as Sundance Industrial (or simply "Sundance"), which closed on June 1, 2001; and (iii) a transaction referred to as Slapshot, which closed on June 22, 2001.

"*Funds Flow from Operations*" or "*funds flow*" means a component of three of Enron's key credit ratios (funds flow interest coverage, pre-tax interest coverage, and funds flow from operations to total obligations) and equals Net Cash Provided by Operating Activities, plus increases in working capital, or less decreases in working capital.

"*GAAP*" means generally accepted accounting principles in the United States and as described in SAS 61.

"*Glisan*" means Ben F. Glisan Jr., a former Enron employee.

"*ISDA*" means International Swap and Derivatives Association.

"*JEDI*" means Joint Energy Development Investments Limited Partnership, an investment partnership originally owned by Enron and CalPERS and, following the redemption of CalPERS' interest, by Enron and Chewco.

"*JEDI II*" means Joint Energy Development Investments II Limited Partnership, an investment partnership between CalPERS and Enron.

"*JPMorgan Chase*" means JPMorgan Chase Bank (formerly Chase Manhattan Bank) and its affiliates and predecessors.

"*K&E*" means Kirkland & Ellis LLP.

"*Kopper*" means Michael J. Kopper, a former Enron employee.

"*LJM1*" means LJM Cayman, L.P., a private investment limited partnership.

"*LJM1/Rhythms Hedging Transaction*" or "*Rhythms Hedge*" means that non-economic hedge executed in June 1999 between Enron and Swap Sub, designed to protect the mark-to-market income Enron had recorded on account of its equity stake in Rhythms.

"*LJM2*" means LJM2 Co-Investment, L.P., a private investment limited partnership.

"*LJM2/Raptors Hedging Transactions*" or "*Raptors Hedges*" means those four non-economic hedges of certain of Enron's merchant investments executed in 2000 between Enron and the Raptor SPEs.

"*Lay*" means Kenneth L. Lay, Enron's former director, Chairman of the Board of Directors and Chief Executive Officer.

"*Lehman*" means Lehman Brothers Holdings Inc. and its affiliates and predecessors.

"*MD&A*" means the section entitled Management's Discussion and Analysis of Financial Condition and Results of Operations, which appeared in Enron's Forms 10-K and 10-Q filed with the SEC.

"*MTM*" means mark-to-market accounting.

"*McMahon*" means Jeffrey J. McMahon, a former Enron employee.

"*Merrill Lynch*" means Merrill Lynch, Pierce, Fenner & Smith Incorporated and its affiliates and predecessors.

"*mezzanine*" refers to the part of the balance sheet appearing after liabilities and before shareholders' equity and would include such interests as minority interest and COPS.

"*Milbank*" means Milbank, Tweed, Hadley & McCloy LLP, co-counsel to the Creditors' Committee.

"*Minority Interest Transactions*" means a financing undertaken by Enron in which the amount financed was reflected on Enron's balance sheet as a minority interest in a consolidated subsidiary, rather than as debt.

"*Mintz*" means Jordan Mintz, former General Counsel to Enron Global Finance.

"*monetize*" refers to the manner in which Enron was able to generate cash immediately from an asset through the use of a structured finance transaction involving an SPE.

"*Moody's*" means Moody's Investors Service, Inc.

"*Newby Class Action*" means *Newby v. Enron Corp.*, No. 01-CV-3624 (S.D. Tex. filed Oct. 22, 2001), a lawsuit alleging, among other things, violations of securities laws.

"*New Power Company*" means The New Power Company, a wholly owned subsidiary of NewPower Holdings, and currently a Chapter 11 debtor in the United States Bankruptcy Court for the Northern District of Georgia, Newnan Division.

"*NewPower Holdings*" means NewPower Holdings, Inc., formerly known as TNPC, Inc., and currently a Chapter 11 debtor in the United States Bankruptcy Court for the Northern District of Georgia, Newnan Division.

"*Outside Directors*" means all of the members of Enron's Board who served during the period 1997 to the Petition Date other than Lay and Skilling.

- 8 -

*"PSI"* refers to the Permanent Subcommittee on Investigations of the Committee on Governmental Affairs, United States Senate.

*"PSI Forest Products Report"* means PSI Report on Fishtail, Bacchus, Sundance and Slapshot: Four Enron Transactions Funded and Facilitated by U.S. Financial Institutions, Jan. 2, 2003.

*"PSI Prepay Report"* means The Role of Financial Institutions in Enron's Collapse (Day One): Hearings before the Permanent Subcomm. on Investigations of the Senate Comm. of Governmental Affairs, 107th Cong. (July 23, 2002).

*"PWC"* means PricewaterhouseCoopers LLP.

*"Participating Rights Test,"* as further described in the Accounting Standards Appendix, means an examination of the governance rights held, typically, by a minority owner of an entity to be considered in determining whether accounting consolidation of the entity is appropriate under the Basic Accounting Consolidation Analysis.

*"Petition Date"* means December 2, 2001, the date of the initial bankruptcy filings.

*"Plante & Moran"* means Plante & Moran, PLLC, an accounting firm engaged to advise the Examiner.

*"Powers Committee"* refers to the Special Investigative Committee formed by the Enron Board and headed by William Powers, Jr., Dean of the University of Texas Law School, to examine and recommend actions with respect to transactions between Enron and entities connected with related parties.

*"Powers Report"* refers to that certain Report of Investigation by the Powers Committee, released February 1, 2002.

- 9 -

"*Prepay Transactions*" means those structured commodity transactions engaged in by Enron under which it would (i) deliver (or pay the financial equivalent of) a commodity in the future in exchange for a single prepayment from a conduit entity or other counterparty, (ii) repay the prepayment over time, with a fixed amount of interest, through a prepaid forward contract or swap, and (iii) receive the precise amounts of commodities (or the financial equivalent) it had contracted to deliver, such that effectively all commodity price risk was eliminated and the lump sum prepayment was repaid with interest.

"*Prior Reports*" means, collectively, the First Interim Report, the Second Interim Report and the Third Interim Report.

"*RBS*" means The Royal Bank of Scotland plc and its affiliates and predecessors.

"*Raptor SPEs*" as described in Appendix L (Related Party Transactions) to the Second Interim Report means the SPEs used by Enron in an attempt to hedge certain investments.

"*Rating Agencies*" means rating agencies that from time to time provided credit ratings on Enron's unsecured credit, including Moody's, S&P, Fitch and Duff & Phelps.

"*Related Party Transactions*" means those transactions between Enron and certain entities such as Chewco, LJM1 and LJM2, which were controlled by Fastow, Kopper, Glisan or other Enron employees or their associates.

"*Reports*" means, collectively, the First Interim Report, the Second Interim Report, the Third Interim Report and the Final Report.

"*Rhythms*" means Rhythms NetConnections, Inc.

"*S&P*" means Standard & Poor's Credit Information Services.

"*SAB*" refers to SEC Staff Accounting Bulletin.

"*SAS*" means AICPA Statement of Auditing Standard.

"*SEC*" refers to the United States Securities and Exchange Commission.

"*SOP*" refers to Statement of Position of the AICPA.

"*SPE*" has the meaning given in the April 8th Order. When used in connection with the application of the SPE Accounting Consolidation Analysis, the term SPE usually refers to an entity or commercial arrangement with a limited duration and a limited purpose, usually designed to benefit a single person, although SPE is not defined under GAAP.

"*SPE Accounting Consolidation Analysis,*" as further described in the Accounting Standards Appendix, means the analysis employed to determine whether an SPE should be consolidated with a person that the SPE is designed to benefit.

"*Salomon*" means Salomon Smith Barney Inc. and its affiliates and predecessors.

"*Salomon Holding*" means Salomon Brothers Holding Company and its affiliates and predecessors.

"*Second Interim Report*" means the Second Interim Report of Neal Batson, Court-Appointed Examiner dated January 21, 2003.

"*Share Trust Transactions*" means transactions in which an Enron-controlled entity would raise funds via off-balance sheet financing, and use the proceeds to acquire or refinance assets owned by Enron or its affiliates, with the repayment of the financing supported by Enron preferred stock, Enron notes and related contractual obligations of Enron.

"*Skadden, Arps*" means Skadden, Arps, Slate, Meagher & Flom LLP, special counsel to the Debtors in the Bankruptcy Case.

"*Skilling*" means Jeffrey K. Skilling, Enron's former director, President and Chief Operating Officer.

"*Squire, Sanders*" means Squire, Sanders & Dempsey L.L.P., co-counsel to the Creditors' Committee.

"*Sufficient Equity Requirement,*" as further described in the Accounting Standards Appendix, means a test utilized under the Participating Rights Test in the Basic Accounting Consolidation Analysis to determine whether a holder of participating rights has sufficient equity to demonstrate that those participating rights are substantive.

"*Swap Sub*" means LJM Swap Sub, L.P., a limited liability partnership owned by LJM1, which was used in connection with the Rhythms hedging transactions.

"*Tax Transactions*" means the transactions referred to as Steele, Cochise, Teresa, Condor, Tammy I, Renegade, Valhalla, Tomas, Apache, Tanya and Valor in Appendix J (Tax Transactions) to the Second Interim Report.

"*Third Interim Report*" means the Third Interim Report of Neal Batson, Court-Appointed Examiner dated June 30, 2003.

"*Topic*" refers to Industry Practices Widely Recognized and Prevalent as determined by the EITF.

"*Toronto Dominion*" means Toronto Dominion Bank and its affiliates and predecessors.

"*Total Return Swap*" typically refers to a swap transaction, documented by standard agreements published by ISDA, where one party agrees to pay the other the

"total return" (e.g., dividends, interest and any appreciation in value) of a defined underlying asset (which may be an equity interest, a debt obligation or another asset), usually in return for a fixed payment stream, typically tied to an interest rate index. In the case of certain of Enron's SPE transactions, notably the FAS 140 Transactions, the term refers to a swap transaction pursuant to which Enron was entitled to receive the total return of an asset transferred by Enron to an SPE (whether by sale of the asset or otherwise) and agreed to make payments to its counterparty (usually the SPE holding the reference asset or the lenders to the SPE) equal to the scheduled principal and interest payments on the amounts borrowed by the SPE under a credit facility to acquire the asset. In these instances, the Total Return Swap was the functional equivalent of a guaranty of the loan to the SPE.

*"underwriter"* refers to a financial institution that arranges for the sale or distribution of an issuer's securities (equity and debt) to third parties. It includes private placements but does not include syndications of commercial loans.

*"Vinson & Elkins"* means Vinson & Elkins, L.L.P.

*"Watkins"* means Sherron S. Watkins, a former Enron employee.

*"Watkins Investigation"* means the investigation performed by Vinson & Elkins at the direction of Derrick into certain issues raised in correspondence from Watkins to Lay in August 2001 relating to Enron's SPEs.

*"Weil"* means Weil, Gotshal & Manges LLP, the Debtors' restructuring lawyers.

*"West LB"* means Westdeutsche Landesbank Girozentrale, London Branch and its affiliates and predecessors.

"*Wilmer Cutler*" means Wilmer, Cutler & Pickering, counsel to the Powers Committee.

In addition to the terms set forth above, to the extent a term is defined in any Appendix to this Final Report, such defined term shall apply for all Annexes to that Appendix.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------- x
                                                  :
In re:                                            :        Chapter 11
                                                  :
ENRON CORP., et al.,                              :        Case No. 01-16034 (AJG)
                                                  :
                        Debtors.                  :        Jointly Administered
                                                  :
------------------------------------------------- x
```

## APPENDIX B

### (Role of Andersen)

### to

## FINAL REPORT OF NEAL BATSON,
## COURT-APPOINTED EXAMINER

Reference is made to the preceding Final Report of Neal Batson, Court-Appointed Examiner (the "Report"). This Appendix constitutes an integral part of the Report. All capitalized terms not otherwise defined herein shall have the meanings set forth in the Report.

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................. 1
      A.    Overview ................................................................ 1
      B.    Andersen's Potential Liability ................................ 5

II.   HISTORY OF THE ANDERSEN/ENRON RELATIONSHIP ............ 9
      A.    Andersen's Services to Enron .............................. 9
      B.    Fees ..................................................................... 28
      C.    Andersen's Independence ..................................... 31

III.  ENRON'S BANKRUPTCY AND THE DEMISE OF ANDERSEN ................. 39
      A.    The Final Months of the Enron/Andersen Relationship ......... 39
      B.    Andersen's Conviction and Current Status ............... 59

IV.   ANDERSEN'S ROLE IN ENRON'S SPE TRANSACTIONS ........... 62
      A.    Three Errors Acknowledged by Andersen ................ 62
      B.    Evidence of Enron's Deception of Andersen ............. 63
      C.    Andersen's Role in the Prepay Transactions ........... 68
      D.    Andersen's Role in the FAS 140 Transactions ......... 85
      E.    Andersen's Role in the Non-Economic Hedges ......... 94
      F.    Andersen's Role in the Tax Transactions ............... 105
      G.    Andersen's Role in the Nahanni Transaction ......... 126
      H.    Conclusions on Andersen's Role in Enron's SPE Transactions ........ 130
      I.    Andersen's Interaction with Enron's Audit Committee ......... 131

V.    POTENTIAL LIABILITY OF ANDERSEN ........................... 156
      A.    Arguments Supporting the Imposition of Professional Malpractice
            and Aiding and Abetting Liability .............................. 156
      B.    Arguments Against the Imposition of Professional Malpractice and
            Aiding and Abetting Liability .................................. 164
      C.    Conclusion ............................................................ 167


Annex 1 – Summary of Raptor Memoranda
Annex 2 – Legal Standards Applicable to Andersen

## I.    INTRODUCTION

### A.    <u>Overview</u>

Arthur Andersen LLP ("Andersen") audited Enron's annual financial statements and opined that they fairly presented, in all material respects, Enron's financial position, results of operations and cash flows in accordance with GAAP.[1]  In the fall of 2001, Andersen discovered certain material errors in Enron's financial statements.   Within months of that discovery, Enron filed its bankruptcy petition.

The discovery by Andersen in the fall of 2001 of material errors in Enron's accounting contributed to the velocity of Enron's demise in the last months of 2001. Despite the dramatic conclusion to the relationship between Enron and Andersen, however, the events of these final months are but a small part of the story of how Enron's management involved Andersen in the most complex public company accounting fraud in history.

Putting aside the mistakes Andersen acknowledges having made, the evidence suggests that Enron officers withheld information from Andersen in numerous instances in which, had Andersen known of the actual facts, Andersen would not have approved Enron's misleading accounting and disclosure for the particular transactions involved. The story of Andersen's role in the rise and fall of Enron, however, cannot be explained simply by the fact that in some cases Enron's officers withheld material information from

---

[1] *See* Enron Annual Report 2000 (the "Enron 2000 Annual Report"), at 30.  Andersen also issued separate letters opining that the assertion by Enron management that Enron's system of internal control was adequate to provide reasonable assurance as to the reliability of its financial statements and the protection of its assets was fairly stated in all material respects.  Enron was formed in 1985 upon the merger of Houston Natural Gas and InterNorth Pipeline ("InterNorth"), and Andersen became the auditor for the resulting company.  Prior to the merger, Andersen was the auditor for InterNorth. *See* InterNorth, Inc., Schedule 14A filed with the SEC on Feb. 27, 1984, at 32 (in connection with annual meeting of stockholders held on April 10, 1984) [ELIB00004764-00001-ELIB00004764-00070].

Andersen or that Andersen made the several mistakes that it has acknowledged. Transcending these circumstances, the evidence suggests a concerted effort over a period of years by Andersen to assist one of its largest clients in taking advantage of rules-based GAAP accounting in order to present financial information to the public that made it appear that Enron's income, cash flow and financial position were materially more robust than was the case.

As discussed in more detail below, the evidence reviewed by the Examiner is sufficient for a fact-finder to conclude that Andersen breached its duty of care and was negligent as to certain portions of work it performed for Enron. In public statements and testimony, Andersen has acknowledged that it made material errors. The Examiner has reviewed evidence that suggests additional acts of negligence beyond those previously acknowledged. This includes evidence indicating Andersen's failure to discharge its duties in communicating with Enron's Audit Committee, as well as evidence indicating a failure to perform appropriate audit procedures to learn of facts that were critical to Andersen's understanding of the SPE transactions.

Beyond instances of negligence, the Examiner has also determined that a fact-finder could conclude that, in connection with certain transactions, Andersen aided and abetted Enron officers in breaches of fiduciary duty. The evidence suggests that, on multiple occasions, Andersen accountants had actual knowledge of the wrongful conduct giving rise to breaches of fiduciary duty by Enron officers with respect to those transactions, and gave substantial assistance to those officers by: (i) approving accounting that made Enron's financial statements materially misleading; and (ii) not communicating to the Audit Committee in accordance with applicable standards.

In this Appendix, the Examiner reviews the evidence relevant to the foregoing conclusions, including evidence related to:

- the types of audit and other services Andersen rendered to Enron;

- the deployment of Andersen personnel, including: (i) its engagement team in Houston and other locations (the "Engagement Team"); (ii) its GAAP accounting experts within its Professional Standards Group (the "PSG") at its headquarters in Chicago; and (iii) its "on-call" group of experts in New York;

- the fees Andersen received for its services;

- factors relevant to Andersen's independence in certifying Enron's financial statements;

- Andersen's role in designing and approving accounting techniques that Enron used to manipulate its financial statements, including specific errors that Andersen has acknowledged; and

- Andersen's interaction with Enron's Audit Committee.

As discussed in this Appendix, evidence would permit a fact-finder to conclude that Andersen was negligent as to, and aided and abetted breaches of fiduciary duties in connection with, a variety of Enron's accounting techniques. In particular, the evidence reviewed by the Examiner is sufficient to permit a fact-finder to conclude that:

- Andersen assisted Enron's abuse of rules-based GAAP by helping Enron design accounting techniques or "models"[2] that Enron could use in order to report income, cash flow and financial position more favorable than if the financial statements and related disclosures faithfully represented the economic substance of the transactions.[3]

_____

[2] These "models" include each of the six accounting techniques described in the Examiner's Second Interim Report. *See generally* Second Interim Report; *see also* discussion below in the *Andersen's "Continuous" Audit of Enron and Accounting Consultation* Section of this Appendix.

[3] Qualitative Characteristics of Accounting Information, Statement of Financial Accounting Concepts No. 2 (Financial Accounting Standards Bd. 1980) ("FAC 2"), ¶¶ 47-97. In responding to one of his colleagues who suggested that a particular accounting result might violate Financial Accounting Concepts requiring faithful representation of the underlying transaction, John Stewart of the Andersen Professional Standards Group (the "PSG") stated, "The conceptual framework has little to do with how we in practice respond to day to day questions. . . . As you know, the FASB's conceptual framework was developed

- Andersen failed to exercise due care in auditing whether the intermediaries used by Enron in its Prepay Transactions were SPEs,[4] and whether the 3% equity investments in the SPEs utilized by Enron in its FAS 140 Transactions were at risk.[5]

- Andersen failed to discharge its duty under applicable auditing standards to "determine that the audit committee is informed about the methods used to account for significant unusual transactions and the effect of significant accounting policies in controversial or emerging areas for which there is a lack of authoritative guidance or consensus."[6]

With Andersen's certification of Enron's annual financial statements, Enron portrayed itself as a thriving, fast-growing, diversified global energy and communications conglomerate and thus attracted billions of dollars in debt and equity financing. As indicated in the Prior Reports, Enron's financial statements and related disclosures were materially misleading. For example, virtually all of Enron's $979 million of net income and $3 billion of funds flow from operations for the year 2000, and approximately

---

primarily to help the FASB itself as it developed new standards not so much to aid practice on a day to day basis." Email from John E. Stewart, Andersen, to Kieva M. Skinner, Andersen, and copy to H. Ronald Weissman, *et al.*, Andersen, regarding ANZ Transaction, Aug. 9, 1999, at 1 [AB0633 2448-AB0633 2456]. As discussed in the Examiner's Second Interim Report, Financial Accounting Concepts are not contained within the GAAP hierarchy. *See* Second Interim Report, Appendix B (Accounting Standards); *see also* Objectives of Financial Reporting by Business Enterprises, Statement of Financial Accounting Concepts No. 1 (Financial Accounting Standards Bd. 1978), ¶ 3.

[4] As discussed below in the *Accepting Questionable Audit Evidence* Section of this Appendix.

[5] As discussed below in the *Evidence of Enron's Deception of Andersen* Section of this Appendix.

[6] Communication with Audit Committees, Statement on Auditing Standards No. 61 (American Institute of Certified Public Accountants 1988) ("SAS 61"), at § 7. Similarly, the evidence suggests that Andersen failed to discharge its duty under applicable auditing standards to have an "open and frank" discussion with Enron's Audit Committee concerning the "quality, not just the acceptability, of [Enron's] accounting principles as applied in its financial reporting" and by failing to discuss "items that have a significant impact on the representational faithfulness . . . of the accounting information included in the financial statements, which include related disclosures." Audit Committee Communications, Statement on Auditing Standards No. 90 (American Institute of Certified Public Accountants 1989) ("SAS 90"), at § 1 (amending SAS 61) (effective for audits of financial statements for periods ending on or after December 15, 2000); *see also* discussion below in the *Andersen's Interaction with Enron's Audit Committee* Section of this Appendix. Statements on Auditing Standards, normally cited as "SAS (statement number)," were also codified, as issued, into the Codification of Statements on Auditing Standards by the American Institute of Certified Public Accountants (cited as "AU (section number)"). Such codifications for the SAS 61 and SAS 90 quotes above are AU § 380.07 and AU § 380.11, respectively. Where a SAS is cited, a short citation to the related AU codification is provided for ease of reference.

$8.6 billion of full recourse indebtedness not reflected on Enron's balance sheet as of December 31, 2000, were attributable to six accounting techniques used by Enron.[7]

In light of this evidence and applicable legal standards, the Examiner concludes that a fact-finder could determine that Andersen is liable to the Debtors for professional negligence and for aiding and abetting breaches of fiduciary duties by Enron's officers. Andersen would be able to raise factual and legal defenses to such claims, however, including defenses based on statutory proportionate responsibility and the doctrine of *in pari delicto*, both of which would be related to deception or other misconduct by Enron officers in certain transactions.

The Examiner has reviewed a substantial amount of evidence, including documentary and testimonial evidence, and has noted reasonable inferences that could be drawn from the evidence. A fact-finder may draw alternative or contrary inferences from the same evidence. Moreover, as described above, there are certain defenses to negligence and aiding and abetting available to Andersen, many of which arise from the evidence of Enron officers' deception of Andersen. Whether Andersen will succeed on one or more defenses will depend upon the fact-finder's resolution of the facts.

### B.   Andersen's Potential Liability

*Professional Malpractice*

As discussed in more detail below, the Examiner has determined that there is sufficient evidence, including the testimony of Andersen partners and related

---

[7] Second Interim Report, Appendix Q (Schedule Depicting Impact of Enron's Six Accounting Techniques). Enron's 2000 financial statements were not the only materially misleading financial statements. For example, all of Enron's 1999 cash flow from operations was attributable to just two transactions in which Enron used its accounting techniques – the Nahanni Minority Interest Transaction ($500 million of operating cash flow) and the Yosemite I Prepay Transaction ($800 million of operating cash flow). Third Interim Report, Appendix D (Role of Citigroup and its Affiliates), at 13, 14.

documentary evidence admitted in the Andersen criminal trial, for a fact-finder to conclude that Andersen was negligent in rendering its services to Enron.

*Aiding and Abetting Breaches of Fiduciary Duties*

The Examiner determined in the Third Interim Report that there is sufficient evidence for a fact-finder to conclude that certain of Enron's officers, including those responsible for Enron's accounting and disclosure, breached their fiduciary duties under applicable law by causing the Debtors to enter into certain SPE transactions that were designed to manipulate the Debtors' financial statements and that their breaches of duty resulted in the dissemination of financial information known to be materially misleading.

In this Appendix, the Examiner discusses evidence from which a fact-finder could conclude that:

(i)      Andersen had actual knowledge of the wrongful conduct giving rise to breaches of fiduciary duty by Enron's officers;

(ii)     Andersen gave substantial assistance to those officers by (a) designing and approving the accounting and disclosure of certain transactions that Andersen knew had no business purpose other than to manipulate the Debtors' financial statements, and (b) misleading the Enron Audit Committee about the manipulation; and

(iii)    injury to the Debtors was a direct or reasonably foreseeable result of this conduct.

Accordingly, the evidence discussed, and the reasonable inferences that may be drawn from that evidence, are sufficient for a fact-finder to conclude that Andersen aided and abetted Enron's officers in breaching their fiduciary duties.

- 6 -

*Defenses Available to Andersen*

While the evidence, and the reasonable inferences that may be drawn therefrom, are sufficient to create issues of fact concerning the liability of Andersen for negligence and for aiding and abetting breaches of fiduciary duties by Enron's officers, Andersen would be able to raise factual and legal defenses to such claims, including defenses based on statutory proportionate responsibility and the doctrine of *in pari delicto*.[8]    Many of those defenses would arise from facts suggesting that Enron officers deceived Andersen.

As discussed in Prior Reports, the Examiner has concluded that Enron's accounting for the SPE transactions violated GAAP in a number of respects.   With respect to some of these violations of GAAP, there is evidence that certain of Enron's officers and others acting at their direction concealed material facts from Andersen that would have precluded Enron's desired accounting treatment if Andersen had been made aware of those facts.   For example, as discussed later in this Appendix, Andersen accountants have indicated that they were unaware that Enron officers had entered into side agreements guaranteeing repayment of equity that was supposedly "at-risk" in Enron's FAS 140 Transactions.[9]   Andersen accountants also have indicated that, had they known this information, they would not have approved Enron's accounting for those

---

[8] *See* Annex 2 to this Appendix.

[9] In-Person Interview with Kimberly Scardino, Andersen, by H. Bryan Ives, III, A&B, May 29, 2003 (the "Scardino Interview"); Sworn Statement of Debra A. Cash, Andersen, to H. Bryan Ives, III, A&B, June 5, 2003 (the "Cash Sworn Statement"), at 139-42; Sworn Statement of Carl E. Bass, Andersen, to H. Bryan Ives, III, A&B, June 4, 2003 (the "Bass Sworn Statement"), at 31-32; In-Person Interview with Benjamin S. Neuhausen, Andersen, by H. Bryan Ives, III, A&B, June 13, 2003 (the "Neuhausen Interview"); In-Person Interview with John E. Stewart, Andersen, to H. Bryan Ives, III, A&B, June 12, 2003 (the "Stewart Interview"); Sworn Statement of Patricia Grutzmacher, Andersen, to H. Bryan Ives, III, A&B, June 11, 2003 (the "Grutzmacher Sworn Statement"), at 106-07.

transactions.[10]  Indeed, evidence suggests that Enron officers and employees understood

that Andersen accountants would not agree with the chosen accounting if they were

aware of the information, and thus the officers and employees deliberately kept the

information from Andersen.[11]  Andersen would likely claim that this deception and other

misconduct by Enron officers is a defense to claims of negligence and aiding and

abetting.  Andersen would need to show, however, that the misconduct by Enron's

officers should be imputed to Enron.  Moreover, even if the misconduct were imputed to

Enron, under statutory proportionate responsibility in Texas, Andersen could still be held

liable to Enron for some portion of the resulting damages.

---

[10] Scardino Interview; Stewart Interview; Bass Sworn Statement at 44-46.  Evidence also suggests that Andersen may not have been aware that the Raptor entities were prohibited from commencing hedging activities until an amount greater than its initial investment was distributed to LJM2.  *See* Memorandum from Dave Duncan, *et al.*, Andersen, to the Files, regarding Raptor Transaction, Mar. 28, 2000 ("Raptor Memo #3") (listed in Annex 1 to this Appendix) (containing no description of this prohibition) [AB0648 01051-AB0648 01058].  *See* Third Interim Report, Appendix C (Role of Enron's Officers), at 39-44 for other circumstances in which the evidence indicates that important information was withheld or concealed from Andersen.

[11] As discussed below in the *Evidence of Enron's Deception of Andersen* Section of this Appendix.

## II.    HISTORY OF THE ANDERSEN/ENRON RELATIONSHIP

### A.    Andersen's Services to Enron

*The Engagement Team and the PSG*

Andersen's audit of Enron was a massive undertaking.    In February 2001,

Andersen partner David Duncan reported to Andersen senior executives that the

Andersen professional personnel deployed on the Enron engagement consisted of:[12]

|  | Houston Core Team | London Core Team | Total |
|---|---|---|---|
| Partners | 9 | 4 | 13 |
| Managers | 31 | 11 | 42 |
| Staff accountants | <u>58</u> | — | <u>58</u> |
| Total | <u>98</u> | <u>15</u> | <u>113</u> |

In addition, Andersen offices in Portland; Chicago; New York; Sao Paulo, Brazil; Tokyo,

Japan; Buenos Aires, Argentina and India were involved in the Enron engagement.[13]

Andersen's fees from its Enron engagement were approximately $54 million for 2000,

broken down as follows:[14]

---

[12] Enron Client Retention Meeting Presentation (the "Retention Meeting Presentation"), at 21-22 [AA-EX00291216-AA-EX00291245].

[13] *United States v. Arthur Andersen, LLP*, Transcript of the Proceedings, No. H-02-121, May 6, 2002-June 5, 2002 (S.D. Tex. 2002) (the "Andersen Criminal Trial Transcript"), at 1665, 1690 (testimony of David Duncan, May 13, 2002).

[14] Retention Meeting Presentation, at 7.    Unlike Enron, Andersen's fiscal year ended on August 31. *See* Andersen Criminal Trial Transcript, at 1684 (testimony of David Duncan, May 14, 2002).    Accordingly, the amount of 2000 fees identified on the Retention Meeting Presentation differs from the amount of 2000 fees identified in the April 2001 Audit Committee presentation.    *See* First Quarter 2001 Audit Update Presentation, *Summary of Fees*, undated, at AB0246 01899 ("Recurring Baseline Audit" of $12,200,000 + "Expanded Audit Activities" of $12,900,000 + "Other Fees" of $22,800,000 = $47,900,000) (attached to Enron Audit Committee Meeting Minutes, Apr. 30, 2001) [AB0246 01899–AB0246 01900].

|  | **Fees (in millions)** |
|---|---|
| **U.S.** | |
| Audit | $10.3 million |
| "ABA [Audit and Business Advisory] Consult" | 14.1 |
| "Other Consult" | 8.3 |
| **International** | |
| London | 8.3 |
| Other | 13.0 |
|  | $54.0 million[15] |

Enron's business operations were managed on a semi-autonomous basis. Thus, for example, there was a CFO and principal accounting officer for Enron North America, Enron Broadband, Enron Energy Services, Enron International, Enron Europe and Portland General.[16] Andersen's Engagement Team was organized to mirror Enron's organizational structure, with separate teams of Andersen accountants, each headed by an Andersen partner, deployed to serve the various business units. The following organizational chart is typical of the deployment of staff during the engagement:[17]

---

[15] $12 million of these fees were related to "accounting consultation" or advice on how proposed transactions would be accounted for and advice on the development of Enron's various accounting "models" or techniques. As discussed below in the *Andersen's Continuous Audit of Enron and Accounting Consultation* Section of this Appendix.

[16] Third Interim Report, Appendix C (Role of Enron's Officers), at 10; *see also* In-Person Interview with Christopher Herbold, Andersen, by H. Bryan Ives, III, A&B, Oct. 10, 2003 (the "Herbold Interview") (stating that "Enron was decentralized by business units"). These business unit officers had dual reporting relationships -- they reported to the heads of their business unit and to Enron's headquarters operations. The headquarters operations included Andrew Fastow as CFO, Richard Causey as CAO, and Jeff McMahon, and later Ben Glisan, as Treasurer.

[17] Arthur Andersen LLP Organizational Chart, undated (the "Andersen Organizational Chart"), at ELIB00003616-00001 (relevant portion of chart shown with stray marks removed to improve legibility) [ELIB00003614-00001-ELIB00003616-00001].

# ENRON ENGAGEMENT
# (HOUSTON)



Duncan[18] was the "Global Managing Partner" for the Enron engagement and thus responsible for Andersen's worldwide services to Enron.[19]    Duncan was also the partner who headed the "corporate" engagement team.    The corporate engagement team was

---

[18]    In this Appendix, references to "Duncan" refer to David B. Duncan of Andersen, not John H. Duncan, who served on Enron's board of directors.

[19]    Andersen Criminal Trial Transcript, at 1665 (testimony of David Duncan, May 13, 2002).

responsible for Andersen's work in consolidating the various business units into Enron's quarterly and annual financial statements and reviewing Enron's filings with the SEC.[20] This group was responsible for coordinating with Enron's corporate reporting group led by Enron vice president Bob Butts, and reviewing and commenting on Enron's MD&A disclosures.[21]

Other Engagement Team partners included Thomas Bauer, who was in charge of the audit of Enron's wholesale services business segment; Debra Cash, who was in charge of the audit of Enron's Global Finance operations headed by Fastow, as well as Enron Energy Services; and Roger Willard, who was in charge of the audit of Enron Broadband Services.[22]

In addition to the Engagement Team partners noted above, a number of other Houston-based partners were involved in the Enron engagement, including:

| Partner | Title/Role |
|---------|-----------|
| Stephen Goddard | Advisory Partner on the Enron engagement; Managing Partner of the Houston office; Duncan's immediate predecessor as Global Managing Partner for the Enron engagement; attended most Enron Audit Committee meetings with Bauer and Duncan.[23] |
| Michael Odom | Practice Director for the Gulf Coast Market Circle.[24] |

---

[20] Herbold Interview.

[21] *Id.*

[22] Andersen Organizational Chart, at ELIB00003616-00001.

[23] In-Person Interview with Stephen Goddard, Andersen, by H. Bryan Ives, III, A&B, Sept. 10, 2003 (the "Goddard 9/10/03 Interview").

[24] In-Person Interview with Michael C. Odom, Andersen, by H. Bryan Ives, III, A&B, Sept. 15, 2003 (the "Odom Interview"). Andersen divided its U.S. offices into groups called "market circles." Its "Gulf Coast Market Circle" included the Houston office and several other offices. Andersen Criminal Trial Transcript, at 1681 (testimony of David Duncan, May 13, 2002). Andersen's audit practice was called its "Assurance and Business Advisory" group or "ABA." In-Person Interview with Roger D. Willard, Andersen, by H. Bryan Ives, III, A&B, Sept. 9, 2003 (the "Willard Interview"). The ABA portion of the Gulf Coast Market Circle included the Houston Office Energy Division, which handled the Enron audit. *See* Memorandum

| Michael Lowther | Partner in charge of the Energy Audit Division of Andersen's Houston office; Concurring Partner on the Enron engagement;[25] along with Odom, his advice was sought and concurrence required on many major accounting and auditing determinations made by the Engagement Team.[26] |
| William Swanson | Head of the Assurance and Business Advisory ("ABA") Audit Practice for the Gulf Coast Market Circle.[27] |
| Gary Goolsby | Practice Director for the Gulf Coast Market Circle prior to Odom and then Global Managing Partner, Risk Management.[28] |

Outside the Engagement Team, many of the material GAAP determinations made by Andersen in the Enron engagement were discussed with and approved by the PSG.

The Examiner has taken sworn statements from or interviewed many members of the Engagement Team, four members of the PSG, Goddard, Odom and Lowther. Duncan and Bauer exercised their Fifth Amendment privilege and did not provide sworn testimony or an interview to the Examiner.

To understand the roles of the Engagement Team and the PSG in Andersen's Enron engagement, it is helpful to understand the goal of an audit and the basic undertakings necessary to achieve that goal. "The objective of the ordinary audit of financial statements by the independent auditor is the expression of an opinion on the

---

from Richard Corgel, Andersen, to D. Stephen Goddard, *et al.*, Andersen, regarding 2000 Houston Office Energy Division ABA Practice – Assurance Review Report, July 21, 2000 (presented Aug. 22, 2000) [AACC000088580-AACC000088590].

[25] In-Person Interview with Michael Lowther, Andersen, by H. Bryan Ives, III, A&B, Sept. 10, 2003 (the "Lowther Interview").

[26] *Id.*; Andersen Criminal Trial Transcript, at 4496-99, 5532 (testimony of Richard Corgel, May 27, 2002, and John Stewart, May 31, 2002).

[27] Lowther Interview; *see also* Andersen Organizational Chart, at ELIB00003614-00001.

[28] Odom Interview; Lowther Interview.

- 13 -

fairness with which they present, in all material respects, financial position, results of

operations, and its cash flows in conformity with generally accepted accounting

principles."[29]    To meet this objective, "[t]he auditor has a responsibility to plan and

perform the audit to obtain reasonable assurance about whether the financial statements

are free of material misstatement, whether caused by error or fraud."[30]

> The auditor's opinion that financial statements present fairly an entity's
> financial position, results of operations, and cash flows in conformity with
> generally accepted accounting principles should be based on his or her
> judgment as to whether (a) the accounting principles selected and applied
> have general acceptance; (b) the accounting principles are appropriate in
> the circumstances; (c) the financial statements, including the related notes,
> are informative of matters that may affect their use, understanding, and
> interpretation . . . ; (d) the information presented in the financial
> statements is classified and summarized in a reasonable manner, that is,
> neither too detailed nor too condensed . . . ; and (e) the financial
> statements reflect the underlying transactions and events in a manner that
> presents the financial position, results of operations, and cash flows stated
> within a range of acceptable limits, that is, limits that are reasonable and
> practicable to attain in financial statements. [Noting in a footnote: The
> concept of materiality is inherent in the auditor's judgments  That concept
> involves qualitative as well as quantitative judgments.] [31]

The Engagement Team was responsible both for the audit and for assessing

Enron's compliance with GAAP.  The PSG was responsible for advising the Engagement

Team on GAAP compliance in those cases on which it was consulted by the Engagement

Team.[32]    The PSG did not consult directly with Enron personnel on specific issues,

---

[29] Codification of Auditing Standards and Procedures, Statement on Auditing Standards No. 1 (American Institute of Certified Public Accountants 1972) ("SAS 1"), at § 110.01 (AU § 110.01).

[30] SAS 1, at § 110.02 (AU § 110.02).

[31] The Meaning of *Present Fairly in Conformity With Generally Accepted Accounting Principles* in the Independent Auditor's Report, Statement on Auditing Standards No. 69 (American Institute of Certified Public Accountants 1992) ("SAS 69"), at § 4 (AU § 411.04).

[32] Under Andersen's policies, Andersen's Enron engagement team (the "Engagement Team") was expected to consult with the PSG on novel or complex GAAP issues.  Lowther Interview; Andersen Criminal Trial Transcript, at 4493 (testimony of Richard Corgel, May 27, 2002).

although on occasions PSG member John Stewart and other PSG accountants would meet with Enron's Chief Accounting Officer, Rick Causey, and other Enron accounting executives to discuss general GAAP matters.[33] When the PSG rendered advice on GAAP matters, the Engagement Team was, for all practical purposes, required to follow it.[34]

*Andersen's "Integrated" Audit of Enron*

The professional standards under which accountants perform the auditing component of their work are called Generally Accepted Auditing Standards ("GAAS"). At all relevant times, GAAS was promulgated by the accounting industry's trade association, the American Institute of Certified Public Accountants ("AICPA"). GAAS provides substantial latitude to the accountant in the procedures used to obtain reasonable assurance that the financial statements are free from material misstatements. One essential element of the audit component, however, is obtaining evidence on a test basis that the underlying transactions are properly reflected in the financial statements.

In determining the amount and nature of evidence and the number and type of transactions to be tested, the accountant must assess the entity's system of "internal

---

[33] *See, e.g.*, Email from David B. Duncan, Andersen, to Thomas H. Bauer, *et al.*, Andersen, regarding Monthly conf. call w/Enron, July 1, 1999 [PSI00006361].

[34] As a technical matter, an engagement team could deviate from the PSG's advice on the application of GAAP if the engagement team obtained the approval of its Practice Director. It was the policy of the Practice Directors, however, to require that the PSG's GAAP accounting advice be followed. Andersen Criminal Trial Transcript, at 4499 (testimony of Richard Corgel, May 27, 2002). There were several instances in which the PSG disagreed, after-the-fact, with GAAP conclusions reached and client advice rendered by the Engagement Team, or disagreed on matters that were part GAAP, part auditing. The most prominent example is the controversy surrounding the aggregation of the credit capacity of Raptor entities at the end of 2000 and the first and second quarters of 2001 (the "Aggregation Issue"). In addition, in the Blockbuster transaction (*see* Second Interim Report, at 29-32), Stewart thought the Engagement Team was going to require an outside appraisal to support the gain on sale recognized in that FAS 140 Transaction. Andersen Criminal Trial Transcript, at 5570 (testimony of John Stewart, May 30, 2002). When Enron would not obtain an outside appraisal, the Engagement Team, with the concurrence of Odom and Lowther, viewed that as an issue relevant to whether sufficient audit evidence was obtained, rather than a GAAP issue. Willard Interview; Odom Interview.

- 15 -

control."[35]   An entity's system of internal control, for this purpose, is comprised of the

entity's policies and procedures that:[36]

- pertain to maintenance of records in reasonable detail to accurately reflect the entity's transactions;

- provide reasonable assurance that transactions are recorded as necessary to permit preparation of GAAP financial statements and that receipts or expenditures are made only as authorized; and

- provide reasonable assurance to prevent or timely detect unauthorized acquisition, use or disposition of assets.

If the accountant determines that an entity's internal control has a "reportable

condition," the accountant must report this to the entity's audit committee.[37]   The

accountant can still give a "clean" opinion that the financial statements fairly present in

all material respects the financial position, results of operations and cash flow of the

entity, but the audit tests must be designed to meet the misstatement risk arising from

those areas in which there are weaknesses in internal control.[38]

---

[35] The accountant must also consider what items would be material in amount to the reported financial position, results of operations and cash flow. *See* Audit Risk and Materiality in Conducting an Audit, Statement on Auditing Standards No. 47 (American Institute of Certified Public Accountants 1983) (AU § 312).

[36] *See id.*

[37] Communication of Internal Control Related Matters Noted in an Audit, Statement on Auditing Standards No. 60 (American Institute of Certified Public Accountants 1989) ("SAS 60"), at § 2 (AU § 325.02). "Reportable conditions" are "matters coming to the auditor's attention that, in his judgment, should be communicated to the audit committee because they represent significant deficiencies in the design or operation of internal control, which could adversely affect the organization's ability to record, process, summarize, and report financial data consistent with the assertions of management in the financial statements." *Id.*  "A *material weakness* in internal control is a reportable condition in which the design or operation of one or more of the internal control components does not reduce to a relatively low level the risk that misstatements caused by fraud or error in amounts that would be material in relation to the financial statements being audited may occur and not be detected within a timely period by employees in the normal course of performing their assigned functions."  SAS 60, at § 15 (AU § 325.15) (emphasis added).   Reportable conditions must be reported to the board or audit committee, but the standards do not require the auditor to state whether the reportable condition constitutes a material weakness. *Id.*

[38] The Examiner has not undertaken to assess Enron's system of internal control.  The Examiner has seen no evidence that Andersen identified any "material weaknesses" in Enron's internal control for the years under investigation.  Andersen did identify "significant deficiencies" in the internal control of Enron

---

Designing and maintaining an effective system of internal control for large and complex operations is a major undertaking requiring substantial resources. Just as an entity's financial statements are primarily the responsibility of management, the adequacy of internal control is also primarily the responsibility of management.[39] To maintain an effective system of internal control, most large businesses have employees who perform an "internal audit" function – that is, they obtain evidence on a test basis to determine whether the entity's transactions are being reflected properly in its financial statements and whether its assets are being adequately protected. Even if the entity has a strong internal audit function, the outside accountant must still perform sufficient auditing work by obtaining evidence, on a test basis, that the transactions have been reflected properly in the books in order to obtain reasonable assurance that the financial statements contain no material misstatements.[40] There is, however, some overlap between the internal audit function and the procedures that must be performed by the outside accountant in order to certify to the public that the entity's financial statements fairly present its financial position, results of operation, and cash flow in accordance with GAAP.

---

Energy Services LLC ("EES") as part of its 1998 audit of that majority-owned subsidiary and reported those deficiencies to the EES board. Letter from Arthur Andersen LLP, by Debra A. Cash, to Management and the Board of Directors, Enron Energy Services, LLC, Apr. 26, 1999, at AA000021421-AA000021422 (letter includes attachment entitled "Memorandum on Internal Control Structure and Other Matters") [AA000021420-AA000021424]. The Examiner has found no evidence that the significant deficiencies in the EES internal control reported by Andersen resulted in Enron's materially misleading financial statements.

[39] Enron 2000 Annual Report, at 29. The financial statements and internal control are not ultimately the responsibility of the audit committee or the board, although the board is charged with the obligation of due care in overseeing management in designing and maintaining internal control and preparing financial statements. *See* Report, Appendix D (Roles of Lay, Skilling and Outside Directors).

[40] *See generally* The Auditor's Consideration of the Internal Audit Function in an Audit of Financial Statements, Statement on Auditing Standards No. 65 (American Institute of Certified Public Accountants 1991) (AU § 322).

To some extent, Andersen performed both of these functions for Enron – it assisted Enron by performing an internal audit function, and it evaluated Enron's internal controls in setting the scopes for the audit necessary for rendering an opinion on Enron's financial statements. Andersen called this approach an "integrated audit" or its "Business Audit methodology."[41] Even with the integrated audit approach, however, Enron's management was ultimately responsible for all decisions with respect to the design and maintenance of Enron's system of internal control.[42]

Because of its increased work on internal control as a part of its integrated audit approach, Andersen was able to render Enron a second opinion -- that management's assertion that Enron's system of internal control provided reasonable assurance that Enron's financial statements did not contain material misstatements and that its assets were protected was accurate in all material respects. This so-called internal control opinion goes beyond the evaluation of internal control implicit in the standard audit opinion. In essence, it is a representation that the outside accountant has found no material weaknesses in the entity's internal control.

Andersen believed that its integrated audit approach to the Enron engagement was innovative and on the leading edge of things to come. The Examiner has found no evidence that Andersen's integrated audit approach contributed directly to Enron's

---

[41] Memorandum from Thomas H. Bauer, Andersen, and Debra A. Cash, Andersen, regarding Implementation of the Business Audit of Enron North America and Enron Energy Services for the year ended Dec. 31, 1999, Sept. 23, 1999 (the "ENA Memo") [AA000025246-AA000025247].

[42] Enron 2000 Annual Report, at 30. An accountant is not "auditing its own work" when the accountant performs an integrated audit. At its most basic, the audit function involves determining on a test basis that an entity's transactions are accurately reflected in its books and records. Neither the internal auditor nor the outside accountant, who certifies the financial statements, records the results of transactions in the entity's books, nor are they responsible for maintaining the books and records. Thus, neither the internal auditor nor the outside accountant is "auditing its own work" when they determine on a test basis that the transactions have been properly recorded.

- 18 -

misleading financial statements.  In fact, to some extent, the integrated audit approach

used by Andersen in its audit of Enron has since been enacted into law by Congress[43] and

implemented through SEC regulations effective for most large public companies, which

will be required to obtain and publish in their annual reports internal control opinions of

their outside auditors beginning in 2004.[44]  Under those regulations, however, an external

auditor is restricted from performing a client's internal audit function.[45]

### Andersen's "Continuous" Audit of Enron and Accounting Consultation

Andersen's audit of Enron was also a "continuous audit" in that the audit began in

the first quarter of the year and progressed through the year.[46]  In essence, Andersen was

auditing Enron's transactions as they occurred on an almost real-time basis.  In an

organization dependent on numerous, large transactions (rather than on operations) to

achieve income and cash flow targets,[47] a "continuous" audit was a necessity.

Andersen took the notion of a continuous audit one step further in the case of

Enron by advising on the GAAP consequences of proposed or hypothetical transactions,

thereby helping Enron design and structure actual transactions prior to their closing in

order to ensure that Enron would achieve its desired income, cash flow and balance sheet

results.  Memoranda contained in Andersen's Enron audit work papers and documents

---

[43]  Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, § 404, 116 Stat. 745 (2002).

[44]  Management's Report on Internal Control Over Financial Reporting and Certification of Disclosure in Exchange Act Periodic Reports, Release No. 33-8238, 68 Fed. Reg. 36636 (June 18, 2003), *available at* http://www.sec.gov/rules/final/33-8238.htm.

[45]  Strengthening the Commission's Requirements Regarding Auditor Independence, Exchange Act Release No. 33-8183, 68 Fed. Reg. 6006 (Feb. 5, 2003), *available at* http://www.sec.gov/rules/final/33-8183.htm. Under the regulations, it remains permissible for an external auditor to perform an internal audit service for a client only if it is "reasonable to conclude that the results of these services will not be subject to audit procedures during an audit of the audit client's financial statements." *Id.*

[46]  *See, e.g.*, ENA Memo.

[47]  Retention Meeting Presentation, at 23.

produced from the desk files of various Andersen accountants show that Andersen helped

Enron design the template or model for the

- FAS 140 Transactions;[48]

- Prepay Transactions;[49]

- Non-Economic Hedges;[50]

- Minority Interest Transactions;[51]

- Share Trust Transactions;[52] and

- Tax Transactions.[53]

---

[48] *See, e.g.,* Memorandum from Tom Bauer, *et al.,* Andersen, regarding EOTT 140 Sale-Project Nikita, Oct. 1, 2001 (the "EOTT-Project Nikita Memo") [AB0911 1931-AB0911 1937]; Memorandum from Kimberly R. Scardino, Andersen, to the Files, regarding Project Generic - Sale of Enron's Sub's Financial Asset (a Hawaii 125-O transaction), Apr. 9, 2000 (the "Hawaii Memo") [AB0911 1938-AB0911 1943]; Memorandum from H Ronald Weissman, *et al.,* Andersen, to the Files, regarding Enron/Tax Efficient Lease Monetization, Sept. 9, 1998 (the "Tax Efficient Lease Memo") (draft) [AB0911 1920-AB0911 1930].

[49] *See* Memorandum from Patricia S. Grutzmacher, Andersen, to the Files, regarding Chase/Mohonia (sic) Prepay, June 30, 1999 (the "Chase/Mahonia Prepay Memo") [AB0648 00056-AB0648 00057]; Prepay Swap, undated  (the "Prepay Swap Diagram") (PowerPoint presentation containing diagram of the Mahonia transaction) [AB0786 02965-AB0786 02968]; Memorandum from Deb Cash and Patty Grutzmacher, Andersen, to the Files, regarding Yosemite Prepay, Dec. 1999 (the "Yosemite Prepay Memo") [AB0786 02953-AB0786 02955]; Email from Patricia S. Grutzmacher, Andersen, to Lisa A. Bomba, Andersen regarding Yosemite II, Mar. 16, 2001 (the "Yosemite II Email") [AB0786 02961-AB0786 02964]; Memorandum from Deb Cash, Andersen, and Kimberly Scardino, Andersen, to the Files, regarding Yosemite III- Transaction Summary, Aug. 2000 (the "Yosemite III Memo") [AB000565301-AB000565305]; Memorandum from Kimberly Scardino, Andersen, and Don Holley, Andersen, to the Files, regarding Yosemite IV- Transaction Summary, May 2001 (draft) (the "Yosemite IV Memo") [AB0786 02956-AB0786 02960].

[50] *See* Annex 1 to this Appendix (summarizing the Raptor memos).

[51] *See* Memorandum from Debra A. Cash, *et al.,* Andersen, to the Files, regarding Non-Cash Activity, Dec. 7, 1999 (the "Nahanni Memo") [AA000019694-AA000019695].

[52] *See* Second Interim Report, Appendix G (Whitewing Transaction), at 116-17; Second Interim Report, Appendix H (Marlin Transaction), at 57-59.

[53] *See* Memorandum from H Ronald Weissman, *et al.,* Andersen, to the Files, regarding Enron/Tax Efficient Lease Monetization, May 27, 1998 (the "Tomas Accounting Memo") [PSI00020546-PSI00020556]; Memorandum from H Ronald Weissman, Andersen, and P. Michael Baldasaro, Andersen, to the Files, regarding Project Aries, July 7, 2000 (the "Tammy I Accounting Memo") [AB0785 02620-AB0785 02629]; Memorandum from Herman Manis and Christopher J. Herbold, Andersen, to Enron Corp. Files, Houston, regarding Project Cochise – Acquisition of REMICs, Mar. 31, 1999 (the "Cochise Accounting Memo") [AA 000006082-AA 000006088]; Memorandum from Roger D. Willard, Andersen, to Enron Corp. Files, Houston, regarding Acquisition of Interests in Real Estate Mortgage Investment

When performing this function, Andersen viewed itself as providing "accounting consultation" audit services. As described above, in 2000, $12 million of $54 million, or 22%, of Andersen's fees from Enron were attributable to accounting consultation. This accounting consultation process involved Enron's transaction support accountants who reported to Causey,[54] the Engagement Team and the PSG. Enron's transaction support accountants, most of whom were Andersen alumni,[55] often advocated very aggressive positions, which on some occasions Andersen rebuffed.[56]   In this process, the

---

Condu[i]ts (REMIC), Oct. 30, 1997 (the "Steele Accounting Memo") [AA 000006581-AA 000006587]; Memorandum from David B. Duncan, *et al.*, Andersen, to the Files, regarding Tax Accounting for Project Teresa, Mar. 14, 1997 (the "Teresa Accounting Memo") [AA-EX00016709-AA-EX00016715]; *see* Facsimile from Thomas Finley, Bankers Trust, to Robert Hermann, Enron, May 28, 1996 (notifying Hermann that Mike Baldasaro in Andersen's New York office would be calling to discuss the structure of the transactions that later became the Teresa Transaction and attaching PowerPoint presentation materials) [DBC 013815-DBC 013827]. In several transactions, Andersen issued SAS 50 letters to BT/Deutsche, which were furnished to Enron by BT/Deutsche. *See* Third Interim Report, Appendix G (Role of BT/Deutsche and its Affiliates), at 76 n.363; Report on the Application of Accounting Principles, Statement on Auditing Standards No. 50 (American Institute of Certified Public Accountants 1986) ("SAS 50") (AU § 625).

[54] Third Interim Report, Appendix C (Role or Enron's Officers).

[55] From 1989 through 2000, 86 Andersen accountants left Andersen for employment with Enron. *See* Chart entitled "AA Employees who left for Enron," undated, at ELIB00003650-00002 (part of Government exhibit 2000H to Andersen Criminal Trial) [ELIB00003650-00001-ELIB00003650-00009].

[56] Examples of instances in which Andersen apparently insisted on less aggressive positions than Enron accountants initially advocated include:

- Insisting that three parties were needed in Prepay Transactions and insisting on confirmation from the third parties. See discussion below in the *Andersen's Role in the Prepay Transactions* Section of this Appendix.

- Insisting that the LJM2 governance provisions be modified to permit Fastow's removal upon a vote of holders of 66 2/3% rather than 75% of the limited partner interests. *See* Memorandum from Dave Duncan, *et al.*, Andersen, to the Files, regarding the LJMII Governance, July 28, 2000 ("Raptor Memo #4") (listed in Annex 1 to this Appendix) [AA-EX 0179611].

- Disagreeing with the Enron transaction accountant working on the Raptor transactions regarding whether the Raptor entities could be required to distribute funds to LJM2 before the Raptors entered into hedges with Enron. Enron apparently agreed to this requirement anyway, but evidence suggests that the Enron accountants concealed agreement this from Andersen. See discussion below in the *Andersen's Role in the Non-Economic Hedges* Section of this Appendix.

- Requiring that Enron satisfy the 3% Equity Test for the Raptors using the balance sheet footing plus the notional amount of the derivative risk. *See* Raptor Memo #3.

- 21 -

Engagement Team served as a "middle man" by obtaining the facts from the Enron

transaction support accountants, and relaying those facts, Enron's accounting goals and

the arguments of the Enron transaction support accountants to the PSG. The Engagement

Team would debate and "brainstorm" the issues with the PSG and ultimately translate

and deliver the PSG's advice to the transaction support accountants at Enron.[57]

The evidence concerning Andersen's work on Enron matters suggests that while

Andersen may have rebuffed some of Enron's aggressive positions, Andersen's

accountants both on the Engagement Team and at the PSG generally endeavored to

achieve the financial statement goals of Enron by assisting it in utilizing rules-based

GAAP in order to report income, cash flow and financial position that did not faithfully

represent the substance of Enron's underlying transactions. The evidence suggests that

---

- Requiring, in the cases in which Enron was seeking to avoid consolidation of an entity that was arguably a business and not an SPE based on the lack of control, that the non-Enron owner have 3% equity at risk and satisfy Andersen's own internal so-called 4-to-1 test designed to provide evidence that the non-Enron owner would exercise its rights (or at least address the issue in some manner). *See* Second Interim Report, Appendix B (Accounting Standards) and Appendix K (Forest Products Transactions).

- Proposing a proposed adjusting journal entry ("PAJE") on the Eli Lilly transaction. *See* Summary of Proposed Adjusting Journal Entries, 2nd Qtr 2001 (the "PAJE 2001-2Q") [AASDTEX00041208].

- Refusing to permit a FAS 140 Transaction of a power plant in the Sutton Bridge transaction until an informal inquiry made with the SEC indicated that equity interests in entities that owned power plants were not in substance real estate. Subsequently, the EITF ruled to the contrary on a prospective basis. *See* Second Interim Report, Appendix B (Accounting Standards).

[57] This process was the source of internal tension between the PSG and the Engagement Team. Some sources of friction were: (i) the belief by the PSG that the Engagement Team was identifying PSG accountants to Enron who took positions contrary to Enron's view, was sharing with Enron the deliberations or "brainstorming" between the PSG and the Engagement Team, and was not properly documenting consultations with the PSG; and (ii) the belief by the Engagement Team that PSG accountants (other than Stewart) were "programmed to say 'no' or do not have John Stewart's 'bedside' manner." *See* Memorandum from Lawrence A. Rieger, Andersen, to the Enron File, regarding Enron Consultation Process, Feb. 12, 2001 [AB000540830-AB000540833]. In addition, the circumstances surrounding Causey's removal of Bass from Enron matters had an adverse effect on Stewart's view of the client and the Engagement Team. *See* Andersen Criminal Trial Transcript, at 5413 (testimony of John Stewart, May 30, 2002).

this accounting consultation process, when combined with Andersen's failure to: (i) determine whether Enron's Audit Committee was informed of the effects of Enron's use of rules-based GAAP on its reported financial position, results of operations and cash flow; or (ii) insist on disclosure of these effects in the footnotes to Enron's financial statements or MD&A, was a significant contributing factor to Enron's materially misleading financial statements and related disclosures.

*Andersen Materiality and Risk Assessment Resources Used by the Engagement Team*

In performing the Enron audit, the Engagement Team had at its disposal numerous Andersen firmwide resources designed to enable it to render competent and efficient audit services and reduce the risk arising out of its audit work. For example, Andersen had numerous sophisticated and state-of-the-art forms that its accountants used in order to complete their work. One such form was Andersen's Form AP-110, an audit practice aid or "tool" designed to help engagement teams determine what items and amounts were quantitatively and qualitatively "material" to the client's financial statements.[58] Using the Form AP-110, the Engagement Team was required under Andersen's policies to determine each year, in advance of their audit work, the amount of misstatement that would be material to Enron's financial statements based on existing SEC, accounting and legal standards of materiality.[59] Duncan, as the Engagement Partner, was required to approve the materiality determinations,[60] after which audit

---

[58] Other forms included a fraud risk practice aid (Form AP-125), a going concern practice aid (Form AP-330), a financial statement "Inspection Tool" (Form AP-70), and interim financial statements review practice aid (Form AP-324).

[59] *See* SEC Staff Accounting Bulletin No. 99, Materiality, 56 Fed. Reg. 4938 (Feb. 7, 1991) ("SAB 99").

[60] The engagement manager, Christopher Herbold, signed the form that approved the materiality thresholds. Lowther Interview.

scopes were set based on the materiality thresholds.  In addition, "listing scopes" were set to avoid summarizing errors that were clearly inconsequential.  The AP-110 indicated that a suggested listing scope was 5% of the after-tax equivalent of items that were "material."  If the amount of a misstatement detected on audit was beneath the listing scope, it would generally be ignored.  If the matter was greater than the listing scope, it would be "listed" and thus brought to management's attention.  Because Enron's audit was "continuous" (see discussion above), many listed items were corrected by Enron prior to preparing quarterly or annual financial statements.  If the listed misstatement was not corrected by Enron, it became a Proposed Adjusting Journal Entry ("PAJE")[61] for the applicable quarter or year.[62]

It was management's decision whether to record a PAJE on Enron's books and thereby have it reflected in the financial statements.  If, however, the PAJE:  (i) was above Andersen's materiality thresholds; (ii) resulted from a transaction intended to achieve earnings targets or similar goals; or (iii) would result in noncompliance with loan covenants or contractual obligations if it was recorded, Andersen would insist that Enron record the PAJE.

---

[61] A PAJE is an entry that the auditor proposes that the client make on the client's books.

[62] There were also "Proposed Reclassifying Journal Entries" or "PRJEs," which represented reclassifications on the balance sheet such as from long-term to short-term liabilities.  Materiality thresholds, and thus listing scopes, for PRJEs were higher than listing scopes for PAJEs.

Andersen was required to report to the Audit Committee all PAJEs identified by Andersen to management regardless of whether they were recorded.[63] Enron did not fail to record any PAJEs that Andersen insisted it record.

Another tool used in the Enron engagement was Andersen's so-called SMART form. This computerized form was designed to enable engagement teams and firm management to assess the risk inherent in Andersen's audit engagements. This sophisticated risk assessment tool required an engagement team to complete each year a list of very detailed questions concerning such things as management integrity, aggressive use of GAAP, pressure on management to meet earnings expectations, share price, volatility of share price and financial health. Weights were assigned to the various criteria by Andersen's risk assessment software. Using mathematical formulae based in part on Andersen's prior claims experience, the software assigned the audit client to one of the following risk categories:[64]

---

[63] Andersen's policy changed in August 1999. Prior to that time, the policy required that only PAJEs that were not recorded and that exceeded 3% of earnings were required to be reported to the Audit Committee. *See* Author unknown, Typed Document (part of Andersen work papers) (including a section entitled "Communications with Audit Committees") [AASDTEX000357397]. Evidence suggests that Andersen may have been selective in the communication of PAJEs to Enron's Audit Committee, notwithstanding the existence of an Andersen policy requiring the communication of all such proposed entries. On May 9, 2001, an employee in Andersen's London office sent an email to Christopher Herbold inquiring as follows: "Chris – Just wondering what our policy is as far as communicating PAJEs/PRJEs to Enron's audit committee. I know that it is AA's policy (US ABA 99-16) to communicate all PAJEs whether booked or passed but I wanted to know what we do in practice with Enron." Email from Kimberly J. Meyer, Andersen, to Christopher J. Herbold, Andersen, regarding communications with audit committee, May 9, 2001 [AB0786 02943]. In response, Herbold replied, "That decision is made at the Duncan level and he communicates those entries that he feels are necessary. I think his general position is that there is ambiguity surrounding some entries . . . ." Email from Christopher Herbold, Andersen, to Kimberly J. Meyer, Andersen, regarding communications with audit committee, May 9, 2001 [AB0786 02943].

[64] Memorandum from Joseph F. Berardino, Andersen, and Gary B. Goolsby, Andersen, to U.S. ABA Heads, regarding Expanded Consultation Initiative: Discussion Guide and Selected Client List, Oct. 15, 1998 (the "Expanded Consultation Initiative Memo"), at AA-EX00325589-AA-EX00325592 [AA-EX00325577-AA-EX00325592]. "Maximum*" was a higher risk category than "Maximum," but the Examiner understands that the procedures required of "Maximum*" clients were not materially different from those required for "Maximum" clients.

- 25 -

- Maximum*

- Maximum

- High

- Moderate

- Low

Enron was rated "Maximum*" for 1999,[65] and "Maximum" for 2000.[66]  In its 2000 SMART form, Enron's "Management Pressures" and "Accounting and Financial Reporting Risk" were rated "Very Significant."[67]  In the case of "Management Pressures," the SMART Form notes that "Enron has aggressive earnings targets and enters into numerous transactions to achieve those targets."[68]  In the area of "Accounting and Financial Reporting Risk," the SMART form indicates under the category "Complex/risky transactions: Form over substance transactions" that the risk was "Very Significant"[69] and that "[t]he Company's personnel are very sophisticated and enter into numerous complex transactions and are often aggressive in structuring transactions to achieve desired financial reporting objectives."[70]

In the case of "Maximum*" or "Maximum" risk clients, Andersen's procedures required that each year the engagement partner, Practice Director and ABA head

---

[65] Enron SMART Tool form, Nov. 22, 1999, at 4 (part of Andersen work papers) [AASDTEX000360729-AASDTEX000360761].

[66] Enron SMART Tool form, May 18, 2000 (the "2000 SMART Form"), at 5 (part of Andersen work papers) [AASDTEX000367165-AASDTEX000367200].

[67] *Id.* at 13.

[68] *Id.* at 3.

[69] *Id.* at 12.

[70] *Id.* at 3.

articulate a rationale for retaining the client.[71]  With regard to Enron, Andersen's 2000

rationale was as follows:

> We recommend that this engagement be accepted/retained and believe (1)
> the risks identified can be managed to an acceptable level, (2) the
> engagement team is well qualified to manage the risks of this engagement
> and (3) although Enron enters into complex transactions, they regularly
> consult with us and other experts.  Enron's management is very
> sophisticated and understands their risks.  Further, if subsequent facts or
> situations raise significant concerns about this accept/retain decision or the
> ability to manage the engagement risks, we will immediately consult with
> the signees below.[72]

A 1998 memo from Andersen Chief Executive Officer Joseph Berardino and

Goolsby indicates that at least 54 other Andersen audit engagements for U.S. publicly

held companies achieved a "Maximum*" or "Maximum" risk rating for that year.[73]  In

the case of those publicly held clients like Enron, whose risk rating was "Maximum*" or

"Maximum," Andersen mandated additional procedures designed to further evaluate and

manage the risk.  Among these procedures were a series of Andersen internal risk review

meetings.[74]

As discussed in more detail below, evidence reviewed by the Examiner suggests

that the effects of Enron's aggressive use of GAAP on its reported income, cash flow and

financial position, as well as various disclosure issues, were identified and discussed at

the internal risk review meetings, as well as at a client retention meeting held on February

5, 2001.  As also described below, Andersen did not determine whether Enron's Audit

---

[71]  *Id.* at 5.

[72]  *Id.*

[73]  Expanded Consultation Initiative Memo, at AA-EX00325589-AA-EX00325592.

[74]  These risk review meetings were held regularly, with the frequency of such meetings depending on the
risk rating of the client.  For example, as provided in the Expanded Consultation Initiative Memo, two
yearly meetings were to be held among engagement team partners and certain Andersen audit executive
accountants to discuss "maximum risk clients" such as Enron.

Committee had a similar level of understanding of the nature and magnitude of these risks.

## B.   Fees

Until its bankruptcy, Enron was among the largest clients for the worldwide Andersen organization.[75]   For Andersen's "Gulf Coast Market Circle," Enron was Andersen's largest client.[76]   In each of the years following Duncan's transition to the position of "Global Managing Partner" for the Enron engagement in 1997,[77] Andersen's fees from the Enron engagement escalated,[78] as illustrated by the following chart:[79]

---

[75] *See* Andersen Criminal Trial Transcript, at 1689 (testimony of David Duncan, May 13, 2002).

[76] *See* Andersen Criminal Trial Transcript, at 1689 (testimony of David Duncan, May 13, 2002).

[77] *See* Minutes of Enron Audit Committee Meeting, Feb. 10, 1997 [AB000186257-AB000186260].

[78] *See* Andersen Criminal Trial Transcript, at 1683 (testimony of David Duncan, May 13, 2002).

[79] *See* First Quarter 1996 Audit Update Presentation, *Summary of Fees* (the "5/6/96 Fee Attachment") ("Recurring Audit Services" of $5,791,500 + "Other Accounting and Audit Services" of $10,158,000 = $15,949,500) (attached to Enron Audit Committee Meeting Minutes of May 6, 1996) [AB0256 00616–AB0256 00617]; First Quarter 1997 Audit Update Presentation, *Summary of Fees* (the "5/6/97 Fee Attachment") ("Recurring Audit Services" of $5,342,000 + "Other Services" of $10,438,000 = $15,780,000) (attached to Audit Committee Meeting Minutes of May 6, 1997) [AB0246 00307–AB0246 00308]; First Quarter 1998 Audit Update Presentation, *Summary of Fees* (the "5/4/98 Fee Attachment") ("Recurring Audits" of $7,515,000 + "Capital Transactions" of $4,492,000 + "Accounting Consultation" of $3,333,333 + "Other Consulting Services" of $4,329,000 = $19,579,000) (attached to Enron Audit Committee Meeting Minutes of May 4, 1998) [AB0246 00872]; First Quarter 1999 Audit Update Presentation, *Summary of Fees* (the "5/3/99 Fee Attachment") ("Recurring Audits" of $9,996,000 + "Capital Transactions" of $4,940,000 + "Accounting Consultation" of $4,146,000 + "Other Consulting Services" of $7,461,000 = $26,543,000) (attached to Audit Committee Meeting Minutes of May 3, 1999) [AB0246 01186]; First Quarter 2000 Audit Update Presentation, *Summary of Fees* (the "5/1/00 Fee Attachment") ("Recurring Baseline Audit" of $11,100,000 + "Expanded Accounting, Auditing and Risk Management Services" of $23,400,000 + "Other Services" of $11,900,000 = $46,400,000) (identifying $12,200,000 of "Expanded Accounting, Auditing and Risk Management Services" as arising from "Significant Syndication and Structured Finance Activity (Condor, Margaux, LJM, Yosemite, Other)") (attached to Audit Committee Meeting Minutes of May 1, 2000) [AB0246 01583–AB0246 01584]; First Quarter 2001 Audit Update Presentation, *Summary of Fees* (the "4/30/01 Fee Attachment") ("Recurring Baseline Audit" of $12,200,000 + "Expanded Audit Activities" of $12,900,000 + "Other Fees" of $22,800,000 = $47,900,000) (attached to Audit Committee Meeting Minutes of Apr. 30, 2001) [AB0246 01899–AB0246 01900]; Andersen Criminal Trial Transcript, at 1683 (testimony of David Duncan, May 13, 2002) (testifying that the amount of the fees generated by the Enron account in 2001 was "approximately $50 to 55 million").   For purposes of the chart included herein, the midpoint of the 2001 fee range identified by Duncan's testimony is displayed on the graphical representation of 2001 fees.



The evidence reviewed by the Examiner indicates that, on an annual basis, Andersen provided Enron's Audit Committee with detailed information concerning Andersen's fees from the preceding year, including the basic components of those fees.[80] Although Andersen did not always utilize consistent labels to describe the components of those fees, the fees generally included a component for "Recurring Audit" services and other services, such as "Accounting Consultation," "Tax Services" and "Consulting Services."[81]

---

[80] *See* 5/6/96 Fee Attachment; 5/6/97 Fee Attachment; 5/4/98 Fee Attachment; 5/3/99 Fee Attachment; 5/1/00 Fee Attachment; 4/30/01 Fee Attachment.

[81] *See, e.g.*, 5/6/96 Fee Attachment (identifying the following fee components for 1995: "Recurring Audit Services" of $5,791,500, "Capital Transactions" of $1,384,800, "Accounting Consultation" of $2,378,300, "Consulting Services Under Contract Audit Services Arrangement" of $5,849,600, and "Tax Services" of $545,300).

- 29 -

From 1995 through 2000, Andersen's fees for "Recurring Audit" services ranged from a low of $5,342,000 in 1996 to a high of $12,200,000 in 2000.[82]  From 1995 through 2000, Andersen's fees for "Accounting Consultation" ranged from a low of $2,152,000 in 1996 to a high of $12,000,000 in 2000.[83]  Andersen's tax-related Enron fees from 1995 through 2000 ranged from a low of $545,300 in 1995 to a high of $1,456,000 in 1996.[84]  During these time periods, the balance of Andersen's fees from the Enron engagement were described variously as relating to services such as "Capital Transactions," "Consulting Services Under Contract Audit Services Arrangement" and "Other Consulting Services."[85]  Regardless of the service categories into which Andersen's fees might be divided, this much is clear:  In the years leading up to Enron's bankruptcy, Enron was one of Andersen's most significant clients in terms of fees, and those fees were consistently on the rise.[86]

Regardless of the labels employed in describing Andersen's fee components to the Audit Committee, Andersen considered the great majority of the services it provided to Enron to be in the nature of "audit" services.[87]  These "audit" services included the

---

[82] See 5/6/97 Fee Attachment (showing 1996 fees); 4/30/01 Fee Attachment (showing 2000 fees).

[83] See 5/6/96 Fee Attachment (showing 1995 fees); 5/3/99 Fee Attachment (showing 1998 fees).  The internal Andersen Retention Meeting Presentation showed accounting consultation fees of $12 million in 2000.  Retention Meeting Presentation, at 7.  Accounting consultation fees in 1999 are not known.

[84] See 5/6/96 Fee Attachment (showing 1995 fees); 5/6/97 Fee Attachment (showing 1996 fees).

[85] See 5/6/96 Fee Attachment; 5/6/97 Fee Attachment; 5/4/98 Fee Attachment; 5/3/99 Fee Attachment; 5/1/00 Fee Attachment; 4/30/01 Fee Attachment.

[86] See, e.g., Email from James D. Edwards, Andersen, to Thomas H. Bauer, et al., Andersen, Oct. 13, 1999 ("Congratulations to you and the entire Enron team for the unbelievable results of service to this client in Fiscal 1999.  With $47 million in fees and a growth rate of 88%, Enron became the largest client of our firm by a wide margin in Fiscal 1999.") [AB0971 02377].

[87] Goddard 9/10/03 Interview; Odom Interview; Lowther Interview.

consultations provided to Enron as transactions were discussed and planned.[88] They also
included the testing of Enron's internal accounting controls and procedures, conducted as
a part of Andersen's "integrated audit" of Enron.[89]

### C.    Andersen's Independence

*Introduction and Applicable Professional Standards*

The concept of independence lies at the foundation of the public accounting
profession, and the critical importance of auditor independence is widely accepted.  As
the AICPA Professional Standards Board has observed, "It is of utmost importance to the
profession that the general public maintain confidence in the independence of
independent auditors."[90]  Similarly, as late as August 2001, Andersen advised the Enron
Audit Committee that "We believe independence is not only the cornerstone of our
profession, but the only sound basis for our continued success."[91]  Reflecting the same
view, the SEC has described the critical importance of auditor independence as follows:

> Independent auditors have an important public trust.  Investors must be
> able to rely on issuers' financial statements.  It is the auditor's opinion that
> furnishes investors with critical assurance that the financial statements
> have been subjected to a rigorous examination by an objective, impartial,
> and skilled professional, and that investors, therefore, can rely on them.  If
> investors do not believe that an auditor is independent of a company, they
> will derive little confidence from the auditor's opinion and will be far less
> likely to invest in that public company's securities.[92]

---

[88]  Goddard 9/10/03 Interview; Odom Interview; Lowther Interview.

[89]  Goddard 9/10/03 Interview; Odom Interview; Lowther Interview.

[90]  SAS 1, at § 220.03 (AU § 220.03).

[91]  Minutes of the Enron Audit Committee Meeting, Aug. 13, 2001, at 2 [AB000203966-AB000203968].

[92]  Revision of the Commission's Auditor Independence Requirement, Securities Act Release No. 33-7919
[2000-2001 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 86,406 at 83,990.

Although the concept of auditor independence is not controversial in the abstract, difficulties and complexities tend to arise in articulating the standard against which such independence is to be measured. The Second General Standard of GAAS provides as follows: "In all matters relating to the assignment, an independence in mental attitude is to be maintained by the auditor or auditors."[93]   Elaborating on the meaning of this standard, the AICPA has explained that it requires a "judicial impartiality" and an "obligation for fairness not only to management," but to others who may rely on the independent auditor's report:

> This standard requires that the auditor be independent; aside from being in public practice (as distinct from being in private practice), he must be without bias with respect to the client since otherwise he would lack the impartiality necessary for the dependability of his findings, however excellent his technical proficiency may be. However, independence does not imply the attitude of a prosecutor but rather a judicial impartiality that recognizes an obligation for fairness not only to management and owners of a business but also to creditors and those who may otherwise rely (in part, at least) upon the independent auditor's report, as in the case of prospective owners or creditors.[94]

Additionally, the AICPA has stated that "[i]ndependent auditors should not only be independent in fact; they should avoid situations that may lead outsiders to doubt their independence."[95]

In furtherance of the independence requirement, the AICPA has promulgated specific independence rules and interpretations in its Code of Professional Conduct.[96]

---

[93]  SAS 1, at § 220.01 (AU § 220.01).

[94]  SAS 1, at § 220.02 (AU § 220.02).

[95]  SAS 1, at § 220.03 (AU § 220.03).

[96]  The independence rules and interpretations contained in the American Institute of Certified Public Accountants ("AICPA") Code of Professional Conduct are, like GAAP, remarkable in their specificity and detail. Among other requirements, these rules prohibit the independent auditor from: (i) owning or committing to acquire "any direct or material indirect financial interest in the client"; (ii) serving as the

These rules and interpretations provide objective standards against which the
independence of an auditor can be evaluated, but are not designed to serve as a substitute
for the independence requirement imposed by the Second General Standard. The AICPA
has described these rules as "precepts to guard against the *presumption* of loss of
independence,"[97] distinguishing the specific rules from the independence standard itself.
Highlighting this distinction, the AICPA has explained: "'Presumption' is stressed
because the possession of intrinsic independence is a matter of personal quality rather
than of rules that formulate certain objective tests."[98]

---

trustee of a trust or executor or administrator of any estate that owns or is committed to acquire "any direct
or material indirect financial interest in the client"; (iii) owning a joint closely held investment with the
client if the investment is material to the auditor; (iv) having certain loans to or from the client; (v) having
an immediate family member that owns "more than 5 percent of a client's outstanding equity securities or
other ownership interests"; and (vi) serving as a director, officer, employee, promoter, underwriter, voting
trustee, or pension trustee during the period covered by the financial statements under audit. *See* ET
section 101.02, *Independence* (AICPA, Professional Standards).   In addition to these specific rules and
interpretations, the AICPA has issued over 100 "Ethics Rulings" applying those rules and interpretations to
a wide variety of specific factual contexts. *See, e.g.*, ET section 191, *Ethics Rulings on Independence,
Integrity, and Objectivity* (AICPA, Professional Standards); Ethics Ruling No. 1, *Acceptance of a Gift*
(AICPA, Professional Standards); Ethics Ruling No. 8, *Member Providing Accounting and Management
Advisory Services* (AICPA, Professional Standards); Ethics Ruling No. 17, *Member of Social Club*
(AICPA, Professional Standards); Ethics Ruling No. 19, *Receipt of Contingent Fees or Commissions By
Members's Spouse* (AICPA, Professional Standards); Ethics Ruling No. 35, *Stockholder in Mutual Funds*
(AICPA, Professional Standards); Ethics Ruling No. 64, *Member Serves on Board of Organization for
Which Client Raises Funds* (AICPA, Professional Standards); Ethics Ruling No. 92, *Joint Interest in
Vacation Home* (AICPA, Professional Standards).   Notably absent from the independence rules and
interpretations contained in the AICPA Code of Professional Conduct is a consideration of the issue of fee
dependency, i.e., the circumstances in which an auditor's fees might reasonably be thought to call that
auditor's independence into question. Such rules are similarly absent from the SEC's objective standards
concerning auditor independence, although the issue of fee dependency readily could fall within the class
of "all relevant facts and circumstances" that the SEC is authorized to consider when making a
determination of an auditor's independence.   *See* 17 C.F.R.  § 210.2-01(b) ("Qualifications of
accountants"); *see also Independence Discussions with Audit Committees,* Independence Standard No. 1
(Independence Standards Bd. Jan. 1999) ("ISB No. 1") (requiring written disclosure to audit committees of
all relationships between the auditor and the entity under audit that "may reasonably be thought to bear on
independence").

[97] SAS 1, at § 220.04 (AU § 220.04) (emphasis in original).

[98] *Id.*

With respect to the audits of SEC registrants, the SEC has also promulgated rules concerning auditor independence.[99] These rules contain both an objective and a subjective element. The objective component of these rules imposes requirements similar to those found in the AICPA's Code of Professional Conduct.[100] The subjective component of these rules provides that the SEC "will consider all relevant facts and circumstances" in determining auditor independence, not merely those circumstances enumerated in the promulgated rule.[101]

*Andersen's Evaluation and Presentation of Independence Issues*

With increasing degrees of detail from 1996 through 2001, Andersen advised the Enron Audit Committee regarding issues relevant to an analysis of Andersen's independence. On an annual basis, Andersen also provided the Enron Audit Committee with details concerning its fees for both audit and non-audit services.[102] Based upon the minutes of the Enron Audit Committee, it appears that these communications concerning

---

[99] *See* 17 C.F.R. § 210.2-01 ("Qualification of accountants").

[100] *See, e.g.,* 17 C.F.R. § 210.2-01(c)(1) (prohibiting certain financial interests in audit clients); 17 C.F.R. § 210.2-01(c)(2) (prohibiting certain employment relationships with audit clients); 17 C.F.R. § 210.2-01(c)(3) (prohibiting certain business relationships with audit clients); 17 C.F.R. § 210.2-01(c)(4) (prohibiting or restricting certain non-audit services for audit clients); 17 C.F.R. § 210.2-01(c)(5) (prohibiting contingent fees from audit clients).

[101] Setting forth the subjective component of the rule, 17 C.F.R. § 210-01(b) provides as follows:

> The Commission will not recognize an accountant as independent, with respect to an audit client, if the accountant is not, or a reasonable investor with knowledge of all relevant facts and circumstances would conclude that the accountant is not, capable of exercising objective and impartial judgment on all issues encompassed within the accountant's engagement. In determining whether an accountant is independent, the Commission will consider all relevant circumstances, including all relationships between the accountant and the audit client, and not just those relating to reports filed with the Commission.

[102] *See* Minutes of Enron Audit Committee Meeting, May 6, 1996 [AB0256 00006-AB0256 00008]; 5/6/97 Fee Attachment; 5/4/98 Fee Attachment; 5/3/99 Fee Attachment, at 1; 5/1/00 Fee Attachment, at 1-2.

Andersen's independence were made in fairly summary fashion through 1998.[103] Beginning in 1999, however, Andersen reviewed independence issues with the Enron Audit Committee with greater specificity.

At the August 9, 1999, meeting of the Enron Audit Committee, for example, Andersen alerted Enron regarding an SEC initiative concerning auditor independence and reviewed its application to the Enron engagement, discussing factors such as:

- the hiring of Andersen employees by Enron (noting that this "[o]ccurs at Enron with some regularity");

- Andersen's policy against the employment of Andersen auditor family members by Enron and the absence of known violations;

- the prohibition against Andersen/Enron joint ventures;

- the limitations on certain non-audit services;

- the prohibition against the ownership of Enron stock by Andersen personnel; and

- the potential for "fee dependency."[104]

---

[103] *See* Minutes of Enron Audit Committee Meeting, Oct. 13, 1997, at 2 (noting that "Mr. Bennett [of Andersen] distributed and reviewed material related to auditor independence and noted the Company's responsibilities with regard thereto") [AB000186558–AB000186560]; Letter from Andersen, by David B. Duncan, to Dr. Kenneth Lay, Enron Corp., May 11, 1998, at 3 ("Arthur Andersen LLP represents that the Firm and its personnel are independent of Enron pursuant to the rules and regulations of the AICPA and the SEC, as such term is utilized by the AICPA and the SEC.") (attached to the Minutes of Enron Audit Committee Meeting, Oct. 12, 1998) [AB000191867-AB000191872].

[104] Second Quarter Audit Update Presentation, *SEC Initiatives* (the "Independence Initiative"), at AB0246 01221-AB0246 01223 (attached to Minutes of the Audit Committee Meeting, Aug. 9, 1999) [AB0246 01215-AB0246 01228]. It is unclear whether Andersen noted the issue of potential fee dependency solely on its own initiative or as a result of the issuance of ISB No. 1, which became effective for audits of companies with fiscal years ending after July 15, 1999. While not addressing the issue of potential fee dependency directly, ISB No. 1 imposes a requirement of annual written communication from auditors to the audit committees of SEC registrants regarding all relationships that "in the auditor's professional judgment may reasonably be thought to bear on independence." *See* ISB No. 1. Although the Independence Standards Board was dissolved in July 2001, the SEC has announced that it will consider ISB No. 1, *Certain Independence Implications of Audits of Mutual Funds and Related Entities*, Independence Standards Board Standard No. 2 (Independence Standard Bd. July 2000) and *Employment With Audit Committees*, Independence Standards Board Standard No. 3 (Independence Standards Bd. July 2000) to have "substantial authoritative support for the resolution of auditor independence issues."

With respect to potential fee dependency, Andersen noted the existence of the following mitigating factors:

- "AA's unique worldwide income sharing model removes direct relationship between regional results and partner income."[105]

- "Enron fees not material to worldwide fees."[106]

- "Network decision making and cross-checking a matter of policy and extremely utilized at Enron."[107]

At the conclusion of its August 9, 1999, independence presentation, Andersen confirmed that it considered itself independent within the meaning of the applicable rules and stated: "We believe our policies surrounding independence are generally more stringent than those required by the SEC, AICPA and applied by others in the profession and we are the only Firm that applies them consistently on a worldwide basis."[108]   At other Audit Committee meetings in 2000 and 2001, Andersen provided the Enron Audit Committee with similarly detailed presentations, concluding in each instance that Andersen remained independent within the meaning of the applicable professional standards and SEC rules.[109]

---

Commission Policy Statement on the Establishment and Improvement of Standards Related to Auditor Independence, Release No., 66 Fed. Reg. 38149 (July 23, 2001).

[105] Independence Initiative, at AB0246 01221-AB0246 01223.

[106] *Id.*  In 1999, Andersen's fees to Enron were approximately $46.4 million, and Andersen's worldwide gross income was approximately $8 billion.  *See* Second Quarter 2000 Update on Independence Initiatives Presentation, *Independence,* at AB0246 01634 (attached to the Minutes of the Enron Audit Committee Meeting, Aug. 7, 2000) [AB0246 01622-AB0246 01634].

[107] Independence Initiative, at AB0246 01221-AB0246 01223.

[108] *Id.* at AB0246 01224.

[109] *See, e.g.,* Minutes of Enron Audit Committee Meeting, Aug. 7, 2000 (the "8/7/00 Audit Committee Minutes"), at 3 [AB000201297–AB000201300] ("[Duncan] stated that AA considered its policies surrounding independence to be compliant with those currently required by the SEC, the American Institute of Certified Public Accountants, and those applied by others in the profession."); Blue Ribbon Committee:

*Conclusions Regarding Andersen's Compliance With Independence Requirements*

The Examiner is not aware of any evidence indicating that Andersen failed to comply with the technical rules concerning auditor independence as set forth in the AICPA Code of Professional Conduct or the SEC's rules concerning independence, i.e., violation of those rules that the AICPA has characterized as "precepts to guard against the *presumption* of loss of independence."[110]  Indeed, it appears that Andersen was both aware of those precepts and communicated to the Enron Audit Committee in considerable detail concerning its plan of compliance.

Notwithstanding Andersen's apparent compliance with the "precepts," however, it is at least questionable whether Andersen consistently maintained in fact the "independence in mental attitude"[111] that those precepts are designed to safeguard.  As discussed elsewhere in this Appendix, Andersen facilitated Enron's utilization of its accounting techniques[112] on occasions and under circumstances that call into question whether Andersen performed its auditing responsibilities with a "judicial impartiality that recognizes an obligation for fairness not only to management and owners of a business

---

Review of Key Recommendation Points (attached to the 8/7/00 Audit Committee Minutes, noting that Andersen "[c]omplies" with recommendations concerning auditor independence) [AB000201314]; Minutes of Enron Audit Committee Meeting, April 30, 2001, at 4 [AB000204284–AB000204288]; Independence Presentation (attached to the Minutes of Enron Audit Committee Meeting, Aug. 13, 2001, including detailed review of factors analyzed at August 9, 1999, Audit Committee meeting and reaching similar conclusions) [AB000204603-AB00024608].

[110] SAS 1, at § 220.04 (AU § 220.04) (emphasis in original).

[111] SAS 1, at § 220.01 (AU § 220.01).

[112] See discussion below in the *Andersen's Role in the Prepay Transactions, Andersen's Role in the FAS 140 Transactions, Andersen's Role in the Non-Economic Hedges, Andersen's Role in the Tax Transactions,* and *Andersen's Role in the Nahanni Transaction* Sections of this Appendix; *see also* Second Interim Report, Appendix Q (Schedules Depicting Impact of Enron's Six Accounting Techniques).

but also to creditors and those who might otherwise rely (in part, at least) upon the

independent auditor's report, as in the case of prospective owners or creditors."[113]

---

[113] SAS 1, at § 220.02 (AU § 220.02).  Handwritten notes produced by Andersen, which are labeled as concerning Project Nahanni, provide a succinct example of a circumstance in which the evidence calls Andersen's "judicial impartiality" into question.   In part, those notes state, "NEED TO BUILD CASE FOR EQUITY CHARACTERISTICS."  Author unknown, Handwritten Notes entitled "Nahanni," undated (from the desk files of Christopher Herbold) (capitalization in original) [AA-EX00223109].

## III.    ENRON'S BANKRUPTCY AND THE DEMISE OF ANDERSEN

### A.    The Final Months of the Enron/Andersen Relationship

*Interaction of the PSG and the Engagement Team*

The Accounting Principles subgroup of the PSG[114] was a team of expert financial accountants at Andersen's Chicago headquarters, many of whom served on various GAAP standard setting groups, including the Emerging Issues Task Force ("EITF"), the Derivatives Implementation Group ("DIG"), and the Accounting Standards Executive Committee of the American Institute of Certified Public Accountants ("AcSEC").[115] Stewart, a member of both the EITF and DIG and one of the most preeminent GAAP experts in the nation, served as the leader of the PSG.[116]   The PSG accountants were expected to keep abreast of the latest developments and trends in GAAP, and as indicated above, to consult, when requested, with Andersen's engagement teams on the application

---

[114] Andersen's PSG included the following subgroups:

    Accounting Principles Group

    International PSG

    SEC Practice Group

    Auditing Standards Group

    Packaged Knowledge

*See* PowerPoint presentation regarding PSG FY01 Goals and Objectives and Measures [AB0911 1817-AB0911 1823]; *see also* In-Person Interview with Richard Petersen, Andersen, by H. Bryan Ives, III, A&B, Sept. 16, 2003 (the "Petersen 9/16/03 Interview").  Unless otherwise indicated, references in this Appendix to the PSG refer to the Accounting Principles subgroup of the PSG.

[115] *See* Second Interim Report, Appendix B (Accounting Standards) for a discussion of the GAAP hierarchy and the various standard setters.  PSG member John Stewart served on the EITF and Derivatives Implementation Group (the "DIG"); Benjamin Neuhausen served on the Accounting Standards Executive Committee of the American Institute of Certified Public Accountants (the "AcSEC"); and Richard Petersen served on various EITF Working Groups on EITF 98-6.  When Engagement Team member Carl Bass joined the PSG in December 1999, he continued to work out of Andersen's Houston office, and thus became the only PSG member not to work from Chicago.  Andersen Criminal Trial Transcript, at 1121-22 (testimony of Carl Bass, May 9, 2002).

[116] Andersen Organizational Chart, at ELIB00003614-00001.

of GAAP in particular client situations. The PSG spent more time dealing with the Enron

Engagement Team than with any other Andersen engagement team.[117]

If a difference of opinion arose between the PSG and a client engagement team,

Andersen's policy was that the issue was to be resolved by the regional Practice Director,

but ultimately the policy of the Practice Directors was to defer to the PSG on matters of

---

[117] Stewart Interview.   As indicated in the Second Interim Report, Appendix B (Accounting Standards), there is evidence that Andersen accountants facilitated Enron's access to and participation in the GAAP standard setting process.   In addition, Andersen accountants who served on the EITF and its various working groups were able to give Enron up-to-the-minute insights into the process and its likely outcome.

An examination of Andersen comment letters on issues pending before the FASB also indicates, however, that, in formulating and presenting the firm's positions on GAAP issues pending before the GAAP standard setters, Andersen often took positions contrary to those of its client Enron.   Several of the more prominent examples are:

- Advocating that the 3% Equity Test be replaced with an approach under which "limited purpose SPEs would be consolidated unless there is at least 10% outside, residual equity-at-risk in form and substance."   Letter from Richard R. Petersen, Andersen, to Ronald J. Bossio, Financial Accounting Standards Board, Sept. 12, 2000, at AB1129 00621 [AB1129 00621-AB1129 00639].

- Advocating unsuccessfully, during consideration of EITF 96-16 (pertaining to when substantive participating rights of minority shareholders would be sufficient to negate control and thus preclude consolidation by the majority shareholder), that the minority shareholder's investment should be at least 25% of the majority shareholder's investment.   See Second Interim Report, Appendix B (Accounting Standards), at 18-19; Stewart Interview.

- Advocating, during consideration of FAS 125, a risks and rewards model rather than the control model that was eventually adopted.   Stewart Interview.   A risks and rewards model would likely have precluded most of Enron's FAS 140 Transactions.

- Advocating that the risks and rewards approach of FAS 66 rather than the control approach of FAS 125 be applied to the sale of interests in joint ventures that owned real estate such as power plants.   See Second Interim Report, Appendix B (Accounting Standards); Stewart Interview.   The EITF agreed with Andersen and issued EITF 98-8.

Timothy Lucas, former Director of Research and Technical Activities of the FASB and Chairman of the EITF, has stated that, in general, Andersen was a little more willing than the other large accounting firms to take positions that would not be popular with its clients.   Telephone Interview with Timothy Lucas, former Director of Research and Technical Activities, FASB, by H. Bryan Ives, III, A&B, Oct. 20, 2003.

GAAP accounting.[118]   Odom was the Practice Director for the Gulf Coast Market Circle

and thus for the Enron engagement.[119]

As discussed in Prior Reports, Enron routinely engaged in structured finance

transactions toward the end of reporting periods in order to increase its reported income

and cash flow from operations, and to remove debt from its balance sheet.[120]   According

to testimony of Andersen partners in the Andersen criminal trial, Enron engaged in at

least two such transactions in the fourth quarter of 2000 that were the subject of

misunderstandings between the PSG and the Engagement Team:

- *The Blockbuster Transaction.*   As discussed in the Second Interim Report, in the Blockbuster transaction, Enron contributed a contract with Blockbuster to provide movies-on-demand to an Enron subsidiary and sold a 45% interest in this subsidiary in a FAS 140 Transaction, recognizing a $53 million gain and $57 million in cash flow from operations.[121]   Carl Bass, a member of PSG, consulted with the Engagement Team on this transaction and informed them that in order to recognize the transaction as a sale, the subsidiary had to be engaged in "a real business" and that an "independent third-party appraisal" was needed.[122]   On the issue of whether the subsidiary was a real business, Stewart testified: "We were negative on that question. We thought it had more attributes of a special purpose entity than it did of

---

[118]   Andersen Criminal Trial Transcript, at 4496-99, 5532 (testimony of Richard Corgel, May 27, 2002, and John Stewart, May 31, 2002).

[119]   Odom Interview; Andersen Criminal Trial Transcript, at 4501 (testimony of Richard Corgel, May 27, 2002). Odom reported to Richard Corgel who became the Managing Practice Director of North America in April 2001. Andersen Criminal Trial Transcript, at 4501 (testimony of Richard Corgel, May 27, 2002).

[120]   *See, e.g.*, Third Interim Report, at 13 (identifying eleven structured finance transactions completed in the final two weeks of 1999, generating reported net income of $114 million and contributing over $1.2 billion of cash flow from operating activities); Second Interim Report, Annex 1 to Appendix E (Prepay Transactions), at 12 (describing the closing of the Chase XII Prepay Transaction on September 28, 2001, resulting in JPMorgan's delivery (through Mahonia) of $350 million to ENA); Second Interim Report, Appendix H (Marlin Transaction), at 4-5 (describing Enron's formation of Atlantic Water Trust in December 1998 to facilitate Enron's refinancing of certain water-related assets). In a presentation to senior Andersen risk and practice management partners on February 5, 2001, the Engagement Team noted Enron's "Heavy Reliance on Completing Transactions and at a High Pace" and that "Transactions often Bunched at Period End." Retention Meeting Presentation, at 8.

[121]   Second Interim Report, at 29-32.

[122]   Andersen Criminal Trial Transcript, at 1146-1147 (testimony of Carl Bass, May 9, 2002).

a business. It was a start-up. It was just getting started."[123] No third-party appraisal was obtained. Nevertheless, the transaction was closed and accounted for as a sale.[124]

- *The Raptor Aggregation Issue.* As described in the Second Interim Report, the "Raptors" were four separate subsidiaries of LJM2, an investment partnership whose general partner was controlled by Fastow.[125] In 2000, Enron reported $531.9 million of revenue from derivative transactions with LJM2's Raptor subsidiaries, which offset a like amount of loss recognized by Enron with respect to various merchant investments. By December of 2000, however, two of the Raptor entities did not have sufficient assets to satisfy their obligations to Enron.[126] To enable Enron to continue to report income from all of the Raptor vehicles, however, Enron entered into a temporary, 45-day cross-collateralization arrangement. The purpose of this arrangement was to permit Enron to consider on an aggregate basis all of the assets in each of the Raptor entities in determining whether any particular Raptor entity could satisfy its obligations to Enron. Both Stewart and Bass testified at the Andersen criminal trial that they had advised the Engagement Team in December 2000 that viewing the credit capacity of the Raptor vehicles on an aggregated basis (the "Aggregation Issue") was not permitted under GAAP regardless of this

---

[123] Andersen Criminal Trial Transcript, at 5561 (testimony of John Stewart, May 31, 2002).

[124] In an email to Stewart on March 4, 2001, Bass stated with respect to the Blockbuster transaction: "[D]espite all of the turmoil over this, we (PSG) did not object to this transaction as it appeared to meet the technical requirements of Statement 125. We relied on the engagement team to address both the definition of a business and the valuation issues of immediate gain." Email from Carl E. Bass, Andersen, to John E. Stewart, Andersen, regarding Enron, Mar. 4, 2001 (the "Bass 3/4/01 Email"), at 2 [ELIB00003656-00001-ELIB00003656-00004]; *see also* Email from Michael C. Odom, Andersen, to John E. Stewart, Andersen, regarding EBS-Content Services LLC Formation, Oct. 17, 2001 [PSI00002063-PSI0002065]. Based upon the evidence reviewed by the Examiner, the Bass 3/4/01 Email appears to be an accurate example of the internal line of responsibility between the PSG and the Engagement Team. As previously indicated, the PSG would consult on matters of technical GAAP, but factual matters, including auditing procedures undertaken to investigate and verify the facts, were the responsibility of the Engagement Team. In this instance, whether the subsidiary was a business and how the value of the interest sold was audited were matters procedurally within the purview of the Engagement Team and not the PSG. Willard Interview.

[125] Second Interim Report, Annex 5 to Appendix L (Related Party Transactions), at 1; Second Interim Report, at 104.

[126] Second Interim Report, Annex 5 to Appendix L (Related Party Transactions), at 33-34. The obligations of the Raptors to Enron consisted of both promissory notes held by Enron and derivative instruments providing for future settlement. The promissory notes were subject to being written down if Enron's ability to collect was determined to be impaired under FAS 114. Accounting for Creditors for Impairment of a Loan, Statement of Financial Accounting Standards No. 114 (Financial Accounting Standards Bd. 1993) ("FAS 114"). The derivative instruments were carried by Enron at fair value pursuant to FAS 133, which fair value was required to reflect credit risk. Accounting for Derivative Instruments and Hedging Activities, Statement of Financial Accounting Standards No. 133 (Financial Accounting Standards Bd. 1998) ("FAS 133"). Thus, the Raptor aggregation issue was both an impairment and a fair value issue.

arrangement.[127]    Nevertheless, the Engagement Team approved Enron's accounting for the Raptor transactions on an aggregated basis.[128]

In early 2001, Bass, who was formerly on the Engagement Team and became a member of the PSG in December 1999, was informed by Andersen senior executive Gary Goolsby that Causey had requested that Andersen remove Bass from further participation in the Enron engagement, and that Andersen senior executives had agreed to that request.[129] Stewart testified:

> [I] thought it was unprofessional for Enron to make such a request or demand or whatever it was, and I was upset that the firm had agreed to it. . . . [I] can't speak for the whole firm in terms of defining moments, but it was a defining moment to me and me as part of the PSG and our relationship [with Enron]. . . .[130]

*Andersen's February 5, 2001 Client Retention Meeting*

As part of the customary and periodic review of Andersen's "maximum" risk clients such as Enron, described above, on February 5, 2001, a conference call meeting was held between various members of the Engagement Team, PSG and other senior Andersen executives to consider whether to retain Enron as a client for the coming

---

[127] Andersen Criminal Trial Transcript, at 1141-1142, 5571 (testimony of Carl Bass, May 9, 2002, and John Stewart, May 31, 2002).

[128] The final Raptor memorandum on this point states that Michael Odom, the Practice Director, and Lowther, the Concurring Partner, approved the treatment. Memorandum from David Duncan, *et al.*, Andersen, to the Files, regarding Raptor Structures Update, Dec. 28, 2000, as amended, Oct. 12, 2001 ("Raptor Memo #8A") (listed in Annex 1 to this Appendix), at 3 [AB0648 00577-AB0648 00579]. Lowther has told the Examiner that, at the time, he was unaware of the contrary view of the PSG. Lowther believed then, and continues to believe, that the Raptor notes, which were due in four years, were not impaired regardless of the Aggregation Issue. Lowther Interview. There is evidence that the PSG's advice on this point was not clearly communicated. *See* Bass 3/4/01 Email.

[129] Andersen Criminal Trial Transcript, at 1163 (testimony of Carl Bass, May 9, 2002). Even though he moved from the Engagement Team to the PSG in December 1999, Bass spent considerable time as a member of the PSG consulting with the Engagement Team on Enron matters in 2000. Andersen Criminal Trial Transcript, at 1123-24 (testimony of Carl Bass, May 9, 2002). Moreover, even after Andersen agreed to his removal from Enron matters in early 2001, he continued to consult on Enron. Andersen Criminal Trial Transcript, at 1175 (testimony of Carl Bass, May 9, 2002).

[130] Andersen Criminal Trial Transcript, at 5537-38 (testimony of John Stewart, May 31, 2002).

year.[131]   Prior to the meeting, the Engagement Team had provided the participants with presentation materials.[132]   One of the slides in the presentation materials, reproduced below, disclosed how much of Enron's income before interest, minority interest and taxes ("IBIT") for 1999 and 2000 was attributable to mark-to-market accounting, fair value accounting, FAS 140 Transactions and credit/prudency reserves, and how much of Enron's 2000 IBIT and 2000 funds flow was attributable to transactions with LJM, Whitewing[133] and the FAS 140 Transactions:[134]

---

[131] Email from Michael D. Jones, Andersen, to David B. Duncan and Thomas H. Bauer, Andersen, regarding Enron retention meeting, Feb. 6, 2001 (the "Jones 2/6/01 Email"), at PSI00004467 [PSI00004467-PSI00004468].  According to the email, attendees by phone were Steve M. Samek, William Swanson (Head of ABA, Gulf Coast Market Circle), Jeannot Blanchet (former Head of the PSG), Gregory J. Jonas (PSG Partner), Robert Kutsenda (Global Practice Director), Stewart (PSG Partner), and attendees in Houston were Bennett, Goddard (Advisory Partner, Enron Engagement), Goolsby (Global Managing Partner, Risk Management), Odom (Practice Director, Gulf Coast Market Circle), Lowther (Partner in charge of Energy Audit Division and Concurring Partner on the Enron Engagement), Duncan (Global Managing Partner, Enron Engagement), Bauer (Enron Wholesale Audit Partner) and Jones (Enron Europe Partner).  The Engagement Team also held pre-year end risk review meetings with Odom and Lowther. Email from Christopher J. Herbold, Andersen, to Clint Carlin, et al., Andersen, regarding Enron – Risk Review Meeting, Nov. 7, 2000 [AB0911 1919].

[132] See Retention Meeting Presentation.

[133] The Whitewing activity is identified by the "Condor" notation in the slide.  For a more complete description of the Whitewing structure, see Second Interim Report, Appendix G (Whitewing Transaction).

[134] Retention Meeting Presentation, at 5.  The FAS 140 activity is identified by the "FAS 125" notation in the slide.

# Selected Financial Data

## Segment IBIT

|  | 00 | 99 |
|---|---|---|
| **Wholesale** | | |
| Commodity | $1,630 | $628 |
| Assets & Inv. | 889 | 850 |
| Unallocated | (259) | (161) |
| Subtotal | 2,260 | 1,317 |
| **T&D** | | |
| Pipeline | 391 | 380 |
| Electricity | 341 | 305 |
| Retail | 165 | (65) |
| Broadband | (60) | -0- |
| Corp. & Other | (615) | 61 |
| **Total** | **$2,482** | **1,995** |

## IBIT Composition

|  | 00 | 99 |
|---|---|---|
| Asset Based | $2,352 | $2,685 |
| MTM | 3,250 | 1,321 |
| Fair Value | 784 | 839 |
| FAS 125 | 324 | 264 |
| Credit/Prudency | (313) | 115 |
| Other | 60 | 437 |
| Subtotal | $6,457 | $5,491 |
| Expenses/Elims. | (3,955) | (3,496) |
| **Total** | **$2,482** | **$1,995** |

## Impact of Selected Items on 2000

|  | IBIT | Funds Flow |
|---|---|---|
| Related Party Vehicles: | | |
| LJM - Hedging Derivatives | $ 502 | $ — |
| - Other | 167 | 162 |
| Condor | — | 717 (1) |
| SFAS 125 Transactions | 324 | 1,700 (500 net) |
| **Total Company** | **$2,482** | **$2,917** |

1) Includes $540 that are also 125's

## Key Credit Ratios

|  | 00(est.) | 99 | 98 |
|---|---|---|---|
| Funds flow interest coverage | 4.00 | 3.67 | 3.53 |
| Pretax interest coverage | 2.23 | 2.63 | 2.18 |
| Funds flow/total obligations | 26.4% | 25.3% | 21.3% |
| Total obligations/total obligations plus total shareholders' equity and certain other liabilities | 42.0% | 40.4% | 46.3% |
| Debt/total capital | 40.2% | 38.5% | 41.9% |

Through the following slide, the Engagement Team explained that Enron was "Comfortable With GAAP Minimums," and "Comfortable With Use of Related-Party Structures," circumstances that created risk for Andersen:[135]

---

[135] *Id.* at 8.

# Risk Overview
## Company Specific Environmental Factors

- High Growth Rate, P.E. Multiple and Incentives put Management Under Extreme Pressure
  - Overall, Business Unit, Individual
  - Increased Pressure on New Businesses

- Company Culture of Assertiveness, Informed Risk Taking and Sophisticated Structuring
  - History of Success When Challenged
  - High Degree of Confidence in Management by Board of Directors

- Extensive Use of Mark-To-Market and Fair Value Models

- Heavy Reliance on Completing Transactions and at a High Pace
  - "Bring Value Created to Bottom Line"
  - Demonstrate Liquidity of Portfolio
  - Achieve Capital Velocity Necessary to Achieve Business Objectives
  - Transactions Often Bunched at Period End
  - Activity Spread Among Broad Group of Individuals

- Assertive Culture Translates to Transaction Practices
  - Highly Structured Transactions Very Common (SPE's, JIV's, SFAS 125 Transactions, etc.)
  - Comfortable With GAAP Minimums
  - Comfortable With Use of Related Party Structures

- Pace of New Business Development Puts Pressure on Infrastructure and Internal Controls

- Adds People To The Structuring Process Faster Than We Have Been Able (Including Hiring a Number of Our People)

In an email to Duncan and Bauer on the following day, Michael Jones, another Engagement Team partner present at the meeting, passed along his notes on the meeting.[136] Jones' email indicated that "discussions were held to varying degrees on each page of the presentation materials."[137] Jones' email also indicated that significant discussion was held regarding the LJM transactions "including the materiality of such amounts to Enron's income statement and the amount retained 'off balance sheet.'"[138] Jones also noted that the meeting participants "discussed Enron's dependence on

---

[136] Jones 2/6/01 Email, at PSI00004467.

[137] *Id.* at PSI00004468.

[138] *Id.* at PSI00004467.

transaction execution to meet financial objectives."[139]   Jones stated that "ultimately the

conclusion was reached to retain Enron as a client citing that it appeared that we had the

appropriate people and processes in place to serve Enron and manage our engagement

risks."[140]

Also included among the presentation materials for the internal client retention

meeting were examples of slides to be presented by the Engagement Team to Enron's

Audit Committee.  One such slide is reproduced below:[141]

# Selected Observations
# 2000 Financial Reporting

(Audit Committee
Presentation Example)

| Category | Examples | Comment |
|---|---|---|
| Highly structured transactions | • Securitizations<br>• Syndication and off-balance sheet vehicles<br>• Other complex sales structures<br>• Complex contract structures | • High dependency on transactions to meet objectives.<br>• Application of GAAP often requires extreme judgement.<br>• Continued interpretive guidance likely.<br>• Extent of necessary disclosures can be judgemental. |
| Use of mark-to-market and fair value model | • Trading contracts<br>• Derivative contracts<br>• Investment company holdings of public and non-public securities | • Significant inherent judgemental issues regarding:<br>  • Applicability of model to specific products or transactions;<br>  • Valuation (curves, reserves)<br>  • Multi-element arrangement<br>• Consistency of application among business units continues to be refined.<br>• Incorporating new products continues to present challenges.<br>• Continued interpretive guidance likely.<br>• Extent of necessary disclosures can be judgemental. |

---

[139] *Id.*

[140] *Id.*

[141] Retention Meeting Presentation, at 23.

*The Audit Committee Meeting on the 2000 Financial Statements*

One week after attending Andersen's internal client retention meeting, on February 12, 2001, Duncan and Bauer attended a meeting of Enron's Audit Committee.[142]   During the Audit Committee meeting, the Andersen accountants presented this same slide, except that beside the category "Highly structured transactions," under the column "Comment" the second comment presented to the Audit Committee stated that "Application of GAAP often requires *significant* judgment," rather than "Application of GAAP often requires *extreme* judgment."[143]

The risk to Andersen of retaining Enron as a client and the risk to Enron associated with significant or extreme judgment in the application of GAAP or in making financial disclosures was in essence the same – the risk that others could have a different view about whether those accounting judgments were proper.  If that risk were realized, both Enron and Andersen could be subject to claims by third parties that they had been misled by Enron's publicly disseminated financial information.

As is described in detail below, applicable professional standards required that Andersen "*determine that the audit committee is informed* about the methods used to account for significant unusual transactions *and the effect of significant accounting policies* in controversial or emerging areas for which there is lack of authoritative

---

[142] Minutes of Enron Audit Committee Meeting, Feb. 12, 2001 (the "2/12/01 Audit Committee Minutes"), at 1 [AB000204423-AB000204428].

[143] *Compare* the Audit Update Presentation, *Selected Observations - 2000 Financial Reporting* ("Selected Observations of 2000"), at AB000204304 (attached to the 2/12/01 Audit Committee Minutes) [AB000204301-AB000204305] (handwriting redacted to improve legibility), *with* the Retention Meeting Presentation, at 23 (emphasis added).  Handwritten notes related to that meeting suggest that in his oral presentation, Duncan may have described the risks as "extreme."  David Duncan, Typed Notes entitled "Financial Comments," undated [AB0911 2292].  These notes, and other similar typed and handwritten notes described in this Appendix, have not been authenticated, nor has the Examiner been able to obtain the testimony of Duncan with respect to them.  Duncan has exercised his Fifth Amendment privilege.

guidance or consensus."[144]   The standards also required that Andersen discuss the

*"quality, not just the acceptability"* of Enron's accounting policies and "items that have a

significant impact on the *representational faithfulness . . .* of the accounting information

included in the financial statements." The standards provide that the discussion should be

"open and frank and generally should include such matters as the consistency of the

entity's accounting policies and their application and the clarity and completeness of the

entity's financial statements, *which include related disclosures.*"[145]

The Examiner has found no evidence, however, indicating that any of the

Andersen partners at the February 12, 2001 Audit Committee meeting described for the

Audit Committee what those Andersen partners knew (and had discussed a week earlier

among themselves at their meeting to assess Andersen's risk in retaining Enron as a

client), specifically, the amount of Enron's IBIT or funds flow attributable to: (i) mark-

to-market accounting; (ii) the FAS 140 Transactions; or (iii) related party transactions.[146]

Rather, at the Audit Committee meeting, Duncan told the Audit Committee that Andersen

expected to issue an unqualified opinion on Enron's financial statements, whereupon the

Audit Committee approved the financial statements for recommendation to the Board.[147]

On February 23, 2001, Andersen issued its unqualified opinion on Enron's 2000 financial

statements.

---

[144] SAS 61, at § 7 (AU § 380.7) (emphasis added).

[145] SAS 61, at § 11 (as amended by SAS 90, at § 1) (AU § 380.11) (emphasis added).

[146] The 2/12/01 Audit Committee Meeting, as well as other Audit Committee meetings from February 1999, through November 2001, are discussed in more detail below in the *Andersen's Interaction with Enron's Audit Committee* Section of this Appendix.

[147] 2/12/01 Audit Committee Minutes, at 2.

*Bass Identifies Problem Areas*

On March 4, 2001, Bass sent Stewart an email addressing "some sort of assertion that I have a 'problem' with Rick Causey or someone at Enron that results in me having some caustic and inappropriate slant in dealing with their questions."[148]  In this email, Bass highlighted a number of Enron's year-end 2000 transactions:

> *Blockbuster* – Bass stated to Stewart that "both you and I had expressed some concern about this deal."[149]
>
> *Side agreements Guaranteeing 3% Residual Equity Interest in SPE* – Bass stated that he "was aware of another securitization in which [Enron] had provided a side agreement to guarantee the 3% residual equity at risk with [CIBC].  Although it is not my job (which I acknowledged to the Engagement Team), I did suggest confirmation as an audit procedure."[150]
>
> *Bacchus Transaction* – As discussed in the Second Interim Report, Bacchus was a FAS 140 Transaction in which Enron sold an equity interest in its pulp and paper business and recognized $212 million of gain and $200 million of operating cash flow in December of 2000.[151]  After the transaction was closed, Bass advised that additional equity was needed in order to support the nonconsolidation of Fishtail, one of the entities in the structure.[152]  Bass's email states that "the Engagement

---

[148] Bass 3/4/01 Email, at 1.

[149] *Id.* at 2.  In its earnings release of October 16, 2001, in connection with a "restructuring" of its broadband business, Enron recognized a loss of $180 million, thus in effect reversing $58 million of gain recognized in the fourth quarter of 2000 and an additional $53 million of gain recognized in the first quarter of 2001.  Enron Press Release, "Enron Reports Recurring Third Quarter Earnings of $.43 Per Diluted Share; Reports Non-Recurring Charges of $1.01 Billion After-Tax; Reaffirms Recurring Earnings Estimates of $1.80 for 2001 and $2.15 for 2002; and Expands Financial Reporting," Oct. 16, 2001 [ELIB00001783].

[150] Bass 3/4/01 Email, at 2.  As discussed in the Third Interim Report and summarized below in the *Andersen's Role in the FAS 140 Transactions* Section of this Appendix, senior Enron officers had given CIBC, Citigroup and Barclays oral assurances that Enron would pay off the 3% "at risk" equity interests regardless of whether the SPE had sufficient assets.  Andersen accountants have informed the Examiner that had they known this, they would not have approved Enron's accounting for the FAS 140 Transactions because the equity interests were not "at risk."  Despite Bass's suggestion, the Engagement Team did not seek to confirm with the holders of the 3% equity interests whether those interests were "at risk."

[151] *See* Second Interim Report, Appendix K (Forest Products Transactions), at 20-35 (discussing the Fishtail transaction); *see also* Second Interim Report, Appendix K (Forest Products Transactions), at 23 n.104 (discussing Fishtail's initial capital structure).  The Examiner has concluded, for the reasons described in the referenced Appendix, that Fishtail did not own a "business."  For that reason, and other reasons described in the Appendix, the accounting for the Bacchus transaction was not in accordance with GAAP.  Second Interim Report, Appendix K (Forest Products Transactions).

[152] *See* Second Interim Report, Appendix K (Forest Products Transactions).

Team went back and had the equity holder contribute additional equity. The equity holder in this case was the LJM entity, a related party, because the CFO is the managing equity member."

*Raptors* – Bass noted that "one problem I had with Raptor was that the original structure was one in which the PSG was not consulted on."[153]

*Azurix Impairment* – Enron had an investment in the water systems company, Azurix Corp., through its Marlin Share Trust structure, as well as direct stock ownership. The decline in the value of this investment raised an accounting issue at the end of 2000 regarding the amount of impairment charge that Enron should recognize. Regarding this issue, Bass stated to Stewart:

> You told them about 6-9 moths [sic] ago that 6-9 months was a good indicator of whether an impairment was permanent with respect to that investment. I had repeated that advice post yearend but by then the investment was under water for about 18 months. I told the engagement partner that it was judgment – not really PSG's call. I was told by him that 'he had never communicated the original advice to the client and therefore he could not go in now and do so now.' I was led to believe that he went to his Practice Director. Again, not really our call.[154]

*Eli Lilly Transaction* – As discussed in the Second Interim Report, the Eli Lilly transaction was a FAS 140 Transaction in which Enron "monetized" a portion of its contract with Eli Lilly to provide long-term energy-management outsourcing services.[155] In his email to Stewart, Bass described the transaction and stated "in effect, nothing was accomplished in this transaction except a sale of future revenues.[156] The engagement partner [Cash] agreed with my view and in fact had the same view. She was seeking concurrence. I was told they booked the transaction anyway and that we will propose a PAJE."[157] When a PAJE was proposed, Enron did not accept the proposal, Andersen determined in the context

---

[153] Bass 3/4/01 Email, at 3. The "original structure" was the hedge involving Enron's investment in Rhythms NetConnections (the "Rhythms Hedge").

[154] *Id.* In its 2000 financial statements, Enron did not record an impairment of its investment in Azurix Corp., which investment was recorded at $325 million at year end. "Financial Review - Enron Corp. and Subsidiaries Notes to the Consolidated Financial Statements - Unconsolidated Equity Affiliates," Enron 2000 Annual Report, at 42. However, in its earnings release of October 16, 2001, Enron announced that it was taking a $287 million impairment charge on its investment in Azurix Corp. Enron did, on the other hand, reflect in its earnings for 2000 its share of an impairment that Azurix Corp. itself took related to the carrying value of its Argentine assets. Enron's after-tax portion of that charge was $326 million. *Id.*

[155] *See* Second Interim Report, at 32-36.

[156] Bass 3/4/01 Email, at 4.

[157] *Id.*

of both the first and second quarters that the PAJE was not material and thus did not insist that Enron record it.[158]

Bass did not participate in the February 5, 2001 Enron client retention meeting. While Stewart apparently did participate,[159] the Examiner has found no evidence indicating that, at the time, Stewart was fully aware of the various issues set forth in Bass's March 4, 2001 email.

*Problems with the Raptors*

As Enron's stock began to decline in value during the summer of 2001, it became apparent that, even on an aggregate basis, the Raptor entities could not satisfy their obligations to Enron under the various hedging transactions. Accordingly, Enron began to consider a number of options, including the termination of the Raptor transactions.[160]

Stewart testified that he participated in a conference call on September 11, 2001, in which

> the issue being discussed was . . . whether we thought or the firm should recommend or did the firm have a view as to whether these Raptor transactions should be terminated and closed down and finished up with if you will ... but this was a business decision, not an accounting decision. But, I think Rick [Petersen] and I expressed a view that it would be all right with us if they terminated.[161]

On September 14, 2001, Duncan's executive assistant, Shannon Adlong, circulated ten memos that the Engagement Team had prepared documenting their conclusions on LJM2 and the various Raptor transactions to four members of the PSG as

---

[158] Cash Sworn Statement, at 135-36.

[159] Jones 2/6/01 Email.

[160] *See* Memorandum from Ryan H. Siurek and Ron Baker, Enron, to the Files, regarding Project Raptor-Addendum, Sept. 2001 (draft) [AB000182577-AB000182579]; Second Interim Report, Annex 5 to Appendix L (Related Party Transactions), at 43-47.

[161] Andersen Criminal Trial Transcript, at 5406-07 (testimony of John Stewart, May 30, 2002).

well as to a number of partners and managers on the Engagement Team, requesting that they review the memos for a call on the following Monday, September 17, 2001. Bass responded in an email dated September 25, 2001, that he had not seen the Raptor memos until they were circulated on September 14.[162] His September 25th email examines the issues described in five of the memos, indicating those issues on which he was consulted and his advice regarding the same, and those issues on which he was not consulted and rendered no advice. Stewart prepared and sent a similar email dated September 25, 2001.[163]

In September 2001, a group of up to twenty Engagement Team and PSG partners, Practice Directors, in-house legal counsel and senior Andersen executives began to address various Enron issues during conference calls held every two or three days.[164] This group was reduced in size somewhat and was formally designated as the "core consultation group" around October 20-23, 2001.[165]

During the period September 21, 2001 through October 16, 2001, the consultation group reviewed at least sixteen different Raptor memos dated from December 31, 1999, through October 12, 2001. These Raptor memos were prepared by Engagement Team accountants, and they discussed numerous GAAP issues with respect to the Raptors.[166]

---

[162] Email from Carl Bass, Andersen, to Debra Cash, *et al.*, Andersen, regarding Raptor memos, Sept. 25, 2001 [ELIB00003663-00001-ELIB00003663-00002].

[163] Email from John E. Stewart, Andersen, to Debra A. Cash, *et al.*, Andersen, regarding Enron Raptor Memos, Sept. 25, 2001 [AB0786 02952].

[164] Andersen Criminal Trial Transcript, at 4519-24 (testimony of Richard Corgel, May 27, 2002).

[165] Andersen Criminal Trial Transcript, at 4520 (testimony of Richard Corgel, May 27, 2002). This group is referred to in other text as the "consultation group," although inclusion in the group and the group's label was not formalized until October.

[166] *See* Annex 1 to this Appendix (summarizing the Raptor memos). Many of the GAAP issues applied to each of the four Raptor structures.

As a result of this lengthy deliberative process, the memos were rewritten to reflect the agreements and positions of the various accountants on the Engagement Team and the PSG, as well as the senior Andersen executives and in-house lawyers, on the numerous accounting issues identified in the memos. Included in this discussion was mention of the Aggregation Issue: that Enron, with Andersen's concurrence, had improperly permitted the aggregation of the four Raptors for purposes of determining impairment of the notes and the fair value of derivative instruments held by Enron at the end of 2000 and the first and second quarter of 2001.[167]

Also during this period prior to the October 16, 2001 earnings release, Andersen realized that it had made another error connected with the Raptor transactions by permitting Enron to book approximately $1 billion of notes receivable from the Raptor entities as assets rather than as a reduction in equity. This error resulted in an overstatement of Enron's equity as follows:[168]

| Date | Percentage Overstatement |
|------|--------------------------|
| 06/30/2000 | 1.6% |
| 09/30/2000 | 1.5% |
| 12/31/2000 | 1.5% |
| 03/31/2001 | 8.5% |
| 06/30/2001 | 8.5% |

---

[167] Memorandum from David B. Duncan and Debra A. Cash, Andersen, to the Files, regarding Enron-Raptor Entity Note Impairment, Oct. 15, 2001 ("Raptor Memo #14") (listed in Annex 1 to this Appendix) [AB0684 00306-AB0648 00316].

[168] Memorandum from Dave Duncan and Debra A. Cash, Andersen, to the Files, regarding Raptor Notes - Balance Sheet Reclass, Sept. 1, 2001 ("Raptor Memo #13") (listed in Annex 1 to this Appendix) [AACC000010671]. Under GAAP, when a company issues its stock in exchange for a note, the company is not permitted to report the note as an asset and must instead report the note as a reduction to equity ("contra equity"). *See* Classifying Notes Received for Capital Stock, 1 EITF Abstracts (FASB) 85-1 (Mar. 28, 1985); SEC Staff Accounting Bulletin No. 40 (Topic 4-E), Equity Accounts, Receivables from Sale of Stock, 46 Fed. Reg. 115133 (Jan. 23, 1981). After considering other 2000 year-end adjustments that were not made, year-end 2000 equity was overstated by 10.5% as a result of this error. Second Interim Report, Annex 5 to Appendix L (Related Party Transactions).

Andersen initially supported Enron's conclusion that these errors did not have a material impact on the prior periods.[169]  Accordingly, on the morning of October 16, 2001, Duncan informed Causey that although Andersen had not finished its work, it believed that a restatement would not be necessary as a result of the Aggregation Issue or the Raptor equity overstatement.[170]

Enron, without objection from Andersen, did not mention in its earnings release that a restatement was under consideration.[171]  Moreover, Enron chose not to disclose in its earnings release the $1 billion reduction in equity,[172] which was unrelated to the earnings charge of a similar amount.  It was not until an analyst call later that afternoon that Enron revealed the reduction in equity.

*Other Revelations*

The negative publicity surrounding the related party transactions that followed the third quarter earnings release and analyst call resulted in:  (i) a letter dated October 17, 2001 from the SEC's Fort Worth office to Enron opening an informal SEC inquiry;[173]

---

[169] *See, e.g.,* Andersen Criminal Trial Transcript, at 1847, 2038-39, 2422-23 (testimony of David Duncan, May 14-16, 2002).

[170] Andersen Criminal Trial Transcript, at 1796, 1847, 5592-93 (testimony of David Duncan, May 14, 2002, and John Stewart, May 31, 2002).

[171] Duncan testified that he objected to Enron's use of the label "non-recurring" in describing the $1 billion third quarter charge in its earnings release. *See* Andersen Criminal Trial Transcript, at 1796, 1847, 5592-93 (testimony of David Duncan, May 14, 2002).  Other than that, Duncan and Andersen expressed no objections to the press release.  *See* Email from Gary B. Goolsby, Andersen, to David B. Duncan, Andersen, and copy to Debra A. Cash, *et al.*, Andersen, regarding Press Release Verbage, Oct. 13, 2001 [AATR000139-AATR000140]; Email from Michael C. Odom, Andersen, to David B. Duncan, Andersen, regarding Press Release Verbage, Oct. 12, 2001 [PSI00272912]; Memorandum from David B. Duncan, Andersen, to the Files, regarding Enron Press Release Discussions, Oct. 15, 2001 (draft) [AATR000232-AATR000234].

[172] Enron's total reduction of equity was $1.2 billion, composed of the $1 billion resulting from the Raptor equity overstatement and $200 million resulting from the termination of the Raptors themselves. *See* Enron Form 10-Q filed with the SEC for the Quarter ended Sept. 30, 2001 (the "Enron 9/30/01 Form 10-Q").

[173] Letter from Spencer C. Barasch, Associate District Administrator, SEC, and John C. Martin, Staff Attorney, SEC, to James V. Derrick, Jr., Executive Vice President and General Counsel, Enron, and

- 55 -

(ii) Fastow's departure on October 24, 2001; and (iii) the Board's appointment of the Powers Committee. In the days that followed, in order to help Enron respond to the SEC's inquiry, Andersen performed further analysis of the various "high risk" accounting structures it had previously approved. As a part of this work, Duncan testified that Andersen discovered[174] a third error: that Enron's Non-Economic Hedge of its Rhythms stock in 1999, which accounted for $95 million (11%) of that year's net income (the "Rhythms Hedge"), also was flawed.[175] In addition, Andersen reversed its earlier position on the immateriality of the $1 billion equity reduction issue, due in part to adverse public reaction to the analyst call as reflected in the decline of Enron's stock price, concluding that the reduction of 8.5% of Enron's December 31, 2000 equity was material and required restatement.[176]

---

Andrew S. Fastow, Executive Vice President and Chief Financial Officer, Enron, Dec. 17, 2001 [ELIB00003682-00001-ELIB00003682-00006].

[174] Duncan testified that the Engagement Team first discovered this error after the October 16 earnings release. However, Bass informed Stewart in his March 4, 2001 email that the PSG had not approved the Rhythms Hedge. Bass 3/4/01 Email, at 2.

[175] Second Interim Report, Annex 2 to Appendix L (Related Party Transactions); *see generally* Andersen Criminal Trial Transcript, at 2034 (testimony of David Duncan, May 15, 2002); Andersen document entitled "Rhythms Restatement," undated (the "Rhythms Restatement Document") (with handwritten notes) [AB1128 01360].

[176] Andersen Criminal Trial Transcript, at 1848-49, 1927-28 (testimony of David Duncan, May 14, 2002). The Engagement Team's original determination that the $1 billion equity reduction was not material seems to have been in conflict with the SEC's views on materiality in SAB 99. Senior Andersen executives apparently came to this realization as well. Andersen Criminal Trial Transcript, at 6149-6151 (testimony of John Riley, June 4, 2002). Andersen Engagement Team partners Duncan and Cash, Practice Director Odom and Concurring Partner Lowther apparently all agreed prior to the October 16, 2001 earnings release that the overstatement of equity at December 31, 2000, March 31, 2001, and June 30, 2001, was not material. Raptor Memo #13; *see also* Andersen Criminal Trial Transcript, at 2423 (testimony of David Duncan, May 16, 2002). In an email to Duncan dated October 25, 2001, Andersen executive Larry Rieger notes that "since SAB 99 talks about 5% as being material (at least as far as income is concerned), how can 10.5% and 8.5% of equity not be material?" Email from Lawrence A. Rieger, Andersen, to David B. Duncan, Andersen, regarding Balance Sheet Memo, Oct. 25, 2001, at ELIB00003851-00001 [ELIB00003851-00001-ELIB00003851-00002]. Rieger suggested that the Engagement Team add additional justifications to Raptor Memo #13, dated Sept. 1, 2000, to support their initial determination, and they did. *Id.*

Also following the October 16, 2001 earnings release, but prior to the filing of Enron's third quarter 10-Q on November 19, 2001, Andersen became aware that Michael Kopper's investment in Chewco, the entity that had purchased CalPERS' interest in JEDI, was not at risk.[177] This revelation meant that the JEDI partnership should have been consolidated with Enron beginning in 1997. It also called into question the accounting treatment for the other SPEs in which Chewco had invested.[178]

*The Restatement Decision*

On November 2, 2001, Andersen partners Duncan, Goddard and Riley participated in a meeting of the Enron Audit Committee[179] and advised the Audit Committee about: (i) the materiality of the $1 billion reduction to equity; (ii) the reversal of the 1999 Rhythms Hedge; (iii) the consolidation problem caused by the discovery of the Chewco facts; and (iv) the resulting need for restatement.[180] At the meeting, Lay observed that the equity reduction "would likely have had significantly less impact on the market value of the Company if originally taken in the periods now being restated."[181] The draft minutes of that meeting also reflect discussion "on the respective responsibilities of the Company and AA in detecting any related party nature of

---

[177] Second Interim Report, Annex 1 to Appendix L (Related Party Transactions); Third Interim Report, Appendix C (Role of Enron's Officers). As discussed in the Third Interim Report, evidence suggests that Enron officers failed to inform Andersen of critical information regarding this issue. *See* Third Interim Report, Appendix C (Role of Enron's Officers).

[178] Andersen Criminal Trial Transcript, at 5602-03 (testimony of John Stewart, May 31, 2002).

[179] Riley, a former SEC Acting Chief Accountant, was called in by Andersen executives to monitor the Engagement Team. Andersen Criminal Trial Transcript, at 1959 (testimony of David Duncan, May 14, 2002).

[180] Duncan testified that, given the need for restatement caused by discovery after October 16 of the Rhythms Hedge and Chewco errors, the $1 billion equity reduction, which was previously considered immaterial by Andersen, needed to be reflected in the restatement. Andersen Criminal Trial Transcript, at 1950-52, 1980-82 (testimony of David Duncan, May 14-15, 2002).

[181] Minutes of Enron Audit Committee Meeting, Nov. 2, 2001 (the "11/2/01 Audit Committee Minutes"), at AB000468943 [AB000468942-AB000468944].

transactions as well as determining that the initial equity contributions of Chewco were

sufficient to qualify as a SPE, the impact on the Company of potentially consolidating the

structures, and the process and resources currently deployed by the Company and AA to

develop and review the facts to resolve the outstanding issues."[182]

Duncan and Goddard met with the Audit Committee again on November 5, 2001.

During this meeting, the Andersen accountants informed the Audit Committee that

Andersen would not be able to conclude its review of Enron's third quarter financial

statements until Deloitte & Touche, which had been engaged by the Powers Committee,

had completed its work. [183]

*Enron Files for Bankruptcy*

On November 8, 2001, Enron announced its intention to restate its financial

statements for 1997 through the second quarter of 2001.[184]  On November 19, Enron filed

its third quarter 10-Q, indicating that Andersen was unable to finalize its review of those

quarterly statements.[185]  On the same day, Enron met with its bankers in New York.[186]

---

[182] 11/2/01 Audit Committee Minutes, at AB000468943.  Contemporaneous Andersen notes from this meeting indicate that the Audit Committee questioned Andersen regarding why Andersen's audit procedures had not included verification of the Chewco equity and that Andersen may have had no clear explanation for the lack of such auditing procedures. *See* Handwritten Notes entitled "A/C meeting 11/2" (taken from the desk files of Andersen partner D. Stephen Goddard) ("Do we have Firm auditing policy in getting behind SPE equity? -- A/C wanted to know why we hadn't verified the equity in SPE") (underlining in original) [AA-EX00278310].

[183] *See* Discussion with Audit Committee Chair Agenda, Nov. 5, 2001 (containing Duncan's handwritten notes) [ELIB00003838-00001]; *see also* Andersen Criminal Trial Transcript, at 1964, 1978 (testimony of David Duncan, May 14-15, 2002).  During this time, Andersen considered offering to the Powers Committee Andersen's own forensic accounting unit in lieu of Deloitte & Touche. *See* Andersen Criminal Trial Transcript, at 3632-33 (testimony of David Stulb, May 23, 2002).

[184] Enron Form 8-K filed with the SEC on Nov. 8, 2001 (the "Enron 11/8/01 Form 8-K").  Enron has never actually restated its financial statements.

[185] Enron 9/30/01 Form 10-Q.

[186] Enron Corp. PowerPoint Presentation, Waldorf Astoria, New York, N.Y., Nov. 19, 2001 [AB0000321534-AB0000321605].

On November 28, Enron's senior unsecured debt was downgraded to junk status by the Rating Agencies.[187]  Enron filed its bankruptcy petition on December 2, 2001.

### B.      Andersen's Conviction and Current Status

*Allegations of Improper Document Destruction*

The publicity following Enron's bankruptcy included intense congressional reaction and numerous public statements by politicians.[188]  On January 15, 2002, following reports of document destruction at Andersen's Houston offices, Andersen's partners, Bauer, Cash and Willard were placed on administrative leave, and Duncan's employment was terminated by Andersen.[189]  On January 17, 2002, the Enron Board voted to terminate Andersen as its auditor.[190]

On March 7, 2002, Andersen was indicted for obstruction of justice related to this document destruction.  Andersen's criminal trial was held in Houston from May 6, 2002 through June 5, 2002.  On June 15, 2002, Andersen was convicted for violating 18 U.S.C. § 1512(b)(2).  This statute makes it a crime to:  "corruptly persuade[] another person, or attempt[] to do so, . . . with intent to . . . cause or induce any person to - - (A) withhold . . . a record, document, or other object, from an official proceeding; [or] (B) alter,

---

[187] Enron Press Release, "Enron Announces Notification by Dynegy of Merger Termination; Credit Rating Downgraded; Takes Action to Preserve Core Franchise," Nov. 28, 2001 (*available at* http://www.enron.com/corp/pressroom/releases/2001/ene/88-112801Releaseltr.html).

[188] *See, e.g., The Role of Financial Institutions in Enron's Collapse, Hearing before the Permanent Subcomm. on Investigations, Senate Comm. on Governmental Affairs*, 107th Cong. (July 23, 2002) (*available at* http://www.senate.gov/~gov_affairs/072302roachindex.htm).

[189] Andersen Criminal Trial Transcript, at 2086 (testimony of David Duncan, May 15, 2002).

[190] Enron Press Release, "Enron Board Discharges Arthur Andersen in All Capacities," Jan. 17, 2002 (*available at* http://www.enron.com/corp/pressroom/releases/2002/ene/01172002release.html).

destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding."[191]

Andersen has appealed its criminal conviction to the United States Court of Appeals for the Fifth Circuit.[192]   Oral argument was held on October 9, 2003.[193]  As of the date of this Report, Andersen's appeal remains pending.

*Current Status of Andersen*

On June 15, 2002, after the jury had returned its verdict, the SEC issued a press release stating that "[i]n light of the jury verdict and the underlying events," Andersen had informed the SEC that it would "cease practicing before the Commission by Aug. 31, 2002."[194]  As of August 31, 2002, Andersen "voluntarily relinquished, or consented to revocation of, its firm permits in all states where it was licensed to practice public accountancy with state regulators."[195]  While Arthur Andersen, LLP, an Illinois limited liability partnership, continues to exist as a legal entity, only a vestige of its former operations remains.  All of Andersen's former partners have resigned from the firm,

---

[191] 18 U.S.C. § 1512(b) (2); *see also* Brief of Appellant Arthur Andersen, *United States v. Arthur Andersen LLP*, No. 02-21200 (5th Cir. filed Mar. 7, 2002) on Appeal to the United States Court of Appeals for the Fifth Circuit.

[192] *See* Brief for the United States, *United States v. Arthur Andersen LLP*, No. 02-21200, on Appeal to the United States Court of Appeals for the Fifth Circuit.

[193] *See* Oral Argument Schedule, *available at* http://www.ca5.uscourts.gov/clerk/calendar/0310/12.htm.

[194] SEC Statement Regarding Andersen Case Conviction, June 15, 2002 (*available at* http://www.sec.gov/news/press/2002-89.htm).  SEC regulations require that certified public accountants practicing before the SEC remain in good standing under the laws of the place of their residence or principal office.  *See* 17 C.F.R. § 210.2-01(a) ("The Commission will not recognize any person as a certified public accountant who is not duly registered and in good standing as such under the laws of the place of his residence or principal office.").

[195] David Greising, *On Andersen, the "Bad Apple" Argument Rots*, Chi. Trib., Sept. 4, 2002.

leaving four recently created limited liability companies (named Omega Management I through IV) as Andersen's only remaining partners.[196]

According to published reports, Andersen's headcount has been reduced from 28,000[197] to approximately 150 employees, most of whom are engaged in operating Andersen's lone operating asset, a 150-acre conference center in St. Charles, Illinois.[198] Renamed the "Q Center," Andersen's conference center reportedly has a long-term contract with the consulting firm Accenture,[199] which was spun off from Andersen in August 2000.[200]   In addition to its Q Center staff, Andersen employs a few dozen personnel, primarily attorneys, who occupy one floor of Andersen's former headquarters in downtown Chicago.[201]

---

[196] Ameet Sachdev, *Conference Center Last Resort for Andersen*, Chi. Trib., May 22, 2003 (the "Conference Center Last Resort Article").

[197] Delroy Alexander, *Andersen Offices' Art for Sale; Auction May Raise $ 1 Million*, Chi. Trib., Oct. 29, 2002.

[198] Conference Center Last Resort Article.

[199] *Id.*

[200] *See Accenture: Our History,* (last visited Oct. 20, 2003) (*available at* http://www.accenture.com/xd/xd.asp?it=enweb&xd=aboutus\history\hist_ourhistory.xml) (noting that the separation of Accenture from Andersen resulted from an arbitrator's decision in August 2000); *see also* Conference Center Last Resort Article.

[201] Conference Center Last Resort Article.

## IV.    ANDERSEN'S ROLE IN ENRON'S SPE TRANSACTIONS

Unlike other third parties that did business with Enron, evidence indicates that Andersen was involved in nearly all of Enron's SPE Transactions.    The following discussion explores examples of Andersen's involvement in these transactions. As discussed below, based upon the evidence, a fact-finder could conclude that Andersen was negligent and aided and abetted Enron's officers in their breaches of duty in connection with the design, implementation and disclosure of these transactions.

### A.    Three Errors Acknowledged by Andersen

Andersen accountants have acknowledged that they committed three separate errors in their audit of Enron.    These errors would support a claim of professional negligence by Enron against Andersen.    The first relates to the Aggregation Issue.    As previously described, in December 2000 and for the first two quarters of 2001, Enron entered into agreements that were intended to permit it to consider the credit capacity of the Raptor entities collectively in determining whether any particular Raptor entity could satisfy its obligations to Enron.    Andersen has acknowledged that such an aggregation could not have been accomplished under the circumstances, and that it erred in approving Enron's related accounting.[202]    Through the use of a new three-step test to analyze the potential impairment of the Raptor notes held by Enron, developed by the PSG after the applicable financial statements had been issued, Andersen concluded just prior to Enron's Third Quarter 2001 earnings release that the impairment resulting from the PSG's rejection of an aggregation approach was not material.[203]

---

[202] Andersen Criminal Trial Transcript, at 2307-09 (testimony of David Duncan, May 16, 2002).

[203] *See* Raptor Memo #14; *see also* Annex 1 to this Appendix.

Andersen has also acknowledged another, more material, error related to the Raptor transactions.[204]  As previously discussed, Andersen erred in permitting Enron to record notes received from the Raptor entities as assets.  Andersen has acknowledged that GAAP required these notes, given to Enron by the Raptors in exchange for Enron's contribution of its own stock, to be shown not as assets, but as a reduction of equity on Enron's balance sheet.[205]  This error resulted in a $1 billion overstatement of Enron's equity.[206]  Finally, Andersen has acknowledged that it erred when it concluded that Enron had satisfied the 3% Equity Test (a conclusion necessary to its determination that Enron appropriately did not consolidate the entity with which it engaged in the Rhythms Hedge).[207]  The Rhythms transaction accounted for $95 million, or 11%, of Enron's 1999 income before interest and taxes.[208]

## B.    Evidence of Enron's Deception of Andersen

As discussed in Prior Reports, the Examiner has concluded that Enron's accounting for its SPE transactions violated GAAP in a number of respects in addition to those material accounting errors that Andersen has acknowledged.  With respect to certain of these additional violations of GAAP, there is evidence that certain of Enron's

---

[204] Andersen Criminal Trial Transcript, at 2020, 2034 (testimony of David Duncan, May 15, 2002).

[205] Andersen Criminal Trial Transcript, at 1983 (testimony of David Duncan, May 15, 2002).

[206] Andersen Criminal Trial Transcript, at 1816 (testimony of David Duncan, May 14, 2002); Balance Sheet Reclass Memo.  This amount is unrelated to the $1 billion earnings restatement announced on October 16, 2001, described above.

[207] Andersen Criminal Trial Transcript, at 2034 (testimony of David Duncan, May 15, 2002).

[208] *See* Second Interim Report, Annex 2 to Appendix L (Related Party Transactions).

officers and other employees concealed material facts from Andersen that would have precluded Enron's desired accounting treatment if Andersen had been made aware of those facts. For example, as discussed later in this Appendix, Andersen accountants have indicated that they were unaware that Enron officers had entered into side agreements guaranteeing repayment of equity that was supposedly "at-risk" in Enron's FAS 140 transactions.[209]  Andersen accountants also have indicated that, had they known this information, they would not have approved Enron's accounting for those transactions.[210] Evidence suggests that Enron officers and employees understood that Andersen accountants would not agree with the chosen accounting if they were aware of the information, and thus the officers and employees deliberately kept the information from Andersen.   Additional evidence of deception of Andersen by Enron officers and employees includes:

- In Nigerian Barge, "formulating [a] story" to tell Andersen about taking Merrill Lynch out of the transaction.[211]

---

[209] Cash Sworn Statement, at 139-42; Bass Sworn Statement, at 31-32; Grutzmacher Sworn Statement, at 106-07; Neuhausen Interview; Stewart Interview; Scardino Interview.

[210] Scardino Interview; Stewart Interview; Bass Sworn Statement at 44-46; *see also* Third Interim Report for other specific circumstances in which the evidence indicates that important information was withheld or concealed from Andersen. Third Interim Report, Appendix C (Role of Enron's Officers), at 39-44.

[211] Email from Alan Quaintance, Enron, to Sean Long, *et al.*, Enron, regarding Nigeria Barge Project, June 1, 2000 (the "Quaintance Email"), at 1-2 ("We sold AA in December on the idea that [Merrill Lynch] was really wanting to take equity type risk in the deal. We will have to be able to explain why we want to take [Merrill Lynch] out of the deal and why we are willing to finance the take out. I need help formulating this story, if it is even possible.") [AB0911 2401-AB0911 2402]; Email from Cassandra Schultz, Enron, to Eric Boyt, Enron, regarding Nigeria Barge Project, June 2, 2000 ("Did we actually tell AA that ML would be staying in and they wanted to invest in Nigeria and take equity risk permanently?"), at 1 (response email to Quaintance Email) [AB0911 2401-AB0911 2402].

- "fudg[ing]" the assumptions in the Blockbuster appraisal "to get the earnings we are targeting" without telling Andersen.[212]

- Telling Andersen that nCUBE was a strategic investor in Blockbuster when the plan was to repurchase its interest.[213]

- Failing to inform Andersen about the arrangement with LJM2 that hedging would not commence until LJM2 received a return.[214]

Before proceeding to a more detailed examination of Andersen's role in Enron's accounting for its SPE transactions, it is useful to place the evidence that Andersen may have been deceived by its client in a proper analytical context. That context has two points of reference. First, the GAAP errors committed by Andersen and identified by the Examiner are not limited to the instances in which there is evidence that Enron's officers concealed important information from Andersen. Second, while auditors are not required to guarantee the absence of fraud, applicable auditing standards do not relieve the auditor from a duty to plan and perform appropriate audit procedures designed to detect accounting misstatements that may be intentionally made. To the contrary, those standards provide that "The auditor has a responsibility to plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material

---

[212] Email from John Choi, Enron, to Luitgard Fischer, *et al.*, Enron, regarding Revised ELBOW model, Feb. 21, 2000, at 1 ("Afterwards, lets talk to the structuring guys and figure out where we can fudge the assumptions to get the earnings we are targeting. There are certain assumptions that we can increase and still be able to substantiate to AA.  Connie, [p]lease don't let AA see this.") [AB1128 01361-AB1128 01377].

[213] Typed Notes entitled "Meeting on Stream Co.-1/29," undated, at AB0911 2322-AB0911 2323 ("Other more salient accounting questions related to control and deconsolidation – CL & I explained the sensitivity related to keeping the new entity de-consolidated in order to preserve the gain, story we will sell to AA if we take out nCUBE in 2nd Q, why it is important that it be a "believable" strategic investor ....") (attachment to Email from Renee St. Louis, Enron, to Kevin Howard, Enron, and Luitgard Fischer, Enron, regarding Stream Co. meeting today, Jan. 29, 2001) [AB0911 2321-AB0911 2323].

[214] Raptor Memo #3 (containing no description of this prohibition).

misstatement, whether caused by error or fraud."[215]    Statement on Auditing Standards

No. 82 ("SAS 82"), "provides guidance to auditors in fulfilling that responsibility, as it

relates to fraud, in an audit of financial statements conducted in accordance with

generally accepted auditing standards."[216]

Among other guidance, SAS 82 identifies risk factors that the independent auditor

should consider in assessing the risk of fraud and in designing the audit procedures to be

performed.    A number of the risk factors identified by SAS 82 are relevant to the

financial reporting and operating environments at Enron, including the following:[217]

- "A significant portion of management's compensation represented by bonuses, stock options, or other incentives, the value of which is contingent upon the entity achieving unduly aggressive targets for operating results, financial position, or cash flow."[218]

- "An excessive interest by management in maintaining or increasing the entity's stock price or earnings trend through the use of unusually aggressive accounting practices."[219]

- "Inability to generate cash flows from operations while reporting earnings and earnings growth."[220]

---

[215] Consideration of Fraud in a Financial Statement Audit, Statement on Auditing Standards No. 82 (American Institute of Certified Public Accountants 1997) ("SAS 82"), at § 316A.01 (AU § 316A.01).

[216] *Id.* In October 2002, the AICPA issued SAS 99, which superseded SAS 82 and which is effective for audits of financial statements for periods beginning on or after December 15, 2002. *See* Consideration of Fraud in a Financial Statement Audit, Statement on Auditing Standards No. 99 (American Institute of Certified Public Accountants 2002), at § 84 (AU § 316.84). As the SAS in effect at the relevant time, SAS 82 supplies the applicable authoritative guidance with respect to Andersen's audits of Enron's financial statements.

[217] These are many of the factors that Andersen specifically noted were "very significant" under the risk categories of "Management Pressures" and "Accounting and Financial Reporting Risk" in its SMART Form.    *See* Enron SMART Tool form, June 19, 2000, at 3 (part of Andersen work papers) [AASDTEX000082548-AASDTEX000082568].

[218] SAS 82, at § 17(a) ("Risk factors relating to management's characteristics and influence over the control environment") (AU § 316A.17(a)).

[219] *Id.*

[220] *Id.* at § 17(c) ("Risk factors relating to operating characteristics and financial stability") (AU § 316A.17(c)).

- "Significant pressure to obtain additional capital necessary to stay competitive considering the financial position of the entity – including need for funds to finance major research and development or capital expenditures."[221]

- "Assets, liabilities, revenues, or expenses based on significant estimates that involve unusually subjective judgments or uncertainties, or that are subject to potential significant change in the near term in a manner that may have a financially disruptive effect on the entity – such as ultimate collectibility of receivables, timing of revenue recognition, realizability of financial instruments based on the highly subjective valuation of collateral or difficult-to-assess repayment sources, or significant deferral of costs."[222]

- "Significant related-party transactions not in the ordinary course of business or with related entities not audited or audited by another firm."[223]

- "Significant, unusual, or highly complex transactions, especially those close to year end, that pose difficult 'substance over form' questions."[224]

- "Unusually rapid growth or profitability, especially compared with that of other companies in the same industry."[225]

As described above, evidence indicates that in several instances Enron officers deceived Andersen. However, the instances in which the evidence suggests that Enron's management may have withheld or concealed material information from Andersen must be evaluated in light of Andersen's responsibilities under SAS 1 and the presence of the foregoing risk factors to Andersen's audits of Enron. The presence of those risk factors raises questions concerning whether auditing procedures appropriate to the circumstances

---

[221] *Id.*

[222] *Id.*

[223] *Id.*

[224] *Id.*

[225] *Id.*

would have revealed the relevant facts to Andersen, thus precluding Enron's dissemination of materially misleading financial information.[226]   In those instances in which Andersen may assert that its approval of Enron's accounting for its SPE transactions is attributable to the withholding or concealment of material information by Enron's management, a fact-finder likely would be required also to consider whether Andersen was negligent in applying the guidance of SAS 82 in light of circumstances known to exist at Enron, by failing to design and implement auditing procedures adequate to address the risk of fraud inherent in the Enron engagement.

### C.   Andersen's Role in the Prepay Transactions

Utilizing its Prepay Transaction accounting technique, Enron borrowed over $5.0 billion and recognized $3.8 billion in cash flow from operations from 1997 through September 30, 2001.[227]   The obligation to repay the amounts borrowed was included in Enron's price risk management liabilities and the increase in price risk management liabilities attributable to the prepays was included in Enron's cash flow from operating activities.[228]   For 1999 and 2000, Enron reported net cash from operating activities of approximately $6 billion, of which $2.8 billion was attributable to the Prepay Transactions.[229]

---

[226] Based on the evidence adduced to date, Andersen could argue, and a fact-finder could conclude, that even had Andersen made additional inquiry of Enron officers, the deception would have continued and the officers would not have provided accurate information.  However, even in that circumstance, a question of fact would remain as to whether other audit procedures, such as the use of confirmations sent to third parties, should have been utilized.  *See* Bass 03/04/01 Email (suggesting confirmation as an audit procedure for the 3% independent equity required for SPEs).

[227] *See* Second Interim Report, Appendix E (Prepay Transactions), at 1, 9.

[228] *See* Second Interim Report, Appendix E (Prepay Transactions).

[229] *See id.* at 6.

- 68 -

Two groups of Prepay Transactions have received considerable attention from the Examiner and others:

- the $3.7 billion of Prepay Transactions with JPMorgan Chase typically utilizing an off-shore entity created by JPMorgan Chase called Mahonia Limited, a Jersey corporation ("Mahonia");[230] and

- $2.4 billion of Prepay Transactions with the Citigroup utilizing an off-shore entity created by Citigroup called Delta Energy Corporation, a Cayman Islands corporation ("Delta").[231]

The Examiner has previously concluded that Enron's accounting for these Prepay Transactions violated GAAP and applicable SEC disclosure rules.[232]   As discussed below, Andersen draft memoranda on the Prepay Transactions provide additional evidence that Enron's accounting for the Prepay Transactions did not comply with GAAP.  In addition, the evidence indicates that:

- Andersen participated in the planning and designing of the structure of the Prepay Transactions in order to assist Enron in achieving its accounting objectives by, among other things, designing a prepay "model."[233]

- Andersen decided in 1999 that it needed audit evidence to support Enron's assertion that Mahonia[234] and Delta[235] were substantive businesses and not SPEs or intermediaries serving as agents of Enron or the banks.  Although it was able to obtain letters signed by Mahonia and Delta, the fact that the representations in the letters were not

---

[230] *See* Third Interim Report, Appendix E (Role of JPMorgan Chase and its Affiliates), at 18.

[231] *See* Third Interim Report, Appendix D (Role of Citigroup and its Affiliates), at 46.

[232] *See* Second Interim Report, Appendix B (Accounting Standards).

[233] *See* Chase/Mahonia Prepay Memo; Prepay Swap Diagram; Yosemite Prepay Memo; Yosemite II Email; Yosemite III Memo; Yosemite IV Memo.

[234] For a discussion of the evidence concerning the creation and nature of Mahonia, *see* Second Interim Report, Appendix E (Prepay Transactions); Third Interim Report, Appendix E (Role of JPMorgan Chase and its Affiliates).

[235] For a discussion of the evidence concerning the creation and nature of Delta, *see* Second Interim Report, Appendix E (Prepay Transactions); Third Interim Report, Appendix D (Role of Citigroup and its Affiliates).

- 69 -

sufficient to confirm that Mahonia and Delta were businesses and the
process of obtaining the letters provide evidence that Andersen knew
that these entities were not substantive businesses.

- Andersen sought, in memoranda prepared after the fact, to explain
  away applicable GAAP that would have required collapsing the three
  prepay legs, resulting in loan treatment.   This strained analysis,
  coupled with the fact that these memoranda were never signed by the
  Engagement Team or approved by PSG, provides evidence that
  Enron's prepay accounting was highly suspect.

- Andersen suggested that Enron provide enhanced disclosure of the
  prepays in its 1999 financial statements, and suggested specific
  language for the 2000 financial statements and MD&A, revealing the
  portion of its operating cash flow that came from the prepays and the
  amount of its price risk management liabilities that consisted of
  prepays.  When Enron refused, Andersen concluded that the financial
  presentation was not materially misleading and certified Enron's 1999
  and 2000 financial statements anyway.  Moreover, there is no evidence
  that Andersen brought this accounting and disclosure judgment, or its
  recommendations to management concerning that judgment, to the
  attention of the Audit Committee during Andersen's SAS 61
  presentation on either the 1999 or 2000 financial statements, as was
  required by applicable professional standards.

*Accepting Questionable Audit Evidence*

As discussed in Prior Reports, in a typical Mahonia transaction, JPMorgan Chase

advanced money to Mahonia under a prepaid forward contract pursuant to which

Mahonia was required to deliver a commodity in specified installments in the future to

the bank.  Mahonia, in turn, advanced the funds to Enron pursuant to an identical prepaid

forward contract obligating Enron to repay the amount advanced in the form of

commodities delivered in installments to Mahonia in the future.

Enron then entered into a commodity swap with JPMorgan Chase pursuant to

which Enron was the "Fixed Price Payer" and JPMorgan Chase was the "Floating Price

Payer."[236] The swap obligated Enron, as the Fixed Price Payer, to make fixed monthly payments (the equivalent of principal and interest) to JPMorgan Chase based on a notional amount of the commodity (oil or gas), with the notional amount being set to match Enron's commodity delivery obligation to Mahonia.[237] In turn, the swap obligated JPMorgan Chase, as the Floating Price Payer, to make monthly payments to Enron based on the spot price of the same notional amount of the same commodity.[238] The swap eliminated Enron's commodity price exposure under Enron's prepaid forward with Mahonia and the bank's commodity exposure under its prepaid forward with Mahonia.[239] Mahonia had no meaningful commodity risk,[240] because its obligation under the prepaid forward with JPMorgan Chase was offset by mirror rights under the prepaid forward with Enron.[241]

---

[236] As discussed in the Third Interim Report, different Enron entities participated in the prepaid forward contract than participated in the swap contract. *See* Third Interim Report, Appendix E (Role of JPMorgan Chase and its Affiliates), at 25-28. For purposes of this discussion, these entity distinctions are irrelevant, and the term "Enron" is used for the convenience of the reader with respect to all of the Enron entities involved in the various aspects of the Prepay Transactions.

[237] *See* Third Interim Report, Appendix E (Role of JPMorgan Chase and Its Affiliates), at 27.

[238] *See* Third Interim Report, Appendix E (Role of JPMorgan Chase and Its Affiliates), at 27-28. The terms of the Interest Rate and Currency Exchange Agreement governing these swap transactions provided for Enron and JPMorgan Chase to net their respective swap payment obligations on corresponding payment dates. *See* Section 2(c) and Schedule, (Part 417) Interest Rate and Currency Exchange Agreement between Chase Manhattan Bank and Enron North America Corp., Apr. 5, 1994 [JPMBKR 0009936–JPMBKR 0009974]. The economic effect of the swap transactions is unaffected by whether such netting occurred in practice.

[239] Specifically, Enron's receipt of the floating price payment eliminated the commodity price risk Enron otherwise would have borne in meeting its delivery obligations to Mahonia. No matter how much the commodity price might increase between settlement dates, Enron would receive equivalent funds from JPMorgan Chase under the swap to cover the purchase price of the commodity Enron was required to deliver to Mahonia, which Mahonia was in turn required to deliver to JPMorgan Chase. As discussed in the Second Interim Report, the risk that Mahonia would fail to meet its delivery obligations to JPMorgan Chase if Enron met its delivery obligations to Mahonia was minimal. *See* Second Interim Report, Appendix E (Prepay Transactions), at 17.

[240] *See* Second Interim Report, Appendix E (Prepay Transactions), at 18-19.

[241] In the Yosemite I and II Prepay Transactions in which Delta was the intermediary, Delta borrowed the funds from an SPE, the Yosemite I Trust or Yosemite II Trust, which in turn raised the money by issuing

Enron could have structured its Prepay Transactions without the involvement of an intermediary. Had it done so, the bank would have advanced money directly to Enron under a prepaid forward contract, and the bank and Enron would have entered into a swap eliminating the commodity risk. However, Andersen partners have told the Examiner that Andersen would have required Enron to account for such a "two-party prepay" as a loan.[242]

Thus, it was at Andersen's insistence that the three-party structure was used. Stewart indicated that Andersen considered its position to be "conservative" in this regard.[243]

In some cases, Enron used other banks to serve as the intermediary.[244] In the Mahonia Prepays and Delta Prepays, however, Enron utilized nominally capitalized off-

---

Credit Linked Notes that represented Enron credit exposure. Delta thus had commodity exposure to Enron under its prepaid forward contract with Enron. Delta eliminated its commodity exposure by entering into a commodity swap with Citigroup. Citigroup eliminated the exposure through a swap with Enron, which also eliminated Enron's commodity risk under its prepaid forward contract with Delta. The Yosemite III and Yosemite IV Transactions were similar except that the proceeds from the Credit Linked Notes were invested in Citigroup CDs and Citigroup advanced the funds to Enron under a prepaid forward contract. Enron and Citigroup eliminated their commodity price exposure by entering into mirror commodity swaps with Delta. Second Interim Report, Appendix E (Prepay Transactions).

[242] Stewart Interview; Yosemite Prepay Memo.

[243] Stewart Interview. The Examiner has reviewed numerous documents indicating that Enron and Andersen considered using an entity acknowledged to be an SPE capitalized with a 3% "at-risk" equity investment from an independent person to serve as the third party in these transactions. The SPE structure was not selected, however. The selection of the SPE transaction structure would have introduced an additional cost to the transaction, specifically the cost associated with providing a sufficient yield to the holder of the 3% equity certificates of such an SPE. In Enron's FAS 140 Transactions, it was necessary to obtain a 3% equity investment from independent third parties. These investments typically yielded 15% per annum. See Second Interim Report, Appendix M (FAS 140 Transactions). The SPE structure would have also required the equity investor to be exposed to commodity price risk.

[244] For instance, this structure was used in the Roosevelt Prepay Transaction, the Truman Prepay Transaction, Project Jethro, and the Nixon Prepay Transaction. Third Interim Report, Appendix D (Role of Citigroup and its Affiliates), at 53-65. Though the banks used as the third parties were not SPEs, the structure would still not permit Enron's desired accounting if the third party were an intermediary – that is, an agent for Enron or the funding bank.

shore entities created by JPMorgan Chase (in the case of Mahonia) and Citigroup (in the case of Delta).

Andersen developed "Basic Criteria" and "Considerations" which, if satisfied, would result in Andersen's approval of Enron's accounting for its obligations under Prepay Transactions as price risk management liabilities rather than debt, and accounting for the related cash infusion as cash flow from operations rather than cash flow from financing.[245]

One of the "Considerations" was that if the intermediary were an SPE sponsored by Enron, then the intermediary could only hedge 97% of the commodity risk.[246] Otherwise, it would have been necessary for the SPE to be consolidated with Enron, contrary to Enron's accounting objectives.[247] The banks used Mahonia and Delta to serve as third parties in Prepay Transactions to facilitate the favorable accounting result desired by Enron.[248] The entities had virtually no capital.[249] All of their assets except their nominal capital were exactly matched with liabilities to the bank. Any income that inured to these entities would be for the benefit of charitable trusts. When asked how Andersen could conclude that an entity with these characteristics was not an SPE, Stewart noted that, although he was not personally involved in the determination, he understood

---

[245] Chase/Mahonia Prepay Memo; Prepay Swap Diagram.

[246] Chase/Mahonia Prepay Memo.

[247] Under the 3% Equity Test of the SPE Consolidation Analysis, 3% of the SPE's equity must be "at risk." Andersen would not have considered the equity at risk if the SPE's only assets were commodities and 100% of the commodity price risk were eliminated.

[248] Third Interim Report, Appendix D (Role of Citigroup and its Affiliates), at 78-81; Third Interim Report, Appendix E (Role of JPMorgan Chase and its Affiliates), at 54-57 (each describing the purpose of Mahonia and Delta in the Prepay Transactions, and their limited business activities beyond the Prepay Transactions).

[249] Third Interim Report, Appendix D (Role of Citigroup and its Affiliates), at 79-81; Third Interim Report, Appendix E (Role of Morgan Chase and its Affiliates), at 56-57.

that the entities were not legally precluded from transferring some or all of their assets (their only material assets being the prepaid forward contracts with Enron or other contracts exactly matched with mirror liabilities) and thereby seeking to make a profit.[250] This could occur, however, only at the direction of the bank that had caused the creation of the entity.[251]  Because the entity's assets were exactly matched with liabilities to the bank, the bank would permit a transfer of the entity's assets only if the bank either: (i) desired to make a charitable contribution to the beneficiary of the entity (because any profit from the transfer would inure to the charitable trust); or (ii) were willing to incur a loss (because, as the entity's only creditor, the bank would bear any loss).  While GAAP contains no precise definition of "special purpose entity," Andersen considered that an entity that was not a "business" as defined in EITF 98-3 was presumed to be an SPE.[252] For this reason, a fact-finder could conclude that a finding that Mahonia and Delta were not SPEs is not supported simply because it was *legally possible* for the SPE to earn a profit for the benefit of a charity if the bank were willing to risk a loss.

To obtain audit evidence that it had made inquiry into the status of the third-party entity, Andersen helped Enron draft representation letters that Enron in turn sent to the banks with the request that the banks have a representative of the third-party entity sign the representation letters and send them back to Enron.  Typical of these letters is one from Delta that read as follows:

---

[250] Stewart Interview.

[251] Third Interim Report, Appendix D (Role of Citigroup and its Affiliates), at 78-81; Third Interim Report, Appendix E (Role of JPMorgan Chase and its Affiliates), at 53-57.

[252] Stewart Interview; *see also* Determining Whether a Nonmonetary Transaction Involves Receipt of Productive Assets or of a Business, 2 EITF Abstracts (FASB) 98-3 (Jan. 19-20, 2000) ("EITF 98-3").

We confirm:

1. There is no restriction in the corporate documentation of the Company limiting the number of entities with which the Company may conduct business. The Company has undertaken business with a number of entities;

2. The Company has assets other than those acquired through transactions with Yosemite Securities Trust I ("Yosemite"). The payment obligations of the Company under the promissory note dated November 18, 1999 in favor of Yosemite are full recourse obligations of the Company.

3. The Company has unencumbered assets which would be available for application towards obligations owed to its creditors (including Yosemite).[253]

Several versions of this representation letter were found in the files of Andersen partners. Handwriting on one version indicated that Andersen requested that the second sentence of the first representation read as follows: "The Company has undertaken substantive transactions with non-Enron related entities."[254] The handwriting on another version found in the Andersen files commenting on the representation that the Company has assets other than those acquired through transactions with Enron asks: "$1 enough?"[255] The facsimile transmission banner reads "NOV 10 '99 14:54 FR CAP MKTS-LEGAL 212 723 8864," indicating that the letter was transmitted from the legal department of Citigroup's Capital Markets operation in New York City and not from Delta Energy Corporation located in Grand Cayman.[256]

---

[253] *See* Third Interim Report, Appendix D (Role of Citigroup and its Affiliates).

[254] Letter from J.B. Benbow, Director, Delta Energy Corp., to Enron, Nov. 10, 1999, at AA-EX00146000 (draft) (part of quote reflects handwritten notes) [AA-EX0014600-AA-EX00146001].

[255] Letter from J.B. Benbow, Director, Delta Energy Corp., to Enron, Nov. 18, 1999 (draft) (the "Delta Rep. Letter 11/18/99"), at AA-EX00145998 [AA-EX00145998-AA-EX00145999].

[256] Delta Rep. Letter 11/18/99. This information is further evidence from which a fact-finder could conclude that Delta was an agent or instrumentality of the bank, and not a business.

Although, as a technical matter, Delta was able to make the requested representations, in fact Delta: (i) had equity capital of only $1,000; (ii) engaged in no current business operations with other entities except Enron, Citigroup and entities formed by them;[257] and (iii) was used to permit the desired accounting treatment with respect to the Prepay Transactions. Moreover, Citigroup bankers have testified that Delta was a "shell" and an "SPE."[258]

While there is nothing unusual or inherently improper about Andersen's assistance in the drafting of representation letters, the fact that Andersen was unable to obtain the factual representations that they had proposed, and the fact that the representations made were insufficient to conclude that the entity was a business, support a conclusion that these entities were SPEs and not businesses, and are evidence that Andersen knew that Mahonia and Delta were SPEs. A fact-finder could view these circumstances as evidencing a lack of skepticism one would ordinarily expect from an independent auditor with respect to a matter materially important to the financial presentation that being certified. Accordingly, the evidence concerning Andersen's involvement in the representation letters from Mahonia and Delta could support a conclusion by a fact-finder that Andersen knew that Enron's accounting treatment for the Mahonia Prepays and the Delta Prepays was improper.

*Strained Analysis of Applicable GAAP*

In addition to the foregoing, several unsigned Andersen prepay memos that were not included in the audit work papers evidence that Andersen had reason to believe

---

[257] *See* Third Interim Report, Appendix D (Role of Citigroup and its Affiliates), at 79-81.

[258] *See* Second Interim Report, Appendix E (Prepay Transactions), at 97; Third Interim Report, Appendix D (Role of Citigroup and Its Affiliates), at 305-06.

Enron's GAAP accounting was wrong regardless of the substantive nature of the third party. Specifically, regardless of whether the third party was a business, Enron's desired accounting treatment required that the three legs of the Prepay Transactions be viewed in isolation rather than collapsed.[259] In these memos, the Engagement Team authors attempt to explain why the applicable GAAP should not result in collapsing the legs, but their analysis is strained. Moreover, the evidence indicates that: (i) this analysis was not concurred in by the PSG;[260] (ii) at least one PSG member apparently believed the GAAP would require collapsing the legs in a comparable situation;[261] and (iii) these memos did not become a part of the audit work papers. Taken together, these circumstances suggest that, at least by the end of 2000, Andersen had reason to believe that Enron's accounting for the Prepay Transactions did not comply with GAAP.[262]

---

[259] *See* Second Interim Report, Appendix B (Accounting Standards).

[260] The evidence suggests that when the Engagement Team consulted with the PSG on GAAP issues and the PSG concurred with the conclusions of the Engagement Team, it was Andersen's practice to note this consultation and concurrence in the work papers. *See, e.g.*, Memorandum from Dave Duncan, Andersen, to the Files, regarding Partnership Structure, Dec. 13, 1999, at 2 [AB0648 00381-AB0648 00382]; Memorandum from Dave Duncan, Andersen, to the Files, regarding Raptor Transaction, Mar. 28, 2000 [AB0648 01051-AB0648 01058]. No such evidence of consultation and concurrence is present with respect to the analysis set forth in the draft prepay memos identified above.

[261] *See* Email from Jason R. Waldron, Andersen, to John E. Stewart, Andersen, regarding Prepaid Transaction Analysis – US vs. UK GAAP, Apr. 6, 2001 (the "Waldron 4/6/01 Email") [PSI00007898-PSI00007903].

[262] In the Third Interim Report, the Examiner acknowledged the possibility that, notwithstanding the Examiner's conclusion that Enron's prepay accounting violated GAAP, a question of fact might exist on that issue. *See* Third Interim Report, Appendix D (Role of Citigroup and Its Affiliates), at 145-46 (acknowledging that "Citigroup likely would be able to produce expert testimony and other evidence supporting the view that Enron's accounting for the Prepay Transactions complied with GAAP"); Third Interim Report, Appendix E (Role of JPMorgan Chase and Its Affiliates), at 64 (acknowledging that "a fact-finder could determine that the Mahonia Transactions were sufficiently different from loans to support Enron's accounting treatment, i.e., that Enron's accounting for the Mahonia Transactions as price risk management activities, instead of debt, complied with GAAP."). The additional evidence identified above and discussed in more detail in this Appendix, which was analyzed by the Examiner subsequent to the issuance of the Third Interim Report, weighs further against a finding that Enron's accounting for the Prepay Transactions complied with GAAP.

In 1998, the FASB created the DIG to assist the FASB in answering questions concerning the implementation of FAS 133, *Accounting for Derivative Instruments and Hedging Activities*.[263] In essence, the DIG was a mini-EITF for purposes of accounting for derivatives. After they were cleared by the FASB, the interpretations of the DIG had the force of GAAP.[264]

In an interpretation issued on December 6, 2000, the DIG considered the circumstances under which separate derivative contracts may have been entered into in an effort to circumvent GAAP and thus should be collapsed.[265] In DIG Issue F6, the DIG stated that whether separate derivatives have been entered into in order to circumvent GAAP and thus should be collapsed should be analyzed by applying four criteria found in DIG Issue K1:

> [T]he following indicators should be considered in the aggregate and, if present, should cause the transactions to be viewed as a unit and not separately:
>
> > a. the transactions were entered into contemporaneously and in contemplation of one another.
> >
> > b. the transactions were executed with the same counterparty (or structured through an intermediary).
> >
> > c. the transactions relate to the same risk.
> >
> > d. there is no apparent economic need or substantive business purpose for structuring the transactions separately that could *not* also have been accomplished in a single transaction.

---

[263] *See* FAS 133.

[264] SAS 69, at § 10(c) (AU § 411.10(c)).

[265] Fair Value Hedges: Concurrent Offsetting Matching Swaps and Use of One as Hedging Instrument, Derivatives Implementation Group No. F6 (Financial Accounting Standards Bd. 2000) ("DIG Issue F6").

Andersen recognized that DIG Issue F6 was relevant GAAP authority in analyzing whether it could approve Enron's accounting for the Prepay Transactions.[266] In draft memoranda found among the desk files of the Andersen accountants responsible for the Yosemite III and Yosemite IV Prepay Transactions, the Andersen accountants attempt to apply the four criteria to the facts of those transactions.[267] The analysis attempted in those draft memos is flawed in fundamental respects.

In the Yosemite III and Yosemite IV Prepay Transactions, as previously described, the flow of money took a different form than in the Mahonia Prepays, but the substance was the same.[268] In Yosemite III and Yosemite IV, the Yosemite Trusts sold "Credit Linked Notes" to institutional investors. The notes represented Enron credit risk. In turn, the Yosemite Trusts invested the proceeds in certificates of deposit with Citigroup. Citigroup advanced the cash directly to Enron through a prepaid forward with Enron, thus both Enron and Citigroup had commodity risk. The commodity risk was eliminated by Enron and Citigroup by entering into mirror swap agreements through Delta. Under Enron's swap with Delta, Enron paid Delta a fixed price in exchange for a floating price, thus eliminating its floating price risk under the prepaid forward with Citigroup. Under Citigroup's swap with Delta, Delta paid Citigroup a fixed price in exchange for a floating price, thus eliminating Citigroup's floating price risk under the prepaid forward with Enron.

---

[266] *See* Yosemite III Memo; Yosemite IV Memo; Waldron 4/6/01 Email, at 4. The Yosemite III and Yosemite IV memoranda are neither signed nor initialed, and the Examiner has been unable to locate these documents in the work papers provided to the Examiner by Andersen.

[267] *See* Yosemite III Memo; Yosemite IV Memo.

[268] *See* Second Interim Report, Annexes 4 and 5 to Appendix E (Prepay Transactions). The description of Yosemite III and Yosemite IV is substantially simplified and involves only the largest of the two circular flows of cash.

The technical GAAP issue that arises from the arrangement described above is whether the four criteria identified in DIG Issue F6 require the swaps that Delta had with Enron and Citigroup and the prepaid forward obligation between Enron and the bank to be collapsed, resulting in a loan from Citigroup to Enron for accounting purposes.[269]  As discussed below, the draft memoranda arrive at strained conclusions with respect to the application of the four tests.[270]

The draft memoranda recognize that the various steps of the Prepay Transactions were entered into contemporaneously and in contemplation of one another, thus acknowledging that factor "a" is present.[271]   In analyzing factor "b," however, the memoranda find that factor not to be present because the transactions were not executed with the same counterparty.[272]  The memoranda simply ignore the fact that DIG Issue K1, factor "b," which is quoted in DIG Issue F6, includes the parenthetical "(or structured through an intermediary)."[273]  The Prepay Transactions that were the subject of these memoranda were structured through Delta, which would be viewed as an intermediary if it could be viewed as the agent of either Citigroup or Enron.  Regardless of whether Delta was an SPE, given that it was used only as an accommodation party in the transaction and engaged in no business of its own, Delta is properly viewed as acting on behalf of either or both of Enron and Citigroup, and thus as an agent and intermediary.  Therefore, it is apparent that factor "b" is present.

---

[269]  DIG Issue F6.

[270]  *See, e.g.*, Yosemite III Memo, at AB000565304; Yosemite IV Memo, at AB0786 02959.

[271]  Yosemite III Memo, at AB000565304; Yosemite IV Memo, at AB0786 02959.

[272]  *Id.*

[273]  DIG Issue F6.

Addressing factor "c," the memoranda conclude that "[t]he group of contracts in question . . . involve separate credit risks for each of the three parties . . . ."[274] However, the three transactions that are the subject of the analysis (the prepaid forward between the bank and Enron, the swap between the intermediary and Enron, and the swap between the intermediary and the bank) all relate to the *same commodity price risk* and eliminate that risk. The fact that there is credit risk present between Enron and the bank cannot be relevant to the analysis.[275] In fact, the examples contained in DIG Issue K1 and DIG Issue F6 involve both interest rate risk and credit risk with only the interest rate risk eliminated.[276]

Finally, with regard to factor "d," the Andersen memoranda find a substantive business purpose and economic need for structuring the transactions in the manner described by stating: "The group of contracts in question . . . are for trading purposes as well as price risk management for customers, similar to numerous other contracts the company enters into during the normal course of business."[277] However, these arrangements were not for trading purposes, but for financing purposes. Moreover, no "customers" were receiving price risk management services, because neither Citigroup nor Delta had any price risk to manage.

In an email dated April 6, 2001, from PSG member Jason Waldron to Stewart concerning an Enron transaction involving use of the London Metals Exchange as a third

---

[274] Yosemite III Memo, at AB000565303; Yosemite IV Memo, at AB0786 02958.

[275] The intermediary Delta had no meaningful risk because it had virtually no equity and had a "flat" book (i.e., its assets matched its liabilities). If Enron failed to pay Delta, then Delta simply would be unable to pay the bank.

[276] DIG Issue F6.

[277] Yosemite III Memo, at AB000565303; Yosemite IV Memo, at AB0786 02958.

party in a transaction structure similar to the Prepay Transaction, Waldron suggests that DIG Issue F6 was designed to collapse transactions when there was no business purpose for separate transaction legs other than to avoid otherwise applicable GAAP.[278] Waldron's analysis, if applied to the Mahonia and Delta prepays, would have required collapsing of the multiple legs, resulting in loan treatment.

The analysis contained in the draft prepay memos discussed above suggests that Andersen was both aware that DIG Issue F6 was GAAP authority for collapsing the legs of the prepay structure and unable to create a plausible argument for a contrary result. This suggestion is reinforced by Waldron's April 6, 2001 email, in which Waldron suggests that DIG Issue F6 would apply to and require the collapsing of a structure substantially identical in this respect to the structure of the Prepay Transactions.[279]

The draft prepay memos discussed above, although dated as of the closing dates of Yosemite III and Yosemite IV, were prepared after the closings. These memos are marked "draft," and the Examiner has found no evidence that they were ever finalized or concurred in by any member of the PSG. These circumstances, particularly when viewed with the related evidence, would permit a fact-finder to conclude that Andersen knew that Enron's accounting for the Prepay Transactions did not comply with GAAP. This strained analysis of applicable GAAP is a pattern that was repeated when issues were discovered in the Spring of 2001 with regard to Andersen's prior advice on the FAS 140 Transactions.[280]

---

[278] Waldron 4/6/01 Email, at 4.

[279] Waldron 4/6/01 Email, at 4.

[280] As discussed below in the *Andersen's Role in the FAS 140 Transactions* Section of this Appendix.

*Rejection of Proposed Disclosure*

The draft memoranda identified above also discuss disclosure of Prepay Transactions. In December of 2000, Andersen client Aquila Energy Corporation ("Aquila") filed an S-1 registration statement to take its energy trading business public.[281] Aquila engaged in prepaid forward transactions similar to Enron's Prepay Transactions. Aquila discussed its prepay transactions in the MD&A of a registration statement filed with the SEC in 2000, as well as in the notes to the financial statements contained in that filing.[282] Aquila included the following disclosures in its MD&A:

> As part of our Wholesale Services segment, we periodically enter into long-term prepaid commodity contracts with our clients. Under these agreements, our clients pay us upfront for a specified commodity in exchange for a discounted, fixed-price for that commodity. To date, we have executed approximately $1 billion of these contracts, and we have used the proceeds to repay loans from UtiliCorp.[283]

Aquila also disclosed that it experienced "[a] $536 million increase in long-term price risk management liabilities due to additional commodity prepay transactions in 2000,"[284] and that its operating cash flow for the nine months ended September 30, 2000 was $270 million higher than in the comparable period of 1999 due in part to the impact of a gas prepay transaction.[285]

Draft disclosures similar to the Aquila disclosures appear in the Yosemite III and Yosemite IV draft memoranda. Cash, the Andersen partner who was principally responsible for approving Enron's accounting treatment for its Prepay Transactions, was

---

[281] Aquila Energy Corp. Form S-1 filed with the SEC on Dec. 13, 2000 (the "Aquila Form S-1").

[282] *Id.* at 42.

[283] *Id.*

[284] *Id.*

[285] *Id.* at 43.

also reviewing partner in the Aquila S-1 and one of the authors of the Yosemite III and Yosemite IV memoranda.[286] Both Cash and Enron manager Kimberly Scardino have told the Examiner that Andersen recommended to Enron prior to the issuance of Enron's 2000 financial statements that Enron make the same or similar disclosures with respect to Enron's Prepay Transactions as those appearing in the Aquila S-1.[287] Both Cash and Scardino have indicated that they did not present the proposed disclosures to Enron personally.    Scardino has indicated, however, that she understands that Duncan recommended the disclosure to Causey, who rejected the proposal.[288]    As discussed above, the Examiner has located no evidence that Andersen determined that the Audit Committee was informed that its recommended disclosure had been rejected by Enron management.    Andersen, however, certified Enron's 2000 financial statements, and reviewed and voiced no objections to Enron's MD&A disclosure.

Had the proposed disclosures been included in the 1999 and 2000 financial statements, a careful reader of the financial statements and MD&A might have understood the economic impact and substance of the Prepay Transactions, even though Enron's accounting treatment for the Prepay Transactions was not in accordance with GAAP. Without the disclosure, unless the financial statement reader had an independent basis to know about the Prepay Transactions, it was impossible to understand the economic substance of these borrowings or the material impact they had on Enron's operating cash flow.    The evidence suggests that Andersen knew this, but approved Enron's financial presentation nonetheless.

---

[286] Cash Sworn Statement, at 72.

[287] *Id.* at 70-75; Scardino Interview.

[288] Scardino Interview.

### D.    Andersen's Role in the FAS 140 Transactions

The FAS 140 Transactions were another key technique Enron officers used to enhance Enron's reported financial condition, results of operations and cash flow in a manner inconsistent with the economic substance of the transactions. These transactions had a significant impact on Enron's reported financial performance. In 2000 alone, FAS 140 Transactions, which were in substance unsecured loans to Enron accounted for as "sales" of assets, increased reported income by $350 million, increased cash flow from operating activities by more than $1 billion, and kept more than $1 billion of debt off of Enron's balance sheet.[289]

In Prior Reports, the Examiner identified issues regarding the accounting for the FAS 140 Transactions and their attendant obligations, such as the Total Return Swaps typically agreed to as a part of these transactions. Evidence indicates that Andersen had deep involvement not only in the initial creation of the FAS 140 Transaction technique, but also in subsequent refinements to and modifications of the technique.[290] Throughout the years Enron utilized this transaction structure, Andersen accountants routinely consulted with each other and with Enron about the structure to be employed in FAS 140 Transactions and particular challenges presented by individual transactions.[291]

*Inadequate Disclosure of Total Return Swaps*

One factor suggesting that Enron's FAS 140 Transactions did not comply with GAAP relates to Enron's use of Total Return Swaps. In the FAS 140 Transactions, Enron or an affiliate typically entered into a Total Return Swap, under which the Enron

---

[289] *See* Third Interim Report, Appendix C (Role of Enron's Officers), at 62-63.

[290] *See, e.g.,* EOTT-Project Nikita Memo; Hawaii Memo; Tax Efficient Lease Memo.

[291] *See, e.g.,* EOTT-Project Nikita Memo; Tax Efficient Lease Memo.

entity was obliged to pay in full the principal and yield due on the debt owed in the structure. Even though Enron was liable to pay principal and yield pursuant to the Total Return Swap, those obligations were not described on Enron's balance sheet. Instead, Enron officers "buried"[292] the Total Return Swaps by aggregating their notional amounts in a general footnote category labeled "equity investments" as a part of Enron's "trading activities."[293]  As a result, there was no statement in any financial report revealing that Enron or its affiliates were bound unconditionally under the Total Return Swaps to pay the full amount of the principal and interest when due on the debt, regardless of the value of the underlying asset.[294]

In the First Interim Report, the Examiner determined that Enron's accounting treatment of the Total Return Swaps violated FAS 105, because under that Financial Accounting Standard, Enron was required to disclose, *inter alia*, the face, contract or notional amount of the Total Return Swaps, and the terms and nature of those instruments, including attendant cash requirements.[295]  When FAS 140 was adopted, it required similar disclosure, effective for financial statements issued after December 15, 2000.[296]  Under these rules, Enron was required to disclose "the key characteristics of

---

[292] *See* Email from Charles Delacey, Enron, to Steve Pruett, Enron, regarding Hawaii Sec 125 Trust, May 2, 2001 (the "Delacey Hawaii – 125 Email"), at 1 (noting that the "total return swaps are buried in the footnotes under price risk management activities") [AB0971 02990-AB0971 2991].

[293] *See, e.g.*, "Financial Review - Enron Corp. and Subsidiaries Notes to the Consolidated Financial Statements - Price Risk Management Activities and Financial Instruments," Enron 2000 Annual Report, at 38-39.

[294] Enron would be entitled to the proceeds of an eventual sale of the underlying asset other than the proceeds allocable to the 3% equity interest.

[295] *See* Disclosure of Information about Financial Instruments with Off-Balance Sheet Risk and Financial Instruments with Concentrations of Credit Risk, Statement of Financial Accounting Standards No. 105 (Financial Accounting Standards Bd. 1990) ("FAS 105"); First Interim Report, at 57.

[296] *See* Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities, Statement of Financial Accounting Standards No. 125 (Financial Accounting Standards Bd. 1996) ("FAS

securitizations (a description of the transferor's continuing involvement with the transferred assets, including, but not limited to, servicing, recourse, and restrictions on retained interests) and the gain or loss from sale of financial assets in securitizations."[297] Enron did not disclose its continuing involvement with the financial assets transferred in the FAS 140 Transactions and did not disclose the recourse nature of its obligation.[298] Andersen accountants were aware of the specific obligations incurred by Enron and its affiliates under the Total Return Swaps.[299]   They also understood that Enron was not providing the detailed information described in FAS 140.[300]

*No "True Sale"*

As the Examiner has noted in previous reports, many of Enron's FAS 140 Transactions did not comply with GAAP in several respects.   For example, evidence indicates that SPEs established as a part of the FAS 140 structures lacked the requisite "at-risk" equity required under the 3% Equity Test.   Thus, under GAAP, those entities

---

125"), and its successor, Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities, Statement of Financial Accounting Standards No. 140 (Financial Accounting Standards Bd. 2000) ("FAS 140"), ¶ 17(f)(2).

[297] *Id.*

[298] Enron did disclose that "[s]ome of these sales are completed in securitizations, in which Enron concurrently enters into swaps associated with the underlying assets which limits the risk assumed by the purchaser."   "Financial Review - Enron Corp. and Subsidiaries Notes to the Consolidated Financial Statements - Price Risk Management Activities and Financial Instruments," Enron 2000 Annual Report, at 38-39.   The financial statements do not disclose, however, that the full risk was placed on Enron for 97% of the purchase price.   It was not possible for even sophisticated readers to determine from the notional amount table in Note 3 that Enron had full recourse exposure on the Total Return Swaps. *See, e.g.,* Interview of Ronald Barone and Todd Shipman, Standard & Poor's, by H. Bryan Ives, III, Oct. 8, 2003.   Enron employees even acknowledge that the recourse was "buried." *See* Delacey Hawaii – 125 Email.

[299] *See, e.g.,* Hawaii Memo; Memorandum from Debra A. Cash and Kimberly R. Scardino, Andersen, to the Files, regarding Avici, Dec. 29, 2000 (the "Avici Memo") (unsigned) [AB1128 00590-AB1128 0595]; Memorandum from Kimberly Scardino, Andersen, to the Files, regarding Project Braveheart, Dec. 29, 2000 (the "Braveheart Memo") [AA 000000590-AA 000000596].

[300] *See* Email from James F. Green, Andersen, to Christopher J. Herbold, Andersen, regarding FAS 125 Disclosures, Aug. 18, 2000 [AB1129 00652-AB1129 00653]; *see also* Email from Daniel S. Palomaki, Andersen, to Christopher J. Herbold, Andersen, regarding Statement 140 Disclosures, Jan. 11, 2001 [AB1129 00647-AB1129 00651].

(along with the corresponding debt owed by those entities) should have been consolidated for financial accounting purposes with Enron, the Sponsor of the SPEs.[301]

As the Examiner has also noted previously, Enron's numerous FAS 140 Transactions were tied to, and dependent upon, the "true sale" of financial assets by the Sponsor, typically an Enron affiliate, to a third-party SPE, typically referred to as Asset LLC.[302]  In these transactions, Enron recorded the proceeds received as cash flow from operating activities, did not record the debt associated with the transaction on its own balance sheet, and recorded gain on sale to the extent the amount received for the sale exceeded Enron's carrying value for the assets conveyed.[303]  The Examiner has determined that, in several FAS 140 Transactions, no "true sale" of assets actually took place.[304]

Both FAS 125, and its successor FAS 140, tie the desired "sale" accounting treatment to the demonstration of the "legal isolation" of the financial assets from the Sponsor.  Both FAS 125 and FAS 140 require that the transferor have "surrendered control" over the transferred assets.[305]  Both use nearly identical language to describe the conditions for demonstrating that surrender of control: the assets must have been "isolated from the transferor – put presumptively beyond the reach of the transferor and its creditors, even in bankruptcy or receivership," and after the sale, the transferor cannot

---

[301] See Second Interim Report, Appendix M (FAS 140 Transactions); Third Interim Report, Appendix C (Role of Enron's Officers).  As is described in the Examiner's Third Interim Report, Andersen accountants have indicated they were unaware of the existence of the side arrangements that caused Enron to fail the 3% Equity Test.  However, as described below, a question of fact likely exists as to whether Andersen should have known of those arrangements, or should have taken additional steps to learn of their existence.

[302] See First Interim Report; Second Interim Report, Appendix M (FAS 140 Transactions).

[303] See First Interim Report; Second Interim Report, Appendix M (FAS 140 Transactions).

[304] First Interim Report; Second Interim Report, Appendix M (FAS 140 Transactions), at 34.

[305] See FAS 125; FAS 140.

"maintain effective control over the transferred assets."[306]   Both state that, upon the

successful transfer of assets, "the transferor (seller) shall:

> (a) Derecognize all assets sold
>
> (b) Recognize all assets obtained and liabilities incurred in consideration as proceeds of the sale, . . . and
>
> . . . .
>
> (d) Recognize in earnings any gain or loss on the sale."[307]

In their memoranda describing the accounting conclusions reached in the FAS

140 Transactions, Andersen consistently discussed the requirement for legal isolation

contained in both FAS 125 and FAS 140.[308]   Those same memos explain that Andersen

satisfied these requirements through the use of legal opinions of outside counsel secured

by Enron.[309]

In nearly all of Enron's FAS 140 Transactions, however, Andersen did not

determine whether a legal isolation of assets from the Sponsor had occurred.   Instead,

Andersen addressed the "true issuance" of certain equity (the "B shares") by Asset LLC.

The memo regarding the Avici FAS 140 Transaction dated December 29, 2000, is

illustrative.   In that memorandum, Andersen states that the transaction involved the "sale

by [Enron] of 1,093,433 shares of Avici Systems Inc." and concludes that these shares

"represent[] financial assets within the scope of SFAS 125."[310]   The memo does not

---

[306] *See* FAS 125; FAS 140.

[307] *See* FAS 125; FAS 140.

[308] *See, e.g.,* Memorandum from Clint Carlin and Andrew Schuleman, Andersen, to the Files, regarding Ghost, Feb. 21, 2000 (the "Ghost Memo") [AA 000019697-AA 000019698]; Braveheart Memo; Hawaii Memo.

[309] *See, e.g.,* Ghost Memo; Avici Memo, at 4-5; Braveheart Memo; Hawaii Memo, at 4.

[310] Avici Memo, at 1.

examine whether the transfer of Avici stock to Asset LLC constitutes a "true sale." Instead, Andersen looks at the issuance of B shares from Asset LLC, determining that a "true sale occurs when Transferor sells the Asset LLC B share . . . ."[311]  The authority cited "by analogy" for this conclusion, specifically Andersen's analysis of the 1997 SEC staff speech by Armando Pimentel, deals with the question of whether stock in a subsidiary can constitute a financial asset under FAS 125.  However, it does not address the question of whether the financial assets have been legally isolated from the Sponsor.[312]

> In connection with Avici, Andersen notes:
>
> The legal opinion obtained from [Andrews & Kurth] indicates the following:
>
> In the event of bankruptcy of Enron, any of its subs or Asset LLC, the B-share would not be the property of Enron, any of its subs or Asset LLC.
>
> In the event of bankruptcy of Enron or any of its subs, the assets and liabilities of neither Transferor nor the [holder of the B Share] would be consolidated with Enron or any of its subs.[313]

---

[311] *Id.*  The Braveheart Memo contains identical analysis.

[312] *See* Andersen Revisions and Additions to Statement 125 Q&A, Apr. 14, 1998, § 3-7(b) [WP-EVE0037576-WP-EVE0037704].

[313] Avici Memo, at 4.  Other Andersen memoranda apply an analysis consistent with the requirements of FAS 125 and FAS 140.  For example, an unsigned Andersen memo dated April 9, 2000, examines the Hawaii structure purportedly under FAS 140.  *See* Hawaii Memo (given that this memo cites to FAS 140 and discusses analysis utilized by Andersen in 2001, it is possible that this memorandum was completed well after its April, 2000 date).  The discussion in this memo is identical to the discussion in the Avici Memo, except that Andersen adds its view that a true sale must occur from the Sponsor to Asset LLC, and describes the legal opinions to be obtained from Andrews & Kurth as including "True Sale of Financial Asset from Enron Sub to Asset LLC."  Hawaii Memo, at AB0911 0941.

Consistent with this analysis, the legal opinion obtained by Enron in the Avici transaction analyzes only the issuance of the B share from Asset LLC, not whether an effective isolation of the Avici stock took place.[314]

Evidence indicates that both Enron and Andersen were aware that they were not demonstrating the legal isolation of financial assets from the Sponsor as required by FAS 125 and FAS 140. Evidence suggests that attorneys from Vinson & Elkins contacted both Enron[315] and Andersen directly to question whether Andersen fully understood that no "true sale" opinion was being rendered.[316] Andersen apparently acknowledged that it was aware that no such opinion was being given.[317] Despite that acknowledgement, both Andersen and Enron continued to ask only for "true issuance," not "true sale," opinions up until mid-2001.

Evidence also suggests that, in April 2001, Andersen began requiring legal isolation opinions on both the financial asset and the B share.[318] From 1998 through 2000, Enron completed numerous FAS 140 Transactions in which it recognized at least $2.6 billion in operating cash flow and $647 million in net income without requiring "true sale" opinions. Scardino noted in an email on the subject that "[w]e might be able

---

[314] Letter from Andrews & Kurth, LLP, to Enron, regarding Section 541 Non-Consolidation Opinion, Series Avici B, Dec. 7, 2000, at 2-3 [AB000016149-AB000016193].

[315] Typed notes entitled "Notes for meeting with Jim Derrick," undated, at EVE 1250750 ("We a[re] unsure of how opinion rendered satisfies requirements of FASB 125.") [EVE 1250750-EVE 1250751].

[316] Memorandum from Stephen C. Tarry, Vinson & Elkins, to Joe Dilg, Vinson & Elkins, regarding Enron FAS 125 Issues, June 7, 1998 (the "Tarry Memo") [WP-EVE 0036460-WP-EVE 0036462].

[317] Tarry Memo, at 2.

[318] Email from Kimberly Scardino, Andersen, to Daniel S. Palomaki, Andersen, regarding Enron and Statement 140, Apr. 4, 2001 (the "Scardino-Palomaki Email") [AB0911 2867- AB0911 2869].

to build a case (although quite weak) that the changes to [FAS 140] have caused us to

rethink the focus and content of the legal opinions."[319]  She also observed the following:

> If there is anything in SFAS 140 that explains the change in our views on
> the legal opinion, that would be very helpful for us to know.  It is my
> current understanding that there is not.[320]

This evidence suggests that Andersen understood its prior treatment of the FAS 140s, and

its prior analysis of the need for legal opinions, [321] was flawed.

*Andersen's Knowledge of 3% Equity Side Agreements*

As described in the Third Interim Report, in numerous instances Enron officers,

particularly Fastow and Glisan, provided assurances to holders of Equity Certificates that

Enron would pay those certificates in full at maturity regardless of the value of the assets

involved in the transactions.[322]  These assurances were provided in numerous FAS 140

Transactions closed throughout 1999, 2000 and 2001.[323]  These assurances, in nearly all

cases given verbally, meant that the certificates were not "at risk" as required by FAS

140.  With one exception,[324] Andersen accountants have indicated they were unaware of

---

[319]  *Id.*

[320]  *Id.*

[321]  In this context, legal opinions are merely audit evidence.  If the financial assets had in fact been legally isolated from the Sponsor, the lack of an opinion would not be fatal to the accounting.  As noted in Prior Reports, however, in numerous FAS 140 Transactions there had in fact been no legal isolation of assets from the Sponsor.  *See* First Interim Report; Second Interim Report, Appendix M (FAS 140 Transactions).

[322]  Third Interim Report, Appendix C (Role of Enron's Officers), at 46-58.

[323]  *Id.*

[324]  The one instance was a situation, noted by Bass in his March 4, 2001 email, which Andersen believed was remedied after Andersen called it to Enron's attention.  Bass 3/4/01 Email, at 2.

these side arrangements.[325]   They have further stated that had they known of the arrangements, they would not have approved Enron's accounting for the transactions.[326]

A fact-finder required to consider whether Andersen purposely aided Enron officers in a breach of their duties in connection with the FAS 140 Transactions would weigh this arguably exculpatory evidence.  Based on this evidence, a fact-finder could conclude that critical information regarding these transactions was purposely withheld from Andersen regarding these transactions.  However, a fact-finder could also determine that, notwithstanding this evidence, Andersen had multiple other reasons to know that the FAS 140 Transactions violated GAAP and applicable disclosure rules.

Evidence further suggests that Andersen failed to perform audit procedures designed to detect the existence of these side agreements.  Evidence indicates that Andersen accountants learned of at least one such arrangement.[327]  Upon learning of this arrangement, Andersen accountants made inquiry and were told that this provision had been removed from the transaction documents.[328]   In addition, in at least two other instances (regarding the Nigerian Barge and Merlin[329] transactions), Andersen accountants became aware of evidence suggesting the existence of side arrangements inconsistent with the reported financial effect of that transaction.[330]

---

[325] Scardino Interview; Cash Sworn Statement, at 139-42; Bass Sworn Statement, at 31-32; Neuhausen Interview; Stewart Interview; Grutzmacher Sworn Statement, at 106-07.

[326] Scardino Interview; Stewart Interview; Bass Sworn Statement, at 44-46.

[327] Cash Sworn Statement, at 139-42; Bass Sworn Statement, at 31-32.

[328] Cash Sworn Statement, at 140.

[329] In this transaction completed December 22, 1999, Enron securitized a $353.4 million portfolio of 22 loan facilities that were owned by ENA and other Enron affiliates.  *See* Second Interim Report, Annex 4 to Appendix L (Related Party Transactions).

[330] Scardino Interview; Andersen Criminal Trial Testimony, at 3253-56 (testimony of Patricia Grutzmacher, May 21, 2002).  Scardino inquired regarding the possible existence of a side arrangement to

Evidence thus indicates that Andersen accountants were aware of at least the possibility that side agreements inconsistent with Enron's accounting were being entered into between Enron officers and transaction parties. Bass, then a member of the PSG, suggested that confirmations be sent as a part of the audit of these types of transactions.[331] Despite Bass's suggestion, evidence indicates Andersen made no effort to confirm the terms of the transactions with the parties.

### E.    Andersen's Role in the Non-Economic Hedges

*Rhythms*

The Engagement Team approved Enron's accounting for the non-economic hedge of its Rhythms stock through the LJM1/Swap Sub structure[332] with the concurrence of the Practice Director and Concurring Partner, but without consulting the PSG.[333] Enron recognized $95 million of income in 1999 as a result of the Rhythms Hedge, representing 10.6% of its originally reported net income for the year.[334] In the fall of 2001, Andersen realized it had made a mistake in its original analysis and Swap Sub should have been

---

"unwind" the sale of Nigerian barges after the close of 1999. She was told that no such agreement existed. Scardino Interview. As described in the Examiner's Third Interim Report, evidence suggests that such an agreement did in fact exist. *See* Third Interim Report, Appendix C (Role of Enron's Officers), at 52-53. Grutzmacher was suspicious that there may have been a side agreement protecting LJM's equity in the Merlin transaction. Andersen Criminal Trial Transcript, at 3252-53 (testimony of Patricia Grutzmacher, May 21, 2002). After she raised her suspicions, she was informed that the matter was discussed with Causey, who stated that LJM2's equity was paid off to avoid litigation. Andersen Criminal Trial Transcript, at 3255-56 (testimony of Patricia Grutzmacher, May 21, 2002).

[331] *See* Bass 3/4/01 Email.

[332] *See* Second Interim Report, Annex 2 to Appendix L (Related Party Transactions) for a complete discussion of this transaction.

[333] Memorandum from Dave Duncan and Patty Grutzmacher, Andersen, to the Files, regarding LJM1 Partnership Structure and Project Martin, Aug. 1999 (the "Martin Memo") [AA000019665-AA000019669].

[334] Enron 11/8/01 Form 8-K, Table 1.

consolidated with Enron because it did not satisfy the 3% Equity Test.[335]  Because Swap

Sub was an SPE and Enron was the Sponsor of the SPE, Swap Sub should have been

consolidated with Enron unless it had equity equal to at least 3% of the fair value of its

assets.  As illustrated below, Swap Sub's liabilities exceeded its assets by approximately

$23 million and thus it had no equity:

|  | Fair Value (in millions) |
|---|---|
| **Swap Sub Assets** | |
| Cash | $3.75 |
| 3,114,356 shares of Enron common stock restricted for 4 years[336] | 77.0[337] |
| **Total Assets** | 80.75 |
| | |
| **Swap Sub Liabilities** | |
| Put option obligation to Enron on 5,393,258 shares of Rhythms stock exercisable on June 29, 2004 at $56.125/share | (104.00)[338] |
| **Equity** | ($23.25) |

---

[335] *See* Rhythms Restatement Document; *see also* Second Interim Report, Appendix B (Accounting Standards), at 26-39 (discussing the 3% Equity Test).

[336] Transfer Restriction Letter, from Richard Causey, Enron, to Andrew S. Fastow, LJM Cayman, L.P. and LJM Swap Sub, L.P., June 30, 1999 [AB000065400-AB000065403]. Swap Sub was restricted from selling these shares for 4 years.

[337] The closing market price of Enron common stock on June 30, 1999, was $81.75, giving the shares (after adjustment for a 2-for-1 split) a total value of approximately $127 million without restrictions. *See* Second Interim Report, Annex 2 to Appendix L (Related Party Transactions), at 4.  PWC applied a discount of approximately 39% of the trading price, giving the restricted shares owned by Swap Sub a fair value of approximately $77 million. *See* Project Martin Deal Memorandum from Global Finance Tax, undated, at 1 (regarding the LJM1/Rhythms Hedging Transaction) [AB000456678-AB000456680]; PWC Fairness Opinion Letter from Steven Stampf, PWC, to Ben Glisan, Jr., Vice President, Enron Capital Management, Aug. 17, 1999 (the "PWC Opinion Letter 1") [AB000468680-AB000468684]; PricewaterhouseCoopers, Project Martin – Fairness Analysis Presentation, Aug. 13, 1999 (the "PWC Martin Presentation") (draft) [AB000154939-AB000154979].

[338] The $104 million was Enron's valuation. *See* Document entitled "LJM/Rhythms Structure Accounting Entries," undated (produced by Enron) [AB000468781].  The PWC opinion valued the put obligation at between $100-$140 million. *See* PWC Martin Presentation.

Accordingly, the income that Enron recognized by marking to market the put that it received from Swap Sub had to be eliminated as a result of Swap Sub's required consolidation with Enron. Given the size of this error, restatement of Enron's 1999 financial statements was required.[339]

Although Andersen has acknowledged this mistake,[340] because the Rhythms Hedge was the predecessor to the Raptor transactions and because evidence of Andersen's involvement in Enron's non-economic hedging transactions is relevant in determining whether a fact-finder could conclude that Andersen was negligent or aided and abetted the breaches of fiduciary duty by Enron's officers, it is appropriate to analyze the accounting and disclosure issues with the Rhythms Hedge in more detail.

---

[339] *See* Enron 11/8/01 Form 8-K. Andersen and Enron apparently did not realize this error at the time of Enron's October 16, 2001 earnings release. *See also* Andersen Criminal Trial Testimony, at 2043 (testimony of David Duncan, May 15, 2002).

[340] Andersen Criminal Trial Transcript, at 2034 (testimony of David Duncan, May 15, 2002). Andersen's audit memo on the transaction reveals two errors: (1) Andersen used the screen price for the Enron stock held by Swap Sub rather than the restricted stock value; and (2) Andersen stated wrongly that the entire $15 million capital contribution to LJM1 was contributed to Swap Sub when in fact none of it was. *See* Martin Memo. The Examiner has seen no evidence indicating that these errors evidence anything other than less than careful analysis.

In the LJM1/Swap Sub transaction Enron transferred and received the following:

| Transferred | Range of Values (in millions)[341] |
|---|---|
| 6,755,394 shares of Enron common stock[342] | $170 - 223 |
| **Received** | |
| Limited recourse promissory note[343] | 64 - 64 |
| Put option from Swap Sub on Rhythms stock at $56.125/share | 100 - 140 |
| Total received | 164 - 204 |
| **Excess of amount transferred over amount received** | **$ 6 - 19** |

Based on this analysis indicating that the fair value of the items transferred was not materially greater than the fair value of the items received, PricewaterhouseCoopers ("PWC") rendered its opinion to Enron dated August 17, 1999, that as of June 30, 1999, "the consideration received by the Company is fair from a financial point of view."[344] The PWC fairness opinion noted that it was based on "circumstances and conditions existing on June 30, 1999, and our opinion does not represent our view as to value of the consideration following the consummation of the Transactions."[345] Regardless of whether reasonably equivalent values changed hands on June 30, 1999, *there was no possibility of economic benefit to Enron from this arrangement.* Moreover, it was inevitable on June 30, 1999, that Enron would ultimately receive less value from the

---

[341] *See* PWC Martin Presentation; Letter from PricewaterhouseCoopers to Ben F. Glisan, Jr., Vice President, Enron Capital Management, Aug. 17, 1999 (the "PWC Opinion Letter 2") [AB000468680-AB000468684].

[342] Of the 6,755,394 shares, 90,772 shares were sold for approximately $3.75 million in cash which was contributed to Swap Sub, and 3,114,356 shares were contributed by LJM1 to Swap Sub. The remaining Enron shares stayed at LJM1 and thus provided no credit support for the put. *See* Second Interim Report, Annex 2 to Appendix L (Related Party Transactions), at 7-9.

[343] This obligation remained with LJM1.

[344] *See* PWC Opinion Letter 2, at 4.

[345] *See id.* at 3.

transaction than it originally transferred, regardless of the relative movements in Rhythms stock and Enron stock. If the Rhythms stock increased in value above the $56.125/share strike price, Enron would receive back only the $64 million amount of its promissory note (plus interest) despite having transferred $170 million to $223 million worth of its restricted stock. If the Rhythms stock declined in value to zero, Enron would be entitled to $303 million, but the only assets standing behind this promise were $3.7 million of cash and 3,114,356 shares of restricted Enron common stock, which Enron had transferred to LJM1 originally.[346]

Absent the financial statement benefits, Enron would not have engaged in the transaction any more than an individual would purchase health insurance from an insurer whose only asset was a portion of the premium paid by the individual. The accounting and disclosure question posed by these circumstances is whether Enron could properly give accounting effect to a "hedge" that in all circumstances could result only in a net economic detriment to Enron. In other words, assuming that Swap Sub had the requisite 3% equity at risk, was it proper to give accounting effect to the transaction in accordance with its form even though the transaction had no economic substance other than the surrendering of value by Enron to LJM1?

While perhaps surprising to the users of financial statements, under GAAP there is no over-arching requirement that a transaction be accounted for in accordance with its substance if the applicable GAAP rule would require a different accounting treatment.[347]

---

[346] As noted above, the cash came from the sale of Enron shares that Enron transferred on June 30, 1999.

[347] The Examiner finds no over-arching concept of business substance in the GAAP hierarchy of SAS 69. *See* SAS 69 (AU § 411). In some particular GAAP rules, there are provisions directed toward the concept of business purpose. *See, e.g., Miscellaneous: Determining Whether Separate Transactions Should Be Viewed as a Unit,* Derivatives Implementation Group Issue No. K1 (Financial Accounting Standards Bd.

As previously discussed, while the Financial Accounting Concepts contain notions suggesting that accounting should faithfully represent the underlying substance of transactions, these concepts are not within the GAAP hierarchy. Even assuming, however, that the transaction could be accounted for in accordance with its form rather than its substance, and even assuming that Swap Sub had been properly capitalized so as to avoid consolidation with Enron, Andersen nevertheless failed to insist that Enron make the proper GAAP disclosures and permitted financial presentation that was materially misleading. Andersen's memorandum on the Rhythms Hedge provides as follows:[348]

> We informed the client that since the GP of LJM is a related party and transactions are executed with Enron or its affiliates, certain disclosures would be required pursuant to FAS #57. The existence of LJM must be disclosed, including the related party that serves as the GP of the partnership, as well as the purpose of the entity. The nature of transactions executed with Enron and Enron affiliates must also be disclosed as well as any associated gains or losses. We will review Enron's public filings to ensure all appropriate disclosure requirements are met.

The FAS 57 disclosures in Note 16 of Enron's 1999 financial statements with respect to the Rhythms hedge are as follows:[349]

> In June 1999, Enron entered into a series of transactions involving a third party and LJM Cayman, L.P. (LJM). LJM is a private investment company which engages in acquiring or investing in primarily energy-

---

2000) ("DIG Issue K1"); *see also* DIG Issue F6. As acknowledged by the FASB, in the U.S. rules-based approach to GAAP, as opposed to a principles-based approval under International Accounting Standards, the application of broad concepts are subject to numerous exceptions in specific rules and interpretations. See Proposal, Principles-Based Approach to U.S. Standard Setting (FASB) Oct. 21, 2002, *available at* http://www.fasb.org/news/nr102102.shtml. Accountants are required to discuss with audit committees "items that have a significant impact on the representational faithfulness . . . of the accounting information included in financial statements, which include related disclosures." *See* SAS 90, at § 1 (amending SAS 61, at § 11) (AU § 380.11).

[348] *See* Martin Memo.

[349] Enron 1999 Annual Report, at 59. This disclosure is substantially identical to the disclosure in Note 8 to Enron's financial statements filed with its second quarter 1999 Form 10-Q. Enron Form 10-Q filed with the SEC for the Quarter ended June 30, 1999 (the "Enron 6/30/99 Form 10-Q").

related investments. A senior officer of Enron is the managing member of LJM's general partner. The effect of the transactions was (i) Enron and the third party amended certain forward contracts to purchase shares of Enron common stock, resulting in Enron having forward contracts to purchase Enron common shares at the market price on that day, (ii) LJM received 6.8 million shares of Enron common stock subject to certain restrictions and (iii) Enron received a note receivable and certain financial instruments hedging an investment held by Enron. Enron recorded the assets received and equity issued at estimated fair value. In connection with the transactions, LJM agreed that the Enron officer would have no pecuniary interest in such Enron common shares and would be restricted from voting on matters related to such shares. LJM repaid the note receivable in December 1999.

FAS 57 requires that financial statements include disclosures of material related party transactions:

These disclosures shall include:[350]

    a.  the nature of the relationship(s) involved;

    b.  a description of the transactions, . . . for each of the periods for which income statements are presented, and such other information deemed necessary to an understanding of the effects of the transactions on the financial statements;

    c.  the dollar amount of transactions for each period for which income statements are presented and . . . ;

    d.  amounts due from or to related parties as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of settlement.

The Rhythms Hedge disclosure in footnote 16 of Enron's 1999 financial statements (and in footnote 8 to its June 30, 1999 interim statements) violated the GAAP disclosure provisions of FAS 57 quoted above and did not comport with the conclusions in Andersen's audit memorandum.[351] The disclosures do not describe the non-economic

---

[350] Related Party Disclosures, Statement of Financial Accounting Standards No. 57 (Financial Accounting Standards Bd. 1982) ("FAS 57").

[351] Enron 1999 Annual Report, at 59; Enron 6/30/99 Form 10-Q, at 13.

nature of the hedging transaction pursuant to which Enron recognized $95 million of income, much less describe that such income did not represent any possible economic benefit to Enron.  The disclosures do not reveal that the hedging instrument received by Enron was from a subsidiary of LJM1 whose only assets were $3.75 million in cash plus about half of the stock transferred.  Such disclosures are necessary to understand the effects of the transactions, the dollar amount of the transactions and the amounts due, and are thus required by FAS 57.[352]  Andersen was thoroughly aware of the facts of the transaction[353] and thus knew or should have known that the transaction had no economic substance.  Although it recognized that the nature of the transactions  was required to be disclosed pursuant to FAS 57, Andersen reviewed the related party footnote and concluded that the financial statements were in accordance with GAAP in all material respects.  Moreover, although Andersen identified related party transactions as an area of accounting and disclosure risk in its SAS 61 presentation to the Audit Committee on February 7, 2000, and although Andersen knew the Board had approved the related party aspect of the transaction,[354] Andersen did not determine that the Audit Committee was informed about the magnitude or effects of this transaction.

---

[352] As discussed below, both Fastow and LJM1 were "related parties" to Enron.

[353] *See* Martin Memo.

[354] *See* Report, Appendix D (Roles of Lay, Skilling and Outside Directors).

*Raptor Hedges*[355]

Just as in the case of Enron's non-economic hedge of its Rhythms stock, the Engagement Team approved Enron's non-economic hedges of various Enron merchant investments and assets through the LJM2/Raptor structure with the concurrence of the Practice Director and Concurring Partner, but without the advance concurrence of the PSG on many of the critical issues.[356]  The LJM2/Raptor structure was similar to the LJM1/Swap Sub structure.  In Raptors 1, 2 and 4, Enron capitalized a counterparty with Enron's stock and entered into hedging transactions with the counterparty designed to offset, on Enron's income statement, the declines in mark-to-market and fair value assets on Enron's income statement.[357]  The Raptor hedges were also like the Rhythms Hedge because at the time they were entered into there was no possibility of any economic benefit to Enron and it was inevitable that Enron would suffer economic detriment. Unlike Swap Sub, when the Raptor counterparties were initially capitalized, the fair value of their assets exceeded the fair value of their liabilities and they had equity from a third

---

[355] The Examiner has reviewed numerous Andersen memos on the Raptor transactions including draft memos, initialed memos, initialed amended memos, uninitialed memos, and memos with handwritten comments.  In order to assess this evidence, the Examiner has summarized the principal Raptor memos in Annex 1 to this Appendix, which identifies 15 separate Raptor memos, four of which amend earlier ones, and all of which were initialed by their authors (except as indicated in Annex 1).  The memos are listed in chronological order of their original date.  The Annex sets forth the title, the Engagement Team authors, the issues addressed, the conclusions on the issues, and the PSG and Andersen risk management accountants consulted on each issue.  For ease of reference, the Raptor memos referred to in this portion of this Appendix are cross-referenced to by the number assigned to them on Annex 1.  Unless otherwise indicated, all references to Andersen memoranda concerning the Raptors in the proceeding discussion are to memoranda that have been initialed by their authors.

[356] *See* Annex 1 to this Appendix.  As indicated above, evidence suggests that Andersen may have been unaware that the Raptor entities were prohibited from commencing their hedging activities until a return of capital was paid to LJM2.  *See, e.g.*, Raptor Memo #3.  However, as discussed previously, evidence indicates that Andersen was aware that the Raptors had no economic substance.

[357] Raptor 3 was capitalized also with equity interests in the NewPower Company.  See First Interim Report for a discussion of how Raptor 4 was used in connection with other Enron accounting techniques to manipulate Enron's 2000 financial statements.

party equal to or in excess of 3% of the fair value of their assets (taking into account restrictions on the Enron stock). The Examiner has previously concluded, however, that despite this equity, the Raptor entities failed to satisfy the 3% Equity Test[358] and thus should have been consolidated with Enron because the equity was provided by LJM2, the general partner of which was Fastow. The Examiner believes that because of this relationship, equity provided by LJM2 should not be viewed as provided by an "independent" third party as required by the GAAP literature applicable to determining whether an SPE should be consolidated with its Sponsor.[359]

---

[358] *See* Second Interim Report, Appendix B (Accounting Standards), at 26-39 (discussing 3% Equity Test).

[359] Memorandum from Dave Duncan, *et al.*, Andersen, to the Files, regarding the LJMII Partnership Structure, Dec. 31, 1999, as amended, Oct. 12, 2001 ("Raptor Memo #1A"), at 2 ("we determined that the SPE capital threshold was met with respect to any transaction LJMII may undertake directly with Enron") (listed in Annex 1 to this Appendix) [AA000012507-AA000012510]. Andersen concludes without analysis that LJM2's equity can be counted toward satisfying the 3% Equity Test in Raptor 1, except to the extent it was attributable to Fastow or borrowed funds.  Raptor Memo #3; *see also* Memorandum from Dave Duncan, *et al.*, Andersen, to the Files, regarding the Raptor Transaction, Mar. 28, 2000, as amended, Oct. 12, 2001 ("Raptor Memo #3A") [AAEX0179573-AAEX0179580]. All three memos were initialed by the authors and indicated concurrence by John Stewart of the PSG on this issue.

When asked how the PSG could reconcile such a conclusion with Andersen's leasing book, which states that equity from a FAS 57 related party would not be viewed as coming from an independent person, *see* U.S. Professional Standards Group, Andersen, "Accounting for Leases; Interpretation of FASB Statement No. 13, Accounting for Leases, as amended, "Andersen Worldwide Organization (May 1, 2001), Appendix I ("Use of Special Purpose Entities in Lease Transactions"), at 4, Stewart stated that in his view LJM2 was not a FAS 57 related party to Enron but rather its general partner, Fastow, was the related party.  Footnote 16 to Andersen's 2000 financial statements, however, describes LJM2 as the "Related Party."

FAS 57 provides that related parties include "other parties with which the enterprise may deal if one party controls or can significantly influence the management or operating policies of the other to an extent that one of the transacting parties may be prevented from fully pursuing its own separate interests." As stated in the offering memorandum pursuant to which LJM2's equity investment was raised, the purpose of LJM2 was to engage in transactions with Enron and the presence of Fastow as the general partner of LJM2 and the CFO of Enron was considered to be a substantial benefit to LJM2. Private Placement Memorandum of LJM2 Co-Investment, L.P., Oct. 13, 1999, at 5 (LJM2 was "uniquely positioned to capitalize on Enron's need for outside capital due to the Principals' [Fastow and Kopper] familiarity with Enron's assets and their understanding of Enron's objectives and LJM's ability to quickly execute transactions") [PSI00096969-PSI00097017]. Although it is not clear that Andersen reviewed the LJM2 offering memorandum, it is clear that Andersen knew that the purpose of LJM2 was to engage in transactions with Enron. Raptor Memos #1 and #1A both provide that:

As previously mentioned, Andersen concluded that Enron had improperly accounted for the aggregation of the Raptor indebtedness at the end of 2000 and in the first and second quarters of 2001.[360]  With regard to the Aggregation Issue, Bass advised the Engagement Team prior to the issuance of the 2000 financial statements that if the four Raptor entities "were truly cross collateralized that seemed OK to me."[361]  The Examiner has seen no evidence indicating that the Engagement Team or Bass believed that Enron had failed to achieve "true cross collateralization" as of December 31, 2000,

---

> We were informed by a senior officer of Enron (CFO) that he saw a unique opportunity to match various capital providers wanting to diversify into sectors in which he had experience with the needs Enron and other companies like Enron had for a high degree of third party equity capital.  In effect, he wanted to form his own private equity fund . . . .
>
> . . . .
>
> Since LJMII planned to transact business at least initially with Enron, we determined that we should view LJMII as an Enron sponsored SPE.  We informed Enron that, at some point, we might reconsider our view of LJMII as an SPE and such reconsideration would be based on the number of third party transactions and the size of those transactions to the operations of the entity as a whole . . . .

Memorandum from Dave Duncan, *et al.*, Andersen, to the Files, regarding LJMII Partnership Structure, Dec. 31, 1999 ("Raptor Memo #1") [AB0648 00593-AB0648 00606]; Raptor Memo #1A. Thus, Andersen knew that the dominant operations or activities of LJM2, like those of LJM1 before it, would be to engage in transactions with Enron "at least initially."

It is difficult to contend that Enron could not significantly influence the management or operating policies of LJM2 when LJM2 was formed principally to engage in transactions with Enron, and Enron could in fact deprive LJM2 of a significant feature of its management and operating policies by terminating Fastow as Enron's CFO or requiring Fastow to resign as general partner of LJM2 as a condition to remaining employed by Enron or simply refusing to permit Fastow to cause Enron to engage in transactions with LJM2.  The fact that LJM2's limited partners upon a 75% vote (later reduced to 66-2/3%) could remove Fastow, while relevant in determining whether Enron should consolidate LJM2, does not eliminate Enron's ability to significantly influence LJM2's management or operating policies. *See* Raptor Memo #4; *see also* Investor's Accounting for an Investee When the Investor Has a Majority of the Voting Interest but the Minority Shareholder or Shareholders Have Certain Approval or Veto Rights, 2 EITF Abstracts (FASB) 96-16 (July 23, 1998) ("EITF 96-16").  Moreover, just as Enron could significantly influence LJM2, LJM2, through Fastow, could and did significantly influence Enron.  Indeed, the evidence suggests that Enron was prevented from fully pursuing its own separate interests by entering into numerous transactions that were unfair to Enron, notwithstanding the Board's establishment of controls designed to prevent non-arms-length transactions.

[360] Stewart testified that when he read the Raptor memos sent to him on September 14, 2001, he was upset because, among other things, "[I]t became apparent that some of the advice we had given had not been followed."  Andersen Criminal Trial Transcript, at 5414 (testimony of John Stewart, May 30, 2002).

[361] Bass 3/4/01 Email.

as a result of a forty-five day cross collateralization letter between LJM2 and Enron. However, the essence of the PSG's ultimate advice on the Aggregation Issue, and of Enron's (and Andersen's) error, was that there was no way to achieve "true cross collateralization" of the Raptors in a manner that was consistent with GAAP.[362]

## F.   Andersen's Role in the Tax Transactions

As discussed in the Second Interim Report, Enron's tax department consummated eleven Tax Transactions that generated $886.5 million of net income benefits from December 1995 through September 2001.[363]   Five of these transactions (the Steele, Cochise, Teresa, Condor and Tammy I Transactions) were the most aggressive in terms of the manipulation of FAS 109,[364] and the Examiner concluded that the accounting for each of these transactions violated GAAP.[365]

---

[362] *See* Memorandum from Dave Duncan, *et al.*, Andersen, to the Files, regarding Raptor Transaction Update, May 9, 2001, as amended, Oct. 12, 2001 ("Raptor Memo #9A"), at 3 [AAEX0179587-AAEX0179593].

[363] *See* Second Interim Report, Appendix J (Tax Transactions), at 8-9.

[364] Accounting for Income Taxes, Statement of Financial Accounting Standards No. 109 (Financial Accounting Standards Bd. 1992) ("FAS 109").   Under FAS 109, "deferred tax assets" and "deferred tax liabilities" are recognized for the estimated future tax effects attributable to "temporary differences" between (i) the amount of taxable income or expense reported on a company's income tax returns and the amount reported in its financial income statements and (ii) the tax basis in assets or liabilities and the reported amounts of such assets or liabilities in a company's financial statements. *See* Second Interim Report, Appendix J (Tax Transactions), *Accounting for Deferred Taxes Under FAS 109*.   Over time, these temporary differences will reverse, with a deferred tax asset creating taxable income and a deferred tax liability creating a deduction. *Id.*

[365] *See* Second Interim Report, Appendix J (Tax Transactions).

Andersen played a key role in these transactions.  Its New York office[366] issued "SAS 50 letters"[367] to BT/Deutsche and Chase Securities on the underlying hypothetical transactions marketed to Enron or prepared similar memoranda directly for Enron.[368] This work product generally was furnished to Enron[369] and, at least in one instance,

---

[366] Andersen maintained an "on-call group" in its New York office whose primary function was to advise intermediaries such as investment banks about the accounting and tax consequences of hypothetical transactions being developed by those intermediaries. Sworn Statement of H Ronald Weissman, Andersen, to Philip C. Cook, A&B, May 14, 2003 (the "Weissman Sworn Statement"), at 18. Andersen typically was engaged by the intermediaries on an hourly basis and, as a by-product of this advice, may have issued a "SAS 50 letter" summarizing Andersen's tax and accounting analysis of a hypothetical transaction at a specific point in time. *Id.* at 18-20; Sworn Statement of Thomas Finley, former Managing Director, Bankers Trust, to Philip C. Cook, A&B, Apr. 30, 2003 (the "Finley Sworn Statement"), at 18-19, 22; Sworn Statement of Brian J. McGuire, Managing Director, Deutsche Bank, to Philip C. Cook, A&B, May 2 and 7, 2003 (the "McGuire Sworn Statement"), at 95.  To the extent that these engagements included tax consequences of a transaction, the on-call group may have consulted with other professionals in Andersen's New York office. Weissman Sworn Statement, at 21, 23. Andersen and the banks had an understanding that, if a hypothetical transaction was taken to one of Andersen's audit clients, Andersen's on-call group would be notified so that it could contact the engagement team and assist in their analysis of the transaction. *Id.* at 114.

[367] *See* SAS 50 (AU § 625).  A SAS 50 letter is not binding on local engagement teams reviewing the accounting treatment of an actual transaction, and it does not preclude Andersen from changing its views on a particular issue at a later time. Weissman Sworn Statement, at 52-53.

[368] Letter from Andersen to BT Securities Corporation, May 12, 1995 [AB0074 1228-AB0074 1233]; Letter from Andersen to Bankers Trust, July 26, 1995 [AB0074 1235-AB0074 1246]; Letter from Andersen to Bankers Trust, Aug. 11, 1997 (the "Steele SAS 50 Letter") [DBC 017408-DBC 017420]; Letter from Andersen to Bankers Trust, Aug. 6, 1998 (the "First Cochise SAS 50 Letter") [AB0074 0577-AB0074 0592]; Letter from Andersen to Bankers Trust, Nov. 13, 1998 (the "Second Cochise SAS 50 Letter") [AB0074 0558-AB0074 0576]; Letter from Andersen to Bankers Trust, May 26, 1999 (the "Third Cochise SAS 50 Letter") [AB0074 0539-AB0074 0557]; Letter from Andersen to Chase Securities, Sept. 29, 1999 [AB000187050-AB000187055]; Tomas Accounting Memo; Tammy I Accounting Memo; *see also* Second Interim Report, Appendix J (Tax Transactions); Third Interim Report, Appendix G (Role of BT/Deutsche and its Affiliates).   Andersen's on-call group also was engaged to issue a SAS 50 letter on the Tomas and Valhalla Transactions, but Andersen never issued the SAS 50 letter on the Tomas Transaction because it prepared an accounting memorandum directly for Enron instead.  *See* Facsimile from Brian McGuire, Bankers Trust, to John Buser, Akin Gump, May 27, 1998 (attaching draft letter from Andersen to Bankers Trust, May 26, 1998) [AGS34208-AGS34219]; Letter from Andersen to Deutsche Bank, Sept. 22, 1999 [AB000188607-AB000188612]; Weissman Sworn Statement, at 44-45, 54-56; McGuire Sworn Statement, at 298-300.

[369] *See* Third Interim Report, Appendix G (Role of BT/Deutsche and its Affiliates), at 76 n.363; Weissman Sworn Statement, at 47-48; Sworn Statement of Michael P. Baldasaro, Andersen, to Philip C. Cook, A&B, May 15, 2003 (the "Baldasaro Sworn Statement"), at 31; Tammy I Accounting Memo.

Andersen appears to have assisted in marketing the structure to Enron.[370]  This work product also served as a critical resource in Andersen's approval of the accounting treatment of the Tax Transactions, which was discussed among Andersen's Houston, New York and Chicago offices and which relied in part on the issuance of "should" level tax opinions by various law firms.[371]  In one instance (the Teresa Transaction), Andersen also was engaged by King & Spalding to review and comment on the tax opinion,[372] which supported the accounting treatment but which meant that Andersen worked for three separate parties on the same transaction.  Overall, the evidence indicates that Andersen:

---

[370] *See, e.g.,* Facsimile from Thomas Finley, Bankers Trust, to Robert Hermann, Enron, May 28, 1996 (notifying Robert Hermann that Mike Baldasaro in Andersen's New York office would be calling to discuss the structure of the transaction that later became the Teresa Transaction and attaching PowerPoint presentation materials) [DBC 013815-DBC 013827].

[371] *See, e.g.,* Third Interim Report, Appendix G (Role of BT/Deutsche and its Affiliates), at 18 n.67; Email from Roger D. Willard, Andersen, to P. Michael Baldasaro, Andersen, regarding Enron and Bankers Trust Proposed Transaction, Jan. 23, 1997 (forwarding email from Roger D. Willard, Andersen, to Richard R. Petersen, Andersen, Jan. 20, 1997) (Teresa Transaction) [AA 000006916-AA 000006917]; Email from Richard R. Petersen, Andersen, to Roger D. Willard, Andersen, regarding Enron, Oct. 25, 1997 (Steele Transaction) [PSI00021682]; Steele Accounting Memo; Cochise Accounting Memo; Memorandum from Herman Manis, and Christopher J. Herbold, Andersen, to the Files, regarding Project Cochise, Aug. 9, 1999 [AB0785 02552-AB0785 02565]; Tammy I Accounting Memo; Email from Michael D. Jones, Andersen, to P. Michael Baldasaro, *et al.,* Andersen, regarding Project Tammy/Aries, July 31, 2000 [AB0785 02642-AB0785 02643]; Email from Roger D. Willard, Andersen, to David B. Duncan, and D. Stephen Goddard, Jr., Andersen, regarding Tax Planning Strategy, Feb. 11, 1998 [AA-EX00007184]; Tomas Accounting Memo; Email from Richard R. Petersen, Andersen, to Patricia S. Grutzmacher, Andersen, regarding Condor Tax Structure, Oct. 2, 1999 [AA-EX00236394-AA-EX00236395]; Memorandum from David B. Duncan and Herman Manis, Andersen, to the Files, Houston, regarding Project Apache, Feb. 1999 [AA0035343-AA0035344]; Sworn Statement of Roger D. Willard, Andersen, to Philip C. Cook, A&B, May 12, 2003 (the "Willard Sworn Statement"), at 42; Sworn Statement of Robert P. Palmquist, Andersen, to Philip C. Cook, A&B, May 13, 2003 (the "Palmquist Sworn Statement"), at 86, 89-91, 112-13, 123; Baldasaro Sworn Statement, at 21; Weissman Sworn Statement, at 17-18; Finley Sworn Statement, at 118-21; McGuire Sworn Statement, at 138-41.

[372] Engagement Letter from William S. McKee, King & Spalding, to Robert P. Palmquist, Andersen, Feb. 20, 1997 (the "K&S Engagement Letter") [K&S 2 05713-K&S 2 05714]; Palmquist Sworn Statement, at 89-91.

- relied on a strained analogy to APB 16[373] and used a questionable amortization methodology in the REMIC Carryover Basis Transactions to approve Enron's reporting of the potential benefit of speculative future tax deductions in an erroneous and misleading manner as pre-tax income;

- relied on interpretations of FAS 109 in Enron's Tax Basis Step-Up Transactions that permitted Enron to create accounting benefits in violation of the literal accounting requirements and that had a misleading impact on Enron's reported GAAP income;

- permitted Enron to record the accounting benefits of the Tax Transactions even though the transactions had no bona fide business purpose other than the creation of GAAP income;[374] and

- permitted Enron to record the accounting benefits of the Tax Transactions without specific disclosure in Enron's financial statements.[375]

*Pre-Tax Income Generated by REMIC Carryover Basis Transactions*

Both the Steele and Cochise Transactions involved the use of an SPE to acquire

REMIC Residual Interests[376] and Facilitating Assets.[377]    These transactions were

---

[373] Business Combinations, Accounting Principles Bd. Opinion No. 16 (Financial Accounting Principles Bd. 1970) ("APB 16"), *superseded by* Business Combinations, Statement of Financial Accounting Standards No. 141 (Financial Accounting Standards Bd. 2001).

[374] As discussed in the Prior Reports, the Tax Transactions had little to no connection with Enron's ongoing business activities. *See* Second Interim Report, Appendix J (Tax Transactions); *see also* Third Interim Report, Appendix C (Role of Enron's Officers), at 68-77; Third Interim Report, Appendix G (Role of BT/Deutsche and its Affiliates), at 72-73. Instead, they largely were artificial transactions designed to create GAAP income. *Id.* Andersen was aware of this purpose and knew that it was not a valid business purpose for financial accounting. *See, e.g.,* K&S Engagement Letter; Teresa Accounting Memo; Email from Richard R. Petersen, Andersen, to Roger D. Willard, Andersen, regarding Enron, Oct. 25, 1997 [PSI00021682]; Email from Richard R. Petersen, Andersen, to Roger D. Willard, Andersen, regarding Enron-Remic Transaction, Oct. 30, 1997 [AB0785 02530]; Willard Sworn Statement, at 101.

[375] Enron's management intentionally avoided having to highlight the Tax Transactions in the financial statements, and the transactions were disclosed only to the extent that they were included in the increase in the "basis and stock sale differences." *See* Third Interim Report, Appendix C (Role of Enron's Officers), at 70. Andersen audited Enron's financial statements and reviewed its tax footnotes and the tax reserves. Palmquist Sworn Statement, at 56, 196; Willard Sworn Statement, at 163-64.

[376] A "REMIC" refers to a real estate mortgage investment conduit, which is a collaterized pool of mortgages taxed on a flow-through basis. *See* Second Interim Report, Appendix J (Tax Transactions), at 3. Each security interest in a REMIC is classified as either a "REMIC Regular Interest" or a "REMIC Residual Interest." *Id.* In the early years, the REMIC usually generates "Phantom Income," i.e., mortgage interest income that exceeds the deductions for interest paid to the holders of the REMIC Regular Interests.

designed to avoid federal income tax on the income from the REMIC Residual Interests,
but to claim hundreds of millions of dollars of future loss deductions from the same
REMIC Residual Interests.[378]  Using FAS 109, Enron recorded the potential benefit of
these speculative future tax deductions but did so in a manner that created $144 million
of pre-tax income from October 1997 through September 2001.[379]

The accounting benefits from these transactions resulted from their
characterization as "bargain purchases" based on an analogy of the acquisitions to a
"business combination" under APB 16.[380]  With Andersen's approval, Enron recorded the
assets at their market purchase price and then recorded a deferred tax asset (reflecting the
amount by which the assets' tax basis exceeded their fair value) and an offsetting

---

*Id.*  In later years, the REMIC generates "Phantom Losses," i.e., the deductions for interest paid to the holders of the REMIC Regular Interests that exceed the interest income.  *Id.*

[377]  In the Steele Transaction and the Cochise Transaction, the Facilitating Assets were corporate bonds and the Cochise Planes, respectively.  *See* Second Interim Report, Appendix J (Tax Transactions), *Enron's REMIC Carryover Basis Transactions*; Second Interim Report, Annexes 1 and 2 to Appendix J (Tax Transactions); *see also* Third Interim Report, Appendix C (Role of Enron's Officers), at 54, 72-73; Third Interim Report, Appendix G (Role of BT/Deutsche and its Affiliates), at 28-30, 38.  These assets were unrelated to the REMIC Residual Interests, had low economic yields, and were acquired for the sole purpose of enabling Enron to portray the future tax benefits of the transactions as pre-tax income for financial accounting purposes.  *See* Second Interim Report, Appendix J (Tax Transactions), *Enron's REMIC Carryover Basis Transactions*; Second Interim Report, Annexes 1 and 2 to Appendix J (Tax Transactions); *see also* Third Interim Report, Appendix C (Role of Enron's Officers), at 54, 72-73; Third Interim Report, Appendix G (Role of BT/Deutsche and its Affiliates), at 28-30, 38.

[378]  *See* Second Interim Report, Appendix J (Tax Transactions), *Enron's REMIC Carryover Basis Transactions*; Second Interim Report, Annexes 1 and 2 to Appendix J (Tax Transactions); *see also* Third Interim Report, Appendix C (Role of Enron's Officers), at 70-75; Third Interim Report, Appendix G (Role of BT/Deutsche and its Affiliates), at 27-42.

[379]  *See* Second Interim Report, Appendix J (Tax Transactions), *Enron's REMIC Carryover Basis Transactions*; Second Interim Report, Annexes 1 and 2 to Appendix J (Tax Transactions); *see also* Third Interim Report, Appendix C (Role of Enron's Officers), at 70-75; Third Interim Report, Appendix G (Role of BT/Deutsche and its Affiliates), at 27-42.

[380]  For GAAP purposes, a "Business Combination" occurs when a corporation and one or more incorporated or unincorporated businesses are brought together into one accounting entity.  APB 16, ¶ 1; *see also* Steele SAS 50 Letter, at 4; First Cochise SAS 50 Letter, at 8; Second Cochise SAS 50 Letter, at 8; Third Cochise SAS 50 Letter, at 8; Steele Accounting Memo, at 4; Cochise Accounting Memo, at 4.

"deferred credit"[381] (reflecting the bargain purchase element of each transaction).[382]  In the Cochise Transaction, Enron took the additional step of offsetting a portion of the deferred credit against the book basis of the Cochise Planes, thus reducing the aircraft book basis to zero and the amount of the deferred credit by an equal amount.[383]  Enron then amortized the remaining deferred credit in each transaction into pre-tax income over a five year period.[384]  As noted above, the Examiner concluded that Enron's accounting treatment of the Steele and Cochise Transactions violated GAAP, with the most aggressive and misleading aspects of the transactions being the creation of pre-tax income (as opposed to after-tax income through a reduction in tax expense in the tax

---

[381] If a transaction is treated as a business combination under ABP 16 and the sum of the net assets exceeds the purchase price, "negative" goodwill (the presumed discount or bargain on net assets acquired) is created. *See* Second Interim Report, Appendix J (Tax Transactions), *Accounting for Deferred Taxes Under FAS 109*. Under GAAP, the negative goodwill is treated as a proportionate reduction in non-current assets other than long-term investments in marketable securities. *Id.* If the book value of these assets is less than the negative goodwill, the remainder is required to be recorded as a "deferred credit" in the liability section of the balance sheet. *Id.* Enron treated the deferred credit as having no tax basis. *See* Letter from Thomas Finley, Managing Director, Bankers Trust, to R. Davis Maxey, Enron, Nov. 7, 1997, attaching Letter from Bill Boyle, Vice President, Bankers Trust, to William McKee, King & Spalding, June 2, 1997 [AB000187757-AB000187776]; Enron Consolidated Financial Statement Reporting, Limited Financial Accounting Summary of Certain Projects, as requested by the Examiner, Oct. 2002 (the "Enron Consolidated Accounting Summary"), at 8 [AB000427661-AB000427684]. As a result, Enron recorded an additional deferred tax asset for the book and tax basis disparity of the deferred credit, which then increased the amount of the deferred credit recorded on a "gross-up" basis on Enron's books. Enron Consolidated Accounting Summary, at 7-8. Enron apparently used this gross-up procedure until the release of EITF 98-11, which specifically states: "The deferred credit is not a temporary difference under [FAS] 109," which means that a deferred tax asset may not be recognized for the difference in book basis and tax basis of the deferred credit, but only for the difference for the initial asset purchased. Accounting for Acquired Temporary Differences in Certain Purchase Transactions That Are Not Accounted for as Business Combinations, 2 EITF Abstracts (FASB) 98-11, ¶ 3b (Jan. 24, 2002) ("EITF 98-11"); *see also* Enron Consolidated Accounting Summary, at 5-20.

[382] *See* Second Interim Report, Appendix J (Tax Transactions), *Enron's REMIC Carryover Basis Transactions*; Second Interim Report, Annexes 1 and 2 to Appendix J (Tax Transactions).

[383] *See* Second Interim Report, Appendix J (Tax Transactions), *Enron's REMIC Carryover Basis Transactions*; Second Interim Report, Annex 2 to Appendix J (Tax Transactions).

[384] *See* Second Interim Report, Appendix J (Tax Transactions), *Enron's REMIC Carryover Basis Transactions*; Second Interim Report, Annexes 1 and 2 to Appendix J (Tax Transactions).

provision section of Enron's income statement) and the artificially shortened amortization period.[385]

In approving the accounting treatment, Andersen acknowledged that the REMIC Residual Interests and Facilitating Assets did not provide an operating business and that these transactions did not technically constitute business combinations.[386]   Andersen, however, determined that APB 16 provided the best guidance, presumably because the assets were purchased from the same consolidated group, i.e., the BT/Deutsche consolidated group.[387]   This "same seller" theory finds no credible support in the accounting literature.   Under ABP 16, a business combination occurs when "a corporation and one or more incorporated or unincorporated businesses are brought together into one accounting entity."[388]   Other accounting literature defines a "business" as a self-sustaining integrated set of activities and assets conducted and managed for the purpose of providing a return to investors.[389]   As previously determined by the Examiner, the purchase of the unrelated assets in the Steele and Cochise Transactions did not

---

[385] *See* Second Interim Report, Appendix J (Tax Transactions), *Enron's REMIC Carryover Basis Transactions*; Second Interim Report, Annexes 1 and 2 to Appendix J (Tax Transactions); *see also* Third Interim Report, Appendix G (Role of BT/Deutsche and its Affiliates), at 27-42, 77-79.

[386] Steele Accounting Memo, at 4; Facsimile from Roger Willard, Andersen, to Bob Palmquist, Andersen, Sept. 30, 1997, attaching Project Steele Summary of Considerations, Sept. 30, 1997 ("Steele Summary of Considerations"), at AA-EX00016357 [AA-EX00016356-AA-EX00016358]; Cochise Accounting Memo, at 4.

[387] *See* Steele Accounting Memo, at 4; Cochise Accounting Memo, at 4; Second Cochise SAS 50 Letter, at 8; Third Cochise SAS 50 Letter, at 8.

[388] APB 16, ¶ 1.

[389] EITF 98-3, ¶ 6.

represent a "self-sustaining integrated set of activities and assets" and should not have been afforded "negative goodwill" accounting treatment under GAAP.[390]

Even if APB 16 could be appropriately applied to the Steele and Cochise Transactions, Andersen erred in its method of amortizing the deferred credit. APB 16 requires the deferred credit to be "amortized systematically to income over the period estimated to be benefited ... ," with such method and period of amortization being disclosed.[391] In other words, the deferred credit should be amortized into net income over the period benefited by the deferred tax asset. Over the same period, the deferred tax asset should be reduced with an offsetting charge to taxes payable, with the net effect on reported net income being zero over the life of the asset.

Andersen, however, interpreted APB 16 to require nothing more than a "rational and systematic method" and, without citation to any accounting literature, took the position that the deferred credit could be amortized into "other income" (i.e., pre-tax income).[392] According to Andersen, this position is "reasonable as investment in these assets represent(s) traditional operating transactions," even though a senior Andersen tax partner noted that he had never seen a situation where the deferred credit was amortized into pre-tax income instead of the tax provision.[393]

---

[390] *See* Second Interim Report, Appendix J (Tax Transactions), *Accounting for Deferred Taxes Under FAS 109*, at 21-23; *see also* Second Interim Report, Annexes 1 and 2 to Appendix J (Tax Transactions).

[391] ABP 16, ¶ 91.

[392] Steele SAS 50 Letter, at 7; First Cochise SAS 50 Letter, at 11-12; Second Cochise SAS 50 Letter, at 13; Third Cochise SAS 50 Letter, at 13; Steele Accounting Memo, at 5; Steele Summary of Considerations, at AA-EX00016358; Cochise Accounting Memo, at 6.

[393] Steele Summary of Considerations, at AA-EX00016358; Baldasaro Sworn Statement, at 101-102, 105-106 (Baldasaro was contacted during Andersen's engagement by BT/Deutsche with respect to the preparation of a SAS 50 letter relating to the Steele Transaction).

Consistent with Andersen's lack of cited authority, the Examiner has not located any persuasive authority for Andersen's position.[394] In fact, accounting standards have long followed the practice of reflecting the effects of income taxes on net income within the income tax expense component of the income statement.[395] Accounting interpretations, including EITF 98-11, adopted and effective after Enron engaged in the Cochise and Steele transactions, make it clear that those effects are reflected in net (after-

---

[394] During the course of the Examiner's investigation, Andersen indicated that its position was required by FASB Statement No. 109, Accounting for Income Taxes, and supported by analogy to: (i) Accounting for "Investment Credit," Accounting Principles Bd. Opinion No. 2 (Financial Accounting Standards Bd. 1962) ("APB 2"); (ii) Accounting for the Investment Credit, Accounting Principles Bd. Opinion No. 4 (Financial Accounting Standards Bd. 1964) ("APB 4") (amending APB 2); (iii) Accounting for the Investment Credit: Accounting Interpretations of APB Opinion No. 4, AICPA Accounting Interpretation No. AIN-APB 4, (Financial Accounting Standards Bd. Feb. 1972-Mar. 1972) ("AIN-APB 4"); and (iv) Business Combination, Accounting Principles Bd. Opinion No. 16 (Financial Accounting Standards Bd. 1970) ("APB 16"). Telephone Interview with Richard Petersen, Andersen, by Philip C. Cook, A&B, Oct. 14, 2003 ("Petersen 10/14/03 Interview"). APB 2, APB 4, and AIN-APB 4, which predated implementation of FAS 109, provide that the investment tax credit ("ITC") may be accounted for as a reduction to the cost of the asset. According to Andersen, this results in the depreciation of a lower basis that could affect pre-tax income, a result which supports the amortization of the deferred credit in both the Steele and Cochise Transactions into pre-tax income. Id. However, the only issue addressed by APB 2, APB 4, and AIN-APB 4 is the timing of the net income effect for financial accounting purposes. Under GAAP, the ITC can be accounted for under the flow-through method (i.e., a direct reduction to income tax expense in the year the asset is purchased) or under the deferral method (i.e., a reduction to the cost of the asset (either directly or through a contra account) with the ITC allocated over the life of the asset as a direct reduction of periodic income tax expense. Under either approach, the ITC is accounted for as income tax expense. AIN-APB 4, however, does provide one exception for financial institutions in that they may include the ITC as part of the proceeds from leased property and include the ITC in determining the yield from the loan that is reflected in income over the term of the lease. Because Enron was not a financial institution, AIN-APB 4 (like APB 2 and APB 4) offers no support for Andersen's position in the Steele and Cochise Transactions. The Safe Harbor Leasing Exposure Draft, which was never finalized, is inapposite to the Steele and Cochise Transaction because it addresses transactions structured in the form of leases but are in substance solely the purchase or sale of tax benefits such as ITC.

[395] See, e.g., FAS 109; Accounting for Income Taxes, Statement of Financial Accounting Standards No. 96 (Financial Accounting Standards Bd. 1987) ("FAS 96") (superseded by FAS 109); Accounting for Income Taxes, Accounting Principles Bd. Opinion No. 11 (Financial Accounting Standards Bd. 1967) (superseded by FAS 96 and FAS 109); APB 2 (accounting for investment tax credits requires a reduction of income tax expense); APB 4 (same); AIN-APB 4 (same). During the course of the Examiner's investigation, Andersen indicated that paragraph 16 of FAS 109 precluded the amortization of the deferred credit through the income tax provision because it provided, in part: "Total income tax expense or benefit for the year is the sum of deferred tax expense or benefit [i.e., change in deferred tax liabilities or assets] and income taxes currently payable or refundable." Petersen 10/14/03 Interview. The Examiner agrees that paragraph 16 of FAS 109 requires that these two items are reflected in the income tax provision; the Examiner does not agree with Andersen's interpretation that nothing else can be reflected in the income tax provision. For example, FAS 96 precluded interest and penalties from being reported as income tax expense, but this preclusion was removed from FAS 109. Compare FAS 96, ¶ 27 with FAS 109, ¶ 45.

tax) income but not pre-tax income.[396]    Andersen submitted the only comment letter
during the deliberations of EITF 98-11 that discussed the possibility of amortizing the
deferred credit into any part of the income statement other than the income tax
provision.[397]    In this comment letter, Andersen noted that amortization of the deferred
credit into the income tax provision would technically violate FAS 109's definition of
deferred income tax expense (i.e., "the change during the year in an enterprise's deferred
tax liabilities and assets").[398]    In a separate comment letter, the SEC pointed out that this
amortization approach would at least cause an inconsistency with FAS 109 because the
amortization does not affect the deferred tax asset or liability accounts.[399]
Notwithstanding this result, the SEC did not support a substantive change to longstanding
practice of reporting tax-related gains on the income statement as part of the income tax
provision, and the amortization through the tax provision was explicitly made mandatory
in EITF 98-11.[400]

---

[396] EITF 98-11 (deferred credit resulting from so-called bargain purchase amortized into income as part of the provision for income taxes); *see also* AIN-APB 4 (investment credits reflected as reduction of tax expense); Accounting for Tax Benefits Resulting from Investments in Affordable Housing Projects, 1 EITF Abstracts (FASB) 94-1 (May 18-19, 1995) (housing credits reflected as a component of income taxes).

[397] *See* Emerging Issues Task Force, Minutes/Issue Summaries, EITF 98-11 (Financial Accounting Standards Bd. 1998) (the "EITF 98-11 Minutes/Issue Summaries") (materials available from AICPA); Letter from John E. Stewart, Andersen, to Timothy S. Lucas, Chairman, Emerging Issues Task Force, FASB, regarding EITF Issue 98-11, Accounting for Acquired Temporary Differences in Certain Purchase Transactions That Are Not Accounted for as Business Combinations, Mar. 15, 1999 ("Andersen Comment Letter") (attached as Comment Letter No. 3 to EITF 98-11 Minutes/Issue Summaries ).

[398] Andersen Comment Letter, at 3; *see also* FAS 109, ¶ 16.

[399] *See* Letter from Jane B. Adams, Deputy Chief Accountant, SEC, to Timothy S. Lucas, Chairman, Emerging Issues Task Force, FASB, regarding EITF 98-11, Accounting for Acquired Temporary Differences in Certain Purchase Transactions That Are Not Accounted for as Business Combinations, Issue Summary No. 1, Supplement No. 3, May 18, 1999 (attached as Comment Letter No. 6 to EITF 98-11 Minutes/Issue Summaries).

[400] *Id.*

Despite the fact that the treatment of the Steele and Cochise Transactions as bargain purchases under APB 16 was determined only by analogy to the business combination rules that admittedly did not apply and despite the absence of persuasive accounting authority or literature contemplating the amortization of the deferred credit into pre-tax income, Andersen approved Enron's amortization of the deferred credit into pre-tax income as opposed to the tax provision.[401] Andersen's sign-off on the pre-tax income feature of the Steele and Cochise Transactions was aggressive, and the Examiner found no reasonable basis for this characterization.[402]

The distortion of Enron's income resulting from the Steele and Cochise Transactions was exacerbated by Andersen's acceptance of very short amortization periods.[403] In the Steele Transaction, most of the deferred credit was to be amortized over the five-year life of the corporate bonds, even though the deferred credit was attributable to the REMIC Residual Interests (which had an estimated 27-year average life).[404] Similarly, in the Cochise Transaction, most of the deferred credit was to be

---

[401] *See* Steele Accounting Memo, at 5; Steele Summary of Considerations, at AA-EX00016358; Cochise Accounting Memo, at 6.

[402] *See* Second Interim Report, Appendix J (Tax Transactions), *Enron's REMIC Carryover Basis Transactions*; Second Interim Report, Annexes 1 and 2 to Appendix J (Tax Transactions); *see also* Third Interim Report, Appendix G (Role of BT/Deutsche and its Affiliates), at 77-79.

[403] *See* Steele Accounting Memo, at 5; Cochise Accounting Memo, at 6.

[404] *See* Second Interim Report, Appendix J (Tax Transactions), *Enron's REMIC Carryover Basis Transactions*; Second Interim Report, Annex 1 to Appendix J (Tax Transactions). During the course of the Examiner's investigation, Andersen indicated that the five-year amortization period was appropriate under GAAP because Enron represented to Andersen that the inclusion of the corporate bonds was a necessary element to achieving the tax benefits of the Steele Transaction. *See also* Steele Accounting Memo, at 5 ("Inclusion of these bonds in ECTIP is necessary to achieve the desired level of assurance that the objectives of the transaction will be realized."). The Examiner is not persuaded by this argument because Andersen also knew that the "effect of the transaction [was] to create pre-tax accounting income of [. . .] through the amortization of the deferred credit." *See* Steele Accounting Memo, at 1. Knowing Enron's objective or effect of the transaction was to create pre-tax income, Andersen should have questioned Enron's representation to Andersen concerning the necessity of the corporate bonds, rather than accepting the assertion at face value. The Examiner is aware of no evidence indicating that Andersen asked its tax

amortized over the five-year period during which the SPE expected to qualify as a REIT, the very period over which the SPE could not get any tax benefit from the REMIC Residual Interests.[405]  The Examiner concluded that the five-year amortization periods were not rational and did not comply with GAAP.[406]

*Strained Interpretations of FAS 109 in Tax Basis Step-Up Transactions*

As described in the Second Interim Report, the Teresa, Condor and Tammy I Transactions involved contributions of property by an Enron affiliate to an SPE that was taxed as a partnership.[407]  The SPE engaged in transactions to increase the contributing affiliate's tax basis in the partnership interest, without a corresponding increase in the book basis.[408]  Under applicable tax rules, the affiliate was not permitted to take a current tax deduction for the tax basis increase while it held the partnership interest.[409]  Enron expected to realize a tax benefit only in the future when a significant asset was distributed from the SPE to the Enron affiliate with a "stepped-up" basis that could be depreciated.[410]

---

experts about whether the corporate bonds were necessary to the tax result, nor of evidence that the bonds were necessary in fact.

[405] *See* Second Interim Report, Appendix J (Tax Transactions), *Enron's REMIC Carryover Basis Transactions*; Second Interim Report, Annex 2 to Appendix J (Tax Transactions).

[406] *See* Second Interim Report, Appendix J (Tax Transactions), *Enron's REMIC Carryover Basis Transactions*; Second Interim Report, Annexes 1 and 2 to Appendix J (Tax Transactions); *see also* Third Interim Report, Appendix G (Role of BT/Deutsche and its Affiliates), at 78-79.

[407] *See* Second Interim Report, Appendix J (Tax Transactions), *Enron's Tax Basis Step-Up Transactions*; Second Interim Report, Annexes 4, 5 and 6 to Appendix J (Tax Transactions).

[408] *See* Second Interim Report, Appendix J (Tax Transactions), *Enron's Tax Basis Step-Up Transactions*; Second Interim Report, Annexes 4, 5 and 6 to Appendix J (Tax Transactions).

[409] *See* Second Interim Report, Appendix J (Tax Transactions), *Enron's Tax Basis Step-Up Transactions*; Second Interim Report, Annexes 4, 5 and 6 to Appendix J (Tax Transactions).

[410] *See* Second Interim Report, Appendix J (Tax Transactions), *Enron's Tax Basis Step-Up Transactions*; Second Interim Report, Annexes 4, 5 and 6 to Appendix J (Tax Transactions).  In the Teresa, Condor and Tammy I Transactions, the stepped-up basis asset was the Enron North Building (i.e., Enron's corporate headquarters), the Bammel Assets (i.e., natural gas storage facility and pipeline assets) and the Enron South Building (i.e., new headquarters that were under construction), respectively. *Id.*

In these three Tax Transactions, Enron never determined exactly when the distribution would occur but, in each case, it was expected that it would not occur for at least five years because of the disguised sale rules of Section 707 of the Internal Revenue Code.[411]

Even though it would be years before Enron would take the actions necessary to confer a basis step-up for which tax recovery was arguably permissible, Enron recorded deferred tax assets to reflect the excess book basis in the partnership interests, which reduced Enron's current tax provision and increased net income.[412] Andersen's approval of this accounting treatment faced serious impediments under the literal rules of FAS 109. This is perhaps best illustrated by an analysis of Andersen's actions in connection with the Tammy I Transaction.

In simplified terms, the Tammy I Transaction involved the contribution by Enron affiliates of appreciated stock of other Enron affiliates and other assets to an SPE, Enron

---

[411] *See* Second Interim Report, Appendix J (Tax Transactions), *Enron's Tax Basis Step-Up Transactions*; Second Interim Report, Annexes 4, 5 and 6 to Appendix J (Tax Transactions). In addition, other contingencies affected the date of distribution. In the Teresa Transaction, for example, distribution would not occur if it would cause a net present value tax benefit to be achieved by the Enron group, taking into account Enron's weighted average cost of capital. *See* Second Interim Report, Appendix J (Tax Transactions), *Enron's Tax Basis Step-Up Transactions*; Second Interim Report, Annex 4 to Appendix J (Tax Transactions). Because the weighted average cost of capital was an unknown future variable, no one at Enron could accurately determine when the Enron North Building would be distributed after the end of the minimum five year period in which it was expected to be held. *Id.* In the Condor Transaction, distribution of the Bammell Assets was not expected to occur for 15 years. *See* Second Interim Report, Appendix J (Tax Transactions), *Enron's Tax Basis Step-Up Transactions*; Second Interim Report, Annex 5 to Appendix J (Tax Transactions). In the Tammy I Transaction, the SPE did not even own the Enron South Building that it expected to acquire and then distribute to achieve a basis step-up. *See* Second Interim Report, Appendix J (Tax Transactions), *Enron's Tax Basis Step-Up Transactions*; Second Interim Report, Annex 6 to Appendix J (Tax Transactions). Vinson & Elkins assumed in its tax opinion for the Tammy I Transaction that the property would not be distributed until the SPE had held the property for at least five years. *See* Tax Opinion from Vinson & Elkins to Enron Corp., regarding Enron Finance Partners, LLC, Feb. 9, 2001, at 7-8 [AB000151947-AB000151970].

[412] Teresa Accounting Memo, at 3-5; Memorandum from David B. Duncan, *et al.*, Andersen, to Enron Corp. Houston, regarding Formation of Enron Leasing Partners, L.P. (Partnership) and Treatment of Taxable Dividends, Mar. 14, 1997, at 4-6 [AA-EX00004159-AA-EX00004167]; Memorandum from Dave Duncan, *et al.*, Andersen, to the Files, regarding Whitewing Associates, L.P. - Contribution-Leaseback Transaction, Nov. 18, 1999, at 2-4 [AA 000006469-AA 000006472]; Tammy I Accounting Memo, at 8-9.

Finance Partners LLC ("EFP"), in exchange for partnership interests in EFP.[413] These
Enron affiliates then transferred a substantial portion of their EFP interests to Enron
Capital Investment Corp. ("ECIC").[414] EFP was expected to sell the appreciated stock,
with such sales increasing the basis of ECIC's partnership interest in EFP.[415] Ultimately,
EFP planned to acquire the Enron South Building.[416] After at least five years, the Enron
South Building would be distributed by EFP to ECIC in redemption of its interest in EFP,
at which time ECIC's $1+ billion basis in the EFP partnership interest would attach to the
Enron South Building under Section 732(b) of the Internal Revenue Code.[417] The
distribution of the building and its basis step-up would result in a corresponding basis
decrease in the other property held by EFP.[418] Under Enron's plan, EFP then would
purchase stock interests in Enron or its affiliates to absorb this basis decrease without tax
detriment to the Enron consolidated group.[419]

    To achieve the net income benefits from the Tammy I Transaction, Enron had to
obtain Andersen's approval of two results: (i) the relief from recording a deferred tax
liability; and (ii) the necessity of recording a deferred tax asset. As the stock interests

---

[413] *See* Second Interim Report, Appendix J (Tax Transactions), *Enron's Tax Basis Step-Up Transactions*;
Second Interim Report, Annex 6 to Appendix J (Tax Transactions).

[414] *See* Second Interim Report, Appendix J (Tax Transactions), *Enron's Tax Basis Step-Up Transactions*;
Second Interim Report, Annex 6 to Appendix J (Tax Transactions).

[415] *See* Second Interim Report, Appendix J (Tax Transactions), *Enron's Tax Basis Step-Up Transactions*;
Second Interim Report, Annex 6 to Appendix J (Tax Transactions).

[416] *See* Second Interim Report, Appendix J (Tax Transactions), *Enron's Tax Basis Step-Up Transactions*;
Second Interim Report, Annex 6 to Appendix J (Tax Transactions).

[417] *See* Second Interim Report, Appendix J (Tax Transactions), *Enron's Tax Basis Step-Up Transactions*;
Second Interim Report, Annex 6 to Appendix J (Tax Transactions).

[418] *See* Second Interim Report, Appendix J (Tax Transactions), *Enron's Tax Basis Step-Up Transactions*;
Second Interim Report, Annex 6 to Appendix J (Tax Transactions).

[419] *See* Second Interim Report, Appendix J (Tax Transactions), *Enron's Tax Basis Step-Up Transactions*;
Second Interim Report, Annex 6 to Appendix J (Tax Transactions).

with the "built in gain" were contributed to the Tammy I structure, Enron's plan was to avoid having to record a deferred tax liability with respect to the expected gain to be recognized when the asset was sold.[420]  For example, Enron contributed 11.5 million shares of Enron affiliate stock to EFP that had a fair market value and book basis of $485.9 million and a tax basis of $40.7 million.[421]  Enron established no deferred tax liability for the expected $445.2 million of taxable gain that would be incurred upon the subsequent sale of the stock.[422]  Because the contribution of the stock to EFP would give Enron the same basis disparity in its partnership interest in EFP, which is a consolidated subsidiary for GAAP purposes, Enron faced the issue of whether it had to record a deferred tax liability for its interest in EFP, an action that would have reduced Enron's net income for 2000 by $155.8 million.[423]  With Andersen's approval, Enron did not report a deferred tax liability or show any income effect on its 2000 financial statements as a result of the Tammy I Transaction.[424]  Enron also obtained Andersen's approval that

---

[420] Memorandum from Dave Maxey and Shelly Williams, Enron, to Mike Jones, Enron, regarding Project Tammy – Deferred Tax Analysis, Sept. 30, 2000 [AB000187972-AB000187973]; Memorandum from Dave Maxey and Shelly Williams, Enron, to Mike Jones, Enron, regarding Project Tammy – Deferred Tax Analysis, Oct. 19, 2000 [AB000427245-AB000427247]; *see also* Email from P. Michael Baldasaro, Andersen, to Richard R. Petersen, Andersen, regarding FASB 109 Issue, June 13, 2000 ("Baldasaro-Petersen FASB 109 Email"), at AA-EX00017382 [AA-EX00017382-AA0EX00017384]; Tammy I Accounting Memo.

[421] *See* Second Interim Report, Annex 6 to Appendix J (Tax Transactions); Report of Investigation of Enron Corporation and Related Entities Regarding Federal Tax and Compensation Issues, and Policy Recommendations, Vol. I, Prepared by the Staff of the Joint Committee on Taxation, at the Request of Senator Max Baucus and Senator Charles E. Grassley of the Senate Committee on Finance, Feb. 2003 (the "Joint Committee Report"), at 223-24.

[422] *See* Second Interim Report, Annex 6 to Appendix J (Tax Transactions).  The $445.2 million gain is the difference between $485.9 million fair market value and $40.7 million tax basis.

[423] *See* Second Interim Report, Annex 6 to Appendix J (Tax Transactions), at 26 n.104; Tammy I Accounting Memo, at 5-10; Enron Consolidated Accounting Summary, at 18.  The $155.8 million is calculated by taking the expected gain of $445.2 million and multiplying it by a 35% effective tax rate.

[424] *See* Tammy I Accounting Memo, at 5-10; Email from Richard Petersen, Andersen, to Michael D. Jones, Andersen, Sept. 25, 2000, regarding Enron tax issue (forwarding series of email exchanges between

a deferred tax asset could be recorded by ECIC in Enron's 2001 financial statements as appreciated assets were sold and the basis step-up was allocated to ECIC's partnership interest in EFP rather than years later when the Enron South Building was distributed from EFP to ECIC.[425] The authority for both of these accounting issues raised in the Tammy I Transaction is found in FAS 109 and, more particularly, the exceptions to the basic principles that are contained in paragraphs 31 through 34, which govern whether tax and book basis disparities arising from investments in certain subsidiaries or joint ventures are temporary investments (and, therefore, result in deferred tax assets or liabilities).[426]

With respect to recording a deferred tax liability, paragraph 33 of FAS 109 ("Paragraph 33") provides that no such liability will be recorded in a situation where there is an excess of book over tax basis in an investment in a more-than-50% subsidiary provided that "the reported amount of the investment can be recovered tax-free and the enterprise expects that it will ultimately use that means."[427] This is best illustrated by the following example. Assume that an enterprise contributes stock with a high book basis and a low tax basis (and no pre-existing deferred tax asset) to a partnership in exchange for a partnership interest. If the enterprise did not expect to recognize taxable income on account of the disparity because it expected that the asset ultimately would be distributed back to the contributing partner on a tax-free basis, Paragraph 33 does not require the

---

Andersen partners) ("Andersen's Enron Tax Issue Email"), at 2-4 [AA-EX00017206-AA-EX00017210]; Enron Consolidated Accounting Summary, at 18-19.

[425] *See* Tammy I Accounting Memo, at 5-10; Baldasaro Sworn Statement, at 58, 68-69, 73-79; Enron Consolidated Accounting Summary, at 18-20.

[426] *See* FAS 109, ¶ 9.

[427] FAS 109, ¶ 33.

recording of a deferred tax liability with respect to the disparity in the partnership interest. Andersen ultimately relied on this rationale as the basis for relieving Enron from an obligation to record a deferred tax liability in 2000 as the appreciated stock was contributed to EFP in exchange for partnership interests.[428] Yet, Andersen was aware that the appreciated stock was expected to be sold by EFP.[429] Enron had no plan to distribute this stock back from EFP on a tax-free basis.[430] To the contrary, the transaction was designed by Enron to facilitate the sale of the appreciated stock in later periods and recognize taxable gain.[431]

If Andersen had required Enron to record a deferred tax liability in 2000 as ostensibly required by Paragraph 33, the Tammy I Transaction would not have been undertaken because net income would have been reduced by more than $489 million.[432] Andersen was aware of the apparent need to record a deferred tax liability as the appreciated stock was contributed to EFP by the Enron affiliates.[433] Andersen's New

---

[428] Andersen's Enron Tax Issue Email, at 2-4; Tammy I Accounting Memo, at 5-10; Baldasaro Sworn Statement, at 89. During the course of the Examiner's investigation, Andersen expressed the view that Paragraph 33 did not apply to investment partnerships, but that the concepts underlying Paragraph 33 do apply generally to all basis differences. Petersen 10/14/03 Interview. The language of Paragraph 33, however, does not support this conclusion, and Andersen did not take this position at the time of the Tammy I Transaction. *See* Tammy I Accounting Memo, at 5-10; FAS 109, ¶ 33 (refers only to "more-than-50-percent-owned domestic subsidiary").

[429] Andersen's Enron Tax Issue Email, at 2-4; Tammy I Accounting Memo, at 2; Baldasaro Sworn Statement, at 50-51.

[430] *See* Baldasaro-Petersen FASB 109 Email, at AA-EX00017382; Andersen's Enron Tax Issue Email, at 2-4.

[431] *See* Baldasaro-Petersen FASB 109 Email, at AA-EX00017382; Andersen's Enron Tax Issue Email, at 2-4.

[432] The $489 million is the difference in the fair market value of all assets contributed to EFP and their tax basis multiplied by a 35% effective tax rate. *See* Second Interim Report, Annex 6 to Appendix J (Tax Transactions); Joint Committee Report, at 223-24; Enron Finance Partners, LLC Schedule of Contributions, July 11, 2002 [AB000187981].

[433] *See* Tammy I Accounting Memo, at 1-3.

- 121 -

York office, however, concluded that a deferred tax liability did not have to be established, stating that:

> [s]ince [EFP] is controlled by the ENE group, at some future date, EBS and ECI could simply decide to liquidate [EFP], which liquidation, based on the assets owned, and expected to be owned, by [EFP] in the future, would be tax-free and eliminate any basis disparity that might exist in the LLC ownership units.[434]

Andersen's rationale for concluding that Paragraph 33 did not require the recording of a deferred tax liability disregards FAS 109's requirement that the enterprise must "expect . . . that it will ultimately use" the tax planning strategy to avoid tax with respect to the basis disparity inherent in the stock.[435]  Andersen's analysis contradicts the planned use of such a strategy to avoid tax on the built-in-gain in the subsidiaries and, instead, assumes in other parts of its analysis that a taxable sale of the appreciated stock will occur soon after it is contributed.[436]

After Andersen's New York office concluded its analysis of the Tammy I Transaction, Andersen's Houston office raised the following issue:

> There has previously been no deferred taxes provided for the outside basis differences in the subsidiaries to be contributed.  [T]he question is that, if the intent is now to sell under a taxable transaction then you cant [sic] make the assertion required under paragraph 33 of 109 to not book the DFIT liability for the outside basis difference in a domestic subsidiary.[437]

In subsequent correspondence, a partner in Andersen's New York office pointed out that, notwithstanding having contributed appreciated stock to the Tammy I structure with a

---

[434] *Id.* at 5-10.

[435] *See* FAS 109, ¶ 33.

[436] Tammy I Accounting Memo, at 5-10.

[437] Andersen's Enron Tax Issue Email, at 2-4.

plan to sell the stock, Enron remained legally free to retain the stock.[438]   However, no

Andersen partner argued that Enron actually had the requisite intent necessary to comply

with Paragraph 33.[439]   Rather, the PSG finally agreed that:

> [a]s long as we are dealing with a short time period between the transfer of
> the subsidiaries to the partnership and the actual sale of the subsidiaries, I
> could accept not booking the deferred tax liability related to the outside
> basis difference until the conditions of a measurement date under [APB]
> Opinion 30 are met.[440]

In other words, the PSG simply accepted the fact that the deferred tax liability would not

be recognized during the period mandated by Paragraph 33, but received assurance that

the delay in recording the expense would not be too great.   If Andersen had applied the

actual FAS 109 requirements, the Tammy I Transaction would not have been feasible.

Paragraph 34 of FAS 109 ("Paragraph 34") is the reverse of Paragraph 33 in that

it places limitations on the right of an enterprise to recognize a deferred tax asset related

to its investment in a subsidiary.[441]   Under Paragraph 34, an enterprise should recognize a

deferred tax asset with respect to its investment in a subsidiary "only if it is apparent that

the temporary difference will reverse in the foreseeable future."[442]   The apparent rationale

for this rule is that GAAP presumes that the enterprise's investment in its subsidiaries is

"essentially permanent in duration" and, therefore, the basis disparity cannot be expected

to reverse.[443]   Other accounting literature generally takes the position that a basis

---

[438]  *Id.*

[439]  *See* Andersen's Enron Tax Issue Email.

[440]  *Id.* at 1-2.

[441]  *See* FAS 109, ¶¶ 33-34.

[442]  *Id.* ¶ 34.

[443]  *See id.*   According to Andersen, Enron could have taken the position that ¶ 34 of FAS 109 does not
apply to a subsidiary that is a partnership or other flow-through entity.   Petersen 10/14/03 Interview.
Andersen further stated that the application of ¶ 34 to the Tammy I transaction was elective by Enron. *Id.*

disparity from a subsidiary investment will reverse in the "foreseeable future" only if a decision to sell the subsidiary has been made with the specificity necessary to trigger a "measurement date" under paragraph 14 of APB 30.[444] The measurement date is the date on which the management having authority to approve the action commits itself to a "formal plan to dispose" of the asset.[445] Moreover, "in the usual circumstance, it would be expected that the plan of disposal would be carried out within a period of one year from the measurement date . . . ."[446]

In the Tammy I Transaction, Andersen acknowledged that Paragraph 34 does not define the term foreseeable future and turned to APB 30's definition of measurement date.[447] Andersen then concluded that the "point in time that management . . . commits to redeem . . . ECI's ownership interest in the manner set forth above should constitute the 'measurement date'. . . ."[448] Yet, Andersen did not discuss the fact that the period prescribed in APB 30 from the measurement date to the disposal date generally is limited

---

The issue of whether ¶ 34 applies to partnerships such as EFP is discussed in the Second Interim Report. *See* Second Interim Report, Appendix J (Tax Transactions), at 16 n.70. Regardless of whether Enron could have taken such a position, the record is clear that Enron chose to account for the recognition of deferred tax assets under ¶ 34 in the Tammy I transaction. *See* Tammy I Accounting Memorandum, at 8. This choice was consistent with Enron's decision to analyze the need to record deferred tax liabilities under ¶ 33, even though a similar position might be taken with respect to ¶ 33.

[444] Recognition of Deferred Tax Assets for a Parent Company's Excess Tax Basis in the Stock of a Subsidiary That Is Accounted for as a Discontinued Operation, 1 EITF Abstracts (FASB) 93-17 (Jan. 20, 1994) (holding that a deferred tax asset can be recorded with respect to a subsidiary only when the likelihood of the subsidiary being sold meets the criteria for the APB 30 measurement date); Reporting the Results of Operations - Reporting the Effects of Disposal of a Segment of a Business, and Extraordinary, Unusual, and Infrequently Occurring Events and Transactions, Accounting Principles Bd. Opinion No. 30 (Financial Accounting Standards Bd. 1973) ("APB 30").

[445] *Id.* ¶ 14.

[446] *Id.* ¶ 15.

[447] Tammy I Accounting Memo, at 8.

[448] *Id.* at 8-9.

to periods of less than one year.[449]  Andersen was aware that the property would not be distributed for at least five years and that the actual time of distribution had not been determined.[450]  Thus, Andersen provided accounting guidance that stretched Paragraph 34 beyond its limits and ignored the fact that, under the actual facts of the Tammy I Transaction, Andersen's own requirements would not be satisfied.

As a result, Andersen took dramatically inconsistent positions on similar accounting issues in the course of a single transaction.  Andersen declined to require recognition of a deferred tax liability arising from a contribution of subsidiaries to EFP with basis disparities even though Paragraph 33 required that a deferred tax liability be recognized if the subsidiaries were contributed to the partnership for the purpose of sale.[451]  In the same analysis, Andersen determined that when the subsidiaries were sold, Enron could recognize a deferred tax asset from the increased basis disparity in the investment in the EFP partnership even though the depreciable asset would not be distributed in redemption of the interest in EFP for an indefinite period of at least five years.[452]  The accounting for the Tammy I Transaction was designed to allow Enron to recognize tax expense from a basis step-up that would not occur for at least five years and

---

[449] See id.; see also APB 30, ¶ 15.

[450] Email from Michael D. Jones, Andersen, to P. Michael Baldasaro, et al., Andersen, regarding Project Tammy/Aries, July 31, 2000, at 1 ("It has been my understanding that there was some tax requirement to keep the structure in place for 5 years before liquidating the partnership which would be the event that actually results in the migration of basis from the Parent stock to the tangible asset.") [AB0785 02642-AB0785 02643].

[451] See Tammy I Accounting Memo, at 5-10.

[452] Id. at 5-10.

that would be highly likely to be disputed by the IRS.[453]  For these and other reasons, the

Examiner concluded that the accounting treatment did not comply with GAAP.[454]

### G.     Andersen's Role in the Nahanni Transaction

The chief purpose of Enron's Minority Interest Transactions was to structure

particular obligations so that they appeared as "minority interest" in the mezzanine of

Enron's balance sheet, rather than as liabilities.   This technique was motivated by

Enron's desire to maintain its credit rating, and these transactions were structured to

address the particular concerns of Rating Agencies.[455]  As previously reported, Enron

raised approximately $2.75 billion in cash through the Minority Interest Transactions it

completed from 1997 through 2000.[456]

While the typical minority interest structure itself was relatively straightforward,

Enron officers utilized the structure in ways that resulted in financial reporting that was

materially misleading.   The Nahanni Transaction stands out in this regard.   In Nahanni,

Enron officers obtained $500 million in a financing that closed on December 29, 1999,

and was substantially repaid on January 14, 2000.   The cash generated by this financing

transaction was reported as cash flow from operating activities.[457]  Evidence indicates

that Andersen's substantial involvement was critical to Enron achieving its financial

reporting objective in the Nahanni Transaction.

---

[453] *See* Second Interim Report, Appendix J (Tax Transactions), *Enron's Tax Basis Step-Up Transactions*;
Second Interim Report, Annex 6 to Appendix J (Tax Transactions).

[454] *Id.*

[455] *See* Memorandum from Jim Ginty, Enron, regarding Ponderosa Assets, LP and Sundance Assets, LP –
1998 Financing Transaction, Jan. 8, 1999, at AB000500320 [AB000500320-AB000500338].

[456] Second Interim Report, Appendix I (Minority Interest Transactions), at 1.

[457] *See* Third Interim Report, Appendix C (Role of Enron's Officers).

Issues of fact exist as to the level of knowledge possessed by Andersen
accountants regarding the true nature of the Nahanni Transaction. Evidence suggests that
Andersen accountants were aware that the only objective of the transaction was to report
cash flow from operating activities, but approved the accounting and disclosure in the
face of that awareness. As previously reported, the Nahanni Transaction was "hard-
wired" with transaction terms that required the result obtained by Enron – a financing
used to acquire and sell Treasury securities that was closed and repaid within a matter of
days straddling the end of the 1999 fiscal year, all in order to report that Enron had an
additional $500 million in cash flow from operating activities in 1999.[458]

In order for the Nahanni Transaction to create the desired effect – increased cash
flow from operating activities – it was necessary for Enron to take the position that
holding Treasury securities was a part of its "merchant activities," so that it could then
claim that the sale of those securities generated operating cash flow. Evidence indicates
that both Enron and Citigroup,[459] the financial institution that had presented Nahanni to
Enron, consulted with Andersen accountants regarding accounting issues related to the
Nahanni Transaction.[460] Andersen advised Enron that Treasury securities with maturities
greater than 90 days could be included in Merchant Investments, but that "Enron's
Merchant Activities footnote should be changed to include government securities in the

---

[458] *Id.* at 1.

[459] Citigroup witnesses have testified that they obtained advice from Benjamin Neuhausen regarding the
question of whether Treasury securities would be considered cash equivalents. *See* Third Interim Report,
Appendix D (Role of Citigroup and its Affiliates). Neuhausen has indicated that he does recall consulting
with Citigroup regarding minority interest structures, but that he does not recall consulting with Citigroup
regarding any Enron transaction, including Nahanni, or any other minority interest transaction involving a
similar use of Treasury securities. Neuhausen Interview.

[460] Cash Sworn Statement, at 77, 85-86; Nahanni Memo; Third Interim Report, Appendix D (Role of
Citigroup and its Affiliates).

- 127 -

description of Merchant Investments."[461]    Evidence suggests that Andersen also determined that, with this added language, Enron's disclosure of Nahanni was sufficient.[462]

Contemporaneous documents indicate that Andersen accountants knew that these issues were prompted by a transaction that was specifically designed to increase Enron's funds flow from operating activities through the sale of Treasury securities.    The Andersen memorandum outlining the advice described above states: "Objective  Increase Funds Flow through the sale of Merchant Investments held by a newly formed consolidated subsidiary."[463]    Other documents reflect Andersen's awareness that the purpose of this structure was to "liquidate[] T-bills over time resulting in an increase in Operating Cash Flow for Enron."[464]

Evidence further suggests that Andersen was aware that the Nahanni Transaction occurred very quickly over a period of days straddling year-end.  Andersen accountants were aware that, in the structure, the Treasury securities were sold before year-end 1999.[465]  The same Andersen memorandum, dated December 7, 1999, which documents Andersen's advice regarding the use of Treasury securities as Merchant Investments, reveals that the debt incurred in the transaction had already been paid:

---

[461] Nahanni Memo, at AA 000019694.  The Examiner is aware of no evidence that suggests Enron ever sought to hold Treasury securities as "Merchant Investments" in any instance other than in Nahanni. Andersen accountants could not recall considering whether Enron had previously purchased, held or sold Treasury securities. *See* Grutzmacher Sworn Statement, at 162; *see also* Cash Sworn Statement, at 93-94.

[462] Nahanni Memo, at AA 000019694; Cash Sworn Statement, at 95-96.

[463] Nahanni Memo, at AA 000019694.

[464] Email from Derek Claybrook, Andersen, to Patricia Grutzmacher, Andersen, regarding Non-Cash Activity, Dec. 6, 1999, at PSI00006799 [PSI00006799-PSI00006802].

[465] *See* Nahanni Memo; Cash Sworn Statement, at 85.

Subsequent to year end, the LP made a distribution in accordance with the LP Agreement to the SPE in the amount of $485 million. This distribution was used to payoff the debt holder of the SPE and reduced the SPE's investment in the LP to $15 million.[466]

Andersen accountants have indicated that they were unaware that the transaction documents were "hard-wired" to create the result obtained by Enron,[467] and were unaware that Enron intended to sell the Treasury securities within 30 days.[468] Based on all of the evidence, however, a fact-finder could conclude that, before the publication of Enron's 1999 audited financial statements, Andersen accountants understood the result Nahanni was designed to achieve – a $500 million increase in cash flow from operating activities before the end of 1999, and a repayment of debt within days thereafter, all with no material economic effect on Enron. A fact-finder could further conclude that Andersen accountants assisted Enron's officers in crafting the disclosure of Nahanni so that the economic reality of the transaction would not be discernable from the company's financial statements.

---

[466] Nahanni Memo, at AA 000019695. The statement quoted above, and other text of this memo, describe events that did not occur until well after the December 7, 1999 date on the memo. When asked about this, Cash speculated that the document was written in order to "get the transaction documented after a point in time that they performed these procedures," i.e., after December 7, 1999. Cash Sworn Statement, at 84. The Examiner has noted other examples of this apparent practice of back-dating memoranda and other documents within Andersen's work papers and files. *See, e.g.*, Hawaii Memo. Evidence of back-dated documentation could cause a fact-finder to question the credibility of Andersen's records and witnesses.

[467] Neuhausen Interview. None of the Andersen accountants interviewed or examined recalled reviewing any Nahanni Transaction documents. Cash Sworn Statement, at 81; Neuhausen Interview; Grutzmacher Sworn Statement, at 158. The Engagement Team accountants indicated that it was not unusual for them to review transaction documents as a part of their audit of a transaction. Cash Sworn Statement, at 81; Grutzmacher Sworn Statement, at 158-59.

[468] Grutzmacher Sworn Statement, at 164. Ms. Grutzmacher further testified that Enron's intent to sell within 30 days would have been a "relevant factor to consider" regarding the question of whether Treasury securities could constitute Merchant Investments. *Id*. at 165.

## H.    Conclusions on Andersen's Role in Enron's SPE Transactions

Based on the foregoing, a fact-finder could conclude that Andersen was negligent in rendering its professional services with respect to Enron's SPE Transactions. In the Third Interim Report, the Examiner determined that a fact-finder could conclude that Enron officers breached their fiduciary duties in connection with Enron's SPE Transactions.[469] Based on all of the foregoing, a fact-finder also could conclude that, in connection with the SPE Transactions, Andersen aided and abetted breaches of duty by Enron's officers because:

(i)     Andersen had actual knowledge that Enron officers were breaching their fiduciary duties in completing the SPE Transactions because Andersen knew that the financial information the officers were disseminating with respect to the SPE Transactions was materially misleading;

(ii)    Andersen gave substantial assistance to those officers by assisting Enron in designing the transaction templates or "models," structuring the various particular transactions and approving Enron's accounting and disclosure of the SPE Transactions in a manner that made Enron's financial statements materially misleading; and

(iii)   Injury to the Debtors was a direct or reasonably foreseeable result of this conduct.

---

[469] Third Interim Report, Appendix C (Role of Enron's Officers), at 62-63.

## I.    Andersen's Interaction with Enron's Audit Committee

From 1997 through November 18, 2001, the Audit Committee of Enron's Board[470] met thirty times, including two meetings that were joint meetings of the Audit and Finance Committees.  Typically, at least three Andersen partners attended the Audit Committee meetings.[471]  Most often, these partners were Duncan, Bauer and Goddard. The meetings generally lasted about one hour.[472]

At the Audit Committee meeting on February 10, 1997:

[Goddard] reported that Arthur Andersen's policy on seven-year rotation required the end of his engagement on the Company's account at the end of 1996.  He stated that the engagement partner position would now be held by Mr. Duncan and that Mr. Duncan would be signing the opinion letter and other documents furnished by Arthur Andersen.[473]

Goddard continued working on the Enron account in an advisory capacity and attended, along with Duncan and/or Bauer, virtually all of the Enron Audit Committee meetings through November 2001.[474]

---

[470] The name of the Audit Committee was changed to the Audit and Compliance Committee after approval at the Audit Committee's meeting of February 9, 1998. This name change reflected the Committee's role in overseeing Enron's compliance with applicable laws.  Minutes of Enron Audit Committee Meeting, Feb. 9, 1998 (the "2/9/98 Audit Committee Minutes"), at 3 [AB000191552-AB000191554].

[471] The accountants did not attend the joint meetings of the Audit and Finance Committees.

[472] Evidence suggests that the time allotted for the Audit Committee meetings had an effect on the level of detailed information provided by Andersen to the Committee.  See Email from David Duncan, Andersen, to Neil Wood, Andersen, Dec. 19, 2000, at 2 (discussing the provision of information to the Audit Committee regarding internal control issues) ("As this all must occur in about a 30 – 45 minute presentation, you might understand that we necessarily have to stay at a certain level.") [AB1128 00602-AB1128 00605].

[473] Minutes of Enron Audit Committee Meeting, Feb. 10, 1997, at 3 [AB000186257-AB000186260].

[474] In-Person Interview of Stephen Goddard, Andersen, by John L. Latham, A&B, Nov. 6, 2002 (the "Goddard 11/6/02 Interview") (Goddard did not attend the Audit Committee meeting on February 12, 2001, during which Duncan gave Andersen's SAS 61 presentation on the 2000 financial statements); see also Minutes of Enron Audit Committee Meetings (minutes identified below set forth meetings that Andersen representatives were listed as in attendance):

- 131 -

Statement of Auditing Standards No. 61 ("SAS 61") "requires the auditor to ensure that the audit committee receives additional information regarding the scope and results of the audit that may assist the audit committee in overseeing the financial reporting and disclosure process for which management is responsible."[475]    While this

| Meeting Date | Bates No. |
|---|---|
| February 10, 1997 | AB000186257-AB000186260 |
| May 6, 1997 | AB000186458-AB000186460 |
| October 13, 1997 | AB000186558-AB000186560 |
| February 9, 1998 | AB000191552-AB000191554 |
| May 4, 1998 | AB000191649-AB000191651 |
| October 12, 1998 | AB000191694-AB000191697 |
| December 7, 1998 | AB000191699-AB000191700 |
| February 7, 1999 | AB000191702-AB000191704 |
| May 3, 1999 | AB000197684-AB000197685 |
| August 9, 1999 | AB000197680-AB000197682 |
| October 11, 1999 | AB000197531-AB000197534 |
| December 13, 1999 | AB000197738-AB000197740 |
| February 7, 2000 | AB000201248-AB000201251 |
| May 1, 2000 | AB000201253-AB000201256 |
| August 7, 2000 | AB000201297-AB000201300 |
| October 6, 2000 | AB000201349-AB000201351 |
| December 11, 2000 | AB000201410-AB000201413 |
| February 12, 2001 | AB000204423-AB000204428 |
| April 30, 2001 | AB000204284-AB000204288 |
| August 13, 2001 | AB000203966-AB000203968 |
| October 8, 2001 | AB000468935-AB000468940 |
| November 2, 2001 | AB000468942-AB000468944 |
| November 5, 2001 | AB000468946-AB000468948 |
| November 12, 2001 | AB000468950-AB000468952 |
| November 18, 2001 | AB000497457-AB000497460 |

[475] SAS 61, at § 2 (AU § 380.02).

communication may be oral or written, SAS 61 requires that in the case of oral

communications the auditor "document the communication by appropriate memoranda or

notations in the working papers."[476]    Under SAS 61, the matters required to be

communicated include:

> [T]he initial selection of and changes in significant accounting policies or
> their application.  The auditor should also determine that the audit
> committee is informed about the methods used to account for significant
> unusual transactions and the effect of significant accounting policies in
> controversial or emerging areas for which there is a lack of authoritative
> guidance or consensus.  For example, significant accounting issues may
> exist in areas such as revenue recognition, off-balance-sheet financing,
> and accounting for equity investments.[477]

SAS 61 was amended in 1999 by Statement on Auditing Standards No. 90 ("SAS

90"), to reflect a recommendation of the "Blue Ribbon Committee on Improving the

Effectiveness of Corporate Audit Committees" (the "Blue Ribbon Committee").[478]  As a

result of this amendment, auditors of public companies are required "to discuss with the

audit committee the auditor's judgments about the quality, not just the acceptability, of

the company's accounting principles and underlying estimates in its financial

statements."[479]  Effective for audits of public companies with reporting periods ending on

or after December 15, 2000, SAS 90 provides as follows:

> In connection with each SEC engagement . . . , the auditor should
> discuss with the audit committee the auditor's judgments about the
> quality, not just the acceptability, of the entity's accounting principles as
> applied in its financial reporting.  Since the primary responsibility for
> establishing an entity's accounting principles rests with management, the
> discussion generally would include management as an active participant.

---

[476] SAS 61, at § 3 (as amended by SAS 90, at § 1) (AU § 380.03).

[477] SAS 61, at § 7 (AU §.380.07).

[478] SAS 90.

[479] SAS 61, at § 11 (as amended by SAS 90, at § 1) (AU §380.11).

The discussion should be open and frank and generally should include such matters as the consistency of the entity's accounting policies and their application, and the clarity and completeness of the entity's financial statements, which include related disclosures. The discussion should also include items that have a significant impact on the representational faithfulness, verifiability, and neutrality of the accounting information included in the financial statements. Examples of items that may have such an impact are the following:

- Selection of new or changes to accounting policies

- Estimates, judgments, and uncertainties

- Unusual transactions

- Accounting policies relating to significant financial statement items, including the timing of transactions and the period in which they are recorded

Objective criteria have not been developed to aid in the consistent evaluation of the quality of an entity's accounting principles as applied in its financial statements. The discussion should be tailored to the entity's specific circumstances, including accounting applications and practices not explicitly addressed in the accounting literature, for example, those that may be unique to an industry.[480]

The evidence indicates that Andersen kept Enron's Audit Committee informed about the activities of the Blue Ribbon Committee and its recommendations to strengthen the effectiveness of audit committees through improved communication.[481]  When questioned about this topic, Audit Committee Chairman Jaedicke stated: "Now, I put that question directly to Mr. Duncan, Dave Duncan, when it – when that pronouncement came

---

[480]  SAS 90, at § 1 (amending SAS 61, at § 11) (AU § 380.11)  (footnotes omitted).

[481]  *See, e.g.,* Minutes of Enron Audit Committee Meeting, Aug. 9, 1999 (the "Audit Committee 8/9/99 Minutes"), at 2 [AB000197680-AB000197682], Second Quarter 1999 Update Presentation, *SEC Concerns,* at 11-13 (attached to Audit Committee 8/9/99 Minutes) [AB0246 01215-AB0246 01228]; Minutes of Enron Audit Committee Meeting, Oct. 11, 1999 [AB000197531-ABAB000197534].

out. I said, How do we go about discussing the quality of accounting standards? And his

reply to me was, We do that all the time. That was part of the process."[482]

As discussed in more detail below, however, the evidence reviewed by the

Examiner would permit a fact-finder to conclude that Andersen failed to satisfy the

requirements of SAS 61,[483] particularly with respect to determining that the Audit

Committee was informed about the "effect" of Enron's accounting for its SPE

transactions and the significant impact those transactions had on the representational

faithfulness of the accounting information included in Enron's financial statements.[484]

When asked about this subject, Audit Committee Member John Wakeham testified as

follows:

> Q:    . . . I'm trying to understand if Andersen or management ever
> reported the magnitude of these things out?
>
> A:    No.

---

[482] Sworn Statement of Robert K. Jaedicke, Enron, to John L. Latham, A&B, Dec. 19, 2002, at 61.

[483] For the convenience of the reader, this Appendix refers to the communication requirements of SAS 61, both prior and subsequent to the amendments provided by SAS 90, as "SAS 61" communication requirements. Both SAS 61 and the amendment provided by SAS 90 are codified in AU § 380.

[484] "Representational faithfulness" is a concept found in FAC 2, and stands for the proposition that the accounting for a transaction should "faithfully represent" the substance of the underlying transaction. The FACs are not a part of the "GAAP hierarchy" described in SAS 69. Thus it is possible, at least under the standards that accountants have adopted for themselves, that financial statements could "fairly present in accordance with GAAP" the financial condition, results of operations and cash flow of an entity, but still not faithfully represent the economic substance of the entity's financial condition, results of operations and cash flow. That does not mean, however, that GAAP statements cannot be materially misleading. *See U.S. v. Simon*, 425 F.2d 796 (2d Cir. 1969), cert. denied, 397 U.S. 1006 (1970) ("critical test" is whether financial statements as a whole "fairly present" the financial position and results of operations of the company for the period under review; compliance with GAAP "persuasive" but not "conclusive" that the facts as certified were not materially misleading). The work of the Blue Ribbon Committee, as evidenced in SAS 90, amending SAS 61 effective for financial statements issued after December 15, 2000, sought to clarify the accountant's responsibility in this regard: if an entity is using rules-based GAAP to report financial information that does not faithfully represent the economic substance of the entity's financial condition, results of operations and cash flow, the accountant must report this to the audit committee. *See* SAS 90.

Q:      And said, 'Given the impact, we really need to have a heart-to-heart or a hard discussion about some of these issues.'

A:      Absolutely, no, there's no way.  I mean, how could any of us not have. . . I mean, we couldn't have sat there and listened to a presentation of those sort of figures without there being a reference in the minutes, to start off with, without there being some corrective action taken on some things.  It simply didn't happen.  It simply didn't happen.

. . . [I]f these figures or even half of these figures had been presented to us and the auditors had said, "I hope you understand, we're not happy with this" . . . They didn't.  We got 100 per cent signal in the other direction.

What we know now about meetings of the Arthur Andersen managing committee, or whatever it was, the week before February 2001, we know a lot of things we didn't know then, and the story would have been very different.

It was the audit committee meeting in February 2001, February 13th I think but I'm not sure, and the reported Arthur Andersen meeting of the week before which, from what I have understood, totally contrary views of Arthur Andersen's view on Enron was reported.  Now, if they'd told us that then, I don't know whether we could have saved the company but we would have had a damn good shot.  We'd have had a damn good shot.  It was there.  The impact was just horrible.[485]

---

[485] Sworn Statement of John Wakeham, Enron, to John L. Latham, A&B, Dec. 5, 2002 (the "Wakeham Sworn Statement"), at 121, 52, 73-78, 99-100, 120-22, 140-42, 203-04; Sworn Statement of Ronnie C. Chan, Enron, to William C. Humphreys, A&B, Aug. 9, 2003 (the "Chan Sworn Statement"), at 243, 247-49 (Q:  "I mean, as part of this presentation, was there a discussion with Arthur Andersen about, 'Okay. Portfolio montetizations, you've said, get a circle-H on accounting judgment.  How many of those are there that we're talking about?  Is it a billion dollars?  Is it a million dollars?  How much is it so I can at least evaluate my risks or exposure or whatever with regard to the magnitude of these things that are being discussed here?"  A:  "I did not ask that question."  Q:  "All right.  But do you recall that sort of information and dialogue occurring?"  A:  "I do not recall anything specific."); Sworn Statement of Paulo V. Ferraz Pereira, Enron, to William C. Humphreys, Jr., A&B, Sept. 12, 2003 (the "Pereira Sworn Statement"), at 179-80 (Q:  "At the audit committee, did – was there any discussion about prepays and how Enron was using prepays, how they were going to be disclosed, how they were going to be discussed, what the amount, effect, magnitude was at the audit committee?  Did you ever have any of those discussions with Arthur Andersen?"  A:  "Not that I recall."); Sworn Statement of Wendy Lee Gramm, Enron, to William C. Humphreys, Jr., A&B, Aug. 20, 2003 (the "Gramm Sworn Statement"), at 111-13, 131-33, 156 (Q:  "Do you recall whether there was an effort to take any one of these categories of transactions that we've talked about and look back in the financials to see what the dollar figure was associated with that category, or is that something, I think you said before, that you thought that Arthur Andersen was doing and you did not do it as an audit committee?"  A:  "As an audit committee, I agree, that's correct."); Sworn Statement John Mendelsohn, Enron, to William C. Humphreys, Jr., A&B, Sept. 9, 2003 (the "Mendelsohn

*Andersen's SAS 61 Presentation for 1998*

At an Audit Committee meeting held on February 7, 1999, Duncan, as a part of his SAS 61 presentation to the Audit Committee on Enron's 1998 financial statements, "reviewed selected observations by Arthur Andersen including a risk profile analysis of accounting judgments, disclosure judgments, and rule changes," with respect to Enron's 1998 financial statements.[486] The attachments to Audit Committee minutes include the following Andersen slide:[487]

---

Sworn Statement"), at 84-85 (Q: "And you don't recall any particular disclosure issue about anything where Arthur Andersen said, 'Let's talk about this item or accounting principle. Here's its impact on the financial statements, and here's how we may or may not disclose it,' that level of detail?" A: "No, to the contrary, they made me feel that they were confident and comfortable with the conclusions about how to present this information that had been reached, and they were signing off on them, and we – we were in fine shape."), *Id.* at 96-97 (Q: "Do you recall any presentations at the audit committee by Arthur Andersen of, for example, here are the total number of FAS 125 transactions we've entered into – that the company's entered into this year, that sort of discussion?" A: "The example you're giving I do not remember being discussed."); *Id.* at 99-100 (Q: "And you don't recall there were discussions about the magnitude of the prepays at Enron?" A: "No, I don't recall that discussion." Q: "And the same question on prepays and with regard to the manner and method of disclosure of them in financial statements, was that a topic of discussion at the audit committee?" . . . A: "No, we didn't discuss how they should be disclosed. They were disclosed."); *Id.* at 103-04 (Q: "Were there presentations or discussions about – in the audit committee meeting about the amount and extent of earnings that the company was experiencing because of mark to market accounting?" A: "The amount of earnings that they were experiencing because of mark to market accounting, as a – I don't think it was discussed in that context."); Sworn Statement of Joe H. Foy, Enron, to William C. Humphreys, Jr., A&B, Aug. 26, 2003 (the "Foy Sworn Statement"), at 138-39, 143 (Q: "And do you recall that they put any dollar signs or dollar amounts –" A: "No." Q: "—on the magnitude of those transactions?" A: "No. No.").

[486] Minutes of Enron Audit Committee Meeting, Feb. 7, 1999 (the "2/7/99 Audit Committee Minutes"), at 2 [AB000191702-AB000191704]. Duncan's first SAS 61 presentation as engagement partner, on Enron's 1997 financial statements at the February 9, 1998 Audit Committee meeting, contains no mention of high risk accounting judgments or disclosure judgments. 2/9/98 Audit Committee Minutes.

[487] *See* Audit Update Presentation, *Selected Observations - 1998 Financial Reporting*, at AB000191703 (attached to 2/7/99 Audit Committee Minutes) (handwritten notes redacted to improve legibility) [AB000191702-AB000191704].

| Category | Risk Profile | | | Comment |
|---|---|---|---|---|
| | Accounting Judgements | Disclosure Judgements | Rule Changes | |
| **Highly Structured Transactions** | | | | |
| Energy Asset Securitizations | (H) | (H) | (H) | • Judgement Relates To General Applicability of Model And Any Retained Control Features<br>• Significance of Earnings Heightens Need for Disclosure<br>• Ongoing Rulemaking Activity Could Drastically Limit Model |
| Other Income Related | (H) | M | M | • Judgement Usually Relates To Extent of Any Continued Involvement And/Or Contingency Exposures |
| **Commodity and Equity Portfolio** | | | | |
| Commodities (MTM) and Merchant Investments (Fair Value) | (H) | (H) | M | • Inherent Judgement Around Methodologies<br>• Significance of Merchant Earnings Heightens Need For Disclosure |
| Prudency | (H) | (H) | L | • Assessment and Documentation Procedures Recently Enhanced<br>• Relationship to SEC Hot Areas |
| **Purchase Accounting** | (H) | M | L | • Judgement Relates To Original Valuations and Accounting for Subsequent Activity |
| **Balance Sheet Issues** | | | | |
| Equity Investments | (H) | (H) | M | • Judgement Relates To Control And Retained Economic Parameters<br>• Continue Appropriate Commitment/Guarantee/Contingency Disclosures |
| Portfolio Monetizations | (H) | M | (H) | • Judgement Relates To Extent of Any Continued Involvement<br>• Ongoing Rulemaking Activity (Could Be Positive) |
| Other | | | | |

*Selected Observations*
*1998 Financial Reporting*



ARTHUR ANDERSEN

As this slide indicates and as has been confirmed through interviews and testimony, the Andersen partners disclosed to the Enron Audit Committee that Enron's accounting judgments and disclosure judgments in the indicated categories had a high "risk profile." The slide also notes that the "Significance of Earnings Heightens Need for Disclosure" in the area of "Highly Structured Transactions – Energy Asset Securitizations," and that the "Significance of Merchant Earnings Heightens Need for Disclosure" in the area "Commodity and Equity Portfolio – Commodities (MTM) and Merchant Investments (Fair Value)."

These presentation materials, and the testimony of Audit Committee members in attendance,[488] suggest that the Audit Committee was not informed about the amount of income, operating cash flow, or indebtedness involved in these high "risk profile" accounting judgments and disclosure judgments, and was not sufficiently apprised of the facts or analysis on which the judgments were based.[489]  As indicated above, however, SAS 61 requires auditors to

> determine that the audit committee is informed about the methods used to account for significant unusual transactions and the effect of significant accounting policies in controversial or emerging areas for which there is a lack of authoritative guidance or consensus.  For example, significant accounting issues may exist in areas such as revenue recognition, off-balance sheet financing, and accounting for equity investments.[490]

At this meeting, the Audit Committee members were told that Andersen was prepared to render its unqualified opinion on the 1998 financial statements and that Andersen had reviewed the MD&A portion of Enron's 1998 SEC Form 10-K.[491]  The presentation and testimony thus suggest that Andersen disclosed the fact that the accounting judgments and disclosure judgments in the listed categories had a high "risk profile" without advising the Audit Committee about the effect of those judgments on the financial condition or results reported by Enron.  There is no evidence that any member of the Audit Committee asked for a quantification or more detailed analysis concerning

---

[488] *See, e.g.,* Chan Sworn Statement, at 57, 243, 247-49; Gramm Sworn Statement, at 111-13, 131-33, 156; Foy Sworn Statement, at 138-39, 143; Wakeham Sworn Statement, at 52, 73-78, 99-100, 120-22, 140-42, 203-04.  Goddard did not recall specific instances of such information being conveyed to the Audit Committee, although he did state that the meetings were "very interactive."  Goddard Interview.  Bauer has exercised his Fifth Amendment privilege.

[489] Moreover, the precise breakout of earnings from energy asset securitizations and earnings from fair value accounting applied to merchant investments are not apparent from the 1998 financial statements or MD&A.  *See* Second Interim Report, Appendix D (Enron's Disclosure of Its SPEs), at 25.

[490] SAS 61, at § 7 (AU § 380.07).

[491] 2/7/99 Audit Committee Minutes, at 1.

the effects of these accounting and disclosure judgments on Enron's financial statements.[492]

Counsel to Andersen has provided the Examiner with documents purported to be notes prepared by Duncan reflecting statements he made to the Audit Committee at this meeting. These notes indicate that in his SAS 61 presentation on the 1998 financial statements, Duncan may have told the Audit Committee:

- In connection with "Highly Structured Transactions": "$700 million income in wholesale from sale of equity inv. in Dev projects - Completely within current rule framework but some folks of different view. Our big issue was <u>disclosure</u>;" and

- In connection with "Balance Sheet Issues – Equity Investments" that the transactions "Meet 1st Criteria – Control. But Guarantees or Support Arrangements could Shade."[493]

The Examiner has reviewed the Andersen work papers that have been produced to the Examiner and has been unable to find these notes in the work papers. SAS 61 provides that the auditor should document all oral communications with the audit committee in the auditor's work papers.[494] Testimony from Audit Committee members indicates that, notwithstanding the express requirements of SAS 61, they were not

---

[492] *See, e.g.,* Chan Sworn Statement, at 248-49 (Q: "Do you recall any sort of discussion to try to put sort of numbers with regard to the amounts of things being discussed here?" A: "I don't remember having numbers placed on it, nor people asking. Frankly, if one were to get too much into numbers, sometimes you can destroy the impact of the point that you're trying to get at."); Gramm Sworn Statement, at 131-33 ("In our view, that was what the auditors did and management did, and the auditors would be reviewing those kinds of numbers.").

[493] David Duncan, Handwritten Notes on Audit Update Presentation, *Selected Observations - 1998 Financial Reporting,* ("Duncan Notes on 1998 Selected Observations") (presentation slide attached to Audit Committee 2/7/99 Minutes) [AB0911 2248]. As previously indicated, these notes have not been authenticated and, as a result of Duncan's exercise of his Fifth Amendment privilege, the Examiner has been unable to ask Duncan about them.

[494] SAS 61, at § 3 (as amended by SAS 90, at § 1) (AU § 380.03).

informed about the effects of the high "risk profile" accounting judgments and disclosure judgments identified in Andersen's SAS 61 presentation.[495]

Enron's use of its accounting techniques to enhance its 1998 financial statements included the following SPE transactions investigated by the Examiner:

- Prepay Transactions:  Using prepays with JPMorgan Chase/Mahonia and Citigroup/Delta, Enron appears to have produced at least $690 million of operating cash flow.[496]

- FAS 140 Transactions:  Through its Riverside 3, Riverside 4 and Pilgrim transactions with CIBC, Enron recognized $342.2 million of gain ($222.4 million after the tax provision) and $738.5 of operating cash flow from these financings.[497]

- Tax Transactions:  Through its Steele, Teresa and Tomas transactions, Enron reported approximately $51.5 million of GAAP income (net of the tax provision).[498]

---

[495] *See, e.g.,* Chan Sworn Statement, at 248-49;  Gramm Sworn Statement, at 111-13, 131-33, 156; Foy Sworn Statement, at 138-39, 143; Wakeham Sworn Statement, at 52, 73-78, 99-100, 120-22, 140-42, 203-04.

[496] This figure includes $500 million of Prepay Transaction cash flow through transactions with Mahonia, and $190 million of Prepay Transaction cash flow through transactions with Delta, based upon a report by Fastow dated August 13, 2001. *See* Enron Corp. Chief Financial Officer Report, Aug. 13, 2001, at 5 [AB000204725-AB000204736].  It does not include the $500 million Roosevelt Prepay Transaction that was originated in 1998 and repaid in 1999, nor repayments during 1998 of Prepay Transaction obligations incurred prior to 1998.  To the extent that any such repayments were greater than $500 million, the $690 million figure overstates the cash flow generated by 1998 Prepay Transaction activity.  To the extent that any such repayments were less than $500 million, the $690 million figure understates the cash flow generated by 1998 Prepay Transaction activity.

[497] *See* Third Interim Report, Appendix H (Role of CIBC and its Affiliates) (after-tax income effect derived by applying the statutory tax rate of 35%).  As indicated previously, evidence does suggest that Duncan may have informed the Audit Committee as to the total securitizations completed during 1998. *See* Duncan Notes on 1998 Selected Observations.

[498] This amount was calculated based upon the Limited Financial Accounting Summary of Certain Projects as Requested by the Enron Corp. Examiner, prepared by Enron, dated October 2, 2002, describing the financial statement effects of the Teresa, Steele, Tomas, Cochise, Apache, Condor and Tammy I transactions.  The components of reported income generated from these transactions before application of the tax provision, i.e., the pre-IBIT components, have been reduced by applying the statutory tax rate of 35%.

- Minority Interest Transaction:  Through the Rawhide transaction,
  Enron raised $727.5 million of fully recourse indebtedness that it
  reported as minority interest on its balance sheet.[499]

- Share Trust Transaction:  Through the Marlin share trust Enron
  financed the acquisition of the Wessex water system with $1.15 billion
  of off-balance sheet, fully recourse indebtedness.[500]

These transactions represented approximately 39% of Enron's 1998 net income of
$703 million and over 87% of its $1.64 billion of operating cash flow.[501]  It does not
appear that Andersen disclosed these amounts to the Audit Committee or otherwise
determined that the Audit Committee was informed about the material effect of Enron's
high risk profile accounting and disclosure judgments on Enron's 1998 financial
statements.

*Andersen's SAS 61 Presentation for 1999*

At the Audit Committee meeting held February 7, 2000, during his SAS 61
presentation on the 1999 financial statements, Duncan "commented on selected
observations from the Company's 1999 financial reporting and stated that the Company's
sophisticated business practices introduced a high number of accounting models and
applications requiring complex interpretations and judgments and that the broadness of
the SEC business-related disclosure requirements added to the complexity of the

---

[499]  *See* Second Interim Report, Appendix I (Minority Interest Transactions).

[500]  The Marlin Share Trust transaction involved off-balance sheet financing and accounting for equity
investments, two specific examples cited in SAS 61, at § 7 (AU § 380.07) as "controversial or emerging
areas for which there is a lack of authoritative guidance or consensus." The off-balance sheet accounting
depended on an extension of rules governing the consolidation of real estate limited partnership to the non-
real estate area.  Such an extension was the subject of EITF 98-6 in the fall of 1998, in which the EITF
reached no consensus.

[501]  Percentage impact derived through comparison of cited amounts and the Enron 1998 Annual Report.

Company's financial reporting."[502]  The following Andersen slide is attached to the Audit
Committee minutes:[503]



| Selected Observations |
| 1999 Financial Reporting |

• Sophistication of Company's Business Practices Introduces A High Number of Accounting Models and
  Applications Requiring Complex Interpretations and Judgement

    – Highly Structured Transactions           – Application of Mark-to-Market (Commodity) and Fair
       • Energy Asset Securitizations               Value (Investment) Models
       • Syndication Vehicles                    • Interpretation of Complex Business Transactions
       • Complex Sales Structures (Various Assets)    • Judgement Surrounding Valuation
       • Other                             Methodologies (Curves, Models, Reserves)
                               • Consistent Application of Policies
                               • Interaction With Traditional Accrual-Based
                                 Models

• Adequacy of Business-Related Disclosures (e.g. MD&A and Segments) Increasingly Judgemental Given Nature
  of Company Activities

    – SEC Guidance = "Discuss All Material Events or Uncertainties That Would Cause Reported Financial
        Information Not to Be Necessarily Indicative of Future Operating Results"

    – Enron Business-Related Disclosure Challenges:

           • Continued Growth of Earnings Related to "Value Creation" Dependent Businesses
               – Transaction Dependent "Origination" Activities
               – Mark-To-Market and Fair Value Earnings
           • Appropriateness of Reported Segments Considering Continued Expansion of Wholesale Activities
           • Balance of Confidentiality vs. User Considerations
           • Practical Constraints and Practices of Others

     As indicated in the slide, the 1999 report identified some of the same categories of

accounting judgments and disclosure judgments that the 1998 report identified as having

a high "risk profile," including highly structured transactions, and mark-to-market and

fair value accounting.   Notes on this particular slide suggest that Duncan may have

advised the Audit Committee:

---

[502] 2/7/00 Audit Committee Minutes, at 2.

[503] See Audit Update Presentation, *Selected Observations – 1999 Financial Reporting*, at AB000201144
(attached to 2/7/00 Audit Committee Minutes) (handwriting redacted to improve legibility)
[AB000201141-AB000201144].

As we have discussed on a number of occasions, we work closely with the
Company as they structure transactions and take positions. We very often
utilize our central technical group to help the company and us manage risk
surrounding this activity. We are on board with all the companies [sic]
positions or you would hear about them[.] The issue is, particularly
considering today[']s regulatory environment, we are all subject to the
second guessing of those who might have a different view."[504]

However, the Examiner has reviewed no evidence indicating that the 1999

presentation informed the Audit Committee about the effects of these accounting and

disclosure judgments on Enron's financial statements. Instead, it appears that these

issues were addressed summarily through a notation to the effect that the "Sophistication

of Company's Business Practices Introduces A High Number of Accounting Models and

Applications Requiring Complex Interpretations and Judgments." Similarly, the

disclosure risk is identified as being "Increasingly Judgmental Given Nature of Company

Activities."

Enron's use of its accounting techniques to enhance its 1999 financial statements

included the following SPE transactions investigated by the Examiner:

- Prepay Transactions: Prepay Transactions, including the $800 million
  Yosemite I Prepay, were used to produce $1.5 billion of operating cash
  flow.[505]

- FAS 140 Transactions: Through six FAS 140 Transactions with CIBC
  in 1999, Enron recognized $115.3 million in gain ($74.9 million after
  the tax provision) and $827 million of operating cash flow.[506]

---

[504] David Duncan, Handwritten Notes on Audit Update Presentation, *Selected Observations – 1999
Financial Reporting* ("Duncan Notes on 1999 Selected Observations") (presentation slide attached to Audit
Committee 2/7/00 Minutes) [AB0911 2265].

[505] *See* Second Interim Report, Appendix E (Prepay Transactions).

[506] *See* Third Interim Report, Appendix H (Role of CIBC and its Affiliates) (after-tax income effect
derived by applying the statutory tax rate of 35%).

- Non-Economic Hedging Transaction: Enron recognized $95 million ($61.8 million after the tax provision) of its $893 million of net income in the LJM1/Rhythms transaction.[507]

- Tax Transactions: Through its Teresa, Steele, Cochise, Apache and Condor transactions, Enron reported approximately $104.6 million of GAAP income (net of the tax provision).[508]

- Minority Interest Transaction: The Nahanni transaction in late December generated $500 million of Enron's $1.2 billion of 1999 operating cash flow.[509]

- Share Trust Transaction: In 1999, Enron restructured Whitewing from a Minority Interest Transaction to a Share Trust Transaction involving $2.4 billion of off-balance sheet, fully recourse indebtedness.[510]

These transactions represented approximately 27% of Enron's 1999 net income of $893 million and over 206% of its $1.23 billion of operating cash flow (which would have been negative without these transactions).[511]

The FAS 140 Transactions, the Minority Interest Transactions, the Share Trust Transactions and the FAS 140 Transactions were in substance secured loans fully recourse to Enron. The Prepay Transactions were in substance unsecured loans. Each of these structures involved accounting risk because they were, at best, on the outer fringes

---

[507] *See* Second Interim Report, Annex 2 to Appendix L (Related Party Transactions) (after-tax income effect derived by applying the statutory tax rate of 35%).

[508] This amount was calculated based upon the Limited Financial Accounting Summary of Certain Projects as Requested by the Enron Corp. Examiner, prepared by Enron, dated October 2, 2002, describing the financial statement effects of the Teresa, Steele, Tomas, Cochise, Apache, Condor and Tammy I transactions. The components of reported income generated from these transactions before application of the tax provision, i.e., the pre-IBIT components, have been reduced by applying the statutory tax rate of 35%.

[509] *See* Second Interim Report, Annex 3 to Appendix I (Minority Interest Transactions).

[510] *See* Second Interim Report, Appendix G (Whitewing Transaction).

[511] Percentage impact derived through comparison of cited amounts and the Enron 1999 Annual Report.

of rules-based GAAP.[512] The FAS 140 Transactions, the Minority Interest Transactions, and the Share Trust Transactions involved disclosure risks, because the full recourse nature of these financings was not disclosed. The Prepay Transactions involved disclosure risk, because debt was concealed in price risk management liabilities and the extent of Enron's operating cash flow that came from these borrowings was not disclosed. Each of these financing transactions was structured in a manner that resulted in these accounting and disclosure risks, not because of the complexity of Enron's business, but because Enron wanted to achieve financial statement benefits.

The Non-Economic Hedging Transactions and Tax Transactions involved accounting and disclosure risks, because there was no business purpose to those transactions except financial statement enhancement.

Thus, the high risk nature of the accounting judgments and disclosure judgments in the categories Andersen identified to the Audit Committee was attributable to the complexity of the structures, which were designed to present income, cash flow and financial position materially more favorable than that actually produced by its business. However, a fact-finder could conclude that Andersen's communications to the Audit Committee, on this occasion and other occasions, did not inform the Audit Committee about the actual source and implications of these high risk accounting judgments and disclosure judgments.[513]

---

[512] Second Interim Report, Appendix I (Minority Interest Transactions), at 59-69; Second Interim Report, Appendix G (Whitewing Transaction), at 113-36; Second Interim Report, Appendix M (FAS 140 Transactions), at 24-33; Second Interim Report, Appendix E (Prepay Transactions), at 29-45 (each describing the limited applicability of GAAP and the difficulty of applying GAAP to such transactions).

[513] *See* Audit Update Presentation, *Selected Observations – 1999 Financial Reporting*, at AB000201144 (attached to 2/7/00 Audit Committee Minutes) ("Sophistication of Company's Business Practices Introduces A High Number of Accounting Models and Applications Requiring Complex Interpretations

*May 2000 Audit Committee Meeting*

Andersen's annual SAS 61 presentations typically were made at the February meetings of the Audit Committee, just prior to the release of Enron's annual financial statements. At the May 1, 2000 Audit Committee meeting, however, Duncan also commented on "inherent risks" that were "high priorities":

> Mr. Duncan discussed the financial reporting areas that AA had determined to be high priorities due to inherent risks that were present. He stated that the on-going high priority areas included structured transactions, the merchant portfolio, commodity trading activities, project development activities, and inter-company and related party transactions. He also commented on specific areas where AA would be spending additional time including the following: (1) the formalization of accounting models, policies, and procedures relating to Enron Energy Services, LLC ("EES"), Enron Broadband Services, Inc. ("EBS"), Enron NetWorks, and the Company's activities in Japan, (2) structured transactions related to securitizations and syndication and hedging vehicles, and (3) analyzing the impact of rulemaking activity specifically as it relates to the Company. Mr. Causey joined him in a discussion of the interpretation of previously issued financial accounting standards board pronouncements, especially as they related to the Company and its customers.[514]

---

and Judgments.") [AB000201141-AB000201144]; *see also, e.g.,* Wakeham Sworn Statement, at 188 (denying that Andersen conveyed to the Audit Committee that Enron was engaging in "high risk accounting"); *id.* at 76-77 ("They did divide things up into high, immediate [sic] and low, but what they pointed out to us was the high was the complicated issues which they were concentrating on. They said they had to. . . . And I took comfort from the auditors reassuring us that they recognized that some of these transactions were complicated and difficult, and therefore they concentrated their audit work in making sure that the company got it right."); Foy Sworn Statement, at 143-44; (discussing Andersen presentations discussing risk and stating "Andersen was demonstrating to us the nature of its work, the intensity of that work, and the thoroughness of that work. And that was, of course, our principle concern."); Mendelsohn Sworn Statement, at 85 ("[T]hey made me feel that they were confident and comfortable with the conclusions about how to present this information that had been reached, and they were signing off on them, and we – we were in fine shape."); Gramm Sworn Statement, at 112-13 (Q: "[Y]ou don't recall the discussion being we're spending time on this, there are a couple of ways we might disclose it or treat it and we have decided to do X rather than Y, or any discussions like that?" A: "Not on specific issues. What they did say is that there are issues that are, that take time and judgment, and they work, they're on top of it, they work with the management in the early stages, they talk to their Chicago and New York offices and et cetera, so – but not specifics.").

[514] Minutes of Enron Audit Committee Meeting, May 1, 2000, at 1-2 [AB00201253-AB000201256].

Even though Enron used LJM1 in 1999 to recognize $95 million of income through its Rhythms hedge,[515] this is the first recorded mention to the Audit Committee that related party transactions ("hedging vehicles") constituted a risk area. Handwritten notes provided to the Examiner related to this meeting indicate that Duncan may have advised the Audit Committee that a "Structured Vehicle to Facilitate Investment Hedging Activities" had closed in the second quarter providing "≈$1 Billion Notional Amount Capacity for Further Hedge Investments (Swaps, Puts) as accepted by Counterparty. As with prior LJM transactions, any of these will require disclosure as a related party transaction."[516]

At this meeting, Duncan also distributed a handout that addressed the AICPA's suggested topics for "Expanded Qualitative Discussions Between Outside Auditors and Company's Audit Committee." Among the suggested topics for expanded qualitative discussions between auditors and their clients were:

- "Accounting Principles Applied vs. Acceptable Alternatives"

- "Use of Special Structures and Timing of Actions"

- "Frequency and Significance of Transactions with Related Parties."[517]

The minutes of this Audit Committee meeting reflect that Duncan "stated that, in AA's opinion, they were already addressing all of the topics with the Committee and AA would address any specific items on an on-going basis as necessary." The next slide in

---

[515] Second Interim Report, Appendix L (Related Party Transactions), at 23.

[516] David Duncan, Handwritten Notes on Audit Update Presentation, *Selected Observations Through First Quarter of 2000* (presentation slide attached to Audit Committee 5/1/01 Minutes) [AB0911 2268].

[517] First Quarter 2000 Audit Update Presentation, *Financial Reporting & Accounting Principles,* at AB0246 01578 (attached to Minutes of Enron Audit Committee Meeting, May 1, 2000) [AB0246 01578-AB0246 01581].

Duncan's presentation identified the following "High Priority Financial Reporting Risk Areas:"

- Complex Accounting For Structured Transactions
- Merchant Asset and Investment Portfolio
  - Portfolio Management and Valuation
  - Applicability of Fair Value Accounting Model
  - Commodity Trading Activities
- Project Development Activities
  - Cost Deferral
  - Revenue Recognition
  - Consolidation
- Sophisticated Debt and Equity Transactions
- Intercompany and Related Party Transactions[518]

As noted above, in 2000 Enron used its accounting techniques to generate almost all of its net income and operating cash flow, and to keep $8.6 billion of debt off of Enron's balance sheet. Despite express recognition of the need for qualitative discussions with the Audit Committee concerning "Accounting Principles Applied vs. Acceptable Alternatives," the "Use of Special Structures and Timing of Actions," and the "Frequency and Significance of Transactions with Related Parties," and despite specifically identifying categories of "High Priority Financial Reporting Risk Areas," there is no indication in Andersen's work papers, other documentary evidence or

---

[518] First Quarter 2000 Audit Update Presentation, *High Priority Financial Reporting Risk Areas,* at AB0246 01579 (attached to Minutes of Enron Audit Committee Meeting, May 1, 2000) [AB0246 01578-AB0246 01581].

testimony obtained by the Examiner that Duncan, Bauer, Goddard, or Enron management
present at the meeting discussed the magnitude of the risk in terms of income, cash flow
or indebtedness, or what effect realization of the risk would have on Enron or its financial
statements.

Likewise, there is no evidence of discussion concerning the specific accounting
and disclosure judgments that were required with respect to the identified categories. Nor
is there evidence of discussion that the structured transactions and other "risk areas" were
designed and used for the specific purpose of reporting and disclosing the transactions on
a basis that was materially more favorable to Enron than would have resulted from a
faithful representation of the underlying economics of the transactions.[519]

*Andersen's SAS 61 Presentation for 2000*

As discussed above, on February 5, 2001, Andersen held an internal client
retention meeting during which Andersen personnel discussed the risks inherent in
Andersen's continued engagement by Enron, including the risks related to the amount of
Enron's earnings and cash flow attributable to mark-to-market accounting, fair value
accounting, FAS 140 Transactions and related party transactions.

The minutes of the meeting of the Enron Audit Committee one week later on
February 12, 2001 indicate that as a part of Andersen's SAS 61 communication with the
Audit Committee on the 2000 financial statements, that:

> Mr. Duncan then provided selected observations regarding the Company's
> accounting procedures and financial reporting. He stated that the
> Company continued to utilize highly structured transactions, such as
> securitizations and syndications, in which there was significant judgment

---

[519] Nor does the evidence suggest that the members of the Audit Committee asked questions concerning
these high risk accounting judgments and disclosure judgments.

required in the application of GAAP. He commented on the use of mark-to-market and fair value model accounting in the areas of trading and derivative contracts and stated that these also required significant judgment regarding the applicability of certain models to specific products or transactions. He then reviewed related party transactions, classification issues that had arisen during the year, and certain areas requiring material judgments to be made.[520]

In connection with this discussion, Duncan presented the following two slides:[521]

---

[520] 2/12/01 Audit Committee Minutes, at 1-2. As noted above, the enhancement of the SAS 61 auditor communication requirements implemented by SAS 90 was effective for financial reporting periods ending on or after December 15, 2000. See SAS 90, at § 2 (AU 380.03). Accordingly, that enhancement was applicable to the communications made by Andersen at the February 12, 2001 Audit Committee meeting.

[521] Selected Observations of 2000, at AB000204304-AB000204305. As discussed above, these same slides were presented at the internal client retention meeting, except the second bullet under the Comment column beside "Highly structured transactions," read "Application of GAAP often requires extreme judgment" rather than "significant judgment." Handwritten notes related to that meeting suggest that in his oral presentation Duncan may have described the risks as "extreme." David Duncan, Typed Notes entitled "Financial Comments," undated (the "Duncan Financial Comments Notes") [AB0911 2292]. Those same notes suggest Duncan may have told the committee "the Company often draws distinctions or takes positions that could be second guessed by others with a different view." Id.



# 2000 Audit Update
## Selected Observations - Financial Reporting

| _Category_ | _Examples_ | _Comment_ |
|---|---|---|
| Highly structured transactions | • Securitizations<br>• Syndication and off-balance sheet vehicles<br>• Other complex sales structures<br>• Complex contract structures | • High dependency on transactions to meet objectives<br>• Application of GAAP often requires significant judgement<br>• Continued interpretive guidance likely<br>• Extent of necessary disclosures can be judgemental |
| Use of mark-to-market and fair value model | • Trading contracts<br>• Derivative contracts<br>• Investment company holdings of public and non-public securities | • Significant inherent judgemental issues regarding:<br>  • Applicability of model to specific products or transactions;<br>  • Valuation (curves, reserves)<br>  • Multi-element arrangements<br>• Consistency of application among business units continues to be refined<br>• Incorporating new products continues to present challenges<br>• Continued interpretive guidance likely<br>• Extent of necessary disclosures can be judgemental |



# 2000 Audit Update
## Selected Observations - Financial Reporting

| _Category_ | _Examples_ | _Comment_ |
|---|---|---|
| Related party transactions | • LJM related activity<br>• Syndication vehicles where company has an ownership interest | • Relationship issues add scrutiny risk to:<br>  • Judgemental structuring and valuation issues<br>  • Understanding of transaction completeness<br>• Required disclosures reviewed for adequacy |
| Other Material Judgemental Areas | • Azurix impairment<br>• Impact of high volatility on mark-to-market valuations<br>• Credit (California)<br>• India Contingencies | • Company positions reviewed for reasonableness<br>• Certain disclosures made as warranted |
| Classification issues | • Financial statements classification<br>• Other public disclosures | • Categorization of activities between certain segments, operating vs. non-operating or recurring vs. non-recurring can be highly judgemental<br>• Certain intersegment allocation practices need refinement |

Notes provided to the Examiner suggest that Duncan may have advised the Audit

Committee:

> With regard to disclosures, we have discussed before the inherent
> difficulty that exists in determining the appropriate depth to go related to
> any specific company activity.  While the company has many good
> disclosure practices, we have discussed the risk that some might view the
> level of detail available, not so much in the financial statements, but in
> MD&A, as less than desirable in some areas.  We understand the
> Company must balance the detail provided in these disclosures with
> commercial and practical constraints, but we often suggest additional
> details just the same.[522]

While the above notes indicate that Duncan may have alerted the Audit

Committee generally regarding disclosure risk, the Examiner is aware of no evidence that

Andersen informed the Audit Committee regarding which disclosures were "less than

desirable."  Moreover, despite having quantified the various risks for its own internal risk

review and client retention purposes, the evidence suggests that Andersen did not

quantify the risks for the Audit Committee.  As discussed above, SAS 61 requirements

call explicitly for discussion of "items that have a significant impact on the

representational faithfulness, verifiability, and neutrality of the accounting information

included in the financial statements."[523]

*Conclusions Regarding Andersen's SAS 61 Communications.*

The evidence described above would permit a fact-finder to conclude that at least

beginning with Enron's 1998 financial statements, Andersen identified "highly structured

transactions," the use of mark-to-market accounting for commodity positions and the use

---

[522] *See* Duncan Financial Comments Notes.

[523] SAS 61, at § 11 (as amended by SAS 90, at § 1) (AU § 380.11).

of fair value accounting for merchant investments as involving accounting judgments and disclosure judgments that had a high "risk profile," but that Andersen did not:

- describe the magnitude or materiality of these high risk judgments in terms of Enron's net income, operating cash flow or financial position;[524]

- describe specific transactions that were within these risk categories, or the nature of the accounting judgments and disclosure judgments that were required in any specific instance; or

- explain that the complexity and uncertainty arose not from the sophistication of Enron's business operations, but from the sophistication and complexity of Enron's efforts to structure transactions to portray its income, cash flow and financial position in a manner materially more favorable than was economically the case.

Based upon this evidence, a fact-finder could conclude that Andersen failed in its professional responsibility under SAS 61 to discuss with the Enron Audit Committee the selection and use of accounting principles by Enron, as well as the "quality, not just the acceptability"[525] of these principles, the effect of the selection and use of these principles on Enron's financial statements and the impact of their use on the representational faithfulness of Enron's financial statements. In addition, the evidence described above is sufficient for a fact-finder to conclude that Andersen misled the Audit Committee to believe that the risky accounting judgments and disclosure judgments were attributable to the nature of Enron's business rather than to the highly structured nature of transactions

---

[524] Certain materials discussed with the Finance Committee present the type of detailed information regarding the effects of SPE Transactions that a fact-finder could conclude was required under SAS 61. See, e.g., Finance Related Asset Sales (Andersen presentation slide to Finance Committee in April 2001) [AB0911 2306]; Materials from Enron Finance Committee Meeting, Aug. 7, 2000 (the "8/7/00 Finance Committee Materials"), at 23 (slide from Treasurer Report) [AB0247 01347-AB0247 01516]. While there is no evidence to suggest that this data was provided to the Audit Committee itself, the presentation of such information to a Board committee may suggest that at least some Board members were made aware of certain of the effects of some of the SPE transactions.

[525] SAS 61, at § 11 (as amended by SAS 90, at § 1) (AU § 380.11).

in which it was engaging in order to increase reported net income or operating cash flow, or to remove reported debt from Enron's balance sheet. Based on this evidence, a fact-finder could conclude that Andersen aided and abetted breaches of duty by Enron's officers because:

> (i)     Andersen had actual knowledge that the officers were breaching their fiduciary duties by disseminating financial information that was materially misleading;
>
> (ii)    Andersen gave substantial assistance to these officers by failing to properly communicate to the Audit Committee when it was Andersen's duty to do so; and
>
> (iii)   injury to the Debtor was a direct or reasonably foreseeable result of this conduct.

While a diligent member of the Audit Committee could have made further inquiry,[526] having been told that Enron's management, with Andersen's concurrence, was making accounting judgments and disclosure judgments that had a high "risk profile," and possibly having been told that some might view Enron's MD&A as "less than desirable in some areas," the failure of the Audit Committee members to ask more questions does not excuse Andersen from the performance of its professional duty to the Audit Committee as explicitly set forth in SAS 61.

---

[526] *See* Report, Appendix D (Roles of Lay, Skilling and Outside Directors).

## V.    POTENTIAL LIABILITY OF ANDERSEN

### A.    Arguments Supporting the Imposition of Professional Malpractice and Aiding and Abetting Liability

*Elements of Professional Malpractice*

As set out more fully in the Legal Standards Annex to this Appendix, a professional malpractice claim is essentially a negligence claim. The elements of a professional malpractice claim are: (i) a legal duty; (ii) breach of that duty; (iii) proximate cause;[527] and (iv) damages. Thus, a cause of action for professional malpractice would exist if Andersen breached a legal duty owed to Enron, and if this breach proximately caused injury to Enron. Andersen owed Enron "a duty to exercise the degree of care, skill and competence that reasonably competent members of [the accounting] profession would exercise under similar circumstances."[528]

As summarized below and as discussed in this Appendix, there is sufficient evidence, including the testimony of Andersen professionals and related documentary evidence in the Andersen criminal trial, for a fact-finder to conclude that Andersen was negligent in rendering its services to Enron, and that this breach proximately caused damages to Enron.

*Elements of Aiding and Abetting Liability*

In the Third Interim Report, the Examiner determined that there is sufficient evidence for a fact-finder to conclude that: (i) certain of Enron's officers, including those

---

[527] Proximate cause generally includes a degree of reliance. Whether a showing of reliance by Enron could be made depends in part on the "imputation doctrine" discussed in the Legal Standards Annex. Specifically, whether a showing could be made that Enron relied on Andersen's audits will depend on whether knowledge of certain Enron officers (those officers who knew that Enron's financial statements were misleading) would be imputed to Enron.

[528] *In re Sunpoint Sec., Inc.,* 262 B.R. 384, 398 (Bankr. E.D. Tex. 2001).

responsible for Enron's accounting and disclosure, breached their fiduciary duties under applicable law by causing Enron to enter into certain SPE transactions that were designed to manipulate Enron's financial statements; and (ii) the officers' breaches of duty resulted in the dissemination of financial information known to be materially misleading.[529]

As set out more fully in the Legal Standards Annex, an affirmative claim against Andersen for aiding and abetting Enron's officers in the breach of a fiduciary duty will exist if: (i) Andersen had actual knowledge of the wrongful conduct giving rise to breaches of fiduciary duty by Enron's officers; and (ii) Andersen gave substantial assistance to those officers, or "participated" in the breaches of fiduciary duty. As discussed in this Appendix and as summarized below, the evidence is sufficient to permit a fact-finder to conclude that Andersen had knowledge of and participated in the officers' breaches of fiduciary duty by:

- participating in the design and implementation of the transactions used to produce materially misleading financial statements;

- approving the accounting and disclosure of the transactions that Andersen knew had no purpose other than the manipulation of Enron's financial statements; and

- misleading the Enron Audit Committee about the effect of the transactions on Enron's financial statements.

---

[529] Third Interim Report, Appendix C (Role of Enron's Officers), at 94.

*Evidence Concerning Andersen's Role in Enron's Prepay Transactions*

The Examiner has previously concluded that Enron's accounting for the Prepay Transactions violated GAAP and applicable SEC disclosure rules.[530]   The evidence further suggests that:

- Andersen participated in the planning and designing of the structure of the Prepay Transactions in order to assist Enron in achieving its accounting objectives by, among other things, designing a prepay "model."

- Andersen was aware that the information in its possession was insufficient to determine that Mahonia and Delta were substantive businesses.

- Andersen realized that a straightforward application of DIG Issue F6 would result in debt treatment, yet sought to rationalize a result favorable to its client that was strained and implausible.

- Andersen certified Enron's 1999 and 2000 financial statements despite the fact that Enron rejected Andersen's proposed disclosures (regarding the operating cash flow that came from the Prepay Transactions and the amount of its price risk management liabilities arising from the Prepay Transactions).

- Andersen failed to determine that the Audit Committee was aware of the magnitude and nature of the risks inherent in the accounting and disclosure judgments with respect to the Prepay Transactions, but rather misled the Audit Committee with respect to the risk involved.

*Evidence Concerning Andersen's Role in Enron's FAS 140 Transactions*

The evidence indicates that Andersen had deep involvement in the creation and subsequent modification of the FAS 140 Transaction technique.  As previously reported by the Examiner, Enron's accounting for the FAS 140 Transactions did not comply with

---

[530] *See* Second Interim Report, Appendix B (Accounting Standards); *see also* Second Interim Report, Appendix E (Prepay Transactions).

GAAP.  For instance, in the First Interim Report,[531] the Examiner determined that
Enron's accounting treatment of the Total Return Swaps violated FAS 105, because
under that Financial Accounting Standard, Enron was required to disclose the face
contract or notional amount of the Total Return Swaps, and the terms and nature of those
instruments, including cash requirements.  Andersen accountants were aware of the
specific obligations incurred by Enron and its affiliates under the Total Return Swaps.
They also understood that Enron was not providing the detailed information described in
FAS 105.  Moreover, Andersen erred in its acceptance of "true issuance" opinions rather
than "true sale" opinions, because the "true issuance" opinions were inadequate to
support a finding of legal isolation of financial assets from the Sponsor in these
transactions.  As the Examiner determined in the First Interim Report, in many of the
FAS 140 Transactions, the financial assets were not legally isolated.  When Andersen
discovered in 2001 that it had not been obtaining the proper opinion, after Enron had
completed numerous FAS 140 Transactions resulting in at least $647 million in net
income and $2.6 billion in cash flow recognition from 1998 through 2000, the evidence
suggests that Andersen couched its new requirement for a true sale opinion as emanating
from newly effective FAS 140, although Andersen knew that was not the case.

Andersen accountants routinely consulted with each other and with Enron about
the structure to be employed in FAS 140 Transactions and specific challenges presented
by individual transactions.  Evidence indicates that Andersen helped fashion and revise
the structure of Enron's FAS 140 Transactions, and that key Andersen accountants
understood that the FAS 140 Transactions were, in substance, loans.  The evidence

---

[531] *See* First Interim Report, at 54-57.

further suggests that Andersen accountants understood that Enron purposely did not account for the transactions as loans in their GAAP financial statements.

*Evidence Concerning Andersen's Role in Enron's Non-Economic Hedges*

Andersen has acknowledged that Enron's accounting for the Rhythms hedge was improper because Swap Sub should have been consolidated with Enron due to the insufficiency of Swap Sub's equity. Even if LJM1 had provided sufficient equity, because LJM1 was a related party, that equity could not be counted toward the 3% Equity Test. Finally, the Rhythms hedge disclosure in footnote 16 of Enron's 1999 financial statements (and in footnote 8 to its June 30, 1999 interim statements) violated the GAAP disclosure provisions of FAS 57 and did not comport with the conclusions in Andersen's related audit memorandum. Those disclosures do not describe the non-economic nature of the hedging transaction pursuant to which Enron recognized $95 million of income, nor do they reveal that such income did not represent any possible economic benefit to Enron. Such disclosures are required by FAS 57.

The evidence reveals that Andersen was thoroughly aware of the facts of the transaction. Accordingly, a fact-finder could conclude that Andersen knew that the transaction had no economic substance. Although it recognized that the nature of these transactions was required to be disclosed pursuant to FAS 57, Andersen reviewed the related party footnote and concluded that the financial statements were in accordance with GAAP in all material respects. Moreover, although Andersen identified related party transactions as an area of accounting and disclosure risk in its SAS 61 presentation to the Audit Committee on February 7, 2000, it did not determine that the Audit Committee was informed about the non-economic nature or magnitude of this

- 160 -

transaction. Likewise, Andersen was aware that, like Rhythms, the Raptor transactions lacked economic substance. Similarly, the use of LJM2 equity in the Raptors to avoid consolidation as well as the failure to provide adequate FAS 57 disclosure were GAAP violations.

*Evidence Concerning Andersen's Role in Enron's Tax Transactions*

The Examiner has previously concluded that Enron's accounting for the Tax Transactions violated GAAP. In addition, the evidence indicates that Andersen:

- relied on a strained analogy to APB 16 and used an unprecedented amortization methodology in the REMIC Carryover Basis Transactions to approve Enron's reporting of the potential benefit of speculative future tax deductions in an erroneous and misleading manner as pre-tax income;

- relied on interpretations of FAS 109 in Enron's Tax Basis Step-Up Transactions that permitted Enron to create accounting benefits in violation of the literal accounting requirements and that had a misleading impact on Enron's reported GAAP income;

- permitted Enron to record the accounting benefits of the Tax Transactions even though the transactions had no bona fide business purpose other than the creation of GAAP income; and

- permitted Enron to record the accounting benefits of the Tax Transactions without specific disclosure in Enron's financial statements.

*Evidence Concerning Andersen's Role in the Nahanni Transaction*

The evidence indicates that Andersen played a significant role in Enron's accounting for its Minority Interest Transactions. As previously noted, the purpose of the Minority Interest Transactions was to structure particular obligations so that they appeared as "minority interest" in the mezzanine of Enron's balance sheet, rather than as liabilities. While the typical Minority Interest structure itself was relatively

straightforward, Enron officers used the structure in ways that resulted in financial reporting that was materially misleading.

In the Nahanni Transaction, Enron officers obtained $500 million in a financing that closed on December 29, 1999, $485 million of which was repaid on January 14, 2000. Enron reported the cash generated by this financing as cash flow from operating activities. Evidence indicates that Andersen had a substantial involvement in the Nahanni Transaction. A fact-finder could conclude that, before the publication of Enron's 1999 audited financial statements, Andersen accountants understood that Nahanni was designed to achieve a $500 million increase in cash flow before the end of 1999, and a repayment of debt within days thereafter, all with no material economic effect on Enron.

### Conclusion Regarding Andersen's Role in Enron's SPE Transactions

Based on the foregoing, a fact-finder could conclude that Andersen was negligent, and aided and abetted Enron officers in their breaches of duty, in connection with the SPE Transactions.

### Evidence Concerning Andersen's SAS 61 Communications

There is sufficient evidence for a fact-finder to conclude that, beginning at least with Enron's 1998 financial statements, Andersen identified "highly structured transactions," and mark-to-market of commodity positions and fair value of merchant investments as involving accounting judgments and disclosure judgments that had a high "risk profile." At the same time, it does not appear that Andersen described to the Enron Audit Committee:

- the magnitude or materiality of these high risk judgments in terms of Enron's income, operating cash flow or financial position;

- the specific transactions that were within these risk categories, or the nature of the accounting judgments and disclosure judgments that were required in any specific instance;

- that the transactions identified as presenting high accounting and disclosure risk resulted in financial statements that did not faithfully represent the underlying substance of Enron's financial condition, results of operations and cash flow; or

- the fact that the complexity and uncertainty of the accounting treatment arose not from the sophistication of Enron's business operations, but from the complexity of Enron's efforts to structure transactions to portray its income, cash flow and financial position in a manner materially more favorable than was economically the case.

Based upon this evidence, a fact-finder could conclude that Andersen failed in its professional responsibility under SAS 61 to discuss with the Enron Audit Committee: (i) the selection and use of accounting principles by Enron; (ii) the "quality, not just the acceptability"[532] of these principles; and (iii) the effect of using those principles on Enron's financial statements, including the impact of the use of those principles on the faithful representation of Enron's financial statements.    Therefore, there is sufficient evidence for a fact-finder to conclude that Andersen was negligent in performance of its SAS 61 responsibilities, and that this negligence proximately caused Enron damages.

In addition, there is sufficient evidence for a fact-finder to conclude that Andersen affirmatively misled the Audit Committee into believing that the risky accounting judgments and disclosure judgments were attributable to the nature of Enron's business, rather than to the highly structured nature of transactions in which it was engaging in order to create net income or operating cash flow, or to move debt off Enron's balance sheet.    Thus, there is sufficient evidence for a fact-finder to conclude that Andersen aided

---

[532] SAS 61, at § 11 (as amended by SAS 90, at § 1) (AU § 380.11).

and abetted Enron's officers' breaches of fiduciary duty by misleading the Audit

Committee about Enron's true financial condition.

**B.    Arguments Against the Imposition of Professional Malpractice and Aiding and Abetting Liability**

*Introduction*

Andersen could raise legal and factual defenses to claims brought by Enron for

both professional malpractice and aiding and abetting breaches of fiduciary duty by

Enron's officers.  In addition to contending that Enron is unable to establish one or more

essential elements of its claims, Andersen may contend that the wrongful acts committed

by Enron's officers should be imputed to Enron.  As discussed below, if the officers'

wrongful conduct is imputed to Enron, then Enron's recovery may be barred or reduced

by    applicable    comparative    fault    principles,    including    statutory    proportionate

responsibility and the doctrine of *in pari delicto.*

*Enron's Comparative Fault as a Defense to Professional Malpractice*

In response to a professional malpractice claim, Andersen might raise Enron's

comparative fault as a defense against liability.  For example, Andersen may present

evidence that Enron officers were at fault for accounting for transactions in misleading

ways, or evidence that the Enron's Audit Committee negligently performed its oversight

duties.[533]

As explained in the Legal Standards Annex, in order to analyze whether Enron's

fault should bar or reduce recovery by Enron from Andersen for malpractice (in

---

[533] To the extent that Enron's officers are determined to have engaged in intentional (as opposed to negligent) misconduct, the availability to Andersen of a comparative fault defense to a malpractice claim brought by Enron will turn in the first instance on whether such officer misconduct is imputed to Enron itself.  The relevant considerations regarding whether such imputation should occur are discussed in the Legal Standards Annex to this Appendix.

conducting its audits), a Texas court might consider only fault that interfered with Andersen's ability to conduct its audits in conformance with GAAS. Therefore, if Andersen raises a comparative fault defense against the Debtors (with regard to Andersen's audit failures), Andersen likely will have to show both that Enron was at fault and that this fault contributed to Andersen's inability to perform its audits in compliance with GAAS.

Andersen may have a stronger defense in those instances in which it could show that Andersen accountants were deceived by Enron's officers. For example, Andersen could offer evidence in defense of a claim that Andersen committed professional malpractice in connection with the FAS 140 Transactions. Evidence indicates that Enron's officers failed to inform Andersen regarding the existence of side arrangements that were inconsistent with the accounting chosen for the FAS 140 Transactions. Andersen accountants have testified that, had they known of these side arrangements, they would not have agreed with Enron's desired accounting for these transactions. Accordingly, a fact-finder could conclude that Enron's officers did not properly inform Andersen with regard to the FAS 140 Transactions and that this deception impaired Andersen from conducting its audits in accordance with GAAS.

On the other hand, a fact-finder could determine that, notwithstanding this evidence, and given its duties under GAAS to consider the risk of management fraud when determining the nature and extent of its audit procedures, Andersen was negligent in failing to take steps to learn of the existence of side agreements.[534] Evidence indicates that Andersen did learn of facts suggesting the possible existence of three such

---

[534] *See* SAS 82 (AU §316A).

agreements. Thus, the evidence indicates that Andersen accountants were aware of at least the possibility that side agreements inconsistent with Enron's accounting were being entered into between Enron officers and transaction parties and were aware of the extent to which Enron's overall financial presentation depended on satisfying the 3% Equity Test. Accordingly, a fact-finder could conclude that any failure by Enron's officers to inform Andersen of side agreements did not prevent Andersen from conducting its audits in accordance with GAAS and discovering the existence of the side agreements, thus preventing the harm to Enron.

Similarly, the failure of Audit Committee members to question Andersen concerning high risk accounting and disclosure judgments may have been negligent. However, this negligence would not excuse a failure by Andersen to determine that the Audit Committee was informed as required by SAS 61.

To the extent that Enron itself is determined by the fact-finder to bear responsibility for the harm caused by accounting malpractice committed by Andersen, Enron's recovery on a malpractice claim may be reduced or barred by applicable comparative fault principles, including statutory proportionate responsibility and the doctrine of *in pari delicto*. The manner by which such a bar or reduction would be determined is discussed in the Legal Standards Annex to this Appendix.

*Enron's Comparative Fault as a Defense to Aiding and Abetting Liability*

Andersen may contend that deception by Enron's officers should bar or reduce recovery by Enron from Andersen on a claim for aiding and abetting breaches of

fiduciary duties.[535]  For example, Andersen may contend that Enron's officers acted fraudulently by manipulating GAAP accounting rules to report financial results that were materially more favorable than was actually the case and deceived Andersen with respect to material facts.

To the extent that Enron itself is determined by the fact-finder to bear responsibility for the harm caused by breaches of fiduciary duty by its officers, Enron's recovery may be reduced or barred by applicable comparative fault principles, including statutory proportionate responsibility and the doctrine of *in pari delicto*.  The manner by which such a bar or reduction would be determined is discussed in the Legal Standards Annex to this Appendix.

### C.   Conclusion

Andersen has acknowledged material errors in connection with its professional services to Enron.  In addition to the errors that Andersen has acknowledged, there is evidence that Andersen made other material accounting and auditing errors that contributed significantly to the misleading nature of Enron's financial reporting.  The evidence reviewed by the Examiner, and the reasonable inferences that may be drawn from that evidence, are sufficient for a fact-finder to conclude that Andersen was negligent in the provision of its professional services to Enron.  In addition, the evidence is sufficient for a fact-finder to conclude that Andersen aided and abetted certain Enron officers in breaching their fiduciary duties to Enron.  To the extent that Enron itself is determined by the fact-finder to bear responsibility for the misconduct of its officers,

---

[535] The availability to Andersen of such a defense will turn in the first instance on whether such misconduct by Enron's officers is imputed to Enron itself.  The relevant considerations regarding whether such imputation should occur are discussed in the Legal Standards Annex to this Appendix.

Enron's recovery for such claims may be reduced or barred by applicable comparative

fault principles, including statutory proportionate responsibility and the doctrine of *in*

*pari delicto.*

ANNEX 1 (Summary of Raptor Memoranda)

to

APPENDIX B

(Role of Andersen)

to

FINAL REPORT OF NEAL BATSON,
COURT-APPOINTED EXAMINER

**Raptor Memo Summary**

# Summary of Raptor Memoranda[1]

| Memo # | Date | Title | Engagement Team Authors | Issues/Answer | PSG Consulted (Risk Management Accountants Concurring) | Bates # |
|---|---|---|---|---|---|---|
| 1 | 12/31/1999 | LJM2 Partnership Structure | Dave Duncan Deb Cash Patty Grutzmacher Jennifer Stevenson (uninitialed) | 1) Is the minimum SPE capitalization requirement met to support non-consolidation of LJM2 with Enron? Yes. | Carl Bass John Stewart (Odom, Swanson, Lowther) | AB0648 00593-AB0648 00606 |
| | | | | 2) Does the control structure support non-consolidation of the entity (LJM2) for Enron Corp. as a result of the related party relationship? Yes. | None (Odom, Swanson, Lowther) | |
| | | | | 3) What are the necessary disclosures?  Should disclose existence of LJM2, the related party that serves as GP, purpose of LJM2, nature of transactions with Enron, and gains/losses. | None (Odom, Swanson, Lowther) | |
| 1A | 12/31/1999 amended 10/12/2001 | LJM2 Partnership Structure | Dave Duncan Deb Cash Patty Grutzmacher Jennifer Stevenson | 1) Is the minimum SPE capitalization requirement met to support non-consolidation of LJM2 with Enron? Yes. | Carl Bass John Stewart (Odom, Swanson, Lowther) | AA000012507-AA000012510 |
| | | | | 2) Does the control structure support non-consolidation of the entity (LJM2) for Enron Corp. as a result of the related party relationship? Very upper limit of what may be acceptable. | None (Odom, Swanson, Lowther) | |
| | | | | 3) What are the necessary disclosures?  Should disclose existence of LJM2, the related party that serves as GP, purpose of LJM2, nature of transactions with Enron, and gains/losses. | None (Odom, Swanson, Lowther) | |
| 2 | 03/28/2000 | Redesignation Criteria | Dave Duncan Deb Cash Patty Grutzmacher Jennifer Stevenson | Discusses use of redesignated earnings to capital at risk in an SPE.  Criteria are described but not applied to an actual entity. | John Stewart | AB0648 01079-AB0648 01080 |

| Memo # | Date | Title | Engagement Team Authors | Issues/Answer | PSG Consulted (Risk Management Accountants Concurring) | Bates # |
|---|---|---|---|---|---|---|
| 3 | 03/28/2000 | Raptor Transaction | Dave Duncan Deb Cash Patty Grutzmacher Jennifer Stevenson | 1) Does the structure of Talon meet minimum control requirements for SPE not to be consolidated with Enron? Yes. What are capitalization requirements? LJM2 capital (less GP's share) counted. 3% must be computed on notional amount of any derivative instruments. 2) How does Enron account for preferred LLC interest in Talon? Cost method rather than equity method or as a derivative. 3) How should Enron account for the cost of the purchased share-settled put option? Through equity and net income. 4) What is proper accounting for contingent forward sales contract? These are issued and outstanding shares for purposes of calculating EPS of Enron. 5) How will value of derivative transactions be substantiated? Independent appraisal or fairness opinion. 6) What is impact of Talon's credit worthiness on value of derivative instruments to Harrier? Value depends on Talon's credit capacity. 7) What are required Enron disclosures? Description of structure, purpose, and related party should be disclosed. | Carl Bass John Stewart Ben Neuhausen (Odom, Lowther) | AB0648 01051- AB0648 01058 |
| 3A | 03/28/2000 amended 10/12/2001 | Raptor Transaction | Dave Duncan Deb Cash Patty Grutzmacher Jennifer Stevenson | 1) Does the structure of Talon meet minimum control requirements for SPE not to be consolidated with Enron? Yes. What are capitalization requirements? LJM2 capital (less GP's share) counted. 3% must be computed on notional amount of any derivative instruments. | John Stewart (Odom, Lowther) | AA-EX0179573- AA-EX0179580 |
| | | | | 2) How does Enron account for preferred LLC interest in Talon? Cost method rather than equity method or as a derivative. | Carl Bass (Odom, Lowther) | |

-2-

| Memo # | Date | Title | Engagement Team Authors | Issues/Answer | PSG Consulted (Risk Management Accountants Concurring) | Bates # |
|---|---|---|---|---|---|---|
| | | | | 3) How should Enron account for the cost of the purchased share-settled put option? Through equity and net income. | Ben Neuhausen (Odom, Lowther) | |
| | | | | 4) What is proper accounting for contingent forward sales contract? These are issued and outstanding shares for purposes of calculating EPS of Enron. | Ben Neuhausen (Odom, Lowther) | |
| | | | | 5) How will value of derivative transactions be substantiated? Independent appraisal or fairness opinion. | None (Odom, Lowther) | |
| | | | | 6) What is impact of Talon's credit worthiness on value of derivative instruments to Harrier? Value depends on Talon's credit capacity. | John Stewart Carl Bass (Odom, Lowther) | |
| | | | | 7) What are required Enron disclosures? Description of structure, purpose, and related party should be disclosed. | None (Odom, Lowther) | |
| 4 | 07/28/2000 | LJMII Governance | Dave Duncan Patty Grutzmacher Jennifer Stevenson | LJM2 has made amendments to strengthen argument that LJM2 is independent from Enron, including a right to remove the GP upon 66 2/3% vs. 75% vote. | Carl Bass | AA-EX0179611 |
| 5 | 07/31/2000 | Raptor 2 Transaction | Dave Duncan Deb Cash Patty Grutzmacher Jennifer Stevenson | Raptor 2 is a proper transaction because it is analogous to Raptor 1. | None | AB0648 00443- AB0648 00446 |

| Memo # | Date | Title | Engagement Team Authors | Issues/Answer | PSG Consulted (Risk Management Accountants Concurring) | Bates # |
|---|---|---|---|---|---|---|
| 6 | 11/09/2000 | Raptor 3 Transactions | Dave Duncan Deb Cash Jennifer Stevenson Patty Grutzmacher | Raptor 3 is like other Raptors except the Note from Porcupine to Pronghorn in exchange for Class B Member Interest (99.99% economic interest of EES Warrant Trust) does not qualify for FAS 125 treatment and is treated as a retained interest with 0 carrying value. | Jim Green | AB0648 00399- AB0648 00402 |
| 6A | 11/09/2000 amended 10/12/2001 | Raptor 3 Transactions | Dave Duncan Deb Cash Jennifer Stevenson Patty Grutzmacher | Raptor 3 is like other Raptors except the Note from Porcupine to Pronghorn in exchange for Class B Member Interest (99.99% economic interest of EES Warrant Trust) does not qualify for FAS 125 treatment and is treated as a retained interest with 0 carrying value. | None | AB0648 00403- AB0648 00406 |
| 7 | 12/27/2000 | Raptor 4 Transaction | Dave Duncan Deb Cash Patty Grutzmacher Jennifer Stevenson | Raptor 4 is analogous to Raptors 1 and 2. | None | AB0648 00452- AB0648 00455 |
| 8 | 12/28/2000 | Raptor Structures Update | Dave Duncan Deb Cash Patty Grutzmacher Jennifer Stevenson | *AA concluded* that cross-collateralization of the Raptor structures pursuant to 45-day letter would allow Enron to benefit from the assets of each structure on an aggregate basis in assessing the credit capacity of the entities as of December 31, 2000. | Carl Bass John Stewart (Odom) | AB0648 00580- AB0648 00582 |
| 8A | 12/28/2000 amended 10/12/2001 | Raptor Structures Update | Dave Duncan Deb Cash Patty Grutzmacher Jennifer Stevenson | *Enron believes* that cross-collateralization of the Raptor structures pursuant to 45-day letter would allow Enron to benefit from the assets of each structure on an aggregate basis in assessing the credit capacity of the entities as of December 31, 2000. Since credit capacity test did not require impairment at year end, agreed to revisit. | Carl Bass gave advice, not necessarily concurred (Odom, Lowther) | AB0648 0577- AB0648 0579 |
| 9 | 05/09/2001 | Raptor Transaction Update | Dave Duncan Deb Cash Patty Grutzmacher Jennifer Stevenson | Enron's assessment of Raptor credit capacity on an aggregate basis at 3/31/01 given assignments of distributions receivable by those Enron Raptor subs receiving distributions to those whose obligations were not satisfied is appropriate. | None (Odom, Lowther) | AA000001370- AA000001372 |

-4-

| Memo # | Date | Title | Engagement Team Authors | Issues/Answer | PSG Consulted (Risk Management Accountants Concurring) | Bates # |
|---|---|---|---|---|---|---|
| 9A | 05/09/2001 amended 10/12/2001 | Raptor Transaction Update | Dave Duncan Deb Cash Patty Grutzmacher Jennifer Stevenson | Aggregation not appropriate based on cross-assignments, but no impairment "considering latitude allowed by FAS 114." | None (Odom, Lowther) | AA-EX0179587-AA-EX0179593 |
| 10 | 07/09/2001 | Raptor Forwards | Chris Herbold Eric M. McKee (uninitialed) | Should Raptor pre-pay forwards be considered outstanding shares for EPS calculation? Yes. | None | AAWP0073349-AAWP0073350 |
| 11 | 07/17/2001 | Enron-Review on Contingent Issuance Valuation Methodologies for Raptor Vehicles | Jitendra Sharma Scott Gallagher Terry Cheung (uninitialed) | Determination by Andersen's Financial and Risk Consulting Group that Enron's valuation theory and methodology in valuing Enron's contingent sale of Enron stock to the Raptors in March 2001 were reasonable. | None | AB0648 00235-AB0648 00236 |
| 12 | 08/31/2001 | Enron Equity Instruments - Raptor Entities | David Duncan Deb Cash Kimberly Scardino | Reconfirm AA conclusions with respect to accounting for equity-related instruments Enron has with the Raptor entities. | Rick Petersen Ben Neuhausen | AB0648 00283-AB0648 00285 |
| 13 | 09/01/2001 | Raptor Notes-Balance Sheet Reclass | Dave Duncan Deb Cash (uninitialed) | Correcting overstatement by the amount of certain Raptor Notes. | None (Odom, Lowther) | AACC0000110671 |

| Memo # | Date | Title | Engagement Team Authors | Issues/Answer | PSG Consulted (Risk Management Accountants Concurring) | Bates # |
|---|---|---|---|---|---|---|
| 14 | 10/15/2001 | Enron-Raptor Entity Note Impairment | David Duncan Debra Cash | Andersen devises a three-step test to determine whether the Raptor Notes are impaired: 1. Determine for each Raptor if screen price of assets is less than recorded amount of notes and derivative investments. If no, no impairment. If yes, go to step 2. 2. Use Monte Carlo analysis to determine if there is a 25% chance of payment on April 18, 2003 due date. If yes, no impairment. If no, go to step 3. 3. Compute impairment based on best estimate of recovery. Using this method, but not permitting aggregation, Andersen determined that no impairments had to be recorded. | Stewart, Petersen, Neuhausen, Reppi (approval of 3-step method to Note impairment calculation only) (Goddard, Swanson, Odom, Lowther, Corgel, Geron, Goolsby, and Rieger concurred in application of method to Raptors generally) | AB0648 00306-AB0648 00316 |
| 15 | 10/18/2001 (draft) | Enron-Credit Reserve Adjustment | Dave Duncan Deb Cash (uninitialed) | Does valuation of creditworthiness of Raptor vehicles affect Enron's credit policy? Not material enough to require restatement. | None (Swanson, Odom, and Lowther) | AACC000010667-AACC000010668 |

-6-

---

[1] Except as indicated above, each memo is initialed by its engagement team authors indicating that it was a final memo and part of the Andersen Enron workpapers. There were numerous uninitialed prior drafts of a number of the final memos.

ANNEX 2 (Legal Standards Applicable to Andersen)

to

APPENDIX B

(Role of Andersen)

to

FINAL REPORT OF NEAL BATSON,
COURT-APPOINTED EXAMINER

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................. 1

II.     CHOICE OF LAW .............................................................................. 3

III.    LAW APPLICABLE TO CONDUCT OF ENRON'S ACCOUNTANTS ............ 4
        A.      Introduction.............................................................................. 4
        B.      Accountant Malpractice ........................................................... 5
        C.      Aiding and Abetting a Breach of Fiduciary Duty..................... 14
        D.      Defenses................................................................................. 16

IV.     CONCLUSION.................................................................................. 28

## I.    INTRODUCTION

In the Third Interim Report, the Examiner stated that there is sufficient evidence from which a fact-finder could conclude that:    (i) certain senior officers of Enron breached their fiduciary duties under applicable law by causing the Debtors to enter into SPE transactions that were designed to manipulate the Debtors' financial statements and that resulted in the dissemination of financial information known by those officers to be materially misleading; and (ii) these wrongful acts caused direct and foreseeable harm to Enron itself, and resulting harm to innocent parties that dealt with Enron, including creditors in the Bankruptcy Case.

Enron's accountant, Andersen, had an important role in these SPE transactions and in the disclosure of Enron's financial information.    This Annex 2 to Appendix B (Role of Andersen) analyzes the law applicable to Enron's potential claims against Andersen for its role in these SPE transactions and Enron's dissemination of misleading financial information.    Andersen may be liable to Enron because either:    (i) Andersen breached the standard of care that an accountant owes to its client (accountant malpractice); or (ii) Andersen aided and abetted a breach of fiduciary duty by one or more of Enron's officers.    Andersen, however, may assert defenses to these claims.    In addition to contending that Enron is unable to establish one or more essential elements of its claims, Andersen may contend that the wrongful acts committed by Enron's officers should be imputed to Enron.    As discussed below, if the officers' wrongful conduct is

imputed to Enron, then Enron's recovery may be barred or reduced by applicable comparative fault principles, including the doctrine of *in pari delicto*.[1]

---

[1] *See* Third Interim Report, Appendix B (Legal Standards), *Standing Issues*. As noted in the Third Interim Report and the Defenses section below, Texas law generally applies a comparative fault affirmative defense to bar recovery by plaintiffs who engaged in wrongful conduct, rather than the standing analysis set out in *Shearson Lehman Hutton, Inc. v Wagoner*, 944 F.2d 114 (2d Cir. 1991). However, if a New York court applied Oregon law to an aiding and abetting breach of fiduciary duty claim, Andersen may be able to assert that Enron lacks standing. *See id.*

## II.   CHOICE OF LAW

Andersen personnel, working out of Andersen's Houston office, provided most of the audit and consulting services at issue to Enron personnel located in Houston. Enron is domiciled in Texas. Texas "applies the 'most significant relationship' test from the Restatement (Second) of Conflicts, §§ 6 and 145" to determine the choice of law to apply to tort claims such as accountant malpractice and aiding and abetting the breach of fiduciary duties.[2]  In a case brought by Enron against Andersen in a Texas court,[3] under the most significant relationship test, it is likely that Texas law will apply, because most (though by no means all) of the services that Andersen provided to Enron were provided by Andersen personnel in the State of Texas.

---

[2] *Thomas v. N.A. Chase Manhattan Bank,* 994 F.2d 236, 241 (5th Cir. 1993).

[3] If Andersen were sued in a court sitting in New York, the choice of law question could be complicated with respect to a claim for aiding and abetting a breach of fiduciary duty, as there is a split of authority among the New York courts regarding whether such claims are governed by the "internal affairs doctrine" (which would result in Oregon law governing) or the "significant contacts" rule (which would result in Texas law governing). Courts in both Texas and Oregon have recognized a claim for aiding and abetting a breach of fiduciary duty. *See* Third Interim Report, Appendix B (Legal Standards).

## III.    LAW APPLICABLE TO CONDUCT OF ENRON'S ACCOUNTANTS

### A.    <u>Introduction</u>

An accountant may be liable to a client for:  (i) failing to exercise the degree of care, skill and competence that reasonably competent members of the accounting profession would exercise under similar circumstances, thereby committing malpractice; or (ii) aiding and abetting the client's officers in committing breaches of their fiduciary duties.  In order to prevail on such a claim for aiding and abetting, a plaintiff must show that the accountant knew of the facts giving rise to the breaches of fiduciary duty by the client's officers and that the accountant gave substantial assistance to such officers.

An accountant may assert certain defenses to both of these claims.  As discussed below, with respect to claims of professional malpractice or aiding and abetting the breach of fiduciary duties, an accountant may contend that the client's comparative fault bars or reduces recovery by the client from the accountant.  If wrongful conduct of Enron's officers is imputed to Enron, then Enron's recovery may be barred or reduced by applicable comparative fault principles, such as statutory proportionate responsibility or the doctrine of *in pari delicto*.

Both of these potential comparative fault defenses require consideration of whether and what conduct by the client's officers may be imputed to the client itself. With respect to negligent acts of the corporation's officers, this analysis is straightforward:  Negligent acts of a corporation's agents acting within the scope of their employment are imputed to the corporation itself under well-settled principles of agency

- 4 -

law.[4]  With respect to intentional wrongdoing of a corporation's officers, however, the question is more complex.  As discussed below, Texas law provides that such wrongful conduct of a corporation's officers will be imputed to the corporation if that conduct was undertaken *on behalf of* the corporation, but will not be imputed to the corporation if undertaken *against* the corporation.  This is a fact-intensive analysis dependent upon all of the relevant circumstances.

### B.    Accountant Malpractice

*Elements of an Accountant Malpractice Claim*

Most Texas decisions treat accountant malpractice claims as negligence claims.[5] Accountants may be liable to their clients for negligent acts committed in the course of rendering professional services.[6]   Under Texas law, the elements of a professional negligence claim are:  (i) a legal duty; (ii) breach of that duty; (iii) proximate cause; and (iv) damages.[7]  Accountants owe their clients "a duty to exercise the degree of care, skill and competence that reasonably competent members of their profession would exercise under similar circumstances."[8]  In order to recover for the breach of this duty, a plaintiff must show that the breach was the proximate cause of plaintiff's injuries.[9]  Usually, a plaintiff must introduce expert testimony regarding the professional standard of care

---

[4] *See, e.g., Agristor Credit Corp. v. Donahoe*, 568 S.W.2d 422, 426 (1978) (recognizing the "rule of law that the negligence, inadvertence, or mistake of the agent is imputed to the principal").

[5] *See, e.g., Deloitte & Touche v. Weller*, 976 S.W.2d 212, 215 (Tex. App. 1998).

[6] *See Greenstein, Logan & Co. v. Burgess Mktg., Inc.*, 744 S.W.2d 170, 185 (Tex. App. 1987).

[7] *See id.*

[8] *Id.* at 185.

[9] *See, e.g., Sec. Investor Prot. Corp. v. Cheshier & Fuller, L.L.P.  (In re Sunpoint Sec., Inc).*, 262 B.R. 384, 398 (Bankr. E.D. Tex. 2001).

applicable to the circumstances, as well as breach of that standard and causation of damages.[10]

### Breach of the Professional Duty

Whether an accountant exercised the degree of care, skill and competence that reasonably competent members of the accounting profession would exercise under similar circumstances is normally determined by reference to generally accepted accounting principles ("GAAP") and generally accepted auditing standards ("GAAS").[11] Usually, an accountant satisfies his or her professional duties by complying with GAAP and GAAS.[12] "GAAP are those principles recognized as appropriate in the recording, reporting, and disclosing of financial information."[13] GAAP "includes not only broad guidelines of general application, but also detailed practices and procedures."[14] GAAP is a technical term; it includes the conventions, rules and procedures that define acceptable accounting practices. GAAP provides the standards for determining a company's assets, liabilities, revenues, expenses, net income or net loss and sources and uses of money. The ultimate goal of GAAP is the provision of financial information that is relevant, reliable, and useful.[15]

---

[10] *See id.*

[11] In the securities fraud context, courts have held that "[g]eneral allegations that a defendant violated GAAP or generally accepted auditing standards ("GAAS") are inadequate to support a claim under Rule 10b-5." *Graham v. Taylor Capital Group, Inc. (In re Reliance Sec. Lit.)*, 91 F. Supp. 2d. 706, 726 (D. Del. 2000).

[12] *Goss v. Crossley (In re Hawaii Corp.)*, 567 F. Supp. 609, 617 (D. Haw. 1983) ("Compliance with GAAP and GAAS, however, will not immunize an accountant when he consciously chooses not to disclose on a financial statement a known material fact.").

[13] *Id.* at 618.

[14] SAS 69, at § 411.02 (AU § 411.02).

[15] *See* Second Interim Report, Appendix B (Accounting Standards).

GAAS sets forth the accepted standards of practice for auditors in planning and performing audits to determine that the financial statements of a company are in compliance with GAAP.[16]    Many of these standards are set forth explicitly in the accounting literature, in particular the Statements on Auditing Standards ("SASs") promulgated by the American Institute of Certified Public Accountants ("AICPA").    An auditor's good faith compliance with its duties under GAAS generally discharges the auditor's professional duty to act with reasonable care in planning and performing an audit.[17]    These GAAS duties include not only the duty to conduct appropriately designed audit tests, but also the duty to "determine that the audit committee is informed about the methods used to account for significant unusual transactions and the effect of significant accounting policies in controversial or emerging areas for which there is a lack of authoritative guidance or consensus."[18]    Additionally, GAAS requires the auditor to have an "open and frank" discussion with the client's audit committee concerning the "quality, not just the acceptability, of the entity's accounting principles as applied in its financial reporting."[19]

A review of reported decisions reveals few cases analyzing whether an accountant has breached the applicable standard of care in determining how to account for a given transaction in accordance with GAAP, i.e., in determining what GAAP requires the

---

[16] *See United States v. Arthur Young & Co.*, 465 U.S. 805, 811 (1984); *Greenstein*, 744 S.W.2d at 185; *Monroe v. Hughes*, 31 F.3d 772, 774 (9th Cir. 1994); *see also Bankr. Servs., Inc. v. Ernst & Young (In re CBI Holding Co.)*, 247 B.R. 341, 348-49 (Bankr. S.D.N.Y. 2000).

[17] *See Monroe*, 31 F.3d at 774; *Greenstein*, 744 S.W.2d at 185; *In re CBI Holding Co.*, 247 B.R. at 362.

[18] SAS 61, at § 380.07 (AU § 380.07).

[19] SAS 90, at § 380.11 (AU § 380.11) (effective for audits of financial statements for periods ending on or after December 15, 2000).

accounting to be for a given transaction or event. Instead, the vast majority of accounting

malpractice cases concern allegations that an auditor has violated the applicable standard

of care for failing to detect relevant facts. However, the available case law suggests that

allegations of negligence in determining the accounting treatment required by GAAP,

under circumstances in which experts disagree, create issues of fact for the fact-finder.[20]

In *Goss v. Crossley (In re Hawaii Corp.)*, the plaintiff was a trustee in a Chapter

X Reorganization of The Hawaii Corporation ("THC").[21] The plaintiff sought to recover

damages from the defendant accounting firm alleging that the firm had acted negligently

in selecting the method of accounting to be applied to a merger between THC and

another company, American Pacific Group ("APG").[22] Specifically, the plaintiff alleged

that the defendant should have applied the "purchase" accounting method to the merger

rather than the "pooling of interests" method. [23] According to the plaintiff, the decision

to use "pooling of interests" accounting was a negligent GAAP violation.[24] The plaintiff

further alleged that had the proper method of accounting been applied to the transaction,

the relevant financial facts would have been clear, and the merger would not have

occurred.[25]

---

[20] *See Goss*, 567 F. Supp. at 622 (concluding that the plaintiff failed to prove by a preponderance of the evidence that the defendant was negligent in selecting the method of accounting to be applied to a merger).

[21] *See id.* at 611.

[22] *See id.*

[23] *See id.*

[24] *See id* at 618-19.

[25] *See id.* at 617.

Prior to trial, both parties filed for summary judgment. The trial court reserved ruling on the motions and held a bench trial.[26] At the bench trial, both the plaintiff and the defendant offered expert testimony as to the proper method of accounting, and as to whether the "purchase" or "pooling of interests" method was more appropriate under GAAP.[27] Plaintiff's experts and defendant's experts were in complete disagreement as to the accounting method that GAAP required to be applied to the merger.[28]

After the bench trial, the court considered and denied the motions for summary judgment and found in favor of the defendant as a matter of fact.[29] If the reasoning of *Goss* is followed by a court applying Texas law, the issue of whether an accountant is negligent in the application of a GAAP principle to a set of facts becomes a question for the fact-finder if both the plaintiff and the defendant produce qualified expert testimony on the question.

Similarly, in the securities law context, the district court in *Clark v. Cameron-Brown Co.,*[30] denied summary judgment to a defendant accounting firm on a securities law misrepresentation claim when both the plaintiffs and the accounting firm came forward with expert testimony on the question of whether the accounting treatment approved for certain commitment fees was appropriate. As the court explained: "The

---

[26] *See id.* at 612.

[27] *See id.* at 619.

[28] *See id.*

[29] *See id.* at 612, 622. Based on the evidence at trial, the court found for the defendant, because the plaintiff failed to prove, by a preponderance of the evidence, that the defendant was negligent in its selection of the method of accounting for the merger. In reaching this conclusion, the court emphasized that at the time of the merger, GAAP provided no clear answer to the question of which accounting method should be applied. *See id.* at 622.

[30] *Clark v. Cameron-Brown Co.,* No. C-75-65-G, 1980 WL 1416 (M.D.N.C., June 16, 1980).

parties' experts differ on whether commitment fees were properly included as income in the period in which received . . . . When a fact finder is called upon to resolve 'differing versions of the truth,' it is evident that summary judgment is inappropriate and the case must proceed to trial."[31]

A review of the case law reveals that most accounting malpractice cases do not deal with questions concerning the proper application of accounting principles, such as the ones at issue in *Goss* and *Clark*. Instead, most reported cases deal with alleged GAAS violations that lead to audit failures, i.e., typically in the context of a failure by the auditor to detect the relevant facts. The following cases illustrate circumstances in which auditors have failed to exercise the requisite degree of care, skill and competence as defined by GAAS.

In a case arising in Texas, *Greenstein, Logan & Co. v. Burgess Marketing, Inc.*,[32] the plaintiff sued the defendant accounting firm for professional malpractice, alleging that the defendant failed to perform audits in accordance with GAAS. At trial, expert witnesses established that GAAS set forth the standard of care and skill required of reasonably competent certified public accountants in the performance of audits,[33] and how the defendants had departed from GAAS.[34] Specifically, the expert testimony established that a tax delinquency would have been easily discovered during the audits if

---

[31] *Id.* at 3; *cf. Graham v. Taylor Capital Group, Inc. (In re Reliance Sec. Litig.),* 91 F. Supp. 2d 706, 727 (D. Del. 2000) (denying a motion to dismiss Rule 10b-5 securities claim against an accounting firm and observing that, "by stating that the Company's financial disclosure statements were in compliance with GAAP, [the defendant] may have made accounting judgments that no reasonable accountant would have made if confronted with the same facts").

[32] 744 S.W.2d 170 (Tex. App. 1987).

[33] *See id.* at 185.

[34] *See id.*

- 10 -

the defendant had adhered to GAAS.[35]  The court held that expert evidence was both

legally and factually sufficient to support the finding that the failure to perform the audits

in accordance with GAAS was negligence.[36]

In *Bankruptcy Services, Inc. v. Ernst & Young (In re CBI Holding Co.)*,[37]

Ernst & Young ("E&Y") was held liable for malpractice.[38]  In particular, the court found

that E&Y was negligent in failing to detect unrecorded liabilities of almost $2 million, an

amount which was material, and which meant that the audited financial statements did

not fairly present, in all material respects, the financial condition of CBI Holding Co.

("CBI") and the results of CBI's operations and cash flow in accordance with GAAP.[39]

The court described several requirements of GAAS that it found that E&Y did not meet,

including:   (i) that the auditor approach the audit with an appropriate degree of

skepticism;[40] (ii) that the auditor maintain an independence in mental attitude;[41] and (iii)

that the auditor design the audit to provide reasonable assurance of detecting errors and

irregularities in the financial statements.[42]

---

[35] *See id.*

[36] *See id.* at 185-86; *see also In re Sunpoint Sec., Inc.*, 262 B.R. at 400 (holding that the plaintiffs sufficiently alleged a breach of the duty of care; plaintiffs alleged that defendants failed to properly audit the liabilities of the company, failed to properly calculate net capital, failed to accurately present the financial condition of the company, failed to confirm material balances in custodial accounts, and failed to investigate and present liabilities).

[37] 247 B.R. 341 (Bankr. S.D.N.Y. 2000).  This Annex includes accountant malpractice cases from jurisdictions other than Texas, because these cases illustrate GAAS violations.  Although not binding in Texas, these and other cases might provide persuasive authority to a court applying Texas law.

[38] *See id.* at 362.

[39] *See id.* at 361-62.

[40] *See id.* at 349.

[41] *See id.* at 363.

[42] *See id.*

E&Y claimed that its failure to comply with GAAS was excused because "certain members of CBI management intentionally withheld from E&Y the invoices in respect of the unrecorded liabilities."[43]  The court rejected this argument, reasoning that GAAS requires an auditor to design the audit to provide reasonable assurance of detecting errors and irregularities in the financial statements.[44]  According to the court, "irregularities" are defined as "intentional misstatements or omissions of amounts or disclosures in financial statements."[45]  Citing to SAS 19,[46] the court noted that "management representations 'are not a substitute for the application of those auditing procedures necessary to afford a reasonable basis for the accountant's opinion on the financial statements.'"[47]

As illustrated by the foregoing overview of selected case law, accountants breach their professional duties when they fail to "exercise the degree of care, skill and competence that reasonably competent members of their profession would exercise under similar circumstances."[48]  The issue of whether accountants have complied with their

---

[43] *Id.* at 355.

[44] *Id.*

[45] *Id.* (citing GAAS, AU § 316.03).

[46] Client Representations, Statement on Auditing Standards No. 19 (American Institute of Certified Public Accountants 1977) ("SAS19").  SAS 19 was replaced by SAS 85 in November 1997.  *See* Management Representations, Statement on Auditing Standards No. 85 (American Institute of Certified Accountants 1997) (AU § 333).

[47] 247 B.R. at 355; *see also Curtis Packaging Corp. v. KPMG, LLP,* No. CV-99-0156558-3, 2002 WL 31015828, at *2 (Conn. Super. Ct. July 31, 2002) (finding KPMG negligent in the performance of its professional duties when it failed to detect an ongoing scheme of an outsourced payroll service that stole approximately $2.5 million over several years and holding that "[w]hether KPMG met the GAAS obligations is dispositive of the case"); *Sharp Int'l Corp. v. KPMG LLP (In re Sharp Int'l Corp.),* 278 B.R. 28, 34 (Bankr. E.D.N.Y. 2002) (refusing to dismiss complaint against KPMG that alleged GAAS violations related to the failure to uncover the fraudulent scheme of the client's CEO and CFO, including allegations that "KPMG allegedly failed to gather sufficient competent evidential matter to support the financial statements, its audit reports, and its unqualified opinions regarding Sharp's financial statements, and KPMG also allegedly failed to exercise the requisite skepticism throughout the auditing process").

[48] *Greenstein,* 744 S.W.2d at 185.

- 12 -

duties is determined by reference to GAAP and GAAS, generally with the assistance of expert testimony.[49]

*Proximate Cause*

To prove a claim for professional malpractice, a plaintiff must not only show duty and breach, but also demonstrate that the breach proximately caused the plaintiff's injuries.[50]    Proximate cause consists of cause in fact and foreseeability.[51]    In the *Greenstein* case, discussed above, the Texas Court of Appeals held that "[a] certified public accountant should reasonably foresee that his failure to detect material errors or falsifications in a client's books during an audit will likely result in continued errors and falsifications."[52]  Similarly, while accountants should foresee that their clients will rely on their audits,[53] the actual knowledge of the client's employees regarding the true financial condition of the client raises issues of imputation and actual reliance.[54]

---

[49] *See Goss,* 567 F. Supp. at 617; *Greenstein,* 744 S.W.2d at 185; *Clark v. Cameron-Brown Co.,* 1980 WL 1416, at *3.

[50] *See FDIC v. Ernst & Young,* 967 F.2d 166, 170 (5th Cir. 1992); *Resolution Trust Corp. v. Coopers & Lybrand,* 915 F. Supp. 584, 588 (S.D.N.Y. 1996).  It should be noted that some of the same issues that arise in the context of an analysis of proximate cause may also arise in the context of an analysis of the affirmative defense of comparative fault.

[51] *See Greenstein,* 744 S.W.2d at 186.

[52] *Id.*

[53] *See id.* at 186-87 (holding that the jury could have found that the defendant accounting firm should have foreseen that the plaintiff-client would rely on the accuracy of the audits).

[54] *See FDIC v. Ernst & Young,* 967 F.2d 166, 170 (5th Cir. 1992) (observing that upon a showing that a corporate plaintiff's agent had knowledge as to the true financial condition of the company, the question arises as to whether this knowledge should be attributed, or "imputed" to the corporate plaintiff, thereby barring recovery from the accountant).  This imputation analysis can arise in different contexts, such as reliance (for which the plaintiff would have the burden of proof) or the affirmative defense of comparative fault (for which the defendant would have the burden of proof).  The imputation doctrine is discussed in further detail below, under the heading of "Defenses."

Typically, proximate cause is a question of fact for the fact-finder.[55]  Even when

the misconduct of another party is alleged to have intervened, the issue is generally for

the fact-finder:  "When the misconduct of the third party is a foreseeable consequence of

the defendant's inattentiveness, the misconduct generally is not considered an intervening

act [that defeats a showing of proximate cause]."[56]

### C.    Aiding and Abetting a Breach of Fiduciary Duty

In addition to a potential claim for malpractice, as discussed briefly below, several

reported cases have held that accountants may be held liable to their corporate clients if

they have aided and abetted an officer's breach of fiduciary duty to the corporation.[57]

In *Smith ex rel. Estates of Boston Chicken, Inc. v. Arthur Andersen L.L.P.*,[58] the

plaintiff bankruptcy trustee alleged that Andersen aided and abetted the breach of

fiduciary duties of the individual officer and/or director defendants, as follows:

> [E]ach of the Professional Defendants acted in concert with the Individual
> Defendants to increase Boston Chicken's insolvency by falsely and
> unlawfully misrepresenting the true financial condition of Boston
> Chicken, while at the same time concealing the Individual Defendants'
> misconduct and breaches of fiduciary duty.   In so doing, the Professional

---

[55] *See N. Am. Van Lines, Inc. v. Emmons*, 50 S.W.3d 103, 114 (Tex. App.  2001) (recognizing that proximate cause is a fact issue usually left to the jury).

[56] *Id.* at 115.

[57] As discussed in Appendix B (Legal Standards) to the Third Interim Report, the standard for aiding and abetting another's breach of fiduciary duty under Texas Law is "knowing participation" in the breach.  *See Lone Star Partners v. NationsBank Corp.*, 893 S.W. 2d 593, 601 (Tex. App. 1994).  The standard adopted by Oregon for an aiding and abetting claim is "knowledge and substantial assistance" in the breach.  *See Granewich v. Harding*, 985 P.2d 788 (Or. 1999).  These standards for determining whether the defendant aided and abetted a breach of fiduciary duty seem to be similar.  For that reason, the Examiner may refer to these standards interchangeably to describe the elements of aiding and abetting claims under Texas and Oregon law.  In addition, since there are few reported cases concerning allegations that an accountant has aided and abetted the breach of fiduciary duty under Texas or Oregon law, this annex considers cases from other jurisdictions, as such cases likely would be instructive to a Texas or Oregon court considering the issues.

[58] 175 F. Supp. 2d 1180 (D. Ariz. 2001).

- 14 -

Defendants assisted the Individual Defendants in maintaining the facade of growth and solvency while allowing Boston Chicken to become more and more insolvent over time as the Company was increasingly encumbered with obligations, including publicly issued notes, that could not be repaid.[59]

Andersen filed a motion to dismiss the estate's claims for breach of fiduciary duty and aiding and abetting a breach of fiduciary duty. The district court denied the accounting firm's motion to dismiss the aiding and abetting count.[60]

In *Koken v. Steinberg*,[61] the Insurance Commissioner of Pennsylvania, as liquidator of an insolvent insurance company, sued Deloitte & Touche, LLP ("Deloitte") for aiding and abetting breaches of fiduciary duty by the officers and directors of the insurance company. In essence, the plaintiff alleged that the company had been "looted" through a series of improper intercompany transactions. The plaintiff alleged details of the fiduciary duty breaches committed by the officers and directors, and that Deloitte had knowledge of the breaches of those duties. The plaintiff further alleged that Deloitte had rendered substantial assistance in aiding the breaches, causing damage to the company. Based on these allegations, the court refused to dismiss the aiding and abetting count of the complaint.[62]

---

[59] *See id.* at 1191.

[60] *Id.* at 1201.

[61] 825 A.2d 723 (Pa. Commw. Ct. 2003).

[62] *See also Hendricks v. Grant Thornton*, 973 S.W.2d 348 (Tex. App. 1998) (sustaining claim against accounting firm for aiding and abetting a breach of fiduciary duty); *Curiale v. Peat, Marwick, Mitchell & Co.*, 630 N.Y.S.2d 996 (N.Y. App. Div. 1995) (reinstating jury verdict against accounting firm based on a claim of aiding and abetting fraud, based in part on evidence that: (1) its client insurance company had issued a press release reporting positive results and claiming falsely that the accounting firm had audited those results; and (2) that the accounting firm had taken no steps to correct the misrepresentations and had taken an active role in disseminating them).

### D.   **Defenses**

*Introduction*

This section considers two defenses to a claim for accounting malpractice: statutory proportionate responsibility and the equitable doctrine of *in pari delicto*, both of which are grounded upon comparative fault concepts. Because both of these potential defenses require consideration of whether and what knowledge and conduct by the client's officers may be imputed to the client itself, the discussion of these defenses is preceded by a discussion of relevant imputation principles.

*Relevant Imputation Principles*

For purposes of imputation analysis, the wrongful conduct of a corporation's officers may be divided into two categories:  (1) negligent acts; and (2) intentional wrongdoing.  With respect to negligent acts committed by a corporation's officers in the scope of their employment, the imputation analysis is straightforward.  Under settled principles of agency law, these acts are imputed to the corporation as acts of the corporation itself.[63]

With respect to acts of intentional wrongdoing, the analysis is considerably more complex.  Under Texas law, the general rule is that intentional wrongdoing *on behalf of* a corporation is imputed to the corporation, while intentional wrongdoing *against* a corporation is not imputed to the corporation.[64]  While this rule is easily stated, its application is more difficult.  Indeed, as illustrated by the following cases, courts have

---

[63] *See, e.g., Agristor Credit Corp.*, 568 S.W.2d at 426 (recognizing the "rule of law that the negligence, inadvertence, or mistake of the agent is imputed to the principal").

[64] *See, e.g., FDIC v. Ernst & Young*, 967 F.2d 166, 171 (5th Cir. 1992)

sometimes reached arguably inconsistent results in determining what sort of intentional wrongdoing is on behalf of the corporation verses against the corporation.[65]

In *Greenstein*, discussed above, the defendant accounting firm argued that the misconduct of the client's comptroller should be imputed to the client itself to defeat the client's malpractice claim. In support of this defense, the accounting firm emphasized the comptroller's admissions that he had intentionally underpaid taxes owed and then lied to the defendant during the audits.[66] Relying on this testimony, the defendant argued that the comptroller acted fraudulently, and that this fraud was imputed to the plaintiff.

The court of appeals rejected this argument, holding that even if the plaintiff's comptroller had acted fraudulently, the defendant could not automatically attribute this fraud to the plaintiff.[67] The court emphasized that only fraud *on behalf of* a corporation, which benefits the shareholders and harms creditors, could be imputed to a corporation.[68] The court held further that the defendant could not impute the comptroller's intentional acts to the plaintiff because it failed to establish, either as a matter of law or by favorable

---

[65] This analysis would have more utility if it focused in the first instance on whether the officer's conduct breached a duty owed the company, rather than whether the conduct was on behalf of or against the company. If the wrongdoing at issue concerns the breach of a fiduciary duty *owed the company*, then it would seem to follow as a matter of logical reasoning that this wrongdoing is "against the company" and should not be imputed to the company.

[66] *See Greenstein*, 744 S.W.2d at 190.

[67] *See id.*

[68] *Greenstein*, 744 S.W.2d at 190. Texas courts have also held that when an agent acts in part for its own benefit and for the benefit of its principal, the knowledge of the agent is imputed to the principal. *See Crisp v. Southwest Bankshares Leasing Co.*, 586 S.W.2d 610, 615 (Tex. App. 1979); *see also Askanase v. Fatjo*, 130 F.3d 657, 666 (5th Cir. 1997) (stating that in order for a plaintiff to avoid imputation, the plaintiff must show that the officers acted entirely for their own purposes).

- 17 -

factual findings on disputed facts, that the comptroller committed the fraud on behalf of the plaintiff.[69]

On the facts of *Greenstein*, the court held that the evidence had raised factual issues as to the comptroller's motivation for underpaying the corporation's taxes and that the evidence was inconclusive as to whether the plaintiff's principal owner had even known about the tax delinquency.[70]  In the appellate court's view, the evidence tended to show that the plaintiff was "grievously harmed" by the comptroller's fraud.[71]  Because the defendant had failed to resolve "these fact issues in its favor by appropriate jury findings or conclusive proof," the court held that the comptroller's misconduct should not be imputed to the plaintiff.[72]

Similarly, in *Holland v. Arthur Andersen & Co.*,[73] the court declined to impute to the company the knowledge of certain of its officers.[74]  The court agreed with the bankruptcy trustee that Andersen committed malpractice in failing to inform management of the company's true financial condition and that, as a result, the company remained in business past the point of insolvency.[75]  Andersen contended that some members of

---

[69] *Greenstein*, 744 S.W. 2d at 191.

[70] *See id.* at 191.  Although the court made no reference to the *Wagoner* Rule or to the "innocent decision-maker" exception to the *Wagoner* Rule, *see* Third Interim Report, Appendix B (Legal Standards), *Standing Issues*, the holding of *Greenstein* would appear to be consistent with the rationale for the innocent decision-maker exception.  *Cf. FDIC v. Ernst & Young*, 967 F.2d at 171-172 (emphasizing that the *sole* shareholder and CEO engaged in the wrongful conduct).  There are no Texas cases that consider whether the existence of an innocent decision-maker can be a bar to imputation, but the existing Texas law does not seem to preclude such a holding.

[71] *Greenstein*, 744 S.W. 2d at 191.

[72] *See id.*

[73] 469 N.E.2d 419 (Ill. App. Ct. 1984).

[74] *See id.* at 427.

[75] *See id.* at 428.

management were aware of the deteriorating financial condition, and that this knowledge should be imputed to the company.  The court disagreed, holding that prolonging a company's existence beyond the point of insolvency does not benefit the company and that management's knowledge was therefore not subject to imputation.[76]

In contrast, in *FDIC v. Ernst & Young*, the Court of Appeals for the Fifth Circuit imputed the knowledge of the plaintiff's CEO and sole shareholder to the plaintiff.[77]  In *Ernst & Young,* the FDIC, in its capacity as assignee of a failed savings and loan (Western), brought a malpractice action against the defendant accounting firm, Ernst & Young.[78]  The claims were related to audits of Western by E&Y's predecessor, Arthur Young.  During the relevant period, Western's CEO, Woods, was Western's sole shareholder and controlled Western.[79]  The FDIC alleged that Woods engaged in practices that made Western appear profitable on its books, when in fact it was unprofitable.[80]

The district court granted summary judgment to the defendant.[81]  Affirming, the Fifth Circuit Court of Appeals explained that the case was essentially "a client case in which a client is suing its auditor."[82]  For that reason, the FDIC could only assert claims

---

[76] *See id.* at 427; *see also First Nat'l Bank v. Brumleve & Dabbs*, 539 N.E.2d 877 (Ill.  App. Ct. 1989).

[77] *Ernst & Young*, 967 F.2d at 170 (discussing imputation and *in pari delicto* principles in the context of finding no reliance by plaintiff on defendant's audits).

[78] *See id.* at 169.

[79] *See id.* at 168.

[80] *See id.*

[81] *See id.*

[82] *Id.*

that Western could have asserted itself, and the FDIC was subject to any defenses to which Western would have been subject.[83]

With respect to the malpractice claim, the court of appeals held that the FDIC had to prove that Western had relied on Arthur Young's audit.[84] Because the evidence showed clearly that Woods, the wrongdoing CEO and sole shareholder who had dominated the bank, had not relied on the audit, the court affirmed the grant of summary judgment in favor of the defendant.[85] The court explained that Woods had always been aware of the bank's true financial condition and had made false entries in the bank's records in an attempt to deceive the auditors and creditors.[86]

In considering whether Woods' knowledge should be imputed to Western, the court stated the rule that if an employee acts fraudulently *against* its corporate employer, then that employee's knowledge is not imputed to the corporation.[87] Conversely, the court explained that fraud *on behalf of* the corporation benefits the shareholders of the corporation and injures outsiders, such as creditors, and that when fraud is committed for the benefit of the corporation, the benefiting shareholders cannot later escape responsibility for the fraud.[88] Applying this rule to the facts, the court held that the Woods' fraud benefited himself and harmed outsiders, such as creditors.[89] By serving

---

[83] *See id.*

[84] *See id.* at 170.

[85] *See id.*

[86] *See id.*

[87] *See id.*

[88] *See id.* (citing *Greenstein,* 744 S.W.2d at 190-91).

[89] *See id.*

himself, Woods benefited Western, because he was the *sole* shareholder and CEO.[90]  For

that reason, the court of appeals imputed Woods' knowledge and conduct to the bank.[91]

Because the knowledge of the true financial condition was imputed to the bank, the FDIC

could not make out a cause of action for malpractice against the defendant.[92]

As demonstrated above, the determination of whether a corporate officer's

misconduct is *on behalf of* a corporation or *against* the corporation is a fact-intensive

inquiry.  Courts have taken arguably inconsistent positions in making this determination.

For instance, some cases have suggested that when an officer does not steal from a

corporation, but artificially inflates profits, then the fraud is *on behalf of* the

corporation.[93]  These cases suggest that the company and its shareholders benefit from

such conduct, and that such conduct must be imputed to the corporation for that reason. [94]

The analysis applied by these cases may be superficial, however, because a

determination of whether misconduct inflating a company's financial position benefits

shareholders depends on the time period on which the inquiry is focused.[95]  While

shareholders may benefit at the time the corporation appears profitable (before the

unsound practices come to light), shareholders who do not sell their stock before the truth

comes to light do not benefit later when the unsound accounting practices lead the

---

[90] *See id.*

[91] *See id.*

[92] *See id.*

[93] *See FDIC v. Shrader & York*, 991 F.2d 216. 225 (5th Cir. 1993); *Cenco Inc. v. Seidman & Seidman*, 686 F.2d 449, 454 (7th Cir. 1982).

[94] *See Shrader & York*, 991 F.2d at 225; *Cenco Inc.*, 686 F.2d at 454.

[95] *See Cenco Inc.*, 686 F.2d at 456 (observing that stockholders benefit from officer's committing fraud on behalf of the corporation even though the stockholders may not be "net beneficiaries, after the fraud is unmasked and the corporation is sued").

corporation into bankruptcy.[96]  Accordingly, as discussed above, some cases have held that prolonging a company's existence beyond the point of insolvency does not benefit the company.   These cases suggest that management's intentional misconduct in engaging in unsound accounting practices that inflate the company's financial position is not misconduct subject to imputation.[97]

*Comparative Fault.*  To the extent that an accountant-defendant is successful in imputing the wrongful conduct of its client's officers to the client itself, the accountant can rely on comparative fault principles to seek to reduce the client's recovery or to bar recovery altogether.  As discussed below, these comparative fault principles apply to both intentional and negligent torts, and thus would have potential application to both accountant malpractice claims and claims for aiding and abetting a breach of fiduciary duty.  In Texas, these comparative fault principles may be derived from two sources.  First, they are embodied in a "Proportionate Responsibility" statute.  Second, they are

---

[96] *See Greenstein,* 744 S.W.2d at 191 (holding that evidence tended to show that the comptroller's underpayment of taxes "grievously harmed" the company and that there should be no imputation).

[97] *See Holland,* 469 N.E.2d at 427; *see also First Nat'l Bank v. Brumleve & Dabbs,* 539 N.E.2d 877 (Ill. App. Ct. 1989).  As noted in this Appendix B (Role of Andersen) to the Final Report, SAS 61 requires auditors "to ensure that the audit committee receives additional information regarding the scope and results of the audit that may assist the audit committee in overseeing the financial reporting and disclosure process for which management is responsible."  SAS 61, at § 380.02 (AU § 380.02).  Furthermore, auditors of public companies have a duty "to discuss with the audit committee the auditor[s'] judgments about the quality, not just the acceptability, of the company's accounting principles and underlying estimates in its financial statements."  SAS 61, at § 380.11 (AU § 380.11).  Therefore, auditors have a duty to their corporate clients to inform the clients' audit committees regarding the effects of high risk accounting techniques engaged in by management.  *See id.*  If imputation were to bar or reduce recovery in each instance in which corporate officers misuse such techniques to artificially improve reported financial results, then the auditor's duty under SAS 61 would be rendered less meaningful, even when the facts support a finding that the performance of this duty would have ended the wrongful conduct and the resulting harm to the company.  It is at least questionable whether such a result would be consistent with sound public policy.

- 22 -

reflected in the equitable doctrine of *in pari delicto*.[98] Both of these sources of comparative fault principles are analyzed below.

*Statutory Proportionate Responsibility.* As mentioned above, Texas has enacted a "Proportionate Responsibility" statutory framework that applies to torts, including both intentional torts and torts grounded in negligence.[99] Under Texas law, "a claimant may not recover damages if his [or her] percentage of responsibility is greater than 50 percent."[100] However, if a claimant is partially at fault, but does not bear more than 50% of the responsibility, then the claimant can recover.[101] In that circumstance, the claimant's recovery would be reduced pro rata by the percentage of the claimant's responsibility.[102]

There are no reported Texas cases applying the current version of the Texas Proportionate Responsibility statute in the context of professional malpractice by an accountant. However, under common law principles of contributory negligence (prior to enactment of the Proportionate Responsibility statute), the Texas Court of Appeals held

---

[98] As discussed below, it is not entirely clear whether and to what extent the Texas Proportionate Responsibility statute has displaced the *in pari delicto* doctrine

[99] *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 33.001 – 002 ("Proportionate Responsibility").

[100] Tex. Civ. Prac. & Rem. Code Ann. § 33.001.

[101] *See* Tex. Civ. Prac. & Rem. Code Ann. § 33.012(a) ("If the claimant is not barred from recovery under Section 33.001, the court shall reduce the amount of damages to be recovered by the claimant with respect to a cause of action by a percentage equal to the claimant's percentage of responsibility.").

[102] *See id.* The statute draws no distinctions based upon whether the claimant's responsibility arises from negligent or intentional misconduct. Subject to certain exceptions, in the case of multiple defendants, any defendant bearing more than 50% of the responsibility is jointly and severally liable with his or her codefendants for the entirety of the damages that may be recovered by the claimant, whereas those codefendants with lesser responsibility are liable only for their proportionate share of the damages. *See* Tex. Civ. Prac. & Rem. Code Ann. § 33.013. *But see Mims v. Kennedy Capital Mgmt., Inc. (In re Performance Nutrition, Inc.),* 239 B.R. 93, 112 (Bankr. N.D. Tex. 1999) (holding that "[p]arties who knowingly join a fiduciary in breaching his fiduciary duties are jointly and severally liable with that fiduciary," but not mentioning the Texas Proportionate Responsibility statute).

- 23 -

in *Greenstein* that a client's negligence is only a defense when the negligence contributed to the auditor's failure to perform its duties.[103]

In *Greenstein*, the plaintiff brought a suit for accounting malpractice against its former auditor, and the defendant contended on appeal that the plaintiff's contributory negligence should have barred the plaintiff's recovery.[104]   Specifically, the defendant argued that the plaintiff's comptroller had negligently performed his duties.[105]   Affirming the trial court, the appellate court rejected this defense.[106]   The court explained that an accountant has a duty to comply with GAAS, while a client has a duty not to interfere with audits.[107]   Examining authority in other states, the court of appeals adopted the rule that the defendant had to establish not only that the plaintiff had been negligent, but also that the plaintiff's negligence contributed to the accounting firm's failure to perform its audits in conformance with GAAS.[108]

Although *Greenstein* was not decided under the current Proportionate Responsibility statute, the case has not been overruled, and its rule – that a client's negligence is only a defense when that negligence contributed to the auditor's failure to perform its duties – could be applied with equal force under the current Proportionate Responsibility regime.[109]   Thus, a Texas court could adhere to the rule of *Greenstein* and

---

[103]  *See Greenstein,* 744 S.W.2d at 190.

[104]  *See id.* at 190.

[105]  *See id.*

[106]  *See id.*

[107]  *See id.*

[108]  *See id.*

[109]  *See Steiner Corp. v. Johnson & Higgins,* 135 F.3d 684, 690 (10th Cir. 1998) ("We are convinced that under either a comparative or contributory negligence regime, the acts of the client in getting into the

only consider the plaintiff's fault that interfered with the auditor's ability to conduct its audits in conformance with GAAS, when determining the proportionate responsibility of the parties.

Assuming that the rule of *Greenstein* is applicable in the context of the current Texas Proportionate Responsibility statute, in determining a client's comparative responsibility in a professional malpractice case brought against an accountant, a Texas court should consider only conduct by the client that interfered with Andersen's ability to conduct its audits in apportioning fault among the responsible parties.

There are no Texas cases applying the Texas Proportionate Responsibility statute in the context of a claim for aiding and abetting the breach of a fiduciary duty. It is clear, however, that the statute applies to intentional torts.[110] Accordingly, with respect to a claim by a corporation against an accountant for aiding and abetting a breach of fiduciary duty, if the underlying officer misconduct is imputed to the corporation, it appears that the Proportionate Responsibility statute would govern apportionment of the damages.

---

circumstances, which he employs the professional to remedy, may not be asserted to avoid liability for the professional's own subsequent negligence."). However, in *Halla Nursery, Inc. v. Baumann-Furrie & Co.*, 454 N.W.2d 905, 910 (Minn. 1990), the Supreme Court of Minnesota did not apply this rule to a malpractice claim against an accounting firm for failing to discover embezzlement by the client's bookkeeper. The court noted that courts in some jurisdictions, including Texas and New York, had adopted the rule that the negligence of the client is only a defense when it has contributed to the accountant's failure to perform its duties. *See id.* at 908. The court also noted that this rule had "been considered by commentators to be the better rule on policy grounds." *See id.* at 908. Nevertheless, the court stated that Minnesota had a broad, expansive doctrine of comparative fault and held that the trial court did not err in taking into consideration the client's relative fault in determining the comparative fault of the parties. *See id.* at 909. At the same time, the court stated that there could be a case for which "a limiting exception might be necessary, for example, where the scope of employment is such that discovery of defalcations is clearly encompassed." *Id.*

[110] *See* Tex. Civ. Prac. & Rem. Code Ann. § 33.002 ("Except as provided by Subsections (b) and (c), this chapter applies to any cause of action based on tort . . . ."); *see also Burlington N. Ry. Co. v. General Projection Sys., Inc.*, No. 05-97-00425-CV, 2000 Tex. App. LEXIS 5253, at *39 n.9 (Tex. App. Aug. 8, 2000) (unpublished).

- 25 -

Specifically, if the client's own (imputed) wrongful acts caused the client to bear more than 50% of the responsibility, the client's recovery would be barred altogether, whereas if the client's wrongful acts caused the client to bear a lesser proportion of the responsibility, the client's recovery would be reduced accordingly.

*In Pari Delicto*

In addition to relying on the Texas Proportionate Responsibility statute to bar or reduce a plaintiff's recovery, an accountant-defendant might rely on common law equitable principles of *in pari delicto* to bar a plaintiff's recovery.[111] *In pari delicto* means "in equal fault" and when it applies, the courts "will leave the parties as they find them,"[112] meaning that recovery is barred altogether. As noted in the Third Interim Report, the Second Circuit has observed a "paucity" of cases in Texas applying the doctrine of *in pari delicto*, but the doctrine may apply when the fault of the parties is "mutual, simultaneous, and relatively equal."[113]

There are no Texas cases examining directly whether the common law of *in pari delicto* in the tort context survived the enactment of the Texas Proportionate Responsibility statute. However, in other contexts (such as the enforcement of contracts) the doctrine appears to remain in force.[114] Assuming that the doctrine remains in force

---

[111] As noted in the Third Interim Report, this defense might apply under Texas or Oregon law. However, if a New York court determined that Oregon law applied (to an aiding and abetting breach of fiduciary duty claim), the court might apply the *Wagoner* standing analysis instead of considering similar issues in the context of the *in pari delicto* defense. The *Wagoner* rule is discussed in detail in the Third Interim Report and will not be repeated here. *See* Third Interim Report, Appendix B (Legal Standards), at 62-79.

[112] *Sacks v. Dallas Gold & Silver Exch., Inc.*, 720 S.W.2d 177, 180-81 & n.1 (Tex. App. 1986).

[113] *See Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 162 (2d Cir. 2003); *see also* Third Interim Report, Appendix B (Legal Standards), at 55-62.

[114] *See, e.g., New Boston Gen. Hosp., Inc. v. Texas Workforce Comm'n*, 47 S.W.3d 34 (Tex. App. 2001).

notwithstanding the enactment of the Texas Proportionate Responsibility statute, a
plaintiff found to be "in equal fault" with a defendant accountant would be unable to
recover from the accountant on either a malpractice claim or a claim for aiding and
abetting the breach of fiduciary duties.

## IV.   CONCLUSION

When an accountant provides professional services to a corporation, but fails to exercise the degree of care, skill and competence that reasonably competent members of the accounting profession would exercise under similar circumstances, then the accountant may be liable to the corporation for malpractice.  In addition, if an accountant with knowledge of the facts giving rise to an officer's wrongdoing renders substantial assistance to the wrongdoer, the accountant may be liable for aiding and abetting that officer's breach of fiduciary duty.

An accountant may raise affirmative defenses to malpractice or aiding and abetting the breach of fiduciary duty claims, based on concepts of comparative fault as reflected in the Texas Proportionate Responsibility statute and the common law doctrine of *in pari delicto*.  These defenses are dependent upon whether wrongful conduct of the corporate plaintiff's officers may be imputed to the corporation itself.  Such imputation will occur under familiar agency principles when the wrongdoing at issue involves negligence.  When the wrongdoing at issue involves intentional misconduct, however, the question of imputation will turn upon an inquiry as to whether the wrongdoing was on behalf of the corporation or against the corporation.  To the extent that the wrongful conduct of the officers is imputed to the corporation, the corporation's recovery of damages for malpractice or the aiding and abetting the breach of fiduciary duty may be wholly or partially defeated.

- 28 -

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------- x
                                        :

In re:                       :        Chapter 11
                                          :

**ENRON CORP.,** *et al.,*       :        Case No. 01-16034 (AJG)
                                          :

              Debtors.       :        Jointly Administered
                                          :

------------------------------------------------------- x

## APPENDIX C

### (Role of Enron's Attorneys)

to

## FINAL REPORT OF NEAL BATSON,
## COURT-APPOINTED EXAMINER

      Reference is made to the preceding Final Report of Neal Batson, Court-Appointed Examiner (the "Report"). This Appendix constitutes an integral part of the Report. All capitalized terms not otherwise defined herein shall have the meanings set forth in the Report

# TABLE OF CONTENTS

I.    INTRODUCTION ............................................................................. 1
      A.    Scope.................................................................................... 1
      B.    Theories of Potential Liability .............................................. 2
      C.    Overview of Matters Covered in the Appendix ..................... 6

II.   ENRON'S ATTORNEYS ................................................................. 15
      A.    Introduction ......................................................................... 15
      B.    Enron's In-House Legal Department ..................................... 16
      C.    Vinson & Elkins................................................................... 21
      D.    Andrews & Kurth ................................................................ 24

III.  ATTORNEYS' ROLE IN SPE TRANSACTIONS ........................... 26
      A.    Introduction ......................................................................... 26
      B.    FAS 140 Transactions and Vinson & Elkins ......................... 26
      C.    FAS 140 Transactions and Andrews & Kurth ....................... 52
      D.    Nahanni ............................................................................... 66
      E.    Sundance Industrial.............................................................. 72
      F.    Disclosure Issues and the SPE Transactions......................... 81

IV.   ATTORNEYS' ROLE IN TAX SPE TRANSACTIONS ................... 91
      A.    Introduction ......................................................................... 91
      B.    Condor Transaction.............................................................. 93
      C.    Tammy I Transaction ........................................................... 100

V.    ATTORNEYS' ROLE IN RELATED PARTY SPE TRANSACTIONS .......... 108
      A.    Introduction ......................................................................... 108
      B.    Chewco ............................................................................... 108
      C.    LJM1 ................................................................................... 114
      D.    LJM2 ................................................................................... 124
      E.    Raptors ................................................................................ 135
      F.    Disclosure Issues and the Related Party Transactions........... 145

VI.   ATTORNEYS' ROLE IN THE WATKINS INVESTIGATION...................... 159
      A.    The Anonymous Letters ....................................................... 159
      B.    Scope of Vinson & Elkins' Engagement ............................... 161
      C.    The Interview Process........................................................... 166
      D.    The Vinson & Elkins Report................................................. 176

VII.  ANALYSIS AND CONCLUSIONS ................................................. 179
      A.    Vinson & Elkins................................................................... 179
      B.    Andrews & Kurth ................................................................ 187
      C.    In-House Attorneys.............................................................. 190


Annex 1 – Legal Standards Applicable to Attorneys

# I.    INTRODUCTION

## A.    Scope

This Appendix considers the role of certain of Enron's attorneys—specifically, its in-house attorneys and two of its outside law firms (Vinson & Elkins and Andrews & Kurth)—in certain of Enron's SPE transactions and in Enron's disclosures concerning these transactions.[1]  This Appendix also considers the roles of Enron's attorneys in the Watkins Investigation.

As described more fully below, there is sufficient evidence from which a fact-finder could conclude that certain of Enron's attorneys involved in its SPE transactions (i) committed legal malpractice based on Texas Rule 1.12, (ii) committed legal malpractice based on negligence or (iii) aided and abetted the Enron officers' breaches of fiduciary duty.  These attorneys have defenses to such claims that would be presented to the fact-finder or the court, as applicable, including that such claims are barred or reduced by the wrongful conduct of Enron's officers under rules of comparative fault.

Both malpractice liability based on Texas Rule 1.12 (described below) and aiding and abetting liability require that an attorney have *actual knowledge* of wrongful conduct by Enron's officers.  The Examiner has reviewed a substantial amount of documentary and testimonial evidence.  In general, the evidence reveals little or no *direct* evidence of a particular attorney's knowledge of wrongful conduct by an Enron officer.  These attorneys affirmatively deny having any such knowledge.  In some instances, however,

---

[1] In the Second Interim Report, the Examiner described numerous Enron SPE transactions and identified many accounting, disclosure and other issues arising from those transactions.  In the Third Interim Report, the Examiner stated that there was sufficient evidence from which a fact-finder could conclude that: (i) certain senior officers of Enron breached their fiduciary duties under applicable law by causing the Debtors to enter into SPE transactions that were designed to manipulate the Debtors' financial statements and that resulted in the dissemination of financial information known by those officers to be materially misleading; and (ii) these wrongful acts caused direct and foreseeable harm to Enron itself, and resulting harm to innocent parties that dealt with Enron, including creditors in the Bankruptcy Case.

there is *circumstantial* evidence that would be sufficient for a fact-finder to infer that an attorney possessed such knowledge. That evidence is presented below. A fact-finder may draw alternative or contrary inferences from the same evidence.

### B.  <u>Theories of Potential Liability</u>

*Introduction*

The role of Enron's in-house attorneys and its outside counsel in Enron's SPE transactions is measured against two legal theories:[2]

- *Legal Malpractice* – whether there is sufficient evidence for a fact-finder to conclude that an attorney breached the standard of care owed to his client such that the attorney may be liable for damages to Enron, assuming that the claim is not barred by the conduct of Enron.

- *Aiding and Abetting a Breach of Fiduciary Duty* – whether there is sufficient evidence for a fact-finder to conclude that an attorney aided and abetted Enron's officers' breaches of fiduciary duty such that the attorney may be liable for damages to Enron, assuming that the claim is not barred by the conduct of Enron.

*Legal Malpractice*

An attorney (whether "in-house" counsel or "outside" counsel) may become liable to his or her client as a result of a failure to exercise the competence and diligence normally exercised by attorneys in similar circumstances. Such a failure, as well as reckless or knowing conduct that constitutes a breach of an attorney's duty to his or her client, is usually referred to as legal malpractice. To prevail on a claim for legal

---

[2]  In the case where a law firm has filed a claim against the Debtors, this Appendix also considers whether there is sufficient evidence for a court to conclude that such claims should be equitably subordinated to the claims of the other creditors. An attorney's claim filed in the Bankruptcy Case may be equitably subordinated to the payment of other claims filed in the case if (i) the attorney engaged in inequitable conduct and (ii) that conduct resulted in harm to other creditors. Several cases stand for the proposition that a creditor's participation in the debtor's misrepresentation of its financial condition to other creditors may constitute inequitable conduct that will justify the equitable subordination of the creditor's claim. If an attorney engaged in inequitable conduct by participating in Enron's misrepresentation of its financial condition, a fact-finder could conclude that other creditors were injured by this conduct because they relied on this information in extending (or continuing to extend) credit to Enron.

malpractice, Enron must prove: (i) the attorney owed a duty to Enron; (ii) the attorney breached this duty; (iii) there is a causal link between the breach and Enron's injury; and (iv) damages resulting from the breach. To establish an attorney's breach of his or her professional duty, Enron must show that the attorney failed to act as an attorney of reasonable prudence would have acted in a similar situation. As a general rule, a plaintiff must rely upon competent, admissible expert testimony to establish the relevant standard of care, the corresponding breach and causation. In this Appendix, a breach of such duty that is not intentional is referred to as "malpractice based on negligence."

A relevant rule of the Texas Disciplinary Rules of Professional Conduct (the "Texas Rules")[3] may be considered by a fact-finder in understanding and applying the standard of care for malpractice when that rule is designed for the protection of persons in the position of the plaintiff. Texas Rule 1.12 addresses the attorney's role when the attorney represents an organization (such as a corporation) and learns that a representative of the organization has committed or intends to commit a violation of a legal obligation to the organization (such as a breach of fiduciary duty) or a violation of law which reasonably might be imputed to the organization (such as the dissemination of misleading financial information). Ordinarily, an attorney must comply with the directives received from the officers of the corporate client. In the circumstances set forth in Texas Rule 1.12, however, the attorney "must take reasonable remedial actions" that are in the best interest of the organization. Those circumstances are:

---

[3] Texas Disciplinary Rules of Prof'l Conduct (available following Tex. Gov't Code Ann. § 84.004).

whenever the lawyer learns or knows that:

(1) an officer . . . has committed or intends to commit a violation of a legal obligation to the organization or a violation of law which reasonably might be imputed to the organization;

(2) the violation is likely to result in substantial injury to the organization; and

(3) the violation is related to a matter within the scope of the lawyer's representation of the organization.[4]

Remedial action may include "referring the matter to higher authority in the organization," which "if warranted by the seriousness of the matter," may mean the board of directors.[5] In some circumstances, the attorney may have to withdraw from the representation.[6] An analogous rule provides that an attorney may not participate in a client's fraudulent conduct.[7]

Thus, an attorney for Enron who knew that (i) an officer was engaging in wrongful conduct, (ii) substantial injury to Enron was likely to occur as a result of that conduct and (iii) the violation was within the attorney's scope of representation, but failed to take appropriate affirmative steps to cause reconsideration of the matter — including referral of the matter to a higher authority in the company, including, if appropriate, the Enron Board — would not have acted as an attorney of reasonable prudence would have acted in a similar situation. In some circumstances, the attorney would have to withdraw from the representation.[8] This Appendix refers to such a claim as "malpractice based on Texas Rule 1.12."

---

[4] Texas Rule 1.12(b).

[5] Id. at 1.12(c)(3).

[6] See Report, Annex 1 to Appendix C (Role of Enron's Attorneys).

[7] Texas Rule 1.02(c).

[8] Id. at 1.15(a)(1); see id. at 1.02, cmt. 8.

- 4 -

*Aiding and Abetting*

For an attorney to be liable for aiding and abetting, a fact-finder must first determine that there has been a breach of fiduciary duty by one or more Enron officers. If a fact-finder concludes that such a breach has occurred, the fact-finder may then consider whether an attorney is liable to Enron for aiding and abetting that breach if the evidence shows that: (i) the attorney had actual knowledge of the wrongful conduct giving rise to the breach; (ii) the attorney gave substantial assistance to the wrongdoer; and (iii) the resulting injury to the Debtors was the direct or reasonably foreseeable result of such conduct. While there is some authority to the contrary, the actual knowledge standard is strict — "should have known" or "suspicion" will not suffice. Also, "routine" services provided by an attorney will not constitute substantial assistance. Although the legal standards applicable to outside attorneys are also applicable to in-house attorneys, in light of the fiduciary duties that an in-house attorney who is an officer owes to the corporation as an officer, it is more appropriate to evaluate the actions of an in-house attorney on the basis of his or her fiduciary duties as an officer of the corporation rather than from the perspective of aiding and abetting.

*Defenses Available to Attorneys*

Enron's attorneys could raise several legal and factual defenses to these claims. Enron's attorneys may contend that the evidence is not sufficient to establish one or more essential elements of a claim (e.g., failure to meet the standard of care, knowledge of an officer's wrongful conduct). Enron's attorneys may assert that the wrongful acts committed by Enron's officers should be imputed to Enron. If the officers' wrongful conduct is imputed to Enron, then Enron's attorneys could assert that Enron's wrongful

conduct was greater than their wrongful conduct, and therefore claims by Enron should be barred or reduced under comparative fault rules.[9]

## C.    Overview of Matters Covered in the Appendix

*Vinson & Elkins*

Vinson & Elkins acted as outside counsel to Enron and certain of its affiliates in a wide variety of legal matters, including numerous SPE transactions consummated by the Debtors between 1997 and the Petition Date, many of which are identified in the Vinson & Elkins timeline set forth below in the section entitled *Enron's Attorneys, Vinson & Elkins*.

The Examiner concludes that there is sufficient evidence from which a fact-finder could determine[10] that Vinson & Elkins committed malpractice based on Texas Rule 1.12, aided and abetted a breach of fiduciary duty or committed malpractice based on negligence in connection with several transactions, assuming that such claims are not barred by the conduct of Enron's officers. The events or transactions where such liability

---

[9] *See* Report, Annex 1 to Appendix C (Role of Enron's Attorneys).

[10] In this Appendix, where the Examiner concludes that there is sufficient evidence for a fact-finder to determine that a malpractice claim based on Texas Rule 1.12 or based on negligence exists (or an element of such a claim is satisfied), such a conclusion also expresses the Examiner's view that a qualified expert engaged by Enron could reach such a conclusion. *See* Report, Annex 1 to Appendix C (Role of Enron's Attorneys); *see* Report, Introduction (Standard Adopted by the Examiner). A qualified expert engaged by an attorney may reach a different conclusion. Vinson & Elkins has offered certain opinions of law school professors and practitioners on several matters as to which the Examiner took testimony and gathered evidence concerning Vinson & Elkins' role as Enron's counsel on SPE Transactions and related public disclosure. *See, e.g.*, Letter from Mary G. Clark, Williams & Connolly LLP, to Rebecca M. Lamberth, A&B, Oct. 8, 2003, attaching Letter from John C. Coffee, Jr., Columbia Law School, to Williams & Connolly LLP, Oct. 8, 2003 [AB1128 01452-AB1128 01465]; Letter from Geoffrey Hazard, Trustee Professor of Law, University of Pennsylvania, to John K. Villa, Williams & Connolly LLP, Mar. 13, 2002 [AB1128 01480-AB1128 01489]; Letter from Charles W. Wolfram, Professor of Law Emeritus, Cornell Law School, to John K. Villa, Williams & Connolly LLP, Mar. 13, 2002 [AB1128 01490-AB1128 01496]; Letter from Geoffrey C. Hazard, Jr., Trustee Professor of Law, University of Pennsylvania, to John K. Villa, Williams & Connolly LLP, Oct. 5, 2003 [AB1128 01402-AB1128 01451]; Letter from Donald W. Glazer, Goodwin Proctor LLP, to John K. Villa, Williams & Connolly LLP, Oct. 5, 2003 [AB1129 00644-AB1129 00646].

- 6 -

may be found include Vinson & Elkins' representation of Enron with respect to the following:

- The delivery of true issuance opinions in connection with certain FAS 140 Transactions in light of Vinson & Elkins' knowledge of several points. Specifically, there is evidence that Vinson & Elkins knew that (i) these opinions did not address the critical issues under FAS 140, as Vinson & Elkins understood those issues, (ii) Andersen was using its opinions to support Enron's financial reporting and (iii) these transactions were significant to Enron's earnings.

- Project Nahanni, a transaction that had no business purpose except to create cash flow from operating activities at year-end 1999 through a loan that was "hardwired"[11] to be repaid within one month after closing.

- The Rhythms transaction, which was a hedge for financial statement purposes only and lacked any economic substance or rational business purpose, but was intended by certain of Enron's officers to manipulate Enron's financial statements.

- The Raptors transactions from January 2000 through their restructuring in early 2001, which provided hedges for financial statement purposes only, and which lacked any economic substance or rational business purpose, but were intended by certain of Enron's officers to manipulate Enron's financial statements.

- The delivery of a true sale opinion in the Sundance Industrial transaction that enabled Enron to book a $20 million gain, even though Vinson & Elkins knew that there was no valid business purpose for this feature of the transaction and that a valid business purpose was essential to a true sale opinion.

- Enron's related party transaction disclosure for the proxy statement filed in 2001, for which Vinson & Elkins rendered advice regarding the non-disclosure of the amount of Fastow's interest in LJM without knowing the amount of such interest even though Vinson & Elkins knew that Fastow wanted to prevent the Enron Board from learning how much he was making from the LJM transactions with Enron.

- Tax opinions in connection with certain Tax Transactions that enabled Enron to generate accounting income from projection of future tax savings.

---

[11] *See* Third Interim Report, Appendix C (Role of Enron's Officers) (defining "hardwired").

- The Watkins Investigation, without making full disclosure of Vinson & Elkins' role in the transactions being investigated, including the concerns Vinson & Elkins had about the transactions, some of which were similar to those raised by Watkins.

Vinson & Elkins has both legal and factual defenses that may defeat any such claims. Vinson & Elkins may dispute: (i) knowledge of wrongdoing; (ii) the existence of any duty, under the circumstances, to take "remedial actions"; (iii) that its actions constitute substantial assistance; (iv) causation; and (iv) that any damage to Enron was foreseeable. Vinson & Elkins may assert that these claims are barred or reduced by the conduct of Enron's officers, because of comparative fault rules. A fact-finder may find in Vinson & Elkins' favor on one or more of these defenses.

Vinson & Elkins filed claims in an unliquidated amount against each Debtor on account of its claimed rights of contribution, reimbursement, indemnity, setoff and recoupment in the Bankruptcy Case.[12] Vinson & Elkins' claims against the Debtors (including any claim that may arise in the event Vinson & Elkins makes a payment to the Debtors in connection with potential preferential transfers[13]) may be equitably subordinated if Vinson & Elkins engaged in inequitable conduct and such conduct resulted in injury to creditors or an unfair advantage to Vinson & Elkins. The same evidence referred to above, if resolved by a fact-finder against Vinson & Elkins, would permit a fact-finder to conclude that Vinson & Elkins engaged in inequitable conduct that allowed Enron to produce materially misleading financial statements. Enron's other

---

[12] *See, e.g.*, Proof of Claim of Vinson & Elkins L.L.P., filed against Enron in an unliquidated amount [Claim No. 0000010833].

[13] In the Third Interim Report, the Examiner identified approximately $6.2 million in payments to Vinson & Elkins that could be avoided as preferences pursuant to 11 U.S.C. § 547(b). *See* Third Interim Report, Annex 2 to Appendix J (Avoidance Actions), at Ex. A. This amount did not take into account any defenses Vinson & Elkins may have, however, such as a "new value" defense or a contention that the payments were in the ordinary course of business pursuant to 11 U.S.C. § 547(c). *Id.* at 14-15.

creditors were injured because such financial results were publicly reported and disseminated by Enron. Therefore, the Examiner concludes that sufficient evidence exists for a fact-finder to determine that the claims of Vinson & Elkins should be equitably subordinated to those of other creditors.

*Andrews & Kurth*

Andrews & Kurth acted as counsel to Enron and certain of its affiliates in the majority of the FAS 140 Transactions consummated by the Debtors between late 1998 and the Petition Date.

The Examiner concludes that there is sufficient evidence from which a fact-finder could determine that Andrews & Kurth committed malpractice based on Texas Rule 1.12, aided and abetted a breach of fiduciary duty or committed malpractice based on negligence in connection with these FAS 140 Transactions. A fact-finder could determine that Andrews & Kurth knew that Enron had no intention to relinquish control over, or the risks and rewards of, the assets transferred in certain of the FAS 140 Transactions and therefore was engaging in the FAS 140 Transactions to produce materially misleading financial statements.

Andrews & Kurth has both legal and factual defenses that may defeat any such claims. Andrews & Kurth may dispute: (i) knowledge of wrongdoing; (ii) the existence of any duty, under the circumstances, to take "remedial actions"; (iii) that its actions constitute substantial assistance; (iv) causation; and (v) that any damage to Enron was foreseeable. Andrews & Kurth may assert that these claims are barred or reduced by the conduct of Enron's officers, because of comparative fault rules. A fact-finder may find in Andrews & Kurth's favor on one or more of these defenses.

Andrews & Kurth has not filed a claim in the Bankruptcy Case, although a claim may arise in the event Andrews & Kurth makes a payment to the Debtors in connection with potential preferential transfers.[14] Any such claim may be equitably subordinated if Andrews & Kurth engaged in inequitable conduct and such conduct resulted in injury to creditors or an unfair advantage to Andrews & Kurth. The same evidence referred to above, if resolved by a fact-finder against Andrews & Kurth, would permit a fact-finder to conclude that Andrews & Kurth engaged in inequitable conduct that allowed Enron to produce materially misleading financial statements. Enron's other creditors were injured because such financial results were publicly reported and disseminated by Enron. Therefore, the Examiner concludes that sufficient evidence exists for a fact-finder to conclude that the claims of Andrews & Kurth should be equitably subordinated to those of other creditors.

*In-House Attorneys*

Enron may have claims for breach of fiduciary duty, malpractice based on Texas Rule 1.12 or malpractice based on negligence against one or more in-house attorneys, including James Derrick ("Derrick"), Rex Rogers ("Rogers"), Kristina Mordaunt ("Mordaunt"), Scott Sefton ("Sefton") and Jordan Mintz ("Mintz").

All of these in-house attorneys have both legal and factual defenses that may defeat any such claims. Each may dispute: (i) that they breached their fiduciary duties to

---

[14] In the Second Interim Report, the Examiner identified approximately $180,000 in payments to Andrews & Kurth that could be avoided as preferences pursuant to 11 U.S.C. § 547(b) and that likely were not subject to any defenses under 11 U.S.C. § 547(c). *See* Second Interim Report, Annex 3 to Appendix P (Avoidance Actions), at 6-7. After filing the Second Interim Report, the Examiner identified an additional $4.02 million in payments made on the eve of Enron's bankruptcy to Andrews & Kurth that could be avoided as preferences. *See* Third Interim Report, Annex 2 to Appendix J (Avoidance Actions), at 5-7. The Examiner concluded that Andrews & Kurth likely has no affirmative defenses to these transfers, *id.*, and so Andrews & Kurth's total liability to Enron on account of voidable preferences is approximately $4.2 million.

Enron; (ii) knowledge of wrongdoing; (iii) the existence of any duty, under the circumstances, to take "remedial actions"; (iv) causation; and (v) that any damage to Enron was foreseeable. These in-house attorneys may assert that such claims are barred or reduced by the conduct of other officers of Enron. A fact-finder may find in favor of an in-house attorney on one or more of these defenses.

*Derrick.* Derrick, Enron's General Counsel and its chief in-house attorney, viewed his principal role as that of administrator of the law department, relying upon the general counsel of each business unit to manage the attorneys and transactions within that business unit. Although Derrick assumed a significant role in major litigation involving Enron, he did not become substantively involved in any of Enron's business transactions unless a specific issue was brought to his attention. Few issues relating to the SPE transactions appear to have been escalated to him. In those instances when issues came to his attention, however, the evidence suggests that Derrick did not fully analyze the issue but rather accepted the conclusions of others without probing or testing them. Although Derrick attended meetings of the Enron Board, his participation generally was limited to making presentations regarding litigation matters and it appears that he rarely provided any legal advice to the Board. Even when Derrick did advise the Enron Board on the conflict of interest issue presented by the LJM1/Rhythms Hedging Transaction, he failed to educate himself on the underlying facts or the governing law to enable proper execution of his responsibilities as legal advisor to the Enron Board. The Examiner concludes that there is sufficient evidence from which a fact-finder could determine that Derrick committed malpractice based on negligence in connection with the performance of his duties as General Counsel of Enron in the following matters:

- Despite the size, frequency and number of the Related Party Transactions in which Fastow and other Enron employees were involved, Derrick's failure to inform himself and the Enron Board with respect to those matters or to confirm that those to whom he had delegated the responsibility were taking adequate steps to do so.

- Derrick's failure to educate himself on the facts of the LJM1/Rhythms Hedging Transaction, the conflict of interest issues presented by that transaction and governing law, so as to enable proper execution of his responsibilities as legal advisor to the Enron Board.

- Derrick's failure to inform himself about (i) the content of the "anonymous letters" delivered to Lay in August 2001 or (ii) the extent of Vinson & Elkins' involvement in the transactions criticized by the "anonymous" letters, which meant that he was unable to advise Lay properly with respect to the investigation or the propriety of retaining Vinson & Elkins to conduct that investigation.

*Rogers.* Rogers was the in-house attorney at Enron primarily responsible for securities disclosure matters. Rogers failed to fulfill his responsibilities to advise Enron adequately with respect to the disclosure issues surrounding the SPE transactions. The Examiner concludes that a fact-finder could determine that Rogers committed malpractice based on negligence for his failure to inform himself about the SPE transactions so that he could properly advise Enron with respect to the disclosure issues raised by these transactions. The Examiner also concludes that a fact-finder could determine that Rogers committed malpractice based on Texas Rule 1.12 or breached his fiduciary duties, or both, in connection with his failure to inform the Enron Board of the Raptors restructuring in early 2001, when the restructuring involved the issuance of stock.

*Mordaunt.* Mordaunt served as a senior in-house attorney within Enron Global Finance and its predecessor on several SPE transactions. The Examiner concludes that there is sufficient evidence from which a fact-finder could determine that Mordaunt committed malpractice based on Texas Rule 1.12, committed malpractice based on

- 12 -

negligence or breached fiduciary duties in connection with her representation of Enron in the following matters:

- The Chewco transaction because she was aware of the conflict of interest created by Kopper's role as general partner of Chewco but did not take steps to analyze the Code of Conduct with respect to his conflict of interest or to inform the Enron Board of the related party nature of the Chewco transaction when it was asked to approve that transaction.

- The LJM1/Rhythms Hedging Transaction, which was a hedge only for financial statement purposes, lacking any economic substance or rational business purpose, but was intended by certain Enron officers to manipulate Enron's financial statements.

The Examiner concludes that there is sufficient evidence from which a fact-finder could determine that Mordaunt committed malpractice and breached her fiduciary duties in connection with her $5,826 investment in Southampton and her receipt of more than $1 million as a return on that investment without advising Derrick or the Office of the Chairman of the investment and without receiving the necessary approval as required by the Code of Conduct and rules of professional conduct.

*Sefton.* Sefton served as General Counsel of Enron Global Finance for one year, between September 1999 and early October 2000. The Examiner concludes that there is sufficient evidence from which a fact-finder could determine that Sefton committed malpractice based on Texas Rule 1.12, committed malpractice based on negligence or breached his fiduciary duties in connection with his representation of Enron in the following matters:

- Project Nahanni (as Enron's lead in-house attorney on the transaction), a transaction that had no business purpose except to create cash flow from operating activities at year-end 1999 through a loan that was "hardwired" to be repaid within one month after closing.

- The LJM2 transactions, for his failure to advise (or make appropriate efforts to have Derrick or another Enron attorney advise) the Enron Board

concerning numerous significant conflict of interest issues relevant to LJM2 matters.

- Raptors I and II, which were two of the four LJM2/Raptors Hedging Transactions and were hedges for financial statement purposes only, lacking any economic substance or valid business purpose, but were intended by certain Enron officers to manipulate Enron's financial statements.

*Mintz*. Mintz was Sefton's successor as General Counsel to Enron Global Finance. The Examiner concludes that there is sufficient evidence from which a fact-finder could determine that Mintz committed malpractice based on Texas Rule 1.12, committed malpractice based on negligence or breached his fiduciary duties, in connection with his representation of Enron in the following matters:

- Certain matters pertaining to LJM, including (i) his knowledge that the Enron Audit and Finance Committees had not been informed of Enron's repurchases of certain assets from LJM2 during 2000, (ii) his knowledge that Enron employees (in addition to Fastow) were acting in furtherance of the interests of LJM2 in a manner contrary to Enron's interests and (iii) his knowledge that Fastow wanted to prevent the Board from learning how much money he was making from the LJM transactions with Enron.

- Its related party transaction disclosure for the proxy statement filed in early 2001, and Enron's failure to disclose the amount of Fastow's interest in the LJM transactions.

- Payment of the Chewco tax indemnity amount demanded by Kopper, despite the fact that Mintz knew that such payment was not owed under the terms of the Chewco tax indemnity agreement.

## II. ENRON'S ATTORNEYS

### A. **Introduction**

Enron had a large in-house legal department, consisting of approximately 250 attorneys.[15] However, Enron's SPE transactions usually were staffed both with in-house attorneys and with outside attorneys. Outside attorneys were chosen based upon the level of expertise within the law firm and its availability.[16] Enron had "hundreds of outside law firms."[17] Vinson & Elkins was Enron's preferred outside law firm prior to the Petition Date and it handled a variety of transactions for Enron, including numerous SPE transactions.[18] Other firms also handled SPE transactions. Andrews & Kurth, in particular, handled numerous FAS 140 Transactions.[19]

---

[15] Sworn Statement of James V. Derrick, Jr., former General Counsel, Enron, to Rebecca M. Lamberth, A&B, May 20, 2003 (the "Derrick 5/20/03 Sworn Statement"), at 101.

[16] Sworn Statement of Carol Lynne St. Clair, former Assistant General Counsel, Enron, to Rebecca M. Lamberth, A&B, Apr. 18, 2003 (the "St. Clair Sworn Statement"), at 26-27; Sworn Statement of Scott Matthew Sefton, former General Counsel, Enron Global Finance, to Rebecca M. Lamberth, A&B, May 27, 2003 (the "Sefton Sworn Statement"), at 68-70.

[17] Sworn Statement of Rex Rogers, Vice President and Associate General Counsel, Enron, to Rebecca M. Lamberth, A&B, May 28, 2003 (the "Rogers Sworn Statement"), at 66.

[18] Sworn Statement of Robert H. Walls, Jr., General Counsel, Enron, to Mary C. Gill, A&B, Sept. 25, 2003 (the "Walls Sworn Statement"), at 23-25; The Financial Collapse of Enron, Part 4: *Hearing Before the Subcommittee on Oversight and Investigations, House Committee on Energy and Commerce*, 107th Cong. (Mar. 14, 2002) (the "Lawyers Hearing"), at 31 (testimony of Joseph C. Dilg, Managing Partner, Vinson & Elkins).

[19] St. Clair Sworn Statement, at 27-28; Sworn Statement of Joel Ephross, Senior Counsel, Enron Global Finance, to Rebecca M. Lamberth, A&B, May 2, 2003 (the "Ephross 5/2/03 Sworn Statement"), at 102-103; Sworn Statement of Gareth S. Bahlmann, former Assistant General Counsel, Enron Global Finance, to Rebecca M. Lamberth, A&B, May 7, 2003, at 94-96.

### B.    Enron's In-House Legal Department

*Introduction*

Derrick,[20] Enron's General Counsel and its most senior in-house attorney, considered Enron's legal department to be a "world class" in-house law firm.[21] Most of Enron's in-house attorneys had between eight and seventeen years of legal experience when they joined Enron.[22] At any given date at Enron, there were "probably thousands of projects being worked on"[23] by its in-house attorneys.

---

[20] Derrick graduated from the University of Texas with an undergraduate degree in 1967 and a law degree in 1970. Derrick 5/20/03 Sworn Statement, at 15-16. He served as a judicial clerk for the Honorable Homer Thornberry of the United States Court of Appeals for the Fifth Circuit for one year, after which he joined Vinson & Elkins. Derrick 5/20/03 Sworn Statement, at 16. Derrick practiced general business law with Vinson & Elkins from 1971 until 1991, when he became the General Counsel of Enron. Derrick 5/20/03 Sworn Statement, at 16-17.

On October 8, 2001, the Compensation Committee approved an extension of Derrick's employment contract through 2005. Handwritten Notes, entitled "11/4/01 Comp. Comm.," at AB1128 01980 [AB1128 01977-AB1128 01980]. Derrick was to be awarded $1.5 million of equity value at signing. *Id.* However, by the time Derrick reviewed the documents, the price of the stock had fallen significantly and he did not believe that it was proper to receive the grants at such a low price without the Compensation Committee reconsidering the matter. *Id.* At a meeting of the Compensation Committee held on November 4, 2001, Derrick expressed his belief that it was inappropriate for him to gain from a decline in the stock price, or to recover equity in the company in that environment. Email from Stephanie J. Harris, Executive Assistant to Derrick, Enron, to Mary Joyce, Sheila Walton and Sharon Butcher, Enron, Nov. 14, 2001 (transmitting confirmation of Derrick) [AB1128 01976]. In addition, Derrick directed that the signing bonus due under his new contract not be paid. *Id.*

[21] Lawyers Hearing, at 31 (testimony of Joseph C. Dilg, Managing Partner, Vinson & Elkins); Derrick 5/20/03 Sworn Statement, at 94 ("[W]hen I came to Enron, it was my objective to assemble a truly world class legal department.").

[22] *See, e.g.*, Sworn Statement of Nora J. Dobin, Senior Counsel, Enron, to Rebecca M. Lamberth, A&B, Apr. 9, 2003, at 10 (partner and former general counsel prior to joining Enron); Sworn Statement of Lisa J. Mellencamp, former Senior Counsel, Enron, to Rebecca M. Lamberth, A&B, Apr. 24, 2003 (the "Mellencamp Sworn Statement"), at 7 and 90 (17 years of legal experience and partner prior to joining Enron); Sworn Statement of Daniel J. Lyons, current Assistant General Counsel, Enron, to Rebecca M. Lamberth, A&B, Apr. 16, 2003, at 28 (partner prior to joining Enron). One in-house attorney characterized herself as a "junior" attorney "in Enron terms" despite the fact that she had nine years of legal experience prior to joining Enron. St. Clair Sworn Statement, at 90.

[23] Derrick 5/20/03 Sworn Statement, at 98.

*Structure*

Enron Wholesale Services, Enron Energy Services, Enron Global Finance, Enron Transportation Services and Enron Broadband Services,[24] like Enron's other business units, each had its own legal department that was supervised by a general counsel.[25] Each general counsel reported to the head of the business unit he or she served, as well as to Derrick.[26] Rogers, the Associate General Counsel within Enron's corporate legal department who reported directly to Derrick, was the in-house attorney responsible for Enron's compliance with the securities laws.[27] Thus, all SEC filings and SEC-related matters went through Rogers.[28]

---

[24] Enron Organizational Chart, "Enron Corp. Corporate Staff," Aug. 6, 2001 (the "Derrick Org. Chart") (delineating the departments that reported to Derrick) [AB000491818].

[25] Deposition of Mark Haedicke, former Managing Director and General Counsel, ENA, by Rebecca M. Lamberth, A&B, May 23, 2003 (the "Haedicke Depo."), at 19-21. Within each legal group, the attorneys were titled variously as "senior counsel," "assistant general counsel" and "vice president." All ultimately reported to a general counsel. *Id.* at 21.

[26] Sefton Sworn Statement, at 26-27 (describing his reporting responsibilities as General Counsel of Enron Global Finance).

[27] Derrick 5/20/03 Sworn Statement, at 152. After working in the SEC's Houston office and briefly in private practice with various law firms, Rogers became employed by a predecessor corporation to Enron in September 1985 and has remained employed (in a legal capacity) by Enron or one of its predecessors since that time. Rogers Sworn Statement, at 12. While several in-house attorneys at Enron had experience in securities matters, either as result of prior employment or experience on the job at Enron, by 1991 Rogers became identified as the in-house attorney with primary responsibility regarding securities regulation and disclosure. Rogers Sworn Statement, at 12-15; Vice President Profile and Self Evaluation of Rex R. Rogers, July 10, 2001 (the "Rogers Evaluation"), at AB0461 00685 (describing his major strength as "being able to employ my 23 years experience as a corporate securities lawyer (including five years as a senior SEC enforcement lawyer . . .) to counsel the Company on difficult transactions and disclosure issues in a pragmatic way.") [AB0461 00684-AB0461 00685]. In the years immediately preceding the bankruptcy, employees in Enron's Financial Reporting, Investor Relations and Public Relations Groups all considered Rogers to be the primary attorney advising them on matters involving securities regulation and disclosure. Sworn Statement of Paula H. Rieker, Corporate Secretary and former Director of Investor Relations, Enron, to William C. Humphreys, Jr., A&B, Apr. 23, 2003, at 99; Sworn Statement of Mark Palmer, Managing Director, Corporate Communications and Marketing, Enron, to John L. Latham, A&B, May 1, 2003, at 25; Sworn Statement of Gary Peng, Senior Director, Corporate Financial Reporting, Enron, to John L. Latham, A&B, Apr. 17, 2003 (the "Peng Sworn Statement"), at 67, 73-75 and 81; Sworn Statement of Jan Johnson, former Director in Corporate Financial Reporting, Enron, to Oni A. Holley and Richard J. Oelhafen, Jr., A&B, May 20, 2003, at 39-40, 43 and 45-46. Within Enron's organizational chart, Rogers was near the top and supervised approximately eight attorneys in the corporate legal group at the parent holding company level. Derrick Org. Chart, at AB000491818; Rogers Sworn Statement, at 15.

[28] Derrick 5/20/03 Sworn Statement, at 152.

Weekly meetings of the general counsel of the major business units occurred in Derrick's office, and on a monthly basis the conferences grew to include the general counsel of overseas entities.[29] Derrick characterized the meetings as a forum for attorneys to raise issues and concerns, as well as a time to communicate the activities of each group, but he testified that none of the concerns identified in the Prior Reports regarding the SPE transactions were ever voiced in these meetings.[30]

### Enron Global Finance Legal Department

Enron Global Finance and its legal department ("EGF Legal") were created in the third quarter of 1999.[31] Before that time, structured finance projects generally were handled by the finance group within Enron's Capital and Trade Resources legal department, often under the supervision of Mordaunt.[32] Before the formal establishment of Enron Global Finance, Mordaunt functioned as general counsel for the type of structured finance transactions that ultimately came under the jurisdiction of Enron Global Finance.[33]

---

[29] Memorandum from Paul W. Connell, Wilmer Cutler, to Enron Files, regarding Interview of James Derrick, General Counsel, Jan. 17, 2002 ("WC Derrick Interview"), at 2-3 [AB000001258-AB000001272]; David Rubenstein, *Oil Change at Enron, A Decade of Transformation,* Corp. Legal Times, Oct. 2001 ("Oil Change Article"), at 1; Derrick 5/20/03 Sworn Statement, at 42-43. It appears that many of these meetings were cancelled because Derrick was out of the office. WC Derrick Interview, at 3.

[30] Derrick 5/20/03 Sworn Statement, at 60-62.

[31] Ephross 5/2/03 Sworn Statement, at 22; Memorandum from Jeffrey E. McFadden, Wilmer Cutler, to Enron File, regarding Interview of Gareth Bahlman [sic], Nov. 3, 2001 ("WC Bahlmann Interview"), at 1 [AB000001072-AB000001075].

[32] Haedicke Depo., at 28-29; Sefton Sworn Statement, at 30-32; Ephross 5/2/03 Sworn Statement, at 27-28; WC Bahlmann Interview, at 1.

[33] Haedicke Depo., at 28-29; Sefton Sworn Statement, at 30.

Sefton,[34] a securities attorney in Enron's London office, was named General Counsel of EGF Legal in September of 1999.[35] Sefton reported directly to Fastow and to Rob Walls ("Walls"), Deputy General Counsel for Enron.[36] During the first few months of its existence, EGF Legal was staffed, in part, with attorneys "loaned" from Vinson & Elkins and Andrews & Kurth.[37] Each attorney in EGF Legal reported directly to Sefton.[38]

By virtue of his position as General Counsel of Enron Global Finance from September 1999 to October 2000, Sefton possessed an overview of the transactions initiated by Global Finance. Sefton had to be informed of all transactions underway at Enron Global Finance to manage the workload of the attorneys in his department.[39] "Deal flow sheets" (a report listing all pending transactions and the attorneys assigned to each project that was prepared and circulated to attorneys in EGF Legal) and a "mission critical" list provided Sefton with a summary of such transactions.[40]

---

[34] Sefton graduated from Murray State University with an undergraduate degree in 1981 and received his law degree and M.B.A. in 1985 from Vanderbilt University. Sefton Sworn Statement, at 13. After his graduation in 1985, Sefton joined the law firm of Graydon, Head & Ritchie in Cincinnati. *Id.* at 15-16. In 1987, Sefton became associated with Fulbright & Jaworski in Houston, where he was a member of the firm's corporate banking and business department, practicing in the areas of mergers and acquisitions and securities law. *Id.* at 15-17. In July 1994, Sefton took a position in the legal department of Enron Gas Services, reporting to Julia Murray. *Id.* at 20 and 24. From January 1995 until September 1999, he was the acting chief legal counsel at Enron Global Finance in London. *Id.* at 20. In 1999, Sefton returned to Houston to become Vice President and General Counsel of Enron Global Finance. *Id.* at 21 and 28. In this capacity, Sefton reported to Fastow on the commercial side and to Rob Walls on the legal side. *Id.* at 26-27.

[35] Memorandum from Lisa Henriques, Wilmer Cutler, to Enron File, regarding Oct. 10, 2001 Interview with Jordan Mintz, General Counsel, Jan. 4, 2002, at 3 [AB000000580-AB000000585].

[36] Sefton Sworn Statement, at 26-27.

[37] Ephross 5/2/03 Sworn Statement, at 22-23. Although resident at Enron, these "loaned" attorneys continued to bill time as outside counsel. *See id.* at 83.

[38] Ephross 5/2/03 Sworn Statement, at 23-24.

[39] Sefton Sworn Statement, at 68-70.

[40] *Id.* at 68-77.

- 19 -

In October 2000, Sefton resigned when he "was advised that the Global Finance

team was going to make a change, and that I would no longer be serving as the General

Counsel of Global Finance."[41]  Mintz[42] was named as his successor.[43]  As a tax attorney

for Enron Capital and Trade Resources, Mintz had been approached a year earlier by

Fastow about the position, but Derrick had selected Sefton.[44]  In 2000, Fastow again

approached Mintz and he accepted the position.[45]  As General Counsel of EGF Legal,

Mintz, like Sefton, received sufficient information to have an overview of the

transactions undertaken by Enron Global Finance, including the "mission critical" list of

pending deals.[46]

---

[41] *Id.* at 238.

[42] Mintz graduated from the University of Pennsylvania in 1978 with an undergraduate degree in economics and a major in accounting and marketing, and received a law degree from Boston University School of Law in 1982. Deposition of Jordan H. Mintz, former Vice President and General Counsel, Enron Global Finance, by Mary C. Gill, A&B, May 16, 2003 ("Mintz 5/16/03 Depo."), at 13 and 15. Mintz worked for the CPA firm of Loeb & Troper during the year between college and law school. *Id.* at 14-15. Although Mintz had met the educational requirements to become a CPA, he decided to attend law school. *Id.* at 15 and 48-49. Mintz received an L.L.M. in Taxation from New York University School of Law in 1987 and then joined Bracewell & Patterson that same year, where he practiced in the tax department. *Id.* at 13 and 16. In 1996, Mintz joined Enron as Vice President of Tax for Enron Capital and Trade, a position that he held until 2000. *Id.* at 19-20. From October 2000 to December 2002, Mintz served as Vice President and General Counsel of Enron Global Finance. *Id.* at 29. In this capacity, Mintz reported directly to Fastow and Derrick. *Id.* at 32.

[43] *Id.* at 29-30.

[44] *Id.*

[45] *Id.*

[46] Deposition of Jordan Mintz, Vice President and General Counsel, Enron Global Finance, by Rebecca M. Lamberth, A&B, Sept. 29, 2003 (the "Mintz 9/29/03 Depo."), at 186.

### C.    Vinson & Elkins

Although Enron annually retained numerous law firms, Vinson & Elkins[47] was

the outside law firm that Enron turned to with greatest frequency[48] on a wide variety of

matters.  Enron paid fees to Vinson & Elkins of $18,586,479 in 1997, $26,645,963 in

1998, $37,840,290 in 1999, $42,789,338 in 2000 and $36,368,833 in 2001.[49]  During the

period relevant to the Examination, the "relationship partner" at Vinson & Elkins was

Joseph C. Dilg ("Dilg").[50]  During early 1997, Robert Baird ("Baird")[51] was the primary

Vinson & Elkins attorney who advised Enron from time to time regarding SEC disclosure

matters.[52]  Following Baird's move to Austin, Texas in 1997, Ronald Astin ("Astin")[53]

---

[47] Vinson & Elkins, founded in Houston, Texas in 1917, now has offices in ten cities in the United States and abroad. *See* Firm Overview, Vinson & Elkins L.L.P., *available at* http://www.vinson-elkins. com/firm _overview/firm_overview.cfm.  Vinson & Elkins currently has more than 800 attorneys organized into approximately seventy "core practice areas." *Id.*

[48] Walls Sworn Statement, at 24.

[49] Letter from John K. Villa, Williams & Connolly LLP, to Rebecca M. Lamberth, A&B, Oct. 24, 2003, at 1 [AB0911 2855-AB0911 2856].

[50] Dilg is currently the Managing Partner of Vinson & Elkins.  Vinson & Elkins Profile of Joseph C. Dilg, *available at* http://www.vinson-elkins.com/our_lawyers/lawyer_print2.cfm?id000396.   Dilg's practice focuses on domestic and international business transactions, including acquisitions, divestitures, joint ventures and financings. *Id.*

[51] Baird's areas of specialization in securities include Investment Company Act matters, broker-dealer matters and Investment Advisor Act matters.  Sworn Statement of Robert Baird, Vinson & Elkins, to Rebecca M. Lamberth, A&B, Aug. 18, 2003 (the "Baird Sworn Statement"), at 10.

[52] *Id.* at 31-32; Mintz 5/16/03 Depo., at 113 ("When I went to the Global Finance Group, I was advised by both Andy [Fastow] and Rex Rogers that Ron Astin had picked up the responsibilities from Bob [Baird] as outside securities advisor.").

[53] Astin graduated from the University of Utah with an undergraduate degree in 1970 and a master of history degree in 1972.  Sworn Statement of Ronald T. Astin, Vinson & Elkins, to Rebecca M. Lamberth, A&B, July 18, 2003 (the "Astin 7/18/03 Sworn Statement"), at 11.  From 1972-1974, Astin completed some Ph.D. work in history at the University of Chicago and, in 1977, he received his law degree from the University of Chicago Law School. *Id.* at 11-12.  In 1977, Astin joined the firm of Heller, Ehrman, White & McAuliffe as a corporate securities associate. *Id.* at 15.  Astin joined Vinson & Elkins in October 1978 and has been associated with the corporate finance section of Vinson & Elkins ever since. *Id.* at 12-13.  Astin has worked in both the Washington, D.C. and Houston offices of Vinson & Elkins, and has been a member of the corporate finance and securities sections of the firm at all times while located in the Houston office. *Id.* at 13.  As a member of Vinson & Elkins' corporate finance and securities section, Astin has performed considerable amounts of work in public offerings, mergers and acquisitions, private equity and structured finance transactions and is experienced in the energy business. *Id.* at 13-14.  Astin is an adjunct

gradually assumed this role.[54]  On SEC disclosure issues on which Vinson & Elkins was asked for advice, Baird and Astin worked closely with in-house counsel, Rogers.[55]  Terry Yates ("Yates"),[56] Scott Wulfe ("Wulfe"),[57] David Keyes ("Keyes"),[58] Mark Spradling ("Spradling")[59] and Stephen Tarry ("Tarry") all worked on various SPE transactions, in addition to other matters for Enron.

The following table contains a partial listing of the SPE transactions on which Vinson & Elkins rendered legal services to Enron during the period covered in this Appendix.

| 1 | January | |
|---|---------|---|
| 9 | February | |
| 9 | March | **BAMMEL LOOPER** (3/27/97) |
| 7 | April | **BRAZOS SYNTHETIC LEASE** (4/14/97) |
| | May | |
| | June | **CASH 5** (6/30/97) |
| | July | |
| | August | |

---

professor of law at South Texas College of Law, where he teaches a business planning transactional skills course. *Id.* at 15-16.

[54]  Baird Sworn Statement, at 31-32; Mintz 5/16/03 Depo., at 113-14.

[55]  Rogers Sworn Statement, at 65.

[56]  Yates initially worked in Vinson & Elkins' public finance section, representing political subdivisions, performing tax exempt litigation and financing transactions.  Sworn Statement of Terry Yates, Vinson & Elkins, to Mary C. Gill, A&B, Sept. 18, 2003 (the "Yates Sworn Statement"), at 7.  In 1988 or 1989, the public law section merged with the banking section and Yates moved into the structured finance group, where he currently performs general business transactional work. *Id.* at 8-9.

[57]  Wulfe joined Vinson & Elkins upon graduation from the University of Texas Law School in 1983. Sworn Statement of Scott Wulfe, Vinson & Elkins, to Rebecca M. Lamberth, A&B, Aug. 22, 2003 (the "Wulfe Sworn Statement"), at 6-7.  Wulfe has been a member of the corporate section at Vinson & Elkins and has principally practiced in the areas of mergers and acquisitions, private equity and corporate finance. *Id.* at 8.

[58]  Keyes handled many Enron matters and was regarded as the primary transactional attorney on several FAS 140 Transactions, including, but not limited to, Project Iguana, Project Cornhusker, Project Shogun, Project MacArthur and Project Churchill.  Sworn Statement of David Keyes, Vinson & Elkins, to Mary C. Gill, A&B, Oct. 1, 2003 (the "Keyes Sworn Statement"), at 29-30.

[59]  Throughout his tenure at Vinson & Elkins, Spradling has concentrated his practice in the areas of real estate, commercial structured finance and project finance.  Sworn Statement of Mark Raymond Spradling, Vinson & Elkins, to Rebecca M. Lamberth, A&B, July 25, 2003 (the "Spradling 7/25/03 Sworn Statement"), at 9-10.

|  | September | **RIVERSIDE 2** (9/26/97)<br>**SUTTON BRIDGE 1** (9/29/97)<br>**DESTEC** (9/30/97) |
|--|-----------|-------|
|  | October | |
|  | November | **CHEWCO** (11/6/97) |
|  | December | **MAHONIA/CHASE VI** (12/18/97)<br>**NIGHTHAWK** (12/29/97)<br>**JEDI II** (12/30/97)<br>**CHEWCO** (12/30/97) |
| 1<br>9<br>9<br>8 | January | |
|  | February | |
|  | March | **CORNHUSKER** (3/27/98) |
|  | April | |
|  | May | |
|  | June | **CHURCHILL** (6/25/98)<br>**MAHONIA/CHASE VII** (6/26/98)<br>**CASH 6** (6/26/98)<br>**MIDTEXAS** (6/30/98) |
|  | July | |
|  | August | |
|  | September | |
|  | October | |
|  | November | **TRAILBLAZER/SHOGUN** (11/12/98) |
|  | December | **MAHONIA/CHASE VIII** (12/1/98)<br>**MARLIN I** (12/17/98)<br>**RAWHIDE** (12/18/98)<br>**FIREFLY** (12/30/98)<br>**ROOSEVELT** (12/30/98)<br>**AMERICAN COAL** (12/30/98) |
| 1<br>9<br>9<br>9 | January | |
|  | February | |
|  | March | **MACARTHUR** (3/30/99) |
|  | April | |
|  | May | |
|  | June | **MAHONIA/CHASE IX** (6/28/99)<br>**LJM CAYMAN LP/ "LJM1"** formed; **RHYTHMS HEDGE** established  (6/30/99) |
|  | July | |
|  | August | |
|  | September | **NIGHTHAWK** redeemed (9/24/99)<br>**OSPREY/WHITEWING I** (9/24/99)<br>**ROCK** (9/30/99)<br>**LJM1/CUIABA** (9/30/99) |
|  | October | |
|  | November | **CONDOR** (11/10/99)<br>**YOSEMITE I**  (11/18/99) |
|  | December | **IGUANA I** (12/20/99)<br>**YOSEMITE I** (12/22/99)<br>**ENA CLO I TRUST** (12/22/99)<br>**NAHANNI** (12/21/99)<br>**NIGERIAN BARGE** (12/29/99)<br>**SE THUNDERBIRD** (12/29/1999) |
| 2<br>0<br>0<br>0 | January | **NAHANNI** substantially redeemed (1/14/00) |
|  | February | **YOSEMITE II** (2/23/00) |
|  | March | **MONTE** (3/6/00) |
|  | April | **RAPTOR I (TALON)** (4/18/00)<br>**LJM1-RHYTHMS HEDGE** termination of hedging derivatives with Enron (4/28/00) |
|  | May | **EOTT** (5/2/00) |

- 23 -

|  | | | |
|---|---|---|---|
| June | | | **MAHONIA/CHASE X** (6/28/00) |
|  | | | **RAPTOR II (TIMBERWOLF)** (6/29/00) |
|  | | | **BACKBONE 1/LJM2** (6/30/00) |
| July | | | **MARGAUX I** (7/12/00) |
| August | | | **TAMMY I** (7/21/00) |
|  | | | **YOSEMITE III** (8/25/00) |
| September | | | **RAPTOR IV (BOBCAT)** (9/11/00) |
|  | | | **RAPTOR III (PORCUPINE)** (9/27/00) |
| October | | | **OSPREY/WHITEWING II** (10/05/00) |
| November | | | **TAMMY I** (11/21/00) |
|  | | | **VELOCITY I** (12/7/00) |
|  | | | **FISHTAIL** (12/19/00) |
| December | | | **VELOCITY II** (12/20/00) |
|  | | | **BACKBONE II** (12/21/00) |
|  | | | **RAPTOR** cross-collateralization (12/22/00) |
|  | | | **MAHONIA/CHASE XI** (12/28/00) |

|  |  | | | |
|---|---|---|---|---|
| | January | | | |
| | February | | | |
| | March | | | |
| | April | | | **RAPTORS** restructured (4/13/01) |
| 2 | May | | | **YOSEMITE IV** (5/24/01) |
| 0 | June | | | **SUNDANCE INDUSTRIAL** (6/01/01) |
| 0 | | | | **VELOCITY III/DESPERADO** (6/29/01) |
| 1 | July | | | **MARLIN II** (7/19/01) |
| | August | | | |
| | September | | | **BACKBONE III/QUEST** (9/30/01) |
| | October | | | |
| | November | | | |
| | December | | | **Petition Date** (12/02/01) |

### D.     Andrews & Kurth

Beginning in late 1998, Andrews & Kurth became Enron's primary law firm for

FAS 140 Transactions.  Enron closed more than thirty FAS 140 Transactions between

late 1998 and the Petition Date, and Andrews & Kurth represented Enron in twenty-eight

of those transactions.[60]  David Barbour ("Barbour"), a partner in Andrews & Kurth's

Dallas office, was the primary attorney for these transactions.[61]  Barbour was assisted by

---

[60] Letter from Paul E. Coggins, Fish & Richardson P.C., to Rebecca M. Lamberth, A&B, June 13, 2003 (the "Coggins 6/13/03 Letter") [AB1128 00641-AB1128 00642].  In addition to the transactions listed in this letter, Andrews & Kurth acted as counsel to Enron in the Nikita and Nile transactions, both of which were FAS 140 Transactions. Letter from Paul E. Coggins, Fish & Richardson P.C., to Rebecca M. Lamberth, A&B, Nov. 27, 2002 (the "Coggins 11/27/02 Letter"), at 3 and 5 [AB1128 00559-AB1128 00566].

[61] Sworn Statement of David Barbour, Andrews & Kurth, to James C. Grant, A&B, Sept. 16, 2003 (the "Barbour Sworn Statement"), at 10.  Prior to beginning his Enron work, Barbour worked on 300-400 securitizations for other clients. *Id.* at 21.

- 24 -

Patrick Sargent ("Sargent") and Tom Popplewell ("Popplewell").[62]  Sargent assisted

Barbour with the legal opinions only.[63]  Popplewell assisted with tax aspects of the

transactions.[64]  Andrews & Kurth also worked on other Enron transactions, including Bob

West Treasure, Brazos VPP, Gallup and Kachina.[65]  Enron paid fees to Andrews & Kurth

of $991,053 in 1997, $2,355,399 in 1998, $6,644,267 in 1999, $9,740,414 in 2000 and

$9,269,594 in 2001.[66]

A timeline that illustrates the FAS 140 Transactions in which Andrews & Kurth

represented Enron can be found below in the section entitled *FAS 140 Transactions and*

*Andrews & Kurth.*

---

[62] Both Sargent and Popplewell have held CPA degrees at certain points in their careers.  Sargent allowed
his CPA license to lapse approximately thirteen years ago.  Sworn Statement of Patrick C. Sargent,
Andrews & Kurth, to James C. Grant, A&B, Sept. 4, 2003 (the "Sargent Sworn Statement"), at 11-12.
Popplewell is a tax attorney and his accounting experience focused on tax accounting, not financial
accounting.  Sworn Statement of Thomas Popplewell, Andrews & Kurth, to James C. Grant, A&B, Aug.
26, 2003 (the "Popplewell Sworn Statement"), at 12.

[63] Barbour Sworn Statement, at 9.

[64] *Id.*

[65] *See* Coggins 11/27/02 Letter.

[66] Letter from Paul E. Coggins, Fish & Richardson, P.C., to James C. Grant, A&B, Oct. 13, 2003 (the
"Coggins 10/13/03 Letter") [AB1128 00834-AB1128 00835].

## III.   ATTORNEYS' ROLE IN SPE TRANSACTIONS

### A.   **Introduction**

This section discusses the roles of both outside attorneys and in-house attorneys in the FAS 140 Transactions, Nahanni (a minority interest structure) and the Sundance Industrial transaction.   These transactions have been criticized in the Prior Reports. Vinson & Elkins represented Enron in each category of the transactions discussed in this section of this Appendix, and Andrews & Kurth represented Enron on numerous FAS 140 Transactions.   Several in-house attorneys at Enron had roles in these transactions. This section also discusses the role of attorneys in connection with Enron's disclosure of the SPE transactions.

### B.   **FAS 140 Transactions and Vinson & Elkins**

*Summary Description of FAS 140 Transactions*

In its FAS 140 Transactions,[67] Enron "monetized" a variety of otherwise illiquid assets, removing those assets from its balance sheet while at the same time retaining control over them with a view towards better timing the final sale of those assets.[68]   In the Second Interim Report, the Examiner concluded that these transactions were improperly used by Enron to record income from gain on sale of assets and erroneously report the cash proceeds from these transactions as cash flow from operating activities (or, to a

---

[67] Enron's FAS 140 Transactions were structured finance transactions that were intended to comply with either FAS 125, Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities, Statement of Financial Accounting Standards No. 125 (Financial Accounting Standards Bd. 1996) ("FAS 125"), or its successor, FAS 140, Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities, Statement of Financial Accounting Standards No. 140 (Financial Accounting Standards Bd. 2000).   FAS 125 was the accounting standard that governed securitizations of financial assets from January 1, 1997, until it was replaced by FAS 140, which became effective for transactions closing on or after April 1, 2001.   The Examiner discussed the structure of Enron's typical FAS 140 Transactions, as well as several of the FAS 140 Transactions discussed in this Appendix in which Andrews & Kurth (rather than Vinson & Elkins) was involved, in the First Interim Report and Second Interim Report.   This Appendix should be read in conjunction with those descriptions.

[68] *See* Enron Hawaii 125-0 Trust Presentation, June 3, 2002, at 3 [AB000350414-AB000350442].

lesser degree, from investment activities). Enron also failed to disclose adequately its obligations under the Total Return Swaps that were entered into as part of these FAS 140 Transactions, and to reflect indebtedness incurred.[69]

An attorney's willingness to provide certain legal opinions was, as a practical matter, crucial to Enron's ability to complete the FAS 140 Transactions. Paragraph 23 of FAS 125 (the predecessor to FAS 140 which was in effect for many of the transactions discussed in this Appendix) provided that:

> The nature and extent of the supporting evidence required for an assertion in financial statements that transferred financial assets have been isolated – put presumptively beyond the reach of the transferor and its creditors, . . . – depend on the facts and circumstances. All available evidence that either supports or questions an assertion shall be considered. That consideration includes making judgments about whether the contract or circumstances permit the transferor to revoke the transfer. It may also include making judgments about the kind of bankruptcy or other receivership into which a transferor or special-purpose entity might be placed, whether a transfer of financial assets would likely be deemed a true sale at law, whether the transferor is affiliated with the transferee, and other factors pertinent under applicable law. Derecognition of transferred assets is appropriate only if the available evidence provides reasonable assurance that the transferred assets would be beyond the reach of the powers of a bankruptcy trustee or other receiver for the transferor or any of its affiliates. . . .[70]

The Audit Issues Task Force of the Auditing Standards Board issued an auditing interpretation, which stated: "A determination about whether the isolation criterion has been met to support a conclusion regarding surrender of control is largely a matter of law. This aspect of surrender of control, therefore, is assessed primarily from a legal

---

[69] *See* Second Interim Report, Appendix M (FAS 140 Transactions), *Accounting Issues Raised By The FAS 140 Transactions.*

[70] FAS 125, ¶ 23.

perspective."[71]  Andersen's own internal publication,[72] a copy of which was provided to

Vinson & Elkins,[73] stated that "[t]ransactions that would not require a legal letter are

limited to transactions such as the simple sale of equity or debt securities."[74]  If Andersen

was not satisfied that the asset had been legally isolated, Enron (i) could not record a gain

from the transfer of the asset, (ii) would be required to reflect the debt of the borrower-

SPE on its balance sheet, and (iii) would be required to record the proceeds of the

transaction as cash flow from financing activities.

In the FAS 140 Transactions, with few exceptions, Enron asked its outside

attorneys to provide an opinion letter that Andersen would use to satisfy the isolation

requirements of FAS 140.

In the vast majority of the FAS 140 Transactions discussed in this Appendix,

however, Enron asked its attorneys to deliver what the parties generally referred to as a

"true issuance" opinion, rather than what the parties referred to as a "true sale" opinion.

The difference between the parties' use of these terms is illustrated by reference to a

---

[71] AU section 9336, *Using the Work of a Specialist: Auditing Interpretations of Section 336* (AU § 9336) (AICPA, Professional Standards) (interpretations of Using the Work of a Specialist, Statement on Auditing Standards No. 73 (American Institute of Certified Public Accountants 1994) (AU § 336)).

[72] Memorandum from Clint Carlin, Andersen, to Distribution, regarding Statement 125 Q&A, Apr. 27, 1998 (distributing Andersen publication entitled "Financial Assets and Liabilities - Sales, Transfers, and Extinguishments: Interpretations of FASB Statement 125") (the "Andersen 4/27/98 FAS 125 Memo") [WP-EVE 0037535-WP-EVE 0037704].

[73] Keyes received material from Andersen after he raised questions about the nature of the opinion that Enron had requested. Keyes Sworn Statement, at 64; Yates Sworn Statement, at 38-39. When shown an Andersen memorandum produced to the Examiner by Vinson & Elkins, Keyes recognized it as a document he had received in early 1998 while he was working on Project Cornhusker, a FAS 140 Transaction that closed in March 1998, although he could not recall who had provided it to him. Keyes Sworn Statement, at 12. However, the transmittal memorandum from Clint Carlin is dated April 27, 1998, and the publication shows a revision date of April 14, 1998. Andersen 4/27/98 FAS 125 Memo. Therefore, it is more likely that Keyes received this version of Andersen's memo in connection with Project Churchill, which closed on June 25, 1998.

[74] Andersen 4/27/98 FAS 125 Memo, at 66.

simplified diagram containing certain elements of Project Cornhusker,[75] a transaction in

which Vinson & Elkins provided a true issuance opinion:



In one part of this transaction, NBIL (an SPE)[76] transferred money to Northern

Plains,[77] and Northern Plains transferred a financial asset to NBIL.   An opinion

addressing whether the transfer of *that* asset was a true sale (rather than a transfer

intended as collateral for a loan), and whether, in the event of a bankruptcy of Enron or

Northern Plains, the asset would be "property of the estate," was generally referred to as

a "true sale" opinion.   In another part of this transaction, NBIL issued its Class B Interest

---

[75] The FAS 140 Transaction discussed in this Appendix that was known by the name Project Cornhusker closed on or about March 27, 1998.  There appears to have been another transaction that had the same name that closed in June 2000.  *See* Second Interim Report, Appendix M (FAS 140 Transactions), *The Typical FAS 140 Transaction.*

[76] This SPE is generically referred to as "Asset LLC" in later FAS 140 Transactions.

[77] The entity that transfers an asset to Asset LLC is generically referred to as "Sponsor" in later FAS 140 Transactions.

to NBIL2 (an SPE)[78] and NBIL2 assigned the Class B Interest to the Lenders as collateral for a loan made to NBIL2.[79] An opinion addressing whether, in the event of a bankruptcy of NBIL, NBIL's Class B Interest would be property of NBIL's estate, and also whether, in the event of a bankruptcy of Enron, Northern Plains or any entity consolidated with Enron, the Class B Interest would be considered "property of the estate" in any of those bankruptcy proceedings, was referred to as a "true issuance" opinion. This transaction also involved a Total Return Swap. In the Total Return Swaps typically used by Enron in the FAS 140 Transactions, the net effect was that Enron retained all or nearly all of the economic risks and rewards of the asset transferred by the Sponsor, and became, in effect, obligated to pay the loan that funded the transaction.

An internal Vinson & Elkins memorandum[80] – although not prepared until November 2000 – reveals a problem inherent in this transaction structure where a true issuance opinion is given but the law firm would not be able to give a true sale opinion.

---

[78] This SPE is generically referred to as "Transferor LLC" in later FAS 140 Transactions.

[79] In another version of similarly structured FAS 140 Transactions, a trust is inserted between Transferor LLC and the Lenders. The trust borrows 97% of the funds needed for the transaction, raises the remaining 3% denominated as equity and provides those funds to Transferor LLC in exchange for the Class B Interest in Asset LLC.

[80] Memorandum, Author unknown, Vinson & Elkins, regarding Selected True Sale and Non-Consolidation Criteria, Nov. 2000 (the "Selected True Sale and Non-Consolidation Criteria Memo") (draft dated 11/17/00) [WP-EVE 0036444-WP-EVE 0036450]. The memorandum suggests that Vinson & Elkins would not be comfortable giving true issuance opinions in the future:

> Although the true issuance opinion is rendered at the step following the transfer of financial assets into the issuer, we believe that rendering a true issuance opinion based exclusively on the relevant state statute concerning issuances of ownership interests, while technically correct, may not be responsive to the intent or purpose for which the true sale opinion is required. In light of this position, while we may continue to render true issuance opinions in transactions that are modeled on earlier true issuance transactions, we believe it may be better to render true sale opinions at the step preceding the issuance, rather than true issuance opinions, for the following reasons: Such opinion is more responsive to the requirements of FAS 125 and its replacement, FAS 140 . . . .

Selected True Sale and Non-Consolidation Criteria Memo, at 1-2.

"[A] 'true issuance' by an [SPE] would accomplish little, in regard to the isolation of its financial assets from the original transferor, if there had not been a true sale or contribution of the financial assets to the [SPE]."[81]

### Vinson & Elkins' Role in Certain FAS 140 Transactions

Vinson & Elkins served as counsel to Enron on several of Enron's FAS 140 Transactions that closed in late 1997 and in 1998. These transactions were known by the project names Riverside, Sutton Bridge, Cornhusker, Churchill, Mid-Texas, Shogun (also known as Trailblazer) and Bammel Looper.[82] In each of these transactions, Vinson & Elkins gave Enron a true issuance opinion letter that it knew Enron would provide to Andersen to support the FAS 140 accounting treatment that Enron sought.[83] As discussed below, Vinson & Elkins believed, and Vinson & Elkins attorneys testified that they repeatedly told both Enron and Andersen, that Andersen had asked for the wrong opinion when it requested a true issuance opinion. This was potentially significant

---

[81] Kim Scardino, an accountant at Andersen who worked on Enron matters, agreed with this reasoning in an April 9, 2000 memorandum that states:

> It is important to note that it is essential to make sure that two separate transfers each qualify as sales under SFAS 140 including (1) the transfer of the Financial Asset from Enron Sub to Asset LLC and (2) the transfer of the B-Share from Transferor LLC to Trust. The reason why sale treatment is key for the first transfer/contribution is because Asset LLC must own the Financial Asset in the first place before it can consider selling it. . . .

Memorandum from Kimberly R. Scardino, Andersen, to the Files, regarding Project Generic – Sale of Enron Sub's Financial Asset (a Hawaii 125-0 transaction), Apr. 9, 2000, at AB1128 00598–AB1128 00599 [AB1128 00596–AB1128 00601].

[82] As described below, Vinson & Elkins also represented Enron in a few FAS 140 Transactions in 1999.

[83] The opinions were delivered to Enron and one of the entities created by Enron to facilitate the FAS 140 Transaction. As is typical in transactions of this nature, the opinions were not addressed to Andersen. *See e.g.*, Opinion Letter from Vinson & Elkins to Enron Corp. and LNG Power II, L.L.C., June 25, 1998 (the "Churchill Opinion Letter") (addressed to Enron and LNG Power II, L.L.C.) [EVE 3696555–EVE 3696589]. Enron was, however, permitted to provide Andersen with a copy of each FAS 140 opinion and Andersen was permitted to use the opinion "solely as evidential support in determining the appropriate accounting and financial reporting treatment of the Transactions." Churchill Opinion Letter, at 34; *but see* Opinion Letter from Vinson & Elkins to Enron Corp. and NBIL II, L.L.C., Mar. 27, 1998 (the "Cornhusker Opinion Letter"), at 27 ("Arthur Andersen may rely on this opinion. . . .") [EVE 12641-EVE 12668].

because Vinson & Elkins did not believe that it could provide a true sale opinion in some of those transactions as structured. However, Vinson & Elkins received numerous assurances from Andersen and Enron that, indeed, the true issuance opinion was the opinion needed to support the desired accounting treatment.

During the same time period, Vinson & Elkins recognized the substantial financial impact that these transactions (and other structured finance transactions Vinson & Elkins was working on for Enron) could have on Enron's financial statements. As a result, Vinson & Elkins discussed with Enron the need for additional disclosures in Enron's MD&A. Enron did add new language to its MD&A, but there is evidence from which a fact-finder could determine that neither the new language nor other information contained in its public disclosures adequately informed shareholders or creditors of the elements of these transactions that Vinson & Elkins had recognized and brought to Enron's attention.

*Opinion Letter Issues Raised by Certain FAS 140 Transactions*

*Sutton Bridge and Riverside.* Yates worked on the Sutton Bridge and Riverside[84] transactions in 1997,[85] both of which were intended to be accounted for under FAS 140.[86] This was the first time that Yates had ever been asked to give a true issuance opinion, and he wondered if it was "the appropriate type of opinion to be given."[87] Yates spoke to Debra Cash ("Cash") at Andersen, who sent him some Andersen materials.[88] He told her

---

[84] Note that the Riverside transaction discussed in this Appendix is not any of the Riverside transactions previously reported on by the Examiner in Appendix H (Role of CIBC and its Affiliates) to the Third Interim Report.

[85] Yates Sworn Statement, at 35.

[86] *Id.* at 37-38.

[87] *Id.* at 35.

[88] *Id.* at 38-39.

that in FAS 140 situations "that I'm aware of, somebody is buying an asset or has an asset and is selling it. I just want to make sure I'm not missing something here."[89] Cash assured him he was not.[90] Still, he checked with several of his partners and learned that they had never been asked to give a true issuance opinion.[91] Despite Yates' misgivings, but based on Andersen's assurances, Vinson & Elkins delivered a true issuance opinion in both of these transactions.[92]

*Project Cornhusker.* Vinson & Elkins' next FAS 140 Transaction for Enron, which closed in March 1998, was Project Cornhusker.[93] Again, Enron asked for a true

---

[89] *Id.* at 40.

[90] *Id.*

[91] *Id.* at 40-41.

[92] *Id.* at 41. Yates testified that "in cases where we issue a true issuance opinion, that's the opinion that we were asked for." *Id.* at 29. "I mean they were the accountants, they understood what they wanted and based on what she [Cash] said, I had . . . no reason to think that was not reasonable from an accounting criteria standpoint. They were the accountants there." *Id.* at 39-40.

[93] *See* Vinson & Elkins Invoice No. 20033825, regarding Project Cornhusker, Mar. 31, 1998 (the "Project Cornhusker 3/31/98 Invoice") [EVE 1426822-EVE1426825].

Project Cornhusker closed on March 27, 1998. In that transaction, certain lenders loaned $99.16 million to an SPE known as NBIL2. Cornhusker Opinion Letter, at 3-4. NBIL2 used the $99.16 million to make a capital contribution to another SPE, NBIL, in exchange for the Class B Membership Interest in NBIL. *Id.* NBIL used the $99.16 million to make two special distributions to the holder of its Class A Membership interests, Northern Plains Natural Gas Company (a wholly owned subsidiary of Enron), one on March 27, 1998 in the amount of $49.58 million, and another shortly thereafter, on April 2, 1998, also in the amount of $49.58 million. *Id.* By timing the special distributions on either side of March 31, Enron recorded one-half of the gain in the first quarter and the other half of the gain in the second quarter. *See* Memorandum from Stephen C. Tarry, Vinson & Elkins, to Joe Dilg, Vinson & Elkins, copying David Keyes, Mark Spradling, Scott Wolfe and Terry Yates regarding Enron FAS 125 issues, June 7, 1998 (the "Tarry 6/7/98 FAS 125 Issues Memo"), at 1-2 [WP-EVE 0036460–WP-EVE 0036462]. Northern Plains transferred a financial asset (Northern Border limited partnership units) to NBIL in exchange for the two special distributions and the issuance of NBIL's Class A Membership Interest. *See* Cornhusker Opinion Letter, at 3-4 and 18-19; Tarry 6/7/98 FAS 125 Issues Memo, at 1-2. As noted above, NBIL issued its Class B Membership Interest to NBIL2, which meant that NBIL2 was entitled to all proceeds from the financial asset that was contributed to NBIL by Northern Plains. Cornhusker Opinion Letter, at 4. NBIL2 secured its $99.16 million loan by granting the lenders a security interest in the Class B Membership Interest it owned in NBIL. *Id.* at 3-4.

In Cornhusker, the lender, Bankers Trust International PLC ("BTI") entered into a Total Return Swap with ENA (then known as ECT), a wholly owned subsidiary of Enron. *Id.* Enron guaranteed ECT's obligations under the Total Return Swap. Cornhusker Opinion Letter, at 17; *see generally* Second Interim Report, Appendix M (FAS 140 Transactions) (discussing typical Total Return Swaps). The Vinson & Elkins opinion notes that, under "the Total Return Swap . . . [ENA] is basically to make the Lenders whole in the

issuance opinion. Keyes, who would be the primary attorney working on the transaction and the opinion,[94] "didn't know what it was."[95] Keyes contacted Yates to discuss the "comparable aspects" of Project Cornhusker to Sutton Bridge and obtained a copy of the true issuance opinion that Vinson & Elkins had given in that transaction.[96] Keyes questioned whether a true issuance opinion was responsive to FAS 140, which he understood to be directed towards the question of a true sale, and testified that he may have raised the issue with Lance Schuler ("Schuler"), an in-house attorney at Enron.[97] Keyes raised the true issuance versus true sale opinion issue with Clint Carlin ("Carlin"), an Andersen accountant.[98] He also pointed out to Carlin an assumption that Vinson & Elkins had added to its opinion—that a court would not recharacterize the entire

---

event NBIL2 is unable to repay principal, interest, fees, and other amounts owed to the Lenders. . . . " Cornhusker Opinion Letter, at 17. The Vinson & Elkins opinion also notes: "The Total Return Swap is similar in function to a guaranty. . . . " *Id.* at 19.

[94] Keyes was familiar with at least some of the accounting goals of a FAS 140 transaction:

> A. [T]hey'd be able to treat the transaction as a sale for accounting purposes to sell financial assets for accounting purposes.
>
> Q. Thereby recognize the [gain] in connection with that sale?
>
> A. Well, if the sale was for a profit than [sic] I'm sure the profit would be treated in whatever ways appropriate under accounting principles.

Keyes Sworn Statement, at 61-62.

[95] *Id.* at 60.

[96] Yates Sworn Statement, at 79; *see also* Keyes Sworn Statement, at 53-54.

[97] Keyes Sworn Statement, at 64-65.

[98] *Id.* at 70. Astin characterized the situation this way: "Keyes, had . . . remarked to Arthur Andersen . . . that he believed that they were requesting the wrong opinions. . . . When I say the wrong opinions, I mean that, from a lawyer's perspective, he [Keyes] didn't think what they [Andersen] were asking for was what his reading of the corporate rules required." Sworn Statement of Ronald T. Astin, Vinson & Elkins, to Rebecca M. Lamberth, A&B, Aug. 12, 2003 (the "Astin 8/12/03 Sworn Statement"), at 36-37.

transaction, when viewed in its entirety, as a loan.[99]  Carlin indicated his understanding of

these points.[100]

Keyes testified that this "recharacterization" assumption would not be acceptable

in a true sale opinion because a court that found that a true sale did not occur would

recharacterize the transaction as a loan.[101]  A true sale opinion that contained a "no

recharacterization" assumption would thus be assuming away the very issue that a true

sale opinion purported to address—whether the transaction was really a sale or a loan.[102]

According to Keyes, Vinson & Elkins added the "no recharacterization" assumption to

the true issuance opinion letter to "put people on notice"[103] that "we're not giving a true

sale opinion."[104]  As requested by Enron, Vinson & Elkins delivered a true issuance

opinion with respect to the Class B membership interest.[105]

---

[99] Keyes Sworn Statement, at 70-71.  Specifically, the opinion contained the assumptions that a court would not "(i) recharacterize the issuance of the Class B Membership Interest by NBIL . . . as a loan to NBIL supported by a security interest in [its] Class B Membership Interest, or (ii) recharacterize the [t]ransactions as a loan to Northern Plains supported by a security interest in the [financial assets]." Cornhusker Opinion Letter, at 10.

[100] Keyes Sworn Statement, at 71.

[101] *Id.* at 71-72 and 78.

[102] *See, e.g.,* Andersen 4/27/98 FAS 125 Memo (distributing Andersen's publication, "Financial Assets and Liabilities - Sales, Transfers and Extinguishments: Interpretations of FASB Statement 125" from Keyes' files).  Andersen's publication includes the following as one of the factors to be considered to determine whether assets transferred meet the requirements of FAS 125:

> An opinion must be from counsel . . . with sufficient expertise . . . to make the determination . . . whether the transaction would be viewed as a sale and not as a secured borrowing if the seller enters bankruptcy.

Andersen 4/27/98 FAS 125 Memo, at 67.

[103] Keyes Sworn Statement, at 85.

[104] *Id.*

[105] Specifically, Vinson & Elkins opined that, in the event of a bankruptcy of NBIL, Enron, Northern Plains or any other consolidated subsidiary of Enron, including ECT, the Bankruptcy Court would conclude that the Class B Membership Interest would not be the property of NBIL, Enron, Northern Plains or any other consolidated subsidiary of Enron, including ECT, respectively.  Cornhusker Opinion Letter, at 2-3.

*Projects Churchill and MidTexas.* Later in 1998, Yates, Keyes and Wulfe worked on another FAS 140 Transaction known as Project Churchill.[106] The same true issuance/true sale issues still concerned Keyes, which he again discussed with Carlin.[107]

Keyes and Tarry also worked on another "true issuance"[108] structured finance transaction, MidTexas, that was "slated to close"[109] in the second quarter of 1998. However, on Friday, June 5, 1998, Tarry and Spradling had a meeting with Enron and Andersen concerning the MidTexas transaction, and information learned in that meeting caused additional concern about the true issuance/true sale opinion letter issue.[110] On

---

[106] Wulfe Sworn Statement, at 43; Keyes Sworn Statement, at 29-30; Yates Sworn Statement, at 45. Project Churchill related to an interest in a power plant in Puerto Rico. Sworn Statement of Joseph Dilg, Managing Partner, Vinson & Elkins, to Rebecca M. Lamberth, A&B, Sept. 24, 2003 (the "Dilg 9/24/03 Sworn Statement"), at 50.

Project Churchill closed on June 25, 1998. LNG2 contributed $200 million as its initial capital contribution to an SPE known as LNG in exchange for the Class B Membership Interest in LNG. Churchill Opinion Letter, at 4-7. LNG used the $200 million to make two special distributions to the holder of its Class A Membership Interest, Enron LNG Power (Atlantic) Ltd. ("ELP") (a wholly owned subsidiary of Enron), one, on June 30, 1998, in the amount of $100 million, and another shortly thereafter, on July 2, 1998, also in the amount of $100 million. *Id.* By timing the special distributions on either side of June 30, Enron recorded one-half of the gain in the second quarter and the other half of the gain in the third quarter. ELP transferred a financial asset (a class B interest in another SPE that was created when ELP transferred an asset to it) to LNG in exchange for the issuance of LNG's Class A Membership Interest and the two special distributions to which that interest was entitled. *Id.* As noted above, LNG issued its Class B Membership Interest to LNG2, which meant that LNG2 was entitled to all proceeds from the financial asset that was contributed to LNG by ELP. *Id.* LNG2 secured its $200 million loan by granting the lenders a security interest in the Class B Membership Interest it owned in LNG. *Id.*

BTI entered into a Total Return Swap with ENA (then known as ECT). *Id.* Enron guaranteed ENA's obligations under the Total Return Swap. *Id.* Under the Total Return Swap, the proceeds of the financial assets which were to be transferred to BTI would be returned to Enron. *Id.* As it did in the Cornhusker opinion letter, the Vinson & Elkins opinion letter notes that, under "the Total Return Swap, . . . is basically to make the Lenders whole in the event that LNG2 is unable to repay principal, interest, fees and other amounts owed to the Lenders." *Id.* at 20. The Vinson & Elkins opinion also states that "the Total Return Swap is similar in function to a guaranty. . . ." *Id.* at 23.

[107] Keyes Sworn Statement, at 117-18.

[108] Typed Notes for Meeting with Jim Derrick (the "Derrick Meeting Notes"), at EVE 1250750 [EVE 1250750-EVE 1250751].

[109] Derrick Meeting Notes, at EVE 1250750.

[110] Tarry 6/7/98 FAS 125 Issues Memo, at 1-2.

Sunday, June 7, 1998, Tarry wrote Dilg a memo[111] setting out the concerns that Keyes

had noted:

> David [Keyes] noted that in the Cornhusker transaction, the transaction
> was structured to permit Enron to recognize some of the gain in the first
> quarter and some of the gain in the second quarter. The . . . documents
> require that, in order to obtain the class B membership interest from
> NBIL1, NBIL2 must make a $99,160,000 capital contribution to NBIL1
> on or before March 27, 1998. . . . On the other hand, the . . . documents
> provide that NBIL1 shall distribute the $99,160,000 . . . to Northern Plains
> (as the class A member of NBIL1) in two installments, the first of
> $49,580,000 to occur on March 27, 1998, and the second of $49,580,000
> to occur on April 2, 1998.
>
> Based upon Enron's desire to recognize gain in two separate quarters, it
> appears that . . . the event that must have resulted in the recognition of the
> gain was the transaction between Northern Plains and NBIL1 (as to which
> we gave no opinion). Only [that] part of the transaction . . . was structured
> to "straddle" the first and second quarter. . . . This fact suggests that, for
> opinion purposes, we and the accountants focused on the wrong part of the
> transaction.[112]

The meeting also raised concerns in the event Vinson & Elkins were to be asked

to give a true sale opinion.[113] Dilg, Spradling, Keyes and others met to discuss the true

sale versus true issuance issue.[114] As Keyes testified:

---

[111] *Id.*

[112] *Id.* at 1-2.

[113] *Id.* On this issue, Tarry's memo to Dilg states, in pertinent part:

> At the MidTexas meeting on Friday, one of the Arthur Andersen partners stated that, in
> the context of a transaction with a total return swap or a full guaranty from the transferor
> of the asset (or an affiliate of the transferor), the substantive consolidation opinion was
> generally difficult for law firms to give. . . .
>
> David and I did not understand the comment from Arthur Andersen . . . . As a newly-
> established bankruptcy remote entity, NBIL2 is similar to entities in traditional structured
> finance and asset securitization transactions for which non-consolidation opinions are
> routinely given. . . .
>
> In his voice mail to me, David did suggest that Arthur Andersen . . . may have had in
> mind a different kind of substantive consolidation opinion that would be much more
> difficult to give. If, contrary to the opinion we gave in Cornhusker and to the opinions
> we propose to give in Churchill and MidTexas, the accountants really should have
> required that we give an opinion (in the context of Project Cornhusker) the Northern
> Border units [the financial asset] had been truly sold to NBIL1, then such a true sale
> opinion would have to focus, among other things, on the fact that affiliates of Northern

- 37 -

[t]he purpose of the meeting was to bring to Mr. Dilg's attention that there
were transactions involving true issuance opinions; that we had this issue
of whether or not true issuance opinions were responsive to FAS-125. We
wanted to be sure that he as the Enron client relationship partner was
aware of this. We thought that the issue should be confirmed at high
levels on something like this.[115]

At that meeting, Dilg asked about the size and financial impact of these

transactions.[116] The earnings expected to be generated by the MidTexas transaction also

factored into the disclosure concerns that another attorney at Vinson & Elkins, Wulfe,

had spotted with respect to Project Cornhusker.

*Disclosure Issues Identified in the Summer of 1998*

During the same period that these opinion letter issues were being discussed,

Wulfe was having discussions with several of his partners at Vinson & Elkins, including

---

Border (ECT and Enron) provided a full guaranty of the NBIL2 lending transaction.
Virtually all law firms would refuse to give a true sale opinion in a transaction that
provided for full recourse back against the purported transferor of the asset. In the
Cornhusker transaction, the issue then becomes whether recourse against ECT and Enron
(as affiliates of Northern Plains) is equivalent to recourse against Northern Plains itself.
If, upon a bankruptcy of Northern Plains, ECT or Enron, the assets and liabilities of those
entities are substantively consolidated, then, for bankruptcy purposes, recourse against
ECT and Enron would be the same thing as recourse against Northern Plains since the
separate existence of the entities would be disregarded. . . . The delivery of an opinion
that such a consolidation would not occur is very difficult, because, unlike newly-formed
special purpose entities, Northern Plains, ECT and Enron are operating companies. . . .
[W]e would find it very difficult to provide such an opinion.

The preceding long-winded and convoluted discussion is, in short, simply a way of
saying that I still don't understand the position the accountants are taking. Contrary to
my initial impression and based upon the ideas David communicated in his voice mail,
the statements made by the Arthur Andersen partners in the MidTexas meeting did not
make the situation any more comprehensible.

*Id.* at 2-3.

[114] Keyes Sworn Statement, at 102-03.

[115] *Id.* at 103-04.

[116] *Id.* at 105.

Baird,[117] Dilg,[118] Yates, Keyes and Spradling,[119] about Enron's FAS 140 Transactions

and other similar transactions, and the disclosure issues raised by these transactions.[120]

Wulfe had previously worked on Project Cornhusker in the first quarter of

1998.[121] During the second quarter, while Wulfe was working on Project Churchill,[122] he

discussed with Schuler that Enron should consider making certain disclosures with

respect to Churchill and similar transactions.[123]

To Wulfe, it seemed that Enron was obtaining "an increasing percentage of its

earnings" from appreciation of its merchant assets.[124] Wulfe recognized that by using

these transactions Enron was recognizing earnings based on "valuation of assets, some of

---

[117] Wulfe Sworn Statement, at 40. Baird took notes on his conversation with Wulfe regarding certain of Enron's transactions, particularly the FAS 140 Transactions and the disclosure issues associated with them. *See* Baird Sworn Statement, at 169-70; *see also* Baird, Typed Notes, entitled "C/w Wulfe 6/254/98" (the "Baird Notes") [EVE 602914-EVE 602915]. Baird explained that the notes were from a conversation that he had with Wulfe on June 2, 1998, "so the date is obviously a typographical error." Baird Sworn Statement, at 169-70. Baird's time sheets indicate a telephone conversation with Wulfe on June 2, 1998, "regarding Project Cornhusker and other similar transactions and issues relating thereto." Vinson & Elkins Invoice No. 20050263, regarding General Retainer, Reporting and Opinion Matters, July 31, 1998 (the "Reporting and Opinion Matters 7/31/98 Invoice"), at 1 [EVE 1311092-EVE 1311107].

[118] Wulfe Sworn Statement, at 56.

[119] *Id.* at 73.

[120] Wulfe was aware of the opinion letter issue, but he considered that to be more of an issue to Keyes. *Id.* at 102-03.

[121] *Id.* at 43.

[122] *Id.*

[123] *Id.* This was not the first time that Wulfe had raised potential disclosure issues to Schuler. Wulfe had earlier conferred with Schuler on disclosures related to another structured finance transaction, Project Nighthawk, about the need to disclose contingencies under which Enron would have to "pay money," potentially up to $500 million, but he recalled that Enron didn't think the contingency was material. *Id.* at 30. These discussions were in October 1997 and then again in early 1998. *Id.* at 25 and 30-33. Wulfe testified that he believed he saw records that indicated he had similar discussions with Mordaunt. *Id.* at 93-94.

[124] *Id.* at 46.

which may not be publicly traded. . . ."[125] Wulfe discussed the individual and aggregate effect of such transactions on Enron's financials.[126]

Wulfe also recognized, at least on the FAS 140 Transactions that he was working on, that Enron, as a consolidated entity, was not shifting the risk of loss and was not giving up the potential upside of the assets being transferred.[127] Enron's obligation under the Total Return Swap to pay the loan also raised liquidity issues: "[I]f the asset placed in the structure was sold . . . for . . . less than . . . the loan . . . [then] some Enron entity would effectively make-up the shortfall."[128]

Wulfe met with Dilg,[129] who was "trying to get up to speed"[130] on the FAS 140 Transactions for a meeting with Derrick. Although the "principal purpose in the meeting might have been the opinion issue,"[131] Wulfe thought that Dilg "wanted to be in a position to at least discuss" the disclosure issues.[132] Wulfe was aware of other Enron

---

[125] *Id.* at 54-55. Wulfe had a "vague recollection" that "the most independent third party in the transaction," the lender, got "comfortable" with the valuations. *Id.* at 85. Baird's notes indicate that Wulfe told him that Enron (apparently) was "representing to the banks they have an economic model that is roughly the same model they use internally for calculating bonuses; they have been doing analysis re: appropriate discount rate; they think they can justify it." Baird Notes, at EVE 602914; Wulfe Sworn Statement, at 87.

[126] Wulfe Sworn Statement, at 50-51.

[127] *Id.* at 49 and 61. Wulfe elaborated: "Enron, on a global consolidated basis, was retaining risks and that that [sic] transaction viewed on a consolidated basis was therefore different than a transaction where the assets transferred to a third party and where Enron, on a consolidated basis, retains no risk." *Id.* at 83. Another disclosure issue bothered Wulfe: "someone may have suggested using language that the net income from the transactions was net of related charges of unrecovered costs, and my recollection of this discussion is that we raised the issue that the word related should be carefully considered because in some sense they were not related." *Id.* at 61.

[128] *Id.* at 89.

[129] *Id.* at 56.

[130] *Id.* at 58.

[131] *Id.*

[132] *Id.* at 58-59.

transactions that were similar to the FAS 140 Transactions,[133] and Dilg "asked me to sort of check with some of my colleagues who ... focused on the structured finance transactions to get at least some type of feel for the other transactions that we were aware of . . . ."[134] Wulfe checked with Spradling, Yates and Keyes[135] about transactions they were familiar with and likely discussed these issues with them.[136] Some or all of them were aware that these transactions were generating earnings.[137]

From these discussions, Wulfe was able to quantify, at least in the sense of "some ballpark numbers,"[138] the impact that these transactions were having on Enron's financial statements.[139] In Wulfe's view, the numbers were "significant."[140] Sometime during this same time period,[141] Wulfe met with Baird and discussed these matters. Baird's notes from his conversation with Wulfe reflect a recognition of the large amounts that these transactions represented, the impact on Enron's financial statements and other important issues raised by Enron's FAS 140 Transactions.[142] Baird's notes reflect an understanding

---

[133] *Id.* at 72.

[134] *Id.*

[135] *Id.* at 73.

[136] *Id.* at 73-75.

[137] *Id.* at 82.

[138] *Id.* at 77.

[139] *Id.* at 78.

[140] *Id.*

[141] *Id.* at 56 ("exactly what happened during this period is jumbled.").

[142] Baird Notes. Baird's notes that he took during his conversation with Wulfe on June 2, 1998 state:

    C/w Wulfe 6/254/98 [sic]

    What type of transaction
        sale
        "monetization"
        structured finance
    Gross credit swap between Enron and bank (bankk [sic] pyays [sic] enron what it gets; enron pays bank am [sic] amount equal to the stated principal and interest on the loan)

that these issues were not isolated to a few particular transactions. Baird's notes also
indicate that either Wulfe or Baird thought that these matters were known by at least one
senior officer at Enron: "BEN GLISSON [sic] KNOWS ALL OF THIS STUFF."[143]
Wulfe recognized that disclosure of these matters, if required, should appear in Enron's

---

How much it involved
How much was the gain
    net or gross
    iunitial [sic] gain is net of taxes; they will reduce part of snowball [sic]
    is it ok
50 mm after tax gain net of certain charges
how do you refer to the charges . . . "related" charges of unrecovered costs.
Keyes
Cash they get is no more than FMV of asset put in Qualified Structured Vehicle
book lesser of cash proceeds or fmv
Cornhusker: fairly simple (used market) ($20 mm pretax in first quarter)
Churchill (Puerto Rican project): Using discounted cash flow model; representing to the
banks they have an economic model that is roughly the same model they use internally
for calculating bonuses; they have been doing analysis re: appropriate discount rate; they
think they can justify it.

MidTexas
Keep doing cash transactions
Have kept doing Sutton Bridge transactions.
BEN GLISSON [sic] KNOWS ALL OF THIS STUFF

One of the benefits of Churchill is they get $200 of cash, but it isn't reflected as debt.
Use a non-consolidated entity. But credit derivative is an equivalent of a guarantee.

Nighthawk (in billions) (there was no earnings gain; just moving $500 million of debt off
balance sheet). Have they adequately disclosed that they have essentially guaranteed this
$500 million; plus amounts that may be dumped on market? Really different; just a
liquidity issue.

Concern about running out of these assets

Concern about booking deferred taxes, then reversing that if they bid for project when it
is put up for bid in year 2000.

Even if they are permitted under accounting rules, have they properly disclosed the effect
of those transactions.

Cherry picking issues

Issue about lack of market discipline re: valuation process

offer on Churchill re: ½ of valuation.

Baird Notes (emphasis in original).

[143] *Id.* (emphasis in original).

MD&A.[144]  One of Baird's notes from the conversation with Wulfe confirms this point: "Even if they are permitted under the accounting rules, have they properly disclosed the effect of those transactions."[145]  Following their discussion, Wulfe understood that Baird would talk with Rogers about these matters.[146]  As discussed below, Baird did speak with Rogers, as well as Mordaunt, about these matters on June 30, 1998.[147]

### The Dilg-Derrick Meeting

On June 8, 1998, Dilg prepared notes for use at a meeting with Derrick scheduled for later that day[148] "regarding opinion issues,"[149] but at which these disclosure issues were also covered.[150]

*Opinion Letter Issues.*  Dilg understood that his partners had "two concerns"[151] on the opinion letters: one, whether the true issuance opinion was sufficient for the accounting purposes of the transaction; and two, the need to clarify and focus Enron on

---

[144] Wulfe Sworn Statement, at 69.  Wulfe indicated that the concern about disclosure was "prospective" in that they were identifying "recent trends."  *Id.* at 94-95.  At that time, "prospective" meant the "second quarter."  *Id.* at 95-96.  Disclosure regarding known material trends was an explicit requirement of MD&A.  *See* Item 303 of Regulation S-K, 17 C.F.R. § 229.303.

[145] Baird Notes.

[146] Wulfe Sworn Statement, at 93.

[147] *See, e.g.,* Vinson & Elkins Invoice No. 20053363, regarding Enron Capital Management, Aug. 31, 1998 (the "Enron Capital Management 8/31/98 Invoice"), at 1 [EVE 131605-EVE 1301609].

[148] Dilg 9/24/03 Sworn Statement, at 42-50; *see also* Reporting and Opinion Matters 7/31/98 Invoice, at 2 (Dilg's time entry for June 8, 1998).

[149] Reporting and Opinion Matters 7/31/98 Invoice.

[150] Dilg 9/24/03 Sworn Statement, at 42-43.  Derrick could recall very little about this meeting, even after looking at Dilg's notes.  *See* Derrick 5/20/03 Sworn Statement, at 113-15; Sworn Statement of James V. Derrick, former General Counsel, Enron, to Rebecca M. Lamberth, A&B, Sept. 26, 2003 (the "Derrick 9/26/03 Sworn Statement"), at 523 ("So how much of this was discussed?  I don't know.  What was said?  I don't know.").  Derrick did not remember whether these issues were discussed in person or over the telephone, but "whichever way it came about, my action with respect to that was to promptly put Vinson & Elkins directly in contact with both Rick Causey and, I believe, Rick, also, then involved Arthur Andersen in that."  Derrick 5/20/03 Sworn Statement, at 113-14.  When asked about how or whether the issues reflected in Dilg's notes were resolved, Derrick stated, "I don't – No.  I don't recall it coming back."  *Id.* at 114; *see also* Derrick 9/26/03 Sworn Statement, at 522-27.

[151] Dilg 9/24/03 Sworn Statement, at 31.

the qualification in the opinion that the overall transaction would not be recharacterized

as a loan.[152] Dilg recalled that:

> there was some concern whether . . . [the true issuance] was the only piece
> of the transaction that needed to be covered by an opinion and there was
> something in the structure, and I can't recall the details, that would have
> prevented us from being able to render an opinion on the true sale nature
> of the transfer of the assets. . . .[153]

In the notes he prepared for the meeting,[154] Dilg summarized the opinion issues he

wanted to raise:[155]

> Issues:
>
> 1.  True Issuance opinions.  We a [sic] unsure of how opinion rendered
> satisfies requirements of FASB125.  We are not asked to render
> accounting advice but qualification we had to take in opinion could be
> inconsistent with 125 requirements.  We have not had direct contact with
> senior accounting personal [sic].  During Cornhusker we pointed out the
> qualification to junior AA representative and discussed with (Lance
> Schuler?) and they said OK.  In connection with MidTexas David Keyes
> raised opinion issue with Lance Schuler again last week.  Lance reported
> back that he had discussed with Ben Glissen [sic] and Ben said opinion in
> Cornhusker had been reviewed by top levels of AA and they were

---

[152] *Id.* at 31 and 40.

[153] *Id.* at 32.

[154] Derrick Meeting Notes.

[155] In his sworn statement, Dilg testified that he had the following concerns:

> [I]f Arthur Andersen or Enron changed their mind as to the nature of the opinion that was
> being requested, that, without doing a lot more work or perhaps some restructuring, we
> really hadn't gone through what all would be necessary, to the best of my recollection.
> We weren't in a position to issue a different type of opinion . . . .

Dilg 9/24/03 Sworn Statement, at 40-41.  Moreover, Dilg testified:

> [T]o the extent we were requested to do additional work to see whether we could render a
> different opinion and if we came to the decision that we could not professionally render
> the different type of opinion, it might require restructuring transactions to make them
> more expensive or increase interest rates or I'm not sure what effect it would have had if
> we had required restructuring, but I didn't want to be in a position of Mr. Derrick hearing
> that Vinson and Elkins was unwilling to give an opinion that was going to cost the
> company a fair amount of money to restructure transactions to satisfy us without him
> being aware of that potential beforehand.

*Id.* at 65.

- 44 -

satisfied. Point out qualification in opinion and difference from Linx opinion in Sutton Bridge and discuss pg 67 of AA field directive.

Concerns:

1. Similar opinion in MidTexas may get focused upon by other accounting types and if asked to remove qualification we cannot. Don't want deal to blow up at last moment and cause earnings surprise.

2. Possible review in context of MidTexas may cause AA to relook at Cornhusker and cause issues.

3. Have raised issue with Lance and apparently everything is OK. Since we have not had contact with AA don't understand the reasoning.[156]

At the meeting, Dilg told Derrick that Vinson & Elkins:

had been asked to render true issuance opinions and [I] explained to him what that covered in the sequence of events in the transactions; the qualification in the opinion that the entire group of transactions wouldn't be collapsed and treated as a loan. . . .[157]

The evidence suggests that Dilg also "discuss[ed] pg 67 of AA field directive," as his notes indicate that he planned to do.[158] This reference appears to be to Andersen's publication, "Interpretation of FASB Statement 125," which had been provided to Vinson & Elkins. At page sixty-seven of that publication, entitled "The Required Content of a Legal Opinion: General,"[159] Andersen answers the question, "[i]f a legal opinion is required . . . what is the required legal standard?[160] as follows:

In reviewing legal opinions to determine if assets transferred meet the above requirements, the following factors should be considered:

- *Does the opinion provide a specialist's (attorney's) opinion?* An opinion must be from counsel (inside or outside) . . . with sufficient expertise in the applicable laws to make the

---

[156] Derrick Meeting Notes, at EVE 1250750.

[157] Dilg 9/24/03 Sworn Statement, at 40.

[158] Derrick Meeting Notes, at EVE 1250750.

[159] Andersen 4/27/98 FAS 125 Memo, at 67.

[160] *Id.*

determination regarding whether the transaction would be viewed as a sale and not as a secured borrowing if the seller enters bankruptcy.

. . . .

- *Does the opinion contain an opinion that states that the transaction, in a properly presented and argued case, <u>would</u> be beyond the reach of creditors.* In the United States, commercial companies subject to the Bankruptcy Code should generally receive an opinion that the transaction <u>would</u> be considered a sale as opposed to a secured borrowing or a loan and that, if the seller becomes a debtor, the transferred assets <u>would</u> not be deemed to be property of the seller's estate.[161]

Sometime after the meeting, Derrick got back to Dilg on the opinion issues, telling him that Derrick:

> had visited with Mr. Causey and that Mr. Causey had checked with the higher-ups within Arthur Andersen, I took it to be their technical people, and that they had focused on the opinions and they knew what they were and that they felt they were satisfactory for their purposes.[162]

For Dilg, that was the end of the matter: "[t]he word coming back from Mr. Derrick removed any doubt in my mind. . . ."[163] Yates was told that Derrick talked to Causey, and that Vinson & Elkins "got assurance that both Enron and Arthur Andersen understood the nature of our opinions."[164] Project Churchill and MidTexas closed after

---

[161] *Id.* at 67-68 (emphasis in original).

[162] Dilg 9/24/03 Sworn Statement, at 59. Derrick initially stated he "thought I had – put Vinson & Elkins and Rick Causey in direct contact. Now I don't know that that took the form of me calling Joe and saying Joe [Dilg], you call Rick. . . . It may have been telling Rick, you call Joe; but my sense is that I put the two together . . . . But as to exactly which way that occurred, I don't have a specific recall on that." Derrick 9/26/03 Sworn Statement, at 520-21.

After Derrick was informed of Dilg's testimony that Derrick had contacted Causey and that Derrick forwarded Causey's response to Dilg, Derrick stated "Well, as I previously testified, I think, I do remember – I think I do – recall calling Rick Causey. That much I can confirm . . . Beyond that . . . I'm not in a position to say that [Dilg's] recollection is not right. I simply – I don't recall that." *Id.* at 522.

[163] Dilg 9/24/03 Sworn Statement, at 60.

[164] Yates Sworn Statement, at 52.

- 46 -

this meeting.[165]   However, Keyes was still not satisfied,[166] and he continued to raise these

same issues in the next FAS 140 Transactions that he worked on for Enron, Project

Shogun[167] and Project Iguana.

It was not until Project Iguana, a FAS 140 Transaction that closed in late 1999,[168]

that Andersen appears to have understood the import of the true issuance/true sale

distinction and the "no recharacterization" assumption contained in Vinson & Elkins'

true issuance opinion letters.[169]

---

[165] Project Churchill closed on June 25, 1998.  Churchill Opinion Letter, at 1.  Project MidTexas closed on June 30, 1998.  Opinion Letter from Vinson & Elkins to Enron Corp., June 30, 2998 [EVE 13219-EVE 13265].

[166] Keyes Sworn Statement, at 123 ("Well, I always had an issue in my own mind.  Until somebody explained it to me, I never have received any accounting explanation.  I'm not sure I would have been competent if somebody had given me an accounting explanation.  But I had not received one.  So I guess I'm the type of lawyer that if somebody -- if I have an issue, it might always be an issue until somebody gives me an explanation.").

[167] Project Shogun closed in November 1998. *Id.* at 31.  Vinson & Elkins gave a true issuance opinion that was "very similar" to the opinions given in Cornhusker and Churchill.  *Id.* at 33-35; *see also* Opinion Letter from Vinson & Elkins to Enron Corp. and TPC II, L.L.C., Nov. 12, 1998 [EVE 3917253-EVE 3917286].

[168] Keyes Sworn Statement, at 30-31.

[169] Vinson & Elkins had originally agreed to give a true issuance opinion, *id.* at 31-32, but the structure of the transaction changed and a meeting was held with Andersen where the legal opinion was discussed. *Id.* at 129-30, 154-60 and 163-67.  As Keyes described in an email dated December 2, 1999, "[f]or the first time, however, I think he [Carlin] really realized that FAS 125 calls for more than what Arthur Andersen has been getting."  Email from David Keyes, Vinson & Elkins, to Terry Yates, Steve Tarry, Ron Astin, Ed Osterberg and Alicia Curry, Vinson & Elkins, copying Mark Spradling and Joe Dilg, Vinson & Elkins, Dec. 2, 1999, at EVEE 00335156 [EVEE 00335156-EVEE 00335157].  Keyes added:

> I think that I am blamed by some of the inside Enron attorneys, and perhaps by Chris Sherman, for drawing this distinction to AA's attention, as it could jeopardize Enron's FAS 125 transactions.  The Enron theory is, apparently, that relations with AA must be carefully managed and that AA is a sophisticated organization that can read opinions and draw their own conclusion.  I have believed that it is our professional duty to call the attention of a third party recipient to the meaning and scope of our opinion, especially in a situation where we do not believe that the recipient has a correct understanding of what it says in relation to the purpose for which the opinion is requested.

*Id.* at EVEE 00335156.  Keyes testified that the quoted language is not an accurate statement of the firm's professional duty: "I don't think that's a correct statement of legal opinion practice and I -- I'm reasonably confident that what I meant by that was that I shouldn't affirmatively mislead somebody . . . ."  Keyes Sworn Statement, at 178.

Andersen began to rethink whether the "no recharacterization" assumption would be acceptable in a true issuance opinion. *Id.* at 166.  Keyes testified that he was prepared to remove it, and, while Vinson & Elkins

*Disclosure Issues.* Dilg's meeting with Derrick also included a discussion of the

disclosure issues reflected in that portion of Dilg's typed notes:

Notes for meeting with Jim Derrick

CONFIDENTIAL

Wanted to make sure he was aware of several potential issues involved in
ongoing financing transactions under newly issued FASB 125

Large transactions with significant earnings impact.

Cornhusker- closed in 1st quarter 3\27\98 Northern Plains Gas Company-
involved issuance of units in a second tier LLC. As structured we could
not issue a true sale opinion due to nature of total return swap. Structured
as issuance of units and we rendered a "true issuance" opinion satisfactory
to Arthur Anderson [sic] to account as a sale under FASB 125. 40MM of
gain spread over first and second quarter. Scott Wulfe, Steve Tarry and
David Keyes

MidTexas another "true issuance" transaction with a total return swap
slated to close in the 2d quarter. Anticipated to generate 82mm of which
54mm is gain. Said to represent 25% of earnings for 2d quarter.
Spradling

EuroCash- true sale arrangement. Set to close in June. Two parts 23mm
pounds ($55mm) on sale of contract. 12mm pounds consideration from
entering an out of the money swap.

Project Churchhill [sic]--monetization of rights with respect to Puerto
Rico power plant. Closing in June. 150mm of gain - may be spread over
2, 3 and 4 quarters. Some or all of gain may be applied against
accumulated international development costs. Wulfe

. . . .

2. MD&A disclosure: Discussed with Rex the size of these transactions in
connection with offering and MidTexas. Apparently covered as core
earnings and one transaction was not as significant. Given the combined
size of the various deals need to carefully focus on MD&A.[170]

---

was prepared to give a true sale opinion letter in Project Iguana if research and analysis supported it, he
could not remember if an opinion letter was actually given. *Id.* at 32, 134 and 177.

[170] Derrick Meeting Notes.

Dilg testified that in this meeting he alerted Derrick:

> [t]hat we had raised an issue for the Enron Legal Department to focus on
> in connection with the MD&A discussion of these transactions and that we
> understood that was something being focused on and something he should
> be aware of.
>
> . . . .
>
> I can't recall the precise words, but it was to the effect that these
> transactions which were generating income were different than receiving
> fees from pushing gas through a pipeline or other types of things and that
> we had raised an issue with the people that handled their disclosure and
> reporting as far as how to address that sort of change in business in the
> MD&A discussion.[171]

With respect to the content of the disclosures, however, Dilg testified that he did

not "think we knew enough about the overall business to tell them how they ought to

write it."[172]

Baird continued to consider disclosure matters after the Dilg-Derrick meeting.  He

gathered information about these transactions and prepared a list of them, which he

discussed with Enron's Rogers and Mordaunt.   Baird's time entries for days after the

Dilg-Derrick meeting show the following:

| Date | Description | Hours |
|------|-------------|-------|
| 06/16/98 | Regarding reporting obligations and disclosure issues. Telephone conference with Joe Dilg and various telephone messages and voice mails from Scott Wulfe and others who have handled projects for Enron Corp. involving assets securitizations and other matters. Review of prior Securities and Exchange Commission filings. | 1.25 |
| 06/22/98 | Regarding disclosure and reporting.   Telephone conference with Scott Wulfe regarding Projects Cornhusker, Churchill, West Texas and others involving structured transactions. | 0.50 |

---

[171] Dilg 9/24/03 Sworn Statement, at 46.

[172] *Id.* at 69.

| 06/24/98 | Regarding disclosure and reporting obligations. Telephone conferences with Joe Dilg and Scott Wulfe regarding Projects Churchill, Cornhusker, West Texas, Sutton Bridge and other projects and issues relating thereto. | 1.50 |
| 06/29/98 | Regarding disclosure and reporting. Conference call with Scott Wulfe regarding various transactions and disclosure issues relating thereto. | 0.75 |
| 06/30/98 | Regarding reporting and disclosure obligations. Put together list of transactions in preparation for discussion with Rex Rogers and Kristina Mordaunt regarding disclosure issues. Conference with Rex Rogers and Kristina Mordaunt regarding same.[173] | 1.00 |

### *Enron's Earning Release for the Second Quarter 1998*

In early July, Baird received a draft of Enron's earnings release and appears to have reviewed and discussed it with Rogers and Wulfe.[174] Enron issued an earnings release on July 14, 1998, announcing earnings of $0.42 per share and net income before interest, minority interest and taxes of $361 million.[175]

### *Enron's 10-Q for the Second Quarter of 1998*

Baird's time entries also reflect work on the 10-Q for the second quarter 1998, including discussions with Rogers.[176] On August 14, 1998, Enron filed its 10-Q for the

---

[173] Reporting and Opinion Matters 7/31/98 Invoice, at 1.

[174] Baird's time entry for July 6, 1998 contains the following description:

Exchange of voice mail messages with Rex Rogers regarding disclosures relating to earnings for second quarter. Telephone conference with Scott Wulfe regarding various transactions and disclosure issues relating to same. Review of Enron Corp. Forms 10-K and 10-Q and recent press releases and fax to Rex Rogers and Kristina Mordaunt excerpts from same.

Enron Capital Management 8/31/98 Invoice, at 1 (Baird time entry for July 6, 1998); *see also* Vinson & Elkins Invoice No. 20052967, regarding General Retainer, Miscellaneous Matters, Aug. 31, 1998, at 1 (Baird time entry for July 7, 1998) [EVE 1311624-EVE 1311640].

[175] Enron Press Release, "Enron Corp. Reports Earnings of $0.42 Per Share for the Second Quarter of 1998 Compared to $0.38 a Year Ago," July 14, 1998 [ELIB00001491-00002-ELIB00001491-00005].

[176] Vinson & Elkins Invoice No. 20055960, regarding General Retainer, Miscellaneous Matters, Sept. 30, 1998 [EVE 1311978-EVE 1311993]. Baird's time entry for 8/11/98 states: "Review of Enron Corp. form 10-Q draft and mark up section on Wholesale Energy Operations and Services. Telephone conference with Rex Rogers regarding same." Baird's time entry for 8/12/98 states: "Telephone conference with Rex Rogers regarding form 10-Q disclosures relating to financing transaction."

second quarter of 1998.  In MD&A, several new paragraphs appeared in the "Wholesale

Energy Operations and Services" section.[177]  This new language did not reveal that Enron

was obligated to repay the amounts borrowed to fund the FAS 140 Transactions.

From the evidence obtained by the Examiner, there is no indication after Enron's

publication of the 10-Q for the second quarter of 1998 that Vinson & Elkins sought a

follow-up meeting with Derrick to discuss how these disclosure matters were addressed

in that 10-Q.  However, there is an indication that Vinson & Elkins continued to have

some concern about Enron's disclosures related to the FAS 140 Transactions.  Those

concerns are discussed below in the section entitled *Disclosure Issues and the SPE*

*Transactions*.

Although Vinson & Elkins continued to assist Enron with FAS 140 Transactions

from time to time after 1998,[178] as well as other SPE transactions, beginning in

---

[177] The new language was the following:

> Enron continues to be a leading provider of energy commodity sales and services and the development, construction and operation of energy infrastructure worldwide.  These activities have been and will continue to be a significant part of Enron Wholesale's business.  In addition, economic value is being created as Enron expands its worldwide energy businesses and offers comprehensive energy products and services to its customers.  An increasing amount of earnings is derived from the growing number of energy-related investments.  Examples of these investments include investments in debt and equity securities of oil and gas producers and other energy-intensive companies as well as Enron's international energy investments such as power plants and natural gas pipelines.  Earnings from these investments primarily result from changes in the market value of merchant banking related investments held during the period, equity earnings and gains on sales or restructurings of other investments.

> Enron will continue to manage its assets in order to maximize the value and minimize the risks associated with this activity and to provide overall liquidity.  In this process, Enron utilizes portfolio and risk management disciplines including certain hedging transactions to manage market exposures (commodity, interest rate, foreign currency and equity exposures).  Enron Wholesale from time to time monetizes its contract portfolios (producing cash and transferring counterparty credit risk to third parties) and sells interests in investments and assets.

Enron Form 10-Q filed with the SEC for the Quarter ended June 30, 1998, at 18.

[178] For example, Vinson & Elkins was counsel to Enron in the FAS 140 Transaction known as Project Velocity, which closed in Dec. 2000.  *See* Email from Brent Vasconcellos, Enron, to Joel Ephross, Enron, Dec. 13, 2000 [AB0610 0210-AB0610 0211].  In addition, Vinson & Elkins was sometimes consulted on

November 1998, Andrews & Kurth represented Enron in the majority of Enron's FAS

140 Transactions.

### C.     FAS 140 Transactions and Andrews & Kurth

*Andrews & Kurth's Role in Certain FAS 140 Transactions*

From November 1998 through October 2001, Andrews & Kurth provided legal

services to Enron in connection with twenty-eight FAS 140 Transactions. Andrews &

Kurth also assisted Enron with related transactions whereby Enron caused the initial FAS

140 Transactions to be prepaid, and thereby unwound fifteen of the twenty-eight initial

FAS 140 Transactions. In addition, Andrews & Kurth represented Enron in six related

transactions involving the sale at maturity to Enron affiliates of debt and equity issued by

the trusts in the FAS 140 Transactions.[179] Andrews & Kurth delivered at least twenty-

four legal opinion letters regarding true issuance or true sale[180] in the FAS 140

---

potential FAS 140 Transactions that did not proceed, but which continued to inform Vinson & Elkins of Enron's goals in such transactions. For example, a September 7, 2000 email from Keyes to Spradling, Dilg and Astin describes a proposed deal that, according to Keyes, never came to fruition. Email from David Keyes, Vinson & Elkins, to Mark Spradling, Joe Dilg and Ronald T. Astin, Vinson & Elkins, Sept. 7, 2000 (the "Keyes 9/7/00 Email") [EVEE 00638420-EVEE 00638421]; Keyes Sworn Statement, at 211. Keyes' email states in relevant portion:

> Enron has consolidated ownership of six power plants that, if sold, would not qualify as sales . . . under FAS 125, due [to] the equity not being a "financial asset." So Enron will convert the equity into intercompany debt, will then sell the plants to LJM (or possibly some other friendly third party) in exchange for LJM's assumption of the debt, and then will treat the debt as a financial asset. . . . Enron will sell the debt under FAS 125. . . . The profit will be a bump for earnings. The stated business purpose is to reduce the present, bank-financing costs for the power plant, by doing a credit-enhanced, structured deal.

> . . . I have, in this morning's meeting at Enron, disclaimed sufficient personal knowledge of the LJM structure to pass on its use for true sale and nonconsolidation purposes. . . .

Keyes 9/7/00 Email, at EVEE 00638420.

[179] Coggins 6/13/03 Letter; Coggins 11/27/03 Letter. In addition to the transactions listed in this letter, Andrews & Kurth acted as counsel to Enron in the Nikita and Nile transactions, both of which were completed in September 2001. *Id.* at 3 and 5.

[180] As in the case of Vinson & Elkins, the parties used the term "true sale" opinion to refer to an opinion addressing whether a bankruptcy court would find the transfer of the financial asset by the Sponsor to an SPE to be part of the bankruptcy estate of the Sponsor, Enron or Enron's consolidated entities in the event one of them became a debtor in a bankruptcy case. The parties used the term "true issuance" opinion to

Transactions.[181]  The following timeline illustrates the FAS 140 and related transactions where Andrews & Kurth represented Enron.

| Year | Month | Event |
|---|---|---|
| 1998 | December | **PILGRIM:** Pilgrim closed (12/23/98)[182]<br>**POWDER RIVER:** Powder River closed (12/30/98)<br>**WIND RIVER:** Wind River closed (12/30/98) |
| 1999 | January | |
| | February | |
| | March | |
| | April | |
| | May | **LEFTOVER:** Leftover closed (05/28/99) |
| | June | **NIMITZ:** Nimitz closed /**PILGRIM:** Pilgrim partially repaid (06/28/99) |
| | July | |
| | August | |
| | September | **NIMITZ:** Nimitz repaid; **PILGRIM:** remainder of Pilgrim repaid (09/30/99) |
| | October | **LEFTOVER:** Leftover repaid (10/25/99) |
| | November | |
| | December | **GHOST:** Ghost closed (12/21/99)<br>**ALCHEMY:** Alchemy closed (12/27/99)<br>**BLACKBIRD:** Blackbird closed (12/28/99)<br>**DISCOVERY:** Discovery closed (12/29/99) |
| 2000 | January | |
| | February | **DISCOVERY:** Discovery repaid early (02/29/00) |
| | March | **GHOST:** Ghost repaid early (03/21/00)<br>**SPECTER:** Specter closed (03/29/00)<br>**HAWAII:** McGarret A closed (03/31/00) |
| | April | **SPECTER:** Specter repaid early (04/10/00)<br>**BLACKBIRD:** Blackbird repaid (04/14/00) |
| | May | |
| | June | **ALCHEMY:** Alchemy repaid/**HAWAII/Danno B** closed (06/15/00)<br>**HAWAII:** McGarret B closed (06/29/00) |
| | July | |
| | August | **HAWAII:** McGarret C closed (08/31/00) |
| | September | **HAWAII:** McGarret D closed/McGarret B repaid early (09/29/00) |

refer to an opinion addressing whether equity (a class B interest) issued by an entity (an SPE) would be part of that entity's or an affiliate's bankruptcy estate in the event one of them filed bankruptcy. Unlike Vinson & Elkins, Andrews & Kurth did not raise with Enron or Andersen whether or not a true issuance opinion was responsive to the requirements of FAS 125 or FAS 140. Another opinion, the "substantive consolidation" opinion, addresses whether the assets and liabilities of certain entities would, in the event of a bankruptcy of Enron or certain of its subsidiaries, be substantively consolidated with the assets and liabilities of Enron or those subsidiaries.

[181] Coggins 6/13/03 Letter. In addition to the written opinions that were delivered by Andrews & Kurth, draft opinions were prepared for delivery in at least six additional transactions: McGarret G, McGarret J, McGarret L and McGarret M and in connection with the Nikita and Nile transactions. *See* Missing Certificates for Enron Transactions, prepared by Andrews & Kurth (table) [AK 0075290]. Of the twenty-four opinions rendered, twenty-three were true issuance opinions and one was a true sale opinion.

[182] This transaction was structured as two companion FAS 125 transactions and Andrews & Kurth delivered a separate opinion in connection with each such transaction. *See* Opinion Letter from Andrews & Kurth to Enron Corp. and ES Power 2 LLC, Dec. 22, 1998 [AB0076 0469-AB0076 0504]; Opinion Letter from Andrews & Kurth to Enron and ET Power 2 LLC, Dec. 23, 1998 [AB0076 0964-AB0076 0990].

- 53 -

| | |
|---|---|
| October | |
| November | **HAWAII:** Hawaii Restructuring (11/20/00)<br>**CERBERUS:** Cerberus closed (11/29/00) |
| December | **HAWAII:** McGarret F closed (12/07/00)<br>**AVICI:** Avici A closed (12/07/00)<br>**AVICI:** Avici B closed (12/07/00)<br>**CATALYTICA:** Catalytica closed (12/11/00)<br>**HAWAII:** McGarret G closed/McGarret A repaid early (12/14/00)<br>**BACCHUS:** Bacchus closed (12/21/00)<br>**HAWAII:** McGarret H closed (12/22/00) |
| January | **CERBERUS:** Cerberus Refinancing closed (01/31/01) |
| February | **HAWAII:** Danno B repaid early (02/22/01) |
| March | **CATALYTICA:** Catalytica repaid early (03/12/01)[183]<br>**HAWAII:** McGarret I closed/McGarret H repaid early (03/29/01)<br>**HAWAII:** McGarret K closed (03/29/01)<br>**HAWAII:** McGarret L closed (03/29/01) |
| April | **FAS 140 replaces FAS 125 (04/01/01)** |
| May | **HAWAII:** Hawaii Amendments (05/31/01) |
| June | **BACCHUS:** Bacchus repaid early (06/01/01)<br>**HAWAII:** McGarret J closed (06/14/01)<br>**HAWAII:** McGarret M closed (06/22/01)<br>**HAWAII:** McGarret N closed (06/28/01) |
| July | |
| August | **HAWAII:** McGarret N unwound (08/01/01) |
| September | **HAWAII:** McGarret P closed/McGarret G repaid (09/07/01)<br>**HAWAII:** McGarret O closed/McGarret F repaid early (09/07/01)<br>**NIKITA:** Nikita closed (09/28/01)<br>**NILE:** Nile closed (09/28/01) |
| October | **AVICI:** Avici A repaid early (10/04/01)<br>**AVICI:** Avici B repaid early (10/04/01)<br>**HAWAII:** McGarret Q closed/McGarret C repaid early (10/17/01)<br>**HAWAII:** McGarret R closed/McGarret D repaid early (10/17/01)<br>**HAWAII:** McGarret S closed/McGarret P repaid early (10/17/01)<br>**HAWAII:** McGarret T closed/McGarret K repaid early (10/17/01)<br>**HAWAII:** McGarret U closed/McGarret M repaid early (10/17/01)<br>**HAWAII:** McGarret V closed/McGarret O repaid early (10/17/01) |
| November | |
| December | **Petition Date (12/02/01)** |

(2001 shown on left margin)

### Knowledge of Enron's Accounting Objectives

Andrews & Kurth understood at least two of Enron's three principal accounting goals for the FAS 140 Transactions on which the firm worked. First, Andrews & Kurth knew that Enron sought to raise funds through each transaction that would not be reflected as debt on its balance sheet although Andrews & Kurth knew Enron retained the

---

[183] This transaction was actually repaid and unwound on March 12, 2001, effective as of December 11, 2000. *See, e.g.,* Certificate Purchase Agreement between Enron Ventures Corp. and LJM2-Fred LLC Relating to the Lab Trust, entered into as of Mar. 12, 2001 and effective as of Dec. 11, 2000 [AB000122594-AB000122608].

risks and rewards of owning the transferred asset.[184]  Second, Andrews & Kurth knew

that Enron recognized gain on its income statement in those FAS 140 Transactions where

the proceeds received exceeded the basis in the transferred asset.[185]  However, it does not

appear from the testimony that Andrews & Kurth knew that Enron's third accounting

goal was to create cash flow from operating activities by characterizing the proceeds

from these transactions in this manner.[186]

Andrews & Kurth also knew that the opinions it rendered in the FAS 140

Transactions were critical to Enron's intended accounting treatment.[187]  Andrews &

---

[184] Sargent Sworn Statement, at 23 and 27; Barbour Sworn Statement, at 29; Sworn Statement of Daniel Sullivan, Andrews & Kurth, to James C. Grant, A&B, Oct. 8, 2003 (the "Sullivan Sworn Statement"), at 33-34. Enron FASB 125 Transactions (the "Andrews & Kurth FASB 125 Transactions Memo"), at 3 (prepared by Andrews & Kurth) [AK 0141534-AK 0141551].

[185] Sargent Sworn Statement, at 24 and 25; Barbour Sworn Statement, at 29-30; Sullivan Sworn Statement, at 33-34; Memorandum from Thomas R. Popplewell, Andrews & Kurth, to Rick Hopkinson, Enron, regarding SFAS 125 Transaction-Sarlux (Project Nimitz) (closed June 28, 1999), June 30, 1999, at 2 [AK 0074904-AK 0074923]; Andrews & Kurth FASB 125 Transactions Memo, at 1.  Andrews & Kurth, however, did not know the amount of gain Enron recognized either on a per transaction basis or in the aggregate. Sargent Sworn Statement, at 29-31; Barbour Sworn Statement, at 30.

[186] Sargent Sworn Statement, at 26-28; Barbour Sworn Statement, at 30; Sullivan Sworn Statement, at 34-35. However, there are a few examples in the documentary evidence that Andrews & Kurth was on notice that Enron was characterizing the proceeds received through the FAS 140 Transactions as cash flow from operating activities. See Email from Tom Popplewell, Andrews & Kurth, to Bill Bowes, Andrews & Kurth, AnnMarie Tiller, and James Ginty, Enron, Mar. 21, 2001, at 1 [AK 0051381-AK 0051382]; Email from Bill Bowes, Enron, to Tom Popplewell, Andrews & Kurth, Mar. 22, 2001 [AK 0122676]; Email from Bill Bowes, Enron, to AnnMarie Tiller, Enron, James Ginty, Enron, James Sandt, Enron, and Tom Popplewell, Andrews & Kurth, Mar. 22, 2001, at 1 [AK 0122673-AK 0122675].

[187] Sargent Sworn Statement, at 36-37:

Q. Is it your impression that in each FAS 125, FAS 140 that you have done for anyone, one of the parts of this closing binder was a true sale non-substantive consolidation opinion?

A. Well, what I understand is that for the accountants to meet the FAS 125 criteria . . . that they have asked for that opinion.

Barbour Sworn Statement, at 47:

Q. So sometime in the evolution between the start of FAS 125 in '96 and November of 1998, you became aware that a condition to the FAS 125s was the receipt of . . . a bankruptcy opinion?

A. That's correct.

See also Sullivan Sworn Statement, at 42.

Kurth understood that its opinions provided Andersen with evidence of the "legal isolation" required by FAS 140.[188]  With only one exception,[189] Andrews & Kurth's opinion letters were addressed to Enron.[190]  No third party was permitted to rely on them except Andersen, who was permitted to use the opinion "solely as evidential support in determining the appropriate accounting and financial treatment of the [t]ransactions."[191] A fact-finder could conclude that, but for the opinions provided by Andrews & Kurth, Enron could not have obtained the accounting treatment it desired on the FAS 140 Transactions, and that Andrews & Kurth knew this.

*Knowledge of Enron's Desire to Maintain Control Over the Monetized Assets*

*Introduction.*  In the FAS 140 Transactions on which it worked, Andrews & Kurth recognized that Enron retained the risks and rewards of the assets being transferred and that Enron did not want to surrender control of the asset being transferred.  Moreover, Andrews & Kurth assisted Enron with the repeated and consistent prepayment and unwinding of many of these FAS 140 Transactions, such that a fact-finder could determine that Andrews & Kurth came to know that these assets were not being isolated from Enron by these transactions.

*Retention of Risks and Rewards.*  In these FAS 140 Transactions, Andrews & Kurth knew that "Enron, as a practical matter, retains all the risks and rewards of owning

---

[188]  Sargent Sworn Statement, at 33-34; Barbour Sworn Statement, at 45-47.

[189]  In the Cerberus restructuring, Andrews & Kurth delivered a FAS 140 opinion to Rabobank.  Opinion Letter from Andrews & Kurth to Cooperatieve Centrale Raiffeisen-Boerenleenbank B.A., Jan. 31, 2000 [AB000113728-AB000113766].

[190]  The other addressee was one of the entities created by Enron to facilitate the FAS 140 Transaction.  *See, e.g.,* Opinion Letter from Andrews & Kurth L.L.P. to Enron Corp. and McGarret VIII, L.L.C., Dec. 22, 2000, at 42 [AB000044134-AB000044178].

[191]  *See, e.g., id.*

the asset."[192]  In virtually all of the FAS 140 Transactions in which Andrews & Kurth

represented Enron, an Enron affiliate (the Sponsor)[193] transferred an asset to an SPE

(Asset LLC) over which it had voting control.  An ownership interest representing

99.99% of the economics of Asset LLC (generally referred to as the Class B Interest) was

then issued to another SPE, Transferor LLC.  Transferor LLC then transferred this Class

B Interest to another entity (usually a Delaware business trust) that issued debt securities

---

[192] Andrews & Kurth FASB 125 Transactions Memo, at 3.  This memorandum was prepared by Andrews & Kurth in April 2000 for an in-house seminar on Enron's FAS 140 Transactions.  Email from Jason Rodgers, Fish & Richardson, to Emily Washburn, A&B, Sept. 8, 2003, at 1 [AB1129 00613-AB1129 00614].  Sullivan explained the memorandum as follows:

Q. You wrote that Enron as a practical matter retains all of the risks and rewards of owning the asset.  Do you see that?

A. Yes.

. . . .

Q. And what was the basis for you saying what you said in the first sentence of that paragraph?

A. I'm not sure it's completely accurate, so, you know, if I was writing this as legal testimony, I wouldn't have written it this way.  I think I wrote it as a general statement for the purposes of a two-page summary of a complex deal.

Q. Okay.  So let's start with what's the concept you're trying to get across, and then let's move to why you say it's not perfectly accurate.

A. The general concept is that Enron -- the following features Enron retains control over the asset via the class A interest. . . . Enron via total return swap is obligated to pay the debt to the extent the asset falls short of what's required to pay the debt, and to the extent the asset throws up cash in excess of what's required to pay the debt, the certificates, then Enron retains this upside, if you like, so those features, I would say, were consistent or indicative of a general statement that risks and rewards remained with Enron.

Q. Okay.  Tell me how you would characterize that statement as inaccurate.

A. Well, it doesn't factor in the certificateholders and -- because the risks on the asset were, I think, limited to the payment of the debt, and the upside on the asset, rewards on the asset were only in excess of what was required to pay the debts on the certificates, so it misses out that little piece, middle piece in both cases.

Sullivan Sworn Statement, at 120-22.

[193] The typical structure was similar to the structure of Project Cornhusker, but had an additional SPE between Transferor LLC and the lenders, a trust that borrowed funds from a lender.  The Total Return Swap was between the trust and Enron (or an Enron affiliate) rather than with the lenders.

(and sometimes equity securities as well) to finance the acquisition of the Class B Interest.[194]

Most of the transactions also involved a Total Return Swap between the Trust and Enron (or one of its affiliates).[195] In many of its opinions, Andrews & Kurth expressly recognized that the Total Return Swap had characteristics of a guarantee.[196] Andrews & Kurth understood that the net economic effect of the Total Return Swap was that Enron retained the reward of any appreciation in the value of the asset transferred and the risk of any decline in the asset value.[197] None of the Andrews & Kurth attorneys assisting Enron with the FAS 140 Transactions had seen a Total Return Swap like the ones used by Enron.[198]

*Unwillingness to Surrender Control.* Andrews & Kurth also knew that it was very important to Enron to be able to control the assets that were transferred in these transactions. A certain amount of continuing control over the asset resulted from the fact that the asset remained in Asset LLC, and only the "economic" interest in Asset LLC,

---

[194] Enron's FAS 140 structure stands in contrast to the experience of Barbour in the 300-400 securitizations he worked on prior to the Enron FAS 140 Transactions. Barbour Sworn Statement, at 35-38. The non-Enron FAS 140 transactions on which Barbour worked called for the monetized asset to be transferred to the entity issuing securities to finance its acquisition. *Id.* at 35-37.

[195] Pursuant to the Total Return Swaps used in these transactions, Enron would provide the trust with the funds needed to pay principal and interest on the debt securities. In exchange, Enron would receive from the trust all proceeds the trust received with respect to the Class B interest it held less, in certain circumstances, amounts used to repay the holders of the trust's equity securities. The net effect of the Total Return Swap was to obligate Enron to make the principal and interest payments on the notes issued by the trust and for the trust to return all appreciation with respect to the transferred asset to Enron less a small amount for yield on the equity issued by the trust.

[196] Opinion Letter from Andrews & Kurth to Enron Corp. and Sonoma I, L.L.C., Dec. 21, 2000, at 36 [AK 0025940 – AK 0025982].

[197] In fact, Enron even asked Andrews & Kurth to opine that all upside reverted to Enron regardless of the unwind event under the Total Return Swap. Email from James Ginty, Enron, to Thomas Popplewell, Andrews & Kurth, *et al.*, Oct. 31, 2000, at AK 0122658 [AK 0122658-AK 0122671].

[198] Barbour Sworn Statement, at 35-38; Sargent Sworn Statement, at 42-43; Popplewell Sworn Statement, at 36-37.

represented by the Class B interest, was transferred to Transferor LLC and then to the trust.[199]

In addition, as a practical matter, Enron retained control by taking advantage of the trust's ability to prepay and unwind the transactions. Enron accomplished this by approaching the holder of the equity of the trust and offering to purchase the equity certificate.[200]    Neither the lead in-house Enron attorney assigned to the FAS 140 Transactions, Gareth Bahlmann, nor any of the Andrews & Kurth attorneys questioned by the Examiner could identify a single example when Enron's desire for an early unwind was thwarted by the refusal of a certificate holder to sell the certificates associated with a given transaction.[201]    Once Enron purchased the equity certificate, Enron controlled the trust, and could direct the trust to exercise the trust's right to prepay the loan and thus unwind the transaction.

As Andrews & Kurth wrote to Enron on March 19, 2000, "In the deals which closed in December we were given very clear instructions that Enron had to be able to prepay and get the assets back at any time.  A right to prepay in full was included in the

---

[199] For example, in November 2000, in a communication to Enron regarding the Sarlux asset monetized in the Pilgrim transaction and the asset monetized in the Nimitz transaction, Andrews & Kurth noted:

> Whilst Sarlux and Nimitz were structured as sales for the purpose of accounting treatment, Enron retained full control over its interest in Sarlux S.R.L. and commercially the transactions look more like financings.  For example, even in the event that the lenders foreclosed on the asset, they would only be entitled to receive distributions from the project.  They could not obtain any control or voting rights. . . .  It is also relevant to note that all upside in the project over the amount required to pay off the financing was retained by Enron, as well as all downside risk.

Memorandum from Danny Sullivan, Andrews & Kurth, to Mark Evans, Enron, regarding Sarlux/Nimitz Transactions, Nov. 7, 2000, at AK 0070801–AK 0070802 [AK 0070800-AK 0070802].  Sullivan testified that the purpose of the memorandum was to provide Enron with arguments to use to make its joint venture partner, SARAS, comfortable that, despite the monetization, Enron was still in control of its interest in the Sarlux project.  Sullivan Sworn Statement, at 217-18.

[200] *Id.* at 177-78.

[201] Sworn Statement of Gareth S. Bahlmann, former Assistant General Counsel, Enron Global Finance, to Mary C. Gill, A&B, Sept. 25, 2003, at 309; Sullivan Sworn Statement, at 178.

documents (as for all previous deals)."[202]  Attempting to carry out its client's instructions, Andrews & Kurth told Enron that same day, "I want to discuss in more detail with Enron's in-house accounting advisors the circumstances in which Enron can prepay and how the assets can be released from the structure following repayment of the relevant Tranche and series Certificate."[203]

The ability to prepay did cause Andrews & Kurth some concern, however.  On December 21, 1999, in the midst of closing the Discovery transaction, Andrews & Kurth asked Enron:

> Assuming a buyer is found for the FirstWorld Interests, ENA may desire to unwind the FASB 125 transaction by prepaying the facility during the first two months of 2000.  Would prepayment and sale so soon after the FASB 125 sale by ENA jeopardize the FASB 125 treatment of the transaction?  Does it matter if ENA *intends* to arrange such a sale and prepay the facility at the time of entering into the FASB 125 transaction?[204]

Even after the adoption of FAS 140 on April 1, 2001, which resulted in a change to the transaction documents, Enron still wanted to have the ability to unwind a transaction early and retrieve the monetized asset.  Enron asked Andrews & Kurth the following questions:

---

[202] Email from Danny Sullivan, Andrews & Kurth, to Gareth Bahlmann, Enron, with copies to David Barbour, Andrews & Kurth, *et al.*, Mar. 19, 2000 [AK 0066214].  At the time, Andersen told Enron it could no longer prepay any FAS 140 Transactions structured as QSPE deals.  However, prepayment was allowed as to SPE deals.  Beginning in November 2000, Andrews & Kurth told Enron there would be no more QSPE deals.  Email from Tom Popplewell, Andrews & Kurth, to AnnMarie Tiller, Enron, *et al.*, Nov. 22, 2000 [AK 0074973].  Sullivan testified that the trust, not Enron, had the right to prepay.  Sullivan Sworn Statement, at 171.  Sullivan could not identify a single instance where Enron desired the facility to be prepaid and it was refused.  *Id.* at 178.

[203] Email from Danny Sullivan, Andrews & Kurth, to Bill Brown, Enron, *et al.*, Mar. 19, 2000 [CIBC 1083270].

[204] Memorandum from Mike Blaney and David Grove, Andrews & Kurth, to Project Discovery and Enron Communications FirstWorld Working Groups, regarding Project Discovery Issues List, Dec. 21, 1999, at 2 (12/21/99 draft) [AKED00083764-AKED00083767].  The Examiner has not discovered any evidence that Andrews & Kurth received an answer to this question.  Andrews & Kurth appeared to think that the answer required an accounting judgment, but the question calls for a legal conclusion.

[r]egarding early unwinds initiated by Enron: (a) Do the documents grant Enron the unilateral right to unwind the FAS 140 securitization prior to the due date of the Notes? . . . (b) If Enron does not have the unilateral right to force an early unwind, can the FAS 140 securitization be unwound early if the Certificate Holder agrees to sell the Certificates to Enron?[205]

The answers were "no" and "yes" respectively.[206]

There is also evidence suggesting that Andrews & Kurth knew that these planned early unwinds were a problem for the intended accounting of the transactions both from a legal and an accounting standpoint. For example, in an Enron memo that Andrews & Kurth revised at Enron's request, it was stated:

> Keep in mind that the Auction-related mechanisms will come into play ONLY if the indebtedness is not prepaid by the Sponsor, which is always Global Finance's planned means of unwind and has been, with one exception I'm aware of, the actual means of unwind. Nonetheless, because this prepayment plan is not memorialized in any deal documentation (and cannot be for financial accounting and legal opinion purposes), these mechanisms still must be analyzed from a tax perspective.[207]

*Participation in Early Unwinds of FAS 140 Transactions*

The FAS 140 Transaction documents had a built-in maturity date based on the date the trust was required to repay its debt securities. Just prior to that due date, the documents contemplated an auction of the Class B interest.[208] A successful auction

---

[205] Email from Bill Bowes, Enron, to Tom Popplewell, Andrews & Kurth, *et al.*, May 1, 2001, at AK 0067219 – AK 0067220 [AK 0067219-AK 0067220].

[206] *Id.* at AK 0067220.

[207] Email from Bill Bowes, Enron, to Tom Popplewell, Andrews & Kurth, May 22, 2001, at 1 [AK 0067236-AK 0067238] (emphasis in original). Bowes' email to Popplewell states, "I would appreciate your thoughts and comments on the accuracy of my description. . . ." *Id.* at 1. Popplewell's reply states: "Here are our comments." As early as November 1998, in connection with the very first FAS 140 Transactions that Andrews & Kurth handled for Enron, Andrews & Kurth was aware that Enron did not intend to transfer the monetized asset to a third-party. "GB [Gareth Bahlmann] did not want to mention the auction in the consent. I said this was okay as long as Enron were [sic] absolutely confident that there would never in practice be a sale to a third party. GB said that this was correct . . . ." Memorandum from Danny Sullivan, Andrews & Kurth, to File, regarding Enron/Sarlux, Nov. 19, 1998 [AK 0073331].

[208] Many of the FAS 140 Transactions provided for the underlying asset to be sold in an auction procedure prior to the maturity date of the debt and equity. *See, e.g.*, First Interim Report, *Typical Enron FAS 140*

would result in the sale of the Class B interest to a third party and would provide the trust with funds that would be paid to Enron pursuant to the Total Return Swap.[209] Andrews & Kurth knew, however, that it was unusual for the auction ever to occur. In an email Andrews & Kurth received from Enron, Enron stated that in 60% of the transactions the notes were paid off before the maturity of the transaction.[210] In fact, Enron noted that only one successful auction had ever occurred,[211] and that roughly 40% of the transactions were terminated through the use of intentionally failed auctions.[212]

Enron also continued its control through refinancings. For example, on August 22, 2001, Enron sent an email[213] to Andrews & Kurth that stated:

> McG[arret] G currently scheduled to mature on 9/14/01. They don't want to either sell the warrants to a third-party (via auction) or bring them back on-balance sheet for book purposes (via typical unwind), so they [sic] putting the warrants into the longer-term facility.[214]

Over the course of time, Enron prepaid and unwound many of these transactions prior to their contemplated maturity date. In several instances, as Andrews & Kurth was representing Enron in these unwind transactions, it was simultaneously working on the

---

*Transactions – Structure of a Typical Enron FAS 140 Transaction*; Second Interim Report, Annex 6 to Appendix G (Whitewing Transaction), *Structure of the Trakya Transactions*.

[209] *See, e.g.,* Total Return Swap Confirmation Relating to Hawaii II 125-0 Trust Series McGarret H, from Hawaii II 125-0 Trust to Enron North America Corp., Dec. 22, 2000 [AB000035450-AB000035460].

[210] Email from Bill Bowes, Enron, to Jim Ginty, Enron, with a copy to Tom Popplewell, Andrews & Kurth, *et al.*, Nov. 30, 2000 (the "Bowes 11/30/00 Email"), at 1 [AK 0122609-AK 0122610].

[211] The purchaser was apparently an affiliate of Whitewing Associates, L.P., an entity the Examiner has concluded was controlled by Enron. *See* Second Interim Report, Appendix H (Whitewing Transaction); Bowes 11/30/00 Email, at 1. The evidence suggests that not one of the FAS 140 Transactions reached maturity with an auction resulting in a sale of the asset to a real third party.

[212] *Id.*

[213] Email from Bill Bowes, Enron, to Tom Popplewell, Andrews & Kurth, Aug. 22, 2001 [AB1128 00567-AB1128 00568].

[214] *Id.*

opinion relating to the original transaction.[215] On some occasions, the unwind work was completed before delivery of the opinion.[216] Of the fifteen transactions unwound early, eleven were with the same certificate holder/lead lender.[217] A summary of certain illustrative transactions that were prepaid and unwound early is set out below.

*Discovery*. The Discovery transaction was the first FAS 140 Transaction where Andrews & Kurth assisted on the prepayment and unwind. Discovery had closed on December 29, 1999 and had a scheduled maturity of September 30, 2000.[218] The transaction was prepaid and unwound at the end of February 2000.[219] Andrews & Kurth assisted Enron with the initial closing and the prepayment and unwind of the Discovery transaction. As a result of the transaction, Enron did not include as debt $126.4 million on its balance sheet. The opinion for Discovery was not finalized until January 14,

---

[215] On August 14, 2001, Andrews & Kurth delivered to Enron nine opinions. Six of them related to deals closed in the prior year. In addition, there were still six opinions to be delivered, one of which was still outstanding from the prior year. Letter from Muriel C. McFarling, Andrews & Kurth, to Gareth Bahlmann, Enron, regarding Various Nonconsolidation Opinions for Monetizations, Aug. 14, 2001 [AK 0067229-AK 0067231].

[216] *See, e.g.*, Andrews & Kurth Invoice No. 10116950 regarding Project Bacchus, Mar. 23, 2001 (the "Project Bacchus 3/23/01 Invoice"), at 2 [AKIN 006348-AKIN 006352].

[217] *See* Coggins 6/13/03 Letter; Third Interim Report, Appendix H (Role of CIBC and its Affiliates), *History and Development of CIBC's Involvement With Enron*; Report, Appendix C (Role of Enron's Attorneys), *FAS 140 Transactions and Andrews & Kurth* (chart regarding FAS 140 Transactions unwound early); Certificate of Beneficial Ownership, J.M. Owner Trust, Dec. 21, 1999 [AB0071 01021-AB0071 01028]; Certificate of Beneficial Ownership, J.M.2 Owner Trust, Mar. 27, 2000 [AB0073 00105-AB0073-00109].

[218] Opinion letter from Andrews & Kurth to Enron Corp. and Nina I, L.L.C., Dec. 31, 1999 [AK 0025653-AK 0025693].

[219] *See, e.g.*, Memorandum from Mike Blaney and Gillian Robinson, Andrews & Kurth, to Gareth Bahlmann, Enron, *et al.*, regarding Documents required for the dissolution of the Project Discovery Structure, Feb. 14, 2000 [AKED00084777-AKED00084778].

2000.[220]  Two and a half weeks later, Andrews & Kurth began work on the unwind of the Discovery transaction.[221]

*Ghost.* The Ghost transaction, which monetized 5,393,258 shares of Rhythms common stock,[222] closed on December 21, 1999 with a contemplated maturity date of June 30, 2001.[223]  It was prepaid and unwound on March 20, 2000.[224]  Andrews & Kurth assisted with the initial closing and the prepayment and unwind of the Ghost transaction.[225]  As late as February 28, 2000, Andrews & Kurth was still working on issues surrounding the issuance of the Ghost opinion.[226]  Approximately ten days later, Andrews & Kurth began working on the unwind of the Ghost transaction.[227]  As a result of the transaction, Enron did not include as debt $225 million on its balance sheet.

*Specter.* The Specter transaction, which remonetized 3,001,200 of the 5,393,258 shares of Rhythms common stock previously monetized in Ghost,[228] closed on March 27,

---

[220] Andrews & Kurth Invoice No. 10095253, regarding Project Internet, Feb. 24, 2000, at 4 [AKIN 004899-AKIN 004911].

[221] Andrews & Kurth Invoice No. 10096734, regarding Project Internet, Mar. 24, 2000, at 1 [AKIN 004912-AKIN 004925].

[222] Second Interim Report, Annex 2 to Appendix L (Related Party Transactions).

[223] *See, e.g.,* Term Facility Agreement among J.M. Owner Trust, as Issuer of the Notes, the Lenders, Canadian Imperial Bank of Commerce, as Agent, ABN Amro Bank N.V. and Paribas, as Co-Agents, Sanpaolo IMI S.p.A., as Syndication Agent, First Union National Bank, as Documentation Agent, and CIBC World Markets Corp., as Arranger, Dec. 21, 1999 [AB0071 01029-AB0071 01103].

[224] *See, e.g.,* Notice of Prepayment from J.M. Owner Trust to Enron Communications Investments Corp. and Canadian Imperial Bank of Commerce, Mar. 20, 2000 [AB0071 00827-AB0071 00828].

[225] The Ghost transaction was unwound to allow Enron to execute the Specter transaction. *See* Third Interim Report, Appendix H (Role of CIBC and its Affiliates).

[226] Andrews & Kurth Opinion No. 10096737, regarding Project Ghost, Mar. 24, 2000, at 1-2 [AKIN 000455-AKIN 000457].

[227] Andrews & Kurth Opinion No. 10098532, regarding Project Ghost, Apr. 24, 2000, at 1 [AKIN 000460-AKIN 000464].

[228] Second Interim Report, Annex 2 to Appendix L (Related Party Transactions).

2000, with a contemplated maturity of September 15, 2000.[229]  The Specter transaction was prepaid and unwound on April 10, 2000, fourteen days after it closed.[230]  Andrews & Kurth assisted Enron with the closing and the unwind of the Specter transaction.  As a result of the transaction, Enron did not include as debt $125 million on its balance sheet.  There is evidence that suggests that Andrews & Kurth understood prior to closing the Specter transaction that its term would be only two weeks despite a recited term of six months.[231]  In addition, the time records of the Andrews & Kurth attorneys who worked on Specter reflect work on the unwind prior to the finalization of the opinion.[232]

*Bacchus.*  The Bacchus transaction closed on December 20, 2000 with a scheduled maturity of September 21, 2001.[233]  On June 1, 2001, the transaction was prepaid and unwound more than three months prior to the scheduled maturity date.[234]  Andrews & Kurth assisted Enron with the initial closing, and with the prepayment and unwind of the Bacchus transaction.  As a result of the transaction, Enron recorded $112 million of gain and did not include as debt $194 million on its balance sheet.[235]  On February 28, 2001, two months after closing, Andrews & Kurth was still analyzing issues

---

[229] Term Facility Agreement among J.M. 2 Owner Trust, as Issuer, the Lenders, Canadian Imperial Bank of Commerce, as Agent, Paribas, as Co-Agent, Sanpaolo IMI S.p.A., as Syndication Agent, and CIBC World Markets Corp., as Arranger, Mar. 27, 2000 [AB0073 00110-AB0073 00182].

[230] *See, e.g.,* Notice of Prepayment from J.M. 2 Owner Trust to Enron Communications Investments Corp. and Canadian Imperial Bank of Commerce, Apr. 10, 2000 [AB0073 00599-AB0073 00601].

[231] *See* Email from Craig Clark, Enron, to Danny Sullivan, Andrews & Kurth, Gareth Bahlmann, Enron, *et al.,* Mar. 15, 2000 (asking Andrews & Kurth to include a two-week LIBOR rate as one of the interest rates to be applicable to the funds advanced in Specter) [AK 0072833].

[232] Andrews & Kurth Invoice No. 10100389, regarding Project Specter, May 22, 2000, at 2 and 3 [AKIN-011307-AKIN-011311].  In fact, the opinion was executed on April 18, 2000, eight days after the unwind closed.  *Id.* at 3.

[233] *See, e.g.,* Facility Agreement among Caymus Trust, as Issuer of the Notes, the Lenders, Citibank, N.A., as Agent, and Citibank, N.A., as Arranger, Dec. 20, 2000, at 9 [AB0070 00122-AB0070 00193].

[234] *See, e.g.,* Membership Interest Purchase and Sale Agreement between Caymus Trust and Sundance Industrial Partners L.P., June 1, 2001 [AB000066424-AB000066429].

[235] Second Interim Report, Appendix K (Forest Products Transactions).

in connection with issuing the Bacchus opinion.[236]  Seven days later, Andrews & Kurth

began work on the unwind of the Bacchus transaction.[237]  The execution of the Bacchus

opinion occurred on July 9, 2001, more than a month after the unwind had been

completed.

A summary of the relevant details for all of the transactions prepaid and unwound

early is presented in the following table:

| TRANSACTION | CLOSING | UNWIND | OPINION DELIVERED | MATURITY |
|---|---|---|---|---|
| Discovery | 12/29/99 | End Feb. 2000 | 01/14/00 | 09/30/00 |
| Ghost | 12/21/99 | 03/20/00 | After 2/28/00 | 06/30/01 |
| Specter | 03/27/00 | 04/10/00 | 04/18/00 | 09/15/00 |
| Hawaii (McGarret B) | 06/29/00 | 09/29/00 | 07/24/00 | 03/29/01 |
| Hawaii (McGarret A) | 03/31/00 | 12/14/00 | 04/18/00 | 11/19/02 |
| Catalytica | 12/7/00 | 03/12/01 | On or After 02/25/01 | 06/11/02 |
| Hawaii (McGarret H) | 12/22/00 | 03/29/01 | 08/14/01 | 11/19/02 |
| Bacchus | 12/20/00 | 06/01/01 | 08/14/01 | 09/21/01 |
| Hawaii (McGarret N) | 06/29/01 | 08/01/01 | After 10/31/01 | 03/28/02 |
| Hawaii (McGarret F) | 12/07/00 | 09/07/01 | 08/14/01 | 11/19/02 |
| Avici A | 12/07/00 | 10/04/01 | 08/14/01 | 06/11/02 |
| Avici B | 12/07/00 | 10/04/01 | 08/14/01 | 06/11/02 |
| Hawaii (McGarret C) | 08/31/00 | 10/17/01 | 09/18/00 | 11/19/02 |
| Hawaii (McGarret K) | 03/29/01 | 10/17/01 | After 10/31/01 | 12/28/01 |
| Hawaii (McGarret M) | 06/22/01 | 10/17/01 | *Not Delivered* | 03/22/02 |

## D.    Nahanni

*Summary Description of Nahanni*

Project Nahanni was a minority interest financing that Enron entered into in

December 1999 to create $500 million of cash flow from operating activities.[238]

Citigroup loaned $485 million to Nahanni (the minority shareholder) and equity

---

[236] Project Bacchus 3/23/01 Invoice, at 1-2.

[237] Andrews & Kurth Invoice No. 10119105, regarding Project Bacchus, Apr. 25, 2001, at 1 [AKIN-006353-AKIN-006356].

[238] Second Interim Report, *Minority Interest Transactions;* Second Interim Report, Appendix I (Minority Interest Transactions) and Annex 3 to Appendix I (Minority Interest Transactions); Third Interim Report, Appendix C (Role of Enron's Officers), *Potential Breach of Fiduciary Duty by Officers, "Hardwired" Transactions.*  Nahanni also enabled Enron to reduce its debt at year-end 1999 by $500 million, by substituting $500 million of minority interests.

participants contributed $15 million; the resulting $500 million was used to purchase

Treasury securities that were then contributed to Marengo (in which Enron held the 50%

general partnership controlling interest through a wholly owned subsidiary).[239]  Marengo

in turn contributed the Treasury securities to its wholly owned subsidiary, which on

December 29, 1999 liquidated the Treasury securities and loaned the $500 million in

proceeds to Enron in exchange for a demand note from Enron.[240]  Enron's 1999 financial

statements reflected the proceeds from the sale of the Treasury securities as proceeds

from sales of merchant investments,[241] and reported the proceeds as cash flow from

operating activities.[242]

In contrast to other minority interest financings (where the Enron demand loans

could be unsecured), the Enron demand note in Project Nahanni was required to be

supported by a short-term direct-pay letter of credit (the "Letter of Credit").[243]  The

transaction documents required that the Enron demand loan be collected by making a

draw on the Letter of Credit on or before January 18, 2000, which was twenty-eight days

---

[239] Second Interim Report, *Minority Interest Transactions; id.* at Appendix I (Minority Interest Transactions); *id.* at Annex 3 to Appendix I (Minority Interest Transactions).

[240] *See id.* at Annex 3 to Appendix I (Minority Interest Transactions).

[241] Enron expanded the definition of merchant investments in its annual report on Form 10-K for the year ended December 31, 1999  to include government securities with maturation of more than ninety days. Enron Form 10-K filed with the SEC for the Year ended Dec. 31, 1999 (the "10-K for 1999"). There is no evidence, however, that anyone at Vinson & Elkins participated in or was aware of either the change in Enron's definition of "merchant investments" in its 1999 year-end filing on Form 10-K or the manner in which Project Nahanni was disclosed. Sworn Statement of Ronald T. Astin, Partner, Vinson & Elkins, to Rebecca M. Lamberth, A&B, Sept. 22, 2003 (the "Astin 9/22/03 Sworn Statement"), at 162.

[242] *See* Second Interim Report, Annex 3 to Appendix I (Minority Interest Transactions).

[243] Irrevocable Letter of Credit No. 22703100654WLB, Dec. 29, 1999, issued by West LB for the account of Enron in favor of Wilmington Trust Co. (the "Letter of Credit") (providing for expiration at "5:00 p.m., New York City time, on January 27, 2000" unless extended in accordance with the terms set forth therein) [SEC00697937–SEC00697945].

after the closing.[244]  To summarize, through Project Nahanni, Enron borrowed $500 million, bought Treasury securities with it, sold the Treasury securities, recognized $500 million of operating cash flow, paid down $500 million of debt, and repaid the loan, all within thirty days straddling its 1999 year-end, and without reflecting the loan as debt on its financial statements.[245]

In the Second and Third Interim Reports, the Examiner concluded that the transaction documents "hardwired" the Nahanni structure to preordain the unwind of the transaction within thirty days of its December 1999 closing.[246]  Consequently, a fact-finder could conclude the Nahanni transaction was implemented over year-end for the purpose of artificially inflating Enron's cash flow from operating activities, rather than to obtain financing or for another business purpose.  Based on that, as well as sworn testimony from an Enron officer who worked on the Nahanni structure,[247] the Examiner concluded that there was sufficient evidence from which a fact-finder could conclude that: (i) certain senior officers of Enron breached their fiduciary duties under applicable law by causing the Debtors to enter into the Nahanni transaction that was designed to manipulate the Debtors' financial statements and that resulted in the dissemination of

---

[244] Section 2.21(a)(v)(B), Marengo, L.P. Amended and Restated Limited Partnership Agreement among Marengo, Yellowknife Investors, Inc., Enron Corp. and Nahanni Investors L.L.C., Dec. 17, 1999 (the "Marengo Partnership Agreement") [CITI-B 0104277-CITI-B 0104439]; Section 6.2, Yukon Custody Agreement, between Yukon River Assets, L.L.C. and Wilmington Trust Company, Dec. 17, 1999 (the "Yukon Custody Agreement") (requiring the custodian, Wilmington Trust Company, to cause a draw on or before January 18, 2000 all amounts under any letter of credit issued in connection with the Enron demand note) [AB0216 02821-AB0216 02842].

[245] Second Interim Report, *Minority Interest Transactions; id.* at Appendix I (Minority Interest Transactions); *id.* at Annex 3 to Appendix I (Minority Interest Transactions).

[246] *Id.*; Third Interim Report, Appendix C (Role of Enron's Officers), *Potential Breach of Fiduciary Duty by Officers, "Hardwired" Transactions.*

[247] *See* Sworn Statement of Charles Delacey, Vice President – Finance, Enron, to William T. Plybon, A&B, Apr. 3, 2003, at 84; *see also* Sworn Statement of William Brown, Managing Director, Enron, to William C. Humphreys, Jr., A&B, Apr. 14-15, 2003, at 213; Peng Sworn Statement, at 153.  Sefton described Delacey as the "lead commercial person" for Nahanni.  Sefton Sworn Statement, at 226.

financial information known by those officers to be materially misleading; and (ii) these wrongful acts caused direct and foreseeable harm to Enron itself, and resulting harm to innocent parties that dealt with Enron, including creditors in the Bankruptcy Case.[248]

*Attorneys' Role in Nahanni*

Under the supervision of Sefton, the General Counsel for Enron Global Finance, Vinson & Elkins acted as outside counsel for Enron in Project Nahanni.[249] Although it appears that counsel for Citigroup drafted many of the transaction documents,[250] both Sefton[251] and Vinson & Elkins attorneys, including Astin,[252] reviewed and analyzed the operative transaction documents.

When asked who had responsibility for ascertaining that the documents "were accurate and appropriate when drafted for purposes of protecting Enron's interests and

---

[248] *See* Third Interim Report, Appendix C (Role of Enron's Officers).

[249] Astin 9/22/03 Sworn Statement, at 146-48; Vinson & Elkins Invoice No. 20114040, regarding Project Nahanni, Dec. 31, 1999 ("Nahanni 12/31/99 Invoice") (indicating that attorneys at Vinson & Elkins billed a total of 183 hours to Enron on Nahanni in November 1999) [EVE 3041200-EVE 3041209]; Vinson & Elkins Invoice No. 20118055, regarding Project Nahanni, Jan. 31, 2000 ("Nahanni 1/31/00 Invoice") (indicating that attorneys at Vinson & Elkins billed a total of 481 hours to Enron on Nahanni in December 1999) [EVE 3041218-EVE 3041234]; Vinson & Elkins Invoice No. 20121991, regarding Project Nahanni, Feb. 29, 2000 ("Nahanni 2/29/00 Invoice") (indicating that attorneys at Vinson & Elkins billed a total of 4.5 hours to Enron on Nahanni in January 2000) [EVE 3041178-EVE 3041183].

[250] *See* Astin 9/22/03 Sworn Statement, at 153-55 (stating that, while Vinson & Elkins may have drafted the entity documentation for subsidiaries of Marengo, Shearman & Sterling likely had primary responsibility for drafting the operative documents, particularly with respect to Citibank conduit agreements).

[251] Sefton testified that he was not substantively involved in work on this transaction, and that his role was "very limited." Sefton Sworn Statement, at 45. However, other evidence available to the Examiner contradicts that testimony. *See* Astin 9/22/03 Sworn Statement, at 148 ("[Sefton] was the active Enron Global Finance lawyer working on the transaction on a day-to-day basis with me.") and 151 ("My recollection is that in this transaction Mr. Sefton was participating fairly fully. He was reviewing and commenting on the documents as well."); *see also* Nahanni 12/31/99 Invoice, at 3-4; Nahanni 1/31/00 Invoice, at 1 and 4.

[252] *See* Astin 9/22/03 Sworn Statement, at 153-55 (admitting that, although Vinson & Elkins and Enron may not have drafted the operative documents, Sefton, as internal counsel, and Astin and another Vinson & Elkins partner, Kenneth Anderson, were primarily responsible for protecting Enron's interests in the Nahanni transaction); Nahanni 12/31/99 Invoice, at cover page (indicating that Astin billed 68.25 hours on Nahanni in November 1999); Nahanni 1/31/00 Invoice, at cover page (indicating that Astin billed 159.25 hours on Nahanni in December 1999); Nahanni 2/29/00 Invoice, at cover page (indicating that Astin billed 4 hours on Nahanni in January 2000).

achieving Enron's business purpose," Astin responded, "[a]s internal counsel, Mr. Sefton, as outside counsel, it was divided between Mr. Anderson and myself on that primarily."[253]   Astin and his partner, Kenneth Anderson ("Anderson"), whose practice focused on banking, finance and loan transactions, divided responsibility for analysis and revisions to most of the transaction documents.[254]

Astin testified that Vinson & Elkins' understanding of Project Nahanni was that the transaction was in the nature of a revolver available to Enron for use at its discretion over a period of time, and he was not aware of any intent by Enron to promptly repay the loan following year-end.[255]   Astin described his understanding of Enron's business purpose for the transaction as follows: "My recollection is that at this point in time [Enron was] capital hungry and all I can recall thinking is that this is one more in a series of transactions where they were trying to raise money."[256]   Astin also testified that "the structure was designed to be used, repaid and reused."[257]   Astin was aware of Enron's intent to use U.S. Treasury bills in the transaction and understood "that it would result in or at least an aspect of the transaction would result in enhancement of cash flow."[258]

However, given the repeated use of specific year-end straddling dates in connection with the transaction documents, a fact-finder could reasonably infer that the

---

[253] *See* Astin 9/22/03 Sworn Statement, at 155.

[254] *See id.* at 153-55.

[255] *See id.* at 162-67.

[256] *Id.* at 147.

[257] *Id.* at 165; *see* Second Interim Report, Annex 3 to Appendix I (Minority Interest Transactions) (the Nahanni structure remained in existence following the January 2000 unwind until filing of the Enron Petition, which triggered the termination of Marengo and required Marengo to repurchase Nahanni's remaining minority interest for the amount of Nahanni's capital account in Marengo).

[258] Astin 9/22/03 Sworn Statement, at 156.

intent to hardwire the transaction, straddling year-end 1999,[259] was apparent to attorneys working on the transaction — including Sefton and Vinson & Elkins.[260] Evidence of this hardwired design in the transaction documents includes: (i) the Marengo Partnership Agreement provision permitting the Enron demand note to be held only between December 27, 1999 and January 24, 2000;[261] (ii) the requirement that the Yukon custody agent draw down the Letter of Credit on or before January 18, 2000 to pay the Enron demand note;[262] (iii) expiration of the Letter of Credit on January 27, 2000;[263] and (iv) the fact that the Marengo Partnership Agreement permitted only one distribution annually, with that distribution to be made no earlier than January 13 of any calendar year.[264] From these documents, which were among the documents reviewed by Astin or Anderson, although neither attorney worked on all of them,[265] a fact-finder could conclude that it

---

[259] See id. at 148 (stating that he "[doesn't] recall believing or knowing, when we were working in December of 1999 on the transaction, that it would – you know, that it was anything other than a structure that was intended to last for a significant period of time"); Sefton Sworn Statement, at 41-60 (claiming to have almost no recollection of any of the details, purposes, issues, etc. of the Nahanni transaction); but see Memorandum from Philip T. Warman, Associate, Vinson & Elkins, to Scott Sefton, Enron, and Ron Astin, Vinson & Elkins, regarding Project Nahanni Checklist, Feb. 8, 2000 (the "Warman Memo"), at 1 (summarizing the obligations of the Enron parties to the Nahanni transaction imposed by the operative documents and stating that "Yukon must not continue to hold Enron Qualified Demand Loans after January 23, 2000") [EVE 3038530-EVE 3038534]; Letter of Credit; Marengo Partnership Agreement; Yukon Custody Agreement.

[260] Second Interim Report, Appendix M (Minority Interest Transactions); id. at Annex 1 to Appendix M (Minority Interest Transactions); Third Interim Report, Appendix C (Role of Enron's Officers); Warman Memo, at 1 (stating that "Yukon must not continue to hold Enron Qualified Demand Loans after January 23, 2000"); Nahanni 12/31/99 Invoice; Nahanni 1/31/00 Invoice; Nahanni 2/29/00 Invoice; Letter of Credit; Marengo Partnership Agreement; Yukon Custody Agreement.

[261] Section 4.3(j)(ii)(A), Marengo Partnership Agreement.

[262] The Letter of Credit was actually prepaid on January 13, 2000 by Enron, and $485 million of the proceeds were distributed to Nahanni on January 14, 2000. See Second Interim Report, Annex 3 to Appendix I (Minority Interest Transactions).

[263] Letter of Credit.

[264] Section 7.2(a)(iv), Marengo Partnership Agreement.

[265] See Opinion Letter from Vinson & Elkins to Enron, Dec. 21, 1999 [JD 05720-JD 05751]; Section 4.3(j)(ii)(A), Marengo Partnership Agreement; Letter of Credit; Section 6.2, Yukon Custody Agreement; Astin 9/22/03 Sworn Statement, at 158-60.

would have been apparent to these attorneys that the repayment of the $500 million within thirty days of the December 1999 closing, was preordained.

Astin testified that he learned at some point in 2000 that the transaction had been unwound in early 2000.[266] In a memorandum dated February 8, 2000, summarizing the obligations of the Enron parties to the Nahanni transaction imposed by the operative documents and focusing particularly on time requirements imposed thereby, a Vinson & Elkins associate expressly noted a key element to the "hard-wiring": "Yukon must not continue to hold Enron Qualified Demand Loans after January 23, 2000."[267] Astin testified that he recalls having no concerns at any point prior to the bankruptcy filing regarding Project Nahanni, despite his awareness of the fact that Enron had intended to recognize funds flow based upon the December 1999 close of the transaction.[268] The evidence reflects no attempt by either Sefton or Vinson & Elkins attorneys to raise concerns about the transaction — including its early unwind — at any time before or after its close.[269]

### E. Sundance Industrial

*Summary Description of Sundance Industrial*

Project Sundance Industrial was the third of four separate, but related, transactions that involved Enron's forest products business.[270] The four transactions —

---

[266] Astin 9/22/03 Sworn Statement, at 163.

[267] Warman Memo, at 1.

[268] Astin 9/22/03 Sworn Statement, at 146-67.

[269] *See, e.g., id.* at 162-67.

[270] Appendix K (Forest Products Transactions) to the Second Interim Report contains the Examiner's detailed analysis of these four transactions.

Projects Fishtail, Bacchus, Sundance Industrial[271] and Slapshot — closed over a six-month period from December 2000 through June 2001. Projects Fishtail and Bacchus were short-term structures designed by Enron to enable it to meet certain year-end earnings targets for 2000, and Projects Sundance Industrial and Slapshot were designed by Enron to provide the more permanent asset holding structure and financing for the forest products assets in June 2001. The Examiner concluded in the Second Interim Report that Enron had improperly recognized a $20 million gain from a purported sale of a membership interest in Sonoma I, LLC ("Sonoma"), an entity in the Project Fishtail transaction, to a wholly owned subsidiary of Citigroup, which then contributed the interest in Project Sundance Industrial.[272]

In Project Sundance Industrial, Enron formed Sundance Industrial Partners, L.P. ("Sundance") to acquire the forest products business.[273] Salomon Brothers Holding Company Inc. ("Salomon Holding"), a wholly owned subsidiary of Citigroup, was a limited partner in Sundance, contributing equity sufficient for Enron to treat Sundance as an equity method investee rather than a consolidated subsidiary for accounting purposes.[274]

Rather than have Salomon Holding contribute its $28.5 million initial equity investment directly to Sundance in the form of a cash contribution, Enron asked that

---

[271] Enron used the name "Sundance" for two limited partnerships -- Sundance Industrial Partners, L.P. and Sundance Assets L.P. The latter is involved in the transaction referred to as Rawhide, which is discussed in Appendix I (Minority Interest Transactions) to the Second Interim Report.

[272] Second Interim Report, Appendix K (Forest Products Transactions), *Sundance Industrial Transaction, Examiner's Conclusions.*

[273] *Id.*

[274] Enron Interoffice Memorandum from Mark Lian, Enron Industrial Market Department, to the File, regarding Sundance, Nov. 1, 2001 (the "Sundance Accounting Memo"), at AB0252 00851-AB0252 00853 [AB0252 00850-AB0252 00855]; *see also* Second Interim Report, Appendix K (Forest Products Transactions).

Salomon Holding (i) contribute $8.5 million in cash to Sundance and (ii) purchase from ENA for $20 million a 0.01% equity interest in Sonoma (the "Sonoma Class A Interest") and immediately contribute the Sonoma Class A Interest to Sundance.[275] In the Second Interim Report, the Examiner concluded that it was inappropriate for Enron to have recorded the $20 million of income from gain on sale of the interest, because there was no true sale of the Sonoma Class A Interest to Salomon Holdings.[276]

### Attorneys' Role in Sundance Industrial

Vinson & Elkins represented Enron in Project Sundance Industrial and Astin was responsible for the transaction, including the analysis of issues related to rendering a true sale opinion and documenting the transaction to support that opinion.[277] A month before the anticipated closing, and after the terms of the transaction between Enron and Salomon Holding largely had been agreed upon, Enron advised Astin that it believed that the value of the pulp and paper portfolio had increased by $20 million in the months since the closing of Project Fishtail[278] and that Enron was now going to sell an interest that represented that increase in value to Salomon Holding, which would then contribute that interest to Sundance.[279] Vinson & Elkins knew that Enron could not recognize the gain if the interest were contributed directly to Sundance, which had been the original, and more

---

[275] Sundance Accounting Memo, at AB0252 00852; *see also* Second Interim Report, Appendix K (Forest Products Transactions).

[276] Second Interim Report, Appendix K (Forest Products Transactions), *Sundance Industrial Transaction, Examiner's Conclusions*.

[277] Sworn Statement of Ronald T. Astin, Vinson & Elkins, to Mary C. Gill, A&B, Sept. 10, 2003 (the "Astin 9/10/03 Sworn Statement"), at 12 and 15. Astin consulted with other Vinson & Elkins attorneys, including Spradling. *Id.*

[278] *Id.* at 19-21.

[279] *Id.* at 20.

direct, approach to the transaction.[280]   Vinson & Elkins also understood that Enron's

purpose in structuring this two-step process was to enable Enron to recognize the $20

million in earnings.[281]

Two weeks prior to the closing, Enron told Astin that a true sale opinion was

needed on the sale of the Sonoma Class A Interest by ENA to Salomon Holding [282] in

order for Enron to recognize the $20 million gain.[283]   In a draft memorandum, Astin

summarized the characteristics necessary to enable Vinson & Elkins to give the true sale

opinion.[284]

> The requested opinion would state that the sale of the Sonoma A [Interest]
> to SBHC [Salomon Holding] would be treated as a sale for purposes of
> state law, even though it is contributed by SBHC to the capital of
> Sundance immediately or shortly following the sale.
>
> We emphasize that we believe it is necessary for the transaction to reflect
> the assumption by SBHC of real risks and benefits of ownership of the
> Sonoma A that survive the transfer of the Sonoma A interest to Sundance.
> Any court reviewing the transaction would examine the substance and
> reality of the transaction rather than its mere form in order to assess
> whether the characterization chosen by the transaction parties would be
> respected – in short, .[sic]  We believe the current structure lacks several
> elements we believe would be necessary in order for us to render an
> opinion that a sale truly occurs under the current transaction documents
> described above.
>
> In order for us to render a true sale opinion on this transaction, *each* of the
> following elements must be present:

---

[280]  *Id.* at 34-35; Sworn Statement of Mark Spradling, Vinson & Elkins, to Mary C. Gill, A&B, Aug. 7,
2003 (the "Spradling 8/7/03 Sworn Statement"), at 26-27.

[281]  Astin 9/10/03 Sworn Statement, at 34-35; Spradling 8/7/03 Sworn Statement, at 30-33; *see also*
Memorandum from Ronald T. Astin, Vinson & Elkins, to Julia H. Murray and Gareth S. Bahlmann, Enron,
May 21, 2001 (the "Astin 5/21/01 Memo"), at 1 [EVE 219275-EVE 219276] ("[w]e understand one result
of the proposed sale transaction would be recognition of current period earnings . . . ."). Astin testified that
this memorandum was never completed or delivered to Enron. Astin 9/10/03 Sworn Statement, at 47.

[282]  Astin 9/10/03 Sworn Statement, at 22.

[283]  Second Interim Report, Appendix K (Forest Products Transactions).

[284]  Astin 5/21/01 Memo, at 1-2. Astin testified that this memorandum was never completed or delivered to
Enron. Astin 9/10/03 Sworn Statement, at 47.

1.  *The transaction must not be pre-wired* (the option given to SBHC to contribute cash *or* the Sonoma A must be real).

    . . . .

2.  *The transaction must have a commercial purpose for both parties* (other than simply favorable tax or accounting, although favorable tax and accounting treatment doesn't adversely impact a transaction with another purpose. [sic]

3.  *Any interest retained by SBHC must continue to possess aspects of risk and rewards of ownership with regard to the Sonoma A* (that is, SBHC must have some continued ownership characteristics with regard to the asset it purchased).[285]

*Retention of Risks and Rewards*

To enable Vinson & Elkins to provide Enron the true sale opinion requested, Astin focused principally on making sure that Salomon Holding had "aspects of the risks and benefits of ownership" of the Sonoma Class A Interest.[286]   Ordinarily, a sale of an asset to an independent third party would not require a true sale opinion, but Salomon Holding's immediate transfer of the asset to an affiliate of the seller was contrary to at least one essential element of a sale -- that the risks and rewards of the asset had shifted from the seller to the buyer.[287]   To create the transfer of risks and rewards to Salomon Holding, Enron added put and call rights on the Sonoma Class A Interest[288] so that

---

[285] Astin 5/21/01 Memo, at 1-2 (emphasis in original).

[286] Astin 9/10/03 Sworn Statement, at 30.

[287] *See* Opinion Letter from Vinson & Elkins to Enron Corp., June 30, 2001 ("Sundance Opinion Letter"), at 14 and 16 [AB000360880-AB000360913].

[288] Second Interim Report, Appendix K (Forest Products Transactions), *Sundance Industrial Transaction, Legal Issues*; Sundance Accounting Memo, at AB0252 00852.   Astin testified that initially Vinson & Elkins attempted to get the transaction restructured so that Vinson & Elkins could give a true sale opinion. Astin 9/10/03 Sworn Statement, at 33.

Sundance would have the ability to put the interest to Salomon Holding and Salomon

Holding would have the right to reacquire the interest from Sundance.[289]

This put and call provision was the product of several weeks of "intensive back

and forth negotiation."[290]  The negotiations were difficult because Salomon Holding

wanted to minimize its exposure with respect to any continued risk in the Sonoma Class

A Interest, which Vinson & Elkins attempted to resist.[291]  The day before the proposed

closing in an internal email, Astin stated:

> The puts and calls are what is necessary for us to give our true sale
> opinion regarding true sale matters; at the moment, this is still a bone
> sideways in Solly's [Salomon Holding's] throat, which is why we haven't
> closed.  It has also put me in the annoying position of saying no serially to
> every request to remove the risk from Salomon, since we are already at the
> wall on the opinion.[292]

On the day of the proposed closing, counsel for Salomon Holding made a final

effort to include a provision in the agreement that would allow Salomon Holding to avoid

---

[289] Letter Agreement between Salomon Holding and Enron Industrial Markets GP Corp., June 1, 2001 (the "Put Call Agreement"), at AB000066444-AB000066445 [AB000066444-AB000066448]; Astin 9/10/03 Sworn Statement, at 22-24; Email from Ronald T. Astin, Vinson & Elkins, to Edward Osterberg, Vinson & Elkins, May 29, 2001 ("Astin 5/29/01 Email") ("[t]he puts and calls are what is necessary for us to give our opinion regarding true sale matters") [EVEE 00016819-EVEE 00016821].  The provisions of the Put Call Agreement permitting Salomon Holding to repurchase the Sonoma Class A Interest from Sundance for the first seven days following the date of the Put Call Agreement was included at the request of Andersen. Astin 9/10/03 Sworn Statement, at 22.  Other provisions of the Put Call Agreement were intended to satisfy the requirements of the Sundance Partnership Agreement relating to Salomon Holding's making any part of its initial capital contribution other than in cash.  Section 4.01, Amended and Restated Limited Partnership Agreement of Sundance Industrial Partners, L.P., June 1, 2001 (the "Sundance Partnership Agreement") [AB000066270-AB000066367].

[290] Astin 9/10/03 Sworn Statement, at 31; Spradling 8/7/03 Sworn Statement, at 50-51.

[291] Astin 9/10/03 Sworn Statement, at 44, 46 and 61-62.  Salomon Holding continued to negotiate to attempt to limit its exposure to the Sundance put right.  *Id.* at 68 and 69.  However, for Vinson & Elkins to render a true sale opinion, the put and call rights added to the transaction had to be "real" and "really exercisable." *Id.* at 56.  When the Sonoma Class A Interest was transferred to Sundance, Salomon Holding no longer owned it, but it was important to the true sale opinion that, through the put and call rights, there remained the possibility that Salomon Holding would regain ownership, which embodied the risks and rewards necessary to render the true sale opinion.  *Id.* at 66.  There was tension between Enron and Vinson & Elkins because Vinson & Elkins insisted upon looking beyond the first step of the transaction in analyzing the criteria for a true sale.  Spradling 8/7/03 Sworn Statement, at 67; *see also* Astin 5/29/01 Email.

[292] Astin 5/29/01 Email.

---

any risk that the put could become effective.[293]  This would have seriously hampered
Vinson & Elkins' ability to give a true sale opinion,[294] however, and Vinson & Elkins
refused to render a true sale opinion if the provision was accepted.[295]  Moreover, Vinson
& Elkins made certain amendments to the documents intended to bolster the effectiveness
of the put and call provisions.[296]

The transaction closed on June 1, 2001.  Vinson & Elkins delivered the true sale
opinion at the end of July 2001.[297]  In the opinion, Astin included a footnote intended to
make clear that the put option could be exercised, but the last clause of the footnote
indicates that Salomon Holding could block the put *if* a "dissolution event" occurred
before notice of the exercise of the put.[298]  Attorneys at Vinson & Elkins testified that this

---

[293] *See* Email from Frank Puleo, Milbank, to Ron Astin, Vinson & Elkins, May 30, 2001 (stating that to implement the business transaction, the Put Call Agreement should be modified to provide that under specified circumstances, within the sole control of Salomon Holding, the put and call could not be exercised and any prior attempted exercise would be ineffective) [EVE 314433-EVE 314436]; Astin 9/10/03 Sworn Statement, at 79-80.

[294] Astin 9/10/03 Sworn Statement, at 57; Spradling 8/7/01 Sworn Statement, at 41.

[295] Astin 9/10/03 Sworn Statement, at 69 and 80.

[296] *Id.* at 82 and 83.

[297] Although the transaction closed on June 1, 2001 and the true sale opinion is dated June 30, 2001, the opinion was not completed and executed until the end of July 2001.  Astin 9/10/03 Sworn Statement, at 118.

[298] Astin 9/10/03 Sworn Statement, at 87.  The text of the footnote is as follows:

> SBHC as the holder of the Sundance B Interest has the right to cause management of Sundance to be assumed by a Board of Directors of which SBHC is entitled to appoint one half of the members.  However, if a Board of Directors of Sundance were to be appointed before the dates on which the reconveyance options contemplated by the Consent and Reconveyance Agreement [i.e., the put and call rights] could be exercised, it would not affect the Put right held by Sundance, since the Put can only be exercised by EIMGP on behalf of Sundance.  If the Board of Directors, after appointment, experiences Deadlock [an event of dissolution of Sundance] at any time after notice of exercise of the Put is given, neither SBHC's nor EIMGP's representatives on the Board of Directors could force the Partnership to disclaim the contractual rights or obligations of Sundance with respect to such Put.  Thus, SBHC does not have the power to block the exercise of the Put through the appointment of a Board of Directors, unless a Dissolution Event occurs before notice of exercise of the Put is required to be given under the Consent and Reconveyance Agreement.

Note 2, Sundance Opinion Letter (material in brackets added).

was not a correct interpretation of the put and call rights and the Sundance Partnership

Agreement,[299] and that, notwithstanding this clause of the opinion letter, the terms of the

Sundance Partnership Agreement required that the option remain alive for both parties to

exercise prior to December 2000.[300]

The Examiner's conclusion in the Second Interim Report that there was no true

sale of the Sonoma Class A Interest to Salomon Holding was based, in part, upon

evidence that the parties had no real intention of Salomon Holding retaining any of the

risks and rewards relating to the Sonoma Class A Interest.[301] The additional evidence

that the Examiner has gathered for this Report indicates that Vinson & Elkins resisted

efforts by Salomon Holding to eliminate any risk of ownership resulting from the

potential exercise of the put. Although the evidence supports the conclusion that

Salomon Holding believed that its risk of ownership of the Sonoma Class A Interest had

been nullified,[302] there is also evidence that Vinson & Elkins believed that it had

---

[299] Astin 9/10/03 Sworn Statement, at 91. Spradling stated that this footnote was inconsistent with his understanding of the documents. Spradling 8/7/03 Sworn Statement, at 62. Spradling did not review a draft of the true sale opinion that included this footnote. *Id.* at 63.

[300] Astin 9/10/03 Sworn Statement, at 105. Astin testified that he wrote this sentence a month after the transaction closed and did not recall what he was thinking at the time. *Id.* at 107. His best explanation of the apparent inconsistency is that either he had forgotten about a provision of the Sundance Partnership Agreement because it came in late in the transaction or that what he meant to refer to was the termination of the partnership, as opposed to a dissolution event. *Id.* at 107-08. Thus, Astin acknowledged that Salomon Holding continued to have the power to block the exercise of the put if there were a termination of the partnership before the notice of exercise of the put were given. *Id.* at 108-09. Astin indicated that the termination of the partnership would likely take a period of time following the occurrence of an event of dissolution because the assets of the partnership would need to be liquidated. *Id.* at 110.

[301] Second Interim Report, Appendix K (Forest Products Transactions), *Examiner's Conclusions* and *Legal Issues*; Third Interim Report, Appendix D (Role of Citigroup and its Affiliates), *Citigroup's Role in Enron's SPE Transactions, Forest Products Transactions, Sundance*.

[302] Description of the Sundance Transaction, Oct. 29, 2001, at CITI-B 0305125 [CITI-B 0305124-CITI-B 0305125]; Email from Rick Caplan, Citigroup, to Geoffrey O. Coley and James Forese and copy to Doug Warren, Citigroup, regarding Enron transactions, Oct. 30, 2001 [CITI-B 0300526]; Email from Saul Bernstein, Citigroup, to Andrew P. Lee and Rick Caplan with a copy to Amanda Angelini, Citigroup, *et al.*, regarding Sundance Transaction Summary, June 1, 2001, at CITI-B 00501221 [CITI-B 00501219-CITI-B 00501222]; *see also* Third Interim Report, Appendix D (Role of Citigroup and its Affiliates), *Citigroup's Role in Enron's SPE Transactions, Forest Products Transactions, Sundance*.

succeeded in drafting the documents in a way that preserved a significant indicia of risk and reward with Salomon Holding.

The Examiner's conclusion that this was not a true sale did not, however, rest solely on the effectiveness of the put,[303] nor did Vinson & Elkins' analysis of true sale issues.

*Lack of Business Purpose*

As reflected in the May 21, 2001 draft memorandum that Astin prepared relating to the true sale of the Sonoma Class A Interest, another factor needed for Vinson & Elkins to render a true sale opinion was the existence of a commercial business purpose for both parties.[304] In the true sale opinion delivered in this transaction, Vinson & Elkins

---

[303] The Examiner concluded that:

> [t]here was no true sale under the circumstances, where the substance of the transaction was that Salomon Holding contributed $28.5 million of cash to Sundance and had no business purpose for owning the Sonoma Class A Interest separate from the rest of the Sundance assets. Salomon Holding's internal approval documents reflected no interest in this asset, and the put and call the parties placed on the asset was not designed to be implemented, evidenced by the restrictive notice and exercise date.

Second Interim Report, Appendix K (Forest Products Transactions), *Sundance Industrial Transaction, Examiner's Conclusions.*

[304] Astin 5/21/01 Memo, at 2. This was also one of the factors highlighted in a November 2000 internal Vinson & Elkins draft document, "Selected True Sale and Non-Consolidation Criteria."

> **21. Overall Business Purpose.** The transferor should be motivated by bona fide business benefits in consummating the structured finance transaction . . . apart solely or primarily from achieving a perceived accounting, tax or other "structured" result for the transaction. Once this test is met, a transferor should be free to structure the transaction in the most advantageous manner consistent with applicable law and accounting principles.
>
> . . . .
>
> **26. Surrounding Facts Consistent with Assumptions.** It may not be reasonable to rely on recitations set out in the documents, if the statements or conduct of the parties to the transactions are inconsistent with the recitations.

Selected True Sale and Non-Consolidation Criteria Memo, at 6-7 (emphasis in original). Astin testified that he ultimately did not consider this to be a material factor in rendering the true sale opinion. Astin 9/10/03 Sworn Statement, at 25-26 and 52-53; *but see* Sundance Opinion Letter, at 12 (assuming that each party, including Salomon Holding, had a valid business purpose for entering into the transaction).

assumed that "each Party has a valid business purpose" for entering into the transaction.[305] However, Vinson & Elkins did not determine and could not identify any commercial business purpose that Salomon Holding (or Citigroup) had for acquiring the Sonoma Class A Interest.[306] Moreover, the circumstances surrounding the inclusion of the "sale" at the last minute, the persistent attempts of Salomon Holding to extinguish any risk of ownership of the Sonoma Class A Interest, and the difficulty that Vinson & Elkins had in negotiating the put and call provision belie that either Salomon Holding or Enron had any true business purpose in this transaction. The only purpose that Vinson & Elkins knew of from Enron's perspective was to recognize the $20 million gain.[307] In addition, information available to Vinson & Elkins, including the conduct of the parties, indicates that the *only* purpose of the "sale" of the Sonoma Class A Interest to Salomon Holding was to permit Enron to recognize this accounting benefit, a purpose which Astin understood.

F.   **Disclosure Issues and the SPE Transactions**

*Summary Description of Enron's Disclosure of the SPE Transactions*

In the Second Interim Report, the Examiner found Enron's disclosure of the SPE transactions in its MD&A to be materially deficient.[308] Enron's MD&A during the

---

[305] Sundance Opinion Letter, at 12 (assuming that each party, including Salomon Holding, had a valid business purpose for entering into the transaction) and 31 ("We wish to point out that we have not made any investigation or inquiry of any Party or of the books and records of any Party. Rather, we have relied on officer's certificates and representations in the Transaction Documents as to such factual matters as we have deemed appropriate for the purposes of this opinion.").

[306] Astin 9/10/03 Sworn Statement, at 25-26 and 52-53.

[307] *Id.* at 25-26 and 52-53; *see also* Astin 5/21/01 Memo.

[308] *See* Second Interim Report, Appendix D (Enron's Disclosure of its SPEs), *Enron's SEC Disclosures Regarding Selected Categories of SPE Transactions, Related Party Transactions*.

relevant periods failed to describe adequately Enron's financial condition and results in a

narrative fashion.

*Attorneys' Role in Enron's Disclosure of the SPE Transactions*

Enron's attorneys comprised just one of several groups of participants involved in

Enron's public disclosure process. Like most public companies of its size, Enron

employed numerous non-attorney, in-house professionals – principally those in its

Financial Reporting Group – who worked on the preparation and filing of Enron's SEC

disclosure documents.[309]

Rogers was the Enron in-house attorney principally responsible for securities

disclosure matters.[310] Derrick, as well as others within and outside the Enron legal

---

[309] The Financial Reporting Group, relying on the information provided by the business units and transaction support groups, produced initial drafts of financial statements and MD&A. Finalizing the disclosure documents was an iterative process, with a number of groups, both inside and outside of Enron, receiving drafts. For instance, with respect to Enron's 10-Ks, the following groups received drafts: business unit chief accounting officers; transaction support; investor relations; public relations; legal; and treasury. Peng Sworn Statement, at 15, 28, 48 and 80. All of these groups were provided the opportunity to submit comments, either in writing or orally, to the Financial Reporting Group. *Id.* at 15, 21 and 47. Senior officers such as Fastow, Skilling and Lay apparently received drafts from Rick Causey. *See, e.g., id.* at 48-49. In many cases, the SPE transactions were undertaken principally for the purpose of achieving a particular accounting result, and, in that context, Enron's public disclosures needed to support that accounting result by not making the underlying economics apparent. *See* Third Interim Report, Appendix C (Role of Enron's Officers). Due to the considerable number of SPE transactions typically completed by Enron during a reporting period and the fact that many transactions closed during the last few days of a reporting period, the Financial Reporting Group relied greatly upon "real-time" accounting analyses performed at the business unit and transaction support group levels and apparently undertook little or no independent analysis of its own. Peng Sworn Statement, at 41-42. Andersen also reviewed and commented on Enron's public disclosures. *See* Final Report, Appendix B (Role of Andersen).

[310] Rogers stated in his 2001 Profile and Self Evaluation that his transaction practice included "corporate finance, securities offerings and compliance; all legal disclosure matters, equity trading and insider trading policy" and listed as one of his accomplishments that he was "responsible for timing and content [of] all Company legal disclosure matters, including SEC filings and review of press releases, analyst presentations, [and] company website material." Rogers Evaluation, at AB0461 00684-AB0461 00685.

One of Rogers' principal responsibilities was to serve as the lead attorney on providing legal advice and support with respect to Enron's annual and quarterly reports, proxy statements and other filings with the SEC. Rogers Sworn Statement, at 15. Rogers regularly received and commented on drafts and, in the case of the annual meeting proxy statements and portions of the annual reports, Rogers, or attorneys subject to his supervision, actually drafted and addressed comments by others with respect to disclosures. *See* Report, Appendix C (Role of Enron's Attorneys), *The Lawyers' Role in Certain SPE Transactions, Other Disclosure Issues Related to the SPE Transactions.* Rogers' interaction with the Financial Reporting Group – the group within Enron's accounting department that was responsible for SEC financial reporting

department, testified that they understood this.[311]  Rogers did not disagree, although he

testified that he saw his role as more administrative than substantive: "[M]y job was to

ensure that all the proper parties with the experience and expertise were working on [the

public disclosures], and in this case those parties were inside/outside lawyers,

inside/outside accountants, Arthur Andersen and the Audit Committee."[312]

Rogers testified that he "was not involved in the drafting of the MD&A.  I did

review it and make comments . . . ."[313]  Rogers understood the general purpose of

MD&A[314] and acknowledged that "the MD&A section is not limited or restricted to

GAAP accounting."[315]

In the 1999-2001 time frame, Rogers did not perceive an increase in Enron's

reliance on off-balance sheet financings.[316]  Despite the evidence discussed above

regarding conversations with Baird at Vinson & Elkins that appear to have occurred

during June and July 1998, Rogers testified that he did not recall any discussions about a

---

– was regular and continuous.  *See* Rogers Sworn Statement, at 45.  Particularly as filing deadlines drew near, Rogers participated in meetings and telephone calls with the others who played a role in Enron's disclosure process.  *See* Report, Appendix C (Role of Enron's Attorneys), *The Lawyers' Role in Certain SPE Transactions, Other Disclosure Issues Related to the SPE Transactions.*

[311] Derrick 9/26/03 Sworn Statement, at 334 and 345-47.  "I viewed Rex as the person within our organization who was responsible for ensuring that those were done appropriately."  Derrick 9/26/03 Sworn Statement, at 345-46.

[312] Rogers Sworn Statement, at 36.

[313] *Id.* at 73-74.

[314] Rogers stated:

> [M]y understanding of the MD&A section is that it's management's opportunity, responsibility to discuss . . . in a narrative fashion, the company's liquidity, capital resources, results of operations, and discuss any, you know, known trends or uncertainties that might affect the financial position or condition of the company.  It's . . . in . . . layman's terms, the opportunity to tell an investor . . . these are the financial issues that, in a narrative form as opposed to financial statement form, addressing those particular issues.

*Id.* at 72.

[315] *Id.* at 76.

[316] *Id.* at 79.

need to identify Enron's increasing use of off-balance sheet financing transactions and structured finance vehicles in Enron's MD&A.[317]   With respect to the Prepay Transactions, the FAS 140 Transactions and other structured financings, Rogers testified that he tried to get an understanding of the transactions, but at an "overview" level.[318] Rogers professed a lack of any real understanding of the Mahonia and Yosemite Prepay Transactions and recalled no discussion of how they should have been disclosed.[319]  With respect to the Prepay Transactions, he testified that "in reviewing the drafts, [he] sat down with members of the Corporate Financial Reporting Group trying to get an understanding of the underlying transactions, but . . . these were complex transactions . . . ."[320]

Rogers consulted with Vinson & Elkins on disclosure matters.  Rogers testified that the word "episodic" was an accurate description of Vinson & Elkins' involvement:[321]

> I know there were occasions where I sent sections of both 10-Q's and 10-K's to Vinson and Elkins for review.[322]

> As part of the episodic Vinson and Elkins review that we referred to earlier, they reviewed MD&A sections and comments and gave us comments on a -- certainly on an annual basis and I think -- I don't know if every quarterly statement, but on many quarterly statements.[323]

Nevertheless, Derrick testified that he had the impression that Vinson & Elkins was fully involved in ensuring that Enron's public disclosures were adequate.[324]  Derrick

---

[317] *Id.*

[318] *Id.* at 193.

[319] *Id.* at 187-89.

[320] *Id.* at 191.

[321] *Id.* at 27.

[322] *Id.* at 26.

[323] *Id.* at 39-40.

[324] Derrick 9/26/03 Sworn Statement, at 343.  Further, Derrick testified:

believed that, among other things, Rogers was collecting Vinson & Elkins' comments on all of Enron's periodic securities filings.[325] He does not recall, however, ever telling Rogers[326] or Vinson & Elkins[327] his expectation about the scope of Vinson & Elkins' involvement in Enron's public disclosures. Derrick testified that he would have been surprised if someone described Vinson & Elkins' involvement as "limited and episodic,"[328] or if any 10-Qs were filed that Vinson & Elkins had not reviewed "at all."[329] He fully delegated the disclosure process, however, to Rogers.[330]

When Rogers did consult Vinson & Elkins with respect to Enron's SEC filings, it often occurred in the form of an email attaching a draft, but with no explicit instructions for the scope of the review.[331] Rogers testified that Vinson & Elkins was involved "fairly early" in the drafting process of the 10-Ks,[332] and that his expectations for Vinson & Elkins' review of SEC filings generally were as follows:

> [I]t was my impression that any legal matters disclosed in our public ... filings that you're referring to were being looked at by the team which included both Rex Rogers and a Vinson & Elkins representative. So I can't speak to what actually did or did not occur; but if you're asking my impression, my impression was that on distribution lists, that there were Vinson, Elkins representative or representatives shown as participating or in distribution. So I certainly had the impression that they would have been reviewing what was sent to them and making whatever comment, if any, they thought appropriate.

*Id.*

[325] *Id.* at 334. In contrast, in the context of information for Enron's periodic filings, Rogers stated that his only participation in the "information gathering process" for Enron's 10-Qs related to the footnote describing material litigation. Rogers Sworn Statement, at 18.

[326] Derrick 9/26/03 Sworn Statement, at 346.

[327] *Id.* at 346-47.

[328] *Id.* at 348.

[329] *Id.* at 349.

[330] *Id.* at 334 and 345-47. "I viewed Rex as the person within our organization who was responsible for ensuring that those were done appropriately." *Id.* at 345-46.

[331] Rogers Sworn Statement, at 65-66 and 68.

[332] *Id.* at 68.

It was very general . . . . Vinson and Elkins represented the company on a variety of matters, [and it] certainly wasn't Enron's only – Enron had hundreds of outside law firms, but these were individuals who were generally familiar with Enron's business . . . , so there was no specific instructions other than review and give us your comments. . . . I don't recall specific conversations on . . . limitations or instructions, but I think it was understood, certainly by me and I believe by them, that, again, they're getting a document that they have not participated in the drafting of nor necessarily done any due diligence on. . . . With the possible exception of maybe some transactions that are discussed within the document, so there were I think naturally . . . some limitations in their review in that respect.[333]

Baird and Astin were the two outside attorneys with whom Rogers had the most direct contact on various securities disclosure issues.[334] Rogers testified that he did not recall making a request that the reviewing Vinson & Elkins attorney – whether Baird or Astin – solicit the input of the Vinson & Elkins attorneys working on the various SPE transactions that occurred during the relevant time period. It was his understanding that, where specific transactions were discussed in a filing, "not necessarily the entire document but just parts" were sent by in-house attorneys (or other groups at Enron, such as the Financial Reporting Group) to the Vinson & Elkins attorney who worked on the transaction for that attorney's review.[335] Rogers did not, however, make sure that occurred.[336]

The evidence confirms that Vinson & Elkins reviewed portions of Enron's 10-Ks, and portions of some of Enron's 10-Qs, often with a focus on the description of a specific

---

[333] *Id.* at 66-67.

[334] *Id.* at 65.

[335] *Id.* at 68-69; *see, e.g.*, Dilg 9/24/03 Sworn Statement, at 135 ("I rarely had conversations with Mr. Rogers or others at Enron on disclosures. The exceptions would be transactions that I might be working on that would – an M&A transaction or something that they needed a description for disclosure purposes.").

[336] Rogers Sworn Statement, at 68-69.

transaction or portions of a transaction.[337]   The invoices from Vinson & Elkins, however,

should have informed Enron that Vinson & Elkins was not devoting significant time to its

review of Enron's SEC filings, and certainly was not involved to the degree that Derrick

testified was his impression of the firm's involvement.   Vinson & Elkins did, from time

to time, raise disclosure points regarding other SPE transactions.[338]   Vinson & Elkins'

suggestions were not always accepted, but no Vinson & Elkins witness testified to

awareness of any instance of a "mandatory" disclosure that Enron refused to make.[339]

For example, following Vinson & Elkins' disclosure concerns during the summer

of 1998,[340] Vinson & Elkins continued to express some concern about Enron's

disclosures related to the FAS 140 Transactions.   In February 2000, Astin reviewed a

draft of Enron's MD&A for its annual report for 1999.   In a fax to Rogers dated February

---

[337] *See, e.g.,* Vinson & Elkins Invoice No. 2055838, regarding General Retainer, Year 2000 Issues, Sept. 30, 1998 [EVE 1312171-EVE 1312213]; Baird Sworn Statement, at 111 (regarding invoice concerning "J-block disclosure issues," a matter related to a contract dispute).

[338] For instance, in the fall of 1998, Baird drafted proposed language to disclose the triggers for Enron's contingent obligations with respect to Project Marlin.   Memorandum from Bob Baird, Vinson & Elkins, to Bob Butts, Tim Driggers, Ben Glisan, Mark Koenig, Paula Rieker, Rex Rogers, Lance Schuler and Phil Sisneros, Enron, with a copy to Scott Wulfe, Vinson & Elkins, Nov. 10, 1998 (the "Baird 11/10/98 Memo") [EVE 2270907.1-EVE 2270907.4].   Enron did not accept Baird's specific proposed language for its Form 10-Q for the quarter ended September 30, 1998 that the occurrence of a trigger event could result in a cash settlement.   Also, in the fall of 1998, after working on Project Nighthawk, Wulfe again raised the issues that he had raised earlier that year.   Wulfe Sworn Statement, at 98.   In October 1998, Wulfe was involved in disclosure discussions with Baird on liquidity issues raised by several other SPE transactions.   *Id.* at 120; Baird 11/10/98 Memo.   In early 1999, in connection with a review of the 10-K for 1998, Wulfe, probably through Baird, raised these issues again.   Wulfe Sworn Statement, at 99.

[339] *See, e.g.,* Astin 9/10/03 Sworn Statement, at 186-87 ("I don't remember any situation in which I had felt that there was a mandatory disclosure that Enron had refused to make, but that, on the other hand, most disclosure questions are judgmental in nature and it's rare that one is a completely open and shut situation. There were prudential disclosures I had recommended that they didn't agree with."); Sworn Statement of Joseph C. Dilg, Managing Partner, Vinson & Elkins, to Mary C. Gill, A&B, Aug. 14, 2003 (the "Dilg 8/14/03 Sworn Statement"), at 54 ("And I know there were discussion[sic] now, in which when I have said a fuller disclosure is better, and for various reasons, they decided not to make as full a disclosure as we may have initially recommended.").

[340] *See* Report, Appendix C (Role of Enron's Attorneys), *The Lawyers' Role in Certain SPE Transactions, FAS 140 Transactions and Vinson & Elkins.*

10, 2000, Astin sent several marked-up pages.[341]   On the description of Enron's Wholesale Energy Operations and Services for 1998, Astin proposed that Enron add the words "or monetization" to a sentence concerning earnings, so that it would read (with his proposed change shown in double underline), as follows:

> Earnings from assets and investments increased 25% in 1998 as compared to 1997.  This increase reflects earnings from the sale or monetization of interests in certain energy assets including the Puerto Rico, Turkey, Italy and United Kingdom power projects, from which Enron Wholesale realized the value created during the development and construction phases.[342]

As Astin explained the proposed changes: "it's a sale for accounting purposes. It's not a sale as an ordinary person on the street would understand it . . . ."[343]   Enron rejected Astin's suggestion regarding inclusion of the term "monetization" in the description of Enron's Wholesale Energy Operations and Services description, and elsewhere.[344]

---

[341] Facsimile from Ronald T. Astin, Vinson & Elkins, to Rex Rogers, Enron, Feb. 10, 2000 [EVE 358605-EVE 358622].

[342] Id. at EVE 358612.  Although Project Churchill related to an interest in a power plant in Puerto Rico, Dilg 9/24/03 Sworn Statement, at 50, and the FAS 140 Transaction related to it produced approximately $150 million in earnings in 1998, Astin's notes do not indicate that the paragraph related to that transaction. Astin also suggested addition of the term "or monetization" at a few other parts in the draft MD&A. Astin's comments did not include any proposed disclosure language regarding the Nahanni transaction, a transaction that Astin had personally worked on only months before.  Astin 8/12/03 Sworn Statement, at 13.

[343] Astin 8/12/03 Sworn Statement, at 34.

[344] Astin 8/12/03 Sworn Statement, at 23.  The testimony of several Vinson & Elkins attorneys indicates how vague and uninformative the word "monetize" is.  See, e.g., Dilg 9/24/03 Sworn Statement, at 70 ("I recall in discussion that we had . . . . some conversations about the term monetization, whether anybody really knew what monetization meant. . . ."); Wulfe Sworn Statement, at 149 ("The word monetizing, to me in that context, would be a very broad term that would effectively be probably any type of transaction in which funds are obtained through some transaction involving an asset.  Now, whether or not he meant it in a more narrow case, I mean, he may have, but I don't know."); id. at 150 ("I believe in the summer of '98, as best as I recall, my views about these terms was sort of evolving, not having spent that much time thinking about it, so I think I, at different points, had different views about monetization.  I think that ultimately -- well, I think I believed that it encompassed a transaction in which funds were obtained, but if you ask -- I'm not sure that I immediately had a definitive reaction to that term."); id. at 151 ("I think -- synonymous with sale?  I'm not -- I think, generally speaking, monetization is probably a broader term, but could it -- certainly could encompass a sale.  Is it synonymous?  I'm not sure I ever got to that fine of

The FAS 140 Transactions and their potential impact on the financial disclosures of Enron continued to be a matter of concern to Vinson & Elkins, even though, beginning in late 1998, Andrews & Kurth began to handle most of the transactions. In the fall of 2000, Astin learned that some of his partners at Vinson & Elkins were troubled with aspects of the opinions rendered by Andrews & Kurth in the FAS 140 Transactions.[345] The extent of credit support and the use of the Total Return Swaps caused this concern.[346] Astin worried that if these opinions were flawed, it would have an impact on the accounting, and therefore the financial statements:[347]

> Q: You were concerned from a disclosure perspective as to the credibility of the true sale opinions and whether, if they were wrong or erroneous, it would impact the accuracy of Enron's disclosure?
>
> A: Yes. I was concerned that if we believed there was something so fatally wrong with the opinion that we didn't think a reasonable lawyer could give it that it implicitly undercut the reported financial results of the company since the true sale opinions are a necessary component, as I understand it, of getting the accounting treatment of true sale.[348]

Vinson & Elkins ultimately concluded, however, that this was a matter of professional disagreement, and that Vinson & Elkins could not say that an attorney acting within the standard of care would not give the opinions.[349] Therefore, Vinson & Elkins did not raise these concerns with Enron at that time.[350]

---

thinking about it."); Baird Sworn Statement, at 155 ("there were several words that were being considered to describe these kinds of transactions, such as structured finance, monetization, et cetera, et cetera. I do remember we had a discussion on whether monetization is adequate or not and I think he [Wulfe] started saying out that he didn't like that word and later decided that it wasn't such a bad word after all or it might be a good word.").

[345] Astin 9/10/03 Sworn Statement, at 188.

[346] *Id.* at 192.

[347] *Id.* at 188-90.

[348] *Id.* at 190.

[349] *Id.* at 188-89.

[350] *Id.* at 193.

- 89 -

Later, however, Astin raised the issue to Vinson & Elkins partner Max Hendrick ("Hendrick") in the context of the Watkins Investigation.[351]   Notes from their meeting reflect: "Question whether Enron can rely on A&K true sales opinions. This allows cash flow to be recorded and earnings realized . . . ."[352]   Astin shared this information with Hendrick because it related to Watkins' concern about the significance of the funds flow from merchant assets.[353]   However, Vinson & Elkins did not include any reference to this concern in their report to Derrick, Lay or the Audit Committee at the close of the Watkins Investigation.

---

[351] Handwritten Notes, labeled "Enron/Mtg. Ron Astin, Joe Dilg, MH 9-13-2003" (the "Hendrick 9/13/01 Astin Mtg. Notes"), at VEL 01308 [VEL 01304-VEL 01308].

[352] Hendrick 9/13/01 Astin Mtg. Notes,  at VEL 01308; Astin 9/10/03 Sworn Statement, at 188.

[353] Astin 9/10/03 Sworn Statement, at 201.

## IV.    ATTORNEYS' ROLE IN TAX SPE TRANSACTIONS

### A.    Introduction

In the Second and Third Interim Reports, the Examiner reported on eleven transactions (the "Tax Transactions") that were implemented by certain Enron officers to generate GAAP income.  For the most part, they were artificial transactions involving the transfer of substantial assets already owned by Enron and inter-company liabilities of Enron affiliates to an SPE.[354]  Robert J. Hermann, the head of Enron's tax department, acknowledged that the corporate tax department was "only interested in structured transactions where [Enron] got a financial income benefit."[355]  In 1999 and 2000, Enron engaged in two transactions known as the Condor Transaction and the Tammy I Transaction.[356]  Vinson & Elkins advised Enron as to the tax consequences of both transactions.[357]  These transactions were similar in that they were intended to generate after-tax income for financial accounting purposes through an application of FAS 109[358] to transactions designed to increase the tax basis of specific assets.[359]  The tax goal of the Condor Transaction was to obtain a $900 million step-up in the tax basis of the Bammel

---

[354] *See* Second Interim Report, at 89-94; *Id.* at Appendix J (Tax Transactions).

[355] Sworn Statement of Robert J. Hermann, former Managing Director and General Tax Counsel, Enron, to Philip C. Cook, A&B, Apr. 7, 2000, at 156; *see also* In-Person Interview with Robert J. Hermann, former Managing Director and General Tax Counsel, Enron, by Philip C. Cook, A&B, Aug. 8, 2002 (the "Hermann Interview").

[356] *See* Second Interim Report, Appendix J (Tax Transactions).

[357] *Id.*

[358] Accounting for Income Taxes, Statement of Financial Accounting Standards No. 109 (Financial Accounting Standards Bd. 1992) ("FAS 109").

[359] *Id.*

Assets.[360] The tax goal of the Tammy I Transaction was to obtain a $1 billion step-up in

the tax basis of the Enron South Building.[361]

The Condor Transaction and the Tammy I Transaction were structured to create

reported net income in current periods based on tax depreciation deductions that would

occur far into the future.[362] In the Second Interim Report, the Examiner concluded that

Enron's accounting for the Condor Transaction and the Tammy I Transaction did not

comply with GAAP.[363] Under GAAP, Enron could not record the accounting benefits

associated with the Condor Transaction and the Tammy I Transaction unless it was

"probable"[364] that the future depreciation deductions would be realized (i.e., would be

deductible for federal tax purposes).[365] As a result, Enron engaged Vinson & Elkins to

issue a "should" level tax opinion,[366] which generally conveys a level of assurance in the

---

[360] *See* Second Interim Report, Appendix J (Tax Transactions), *Enron's Tax Basis Step-Up Transactions*; Second Interim Report, Annex 5 to Appendix J (Tax Transactions). The "Bammel Assets" included a natural gas storage facility and pipeline assets originally owned by Houston Pipe Line Company. *Id.*

[361] *See* Second Interim Report, Appendix J (Tax Transactions), *Enron's Tax Basis Step-Up Transactions*; Second Interim Report, Annex 6 to Appendix J (Tax Transactions). The Enron South Building was the new corporate headquarters building that adjoined the Enron North Building and that was still under construction as of the Petition Date. *Id.*

[362] *See* Second Interim Report, Appendix J (Tax Transactions).

[363] *Id.*

[364] Under GAAP, a "probable" event is one that is likely to occur, i.e., it can reasonably be expected or believed but is neither certain nor proved. Elements of Financial Statements, Statement of Financial Accounting Concepts No. 6 (Financial Accounting Standards Bd. 1985), at nn. 18 and 21; Accounting for Contingencies, Statement of Financial Accounting Standards No. 5 (Financial Accounting Standards Bd. 1975), ¶ 3. "Probable" is a higher level of certainty than "more than likely," which refers to a probability of more than 50%. FAS 109, ¶ 17e; *see also* Second Interim Report, Appendix J (Tax Transactions), *Accounting for Deferred Taxes Under FAS 109.*

[365] *See* Second Interim Report, Appendix J (Tax Transactions), *Accounting for Deferred Taxes Under FAS 109.*

[366] Sworn Statement of Alicia L. Goodrow, Senior Tax Director, Enron, to Mary C. Gill, A&B, Apr. 24, 2003 (the "Goodrow Sworn Statement"), at 47 and 56; Draft Tax Opinion from Vinson & Elkins to Enron, Mar. 17, 2000 (the "Draft Condor Tax Opinion") [AB000151937-AB000151946]; Tax Opinion from Vinson & Elkins to Enron, Feb. 9, 2001 (the "Tammy I Tax Opinion") [AB000151947-AB000151970].

range of 70% to 90% that the tax position will be sustained.[367]    Vinson & Elkins

understood that Enron needed a "should" level tax opinion to be able to record the

financial benefits of the Condor Transaction and the Tammy I Transaction.[368]

In the Third Interim Report, the Examiner concluded that certain of Enron's tax

officers were responsible for the structuring, recommendation, approval, consummation

and disclosure of the Tax Transactions.[369]    The Examiner further concluded that the

participation of these officers in the Tax Transactions resulted in a breach of their

fiduciary duties as officers, causing injury to Enron itself and to innocent parties that

dealt with Enron.[370]

### B.    Condor Transaction

*Structure of the Condor Structure*

The step-up in basis in the Condor Transaction was to be achieved by causing

Whitewing Associates L.P. ("Whitewing Associates") to elect the remedial allocation

method with respect to the Section 704(c) built-in gain in the Bammel Assets at the time

of contribution.[371]   By adopting the remedial allocation method under Section 704(c) of

---

[367] A "should" level tax opinion is more certain than a "more likely than not" opinion, and less certain than a "will" opinion. *See, e.g.*, Sworn Statement of Steven E. Klig, Partner, D&T, to Philip C. Cook, A&B, Dec. 18, 2002 (the "Klig Sworn Statement"), at 118 ("generally 70 percent to something south of 90 – 89, 88 percent"); Project Apache, Initial Review of Draft Tax Opinions, 1998, at 1 (indicating an 80%-90% level of comfort) [AB0074 0238-AB0074 0241]; Sworn Statement of R. Davis Maxey, former Vice President Tax, Enron, to Philip C. Cook, A&B, Dec. 11, 2002, at 21 ("somewhere between 70 and perhaps 90 percent"); Goodrow Sworn Statement, at 57 ("something in the 70 to 90 percent chance of success of winning on a particular issue"); Sworn Statement of Edward C. Osterberg, Partner, Vinson & Elkins, to Philip C. Cook, A&B, Sept. 16, 2003 (the "Osterberg 9/16/03 Sworn Statement"), at 40 ("in the range of 75 percent"); Hermann Interview (75%-80%).

[368] Osterberg 9/16/03 Sworn Statement, at 15-16.

[369] *See* Third Interim Report, Appendix C (Role of Enron's Officers).

[370] *Id.*

[371] *See* Second Interim Report, Appendix J (Tax Transactions), *Enron's Tax Basis Step-Up Transactions*; Second Interim Report, Annex 5 to Appendix J (Tax Transactions); *see also* I.R.C. § 704(c); Treas. Reg. § 1.704-3(d).

the Internal Revenue Code, Whitewing Associates expected to allocate $900 million of notional income to Kingfisher I LLC ("Kingfisher"), the Enron affiliate partner that contributed the Bammel Assets, and a corresponding amount of notional deduction to Peregrine I LLC ("Peregrine"), another Enron affiliate partner.[372]

The remedial allocations of income to Kingfisher would increase its basis in Whitewing Associates by $900 million over 15 years.[373] However, the notional amounts of income and deduction allocated to Kingfisher and Peregrine would offset each other in Enron's consolidated tax return and would result in no increase in Enron's consolidated tax liability.[374] Upon redemption of Kingfisher's interest in Whitewing Associates, Kingfisher would take a basis in the distributed assets equal to its stepped-up basis in its partnership interest.[375] Kingfisher then was expected to begin depreciating the higher stepped-up basis, with a result of reducing the tax liability of the Enron consolidated group at that time.[376]

*The Draft Condor Tax Opinion*

Vinson & Elkins, specifically Edward C. Osterberg ("Osterberg") and John Lynch ("Lynch"), advised Enron as to the tax consequences of the Condor Transaction.[377] Vinson & Elkins understood that Enron desired a "should" level tax opinion with respect

---

[372] *See* Second Interim Report, Appendix J (Tax Transactions), *Enron's Tax Basis Step-Up Transactions*; Second Interim Report, Annex 5 to Appendix J (Tax Transactions).

[373] *See* Second Interim Report, Appendix J (Tax Transactions), *Enron's Tax Basis Step-Up Transactions*; Second Interim Report, Annex 5 to Appendix J (Tax Transactions).

[374] *See* Second Interim Report, Appendix J (Tax Transactions), *Enron's Tax Basis Step-Up Transactions*; Second Interim Report, Annex 5 to Appendix J (Tax Transactions).

[375] *See* Second Interim Report, Appendix J (Tax Transactions), *Enron's Tax Basis Step-Up Transactions*; Second Interim Report, Annex 5 to Appendix J (Tax Transactions).

[376] *See* Second Interim Report, Appendix J (Tax Transactions), *Enron's Tax Basis Step-Up Transactions*; Second Interim Report, Annex 5 to Appendix J (Tax Transactions).

[377] *See* Second Interim Report, Appendix J (Tax Transactions), *Enron's Tax Basis Step-Up Transactions*; Second Interim Report, Annex 5 to Appendix J (Tax Transactions).

to the Condor Transaction so that it would be permitted by Andersen to record the financial statement benefits from the transaction.[378]  Enron was aware that Vinson & Elkins planned to deliver a "should" level opinion with respect to the transaction.[379] Subsequent to the closing, Vinson & Elkins furnished a draft of its tax opinion to Enron (the "Draft Condor Tax Opinion").[380]  However, the opinion was never finalized, apparently because finalizing the opinion was overlooked by both Enron and Vinson & Elkins.[381]  Enron relied on the advice of Vinson & Elkins in closing the Condor Transaction.[382]

The Draft Condor Tax Opinion did not address the application of Treasury Regulation Sections 1.701-2(c) (the "General Partnership Anti-Abuse Rule") and 1.704-3(a)(7) (the "704(c) Anti-Abuse Rule") (collectively, the "Anti-Abuse Rules").[383]  The Treasury Regulations provide that the remedial allocation method on which Enron relied may be elected as an alternative to the "traditional" allocation method and certain other alternative methods.[384] The election of the remedial method is subject to the 704(c) Anti-Abuse Rule, which provides that an allocation method is not reasonable if the contribution of the property and the corresponding allocation of tax items with respect to the property are made with a view to shifting the tax consequences of built-in gain or loss among partners in a manner that substantially reduces the present value of the partners'

---

[378] Osterberg 9/16/03 Sworn Statement, at 15-16.

[379] Id. at 16.

[380] Id. at 14-15; see also Draft Condor Tax Opinion.

[381] Osterberg 9/16/03 Sworn Statement, at 14.

[382] Id. at 16, 18-20 and 28-29.

[383] See id. at 18; Draft Condor Tax Opinion.

[384] Treas. Reg. §§ 1.704-3(a) and (c).

aggregate tax liability.[385] In the Condor Transaction, it was expected that one partner would achieve a significant increase in its tax basis in a depreciable asset without any corresponding tax cost to the other partner because the items would offset each other on the Enron consolidated return.[386] Because the magnitude of the step-up was so large, the present value of the reduction in tax from the expected future step-up in basis would be many millions of dollars.[387]

The Draft Condor Tax Opinion did not discuss application of the 704(c) Anti-Abuse Rule.[388] However, Vinson & Elkins considered the application of the 704(c) Anti-Abuse Rule and concluded that it should not apply to the transaction.[389] Vinson & Elkins' rationale for its conclusion was as follows:

> Well, in the Condor transaction, the contributing partner contributed low basis assets; and a remedial allocation of depreciation was made to the non-contributing partner with a corresponding remedial allocation of income to the contributing partner. And my understanding is that's exactly the way the remedial method was designed to operate in that there was no shifting of the built-in gain from the contributing partner to the non-contributing partner. In fact, the built-in gain was recognized by the contributing partner through the remedial allocations of income to it.[390]

The foregoing rationale does not appear to be correct. The 704(c) Anti-Abuse Rule is not limited to restricting allocation methods that shift built-in gain from the contributing partner to the non-contributing partner.[391] Rather, the 704(c) Anti-Abuse

---

[385] Treas. Reg. § 1.704-3(a)(10).

[386] See Second Interim Report, Appendix J (Tax Transactions), *Enron's Tax Basis Step-Up Transactions*; Second Interim Report, Annex 5 to Appendix J (Tax Transactions).

[387] See Second Interim Report, Appendix J (Tax Transactions), *Enron's Tax Basis Step-Up Transactions*; Second Interim Report, Annex 5 to Appendix J (Tax Transactions).

[388] See Draft Condor Tax Opinion; Osterberg 9/16/03 Sworn Statement, at 18.

[389] Osterberg 9/16/03 Sworn Statement, at 18.

[390] *Id.* at 85-86. Steven Klig, a D&T partner, made the same argument. See Klig Sworn Statement, at 37.

[391] See Osterberg 9/16/03 Sworn Statement, at 86.

Rule bars any allocation method where "the contribution of property . . . and the corresponding allocation of tax items with respect to the property are made with a view to shifting the tax consequences of built-in gain or loss among the partners" in a manner that reduces aggregate tax liability of the partners.[392]   Vinson & Elkins has correctly pointed out that the Condor remedial allocations shifted income related to the built-in gain to (and not away from) the Enron partner that contributed the built-in gain property.[393] Nevertheless, it appears that the "contribution of the property . . . and the corresponding allocation of tax items with respect to the property [were] made with a view to shifting the tax consequences of built-in gain or loss among partners . . ." to reduce aggregate tax liability in violation of the rule.[394]   The interpretation given to the 704(c) Anti-Abuse Rule by Vinson & Elkins is not supported by the literal language of the Treasury Regulation, and the Examiner has not found any other authority that supports such an interpretation.[395]

---

[392] Treas. Reg. § 1.704-3(a)(10).

[393] Osterberg 9/16/03 Sworn Statement, at 86.

[394] *See* Treas. Reg. § 1.704-3(a)(10).

[395] The Joint Committee on Taxation expressed the conclusion that the 704(c) Anti-Abuse Rule should apply to preclude the use of the remedial allocation method in the Condor Transaction, stating:

> Although the allocations between the Enron entities offset for tax purposes, considering that Enron had prearranged all of the steps to cause a substantial reduction of its tax liability, and made affirmations that it would complete the steps, the anti-abuse rule should apply to preclude the use of the remedial allocation method in this situation.

*Joint Comm. On Taxation, Senate Comm. on Finance, Report of Investigation of Enron Corporation and Related Entities Regarding Federal Tax and Compensation*, 108th Cong. (Feb. 2003) (the "Joint Committee Report"), Vol. I, at 218-19 (prepared at the request of Senators Max Baucus and Charles E. Grassley of the Senate Comm. on Finance) (footnotes omitted).

Vinson & Elkins also concluded that the General Partnership Anti-Abuse Rule should not apply to the Condor Transaction.[396]   Under the General Partnership Anti-Abuse Rule,

> if a partnership is formed or availed of in connection with a transaction a principal purpose of which is to reduce substantially the present value of the partners' aggregate federal tax liability in a manner that is inconsistent with the intent of subchapter K, the Commissioner can recast the transaction for federal tax purposes . . . even though the transaction may fall within the literal words of a particular statutory and regulatory provision . . .[397]

The General Partnership Anti-Abuse Rule also specifies that, to be respected, partnership transactions must be bona fide and have a substantial business purpose.[398]   In addition, the partnership transaction must properly reflect income unless any deviation from this standard is clearly contemplated by the applicable provision of the Internal Revenue Code or Treasury Regulations.[399]

The Draft Condor Tax Opinion did not explicitly deal with whether the Condor Transaction is subject to the General Partnership Anti-Abuse Rule.[400]   However, a draft Vinson & Elkins tax memorandum concerning the Condor Transaction discusses potential application of the General Partnership Anti-Abuse Rule.[401]   The draft memorandum notes that "five of the seven" abuse factors set forth in the Regulations appear to apply to the Condor Transaction, including the fact that "with a net present

---

[396] Osterberg 9/16/03 Sworn Statement, at 21.

[397] Treas. Reg. § 1.701-2(b).

[398] *See* Treas. Reg. § 1.701-2(a)(1).

[399] *See* Treas. Reg. § 1.701-2(a)(3).

[400] *See* Draft Condor Tax Opinion.

[401] *See* Draft Memorandum from Vinson & Elkins to AnnMarie Tiller, Enron, regarding Project Condor: Preliminary Issues Memorandum, Apr. 1999 (the "Draft V&E Condor Memorandum"), at 10-11 [EVE 422680-EVE 422692].   The memorandum, which was prepared in April 1999, apparently was never delivered to Enron. *See* Osterberg 9/16/03 Sworn Statement, at 24.

value of 7%, the Transaction will generate after-tax savings of $72 million."[402]  The draft memorandum does not articulate an argument why the General Partnership Anti-Abuse Rule does not apply.[403]  Vinson & Elkins' position is that the memorandum was an early draft that did not reflect the final thinking of Vinson & Elkins on the issue.[404]

The ostensible business purpose of the Condor Transaction was to facilitate the Osprey I financing.[405]  However, there are substantial reasons to question this claimed business purpose.  As indicated in the Second Interim Report, the Bammel Assets were not contributed to the partnership until after the financing had closed and there is virtually no evidence that the Osprey investors took the Bammel Assets into account in making a decision to invest.[406]  Despite substantial factual questions as to business purpose and the substantial number of "abuse" factors that the transaction triggers under the Regulations, Vinson & Elkins did not provide a substantial argument why the General Partnership Anti-Abuse Rule could not be relied upon by the IRS to defeat the large basis step-up sought to be obtained in the transaction.

The conclusions that the Anti-Abuse Rules do not apply to the Condor Transaction appear to be incorrect.  The Condor Transaction was an aggressively structured tax transaction of a type that ordinarily would be thought to be subject to scrutiny under the Anti-Abuse Rules.  Accordingly, the Examiner concludes that there is

---

[402] Draft V&E Condor Memorandum, at 11.

[403] *See* Draft V&E Condor Memorandum.

[404] Osterberg 9/16/03 Sworn Statement, at 23-26.

[405] A description of the Osprey I financing is contained in Appendix G (Whitewing Transaction) to the Second Interim Report.

[406] *See* Second Interim Report, Annex 5 to Appendix J (Tax Transactions), at 14.  The claim that Enron's business purpose for the Condor Transaction was to facilitate the Osprey I financing is not supported by any explanation of how it facilitated the borrowing.  Indifference of the Osprey I investors to the contribution of the Bammel Assets is evidence that the Condor Transaction did not facilitate the financing.

sufficient evidence for a fact-finder to determine that a reasonably prudent tax attorney acting within the required standard of care could not have given a "should" level tax opinion on the Condor Transaction.

### C.   Tammy I Transaction

*Structure of the Tammy I Transaction*

The step-up in basis in the Tammy I Transaction was to be achieved through a series of interrelated transactions, including: (i) a contribution of appreciated assets (the "Built-In Gain Assets") and Enron notes by Enron and its affiliates to an SPE known as Enron Finance Partners, LLC ("EFP") in exchange for EFP's membership interests; and (ii) a contribution of 95% of these membership interests by Enron and its affiliates to Enron Capital Investment Corp. ("ECIC") in exchange for ECIC's common stock (the "Contributions").[407] Upon the anticipated sale of the Built-In Gain Assets, which had a $1.8 billion value and a $1.3 billion built-in gain, ECIC would be allocated 95% of the recognized built-in gain and its tax basis in EFP would increase by the same amount.[408] EFP was expected to use a portion of the proceeds to purchase the Enron South Building and, after five years, to distribute the building to ECIC in redemption of its interest in EFP.[409] ECIC would take a basis in the Enron South Building equal to its stepped-up basis in its interest in EFP, and depreciation deductions with respect to its stepped-up

---

[407] *See* Second Interim Report, Appendix J (Tax Transactions), *Enron's Tax Basis Step-Up Transactions*; Second Interim Report, Annex 6 to Appendix J (Tax Transactions). The appreciated assets were subject to two additional contributions to lower tier subsidiaries – a contribution by EFP to Enron Intermediate Holdings followed by a contribution to Enron Asset Holdings, LLC, which was to hold the assets until their anticipated sale. *Id.*

[408] *See* Second Interim Report, Appendix J (Tax Transactions), *Enron's Tax Basis Step-Up Transactions*; Second Interim Report, Annex 6 to Appendix J (Tax Transactions).

[409] *See* Second Interim Report, Appendix J (Tax Transactions), *Enron's Tax Basis Step-Up Transactions*; Second Interim Report, Annex 6 to Appendix J (Tax Transactions).

basis in the Enron South Building would be claimed on Enron's consolidated returns.[410]

In addition to accomplishing the step-up in basis and future depreciation deductions, EFP

also served as the vehicle for a $500 million minority interest financing, which was

accomplished by selling a preferred membership interest in EFP to Zephyrus

Investments, LLC ("Zephyrus").[411]

The tax and accounting objectives of the Tammy I Transaction hinged on the

contemplated sale of the Built-In Gain Assets, the resulting step-up in basis of the Enron

South Building, and the depreciation deductions that were expected to exceed $1

billion.[412]  This future step-up in basis created the expectation that Enron would record

more than $400 million of increased net income from the year 2001 through 2005 on its

financial statements from recording deferred tax assets.[413]

*The Tammy I Tax Opinion*

Vinson & Elkins, specifically Osterberg, Lynch and Judith M. Blissard, advised

Enron as to the tax consequences of the Tammy I Transaction.[414]  To record the financial

accounting benefits of the Tammy I Transaction, Enron needed a "should" level tax

---

[410] *See* Second Interim Report, Appendix J (Tax Transactions), *Enron's Tax Basis Step-Up Transactions*; Second Interim Report, Annex 6 to Appendix J (Tax Transactions).

[411] *See* Second Interim Report, Appendix J (Tax Transactions), *Enron's Tax Basis Step-Up Transactions*; Second Interim Report, Annex 6 to Appendix J (Tax Transactions).

[412] *See* Second Interim Report, Appendix J (Tax Transactions), *Enron's Tax Basis Step-Up Transactions*; Second Interim Report, Annex 6 to Appendix J (Tax Transactions); Joint Committee Report, at 222.

[413] *See* Second Interim Report, Appendix J (Tax Transactions), *Enron's Tax Basis Step-Up Transactions*; Second Interim Report, Annex 6 to Appendix J (Tax Transactions); Project Tammy I, Deal Basics, undated [AB000187865]; Joint Committee Report, at 222.  In actuality, Enron did not record any financial accounting benefits because of the termination of the Tammy I Transaction.  Enron Consolidated Financial Statement Reporting, Limited Financial Accounting Summary of Certain Projects, as requested by the Examiner, Oct. 2002, at 18-19 [AB000427661-AB000427684].

[414] *See* Second Interim Report, Appendix J (Tax Transactions), *Enron's Tax Basis Step-Up Transactions*; Second Interim Report, Annex 6 to Appendix J (Tax Transactions).

opinion.[415]   Vinson & Elkins was engaged to provide this opinion (the "Tammy I Tax Opinion").[416]

The Tammy I Tax Opinion concluded that no gain or loss should be recognized on the Contributions.[417]   The opinion also concluded that 95% of the gain with respect to the Built-In Gain Assets should be allocated to ECIC, increasing its basis in its membership interest, and that the creation and use of EFP as a financing vehicle should not be disregarded as a sham or subject to the Anti-Abuse Rules defined above.[418]   As discussed in the Second Interim Report, the Examiner concluded that there are serious questions about whether the future tax benefits (i.e., the depreciation deductions) could withstand scrutiny by the IRS and the courts.[419]

The Tammy I Tax Opinion relied heavily on the assumption that the Tammy I Transaction was entered into for a valid business purpose.[420]   In particular, the Tammy I Tax Opinion noted that the transaction "was entered into for the valid business purpose of obtaining $500 million of financing in a manner that permits favorable financial accounting treatment."[421]   The Joint Committee on Taxation was critical of this statement, noting that "[t]he tax opinion apparently accepts as fact the notion that the

---

[415] Osterberg 9/16/03 Sworn Statement, at 40; Sworn Statement of Judith M. Blissard, Partner, Vinson & Elkins, to Philip C. Cook, A&B, July 23, 2003 (the "Blissard Sworn Statement"), at 24-25.

[416] *See* Tammy I Tax Opinion.

[417] *Id.* at 24.

[418] *Id.*; *see also* Treas. Reg. §§ 1.701-2(c) and 1.704-3(a)(7).

[419] *See* Second Interim Report, Appendix J (Tax Transactions), *Enron's Tax Basis Step-Up Transactions*; Second Interim Report, Annex 6 to Appendix J (Tax Transactions).

[420] *See* Tammy I Tax Opinion.

[421] *Id.* at 23.

- 102 -

partnership structure 'facilitates' the borrowing, but fails to explain how it facilitates the borrowing."[422]

In the Second Interim Report, the Examiner noted that there was little or no factual support for the proposition that contribution of the Built-In Gain Assets to EFP had the purpose or the effect of facilitating the Zephyrus minority interest financing.[423] Zephyrus, the entity investing in the EFP preferred interest on behalf of the banks, performed no due diligence with respect to the Built-In Gain Assets and their potential value as collateral.[424] Presentations prepared for prospective lenders to Zephyrus made no mention of the Built-In Gain Assets.[425] In fact, Enron was required by the Zephyrus lenders to indemnify EFP against any liabilities or losses with respect to the Built-In Gain Assets.[426] Zephyrus was limited in its return and did not share in any way in the gains or losses from the sale of the Built-In Gain Assets in the ordinary course.[427]

While the initial Tammy I structure reviewed by the Vinson & Elkins tax attorneys contemplated a partnership that directly owned all of the Built-In Gain Assets, the final structure, initially resisted by Vinson & Elkins, had the Built-In Gain Assets transferred two tiers below EFP with intervening debt owed to Enron separating the Built-In Gain Assets from the financial assets readily available as collateral to the lenders.[428] Vinson & Elkins was aware that the Zephyrus lenders had requested

---

[422] Joint Committee Report, at 239.

[423] Second Interim Report, Annex 6 to Appendix J (Tax Transactions), at 21.

[424] *Id.*

[425] *Id.*

[426] *Id.*

[427] *Id.* at 21-22.

[428] Memorandum from Robert D. Eikenroht, Enron, to Ron Astin, Vinson & Elkins, *et al.*, regarding Project Tammy, New Structure Diagram, Nov. 9, 2000 [EVE 1954759-EVE 1954760]; Discussion

indemnification from Enron with respect to the Built-In Gain Assets, and that the final structure did not include any provision for the Zephyrus investors to share in the gains and losses from disposition of the Built-In Gain Assets.[429] After they learned that some of the Built-In Gain Assets would not be contributed prior to the closing of the Zephyrus financing, Enron's tax advisors (and not the Zephyrus investors) requested a clause granting the Zephyrus investors the right to rescind their investment if those Built-In Gain Assets were not contributed during a specified period after closing.[430] The clause was requested to improve the appearance of the transaction for tax purposes, even though the lead Vinson & Elkins tax attorney was advised that the Zephyrus investors did not need a rescission right because "[t]he Banks are protected from a collateral perspective in the financing because all of the assets on which they are relying (i.e., the financial assets) are in Tammy and the tax related assets are in different companies, as to which Tammy has no access to either assets or liabilities (and from which liabilities the Banks are indemnified)."[431]

The Tammy I Tax Opinion expressed the opinion that the General Partnership Anti-Abuse Rule should not apply to the Tammy I Transaction.[432] To reach such a conclusion, Vinson & Elkins had to make a threshold determination that the Tammy I

---

Materials for Project Tammy, June 30, 2000 [EVE 2196665-EVE 2196683]; Email from Steve Klig, D&T, to Ed Osterberg, Vinson & Elkins, and R. Davis Maxey, Enron, regarding Project Tammy, Oct. 29, 2000, at 1 [EVE 1646885-EVE 1646886]; Osterberg 9/16/03 Sworn Statement, at 70-72; Blissard Sworn Statement, at 73-74.

[429] Tammy I Tax Opinion, at 5-7; Osterberg 9/16/03 Sworn Statement, at 58 and 63-66; Blissard Sworn Statement, at 78-79 and 95-96.

[430] Email from Tina Livingston, Enron, to Brian Moss, Vinson & Elkins, regarding Tammy LLC Agreement, Nov. 15, 2000 [EVE 1953237].

[431] Email from Ronald T. Astin, Vinson & Elkins, to Brian Moss, Vinson & Elkins, with a copy to Osterberg, Vinson & Elkins, regarding Tammy LLC Agreement, Nov. 15, 2000 [EVE 1953236].

[432] Tammy I Tax Opinion, at 24.

- 104 -

structure met the business purpose requirement of the General Partnership Anti-Abuse
Rule. In particular, Vinson & Elkins had to conclude to a "should" level of certainty that
EFP satisfied the requirement that "[t]he partnership must be bona fide and each
partnership transaction or series of related transactions (individually or collectively, the
transaction) must be entered into for a substantial business purpose."[433] There is
evidence, of which Vinson & Elkins was aware, that the Built-In Gain Assets were not
contributed to EFP for any bona fide business purpose.[434] There is also evidence, of
which Vinson & Elkins was aware, that the transfer of 95% of the partnership interests
from Enron and various Enron affiliates to ECIC served no identified business
purpose.[435] Consequently, there is evidence indicating that the EFP partnership and the
Tammy I structure did not satisfy even the threshold condition of the General Partnership
Anti-Abuse Rule.

The Tammy I Tax Opinion concluded that the effect of the allocations of basis
would not distort the purposes of Subchapter K of the Internal Revenue Code and, thus,
did not violate the General Partnership Anti-Abuse Rule.[436] In reaching this conclusion,
the opinion relied heavily on Example 10 of the Treasury Regulations, which holds that
the intentional distribution of a piece of equipment to a partner in liquidation of its
interest in the partnership would not distort the purposes of the Internal Revenue Code
where the distribution resulted in a step-up in the partner's basis in the equipment.[437] In

---

[433] Treas. Reg. § 1.701-2(a)(1).

[434] *See* Second Interim Report, Annex 6 to Appendix J (Tax Transactions), at 21-22; Osterberg 9/16/03 Sworn Statement, at 58, 63-66 and 70-72; Blissard Sworn Statement, at 73-74, 78-79 and 95-96.

[435] *See* Blissard Sworn Statement, at 49-50; Osterberg 9/16/03 Sworn Statement, at 82-83.

[436] Tammy I Tax Opinion, at 20-23.

[437] *Id.*; *see also* Treas. Reg. § 1.701-2(d), Example (10).

Example 10, however, the partnership in question "had been for several years engaged in substantial bona fide business activities."[438] There was no indication in the example that the partnership had been formed for the purpose of effecting the distribution of the equipment. On its particular facts, the Regulation concludes that the step-up in equipment basis was consistent with permitted "simplifying administrative rules for bona fide partnerships that are engaged in transactions with a substantial business purpose" as permitted under the general purposes of Subchapter K.[439] The Tammy I Tax Opinion's reliance on Example 10 does not appear to be justified by the literal language of the example.

The Tammy I Tax Opinion argued that the shift in basis to ECIC's partnership interest, which was expected ultimately to result in a step-up in basis of the Enron South Building, did not result from an "allocation method" subject to the 704(c) Anti-Abuse Rule, but instead was the result of the rule of the Treasury Regulations requiring that the transferee of a partnership interest be allocated its pro rata share of 704(c) gain (the "Transferee Rule").[440] This argument ignored the general rule of these Regulations, which states:

> Notwithstanding any other provision of this section, the allocations must be made using a reasonable method that is consistent with the purpose of section 704(c). For this purpose, an allocation method includes the application of all the rules of this section (e.g. aggregation rules).[441]

---

[438] *See* Treas. Reg. § 1.701-2(d), Example (10).

[439] *Id.*

[440] Tammy I Tax Opinion, at 17 (arguing that the basis allocation results from the rule of Treas. Reg. § 1.704-3(a)(7)).

[441] *See* Treas. Reg. § 1.704-3(a).

The Regulations indicate that allocations resulting from the Transferee Rule are subject to scrutiny under the 704(c) Anti-Abuse Rule.[442]  Accordingly, the argument of the Tammy I Tax Opinion that this rule cannot be applied to disallow the basis step-up to ECIC appears incorrect.

The conclusions that the Anti-Abuse Rules do not apply to the Tammy I Transaction appear to be incorrect.  The Tammy I Transaction was an aggressively structured tax transaction of a type that would ordinarily be thought to be subject to scrutiny under the Anti-Abuse Rules.  Accordingly, the Examiner concludes that there is sufficient evidence for a fact-finder to determine that a reasonably prudent tax attorney acting within the required standard of care could not have given a "should" level tax opinion on the Tammy I Transaction.

---

[442] *Id.*

## V.    ATTORNEYS' ROLE IN RELATED PARTY SPE TRANSACTIONS

### A.    <u>Introduction</u>

From 1997 until mid-2001, Enron completed twenty-four Related Party Transactions with entities in which Fastow and other Enron employees, including Kopper and Glisan, participated.[443] These entities included Chewco, LJM1, LJM2 and affiliates. In the Second Interim Report, the Examiner concluded that through the Related Party Transactions, Enron overstated its income, overstated its equity and understated its debt.[444] Several Enron officers and employees (including Fastow, Kopper, Glisan and one in-house attorney, Mordaunt) received substantial personal benefits in connection with these transactions.[445] This section discusses the roles of attorneys in the Related Party Transactions and Enron's disclosure of those transactions.

### B.    <u>Chewco</u>

*Formation of Chewco*

Chewco was formed by Enron in late 1997 to acquire CalPERS' 50% limited partnership interest in JEDI.[446] Enron was the other 50% general partner.[447] Enron did not want to purchase CalPERS' interest directly because to do so would require JEDI to

---

[443] *See* Report of Investigation by the Special Investigative Committee of the Board of Directors of Enron Corp., Feb. 1, 2002 (the "Powers Report"), at 2; *see* LJM Investment 2000 Activity with Enron [VEL 00350-VEL 00351]; *see also* LJM Investment Activity 1999 [AB000538905]; Email from Chris Loehr, ECT, to Ron Baker, Enron, Feb. 1, 2001 [AB000538894-AB000538898]; Enron Finance Committee Presentation, Feb. 12, 2001 (regarding review of LJM procedures and transactions completed in 2000) [AB000205058-AB000205061]; Second Interim Report, Annexes 1-5 to Appendix L (Related Party Transactions).

[444] *See* Second Interim Report, Appendix L (Related Party Transactions); Third Interim Report, Appendix C (Role of Enron's Officers).

[445] *See* Second Interim Report, Appendix L (Related Party Transactions); Third Interim Report, Appendix C (Role of Enron's Officers).

[446] Second Interim Report, Annex 1 to Appendix L (Related Party Transactions), *Introduction and Overview of Chewco*.

[447] *Id.*

be consolidated on Enron's financial statements.[448]  Enron initially considered outside investors for the Chewco structure,[449] but it was ultimately decided that Kopper would serve as its general partner.[450]  At that time, Kopper was a vice president in Enron's Global Capital department (which later became Enron Global Finance).[451]

Kopper's involvement in Chewco raised conflict of interest questions under Enron's Code of Conduct.  Under the Code of Conduct, officers (other than the Chairman) and employees could participate in conflict of interest transactions or activities only with the approval of the Enron Board or Office of the Chairman.[452]

The Examiner has found no evidence that the conflict of interest raised by Kopper's role in Chewco was presented to the Office of the Chairman.  The Examiner has found no evidence that Kopper's involvement in Chewco was ever disclosed to the Enron Board, despite the fact that both Fastow and Kopper attended the Executive Committee meeting at which the Chewco transaction was initially presented.[453]  In fact,

---

[448] Agenda for Enron Board Executive Committee Meeting, Nov. 5, 1997, at 3 (presentation slide "Project Chewco") [AB000001740-AB000001743]; see also Minutes of Enron Executive Committee Meeting, Nov. 5, 1997 (the "11/5/97 Executive Committee Minutes"), at 2 [AB000456818-AB000456821].

[449] Memorandum regarding Sale of CalPERS Interest in JEDI, Formation of a New Investment Fund & Related Transactions, Author unknown, Date unknown, at 3 [EVE 149056-EVE 149065].

[450] Facsimile from Carol St. Clair, Assistant General Counsel, Enron to Richard McGee and Mark Spradling, Vinson & Elkins, regarding Project Chewco Transaction Structure, Oct. 31, 1997 (the "St. Clair 10/31/97 Facsimile") [AB000465826-AB000465830].

[451] Memorandum from Renee Barnett, Wilmer Cutler, to Enron Files, regarding January 11, 2003 interview of Kristina Mordaunt, Jan. 12, 2002 (the "WC 1/12/02 Mordaunt Interview"), at 3 [AB000000617-AB000000635].

[452] See generally Enron Conduct of Business Affairs Booklet, Feb. 1996, at 23 [AB000001695-AB000001723]; Derrick 9/26/03 Sworn Statement, at 361-62 and 424-27.

[453] See 11/5/97 Executive Committee Minutes, at 2.  No additional information was disclosed in the Chewco presentation on December 9, 1997 to the full Enron Board.  As reflected in the minutes of the Executive Committee's approval of the Chewco transaction, the Enron Board simply approved the report on Chewco. Minutes of Enron Board Meeting, Dec. 9, 1997, at 1-3 [AB000001759-AB000001798].

the minutes reflect that Chewco was described as a "special purpose vehicle not affiliated with the Company or CalPERS."[454]

An additional issue that proved critical to the Chewco transaction from an accounting standpoint was the requirement that outside investors supply 3% of the equity at risk.[455] A reserve account created for the benefit of Barclays pursuant to a "side letter" dated December 16, 1997 from JEDI to Chewco violated this requirement and ultimately resulted in the consolidation of Chewco and JEDI and the restatement of Enron's financial statements.[456]

*Attorneys' Roles in Connection with Chewco Formation*

Mordaunt, then Assistant General Counsel of Enron Capital and Trade,[457] was the in-house Enron attorney responsible for the Chewco transactions during 1997.[458] She was assisted by Carol St. Clair ("St. Clair").[459] Vinson & Elkins represented Enron in the 1997 transaction, with significant involvement of Astin, Baird and Spradling.[460]

---

[454] *See* 11/5/97 Executive Committee Minutes, at 2.

[455] *See* Memorandum from Mark Spradling, Vinson & Elkins, to Ron Astin, Vinson & Elkins, *et al.*, regarding Revised Chewco Credit Agreement, Dec. 11, 1997 (the "Spradling 12/11/97 Memo"), at 1 ("Overarching Principle: the 97% debt/3% equity balance must be maintained, and any application of funds that would otherwise reduce the equity below 3% would be blocked.") [EVE 114280-EVE 114282]; Spradling 7/25/03 Sworn Statement, at 102-08.

[456] *See* Second Interim Report, Annex 1 to Appendix L (Related Party Transactions), *Accounting and Financial Statement Disclosure of Chewco*; Third Interim Report, Appendix C (Role of Enron's Officers). When Andersen learned of the reserve account in November 2001, Enron was required to consolidate Chewco and JEDI and restate Enron's financial statements for the period from 1997 through September 2001. Second Interim Report, Annex 1 to Appendix L (Related Party Transactions); *see also* Memorandum from Thomas H. Bauer, Andersen, to The Files, regarding Chewco Investigation, Nov. 2, 2001 [AB000535339-AB000535344].

[457] WC 1/12/02 Mordaunt Interview, at 3. The evidence reflects that Mordaunt was frequently involved as in-house counsel in Enron SPE transactions prior to becoming General Counsel of Enron Broadband. St. Clair Sworn Statement, at 54 and 264; Mellencamp Sworn Statement, at 35-36.

[458] St. Clair Sworn Statement, at 160-61.

[459] *Id.* at 161-62 and 264.

[460] Vinson & Elkins Invoice No. 20016125, regarding Chewbacca, Oct. 31, 1997 (the "Chewbacca 10/31/97 Invoice") [EVE 1508849-EVE 1508877]; Vinson & Elkins Invoice No. 20019639, regarding

When Vinson & Elkins attorneys learned in late August 1997 that Enron proposed to allow Enron officers and employees to invest in Chewco,[461] Astin, Baird and Dilg considered at some length the conflict of interest and potential disclosure issues this raised and discussed these issues with several in-house Enron attorneys, including Mordaunt, St. Clair and Rogers.[462] On September 8, 1997, Baird, Dilg and Astin met with Fastow, Kopper, Mordaunt, St. Clair and Rogers (the "September 8 Meeting").[463] Issues discussed at that meeting included conflicts of interest and the Code of Conduct, disclosure obligations, and Enron's compensation and employee retention concerns.[464] Vinson & Elkins emphasized the legal issues raised by an Enron officer's involvement in Chewco.[465] Vinson & Elkins advised Enron that an investment by an "executive officer" would have to be disclosed in Enron's public filings. At the time of this meeting, an investment by Fastow, an executive officer, was being contemplated.[466] A presentation prepared by Mordaunt for the September 8 Meeting shows that those issues, as well as

---

Chewbacca – JEDI I, Nov. 20, 1997 (the "Chewbacca – JEDI I 11/20/97 Invoice") [EVE 903549-EVE 903569].

[461] Chewbacca 10/31/97 Invoice, at 2 (8/26/97 Baird entry); Astin 7/18/03 Sworn Statement, at 61-63; Baird Sworn Statement, at 77-78; Dilg 9/24/03 Sworn Statement, at 9, *but c.f.* Vinson & Elkins Chewco Presentation, Aug. 25, 1997 (the "Vinson & Elkins 8/25/97 Chewco Presentation") (overview of employee investment activity in unaffiliated companies reflecting an effort to secure third-party investors in Chewco) [AB0455 02018-AB0455 02037].

[462] Chewbacca 10/31/97 Invoice, at 2 (8/25/97 and 8/26/97 Baird, Dilg and Astin entries); Chewbacca – JEDI I 11/20/97 Invoice, at 3 and 5 (9/8/97-9/10/97 Baird entries).

[463] Baird Handwritten Notes for meeting among Fastow, *et al.*, Sept. 8, 1997 ("Baird Notes for 9/8/97 Fastow Meeting") [AB000465810-AB000465813]; Astin 7/18/03 Sworn Statement, at 58-61; Baird Sworn Statement, at 61-62; Dilg 9/24/03 Sworn Statement, at 12; Chewbacca 10/31/97 Invoice, at 3 and 5 (9/8/97 Dilg and 9/8/97 Astin entries); Chewbacca – JEDI I 11/20/97 Invoice, at 1 (9/8/97-9/10/97 Baird entries).

[464] Baird Notes for 9/8/97 Fastow Meeting; Astin 7/18/03 Sworn Statement, at 70; Baird Sworn Statement, at 75-76; Dilg 9/24/03 Sworn Statement, at 12; Chewbacca 10/31/97 Invoice (9/8/97 Dilg and 9/8/97 Astin entries); Chewbacca – JEDI I 11/20/97 Invoice, at 1 (9/8/97-9/10/97 Baird entries).

[465] Astin 7/18/03 Sworn Statement, at 80-82 and 87-88.

[466] *See id.* at 73-74.

the potential disclosure implications of such a transaction, had already been identified by attorneys at Enron.[467]

Following the September 8 Meeting, Enron suspended work by Vinson & Elkins on the transaction until disagreements between Enron and CalPERS on critical terms of the CalPERS takeout could be resolved.[468]  In late October 1997, Vinson & Elkins' work resumed, and on October 31, 1997, St. Clair sent a diagram of the proposed structure of the transaction to Vinson & Elkins. The diagram reflected Kopper's management and ownership of Chewco.[469]  At that time, Enron did not deem Kopper an "executive officer" as defined under applicable SEC rules.[470]  Evidence confirms that numerous in-house and Vinson & Elkins attorneys (including Mordaunt, St. Clair, Mintz, Astin and Spradling) were aware of Kopper's role in Chewco thereafter.[471]

When told of Kopper's role in the transaction, Astin's time records reflect that he had a "telephone conversation with Rex Rogers" and that he sent a "voice mail [message]

---

[467] See Draft of Vinson & Elkins Chewco Presentation, Aug. 25, 1997 (containing draft disclosure language that appears to have been prepared by Mordaunt, as reflected by the footer on the page) [EVE 83231-EVE 83242]; see also Astin 7/18/03 Sworn Statement, at 53-54; Baird Sworn Statement, at 69; Vinson & Elkins 8/25/97 Chewco Presentation.

[468] See Astin 7/18/03 Sworn Statement, at 82; see also Chewbacca – JEDI I 11/20/97 Invoice (showing only minor work performed by Astin, Baird and other Vinson & Elkins' attorneys on the Chewco matter).

[469] St. Clair 10/31/97 Facsimile.

[470] The term "executive officer" is defined in Rule 3b-7, 17 C.F.R. § 240.3b-7.  Annually in its 10-K or annual meeting proxy statement, Enron was required to identify all of its executive officers pursuant to Item 401(b) of Regulation S-K.  17 C.F.R. § 229.401(b).  Designation as an executive officer also triggered other disclosures pursuant to various items of Regulation S-K, including the related party transaction disclosures required by Item 404.  See, e.g., id. at § 229.404.  The related party footnote to Enron's financial statements was governed by Related Party Disclosures, Statement of Financial Accounting Standards No. 57, which required disclosures for transactions with "members of management." FAS 57 is an accounting disclosure standard.  In the Second Interim Report, the Examiner concluded that the footnote disclosure regarding Kopper's involvement in Chewco that appeared in Enron's 1999 10-K should have also appeared in Enron's 1997, 1998 and 2000 10-Ks.  See Second Interim Report, Appendix D (Enron's Disclosure of Its SPEs).  The Examiner has been unable to determine why disclosure regarding Kopper's involvement in Chewco only appeared in the 1999 10-K but not the others.

[471] St. Clair Sworn Statement, at 231; Mintz 9/29/03 Depo., at 10-13; Astin 7/18/03 Sworn Statement, at 94-95; St. Clair 10/31/97 Facsimile.

to Jim Derrick" regarding that fact.[472] Derrick testified that he has no recollection of receiving such a message, although he does not dispute Astin's time entry.[473] Rogers testified similarly.[474] Astin discussed the issue with Mordaunt and St. Clair as well, and was informed that all necessary action concerning the conflict of interest issue -- including application of the Code of Conduct and consideration of whether the Enron Board should be informed of Kopper's participation -- would be handled by in-house counsel.[475] However, there is no evidence that Mordaunt ever requested that the Office of the Chairman apply the Code of Conduct, and the minutes reflect that the Board was not told of Kopper's role.[476]

*Attorneys' Role in Establishment of Reserve Account*

Spradling, Mordaunt and St. Clair were aware that 97% debt and 3% equity positions had to be maintained within the Chewco structure to maintain JEDI as an unconsolidated entity, although those attorneys appear to have relied on the accountants' involvement in and approval of the structure to insure that the 3% equity requirement was

---

[472] Chewbacca – JEDI I 11/20/97 Invoice, at 2 (10/29/97 Astin entry); *see also* Astin 8/12/03 Sworn Statement, at 146.

[473] Derrick 5/20/03 Sworn Statement, at 214-15.

[474] Rogers Sworn Statement, at 134-35.

[475] *See* Chewbacca – JEDI I 11/20/97 Invoice (10/29/97 Astin entry); Astin 7/18/03 Sworn Statement, at 83-89. St. Clair testified that she did not raise the issue of Kopper's conflict of interest in the Chewco transaction because she understood that Mordaunt was handling the issue with more senior members of the legal department and outside counsel. St. Clair Sworn Statement, at 124-25, 251 and 253; *see* Astin 7/18/03 Sworn Statement, at 84-85; Carol St. Clair, Handwritten Notes, Oct.-Dec. 1997, at 1-2 [AB0440 00982-AB0440 01001; AB0440 01391-AB0440 01392; AB0440 00961-AB0440 00962]; *see, e.g.,* Meeting Agenda and Notes for JEDI I Buyout, Aug. 25, 1997 (the "8/25/97 Meeting and Agenda Notes") [AB0455 02018]; Handwritten Meeting Notes of Kristina Mordaunt, Assistant General Counsel, Enron, Sept. 11, 1997 [AB0455 01967]; Handwritten Meeting Notes of Carol St. Clair, Assistant General Counsel, Enron, Sept. 11, 1997 [AB0440 01000-AB0440 01001]; Handwritten Notes of Bob Baird, Attorney, Vinson & Elkins, Sept. 8, 1997 [EVE 83222-EVE 83225]; Vinson & Elkins 8/25/97 Chewco Presentation.

[476] 8/25/97 Meeting and Agenda Notes. St. Clair testified that the conflicts issue was a "touchy subject." St. Clair Sworn Statement, at 251.

satisfied.[477] Joel Ephross ("Ephross"), at that time an associate at Vinson & Elkins working with Spradling on this matter, drafted the "side letter" establishing the reserve account that violated the 3% equity requirement.[478] However, the Examiner has not found evidence that either Ephross or Spradling had sufficient experience with such transaction structures to appreciate the significance of the reserve accounts on the consolidation of JEDI.[479]

## C.   LJM1

*Formation of LJM1, the LJM1/Rhythms Hedging Transaction and Enron Board Approval*

LJM1 was created in June 1999 as a private equity fund and entered into a transaction with Enron to provide a hedge for Enron's investment in Rhythms.[480] Through a series of affiliated entities, Fastow served as general partner of LJM1.[481]

LJM1 formed Swap Sub as the entity to engage in the Rhythms hedging transaction with Enron. As consideration for the Rhythms hedge and certain promissory

---

[477] St. Clair Sworn Statement, at 180-81; Spradling 7/25/03 Sworn Statement, at 105-08; *see also* Memorandum from Joel N. Ephross, Vinson & Elkins, to Michael Kopper, Mike Edsall, George McKean, Sarah Ward, Enron, regarding Revised Chewco Credit Agreement, Dec. 16, 1997 (the "Ephross 12/16/97 Memo") (authored while Ephross was employed at Vinson & Elkins) [AB1128 01258–AB1128 01261].

[478] Spradling 7/25/03 Sworn Statement, at 110-17.

[479] *Id.* at 116-17; Spradling 12/11/97 Memo; Ephross 12/16/97 Memo; Mintz 9/29/03 Depo., at 20; *see also* Email from Mark Spradling, Vinson & Elkins, to Joe Dilg, Vinson & Elkins, *et al.*, Nov. 7, 2001 (regarding "Chewco consolidation: a Theory") [EVE 287668]; Email from Mark Spradling, Vinson & Elkins, to Joe Dilg, Vinson & Elkins, *et al.*, Nov. 7, 2001 (regarding follow-up to Chewco consolidation theory email) [EVE 287666]; Side letter between Chewco and JEDI, Dec. 30, 1997 [AB000364721-AB000364722]; Facsimile from Mark Spradling, Vinson & Elkins, to Michael T. Edsall, Kirkland & Ellis, Dec. 16, 1997 (enclosing guarantee fee letter between Chewco and Jedi) [AB1128 01353–AB1128 01358]. As early as 1995, another lawyer at Vinson & Elkins was aware of the characteristics necessary for the equity to satisfy the 3% Equity Test. *See* Memorandum from Mark S. Berg, Vinson & Elkins, regarding 1995 Enron Structured Finance Overview, Apr. 27-28, 1995 [EVE 3695689-EVE 3695756].

[480] *See* Second Interim Report, Annex 2 to Appendix L (Related Party Transactions). Due to the size of Enron's position in the Rhythms stock and its price volatility, Enron was unlikely to find a third party willing to enter into a true economic hedge on terms acceptable to Enron.

[481] Second Interim Report, Appendix L (Related Party Transactions), *Introduction and Overview of the Related Party Transactions.*

notes, Enron transferred to LJM1 6,755,394 shares of its own stock.[482] LJM1 capitalized Swap Sub with approximately one-half of those shares and approximately $3.75 million in cash obtained from the sale of some of those shares. The other Enron shares remained with LJM1. Swap Sub granted Enron a put that gave Enron the right to require Swap Sub to purchase all of its 5.3 million shares of Rhythms stock at a price of $56.125 per share.[483] Thus, if the market price of the Rhythms shares fell below that price, Enron would be "in the money" on the put and, although no consideration could change hands until the exercise date of the put, Enron would take into income the "in the money" amount under mark-to-market accounting, offsetting its loss from the fall in the market price of the Rhythms stock. If Enron exercised the put at the end of the term, the only source of payment Swap Sub had, and the only recourse Enron had for the amounts payable by Swap Sub, was the Enron stock used to capitalize Swap Sub, which was a portion of the stock Enron had originally transferred to LJM1. Because this would be a return of its own property, Enron would never realize any net economic benefit.

The Enron Board reviewed the transaction with LJM1 to hedge Enron's Rhythms investment at a special meeting held on June 28, 1999, and approved certain aspects of the transaction related to the use of Enron's stock.[484] Fastow's presentation to the Board at that meeting stated that he would have "no direct pecuniary interest, either current or in

---

[482] Enron obtained those shares from UBS. Enron had previously entered into equity forward contracts with UBS and UBS had purchased Enron stock to cover its position. The forward contracts were "in the money" for Enron. Enron and UBS amended those agreements so that UBS no longer needed, and then released, some of those shares to Enron. Second Interim Report, Annex 2 to Appendix L (Related Party Transactions), *Structure of Rhythms Transactions*.

[483] *Id.*

[484] Minutes of Enron Board Special Meeting, June 28, 1999 (the "6/28/99 Board Special Meeting Minutes") [AB000196728-AB000196740].

the future, in the Enron stock"[485] and that he would "not receive any current or future (appreciated) value of ENE stock."[486]

LJM1 completed two additional transactions with Enron during 1999 – LJM1's purchase of a 13% interest in the Cuiaba power plant project and a $15 million purchase of equity in Osprey/Condor.[487]

*Attorneys' Roles in LJM1 Formation and the LJM1/Rhythms Hedging Transaction*

Kirkland & Ellis established LJM1 and worked on the Rhythms transaction as counsel for Fastow and LJM1, drafting much of the relevant documentation and participating in numerous meetings and telephonic discussions and analyses.[488] Mordaunt and Vinson & Elkins represented Enron in this matter, which was code-named Project Martin.[489] In light of the fact that Mordaunt has exercised her Fifth Amendment privilege,[490] the full scope of her involvement is unclear, although the evidence indicates that she directed the legal work on the transaction on behalf of Enron.[491] Vinson & Elkins' principal attorneys were Osterberg, John Leggett ("Leggett") and Petrina

---

[485] *Id.* at 6-8; Presentation to Enron Board, June 28, 1999 (the "LJM 6/28/99 Board Presentation"), at 4 [AB000196578-AB000196589].

[486] 6/28/99 Board Special Meeting Minutes; LJM 6/28/99 Board Presentation, at 7.

[487] Second Interim Report, Annex 3 to Appendix L (Related Party Transactions); Second Interim Report Appendix G (Whitewing Transaction).

[488] *See* Vinson & Elkins Invoice No. 20093953, regarding Project Martin, July 30, 1999 (the "Project Martin 7/30/99 Invoice") [EVE 904968-EVE 904983]; Vinson & Elkins Invoice No. 20099442, regarding Project Martin, Aug. 31, 1999 (the "Project Martin 8/31/99 Invoice") [EVE 904984-EVE 904990]; Vinson & Elkins Invoice No. 20103423, regarding Project Martin, Sept. 30, 1999 (the "Project Martin 9/30/99 Invoice") [EVE 1301539-EVE 1301544]; Vinson & Elkins Invoice No. 20107253, regarding Project Martin, Oct. 31, 1999 (the "Project Martin 10/31/99 Invoice") [EVE 1301545-EVE 1301549]; *see also* Sworn Statement of Edward C. Osterberg, Jr., Partner, Vinson & Elkins, to Rebecca M. Lamberth, A&B, Oct. 23, 2003 (the "Osterberg 10/23/03 Sworn Statement"), at 16.

[489] *See* Astin 7/18/03 Sworn Statement, at 151-55; Project Martin 7/30/99 Invoice; Project Martin 8/31/99 Invoice; Project Martin 9/30/99 Invoice; Project Martin 10/31/99 Invoice.

[490] *See* Third Interim Report, Appendix C (Role of Enron's Officers).

[491] *Id.*

- 116 -

Chandler ("Chandler").[492] Osterberg and Leggett advised Enron with respect to "the tax consequences of Project Martin,"[493] while Chandler acted as the lead transactional attorney from Vinson & Elkins.[494] Astin also was involved in the transaction, analyzing certain securities law issues,[495] discussing with Mordaunt unspecified disclosure issues, and briefly reviewing two transaction term sheets and the LJM1 partnership agreement.[496] The evidence does not indicate that Vinson & Elkins participated in the planning or initial structuring of Project Martin.[497] Osterberg later participated in several discussions regarding the potential tax consequences of various alternative structures under consideration by Enron and LJM1 during June 1999.

Osterberg understood the purpose of Project Martin to be "a method for Enron to hedge its downside risk on the RhythmsNet investment" based on "conversations with

---

[492] Project Martin 7/30/99 Invoice.

[493] Osterberg 10/23/03 Sworn Statement, at 7 and 10-11. ("[T]here were several [tax issues]. One was whether the forward contracts would be treated as forward contracts for federal tax purposes. Two was whether the proposed amendments to the forward contracts would be treated as a taxable exchange of those contracts. Three was the overall tax treatment of the transaction, how we would characterize it for tax purposes. Four was whether Enron would recognize any gain on the delivery of its shares of stock to the LJM entity. And then five was whether the constructive sales rules of the Internal Revenue Code would apply with respect to the hedge of the RhythmsNet stock."); *see generally* Memorandum from Edward Osterberg, Jr. and John Leggett, Vinson & Elkins, to Michael Herman, Enron, regarding Project Martin-Enron Common Stock Forward Contracts, July 30, 1999 (the "Osterberg/Leggett 7/30/99 Memo") [AB1129 00597-AB1129 00612].

[494] Osterberg 10/23/03 Sworn Statement, at 48-49. Clarifying an earlier response to a question regarding his understanding of Chandler's role on Project Martin, Osterberg testified:

> I believe my answer was that I thought she was the principal lawyer drafting the documents. What I was trying to say, but I didn't say explicitly, is that she was the principal lawyer at Vinson & Elkins drafting the documents. I didn't mean to infer that she was the principal lawyer for the entire deal drafting the documents.

*Id.* at 49; *see also* Email from Petrina Chandler, Vinson & Elkins, to Michael Edsall, Kirkland & Ellis, June 17, 1999 [AB1129 00582-AB1129 00585]; Facsimile from Michael Edsall, Kirkland & Ellis, to Edward Osterberg and Petrina Chandler, Vinson & Elkins, *et al.*, June 30, 1999 [AB1129 00586-AB1129 00596].

[495] Astin 7/18/03 Sworn Statement, at 151-55.

[496] Project Martin 7/30/99 Invoice.

[497] *Id.*

- 117 -

people at Enron and the descriptions of the transaction [he] saw."[498]   He knew that
(i) Enron delivered shares of Enron stock to Swap Sub as "consideration that Enron paid
for the put option on the RhythmsNet stock,"[499] (ii) Enron stock constituted the assets of
Swap Sub[500] and (iii) it was the Enron stock held by Swap Sub that supported the
hedge.[501]   Osterberg therefore possessed all of the facts necessary to an understanding
that Enron effectively paid significant value in a transaction in which it had no possibility
of obtaining an economic return and that the Rhythms hedge was non-economic in nature
and could achieve only accounting benefits.   Osterberg testified, however, that during his
work on Project Martin he neither discussed nor considered whether the Rhythms hedge
was economic in nature and did not know how Enron would account for the Rhythms
hedge.[502]

    The evidence also confirms that Osterberg knew that Fastow was affiliated with
LJM1.[503]   As reflected in a July 30, 1999 memorandum, Leggett and Osterberg prepared
for Enron regarding Project Martin, Vinson & Elkins likewise appreciated other principal
aspects of the Rhythms transactions, including the fact that a transferability restriction
was placed on the Enron shares in Swap Sub and the fact that PWC provided a fairness
opinion in relation to this transaction.[504]

---

[498]  Osterberg 10/23/03 Sworn Statement, at 8.

[499]  *Id.* at 23.

[500]  *Id.* at 26-27.

[501]  *Id.* at 27-28.

[502]  *Id.* at 33.

[503]  Project Martin 7/30/99 Invoice; *see also* Osterberg 10/23/03 Sworn Statement, at 21 and 25-26.

[504]  Osterberg/Leggett 7/30/99 Memo; *see also* Osterberg 10/23/03 Sworn Statement, at 12-15 and 7.

- 118 -

*Attorneys' Roles in Enron Board Approval of LJM1 and the LJM1/Rhythms Hedging Transaction*

When the LJM1/Rhythms Hedging Transaction and LJM1 were presented to the Enron Board, neither Mordaunt nor any other attorney who had represented Enron on this transaction was in attendance.[505] In light of the conflict of interest issues this transaction presented, Derrick outlined his interpretation of the Code of Conduct and its application to Fastow's participation in LJM1.[506] That presentation, however, was based solely upon Derrick's inference that Lay's participation in the same Board presentation reflected that the Office of the Chairman had made the requisite determination that Fastow's involvement in LJM1 would not adversely affect the interests of the company.[507]

Fastow's conflicting roles as CFO of Enron and as general partner of LJM1 presented a heightened risk that Enron's transactions with LJM1 might not be fair to the company. Despite the "related party" nature of LJM1 and the LJM1/Rhythms Hedging Transaction, however, there is no evidence that Derrick developed an informed understanding of the transaction or performed a substantive analysis of its material terms.[508] Thus, Derrick did not advise the Board (nor did he make certain that another member of the Enron in-house legal department would do so) regarding the basis upon which its approval of LJM1 and the Rhythms transaction could be given.[509]

---

[505] 6/28/99 Board Special Meeting Minutes.

[506] *See* Derrick 9/26/03 Sworn Statement, at 435-39; 6/28/99 Board Special Meeting Minutes.

[507] 6/28/99 Board Special Meeting Minutes; LJM 6/28/99 Board Presentation; Derrick Sworn Statement, at 436-39.

[508] 6/28/99 Board Special Meeting Minutes; LJM 6/28/99 Board Presentation, at 4.

[509] 6/28/99 Board Special Meeting Minutes; LJM 6/28/99 Board Presentation, at 4. Neither the Board minutes nor the resolutions adopted regarding approval of the LJM1/Rhythms Hedging Transaction reflect the discussion or imposition of any such controls.

- 119 -

*Mordaunt's Role in Southampton and the Termination of the Rhythms Hedge*

In early 2000, Fastow, Kopper and three RBS bankers allegedly devised a plan to benefit personally from the April 2000 termination of the LJM1/Rhythms Hedging Transaction in which Enron would make payments to Swap Sub.[510] Fastow and Kopper apparently decided to include certain Enron employees, including Mordaunt, and certain LJM1 employees in the transaction as well.[511] To carry out their plan, they formed Southampton, L.P. ("Southampton") in March 2000 to acquire ownership of Swap Sub and its parent entity, SwapCo.[512]

At the time of the sale, Swap Sub's only asset, aside from approximately $3.75 million in cash, was the value of the Enron stock it held offset by its obligations under the LJM1/Rhythms Hedging Transaction.[513] In March 2000, LJM1 distributed its interests in Swap Sub and SwapCo to its limited partners, RBS and CSFB (through their affiliates).[514] Concurrently with that distribution, each limited partner entered into a separate purchase and sale agreement with Southampton under which Southampton purchased the Swap Sub and SwapCo interests from each limited partner.[515]

---

[510] The termination of the LJM1/Rhythms Hedging Transaction is described in Annex 2 to Appendix L (Related Party Transactions) to the Second Interim Report.

[511] Powers Report, at 92-96.

[512] Section 1.3, Southampton Place, L.P. Amended and Restated Agreement of Limited Partnership, Mar. 20, 2000 [AB000002941-AB000002968]. The Examiner has found no evidence that the existence of Southampton, L.P. or the identity of its owners and their economic interests were disclosed to or approved by the Enron Board.

[513] Second Interim Report, Annex 2 to Appendix L (Related Party Transactions).

[514] *See, e.g.,* PWC Memorandum to File, at 2; *See* Memorandum from Richard Ivers, Managing Director, CSFB, and Mary Beth Mandanas, Vice President, CSFB, to Chuck Ward, Co-Head of Investment Banking, *et al.*, CSFB, regarding Proposed Sale of Swap Sub interests to Southampton, Mar. 20, 2000 (the "Ivers Memorandum, Mar. 20, 2000") [CSFBCO005718431-CSFBCO005718432]; LJM1 Analysis of Accounts, Dec. 31, 2000, at PSI00124655 [PSI00124655-PSI00124664].

[515] Ivers Memorandum, Mar. 20, 2000.

Although CSFB's affiliate received $10 million in exchange for its interests in Swap Sub and SwapCo, the RBS affiliate, Campsie, was offered[516] and received $1 million for the sale of its equal interest to Southampton.[517] Fastow and others apparently agreed to convince Campsie to accept the $1 million for the interest, while representing to Enron that the purchase price for Campsie's interest was $20 million.[518] Fastow and other individuals allegedly split the difference of $19 million among themselves and the small number of other Enron and LJM1 employees who were investors in Southampton.[519] Ultimately, RBS bankers allegedly received approximately $7.3 million in the aggregate and the other Southampton investors – including Fastow and Kopper – apparently received the remaining $11.7 million.[520]

In the case of Mordaunt, documentary evidence shows that she invested $5,826, and within six weeks received $1,040,744.[521] Despite the fact that she knew LJM1 was a related party because she had participated in its formation during the LJM1/Rhythms Hedging Transaction, Mordaunt invested in Southampton without consulting or even

---

[516] *See* Letter from Michael Kopper, Managing Director, LJM Partners, LLC, to Giles Darby, Managing Director, RBS, Mar. 6, 2000 [PSI00119851].

[517] *See* Information, *United States v. Kopper*, Cr. No. H-02-0560 (S.D. Tex. filed Aug. 20, 2002), (the "Kopper Criminal Information"),¶ 21; Purchase Agreement, among Campsie, Southampton, Swap Sub, SwapCo, and LJM Partners, L.P., Mar. 17, 2000 [RBS 1060261-RBS 1060266].

[518] *See* Kopper Criminal Information,¶¶ 21-22; *see also* RBS Bankers Indictment,¶¶ 16-20.

[519] *See* Kopper Criminal Information,¶ 21; RBS Bankers Indictment,¶¶ 20-22; Fastow Superseding Indictment,¶¶ 88-95.

[520] *See* Kopper Criminal Information, ¶ 23; RBS Bankers Indictment, ¶ 22; Fastow Superseding Indictment, ¶¶ 93-95.

[521] Southampton Funds Flow Analysis, May 2, 2000, at 3 [AB000548871-AB000548874]. Southampton Place LP Amended and Restated Agreement of Limited Partnership, Mar. 20, 2000, at S-1 [AB000002941-AB000002969].

- 121 -

informing either Derrick or any other member of the legal department, or anyone in the Office of the Chairman.[522]

*Cuiaba LJM1 Transactions*

*Summary Description of the Cuiaba Transaction.* A subsidiary of LJM1 was used to purchase from Enron an interest in Empressa Produtora de Energia Ltda ("EPE") (which owned a power plant located in Cuiaba, Mato Grosso, Brazil) that reduced Enron's ownership to 52% and reduced Enron's board representation from three to two seats out of a total of four. As a result of the sale to LJM1, Enron took the position that it could deconsolidate the entity that owned the power plant, which allowed Enron to mark-to-market income from a related gas supply contract and to avoid reporting approximately $200 million of debt associated with the power plant on its balance sheet. It was originally contemplated that LJM1 would sell the interest in EPE in a short time, but when efforts to find a third party buyer failed, Enron repurchased the EPE interests at a premium, even though its value had fallen.[523]

*Attorneys' Roles in Connection with Cuiaba Transaction.* Boyd Carano ("Carano") was the lead Vinson & Elkins attorney on this transaction. Just before the closing at the end of September 1999, he overheard Enron employee Cheryl Lipshutz[524] say words to the effect that, at the end of the day, Enron would make LJM1 whole in the

---

[522] Memorandum from Reed M. Brodsky, Wilmer Cutler, to Enron Files, regarding Oct. 30, 2001 interview of Kristina Mordaunt, Nov. 28, 2001, at 2 [AB000000612-AB000000615].

[523] Second Interim Report, Annex 2 to Appendix L (Related Party Transactions).

[524] Lipshutz represented LJM1 in the Cuiaba Transaction despite being an Enron employee. Sworn Statement of Boyd Carano, Vinson & Elkins, to James C. Grant, A&B, Sept. 24, 2003 (the "Carano Sworn Statement"), at 66-67.

Cuiaba Transaction.[525]   As a result, Carano initiated a contact with Causey to determine whether or not Lipshutz's statement was accurate.[526]   Carano wanted Causey to confirm to him that there was no "make-whole" agreement.[527]   While Carano did not ultimately speak directly to Causey, he did receive from Enron employee Kent Castleman confirmation that Causey denied the existence of any such agreement with LJM1.[528] After the closing with LJM1, as contemplated, Enron worked in earnest to sell LJM1's interest in EPE to a third party.  These efforts were unsuccessful.[529]

By March 2001, Enron had agreed to repurchase LJM1's interests in EPE.[530]   The actual closing of the repurchase, however, occurred in August 2001.[531]   As Vinson & Elkins knew, Enron delayed the closing to allow the restructuring of LJM1 and LJM2 to

---

[525] Id. at 62.  Carano testified that he confirmed his understanding of Lipshutz's statement with Enron employee Kent Castleman ("Castleman") who confirmed that he also heard Lipshutz make the same statement. Id. at 69.

[526] Id. at 71-73.

[527] Id. at 72-73.

[528] Id. at 77.  For two years, Carano saved two voice mail messages that he created and received, memorializing Castleman's confirmation that there was no make-whole agreement.  Boyd Carano Voicemail Transcription prepared by Williams & Connolly LLP [EVE 1408439.01-EVE 1408439.04].  In the fall of 2001, Lipshutz told the Powers Committee about this side deal between Fastow and Causey. Memorandum from Lisa Henriques, Wilmer Cutler, to File, regarding Dec. 5, 2001 and Dec. 7, 2001 Interviews of Cheryl Lipshutz, Dec. 7, 2001, at 6-7 [AB00000510-AB00000520].  Terrance Bessey, the Kirkland & Ellis attorney representing LJM1, also told Carano he was unaware of a side agreement to make LJM1 whole. Carano Sworn Statement, at 65-66.

[529] See, e.g., Email from William Montjoy, Vinson & Elkins, to Boyd Carano, Vinson & Elkins, Oct. 9, 1999 [EVEE 00762248-EVEE 00762293].

[530] Share Purchase Agreement between LJM Brazil Co. and Enron de Brazil Holdings Ltd., Mar. 28, 2001, ¶ 1 [AB000153799-AB000153805].  The March 28, 2001 Share Purchase Agreement called for closing prior to May 30.  Id. ¶ 1.  At the time, Carano asked Enron whether the repurchase caused the need to unwind the earlier accounting Enron had used with respect to the Cuiaba Transaction.  Email from Boyd Carano, Vinson & Elkins, to Kent Castleman, Enron, Mar. 27, 2001, at 1 [EVEE 00251646-EVEE 00251649].  Castleman replied that, while a "close call," there was no need to unwind the earlier accounting treatment.  Email from Kent Castleman, Enron, to Boyd Carano, Vinson & Elkins, Mar. 28, 2001, at 1 [EVEE 00520585-EVEE 00520588].

[531] EPE Holdings Ltd. transfer of share from LJM Brazil Co. to EPE Holdings Ltd., August 15, 2001 [AB000153819-AB000153820].

occur to avoid proxy statement and 10-Q disclosure issues surrounding Fastow's association with those entities.[532]

### D.   LJM2

*Formation of LJM2*

In October 1999, LJM2 was formed "to make privately negotiated equity and equity-related investments in energy- and communications-related businesses and assets."[533]  Through a series of affiliated entities, Fastow served as the LJM2 general partner.   On October 11, 1999, acting upon the recommendation of its Finance Committee, the Enron Board approved LJM2 as a potential transaction partner for Enron and ratified the determination of the Office of the Chairman, under the Code of Conduct, that Fastow's ownership and management of LJM2 would not adversely affect Enron's interest.[534]  However, the roles of other Enron employees – including Kopper and Glisan – were not disclosed to, or approved by, the Enron Board.[535]

In his comments to the Enron Board on October 12, 1999, Herbert Winokur, Chair of the Finance Committee, stated that controls would be established "to manage

---

[532] Email from William Montjoy, Vinson & Elkins, to Boyd Carano, Vinson & Elkins, May 29, 2001 [EVEE 001188124].

[533] Private Placement Memorandum of LJM2 Co-Investment, L.P., Oct. 13, 1999 (the "LJM2 PPM"), at 1 [MLBE 0006895-MLBE 0006944].

[534] Minutes of Enron Board Meeting, Oct. 11-12, 1999 (the "Enron 10/11/99 Board Minutes"), at 17-18 [AB000194645-AB000194673].  As Chair of the Finance Committee, Winokur reported to the Board that the LJM2 "partnership could possibly provide the Company with an alternative, optional source of private equity to manage its investment portfolio risk, funds flow, and financial flexibility."  Winokur recommended ratification of the Finance Committee's determination regarding Fastow's management role in LJM2, subject to certain "controls" for transactions between LJM2 and Enron.  *See also* Minutes of Meeting of Enron Finance Committee, Oct. 11, 1999 (the "10/11/99 Finance Committee Minutes") [AB000196889-AB000196893].

[535] Enron 10/11/99 Board Minutes, at 17-18; *see also* Finance Committee Meeting Presentation entitled "Rationale for LJM2 Structure" [AB0247 00858].

any transactions between the Company and LJM2 . . . ,"[536] and specifying that Causey and Buy would be required to review and approve, on behalf of Enron, all such transactions and the Audit Committee would annually review all transactions completed within the past year and make any recommendations it deemed appropriate.[537]

By the end of 2001, LJM2 had completed a total of twenty-one Enron-related transactions.[538] In addition, the LJM2/Raptors Hedging Transactions were entered into with subsidiaries of LJM2.

### Attorney Role in LJM2 Formation and Board Approval

Kirkland & Ellis served as counsel to LJM2 and Fastow.[539] Kirkland & Ellis formed LJM2 and drafted the LJM2 Private Placement Memorandum (the "LJM2 PPM"), through which investors in the investment partnership were solicited.[540] Both Sefton and Rogers reviewed and analyzed the LJM2 PPM.[541]

---

[536] Enron 10/11/99 Board Minutes, at 17.

[537] *Id.*

[538] Email from Gordon McKillop, Enron, to Ron Baker, Enron, *et al.*, Jan. 19, 2001 (the "McKillop 1/19/01 Email") [AB000538888- AB000538890].

[539] Baird Sworn Statement, at 187.

[540] *See id.* at 187-91; Facsimile from Bob Baird, Vinson & Elkins, to Martha Stuart, Kirkland & Ellis, Oct. 5, 1999 (including comments on draft LJM2 Private Placement Memorandum) [AB1128 00846-AB1128 00860].

[541] Email from Bob Baird, Vinson & Elkins, to Scott Sefton and Rex Rogers, Enron, Oct. 4, 1999 (the "Baird 10/4/99 Email") [AB0472 01453-AB0472 01455]; Sefton Handwritten Notes, Date unknown (the "Sefton Handwritten Notes") at AB0472 01650 [AB0472 01649-AB0472 01668]; Facsimile from Scott Sefton, Enron, to Martha Stuart, Kirkland & Ellis, Oct. 5, 1999 (including Sefton's comments and edits to LJM2 Private Placement Memoranda) [AB1128 00861-AB1128 00910]; Facsimile from Bob Baird, Vinson & Elkins, to Martha Stuart and Mike Edsall, Kirkland & Ellis, Oct. 7, 1999 (the "Baird 10/7/99 Facsimile") (with Baird's additional comments) [AB1128 00861-AB1128 00910]; Facsimile from Scott Sefton, Enron, to Martha Stuart and Mike Edsall, Kirkland & Ellis, Oct. 11, 1999 (with Sefton's subsequent comments) [AB1128 00921-AB1128 0970]; Sefton Sworn Statement, at 131; *see generally* Baird Sworn Statement, at 176-81.

In early October 1999 – before the October 12 Enron Board meeting – Rogers asked Baird to review a draft of the LJM2 PPM and provide comments.[542] Baird did so, and his comments focused on the conflicts of interest and other issues posed by LJM2.[543] Specifically, Baird noted in an email addressed to both Sefton and Rogers that (i) "Andy [Fastow], Michael [Kopper] and Ben [Glisan]" had a conflict of interest given their intended roles in LJM2 and advised that "[i]n order to make an intelligent waiver . . . the Enron board needs to know what financial interests the principals have in LJM2 and what financial commitment they have made to it," (ii) "all transactions involving over $60,000 between Enron and LJM2 will probably need to be disclosed,"[544] (iii) "[t]here are several places where the draft says that this has been fully reviewed and approved by Enron's board of directors and office of chairman . . . ." and posed a question as to whether that had occurred and (iv) "[t]he draft says that Rick Causey will review the activities of LJM2" and posed a question as to whether any additional controls would be put in place.[545] Baird also noted that "Andy would get more protection if there were some review and approval process at the board level or at a more senior executive level."[546]

With respect to Baird's advice regarding factors important to an "intelligent waiver" of the conflicts of interest, Baird has testified that he discussed this issue "explicitly" with Sefton, recommending that each LJM2/Enron transaction receive

---

[542] Baird Sworn Statement, at 177; *see also* Baird 10/4/99 Email.

[543] *See* Baird 10/7/99 Facsimile, at 36 (reflecting Baird's handwritten edits to the "Conflicts of Interest" section of the LJM2 PPM).

[544] Baird described this disclosure comment as "a pretty obvious point." Baird Sworn Statement, at 186-88.

[545] Baird 10/4/99 Email (reflecting Sefton's handwritten notes).

[546] *Id.* (reflecting Sefton's handwritten notes); *see also* Baird 10/7/99 Facsimile (LJM2 PPM drafts circulated to Baird); Email from Martha Stuart, Kirkland & Ellis, to Andrew Fastow, Enron, Michael Kopper, Enron, Bob Baird, Vinson & Elkins, *et al.*, Oct. 8, 1999 (enclosing LJM2 PPM latest black-line comments) [AB1128 00971-AB1128 01064].

advance Board approval rather than after-the-fact review, but that Sefton did not share his professional opinion.[547]

Despite having received such advice from Vinson & Elkins, there is no evidence that either Sefton or Rogers shared that advice with anyone, nor did they advise Enron regarding the establishment of LJM2 or the manner in which LJM2/Enron transactions should be monitored.[548]

When the Enron Board was asked to approve LJM2 in October 1999, it apparently did not receive advice from any attorney acting on Enron's behalf.[549] Neither Derrick (who was absent from the meetings), Sefton nor Rogers advised the Enron Board regarding the conflict of interest issues posed by LJM2 – including the involvement of Kopper or Glisan, or numerous other Enron employees who would negotiate for or otherwise represent LJM2 in transactions with Enron[550] or the scope or nature of controls

---

[547] Baird Sworn Statement, at 195-97. Baird later learned that Enron decided against requiring advance Board approval on a deal by deal basis. *Id.* at 196. In May 2001, Sefton's successor, Mintz, sought the advice of Fried, Frank, Harris, Shriver & Jacobson ("Fried Frank") on several issues relating to LJM. One such issue was whether the Board approval process employed with respect to the LJM2 transactions was sufficient. Sworn Statement of James H. Schropp, Fried Frank, to Mary C. Gill, A&B, Aug. 6, 2003 (the "Schropp Statement"), at 12-14. Fried Frank advised Mintz that the approval process was unsatisfactory, in part because the Enron Board was not approving each LJM transaction on a fully informed basis prior to the completion of the transaction. *Id.* at 96. Fried Frank's recommended approach was to have the specifics of each transaction presented to the Enron Board on a case-by-case basis to determine whether it was appropriate to waive a conflict of interest with respect to each transaction. *Id.* at 28. Notes taken at one of the meetings of the Fried Frank attorneys reflect a discussion with Mintz on this issue: "Upgrade procedure re Bd approval – deal by deal." James Schropp, Fried Frank, Handwritten Notes of Meeting with Jordan Mintz, May 23, 2001 [FFH00949-FFH00950].

[548] *See, e.g.,* Sefton Sworn Statement, at 222-23 (Sefton does not recall leaving a voicemail for Jim Derrick regarding advice received from Baird); *but see id.* at 193-195 (Sefton testified that he did leave Derrick a voicemail when Sefton "first became aware of the LJM2 transactions" in which he "explained to [Derrick] what LJM was, very high level description, Andy's involvement, the purpose for LJM, you know, sort of the very high level information."); Rogers Sworn Statement, at 136-38 (Rogers took no further action with respect to Baird's advice because he understood that Sefton would be contacting LJM's counsel, Kirkland & Ellis, regarding the comments).

[549] *See generally* Enron 10/11/99 Board Minutes; 10/11/99 Finance Committee Minutes.

[550] Derrick 9/26/03 Sworn Statement, at 359-63; *but see* Baird 10/4/99 Email (reflecting Sefton's handwritten notes in relation to the conflict of interest issue, "leave Jim a vmail," but there is no evidence

- 127 -

that should be put in place.[551]  Although with respect to LJM1 Derrick had acknowledged the conflict of interest issue and had advised the Board regarding the application of the Code of Conduct,[552] he testified that he considered the LJM2 issue to fall within Sefton's responsibilities, rather than his own.[553]

*"LJM 2000 Investment Activity" Board Presentation.* During January 2001, Causey asked Mintz to prepare a chart reflecting LJM2's investment activity with Enron during 2000.[554]  To prepare this chart, Mintz obtained a document entitled "LJM transaction list" that set forth all LJM2/Enron transaction activity during 1999 and 2000.[555] This list included so-called "divestitures," representing several assets LJM2 had purchased from Enron in 1999 that were repurchased by Enron in 2000.[556] The chart that Mintz drafted and sent to Causey, Buy and Fastow for review included these divestitures,[557] but Causey instructed Mintz to delete all reference to them.[558]  Thus, as presented to the Audit and Finance Committees on February 12, 2001 by Causey — with

---

that Sefton, in fact, raised this or any other issue addressed in Baird's comments on the LJM2 PPM with Derrick); Sefton Sworn Statement, at 193-95; *see also* Baird Sworn Statement, at 180-81.

[551]  *See generally* Enron 10/11/99 Board Minutes; 10/11/99 Finance Committee Minutes.  When asked whether he recalled "giving any advice or legal analysis to the board or any member or constituency of the board on the subject of the review, monitoring, or any controls with respect to JM matters before any of those matters were adopted at the board level," Derrick testified, "I don't recall having any conversations of that nature . . . with any member of the board." Derrick 9/26/03 Sworn Statement, at 362-63.

[552]  Derrick 9/26/03 Sworn Statement, at 361-62; *see also* 6/28/99 Board Special Meeting Minutes.

[553]  Derrick 9/26/03 Sworn Statement, at 386-88.

[554]  Mintz 9/29/03 Depo., at 101.

[555]  McKillop 1/19/01 Email (attaching LJM Transaction List); Mintz 9/29/03 Depo., at 117-18.  The name of this document does not specify LJM1 or LJM2, but from the context it is clear that LJM2 is the entity to which the LJM Transaction List refers.  In their documents and in their testimony the parties often referred to "LJM" without specifying the specific entity.

[556]  McKillop 1/19/01 Email; Mintz 9/29/03 Depo., at 117-18 and 122-23.

[557]  Draft Chart of LJM Investment 2000 Activity With Enron (the "Draft LJM 2000 Investment Activity Chart") (with handwritten notes) [VEL 00350-VEL 00351]; Mintz 9/29/03 Depo., at 106-111.

[558]  Draft LJM 2000 Investment Activity Chart; Mintz 9/29/03 Depo., at 106-12.

Mintz in attendance — the chart, entitled "LJM 2000 Investment Activity," omitted any mention of those "divestitures."[559]

Mintz testified that the purpose of the February 12, 2001 Board Committee presentations were as follows:

> My understanding was that this presentation was made to the two committees to advise them of the related transactions that were entered into so if the board had any questions or concerns or issues, they had the opportunity to raise them at this meeting.[560]

The omission of the "divestitures" to Enron meant that this purpose was not accomplished. There is no evidence that Mintz made any effort to inform Board members that the information had been omitted.[561]

*Other Information Not Communicated to the Enron Board.* Fastow told Mintz an important piece of information shortly before the February 12, 2001 Board Committee meeting: "[H]e told me that if Skilling ever found out how much money he [Fastow] was making, Skilling would have no choice but to shut down LJM."[562] Mintz

---

[559] Minutes of Enron Finance Committee Meeting, Feb. 12, 2001 (the "2/12/01 Finance Committee Minutes") [AB000205010-AB000205014]; Review of LJM Procedures and Transactions Completed in 2000, Feb. 12, 2001, at 2B-2-2B-3 (Finance Committee Meeting presentation materials) [AB0247 01935-AB0247 01938]; Mintz 9/29/03 Depo., at 122-23.

[560] Mintz 9/29/03 Depo., at 106-08.

[561] *See* 2/12/01 Finance Committee Minutes; Mintz 9/29/03 Depo., at 122-28. When questioned about this discrepancy, Mintz first testified that these transactions were deleted because they had originally occurred in 1999; he then speculated that these transactions were removed because subsequent transactions with the same assets were not within the scope of information that the Enron Board expected to be presented to the Audit Committee. *Id.* at 120 and 122-24. However, Mintz also testified that the purpose of the presentation was to advise the Audit Committee of any of the related party transactions entered into that year. *Id.* at 120-21.

[562] Mintz 5/16/03 Depo., at 130 and 133. Mintz testified that he passed this statement on to Rogers and Astin in an email. Email from Jordan Mintz, Enron, to Rex Rogers, Enron, and Ron Astin, Vinson & Elkins, Jan. 16, 2001 (the "Mintz 1/16/01 Email"), at 1 [AB0911 1156-AB0911 1157]. Mintz forwarded the same message to Walls, who forwarded it on the same day to Derrick. Email from Rob Walls, Enron, to James Derrick, Enron, Jan. 16, 2001 (the "Walls 1/16/01 Email"), at 1 [AB0270 00122-AB0270 00124].

- 129 -

"interpreted"[563] that to mean Skilling would "have no choice but to tell the board and the board would shut it down."[564]

Thus, Mintz knew prior to the February 2001 Board meeting that Fastow wanted to keep his LJM compensation from being revealed to the Enron Board.[565] Mintz thought this information should be brought to the Board.[566] Acting on that concern, he "met with Rick Causey and ... shared with Rick [his] belief that Rick needed to get that issue in front of the board at the February meeting,"[567] but Causey was "non-committal" about doing so.[568] Mintz was present at the February 2001 Enron Board meetings.[569] When the topic was not raised at these Board meetings,[570] however, Mintz essentially dropped the issue—although he was "disappointed."[571] During the same time period, as described below, Mintz made some efforts to improve the LJM2 transaction approval process. At

---

[563] Mintz 5/16/03 Depo., at 130.

[564] Id. Likewise, Fastow's comment should have indicated that it was likely that Lay, who had granted the waiver, was also unaware of Fastow's monetary payments from the LJM entities. Mintz testified that he had no basis for knowing whether Lay knew or did not know about Fastow's compensation. Id. at 153-54.

[565] Id. at 124-25.

[566] Id. at 133.

[567] Id.

[568] Id. at 288.

[569] Mintz 9/29/03 Depo., at 106, 127 and 130-31.

[570] Mintz 5/16/03 Depo., at 290-93.

[571] Id. at 291. After the Board meeting, Mintz made small talk with Derrick, in which Mintz stated that he was "surprised that there weren't more questions about LJM." Id. Derrick responded by saying that the Board had "a lot of confidence in ... senior management." Id. Mintz thus did not directly raise with Derrick his concern that the Enron Board was unaware of Fastow's compensation from the LJM entities. In addition, Mintz held three meetings concerning LJM matters with Derrick and others between March and July 2001, at which Mintz talked about numerous LJM and related disclosure issues, but Mintz never directly confronted Derrick with his concerns. See, e.g., id. at 295 ("I would talk about LJM from time to time but never in any great detail."). Testimony of Derrick confirms this conclusion. Derrick 5/20/03 Sworn Statement, at 199-201. Several months later, in May 2001, Mintz attempted to get an appointment to meet with Skilling and, at that time, hoped to discuss the issue with him. Mintz 5/16/03 Depo., at 294. When Skilling's assistant failed to return his call, however, he once again dropped the issue. Id. The Financial Collapse of Enron: Hearing before the Subcommittee on Oversight and Investigations, House Committee on Energy and Commerce, 107th Cong. Feb. 7, 2002 (the "Mintz Congressional Testimony") at 52.

about that same time, he also had to deal with unfinished business from Chewco – a demand by Kopper for a payment under the Chewco tax indemnity, discussed in the following section.

*Tax Indemnity Demand.* After the Chewco repurchase closed in March 2001, Kopper and the outside accounting firm for Chewco demanded a $2.6 million payment pursuant to a tax indemnification agreement that had been executed when the transaction originally closed in late 1997.[572] Mintz, who had served as Enron's in-house tax counsel during the original 1997 transaction with regard to the tax indemnity agreement, took the lead attorney role with respect to this tax indemnity issue.[573]

Although Mintz was certain that the payment demanded by Kopper was not required under the 1997 agreement,[574] and repeatedly advised Kopper, and later Fastow, of that fact, Mintz was ultimately instructed by Fastow that Skilling had personally approved the payment.[575] Despite his strong professional views on this issue, Mintz never advised Derrick or any Enron officer senior to Fastow of that opinion or its basis.[576] Instead, Mintz instructed Vinson & Elkins to amend the governing documents to provide for the payment.[577] Thus, long after the closing of Enron's purchase of Chewco's interest in JEDI, the purchase agreement was amended effective as of July 30, 2001.[578] This

---

[572] Mintz 9/29/03 Depo., at 34-35; *see also* Mintz Congressional Testimony, at 90-91.

[573] Mintz 9/29/03 Depo., at 6-7 and 30; *see also* Mintz Congressional Testimony, at 90-91.

[574] Mintz's understanding on this point was based in significant part on the fact of his participation in the 1997 negotiations of the tax indemnity agreement. Mintz 9/29/03 Depo., at 34.

[575] *Id.* at 34-41; *see also* Mintz Congressional Testimony, at 90-91. Mintz also consulted John Lynch, a Vinson & Elkins tax partner, who concurred with Mintz that such payment was not called for under the agreement. Mintz 9/29/03 Depo., at 34-36.

[576] Mintz 9/29/03 Depo., at 6-7; *see also* Mintz Congressional Testimony, at 90-91.

[577] Mintz 9/29/03 Depo., at 39-45.

[578] *See* Purchase Agreement among Joint Energy Development Investment Limited Partnership, Enron Corp. and Chewco Investments, L.P. and, for the limited purposes of Section 10.03 thereof, Enron Capital

amendment, which permitted an additional payment to Chewco as a tax indemnity, resulted in an increase in the purchase price of approximately $2.6 million.[579]

*Attorneys' Role in LJM2 Transaction Monitoring*

After Mintz succeeded Sefton as General Counsel of Enron Global Finance, he identified numerous deficiencies in the LJM2 approval sheet that Sefton had created.[580] Mintz's criticisms were contained in a March 8, 2001 memorandum to Buy and Causey.[581] Based on his "due diligence" review of all available information concerning the manner in which LJM2/Enron transactions were approved,[582] it became "fairly clear . . . that there was not a whole lot of analysis of whether there was compliance with the policies and procedures"[583] in place regarding the transactions with LJM2. Although Mintz asserted at various points in the memorandum that the LJM2 approval procedures should merely be "improved . . . with minimum disruption to commercial efforts," his specific concerns included the following:

---

Management L.L.C., dated as of Mar. 26, 2001 but effective as of Mar. 16, 2001 [AB000499201-AB000499226]; First Amendment to the Purchase Agreement among Joint Energy Development Investment Limited Partnership, Enron Corp. and Chewco Investments, L.P., July 30, 2001 (executed for the purpose of adjusting the purchase price) [AB000465805-AB000465806].

[579] *See id.* Enron made this $2.6 million payment in mid-September 2001. *See generally* Accounting Sheet, regarding Net Cash retained by Chewco, Author unknown, Date unknown [EVE 61999]; Second Interim Report, Annex 1 to Appendix L (Related Party Transactions), *Economics and Allocation of Risk in Chewco.*

[580] Sefton drafted the LJM2 Approval Forms. The forms were not required by the Enron Board, but were Sefton's attempt to improve the control mechanisms mandated at the October 1999 Board meetings. Sefton Sworn Statement, at 154-56; *see also* Lawyers Hearing, at 58 (testimony of Sefton). Although the Enron Board did not suggest or require Skilling's approval, Sefton included a line for Skilling's signature on the forms. Sefton Sworn Statement, at 156. Sefton testified that Skilling never signed an LJM2 approval form. Lawyers Hearing, at 45 (testimony of Sefton).

[581] Memorandum from Jordan Mintz, Enron, to Rick Buy and Rick Causey, Enron, "LJM Approval Process—Transaction Substantiation," Mar. 8, 2001 (the "Mintz 3/8/01 Memo") [AB0472 01933-AB0472 01937]; *see also* Mintz 5/16/03 Depo., at 143-44.

[582] Mintz 5/16/03 Depo., at 143-44.

[583] *Id.* at 144.

- 132 -

(1)    Enron does not consistently seek to negotiate with third parties before it transacts with LJM.  No policy exists specifically requiring evaluation and pursuit of third party alternatives before transacting with LJM.  Because no existing policy requires the prior evaluation of third party alternatives and, given the fluid nature of the Company's commercial activities, too often Enron finds itself facing a time deadline that makes it difficult (*in fact* often impossible, as a practical matter) to transact with a third party, thus potentially: (a) reducing the benefits Enron realizes from the LJM transaction by eroding Enron's bargaining position; (b) clouding the objective evidence of such benefits (due to a lack of comparable alternatives) and, perhaps; (c) undermining the arm's-length nature of the transaction (due to a lack of both comparable and practical alternatives);

(2)    Enron does not always adequately substantiate in writing the procedures it follows with respect to transacting with LJM . . . . For example:

> (a)    The [LJM2 approval sheet] Checklist does not require an explanation as to *why* the particular transaction would be the most beneficial alternative for Enron -- only that it is. . . .;
>
> . . . .
>
> (c)    The [LJM2 approval sheet] Checklist does not require an explanation as to *how* Enron determined that the transaction was conducted at arm's length -- only if it was not . . . .;
>
> . . . .
>
> (e)    The [LJM2 approval sheet] Checklist does not provide any level of detail regarding the Chief Accounting and Risk's [sic] Officer's review and approval; I believe, for the Board's Audit and Finance Committee's benefit, this additional information – when coupled with formal Board presentations -- would provide additional enhancement to the Board's decision-making as to having all relevant facts before it.

(3)    Inherent employee conflicts exist that can contribute to a perception that Enron and LJM *cannot* transact at arm's-length. . . .[584]

---

[584] Mintz 3/8/01 Memo (emphasis in original); *see also* Mintz 5/16/03 Depo., at 143-44; Transcription of Voicemail from Andy Fastow, May 1, 2001 [AB000539060].  The Mintz 3/8/01 Memo was copied to Derrick, Rogers, Walls and Astin, and blind copied to Ron Baker, Rodney Faldyn, Glisan, George McKean, Gordon McKillop and Ryan Siurek. Mintz 3/8/01 Memo, at 4-5.

In fact, Mintz believed the entire LJM/Enron relationship within Enron Global Finance to be "dysfunctional[]":[585]

> What I observed on a daily basis in terms of the two hats that people were wearing, and I felt it was unusual to say the least that the CFO of a Fortune 100 company was operating a private equity fund. And obviously a number of people in the company were aware of it, had approved it; and I still couldn't reconcile it . . . .[586]

On three occasions during 2001, Mintz held meetings attended by Derrick, Rogers and others on the subject of LJM2 matters.[587] Neither at those meetings nor at any other time prior to the Petition Date, however, did Mintz reveal his opinion regarding the dysfunctional LJM2/Enron transaction process to Derrick, to any Enron officer senior to Fastow,[588] or to anyone on the Enron Board.[589] Furthermore, Mintz did nothing to make the Enron Board aware that numerous Enron Global Finance employees other than Fastow were actively engaged in negotiating and otherwise representing the interests of LJM2.[590]

---

[585] Mintz 5/16/03 Depo., at 317; *see also* Mintz Congressional Testimony, at 46 ("As soon as I got down to the 20th floor, I saw a lot of dysfunctionality on that floor. . . .").

[586] Mintz 5/16/03 Depo., at 187.

[587] LJM Legal Review Meeting Agenda, Mar. 7, 2001 [VEL 00536]; LJM Legal Review Meeting Agenda, May 22, 2001 (containing Derrick's handwritten notes) [AB0472 01884]; LJM Legal Review Meeting Agenda, May 22, 2001 (containing Mintz's handwritten notes) [AB0472 01885]; LJM Legal Review Meeting Agenda, July 9, 2001 [VEL 00540].

[588] As noted above, Mintz did, on one or two occasions, discuss with Causey his concerns that the Enron Board did not know the amount of Fastow's interest in LJM and that maybe the company should re-think "the whole idea of allowing your CFO to run a private equity fund that transacted exclusively with his employer." Mintz 5/16/03 Depo., at 321; Mintz Congressional Testimony, at 51-54. Causey withheld that suggestion rather than sharing Mintz's concern further. Mintz 5/16/03 Depo., at 133, 288.

[589] During the February 12, 2001 Finance Committee meeting Mintz attended, Fastow "commented that the process was working effectively." 2/12/01 Finance Committee Minutes, at 5 [AB000205010-AB00020514].

[590] Mintz 5/16/03 Depo., at 291-94.

E.    **Raptors**

*Formation of Raptors*

During 2000, Enron created a series of structures known as Raptors I through IV.[591] Enron's stated motivation[592] for the use of the Raptor structures was to "hedge the profit and loss volatility of Enron investments."[593]  The Examiner has previously concluded that this structure had no valid business purpose and was fundamentally inconsistent with the purpose of a hedge,[594] which is to shift economic risk from one party to another.[595]

---

[591] Raptor I was established on April 18, 2000.  *See* Second Interim Report, Annex 5 to Appendix L (Related Party Transactions).  Raptor II was established on June 29, 2000. *See id.* Raptor III was established on September 27, 2000.  *See id.* Raptor IV was established on September 11, 2000.  *See id.*

[592] Glisan pled guilty for conspiring to commit wire and securities fraud in connection with the Raptors. Glisan filed a one page statement regarding his role in Raptors that states in relevant part:

> Talon [the SPE hedging vehicle in Raptor I], which was created in April 2000, was designed by me and others to protect Enron's balance sheet from decreases in value of certain investments.  Talon was funded mainly by Enron through a promissory note and Enron's own stock.  The remainder of Talon's funding came from a $30 million "investment" from LJM.  This alleged third party funding served as the supposed 3% outside equity that I knew was required for Talon not to be reflected in Enron's financial statements, which I knew were publicly filed with the Securities and Exchange Commission and relied on by the public.  As I knew, this transaction violated existing accounting principles in that its form was misleading and was accounted in a manner inconsistent with its economic substance.  As I also knew, Talon was not properly off-balance-sheet.  I and others arranged for Enron to pay $41 million to LJM before Talon would engage in the hedging transactions for which it was created.  Enron and Talon entered into a "put", that is, a transaction purportedly served to hedge Enron against a decline in its own stock value.  Although there was no true business purpose, the "put" option was purchased by Enron for $41 million.  The put was designed by me and others as an ostensible reason to make a distribution of $41 million to LJM, economically providing a return of and return on capital.  Since the put failed to have a true business purpose, Talon failed to meet the minimum equity test as required by applicable accounting rules.  As a result of this failure, LJM lacked substantive control of Talon. This failure, in turn, led to the substantive control of Talon by Enron.

Enron Plea Agreement, at Ex. 1, *United States v. Glisan*, Cr. No. H-03-3628 (S.D. Tex. filed Sept. 10, 2003).

[593] Enron Corp. Finance Committee Presentation, "Project Raptor: Hedging Program for Enron Assets," May 1, 2000 (the "Raptor Finance Committee Presentation") [AB000004247-AB000004251]; *see* Draft Memorandum from Ryan J. Siurek and Kevin D. Jordan, Enron, to The Files, regarding Project Raptor, Apr. 2000 [AB000182529-AB000182539].

[594] *See* Second Interim Report, Annex 5 to Appendix L (Related Party Transactions), *Examiner's Conclusions with Respect to the Raptors*; Sworn Statement of Ron E. Baker, Director of Transactional

- 135 -

Three of the four Raptors – Raptors I, II and IV – were similarly structured. In each case, the Raptor was capitalized by subsidiaries of LJM2 and Enron, but the bulk of the assets came from participating subsidiaries of Enron, which contributed a promissory note, shares of Enron stock and/or commitments to deliver shares of Enron stock, and a small amount of cash. In each instance, the LJM2 subsidiary contributed $30 million, but quickly received a distribution of that amount and more (each, a "Distribution") – in each case within four months of the structure's establishment.[596]

Raptor III was somewhat different from the other three. Raptor III was capitalized primarily with the economic interest in certain warrants (the "Warrants") to purchase 120,000 shares of the common stock of TNPC, Inc. ("TNPC") contributed by Enron. Once again, LJM2 contributed $30 million. However, Enron's purpose for and use of this third Raptor structure was essentially the same.[597]

To permit the Distributions to LJM2 but still permit the Raptor entities to comply with the 3% Equity Test, each of the Raptor structures had to generate GAAP earnings from which the Distribution could be made. This was accomplished in each Raptor (other than Raptor III) by Enron paying $41 million for a put on Enron stock (the "Enron Put"). The Enron Put was settled within four months after establishment of the structure

---

Accounting, Enron, to William T. Plybon, A&B, Mar. 20, 2003, at 65-67; *see also* Enron Finance Committee Presentation, "Project Raptor: Hedging Program for Enron Assets," Apr. 2000, at 23 (handwritten notes indicating that the structure "[d]oes not transfer economic risk but transfers P&L volatility") [AB0971 00148-AB0971 00152].

[595] *See* Second Interim Report, Annex 5 to Appendix L (Related Party Transactions), *Examiner's Conclusions with Respect to the Raptors.*

[596] Under the Raptors' operating agreements, LJM2's subsidiary was to receive 100% of all distributions until it had received the greater of $41 million or a 30% annualized rate of return (the "Distribution"). *See* Second Interim Report, Annex 5 to Appendix L (Related Party Transactions), *Examiner's Conclusions with Respect to the Raptors.*

[597] *See id.*

and before any deadlines set out in the documents.[598] The Distribution in Raptor III was made with funds borrowed from Enron. The Raptor III Distribution was deemed not to reduce the 3% equity because Raptor III had realized sufficient mark-to-market GAAP income when the value of the Warrants increased dramatically after TNPC's initial public offering.[599]

Following payment of the Distribution to the LJM2 entity, Enron began using the Raptor structures to hedge merchant assets. The Raptors' initial hedging capacity equaled the amount of the discount on the Enron stock (or the increase in the value of the Warrants in Raptor III's case) in each structure plus the $30 million contributed by LJM2.[600] By the fall of 2000, however, the value of Enron's merchant investments hedged through the Raptor structures had declined substantially.[601] This triggered a concern at Enron that the Raptors' liabilities under the hedges would exceed their assets by year-end, and thus require Enron to record a charge to income on its financial statements.[602] In the fall of 2000, Enron entered into costless collar transactions with three of the Raptor entities in a manner that lacked any independent fairness validation or economic support.[603]

By mid-December 2000, it was apparent that prior efforts to shore up the Raptors' apparent credit capacity had failed, for the Raptors' derivative losses exceeded the value

---

[598] *See id.*

[599] *See id.*

[600] Opinion Letter from Steven J. Stanpf, PricewaterhouseCoopers, LLP, to Ben Glisan, May 5, 2000 [AB000004143-AB000004148]; PricewaterhouseCoopers Project Raptor Fairness Analysis Presentation, Mar. 31, 2000 [AB000182855-AB000182872].

[601] Second Interim Report, Annex 5 to Appendix L (Related Party Transactions), *Credit Concerns and Responses.*

[602] *Id.*

[603] *Id.*

of their assets.[604]  To allow Enron to avoid recording a loss for these transactions on its

2000 financial statements, a temporary, 45-day cross-collateralization agreement was

entered into as of December 22, 2000.[605]

Throughout the first quarter of 2001, as Enron's share price (and the share price

of TNPC) declined, the credit capacity of the Raptors also continued to decline,[606] and by

late March, it appeared that Enron would have to take a pre-tax charge against earnings of

more than $500 million to reflect the shortfall in credit capacity of the Raptors.[607]  To

reverse these credit difficulties, Enron restructured the Raptors on April 13, 2001, but "as

of" March 26, 2001.  The restructuring included an assignment arrangement among the

Enron subsidiaries that held the Raptor interests[608] (the December 22 cross-

collateralization having expired), the contribution of 12 million additional shares of

Enron stock having an aggregate stock price in excess of $600 million[609] to two of the

Raptors, other agreements relating to Enron stock and certain costless collars.[610]

---

[604] *See* Email from Gordon McKillop, Enron, to Ben Glisan and Andrew Fastow, Enron, *et al.*, Dec. 19, 2000 (the "McKillop 12/19/00 Email") [AB1128 01324–AB1128 01331]. In his email, McKillop indicates that "Raptor credit capacity is at $(6.2) million due mainly to Catalytica which is now a publicly traded stock. Raptor 3 also has a negative credit capacity." *Id.*

[605] *See* Letter Agreement among LJM2, Enron Corp. and Enron Energy Services, LLC, Dec. 22, 2000, ¶ 1 [AB000059924-AB000059926].

[606] *See* Email from Travis Winfrey, Enron, to Ryan Siurek, Enron, Apr. 24, 2001 (indicating that credit capacity as of March 31 was $(503.4) million but would be improved by $466.6 million under terms of Letter of Intent) [AB0784 00339-AB0784 00386].

[607] Second Interim Report, Annex 5 to Appendix L (Related Party Transactions), *Credit Concerns and Responses, Restructuring in the Spring of 2001.*

[608] Under this arrangement, upon the liquidation of the Raptor entities in April 2005, if one Raptor subsidiary did not receive amounts it was due from its Raptor and another received what it was due as well as an equity distribution, then the second Enron Raptor subsidiary would assign its equity proceeds to the first Enron Raptor subsidiary to the extent needed to make the first whole.

[609] *See* Second Interim Report, Annex 5 to Appendix L (Related Party Transaction).

[610] Under the Raptors' operating agreements, LJM2's subsidiary was to receive 100% of all distributions until it had received the greater of $41 million or a 30% annualized rate of return. *See* Second Interim Report, Annex 5 to Appendix L (Related Party Transactions), *Examiner's Conclusions with Respect to the Raptors.*

*Attorneys' Role in Raptors and Board Approval*

Attorneys within Enron Global Finance and Vinson & Elkins worked on each of

the Raptor structures, as well as on the fourth quarter 2000 and early 2001 efforts to shore

up the Raptors' credit capacity.[611] Within Enron Global Finance, the principal attorneys

---

[611] *See* Sefton Sworn Statement, at 81 (Raptors I and II); Mintz 9/29/03 Depo., at 197 (cross-collateralization of Raptors); Sworn Statement of Joel Ephross, Senior Counsel, Enron Global Finance, to Rebecca M. Lamberth, A&B, Sept. 19, 2003 (the "Ephross 9/19/03 Sworn Statement"), at 10-11 (primarily Raptor III); Astin 9/22/03 Sworn Statement, at 8-9 (Raptors I-IV); Sworn Statement of Mark R. Spradling, Vinson & Elkins, to Rebecca M. Lamberth, A&B, Sept. 3, 2003 (the "Spradling 9/3/03 Sworn Statement"), at 8-9 (Raptors I-IV); *see generally* Vinson & Elkins Invoice No. 20121680, regarding Project Raptor, Feb. 29, 2000 (the "Raptor 2/29/00 Invoice") [EVE 903031-EVE 903040]; Vinson & Elkins Invoice No. 20126798, regarding Project Raptor, Mar. 30, 2000 (the "Raptor 3/30/00 Invoice") [EVE 903041-EVE 903062]; Vinson & Elkins Invoice No. 20131330, regarding Project Raptor, Apr. 20, 2000 (the "Raptor 4/30/00 Invoice") [EVE 903063-EVE 903077]; Vinson & Elkins Invoice No. 20135069, regarding Project Raptor, May 31, 2000 (the "Raptor 5/31/00 Invoice") [EVE 903078-EVE 903098]; Vinson & Elkins Invoice No. 20138984, regarding Project Raptor, June 30, 2000 (the "Raptor 6/30/00 Invoice") [EVE 903099-EVE 903109]; Vinson & Elkins Invoice No. 20143764, regarding Project Raptor, July 31, 2000 (the "Raptor 7/31/00 Invoice") [EVE 903110-EVE 903119]; Vinson & Elkins Invoice No. 20146954, regarding Raptor I, Aug. 31, 2000 (the "Raptor I 8/31/00 Invoice") [EVE 903120-EVE 903130]; Vinson & Elkins Invoice No. 20152079, regarding Project Raptor, Sept. 22, 2000 (the "Raptor 9/22/00 Invoice") [EVE 903131-EVE 903139]; Vinson & Elkins Invoice No. 20152082, regarding Raptor 2, Sept. 29, 2000 (the "Raptor 2 9/29/00 Invoice") [EVE 903140-EVE 903147]; Vinson & Elkins Invoice No. 20152093, regarding Raptor III, Sept. 29, 2000 (the "Raptor III 9/29/00 Invoice") [EVE 903191-EVE 903195]; Vinson & Elkins Invoice No. 20152118, regarding Raptor IV, Sept. 29, 2000 (the "Raptor IV 9/29/00 Invoice") [EVE 903264-EVE 903267]; Vinson & Elkins Invoice No. 20158858, regarding Project Raptor, Oct. 31, 2000 (the "Raptor 10/31/00 Invoice") [EVE 903148-EVE 903153]; Vinson & Elkins Invoice No. 20156397, regarding Raptor IV, Oct. 31, 2000 (the "Second Raptor 10/31/00 Invoice") [EVE 903268-EVE 903275]; Vinson & Elkins Invoice No. 20158934, regarding Raptor III, Nov. 3, 2000 (the "Raptor III 11/3/00 Invoice") [EVE 903206-EVE 903225]; Vinson & Elkins Invoice No. 20160086, regarding Project Raptor, Nov. 30, 2000 (the "Raptor 11/30/00 Invoice") [EVE 903154-EVE 903157]; Vinson & Elkins Invoice No. 20160090, regarding Project Raptor, Nov. 30, 2000 (the "Second Raptor 11/30/00 Invoice") [EVE 903158-EVE 903162]; Vinson & Elkins Invoice No. 20159946, regarding Raptor III, Nov. 30, 2000 (the "Raptor III 11/30/00 Invoice") [EVE 903196-EVE 903205]; Vinson & Elkins Invoice No. 20166548, regarding Project Raptor, Dec. 22, 2000 (the "Raptor 12/22/00 Invoice") [EVE 903163-EVE 903166]; Vinson & Elkins Invoice No. 20166550, regarding Raptor III, Dec. 22, 2000 (the "Raptor III 12/22/00 Invoice") [EVE 903230-EVE 903237]; Vinson & Elkins Invoice No. 20166546, regarding Raptor IV, Dec. 22, 2000 (the "Raptor IV 12/22/00 Invoice") [EVE 903280-EVE 903283]; Vinson & Elkins Invoice No. 20168553, regarding Project Raptor, Jan. 31, 2001 (the "Raptor 1/31/01 Invoice") [EVE 903167-EVE 903169]; Vinson & Elkins Invoice No. 20168820, regarding Raptor III, Jan. 31, 2001 (the "Raptor III 1/31/01 Invoice") [EVE 903238-EVE 903244]; Vinson & Elkins Invoice No. 20174396, regarding Raptor III, Feb. 28, 2001 (the "Raptor III 2/28/01 Invoice") [EVE 903245-EVE 903252]; Vinson & Elkins Invoice No. 20177765, regarding Raptor III, Mar. 30, 2001 (the "Raptor III 3/30/01 Invoice") [EVE 903253-EVE 903259]; Vinson & Elkins Invoice No. 20182571, regarding Project Raptor, Apr. 30, 2001 (the "Raptor 4/30/01 Invoice") [EVE 903170-EVE 903178]; Vinson & Elkins Invoice No. 20185689, regarding Raptor III, May 31, 2001 (the "Raptor III 5/31/01 Invoice") [EVE 903260-EVE 903263]; Vinson & Elkins Invoice No. 20207568, regarding Project Raptor, Oct. 31, 2001 (the "Raptor 10/31/01 Invoice") [EVE 903185-EVE 903190].

on the Raptors were, at various times, Sefton and Ephross.[612] During his tenure as General Counsel of EGF Legal, Mintz also was fully aware of the Raptors' credit capacity issues.[613] At Vinson & Elkins, both Astin and Spradling were heavily involved in work on the Raptors – albeit at different times and on different issues or legal efforts.[614]

As the attorneys most heavily involved in the work on Raptor I, Sefton, Astin and Spradling participated in meetings during January and February 2000 where participants discussed and analyzed structuring issues.[615] A Vinson & Elkins partner present at one of the first meetings recalls that Glisan described the intended purpose of the Raptors to be "a means to hedge a possible decline in value of certain Enron investments."[616] At some

---

[612] *See* Sefton Sworn Statement, at 81; Mintz 9/29/03 Depo., at 197; Ephross 9/19/03 Sworn Statement, at 10-11; Spradling 9/3/03 Sworn Statement, at 79.

[613] *See, e.g.,* McKillop 12/19/00 Email; Mintz 9/29/03 Depo., at 209-10 and 215-17; *see generally* Ephross 9/19/03 Sworn Statement, at 109-10.

[614] *See* Sefton Sworn Statement, at 83; Mintz 9/29/03 Depo., at 197 and 218-19; Ephross 9/19/03 Sworn Statement, at 25-26; *see generally* Raptor 2/29/00 Invoice; Raptor 3/30/00 Invoice; Raptor 4/30/00 Invoice; Raptor 5/31/00 Invoice; Raptor 6/30/00 Invoice; Raptor 7/31/00 Invoice; Raptor I 8/31/00 Invoice; Raptor 9/22/00 Invoice; Raptor 2 9/29/00 Invoice; Raptor III 9/29/00 Invoice; Raptor IV 9/29/00 Invoice; Raptor 10/31/00 Invoice; Second Raptor 10/31/00 Invoice; Raptor III 11/2/00 Invoice; Raptor III 11/30/00 Invoice; Second Raptor 11/30/00 Invoice; Raptor III 11/30/00 Invoice; Raptor 12/22/00 Invoice; Raptor III 12/22/00 Invoice; Raptor IV 12/22/00 Invoice; Raptor 1/31/01 Invoice; Raptor III 1/31/01 Invoice; Raptor III 2/28/01 Invoice; Raptor III 3/30/01 Invoice; Raptor 4/30/01 Invoice; Raptor III 5/31/01 Invoice; Raptor 10/31/01 Invoice.

[615] *See* Raptor 2/28/00 Invoice; Raptor 3/20/00 Invoice.

[616] *See* Sworn Statement of Edward Osterberg, Partner, Vinson & Elkins, to Mary C. Gill and James C. Grant, A&B, Oct. 3, 2003, at 6; *see also* Rogers Sworn Statement, at 204-05. Rogers testimony was as follows: "I understood that generally they were set up to mitigate or hedge risk in various Enron investments; as it was explained to me, particularly investments that require mark to market accounting to hedge some of the volatility in those investments." *Id.* Sefton Sworn Statement, at 84 ("my understanding is that it was a structure to hedge Enron assets"); Mintz 9/29/03 Depo., at 193 ("What was described to me was an effort to take what were otherwise assets that were fair valued or mark-to-market for financial statement purposes to put them back on an accrual basis for financial statement purposes."); Ephross 5/2/03 Sworn Statement, at 144 ("I understood the purpose of the Raptors transactions was to create an accounting hedge"). Spradling and Astin testified that they understood the purpose of the Raptors to be to "smooth out" peaks and valleys in Enron's financial reporting based on mark-to-market accounting. *See* Spradling 9/3/03 Sworn Statement, at 92 ("[o]ne way to view the original opening statement that was made that they wanted to smooth the volatility of their mark-to-market assets."); *see generally* Astin 9/22/03 Sworn Statement, at 9 ("What I recollect being said was that they wanted to be able to manage the volatility that

point during the formation of Raptor I, Astin questioned Glisan regarding the Distribution feature of the Raptor I documentation that was critical to maintenance of LJM2's 3% equity position, and thus to the off-balance sheet treatment of the structure.[617]

Later, after the Distribution was made, Astin again raised the issue of "whether Andersen remained comfortable with the accounting and payment that was made out of retained earnings."[618] Prior to raising the issue with Glisan, Astin reviewed "the position of the SEC with regard to three percent equity investment and how it was to remain at risk throughout the life of the structure as a prelude to discussing the issue."[619]

Spradling also raised his concerns regarding this same issue, first with Dilg[620] and, subsequently, with Glisan.[621] Spradling testified that Dilg considered the matter to be an accounting issue, and therefore suggested that Spradling "go check, make sure everybody's comfortable with the accounting and then, you know, it doesn't sound like a legal issue."[622] Both Astin and Spradling testified that they shared their questions on this

---

was inherent in certain of the existing merchant assets and particularly with respect to the broadband business that they might be acquiring in the future").

[617] Astin 9/22/03 Sworn Statement, at 20-21. Astin testified that around the time the put option was terminated, he spoke with Glisan to confirm that Andersen remained comfortable with the analysis that LJM2's investment was still "at risk." *Id.* at 21.

[618] *Id.* at 115.

[619] *Id.*

[620] Spradling 9/3/03 Sworn Statement, at 104-06. Spradling discussed this concern with Dilg in early September 2000 shortly before he understood that the Enron Put was about to be settled early and that $41 million was about to be distributed to LJM2. *Id.* at 103-06. Spradling testified that he did not explain the Raptors structures in detail to Dilg, but that Dilg told him that the concern sounded like "accounting issues." *Id.* at 97 and 111. Dilg then suggested that Spradling check to make sure that "everyone's comfortable" with the propriety of the accounting on that point. *Id.* at 97. Although Spradling's memory on this subject lacks specificity, he testified that he was able to get comfortable on the subject after talking with Glisan and possibly with Ryan Siurek. *Id.* at 97-98.

[621] *See id.* at 105-06.

[622] *Id.* at 97.

- 141 -

issue with Sefton[623] and that Glisan confirmed both Enron's confidence in Enron's conclusions concerning the effect of the Distribution on the 3% Equity Test and Causey's knowledge of and comfort with the accounting treatment.[624]

Notes taken by Astin's partner Hendrick during his work on the Watkins Investigation indicate that Astin continued to have concerns regarding the Raptors despite his conversation with Glisan.[625] With respect to the Distribution issue, Hendrick's notes from the meeting with Astin state:

> 90-day period, settled option. Paid LJM full investment, plus 30% rate of return. Theoretically, LJM still has capital in and will get equity back or get back again. This is the troubling part, as a practical matter, LJM has its investment back.[626]

However, Astin testified that he had no further concerns regarding the Raptors following his communications with Glisan regarding the accounting effect of the Distribution.[627]

There is no evidence that Vinson & Elkins similarly raised a concern with anyone at Enron regarding the Raptors' non-economic nature. Although the evidence indicates that this fact was acknowledged during a presentation to the Enron Board -- i.e., that the Raptors "[did] not transfer economic risk" -- both Spradling and Astin testified that this issue was never discussed in their presence during work on the structures.[628] Astin, for example, also testified that he (i) did not understand a distinction to exist between an

---

[623] No one at Vinson & Elkins discussed this issue with Derrick – either during 2000 or in September 2001 when Astin and Dilg discussed the Raptor transactions with Derrick in the wake of Sherron Watkins' letter. *See* Astin 9/22/03 Sworn Statement, at 31-32; *see also* Max Hendrick Handwritten Notes of Meeting with Ron Astin, Aug. 23, 2001 (the "Hendrick 8/23/01 Notes") [VEL 01284-VEL 01289]; Hendrick 9/13/01 Astin Mtg. Notes (relating to Astin's concerns about Raptor) [VEL 01304-VEL 01308]; Derrick 9/26/03 Sworn Statement, at 491-92.

[624] *See* Astin 9/22/03 Sworn Statement, at 21; Spradling 9/3/03 Sworn Statement, at 98.

[625] Astin 9/22/03 Sworn Statement, at 144-45.

[626] Hendrick 8/23/01 Notes, at VEL 01288 (relating to call with Astin).

[627] Astin 9/22/03 Sworn Statement, at 125-26.

[628] *See id.* at 13-15; Spradling 9/3/03 Sworn Statement, at 19-25.

economic hedge and an accounting hedge and (ii) did not recognize the Raptors to be non-economic in nature.[629] When questioned, however, Astin was unable to identify any assets that Raptor I could use to satisfy its obligations under the hedge that did not originate with Enron, other than LJM2's investment of $30 million.[630]

On or about August 31, 2000, Stuart Zisman ("Zisman"), an in-house Enron attorney, prepared a legal risk memorandum[631] with respect to the Raptors structures in which he identified as a potential legal risk, "[o]verall book manipulation."[632] In further explanation, he noted:

> Our original understanding of this transaction was that all types of assets/securities would be introduced into this structure (including both those that are viewed favorably and those that are viewed as being poor investments). As it turns out, we have discovered that a majority of the investments being introduced into the Raptor structure are bad ones. This is disconcerting [because] . . . it might lead one to believe that the financial books at Enron are being "cooked" in order to eliminate the drag on earnings that would otherwise occur under fair value accounting.[633]

This memorandum was distributed to Mark Haedicke ("Haedicke") and another ENA attorney, Julia Murray, as well as to several ENA business team members.[634] Haedicke chided Zisman for using "colorful" and "inflammatory" language and

---

[629] See Astin 9/22/03 Sworn Statement, at 12-13.

[630] See id. at 37-38.

[631] Sworn Statement of Stuart Zisman, former Senior Counsel, Enron, to Rebecca M. Lamberth, A&B, Apr. 21, 2003 (the "Zisman Sworn Statement"), at 57-58. Legal risk memoranda typically were prepared with respect to transactions conducted by attorneys in the legal department of ENA. Mark Haedicke, General Counsel of ENA, had begun requiring the preparation of such memoranda to help identify the key legal risks associated with significant transactions. Haedicke wanted to quantify the question: "Tell me what you're worried about . . . ." Haedicke Depo., at 53.

[632] Memorandum from Stuart Zisman, Enron, to Mark Haedicke and Julia Murray, Enron, regarding Project Raptor, Aug. 31, 2000 (the "Zisman 8/31/00 Memo"), at 1 [AB0417 03120-AB0417 03123].

[633] Id.

[634] See Haedicke Depo., at 168-69.

dismissed the concerns expressed without further inquiry.[635]   Others, including Mintz,

also received the Zisman memorandum, but no action was ever taken as a result.[636]

There is no evidence that this memorandum or its concern about "financial statement

manipulation" was ever shared with Derrick.[637]

Ephross[638] was not involved in work on Raptors I or II, but served as the principal

in-house attorney on Raptors III and IV during September 2000 and thereafter.[639]

Ephross has acknowledged that he understood, while working on the Raptors in late 2000

and early 2001, that these hedges had only an accounting, rather than an economic,

purpose: "I believe the advice I gave my client was that they're trading economics for

accounting and that was a bad trade."[640]

---

[635] Zisman Sworn Statement, at 53. Mike France, *What About the Lawyers?*, Bus. Wk., Dec. 23, 2002, at 58.

[636] Mintz, who had known Zisman while both were practicing at Bracewell & Patterson prior to joining Enron, testified that he discussed the memorandum with Zisman shortly after becoming General Counsel of Enron Global Finance. Mintz 9/29/03 Depo., at 201-03. Zisman informed Mintz that his conclusion on this point was not based on personal knowledge of the assets in the Raptors structures and that it may, therefore, have been overstated or even erroneous. *See id.* at 204-05; Zisman Sworn Statement, at 36 and 40.

[637] Derrick 9/26/03 Sworn Statement, at 482-83.

[638] Ephross possessed significant corporate finance experience and had worked on structured finance transactions for Enron as an associate at Vinson & Elkins prior to joining Enron. Ephross 5/2/03 Sworn Statement, at 16-17 and 44-49.

[639] *See* Spradling 9/3/03 Sworn Statement, at 132-33 and 158; *but see* Ephross 9/19/03 Sworn Statement, at 33 (Ephross recalls discussions he had with Spradling regarding Vinson & Elkins' ability to issue a true sale opinion on Porcupine, but that Bahlmann was the primary in-house counsel responsible for the transaction). *Cf.* Second Raptor 11/30/00 Invoice, at 2; Raptor III 12/22/00 Invoice, at 3; Raptor 4/30/01 Invoice, at 1-3; Raptor 10/31/01 Invoice, at 1-2.

[640] Ephross 9/19/03 Sworn Statement, at 89. Ephross also testified, "I believe the purpose was the same as Raptors I, II and IV.  It was to create an accounting hedge," and then explained his use of the term "accounting hedge" to be "one that had not [sic] economic effect but accounting effect." *Id.* at 15.

With respect to the restructuring of the Raptors in early 2001, Ephross and Rogers[641] consulted with Enron accountants regarding whether it was necessary to seek Board approval to complete the transaction:[642]

> I recall conversations about the authority to execute a derivative on Enron common stock. I recall that the conclusion was reached that an existing board resolution allowing for derivative transactions on Enron common stock was available to be used and that a decision was that the derivative could be written utilizing the existing resolution, the standing resolution, on derivative transactions.[643]

Ultimately, the Enron Board was not informed of the restructuring of the Raptors and authorization for that transaction was not sought.[644]

## F.    Disclosure Issues and the Related Party Transactions

*Summary Description of Enron's Disclosures of the Related Party Transactions*

In the section of Enron's proxy statements entitled "Certain Transactions," Enron was required to provide certain disclosures pursuant to Item 404 of Regulation S-K, "Certain Relationships and Related Transactions."[645] Disclosure of Enron's transactions with the LJM entities belonged in this section.[646] In the Second Interim Report, the Examiner concluded that one failure of Enron's related party transaction disclosure was

---

[641] *See id.* at 134.

[642] *See id.* at 133-34.

[643] *See id.*

[644] An email on this subject, dated March 22, 2001, began with a message from another Enron attorney to Ephross and Rogers, stating, "Per my voicemail to you, and Rex's request, here are the resolutions which were adopted by the Board relating to derivatives such as forwards" and attaching a copy of such previously-adopted resolutions. Email from Joel Ephross, Enron, to George McKean, Enron, Mar. 22, 2001 [AB1128 01345–AB1128 01349]. Ephross replied, "George, as I read the attached, it is exactly what we are looking for, except that capacity looks short, even if 100% of the shares are available." *Id.; see also* Email from Joel Ephross, Enron, to Ryan Siurek, Enron, *et al.*, Mar. 9, 2001 [AB0784 00859-AB0784 00861]; Second Interim Report, Annex 5 to Appendix L (Related Party Transactions); Report, Appendix B (Role of Andersen).

[645] 17 C.F.R. § 229.404.

[646] *Id.*

the absence of legally sufficient information regarding the amount of Fastow's financial

interest in Enron's transactions with the LJM entities.[647]  The proxy statements filed in

2000 and 2001 did not quantify the amount of that interest.[648]  In the Third Interim

Report, the Examiner concluded that there was sufficient evidence for a fact-finder to

determine that Fastow breached his fiduciary duties in connection with Enron's related

party transaction disclosures.[649]

*Attorneys' Role in Enron's Disclosure of the Related Party Transactions*

*Responsibilities of In-House Attorneys.*  In the years immediately prior to the

Petition Date, a team of attorneys led by Rogers was responsible for drafting Enron's

proxy statement for its annual meeting of shareholders.[650]  Portions of Enron's proxy

statements also were incorporated by reference into Enron's 10-Ks.

---

[647] *See* Second Interim Report, Appendix D (Enron's Disclosure of Its SPEs), *Enron's SEC Disclosures Regarding Selected Categories of SPE Transactions, Related Party Transactions.*  The documents and the testimony on these issues usually do not distinguish between LJM1 and LJM2, although the context usually makes clear which entity was intended when reference is made only to "LJM."

[648] Enron Schedule 14A, filed with the SEC on Mar. 27, 2001 (the "2001 Proxy"), at 29; Enron Schedule 14A, filed with the SEC on Mar. 21, 2000 (the "2000 Proxy").  As the Examiner has previously reported, the 2000 Proxy and the 2001 Proxy both failed to include any disclosure regarding management fees earned by Fastow, which were separate and apart from amounts he received as a result of partnership distributions. These fees were not insignificant.  A fee of $550,000 was paid for LJM1 for the last half of 1999 alone, and Fastow personally received approximately $2.2 million in management fees directly from LJM2 in 2000. *See* Second Interim Report, Appendix L (Related Party Transactions).  As a point of comparison, Fastow was entitled to a base annual salary of $375,000 from Enron under his employment agreement effective January 31, 2000.  Employment Agreement between Enron Corp. and Andrew S. Fastow, Jan. 31, 2000, at 8 [AB000255916-AB000255924].  The Examiner has uncovered no documents evidencing any rationale for not disclosing the management fees (even if only in formulaic terms), but has considered that some may have argued that the fees resulting from the formation of LJM1 and LJM2 were payable regardless of any transactions between Enron and LJM1 or LJM2.  The Examiner, however, concludes that such a rationale fails because LJM1 and LJM2 were entities formed with the consent of the Enron Board and for the primary purpose of investing in Enron-owned assets and businesses and to co-invest with Enron.

[649] *See* Third Interim Report, Appendix C (Role of Enron's Officers), *Potential Breach of Fiduciary Duty By Officers, Failure to Disclose the Substance of Material Transactions.*

[650] Rogers Sworn Statement, at 84-85.  With respect to both the 2000 Proxy and 2001 Proxy, Gary Peng ("Peng"), a member of Enron's Financial Reporting Group, was responsible for providing accounting support, including numbers for related party transactions to Sefton and Mintz, respectively.  *See, e.g.,* Peng Sworn Statement, at 14-15; Email from Gary Peng, Enron, to Jordan Mintz, Enron, *et al.*, Nov. 10, 2000 [AB1128 01350-AB1128 01352]; Email from Gary Peng, Enron, to Scott Sefton, Enron, Aug. 14, 2000 [AB0472 01899].

Because attorneys in EGF Legal performed the legal work with respect to Enron's

transactions with the LJM entities, Rogers asked Sefton, and subsequently Mintz,[651] to

analyze and draft disclosure regarding these Related Party Transactions.[652] As Enron's

most senior securities attorney, however, Rogers actively participated in the analysis and

reviewed the disclosure.[653] This group of in-house attorneys also consulted with Vinson

& Elkins on the analysis and disclosure in the proxy statement.[654]

*Legal Analysis Used by Enron.* The disclosure analysis applied by Enron

regarding Fastow and the LJM entities hinged upon whether it was "practicable"[655] to

quantify the amount of Fastow's interest.[656] Enron took the position that where the

transactions had not yet been settled or liquidated, it was not practicable to determine the

---

[651] Mintz was a tax attorney by training and did not possess expertise in public disclosure law, so he consulted several outside law firms, including Vinson & Elkins, Kirkland & Ellis, Bracewell & Patterson and later Fried Frank for guidance on these issues. Mintz 5/16/03 Depo., at 106-09; Letter from Gary Orloff, Bracewell & Patterson, to Jordan Mintz, Vice President & General Counsel, Enron Global Finance, Jan. 10, 2001 [AB000538909-AB000538917]; Mintz 1/16/01 Email. He also consulted with Fried Frank to consider whether the board approval process and the disclosures relating to LJM were sufficient. Schropp Sworn Statement, at 12-14.

[652] Mintz 5/16/03 Depo., at 98-100; Rogers Sworn Statement, at 94.

[653] Astin 8/12/03 Sworn Statement, at 28-29 (explaining that Rogers was the "chief securities lawyer and therefore had – was responsible for legal input and coordinating legal input into those matters"); Rogers Sworn Statement, at 16-40; Mintz 5/16/03 Depo., at 139.

[654] Astin 8/12/03 Sworn Statement, at 11-14; Rogers Sworn Statement, at 65 (stating that he had the most contact with Baird and Astin on securities disclosure issues). When Mintz took over as general counsel for Global Finance, he was instructed by Fastow and Rogers that Astin "picked up the responsibilities from Bob [Baird] as outside securities advisor." Mintz 5/16/03 Depo., at 113.

[655] *See* 17 C.F.R. § 229.404(a) (requiring disclosure, where practicable, of the related party's interest in the transaction(s)).

[656] *See* Second Interim Report, Appendix D (Enron's Disclosure of Its SPEs), *Enron's SEC Disclosures Regarding Selected Categories of SPE Transactions, Related Party Transactions*; Mintz 5/16/03 Depo., at 115-21 (discussing consultations that Mintz had with Astin and Rogers regarding the basis for not disclosing Fastow's compensation and their interpretation of the words "where practicable"); *but see* Memorandum from Jordan Mintz, Enron, to Andrew Fastow, Enron, regarding Related-Party Proxy Disclosures, Apr. 6, 2001 (the "Mintz 4/6/01 Memo") ("The rationale for not making any additional disclosure relating to the settlement of the RythmsNet transaction, however, is somewhat different.") [AB0971 00645-AB0971 00646].

amount of Fastow's interest in the LJM transactions.[657]  Enron used this test to conclude that disclosure was not necessary in the proxy statements filed in 2000 and 2001, notwithstanding the fact that no attorney asked Fastow how much he had received from the LJM entities, and that, by January 16, 2001, these attorneys knew that Fastow believed LJM would be shut down if his superiors knew the answer to that question.[658]

*Fastow's Responses to the D&O Questionnaires.*  Fastow was required to inform Enron regarding the amount of his interest in the LJM transactions in his response to the standard "D&O Questionnaire" distributed annually by Enron in the context of work on its proxy statement.[659]  Fastow side-stepped this responsibility.  In response to the relevant question, Fastow stated: "See Addendum to Questionnaire."[660]  For the proxy statement to be filed in 2000, the addendum stated that "Scott Sefton is preparing a draft of the disclosure relating to these transactions, which he will provide shortly."[661]  For the proxy statement to be filed in 2001, the addendum stated that "[t]he nature of those arrangements, as well as the nature of my relationship with LJM1 and LJM2 (including payments made, or proposed to be made, between such entities and Enron) are described

---

[657]  Mintz 4/6/01 Memo; *see also* McKillop 1/19/01 Email. After assuming the position of General Counsel of Global Finance, Mintz questioned whether the decision on nondisclosure for the proxy filed in 2001 was appropriate, in light of the "settling" of the Rhythms transaction in the first quarter of 2001. Email from Jordan Mintz, Enron, to Ron Astin, Vinson & Elkins, and Rex Rogers, Enron, Jan. 31, 2001 [AB0786 02054].

[658]  Mintz 1/16/01 Email; Mintz 4/6/01 Memo.

[659]  Mintz 5/16/03 Depo., at 228.

[660]  Enron Short-Form Questionnaire for Executive Officers, Directors and Nominees for Director, Fiscal Year Ended Dec. 31, 1999, at 5 [FFH02440-FFH02453]; Enron Short-Form 135 Questionnaire for Executive Officers, Directors and Nominees for Director, Fiscal Year ended Dec. 31, 2000 (the "Enron 12/31/00 Short-Form Questionnaire"), at 5 [AB000554276-AB000554288].

[661]  Addendum to Questionnaire for Andrew S. Fastow, Feb. 23, 2000 (the "Fastow Questionnaire Addendum") [FFH02453].

- 148 -

in the Company's 1999 and 2000 Proxy Disclosure under 'Certain Transactions.'"[662]

Mintz took no steps to make Fastow provide a meaningful and responsive answer to the

relevant question on the annual D&O Questionnaire, and the Examiner found no

evidence showing that Sefton did either.[663]

*The Proxy Statement Filed in 2000.* The proxy statement filed in 2000 was

prepared during Sefton's tenure as General Counsel of Enron Global Finance.[664] Sefton

prepared an initial draft of the proxy statement disclosure that included a section

generally describing Fastow's entitlement to a percentage of the profits of LJM2.[665]

Astin provided comments on the draft.[666] Enron accepted Astin's suggestion, among

others, that Fastow should be specifically identified (which was a requirement of Item

404),[667] and that Enron should disclose that Fastow had a "promoted interest that grew

---

[662] *Id.* Enron 12/31/00 Short-Form Questionnaire, at AB000554288. Astin stated that "it would be a good idea for [Fastow] to acknowledge in the addendum that he reviewed and was satisfied with the attached disclosure." Email from Ron Astin, Vinson & Elkins, to Jordan Mintz, Enron, and Rex Rogers, Enron, Mar. 12, 2001 [AB0472 01408].

[663] Mintz 5/16/03 Depo., at 232-34.

[664] Sefton testified that he relied entirely upon the advice of Astin regarding issues relating to the proxy statement disclosure. Sefton Sworn Statement, at 158-59 and 178-79. Sefton stated that he had not previously addressed issues relating to proxy disclosure. *Id.* at 159. Sefton did participate in analyzing with Astin the issue of whether Fastow's compensation from LJM should be considered in calculating compensation from Enron for purposes of disclosure of the five most highly compensated employees of Enron. *Id.* at 158-59 and 186; *see also* Sefton Handwritten Notes, at AB0472 01663-AB0472 01667; Email from Scott Sefton, Enron, to Rex Rogers, Enron, Feb. 24, 2000 (regarding Fastow Proxy Questionnaire) [AB0786 02038-AB0786 02039].

[665] Email from Scott Sefton, Enron, to Andy Fastow, Enron, Feb. 2, 2000 (the "Sefton 2/2/00 Email") [AB0786 02036-AB0786 02037]; Sefton Sworn Statement, at 208-09; *see also* Draft Proxy Statement (the "Draft Proxy Statement") (regarding LJM) [EVE 02981].

[666] Draft Proxy Statement. Astin testified that the handwritten comments on the Draft Proxy Statement were his. Astin 8/12/03 Sworn Statement, at 32.

[667] Astin 8/12/03 Sworn Statement, at 41-42 and 46; Draft Proxy Statement.

the more successful LJM2 was."[668]  Following a discussion with Astin, Sefton turned the

draft over to others at Enron who had responsibility for the proxy statement.[669]

*The Proxy Statement Filed in 2001.*  After becoming General Counsel of EGF

Legal in October of 2000, Mintz became involved in drafting and analyzing the required

related party disclosures for the proxy statement to be filed in 2001.[670]  The issue was

before him as early as November 2, 2000, when Astin sent him an email that stated:

> As I hope everyone is aware, the "senior officer"['s] name, and the nature
> and amount of his interest in the transactions, if quantifiable, will be
> disclosed in the 2001 proxy.[671]

In November, Mintz understood that Astin was advising him that Enron "would

have to disclose in the related party section of the proxy statement the compensation

Andy [Fastow] earns from his GP position in LJM."[672]  Mintz raised this issue with

Fastow, and Fastow's voicemail response (which Mintz had transcribed) revealed his

concern with this approach:

> With respect to the compensation issue and the proxy, it is my
> understanding the reason that nothing showed up in the compensation

---

[668] Astin 8/12/03 Sworn Statement, at 46.

[669] Sefton 2/2/00 Email; Sefton Sworn Statement, at 208-09. With limited exception, Astin recalls no further involvement, other than being copied on emails by others. Astin 8/12/03 Sworn Statement, at 50 and 56. A March 8, 2000 email from Rogers to Astin reflects a request for assistance from Sefton in reconciling an apparent inconsistency between the disclosure in footnote 16 of the financial statements regarding LJM and the proxy disclosure. Email from Rex Rogers, Enron, to Ron Astin, Vinson & Elkins, Mar. 8, 2000 (regarding Proxy Disclosure) [EVE 775655]; *see also* Email from Scott Sefton, Enron, to Clement Adams and Kriste Sullivan, Enron, and copy to Rex Rogers, Enron, and Ron Astin, Vinson & Elkins, Mar. 8, 2000 (regarding LJM proxy disclosure) [EVE 775656-EVE 775658]; Email from Scott Sefton, Enron, to Anne Yaeger, Enron, Mar. 8, 2000 (regarding LJM proxy disclosure) [AB0786 02044-AB0786 02046]. For example, Kriste Sullivan, an Enron in-house attorney, called Astin to "evaluate accounting arguments," which related to the categorization of eight LJM transactions in 1999. Astin 8/12/03 Sworn Statement, at 56-57.

[670] *See generally* Mintz 5/16/03 Depo., at 81 and 97-130.

[671] Email from Ronald Astin, Vinson & Elkins, to Jordan Mintz and Rex Rogers, Enron, Nov. 2, 2000 [AB1129 00640-AB1129 00641].

[672] Email from Jordan Mintz, Enron, to Rex Rogers, Enron, Nov. 28, 2000 (the "Mintz 11/28/00 Email") [EVE 543659].

issue is because, with respect to any LJM related deals there is no compensation being paid from Enron to me. Simply because LJM is investing in an Enron deal, does not constitute compensation from [sic] me, so there is a difference. Any earnings I get from LJM is [sic] being paid to me by the Limited Partners of LJM not by Enron. So that was, I believe, the analysis that was done which concluded that while we did need to disclose everything in the related party section, we did not have to disclose anything in the compensation section. If that thinking has changed, that's a BIG issue and I need to know about that. But we should probably get together to follow-up on the whole proxy disclosure anyway.[673]

Mintz forwarded a transcription of the voicemail to Rogers and copied Astin.[674]

On or about January 16, 2001, a conversation with Fastow reinforced Mintz's understanding that Fastow wished to avoid disclosure of his compensation from LJM1 or LJM2.[675] Specifically, Fastow "told me [Mintz] that if Skilling ever found out how much he [Fastow] was making, Skilling would have no choice but to shut down LJM."[676] Mintz sent an email to Astin and Rogers setting out this conversation, and discussing his goals for the proxy statement disclosure:

Can we visit sometime this week to discuss our Proxy preparation for LJM – perhaps for an hour or so. I think that the number one item on our list is to resolve the "where practicable" language in connection with AF's interest in the transactions engaged in with Enron by LJM1 and 2. I spoke, again, with Andy about this earlier today and he believes (perhaps rightly so) that Skilling will shutdown [sic] LJM if he knew how much Andy earned with respect to the Rhythms transaction . . . We need to be "creative" on this point within the contours of Item 404 so as to avoid any type of stark disclosure, if at all possible.[677]

---

[673] Id.

[674] Id.

[675] Mintz 5/16/03 Depo., at 130.

[676] Id.

[677] Mintz 1/16/01 Email. This email also was forwarded to Walls and then to Derrick on the same day. Derrick 5/20/03 Sworn Statement, at 117-20; see Mintz 1/16/01 Email; Walls 1/16/01 Email (forwarding Mintz's email). Rogers testified that the statement in the email was "startling," but that:

[M]y understanding from – directly from Mr. Mintz is contrary to what's in the email, that Mr. Fastow's compensation could not be calculated. So what he verbally told me

Astin testified that upon receipt of this email, he "thought it was a significant issue that needed to be discussed" but "had some skepticism about its accuracy."[678] Astin testified that he was skeptical because he had seen a Board presentation about an LJM3 entity (never formed) that contained a reference "to Mr. Fastow holding discussions with Mr. Skilling about his compensation."[679] He understood this email to suggest that Fastow had received money in connection with the Rhythms transaction during 2000,[680] but he believed that Fastow had no pecuniary interest in the Rhythms transaction.[681]

Astin, Mintz and Rogers met on January 18, 2001, and the group decided that this issue "was a matter that had to be pursued."[682] At this point, the testimony is in dispute. Rogers testified that Mintz bore the fact-finding responsibility:

> All I can tell you is that Mr. Mintz was given the responsibility and undertook and accepted the responsibility to get the factual information from Mr. Fastow; he reported back what that was. Mr. Astin applied the

---

and what I've understood from Mr. Astin, who worked closely with Mr. Mintz on this subject on disclosure, was contrary to what's in this email.

Is it possible that the reference is to, you know, what LJM earned as opposed to what Andy earned, I don't know, but the consistent factual information that we got in the meetings with Mr. Derrick was that his compensation could not be calculated.

Rogers Sworn Statement, at 146-47.

[678] Astin 8/12/03 Sworn Statement, at 77. Sometime in January 2001, Astin and Mintz visited with Walls to discuss this related party transaction disclosure issue. Walls Sworn Statement, at 31. They wanted to "bounce off" Walls "how they were thinking about disclosing Andy's compensation from one of the LJM transactions." *Id.* Astin explained to Walls that "Andy's interest wasn't choate or determinable and, therefore, was not to be disclosed under the securities laws." *Id.* Walls asked Astin; "Is this one of those things that's technically the law, but not the spirit of [the] law? And he said: No. This is the spirit of the law and technically the law." *Id.* Later that day, Walls saw Astin again. Walls told Astin that he "wouldn't stick my neck out for Andy Fastow. I would play this right down the middle." *Id.* at 32. Astin responded: "I'm not sticking my neck out for Andy Fastow . . . . I am playing it right down the middle." *Id.*

[679] Astin 8/12/03 Sworn Statement, at 79.

[680] *Id.* at 76-77.

[681] *Id.* at 78.

[682] *Id.* at 83-84. Astin believed that Rogers was going to discuss the issue with Derrick. *Id.* at 84.

- 152 -

legal standards to that disclosure. That was the advice we were given and that's the advice we accepted.[683]

Astin also testified that the factual investigation was Mintz's responsibility.[684] Mintz disputes that he was responsible for making a factual inquiry of Fastow and claims that he understood the advice of Astin and Rogers to be that "the company didn't have an obligation to pursue that with [Fastow]."[685] One thing is clear—neither Rogers, Mintz nor Astin ever determined whether distributions by the LJM entities had in fact been made to Fastow.[686] Astin acknowledged that he never asked[687] but merely inferred from statements made by Mintz that Fastow had received no distributions from LJM1 or LJM2 by year-end 2000.[688] Astin acknowledged that if he had learned that any material amount of distributions had been received by Fastow, additional analysis would have been required under Item 404.[689]

---

[683] Rogers Sworn Statement, at 168-69.

[684] When asked whether he had asked Mintz, or anyone else at Enron, how much money, if any, Fastow had received in 2000 in relation to his involvement in LJM1 and LJM2 during 2000, Astin stated that this task was assigned to Mintz and that "the guidance we were trying to get was to make sure that there had been no distributions and that was one of the touchstones to determine whether it was practicable and how much money he actually left the partnership." Astin 8/12/03 Sworn Statement, at 108. Despite the crucial importance of determining whether distributions had been made to Fastow, Astin did not recall whether Mintz informed him whether distributions had been made to Fastow, but he inferred that there were no such distributions. *Id.* at 120-21.

[685] Mintz 9/29/03 Depo., at 149-55.

[686] Whether and to what extent Mintz, Rogers and Astin actually spent time reviewing the LJM documents and working through the distribution provisions in these documents is unclear. If the LJM entities were truly independent investment funds with operations apart from their dealings with Enron, it might have been reasonable for these attorneys not to review the source documents. The LJM entities, however, were made-for-Enron vehicles with no significant investments other than those involving Enron. Attorneys from Vinson & Elkins even reviewed and provided comments on the LJM2 PPM. *See, e.g.,* Spradling 7/25/03 Sworn Statement, at 152-54. By all accounts, access to LJM was as simple as walking down the hallway of Enron's corporate offices.

[687] Astin 8/12/03 Sworn Statement, at 120.

[688] *Id.* at 120-23.

[689] *Id.* at 119. Astin testified that "[i]f we had known distributions had been made, I had expressed the view at the time, as I recall it, that we would have to say something, even if it was caveated by the fact that there was a recontribution obligation." *Id.* Later, Astin clarified this testimony by stating that "I think [sic] more accurate to say that we would have had to revisit the analysis and make a new determination if we

Despite lacking this crucial piece of information, preparation of the related party transaction disclosure proceeded. According to Mintz, Astin and Rogers advised him that because the LJM1/Rhythms Hedging Transaction had been disclosed in 2000, there was no need to make another disclosure in 2001.[690] However, the amount of Fastow's interest, other than the general statement regarding Fastow's "promoted" interest, had not been disclosed. Mintz testified that he initially disagreed with their rationale for non-disclosure because he believed that Fastow's financial interest should have been "practicably" calculated and disclosed after the Rhythms transaction "settled."[691]

With respect to the "not practicable" conclusion concerning Fastow's interest in LJM2, Astin testified as follows:

> [W]e concluded with regard to LJM2 that Mr. Fastow's compensation was not practicable to determine. This was after Mr. Mintz made an investigation of what – of some kind, I'm not exactly sure what Mr. Mintz did, but he was tasked with undertaking it to find out whether it was determinable to put a numerical number on Fastow's compensation, and the guidance that we gave Mr. Mintz, after the full discussion, was to find out whether or not any distributions had been made from LJM2 and otherwise to find out what he could about the provisions of the partnership agreement and find out if it was otherwise practicably determinable.

> What I recall the conclusion of that was is that it was not practicable to determine Fastow's compensation based on what I believe was provisions for reinvestment of capital in the LJM2 partnership agreement after investment, what rolled off, and because there was what was called a claw back, which is to say a recontribution contingency on the general partner.

---

take into account the relevant factors if that had happened, but I do believe that I did infer from what was reported back to me that no distributions had taken place." *Id.* at 122. Fastow received at least $18 million in distributions and $2.6 million in management fees from LJM1, a portion of which was received during 2000. *See* Second Interim Report, Appendix L (Related Party Transactions).

[690] Mintz 5/16/03 Depo., at 123-27.

[691] *Id.* at 128-29.

I don't recall how those were reported to us, but that's what I recall being the conclusion that Mintz indicated was the one that was warranted.[692]

In any event, it was ultimately concluded that it was unnecessary to disclose the amount of Fastow's LJM2 interest. On that subject, Astin testified that he, Rogers and Mintz took into account that any amounts received by Fastow were subject to claw back provisions, and therefore, Fastow's interest was not "practicably determinable."[693]

On March 7, 2001, Mintz, Rogers and Astin met with Derrick to discuss the proposed disclosure in the related party transaction section of the proxy statement.[694] Derrick was told that no disclosure was required and that all involved were comfortable with that position.[695] The proxy statement was filed on March 27, 2001.[696]

---

[692] Astin 8/12/03 Sworn Statement, at 106-07.

[693] Id.

[694] Astin testified that:

> At a meeting in March of 2001, we did discuss the proposed disclosure of the related party section of the proxy statement with Mr. Derrick. I don't recall the subject of Mr. Fastow's assertions regarding his compensation from RhythmNet coming up. It's possible that they did, but I don't recall it. But I do recall having a sense that Mr. Derrick was familiar with the issue of LJM and the Fastow compensation and the conflicts that it presented without attributing any specific statement to him. I mean, he didn't act surprised when the subject came up.

*Id.* at 86-87; *see also* Vinson & Elkins Invoice No. 20180960, regarding General Retainer, Proxy & General Corporate, Apr. 30, 2001, at 1 (indicating that Astin billed 4 hours on March 5, 2001 preparing for a meeting with Derrick, "research[ing] applicable management compensation releases, etc." and 4.5 hours on March 7, 2001 reviewing the history of LJM disclosure and analysis for proxy, meeting with Rogers and Mintz regarding same and Derrick regarding same) [EVE 1302292-EVE 1302301]; Derrick 5/20/03 Sworn Statement, at 195-97.

[695] Astin 8/12/03 Sworn Statement, at 86-87.

[696] The proxy statement filed on March 27, 2001, contained the following description of Fastow's interest:

> Enron . . . entered into a number of transactions with [LJM2], a private investment company that primarily engages in acquiring or investing in energy and communications related investments, primarily involving either assets Enron had decided to sell or risk management activities intended to limit Enron's exposure to price and value fluctuations with respect to various assets. Andrew S. Fastow, Executive Vice President, and Chief Financial Officer of Enron, is the managing member of LJM2's general partner. The general partner of LJM2 is entitled to receive a percentage of the profits of LJM2 in excess of the general partner's portion of the total capital contributed to LJM2, depending upon the performance of the investments made by LJM2.

2001 Proxy, at 27.

Shortly thereafter, Mintz prepared a memorandum to Fastow summarizing why

Enron "did not disclose financial information regarding your interest as the ultimate

general partner/managing member in either LJM1 or LJM2":[697]

> We determined it was not practicable to quantify your interest in LJM2 in
> the most recent Proxy, again, based on the existence of multiple open and
> unmatured transactions making it impracticable to compute. The rationale
> for not making any additional disclosure relating to the settlement of the
> RhythmsNet transaction, however, is somewhat different. In particular,
> the RhythmsNet transaction settled in 2000 pursuant to terms allowed for
> under the original agreement. At settlement of RhythmNet it may have
> been practicable to determine your financial interest. However, no further
> disclosure was otherwise required of the RhythmsNet transaction in 2000
> because settlement occurred under conditions permitted in the original
> agreement. Thus, there was no new transaction involving LJM1 and
> Enron in the year 2000 required to be disclosed in this year's proxy;
> accordingly, we have concluded that there was no requirement to disclose
> any financial information related to what you may have earned in that
> transaction – notwithstanding that it was now more practicable to do so.[698]

Stating that the "decision not to disclose in this instance was a close call;

arguably, the more conservative approach would have been to disclose the amount of

[Fastow's] interest,"[699] Mintz concluded:

> It was, perhaps, fortuitous that the RhythmsNet transaction extended over
> two proxy filing years and the specific facts of the particular case allowed
> us to conclude that a disclosable transaction occurred only in the year in
> which financial disclosure was impracticable. Thus, we have relied on
> two different arguments for avoiding financial disclosure for you as the
> LJM1 general partner in both 1999 [for the proxy filed in 2000] and then
> 2000 [for the proxy filed in 2001]. If, however, the RhythmsNet
> transaction began and concluded in the same year, it would have been

---

[697] Mintz 4/6/01 Memo, at 1-2.

[698] *Id.*

[699] *Id.* at 2. Both Rogers and Astin received a draft of the memorandum before it was finalized and were asked to comment on it. Email from Jordan Mintz, Enron, to Ron Astin, Vinson & Elkins, and Rex Rogers, Enron, *et al.*, Mar. 28, 2001, at 1 [EVE 543401-EVE 543403]. As noted below, this memorandum troubled Derrick and caused him to verify with Astin that they were comfortable with the disclosure decision. Derrick 5/20/03 Sworn Statement, 171-73.

more difficult to avoid making some additional level of financial disclosure.[700]

Upon receipt of this memorandum, Derrick contacted Astin to ask whether he was comfortable that the disclosure made was adequate, because Derrick had not understood from Mintz or others that the level of Enron's related party transaction disclosure had been "a close call."[701] Astin confirmed his comfort with the disclosure made.[702]

Shortly thereafter, Mintz sought advice from the law firm of Fried, Frank, Harris, Shriver & Jacobson ("Fried Frank") regarding LJM.[703] Mintz informed neither Derrick nor Rogers of his intent to consult with outside counsel on the matter.[704] He did discuss this with Ephross, and they concluded that "it was better to ask forgiveness than permission."[705]

Mintz described his concerns on the Related Party Transactions with Fried Frank and asked Fried Frank to analyze the various securities and corporate law implications.[706] Fried Frank viewed the amount of the payments that Fastow received from LJM to be material to determining the adequacy of the prior disclosures and crafting any future disclosure.[707] Fried Frank also concluded that the prior disclosures were incomplete.[708] Even though the LJM vehicles were to be restructured (eliminating Fastow's interest),

---

[700] Mintz 4/6/01 Memo, at 2; *see* Second Interim Report, Appendix D (Enron's Disclosure of Its SPEs), *Enron's SEC Disclosures Regarding Selected Categories of SPE Transactions, Related Party Transactions.*

[701] Astin 8/12/03 Sworn Statement, at 162-65.

[702] *Id.*

[703] Mintz 5/16/03 Depo., at 120, 138, 142 and 186-211. Several securities law partners at Fried Frank, including two former attorneys for the SEC, were involved in reviewing the issues presented by Mintz. Schropp Sworn Statement, at 4-7.

[704] Mintz 5/16/03 Depo., at 139-42 and 189.

[705] Ephross 9/19/03 Sworn Statement, at 62-63.

[706] Schropp Sworn Statement, at 8-9.

[707] *Id.* at 22. Fried Frank was never provided this information. *Id.*

[708] *Id.* at 48.

Fried Frank believed that issues remained relating to the existing structures and prior transactions that warranted review and possibly fuller disclosure.[709]

Fried Frank considered the prior conclusion — that Fastow's interest need not be disclosed because the transactions had not settled and therefore disclosure was not "practicable" — to be "too aggressive."[710]

---

[709] *Id.* at 58-59.

[710] *Id.* at 67-68. Schropp testified:

> A:    So that whole issue [of whether it was practicable to determine the amount of Fastow's interest] needs to be considered from a variety of perspectives and it is simply too black and white to say that because it's still in progress, there is no further need to look into it.
>
> Q:    So relying on that single factor was not sufficient to answer the question?
>
> A:    I believe so.

*Id.* at 69. His testimony also contains the following:

> Q:    Another way of saying that, just because there is some level of uncertainty as to the exact amount of compensation does not render disclosure unnecessary . . . ?
>
> A:    Correct.

*Id.* at 70.

## VI.  ATTORNEYS' ROLE IN THE WATKINS INVESTIGATION

### A.  <u>The Anonymous Letters</u>

On August 15, 2001, the day after Skilling resigned for "personal reasons," Lay received an anonymous letter that stated: "Skilling's abrupt departure will raise suspicions of accounting improprieties and valuation issues."[711]  On the same day, Lay forwarded the letter to Derrick.[712]  A week passed before Derrick contacted Vinson & Elkins to request assistance in responding to the letter.  During that time, the author of the letter, Sherron Watkins ("Watkins") (i) forwarded supplemental material to Lay,[713] (ii) met with an Enron human resources manager to discuss the points raised in the letter,[714] (iii) met with Rogers to discuss her concerns,[715] (iv) contacted one of her former colleagues at Andersen to discuss her concerns[716] and (v) scheduled a meeting with Lay

---

[711] Letter from Sherron Watkins, Enron, to Ken Lay, Enron (the "Watkins Letter") [VEL 00681]; *see also* Deposition of Sherron Smith Watkins, Vice President, Corporate Development, by Mary C. Gill, A&B, June 6, 2003 (the "Watkins Depo."), at 57.

[712] *See* Sworn Statement of Sharon Butcher, Assistant General Counsel, Enron, to Mary C. Gill, A&B, May 6, 2003 (the "Butcher Sworn Statement"), at 146.  Derrick told Butcher that, after learning of the letter, Fastow did not want Watkins working in his group.  Derrick requested that Butcher contact an employment attorney at Vinson & Elkins to discuss the legal ramifications of this situation.  *Id.* at 150-51. Butcher's notes from her conversation with Vinson & Elkins attorney Carl Jordan ("Jordan") pose the question, "Sherron Watkins works for Enron Corporate Department, ultimately reports to Andy Fastow. What do we do with Sharon [sic]?"  Butcher, Handwritten Notes, Aug. 20, 2001 [AB0757 00500]; Butcher Sworn Statement, at 153.  At about the same time, Watkins learned that Fastow wanted to have her terminated.  Watkins Depo., at 85.  Jordan's recommendation was to offer Watkins a comparable position at Enron.  Butcher Sworn Statement, at 162.

[713] Letters from Sherron Watkins, Enron, to Ken Lay, Enron (the "Watkins Packet") (packet of information given to Lay by Watkins) [VEL 00680-VEL 00691].

[714] Watkins Depo., at 38, 59-60 and 63-64.  Watkins testified in Congress that Fastow had demanded that her computer be seized, which it was, after Olsen instructed Watkins to remove or delete any information that she wanted so that Fastow would only be seizing the hardware.  The Financial Collapse of Enron, Part 3: Hearing Before the Subcommittee on Oversight and Investigations, House Committee on Energy and Commerce, 107th Cong. (Feb. 14, 2002) (the "Watkins Congressional Testimony"), at 46 (testimony of Sherron Watkins, Vice President of Corporate Development, Enron).

[715] Watkins Depo., at 62-68.

[716] Watkins contacted James Hecker ("Hecker") at Andersen, who was not involved in the Enron engagement.  With respect to the Raptors transactions that she described, he confirmed that the 3% equity must be the last money out of the structure and that "even if there's equity on paper, if LJM has gotten their money out, that kills it."  *Id.* at 70-71.

for August 22.[717]  On August 22, Watkins met with Lay.[718]  On the same day, Derrick

called Dilg at Vinson & Elkins.[719]  Although Derrick reviewed the first letter, he did not

read the other material that Watkins delivered.[720]

Watkins' first letter (i) identified the Raptor vehicles and Condor as being among

the most aggressive from an accounting point of view, (ii) questioned how Enron could

settle the decline in the value of the stock in Raptors, noting that "it sure looks to the

layman on the street that we are hiding losses in a related company and will compensate

that company with Enron stock in the future," which is "a bit like robbing the bank in one

year and trying to pay it back 2 years later" and (iii) stated that the author was "incredibly

nervous that we will implode in a wave of accounting scandals."[721]  A separate document,

entitled "Summary of alleged issues," described the Raptor structure and the problems

embedded in that structure.  Watkins noted: "I realize that we have had a lot of smart

people looking at this and a lot of accountants including AA&Co. have blessed the

accounting treatment.  None of that will protect Enron if these transactions are ever

disclosed in the bright light of day."[722]  In another document, Watkins suggested that

independent counsel and accountants be retained to review the transactions.[723]  She

---

[717] Watkins also contacted Rick Buy ("Buy") prior to her meeting with Lay, but Buy said that he would rather not see the information that she wanted to send to him.  Watkins Congressional Testimony, at 59.

[718] Watkins Depo., at 61.

[719] Vinson & Elkins Invoice No. 20202513, regarding General Retainer, Sept. 28, 2001, at 4 [VEL 01721-VEL 01730].

[720] Derrick 9/26/03 Sworn Statement, at 552.

[721] Watkins Letter.

[722] Watkins Packet, at VEL 00682.

[723] *Id.* at VEL 00683-VEL 00684.

specifically noted that Vinson & Elkins should not be selected for this purpose.[724] Watkins testified that the purpose of her letters was to focus Lay's attention on these issues for damage control and to avoid the selection of either Fastow or Causey to replace Skilling.[725] Watkins had intended to raise these issues with Skilling before his departure, but only after she had found new employment.[726]

### B.  Scope of Vinson & Elkins' Engagement

*Vinson & Elkins' Analysis of Its Role*

Dilg recognized that Astin and others at Vinson & Elkins had worked on the Condor, Whitewing and Raptors transactions mentioned in the letters.[727]  As Dilg described it, he knew that Vinson & Elkins had been counsel for Enron "in the documentation of those transactions."[728] Dilg disavowed any Vinson & Elkins role in the conception of these transactions, but knew that Vinson & Elkins had played a role in analyzing legal issues on the structures, developing the legal entities that needed to be formed and the types of agreements needed, and preparing documentation to effect

---

[724] *Id.* at VEL 00684. Watkins urged that Vinson & Elkins not be retained because it had rendered true sale opinions. *Id.* Dilg and Hendrick were purposely not told of the identity of the author. At some point, they learned that she reported to Fastow. It was not until they actually interviewed Watkins on September 10, 2001 that they became aware she was an accountant, formerly with Andersen. Dilg stated that these facts did not add to the credibility of the letters, because they considered the letters credible in the first instance. Dilg 8/14/03 Sworn Statement, at 66-69.

[725] Watkins Depo., at 63-64.

[726] *Id.* at 41-42.

[727] Dilg 8/14/03 Sworn Statement, at 10-11. Dilg knew that Spradling and Chandler had worked on the Raptors, and was generally familiar with the roles that they had played. At the time of the investigation, Dilg discussed the specific transactions with Astin, but not with Spradling and Chandler. *Id.* at 11-12.

[728] *Id.* at 12-13.

- 161 -

Enron's stated objectives.[729]  Dilg assumed that Vinson & Elkins attorneys also possessed an understanding of the purpose of the vehicles.[730]

When Dilg received the Watkins materials from Derrick, he forwarded them to Astin.[731]  After reviewing the materials, Astin understood that the allegations focused upon the substance of the accounting in the transactions and how the transactions had been disclosed.[732]  Dilg met with Astin on the same day to get his reaction[733] and to determine if there was any problem with Vinson & Elkins handling the matter.[734]  Astin pointed out that the author's basis for stating that Vinson & Elkins had a conflict was erroneous – Vinson & Elkins had not rendered true sale opinions in these structures, only non substantive consolidation opinions.[735]  Although Vinson & Elkins had represented Enron in each of the transactions at issue,[736] in Astin's opinion the allegations did not focus upon the work Vinson & Elkins had performed in connection with the structures in a way that would preclude Vinson & Elkins from looking further into these matters.[737]

---

[729] Astin and Osterberg attended an early meeting in the development of the Raptors, at which Glisan described the structure. Astin 9/22/03 Sworn Statement, at 8-9 and 60; Osterberg 10/23/03 Sworn Statement, at 5-6.

[730] Dilg 8/14/03 Sworn Statement, at 15. Later, in the process of the investigation and review of the LJM approval sheets, Dilg also noted that Vinson & Elkins frequently served as Enron counsel on the transactions. Id. at 121.

[731] Id. at 103; Astin 9/10/03 Sworn Statement, at 121.

[732] Astin 9/10/03 Sworn Statement, at 125.

[733] Id. at 121.

[734] Id. at 124.

[735] Id. at 122-123. Enron did request that Vinson & Elkins render a true sale opinion in Raptor III, but Vinson & Elkins declined to do so. Spradling 9/3/03 Sworn Statement, at 122-25.

[736] Astin 9/10/03 Sworn Statement, at 126 and 127; Report, Appendix C (Role of Enron's Attorneys), *Attorney Role in Raptors and Board Approval.*

[737] Astin 9/10/03 Sworn Statement, at 123; Dilg 8/14/03 Sworn Statement, at 83-84. Dilg had little substantive involvement in these transactions and Hendrick, a litigation partner, had none. Dilg 8/14/03 Sworn Statement, at 10-11; Sworn Statement of Max Hendrick, III, Vinson & Elkins, to Mary C. Gill, A&B, July 8, 2003 (the "Hendrick 7/8/03 Sworn Statement"), at 21.

Dilg agreed with this view.[738]

Dilg also contacted his litigation partner, Hendrick, to request his assistance in the investigation[739] and suggested that Hendrick call Astin to get information about the structures at issue.[740] In the call with Hendrick, Astin discussed (i) the nature of the transactions, (ii) the disclosure process and (iii) certain issues regarding the Raptors that Astin had raised with Enron at the time of the transactions.[741]

With respect to the Raptors, Astin described an initial option transaction – either a put or a call on the Enron stock – that was settled after the movement of the stock on the basis that it provided the Raptor entity with sufficient proceeds.[742] This resulted in a distribution to LJM in an amount exceeding its investment, which was a concern also expressed by Watkins in her letter.[743] Hendrick's notes from the meeting with Astin reflect:

> 90-day period, settled option. Paid LJM full investment, plus 30% rate of return. Theoretically, LJM still has capital in and will get back equity[.] This is the troubling part. As a practical matter, LJM has its investment back.[744]

---

[738] Dilg 8/14/03 Sworn Statement, at 83-84. Dilg did not believe that Watkins' letter addressed the legal work provided by Vinson & Elkins and, therefore, the firm was not being asked to review its own work. Lawyers Hearing, at 34-35 (testimony of Dilg). Although Vinson & Elkins had a Professional Responsibility Committee, no one consulted the Committee to determine whether there was a conflict of interest that might preclude Vinson & Elkins from accepting the engagement or require a formal waiver from the client. Astin 9/10/03 Sworn Statement, at 130; Hendrick 7/8/03 Sworn Statement, at 75; *see generally* Dilg 8/14/03 Sworn Statement, at 78-82.

[739] Hendrick 7/8/03 Sworn Statement, at 10.

[740] *Id.* at 13.

[741] *Id.* at 21; Hendrick 8/23/01 Notes (relating to call with Astin).

[742] Astin 9/10/03 Sworn Statement, at 151.

[743] Watkins Packet, at VEL 00682.

[744] Hendrick 8/23/01 Notes, at VEL 01287-VEL 01288 (relating to call with Astin). In the course of the investigation, Dilg and Hendrick met again with Astin and discussed further these transactions. Astin 9/10/03 Sworn Statement, at 170. At the time of the Raptors structures in August 2000, Spradling had harbored similar concerns, which he brought to Dilg's attention. Spradling 9/3/03 Sworn Statement, at 97. Spradling questioned the accounting where LJM2 had received a return of $41 million and the impact of

- 163 -

*Meeting With Derrick Regarding Scope of the Engagement*

Two days after his first call to Dilg, Derrick met with Dilg and Hendrick regarding the "anonymous" letter.[745] As Derrick expressed it, Enron's objective was to determine, within a relatively short time frame, whether Watkins' concerns were widely shared among Enron's senior management group and whether the letter presented new facts that were not understood by those individuals.[746] They did not discuss, and Vinson & Elkins did not consider, whether the matter should be referred to the Enron Board or the Audit Committee.[747]

Although Derrick was aware that Vinson & Elkins had performed work on the structures being challenged, Dilg and Hendrick did not describe to him the full extent of Vinson & Elkins' role in these transactions.[748] Derrick's objective was to conduct the review as quickly as possible and on a confidential basis.[749] Neither Dilg nor Hendrick fully recognized, nor did they fully advise Derrick of, the conflict of interest issue presented by the proposed investigation.[750]

---

this on the 3% equity requirement. *Id.* at 106. Spradling received confirmation from Enron that the accounting was appropriate. *Id.* at 99.

[745] Although Derrick was aware of the identity of the author, this information was not provided to Dilg or Hendrick until much later in the investigation. Dilg 8/14/03 Sworn Statement, at 66-69. Also, Astin and Dilg subsequently met with Derrick to review with him the Condor/Whitewing and Raptors structures. Astin 9/10/03 Sworn Statement, at 161-70.

[746] Dilg 8/14/03 Sworn Statement, at 64.

[747] *Id.* at 78-81.

[748] Derrick 9/26/03 Sworn Statement, at 556-57. Derrick testified before Congress that he was not aware that Vinson & Elkins represented Enron on all of the transactions. Lawyers Hearing, at 52.

[749] Hendrick 7/8/03 Sworn Statement, at 52.

[750] Derrick 9/26/03 Sworn Statement, at 561-62. There is a conflict in the evidence on the extent of the discussion on this point. Dilg recalls that he discussed the fact that if Enron wanted to formally use the investigation, in the context of an SEC inquiry or a derivative suit, retention of Vinson & Elkins would not be appropriate because of the firm's involvement in the transactions and with Enron, more generally. Therefore, if Enron were looking for an "independent" investigation, it would need to select another law firm. Dilg 8/14/03 Sworn Statement, at 59. Derrick does not recall any discussion beyond Dilg stating that if there was litigation relating to these issues, Vinson & Elkins could not be engaged to represent Enron.

Vinson & Elkins recognized that a principal point of the Watkins letter raised accounting issues,[751] but Vinson & Elkins also noted that the author stated that the accounting was "technically" correct.[752] In discussing this issue, Derrick, Dilg and Hendrick determined that to bring in an outside auditor at that point in time, with the attendant focus of the media upon Enron, would be "fairly drastic."[753] In concluding that an outside auditor would not be retained, it was determined that Vinson & Elkins would not "second guess" Andersen or "dig down" into the transactions.[754] It was decided that they would first determine whether other senior executives identified by the author had serious concerns before undertaking a full-blown "discovery-style" investigation or considering the retention of another accounting firm.[755]

By the end of the initial meeting with Derrick, Hendrick and Dilg understood the scope of the engagement to be a "fact finding mission," which they concluded that Vinson & Elkins could perform.[756] The review would be limited to determining whether there were any facts about the Condor/Whitewing or Raptors structures that Enron management or Andersen did not have that might warrant a further investigation of the

---

Derrick 9/26/03 Sworn Statement, at 561-62. Otherwise, neither Dilg nor Hendrick advised Derrick of any limitations on any investigation that they could perform. *Id.* at 563. Hendrick recalls only that Dilg may have "made note" that Vinson & Elkins attorneys had worked on the transactions, but that there was no prolonged discussion of this. Hendrick 7/8/03 Sworn Statement, at 63. They did not discuss any role that on the part of Vinson & Elkins with respect to financial statement disclosures. *Id.* at 64.

[751] Hendrick 7/8/03 Sworn Statement, at 66.

[752] Dilg 8/14/03 Sworn Statement, at 70.

[753] Hendrick 7/8/03 Sworn Statement, at 62.

[754] *Id.* at 65. Dilg testified before Congress: "We wanted to make sure in our review that Arthur Andersen had the proper facts, that they had all of the facts that they needed to make the review, and that they were comfortable with their accounting decisions. But we were not in a position to second-guess Arthur Andersen's ultimate professional judgment on the accounting issues involved." Lawyers Hearing, at 36 (testimony of Dilg).

[755] At no time did Vinson & Elkins consider whether the scope of the investigation should be broadened. Hendrick 7/8/03 Sworn Statement, at 67-68.

[756] Dilg 8/14/03 Sworn Statement, at 89; Hendrick 7/8/03 Sworn Statement, at 55-56.

matters, but Vinson & Elkins would not attempt to study the structures themselves.[757]
Dilg and Hendrick agreed that they would interview current employees to determine
whether they shared Watkins' concerns.[758]   With respect to disclosure issues, it was
agreed that they would not go back and "re-build the disclosure process" to fully analyze
the disclosures.[759]

### C.   The Interview Process

Vinson & Elkins interviewed Mintz, Fastow, Mark Koenig and Paula Rieker from
Investor Relations, McMahon, Lawrence Whalley, Causey, Buy and Watkins.[760]   As a
result of the decision not to interview former employees, neither Cliff Baxter ("Baxter")
nor Skilling, both of whom had been identified by Watkins as potential sources of
information, were interviewed.   Kopper also was not interviewed.[761]   Dilg and Hendrick
met again with Astin[762] and with Duncan and Cash of Andersen.[763]

---

[757] Derrick 9/26/03 Sworn Statement, at 565-68; Dilg 8/14/03 Sworn Statement, at 41 and 74-75 and 82-83.  The fact that Enron had entered into transactions involving Condor and the Raptor entities was well known.  Derrick informed them that Fastow's role in LJM had been approved at the Enron Board level.  Therefore, Dilg found it a little curious that the author would suggest that there was wide-spread concern about these transactions at the senior management level.  Dilg 8/14/03 Sworn Statement, at 76.

[758] Hendrick 7/8/03 Sworn Statement, at 58-59.  The list of current employees to be interviewed included those identified by Watkins.  Watkins Letter, at VEL 00684.

[759] Dilg 8/14/03 Sworn Statement, at 42; Hendrick 7/8/03 Sworn Statement, at 64-67.

[760] Memoranda from Max Hendrick, III, Vinson & Elkins, to Enron Corp. File, regarding interviews with Enron Employees regarding Issues Raised by Sherron Watkins, Aug. and Sept. 2001 [VEL 00001-VEL 00036].

[761] Dilg 8/14/03 Sworn Statement, at 89-90.  Hendrick's notes identified all three of these individuals as potential sources of information.  Hendrick 7/8/03 Sworn Statement, at 59; Max Hendrick, III, Vinson & Elkins, Handwritten Notes entitled "Enron/Gen/Meeting w/Jim Derek [sp] 8-24-2001" [VEL 01291].  It is perhaps particularly notable that Vinson & Elkins did not interview Baxter, although he was specifically identified as someone who had complained "mightily" about LJM.  Dilg 8/14/03 Sworn Statement, at 90.  Nor did Vinson & Elkins attempt to interview Skilling, who would be uniquely situated to answer questions about any "handshake" deal that he allegedly made with Fastow on LJM.

[762] Astin 9/10/03 Sworn Statement, at 170.

[763] Memorandum from Max Hendrick, III, to Enron Corp. File, regarding Interview with David Duncan and Debra Cash, Sept. 5, 2001 (the "Vinson & Elkins Duncan and Cash Interview") [VEL 00027-VEL 00031]; Dilg 8/14/03 Sworn Statement, at 99.

- 166 -

*Interview of Mintz*

Dilg and Hendrick first interviewed Mintz.[764]  At that time, Mintz offered to provide them with a package of material relevant to LJM, which was later delivered under a series of cover letters.[765]  Although Mintz approximated Fastow's compensation from one of the LJM transactions to be $10 to $15 million, Dilg and Hendrick did not explore that subject because they did not view it to be within the scope of issues raised by the Watkins letters.[766]  Mintz never informed Dilg and Hendrick of the issues that had arisen concerning the disclosure of Fastow's financial interest in the context of the proxy statement filed in 2001,[767] nor did Mintz disclose that he had sought independent legal advice on this issue from Fried Frank.[768]

*Interview of Fastow*

Dilg and Hendrick next interviewed Fastow, who "expressed some irritation with the implication of the employee's letter."[769]  Fastow pointed out that the transactions had been reviewed by the Office of the Chairman and received the approval of the Enron

---

[764] Memorandum from Max Hendrick, III, to Enron Corp. File, regarding Interview with Jordan H. Mintz, Aug. 24, 2001, Aug. 30, 2001 [VEL 00001-VEL 00003].

[765] Sworn Statement of Max Hendrick, III, to Mary C. Gill, A&B, Aug. 8, 2003 (the "Hendrick 8/8/03 Sworn Statement"), at 273-74; Memoranda from Jordan Mintz, Enron, to Buy, Causey, Fastow, Enron, *et al.*, regarding LJM, Dec. 7, 2000 through June 4, 2001 (the "Mintz LJM Memoranda") [VEL 00522-VEL 00535 and VEL 00204-VEL 00205].

[766] Dilg 8/14/03 Sworn Statement, at 41-42; *see also* Hendrick 7/8/03 Sworn Statement, at 84-85.

[767] The packet of materials provided by Mintz to Dilg and Hendrick included the various LJM memoranda that Mintz had prepared in early 2001, including Mintz's April 6, 2001 memorandum that describes the analysis undertaken in conjunction with the decision to not disclose in either the 2000 Proxy or the 2001 Proxy the amount of compensation that Fastow received from LJM, and the characterization of this decision as a "close call." Hendrick 8/8/03 Sworn Statement, at 273-74; Mintz LJM Memoranda, at VEL 00530; *see* Report, Appendix C (Role of Enron's Attorneys), *Disclosure Issues and the Related Party Transactions.*

[768] *See generally* Mintz 5/16/03 Depo., at 249-52; Dilg 8/14/03 Sworn Statement, at 36.

[769] Memorandum from Max Hendrick, III, to Enron Corp. File, regarding Interview with Andrew S. Fastow, August 27, 2001 (the "Vinson & Elkins Fastow Interview"), at 1 [VEL 00004-VEL 00008].

Board.[770] He noted that Vinson & Elkins and Andersen "worked diligently on the necessary disclosure reports."[771]

Fastow interpreted the letter to have two primary implications: (i) Andersen had made a mistake when it determined that Enron could book earnings from the Raptor hedges; and (ii) disclosure of the issuance of Enron stock to support the transactions was inadequate.[772] In Fastow's view, "the employee is simply 'second guessing' AA's determination as to the first implication and is factually wrong on the disclosure issue."[773] According to Fastow, "this situation works perfectly under the accounting rules. Although the structure may be in a gray area, it is fully approved by AA and is fully disclosed."[774]

*Interview of McMahon*

McMahon described to Dilg and Hendrick the concerns he had expressed to Fastow and Skilling (while Skilling was Enron's Treasurer) regarding the conflict of

---

[770] *Id.* Several statements made by Fastow should have raised issues when compared against the materials that Mintz forwarded to Vinson & Elkins. For example, Fastow stated that, with respect to LJM, Causey was designated to represent Enron and "negotiated" all transactions. The LJM approval sheets make it clear that he did not. Hendrick 8/8/03 Sworn Statement, at 274; LJM Approval Documents (LJM Approval Sheet for Nowa Sarzyna and others) [VEL 00060-VEL 00198]. The interview with Causey also refuted this assertion. Memorandum from Max Hendrick, III, to Enron Corp. file, regarding Interview with Richard Causey on Aug. 31, 2001, Sept. 18, 2001 (the "Vinson & Elkins Causey Interview") [VEL 00016-VEL 00020]. In addition, Fastow discussed the compensation arrangements of several Enron employees who also worked for LJM (Michael Kopper and Cathy Lynn). The minutes of the Board meeting at which the LJM2 structure was approved reveal that the role of other Enron employees in LJM was not disclosed to the Board. Hendrick 8/8/03 Sworn Statement, at 275; Excerpt of Minutes of the Enron Board Meeting, Relating to LJM2, Oct. 11-12, 1999 [VEL 00337-VEL 00338].

[771] Vinson & Elkins Fastow Interview, at 1. Fastow's statement regarding the extent of Vinson & Elkins' role in the disclosure process was inconsistent with the information that Astin had provided to Dilg and Hendrick. *See* Dilg 8/14/03 Sworn Statement, at 27-28 (Astin stated to Dilg that, at times, he would see Enron's 10-Ks and 10-Qs "before they were publicly filed, at times he would not, but since they were part of the overall financial statements, we had very limited ability to comment, et cetera.").

[772] Vinson & Elkins Fastow Interview, at 2.

[773] *Id.*

[774] *Id.*

- 168 -

interest presented by LJM.[775]  That conflict arose, according to McMahon, because Enron

employees were negotiating on both sides of the LJM/Enron transactions.[776]  Because

Fastow had final authority on all such employees' evaluations and bonuses, the

perception was that the individuals negotiating on Enron's behalf "might shrink" from

their responsibility to vigorously protect Enron's interests.[777]  McMahon also noted a

conflict of interest with respect to Fastow's solicitation of bank investors in LJM who

believed that a continued banking relationship with Enron was dependent upon investing

in LJM.[778]

      With respect to the accounting issues, McMahon was confident that Causey and

Andersen had made sure that everything was done properly.[779]  He did not believe that

the Watkins letter raised any "new" information and could not believe that "the

accounting is not absolutely perfect."[780]

---

[775] Memorandum from Max Hendrick, III, Vinson & Elkins, to Enron Corp. File, regarding Interview with Jeffrey M. McMahon, August 30, 2001 (the "Vinson & Elkins 8/30/01 McMahon Interview"), at 2 [VEL 00012-VEL 00015].

[776] Id.

[777] Id.  At this time, McMahon cited one example of Fastow's direct intervention in the negotiation process.  In a subsequent interview conducted after the close of the Vinson & Elkins investigation, McMahon identified other individuals who would attest to Fastow exerting pressure in the Enron/LJM negotiations.  Memorandum from Max Hendrick, III, to Enron General File (re: Accounting Issues), regarding Telephone Interview with Jeffrey McMahon on Oct. 18, 2001, Oct. 22, 2001 (the "Vinson & Elkins 10/18/01 McMahon Interview"), at 3 [VEL 01408-VEL 01411].  However, McMahon stated that he had no issue with the fairness of the LJM/Enron transactions.  Vinson & Elkins 8/30/01 McMahon Interview, at 2.

[778] Vinson & Elkins 8/30/01 McMahon Interview, at 3-4.  In his subsequent interview, McMahon identified several bank representatives who had described the pressure that Fastow exerted upon them to invest in LJM.  Vinson & Elkins 10/18/01 McMahon Interview, at 2.

[779] Vinson & Elkins 8/30/01 McMahon Interview, at 3.

[780] Id. at 4.  On October 18, 2001, Dilg and Hendrick interviewed McMahon again.  In this second interview, McMahon was more specific in identifying banks that understood that investing in LJM would help their prospects for securing business with Enron.  McMahon identified persons who had complained that Fastow had interceded on behalf of LJM in the Enron negotiations.  He also for the first time raised his concern over the repurchase of Kopper's interest in JEDI.  Vinson & Elkins 10/18/01 McMahon Interview, at 3.  Vinson & Elkins was also concerned, but Vinson & Elkins deferred to Wilmer Cutler to investigate this, because Wilmer Cutler was hired within a few days of this interview.  Dilg 8/14/03 Sworn Statement,

---

*Interview of Causey*

Causey reviewed the history of the Raptors and Andersen's role in approving the accounting.[781] Causey had discussed the anonymous letter with Duncan, who had then reviewed the issues and advised Causey that he felt "comfortable."[782] However, Causey informed Dilg and Hendrick of "an unfortunate error" regarding the accounting in the cross-collateralization of the Raptors that would require an adjustment to Enron's third quarter financial statements and a $1 billion charge against equity.[783] Causey also identified Bob Butts and Rodney Faldyn as Enron accountants who would be knowledgeable about the accounting for the structures, but Dilg and Hendrick did not meet with them.[784]

*Discussions with Astin*

Late in the interview process, Dilg and Hendrick met again with Astin and discussed further several Enron SPE structures.[785] Astin noted his belief that the LJM1/Rhythms Hedging Transaction had lacked "adequate consideration."[786] Astin had also been troubled by the extent of the return to LJM,[787] describing LJM as a "gift" to

---

at 150-54. Dilg indicated that following the release of the earnings in October, 2001, and either the filing of the initial derivative lawsuit or the SEC preliminary investigation, Vinson & Elkins advised Enron that it needed to engage special, independent counsel. *Id.* at 92-93.

[781] Vinson & Elkins Causey Interview.

[782] *Id.* at 2.

[783] *Id.* at 2-3.

[784] *Id.* at 5. In the September 10, 2001 interview with Watkins, Watkins also identified other individuals with knowledge of the accounting problems that she had raised, including Cliff Baxter, Jeff Donaghey, Vince Kaminski, Rudi Zipter and Ding Yuan. Memorandum from Max Hendrick, III, to Enron Corp. File regarding Interview with Sherron Watkins, Sept. 10, 2001 (the "Vinson & Elkins Watkins Interview"), at 3 and 5 [VEL 00032-VEL 00036]. None of these individuals were interviewed by Vinson & Elkins.

[785] Astin 9/10/03 Sworn Statement, at 170; Hendrick 9/13/01 Astin Mtg. Notes.

[786] Astin 9/10/03 Sworn Statement, at 185.

[787] *Id.* at 152-53 and 158. Astin testified that he had expressed these concerns to Glisan and was told that Andersen knew of the return and that Causey had approved the final transaction terms. *Id.* at 152. Astin

Fastow.[788]  Astin had also heard rumors that it was "unlikely" that Fastow would lose any money on LJM transactions with Enron[789] and of a "handshake" arrangement to ensure this[790] which made him "uneasy."[791]  Astin also told Hendrick that it was uncertain whether the Enron Board knew how much money Fastow was making from LJM matters.[792]

Astin also discussed with Dilg and Hendrick issues concerning the FAS 140 Transactions, which related to Watkins' concern regarding funds flow from merchant asset sales.[793]  In particular, he raised a question regarding "whether Enron can rely on [Andrews & Kurth] true sales opinions.  This allows cash flow to be . . . recorded . . . and earnings realized . . . ."[794]  Because Astin understood that the true sale opinions Enron had obtained on FAS 140 Transactions were a "necessary component" of the accounting for those transactions, he also understood that, if the opinions were not correct, it would "undercut the company's financial results."[795]

---

had also previously advised Dilg of the discussions earlier in the year regarding the issue of disclosure of Fastow's compensation from LJM, but this issue was not revisited at this time. *Id.* at 154-55.

[788] Hendrick 9/13/01 Astin Mtg. Notes, at VEL 01306; Astin 9/10/03 Sworn Statement, at 187.

[789] Astin 9/10/03 Sworn Statement, at 178-79.

[790] Hendrick 9/13/01 Astin Mtg. Notes, at VEL 01305; Astin 9/10/03 Sworn Statement, at 182.

[791] Astin 9/10/03 Sworn Statement, at 182; Hendrick 9/13/01 Astin Mtg. Notes, at VEL 01305.

[792] Max Hendrick, III, Vinson & Elkins, Handwritten Notes entitled "Enron/Gen Tel. Conf. w Ron Astin 8-23.2001," at VEL 01288 [VEL 01284-VEL 01289]; Astin 9/10/03 Sworn Statement, at 159.

[793] Astin 9/10/03 Sworn Statement, at 188-201; Hendrick 9/13/01 Astin Mtg. Notes, at VEL 01308.

[794] Hendrick 9/13/01 Astin Mtg. Notes, at VEL 01308; Astin 9/10/03 Sworn Statement, at 188.

[795] Astin 9/10/03 Sworn Statement, at 188-90.  Astin raised this issue with his partners in the context of Vinson & Elkins' "disagreements with other structures." *Id.* at 190. Vinson & Elkins concluded that the issue with the Andrews & Kurth true sale opinions were a matter of professional judgment and did not raise this issue with Enron. *Id.* at 188-89.

Astin indicated that the Related Party Transactions were disclosed in the footnotes to the financial statements, which were drafted primarily by Andersen.[796]  Astin explained that Vinson & Elkins typically received Enron's financial statements two to three days before filing, and that Vinson & Elkins thus had very limited opportunities to comment on them.[797]  Nevertheless, Astin believed that the disclosure on Enron's structures at issue had been "adequate."[798]  Astin acknowledged that Vinson & Elkins' role with respect to Enron's proxy statements was more involved.[799]

*The LJM Approval Process*

Vinson & Elkins did not attempt to review the process by which the Enron Board had approved Fastow's involvement in LJM, or the manner in which the subsequent transactions were approved, although it was noted that Enron Board approval had been obtained.[800]  Vinson & Elkins did review Enron Audit Committee and Finance Committee minutes, and interviewed Causey to confirm that annual LJM presentations had been made to those committees.[801]  Vinson & Elkins did not attempt to verify that all LJM transactions were reported to the Audit Committee and Finance Committee.[802]

---

[796] *See id.* at 183-85.

[797] Hendrick 8/8/03 Sworn Statement, at 280; *see also* Dilg 8/14/03 Sworn Statement, at 27-28.

[798] Hendrick 9/13/01 Astin Mtg. Notes, at VEL 1307.

[799] Dilg 8/14/03 Sworn Statement, at 29-30.

[800] *Id.* at 106-09.

[801] Causey explained the Audit Committee review of the LJM transactions.  Vinson & Elkins Causey Interview, at 3-4.  He identified the document entitled "Related Party Transactions – LJM 2000," which Mintz had provided to Hendrick, as the document used to make the presentation.  Vinson & Elkins Causey Interview, at 3.  This document, which bears handwritten notes from Causey, shows that certain transactions were crossed out and the words "not in book" are added.  As previously discussed, this document reflected the "divestitures," or sale of assets from LJM back to Enron, which Mintz deleted from the February 2001 Audit Committee presentation.  However, Dilg did not question Causey about the meaning of these handwritten notes.  Dilg 8/14/03 Sworn Statement, at 128-129.

[802] Dilg 8/14/03 Sworn Statement, at 131.

Vinson & Elkins noted that although the LJM approval forms included a line for Skilling's signature, Mintz had been unable to get Skilling to sign the forms.[803] In Vinson & Elkins' interview with the Andersen partners, Duncan suggested the need for better documentation and analysis of transactions involving LJM,[804] much like suggestions made by Mintz in his March 8, 2001 memorandum.[805] Vinson & Elkins did not pursue whether any of Mintz's suggestions had been implemented.[806]

Dilg and Hendrick confirmed from the interviews they conducted that no one believed that Enron had suffered from the transactions with LJM or that they were not in Enron's best interest.[807] However, Vinson & Elkins did not determine how people had reached this conclusion. Mintz had observed that "Enron does not consistently seek to negotiate with third parties before it transacts with LJM," and Vinson & Elkins knew that Enron often lacked either a third party offer or an appraisal.[808]

*Accounting Issues*

Prior to meeting with Andersen partners Duncan and Cash, Vinson & Elkins provided them a copy of the Watkins letters.[809] In the interview, Duncan advised Vinson & Elkins that one of their partners had been contacted by the author, who had attempted

---

[803] *Id.* at 109.

[804] Vinson & Elkins Duncan and Cash Interview, at 4.

[805] Mintz LJM Memoranda, at VEL 00524.

[806] Dilg 8/14/03 Sworn Statement, at 110-11.

[807] *Id.* at 112-13.

[808] *Id.* In Vinson & Elkins interview with Duncan, Duncan noted that the Enron/LJM transactions were, by definition, not at arm's length. *Id.* at 117. However, at the Audit Committee and Finance Committee meetings, these transactions were presented by Causey as being negotiated on an "arm's length" basis. *Id.* at 117-20.

[809] Hendrick 8/8/03 Sworn Statement, at 154 and 220; Hendrick 7/8/03 Sworn Statement, at 114. Hendrick and Dilg met twice with Duncan and Cash. *Id.* at 153.

to discuss the issues with him.[810]  They did not discuss that James Hecker ("Hecker"), the partner Watkins had called, had memorialized the call from Watkins in a memorandum. That memorandum was forwarded to Duncan under an email that stated: "Here is my draft memo, for your review for 'smoking guns' that you can't extinguish.  I tried to include only the perspectives obtained from Sherron [Watkins], no other facts later discussed by us."[811]  Had this memorandum been shared with Vinson & Elkins, they would have learned that, in Hecker's view, Watkins' accounting concerns regarding Raptors raised "some good questions."[812]

In the interview with Vinson & Elkins, the Andersen partners explained the accounting analysis conducted in each of the transactions, which was complex and aggressive.[813]  They also discussed the footnote disclosures of the transactions, and acknowledged that a possible criticism was that the related parties and non-cash transactions were "lumped together," making it difficult to discern which portion of the revenues was attributable to any particular transaction.[814]  Dilg and Hendrick confirmed in their interview with Duncan and Cash that Anderson was comfortable with the

---

[810]  Vinson & Elkins Duncan and Cash Interview, at 1.

[811]  Email from James A. Hecker, Andersen, to David B. Duncan, Debra A. Cash, Michael C. Odom, and William E. Swanson, Enron, Aug. 23, 2001 (the "Hecker/Duncan Email") [AA-EX00274376-AA-EX00274379].  The memorandum indicates that after his discussion with Watkins, Hecker contacted Andersen's ABA practice director, Duncan, Cash, and Mike Odom, and that they agreed to consult with Andersen's legal advisor "about what actions to take in response to Sherron's discussion of potential accounting and disclosure issues." Id. at AA-EX00274379.

[812]  Id. at AA-EX00274378.

[813]  Vinson & Elkins Duncan and Cash Interview, at 2 and 3; Lawyers Hearing, at 82; Dilg 8/14/03 Sworn Statement, at 47-50 and 71.  There was also a follow-up interview with Andersen following the completion of other interviews. Max Hendrick, III, Vinson & Elkins, Handwritten Notes entitled "Enron/Mtg w AA-David Duncan/Debra Cash 9-19, 2001" (the "Hendrick Duncan and Cash Meeting Notes") [VEL 01318-VEL 01322].

[814]  Vinson & Elkins Duncan and Cash Interview, at 2.

accounting on Raptors.[815]  They did not discuss the "unfortunate error" that Causey had

identified and the resulting $1 billion charge to equity that would be required in the next

quarter.[816]

Andersen noted two issues raised in the Watkins letter that might have impact on

their accounting: (i) the suggestion that LJM was assured that it would not lose money;

and (ii) the level of fees paid to LJM in connection with the Raptors partnership as

equaling or exceeding the entire investment.[817]  With respect to the first issue, Vinson &

Elkins interviewed Causey, the senior officer responsible for representing Enron in the

transactions with LJM, who denied that any such agreement existed.[818]  On the LJM side,

they interviewed Fastow, who likewise denied any such agreement.[819]  On the second

issue, Vinson & Elkins verified that Andersen was aware of the put option and was

comfortable with it and the fee arrangement.[820]

---

[815] Dilg 8/14/03 Sworn Statement, at 73.

[816] *See* Vinson & Elkins Duncan and Cash Interview; *see also* Hendrick Duncan and Cash Meeting Notes.

[817] Dilg 8/14/03 Sworn Statement, at 99-100.

[818] *Id.* at 100; Hendrick 8/8/03 Sworn Statement, at 210, Max Hendrick, III, Vinson & Elkins, Handwritten Notes entitled "Enron/Tel. Conf. w Rick Causey, 9/24/2001," at 1 [VEL 01329-VEL 01331].  This issue was not discussed at the initial interview of Causey.  *See* Vinson & Elkins Causey Interview.

[819] Hendrick 8/8/03 Sworn Statement, at 187; Vinson & Elkins Fastow Interview, at 1.  In his interview, Fastow affirmatively stated that LJM had lost money on some of the transactions. *Id.* at 5.

[820] Duncan and Cash explained the put option and noted that the investors received amounts equal to their investments, plus profit.  They stated that "technically" the investment and return was proper.  The question was whether there was a valid business purpose for the put, and Andersen relied upon Enron's representation that a good business reason existed.  Duncan stated that although this accounting treatment may have looked facially questionable, it satisfied the technical requirements.  Vinson & Elkins Duncan and Cash Interview, at 4.  In contrast, in Watkins' earlier conversation with Andersen partner, Hecker, Hecker had agreed that if LJM got their money out, it "kills" the accounting.  Watkins Depo., at 71.

**D.     The Vinson & Elkins Report**

Vinson & Elkins concluded their investigation and made a presentation to Lay and Derrick on September 21, 2001.[821]  They explained the scope of the investigation, what they had done, the materials they had reviewed and the people they had interviewed.[822]

Their findings and conclusions were summarized in an outline:

- LJM was fully disclosed and approved in advance

- Special approval procedures were adopted and utilized on transactions involving LJM

- LJM transactions were reviewed by audit committee and finance committee on annual basis

- No apparent economic harm to Enron as a result of the perceived conflicts of interest

- All material facts of Condor and Raptor transactions appear to have been disclosed to and reviewed by Andersen

- Enron and Andersen acknowledge that the accounting treatment is aggressive, but no reason to believe inappropriate from a technical standpoint

- Andersen is comfortable with the footnotes to the financials describing the structures

- Bad Cosmetics -- concern frequently expressed that the transactions would not look good if subjected to a Wall Street Journal expose or a class action lawsuit

---

[821] Dilg 8/14/03 Sworn Statement, at 98.  Dilg and Hendrick followed an outline in their presentation.  *Id.* at 95; Hendrick 8/8/03 Sworn Statement, at 223; Vinson & Elkins Outline of Points to Discuss with Ken Lay and Jim Derrick, Sept. 21, 2001 (the "Vinson & Elkins Investigation Presentation") [AB1128 01170–AB1128 01178].

[822] There was no discussion of the role that Vinson & Elkins had played in the transactions being reviewed. *See* Vinson & Elkins Investigation Presentation; Hendrick 8/8/03 Sworn Statement, at 223.

01-16034 Case 20-1068-JD Doc 613-5 Filed 02/03/23 Entered 02/24/03 Page 544 of 1137 Appendix C
Pg 179 of 247

- Notwithstanding the bad cosmetics, Enron representatives uniformly stated that the Condor and Raptor vehicles were clever, useful vehicles that benefited Enron.[823]

At the presentation, Lay requested that Dilg and Hendrick make a similar presentation to Dr. Robert K. Jaedicke ("Jaedicke"), the chair of the Audit Committee.[824] They did so on October 1, 2001 in a telephone conference, using the same outline.[825] Jaedicke asked Vinson & Elkins to make a shortened presentation to the full Audit Committee, which occurred on October 8, 2001.[826] Lay and Derrick also were present at the Audit Committee presentation.[827] The Audit Committee was not supplied a copy of the letter or informed that its author was a former Andersen accountant.[828] No one told the Audit Committee of the role that Vinson & Elkins had played in the structures under investigation, or that the author of the letter had specifically urged Enron not to retain Vinson & Elkins to conduct the investigation based on a conflict.[829]

On October 15, 2001, Vinson & Elkins submitted its written report to Enron, which followed the outline presented orally to Lay, Derrick and Jaedicke.[830] In its report, Vinson & Elkins highlighted, among other things, Andersen's comment that the

---

[823] Vinson & Elkins Investigation Presentation, at 4-8; Hendrick 8/8/03 Sworn Statement, at 223-24.

[824] Hendrick 7/8/03 Sworn Statement, at 174; Hendrick 8/8/03 Sworn Statement, at 226; Dilg 8/14/03 Sworn Statement, at 96.

[825] Hendrick 8/8/03 Sworn Statement, at 238-39.

[826] Id. at 241-42.

[827] Dilg 8/14/03 Sworn Statement, at 137; Document Titled, "Outline For Meeting With Audit Committee," Vinson & Elkins, undated (the "Vinson & Elkins Outline for Audit Committee Meeting") [VEL 00658]. Dilg stated that they clearly informed the Audit Committee of the limited scope of the investigation, including that they did not second-guess the judgment of Andersen. Dilg 8/14/03 Sworn Statement, at 155.

[828] Dilg 8/14/03 Sworn Statement, at 137-38; Derrick 9/26/03 Sworn Statement, at 572-74.

[829] See Vinson & Elkins Investigation Presentation; see also Vinson & Elkins Outline for Audit Committee Meeting.

[830] Letter from Max Hendrick, Vinson & Elkins, to James V. Derrick, Enron, Oct. 15, 2001, regarding Preliminary Investigation of Allegations of Anonymous Employee, at 9 [AB1128 01179–AB1128 01187].

- 177 -

accounting on the transactions was "creative" and "aggressive."[831] Vinson & Elkins noted

issues raised by the Condor, Whitewing and Raptors vehicles, which were already known

to the company.[832] At that time, however, Enron was already taking action with respect

to the issues regarding the Raptor hedges and Fastow had terminated his role in LJM.[833]

Vinson & Elkins concluded that no further investigation was necessary to determine if

there were *new facts* that needed to be brought to the attention of senior management

with respect to these transactions.[834]

---

[831] *Id.* at 7.

[832] *Id.* at 3-9.

[833] Dilg 8/14/03 Sworn Statement, at 72.

[834] *Id.* at 44. Dilg summarized Vinson & Elkins' findings in his testimony to Congress:

> Vinson & Elkins did not advise Enron that there were no problems. Our written and oral reports pointed out significant issues, including the credit problem in the Raptor vehicles, the aggressiveness of the accounting, conflicts of interest, litigation risks, and the risk of credibility harming media attention.
>
> The report did conclude that no further investigation was necessary because the appropriate senior-level officers of Enron were, at that time, fully aware of the primary concerns expressed by Ms. Watkins, and, in fact, were taking actions to address them.
>
> Mr. Fastow had already resigned from his position with the LJM partnerships, eliminating the conflict of interest issues raised by Ms. Watkins in her letter, and earlier by Mr. McMahon to Mr. Skilling. Prior to the delivery of our final written report, the company had terminated the Raptor entities, which were the primary focus of Ms. Watkins' concerns. The company reported in its earnings release for the third quarter of 2001 a loss of more than $500 million associated with such termination.

Lawyers Hearing, at 29 (testimony of Dilg).

## VII.   ANALYSIS AND CONCLUSIONS

### A.   Vinson & Elkins

*Malpractice Based on Texas Rule 1.12 and Aiding and Abetting*

*FAS 140 Transactions.* In several of the FAS 140 Transactions, attorneys at Vinson & Elkins rendered true issuance opinions even though those attorneys knew that these opinions did not address the critical issues under FAS 140, as Vinson & Elkins understood those issues.  Vinson & Elkins also knew that Andersen was using these opinions to support Enron's accounting for the transactions.  Vinson & Elkins knew that these transactions were significant to Enron's earnings and that these earnings were not like earnings from "gas being pushed through the pipeline."[835]  In several of these transactions, Vinson & Elkins knew that Enron was retaining the risks and rewards of the financial asset supposedly transferred, and that Enron was guaranteeing the repayment of the loans that funded the "purchase" of the asset through total return swaps.  Vinson & Elkins discussed with Enron its disclosures related to these transactions prior to the filing of Enron's 10-Q for the second quarter of 1998.  A fact-finder could conclude that, after that 10-Q was filed, Vinson & Elkins knew that Enron was not adequately disclosing Enron's obligations to pay the debt incurred in connection with these types of transactions.

Vinson & Elkins may argue that it had no duty to question the subject matter of a legal opinion requested by an accountant.  Vinson & Elkins may argue that, although they had no duty to do so, Vinson & Elkins attorneys informed both Andersen and Enron of Vinson & Elkins' belief that Andersen was asking for the wrong opinion, and Vinson & Elkins was assured that, from an accounting standpoint, the opinions requested by Enron

---

[835]  Dilg 9/24/03 Sworn Statement, at 46.

and Andersen were the opinions needed to support the "legal isolation" requirements of FAS 140. These arguments present issues of fact for determination by a fact-finder.

*Nahanni.* In Project Nahanni, a fact-finder could conclude that Vinson & Elkins knew of Enron's accounting goal – to recognize funds flow at year-end – and knew that the Nahanni transaction lacked any material business purpose apart from its impact on Enron's financial statements. Vinson & Elkins may argue that a rational business purpose existed for Nahanni (e.g., the transaction was a financing). However, the "hardwired" nature of the transaction meant that if Project Nahanni was, in fact, a financing, it was being entered into for a very short term and was structured to require repayment within thirty days, all to produce operating cash flow at year-end 1999. Vinson & Elkins may argue that it did not know the $500 million would be repaid shortly after year-end, but the documents clearly require such repayment, so any such contention would present an issue of fact for the fact-finder.

*LJM1.* With respect to the Rhythms hedging transaction, there is evidence that would support a finding that Vinson & Elkins knew that the transaction "was a method for Enron to hedge its downside risk on the RhythmsNet investment"[836] and that the hedge was supported solely by Enron's own stock. Therefore, there is evidence that would support a finding that the Rhythms transaction was a hedge only for financial statement benefits, lacking any genuine economic substance, and intended by certain officers to manipulate Enron's financial statements.

Vinson & Elkins may argue that it did not consider or analyze whether the Rhythms hedge was economic or accounting in nature, and that this issue was outside the

---

[836] Osterberg 10/23/03 Sworn Statement, at 8.

scope of their representation of Enron and their area of expertise. Vinson & Elkins may argue that the Enron Board approved the Rhythms hedge and that the issue of whether the transaction was appropriate for Enron was a matter for the Enron Board to decide. Vinson & Elkins may argue that they appropriately relied upon Andersen's approval of Enron's accounting for the Rhythms hedge. Thus, there are issues of fact for determination by a fact-finder.

*Raptors.* There is evidence that Vinson & Elkins knew that the Raptor hedges were hedges only for the purpose of financial statement manipulation, and that they lacked any economic substance. Vinson & Elkins knew that virtually all of the assets supporting LJM2's obligation to make payments under the Raptor hedges came from Enron. Amounts in excess of LJM2's contribution to Raptors were distributed to LJM2 shortly after LJM2 made its contribution, leaving only Enron stock to support the hedge.

Vinson & Elkins may argue that it did not consider or analyze whether the Raptor hedges were economic or accounting in nature, and that this issue was outside the scope of their representation of Enron and their expertise. Vinson & Elkins may argue that the Enron Board approved the Raptor transactions with knowledge that they "did not transfer economic risk, but hedged P&L volatility,"[837] and that the issue of whether these transactions were appropriate for Enron was a matter for the Enron Board to decide. Vinson & Elkins may also argue that they appropriately relied upon Andersen's approval of the accounting for the Raptor hedges, that Vinson & Elkins raised with senior financial officers at Enron concerns regarding the Distributions to LJM2, and those senior officers assured Vinson & Elkins that its concerns were unfounded and that the accounting

---

[837] Raptor Finance Committee Presentation.

treatment given to the Raptors was appropriate. These arguments present issues of fact for determination by the fact-finder.

*Sundance Industrial.* There is evidence from which a fact-finder could conclude that in the Sundance Industrial transaction, neither Enron nor Salomon Holding had any valid business purpose for the transfer of the Sonoma A Interest to Salomon Holding and that Enron structured the transaction in this way solely to enable Enron to obtain a financial statement benefit, and Vinson & Elkins knew this. Despite this knowledge, Vinson & Elkins provided Enron with a true sale opinion that was used by Enron to support the recognition of a gain of $20 million from this transaction. Vinson & Elkins had determined that the presence of a valid business purpose, not simply a financial statement benefit, was critical for a true sale opinion under these circumstances. However, in the Sundance Industrial true sale opinion, Vinson & Elkins assumed the "fact" of a valid business purpose, which Vinson & Elkins knew to be untrue.

Vinson & Elkins is likely to argue that its true sale opinion assumed that there was a valid business purpose for this transaction, that it was entitled to rely upon this assumption and that the transfer of the Sonoma A Interest to Salomon Holding was a true sale. These are issues of fact for determination by the fact-finder.

*Summary.* With respect to one or more of these transactions, there is evidence from which a fact-finder could conclude that Vinson & Elkins knew that an officer of Enron had committed a violation of a legal obligation to Enron or a violation of law that might reasonably be imputed to Enron, that the violation was likely to result in substantial injury to Enron, that the violation was related to the scope of Vinson & Elkins' representation of Enron, and that Vinson & Elkins did not take appropriate

"remedial action" as required by Texas Rule 1.12. Vinson & Elkins may respond that, in connection with many of these transactions, Vinson & Elkins raised issues to senior Enron officers, senior in-house attorneys and Andersen, and had a reasonable basis to believe that Enron had considered these concerns and had made an appropriate business decision. In particular, Vinson & Elkins may point out that the Enron Board approved some of these transactions. However, in certain circumstances an attorney is required to withdraw from the representation of its client even if the wrongful conduct is approved at the highest level of the organization.

With respect to one or more of these transactions, there is evidence from which a fact-finder could conclude that, in addition to having the knowledge described above, Vinson & Elkins substantially assisted Enron by enabling the transactions through the issuance of opinions or otherwise preparing necessary documents for the transactions to close. Vinson & Elkins may claim that it did not substantially assist Enron, but acted merely as scriveners of the transactions, memorializing their terms. However, the rendering of just one legal opinion can constitute substantial assistance under some circumstances. Vinson & Elkins rendered opinions in several of the FAS 140 Transactions and the Sundance Industrial transaction. In all of these transactions, the complexity of the deals and their documentation may permit a fact-finder to determine that Vinson & Elkins was not a "mere scrivener."

One or more of these issues, including the knowledge of Vinson & Elkins referred to above, are factual issues that could be determined in Vinson & Elkins' favor by a fact-finder.

*Malpractice Based on Negligence*

If a fact-finder did not find that Vinson & Elkins had the requisite knowledge on the matters discussed above, based on the characteristics of and the facts surrounding the Nahanni, Rhythms, Raptors and Sundance Industrial transactions, the Examiner concludes that a fact-finder could determine that an attorney practicing within the standard of care should have recognized that these transactions had no business purpose other than to manipulate Enron's financial statements, and therefore would not have participated in such transactions, either by providing an opinion or otherwise. The Examiner concludes that there is sufficient evidence from which a fact-finder could conclude that Vinson & Elkins committed legal malpractice based on negligence.

With respect to Vinson & Elkins' advice to Enron in connection with the disclosure of the amount of Fastow's interest in the LJM1 and LJM2 transactions in the proxy statement filed in 2001, a fact-finder could conclude that under the circumstances Vinson & Elkins was negligent in failing to ascertain the facts that were material to its legal analysis. Vinson & Elkins knew that Fastow considered the amounts to be so large that, if Skilling knew how much Fastow was making, Skilling would have to shut down LJM2. Knowing that, Vinson & Elkins never received or insisted upon receiving facts that were sufficiently developed to make an informed legal judgment. No one asked Fastow the simple question: How much money have you received in connection with your LJM activities? Vinson & Elkins may argue that it relied upon Enron's in-house attorneys to ascertain whether the amounts of Fastow's interest from the LJM activities were "practicably determinable." These are questions of fact for determination by the fact-finder.

The Condor Transaction and the Tammy I Transaction were aggressively structured tax transactions of a type that would ordinarily be thought to be subject to scrutiny under the Anti-Abuse Rules. Although the conclusions of Vinson & Elkins that the Anti-Abuse Rules do not apply to the Condor and Tammy I Transactions represent expressions of professional judgment, there is sufficient evidence for a fact-finder to determine that a reasonably prudent tax attorney acting within the required standard of care could not have given a "should" level tax opinion on these transactions.[838] Vinson & Elkins may argue that it was entitled to assume that Enron entered into each transaction for the bona fide business purpose of facilitating the Osprey I (Condor) and Zephyrus (Tammy I) financings and consequently that the Anti-Abuse Rules do not apply. There is sufficient evidence, however, from which a fact-finder could conclude that the partnership transactions did not have a bona fide business purpose and that the Anti-Abuse Rules do apply. Thus, there are issues of fact for determination by a fact-finder.

With respect to the Watkins Investigation, a fact-finder could conclude that Vinson & Elkins committed malpractice based on negligence by its failure (i) to advise Enron that Vinson & Elkins had many of the same concerns about the Raptors that Watkins had expressed, which would possibly impair its objectivity and independence in the investigation of her claims and (ii) to fully inform Enron of this conflict so as to enable Enron to make an informed waiver, if it chose to do so. Vinson & Elkins may argue that Derrick knew that Vinson & Elkins had represented Enron in the transactions and that Vinson & Elkins' involvement in the transactions was viewed as an advantage to a speedy and efficient investigation. However, Derrick did not know of the concerns of

---

[838] These two tax opinions dealt with future tax positions of Enron affecting its tax liability for periods after the Petition Date. The Examiner is aware that there has not been, and may never be, an authoritative determination that the tax conclusions expressed in the opinions are erroneous.

Vinson & Elkins about the very transactions and issues that they were investigating. Vinson & Elkins will argue that no conflict existed because Watkins was not challenging the legal work rendered by the law firm, and that, even if a conflict existed and Vinson & Elkins had fully disclosed the basis for any conflict, Enron would have waived the conflict to achieve its objective of a speedy and efficient review of the matter.

*Defenses*

Vinson & Elkins may contend that the evidence is not sufficient to establish one or more essential elements of these claims. Vinson & Elkins may assert that the wrongful acts committed by Enron's officers should be imputed to Enron so as to defeat such claims. There are few Texas cases that address the circumstances under which the wrongful conduct of a corporation's officers would be imputed to the corporation to defeat such claims, but it appears that imputation is a factual matter. If the officers' wrongful conduct is imputed to Enron, then Vinson & Elkins could assert that Enron's wrongful conduct was greater than their wrongful conduct, and therefore claims by Enron should be barred or reduced under comparative fault rules.

With respect to a malpractice claim based on Texas Rule 1.12, Vinson & Elkins may argue that Texas Rule 1.12 is an ethical rule that may form the basis for disciplinary action but does not give rise to a cause of action for damages. However, as described in Annex 1 to this Appendix, a relevant professional rule may be considered by the fact-finder in understanding and applying the standard of care for malpractice when that rule is designed for the protection of persons in the position of the claimant.

**B.** **Andrews & Kurth**

*Malpractice Based on Texas Rule 1.12 and Aiding and Abetting*

Andrews & Kurth provided legal opinions and assisted Enron in the closing and unwinding of several FAS 140 Transactions. Andrews & Kurth knew of Enron's accounting goals in executing the FAS 140 Transactions and also knew that the risks and rewards of owning the assets remained with Enron and that isolation of the assets was not occurring. Andrews & Kurth also assisted Enron in unwinding a number of these transactions. In certain instances, Andrews & Kurth began to work on unwinding a FAS 140 Transaction even before delivering the opinion in that transaction. As the number of prepayments and unwinds grew, Andrews & Kurth also knew that the transactions were being used by certain officers of Enron to manipulate its financial statements.

Andrews & Kurth may argue that it lacked the requisite knowledge of wrongful conduct because the prepayments and unwinds were not prohibited by the transaction documents, and therefore there was nothing inappropriate about Enron purchasing the certificate holder's interest and then causing unwinds to occur early in certain of the FAS 140 Transactions. Loans are routinely repaid prior to their maturity dates or otherwise modified for a variety of legitimate business purposes, but these transactions were supposed to be sales, not loans.

Andrews & Kurth may argue that the opinions were issued "as of" the closing, although delivered later (following the late receipt of officer certificates), and they were correct as of their respective dates. However, the decision to issue an opinion must be made within the context of what the attorneys know about the intent of the parties, and their conduct reveals that intent. Conduct occurring after closing but before delivery of an opinion can reflect on the intent of the parties at closing.

A fact-finder could conclude that Andrews & Kurth knew that an officer of Enron had committed a violation of a legal obligation to Enron or a violation of law that might reasonably be imputed to Enron, that the violation was likely to result in substantial injury to Enron, that the violation was related to the scope of Andrews & Kurth's representation of Enron, and that Andrews & Kurth did not take appropriate "remedial action" as required by Texas Rule 1.12. Instead, Andrews & Kurth continued to assist Enron with the documentation of such transactions and gave legal opinions needed by Enron to obtain the desired accounting result.

There is evidence from which a fact-finder could conclude that, in addition to having the knowledge described above, Andrews & Kurth substantially assisted Enron by enabling the transactions through the issuance of opinions and otherwise preparing necessary documents for the transaction to close. Andrews & Kurth may claim that it did not substantially assist Enron in the FAS 140 Transactions, but acted merely as scriveners of the transactions, memorializing their terms. However, the rendering of just one legal opinion can constitute substantial assistance under some circumstances. Andrews & Kurth rendered twenty-four opinions in the FAS 140 Transactions.

One or more of these issues, including the knowledge of Andrews & Kurth referred to above, are factual issues that could be determined in Andrews & Kurth's favor by a fact-finder.

*Malpractice Based on Negligence*

If a fact-finder did not find that Andrews & Kurth had the requisite knowledge based on the characteristics of the FAS 140 Transactions and the conduct of Enron in connection with the transactions, the Examiner concludes that a fact-finder could determine that an attorney practicing within the standard of care would have recognized

that certain officers at Enron had no real intent to permit Enron to relinquish the control or rewards of the assets or shift any risk of the assets and was employing these transactions to manipulate its financial statements, and therefore would not have participated in such transactions, either by providing an opinion or otherwise.[839]   The Examiner concludes that there is sufficient evidence from which a fact-finder could conclude that Andrews & Kurth committed legal malpractice based on negligence.

*Defenses*

Andrews & Kurth may contend that the evidence is not sufficient to establish one or more essential elements of these claims.  Andrews & Kurth may assert that the wrongful acts committed by Enron's officers should be imputed to Enron so as to defeat such claims.  There are few Texas cases that address the circumstances under which the wrongful conduct of  a corporation's officers would be imputed to the corporation to defeat such claims, but it appears that imputation is a factual matter.  If the officers' wrongful conduct is imputed to Enron, then Andrews & Kurth could assert that Enron's wrongful conduct was greater than their wrongful conduct, and therefore claims by Enron should be barred or reduced under comparative fault rules.

Andrews & Kurth may argue that Texas Rule 1.12 is an ethical rule that may form the basis for disciplinary action but does not give rise to a cause of action for damages.  However, as described in Annex 1 to this Appendix, a relevant professional rule may be considered by a fact-finder in understanding and applying the standard of care for

---

[839] Vinson & Elkins recognized the problem with recycling of assets.  *See* Email from David Keyes, Vinson & Elkins, to Mark Spradling, Vinson & Elkins, *et al.*, Aug. 3, 2000 [WP-EVE 0036423-WP-EVE 0036425]; *see also* Memorandum (Draft) from David Keyes, to Internal File, regarding Factors Affecting True Sale Opinions, Aug. 3, 2000, at 1 [WP-EVE 0036424-WP-EVE 0036425]:

> A substantial risk is presented when assets circle back and forth among the seller and its affiliates . . . .  This can be argued to indicate that there was never any real intention to part with the assets.

malpractice when that rule is designed for the protection of persons in the position of the claimant.

### C.    In-House Attorneys

*Derrick*

*Malpractice Based on Negligence.* Derrick relied upon the general counsel of Enron's business units with regard to transactional matters and did not become substantively involved in any of Enron's business transactions unless a specific issue was brought to his attention. It appears that Derrick rarely provided legal advice to Enron's Board even when significant issues – such as those raised by the Related Party Transactions – came to his attention. When Derrick did advise the Enron Board on the conflict of interest issue presented by the LJM1 Rhythms transaction, Derrick failed to educate himself adequately on the underlying facts or the applicable law to enable him to carry out his responsibilities as legal advisor to the Enron Board. Furthermore, despite the size, frequency and number of the Related Party Transactions in which Enron employees, including Fastow, were involved, Derrick failed either (i) to inform himself and then the Enron Board with respect to those matters or (ii) to confirm that those to whom he had delegated the responsibility were taking adequate steps to do so. He also failed to cause the issues created by the conflicts of interest present in the Related Party Transactions to be disclosed to the Enron Board.

The Examiner concludes there is sufficient evidence from which a fact-finder could determine that Derrick committed malpractice based on negligence in connection with the performance of his duties as General Counsel of Enron. Derrick may argue that the scope and breadth of his responsibilities did not enable him to oversee all of these transactions and events. He may argue that he discharged his responsibilities by

delegating certain matters to others. Derrick may argue that to the extent the Enron Board needed his advice, the Board could have requested it. These present issues of fact for determination by a fact-finder.

Derrick also failed to meet the standard of care by not being sufficiently informed as to the nature and extent of Watkins' allegations so as to be in a position to effectively advise Enron. Derrick testified that he read only the first of Watkins' letters and simply forwarded the supplemental letters delivered to Lay to Vinson & Elkins without review. In doing so, he failed to apprehend the full import of her message. If, in fact, Derrick only read the first letter delivered to Lay, he would have failed to notice that the author specifically urged Enron *not* to retain Vinson & Elkins due to a conflict of interest. Derrick failed to determine the extent of Vinson & Elkins' roles in the transactions criticized by Watkins so as to determine whether such a conflict existed. There is sufficient evidence from which a fact-finder could determine that Derrick committed malpractice based on negligence with respect to this matter. Derrick may argue that he relied upon Vinson & Elkins to advise him if there was a conflict and that he fully discharged his responsibilities by delegating the matter to a law firm that had knowledge of Enron and the transactions at issue.

*Rogers*

*Malpractice Based on Negligence.* A fact-finder could conclude that Rogers failed to discharge his responsibilities, as Enron's primary securities attorney, to advise Enron with respect to the disclosure issues surrounding the SPE transactions. Although Rogers testified that he took some steps to understand several of Enron's most frequently used SPE transactions — the Prepay Transactions and the FAS 140 Transactions — he

found them "complex."[840]  While it is true that many of these transactions were exceedingly complicated in their structure, the reason that certain Enron officers used them — to manipulate Enron's financial statements — was not.  If, in fact, Rogers was unable to understand these transactions, he could not properly advise Enron regarding the necessary disclosure.  A fact-finder could conclude that Rogers committed malpractice based on negligence with respect to Enron's disclosures.

There is also evidence, at least with respect to some of the FAS 140 Transactions and other SPE transactions, that Vinson & Elkins told Rogers that Enron needed to make additional disclosures in the MD&A section of its public filings.  Rogers failed to serve the role that was so necessary at Enron – to advocate, if not insist, on narrative disclosure adequately explaining the economics of the SPE transactions and the known risks, uncertainties and obligations that surrounded them.

*Malpractice Based on Texas Rule 1.12 and Breach of Fiduciary Duty.* With respect to the disclosure of the amount of Fastow's interest in the LJM transactions in the proxy statement filed in 2001, a fact-finder could conclude that Rogers was negligent and failed in his duty to ascertain the facts and then apply the law to those facts.  At the time of the proxy statement filed in 2001, Rogers knew that Fastow considered the amounts to be so large that Fastow feared Skilling would shut down LJM2 if Skilling knew.  Rather than asking Fastow how much money he was receiving from the LJM transactions, Rogers, Mintz and Vinson & Elkins focused on why it was not practicable to quantify that interest.

---

[840] Rogers Sworn Statement, at 191.

Rogers may argue that his responsibility with respect to disclosures was more administrative than substantive, and that he relied on Enron employees with greater knowledge about the SPE transactions than his own to review disclosures initially drafted by the Financial Reporting Group for accuracy and completeness. Rogers may argue that Enron Global Finance employees bore responsibility to inform the Enron Board about the Raptors restructuring. Rogers may argue that he relied upon Mintz and Vinson & Elkins with respect to the disclosure obligations on the Related Party Transactions, including the disclosure of Fastow's interest. These present issues of fact for determination by a fact-finder.

There is evidence from which a fact-finder could conclude that, in addition to having the knowledge described above, Rogers substantially assisted Enron's officers in intentionally withholding from the Enron Board any information regarding the restructuring of the Raptors in early 2001 and that he failed to take remedial action as required by Texas Rule 1.12.

*Mordaunt*

*Malpractice Based on Texas Rule 1.12 and Breach of Fiduciary Duty.* There is evidence from which a fact-finder could conclude that Mordaunt knew of the conflict of interest created by Kopper's role as general partner of Chewco, but failed to cause the Enron Code of Conduct to be applied properly to this conflict of interest and failed to consider whether the Board needed to be advised of Kopper's role in Chewco. Mordaunt also knew that the Board was misinformed that Chewco was not affiliated with Enron. The Examiner concludes that there is sufficient evidence for a fact-finder to determine that Mordaunt knew that an officer of Enron had committed a violation of a legal obligation to Enron or a violation of law that might reasonably be imputed to Enron and

- 193 -

the violation was likely to result in substantial injury to Enron. This violation was related to the scope of Mordaunt's representation of Enron. There is no indication that Mordaunt took any steps that might be considered "remedial action" pursuant to Texas Rule 1.12. Instead, Mordaunt assisted Enron in connection with the documentation and closing of the Chewco transaction. Mordaunt may argue that it was not her responsibility to advise the Board on these matters. These are issues of fact to be determined by the fact-finder.

*Malpractice Based on Texas Rule 1.06(b) and 1.08 and Breach of Fiduciary Duty.* With respect to Southampton, there is evidence from which a fact-finder could conclude that Mordaunt engaged in a transaction with an Enron related party that placed her personal financial interests in conflict with her duties to her client, Enron. There is evidence that, as a result of engaging in a transaction with an Enron related party, Mordaunt breached her fiduciary duty of loyalty to Enron. There is also evidence that she committed malpractice based on a violation of Texas Rule 1.06(b) or Texas Rule 1.08. Texas Rule 1.06(b) provides that an attorney shall not represent a party if the representation of that party becomes adversely limited by the attorney's own interest. Texas Rule 1.08 forbids an attorney from entering into a business transaction with a client unless, in general, the terms of the arrangement are fair to the client, the terms are understood by the client, the client has an opportunity to seek advice of counsel and the client gives written consent as to the attorney's participation. Mordaunt may argue her transactions were not with her client, Enron, and that these rules do not apply. This presents issues for determination by a fact-finder.

*Sefton*

*Malpractice Based on Texas Rule 1.12 and Breach of Fiduciary Duty.* There is evidence from which a fact-finder could conclude that Sefton knew that the Nahanni

- 194 -

transaction lacked any business purpose apart from its impact on Enron's financial statements. Sefton may argue that he did not understand enough about the substantive terms or purpose of the transaction to comprehend its lack of any valid business purpose. Such an argument may, however, provide support for a claim that he committed malpractice in light of his responsibility to oversee the legal work on Project Nahanni on Enron's behalf. Alternatively, Sefton may argue that the transaction was a financing and, thus, that a rational business purpose existed for Nahanni. The "hardwired" nature of the transaction, however, meant that if Project Nahanni was, in fact, a financing, it was being entered into for a very short term and was structured to result in its repayment within thirty days which straddled year-end 1999, all to produce operating cash flow at year-end 1999. Sefton may argue that he did not know the $500 million would be repaid shortly after year-end, although the documents clearly require such repayment, so that any contrary contention presents an issue of fact for the fact-finder.

There is also evidence from which a fact-finder could conclude that Sefton was aware of various conflicts of interest issues relevant to LJM matters about which he neither advised Derrick, any Enron officer senior to Fastow or the Enron Board, nor took action to cause any other legal officer of Enron to do so. There is evidence that Sefton received advice from Vinson & Elkins regarding the conflicts of interest created by the participation of Enron employees – including Fastow, Glisan and Kopper – in LJM matters and various ways to address those conflicts issues, but did not relay that advice to Derrick, as Enron's most senior legal officer, or any member of the Enron Board. Sefton may argue that Rogers was aware of these issues. He also may argue that he informed

Derrick of certain information.  These facts present issues for determination by the fact-finder.

With respect to the Raptors, there is evidence that Sefton knew that Raptors I and II lacked any economic substance or valid business purpose, and were hedges only for financial statement purposes intended to manipulate Enron's financial statements.  There is evidence that Sefton was involved in the day-to-day analysis and discussion concerning establishment and documentation of Raptors I and II, and thus that Sefton knew that virtually all of the assets supporting LJM2's obligation to make payments under the Raptor hedges came from Enron.  LJM2's contribution to Raptors was distributed to it shortly thereafter, leaving only Enron stock to support the hedge.  There is no indication that Sefton took steps that might be considered "remedial action" pursuant to Texas Rule 1.12.  Instead, Sefton assisted Enron in connection with the documentation of Raptors I and II.

Sefton may argue that he was not told and did not consider or analyze whether the Raptors hedges were economic or accounting in nature, and that this issue was outside the scope of his legal expertise.  Sefton may argue that the Enron Board approved the Raptor transactions with knowledge that they "did not transfer economic risk, but hedged P&L volatility,"[841] and that the issue of whether these transactions were appropriate for Enron was a matter that fell within the Board's business judgment.  Sefton may argue that he appropriately relied upon Andersen's approval of the accounting for the Raptor Hedges.  These facts raise issues for determination by the fact-finder.

---

[841] *Id.*

- 196 -

*Malpractice Based on Negligence.* If a fact-finder did not find that Sefton had the requisite knowledge on the matters discussed above based on the facts surrounding those matters, the Examiner concludes that a fact-finder could determine that an attorney practicing within the standard of care should have recognized that the Nahanni transaction and the LJM2/Raptors Hedging Transactions lacked a valid business purpose and were intended to facilitate manipulation of Enron's financial statements. Likewise, such an attorney would have recognized the importance of advising the Enron Board regarding the conflict of interest and corporate governance issues created by the approval of LJM2. Based on such knowledge, an attorney practicing within the standard of care would not have participated in such matters or would have taken action to alert Derrick or other appropriate senior Enron officers or the Enron Board to the information Sefton possessed.

*Mintz*

*Malpractice Based on Texas Rule 1.12 and Breach of Fiduciary Duty.* There is evidence from which a fact-finder could conclude that Mintz knew Fastow was violating a legal obligation to Enron with respect to LJM matters – in particular, Fastow's fiduciary duty of loyalty. Fastow told Mintz that if Skilling knew how much Fastow was making from LJM2, Skilling would have to shut down LJM2. Mintz realized that the Enron Board should have been informed of this fact. After his efforts to encourage Causey to tell the Board came to nothing, however, Mintz dropped the matter. Even when presented with an opportunity to alert Derrick to this issue during a break between the Audit and Finance Committee meetings on February 12, 2001, Mintz chose not to do so. Although Mintz conducted three meetings between March 2001 and late July 2001 attended by Derrick and other senior in-house Enron attorneys, he never raised this point.

Mintz may argue that he discussed his concern on the subject with Causey, urging
that Causey bring the issue to the attention of the Enron Board. Mintz may argue that,
because the Enron Board had previously approved the transaction of business with LJM1
and LJM2, the Board should have understood its need to ask Fastow about his financial
interest in LJM matters. Mintz may argue that he forwarded to Walls (who then
forwarded to Derrick) a copy of the January 16, 2001 email message containing a
transcription of Fastow's admission of concern on this subject. These facts present issues
for determination by a fact-finder.

There is evidence from which a fact-finder could conclude that Mintz knew that
Causey was violating his fiduciary duties to Enron by omitting information from his
presentation to the Audit Committee and the Finance Committee on February 12, 2001,
regarding Enron's repurchase from LJM2 during 2000 of certain assets LJM had
originally purchased from Enron during 1999. Although present during these Board
Committee presentations by Causey, Mintz said nothing about the omission of these
"divestitures."

Mintz may argue that he did not believe that this information was required to be
furnished to the Enron Board Committees. This defense raises an issue of fact for
determination by a fact-finder.

With respect to whether the amount of Fastow's interest in the LJM transactions
had to be disclosed in the proxy statement filed in 2001, a fact-finder could conclude that
Mintz failed in his duty to ascertain the facts and then apply the law to those facts –
whether with the assistance of Vinson & Elkins and Rogers or on his own. When Fastow
told Mintz of Fastow's concern that Skilling would shut down LJM2 if Skilling learned

- 198 -

how much money Fastow had received, there is evidence that Mintz, Rogers and Vinson & Elkins focused on arguments that it was not "practicable" to quantify Fastow's interest in LJM rather than simply asking Fastow how much he had received from LJM1 and LJM2. There is also evidence that Mintz was given responsibility – as among Astin, Rogers and Mintz – to determine whether Fastow had received any distributions from LJM matters during 2000 and, if so, in what amount.

Mintz may argue that he relied on Vinson & Elkins and Rogers, both of whom had expertise on SEC disclosure matters that he lacked. Mintz may disagree that he had any responsibility to ascertain whether Fastow had received any LJM distribution and, if so, in what amount. These are issues of fact for determination by a fact-finder.

There is also evidence from which a fact-finder could conclude that Mintz knew that other Enron employees – including Glisan, Kopper and other employees – were representing Chewco, LJM1 or LJM2 in various transactions with Enron, and were thereby also breaching their fiduciary duties to Enron. Kopper's demand for the tax indemnity payment in favor of Chewco is one example of this. A fact-finder could conclude that Mintz did not tell Derrick, any other senior Enron officer or any Board member of these conflicts and breaches of duty. Mintz may argue that he took action through the various memoranda he sent on the subject of LJM "Transaction Substantiation" and other LJM-related matters and his efforts to meet with Skilling. The evidence regarding those efforts will raise an issue of fact for determination by the fact-finder.

There is also evidence from which a fact-finder could conclude that Mintz knew that Chewco was not entitled to receive the payment of $2.6 million demanded under the

Chewco tax indemnity agreement, and that Mintz made no effort to inform Derrick or any Enron official senior to Skilling of the lack of merit in Kopper's demand, thereby failing to take steps sufficient to constitute "remedial action" pursuant to Texas Rule 1.12. Mintz may argue that he attempted to raise this matter to Skilling, and that being told by his boss, Fastow, that Skilling had approved the payment was sufficient authorization to proceed with the payment.

With respect to one or more of these matters, there is evidence from which a fact-finder could conclude that Mintz knew that an officer of Enron had committed a violation of a legal obligation to Enron or a violation of law that might reasonably be imputed to Enron, that the violation was likely to result in substantial injury to Enron, that the violation was related to the scope of Mintz's representation of Enron and that Mintz did not take appropriate "remedial action" as required by Texas Rule 1.12. Mintz may respond that, in connection with many of these matters, he raised issues to appropriate senior Enron officials and had a reasonable basis to believe that Enron had considered these concerns and had made appropriate business decisions.

With respect to one or more of these matters, there is evidence from which a fact-finder could conclude that Mintz breached fiduciary duties he owed to Enron in his capacity as an Enron officer. One or more of these issues, including the knowledge of Mintz referred to above, are factual issues that could be determined in Mintz's favor by a fact-finder.

*Malpractice Based on Negligence.* If a fact-finder did not find that Mintz had the requisite knowledge of the matters discussed above, based on the facts surrounding those matters, a fact-finder could determine that an attorney practicing within the standard of

care should have recognized that Fastow, Causey and other Enron employees who represented the interests of LJM1 and LJM2 in transactions with Enron were breaching their fiduciary duties to Enron in relation to those transactions. Based on such knowledge, an attorney practicing within the standard of care would not have participated in such matters – by, for example, assisting in the withholding of information regarding Enron's repurchase of assets from LJM – or would have taken action to alert Derrick or other appropriate senior Enron officers or the Enron Board to the information Mintz possessed.

With respect to Mintz's participation in determining that Enron's Related Party Transaction disclosure contained in the proxy statement filed in 2001 would omit information regarding the amount of Fastow's interest in LJM1 and LJM2, a fact-finder could conclude that Mintz was negligent in failing to ascertain the facts upon which the legal analysis was based. There is evidence that it was Mintz who was given the responsibility to ask Fastow, "How much money are you receiving in connection with your LJM activities?" Given the information Mintz possessed regarding Fastow's reluctance to disclose these amounts, a fact-finder could conclude that Mintz acted negligently. Mintz may argue that he forwarded this information to Rogers and Walls, and that the evidence indicates that Derrick, too, received the message from Fastow reflecting his concerns that Skilling not learn of the amount of Fastow's interest. These facts present issues to be determined by the fact-finder.

*Defenses*

Each in-house attorney may contend that the evidence is not sufficient to establish one or more essential elements of these claims. One or more of these issues, including the knowledge of an in-house attorney referred to above, are factual issues that could be

- 201 -

determined in favor of such in-house attorney by a fact-finder. Each in-house attorney may assert that the wrongful acts committed by Enron's officers should be imputed to Enron. If the officers' wrongful conduct is imputed to Enron, then each in-house attorney could assert that Enron's wrongful conduct was greater than their wrongful conduct, and therefore claims by Enron should be barred or reduced under comparative fault rules.

With respect to a malpractice claim based on Texas Rule 1.12, these attorneys may argue that Texas Rule 1.12 is an ethical rule that may form the basis for disciplinary action but does not give rise to a cause of action for damages. However, as described in Annex 1 to this Appendix, a relevant professional rule may be considered by a trier of fact in understanding and applying the standard of care for malpractice when that rule is designed for the protection of persons in the position of the claimant.

ANNEX 1 (Legal Standards Applicable to Attorneys)

to

APPENDIX C

(Role of Enron's Attorneys)

to

FINAL REPORT OF NEAL BATSON,
COURT-APPOINTED EXAMINER

# TABLE OF CONTENTS

I.  INTRODUCTION .................................................................................... 1

II. CHOICE OF LAW ................................................................................ 3

III. LAW APPLICABLE TO CONDUCT OF ATTORNEYS.......................... 4
    A.  Introduction................................................................................. 4
    B.  Legal Malpractice ....................................................................... 5
    C.  Texas Rule 1.12 .......................................................................... 10
    D.  *FDIC v. Nathan*......................................................................... 14
    E.  Aiding and Abetting a Breach of Fiduciary Duty...................... 17
    F.  Opinion Letters .......................................................................... 25
    G.  Business Transactions with a Client .......................................... 31
    H.  Conflicts of Interest.................................................................... 32
    I.  Comparative Fault Defenses ...................................................... 34

IV. CONCLUSION....................................................................................... 41

## I.    INTRODUCTION

In the Third Interim Report, the Examiner stated that there is sufficient evidence

from which a fact-finder could conclude that: (i) senior officers of Enron breached their

fiduciary duties under applicable law by causing the Debtors to enter into SPE

transactions that were designed to manipulate the Debtors' financial statements and that

resulted in the dissemination of financial information known by those officers to be

materially misleading; and (ii) these wrongful acts caused direct and foreseeable harm to

Enron itself, and resulting harm to innocent parties that dealt with Enron, including

creditors in the Bankruptcy Case.

Some of Enron's attorneys provided services to Enron in connection with these

SPE transactions and in the disclosure of Enron's financial information.  This Annex 1 to

Appendix C (Role of Enron's Attorneys) discusses the law applicable to Enron's

potential claims against its attorneys related to these services.  Enron's outside attorneys

who were involved in Enron's SPE transactions may be liable to Enron because they

either: (i) committed malpractice in connection with the rendering of legal services that

fell within the scope of their legal representation of Enron; or (ii) aided and abetted the

Enron officers' breaches of fiduciary duty.[1]    However, because Enron's officers

participated in the wrongful conduct, these attorneys will likely assert that such conduct

should be imputed to Enron, and either that the defense of proportionate responsibility

---

[1]  As discussed in this Annex, there appears to be no reported decision in Texas holding whether a cause of action by a corporate client against its attorney based upon aiding and abetting a breach of fiduciary duty is a separate cause of action or is subsumed within a malpractice cause of action.  The Examiner expresses no views on this issue.  For purposes of this Report, the Examiner's analysis of the attorneys' conduct includes consideration of the elements of an aiding and abetting cause of action, regardless of which label may ultimately attach to any potential cause of action.

would apply to bar any such claims brought by Enron, or that the doctrine of *in pari delicto* is a defense to any such claim by Enron.

Because attorneys gave opinion letters with respect to one or more aspects of the SPE transactions, the elements of the standard of care applicable to those opinion letters, and the circumstances under which the attorneys may be liable for giving the opinion letters, are discussed.  The Rules of Professional Conduct with respect to conflicts are examined as they may be relevant to the conduct of attorneys in the investigation of the Watkins letter.  Finally, because one of Enron's in-house attorneys made an investment in an SPE that was involved in transactions with Enron, the law applicable to such an investment by an attorney is considered.

## II.   CHOICE OF LAW

Enron's in-house attorneys who played a role in the transactions reported on by the Examiner resided in Texas, practiced law in Texas, and were licensed to practice law in Texas.  With one exception, all of Enron's outside counsel whose conduct is discussed in Appendix C (Role of Enron's Attorneys) also resided in Texas, practiced law in Texas, and were licensed to practice law in Texas.  Claims brought by Enron against an attorney practicing in Texas likely would be governed by Texas law.[2]

---

[2] *See, e.g., Two Thirty Nine Joint Venture v. Joe,* 60 S.W.3d 896, 905 (Tex. App. 2001).  In the case of an outside law firm subject to the jurisdiction of a court sitting in New York and sued in such court, the choice of law question could be complicated with respect to a claim for aiding and abetting a breach of fiduciary duty, as there is a split of authority among the New York courts as to whether such claims are governed by the "internal affairs doctrine" (which would result in Oregon law governing) or the "significant contacts" rule (which would result in Texas law governing).  However, courts in both Texas and Oregon have recognized a claim for aiding and abetting a breach of fiduciary duty and the elements of such claims are essentially the same. *See* Third Interim Report, Appendix B (Legal Standards), Part III.

## III. LAW APPLICABLE TO CONDUCT OF ATTORNEYS

### A. <u>Introduction</u>

Attorneys who render services to a company may be liable to that company if they either (i) committed malpractice in rendering legal services to the company, or (ii) aided and abetted breaches of fiduciary duty by company officers.

One commentator has noted that the "phrase 'legal malpractice' is commonly used to describe a kind of tortious conduct, but there is little consensus on, or even discussion of, its meaning."[3] Regardless of the label, it is clear that an attorney (whether "in-house" counsel or "outside" counsel)[4] may become liable to his or her client as a result of a failure to exercise the competence and diligence normally exercised by reasonably prudent attorneys in similar circumstances. While the most common malpractice claim involves negligence in the performance of legal services, reckless or knowing misconduct also may form the basis for a claim of legal malpractice.[5] Texas

---

[3] Ronald E. Mallen & Jeffrey M. Smith, *Legal Malpractice* § 1.1, at 2 (5th ed. 2000).

[4] "In-house" counsel refers to an attorney who is an employee of the company. "Outside" counsel refers to an attorney in private practice who is retained (or whose firm is retained) by the company. In-house counsel and outside counsel are subject to the same professional standards. *FDIC v. Mmahat*, 907 F.2d 546 (5th Cir. 1990). However, in the case of an in-house attorney who is also an officer of the company, that attorney may also be liable to the company as a result of any breach of the fiduciary duties owed by an officer to the corporation that employs him or her. *See* Third Interim Report, Appendix B (Legal Standards).

[5] Statistically, the most common form of legal malpractice is negligence in the rendering of legal services. Ronald E. Mallen & Jeffrey M. Smith, *Legal Malpractice, at* § 8.13 (5th ed. 2000).

An attorney may also be liable to his client for a breach of specific fiduciary duties owed by an attorney to the client. In Texas, an attorney will have breached a fiduciary duty if the attorney: (1) failed to disclose conflicts of interest; (2) failed to deliver funds belonging to the client; (3) placed personal interests over the client's interests; (4) improperly used client confidences; (5) took advantage of the client's trust; (6) engaged in self-dealing; or (7) made misrepresentations. *See, e.g., Kimleco Petroleum, Inc. v. Morrison & Shelton*, 91 S.W.3d 921, 923 (Tex. App. 2002) (distinguishing such claims from "legal malpractice" claims); *Deutsch v. Hoover, Bax & Slovacek, L.L.P.*, 97 S.W.3d 179, 189 (Tex. App. 2002) (referring to all claims against an attorney as "legal malpractice" but distinguishing between "negligence" claims and "breach of fiduciary duty" claims); *Jackson Law Office, P.C. v. Chappell*, 37 S.W.3d 15, 22-23 (Tex. App.

recognizes a claim for aiding and abetting a breach of fiduciary duty by another, and

several courts in jurisdictions other than Texas have ruled that a company's outside

attorneys may be liable to the company if the attorney aided and abetted an officer's

breach of fiduciary duty to the corporation. Accordingly, it is appropriate to consider

whether an attorney's actions constitute aiding and abetting an officer's breach of

fiduciary duty to the company.

### B.    Legal Malpractice

*Elements of a Legal Malpractice Claim*

To prevail on a claim for legal malpractice, a client must prove: (1) the attorney

owed a duty to the client; (2) the attorney breached this duty; (3) the breach of duty

caused the client's injury; and (4) damages resulted.[6]  The attorney-client relationship

establishes the requisite duty.    Thus, both attorneys employed by a company and

attorneys in private practice who were retained by the company owe a duty to the

company.  The analysis employed in establishing whether a breach of the duty occurred

is explored further below.

---

2000); *Avila v. Havana Painting Co.*, 761 S.W.2d 398, 399-400 (Tex. App. 1988); *Two Thirty Nine Joint Venture*, 60 S.W.3d at 909; *Goffney v. Rabson*, 56 S.W.3d 186 (Tex. App. 2001).  *See also* Restatement (Third) of The Law Governing Lawyers § 49 ("a lawyer is civilly liable to a client if the lawyer breaches a fiduciary duty to the client set forth in § 16(3) and if that failure is a legal cause of injury within the meaning of § 53, unless the lawyer has a defense within the meaning of § 54.") and Restatement (Third) of the Law Governing Lawyers § 16 ("To the extent consistent with the lawyer's other legal duties and subject to the other provisions of this Restatement, a lawyer must, in matters within the scope of the representation: (1) proceed in a manner reasonably calculated to advance a client's lawful objectives, as defined by the client after consultation; (2) act with reasonable competence and diligence; (3) comply with obligations concerning the client's confidences and property, avoid impermissible conflicting interests, deal honestly with the client, and not employ advantages arising from the client-lawyer relationship in a manner adverse to the client; and (4) fulfill valid contractual obligations to the client.").

[6] *Two Thirty Nine Joint Venture*, 60 S.W.3d at 904.  A failure of the plaintiff to establish each element will result in dismissal of the claim.

- 5 -

Assuming that the attorney is found to have breached his duty to his client, the breach must be the proximate cause of an injury to the client. In a malpractice claim, a party must prove both (i) that the attorney's act or omission was a substantial factor in bringing about the injury that would not otherwise have occurred and (ii) that the injury was foreseeable. Foreseeability means that the attorney should have anticipated injury to others, but does not require that the attorney anticipate the precise consequences of his actions.[7]

The measure of damages in a malpractice case relating to the conduct of a lawsuit generally is the amount of money that would have been generated "but for" the malpractice.[8] A different approach usually is required outside the litigation context. As one commentator explained,

> [w]hen the legal malpractice takes place in a transactional setting – that is, in the advising and planning of business dealings – the courts take a much less structured approach to proof of damages. No longer wedded to a narrow interpretation of what can constitute adequate proof of the fact and amount of injury, the courts tend to treat such actions like ordinary business cases and allow considerably more flexibility to plaintiffs in proving their damages.[9]

Thus, in non-litigation contexts, courts have borrowed from the law of contracts, restoring the plaintiff to the position he would have been in but for the malpractice.[10]

---

[7] *Id.* at 909.

[8] *Id.* at 910.

[9] John H. Bauman, *Damages for Legal Malpractice: An Appraisal of the Crumbling Dike and the Threatening Flood*, 61 Temp. L. Rev. 1127, 1150 (1988).

[10] *Two Thirty Nine Joint Venture*, 60 S.W.3d at 910. *See also Streber v. Hunter*, 221 F.3d 701, 726 (5th Cir. 2000) (the measure of damages should be the amount of money that the plaintiff would have made but for her attorney's negligence); *First Nat'l Bank of Durant v. Trans Terra Corp. Int'l*, 142 F.3d 802 (5th Cir. 1999) (the measure of damages for negligent misrepresentation claim, based on attorney's preparation of inaccurate title opinion for lender's use, was amount paid out by lender, less recoveries on loan); and *Vaughn v. Akin, Gump, Hauer & Feld, L.L.P. (In re Legal Econometrics, Inc.)*, No. 3-95-CV-0457-R, 1997

When the attorney's conduct constitutes an intentional tort, and is sufficiently aggravated, exemplary damages "reasonably proportioned" to the amount awarded as actual damages may be awarded.[11] Proof of actual damages is not required to obtain forfeiture of attorneys' fees[12] in those cases where the courts have allowed forfeiture of fees.[13] Recovery of fees may be appropriate where the services were of no value.[14] Similarly, a plaintiff can force the disgorgement of profits realized by an attorney through a self-dealing transaction without proving actual damages.[15]

*Establishing the Breach of the Professional Duty*

To establish an attorney's breach of his professional duty, the client must show that the attorney failed to act as an attorney of reasonable prudence would have acted in a

---

WL 560617 (N.D. Tex. Aug. 29, 1997) (loss of plaintiff's earning capacity was proper measure of damages in legal malpractice case).

[11] *Rhodes v. Batilla*, 848 S.W.2d 833, 843 (Tex. App. 1993) (The five factors for a court to consider when considering exemplary damages are: "(1) the nature of the wrong, (2) the character of the conduct involved, (3) the degree of culpability of the wrong doer, (4) the situation and sensibilities of the parties concerned, and (5) the extent to which such conduct offends a public sense of justice and propriety."). In addition, Texas courts may award exemplary damages for breach of fiduciary duty where the breach is committed with malice and where the plaintiff suffers actual damages. *Avila v. Havana Painting Co., Inc.*, 761 S.W.2d 398, 400 (Tex. App. 1988).

[12] *Burrow v. Arce*, 997 S.W.2d 229 (Tex. 1999). However, the fees incurred by the plaintiff in prosecuting the legal malpractice claim are normally not recoverable. *See Streber*, 221 F.3d at 732 n.44.

[13] A Texas court will impose fee forfeiture in cases where the attorney committed a clear and serious violation of a fiduciary duty. *Burrow*, 997 S.W.2d at 237. For example, the court in *Burrow* affirmed that fee forfeiture could be available to clients who alleged that their attorneys breached their fiduciary duties by (i) failing to fully investigate and assess individual claims, (ii) failing to communicate offers of settlement and demands made, (iii) entering into an aggregate settlement without plaintiffs' approval and authority, and (iv) intimidating and coercing their clients into accepting the settlement.

[14] *Judwin Props., Inc. v. Griggs & Harrison*, 911 S.W.2d 498, 507 (Tex. App. 1995).

[15] *Yaquinto v. Segerstrom (In re Segerstrom)*, 247 F.3d 218, 225 n.5 (5th Cir. 2001) (differentiating among claims for damages and claims for fee forfeiture and explaining that causation and damages are not required for fee forfeiture); *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 160 S.W.2d 509, 513 (Tex. 1942) (holding that agent who earned a secret commission received from a conflicting interest transaction had to forfeit the commission even though the principal was unharmed).

- 7 -

similar situation.[16] This standard of care is an objective one. There is "no subjective good faith excuse for attorney negligence."[17] An attorney's good faith belief that his or her conduct was in the client's best interest is not a defense to a claim for legal malpractice.[18] Whether an attorney's conduct is reasonable is evaluated within the context of the information available to the attorney at the time of the alleged professional misconduct.[19]

At times, there may be more than one possible decision or course of conduct available to an attorney of reasonable prudence. "If an attorney makes a decision which a reasonably prudent attorney *could* make in the same or similar circumstance,[20] it is not an act of negligence even if the result is undesirable."[21] Because attorneys are not penalized for decisions that a reasonably prudent attorney *could* have made, the objective standard allows some latitude in making strategic and tactical decisions without the fear that an imperfect outcome will result in a finding of liability.[22] An attorney is not a guarantor of results, and an attorney who makes a reasonable decision will not be held liable merely

---

[16] *Cosgrove v. Grimes*, 774 S.W.2d 662, 664 (Tex. 1989).

[17] *Id.*

[18] *Id.* at 664-65; *see also Bobbitt v. Weeks*, 774 S.W.2d 638, 639 (Tex. 1989); *Byrd v. Woodruff*, 891 S.W.2d 689, 700 (Tex. App. 1994).

[19] *Cosgrove*, 774 S.W.2d at 664; *see also Ramsey v. Reagan, Burrus, Dierksen, Lamon & Bluntzer, P.L.L.C.*, No. 03-01-00582-CV, 2003 WL 124206 (Tex. App. Jan. 16, 2003).

[20] Attorneys who hold themselves out as specialists may be held to a higher standard of care. *See Rhodes v. Batilla*, 848 S.W.2d 833, 843 (Tex. App. 1993); *see also Streber v. Hunter*, 221 F.3d 701 (5th Cir. 2000) (higher standard of care applied to tax attorneys as specialists in the area of tax law).

[21] *Cosgrove*, 774 S.W.2d at 665 (emphasis in original); *see also Lehrer v. Supkis*, No. 01-00-00112-CV, 2002 WL 356394, at *3 (Tex. App. Feb. 28, 2002); *Ellis v. Ellis*, No. 08-98-00370-CV, 2001 WL 83212, at *5 (Tex. App. Jan. 25, 2001).

[22] *Cosgrove*, 774 S.W.2d at 664-65.

because the decision later proves to be imperfect.[23] The reasonableness of the attorney's conduct is the issue and a plaintiff must rely upon expert testimony to establish the relevant standard of care, the corresponding breach and causation.[24] These general statements leave unanswered how a fact-finder is to understand what "an attorney of reasonable prudence would have done in a similar situation." Texas, like other states, has rules of professional responsibility applicable to attorneys. Texas courts have held that those rules, known as the Texas Disciplinary Rules of Professional Conduct[25] (the "Texas Rules") may, in certain circumstances, assist a fact-finder in understanding the standard of care applicable to an attorney.[26]

---

[23] *Id.*

[24] *Streber v. Hunter*, 221 F.3d 701, 724 (5th Cir. 2000); *Anderson v. Snider*, 809 S.W.2d 505, 508 (Tex. App. 1990), *rev'd on other grounds*, 808 S.W.2d 54 (Tex. 1991).

[25] Texas Disciplinary Rules of Prof'l Conduct (available following Tex. Gov't Code Ann. § 84.004).

[26] *Two Thirty Nine Joint Venture*, 60 S.W.3d at 905. *See also Avila v. Havana Painting Co., Inc.*, 761 S.W.2d 398, 400 (Tex. App. 1988) (citing Texas state bar rule requiring an attorney to promptly return client funds and attorney's breach of that rule as evidence that the lawyer committed malpractice); *Heath v. Herron*, 732 S.W.2d 748, 751 (Tex. App. 1987); *Hall v. Fullbright & Jaworski, L.L.P.*, No. 05-95-00488-CV, 1996 WL 87211, at *2 (Tex. App. Feb. 29, 1996).

In *Two Thirty Nine Joint Venture*, 60 S.W.3d at 905, the Court of Appeals relied on the Restatement (Third) of the Law Governing Lawyers § 52 that provides:

> (2) Proof of a violation of a rule or statute regulating the conduct of lawyers:
>
>   (a) does not give rise to an implied cause of action for professional negligence or breach of fiduciary duty;
>
>   (b) does not preclude other proof concerning the duty of care in Subsection (1) or the fiduciary duty; and
>
>   (c) may be considered by a trier of fact as an aid in understanding and applying the standard of Subsection (1) or § 49 to the extent that (i) the rule or statute was designed for the protection of persons in the position of the claimant and (ii) proof of the content and construction of such a rule or statute is relevant to the claimant's claim.

A defendant in a malpractice action may argue that, because Texas Rule 1.12 is a disciplinary rule, no private right of action exists on the part of a client to seek damages based on such violation. Comment 15 to the Preamble of the Texas Rules states that "[t]hese rules do not undertake to define standards of civil liability of lawyers for professional conduct. Violation of a rule does not give rise to a private cause of action nor does it create any presumption that a legal duty to a client has been breached." Texas Rules, Preamble, ¶ 15. However, *Two Thirty Nine Joint Venture* speaks directly to such issue. The court notes

## C.   Texas Rule 1.12

Texas Rule 1.12 is relevant in a situation where a company's attorney knows that

an officer of a company is causing the company to enter into transactions that have an

improper purpose.[27]  Texas Rule 1.12[28] addresses the attorney's role when the attorney

---

that proof of a violation of disciplinary rules may be considered by the fact-finder in understanding the appropriate standard of care, against which the attorney's conduct will be judged.  The court stated that the language of "the preamble does not comment on and is not inconsistent with the use of the rules as evidence of a violation of an existing duty of care . . . ." *Two Thirty Nine Joint Venture*, 60 S.W.3d at 905.

[27] An analogous rule is Texas Rule 1.02, which provides:

> (c) A lawyer shall not assist or counsel a client to engage in conduct that the lawyer knows is criminal or fraudulent.  A lawyer may discuss the legal consequences of any proposed course of conduct with a client and may counsel and represent a client in connection with the making of a good faith effort to determine the validity, scope, meaning or application of the law.

> (d) When a lawyer has confidential information clearly establishing that a client is likely to commit a criminal or fraudulent act that is likely to result in substantial injury to the financial interests or property of another, the lawyer shall promptly make reasonable efforts under the circumstances to dissuade the client from committing the crime or fraud.

However, reliance on Texas Rule 1.02 to assist a trier of fact in applying the standard of care for a malpractice claim *brought by the client* may be less clear in that Texas Rule 1.02 would not appear to be designed so much for the protection of *the client*, but for a party defrauded by the client.  Of course, Texas Rule 1.02 also would be applicable to any disciplinary proceedings against such an attorney.

[28] The corresponding rule in the American Bar Association's Model Rules of Professional Conduct is Model Rule 1.13.  Model Rule 1.13 was amended by the ABA on August 12, 2003.  In this Annex, "Old Model Rule 1.13" refers to Model Rule 1.13 as it existed prior to the effective date of the August 12, 2003 amendment, and "New Model Rule 1.13" refers to Model Rule 1.13 after the effective date of the August 12, 2003 amendment.  There are differences between both versions of Model Rule 1.13 and Texas Rule 1.12.  For instance, Texas Rule 1.12 states that "[a] lawyer employed or retained by an organization represents the entity," but Old Model Rule 1.13 adds the following qualifier at the end of the sentence: "acting through its duly authorized representatives."  Both Texas Rule 1.12 and Old Model Rule 1.13 state that when a client representative is violating a legal obligation to the organization, "the lawyer shall proceed as is reasonably necessary in the best interest of the corporation."  However, Texas Rule 1.12 arguably places more of an affirmative responsibility on the attorney to take action in such a case, in that it states that an attorney "must take reasonable remedial action," language which is not found in Old Model Rule 1.13.  Neither rule specifies any particular action as always being required.  The examples given in both rules, such as "referring the matter to a higher authority" are just that - examples of what may be the appropriate action.

Old Model Rule 1.13 has been criticized as "ambiguous."  Roger C. Cramton, *Enron and the Corporate Lawyer: A Primer on Legal and Ethical Issues*, 58 Bus. Law. 143, 155 (2002).  The same article states that "[m]any lawyers view the provision as only giving the lawyer discretion to choose among a number of options, including doing nothing at all, an interpretation that creates a clear risk of liability."  *Id.*  Cramton asks: "Why isn't it always in the best interests of the corporation for fraud to be reported up the ladder as high as necessary?  'Loyal disclosure' within the hierarchy of an entity client protects the client from disloyal managers and furthers the diligence and loyalty of the lawyer to the interests of the organization

represents an organization (such as a corporation), but a representative of the organization has committed or intends to commit a violation of a legal obligation to the organization (such as a breach of fiduciary duty) or a violation of law that reasonably might be imputed to the organization (such as the dissemination of misleading financial information).[29]

Texas Rule 1.12 first states the basic premise: "A lawyer employed or retained by an organization represents the entity."[30] Ordinarily, the attorney "may report to, and

---

itself. As one commentator noted, '[h]onest corporate officers intent on complying with legal requirements, who are certainly the vast majority, should welcome the enhanced vigilance and protection of their legal counsel.'" *Id.*

The drafters of New Model Rule 1.13 apparently did not think that disclosure "up the ladder" would always be in the best interests of the corporation, as it now includes the following language: "[u]nless the lawyer reasonably believes that it is not necessary in the best interests of the organization to do so, the lawyer shall refer the matter to higher authority in the organization, including, if warranted by the circumstances, to the highest authority that can act. . . ." Compare the new rules announced by the SEC on January 29, 2003 as required by Section 307 of the Sarbanes-Oxley Act of 2002, discussed below.

The New Model Rule 1.13 also includes a provision that, if despite the lawyer's efforts, the highest authority fails to address an act that is "clearly a violation of law" that the lawyer "reasonably believes" is "reasonably certain to result in substantial injury to the corporation," then the lawyer may reveal information relating to the representation to third parties but "only if and to the extent the lawyer reasonably believes necessary to prevent substantial injury to the corporation."

[29] On January 29, 2003, as required by Section 307 of the Sarbanes-Oxley Act of 2002 (the "Act"), the SEC released final rules implementing provisions of the Act that prescribe minimum standards of professional conduct for attorneys appearing and practicing before the SEC in the representation of issuers. The rules are analogous to an attorney's responsibilities under Texas Rule 1.12. Such attorneys are required to report "up the ladder" within an issuer when he or she discovers evidence of "material violations of applicable United States federal or state securities law, a material breach of fiduciary duty arising under United States or state law, or a similar material violation of any United States federal or state law." Evidence of such a violation is defined to be "credible evidence, based upon which it would be unreasonable, under the circumstances, for a prudent and competent attorney not to conclude that it is reasonably likely that a material violation has occurred, is ongoing or is about to occur." Such an attorney is required to report the evidence to the chief legal officer of the issuer, or to both the chief legal officer and the chief executive officer. If the attorney receives an "appropriate response" that either concludes that no violations occurred or confirms that "appropriate" remedial action has been taken, the attorney's obligations under the rules would end. Otherwise, the attorney is obligated to report the violation "up the ladder" to the audit committee of the board or, if there is not an audit committee, to another committee of independent directors, or if there is no such committee, to the entire board of directors. An issuer may also establish a Qualified Legal Compliance Committee which changes the reporting procedures.

[30] Texas Rule 1.12(a).

accept direction from, an entity's duly authorized constituents,"[31] such as the entity's officers. Indeed, the attorney generally must comply with the directives received from the corporate representative with whom he works:

> When constituents of the organization make decisions for it, the decisions ordinarily must be accepted by the lawyer even if their utility or prudence is doubtful. Decisions concerning policy and operations, including ones entailing serious risk, are not as such in the lawyer's province.[32]

In circumstances where the entity's constituents are acting against the interests of the entity, however, "the lawyer shall proceed as reasonably necessary in the best interest of the organization."[33] In particular, the attorney "must take reasonable remedial actions"[34] in the following circumstances:

> whenever the lawyer learns or knows that:
>
> (1) an officer . . . has committed or intends to commit a violation of a legal obligation to the organization or a violation of law which reasonably might be imputed to the organization;
>
> (2) the violation is likely to result in substantial injury to the organization; and
>
> (3) the violation is related to a matter within the scope of the lawyer's representation of the organization.[35]

The Texas Rules provide guidance on the remedial action required:

> [A] lawyer shall first attempt to resolve a violation by taking measures within the organization. In determining the internal procedures, actions or measures that are reasonably necessary in order to comply with paragraphs (a) and (b), a lawyer shall give due consideration to the seriousness of the violation and its consequences, the scope and nature of the lawyer's

---

[31] *Id.*

[32] Texas Rule 1.12 cmt. 6.

[33] Texas Rule 1.12(a).

[34] Texas Rule 1.12(b).

[35] *Id.*

- 12 -

representation, the responsibility in the organization and the apparent motivation of the person involved, the policies of the organization concerning such matters, and any other relevant considerations. Such procedures, actions and measures may include, but are not limited to, the following:

(1) asking reconsideration of the matter;

(2) advising that a separate legal opinion on the matter be sought for presentation to appropriate authority in the organization; and

(3) referring the matter to higher authority in the organization, including, if warranted by the seriousness of the matter, referral to the highest authority that can act in behalf of the organization as determined by applicable law.[36]

---

[36] Texas Rule 1.12(c). The Texas Rules recognize that prior disclosure to third parties may be required by law or other provisions in the Texas Rules, because the lawyer's obligation to resolve such a violation internally is subject to the following exception: "Except where prior disclosure to persons outside the organization is *required* by law or other Rules, . . . ." Texas Rule 1.12(c) (emphasis added). However, under the Texas Rules the only circumstances in which disclosure to third parties is required is in the case where "a lawyer has confidential information clearly establishing that a client is likely to commit a criminal or fraudulent act that is likely to result in death or substantial bodily harm to a person. . . ." In such a case, "the lawyer shall reveal confidential information to the extent revelation reasonably appears necessary to prevent the client from committing the criminal or fraudulent act." Texas Rule 1.05(e).

The comments to Texas Rule 1.12 also indicate that in certain cases, after referring a matter to higher authority, an attorney may be required to withdraw from the representation.

> In some cases, it may be reasonably necessary for the lawyer to refer the matter to the organization's highest responsible authority. See paragraph (c)(3). Ordinarily, that is the board of directors or similar governing body. However, applicable law may prescribe that under certain conditions highest authority reposes elsewhere, such as in the independent directors of a corporation. Even that step may be unsuccessful. The ultimate and difficult ethical question is whether the lawyer should circumvent the organization's highest authority when it persists in a course of action that is clearly violative of law or of a legal obligation to the organization and is likely to result in substantial injury to the organization. These [disclosures to third party] situations are governed by Rule 1.05; see paragraph (d) of this Rule. If the lawyer does not violate a provision of Rule 1.02 or Rule 1.05 by doing so, the lawyer's further remedial action, after exhausting remedies within the organization, may include revealing information relating to the representation to persons outside the organization. If the conduct of the constituent of the organization is likely to result in death or serious bodily injury to another, the lawyer may have a duty of revelation under Rule 1.05(e). The lawyer may resign, of course, in accordance with Rule 1.15, in which event the lawyer is excused from further proceeding as required by paragraphs (a), (b), and (c), and any further obligations are determined by Rule 1.05.

Texas Rule 1.12, cmt. 7. *Compare* Old Model Rule 1.13 ("the lawyer may resign , . . . .") *with* New Model Rule 1.13 ("A lawyer who reasonably believes that he or she has been discharged because of the lawyer's actions taken pursuant to paragraphs (b) or (c), or who withdraws under [such] circumstances . . . , shall

- 13 -

Thus, an attorney for a company could not have acted as an attorney of reasonable prudence if the attorney knew of an officer's wrongful conduct, that substantial injury to the company was likely to occur as a result of that conduct and that the violation was within the attorney's scope of representation,[37] and the attorney failed to take appropriate affirmative steps to cause reconsideration of the matter, including referral of the matter to higher authority in the company, which could include the company's board of directors.

### D.    *FDIC v. Nathan*

The case of *FDIC v. Nathan*,[38] a 1992 decision of the United States District Court for the Southern District of Texas, involved a law firm that was accused of knowingly aiding the majority owners and officers of Continental Savings Association ("Continental") in a breach of fiduciary duty by structuring and closing fraudulent loans. The law firm was Continental's general counsel and did most of its real estate and loan closing work. The majority owners of Continental, Kelly and his nephew, Wylie, were sued for breach of fiduciary duty, negligence and waste of corporate assets. The allegations regarding the officers' breach of fiduciary duty were as follows:

> FDIC alleges that while on paper Continental appeared to be generating remarkable profits through what were actually unsound and illegal loans during the early to mid 1980's, the money disappeared into large salaries,

---

proceed as the lawyer reasonably believes necessary to assure that the organization's highest authority is informed of the lawyer's discharge or withdrawal.").

[37] With respect to the "scope of representation," *see generally FDIC v. Wise*, 758 F. Supp. 1414, 1419 (D. Colo. 1991) ("an attorney cannot discount his continuing fiduciary obligation to the client simply because he was not specifically or expressly retained as legal counsel in connection with a particular transaction. . . . [A]n argument can be made that a responsible attorney should not act as a passive observer, silently sitting by in the face of a client's legally unacceptable decision. . . . Hence, at this juncture, defendants have failed to establish that it is beyond doubt that they did not have a duty to offer certain advice to [the client]").

[38] 804 F. Supp. 888 (S.D. Tex. 1992).

bonuses, and substantial dividends to the self-interested, director-shareholders. Thus, claims FDIC, the thrift was operated primarily to enrich the shareholders. The officers covered up Continental's actual financial status by lending practices such as making new loans to fund delinquent interest payments on previous ones or creating a new loan in exchange for the purchase of inadequate collateral securing a problem loan, often later allowing the buyer to turn the collateral back to Continental without liability.[39]

With respect to the aiding and abetting claim against the attorneys, the court

stated:

> The complaint alleges that the attorney Defendants knowingly aided Kelly and Wylie in breaching their fiduciary duties by structuring, documenting, and closing fraudulent loans and failed to warn any nonculpable party of the illegal transactions. Here the transactions were allegedly so improper that it was foreseeable that the loans would not be repaid. The Court finds sufficient allegations of injury here to defeat a motion to dismiss.[40]

In its opinion, the court frequently refers to the claims against the attorneys as

"legal malpractice" claims, but the opinion also indicates that several theories of liability

were asserted:

> Under theories of breach of fiduciary duty, legal malpractice, knowing participation in the breach of fiduciary duty, failure to supervise the lawyers involved, failure to advise the board of directors properly about a fidelity bond claim, violation of regulations, breach of contract, and breach of implied warranties, FDIC sues the law firm. . . .[41]

Regardless of the label given to conduct of the type alleged in *FDIC v. Nathan*, an

attorney who engages in such conduct can clearly be subject to liability.[42]

---

[39] *Id.* at 891.

[40] *Id.* at 896.

[41] *Id.* at 890.

[42] Because important considerations can sometimes turn on the precise "cause of action" asserted against an attorney, such as the statute of limitations applicable to that cause of action, a number of the reported decisions in Texas address the issue of whether or not a plaintiff has impermissibly "fractured" a malpractice claim into other claims. In *Kimleco Petroleum, Inc. v. Morrison & Shelton*, 91 S.W.3d 921 (Tex. App. 2003), clients brought suit claiming that the law firm was negligent and committed breaches of

- 15 -

contract and fiduciary duty in representing the clients in a prior lawsuit. The clients' sole issue on appeal was that the trial court erred in granting summary judgment to the law firm by applying a two-year statute of limitations (applicable to legal malpractice claims) instead of a four-year statute of limitations (applicable to a breach of fiduciary duty). *Id.* at 923. The court agreed "that an attorney has a fiduciary duty to his client," *id.* at 923, but disagreed with the clients' "characterization of their claims as a breach of fiduciary duty."

> The essence of a breach of fiduciary duty involves the "integrity and fidelity" of an attorney. A breach of fiduciary duty occurs when an attorney benefits improperly from the attorney-client relationship by, among other things, subordinating his client's interests to his own, retaining the client's funds, using the client's confidences improperly, taking advantage of the client's trust, engaging in self-dealing, or making misrepresentations.
>
> . . . A cause of action for legal malpractice arises from an attorney giving a client bad legal advice or otherwise improperly representing the client. . . .
>
> Generally, courts do not allow a case arising out of an attorney's alleged bad legal advice or improper representation to be split out into separate claims for negligence, breach of contract, or fraud, because the "real issue remains one of whether the professional exercised that degree of care, skill, and diligence that professionals of ordinary skill and knowledge commonly possess and exercise." Regardless of the theory a plaintiff pleads, as long as the crux of the complaint is that the plaintiff's attorney did not provide adequate legal representation, the claim is one for legal malpractice.
>
> . . . Here, although Appellants alleged three separate and distinct causes of action that were not labeled "legal malpractice," the crux of each of those claims was that [the law firm] did not provide [the clients] with adequate legal representation. [The clients] do not allege any conduct that could constitute breach of contract or fiduciary duty. In fact, the alleged professional failures of [the law firm] can only be characterized as legal malpractice.

*Id.* at 923-24 (citations omitted). As one recent Texas decision stated, "[t]his is a difficult area of the law and there are confusing statements in dicta in some of the cases," *Deutsch v. Hoover, Bax & Slovacek, L.L.P.*, 97 S.W.3d 179, 189 (Tex. App. 2003). In *Deutsch*, with respect to some of the client's allegations relied on to establish a breach of fiduciary claim (e.g., that the lawyer failed to call witnesses that would have supported the client's case, *id.* at 187) the court concluded that "the gist of these allegations is that the Law Firm did not exercise that degree of care, skill, or diligence as attorneys of ordinary skill and knowledge commonly possess. Therefore, these allegations should be pursued only as a negligence claim, and Deutsch impermissibly fractured his negligence claim by asserting these complaints as breach-of-fiduciary-duty allegations." *Id.* at 189-90. The same was not true with respect to other allegations against the law firm: "Deutsch complained about the Law Firm's failure to disclose . . . conflicts of interest. . . .The gist of these complaints regarding the Law Firm's conflicts of interest was not that the Law Firm failed to exercise that degree of care, skill, or diligence as attorneys of ordinary skill and knowledge commonly possess; rather, these complaints are appropriately classified as a breach-of-fiduciary-duty claim, independent of Deutsch's negligence claim." Thus, "[w]hen . . . the evidence raises a genuine issue of material fact regarding alleged wrongful conduct that sounds in negligence as well as alleged wrongful conduct that sounds in breach of fiduciary duty, the trial court should charge the jury on both claims. . . ." *Id.* at 190. *See Sullivan v. Bickel & Brewer,* 943 S.W.2d 477, 482-83 (Tex. App. 1995) (client stated separate claim for fraud); *Jampole v. Matthews,* 857 S.W.2d 57, 61-63 (Tex. App. 1993) (under certain circumstances, clients may assert fraud and breach-of-contract claims against their attorneys, separate from negligence claims). *But see Cuyler v. Minns,* 60 S.W.3d 209, 216 (Tex. App. 2001) (indicating that all claims asserted by clients against their attorneys should be considered negligence claims); *Sledge v. Alsup,* 759 S.W.2d 1, 2-3 (Tex. App. 1988) (same).

## E.   Aiding and Abetting a Breach of Fiduciary Duty

As described in Appendix B (Legal Standards) to the Third Interim Report, Texas
recognizes a claim for aiding and abetting a breach of fiduciary duty.[43]   Subject to
comparative fault defenses (discussed below), a corporation will have an affirmative
claim against its attorney for aiding and abetting the corporation's officer's breach of
fiduciary duty if the attorney had actual knowledge of the wrongful conduct giving rise to
such breach, if the attorney gave substantial assistance to the primary wrongdoer, and if
the injury to the corporation was the direct or reasonably foreseeable result of the

---

There does not appear to be any reported Texas decision deciding whether a client's assertion of a
"malpractice" claim and a claim for "aiding and abetting a breach of fiduciary duty" against its lawyer
would constitute an impermissible fracturing of a single claim.  However, a similar argument was rejected
in a case from Colorado.  In *Sender v. Porter (In re Porter McLeod, Inc.)*, 231 B.R. 786 (D. Colo. 1999),
attorneys for a corporation were defendants in a suit alleging both legal malpractice and aiding and abetting
a breach of fiduciary duty by the corporation's officers.  The attorneys moved to dismiss the aiding and
abetting claim, asserting that, because the claim was based on the same conduct as the legal malpractice
claim, it was duplicative of and subsumed into the legal malpractice claim.  The court disagreed, stating:

> Here, the allegations in support of claims eleven and twelve reveal the error in the legal
> defendants' assertion that claim twelve is subsumed into claim eleven.  Claim eleven for
> professional malpractice alleges that the legal defendants were negligent by breaching
> *their* dut[ies] to plaintiffs.  Claim twelve avers that the legal defendants "aided and
> abetted the breaches of fiduciary duties *by the officers and directors* of the debtor
> corporations."  The legal defendants' duties to the debtor corporations, *see* claim eleven,
> are distinct and different from the duties of the officers and directors of the debtor
> corporations to the debtor corporations, its four subsidiaries, and their creditors.  Hence,
> claims eleven and twelve are separate and discrete claims, neither of which is duplicative
> of, or can be subsumed into, the other.

*Id.* at 793; *see also Resolution Trust Corp. v. Holland & Knight*, 832 F. Supp. 1528 (S.D. Fla. 1993).  In
*Resolution Trust Corp.*, the RTC, as successor in interest to a savings and loan, sued a law firm.  The law
firm was hired by a special committee of the board of directors to investigate a potential claim against the
president of the savings and loan and a company wholly owned by the president.  The law firm concluded
that there was no liability, and no claim was pursued.  The RTC sued the law firm claiming that it "was
both incompetent and disloyal. . . .," *id.* at 1530, and sued for malpractice and breach of fiduciary duty.
The law firm moved to dismiss the breach of fiduciary duty claim on the basis that it was duplicative of the
legal malpractice claim.  *Id.*  The court disagreed, noting that a plaintiff can plead in the alternative "so as
to ensure a complete presentation of all relevant facts and legal theories," *id.* at 1531 (citing 5 Charles A.
Wright and Arthur R. Miller, Federal Practice and Procedure § 1282, at 526 (2d ed. 1990)), and concluding
that the two counts did not duplicate each other, but represented two distinct theories of malpractice, pled in
the alternative.

[43]  Third Interim Report, Appendix B (Legal Standards), at 44-47.  Such a cause of action is also recognized
in New York, *id.* at 47-53, and Oregon, *id.* at 42-43.

attorney's conduct. Section 56 of the Restatement of the Law Governing Lawyers states

that, in addition to being subject to claims for malpractice,[44] claims for breach of contract

and equitable remedies,[45] an attorney is also subject to liability to a client when a non-

attorney would be liable in similar circumstances.[46] Texas courts have also recognized

that "[l]egal malpractice is not the only cause of action under which a client can recover

from her attorney."[47] There are several reported decisions in jurisdictions other than

Texas that have held that attorneys may be liable to their corporate clients if they aided

and abetted an officer's breach of his or her fiduciary duty to the corporation.[48]   To

---

[44] "Actions under this Chapter are ordinarily referred to as based on a lawyer's 'malpractice.' That term can refer to various specific grounds of liability. As used in this Chapter, 'legal malpractice' or 'malpractice' refers to theories of both professional negligence (§ 48) and a violation of a fiduciary duty (§ 49)." Introductory Note to Chapter 4, Lawyer Civil Liability, Restatement (Third) of Law Governing Lawyers, at 341. Restatement (Third) of Law Governing Lawyers §§ 47-48 (2000).

[45] Restatement (Third) of Law Governing Lawyers § 55 (2000).

[46] Restatement (Third) of Law Governing Lawyers § 56 provides as follows: "Except as provided in § 57 and in addition to liability under §§ 48-55, a lawyer is subject to liability to a client or non-client when a nonlawyer would be in similar circumstances." Section 57 describes certain defenses and exceptions to liability that relate only to claims against an attorney brought by a nonclient. Section 48, entitled Professional Negligence-Elements and Defenses Generally, "summarizes the issues arising in a legal malpractice action for negligence. Those issues are then treated in more detail in §§ 50-54," Section 48, cmt. a., scope and cross references, at 342. Section 49 generally describes what constitutes an attorney's breach of fiduciary duty. Section 55, entitled "Civil Remedies of a Client Other Than for Malpractice" pertains to claims for breach of contract and to restitutionary, injunctive or declaratory remedies. *See also* Ronald E. Madden & Jeffrey M. Smith, *Legal Malpractice* § 8.1, at 768-69 (5th ed. 2000) ("Most actions brought by clients against their attorneys are for negligence, a fiduciary breach, breach of contract or fraud. Although there are other theories, these bases of liability are familiar, usually easier to establish and provide full relief. . . . The breach of a duty, even if consisting of only one act or omission, can produce a multitude of causes of action.").

[47] *Goffney v. Rabson*, 56 S.W.3d 186, 190 (Tex. App. 2001).

[48] *Smith v. Andersen L.L.P.*, 175 F. Supp. 2d 1180 (D. Ariz. 2001); *Adena, Inc. v. Cohn*, 162 F. Supp. 2d 351, 357-58 (E.D. Pa. 2001) (closely held corporation together with two shareholders brought action against former majority shareholder and president of the corporation and the attorney for the corporation and the president, alleging, among other things, a claim against the attorney for aiding and abetting the corporate officer's breach of fiduciary duty; the attorney argued that he could not be liable for aiding and abetting a corporate officer's breach of fiduciary duty absent direct and knowing participation in the breach itself; court found that to establish claim of aiding and abetting breach of fiduciary duty a plaintiff must show: (i) a breach; (ii) knowledge of the breach; and (iii) substantial assistance; even if heightened involvement urged by attorney-defendant was required to establish such a claim, plaintiff had alleged same; and accordingly, plaintiffs had sufficiently alleged a claim of aiding and abetting a breach of fiduciary

- 18 -

establish such a cause of action, the plaintiff must show that the attorney had actual knowledge of the officer's wrongful conduct and gave substantial assistance to the wrongdoer.[49]

---

duty); *Resolution Trust Corp. v. Farmer*, 823 F. Supp. 302 (E.D. Pa. 1993), and *FDIC v. Wise*, 758 F. Supp. 1414, 1420 (D. Colo. 1991) (FDIC, as receiver, sued certain officers, directors and outside general counsel of savings and loan. The FDIC's claims for relief against the attorneys were for breach of fiduciary duties, professional negligence and aiding and abetting the directors and officers in breaching their fiduciary duties. The attorneys' motion to dismiss all such counts were denied. With respect to the claim that the attorneys had aided and abetted the directors' breach of fiduciary duties, the attorneys contended that the FDIC had "not adequately alleged any knowledge of wrongdoing." Reviewing the complaint the court noted that at various points the FDIC indicated that the attorneys had knowledge of breaches of fiduciary duties, including knowledge of particular improprieties of particular transactions, and that such "general" allegations of knowledge were sufficient to satisfy the pleading standard of Fed. R. Civ. P. 9(b). Accordingly, the motion to dismiss such claim was denied). *See also Chem-Age Indus., Inc. v. Glover*, 652 N.W.2d 756 (S.D. 2002). Two directors of and investors in a corporation and the corporation (which had been dissolved but was reinstated "in apparent preparation for suit") sued the former president of the corporation and an attorney – who may have been the president's lawyer or may have been the corporation's lawyer. The attorney, Glover, denied that he was counsel to the corporation, but the court found that a question of fact was presented on this issue, as Glover had incorporated the company, and had held himself out as counsel to the corporation both in conversations with third parties and in a formal court appearance. If found to be counsel to the corporation, Glover had a duty to it. *Id*. at 767. The court held that "[a]lthough he may not have directly breached a fiduciary duty, if Glover assisted Dahl [the corporation's president] in a breach of Dahl's fiduciary duty, Glover may still be subject to liability." *Id*. at 773.

> Dahl, as the operating officer of the corporation, owed a fiduciary duty to the company and to its investors. Like controlling shareholders, officers and directors possessing discretion in the management of a company have a fiduciary duty "to use their ability to control the corporation in a fair, just, and equitable manner . . . ." *Jones v. H.F. Ahmanson & Co.*, 460 P.2d 464, 471 (Cal. 1969). For summary judgment purposes, the evidence that Dahl breached his fiduciary duties to the corporation and the investor-directors remains wholly uncontradicted. He used corporate funds for personal expenditures; he failed to deliver promised stock issues; he sold corporate assets and kept the proceeds. Now the question is whether his lawyer may be subject to liability for assisting Dahl in his breach of fiduciary duties.

*Id*. at 744. The court noted that, to protect lawyers from meritless claims, many courts had strictly construed the common law elements of an aiding and abetting claim – knowledge of the wrong and substantial assistance. *Id*. The court cited to other reported decisions for the propositions that an attorney acting as a "mere scrivener" for a client, or an attorney only providing "routine" professional services, would not have provided "substantial assistance within the meaning of an aiding and abetting claim. *Id*. at 775; *Sender v. Porter (In re Porter McLeod, Inc.)*, 231 B.R. 786 (D. Colo. 1999); *Newport Acquisition Co. No. 1, L.L.C. v. Shiro (In re C-Power Prods., Inc.)*, 230 B.R. 800 (Bankr. N.D. Tex. 1998) (malpractice claim against attorney for debtor could not be assigned to purchaser of assets of debtor, but purchaser had standing to object to fee application of attorney for company and to prosecute claims against attorney for breach of fiduciary duty and aiding and abetting breach of fiduciary duty); *FDIC v. Nathan*, 804 F. Supp. 888 (S.D. Tex. 1992).

[49] *See* Third Interim Report, Appendix B (Legal Standards).

In *Smith v. Arthur Andersen L.L.P.*,[50] which arose out of the collapse of the Boston Chicken restaurant chain, the court refused to dismiss a claim against attorneys for aiding and abetting a breach of fiduciary duty by the client's officers. In *Boston Chicken*, the Chapter 11 plan trustee, Smith, filed a complaint on behalf of the bankruptcy estates of the Boston Chicken companies ("Boston Chicken"). The Boston Chicken system included 1,166 stores, 847 of which were owned by "Area Developers" financed in part by Boston Chicken. (Each Area Developer financed by Boston Chicken was referred to as a "FAD"). The complaint alleged the following:

> Boston Chicken's loan agreements with the Area Developers gave Boston Chicken the right to convert the loans to a controlling equity interest . . . . [Certain officers of Boston Chicken] planned to exercise an option to take the majority control of each FAD in the event that it became profitable, thus ensuring that only the profitable entities would be reflected in Boston Chicken's financial statements.

> The FAD system created the "illusion" of escalating earnings by enabling Boston Chicken to conceal the massive franchise store losses by reflecting them on the financial statements of the FADs and not on the financial statements of Boston Chicken.

The complaint also asserted that:

> Each of the Professional Defendants acted in concert with the Individual Defendants to increase Boston Chicken's insolvency by falsely and unlawfully misrepresenting the true financial condition of Boston Chicken, while at the same time concealing the Individual Defendants' misconduct and breaches of fiduciary duty. In so doing, the Professional Defendants assisted the Individual Defendants in maintaining the facade of growth and solvency while allowing Boston Chicken to become more and more insolvent over time as the Company was increasingly encumbered with obligations, including publicly issued notes, that could not be repaid.

A law firm for Boston Chicken was named as a defendant in the lawsuit and filed

---

[50] 175 F. Supp. 2d 1180 (D. Ariz. 2001).

- 20 -

a motion to dismiss the estate's claims for beach of fiduciary duty and aiding and abetting

a breach of fiduciary duty.[51] Because Colorado law recognized the claim for aiding and

abetting breach of fiduciary duty, the Court refused to grant the law firm's motion to

dismiss.

In *Resolution Trust Corp. v. Farmer*,[52] the RTC in its capacity as receiver for a

failed savings and loan association, Horizon Financial F.A. ("Horizon"), brought suit

against Horizon's officers for, among other things, breach of fiduciary duty, and against

Horizon's general counsel for, among other things, aiding and abetting such alleged

breach.[53]

> Specifically, the RTC alleges that Horizon's directors and officers made
> and approved loans in the absence of adequate lending policies and
> procedures, documentation and due diligence, and in a manner which
> often exceeded the authority of the lending officers with no regard for the
> loans' potentially devastating impact upon the institution. Additionally,
> the RTC alleges that Horizon's longtime general counsel, S & Y, whose
> senior partner, Yates, was primarily responsible for Horizon matters,
> neither cautioned the institution that it lacked adequate lending policies
> and procedures nor that the loans were poorly documented and
> underwritten. The RTC alleges that the S & Y attorneys affirmatively
> encouraged and participated in the making of such loans by reviewing and
> approving relevant loan agreements and by attorney Marshall's service on
> Horizon's Loan Committee during critical times.[54]

After determining that the applicable state law recognized an aiding and abetting

claim, the court held:

> Assuming that all of the RTC's factual allegations are true, the court finds
> that the RTC has stated sufficient facts to make out an aiding and abetting
> claim. The RTC has averred that tortious acts were committed (the

---

[51] *Id.* at 1192 (identifying firm in question as counsel to Boston Chicken).

[52] 823 F. Supp. 302 (E.D. Pa. 1993).

[53] *Id.* at 304-05.

[54] *Id.* at 305 (citations omitted).

averred counts against the Director/Officer Defendants), that the wrongful acts were known to the Attorney Defendants, and that the Attorney Defendants played substantial and knowing roles in carrying out those acts.[55]

As stated above, to prove that an attorney aided and abetted the breach by a client's officers of their fiduciary duties, a plaintiff must demonstrate that the attorney knows of the breach, that the attorney's actions substantially assisted the breach, and that damage to the client was foreseeable as a result. A case that is instructive on these elements arose in the context of an SEC enforcement action, where an attorney's delivery of an opinion letter was held sufficient to establish a case of aiding and abetting a violation of the securities laws.[56] In *SEC v. National Student Marketing Corp.*,[57] the SEC alleged that officers and directors of National Student Marketing Corporation ("NSMC") were parties to a series of transactions that resulted in the dissemination of false and misleading financial statements. An attorney, Katz, was alleged to have aided and abetted the issuance of the financial statements by rendering a legal opinion in connection with the sale to his clients of a NSMC subsidiary.[58]

The subsidiary at issue was losing money and represented a significant cash drain for the fiscal year ending August 31, 1969, so NSMC wanted to sell the subsidiary and remove its losses from NSMC's soon-to-be-published financial statements.[59] The buyers told Katz, who was their attorney, that NSMC's "failure to meet their estimated earnings

---

[55] *Id.* at 309 (citation omitted).

[56] In *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994), the Supreme Court held that a private plaintiff may not maintain an aiding and abetting suit under § 10(b) of the Securities Exchange Act of 1934.

[57] 402 F. Supp. 641 (D.D.C. 1975).

[58] *Id.* at 643.

[59] *Id.* at 644.

will damage their reputation in Wall Street. . . . They want the deal badly . . . ."[60]  The

purchase and sale agreement was negotiated during November, but was backdated and

the agreement was "made as of August 27, 1969",[61] to remove the subsidiary from

NSMC's financial statements for the fiscal year that ended August 31, 1969.  The terms

of the transaction were extraordinarily favorable to Katz's clients.  Most of the risks of

the subsidiary's business remained with NSMC.[62]

NSMC's auditors requested an opinion letter from Katz, which he gave, stating

that "[n]otwithstanding that the Closing of the Agreement took place subsequent to

August 29, 1969, the parties explicitly intended that it be effective as of said date.  I am

of the opinion that, under the laws of the state of New York . . . title to all of the . . . stock

of [the subsidiary] and all of the risks and benefits of ownership thereof passed to the

purchasers as of August 29, 1969."[63]

Katz moved for summary judgment on the SEC's enforcement action on the basis

that his participation in the transaction was limited to the preparation of a legal opinion

on a narrow matter, that his role was peripheral and his knowledge, if any, of any scheme

to mislead was so slight that as a matter of law he could not be held liable.  Katz argued

that his opinion was technically correct concerning the date the agreement was effective,

---

[60] *Id.*

[61] *Id.*

[62] A nonrecourse note was given for the purchase price, and the note was secured through certain shares of NSMC stock provided by NSMC's president.  *Id.*  In addition, NSMC agreed to manage the subsidiary for 14 months after the closing and to provide all working capital it needed, and NSMC would be reimbursed for such services and advances from a portion of the subsidiary's profits, if any.  Moreover, the purchasers could terminate the subsidiary's operations at any time during the 14 month period, and all associated expenses would be borne by NSMC.  *Id.* at 645.

[63] *Id.*

and that any judgment about the economic reality of the transaction was a matter for the accountants.[64] The court disagreed, stating:

> Katz's arguments concerning the passage of title, however, ignore the overall factual picture which should have been readily apparent to him. He drafted the several documents . . . which constituted the entire . . . transaction. The Commission contends that the alleged sale, reported in the 1969 financials of NSMC, was actually a sham because of the underlying agreements which accompanied the 'sale'. Although technically title to the shares of stock may have been transferred, the economic substance of the transaction did not transfer any of 'the risks and benefits of ownership' to the purchasers. . . .
>
> . . . . Lawyers are not free to ignore the commercial substance of a transaction which could obviously be misleading to stockholders and the investing public. Courts have not hesitated to pierce through legalistic form in order to circumvent violation of the securities law.
>
> . . . .
>
> [T]his Court rejects the proposition that a member of the bar can seek refuge behind a legal technicality, elevating form over substance, when he is a party to and fully familiar with the circumstances which indicate that an illusory transaction is being undertaken which could be utilized to mislead third parties. Katz's focus on the narrow legal questions on which he opined is unrealistic in view of his participation in the total transaction which obviously had the possibility for misleading outsiders.[65]

Against this factual background, the court found that Katz could be found liable for aiding and abetting a breach of the securities laws because he knew NSMC intended to distribute misleading financial statements and the delivery of his opinion was essential for NSMC to achieve this result.[66] Accordingly, the court denied Katz's motion for summary judgment.

---

[64] *Id.* at 646-47.

[65] *Id.* at 647-48.

[66] The Court stated:

- 24 -

## F.    Opinion Letters

Enron's attorneys sometimes provided opinions to Enron in connection with Enron's FAS 140 Transactions.  In addition, Enron's attorneys provided legal opinions that were needed for other SPE transactions, such as certain tax-related transactions.

Under Texas law, "an attorney can commit legal malpractice by giving an erroneous legal opinion or erroneous advice."[67]  To establish an attorney's negligent breach of his professional duty, a client must show that the attorney in question failed to act as a reasonably prudent attorney would have acted in a similar situation, and the client would be required to rely upon expert testimony to establish the relevant standard of care.[68]

---

[I]t can be inferred from the factual circumstances of this case that Katz either knew that NSMC planned to issue a false financial statement, or he ignored what should have been evident to him as a lawyer with some expertise in corporate mergers and acquisitions.

. . . .

The defendant's assertion that he had no idea that the . . . transaction would be fraudulently accounted for is belied by his intimate acquaintance with the entire transaction which revealed a transparent attempt to make it appear that [the subsidiary] had been sold for value in fiscal 1969 whereas in actuality, [the purchasers] had been paid to take a disappointing subsidiary off the hands of the parent corporation, as a result of negotiations which occurred months after the close of the fiscal year.

Katz, with knowledge that the auditors were relying on the opinion of counsel, stated that all 'risks and benefits of ownership' had passed to [the purchasers] as of the end of fiscal 1969, whereas he knew, from having drafted the documents, that the 'sale' . . . had no real substance and that any reported gain would falsely enhance the financial posture of NSMC. . . . He cannot credibly claim that he was unaware that NSMC was planning to mislead investors when at the very outset of the negotiations, he had in hand an analysis of the situation, furnished him by his clients in their October 24 memorandum.

*Id.* at 649-50.

[67] *Kimleco Petroleum, Inc. v. Morrison & Shelton,* 91 S.W.3d 921, 923 (Tex. App. 2002).

[68] In Texas, a lawyer is held to the standard of care that would be exercised by a "reasonably prudent attorney." *See Veschi v. Stevens,* 861 S.W.2d 291, 292 (Tex. App. 1993).  Texas courts have held that expert testimony is necessary to establish the standard of care and any departure from it.  *See generally*

Attorneys provide legal advice to their clients both in writing and orally. Sometimes this advice takes the form of a formal opinion letter. However, the few reported decisions and virtually all of the literature on legal opinions are concerned with legal opinions given by an attorney to, or allegedly relied on by,[69] a third party in connection with the closing of a business transaction.[70] It has been recognized that when rendering an opinion to a third party, attorneys perform a "different kind of function and

---

*Hall v. Rutherford*, 911 S.W.2d 422 (Tex. App. 1995); *see also Streber v. Hunter*, 221 F.3d 701, 722 (Tex. 2000) (expert opinion testimony that the standard of care is higher for tax specialists because they "have been trained in . . . a fairly complex-- very complex area" is sufficient to defeat summary judgment); *cf. Greenstein, Logan & Co. v. Burgess Mktg., Inc.,* 744 S.W.2d 170, 185 (Tex. App. 1987) (in the context of accounting malpractice, "expert testimony is usually necessary to establish the requisite standard of care and skill, a departure from that standard, and the causal link between plaintiff's damages and the accountant's negligence."). To survive a summary judgment challenge once an expert opinion establishes that the defendant's acts conformed to the standard of care, the plaintiff must offer expert testimony to contradict the defendant's expert testimony. *See Tijerina v. Wennermark,* 700 S.W.2d 342, 347 (Tex. App. 1985), *overruled on other grounds,* 774 S.W.2d 662 (Tex. 1989).

[69] *Compare Vereins-Und Westbank, AG v. Carter*, 691 F. Supp. 704 (S.D.N.Y. 1988) (under the principles of *Ultramares Corp. v. Touche,* 174 N.E. 441 (N.Y. 1931), court determined that attorney could be liable to non-client for negligence in professional conduct in connection with opinion letter) *with Hafner v. Infocure Corp. (In re Infocure Sec. Litig.),* 210 F. Supp. 2d 1331 (N.D. Ga. 2002) (opinion letter given in connection with merger stated that it could be relied on only by target corporation, not shareholders, and that it was given pursuant to the Legal Opinion Accord of the ABA Section of Business Law, which expressly limits use of an opinion; court found that shareholders were represented by counsel; court found no policy reason to ignore disclaimers contained in opinion letters).

[70] *See, e.g.*, M. John Sterba, *Legal Opinion Letters: A Comprehensive Guide to Opinion Letter Practice* (3d ed. 2003); Donald W. Glazer, Scott FitzGibbon & Steven O. Weise, *Glazer & FitzGibbon on Legal Opinions*, § 1.1 at 3 (2d ed. 2001) ("Third party closing opinions are the subject of this book."); Committee on Legal Opinions, *Guidelines for the Preparation of Closing Opinions*, 57 Bus. Law. 875 (2002); TriBar Opinion Committee, *Third-Party "Closing" Opinions: A Report of the TriBar Opinion Committee*, 53 Bus. Law. 591 (1998); *Report of the Legal Opinions Committee Regarding Legal Opinions in Business Transactions*, Business Law Section, State Bar of Texas, 7, 8 (1994) (the "Texas Report") (The "goals of the Committee were primarily to encourage and express a consensus of Texas business lawyers with regard to . . . legal opinions rendered to third parties in business transactions. . . . Much of the discussion in this report centers on business transactions, and opinions which are delivered at a 'closing'. However, the discussion as to the preparation of legal opinions, the standards for legal opinions, the ethical considerations involved, and potential liabilities for legal opinions relate generally to all legal opinions, regardless of the circumstances in which they are given."). Glazer & FitzGibbon note that "[T]he various bar association reports reflect a remarkable consensus . . . Differences, however, . . . do exist. . . . Our discussions with lawyers from states having older reports have left us with the strong sense that if they were to revise those reports today they would bring them into line in most areas with current practice. . . ." *Glazer & FitzGibbon on Legal Opinions,* at xlviii.

accept a different type of responsibility . . . ."[71]  Accordingly, when using the literature or

cases for opinions given to third parties to establish the standard of care with respect to

client opinions, one must keep this difference in mind,[72] because an attorney will

generally have a higher and more complete duty to his or her client than to a third party.[73]

A report on legal opinions prepared by a committee of the State Bar of Texas[74]

(the "Texas Report") states that:

> Because of the importance of legal opinions to attorneys, as well as to
> their Clients, each attorney who prepares or reviews a legal opinion should
> exercise good professional judgment and give careful and thoughtful

---

[71] *See, e.g.*, Texas Report at 15, 16 ("[L]awyers' responsibilities differ significantly depending on the identity of the Opinion Recipient. . . . [I]f the Opinion Recipient is the Client, the Opinion Giver has a paramount duty, based on the professional responsibility of the attorney to the Client. . . . [L]awyers are often requested by their Clients to render an opinion to a third party as a condition to the consummation of a Transaction. In this context, lawyers perform a different kind of function and accept a different type of responsibility than when they perform or accept while rendering advice to their own Clients.").

[72] In addition, the Texas Report states that "[t]his report does not define or establish ethical or liability standards, and is not intended to be given effect in any disciplinary or liability proceedings," *id.* at 8, rather, it was "to be published as an educational tool and a guide to Texas Lawyers in negotiating and drafting legal opinions." *Id.* at 7. The Texas Report also observed that:

> Texas courts have not expressed a standard of care applicable particularly to the
> rendering of legal opinions, but have applied a standard applicable generally to the
> professional conduct of Texas lawyers. . . A lawyer is "not bound to possess and exercise
> the highest degree of skill, but is required to possess such legal knowledge and to
> exercise such skill and diligence as men of the legal profession commonly employ."

*Id.* at 38.

[73] Some of the differences noted by the Texas Report include the following:

> [A] lawyer giving an opinion to a third party non-Client does not owe the third party the
> same ethical duties that are owed a Client. For example, the Opinion Giver does not have
> an obligation to address legal issues outside the directly negotiated scope of the opinion,
> even if the Opinion Giver believes the legal issues could be important to the Opinion
> Recipient.
>
> . . . [T]he requirement of candor overrides the lawyer's understandable desire to provide
> the answer desired by the Client.

*Id.* at 16 and 29.

[74] *Report of the Legal Opinions Committee Regarding Legal Opinions in Business Transactions*, Business Law Section, State Bar of Texas (1994).

attention to the language and meaning of the opinion, as well as to any factual investigation and legal research necessary to support the opinion.[75]

The Texas Report also notes that:

[D]ecisions of courts in other jurisdictions indicate that the standard [of care] includes two duties that clearly are fundamental to an attorney rendering an opinion: ... 'to possess knowledge of those plain and elementary principles of law which are commonly known by well informed attorneys, and to discover those additional rules of law which, although not commonly known, may readily be found by standard research techniques' ... [and] to conduct a reasonable investigation of the relevant facts necessary to support the opinion.[76]

Finally, a higher standard of care may apply to an attorney who opines or advises on a matter within a recognized legal specialty, such as tax law.[77]

The duty to conduct a reasonable investigation typically refers to the process through which the issuing attorney establishes the factual basis for the opinion. Attorneys frequently rely on factual information provided to them from others (often corporate officers). In the context of opinion letters given to third parties, one commentator has summarized an attorney's ability to rely on "facts" provided by another as follows:

The principle is that, in rendering a closing opinion, the opinion preparers are entitled to rely on factual information provided by an appropriate source if they do not know the information to be untrue, the information does not appear irregular on its face and they do not know of circumstances that make reliance unwarranted.[78]

---

[75] *Id.* at 14.

[76] *Id.* at 38-39.

[77] *Id.*; *see also Streber v. Hunter*, 221 F.3d 701 (5th Cir. 2000) (affirming malpractice award against tax attorneys and finding that plaintiffs' expert witness properly identified the higher standard of care applicable to tax specialists).

[78] *Glazer & FitzGibbon on Legal Opinions*, § 4.2.3 at 94-96.

- 28 -

Similarly, attorneys frequently rely on factual assumptions in rendering their opinions. The standard of care applicable to attorneys in the context of opinions given to third parties has been summarized as follows: "Opinion preparers are not permitted to base an opinion on an unstated factual assumption they recognize to be untrue or not to warrant reliance under the circumstances."[79] Similarly, "[o]pinion preparers should not, however, rely on a stated assumption if they believe it will be misleading to the opinion recipient with regard to the subject matter covered."[80]

The inability of counsel to rely on factual information from their client, or to base their opinions on "assumptions" that they recognize as untrue, is illustrated by the decision in *Kline v. First Western Government Securities, Inc.*[81] In *Kline*, a law firm for a tax shelter promoter was sued based on alleged misrepresentations and omissions contained in opinion letters. The law firm defended on several grounds, including on the basis that:

> it cannot be held liable for an opinion letter in which it made explicit that it was basing its opinion on an assumed set of facts represented to it by its client and that it had conducted no independent investigation into whether those represented facts accurately reflected reality.[82]

The court responded:

> We are unpersuaded by this argument.
>
> . . . .
>
> [W]hen a law firm knows or has good reason to know that the factual description of a transaction provided by another is materially different

---

[79] *Glazer & FitzGibbon on Legal Opinions*, § 4.3.4 at 115.

[80] *Id.* at 116.

[81] 24 F.3d 480 (3d Cir. 1994).

[82] *Id.* at 486.

from the actual transaction, it cannot escape liability simply by including in an opinion letter a statement that its opinion is based on provided facts.

> . . . .

These allegations clearly permit the inference that [the law firm] knew or had good reason to know that the factual assertions contained in its opinion letters did not reflect the substance of actual . . . transactions. As such, [the law firm's] opinions, despite their disclaimers, fall squarely within the category of opinion letters that we have held to be actionable.[83]

The foregoing principles, although they arose in a somewhat different context, should apply with even more force when an attorney gives an opinion to his own client. Texas Rule 2.01 states that "[i]n advising or otherwise representing a client, an attorney shall exercise independent, professional judgment and render candid advice."[84] The comments note that "[a] client is entitled to straightforward advice expressing the lawyer's honest assessment. Legal advice often involves unpleasant facts and

---

[83] *Id.* at 486-87. *See also Akerman v. Schwartz*, 947 F.2d 841, 843-44 (7th Cir. 1991) ("Schwartz gave the promoters an opinion letter reciting 'facts' that made this venture look legitimate -- that the four corporations were unaffiliated, that the equipment would be sold at market price, that all of the equipment would be placed in service by the end of 1983, and so on -- and concluding that the IRS would be unable to deny investors the $20,000 credit and $10,000 deduction per $10,000 unit of investment. The 'facts' so recited were fictions. Schwartz says that he told Robert Clemente, an associate at the law firm, to conduct the due diligence inquiry. Clemente recalls things differently, testifying at his deposition that Schwartz said he would check the facts personally. Whether the lack of inquiry was attributable to an Alfonse-and-Gaston routine or to utter indifference to the truth, there was no verification. The letter says that the law firm examined documents 'as we deem relevant' and relied on unnamed persons for unspecified facts. Although it added that '[w]e have not made an attempt to independently verify the various representations', the letter also said that it was prepared 'in a manner that . . . complies with the requirements of both the proposed Treasury Regulations [Treas.Reg. 230] and [the ABA's] Formal Opinion 346.' Both Regulation 230 and Opinion 346 require a lawyer to verify questionable assertions by the promoters. Assertions that every piece of equipment in an ethanol manufacturing business has a market value of precisely $100,000, that the transactions among four shell corporations were at arms' length, and that equipment that could not be ordered until late 1983 (counsel's letter is dated August 30, 1983, and the money-raising lay ahead) would be placed in service by the end of December 1983, carry warning signals -- especially considering that one of the promoters, Leibowitz, was a disbarred lawyer -- so a reader of the letter might well infer that the law firm had inquired independently.")

[84] Texas Rule 2.01. Similarly, as the preamble to Texas Rules point out, "a lawyer provides a client with an informed understanding of the client's legal rights and obligations. . . . A lawyer acts as evaluator by examining a client's affairs and reporting about them to the client or to others." Comment 7 to Texas Rule 1.02 notes that "[a] lawyer is required to give an honest opinion about the actual consequences that appear likely to result from a client's conduct."

alternatives that a client may be disinclined to confront . . . . [A] lawyer should not be deterred from giving candid advice by the prospect that the advice will be unpalatable to the client."[85]

### G.    Business Transactions with a Client

The Texas Rules prohibit an attorney from entering into a business transaction with a client unless:

> (1) the transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed in a manner which can be reasonably understood by the client;

> (2) the client is given a reasonable opportunity to seek the advice of independent counsel in the transaction; and

> (3) the client consents in writing thereto.[86]

Similarly, except in cases where there has been full disclosure, the Texas Rules provide that "a lawyer shall not represent a person if the representation of that person . . . reasonably appears to be or become adversely limited by the . . . lawyer's . . . own interests."[87]  If an in-house attorney for a company is an officer of the corporation, that attorney would also be subject to the fiduciary duties owed by an officer to the corporation.  It is a breach of the fiduciary duty of loyalty for an officer to derive an improper personal benefit at the expense of the corporation through self-dealing.[88]

---

[85]  Texas Rule 2.01, Cmt. 1.

[86]  Texas Rule 1.08(a).

[87]  Texas Rule 1.06(b).

[88]  *See Anadarko Petroleum Corp. v. Panhandle E. Corp.*, 545 A.2d 1171 (Del. 1988); *Klinicki v. Lundgren*, 695 P.2d 906 (Or. 1985).

## H.    Conflicts of Interest

While a client is generally entitled to counsel of his choice, ethical concerns, such as those presented when there are conflicts, may preclude the attorney from accepting employment.[89]  The Preamble to the Texas Rules states: "In the nature of law practice, conflicting responsibilities are encountered.  Virtually all difficult ethical problems arise from apparent conflict between a lawyer's responsibilities to clients, to the legal profession and the lawyer's own interests."[90]  A comment to the Texas Rules states that "[a] lawyer should not accept representation in a matter "unless it can be performed competently, promptly, and without improper conflict of interest."[91]

In addition, an attorney's duty of care includes the duty to avoid conflicts that may impair the attorney's ability to exercise independent professional judgment on behalf of the client.[92]  Thus, raising questions of conflict is primarily the responsibility of the attorney undertaking the representation.[93]  Texas Rule 1.06(b)(2) states in relevant part, "a lawyer shall not represent a person if the representation of that person reasonably appears to be or become adversely limited by the lawyer's or law firm's . . . own interests."[94]  "If the probity of a lawyer's own conduct in a transaction is in question, it

---

[89] *Doe v. A Corp.*, 709 F.2d 1043 (5th Cir. 1983); *see also* Texas Rule 1.06.

[90] Texas Rule, Preamble, ¶ 7.

[91] Texas Rule 1.15, Cmt. 1.

[92] *Two Thirty Nine Joint Venture*, 60 S.W.3d at 905; Texas Rule 1.06.

[93] *In re Hunt Int'l Res. Corp.*, No. 335-30831 RCM-11, 1992 WL 235580, at *21 (Bankr. N.D. Tex. Mar. 11, 1992).

[94] Texas Rule 1.06(b)(2).

may be difficult for the lawyer to give a client detached advice."[95]  However, a conflict

exists only if the law firm's participation was substantial.[96]  Texas Rule 1.06 also

provides that "if a lawyer would be prohibited by this Rule from engaging in particular

conduct, no other lawyer while a member or associated with that lawyer's firm may

engage in that conduct."[97]

Under these circumstances, an attorney may represent a client if the client

consents to the representation "after full disclosure of the existence, nature, implications,

and possible adverse consequences of the common representation and the advantages

involved, if any."[98]  Full disclosure means "[a] lawyer shall explain a matter to the extent

reasonably necessary to permit the client to make informed decisions regarding the

representation."[99]  Although a client may under some circumstances consent to a conflict

or potential conflict, "when a disinterested lawyer would conclude that the client should

not agree to the representation under the circumstances, the lawyer involved should not

ask for such agreement or provide such representation on the basis of the clients [sic]

consent."[100]

---

[95] *In re Hunt Int'l Res. Corp.*, No. 335-30831 RCM-11, 1992 WL 235580, at *19 (Bankr. N.D. Tex. Mar. 11, 1992); Texas Rule 1.06, Cmt. 5.

[96] *Johnson v. Hui*, 811 F. Supp. 479, 486 (N.D. Cal. 1991).

[97] Texas Rule 1.06(f).

[98] Texas Rule 1.06(c)(2).

[99] Texas Rule 1.03(b).

[100] Texas Rule 1.06, Cmt. 7; *cf. Tran v. Meyers*, No. 95-2587, 1995 WL 584374 at *4 (E.D. Pa. Oct. 2, 1995) ("When appropriate, a court 'may enforce the ethical rules governing the legal profession with respect to . . . conflict-free representation regardless of any purported waiver.'").

## I.    Comparative Fault Defenses

*Introduction*

This section considers two potential comparative fault defenses to claims for malpractice based on Texas Rule 1.12, malpractice based on negligence or aiding and abetting: statutory proportionate responsibility and the equitable doctrine of *in pari delicto*. Both of these defenses depend on the imputation of the officer's knowledge or conduct to the corporate client. Accordingly, the discussion of these defenses is preceded by a discussion of relevant imputation principles.

*Relevant Imputation Principles*

The Texas standard for imputation of fraud,[101] which is discussed in more detail elsewhere in this Report,[102] has been expressed this way: fraud *against* a corporation, which hurts the shareholders, is not imputed to a corporation,[103] whereas fraud *on behalf of* a corporation, which benefits the shareholders and harms creditors, can be imputed to a corporation.[104]    While this rule is easily stated, its application is more difficult. As

---

[101] For purposes of imputation analysis, the wrongful conduct of a corporation's officers may be divided into two categories: (1) negligent acts; and (2) intentional wrongdoing. With respect to negligent acts committed by a corporation's officers in the scope of their employment, the imputation analysis is straightforward. Under settled principles of agency law, these acts are imputed to the corporation and as acts of the corporation itself. *See, e.g., Agristor Credit Corp. v. Donahoe*, 568 S.W.2d 422, 426 (Tex. App. 1978) (recognizing the "rule of law that the negligence, inadvertence, or mistake of the agent is imputed to the principal").

[102] *See* Report, Annex 2 to Appendix B (Role of Andersen).

[103] *Id.* at 190 (quoting *Cenco Inc. v. Seidman & Seidman*, 686 F.2d 449, 456 (7th Cir. 1982)); *see also FDIC v. Shrader & York*, 991 F.2d 216, 224 (5th Cir. 1993) (discussing imputation in the context of the discovery rule and the statute of limitations).

[104] *Greenstein*, 744 S.W.2d at 190. Texas courts have also held that where an agent acts for its own benefit and for the benefit of its principal, the agent's knowledge is imputed to the principal. *Crisp v. Southwest Bancshares Leasing Co.*, 586 S.W.2d 610, 615 (Tex. App. 1979); *see also Askanase v. Fatjo*, 130 F.3d 657, 666 (5th Cir. 1997) (in order for a plaintiff to avoid imputation, the plaintiff must show that the officers acted entirely for their own purposes).

illustrated by the discussion elsewhere in this Report, courts have sometimes reached arguably inconsistent results in determining what sort of intentional wrongdoing is on behalf of the corporation or against the corporation.[105]

The determination of whether a corporate officer's misconduct is *on behalf of* a corporation or *against* the corporation is a fact-intensive inquiry. For instance, some cases have suggested that when an officer does not steal from a corporation, but artificially inflates profits, then the fraud is *on behalf of* the corporation.[106] These cases suggest that the company and its shareholders benefit from the conduct, and the company cannot claim damages for the same conduct. [107] On the other hand, some cases have held that prolonging a company's existence beyond the point of insolvency does not benefit the company. These cases suggest that management's intentional misconduct in engaging in unsound accounting practices that inflate the company's financial position is misconduct *against* the corporation and is not subject to imputation.[108]

*Comparative Fault*

*Introduction.* To the extent that the wrongful conduct of a client's officers is imputed to the client itself, the attorney can rely on comparative fault principles to seek to reduce the client's recovery or to bar recovery altogether. As discussed below, in Texas, these comparative fault principles apply to both intentional and negligent torts and, thus, would have potential application to both malpractice claims (whether based on

---

[105] *See* Report, Annex 2 to Appendix B (Role of Andersen).

[106] *See Shrader & York*, 991 F.2d at 225; *Cenco Inc.*, 686 F.2d at 454.

[107] *See id.*

[108] *See Holland v. Arthur Andersen & Co.*, 469 N.E.2d 419, 427 (Ill. App. Ct. 1984); *see also First Nat'l Bank v. Brumleve & Dabbs*, 539 N.E.2d 877 (Ill. App. Ct. 1989).

negligence or Texas Rule 1.12) and claims for aiding and abetting a breach of fiduciary duty. In Texas, these comparative fault principles may be derived from two sources. First, they are embodied in Texas's "Proportionate Responsibility" statute. Second, they are reflected in Texas common law equitable principles of *in pari delicto*, though it is not clear whether and to what extent the Texas Proportionate Responsibility statute has displaced the *in pari delicto* doctrine. Both of these sources of comparative fault principles are analyzed below.

*Statutory Proportionate Responsibility.* Texas has enacted a "Proportionate Responsibility" statutory framework that applies to torts, including both intentional torts and torts grounded in negligence.[109] Under Texas law, "a claimant may not recover damages if his [or her] percentage of responsibility is greater than 50 percent."[110] However, if a claimant is partially at fault, but does not bear more than 50% of the responsibility, then the claimant can recover.[111] In that circumstance, the claimant's recovery would be reduced *pro rata* by the percentage of the claimant's responsibility.[112] Because there is a paucity of case law in Texas examining the issue of comparative fault

---

[109] *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 33.001 – 002 ("Proportionate Responsibility").

[110] Tex. Civ. Prac. & Rem. Code Ann. § 33.001.

[111] *See* Tex. Civ. Prac. & Rem. Code § 33.012(a) ("If the claimant is not barred from recovery under Section 33.001, the court shall reduce the amount of damages to be recovered by the claimant with respect to a cause of action by a percentage equal to the claimant's percentage of responsibility.").

[112] *See id.* The statute draws no distinctions based upon whether the claimant's responsibility arises from negligent or intentional misconduct. Subject to certain exceptions, in the case of multiple responsible parties, any defendant that bears more than 50% of the responsibility is jointly and severally liable with his or her codefendants for the entirety of the damages that may be recovered by the claimant, whereas those codefendants with lesser responsibility are liable only for their proportionate share of the damages. *See* Tex. Civ. Prac. & Rem. Code § 33.013. *But see Mims v. Kennedy Capital Mgmt., Inc. (In re Performance Nutrition, Inc.),* 239 B.R. 93, 112 (Bankr. N.D. Tex. 1999) (holding that "[p]arties who knowingly join a fiduciary in breaching his fiduciary duties are jointly and severally liable with that fiduciary," but not mentioning the Texas Proportionate Responsibility statute).

in a legal malpractice context, and because the comparative fault defense is discussed at some length elsewhere in this Report,[113] this defense is only summarized here.

Because a claim for legal malpractice "sounds in tort and is evaluated based on negligence principles,"[114] comparative fault principles have been applied in actions against attorneys for malpractice based on negligence.[115] However, in *Greenstein, Logan & Co. v. Burgess Mktg., Inc.*, discussed above,[116] a professional malpractice case involving accountants decided before the adoption of the Texas Proportionate Responsibility statute, the Texas Court of Appeals held that a client's negligence was only a defense to a professional malpractice claim when the negligence contributed in some way to the professional's failure to perform its duties.[117] Under this reasoning, if it were applied to a legal malpractice claim,[118] to assert successfully a comparative fault defense, an attorney would be required to demonstrate that the client's actions affected the ability of the attorneys to render professional services to the client.

*In Pari Delicto.* In addition to relying on the Texas Proportionate Responsibility statute to bar or reduce a plaintiff's recovery, an attorney might rely on common law

---

[113] *See infra* Report, Annex 2 to Appendix B (Role of Andersen).

[114] *Streber v. Hunter*, 221 F.3d 701, 722 (5th Cir. 2000) (applying Texas law).

[115] *See id.* at 726 n.35 (jury was properly instructed to allocate responsibility under Texas' proportionate liability statute to the extent that lawyers' culpability was less than client's); *see also Roberts v. Burkett*, 802 S.W.2d 42, 45 (Tex. App. 1990) (trial court's determination that each client was 20% negligent and attorneys were 60% negligent if error was harmless).

[116] 744 S.W.2d 170 (Tex. App. 1987).

[117] *Id.* at 190. *See* Report, Annex 2 to Appendix B (Role of Andersen).

[118] This also assumes that a court would apply *Greenstein* in light of the subsequently executed Texas "Proportionate Responsibility" statute. There are no Texas cases that suggest *Greenstein* is inconsistent with the statute. *See* Tex. Civ. Prac. & Rem. Code § 33.001; *see infra* Annex 2, Appendix B (Legal Standards Applicable to Accountants). In *Steiner Corp. v Johnson & Higgins*, 135 F.3d 684, 688-89 (10th Cir. 1998), the Tenth Circuit Court of Appeals noted that comparative negligence principles "appl[y] logically to professionals performing accounting services . . . or to attorneys . . . ." (citations omitted).

equitable principles of *in pari delicto* to bar a plaintiff's recovery.[119] *In pari delicto* means "in equal fault" and when it applies, the courts "will leave the parties as they find them,"[120] meaning that recovery is barred altogether. As noted in the Third Interim Report, the Second Circuit has observed a "paucity" of cases in Texas applying the doctrine of *in pari delicto*, but the doctrine may apply when the fault of the parties is "mutual, simultaneous, and relatively equal."[121]

There are no reported decisions in Texas deciding whether an *in pari delicto* defense exists for malpractice claims based on negligence. In *Official Committee of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand LLP*,[122] a case involving accountant malpractice, the Second Circuit (applying Texas law) noted that there was no Texas case sustaining an *in pari delicto* defense in a malpractice claim.[123] The court, in discussing the applicability of *in pari delicto* generally, stated:

> The rule in Texas, even in the case of an unlawful transaction, is that courts must decide "whether the policy against assisting a wrongdoer outweighs the policy against permitting unjust enrichment of one party at the expense of the other," and this balancing of the equities often "depends upon the peculiar facts and equities of the case, and the answer usually given is that which is thought will better serve public policy."[124]

---

[119] As noted in the Third Interim Report, this defense might apply under Texas or Oregon law. However, if a New York court determined that Oregon law applied (to an aiding and abetting breach of fiduciary duty claim), the court might apply the *Wagoner* standing analysis instead of considering similar issues in the context of the *in pari delicto* defense. The *Wagoner* rule is discussed in detail in the Third Interim Report. *See* Third Interim Report, Appendix B (Legal Standards) at 62-79.

[120] *Sacks v. Dallas Gold & Silver Exch., Inc.*, 720 S.W.2d 177, 180-81 & n.1 (Tex. App. 1986).

[121] *See Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 162 (2d. Cir. 2003); *see also* Third Interim Report, Appendix B (Legal Standards), at 55-62.

[122] 322 F.3d 147, 161 (2d Cir. 2003).

[123] *Id.* at 162.

[124] *Id.* (citations omitted).

Although the court declined to consider the plaintiff/appellant's arguments as to the applicability of the *in pari delicto* defense to certain claims, because such arguments were not raised timely, it nevertheless reviewed the district court's analysis.[125] The complaint had alleged that the auditors failed to disclose material information regarding a transaction that was approved by the corporation's board.[126] Because the board had the same knowledge that the auditors were alleged to have failed to disclose, the district court concluded that the company was at least equally at fault with the auditors.[127] As such, *in pari delicto* served as a complete defense to the malpractice claims alleged against the corporation's outside accountants. The Second Circuit affirmed this decision.

*Applicability of Comparative Fault to Malpractice Based on Texas Rule 1.12.* The interaction between (i) the imputation of an officer's wrongful conduct to the corporation to bar a claim by that corporation, and (ii) a claim for malpractice based on Texas Rule 1.12, presents an issue that has not been addressed in any reported decision. As discussed above, when an attorney knows of an officer's wrongful conduct, the attorney has a duty in certain circumstances to take "remedial action." That remedial action can include escalating the matter to a higher authority within the organization, which may include the board of directors. This rule contemplates that if the wrongful conduct is brought to the attention of a higher authority within the organization, such conduct might have been stopped thus averting harm to the company. Therefore, if a court imputes an officer's wrongful conduct (such as when that wrongful conduct

---

[125] *Id.* at 163.

[126] *Id.* at 164.

[127] *Id.*

artificially inflates the corporation's profits) to the corporation whether or not more senior officers or the board of directors were aware of the wrongdoing, and bars any claim by the corporation against a third party (in this case, the attorney), then an attorney's responsibilities under Texas Rule 1.12 would appear to be made irrelevant in many cases. In other words, had the attorney performed his duty, when applicable, and reported the wrongful conduct, the conduct and the harm to the company might not have occurred. To hold that imputation bars recovery in every such circumstance would insulate the attorney from any consequences of a failure to take remedial action when required under Texas Rule 1.12. Thus, it is not clear whether a Texas court would permit principles of imputation to bar a malpractice claim based on Texas Rule 1.12.

## IV.    CONCLUSION

Where an attorney represents a corporation and fails to exercise the competence and diligence normally exercised by reasonably prudent attorneys in similar circumstances during the course of such representation, then the attorney may be liable to the corporation for malpractice.  In addition, under relevant Texas Rules, an attorney who knows that a representative of the corporation has committed, or intends to commit, a violation of a legal obligation to the organization (such as a breach of a fiduciary duty) or a violation of law which reasonably might be imputed to the organization (such as the dissemination of misleading financial information), must take remedial actions in the best interest of the corporation.  An attorney may have to refer the matter to a higher authority within the corporation, including the board of directors.  A failure to do so may constitute a breach of the standard of care applicable to an attorney, thus also forming the basis for a claim of legal malpractice.

In addition, if an attorney with knowledge of an officer's breach of fiduciary duty renders substantial assistance to the wrongdoer, the attorney may be liable for aiding and abetting that officer's breach of fiduciary duty, although this cause of action likely would also be subject to analysis under the Texas Proportionate Responsibility statute.

All or some of these claims may be barred by comparative fault rules if the wrongful conduct of the client's officer is imputed to the client.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------- x
                                                     :
In re:                                               :        Chapter 11
                                                     :
ENRON CORP., *et al.*,                               :        Case No. 01-16034 (AJG)
                                                     :
                        Debtors.                     :        Jointly Administered
                                                     :
---------------------------------------------------- x


### APPENDIX D

### (Roles of Lay, Skilling and Outside Directors)

### to

### FINAL REPORT OF NEAL BATSON,
### COURT-APPOINTED EXAMINER


    Reference is made to the preceding Final Report of Neal Batson, Court-Appointed
Examiner (the "Report"). This Appendix constitutes an integral part of the Report. All
capitalized terms not otherwise defined herein shall have the meanings set forth in the
Report.

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................. 1

II.     BACKGROUND REGARDING LAY AND SKILLING ....................... 9
        A.      Biographies ................................................................................ 9
        B.      Involvement in Enron's Business ............................................ 14
        C.      Involvement with the Board .................................................... 25
        D.      Compensation .......................................................................... 26

III.    BACKGROUND REGARDING OUTSIDE DIRECTORS .............. 30
        A.      Biographies .............................................................................. 30
        B.      The Board's Structure and Processes...................................... 34
        C.      Independence ........................................................................... 38

IV.     ACTIONS OF LAY, SKILLING AND OUTSIDE DIRECTORS
        REGARDING SPE TRANSACTIONS .......................................... 45
        A.      Duty to Make Informed Business Judgments ......................... 46
        B.      Duty to Monitor ....................................................................... 80
        C.      Duty to Inquire ...................................................................... 118
        D.      Duty of Candor ...................................................................... 147

V.      ANALYSIS OF EVIDENCE OF BREACH OF FIDUCIARY DUTIES
        BY LAY, SKILLING AND OUTSIDE DIRECTORS ..................... 154
        A.      Duty to Make Informed Business Judgments ....................... 155
        B.      Duty to Monitor ..................................................................... 160
        C.      Duty to Inquire ...................................................................... 162
        D.      Duty of Candor ...................................................................... 167

VI.     DEFENSES ..................................................................................... 168
        A.      Reliance on Officers .............................................................. 168
        B.      Reliance on Professionals ...................................................... 171
        C.      Reliance on Committees of the Board .................................... 173
        D.      Good Faith .............................................................................. 174
        E.      Exculpation and Indemnity .................................................... 175

VII.    CONCLUSIONS.............................................................................. 178


Annex 1 – Lay's and Skilling's Use of Enron Stock to Repay Loans
Annex 2 – Legal Standards Applicable to Lay, Skilling and Outside Directors

# I.    INTRODUCTION

In the Second Interim Report, the Examiner described numerous Enron SPE transactions and identified many accounting, disclosure and other issues arising from those transactions.  In the Third Interim Report, the Examiner determined that sufficient evidence existed for a fact-finder to conclude that certain senior officers, including, among others, Causey, Fastow, McMahon and Glisan (the "Senior Officers"), breached their fiduciary duties to Enron by manipulating Enron's financial statements through the design, implementation and materially inadequate disclosure of certain SPE transactions. The use and disclosure of these SPE transactions resulted in the dissemination of financial information known by the breaching officers to be materially misleading.  This wrongful conduct caused direct and foreseeable harm to Enron, and resulted in harm to innocent parties that dealt with Enron, including certain creditors in the Bankruptcy Case. In this Appendix, the Examiner now considers the roles of Kenneth Lay ("Lay") and Jeffrey Skilling ("Skilling"), as well as the Enron directors during the relevant period other than Lay and Skilling (collectively, the "Outside Directors"), in the Debtors' SPE transactions.

*Legal Standards*.  As discussed in Annex 2 to this Appendix and Annex B (Legal Standards) to the Third Interim Report, officers and directors have fiduciary duties to the corporation and its shareholders, including duties of care and good faith.[1]  These duties require, among other things, that officers and directors as corporate fiduciaries make decisions on an informed basis, following a decision-making process that takes into consideration all material information reasonably available.  Absent conflicts of interest

---

[1]  A director also has a duty of loyalty, as discussed later in this Appendix.

on the part of the decision-makers, decisions made in good faith and on an informed basis generally will be protected by the business judgment rule and will not be subject to judicial second-guessing. However, a decision that lacks any rational business purpose will not be protected from judicial scrutiny by the business judgment rule and, if challenged, the decision-makers may be required to prove that their decision was fair to the corporation. Absent such proof of fairness, the decision-makers may be found to have breached their fiduciary duty if the evidence shows they made the decision in bad faith. The lack of a rational business purpose for the decision can support an inference of bad faith.

The fiduciary duties of officers and directors also require the exercise of diligence in overseeing the business and affairs of the corporation. Thus, officers and directors have a duty to monitor corporate affairs, as well as a duty to inquire into circumstances, or "red flags," indicating that potential problems exist within the corporation. A director who negligently fails to fulfill his or her duty of oversight, but who does not (i) abdicate his or her monitoring responsibilities, (ii) exhibit a conscious disregard for known risks, or (iii) otherwise fail to act in good faith, may be protected from liability to a corporation and its shareholders, if the corporation has adopted a director exculpation provision in its charter.[2] However, a director exculpation provision does not protect a director who is also an officer of the corporation from liability for negligence when acting in his or her capacity as an officer.

---

[2] Enron adopted such a director exculpation provision in its articles of incorporation. *See* Section A, Article VII, Articles of Incorporation of Enron, Oct. 8, 1996 [AB0785 03888-AB0785 04147]. As a result of this, and for other reasons, the Examiner has not attempted to reach conclusions as to whether conduct of the Outside Directors, or of Lay and Skilling acting in their capacities as directors, constitutes negligence not rising to the level of bad faith.

*Available Evidence.* The evidence available to the Examiner regarding the roles of Lay, Skilling and the Outside Directors was limited. Lay submitted to a one-day interview with the Examiner,[3] but Skilling invoked his Fifth Amendment privilege and did not provide the Examiner either testimony or an interview.[4] Lay has provided no sworn testimony to any party in connection with any examination of Enron conducted after the Petition Date,[5] and his only known interviews granted since that date are his interview with the Examiner and an interview conducted in January 2002 by the Powers Committee.[6] Skilling provided sworn testimony to a subcommittee of the House of Representatives Energy and Commerce Committee (the "HEC") on February 7, 2002,[7] and to the SEC in December 2001 and November 2002.[8] Skilling also submitted to two interviews with the Powers Committee.[9]

---

[3] In-Person Interview with Kenneth L. Lay, former CEO, Enron, by William C. Humphreys, Jr., A&B, Oct. 18, 2003 (the "Lay In-Person Interview").

[4] Letter from Bruce A. Hiler, O'Melveny & Myers, L.L.P., to William C. Humphreys, Jr., A&B, Sept. 15, 2003.

[5] Lay In-Person Interview (confirming that he has provided no sworn testimony).

[6] Memorandum from Lisa Henriques, Wilmer Cutler, to Enron Files, regarding Ken Lay Interview, Jan. 16, 2002 (the "Lay 1/16/02 Wilmer Cutler Interview") [AB000000491-AB000000507].

[7] Transcript of the *Financial Collapse of Enron*, Subcomm. on Oversight and Investigations, Comm. on Energy and Commerce, 107th Cong. (Feb. 7, 2002) (the "2/7/02 HEC Hearing Transcript"). Skilling testified to the HEC: "I am here today because I think Enron's employees, shareholders and the public at large have the right to know what happened. I have done all I can to help this investigation. I have testified for two days at the Securities and Exchange Commission. I have spoken on three occasions to the special committee of the board. And have spoken to the committee of this staff as well. I have not exercised my rights to refuse to answer a single question. Not one. And I don't intend to start now." *Id.* at 108.

[8] *See* Testimony of Jeffrey K. Skilling before the SEC, Dec. 5, 2001, Dec. 6, 2001, Nov. 1, 2002, Nov. 4, 2002 and Nov. 5, 2002. When the SEC asked to conduct additional testimony in January 2003, Skilling invoked his Fifth Amendment privilege. *See* Testimony of Jeffrey K. Skilling before the SEC, Jan. 31, 2003, at 5-7.

[9] Memorandum from Steven Rosen, Wilmer Cutler, to Enron Files, regarding Interview of Jeffrey Skilling, Nov. 27, 2001 (the "Skilling 11/27/01 Wilmer Cutler Interview") [AB000000740-AB000000748]; Memorandum from Steven Rosen, Wilmer Cutler, to Enron Files, regarding Interview of Jeffrey Skilling, Jan. 18, 2002 (the "Skilling 1/18/02 Wilmer Cutler Interview") [AB000000750-AB000000760]. Skilling told the HEC that he was interviewed three times in connection with the Powers Report, but the Examiner obtained written reports from Wilmer Cutler for only two interviews. 2/7/02 HEC Hearing Transcript, at

None of the Outside Directors invoked their Fifth Amendment privilege when requested to provide testimony to the Examiner. However, more than twenty of the Enron officers invoked their Fifth Amendment privilege and refused to provide testimony to the Examiner, including the Senior Officers who participated in virtually all of the Board and committee meetings.[10]

With respect to documentary evidence, both Lay and Skilling were infrequent users of emails,[11] and they also apparently did not retain many documents.[12] They produced very little relevant written material in response to the Examiner's subpoenas.

As a result, the evidence available to the Examiner with respect to Lay, Skilling and the Outside Directors consisted primarily of: (i) Lay's one-day interview by the Examiner that was not taken under oath; (ii) Skilling's sworn testimony to the HEC and

---

108. It is unclear whether a third interview took place and, if so, whether Wilmer Cutler made a written record of that interview.

[10] To date, the following former Enron officers and employees, other than Lay and Skilling, invoked their Fifth Amendment privilege against self-incrimination in response to subpoenas for testimony and documents served by the Examiner: Kelly Boots, Robert Butts, Richard B. Buy, Causey, Wes Colwell, David Delainey, Rodney Faldyn, Julia Fang (formerly Chin), Fastow, Lea Fastow, Glisan, Kopper, Lawrence Lawyer, Cheryl Lipshutz, Kathy Lynn, R. Davis Maxey, McMahon, Kristina Mordaunt, Lou L. Pai, Michael Patrick, Kenneth D. Rice, Ryan Siurek, AnnMarie Tiller, and Anne Yaeger Patel. Alan Quaintance provided testimony to the Examiner, but invoked his Fifth Amendment privilege as to questions regarding the Nigerian Barge Transaction.

[11] Testimony of Jeffrey K. Skilling before the SEC, Dec. 6, 2001, at 497. Skilling indicated that he preferred direct contact with the employees and that he spent a considerable part of his working time walking around the company's offices to have informal and impromptu meetings. Testimony of Jeffrey K. Skilling before the SEC, Nov. 1, 2002 (the "Skilling 11/1/02 SEC Testimony"), at 76. See also Phone Interview with Rosalee Fleming, former Assistant to Lay, Enron, by A. Annette Teichert and H. Sadler Poe, A&B, Sept. 10, 2003 (the "Fleming Phone Interview") (Fleming described Lay as not being proficient with computers and stated that she or another assistant typically printed his emails for his review, and either Lay responded with a phone call or a letter, or she responded if the response was via email); Phone Interview with Sherri Sera, former Assistant to Skilling, Enron, by A. Annette Teichert and H. Sadler Poe, Sept. 10, 2003 (the "Sera Phone Interview") (stating that Skilling was not proficient with computers and did not make regular use of email to communicate with business associates).

[12] Administrative assistants for both Lay and Skilling told the Examiner in interviews that neither officer tended to retain copies of letters or documents, nor did they keep copies of written presentations that they may have obtained while meeting with subordinates. Fleming Phone Interview; Sera Phone Interview. One of the assistants indicated that written materials were either discarded or, if appropriate, sent to the part of the company for which the materials had relevance. Fleming Phone Interview.

- 4 -

SEC; (iii) Lay's and Skilling's interviews with the Powers Committee; (iv) sworn testimony of Outside Directors; (v) interviews with and testimony of certain Enron officers; (vi) minutes of the meetings of the Board and its committees, along with related presentations and other materials preserved with such minutes; and (vii) other documentary evidence produced to the Examiner by Enron and other individuals and entities involved in this examination.

*Conclusions.* Although limited by the lack of sworn testimony from certain key officers, and by the small amount of relevant documents, the evidence is sufficient to show that Lay, Skilling and the Outside Directors were actively engaged in performing their monitoring functions. Lay and Skilling were hands-on managers involved in the daily operation of Enron's business. The Outside Directors on the Board and its committees were not involved in the day-to-day operations, but they were generally engaged in activities designed to fulfill their supervisory roles.

However, the evidence shows that, as a result of their day-to-day involvement at the company, Lay and Skilling knew or should have known their subordinate officers misused the SPE transactions in a manner that resulted in the dissemination of materially misleading financial information. Both Lay and Skilling failed to respond to indications of potential problems related to the use of SPE transactions. In addition, Skilling failed to respond to red flags regarding the SPE transactions Enron entered into with LJM1 and LJM2. These were entities in which the company's CFO had a personal interest and from which he received substantial compensation; when his compensation was ultimately revealed, the Board terminated his employment. By failing to respond to red flags that Lay and Skilling either knew or, as Enron's two most senior officers, should have known

- 5 -

indicated potential problems with the SPE transactions, Lay and Skilling were at least

negligent and, therefore, breached their fiduciary duties as officers.

The Outside Directors, however, may not have recognized the same red flags as

indicators of the wrongful conduct of the Senior Officers. They did not have the intimate

knowledge of Enron's day-to-day operations that Lay and Skilling shared. In addition,

although Enron officers often provided voluminous information to the Outside Directors,

helping the Outside Directors understand fully the financial activities at Enron was

apparently not a high priority for Enron management.[13] The officers often presented

information to the Board and its committees in ways that obfuscated the facts, and there

are several instances of apparent intentional misrepresentations by officers. Although the

Outside Directors may be criticized for failing to inquire about aspects of Enron's

financing activities that might have led them to knowledge of the Senior Officers'

wrongful conduct, the evidence does not support a conclusion that the Outside Directors

acted in bad faith or with a conscious disregard for known risks in failing to recognize

and respond to red flags.

The Outside Directors, however, together with Lay and Skilling, authorized Enron

to enter into the "Rhythms" hedge and three of the "Raptors" hedges, none of which had

---

[13] For example, Jordan Mintz ("Mintz"), General Counsel of Enron's Global Finance Group, testified regarding the decision of Enron officers, including him, not to tell the Audit Committee of the Board in February 2001 about transactions in which Enron had repurchased assets from LJM2. When Mintz was asked why the officers did not disclose those transactions, he said: "I felt that there was a substantial opportunity for the board to ask questions, perhaps as we as lawyers are trained, Is there anything else that we should be aware of, and I don't recall them doing that . . . ." Deposition of Jordan Mintz, former Vice President and General Counsel, Enron Global Finance, by Rebecca M. Lamberth, A&B, Sept. 29, 2003 (the "Mintz 9/29/03 Deposition"), at 130. However, Outside Director Herbert Winokur testified, when asked if he had been interested in learning the identity of the person who purchased Fastow's interest in LJM1 and LJM2: "[I]t's management's responsibility to tell me what I should know . . . . I didn't inquire because I assumed somebody would tell me if I needed to know." Sworn Statement of Herbert S. Winokur, Jr., former Director, Enron, to John L. Latham, A&B, Nov. 21, 2002 (the "Winokur 11/21/02 Sworn Statement"), at 240 (second day of testimony).

a rational business purpose. In these transactions, Enron transferred substantial value for non-economic hedges, meaning the value of each hedge to Enron was based solely on the value of securities and cash that Enron itself transferred to the hedging vehicles, providing Enron a financial statement benefit but no economic value. There is evidence that Lay, Skilling and the Outside Directors were aware of facts demonstrating this lack of rational business purpose before approving the transactions. From this evidence, an inference can be drawn that they acted in bad faith by approving the transactions.

Thus, as discussed in detail in this Appendix, based on the evidence available to the Examiner with respect to Lay, Skilling and the Outside Directors, and the reasonable inferences that may be drawn from such evidence, the Examiner has determined that there is sufficient evidence for a fact-finder to conclude that:

- Lay, Skilling and the Outside Directors who were members of the Board in June 1999, breached their fiduciary duty of good faith in authorizing Enron to enter into the Rhythms hedging transaction;

- Lay, Skilling and the Outside Directors who were members of the Board in May through August 2000 breached their fiduciary duty of good faith in authorizing Enron to enter into three of the Raptor hedging transactions; and

- Lay and Skilling were at least negligent in fulfilling their duty of oversight by failing to respond to red flags regarding the Senior Officers' misuse of the SPE transactions, which Lay and Skilling either knew or should have known were indications that the Senior Officers were disseminating materially misleading financial information.

The evidence also shows that, between May 1999 and October 2001, Lay borrowed from Enron a total of over $94 million and repaid this amount using shares of his Enron stock. In May 1999, Skilling repaid $2 million of an Enron loan with shares of his Enron stock. The Compensation and Management Development Committee (the "Compensation Committee") of the Board had granted its approval for Lay and Skilling

- 7 -

to make repayments with stock, but Enron's Board apparently never ratified the decision and did not otherwise grant its approval for what was essentially Enron's repurchase of shares from Lay and Skilling.

As described in Annex 1 to this Appendix, the Compensation Committee did not have authority to grant such approvals under Oregon law; that authority was vested solely in the Board. Because the Board neither approved, nor apparently ratified the Compensation Committee's approval of, the repayments by Lay and Skilling, the evidence is sufficient for a fact-finder to conclude that such repayments are voidable at the election of Enron. Upon such event: (i) Enron would return to Lay 2,131,282 shares of common stock, and Lay would be liable to repay loans in the amount of $94,267,163 plus any applicable interest;[14] and (ii) Enron would return to Skilling 26,425 shares of common stock, and Skilling would be liable to repay his loan in the amount of $2,000,042 plus any applicable interest.

---

[14] The Examiner concluded in the Second Interim Report that Enron has an alternative cause of action against Lay for $74.025 million of this amount under Section 548(a)(1)(B) of the Bankruptcy Code. *See* Second Interim Report, Annex 1 to Appendix P (Avoidance Actions).

## II.    BACKGROUND REGARDING LAY AND SKILLING

During the period 1997 through the Petition Date, Lay and Skilling held the top two officer positions at Enron. They also served on the Board, and Lay served as Chairman. Lay joined the predecessor of Enron in 1984, and Skilling joined Enron in 1990. They led Enron during its steep climb to become the seventh largest public company in America,[15] and then during its dramatic plummet to become, in December 2001, the world's then largest bankruptcy petitioner.[16] Lay remained with Enron until January 2002.[17] Skilling resigned his positions with the company in August 2001, only months before the Petition Date.[18] Both officers held advanced degrees, enjoyed significant professional successes, and had extensive experience in corporate operations. Both officers were fully engaged in the daily affairs of Enron.

### A.    **Biographies**

*Lay*

Lay was born in Missouri[19] in 1942[20] and received a master's degree in economics in 1965 from the University of Missouri.[21] Following graduation, he accepted

---

[15] *The 500 Largest U.S. Corporations*, Fortune, Apr. 16, 2001, at F-1.

[16] In its Chapter 11 bankruptcy petition, Enron estimated its assets at $63.4 billion. In July 2002, World Com Inc. filed a Chapter 11 petition estimating its assets at $107 billion. Bankruptcy Data, *available at* http://www.bankruptcydata.com/Research/15_Largest.htm (last visited Oct. 24, 2003).

[17] Enron Press Release, "Enron Announces Kenneth L. Lay Resigns From Board," Feb. 4, 2002 (the "2/4/02 Enron Press Release") (announcing Lay's resignation that was effective January 23, 2002) [AB1128 01359].

[18] Enron Press Release, "Enron Announces Skilling Resignation; Lay Assumes President and CEO Duties," Aug. 14, 2001 (the "8/14/01 Enron Press Release") [AB1128 00072-AB1128 00073].

[19] Laura Goldberg & Mary Flood, *The Fall of Enron*, Hous. Chron., Feb. 3, 2002 (the "2/3/02 Hous. Chron. Article"), at 1.

[20] Bryan Gruley & Rebecca Smith, *Anatomy of a Fall: Keys to Success Left Kenneth Lay Open to Disaster*, Wall St. J., Apr. 26, 2002 (the "4/26/02 Wall St. J. Article"), at A1.

[21] 2/3/02 Hous. Chron. Article, at 1.

a position as an economist in the Corporate Planning Department of Humble Oil, a predecessor to Exxon Mobile Corporation.[22] While in this position, he wrote speeches for the company's president and represented the company in connection with the Wharton Business School's development of econometric models.[23]

In 1967, he joined the Navy, and his assignments included work on a study to gauge the impact of a Vietnam pullout on the national economy.[24] At the same time, he pursued a Ph.D. in economics from the University of Houston, which he received in 1970.[25] After being released from the Navy in 1971, Lay served as Technical Assistant to the Commissioner of the Federal Energy Regulatory Commission,[26] and as Deputy Undersecretary of the Department of Interior focusing on energy policy.[27]

In 1974, Lay joined the Florida Gas Company, where he held the positions of Vice President of Corporate Planning, Vice President of Gas Supply, President of the Pipeline division, and then ultimately President of the entire company.[28] In 1981, Lay moved to Houston and took the position of President and COO of Transco Energy Corp. ("Transco").[29]

In 1984, Transco offered to acquire Houston Natural Gas Company ("HNG"), when HNG was the target of an attempted hostile takeover by Coastal Corp.[30] Neither

---

[22] Lay 1/16/02 Wilmer Cutler Interview, at 2; 4/26/02 Wall St. J. Article, at A1.

[23] 2/3/02 Hous. Chron. Article, at 1.

[24] *Id.*

[25] *Id.*

[26] Lay 1/16/02 Wilmer Cutler Interview, at 2.

[27] *Id.*

[28] *Id.*

[29] 4/26/02 Wall St. J. Article, at A1.

[30] *Id.*

takeover occurred, but Lay left Transco to become HNG's Chairman and CEO.[31]  Within
less than a year, in May 1985, InterNorth Inc. acquired HNG, creating the nation's largest
coast-to-coast pipeline network.[32]  The combined company changed its name to Enron
Corp., and Lay became Chairman and CEO in 1986.[33]  Lay held the position of CEO at
Enron for fifteen years until February 2001, when the company promoted Skilling to that
position.[34]  Lay remained, however, as Chairman of the Board.  Then in August 2001,
when Skilling resigned from the company, Lay returned to the position of CEO.[35]  Lay
resigned from Enron in January 2002, after its bankruptcy filing.[36]

During his tenure at Enron, Lay became active in political, community and
charitable activities, particularly in the Houston area.  In 1990, he played a leading role in
Houston's Economic Summit of Industrialized Nations,[37] and in 1992, he was Chairman
of the Host Committee for the Republican National Convention.[38]  He also served as
Chairman of the University of Houston System Board of Regents and, in 1996, he led the
successful campaign to build a new stadium in Houston when the Astros professional
baseball team threatened to leave the city.[39]  Lay and his wife formed their own charitable

---

[31] *Id.*

[32] *Id.*

[33] *Id.*

[34] Lay 1/16/02 Wilmer Cutler Interview, at 2.

[35] *Id.*

[36] 2/4/02 Enron Press Release (announcing Lay's resignation that was effective January 23, 2002).

[37] 2/3/02 Hous. Chron. Article, at 1.

[38] 4/26/02 Wall St. J. Article, at A1.

[39] 2/3/02 Hous. Chron. Article, at 1.

foundation, reported to have $52 million of assets in 2000 and to have made about $3.6 million in charitable contributions that year.[40]

*Skilling*

Skilling was born in Pittsburgh in 1953[41] and grew up in Aurora, Illinois.[42] He received a bachelor's degree from Southern Methodist University in 1973[43] and accepted a position in asset and liability management with First City National Bank.[44] He left that position to attend Harvard Business School, where he received an M.B.A. in 1979,[45] graduating in the top 5% of the class.[46] Following his Harvard graduation, Skilling went to work for the management consulting firm McKinsey & Company ("McKinsey"), where he oversaw the firm's worldwide energy and North American chemical consulting practices and rose to be a senior partner.[47]

In 1990, Skilling left McKinsey to join the Enron Finance unit, a division reportedly created for him.[48] According to an article in *The Wall Street Journal*, Skilling built that unit "into a multibillion dollar juggernaut that traded everything from electricity

---

[40] *Id.*

[41] Wendy Zellner, *Derring-Do in the Corner Office*, Bus. Wk., Feb. 12, 2001 (the "2/12/01 Bus. Wk. Article"), at 80.

[42] John R. Emshwiller & Kathryn Kranhold, *A Year Later, Ex-CEO Skilling Is Waiting His Fate*, Wall St. J., Aug. 14, 2002 (the "8/14/02 Wall St. J. Article"), at C1.

[43] 2/12/01 Bus. Wk. Article, at 80.

[44] *Id.*

[45] Mike Tolson & Alan Bernstein, *Power Failure, Skilling Energized Enron But Draws Suspicion After Its Fall*, Hous. Chron., Feb. 10, 2002 (the "2/10/02 Hous. Chron. Article"), at 1.

[46] *Id.*

[47] An internal Enron biography states that Skilling also worked as an associate with MJH Nightingale and Company, Ltd., an investment banking firm in London, England, but it does not provide the dates of this employment. Biography of Jeffrey K. Skilling, President and COO, Enron (the "Skilling Biography"), at AB0971 02982 [AB0971 02982-AB0971 02983].

[48] 8/14/02 Wall St. J. Article, at C1.

to space on the information superhighway."[49]  In December 1996, Skilling was promoted
to President and COO of Enron,[50] and he was elected to the Board in February 1997.[51]
He was promoted again in February 2001, this time to President and CEO.[52]  Six months
later, on August 14, 2001, Skilling resigned all positions with the company.[53]

Like Lay, Skilling was active in the community.  Skilling sat on the boards of
directors for the Greater Houston Community Foundation, the Houston Technology
Center, and the Houston Branch of the Federal Reserve Bank of Dallas.[54]  He was a
member of the Advisory Board for the North American Electric Reliability Council.[55]  He
reportedly formed his own foundation and donated significant amounts to the Houston
Ballet, Junior Achievement, the Multiple Sclerosis Society and other charities.[56]

Skilling's resignation from Enron was unexpected by most accounts.  The Outside
Directors uniformly testified that they were surprised, because he was viewed as
ambitious and had held the position of CEO for such a short period of time.[57]  Skilling
told the Board that his resignation was for personal reasons, and that he wanted to spend

---

[49] Id.

[50] Enron Press Release, "Enron Names Jeffrey K. Skilling President & Chief Operating Officer," Dec. 10,
1996 [AB1128 00074-AB1128 00075].

[51] Minutes of Enron Board Meeting, Feb. 11, 1997 (the "2/11/97 Board Minutes"), at 11 (nominating
Skilling as a director and resolving to place him on shareholder proxy) [AB000185043-AB000185066].

[52] Minutes of Enron Board Meeting, Feb. 13, 2001, at 23 [AB000203924-AB000203947].

[53] 8/14/01 Enron Press Release.

[54] Skilling Biography, at AB0971 02982.

[55] Id.

[56] 2/10/02 Hous. Chron. Article, at 1.

[57] See, e.g., Sworn Statement of Robert A. Belfer, former Director, Enron, to Steven M. Collins, A&B,
July 31, 2003 (the "Belfer Sworn Statement"), at 178-79; Sworn Statement of John House Duncan, former
Director, Enron, to John L. Latham, A&B, Nov. 26, 2002 (the "Duncan Sworn Statement"), at 92; Sworn
Statement of Wendy L. Gramm, former Director, Enron, to William C. Humphreys, Jr., A&B, Aug. 20,
2003 (the "Gramm Sworn Statement"), at 221; Sworn Statement of Charles A. LeMaistre, former Director,
Enron, to William C. Humphreys, Jr., A&B, July 17, 2003 (the "LeMaistre Sworn Statement"), at 64-66.

more time with his family.[58]  However, in an interview he granted to *The Wall Street
Journal* on the day after Enron announced his resignation, Skilling acknowledged that he
might have stayed with the company had its stock price not dropped.[59]  Skilling's
voluntary departure in August 2001 meant that he had to repay $2 million that he had
borrowed from Enron, which Enron would have forgiven under the terms of his
employment agreement if he had stayed employed for just four more months, through
December 31 of that year.[60]

### B.    Involvement in Enron's Business

*Lay*

The evidence available to the Examiner indicates that Lay was fully engaged in
the daily affairs of Enron.  The record made by the Powers Committee of its interview
with Lay shows that Lay was able to discuss at length and in detail Enron's business
direction in the 1990s.[61]  Lay's only indication in that interview of any disengagement
from the daily operations was his discussion of Skilling becoming CEO in February

---

[58] *See, e.g.*, Belfer Sworn Statement, at 178-79; Duncan Sworn Statement, at 92-93; Sworn Statement of
Frank Savage, former Director, Enron, to Steven M. Collins, A&B, Aug. 13, 2003 and Sept. 4, 2003 (the
"Savage Sworn Statement"), at 268-69; Minutes of Enron Board, Aug. 13-14, 2001 (the "8/13-14/01 Board
Minutes"), at 3, 20 [AB000203059-AB000203079].  Skilling's wife, Rebecca Carter, who was also an
Enron employee, testified that Skilling left the position because "[h]e was not happy." Sworn Statement of
Rebecca Comeau Carter, former Senior Vice President and Corporate Secretary, Enron, to William C.
Humphreys, Jr., A&B, Sept. 3, 2003 (the "Carter Sworn Statement"), at 195.  She testified: "He hadn't
wanted the job in the first place and it was not what he enjoyed doing. . . . Jeff liked building businesses
. . . and that's not what he was doing anymore." *Id.* at 195.

[59] John R. Emshwiller, *Enron's Skilling Cites Stock-Price Plunge As Main Reason for Leaving CEO Post*,
Wall St. J., Aug. 16, 2001, at A2.  After Enron's October 23, 2001 analyst call, Skilling called Lay and
offered to return to the company, but the Board decided not to accept his offer.   Lay In-Person Interview;
Gramm Sworn Statement, at 56-57.

[60] Section 2.3(d), Third Amendment to Employment Agreement between Enron and Skilling, Feb. 7, 2000
("The outstanding amount of 2 Million Dollars shall be forgiven by Employer if Employee fully performs
all duties and responsibilities expected of him in his position and under this Agreement through December
31, 2001.") [AB000517418-AB000517426]; Sections 2.02 and 2.07, Loan Agreement between Enron and
Skilling, Oct. 13, 1997 [AB000517438-AB000517442].

[61] Lay 1/16/02 Wilmer Cutler Interview, at 2-3.

2001, a job Lay relinquished to Skilling for just over six months.   The Powers

Committee's record of the interview with Lay states:

> When Lay stepped down as CEO, he wanted to make the transition
> seamless.  He started to turn responsibilities over to Skilling.  Skilling
> would take the responsibilities over and run with them.  After Lay stepped
> down as CEO, Skilling appropriately slowed the flow of information to
> Lay.  After stepping down as CEO, Lay concentrated on other areas of
> Enron business, like problems in California.[62]

However, Lay also told the Powers Committee that Skilling "always kept him

well informed on Enron business."[63]   Others have testified that Lay and Skilling

continued to work closely together.   For example, Outside Director Frank Savage

("Savage") testified regarding Skilling's appointment to CEO:

> Q.  Now, at that point, as far as you could tell, did Mr. Lay kind of back
> off from the executive responsibilities of the business?  Was he less
> involved?
>
> A.  He was still involved, but he had to give Skilling the reins to be the
> CEO.  So it was natural that he would back up somewhat, you know, from
> the day-to-day running of the company.   But he still was very much
> involved.[64]

One example of Lay's involvement is his participation in weekly management

meetings.  From at least 1994, Lay and Skilling began each week with a one to two hour

Monday morning "operating committee" meeting.[65]   In addition to these two senior

---

[62] *Id.* at 4.

[63] *Id.*

[64] Savage Sworn Statement, at 264.

[65] Lay In-Person Interview; Sworn Statement of Rebecca Mark-Jusbasche, Enron, to William C. Humphreys, Jr., A&B, Aug. 28, 2003 (the "Mark-Jusbasche Sworn Statement"), at 66.  Mark-Jusbasche testified that the average length of the meeting was one or two hours.  *Id.* at 67.  Skilling testified that the meetings took place "[v]irtually every Monday."  Skilling 11/1/02 SEC Testimony, at 43-44.  The name of this committee changed over time and was also called the Executive Committee and Management Committee depending on the time period.  *See, e.g.,* Draft Transitioning to a Professional Partnership Model, Presentation to the Board of Directors, Dec. 11, 2000 [AB1128 01378-AB1128 01398]; Email from Ken Lay, Enron, to All Enron Worldwide, Aug. 24, 2001, regarding Executive Committee [AB1128 01399]; Email from Enron Announcements, to All Enron Worldwide, regarding Formation of Enron

- 15 -

officers, the attendees at each meeting included "all the business heads, and their number two person[s]"[66] along with "the staff people," described by Skilling as including "the head accountant, chief accountant, chief risk officer, head of investor relations, [and] chief of staff . . . ."[67] Skilling testified that these meetings were "attended by all of the key people in the company."[68]

According to Skilling, each "meeting was, essentially, everyone going around and just reporting out what was going on in their business, and if there were issues or things that they felt that Ken [Lay] and I, and other members of management should be aware of."[69] These meetings would often be used to discuss the company's performance compared to budgets and other expectations,[70] and Causey would report on any below-budget performance to both Lay and Skilling.[71] Skilling testified that the participants in the meetings would sometimes discuss "the financial statements, and what the current estimate was versus actual."[72]

According to Rebecca Mark-Jusbasche ("Mark-Jusbasche") who, as an Enron senior officer, regularly attended the meetings:[73]

---

Management Committee, Aug. 21, 2001 [AB1128 01400]; Enron Memorandum from Ken Lay and Jeff Skilling, to Enron Corporate Policy Committee, Dec. 6, 2000 [AB1128 01401].

[66] Skilling 11/1/02 SEC Testimony, at 43.

[67] Id. at 44. According to Lay, the group included 20-25 people. Lay In-Person Interview.

[68] Skilling 11/1/02 SEC Testimony, at 78.

[69] Id. at 78. Lay stated that the head of each operating unit and each major staff group would report on important projects as well as legal and regulatory items. Lay In-Person Interview.

[70] Skilling 11/1/02 SEC Testimony, at 59.

[71] Id. at 57-59.

[72] Id. at 43. Lay stated that Causey would give these reports at least once each month. Lay In-Person Interview.

[73] Mark-Jusbasche Sworn Statement, at 66 (testifying that she attended from about 1994 through 2000). Mark-Jusbasche, who was also a director, left Enron in August of 2000. Id. at 104.

- 16 -

[E]ither Ken [Lay] or Jeff [Skilling], depending upon who was in town, was in charge of the meeting. So if one of them happened to have a conflict, the other one was there and in charge of the meeting. And I cannot recall a time when one of them wasn't there . . . . Often -- often they were both in the meetings, and I also can't recall a time when they both didn't actively participate. There wasn't one person sitting silent while the other did all the heavy-lifting.[74]

Lay also appears to have been involved alongside Skilling in many areas of approval and control at Enron. For example, Skilling testified that both he and Lay received reports of trading violations from the trading controls group within Enron.[75] With respect to certain units of Enron, such as the pipeline unit, Lay and Skilling met twice each quarter with the heads of those units and with accounting and risk control staff to review "performance against current estimate, and discuss the business strategy that was going on."[76] In addition, Lay sometimes met with Skilling and the "head of systems"[77] to discuss systems development projects that were underway.[78] Lay stated that when he and Skilling were in the office, they would meet at least once or twice each week for thirty to forty minutes, to bring each other up to date on various issues.[79]

Mark-Jusbasche testified: "It was my impression that Ken [Lay] and Jeff [Skilling] worked together really closely and that they spoke often, multiple times a day, for example, and that they were focused at different areas, focused on doing different

---

[74] *Id.* at 72-73.

[75] Skilling 11/1/02 SEC Testimony, at 47-48.

[76] *Id.* at 48.

[77] *Id.* at 67.

[78] *Id.* at 67.

[79] Lay In-Person Interview.

- 17 -

things, but that they shared information on a regular basis."[80]   She characterized

Skilling's focus as the operational areas of the business, such as the trading business,

broadband and The New Power Company.[81]   She and Skilling both characterized Lay as

being more involved in the international operations.[82]   According to Mark-Jusbasche, Lay

was "always more organizationally involved,"[83] handling matters like compensation for

senior level employees in the international area.[84]   Skilling testified that Lay

> would have had much more information on what was going on, on that
> side of the business than I would. . . . [W]hen I was president and chief
> operating officer, I was rarely involved in the international assets, and did
> not receive notification of things that were going to the board, for
> example. . . . Ken was involved in those, where he'd fly to Indonesia and
> meet with people, or India, or other places.  South America and so forth.[85]

Lay said that he and Skilling generally split responsibility for business strategy,

which was a high priority for both of them.[86]   Lay also said that he spent more time than

Skilling on legal matters, governmental affairs, communications, overseeing the pipeline

and regulated group, international projects, employee relations and Enron's global

presence.[87]

As a top executive officer, Lay was also active in matters involving the Enron

Board, including determining what information would be presented to the Board and

making certain that he had a detailed understanding of that information.  He presided at

---

[80]  Mark-Jusbasche Sworn Statement, at 50.

[81]  *Id.* at 51.

[82]  Skilling 11/1/02 SEC Testimony, at 82-83.

[83]  Mark-Jusbasche Sworn Statement, at 51.

[84]  *Id.* at 53.

[85]  Skilling 11/1/02 SEC Testimony, at 82-83.

[86]  Lay In-Person Interview.

[87]  *Id.*

all Board meetings, and he developed the agendas for the Board meetings.[88]  In addition,

he and Skilling held a rehearsal several days in advance of each meeting to review with

the presenters the business unit presentations.[89]  According to Rebecca Carter ("Carter"),

who served as corporate secretary from 1999 to 2001, at these review sessions, Lay and

Skilling "went through every slide, so it was pretty – fairly detailed."[90]  Lay said that he

would often make comments and suggestions on the presentations during this review.[91]

Mark-Jusbasche testified that Lay was not detached or disengaged from the

operations of Enron: "You know, he was not involved in a number of activities that Jeff

may have been involved with, but he was very busy and very involved in the activities

that he was taking direct responsibility [sic]."[92]  Other Outside Directors shared this

impression of Lay.  Dr. Charles LeMaistre testified:

> I would say to you that [I] was very familiar with all of Mr. Lay's outside
> activities in Houston, and I did not think they were excessive or
> detrimental to his position at Enron.
>
> Indeed, I never found Mr. Lay uninformed on an issue because he had
> been spending time elsewhere.  He understood the issues thoroughly.  He
> presented them to the board, and we felt that Mr. Lay was on top of all that
> was going on at Enron.[93]

Dr. John Mendelsohn ("Mendelsohn") testified that Lay was "substantially

engaged" in Enron's operations.[94]  Mendelsohn stated that he

---

[88]  Skilling 11/1/02 SEC Testimony, at 128, 130.

[89]  Carter Sworn Statement, at 114-17; Lay In-Person Interview (confirming agenda review sessions).

[90]  Carter Sworn Statement, at 114.  *See also id.* at 17 (stating that she became corporate secretary in May 1999), 6 (stating that she left the position in August 2001).

[91]  Lay In-Person Interview.

[92]  Mark-Jusbasche Sworn Statement, at 53.

[93]  LeMaistre Sworn Statement, at 44-45.

[94]  Sworn Statement of John Mendelsohn, M.D., former Director, Enron, to William C. Humphreys, Jr., A&B, Sept. 9, 2003 (the "Mendelsohn Sworn Statement"), at 121-22.

had the impression that he [Lay] delegated certain aspects. He depended on Mr. Buy for certain things and Jeff Skilling for certain things and Derrick for certain things. He was not the kind of man who assumed he knew everything, but I had the feeling that he was in touch with their thinking and that he was the synthesizer.[95]

Several Outside Directors testified that their concern about the operations of the company when Skilling resigned were reduced when Lay agreed to resume the position of CEO:

- Ronnie Chan testified: "I think I expressed to Ken my taking comfort in the fact that he would be returning to the CEO post."[96]

- John Duncan testified that he told Skilling, upon learning of Skilling's resignation: "I'm grateful that Ken Lay can step back into that position, if he's willing to, because after all he's the guy that got us where we are up until six months before your resignation."[97]

- Savage testified regarding his conversation with Lay at the time Skilling resigned. According to Savage:

  [Lay said] I'm willing to come back as CEO. And when he said that, whew, I was relieved. I was very relieved, and very comforted, because I felt that okay, well, Ken is going to come back, and I knew he was interrupted – actually I thanked him for this, because I thought that that would – it gave me a lot of comfort, personally, when he said that.

  So quite frankly, Skilling was history in my mind from that point on. There now was another CEO, and that was Ken. Whom I had – I had a lot of confidence in. I had a lot of confidence in him.[98]

---

[95] *Id.* at 122-23.

[96] Sworn Statement of Ronnie C. Chan, former Director, Enron, to William C. Humphreys, Jr., A&B, Aug. 9, 2003 (the "Chan Sworn Statement"), at 65.

[97] Duncan Sworn Statement, at 93.

[98] Savage Sworn Statement, at 266-67. Savage was asked: "Did you believe that there would be a seamless transition from Mr. Skilling to Mr. Lay?" *Id.* at 168. He replied: "It was only six months that Skilling was in office. So yes, I did think that there would be a seamless one. And they worked closely together." *Id.* at 268.

*Skilling*

The evidence is clear that Skilling was a hands-on manager at Enron. In five days of testimony provided to the SEC, Skilling discussed Enron's operations in great detail. In describing his duties as COO and then CEO, he estimated the allocation of his time among routine internal and external matters and special focus areas, evidencing that he was involved in virtually all aspects of the business.[99]

Skilling estimated that he spent approximately 40% of his time dealing with "internal" matters with the company's strategic business units, including "strategic planning activities and budgeting, and financial performance review and that sort of thing."[100] These internal matters also included handling:

> personnel issues, and that would be management of personnel – you know, performance evaluation, promotions, reorganizations. We had a very complex performance evaluation process in place, which took an enormous amount of time. And just general personnel; you know, making sure you have the right people in the right places.[101]

Internal matters also included dealing with:

> a number of different policy issues . . . all the way from employment practices to . . . the trading policy – which . . . specified what standardized transactions could be undertaken by the company. And then the other policy area was our capital investment and contracting policies, which had a whole system in place for managing and overseeing capital investments in contracts.[102]

According to Skilling, he spent approximately 30% of his time on "external" matters, which included:

---

[99] Testimony of Jeffrey K. Skilling before the SEC, Dec. 5, 2001 (the "Skilling 12/5/01 SEC Testimony"), at 13-19.

[100] *Id.* at 15.

[101] *Id.* at 16.

[102] *Id.* at 16.

dealing with investors. I would meet with equity analysts; I would meet with mutual funds; I would meet with investors, pension funds, those sorts of things.

Another big piece was debt. People who had provided us with debt, meeting with banks, partners that we had in various businesses. That's – credit rating agencies, that sort of thing.

. . . .

And then the other component of external – there's just a whole range of other interested people that you met with. . . . I spent a reasonable amount of time speaking at universities for recruiting purposes. Government officials, we would brief the FERC, the Federal Energy Regulator[y] Commission, and whether there were issues or glitches in the deregulation of the electricity and natural gas businesses.[103]

Finally, Skilling described some of the special focus areas, which he estimated

required 30% of his time:

[T]here was always something that was a major focus of effort, in addition to those that were more recurring-type activities.

And in 1997, it was J-Block, which was a large contract, troubled contract, that we had for purchase of natural gas in the North Sea. And that had to be completely restructured in 1997, and I spent probably a third of my time during 1997 working on the restructuring of that contract.

In 1998 and 1999, one of the emphasis areas was to modify and change our international strategy. You know, we had made large investments in the developing countries, in the power plants and the pipelines, and these were not earning compensatory rates of return. And so we had to make major efforts to reduce investment activity there, and to manage those investments more aggressively, to try to make them work.

In 1999 and 2000, the focus changed to selling those assets, selling those international assets. And I spent an incredible amount, a large portion of that 30 percent, on trying to sell those assets. And then also in 1999 and 2000, the creation of our telecommunications business . . . in 1999 and 2000.

In 2000 and 2001, I spent a great deal of time dismantling our telecommunications business after that marketplace fell apart.

. . . .

---

[103] *Id.* at 17-18.

And then in 2000 and 2001, the other big one was California, just the energy problems in California were significant, and took an enormous amount of time, an enormous amount of time.[104]

As Outside Director Bruce Willison testified:

[M]y impression was that Jeff was the chief operating officer and basically had his – his hands on the pulse of all the various activities of the company.

. . . .

My impression of Jeff was that he was a [sic] very hands on, you know, very knowledgeable about what was going on, very involved in decision making. Very smart individual.[105]

Another Outside Director, Jerome Meyer ("Meyer"), characterized Skilling as "a very control-oriented manager"[106] with detailed knowledge about the business.[107]

According to Outside Director John Urquhart ("Urquhart"), Skilling was

[o]ne of the brightest people in the industry at that time. It was the view of several CEO's that I knew personally who were exposed to him that he was very, very bright, and could have easily been the CEO of any major company.[108]

*Relationship to Certain Senior Officers*

During the years 1997 through 2001, the highest office at Enron was the Office of the Chairman, which Lay and Skilling shared. At times, the Office of the Chairman officially included other executives, but the office appears to have been more honorary

---

[104] *Id.* at 18-19.

[105] Sworn Statement of Bruce G. Willison, former Director, Enron, to Jenna L. Moore, A&B, Sept. 3, 2003 (the "Willison Sworn Statement"), at 42-43, 46.

[106] Sworn Statement of Jerome J. Meyer, former Director, Enron, to Steven M. Collins, A&B, Aug. 29, 2003 (the "Meyer Sworn Statement"), at 49.

[107] *Id.* at 50 ("Q. So was it your view that Mr. Skilling appeared to be – have a detailed familiarity with all of the operations of the business? A. Absolutely.").

[108] Sworn Statement of John A. Urquhart, former Director, Enron, to Steven M. Collins, A&B, Sept. 5, 2003 (the "Urquhart Sworn Statement"), at 133.

than substantive with respect to those other officers.[109] As the top two officers, Lay and Skilling supervised certain of the officers at Enron who were involved with designing and implementing the SPE transactions. Fastow and Causey reported directly to Lay and Skilling, and Glisan and McMahon reported to Fastow. The following chart shows the relevant portion of Enron's organizational structure as of June 2000:

---

[109] The office included the following individuals serving as Vice Chairman at various times: Ken Harrison ("Harrison"), who was CEO of Portland General Electric ("PGE"); Mark-Jusbasche, who was CEO of Enron International; Joe Sutton, Mark-Jusbasche's successor as CEO of Enron International; Cliff Baxter, who was CEO of Enron North America; and Mark Frevert, who was CEO of Enron Wholesale Services and Enron Europe. Enron Press Release, "Enron Announces Management Appointments," May 6, 1998 [AB1129 00615]; Enron Press Release, "Enron Promotes Joseph Sutton to Vice Chairman," July 1, 1999 [AB1129 00616-AB1129 00617]; Enron Press Release, "Enron Promotes Cliff Baxter to Vice Chairman," Oct. 18, 2000 [AB1129 00618]; Enron Press Release, "Greg Whalley, Mark Frevert Promoted to Office of the Chairman," Aug. 28, 2001 [AB1129 00619-AB1129 00620]. Greg Whalley joined the Office of the Chair in August 2001, when he was promoted to President and COO after Skilling's resignation. Enron Press Release, "Greg Whalley, Mark Frevert Promoted to Office of the Chairman," Aug. 28, 2001 [AB1129 00619-AB1129 00620]. The function of the office, however, was not clear. Harrison testified that his responsibilities in that office were "ambiguous." Sworn Statement of Ken L. Harrison, former Director, Enron, to Steven M. Collins, A&B, Aug. 27, 2003 (the "Harrison Sworn Statement"), at 20-21 (testifying that the Office of the Chairman never held meetings, and that his title "was intended to sound good but didn't really entail much activity"). Skilling testified to the HEC that "[t]he office of the chairman was a concept that we applied for reporting purposes," and stated that it included himself, Lay, Mark-Jusbasche and Sutton, with no mention of Harrison. 2/7/02 HEC Hearing Transcript, at 153. Mark-Jusbasche testified that her position in the office was simply a "label," and that she did not "function as a part of the decision making body of the Office of the Chair." Mark-Jusbasche Sworn Statement, at 48-49.

- 24 -



## C. Involvement with the Board

From 1997 through the Petition Date with respect to Lay, and through his August 2001 resignation with respect to Skilling, both officers attended every regularly scheduled and special Board meeting. Lay presided as Chairman at each meeting. Lay was also a member of the Executive Committee, but he attended most meetings of other committees. Skilling was also a member of the Executive Committee, and he attended all Finance and Audit Committee meetings and most Compensation Committee meetings.[110]

Other members of the Board recalled Lay as taking "a very active role in leading the discussion" at Board meetings,[111] "going from agenda item to agenda item, as well as

---

[110] Both Lay and Skilling left certain meetings of the Audit and Compensation Committees when those committees held "executive sessions" at which those committees did not want management present. *See, e.g.*, Minutes of Enron Audit Committee Meeting, Oct. 12, 1998 (the "10/12/98 Audit Committee Minutes"), at 4 [AB000191694-AB000191697]; Minutes of Enron Compensation Committee Meeting, Jan. 10, 2000 (the "1/10/00 Compensation Committee Minutes"), at 2 [AB000202328-AB000202330].

[111] Chan Sworn Statement, at 224.

making relevant comments along the way."[112]  "[H]e ran the board meetings and was
very much in command of the business planning that was being discussed at the
board."[113]  Several of the Outside Directors testified about the level of involvement of
both Lay and Skilling.  For example, Robert Belfer testified:

> I would say that Ken ran the board meetings with a pretty firm hand and
> that he, you know, expressed his views and recommendations, in effect,
> and responded to various comments and questions made by directors
> during discussions.
>
> . . . .
>
> Mr. Skilling was similar to Mr. Lay at finance committee meetings, and at
> board meetings when he wasn't a presenter he would tend to be somewhat
> more passive than Mr. Lay.[114]

Meyer testified regarding Lay specifically:

> I would say that whenever we had a dialogue in either committee or board
> meetings, Ken would interject himself.  He would be conversant.  He
> appeared to know a lot about whatever subject that we were dialoguing
> about, but, clearly, he was more focused to the outside.[115]

## D.  Compensation

Lay and Skilling received substantial cash compensation from Enron, as well as
significant value in the form of stock options, restricted stock and other stock-based
incentives.  Enron's March 2001 proxy statement reported Lay's and Skilling's
compensation as follows:

---

[112] *Id.*

[113] Mendelsohn Sworn Statement, at 122.

[114] Belfer Sworn Statement, at 66.

[115] Meyer Sworn Statement, at 50.

### Lay's Compensation in 2000[116]

| | |
|---|---|
| Base Salary | $ 1,300,000 |
| Cash Bonus | 7,000,000 |
| Restricted Stock Awards | 7,500,025 |
| Long-Term Incentive Plan Payout | 1,218,750 |
| Options[117] | 14,816,188 |
| Other Compensation[118] | 1,238,867 |
| Total | $33,073,830 |

### Skilling's Compensation in 2000[119]

| | |
|---|---|
| Base Salary | $ 850,000 |
| Cash Bonus | 5,600,000 |
| Restricted Stock Awards | 3,500,037 |
| Options[120] | 6,914,195 |
| Other Compensation[121] | 168,228 |
| Total | $17,032,460 |

According to Enron's proxy statement, at least the cash bonus for each officer was determined taking into consideration the financial performance of the company. The proxy statement provided that Lay's $7 million bonus was determined after a review of management's performance report, which "reflected an increase in total recurring net

---

[116] Enron Schedule 14A filed with the SEC on Mar. 27, 2001 (the "Enron 2001 Proxy Statement"), at 19-21.

[117] As explained in the Enron 2001 Proxy Statement, this amount represents the potential realizable value on 769,235 shares, assuming the market value of Enron stock appreciated in value at an annual rate of 5%. *See* Enron 2001 Proxy Statement, at 21.

[118] This amount, which is explained in detail in the Enron 2001 Proxy Statement, includes such items as split dollar life insurance benefits and allocations under an employee stock ownership plan. *See* Enron 2001 Proxy Statement, at 19-20.

[119] Enron 2001 Proxy Statement, at 19-21.

[120] As explained in the Enron 2001 Proxy Statement, this amount represents the potential realizable value on 358,975 shares, assuming the market value of Enron stock appreciated in value at an annual rate of 5%. *See* Enron 2001 Proxy Statement, at 21.

[121] This amount, which is explained in detail in the Enron 2001 Proxy Statement, includes such items as allocations under an employee stock ownership plan. *See* Enron 2001 Proxy Statement, at 19-20.

income of 28% from the previous year" among other financial measures.[122]   As the

Examiner reported in the Second Interim Report, however, the six accounting techniques

employed by Enron in certain of its SPE transactions accounted for almost one-third of

Enron's reported income before interest, minority interests and income taxes in 2000.[123]

Thus, a substantial part of Lay's and Skilling's compensation was related to the use of the

SPE transactions.

Lay and Skilling also received substantial sums from selling their Enron stock.

During the four-year period 1998 through 2001, Lay had gross proceeds of over $209

million from Enron stock sales.[124]  Of that amount, $94 million was derived from selling

stock back to Enron to repay money that Lay borrowed from the company under a line of

credit.[125]  During the same four-year period, Skilling had gross proceeds of over $96

million from Enron stock sales,[126] of which $2 million was derived from selling stock

back to Enron to repay a loan.[127]

The use of Enron stock to repay corporate loans is discussed in Annex 1 to this

Appendix.  As described in that Annex, the Compensation Committee, which approved

Lay's and Skilling's use of Enron stock to repay loans, did not have authority to grant

such approvals under Oregon law, and the repayments were apparently never approved or

ratified by the Board.  Therefore, the repayments by Lay and Skilling are likely voidable

---

[122]  Enron 2001 Proxy Statement, at 15.

[123]  *See* Second Interim Report, Appendix Q (Schedules Depicting Impact of Enron's Six Accounting Techniques).

[124]  This amount was reported by Lay in filings he made with the SEC during 1998 through 2001 pursuant to Section 16(a) of the Securities Exchange Act of 1934, as amended (the "Exchange Act").

[125]  List entitled "Sales to Enron Corp. to Repay Loan, produced by Enron" [AB000430358].

[126]  This amount was reported by Skilling in Section 16 filings he made with the SEC during 1998 through 2001 pursuant to Section 16(a) of the Exchange Act.

[127]  Enron Corp. – Account Reconciliation, Officers' Loans, as of Sept. 30, 2001 [AB0522 08492].

at the election of Enron.  Upon such event:  (i) Enron would return to Lay 2,131,282 shares of common stock, and Lay would be liable to repay loans in the amount of $94,267,163 plus any applicable interest; and (ii) Enron would return to Skilling 26,425 shares of common stock, and Skilling would be liable to repay his loan in the amount of $2,000,042 plus any applicable interest.

## III.  BACKGROUND REGARDING OUTSIDE DIRECTORS

During the five-year period 1997 through the Petition Date, the total number of directors on Enron's Board ranged from fifteen to nineteen,[128] and a majority of the directors served Enron in no role other than that of director.  There were five directors who had other roles at Enron, namely Lay, Skilling, Mark-Jusbasche, Ken Harrison and Urquhart.  Harrison and Mark-Jusbasche were full-time Enron employees, and Urquhart provided full-time consulting services for Enron for a period of time.

For purposes of this Appendix, however, the term "Outside Directors" includes all of the members of Enron's Board who served during the period 1997 to the Petition Date other than Lay and Skilling.  Although Harrison, Mark-Jusbasche and Urquhart were employed or engaged by Enron, based on the evidence available to the Examiner, their positions with the company were such that they would have had effectively no involvement with the SPE transactions beyond that of the non-officer and non-employee directors.

### A.  Biographies

Each of Enron's Outside Directors was an accomplished, successful business person or professional.  Most had advanced degrees, many held senior leadership positions in U.S. and international businesses, and many served on the boards of other for-profit U.S. corporations.  Enron's Outside Directors included, for example, four people who held Ph.D.s and one with an honorary doctorate, two medical doctors who each served as president of one of the world's leading cancer treatment centers, and two

---

[128] All directors were elected for one-year terms each May at the company's annual meeting of shareholders.  Thus, Enron's Board was not staggered.  Occasionally, Enron added new directors or replaced resigning directors at times other than the annual meeting, with the Board, rather than the shareholders, voting on the election of such new or replacement directors.

law school graduates. The group also included twelve people who had served as CEOs, a Dean of the Stanford University School of Business, a member of Great Britain's House of Lords who also served as Energy Secretary under Margaret Thatcher, and a former chair of the Commodity Futures Trading Commission. As one director testified to the PSI, "[t]hese directors were a smart and talented group of people who brought a diversity of experience and expertise to the Board."[129]

The following chart sets forth the name of each Outside Director who served during the period 1997 to the Petition Date, such director's dates of service and age as of the Petition Date, and the Board committees on which such director served.

### Enron Directors[130]

| Name | Date Board Service Began[131] | Date Board Service Ended | Age at Petition Date[132] | Committees |
|---|---|---|---|---|
| Robert A. Belfer ("Belfer") | 1983[133] | June 2002[134] | 65 | Finance Executive |
| Norman P. Blake, Jr. ("Blake") | 1993[135] | June 2002[136] | 59 | Finance Compensation |

---

[129] *The Role of the Board of Directors in Enron's Collapse: Hearing before the Permanent Subcomm. on Investigations, Senate Comm. on Governmental Affairs*, 107th Cong. (May 7, 2002) (the "5/7/02 PSI Hearing Transcript"), at 27 (testimony of Norman Blake).

[130] Enron was formed in May 1985, when InterNorth Inc. ("InterNorth") merged with HNG. The merged entity changed its name to Enron Corp. in 1986. To the extent that dates in this chart refer to time periods prior to the merger, they refer to Board service with either HNG or InterNorth.

[131] For directors whose Board service commenced before 1997, the month they joined the Board is not included.

[132] These ages have been determined using the ages stated in Enron's proxy statements filed with the SEC during the years 1998 through 2001 and were, therefore, determined without the benefit of knowing each director's date of birth. Thus, these ages could be in error by one year.

[133] Belfer Sworn Statement, at 15.

[134] *Id.*

[135] Enron 2001 Proxy Statement, at 2. However, Blake testified that he joined the board in 1994. Sworn Statement of Norman P. Blake, Jr., former Director, Enron, to John L. Latham, A&B, Dec. 13, 2002 (the "Blake Sworn Statement"), at 12.

[136] Enron Press Release, "Enron Board Reports Progress on Planned Transition," June 6, 2002 (the "6/6/02 Enron Press Release"), at AB1128 00088 [AB1128 00088-AB1128 00091].

| | | | | |
|---|---|---|---|---|
| Ronnie C. Chan ("Chan") | 1996[137] | March 2002[138] | 51 | Audit Finance |
| John H. Duncan ("Duncan") | 1968[139] | March 2002[140] | 73 | Executive (Chair) Compensation |
| Joseph H. Foy ("Foy") | 1970[141] | May 2000[142] | 74 | Audit Executive |
| Wendy L. Gramm ("Gramm") | 1993[143] | June 2002[144] | 56 | Audit Nominating |
| Ken L. Harrison ("Harrison") | August 1997[145] | May 2001[146] | 58 | None |
| Robert K. Jaedicke ("Jaedicke") | 1984[147] | March 2002[148] | 72 | Audit (Chair) |
| Rebecca Mark-Jusbasche ("Mark-Jusbasche") | July 1999[149] | August 2000[150] | 46 | None |
| Charles A. LeMaistre ("LeMaistre") | 1980[151] | March 2002[152] | 77 | Compensation (Chair) Executive |

---

[137] Enron Schedule 14A filed with the SEC on Mar. 24, 1997 (the "Enron 1997 Proxy Statement"), at 2.

[138] Enron Press Release, "Enron Board of Directors Announces Plan to Restructure Board," Feb. 12, 2002 (the "2/12/02 Enron Press Release"), at AB1128 00084 [AB1128 00084-AB1128 00085].

[139] HNG Schedule 14A filed with the SEC on Oct. 30, 1984 (the "HNG 1984 Proxy Statement"), at 2.

[140] 2/12/02 Enron Press Release, at AB1128 00084.

[141] HNG 1984 Proxy Statement, at 3.

[142] Enron Press Release, "Enron Board Director Joe H. Foy Retires," May 2, 2000 [AB1128 00082].

[143] Enron 1997 Proxy Statement, at 3.

[144] 6/6/02 Enron Press Release.

[145] Harrison Sworn Statement, at 13, 22-23.

[146] Id. at 9.

[147] Sworn Statement of Robert K. Jaedicke, former Director, Enron, to John L. Latham, A&B, Dec. 19, 2002 and Dec. 20, 2002 (the "Jaedicke Sworn Statement"), at 16.

[148] Id.

[149] Enron Press Release, "Enron Promotes Joseph Sutton to Vice Chairman," July 1, 1999 (the "7/1/99 Enron Press Release"), at AB1128 00078 [AB1128 00078-AB1128 00079].

[150] Enron Press Release, "Enron Announces Board Resignation," Aug. 25, 2000 [AB1128 00083].

[151] HNG 1984 Proxy Statement, at 5.

[152] 2/12/02 Enron Press Release.

| John Mendelsohn ("Mendelsohn") | May 1999[153] | May 2002[154] | 64 | Audit Nominating |
| Jerome J. Meyer ("Meyer") | August 1997[155] | February 2001[156] | 63 | Finance Nominating |
| Paulo V. Ferraz Pereira ("Pereira") | October 1999[157] | March 2002[158] | 46 | Audit Finance |
| Frank Savage ("Savage") | October 1999[159] | May 2002[160] | 62 | Finance Compensation |
| John A. Urquhart ("Urquhart") | 1990[161] | May 2001[162] | 72 | Finance Board Vice Chair[163] |
| John Wakeham ("Wakeham") | 1994[164] | March 2002[165] | 68 | Audit Nominating (Chair) |
| Charls E. Walker ("Walker") | 1984[166] | May 1999[167] | 77 | Finance |

---

[153] Enron Press Release, "Enron Corp. Elects John Mendelsohn to Board of Directors," May 19, 1999 (the "5/10/99 Enron Press Release") [AB1128 00076-AB1128 00077].

[154] Enron Press Release, "Enron Names Two New Board Members," May 30, 2002 (the "5/30/02 Enron Press Release"), at AB1128 00087 [AB1128 00086-AB1128 00087].

[155] Minutes of Enron Board Meeting, Aug. 11, 1997 (the "8/11/97 Enron Board Minutes"), at 1 (first meeting with record of Meyer's attendance) [AB000183958-AB000183991].

[156] Meyer Sworn Statement, at 7.

[157] Enron Press Release, "Enron Corp. Elects Paulo V. Ferraz Pereira and Frank Savage to Board of Directors," Oct. 12, 1999 (the "10/12/99 Enron Press Release") [AB1128 00080-AB1128 00081].

[158] 2/12/02 Enron Press Release.

[159] 10/12/99 Enron Press Release.

[160] 5/30/02 Enron Press Release, at AB1128 00087.

[161] Enron 1997 Proxy Statement, at 5.

[162] Urquhart Sworn Statement, at 13. The last Board meeting he attended was in February 2001. *Id.*

[163] Urquhart became the Vice Chair of the Board in August 1991. 1997 Proxy Statement, at 5.

[164] *Id.*

[165] 2/12/02 Enron Press Release.

[166] HNG 1984 Proxy Statement, at 5.

[167] 5/10/99 Enron Press Release, at AB1128 00076.

| Bruce G. Willison ("Willison") | August 1997[168] | December 1998[169] | 52 | Audit Finance |
| Herbert S. Winokur, Jr. ("Winokur") | 1984[170] | June 2002[171] | 57 | Finance (Chair) Executive |

Despite many of the Outside Directors being age sixty-five or older, all appear to have been either employed full time or otherwise engaged in activities that required significant commitments in addition to their service to Enron. Attachment A to this Appendix provides a brief description of certain aspects of each Outside Director's accomplishments and qualifications, as well as his or her business and professional activities in addition to the Enron Board service.

## B. The Board's Structure and Processes

### Committees

The Board had five standing committees, including four that were either required or customary for public companies: Audit and Compliance (the "Audit Committee"); Compensation and Management Development (the "Compensation Committee"); Nominating and Corporate Governance (the "Nominating Committee"); and Executive (the "Executive Committee").[172] The fifth standing committee was Finance (the "Finance

---

[168] 8/11/97 Board Meeting Minutes (first meeting with record of Willison's attendance); Willison Sworn Statement, at 17.

[169] Willison Sworn Statement, at 17.

[170] HNG 1984 Proxy Statement, at 6.

[171] 6/6/02 Enron Press Release.

[172] The Audit Committee and the Finance Committee typically had six to eight members each; the Compensation Committee and the Nominating Committee typically had four to five members each. The Executive Committee consisted of each committee chair, plus Lay, Skilling and typically two other directors. Generally, when a new director joined the Board, Lay suggested the committees, if any, that the director would join, and there was no shifting of directors among committees during the period 1997 to 2001. See, e.g., Sworn Statement of Paulo V. Ferraz Pereira, former Director, Enron, to William C. Humphreys, Jr., A&B, Sept., 12, 2003 (the "Pereira Sworn Statement"), at 27-29; Gramm Sworn Statement, at 33; Meyer Sworn Statement, at 28.

- 34 -

Committee"), which served "as a monitor of the Company's financial activities."[173]
Outside Directors most involved with overseeing Enron's SPE transactions were the members of the Finance Committee, who were charged with, among other things, reviewing and approving the company's significant financings,[174] and the members of the Audit Committee, who were responsible for reviewing Enron's publicly disseminated financial statements.[175]

*Meeting Process*

During the years 1997 through 2001, Enron's directors met for regularly scheduled meetings five times per year, in February, May, August, October and December.[176] Typically, these sessions encompassed ten to twelve hours of meetings spanning a two-day period.[177] In addition to the regularly scheduled meetings, the Board

---

[173] Enron Finance Committee Charter, undated (the "Finance Committee Charter"), at 1 [AB1114 00003-AB1114 00004].

[174] Finance Committee Charter, at 1.

[175] Enron Audit and Compliance Committee Charter, as amended Feb. 12, 2001 (the "2/12/01 Audit Committee Charter"), at AB000203950 [AB000203948-AB000203951]. Many of the SPE transactions were not brought to the Board or its committees for review and approval. As discussed in more detail in the Report to which this Appendix is attached, it appears that the structures used in many of the SPE transactions meant that they were subject to certain Enron approval policies that allowed the officers to enter into the transactions without Board approval. The Board appears to have approved SPE transactions involving the issuance or transfer of Enron stock, including Chewco, Whitewing, Marlin, Rhythms and Raptors.

[176] These meetings were held on February 10-11, 1997; May 5-6, 1997; August 10-11, 1997; October 13-14, 1997; December 8-9, 1997; February 9-10, 1998; May 4-5, 1998; August 10-11, 1998; October 12-13, 1998; December 7-8, 1998; February 7-8, 1999; May 3-4, 1999; August 9-10, 1999; October 11-12, 1999; December 13-14, 1999; February 7-8, 2000; May 1-2, 2000; August 7-8, 2000; October 6-7, 2000; December 11-12, 2000; February 12-13, 2001; April 30-May 1, 2001; August 13-14, 2001; October 8, 2001; and December 20, 2001. Enron held the regularly scheduled meetings most often at its offices in Houston, but occasionally it held the meetings at off-site locations. For example, in August 1997, the Board met in Portland, Oregon in connection with the acquisition of Portland General Electric. In February 1998, the Board met in Philadelphia, following Pennsylvania's decision to deregulate the electricity market in that state. Gramm Sworn Statement, at 102-03. In February 1999, the Board met in London, which permitted the Board to tour Enron's Wessex water plant. In October 2000, the Board met in Palm Beach, Florida.

[177] Beginning in the afternoon of the first day, the standing committees met, followed by a dinner that was primarily a social event but at which the directors might hear presentations about various company matters. On the morning of the second day, the full Board met, usually ending around noon or mid-afternoon. In

and some of the committees held special meetings on an ad hoc basis. For example, in 2000, the Board held four special meetings, the Compensation Committee held five special meetings, and the Executive Committee held seven such meetings.[178]

The Outside Directors were rarely absent from the regularly scheduled Board meetings.[179] Even though the special meetings of the Board were generally scheduled on short notice, few of the Outside Directors missed those meetings.[180]

The committee meetings were also regularly attended. For example, of the twenty-four regularly scheduled Finance Committee meetings held from 1997 to 2001, there was perfect attendance for twelve of those meetings, and at six of the meetings only one member was missing. Additionally, during this period, several of the Outside Directors made it a practice to attend meetings of committees on which they did not

---

addition, any committee that did not meet or complete its meeting on the first day would meet on the second day. Skilling 12/5/01 SEC Testimony, at 39-40.

[178] The following chart shows the number of special meetings held, according to the records of Enron's Board and its committees:

Special Meetings

|              | 1997 | 1998 | 1999 | 2000 | Jan. – Sept. 2001 | Oct. 2001 – Petition Date |
|--------------|------|------|------|------|-------------------|---------------------------|
| Board        | 3    | 3    | 8    | 4    | 4                 | 24                        |
| Audit        | 1    | 0    | 0    | 0    | 0                 | 4                         |
| Compensation | 3    | 2    | 3    | 5    | 5                 | 4                         |
| Executive    | 11   | 13   | 10   | 7    | 3                 | 0                         |
| Finance      | 0    | 1    | 0    | 0    | 0                 | 0                         |
| Nominating   | 0    | 0    | 1    | 0    | 1                 | 0                         |

[179] For example, from 1997 through the fall of 2001, there were 24 regularly scheduled Board meetings, with perfect attendance at 10 of these meetings, one director absent from nine of the meetings, and two directors absent from five of the meetings.

[180] For example, from 1997 through October 22, 2001, there were 25 special meetings, with perfect attendance at nine of the meetings, one director missing from eight meetings, two directors missing from three meetings and four or more directors missing from four meetings. Attendance information was omitted from the minutes of one of the meetings.

officially serve. For example, LeMaistre often attended the Finance Committee meetings "because of [his] interest in what the finance committee was doing," even though he was never a member of that committee.[181]

In advance of each regularly scheduled meeting, Enron usually provided to each Outside Director a package containing the meeting agendas and voluminous amounts of preparatory materials, often exceeding several hundred pages in length.[182] Despite the Outside Directors' busy schedules and the volume of material they received, the Outside Directors testified that they read the materials and were generally impressed by the level of preparedness of their colleagues.[183] The number of hours that each Outside Director estimated he or she spent in a year on all matters related to Enron, including reviewing

---

[181] LeMaistre Sworn Statement, at 93-94. According to attendance records as reflected in the meeting minutes, LeMaistre attended 10 of the Finance Committee's 24 meetings during 1997 through 2001. Other non-Finance Committee members who regularly attended that committee's meetings included Harrison (who attended 14 of the meetings) and Duncan (who attended 11). From time to time, other Board members, including Mendelsohn, Gramm, Foy and Jaedicke, also attended Finance Committee meetings.

[182] These materials typically included copies of the presentations that would be made at the meetings, as well as reports on various company matters. *See* Gramm Sworn Statement, at 121 ("I would say that the finance committee would have up to a foot of documents, sometimes even more, because I wouldn't necessarily see everything that they got beforehand that they read while they were at home . . . . The audit committee got a substantial amount of, I would say, several inches of documents."). *See also* Meyer Sworn Statement, at 35-36; Savage Sworn Statement, at 46-49; LeMaistre Sworn Statement, at 88-89; Chan Sworn Statement, at 49-50; Willison Sworn Statement, at 24-26; Blake Sworn Statement, at 33-35. Occasionally, there were problems getting the materials to the directors traveling from other countries before the meetings. Chan (who lived in Hong Kong), Pereira (who lived in Brazil), and Wakeham (who lived in England) indicated that when this happened, they would review the materials in their hotel rooms before the committee meetings began. Chan Sworn Statement, at 42-45; Pereira Sworn Statement, at 38-40; Sworn Statement of Lord John Wakeham, former Director, Enron, to Oni A. Holley and John L. Latham, A&B, Dec. 5, 2002 (the "Wakeham Sworn Statement"), at 72.

[183] LeMaistre Sworn Statement, at 90-91 ("I don't recall any board member who appeared not to be prepared when they came to the meeting."); Savage Sworn Statement, at 156 ("I thought that the board was a very strong board, very intelligent asked a lot of questions. And we met frequently. So I didn't have any concerns about the board or the board structure or the board practices."); Meyer Sworn Statement, at 35-38; Chan Sworn Statement, at 35; Pereira Sworn Statement, 32-34; Duncan Sworn Statement, at 47.

materials and attending meetings, varied widely, ranging from 100 to over 400 hours per year.[184]

The Board and committee meetings were not tape recorded.[185] The corporate secretary took handwritten notes of all Board and committee meetings, and Carter confirmed in testimony that, for 1999 through 2001 while she held that position, handwritten notes on the presentation and other materials preserved with the Board and committee minutes were made contemporaneously by her at the meetings.[186]

### C.  Independence

The Outside Directors received substantial compensation from Enron each year in the form of cash and stock options. Towers Perrin valued compensation for the year 2000 at more than $300,000 per director.[187] In addition, certain Outside Directors had consulting agreements or other financial connections to the company. During the period

---

[184] Belfer Sworn Statement, at 45-64 (390-410 hours); Blake Sworn Statement, at 31-37 (200-300 hours); Chan Sworn Statement, at 42-44 (130-140 hours); Duncan Sworn Statement, at 45-47 (300-400 hours); Sworn Statement of Joe H. Foy, former Director, Enron, to William C. Humphreys, A&B, Aug. 26, 2003 (the "Foy Sworn Statement"), at 50-51 (240-300 hours); Gramm Sworn Statement, at 61-62 (125-150 hours); LeMaistre Sworn Statement, at 84-89 (300-325 hours); Meyer Sworn Statement, at 44-45 (100-150 hours); Savage Sworn Statement, at 38-53 (125-175 hours); Wakeham Sworn Statement, at 17 (350-400 hours); Sworn Statement of Herbert S. Winokur, Jr., former Director, Enron, to John L. Latham, A&B, Nov. 20, 2002 (the "Winokur 11/20/02 Sworn Statement"), at 52, 57 (200-250 hours) (first day of testimony).

[185] Carter Sworn Statement, at 140-41.

[186] *Id.* at 140-41. Following the meetings, the secretary then drafted minutes, which would usually be reviewed and revised by a number of people, including Enron's General Counsel, James Derrick. Sworn Statement of James V. Derrick, Jr., General Counsel, Enron, to Rebecca M. Lamberth, A&B, Sept. 26, 2003, at 333-37. Carter had a financial background and, thus, a good understanding of many of the topics covered at the Board and committee meetings relating to the SPE transactions. *See* Carter Sworn Statement, at 8-9 (testifying that she holds a master's degree in accounting and worked for Andersen for three and one-half years, before moving to Enron); *Id.* at 14-21 (testifying that she worked in Enron's financial reporting area, that she also served as Enron's chief control officer, and that at one point in her Enron career she helped draft the MD&A section of Enron's SEC filings). Lay asked Carter to resign as corporate secretary in August 2001 when Skilling resigned from the company. *Id.* at 6. Carter and Skilling were married in March 2002. *Id.* at 4.

[187] Materials from Enron Compensation Committee Meeting, May 1, 2000 (the "5/1/00 Compensation Committee Materials"), at AB000496605 (slide from Towers Perrin presentation entitled "Enron Corp. Board of Director Compensation") [AB000496545-AB000496612].

1997 through the Petition Date, twelve of the Outside Directors sold or otherwise engaged in transactions involving Enron stock from which they received aggregate proceeds of over $217 million. Despite the significant financial benefits that many of the Outside Directors received in connection with their services for Enron, the evidence available to the Examiner is not sufficient for the Examiner to conclude that any of the Outside Directors engaged in self-dealing in connection with Enron's transactions or that such financial benefits resulted in the Outside Directors being beholden to Enron's officers or otherwise unable to exercise independent judgment so as to amount to a breach of their duty of loyalty.[188]

*Compensation*

Beginning in 1999, each of Enron's Outside Directors[189] received a $50,000 annual service fee[190] and $1,250 per Board or committee meeting attended.[191] Each committee Chair received an additional $10,000 per year.[192] As of 2000, the Outside Directors were required to defer 50% of their annual service fee into a "phantom stock

---

[188] The Examiner has not conducted a separate analysis of claims based on insider trading under federal or state corporate law. The key elements of a state corporate law claim for breach of fiduciary duty based on insider trading (to the extent such claims have been recognized) generally are subsumed within the elements of a federal securities law claim for insider trading under the Exchange Act Section 10(b), Rule 10b-5 thereunder, and Section 20A. Federal insider trading claims were asserted against certain of the Outside Directors in the Newby Class Action. By order dated March 12, 2003, the district court in the Newby Class Action dismissed the insider trading claims against the Outside Directors.

[189] Harrison and Mark-Jusbasche, who were also Enron employees, did not receive any additional compensation for serving as Board members. Harrison Sworn Statement, at 64-65.

[190] Enron Schedule 14A filed with the SEC on Mar. 30, 1999 (the "Enron 1999 Proxy Statement"), at 12; Enron Schedule 14A filed with the SEC on Mar. 21, 2000 (the "Enron 2000 Proxy Statement"), at 12; Enron 2001 Proxy Statement, at 12. In 1998, the annual service fee was $40,000. Enron Schedule 14A filed with the SEC on Mar. 24, 1998 (the "Enron 1998 Proxy Statement"), at 12.

[191] Enron 1999 Proxy Statement, at 12; Enron 2000 Proxy Statement, at 12; Enron 2001 Proxy Statement, at 12. In 1998, the attendance fee was $1,250 for each Board meeting and $1,000 for each committee meeting. Enron 1998 Proxy Statement, at 12.

[192] Enron 1999 Proxy Statement, at 12; Enron 2000 Proxy Statement, at 12; Enron 2001 Proxy Statement, at 12. In 1998, committee chairs received an additional $5,000 per year rather than $10,000. Enron 1998 Proxy Statement, at 12.

plan" and were allowed to receive the remaining fees in cash, deferred compensation,

phantom stock units or stock options.[193]   Although Enron's 2000 Proxy Statement

reported an average of $86,829 per director in annual directors' fees for 1999,[194] an

analysis performed by Towers Perrin for the Compensation Committee that same year

estimated the average annual compensation for Enron's Outside Directors at $304,565

when including the value of stock-based compensation.[195]

### Personal, Business and Financial Relationships with Enron and its Officers

Certain of the Outside Directors had personal, business and financial relationships

with Enron and certain Enron officers during the period 1997 through the Petition Date.

The list below describes all such relationships of which the Examiner has found

evidence:

- *Belfer*. Beginning in 1996, a subsidiary of Enron entered into natural gas and crude oil commodity swap agreements and option agreements with Belco Oil & Gas Corp. ("BOGC"), of which Belfer was Chairman and CEO.[196]   According to Enron's annual proxy

---

[193] Enron 2000 Proxy Statement, at 12; Enron 2001 Proxy Statement, at 12.

[194] Enron 2000 Proxy Statement, at 12.

[195] 5/1/00 Compensation Committee Materials, at AB000496596-AB000496608 (the Towers Perrin Presentation).  In 2000, Enron engaged Towers Perrin to help evaluate the appropriateness of its Outside Director compensation and "determine if the level of compensation for non-employee Directors was competitive with the marketplace."  Minutes of Enron Compensation Committee Meeting, May 1, 2000 (the "5/1/00 Compensation Committee Minutes"), at 2 [AB000202343-AB000202348].  Towers Perrin compared Enron's director compensation to that of "a select group of comparable companies," *id.* at 2, including Exxon Corp., GE, IBM Corp., Dynegy, Inc., and Williams Corporation.  5/1/00 Compensation Committee Materials, at AB000496605 (slide from Towers Perrin Presentation).  Towers Perrin concluded that Enron's cash compensation exceeded the 75th percentile, but that the annual stock value given to directors was below the 75th percentile.  5/1/00 Compensation Committee Minutes, at 2.  Towers Perrin further observed that Enron's cash compensation "appear[ed] to be in line with the intended level," and recommended "that Enron increase its long-term incentive awards for outside directors to a level consistent with the 75th percentile of the comparable companies."  5/1/00 Compensation Committee Materials, at AB000496599-AB000496600 (slides from Enron Board of Director Compensation Presentation by Towers Perrin).  In response, the Compensation Committee granted an additional 3,335 stock options to each of the Outside Directors to bring the stock value compensation to the 75th percentile target.  5/1/00 Compensation Committee Minutes, at 2.

[196] Enron 1998 Proxy Statement, at 28.

statements, BOGC made net payments to the Enron subsidiary under the contracts in every year except 1997.[197]

In November 1997, BOGC purchased Coda Energy, Inc. ("Coda") from JEDI I for approximately $325 million of cash and assumption of liabilities.[198] Goldman Sachs represented BOGC in the transaction, and the engineering firm of Miller & Lents separately analyzed the value of Coda's reserves.[199]

- *Foy.* In 1998 and 1999, Enron retained the law firm of Bracewell & Patterson L.L.P., from which Foy is a retired partner.[200]

- *Gramm.* From 1989 through 2002, Enron and its employees contributed a total of $97,350 to political campaigns of Gramm's husband, U.S. Senator Phil Gramm.[201]

  In addition, during the period 1996 through 2001, Enron and Lay's personal foundation donated approximately $50,000 to the Mercatus Center of George Mason University, which employs Gramm.[202] Gramm testified that part of Enron's donations occurred before she was affiliated with the Mercatus Center,[203] and that she never solicited contributions from Enron other than through mass mailings.[204]

- *LeMaistre and Mendelsohn.* From 1997 through 2002, Enron and Lay donated approximately $600,000 to the M.D. Anderson Cancer Center located in Houston, of which LeMaistre and Mendelsohn served as

---

[197] Enron 1998 Proxy Statement, at 28 (showing net payment from Enron to BOGC of $1,808,537.60 in 1997); Enron 1999 Proxy Statement, at 28 (showing net payment from BOGC to Enron of $1,682,110 in 1998); Enron 2000 Proxy Statement, at 27 (showing net payment from BOGC to Enron of $4,065,000 in 1999); Enron 2001 Proxy Statement, at 27 (showing net payment from BOGC to Enron of $33,000,000 in 2000).

[198] Enron 1998 Proxy Statement, at 28-29; Belfer Sworn Statement, at 22.

[199] Belfer Sworn Statement, at 23.

[200] Enron 1998 Proxy Statement, at 29; Enron 1999 Proxy Statement, at 28. In addition, Foy testified that Enron made contributions totaling $100,000 to the Cowboy Artists of America Museum, of which Foy served as president and chairman. Foy Sworn Statement, at 39-40. Although Foy did not state when these contributions were made, it appears they occurred prior to 1997, because he testified that he solicited the contributions through an executive assistant to Lay who left Enron in 1997. *Id.* at 40.

[201] Jeff Gerth & Richard A. Oppel, Jr., *Enron's Collapse: The Power Couple*, N.Y. Times, Jan. 18, 2002, at C1. Gramm testified that she had no knowledge of Enron's contributions to her husband. Gramm Sworn Statement, at 47-51.

[202] Gramm Sworn Statement, at 43-44; Reed Abelson, *Enron's Collapse: The Directors*, N.Y. Times, Nov. 30, 2001 (the "11/30/01 N.Y. Times Article"), at C6.

[203] Gramm Sworn Statement, at 46-47.

[204] *Id.* at 44-45.

president at different times.[205]    Both LeMaistre and Mendelsohn
testified that they never solicited donations from anyone at Enron on
behalf of that institution.[206]

- *Savage*. Until 2001, Savage served on the board of directors of
Alliance Capital Management ("Alliance"), which held Enron stock in
the investment funds it managed. Savage testified that when he joined
Enron's Board in 1999, Alliance erected an ethical wall to prevent him
from having any involvement with the Enron investments.[207]

- *Urquhart*. From 1991 through 2001, Urquhart had a consulting
agreement with Enron, pursuant to which Enron paid Urquhart
between $410,000 and $632,000 per year.[208] Urquhart testified that he
performed services under this agreement relating to Enron's
international projects, utilizing his knowledge of power generation
equipment gained during his career at General Electric Company.[209]
He supervised the construction of the Teeside plant in England, which
required almost full time work, in addition to working on other
international projects.[210]

- *Walker*. According to the PSI, for more than ten years ending in 2001,
Enron contributed up to $50,000 annually to the American Council for
Capital Formation, a non-profit corporation that lobbied on tax issues
and was chaired by Walker.[211]

- *Wakeham*. From 1997 through 2000, Enron paid Wakeham a monthly
retainer of $6,000 for "his advice and counsel on matters relating
specifically to European business and operations."[212]    Wakeham

---

[205] 11/30/01 N.Y. Times Article, at C6. In 1993, the Enron Foundation pledged $1.5 million to the M.D.
Anderson Cancer Center. *See id.* at C6.

[206] LeMaistre Sworn Statement, at 74-76; Mendelsohn Sworn Statement, at 16-17. Mendelsohn also
testified that Enron made no substantial gifts to the M.D. Anderson Cancer Center after he became
president in 1996. Mendelsohn Sworn Statement, at 16-17.

[207] Savage Sworn Statement, at 37-38. Savage testified that he had no involvement in recommendations by
Alliance as to whether to buy or sell Enron stock. *Id.* at 38.

[208] Enron 1998 Proxy Statement, at 27; Enron 1999 Proxy Statement, at 27; Enron 2000 Proxy Statement,
at 25; Enron 2001 Proxy Statement, at 26. Enron also granted Urquhart options on 100,000 shares of Enron
phantom stock, with an exercise price of just over $19 per share. Enron 2000 Proxy Statement, at 25;
Enron 2001 Proxy Statement, at 26.

[209] Urquhart Sworn Statement, at 25.

[210] *Id.* at 25-28 (testifying that, in addition to Teeside, he worked on a pipeline project in Russia, and power
plant activities in South America, China and Spain).

[211] Chart of Enron Board of Directors – Financial Ties to Enron, May 2000 (prepared by the PSI) (Exhibit
43 to the PSI Report) [AB000150808]. The Examiner did not receive testimony from Walker and has
otherwise found no evidence of these contributions.

[212] Enron 1998 Proxy Statement, at 27.

testified that, in return for his fees, he advised Enron on the "fast-moving energy scene in Europe"[213] and that as "clearly a public figure" in Europe, he "could do things for Enron that Enron couldn't do for itself. I mean, I was better known than Enron was in Europe."[214]

- *Winokur.* National Tank Company ("Natco"), with which Winokur was indirectly affiliated through his work as an investment manager, sold equipment, parts and service to Enron from 1996 through 2000. Natco recorded annual revenues from these sales ranging from $316,000 to $1,035,000.[215]

*Stock Transactions*

The Examiner has reviewed each Outside Director's stock transactions during 1997 through 2001, using information obtained from the Outside Directors' transaction reports filed with the SEC.[216] Attachment B to this Appendix contains a chart showing the proceeds received by each Outside Director as a result of those transactions.

Seven of the Outside Directors reported no Enron stock transactions during the five years 1997 through 2001.[217] Of the twelve Outside Directors who engaged in Enron stock transactions during that period,[218] six received proceeds of more than $1 million each. Belfer received approximately $98 million, of which approximately $80 million was derived from costless collars he entered into with JPMorgan Chase and Morgan

---

[213] Wakeham Sworn Statement, at 22.

[214] *Id.* at 23.

[215] Enron 1998 Proxy Statement, at 28; Enron 1999 Proxy Statement, at 28; Enron 2000 Proxy Statement, at 26; Enron 2001 Proxy Statement, at 26-27.

[216] These reports were filed by the respective directors with the SEC on Forms 3, 4 and 5 pursuant to Section 16(a) of the Exchange Act.

[217] These seven Outside Directors were Mendelsohn, Meyer, Pereira, Savage, Wakeham, Willison and Winokur. Mendelsohn is included in this list because he reported only one *de minimis* stock sale of 50 shares in November 2001 for which he received total gross proceeds of $40. *See* Attachment B to this Appendix.

[218] These twelve Outside Directors are Belfer, Blake, Chan, Duncan, Foy, Gramm, Harrison, Jaedicke, LeMaistre, Mark-Jusbasche, Urquhart and Walker. *See* Attachment B to this Appendix.

Stanley.  Harrison and Mark-Jusbasche, each of whom were senior officers of Enron, also received substantial sums—in excess of $50 million each—from exercising options and selling the related shares.[219]  Duncan received just over $2 million from his Enron stock transactions, and Blake and Foy received just over $1 million each.

---

[219] Belfer and Harrison held substantial Enron stock and stock options acquired when Enron purchased companies they owned or worked for, rather than through their service on Enron's Board.

## IV. ACTIONS OF LAY, SKILLING AND OUTSIDE DIRECTORS REGARDING SPE TRANSACTIONS

The responsibilities of Lay, Skilling and the Outside Directors included a decision-making function and an oversight function. In order to fulfill their decision-making function, these fiduciaries were required to make decisions on an informed basis, following a decision-making process that took into consideration all material information reasonably available. A decision that lacked any rational business purpose may support an inference that the decision-makers did not make the decision in good faith.

To fulfill their oversight responsibility, Lay, Skilling and the Outside Directors were required to monitor the affairs of Enron by undertaking reasonable efforts to remain attentive to and informed of the company's business and affairs. They also had a duty to inquire when indications of potential problems, or "red flags," arose.

The evidence shows that Lay, Skilling and the Outside Directors did not make informed business judgments attributable to a rational business purpose when they approved: (i) the "Rhythms" hedging transaction, a non-economic hedge with LJM1; and (ii) the "Raptors" hedging transactions, also non-economic hedges that were completed with LJM2.

With respect to their oversight obligations, the evidence shows that Lay, Skilling and the Outside Directors were all active in monitoring Enron's financial affairs. Although their actions may be subject to criticism, none of Lay, Skilling or the Outside Directors appears to have abdicated his or her monitoring responsibilities.

Another element of their oversight responsibilities, however, required Lay, Skilling and the Outside Directors to respond to the red flags alerting them to potential wrongful conduct of Senior Officers in connection with the SPE transactions. Because of

Lay's and Skilling's full-time positions as CEO and COO, they were more familiar with the affairs under their supervision and had greater access to information regarding SPE transactions than the Outside Directors. Thus, they had more occasion to encounter red flags than the Outside Directors and, correspondingly, more responsibility to respond to them.

The failure to recognize or respond to red flags by the Outside Directors, who necessarily could not have a detailed knowledge of the day-to-day operations of the company, is subject to criticism. However, the evidence reviewed by the Examiner is not sufficient for a fact-finder to conclude that any of the Outside Directors failed to act in good faith, or that they acted with a conscious disregard for known risks. This is particularly true in an environment in which management often failed to provide the Board with meaningful information and even intentionally misled the Board from time to time.

The evidence shows that Lay and Skilling, however, given their far more intimate involvement with the daily activities of Enron, either knew or should have known from the existence of red flags they encountered that the Senior Officers were misusing SPE transactions in a manner that resulted in the dissemination of materially misleading financial information.

A. **Duty to Make Informed Business Judgments**

As described in the Second Interim Report, Enron entered into a hedging transaction involving LJM1 relating to Enron's investment in stock of Rhythms NetConnections, Inc. ("Rhythms"), and a series of hedging transactions involving LJM2

referred to as the Raptors, which related to a number of Enron's portfolio assets.[220] The Rhythms and Raptors hedges were non-economic, meaning that (i) Enron used them purely to achieve the ability to offset the income statement impact of any decline in the hedged assets' value by writing up the value of the hedge, and (ii) the only assets available to pay any hedge obligations to Enron were the securities or cash Enron itself transferred to the structures. Enron gave substantial value to LJM1 and LJM2 to accomplish these structures, which were designed solely to provide a financial statement benefit and had no economic benefit to Enron.

*Rhythms*

*Background.* In March 1998, Enron purchased equity in Rhythms for approximately $10 million.[221] Following Rhythms' initial public offering, its stock price was volatile, and the value of Enron's investment increased to over $500 million at one point[222] and was approximately $260 million as of June 1, 1999.[223] Because the Rhythms stock was a fair value asset in Enron's portfolio, Enron had recognized the large increase in value as income and was concerned about the adverse effect on its income statement if the value were to decline. Enron was contractually prohibited from selling or hedging the stock for a period of six months.[224] Even if Enron were not prohibited from hedging the

---

[220] *See* Second Interim Report, Appendix L (Related Party Transactions).

[221] *See* Rhythms NetConnections, Inc. Form S-1 filed with the SEC on Apr. 6, 1999 (the "Rhythms S-1"), at Item 15.

[222] Memorandum from Rebecca C. Carter, Senior Vice President, Board Communications, Enron, to Enron Board of Directors, regarding weekly update, Apr. 16, 1999 (the "4/16/99 Weekly Board Update"), at 2 (reporting that the stock price had reached as much as $110 per share) [AB000448792-AB000448797]. Enron held approximately 5.3 million shares of Rhythms common stock.

[223] Rhythms S-1, at Principal Stockholders Table. Rhythms' closing stock price on June 1, 1999 was $48.50 per share. *NASDAQ National Market Issues*, Wall St. J., June 2, 1999, at C12.

[224] Letter from Gil Melman, Senior Counsel, Enron Communications Investments Corp., to Rose Stroud, Legal Transfers Area, American Securities Transfer & Trust Inc., Mar. 20, 2000, at AB000468667

stock, due to the large percentage of Rhythms' total equity represented by Enron's investment—approximately 50% of Rhythms' publicly traded shares—and the volatility of the stock price in the market, Enron was unlikely to find a third party willing to enter into a hedge on economic terms acceptable to Enron.

Enron's Board was aware of the concern over the potential volatility in the company's reported income resulting from changes in the Rhythms stock price, and they had been told about contractual and market restrictions on Enron's ability to sell or hedge the stock. In at least four of her regular weekly updates to the Board, the corporate secretary kept the Board apprised of developments. On April 9, 1999, she told the Board that Rhythms priced its stock at $21 per share in the initial public offering, and that the stock price closed at over $69 per share on the first day.[225] She wrote:

> Enron will be analyzing the investment during the second quarter to determine how much of an additional write-up will be taken. There will likely be **considerable** reserves taken against any write-up since Enron has a 6-month hold requirement related to the investment, the limited public float of the stock and the size of Enron's holding [sic].[226]

One week later, she told the Board that "[t]he stock was very volatile this week, trading at $110/share at one point."[227] She also wrote: "Our investment in Rhythms was questioned by an analyst during the earnings release conference call. In addition, we

---

(attaching a copy of Rhythms NetConnections, Inc. stock certificate registered in the name of Enron Communications Investments Corp.) [AB000468665-AB000468668].

[225] Memorandum from Rebecca C. Carter, Senior Vice President, Board Communications, Enron, to Enron Board of Directors, regarding weekly update, Apr. 9, 1999 (the "4/9/99 Weekly Board Update"), at 2 [AB000448815-AB000448820].

[226] *Id.* at 2 (bolded in original).

[227] 4/16/99 Weekly Board Update, at 2.

received some additional press coverage related to our investment."[228] One week after

that, she reported that the stock price had continued to be volatile, trading between $56

and $88 per share during the previous week.[229] She again pointed out to the Board

members that Enron was subject to a "six-month hold requirement on the stock,"[230] and

stated that Enron was "hedging our investment by buying puts on other internet stocks.

This will protect us in the event the entire sector falls out of favor."[231] Finally, on May 7,

1999, the corporate secretary responded to questions from "[s]ome of the Board members

[who] had asked how we were hedging Rhythms"[232] by explaining that Enron had

purchased individual stocks in the internet sector, and was also utilizing an index

comprised of twenty leading internet companies such as Amazon.com, America Online

and Yahoo, Inc.[233]

The hedge that Enron structured in response to its concerns and entered into with

LJM1 is described in detail in Annex 2 to Appendix L (Related Party Transactions) to the

---

[228] *Id.*

[229] Memorandum from Rebecca C. Carter, Senior Vice President, Board Communications, Enron, to Enron Board of Directors, regarding weekly update, Apr. 23, 1999 (the "4/23/99 Weekly Board Update"), at 1 [AB000448792-AB000448797].

[230] *Id.* In addition to the Board members being told on two occasions about the six-month hold restrictions, Harrison, who served on Rhythms' board of directors, had signed a letter agreement with the underwriters of Rhythms' initial public offering, agreeing to similar restrictions on any Rhythms stock he owned personally. *See* Letter from Ken L. Harrison, former Director, Enron, to Merrill Lynch & Co., *et al.*, Mar. 12, 1999, at 1-2 (agreeing that he would not enter into "any swap or any other agreement or any transaction that transfers, in whole or in part, directly or indirectly, the economic consequence of ownership of the Common Stock, whether such swap or transaction is to be settled by delivery of Common Stock or other securities, in cash or otherwise . . ."). [AB000468663-AB000468664]. Harrison testified that he had recommended to Enron that it invest in Rhythms, Harrison Sworn Statement, at 43, and that he became a director of Rhythms when Enron made that investment. *Id.* at 45.

[231] 4/23/99 Weekly Board Update, at 1.

[232] Memorandum from Rebecca Carter, Senior Vice President, Board Communications, Enron, to Enron Board of Directors, regarding weekly update, May 7, 1999, at 1 [AB000448785-AB000448790].

[233] *Id.* ("The index is an equal-dollar weighted index made up of 20 leading companies involved in internet commerce, service and software. The index was developed with a base value of 200 as of September 30, 1998. The current value of the index is 614. A few of the companies in the index are Amazon.com, America Online, Egghead.com, Realnetworks, Inc., and Yahoo, Inc.").

Second Interim Report.  In summary, Fastow invested $1 million personally in LJM1 and served as its sole general partner.  Two third party financial institutions invested $7.5 million each and served as the limited partners.[234]  Enron transferred to LJM1 shares of Enron common stock (which were then subject to certain forward contracts with UBS)[235] having an aggregate stock price of $276 million.[236]  LJM1 then transferred approximately half of the shares to a "Swap Sub," which LJM1 had formed to serve as the hedging vehicle.[237]  Enron received promissory notes from LJM1 for $64 million and a put right that Enron could exercise in the future to force Swap Sub to purchase the Rhythms stock at $56.125 per share.[238]  Enron took the position for accounting purposes that it could record an increase in the value of its put right that would equal and therefore offset any amount by which the Rhythms stock price fell below $56.125.

However, only Swap Sub, and not LJM1, was liable to Enron for the put, and Swap Sub's only asset was the portion of the Enron stock that LJM1 had transferred to it, plus $3.75 million in cash that represented proceeds from selling some of the Enron

---

[234] These financial institutions were ERNB Ltd., an affiliate of CSFB, and Campsie Ltd., an affiliate of RBS.  *See* Second Interim Report, Annex 2 to Appendix L (Related Party Transactions); Report, Appendix F (Role of CSFB and its Affiliates); Report, Appendix E (Role of RBS and its Affiliates).

[235] At the same time Enron was considering the hedge of its Rhythms stock, it was also looking for a way to take advantage of increases in the value of its stock that was subject to forward contracts with UBS AG ("UBS").  These contracts obligated Enron to purchase shares of its stock from UBS at approximately $45 per share and, in June 1999, Enron's stock was trading at around $81 per share.  Until these forward contracts matured, however, Enron could not purchase the stock and actually realize this gain.  In connection with the Rhythms hedge, Enron restructured the forward contracts with UBS and caused UBS to transfer a portion of the shares to LJM1, thereby realizing some of the otherwise unrealized gain.  *See* Second Interim Report, Annex 2 to Appendix L (Related Party Transactions).

[236] The shares were actually transferred by UBS at Enron's direction.  *See* Second Interim Report, Annex 2 to Appendix L (Related Party Transactions).

[237] LJM1 capitalized Swap Sub with approximately one-half of the stock from Enron and $3.75 million in cash, which represented proceeds from selling a portion of the Enron stock.

[238] Within two weeks after closing the Rhythms transaction, Enron became concerned about the continued volatility of the Rhythms stock.  Thus, on July 13, 1999, Enron entered into a "costless collar" with Swap Sub that, among other things, protected Enron from Rhythms' stock price falling below $65 per share.  *See* Second Interim Report, Annex 2 to Appendix L (Related Party Transactions).

stock. Thus, Enron did not transfer any of its true economic risk in the Rhythms investment to any third party with assets other than assets provided by Enron. Instead, Enron gave up $276 million to receive promissory notes of $64 million and a hedge that was supported only by about half of the stock that Enron itself had transferred to the structure.[239]

The Board heard a presentation about the Rhythms transaction, and approved the necessary components relating to the use of Enron stock, on June 28, 1999 at a specially called meeting.[240] The Board also ratified a determination by Enron's Office of the Chairman (meaning Lay and Skilling)[241] under the company's Code of Ethics[242] that Fastow's role as general partner of LJM1 would "not adversely affect the interests of the

---

[239] As discussed in Appendix L to the Second Interim Report, LJM1 and Enron unwound the Rhythms hedge in March 2000. As part of the unwinding, the parties terminated the hedge and the related put option. LJM1 returned or sold all of the Enron stock to Enron, and Enron paid LJM1 approximately $30 million. At the time of this unwind, the LJM1 subsidiary Swap Sub was owned by the Southampton partnership, whose partners were Fastow, Kopper, other Enron employees (including Glisan and Kristina Mordaunt), LJM employees and three investment bankers at National Westminster Bank. Southampton had acquired Swap Sub from LJM1's limited partners for an aggregate of $11 million ($10 million to CSFB and $1 million to RBS) and Fastow negotiated a $30 million payment to Swap Sub (leaving a net of $19 million to split among the Southampton partners). This unwinding was apparently never discussed at any Board or committee meeting, although the members of the Audit Committee may have reviewed Enron's broad disclosure of the unwind transaction in Enron's Form 10-Q for the first quarter of 2000 (filed in May 2000). Although there are outstanding criminal indictments against certain participants in the Southampton partnership, the Examiner has found no evidence that Lay, Skilling or the Outside Directors were involved in that partnership or had knowledge of the alleged criminal activities.

[240] Minutes of Enron Board Meeting, June 28, 1999 (the "6/28/99 Board Minutes"), at 6-7 [AB000196728-AB000196740]. The Board approved: (i) amendments to certain forward stock purchase contracts that Enron had with UBS, since these were the shares that Enron would transfer to the Rhythms hedging SPE; and (ii) a new forward contract with LJM1 and the early cancellation of that agreement. Id. at 7.

[241] Skilling 12/5/01 SEC Testimony, at 6-7.

[242] Enron's Code of Ethics provided: "[N]o full-time officer or employee should: . . . (c) Own an interest in or participate, directly or indirectly, in the profits of any other entity which does business with or is a competitor of the Company, unless such ownership or participation has been previously disclosed in writing to the Chairman of the Board and Chief Executive Officer of Enron Corp. and such officer has determined that such interest or participation does not adversely affect the best interests of the Company." Enron Code of Ethics, Conflicts of Interests, Investments, and Outside Business Interests of Officers and Employees, at 56 [AB000343329-AB000343358].

- 51 -

Company."[243]   The following discussion describes the information presented to the
Board, which included facts about the transaction from which the Outside Directors could
reasonably have determined that the hedge was non-economic and had no rational
business purpose.  If, as several of the Outside Directors testified, they did not in fact
understand the transaction,[244] it may have been the result of a meeting process, also
described below, that did not allow them to consider carefully all material information
reasonably available.[245]   Finally, as described below, Lay and Skilling conducted the
meeting and likely knew even more about the transaction than the Outside Directors.

  *Economic Terms.*  After noting that "due to changes in the accounting treatment
of off-balance sheet transactions [Enron] has been analyzing new types of financing
vehicles," Skilling asked Fastow to make a presentation regarding "a proposed
investment partnership."[246]   Fastow made a presentation using a ten-page PowerPoint
handout, in which he included a transaction structure chart and several slides showing the
economic terms.

---

[243]  6/28/99 Board Minutes, at 7.

[244]  *See, e.g.*, Harrison Sworn Statement, at 146 ("Q: Do you recall what the structure of the . . . hedging transaction with LJM1 was to be?  A: I don't believe they described it exactly.  If they did, I don't recall it."); Urquhart Sworn Statement, at 136-37; Winokur 11/21/02 Sworn Statement, at 106-07; Gramm Sworn Statement, at 182-87; Wakeham Sworn Statement, at 87-92.

[245]  The process by which the Outside Directors reviewed and approved the Rhythms transaction may raise process due care issues.  The duty of care imposes on directors the obligation to make informed business judgments, taking into consideration all material information reasonably available.  Under Oregon law, the adequacy of the decision making process (i.e., whether the business decision was sufficiently informed) would likely be measured by concepts of ordinary negligence.  The business judgment rule will not protect an uninformed business judgment from judicial scrutiny.  *See* Third Interim Report, Appendix B (Legal Standards); Annex 2 (Legal Standards) to this Appendix.  Moreover, where directors know they are making material decisions without adequate information and without adequate deliberation, a court may find such conduct not to be in good faith.  *In re Walt Disney Co. Derivative Litig.*, 825 F.2d 275 (Del. Ch. 2003).  *See* Annex 2 (Legal Standards) to this Appendix.  The review and approval processes followed in the Raptor transactions may raise similar issues.

[246]  6/28/99 Board Minutes, at 6.

During the presentation, Fastow told the Board that PricewaterhouseCoopers ("PWC") would render a fairness opinion that would state "the value the Company was receiving in the transaction was in excess of the value of the forward contract the Company was giving up."[247] He then explained that Enron would contribute to LJM1 shares of stock with a total value of $234 million (which had increased to $276 million by the time the transaction was consummated).[248] He also showed the Board a slide that said Enron would receive "Direct Value" of $165 million.[249] That amount included $50 million for the LJM1 promissory notes (which increased to $64 million after closing), but the remainder of the purported value was derived from the stock that Enron was transferring.

Outside Directors did not recall any discussion of the substantial difference between the value being contributed and the value being received. Meyer's testimony included the following exchange: "Q. Do you recall any discussion at this board meeting about the difference between the $165 million value to Enron on this chart and the $234 million stock value in the UBS forwards on the other chart? A. I don't remember the conversation."[250] Gramm demonstrated a similar lack of recollection: "Q. You don't recall anyone asking questions about the numbers that were presented and why and how those numbers did or didn't make any sense? A. I don't recall people questioning the actual numbers, no."[251]

---

[247] Id. at 6-7.

[248] Materials from Enron Board Meeting, June 28, 1999 (the "6/28/99 Board Materials"), at AB0254 00464 (slide from Fastow's LJM Presentation) [AB0254 00452-AB0254 00499].

[249] Id. at AB0254 00467 (slide from Fastow's LJM Presentation).

[250] Meyer Sworn Statement, at 114.

[251] Gramm Sworn Statement, at 193. Lay stated that the Board discussion focused more on Fastow's conflict than the economics of the transaction. Lay In-Person Interview.

Fastow's transaction structure chart showed that Swap Sub was the hedging vehicle and that it would receive only half of the Enron stock.[252] Nothing on the chart indicated that Swap Sub would receive any other capitalization from LJM1, and nothing explained why LJM1 retained half of the Enron shares. Fastow also did not tell the Board the amount of capital that the limited partners would contribute to LJM1, or the identity of those limited partners.[253] Thus, even if the Outside Directors thought that LJM1 would contribute sufficient third party capital to Swap Sub to allow it to honor its obligations to Enron under the put, the Outside Directors did not know how much third party capital LJM1 had available for that purpose. The "hold" restriction on the Rhythms stock, which had been mentioned to the Outside Directors in two communications prior to the Board meeting,[254] was apparently not discussed, even though the Rhythms transaction may have violated those restrictions.[255]

With respect to outside accounting or legal approval, representatives of PWC did not attend the meeting,[256] and the fairness opinion had not been delivered, so no copy was provided to the Board.[257] Also, there is no evidence in the minutes of the meeting or

---

[252] 6/28/99 Board Materials, at AB0254 00471 (slide from Fastow's LJM Presentation).

[253] See 6/28/99 Board Minutes; 6/28/99 Board Materials.

[254] 4/9/99 Weekly Board Update, at 2; 4/23/99 Weekly Board Update, at 1.

[255] See Letter from Ken L. Harrison, former Director, Enron, to Merrill Lynch & Co., et al., Mar. 12, 1999 [AB000468663-AB000468664]; Letter from Gil Melman, Senior Counsel, Enron Communications Investments Corp., to Rose Stroud, Legal Transfers Area, American Securities Transfer & Trust Inc., Mar. 20, 2000, at AB000468667 (attaching a copy of Rhythms NetConnections, Inc. stock certificate registered in the name of Enron Communications Investments Corp.) [AB000468665-AB000468668].

[256] 6/28/99 Board Minutes, at 1.

[257] Id. at 6-7. None of the Outside Directors who testified about this matter had ever seen the opinion. Harrison Sworn Statement, at 145; Urquhart Sworn Statement, at 142-43; Meyer Sworn Statement, at 105-06 (testifying that he didn't recall seeing a fairness opinion, but stating that he would not have expected to see it if management represented there was one); Blake Sworn Statement, at 160-61. However, many of the Outside Directors testified that they relied on the PWC opinion in reaching their decision to approve the transaction. Winokur 11/21/02 Sworn Statement, at 106-08; Blake Sworn Statement, at 159-60; LeMaistre Sworn Statement, at 223-24; Harrison Sworn Statement, at 142, 144-46, 155; Belfer Sworn Statement, at

presentation materials that Fastow told the Board, or that the Board asked, whether Andersen or outside legal counsel had reviewed the transaction.[258]   In addition, no representatives from Andersen or outside law firms were present.[259]   Several Outside Directors nevertheless recalled that Andersen had approved the transaction.   Blake testified that: "My recollection is that – let me say it this way: I certainly was left with the impression that Arthur Andersen had reviewed this transaction and was okay with it."[260] In addition, Duncan testified that: "We were also told that Arthur Andersen had signed off on the concept . . . ."[261]

    *Unusual Conflict of Interest.*   Fastow's involvement in this transaction created a highly unusual conflict of interest.   Several of the Outside Directors testified that they had never encountered this kind of conflict before, even though they had significant experience in senior management positions and as directors of large public companies.[262]

---

184-85; Duncan Sworn Statement, at 56; Foy Sworn Statement, at 86; Jaedicke Sworn Statement, at 279-80.   At the time PWC rendered the opinion, it was performing accounting services for LJM1, but Fastow did not inform the Board of this fact.   *See* Wire Transfer Request, Aug. 18, 1999 [PSI00134216]; Related Invoice from PWC, July 29, 1999 [PSI00134217-PSI00134218].   Outside Directors testified that, had Fastow told them about PWC's engagement with LJM1, they would have asked more questions about the transaction.   *See, e.g.,* Blake Sworn Statement, at 160-61; Jaedicke Sworn Statement, at 280; Winokur 11/21/02 Sworn Statement, at 109.

[258]   *See* 6/28/99 Board Minutes.

[259]   Causey, Enron's Chief Accounting Officer, also was not present.   *See id.* at 1.

[260]   Blake Sworn Statement, at 159.   *See also* Jaedicke Sworn Statement, at 279 ("And I was also familiar enough with not the details of but familiar enough with the requirements of an accounting hedge of which this was.   I mean it was accounting in the sense that they were going to account for it as a hedge, at least had to be reviewed by management and before the end of the quarter would have to be reviewed by Arthur Andersen, it didn't surprise me that apparently both of them had reviewed it prior to the – prior to bringing this to the board, that was my understanding anyway.").

[261]   Duncan Sworn Statement, at 56.

[262]   Winokur 11/21/02 Sworn Statement, at 106 ("Q. Are you aware of any precedent for having the chief financial officer of a public company serve in a role similar to Mr. Fastow's role in LJM1? A. No, sir."); Meyer Sworn Statement, at 106-07 ("Q. In your prior business experience, had you ever had an instance where a transaction like this; that is, the company engaging in a transaction with an entity managed by one of its senior officers, where that was presented to you for approval?  A.  Not an entity just like this."). *But see* Urquhart Sworn Statement, at 137 ("Q.  Before this time in your business life, had you ever been involved in a situation where a company proposed to engage in business where an entity is managed by one

That potential conflict, which the Outside Directors recognized would create questions of disclosure for the company,[263] should have been of special concern to all the members of the Board. There is no evidence in the record of the meeting, however, to indicate any discussion of why Fastow, as opposed to an unrelated third party, needed to serve as general partner of LJM1.[264] Several of the Outside Directors testified that they understood Fastow's serving as general partner of LJM1 would allow Enron to "effect the transaction more quickly and more cheaply than if they went out on the market to hedge this capital,"[265] because "he would know the players involved and therefore could get it done more cheaply . . . ."[266]

The Board knew that Enron might engage in multiple transactions with LJM1.[267] Pursuant to two slides in his ten-page presentation, Fastow told the Board that LJM1 would engage in additional transactions with Enron after the Rhythms hedge. On one slide, Fastow wrote: "LJM . . . Negotiates with Enron for purchase of additional merchant

---

of the company's own officers? A. I believe I have, because again you've got GE Capital Company that buys and sells things constantly, and sometimes the products involved may be products from operations, but I can't cite an example.").

[263] See Jaedicke Sworn Statement, at 289-90 ("Well, it had to be disclosed. I guess I didn't think hard about that issue, but one way to handle conflicts are to disclose them. And I didn't think about – I don't think I thought about, well, what would come downstream."); Winokur 11/21/02 Sworn Statement, at 109-10; Savage Sworn Statement, at 274-75.

[264] In addition, there was apparently no discussion at the meeting about the company's efforts to find a third party hedging partner. According to Blake, "I do not recall any recital of specific initiatives that had been taken or anything of that nature." Blake Sworn Statement, at 164.

[265] Gramm Sworn Statement, at 186.

[266] Urquhart Sworn Statement, at 137-38 ("It was presented to us by Mr. Lay that it would facilitate the efficient operation of LJM if he was the managing partner or director of LJM1. Q: And how would he do that? A: Because he knew the assets that were going to be put on the market. He had the confidence of people who might be buying them, and he could get the thing done quicker."); see also Blake Sworn Statement, at 96-98. It was unclear, however, if some of the Outside Directors were confusing LJM1 with LJM2, which they approved three months later and which was set up in advance of any specific transactions with Enron.

[267] 6/28/99 Board Minutes, at 6-10.

assets."[268]   On another slide, he suggested that LJM1 would be a "future investment management company" that could "capture Cuiaba / Elektro value."[269]   The minutes of the meeting reflect that Fastow stated:  "LJM may negotiate with the Company regarding the purchase of additional assets in the Merchant Portfolio."[270]

The Board authorized Fastow's involvement in LJM1, however, without requiring any controls be implemented to ensure that Enron's transactions with LJM1 would be fair to Enron.[271]   Also, there is no evidence that the Board discussed how Fastow's compensation from LJM1 would be monitored to ensure that it would not adversely affect his performance for and loyalty to Enron.   Fastow's presentation materials described his interest in LJM1 as general partner and stated that he would not receive any current or future appreciated value of the Enron stock.[272]   He told the Board that he would receive a fee of $500,000 plus 2% of the limited partners' invested capital.[273]   However, he never told the Board, nor did any Outside Director apparently ask, the amount of that invested capital.

Outside Directors were asked why the Board included no other controls, such as a requirement about who other than Fastow would have to authorize transactions with LJM1, or a requirement that Fastow report to Lay or Skilling the amount of his compensation from LJM1.   In response, several testified that they understood LJM1

---

[268]  6/28/99 Board Materials, at AB0254 00466 (slide from presentation regarding LJM).

[269]  6/28/99 Board Materials, at AB0254 00468 (slide from presentation regarding LJM) (capitalization omitted).

[270]  6/28/99 Board Minutes, at 6.

[271]  *Id*. at 6-8.

[272]  6/28/99 Board Materials, at AB0254 00466 (slide from Fastow's LJM Board Presentation).

[273]  *Id*. at AB0254 00469.

would be used only for the Rhythms transaction,[274] even though some testified that they

recalled Fastow stating that LJM1 might be used for additional transactions.[275]

      Internal Andersen email correspondence, that apparently was not shared with the

Board, showed skepticism that the Board would approve a transaction with the conflict of

interest created by Fastow being the general partner of LJM1. Benjamin Neuhausen, an

Andersen technical expert in the Chicago office, wrote:

> Setting aside the accounting, idea of a venture entity managed by CFO is
> terrible from a business point of view. Conflicts of interest galore. Why
> would any director in his or her right mind ever approve such a scheme?[276]

David Duncan, the Enron engagement partner, replied:

> "[O]n your point 1 (i.e., the whole thing is a bad idea), I really couldn't
> agree more. Rest assured that I have already communicated and it has
> been agreed to by Andy that CEO, General [Counsel], and Board
> discussion and approval will be a requirement, on our part, for acceptance
> of a venture similar to what we have been discussing.[277]

---

[274] *See, e.g.,* Mendelsohn Sworn Statement, at 32; Winokur 11/21/02 Sworn Statement, at 106. *See also* Lay In-Person Interview (stating that he thought LJM1 was established primarily to hedge the Rhythms stock).

[275] Belfer Sworn Statement, at 186; Meyer Sworn Statement, at 108; Harrison Sworn Statement, at 152-53. At the October 11, 1999 Finance Committee meeting, at which the Finance Committee approved LJM2 for recommendation to the Board, Fastow gave the Finance Committee an update on LJM1 transactions. He told the Finance Committee that LJM1 had completed several transactions with Enron, including (i) that LJM1 had purchased $15 million of equity in Osprey/Condor, which had "[b]ridged Project Margaux" and had purchased Promigas and Sarlux, and (ii) that LJM1 had purchased an interest in Cuiaba. Materials from Finance Committee Meeting, Oct. 11, 1999 (the "10/11/99 Finance Committee Materials"), at AB0247 00846 (slide entitled "LJM1 Update, from Fastow's Chief Financial Officer ("CFO") Report") [AB0247 00818-AB0247 00894].

[276] Email from Benjamin S. Neuhausen, Andersen, to David B. Duncan, Andersen, May 28, 1999, at 1 [ELIB00003903-00001-ELIB00003903-00002].

[277] Email from David B. Duncan, Andersen, to Benjamin S. Neuhausen and copy to John E. Stewart, Andersen, June 1, 1999, at 1 [ELIB00003904-00001-ELIB00003904-00002].

- 58 -

*Process of the Meeting.* The special meeting at which the Board authorized the Rhythms transaction was held by telephone[278] and lasted only one hour.[279] During that time, seven topics were considered in this order: (i) a two-for-one stock split; (ii) a Compensation Committee report regarding Black-Scholes values for the company's grant of stock options and restructuring of stock-based incentive plans for several business units; (iii) an increase in the number of shares authorized under the Enron Corp. stock plan; (iv) the Rhythms transaction; (v) an agreement to lease an aircraft that the Board had previously approved for the company to purchase; (vi) a proposal to build a power plant in the Gaza Strip, which would be the first independent power plant in Palestine; and (vii) a reorganization of the company that was currently underway and that would be discussed further at the next Board meeting.[280]

The Board made decisions, and approved resolutions, with respect to all of the agenda items except the pending reorganization.[281] The minutes of the meeting reflect only that certain officers made presentations or reports on all seven of the topics, and that "discussions" ensued regarding the Rhythms transaction, the aircraft lease and the Gaza Strip power plant.[282] There is no record as to how much time was spent on each topic.[283]

---

[278] *See* 6/28/99 Board Minutes, at 1; Facsimile Cover Sheet from Rebecca C. Carter to Members of the Board of Directors, June 22, 1999 (providing formal notice of a June 28, 1999 telephonic special meeting of the Enron Board) [AB0254 00500-AB0254 00501]. At least two of the Outside Directors testified that the conditions were not ideal. Wakeham Sworn Statement, at 62 ("I was there by telephone, over a transatlantic telephone line, which is not the best of arrangements . . . ."); Gramm Sworn Statement, at 184-85 ("I was in transit and I was at a pay phone on the side of the road in Northern Virginia and the light was fading . . . . [I]t was physically more difficult hearing, and my papers weren't exactly standing still in front of me. It was not an enclosed pay phone.").

[279] 6/28/99 Board Minutes, at 1, 13.

[280] *Id.*

[281] *Id.*

[282] *Id.*

[283] Meyer testified that he had difficulty recalling, but that he thought maybe the Board spent "15 minutes, minimum" on the topic of the Rhythms transaction. Meyer Sworn Statement, at 104. Lay told the

To prepare directors for the 10:00 a.m. Monday Board meeting, the corporate secretary faxed each Outside Director forty-eight pages of materials on Friday afternoon between approximately 4:00 p.m. and 9:00 p.m. central time.[284] These materials included twelve pages about the Rhythms transaction[285] and twenty-one pages about the Gaza Strip power plant.[286] In addition, four of the Outside Directors who were on the Compensation Committee also received an additional twenty pages in preparation for a special meeting of that committee, which was held from 9:00 a.m. to 10:00 a.m. immediately preceding the special Board meeting.[287] The proposed transaction with Rhythms was not reviewed by the Finance Committee before it was introduced to the entire Board.

Finally, the record of the meeting does not reflect a reason for urgency. Blake testified:

> Q. Was the need for speed related at all to the fact that you would be closing the quarter two days later, and if the volatility did not get hedged, you could report a number attributable to Rhythms in the second quarter which, if the stock declined, could be disadvantageous in the third quarter?
>
> A. No, there was no discussion to that effect.[288]

---

Examiner that he thought the Board may have spent 30 to 40 minutes on this topic. Lay In-Person Interview.

[284] *See* Facsimile Cover Sheet from Rebecca C. Carter to Members of the Board of Directors, June 25, 1999 (with transmission confirmations attached) [AB0254 00507-AB0254 00524].

[285] 6/28/99 Board Materials, at AB0254 00463-AB0254 0474 (Project LJM Presentation and Proposed Resolutions).

[286] *Id.* at AB0254 00476-AB0254 00496 (Palestine Electric Company Presentation and Proposed Resolutions).

[287] Minutes of Enron Compensation Committee Meeting, June 28, 1999, at 1 [AB000197877-AB000197881]; Materials from Enron Compensation Committee, June 28, 1999 [AB000495866-AB000495910].

[288] Blake Sworn Statement, at 165.

Lay confirmed in his interview with the Examiner that there was no apparent economic urgency that required the Board to act on such an unusual matter on such short notice.[289]

*Additional Involvement of Lay and Skilling.* The concept of hedging the Rhythms investment in some fashion apparently started with Skilling,[290] and Causey was skeptical of the idea.[291] Wincenty Kaminski ("Kaminski"), a Ph.D. in economics and head of

---

[289] Lay In-Person Interview. Nevertheless, Meyer testified that he did not recall anyone on the Board asking for more time to study the matter. Meyer Sworn Statement, at 107.

[290] Skilling 12/5/01 SEC Testimony, at 185. Skilling was apparently a proponent of hedging Enron's merchant asset portfolio, even at significant cost to Enron. In August 1998, Skilling and Fastow engaged McKinsey & Company, Inc. ("McKinsey") to assist Enron "in developing and implementing your vision of a merchant asset portfolio." Letter from Ron Hulme, McKinsey, to Jeff Skilling, President and COO, and Andrew S. Fastow, Senior Vice President and CFO, Enron, Aug. 17, 1998, at 1 [MCK 0136019-MCK 0136028]. McKinsey described the project, in part, as follows:

> The primary goal of the effort is to create a more liquid merchant asset portfolio. This portfolio will give Enron the ability to raise sizable sums of capital when needed and potentially cause the rating agencies to treat these assets the same way they do those in a bank's portfolio. This includes both leveragability and treatment of sales as funds flow.

*Id.* at 2. One of several factors identified by McKinsey that would affect the stated goal was "Hedging policies for portfolio positions." McKinsey Engagement Letter, at Exhibit 1. In a report prepared for a discussion with Skilling on November 6, 1998, McKinsey listed as one of the action items: "Develop hedging, funding, and securitization strategies for enhancing the risk/return profile of the merchant portfolio." McKinsey Portfolio Project Presentation: Update on Valuation Progress, Discussion with Jeff Skilling, Nov. 6, 1998, at 1 [MCK 0058624-MCK 0058633]. As one of the "Key activities/issues," the report listed "Implications of merchant asset hedging and leveraging upon NI, RAROC, EPS." *Id.* Presumably the capitalized abbreviations refer to Net Income, Risk Adjusted Return on Capital and Earnings Per Share.

Then, on July 13, 1999, just two weeks after the effective date of the Rhythms hedge, McKinsey sent a memorandum to Jeff Donahue and Ray Bowen of Enron addressing McKinsey's concern that the cost of hedging the portfolio would be so expensive as to make the portfolio unprofitable. The memorandum focused on economic hedges:

> Our recent discussions regarding the merchant equity hedging program clarified that the primary goal of hedging is to provide insurance against a major market downturn, not to minimize quarter-to-quarter earnings volatility through regression-based modeling. In this sense, hedging represents a "cost of doing business" in the equity arena of merchant finance.

Memorandum from Ron Hulme, McKinsey, *et al.*, to Jeff Donahue and Ray Bowen, Enron, regarding Hedging Equity Market Risk in the Merchant Portfolio, July 13, 1999, at 1 [MCK 0082562-MCK 0082564]. Although Skilling was not an addressee of that memorandum, he was involved in the project with McKinsey. He also attended a meeting on July 1, 1999 at which he emphasized that a hedging program like the one being considered by McKinsey would be worthwhile despite the implications of the significant associated costs for the merchant portfolio. *Id.* at 3.

[291] Skilling 12/5/01 SEC Testimony, at 188.

- 61 -

Enron's research group that often analyzed hedging transactions,[292] had already been asked to find a way to hedge the Rhythms exposure.[293] Kaminski testified that he had led a task force that had failed at finding a hedge that would not be "prohibitively expensive."[294]

Apparently, Fastow then created the idea of completing the hedge with a newly formed private equity fund.[295] According to Skilling's testimony, Fastow and Causey approached him and suggested using the LJM1-type structure.[296] Skilling testified that they told him very little about the structure but simply said they were "working on something" with Andersen, that was "a long shot, because it's very complicated."[297]

Skilling, however, attended several meetings with Causey and other Enron personnel working on the hedging structure:

- Kaminski recalled two communications with Skilling about Rhythms. On June 2, 1999, Richard Buy ("Buy"), the Chief Risk Officer, and Skilling called Kaminski from Buy's office and asked Kaminski to have his group price the put option that would be involved.[298] Sometime after that call Skilling came to Kaminski's office, which was a highly unusual occurrence, to explain the transaction to

---

[292] Memorandum from Steven Rosen, Wilmer Cutler, to Enron Files, regarding Interview of Wincenty Kaminski, Dec. 19, 2001 (the "Kaminski 12/19/01 Wilmer Cutler Interview"), at 2 [AB000000462-AB000000470].

[293] Sworn Statement of Wincenty Kaminski, Managing Director, Enron Wholesale Services, to William C. Humphreys, Jr., A&B, May 9, 2003 (the "Kaminski Sworn Statement"), at 106-07.

[294] Id.

[295] Testimony of Jeffrey K. Skilling before the SEC, Nov. 4, 2002 (the "Skilling 11/4/02 SEC Testimony"), at 94-95.

[296] Skilling 11/4/02 SEC Testimony, at 96. Skilling testified that Glisan may have also been present for this discussion. Id.

[297] Id. In his interview with the Powers Committee, Skilling also linked the idea for LJM1 with the difficulties Enron was having finding a buyer for a portion of Enron's interest in Cuiaba, a Brazilian power plant. According to the record of the interview, Skilling said that Fastow suggested forming LJM, with Fastow as general partner, to expedite complex transactions that otherwise would require time and expensive investigation by buyers. Skilling 11/27/01 Wilmer Cutler Interview, at 5.

[298] Kaminski 12/19/01 Wilmer Cutler Interview, at 3.

Kaminski.[299]  Skilling told Kaminski this was "the highest priority for him."[300]

- Vasant Shanbhogue, a member of the Enron research group who also holds a Ph.D., recalled when interviewed by the Powers Committee that he attended only one meeting regarding the Rhythms hedge.[301] He recalled, however, that Skilling attended that meeting for the purpose of emphasizing the importance of creating a hedge for the Rhythms investment.[302]

- Kristina Mordaunt, a lawyer at Enron who worked on the hedging transaction, recalled a presentation about the transaction made to Lay and Skilling.[303] Lay confirmed that this meeting occurred on June 18, 1999, ten days before the Board meeting, however, he did not remember Mordaunt attending.[304] In an interview conducted by the Powers Committee, Mordaunt stated that Fastow made a 15-20 minute PowerPoint presentation, and both she and Rex Rogers, an Enron lawyer, were present.[305] According to the Powers Committee's record of the interview, Mordaunt stated that "Skilling already seemed familiar with the concept."[306] She also said that it was her impression the meeting was held for the purpose of getting Lay comfortable with the transaction.[307] She could not recall that Lay asked any questions,

---

[299] *Id.* Kaminski told the Powers Committee in the interview that he found Skilling's explanation during that office visit to be "somewhat incoherent, and so he called Buy for an explanation, but found that also to be "extremely confusing." *Id.* at 3. In testimony provided to the Examiner, Kaminski stated that Causey told him "to price an option, but, you know, I want you to use as high volatility as possible." Kaminski Sworn Statement, at 104. Kaminski then explained that when Causey used the term "high volatility," he meant to "[e]ffectively make it as expensive as you can, as you can justify it." *Id.* at 105. According to Kaminski, this "confused us even more because effectively he was telling us to make sure that Enron price – pays the highest price we can justify for the option." *Id.*

[300] Kaminski Sworn Statement, at 105.

[301] Memorandum from Steven Rosen, Wilmer Cutler, to Enron Files, regarding Interview of Vasant Shanbhogue, Dec. 28, 2001, at 2 [AB000000720-AB000000722].

[302] *Id.*

[303] Memorandum from Renee Barnett, Wilmer Cutler, to Enron Files, regarding Second Interview of Kristina Mordaunt, Jan. 12, 2002 (the "Mordaunt 1/12/02 Wilmer Cutler Interview"), at 10. [AB000000617-AB000000635].

[304] Lay In-Person Interview. Lay acknowledged that his calendar listed Mordaunt as a meeting attendee, but said he only remembered Skilling and Fastow being in the meeting. *Id.*

[305] Mordaunt 1/12/02 Wilmer Cutler Interview, at 10.

[306] *Id.*

[307] *Id.*

and at the end of the meeting he congratulated Fastow for doing a good job and told the lawyers to "get it done."[308]

Skilling also testified to the SEC that he understood much of the detail of the Rhythms hedge. Importantly, Skilling understood that the credit capacity of Swap Sub and, therefore, its ability to meet its obligations under the hedge, was supported only by the stock Enron contributed.[309] He also knew that the Enron stock being contributed had a market value of $234 million, because Fastow presented that information to the Board.[310] Finally, Skilling confirmed that the $165 million "Direct Value" on Fastow's slide provided to the Board represented the credit capacity of Swap Sub, which was derived from the value of the stock Enron had contributed.[311] Thus, it is reasonable to infer that Skilling understood that the Rhythms transaction was a non-economic hedge, for which Enron had paid significant value.

According to Lay, his first involvement with the Rhythms hedge occurred ten days before the Board meeting, at the meeting described by Mordaunt as discussed above.[312] Skilling testified to the SEC that it was possible he had discussed Rhythms with Lay before that date:

> Q. Do you have any memory of any meeting with Mr. Lay about Rhythms Net hedge?

---

[308] Id.

[309] Skilling 11/4/02 SEC Testimony, at 115-16.

[310] 6/28/99 Board Materials, at AB0254 00464 (slide from Project LJM Board Presentation). Apparently, at the time the Board presentation was prepared, Enron's shares that would be contributed to LJM1 had an aggregate market value of $234 million. By the time the hedging transaction closed, Enron's stock price had increased, causing the aggregate value of the contributed stock to be approximately $276 million.

[311] Skilling 11/4/02 SEC Testimony, at 117. Skilling testified that he understood there was third party capital in LJM1, but he could not recall the amount. Id.

[312] Lay In-Person Interview.

A. In the normal course of activity we would meet once or twice a week just to update things. I don't specifically remember updating, but I would imagine we went through it.[313]

Regardless of when Lay first learned of the Rhythms transaction and LJM1, he stated to the Examiner his clear understanding that a hedge in which economic risk is not transferred to a third party is not a true hedge.[314] He then explained that he believed Enron had transferred economic risk to Swap Sub, because he thought LJM1 had sufficient capital from outside investors to support Swap Sub's obligations to Enron.[315] However, he did not recall ever learning the amount of LJM1's third party capital or that Swap Sub only received half of the stock Enron contributed, and he did not recall any discussion at the Board meeting regarding Fastow's transaction structure chart.[316]

Lay acknowledged in his interview with the Examiner that, before the Rhythms transaction was presented to him, he had never seen a company complete a hedge using its own stock as the underlying credit for the hedge.[317] He also stated that he had never encountered a conflict of interest situation like the one created by Fastow's dual roles as CFO of Enron and general partner of LJM1.[318] Nevertheless, he not only approved the transaction as a member of the Board, but he and Skilling also apparently assisted the Board in reaching its decision. According to the minutes of the Board meeting, following Fastow's presentation, "[a] discussion ensued, with Messrs. Derrick, Fastow, Lay and

---

[313] Skilling 11/4/02 SEC Testimony, at 112.

[314] Lay In-Person Interview.

[315] *Id.*

[316] *Id.*

[317] *Id.*

[318] *Id.* Lay stated that he asked Fastow whether related party transactions were unusual and Fastow replied that they were fairly common in large companies. *Id.*

- 65 -

Skilling answering questions from the Directors regarding Mr. Fastow's involvement in the partnership and the economics of the transaction."[319]

*Raptors*

In 2000, Enron created a series of four hedging structures called Raptors I through IV that, although structured somewhat differently from the Rhythms transaction, were also non-economic hedges. The Raptors were established to hedge various merchant assets, rather than one single investment like the Rhythms stock. However, in each of the Raptors, the only assets available to pay Enron any amount under the hedge were the securities and cash that Enron itself transferred to the hedging vehicles. These transaction structures are described in detail in Annex 5 to Appendix L (Related Party Transactions) to the Second Interim Report.

Raptor III, in which Enron transferred to the hedging vehicle securities Enron held in The New Power Company rather than Enron's own stock, was not presented to the Board or any committees for approval. Also, the Examiner has found no evidence that Lay and Skilling approved Raptor III in their capacities as officers. Each of Raptors I, II and IV, however, were approved by the Board or the Executive Committee, and each had a similar capital structure.

---

[319] 6/28/99 Board Minutes, at 6. Mendelsohn testified regarding his recollection of the Board meeting: "Well, of course, the board member I recall the most is [sic] Ken Lay and Jeff Skilling, both of whom commented on this, commented on the – rationale for this arrangement with Mr. Fastow and commented on the need for this." Mendelsohn Sworn Statement, at 30. *See also* Derrick 9/26/03 Sworn Statement, at 361-62 ("I did not make a presentation, not with respect to the details of the transaction, but with respect to the fact that this was a matter that presented a conflict of interest; that it was not something under our -- under the Enron code of business conduct that was required to be brought before the board. It was required to be taken to the Chairman and chief executive officer; but given the nature of the transaction, we felt it appropriate to bring it to the board of directors for their – whatever decision they wanted to make with respect to it.").

In each of Raptor I, II and IV, LJM2 contributed $30 million, and Enron contributed substantial amounts of its stock or rights to receive its stock. Although LJM2 contributed cash to the hedging vehicles, those vehicles were effectively required to return the money to LJM2 with interest within a very short period of time after each transaction was consummated. Each of Raptors I, II and IV was structured so that LJM2 could unwind the transaction if it did not receive from the hedging SPE a distribution equal to the greater of $41 million or a 30% annualized rate of return on its investment within six months. In order to give the hedging SPEs the cash with which to pay the distributions, Enron purchased a put in each of Raptors I, II and IV that allowed Enron to put shares of its own stock to the SPE in the future, for which Enron paid an upfront fee equal to exactly $41 million per structure.[320] In each of the Raptor transactions, LJM2 received its required cash distribution within three months after closing.

Thus, the hedging vehicles were left with the securities Enron had transferred to them, plus the cash Enron had paid, meaning the only assets available to pay Enron under the hedges were assets Enron had given up. Net of the $90 million returned to LJM2, Enron had paid a total of $33 million ($11 million for each of Raptor I, II and IV) to purchase hedges that gave it no economic value.[321] The hedges gave Enron only a financial statement benefit, allowing Enron to take the position that it could record an increase in the value of the hedges that would equal and therefore offset any amount by which the hedged merchant assets might decline.

---

[320] As additional protection for LJM2, Enron guaranteed the obligations of the Raptor SPEs to make the required distributions. See Second Interim Report, Annex 5 to Appendix L (Related Party Transactions).

[321] In connection with the subsequent terminations of the puts and cash distributions to LJM2, Enron received "termination payments" from the Raptor SPEs totaling $17.1 million. See Second Interim Report, Annex 5 to Appendix L (Related Party Transactions).

Just a few months after the Raptors were formed, Enron began to experience adverse consequences of having recorded non-economic hedges where the hedging vehicle had no third party credit support. As the value of Enron's merchant assets hedged with the Raptors steadily and substantially declined, and the market price of Enron's stock also began to decline, the hedging vehicles needed more assets to create more credit capacity. In response, Enron restructured the Raptors three times, in November 2000, December 2000 and April 2001.[322] Finally, in September 2001, Enron terminated the four Raptors hedges altogether. As a result of the termination, Enron incurred a pre-tax charge to earnings of $710 million. In addition, as a result of an Andersen accounting error, the Raptors caused Enron to restate its financial statements and reduce shareholders equity by $1 billion.

Although the restructurings and termination of the Raptors were not reviewed and approved by the Board or any of its committees, the Finance Committee and the full Board reviewed and approved the formation of Raptor I in May 2000. The Executive Committee approved the formation of Raptor II in June 2000,[323] and the Finance

---

[322] As the value of the hedged assets declined, in order to continue being able to avoid charges to earnings, Enron needed for the Raptors' credit capacity to increase in value correspondingly. To provide the Raptors hedges with at least temporary support, in November 2000 Enron put into place with each of the Raptor I, II and IV SPEs a "costless collar," pursuant to which Enron would pay those SPEs any amount by which the Enron stock price fell below a specified amount. Enron took the position that the SPEs could then record the value of this Enron promise to help give the SPEs more credit capacity to support higher hedge values. By mid-December 2000, the decline in Enron's merchant asset values had continued. To avoid a charge to earnings on its 2000 financial statements, Enron had the Raptor SPEs temporarily cross-collateralize their obligations under the hedges to Enron. By spring 2001, Enron's merchant asset values had not improved, and Enron was facing a charge to earnings of more than $500 million. In response, Enron restructured the Raptor SPEs in April, backdated to March so that it would apply to the first quarter financial statements. The restructuring involved, among other things, Enron's infusion of 12 million additional shares of its stock having an aggregate stock price in excess of $600 million. *See* Second Interim Report, Annex 5 to Appendix L (Related Party Transactions).

[323] Duncan, the Chair of the Executive Committee, reported to the full Board at the August 8, 2000 meeting that the Executive Committee had approved Raptor II in June. However, the Board was not asked to, and did not, take any action to approve or ratify Raptor II. Minutes of Enron Board Meeting, Aug. 7-8, 2000 (the "8/7-8/00 Board Minutes"), at 3 [AB000199696-AB000199729].

- 68 -

Committee and the full Board approved the formation of Raptor IV in August 2000. At each of the relevant meetings, the Outside Directors who were present adopted resolutions approving the necessary stock-related components of the transactions. Lay and Skilling were present at each meeting and participated in explaining the transactions, and they voted in favor of the transactions as Board and Executive Committee members. They also had significantly more access to the Senior Officers who worked directly on structuring the transactions, and it is reasonable to infer Lay and Skilling, therefore, knew even more about the transactions than the Outside Directors. In approving Raptors I, II and IV, Lay, Skilling and the Outside Directors authorized three transactions that had no rational business purpose.[324]

*Raptor I.* Glisan presented Raptor I to the Finance Committee, with Lay and Skilling present, at a regularly scheduled meeting on May 1, 2000.[325] The Finance Committee meeting was relatively short, lasting one hour and thirty minutes, and it had a full agenda.[326] In addition to Raptor I, agenda items included a CFO report, during which Fastow discussed, among other items, Glisan replacing McMahon as Treasurer, the effect of the proposed sale of Portland General Electric on key financial ratios, and a report on LJM.[327] It also included the Treasurer Report, during which McMahon discussed, among other items, Enron's intention to "monetize $1 billion in investments" by year end, and

---

[324] Although it may be reasonable to infer that Lay and Skilling approved Raptor III in their capacities as officers, the Examiner has found no evidence of such approvals.

[325] The minutes reflect that Finance Committee members Chan, Meyer, Pereira and Urquhart were absent, but that Finance Committee members Belfer, Blake, Savage and Winokur, along with Lay, Skilling and Outside Directors Duncan and Harrison attended the meeting. Minutes of Enron Finance Committee Meeting, May 1, 2000 (the "5/1/00 Finance Committee Minutes"), at 1 [AB000201467-AB000201471].

[326] *Id.* at 1, 5; 5/1/00 Finance Committee Materials, at 1.

[327] 5/1/00 Finance Committee Minutes, at 2-3.

requested the committee approve issuance of up to $1 billion of additional debt securities.[328] There was also a Chief Risk Officer report from Buy, in which he discussed, among other items, changes in the risk management policy, including the addition of Japanese Electricity as a new commodity group, and reasons why Enron Energy Services and the Risk Assessment Control group had developed different values for proposed transactions.[329]

At the meeting, Glisan used a four-page PowerPoint presentation regarding Raptor I.[330] This presentation and the record of the meeting reflect that Glisan told the Finance Committee information that made the transaction sound beneficial for Enron, yet he also presented information that was inconsistent with an economic hedge that had a rational business purpose.

Glisan stated on his first slide that the purpose of the transaction was to "[e]stablish a risk management program in order to hedge the Profit & Loss volatility of Enron investments."[331] The corporate secretary's handwritten notes on the second slide entitled "Structural Highlights" show that Glisan stated the transaction "[d]oes not transfer economic risk but transfers P&L volatility."[332] Thus, in the event the true nature of the hedge was not otherwise clear from the rest of Glisan's presentation, Glisan told the directors orally that the hedge was non-economic. Lay, who acknowledged in his

---

[328] *Id.* at 1-2.

[329] *Id.* at 3-4.

[330] 5/1/00 Finance Committee Materials, at 21-25 (the Project Raptor Presentation).

[331] *Id.* at 22 (slide from Project Raptor Presentation).

[332] *Id.* at 23 (slide from Project Raptor Presentation).

interview with the Examiner that a non-economic hedge was not a true hedge, said that he did not recall Glisan making this statement.[333]

Glisan's presentation included other information that indicated the hedge provided no economic benefit to Enron. Glisan effectively told the directors present at the meeting that this financial statement benefit was only available to the extent of Enron's own stock price. A slide included the following: "Initially, vehicle can provide approximately $200 million of P & L protection to ENE. As ENE stock price increases, the vehicle's P & L protection capacity increases as well."[334] The converse was also true. As Enron's stock price declined, so would the ability of the vehicle to provide any hedging value to the company. Winokur testified that he understood this. Reviewing a copy of the third slide in Glisan's presentation, which is discussed and reproduced below, Winokur said "it's quite clear to me from the structure on the next page that if the Enron stock declines, the credit capacity of the vehicle goes down . . . ."[335]

The slide Winokur referred to, which is reproduced below, disclosed the $41 million put payment, which apparently was never questioned by any of the Finance Committee members.[336]

---

[333] Lay In-Person Interview. Blake, who was present at the meeting, testified that he understood "[t]hat economic risk was transferred in the transaction. Otherwise, I don't believe Arthur Andersen would have approved it." Blake Sworn Statement, at 198.

[334] 5/1/00 Finance Committee Materials, at 23 (slide from Project Raptor Presentation).

[335] Winokur 11/21/02 Sworn Statement, at 168.

[336] 5/1/00 Finance Committee Materials, at 24 (slide from Project Raptor Presentation). One of LJM2's reports to its investors disclosed the true purpose of the put. The report stated that the put from Enron was designed "to provide LJM2 return of and return on capital when the put expired." Report to Limited Partners of LJM2 from the General Partner, Feb. 6, 2001, at 6 [AB000214509-AB000214517].



One of the corporate secretary's handwritten notes on this slide indicated that Glisan said "once LJM2 receives a return of 30% then Enron gets all upside."[337] This was not entirely accurate, since LJM2 was entitled immediately to the greater of $41 million or a 30% return, and it was entitled to an additional $30 million upon termination.[338]

The minutes of the meeting reflect that Causey told the Finance Committee that Andersen had "spent considerable time"[339] analyzing the structure and LJM2's corporate

---

[337] 5/1/00 Finance Committee Materials, at 24 (slide from Project Raptor Presentation).

[338] *See* Second Interim Report, Annex 5 to Appendix L (Related Party Transactions).

[339] 5/1/00 Finance Committee Minutes, at 3.

governance and was "comfortable with the proposed transaction."[340] However, one of

the slides identified "accounting scrutiny" as a significant risk in the project.[341]

Following the May 1 Finance Committee meeting, Winokur reported on the

project to the full Board on May 2 and told the members of the Board that the Finance

Committee recommended their approval.[342] The full Board voted to approve Raptor I as

part of a package of five unrelated items that Winokur included in his report, but the

Board did not receive any presentation on the transaction or a copy of Glisan's

PowerPoint presentation.[343]

*Raptor II.* Fastow made the request to the Executive Committee for approval of

Raptor II. This request was made at a special, telephonic meeting of the Executive

Committee held on June 22, 2000.[344] The meeting lasted thirty-five minutes, and the

---

[340] *Id.* at 3.

[341] 5/1/00 Finance Committee Materials, at 25 (slide from Project Raptor Presentation).

[342] The Board meeting was also relatively short with a full agenda. It lasted 3 hours and 55 minutes, during which the directors accomplished the following: (i) Duncan reported on the Executive Committee's prior meeting; (ii) LeMaistre reported on the Compensation Committee's prior meeting, and the Board voted to change the vesting schedule for directors' options and to increase the number of options granted to directors; (iii) Jaedicke reported on the Audit Committee's prior meeting, and the Board approved a new charter for that committee; (iv) Winokur reported on the Finance Committee's prior meeting, and the Board approved over 10 pages of resolutions, including approval of Raptor I, the election of Glisan as Treasurer, authority for the new $1 billion debt issuance, and changes to the transaction approval process; (v) Lay reported on the company's aviation budget and consideration of purchasing new aircraft; (vi) Causey provided a "Financial and Earnings" report; (vii) Mark Koenig, head of Investor Relations, provided a report that discussed, among other things, the company's returns to shareholders and a number of analysts' issues; (viii) Derrick reported on two lawsuits pending with respect to operations in India and the North Sea, and also on tax disputes with certain provinces in Argentina; (ix) Skilling reported on "Project California," which would involve the sale of certain international assets; (x) Lou Pai, one of Enron's officers, gave a presentation on the Enron Energy Services business unit; (xi) David Delainey, an Enron employee, gave a presentation on ENA; (xii) Whalley gave a presentation on the Enron NetWorks business unit; (xiii) Mark-Jusbasche gave a presentation on Azurix Corp.; (xiv) Lay presented several corporate matters for consideration, including the declaration of a common stock dividend, the declaration of a preferred stock dividend, and the election of a new assistant corporate secretary; and (xv) Skilling reported on the progress with Enron Broadband Services. 5/2/00 Board Minutes.

[343] 5/2/00 Board Minutes, at 4-14; Materials from Enron Board Meeting, May 2, 2000 [AB0245 06452-AB0245 06587].

[344] Minutes of Enron Executive Committee Meeting, June 22, 2000 (the "6/22/00 Executive Committee Minutes"), at 6-12 [AB000467341-AB000467358]; Materials from Enron Executive Committee Meeting,

Executive Committee considered and approved five significant items: (i) the purchase of a power plant in Texas and the related restructuring of long-term power contracts; (ii) the election of two new officers; (iii) the utilization of power barges in Nigeria and construction of related facilities; (iv) Raptor II; and (v) the issuance of up to $1 billion of additional debt securities.[345]

In his presentation regarding Raptor II, Fastow told the Executive Committee that the company needed to establish a second Raptor hedging vehicle, just one month after the first Raptor had been formed, because "there had been tremendous utilization by the business units of Raptor I . . . ."[346] He "stated that the structure of Raptor II would be identical to Raptor I" and would provide $200 million of hedges.[347] Fastow gave the Executive Committee a one-page chart identifying some of the benefits of Raptor II, including one of the same statements that Glisan had told the Finance Committee in the previous month: "As ENE stock price increases, the vehicle's P&L protection capacity increases as well."[348]

Fastow's slide also included a statement that "[t]he structure requires 6 months from the closing of the transaction before hedges can be executed."[349] There is no indication that anyone asked why this was the case. In fact, it was because LJM2 had to receive a cash distribution before Enron could make any hedges, and Enron had six

---

June 22, 2000 (the "6/22/00 Executive Committee Materials") (Agenda includes call-in numbers for meeting) [AB000473317-AB000473372]. The minutes reflect that all Executive Committee members were present, which included Lay, Skilling, Duncan, Belfer, LeMaistre and Winokur.

[345] 6/22/00 Executive Committee Minutes.

[346] *Id*. at 6.

[347] *Id*.

[348] 6/22/00 Executive Committee Materials, at AB000473356.

[349] *Id*.

months under the terms of the transaction in which to ensure that payment was made.[350]
The minutes of the Executive Committee's approval of Raptor II state only that
"[f]ollowing a discussion," the committee members voted to approve the transaction,[351]
and there is no indication of the extent or content of any such discussion.

*Raptor IV.* To obtain approval for Raptor IV, Glisan requested the approval
during his customary Treasurer report at the regularly scheduled Finance Committee
meeting on August 7, 2000.[352] Glisan did not include any information about the terms of
Raptor IV, although he "discussed Raptor I and Raptor II, previously approved by the
Board, and note[d] that Raptor I was almost completely utilized and that Raptor II would
not be available for utilization until later in the year."[353] Thus, Glisan at least implied
that Raptor IV would have the same structure as Raptors I and II, and he once again
highlighted the six-month restriction imposed to protect LJM2 that no one appeared to
question.

---

[350] *See* Second Interim Report, Annex 5 to Appendix L (Related Party Transactions). LJM2 received the required cash distribution on August 3, 2000, and Enron began hedging effective the same day. *Id.*

[351] 6/22/00 Executive Committee Minutes, at 6.

[352] The minutes reflect that all of the Finance Committee members were present, which included Belfer, Blake, Chan, Meyer, Pereira, Savage, Urquhart and Winokur. Lay and Skilling were also present, along with Gramm, Harrison and Mendelsohn. Minutes of Enron Finance Committee, Aug. 7, 2000 (the "8/7/00 Finance Committee Minutes"), at 1 [AB000454174-AB000454187]. Jaedicke and LeMaistre were also present for Glisan's portion of the meeting. *Id.* at 2. The minutes for this meeting, as well as those for the meeting at which the Board approved Raptor IV, referred to the transaction as "Raptor III," even though the true Raptor III, involving The New Power Company securities, had already been structured by that time. Report of Investigation, Special Investigative Committee of the Board of Directors of Enron Corp., Feb. 1, 2002, at 112 n.53.

[353] 8/7/00 Finance Committee Minutes, at 2.

Glisan presented a single PowerPoint slide at this meeting regarding Raptor IV entitled "2000 Balance Sheet Management."[354] According to the minutes, it was a "schedule describing the vehicles the Company was utilizing to manage its balance sheet debt."[355] The schedule listed Whitewing's purchase of assets from Enron, FAS 140 "asset sales to third parties supported by Enron total return swaps," Hawaii and LJM2.[356] Glisan apparently considered the hedging capacity of Raptor IV to be important in managing the company's balance sheet, and the Finance Committee approved it "[f]ollowing a discussion" that is not described in the minutes.[357]

One day later, at the regularly scheduled August 2000 Board meeting, Skilling requested that the full Board approve Raptor IV.[358] Winokur was not present at the meeting and, thus, did not make his typical report to the Board as Chair of the Finance Committee.[359] Skilling apparently did not provide any presentation materials to the Board, but he stated that "Raptor [IV] would be similar in structure to Raptor I and Raptor II."[360] Again, "[f]ollowing a discussion," of which there is no description in the minutes, the Board approved Raptor IV.[361]

*Additional Involvement of Lay and Skilling.* In addition to the information presented to the Finance Committee, there is evidence that Skilling was involved in

---

[354] Materials from Enron Finance Committee Meeting, Aug. 7, 2000 (the "8/7/00 Finance Committee Materials"), at 23 (slide from Treasurer Report) [AB0247 01347-AB0247 01516].

[355] 8/7/00 Finance Committee Minutes, at 2.

[356] 8/7/00 Finance Committee Materials, at 23 (slide from Treasurer Report).

[357] 8/7/00 Finance Committee Minutes, at 2.

[358] 8/7-8/00 Board Minutes, at 28.

[359] *Id.* at 1 (noting Winokur's absence). Carter, the corporate secretary, made a report on the Finance Committee meeting held the previous day, but she did not mention the Raptor IV transaction. *Id.* at 7.

[360] *Id.* at 28.

[361] *Id.*

discussions about the Raptors with Enron officers charged with structuring and implementing the transactions. Wesley Colwell ("Colwell"), the Chief Accounting Officer for ENA, recalled in an interview conducted by the Powers Committee that Skilling had been an initiator of the hedges.[362] According to Colwell, Causey told him in 1999 that Skilling wanted to create a vehicle to hedge Enron holdings in technology stocks.[363] Internal documents at Enron also show that Skilling was apprised in May 2000 of the potential projects that would be hedged in Raptor I.[364] In addition, Skilling testified that he understood Raptor I "was based on capacity in the vehicle. So if Enron stock went up, you had additional capacity. And, conversely, if Enron stock went down, you would have less capacity."[365]

Skilling told the Powers Committee, however, that he did not know about the $41 million put payment, and did not know why Enron would buy a put on its own shares.[366] According to the record of Skilling's interview made by the Powers Committee, Skilling said that "[p]rior to the Board meeting, [he] was not told the details of the transaction. Even if he were told, he would not understand."[367]

---

[362] Memorandum from Christopher P. Simkins, Wilmer Cutler, to Enron Files, regarding Interview of Wesley Colwell, Jan. 15, 2002 (the "Colwell 1/15/02 Wilmer Cutler Interview"), at 2 [AB000001235-AB000001240]. In October 2003, Colwell settled accusations by the SEC that he manipulated Enron's earnings by, among other things, improperly avoiding the write-down of an asset to prevent losses. Kurt Eichenwald, *Fraud Case at Enron is Settled*, N.Y. Times, Oct. 10, 2003, at C-3. He paid a fine of $500,000 but did not admit or deny any wrongdoing. *Id.*

[363] Colwell 1/15/02 Wilmer Cutler Interview, at 2.

[364] Email from David W. Delainey, Chairman and CEO, Enron North America, to Ben F. Glisan and copy to Jeff Skilling, Andrew S. Fastow, Raymond Bowen, *et al.*, Enron, May 10, 2000 [CCLL 0010140-CCLL 0010142].

[365] Skilling 11/5/02 SEC Testimony, at 71.

[366] Skilling 1/18/02 Wilmer Cutler Interview, at 3.

[367] *Id.* at 3.

Lay told the Examiner and the Powers Committee in separate interviews that he "became aware of the Raptor transactions either at a Board meeting or in an agenda-review meeting prior to the meeting."[368]  Lay stated in the interview with the Powers Committee that he did not recall why Enron would buy a put on its own stock and that he did not recall any conversation about the Raptor SPE's ability to pay should the price of Enron stock decline.[369]  He also stated that he did not know why accounting would be a risk with respect to the Raptors, which Glisan had reported at the meeting.[370]

There is evidence that Skilling was aware of the Raptor restructurings that took place in early 2001.  Rodney Faldyn ("Faldyn"), head of Enron's accounting transactional support group, told the Powers Committee that he, Causey, Glisan and several other employees were involved in "brainstorming sessions" to devise the restructuring, and that Causey told him that Skilling was aware of the credit capacity deficiencies.[371]  According to Faldyn, Causey reported that "Skilling said the restructuring was a top priority."[372]

Skilling confirmed in an interview with the Powers Committee that he had told Causey to take actions to solve the problems, but Skilling said that he did not know what actions Causey took.[373]  This is inconsistent with statements Causey made to the Powers Committee.  Causey stated in an interview that

---

[368] Lay 1/16/02 Wilmer Cutler Interview, at 9.  *See also* Lay In-Person Interview (stating that he first learned of the Raptor transactions upon receiving the materials of the May 1, 2000 Finance Committee meeting, or at the meeting itself).

[369] Lay 1/16/02 Wilmer Cutler Interview, at 9.

[370] *Id.*

[371] Memorandum from Reed M. Brodsky, Wilmer Cutler, to Enron Files, regarding Interview of Rodney Faldyn, Jan. 14, 2002 (the "Faldyn 1/14/02 Wilmer Cutler Interview"), at 7 [AB000001315-AB000001328].

[372] *Id.* at 8.

[373] Skilling 1/18/02 Wilmer Cutler Interview, at 4.

> [w]hen they found what Causey felt was a solution, Causey sought and
> obtained Skilling's approval.  Causey updated Skilling before executing
> the Raptor Restructuring plan, during development of the restructuring
> plan, and after determining the solution of the problem.[374]

Lay told the Powers Committee that "he never heard of the restructuring in the first

quarter 2001 and would have remembered a discussion of this magnitude."[375]

To date, one Enron Senior Officer—Glisan—has admitted wrongdoing in

connection with Raptor I and acknowledged that the transaction had "no true business

purpose."[376]  On September 10, 2003, Glisan entered into a plea agreement with the U.S.

Department of Justice, agreeing to serve a five-year prison sentence and admitting that he

knew at the time Raptor I was created (i) that it violated GAAP because, in part, the cash

distribution to LJM2 was a return of LJM2's investment, (ii) that the put for which Enron

paid $41 million was designed solely to provide LJM2 a return of its investment, and (iii)

that "he and others" had arranged for Enron to make the $41 million payment before

allowing the Raptor I SPE to engage in any hedging transactions with Enron.[377]

---

[374] Memorandum from Reed M. Brodsky, Wilmer Cutler, to Enron Files, regarding Interview of Richard Causey, Jan. 22, 2002, at 1 [AB000001221-AB000001222].

[375] Lay 1/16/02 Wilmer Cutler Interview, at 11.

[376] Plea Agreement, *United States v. Glisan*, No. 02-CR-665 (S.D. Tex. Sept. 10, 2003), at Ex. 1 (Glisan Statement – Count Five).

[377] *Id.* In a statement attached to the Plea Agreement, Glisan said:

> As I knew, this transaction [Raptor I] violated existing accounting principles in that its
> form was misleading and was accounted in a manner inconsistent with its economic
> substance.  As I also knew, Talon [the name of the Raptor I SPE] was not properly off-
> balance-sheet.  I and others arranged for Enron to pay $41 million to LJM before Talon
> would engage in the hedging transactions for which it was created.  Enron and Talon
> entered into a "put", that is, a transaction that purportedly served to hedge Enron against
> a decline in its own stock value.  Although there was no true business purpose, the "put"
> option was purchased by Enron for $41 million.  The put was designed by me and others
> as an ostensible reason to make a distribution of $41 million to LJM, economically
> providing a return of and return on capital.  Since the put failed to have a true business
> purpose, Talon failed to meet the minimum equity test as required by applicable
> accounting rules.  As a result of this failure, LJM lacked substantive control of Talon.
> This failure, in turn, led to the substantive control of Talon by Enron.

*Id.*

**B.      Duty to Monitor**

The evidence suggests that Lay, Skilling and the Outside Directors took actions

designed to satisfy their monitoring obligations with respect to Enron's SPE transactions.

Even though these actions were flawed, it cannot be said that these officers and directors

abdicated their responsibilities or exhibited a sustained inattention to Enron's financial

activities.

*Lay and Skilling*

Both Lay and Skilling appear to have had substantial knowledge of Enron's

financial condition, including knowledge of the company's capital investments and

financings.    Skilling's testimony to the SEC described routine processes within the

company that make it clear both Lay and Skilling were involved in supervising the

financial aspects of Enron.

For example, Lay and Skilling received information about the company's capital

investments from Buy, the Chief Risk Officer, in frequent periodic meetings.  Buy and

his staff met with Skilling on a weekly or biweekly basis to discuss the list of all projects

then underway or being evaluated across the company.[378]   According to Skilling, "in

some cases, Ken would go to this meeting."[379]

Skilling also described how he and Lay reviewed and helped shape the company's

financial performance each quarter.  Throughout a typical quarter, he and Lay met with

Buy and Fastow on an ad hoc basis to receive updates, sometimes meeting with these

---

[378] Skilling 11/1/02 SEC Testimony, at 67, 78-79.

[379] *Id*. at 79.  In addition, Mark-Jusbasche testified that Lay "was present for virtually all of the discussions about investments in our [Enron's] international activities."  Mark-Jusbasche Sworn Statement, at 52-53.

officers together and sometimes separately.[380]  Then "a couple of days before"[381] the end

of the quarter, Lay and Skilling met with Causey to "ask how we're doing."[382]  At this

pre-quarter-end meeting, Causey provided an estimate for the quarter, along with a list of

pending transactions.[383]  Skilling testified:

> You'd have, here's what our plan was for the quarter; here's what the most
> recent, current estimate is, knowing what was going on; you'd have a
> number that would say, here's what Wall Street is expecting; and then
> you'd have here's where we are right now; and then you'd have up sides
> and down sides, as you just look at all those numbers. [384]

According to Skilling, this meeting "was kind of your last opportunity to allocate

resources to the organization to try to get things timed properly."[385]  Thus, it appears that

Lay and Skilling were involved in the process of reviewing pending transactions and

helping determine if resources should be allocated to complete those transactions in order

to meet the financial community's expectations for Enron.  Lay and Skilling were also

involved in preparing the earnings press releases with the investor relations staff, and

they held "lots of meetings associated with that."[386]  In addition, both officers were

involved in the annual budgeting process, at which capital expenditure levels for the

coming year were determined.[387]

---

[380]  Skilling 11/1/02 SEC Testimony, at 81; Lay In-Person Interview.

[381]  Skilling 11/1/02 SEC Testimony, at 144-45.

[382]  *Id.* at 145.

[383]  *Id.* at 146-47.

[384]  *Id.* at 147.

[385]  *Id.*

[386]  *Id.* at 142.

[387]  *Id.* at 178-79 (stating that Lay attended budget review meetings).  In addition, both Lay and Skilling helped develop the presentation for the company's annual analyst conference held in January or February each year.  *Id.* at 161, 164-66.  The evidence reflects that Lay attended the 1999 and 2001 conferences, and that Skilling attended in 1997, 1998, 2000 and 2001.  Enron Credit Conference, Feb. 5-6, 2001 [CIBC 1020329-CIBC 1020331]; Enron Credit Conference 2000 (handwritten notation suggests Skilling gave the Company Performance Review) [RBS 1087008-RBS 1087017]; Enron Credit Conference, Enron

There is evidence that Skilling also reviewed the company's Form 10-Q quarterly and Form 10-K annual filings with the SEC before they were submitted. In interviews conducted by the Powers Committee, both Enron's Controller and its Director of Financial Reporting described sending these filings to Skilling. According to records of the interviews:

- "Butts [the Controller] would always send drafts of the 10-Q's and 10-K's to Jeff Skilling and make sure that Skillings' [sic] comments were received. Skilling definitely went through the financial disclosures in the 10-K. . . . Skilling always provided his comments to Butts' team in Skilling's office."[388]

- "After Peng [the Director of Financial Reporting] prepared the draft 10-Q or 10-K, he distributed it for comments to approximately 50 people. . . . A smaller group were [sic] required to sign off on the 10-Qs and 10-Ks before release. These included the Chief Accounting Officer (Rick Causey), the Legal Department, Jeff Skilling, and, under new disclosure rules, Enron's Board."[389]

---

Attendees, Feb. 24-25, 1999, at 2 [STB11861-STB11864]; 1998 Enron Credit Conference Agenda, Feb. 11, 1998 [AB1128 01506]; 1997 Enron Credit Conference Agenda, Feb. 19, 1997 [BDR00683]. The 1999 conference, for which the Examiner obtained a copy of the conference materials, was held over a two-day period and included presentations by major business units. Enron Credit Conference Meeting Materials, Feb. 24-25, 1999, at AB1128 00104-AB1128 00105 [AB1128 00103-AB1128 00430]. It also included a credit profile presented by McMahon and a controls review presented by Buy. Enron Credit Profile Presentation, Feb. 24, 1999 (presented at the February 1999 Enron Credit Conference) [AB1128 00123-AB1128 00153]; Enron Controls Review Presentation, Feb. 24, 1999 (presented at the February 1999 Enron Credit Conference) [AB1128 00155-AB1128 00191]. The credit profile included detail about the company's funds flow, debt and equity levels, and investment performance. Enron Credit Profile Presentation, Feb. 24, 1999 (presented at the February 1999 Enron Credit Conference) [AB1128 00123-AB1128 00153].

[388] Memorandum from Reed M. Brodsky, Wilmer Cutler, to Enron Files, regarding Interview of Bob Butts, Jan. 20, 2002, at 3 [AB000001148-AB000001156].

[389] Memorandum from Lowry A. Crook, Wilmer Cutler, to Enron Files, regarding Interview of Gary Peng, Jan. 19, 2002, at 2 [AB000000649-AB000000667].


In addition, Paula Rieker, an Enron employee responsible for drafting many of the disclosures in the company's SEC filings, testified that Skilling "had a general satisfaction with the level of disclosure . . . ."[390]

Lay described his involvement with the SEC filings in his interview with the Examiner. He said that he typically scanned the final or almost final drafts of those filings, including the financial statements and disclosures, and that he would sometimes offer comments.[391] However, he did not recall any specific comments that he might have made.[392]

Both Lay and Skilling also attended the Finance, Audit and Executive Committee meetings and the full Board meetings. Their involvement in preparing for these meetings, as well as their participation in presentations at these meetings, evidences a substantial level of knowledge about the company's financial activities.[393]

---

[390] Sworn Statement of Paula H. Rieker, Enron, to William C. Humphreys, Jr., A&B, Apr. 23, 2003, at 103-04 (recalling meetings where Mark Koenig, an Enron investor relations employee, communicated to Skilling the analysts' desire for more information).

[391] Lay In-Person Interview.

[392] Id. He stated that he was usually more involved in helping prepare the annual proxy statement and letter to shareholders that was included in the annual report. Id.

[393] For example, minutes of the Finance Committee meetings, which Lay and Skilling always attended, reflect that Glisan, Fastow and other senior managers made detailed reports. Illustrative of a typical meeting, in August 2000 Glisan presented his customary Treasurer Report (the "Treasurer Report"), and the minutes describe the beginning of his presentation as follows:

> Mr. Glisan reviewed the liquidity report as of July 25, 2000 and noted that the Company's total liquidity was over $7 billion. He reviewed year-to-date investments and proceeds on sales of assets and he stated that without additional action by the Company the year-end debt balances would be over the target levels.

8/7/00 Finance Committee Minutes, at 2. The minutes then continue, reflecting Skilling's involvement: "Messrs. Fastow and Skilling joined him [Glisan] in a discussion of the Company's capacity in the bank markets, the constraints facing the Company, and the projected cash flows from new businesses." Id. Later in that same meeting, Skilling joined Buy and Joe Sutton in discussing "international investments included in the troubled assets detail and a general discussion of Project Summer." Id. at 3. Project Summer was an unsuccessful effort to sell a large number of Enron's international assets to a third party. Following the collapse of that transaction, in May 2001 Enron prepared an internal valuation of its international assets, showing that assets with a carrying value of $10.1 billion had an estimated value of only $5.5 billion. The report refers to this as "Jeff Skilling's Estimate." Joint Audit and Compliance/Finance Committee Meeting

Lay and Skilling also attended periodic meetings with the rating agencies to review Enron's financial performance.[394]  These presentations were necessarily focused on the financial aspects of Enron that were important to the rating agencies, including primarily Enron's debt, equity and cash flows.[395]  Lay and Skilling were aware of the importance of Enron's financial ratios in maintaining the company's investment grade credit ratings, since these ratios were discussed at every Finance Committee meeting.[396]  The "Targeted Key Financial Ratios" presented by Fastow at these meetings included interest coverage, funds flow interest coverage, total obligations to total capital, debt to balance sheet capital, and funds flow from operations to total obligations.[397]  Skilling testified that understanding the ratios

> was just real simple.  I mean, you had net income and you had cash flow, and we knew which ratios the credit agencies looked for, and when it was rolled up, you'd look at those ratios and were they okay with the credit agencies, and if they weren't, then you'd go back to the business units and,

---

Supplemental Schedules – Investment Revaluations, Aug. 13, 2001, at 2 (Distribution List includes Skilling, Rick Buy and Dave Gorte, all of Enron) [AB1128 00431-AB1128 00441].  In another example of Skilling's involvement, at the December 1998 Audit Committee meeting, Skilling joined with Andersen in discussing the effects of the pending implementation of EITF 98-10 (which involves accounting for energy trading contracts and was a principle relied on by Andersen with respect to Enron's Prepay Transactions). Minutes of Enron Audit Committee Meeting, Dec. 7, 1998, at 1 [AB000191699–AB000191700].  This also evidences Skilling's knowledge of some of the sophisticated accounting principles employed at Enron.

[394] Letter from Rebecca Carter, Enron, to Enron Board of Directors, Sept. 10, 1999 [AB000448723]; Skilling 12/5/01 SEC Testimony, at 17.

[395] See, e.g., Rating Agency Presentation Enron Corp., Nov. 22, 1999, at EC000469153-EC000469159 [EC000469120-EC000469169]; Skilling 12/5/01 SEC Testimony, at 17.

[396] See, e.g., Minutes of Enron Finance Committee Meeting, Oct. 11, 1999 (the "10/11/99 Finance Committee Minutes"), at 1-2 [AB000196890-AB000196893]; 10/11/99 Finance Committee Materials, at AB0247 00829 (slide from CFO Report); Minutes of Enron Finance Committee Meeting, Dec. 11, 2000, at 2 [AB000201489-AB000201494]; Materials from Enron Finance Committee Meeting, Dec. 11, 2000 (the "12/11/00 Finance Committee Materials"), at AB0247 01653, AB0247 01664 (slides from CFO Report) [AB0247 01641-AB0247 01895]; Minutes of Enron Finance Committee Meeting, Feb. 12, 2001 (the "2/12/01 Finance Committee Minutes"), at 1-2 [AB000205010-AB000205014]; Materials from Enron Finance Committee Meeting, Feb. 12, 2001, at AB0247 01923-AB0247 01924 (slides from CFO Report) [AB0247 01908-AB0247 02041]; Belfer Sworn Statement, at 58.

[397] See, e.g., Materials from Enron Finance Committee Meeting, Dec. 13, 1999 (the "12/13/99 Finance Committee Materials") at 8-9 (the CFO Report) [AB0247 00947-AB0247 01075].

you know, tell them, "Hey, look, we've got surplus capacity, less capacity, here's what needs to be done."[398]

Lay and Skilling also participated in "road shows" to help sell the company's securities.[399] In addition, Skilling regularly conducted the quarterly calls with Wall Street analysts following Enron's earnings releases.[400] Skilling's initial remarks during these calls were most often scripted, but his prepared remarks were followed by the opportunity for the analysts to ask questions, requiring that Skilling have sufficient knowledge about the company's finances to respond appropriately on behalf of Enron.[401]

Skilling also apparently had regular contact with the financial institutions that provided financing and services to Enron. Evidence of this involvement includes:

- Rick Walker, an Enron relationship manager at JPMorgan Chase, wrote to a colleague at the bank in October 1998 that Skilling and Fastow were planning a visit to the bank in order "to kick off your relationship with Jeff Skilling," and "to provide assurance that Enron is working very hard to bring their relationship pull over the bank market to bear in order to make all of their 4th quarter deals (including Project Apache) successful."[402]

---

[398] Skilling 11/1/02 SEC Testimony, at 34.

[399] See, e.g., Letter from Rebecca Carter, Enron, to Enron Board of Directors, July 16, 1999 [AB000448723]; Letter from Rebecca Carter, Enron, to Enron Board of Directors, Jan. 14, 2000 [AB000448696]; Letter from Rebecca Carter, Enron, to Enron Board of Directors, Apr. 14, 2000 [AB000448680].

[400] See, e.g., Enron Q2 2001 Conference Call Transcript, July 7, 2001 (the "7/12/01 Call Transcript") [ELIB0001900-00001-ELIB00001900-00029]; Enron Q1 2001 Conference Call Transcript, Apr. 17, 2001 (the "4/17/01 Call Transcript") [ELIB00001897-00001-ELIB00001897-00028]; Enron Q2 2000 Conference Call Transcript, July 24, 2000 (the "7/24/00 Call Transcript") [ELIB00001899-00001-ELIB00001899-00034]; Enron Q1 2000 Conference Call Transcript, Apr. 12, 2000 (the "4/12/00 Call Transcript") [ELIB00001896-00001-ELIB00001896-00026]; Enron Q2 1999 Conference Call Transcript, July 13, 1999 (the "7/13/99 Call Transcript") [ELIB00001898-00001-ELIB00001898-00027]; Enron Q3 1998 Skilling on Q3 Results Call Transcript, Oct. 13, 1998 (the "10/13/98 Call Transcript") [ELIB00001902-00001-ELIB00001902-00008].

[401] See, e.g., 7/12/01 Call Transcript; 4/17/01 Call Transcript; 7/24/00 Call Transcript; 4/12/00 Call Transcript; 7/13/99 Call Transcript; 10/13/98 Call Transcript.

[402] Memorandum from Rick Walker, JPMC, to James B. Lee, III, et al., JPMC, regarding October 27, 1998 meeting with Jeff Skilling and Andy Fastow, Oct. 23, 1998, at 1 [PSI00414581-PSI00414588].

- In 1999, Skilling called Rick Walker at JPMorgan Chase to discuss several pending transactions.[403] During the call, Skilling complimented the bank's responsiveness and said it had been "very helpful to [Enron] for [JPMorgan Chase] to commit to use [the bank's] balance sheet to get a transaction done."[404]

- CSFB talked with Skilling about broadband,[405] Enron's business segment by segment,[406] and Enron's need to maintain funds flow at a minimum of 3.5.[407]

- Skilling confirmed to CSFB that the LJM1 transaction had been reviewed and approved by Enron's Board and had the support of senior management of Enron.[408]

- Skilling led a call with bankers from RBS, in which Fastow and Glisan also participated.[409] During that call, Skilling discussed a number of issues, including Enron's "perennial challenge" of matching cash to earnings and the "need to bridge the gap in cashflow,"[410] as well as Enron's strategy to sell assets, its credit ratings, and its relationship with RBS.[411]

- Skilling and Fastow met with senior executives of Toronto Dominion in October 1998 to discuss the bank's involvement in Enron's

---

[403] Email from Marc Shapiro, JPMC, to Richard S. Walker and copy to James B. Lee and Todd Maclin, JPMC, June 25, 1999, at 2 [JPMCBKR0017759-JPMCBKR0017760].

[404] *Id.*

[405] Email from Spider, CSFB, to Adebayo Ogunlesi, *et al.,* CSFB, Sept. 19, 2000 (client meeting information sent by Spider, a CSFB computer program) [CSFBCO 005138930].

[406] Memorandum from Robert Jeffe, *et al.,* CSFB, to The Investment Banking Committee, CSFB, regarding Enron Primary Stock Offering, Feb. 2, 1999, at CSFBCO 000004998 [CSFBCO 000004992-CSFBCO 000005015].

[407] Email from Adam de Courcy Ling, CSFB, to Jeremy Mead, *et al.,* CSFB, July 26, 1999 [CSFBCO 005128689].

[408] Sworn Statement of Adebayo Ogunlesi, Energy Group Head, CSFB, to M. Russell Wofford, Jr., A&B, May 19-20, 2003 (the "Ogunlesi Sworn Statement"), at 168.

[409] Royal Bank of Scotland, Meeting/Telephone Call Report, Jan. 24, 2001, at 1 [RBSC256566-RBSC156568].

[410] *Id.* at 2.

[411] *Id.* at 2-3. During the call, Skilling discussed Enron's strategy "to sell its physical assets and operate via contracts." *Id.* at 1. According to the call report: "Coupled with this concept is the need to fully diversify risk, in many ways making Enron's strategy similar to that [of] an investment bank, which tends to 'churn' assets by collecting fees and then selling down position to free up capital." *Id.* at 2.

financings.[412] According to one of the bankers present, Skilling led the meeting and appeared knowledgeable about the matters discussed.[413]

*Outside Directors*

The Outside Directors most responsible for monitoring Enron's SPE transactions were the Finance and Audit Committees, with the full Board being involved from time to time. All of these groups of directors were generally active, and the following discussion reviews the evidence about their activities related to the SPE transactions. This discussion also highlights their actions with respect to LJM2. Given the conflict of interest created by Fastow serving as both CFO of Enron and general partner of LJM2, those circumstances required a higher level of director supervision.

*Generally.* Enron's Board and Board committees met often. During 1997 through 2001, the Board met at least eight times each year and often more frequently, counting both regularly scheduled and specially called meetings. Attendance was strong, and prior to each regularly scheduled meeting, directors received agendas and large quantities of preparatory materials.

Certain aspects of the Board's oversight activities generally, however, are subject to criticism. Board meetings typically lasted a total of about four to five hours, and committee meetings were generally not more than ninety minutes each. With the large number of significant agenda topics presented at each meeting, these circumstances raise questions of whether the Outside Directors always had sufficient time to discuss and understand the matters fully. Although none of the Outside Directors admitted in

---

[412] Briefing Memorandum, prepared by Toronto Dominion, Oct. 23, 1998 (the "10/23/98 Toronto Dominion Memo") (regarding upcoming meeting with Enron executives) [TDB-EX 002419-TDB-EX 002422].

[413] Sworn Statement of Julian Mark Bott, Toronto Dominion, to Robb E. Hellwig, A&B, Oct. 8, 2003, at 66; 10/23/98 Toronto Dominion Memo.

testimony that they felt the Board or committee meetings were too short,[414] several

directors provided such criticism in a Board self-assessment they completed in 2001 (the

"2001 Board Assessment"):

- "This is a great board (in my opinion). And, if anything, more meeting time (especially committees) would be nice. It is a working board and lots going on in the company!"[415]

- "We may need to meet beyond noon more often, to allow for in-depth briefings, and to leave sufficient time for the special reports to present risks, hurdles, alternative scenarios, and requests for specific advice."[416]

- "I think I would support a move to six meetings a year (but not too strongly.)"[417]

Even with 15 to 19 directors, which was large for a public company,[418] Enron's

Board did not include a large number of Outside Directors who had hands-on experience

---

[414] *See, e.g.*, Meyer Sworn Statement, at 45-46 ("Q. With respect to the board meetings, did you feel that the time that was allotted to the board meetings was sufficient for you to have all your questions answered about the matters that were brought before the board? A. Yes. I never felt like we were without time to address everything that needed to be addressed. I'm comfortable with that. Again, time is a commodity you'd always like more of.").

[415] Materials from Enron Nominating Committee Meeting, Feb. 12, 2001 (the "2/12/01 Nominating Committee Materials"), at AB000467840 (part of 2001 Board Assessment) (underlining in original) [AB000467834-AB000467851].

[416] *Id.* at AB000467840 (part of 2001 Board Assessment).

[417] *Id.*

[418] A recent survey of public companies reported an average board size of 9.4 total directors, with an average of 6.9 "independent" or outside directors. Financial Executives International Survey of Corporate Governance Best Practices, May 2002, *available at* http://www.fei.org/download/feigovsur.pdf#xml=http:/ fei.org.master.com/texis/master/search/mysite.txt?q=corporate+governance&order=r&id=3860184834ad7a 56&cmd=xml (last visited Oct. 24, 2003). Several of the directors noted that the Board was too large in the 2001 Board Assessment. Comments in the 2001 Board Assessment included: "Board too large"; "Need to reduce the size of the board . . ."; "Board slightly too big." 2/12/01 Nominating Committee Materials, at AB000467839 (part of 2001 Board Assessment). The large size can undermine the individual director's sense of personal responsibility for understanding complex matters. Several of the Outside Directors testified that they might not have understood an area of the company's operations or a particular matter, but they were not concerned because they expected that someone else on the Board did. For example, Chan, who served on both the Audit and Finance Committees, testified that he relied on Jaedicke, Gramm and Duncan to understand whether it was appropriate for Andersen to provide both external and internal audit functions at Enron: "For something like that, I do rely on my colleagues at the audit committee – such as Bob Jaedicke was much more qualified in this regard, and certainly he has, you know, mentioned about – these concepts, and that's how I learned about it." Chan Sworn Statement, at 208. Chan also testified that

in the types of sophisticated finance employed by Enron. In the 2001 Board Assessment, the directors acknowledged this lack of depth on the Board. A summary of the self-assessment responses quoted the directors' responses, but without attributing the quotes to individual directors. Regarding this lack of financial expertise, the directors wrote:

- "Board is too large, but missing skills in technology and very sophisticated finance."[419]

- "Need more technology/risk management and finance skills."[420]

- "Add expertise in derivatives/hedging/trading."[421]

- "Another person with strong background on financial derivatives may also help."[422]

- "Need to reduce the size of the board and add more expertise in finance, technology and possibly entertainment/media."[423]

---

he considered the Audit Committee to have "experts on this field" and said Duncan and Gramm were "very qualified" when asked to name those experts. Chan Sworn Statement, at 210. Gramm, however, testified:

A. I took accounting in, one accounting course in undergraduate school.

Q. Other than that course and just sort of a normal knowledge you picked up reading financial statements and balance sheets, did you have any other particular expertise in dealing, or knowledge, I should say, about accounting and auditing issues?

A. No.

Gramm Sworn Statement, at 34.

[419] 2/12/01 Nominating Committee Materials, at AB000467839 (part of 2001 Board Assessment).

[420] *Id.*

[421] *Id.*

[422] *Id.*

[423] *Id.*

The Board also included two employees, Harrison[424] and Mark-Jusbasche,[425] who were heads of Enron business units and whose conflicting positions rendered them somewhat ineffective in questioning or otherwise monitoring management. As Harrison testified, in his role as head of a business unit, he was "competing for capital" with other business unit managers, which he testified was difficult because of "the internal competitiveness of Enron."[426] He stated that his role on the Board gave him authority to oversee the other business units, while at the same time competing on the same level with those business units,[427] which made his position "awkward at times."[428] Harrison noted that he was uncomfortable being a director where he oversaw Skilling's performance, while at the same time reporting to Skilling like other business unit heads.[429] In Harrison's opinion, "I don't think it works to sit in both – in both views, in both seats."[430]

---

[424] Harrison joined the Board in August 1997 following Enron's acquisition of Portland General Electric, and he served until May 2001. For all of that time, he also served as CEO of Portland General Electric, which operated as a business unit of Enron. He described his "oral participation" in Board meetings as "modest." Harrison Sworn Statement, at 13, 32.

[425] Mark-Jusbasche joined the Board in 1999 and served for one year while holding the position of Chairman and CEO of Azurix Corporation, a global water company Enron formed in 1998 and took public. When Enron took Azurix private in 2000, Mark-Jusbasche resigned from Enron's Board at Lay's request. Mark-Jusbasche Sworn Statement, at 145.

[426] Harrison Sworn Statement, at 179-80.

[427] Id. at 179-81.

[428] Id. at 179.

[429] Id. at 180-81.

[430] Id. at 181.

Another Outside Director indicated tension with Skilling. Meyer testified that he did not stand for reelection in 2001 in part because Skilling thought Meyer was too "negative" in his questioning. Meyer Sworn Statement, at 27. Meyer offered not to stand for reelection and Lay accepted the offer saying, according to Meyer: "Jeff thinks you're one of a couple of directors that are too negative in your questioning and he thinks we need some folks that maybe have a background much more aligned with the trading business." Id. As an example of his interaction with Skilling at Board meetings, Meyer testified regarding Skilling's development of the broadband business:

> I come from the world of technology. Enron was going into the broadband business – a business that I knew a little bit about from a technological standpoint. And I recall . . .[t]here was a status report in a presentation by the management about broadband, and I questioned exhaustively.

*Finance Committee.* The Finance Committee, which had responsibility for reviewing and monitoring all aspects of the company's financial plans, appears to have taken actions designed to meet its monitoring obligations. Although those actions had discernible flaws, the evidence shows some action on the part of the committee and, thus, the members of the Finance Committee do not appear to have abdicated their monitoring responsibilities.

For example, the Finance Committee always received reports from the CFO (the "CFO Report") and the Treasurer (the "Treasurer Report"), and often received reports from the Chief Risk Officer (the "CRO Report"), along with presentations and deal approval sheets ("DASHs") about specific transactions being considered. These reports provided information about Enron's key financial ratios, credit ratings, cost of capital, liquidity sources and financing transactions, among other items. Some of these reports were so detailed that, according to Belfer's description of a 1998 capital status report, "the level of detail is numbing rather than elucidating."[431]

The Finance Committee also regularly considered many matters designed to fulfill its obligations under its charter. These included, for example:

---

I remember the consultants were there and I said, "I don't quarrel with what you're seeing strategically, and with what you're expecting to have as steps in that business." But I said, "I seriously question the timing." I said, "You know, you can't – until you get broadband to the home, the last mile thing, I'm not sure that you want to do all these things first," and I said, "That's my view."

And that's the kind of dialogue where I would interject myself, you know, and I think I interpreted Jeff didn't necessarily agree with what I was saying.

*Id.* at 47-48.

[431] Belfer Sworn Statement, at 119-23. The chart Belfer referred to was a list that identified many types of Enron's on and off balance sheet liabilities, listing Prepays under the heading "Debt Classified as Non-Debt Liabilities." Draft Enron Capital Management Capital Activity Report, Jan. 27, 1998, at AB0246 00815 [AB0246 00725-AB0246 01638]; Agenda for Joint Audit and Finance Committee Meeting, Feb. 9, 1998 [AB000473540].

- Approving debt and equity offerings.[432]  The Finance Committee regularly considered and recommended for approval shelf registrations and other issuances of public debt and equity.[433]

- Reviewing the company's activities with rating agencies.[434]  The CFO Report and the Treasurer Report always reported the company's current credit ratings, key financial ratios used by the rating agencies, and the "credit rating implications of certain transactions."[435]

- Reviewing the company's "Capital Risk Policy," which covered, among other matters, "capital expenditures, investments and risk limits for the commodity and capital books . . . ."[436]  The Finance Committee spent a great deal of time reviewing Enron's "value at risk" limits relating to the trading operations,[437] as well as reviewing risks in the company's merchant portfolio.  Buy often presented the CRO Report,[438] discussing the "trade and merchant credit quality, with specific emphasis on the top 25 credit exposures, and the top and bottom ten performing investments."[439]

---

[432] Finance Committee Charter, at 1.

[433] See, e.g., Minutes of Enron Finance Committee Meeting, Aug. 10, 1997, at 2 (shelf registration/credit facilities) [AB000186620-AB00018662]; Minutes of Enron Finance Committee Meeting, Dec. 8, 1997, at 2 (shelf registration) [AB000469806-AB000469809]; Minutes of Enron Finance Committee Meeting, Oct. 12, 1998, at 2 (shelf registration) [AB000192038-AB000192042]; Minutes of Enron Finance Committee Meeting, Aug. 9, 1999, at 2 (issuance of exchangeable security) [AB000196885-AB000196888]; 10/11/99 Finance Committee Minutes, at 3 (shelf registration); 5/1/00 Finance Committee Minutes, at 2 (debt authority).

[434] Finance Committee Charter, at 1.

[435] Minutes of Enron Finance Committee Meeting, May 3, 1999 (the "5/3/99 Finance Committee Minutes"), at 2 [AB000196881-AB000196883].

[436] Finance Committee Charter, at 1.

[437] See Winokur 11/20/02 Sworn Statement, at 197-201.

[438] See, e.g., Materials from Enron Finance Committee Meeting, Dec. 7, 1998 (the "12/7/98 Finance Committee Materials"), at AB0247 00438 (the Agenda) and AB0247 00479-AB0247 00551 (the Chief Risk Officer Report (the "CRO Report")) [AB0247 00436-AB0247 00557]; Materials from Enron Finance Committee Meeting, Feb. 7, 1999 (the "2/7/99 Finance Committee Materials"), at AB0247 00561 (the Agenda) and at AB0247 00603-AB0247 00623 (CRO Report) [AB0247 00561-AB0247 00623]; Materials from Enron Finance Committee Meeting, Feb. 7, 2000 (the "2/7/00 Finance Committee Materials"), at AB0247 01086 (the Agenda) and at AB0247 01123-AB0247 01144 (CRO Report) [AB0247 01084-AB0247 01209]; 5/1/00 Finance Committee Materials, at AB0247 01213 (the Agenda) and at AB0247 01263-AB0247 01323 (CRO Report); 2/12/01 Finance Committee Materials, at AB0247 01910 (the Agenda) and AB0247 01997 (CRO Report).

[439] Minutes of Enron Finance Committee Meeting, May 3, 1999 (the "5/3/99 Finance Committee Minutes"), at 2-3 [AB000196881-AB000196883].

- Reviewing the company's "exposure under outstanding letters of indemnity, letters of credit and corporate guaranties . . . ."[440] The Treasurer Report delivered at almost every regularly scheduled meeting included lists of Enron's active letters of credit and guaranties, even providing comparisons of the current amounts to prior periods.[441]

The Finance Committee did not appear as strong, however, in monitoring the company's "liquidity, including debt maturities, and its contingent liabilities."[442] The Finance Committee regularly received liquidity reports showing sources and amounts of cash available to Enron, and on several occasions it also received "stress testing" analyses showing the adverse effect of certain events on that liquidity. However, the liquidity reports were never combined with any information as to the amount of liquidity that the company needed. A sample of one of the liquidity reports, which was provided to the Finance Committee in August 1999, is reproduced below:[443]

---

[440] Finance Committee Charter, at 1.

[441] *See, e.g.*, Materials from Enron Finance Committee Meeting, Oct. 12, 1998 (the "10/12/98 Finance Committee Materials"), at AB0247 00254-AB0247 00255 (slides from Treasurer Report) [AB00247 00224-AB0247 00418]; 2/7/99 Finance Committee Materials, at AB0247 00582 (slide from Treasurer Report); 10/11/99 Finance Committee Materials, at AB0247 00855-AB0247 00856 (slide from Treasurer Report); 2/7/00 Finance Committee Materials, at AB0247 01111 (slide from Treasurer Report); 10/6/00 Finance Committee Materials, at AB0247 01561-AB0247 01562 (slides from Treasurer Report); Materials from Enron Finance Committee Meeting, Aug. 13, 2001 (the "8/13/01 Finance Committee Materials"), at AB0247 02312-AB0247 02313 (slides from Treasurer Report) [AB0247 02285-AB0247 02359].

[442] Finance Committee Charter, at 1.

[443] Materials from Enron Finance Committee Meeting, Aug. 9, 1999 (the "8/9/99 Finance Committee Materials"), at 19 (slide from Treasurer Report) [AB0247 00716-AB0247 00815].

**Enron Corp.**
**Liquidity Report**
**as of July 23, 1999**
**($000's)**

| | Overnight | 1-30 Days | 31-60 Days | 61-90 Days | 91 and over | Total |
|---|---|---|---|---|---|---|
| Comm rcial Paper & Uncommitted Lines | 2,029,000 | | | | | 2,029,000 |
| Bank Facilities: | | | | | | |
|   Multi-currency | 71,460 | | | | | 71,460 |
|   BHF | 15,800 | | | | | 15,800 |
| Accounts Receivable Facility | 51,050 | | | | | 51,050 |
| Sh lf R gistration - Debt | | 500,000 | | | | 500,000 |
| Sh lf R gistration - Equity' | | 629,063 | | | | 629,063 |
| Mon tizations: | | | | | | |
|   Commodity Books | | | 250,000 | | | 250,000 |
|   M rchant Equity Portfolio | | | | 1,000,000 | 2,310,000 | 3,310,000 |
| | 2,167,310 | 1,129,063 | 250,000 | 1,000,000 | 2,310,000 | 6,856,373 |

' Reflects 7.5mm shares at $83 7/8 per share.

19

AB0247 00739

*ENRON*
Finance Committee Meeting
1999KM-000999

The report reflected the amount of cash Enron could raise within specified time periods, in this case as of July 23, 1999, but it did not indicate how much liquidity Enron needed at that time. The stress testing reports also did not provide that information. The first slide of the stress testing report provided at the same August 1999 meeting is reproduced below:[444]

---

[444] *Id.* at 24 (slide from Treasurer Report).

## Liquidity Stress Analysis
### ($ Billions)

| | Rating Agency Plan Cash Flow | Per Plan (Adjusted) Investing | Financing | Cash Needs |
|---|---|---|---|---|
| Exploration & Production | 369 | (474) | - | (105) |
| Transmission & Distribution | 504 | (53) | - | 451 |
| Wholesale Energy Operations & Services | 1,309 | (1,941) | - | (632) |
| Enron Energy Services | (100) | (56) | - | (156) |
| Corporate & Other | 18 | (497) | (928) | (1,407) |
| TOTAL | 2,100 | (3,021) | (928) | (1,849) |
| 1999 Interest Expense | 613 | | | |

AB0247 00744

Finance Committee Meeting
16992JM-000000

As shown on this slide, the stress test analysis was performed using the amount of cash that Enron needed according to its annual plan. But as discussed later in this Appendix, by May of each year Enron had typically already spent more than its entire annual capital investments budget. By August 1999, Enron was $2 billion over plan, having committed to capital investments totaling over $3.6 billion,[445] which reached over $5 billion by the end of the year.[446] Thus, a liquidity analysis based on a plan that showed a need for $1.8 billion of cash was not relevant.

---

[445] *Id.* at 8 (slide from CFO Report).

[446] 12/13/99 Finance Committee Materials, at 22 (part of Treasurer Report).

There also does not appear to have been any report in the materials provided to the Finance Committee showing a maturity schedule for Enron's obligations. The only information the Finance Committee received regarding the maturities of debt and other obligations was apparently the information Enron distributed publicly in its financial statements. The Examiner has found no evidence in the Finance Committee materials indicating that the Outside Directors requested more information on this topic. When Belfer was shown the Finance Committee materials for the August 1999 meeting and asked if it contained a report of "the maturities of the company's obligations,"[447] he testified:

> Q. I take it, then, there's not, to your understanding, a sort of a standard section of the report [to the Finance Committee] that covers that?
>
> A. I believe that's accurate, but, again, I mentioned that in the footnotes to the financial statements that are audited by Arthur Andersen there is a schedule of debt, of aggregate debt maturities by year.[448]

Similarly, the Finance Committee did not appear to have a clear understanding of Enron's total obligations. The committee regularly reviewed Enron's "key financial

---

[447] Belfer Sworn Statement, at 140-41.

[448] *Id.* at 141. *See also* Willison Sworn Statement, at 111-12 (testifying that the Board did not need to monitor the maturities of individual debts because it monitored the matching of debt maturities to financings by reviewing "the overall funds flow on a year-to-year basis," and that he "would be looking to management to structure the maturity schedule"). *But see* Meyer Sworn Statement, at 59 ("Q. In analyzing liquidity issues, did the finance committee evaluate the maturities of the company's obligations? A. I recall that we looked at the maturities. I recall one of the things that we had was, you know, the top 25 list to see – the top 25 meaning what did I – What are the top 25 things that are sort of out of the range of where we would like them to be. And so we did look at those things."); Chan Sworn Statement, at 145 ("Q. Okay. Did you ever see anything that looked like a – that was a maturity schedule . . . that tried to, you know, show when various obligations or categories of obligations were maturing and how Enron expected to either pay or refinance those obligations? A. Yes, there's always projections this year, next year, the year after and so forth, year by year, what the obligations are likely going to be, and, hence, what the cash position is going to be. There's always rather comprehensive information of that sort. Q. Okay. So you recall some sort of maturity schedule presented or a plan, what? A. Yes."). Savage testified: "As I recall, we would typically get a schedule of debt maturities over a period of years to show those debt maturities, and when they were coming up and how we were going to meet them." Savage Sworn Statement, at 65. However, there is no such report in the records of the Finance Committee or Board meetings provided to the Examiner.

ratios, including funds flow and the debt to total capitalization ratio, for both consolidated and unconsolidated obligations."[449] Beginning in October 1998, the CFO Report at each regularly scheduled meeting included a chart showing, among other calculations, Enron's ratio of "debt / B/S capital" and "FFO/Total Obligations."[450] However, the chart did not provide the amounts used to calculate the ratios, and it did not explain whether "Total Obligations" included Enron's unconsolidated obligations. Since the names of the ratios presented in the CFO Report were identical to the names of the ratios published in Enron's annual financial statements,[451] it is reasonable to infer that these were the same ratios.[452] Per the annual financial statements, "total obligations" did not include debt of Enron's unconsolidated affiliates, because that debt was "non-recourse and therefore is excluded from Enron's obligations."[453]

The amount of total obligations also was not included in the cost of capital report that Fastow regularly provided to the Finance Committee. The first such report that is reflected in the Finance Committee minutes was provided in October 1998. That report showed the cost of capital computed three ways. First, the cost was calculated "using the CAPM [capital asset pricing model] Model." Second, the chart showed the "[t]rue cost

---

[449] Finance Committee Charter, at 1.

[450] Materials from Enron Finance Committee Meeting, Oct. 12, 1998 (the "10/12/98 Finance Committee Materials"), at AB0247 00242 (slide from CFO Report) [AB0247 00231-AB0247 00417].

[451] *See, e.g.*, Enron Annual Report for 2000, at Selected Financial and Credit Information (Unaudited) [AB1128 01916-AB1128 01975]; Enron Annual Report for 1999, at Selected Financial and Credit Information (Unaudited) [AB000524031-AB000524090].

[452] On one occasion, however, Fastow's presentation to the Board included ratios derived from total obligations that included "funding sources unknown to the rating ag[encies]." Enron Capital Management Capital Activity Report, at 5 (presented at 5/4/98 Finance Committee Meeting) [AB0247 00011-AB0247 00017]. None of the directors who were asked about this notation could explain what sources it referred to. Belfer Sworn Statement, at 129-30 ("I have no idea of what this is about, and I have no recollection of ever having seen this before."); Harrison Sworn Statement, at 118.

[453] *See, e.g.*, 2000 Selected Financial and Credit Information, at AB1128 01969; 1999 Selected Financial and Credit Information, at AB000524084.

of capital including off balance sheet obligations" and, finally, it showed the "[t]rue cost of capital including off balance sheet obligations and non-recourse obligations."[454] Thereafter, Fastow always included a cost of capital report in his CFO Report to the Finance Committee, but he never again showed the "true costs" of capital, only the calculation using CAPM.

Thus, it does not appear that the Finance Committee actually made a meaningful review of the total obligations. Belfer testified that although the Finance Committee materials included "a chart of total assets, I suspect one would have to work a little harder to find out what the total liabilities were."[455]

While this lack of information about total obligations might have been avoided if the Finance Committee had asked for more or clearer information, it also resulted at least in part from the officers' failure to provide certain information to the Finance Committee and the other Outside Directors, and the failure to provide it in a clear and meaningful fashion.

Fastow, Glisan and others often used misleading or unclear terms or jargon. For example, the CFO Reports and Treasurer Reports used terms like "balance sheet

---

[454] 10/12/98 Finance Committee Materials, at AB0247 00246 (slide from CFO Report).

[455] Belfer Sworn Statement, at 130-31. At seven Finance Committee meetings beginning in August 2000, Fastow gave the Finance Committee an indication of the amount of Enron's total obligations on a chart that tracked Enron's interest rate exposure. 8/7/00 Finance Committee Materials, at AB0247 01363 (slide from CFO Report); 10/6/00 Finance Committee Materials, at AB0247 01538 (slide from CFO Report); 12/11/00 Finance Committee Materials, at AB0247 01656 (slide from CFO Report); 2/12/01 Finance Committee Materials, at AB0247 01927 (slide from CFO Report); Materials from Enron Finance Committee Meeting, Apr. 30, 2001 (the "4/30/01 Finance Committee Materials"), at AB0247 02071 (slide from CFO Report) [AB0247 02055-AB0247 02280]; 8/13/01 Finance Committee Materials, at AB0247 02302 (slide from CFO Report); Materials from Enron Finance Committee Meeting, (the "10/8/01 Finance Committee Materials"), at AB0247 02545 (slide from CFO Report) [AB0247 02536-AB0247 02696]. For example, the August 2001 chart showed $36 billion of total obligations. 8/13/01 Finance Committee Materials, at AB0247 02302. Despite the amount increasing from $26 billion in February 2001 to $36 billion in August 2001, Lay and the Outside Directors who testified about this chart did not recall any discussion or concern about the information presented. Lay In-Person Interview; Savage Sworn Statement, at 251-52; Belfer Sworn Statement, at 171-72.

management"[456] transactions and "funds flow management transactions"[457] to describe the SPE transactions generally, but with no explanation of the "management" those transactions might have effected. The records of the Finance Committee meetings show frequent use of the term "monetization"—for example, Fastow referred to the Rhythms transaction as a "monetization of value"[458]—but testimony from the Outside Directors indicated that they did not all share the same understanding of that term and may not have understood how the term was being used by management. Skilling testified that "to monetize" an asset meant to

> [c]onvert an asset into cash, if we needed to. You know, for example, as a part of our merchant business we created, the business created a lot of accounts receivable. Accounts receivable [sic] is an asset, but is not cash, you know. But you can monetize an accounts [sic] receivable by factoring it.
>
> . . . .
>
> And then there would be all sorts of other assets that you could do some of the same things with. You know, power plant [sic].[459]

Outside Directors understood "monetizations" as follows:

- Chan, who was a Finance Committee member, testified that he believed "asset monetizations" meant "just selling outright."[460]

- LeMaistre, who often attended Finance Committee meetings, testified that if an asset were underperforming, the company could "monetize it in order to free up the money to reinvest it elsewhere at a better rate of return," which would "in most instances" mean selling or disposing of the asset in some fashion.[461]

---

[456] *See, e.g.,* 8/7/00 Finance Committee Materials, at 23 (slide from Treasurer Report); 10/11/99 Finance Committee Materials, at AB0247 00840 (slide from CFO Report using term "Balance Sheet Vehicles"); 12/13/99 Finance Committee Materials, at 18 (slide from CFO Report).

[457] *See, e.g.,* 10/11/99 Finance Committee Materials, at AB0247 00836 (slide from the CFO Report).

[458] *Id.* (slide from CFO Report).

[459] Skilling 12/5/01 SEC Testimony, at 72-73.

[460] Chan Sworn Statement, at 169.

[461] LeMaistre Sworn Statement, at 142-43.

- Foy and Willison testified that "monetization" could include either selling or borrowing against an asset.[462]

- Urquhart, a Finance Committee member, testified that "monetization" was "converting hard assets to several vehicles."[463]

Some of the Outside Directors also appeared to have varying understandings of the difference between the terms "off balance sheet" and "non-recourse debt." For example, Urquhart testified that the terms were synonymous, "because once you stop your balance sheet, there is no recourse. Your debt is off your balance sheet, not something they have recourse to."[464] Other Outside Directors testified as follows:

- Savage testified that "typically" off balance sheet meant non-recourse, with some exceptions.[465]

- Belfer testified that "non-recourse" financing would refer to outright dispositions, whereas "off balance sheet" financings would refer to structured financings in which Enron had continuing involvement.[466]

- Chan testified that sometimes off balance sheet debt was non-recourse, but that sometimes it was recourse, depending on the situation.[467]

- Harrison testified that he "most of the time would equate" the terms off balance sheet debt with non-recourse debt, but believed that there was a "technical accounting difference" between the two.[468]

Other examples of ambiguous language include Fastow's reference to a collateralized loan obligation transaction as a "CBO translation,"[469] which he explained

---

[462] Foy Sworn Statement, at 113 ("In general it means either selling an asset or borrowing up to its full market value."); Willison Sworn Statement, at 88 ("Q. [Is monetization] different than a sale? A. No. I think usually it probably is a sale, but in some cases, perhaps you might borrow against a commodity . . . .").

[463] Urquhart Sworn Statement, at 57.

[464] *Id*. at 80.

[465] Savage Sworn Statement, at 73.

[466] Belfer Sworn Statement, at 132.

[467] Chan Sworn Statement, at 53.

[468] Harrison Sworn Statement, at 101.

[469] 10/11/99 Finance Committee Materials, at AB0247 00836 (slide from CFO Report).

was a "3rd party credit being monetized."[470] One of the Global Finance unit's objectives for 2000 was to "Provide Platform(s) for Increased Capital Velocity to Achieve Return on Equity Target."[471] Officers often cited "financial flexibility," without further explanation, as the reason for a proposed transaction.[472] Although such obfuscating terminology might have given the Outside Directors reason to ask more questions about the SPE transactions than they appear to have asked, the terminology Enron's officers employed could not have been designed to clarify, simplify or provide a meaningful understanding of Enron's financial activities.

*Audit Committee.* Like the Finance Committee, the Audit Committee appeared to have taken actions generally to fulfill its monitoring responsibilities with respect to the SPE transactions. Also like the Finance Committee, the Audit Committee took actions designed to meet its obligations under its charter that, although subject to criticism, would not appear to support a conclusion that members of the Audit Committee abdicated their monitoring responsibilities.

---

[470] *Id.* (Carter's handwritten notes on slide from CFO Report).

[471] 2/7/00 Finance Committee Materials, at 16 (slide from CFO Report).

[472] *See, e.g.,* 10/6/00 Finance Committee Materials, at AB0247 01549 (slide from CFO Report); 10/11/99 Finance Committee Materials, at AB0247 00846 and AB0247 00848-AB0247 00849 (slides from the CFO Report).

The schedule reproduced below is illustrative of the Audit Committee's process for ensuring compliance with its charter:

### Audit and Compliance Committee
### Calendar of 2001 Activities

| | Scheduled Meetings | | | | |
|---|:---:|:---:|:---:|:---:|:---:|
| | February | May | August | October | December |
| **I. Audit Committee Composition and Meetings** | | | | | |
| • Assess independence and financial literacy of audit committee, submit written affirmation to NYSE | | X | | | |
| • Review charter (publish in proxy every 3 years) | X | | | | |
| • Audit Committee Chair to approve meeting agenda | X | X | X | X | X |
| • Executive session with auditors, internal audit, management, committee | X | * | * | * | * |
| • Maintain minutes and report to Board | X | X | X | X | X |
| **II. Audit Committee Responsibilities and Duties** | | | | | |
| • Recommend appointment of auditors | X | | | | |
| • Approve audit fees | | X | | | |
| • Discuss auditor independence, obtain written statement of all relationships | X | | X | | |
| • Review plans for financial statement audit | | X | | | |
| • Review annual financial statements prior to release– discuss with mgmt, auditors | X | | | | |
| • Discuss quality of accounting principles-approve major changes | X | * | * | * | * |
| • Review adequacy of financial and EDP internal controls | | | | | X |
| • Review internal control plan | X | | | | |
| • Discuss results of year-end audit and other matters required by SAS 61 | X | | | | |
| • Prepare report to shareholders to be included in the annual proxy | X | | | | |
| • Review quarterly results and findings prior to filing | X | X | X | X | |
| • Review policies and practices for management's communications with analysts | X | | | | |
| • Review/Approve for recommendation to the Board policies and procedures regarding compliance with laws and significant policy | | | | X | |
| • Review credit and market risk with RAC | X | X | X | X | X |
| • Review legal matters with general counsel | X | * | * | * | * |
| • Conduct special investigations, studies or tests | * | * | * | * | * |
| • Review director and officer use of aircraft | X | | | | |

X = Recommended Timing
* = As Needed

**EXHIBIT**

This schedule, which was included with the minutes of the Audit Committee's February 2001 meeting, identified the material responsibilities of the committee and the meetings at which those items would be addressed.[473] Minutes of the Audit Committee's meetings show a general effort by the Outside Directors on that committee to comply with its charter and these targets, even though their efforts are subject to criticism.

---

[473] Materials from Enron Audit Committee Meeting, Feb. 12, 2001 (the "2/12/01 Audit Committee Materials"), at AB0246 01764 [AB0246 01755-AB0246 01881].

A primary responsibility of the Audit Committee was to review Enron's annual financial statements prior to their publication.[474] At its February meeting in each of 1997 through 2001, with at least two Andersen representatives present at each meeting,[475] the Audit Committee engaged in a discussion of the annual financial statements led by a member of Enron's senior management.[476]

The minutes of the meetings do not mention any specific questions or items of discussion raised by Audit Committee members, but they generally reflect areas discussed by the Enron officer. For example, in February 2000, Causey discussed the 1999 financial statements, which had been provided in advance to the committee members.[477] He "discussed some of the changes from the prior year," he "commented on the Statement footnotes regarding related party transactions and asset impairments," and Derrick "joined him in a discussion of the legal matters disclosed in the Statements."[478]

Outside Directors who sat on Enron's Audit Committee testified that they did not review the annual financial statements in detail. For example, Wakeham testified that

---

[474] 2/12/01 Audit Committee Charter, at AB000203950.

[475] See Minutes of Enron Audit Committee Meeting, Feb. 10, 1997 (the "2/10/97 Audit Committee Minutes"), at 1 (Thomas H. Bauer, Michael L. Bennett, David Duncan and D. Stephen Goddard of Andersen present) [AB000186257-AB000186260]; Minutes of Enron Audit Committee Meeting, Feb. 9, 1998 (the "2/9/98 Audit Committee Minutes"), at 1 (Thomas H. Bauer, David Duncan and D. Stephen Goddard of Andersen present) [AB000191552-AB000191554]; Minutes of Enron Audit Committee Meeting, Feb. 7, 1999 (the "2/7/99 Audit Committee Minutes"), at 1 (Thomas H. Bauer, David Duncan, D. Stephen Goddard and Douglas King of Andersen present) [AB000469810-AB000469812]; Minutes of Enron Audit Committee Meeting, Feb. 7, 2000 (the "2/7/00 Audit Committee Minutes"), at 1 (Thomas H. Bauer, David Duncan and D. Stephen Goddard of Andersen present) [AB000201248-AB000201251]; Minutes of Enron Audit Committee Meeting, Feb. 12, 2001 (the "2/12/01 Audit Committee Minutes"), at 1 (Thomas H. Bauer and David Duncan of Andersen present) [AB000204423-AB000204428].

[476] 2/10/97 Audit Committee Minutes, at 2; 2/9/98 Audit Committee Minutes, at 2; 2/7/99 Audit Committee Minutes at 2; 2/7/00 Audit Committee Minutes, at 3; 2/12/01 Audit Committee Minutes, at 3.

[477] Materials from Enron Audit Committee Meeting, Feb. 7, 2000 (the "2/7/00 Audit Committee Materials") [AB0246 01470-AB0246 01568].

[478] 2/7/00 Audit Committee Minutes, at 3.

prior to the meeting, he would review the draft financial statements "as best I could."[479]

He went on to say:

> But I also took the view that it was extremely important – and, if I may
> say so, I think the primary duty of an audit committee is to satisfy
> themselves that the auditors and the legal advisers have studied these
> things, are in agreement with them, . . . and they report to us that they are
> right. I think that is actually the most important question that an audit
> committee has to ask of the auditors; it is their prime duty.[480]

While the Audit Committee members may not have examined the financial statements in detail, they did receive constant reassurances from Andersen that the audit firm was "comfortable" with the financial statements.[481] In addition, even though a detailed examination of the financial statements might have led the Audit Committee members to question whether the SPE transactions were disclosed adequately, there is evidence that in at least two instances management made material changes to the annual financial statements after the Audit Committee's review:

- *Nahanni.* In the 1999 financial statements, Enron changed a footnote to add government securities to the definition of "merchant investments."[482] This was done to facilitate the Nahanni transaction, in which Enron recorded $500 million of cash flow from operations from the sale of U.S. treasury securities.[483] The change was not included in the draft of the financial statements provided to the Audit Committee.[484]

- *Related Party Transactions.* A footnote in the draft 1999 financial statements provided to the Audit Committee stated that LJM1 and

---

[479] Wakeham Sworn Statement, at 72.

[480] *Id.* at 72-73. When asked "did you go through that exercise of trying to find all those things [off-balance sheet obligations] in the annual report," Chan replied "I cannot say everything, but I certainly looked at the balance sheet and looked at the notes and so forth." Chan Sworn Statement, at 203.

[481] *See, e.g.,* 2/7/99 Audit Committee Minutes, at 2.

[482] Enron Form 10-K filed with the SEC for the Year ended Dec. 31, 1999, at Note 4 to the Consolidated Financial Statements.

[483] *See* Second Interim Report, Annex 3 to Appendix I (Minority Interest Transactions).

[484] 2/7/00 Audit Committee Materials, at AB0246 01497-AB0246 01551.

LJM2 had acquired $60 million of merchant assets and investments from Enron, while the final published financial statements showed this amount as $360 million.[485]

Another important responsibility of the Audit Committee was to review with Andersen and Enron management the adequacy of Enron's internal financial controls and the plan for auditing those controls, as well as Andersen's judgments about the quality of the company's accounting principles.[486] Each February, discussions of these areas were led at the Audit Committee meetings by Andersen and Causey, Enron's Chief Accounting Officer. The minutes do not reflect the extent of any discussion or questioning by the Audit Committee members, but they show that Andersen and management repeatedly led the Audit Committee to believe there were no problems. For example, according to the minutes of the Audit Committee meeting in February 2001, David Duncan of Andersen told the Audit Committee:

> AA's financial statement opinion was expected to be unqualified and that there were no significant audit adjustments, new accounting policies, changes not previously communicated to the Committee, modifications to interim financial information, disagreements with management, significant difficulties encountered during the audit, major issues discussed with management affecting retention, or consultation with other accountants on the application of Generally Accepted Accounting Principles ("GAAP").[487]

The Audit Committee also typically offered to meet with Andersen with no Enron management present. However, the minutes of the various meetings reflect that either (i) Andersen told the Audit Committee that such non-management sessions were not

---

[485] Neither amount was consistent with the aggregate amount of LJM-related transactions shown to the Audit Committee at the same February 2000 meeting at which the financial statements were reviewed. In a presentation made by Causey, he told the Audit Committee that LJM1 had completed Rhythms for $104 million, and that LJM2 had done seven transactions totaling $107 million, for an aggregate of $211 million. 2/7/00 Audit Committee Materials, at AB0246 01568.

[486] 2/12/01 Audit Committee Charter, at AB000203949.

[487] 2/12/01 Audit Committee Minutes, at 1-2.

necessary,[488] or (ii) the Audit Committee held such non-management sessions with Andersen, during which Andersen reported that it had no concerns with Enron's accounting.[489]

There is evidence, however, that Andersen gave the Audit Committee indications that Enron's accounting for its SPE transactions included certain risks. As discussed below in connection with the Outside Directors' duty to inquire about red flags, Andersen typically noted during these annual reviews that "the Company's sophisticated business practices introduced a high number of accounting models and applications requiring complex interpretations and judgement."[490] Although it is reasonable to criticize the Audit Committee members for apparently failing to question Andersen about these kinds of statements, the Examiner has concluded in Appendix B (Role of Arthur Andersen) to this Report that the evidence regarding Andersen's conduct with respect to Enron is sufficient to support a conclusion that Andersen failed in its professional responsibility to discuss with the Audit Committee Enron's selection and use of accounting principles.[491]

---

[488] Minutes of Enron Audit Committee Meeting, Oct. 13, 1997, at 2 [AB000186558-AB000186560].

[489] See, e.g., 2/7/99 Audit Committee Minutes, at 3 ("Mr. [David] Duncan indicated there were no areas of significant concern."); 10/12/98 Audit Committee Minutes, at 4. Occasionally, the Audit Committee held non-management sessions during which "[m]inutes were not recorded for the record." See, e.g., 2/7/00 Audit Committee Minutes, at 4; Minutes of Enron Audit Committee Meeting, Apr. 30, 2001, at 5 [AB000204284-AB000204288].

[490] 2/7/00 Audit Committee Minutes, at 2.

[491] Another obligation under the Audit Committee's charter was for the Audit Committee to "institute special investigations and, if appropriate, hire special counsel or experts to assist." Audit Committee Charter 2/12/01, at AB000203949. The letter and follow-up memorandum that Sherron Watkins wrote to Lay in August 2001 (the "Watkins Letter") may have been a situation that merited such an investigation, had the Audit Committee been informed of the existence of the letter on a timely basis. Enron management, however, did not disclose the existence of the letter until the October 8, 2001 Board meeting, at which time management gave the Board a copy of the Vinson & Elkins investigation report that had been done at management's direction. Minutes of Enron Board Meeting, Oct. 8, 2001 (the "10/8/01 Board Minutes"), at 5 [AB000469876-AB000469885]. Management did not, however, give the Board a copy of the Watkins Letter. Even if the Board had felt comforted by Vinson & Elkins' cursory investigation of the Watkins allegations, it is difficult to understand why none of the Outside Directors asked for a copy of the Watkins Letter. Testimony from several of the Outside Directors confirmed that they did not ask to see the

*LJM2*

LJM2 is discussed in detail in Appendix L (Related Party Transactions) to the Second Interim Report. It was a limited partnership, formed with Fastow as the general partner and with outside investors as limited partners, that engaged in transactions with Enron beginning in the fall of 1999. LJM2 completed a total of twenty-one Enron-related transactions, including the Raptors non-economic hedges, investing a total of $405 million during the period December 1999 through mid-2001.[492]

These transactions made a significant contribution to Enron's financial results.[493] As a direct and indirect result of its transactions with LJM2, Enron reported earnings of over $1.3 billion and cash flow of over $3.5 billion. However, the Raptors hedges resulted in significant costs to Enron and ultimately resulted in material financial statement restatements that occurred just prior to Enron's bankruptcy. LJM2's purchases of assets from Enron were not arm's length transactions, and LJM2 rarely lost money on an investment with Enron, even when the underlying asset declined in value. Regardless of the effect on Enron, though, Fastow received a material economic benefit from his role in LJM2. He received over $60 million in fees and other proceeds in less than a three-year period from LJM1 and LJM2 transactions.[494]

---

letter, and that they first received a copy in January 2002. 5/7/02 PSI Hearing Transcript, at 36-37 (testimony of Duncan, Winokur, Jaedicke, LeMaistre, and Blake). *See also* Facsimile from Paula Rieker, former Corporate Secretary, Enron, to Board of Directors, Enron, Jan. 1, 2002 (distributing the Watkins Letter to the Board) [AB1128 01497-AB1128 01503].

[492] LJM2 also invested approximately $46 million in two transactions that were not Enron related. *See* LJM2 Co-Investment, L.P. Annual Partnership Meeting Presentation, Oct. 15, 2001, at 22 [AB000350511-AB000350553].

[493] *See* Second Interim Report, Appendix L (Related Party Transactions).

[494] *See id.*

Thus, Fastow's conflicting roles as CFO of Enron and as general partner of LJM2 presented a heightened risk that Enron's transactions with LJM2 might not be fair to the company. The evidence shows, however, that the Board and its committees implemented only minimal controls to ensure that the LJM2 transactions were done at arm's length and that the compensation Fastow received from LJM2 did not adversely affect his performance for and loyalty to Enron. The Board and its committees also may be criticized for failing to monitor the controls that it did impose, particularly with respect to the amount of Fastow's compensation from LJM2. The following text describes the chronology of the Outside Directors' actions with respect to LJM2.

*October 1999.* At the October 11, 1999 Finance Committee meeting, just three and one-half months after the Board had ratified Fastow's involvement in LJM1 and authorized the Rhythms transaction, Fastow requested approval to serve as the general partner of LJM2 in order to "provide the company with an alternative, optional source of private equity to manage its investment portfolio risk, funds flow and financial flexibility."[495] Fastow told the Finance Committee that two controls "would be put in place to manage any transactions between the Company and LJM 2, the fund fees and promote [effectively, Fastow's compensation], and any required disclosure."[496] Fastow said the first control would be "review and approval of all transactions by the Chief Accounting Officer [Causey] and the Chief Risk Officer [Buy]."[497] For the second control, he stated that "the Audit and Compliance Committee would, on an annual basis, review all transactions completed within the past year and make any recommendations

---

[495] 10/11/99 Finance Committee Minutes, at 2.

[496] *Id.*

[497] *Id.*

they deemed appropriate."[498] There was no discussion of how or by whom Fastow's compensation would be monitored.

At the Board meeting on the following day, Winokur reported that the Finance Committee recommended ratification of the determination regarding Fastow's involvement in LJM2, with these controls. Thereafter, Enron and LJM2 began entering into transactions with those minimal controls in place, namely that Causey and Buy would review all LJM2 transactions, and that the Audit Committee would once each year review transactions that had already closed.

Foy, who was a member of the Audit Committee, testified that he believed the controls in place, including Fastow's continued fiduciary duties to Enron, were sufficient to protect Enron:

> Q. [D]id you have concerns about Enron engaging in transactions with a company whose general partner was going to be the Enron chief financial officer so that he would be on both sides of the transaction?
>
> A. I thought that we had in place plenty of reasons to believe that Enron would be fully protected, in any event; and to tell you the truth, I was really more concerned about Andy's potential liability to third parties than I was any particular harm to Enron.[499]

*February 2000.* The Audit Committee conducted its first annual review of the LJM2 transactions in February 2000.[500] At that meeting, Causey "outlined the transactions that had been completed during the year including a description and the total amount of each transaction. He stated that in his opinion all of the transactions had been

---

[498] *Id.*

[499] Foy Sworn Statement, at 91-92 ("Andy retained all of his fiduciary duties to the company. He was still subject to supervision by Jeff Skilling and Ken Lay . . . .").

[500] *See* 10/11/99 Finance Committee Minutes, at 2.

negotiated on an arms-length basis."[501] The report Causey provided was a one-page document that listed seven LJM2 transactions and the Rhythms transaction with LJM1.[502] It provided a very brief (three to ten word) description of each transaction and a dollar amount.[503]

There is no evidence in the minutes of the meeting that the Outside Directors who comprised the Audit Committee questioned Causey about the process applied in negotiating the transactions. For example, the Audit Committee apparently did not question whether the transactions had been offered to third parties to ensure a fair bidding process, whether fairness opinions had been obtained, or who had negotiated on behalf of each of Enron and LJM2. Chan, a member of the Audit Committee, testified that he believed Enron management and Andersen should review the transactions, and that "it is not right for the audit committee to delve into each of the transactions . . . ."[504] Chan testified:

> Q. Is it fair, then, that you believe that the audit committee's duty was to receive reports from Causey and Andersen, that the LJM transactions were satisfactory and done at arm's length with the company and that that was the function of the audit committee in monitoring the LJM transactions?
>
> A. Yes.[505]

*October 2000.* During the six-month period between February and October 2000, the Board and its committees did not receive any reports regarding LJM2 or Fastow's

---

[501] 2/7/00 Audit Committee Minutes, at 3-4.

[502] Materials from Enron Audit Committee Meeting, Feb. 7, 2000 (the "2/7/00 Audit Committee Materials"), at AB0246 01568 (slide entitled "LJM Investment Activity 1999") [AB0246 01470-AB0246 01568].

[503] *Id.* (e.g., "Yosemite" is identified at $34 million and described only as "Equity in vehicle used to finance ENE natural gas prepays").

[504] Chan Sworn Statement, at 120.

[505] *Id.* at 121.

related compensation. Outside Directors dealt with LJM2-related transactions during that

period, however, with the Board and the Finance Committee approving Raptors I and IV,

and the Executive Committee approving Raptor II. The Finance Committee and the

Board were then asked in October 2000 to approve LJM3, a third private equity fund with

Fastow serving as general partner. At its October 6, 2000 meeting, the Finance

Committee discussed a longer list of internal controls that were apparently intended to

apply to both LJM2 and LJM3. During his presentation to the Finance Committee,

Fastow outlined

> mechanisms that had been put in place to mitigate any potential conflicts
> including: 1) his fiduciary responsibilities to the Company, 2) the Office
> of the Chairman of the Board could ask him to resign from the LJM funds
> at anytime, 3) Messrs. Buy, Causey, and Skilling approve all transactions
> between the Company and the LJM funds, 4) there is an annual Audit and
> Compliance Committee review of the Company's transactions with the
> LJM funds, 5) a review of his economic interest in the Company and the
> LJM funds is presented to Mr. Skilling, and 6) there is no obligation for
> the Company to transact with the LJM funds.[506]

In addition, Blake suggested that the Finance Committee also review the

transactions between Enron and any of the LJM funds on a quarterly basis, and Winokur

suggested that the Compensation Committee should "review the compensation received

by Mr. Fastow from the LJM funds and the Company."[507] The Finance Committee then

voted to recommend that the full Board provide the necessary ratification under the Code

of Ethics to allow Fastow to participate in LJM3, with the noted "mitigation

mechanisms" in place. On the following day, Winokur's report to the Board on this

matter mentioned that the Finance Committee's recommendation included an

---

[506] Minutes of Enron Finance Committee Meetings, Oct. 6, 2000 (the "10/6/00 Finance Committee Minutes"), at 2 [AB000201481-AB000201486].

[507] Id. at 3.

- 111 -

understanding that the controls would be in place. The Board ratified the decision to allow Enron to engage in transactions with LJM3, which would be controlled by Fastow,[508] but LJM3 was never formed.

At that same time in October 2000, Andersen mentioned the LJM-related transactions to the Audit Committee in a discussion of "selected observations." Andersen stated that LJM1 and LJM2 had entered into certain transactions with Enron, including hedging transactions with $750 million of notional value, "equity participation in certain Enron structured entities," and the "purchase of TNPC [The New Power Company] warrants and various other assets."[509] However, there is no record that Andersen discussed any review it might have done with respect to the arm's length nature of the transactions.

*February 2001.* In February 2001, both the Finance and Audit Committees received a list of transactions that Enron had completed with LJM2 during 2000, showing for each the name, a brief description and the notional amount.[510] There is evidence that certain Enron officers intentionally omitted from this list transactions in which LJM2 had sold assets back to Enron. Jordan Mintz ("Mintz"), General Counsel of Enron's Global Finance Group, deleted those resale transactions from a draft of the list prior to the Audit and Finance Committee meetings and distributed it internally, with an email attaching "a revised draft of those 'disclosable' LJM transactions for use with the Audit Committee at

---

[508] Minutes of Enron Board Meeting, Oct. 7, 2000 (the "10/7/00 Board Minutes"), at 7-9 [AB000497391-AB000497409].

[509] Materials from Enron Audit Committee Meeting, Oct. 6, 2000 (the "10/6/00 Audit Committee Materials"), at AB0246 01662 (2000 Financial Reporting) [AB0246 01654-AB0246 01703].

[510] 2/12/01 Finance Committee Materials, at AB0247 01936 (slide entitled "LJM Investment 2000 Activity With Enron").

this month's Board Meeting."[511]   His email said that he had "reviewed this draft with

Rick [Causey] and he is comfortable with it.   A copy has also been sent to Andy

[Fastow]."[512]   Thus, Audit and Finance Committee members were not made aware that

Enron was repurchasing assets from LJM2.

At these committee meetings, in addition to the edited list of transactions, Fastow

and Causey presented a list of "internal policies and procedures that were in place to

monitor transactions between the Company and LJM."[513]   Causey's presentation to the

Audit Committee identified the following controls:

> 1) LJM senior professionals do not ever negotiate on behalf of the
> Company, 2) Company professionals negotiating with LJM report to
> senior Company professionals separate from Mr. Andrew S. Fastow,
> 3) numerous groups monitor compliance with procedures and controls and
> regularly update him and Mr. Buy, and 4) the Company regularly consults
> with internal and outside counsel regarding disclosure obligations.[514]

In presenting the controls to the Finance Committee, Fastow "commented that the

process was working effectively."[515]

---

[511] Email from Jordan Mintz, Enron, to Ron Baker, Enron, Feb. 2, 2001 (the "2/2/01 Mintz Email")
[AB0911 2838-AB0911 2840].

[512] Email from Jordan Mintz, Enron, to Tod A. Lindholm, Enron, and copy to George McKean, Gordon
McKillop, Ryan Siurek, Enron, Feb. 2, 2001 [AB0911 2841-AB0911 2843]; 2/2/01 Mintz Email.  When
asked why LJM2's sales to Enron were omitted from the Board presentation, Mintz testified:

> I think my recollection was that those transactions were not the type of transactions that
> fit the parameters of what the – what was required to be reviewed by the board.
>
> . . .
>
> I initially included them in the draft I was preparing, and my recollection – I think it was
> from Rick because I believe I spoke mostly with Rick Causey, not with Andy Fastow on
> this – is that technically they don't fit the new transactions and we'll just talk it through
> with the board.

Mintz 9/29/03 Deposition, at 122-23. Mintz went on to testify that the Board could have asked if there was
anything else they should be aware of, but that no one asked such a question. *Id*. at 129-30.

[513] 2/12/01 Finance Committee Minutes, at 5.

[514] 2/12/01 Audit Committee Minutes, at 3.

[515] 2/12/01 Finance Committee Minutes, at 5.

- 113 -

The Board and its committees apparently received no further reports on LJM2 transactions until the fall of 2001. Also, until October 2001, when *The Wall Street Journal* estimated that Fastow's LJM-related compensation was $7 million,[516] there were never any reports to and almost no actions taken by the Board or its committees regarding Fastow's compensation. In response to the newspaper article, LeMaistre and Duncan arranged a call with Fastow and asked for his LJM-related compensation, and Fastow disclosed that it was $45 million.[517] The Board promptly discharged him.[518]

With respect to reviewing LJM2 transactions, one of the Finance Committee members was asked why the Outside Directors did not require the Board or an appropriate committee to review and approve each transaction done between Enron and the LJM entities. His answer focused on speed of completing the deals rather on ensuring proper arms length transactions for Enron:

> It's totally inconsistent with what the purpose of these vehicles were. The purpose of these vehicles was to move efficiently and quickly to be able to securitize or monetize assets, as the case may be, and the timing was an issue. Were it required that the board, irrespective of size, that it had to review and approve each of these transactions, it would defeat the actual purpose that this was intended to serve, namely speed and efficiency and cost effectiveness. Moreover, it was an understanding that on a postmortem basis, after-the-fact basis, that there was subject post-review of these transactions as part of our overall management process and control.[519]

The Private Placement Memorandum for LJM2 (the "LJM2 Offering Memo") focused on how Enron officers' inside knowledge of Enron's investment information

---

[516] Rebecca Smith & John R. Emshwiller, *Enron CFO's Partnership Had Millions in Profit*, Wall St. J., Oct. 19, 2001, at C1.

[517] LeMaistre Notes of Phone Call with Fastow (noting that Fastow said his compensation was approximately $23 million from LJM1 and $22 million from LJM2) [AB000150719].

[518] By that time, Fastow had already sold his general partnership interest in LJM1 and LJM2 to Kopper.

[519] Blake Sworn Statement, at 223.

would provide a financial benefit to the potential limited partners. The LJM2 Offering

Memo defined the "Principals" of the partnership as Fastow, Glisan and Kopper,[520] and

then stated:

> The Principals believe that LJM2 provides investors with an unusually
> attractive investment opportunity for the following reasons:
>
> . . . .
>
> Due to their active involvement in the investment activities of Enron, the
> Principals will be in an advantageous position to analyze potential
> investments for LJM2. . . . The Principals believe that their access to
> Enron's information pertaining to potential investments will contribute to
> superior returns.[521]

None of the Outside Directors reviewed the LJM2 Offering Memo,[522] even though one

Outside Director stated that he received a copy and discarded it.[523] It appears that none

of the Outside Directors were advised that Glisan and Kopper were also principals in

LJM2, even though at least two in-house lawyers at Enron and two Vinson & Elkins

lawyers were aware of this fact.[524]

---

[520] LJM2 Offering Memorandum, compiled as of Oct. 13, 1999 (the "LJM2 Offering Memo"), at 2 [MLBE 0006895-MLBE 0006944]. Neither Glisan nor Kopper received permission under Enron's Code of Ethics to participate in LJM2.

[521] *Id.* at 3.

[522] *See, e.g.,* Winokur 11/21/02 Sworn Statement, at 125 ("Q. I believe I have asked you and you told me that you did not receive or review the LJM2 prospectus; is that correct? A. Yes, sir, I did not receive it."); Wakeham Sworn Statement, at 144 ("Q. Did you ever have any occasion to receive or review the prospectus that was used to solicit funds for the LJM/2 entity? A. I can't recall having done so. No, I simply can't recall that at all, no."). The LJM2 Offering Memo was dated October 13, 1999, just one day after the Board authorized Fastow's involvement in LJM2, indicating that it likely had been drafted prior to the Board meeting. LJM2 Offering Memo, at iii.

[523] Permanent Subcomm. on Investigations, Senate Comm. on Governmental Affairs, Report on the Role of the Board of Directors in Enron's Collapse, 107th Cong., July 8, 2002 (Belfer told the PSI that he received the document in the mail, offering him an opportunity to invest in LJM2, but that he discarded it without reading it), at 28.

[524] Email from Bob Baird, Vinson & Elkins, to Scott Sefton and Rex Rogers, Enron, and copy to Ronald Astin, Vinson & Elkins, Oct. 4, 1999 [AB000520797-AB000520798].

With respect to Fastow's compensation from LJM2, Belfer testified that "it was clear from the outset that Andy Fastow's compensation should be monitored as part of the overall transaction."[525] Yet, this was not what occurred. When the Finance Committee and the Board approved Fastow's participation in LJM2 in October 1999, no mention was made of his compensation.[526] When that committee approved LJM3 one year later, and Winokur suggested that the Compensation Committee should review the compensation, LeMaistre, the Chair of the Compensation Committee, was present at this meeting, as were all of the other Compensation Committee members, including Blake, Duncan and Savage.[527] Despite Winokur's suggestion, the only action the Compensation Committee took in response was to ask an Enron staff person for a list of all outside compensation reported by the Section 16 officers, including Fastow.[528] None had been reported.[529] LeMaistre testified that he took no other action because he thought Skilling, Lay and the Audit Committee members were reviewing Fastow's compensation.[530]

---

[525] Belfer Sworn Statement, at 186. With respect to LJM1, Outside Directors testified that they believed Fastow's LJM1 compensation would be de minimis. For example, Belfer testified: "I think LJM1, while it permitted some subsequent transaction, was very modest in the scope and was largely viewed as a runoff to hedge Rhythms, and it has this separate Price Waterhouse opinion, so I don't think there was much of an effort made to, with regards to monitoring the compensation of Fastow . . . ." Belfer Sworn Statement, at 186.

[526] See 10/11/99 Finance Committee Minutes; Minutes of Enron Board Meeting, Oct. 11-12, 1999 (the "10/11-12/99 Board Minutes") [AB000194646-AB000194673].

[527] 10/6/00 Finance Committee Minutes, at 1. Duncan testified that he did not recall hearing Winokur's suggestion to the Compensation Committee and that the matter was never on the Compensation Committee's agenda. Duncan Sworn Statement, at 67-68 ("Q. What steps, if any, did you take, either as a compensation committee member or otherwise, to understand Mr. Fastow's compensation from the LJM transactions? . . . A. I didn't take any steps. I didn't take any steps to find out or analyze.").

[528] LeMaistre Sworn Statement, at 230-32.

[529] According to LeMaistre, he routinely asked Enron personnel for any outside compensation reported by the Section 16 officers, and none was ever reported. Id. at 232-33.

[530] Id. at 241.

When asked why he did not call Skilling and request information about Fastow's compensation, LeMaistre testified:

> I considered that, but I thought the proper channels would be for that to come forward. It was the responsibility of Mr. Skilling to do that; and if he had that information, to share it with the staff of the compensation committee.[531]

In addition, despite Fastow being present at the October 2000 Finance Committee meeting, and at many Board and committee meetings after that, apparently none of the Outside Directors ever simply asked him for a report on his LJM-related compensation.[532] Richard Foster ("Foster"), a consultant with McKinsey who regularly attended Board and committee meetings as a guest at Lay's invitation, testified that the Board expressly did not intend to review Fastow's LJM-related compensation.[533]

---

[531] *Id.*

[532] When asked why no one at the meeting asked Fastow for a report on his compensation, LeMaistre testified, "Let me simply say that at that point in time nobody had any reason to believe that what was told to us was not accurate in terms of modest income. Therefore, nobody was concerned about it . . . ." LeMaistre Sworn Statement, at 234-35. *See also* Lay In-Person Interview (stating that no one asked Fastow about his compensation because the Board relied on Fastow's representations that he would not spend much time on or receive significant compensation from LJM); 5/1/00 Finance Committee Minutes, at 3 (reflecting statement by Fastow that he was devoting approximately three hours a week to the LJM vehicles).

[533] Sworn Statement of Richard N. Foster, McKinsey, to Steven M. Collins and Christina Hull Eikhoff, A&B, Sept. 30, 2003 (the "Foster Sworn Statement"), at 106-07. Foster, a senior level director with McKinsey, was invited to join Enron's Board as a director in May 2000. Foster Sworn Statement, at 20; 8/7-8/00 Board Minutes, at 20 (unanimously approving offering Foster a position as an "advisor to the Board" without voting privileges). Foster declined because McKinsey had a policy generally prohibiting its employees to serve on boards of public or private companies. Foster Sworn Statement, at 21. He then began attending Enron's Board and committee meetings "in an unofficial capacity." Foster Sworn Statement, at 26. He attended all Board meetings and nearly all committee meetings from October 2000 through October 2001. Foster Sworn Statement, at 24, 28. Some of the Outside Directors testified that Foster both observed and participated in the Board and committee discussions. Meyer Sworn Statement, at 159-60; Harrison Sworn Statement, at 188; Savage Sworn Statement, at 294.

According to Foster, the Board determined that it was not entitled to know that sum because the money was not being paid by Enron.[534]

### C.   Duty to Inquire

The SPE transactions created red flags that, had the Outside Directors recognized them and responded, might have caused the Outside Directors to know that the Senior Officers were misusing SPE transactions in a manner that resulted in the dissemination of materially misleading financial information. This failure to recognize or respond to red flags by the Outside Directors, who necessarily could not have a detailed knowledge of the day-to-day operations of the company, is subject to criticism. However, the evidence reviewed by the Examiner is not sufficient for a fact-finder to conclude that any of the Outside Directors failed to act in good faith, or that they acted with a conscious disregard for known risks.

---

[534] Foster testified:

> Q. Was there any discussion … about the level of Mr. Fastow's compensation from LJM?
>
> A. I do recall that his compensation was, at LJM, was represented to be confidential to the other side of the transaction, that Enron should not know about what that compensation is because it would violate the arm's length nature of the transaction, and being assured that the compensation levels were reasonable for private equity transactions.
>
> . . . .
>
> Q. So there were assurances that the level of Mr. Fastow's compensation was reasonable, but the company could not know the details without violating the confidentiality of LJM1 or LJM?
>
> A. Without violating the arm's length guarantee that the transactions were all at arm's length, because that would give the seller and the buyer insight into each other's cost structure and that would not be viewed as arm's length.
>
> Q. How was the finance committee assured, then, that Mr. Fastow's compensation was reasonable?
>
> A. By his word, presumably. There was no audit provision that I recall.

Foster Sworn Statement, at 106-07. *See also* LeMaistre Sworn Statement, at 236 (testifying that he asked Enron legal counsel to help draft the questions for his discussion with Fastow about LJM-related compensation in October 2001, because he thought the questions would be "invading really what is an arm's length institution.").

Lay and Skilling, however, as a result of their day-to-day involvement at the company, had more occasion to encounter red flags than the Outside Directors and, thus, more responsibility to respond to them. The evidence shows that both Lay and Skilling either knew or should have known from the existence of red flags they encountered that the Senior Officers were misusing the SPE transactions in a manner that resulted in the dissemination of materially misleading financial information.

Red flags about the SPE transactions included:

- Enron's ability to obtain large amounts of cash and financing through means other than incurring debt or issuing equity, with significantly disproportionate amounts of reported cash flows from operations being generated at the end of each accounting year;

- The significant volume of highly unusual SPE transactions, and information presented to the Finance Committee by Enron's officers, including the CFO and the Treasurer, indicating the SPE transactions were in substance different from the manner in which they were being accounted for and disclosed; and

- Reports from Andersen and Enron's CFO that Enron depended heavily on SPE transactions that required a high level of accounting and disclosure judgment, and for which accounting rules changed often.

Skilling also failed to respond to red flags created by Fastow's involvement with LJM2. Allowing the CFO to benefit personally on the opposite side of transactions with the company was a circumstance that created heightened risks for Enron. Red flags to which Skilling should have responded included:

- Attempts from officers to obtain Skilling's approval of the transactions between Enron and LJM2;

- Indications that both sides of the transactions were being negotiated by Enron employees, all of whom reported to Fastow; and

- The Finance Committee being told in Skilling's presence that Skilling was reviewing Fastow's compensation from LJM2.

*Ability to Generate Cash Flows From Operations*

As reported in the Second Interim Report, Enron's widely employed mark-to-market accounting resulted in a large part of the company's revenues being generated from increases in the values of assets rather than from third party sales. In order to meet rating agency expectations, one of Enron's primary financial objectives was to present financial statements that made it appear the company's revenues were not disproportionate to the cash it received from its operating activities. Thus, Enron constantly sought sources of cash that could be characterized as cash flows from operations so that this figure would more closely match revenues. Fastow often told the Finance Committee that "funds flow continued to be the primary focus"[535] and in one Finance Committee meeting, he described Prepay Transactions as "financings to bring cash forward to match earnings."[536]

Winokur, Chair of the Finance Committee, testified that the pressure to match cash to earnings was widely known:

> Well, the company as a whole had these debt ratios, rating agencies ratios to which we referred, so everybody knew that to maintain the investment grade rating and to make sure the mark to market earnings and the funds flow didn't get too far out of balance, that whatever people were doing they had to make sure the two stayed reasonably in sync.
>
> Certainly to the extent anybody, either because their assets aren't doing as well or more likely the case is because they had lots more assets opportunities would always be trying to find ways to generate funds flow to match up with the mark to market earnings. . . . [537]

---

[535] *See, e.g.,* 10/12/98 Finance Committee Materials, at AB0247 00242 (handwritten notes of Corporate Secretary on slide from CFO Report); 5/3/99 Finance Committee Minutes, at 1; 10/11/99 Finance Committee Materials, at AB0247 00836-AB0247 00837 (slides from CFO Report); 10/11/99 Finance Committee Minutes, at 1-2; Minutes of Enron Finance Committee Meeting, Feb. 7, 2000 (the "2/7/00 Finance Committee Minutes"), at 2 [AB000201463-AB000201466].

[536] 8/13/01 Finance Committee Materials, at 2-5 (slides from CFO Report).

[537] Winokur 11/21/02 Sworn Statement, at 123-24. *See also* Lay In-Person Interview (stating that from the early 1990s, Enron had a disparity between earnings and cash, motivating it to monetize assets).

In addition, beginning in 1998, Enron made significant amounts of unbudgeted capital investments, causing the company to need sources of financing in amounts that had not been specified at the beginning of the year.[538]  The following chart shows the annual budgeted amounts of capital investments for the company, compared to the amounts of the actual expenditures:

---

[538] Blake testified about his concern over this level of investment:

> Q. And you also recall that during the course of the year, the executive committee, which I know you didn't sit on, or the board would be asked to approve acquisitions or other capital expenditures that might not have been in the original plan for that year.  Do you recall, sir?
>
> A. Yes, absolutely.
>
> Q. It appears – and again, we can look at specific handouts – but that in the '98-'99 time period going forward, that a pattern would therefore develop where the expenditures during the course of the year that had not been part of the plan caused the company to, at least at a point in time in the year, to be behind plan as well in terms of funds flow.  Do you recall that generally, sir?
>
> A. Yes, I do, absolutely.
>
> Q. Okay.  Did you ever have a concern, other than as you've previously discussed, for example, in connection with Azurix, that management was being too aggressive, if you will, or was putting undue stress on the organization by the acquisitions and causing, therefore, a lot of focus year end on getting back into the planned ratios?
>
> A. Yes, I was concerned.
>
> Q. Okay.
>
> A. It's kind of a management call in terms of balance.  On one hand you want to grow earnings, and where there's opportunities you want to seize the moment.  On the other hand, you have to do it within your means.
>
> The concern I had was our ability to monetize or securitize assets or the disposition or sale of companies or whatever on a timely basis to be able to meet the investment appetite of the company.  That was my concern.

Blake Sworn Statement, at 61-63.

### Enron's Capital Investments[539]

| Year[540] | Budget | Actual | Over Budget |
|-----------|--------|--------|-------------|
| 1998 | $772.5 million[541] | $5.824 billion[542] | $5.052 billion |
| 1999 | $1.1 billion[543] | $5.021 billion[544] | $3.921 billion |
| 2000 | $2.054 billion[545] | $4.363 billion[546] | $2.309 billion |

At each regularly scheduled meeting of the Finance Committee in 1997 through 2000, five times each year either Fastow or McMahon presented a chart showing this comparison for the year-to-date.[547] Thus, all of the directors present, including Lay and Skilling, were aware of this need for financing. For example, the chart presented at the December 1999 Finance Committee meeting is reproduced below, showing the investments to be $3.921 billion over plan:[548]

---

[539] Fastow referred to the capital investments as "discretionary" in his CFO Reports. Enron budgeted separately for capital expenditures that Fastow referred to as "non-discretionary." The Outside Directors did not receive regular reports comparing the actual non-discretionary capital expenditures to the budgeted amounts.

[540] Enron's bankruptcy occurred prior to year-end 2001, and the Examiner has been unable to obtain any information regarding the total amount of capital expenditures and investments made during 2001.

[541] Materials from Enron Board Meeting, Dec. 9, 1997 (the "12/09/97 Board Materials"), at AB0245 01495 (slide from 1998-2000 Operating & Strategic Plan presentation) [AB0245 01342-AB0245 01549].

[542] Materials from Enron Board Meeting, Dec. 8, 1998 (the "12/08/98 Board Materials"), at AB0245 03348 (slide from Operating & Strategic Plan presentation) [AB0245 03084-AB0245 03589].

[543] Id. at AB0245 03345 (slide from Operating & Strategic Plan presentation).

[544] 12/13/99 Finance Committee Materials, at 22 (part of the Treasurer Report).

[545] 12/11/00 Finance Committee Materials, at 23 (part of the Treasurer Report).

[546] Id.

[547] See, e.g., 12/13/99 Finance Committee Materials, at 22; 5/1/00 Finance Committee Materials, at 35; 8/7/00 Finance Committee Materials, at 22; 12/7/00 Finance Committee Materials, at 19.

[548] 12/13/99 Finance Committee Materials, at 22 (part of the Treasurer Report).

### 1999 Investments to Date
### (in millions USD)

| | Actual | Original Estimate | Over (Under) |
|---|---|---|---|
| Transmission & Distribution | 100 | 19 | 81 |
| Wholesale | 4,265 | 652 | 3,613 |
| Retail | 571 | 160 | 411 |
| Communications | 10 | 5 | 5 |
| Corp/Other | 75 | 264 | (189) |
| | 5,021 | 1,100 | 3,921 |

*Issued equity private transactions etc to cover average*

*Fastow Anything above that approved - in plan needs add'l financing*

22



Finance Committee Meeting
JM-1/99

ASB0247 00978

According to the corporate secretary's handwritten notes on this slide, Fastow told the Finance Committee "[a]nything above that approved in plan needs add'l [sic] financing."[549] However, the Finance Committee understood the company's strong bias against raising such financing through debt, because that would adversely affect the company's credit ratings, or through issuing equity, because that would be dilutive and potentially decrease the stock price.

---

[549] *Id.* Skilling's testimony to the SEC appears to confirm his understanding that the company would first commit to new investments, and then later deal with the burden of finding the financing: "So once the business unit wants to spend the money, that would go through the Dash process. And once the money had been spent, it was up to the finance group and treasury to come up with that money." Skilling 11/1/02 SEC Testimony, at 64.

Belfer testified regarding the company's desire to avoid increasing debt:

Q.      If the company frequently exceeded its capital expenditure budget, would that have been of concern to you?

A.      It would be a concern if it affected the overall financial structure of the company.

Q.      Does that mean if it caused the debt load to increase in order to raise the funds?

A.      Yes.  Let me put it to you this way.  If it would be adversely viewed by the rating agencies it would certainly be a cause of concern to the finance committee.

Q.      Do you recall any instances where the company needed to raise additional funds to meet excess capital expenditures but needed to do so in ways that avoided increased debt loads?

A.      I think that Enron was a company that had continuing need for increased capital, and Enron developed various alternatives for meeting that need.[550]

Winokur's testimony illustrates an understanding of the concerns with issuing

new equity:

[w]e have to finance growth and the fact that there's a delay in the generation of cash flow and earnings.  How do we do that? . . .  To the extent that we sell equity, our earnings per share will go down to the extent that these assets aren't generating accounting earnings or book earnings.[551]

---

[550]  Belfer Sworn Statement, at 104-05.

[551]  Winokur 11/20/02 Sworn Statement, at 157-58.  Skilling spoke about the expectation that Enron would not issue new equity at an October 2000 analyst call:

We have been running about $2.5 billion capital expenditures, and I would have imagined that that sort of expenditure number will keep up.  As I have mentioned in the past, we are working extremely hard to find places where we can monetize assets, increase the velocity of capital through Enron and you will be seeing a lot of that over the next couple of quarters.  So, in aggregate, we would expect, not only expect, we are pretty certain, no new equity issues and in fact I think it is going in the other direction.  We expect to see enhanced liquidity over the next couple of quarters.

Enron Q3/2000 Conference Call, Oct. 17, 2000, at 29 [ELIB00001903-00001-ELIB00001903-00031].

- 124 -

Despite these constraints on the types of financings in which Enron preferred to engage, it was able to generate significantly disproportionate amounts of cash flows from operations just prior to the close of each accounting year. As reflected in the following chart, which was compiled from information in Enron's public SEC filings, in 1998, 1999 and 2000, Enron generated all or almost all of its reported cash flows from operations in the fourth quarter of the year:

### Reported Cash Flows from Operations

| Year | YTD as of Sept. 30 | YTD as of Dec. 31 | Generated in 4th Quarter | |
|------|--------------------|--------------------|--------------------|--------|
| 1998 | $317 million[552] | $1.640 billion[553] | $1.323 billion | 81% |
| 1999 | $(43) million[554] | $1.228 billion[555] | $1.271 billion | 104% |
| 2000 | $100 million[556] | $4.779 billion[557] | $4.679 billion | 98% |

There is no apparent seasonality in Enron's business that would account for the large amount of cash flows from operations in the fourth quarter of each year. Instead, Enron appears to have generated these disproportionately large amounts of cash through

---

[552] Enron Form 10-Q filed with the SEC for the Quarter ended Sept. 30, 1998, at Financial Condition, Cash Flows. In Enron's Form 10-Q for the quarter ended one year later, September 30, 1999, Enron reported this historical amount for year-to-date September 30, 1998 as a negative $29 million. *See* Enron Form 10-Q filed with the SEC for the Quarter ended Sept. 30, 1999 (the "Enron 9/30/99 Form 10-Q"), at Financial Condition, Cash Flows.

[553] Enron 9/30/99 Form 10-K, at Consolidated Statement of Cash Flows.

[554] Enron Form 10-Q filed with the SEC for the Quarter ended Sept. 30, 1999, at Financial Condition, Cash Flows.

[555] Enron Form 10-K filed with the SEC for the Year ended Dec. 31, 1999, at Consolidated Statement of Cash Flows.

[556] Enron Form 10-Q filed with the SEC for the Quarter ended Sept. 30, 2000, at Financial Condition, Cash Flows.

[557] Enron Form 10-K filed with the SEC for the Year ended Dec. 31, 2000, at Consolidated Statement of Cash Flows.

the use of SPE transactions.[558]  For example, in 1999, Enron completed a large number of

SPE transactions in the last two weeks of December that generated virtually all of the

cash flows from operating activities for that year.  By the end of 1999, Enron had spent

during the year almost $4 billion more on capital investments than it had budgeted.  To

raise cash, Enron completed at least eleven SPE transactions in the last two weeks of the

year, generating $114 million of net income and more than $1.2 billion of cash flows

from operating activities, while keeping the repayment obligations off the balance sheet

entirely or on the balance sheet as something other than debt.[559]

This urgent need for cash and flurry of structured financings were discussed at the

December 1999 Finance Committee meeting.[560]  Belfer, who was present at that meeting,

testified that:

> it was a little disturbing to have these come so close to the end of the year,
> but there was some discussion of that, as I recall, and the idea was to not
> put ourselves in a situation like that again if we could avoid it.[561]

---

[558] Lay told the Examiner that at least some of the cash received in fourth quarter 2000 was due to unusual circumstances.  According to Lay, Enron received substantial cash deposits of $1.5 billion to $2 billion during the second half of 2000 due to extraordinary commodity price increases that year.  Lay In-Person Interview.

[559] Third Interim Report.  Showing an even larger number, McMahon presented a chart to the Finance Committee at its December 13, 1999 meeting listing eight closed or pending transactions totaling $2.8 billion.  12/13/99 Finance Committee Materials, at 26 (part of Treasurer Report).  However, at least one of the listed transactions, Margaux, was listed at $525 million, even though that transaction ultimately closed in 2000 raising only $125 million.

[560] According to the minutes of the December 13, 1999 Finance Committee meeting: "[McMahon] reviewed the year-to-date investments and status of capital commitments by business unit and commented on the year-end transactions the Company would be undertaking to fund the cash outflows."  Minutes of Enron Finance Committee Meeting, Dec. 13, 1999 (the "12/13/99 Finance Committee Minutes"), at 2 [AB000196895-AB00196898].  *See also id.* at 1 (stating that Lay and Skilling were present at the meeting).

[561] Belfer Sworn Statement, at 151.  Similarly, Urquhart testified that he recalled the discussion at this meeting, stating that the concerns expressed about the year-end need for cash were "[n]ormal business comments that people always make, why the hell do we always have to have this happen in the last quarter.  That's in every business I've ever been in.  So it didn't ring any bells for me."  Urquhart Sworn Statement, at 112.

However, at the end of 2000, the company had exceeded its capital investments budget by over $2.3 billion, and it completed at least 18 structured financings in the second half of 2000 for almost $11 billion.[562]

Not only did Enron use SPE transactions to generate this cash, but it also did a number of the transactions with LJM2, raising the question of whether it was difficult or impossible to complete them with an outside third party. In his "LJM2 Update" to the Finance Committee in May 2000, Fastow reported: "Q41999: 8 days/6 deals/$125 million."[563]

Lay, Skilling and the Finance Committee members were aware that all of this financing was accomplished without adversely affecting Enron's debt and, therefore, its credit ratings. When Fastow and McMahon presented the CFO Report and the Treasurer Report, respectively, to the Finance Committee at its February 2000 meeting, they showed the directors who were present, including Lay and Skilling, that the "Targeted Key Financial Ratios" were substantially the same as they were a year previously,[564] and the four major rating agencies had not changed their outlooks on Enron, except that Moody's had recently determined to review Enron for an upgrade.[565] At the December 1999 Finance Committee meeting, Fastow presented a slide that listed the "Highlights" of his 1999 finance initiatives.[566] These included executing over $21 billion of funding

---

[562] 12/11/00 Finance Committee Materials, at 25 (part of Treasurer Report).

[563] 5/1/00 Finance Committee Materials, at 20 (slide from CFO Report).

[564] 2/7/00 Finance Committee Materials, at 8 (slide from CFO Report); 2/7/99 Finance Committee Materials, at 8 (slide from CFO Report).

[565] Minutes of Enron Finance Committee Meeting, Feb. 7, 2000 (the "2/7/00 Finance Committee Minutes"), at 2 [AB000201463-AB000201466]; 2/7/00 Finance Committee Materials, at 23 (part of Treasurer Report); Minutes of Enron Finance Committee Meeting, Feb. 7, 1999 (the "2/7/99 Finance Committee Minutes"), at 21 (slide from Treasurer Report) [AB0247 00561-AB0247 00623].

[566] 12/13/99 Finance Committee Materials, at 18 (slide from CFO Report).

transactions and over $5 billion of "balance sheet management transactions," while at the same time reducing bank debt by $6 billion and convincing Moody's to move Enron to a positive watch position for possible upgrade.

*Materiality of the SPE Transactions*

The SPE transactions that Enron used liberally in the five years leading up to the Petition Date accounted for significant amounts of Enron's reported cash flows and earnings. As reported by the Examiner in the Second Interim Report,[567] in the year 2000 alone, the six accounting techniques employed by Enron in certain of its SPE transactions constituted more than 100% of Enron's net reported cash flows from operations, and almost one-third of Enron's reported income before interest, minority interests and income taxes ("IBIT"). With Enron's manner of accounting for the SPE transactions, in 2000 the company reported $3.01 billion of net cash flows from operations, but if the SPE transactions had been accounted for in accordance with GAAP, net cash flows from operations would have been a negative $153.9 million. Similarly, with Enron's manner of accounting for the SPE transactions, it reported in 2000 just under $2.5 billion of IBIT, but with proper accounting, Enron's IBIT would have been only $1.8 billion.

Each type of SPE transaction, as accounted for by Enron, had a material effect on Enron's financial condition. For example, in 2000:[568]

- *Prepays*: The Prepays accounted for over $1.5 billion of reported cash flows from operations. They also increased price risk management liabilities by over $4 billion, with that amount not being reflected as debt on Enron's balance sheet.

---

[567] *See* Second Interim Report, Appendix Q (Schedules Depicting Impact of Enron's Six Accounting Techniques).

[568] *See id.*

- 128 -

- *FAS 140s*: The FAS 140 Transactions accounted for almost $1.2 billion of reported cash flows from operations. Enron reduced its total assets by $812 million, since it considered that this amount of assets had been sold through the FAS 140 Transactions.

- *Tax Transactions*: The Tax Transactions accounted for over $60 million of reported cash flows from operations. They also created a $547 million deferred tax liability for Enron, which the company did not reflect on its balance sheet.

- *Share Trust Transactions*: These transactions accounted for $418 million of reported cash flows from operations. Enron reduced its total assets by almost $4.2 billion, since it considered that this amount of assets had been sold through the Share Trust Transactions. Had the Share Trust Transactions been accounted for in accordance with GAAP, Enron would have reported almost $5.5 billion of additional balance sheet liabilities as a result.

- *Non-Economic Hedges*: These include the Rhythms and Raptor hedges. Had these transactions been accounted for in accordance with GAAP, Enron's reported assets would have been reduced by $867 million, and its reported liabilities would have been increased by $349 million.

- *Minority Interest Transactions*: Enron reported $1.74 billion of minority interest investments, rather than debt.

The Finance Committee members were aware of these types of transactions. They received presentations on specific transactions from time to time, and the CFO Reports and Treasurer Reports often identified the transactions by type and amount. [569]

For example, at the October 1999 Finance Committee meeting, Fastow presented a chart

---

[569] *See, e.g.*, Minutes of Enron Finance Committee Meeting, May 5, 1997 (the "5/5/97 Finance Committee Minutes"), at 2-3 (reviewing Project Theresa, a Tax Transaction) [AB000186616-AB000186618]; 5/1/00 Finance Committee Minutes, at 3 (reviewing Raptor I, a non-economic hedge transaction); Minutes of Enron Finance Committee Meeting, Dec. 8, 1997 (the "12/8/97 Finance Committee Minutes"), at 2 (approving equity hybrid financing (Project Nighthawk), a Minority Interest Transaction) [AB000469806-AB000469809]; 8/7/00 Finance Committee Minutes, at 6 (reviewing Project Tammy, a Tax Transaction); 8/7/00 Finance Committee Materials, at AB0247 01374 (slide from Treasurer Report) (identifying Whitewing, a Share Trust Transaction, and Hawaii, a FAS 140 Transaction, as "Balance Sheet Management" vehicles); 10/11/99 Finance Committee Materials, at 15 (slide from CFO Report identifying Prepays as a "Funds Flow Management Transaction").

called "Funds Flow Management Transactions."[570]   That chart listed, among other

transactions, the following:

- "Merchant Asset Exchange," which was described as the $250 million "Creation of Minority Interest for Funds Flow."[571]  This transaction apparently referred to Nahanni, which Enron completed in December 1999, for a total of $500 million.[572]

- "JEDI 1 Stock Leverage," which was described as the $250 million "Monetization of Additional ENE Stock Value."[573]

- "Prepays," with the description "Commodity Prepay" for $245 million.[574]

- "Rhythms Monetization," which was described as the $345 million "Monetization of Value."[575]

That same CFO Report included another chart titled "Selected Funds

Flow/Balance Sheet Vehicles," which listed certain transactions for years 1993 through

2000, including Prepays, Nighthawk, JEDI II, Rawhide, Marlin, Firefly, Yosemite,

Margaux and Condor.[576]  This chart did not include any amounts, but the minutes reflect

that Fastow "discussed issues impacting funds flow and how the Company was managing

funds flow, including vehicles currently in place and the strategy for the future."[577]

The Treasurer Report presented at the August 2000 Finance Committee meeting

included a list of "Balance Sheet Management" transactions, including, among others, the

following:

---

[570] 10/11/99 Finance Committee Materials, at AB0247 00836 (slide from CFO Report).

[571] *Id.*

[572] *See* Second Interim Report, Annex 3 to Appendix I (Minority Interest Transactions).

[573] 10/11/99 Finance Committee Materials, at AB0247 00836 (slide from CFO Report).

[574] *Id.*

[575] *Id.*

[576] *Id.*

[577] 10/11/99 Finance Committee Minutes, at 1-2.

- 130 -

- "Whitewing Purchases," described as an "Off balance vehicle to purchase assets from Enron," totaling $561 million.[578]

- "FAS 125's," described as $468 million of "Asset sales to third parties supported by Enron total return swaps."[579]

- "Hawaii," described as a $242 million "Add-on to existing $400MM FAS 125 line . . . ."[580]

At least one Outside Director acknowledged a concern with the growing materiality of the SPE transactions. When asked whether the amount of activity involving SPEs caused him any concern, Blake testified that Enron needed to use SPE transactions "in order to protect the financial well-being of the company and to provide the funds flow in order to keep our ratios intact and preserve our investment grade rating and make sure we had a provision of funds to grow the business."[581] He then said:

> The amount of SPEs that [were] involved became more and more, and it became a concern on our ability to provide oversight and the like from an [sic] finance committee standpoint. But I deemed it as an important part of the overall need to preserve the financial strength of the company and sustain its earnings growth.[582]

*Indications that Substance Differed from Disclosure*

There is evidence of information provided at Finance Committee and Audit Committee meetings indicating that certain of the SPE transactions were not being disclosed in accordance with their substance.

---

[578] 8/7/00 Finance Committee Materials, at AB0247 01374 (slide from Treasurer Report).

[579] *Id.*

[580] *Id.*

[581] Blake Sworn Statement, at 67.

[582] *Id.* at 68. At this point in the testimony, Blake's legal counsel requested a break, immediately after which Blake modified his testimony to say in part, "Was I satisfied that we had adequate control over the SPEs? I would say yes. . . . I do believe that the board did have sufficient oversight relative to that activity. And if this is in conflict with my previous statement, I'd like to correct the record accordingly." *Id.* at 70-71.

*Prepays Were Debt.* At the February 1998 joint meeting of the Audit and Finance Committees, Fastow presented a detailed nine-page status report of Enron's capital that identified both on and off balance sheet obligations of all types.[583] The first heading on the first page was "Balance Sheet Obligations," and its first subheading was "Debt Classified as Non-Debt Liabilities."[584] The first three items identified under that subheading were three Prepay Transactions entered into with JPMorgan Chase and its SPE, Mahonia.[585] Fastow did not present that same chart to the Board or its committees after that.

However, as mentioned above, on a chart provided to the Finance Committee, Fastow included the Prepays under the heading "Selected Funds Flow/Balance Sheet Vehicles,"[586] along with financing vehicles such as Nighthawk and Rawhide, which were Minority Interest Transactions. In the Treasurer Report presented to the Finance Committee in August 1999, a $500 million natural gas Prepay is included on a list of "1999 Financings."[587]

Beginning in August 2000, Fastow included in his CFO Reports to the Finance Committee a chart showing Enron's interest rate exposure.[588] These charts included

---

[583] *See* Agenda for Joint Audit and Finance Committee Meeting, Feb. 9, 1998 [AB000473540]; Draft Enron Capital Management Capital Activity Report (the "Capital Activity Report"), at AB0246 00815-AB0246 00823 (Enron Capital: Status Report as of 9/30/97) [AB0246 00725-AB00246 00838].

[584] Capital Activity Report, at AB0246 00815. *See* Second Interim Report, Appendix E (Prepay Transactions), for a discussion of Prepays entered into with JPMorgan Chase.

[585] *Id.*

[586] 10/11/99 Finance Committee Materials, at AB0247 00840 (slide from CFO Report).

[587] Materials from Enron Finance Committee Meeting, Aug. 9, 1999 (the "8/9/99 Finance Committee Materials"), at 20 (slide from Treasurer Report) at 20 [AB0247 00716-AB0247 00815].

[588] 8/7/00 Finance Committee Materials, at 13 (slide from CFO Report); 10/6/00 Finance Committee Materials, at AB0247 01538 (slide from CFO Report); 12/11/00 Finance Committee Materials, at 13 (slide from CFO Report); 2/12/01 Finance Committee Materials, at 2A-6 (slide from CFO Report); 4/30/01 Finance Committee Materials, at AB0247 02071 (slide from CFO Report); 8/13/01 Finance Committee

Prepays and characterized them as presenting a fixed interest rate exposure for the company. A number of the Finance Committee members testified, however, that they understood Prepays to have no interest rate risk. These Outside Directors appeared to have believed that, in a Prepay Transaction, Enron would receive cash upfront from a third party representing the purchase price of a commodity, and that Enron would then have the obligation to deliver that commodity at some point in the future.[589] Savage testified as follows:

> Q. If Enron's obligation was to deliver a commodity at a future time, to your understanding, would the nature and the quality of that obligation vary with interest rates?
>
> A. Not directly. Not directly.
>
> Q. Indirectly?
>
> A. . . . I don't think so. Not in a normal prepay transaction, I don't think so.[590]

Belfer testified in a similar fashion:

> Q. [W]ould such a [prepay] transaction, as you understood it, involve interest rate sensitivity to Enron?
>
> A. No.
>
> Q. Why is that?
>
> A. Because it was, the way I understood it, except to the extent it was hedged, this was a transaction where the commodity risk stayed with Enron.

---

Materials, at AB0247 02302 (slide from the CFO Report); 10/8/01 Finance Committee Materials, at AB0247 02545 (slide from CFO Report ).

[589] *See, e.g.*, Savage Sworn Statement, at 123; Meyer Sworn Statement, at 76; Blake Sworn Statement, at 107; Urquhart Sworn Statement, at 63-64; Wakeham Sworn Statement, at 100-01; Winokur 11/20/02 Sworn Statement, at 148-49; Pereira Sworn Statement, at 161-62. Lay also described Prepay Transactions in this manner. Lay In-Person Interview

[590] Savage Sworn Statement, at 128-29.

Q. And if Enron hedged that risk to a third party in the marketplace would Enron then have any interest rate sensitivity in the transaction?

A. I don't think so.[591]

As discussed in Appendix E (Prepay Transactions) to the Second Interim Report, however, in its Prepay Transactions, Enron eliminated the commodity risk. The risk circled back to Enron, causing the transaction to be effectively debt, which Enron was obligated to repay in the future plus a fixed rate of interest. Thus, the inclusion of the Prepay Transactions on Fastow's interest rate exposure chart was a proper depiction of the true substance of these transactions. Fastow presented this chart to the Finance Committee seven times, at each of its regularly scheduled meetings from August 2000 through October 2001.[592] When Lay was asked during his interview with the Examiner why the Prepay Transactions would be included on these charts, he did not recall noticing that they had been included.[593] He stated, however, that a Prepay Transaction as he understood the structure would not have any significant interest rate risk.[594]

*FAS 140 Transactions Were Not True Sales.* At the August 1999 Finance Committee meeting, the Treasurer Report included a list of "1999 Financings."[595] Among the "Refinancings" on that list were two FAS 140 Transactions marked with the notation "Total Return Swaps," along with "takeouts" of two other FAS 140

---

[591] Belfer Sworn Statement, at 160-61.

[592] 8/7/00 Finance Committee Materials, at AB0247 01363 (slide from CFO Report); 10/6/00 Finance Committee Materials, at AB0247 01538 (slide from CFO Report); 12/11/00 Finance Committee Materials, at AB0247 01656 (slide from CFO Report); 2/12/01 Finance Committee Materials, at AB0247 01927 (slide from CFO Report); 4/30/01 Finance Committee Materials, at AB0247 02071 (slide from CFO); 8/13/01 Finance Committee Materials, at AB0247 02302 (slide from CFO Report); 10/8/01 Finance Committee Materials, at AB0247 02545 (slide from CFO Report).

[593] Lay In-Person Interview.

[594] *Id.*

[595] Materials from Enron Finance Committee Meeting, Aug. 9, 1999 (the "8/9/99 Finance Committee Materials"), at 20 (slide from Treasurer Report) [AB0247 00716-AB0247 00815].

Transactions.[596]  This characterization of the FAS 140 Transactions as refinancings or "takeouts" was inconsistent with Enron's desired accounting treatment of the FAS 140 Transactions, which depended on there being "true sales" of the assets from Enron to the applicable SPEs.[597]

This inconsistency may have been recognized by at least Jaedicke, the Chair of the Audit Committee, at the joint meeting of the Audit and Finance Committees in December 1999.  At that meeting, Buy presented a chart showing the amounts in Enron's merchant portfolio, and one column of the chart identified FAS 140 Transactions as part of the company's "Net Off-Balance Sheet Portfolio."[598]  The corporate secretary's handwritten notes on the slide indicate that "Jaedicke asked FASB 125."[599]  Causey apparently answered the question by explaining that these transactions were subject to Total Return Swaps, which meant that Enron kept the risk associated with the assets.  The

---

[596]  At the time these were referred to as "FAS 125" transactions.  FAS 125 was superseded by FAS 140 in early 2001.

[597]  *See* Second Interim Report, Appendix M (FAS 140 Transactions).  Outside Directors appeared to be aware of this requirement that no sale could occur where the risk of the asset was not transferred.  Blake testified with respect to the FAS 140 Transactions:

> In order – in order for it to be constituted as a sale and that there is no continuing obligation – in other words, for it to be unconsolidated or taken off your balance sheet, there has to be a transfer of risk to a third party of which you are not responsible.  There has to be a determination, then, that the vehicle itself, whatever the economics were of that vehicle, had, in fact, been transferred to the third party, the SPE.  Otherwise, you couldn't – you couldn't deconsolidate it or unconsolidate it.

Blake Sworn Statement, at 84.  Urquhart Sworn Statement, at 116-18 (testifying that he understood Enron's "off balance sheet portfolio" to include assets in which Enron had an equity interest, but not to include assets in which Enron only retained an interest through an operating agreement).

[598]  Materials from Joint Meeting of Audit and Finance Committees, Dec. 13, 1999 (the "12/13/99 Joint Committee Materials"), at 4 (part of Merchant Portfolio Summary) [AB0246 01365-AB0246 01412].

[599]  *Id.*

- 135 -

corporate secretary's notes have the name "Causey" and beside his name the statement:

"Total Return Swap keep [sic] risk but off-balance sheet."[600]

Lay told the Examiner that he did not recall this exchange between Jaedicke and Causey, but that he would have questioned Causey's answer had he heard it.[601] According to Lay, he understood that the FAS 140 Transactions transferred risk and that all associated debt was nonrecourse to Enron.[602]

The indication that Enron's FAS 140 Transactions did not accomplish "true sales" was also present in a chart Fastow provided to the Finance Committee in August 2001.[603] That chart included a list of FAS 140 Transactions, showing the deal name, the related business unit, the origination date, and the maturity date.[604]   The designation of a maturity date for a transaction characterized as a true sale of an asset without recourse raises substantial issues about the merits of that characterization.

---

[600] *Id.* There may be evidence that the Audit Committee discussed how the Total Return Swaps resulted in Enron's retention of risk at some point following the end of first quarter 2001.  Counsel for Andersen produced documents to the Examiner that included handwritten notes ostensibly made by David Duncan on copies of presentations he made to the Audit Committee.  Handwritten notes on a copy of a the selected observations regarding the first quarter 2001 state: "Nature of the securitization is that Enron retains the volatility related to the fair value of the business through a Total Return Swap."  Andersen Presentation Slide entitled "2001 Financial Reporting, Selected Observations Through First Quarter" [AB0911 2307].  These notes have not been authenticated.  In addition, David Duncan invoked his Fifth Amendment privilege and, therefore, the Examiner has been unable to obtain his testimony regarding whether he actually informed the Audit Committee of the handwritten comments included on this presentation copy. *See* Appendix C (Role of Arthur Andersen) to this Report.

[601] Lay In-Person Interview.

[602] *Id.*

[603] 8/13/01 Finance Committee Materials, at 2-11 (slide from CFO Report).

[604] *Id.*

In addition, Enron's repayments under the FAS 140 Transactions appear to have been included on lists of capital commitments provided to the Finance Committee. At each of the seven Finance Committee meetings between February 1999 and May 2000, the CFO Report or the Treasurer Report included a list of Enron's capital commitments for the year-to-date, separated by business unit.[605] All but one of these lists included a type of commitment identified only as "TRS Repurchases," which were often for substantial amounts.[606] For example, at the October 1999 meeting, Fastow told the Finance Committee that there were four such commitments at the company, totaling $927 million of the total $4.2 billion committed.[607]

A reasonable interpretation of "TRS Repurchases" is that they referred to Enron unwinding the FAS 140 Transactions in which Enron had entered into Total Return Swaps. These Total Return Swaps had resulted in Enron's obligation to repurchase assets, which meant Enron had not effected "true sales" of the assets. However, none of the Finance Committee members who provided testimony to the Examiner on this matter could identify these commitments.[608] For example, when shown a copy of the capital

---

[605] Materials from Enron Finance Committee Meeting, Feb. 7, 1999 (the "2/7/99 Finance Committee Materials"), at 11 (slide from CFO Report) [AB0247 00561-AB0247 00623]; Materials from Enron Finance Committee Meeting, May 3, 1999 (the "5/3/99 Finance Committee Materials"), at 9 (slide from CFO Report) [AB0247 00670-AB0247 00701]; Materials from Enron Finance Committee Meeting, Aug. 9, 1999 (the "8/9/99 Finance Committee Materials"), at 9-11 (slides from CFO Report) [AB0247 00716-AB0247 00815]; 10/11/99 Finance Committee Materials, at AB0247 00833-AB0247 00834 (slide from CFO Report); 12/13/99 Finance Committee Materials, at 23-25 (part of the Treasurer Report); 5/1/00 Finance Committee Materials, at 36.

[606] 5/3/99 Finance Committee Materials, at 9 (slide from CFO Report); Materials from Enron Finance Committee Meeting, Aug. 9, 1999 (the "8/9/99 Finance Committee Materials"), at 9-11 (slides from CFO Report) [AB0247 00716-AB0247 00815]; 10/11/99 Finance Committee Materials, at AB0247 00833-AB0247 00834 (slide from CFO Report); 12/13/99 Finance Committee Materials, at 23-25 (part of Treasurer Report); 5/1/00 Finance Committee Materials, at 36.

[607] 10/11/99 Finance Committee Materials, at AB0247 00833-AB0247 00834 (slides from CFO Report).

[608] See, e.g., Chan Sworn Statement, at 159-60; Savage Sworn Statement, at 163; Urquhart Sworn Statement, at 111; Belfer Sworn Statement, at 149.

commitment list from the December 1999 Finance Committee meeting and asked to explain generally the concept of capital commitments, Belfer responded that he could explain it with respect to everything on the list other than the "TRS Repurchases."[609] Lay also did not recall having any understanding of the transactions identified by this term.[610]

*Other Asset Transfers Were Not True Sales.* For a variety of reasons, including Skilling's "asset light" business strategy[611] and the need to raise cash, Enron management wanted to move large amounts of assets off the company's balance sheet during the five-year period prior to the bankruptcy. However, Enron experienced difficulty in selling the assets to third parties and particularly in making the sales quickly.[612] This led to the use of transactions with LJM1 and LJM2, as well as the use of several Enron-controlled SPEs that had the stated purpose of buying assets and holding them until the assets could be sold to an unaffiliated third party. Several presentations to the Finance Committee referred to this as "bridging" the asset sales. These entities included Whitewing and Hawaii, which were used to complete a number of the "true sales" in the FAS 140 Transactions.

---

[609] Belfer Sworn Statement, at 149. He also commented that he was not certain what was included in a category called "Other" that reflected a cost of $319 million. *Id.*

[610] Lay In-Person Interview.

[611] Skilling 11/1/02 SEC Testimony, at 203-09.

[612] 7/12/01 Call Transcript, at 13-14; Enron 4Q 2000 Conference Call Transcript, Jan. 22, 2001 [ELIB00001906-00001-ELIB00001906-00029].

None of the directors appeared to question the term "bridging" or the term "true sale" when the asset had only been transferred to an Enron-related SPE while Enron sought a permanent buyer. In addition, on at least one occasion, in August 2000, the Treasurer Report that was provided to the Finance Committee included a slide called "2000 Balance Sheet Management" describing how these asset bridging vehicles were at full capacity. This slide stated that Enron needed to expand the capacity of Whitewing by $700 million, and of Hawaii by $150 million,[613] in effect so that Enron could "buy" more assets from itself.

*High Level of Accounting and Disclosure Judgment*

The members of the Finance and Audit Committees were told that the accounting for and disclosure of the SPE transactions required a high degree of judgment and attention, given the company's significant reliance on the transactions and the volatility in applicable accounting and disclosure rules. In December 1999, Fastow told the Finance Committee that "[a]ccounting treatment for structured finance transactions" was one of Enron's "Major 2000 Finance Issues," because the company "[h]eavily relied on" such transactions and the "rules always changed."[614]

In addition, Andersen routinely told the Audit Committee that "complex accounting for structured transactions" was one of the company's "high priority financial reporting risk areas."[615] In February 1999, Andersen showed the Audit Committee the

---

[613] 8/7/00 Finance Committee Materials, at 23 (slide from Treasurer Report).

[614] A slide within Fastow's CFO Report at the December 13, 1999 Finance Committee meeting was titled "Major 2000 Finance Issues," and it included a bullet point that read "Accounting treatment for structured finance transactions." 12/13/99 Finance Committee Materials, at AB0247 00971. Handwritten notes beneath that bullet point made by the corporate secretary, Rebecca Carter, recorded Fastow's oral remarks as "Heavily relied on, rules always changed." *Id.*

[615] Materials from Enron Audit Committee Meeting, May 1, 2000 (the "5/1/00 Audit Committee Materials"), at AB0246 01579 (quoting from an Andersen presentation, capitalization omitted)

- 139 -

following slide, which rated Enron's "Risk Profile" with respect to "Highly Structured

Transactions," assigning an "H" (as opposed to an "M" or an "L") in all three categories

of accounting judgments, disclosure judgments and rule changes.[616]



The following year, in February 2000, Andersen told the Audit Committee that

the "sophistication of [the] company's business practices introduces a high number of

accounting models and applications requiring complex interpretations and judgement,"

---

[AB0246 01569-AB0246 01600]; Materials from Enron Audit Committee Meeting, Apr. 30, 2001 (the "4/30/01 Audit Committee Materials"), at AB0246 01925 [AB0246 01882-AB0246 01925].

[616] Materials from Enron Audit Committee Meeting, Feb. 7, 1999 (the "2/7/99 Audit Committee Materials"), at AB0246 01067 [AB0246 01057-AB0246 01167].

citing "syndication vehicles" and "complex sales structures (various assets)" as
examples.[617] Then one year later, in February 2001, Andersen told the Audit Committee
that Enron had a "[h]igh dependency on transactions to meet objectives," where the
"[a]pplication of GAAP often requires significant judgement," and the "[e]xtent of
necessary disclosures can be judgemental," referring to "[h]ighly structured transactions"
such as "[s]yndication and off-balance sheet vehicles."[618]

### LJM2 Red Flags to Skilling

*Approvals.*  In October 2000, when the Finance Committee and the Board
authorized Fastow's involvement in LJM3, the minutes reflect that Fastow told the
Finance Committee about "the mechanisms that had been put in place to mitigate any
potential conflicts including: . . . 3) Messrs. Buy, Causey, and Skilling approve all
transactions between the Company and the LJM funds . . . ."[619]  The minutes of the
meeting reflect that Skilling was present for Fastow's presentation, but there is no record
that Skilling contradicted Fastow.[620]  Outside Directors testified that they assumed

---

[617] Materials from Enron Audit Committee Meeting, Feb. 7, 2000 (the "2/7/00 Audit Committee Materials"), at AB0246 01488 (capitalization omitted) [AB0246 01470-AB0246 01568].

[618] 2/12/01 Audit Committee Materials, at AB0246 01769.  There may be additional evidence that Andersen discussed with the Audit Committee concerns about possible inadequacies in Enron's disclosures.  David Duncan's prepared notes for the February 2001 Audit Committee meeting stated: "While the company has many good disclosure practices, we have discussed the risk that some might view the level of detail available, not so much in the financial statements, but in the MD&A, as less than desirable in some areas.  We understand that the Company must balance the detail provided in these disclosures with commercial and practical constraints, but we often suggest additional details just the same."  Financial Comments, produced by Andersen [AB0911 2292].  These notes have not been authenticated.  In addition, David Duncan invoked his Fifth Amendment privilege and, therefore, the Examiner has been unable to obtain his testimony regarding whether he actually informed the Audit Committee of the comments included in these notes.  *See* Appendix C (Role of Arthur Andersen) to this Report.

[619] 10/6/00 Finance Committee Minutes, at 2.

[620] 10/6/00 Finance Committee Minutes, at 1 (noting Skilling's presence).  Skilling testified to the HEC that he did not recall this part of the meeting and may have stepped out of the room, Skilling HEC testimony, at 125-26, 129, although the minutes of the meeting do not reflect that he left at any time.  10/6/00 Finance Committee Minutes.

Skilling was reviewing transactions prior to that time.[621] Skilling, however, has testified

that he was not required to approve the transactions.[622]

Skilling failed to respond to a direct request from at least one officer of Enron for

such approvals. According to Mintz, General Counsel for Enron Global Finance, the

legal department formulated a special LJM approval sheet to supplement the typical

transaction DASHs, and those LJM approval sheets were supposed to be signed by,

among others, Causey and Skilling.[623] Although Skilling testified that no Enron

transactions were supposed to be closed without completed DASHs,[624] it is not clear that

DASHs were completed for every LJM2 transaction. Instead, it appears that LJM

approval sheets were generated, and Skilling failed or refused to complete them in most

instances. In connection with the investigation of Sherron Watkins' letter in Fall 2001,

Mintz provided eighteen LJM approval sheets to Vinson & Elkins.[625] Skilling had signed

only three.[626]

According to Mintz's testimony to the HEC, in May 2001 he sent Skilling a

memo discussing the procedures for obtaining Skilling's signatures on the LJM approval

---

[621] *See, e.g.*, Harrison Sworn Statement, at 153 ("And I guess it was my impression that any and all of those [referring to transactions with LJM1] would be vetted independently and valued and reviewed by the various appropriate legal and accounting and maybe most importantly Skilling, since he was overseeing this."); Meyer Sworn Statement, at 108.

[622] 2/7/02 HEC Hearing Transcript, at 124.

[623] Memorandum from Lisa Henriques, Wilmer Cutler, to Enron File, regarding Interview with Jordan Mintz, General Counsel, Jan. 4, 2002 (the "Mintz 1/4/02 Wilmer Cutler Interview"), at 3 [AB000000580-AB000000585].

[624] 2/7/02 HEC Hearing Transcript, at 127 (testifying that "those transactions could not have been completed if it was necessary for me to authorize those transactions. It couldn't have been done.").

[625] These included: Cuiaba (9/99), Cuiaba 2 (5/00), Nowa Sarzyna (12/99), CLO Notes/Equity (12/99), Bob West (12/99), Megs (12/99), Cortez (1/00), Yosemite (2/00), Raptor I (4/00), Blue Dog (5/00), Raptor II (6/00), Osprey Add-On (6/00), Backbone (6/00), Margaux (6/00), Raptor IV (9/00), Fishtail (12/00), Catalytica (12/00), ENA-CLO repurchase (5/01).

[626] Skilling had signed Blue Dog, Margaux and Raptor IV.

sheets.[627]  Skilling did not respond, and Mintz attempted to schedule a meeting with Skilling, but that also failed.[628]  Skilling testified that he did not recall receiving Mintz's memo: "Had I received that memo, what I would have done is looked at the specific transactions.  If Rick Buy and Rick Causey had signed those transactions, and I looked at the transactions and they looked reasonable, I would have had no trouble signing for those transactions."[629]

Skilling testified that he "was not required to approve those [LJM] transactions"[630] and that he did not recall being presented with the LJM approval sheets.[631]  When asked if he ever told the Board he was not reviewing the transactions, Skilling responded:  "I wouldn't have to.  In October of 1999, when the process was established for approval of transactions with LJM, the process is absolutely crystal clear.  It involved approval by Mr. Causey and Mr. Buy."[632]

---

[627] 2/7/02 HEC Hearing Transcript, at 43.

[628] Id. at 43.  Mintz also testified to the HEC that he had discussed his concerns with Causey and Buy, trying to determine if Skilling's signature on the approval sheets was substantive or ministerial.  Id. at 47.  Causey apparently told Mintz "I wouldn't stick my neck out."  Id. at 47.  Mintz said that both Buy and Causey "shared with me that Jeff [Skilling] was very fond of Andy [Fastow], don't go there."  Id.

[629] Id. at 132.

[630] Id. at 124.

[631] Id. at 128.

[632] Id. at 126.  In Lay's interview with the Powers Committee, he said only that he

> never reached out on his own to investigate whether the controls the Board put in place to ensure arm's-length transactions were followed. . . .  Skilling was responsible for ensuring that the controls were in place. . . .  Also, the Audit and Finance Committees would look over the procedures at the annual meeting where they discuss the year's transactions.
>
> Both Causey and Buy were responsible for making sure that the transactions with LJM1 and LJM2 were fair to the company and at arm's-length.  Lay thought it was clear to Causey and Buy that they were supposed to look at the deal and make sure it was fair.  They were supposed to look not only to see if there were independent people on each side of the deal, but also at the terms of the deal.

Lay 1/16/02 Wilmer Cutler Interview, at 8.

*Negotiations.*  The evidence shows that Enron's transactions with LJM2 were being negotiated by Enron employees on behalf of both Enron and LJM2, and that the Enron employees on both sides of the transactions reported to Fastow. For example, the DASHs for Raptors I, II and IV stated: "Person(s) negotiating for Enron: Ben Glisan," and "Person(s) negotiating for LJM: Michael Kopper."[633] In May, June and September, 2000 when those transactions were completed, both Kopper and Glisan were Enron employees; Glisan reported to Fastow, and Kopper reported to Glisan. Skilling signed the DASH for Raptor IV dated September 11, 2000 on March 12, 2001,[634] so it is reasonable to infer that he saw this identification of the negotiators.

In any event, the conflict was brought to at least Skilling's attention in March 2000 by McMahon, who testified to the HEC that he met with Skilling to request changes be made.[635] According to McMahon:

> [T]he LJM situation had gotten to basically a point that was just untenable for myself and my group. We found ourselves negotiating against people who represented LJM. They were Enron employees. Andy Fastow was the ultimate senior person that all those people reported to. He set compensation and promotion.[636]

McMahon then testified that Skilling said he understood the concerns and "would remedy the situation" that McMahon had outlined.[637] According to McMahon, Skilling

---

[633] LJM2 Approval Sheet for Raptor, at 1 [AASDTEX000419918-AASDTEX000419923]; LJM2 Approval Sheet for Raptor II, at 1 [AASDTEX000419934-AASDTEX000419938]; LJM2 Approval Sheet for Raptor IV, at 1 [VEL 00179-VEL 00182].

[634] LJM2 Approval Sheet for Raptor IV, at 1 [VEL 00179-VEL 00182]. Skilling made a presentation at an annual meeting of LJM2 partners in October 2000. The materials for that meeting listed five other Enron employees as being involved in LJM2, including Kathy Lynn, Anne Yaeger, Joyce Tang, Chris Loehr and Ace Roman. LJM Investments Annual Partnership Meeting, Oct. 26, 2000, at 4 [AB0971 00246-AB0971 00289]. Skilling testified that he attended the meeting for only the time required to make his presentation and that he did not see those materials. Skilling 12/5/01 SEC Testimony, at 269-72.

[635] 2/7/02 HEC Hearing Transcript, at 61-63.

[636] *Id*. at 62.

[637] *Id*. at 63.

asked Joe Sutton, who was a member of the Office of the Chairman at the time, to meet with McMahon.[638]  Following that meeting McMahon was moved to another position within Enron where he did not report directly to Fastow.[639]

*Fastow's Compensation.*  The Outside Directors testified that they believed Skilling was reviewing Fastow's compensation from the LJM entities, and particularly LJM2, beginning in at least October 2000.[640]  At the October 2000 Finance Committee meeting, Fastow stated that "a review of his economic interest in the Company and the LJM funds is presented to Mr. Skilling."[641]  Skilling was present at that meeting and apparently never contradicted Fastow's report.[642]

Skilling told the Powers Committee that he received conceptual information about Fastow's LJM1 and LJM2 compensation on two occasions, once in the spring of 2000 and once in the spring of 2001.[643]  According to the record of the Powers Committee interview:

> Fastow provided information to Skilling that was intended to demonstrate that his interest in Enron significantly outweighed his interest in LJM.  In handwritten documents, which Skilling did not retain, Fastow compared his compensation from LJM assuming a 25% rate of return over five years on its investments with the benefit to him if Enron's stock price appreciated at a 15% rate, which is the rate the Compensation Committee

---

[638] *Id.* at 66-67.

[639] *Id.*

[640] *See, e.g.,* Belfer Sworn Statement, at 187 ("Q.  Who was to monitor Mr. Fastow's compensation?  A.  Well, Mr. Fastow reported to Mr. Skilling, and the board understood that Mr. Skilling was to monitor the compensation."); Harrison Sworn Statement, at 165 ("Q.  Was Mr. Fastow's level of compensation from LJM2 a matter of concern to you?  A.  I would say it – it – it was of interest, but I felt that interest was satisfied by virtue of the different checks and balances and the fact that Skilling would be reviewing that.  I didn't see Skilling as someone that gave money away."); Savage Sworn Statement, at 101.

[641] Minutes of Enron Finance Committee Meeting, Oct. 6, 2000 (the "10/6/00 Finance Committee Minutes"), at 2 [AB000201482-AB000201486].

[642] *Id.* at 1.

[643] Skilling 11/27/01 Wilmer Cutler Interview, at 5.  Skilling recalled only the 2001 information when he testified to the SEC.  Skilling 12/5/01 SEC Testimony, at 227.

used to project the increase in officer's [sic] holdings of Enron stock. Skilling recalled that the benefit from the increase in Enron stock was four or five times greater.[644]

Thus, the information Fastow provided did not include a disclosure of the actual amounts he had received from LJM1 and LJM2. Skilling told the Powers Committee that he never asked Fastow for the actual dollar amounts, explaining that "he did not do so because determining Fastow's actual compensation from LJM would be too difficult because LJM was investing in long-term assets; therefore, the actual return on LJM's investment would not be known for a long time (maybe years)."[645] Skilling said that "as long as the transactions were arms-length and Enron considered alternatives, Skilling did not care what Fastow made."[646]

Enron officers believed differently. In a January 2001 email to Ron Astin ("Astin") of Vinson & Elkins, Mintz asked for assistance in determining what to disclose in Enron's proxy statement about Fastow's LJM-related compensation.[647] Mintz said: "I spoke, again, with Andy about this earlier today and he believes (perhaps rightly so) that Skilling will shutdown LJM if he knew [sic] how much Andy earned with respect to the Rhythms transaction."[648]

In Lay's interview with the Examiner, he could not explain why neither he, Skilling nor any other Board member did not simply ask Fastow for the amount of his

---

[644] Skilling 11/27/01 Wilmer Cutler Interview, at 5.

[645] Id. at 5-6.

[646] Id. at 6.

[647] Email from Jordan Mintz, General Counsel, Enron Global Finance, to Ron Astin, Partner, Vinson & Elkins, and copy to Rex Rogers, Enron, regarding Proxy (Confidential Communications), Jan. 16, 2001 [AB0911 1156-AB0911 1157].

[648] Id. (Mintz also said: "Andy's point is that he 'outnegotiated' the banks in that transaction--not Enron. We need to be 'creative' on this point within the contours of Item 404 [of SEC Regulation S-K] so as to avoid any type of stark disclosure, if at all possible.").

LJM compensation, at some point before the fall of 2001.[649]  In Lay's interview with the

Powers Committee, Lay discussed Fastow's compensation from LJM1 and LJM2

separately.  According to the record of that interview, Lay said that he

> never directly asked how much Fastow would make from his involvement
> in LJM[1].  Lay did not think it was relevant because Fastow was
> concerned that if he created LJM it would impair his career at Enron.
> Fastow was willing to create the structure, but wanted to ensure that his
> career at Enron would not be affected by being involved with LJM.[650]

With respect to LJM2, Lay did not recall any discussion about Fastow's

compensation during the Finance Committee meeting that approved LJM2.  Lay said he

was shocked to learn in October 2001 that Fastow had made $30 million from LJM2,

because he thought Fastow was reluctant to create both it and LJM1, and he thought

Fastow was only spending a few hours per week on LJM related work.[651]

### D.    Duty of Candor

As an agent of the corporation, an officer has a duty to disclose to the board of

directors information material to the board's ability to make an informed decision.  As

discussed in several places in this Appendix, the evidence shows a number of examples

where Enron's officers withheld information from the Outside Directors, provided

information in a manner that was misleading, or even intentionally misrepresented certain

facts.  A significant example in which at least Skilling failed to provide material

information to the Board involved Kopper's personal interest in the transaction involving

the Chewco limited partnership.

---

[649]  Lay In-Person Interview.

[650]  Lay 1/16/02 Wilmer Cutler Interview, at 6.

[651]  *Id.* at 7.

As discussed in more detail in Annex 1 to Appendix L (Related Party Transactions) to the Second Interim Report, Enron formed Chewco in the fall of 1997. Enron's purpose for forming Chewco was to have it acquire a 50% limited partnership interest in JEDI from CalPERS, which wanted to liquidate its position in the partnership. Enron already held the other 50% interest in JEDI and treated JEDI as an unconsolidated entity. Thus, Enron did not want to purchase CalPERS' interest directly, because that would have meant bringing JEDI onto Enron's balance sheet as a consolidated subsidiary.

In order to accomplish the objectives of both Enron and CalPERS, Enron formed Chewco, with Kopper holding both the ownership and management interests. At that time, Kopper was a Vice President in Enron's Capital Management Group and reported directly to Fastow. Enron treated Chewco as an independent entity, despite Kopper's involvement and even though Enron financed the entire $383 million amount needed for Chewco to purchase CalPERS' interest. Chewco's purchase from CalPERS closed in November 1997 with Enron guaranteeing a $383 million bridge loan. It was restructured in December 1997 with permanent financing from Enron, provided directly through an Enron guarantee of Chewco's bank debt, and indirectly through a JEDI-provided line of credit.

Just over three years later, in March 2001, Enron purchased Chewco's interest in JEDI for $35 million, even though Chewco was entitled to less than $20 million in distributions from JEDI.[652] Several months later, at the request of Kopper, Enron agreed

---

[652] *See* Second Interim Report, Annex 1 to Appendix L (Related Party Transactions).

to pay Chewco an additional $2.6 million under a tax indemnity agreement.[653]  Mintz

testified that no such payment was due, but that Fastow insisted the payment be made,

telling Mintz that Skilling had personally approved it.[654]  On a net basis, including

purchase price, tax payment and management fees, Kopper and a friend who had co-

invested with him received a total return of $14.2 million on their initial investment of

just over $125,000.[655]  In 2002, the SEC brought an action against Kopper alleging that

Kopper "secretly shared" a portion of the money with Fastow.[656]

Kopper's involvement in Chewco was not disclosed to the Board when it

approved the transaction, and Kopper never received proper approval for the conflict of

interest under Enron's Code of Ethics.  The evidence, as described below, shows that

Skilling was aware of Kopper's involvement and that he failed to disclose that

information to the Board, even though he was present at the meeting.

The evidence shows that, early in the development of the Chewco transaction

structure, Skilling had a "hallway conversation" with Fastow regarding establishing a

private equity fund to purchase CalPERS' interest, in which members of Fastow's wife's

family would invest.[657]  Skilling testified that he told Fastow he did not think this was a

good idea, but only because Enron was moving to a compensation system that was based

on subjective reviews of an employee's performance.  Skilling was concerned Fastow's

---

[653] *See id.*

[654] Mintz 9/29/03 Deposition, at 34-41.

[655] *See* Second Interim Report, Annex 1 to Appendix L (Related Party Transactions).

[656] Complaint, *U.S. SEC v. Michael J. Kopper,* No. H-02-3127 (S.D. Tex. filed Aug. 21, 2002), Docket No. 1.

[657] Skilling 11/4/02 SEC Testimony, at 36-38.

idea would perpetuate an objective system of compensating employees based on a formula of the company's profitability.[658]

Fastow then pursued the idea of using Enron insiders as investors in Chewco instead of his wife's family. On September 8, 1997, Vinson & Elkins lawyers Astin, Bob Baird and Joe Dilg met with Fastow, Kopper and Enron in-house attorneys Kristina Mordaunt, Carol St. Clair and Rex Rogers to discuss the proposal.[659] Initially Bill Brown, another Enron officer working with Fastow in the finance area, was considered to be the Chewco general partner, but Kopper was ultimately selected for this role.[660]

Fastow presented the Chewco transaction to the Executive Committee of Enron's Board at a special meeting on November 5, 1997.[661] Fastow did not identify any of the investors or partners in Chewco, and no one told the Executive Committee that Kopper was the sole manager and ultimate owner of Chewco, despite Kopper being present at the

---

[658] *Id.* at 38. When asked why he did not think it was a good idea, Skilling replied that the company was trying to eliminate compensation structures that provided "formulaic" profitability, and that Fastow's proposal "looked like a way that might have done it to an employee's family." *Id.* Skilling then explained "formulaic" profitability: "if our profit does this, you make this much money, or if you're [sic] trading makes this much money, you make this much money . . . ." *Id.* When asked "Were there any other reasons?" for rejecting Fastow's proposal, Skilling replied "No." *Id.*

[659] Author unknown, Handwritten Notes of meeting among employees of Enron and Vinson & Elkins, including Kopper, regarding Enron insiders investing in Chewco, Sept. 8, 1997 [AB000465810-AB000465813].

[660] Sworn Statement of William Brown, former Vice President, Enron, by William C. Humphreys, A&B, June 12, 2003, at 287-88.

[661] *See* Minutes of Enron Executive Committee Meeting, Nov. 5, 1997 (the "11/5/97 Executive Committee Minutes"), at 2 [AB000456818-AB000456821].

- 150 -

meeting.[662]  According to the minutes of the meeting, Skilling was present,[663] and Lay
joined late during the Chewco presentation.[664]

Skilling and Lay were also at the Board meeting on December 9, 1997, when the
Chair of the Executive Committee reported to the full Board about the Chewco
transaction.[665]  No mention was made during that meeting of the identity of the Chewco
investors or partners, or of Kopper's involvement.[666]

Skilling admitted on several occasions that he knew of Kopper's involvement at
the time the Chewco transaction was presented to the Executive Committee.[667]  In an
interview conducted by the Powers Committee, Skilling said that he "was sure" he had
told the directors about Kopper's involvement, although he did not recall the content of
the discussion nor discussing the need for a conflict waiver.[668]  Contrary to Skilling's
statement, however, Chewco was described to the Executive Committee as a "special
purpose vehicle not affiliated with the Company or CalPERS."[669]

---

[662] *See id.*; Materials from Enron Executive Committee Meeting, Nov. 5, 1997 (the "11/5/97 Executive Committee Materials") [AB000472445-AB000472465].  As a result, the directors did not know that Kopper was entitled to a $500,000 per year management fee, or that he would receive over $141,000 of the first year's fee within less than two weeks after the December 1997 closing, repaying more than fully Kopper's $125,000 cash investment in Chewco.  Ultimately, Kopper and his friend, Dodson, received $14.2 million in distributions and management fees from Chewco.  *See* Accounting Sheet entitled "Net Cash Retained by Chewco," Date unknown [EVE 61999]; First Amendment to the Purchase Agreement among JEDI, Enron Capital Management Limited Partnership, Enron Corp., and Chewco Investments, L.P., July 30, 2001 [AB000465805–AB000465807]; Summaries of Distributions to Chewco and Chewco Cash Activities, 1997-2001, undated, at 2 [AB0252 01179-AB0252 01182].

[663] 11/5/97 Executive Committee Minutes, at 1.

[664] *Id.* at 3.

[665] Minutes of Enron Board Meeting, Dec. 9, 1997, at 1 [AB000184686-AB000184725].

[666] *Id.* at 2.

[667] Skilling also makes a distinction in his SEC testimony, though not in his Powers interview, between Kopper's ownership of Chewco and his management of Chewco.  Skilling 11/4/02 SEC Testimony, at 41-44, 83-84.  Before the SEC, he knew only that Kopper was to be a manager, not an owner of Chewco.  *Id.*

[668] Skilling 11/27/01 Wilmer Cutler Interview, at 4.

[669] 11/5/97 Executive Committee Minutes, at 2.

- 151 -

With respect to granting authority for Kopper's conflict under the Code of Ethics, Skilling testified to the SEC that it was necessary to have presented Chewco to the Board, but he could not recall what might have been said to the Board about this issue.[670] He testified that he was certain, however, that Chewco was a significant transaction and that Enron's outside lawyers (i.e., Vinson & Elkins) and accountants (i.e, Andersen) knew about it.[671] A number of the Board members have testified that they were never told of Kopper's involvement or the conflict of interest it created, and none have testified that they were aware of these facts.[672] Apparently, the Board members never asked for the identity of Chewco's investors, even though the directors authorized Enron to guarantee almost $400 million of the unknown investors' indebtedness.[673]

There is little evidence indicating whether Lay knew about Kopper's involvement in Chewco. Skilling testified to the SEC that Kopper's role was "general knowledge within Enron."[674] In his interview with the Powers Committee, however, Lay stated that he did not know Kopper and would not recognize him.[675] Lay also stated to the Examiner that he first became aware of Kopper's interest in Chewco in October 2001 when an article in *The Wall Street Journal* published that information.[676] With respect to

---

[670] Skilling 11/4/02 SEC Testimony, at 54-56.

[671] Skilling 12/5/01 SEC Testimony, at 87, 162-63.

[672] *See, e.g.,* Blake Sworn Statement, at 154; Duncan Sworn Statement, at 102-03; Belfer Sworn Statement, at 189-90; Willison Sworn Statement, at 55-58; Winokur 11/21/02 Sworn Statement, at 103; Mendelsohn Sworn Statement, at 151-52.

[673] *See, e.g.,* Belfer Sworn Statement, at 190-91 ("Q: Did you or anyone else on the Board inquire as to the nature of Chewco's business and other facts that might reflect on its creditworthiness? A: I believe that this inquiry wasn't made, because Enron was buying a half of a pool of assets, and this was represented to us as a fair transaction, so we relied upon management's representations."); Duncan Sworn Statement, at 97.

[674] Skilling 11/4/01 SEC Testimony, at 83.

[675] Lay 1/16/02 Wilmer Cutler Interview, at 5.

[676] Lay In-Person Interview.

Skilling, there is no indication in the evidence reviewed by the Examiner to explain why

Skilling apparently failed to inform the Board of Kopper's involvement.[677]

---

[677] There were other Enron officers and employees present at the Executive Committee meeting who, if they knew about Kopper's involvement, also failed to tell the committee members. The minutes show that Fastow, Derrick, William D. Gathmann, Steven J. Kean, Mark E. Koenig, Richard S. Shapiro and Thomas E. White were also present, in addition to Peggy B. Menchaca, the corporate secretary. 11/5/97 Executive Committee Minutes, at 1. Lay joined the meeting late, but before the presentation regarding Chewco. *Id.* The Examiner has not found any evidence that any of the officers or employees at the meeting, other than Skilling, Fastow and perhaps Derrick, knew about Kopper's involvement. Astin, a partner at Vinson & Elkins, testified that he believes he told Derrick in a voicemail prior to the meeting that Kopper was personally involved in Chewco. Sworn Statement of Ronald T. Astin, Partner, Vinson & Elkins, to Rebecca M. Lamberth, A&B, July 18, 2003, at 108; Sworn Statement of Ronald T. Astin, Partner, Vinson & Elkins, to Rebecca M. Lamberth, A&B, Aug. 12, 2003, at 146. Astin's time records reflect that he left a voice mail message for Derrick at that time. Vinson & Elkins Invoice No. 20019639, regarding Chewbacca-JEDI I, Nov. 20, 1997, at 2 [EVE 903549-EVE 903569]. Derrick testified that he did not recall knowing about Kopper's involvement. Sworn Statement of James V. Derrick, Jr., Vinson & Elkins, to Rebecca M. Lamberth, A&B, May 20, 2003, at 214-15.

## V. ANALYSIS OF EVIDENCE OF BREACH OF FIDUCIARY DUTIES BY LAY, SKILLING AND OUTSIDE DIRECTORS

As discussed in Annex 2 to this Appendix and Annex B (Legal Standards) to the Third Interim Report, officers and directors have fiduciary duties to the corporation and its shareholders, including duties of care and good faith. These duties require, among other things, that corporate fiduciaries make decisions on an informed basis, following a decision-making process that takes into consideration all material information reasonably available. Absent conflicts of interest on the part of the decision-makers, decisions made in good faith and on an informed basis generally will be protected by the business judgment rule and will not be subject to judicial second-guessing. However, a decision that lacks any rational business purpose will not be protected from judicial scrutiny by the business judgment rule and, if challenged, the decision-makers may be required to prove that their decision was fair to the corporation. Absent such proof of fairness, the decision-makers may be found to have breached their fiduciary duty of good faith if the evidence shows they made the decision in bad faith. The lack of a rational business purpose for the decision can support an inference of bad faith.

The fiduciary duties of officers and directors also require the exercise of diligence in overseeing the business and affairs of the corporation. Thus, officers and directors have a duty to monitor corporate affairs, as well as a duty to inquire into red flags indicating that potential problems exist within the corporation. A director who negligently fails to fulfill his or her duty of oversight, but who does not (i) abdicate his or her monitoring responsibilities, (ii) exhibit a conscious disregard for known risks, or (iii) otherwise fail to act in good faith, may be protected from liability to a corporation and its shareholders, if the corporation has adopted a director exculpation provision in its charter.

However, a director who is also an officer of the corporation is not protected by exculpation when acting in his or her capacity as an officer with respect to the duty of oversight or any other fiduciary duty.

**A.**    <u>**Duty to Make Informed Business Judgments**</u>

*Rhythms*

There is sufficient evidence for a fact-finder to conclude that Lay, Skilling and the Outside Directors who were members of the Board in June 1999 breached their fiduciary duty of good faith by authorizing Enron to enter into the Rhythms hedging transaction. Enron effectively paid significant value in a transaction in which it had no possibility of obtaining an economic return. If the value of the Rhythms stock did not decline below the strike price of the hedge, Enron would receive no payment from the hedge. If the Rhythms stock became worthless, the most Enron could receive upon settlement of the hedge was a return of one-half of the Enron stock (or the proceeds therefrom) that Enron itself had transferred to the hedging vehicle. Thus, according to the information provided to the Board when it approved the Rhythms transaction, Enron gave up stock valued at $234 million, and the most it could receive in return was one-half of that value plus payment under a $50 million promissory note. The transaction, therefore, had significant and tangible economic cost to Enron.

In addition, the transaction was designed to give Enron only a potential financial statement benefit. If the Rhythms stock declined and the hedging vehicle had sufficient credit capacity to offset the amount of the decline, Enron could avoid incurring a net charge to its reported earnings.

As a result, the transaction had no rational business purpose. Therefore, the business judgment rule will not protect from judicial scrutiny the Board's decision to authorize the transaction. There is evidence that Lay, Skilling and the Outside Directors who approved the Rhythms transaction were provided or otherwise had information that showed the transaction had no rational business purpose, and such lack of a rational business purpose supports an inference that these directors acted in bad faith by granting the transaction approval.

The Board members involved had been told that Enron could not obtain a hedge with a third party because the Rhythms investment was large, the stock price was volatile, and Enron was contractually prohibited from entering into a hedge. Thus, Enron structured a hedge with a counterparty that was controlled by its own CFO. Fastow's presentation of the transaction to the Board members informed them that Enron was giving up stock valued at $234 million, to receive a promissory note of $50 million and other "value" that was derived solely from the company's own stock. Even if the Board members believed that Enron was obtaining the full "Direct Value" of $165 million indicated in Fastow's presentation, nothing in that presentation explained why Enron would pay $234 million in exchange.

Fastow told the Board that PWC would render a fairness opinion on the transaction, but it had not been received at the time the Board approved the transaction. No representatives from PWC attended the meeting, and there also were no representatives from either Andersen or outside legal counsel present. Moreover, a PWC fairness opinion finding that what Enron received was fair in relationship to what it gave

- 156 -

up would not relieve Lay, Skilling or the Outside Directors of their obligations to assess the business purpose of the transaction.

Lay and Skilling, who were actively engaged in Enron's day-to-day business as its two most senior officers, had advance notice of the transaction. Evidence indicates that Skilling may have even participated in the planning stages, and that Lay, when presented with an explanation of the transaction, instructed his subordinates to "get it done." Both participated at the Board meeting by answering questions for the Outside Directors regarding the economic terms of the transaction. Skilling testified to the SEC that he understood the structure of the transaction, and so it is reasonable to infer that he knew the hedge provided no economic value to Enron. Lay told the Examiner that he knew a hedge that does not transfer economic risk is not a true hedge, but he stated that he believed there was sufficient outside investment in LJM1 to provide value to Enron. However, he could not recall ever learning the amount of that outside investment, which turned out to be only $16 million.

The Board members were aware that Enron was asking for authorization to enter into a transaction with a highly unusual conflict of interest. Yet, they granted the approval, implementing no internal controls on this transaction or other transactions that might be accomplished with LJM1. The Board gave its approval on short notice with little time to consider the consequences, even though there was no particular urgency expressed by management.

Moreover, if there were any material facts not known to the Board, it may have been because the process surrounding the meeting at which the Board granted its approval did not permit them to consider all the material information available. The

meeting was only one hour long with six significant items on the agenda for approval. It
was a special meeting held by telephone with at least two Outside Directors recalling less
than ideal conditions, and the Outside Directors received the information for the meeting
by facsimile on Friday evening for a Monday morning call. The proposed transaction
was not reviewed in advance by the Finance Committee, despite the fact that this was
Enron's typical practice.

*Raptors*

There is sufficient evidence for a fact-finder to conclude that Lay, Skilling and the
Outside Directors who were members of the Board in May through August 2000
breached their fiduciary duty of good faith by authorizing Enron to enter into three of the
Raptors hedging transactions. As with the Rhythms transaction, the Raptor hedges were
supported only by Enron's own stock and cash, which Enron itself had transferred to the
transaction structures. Thus, the Raptors hedges could produce no economic benefit to
Enron. Instead they were designed solely to provide Enron with a financial statement
benefit and had no rational business purpose. Therefore, the business judgment rule will
not protect from judicial scrutiny the Board's decision to authorize the transactions.

The lack of a rational business purpose supports an inference of bad faith, as with
the Rhythms transaction. There is evidence that Lay, Skilling and most of the members
of the Board in May through August 2000 were provided or otherwise had information
that showed the transactions had no rational business purpose.

In connection with Raptor I, which was approved in May 2000, Glisan told the
Finance Committee, with Lay and Skilling present, that the transaction did not transfer
economic risk, but was designed to eliminate volatility in Enron's income statement.

- 158 -

Glisan also gave the Finance Committee sufficient information for them to understand that Enron's stock and cash were the only assets supporting the value of the hedges. He told them that as Enron's stock price increased, the credit capacity supporting the hedge would increase. Winokur, Chair of the Finance committee, testified that he knew this also meant the converse – that the credit capacity supporting the hedge would also decline with any decline in Enron's stock price.

Glisan also showed the Finance Committee a structure chart that identified Enron's $41 million put payment, but he did not explain that the payment was designed to give the hedging vehicle the necessary cash to repay LJM2's investment. Glisan told the directors present at the meeting that Andersen was comfortable with the transaction, but he also stated that accounting scrutiny was a significant risk in the project.

When the Executive Committee and Finance Committee, respectively, approved Raptor II a month later and Raptor IV just two months after that, those directors were told that the structures were the same as Raptor I. In addition, Fastow made a presentation regarding Raptor II in which he told the Executive Committee that Raptor I could not be used to hedge any assets for six months. He apparently did not explain this restriction, because it resulted from the requirement that LJM2 receive a mandatory cash distribution before any hedges could be effected. Glisan has admitted that he knew Raptor I was structured so that the cash distribution would be a return of capital to LJM2, with Enron buying a put for no reason other than to provide the cash to make the distribution, and that he knew this structure caused Enron's accounting for the transaction to be in error. He also acknowledged that the transaction had no business purpose.

**B.    Duty to Monitor**

As discussed in Annex 2 to this Appendix, courts have generally been reluctant to impose liability on officers and directors for failing to monitor corporate affairs adequately, absent sustained inattention or abdication of duty.    Courts have acknowledged that actively engaged boards of directors and executive officers will not always be able to detect and prevent misconduct occurring within the corporation. Although the monitoring activity of Lay, Skilling and the Outside Directors is subject to criticism, it does not appear to constitute either sustained inattention or abdication of duty.

*Lay and Skilling*

The evidence shows that Lay and Skilling were actively involved in the day-to-day financial and other affairs of Enron.  Lay served as CEO and Chairman of Enron from 1986 until February 2001. Skilling was COO for most of that time, being promoted to CEO in February 2001.  At Enron, the CEO and COO shared the duties of the Office of the Chairman.

As the top officers in the company, Lay and Skilling met weekly with the other senior management, they were involved in numerous areas of review and approval of business opportunities and transactions, and they shared administrative responsibilities. They had a division of duties between them, with Lay taking more of an interest in international operations and Skilling more involved in other operational areas, like broadband.  However, they worked closely together and also worked closely with the Board, setting agendas for meetings and conducting pre-meeting agenda reviews with other senior management.

With respect to financial affairs, they were both involved in the annual budgeting process, and they regularly monitored the financial performance of the company. They met throughout the quarter with appropriate personnel to get reports on capital investments and estimates on other performance measures. They helped allocate resources at the end of each quarter to meet earnings expectations. Skilling always reviewed the quarterly and annual SEC filings, including the disclosures; Lay also reviewed portions of these filings. Both regularly participated in road shows regarding the company's projects and met with rating agencies, and Skilling regularly met with lenders. Both Lay and Skilling met regularly with the Executive Committee, where significant projects were discussed and approved; with the Finance Committee, where there were detailed reviews of the company's financing needs and structures designed to meet those needs; and with the Audit Committee, which reviewed Enron's financial statements and had numerous discussions with Andersen about the company's financial disclosures.

*Outside Directors*

The evidence shows that Enron's Board appeared to be engaged in monitoring the SPE transactions and did not abdicate this responsibility. The Board, the Finance Committee and the Audit Committee met frequently and received voluminous information and detailed reports. There is evidence that the Outside Directors spent a reasonable number of hours focused on Enron's financing activities. The Audit Committee met frequently with Andersen and consistently received favorable reports from the auditors.

The actions of the Outside Directors were not without flaws, however. For example, the Finance Committee appears to have done little review of Enron's debt maturity schedules, and the Outside Directors appear to have had little knowledge of the true size of Enron's total obligations. Enron's management often used confusing terminology in reports to the Board, but the Outside Directors appear to have allowed this to happen without insisting on clearer and more precise definitions and descriptions.

The Outside Directors likely deserve the most criticism for the flaws in their monitoring of Enron's transactions with LJM2 and Fastow's compensation from that entity. The Outside Directors implemented few controls to ensure fairness to Enron, did little to follow up on those controls, and took almost no action to monitor Fastow's compensation. While this record of monitoring the relationship between Enron and LJM2 is less than desirable, the Outside Directors took enough actions that their conduct likely is not properly characterized as sustained inattention or abdication of their monitoring responsibility.

## C. Duty to Inquire

As discussed in Annex 2 to this Appendix, when indications, or "red flags," of potential problems arise within a corporation, its officers and directors have an affirmative duty to respond to those red flags by making further inquiry. A negligent failure to recognize and respond to red flags breaches this duty. However, when director exculpation applies, as in the case of Enron, the actions of the directors must involve a knowing violation of law or amount to intentional misconduct or conduct not in good faith in order to establish liability. Courts have concluded that a conscious disregard of known risks will constitute a lack of good faith.

Directors who are also officers, however, are not entitled to exculpation when acting in their capacities as officers; rather, they are subject to a negligence standard. Moreover, because of their positions, they have greater occasion to encounter red flags and, correspondingly, more responsibility for recognizing and responding to red flags.

*Red Flags Regarding SPE Transactions Generally*

Enron's SPE transactions created certain red flags that, had the Outside Directors recognized them and responded, might have caused them to know that the Senior Officers were misusing the transactions to disseminate materially misleading financial information. This failure to recognize or respond to red flags by the Outside Directors, who necessarily could not have a detailed knowledge of the day-to-day operations of the company, is subject to criticism. However, none of the evidence available to the Examiner indicates that the Outside Directors had actual knowledge that the Senior Officers were using the SPE transactions in a manner that violated law. In addition, the available evidence is not sufficient for a fact-finder to conclude that any of the Outside Directors acted with a conscious disregard for known risks in failing to recognize or respond to the red flags.

Lay and Skilling, however, as a result of their day-to-day involvement at the company, knew or should have known that their subordinate officers misused the SPE transactions, and it is reasonable to infer that Lay and Skilling knew or should have known that such misuse resulted in the dissemination of materially misleading financial information. The evidence available to the Examiner, and the reasonable inferences that may be drawn from that evidence, are sufficient to support a finding that Lay and Skilling were at least negligent in not responding to the red flags.

Those red flags included:

- Enron's ability to obtain large amounts of cash and financing through means other than incurring debt or issuing equity, with significantly disproportionate amounts of reported cash flows from operations being generated at the end of each accounting year.

Lay and Skilling were aware of Enron's intense focus on generating large amounts of cash flows from operations, including for purposes of matching its cash flows to its mark-to-market earnings. They were also aware of the significant amounts of capital investments Enron made each year, exceeding its annual capital budgets by $5 billion in 1998, almost $4 billion in 1999, and over $2 billion in 2000. This spending had to be funded, and with sources of financing not identified when budgets were set.

Enron obtained a disproportionately large amount of this financing at year end. In each of 1998, 1999 and 2000, Enron generated all or almost all of its reported cash flows from operations in the fourth quarter. With the company's strong bias against using debt or equity to obtain financing, and the difficulty the company had in selling assets quickly and efficiently, it had to raise much of this financing through the use of the SPE transactions, including SPE transactions with related parties like LJM2.

- The significant volume of highly unusual SPE transactions, and information presented to Lay and Skilling by Enron's officers, including the CFO and the Treasurer, indicating the SPE transactions were in substance different from the manner in which they were being accounted for and disclosed.

The six accounting techniques employed by Enron in certain of its SPE transactions accounted for significant amounts of the company's reported cash flows and earnings. In 2000, they constituted more than 100% of the company's net reported cash flows from operations, and almost one-third of its IBIT.

Fastow, McMahon and other officers routinely provided detailed information at Finance Committee meetings, which Lay and Skilling always attended, regarding Enron's capital structure. This information often included descriptions or characterizations of the SPE transactions that indicated they were being accounted for and disclosed in a manner inconsistent with their substance. For example, on one occasion Fastow referred to Prepay Transactions as "Debt Classified as Non-Debt Liabilities," and he often included them on lists of financings rather than commodity sales. Similarly, there were numerous references to FAS 140 Transactions such as their having maturity dates and not shifting risk to the buyers, concepts that were inconsistent with the "true sales" of assets that Enron considered the FAS 140 Transactions to accomplish.

- Reports from Andersen and Enron's CFO that Enron had a heavy dependence on SPE transactions that required a high level of accounting and disclosure judgment, and for which accounting rules changed often.

Andersen routinely told the Audit Committee, at meetings attended by Lay and Skilling, that "complex accounting for structured transactions" was one of the company's "high priority financial reporting risk areas."[678] Fastow told the Finance Committee, with Lay and Skilling present, that accounting for the SPE transactions was a major issue for 2000, because of the company's heavy reliance on those transactions and the volatility of the accounting rules.

---

[678] Materials from Enron Audit Committee Meeting, May 1, 2000 (the "5/1/00 Audit Committee Materials"), at AB0246 01579 (quoting from an Andersen presentation, capitalization omitted) [AB0246 01569-AB0246 01600]; Materials from Enron Audit Committee Meeting, Apr. 30, 2001 (the "4/30/01 Audit Committee Materials"), at AB0246 01925 [AB0246 01882-AB0246 01925].

*Red Flags Regarding LJM2*

Skilling also failed to respond to red flags created by Fastow's involvement with LJM2, where the conflict of interest created a heightened risk for Enron. These red flags included: (i) attempts to obtain Skilling's approval of transactions between Enron and LJM2; (ii) indications that both sides of the transactions were being negotiated by Enron employees, all of whom reported to Fastow; and (iii) the Finance Committee being told in Skilling's presence that Skilling was reviewing Fastow's compensation from LJM2.

*Approval.* The Finance Committee expected Skilling to review and approve all transactions between Enron and LJM2, having been told by Fastow, with Skilling present, that this was the case. In addition, subordinate officers expected at least Skilling to approve the transactions between Enron and LJM2. The legal department at Enron had developed procedures to ensure that the transactions were completed on an arm's length basis, which included a separate approval sheet requiring the signature of either Lay or Skilling. Despite efforts by legal counsel to meet with Skilling to discuss the matter, Skilling testified that he was never responsible for approving those transactions. Of eighteen LJM transaction approval sheets collected in the fall of 2001, Skilling had signed three and Lay had signed only one.

*Negotiation.* At least some of the LJM transaction approval sheets indicated that Enron employees were negotiating the deals against each other, and in the spring of 2000 McMahon complained to Skilling about this conflict.

*Compensation.* Skilling took essentially no action to inquire about the amount of compensation that Fastow was receiving from LJM2. Skilling obtained conceptual

information about compensation from Fastow on two occasions, but he never simply asked Fastow for the details of his compensation from LJM2.

### D.     Duty of Candor

As an agent of the corporation, an officer has a duty to disclose to the board of directors information material to the board's ability to make an informed decision.[679] There is evidence with respect to the Chewco transaction that at least Skilling knew that Kopper controlled and had a personal financial interest in the Chewco partnership, a fact Skilling did not disclose to the Board when it approved the transaction.  Although none of the other Board members asked for the identity of the debtor for whom they approved a $383 million guaranty, Skilling's failure to disclose the material fact that the transaction involved a conflict of interest involving an Enron officer is evidence that Skilling breached his fiduciary duty.

---

[679] *See Potter v. Pohlad*, 560 N.W.2d 389, 394 (Minn. Ct. App. 1997) ("We agree that officers, as agents of the corporation, have an obligation to disclose information material to the board's ability to make an informed decision regarding major acquisitions."); *Science Accessories Corp. v. Summagraphics Corp.*, 425 A.2d 957, 962 (Del. 1980) (An agent has a "duty to disclose information that is relevant to the affairs of the agency entrusted to him."  This duty "carr[ies] over into the field of corporate employment so as to apply not only to officers and directors but also to key managerial personnel.") (citations omitted).

## VI.   DEFENSES

### A.   <u>Reliance on Officers</u>

*Outside Directors*

A director "is entitled to rely on information, opinions, reports or statements including financial statements and other financial data if prepared or presented by: (a) one or more officers or employees of the corporation whom the director reasonably believes to be reliable and competent in the matters presented . . . ."[680]  The Outside Directors may contend that they reasonably relied on the presentations and recommendations of management in deciding to approve the Rhythms transaction and Raptors I, II and IV.  In so doing, they would contend that they could not have acted in bad faith.

The evidence indicates that senior management of Enron, knowledgeable in the matters presented, recommended that the Board approve each of these transactions.  The evidence suggests that the Board relied, at least in part, on these recommendations in approving the transactions.  Thus, the Outside Directors would likely be able to establish these elements of this defense.

In order to prevail on the defense, however, the Outside Directors must also show that their reliance on the recommendations of senior management was reasonable.  A director does not act in good faith if he or she is aware of facts or circumstances concerning the matter in question that render reliance on such information, opinions,

---

[680]  Or. Rev. Stat. § 60.357(2)(a); Third Interim Report, Appendix B (Legal Standards), at 7.

reports or statements unwarranted.[681]  A director is not entitled to rely on information,

opinions, reports or statements "when the director has actual knowledge that makes (or

has a measure of knowledge that would cause a person, in a like position under similar

circumstances, to undertake reasonable inquiry that would lead to information making)

reliance unwarranted."[682]

As described above in this Appendix, the Board (or the relevant committees of the

Board with respect to the Raptors) was presented with information indicating that these

transactions constituted non-economic hedges in which Enron would transfer substantial

value in exchange for financial statement benefits only.   All of these transactions

involved doing business with entities managed by the company's CFO, who was among

the management group recommending approval of the transactions.  A fact-finder could

conclude that the information actually presented to the Outside Directors, either on its

face, or coupled with additional knowledge after reasonable inquiry, caused reliance by

the Outside Directors on the recommendations of management to be unwarranted.

*Lay and Skilling*

As officers, Lay and Skilling were also entitled to rely on information prepared or

presented by "[o]ne or more officers or employees of the corporation whom the officer

reasonably believes to be reliable and competent in the matters presented . . . ."[683]  Lay

and Skilling may also assert that they relied on information provided to them by other

senior officers of the company in acting or failing to act as described above in this

Appendix with respect to recommendation and approval of the Rhythms and Raptor

---

[681] Or. Rev. Stat. § 60.357(3).

[682] 2 ABA Model Bus. Corp. Act Ann. § 8.30 Official cmt. at 8-164.

[683] Or. Rev. Stat. § 60.377(2)(a).

transactions, the monitoring of transactions with LJM1 and LJM2, and their response to various red flags concerning the company's SPE transactions.

Given the size and complexity of Enron, even the two most senior officers could not have possessed complete information about all aspects of the company's operations, and it is reasonable that Lay and Skilling would have relied on other officers and employees of the company to report on important matters and issues within their respective areas. The evidence suggests that, although the SPE transactions became an increasingly important part of Enron's business in the years leading up to the bankruptcy, there were nevertheless areas of the business (for example, international and broadband) that also required the attention of Lay and Skilling. Thus, they may contend, and likely will be able to produce evidence that, being in charge of a large, complex company, they were responsible for its many different areas of operations, necessarily relied on other officers and employees to keep them informed of significant developments, and, thus, were entitled to rely on information provided by those officers.

As with the Outside Directors, Lay and Skilling must also show, however, that their reliance was reasonable. In particular, an officer does not act in good faith if he or she is aware of facts or circumstances concerning the matter in question that renders reliance on such information, opinions, reports or statements unwarranted.[684] Given the depth of information, described above in this Appendix, that was available to Lay and Skilling concerning the Rhythms and Raptors transactions, other transactions with LJM1 and LJM2, and the SPE transactions, and given the evidence of Lay and Skilling's active involvement in Enron's financial matters, a fact-finder could conclude that reliance by

---

[684] *Id.* at § 60.377(3).

- 170 -

Lay and Skilling on information provided by other officers and employees was unwarranted.

**B.    Reliance on Professionals**

*Outside Directors*

A director is also entitled to rely on information provided by "[l]egal counsel, public accountants or other persons as to matters the director reasonably believes are in the person's professional or expert competence. . . ."[685] With respect to the approval of the Rhythms transaction, the Outside Directors may contend that they relied on PWC's fairness opinion and on Andersen's approval of the accounting for the transaction. With respect to Raptors I, II and IV, the Outside Directors may contend that they relied, at least in part, on Andersen's approval of the accounting for the transactions.

The minutes for the June 28, 1999 Board meeting at which the Rhythms transaction was presented and approved do not reflect any attendance by Andersen representatives or any mention of Andersen's view of the transaction. Some of the Outside Directors nevertheless testified that they recalled being informed, or at least having the impression, that Andersen had approved the accounting for the transaction. With respect to the PWC fairness opinion, the minutes reflect that the Board was told that such an opinion would be forthcoming. However, management did not provide the directors with a copy of the opinion, even in draft form, and no PWC representative attended the meeting.

At the Finance Committee presentation on Raptor I, Causey stated that Andersen had spent considerable time analyzing the structure and was comfortable with the

---

[685]  *Id.* at § 60.357(2)(b).

transaction. There is no evidence that this information was provided to the Board when it approved Raptor I, nor is there any evidence that Andersen's view was communicated to the Executive Committee when it approved Raptor II or to the Board when it approved Raptor IV.

Thus, there is no clear and consistent evidence that the Board was informed of Andersen's accounting views or the details of the PWC fairness opinion. Nevertheless, it is reasonable to infer that the Board actually relied on Andersen's approval of the accounting for these transactions and on the PWC fairness opinion they were told would be forthcoming.

Even if the Outside Directors succeeded in establishing actual reliance, however, they would also have to show that such reliance was reasonable. The evidence may support a finding that the Outside Directors reasonably relied on Andersen to determine the proper GAAP accounting for these transactions and that they reasonably relied on PWC to determine the fairness of the Rhythms transaction from Enron's point of view. However, it is not clear that reliance on such professionals eliminated the Board's obligation to determine whether the transactions had a rational business purpose. In light of the information the Outside Directors actually had about the transactions, whether the Board could reasonably rely on Andersen or PWC to make a determination on this issue, even had these professional firms undertaken to do so, would raise an issue of fact for the fact-finder.

*Lay and Skilling*

Lay and Skilling may contend that they relied on a number of highly qualified professionals, including Enron officers who were accountants and lawyers, Andersen,

Vinson & Elkins and other outside lawyers, to reach proper judgments about the accounting for and disclosure of the various SPE transactions. Neither Lay nor Skilling held any professional degrees or certifications in the areas of accounting or law. However, they were both experienced in corporate matters and were deeply involved in, and knowledgeable about, many aspects of the company's operations, including Enron's SPE transactions and related matters, as described above in this Appendix. Based on this evidence, along with evidence suggesting that Enron's inside professionals were not always candid with senior management and did not always provide the company's outside professionals with complete and accurate information concerning the transactions,[686] the Examiner believes that the reasonableness of any reliance by Lay and Skilling on such professionals is a question of fact for resolution by the fact-finder.

### C.   Reliance on Committees of the Board

A director is also entitled to rely on information and reports provided by a committee of the board if the director reasonably believes the committee merits confidence.[687]

The Rhythms transaction was presented directly to the Board and was not reviewed by any committee in advance. However, Raptors I and IV were first presented to the Finance Committee, which then recommended the transactions to the full Board for approval. The Executive Committee alone approved the formation of Raptor II. In each

---

[686] *See* Second Interim Report, Appendix C (Role of Enron's Officers).

[687] Or. Rev. Stat. § 60.357(2)(c).

instance, important details about the transaction were provided to the committee but not to the Board. In Raptors I and IV, the Board acted largely on the recommendation of the Finance Committee, and in Raptor II the Board did not act at all.

The directors who were not present in the three committee meetings in which Raptors I, II and IV were presented may argue that they should have no liability as Board members for approving the transactions, because they had a right to rely on the recommendations of the Finance Committee as to Raptors I and IV, and because they made no decision on Raptor II. Thirteen of the Board members, however, heard the presentations of one or more of the Raptor transactions at the committee level:

- Raptor I – Finance Committee Meeting: Lay, Skilling, Winokur, Belfer, Blake, Savage, Duncan and Harrison.

- Raptor II – Executive Committee Meeting: Lay, Skilling, Duncan, Belfer, LeMaistre and Winokur.

- Raptor IV – Finance Committee Meeting: Lay, Skilling, Winokur, Belfer, Blake, Chan, Jaedicke, LeMaistre, Meyer, Pereira, Savage, Urquhart, Gramm, Harrison and Mendelsohn.

Only directors Wakeham and Mark-Jusbasche were not present at any of these committee presentations. Thus, they are the only directors who did not hear the facts of the transaction as described to the committees, did not have the opportunity to raise questions or seek additional information from the presenters.

### D. __Good Faith__

Lay, Skilling and the Outside Directors may contend that even if a particular transaction lacked a rational business purpose, that would simply vitiate the protection of the business judgment rule and would not automatically constitute an act of bad faith.

- 174 -

However, bad faith can be inferred from the lack of a rational business purpose.[688] The directors would be permitted to introduce evidence to support their claim that they acted in good faith, and the fact-finder would resolve the conflicting evidence, including inferences therefrom, in reaching a decision.

### E.    Exculpation and Indemnity

As discussed in Appendix B (Legal Standards) to the Third Interim Report, Oregon law contains a so-called director "exculpation" statute that permits an Oregon corporation to include in its articles of incorporation a provision that eliminates or limits the personal liability of directors to the corporation or its shareholders for monetary damages for certain conduct as a director.[689]

Consistent with this statute, Enron's articles of incorporation provide that a director shall not be personally liable to Enron or its shareholders for monetary damages for conduct as a director except for liability for, among other things, "acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law."[690] This director exculpation provision will likely apply to any claim by the company or its shareholders against the Outside Directors alleging breach of fiduciary duty.[691] Thus, the Outside Directors may assert exculpation in defense of any such claim,

---

[688] See Third Interim Report, Appendix B (Legal Standards), at 17-20; Annex 2 (Legal Standards) to this Appendix, at 6.

[689] Or. Rev. Stat. § 60.047(2)(d).

[690] Section A, Article VII, Articles of Incorporation of Enron.

[691] Under certain circumstances, the courts have held that the fiduciary duties of a board to the corporation and to its shareholders may expand to include fiduciary duties to creditors. The more recent decisions in the area find that upon the corporation's insolvency (or when the corporation is within the "zone of insolvency"), the board of directors must manage the corporation in a manner consistent with the interests of creditors (and, potentially, shareholders as well). Certain courts have recognized the standing of creditors (and, in certain cases, bankruptcy trustees as the representative of creditors) to initiate litigation against directors to recover damages for the breach of the fiduciary duty to creditors. These cases typically involve situations where the directors have breached their duty of loyalty (such as preferring themselves).

- 175 -

and they would be exculpated for any of their actions that were taken in good faith.
Thus, if a fact-finder were to conclude that the Outside Directors acted in bad faith in
approving the Rhythms and Raptors transactions, exculpation would not protect them
from related claims.

Enron's director exculpation provision would not be available to Lay and Skilling
as a defense to claims by the company or its shareholders for breach of their duties as
officers, because by its terms, the exculpation provision does not extend to officers.[692]

Under certain circumstances, directors and officers of Oregon corporations can be
entitled to indemnification from the corporation with respect to claims made against them
in their capacities as directors or officers.[693]  However, such claims may be subject to
disallowance pursuant to Section 502(e)(1)(B) of the Bankruptcy Code.[694]  An officer or

---

Other courts have held that claims of this sort are individual or personal claims, which a trustee or debtor in possession does not have standing to assert. Ultimately, the law of the state of incorporation should govern these types of claims and the law in Oregon is not fully developed on this particular set of issues. Accordingly, individual creditors and/or the Debtors (in their capacity as debtors in possession and representatives of the estates) may be able to state a claim against the Enron Board in connection with certain decisions made by the Enron Board while Enron was insolvent. One aspect of that litigation may be the ability of the plaintiff in the litigation to take the position that the director exculpation provision in Enron's articles of incorporation does not apply to the plaintiff (suing on behalf of the creditors) and, potentially, that the so-called business judgment rule does not apply. The Examiner has analyzed the conduct of the Enron Board under the assumption that the director exculpation provision contained in Enron's articles of incorporation and the business judgment rule would apply. If, and to the extent, litigation were brought by a plaintiff with standing (be that the debtor in possession, a litigation trustee appointed under the terms of the Debtors' proposed Joint Plan or an individual creditor), the conduct of the Enron Board may be subject to review without consideration of these doctrines.

[692] Section A, Article VII, Articles of Incorporation of Enron.

[693] Third Interim Report, Appendix B (Legal Standards).

[694] Any claim filed for mandatory indemnification by a member of the Board may be subject to disallowance under the terms of 11 U.S.C § 502(e)(1)(B) and the cases thereunder. *See In re Drexel Burnham Lambert Group, Inc.*, 148 B.R. 982, 985-93 (Bankr. S.D.N.Y. 1992) (disallowing contingent contractual claims for indemnification); *In re Wedtech Corp.*, 85 B.R. 285 (Bankr. S.D.N.Y. 1988) (recognizing that the concept of reimbursement under Section 502(e)(1)(B) would include indemnity claims). If, and to the extent that, members of the Enron Board filed proofs of claim in respect of the mandatory indemnification provisions of the articles of incorporation, or pursuant to any contractual provisions regarding indemnification, the Debtors and the Committee may seek disallowance of those claims, to the extent contingent, under Section 502(e)(1)(B).

director's right of indemnification would not, however, provide relief from, or alter the

liability standard for, any claims brought by the company against such officer or

director.[695]

---

[695] Third Interim Report, Appendix B (Legal Standards).

## VII.  CONCLUSIONS

Acting in their capacities as directors, Lay, Skilling and the Outside Directors authorized Enron to enter into the Rhythms hedge and three of the Raptors hedges, none of which had a rational business purpose.  In these transactions, Enron transferred substantial value for non-economic hedges, meaning the value of each hedge to Enron was based solely on the value of securities and cash that Enron itself had transferred to the hedging vehicles, providing Enron no economic value but only a financial statement benefit.  There is evidence that Lay, Skilling and the Outside Directors were aware of facts demonstrating this lack of rational business purpose.  From this evidence, an inference can be drawn that they acted in bad faith by approving the transactions and, therefore, breached their fiduciary duties of good faith.

With respect to their duty to exercise diligence in overseeing the business and affairs of the company, the evidence is sufficient to show that Lay, Skilling and the Outside Directors were actively engaged in performing their monitoring functions.  Lay and Skilling were hands-on managers involved in the daily operation of Enron's business.  The Outside Directors on the Board and its committees were not involved in the day-to-day operations, but they were generally engaged in activities designed to fulfill their supervisory roles.

However, the evidence also shows that, in light of their day-to-day involvement at the company, Lay and Skilling knew or should have known their subordinate officers misused the SPE transactions in a manner that resulted in the dissemination of materially misleading financial information.  Both Lay and Skilling failed to respond to indications of potential problems related to the use of SPE transactions.  In addition, Skilling failed

to respond to red flags regarding the SPE transactions that Enron entered into with LJM1 and LJM2. By failing to respond to such red flags, Lay and Skilling were at least negligent and, therefore, breached their fiduciary duties as officers.

The Outside Directors, however, may not have recognized the same red flags as indicators of the wrongful conduct of the Senior Officers. They did not have the intimate knowledge of Enron's day-to-day operations that Lay and Skilling shared. Although the Outside Directors may be criticized for failing to inquire about aspects of Enron's financing activities that might have led them to knowledge of the Senior Officers' wrongful conduct, the evidence does not support a conclusion that the Outside Directors acted in bad faith or with a conscious disregard for known risks in failing to recognize and respond to red flags.

As discussed in the Second Interim Report, the use and disclosure of Enron's SPE transactions resulted in the dissemination of financial information known by the Senior Officers to be materially misleading. This wrongful conduct caused direct and foreseeable harm to Enron, and resulted in harm to innocent parties that dealt with Enron, including certain creditors in the Bankruptcy Case.

There is also evidence showing that, between May 1999 and October 2001, Lay borrowed from Enron and repaid using shares of his Enron stock a total of over $94 million. In May 1999, Skilling repaid approximately $2 million of a loan from Enron with shares of his Enron stock. The Compensation Committee, which had granted approval for the repayments, did not have authority under Oregon law to authorize Enron to repurchase its stock. Because the Board neither approved, nor apparently ratified the Compensation Committee's approval of the repayments by Lay and Skilling, the

evidence is sufficient for a fact-finder to conclude that such repayments are voidable at the election of Enron. Upon such event: (i) Enron would return to Lay 2,131,282 shares of common stock, and Lay would be liable to repay loans in the amount of $94,267,163 plus any applicable interest; and (ii) Enron would return to Skilling 26,425 shares of common stock, and Skilling would be liable to repay his loan in the amount of $2,000,042 plus any applicable interest.

# ATTACHMENT A

# BIOGRAPHIES OF OUTSIDE DIRECTORS

*Robert A. Belfer*

     Belfer has spent his professional career in the oil and gas business.  After earning an undergraduate degree from Columbia University in 1955 and a law degree from Harvard University in 1958, he joined Belco Petroleum Company ("BPC"), which was founded by his father[1] and went public in 1959.[2]  Belfer became CEO of BPC around 1983, and he continued in its management after its acquisition by InterNorth Inc. around the same time.[3]  He left BPC in 1986 and was self-employed as an investment manager until 1992, when he formed a company called Belco Oil & Gas Company ("BOGC").[4]  BOGC went public in 1996[5] and, in August 2001, it merged with Westport Resources, a Denver-based independent exploration and production company.[6]  Belfer continues to serve as a director of the merged entity.[7]

     Belfer joined the board of directors of InterNorth at the time that it acquired BPC in 1983.[8]  After InterNorth merged with HNG, he continued on the Board and, thus, became a director of Enron.  During 1985 until around 1998, he was also a director of NacRE Corporation, a reinsurance company, where he served on the finance and investment committees.[9]  He has also served on the boards of directors or boards of trustees of several charitable organizations, including Weil Cornell College of Medicine, Albert Einstein College of Medicine, the American Jewish Committee and The Kennedy School.[10]

*Norman P. Blake, Jr.*

     Blake earned bachelor's and master's degrees in international relations and international economics from Purdue University, and that university has also awarded him an honorary doctorate.[11]  He spent much of his professional career at General

---

[1]  Belfer Sworn Statement, at 6.

[2]  *Id.* at 10.

[3]  *Id.* at 7-8.

[4]  *Id.* at 8.

[5]  *Id.* at 16-17.

[6]  *Id.* at 15.

[7]  *Id.* at 15-16.

[8]  *Id.* at 15.

[9]  *Id.* at 28.

[10]  *Id.* at 28-29.

[11]  Blake Sworn Statement, at 4.

Electric Company ("GE"), serving in various senior management positions responsible for strategic and operational planning.[12]  In the mid-1970s, he reported to Jack Welch at GE as a staff executive for strategic planning and business development operations for the consumer products and services sector.[13]

In 1984, Blake left GE to accept the position as president, chairman and CEO of Heller Financial.[14]  In 1990, he moved to USF&G, an insurance company headquartered in Baltimore, to be its president, chairman and CEO.[15]  When USF&G merged with the St. Paul Companies in 1998, Blake left to become president, chairman and CEO of Promus Hotels, a position he held until that company merged with Hilton Hotels in 2000.[16]  In January 2000, Blake became the CEO of the U.S. Olympic Committee and served in that capacity for approximately nine months.[17]  In February 2001, Blake became president, chairman and CEO of Comdisco, Inc., a position he held until the company emerged from bankruptcy protection in August 2001.[18]

Blake joined Enron's Board in 1994 at the invitation of Lay.  A director on the board of USF&G, who served while Blake was at the helm of that company, introduced Blake and Lay for the specific purpose of permitting Lay to consider Blake for a position on the Board.[19]  When he joined the Board, Blake served for one year on the Audit Committee at Lay's request.[20]  Lay then asked him to move to the Compensation Committee and later to the Finance Committee.[21]  Blake's experience as a director included serving on an internal board at GE, as well as the boards of directors of all of the companies for which he served as chairman and CEO.[22]  In addition, while he served on Enron's Board, he also served as an outside director of Owens-Corning, sitting on its audit committee and its financial restructuring committee.[23]

*Ronnie C. Chan*

Chan, a native of Hong Kong, studied and lived in the U.S. for a number of years. Immediately upon earning a master's degree in biology from California State University

---

[12] *Id.* at 5-8.

[13] *Id.* at 6-7.

[14] *Id.* at 7.

[15] *Id.*

[16] *Id.* at 7-8.

[17] *Id.* at 8.

[18] *Id.*

[19] *Id.* at 12.

[20] *Id.* at 26.

[21] *Id.* at 27.

[22] *Id.* at 9-10.

[23] *Id.* at 10.

in Los Angeles, he began work on a master's degree in business, which he received from the University of Southern California.[24] He lived in California from 1967 to 1985, except for two years, 1981 to 1983, when he returned to Hong Kong.[25] He has resided continuously in Hong Kong since 1985.[26]

His primary business activity is serving as chairman of the board of a group of companies owned by a holding company called Hang Lung Group, Ltd.[27] This holding company develops and rents real property and is publicly traded in Hong Kong, although Chan's family trust is a significant shareholder.[28] Chan also has an affiliation with the Morningside/Springfield Group, a private company run by Chan's brother, that buys and manages mature-stage companies.[29]

Chan joined Enron's Board in 1996 at Lay's invitation.[30] According to Chan, he became known to Lay because of his publications and speeches relating to Asia's economic and political development.[31] Chan and Lay served together on the Council of the World Economic Forum that holds an annual world economic conference in Davos, Switzerland.[32]

*John H. Duncan*

Duncan graduated from the University of Texas at Austin in 1949 with a bachelor's degree in business administration.[33] He worked in his family's coffee business from 1949 to 1958, except for a period of time when he was an Air Force Second Lieutenant during the Korean War.[34] In 1958, along with a partner, he started Gulf + Western Industries.[35] Duncan was President of Gulf + Western Industries when it became a conglomerate in the 1960s.[36] Some of the more well known subsidiaries of the company included Paramount Pictures, Simon & Shuster and Prentice Hall.[37] The

---

[24] Chan Sworn Statement, at 5-6.

[25] *Id.* at 4-5.

[26] *Id.* at 4.

[27] *Id.* at 6.

[28] *Id.* at 9-10.

[29] *Id.* at 6-7.

[30] *Id.* at 11.

[31] *Id.* at 12.

[32] *Id.*

[33] Duncan Sworn Statement, at 6.

[34] *Id.*

[35] *Id.* at 6-7.

[36] *Id.* at 7-8.

[37] *Id.* at 8.

company relocated to New York and Duncan decided not to move with the company.[38] Instead, he relinquished the position of President and became Chairman of the Executive Committee, where he served until 1982.[39]   Duncan has been a private investor since 1982.[40]   Duncan joined the Board of Enron's predecessor, HNG, in 1968.[41]

### Joseph H. Foy

After attending the Georgia Institute of Technology and being commissioned as an ensign in the Naval Reserve, Foy received a J.D. from Vanderbilt University.[42]   After law school, Foy moved to San Angelo, Texas and practiced law until 1965, when he joined HNG as Vice President and General Counsel.[43]   Foy became Vice Chairman of HNG in 1973, and became President and CEO in 1974.[44]   He left HNG in 1980 and joined the law firm of Bracewell & Patterson as a senior partner.[45]   He retired from the practice of law in 1993.[46]

Foy joined the board of HNG in 1970 while an employee of the company,[47] and he was elected to the Enron Board after the merger with InterNorth in 1984.[48]   Foy was on the Board when it decided to hire Lay as Chairman and CEO.[49]

### Wendy L. Gramm

Gramm holds a Ph.D. in economics from Northwestern University.[50]   In 1988, she was appointed to be Chair of the Commodity Futures Trading Commission ("CFTC"), a position that she described as requiring her to play a policy-making and decision-making role relying on an experienced and knowledgeable staff.[51]   Promptly after leaving the CFTC in 1993, she joined a number of boards of directors of for-profit corporations, including Enron, as well as several non-profit entities.[52]

---

[38] *Id.*

[39] *Id.*

[40] *Id.* at 10.

[41] *Id.* at 5; HNG 1984 Proxy Statement, at 2.

[42] Foy Sworn Statement, at 8-9.

[43] *Id.* at 9-10.

[44] *Id.* at 12.

[45] *Id.* at 12-13.

[46] *Id.* at 8.

[47] HNG 1984 Proxy Statement, at 3.

[48] Foy Sworn Statement, at 13.

[49] *Id.*

[50] Gramm Sworn Statement, at 7.

[51] *Id.* at 7-8, 14.

[52] *Id.* at 15-19; 32.

She had met Lay earlier in a "social context" at an Enron-hosted reception in connection with the Republican party, with which Gramm's husband, former Senator Phil Gramm, was affiliated.[53] When they met again at the Davos World Economic Forum in 1993, Lay initiated the process to invite Gramm onto the Enron Board.[54] She served on the Audit and Nominating Committees at Lay's suggestion.[55]

While serving on Enron's Board, Gramm also served as a director and audit committee member of IBP, Inc., a beef processing company that was acquired by Tyson Foods, Inc. in 2001.[56] She also served on the boards of State Farm Insurance Company and Invesco Mutual Funds.[57] In addition, she served and is still serving on the board of Longitude, Inc. which, according to Gramm, has "produced a new mechanism for trading derivatives" or "for producing derivative-type products."[58] That company apparently has a patent on certain software it developed that allows the trading of derivative instruments.[59]

With respect to non-profit corporations, Gramm is on the Board of Regents of the Texas A&M University system, as well as the boards of the Independent Women's Forum and the National Federation of Independent Business. In addition, she chairs the board of the Texas Public Policy Foundation.[60] In 1998, Gramm became a Distinguished Senior Fellow and Director of the Regulatory Studies Program at the Mercatus Center at George Mason University.[61]

*Ken L. Harrison*

Harrison was CEO of PGE when Enron acquired that company in 1997.[62] Harrison attended Oregon State University, receiving an undergraduate degree in science and math in 1964 and a master's degree in counseling psychology in 1966.[63] He started

---

[53] *Id.* at 9-10.

[54] *Id.* at 11-12.

[55] *Id.* at 33.

[56] *Id.* at 16-19; Tyson Foods, Inc. Form 8-K filed with the SEC on Sept. 28, 2001. She also served on the compensation and nominating committees of IBP, Inc. in addition to its audit committee. Gramm Sworn Statement, at 18-19.

[57] Gramm Sworn Statement, at 25, 27.

[58] *Id.* at 29.

[59] *Id.*

[60] *Id.* at 31-32.

[61] *Id.* at 6.

[62] Harrison Sworn Statement, at 13.

[63] *Id.* at 10.

his career at the predecessor to First Interstate Bank in Oregon, working as an analyst and money manager.[64] While working at the bank, he became a chartered financial analyst.[65]

In 1975, Harrison joined PGE as an assistant to the President, and became Vice President of Finance and Chief Financial Officer in 1980.[66] He was named President in 1986, and CEO in 1988.[67] After Enron acquired PGE in 1997, Harrison continued to serve as CEO and Chairman of PGE, and joined the Enron Board as a director.[68]

Harrison has served on the boards of Sprouse-Reitz stores, United Savings Bank, and several private start-up companies.[69] His community involvement has included serving as chairman of the Oregon Business Council and chairman of the Oregon Independent Colleges Foundation.[70]

*Robert K. Jaedicke*

Jaedicke's professional career was spent primarily in the field of academia. After earning a bachelor's degree in business administration in 1952, and an M.B.A. in 1953, both at the University of Washington in Seattle, Jaedicke earned a Ph.D. in business administration at the University of Minnesota in 1957.[71] He then went on to teach accounting courses at Harvard University and at Stanford University.[72] In 1983, Jaedicke became Dean of the Stanford University School of Business, where he served for seven years.[73] After two years of taking leave and handling certain special projects at the university, he was named Dean Emeritus in 1992.[74]

Jaedicke has published extensively on the topic of accounting. He testified that he has published approximately twenty articles in accounting journals,[75] and he has co-authored a number of textbooks and research collections, including a book called "Accounting Flows, Cash, Funds, Income," and one called "Quantitative Methods for Business Decisions."[76] Jaedicke passed the certified public accountant's exam and, for a

---

[64] *Id.*

[65] *Id.*

[66] *Id.* at 12-13.

[67] *Id.* at 13, 18.

[68] *Id.* at 18, 22.

[69] *Id.* at 18.

[70] *Id.* at 57.

[71] Jaedicke Sworn Statement, at 5-6.

[72] *Id.* at 6-9.

[73] *Id.* at 7; Stanford Graduate School of Business ("GSB") History on Robert K. Jaedicke, Dean, 1983-1990, *available at* http://www.gsb.stanford.edu/history/jaedicke.html (last visited Oct. 24, 2003).

[74] Jaedicke Sworn Statement, at 7.

[75] *Id.* at 10.

[76] *Id.* at 10-12.

brief period, he practiced as a "junior accountant," although not long enough to earn his CPA designation.[77]  He also worked as a consultant on accounting matters from time to time throughout his academic career.[78]

While serving on Enron's Board, Jaedicke also served on the boards of directors of a number of other corporations, including Boise Cascade Corporation, Gencorp Incorporated, Home State Mining Company, Wells Fargo Bank, State Farm Insurance Company, and California Water Service Company.[79]  He served as chair of the audit committee of each of these corporations for at least part of his service on their boards of directors.

Jaedicke joined the board of directors of HNG in 1985 at Lay's request.[80]  He came to Lay's attention through a Stanford University faculty colleague who had served as an officer of HNG.[81]  Jaedicke turned seventy-two in February 2001 and ordinarily would have left Enron's Board due to the mandatory retirement provision in the company's bylaws.[82]  However, Lay asked him to remain on the Board with a waiver of that provision by the other directors.[83]  Jaedicke testified that Lay asked him to remain in part to help keep stability on the Board, since three other directors were leaving in 2001 and Skilling had just been named CEO.[84]

### Rebecca Mark-Jusbasche

Mark-Jusbasche holds an M.B.A. from Harvard University[85] as well as a masters degree in international management from Baylor University.[86]  She joined Continental Resources in 1982, which was subsequently acquired by HNG.[87]  The merger of HNG and InterNorth created the entity that ultimately became Enron.  In 1986, Mark-Jusbasche was a Vice President of Finance at Enron, working almost exclusively on project financing activities associated with co-generation plants.[88]  She started Enron Development Corporation in 1992, with the goal to take Enron's domestic and U.K.

---

[77]  *Id.* at 13.

[78]  *Id.* at 13-14.

[79]  *Id.* at 14.

[80]  HNG 1984 Proxy Statement, at 3; Jaedicke Sworn Statement, at 27-28.

[81]  Jaedicke Sworn Statement, at 27-28.

[82]  *Id.* at 24.

[83]  *Id.* at 24-25.

[84]  *Id.*

[85]  Mark-Jusbasche Sworn Statement, at 5.

[86]  *Id.*

[87]  *Id.* at 5-7.

[88]  *Id.* at 7-8.

development experience to other parts of the world.[89]  With the consolidation of Enron's international activities into a single business unit, in 1996 Mark-Jusbasche was named Chairman and CEO of Enron International.[90]  In the spring of 1998, she was promoted to Vice Chairman of Enron,[91] and beginning in July 1998 she also became Chairman and CEO of Azurix, Enron's venture in the global water business.[92]  She became a member of the Enron Board in July 1999,[93] and she left Enron and its Board in August 2000.[94]

### Charles A. LeMaistre

LeMaistre received a medical degree from Cornell University in 1947.[95]  He taught as a member of the faculty at Cornell until 1954, when he became a professor of medicine at Emory University.[96]  From 1959 to 1966, he taught at the University of Texas Southwestern Medical School, and then moved into administration of the medical school, ultimately becoming its Chancellor.[97]  In 1978, he accepted the position as President of M.D. Anderson Medical Center in Houston, and he retired from that position in 1996.[98]

LeMaistre joined the board of directors of HNG in 1979 and, at Lay's request, remained with HNG after the merger that created Enron.[99]  Before the merger, LeMaistre served on HNG's audit committee and as its chair for about four years.[100]  From the time of the merger in 1985, LeMaistre served on Enron's Compensation Committee and became its Chair in 1987.[101]

While serving on HNG's and then Enron's boards, LeMaistre also served on the boards of directors of two other corporations, Capital National Bank in Austin, Texas, and Southwest Savings and Loan in Houston.[102]

---

[89] *Id.* at 12.

[90] Enron biography of Joseph W. Sutton, Vice Chairman [AB0971 02998].

[91] Mark-Jusbasche Sworn Statement, at 39-40.

[92] *Id.* at 120-21, 137.

[93] 7/1/99 Enron Press Release.

[94] Mark-Jusbasche Sworn Statement, at 104.

[95] LeMaistre Sworn Statement, at 9.

[96] *Id.*

[97] *Id.* at 9-10.

[98] *Id.* at 10-11.

[99] *Id.* at 11-15.

[100] *Id.* at 29.

[101] *Id.* at 15-16.

[102] *Id.* at 25-26.  LeMaistre testified that he served on the board of directors of Southwest Savings and Loan for approximately three years, resigning in either 1984 or 1985.  *Id.* at 27.  According to LeMaistre, that corporation joined a larger group called United Financial Group, "and their activities were quite different from the savings and loan association; and I simply didn't have the time to learn their business."

*John Mendelsohn*

Mendelsohn holds degrees from Harvard College and Harvard Medical School and is board certified in internal medicine, hematology and medical oncology.[103] He is currently the President of the M.D. Anderson Cancer Center, and prior to that was the Chairman of the Department of Medicine at Memorial Sloan Cancer Center.[104] He was also a Professor and Director of the Cancer Center at the University of California, San Diego School of Medicine.[105] Mendelsohn joined Enron's Board in 1999 at Lay's invitation, having met Lay at a number of civic events.[106]

While doing research at the University of California, San Diego, Mendelsohn was the co-inventor of C225, known more popularly today as Erbitux, which acts by blocking growth factors from cell receptors and stops cell proliferation.[107] Mendelsohn was asked to join the board of ImClone in 1998 because Erbitux was one of the lead products ImClone was developing.[108]

*Jerome J. Meyer*

Meyer received a bachelor of arts degree in economics and math from the University of Minnesota in 1960.[109] After starting his career as a design engineer at Firestone, he joined Univac and worked in the high tech and military fields for approximately seventeen years.[110] From Univac, Meyer moved to Honeywell, where he worked in computer operations.[111] He left Honeywell for a two-year period during which he served as President and COO of Varian Associates, a high-tech company that produces

---

*Id.* at 26-27. He resigned from the United Financial Group board about 9-12 months after the merger. He testified that "[i]t was the complexity of the financial deals that would require that I really go to school and learn a great deal more about the kind of business – They were doing a great deal of arbitrage, which I found to be something I knew very little about and didn't feel competent to be a director on the board and told them so and resigned." *Id.* at 27. When asked if he found the types of transactions being done by United Financial Group to be more complex than Enron's transactions, LeMaistre testified that he did not, but that "at that particular time [referring to his resignation from United Financial Group], my position as president of M.D. Anderson was very demanding, and I had a limited amount of time to devote to any outside activities." *Id.* at 28. LeMaistre was then asked whether it was "fair to say that by the time that Enron began doing extremely complex transactions, you felt like you had the time to devote to understanding those?" *Id.* LeMaistre answered, "I took the time to understand." *Id.*

[103] Sworn testimony of John Mendelsohn, M.D., by the U.S. Department of Labor, Feb. 26, 2003.

[104] *Id.*

[105] *Id.*

[106] Mendelsohn Sworn Statement, at 6-8.

[107] *Id.* at 11-12.

[108] *Id.*

[109] Meyer Sworn Statement, at 8.

[110] *Id.* at 9.

[111] *Id.* at 9-10.

electron devices, tubes used in x-ray machines, and radio and television transmitting locations.[112] He returned to Honeywell as CEO of its computer business, and then served as President of Honeywell's industrial operations.[113] In 1990, Meyer joined Tektronix as CEO and became chairman soon afterward.[114] Under Meyer's leadership, Tektronix sold its billion-dollar color printer business to Xerox.[115]

Meyer became a director of PGE around 1995, and joined the Enron Board when Enron acquired PGE in 1997.[116] During his service on Enron's Board, Meyer was engaged full-time as CEO and chairman of Tektronix.[117] Meyer also served at various times on the boards of directors of Standard Insurance, AMP (which was later acquired by Tyco), and Esterline Technologies.[118] His non-profit board service included the Oregon Business Counsel and Oregon Public Broadcast.[119]

*Paulo V. Ferraz Pereira*

Pereira holds a bachelor's degree in metallurgical engineering from Pontificia Universidade Catolica do Rio de Janeiro and an M.B.A. from Harvard University.[120] After obtaining his M.B.A. in 1978, Pereira returned to Brazil and worked for a company called Embramec, where he analyzed potential investments opportunities for the Brazilian government.[121] After a year and a half, Pereira started a software consulting company that produced software for microcomputers.[122] In 1982, he joined Companhia Bozano, Someonsen, one of the largest diversified groups in Brazil of which Meridional Financial Group was the core business.[123] In 1985, he was promoted to Vice President in charge of Treasury, Corporate Finance, International Area and Products for Meridional Financial Group.[124]

When Pereira joined Enron's Board, he was President and CEO of Meridional Financial Group, responsible for overseeing the group's holdings, which included: Banco Meridional do Brasil; Banco Bozano, Simonsen; Bozano, Somonsen Suguros; and

---

[112] *Id.* at 10-11.

[113] *Id.* at 10.

[114] *Id.* at 13.

[115] *Id.* at 20.

[116] *Id.* at 14-17.

[117] *Id.* at 38.

[118] *Id.* at 39.

[119] *Id.* at 42.

[120] Pereira Sworn Statement, at 5-6.

[121] *Id.* at 6-8.

[122] *Id.* at 9.

[123] *Id.* at 10-12; 10/12/99 Enron Press Release.

[124] 10/12/99 Enron Press Release.

- 10 -

Bozano, Somonsen Leasing.[125]  During his tenure as CEO of Banco Bozano, they sold the bank to Banco Santander and Pereira moved to the holding company.  He is currently the Executive Vice President of the holding company.[126]  Pereira also served as President and CEO of State Bank of Rio de Janeiro.[127]  Pereira joined the Enron Board after being recruited by an executive search firm engaged by Enron.[128]

*Frank Savage*

Savage has extensive experience in international finance.  Savage earned his B.A. in political science and economics from Howard University in 1962, and received a master's degree in international relations from Johns Hopkins University in 1968.[129]  In 1964, Savage joined Citibank International, where he was involved in a number of aspects of banking in the Middle East and Monrovia, Liberia.[130]

In 1971, Savage was tapped by Equitable Life Assurance Society ("Equitable") to establish a "minority enterprise small business investment company" as part of a Nixon initiative to encourage minority-owned businesses.[131]  While at Equitable, Savage worked in the private placement department and managed several portfolios, including energy, transportation, and agribusiness.[132]  He also took responsibility for building Equitable's global business, and eventually became Chairman of the Board of Equitable Capital Management, a wholly owned subsidiary of Equitable.[133]

Except for a brief time period, Savage remained with Equitable until it merged with Alliance Capital Management ("Alliance") in 1993, at which time he joined Alliance.[134]  Alliance is owned by AXA.[135]  After the merger, Savage became Chairman of the Board of Alliance Capital Management International, and he was also a member of the Alliance board of directors.[136]  In July 2001, Savage resigned from Alliance to start the Africa Millennia Fund, a private equity fund to invest in projects in Africa.[137]

---

[125] *Id.*

[126] Pereira Sworn Statement, at 12-13.

[127] 10/12/99 Enron Press Release.

[128] Pereira Sworn Statement, at 13-14.

[129] Savage Sworn Statement, at 7-8.

[130] *Id.* at 8-9.

[131] *Id.* at 11-12.

[132] *Id.* at 12-13.

[133] *Id.* at 15-17.

[134] *Id.* at 12, 16-17.

[135] *Id.* at 19-20.

[136] *Id.*

[137] *Id.* at 6, 17.

Savage currently serves on the boards of Alliance, Lockheed Martin, Qualcomm, Inc. and Bloomberg, L.P.[138] He has formerly served on the boards of Equitable, Arco Chemical, and Lyondell Chemical.[139] He joined the Enron Board in October 1999, and remained on the Board until March 2002.[140]

*John A. Urquhart*

Urquhart is an engineer, trained at the Georgia Institute of Technology and Virginia Polytechnic Institute.[141] He spent forty-one years at GE, where he was involved in GE's international operations, primarily overseeing construction of power plants in foreign countries as a senior manager under Jack Welch.[142] Shortly before his retirement from GE in 1991, Urquhart joined Enron's Board at the request of Lay, having been connected to Lay through a former GE employee then working at Enron.[143] Promptly after his retirement, he entered into a consulting agreement with Enron under which he initially oversaw Enron's construction of the Teeside plant in the U.K., followed by significant involvement in a number of Enron's other international projects.[144] Urquhart estimated that overall his work for Enron consumed around 60% of his time, with that time commitment gradually declining in the later years.[145]

This consulting arrangement, and Urquhart's service on the Board, lasted until 2001.[146] By that time, Enron had shifted to its "asset light" business strategy. Lay asked Urquhart not to stand for reelection to the Board in May 2001, because Lay wanted to use that Board seat to add someone more knowledgeable about finance matters or perhaps someone in the entertainment industry.[147]

While serving on the Board, Urquhart was also Chairman and CEO of Enron Solar Energy Inc.,[148] as well as a member of the managing board of Amoco/Enron Solar Partnership, a joint venture formed to own Enron's solar business.[149] He was also a director of Enron Renewable Energy Corp.[150] In addition, Enron gave him officer titles

---

[138] *Id.* at 24-26, 28.

[139] *Id.* at 26-27.

[140] *Id.* at 24.

[141] Urquhart Sworn Statement, at 6.

[142] *Id.* at 7-9.

[143] *Id.* at 15-16.

[144] *Id.* at 17-18, 24-29.

[145] *Id.* at 17.

[146] *Id.* at 13; Enron 2001 Proxy Statement, at 26.

[147] Urquhart Sworn Statement, at 13.

[148] Enron 1998 Proxy Statement, at 6.

[149] *Id.*

[150] *Id.*

in a number of its other subsidiaries. Urquhart testified that he performed no services for those subsidiaries, but needed the titles in order to assist him in performing his consulting services for Enron.[151]

During the period 1997 to the Petition Date, Urquhart also served as a director of several companies not affiliated with Enron, including Aquarion Company, TECO Energy, Inc., Hubbell, Inc., The Weir Group, PLC and Catalytica Inc., all of which were equipment manufacturers.[152]

*Charls Walker*

Walker holds B.B.A. and M.B.A. degrees from the University of Texas and a Ph.D. in finance from the Wharton School at the University of Pennsylvania.[153] Walker is Adjunct Professor of Finance and Public Affairs at the University of Texas at Austin, Adjunct Professor of Business Administration at Texas A&M University, and Visiting Distinguished Professor in the Practice of Business Management at Emory University. Earlier in his career, he taught at both the Wharton School and Georgetown University.[154]

In the 1950s, Walker served as an economist with the Federal Reserve Bank of Philadelphia, special assistant to the President of the Republic National Bank of Dallas, and Vice President and Economic Advisor to the President of the Federal Reserve Bank of Dallas. From 1961 to 1969, he was Executive Vice President of The American Bankers Association.[155]

Walker served as assistant and economic advisor to the Secretary of the Treasury in the second Eisenhower Administration and Deputy Secretary of the Treasury in the first Nixon Administration.[156] He served as co-chairman of the 1976 presidential debates. He is a past chairman of President Nixon's Committee on Minority Enterprises and was chairman of Governor Reagan's tax task force in the 1980 presidential campaign. He is currently an advisor to the Center for Deliberative Polling at The University of Texas.[157]

---

[151] Urquhart Sworn Statement, at 23-24.

[152] Enron 1998 Proxy Statement, at 6; Enron 1999 Proxy Statement, at 6; Enron 2000 Proxy Statement, at 7.

[153] The University of Texas at Austin, Biography of Charls E. Walker [AB1128 00041].

[154] *Id.*

[155] *Id.*

[156] *Id.*

[157] *Id.*

*Lord John Wakeham*

      Wakeham is a chartered accountant and a member of Great Britain's House of Lords.[158]  He became qualified as a public accountant in 1955.[159]  From 1955 to 1957, he served in the Army as a Lieutenant in the Royal Artillery.[160]  In 1957, he joined the London office of an affiliate of Arthur Young & Company, a predecessor to Ernst & Young, as an auditor.[161]  In 1960, he left Arthur Young & Company and became affiliated with other smaller accounting firms and partnerships.[162]

      Wakeham became a full time politician in 1974.[163]  One of his first government jobs in the early 1980s was as a parliamentary Under Secretary of State at the Department of Trade, then responsible for shipbuilding.[164]  Wakeham served as Margaret Thatcher's chief whip during her tenure as Prime Minister in the 1980s.[165]  He went on to become Leader of the House of Commons in the late 1980s, piloting arrangements to televise Parliament.[166]  He was appointed Energy Secretary by Margaret Thatcher in 1989 with the task of privatizing the electricity industry.[167]  In 1990, in his government position, Wakeham became involved with Enron's development of the Teeside power station.[168]  In 1992, he was appointed a life peer by John Major,[169] and he retired from government in 1994.[170]  He took the reins at the Press Complaints Commission in 1995 and has vigorously defended self-regulation for the newspaper industry.[171]  In 1999, he was appointed by Tony Blair to head a Royal Commission on Lords Reform.[172]

---

[158] Wakeham Sworn Statement, at 5-6.

[159] *Id.* at 5.

[160] *Id.* at 6.

[161] *Id.*

[162] *Id.* at 7.

[163] *Id.* at 6.

[164] Andrew Clark & David Hencke, *Master fixer who ended up in a fix,* The Guardian, Jan. 30, 2002 (the "1/30/02 The Guardian Article"), *available at* http://median.guardian.co.uk/presspublishing/comment/0,7495,642431,00.html (last visited Oct. 24, 2003).

[165] *Lord Wakeham—the 'Fixit' man,* BBC News, Jan. 9, 2002 (the "1/9/02 BBC News Article"), *available at* http://news.bbc.co.uk/1/hi/uk_politics/1750283.stm (last visited Oct. 24, 2003).

[166] *Id.*

[167] 1/30/02 The Guardian Article.

[168] David Hencke & Michael White, *Enron Fallout Threatens Wakeham,* The Guardian, Jan. 30, 2002, *available at* http://www.guardian.co.uk/guardianpolitics/story/0,3605,641564,00.html (last visited Oct. 24, 2003).

[169] 1/9/02 BBC News Article.

[170] Wakeham Sworn Statement, at 6.

[171] 1/9/02 BBC News Article.

[172] *Id.*

*Bruce G. Willison*

Willison has an undergraduate degree in economics from UCLA and an M.B.A. from the University of Southern California.[173] After receiving his M.B.A., he worked for Bank of America in Los Angeles and Mexico City in corporate banking.[174] From 1973 to 1979, he was in the energy division and handled multinational energy companies headquartered in Oklahoma and Dallas/Ft. Worth.[175] In 1979, he went to Western Bancorporation, which became First Interstate Bancor, where he held various positions including strategic planning, director of marketing, head of trusts and investments, and head of world bank group.[176] Starting in 1986, he was Chairman and CEO of First Interstate Bank of Oregon. He was Chairman and CEO of First Interstate Bank of California from 1991 until the company was acquired by Wells Fargo in 1996.[177] In April 1996, Willison became President and CEO of H.F. Ahmanson, which was the holding company to Home Savings of America, and he served in that capacity until the company was acquired by Washington Mutual in October 1998.[178] In April 1999, Willison began work as Dean of the Anderson Graduate School of Management at UCLA.[179]

Willison joined the board of directors of PGE in 1988. In connection with Enron's acquisition of PGE, Lay asked Willison to join the Enron Board,[180] in part because of Willison's financial and energy background.[181] Willison resigned from the Enron Board in the fall of 1998.[182]

*Herbert S. Winokur, Jr.*

Winokur holds a Ph.D. in applied math decision control from Harvard College.[183] Winokur worked in the Pentagon in the Office of the Secretary of Defense as an Army Lieutenant from 1967 to 1970.[184] He then formed a consulting firm called Inner City Fund and worked there until approximately 1973.[185] He then worked at a company called

---

[173] Willison Sworn Statement, at 8-9.

[174] *Id.* at 9.

[175] *Id.*

[176] *Id.* at 10-11.

[177] *Id.* at 11.

[178] *Id.* at 11-12.

[179] *Id.* at 12.

[180] *Id.* at 17-18

[181] *Id.* at 18.

[182] *Id.* at 40.

[183] Winokur 11/20/02 Sworn Statement, at 13.

[184] *Id.* at 13-14.

[185] *Id.*

Buckeye Pipe Line as Vice President of Finance and Treasurer.[186]  He later became the Senior Vice President of Buckeye's parent company, the Pennsylvania Company.[187]

Winokur became President of Pinehurst, Incorporated, the golf resort and real estate complex in approximately 1977.[188]  Sometime later, he became Senior Vice President of a company called Pacific Holdings, which was wholly owned by David H. Murdoch, and Winokur was responsible for all of Mr. Murdoch's investments.[189]  In approximately 1983, Winokur became the Senior Executive Vice President and director of Penn Central Corporation (when Carl Whitkin was chairman) and was the number two operating executive at the company.[190]  Winokur formed Capricorn Investors Partnership in 1987, where he raised the fund and had the responsibility to invest that fund in middle market companies with the focus on turnarounds and restructuring.[191]  Lay asked Winokur to join the Board when Lay became CEO of HNG.[192]

---

[186] *Id.*

[187] *Id.*

[188] *Id.* at 14.

[189] *Id.* at 15.

[190] *Id.*

[191] *Id.* at 15-16.

[192] *Id.* at 17.

# ATTACHMENT B

## OUTSIDE DIRECTOR STOCK SALES 1997-2001

| Name | Aggregate Number of Shares Sold | Aggregate Gross Consideration Received | Number of Shares Attributed to Options | Aggregate Option Exercise Price Paid | Number of Shares Not Attributed to Options | Net Proceeds Received[1] |
|---|---|---|---|---|---|---|
| Belfer[2] | 291,871 | $16,683,662 | 12,661 | $119,322 | 279,210 | $97,797,512 |
| Blake[3] | 21,200 | $1,705,328 | 21,200 | $386,437 | -0- | $1,318,891 |
| Chan[4] | 8,000 | $337,250 | -0- | -0- | 8,000 | $337,250 |
| Duncan[5] | 35,000 | $2,009,700 | -0- | -0- | 35,000 | $2,009,700 |
| Foy[6] | 23,640 | $1,639,600 | 23,640 | $454,049 | -0- | $1,185,551 |
| Gramm[7] | 9,044 | $469,983 | 7,608 | $261,840 | 1,436 | $208,143 |
| Harrison[8] | 1,041,090 | $81,895,439 | 1,017,900 | $23,571,009 | 23,190 | $58,324,430 |
| Jaedicke | 13,360 | $841,438 | 13,360 | $94,618 | -0- | $746,820 |
| LeMaistre | 16,352 | $841,765 | 16,352 | $119,540 | -0- | $722,225 |
| Mark-Jusbasche[9] | 1,276,278 | $85,752,631 | 953,873 | $32,162,171 | 322,405 | $53,590,460 |
| Mendelsohn[10] | 50 | $40 | -0- | -0- | 50 | $40 |
| Meyer | -0- | -0- | -0- | -0- | -0- | -0- |
| Pereira | -0- | -0- | -0- | -0- | -0- | -0- |
| Savage | -0- | -0- | -0- | -0- | -0- | -0- |
| Urquhart | 25,000 | $1,850,000 | 25,000 | $953,125 | -0- | $896,875 |
| Walker | 21,760 | $1,180,291 | 14,520 | $354,590 | 7,240 | $825,701 |
| Wakeham | -0- | -0- | -0- | -0- | -0- | -0- |
| Willison | -0- | -0- | -0- | -0- | -0- | -0- |
| Winokur | -0- | -0- | -0- | -0- | -0- | -0- |
| TOTALS | 2,782,645 | $195,207,127 | 2,106,114 | $58,476,701 | 676,531 | $217,963,598 |

[1] For all Outside Directors other than Belfer (see the following note), Net Proceeds Received was computed by deducting the Aggregate Option Exercise Price Paid from the Aggregate Gross Consideration Received. Thus, the net amount does not take into consideration the amount paid for shares that were sold but were not attributable to reported stock option exercises, because that information was not available to the Examiner.

[2] According to Enron's March 2001 Proxy Statement, Belfer was one of the largest individual shareholders of Enron stock at that time with beneficial ownership of approximately 8.5 million shares. Enron 2000 Proxy Statement. Belfer testified that he sold some of his stock almost every year for diversification

purposes, Belfer Sworn Statement, at 42, and that if he exercised stock options, it was his practice to sell the shares immediately. *Id.* at 38.

According to Belfer, when Enron's stock price increased and his Enron holdings became a larger percentage of his net worth, his investment advisers counseled him that he should protect against a decrease in Enron's stock value. *Id.* at 39-40. In response, Belfer entered into costless collar arrangements with JPMorgan Chase and Morgan Stanley on approximately one million shares of Enron stock. *Id.* at 39-40. Under the costless collars, Belfer was protected if the stock price fell below a certain value, but he would only get the benefit of an increase in stock value to a defined ceiling. *Id.* at 39-40. Because Enron's stock value did in fact drop, Belfer benefited from the collars, and approximately $80 million of his proceeds was derived from these transactions. *See* Forms 3, 4 and 5 filings made by Belfer pursuant to Section 16(a) of the Exchange Act.

[3]  Blake testified that in October 2000, he sold approximately 40% to 45% of his Enron holdings on the advice of his financial adviser. Blake Sworn Statement, at 16-18. Blake testified that he insisted on retaining a majority of his Enron holdings. *Id.* at 18.

[4]  Chan testified that he made a sale of shares in July 1999 for the following reason:

> Well, I was one day on the phone with one of my fellow directors, Bob Belfer, and he in passing made the statement that he noticed that some of management was selling.
>
> And I thought to myself, "Well if management is selling, it's usually a good time to sell." So I did.
>
> . . . .
>
> Q: Did Mr. Belfer explain to you his – any theories or opinions that he had with regard to why management was selling?
>
> A: I don't remember.

Chan Sworn Statement, at 38-39. Belfer did not provide testimony regarding this event.

[5]  Duncan made one sale of Enron stock in May 2001 when he was 73 years old. He explained the reasons for the sale in a letter to Lay dated May 14, 2001:

> At age 73 (and growing older by the day) and building Brenda's dream house, and knowing, actuarially, that my allotted time is shorter than most, I simply, and finally, crossed the bridge to "lighten up" on all of my portfolio. So, I not only sold a few shares of Enron, but also some of my other significant holdings like: Group One, Coke, etc., and etc. I have thought about this for the last few months, but since I "liked" all the stocks in my portfolio and could not decide what to "lighten up" on, I finally decided to "lighten" across the board. Thus, I sold the [sic] about the same percentage of each security.
>
> Lord knows, in doing this I pray I made a big mistake because, in all cases, I sold only about 15% of my holding and I am keeping the 85% that remains.

Letter from John Duncan, former Director, to Kenneth Lay, former CEO, Enron, May 14, 2001, at 1 [AB000484882-AB000484883]. Duncan went on to say that his sale should not be misinterpreted as a lack of faith in Enron's management because he was very proud of Enron. *Id.* Duncan testified that this letter accurately stated the reason for the sale. Duncan Sworn Statement, at 20.

[6]  Foy was 73 years old when he retired from the Enron Board in March 2000. Foy Sworn Statement, at 20-21. He testified that in each of 1999, 2000 and 2001, he exercised some of his stock options and then immediately sold the stock. *Id.* at 32. According to Foy's testimony, the stock options were nearing their expiration dates at the time he exercised them. *Id.* at 32.

[7]  In December 1998, Gramm's counsel issued an opinion that, in light of her marriage to a U.S. Senator, her ownership of Enron stock could result in a material conflict of interest as a result of legislation

involving electricity deregulation and other issues of concern to Enron. Consequently, Gramm disposed of all of her beneficial stock ownership, and subsequently received all of her director fee compensation in cash. Enron 1999 Proxy Statement.

[8] Most of Harrison's stock transactions occurred in 2000, after Harrison had retired as an Enron employee, but while he was still serving on the Board because "virtually, my entire life's net worth was tied up in Enron stock. You know, it made sense to start diversifying." Harrison Sworn Statement, at 70-71. Harrison testified that he nevertheless retained approximately 50% of his stock options and 100% of the stock that he held outright. *Id.* at 71.

[9] Mark-Jusbasche, who was a senior officer at Enron, testified that she exercised and sold stock options as they were awarded on a continuing basis. Mark-Jusbasche Sworn Statement, at 97. Mark-Jusbasche explained her practice as follows:

> [M]y compensation plan had always been heavily cash-based, and it was tied to what I had accomplished over the course of a number of years. And so I really tended to treat the stock options as if they were an alternative to cash at the time, and I might have held onto them for a period of time, but I wasn't . . . really treating it as a long-term holder.

> My view was I was dependent on Enron for my livelihood and my salary and a lot of things that I was putting at risk in the company, and given the strenuousness of creating those businesses over the years, I wasn't . . . putting those, quote, "bonus" amounts at risk. And by the time I had left the company completely in August of 2000, I sold out of stock shortly after that time. I didn't have anything that expired.

*Id.* at 100-01. Mark-Jusbasche also stated that she reduced her Enron holdings at the time she was preparing for the initial public offering of Azurix because she was Chairman and CEO of Azurix and she did not think it was appropriate for her to have a large holding in Enron, which was the largest shareholder of Azurix. *Id.* at 100-01, 121.

[10] Mendelsohn reported on a Form 4 filed with the SEC on Dec. 10, 2001 that his spouse purchased 50 shares of Enron stock on March 23, 2001 for $53.53 per share, and that she sold those 50 shares on November 28, 2001 for $.79 per share. *See* Statement of Changes in Beneficial Ownership, Form 4, filed by John Mendelsohn with the SEC on Dec. 10, 2001, at 1.

**ANNEX 1 (Lay's and Skilling's Use of Enron Stock to Repay Loans)**

to

**APPENDIX D**

**(Roles of Lay, Skilling and Outside Directors)**

to

**FINAL REPORT OF NEAL BATSON,
COURT-APPOINTED EXAMINER**

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................. 1

II.     BACKGROUND .................................................................. 3

III.    ANALYSIS ......................................................................... 8

IV.     CONCLUSIONS ................................................................. 13

## I. INTRODUCTION

Lay and Skilling each used shares of their Enron common stock to repay loans from the Company. In May 1999, the Compensation and Management Development Committee (the "Compensation Committee") of Enron's board of Directors (the "Board") authorized the officers to make such repayments. From that date through October 2001, Lay borrowed from Enron over $94 million by repeatedly drawing on a line of credit, and then repaying that amount with shares of his Enron stock. Skilling made only one repayment with Enron stock, repaying $2 million of a loan that Enron had extended to him earlier. The effect of all the loan repayments was that Enron repurchased these shares of stock from Lay and Skilling.

As described in this Annex, the Compensation Committee did not have authority under applicable Oregon corporate law to approve Enron's repurchase of shares. That authority was vested in Enron's Board, but the Board apparently never approved the repayments or ratified the Compensation Committee's approval. Therefore, there is sufficient evidence for a fact-finder to conclude that the repayments by Lay and Skilling are voidable at the election of Enron. Upon such event: (i) Enron would return to Lay 2,131,282 shares of Enron common stock, and Lay would be liable to repay loans in the amount of $94,267,163 plus any applicable interest;[1] and (ii) Enron would return to

---

[1] As discussed in the Conclusions section of this Annex, the Examiner concluded in the Second Interim Report that Enron has an alternative cause of action against Lay for $74.025 million of this amount under Section 548(a)(1)(B) of the Bankruptcy Code. *See* Second Interim Report, Annex 1 to Appendix P (Avoidance Actions). Subsequent to the submission of the Second Interim Report to the Court on January 21, 2003, *see* Notice of Submission of the Second Interim Report of Neal Batson, Court-Appointed Examiner, Jan. 21, 2003, Docket No. 8800, the Committee initiated an adversary proceeding against Lay and his wife seeking to recover approximately $74 million under such a fraudulent conveyance theory. *See Official Comm. of Unsecured Creditors of Enron Corp., et al. v. Kenneth L. Lay and Linda P. Lay,* Adversary Proceeding No. 03-02075 (AJG) (Bankr. S.D.N.Y. filed Jan 31, 2003) (also seeking recovery of certain amounts related to annuities that Enron purchased from Lay and his wife).

Skilling 26,425 shares of Enron common stock, and Skilling would be liable to repay his

loan in the amount of $2,000,042 plus any applicable interest.

## II.  BACKGROUND

In 1987, Lay signed an employment agreement[2] and a loan commitment agreement[3] with Enron.  Pursuant to these agreements, Enron agreed to make cash advances to Lay from time to time (the "line of credit"), with the maximum amount not to exceed $1.5 million.[4]  Enron increased the maximum amount several times, so that during 1997 through October 2001, the maximum was $4 million.[5]

Skilling did not have a line of credit with Enron, but he had borrowed $4 million from the company pursuant to a loan agreement signed in October 1997.[6]  Skilling's loan was due in full on December 31, 2001, but the loan agreement provided that Enron would forgive $2 million of the debt if Skilling remained employed with Enron in accordance with the terms of his employment agreement through that date.[7]

In May 1999, the Compensation Committee of Enron's Board agreed to give both Lay and Skilling the right to repay amounts due under their loans with Enron stock.[8]

---

[2]  Employment Agreement between Enron and Lay, May 15, 1987 [AB0252 00728-AB0252 00735].

[3]  Loan Commitment Agreement between Enron and Lay, May 15, 1987 [AB0252 00736-AB0252 00740]; First Amendment to Loan Commitment Agreement between Enron and Lay, May 1, 1989 [AB0252 00741].

[4]  Section 2.01, Loan Commitment Agreement between Enron and Lay, May 15, 1987 [AB0252 00736-AB0252 00740].

[5]  Section 3(b), Fifth Amendment to Employment Agreement between Enron and Lay, Feb. 28, 1994 [AB0252 00755-AB0252 00758].  The parties entered into agreements effective as of December 9, 1996 that superseded the 1989 employment agreement and amended the 1989 loan commitment agreement to extend the termination date to December 31, 2001.  Employment Agreement between Enron and Lay, Dec. 18, 1996 (as amended on February 7, 2000 and January 23, 2001) [AB0252 00759-AB0252 00781].  In November 2001, Enron raised the maximum available to Lay under the line of credit to $7.5 million.  Amendment of Loan Agreement and Promissory Note between Enron and Lay, Nov. 4, 2001 [AB000430428-AB000430429].

[6]  Section 2.01, Loan Agreement between Enron and Skilling, Oct. 13, 1997 [AB000517438-AB000517442].

[7]  *Id.* Sections 2.02 and 2.07; *See also* Section 3, Third Amendment to Employment Agreement between Enron and Skilling, Feb. 7, 2000, at 1 [AB000517418-AB000517426].

[8]  Minutes of Enron Compensation Committee Meeting, May 3, 1999 (the "5/3/99 Compensation Committee Minutes"), at 8-11 [AB000197864-AB000197875].

According to the minutes of the Compensation Committee's meeting on May 3, 1999, "Skilling had requested that he be permitted to pay back 50% of an outstanding executive loan from the Company using already owned shares of Company stock."[9] After the Compensation Committee approved that request,[10] "Mr. Lay then requested the Committee to consider permitting him to effect a similar transaction,"[11] which the Compensation Committee also approved.[12]

Skilling on that day transferred to the company 26,425 shares of Enron common stock having an aggregate market value of $2,000,042.[13] He paid the remaining principal

---

[9] *Id.* at 8; Sworn Statement of Charles A. LeMaistre, former Director, Enron, to William C. Humphreys, Jr., A&B, July 17, 2003 (the "LeMaistre Sworn Statement"), at 206-07; Sworn Statement of Rebecca Comeau Carter, former Senior Vice President and Corporate Secretary, Enron, to William C. Humphreys, Jr., A&B, Sept. 3, 2003 (the "Carter Sworn Statement"), at 203.

[10] 5/3/99 Compensation Committee Minutes, at 8-10.

[11] *Id.* at 10.

[12] *Id.* at 10-11. According to Dr. Charles LeMaistre ("LeMaistre"), Chair of Enron's Compensation Committee, Lay and Skilling asked for this permission because "they had been over the years rewarded with a great deal of Enron stock; and they were stock heavy and liquidity poor, and that in order to meet his [sic] financial obligations they needed the freedom to pay the loan back not in cash but in stock." LeMaistre Sworn Statement, at 208.

[13] Enron – Account Reconciliation, Officers' Loans, as of Sept. 30, 2001 [AB0522 08492]. Skilling reported this transfer of shares on a Form 4 filed with the SEC on February 10, 2000, stating that the transfer occurred on June 14, 1999. Statement of Changes in Beneficial Ownership, Form 4, filed by Skilling with the SEC on Feb. 10, 2000, at 1. Lay also reported his repayments with shares to the SEC on Forms 4 and 5. Statement of Changes in Beneficial Ownership, Form 4, filed by Lay with the SEC on Feb. 10, 2000, at 1; Statement of Changes in Beneficial Ownership, Form 4, filed by Lay with the SEC on Feb. 12, 2001, at 1; Annual Statement of Changes in Beneficial Ownership, Form 5, filed by Lay with the SEC on Feb. 14, 2002, at 1. In their reports to the SEC, both Lay and Skilling indicated that the transactions were a code type "D" for SEC purposes, which means "Disposition to the issuer of issuer equity securities pursuant to Rule 16b-3(e)." Form 4, Statement of Changes in Beneficial Ownership of Securities, General Instructions, Transaction Codes, 5 Fed. Sec. L. Rep. (CCH) ¶ 33,721, at 22,621 (May 21, 2003). Rule 16b-3(e) provides in relevant part that a transaction between an issuer and one of its officers will be exempt from Section 16(b) (i.e., short-swing profit restrictions) if the transaction was approved by the issuer's board of directors or a committee of the board composed solely of two or more non-employee directors. Transactions Between an Issuer and its Officers or Directors, 17 C.F.R. § 240.16b-3(e). The Compensation Committee's resolutions approving Lay's and Skilling's repayment of loans with stock expressly stated that the Committee's approval "shall evidence compliance with Rule 16b-3(e)." 5/3/99 Compensation Committee Minutes, at 9-10. Enron's Compensation Committee was comprised solely of four non-employee directors, but even if the approval satisfied Rule 16b-3(e), it was not valid under Oregon corporate law.

amount of his loan in cash when he resigned from the company in August 2001, just four months before that amount would have been forgiven.[14]

Within a few days after receiving approval from the Compensation Committee, Lay began to repay the outstanding balance under his line of credit with shares of Enron common stock.[15] He borrowed the maximum under his line of credit and repaid it with stock twice in 1999 for a total of approximately $8 million, and he repeated this cycle four times in 2000 for a total of over $16 million.[16]

In 2001, he repeated the cycle 17 times.[17] He repaid one $4 million borrowing with stock in February 2001, and then borrowed and repaid another $4 million in April.[18] In May 2001 he borrowed his limit and repaid it with stock twice, and in the month of June alone the cycle occurred six times.[19] The pattern continued in every month through October 2001, with Lay borrowing his limit under the line of credit and repaying it with his stock at least once, and sometimes four times, each month.[20] From the time that the Compensation Committee granted him the right to repay his loan with Enron stock in May 1999, through the last date for which the Examiner received this information, October 26, 2001, Lay repaid loans from Enron with a total of 2,131,282 shares of Enron

---

[14] Check from Skilling to Enron in the amount of $2,548,000, Sept. 15, 2001 (with handwritten note "2 MM Loan Repayment, Buyout of Split Dollar") [AB000255871]; Carter Sworn Statement, at 204. However, Skilling did not pay the interest accrued on the indebtedness and, as of the Petition Date, owed approximately $89,000 in interest.

[15] See List entitled "Sales to Enron Corp. to Repay Loan," produced by Enron (the "Lay Loan Transaction Chart") [AB000430358].

[16] Id.

[17] Id.

[18] Id.

[19] Id.

[20] Id.

common stock having a market value of $94,267,163.[21]   The chart reproduced below,

which Enron provided to the Examiner, shows Lay's stock repayment transactions:[22]

---

[21] *Id.* During 2001, as Lay was selling large amounts of his stock back to Enron, he publicly encouraged
employees to buy Enron stock. Kurt Eichenwald, *Company Man to the End, After All*, N.Y. Times, Feb. 9,
2003, at 1. According to *The New York Times*, Lay's stock sales may not have indicated that he held a
contrary view of the company's stock value, but may have instead been prompted by a "risky – some would
say foolhardy – trading position." *Id.* at 2. Lay apparently pledged his Enron stock as collateral against
bank and brokerage loans used to make other investments and, when Enron's stock price began falling in
early 2001, Lay was required to make payments on those loans because the value of the collateral had
declined. *Id.* at 2. *The New York Times* has suggested that Lay may have taken actions in the summer of
2001 to avoid having to generate cash through selling his shares back to Enron, as well as other actions
consistent with his public statements that Enron stock was a good buy. *Id.*

[22] Lay Loan Transaction Chart.

SALES TO ENRON CORP. TO REPAY LOAN

| DATE | NO. OF SHARES | SALE PRICE | AGGREGATE SALES PRICE |
|------|---------------|------------|------------------------|
| 5/11/1999 | 54,000 | $74.69 | $4,033,260.00 |
| 11/10/1999 | 98,487 | $40.81 | $4,019,254.47 |
| 2/15/2000 | 58,152 | $68.94 | $4,008,998.88 |
| 8/24/2000 | 47,815 | $85.50 | $4,088,182.50 |
| 11/20/2000 | 49,950 | $80.25 | $4,008,487.50 |
| 12/28/2000 | 47,320 | $84.62 | $4,004,218.40 |
| 2/1/2001 | 50,814 | $78.79 | $4,003,635.06 |
| 4/27/2001 | 63,152 | $63.50 | $4,010,152.00 |
| 5/14/2001 | 68,182 | $58.75 | $4,005,692.50 |
| 5/25/2001 | 75,491 | $53.00 | $4,001,023.00 |
| 6/12/2001 | 79,423 | $50.37 | $4,000,536.51 |
| 6/19/2001 | 86,665 | $46.18 | $4,002,189.70 |
| 6/22/2001 | 89,126 | $44.88 | $3,999,974.88 |
| 6/26/2001 | 90,518 | $44.19 | $3,999,990.42 |
| 6/27/2001 | 85,616 | $46.72 | $3,999,979.52 |
| 6/28/2001 | 82,747 | $48.34 | $3,999,989.98 |
| 7/26/2001 | 85,720 | $46.84 | $4,015,124.80 |
| 8/21/2001 | 110,706 | $36.25 | $4,013,092.50 |
| 8/23/2001 | 108,254 | $36.95 | $3,999,985.30 |
| 8/24/2001 | 110,041 | $36.35 | $3,999,990.35 |
| 8/30/2001 | 112,706 | $35.50 | $4,001,063.00 |
| 9/4/2001 | 114,346 | $35.00 | $4,002,110.00 |
| 10/23/2001 | 76,995 | $19.79 | $1,523,731.05 |
| 10/24/2001 | 103,614 | $16.41 | $1,700,305.74 |
| 10/25/2001 | 33,672 | $16.35 | $550,537.20 |
| 10/26/2001 | 147,770 | $15.40 | $2,275,658.00 |
| | 2,131,282 | | $94,257,163.26 |

AB000430358

EC 000771607

- 7 -

## III.  ANALYSIS

By accepting shares of stock from Lay and Skilling as repayment of their loans, Enron in effect repurchased those shares from the two officers.  Although the Compensation Committee adopted resolutions authorizing the repayments, that Committee lacked authority to authorize the company's repurchase of its stock under applicable corporate law.

Enron is an Oregon corporation,[23] and under Oregon law boards of directors are authorized to create committees and appoint members of the board to serve on them.[24] Such committees are authorized to exercise the authority of the board of directors to the extent specified by the board or in the corporation's articles of incorporation or bylaws. However, in May 1999, when the Compensation Committee authorized Lay and Skilling to repay loans with stock, Oregon law contained a number of restrictions on the authority that can be given to a committee, including a restriction providing that a committee may not "[a]uthorize or approve reacquisition of shares, except within limits prescribed by the board of directors."[25]

The Compensation Committee's authority was clearly set out in its charter adopted by the Board in 1998.[26]  There is nothing in that charter authorizing the Compensation Committee to approve the reacquisition of shares by Enron under any circumstances.  In addition, records of Enron's Board meetings do not reflect any grant of

---

[23] *See* Section A, Articles of Incorporation of Enron [AB0785 03888-AB0785 04147].

[24] Or. Rev. Stat. § 60.354(1).

[25] *Id.* § 60.354(5)(g).  Oregon Revised Statutes Section 60.354(5) was amended on May 24, 2003 and no longer restricts a committee's ability to authorize the reacquisition of shares.  However, the law described above was the law in effect at the time the Compensation Committee authorized Enron to repurchase shares from Lay and Skilling.

[26] Enron Compensation Committee Charter, undated [AB000189440-AB000189441].

authority to the Compensation Committee with respect to approving reacquisitions of Enron stock.

While the Compensation Committee lacked authority to approve reacquisitions of Enron stock, such transactions are within the power of a corporation generally. Therefore, the reacquisition of Enron stock from Lay and Skilling without proper authority was voidable, but not void. In *CarrAmerica Realty Corp. v. Kaidanow*,[27] the court found that while a corporation had the power to issue shares of stock in exchange for the cancellation of a debt, because it did so in a way that violated a statutory requirement, the shares were voidable.[28] However, the court also concluded that because the shares were voidable, not void, equitable defenses were available, such as laches and ratification.[29] In the course of finding that the corporation's board of directors had ratified the issuance of the shares, the *CarrAmerica* court held: "Directors may ratify a corporate action either expressly or impliedly. Ratification may be implied 'if the corporation, represented by the board of directors, who have knowledge of the facts,

---

[27] *CarrAmerica Realty Corp. v. Kaidanow*, 321 F.3d 165 (D.C. Cir. 2003).

[28] *Id.* Similarly, *Reade v. Pac. Coast Home Supply Ass'n*, 66 P. 443 (Or. 1901), involved an action to recover on a promissory note alleged to have been issued by a corporation. The plaintiff alleged that the officers of the corporation who issued the note did not have the requisite authority of the board. The Supreme Court of Oregon stated that "if, therefore, the note was given for the private debt, or in settlement of the personal obligation ... and its execution was not authorized by the defendant's charter, it was issued without authority..." and the corporation would have a valid defense. *Id.* at 446. *See also Michelson v. Duncan*, 407 A.2d 211 (Del. 1979).

[29] *CarrAmerica*, 321 F. 3d at 171. *See also Michelson*, 407 A.2d at 218-19. Ratification is the retroactive adoption and affirmance by a corporation of an act done by one of its officers or agents without authority. *See* William Meade Fletcher, *et al.*, 2A *Fletcher Cyclopedia of the Law of Private Corporations* § 751 (perm. ed., rev. vol. 2001). However, in order to ratify an unauthorized act, the ratification must be made with full knowledge of the material facts connected to the transaction to which it relates. *See Young v. Janas*, 103 A.2d 299, 301 (Del. Ch. 1954); *see also Minniti v. Cascade Employers Ass'n, Inc.*, 570 P.2d 1171, 1178 (Or. 1977) ("In order to constitute ratification by a principal of a previously unauthorized contract by an agent, there must be evidence from which a jury could properly find that the principal, with knowledge of the material facts, intended to ratify the contract.").

accepts and retains the benefits of the contract or act, or recognizes it as binding, or acquiesces in it."[30]

Similarly, in *Currie v. Bowman*,[31] the Supreme Court of Oregon recognized that agents of a corporation's board of directors have only those powers conferred upon them by resolution or by other express manner. That court also stated that when such an agent, without the requisite conferral of authority by the board of directors, undertakes an unauthorized action on behalf of the corporation, the corporation is not bound by that action absent board ratification.[32]

The full Board of Enron met on May 4, 1999, one day after the Compensation Committee's meeting at which it had granted permission for the stock repayments. According to the minutes of the Board meeting, no mention was made of the decision to allow Lay and Skilling to repay their loans using Enron stock.[33] The full Board met again in August 1999, and again the minutes reflect no mention of the Compensation

---

[30] *CarrAmerica,* 321 F.3d at 173 (quoting William Meade Fletcher, *et al., 2A Fletcher Cyclopedia of the Law of Private Corporations* § 762 (perm. ed., rev. vol. 2001)).

[31] Currie v. Bowman, 35 P. 848 (Or. 1894).

[32] *Id.* at 850. *See also Phillips v. Colfax Co.,* 243 P.2d 276 (Or. 1952), in which a lender sought to recover on a loan allegedly made to the corporation through the actions of its president, who negotiated the loan. In defense, the corporation contended that the funds were lent to the president personally, and not to the corporation. Weighing against the plaintiff's allegation that the president had entered into the loan on behalf of the corporation was the "[p]laintiff's failure to bring to the record evidence of express or implied authority in [the president] to borrow money for the corporation." *Id.* at 281. Due to the president's lack of authority, the *Phillips* court found that the plaintiff's attempts to establish the corporation's liability on the loan "does not fail if [the plaintiff] can show that the loan negotiated by [the president] was afterward ratified by [the corporation]." *Id.* Noting that "[i]t is elementary that when a corporation, with full knowledge of the facts, accepts and retains the benefits of an unauthorized contract, it will be bound thereby," the *Phillips* court ultimately concluded that there was sufficient evidence to create a triable issue of fact as to whether the corporation had ratified the unauthorized borrowing by knowingly accepting the benefits of the loan without repudiating it. *Id.*

[33] *See* Minutes of Enron Board Meeting, May 4-5, 1998 [AB000189397-AB000189418]. At this meeting, the Compensation Committee sought approval from the Board for only three items, none of which involved the repayment of Lay's and Skilling's loans with stock. The minutes do not reflect that the Compensation Committee's approval was ever reported to the Board as a decision made by that committee.

Committee's decision to allow the stock repurchases.[34] Several of the Outside Directors who were not members of the Compensation Committee denied knowledge that the Compensation Committee had granted this approval. The Outside Directors, including members of the Compensation Committee, have consistently denied any knowledge of Lay's repeated borrowings and repayments with stock.[35]

In the absence of knowledge, there is not even a preliminary issue of ratification. Moreover, it is the knowledge and conduct of only the Board that is relevant to the question of ratification by its members. Knowledge of others at Enron who did not have the authority to approve the reacquisition of shares by the company is irrelevant. Ratification could only have come from the conduct of the body having the power to

---

[34] *See* Minutes of Enron Board Meeting, Aug. 10, 1999 [AB000196153-AB000196175].

[35] *See, e.g.*, Sworn Statement of Ken L. Harrison, former Director, Enron, to Steven M. Collins, A&B, Aug. 27, 2003, at 186-87; Sworn Statement of John A. Urquhart, former Director, Enron, to Steven M. Collins, A&B, Sept. 5, 2003, at 131-32; Sworn Statement of Joe H. Foy, former Director, Enron, to William C. Humphreys, Jr., A&B, Aug. 26, 2003, at 169-70. Former director Robert A. Belfer testified that he noticed Lay was selling stock in the first quarter of 2001 and made inquiries:

> Q. Did you notice in the first quarter of 2001 that Mr. Lay was selling stock, Enron stock?
>
> A. I – yes.
>
> Q. Did you make any inquiry about it?
>
> A. Yes, I did.
>
> Q. What did you do?
>
> A. I mentioned this to either Mr. Winokur or Mr. Lay or both of them, and they made inquiry of Mr. Lay, who told them that he was exercising options and selling them, the stock that he, that ensued from the options.
>
> Q. As opposed to repaying company loans with stock?
>
> A. That is correct.

Sworn Statement of Robert A. Belfer, former Director, Enron, to Steven M. Collins, A&B, July 31, 2003, at 182-83. Lay told the Examiner that he recalled discussing his use of the Enron line of credit with LeMaistre in September 2001, when the Compensation Committee was considering revisions to his compensation package following his return to the CEO position. In-Person Interview with Kenneth L. Lay, former CEO, Enron, by William C. Humphreys, Jr., A&B, Oct. 18, 2003. Lay did not recall providing any previous notice to the Board of his draws under the line of credit, or his use of stock to repay those loans. *Id.*

approve Enron's reacquisition of its shares in the first place—i.e., the Board of Directors.[36]

---

[36] *See Sea Lion Corp. v. Air Logistics of Alaska, Inc.,* 787 P.2d 109, 118 (Alaska 1990) ("[K]nowledge necessary to ratify an unauthorized act must be that of an entity with power to authorize it in the first instance.") (citing *Ulloa v. Guam Econ. Dev. Auth.,* 580 F.2d 952, 956 (9th Cir. 1978)).

While knowledge of the affairs of a corporation by directors will be presumed in favor of an innocent third party for purposes of ratification, it will not be presumed in favor of an officer or director. *Alward v. Broadway Gold Mining Co.,* 20 P.2d 647, 650 (Mont. 1933). Similarly, in *Reade* the Supreme Court of Oregon stated that if the note had been assigned, before maturity to an innocent purchaser for valuable consideration, the corporation would not be able to assert the defense that it was issued without the requisite authority. *Reade,* 66 P. at 445.

## IV.  CONCLUSIONS

Enron took action it was legally entitled to take, but in a manner that failed to comply with the enabling statute.  The Compensation Committee's decision to allow Lay and Skilling to repay their loans using Enron stock was not sufficient to authorize the transactions.  Oregon law was clear at the time of these transactions:  committees of the Board were not permitted to approve repurchases of company stock without specific authority from the Board.  In this instance, that authority was apparently never granted to the Compensation Committee.

Lay and Skilling may argue that the repurchases of their shares were ratified by the Board.  The burden of proving that the Board had knowledge of the Compensation Committee's decision will fall on Lay and Skilling.  Based on the minutes of the Board meetings and the testimony of Outside Directors, it does not appear that Lay or Skilling would be able to meet that burden.  Furthermore, any attempt by Lay and Skilling to claim they are innocent third parties should also fail because they were inside directors and should have had knowledge of Enron's policies.  Thus, there is sufficient evidence for a fact-finder to conclude that the transactions Lay and Skilling consummated with Enron in reliance upon the Compensation Committee's improper approval are voidable at the election of Enron.  Upon such event: (i) Enron would return to Lay 2,131,282 shares of Enron common stock, and Lay would be liable to repay loans in the amount of $94,267,163 plus any applicable interest; and (ii) Enron would return to Skilling 26,425 shares of Enron common stock, and Skilling would be liable to repay his loan in the amount of $2,000,042 plus any applicable interest.

In the Second Interim Report, the Examiner concluded that Enron has an alternative cause of action against Lay for $74.025 million of the amount stated above under Section 548(a)(1)(B) of the Bankruptcy Code.[37]   This is the amount that Lay borrowed from Enron and repaid with shares of his stock within the twelve months prior to the Petition Date (which is the applicable "reach back period" under the Bankruptcy Code).

The state law theory of voiding the repayments due to lack of proper approval, as described in this Annex, is an alternative to the presently pending claim against Lay under Section 548(a)(1)(B) for the avoidance of a constructively fraudulent transfer.  This alternative state law theory would increase the claim against Lay by approximately $20 million, which is the amount of loans Lay repaid with stock during the period that was more than twelve months prior to the Petition Date.

---

[37] *See* Second Interim Report, Annex 1 to Appendix P (Avoidance Actions).

**ANNEX 2 (Legal Standards Applicable to Lay, Skilling and Outside Directors)**

to

**APPENDIX D**

**(Roles of Lay, Skilling and Outside Directors)**

to

**FINAL REPORT OF NEAL BATSON,
COURT-APPOINTED EXAMINER**

# TABLE OF CONTENTS

| | | |
|---|---|---|
| I. | INTRODUCTION ................................................................ | 1 |
| II. | CHOICE OF LAW ............................................................. | 3 |
| III. | BOARD DECISION-MAKING ........................................... | 4 |
| IV. | BOARD OVERSIGHT ....................................................... | 8 |
| | A. GENERALLY .......................................................... | 8 |
| | B. THE DUTY TO MONITOR .................................... | 9 |
| | C. THE DUTY TO INQUIRE ...................................... | 18 |
| V. | INSIDE DIRECTORS COMPARED TO OUTSIDE DIRECTORS ................. | 27 |
| VI. | INDEMNIFICATION AND INSURANCE .......................... | 32 |
| | A. INDEMNIFICATION ............................................. | 32 |
| | B. INSURANCE .......................................................... | 34 |

## I.    INTRODUCTION

The role of a corporate director includes two principal functions:  a decision-making function and an oversight function.[1]  The decision-making function generally involves action taken at a particular point in time, while the oversight function generally involves ongoing monitoring of the corporation's business and affairs over a period of time.[2]  The standard of conduct for performing both of these functions with respect to an Oregon corporation is set forth in Oregon Revised Statutes § 60.357(1), which provides:

> A director shall discharge the duties of a director, including the duties as a member of a committee, in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances and in a manner the director reasonably believes to be in the best interests of the corporation.[3]

The following discussion begins with a brief summary of a director's fiduciary duty of care in the decision-making context and then provides a more in-depth explanation of a director's oversight responsibility.[4]  The explanation of board oversight divides oversight responsibility into two principal components:  a duty to monitor and a duty to inquire.  It observes that a failure to discharge the duty to monitor, where found actionable by the courts, has typically been characterized by abdication or sustained inattention, while actionable failures to satisfy the duty to inquire occur in cases of ordinary negligence.  If a customary director exculpation provision applies, a director's failure to satisfy either component of oversight must amount to conduct "not in good faith" or must involve "intentional misconduct" or "a knowing violation of law" in order

---

[1] 2 *ABA Model Bus. Corp. Act Ann.* (3d ed. 2000 & Supp. 2002) § 8.31 Official cmt. at 8-204 (the "*ABA Model Bus. Corp. Act Ann.*").

[2] *Id.*

[3] Or. Rev. Stat. § 60.357(1).

[4] For a more complete discussion of fiduciary duties in the decision-making context, see Appendix B (Legal Standards) to the Third Interim Report.

to establish liability. However, a customary director exculpation provision would not apply when a director who is also an officer (i.e., an "inside director") acts or fails to act in his or her capacity as an officer. Moreover, due to an inside director's greater role in and responsibility for the corporation's day-to-day affairs, he or she typically would have more occasion to encounter circumstances giving rise to a duty to inquire and, correspondingly, more exposure to liability for failing to satisfy this duty as compared to a non-officer (or "outside") director.

## II.    CHOICE OF LAW

A fiduciary duty claim brought against a director of a corporation is governed by the law of the state where the corporation is incorporated, pursuant to the "internal affairs doctrine."[5] Enron is incorporated under the laws of the State of Oregon.[6] Accordingly, Oregon law governs the fiduciary duty of Enron's directors.

Because there are relatively few published opinions regarding fiduciary duties under Oregon corporation law, this Appendix will also refer to the corporation law of other states, particularly the State of Delaware, the jurisdiction widely recognized as having the most fully developed body of corporation law.[7] In addition, because Oregon's corporation law statute, the Oregon Business Corporation Act ("OBCA"), is based upon the Model Business Corporation Act developed by the Committee on Corporate Laws of the Section of Business Law of the American Bar Association (the "Model Act"), this Appendix will from time to time refer to the official commentary that accompanies the Model Act.

---

[5] This result is true whether such a claim were brought in this court or a court sitting in Texas. In the Second Circuit, a bankruptcy court must apply the choice of law rules of the forum state unless the case implicates important federal bankruptcy policies. *Bianco v. Erkins (In re Gaston & Snow)*, 243 F.3d 599 (2d Cir.), *cert. denied*, 534 U.S. 1042 (2001). New York applies the internal affairs doctrine to such claims. *BBS Norwalk One, Inc. v. Raccolta, Inc.*, 60 F. Supp. 2d 123, 129 (S.D.N.Y. 1999*), aff'd*, 205 F.3d 1321 (2d Cir. 2000). The result would be the same if a fiduciary duty claim were brought against a corporation's director in a Texas court. Under Texas law, the law of the jurisdiction of incorporation of a foreign corporation governs the internal affairs of the corporation, including but not limited to the rights, powers and duties of its board of directors. Tex. Bus. Corp. Act Ann. art. 8.02. *See also Hollis v. Hill*, 232 F.3d 460, 464-65 (5th Cir. 2000) (applying Texas law in a diversity action and recognizing Texas' codified internal affairs doctrine).

[6] Articles of Incorporation of Enron [AB0785 03888-AB0785 04147].

[7] Oregon courts, as well as federal courts applying Oregon law, have in the past relied upon Delaware law for guidance regarding corporation law issues. *See, e.g., Stringer v. Car Data Sys., Inc.*, 841 P.2d 1183 (Or. 1992); *Chiles v. Robertson*, 767 P.2d 903 (Or. Ct. App.), *modified*, 744 P.2d 500 (Or. Ct. App. 1989); and *Kahn v. Sprouse*, 842 F. Supp. 423 (D. Or. 1993).

## III.    BOARD DECISION-MAKING

As explained more fully in Appendix B (Legal Standards) to the Third Interim Report, when directors of a corporation make business decisions on behalf of the corporation, they must satisfy their fiduciary duty of care.[8]  A doctrine known as the business judgment rule focuses the duty of care analysis of a business decision on the process by which the decision was reached (e.g., whether all material information reasonably available was taken into consideration), as opposed to the substance of the decision itself (e.g., whether a reasonably careful, or risk free, course of action was selected).[9]  Accordingly, where the business judgment rule applies, the duty of care may be characterized as a duty to exercise informed business judgment.  Under Oregon law, the adequacy of the decision-making process (i.e., whether the business decision was sufficiently "informed") would likely be measured by concepts of ordinary negligence.

There is a limit, however, on the amount of judicial deference afforded to the substance of a business decision by the business judgment rule.  Even if a director makes a business decision in a manner that satisfies the duty of process due care, the business judgment rule will not protect a decision that cannot be attributed to any rational business purpose.[10]

---

[8]  As always, directors must also satisfy their fiduciary duties of good faith and loyalty, each of which is discussed more fully in Appendix B (Legal Standards) to the Third Interim Report.

[9]  See Brehm v. Eisner, 746 A.2d 244, 264 (Del. 2000) ("Courts do not measure, weigh or quantify directors' judgments.  We do not even decide if they are reasonable in this context.  Due care in the decisionmaking context is *process* due care only.") (emphasis in original).

[10]  The limited substantive review contemplated by this outer limit of the business judgment rule may be thought of as a manifestation of the fiduciary duty of good faith. See, e.g., Parnes v. Bally Entm't Corp., 722 A.2d 1243, 1246 (Del. 1999) ("The presumptive validity of a business judgment is rebutted in those rare cases where the decision under attack is 'so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith.'") (quoting West Point – Pepperell, Inc. v. J.P. Stevens & Co. (In re J.P. Stevens & Co.), 542 A.2d 770, 780-81 (Del. Ch. 1988)); In re RJR Nabisco, Inc. Shareholders Litig., No. 10389, 1989 WL 7036, at *22 n.13 (Del. Ch. Jan. 31, 1989) (stating that the limited substantive review contemplated in the business judgment rule (i.e., whether the decision is

- 4 -

In addition, when directors know they are making material decisions without adequate information and without adequate deliberation, their conduct may be considered to lack good faith. In the recent case of *In re Walt Disney Co. Derivative Litigation*,[11] the plaintiffs alleged that Disney's directors breached their fiduciary duties when they blindly approved an employment agreement with Michael Ovitz and then, again without any review or deliberation, ignored Michael Eisner's dealings with Ovitz regarding his non-fault termination, resulting in an award to Ovitz (allegedly exceeding $140 million) after barely one year of employment. As alleged, Eisner, Disney's chief executive officer, decided unilaterally to hire Ovitz, Eisner's close friend for over 25 years, as Disney's president. The *Disney* court summarized the facts alleged in the complaint as follows:

> No draft employment agreements were presented to the compensation committee or to the Disney board for review before the September 26, 1995 meetings. The compensation committee met for less than an hour on September 26, 1995, and spent most of its time on two other topics, including the compensation of director Russell for helping secure Ovitz's employment. With respect to the employment agreement itself, the committee received only a summary of its terms and conditions. No questions were asked about the employment agreement. No time was taken to review the documents for approval. Instead, the committee approved the hiring of Ovitz and directed Eisner, Ovitz's close friend, to carry out the negotiations with regard to certain still unresolved and significant details.

> The [board] met immediately after the committee did. Less than one and one-half pages of the fifteen pages of [board] minutes were devoted to discussions of Ovitz's hiring as Disney's new president. Actually, most of that time appears to have been spent discussing compensation for director Russell. No presentations were made to the [board] regarding the terms of the draft agreement. No questions were raised, at least so far as the minutes reflect. At the end of the meeting, the [board] authorized Ovitz's hiring as Disney's president. No further review or approval of the employment agreement occurred. Throughout both meetings, no expert

---

irrational or egregious or so beyond reason) is really a way of inferring bad faith), *appeal refused*, No. 49,1989, 1989 WL 16907 (Del. Feb. 2, 1989).

[11] 825 A.2d 275 (Del Ch. 2003).

consultant was present to advise the compensation committee or the [board]. Notably, the [board] approved Ovitz's hiring even though the employment agreement was still a "work in progress." The [board] simply passed off the details to Ovitz and his good friend, Eisner.[12]

The complaint alleged facts depicting even less involvement by the Disney board in the decision to grant Ovitz a non-fault termination, which, in turn, triggered significant financial benefits to Ovitz. That decision allegedly was made by Eisner and one other director without ever consulting the board. Once the board was made aware of the decision, the directors allegedly did nothing to question it, explore alternatives or evaluate the implications of the non-fault termination.

Denying the directors' motion to dismiss the claims, the *Disney* court concluded:

These facts, if true, do more than portray directors who, in a negligent or grossly negligent manner, merely failed to inform themselves or to deliberate adequately about an issue of material importance to their corporation. Instead, the facts alleged in the new complaint suggest that the defendant directors *consciously and intentionally disregarded their responsibilities,* adopting a "we don't care about the risks" attitude concerning a material corporate decision. Knowing or deliberate indifference by a director to his or her duty to act faithfully and with appropriate care is conduct, in my opinion, that may not have been taken honestly and in good faith to advance the best interests of the company. Put differently, all of the alleged facts, if true, imply that the defendant directors *knew* that they were making material decisions without adequate information and without adequate deliberation, and that they simply did not care if the decisions caused the corporation and its stockholders to suffer injury or loss. Viewed in this light, plaintiffs' new complaint sufficiently alleges a breach of the directors' obligation to act honestly and in good faith in the corporation's best interests for a Court to conclude, if the facts are true, that the defendant directors' conduct fell outside the protection of the business judgment rule.[13]

---

[12] *Id.* at 287 (footnote omitted).

[13] *Id.* at 289 (emphasis in original) (citation omitted).

The court also concluded that the plaintiffs' claims fell outside the protection of the director exculpation provision in Disney's charter because the claims were based on alleged actions that are either "not in good faith" or "involve intentional misconduct."[14]

---

[14] *Id.* at 290.

## IV. BOARD OVERSIGHT

### A. <u>Generally</u>

The oversight responsibility of an Oregon corporation's board of directors is established indirectly by Oregon Revised Statutes § 60.301(2)'s broad provision making the board responsible for the exercise of corporate powers and the direction of how the corporation's business and affairs are managed.[15]   Proper discharge of the board's oversight responsibility has two principal components:   (1) a duty to monitor by undertaking reasonable efforts to remain attentive to and informed of the corporation's business and affairs; and (2) a duty to inquire when indications of potential problems, or "red flags," arise.  As explained by the drafters of the Model Act, the board's oversight function

> refers to concern with the corporation's information and reporting systems and not to proactive inquiry searching out system inadequacies or noncompliance.  While directors typically give attention to future plans and trends as well as current activities, they should not be expected to anticipate the problems which the corporation may face except in those circumstances where something has occurred to make it obvious to the board that the corporation should be addressing a particular problem.  The standard of care associated with the oversight function involves gaining assurances from management and advisers that systems believed appropriate have been established coupled with ongoing monitoring of the systems in place, such as those concerned with legal compliance or internal controls--followed up with a proactive response when alerted to the need for inquiry.[16]

---

[15]  *See* Or. Rev. Stat. § 60.301(2); 2 *ABA Model Bus. Corp. Act Ann.* § 8.30 Official cmt. at 8-168.

[16]  2 *ABA Model Bus. Corp. Act Ann.* § 8.30 Official cmt. at 8-169.

## B.    <u>The Duty to Monitor</u>

The duty of a board of directors to monitor corporate affairs is well established.[17] The failure to discharge this duty, where found actionable, has typically been characterized by the courts in terms of abdication or sustained inattention, not a brief distraction or temporary interruption.[18] The American Law Institute ("ALI") notes "[c]ourts have generally recognized the dangers inherent in making *post hoc* judgments about the care exercised by directors and officers and have allowed them considerable leeway."[19] Nevertheless, according to the ALI, "sustained patterns of inattention to obligations by directors or officers or unreasonable blindness to problems that later cause substantial harm will create exposure to liability."[20]

In *Francis v. United Jersey Bank*,[21] the primary issue was whether a corporate director was personally liable in negligence for failing to prevent the misappropriation of funds by other directors who were also officers and shareholders of the corporation. Over a period of approximately five years, the officers withdrew for themselves ever-increasing sums of money from the corporation under the guise of loans. The funding of the loans left the corporation insolvent and eventually led to its bankruptcy. The "loans" far exceeded the financial resources of the officers and were never repaid. Thus, the court characterized them as misappropriations rather than loans. The defendant (the officers' mother) served as a director throughout this period of time, but was not actively

---

[17] *See* American Law Institute, *Principles of Corporate Governance: Analysis & Recommendations* § 3.02 cmt. d (1994) (the "ALI Principles") ("A significant aspect of oversight by the board is continuing attention to the conduct of the corporation's business.").

[18] 2 *ABA Model Bus. Corp. Act Ann.* § 8.31 Official cmt. at 8-204.

[19] ALI Principles § 4.01(a) cmt. h.

[20] *Id.*

[21] 432 A.2d 814 (N.J. 1981).

engaged, knew virtually nothing about the corporation's affairs and never read or obtained the corporation's financial statements. The loans were listed as assets on the corporation's annual balance sheets and increased each year in tandem with corresponding increases in working capital deficits. The court held:

> Directors are under a continuing obligation to keep informed about the activities of the corporation . . . . Directors may not shut their eyes to corporate misconduct and then claim that because they did not see the misconduct, they did not have a duty to look. The sentinel asleep at his post contributes nothing to the enterprise he is charged to protect . . . . Directorial management does not require a detailed inspection of day-to-day activities, but rather a general monitoring of corporate affairs and policies . . . . While directors are not required to audit corporate books, they should maintain familiarity with the financial status of the corporation by a regular review of financial statements.[22]

Noting that even a cursory reading of the financial statements would have revealed the officers' misappropriations, the court held the defendant director liable for breaching her duty to monitor.

Similarly, in *Hoye v. Meek*,[23] the Tenth Circuit upheld a finding of liability on the part of the chairman and president of a bank for failing to avert substantial investment losses incurred by the bank. The chairman/president delegated virtually all authority to run the bank's day-to-day operations to his son and did not take an active role in the bank's affairs or regularly attend board meetings. Through the son's initiative, and apparently unknown to the chairman/president, the bank made a number of imprudent investments that ultimately led to the bank's failure and bankruptcy. The court concluded that the chairman/president breached his fiduciary duty of care by failing to monitor the bank's investments and failing to supervise his son. The court expressly rejected an

---

[22] *Id.* at 822 (citations omitted).

[23] 795 F.2d 893 (10th Cir. 1986).

argument that the chairman/president's duty of care was lessened by his semi-retired status. The court also rejected an argument that, because the son had operated the bank at a profit for seven years, the directors' and president's duty to monitor was dissipated. The holding in *Hoye* did not depend on whether or to what extent the chairman/president had actual knowledge of the losses being incurred by the bank, but rather on his overall lack of attention to the bank's affairs. According to the court, "[The chairman/president] had a duty to keep abreast of [the bank's] investments, particularly investments that posed a double risk of decrease in market price and an increase in transactional costs."[24]

When directors do remain actively engaged and attentive to corporate affairs, courts have been more reluctant to hold them liable for breach of the duty to monitor notwithstanding their failure to detect and prevent misconduct occurring within the corporation.

In *Devlin v. Moore*,[25] the receiver of the Oregon Trust & Savings Bank alleged that

> each of the [bank's] directors . . . neglected and violated all and singular his duties and obligations, and that each was guilty of gross negligence and inattention in the discharge of his several duties and obligations, and of a reckless disregard of the interests of the corporation, its stockholders and creditors, resulting in large losses . . . on account of loans to insolvent and irresponsible parties and misappropriations of funds and property by some of the officers of the bank.[26]

The Supreme Court of Oregon upheld findings of liability for two directors who were also officers of the bank and who actively participated in misappropriating bank funds. As to the remaining directors, the court focused on whether they were negligent in their

---

[24] *Id.* at 896.

[25] 130 P. 35 (Or. 1913).

[26] *Id.* at 37.

supervision of the bank's affairs by failing to discover and prevent the officer misconduct. The court explained:

> As a general rule, directors are charged with the duty of reasonable supervision over the affairs of the bank. It is their duty to use ordinary diligence in ascertaining the condition of its business, and to exercise reasonable control and supervision over its affairs. They are not insurers or guarantors of the fidelity and proper conduct of the executive officers of the bank and are not responsible for losses resulting from their wrongful acts or omissions, provided that they have exercised ordinary care in the discharge of their own duties as directors.
>
> Ordinary care, in this matter as in other departments of the law, means that degree of care which prudent and diligent men would ordinarily exercise under similar circumstances. The degree of care required further depends upon the subject to which it is to be applied, and each case must be determined in view of all the circumstances of that particular case. If nothing has come to the knowledge to awaken suspicion that something is going wrong, ordinary attention to the affairs of the institution is sufficient. If, on the other hand, directors know, or by the exercise of ordinary care should have known, any facts which would awaken suspicion and put a prudent man on his guard, then a degree of care commensurate with the evil to be avoided is required, and a want of that care makes them responsible. Directors cannot, in justice to those who deal with the bank, shut their eyes to what is going on around them. Directors are not expected to watch the routine of every day's business, but they ought to have a general knowledge of the manner in which the bank's business is conducted, and upon what securities its larger lines of credit are given, and generally to know of and give direction to the important and general affairs of the bank.[27]

Although the directors failed to detect and prevent the officer misconduct, the *Devlin* court concluded the directors were not liable. The court noted that, with the benefit of hindsight, the supervision of the bank's affairs was "faulty."[28] But, because the directors were actively engaged and made certain inquiries, the court concluded they were not negligent in discharging their duty of oversight. Rather, the court attributed the

---

[27] *Id.* at 45.

[28] *Id.*

board's failure to detect and prevent the officer misconduct to having been deceived by one of the officers.

In *Graham v. Allis-Chalmers Manufacturing Co.*,[29] the Supreme Court of Delaware considered the potential liability of directors for losses incurred by a corporation as a result of federal anti-trust law violations by certain of its employees. There was no claim that the directors had actual knowledge of the employee misconduct. Rather, the plaintiffs were "forced to rely solely upon the legal proposition . . . that directors of a corporation, as a matter of law, are liable for losses suffered by their corporations by reason of their gross inattention to the common law duty of actively supervising and managing the corporate affairs."[30] Addressing this theory of liability, the *Graham* court held:

> If [a director] has recklessly reposed confidence in an obviously untrustworthy employee, has refused or neglected cavalierly to perform his duty as a director, or has ignored either willfully or through inattention obvious danger signs of employee wrongdoing, the law will cast the burden of liability upon him. This is not the case at bar, however, for as soon as it became evident that there were grounds for suspicion, the Board acted promptly to end it and prevent its recurrence.
>
> Plaintiffs say these steps should have been taken long before, even in the absence of suspicion, but we think not, for we know of no rule of law which requires a corporate director to assume, with no justification whatsoever, that all corporate employees are incipient law violators who, but for a tight checkrein, will give free vent to their unlawful propensities.[31]

The Delaware Court of Chancery revisited *Graham's* holding and the duty of oversight in *In re Caremark International Inc. Derivative Litigation*.[32] Caremark derived

---

[29] 188 A.2d 125 (Del. 1963).

[30] *Id.* at 130.

[31] *Id.* at 130-31.

[32] 698 A.2d 959 (Del. Ch. 1996).

a substantial part of its revenues from Medicare and Medicaid and was subject to federal anti-kickback laws that prohibit health care providers from paying remuneration to induce the referral of Medicare or Medicaid patients. Caremark maintained contracts and relationships with health care industry participants that, while not expressly prohibited by the anti-kickback laws, nevertheless raised a possibility of unlawful kickbacks. Caremark's directors were aware of these relationships and of the uncertainty regarding their legality. Caremark's directors took a number of steps apparently in an effort to address these uncertainties and assure compliance with law, including obtaining expert legal advice and developing and disseminating company policies designed to assure compliance. Nevertheless, following a series of governmental investigations, several indictments were obtained against Caremark and certain of its officers charging them with violations of the anti-kickback laws. In addition, several private insurance company payors asserted claims against Caremark for allegedly improper business practices stemming from the same conduct. Caremark paid in excess of $250 million to settle the claims raised by the government and the private payors.

Caremark shareholders brought a derivative claim against Caremark's board of directors for breach of fiduciary duty. The *Caremark* court summarized the derivative claim as follows: "The claim is that the directors allowed a situation to develop and continue which exposed the corporation to enormous legal liability and that in so doing they violated a duty to be active monitors of corporate performance."[33] After characterizing the plaintiffs' theory of liability as "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment," the court

---

[33] *Id.* at 967.

- 14 -

explained that "director liability for a breach of the duty to exercise appropriate attention" may arise in two distinct contexts:

> First, such liability may be said to arise *from a board decision* that results in a loss because that decision was ill advised or "negligent". Second, liability to the corporation for a loss may be said to arise from an *unconsidered failure of the board to act* in circumstances in which due attention would, arguably, have prevented the loss. The first class of cases will typically be subject to review under the director-protective business judgment rule . . . .[34]

Addressing the second class of cases in which director liability is asserted for losses resulting from unconsidered inaction, the *Caremark* court said "as in this case, the claim asserted [in *Graham*] was that the directors *ought to have known* of [the employee misconduct] and if they had known they would have been under a duty to bring the corporation into compliance with the law and thus save the corporation from the loss."[35] Without disagreeing with *Graham's* holding that directors can be "blamelessly unaware" of loss-creating conduct when there are no "grounds for suspicion," the *Caremark* court refused to generalize this holding too broadly.[36] The *Caremark* court stated that *Graham* does not mean "that corporate boards may satisfy their obligation to be reasonably informed concerning the corporation, without assuring themselves that information and reporting systems exist in the organization that are reasonably designed to provide to senior management and to the board itself timely, accurate information sufficient to allow management and the board, each within its scope, to reach informed judgments

---

[34] *Id.* (emphases in original) (citation omitted). Conversely, in cases involving the board's unconsidered failure to act, the business judgment rule does not apply because, as a threshold matter, no business judgment has been made. *See Aronson v. Lewis*, 473 A.2d 805, 813 (Del. 1984) ("[T]he business judgment rule operates only in the context of director action. Technically speaking, it has no role where directors have either abdicated their functions, or absent a conscious decision, failed to act."), *overruled on other grounds, Brehm*, 746 A.2d 244. For a discussion of the business judgment rule, see Appendix B (Legal Standards) to the Third Interim Report.

[35] *Caremark*, 698 A.2d at 969 (emphasis in original).

[36] *Id.*

- 15 -

concerning both the corporation's compliance with law and its business performance."[37]

The *Caremark* court added:

> Obviously the level of detail that is appropriate for such an information
> system is a question of business judgment.  And obviously too, no
> rationally designed information and reporting system will remove the
> possibility that the corporation will violate laws or regulations, or that
> senior officers or directors may nevertheless sometimes be misled or
> otherwise fail reasonably to detect acts material to the corporation's
> compliance with the law.  But it is important that the board exercise a
> good faith judgment that the corporation's information and reporting
> system is in concept and design adequate to assure the board that
> appropriate information will come to its attention in a timely manner as a
> matter of ordinary operations, so that it may satisfy its responsibility.[38]

Turning to its analysis of the directors' conduct, the *Caremark* court began by

saying:

> In order to show that the Caremark directors breached their duty of care by
> failing adequately to control Caremark's employees, plaintiffs would have
> to show either (1) that the directors knew or (2) should have known that
> violations of law were occurring and, in either event, (3) that the directors
> took no steps in a good faith effort to prevent or remedy that situation, and
> (4) that such failure proximately resulted in the losses complained
> of . . . .[39]

Finding no evidence that the board actually knew of the unlawful conduct, the court

turned to the issue of whether the board was culpable for being unaware of it:

> Generally where a claim of directorial liability for corporate loss is
> predicated upon ignorance of liability creating activities within the
> corporation, as in *Graham* or in this case, in my opinion only a sustained
> or systematic failure of the board to exercise oversight—such as an utter
> failure to attempt to assure a reasonable information and reporting system
> exists—will establish the lack of good faith that is a necessary condition of
> liability.  Such a test of liability—lack of good faith as evidenced by
> sustained or systematic failure of a director to exercise reasonable
> oversight—is quite high.  But, a demanding test of liability in the
> oversight context is probably beneficial to corporate shareholders as a

---

[37] *Id.* at 970.

[38] *Id.*

[39] *Id.* at 971.

class, as it is in the board decision context, since it makes board service by qualified persons more likely, while continuing to act as a stimulus to *good faith performance of duty* by such directors.[40]

The *Caremark* court concluded that the claims against the Caremark directors were "extremely weak" factually because the record did not support the conclusion that the directors either lacked good faith in the exercise of their monitoring responsibilities or conscientiously permitted a known violation of law to occur.[41]

In summary, courts have generally been reluctant to impose liability on directors for failing adequately to monitor corporate affairs absent some form of sustained inattention or abdication of duty. Courts have acknowledged that actively engaged boards will not always be able to detect and prevent misconduct occurring within the corporation. Thus, as long as reasonable efforts are undertaken to remain attentive to and informed of the corporation's business and affairs, directors generally will be found to have discharged their duty to monitor, even if loss-creating activities go unnoticed.

Before turning to the second component of board oversight - the duty to inquire - a comment on director exculpation provisions and their impact on liability for breach of the duty to monitor is appropriate.[42] Many director exculpation provisions (including Enron's) contain an exception for "acts or omissions not in good faith or which involve

---

[40] *Id.* (emphasis in original).

[41] *Id.*

[42] Like the corporate codes of most states, the Oregon Business Corporation Act (the "OBCA") expressly permits an Oregon corporation to include in its articles of incorporation a provision eliminating or limiting the personal liability of directors to the corporation or its shareholders for monetary damages for certain conduct as a director. *See* Or. Rev. Stat. § 60.047(2)(d). Consistent with this statute, Enron's articles of incorporation provide that a director of Enron shall not be personally liable to Enron or its shareholders for monetary damages for conduct as a director, except for liability (i) for any breach of the director's duty of loyalty to Enron or its shareholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) for any unlawful distribution under Or. Rev. Stat. § 60.367, or (iv) for any transaction from which the director derived an improper personal benefit. *See* Article VII, Section A., Articles of Incorporation of Enron [AB0785 03888-AB0785 04147].

- 17 -

intentional misconduct or a knowing violation of law." In this regard, it is noteworthy that the *Caremark* court characterized its test for liability in the oversight context (i.e., "sustained or systematic failure of a director to exercise reasonable oversight") as conduct that lacks good faith.[43] Accordingly, a failure to monitor that amounts to sustained inattention or abdication is not likely to be protected by a customary director exculpation provision.

### C.   The Duty to Inquire

The foregoing discussion focused on the general duty of a board of directors to monitor corporate affairs. The following discussion turns to a director's specific duty to inquire when, in the course of monitoring corporate affairs, red flags arise indicating a potential problem that merits more in-depth attention.[44] As stated by the drafters of the Model Act:

> Embedded in the oversight function is the need to inquire when suspicions are aroused. This duty is not a component of ongoing oversight, and does not entail proactive vigilance, but arises when, and only when, particular facts and circumstances of material concern (e.g., evidence of embezzlement at a high level or the discovery of significant inventory shortages) suddenly surface.[45]

The Supreme Court of Delaware alluded to the duty to inquire in *Graham v. Allis-Chalmers* when it indicated that directors could be liable if they have "ignored either

---

[43] *Caremark*, 698 A.2d at 971. Note that the *Francis, Hoye, Devlin* and *Graham* decisions discussed above predate the proliferation of director exculpation provisions and do not address the impact of such provisions. The first statute expressly permitting director exculpation provisions was passed in the State of Delaware in 1986.

[44] The circumstances surrounding a duty of inquiry can affect the manner and scope of inquiry that is appropriate. *See Fitzpatrick v. FDIC*, 765 F.2d 569, 577 (6th Cir. 1985) ("While it is true that there is no 'invariable presumption of rascality as to one's agents in business transactions,' that does not mean that an officer or director should not inquire further when insider transactions are being considered by the board. The director's duty of inquiry cannot be met by representations of propriety from interested parties; he must be personally satisfied that there was an adequate independent investigation showing the propriety of the transaction.") (citation omitted).

[45] 2 *ABA Model Bus. Corp. Act Ann.* § 8.31 Official cmt. at 8-204 to 8-205.

willfully or through inattention obvious danger signs of employee wrongdoing."[46]  In

addition, the Supreme Court of Oregon articulated this embedded duty of inquiry in

*Devlin v. Moore* when it stated:

> If nothing has come to the knowledge to awaken suspicion that something
> is going wrong, ordinary attention to the affairs of the institution is
> sufficient.  If, on the other hand, directors know, or by the exercise of
> ordinary care should have known, any facts which would awaken
> suspicion and put a prudent man on his guard, then a degree of care
> commensurate with the evil to be avoided is required, and a want of that
> care makes them responsible.[47]

In light of the "ordinary care" standard articulated by the *Devlin* court and the

"ordinarily prudent person" language of the standard of care set forth in Oregon Revised

Statutes § 60.357(1), it is likely that a court undertaking a duty to inquire analysis under

Oregon law would apply a standard of ordinary negligence.[48]  Thus, in addition to

remaining informed generally of corporate affairs through on going monitoring, directors

must exercise reasonable care to recognize and inquire about circumstances that "awaken

suspicion."

---

[46] *Graham*, 188 A.2d at 130.

[47] *Devlin v. Moore*, 130 P. 35, 45 (Or. 1913).

[48] *See also Hoye*; *FDIC v. Mason*, 115 F.2d 548 (3d Cir. 1940); *Atherton v. Anderson*, 99 F.2d 883 (6th Cir. 1938); ALI Principles § 4.01(a)(1)-(a)(2) cmt. a ("Although the specific wording of court decisions has varied, the decisions have long required a director or officer to be attentive to his or her functions and obligations and to make inquiry when the circumstances would alert a reasonable director or officer to the need therefor.").

On the other hand, it is less clear whether the standard for the duty to inquire under Delaware law is ordinary negligence or something less exacting of fiduciaries, such as gross negligence. In *Rabkin v. Hunt*, No. 28436, 1987 WL 28436, at *3 (Del. Ch. Dec. 17, 1987), the Delaware Court of Chancery, citing *Graham*, concluded that ordinary negligence is the appropriate standard of liability in claims involving director inaction to which the business judgment rule does not apply.  However, in *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 364 n.31 (Del. 1992), the Supreme Court of Delaware characterized the standard formulated in *Graham* as "quite confusing and unhelpful," noting that while the *Graham* opinion "seems to apply a 'prudent man' standard, three paragraphs later it speaks of director liability in terms of reckless conduct." (citations omitted).

In *Miller v Schreyer*,[49] the court denied a motion to dismiss a claim that the board of directors of an investment bank negligently failed to detect and prevent an alleged $900 million illegal "parking scheme."[50] The plaintiffs alleged that, in a series of transactions over a four-year period, high quality United States Treasury securities held by the investment bank were exchanged for junk bonds held by an insurance company for the purpose of falsifying the insurance company's year-end balance sheets. The exchanges allegedly took place on or about December 31st and were reversed a few days later. As alleged, the transactions served no legitimate business purpose but were designed to artificially enhance the quality of the insurance company's capital position on its year-end balance sheets, thereby misleading insurance regulators and staving off insolvency for several years. The plaintiffs alleged that the suspicious circumstances surrounding these trades should have come to the attention of a diligent board of directors. Denying the board's motion to dismiss the claims, the court stated:

> In view of the illegal purpose of the transactions, their magnitude and duration, their timing, and the identity of their beneficiary, the matter should have come to the attention of senior management even on a rudimentary audit.[51]

The court in effect concluded that the plaintiffs adequately alleged facts and circumstances that represented "obvious danger signs of employee wrongdoing."[52]

As with the duty to monitor, one must consider the impact of director exculpation provisions on liability for breach of the duty to inquire. Two recent federal circuit court

---

[49] 683 N.Y.S.2d 51 (N.Y. App. Div. 1999).

[50] *Id.* at 53.

[51] *Id.* at 55.

[52] *Id.*

cases have addressed claims of inadequate board oversight and failure to inquire under circumstances in which director exculpation provisions applied.

In *McCall v. Scott*,[53] shareholders of Columbia/HCA Healthcare Corporation brought a derivative claim against certain directors and officers of Columbia/HCA for breach of fiduciary duty under Delaware law. The claims arose following numerous governmental investigations and whistleblower lawsuits with respect to allegedly widespread and systematic health care fraud involving the company's hospitals, home health agencies and other facilities. Columbia/HCA, having grown rapidly through a series of mergers and acquisitions, allegedly owned and operated 45% of all for-profit hospitals in the United States, was the nation's ninth largest employer and was Medicare's single largest provider. According to the plaintiffs, "Columbia's senior management, with Board knowledge, devised schemes to improperly increase revenue and profits, and perpetuated a management philosophy that provided strong incentives for employees to commit fraud."[54] The plaintiffs further alleged that management set growth targets that could not reasonably be attained without committing Medicare and Medicaid fraud.

The court acknowledged that Columbia/HCA maintained information and reporting systems, including nationwide internal and external audits undertaken with attention to areas that could have legal ramifications for the company.[55] Accordingly, the *McCall* court did not focus on the duty to monitor, but rather on allegations that the board failed to address certain "red flags" that warned of fraudulent practices within the

---

[53] 239 F.3d 808 (6th Cir.), *amended*, 250 F.3d 997 (6th Cir. 2001) ("*McCall II*").

[54] *Id*. at 814.

[55] *Id*. at 820, n. 11.

company. The defendant directors argued that the claims should be dismissed because the directors were protected by the director exculpation provision in Columbia/HCA's charter. The plaintiffs countered that the exculpation provision did not apply because their claims were based not on gross negligence (which the court recognized as Delaware's standard of liability for breach of the duty of care and which the court acknowledged would be precluded by a director exculpation provision), but rather on reckless or intentional misconduct on the part of the directors, which is not protected by the director exculpation provision. The court agreed, stating:

> We construe plaintiffs' complaint as alleging a breach of the directors' duty of good faith for the purposes of determining whether plaintiffs' claims are precluded by Columbia's [director exculpation] provision. Under Delaware law, the duty of good faith may be breached where a director consciously disregards his duties to the corporation, thereby causing its stockholders to suffer. Here, Plaintiffs accuse the directors not merely of "sustained inattention" to their management obligations, but rather of "intentional ignorance of" and "willful blindness" to "red flags" signaling fraudulent practices throughout Columbia. Accordingly, regardless of how plaintiffs style their duty of care claims, we find that they alleged a conscious disregard of known risks, which conduct, if proven, cannot have been undertaken in good faith. Thus, we hold that plaintiffs' claims are not precluded by Columbia's [director exculpation] provision.[56]

To support its claim of director liability for intentional or reckless breach of the duty of care based on a conscious disregard of known risk, the plaintiff had to allege the existence of red flags sufficient for the court to infer director awareness of risks that were disregarded. The court considered alleged red flags emanating from audit information, ongoing acquisition practices, allegations brought in a whistleblower proceeding, an extensive federal investigation and an investigation by *The New York Times*. According to the court, the prior experience of certain directors as directors or managers of

---

[56] *McCall II*, 250 F.3d at 1001 (citations omitted).

businesses acquired by Columbia/HCA was a "significant factor" supporting an inference of director awareness of risks underlying the alleged red flags that emanated from those businesses.[57] In addition, the court considered the magnitude and duration of the alleged wrongdoing as relevant in determining whether the alleged failure of the directors to act amounted to a lack of good faith.[58]

In *In re Abbott Laboratories Derivative Shareholders Litigation*,[59] shareholders of Abbott Laboratories brought a derivative suit against Abbott's board of directors alleging breach of fiduciary duty for failing to address problems that led to a consent decree with the United States Food and Drug Administration ("FDA"). The consent decree followed six years of alleged violations of FDA regulations and required Abbott to pay a $100 million civil fine, withdraw 125 types of medical diagnostic kits from the United States market, destroy certain inventory and make a number of corrective changes in its manufacturing procedures. Prior to entering into the consent decree with Abbott, the FDA conducted thirteen separate inspections of certain Abbott facilities, resulting in four formal certified warning letters to Abbott, several of which were sent to a member of Abbott's board of directors. *The Wall Street Journal* publicly reported Abbott's FDA problems in 1995.

The plaintiffs alleged that the directors were aware of the six-year history of noncompliance problems involving the FDA, that they had a duty to take necessary action to correct these problems and that they demonstrated gross negligence by ignoring the problems for six years. The plaintiffs did not allege that Abbott's information and

---

[57] *McCall*, 239 F.3d at 819.

[58] *Id.* at 823.

[59] 325 F.3d 795 (7th Cir. 2003).

reporting system was inadequate. Accordingly, like *McCall*, the *Abbott* case focused on allegations that the Abbott directors failed to respond to red flags signaling potential problems within the company.

Regarding the directors' awareness of red flags, the court noted that several warning letters from the FDA were copied to a member of Abbott's board of directors. In addition, the court determined that Abbott's disclosure of FDA problems in reports filed with the SEC imputed knowledge of the disclosed problems to the directors. The court also noted that as early as 1995 the FDA problems were "public knowledge" (presumably referring to the report in *The Wall Street Journal*).[60] Accordingly, the court inferred that members of the Abbott board were aware of the FDA problems. The court then held:

> Given the extensive paper trail . . . concerning the violations and the inferred awareness of the problems, the facts support a reasonable assumption that there was a "sustained and systematic failure of the board to exercise oversight," in this case intentional in that the directors knew of the violations of law, took no steps in an effort to prevent or remedy the situation, and that failure to take any action for such an inordinate amount of time resulted in substantial corporate losses, establishing a lack of good faith.[61]

In light of the board's alleged awareness of the FDA problems, the *Abbott* court characterized the board's alleged failure to act as an intentional decision.[62] In *McCall*, on the other hand, the Columbia/HCA board's alleged failure to act in the face of red flags was characterized as "unconsidered inaction."[63] As a result, unlike the *McCall* court, the *Abbott* court confronted the business judgment rule, which only applies to board actions

---

[60] *Id.* See also *McCall*, 239 F.3d at 822, in which the court infers board awareness of a lawsuit described in the corporation's Annual Report on Form 10-K filed with the SEC.

[61] *Abbott*, 325 F.3d at 809.

[62] *Id.*

[63] *McCall*, 239 F.3d at 817.

and not to unconsidered inaction.[64]  However, the application of the business judgment

rule in *Abbott* did not provide a shield for the directors.  The *Abbott* court found that the

plaintiffs had "sufficiently pleaded allegations, if true, of a breach of the duty of good

faith to reasonably conclude that the directors' actions fell outside the protection of the

business judgment rule."[65]  Notwithstanding this analytical difference between *Abbott*

and *McCall*, the *Abbott* court found support for its holding in *McCall's* emphasis on the

magnitude and duration of the alleged wrongdoing.  In particular, the *Abbott* court noted

that "the magnitude and duration of the FDA violations in *Abbott* were so great that it

occasioned the highest fine ever imposed by the FDA" and that the Abbott directors'

failure to act spanned a six-year period as opposed to an approximate two-year period in

*McCall*.[66]

    Regarding Abbott's director exculpation provision, the court noted that, while the

plaintiffs' complaint alleged a breach of the duty of care characterized by gross

negligence, it also alleged intentional conduct in failing to address known federal

violation problems.  Citing *McCall*, the court concluded that the plaintiffs had adequately

alleged a conscious disregard of known risks, which conduct, if proven, cannot have been

undertaken in good faith and would not be protected by Abbott's director exculpation

provision.  Accordingly, the court denied the directors' motion to dismiss the claim.

    In summary, when red flags arise in the course of monitoring corporate affairs,

directors have an affirmative duty to respond to those red flags by making further inquiry.

---

[64] *See Aronson*, 473 A.2d at 813 ("[T]he business judgment rule operates only in the context of director action.  Technically speaking, it has no role where directors have either abdicated their functions, or absent a conscious decision, failed to act."), *overruled on other grounds, Brehm*, 746 A.2d 244.

[65] *Abbott*, 325 F.3d at 809 (citation omitted).

[66] *Id.*

Under Oregon law, a negligent failure to recognize and respond to red flags breaches this

duty. However, when a director exculpation provision such as Enron's applies, a

director's failure to respond to red flags must amount to conduct "not in good faith" or

must involve "intentional misconduct" or "a knowing violation of law" in order to

establish liability. Under *McCall* and *Abbott*, a failure to respond to red flags that

amounts to a "conscious disregard of known risks" would constitute conduct not in good

faith and, therefore, would not be protected by such a director exculpation provision. To

meet this test for liability, a plaintiff must establish director awareness of risks that were

disregarded. According to *McCall*, inferences regarding a director's awareness of risk

can be supported by the director's prior experience managing a business unit from which

red flags emanate. In addition, under both *McCall* and *Abbott*, inferences of risk

awareness on the part of directors can be supported by reference to risks disclosed in a

company's SEC reports.

## V.    INSIDE DIRECTORS COMPARED TO OUTSIDE DIRECTORS

Directors who are also officers or employees of a corporation are commonly referred to as "inside directors" and directors who serve only as directors are commonly referred to as "outside directors."   Most director exculpation provisions, including Enron's, apply only to directors and not to officers.  This raises a question of whether and to what extent a director exculpation provision applies to an inside director who is serving as both an officer and a director of a corporation.

This question was addressed in the context of a claim for breach of the duty of oversight in *Hahren v. Brown*.[67]  In *Hahren*, representatives of John Hancock Mutual Life Insurance Company's government relations department engaged in a series of illegal lobbying activities, resulting in fines and legal expenses paid by Hancock and alleged harm to Hancock's reputation.   A Hancock policyholder brought a derivative action against, among others, three inside directors for breach of fiduciary duty.  The inside directors were members of Hancock's management committee, which allegedly was responsible for overseeing all aspects of Hancock's operations, including government relations.   The plaintiffs alleged that members of the management committee were kept informed of lobbying activities on behalf of Hancock and that they knew or should have known of the conduct that was subsequently revealed as illegal.  Based on these and other particularized allegations, the court concluded that the plaintiffs had adequately alleged events and conduct which, if true, support a claim that the inside directors "violated their duty of care in failing, as directors, senior officers and members of the management committee, properly to direct and manage the affairs of Hancock so that the illegal

---

[67] 710 N.E.2d 224 (Mass. App. Ct. 1999), *rev'd on other grounds*, 730 N.E.2d 859 (Mass. 2000).

activities . . . --of which [they] knew or should have known--would not have occurred or

persisted."[68]  Therefore, the court denied the inside directors' motion to dismiss the

claim.  Regarding Hancock's director exculpation provision, the court stated:

> the benefit of the exculpatory clause . . . is extended only to directors of
> Hancock, and [the inside directors] are all alleged to be senior officers of
> Hancock as well as directors. To the extent that the claims against these
> defendants arise out of the alleged failure of their performance as officers
> and members of the management committee which is charged with
> responsibility of overseeing all the operations of Hancock--viz., their
> alleged approval and support of the unlawful activities of [Hancock's
> lobbyist]--the exculpatory clause is not available to them.  The fact that
> these defendants are also directors may be regarded as mere
> happenstance.[69]

Accordingly, when an inside director acts (or fails to act) in his or her capacity as

an officer, he or she would not enjoy the protections of a director exculpation provision.

In addition, as explained in Appendix B (Legal Standards) to the Third Interim

Report, although officers and directors are generally held to the same standards of

conduct, the roles and responsibilities of officers present a different context in which to

apply those standards and may subject officers to a higher degree of scrutiny than that

given to directors.[70]  For example, "full-time officers will generally be expected to be

more familiar with the affairs of a corporation than outside directors."[71]  Similarly,

"[o]fficers will be expected to be more familiar with business affairs under their direct

supervision than officers who do not have such responsibility."[72]  Oregon's statutory

---

[68] *Id.* at 231.

[69] *Id.* at 238.

[70] *See* Third Interim Report, Appendix B (Legal Standards). *See also Raines v Toney*, 313 S.W.2d 802 (Ark. 1958); *Mixon v. Anderson (In re Ozark Rest. Equip. Co.)*, 41 B.R. 476 (Bankr. W.D. Ark. 1984), *rev'd on other grounds*, 61 B.R. 750 (W.D. Ark. 1986); *Taylor v. Alston*, 447 P.2d 523 (N.M. Ct. App. 1968); *Bynum v. Scott*, 217 F. 122 (E.D.N.C. 1914).

[71] ALI Principles § 4.01 cmt. a.

[72] *Id.*

standard of care for corporate directors allows for these differing circumstances to be taken into account by requiring directors to exercise the care of an ordinarily prudent person "in a like position . . . under similar circumstances."[73]  Indeed, the drafters of the Model Act observe that the phrase "in a like position . . . under similar circumstances" is intended to recognize, among other things, that the "management responsibilities of a particular director may be relevant in evaluating that director's compliance with the standard of care."[74]

The Supreme Court of the United States focused on the different roles and responsibilities of inside directors and outside directors in *Bates v. Dresser*.[75]  In *Bates*, the Supreme Court considered whether directors of a bank neglected their duties by accepting a fraudulent cashier's statement of liabilities and failing to inspect the depositors' ledger.  The court found that confidence in the cashier's statement was warranted for the bank's outside directors, but not for a director who was also the bank's president.  According to the court, the president was "the master of the situation" and had greater responsibility and greater knowledge due to his daily presence at the bank.[76]  The president had hints and warnings to which the outside directors were not exposed and therefore had a greater responsibility to take steps to prevent the cashier's fraud.

The distinction between inside and outside directors was also addressed in *Rowen v. LeMars Mutual Insurance Co. of Iowa*.[77]  In *Rowen*, an individual, Mr. Alesch, owned and controlled an insurance agency and at the same time served as chief operating officer

---

[73] Or. Rev. Stat. § 60.357(1).

[74] 2 *ABA Model Bus. Corp. Act Ann.* § 8.30 Official cmt. at 8-170.

[75] 251 U.S. 524 (1920).

[76] *Id.* at 530.

[77] 282 N.W.2d 639 (Iowa 1979).

and a director of an insurance company with which the agency did most of its business. Alesch sought to sell his insurance agency to a third party purchaser and, in order to obtain a substantial premium in the sale, promised to deliver control of the insurance company to the purchaser. However, Alesch did not own the insurance company and therefore did not have the legal power to transfer control of it. Instead, Alesch agreed to use his considerable influence over the insurance company to secure the resignation of its directors and to guarantee the election of directors designated by the purchaser.

The court determined that the promise was unenforceable and that Alesch violated his fiduciary duties as an officer and director of the insurance company. The court also determined that the inside directors of the purchaser, who were managing its affairs and deciding its policy, conspired with Alesch to accomplish the illegal sale and were also liable. Turning to the outside directors of the purchaser, the court concluded that they were unaware of the illegal plan to take over the insurance company and did not actively participate in it. Thus, the court focused on whether they were liable for neglecting to detect the illegal conduct of the inside directors who conspired with Alesch. After acknowledging their duty to monitor corporate affairs, the court stated that the outside directors may within reasonable limits rely on the inside directors "until they have reason to suspect impropriety." The court held:

> We find no circumstances to arouse the suspicion of the outside directors. They had learned to rely on the management skill and judgment of the officers and executive committee. There had been no previous deception in their dealings with the directors. The record shows they had confidence in the business judgment of these men as well as in their integrity. We cannot say these directors should have viewed this transaction with suspicion and cynicism. Plaintiffs argue they should have been alerted by the substantial purchase price. However, that is pure hindsight. They were told this was an advantageous deal, as indeed it was for [the purchaser]. The question is whether they had a duty to make an

- 30 -

independent investigation concerning [the insurance agency] valuation. We hold they did not.[78]

The circumstances concerning the directors of the insurance company were entirely different. In the first place, the court noted that the insurance company was the one victimized by the wrong and had a right to expect its directors to be more vigilant in protecting it. Without distinguishing between inside directors and outside directors, the court held:

> Unlike [the purchaser]'s outside directors, these men were faced with questionable conduct directly affecting their own corporation. There were circumstances which should have clearly signaled a duty to inquire and investigate. The principal one was the request for en masse resignations, prepared and submitted for their signatures, as part of the overall plan by which [Alesch] was retiring from [the insurance company] and at the same time selling his agency. We find these directors failed to discharge their duties as directors when even the most ordinary diligence on their part would have prevented the surrender of their corporation to [the purchaser]. They cannot escape the consequences of this neglect of their fiduciary duty.[79]

In summary, due to the inapplicability of Enron's director exculpation provision to officers, liability for the failure of an inside director of Enron to recognize and respond to red flags that arise in an area for which he or she has management responsibility as an officer would likely be evaluated under standards of ordinary negligence. Moreover, due to an inside director's greater role in and responsibility for the corporation's day-to-day affairs, he or she has more occasion to encounter red flags and, correspondingly, more responsibility for responding to them in the exercise of ordinary care.

---

[78] *Id.* at 653.

[79] *Id.* at 654.

- 31 -

## VI.   INDEMNIFICATION AND INSURANCE

### A.   <u>Indemnification</u>

Under certain circumstances, directors and officers of Oregon corporations can be entitled to indemnification from the corporation with respect to claims made against them in their capacity as directors or officers.   However, such claims may be subject to disallowance pursuant to Section 502(e)(1)(B) of the Bankruptcy Code.[80]

Because Enron's articles of incorporation do not provide anything to the contrary,[81] Enron is obligated by statute to indemnify any Enron director or officer who is wholly successful, on the merits or otherwise, in the defense of any proceeding to which the director or officer is a party because of being a director or officer against reasonable expenses incurred by the director or officer in connection with the proceeding.[82]   In addition, any Enron director or officer who is a party to a proceeding may apply for indemnification to the court conducting the proceeding, or to another court of competent jurisdiction, and the court may order indemnification if it determines that (i) the director or officer is entitled to the mandatory indemnification described in the preceding sentence, in which case the court would also order Enron to pay the reasonable expenses incurred to obtain the court-ordered indemnification or (ii) the director or officer is fairly

---

[80] Any claim filed for mandatory indemnification by a member of the Enron Board may be subject to disallowance under the terms of 11 U.S.C § 502(e)(1)(B) and the cases thereunder.  *See In re Drexel Burnham Lambert, Inc.,* 148 B.R. 982, 985-93 (Bankr. S.D.N.Y. 1992) (disallowing contingent contractual claims for indemnification); *In re Wedtech Corp.,* 85 B.R. 285 (Bankr. S.D.N.Y. 1988) (recognizing that the concept of reimbursement under Section 502 (e)(1)(B) would include indemnity claims).  If, and to the extent that, members of the Enron Board filed proofs of claim in respect of the mandatory indemnification provisions of the articles of incorporation, or pursuant to any contractual provisions regarding indemnification, the Debtors and the Committee may seek disallowance of those claims, to the extent contingent, under Section 502(e)(1)(B).

[81] Enron's articles of incorporation do not limit any of the indemnification rights extended to directors or officers under the OBCA.  *See* Articles of Incorporation of Enron [AB0785 03888-AB0785 04147].

[82] *See* Or. Rev. Stat. § 60.394 (regarding directors); Or. Rev. Stat. § 60.407(1) (regarding officers).

and reasonably entitled to indemnification in view of all the relevant circumstances, regardless of the limitations described in the following paragraph.[83]

In addition to the "mandatory" and "court-ordered" indemnification rights described above, under the OBCA, an Oregon corporation *may* affirmatively provide indemnification to a director, officer, employee or agent made a party to a proceeding because he or she is or was a director, officer, employee or agent against liability incurred in the proceeding if:

(a)    The conduct of the individual was in good faith;

(b)    The individual reasonably believed that the individual's conduct was in the best interests of the corporation, or at least not opposed to its best interests; and

(c)    In the case of any criminal proceeding, the individual had no reasonable cause to believe the individual's conduct was unlawful.[84]

However, an Oregon corporation may not provide such indemnification under the OBCA in connection with (i) a proceeding by or in the right of the corporation in which the director, officer, employee or agent is adjudged liable to the corporation or (ii) any other proceeding charging improper personal benefit to the director, officer, employee or

---

[83] *See* Or. Rev. Stat. § 60.401 (regarding directors); Or. Rev. Stat. § 60.407(1) (regarding officers).

[84] *See* Or. Rev. Stat. § 60.391(1) (regarding directors); Or. Rev. Stat. § 60.407(2) (regarding officers, employees and agents). In addition, under the OBCA, an Oregon corporation may advance the reasonable expenses incurred by a director, officer, employee or agent who is a party to a proceeding in advance of final disposition of the proceeding if (i) the director, officer, employee or agent furnishes a written affirmation of his or her good faith belief that he or she has met the standard of conduct described in the sentence to which this footnote relates and (ii) the director, officer, employee or agent furnishes a written undertaking to repay the advance if it is ultimately determined that he or she did not meet such standard of conduct. *See* Or. Rev. Stat. § 60.397(1) (regarding directors), Or. Rev. Stat. § 60.407(2) (regarding officers, employees, and agents).

agent in which the director, officer, employee or agent is adjudged liable on the basis that personal benefit was improperly received.[85]

Enron's articles of incorporation provide that each person who is, or is threatened to be made, a party to any proceeding by reason that he or she was or is a director or officer of Enron *shall be* indemnified by Enron to the fullest extent authorized by the OBCA against all liability reasonably incurred by such person in connection with the proceeding.[86]

**B.    Insurance**

The OBCA permits Oregon corporations to purchase and maintain insurance on behalf of an individual against whom liability is asserted or who incurs liability and who is or was a director, officer, employee or agent of the corporation.[87] The coverage of that

---

[85] *See* Or. Rev. Stat. § 60.391(4) (regarding directors); Or. Rev. Stat. § 60.407(2) (regarding officers, employees, and agents).

[86] Article VII, Section B.(1), Articles of Incorporation of Enron [AB0785 03888-AB0785 04147]. Enron's articles of incorporation further provide that the indemnification rights include the right to be paid by Enron for expenses incurred in defending any proceeding in advance of its final disposition, provided that the director or officer delivers any written affirmation and written undertaking required by the OBCA. *Id.*

The OBCA also provides that the OBCA's statutory provisions for indemnification and advancement of expenses are *not* exclusive of any other rights to which directors, officers, employees or agents may be entitled under the corporation's articles of incorporation or bylaws, any agreement, general or specific action of its board of directors, vote of shareholders or otherwise. Or. Rev. Stat. § 60.414(1). Specifically with respect to officers, employees and agents of the corporation who are not directors, the OBCA gives an Oregon corporation the power to make or agree to make any further indemnification or advancement of expenses as authorized by its articles of incorporation or bylaws, by general or specific action of its board of directors or by agreement. Or. Rev. Stat. § 60.414(1)(b). Enron's articles of incorporation also provide that the Enron Board *may* provide indemnification to employees and agents of Enron who are not officers or directors with the same scope and effect as the indemnification provided to Enron's officers and directors. Article VII, Section B.(1), Articles of Incorporation of Enron [AB0785 03888-AB0785 04147]. Enron's bylaws contain no provisions regarding indemnification of directors, officers, employees or agents, Bylaws of Enron [AB0971 00550-AB0971 00565], and the Examiner is not aware of any indemnification agreements or board actions that provide additional rights to indemnification or advancement of expenses to any Enron directors or officers. The Examiner has located a copy of an Indemnification Agreement between Enron and Fastow purportedly granting certain indemnification rights to Fastow with respect to LJM1. The copy located by the Examiner bears a signature on behalf of Fastow but is not countersigned on behalf of Enron. The Examiner has attempted to locate a copy of the agreement bearing a signature on behalf of Enron, to no avail. Accordingly, the Examiner has treated the agreement as not being in effect.

[87] Or. Rev. Stat. § 60.411.

insurance may include liabilities against which the corporation does not have power to indemnify the individual under the OBCA.[88]

In 1998, Enron purchased a Directors and Officers Liability Insurance policy from Associated Electric & Gas Insurance Services Limited ("AEGIS"), Policy No. D0079A1A98 (the "Policy").[89] In addition to the Policy, there are excess policies that, together with the Policy, provide for insurance coverage of at least $350 million for claims against officers and directors.[90]

---

[88] Id.

[89] Directors and Officers Liability Insurance Policy from Associated Electric & Gas Insurance Services Limited; Policy No. D0079A1A98 [AB0971 01685-AB0971 01782]. The Policy originally applied to claims first asserted during the period from September 1, 1998 to September 1, 1999. The policy was subsequently renewed to extend to September 1, 2002. Id.

[90] The excess policies are as follows: Energy Insurance Mutual, policy no. 900630-00DO, $65 million in excess of $35 million; Federal Insurance Company, policy no. 8142-05-47, $25 million in excess of $100 million; Twin City Fire Insurance Company, policy no. NDA 0131301-98H, $25 million in excess of $125 million; Executive Liability Underwriters, policy no. ELU 82248-01, $25 million in excess of $150 million; Lloyd's of London, policy no. 901/LK9802531, $25 million in excess of $175 million; St. Paul Fire and Marine Insurance Company, policy no. 568CM0934, $25 million in excess of $200 million; Federal Insurance Company, policy no. 8181-4314, $25 million in excess of $225 million; Royal & SunAlliance, policy no. PSF000633, $25 million in excess of $250 million; ACE, policy no. ENE-9459D, $25 million in excess of $275 million; Federal Insurance Company, et al, policy no. 8179-41-03, $50 million in excess of $300 million. Total coverage: $350 million. *See* Motion of Debtors for an Order Authorizing and Approving Direct Payment and/or Advancement of Defense Costs to Individual Defendants in Securities and ERISA Lawsuits Under Debtors' Directors and Officers Liability Insurance and ERISA Fiduciary Liability Insurance Policies, Jan. 18, 2002, Docket No. 1005, at 4, n.2.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------ x
                                            :
In re:                                      :        Chapter 11
                                            :
ENRON CORP., *et al.*,                      :        Case No. 01-16034 (AJG)
                                            :
                        Debtors.            :        Jointly Administered
                                            :
------------------------------------------------------ x


## APPENDIX E

### (Role of RBS and its Affiliates)

to

## FINAL REPORT OF NEAL BATSON,
## COURT-APPOINTED EXAMINER


      Reference is made to the preceding Final Report of Neal Batson, Court-Appointed Examiner (the "Report"). This Appendix constitutes an integral part of the Report. All capitalized terms not otherwise defined herein shall have the meanings set forth in the Report.

## TABLE OF CONTENTS

I.   INTRODUCTION ...................................................................... 1
     A.   Introduction and Overview ........................................ 1
     B.   Summary of RBS's Role in Enron's SPE Transactions............ 6
     C.   RBS Background Information ................................... 11

II.  HISTORY AND DEVELOPMENT OF RBS'S INVOLVEMENT WITH
     ENRON........................................................................... 12
     A.   Relationship Between RBS and Enron ..................... 12
     B.   RBS's Knowledge of Enron's Accounting Objectives and Financial
          Condition........................................................... 18

III. RBS'S ROLE IN ENRON'S SPE TRANSACTIONS ....................... 29
     A.   Participating as a Limited Partner in LJM1 ................ 29
     B.   Obtaining Verbal Assurances From Enron ................ 63
     C.   Funding the Nixon Prepay Transaction .................... 79

IV.  POTENTIAL LIABILITY OF RBS ........................................... 84
     A.   Arguments Supporting the Imposition of Aiding and Abetting Liability
          and Equitable Subordination........................................ 84
     B.   Arguments Against the Imposition of Aiding and Abetting Liability and
          Equitable Subordination............................................. 89
     C.   Conclusions............................................................ 99

## I.  INTRODUCTION

### A.  Introduction and Overview

In Appendix C (Role of Enron's Officers) to the Third Interim Report, the Examiner concluded that there is sufficient evidence for a fact-finder to determine that certain of the Debtors' officers breached their fiduciary duties under applicable law by engaging in self-dealing in violation of their duty of loyalty and by causing the Debtors to enter into certain SPE transactions that were designed to manipulate the Debtors' financial statements and that resulted in the dissemination of financial information known to be materially misleading.  These wrongful acts caused direct and foreseeable harm to Enron itself and resulting harm to innocent parties that dealt with Enron, including certain creditors in the Bankruptcy Case.

This Appendix considers the role of The Royal Bank of Scotland plc ("RBS") in certain of the Debtors' SPE transactions.  RBS acquired National Westminster Plc ("NatWest") by hostile takeover in March 2000.[1]  RBS, as that entity existed both before and after the NatWest takeover, and NatWest prior to that takeover, each participated in multiple Enron SPE transactions.  Among those transactions were the following, each of which is discussed in this Appendix: LJM1,[2] a Related Party Transaction which NatWest helped fund, participated in as a limited partner, and profited from substantially; Nixon,[3]

---

[1] RBS Corporate Profile, *available at* http://www.rbs.co.uk/Group_Information/Corporate_Profile/About_the_Group/default.htm (the "RBS Profile") (last visited Oct. 23, 2003); Erik Portanger, *Deals & Deal Makers:  Royal Bank of Scotland Advisers Use Novel 'Club' to Beat Rival in Fight to National Westminster*, Wall St. J., Feb. 15, 2000 (describing the means used to accomplish the takeover); Sworn Statement of RBS, to John E. Stephenson, Jr., A&B, July 30, 2003 (the "RBS Sworn Statement"), at 111, lines 20-21.

[2] Second Interim Report, Annex 2 and Annex 3 to Appendix L (Related Party Transactions).

[3] Third Interim Report, Appendix D (Roles of Citigroup and its Affiliates), *Citigroup's Role in Enron's SPE Transactions, Prepay Transactions*.

a multi-bank Prepay Transaction closed in December 1999 (the "Nixon Prepay"), in

which RBS participated (along with Citigroup and Barclays, and with Toronto Dominion

acting in a conduit capacity between each of the three other banks and Enron); and four

FAS 140[4] Transactions – Sutton Bridge, a NatWest deal closed in June 1999, and three

additional transactions that closed between November 2000 and June 2001, known as

ETOL I, ETOL II and ETOL III (all of the identified transactions are sometimes referred

to cumulatively as the "RBS Transactions").[5]  In Appendix C (Role of Enron's Officers)

to the Third Interim Report, the Examiner concluded that there is sufficient evidence for a

fact-finder to determine that certain of the Debtors' officers breached their fiduciary

duties by causing Enron to enter into certain of these transactions.[6]

In this Appendix, the Examiner discusses evidence indicating that: (i) RBS had

actual knowledge of the wrongful conduct giving rise to breaches of fiduciary duty by the

Debtors' officers; (ii) RBS gave substantial assistance to the Debtors' officers by

participating in the transactions; and (iii) injury to the Debtors was the direct or

reasonably foreseeable result of this conduct.  The evidence reviewed by the Examiner,

and the reasonable inferences that may be drawn from that evidence, are sufficient for a

---

[4] All but one of these transactions, ETOL III, were considered FAS 125 transactions at the times of their closings. FAS 125 was modified, and became known as FAS 140, effective April 1, 2001. Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities, Statement of Financial Accounting Standards No. 140 (Financial Accounting Standards Bd. 2000). For ease of reference, and for consistency with previous Reports by the Examiner, this Appendix will refer to all such transactions as FAS 140 Transactions. *See also* First Interim Report; Second Interim Report, Appendix M (FAS 140 Transactions).

[5] RBS acquired all assets and liabilities of NatWest as part of the corporate takeover. Because RBS is the successor in interest to NatWest, the Examiner regards the acts of NatWest prior to its takeover by RBS as acts of RBS.

[6] Third Interim Report, Appendix C (Role of Enron's Officers) (discussing, *inter alia*, the officers' roles in Related Party Transactions, Prepay Transactions, FAS 140 Transactions and "Transactions Lacking Any Business Purpose").

fact-finder to conclude[7] that RBS aided and abetted certain Enron officers in breaching their fiduciary duties. In addition, there is sufficient evidence of inequitable conduct by RBS in connection with the Enron SPE transactions discussed in this Appendix for a court to conclude that RBS's claims should be equitably subordinated to the claims of other creditors.

As set forth more fully below, RBS's conduct in the LJM1 Related Party Transaction enabled Enron to complete the LJM1/Rhythms Hedging Transaction, through which Enron recognized $95 million of income in 1999, representing 10.6% of its originally reported net income for that year.[8] RBS's conduct in the LJM1 Related Party Transaction also enabled Fastow improperly to enrich himself and other Enron officers in violation of their fiduciary duties to Enron. As a result of the LJM1 Related Party Transaction, Fastow and his colleagues, several of whom were Enron officers, received over $40 million.[9]

RBS's conduct in the FAS 140 Transactions and in the Nixon Prepay enabled Enron to:

- record approximately $191 million of income from gain on sales of assets that should not have been recorded;

---

[7] *See* Report, *Introduction, Standard Adopted by the Examiner.*

[8] Enron Form 8-K filed with the SEC on Nov. 8, 2001 (the "Enron 8-K filed Nov. 8, 2001"), Table 1.

[9] *See* Second Interim Report, Appendix L (Related Party Transactions), *Provision of Cash to Participating Enron Insiders.* This amount includes: (i) $18 million in distributions and $2.6 million in management fees received by Fastow from LJM1; (ii) at least $7.3 million in distributions and $178,000 in management fees received by Kopper from LJM1; (iii) $4.5 million received by each of Kopper and The Fastow Family Foundation in connection with the sale of Swap Sub to Southampton, L.P. in March 2000; and (iv) an aggregate of $3.3 million received by Michael Hinds (an LJM2 employee), Kristina Mordaunt, Ben Glisan, Anne Yaeger Patel and Kathy Lynn in connection with the sale of Swap Sub to Southampton, L.P. in March 2000. In addition, Fastow received $15.5 million in cash and a house valued at $850,000 from Kopper in connection with Fastow's sale of his LJM1 and LJM2 interests to Kopper. *Id.*

- receive approximately $444 million of proceeds, most of which Enron erroneously recorded as cash flow from operating activities and the remainder of which Enron erroneously recorded as cash flow from investing activities; and

- understate debt by $177 million and $273 million in its December 31, 1999 and 2000 balance sheets, respectively.

The evidence would allow a fact-finder to conclude that RBS:

- participated with Fastow and CSFB in the formation and funding of LJM1, knowing that Enron would use LJM1 to enter into a non-economic hedging transaction;

- structured and implemented a subsequent transaction through which LJM1 received funding that was improperly used by LJM1 to enrich Fastow;[10]

- obtained verbal assurances from Enron in connection with the FAS 140 Transactions wherein Enron assured repayment of RBS's equity interests in SPEs, knowing that such assurances precluded the accounting treatment Enron sought for such transactions, and that Enron nonetheless intended to account for these transactions as if no assurances of repayment had been provided; and

- funded and assisted Enron in completing the Nixon Prepay even though RBS knew that Enron's accounting for the transaction, with no other meaningful related disclosure, would result in misleading financial presentation.

The Examiner has reviewed a substantial amount of evidence, including documentary and testimonial evidence, and has noted reasonable inferences that could be drawn from the evidence. A fact-finder may draw alternative or contrary inferences from

---

[10] As discussed below, Fastow's profit, if any, from LJM1 was to come only from investments made with the $16 million in capital contributed by RBS, CSFB, and Fastow, not from the Enron stock transferred to LJM1. Through Total Return Swaps that it entered with American International Group ("AIG"), RBS effectively hedged its interest in the Enron shares held by LJM1, thereby recording a $22.7 million gain on its investment, and then contributed $45 million, through its wholly owned affiliate, Campsie Ltd. ("Campsie"), in cash to LJM1. The parties treated the proceeds that resulted from the transaction as an additional capital contribution to LJM1 from which Fastow could profit, rather than proceeds resulting from the Enron stock, from which he could not. As discussed in Appendix F (Role of CSFB and its Affiliates) to the Report, LJM1's other limited partner made a similar contribution. As a result of these transactions, an additional $25 million was contributed to LJM1 and recharacterized so that Fastow could profit directly from these funds.

the same evidence. Moreover, there are certain defenses to aiding and abetting liability and equitable subordination available to RBS. Whether RBS will succeed on one or more of these defenses will depend upon the fact-finder's resolution of the facts.

The elements most likely to present issues of material fact for consideration by the fact-finder are:

- The degree of RBS's *knowledge* of the acts giving rise to the breaches of fiduciary duty. In connection with the formation and funding of LJM1 and the execution of the LJM1/Rhythms Hedging Transaction, a fact-finder may consider whether RBS's belief that the Enron Board had approved the LJM1 Related Party Transaction might lead to the conclusion that RBS lacked knowledge that Fastow and other Enron officers had breached any fiduciary duty to Enron in connection with that transaction. As part of this determination, the fact-finder may consider, among other things: (i) RBS's knowledge of the existence and terms of any approval of the LJM1 Related Party Transaction by the Enron Board and senior officers; and (ii) whether RBS relied on representations from Enron, LJM1 or their officers, and if so, whether this reliance was reasonable.

- In connection with the Total Return Swaps with AIG,[11] a fact-finder may consider, among other things: (i) RBS's knowledge of the existence and terms of any approval of subsequent modifications of the LJM1 Related Party Transaction (including those necessitated by the Total Return Swaps) by the Enron Board and senior officers; and (ii) whether RBS relied on representations from Enron, LJM1 or their officers, and if so, whether this reliance was reasonable.

---

[11] The Total Return Swaps actually consisted of several interrelated transactions: (i) Campsie and RBS entered into a Total Return Swap on the 1.775 million Enron shares transferred into escrow by LJM1 for Campsie. RBS loaned Campsie $44.5 million to cover Campsie's "Additional Capital Contribution" to LJM1 (discussed more fully below). Campsie paid to RBS the dividends on the Enron shares and a specified interest rate (held back for two years) on the $44.5 million loan; (ii) AIG and RBS entered into a separate Total Return Swap through which RBS paid to AIG the dividends received from Campsie on the Enron shares. AIG agreed (i) at settlement, to take physical delivery of the Enron shares from RBS and pay RBS approximately $67 million, and (ii) throughout the term prior to settlement, to pay RBS a specified interest rate on the $67 million settlement price. *See* Email from Adam Pettifer, RBS, to Kevin Howard, RBS, Aug. 15, 2000 (the "Pettifer/Howard Email, Aug. 15, 2000") (attaching a memorandum regarding the "Background of LJM Structure") [RBS 1080193, RBS 4003280-RBS 4003284, RBS 3123636-RBS 3123643]; Email from David Bermingham, RBS, to Andrew Galloway, Campsie, *et al.*, Nov. 12, 1999 (the "Bermingham/Galloway Email, Nov. 12, 1999"), at RBS 4016222 (attaching "Investment Proposal Presentation to the Board of Campsie Limited") [RBS 4016218-RBS 4016222]; Chart of RBS LJM1 Contributions and Distributions, Author unknown, undated (the "Chart of RBS/LJM1 Distributions") (noting "$67,011,270.75" as "Distribution into escrow of 1,775,133 of ENE stock") [RBS 4007194].

- In connection with the FAS 140 Transactions and Nixon Prepay, a fact-finder may consider the degree of RBS's *knowledge* that Enron's reporting of these transactions would result in materially misleading presentations of Enron's financial condition because: (i) the transactions were disclosed in a manner that disguised the economic substance of these transactions so as to mislead rating agencies, creditors and investors; and/or (ii) the accounting for the transactions was incorrect. As part of this determination, the fact-finder may consider, among other things: (i) RBS's knowledge that the economic substance of these transactions was inconsistent with the disclosure; (ii) its knowledge that Enron's accounting for these transactions was likely incorrect; (iii) the impact, if any, of verbal assurances received on its equity investment made in these transactions; and (iv) whether there was any reliance on accounting representations from Enron or from Andersen and, if so, whether this reliance was reasonable.

- The degree of *assistance* provided by RBS to Enron's officers. As part of this determination, the fact-finder may consider whether RBS designed the transaction, structured the transaction, assisted in the disclosure process, consummated the transaction or took any action that would invalidate the desired accounting.

- Whether it would have been reasonably *foreseeable* to RBS that these transactions would cause injury to Enron and/or its creditors. As part of this analysis, a fact-finder may consider whether the transaction had a material impact on Enron's financial statements.

RBS's claims in the Bankruptcy Case, totaling approximately $537 million, are susceptible to being equitably subordinated to the claims of other creditors. This subordination would be in addition to any affirmative recovery that may be available to the Debtors against RBS for aiding and abetting the officers' breaches of fiduciary duties, assuming the Debtors have standing to pursue such a claim.

**B.**     <u>**Summary of RBS's Role in Enron's SPE Transactions**</u>

RBS was involved in a variety of Enron's SPE transactions, including the LJM1 Related Party Transaction, four FAS 140 Transactions, and the Nixon Prepay. RBS was

one of two limited partners in LJM1.[12]  In this capacity, RBS purchased its partnership interest for $7.5 million and received payments in excess of $22 million over slightly more than two years.  LJM1 entered into the LJM1/Rhythms Hedging Transaction with Enron, as a result of which Enron recognized $95 million of income in 1999, representing 10.6% of its originally reported net income for that year.[13]  In addition, RBS structured and implemented Total Return Swaps with AIG through which LJM1 received funding that was used by LJM1 improperly to enrich Fastow.  During this same period, Fastow and his colleagues, several of whom were Enron officers, received over $40 million[14] in return for a $1 million initial investment by Fastow and minimal investments by the others.

The Examiner has concluded that the limited partnership existed principally to enter into a hedging transaction with Enron that it could not expect unaffiliated third parties to enter into on terms acceptable to Enron.[15]  The Enron Board approved the hedging transaction, in part, based on a to-be-delivered PWC fairness opinion (the "Fairness Opinion"), which relied on certain restrictions (through a "Lock-Up

---

[12]  One of the two limited partners of LJM1 was Campsie.  ERNB Ltd. ("ERNB"), a wholly owned affiliate of CSFB was the other limited partner.  In this Appendix, the Examiner generally refers to CSFB and RBS as the limited partners of LJM1.  The role of CSFB in LJM1 is discussed in Appendix F (Role of CSFB and its Affiliates) to this Report.

[13]  Enron 8-K filed Nov. 8, 2001, Table 1.

[14]  This number includes the amounts received by Fastow and by certain of his colleagues in connection with Enron's termination of the LJM1/Rhythms Hedging Transaction.

[15]  *See* Second Interim Report, Annex 2 to Appendix L (Related Party Transactions), *Introduction and Overview of Rhythms Transactions*.

01-16034-cag Case 23-11962-JTD Doc 943-5 Filed 06/13/24 Filed 02/03/23 Entered 02/03/23 12:04:13 Exhibit E Page 876 of 1137

Pg 10 of 102

Agreement")[16] on the transfer and use of the Enron shares transferred to LJM1.[17] Moreover, Fastow also informed the Enron Board of another significant restriction – namely, that he would not profit from the Enron shares transferred to LJM1.[18] Despite knowledge of these restrictions, RBS acted to circumvent them and thereby generated substantial profits from the property subject to these restrictions.[19]

In the FAS 140 Transactions, RBS held the 3% outside equity that was required for Enron to record a gain on sale from the transfer to SPEs of Enron's interests in certain assets. In order to comply with the 3% Equity Test,[20] the transferee SPE must be capitalized with at least 3% independent equity at risk. Under FAS 140 (and previously

---

[16] See Confirmation Letter from Enron to LJM1 and Swap Sub, June 30, 1999 (the "Lock-Up Agreement") [RBS 4010115-RBS 4010117].

[17] Enron Board Special Meeting Minutes, June 28, 1999 (the "Enron Board Minutes for Special Meeting, June 28, 1999"), at 6-7 [AB000172836-AB000172848]; Presentation to the Enron Board "Project LJM," June 28, 1999 (the "LJM1 Presentation to the Enron Board"), at AB000001732 (noting one of several "benefits to Enron" of the transaction was that it "keeps [a] large block of stock closely held and restricted") [AB000001727-AB000001738]; Letter from Steven J. Stampf, PWC, to Ben Glisan, former Vice President, Enron, Aug. 17, 1999 (the "Fairness Opinion"), at 3 (noting PWC "determined a range of appropriate restricted stock discounts to apply to the 3.378 million Enron shares transferred from Enron to LJM.") [AB000468680-AB000468684]; Project Martin Fairness Analysis Draft Presentation by PWC, Aug. 13, 1999 (the "PWC Fairness Analysis") [AB000154939-AB000154981]; see also Report, Appendix D (Roles of Lay, Skilling and Outside Directors).

[18] Enron Board Minutes for Special Meeting, June 28, 1999, at 6; LJM1 Presentation to the Enron Board, at AB000001730; Facsimile from Anne Yaeger, Enron Capital Management, to James Esposito, RBS, June 25, 1999 (the "Yaeger Facsimile"), at RBS 4005100, RBS 4005103 ("**[Fastow] will not receive any current or future (appreciated) value of [Enron] stock.**") (emphasis in original) (attaching draft Enron Board resolutions approving the assignment of Enron shares to LJM1 and draft Project LJM Board Presentation) [RBS 4005094-RBS 4005106].

[19] Email from David Bermingham, RBS, to Kevin Howard, et al., RBS, Aug. 6, 1999 (the "Bermingham/Howard Email, Aug. 6, 1999") [RBS 4016350-RBS 4016351]; Email from David Bermingham, RBS, to Ben Glisan, Treasurer, Enron, et al., Nov. 9, 1999 (the "Bermingham/Glisan Email, Nov. 9, 1999") [RBS 4016225-RBS 4016227, RBS 4005808].

[20] The Examiner discussed the 3% Equity Test in the Second Interim Report. The relevance of the 3% Equity Test to Enron's FAS 140 Transactions is that in transactions where the borrower-SPE is not a QSPE, the 3% Equity Test must be met or the borrower-SPE will be required to be consolidated with Enron, thereby bringing the debt incurred by that SPE onto Enron's balance sheet. See Second Interim Report, Appendix M (FAS 140 Transactions), *Was the Accounting Treatment Proper?, Accounting Consolidation Analysis*. That section also includes a discussion of the difference between a QSPE and an SPE that is not a QSPE.

under FAS 125), this equity must remain at risk for the term of the entire transaction and there can be no assurance or guaranty as to its repayment. Were the 3% Equity Test not met, Enron would be required to reflect on its balance sheet the debt of the SPE that borrowed funds in the transaction and to reflect the proceeds of the transaction as cash flow from financing activities as opposed to cash flow from operating activities. Moreover, Enron could not record a gain from the transfer of the asset in the transaction in its consolidated financial statements. Enron accounted for each of the FAS 140 Transactions in which RBS participated as if it had complied with the relevant requirements, but in fact provided RBS with verbal assurances that the bank's equity investment and promised return in each of the FAS 140 Transactions would be repaid in full at maturity.[21] The evidence indicates that RBS understood the structure by which Enron booked such gains to be "'21st Century Alchemy,'"[22] and understood that Enron's verbal assurances in connection with these transactions could neither be documented nor publicly disclosed.[23]

---

[21] Credit Application, Sept. 18, 2000 (the "ETOL I Credit Application"), at RBS 3141124, RBS 3141129-RBS 3141130 [RBS 3141118-RBS 3141165]; Credit Recommendation by Chris Clarke, Senior Manager, RBS, Sept. 19, 2000 (the "ETOL I Credit Recommendation"), at RBS 3141116 [RBS 3141115-RBS 3141117]; Memorandum from Konrad Kruger, Chief Executive, *et al.*, Greenwich NatWest, regarding Enron Sutton Bridge Ltd., undated (the "Kruger Memorandum"), at RBS 3038535 (referencing the handwritten comments) [RBS 3038532-RBS 3038535]; RBS CBFM Credit Committee Minutes, Sept. 20, 2000 (the "CBFM Credit Committee Minutes, Sept. 2000"), at RBS 3121434 [RBS 3121434-RBS 3121436]; RBS Group Credit Committee Minutes, Sept. 22, 2000 (the "Group Credit Committee Minutes, Sept. 2000"), at RBS 3121150 [RBS 3121150-RBS 3121151]; Credit Application, Mar. 15, 2001 (the "ETOL II and III Credit Application"), at RBS 3124939 [RBS 3124926-RBS 3124949]; Credit Recommendation by Chris Clarke, Senior Manager, RBS, Mar. 16, 2001 (the "ETOL II and III Credit Recommendation"), at RBS 3124953 [RBS 3124952-RBS 3124953]; RBS Group Credit Committee Minutes, Mar. 20, 2001 (the "Group Credit Committee Minutes, Mar. 2001"), at RBS 3120874 [RBS 3120874-RBS 3120875].

[22] Group Credit Committee Minutes, Sept. 2000, at RBS 3121150.

[23] ETOL I Credit Application, at RBS 3141124 ("[Enron's] desired accounting treatment does not permit any formal arrangements to be made. . . . Senior management . . . [has] made verbal assurances at a high level within [RBS] on this basis."); ETOL I Credit Recommendation, at RBS 3141116 ("We are therefore looking to verbal undertakings (they cannot be formally documented for accounting reasons) from Enron

In the Nixon Prepay, RBS loaned Enron $110 million.[24] In this transaction, RBS provided Enron with what the bank internally recognized was simply a loan,[25] knowing that Enron nonetheless deemed it urgent to close the Nixon Prepay by quarter-end.[26] Despite privately assessing the Nixon Prepay as "effectively a window dressing request" that Enron would employ "to reduce [its] reported year-end net debt position,"[27] and questioning "whether the rating agencies understood Enron's balance sheet,"[28] RBS participated in this commodity prepay transaction[29] that lacked any commodity risk. It

---

that they will ensure that RBS is kept whole through the exit strategy."); The Royal Bank of Scotland: Proposed Transaction with Enron, author unknown, undated (the "RBS ETOL Memorandum"), at 1 ("[I]n order to achieve the desired US accounting treatment . . . there must be no arrangements to ensure the repayment of, or the return on, the 3% equity that RBS will be providing . . . .") [RBS 3104222-RBS 3104226]; see also Sworn Statement of Susan Milton, Director, RBS, to John E. Stephenson, Jr., A&B, Sept. 9, 2003 (the "Milton Sworn Statement"), at 73, lines 7-13, and at 163, lines 22-25.

[24] Credit Application, Dec. 6, 1999 (the "Nixon Credit Application"), at RBS 3118965 (stating that the transaction "creates a synthetic loan . . . to Enron for three months") [RBS 3118960-RBS 3118984]; see Swap Transaction Confirmation between ENA and RBS, Dec. 14, 1999 (the "Dec. 14, 1999 Enron Swap"), at 2 [RBS 4016646-RBS 4016649].

[25] Nixon Credit Application, at RBS 3118965 (stating that the transaction "creates a synthetic loan ... to Enron for three months"); Sworn Statement of Brian McInnes, Relationship Manager, RBS, to Philip R. Stein, A&B, Sept. 10, 2003 (the "McInnes Sworn Statement"), at 66.

[26] Nixon Credit Application, at RBS 3118964, RBS 3118966 (citing as part of the rationale for recommending this year-end, three-month bridging facility that RBS could thereby "[o]nce again uptier the Enron Corp. relationship by assisting them over their crucial de-leveraging periods of quarter and year ends."); see also Credit Recommendation by Andrew Close, Credit Manager, RBS, and Alex Sinclair, Senior Credit Manager, RBS, March 30, 2000 (the "Nixon Extension Recommendation") [RBS 3121283]. Andrew Close and Alex Sinclair summarized Enron's request for a subsequent extension of the facility as follows:

> On 10th March an urgent request was received to roll the facility for a further one-month period pending completion of Yosemite III in mid-April. Credit concern again centered on the extent of Enron's manipulation and the danger given such heavy reliance on short-term transactions of bad news cutting Enron's ability to refinance and keep these sizeable numbers off balance sheet.

Id.

[27] ARD Memorandum from A.W. McAlister, Senior Analyst, RBS, Dec. 6, 1999 (the "ARD Memorandum, Dec. 6, 1999"), at RBS 3118972 [RBS 3118972-RBS 3118973].

[28] RBS UK Bank Credit Committee Minutes – Special Meeting, Dec. 8, 1999 (the "UK Bank Credit Committee Minutes, Dec. 1999"), at RBS 1007764 [RBS 1007764-RBS 1007765].

[29] Second Interim Report, Appendix E (Prepay Transactions); Third Interim Report, Appendix D (Roles of Citigroup and its Affiliates), Citigroup's Role in Enron's SPE Transactions, Prepay Transactions.

did so with the knowledge that the proceeds of loan transactions such as the Nixon Prepay were booked by Enron as cash flow from operating activities.[30]

### C. RBS Background Information

RBS was founded in 1727.[31] By market capitalization, it is the second largest bank in Europe and ranks fifth in the world.[32] In March 2000, RBS completed the acquisition of NatWest in a $33 billion[33] deal that was the largest takeover in British banking history.[34] As of August 2003, RBS had a market capitalization of $82.2 billion and total assets at year-end 2002 of $661 billion.[35] In 2002, RBS had total income of $27 billion.[36]

---

[30] Email from Wilson McAlister, RBS, to Derek Weir, *et al.*, RBS, Feb. 1, 2000 (the "McAlister/Weir Email, Feb. 1, 2000") ("Other income includes unrealised gains and losses from price risk management activities . . . . These activities are reported as part of operational cash flow, boosting the reported position by $550M over the last two years . . . and representing 30% of reported operating cash flow in that period.") [RBS 3112211].

[31] RBS Profile.

[32] *Id.*

[33] Throughout this Appendix, British Pound figures have been converted to U.S. Dollar amounts using the daily average interbank exchange rate on the relevant date.

[34] RBS Profile.

[35] *Id.*

[36] RBS Annual Review and Summary Financial Statement 2002, at 40 (as converted to U.S. Dollars), *available at* http://www.rbs.co.uk/Group_Information/Investor_Relations/default.asp (last visited Oct. 23, 2003).

## II.    HISTORY AND DEVELOPMENT OF RBS'S INVOLVEMENT WITH ENRON

### A.    Relationship Between RBS and Enron

For several years prior to the Petition Date, RBS periodically evaluated the overall financial performance and business outlook for large clients such as Enron, often in conjunction with consideration of credit applications ("Credit Applications") for proposed new transactions.[37]    In addition to being presented as part of Credit Applications, these periodic evaluations appeared both in documents referred to as "Annual Revisals," essentially annual reports on Enron's financial position and the bank's credit exposure to Enron, and memoranda prepared by the bank's Analysis & Research Department (individually the "ARD Memorandum").[38]    Credit Applications for particular proposed transactions above certain monetary thresholds were submitted for two levels of review.    First, a division-specific credit committee would typically review a Credit Application.    In the bank's dealings with Enron, this was most often the Corporate Banking and Financial Markets ("CBFM") Credit Committee.[39]    If the divisional credit committee approved the transaction, it then typically proceeded to what the bank called its Group Credit Committee for a higher level of review.[40]

---

[37]   RBS Sworn Statement, at 86-87.

[38]   See, e.g., Credit Application, Nov. 2000 (the "2000 Annual Revisal") [RBS 3088311-RBS 3088330, RBS 3088340-RBS 3088372]; ARD Memorandum, Dec. 6, 1999.

[39]   See, e.g., CBFM Credit Committee Minutes, Sept. 2000.

[40]   See, e.g., Group Credit Committee Minutes, Sept. 2000.

As early as 1995, the extent of NatWest's[41] dealings with Enron was such that the

bank could report in its Annual Revisal that

> [w]e are one of Enron's prime relationship banks worldwide . . . . The
> strong relationship between our two organizations, which extends to the
> highest executive levels, has resulted in business opportunities being
> presented to us on a regular basis.  Our willingness to support the
> company is recognized and appreciated by management and has now
> placed us in an enviable position of receiving invitations to continue to bid
> for lead/co-lead roles in all future financings and at the same time obtain
> remunerative spin-off business across the full spectrum of NatWest . . . .
> This premier bank status is a position we believe we have deserved and
> aim to jealously protect.  It is not surprising therefore, that we wish to
> maintain the momentum we have built up over several years of concerted
> and focused marketing which has resulted in relationships being
> established at every level of the company, including the Group Chief
> Executives of both organizations [appending a list of 15 meetings over the
> previous four years between top executives of RBS and Enron].[42]

The same Annual Revisal noted NatWest's success in "'cross-selling'

structured/specialized finance, treasury, advisory and capital markets products" to Enron

between 1990-1995, during which time the Enron relationship had "**produced income of**

**$22.6m utilizing no [fewer] than 10 NatWest Markets products/services.**"[43]  By 1995,

as a result, NatWest characterized its relationship with Enron as "excellent . . . .  We are

considered Enron's lead international bank and one of their top five banks overall.  Our

strong ties extend to the Chairman of the company."[44]

Over the next four years, the magnitude of NatWest's transactions with Enron

was such that an "Exposure Analysis" in a 1999 Annual Revisal approval concluded that

---

[41] As noted previously herein, RBS acquired all assets and liabilities of NatWest as part of a corporate
takeover in March 2000.  Because RBS is the successor in interest to NatWest, the Examiner regards the
acts of NatWest prior to its takeover by RBS as acts of RBS.

[42] NatWest 1995 Enron Annual Revisal, Oct. 5, 1995 (the "1995 Annual Revisal"), at RBS 1115546 [RBS
1115542-RBS 1115570].

[43] Id. at RBS 1115548 (emphasis in original).

[44] Id. at RBS 1115551.

the bank's "Prudential Limit of [$971 million] has recently been breached."[45] While noting that it had become "one of the leading banks to Enron, particularly in relation to structured credit products and derivatives," NatWest in 1999 recognized that "successes achieved to date in winning highly remunerative business suggests [sic] that significant business opportunities will continue to flow and thereby place increasing pressure on our finite credit capacity. Enron management are aware of these capacity constraints, however[,] and are actively involved [in] assisting us in the management thereof through selldown."[46] In June 1999, NatWest completed two transactions that Enron management had informed the bank it considered particularly important: Sutton Bridge, a FAS 140 Transaction, and LJM1. As its exposure to Enron fluctuated, the bank actively pursued and completed sales in secondary markets and purchased credit derivatives so that it could take on more exposure.[47]

Prior to its takeover of NatWest, RBS was not among a select group of Enron's leading banks (as NatWest was), but it nevertheless had maintained a steady working relationship with Enron, participating in fourteen transactions between 1997 and March 2000. Among these was the Nixon Prepay, which closed in December 1999. In March 2000, RBS completed its acquisition of NatWest.[48]

---

[45] Greenwich NatWest 1999 Enron Annual Revisal Approval, Aug. 5, 1999 (the "1999 Annual Revisal Approval"), at RBS 3088395 [RBS 3088394-RBS 3088400]. "Prudential limit was an indication of the maximum amount of exposure that the bank wanted to have for a particular customer in a particular grade." Sworn Statement of RBS, to Christopher A. Riley, A&B, Sept. 4, 2003, at 341, lines 2-4.

[46] Id. at RBS 3088395-RBS 3088396.

[47] See, e.g., Email from Peter Commons, RBS, to Chris Mackenzie, et al., RBS, Nov. 27, 1998 (the "Commons/Mackenzie Email, Nov. 27, 1998") [RBS 1117824-RBS 1117826].

[48] All subsequent references, other than citations to names of documents, in this Appendix to either NatWest or RBS will use the designation "RBS," even if the matter referred to involved NatWest prior to the takeover.

In November 2000, RBS acted as lead bank and holder of the 3% equity in the

ETOL I FAS 140 Transaction.[49] In conjunction with its application for credit approval of

ETOL I, RBS employees prepared an updated Annual Revisal detailing and analyzing the

Enron relationship and credit. The analysis determined that the merged bank's lifetime

average return on investment on Enron transactions as of November 2000 was 110%.[50]

RBS assessed the state of its relationship as

> extremely strong[,] and there are no doubts that [Enron is] one of
> Structured Finance's and the Banks [sic] most remunerative clients. As
> one of [Enron's] nine tier one banks, out of a banking group of 120, we
> are placed in a very coveted position in that we have the opportunity to
> look at all Enron deals before the remainder of their Banking Group.[51]

In sum, to RBS in late 2000, "[t]he future opportunities with Enron appear[ed] endless

with a number of transactions in the pipeline."[52] The year 1999 had brought the bank

"record income levels of US$31m [sic] (primarily due to LJM1/Campsie)[,] and [income

levels thus far in] 2000 exceeding those of previous years . . . ."[53]

---

[49] £138,548,241 Term Facility Agreement for RBSF by RBS and NatWest, Nov. 1, 2000 (the "RBSF Term Facility Agreement, Nov. 2000") [AB000131149-AB000131223]; Subscription Agreement between RBSF and RBS, Nov. 1, 2000 (the "RBSF Subscription Agreement, Nov. 2000") [AB000131574-AB000131578]; Memorandum from Andrew Jameson, Project Finance, *et al.*, RBS, regarding Enron's Teesside deals, Nov. 28, 2001 (the "Jameson Memorandum, Nov. 28, 2001"), at RBS 3141906 [RBS 3141903-RBS 3141907]; ETOL I Credit Application, at RBS 3141124.

[50] 2000 Annual Revisal, at RBS 3088311.

[51] *Id.* at RBS 3088328.

[52] *Id.*

[53] *Id.* at RBS 3088330.

RBS's pipeline of Enron deals flowed into 2001, and included closing ETOL II in March 2001, followed by ETOL III near the end of the subsequent quarter, in June 2001.[54]

During the period from 1997 through the Petition Date in 2001, RBS (including both predecessor banks prior to the March 2000 takeover) completed approximately fifty-three transactions with Enron, including extensions of and modifications to existing financings and credit facilities.[55] The following timeline illustrates when each of several representative RBS transactions with Enron between 1997 and the Petition Date was completed:[56]

| | |
|---|---|
| January 1997 | 2 lending transactions |
| February 1997 | |
| March 1997 | 1 lending transaction |
| April 1997 | |
| May 1997 | |
| June 1997 | 4 lending transactions |
| July 1997 | 1 lending transaction |

---

[54] See, e.g., ETOL II and III Credit Application, at RBS 3124934; ETOL II and III Credit Recommendation; Credit Recommendation by Chris Clarke, Senior Credit Manager, RBS, June 15, 2001 [RBS 3141171].

[55] See Final Report, Appendix E (Role of RBS and its Affiliates), RBS Transaction Summary Chart.

[56] The timeline also illustrates Enron's tendency, noted by RBS, to concentrate deal activity near the end of quarterly reporting periods. ETOL I Credit Application, at RBS 3141124 ("[ETOL I] is required to close by 30th September 2000 . . . ."); Memorandum from Nicola Goss, Associate Director, Project and Export Finance, RBS, to Iain S. Robertson, et al., RBS, regarding additional ETOL funding, Mar. 1, 2001 (the "Goss ETOL Funding Memorandum"), at RBS 3141241 [RBS 3141241-RBS 3141243]; GNW Commitments Committee Briefing Paper, June 24, 1999, at RBS 1123621 ("Enron [is] very keen to get [Kachina] completed before the half year end and as a 'reward' for speedy assistance on this facility Enron will afford us an exclusive mandate to arrange [a future financing].") [RBS 1123620-RBS 1123621]; Transaction Summary: Sutton Bridge Funding Limited, July 8, 1999 (the "Sutton Bridge Transaction Summary"), at RBS 3126617 ("Facilitated [Enron's] ability . . . to boost half year earnings.") [RBS 3126609-RBS 3126623]; Nixon Credit Application, at RBS 3118966 (citing as part of the rationale for recommending this year-end, three month bridging facility that RBS could thereby "[o]nce again uptier the Enron Corp. relationship by assisting them over their crucial de-leveraging periods of quarter and year ends."); Email from Patricia Dundee, Senior Vice President, North American Oil & Gas, Houston, RBS, to Andrew Hews, et al., RBS, July 2, 1999 [RBS 3018561]; Credit Application, June 25, 1999, at RBS 3018566, RBS 3018570 (the Credit Application for the Kachina transaction) [RBS 3018566-RBS 3018576]; Memorandum from Andrew Hews, Director, RBS, to Kevin Howard, RBS, regarding Enron Compression – Gallup, Mar. 8, 2000, at RBS 3088647 (attaching the draft Gallup Credit Application) [RBS 3088646-RBS 3088654].

| | |
|---|---|
| August 1997 | |
| September 1997 | |
| October 1997 | |
| November 1997 | |
| December 1997 | |
| January 1998 | 1 lending transaction |
| February 1998 | 1 lending transaction |
| March 1998 | 2 lending transactions |
| April 1998 | |
| May 1998 | 3 lending transactions |
| June 1998 | |
| July 1998 | |
| August 1998 | 3 lending transactions |
| September 1998 | |
| October 1998 | 1 lending transaction |
| November 1998 | 1 lending transaction |
| December 1998 | 4 lending transactions |
| January 1999 | 1 lending transaction |
| February 1999 | |
| March 1999 | |
| April 1999 | |
| May 1999 | |
| June 1999 | **SUTTON BRIDGE:** Sutton Bridge closed<br>**LJM1:** LJM1 formed<br>**LJM1:** LJM1/Rhythms Hedging Transaction closed<br>Kachina: Closing of monetization<br>Rawhide $727.5 million Commercial Paper Facility: NatWest participated at $49.3 million |
| July 1999 | |
| August 1999 | |
| September 1999 | |
| October 1999 | |
| November 1999 | **LJM1:** distributed into escrow 1.775 million Enron shares for SAILS and same for RBS Total Return Swaps with AIG<br>**RBS Total Return Swaps:** Total Return Swaps with AIG closed – RBS made in excess of $22 million profit |
| December 1999 | **NIXON:** Nixon Prepay closed<br>1 lending transaction |
| January 2000 | |
| February 2000 | Yosemite: RBS participated in $338.1 million 8.75% Enron Linked Obligations due 2007 |
| March 2000 | **RBS acquired NatWest**<br>Gallup: Closing of monetization<br>**LJM1:** Southampton acquired Swap Sub from RBS and CSFB |
| April 2000 | **LJM1:** LJM1/Rhythms Hedging Transaction terminated |
| May 2000 | 2 lending transactions |
| June 2000 | |
| July 2000 | **LJM1:** made distributions to Fastow, RBS and CSFB<br>Hawaii $485 million Credit Facility: RBS participated at $20 million |
| August 2000 | |

- 17 -

| | |
|---|---|
| September 2000 | |
| October 2000 | |
| | **ETOL I:** ETOL I closed |
| | Hawaii $165 million Facility: RBS participated at $6 million |
| | Hawaii II $385 million Facility: RBS participated at $14 million |
| November 2000 | LJM2 $120 million Credit Facility: RBS committed $30 million |
| December 2000 | |
| January 2001 | |
| February 2001 | |
| March 2001 | **ETOL II:** ETOL II closed |
| April 2001 | **FAS 140 replaces FAS 125** |
| May 2001 | 3 lending transactions |
| June 2001 | **ETOL III:** ETOL III closed |
| July 2001 | |
| August 2001 | **LJM1:** Enron repurchases portion of its partial interest in Cuiaba |
| September 2001 | |
| October 2001 | |
| November 2001 | |
| December 2001 | **Petition Date** |

A bold line indicates the end of a quarterly or yearly reporting period.

From 1994-1997, RBS earned approximately $22.8 million in income from Enron.[57] The magnitude of Enron-related income substantially increased beginning in 1998. From 1998 through 2001, RBS received over $60 million in income from Enron-related transactions.[58]

## B.    RBS's Knowledge of Enron's Accounting Objectives and Financial Condition

Over the course of nearly a decade prior to the Petition Date, RBS had significant access to Enron financial information and Enron senior management. At least as early as November 17, 1992, two top bank executives met with Lay to discuss, among other things, further development of RBS's Enron relationship, as well as Enron's "financial

---

[57] 2000 Annual Revisal, at RBS 3088328.

[58] *Id.*; Enron Debt Investor Relationship Review, Aug. 2001, at AB0252 01323 [AB0252 01291-AB0252 01348].

- 18 -

profile going forward."[59] On March 7, 1995, Kevin Howard ("Howard") and two other

RBS representatives met with Skilling in London to discuss Enron's "Rate Risk

Management/Internal Controls."[60] One aspect of the knowledge that RBS was able to

obtain from these and numerous other contacts with Enron officials was an understanding

of Enron's specific motivations for the types of transactions for which it sought to engage

the bank's services. For example, RBS understood from a July 20, 1995 meeting with

Kopper and other Enron officials concerning the proposed monetization of certain natural

gas contracts through a master securitization vehicle (known as the "Cash II transaction")

that "[a] key rationale for the monetizations is to counter criticisms by the rating agencies

that Enron has low earnings quality due to its use of mark-to-market accounting."[61]

In particular, Enron communicated to RBS as early as 1995 that it *"envision[ed]*

*that approximately $2 billion of such contracts could ultimately be monetized within*

*the next 2-3 years.*"[62] Enron told RBS that it wanted each of these contract monetizations

to be:

- viewed as a "sale" for accounting purposes enabling a reduction in assets, a higher return on assets and in general, off-balance sheet treatment;

- viewed as "debt" for tax purposes so the taxes can be deferred in line with receipt of cash flows from the contracts and the payment of interest expense; [and]

- viewed as "off-credit" so that the rating agencies would exclude it from their definition of debt when calculating credit ratios.[63]

---

[59] 1995 Annual Revisal, at RBS 1115568.

[60] *Id.* at RBS 1115565.

[61] NatWest Meeting Report, July 20, 1995, at 1 [RBS 1059304-RBS 1059309].

[62] *Id.* (emphasis in original).

[63] *Id.* at 2.

In a July 1997 credit rating report regarding Enron, RBS detailed Enron's "extensive use of off-balance sheet liabilities in both international projects and minority owned subsidiaries," which the bank deemed "an attempt to preserve [Enron's] balance sheet whilst implementing an aggressive growth strategy."[64] RBS determined that certain identified unconsolidated subsidiaries of Enron held $5.2 billion of long-term debt at year-end 1996.[65] Factoring in an "element of [Enron] support" for unconsolidated subsidiaries and Enron's "rel[iance] on the extensive use of off-balance sheet liabilities," RBS's view in July 1997 was that "Enron's apparently strong financial position looks considerably weaker."[66]

RBS considered anew its Enron credit capacity in a November 1998 internal email, spurred in part by the observation that "there are numerous other Enron-related business opportunities kicking around and none of them seem to lie down long enough for us to see the 'bottom line.'"[67] The author of the email, Peter Commons ("Commons"), Head of Credit Risk for RBS, stated that the bank's corporate risk rating of Enron

> is not going to improve its current level of BBB+ and there is always a chance of it declining to BBB/BBB- if things do not go according to plan; a possibility which has come into sharp focus over the last few weeks and Enron are [sic] currently working very, very hard indeed to avoid.[68]

---

[64] Section 3.2.1, Enron Rating Report, July 11, 1997 [RBS 3147023-RBS 3147035].

[65] *Id.* at Section 3.2.1(a).

[66] *Id.* at Section 5. RBS at this time maintained an internal rating for Enron equivalent to an S&P rating of BBB+. NatWest Credit Profile of Enron, July 11, 1997 [RBS 3147019-RBS 3147022].

[67] Commons/Mackenzie Email, Nov. 27, 1998, at 1.

[68] *Id.*

He further recognized that Enron "will remain very heavily leveraged if one takes into account all their off-balance sheet liabilities.... Moreover, one suspects that, if problems emerged, Enron would support many of these off-balance sheet entities/projects/structures in any event, rather than put their wider interests/strategies at risk."[69]

Commons observed that "there is little genuine value in having recourse to [Enron]. As such, we much prefer to see exposure concentrated with subsidiaries/affiliates that are – to one degree or another – ring fenced and have reasonably secure revenue streams we can attach."[70] He further noted that Enron "continue[s] to make huge demands on the bank market, will not provide 'clear market' language and, as such, bank appetite could be significantly hit by any number of adverse factors very quickly."[71] Commons concluded that, "[a]gainst this background, our appetite for Enron exposure is very far from a bottomless pit and I would certainly not wish to see risk (net of underwritings) come anywhere near the Prudential Limit ... (Mr. [Kevin] Howard please note!!)."[72]

As part of the declared Risk Exposure Strategy set forth in its 1998 Annual Revisal and then reiterated in 1999, RBS undertook

> [t]o limit direct financial reliance on Enron Corp[.] and, absent acceptable risk mitigants, ensure that the term of such risk is consistent with the parental rating. **This restraint becomes more important in the light of**

---

[69] *Id.*

[70] *Id.* The bank nonetheless sought, and received, assurances of repayment from Enron, not its affiliates, of the bank's equity investments in the FAS 140 Transactions.

[71] *Id.*

[72] *Id.* Howard, referred to in the Commons/Mackenzie Email, was the bank's Enron Relationship Manager, and thus its principal contact with Enron. The bank indeed exceeded its Prudential Limit in the following year. *See* 1999 Annual Revisal Approval, at RBS 3088394.

> **continuing moves by Enron to, not only transfer assets off-balance sheet[,] but also to leave Enron itself as little more than a provider of intellectual, hedging and other operational support.**[73]

RBS nevertheless took solace in the facts that "executive contact between our respective institutions extends to the highest levels and, over the years, considerable comfort has been obtained as to the quality and integrity of the senior management team, as well as the strict risk controls operated in support of Enron's highly complex marketing/hedging activities."[74] RBS had at least $734 million in Enron-related exposure at this time.[75]

As RBS began in 1999 to undertake new types of transactions for Enron, the bank continued to demonstrate (i) its grasp of Enron's specific accounting objectives and (ii) its knowledge of Enron's actual accounting for these transactions. A "Transaction Summary" prepared by the bank in connection with the Sutton Bridge FAS 140 Transaction discussed the accounting requirement that, in order to qualify as a "'true sale,'" "substantially all of the future economic benefits of the asset" in the transaction needed to be sold to a third party.[76] The same document stated that the investor contributing the equity required in a FAS 140 Transaction must have "'significant' equity risk," and noted that there could be "no contractual commitment of the vendor to repurchase the shares."[77] RBS completed Sutton Bridge in June 1999 and then completed the three ETOL FAS 140 Transactions in 2000 and 2001. In each of these transactions,

---

[73] 1999 Annual Revisal Approval, at RBS 3088396 (emphasis in original).

[74] *Id.*

[75] *Id.* at RBS 3088399-RBS 3088400 (representing dollar figures for pre-takeover NatWest exposure only).

[76] Sutton Bridge Transaction Summary, at RBS 3126617.

[77] *Id.*

RBS relied on undocumented assurances by Enron to repurchase the bank's equity interest in the SPE plus yield at maturity.[78]

When considering participation in the Nixon Prepay in December 1999, RBS likewise had a detailed understanding of its structure and accounting purpose. The Nixon Credit Application described in great detail the form of the transaction and concluded that "the whole structure is set up to remove the commodity risk for all parties."[79] The ARD Memorandum regarding Nixon stated that the "revenue [from the proposed prepay] is likely to be included as deferred income in the current liabilities section of the balance sheet, with cash balances increasing by a corresponding amount. This transaction is consequently anticipated to reduce the reported year-end net debt position of Enron and is effectively a window dressing request."[80] RBS was also cognizant of the fact that Enron "engaged in price risk management activities for trading and non-trading purposes," and that "[t]hese assets / liabilities are disclosed separately in the balance sheet, with unrealised gains and losses recognized as 'other revenues.'"[81] The RBS senior analyst who authored this ARD Memorandum concluded, however, that Enron's financial

---

[78] See, e.g., Kruger Memorandum, at RBS 3038535 (referencing the handwritten comments); Sworn Statement of Peter Commons, RBS, to John E. Stephenson, Jr., A&B, Sept. 24-25, 2003 ("Commons Sworn Statement"), at 197, lines 15-22; Email from Peter Commons, RBS, to Thomas Hardy, et al., RBS, Aug. 11, 2000 (the "Commons/Hardy Email, Aug. 11, 2000") [RBS 6074362]; ETOL I Credit Application, at RBS 3141124; ETOL I Credit Recommendation, at RBS 3141116; CBFM Credit Committee Minutes, Sept. 2000, at RBS 3121434; ETOL II and III Credit Application, at RBS 3124937, RBS 3124939; ETOL II and III Credit Recommendation, at RBS 3124953; RBS CBFM Credit Committee Minutes, Mar. 20, 2001 (the "CBFM Credit Committee Minutes, Mar. 2001"), at RBS 1113345 [RBS 1113344-RBS 1113346].

[79] Nixon Credit Application, at RBS 3118966. RBS had previously submitted an unsuccessful bid to participate in another Prepay Transaction, Roosevelt, in 1998. Email from Kevin Howard, RBS, to Peter Commons, et al., RBS, Dec. 15, 1998 [RBS 1127685-RBS 1127686]; Email from Michael Keating, RBS, to Gary Mulgrew, et al., RBS, Dec. 23, 1998 [RBS 1127624-RBS 1127625].

[80] ARD Memorandum, Dec. 6, 1999, at RBS 3118972.

[81] Id. at RBS 3118973. The ARD Memorandum further notes that "[t]he market price used to determine these valuations reflects management's best estimates. As at 31 December 1998, Enron had total assets from price risk management activities of $3.8 Bn (13% of total assets) and liabilities of $3.9 Bn." Id.

disclosures of its price risk management activities were "insufficient to determine the actual payment / receipt profile associated with these activities."[82]  The analyst suggested that the proposed Nixon transaction represented an acceptable level of financial risk for RBS given its short term, but noted that "Enron has an aggressive stance to balance sheet funding with this transaction appearing little more than a 'window dressing' request.  While in isolation the transaction is low risk, it raises issues over the absolute level of manipulation undertaken by Enron in its financial statements."[83]

In late January and early February 2000, RBS considered participation (and ultimately agreed to participate) as a syndicate bank in the Ghost transaction.[84]  Internal email communications among RBS bankers considering the proposed transaction reveal continuing concerns about the kind of "manipulation" of which the RBS senior analyst had written previously.  A top official in the bank's Corporate Banking division informed colleagues that "[m]y concern is the things that [Enron is] doing to massage their Balance Sheet.  Provided we keep things short-term I am not too worried but we need to understand ever better."[85]  One of those colleagues noted, in support of RBS's participation in the transaction, that "[b]ecause this is balance sheet management, it pays better than straight Enron corporate risk,"[86] and the subsequent Ghost Credit Application

---

[82] *Id.*

[83] *Id.*

[84] The Examiner detailed Ghost in, *inter alia*, Appendix H (Role of CIBC and its Affiliates) to the Third Interim Report.

[85] Email from Alan Dickinson, RBS, to Derek Weir, RBS, and copy to Brian McInnes, Relationship Manager, RBS, Feb. 1, 2000 [RBS 3112212].

[86] Email from Derek Weir, RBS, to Alan Dickinson, RBS, and copy to Brian McInnes, Relationship Manager, *et al.*, RBS, Jan. 31, 2000 (the "Weir/Dickinson Email, Jan. 31, 2000"), at RBS 3112212 [RBS 3112212-RBS 3112213].

likewise refers to the "higher return" that the bank would receive for its participation in this transaction, "due to its balance sheet management function."[87]

The Ghost Credit Application also reflects RBS's understanding that Enron had entered into a Total Return Swap as part of the Ghost transaction that was "equivalent to an Enron guaranty, but will be reported under the derivatives rather than guaranties section in Enron's accounts."[88]  An ARD Memorandum prepared in conjunction with the Ghost Credit Application identified Enron's off-balance sheet debt as $7.6 billion as of December 1998.[89]  As he had two months previously in the ARD Memorandum submitted with the Nixon Credit Application, the author of the Ghost ARD Memorandum concluded that, "[w]hile in isolation this transaction is low risk, it again raises issues over the absolute level of manipulation undertaken by Enron in its operations and the preparation of its financial statements."[90]

On March 10, 2000, in considering whether to agree to extend the maturity date for the Nixon Prepay by one month (thereby making it, in total, a four-month facility), an RBS credit manager concluded that no new developments since the time that the bank had originally approved the transaction precluded the extension, but commented that

> [t]he scale of financial period manipulation [by Enron] is exceedingly worrying and I don't yet understand it, nor am I sure that anyone in the bank does . . . .  Such concern has been a theme of all our discussions for a while. . . .  We have twice increased exposure since doing this deal, [including] another manipulation when we joined in the JM Trust [i.e., Ghost] 18 month bridge . . . .

---

[87] Credit Application, Feb. 7, 2000, at RBS 3118875 (the Credit Application for the Ghost transaction) [RBS 3118869-RBS 3118891].

[88] *Id.* at RBS 3118874.

[89] ARD Memorandum from A.W. McAlister, Senior Analyst, RBS, Feb. 7, 2000, at RBS 3118880 [RBS 3118879-RBS 3118880].

[90] *Id.*

I can see from a relationship/business perspective that there is a temptation to write another income generating transaction on the basis of the comfort we are drawing from it being very short term, but the concern must obviously be that if lots of counterparties are doing this then any bad news (or shortage for whatever reason of counterparty capacity) will cut refinance ability dramatically and/or end Enron's ability to manipulate thus leading to a horrendous on-balance sheet position which would further exacerbate the position. The question is when do we stop[?][91]

RBS renewed its participation in FAS 140 Transactions with Enron several months later. The bank's ETOL I Credit Application in September 2000 made plain that the proposed transaction was "aimed at effecting a 'true sale,'" and that the deal was structured as it was for "U.S. accounting purposes."[92] Though Enron provided its verbal assurance that RBS would receive its "required return" on its equity investment in the structure, the Credit Application disclosed that, "their desired accounting treatment does not permit any formal arrangements to be made."[93] When the CBFM Credit Committee met to consider the proposed ETOL I transaction on September 20, 2000, one of the documented "key points" of the discussion was "[t]he impact on Enron risk of structures such as this (i.e., the existence of significant off-balance sheet contingent liabilities)."[94] Commons characterized Enron as "very open on this issue," and stated that he would be attending a meeting with other RBS and Enron representatives the following week to discuss that issue further.[95]

---

[91] Email from Alex Sinclair, RBS, to Brian McInnes, *et al.*, RBS, Mar. 10, 2000 (the "Sinclair/McInnes Email, Mar. 10, 2000") [RBS 3118862].

[92] ETOL I Credit Application, at RBS 3141124.

[93] *Id.*

[94] CBFM Credit Committee Minutes, Sept. 2000, at RBS 3121435.

[95] *Id.*

Howard, Commons, and their RBS colleague Philip Carraro ("Carraro") met with several members of Enron management, including Vice President and Treasurer Ben Glisan, over a period of two days in late September 2000. In Carraro's words, the RBS contingent learned from Glisan that he "did not believe [Enron's] recognition of income through monetization[s] represented more than 15 [to] 20% of reported earnings, at the most."[96] At another point in this series of meetings, RBS learned that

> In terms of internal RBS treatment of these structures, while Enron may achieve off-balance sheet treatment, we should consider these direct Enron exposure as their operation and off-take is so closely related to Enron. Additionally, whatever the tax and accounting treatment, Enron's senior management are consistent in strongly representing verbally that Enron will do everything in their power to protect the investors and lenders involved.[97]

Following these meetings, in its Enron Annual Revisal for 2000, RBS again privately manifested its insight into non-public aspects of Enron's accounting practices and financial performance. In its "Rating Profile" of Enron, RBS stated that Enron's "aggressive financial policy . . . results in massive off-balance sheet liabilities," of various forms.[98] A listing of "potential follow-up matters" from the September 2000 meetings included undertaking an analysis of the "off-balance sheet activities/valuation issues in the Enron business portfolio," as well as "a careful perusal of the footnotes to

---

[96] Email from Philip Carraro, RBS, to Iain Robertson, *et al.*, RBS, Oct. 4, 2000 (the "Carraro/Robertson Email, Oct. 4, 2000"), at RBS 3120717 (attaching the RBS call report summary of the meeting at Enron) [RBS 3120713-RBS 3120725]. Carraro also noted that "Ben promised to provide me with specific figures (Kevin Howard needs to follow-up on this point)." *Id.*

[97] *Id.* at RBS 3120723 (attaching the RBS call report summary of the meeting at Enron) (emphasis in original).

[98] 2000 Annual Revisal, at RBS 3088345 (citing the June 2000 Rating Profile of Enron included as part of the 2000 Annual Revisal materials).

Enron's accounts [that] might identify other accounting practices that we should more fully appreciate."[99]

In early September 2001, in connection with the bank's consideration of a proposed FAS 140 Transaction, ETOL I, a member of the bank's Enron Relationship Management team reported to some of his colleagues within the bank that

> [RBS's Iain Robertson] wanted to know what percentage of Enron's earnings were booked as a result of such FAS 125 and FAS 140 structures. 15% to 20% was the answer given by Andy Fastow and Ben Glisan (on separate occasions) and our analysis of the 2000 accounts shows 17% of earnings before interest and tax was derived this way.[100]

Additional details concerning RBS's knowledge of Enron's financial condition and accounting objectives are provided below in the context of the specific RBS Transactions discussed herein.

---

[99] Email from Philip Carraro, RBS, to Iain Robertson, *et al.*, RBS, Sept. 28, 2000 (the "Carraro/Robertson Email, Sept. 28, 2000"), at RBS 3120714 [RBS 3120713-RBS 3120715]. Regarding Enron's perceived willingness to discuss its finances with RBS, the email states, "[t]hey are open, if we don't ask, we won't know what they know/are doing." *Id.*

[100] Email from Adam Pettifer, RBS, to Paul Fairbairn, *et al.*, RBS, Sept. 6, 2001 (the "Pettifer/Fairbairn Email, Sept. 6, 2001") [RBS 6024063].

## III.  RBS'S ROLE IN ENRON'S SPE TRANSACTIONS

### A.  <u>Participating as a Limited Partner in LJM1</u>

*Background of LJM1 and its Transactions*

As described in the Second Interim Report,[101] beginning in 1997 and ending in mid-2001, Enron engaged in a number of transactions with entities in which Fastow and other Enron officers, including Kopper and Glisan, participated.[102] One of these entities, LJM1, engaged in a number of transactions with Enron and its affiliates (collectively the "LJM1 Related Party Transaction").  LJM1 enriched Fastow and his colleagues by approximately $40 million on an aggregate investment of slightly more than $1 million.[103] The sources of these distributions were primarily Enron assets and payments by Enron to LJM1.[104]

---

[101]  *See* Second Interim Report, Appendix L (Related Party Transactions).

[102]  Based on the evidence that he has reviewed to date, the Examiner believes that Fastow received at least $60.6 million, that Kopper and Dodson together received at least $33.4 million, and that Glisan received at least $1 million from the Related Party Transactions. *See* Second Interim Report, 104-05; Plea Agreement, *United States v. Glisan*, Cr. No. H-02-0665 (S.D. Tex.), Sept. 10, 2003, at 6.  The Creditors' Committee brought suit against Fastow, Glisan, Richard B. Buy, Causey, Skilling, Lay, Kristina M. Mordaunt, Kathy Lynn and Anne Yaeger-Patel on October 1, 2002, alleging, among other things, that these defendants breached their fiduciary duties to Enron and seeking to recoup certain sums from such insiders.  Kopper has not been sued as a part of this action. *See Enron Corp. Official Comm. of Unsecured Creditors v. Fastow*, No. 02-10-06531 (9th Jud. Dist. Montgomery Co., Tex.), Oct. 1, 2002.

[103]  *See* Second Interim Report, Appendix L (Related Party Transactions), *Provision of Cash to Participating Enron Insiders*.  In addition, Fastow received $15.5 million in cash and a house valued at $850,000 from Kopper in connection with Fastow's sale of his interests in LJM1 and LJM2 to Kopper. *Id.*

[104]  *Id.*

LJM1[105] was created in June 1999,[106] with the consent of the Enron Board,[107] as a private equity fund in order to hedge Enron's investment in Rhythms NetConnections, Inc. ("Rhythms").[108]   In March 1998, Enron purchased equity in Rhythms for approximately $10 million.[109] Following Rhythms' initial public offering, its stock price was volatile, and the value of Enron's investment increased to over $500 million at one point[110] and was approximately $260 million as of June 1, 1999.[111] Because the Rhythms stock was a fair value asset in Enron's portfolio, Enron would recognize the large increase in value as income and was concerned about the adverse effect on its income statement if the value were to decline.  Enron was contractually prohibited from selling or hedging the Rhythms stock for a period of six months.[112]  Even if Enron were not prohibited from hedging the stock, due to the large percentage of Rhythms' total equity represented by Enron's investment – approximately 50% of Rhythms' publicly traded shares – and the volatility of the stock price in the market, Enron was unlikely to find a

---

[105] A complete discussion of the LJM1 structure and the transactions in which it engaged that are the subject of this Appendix are set forth in Annex 2 and Annex 3 to Appendix L (Related Party Transactions) to the Second Interim Report.

[106] LJM1, Statement by the General Partner for Registration as an Exempted Limited Partnership, June 21, 1999 (the "LJM1 GP Registration") [AB000154302-AB000154303].

[107] See Enron Board Minutes for Special Meeting, June 28, 1999, at 6-8.

[108] See LJM1 Presentation to the Enron Board.

[109] See Rhythms Form S-1 filed with the SEC on Apr. 6, 1999 ("Rhythms S-1"), Item 15.

[110] Memorandum from Rebecca Carter, Senior Vice President, Board Communications, Enron, to Enron Board of Directors, regarding weekly update, Apr. 16, 1999, at 2 (reporting that the stock price had reached as much as $110 per share). Enron held approximately 5.3 million shares of Rhythms common stock. [AB000448792-AB000448797].

[111] Rhythms S-1, Principal Stockholders Table. Rhythms' closing stock price on June 1, 1999 was $48.50 per share. *NASDAQ National Market Issues*, Wall St. J., June 2, 1999, at C12.

[112] See Letter from Gil Melman, Senior Counsel, Enron Communications Investments Corp., to Rose Stroud, Legal Transfers Area, American Securities Transfer & Trust Inc., Mar. 20, 2000, at AB000468667 (attaching a copy of Rhythms NetConnections, Inc. stock certificate registered in the name of Enron Communications Investments Corp.) [AB000468665-AB000468668].

third party willing to enter into a hedge on economic terms acceptable to Enron. The LJM1/Rhythms Hedging Transaction is described in detail in Annex 2 to Appendix L (Related Party Transactions) to the Second Interim Report. In summary, Fastow invested $1 million personally in LJM1 and served (until the summer of 2001), through two entities that he wholly owned, as its sole general partner.[113] Affiliates of RBS and CSFB were LJM1's limited partners,[114] each investing $7.5 million for a 50% limited partnership interest. Enron transferred to LJM1 shares of Enron common stock having an aggregate stock price of $276 million.[115] LJM1 then transferred approximately one-half of the shares to a "Swap Sub," which LJM1 had formed to serve as the hedging vehicle. Enron received $64 million in promissory notes from LJM1 (the "LJM1 Notes") and a put right that Enron could exercise in the future to force Swap Sub to purchase the Rhythms stock at $56.125 per share.[116]

Only Swap Sub, however, and not LJM1, was liable to Enron for the put, and Swap Sub's only asset was the portion of the Enron stock that LJM1 had transferred to

---

[113] LJM1 GP Registration; LJM Partners, L.P. Statement by the General Partner for Registration as an Exempted Limited Partnership, June 21, 1999 [AB000154309-AB000154310]; Limited Liability Company Agreement of LJM Partners, LLC, June 25, 1999, at 1 [AB000154362-AB000154365]; Amended and Restated Agreement of Limited Partnership of LJM1, June 30, 1999 (the "Partnership Agreement") [RBS 4000182-RBS 4000222]. Until July 2001, Fastow owned and controlled the general partner of LJM1. *See* Fastow/Kopper Purchase Agreement.

[114] Partnership Agreement, at RBS 4000218.

[115] The shares were actually transferred by UBS at Enron's direction. *See* Second Interim Report, Annex 2 to Appendix L (Related Party Transactions).

[116] Within two weeks after closing the Rhythms transaction, Enron became concerned about the continued volatility of the Rhythms stock. Thus, on July 13, 1999, Enron entered into a "costless collar" with Swap Sub that, among other things, protected Enron from the Rhythms stock price falling below $65 per share. *See* Second Interim Report, Annex 2 to Appendix L (Related Party Transactions).

it.[117]  Thus, Enron did not transfer any of its true economic risk in the Rhythms

investment to any third party with assets other than assets provided by Enron.  Instead,

Enron transferred $276 million and received $64 million in promissory notes and a hedge

that was supported only by approximately one-half of the stock that Enron itself had

transferred into the structure.

In addition to the LJM1/Rhythms Hedging Transaction, LJM1 made two

investments (both acquired from Enron or Enron-related entities): (i) the purchase of a

13% interest in a Brazilian power plant project known as Cuiaba;[118] and (ii) the purchase

of $15 million of certificates issued by the Osprey Trust (which provided the financing

for the Whitewing Share Trust transaction).[119]

In the Second Interim Report, the Examiner reached three general conclusions

about the Related Party Transactions (each of which is applicable to LJM1):

- the Related Party Transactions, including most notably the hedging transactions (such as the LJM1/Rhythms Hedging Transaction), had no valid business purpose from Enron's perspective, other than to achieve desired financial statement reporting;

- Enron temporarily "warehoused"[120] poorly performing assets or investments, such as its interest in Cuiaba, until Enron repurchased them; and

---

[117] Swap Sub was capitalized with approximately one-half of the Enron stock transferred to LJM1 by Enron and $3.75 million, which were the proceeds from the disposition of a portion of Enron stock transferred to LJM1.

[118] The Cuiaba transaction is described in Annex 3 to Appendix L (Related Party Transactions) to the Second Interim Report.

[119] The Whitewing Share Trust transaction is described in Appendix G (Whitewing Transaction) to the Second Interim Report.

[120] The Examiner uses the term "warehouse" to refer to those transactions in which Enron temporarily transferred assets to a Related Party to impact favorably Enron's financial statements, while Enron continued to search for a third party purchaser.  In many instances, there was no third party purchaser, and Enron repurchased those assets at a premium over the price at which the assets had been sold to the Related Party.

- Enron insiders, including Fastow, Kopper, and Glisan, received significant cash payments in breach of their fiduciary duties to Enron and/or in violation of the express conditions upon which the Related Party's creation – and its dealings with Enron – were approved.

In his Third Interim Report, the Examiner concluded that officers of Enron, including Fastow and Glisan, breached fiduciary duties to Enron in connection with LJM1.[121]

RBS, as the parent of one of the two limited partners in LJM1, played a significant role in its formation and in the implementation of transactions involving LJM1. In addition, RBS structured and implemented the Total Return Swap transactions with AIG, which, as described below, circumvented certain restrictions in the Amended Partnership Agreement, contravened representations made by Fastow to the Enron Board when he sought Enron Board approval for LJM1, and facilitated increased distributions to Fastow and other Enron insiders.

*RBS's Knowledge of LJM1's Purpose and Structure*

RBS's facilitation through the LJM1 Related Party Transaction of the personal enrichment of Fastow and other Enron insiders was accomplished with substantial knowledge of the motivations for LJM1's formation, the intended operational procedures of the limited partnership, and the economics of the LJM1/Rhythms Hedging Transaction. RBS understood that LJM1 was:

> set up as an investment vehicle, predominantly to enable Enron to get liquidity into its [$4 billion] merchant portfolio, which has a very positive effect on Enron's ability to gear itself up, since the ratings agencies currently ascribe a very low liquidity quotient to [Enron's] merchant portfolio, and this vehicle will enable that quotient to rise significantly. . . .

---

[121] *See* Third Interim Report, Appendix C (Role of Enron's Officers).

Over the [contemplated] 5 year life of the deal, [LJM1] will make investments with a view to capital appreciation. This will almost certainly involve liquidating some or all of the Enron shares currently held, in exchange for other assets (eg [sic] Enron assets).[122]

RBS also understood that there were at least two additional motivations for the creation of LJM1 from Enron's perspective. First, Enron had approximately $250 million of value in a series of forward purchase contracts on Enron shares with UBS. UBS had hedged its position by purchasing 7.8 million Enron shares. As stated in an internal RBS presentation, "[r]ealisation [by Enron] of the value would have meant UBS selling the underlying shares into the market, creating downwards [sic] pressure on [Enron's] share price."[123] Second, Enron was "holding approximately $500m of Rhythm[s] Net[Connections] Stock" which Enron could not yet sell because of transfer restrictions, thus requiring Enron "to pass the [mark-to-market] movement in value through P&L quarterly."[124]

RBS knew before it made its initial investment as a limited partner that the limited partners in LJM1 were entitled to the exclusive economic benefit of the Enron stock that would be transferred to LJM1 by Enron, subject to satisfaction of the obligations of Swap Sub under the LJM1/Rhythms Hedging Transaction and an LJM1 promissory note payable to Enron.[125] Thus, RBS knew that it and CSFB, as the other limited partner in

---

[122] Email from David Bermingham, RBS, to Kristi DeMaiolo, RBS, and David Clement, RBS, Aug. 31, 1999 [RBS 4014686].

[123] Email from David Clement, RBS, to David Bermingham, RBS, July 27, 1999 (the "Clement/Bermingham Email, July 27, 1999"), at RBS 4014615 (attaching an internal presentation regarding LJM1 dated July 1999) [RBS 4014613-RBS 4014626].

[124] *Id.*

[125] Memorandum from Lawrence Nicholls, Head of Investment Appraisal, RBS, to Derek Wanless, *et al.*, RBS, regarding Project LJM, June 23, 1999 (the "Nicholls LJM Memorandum"), at RBS 3030496, RBS 3030498 (attaching a draft memorandum from Giles Darby, Managing Director, RBS, and David

LJM1, would have the benefit of (i) the value of the Enron stock held by LJM1 that was
not transferred to Swap Sub (less the $64 million in LJM1 promissory notes ultimately
owed to Enron and certain other *de minimis* LJM1 obligations) and (ii) any excess in the
value of the Enron stock held by Swap Sub over the amounts needed to settle the
LJM1/Rhythms Hedging Transaction. RBS understood that an important term of the
LJM1 Related Party Transaction was that Fastow was to have no economic interest in the
stock.[126]

RBS also understood that Fastow represented to the Enron Board, prior to its
approval of LJM1's formation, that he would have no economic interest in that stock.[127]

---

Bermingham, Director, RBS, discussing the business aspects of "Project LJM (formerly known as
MARTIN)") [RBS 3030490-RBS 3030501]; Yaeger Facsimile; Email from David Bermingham, RBS, to
Tim Shaw, *et al.*, RBS, Nov. 1, 1999 (attaching "Investment Proposal: Presentation to the Board of
Campsie Limited") [RBS 4014860-RBS 4014865]; LJM Restructuring – Summary of Outstanding Issue
between LP's and GP, author unknown, undated (the "LJM Restructuring Memorandum") [RBS 4007111-
RBS 4007112].

> As an employee of Enron Corp., in his capacity as General Partner & Manager, Andy
> Fastow is precluded from enjoying any rights to profit from the Enron Corp. shares (the
> "Initial Property") to be assigned to LJM Cayman. Hence, all realized proceeds from the
> shares are solely attributable to Limited Partners.

Email from Mike Ellison, RBS, to Giles Darby, *et al.*, RBS, June 18, 1999 (the "Ellison/Darby Email, June
18, 1999"), at RBS4014253 [RBS 4014252-RBS 4014253].

[126] Certain terms of the Partnership Agreement, to which RBS's subsidiary, Campsie, was a party, provide
that distributions and allocations with respect to the shares of Enron stock transferred to LJM1 were to be
made only to the limited partners (CSFB and RBS) and not the general partner (an entity owned and
controlled by Fastow). Section 4.2 of the Partnership Agreement provides that "[a]ll distributions of [the
shares of Enron stock transferred to LJM1, proceeds of those shares and property received by LJM1 in
exchange for those shares] shall be distributed among the Limited Partners." Section 4.2, Partnership
Agreement. Section 4.4 of the Partnership Agreement provides that "any income, gain, loss or deduction
recognized by [LJM1] as a result of or in connection with the transfer to it of the [shares of Enron stock
transferred to LJM1] . . . shall be allocated solely to the Limited Partners." *Id.* at Section 4.4. The general
partner would, however, share in other distributions by LJM1. *Id.* at Section 4.3. Further, the general
partner's management fee was to be calculated by reference to assets in LJM1 other than the shares of
Enron capital stock transferred to LJM1 or the proceeds of those shares. *Id.* at Section 5.2.

[127] *See* Enron Board Minutes for Special Meeting, June 28, 1999, at 6 ("Mr. Fastow stated that he
would . . . have no direct pecuniary interest in [Enron's] stock."); Yaeger Facsimile; Memorandum from
Gary Mulgrew, Managing Director, RBS, to Campsie Directors, *et al.*, Aug. 20, 1999 (the "Mulgrew
Memorandum") [RBS 3030454-RBS 3030460]; LJM Restructuring Memorandum; LJM1 Investment
Summary, author unknown, undated (the "LJM1 Investment Summary"), at RBS 4004810
("G[eneral]P[artner] cannot touch the Enron stock which forms the basis of Campsie's investment value.")

RBS understood that Swap Sub's only asset was the Enron stock contributed through

LJM1 and that, as a result, the only asset available for the obligations of Swap Sub to

Enron under the LJM1/Rhythms Hedging Transaction was stock of Enron.[128]  Therefore,

RBS was aware that the LJM1/Rhythms Hedging Transaction was a non-economic

hedge.[129]  Because the Enron stock supporting Swap Sub's obligations and the Enron

stock retained in LJM1 were Enron's property in the first instance, this transaction could

only result in economic loss to Enron.  Finally, with regard to the proposed LJM1

---

[RBS 4004808-RBS 4004810]; Ellison/Darby Email, June 18, 1999, at RBS4014253 ("As an employee of Enron Corp., in his capacity as General Partner & Manager, Andy Fastow is precluded from enjoying any rights to profit from the Enron Corp. shares (the 'Initial Property') to be assigned to LJM Cayman. Hence, all realized proceeds from the shares are solely attributable to Limited Partners."); Clement/Bermingham Email, July 27, 1999, at RBS 4014617; *see also* Sworn Statement of Kevin Howard, RBS, to John E. Stephenson, Jr., A&B, Sept. 18-19, 2003 (the "Howard Sworn Statement"), at 198, 275; *Id.* at 209 (Q. [Did the LJM1 limited partners have] any discussion about the need to ensure that Mr. Fastow did not profit directly or indirectly in the Enron stock? A. That was the understanding of the bank.").

[128]  Lawrence Nicholls, Head of Investment Appraisal for RBS, described the Enron risk as follows:

> Enron's recourse will be solely to [Swap Sub], and secured on the 1.67m of Enron shares which are [Swap Sub's] only asset.  Although in theory [Swap Sub's] maximum loss on the derivative could be $292m if Rhythm Net shares are worthless at year 5, Enron's receipt under the derivative will always be the lower of the actual loss and the value of [Swap Sub's] assets.

Nicholls LJM Memorandum, at RBS 3030495; Memorandum from Peter Commons, Head of Credit Risk, RBS, to William Martin, Group Risk Director, RBS, regarding Project LJM, June 29, 1999 (the "Project LJM Memorandum"), at RBS 3030462 ("Moreover, there is a clear 'firewall' between the investment in LJM and the [Swap Sub] holdings . . . .") [RBS 3030461-RBS 3030463]; LJM1 Investment Summary, at RBS4004809 ("Enron's recourse under the Put Option is only to [Swap Sub], and only to the extent of the value of the [1.67m] Enron shares which are [Swap Sub's] only assets."). Sworn Statement of David Clement, RBS, to John E. Stephenson, Jr., A&B, Oct. 25, 2003 (the "Clement Sworn Statement"), at 62, line 19 – 63, line 5.  The hedge consisted of Swap Sub granting to Enron a European style put option under which Enron had the right to require Swap Sub to purchase 5,393,258 shares of Rhythms stock at an exercise price of $56.125 per share on June 29, 2000.  Second Interim Report, Annex 2 to Appendix L (Related Party Transactions), *Structure of Rhythms Transactions, Rhythms Hedge*; Yaeger Facsimile, at RBS 4005106; Clement/Bermingham Email, July 27, 1999, at RBS 4014618 ("Swap Sub Put Option Liability Limited only to its 1.60m shares or any subsequent assets Fastow acquires with the shares . . . .").

[129]  RBS was also aware of the financial statement impact for Enron of this non-economic hedge.  Howard Sworn Statement, at 256, lines 7-9 ("It enabled the smoothing of earnings to Enron's P&L so the volatility in the Rhythms Net stock was mitigated.").

investment in Cuiaba, RBS understood that all of the partners in LJM1 would share in any benefits produced from that investment.[130]

Soon after being invited by Fastow to participate as a limited partner, RBS appears to have focused on at least three fundamental concerns about the proposed LJM1 structure:

(i)     The dual role of Fastow as both LJM1's general partner and a senior officer of Enron;

(ii)    The lack of any obvious economic justification for the transaction from Enron's perspective; and

(iii)   The fact that Enron was giving up value greatly in excess of what it appeared to be receiving.[131]

Shortly after communicating Fastow's LJM1 proposal to RBS colleagues, in May 1999, Howard received responses expressing discomfort with the proposed transaction. David Bermingham ("Bermingham"), a member of the bank's Structured Finance group, wrote Howard to express doubts about the fairness of the transaction to Enron, which, "[c]oupled with Fastow's insistence on total secrecy," led him to conclude that "we should exercise extreme diligence."[132]  Howard reassured Bermingham and others that the transaction was "above board" and had "the highest executive support.  Indeed, it will, in Andy Fastows [sic] words[,] 'take Enron to the next level' in the enhancement of

---

[130]  Sections 4.2 and 4.3, Partnership Agreement; Nicholls LJM Memorandum, at RBS 3030496 (noting "[a]ll distributions (after paydown of debt) on disposal of other assets to cascade [to Andy Fastow and Limited Partners]").

[131]  *See, e.g.,* Project LJM Memorandum; Letter from Iain Cummings, KPMG Audit Plc, to Chris Learmonth, RBS, *et al.,* June 23, 1999 (the "KPMG Letter, June 23, 1999") [RBS 3030569-RBS 3030570]; Email from David Bermingham, RBS, to Kevin Howard, RBS, and Kristi DeMaiolo, *et al.,* RBS, May 26, 1999 (the "Bermingham/Howard Email, May 26, 1999") [RBS 4014174]; Email from David Bermingham, RBS, to Kevin Howard, RBS, and Mike Ellison, RBS, May 28, 1999 (the "Bermingham/Ellison Email, May 28, 1999") [RBS 4016410].

[132]  Bermingham/Howard Email, May 26, 1999.

Enrons [sic] share price."[133]   Moreover, Howard explained, Fastow's insistence on secrecy related to the possibility of Enron officers investing in LJM1, a concept that had not yet received the approval of the Enron Board.[134]

Notwithstanding Howard's vouching for the transaction, Bermingham responded two days later that he was unable to "get away from the fact that value is going out of the Enron group."[135]  He added that:

> The fact is that a two bit LLC called Martin [the original name for LJM1], owned by a couple of Enron employees, will all of a sudden be **gifted** $220m of Enron stock.  It could never bother about the borrowing base, sell the stock in the market, pack up [its] bag and disappear off to Rio.  If you owned it, wouldn't you?  Now I'm beginning to understand why these guys are so keen to get in on it. . . .
>
> What am I missing???????
>
> There needs to be consideration given to the Enron group.[136]

On June 9, 1999, Mike Ellison, another member of the bank's Structured Finance group, and Bermingham prepared a list of issues and questions for a meeting the next day that Howard and Giles Darby ("Darby") (also of RBS's Structured Finance group) had set with Fastow.  Foremost among the issues to be discussed was the bank's need to

---

[133] *Id.*

[134] *Id.*

[135] *Id.*

[136] *Id.* (emphasis in original). Ironically, Bermingham ultimately was indicted and charged with wire fraud for his role in allegedly improperly profiting from LJM1 and allegedly is evading authorities.  Indictment, *United States v. Bermingham*, Cr. No. H-02-0597 (S.D. Tex. filed June 27, 2002), (the "RBS Bankers Indictment"); *see also* Criminal Docket, *United States v. Bermingham*, 02-CR-0597-ALL (S.D. Tex. filed June 27, 2002) (claiming David Bermingham is a "fugitive").

"understand the *fundamental rationale*" for LJM1.[137]  Among the suggested questions

for Fastow were the following:

- whether the proposal to create LJM1 suggested that Enron was in trouble;

- what consideration was LJM1 providing to Enron as part of the contemplated structure;

- how Enron senior management, as owners of LJM1, could have anything but a conflict of interest in negotiating the purchase of assets from Enron entities; and

- if LJM1 "were owned by an unrelated third party and brought [this] idea to Enron, would Enron do it **on the same terms** as are currently being proposed?"[138]

The potential unfairness of the transaction to Enron's shareholders and resulting

reputational risk to the bank were also recognized in a memorandum from Commons,

Head of Credit Risk:

> The fundamental issue from my perspective is one that I raised when this transaction was first discussed [internally] and which has, I know, been exercising the minds of everyone concerned over the last two weeks. This is the potential reputational risk given that Enron assets are being transferred into the control of (and for the future benefit of) third-parties, where the third-parties are not necessarily valid 'arms length' counterparties, given the shareholding and control exercised by Andy Fastow.[139]

---

[137] Email from Mike Ellison, RBS, to Kevin Howard, RBS, and Giles Darby, *et al.*, RBS, June 9, 1999, at 2 (emphasis in original) [RBS 4016402-RBS 4016405].

[138] *Id.* at 2-3 (emphasis in original).

[139] Project LJM Memorandum, at RBS 3030461. In the same memorandum, Commons purported to have "offset" his "initial view that Enron shareholders are being 'short[-]changed,'" through analysis of the "historic" nature of the UBS share trade and other mitigating factors. *Id.* at RBS 3030462. He nevertheless expressed continuing concern regarding Enron's "heavy off-balance sheet liabilities" and its "inadequate internal cash generation (hence one of the objectives behind this structure [i.e., LJM 1])." *Id.* at RBS 3030463.

KPMG Audit Plc, engaged by RBS to analyze the bank's internal accounting for
the transaction, noted that:

> the nature of the transaction is highly unusual. The role of the CFO of
> Enron and the use of its own shares, raises significant concerns as to the
> potential reputational risk to the bank if the transaction is not disclosed
> appropriately by Enron or [if] shareholders claim to have been
> disadvantaged.[140]

Contemporaneous RBS internal documents also reveal an appreciation of potential risks
to RBS: "it is not too difficult to construct some form of legal action by Enron
shareholders (however spurious) claiming that they have been short-changed, that Andy
Fastow has 'cherry picked' assets etc. and, in isolation, the position does not look
good."[141]

### Enron Board Approval of LJM1

Fastow presented LJM1 and the LJM1/Rhythms Hedging Transaction at a
special meeting of the Enron Board on June 28, 1999.[142] The minutes and the LJM1
Presentation to the Enron Board indicate Fastow, among other things, told the Enron
Board that: (i) he would have no "direct pecuniary interest" in the Enron stock used to
fund LJM1 (consistent with this representation to the Enron Board, the Partnership
Agreement provided that only the Limited Partners, and not Fastow, could benefit from
the proceeds of the Enron shares);[143] (ii) the transaction would keep a large block of

---

[140] KPMG Letter, June 23, 1999, at 2; *see also* Project LJM Memorandum, at RBS 3030461.

[141] Project LJM Memorandum, at RBS 3030461; Clement/Bermingham Email, July 27, 1999, at RBS
4014620 ("Absolute exposure is limited to $7.5m but the nature of an equity stake provides a different
focus on risk analysis[:] Reputation[;] Partnership liability[; and] US shareholder action[.]").

[142] *See* LJM1 Presentation to the Enron Board.

[143] Section 4.2, Partnership Agreement ("All distributions of Initial Property, Initial Property Proceeds and
Substituted Property . . . shall be distributed among the Limited Partners . . . ratably in proportion to their
respective Commitments.").

Enron stock restricted; and (iii) PWC would render a Fairness Opinion stating that the value Enron received would exceed the value of the forward contract with UBS that Enron would be giving up.[144] RBS received, prior to the Enron Board meeting, a copy of Fastow's LJM1 Presentation to the Enron Board, as well as proposed resolutions approving the formation of LJM1.[145]

The Enron Board approved the transaction and Fastow's role in LJM1 and appointed Lay and Skilling as a committee of the Enron Board to determine if the consideration Enron received was sufficient in the event of a change in the terms of the transaction from those presented to the Enron Board.[146] In addition, the Enron Board authorized the officers to execute various documents in connection with the transaction, including indemnification agreements.[147] Ultimately, RBS took comfort from its understanding that Fastow had obtained necessary internal approvals within Enron, including Enron Board authority, and that the formation of LJM1 (and, presumably, Fastow's role in it) would be, as RBS understood it, "fully disclosed in Enron's SEC filings."[148] RBS also understood that PWC would issue a fairness opinion in connection with the transaction, although RBS was ultimately denied access to the fairness opinion

---

[144] Enron Board Minutes for Special Meeting, June 28, 1999, at 6-7.

[145] Yaeger Facsimile; Clement Sworn Statement, at 38, line 25 – 39, line 3.

[146] Enron Board Minutes for Special Meeting, June 28, 1999, at 7.

[147] *Id.* at 7-8. The Examiner has discovered an Indemnification Agreement signed by Fastow, but not by Enron, that purports to indemnify Fastow for all "Liability" incurred by him in connection with any claim arising out of the fact that he is the general partner and manager of LJM1. The definition of "Liability" specifically includes Section 16 liability under the Securities Exchange Act of 1934. *See* Section 12 (definition of "Liability"), Indemnification Agreement between Enron and Andrew S. Fastow, June 1999 [AB000468749-AB000468753].

[148] Project LJM Memorandum, at RBS 3030462. RBS also intended to "have sight of the relevant Board minutes/resolutions." *Id.*

itself. Kopper told RBS that a fairness opinion would be delivered and contained nothing
that caused him any concern.[149] No fairness opinion had been issued at that time.

*LJM1 is Capitalized and the LJM1/Rhythms Hedging Transaction is Closed*

The CSFB and RBS subsidiaries each contributed $7.5 million to LJM1, and
Fastow, as General Partner, contributed $1 million.[150] These amounts were funded on
July 9, 1999, with an effective date of June 30, 1999.[151] Enron provided the vast majority
of LJM1's funding by transferring 6,755,394 shares of Enron stock to LJM1.[152] Effective
June 30, 1999, these shares had an aggregate stock price of approximately

---

[149] In an email, Kevin Howard further explained Kopper's comfort with the forthcoming Fairness Opinion:

> However, we will not receive a copy of the fairness opinion from Price Waterhouse . . . .
> To mitigate our concerns in this regard, Enron point to the following: []Kopper and
> Glissen [sic] have received nothing to date from PW which causes them any concern and
> although the board wont [sic] have the final sign off from PW before making a decision
> on Monday, they will have a sign off from Enrons [sic] Chief Accounting Officer that in
> Enrons [sic] opinion[,] the company is receiving fair consideration. . . . Following the
> call, Howard and Bermingham discussed the issues with Gies [sic] Darby and [I] think it
> is fair to say that all three of us feel we should accept what we are being offered and not
> push any further. . . . Kopper apologised on the call for misleading us on the issue of the
> fairness opinion [–] has taken alot [sic] of heat internally for making representations
> which he could not deliver. This is a PW issue [–] not Enron trying to hide anything.

Email from Kevin Howard, RBS, to Giles Darby, *et al.*, RBS, June 25, 1999 (the "Howard/Darby
Email, June 25, 1999") [RBS 4007532-RBS 4007533]; *see also* Email from David Bermingham,
RBS, to Gary Mulgrew, *et al.*, RBS, June 27, 1999 (reporting, after a conference call with Fastow
and other Enron officials that "[n]o sight of the fairness opinion or conversation with PwC is on
the table") [RBS 4016354-RBS 4016355].

[150] *See, e.g.*, Partnership Agreement, at RBS 4000221; Memorandum from Michele Wu, PWC, to Files,
regarding Distribution in Excess of Basis, Mar. 7, 2001 (the "PWC Memorandum to File"), at 1
[PSI00232176-PSI00232180]. Very shortly after investing $1 million as General Partner, Fastow collected
a $550,000 "semi-annual management fee." Letter from Andrew S. Fastow, Enron, to LJM1, Aug. 12,
1999, at 1 [RBS 4016340-RBS 4016341].

[151] Email from Rodger Yeomans, Director, Campsie, to David Bermingham, RBS, *et al.*, July 9, 1999
(communicating that payment should be completed that day) [RBS 4009663]; Memorandum from David
Bermingham, Director, RBS, to Rodger Yeomans, Director, Campsie, *et al.*, regarding Capital Investment
in LJM1, July 8, 1999 [RBS 4009678].

[152] Assignment and Assumption Agreement; Memorandum from Richard Ivers, Managing Director, *et al.*,
CSFB, to Chuck Ward, Co-Head of Investment Banking, CSFB, and Mark Patterson, CSFB, regarding
LJM1, Nov. 29, 1999, at 1 [CSFBCO 000010739-CSFBCO 000010741].

$276 million,[153] but because they were subject to a contractually mandated four-year restriction on resale and a one-year restriction on hedging put in place by Enron for this transaction,[154] the discounted value of the shares was substantially less than the aggregate stock price. In exchange for the transfer of shares, Enron received a put option on its Rhythms stock from Swap Sub that LJM1 valued at $104 million[155] and a $50 million promissory note from LJM1 that was due September 30, 1999.[156] This left approximately $122 million of unrealized value in LJM1 (of which RBS, through its affiliate, Campsie, owned a 50% interest).[157]

*The Fairness Opinion and Post-Closing Changes to the Terms of the Transaction*

PWC did not render the Fairness Opinion based on the initial terms of the LJM1 Related Party Transaction.[158] Two changes were made thereafter to the transaction terms. First, on July 27, 1999, almost a month after the recorded closing date of LJM1's funding, LJM1 issued a second limited recourse promissory note to Enron in the principal

[153] See Enron stock closing price of $81.75, June 30, 1999, Enron Corp. stock price history report, 1/1/1998 to 6/26/2002, at AB000499883 [AB000499873-AB000499904].

[154] Confirmation Letter from Enron to LJM1 and Swap Sub, June 30, 1999 (the "Original Lock-Up Agreement"), at RBS 4000313-RBS 4000314 [RBS 4000313-RBS 4000316]. The time period for the hedging restriction was extended from one year to two years by amendment a few weeks later.

[155] See LJM/Rhythms Structure Accounting Entries Worksheet, author unknown, undated [AB000468781].

[156] See Limited Recourse Promissory Note in the amount of $50,000,000 by LJM1 in favor of Enron, June 30, 1999 [AB0068 00315-AB0068 00317].

[157] The Examiner attributes the acts of Campsie to its parent, RBS, and will generally refer to those acts as acts of RBS throughout this Appendix. At the time of closing, RBS computed its share of the unrealized value in LJM1 to be $42.1 million. Email from David Bermingham, RBS, to Simon Lee, et al., RBS, June 30, 1999 (the "Bermingham/Lee Email, June 30, 1999") [RBS 4007010].

[158] Letter from Andrew S. Fastow, LJM Partners, LLC, to Limited Partners of LJM1, July 27, 1999 (the "Fastow Letter to LJM1 Limited Partners"), at 1 ("[W]e have determined that a couple of changes to the initial structure are necessary to support the initial valuation presented to you.") [RBS 4016342-RBS 4016343]; Mulgrew Memorandum, at RBS 3030456 ("There was a subsequent amendment to the Partnership Agreement to $64m as Enron's original consideration of $50m cash had been calculated on a lower share price than we obtained at execution. The increase was important as it was part of Enron's fairness calculations for the value they passed to the partnership."); see Fairness Opinion.

amount of $14 million as additional consideration for the Enron shares.[159]  Second, the
prohibition against hedging was extended from one to two years via the Lock-Up
Agreement, of which the "no-hedge clause" was a part.[160]  Consistent with the PWC
Fairness Analysis, Enron ultimately applied a 39% illiquidity discount to the Enron
shares, which reduced the value of the Enron shares transferred into LJM1 by
approximately $108 million.[161]  RBS was aware of the reduction in the value of the Enron
shares held by LJM1 (in which RBS had a 50% interest) that resulted from these actions,
but does not appear to have expressed any concern or raised any objection.[162]

On August 17, 1999, PWC delivered its Fairness Opinion on the exchange of the
Enron shares from Enron in return for the LJM1 Notes and the LJM1/Rhythms Hedging
Transaction.[163]  PWC opined that the range of value for the LJM1/Rhythms Hedging
Transaction and LJM1 Notes was $164-$204 million and the range of value for the
Enron shares was $170-$223 million and concluded that the consideration received by
Enron was fair from a financial perspective.[164]

---

[159] Fastow Letter to LJM1 Limited Partners, at 2; *see also* Amended and Restated Limited Recourse Promissory Note in the amount of $14,000,000 by LJM1 in favor of Enron [PSI00110108-PSI00110110]. RBS understood that this amendment was made to satisfy PWC's concerns.  Mulgrew Memorandum, at RBS 3030456.

[160] *See* Lock-Up Agreement, at RBS 4010116.

[161] On August 13, 1999, PWC delivered a copy of its Fairness Analysis as a precursor to the delivery of its Fairness Opinion four days later.  *See* PWC Fairness Analysis. In the Fairness Analysis PWC noted that "Bear Stearns would require a 20% to 40% [illiquidity] discount for four year restricted stock." *Id.* at 20. PWC also noted that "[i]n Enron Treasury experience, >30% discount is appropriate for 2 to 4 year[] [restricted stock]." *Id.*; Project Martin Deal Memorandum from Global Finance Tax, undated, at 1 (regarding the LJM1/Rhythms Hedging Transaction) [AB000456678-AB000456680]; *see also* Second Interim Report, Annex 2 to Appendix L (Related Party Transactions).

[162] Fastow Letter to LJM1 Limited Partners, at 2.

[163] *See* Fairness Opinion.

[164] *See id.* at 3.

Thus, when RBS made its investment in LJM1, contracts were in place that: (i) prohibited Fastow from sharing in distributions of proceeds resulting from the Enron stock transferred to LJM1;[165] (ii) prohibited LJM1 from hedging the Enron stock it held for one year (subsequently amended to two years);[166] and (iii) prohibited LJM1 from selling or otherwise transferring that stock for four years.[167] RBS was aware of these restrictions even before PWC had issued its Fairness Opinion.[168] In a July 1999 internal presentation on LJM1 provided to the bank's Structured Finance group, Bermingham and a colleague, David Clement, advised their fellow bankers that "Fastow [is] prohibited from obtaining any value on Enron stock delivered to the partnership."[169] RBS was also aware of the hedging prohibition. When it was amended from its original form and became a two-year prohibition, Howard, the bank's Enron Relationship Manager, signed his agreement to the amendment in his capacity as a representative of Campsie.[170]

Notwithstanding its knowledge of these restrictions, RBS was concerned that the embedded value in its LJM1 investment (resulting from the excess value of the Enron

---

[165] Section 4.2 of the Partnership Agreement provides that "[a]ll distributions of [the shares of Enron stock transferred to LJM1, proceeds of those shares and property received by LJM1 in exchange for those shares] shall be distributed among the Limited Partners." Section 4.2, Partnership Agreement. Section 4.4 of the Partnership Agreement provides that "any income, gain, loss or deduction recognized by [LJM1] as a result of or in connection with the transfer to it of the [shares of Enron stock transferred to LJM1] . . . shall be allocated solely to the Limited Partners." *Id.* at Section 4.4. The general partner would, however, share in other distributions by LJM1. *Id.* at Section 4.3. Further, the general partner's management fee was to be calculated by reference to assets in LJM1 other than the shares of Enron capital stock transferred to LJM1 or the proceeds of those shares. *Id.* at Section 5.2.

[166] Original Lock-Up Agreement, at RBS 4000314. Lock-Up Agreement, at 4010116.

[167] Original Lock-Up Agreement, at RBS 4000314.

[168] *See, e.g.,* Fastow Letter to LJM1 Limited Partners; Yaeger Facsimile, at RBS 4005102; Clement Sworn Statement, at 43, lines 11-13 ("I was clearly aware of [the transfer restriction] prior to the close of the transaction or on the close of the transaction.").

[169] Clement/Bermingham Email, July 27, 1999, at RBS 4014617.

[170] Fastow Letter to LJM1 Limited Partners, at 2.

stock transferred to LJM1) was at risk if Enron's stock price were to fall. Indeed, even before the LJM1 Related Party Transaction closed, RBS had begun searching for a way to hedge its indirect investment in the Enron stock in LJM1 in order to protect the gain that RBS stood to realize.[171]

*RBS Circumvents the Partnership Agreement*

As early as June 1999, RBS contemplated hedging the Enron stock that capitalized LJM1 to "unlock" what it often referred to as the "seated value" in the "upside" of the Enron shares, while protecting against "downside" risk that the Enron shares would decline in value. On June 14, 1999, Bermingham sent to several of his colleagues at the bank a model "profit payout profile" that, among other things, "calculate[d] how many [Enron put] options [the bank] need[ed] to buy to provide a perfect hedge" of its exposure to downside risk on the Enron shares in LJM1.[172] Bermingham explained that, under the model, "our return on [LJM1] can never be negative[.] We can only lose our [initial investment]. But the payout on our options is a maximum of $82 per option, which is quite handy!!"[173] Noting that "[p]erversely ... we will be coining [the hedge] on our Enron puts, and so will actually be better off with Enron shares at $20 than we would with Enron shares at $50," Bermingham concluded that "if we buy our protection, this is a one way bet in a financial sense, and as the

---

[171] Email from David Bermingham, RBS, to Gary Mulgrew, *et al.*, RBS, June 14, 1999 (the "Bermingham/Mulgrew Email, June 14, 1999") [RBS 4016394-RBS 4016395]; Email from Mike Ellison, RBS, to David Bermingham, RBS, June 18, 1999 (the "Ellison/Bermingham Email, June 18, 1999") [RBS 4014255]; Nicholls LJM Memorandum, at RBS 3030497.

[172] Bermingham/Mulgrew Email, June 14, 1999, at 1.

[173] *Id.*

numbers demonstrate, it could be quite a nice bet!!!"[174]  Bermingham's message neither

addressed nor acknowledged the transfer restrictions and no-hedge clause contained in

the Lock-Up Agreement, which (i) provided the basis for the $108 million discount

ultimately applied to the Enron stock transferred to LJM1, and (ii) underpinned the

Fairness Opinion rendered by PWC.[175]

On June 18, 1999, reporting that "feedback suggests that we might be able to take

to [the bank's] P&L a 'prudent [percentage]' of the initial write up in the [Enron] shares

value," an RBS banker exulted that "[t]his is a GREAT deal, I love it (greed and

avarice . . . and the year[-]end bonus raise their ugly heads . . . .!!)."[176]  Representatives of

the bank reacted immediately to the closing of the LJM1 Related Party Transaction by

expressing – at  least implicitly –  a desire to circumvent the transfer and hedging

restrictions in the Lock-Up Agreement.  In an email on June 30, 1999, Bermingham

reported that LJM1 was

> signed tonight.  For information, the "seated" value of [the bank's]
> equity (over and above $7.5m contributed) is $42.1m as of this
> evening (Enron stock price $81.1875).  Our challenge now is to lock in
> and extract value from this trade.  Thanks to all who helped to get us
> there.[177]

On July 19, 1999, an internal RBS memorandum entitled "LJM Profit

Extraction" stated that foremost among the bank's "[o]bjectives" was "to extract profit

---

[174] *Id.*

[175] Bermingham/Mulgrew Email, June 14, 1999.

[176] Ellison/Bermingham Email, June 18, 1999.

[177] Bermingham/Lee Email, June 30, 1999.

from LJM[1] which may be realised in this accounting year."[178]   In the memorandum,

the bank identified "two steps" through which it could extract profit:

> i)   hedge the downside risk associated with the LJM investment to
> ensure that [the bank's] initial investment of $7.5m is protected;
>
> ii)   extract profit from the existing upside position.[179]

In addition, even before PWC had rendered its Fairness Opinion, RBS became

aware that CSFB also intended to derive immediate value (both for itself and for

Fastow) from the use or transfer of the Enron shares that had funded the partnership.

Shortly after LJM1 was collateralized, CSFB had begun to develop its own plan to

obtain the unrealized value in the restricted Enron stock held by LJM1.[180]   On August 5,

1999, CSFB presented a proposal to Enron and RBS representatives at a meeting in

London.[181]   The proposal outlined a means by which CSFB intended to hedge its own

position in the Enron shares – a CSFB-developed transaction known as SAILS, which

was an acronym for "Shared Appreciation Income Linked Securities."   CSFB developed

SAILS to permit its clients to monetize or hedge securities that were otherwise subject to

---

[178] Memorandum from the Structuring Group, regarding LJM Profit Extraction, July 14, 1999, at RBS 4008755 [RBS 4008755-RBS 4008764].

[179] *Id.*

[180] Email from Carmen Marino, Managing Director, CSFB, to Robert Furst, Director, CSFB, and Richard Ivers, Managing Director, *et al.*, CSFB, July 6, 1999 [CSFBCO 000049286-CSFBCO 000049287].

[181] *See* CSFB Presentation to LJM1, "Materials Prepared for Discussion LJM Cayman, L.P.," Aug. 5, 1999 (the "CSFB SAILS Presentation") [CSFBCO 000008370-CSFBCO 000008385];   Clement Sworn Statement, at 27, lines 17-23.

transfer restrictions.[182]  That proposal contemplated providing funds to Fastow resulting from a hedging transaction.[183]

CSFB's proposal would allow the limited partners of LJM1 to lock-in a guaranteed minimum return on the shares of Enron stock held by LJM1, while still allowing the limited partners of LJM1 to participate in up to 10% of any appreciation in that stock.[184]  The SAILS transaction, as proposed, would also result in a payment to LJM1, thereby enabling it to repay the LJM1 Notes to Enron and creating additional funds for LJM1 to invest.[185]  This was presumably a highly attractive proposition to Fastow for at least two reasons.  First, his management fee was computed based on assets under management (other than the Enron shares), which would be increased by the additional amount available to be invested.  Second, the parties treated the additional funds not as proceeds of the Enron stock (in which Fastow could not participate), but as additional capital contributions in which Fastow could share.  In other words, while Fastow could only invest and profit from $16 million when LJM1 closed, after SAILS, he could invest and profit from what would eventually be $41 million (the $16 million from the initial partnership investments plus the additional $25 million contributed to LJM1 that resulted from SAILS).

In an internal email one day after learning of the SAILS proposal, RBS evaluated the CSFB plan.  RBS representatives saw obvious benefits to "LJM/Fastow" (as RBS

---

[182] See Sworn Statement of Carmen Marino, former Managing Director, CSFB, to Frank G. Smith, A&B, Sept. 25, 2003, at 31-37.

[183] Bermingham/Howard Email, Aug. 6, 1999, at 1 (noting that the proposal provides "[u]pside for Fastow on all investments made" and has "enormous attraction for" Fastow).

[184] See CSFB SAILS Presentation.

[185] See id. at CSFBCO 000008384.

- 49 -

referred to the beneficiary) and to CSFB in the proposal, but little advantage for RBS.[186]
Specifically, RBS observed that the CSFB proposal would provide "LJM/Fastow" the
advantage of "[l]iquidity of (net) $66m, which is entirely windfall (it was NEVER the
intention in the original deal)," and "[u]pside for Fastow on all investments made (he
currently has none)."[187]  Likewise, RBS assessed CSFB's proposal as potentially
affording CSFB the benefits of removal of Enron stock price risk, as well as
approximately $2 million on derivatives trades.[188]  In summary, RBS determined the
proposal had "enormous attraction for Andy, substantial attraction for CSFB, and a
whole lot of nothing for us."[189]

Despite these misgivings, and "bearing in mind everyone's objectives," RBS
initially decided in favor of *accepting* CSFB's proposal on the condition that certain new
provisions be added that ensured that RBS could share in the "upside."[190]  In particular,
RBS contemplated a counterproposal whereby Fastow would still reap "[n]ew liquidity
of $36m (over and above the $16m of cash he already has), which was never envisaged
in the original deal" and would allocate to Fastow over 60% of the upside in new
investments made – but would also provide RBS with "P&L now of $15m," and, among
other things, "indeterminate upside going forward (totally new risk profile, but really

---

[186] Bermingham/Howard Email, Aug. 6, 1999, at 1.

[187] *Id.*

[188] *Id.*

[189] *Id.* RBS believed the transaction did "a whole lot of nothing" for the bank because unlike CSFB, RBS
did not mark-to-market its investment in LJM1. *Id.* ("[Michael Kopper] is likewise aware that we do not
[mark-to-market] and that therefore this has no P&L effect for us."). Bermingham further noted that
"[SAILS] is not an attractive deal for us. Ben Glisan describes it as a great day at the office. I would
describe it as three hours at a Leonard Cohen concert." *Id.*

[190] *Id.* at 2.

upside only, since we will already have made a 200% guaranteed return)."[191]  RBS put

forth this counterproposal knowing that it would result in Fastow participating in

liquidity derived from the Enron shares,[192] which was contrary to the terms of the

Partnership Agreement and his representations to the Enron Board.

On August 20, 1999, RBS presented a "restructuring proposal" for LJM1 to the

directors of the bank's affiliate, Campsie.  The premise for the proposal was that "Enron

stock [is] at an all-time high – Limited Partners ('LP's') seated value is currently $45m

discounting any value attributed to Swap Sub and excluding the initial $7.5m

investment."[193]  Because the "LP's [were] currently fully exposed to a single asset, ie

[sic] the Enron stock price," the proposal suggested that "it may be appropriate for the

LP's to lock-in the seated value at the current share price."[194]  The Campsie directors,

including Howard, do not appear to have raised any issues regarding the proposal,

including specifically questioning whether the transaction might violate the Lock-Up

Agreement or run afoul of the restrictions on Fastow profiting from the Enron stock.

---

[191]  *Id.*

[192]  Bermingham further commented on the CSFB proposal:

> We may need to consider some other restrictions on the types of investment Andy [Fastow] can
> make, since he is now playing poker with our seated value[.] . . . [W]ould we wish to make the
> terms slightly less favourable to him on these new investments, since it is really new wealth for
> him, so it would be unreasonable for him to assume that he should get such a large slice of the pie
> on whjat (sic) used to be exclusively our money...........?

*Id.*

[193]  Mulgrew Memorandum, at RBS 3030455.

[194]  *Id.*  The proposal also contemplated that the funds generated by the transaction, like the Enron stock,
would be classified as "Initial Property."

> Campsie's risk/reward profile will however shift under the terms of the agreed
> documentation and for incentivisation purposes – the GP will receive approximately 60%
> of the upside in future investments which are not 'initial property.'  The initial property
> was the original Enron stock and will now be the funds generated via the transaction
> outlined above.

*Id.* at RBS 3030457.

During the second half of 1999, RBS, CSFB, and LJM1 discussed various means, including SAILS, by which the banks and Fastow could realize an immediate gain from the Enron stock held by LJM1.[195] Most or all of these proposals appear to have contemplated hedging exposure to the Enron shares and/or transfer of the Enron shares contrary to the terms of the Lock-Up Agreement.[196] The proposals also appear to have contemplated providing Fastow with a direct pecuniary interest in the proceeds resulting from the Enron stock that had been used to fund LJM1, in violation of the Partnership Agreement and contrary to Fastow's representations to the Enron Board. Howard testified that he understood at the time that it was solely the limited partners (not Fastow) that could receive the value of the Enron shares that were contributed to LJM1 on formation.[197] He nevertheless acknowledged that between August and November 1999, the bank had discussed restructuring transactions under which "Mr. Fastow was going to get some more benefit" than was permitted in the original structuring of LJM1.[198] Howard understood that such benefit would result from contributions made to LJM1 by the limited partners in exchange for, in essence, the

---

[195] Clement Sworn Statement, at 91, lines 9-13 ("[V]arious permeations and structure ideas were battered back and forth for some period until we got the transaction we actually consummated, which we discussed earlier, in November.").

[196] See, e.g., Mulgrew Memorandum; Email from David Bermingham, RBS, to Gary Mulgrew, et al., RBS, Oct. 19, 1999 (attaching an "Application to Credit Risk" discussing the proposed hedging activities) (Ex. 19 to Howard Sworn Statement) [RBS 4014816-RBS 4014824]; Email from David Bermingham, RBS, to Kevin Howard, et al., RBS, Oct. 28, 1999 (attaching an "Investment Proposal Presentation to the Board of Campsie" from RBS discussing the proposed hedging activities and benefits to Campsie) (Ex. 21 to Howard Sworn Statement) [RBS 4014844-RBS 4014848]. David Clement testified that the Total Return Swap did not involve the actual Enron shares held by LJM1, but rather a notional amount of Enron shares. See Clement Sworn Statement, at 146, lines 3-10.

[197] Howard Sworn Statement, at 198, 209, 275.

[198] Id. at 283.

ability to obtain immediate value from the Enron shares that had been used to capitalize

LJM1.[199]

On November 9, Bermingham sent an email to Glisan setting forth RBS's latest

LJM1 restructuring proposal pursuant to which the bank could receive the "seated

value" of the Enron shares in LJM1:

> [T]he attached spreadsheet illustrates a proposal which we hope will be
> acceptable to Andy.  The underlying principle here is that there is
> essentially $14m of value that we need to transfer to Andy over a period
> which is assumed to be 2 years, but might be longer if that would suit
> Andy better.[200]

Various iterations of RBS's proposal continued to contemplate that the limited partners

would realize the entire value of the Enron shares in exchange for the infusion of cash to

LJM1.[201]

The end result of the various proposals and counterproposals from August

through November 1999 was that LJM1, on November 29, 1999, distributed into escrow

accounts for the benefit of each limited partner 1,775,000 shares of Enron stock (worth

approximately $137 million) that had been transferred to LJM1 at formation.[202]  The

transfer of these shares allowed RBS to complete, on November 30, 1999, Total Return

---

[199] Howard Sworn Statement, at 283.  Howard further testified that it was his understanding that the additional "benefit" conveyed to Fastow was the result of the hedging transactions related to the Enron shares. *Id.* at 284, lines 2-12.

[200] Bermingham/Glisan Email, Nov. 9, 1999, at 1.

[201] *See, e.g.*, Email from David Bermingham, RBS, to Ben Glisan, Treasurer, Enron, *et al.*, Nov. 12, 1999 (the "Bermingham/Glisan Email, Nov. 12, 1999") (proposing that "LP's each invest $44.5m as BLP Interests [i.e., what were denominated as "B" Interests held by the limited partners], which represent the entire interest in the Initial/Substitute property.  Proceeds used to repay Enron debt and CSFB loan.") [RBS 1029943]; Clement Sworn Statement, at 86, lines 12-22, and at 92, lines 18-23.

[202] Escrow Agreement between LJM1, Campsie and Coutts (Cayman) Limited, Nov. 29, 1999 (the "RBS Escrow Agreement"), at RBS 1060978 [RBS 1060972-RBS 1060979]; Escrow Agreement among LJM1, ERNB, Credit Suisse Financial Products and CSFB, Nov. 29, 1999 [AB1128 01068-AB1128 01079].

Swaps with AIG that enabled RBS to book approximately $67 million[203] in income.[204]
In return, RBS and CSFB agreed that they would each make equal "Additional Capital
Contributions"[205] sufficient to infuse LJM1 with enough cash to pay off the $64 million
in LJM1 Notes, as well as a $25 million bridge loan that CSFB had made to the
partnership.[206] LJM1's commitment to escrow the Enron stock was a condition
precedent to the limited partners' obligation to make the cash infusion.[207] In view of its
$45.1 million "Additional Capital Contribution" to LJM1 and the $67 million that it
received through its Total Return Swaps with AIG (which closed approximately two

---

[203] Chart of RBS/LJM1 Distributions (noting "$67,011,270.75" described as "Distribution into escrow of
1,775,133 shares of ENE stock"). Other RBS documents set the figure at $68 million and $70 million
respectively. Email from David Bermingham, RBS, to Allen Hing, RBS, Nov. 30, 1999, at RBS 4006444
($68 million) [RBS 4006444-RBS 4006445]; Pettifer/Howard Email, Aug. 15, 2000, at RBS 4003283 ($70
million) (attaching a memorandum regarding the "Background of LJM Structure").

[204] See, e.g., Bermingham/Glisan Email, Nov. 12, 1999; Pettifer/Howard Email, Aug. 15, 2000 (attaching a
memorandum regarding the "Background of LJM Structure"). On December 9, 1999, CSFB closed the
SAILS transaction that had been the subject of its discussions over the previous months with Enron and
LJM1, and obtained $57.1 million in proceeds. Section 2.01, SAILS Mandatorily Equity-Linked Securities
Contract among ERNB, Credit Suisse Financial Products and CSFB, Dec. 9, 1999 [CSFBCO 000008587-
CSFBCO 000008613]. For a more detailed discussion of this transaction, see Final Report, Appendix F
(Role of CSFB and its Affiliates).

[205] The payments made by the limited partners were ultimately characterized in this manner, apparently to
allow Fastow to benefit from this infusion. Had the payments instead been characterized as "Initial
Property Proceeds" or "Substituted Property," as RBS previously expected, "Andy [Fastow] [could] not
benefit from their base valuation." See LJM Restructuring Memorandum, at RBS 4007112 (stating that a
contrary characterization was "fundamentally not the 'understanding' of the Partnership"). RBS's belief
that proceeds resulting from its hedging of the value of the Enron shares transferred to LJM1 would
constitute "initial property" is evident from an August 20, 1999 memorandum stating that "[t]he initial
property was the original Enron stock and will now be the funds generated via [this hedging] transaction
outlined above." Mulgrew Memorandum, at RBS 3030457; Howard Sworn Statement at 284, lines 2-12
(the hedging transactions related to the Enron shares conveyed the additional "benefit" to Fastow).

[206] Bermingham/Glisan Email, Nov. 12, 1999 ("LP's each invest $44.5m as BLP interests, which represent
the entire interest in the Initial/Substitute property. Proceeds used to repay Enron debt and CSFB loan.");
Bermingham/Galloway Email, Nov. 12, 1999 (attaching "Investment Proposal Presentation to the Board of
Campsie Limited").

[207] Sections 1.6 and 1.7, Second Amended and Restated Agreement of Limited Partnership of LJM1, Nov.
29, 1999 (the "Amended Partnership Agreement") [RBS 1061131-RBS 1061173]. The limited partners'
obligation to make the "Additional Capital Contributions" was contingent upon "the prior performance of
the covenants in the first sentence of Section 1.7 [i.e., the requirement that LJM1 transfer the shares into
escrow]." Id.

weeks before RBS provided the cash infusion), RBS reaped in excess of $22 million in

profits as part of this process.[208]

Bermingham recognized in an email to colleagues shortly after the Total Return

Swaps were completed that "the [Total Return Swaps] amounted to a realisation of the

value of the Enron stock."[209] An internal briefing on the bank's historical involvement

in LJM1 stated succinctly the respective goals achieved by RBS and Fastow through the

Total Return Swaps with AIG: "[RBS] wished to lock in and realise its profit from the

[LJM1] deal straight away and [Fastow] wished for more cash in LJM for him to invest

and generate profit from."[210]

The Total Return Swaps, including the related RBS Escrow Agreement, required

Fastow's consent as the general partner[211] and Enron's consent under the Lock-Up

Agreement.[212] Causey executed a consent to the RBS Escrow Agreement on behalf of

Enron.[213] The RBS Escrow Agreement contemplated the release to RBS's affiliate,

Campsie, of "all or a portion of" the Enron shares transferred into escrow "[u]pon receipt

---

[208] *See, e.g.*, Bermingham/Glisan Email, Nov. 12, 1999; Pettifer/Howard Email, Aug. 15, 2000 (attaching a memorandum regarding the "Background of LJM Structure"); Clement Sworn Statement, at 57, line 23 – 58, line 2.

[209] Email from David Bermingham, RBS, to Chris Clarke, *et al.*, RBS, Dec. 6. 1999 [RBS 6025615]. In discussing potential bonuses to be paid to certain RBS employees for 1999, Bermingham stated "[s]o what [Clement] and I have achieved over the last couple of months is to strip out 94% of the value remaining in the vehicle after Fastow put his grubby little fingers in the till, and convert it to P&L." For emphasis, what we have executed was not Enron's idea, or Fastow's idea, or CSFB's idea, it was OUR idea." Email from David Bermingham, RBS, to Gary Mulgrew, RBS, Dec. 1, 1999, at RBS 4015211 [RBS 4015211-RBS 4015212]; *see also* Howard Sworn Statement, at 362, line 18 – 363, line 4.

[210] Pettifer/Howard Email, Aug. 15, 2000, at RBS 4003282 (attaching a memorandum regarding the "Background of LJM Structure").

[211] RBS Escrow Agreement, at RBS 1060978 [RBS 1060972-RBS 1060979].

[212] Lock-Up Agreement, at RBS 4010115 ("LJM Cayman and LJM Swap Sub agree that without the consent of Enron, they will not sell, assign, transfer, pledge, hypothecate or otherwise dispose of the Settlement Shares.").

[213] Acknowledgment and Agreement between Enron and Campsie, Nov. 29, 1999 (the "Acknowledgment Agreement") [AB1128 01102-AB1128 01105].

- 55 -

of a certificate executed by an officer of Campsie," and in no event later than November

29, 2001.[214] The Examiner has found no evidence that RBS sought any assurances that

either the RBS Escrow Agreement or the Total Return Swaps had been considered or

approved by the Enron Board and has found no evidence of such approval.

Through the Total Return Swaps, RBS helped restructure LJM1 to achieve its

long-stated objective of locking in its share of the "seated value" in the Enron stock

contributed to LJM1, and Fastow, through his general partnership interest in LJM1,

personally profited in a manner that was, as Bermingham had previously stated, "NEVER

the intention in the original deal."[215]   Thus, a fact-finder could conclude that RBS,

through the Total Return Swaps, enabled Fastow to receive funds derived from the value

of the Enron stock held in LJM1 contrary to Fastow's representations to the Enron Board

in connection with its approval of the LJM1 Related Party Transaction[216] and the express

terms of the Amended Partnership Agreement.[217]

*RBS's Sale of Its Interests in Swap Sub to Enron Insiders*

In early 2000, Fastow, Kopper and three of the RBS bankers involved in the

LJM1 Related Party Transaction (Bermingham, Darby, and Gary Mulgrew ("Mulgrew"),

all in RBS's Structured Finance group) allegedly devised a plan to benefit personally

from the April 2000 termination of the LJM1/Rhythms Hedging Transaction in which

Enron would make payments to Swap Sub.[218]   Fastow and Kopper apparently decided to

---

[214] Section 4, RBS Escrow Agreement.

[215] Bermingham/Howard Email, Aug. 6, 1999, at 1.

[216] Enron Board Minutes for Special Meeting, June 28, 1999, at 6.

[217] *See* Section 4.2, Amended Partnership Agreement.

[218] The termination of the LJM1/Rhythms Hedging Transaction is described in Annex 2 to Appendix L (The Related Party Transactions) to the Second Interim Report.

include certain Enron and LJM1 employees in the transaction as well.[219]  To carry out

their plan, they formed Southampton, L.P. ("Southampton") in March 2000 to acquire

ownership of Swap Sub and its parent entity, SwapCo.[220]

At the time of the sale, Swap Sub's only asset, aside from approximately

$3.75 million in cash, was the value of the Enron stock it held offset by its obligations

under the LJM1/Rhythms Hedging Transaction.[221] In March 2000, LJM1 distributed its

interests in Swap Sub and SwapCo to its limited partners, RBS and CSFB (through their

affiliates).[222]  Concurrently with that distribution, each limited partner entered into a

separate purchase and sale agreement with Southampton under which Southampton

purchased the Swap Sub and SwapCo interests from each limited partner.[223]

Although CSFB's affiliate received $10 million in exchange for its interests in

Swap Sub and SwapCo, Campsie was offered[224] and received $1 million for the sale of its

equal interest to Southampton.[225]  Fastow, Kopper, Bermingham, Darby and Mulgrew

---

[219] Powers Report, at 92-96, *available at* http://www.chron.com/content/news/photos/02/02/03/enron-powersreport.pdf.

[220] Section 1.3, Southampton Place, L.P. Amended and Restated Agreement of Limited Partnership, Mar. 20, 2000 [AB000002941-AB000002968]. The Examiner has found no evidence that the existence of Southampton, L.P. or the identity of its owners and their economic interests were disclosed to or approved by the Enron Board.

[221] Second Interim Report, Annex 2 to Appendix L (Related Party Transactions).

[222] *See, e.g.,* PWC Memorandum to File, at 2; *See* Memorandum from Richard Ivers, Managing Director, CSFB, and Mary Beth Mandanas, Vice President, CSFB, to Chuck Ward, Co-Head of Investment Banking, *et al.,* CSFB, regarding Proposed Sale of Swap Sub interests to Southampton, Mar. 20, 2000 (the "Ivers Memorandum, Mar. 20, 2000") [CSFBCO005718431-CSFBCO005718432]; LJM1 Analysis of Accounts, Dec. 31, 2000 (the "Dec. 31, 2000, LJM1 Account Analysis"), at PSI00124655 [PSI00124655-PSI00124664].

[223] Ivers Memorandum, Mar. 20, 2000.

[224] *See* Letter from Michael Kopper, Managing Director, LJM Partners, LLC, to Giles Darby, Managing Director, RBS, Mar. 6, 2000 [PSI00119851].

[225] *See* Information, *United States v. Kopper,* Cr. No. H-02-0560 (S.D. Tex.), Aug. 20, 2002 (the "Kopper Criminal Information"), at ¶ 21; Purchase Agreement, among Campsie, Southampton, Swap Sub, SwapCo, and LJM Partners, L.P., Mar. 17, 2000 [RBS 1060261-RBS 1060266].

apparently agreed to convince Campsie to accept $1 million for the interests, while
representing to Enron that the purchase price for Campsie's interests was $20 million.[226]
Mulgrew and Darby recommended that the Campsie board accept the $1 million offer in
part because "we had ascribed no value to Swapsub [sic] anyway."[227]   The
aforementioned five individuals allegedly split the difference of $19 million among
themselves and the small number of other Enron and LJM1 employees who were
investors in Southampton.[228]   Ultimately, RBS bankers Bermingham, Darby and
Mulgrew allegedly received approximately $7.3 million in the aggregate and the other
Southampton investors – including Fastow and Kopper – allegedly received the
remaining $11.7 million.[229]   Bermingham resigned from RBS (which had completed its
acquisition of NatWest in the same month as Southampton acquired Swap Sub) one
month after this purchase of Swap Sub and SwapCo by Southampton.   Mulgrew and
Darby left the bank approximately three and four months after this purchase by
Southampton, respectively.   Bermingham, Mulgrew and Darby all face criminal charges
in connection with their dealings with LJM1.[230]

In sum, as set forth in more detail in Appendix L (Related Party Transactions) to
the Second Interim Report, the unwinding of Swap Sub, to which RBS attributed no

---

[226] *See* Kopper Criminal Information, at ¶¶ 21-22; *see also* RBS Bankers Indictment, at ¶¶ 16-20.

[227] Memorandum from Giles Darby, *et al.*, RBS, to Gary Mulgrew, RBS, regarding Swap Sub, Mar. 7, 2000, at RBS 4010354 (quoting Mulgrew's handwritten note) [RBS 4010353-RBS 4010354].

[228] *See* Kopper Criminal Information, at ¶ 21; RBS Bankers Indictment, at ¶¶ 20-22; Fastow Superseding Indictment, at ¶¶ 88-95.

[229] *See* Kopper Criminal Information, at ¶ 23; RBS Bankers Indictment, at ¶ 22; Fastow Superseding Indictment, at ¶¶ 93-95.

[230] *See* RBS Bankers Indictment.

value, yielded $1 million to RBS, $10 million to CSFB, and $19 million to Fastow, his colleagues, and Mulgrew, Bermingham, and Darby.

*The July 2000 Distributions*

On July 14, 2000, Fastow declared an LJM1 distribution. The distribution transferred $17.9 million to Fastow and $5.9 million to each of RBS and CSFB.[231] The Examiner has concluded that Fastow's ability to distribute $17.9 million to himself at this time was a consequence of the payments made to LJM1 by RBS and CSFB as part of RBS's Total Return Swap transactions with AIG and CSFB's SAILS transaction, respectively. Fastow in this manner derived personal profit from the transfer (into escrow) by LJM1 of the Enron shares, notwithstanding his contrary representations to the Enron Board and the express prohibition in the Amended Partnership Agreement.

*LJM1's Investment in Cuiaba*

Enron ultimately purchased LJM1's Cuiaba investment for $13.7 million on August 15, 2001.[232] From the purchase price, $7.3 million was distributed to the general partner of LJM1 and approximately $2.7 million to each limited partner in LJM1.[233] Enron repurchased LJM1's Cuiaba interests at a premium,[234] even though the facts

---

[231] Dec. 31, 2000, LJM1 Account Analysis, at PSI00124659-PSI00124660; LJM Cayman Wire Transfer Request, July 14, 2000 [PSI00133904]; LJM Cayman Wire Transfer Request, July 14, 2000 [PSI00133905]; LJM Cayman Wire Transfer Request, July 14, 2000 [PSI00133906].

[232] *See* EPE Holdings Ltd. Transfer of Share from LJM BrazilCo. to Enron do Brazil Holdings Ltd., Aug. 15, 2001 [AB000153819-AB000153820].

[233] *See* Second Interim Report, Annex 3 to Appendix L (Related Party Transactions), *LJM1 Cuiaba Transactions*.

[234] *See* Second Interim Report, Appendix L (Related Party Transactions).

indicate that the market value of the interests actually decreased during LJM1's ownership period.[235]

Perhaps as early as November 9, 1999, RBS may have been aware of a verbal agreement between Fastow and Enron that Enron would repurchase Cuiaba at a profit to LJM1.[236] Prior to the repurchase, RBS had been concerned that it would be required to write-down on its financial statements its interest in Cuiaba, held through LJM1, because it anticipated receiving less than its "carrying value" for that interest.[237] In September 2000, when the investment in Cuiaba was LJM1's sole remaining asset, Fastow proposed purchasing RBS's limited partnership interest in LJM1 for $100,000 on or before October 10, 2000.[238] When the parties were unable to agree upon sale terms, the Cuiaba asset remained in LJM1, and Fastow continued to draw management fees based on the asset's book value.[239]

When Enron repurchased Cuiaba in August 2001, RBS was provided with no new information explaining why the value of its interest had increased to $2.7 million in the

---

[235] *See id.*

[236] *See* Bermingham/Glisan Email, Nov. 9, 1999, at RBS 4016225 (stating that "we know" that Cuiaba will yield more than 12% over two years). In any event, it is clear that RBS, when it subsequently became concerned that it would need to write down its interest in Cuiaba, benefited from Fastow's dual role as LJM1 General Partner and Enron CFO. *See* Memorandum from Kevin Howard, *et al.*, RBS, to Leith Robertson, *et al.*, RBS, regarding buyout of Fastow's LJM interests, June 22, 2001, at RBS 1112362 (stating that Fastow *"secured a sale of the Brazilian asset to Enron at a price which will be enough to repay our outstanding capital amount and return a further small LP distribution"*) (emphasis in original) [RBS 1112361-RBS 1112364]. The memorandum further noted that Fastow *"was able to achieve this as a result of the close ties between Enron and LJM[1]."* *Id.* at RBS 1112362 (emphasis in original).

[237] Howard Sworn Statement, at 414, line 13 – 415, line 15.

[238] *See* Letter from Andrew S. Fastow, General Partner, LJM1, to Campsie c/o Kevin Howard, RBS, Sept. 15, 2000 (the "Fastow Letter to Campsie"), at RBS 4003318 [RBS 4003318-RBS 4003319].

[239] *See* Email from Kevin Howard, RBS, to Iain Houston, *et al.*, RBS, Sept. 26, 2000 (noting that Fastow refused RBS's counteroffer regarding Cuiaba and intended "to continue the partnership for the foreseeable future to maximize value") [RBS 4014158].

year since Fastow offered RBS $100,000 for that interest.[240] It appears that this sum was intended to provide the bank with slightly more than its carrying value of its interest in Cuiaba, thus relieving RBS of a potential accounting problem that would result from receiving less than the carrying value for its interest. Howard wrote several of his colleagues shortly after the bank received its $2.73 million distribution to inform them that

> Andy Fastow, LJM's [G]eneral Partner and CFO of Enron[,] was looking to liquidate [LJM1] in the belief that both RBS and CSFB (the other Limited Partner) had already ensured that their equity investments had been repaid in full. Learning of our situation and not wanting the deal to be tainted in the eyes of the RBS Executive, Fastow has negotiated for Enron to buy back LJM[1]'s interest in [Cuiaba] for an amount that, inter-alia [sic], would totally liquidate our outstanding equity investment.[241]

Fastow told the bank that its receipt of this distribution from the Cuiaba sale would make him "look like a hero in the bank's eyes, in [RBS's] executive's eyes."[242] On August 31, 2001, with no assets remaining in LJM1, RBS calculated that in the aggregate it had received from the LJM1 Related Party Transaction, "a total return on our $7.5m

---

[240] Howard Sworn Statement, at 417, lines 8-17. In fact, the value of the sole remaining LJM1 asset had decreased in the interim. *See* Fastow Letter to Campsie, at RBS 4003318 ("[A] review of the Cuiaba investment leads me to the conclusion that there is little or no value remaining in the asset . . . ."); Memorandum from Peter Commons, RBS, regarding LJM investments, Oct. 24, 2000, at RBS 1031070 (noting that the Cuiaba plant "is currently operating at 30% of capacity and using fuel oil which has higher cost and is affecting turbine effectiveness") [RBS 1031070-RBS 1031071]; Enron Risk Assessment and Control Deal Approval Sheet, Dec. 5, 2000, at AB000153900 (describing the "construction delays, multiple problems with local communities and large cost overruns" that hindered the Cuiaba project) [AB000153900-AB000153918]; Memorandum from Renee Barnett, Wilmer Cutler, to Enron Files, regarding her interview of Kent Castleman, Dec. 7, 2001, at 2 ("Castleman thought Enron had reported $2-3 million in mark-to-market losses during 2000 due to plant delays and other problems.") [AB000001170-AB000001176]; Memorandum from Lisa Henriques, Wilmer Cutler, to Enron File, regarding the Interview of Cheryl Lipshutz, Dec. 7, 2001, at 6 ("No outside investor would have bought this investment because it was so problematic . . . .") [AB000000510-AB000000516].

[241] Email from Kevin Howard, RBS, to Iain Robertson, *et al.*, RBS, Aug. 31, 2001 (the "Howard/Robertson Email, Aug. 31, 2001"), at RBS 6021378 (Ex. 33 to Howard Sworn Statement) [RBS 6021378-RBS 6021379].

[242] Howard Sworn Statement, at 418, lines 6-8.

investment of approx [sic] $22.7m or in excess of 1200% []. This is a most satisfactory result and underlines the way Enron supports its Tier 1 banks."[243]

*Provision Of Cash To Participating Enron Insiders Through LJM1*

The LJM1 Related Party Transaction provided Enron insiders, including Fastow and Kopper, with millions of dollars, primarily through cash distributions and management fees. These included the following:

- Fastow received at least $18 million in distributions[244] and $2.6 million in management fees from LJM1;[245]

- Kopper received at least $7.3 million in distributions[246] and $178,000 in management fees from LJM1;[247]

- In connection with Southampton's purchase of the limited partners' interests in Swap Sub, Kopper and The Fastow Family Foundation each received $4.5 million each on investments of $25,000 each, and Michael Hinds (an LJM1 employee), Kristina Mordaunt, Ben Glisan, Anne Yaeger-Patel and Kathy Lynn received $3.3 million in the aggregate on a total investment of $19,235.[248]

---

[243] Howard/Robertson Email, Aug. 31, 2001, at RBS 6021378.

[244] *See* Dec. 31, 2000, LJM1 Account Analysis, at PSI00124659-PSI00124660; LJM Cayman Wire Transfer Request, July 14, 2000 [PSI00133904]; LJM Cayman Wire Transfer Request, July 14, 2000 [PSI00133905]; LJM Cayman Wire Transfer Request, July 14, 2000 [PSI00133906].

[245] *See* Wire Transfer Request, Aug. 11, 1999 [PSI00134211]; LJM1 Wire Transfer Request, Feb. 11, 2000 [PSI00133875]; MM Fee Calculation, undated [PSI00133876]; LJM Cayman Wire Transfer Request, July 7, 2000 [PSI00133901]; MM Fee Calculation, undated [PSI00133902]; Dec. 31, 2000, LJM1 Account Analysis, at PSI00124656; MM Fee Calculation (for Jan. 1, 2001 to June 30, 2001) [PSI00133996]; Email from Joyce Tang, LJM, to Kevin Howard, RBS, Jan. 17, 2001 [PSI00133997].

[246] LJM Summary of Accounts, Oct. 4, 2001 [PSI00135525].

[247] *Id.*

[248] Cooperation Agreement, *United States v. Kopper*, Cr. No. H-02-0560 (S.D. Tex.) Aug. 21, 2002, at ¶ 14.

B.    **Obtaining Verbal Assurances From Enron**

*Sutton Bridge – The Bank's First FAS 140 Transaction*

RBS contemplated a transaction with Enron known as Sutton Bridge more than two years before the Sutton Bridge FAS 140 Transaction was finally consummated.[249] RBS understood that Enron's accounting objectives would drive the transaction. Specifically, it identified in a Discussion Paper the aim of the contemplated transaction as the "[a]bility to mark tolling contract to market:  in order to confirm accounting gain already booked [and] to book further gain?"[250]  When Sutton Bridge closed on June 8, 1999, it was the first structured equity participation in a transaction by the bank's structured finance group.[251]  It provided RBS with revenues in excess of $1.2 million, and an equivalent ROE [return on equity] of 1161% [per year].[252]  RBS took pride in having "[f]acilitated [Enron's] ability to realise [$29 million] capital gain to boost half year earnings."[253]  It also identified "[c]ashflow [sic] generation of [$68 million]" among the benefits to Enron of the transaction.[254]

Sutton Bridge was a FAS 140 Transaction.  The Examiner discussed this type of transaction in each of the Prior Reports and refers the reader to those previous discussions for a more detailed description of the structure and requirements of FAS 140

---

[249]  *See* Discussion Paper: Enron's Sutton Bridge, Jan. 20, 1997 [RBS 3038319-RBS 3038323].

[250]  *Id.* at RBS 3038319.

[251]  Sutton Bridge Transaction Summary, at RBS 3126610.

[252]  *Id.*

[253]  *Id.* RBS characterized this as the monetization of a "latent gain in an off balance sheet equity interest." *Id.* at RBS 3126611.

[254]  *Id.* at RBS 3126611.

Transactions.[255]  In brief, the general structure of Sutton Bridge was as follows:  Enron

owned a 50% economic and voting interest in Sutton Bridge Power ("SBP") via a

subsidiary, Enron Sutton Bridge Ltd. ("ESBL").  ESBL was in turn owned by two other

Enron subsidiaries, ESB2 and ESB3.  Enron's purpose in the Sutton Bridge transaction

was to "crystallise its latent gain in its SBP investment by selling its economic interest in

ESB2 to a new SPE[,] [which] would enable Enron to take the gain to P&L,

notwithstanding its continued ownership of the ordinary shares."[256]  RBS was to establish

an SPE (known as "SBI4"), capitalized with 3% equity and 97% debt, in a total amount

of approximately $66.5 million.[257]  Enron unconditionally guaranteed the debt, which had

a maturity date of six months.[258]

In addition to providing the debt, RBS was the holder of the equity in Sutton

Bridge.[259]  In order for Enron to account for the transaction under FAS 140, it was

required that, among other things, the equity in SBI4 remain at risk at all times.  RBS

---

[255]  Enron's numerous FAS 140 Transactions went by names such as Alchemy, Discovery, Ghost, Hawaii,
Leftover, Nimitz, Pilgrim, Riverside and Specter.  An analysis of many of the FAS 140 Transactions can be
found in the Third Interim Report, Appendix H (Role of CIBC and its Affiliates).  The structure of Hawaii,
one of Enron's most significant FAS 140 projects, and certain legal issues associated therewith are
described in the First Interim Report, *The Hawaii Transaction*, and accounting issues raised by Hawaii are
described in the Second Interim Report, Annex 3 to Appendix M (FAS 140 Transactions), *Accounting
Issues Raised By The Hawaii Transaction*.  Ghost and Specter are described in the Second Interim Report,
Annex 2 to Appendix L (Related Party Transactions), *Ghost and Specter*.  Nimitz is described in the
Second Interim Report, Annex 5 to Appendix G (Whitewing Transaction), and Leftover is described in the
Second Interim Report, Annex 6 to Appendix G (Whitewing Transaction).

[256]  Kruger Memorandum, at RBS 3038532.

[257]  *See* £41,475,000 Term Facility Agreement between Sutton Bridge Funding Limited and NatWest, June
8, 1999 [AB0152 00694-AB0152 00792]; Subscription Agreement between NatWest and Sutton Bridge
Funding Limited, June 8, 1999 (the "NatWest Subscription Agreement") [AB0152 00662-AB0152 00666];
Kruger Memorandum, at RBS 3038532.

[258]  *See* Enron Guarantee, June 8, 1999 [RBS 1067259-RBS 1067267]; Kruger Memorandum, at RBS
3038532.

[259]  *See* NatWest Subscription Agreement.

knew that its equity had to be at risk,[260] but faced no such risk as the equity holder in this structure. On June 7, 1999, the bank's Head of Credit Risk stated that "Group Finance have [sic] now approved this investment . . . recognising the short-term involved and the 'understanding' with Enron regarding their repurchasing at an agreed return by [December 1,] [19]99."[261] Commons testified that, in approving the transaction, he relied upon the understanding that Enron would repurchase the equity at an agreed upon return by December 1, 1999.[262]

RBS's equity in Sutton Bridge was indeed repaid by Enron upon the sale of the underlying asset in the structure.[263] The Examiner has seen no evidence that the existence of the verbal assurance of repayment of equity was ever disclosed by either Enron or RBS to third parties, including, but not limited to, Andersen. To the contrary, the evidence suggests RBS's awareness that the verbal assurance could not be disclosed.[264] In a summary of the Sutton Bridge transaction one year later, Commons

---

[260] Sutton Bridge Transaction Summary, at RBS 3126617 ("Third party must be independently capitalised and its investor(s) must have a 'significant' equity risk, currently accepted as 3% equity (97% debt).").

[261] Kruger Memorandum, at RBS 3038535 (Ex. 5 to Sworn Statement of Peter Commons, RBS, to John E. Stephenson, Jr., A&B, Sept. 24-25, 2003). Commons testified that "[w]hat we said to Enron was this investment is essentially outside our day-to-day control so please understand that we expect to get an [invested rate of return] of whatever figure we wished to see generated and . . . that they would not try to do something to our detriment so that our return proved to be less than what we were seeking to achieve." Commons Sworn Statement, at 195, line 10 – 196, line 3. In an errata sheet, Commons stated that portions of the testimony cited above were "misrecorded."

[262] Commons Sworn Statement, at 197, lines 15-22.

[263] Pettifer/Fairbairn Email, Sept. 6, 2001.

[264] See Sutton Bridge Transaction Summary, at RBS 3126617 ("For 'true sale' there can be no contractual commitment of the vendor to repurchase the shares based upon either a predetermined price formula or at fair market value."). The same summary alludes to the verbal assurance when it describes the relationship with Enron as "Trust Us." Id. at RBS 3126621. In addition, Commons testified that he did not know whether Andersen was informed of the verbal assurances in the Sutton Bridge transaction. Commons Sworn Statement, at 212-13.

explained to his colleagues at RBS, who were then considering participation in the first

ETOL transaction, that the new proposed ETOL transaction was

> exactly aligned to the Sutton Bridge deal we did last year – [in that] the
> whole thing hinges on an 'understanding' with Enron [that] they will buy
> it all back . . . .

> . . . I would be happy to sit on the lot for the short period involved
> providing we get paid well – this is what we did on Sutton Bridge.[265]

*The ETOL Transactions*

ETOL I.   RBS and Enron worked together on at least three additional FAS 140

Transactions in which RBS received verbal assurances of repayment that were at odds

with the requirements of the applicable accounting rules.  These were the ETOL I, II, and

III transactions, which closed in November 2000, March 2001, and June 2001,

respectively.

The general background and rationale for the ETOL transactions first came into

focus in 1998, when Enron Europe Ltd ("EEL") formed Enron Teesside Operations Ltd.

("ETOL") for purposes of acquiring the Teesside Utilities and Services Business

("TUSB").[266]  On December 31, 1998, Enron, through ETOL, completed the acquisition

of TUSB for $490 million (plus $22 million in additional costs).[267]   EEL's interest in

ETOL was held indirectly through multiple wholly owned subsidiaries.

---

[265] Commons/Hardy Email, Aug. 11, 2000.  Sue Milton testified that in structuring the ETOL I transaction, she learned that a "verbal assurance in support of equity-related risk" was given by Enron in the Sutton Bridge transaction.  Milton Sworn Statement, at 85, lines 8-9.

[266] *See* Credit Risk Recommendation, Dec. 21, 1998, at RBS 1109114 [RBS 1109114-RBS 1109119].

[267] *Id.*

After its acquisition of TUSB, Enron reported the implementation of several cost
savings measures.[268] These measures purportedly increased the value of EEL's economic
interests in ETOL, and the rationale for the ETOL transactions was to allow Enron to
monetize this purportedly increased value by effecting a "true sale" of its interests in
ETOL to an off-balance sheet SPE in order to book accounting gains in 2000 and 2001.[269]

ETOL I closed on November 1, 2000, and allowed Enron to book a fourth-quarter
gain of $91.6 million in 2000.[270] The SPE employed to effect the "true sale" in ETOL I
was RBS Financial Trading Company Ltd. ("RBSF"), which it appears was created for
the transaction by RBS.[271] RBS capitalized RBSF with $207.8 million, consisting of
$200.7 million in debt and $7.1 million in equity.[272]

A critical component of the transaction was the Total Return Swap between Enron
and RBSF.[273] By virtue of the Total Return Swap, Enron effectively guaranteed payment

---

[268] ETOL I Credit Application, at RBS 3141124 ("[S]ignificant cost savings have been instigated.");
Memorandum from Janis Wallis, Associate Director, RBS, regarding ETOL, Sept. 26, 2001 (the "Wallis
ETOL Memorandum"), at RBS 3089524 ("Enron made several cost savings/rationalisations . . . .") [RBS
3089524-RBS 3089527]; Memorandum from Nicola Goss, RBS, to Peter Whitby, *et al.*, RBS, regarding
ETOL equity purchase, Sept. 6, 2000 (the "Goss ETOL Equity Memorandum"), at RBS 3141015
("[S]ignificant operating cost savings have been made.") [RBS 3141015-RBS 3141017].

[269] Goss ETOL Equity Memorandum, at RBS 3141015; Wallis ETOL Memorandum, at RBS 3089524;
ETOL I Credit Application, at RBS 3141124. RBS later noted that this goal had been achieved. Goss
ETOL Funding Memorandum, at RBS 3141241 ("[ETOL I] was aimed at achieving a 'true sale' in
accounting terms for Enron's sale of the preference shares, and this element of the transaction was
achieved."); *see also* Email from Chris Clarke, Senior Manager, Structured & Specialised Credit, RBS, to
Thomas Hardy, *et al.*, RBS, Mar. 9, 2001 (the "Clarke/Hardy Email, Mar. 9, 2001") ("[ETOL I] recognised
and accepted Enron's financial engineering to achieve its goal of extracting the equity value from ETOL.")
[RBS 3141245].

[270] An internal RBS document stated that Enron recorded a $103 million profit and an "embedded gain" of
$13.6 million over the three-year life of the transaction. ETOL II and ETOL III Credit Application, at RBS
3124944.

[271] *See* Memorandum of Association of RBSF, Nov. 1, 2000 [AB000131595-AB000131599].

[272] *See* RBSF Term Facility Agreement, Nov. 2000; RBSF Subscription Agreement, Nov. 2000; Jameson
Memorandum, Nov. 28, 2001, at RBS 3141906.

[273] *See* ISDA Master Agreement, Schedule and Total Return Swap Confirmation between RBSF and
Enron, Nov. 1, 2000 [AB000131301-AB000131492].

of the interest, the principal, and other amounts due under the $200.7 million loan to

RBSF.[274] In turn, RBSF agreed to pay Enron the ETOL dividends received by RBSF in

the transaction.[275]

As in Sutton Bridge, RBS received verbal assurances of repayment of its equity

investment in ETOL I. The existence of such an agreement — and RBS's

acknowledgment that Enron's assurance could not be documented — is laid out in RBS's

ETOL I Credit Application:

> Enron ha[s] made an informal agreement to ensure that we achieve our
> required return and are made whole on the equity principal at transaction
> maturity. However, their desired accounting treatment does not permit
> any formal arrangements to be made. We therefore rely on Enron's
> undertaking to make us whole. Our ability to accept Enron's "promise" as
> sufficient comfort on the transaction is based on the strength of our
> relationship with the client. Senior management at EEL have made verbal
> assurances at a high level within the bank on this basis.[276]

Indeed, even prior to the submission of the Credit Application, RBS's Head of

Structured Finance, Iain Houston, had told colleagues internally evaluating the proposed

transaction that "I have no issue doing this type of deal in view of the verbal assurances

we have been given consistently by senior Enron staff – most recently by Andy Fastow to

---

[274] Goss ETOL Equity Memorandum, at RBS 3141015 (noting that the debt will be "serviced by a Total
Return Swap . . . supported by an unconditional guarantee from Enron Corporation and will be repaid by
a bullet at the end of year 3").

[275] ETOL I Credit Application, at RBS 3141124 (noting that "[97%] of the dividend flow is exchanged
[under the Total Return Swap]" and "[3%] of dividend flows is retained by the SPE as its return on
equity").

[276] *Id.* at RBS 3141124 (Ex. 12 to Milton Sworn Statement). This same credit application explained
further that "[w]e take considerable comfort from Enron's informal undertaking to keep us whole with
regard to the Equity required in the proposed transaction." *Id.* at RBS 3141130. In response to a question
regarding why the agreement could not be documented, Sue Milton testified "Enron later explained to us
that[,] as a result of accounting requirements, that [i.e., the verbal assurances] could not be documented."
Milton Sworn Statement, at 73, lines 7-13. She later testified, "FAS 125 principles would not allow Enron
to – FAS 125 principles would have to be adhered to – could not happen if that support arrangement were
documented." *Id.* at 163, lines 22-25.

[senior RBS executives Iain Robertson ("Robertson"), Johnny Cameron] and other [RBS]

leading lights."[277]

On the same day of the CBFM Credit Committee meeting regarding ETOL I,

Tom Hardy ("Hardy"), Head of Project and Export Finance of RBS, called Paul Chivers

("Chivers"), Chief Financial Officer of Enron Europe, to discuss the assurances provided

by Enron regarding the repayment of the equity and yield in ETOL I. In a

contemporaneous memorandum, Hardy noted that,

> [i]n answer to my direct question as to Enron's support for such an
> unwritten [pledge to ensure repayment of equity plus a 13.5% return on
> such equity], Paul [Chivers, Chief Financial Officer of Enron Europe] was
> categoric [sic] that ".....Enron Corporation will not leave RBS hanging out
> to dry on this deal. It will ensure that your principal and 13.5% return are
> paid."

> Paul went on to add that Enron had undertaken 12 similar deals in Europe
> and that, insofar as we were prepared to take further comfort, ".....you
> have my absolute commitment (as CFO, Enron Europe) to ensure that
> RBS does not suffer a loss from its equity investment in the ETOL
> transaction."[278]

---

[277] Email from Iain Houston, RBS, to Nicola Goss, *et al.*, RBS, Aug. 10, 2000 [RBS 6074373]. Verbal
assurances by Enron officers of repayment of equity in connection with the FAS 140 Transactions
constituted breaches of their fiduciary duties, as discussed in Appendix C (Role of Enron's Officers) to the
Third Interim Report. As was concluded therein, the officers breached their fiduciary duties by concealing
from their outside accountants the existence of side agreements with lenders in order to achieve an
unsupportable accounting result and produce materially misleading information regarding Enron's reported
financial condition, results of operations and cash flows.

[278] Memorandum from Tom Hardy, Project and Export Finance, RBS, to Sue Milton, *et al.*, RBS,
regarding ETOL transaction, Sept. 22, 2000 (also noting that the phone call took place on September 20,
2000 and that Chivers had encouraged Hardy to call Glisan so that the bank "received the same message of
commitment from Enron headquarters in Houston") [RBS 3142779]. Hardy further testified about the
discussions with Chivers and said:

> It was a support from Enron for the deal in relation to its, Enron's, anticipation and
> efforts to ensure that the deal was successful, and that it would do everything to – to
> make the deal successful; and that if there were circumstances in which the deal was not
> successful, it would seek to compensate the bank.

Sworn Statement of Thomas Hardy, Head of Project and Export Finance, RBS, to Philip R. Stein, A&B,
Oct. 24, 2003, at 71, line 20 – 72, line 2. In addition, Hardy testified that the September 22, 2000
memorandum accurately memorialized his conversation with Chivers and that he never received a message
from Enron inconsistent with the assurances described in the memorandum. *Id.* at 79, lines 8-15, and at 84,
lines 5-11.

At the CBFM Credit Committee meeting, Hardy emphasized that "the verbal assurances from Enron have come from a very high level and are unequivocal," and the Committee was further advised that additional discussions on this subject would be held with Glisan.[279] Despite expressing concern about the "impact on Enron risk of structures such as this (i.e. the existence of significant off-balance sheet contingent liabilities)," the CBFM Credit Committee recommended ETOL I for Group Credit Committee approval.[280] Following the Group Credit Committee meeting, it appears Robertson, the Chief Executive of CBFM, spoke to Fastow regarding verbal assurances on the equity investment in ETOL.[281]

RBS relied heavily on Enron's verbal assurances to repay its equity interest because RBS determined that the dividend flow from the asset being monetized was

---

[279] CBFM Credit Committee Minutes, Sept. 2000, at RBS 3121434. The Committee minutes further note that "S. Milton explained that very strong verbal assurances have been received from Enron that, via the auction process governing sale of the equity stake, the Bank will be made whole." Id. at RBS 3121434.

[280] Id. at RBS 3121435-RBS 3121436.

[281] Email from Nicola Goss, RBS, to Paula Francis, RBS (Iain Robertson's secretary), Sept. 28, 2000 ("[F]ollowing our conversation with ISR [Iain Robertson] this morning, it was agreed that he wanted to talk to Andy Fastow of Enron.") [RBS 6071632].

> Following our discussion this morning, I am now satisfied that I have had answers to issues raised at GCC on 22nd September 2000 and confirm that I have approved the ETOL [$206.8 million] Equity Purchase Scheme. I also understand that you will arrange for me to speak with Andy Fastow, Head of ETOL in Houston this afternoon. Please contact my secretary Paula Francis, with the details.

Email from Iain Robertson, RBS, to Nicola Goss, et al., RBS, Sept. 28, 2000 [RBS 3037175]; Email from Nicola Goss, RBS, to Stuart Schardin, Enron, et al., Sept. 28, 2000 [RBS 6071612]. Commons testified that the conversation between Robertson and Fastow was not the only conversation between the bank and Enron on this subject:

> The only additional thing that I would say to you is that my recollection is that the conversation I believe Iain Robertson had with Enron was not the only conversation between the bank and other Enron executives on the same subject, but I can't be more specific as to who spoke to who and when, but I am sure the file reflects who did.

Commons Sworn Statement, at 390, lines 13-20.

- 70 -

insufficient to cover the debt and equity repayment plus yield.   In recommending

approval of ETOL I, Chris Clarke ("Clarke") noted that

> [w]hilst 97% of the expected preference share dividend flow is insufficient
> to cover debt service the risk is mitigated by the provision of an Enron
> [Total Return Swap] which will cover both interest, regardless of the level
> of preference share dividend flow, and principal.  The risk can therefore be
> viewed as Enron corporate risk.[282]

Clarke stated a similar conclusion regarding repayment of the equity and yield:

> Sourced from 3% of expected preference share dividend flow[,] the model
> clearly demonstrates the ETOL's inability to service the annual coupon of
> 13.5%, given the accelerated payback period.  We are therefore looking to
> verbal undertakings (they cannot be formally documented for accounting
> reasons) from Enron that they will ensure that RBS is kept whole through
> the exit strategy.[283]

Clarke concluded his recommendation by noting that

> notwithstanding the proposed ETOL equity control mechanisms that will
> restrict Enron's ability to sell their management (voting rights) interest in
> ETOL, considerable reliance will still have to be placed on Enron's verbal
> undertakings to see RBS whole on the equity tranche.    Previous
> understandings with Enron have always been delivered upon and there is
> no reason to believe that this particular transaction will prove to be the
> exception to the rule.[284]

---

[282]  ETOL I Credit Recommendation, at RBS 3141115.

[283]  *Id.* at RBS 3141116.  Milton informed the CBFM Credit Committee of this fact.  "[The Fair Market
Value put option] is required as surplus cashflows during the three year tenor of the transaction are unlikely
to be sufficient to assure the required rate of return on the equity stake."  CBFM Credit Committee
Minutes, Sept. 2000, at RBS 3121434; *see also* Enron Group – Facility Summary Sheets (ETOL I, II, &
III), author unknown, undated, at RBS 3141889 ("It is not expected that the dividends that RBSF receives
will be sufficient to service equity in full after debt service.  Therefore, under the informal agreement with
Enron, we are expecting to be 'made whole' at transaction maturity via the sale proceeds.") [RBS 3141889-
RBS 3141892].

[284]  ETOL I Credit Recommendation, at RBS 3141117.

Indeed, RBS determined that if Enron failed to meet its obligations under the Total Return Swap and verbal assurances, "we [are] looking at a 22 year payout."[285] In other words, if the bank had relied on the dividends from the underlying asset (and not the Total Return Swap and verbal assurances) for repayment of the debt and equity plus yield, it could not have expected to be repaid fully for approximately twenty-two years.[286]

In addition to the Total Return Swap and verbal assurances, the ETOL I transaction also included a put option in favor of RBS. In presenting ETOL I to the Group Credit Committee, Sue Milton ("Milton") described the put option as a "backstop in the event that Enron do [sic] not honour its promise to make the bank whole on the equity."[287] However, the bank's fair market value calculations on the put option indicated that the option would not cover the equity and yield. "[U]nder basecase [sic] economics, based on a valuation of the FMV today, we would not be made whole under the put option and [this] highlights our reliance on Enron to make us whole under the auction process."[288] This "auction process" could provide little comfort for RBS, however, because of its conclusion that the fair market value was insufficient to repay the bank's investment.[289] In short, though the auction process was the mechanism by which

---

[285] Clarke/Hardy Email, Mar. 9, 2001. Sue Milton also stated that "in the extreme scenario of Enron Corporation failing during the 3.25 years of the proposed transaction, we can expect to achieve repayment of the principal in full (i.e. [\$206.8 million]) by 2022." Memorandum from Sue Milton, et al., RBS, to Iain Robertson, et al., RBS, regarding ETOL equity purchase, Sept. 26, 2000 (the "Milton ETOL Memorandum"), at 3091028 [RBS 3091028-RBS 3091029].

[286] Clarke/Hardy Email, Mar. 9, 2001; Milton ETOL Memorandum, at 3091028.

[287] Group Credit Committee Minutes, Sept. 2000, at RBS 3121150.

[288] Memorandum from Sue Milton, et al., RBS, to Peter Commons, et al., RBS, regarding ETOL equity purchase, Sept. 25, 2000 (the "Milton Memorandum, Sept. 25, 2000") (Ex. 18 to Milton Sworn Statement), at RBS 3074100 [RBS 3074099-RBS 3074101]; Milton Sworn Statement, at 257, lines 4-8.

[289] Milton Memorandum, Sept. 25, 2000 (Ex. 18 to Milton Sworn Statement), at RBS 3074100 [RBS 3074099-RBS 3074101]; Milton Sworn Statement, at 257, lines 4-8.

it was contemplated that Enron would repay the bank, it was plainly Enron's verbal assurance on which RBS relied.

*ETOL II and III.* In March 2001, less than four months following the closing of ETOL I in November 2000, RBS considered two additional ETOL transactions. ETOL II was essentially an amendment to ETOL I. In ETOL I, Enron intended to account for the Total Return Swap on a mark-to-market basis which RBS believed would have enabled Enron to book an upfront gain of approximately $29 million.[290] However, Andersen subsequently informed Enron that it could not account for the Total Return Swap in this manner "unless the cash value is actually received."[291] Accordingly, Enron came to RBS in the ETOL II transaction "seeking additional funds in order to book the up front value of the transaction originally anticipated."[292] To maintain the required 97% debt/3% equity capital structure in ETOL II, RBS further capitalized RBSF (the same SPE used in ETOL I) with $32.1 million debt and $0.7 million equity.[293]

ETOL III was "designed to extract all remaining value from ETOL, the underlying asset" by "realising the increased book value of the project as a result of the increased cost savings."[294] This increased book value in ETOL (purportedly about $43 million) reflected the economic benefit Enron projected to achieve over the seven-year

---

[290] Goss ETOL Funding Memorandum, at RBS 3141242.

[291] ETOL II and III Credit Application, at RBS 3124936.

[292] *Id.*

[293] *See* £22,974,750 Term Facility Agreement for RBSF by RBS and NatWest, Mar. 30, 2001 (the "RBSF Term Facility Agreement, Mar. 2001") [AB000130726-AB000130804]; Subscription Agreement between RBSF and RBS, Mar. 30, 2001 (the "RBSF Subscription Agreement, Mar. 2001") [AB000130912-AB000130916].

[294] ETOL II and III Credit Application, at RBS 3124934, RBS 3124936.

period following the 2004 maturity of ETOL I due to additional cost savings.[295]   In ETOL III, RBS capitalized a new RBS-sponsored SPE – Sideriver Investments Limited ("Sideriver") – with $41.7 million debt and $1.7 million equity (to achieve the required 97% debt/3% equity capital structure) in order to acquire the Class C shares in the transaction.[296]   Accordingly, by virtue of the three ETOL transactions, RBS funded approximately $274.5 million debt and $9.5 million equity.[297]

Notwithstanding the bank's calculations prior to the closing of ETOL I that the dividend flow on the underlying asset was insufficient to pay the then-outstanding debt and equity plus yield amounts in ETOL I for twenty-two years, RBS proposed to fund an additional $76.6 million in ETOL II and III[298] based on the belief that Enron had nonetheless achieved this additional economic benefit in the project in the ninety days following the closing of ETOL I.   Clarke stated his concern following his review of the initial proposal on ETOL II and III that

> the[re] is clearly a need to get behind the accounting issues here to check out Enron's story and I suggest that a detailed cashflow [sic] analysis is carried out again to identify the support that Enron is actually providing via the [Total Return Swap] with revised structure.
>
> As regards proposal 2 [ETOL III] – is Enron serious???   This appears to be a case of a step too far in my view.[299]

---

[295] *Id.* at RBS 3124953.

[296] *See* £29,756,139 Term Facility Agreement for Sideriver, June 20, 2001 (the "Sideriver Term Facility Agreement") [RBS 1100700-RBS 1100778];   Sideriver B Shares Subscription Agreement between Sideriver and RBS, June 19, 2001 (the "Sideriver Subscription Agreement") [AB000130543-AB000130547].

[297] *See* RBSF Term Facility Agreement, Nov. 2000; RBSF Subscription Agreement, Nov. 2000; RBSF Term Facility Agreement, Mar. 2001; RBSF Subscription Agreement, Mar. 2001; Sideriver Term Facility Agreement; Sideriver Subscription Agreement.

[298] Goss ETOL Funding Memorandum.

[299] Clarke/Hardy Email, Mar. 9, 2001.   Robertson also communicated his concern on the new proposal, writing "not sure I am happy with this.   It is surely this remaining value that underpins the equity sell off in

- 74 -

No additional analysis appears to have been done by RBS to verify the alleged cost savings that Enron was purporting to monetize here.[300] Milton testified that the bank essentially accepted Enron's representations regarding the increased value of this asset, and did not engage in further due diligence.[301] This testimony underscores the bank's reliance on the verbal assurances provided by Enron. It also demonstrates RBS's willingness to accommodate Enron's financial statement objective to book additional earnings without undertaking any analysis regarding the value of the interest monetized.

As in ETOL I, RBS received verbal assurances of repayment of RBS's equity investment from Enron in ETOL II and ETOL III. Indeed, initial proposal papers discussing ETOL III noted that, in light of the apparent inability of the performance of the underlying asset to support repayment of the amount monetized, even greater reliance was placed on the verbal agreement with Enron.[302] The Credit Application submitted for ETOL II and ETOL III contains numerous references to the "informal arrangement" and "high level assurances" regarding repayment of the equity and yield in the two

---

our current deal and we are passing that to them – or have I got it wrong[?]" Email from Iain Robertson, RBS, to Thomas Hardy, *et al.*, RBS, Mar. 8, 2001 [RBS 3141246].

[300] RBS did, however, attempt to confirm the purported increase in the book value of Enron's interest in ETOL based upon these purported cost savings. ETOL II and III Credit Recommendation, at RBS 3124953 ("Enron have identified further savings/income growth in operating ETOL that Project Economics (Appdx 1) have independently confirmed generates a [$51.7 million] (to [$260 million]) increase in the book value of Enron's economic interest in ETOL.").

[301] Milton Sworn Statement, at 271, line 21 – 272, line 17, and at 276, line 20 – 277, line 14. Milton did not recall anyone at the bank raising any concern about extending the additional funds to Enron based on the information received from Enron. *Id.* at 278, lines 13-18.

[302] Goss ETOL Funding Memorandum, at RBS 3141243 ("We are therefore more reliant on the verbal agreement with Enron to make us whole than in the existing deal."). In recommending approval of the transactions, Clarke similarly noted the increased reliance on the verbal agreement with Enron in ETOL III. "ETOL III represents a deeply subordinated position, ranking fifth in the cashflow/asset value priority chain placing even greater reliance on Enron to see us out whole in the unlikely event that ETOL does not perform in accordance with expectations." ETOL II and III Credit Recommendation, at RBS 3124953. As a condition of his recommendation, Clarke specifically identified "[t]he need for Enron Executive to be made aware of the reliance we place on their verbal 'make whole' assurances." *Id.* at RBS 3124953.

transactions.[303]  For example, in the conclusion, the Credit Application states, "[w]e take

considerable comfort from Enron's informal undertaking to keep us whole with regard to

the equity required in the proposed transactions."[304]

These verbal assurances were the subject of discussion at both the CBFM and

Group Credit Committees.  Nicola Goss ("Goss") informed both credit committees that

"these transactions place reliance on Enron through an informal arrangement to make us

whole for [$4.6 million] in terms of return on equity and [$8.9 million] of equity

principal."[305]  According to minutes of the CBFM Credit Committee meeting, Robertson

told the attendees that he had participated in a "meaningful and open discussion with

Enron's CFO (A[.] Fastow) to augment both senior executive relationship and obtain

further confirmation on Enron's commitment to the Bank in relation to these

facilities."[306]  Robertson reported that Fastow had provided confirmation, and Robertson

---

[303] ETOL II and III Credit Application, at RBS 3124934, RBS 3124935, RBS 3124939.  The Credit Application also provides that "[t]he return on equity (13.5%) will be the same as ETOL I, with an informal arrangement from Enron to make us whole at transaction maturity." *Id.* at RBS 3124934.  "ETOL III will have . . . an informal arrangement with Enron to make us whole on the equity at maturity.  The return on equity under ETOL III is 15%."  *Id.* at RBS 3124934.  "Should disposal proceeds be insufficient to meet our equity principal and required return, we will look to Enron to make us whole under an informal arrangement."  *Id.* at RBS 3124937.  The Application concludes that, "[g]iven the strength of our relationship with the company, the high level assurances that have been made and the reputational risk to Enron of not honouring this arrangement, we believe that this is acceptable."  *Id.* at RBS 3124939.

[304] *Id.*  In a subsequent memorandum referring to the Credit Application, Nicola Goss further described the verbal assurance as an "Enron 'promise' to make us whole on the equity at the end of the transaction." Memorandum from Nicola Goss, RBS, to Chris Clarke, *et al.*, RBS, regarding ETOL III, June 13, 2001 (the "Goss ETOL III Memorandum"), at RBS 1087734 [RBS 1087733-RBS 1087736].

[305] CBFM Credit Committee Minutes, Mar. 2001, at RBS 1113345; Group Credit Committee Minutes, Mar. 2001, at RBS 3120874.

[306] CBFM Credit Committee Minutes, Mar. 2001, at RBS 1113345.  It appears these discussions took place shortly before the credit committee meetings.  Email from Sue Milton, RBS, to Nicola Goss, RBS, Mar. 15, 2001 ("I have subsequently spoken to Iain Houston (twice!) and will update you tomorrow.  Have also spoken to Paula [Francis, Iain Robertson's secretary] and Stuart [Schardin of Enron] and we are trying to see whether we can organise a 2.30 pm slot for ISR [Iain Robertson] and Andy Fastow tomorrow.") [RBS 6063970]; Email from Nicola Goss, RBS, to Iain Houston, RBS, Mar. 15, 2001 ("Andy Fastow is available from 3pm London time if ISR [Iain Robertson] wants to call him.") [RBS 6064031].

was "comforted by [Fastow's] assurance that the bank's remuneration would be met by

Enron."[307]   The minutes of the Group Credit Committee note similar discussions

regarding the verbal assurances:

> It was acknowledged that the Bank was placing a significant reliance on
> Enron's informal undertaking to make the Bank whole and [Iain] Houston
> added that a great deal of comfort had been taken in this connection from
> the personal undertakings given by the senior Enron executive during
> conversations at a senior level with the Bank.[308]

As with ETOL I, it is apparent that RBS placed considerable reliance on the

verbal assurances from Enron regarding repayment of the equity and yield in the ETOL II

and III transactions because the expected cash flows and the put option were insufficient

to cover the equity and yield.  The Credit Application comments that, "[a]s under the

ETOL I transaction, the expected cashflows [sic] over the life of ETOL I and II do not

meet either the senior and subordinated debt or equity service requirements in every

period."[309]  The bank recognized that in the event of "Enron failing to meet its obligations

under the [Total Return Swap]" the bank would not expect to be fully repaid under ETOL

I, II, and III for twenty-two years.[310]  The ETOL III transaction similarly included a put

option in favor of RBS.  However, as in ETOL I, RBS understood that the value of the

put was insufficient to repay the equity and yield and thus the bank was relying on the

verbal assurance for repayment.  "The exit route for [$1.3 million] equity element

remains via an auction process or more likely exercise of the 'put' option and here we are

---

[307] CBFM Credit Committee Minutes, Mar. 2001, at RBS 1113345.

[308] Group Credit Committee Minutes, Mar. 2001, at RBS 3120874.  While noting the reliance placed on
the "verbal undertakings," the minutes also state that "[w]hilst the Committee did indeed take comfort from
the personal undertakings, it was emphasised that the deal must stand up on its own merits which the Deal
Team confirmed was the case."  Id. at RBS 3120874.

[309] ETOL II and III Credit Application, at RBS 3124938.

[310] ETOL II and III Credit Recommendation, at RBS 3124953.

entirely reliant on Enron's verbal assurances to make us 'whole.'"[311]   In her memo

outlining the put option valuation, Goss concluded that "[t]his arrangement effectively

places reliance on agreement between ourselves and Enron on the put option, which is in

line with the underlying nature of the transaction."[312]   The Examiner is aware of no

evidence indicating that Enron or RBS ever disclosed this verbal assurance to Andersen,

and RBS has provided no such evidence to the Examiner.[313]

      In the course of reviewing the ETOL transactions, RBS employees expressed

concern regarding Enron's recording of potentially improper accounting gains[314] and

again raised questions about financial statement manipulation by Enron.[315]   RBS was

conscious of "the financial engineering" that the ETOL transactions would facilitate.[316]

The ETOL "structure struck [RBS's Group Credit] Committee as '21st Century

Alchemy'" and the Group Credit Committee further "noted the possibility of Enron's

---

[311] Email from Chris Clarke, RBS, to Gordon Pell, *et al.*, RBS, May 9, 2001, at RBS 3141184-RBS 3141185 [RBS 3141184-RBS 3141185].

[312] Goss ETOL III Memorandum, at RBS 1087734.

[313] Milton testified that she did not know or did not remember whether anyone from the bank discussed the verbal assurance with Andersen. Milton Sworn Statement, at 134-37. Milton did testify, however, that Andersen was present at meetings between the bank and Enron, although she could not remember whether any of these meetings included discussions regarding the verbal assurances. *Id.* at 131-34. Commons testified that he did not know whether Andersen was informed of the verbal assurances in the Sutton Bridge transaction. Commons Sworn Statement, at 212-13. Similarly, Howard testified that he did not know whether Andersen was informed of the verbal assurances provided in the FAS 140 Transactions. Howard Sworn Statement, at 458-59. Notwithstanding the fact that Howard was aware the assurances were not in writing, Howard testified that he "presumed" Andersen was aware of the assurances because he thought Enron would not have entered into a transaction "that wasn't signed off on by the auditors because that is what we always expected." *Id.* at 459, lines 12-20.

[314] Email from Aldo Ferri, RBS, to Nicola Goss, RBS, Aug. 16, 2000 (asking if ETOL is "purely some sort of accountancy wheeze") [RBS 1142896].

[315] CBFM Credit Committee Minutes, Sept. 2000, at RBS 3121435-RBS 3121436; Group Credit Committee Minutes, Sept. 2000, at RBS 3121150-RBS 3121151; Clarke/Hardy Email, Mar. 9, 2001.

[316] Group Credit Committee Minutes, Sept. 2000, at RBS 3121151.

tactic of enhancing 3rd quarter earnings."[317]   The Group Credit Committee nevertheless

approved RBS's participation as debt and equity holder in three separate transactions

under the structure based on the short-term nature of the financings, the fees received by

the bank, and its "relationship" with Enron.[318]

### C.    Funding the Nixon Prepay Transaction

A fact-finder could conclude that RBS helped to facilitate the creation and

dissemination of misleading financial statements by Enron by providing funding for the

Nixon Prepay, a quarter-end transaction that RBS understood was motivated by Enron's

strong desire to achieve specific accounting results.[319]   The Nixon Prepay closed in

December 1999 and was intended as a three-month bridge financing that would be repaid

with proceeds from another Enron Prepay Transaction, Yosemite II, which was scheduled

to close in the first quarter of 2000.[320]   Nixon was actually a set of three interrelated

prepay transactions that provided Enron with a total of $324 million.   In the Nixon

Prepay, RBS and Barclays each provided $110 million to Enron, and Citigroup provided

---

[317] *Id.* at RBS 3121150, RBS 3121151.

[318] Group Credit Committee Minutes, Mar. 2001, at RBS 3120874 (RBS noted the "short-term nature" of the ETOL transactions, that total income would be $6.7 million, and that a "great deal of comfort" was provided by Enron's verbal assurances.).   RBS obtained advance approval for ETOL II and ETOL III at this meeting. *Id.* at RBS 3120875.

[319] Nixon Credit Application, at RBS 3118964 ("[T]he pre-paid oil swap structure allows [Enron] to realise cash on the asset side of the balance sheet whilst booking only a price risk management liability (as opposed to a loan) on the other over their critical year-end period."); ARD Memorandum, Dec. 6, 1999, at RBS 3118972 ("This revenue is likely to be included as deferred income in the current liabilities section of the balance sheet, with cash balances increasing by a corresponding amount.   This transaction is consequently anticipated to reduce the reported year-end net debt position of Enron and is effectively a window dressing request.").

[320] Nixon Credit Application, at RBS 3118964.

another $104 million, with Toronto Dominion serving as the conduit entity for all three lenders.[321]

RBS paid Enron $110 million on the closing date pursuant to a swap agreement.[322] Enron agreed to pay RBS an amount based on the price of crude oil on the settlement date.[323] RBS then entered into a swap with Toronto Dominion pursuant to which RBS agreed to pay the same price on a notional amount of crude oil to Toronto Dominion, in exchange for a fixed payment equal to the $110 million prepayment amount plus an amount that functioned as interest.[324]

To complete the circle, Toronto Dominion entered into a swap with Enron.[325] Toronto Dominion served as a conduit to (i) pass the floating price back to Enron, (ii) receive the principal repayments plus interest from Enron, and (iii) pass those payments on to RBS and the other lenders.

---

[321] Third Interim Report, Appendix D (Role of Citigroup and its Affiliates), *Prepay Transactions, Summary Description, Nixon.*

[322] *See* Dec. 14, 1999 Enron Swap, at 2.

[323] *Id.*; Mar. 15, 2000 Enron Swap, at 2.

[324] *See* Swap Transaction Confirmation between Toronto Dominion and RBS, Dec. 14, 1999 [RBS 4016658-RBS 4016662]. The initial settlement date of this step was extended like all of the other steps. The original termination date was March 15, 2000, but Enron requested an additional month, which led to an extension of the termination date. *See* Swap Transaction Confirmation between Toronto Dominion and RBS, Mar. 15, 2000, at RBS 4016655 (listing the new termination date as Apr. 14, 2000) [RBS 4016654-RBS 4016657]; Email from Thomas Hardy, RBS, to Iain Houston, *et al.*, RBS, Mar. 14, 2000 (describing Enron's request for a 30-day extension) [RBS 3142347].

[325] Swap Transaction Confirmation between ENA and Toronto Dominion, Dec. 20, 1999 [CITI-B 0032459-CITI-B 0032462]. The initial settlement date of Mar. 15, 2000 was extended to Apr. 14, 2000. Revised Swap Transaction Confirmation between ENA and Toronto Dominion, Mar. 14, 2000 [SS000037788-SS000037792].

RBS understood that the economic substance of the Nixon transaction was a loan to Enron.[326] It further understood that the transaction's "whole structure [was] set up to remove the commodity risk for all parties, [so] all payments against commodity price moves are exactly off-set by receipts from the party on the other side."[327] It also knew at the time that it agreed to participate in Nixon that Enron booked the repayment obligation in the transaction as price risk management activities rather than debt and that the proceeds of loan transactions such as Nixon were booked by Enron as cash flow from operating activities.[328]

As noted previously, the Nixon transaction was approved despite the conclusion of RBS's senior research analyst that the transaction appeared to be "little more than a 'window dressing' request" that "raises issues over the absolute level of manipulation undertaken by Enron in its financial statements."[329] RBS proceeded with the Nixon Prepay largely on the basis of the expected short term of the loan.[330] The bank also

---

[326] Nixon Credit Application, at RBS 3118965 (stating that the transaction "creates a synthetic loan . . . to Enron for three months."); McInnes Sworn Statement, at 63, line 12 – 66, line 15 (testifying that Nixon was a "short-term loan to Enron and viewed as Enron corporate risk").

[327] Nixon Credit Application, at RBS 3118966 (noting, however, that the bank could not exercise recourse to the third party in the event of default of the second party within the transaction).

[328] McAlister/Weir Email, Feb. 1, 2000 ("Other Income includes unrealised gains and losses from price risk management activities . . . . These activities are reported as part of operational cash flow, boosting the reported position by $550M over the last two years . . . and representing 30% of reported operating cash flow in that period."); see also Nixon Credit Application, at RBS 3118964.

[329] ARD Memorandum, Dec. 6, 1999, at RBS 3118973 (Ex. 5 to Sworn Statement of Wilson McAlister, Senior Analyst, RBS, to Philip R. Stein, A&B, Oct. 3, 2003). Wilson McAlister told counsel to the Examiner he did not mean "manipulation" in a pejorative sense. Sworn Statement of Wilson McAlister, Senior Analyst, RBS, to Philip R. Stein, A&B, Oct. 3, 2003, at 128, line 10 – 129, line 14 ("The word manipulation . . . means to move or to change something" and "doesn't mean that something is wrong or it is bad. It is just something reflected in a different way.") He also testified that, by his use of the phrase "window dressing," he meant that "within the [Enron] balance sheet there were certain items which have been classified in certain ways and that we needed to be aware of that." Id. at 116, lines 15-18.

[330] ARD Memorandum, Dec. 6, 1999, at RBS 3118973 (noting that Nixon "represents a limited level of financial risk given its term"); UK Bank Credit Committee Minutes, Dec. 1999, at RBS 1007764 (reporting

recognized, as it noted in a contemporaneous transaction, that "[b]ecause this is balance sheet management, it pays better than straight Enron corporate risk – 75 [basis points] margin and 10 [basis points] upfront which gives a [risk adjusted return on equity] of 22.4%."[331]

RBS nonetheless appears to have been troubled by Enron's request to extend the Nixon transaction for one month beyond its anticipated maturity date, which would enable Enron to reap financial reporting benefits for the first quarter of 2000 (in addition to the financial reporting benefits Enron previously received by closing the transaction in the fourth quarter of 1999). In response to the proposed extension of the facility, an RBS internal credit analyst stated that "[t]he scale of financial period manipulation is exceedingly worrying," and that she preferred "to let [the transaction] close off as per existing agreement with Enron."[332] A senior manager at the bank, perhaps more focused on the bank's future relationship with Enron, responded to these statements by saying "[u]rgent discussion required here methinks . . . capital constraints or no."[333]

An RBS Credit Approval document comments on Enron's desire to extend the Nixon facility for one month, into mid-April 2000:

> On 10th March an urgent request was received to roll the facility for a further one-month period pending completion of Yosemite III in mid-April. Credit concern again centred on the extent of Enron's manipulation and the danger given such heavy reliance on short-term transactions of bad news cutting Enron's ability to refinance and keep these sizeable numbers off balance sheet. In light of a lack of increased margin/fees for rolling over, the extent to which Enron might be window dressing, and RBS

---

that Brian McInnes commented that RBS "was taking a 90 day risk on Enron and 90 days on Toronto Dominion and he was comfortable with both parties for this tenor").

[331] Weir/Dickinson Email, Jan. 31, 2000, at RBS 3112212.

[332] Sinclair/McInnes Email, Mar. 10, 2000.

[333] Email from Alan Dickinson, RBS, to Andrew Hartee, et al., RBS, Mar. 10, 2000 [RBS 6021777].

capital issues . . . it was decided on 13th March not to assist Enron in this instance.

Following intense pressure on Relationship grounds the following day the transaction was however extended for a further month to 14 April in discussion/by agreement with [RBS bankers Iain Robertson, Johnny Cameron, and Alan Dickinson] on the basis of a credit derivative . . . which achieved 20% weighting and mitigated balance sheet and credit concerns. An additional fee of a minimum US$40K was also charged.[334]

Notwithstanding its concerns about Enron's "financial period manipulation," RBS appears to have agreed to extend the facility based upon pressure from Enron and mitigated its credit risk through the purchase of a credit derivative.

---

[334] Nixon Extension Recommendation.

- 83 -

## IV.   POTENTIAL LIABILITY OF RBS

### A.   <u>Arguments Supporting the Imposition of Aiding and Abetting Liability and Equitable Subordination</u>

*Aiding and Abetting Liability*

*Elements of Aiding and Abetting Liability.* As described in Appendix C (Role of Enron's Officers) to the Third Interim Report, the Examiner concluded that certain of the Debtors' officers breached their fiduciary duties under applicable law by causing the Debtors to enter into certain SPE transactions that were designed to manipulate the Debtors' financial statements and which resulted in the dissemination of financial information known to be materially misleading. RBS participated in the LJM1 Related Party Transaction, the FAS 140 Transactions, and the Nixon Prepay, transactions in which Enron officers breached fiduciary duties. In addition, the Related Party Transactions present facts sufficient to support the conclusion that Fastow and other Enron officers engaged in self-dealing in violation of the duty of loyalty.

As set forth more fully in Appendix B (Legal Standards) to the Third Interim Report, assuming the Debtors have standing, an affirmative claim against RBS for aiding and abetting these breaches of fiduciary duty will exist if: (i) RBS had actual knowledge of the wrongful conduct giving rise to the breach of fiduciary duty; (ii) RBS gave substantial assistance to the primary wrongdoers; and (iii) injury to the Debtors was the direct or reasonably foreseeable result of RBS's conduct.

*Analysis of Evidence.* RBS knew that LJM1 was formed to enter into the LJM1/Rhythms Hedging Transaction with Enron. The evidence also suggests RBS was in possession of all the facts necessary to conclude that the LJM1/Rhythms Hedging Transaction was a non-economic hedge. RBS was also in possession of all the facts

necessary to conclude that Enron paid significant value in a transaction in which it had no

possibility of obtaining an economic return and that the transaction was designed to give

Enron only a potential financial statement benefit.  RBS also knew that the Enron stock

held by LJM1 could not be hedged, sold, or transferred and could not be used to enrich

Fastow.  There is evidence that through the restructuring of LJM1, including execution of

the Total Return Swaps with AIG, RBS effectively hedged its interest in the Enron stock

transferred to LJM1 and provided substantial assistance to Fastow, enabling him to profit

from the Enron stock notwithstanding his representations to the Enron Board and the

express prohibitions in the Amended Partnership Agreement.  In addition, there is

evidence that RBS knew that the FAS 140 Transactions in which it participated and the

Nixon Prepay would result in the dissemination of materially misleading information in

Enron's financial statements, and that RBS provided substantial assistance to Enron in

completing those transactions.

     With respect to LJM1, RBS understood that Fastow had designed a transaction

that resulted in the transfer of significant value in the form of Enron stock from Enron to

LJM1.  Because of the conflicts of interest between Fastow and Enron that were inherent

in this arrangement, RBS had concerns about the propriety of the transaction and took

steps to ensure that the Enron Board had approved its terms.  RBS learned that the Enron

Board had approved the transaction, subject to the understanding that Fastow would not

have any pecuniary interest in the Enron stock.  RBS also understood that the Enron stock

contributed to LJM1 was subject to restrictions on transfer or hedging.  RBS was aware

that Fastow was to share in only those distributions and allocations from assets other than

the Enron stock transferred to LJM1 or the proceeds resulting from those shares.[335]
Further, RBS knew that Fastow's management fee was to be calculated by reference to
assets in LJM1 other than the shares of Enron stock transferred to LJM1 or the proceeds
resulting from those shares.[336]

Notwithstanding this knowledge, RBS helped structure and implement a
transaction that accomplished precisely what had been prohibited by these restrictions.
Through the Total Return Swaps with AIG, RBS hedged its allocable portion of the
Enron shares held by LJM1. As a consequence of these transactions, RBS contributed
cash to LJM1 for the benefit of Fastow. RBS and Fastow treated the proceeds of the
transactions as an additional capital contribution by RBS to LJM1 from which Fastow
could profit.

There is also sufficient evidence for a fact-finder to conclude that RBS was in
possession of all the facts necessary to conclude that the LJM1/Rhythms Hedging
Transaction was a non-economic hedge that would contribute to the dissemination of
materially misleading financial information by Enron officers. Most notably, RBS
understood that Swap Sub's only asset was the Enron stock contributed to it by Enron
and that, as a result, the only asset available to support the obligations of Swap Sub to
Enron under the LJM1/Rhythms Hedging Transaction was stock Enron had contributed
to LJM1.

In Sutton Bridge and the ETOL transactions, RBS obtained verbal assurances
from Enron wherein Enron assured repayment of RBS's equity interest in the SPEs

---

[335] Section 4.2, Partnership Agreement.

[336] *Id*. at Section 5.2.

involved in these transactions. RBS obtained such verbal assurances from highly placed Enron officers, including Fastow and Glisan, knowing that Enron could not account for the transactions as it intended if the assurances were disclosed to third parties. In particular, there is evidence that RBS knew that Enron's verbal assurances, if documented, would compromise Enron's specific accounting objectives for these transactions by causing it to fail to meet the 3% Equity Test under GAAP. The existence of these verbal assurances resulted in RBS's 3% investment in the borrower SPE not being "at risk" within the meaning of FAS 140.[337] The evidence also suggests that these assurances were of particular importance to RBS, because it did not believe that, absent the assurances, there was sufficient value in the transaction structures to repay its investments before the transaction maturity dates, or for twenty-two years thereafter in the ETOL transactions. Thus, there is sufficient evidence for a fact-finder to conclude that RBS aided and abetted certain Enron officers' breaches of fiduciary duties.

In the Nixon Prepay, RBS's internal documents establish the bank's focus on the "window dressing" and "manipulation" that Enron sought to achieve by completing the transaction. Enron's accounting for this transaction resulted in misrepresentations in Enron's financial statements because what the bank plainly understood to be a loan was not treated as such by Enron in its financial reporting.

Under the applicable law of aiding and abetting, courts often include, as part of the element of substantial assistance, a requirement that the harm caused must be a reasonably foreseeable result of the actions of the aider and abettor. In the LJM1 Related Party Transaction, RBS's participation in a limited partnership that it understood was

---

[337] *See* Second Interim Report, Appendix M (FAS 140 Transactions).

formed principally for the purpose of executing the LJM1/Rhythms Hedging Transaction — which RBS had sufficient information to determine was a non-economic hedge — resulted in Enron transferring significant value for no economic return and led to the dissemination of materially misleading financial information by Enron. A fact-finder could conclude that this result was reasonably foreseeable. Similarly, a fact-finder could conclude that Enron would not have consented to Fastow's participation in LJM1 had it known that subsequent transactions would be designed and implemented to enable Fastow to profit personally from the Enron stock transferred to LJM1. A fact-finder could conclude that a reasonably foreseeable result of the Total Return Swaps was enabling Fastow to profit from the Enron stock notwithstanding his prior representations to the Enron Board and the provisions of the Amended Partnership Agreement.

In the case of RBS's FAS 140 Transactions and the Nixon Prepay, there is also evidence of substantial assistance. Each of these transactions was structured to enable Enron to produce misleading financial statements, which were disseminated to the public. There is sufficient evidence from which a fact-finder could conclude that Enron suffered damages by virtue of the preparation and dissemination of these materially misleading financial statements, including incurring the costs of governmental investigations, the administrative costs of Enron's bankruptcy proceedings, and losses caused by the "deepening insolvency" of Enron that occurred while its true financial condition was disguised. A fact-finder could determine that damages such as these were a reasonably foreseeable result of the conduct of RBS in connection with the RBS Transactions.

*Equitable Subordination*

As set forth more fully in Appendix B (Legal Standards) to the Third Interim Report, RBS's claims against the Debtors may be equitably subordinated if RBS engaged in inequitable conduct and such conduct resulted in an injury to creditors or an unfair advantage to RBS. The evidence discussed above supports a finding that RBS engaged in inequitable conduct that allowed Enron to produce materially misleading financial statements and allowed Fastow and other Enron officers to enrich themselves in violation of their duties of loyalty. Enron's other creditors were injured because such financial results were publicly reported and disseminated by Enron. Therefore, sufficient evidence exists for a court to equitably subordinate the claims of RBS to those of other creditors.

**B.    Arguments Against the Imposition of Aiding and Abetting Liability and Equitable Subordination**

The Examiner has considered the arguments that RBS might assert as defenses to aiding and abetting liability and equitable subordination, including:

- With respect to the RBS Transactions in which RBS assisted Enron, the bank relied on Enron obtaining its own independent accounting advice with respect to its financial statements and other disclosures;

- With respect to LJM1, RBS may argue that the transaction was approved by the Enron Board, the subject of a PWC Fairness Opinion, and, at least in general terms, publicly disclosed;

- With respect to its Total Return Swaps with AIG, RBS may argue that it reasonably believed that there was no violation of the transfer and hedging restrictions on the Enron stock because the related RBS Escrow Agreement was known to, and approved by, a senior officer of Enron;

- RBS, as a limited partner in LJM1, may argue that it did not approve or substantially participate in any decision by LJM1 to distribute value to Fastow or any other Enron officer and had no responsibilities with respect to the characterization of property held by LJM1 under the Amended Partnership Agreement;

- With respect to the FAS 140 Transactions, RBS may argue that the verbal assurances provided by Enron were legally unenforceable and, therefore, did not adversely affect Enron's accounting for those transactions; and

- With respect to the FAS 140 Transactions and the Nixon Prepay, RBS may argue that it did not have knowledge of Enron's accounting for significant aspects of the transactions.

*Reliance on Independent Accounting Advice.*

Most of the transactions that RBS completed with Enron were complex, and all required sophisticated accounting analyses and interpretations. RBS may argue that its reliance on Enron being financially sophisticated and receiving accounting advice from one of the most well-respected accounting firms in the world at the relevant times precludes it from having any scienter or intent to aid and abet Enron's financial misrepresentations.

Indeed, in approving RBS's participation in LJM1 the bank's Head of Credit Risk noted an important premise for his overall analysis:

> Although a number of issues have necessarily been debated at great length, the majority have related to legal/tax accounting issues and I will not focus on such matters here in any detail, as other parties are much better qualified to do so and, to my knowledge, have all opined favourably.[338]

In late September 2000, when three RBS representatives held a series of meetings with various members of Enron management, they again heard representations to the effect that Enron was assured by Andersen that off-balance sheet structures were appropriate in

---

[338] Project LJM Memorandum, at RBS 3030461.

each instance in which Enron contemplated using them, and that Enron also discussed its

off-balance sheet liabilities with external rating agencies.[339]

RBS may nevertheless have had knowledge of, and substantially assisted Enron

with, Enron's filing of materially misleading financial statements.    Whether RBS's

reliance on Enron's independent accounting advice was reasonable is a question of fact.

While there is evidence that RBS believed Andersen approved Enron's transactions, there

is also evidence from which a fact-finder could conclude that such reliance was not

reasonable.    For example, there is ample evidence that RBS did not merely understand

Enron's particular accounting objectives for the Nixon Prepay, but also characterized

those objectives as "window dressing," and thought that the Nixon Prepay raised

questions as to the full magnitude of Enron's "financial statement manipulation."[340]

Moreover, an RBS senior credit manager called to colleagues' attention her assessment

that

> [t]he scale of financial period manipulation [by Enron] is exceedingly
> worrying . . . .  Such concern has been a theme of all our discussions for a
> while. . . .  We have twice increased exposure since doing [the Nixon
> Prepay, including] another manipulation when we joined in the JM Trust
> [i.e., Ghost] 18 month bridge . . . . The question is when do we stop[?]"[341]

A fact-finder might also conclude that RBS's reliance on its belief that Andersen

had approved Enron's transactions was unreasonable to the extent that RBS knew that

---

[339]  Email from Philip Carraro, RBS, to Iain Robertson, *et al.*, RBS, Sept. 29, 2000, at RBS 3088386 [RBS 3088375-RBS 3088389].

[340]  *See, e.g.*, Email from Alan Dickinson, RBS, to Thomas Hardy, *et al.*, RBS, Mar. 10, 2000 (expressing concern about the "extent of [Enron's] window-dressing") [RBS 1142376]; ARD Memorandum, Dec. 6, 1999, at RBS 3118972 (describing an Enron transaction as "effectively a window dressing request"); Memorandum from Andrew Close, Credit Manager, *et al.*, RBS, regarding approval for Nixon, Dec. 7, 1999 (describing a facility as a "window-dressing tool for Enron across the year-end") [RBS 3118959]; ARD Memorandum, Dec. 6, 1999, at RBS 3118973 (expressing concern "over the absolute level of manipulation undertaken by Enron in its financial statements").

[341]  Sinclair/McInnes Email, Mar. 10, 2000.

certain key transaction details had not been disclosed to Andersen. The FAS 140

Transactions, in particular, raise this issue. RBS did not (i) inform Andersen, (ii) request

that Enron inform Andersen, or (iii) undertake to determine whether Andersen was aware

that Enron verbally assured repayment of RBS's equity investments in the FAS 140

Transactions. There is evidence that Andersen was not aware of the existence of any

verbal assurances in the FAS 140 Transactions and that Andersen would have concluded

that such verbal assurances invalidated Enron's accounting for and disclosure of the

applicable transactions.[342] There is also evidence from which a fact-finder could

conclude that RBS understood that documenting the existence of such assurances would

---

[342] Debra Cash of Andersen testified that she did not know about any situation in which Enron provided verbal assurances to any equity holder. Sworn Statement of Debra Ann Cash, Andersen, to William T. Plybon and H. Bryan Ives III, A&B, June 5, 2003, at 145, lines 16-23. Cash worked on Andersen's Enron management team, at various times having audit responsibility for the Enron Energy Services and Enron Global Finance Business units. *Id.* at 21, line 22 – 22, line 15. Carl Bass of Andersen testified that he was not aware of any equity in an Enron FAS 140 Transaction that was covered by either a written agreement that Enron would pay it or an oral minuted agreement. Sworn Statement of Carl Bass, Andersen, to William T. Plybon, A&B, June 4, 2003, at 41, line 14 – 42, line 1. Bass was a member of Andersen's Professional Standards Group (the "PSG") from 1999 until August 2001. *Id.* at 17, line 14 – 18, line 6. The PSG was a resource within Andersen comprised of partners and managers with in-depth technical knowledge on various areas of accounting literature. The PSG would respond to questions from the Andersen engagement teams, advising them as to the appropriate accounting literature; the auditing of a transaction would be the role of the engagement team. *Id.* at 30, line 23 – 31, line 8. Bass further testified that it would be incumbent upon the client to inform the auditor of all relevant facts about a transaction, so that the auditor could make an informed conclusion on that transaction; he stated that the existence of verbal assurances would be material. *Id.* at 42, lines 2-19. Bass also stated that he did not know whether Enron, as a matter of routine audit practice with Andersen, sent confirmations to the equity certificate holders in its FAS 140 Transactions, asking them if the 3% equity was at risk. *Id.* at 39, line 18 – 40, line 3.

Bass testified that if, in his capacity as a member of the PSG, he were told by the Andersen engagement teams that while there was no written agreement or guarantee with respect to the 3% equity, there were oral assurances from the company's CFO that were documented in writing in the certificate holders' credit approval minutes and processes, he would advise the engagement team that the equity was not at risk. *Id.* at 40, line 22 – 41, line 13. John Stewart, the head of the Accounting Principles Group within the PSG, also stated that the effect of an oral assurance of repayment of the equity would be to require Enron to consolidate the Enron-sponsored, borrower-SPE because the requisite equity would not be at risk. In-Person Interview with John Stewart, former Partner, Andersen, by H. Bryan Ives III, A&B, June 12, 2003.

invalidate the accounting treatment that was Enron's purpose in using the FAS 140 structure.[343]

With respect to potential aiding and abetting liability, whether a fact-finder would infer that RBS knew that the lack of disclosure related to the FAS 140 Transactions and the Nixon Prepay would result in dissemination of materially misleading financial information is the fundamental issue, not whether the technical rules of GAAP were satisfied or whether RBS relied on Enron's auditors. Accordingly, the Examiner is unable to conclude that RBS must be excused as a matter of law from potential aiding and abetting liability. Similarly, the Examiner is unable to conclude that a fact question on these issues would demand a finding that RBS did not engage in inequitable conduct in connection with those transactions.

*Reliance on Enron Board and PWC Approval of LJM1.*

It is apparent that RBS agreed to participate in LJM1 only after confirming that Fastow would present the proposed transaction to the Enron Board for its approval, and that the transaction would be reviewed and deemed fair to Enron by PWC. RBS requested and received, in advance of Fastow's presentation to the Enron Board, a draft resolution and received, before closing LJM1, the ratified Enron Board resolution approving LJM1 and the "full presentation made to the [B]oard."[344]

RBS may, on the basis of these facts, argue that RBS had no duty to refrain from participating in a transaction that the Enron Board approved and PWC concluded was fair

---

[343] *See, e.g.,* ETOL I Credit Application, at RBS 3141124 (Enron's "desired accounting treatment does not permit any formal arrangements to be made."); RBS ETOL Memorandum, at RBS 3104222 ("The transaction needs to be structured as described . . . to achieve the desired US accounting treatment and, in particular, there must be no arrangements to ensure the repayment of, or the return on, the 3% of equity . . . ."); Milton Sworn Statement, at 73, lines 7-13, and at 163, lines 22-25.

[344] Howard/Darby Email, June 25, 1999, at RBS 4007532.

to Enron from a financial point of view. Whether RBS aided and abetted a breach of fiduciary duties in light of these considerations is a question of fact. There is evidence from which a fact-finder could conclude that, notwithstanding Enron Board approval, the PWC Fairness Opinion and public disclosure of some aspects of LJM1, RBS assisted Fastow and other Enron insiders in breaching fiduciary duties owed to the corporation. In particular, RBS understood that fundamental conditions and expectations upon which LJM1 had been approved were circumvented by developments *after* Enron Board approval had been given, such as Fastow profiting from the value of the Enron stock held in LJM1, which RBS substantially assisted. There is also evidence from which a fact-finder could conclude that RBS aided and abetted breaches of fiduciary duty by participating in the formation of LJM1, which RBS understood was intended to create a hedge for Enron's investment in Rhythms with an entity capitalized entirely with Enron stock.

*Reliance on Enron Approval of RBS Escrow Agreement.*

RBS obtained Enron's approval of the RBS Escrow Agreement through which LJM1 transferred one-half of its Enron shares into escrow for RBS's benefit, as evidenced by the Acknowledgment Agreement executed on behalf of Enron by Causey.[345] The RBS Escrow Agreement contemplated the transfer of those shares from escrow to Campsie at any time upon receipt of a certificate from Campsie, but in no event later than November 29, 2001.[346] Through the same Acknowledgment Agreement, Causey also consented, on Enron's behalf, to an amendment to the Partnership

---

[345] Acknowledgment Agreement.

[346] Section 4, RBS Escrow Agreement.

Agreement that characterized the payment by RBS to LJM1 in December 1999 (as a consequence of RBS's Total Return Swaps with AIG) as an "Additional Capital Contribution."[347] A fact-finder could therefore conclude that RBS's role in the transfer of shares from LJM1 into escrow for the benefit of Campsie did not (i) circumvent the Lock-Up Agreement or (ii) result in a violation of the Amended Partnership Agreement by providing Fastow with pecuniary value from the Enron shares transferred to LJM1. Moreover, a fact-finder could determine that RBS's Total Return Swaps with AIG effected a hedge of a notional amount of Enron shares, as opposed to a hedge of the shares actually transferred by Enron to LJM1, and thus likewise did not circumvent the Lock-Up Agreement or result in a violation of the Amended Partnership Agreement by allowing Fastow to profit from the shares.

Such defenses must be weighed by the fact-finder against evidence suggesting that RBS understood that (i) Fastow represented to the Enron Board at the time of its approval of LJM1 that he would not profit from the Enron shares transferred to LJM1, and (ii) Enron Board approval had been conditioned on the issuance of the PWC Fairness Opinion, which in turn depended on the existence of an illiquidity discount applied to those shares that was based upon the restrictions placed on them by the Lock-Up Agreement. In addition, there is no evidence of approval by the Enron Board of the RBS Escrow Agreement, or of the Total Return Swaps, which resulted in payments to Fastow from RBS's hedging of the Enron shares held by LJM1.

---

[347] *Id.* at Section 1 ("Enron acknowledges and consent [sic] to all of the transactions contemplated by the Transaction Agreements."). The term "Transaction Agreements" is defined in the Acknowledgement Agreement as including the RBS Escrow Agreement and the Amended Partnership Agreement. *Id.* at Preamble. *See* Section 1.6, Amended Partnership Agreement.

*RBS's Role as Limited Partner of LJM1.*

RBS could argue that it did not substantially participate in any transfer of value to Fastow and other Enron officers. RBS could assert that the transfer of value resulted from the declaration of distributions from LJM1 to Fastow and other Enron officers, that RBS was a limited partner in LJM1 and that RBS did not have any right to approve or disapprove (or duty to monitor) distributions of funds to the LJM1 partners. A fact-finder could view this as evidence that the "substantial participation" element of an aiding and abetting claim is not satisfied.

Some evidence supports this defense as well as the defense that RBS relied on the Enron Board's approval of LJM1's formation. A fact-finder would have to weigh this evidence, however, against factors such as RBS's knowledge that Fastow was profiting from the LJM1 Related Party Transaction and that the source of this profit was the Enron stock in LJM1. Further, RBS's Total Return Swaps with AIG facilitated this transfer of value, which was prohibited by the terms of the Amended Partnership Agreement.

*Enforceability of Verbal Support.*

The Examiner has also considered whether the verbal assurances in the FAS 140 Transactions were enforceable as a matter of law and a matter of fact.[348] As discussed in the Third Interim Report, agreements that are "oral" or "unwritten" may be legally enforceable contracts.[349] Sufficient evidence exists for a fact-finder to conclude either that (a) Enron and RBS intended to and did enter into an enforceable agreement for RBS

---

[348] Milton Sworn Statement, at 211, line 23 – 212, line 7 (expressing her belief that verbal assurances were not "contractually binding").

[349] Third Interim Report, *Potential Defenses to Aiding and Abetting Claims and Equitable Subordination, Impact of Agreements or Assurances on Equity at Risk.*

- 96 -

to purchase the 3% equity certificates in exchange for Enron's promise to repay the certificate plus yield at maturity in the event the underlying asset value was insufficient to pay out the equity, or (b) alternatively, that RBS relied to its detriment by purchasing the equity certificates based upon Enron's promise that the equity investment would be repaid. Thus, the fact-finder could determine that the assurances of repayment were offered as consideration for RBS's agreement to purchase the equity certificates, an offer that RBS accepted. If the fact-finder were to make that determination, then the equity was not "at risk" as required by GAAP rules pursuant to traditional contract law, or pursuant to theories of promissory estoppel or detrimental reliance. Alternatively, the fact-finder could conclude that the evidence was insufficient to establish the formation of an informal contract. The fact-finder could also draw the inference that the verbal assurances are not "unequivocally referable" to RBS's decision, because RBS relied on elements other than the verbal assurances in making that decision.

As discussed in the Third Interim Report, regardless of the enforceability of the verbal assurances provided by Enron, a fair reading of the applicable GAAP suggests that the "at risk" rule of the 3% Equity Test requires that the equity be at risk not just as a matter of strict legal form, but that it be at risk in substance as well. Thus, the intentions of the parties must be considered in determining whether the equity is truly at risk. The evidence suggests that RBS sought and obtained these verbal assurances and relied upon them in purchasing the equity interests, fully expecting Enron to honor them. The evidence also suggests that RBS knew that if the verbal assurances were documented and thereby revealed to Andersen, Enron would not be permitted to account for the transactions as sales. Thus a fact-finder could determine that RBS was in fact looking to

Enron for the return of its equity, and in substance the equity was not at risk. RBS may have had other reasonable bases for concluding that its equity would be repaid in full at maturity. For example, RBS may have believed that, given Enron's requirement to repay the debt that represented approximately 97% of the amount owed in the transaction, it would have no incentive not to pay the additional 3% and reacquire the underlying asset.[350] Other structural elements of the FAS 140 Transactions may have also provided some degree of assurance to RBS, but any resulting comfort must have been tempered by the knowledge that the assets in the FAS 140 Transactions were insufficient to repay the bank's equity investment and yield.[351]

RBS's expectations, considered in isolation, may have been based on economic realities and consistent with the accounting rules. These normal commercial expectations, however, did not arise, and may not be considered, in isolation. They arose in the context of Enron's specific assurances regarding the repayment of the 3% equity. Thus, a fact-finder could determine that the verbal assurances were the principal or exclusive basis for RBS's expectations of recovery from Enron of its 3% equity investment. Accordingly, there is sufficient evidence for the fact-finder to conclude that Enron's verbal assurances were in fact and substance "residual guarantees" under the applicable GAAP. Under this analysis, the equity investments are not "at risk" as required under the 3% Equity Test.

---

[350] *See* ETOL II and III Credit Application, at RBS 3124939 (noting that various controls on equity "incentivize Enron to unwind the transaction at maturity").

[351] *See id.* at RBS 3124939 ("The risk to equity in ETOL I and II under the base case economics is a shortfall of [$1.2 million]. . . . ETOL III relies solely on sale proceeds for our return on equity. . . . [T]otal equity principal is [$1.5 million] over the ETOL I, II and III transactions (assuming we are made whole)."); ETOL I Credit Application, at RBS 3141130 ("[T]he principal risk associated with the put option may be viewed as the calculation method [of fair market value] and the underlying value of the asset.").

*Lack of Awareness of Enron Accounting.*

RBS may also argue that it lacked knowledge of how Enron accounted on its statement of cash flows for the proceeds it received from the FAS 140 Transactions and the Nixon Prepay, and that such a lack of knowledge precludes a finding of aiding and abetting liability or equitable subordination.

Whether RBS had sufficient knowledge of acts giving rise to breaches of fiduciary duty by officers of Enron is a question of fact. Certain RBS contemporaneous documents appear to reflect a sophisticated level of understanding of Enron's accounting objectives, a meaningful degree of understanding of Enron's methods of accounting for specific line items on Enron's financial statements, and substantial concerns as to the "absolute level of manipulation undertaken by Enron in its financial statements."[352] Moreover, there is documentary evidence that RBS understood that Enron accounted for the cash proceeds from the Prepay Transactions as cash flow from operating activities.[353] Accordingly, a fact-finder could infer that RBS was aware of Enron's accounting for the FAS 140 Transactions and the Nixon Prepay on which RBS worked with Enron.

**C.    Conclusions**

There is evidence sufficient for a fact-finder to conclude that: (i) RBS had actual knowledge of the wrongful conduct giving rise to breaches of fiduciary duty by certain of the Debtors' officers; (ii) RBS gave substantial assistance to the Debtors' officers by

---

[352] ARD Memorandum, Dec. 6, 1999, at RBS 3118973; *see also* Sinclair/McInnes Email, Mar. 10, 2000; Kruger Memorandum, at RBS 3038532 (describing Enron's goal in Sutton Bridge as taking "latent gain" as profit); Wallis ETOL Memorandum, at RBS 3089524; ETOL I Credit Application, at RBS 3141124; ETOL II and III Credit Application, at RBS 3124936.

[353] McAlister/Weir Email, Feb. 1, 2000 ("Other Income includes unrealised gains and losses from price risk management activities . . . . These activities are reported as part of operational cash flow, boosting the reported position by $550M over the last two years . . . and representing 30% of reported operating cash flow in that period.").

participating in the transactions; and (iii) injury to the Debtors was the direct or reasonably foreseeable result of such conduct.  The evidence reviewed by the Examiner, and the reasonable inferences that may be drawn from that evidence, are sufficient for a fact-finder to conclude that RBS aided and abetted certain Enron officers in breaching their fiduciary duties.  There is also sufficient evidence of inequitable conduct by RBS in connection with the RBS Transactions for a court to conclude that RBS's claims should be equitably subordinated to the claims of other creditors.

As a result, RBS's claims in the Bankruptcy Case totaling approximately $537 million are susceptible of being equitably subordinated to the claims of other creditors. This subordination would be in addition to any affirmative recovery that may be available to the Debtors against RBS for aiding and abetting the officers' breaches of fiduciary duty, assuming that the Debtors have standing to pursue such a claim.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- x
                                        :

| | |
|---|---|
| In re: | Chapter 11 |
| ENRON CORP., *et al.*, | Case No. 01-16034 (AJG) |
| Debtors. | Jointly Administered |

------------------------------------------------------- x

APPENDIX F

(Role of CSFB and its Affiliates)

to

FINAL REPORT OF NEAL BATSON,
COURT-APPOINTED EXAMINER

      Reference is made to the preceding Final Report of Neal Batson, Court-Appointed Examiner (the "Report"). This Appendix constitutes an integral part of the Report. All capitalized terms not otherwise defined herein shall have the meanings set forth in the Report.

# TABLE OF CONTENTS

I.     INTRODUCTION ...................................................................................1
       A.     Introduction and Overview ..........................................................1
       B.     CSFB's Role In Enron's SPE Transactions ................................6
       C.     Background Information on CSFB ...............................................9

II.    THE HISTORY AND DEVELOPMENT OF CSFB'S INVOLVEMENT
       WITH ENRON ....................................................................................11
       A.     Relationship Between CSFB and Enron ....................................11
       B.     CSFB's Knowledge of Enron's Financial Condition.................20
       C.     Role of CSFB's Equity and Fixed-Income Analysts .................29

III.   DETAILED ANALYSIS OF CSFB'S INVOLVEMENT IN ENRON-
       RELATED DEALS ..............................................................................36
       A.     LJM1 Transactions.....................................................................36
       B.     The CSFB Prepay .......................................................................63
       C.     The Nile FAS 140 Transaction ..................................................73

IV     POTENTIAL LIABILITY OF CSFB ...................................................79
       A.     Arguments Supporting the Imposition of Aiding and Abetting
              Liability and Equitable Subordination.......................................79
       B.     Arguments Against the Imposition of Aiding and Abetting
              Liability and Equitable Subordination.......................................85
       C.     Conclusions.................................................................................93

V.     POTENTIAL VOIDABLE PREFERENCE LIABILITY OF CSFB ...................95

## I.    INTRODUCTION

### A.    Introduction and Overview

In Appendix C (Role of Enron's Officers) to the Third Interim Report, the Examiner concluded that there is sufficient evidence for a fact-finder to determine that certain of the Debtors' officers breached their fiduciary duties under applicable law by (i) engaging in self dealing in violation of their duty of loyalty and (ii) causing the Debtors to enter into certain SPE transactions that were designed to manipulate the Debtors' financial statements and that resulted in the dissemination of financial information known to be materially misleading.  These wrongful acts caused direct and foreseeable harm to Enron itself and resulting harm to innocent parties that dealt with Enron, including certain creditors in the Bankruptcy Case.

This Appendix considers the role of Credit Suisse First Boston, Inc. ("CSFB")[1] in certain of the Debtors' SPE transactions.  CSFB was one of Enron's Tier 1 banks and acted in several different capacities in the SPE transactions.  Among these transactions were the following, each of which is discussed in this Appendix:  LJM1,[2] a Related Party Transaction[3] that CSFB participated in as a limited partner; one Prepay Transaction[4] (the "CSFB Prepay") that closed in December 2000 and was renewed in September 2001; and

---

[1] In this Appendix, unless the context otherwise requires, the term "CSFB" includes Credit Suisse First Boston, Inc. and all of its affiliated and predecessor entities, including Donaldson, Lufkin & Jenrette, Inc. and all of its affiliated entities.

[2] LJM1 is a limited partnership, named LJM Cayman, L.P., that engaged in certain transactions with Enron.  A complete discussion of the LJM1 structure and the transactions in which LJM1 engaged is included in Annex 2 and Annex 3 to Appendix L (Related Party Transactions) to the Second Interim Report.

[3] *See* Second Interim Report, Appendix L (Related Party Transactions).

[4] For a discussion of certain of Enron's Prepay Transactions, see Second Interim Report, Appendix E (Prepay Transactions).

the FAS 140 Transaction[5] known as Nile that closed in September 2001. In Appendix C (Role of Enron's Officers) to the Third Interim Report, the Examiner concluded that there is sufficient evidence for a fact-finder to determine that certain of the Debtors' officers breached their fiduciary duties by causing Enron to enter into certain of these transactions or transactions of the same types as these.

In this Appendix, the Examiner discusses evidence indicating that: (i) CSFB had actual knowledge of the wrongful conduct giving rise to breaches of fiduciary duty by the Debtors' officers; (ii) CSFB gave substantial assistance to the Debtors' officers by participating in certain transactions; and (iii) injury to the Debtors was the direct or reasonably foreseeable result of this conduct. The evidence reviewed by the Examiner and the reasonable inferences that may be drawn from that evidence are sufficient for a fact-finder to conclude[6] that CSFB aided and abetted certain Enron officers in breaching their fiduciary duties. In addition, there is sufficient evidence of inequitable conduct by CSFB in connection with the Enron SPE transactions discussed in this Appendix for a court to conclude that CSFB's claims should be equitably subordinated to the claims of other creditors.

As set forth more fully below, CSFB's conduct in transactions involving LJM1 enabled Enron to complete the LJM1/Rhythms Hedging Transaction, through which Enron recognized $95 million of income in 1999, representing 10.6% of its originally

---

[5] For a discussion of certain of Enron's FAS 140 Transactions, see Second Interim Report, Appendix M (FAS 140 Transactions).

[6] *See* Report, *Standard Adopted by the Examiner*.

reported net income for that year.[7] CSFB's conduct also enabled Fastow improperly to enrich himself and other Enron officers in violation of their fiduciary duties to Enron. As a result of transactions involving LJM1, Fastow and his colleagues, several of whom were Enron officers, received over $40 million.[8]

CSFB's conduct in the CSFB Prepay and the Nile transaction enabled Enron to:

- record approximately $18.9 million of income from gain on sales of assets that should not have been recorded;[9]

- receive approximately $175 million[10] of proceeds, approximately $172.2 million[11] of which Enron erroneously recorded as cash flow from operating activities and the remainder of which Enron erroneously recorded as cash flow from investing activities;[12] and

- understate debt by $150 million in its December 31, 2000 balance sheet.[13]

The evidence would permit a fact-finder to conclude that CSFB:

---

[7] Enron Form 8-K filed with the SEC on Nov. 8, 2001, Tbl. 1.

[8] *See* Second Interim Report, Appendix L (Related Party Transactions), at 19-20. This amount includes: (i) $18 million in distributions and $2.6 million in management fees received by Fastow from LJM1; (ii) at least $7.3 million in distributions and $178,000 in management fees received by Kopper from LJM1; (iii) $4.5 million received by each of Kopper and The Fastow Family Foundation in connection with Enron's termination of the LJM1/Rhythms Hedging Transaction; and (iv) an aggregate of $3.3 million received by Michael Hinds (an LJM2 employee), Kristina Mordaunt, Glisan, Anne Yaeger Patel and Kathy Lynn in connection with Enron's termination of the LJM1/Rhythms Hedging Transaction. In addition, Fastow received $15.5 million in cash and a house valued at $850,000 from Kopper in connection with Fastow's sale of his LJM1 and LJM2 interests to Kopper. *Id.* For a complete discussion of LJM2, see Second Interim Report, Annex 4 to Appendix L (Related Party Transactions).

[9] This gain resulted from the Nile transaction.

[10] Of this amount, $150 million resulted from the CSFB Prepay and $25.0 million resulted from the Nile transaction.

[11] Of this amount, $150 million resulted from the CSFB Prepay and $22.2 million resulted from the Nile transaction. While the Examiner has been unable to confirm that Enron included the CSFB Prepay in price risk management activities and that the proceeds were treated as cash flow from operating activities, the Examiner has discovered no evidence that the CSFB Prepay was not accounted for in the same manner in which Enron accounted for the other Prepay Transactions that the Examiner has reviewed. *See* Second Interim Report, Appendix E (Prepay Transactions).

[12] This cash flow from investing activities resulted from the Nile transaction.

[13] This amount reflects the proceeds from the CSFB Prepay that should have been recorded as debt.

- participated with Fastow and The Royal Bank of Scotland plc ("RBS")[14] in the formation and funding of LJM1, knowing that Enron would use LJM1 to enter into a non-economic hedging transaction;

- structured and implemented a subsequent transaction through which LJM1 received funding that was improperly used by LJM1 to enrich Fastow;[15]

- assisted Enron in completing the CSFB Prepay, even though CSFB knew that Enron's accounting for transactions of this type, with no other meaningful related disclosure, would result in misleading financial presentation; and

- obtained assurances from Enron in the Nile transaction wherein Enron assured repayment of CSFB's equity interest in the SPE in the Nile transaction, knowing that the assurances precluded the accounting treatment Enron sought for such transactions and that Enron nonetheless intended to account for these transactions as if no assurances of repayment had been provided.

The Examiner has reviewed a substantial amount of evidence, including documentary and testimonial evidence, and has noted reasonable inferences that could be drawn from the evidence. A fact-finder may draw alternative or contrary inferences from the same evidence. Moreover, there are certain defenses to aiding and abetting liability and equitable subordination available to CSFB. Whether CSFB will succeed on one or more of these defenses will depend upon the fact-finder's resolution of these facts.

---

[14] RBS acquired National Westminster Plc ("NatWest") by hostile takeover in March 2000. *See* Report, Appendix E (Role of RBS and its Affiliates). RBS acquired all assets and liabilities of NatWest as part of the corporate takeover. Because RBS is the successor in interest to NatWest, the Examiner regards the acts of NatWest prior to its takeover by RBS as acts of RBS.

[15] As discussed below, Fastow's profit, if any, from LJM1 was to come only from investments made with the $16 million in capital contributed by CSFB, RBS and Fastow, not from the Enron stock transferred to LJM1. Through the SAILS transaction discussed below, CSFB effectively monetized its interest in the Enron shares held by LJM1 and then contributed $45.1 million in cash to LJM1. The parties treated the proceeds of the transaction as an additional capital contribution to LJM1 from which Fastow could profit, rather than proceeds resulting from the Enron stock, from which he could not. As discussed in Appendix E (Role of RBS and its Affiliates) to the Report, LJM1's other limited partner made a similar contribution. As a result of these transactions, an additional $25 million was contributed to LJM1 and recharacterized so that Fastow could profit directly from these funds.

- 4 -

The elements most likely to present issues of material fact for consideration by the fact-finder are:

- The degree of CSFB's *knowledge* of the acts giving rise to the breaches of fiduciary duty. In connection with the formation and funding of LJM1 and the execution of the LJM1/Rhythms Hedging Transaction, a fact-finder may consider whether CSFB's belief that the Enron Board had approved these transactions might lead to the conclusion that CSFB lacked knowledge that Fastow and other Enron officers had breached any fiduciary duty to Enron in connection with these transactions. As part of this determination, the fact-finder may consider, among other things: (i) CSFB's knowledge of the existence and terms of any approval of the formation and funding of LJM1 and the execution of the LJM1/Rhythms Hedging Transaction by the Enron Board and senior officers; and (ii) whether CSFB relied on representations from Enron, LJM1 or their officers, and if so, whether this reliance was reasonable.

- In connection with the SAILS[16] transaction, a fact-finder may consider, among other things: (i) CSFB's knowledge of the existence and terms of any approval of subsequent modifications of the LJM1 structure or the LJM1/Rhythms Hedging Transaction (including those necessitated by the SAILS transaction) by the Enron Board and senior officers; and (ii) whether CSFB relied on representations from Enron, LJM1 or their officers, and if so, whether this reliance was reasonable.

- In connection with the CSFB Prepay and the Nile transaction, a fact-finder might consider the degree of CSFB's *knowledge* that Enron's reporting of these transactions would contribute to materially misleading presentations of Enron's financial condition because: (i) the transactions were disclosed in a manner that disguised the economic substance of these transactions so as to mislead Rating Agencies, creditors and investors; and/or (ii) the accounting for the transactions was incorrect. As part of this determination, the fact-finder may consider, among other things: (i) CSFB's knowledge that the economic substance of these transactions was inconsistent with the disclosure; (ii) its knowledge that Enron's accounting for these transactions was likely incorrect; (iii) the impact, if any, of assurances received regarding its equity investment made in the Nile transaction; and (iv) whether there was any reliance on accounting representations from Enron or from Andersen, and if so, whether this reliance was reasonable.

---

[16] SAILS is an acronym for "Shared Appreciation Income Linked Securities."

- The degree of *assistance* provided by CSFB to Enron's officers. As part of this determination, the fact-finder may consider whether CSFB designed the transaction, structured the transaction, assisted in the disclosure process, consummated the transaction or took any action that would invalidate the desired accounting.

- Whether it would have been reasonably *foreseeable* to CSFB that these transactions would cause injury to Enron and/or its creditors. As part of this analysis, a fact-finder may consider whether the transaction had a material impact on Enron's financial statements.

CSFB's claims in the Bankruptcy Case totaling at least $417 million are susceptible of being equitably subordinated to the claims of other creditors. This subordination would be in addition to any affirmative recovery that may be available to the Debtors against CSFB for aiding and abetting the officers' breaches of fiduciary duty, assuming the Debtors have standing to pursue such a claim.

## B.    CSFB's Role In Enron's SPE Transactions

CSFB played important roles in several of Enron's SPE transactions. CSFB was one of two limited partners in LJM1.[17] In this capacity, CSFB purchased its partnership interest for $7.5 million and received payments in excess of $38 million[18] over slightly more than two years. LJM1 entered into the LJM1/Rhythms Hedging Transaction with Enron, as a result of which Enron recognized $95 million of income in 1999, representing

---

[17] To be precise, ERNB Ltd. ("ERNB"), a wholly owned affiliate of CSFB, was one of the two limited partners of LJM1. The other limited partner was Campsie Ltd. ("Campsie"), a wholly owned affiliate of RBS. In this Appendix, the Examiner generally refers to CSFB and RBS as the limited partners of LJM1. The role of RBS in LJM1 is discussed in Appendix E (Role of RBS and its Affiliates) to the Report.

[18] As discussed more fully in this Appendix, this amount includes:  (i) $12 million retained by CSFB following completion of the SAILS transaction in December 1999; (ii) $10 million received by CSFB in connection with the sale of its interests in Swap Sub to Southampton, L.P. in March 2000; (iii) $5.9 million received by CSFB as a distribution from LJM1 in July 2000; (iv) $5.4 million received by CSFB in connection with the SAILS transaction in September 2000; (v) $2.7 million received by CSFB as a distribution following Enron's purchase of Cuiaba from LJM1 in August 2001; and (vi) $2.8 million received by CSFB as a distribution from LJM1 in connection with the liquidation of LJM1 in October 2001.

- 6 -

10.6% of its originally reported net income for that year.[19]  In addition, CSFB structured and implemented the SAILS transaction through which LJM1 received funding that was used by LJM1 improperly to enrich Fastow.  During this same period, Fastow and his colleagues, several of whom were Enron officers, received over $40 million[20] in return for a $1 million initial investment by Fastow and minimal investments by the others.

The Examiner has concluded that LJM1 existed principally to enter into a hedging transaction with Enron that Enron could not expect unaffiliated third parties to enter into on terms acceptable to Enron.[21]  The Enron Board approved the hedging transaction, in part, based on a to-be-delivered PWC fairness opinion (the "Fairness Opinion"),[22] which relied on certain restrictions (through a "Lock-Up Agreement")[23] on the transfer and use of the Enron shares transferred to LJM1.  Moreover, Fastow also informed the Enron Board of a significant restriction – namely, that he would not profit from the Enron shares transferred to LJM1.  Despite knowledge of these restrictions, CSFB acted to circumvent them and thereby generated substantial profits from the property subject to these restrictions.  In so doing, CSFB aided and abetted Fastow in breaching his fiduciary duties to Enron and helped facilitate a substantial distribution to Fastow that contradicted his representation to the Enron Board that he would not profit from the Enron stock transferred to the partnership.

---

[19]  Enron Form 8-K filed with the SEC on Nov. 8, 2001, Tbl. 1.

[20]  This number includes the amounts received by Fastow and by certain of his colleagues in connection with Enron's termination of the LJM1/Rhythms Hedging Transaction.

[21]  *See* Second Interim Report, Annex 2 to Appendix L (Related Party Transactions), *Introduction and Overview of Rhythms Transactions*.

[22]  *See* Fairness Opinion Letter from PWC to Ben Glisan, Aug. 17, 1999 (the "Fairness Opinion") [AB000468680-AB000468684].

[23]  *See* Confirmation Letter from Enron Corp. to LJM Cayman, L.P., LJM Swap Sub, L.P., June 30, 1999 (the "Lock-Up Agreement") [CSFBCO 000010701-CSFBCO 000010704].

In the CSFB Prepay, CSFB provided funds to Enron in the amount of $150 million. As in other Prepays, the transaction was effectively a loan, which Enron accounted for as a commodity transaction.

CSFB participated in Nile, a FAS 140 Transaction, by providing funding in the aggregate amount of $25 million. CSFB provided approximately $1.0 million of that funding through the purchase of the 3% equity in the borrower-SPE necessary for Enron to avoid reflecting the debt of the borrower-SPE on Enron's financial statements. CSFB, however, received Enron's agreement – an agreement inconsistent with the accounting treatment Enron sought – to repurchase the equity at par. CSFB loaned the remaining funds (approximately $24.0 million) to the borrower-SPE, the obligations of which were supported by a Total Return Swap from ENA.

In addition to these transactions, CSFB participated in other SPE transactions that are not the subject of this Appendix. CSFB participated as the holder of the 3% equity in FAS 140 Transactions known as Iguana and Nikita,[24] assisted with the structuring of the Marlin,[25] Firefly and Whitewing[26] Share Trust Transactions[27] and acted as initial purchaser of securities issued by the Marlin and Whitewing structures,[28] and participated

---

[24] For information regarding the Nikita transaction, see Second Interim Report, Appendix M (FAS 140 Transactions) and Third Interim Report, Appendix F (Role of Barclays and its Affiliates).

[25] *See* Second Interim Report, Appendix H (Marlin Transaction).

[26] *See* Second Interim Report, Appendix G (Whitewing Transaction).

[27] *See* Second Interim Report, at 67-78.

[28] *See* Second Interim Report, Appendix G (Whitewing Transaction) and Appendix H (Marlin Transaction).

- 8 -

in equity derivative transactions with Enron with a gross notional amount of approximately $456.9 million.[29]

## C.    Background Information on CSFB

CSFB is the product of two mergers:  (i) the 1988 combination of Credit Suisse Group and First Boston, Inc. to form CS First Boston, Inc.[30] and (ii) the Credit Suisse Group's acquisition of Donaldson, Lufkin & Jenrette, Inc. ("DLJ"[31]) in November 2000.[32]   CSFB now consists of both institutional securities and financial services businesses.[33]   On the institutional securities side, CSFB provides financial advisory and

---

[29] Enron Schedule of Equity Swap & Forward Transactions, at AB1128 00647 [AB1128 00646-AB1128 00833].  The equity derivative transactions that CSFB engaged in with Enron included both equity forward transactions and equity swap transactions.  In its simplest terms, an equity forward contract is a contract to exchange an equity or equity basket at a set price at a future date.  An equity swap is a contract in which one or both payments are linked to the performance of equities or an equity index (for example, S&P 500). An equity swap involves the exchange of one equity or equity index return for another, or the exchange of an equity or equity index return for a floating or fixed interest rate.  *See* Board of Governors of the Federal Reserve System, Instructions for Semiannual Report of Derivatives Activity, FR 2436, OMB No. 7100-0286, at 13, *available at* http://www.federalreserve.gov/boarddocs/reportforms/forms/FR_243620030624_ i.pdf.  In some cases, Enron entered into an equity derivative transaction with CSFB using shares of Enron common stock held by CSFB as a result of earlier equity derivative transactions that were terminated prior to or contemporaneously with the new transaction.  Credit Suisse First Boston International ("CSFBi") filed a claim against Enron (Case No. 01-16034) with respect to equity derivative transactions in the amount of $120,448,323.  Proof of Claim of CSFBi filed against Enron in the amount of $120,448,323 [Claim No. 0000007524].  The claim under the equity derivative transactions appears to fall within the language of Section 510(b), as it is a claim arising from an obligation of Enron to purchase the securities of Enron.  *See* 11 U.S.C. § 510(b).  A claim such as this is "an obligation undertaken by the Debtors in connection with the issuance of their stock and as a guarantee of the Debtors for the value of their stock.  This is clearly a claim based on damages resulting from the sale or purchase of the securities of the Debtors."  *In re Kaiser Group Int'l, Inc.*, 260 B.R. 684, 687 (Bankr. D. Del. 2001) (subordinating debtor's obligation to pay cash of certain shareholders with respect to the value of their stock).  *See also Queen v. Official Comm. of Unsecured Creditors (In re Response USA, Inc.)*, 288 B.R. 88 (D.N.J. 2003) (claims arising under breach of stock option agreement susceptible to subordination under Section 510(b)).

[30] *First Boston Inc.:  Company Completes Merger with Credit Suisse Affiliate*, Wall St. J., Dec. 23, 1988; PR Newswire, *First Boston, CSFB, and Credit Suisse Announce*, Oct. 10, 1988, at 1 [ELIB00004814-0001-ELIB00004814-0005].

[31] In this Appendix, unless the context otherwise requires, the term "DLJ" includes Donaldson, Lufkin & Jenrette, Inc. and all of its affiliated and predecessor entities.

[32] Credit Suisse Group Press Release, "Credit Suisse Group Completes Acquisition of Donaldson, Lufkin & Jenrette," Nov. 3, 2000 (the "CSFB/DLJ Merger Press Release"), at 1 [AB0911 2158 – AB0911 2159].

[33] Credit Suisse First Boston (USA), Inc. Form 10-K filed with the SEC for the Year ended Dec. 31, 2002 (the "10-K for 2002"), at 1.

capital raising services, as well as sales and trading for users and suppliers of capital around the world.[34]  On the financial services side, CSFB provides international asset management to institutional, mutual fund and private investors, as well as financial advisory services to high net worth individuals and corporate investors.[35]  CSFB now has "60 offices across more than 30 countries and six continents," and, in 2001, was "one of the world's largest securities firms in terms of financial resources, with . . . $10 billion in equity and $410 billion in assets."[36]  In 2002, CSFB reported total net revenues of $5.739 billion.[37]

---

[34] *Id.*

[35] *Id.*

[36] CSFB Presentation to Enron, Aug. 24, 2001, at 9 [CSFBCO 005426351-CSFBCO 005426371].

[37] 10-K for 2002, at 28.

- 10 -

## II.   THE HISTORY AND DEVELOPMENT OF CSFB'S INVOLVEMENT WITH ENRON

### A.   Relationship Between CSFB and Enron

*Pre-Merger CSFB*

Before its merger with DLJ, CSFB was one of Enron's most valued investment banks. By mid-1999, Enron consistently ranked CSFB among its Tier 1 banks.[38] Similarly, CSFB regarded Enron as "one of [its] top accounts, if not the number one relationship."[39] Enron paid CSFB more in fees in 1999 – over $23 million – than any other of its Tier 1 banks.[40] In early 2001, Enron rated CSFB its "Best Bank" in North America, and recognized in particular CSFB's strength in debt capital markets.[41]

*Pre-Merger DLJ*

Before its merger with CSFB, DLJ enjoyed a profitable, but somewhat more limited, relationship with Enron. For most of the pre-merger period, Enron rated DLJ as a Tier 2 bank,[42] until 2000 when DLJ also attained Tier 1 status.[43] Although DLJ

---

[38] Enron Relationship Review Mid-Year 1999, at AB000538629 [AB000538625-AB000538674]. As early as October 1998, at least one Enron employee believed that CSFB should be considered a Tier 1 bank, praising its ability to "consistently deliver competitive investment banking services," while being "willing to deliver the balance sheet strategically." Memorandum from Kelly Boots, Enron, to Jeff Skilling and Andrew Fastow, Enron, Oct. 21, 1998, regarding CSFB [AB0911 2165].

[39] Email from James Moran, Director, CSFB, to Geoff Smailes, CSFB, Dec. 14, 2000 [CSFBCO 000044034]; *see also* Memorandum from James Moran, Director, CSFB, to David Maletta, Managing Director, and Ed Devine, Managing Director, CSFB, Dec. 11, 2000 (the "Dec. 11, 2000 Credit Memorandum"), at 3 (describing Enron as a "Priority 1 client") [CSFBCO 000044755-CSFBCO 000044758]; Sworn Statement of Osmar Abib, Managing Director, CSFB, to Frank G. Smith, A&B, May 6-7, 2003 (the "Abib Sworn Statement"), at 299, lines 18-19 ("Enron was a priority one client").

[40] Enron Relationship Review January 2000 (the "Enron Relationship Review January 2000"), at AB000538544 [AB000538536-AB000538624].

[41] Enron Debt Investor Relationship Review Highlights January 2001, at AB0911 1958, AB0911 1962 [AB0911 1956-AB0911 1964].

[42] Enron Relationship Review January 2000, at AB000538573; Enron Debt Investor Relationship Review January 2001, at AB000538426 [AB000538419-AB000538535].

[43] Enron Mid-Year Debt Investor Relationship Review July 2000 (the "Enron Mid-Year Debt Investor Relationship Review July 2000"), at 6, 15 [AB0252 01443-AB0252 01545].

- 11 -

provided structured finance services, equity underwriting, high-yield offering assistance, mergers and acquisitions advice, private equity and debt financing,[44] DLJ was less of a full-service investment bank and did not provide the same level of commercial lending or derivatives services to Enron as did CSFB.[45]

*The Merger of CSFB and DLJ*

DLJ merged with CSFB in November 2000.[46] The Enron coverage team from CSFB continued to manage the relationship after the merger,[47] although DLJ's equity and fixed-income analyst teams covering Enron and other energy-sector companies assumed those roles after the merger for CSFB.[48] By mid-2001, CSFB officers described Enron as "a Firm wide ... priority," and understood Enron to view CSFB as "its optimal investment-banking partner from both a global and product expertise perspective."[49]

---

[44] Sworn Statement of Laurence Nath, Managing Director, CSFB, to M. Russell Wofford, A&B, May 13, 2003 (the "Nath Sworn Statement"), at 10, line 14 – 11, line 6.

[45] Nath Sworn Statement, at 16, line 15 – 17, line 13.

[46] CSFB/DLJ Merger Press Release, at 1.

[47] *See* Abib Sworn Statement, at 9, line 20 - 10, line 2. CSFB's "coverage teams" included "a number of bankers who assist in the function[s] of coordination, ... pursuing new opportunities ... and responding to client inquiries and issues." *Id.* at 11, lines 4-9.

[48] *See* Sworn Statement of Curt Launer, Managing Director, CSFB, to Frank G. Smith, A&B, Apr. 15, 2003 (the "Launer Sworn Statement"), at 43, lines 19-25; Sworn Statement of Terran Miller, former fixed-income analyst, CSFB, to Frank G. Smith, A&B, Apr. 17, 2003 (the "Miller Sworn Statement), at 12, line 21 – 14, line 4.

[49] Email from David Koczan, Assistant Vice President, CSFB, to Osmar Abib, Managing Director, CSFB, June 17, 2001 (forwarding language previously used by Abib in his description of the business relationship for inclusion in credit proposal) [CSFBCO 005002813]. According to the CSFB Energy Group's Business Plan Overview, dated July 16, 2001, for the period of January 1999 through May 2001, Enron was the Energy Group's third largest client in terms of gross revenue ($44.6 million) and second largest in terms of net revenue ($35.4 million). Business Plan Overview for Energy Group, July 16, 2001, at 114 [CSFBCO 000546111-CSFBCO 000546223].

*Summary of CSFB's Transactions with Enron*

The following timeline illustrates the transactions or proposed transactions that CSFB entered into with Enron or Enron-related entities since 1997.[50] Transactions discussed in this Appendix or the Prior Reports appear in bold.



---

[50] *See* Credit Suisse First Boston LLC's Responses and Objections to the Examiner's and the Official Committee of the Unsecured Creditors of Enron Corp.'s Requests for Testimony Under Oath, Feb. 28, 2003, *In re Enron Corp.*, No. 01-16034 (AJG) (Bankr. S.D.N.Y. filed Feb. 28, 2003) ("CSFB's Original Responses"); Credit Suisse First Boston LLC's Responses and Objections to the Examiner's and the Official Committee of the Unsecured Creditors of Enron Corp.'s Requests for Testimony Under Oath, Mar. 21, 2002, *In re Enron Corp.*, No. 01-16034 (AJG) (Bankr. S.D.N.Y. filed Mar. 21, 2003) ("CSFB's Supplemental Responses" and, collectively with CSFB's Original Responses, "CSFB's Responses"). The classification of the majority of the listed transactions as public offering, private placement, lending, "other," prepay or M&A (mergers and acquisitions) advisory work was provided by CSFB in CSFB's Responses. This timeline does not include all transactions and services in which CSFB was involved. For example, commodity trades are omitted.



|  | CSFB | DLJ |
|---|---|---|
| June 1998 | | |
| July 1998 | | |
| August 1998 | 1 lending transaction | |
| September 1998 | 1 M&A advisory engagement | |
| October 1998 | | |
| November 1998 | **JEDI** / $325 million credit facility | |
| December 1998 | 1 public offering | |
| | **RAWHIDE** / $727.5 million liquidity facility | |
| | 1 private placement | **MARLIN I** / Rule 144A offering of approximately $1 billion of debt and private placement of $125 million of equity |
| | | **FIREFLY** / $60 million private placement and $415 million bank facility |
| January 1999 | | |
| February 1999 | 1 public offering | |
| | 1 M&A advisory engagement | 1 public offering |
| March 1999 | 1 lending transaction | |
| April 1999 | **JEDI II** / East Coast Power $850 million public offering | |
| | 1 M&A advisory engagement | |
| May 1999 | | |
| June 1999 | 1 public offering | 1 public offering |
| | **LJM1** / $7.5 million investment in LJM1 by CSFB affiliate (ERNB) | |
| | 1 M&A advisory engagement | |
| July 1999 | 3 M&A advisory engagements | |
| August 1999 | 1 lending transaction | |
| | 1 M&A advisory engagement | 1 lending transaction |
| | | 1 M&A advisory engagement |
| September 1999 | 1 lending transaction | **WHITEWING** / Rule 144A offering of $1.4 billion of debt and private placement of $100 million of equity |
| | **LJM1** / $25 million bridge loan | |
| October 1999 | | |
| November 1999 | 1 M&A advisory engagement | |
| | | 1 private placement |
| December 1999 | **LJM2** / $10 million commitment to invest equity in LJM2 | **LJM2** / $5 million commitment to invest equity in LJM2 |

- 14 -



|  | CSFB | DLJ |
|---|---|---|
| | | **IGUANA** / Rule 144A offering of $202 million of debt and private placement of $6.4 million of equity |
| | **JEDI** / $513.5 million loan facility to a subsidiary of JEDI with a $128.3 million commitment (reduced to $27.5 million after syndication) | |
| | **LJM1** / $45.1 million investment in LJM1 by CSFB affiliate (ERNB) from proceeds of SAILS transaction | |
| January 2000 | | |
| | | 1 private placement |
| | | 1 M&A advisory engagement |
| February 2000 | 1 public offering | |
| | | 1 public offering |
| March 2000 | **LJM1** / Sale of ERNB interest in Swap Sub to Southampton | |
| | 1 private placement | |
| April 2000 | | |
| May 2000 | 2 lending transactions | |
| | | 1 lending transaction |
| | 1 M&A advisory engagement | |
| June 2000 | | |
| | | **WHITEWING** / proposed transaction in which Osprey would acquire Marlin |
| July 2000 | | **WHITEWING** / private placement of $70 million Osprey certificates |
| | **LJM2** / $10 million commitment in $65 million credit facility | **WHITEWING** / Rule 144A offering of $95 million in debt and private placement of $30 million in equity (monetization of Margaux swap) |
| | | 1 private placement |
| August 2000 | | |
| September 2000 | | |
| October 2000 | 1 public offering | |
| | | 1 public offering |
| | **WHITEWING** / Rule 144A offering of $750 million and €315 million of debt and private placement of $50 million of equity of Osprey | **WHITEWING** / Rule 144A offering of $750 million and €315 million of debt and private placement of $50 million of equity of Osprey |
| | **JEDI** / increased commitment to $50 million (from $27.5 million) in connection with extension of maturity of December 1999 $513.5 loan facility to a subsidiary of JEDI | |
| November 2000 | | |

**CSFB / DLJ MERGER**

| | | |
|---|---|---|
| | **LJM2** / $30 million commitment in $120 million 4.5-year revolving credit facility | |
| December 2000 | 1 M&A advisory engagement | |
| | 2 "other" transactions (synthetic leases) | |
| | **CSFB PREPAY** / $150 million oil swap with maturity in September 2001 | |
| January 2001 | | |
| February 2001 | | |

- 15 -



ENRON FILED CHAPTER 11

*CSFB's Role as Underwriter,[51] Lender and Investor*

Since 1997, CSFB has acted as an underwriter in over 30 Enron-related

transactions, including public offerings and private placements of notes, certificates and

---

[51] Federal law defines "underwriter" as "any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security." 15 U.S.C. § 77b(a)(11); *Ackerberg v. Johnson*, 892 F.2d 1328, 1335 (8th Cir. 1989). This Appendix uses the term more broadly to include private placements but to exclude syndications of commercial loans. *See* Report, Appendix A (Defined Terms).

stock.[52]   At least eight of these transactions involved SPEs.[53]   CSFB derived at least

$94.1 million in fees and other payments from this work, including at least $30.7 million

in fees from underwriting SPE-related issuances and private placements.[54]

---

[52] CSFB's Supplemental Responses. *See, e.g.*, Azurix Corp. Form S-1/A Amendment No. 4 filed with the SEC on June 9, 1999, at 186; Enron Corp. Form S-3 filed with the SEC on Apr. 21, 1998, at 10; Enron Corp. Form S-3/A filed with the SEC on Feb. 3, 1999, at 3; CSFB Press Release, "Credit Suisse First Boston acts as co-manager on a $600 million equivalent transaction for Azurix Corp.," Feb. 11, 2000 [CSFBCO 000723424].

[53] CSFB's Supplemental Responses. *See, e.g.*, Engagement letter from DLJ, BT Alex Brown, Inc., and Chase Securities, Inc. to Ray Bowen, Enron, Dec. 28, 1999, regarding private placement of certificates in the Firefly Trust [CSFBCO 005510612-CSFBCO 005510620]; Osprey Trust Certificate Purchase Agreement, Sept. 16, 1999, regarding the sale of $100 million of Certificates of Beneficial Ownership [CSFBCO 000034547-CSFBCO 00034570]; Memorandum from Dwight Scott, Managing Director, Larry Nath, Managing Director, Dominic Capolongo, Managing Director, *et al.*, DLJ, to the Banking Review Committee, DLJ, Oct. 26, 1999, regarding the issuance of $725 million linked Enron obligations by Yosemite Securities Trust I, at 1 (noting the private placement of $75 million of trust certificates) [CSFBCO 000558567-CSFBCO 000558568]; CSFB U.S. Debt Capital Markets Update, July 13, 2001, at 1-2, 5 (noting CSFB's completion of Marlin II debt offering) [CSFBCO 005396059-CSFBCO 005396064].

[54] CSFB's Supplemental Responses.

Over the same period, CSFB participated in at least 54 revolving credit facilities and other lending transactions for the benefit of Enron.[55] These transactions demonstrate the breadth of CSFB's relationship with Enron and include many different products such as synthetic lease transactions,[56] loans for project finance purposes,[57] a bridge loan to an SPE[58] and participation in various loan syndicates.[59]

---

[55] Id. See, e.g., Memorandum from James Moran, Director, CSFB, to Ed Devine, Managing Director, CSFB, Mar. 23, 2000, regarding the extension of the maturity of CSFB's participation in the $727.5 million liquidity facility [CSFBCO 000238071-CSFBCO 000238073]; Credit Approval Request for JEDI II $500 Million Revolving Credit Facility, submitted by James Moran, Director, Robert Furst, Director, and Scott Karro, Associate, CSFB, May 11, 1998 [CSFBCO 005423610-CSFBCO 005423615]; Memorandum from James Moran, Director, and David Koczan, Assistant Vice President, CSFB, to David Maletta, Managing Director, and Ed Devine, Managing Director, CSFB, Sept. 12, 2000, regarding LJM2 Co-Investment, L.P. (requesting approval to participate $30 million in a $150 million 4.5-year revolving credit facility) [CSFBCO 005356783-CSFBCO005356789].

[56] CSFB's Supplemental Responses. See, e.g., Memorandum from James Moran, Director, and David Koczan, Assistant Vice President, CSFB, to David Maletta, Managing Director, and Ed Devine, Managing Director, CSFB, Nov. 16, 2000, regarding renewal of existing Enron Corp. $170 million synthetic lease [CSFBCO 005423703-CSFBCO 005423706]. See also Memorandum from Osmar Abib, Managing Director, Adebayo Ogunlesi, Head of Energy Group, et al., CSFB, to Bob O'Brien, Chief Credit Officer, David Maletta, Managing Director, and Ed Devine, Managing Director, CSFB, Nov. 7, 2000 (the "Nov. 7, 2000 Credit Memorandum"), at CSFBCO 000044702 [CSFBCO 000044687-CSFBCO 000044705].

[57] CSFB's Supplemental Responses. See, e.g., Draft Letter from Lars Bespolka, Director and Regional Head, Global Power, Utilities, & Project Finance, and Bonnie Wu, Vice President, Corporate Communications, Pacific Region, CSFB, Aug. 1999, regarding CSFB's Asia-Pacific Global Power, Utilities, & Project Finance Group: Mid-Year Update (referencing $763 million credit facilities for Dabhol Phase II Power Project) [CSFBCO 005128880-CSFBCO 005128883]; Enron North America Corp., $600,000,000 Electric Generating Development and Construction Program, Confidential Information Memorandum, Mar. 7, 2001 [CSFBCO 005526576-CSFBCO 005526700].

[58] CSFB's Supplemental Responses. See, e.g., Memorandum from Rick Ivers, Managing Director, CSFB, and Mary Beth Mandanas, Associate, CSFB, to David Maletta, Managing Director, CSFB, Sept. 13, 1999, regarding LJM Cayman bridge loan for $25 million [CSFBCO 000020699-CSFBCO 000020700].

[59] CSFB's Supplemental Responses. See, e.g., Joint Energy Development Investments Limited Partnership, Confidential Information Memorandum, $513,500,000 Term Loan, Oct. 1999 [CSFBCO 000060832-CSFBCO 000060857]; Memorandum from James Moran, Director, and David Koczan, Assistant Vice President, CSFB, to David Maletta, Managing Director, and Ed Devine, Managing Director, CSFB, May 8, 2000, regarding approval of $75 million commitment to two revolving credit facilities aggregating $3.0 billion (the "May 8, 2000 Credit Memorandum") [CSFBCO 000208525-CSFBCO 000208534]; Memorandum from Adebayo Ogunlesi, Head of Energy Group, et al., CSFB, to the Credit Committee, CSFB, Nov. 11, 1999, regarding $128.38 million share of $513.5 million term loan to a subsidiary of JEDI (the "Nov. 19, 1999 Credit Memorandum") [CSFBCO 000722557-CSFBCO 000722570]; Memorandum from James Moran, Director, and David Koczan, Assistant Vice President, CSFB, to Ed Devine, Managing Director, CSFB, May 16, 2001, regarding approval to participate in renewal of Enron's existing $1.75 billion 364-day credit facility and in a new two-year $500 million letter of credit facility (the "May 16, 2001 Credit Memorandum") [CSFBCO 005423487-CSFBCO 005423491]; Joint Energy Development Investments Limited Partnership, Confidential Information Memorandum,

- 18 -

CSFB also made or committed to make investments that were purported to be equity investments aggregating approximately $129.1 million in various Enron-related entities, including LJM1 ($7.5 million and $45.1 million),[60] LJM2 ($15 million),[61] the issuer of debt and equity in the Iguana transaction ($6.4 million),[62] the issuer of debt and equity in the Nile transaction ($1.0 million)[63] and the issuer of debt and equity in the Nikita transaction ($8.1 million).[64]  A DLJ subsidiary and a dozen then-DLJ employees also invested in the Osprey Trust, the issuing entity in the Whitewing Transaction, through a vehicle named OA Investments, LLC, in amounts ranging from between

---

$120,000,000 Revolving Credit, $205,000,000 Term Loan, Nov. 1998 [CSFBCO 005505917-CSFBCO 005505977].

[60] *Id.  See, e.g.*, Memorandum from Robert Furst, Director, CSFB, to Michael Gilligan, CSFB, July 8, 1999, regarding $7.5 million investment in LJM Cayman, L.P. (the "July 8 Memorandum") [CSFBCO 005522746-CSFBCO 005522747]; Memorandum from Mary Beth Mandanas, Vice President, CSFB, to Adebayo Ogunlesi, Head of Investment Banking, Robert Jeffe, Managing Director, and Osmar Abib, Managing Director, CSFB, June 19, 2001, regarding LJM Investment Overview (the "LJM Investment Overview") [CSFBCO 000521536-CSFBCO 000521538]; Memorandum from Mary Beth Mandanas, Vice President, and Jaime Casas, Associate, CSFB, to Tony James, Co-Head of Investment Banking, and Chuck Ward, Co-Head of Investment Banking, CSFB, July 18, 2001, regarding LJM financing (the "LJM Financing Memorandum"), at 1 [CSFBCO 000545978-CSFBCO 000545986]; Memorandum from Mary Beth Mandanas, Associate, CSFB, to Chuck Ward, Co-Head of Investment Banking, *et al.*, CSFB, Dec. 8, 1999, regarding LJM Cayman, L.P. (the "Dec. 8, 1999 Mandanas Memorandum"), at CSFBCO 000009613 (discussing the use of $45.1 million proceeds from SAILS transaction to repay LJM debt) [CSFBCO 000009612-CSFBCO 000009616].

[61] *See, e.g.*, LJM Investment Overview; Memorandum from Adebayo Ogunlesi, Head of Energy Group, Rick Ivers, Managing Director, CSFB, and Mary Beth Mandanas, Associate, CSFB, to Richard E. Thornburgh, Vice Chairman of the Executive Board and CFO, Chuck Ward, Co-Head of Investment Banking, *et al.*, CSFB, Dec. 15, 1999 [CSFBCO 000019419-CSFBCO 000019421]; LJM Financing Memorandum, at 1.

[62] CSFB's Supplemental Responses. *See, e.g.*, Memorandum from Dwight Scott, Managing Director, *et al.*, DLJ, to Rob Grien, *et al.*, DLJ, Dec. 9, 1999, regarding request for approval for equity investment in Iguana Limited Company (which at the time such Memorandum was prepared was to be in the amount of $6.75 million), at 2 [CSFBCO 000125486-CSFB 000125496].

[63] *See* Project Nile, Series A, Asset Notice, Sept. 28, 2001, at CSFBCO 000581626 (noting $1 million proposed equity amount) [CSFBCO 000581626-CSFBCO 000581629].

[64] CSFB's Supplemental Responses. *See* Memorandum from James Moran, Director, and David Koczan, Assistant Vice President, CSFB, to Robert O'Brien, Chief Credit Officer, David Maletta, Managing Director, and Ed Devine, Managing Director, CSFB, Oct. 10, 2001, regarding CSFB's participation in Project Nile and Project Nikita (which at the time such Memorandum was prepared was to include an equity participation in the amount of $8.5 million), at 5 (the "Oct. 10, 2001 Credit Memorandum") [CSFBCO 000215804-CSFBCO 000215822].

- 19 -

$200,000 and $35,000 for the employee investors to $42.5 million for the DLJ subsidiary.[65]

**B.     CSFB's Knowledge of Enron's Financial Condition**

CSFB possessed detailed knowledge of Enron's operations through its many contacts with the company and the due diligence that it completed in connection with its over thirty underwritings of Enron securities.[66]  Through its involvement in Enron's many failed assets sales, CSFB had first-hand knowledge that many of Enron's assets could not be sold at prices that would avoid requiring Enron to record a loss.[67]  Through its investments in LJM1[68] and LJM2,[69] CSFB was aware of Enron's use of non-economic hedges, such as those in the LJM1/Rhythms Hedging Transaction[70] and the LJM2/Raptor Hedging Transactions,[71] and asset warehousing transactions such as Cuiaba,[72] and how these transactions benefited Fastow and other Enron officers personally.[73]  Through its participation in the Share Trust Transactions[74] and in equity derivative transactions with Enron and its knowledge of Enron's use of non-economic hedges, CSFB also was aware

---

[65] CSFB's Supplemental Responses, at 9; *see also* Schedule A (as amended), OA Investments Limited Liability Company Agreement, Oct. 4, 2000, at CSFBCO 000559398 [CSFBCO 000559398-CSFBCO 000559401].  The aggregate amount invested by the ten DLJ employees was $1 million. *Id.*

[66] *See Summary of CSFB's Transactions with Enron* above.

[67] *See CSFB's Knowledge that Many of Enron's Assets were Overvalued and Illiquid* below.

[68] *See LJM1 Transactions* below.

[69] *See* Second Interim Report, Annex 4 to Appendix L (Related Party Transactions).

[70] *See* Second Interim Report, Annex 2 to Appendix L (Related Party Transactions).

[71] *See* Second Interim Report, Annex 5 to Appendix L (Related Party Transactions).

[72] *See* Second Interim Report, Annex 3 to Appendix L (Related Party Transactions).

[73] *See General Background on LJM1* below.

[74] *See* Second Interim Report, Appendix G (Whitewing Transaction).

of the many negative consequences that a decline in Enron's common stock price would have.[75]

Senior CSFB representatives who were charged with the day-to-day responsibility for CSFB's relationship with Enron, as well as those who oversaw these individuals, included, at various times, Managing Director Osmar Abib ("Abib"), Managing Director Robert Jeffe ("Jeffe"), who was also at one time the co-chairman of CSFB's Energy Group,[76] Adebayo Ogunlesi ("Ogunlesi"), who at the time headed CSFB's Energy Group[77] and later became head of investment banking for CSFB, and Director Robert Furst ("Furst").[78]

*CSFB's Awareness of Enron's Off-Balance Sheet Financings*

Through its participation in the Share Trust Transactions, the FAS 140 Transactions, the CSFB Prepay, and equity derivative transactions with Enron and through its many contacts at Enron, CSFB knew that Enron's financial statements did not

---

[75] See *CSFB's Awareness of the Importance of Enron's Stock Price* below.

[76] Sworn Statement of Robert A. Jeffe, former Managing Director, CSFB, to Frank G. Smith, A&B, Oct. 8, 2003 (the "Jeffe Sworn Statement"), at 6, lines 17-25.

[77] Sworn Statement of Adebayo Ogunlesi, Head of Investment Banking, CSFB, to M. Russell Wofford, A&B, May 19-20, 2003 (the "Ogunlesi Sworn Statement"), at 12, line 2 – 13, line 4. Ogunlesi was promoted from the Head of the Energy Group to the Head of Investment Banking in February 2002. *Id.* at 12, lines 11-16.

[78] Jeffe Sworn Statement, at 19, lines 19-24. After leaving CSFB, Furst was employed by Merrill Lynch. Abib Sworn Statement, at 18, lines 20-25. The SEC filed an enforcement action against Merrill Lynch and four former senior executives, including Furst, on March 17, 2003. Complaint, *SEC v. Merrill Lynch & Co.*, No. 03-CV-946 (S.D. Tex. filed Mar. 17, 2003) (the "SEC Complaint"). Furst asserted his Fifth Amendment rights and refused to provide testimony to the SEC regarding Merrill Lynch's dealings with Enron on August 21, 2002. SEC Complaint, ¶ 12. On April 18, 2003, Furst's counsel stated that Furst would also assert his Fifth Amendment privilege if called to testify by the Examiner. Letter from Ira Lee Sorkin, Carter Ledyard & Milburn LLP, to Steven M. Collins, A&B, Apr. 18, 2003 [AB0786 02601]. Since that time, Furst has been indicted for Conspiracy to Commit Wire Fraud and Falsify Books and Records, on account of his role in the "Nigerian Barge" transaction between Enron and Merrill Lynch. *United States v. Bayly et al.*, Cr. No. H-03-CR-363 (S.D. Tex. filed Sept. 16, 2003).

reflect as debt at least $4.5 billion in off-balance sheet obligations.[79] Moreover, CSFB

was aware that many of these transactions were exceedingly complex and not transparent

to the marketplace. For example, in July 1999, Carmen Marino ("Marino"), then a

Managing Director at CSFB, sent an email in which he noted that "running a pipeline

business can't take much time – Enron seems to spend all its available man hours on

various, convoluted financing schemes."[80] In November 2000, after reviewing Enron's

Quarterly Report on Form 10-Q for the quarter ended September 30, 2000, Philip Salles

("Salles"), an equity analyst at CSFB, wrote an email to Curt Launer ("Launer")

containing what Salles described as "fun facts" from that Quarterly Report, including

excerpts from Enron's disclosure of certain Related Party Transactions, which Salles

described as being "clear as mud. . . ."[81]

---

[79] For example, the Whitewing, Marlin and Firefly Share Trust Transactions provided an aggregate of over $4.2 billion of financing to Enron. *See* Second Interim Report, at 67-78; Second Interim Report, Annex 2 to Appendix G (Whitewing Transactions). As discussed in this Appendix, the CSFB Prepay and the Nile transaction provided $150 million and $25 million of financing to Enron, respectively. The Nikita transaction provided approximately $80 million of financing to Enron. *See* Second Interim Report, Annex 2 to Appendix M (FAS 140 Transactions). The Iguana transaction provided approximately $202 million of financing to Enron. *See* CSFB's Supplemental Responses.

[80] Email from Carmen Marino, Managing Director, CSFB, to Tim Bock, Managing Director, CSFB, July 28, 1999 (the "July 28, 1999 Marino Email") [CSFBCO 000019283]. Marino testified that this statement was intended to be "tongue and cheek." *See* Sworn Statement of Carmen Marino, former Managing Director, CSFB, to Frank G. Smith, A&B, Sept. 25, 2003 (the "Marino Sworn Statement"), at 48, lines 5-18.

[81] Email from Philip Salles, CSFB, to Curt Launer, Managing Director, CSFB, Nov. 26, 2000, at 1 [CSFBCO 005255148-CSFBCO 005255149]. Additional documents demonstrate CSFB's knowledge of Enron's financial condition:

- On September 16, 1999, Wesley Jones, a Vice President in CSFB's Global Energy and Project Finance Group, emailed Jonathan Yellen, a CSFB Investment Banking Vice President (later Director), referring to Osprey as "a vehicle enabling Enron to raise disguised debt which appears as equity on Enron's balance sheet" and stating that "Osprey serves the added purpose for Enron of being an off balance sheet parking lot for certain assets." Email from Wesley Jones, Vice President, CSFB, to Jonathan Yellen, Vice President, CSFB, Sept. 16, 1999, at 1 (Ex. 302 to Abib Sworn Statement) [CSFBCO 005129123-CSFBCO 005129124]. Jones testified that he did not work on Osprey and that he was getting "second- or third-hand information." Sworn Statement of Wesley Jones, former Vice President, CSFB, to M. Russell Wofford, A&B, Apr. 29, 2003, at 23, lines 3-17. He also testified that it was his understanding that "the structure had obligations back to Enron, which had the effect of making this transaction less of an issuance of convertible preferred stock and more some hybrid instrument that had debt-like features." *Id.* at 32, line 19 –

*CSFB's Knowledge that Many of Enron's Assets were Overvalued and Illiquid*

CSFB was aware that many of Enron's assets were overvalued. Enron repeatedly retained CSFB to assist Enron with the sale of many of Enron's "non-core" assets over a sustained period of time, but CSFB had no success in its attempts to sell these assets.[82] It

---

33, line 7. Ogunlesi testified that it would not have concerned him to receive an email such as this discussing "disguised debt," because "the rating agencies seemed to be fully aware of what Enron was doing." Ogunlesi Sworn Statement, at 131, line 13 – 132, line 7.

- In emails between Yellen and Abib, in light of Enron's "latest travails," recounted Abib's "ominous warnings 2 years ago that the 'house of cards' may some day collapse." Yellen concluded with "hopefully, we're still making good money on that account, anyway. [I]t seems like we are." Email from Jonathan Yellen, Director, CSFB, to Osmar Abib, Managing Director, CSFB, Oct. 19, 2001, at 1 [CSFBCO 005122908-CSFBCO 005122909]. In his response, Abib noted "P.S. We are still making $$$ at ENE but look out!" Email from Osmar Abib, Managing Director, CSFB, to Jonathan Yellen, Director, CSFB, Oct. 21, 2001 [CSFBCO 005122670]. Yellen testified that he had a "very vague recollection" that, in describing "Enron" as a "house of cards" in 1999, Abib did not refer to Enron's financial viability, but to the quality of the relationship at that time between Enron and CSFB. Sworn Statement of Jonathan Yellen, Director, CSFB, to Jason Sneed, A&B, Apr. 29, 2003 (the "Yellen Sworn Statement"), at 148, line 3 – 152, line 5. Abib testified that he did not recall what he meant by his reference to a "house of cards," but following a brief recess during his testimony, testified that he, too, believed that he had been referring to the Enron-CSFB relationship. Abib Sworn Statement, at 497, line 7 – 506, line 13.

- In an email, Salles stated to Launer, on the heels of the announcement that Dynegy would acquire Enron, that "ENE just could never tell the truth. ... A year from now we will talk about ... Enron greed (of a few) and fair value accounting." Email from Philip Salles, CSFB, to Curt Launer, Managing Director, CSFB, Nov. 11, 2001, at 1 [CSFBCO 006090157 – CSFBCO 006090158].

- Mike Powell, a Director in Energy & Project Finance Banking, sent an email to multiple addressees, including Abib, Moran and Welch, in which he said that he doubted Dynegy would keep Enron's global water business post-acquisition of Enron "given the need for Dynegy to conduct a public style clean-up of the Stygian Stables." Email from Mike Powell, Director, CSFB, to Mark Seligman, *et al.*, CSFB, Nov. 12, 2001 [CSFBCO 000094856-CSFBCO 000094857]. "Stygian" means "dark and gloomy," "infernal," or, in invoking the mythical river Styx, "hellish." American Heritage Dictionary of the English Language New College Edition 1280 (1969). Powell, the author of this reference, perhaps meant "Augean stables," the cleansing of which in a single day the mythical hero Hercules accomplished by diverting two nearby rivers – thus completing the fifth of twelve labors assigned by King Eurystheus. The Labors of Hercules, *available at* http://www.perseus.tufts.edu/Hercules/labors.html. Abib testified that he was not familiar with the phrase "Stygian Stables," but understood this statement by Powell to mean that if the merger between Enron and Dynegy were to be completed, strategic alternatives for Azurix would need to be considered as he did not believe that Azurix would be a core business for Dynegy. Abib Sworn Statement, at 517, line 18 – 158, line 11.

[82] Abib Sworn Statement, at 212, lines 4-25; Sworn Statement of Jamie Welch, Managing Director, CSFB, to Frank G. Smith, A&B, May 28, 2003 (the "Welch Sworn Statement"), at 167, line 24 – 168, line 14. Welch, for example, spent over half of his time from mid-2000 until Enron's bankruptcy trying to sell Enron assets without closing a single deal. As Welch testified:

appears that CSFB's efforts failed to succeed because the assets involved would not command a market price that would avoid requiring Enron to record a loss upon the sale of the assets.[83] Further, in April 2001, after months of attempting to sell many of Enron's international assets without success, CSFB considered purchasing, through one of its private equity funds, a 50% interest in a portfolio of those assets[84] for between $1.9 and $2.1 billion, an amount that was materially less than Enron's book value for the assets.[85]

---

> Q: And from the middle of 2000 through the end of 2000 through November of 2001 you spent half or more of your time trying to sell Enron businesses did you not?
>
> A: Yes.
>
> Q: And with all due respect you were remarkably unsuccessful in that regard. Correct?
>
> A: Yes.
>
> . . .
>
> Q: Remarkably, given the efforts he expended and his clear expertise as an M&A investment banker. That's what I meant by it. I think that's the way Mr. Welch understood it.
>
> A: Yes.

*Id.* at 167, line 24 – 168, line 7.

[83] Jeffe Sworn Statement, at 95, lines 6-18. Jeffe testified about the valuation of the assets of which Enron was seeking to dispose:

> Q.   What did you mean by valuation of the assets?
>
> A.   Enron's expectation of value versus what the buyer was prepared to pay.
>
> Q.   Enron expected to receive meaningfully more money for the assets than others were willing to pay for them?
>
> A.   Yes.
>
> Q.   Did you have an understanding that Enron did not want to dispose of any assets at a loss?
>
> A.   I believe that's true, yes. They did not want to impair their equity.

*Id.*

[84] *See* CSFB Materials Prepared for Discussion: Project Cardinal, Apr. 25, 2001, at 7 (the "Project Cardinal Presentation") (Ex. 557 to Welch Sworn Statement) [CSFBCO 005145569-CSFBCO 005145621]; Welch Sworn Statement, at 85, line 20 – 86, line 20. *See generally* Abib Sworn Statement, at 201, line 6 – 202, line 11.

[85] *See* Project Cardinal Presentation, at 29-39; Welch Sworn Statement, at 92, line 13 – 97, line 10. Although CSFB projected an internal rate of return on its investment of over 30%, CSFB did not make an offer for the assets, because "[CSFB private equity's] view was the size of this investment, notwithstanding the relative returns, was not an investment they thought they were prepared to undertake." Welch Sworn Statement, at 86, lines 21-22 and 102, lines 16-25.

- 24 -

CSFB also understood that Enron owned numerous illiquid assets and that Enron was in substantial need of liquidity to meet its financial obligations.[86] Enron's inability to raise cash from the assets posed financial problems for Enron, about which CSFB was fully aware.[87]

*CSFB's Awareness of the Importance of Enron's Stock Price*

CSFB was aware that the price of Enron's common stock was important to Enron's continued financial stability because it was essential to the LJM1/Rhythms Hedging Transaction between Enron and an affiliate of LJM1 with respect to Enron's Rhythms NetConnections, Inc. ("Rhythms") stock.[88] A significant decline in the price of Enron stock held by the affiliate of LJM1 would render the LJM1/Rhythms Hedging Transaction worthless. Further, CSFB knew that, unless the value was realized in another manner, maintenance of the price of the Enron stock held by LJM1 was essential if it, RBS and Fastow were to profit from their investments in LJM1.[89]

---

[86] *See* Presentation to Enron – Contract Monetization Alternatives, Aug. 24, 2001, at 2 (noting CSFB's understanding that one of Enron's objectives is to "[r]aise $1 billion of deployable cash") [CSFBCO 000548124-CSFBCO 000548143]; Email from Dominic Capolongo, Managing Director, CSFB, to Jill Sakol, Associate, CSFB, Oct. 23, 2001 [CSFBCO 005301349]; Email from Osmar Abib, Managing Director, CSFB, to Jeffrey Hamilton, CSFB, Oct. 28, 2001 ("Enron needs liquidity and is willing to take a lower sales price from CSFB Private Equity if we can move very quickly in return for an upside sharing ratio once we sell the business to a strategic buyer.") [CSFBCO 000194562].

[87] *See* Call Report by Robert Jeffe, June 11, 2001, regarding meeting with Fastow ("Importance of divestitures – while they want to sell the assets for which we've had these ongoing engagements for over a year, they are prepared to do structured transactions to take out cash and get them off balance sheet.") (Ex. 268 to Abib Sworn Statement) [CSFBCO 005725130]; Abib Sworn Statement, at 201, line 6 – 203, line 2 (stating that "it's a statement of fact that the inability to produce material proceeds from divestitures will have a negative impact on liquidity"); *see also* Ogunlesi Sworn Statement, at 117, line 6 – 118, line 22 (regarding Nov. 2, 2001 meeting to discuss Enron's liquidity situation).

[88] *See* Sworn Statement of Mary Beth Mandanas, Vice President, CSFB, to Frank G. Smith, A&B, Apr. 22-23, 2003 and Sept. 23, 2003 (the "Mandanas Sworn Statement"), at 88, line 23 – 92, line 8 and 190, line 4 – 192, line 3. Mandanas was promoted from Associate to Vice President in January 2000.

[89] *See* Email from Carmen Marino, Managing Director, CSFB, to Robert Furst, Director, Richard Ivers, Managing Director, *et al.*, CSFB, July 6, 1999, outlining monetization alternatives for "LJM Partners" (the "July 6, 1999 Marino Email") [CSFBCO 000049286-CSFBCO 000049287].

CSFB was also aware that the price of Enron's common stock was important to Enron's continued financial stability because it was essential to the credit support for the Marlin and Whitewing Share Trust Transactions and Enron's equity derivative transactions.

*CSFB's Knowledge of Enron's Financial Condition Immediately Prior to the Bankruptcy*

CSFB's understanding of Enron's financial condition is also illustrated by CSFB's conduct in the final months leading up to Enron's bankruptcy. As Enron's stock price continued to decline, Fastow met with representatives of CSFB, including Abib, Jeffe, Jamie Welch ("Welch") and Paul Davis ("Davis"), on June 20, 2001, to discuss a strategy to improve the market performance of Enron's stock.[90]

Shortly after the June 20, 2001 meeting between Fastow and the CSFB bankers, CSFB began to prepare a presentation to Enron that would outline strategic alternatives for Enron.[91] According to CSFB witnesses, CSFB presented a proposal to Fastow on August 27, 2001 to divide Enron into two companies – one regulated and one not regulated.[92] According to the call report prepared by Jeffe[93] and to other CSFB

---

[90] Call Report by Robert Jeffe, Managing Director, CSFB, June 20, 2001, regarding meeting with Fastow and Glisan [CSFBCO 005725156].

[91] *See* Email from Chris Hearn, Vice President, CSFB, to Jamie Welch, Managing Director, CSFB, July 10, 2001, regarding outline for July 16 meeting with Enron, at 1 [CSFBCO 005394817-CSFBCO 005394818].

[92] Abib Sworn Statement, at 442, line 19 – 444, line 3; *see also* Jeffe Sworn Statement at 70, line 15 – 72, line 10; Welch Sworn Statement, 127, line 2 – 135, line 20.

[93] Call Report by Robert Jeffe, Managing Director, CSFB, Aug. 27, 2001, regarding meeting with Fastow (the "August 27, 2001 Call Report") (Ex. 320 to Abib Sworn Statement) [CSFBCO 005725129]; CSFB Presentation Regarding Project Cleaver, Aug. 22, 2001, at 2 [CSFBCO 00521498-CSFBCO 000521522]. In addition to the foregoing copy of the presentation, four other versions of the presentation exist – Aug. 15, Aug. 21, Aug. 30 and Oct. 19, 2001, respectively. *See* CSFB Presentation Regarding Project Cleaver, Aug. 15, 2001 [CSFBCO 000521432-CSFBCO 000521456]; CSFB Presentation Regarding Project Cleaver, Aug. 21, 2001 [CSFBCO 000547020-CSFBCO 000547045]; CSFB Presentation Regarding Project Cleaver, Aug. 30, 2001 [CSFBCO 000521481-CSFBCO 000521497]; CSFB Presentation Regarding Project Cleaver, Oct. 19, 2001 (the "Oct. 19, 2001 Cleaver Presentation")

witnesses, Fastow disclosed to CSFB during the presentation that Enron's total on- and off-balance sheet debt was $36 billion.[94] CSFB witnesses have testified that this is the first time CSFB learned Enron's indebtedness was of this magnitude.[95]

Following the August 27, 2001 meeting, CSFB accelerated the process of reducing its exposure to Enron. For example, CSFB: (i) decided to reduce its "Enron

---

[CSFBCO 000521457-CSFBCO 000521480]. While all the reports state that CSFB's analysis is based "solely on publicly available data," the Oct. 19, 2001 presentation is unique in that it explicitly "[i]ncorporates no recognition or restructuring of existing off-balance sheet obligations." Oct. 19, 2001 Project Cleaver Presentation, at 2; *see also* Spider Call Report by Osmar Abib, Managing Director, CSFB, Aug. 21, 2001, regarding meeting with Fastow [CSFBCO 000547004]; Email from Osmar Abib, Managing Director, CSFB, to Robert Jeffe, Managing Director, CSFB, Aug. 21, 2001 ("we should focus on … the potential split up of the company into reg and unreg pieces") [CSFBCO 000547504].

[94] *See* August 27, 2001 Call Report; Abib Sworn Statement, at 434, line 7 – 435, line 20. Welch testified that his notes taken at the meeting indicated that a total debt amount of $30 billion, rather than $36 billion, was disclosed. Welch Sworn Statement, at 173, lines 6-20. Jeffe noted at the end of the August 27, 2001 Call Report that "[a]s far as balance sheet issues, we need to talk with Tim DeSpain." August 27, 2001 Call Report. Jeffe testified that he did not subsequently discuss balance sheet issues with DeSpain. Jeffe Sworn Statement, at 80, lines 17-25. On August 30, 2001, Abib emailed Jeffe and others, indicating that he had spoken with DeSpain but had not yet received information from him. Email from Osmar Abib, Managing Director, CSFB, to Chris Hearn, Vice President, CSFB, Aug. 30, 2001 (Ex. 323 to the Abib Deposition) [CSFBCO 0050006619]. Abib described this email as:

> an attempt to follow up on [the August 27, 2001] meeting to see where he stood with the information that Mr. Fastow and Mr. DeSpain said they would endeavor to deliver to us, and this is the response we got back when we followed up. To my knowledge, we never received any detail as to what was the right number, what did it really mean, where was it, what assets might be offsetting it, all those sorts of things. We just never got any more information or details from anybody in Enron to my knowledge.

Abib Sworn Statement, at 450, lines 13-23.

[95] Abib Sworn Statement, at 435, lines 9–20 and 441, line 22 – 442, line 2; Jeffe Sworn Statement, at 75, line 20 – 76, line 4. Jeffe stated that, prior to this meeting, he thought Enron's debt was "on-balance sheet . . . 12 or 13 [billion dollars] . . . and maybe 3 or 4 [billion dollars] off-balance sheet." Jeffe Sworn Statement, at 76, lines 8-10. Jeffe testified that:

> We had been asking for sometime [sic] for detailed financial projections and balance sheet, consolidated balance sheet data, and they had never provided us the information, and in fact this was one of several meetings we were having with Fastow where he was going to provide us with these numbers. He did not provide us with anything, and I recall – I was irritated because we brought everyone down there to have this serious discussion with him and there was no information. And we finally pressed him and we said, "Look, can you give us at least one number? What is your total debt?" And this was the first time we had any sense that they had that much debt.

*Id.* at 75, lines 9-23.

exposure" to $500 million[96] and then to $300 million[97] (and in fact reduced it to $167 million),[98] in October and November;[99] (ii) completed the Nile transaction and

---

[96] *See* Memorandum from Osmar Abib, Managing Director, Robert Jeffe, Managing Director, *et al.*, CSFB, to Tony James, Co-Head of Investment Banking, CSFB, Oct. 9, 2001, regarding meeting with Fastow, Mark Frevert, and Greg Whalley on October 10, 2001 (the "Oct. 10, 2001 Memorandum to James"), at 1 ("CSFB's internal credit team has determined that this net exposure position needs to be reduced to $500 million by the end of October.") [CSFBCO 000553330-CSFBCO 000553333]. Jeffe testified that at the time this memorandum was issued, the need to reduce exposure "was an ongoing issue with Enron. It was an ongoing issue with all large companies." Jeffe Sworn Statement, at 87, line 8 – 89, line 3.

[97] *See* Email from James Moran, Director, CSFB, to Adebayo Ogunlesi, Head of Energy Group, Oct. 22, 2001, regarding credit meeting concerning Enron [CSFBCO 005157362].

[98] Enron Credit Overview as of November 29, 2001 [CSFBCO 005422943].

[99] One method employed by CSFB to reduce its net Enron credit exposure was the purchase of credit default protection. Between September 10, 2001 and October 17, 2001, CSFB purchased credit default protection totaling $253 million. *See* Confirmation from CSFBi to The Toronto-Dominion Bank, Sept. 17, 2001 ($20 million) (the "Toronto-Dominion Bank Confirmation") [CSFBCO 006272644-CSFBCO 006272652]; Confirmation from Deutsche Bank to CSFB, Sept. 24, 2001 [CSFBCO 006272287-CSFBCO 006272290]; Letter from Deutsche Bank to CSFB, Dec. 7, 2001, regarding credit event notice and notice of publicly available information, at 2 (confirming the Sept. 24, 2001 purchase of credit default protection in the amount of $15 million) [CSFBCO 006272359-CSFBCO 006272364]; Confirmation from Credit Suisse First Boston Corporation ("CSFB Corp.") to CSFB and CSFBi, Oct. 1, 2001 ($25 million) [CSFBCO 006272629-CSFBCO 006272636]; Confirmation from CSFB Corp. to CSFBi and Transamerica Life Insurance Corporation, Oct. 11, 2001 ($10 million) [CSFBCO 006272614-CSFBCO 006272621]; Confirmation from CSFB Corp. to CSFBi and Transamerica Life Insurance Corporation, Oct. 11, 2001 ($5 million) [CSFBCO 006272622-CSFBCO 006272628]; Confirmation from CSFB Corp. to CSFB and CSFBi, Oct. 5, 2001 ($12.5 million) [CSFBCO 006272299-CSFBCO 006272306]; Confirmation from CSFB Corp. to CSFB and CSFBi, Oct. 5, 2001 ($15 million) [CSFBCO 006272307-CSFBCO 006272313]; Confirmation from CSFBi to Morgan Guaranty Trust Company of New York, Dec. 10, 2001 ($12 million) [CSFBCO 006272815-CSFBCO 006272820]; Confirmation from CSFB Corp. to CSFB and CSFBi, Oct. 9, 2001 ($12 million) [CSFBCO 006272314-CSFBCO 006272320]; Confirmation from Bank of America to CSFBi, 4 Oct. 2001 ($10 million) [CSFBCO 006272550-CSFBCO 006272557]; Confirmation from CSFB Corp. to CSFB and CSFBi, Oct. 9, 2001 ($10 million) [CSFBCO 006272322-CSFBCO 006272329]; Confirmation from RBC Royal Bank to CSFBi, Nov. 8, 2001 ($5 million) [CSFBCO 006272540-CSFBCO 006272549]; Confirmation from CSFB Corp. to CSFB and CSFBi, Oct. 10, 2001 ($20 million) [CSFBCO 006272330-CSFBCO 006272337]; Confirmation from CSFB Corp. to CSFB and CSFBi, Oct. 15, 2001 ($16.5 million) [CSFBCO 006272338-CSFBCO 006272345]; Confirmation from CSFBi to The Bank of Tokyo-Mitsubishi, Ltd., Dec. 3, 2001 (¥1 billion) (as of the trade date, Oct. 10, 2001, ¥1 billion was equivalent to approximately $8,317,392) [CSFBCO 006272495-CSFBCO 006272503]; Confirmation from CSFB Corp. to CSFB and CSFBi, Oct. 18, 2001 ($24 million) [CSFBCO 006272346-CSFBCO 006272353]; Confirmation from Deutsche Bank to CSFBi, Oct. 11, 2001 ($10 million) [CSFBCO 006272472-CSFBCO 006272478]; Confirmation from JPMorgan Securities, Inc. to CSFBi, Oct. 16, 2001 ($5 million) (the "JPMorgan Securities Confirmation") [CSFBCO 006272463-CSFBCO 6272468]. CSFB purchased this credit default protection notwithstanding the fact that the cost of such protection increased from approximately 1.6% per annum to 3% per annum during this period. *See* Toronto-Dominion Bank Confirmation (with a trade date of Sept. 10, 2001, at a rate of 1.6% per annum); JPMorgan Securities Confirmation (with a trade date of Oct. 16, 2001, at a rate of 3% per annum).

renewed the CSFB Prepay without incurring additional credit exposure to Enron;[100] and (iii) reduced its holdings of Enron debt. A fact-finder could also conclude that CSFB discouraged one of its fixed-income analysts from publishing negative reports with regard to Enron's securities.[101]

## C.    Role of CSFB's Equity and Fixed-Income Analysts

After the merger of CSFB and DLJ, Launer, the former head of DLJ's energy-sector equity analyst team, and Terran Miller ("Miller"), the former head of DLJ's energy-sector fixed-income analyst team, replaced their CSFB counterparts.[102]

Launer was one of the most consistently pro-Enron analysts on Wall Street. Among the fifteen largest investment banks covering Enron, CSFB maintained its "strong buy" recommendation for longer than all but one.[103] Launer, in fact, maintained a "strong buy" on Enron until November 23, 2001, by which point Enron's stock price had

---

[100] *See* Memorandum from James Moran, Director, David Koczan, Assistant Vice President, *et al.*, CSFB, to Robert O'Brien, Chief Credit Officer, David Maletta, Managing Director, and Ed Devine, Managing Director, CSFB, Sept. 19, 2001 (the "Sept. 19 Credit Memorandum"), at 1 [CSFBCO 006011391-CSFBCO 006011410]; Memorandum from Brian McCabe, Vice President, David Koczan, Assistant Vice President, and James Moran, Director, CSFB, to Robert O'Brien, Chief Credit Officer, David Maletta, Managing Director, and Ed Devine, Managing Director, CSFB, Sept. 24, 2001 (the "Sept. 24 Credit Memorandum"), at 1 [CSFBCO 000043589-CSFBCO 000043609].

[101] Sworn Statement of Jill Sakol, former Associate, CSFB, to Frank G. Smith, A&B, May 22, 2003 and June 4, 2003 (the "Sakol Sworn Statement"), at 70, lines 20–23, and 73, line 16 – 75, line 6; Handwritten notes of Jill Sakol, undated (the "Sakol Notes") (Ex. 498 to Sakol Sworn Statement), at CSFBCO 006290129 [CSFBCO 006290129-CSFBCO 006290130]. *See Role of CSFB's Equity and Fixed-Income Analysts* below.

[102] Launer Sworn Statement, at 22, line 17 – 23, line 14; Miller Sworn Statement, at 12, line 21 – 14, line 4.

[103] *The Watchdogs Didn't Bark: Enron and the Wall Street Analysts, Hearing Before the Committee on Governmental Affairs, United States Senate*, 107th Cong. (Feb. 27, 2002) (the "Feb. 27, 2002 Senate Committee on Governmental Affairs Hearing"), at 127 ("Enron Stock Recommendations by Broker") [ELIB00004414-00001-ELIB00004414-00174].

fallen to $4.71 per share.[104] CSFB made sure that Enron was aware of Launer's views in comparison to those of other analysts.[105]

This evidence alone does not suggest any impropriety on the part of CSFB or Launer. Many analysts from many institutions remained bullish on Enron stock long after the decline in the price of Enron's shares in late 2000 and 2001. On the other hand, a fact-finder could conclude that CSFB published positive assessments of Enron by one of its analysts, while discouraging the public release of negative internal Enron analyses by another analyst, and used such negative information internally to its benefit and to the detriment of other Enron creditors.

As previously noted, Miller, DLJ's lead fixed-income analyst, initially replaced his CSFB counterpart after the CSFB/DLJ merger.[106] He was, however, terminated by CSFB in April 2001[107] and replaced by Jill Sakol ("Sakol"), a more junior fixed-income analyst who had worked with Miller on Enron and other energy companies.[108]

Senior executives at Enron were not satisfied with Sakol's published research on Enron and complained about her performance to CSFB even though she had not changed the "attractive" rating on Enron debt securities that she inherited from Miller in the spring

---

[104] *See* Enron Corp. stock price history report, 1/1/1998 to 6/26/2002 (the "Enron Corp. Stock Price History Report"), at AB000499900 [AB000499873-AB000499904].

[105] Email from Osmar Abib, Managing Director, CSFB, to Greg Whalley, Enron, Oct. 28, 2001 (attaching a Salomon Smith Barney report entitled "Credit Concerns Need to be Addressed" that downgraded Enron's equity rating) [CSFBCO 005407953-CSFBCO 005407956]. Abib touted Launer as a way CSFB "can be of value to Enron," because Launer was "the most visible and supportive equity research analyst on Enron." *Id.*

[106] Sakol Sworn Statement, at 23, line 24 – 24, line 5; Launer Sworn Statement, at 50, lines 12-18.

[107] Miller Sworn Statement, at 14, line 22 – 15, line 6.

[108] Sakol Sworn Statement, at 10, line 12 – 13, line 15, and 34, lines 6-12.

- 30 -

of 2001.[109]  However, by the fall of 2001, Sakol began to believe that Enron's debt securities should be downgraded.[110]

Some of Sakol's Enron research was edited by a CSFB investment banker to present to the investing public a more positive picture of the debt associated with the Marlin and Osprey Share Trust Transactions.[111]  At other times her research was sent without her knowledge to CSFB investment bankers in advance of its release.[112]  In addition, as reflected in notes that Sakol prepared at the suggestion of a colleague,[113] Sakol documented, among other things, that she was discouraged from publishing her candid assessment of Enron even though she contemporaneously communicated this assessment to CSFB bond traders in London and New York, at least one of whom

---

[109] *Id.* at 21, line 25 – 22, line 15; *see also* Email from Michael Davis, Vice President, CSFB, to Peter O'Malley, Vice President, *et al.*, CSFB, Aug. 31, 2001, regarding research "issues" to be discussed with Glisan, at 1 [CSFBCO 005006435-CSFBCO 005006436]; Email from Osmar Abib, Managing Director, CSFB, to Adebayo Ogunlesi, Head of Energy Group, and James Moran, Director, CSFB, Sept. 25, 2001 [CSFBCO 000095343]; Abib Sworn Statement, at 354, line 8 – 357, line 12. Sakol testified that a complaint by Glisan regarding her coverage in the fall of 2001 was not brought to her attention. Sakol Sworn Statement, at 59, lines 2-18.

[110] Sakol Sworn Statement at 72, lines 13-15 and 111, lines 3-21.

[111] *Id.* at 79, line 4 – 81, line 23 and 89, line 1 – 91, line 14; *see also* Email from Michael Davis, CSFB, to Jill Sakol, Associate, CSFB, Oct. 19, 2001 (Ex. 512 to Sakol Sworn Statement) ("added two paragraphs . . . that may help accounts in both the US and Europe get more comfortable with the share trust deals") [CSFBCO 005066438].

[112] Sakol Sworn Statement, at 110, line 18 – 112, line 2; *see also* Email from Lauren Pugliese, CSFB, to Paul Davis, Director, and Jamie Welch, Managing Director, CSFB, Nov. 9, 2001, asking Davis and Welch to review note by Sakol that downgrades Enron's debt from "buy" to "hold" (the "Nov. 9, 2001 Pugliese Email"), at 1 [CSFBCO 005009898-CSFBCO 005009900].

[113] Sakol Sworn Statement, at 116, line 2 – 118, line 8; Sworn Statement of Paula White-Lavitt, Managing Director, CSFB, to Frank G. Smith, A&B, Apr. 17, 2003 (the "White-Lavitt Sworn Statement"), at 57, lines 5-24; Email from Paula White-Lavitt, Managing Director, CSFB, to Jill Sakol, Associate, CSFB, Nov. 20, 2001 (telling Sakol that "[i]t is very important that you put together a diary of all that has happened with the investigation and follow up on your part regarding the share trust transaction.") (Ex. 90 to White-Lavitt Sworn Statement) [CSFBCO 000228165]; Sakol Notes. Sakol testified that the notes are accurate but not "all-inclusive." Sakol Sworn Statement, at 26, line 22 – 27, line 2.

thereafter used that information successfully to divest CSFB of its holdings of the Marlin share trust notes.[114]

Even though Sakol wanted to "provide useful information to investors," she was concerned about doing so because she did not "want to upset people that [she] worked with," because "Enron was an important client."[115] Also, even though Sakol wanted to communicate her "potentially negative" assessment of Enron to investors, she did not do so because she was under "some constraints ... because of the way [she] thought others within CSFB might react" to published research that reflected her honest views on Enron.[116] Specifically, Sakol testified that William Battey, the head of CSFB's analyst department, called her to his office where he quizzed her about Enron, praised her for getting timely information to CSFB's bond traders, and reminded her of the importance

---

[114] Sakol Sworn Statement, at 70, line 20 – 73, line 21, 75, lines 4-6, 123, line 19 – 127, line 4, and 204, line 20 – 205, line 5. *See also* Sakol Notes. At other times, Sakol considered publishing research regarding share trust structures in general, including the share trusts in the Enron Share Trust Transactions, but did not distribute the research because she did not have "all of the information that I wanted to put in the report." Sakol Sworn Statement, at 76, lines 1-21.

[115] *Id.* at 95, lines 8-15.

[116] The "others" included "investment bankers" and "capital markets people." *Id.* at 95, line 16 – 96, line 24. CSFB has policies that limit the publishing of research concerning issuers that appear on its "Restricted List." According to CSFB, Enron appeared on CSFB's Restricted List from October 8, 2001 through October 10, 2001 and from November 28, 2001 through December 5, 2001. Letter from Richard W. Clary, Cravath, Swaine & Moore, LLP, to Frank G. Smith, A&B, Oct. 24, 2003 ("Oct. 24 Letter from Clary") [AB1129 00642-AB1129 00643]. As a result, Sakol may at times have been unable to publish research as a result of Enron's being on this list. *See* CSFB, DLJ and Pershing U.S. Compliance Manual, June 2001 (the "CSFB Compliance Manual"), at 141 [CSFBCO 000728531-CSFB 000728748]. Sakol informed her superiors on or about November 9, 2001 that she wanted to change her rating on Enron. Nov. 9, 2001 Pugliese Email, at 1. Enron was not on CSFB's Restricted List at this time. Oct. 24 Letter from Clary. Notwithstanding the fact that Enron was not on CSFB's Restricted List, CSFB's Legal and Compliance Department refused to let Sakol downgrade Enron's bonds following comments the Legal and Compliance Department received from CSFB investment bankers about Sakol's proposed downgrading of Enron bonds. CSFB Watch /Restricted Deal Sheet, at 3 (noting that "did not permit a downgrade (buy to hold) of [Enron] bonds.") [CSFBCO 006185996-CSFBCO 006186000]. Further, Sakol's understanding that others at CSFB did not want her to publish negative research regarding Enron does not appear to have been limited to a single point in time and was clearly a factor in deterring publication of her candid assessment of Enron. Sakol Sworn Statement, at 95, line 16 – 97, line 4 and 225, lines 12-19.

of the Enron relationship to CSFB.[117]  Sakol's later testimony demonstrates that she "got

the message":

> Q.    Did you understand Battey to be suggesting that there would be
>       sensitivity about publishing negatively about Enron, given the fact
>       that they were an important client to CSFB?  Is that the sum and
>       substance of what you understood?
>
> A.    I think, at the time that I had that meeting with him, that was what
>       I took away from it.[118]

Sakol left CSFB in early 2002.[119]

*Conclusions regarding CSFB's Securities Analysts*

A fact-finder could conclude that CSFB published Launer's positive portrayal of

Enron while discouraging Sakol from publishing her more negative assessment.  At the

same time, Sakol's views were known internally, and CSFB bond traders disposed of

Enron-related fixed-income securities based on those views.  As Sakol wrote in her

private notes:

> Spoke on regular basis to PH [her counterpart at CSFB in London];
> relayed thoughts on ENE.  PH understood that "attractive" rating did not
> reflect my views.  He said that they were able to get out of Marlin position
> at a cost but were glad they did based on my advice to him.[120]

Similarly, in an October 2001 memo prepared by Abib, Jeffe and others for Tony James

("James"), CSFB's co-head of investment banking,[121] in anticipation of a meeting

between James and Fastow, the authors note that Launer "maintains a 'Strong Buy'"

---

[117] *Id.* at 123, line 19 – 124, line 8.

[118] *Id.* at 225, lines 12-19.  Although Sakol's testimony supports the proposition that she felt pressured not to publish negative research regarding Enron, Sakol also testified that she did not perceive that she was pressured to publish research about Enron that was more positive than she thought it should be.  Sakol Sworn Statement, at 56, lines 6-24.

[119] *Id.* at 24, line 9.

[120] Sakol Notes, at CSFBCO 006290129; *see also* Sakol Sworn Statement, at 70, line 20 – 71, line 1.

[121] Jeffe Sworn Statement, at 85, lines 5-8.

rating, but then note in the next paragraph that "CSFB currently has net credit exposure of $625 million to Enron and CSFB's internal credit team has determined that this net exposure position needs to be reduced to $500 million by the end of October."[122]

Based on the foregoing, a fact-finder could conclude that CSFB sought to support its relationship with Enron and Enron's stock price through the publication of positive equity analyst reports while simultaneously acting internally on more negative analyst reports in making its own investment decisions.[123]

---

[122] See Oct. 10, 2001 Memorandum to James, at 1. As noted above, Jeffe testified that at the time this memorandum was issued, the need to reduce exposure "was an ongoing issue with Enron. It was an ongoing issue with all large companies." Jeffe Sworn Statement, at 87, line 8 – 89, line 3.

[123] Additional evidence that could lead a fact-finder to conclude that CSFB published positive equity reports notwithstanding a more negative internal view is contained in email messages among Andrew DeVries ("DeVries"), an equity research analyst at CSFB who covered Enron, and Brian Gibbons ("Gibbons"), another CSFB equity research analyst, and their mutual friend, Wade Suki ("Suki"), an equity research analyst at JPMorgan Chase. These email messages include:

- Email from Wade Suki, Associate Analyst, JPMorgan Chase, to Brian Gibbons, CSFB, Oct. 24, 2001, at JPMBKR-E0817342-JPMBKR-E0817343 (Gibbons believes that, with respect to Enron, "all things point to the potential for one of the biggest frauds in the history of corporate america [sic], bankruptcy is not out of the question." To which Suki responds, "bankruptcy??? [H]oly Moses . . . . that's HUGE!!! . . . wow, DeVries has actually been right on this one.") [JPMBKR-E0817342-JPMBKR-E0817344];

- Email from Wade Suki, Associate Analyst, JPMorgan Chase, to Andy DeVries, Equity Research Associate, Brian Gibbons, CSFB, et al., Oct. 25, 2001, at JPMBKR-E0817387-JPMBKR-E0817388 (After DeVries boasts, "[c]orrect me if I'm wrong, but you have been speaking to a member of the coverage team at CSFB who has specifically told you NOT TO BUY it but to STAY AWAY from it all the way down from $45", Suki responds, "hey, how has your rating helped clients??? [Y]ou're telling me one thing but clients a different story??? a little shady if you ask me . . . . . strap it on, man!!! take a stand!!! afraid to lose the banking business??? are you an investment banker or equity research analyst???") (emphasis in original) [JPMBKR-E0817387-JPMBKR-E0817389];

- Email from Wade Suki, Associate Analyst, JPMorgan Chase, to Andy DeVries, Equity Research Associate, CSFB, et al., Oct. 30, 2001 ("still a strong buy??? way to serve your clients' interests . . . . ") [CSFBCO 006303844];

- 34 -

- Email from Andy DeVries, Equity Research Associate, CSFB, to Wade Suki, Associate Analyst, JPMorgan Chase, et al., Nov. 28, 2001, at JPMBKR-E0817431-JPMBKR-E0817432 (DeVries writes to Suki, "Okay Wade, how about now? Now will you give me some credit for saying NO to buying ENE at 50, at 40, at 30, at 20?", to which Suki responds, "no dude, you get squatola." DeVries then responds, "From $50 to $30, lucky, from $30 (when the first skelton [sic] came out) to now, I was in the know . . . . the funny thing is, Gibbons was also in the know, yet bought the thing.") [JPMBKR-E0817430-JPMBKR-E0817434];

- Email from Brian Gibbons, CSFB, to Andy DeVries, Equity Research Associate, CSFB, Nov. 29, 2001 ("We were [Enron's] number 1 supporter so the threat of a damaging research note was zero. [T]hey needed us to publicly sell the stock almost as much as we needed them for the fees.") [CSFBCO 006303837];

- Email from Wade Suki, Associate Analyst, JPMorgan Chase, to Andy DeVries, Equity Research Associate, CSFB, et al., Dec. 20, 2001, at 2 ("man, you guys are the ones that helped set up these partnerships . . . not to mention you guys as analysts knew about it and didn't say a word to clients in your research . . . who's hiding what??? I'm sure the SEC would be very interested in this . . . don't you think?") [CSFBCO 006172707-CSFBCO 006172710];

- Email from Wade Suki, Associate Analyst, JPMorgan Chase, to Andy DeVries, Equity Research Associate, CSFB, et al., Feb. 26, 2002, at 1 ("I'm sure Curt [Launer's] testimony will NOT include the fact that you guys knew about this crap in august (at the latest) but still didn't write about it or bring it to the attention of investors . . . shall I forward your emails to the justice department??? the ones warning me to stay away from ENE – these date waaaaaay back . . . now, if you were telling me and everyone on your salesforce (as you claim) to stay away, don't you think Congress would like to know about this???") [CSFBCO 006173455-CSFBCO 006173459]; and

- Suki's February 26, 2002 email was sent the day before Launer was scheduled to testify at a hearing before the United States Senate Committee on Governmental Affairs about the role of Wall Street analysts in the collapse of Enron. See Feb. 27, 2000 Senate Committee on Governmental Affairs Hearing, at 18-20 and 73-82. In an email sent two days prior to such testimony, Launer refers to his "'testimony'" as being "'sanitized'" in order to "curry populist favor." Emails between Curt Launer, Managing Director, CSFB, and Jim Clark, CSFB, Feb. 25, 2002 [CSFBCO 006057889.001].

Several CSFB equity research reports specifically covering Enron list Devries as a member of the research team. See, e.g., CSFB Company Update – Enron Corp., "SEC Requests Info On Partnerships," Oct. 22, 2001 [CSFBCO 000727063-CSFBCO 000727065]; CSFB Company Update – Enron Corp., "Recovery Scenario Incl Equity, Write-offs, Other Actions, '02 Pro-forma EPS $1.60, Target $25," Nov. 5, 2001 [CSFBCO 000727152-CSFBCO 000727159].

- 35 -

III.   **DETAILED ANALYSIS OF CSFB'S INVOLVEMENT IN ENRON-
       RELATED DEALS**

    A.   **LJM1 Transactions**

*General Background on LJM1*

    As described in the Second Interim Report,[124] beginning in 1997 and ending in
mid-2001, Enron engaged in a number of transactions (collectively, the "Related Party
Transactions") with entities in which Fastow and other Enron officers, including Kopper
and Glisan, participated.[125]   One of these entities, LJM1, engaged in a number of
transactions with Enron and its affiliates.  The Related Party Transactions resulted in the
personal enrichment of Fastow and his colleagues.[126]   LJM1 enriched Fastow and his
colleagues by approximately $40 million on an aggregate investment of slightly more
than $1 million.[127] The sources of these distributions were primarily Enron assets and
payments by Enron to LJM1.[128]

---

[124]  *See* Second Interim Report, Appendix L (Related Party Transactions).

[125]  Based on the evidence that he has reviewed to date, the Examiner believes that Fastow received at least
$60.6 million, that Kopper and Dodson together received at least $33.4 million and that Glisan received at
least $1 million from the Related Party Transactions.  *See* Second Interim Report, at 104-105; Plea
Agreement, *United States v. Glisan*, Cr. No. H-02-0665 (S.D. Tex), Sept. 10, 2003, at 6.  The Creditors'
Committee brought suit against Fastow, Glisan, Richard B. Buy, Causey, Skilling, Lay, Kristina M.
Mordaunt, Kathy Lynn and Anne Yaeger-Patel on October 1, 2002, alleging, among other things, that these
defendants breached their fiduciary duties to Enron and seeking to recoup certain sums from such insiders.
Kopper has not been sued as a part of this action.  *See Enron Corp. Official Comm. of Unsecured Creditors
v. Fastow*, No. 02-10-06531 (9th Jud. Dist. Montgomery County, Tex., filed Oct. 1, 2002).

[126]  *See* Second Interim Report, Appendix L (Related Party Transactions).

[127]  *See id.* at 19-20.  In addition, Fastow received $15.5 million in cash and a house valued at $850,000
from Kopper in connection with Fastow's sale of his interests in LJM1 and LJM2 to Kopper.  *Id.* at 20.

[128]  *See id.* at 19-20.

CSFB's involvement in the Related Party Transactions was primarily as a limited partner of LJM1,[129] a private equity fund created in 1999 to hedge Enron's investment in Rhythms.[130] In March 1998, Enron purchased equity in Rhythms for approximately $10 million.[131] Following Rhythms' initial public offering, its stock price was volatile, and the value of Enron's investment increased to over $500 million at one point[132] and was approximately $260 million as of June 1, 1999.[133] Because the Rhythms stock was a fair value asset in Enron's portfolio, Enron had recognized the large increase in value as income and was concerned about the adverse effect on its income statement if the value were to decline. Enron was contractually prohibited from selling or hedging the stock for a period of six months.[134] Even if Enron were not prohibited from hedging the stock, due to the large percentage of Rhythms' total equity represented by Enron's investment—approximately 50% of Rhythms' publicly traded shares—and the volatility of the stock

---

[129] CSFB also participated as a limited partner in a second private equity fund, LJM2. Enron's transactions with LJM2 are described in Appendix L (Related Party Transactions) to the Second Interim Report. While CSFB, as one of a number of limited partners in LJM2 and as one of the lenders to LJM2, does not appear to have had as significant a role in the implementation of transactions involving LJM2, it did play a significant role in the transactions involving LJM1.

[130] *See* Presentation to the Enron Board, "Project LJM," June 28, 1999 (the "LJM1 Presentation to the Enron Board") [AB000001727-AB000001738].

[131] *See* Rhythms NetConnections, Inc. ("Rhythms") Form S-1 filed with the SEC on Apr. 6, 1999 ("Rhythms S-1"), Item 15.

[132] Memorandum from Rebecca Carter, Senior Vice President, Board Communications, Enron, to Enron Board of Directors, regarding weekly update, Apr. 16, 1999, at 2 (reporting that the stock price had reached as much as $110 per share) [AB000448792-AB000448797]. Enron held approximately 5.3 million shares of Rhythms common stock.

[133] Rhythms S-1, Principal Stockholders Table. Rhythms' closing stock price on June 1, 1999 was $48.50 per share. *NASDAQ National Market Issues*, WALL ST. J., June 2, 1999, at C12.

[134] *See* Letter from Gil Melman, Senior Counsel, Enron Communications Investments Corp., to Rose Stroud, Legal Transfers Area, American Securities Transfer & Trust Inc., Mar. 20, 2000, at AB000468667 (attaching a copy of Rhythms NetConnections, Inc. stock certificate registered in the name of Enron Communications Investments Corp.) [AB000468665-AB000468668].

price in the market, Enron was unlikely to find a third party willing to enter into a hedge on economic terms acceptable to Enron.

Fastow invested $1 million personally in LJM1 and served as its sole general partner.[135] ERNB Ltd. ("ERNB"), an affiliate of CSFB, and Campsie Ltd. ("Campsie"), an affiliate of RBS, invested $7.5 million each and served as the limited partners.[136] Enron transferred to LJM1 shares of Enron common stock having an aggregate stock price of $276 million.[137] Thereafter, LJM1 transferred approximately half of the shares to LJM1 Swap Sub, L.P. ("Swap Sub"), which LJM1 had formed to serve as the hedging vehicle. Enron received promissory notes in the amount of $64 million from LJM1 (the "LJM1 Notes") and a put right that Enron could exercise in the future to force Swap Sub to purchase the Rhythms stock at $56.125 per share.[138]

However, only Swap Sub, and not LJM1, was liable to Enron for the put, and Swap Sub's only asset was the portion of the Enron stock that LJM1 had transferred to it.[139] Thus, Enron did not transfer any of its true economic risk in the Rhythms investment to any third party with assets other than assets provided by Enron. Instead,

---

[135] The Enron Board heard a presentation about the formation of LJM1 and the LJM1/Rhythms Hedging Transaction, and approved the necessary components relating to the use of Enron stock, on June 28, 1999 at a specially called meeting. Minutes of Enron Board Special Meeting, June 28, 1999 (the "Enron Board Minutes for Special Meeting, June 28, 1999"), at 6-8 [AB000196728-AB000196740]. The Enron Board approved: (i) amendments to certain forward stock purchase contracts that Enron had with UBS, since these were the shares that Enron would contribute to the Rhythms hedging SPE; and (ii) a new forward contract with LJM1 and the early cancellation of that agreement. *See id.* at 7-8.

[136] *See* Second Interim Report, Annex 2 to Appendix L (Related Party Transactions), at 6-7.

[137] The shares were actually transferred by UBS Warburg ("UBS") at Enron's direction. *See id.* at 7-8.

[138] Within two weeks after closing the LJM1/Rhythms Hedging Transaction, Enron became concerned about the continued volatility of the Rhythms stock. Thus, on July 13, 1999, Enron entered into a "costless collar" with Swap Sub that, among other things, protected Enron from Rhythms' stock price falling below $65 per share. *See id.* at 15-16.

[139] Swap Sub was capitalized with approximately one-half of the Enron stock transferred to LJM1 upon its formation and $3.75 million, which were proceeds resulting from the disposition of a portion of the Enron stock transferred to LJM1.

Enron transferred $276 million to receive the LJM1 Notes in the amount of $64 million and a hedge that was supported only by approximately half of the stock that Enron itself had transferred into the structure.

In addition to the LJM1/Rhythms Hedging Transaction, LJM1 made two investments (both acquired from Enron or Enron-related entities and both initially financed with the proceeds of an unsecured $25 million bridge loan from CSFB):[140] (i) the purchase of a 13% interest in a Brazilian power plant project known as Cuiaba;[141] and (ii) the purchase of $15 million of certificates issued by the Osprey Trust (which provided the financing for the Whitewing Transaction).[142]

*CSFB's Knowledge of LJM1's Purpose and Structure*

In June 1999, Fastow approached CSFB with a request that CSFB invest as a limited partner in LJM1.[143]  Based on his initial conversations with Fastow, Jeffe

---

[140] On September 17, 1999, LJM1 and CSFB entered into a loan agreement under which LJM1 borrowed $25 million at an annual interest rate of LIBOR plus 2%. The loan was due on March 31, 2000. *See* Section 4, Loan Agreement among LJM Cayman and CSFB, Sept. 17, 1999 (the "CSFB LJM1 Loan Agreement") [AB000468721-AB000468726]; Limited Recourse Promissory Note between LJM1 and CSFB, Sept. 20, 1999 (the "CSFB LJM1 Limited Recourse Promissory Note") [AB000468727-AB000468729]; Notice of Borrowing by LJM1 to CSFB, Sept. 27, 1999 (the "Sept. 27, 1999 Notice of Borrowing") [AB000502540]; Notice of Borrowing by LJM1 to CSFB, Sept. 17, 1999 (the "Sept. 17, 1999 Notice of Borrowing") [AB000468730].

[141] The Cuiaba transaction is described in the Second Interim Report, Annex 3 to Appendix L (Related Party Transactions).

[142] In September 1999, LJM1 purchased $15 million of Osprey Trust certificates on the same terms as other investors. Memorandum to Condor Working Group from Dominic Capolongo, Managing Director, and Brian Herman, Associate, DLJ, Sept. 22, 1999 [PSI00134251]; Wire Transfer Request, Sept. 23, 1999 (request by Fastow on behalf of LJM1 to wire $15 million to DLJ Securities Corp., referencing "Enron – Osprey Private Placement") [PSI00134250]; Benefits to Enron Summary, undated (regarding "Osprey – LJM Cayman's purchase") [PSI00068220].  LJM1 sold the Osprey Trust certificates to Chewco in December 1999 for $15 million, plus a fee of $131,250 and accrued interest of approximately $380,000. Note 4, LJM Cayman, L.P., Consolidated Financial Statements, Dec. 31, 1999, at 9 (audited by KPMG LLP) [PSI00210121-PSI00210133].  The Whitewing Transaction is described in the Second Interim Report, Appendix G (Whitewing Transaction).

[143] Call Report by Robert Jeffe, Managing Director, CSFB, June 8, 1999 (the "June 8 Call Report") (Fastow contacted CSFB regarding an $8 million equity investment in a partnership) [CSFBCO 005725132]; *see also* Call Report by Robert Jeffe, Managing Director, CSFB, June 10, 1999 (the "June 10

understood that CSFB's equity investment would be used to create an off-balance sheet vehicle, that the transaction needed to be accomplished by the end of the month and that the transaction would involve canceling an existing equity forward contract between Enron and UBS Warburg ("UBS") that, if not cancelled, could have negative accounting and balance sheet implications for Enron.[144] Jeffe also understood that the off-balance sheet vehicle would be used to address "other financial and accounting issues."[145] Jeffe described the transaction as a "very creative and complicated structure."[146] Jeffe also noted Fastow had stated that the transaction had been carefully reviewed with outside counsel and Enron's outside auditors.[147]

Jeffe testified that CSFB did not want to invest in LJM1.[148] CSFB had concerns about the apparent conflict of interest raised by Fastow's role in LJM1.[149] CSFB also had concerns about the compensation that Fastow would receive as a result of the transaction,[150] which Jeffe understood as early as June 1999 to be "north of 20 [million]."[151] Jeffe noted that he "found it . . . astonishing that the [Enron Board],

---

Call Report") ("Andy outlined a creative transaction where he wants us to come up with $8 MM of equity to create an off balance sheet vehicle.") [CSFBCO 005725133].

[144] June 8 Call Report; June 10 Call Report.

[145] June 8 Call Report.

[146] *Id.*

[147] *Id.*

[148] Jeffe Sworn Statement, at 24, lines 11-14.

[149] *Id.* at 25, lines 11-19. Jeffe noted that "at the time and even today the idea of somebody selling something to themselves representing both sides was something I had never seen." *Id.* at 26, lines 3-6. Jeffe saw the transaction as "a senior officer of the company [Fastow] negotiating to sell something to himself." *Id.* at 39, lines 5-8.

[150] *Id.* at 26, lines 13-16.

[151] *Id.* at 41, lines 5-11.

[Vinson & Elkins], which was a top law firm in Houston, and a top accounting firm [Andersen] had supposedly blessed the transaction."[152]  He further testified that:

> It was also troubling from the standpoint of Fastow personally wanting to do the transaction.  Because I think we all told him at various times that at some point this transaction would come to light and he would look very, very bad.[153]

When asked to explain why it was troubling to him that Fastow wanted to do the transaction, Jeffe testified that:

> we are all taught there are lines of proper behavior and in terms of the way you comport yourself, and this was something that I never ever would consider doing myself even if I had approval from the President of the United States or the U.S. Supreme Court.[154]

The LJM1 investment proposal was presented to senior CSFB management on June 22, 1999, by the CSFB "Enron relationship team" of Jeffe, Ogunlesi and Furst.  By that time, they understood more about the proposed transaction.  Specifically, they understood that Enron had previously entered into a forward contract with UBS pursuant to which UBS had agreed to sell Enron over 7.8 million shares[155] of Enron stock at $44.44 per share at a time when the stock price had risen to more than $77 per share.[156]  While this forward contract was now in the money to Enron, settlement of the contract would either permit UBS to sell a large number of Enron shares on the open market or

---

[152]  *Id.* at 43, lines 4-9.

[153]  *Id.* at 27, lines 20-24.

[154]  *Id.* at 42, lines 20-25.

[155]  Unless otherwise indicated, all references in this Appendix to shares of Enron stock have been adjusted to reflect Enron's two-for-one stock split that took place on August 16, 1999.  *See* Enron Corp. Stock Price History Report, at AB000499884.  This number has not been so adjusted.

[156]  Memorandum to Richard E. Thornburgh, Vice Chairman of the Executive Board and CFO, *et al.*, CSFB, from Robert Jeffe, Managing Director, *et al.*, CSFB, dated June 22, 1999 (the "June 22 Memorandum"), at CSFBCO 000005024 [CSFBCO 000005024-CSFBCO 000005033].

require Enron to incur debt to purchase the stock.[157] To address these issues, Enron and UBS agreed to release to Enron almost 6.4 million shares of the Enron stock subject to the forward contract and to adjust the settlement price on the remaining shares to $75 per share.[158] The proposal then contemplated that Enron would cause these shares, valued at that time at an aggregate of approximately $240 million, to be transferred to LJM1 in return for:[159] (i) a put option on the Rhythms stock held by Enron;[160] and (ii) a $50 million note from LJM1.[161] CSFB also believed that the Enron Board had approved the transaction and that the transaction had the support of Skilling and Lay.[162]

With regard to the Enron stock that would be held by LJM1, CSFB understood that the limited partners in LJM1 were entitled to the exclusive economic benefit of that

---

[157] Id.

[158] Id.

[159] Id. at CSFBCO 000005025.

[160] CSFB recognized that the value of the put option to Enron could not exceed the value of the Enron stock held by Swap Sub, which was valued by CSFB as of June 22, 1999 at $127 million. See id. ("This equity contribution will serve as the only collateral for writing a put to Enron Corp. for 5.2 million shares of Rhythms Netconnections for $57 per share. Enron will be able to put Rhythms Netconnection's stock to the Put Sub. While the nominal amount of the put is $296 [million], this obligation will be limited to the FMV of the Put Sub's assets. The only asset in the Put Sub will be Enron Stock valued at $127 [million] (1,666,667 x $76.625).") See also July 8 Memorandum, at CSFBCO 005522746. LJM1 valued the LJM1/Rhythms Hedging Transaction at $104 million. See LJM/Rhythms Structure Accounting Entries Worksheet, undated (the "LJM/Rhythms Structure Accounting Entries Worksheet") [AB000468781].

[161] LJM1 subsequently issued a second limited recourse promissory note to Enron in the principal amount of $14 million as additional consideration for the Enron stock. See Letter from Andrew S. Fastow, LJM Partners, LLC, to the Limited Partners of LJM1, July 27, 1999 (the "Fastow Letter to LJM1 Limited Partners"), at 1 [RBS 4016342-RBS 4016343]; see also Amended and Restated Limited Recourse Promissory Note in the principal amount of $50 million by LJM Cayman, L.P. in favor of Enron Corp., June 30, 1999 (the "Amended and Restated $50 million Limited Recourse Promissory Note") [PSI00110066-PSI00110068] and Amended and Restated Limited Recourse Promissory Note in the principal amount of $14 million by LJM Cayman, L.P. in favor of Enron Corp., June 30, 1999 (the "Amended and Restated $14 million Limited Recourse Promissory Note") [PSI00110108-PSI00110110] (collectively, the "LJM1 Notes"). The original proposal also included a commitment from LJM1 to purchase "a 15.5% equity interest from Enron" in the Cuiaba project for $16 million. June 22 Memorandum, at CSFBCO 000005025.

[162] June 22 Memorandum, at CSFBCO 000005024 (stating that LJM1 had already been approved by the Enron Board and has the full support of Lay and Skilling; the date of this memorandum is six days prior to the June 28, 1999 special meeting of the Enron Board at which LJM1 was approved).

stock, subject to satisfaction of the obligations of Swap Sub under the put and the $50 million note from LJM1 to Enron.[163] CSFB understood that an important term of the LJM1 structure was that Fastow was to have no economic interest in the stock.[164] CSFB also understood that only the portion of the Enron stock that had been contributed to Swap Sub, which was roughly half the Enron stock transferred to LJM1, would be at risk to cover Swap Sub's obligations under the LJM1/Rhythms Hedging Transaction.[165] The other half of the Enron stock remained in LJM1. CSFB further understood that the LJM1/Rhythms Hedging Transaction would allow Enron "to hedge its downside exposure to [Rhythms]."[166] Finally, CSFB understood that Swap Sub's only asset was the shares of Enron stock contributed to it and that, as a result, the only asset that provided collateral for the obligations of Swap Sub to Enron under the LJM1/Rhythms

---

[163] *Id.*

[164] *See* Ogunlesi Sworn Statement, at 165, line 24 – 171, line 24. Certain terms of the First Amended LJM1 Partnership Agreement, to which CSFB's affiliate, ERNB, was a party, provide that distributions and allocations with respect to the shares of Enron stock transferred to LJM1 were to be made only to the limited partners (CSFB and RBS) and not the general partner (an entity owned and controlled by Fastow). Section 4.2 of the First Amended LJM1 Partnership Agreement provides that "[a]ll distributions of [the shares of Enron stock transferred to LJM1, proceeds resulting from those shares and property received by LJM1 in exchange for those shares] shall be distributed among the limited partners." Section 4.2, LJM Cayman, L.P. Amended and Restated Agreement of Limited Partnership, June 30, 1999 (the "Partnership Agreement") [AB000002264-AB000002304]. The general partner would, however, share in other distributions by LJM1. *Id.* Section 4.3. Section 4.4 of the Partnership Agreement provides that "any income, gain, loss or deduction recognized by [LJM1] as a result of or in connection with the transfer to it of the [shares of Enron stock transferred to LJM1] . . . shall be allocated solely to the Limited Partners." *Id.* Section 4.4. Further, the general partner's management fee was to be calculated by reference to assets in LJM1 other than the shares of Enron capital stock transferred to LJM1 or the proceeds resulting from those shares. *Id.* Section 5.2. James Clark, an attorney with the firm of Cahill, Gordon & Reindel, LLP, represented CSFB in connection with LJM1 and was aware of this restriction. Clark testified that "I have a general recollection of a principle that Enron told us they had established, which was that they did not want Mr. Fastow to profit from transactions that resulted – as a result of sales of Enron's common stock or something of that nature." Sworn Statement of James J. Clark, Partner, Cahill, Gordon & Reindel, LLP, to Frank Smith, A&B, Sept. 17, 2003 (the "Clark Sworn Statement"), at 36, lines 2 – 7 and at 23, line 20 – 25, line 18. Clark testified that, throughout the negotiations of the Partnership Agreement and his involvement with LJM1, this principle never changed *Id.* at 36, line 25 – 37, line 6. Ogunlesi also testified that this term never changed. Ogunlesi Sworn Statement, at 171, lines 10-17.

[165] June 22 Memorandum, at CSFBCO 000005024-CSFBCO 000005025; *see also* July 8 Memorandum, at CSFBCO 005522747.

[166] Dec. 8, 1999 Mandanas Memorandum, at CSFBCO 000009612.

Hedging Transaction was stock of Enron.[167]  Therefore, CSFB was in possession of all the facts necessary to conclude that the LJM1/Rhythms Hedging Transaction was a non-economic hedge.  Because the Enron stock supporting Swap Sub's obligations and the Enron stock retained in LJM1 was effectively Enron's property in the first instance, this transaction could only result in economic loss to Enron.

With regard to a proposed investment by LJM1 in Cuiaba, CSFB understood that all of the partners in LJM1 would share in any benefits produced from that investment.[168]

Thus, assuming a total loss on the LJM1/Rhythms Hedging Transaction (which CSFB assumed had a value to Enron of $127 million as of June 22, 1999), CSFB necessarily understood that as one of two limited partners in LJM1, it would have a 50% share of the economic benefit of approximately $240 million worth of Enron stock, the value of which would be reduced by the value of the LJM1/Rhythms Hedging Transaction and the $50 million note from LJM1 to Enron.[169]  CSFB also had a shared interest with LJM1's other limited partner and its general partner in a $16 million investment in Cuiaba that was contemplated at the time, all in return for an investment of $9.0 million.[170]

---

[167] *See* June 22 Memorandum, at CSFBCO 000005025; July 8 Memorandum, at CSFBCO 005522746.

[168] Sections 4.2 and 4.3, Partnership Agreement.  CSFB understood that LJM1 would purchase the interest in Cuiaba from Enron for $16 million to permit Enron to use mark-to-market accounting with respect to a contract to which Cuiaba was party.  June 22 Memorandum, at CSFBCO 000005025.  CSFB also understood that Enron was not able to complete a sale of the interest in Cuiaba to another party by June 30, 1999, and that therefore Enron was selling the interest to LJM1 (and that LJM1 intended to sell the interest to an unaffiliated third party within six months). *Id.*

[169] *Id.* at CSFBCO 000005024.  The amount of the LJM1 debt referred to in the June 22 Memorandum is less than the $64 million LJM1 Notes that were actually issued.

[170] The investment would ultimately be reduced to $7.5 million.

- 44 -

The terms of the proposed transaction raised concerns within CSFB in addition to those expressed by Jeffe.[171] As a result, Ogunlesi, who at the time headed CSFB's Energy Group and was one of the senior CSFB officers on the Enron account,[172] met with Jeffe, Chuck Ward, Head of Investment Banking, David DeNunzio, Head of Merchant Banking, Mark Patterson, Head of Leveraged Finance, and Richard E. Thornburgh, CFO of CSFB, to discuss Fastow's proposal.[173] When questioned as to how he addressed the group's concerns, Ogunlesi testified that he had contacted Skilling, who was then the President and Chief Operating Officer of Enron,[174] to obtain confirmation "that the transaction had actually been reviewed and approved by the [Enron Board], that it had been approved by the senior management of Enron, and that their outside counsel or accountants had also approved going forward with the transaction."[175] According to Ogunlesi, "we wanted to be sure that Enron's board and management were fully aware of the transaction, of Mr. Fastow's role in it, and get also the reason that Enron was doing the transaction … what [were] the benefits of the transaction to Enron."[176] Skilling confirmed that he was aware of the transaction, that the Enron Board had approved it, that Enron's legal counsel had reviewed it and that the LJM1/Rhythms Hedging

---

[171] CSFB recognized that LJM1 raised significant reputational risk for CSFB and held numerous internal meetings on the subject. Mandanas Sworn Statement, at 512, lines 8-12. Because counsel attended some of these meetings, CSFB has not provided evidence of their content based on an assertion of the attorney-client privilege. *Id.* at 512, lines 13-25.

[172] Ogunlesi Sworn Statement, at 12, line 2 – 13, line 4.

[173] *Id.* at 160, line 24 – 161, line 6.

[174] *Id.* at 168, lines 13-15.

[175] *Id.* at 166, lines 2-7; *see also* June 22 Memorandum, at CSFBCO 000005024 (stating that LJM1 had already been approved by the Enron Board and has the full support of Lay and Skilling; the date of this memorandum is six days prior to the June 28, 1999 special meeting of the Enron Board at which LJM1 was approved).

[176] Ogunlesi Sworn Statement, at 166, line 22 – 167, line 4.

- 45 -

Transaction was very important to Enron.[177]  Because of this, and to preserve its relationship with Enron,[178] CSFB approved the transaction despite it concerns.

*Enron Board Approval of LJM1*

Fastow presented the formation of LJM1 and the LJM1/Rhythms Hedging Transaction at a special meeting of the Enron Board on June 28, 1999.[179]  As described below, the terms of the transaction had been altered slightly from what had initially been presented to CSFB.[180]  The board minutes, together with Fastow's presentation, indicate that Fastow told the Enron Board that: (i) he would have no direct pecuniary interest in the Enron stock used to fund LJM1 (in fact, a provision establishing that only the Limited Partners, and not Fastow, could benefit from proceeds resulting from the Enron shares was included in the Partnership Agreement executed by each of the partners);[181] (ii) the transaction would keep a large block of Enron stock restricted; and (iii) PWC would render the Fairness Opinion stating that the value Enron received would exceed the value of the forward contract with UBS that Enron would be giving up.[182]

The Enron Board approved the transaction and Fastow's role in LJM1 and appointed Lay and Skilling as a committee of the Enron Board to determine if the consideration Enron received was sufficient in the event of a change in the terms of the

---

[177] *Id.* at 168, line 13 – 169, line 1.

[178] Jeffe Sworn Statement, at 29, line 24 – 30, line 14.  When asked if he perceived that Fastow had the ability to decide which business went to which bank, Jeffe testified that Fastow "was a critical factor if not the most important factor." *Id.* at 65, lines 3-10.

[179] *See* Enron Board Minutes for Special Meeting, June 28, 1999, at 6-8.

[180] *See id.*; LJM1 Presentation to the Enron Board.

[181] Section 4.2, Partnership Agreement ("All distributions of Initial Property, Initial Property Proceeds and Substituted Property . . . shall be distributed among the Limited Partners . . . ratably in proportion to their respective Commitments.").

[182] Enron Board Minutes for Special Meeting, June 28, 1999, at 6-7.

transaction from those presented to the Enron Board.[183]   In addition, the Enron Board

authorized the officers to execute various documents in connection with the transaction,

including indemnification agreements.[184]

*LJM1 is Capitalized and the LJM1/Rhythms Hedging Transaction is Closed*

The CSFB and RBS subsidiaries that were the limited partners in LJM1 each

contributed $7.5 million to LJM1, and Fastow, as General Partner, contributed

$1 million.[185]   These amounts were funded on July 9, 1999, with an effective date of

June 30, 1999.[186]   Enron transferred 6,755,394 shares of Enron stock to LJM1.[187]

Effective June 30, 1999, these shares had a stock price of approximately $276 million.[188]

However, as a result of a four-year restriction on resale and a one-year restriction on

hedging that Enron put in place in connection with this transaction,[189] this value would

---

[183]   *Id.* at 7.

[184]   *Id.* at 7-8. The Examiner has discovered an Indemnification Agreement signed by Fastow in his individual capacity, but not on behalf of Enron, that purports to indemnify Fastow for all "Liability" incurred by him in connection with any claim arising out of the fact that he is the general partner and manager of LJM1. The definition of "Liability" specifically includes Section 16 liability under the Securities Exchange Act of 1934. *See* Section 12, Indemnification Agreement between Enron and Fastow, June 1999 (definition of "Liability") [AB000468749-AB000468753].

[185]   July 8 Memorandum, at CSFBCO 005522746.

[186]   Email from Simon Stormer, CSFB, to John Carroll, CSFB, July 7, 1999, at 2-3 [CSFBCO 000059794-CSFBCO 000059798].

[187]   *See* Second Interim Report, Annex 2 to Appendix L (Related Party Transactions), at 7-8.

[188]   Enron Corp.'s stock closing price on June 30, 1999 was of $81.75. *See* Enron Corp. Stock Price History Report, at AB000499883.

[189]   Confirmation Letter from Enron Corp. to LJM Cayman, L.P., LJM Swap Sub, L.P., June 30, 1999 (the "Original Lock-Up Agreement"), at AB000065401 [AB00065400-AB00065403]. The Examiner has been provided with three versions of this document, each of which is dated June 30, 1999. In addition to the Original Lock-up Agreement, which contains a one-year restriction on hedging, a second version contains a two-year restriction on hedging. *See* Lock-Up Agreement, at CSFBCO 000010702. A third version does not contain any restriction on hedging. *See* Confirmation Letter from Enron Corp. to LJM Cayman, L.P., LJM Swap Sub, L.P., June 30, 1999 [PSI00110052-PSI00110054]. Because the Original Lock-Up Agreement contains a one-year restriction on hedging and the Lock-Up Agreement contains a two-year restriction, it would appear that the Lock-Up Agreement is the later of these two documents. *See* Fastow Letter to LJM1 Limited Partners, at 1 (LJM1 and Swap Sub "will amend the existing transfer restriction

have been discounted by the parties. In exchange, Enron received a put option on its Rhythms stock from Swap Sub that LJM1 valued at $104 million[190] and a $50 million note from LJM1 that was due September 30, 1999.[191] Subtracting the $154 million in consideration Enron received for the $276 million of consideration Enron gave, $122 million of value remained in LJM1, an entity in which CSFB had obtained a 50% interest in exchange for a $7.5 million investment.

On July 8, Furst, then CSFB's relationship manager on the Enron account, estimated that there was likely $142 million of value in LJM1 as a result of the value in the Enron stock held by LJM1 and that the expected after-tax proceeds from those shares to the limited partners in LJM1 were between $21 million and $88 million.[192] Furst projected that CSFB would earn an *annual* rate of return on LJM1 of between 26% and 81%.[193] Furst also noted that CSFB's investment would "solidify the relationship between CSFB and Enron."[194]

*The Fairness Opinion and Post-Closing Changes to the Terms of the Transaction*

PWC did not render the Fairness Opinion regarding the fairness to Enron of the consideration it was receiving for the stock transferred into LJM1 based upon the original

---

agreement with Enron Corp. to extend the period that each is obligated to refrain from hedging its exposure to Enron Corp. common stock from 12 months to 24 months from the closing date.").

[190] *See* LJM/Rhythms Structure Accounting Entries Worksheet.

[191] *See* Amended and Restated $50 million Limited Recourse Promissory Note.

[192] July 8 Memorandum, at CSFBCO 005522747. In other internal documents, CSFB valued the Enron stock that would be held by LJM1 at $243 million. June 22 Memorandum, at CSFBCO 000005026.

[193] June 22 Memorandum, at CSFBCO 000005026. Based on an estimated investment by the partners of $18 million being used at that time, CSFB calculated that the partners could receive as much as $348 million in five years. *Id.*

[194] July 8 Memorandum, at CSFBCO 005522747.

terms of the transaction.[195] Two changes were made to the terms initially contemplated. First, on July 27, 1999, almost a month after the recorded closing date of LJM1's funding, LJM1 issued a second limited recourse promissory note to Enron in the principal amount of $14 million as additional consideration for the Enron stock.[196] Second, the Lock-Up Agreement's prohibition against hedging the Enron stock was extended from one to two years (the "Lock-Up Agreement").[197] Consistent with the fairness analysis delivered by PWC as a precursor to the delivery of the Fairness Opinion, Enron ultimately applied a 39% illiquidity discount to the Enron shares that reduced the value of those shares transferred into LJM1 by approximately $108 million.[198] CSFB does not appear to have expressed any concern or to have raised any objection to the reduction in the value of the Enron shares (in which it had a 50% interest) that resulted from these actions.[199]

---

[195] *See* Fastow Letter to LJM1 Limited Partners, at 1 ("we have determined that a couple of changes to the initial structure are necessary to support the initial valuation presented to you"); Memorandum from Gary Mulgrew, Managing Director, RBS, to Campsie Directors, *et al.*, Aug. 20, 1999, at RBS 3030456 (the $14 million increase "was important as it was part of Enron's fairness calculations for the value they passed to the partnership") [RBS 3030454 – RBS 3030460].

[196] *See* Fastow Letter to LJM1 Limited Partners, at 1; *see also* Amended and Restated $14,000,000 Limited Recourse Promissory Note.

[197] *See* Lock-Up Agreement; *see also* July 28, 1999 Marino Email. As noted above, the Lock-Up Agreement, which contains a two-year restriction on hedging, appears to have been executed after the Original Lock-Up Agreement, which contains a one-year restriction.

[198] On August 13, 1999, PWC delivered a copy of its fairness analysis as a precursor to the delivery of the Fairness Opinion four days later. *See* Project Martin Fairness Analysis Draft Presentation by PWC, Aug. 13, 1999 (the "PWC Fairness Analysis") [AB000154939-AB000154981]; Fairness Opinion. In the Fairness Analysis, PWC noted that "Bear Stearns would require a 20% to 40% [illiquidity] discount for four year restricted stock." *Id.* at 20. PWC also noted that "[i]n Enron Treasury experience, >30% discount is appropriate for 2 to 4 year [restricted stock]." *Id.*; *see also* Project Martin Deal Memorandum from Global Finance Tax, undated, at 1 (regarding the LJM1/Rhythms Hedging Transaction) [AB000456678-AB000456680]. *See also* Second Interim Report, Annex 2 to Appendix L (Related Party Transactions), at 16-18.

[199] Mandanas Sworn Statement, at 474, line 14 – 480, line 23. When asked whether increasing the amount of this indebtedness, and therefore the amount of the liabilities of LJM1, would reduce the value of CSFB's interest in LJM, Mandanas testified that this value would depend on the value of all of the assets and liabilities of LJM1, including the Enron stock held by LJM1. *See* Mandanas Sworn Statement, at 476, line 11 – 480, line 23.

On August 17, 1999, PWC delivered the Fairness Opinion on the exchange of the Enron shares in return for the LJM1 Notes and the LJM1/Rhythms Hedging Transaction.[200] PWC opined that the range of value for the LJM1/Rhythms Hedging Transaction and LJM1 Notes was between $164 million and $204 million and the range of value for the Enron shares was between $170 million and $223 million, and concluded that the consideration received by Enron was fair from a financial perspective.[201]

*The SAILS Transaction*

When CSFB made its investment in LJM1, documents were in place that prohibited: (i) Fastow from sharing in distributions resulting from the Enron stock that was transferred to LJM1 or proceeds resulting from that stock; (ii) LJM1 from directly or indirectly hedging the Enron stock it held for two years;[202] and (iii) LJM1 from selling or otherwise transferring that stock for four years. CSFB was aware of these restrictions at the time[203] and thus was concerned that the value of its LJM1 investment (resulting from the amount by which the value of the Enron stock exceeded LJM1's liabilities) was at risk if Enron's stock price were to fall.[204] Even before LJM1 was funded, CSFB

---

[200] *See* Fairness Opinion.

[201] *Id.* at 3.

[202] When it was amended from its original form and became a two-year prohibition, Ivers signed his agreement to the amendment in his capacity as a representative of ERNB. Fastow Letter to LJM1 Limited Partners, at 2.

[203] Mandanas Sworn Statement, at 62, line 5 – 64, line 19, and 336, lines 5-10.

[204] Mandanas testified that the SAILS transaction was done "so that we could realize a return on the asset," the asset being the Enron stock. Mandanas Sworn Statement, at 41, line 21 – 42, line 6. When asked if CSFB was concerned that the value of the Enron stock in LJM1 would deteriorate, Mandanas testified that she knew "Rick Ivers believed that there was downside risk in the stock" Mandanas Sworn Statement, at 504, line 17 – 505, line 2. Nevertheless, Mandanas also testified that "I don't know that there was a concern. However, anytime you own shares of a company, it could go up. It could go down." Mandanas Sworn Statement, at 55, lines 20-25. *See also* Materials Prepared for Discussion LJM Cayman, L.P., Aug. 5, 1999 (the "Aug. 5, 1999 LJM1 Presentation"), at 1 (describing a proposed financing structure which hedges the price risk associated with the Enron shares contributed to LJM1) [PSI00054754-PSI00054772]. *See also* July 8 Memorandum, at CSFBCO 005522747 ("Our return is dependent on the Enron stock price.").

- 50 -

therefore began to search for a way to hedge its interest in the Enron stock in LJM1 to protect the gain that it stood to realize.[205]

The vehicle selected by CSFB to hedge its position was a CSFB-developed transaction known as SAILS. CSFB developed SAILS to permit its clients to monetize or hedge securities that were otherwise subject to transfer restrictions.[206] The CSFB employees selected to implement the hedging transaction, and thereafter to monitor CSFB's investment in LJM1, were Rick Ivers ("Ivers") and Mary Beth Mandanas ("Mandanas").[207] CSFB understood that LJM1's other limited partner, RBS, was presenting a competing proposal to hedge its interest in the Enron shares in LJM1.[208]

On August 5, 1999, CSFB made a presentation in London to LJM1 and RBS regarding the proposed SAILS transaction, noting it that would allow the limited partners of LJM1 to lock-in a guaranteed minimum return on the shares of Enron stock held by LJM1, while still allowing the limited partners of LJM1 to participate in up to 10% of any appreciation in that stock.[209] The SAILS transaction, as proposed, would also result in a payment to LJM1, thereby enabling it to repay the LJM1 Notes to Enron and creating

---

[205] *See* Mandanas Sworn Statement, at 39, line 3 – 43, line 3; Sworn Statement of Richard Ivers, former Managing Director, CSFB, to Frank G. Smith, A&B, Apr. 24, 2003 (the "Ivers Sworn Statement"), at 44, line 6 – 49, line 15. As early as a week after the effective date of the creation of LJM1 and two days before it funded, CSFB was contemplating its alternatives for hedging the price risk on the Enron shares. *See* July 6, 1999 Marino Email.

[206] *See* Marino Sworn Statement, at 34, line 4 – 37, line 3.

[207] *See* Email from Mary Beth Mandanas, Associate, CSFB, to Osmar Abib, Managing Director, CSFB, *et al.*, Sept. 29, 1999, regarding SAILS transaction (the "Sept. 29, 1999 Mandanas Email") [CSFBCO 000054522].

[208] *See* Email from Shad Stastney, Vice President, CSFB, to Mary Beth Mandanas, Associate, Carmen Marino, Managing Director, and Tim Bock, Managing Director, CSFB, Aug. 25, 1999, regarding RBS's "interest in hedging their own portion of the underlying" [CSFBCO 000054805 – CSFBCO 000054806]; Ivers Sworn Statement, at 64, line 17 – 66, line 5; Mandanas Sworn Statement, at 81, line 23 – 82, line 21.

[209] *See* Aug. 5, 1999 LJM1 Presentation, at 1, 4, 8, and 14 (providing an overview of the proposed Private SAILS transaction) [PSI00054754-PSI00054772].

- 51 -

significant additional funds for LJM1 to invest, which in turn provided increased management fees to Fastow.[210] This was presumably a highly attractive proposition to Fastow for at least two reasons. First, his management fee was computed based on assets under management (other than the Enron shares), which would be increased by the additional amount available to be invested. Second, the parties treated the additional funds, together with funds that LJM1 would receive from RBS as a result of a monetization transaction completed by RBS, not as proceeds resulting from the Enron stock (in which Fastow could not participate), but as additional capital contributions in which Fastow could share.[211] In other words, while Fastow could only invest and profit from $16 million when LJM1 closed, after SAILS and the RBS transaction, he could invest and profit from what would eventually be $41 million (the $16 million from the initial partnership investments plus the additional $25 million that was available to LJM1 as a result of the SAILS transaction and the RBS transaction, after repayment of the $64 million LJM1 Notes to Enron and the $25 million bridge loan from CSFB).

The SAILS transaction was delayed, however, due to "complex securities law issues."[212] This delay threatened to push the closing of the SAILS transaction past the end of the third quarter. Fastow, however, needed the funds from SAILS so LJM1 could make an investment in Osprey certificates issued in connection with the Whitewing transaction and to purchase the 13% interest in Cuiaba that would allow Enron to deconsolidate the entity, thereby allowing: (i) $200 million of debt to be moved off

---

[210] *Id.* at 8-9, and 14.

[211] Although Mandanas testified that the increased liquidity resulting from the SAILS transaction would not permit Fastow to share in assets or proceeds resulting from assets in which he would not otherwise be permitted to share, she also testified that all of the partners, including the general partner, would benefit from the increased liquidity. Mandanas Sworn Statement, at 492, line 19 – 493, line 14.

[212] *See* Sept. 29, 1999 Mandanas Email.

- 52 -

Enron's balance sheet; and (ii) a gas supply contract to the plant to be marked to market.[213]  To accommodate Fastow, CSFB provided a $25 million bridge loan to LJM1 so that LJM1 could purchase the Osprey certificates and the interest in Cuiaba from Enron pending the SAILS closing.[214]

The SAILS transaction required that CSFB's proportionate share of LJM1's restricted Enron stock be distributed to CSFB and be available for resale at the maturity of the forward contract underlying the SAILS transaction.  As originally contemplated, the SAILS transaction would have required the registration of the Enron shares that were to be hedged as part of the SAILS transaction.[215]  Enron rejected CSFB's proposal and refused to allow the Enron shares that were held by LJM1 (and still subject to the Lock-Up Agreement) to be registered.[216]

CSFB therefore modified the SAILS structure to call for LJM1 to transfer the Enron shares into escrow until the lock up period lapsed or Enron agreed to lift the restrictions.  On November 29, 1999, LJM1 distributed into escrow accounts for each of the limited partners 1,775,000 shares of Enron stock (worth approximately $137 million) that had been used to capitalize LJM1 at formation.  In return, RBS and CSFB agreed

---

[213] *Id.; see also* Memorandum from Rick Ivers, Managing Director, and Mary Beth Mandanas, Associate, CSFB, to David Maletta, Managing Director, CSFB, Sept. 13, 1999, regarding LJM Cayman $25 million bridge loan [CSFBCO 000010772-CSFBCO 000010773].

[214] *See* Section 4, CSFB LJM1 Loan Agreement; CSFB LJM1 Limited Recourse Promissory Note; Sept. 27, 1999 Notice of Borrowing; Sept. 17, 1999 Notice of Borrowing.  The proceeds of this loan were used by LJM1 to purchase $15 million of Osprey Trust certificates, as described above, and to purchase a 13% ownership interest in Cuiaba.  *See* Sept. 29, 1999 Mandanas Email ("The purpose of the loan was to provide funds so that Andy could invest in Condor . . . and a Brazilian power plant").  Subsequent CSFB descriptions of the SAILS transaction reflect that the $25 million bridge loan was also to be repaid from the proceeds of the SAILS transaction. *See, e.g.*, LJM Cayman SAILS Transaction Schematic, Oct. 11, 1999 ("Step 3" includes "Complete SAILs transaction ($117MM net proceeds)" and "Repay ENE note and CSFB loan") [CSFBCO 000008151].

[215] Email from Steve Simonte, CSFB, to David Maletta, Managing Director, CSFB, Oct. 21, 1999 [CSFBCO 005046348].

[216] *Id.*

- 53 -

that they would each make equal "Additional Capital Contributions" sufficient to infuse LJM1 with enough cash to pay off $64 million in LJM1 Notes, as well as the $25 million bridge loan that CSFB had made to the partnership.[217] LJM1's commitment to escrow the Enron stock was a condition precedent to the limited partners' obligation to make the cash infusion.[218]

The SAILS transaction, as closed in December 1999, is detailed in Appendix L (Related Party Transactions) to the Examiner's Second Interim Report. The transaction was based on a forward sale of CSFB's share of the Enron stock held in LJM1. This forward sale generated proceeds of $57.1 million. From these proceeds, CSFB retained $12 million (thereby generating a $4.5 million or 120% annual return in only six months on its $7.5 million investment) and contributed the remaining $45.1 million to LJM1, which used the proceeds (together with approximately the same amount from a contemporaneous RBS monetization transaction) to repay both the $64 million LJM1 Notes and the $25 million CSFB bridge loan.

Importantly, the parties treated the $90 million in funds that CSFB and RBS contributed to LJM1 not as proceeds resulting from the Enron shares in which Fastow could not participate, but instead as additional capital contributions that Fastow could invest and participate in without restriction.[219] The net result of the receipt of the $25 million bridge loan from CSFB and the additional $90 million characterized as capital

---

[217] Sections 1.6 and 1.7, LJM Cayman, L.P. Second Amended and Restated Agreement of Limited Partnership, Nov. 29, 1999 (the "Amended Partnership Agreement") [CSFBCO 000008615-CSFBCO 000008657]. The limited partners' obligation to make the "Additional Capital Contributions" was contingent upon "the prior performance of the covenants in the first sentence of Section 1.7 [*i.e.*, the requirement that LJM1 transfer the shares into escrow]." *Id.*

[218] *See id.*

[219] *See* Sections 2.1 and 4.2, Partnership Agreement.

contributions and the repayment of the CSFB bridge loan and the LJM1 Notes was that LJM1 had $25 million in additional funds available to it in which Fastow could invest and participate. As noted in an earlier email from David Bermingham of RBS to various colleagues, "this was NEVER the intention of the original deal."[220]

The SAILS transaction, including the transfer of the Enron shares into escrow,[221] required Fastow's consent as the general partner[222] and Enron's consent under the Lock-Up Agreement.[223] Although Causey executed a consent to the SAILS transaction on behalf of Enron,[224] the Examiner has found no evidence that CSFB sought any assurances that the SAILS transaction had been considered or approved by the Enron Board or by Enron's outside accountants or lawyers, as it had in connection with the original LJM1 closing.

Thus, the SAILS transaction achieved indirectly what was directly prohibited by the Amended Partnership Agreement in order to obtain the approval of the Enron Board. Through the SAILS transaction, the Enron stock in LJM1 was monetized and Fastow obtained a pecuniary interest in proceeds resulting from those shares.[225] In summary, a fact-finder could conclude that CSFB, through the SAILS transaction, participated in

---

[220] Email from David Bermingham, RBS, to Kevin Howard, *et al.*, RBS, Aug. 6, 1999, at 1 (emphasis in original) [RBS 4016350-RBS 4016351].

[221] Escrow Agreement between LJM Cayman, ERNB, Credit Suisse Financial Products ("CSFP") and CSFB, Nov. 29, 1999 (the "Escrow Agreement") [CSFBCO 000008661-CSFBCO 000008674].

[222] *Id.* at CSFBCO 00008671.

[223] Lock-Up Agreement; Mandanas Sworn Statement, at 532, lines 3-14.

[224] Acknowledgment and Agreement between Enron and CSFP, Nov. 29, 1999 (the "Enron SAILS Consent") [CSFBCO 000008676-CSFBCO 000008679].

[225] CSFB was aware that the SAILS transaction violated the hedging restrictions and could not be completed without Enron's consent. *See* Mandanas Sworn Statement, at 516, lines 15-25 and 529, line 20 – 532, line 14. In addition, there were numerous CSFB internal meetings regarding the reputational risks associated with SAILS. *Id.* at 511, line 24 – 512, line 12. However, Mandanas testified that all of these conversations occurred in the presence of counsel and were therefore in CSFB's view privileged communications. *Id.* at 512, lines 13-25.

enabling Fastow to receive funds derived from the value of the Enron stock held in LJM1 in violation of Fastow's representations to the Enron Board in connection with its approval of LJM1[226] and contrary to the related terms of the Amended Partnership Agreement.[227]

On December 8, 1999, Mandanas reported to senior CSFB bankers that ERNB had completed the SAILS transaction.[228] If LJM1 were to be liquidated immediately, Mandanas estimated the return to CSFB and RBS from their original $7.5 million investments in LJM1 would be an additional $12.7 million each, while the return on Fastow's $1 million investment would be more than $17 million in addition to the payment of $5.3 million of management fees.[229] Mandanas concluded her report by noting that this transaction "has provided a significant return to CSFB and has further enhanced our relationship with Andy Fastow, CFO of Enron Corp."[230] For his part, Ivers, Mandanas's immediate superior, informed the same senior CSFB bankers that he estimated present and projected profits from CSFB's $7.5 million investment in LJM1 to be between $22.5 million and $27.6 million. He praised Mandanas for doing "an excellent job in the harrowingly complex execution of this deal."[231]

---

[226] Enron Board Minutes for Special Meeting, June 28, 1999, at 6.

[227] *See* Section 4.2, Amended Partnership Agreement.

[228] Dec. 8, 1999 Mandanas Memorandum, at CSFBCO 000009613.

[229] *Id.* at CSFBCO 000009614.

[230] *Id.*

[231] Memorandum from Richard Ivers, Managing Director, CSFB, to Chuck Ward, Co-Head of Investment Banking, Adebayo Ogunlesi, Head of Energy Group, *et al.*, CSFB, Dec. 9, 1999, regarding LJM update [CSFBCO 000010750]. In September 2000, the affiliate of CSFB that was a party to the SAILS forward contracts assigned its right under these contracts, amended certain terms of these contracts and paid ERNB $5.4 million. In October 2001, LJM1 distributed 1,775,133 shares of Enron stock to ERNB. *See* Second Interim Report, Appendix L (Related Party Transactions), at 31-32.

*Sale of CSFB's Interest in Swap Sub*

In early 2000, Fastow, Kopper and three of the RBS bankers involved in LJM1 allegedly devised a plan to benefit personally from the April 2000 termination of the LJM1/Rhythms Hedging Transaction in which Enron would make additional payments to Swap Sub.[232] To carry out their plan, Fastow and Kopper formed Southampton, L.P. in March 2000 to acquire ownership of Swap Sub and its parent entity, Swap Co.[233] Certain other Enron and LJM2 employees, including Michael Hinds, Kristina Mordaunt, Glisan, Anne Yaeger-Patel and Kathy Lynn, were also included in the transaction.[234]

At the time of the sale, Swap Sub's only asset, aside from approximately $3.75 million in cash, was the value of the Enron stock it held offset by the value of the LJM1/Rhythms Hedging Transaction.[235] Because the price of the Rhythms stock was so volatile, CSFB could not value the Rhythms stock and therefore could not value its indirect investment in Swap Sub with any precision.[236] Nevertheless, after Southampton

---

[232] The termination of the LJM1/Rhythms Hedging Transaction is described in the Second Interim Report, Annex 2 to Appendix L (Related Party Transactions), at 20-24. RBS's role in the sale of Swap Sub and Swap Co. to Southampton is described in Appendix E (Role of RBS and its Affiliates) to the Report.

[233] Section 1.3, Southampton Place, L.P. Amended and Restated Agreement of Limited Partnership, Mar. 20, 2000 (the "SH Partnership Agreement") [AB000002941-AB000002968]. The Examiner has found no evidence that the existence of Southampton, L.P. or the identity of its owners and their economic interests were disclosed to or approved by the Enron Board.

[234] Cooperation Agreement between the Enron Task Force and Kopper (the "Cooperation Agreement"), at 11, *United States v. Kopper*, No. 4:02-cr-00560 (S.D. Tex. Filed Aug. 21, 2002), *available at* http://news. findlaw.com/hdocs/docs/enron/uskopper82102pagr.pdf.

[235] *See* Second Interim Report, Annex 2 to Appendix L (Related Party Transactions), at 42.

[236] On November 11, 1999, in response to a request from Fastow, CSFB attempted to place a value on the LJM1/Rhythms Hedging Transaction. Fastow's management fee was to be calculated by reference to assets in LJM1 other than the shares of Enron stock transferred to LJM1 or proceeds resulting from those shares. Section 5.2, Partnership Agreement. CSFB's Shad Stastney reported that there was "no 'fair market value' for this put, since we would not purchase the put at any price …" and that any value assigned to the "put" was "A THEORETICAL VALUE ONLY." Email from Shad Stastney, Vice President, CSFB, to Mary Beth Mandanas, Associate, CSFB, Nov. 11, 1999, at 1 (emphasis in original) [CSFBCO 000056440-CSFBCO 000056441]. A second CSFB employee, Richard Han, confirmed Stastney's findings that there was no fair market value on the put and that any value assigned was theoretical only. Email from Richard Han, CSFB, to Mary Beth Mandanas, Associate, CSFB, Nov. 16, 1999, at 1 [CSFBCO

offered to buy Swap Sub, Ivers and Mandanas undertook to value CSFB's interest in

Swap Sub. They informed senior bankers at CSFB that for book purposes Swap Sub was

worth negative $25.4 million but that as of mid-March 2000, it had a market value of

$5.8 million, thus making CSFB's half interest worth just under $3.0 million.[237]

The transaction was negotiated between Ivers (on behalf of CSFB) and Fastow

(on behalf of LJM1) with apparently no one negotiating on behalf of the buyer,

Southampton,[238] and yielded $10.0 million to CSFB, more than three times the fair

market value it had assigned to its interest in Swap Sub.

CSFB consulted with both "internal and external counsel" regarding this

transaction.[239] CSFB's outside counsel contacted Causey to inquire about the sale of

Swap Sub to "entities that would appear to have some affiliation with other employees of

---

000723168-CSFBO 000723169]. Shortly after the SAILS transaction closed, RBS confirmed to CSFB that it could not see how Swap Sub would ever have a positive value and that, for accounting purposes, RBS carried Swap Sub at "zero." Email from David Bermingham, RBS, to Mary Beth Mandanas, Associate, CSFB, Dec. 11, 1999, at 1 [CSFBCO 000058675-CSFBCO 000058676]. Early in 2000, CSFB and RBS exchanged emails in which they each acknowledged that LJM's most recent quarterly financials (for the third quarter of 1999) indicated that Swab Sub actually had a negative value of about $25 million. Email from Mary Beth Mandanas, Vice President, CSFB, to David Bermingham, RBS, Jan. 5, 2000 [CSFBCO 000054702-CSFBCO 000054703].

[237] Memorandum from Rick Ivers, Managing Director, and Mary Beth Mandanas, Vice President, CSFB, to Chuck Ward, Co-Head of Investment Banking, *et al.*, CSFB, Mar. 20, 2000, regarding proposed sale of LJM Swap Sub interests to Southampton, Ltd. (the "Mar. 20, 2000 Memorandum"), at CSFBCO 005718432 [CSFBCO 005718431-CSFBCO 005718432]. In another memorandum dated the following day, Mandanas reflected the same $5.8 million market value, but also included an additional analysis which relied on different assumptions, *e.g.,* that CSFB would retain its interests in Swap Sub until year end 2000. Relying on this assumption, and assuming a higher price per share for the Rhythms stock, Mandanas was able to reflect a "Potential Market Value" of $38.8 million (of which CSFB's share would be approximately $19.4 million). Memorandum from Mary Beth Mandanas, Vice President, CSFB, to Neil Radey, *et al.*, CSFB, Mar. 21, 2000, regarding analysis of the value of Swap Sub, at CSFBCO 000121337 [CSFBCO 000121337-CSFBCO 000121338]. Given that Mandanas had authored an email on March 20, 2000 that indicated the transaction was to close on March 22, 2000, her assumption that CSFB would retain its interests in Swap Sub until the end of 2000 does not appear to have been valid. Email from Mary Beth Mandanas, Vice President, CSFB, to Tim Barney and Michael Gilligan, CSFB, Mar. 20, 2000 (the "Mar. 20, 2000 Mandanas Email") [CSFBCO 000654808]. Ivers testified that, given the volatility of Swap Sub's value, "10 million was a fair number for half of it." Ivers Sworn Statement, at 80, line 6 – 81, line 17.

[238] Mar. 20, 2000 Mandanas Email.

[239] *Id.*

- 58 -

Enron."[240]  In response, Causey advised CSFB's counsel that "no consent of Enron [was]

necessary for [the transaction]" and that Enron management "was aware of such

transactions and approved of them" without the need for any "actions on Enron's part."[241]

CSFB's outside counsel memorialized his discussion with Causey in a file memorandum,

which he forwarded to CSFB.[242]  No further diligence was conducted.[243]

Thereafter, LJM1 distributed its interests in Swap Sub and Swap Co. to CSFB and

RBS as the limited partners in LJM1.[244]  Concurrently with that distribution, CSFB and

RBS each sold their Swap Sub and Swap Co. interests to Southampton, L.P.[245]  As noted

above, ERNB received $10 million for the sale of its Swap Sub and Swap Co. interests to

Southampton, L.P.[246]  As detailed in Appendix L (Related Party Transactions) to the

---

[240] Letter from James J. Clark, Cahill Gordon & Reindel LLP, to Mary Beth Mandanas, Vice President, CSFB, Mar. 24, 2000, at CSFBCO 000121347 (transmitting a March 20, 2000 memorandum prepared by Clark) [CSFBCO 000121346-CSFBCO 000121347].

[241] Id.

[242] Id.

[243] During the course of the examination, CSFB informed the Examiner's counsel that it intended to waive the attorney-client privilege with respect to the sale of Swap Sub to Southampton. CSFB asserts that this waiver is limited to the specific transaction and does not extend to legal advice it received in connection with any other aspect of its involvement with LJM1.

[244] See Mar. 20, 2000 Memorandum, at CSFBCO 0005718431; Memorandum to Files from Michele Wu, PWC, Mar. 7, 2001, regarding LJM Cayman, L.P. distribution in excess of basis [PSI00232176-PSI00232180]; LJM Cayman, L.P. Analysis of Accounts, Dec. 31, 2000 [PSI00124655]; LJM Cayman L.P. Draft Partnership Separate Item Allocation, as of Dec. 31, 1999 [AB1128 00499-AB1128 00502].

[245] See Mar. 20, 2000 Memorandum, at CSFBCO 0005718431.

[246] See Section 1, Draft Purchase Agreement among ERNB, Southampton L.P., LJM Partners, and LJM Cayman LP, Mar. 17, 2000 [PSI00054774-PSI00054781]; Mar. 20, 2000 Memorandum, at CSFBCO 0005718431. On March 23, 2000, Swap Sub borrowed $10 million from Enron at an annual interest rate of 6.3% under a promissory note dated March 23, 2000. See Promissory Note in the principal amount of $10 million by LJM Swap Sub in favor of Enron Corp., Mar. 23, 2000 (the "Swap Sub Note") [AB1128 00495]. The Swap Sub Note became due and payable on April 28, 2000. Id. The Examiner believes this $10 million was used to fund the purchase by Southampton, L.P. of ERNB's interests in Swap Sub and its parent entity, Swap Co. See Memorandum to Enron Files from Reed M. Brodsky, Wilmer, Cutler & Pickering, Dec. 22, 2001 (the "Causey Memorandum"), at 9 (regarding Third Interview of Richard Causey conducted in connection with the Powers Committee's investigation of certain of the Related Party Transactions) [AB000001206-AB000001219]. As noted above, Swap Sub may have borrowed the $10 million from Enron under the Swap Sub Note to purchase ERNB's interests in Swap Sub and Swap Co., which was repaid in connection with the termination of the LJM1/Rhythms Hedging Transaction. See

- 59 -

Second Interim Report, the unwinding of Swap Sub, which by CSFB's own calculations had a market value of $5.8 million, also yielded $1.0 million to RBS and $19 million to Fastow, his colleagues and the RBS bankers.

*Additional LJM1 Distributions*

On July 14, 2000, Fastow declared an LJM1 distribution. The distribution transferred $17.9 million to Fastow himself and $5.9 million to each of CSFB and RBS.[247] The Examiner has concluded that Fastow's ability to distribute $17.9 million to himself at this time was a consequence of the payments made to LJM1 by CSFB and RBS as part of the SAILS transaction and RBS's hedging transaction, respectively. Fastow, in this manner, derived personal profit from the transfer (into escrow) by LJM1 of the Enron shares, thus, contradicting his representations to the Enron Board, as well as his contractual agreement in the Amended Partnership Agreement that he could not so profit.

In July 2001, Fastow sold his general partnership interests in LJM1 and LJM2 to Kopper.[248] To finance the purchase of those interests, Kopper requested that CSFB

---

Letter Agreement from Enron Corp. to LJM Swap Sub, L.P., Mar. 22, 2000, regarding the termination of the LJM1/Rhythms Hedging Transaction [AB000065509-AB000065511].

[247] LJM Cayman, L.P. Analysis of Accounts, Nov. 16, 2000 (the "November 16, 2000 LJM Cayman Account Analysis") [PSI00124659-PSI00124660]; LJM Cayman Wire Transfer Request to LJM2 Capital Management, L.P., July 14, 2000 ("LJM Cayman Distribution" in the amount of $17,948,794.68) (the "July 14, 2000 Wire Transfer to LJM2 Capital Management, L.P.") [PSI00133904]; LJM Cayman Wire Transfer Request to Coutts (Cayman) Limited, July 14, 2000 ("LJM Cayman Distribution" in the amount of $5,898,438.64) [PSI00133905]; LJM Cayman Wire Transfer Request to CSFB, Nassau Branch, July 14, 2000 ("LJM Cayman Distribution" in the amount of $5,898,438.64) [PSI00133906].

[248] *See* Second Interim Report, Annex 2 to Appendix L (Related Party Transactions), at 35. Abib testified that:

> [A]round this time Mr. Fastow's responsibilities changed; and, in addition to being the chief financial officer of Enron, he, also – he acquired the corporate development function at Enron as well, or what we've referred to previously as the M&A function. And I think – as he explained to us, given that he was going to be responsible for the purchase and sale of assets and transactions that related to those type of activities, that the

provide him with a $14.5 million loan.[249]  One possible source of funds for the repayment of the loan to Kopper would be distributions that he would receive from LJM1 upon the sale of LJM1's last remaining investment (its interest in Cuiaba) to Enron.[250]  CSFB understood that due to increasingly complex disclosure issues associated with Fastow's conflict of interest, LJM1 and Enron were not to enter into an agreement for such a sale before Fastow had disposed of his general partnership interest in LJM1.  CSFB also understood, however, that there was a "verbal agreement" between Enron and LJM1 for the sale at a price of $13.8 million after Fastow had disposed of his interest in LJM1.[251]

As described above, Enron ultimately purchased LJM1's Cuiaba investment for $13.7 million on August 15, 2001[252] and also redeemed certain preference shares from LJM1 for approximately $800,000, resulting in an aggregate payment of approximately $14.5 million to LJM1.[253]  The general partner received $7.3 million of this amount and $2.7 million was distributed to each limited partner in LJM1.[254]  Enron repurchased

---

potential for conflict would be greater and that there had been some determination that it made sense for him to sell his general partner position in the LJM entities.
Abib Sworn Statement, at 150, line 14 - 151, line 3.

[249] Memorandum to Michael Arpey and John Moriarty, Managing Director, CSFB, from Adebayo Ogunlesi, Head of Energy Group, Mary Beth Mandanas, Vice President, and Jaime Casas, Associate, CSFB, July 23, 2001 (Ex. 180 to Mandanas Sworn Statement) ("Kopper Credit Request"), at 1 [CSFBCO 005718492-CSFBCO 005718500].  CSFB did not provide the requested financing to Kopper. See Second Interim Report, Annex 2 to Appendix L (Related Party Transactions), at 35.

[250] Kopper Credit Request, at 4.

[251] Id.

[252] See EPE Holding Ltd. Transfer of Share from LJM Brazil Co. to EPE Holdings Ltd., Aug. 15, 2001 [AB000153819-AB000153820].

[253] See Second Interim Report, Annex 3 to Appendix L (Related Party Transactions), at 7-8.

[254] See id.

- 61 -

LJM1's Cuiaba interests at a premium,[255] even though the facts indicate that the market value of the interests actually decreased during LJM1's ownership period.[256]

LJM1 was liquidated on October 11, 2001.[257] Upon the liquidation of the partnership, CSFB received almost $2.8 million. Thus, for its investment of $7.5 million in LJM1 in July of 1999, CSFB received a total of more than $38 million in slightly more than two years.

*Provision Of Cash To Participating Enron Insiders Through LJM1*

The transactions involving LJM1 provided Enron insiders, including Fastow and Kopper, with millions of dollars, primarily through cash distributions and management fees. These included the following:

- Fastow received at least $18 million in distributions[258] and $2.6 million in management fees from LJM1;[259]

- Kopper received at least $7.3 million in distributions[260] and $178,000 in management fees from LJM1;[261]

---

[255] *See id.* at 16-17.

[256] *See id.*

[257] LJM Cayman, L.P. Written Consent of the Sole Limited Partners to Dissolve Partnership, Oct. 11, 2001 [PSI00198499-PSI00198500].

[258] *See* November 16, 2000 LJM Cayman Account Analysis; July 14, 2000 Wire Transfer to LJM2 Capital Management, L.P.

[259] *See* Wire Transfer Request to LJM Management, LLC, Aug. 11, 1999 (management fee of $550,000) [PSI00134211]; LJM Cayman, L.P. Wire Transfer Request to LJM Management, LLC, Feb. 11, 2000 (management fee of $779,671") [PSI00133875]; MM Fee Calculation [PSI00133876]; LJM Cayman Wire Transfer Request to LJM Management, LP, July 7, 2000 (management fee of $801,999) [PSI00133901]; MM Fee Calculation [PSI00133902]; Dec. 31, 2000, LJM Cayman Account Analysis; MM Fee Calculation (for Jan. 1, 2001 to June 30, 2001) [PSI00133996]; Email from Joyce Tang, LJM, to Kevin Howard, Managing Director, RBS, Jan. 17, 2001 (indicating that the management fee due for the 6-month period ending June 30, 2001 is $505,949) [PSI00133997]. In addition to these distributions and management fees, Fastow received $15.5 million in cash and a house valued at $850,000 from Kopper in connection with Fastow's sale of his LJM1 and LJM2 interests to Kopper. *See* Second Interim Report, Appendix L (Related Party Transactions), at 20.

[260] LJM Summary of Accounts, Oct. 4, 2001 [PSI00135525].

[261] *Id.*

- 62 -

- In connection with Enron's termination of the LJM1/Rhythms Hedging Transaction, Kopper and The Fastow Family Foundation each received $4.5 million on investments of $25,000 each, and Michael Hinds (an LJM2 employee), Kristina Mordaunt, Glisan, Anne Yaeger-Patel and Kathy Lynn received $3.3 million in the aggregate on a total investment of $19,235.[262]

## B.     The CSFB Prepay

*Overview*

In early December 2000,[263] CSFB completed a Prepay Transaction (the "CSFB Prepay") involving CSFB,[264] Morgan Stanley Capital Group Inc. (later replaced by Barclays) and ENA.[265] The CSFB Prepay consisted of the familiar circular structure of three swaps:[266] one between CSFB and ENA;[267] one between CSFB and Morgan

---

[262] Cooperation Agreement, at 11.

[263] Enron's Prepay Transactions tended to close within 30 days of a financial quarter's end. Second Interim Report, Appendix E (Prepay Transactions), at 5.

[264] Credit Suisse Financial Products (USA) Inc., a corporate cousin of CSFB and the signing party on the swap documents, was renamed "Credit Suisse First Boston International (USA) Inc.," effective as of Mar. 27, 2000. Certificate of Amendment of Certificate of Incorporation of Credit Suisse Financial Products (USA), Inc., Mar. 7, 2000 [AB1128 00496]; *see also* CSFB's Supplemental Responses.

[265] Like the other Prepay Transactions, the CSFB Prepay involved an Enron affiliate, in this case ENA. *See* Second Interim Report, Appendix E (Prepay Transactions), at 10.

[266] *See id.* The CSFB Prepay did not, unlike those analyzed in the Examiner's Second Interim Report, involve a conduit entity formed by or at the direction of a participating financial institution. The CSFB Prepay instead involved first Morgan Stanley, then Barclays. In its Administrative Proceeding against Citigroup, the SEC indicated that it sees no distinction between the Prepays entered into by Citigroup that involved an SPE as the conduit entity and those in which another financial institution served as the conduit entity. *See In re Citigroup, Inc.*, Order Instituting a Public Administrative Proceeding Pursuant to Section 21C of the Securities Exchange Commission Act of 1934, Making Findings and Imposing a Cease-And-Desist Order and Other Relief, July 28, 2003 (the "Citigroup Administrative Proceeding"), at 7-8, n.20. The SEC standard is a "should have known" standard, however, which is less stringent than the "actual knowledge" standard analyzed in this Report.

[267] Confirmation (Swap) deal No. QH4714.1 between ENA and CSFBi, Dec. 15, 2000 ("Original ENA/CSFB Swap") [AB0911 1965-AB0911 1968].

- 63 -

Stanley;[268] and one between ENA and Morgan Stanley.[269]  Under these swaps, ENA

received $150 million from CSFB at closing[270] and was required to repay approximately

$158 million to CSFB in September 2001.[271]  Like the swap transactions in the Yosemite

transactions discussed in Appendix E (Prepay Transactions) to the Second Interim

Report, the swaps comprising the original CSFB Prepay were financially settled.[272]  The

CSFB Prepay was structured to eliminate the commodity risk by virtue of the offsetting

swaps.

In September 2001, rather than repay these original swaps, Enron caused the

original swaps to be amended, restated and extended to October 2002.[273]  The day before

---

[268] Confirmation between CSFB and Morgan Stanley Capital Group, Inc. ("Original CSFB/MS Swap"), Jan. 9, 2001 [CSFBCO 000128279-CSFBCO 000128282]. Although documents provided by CSFB indicate that a signed confirmation between CSFB and Morgan Stanley existed at one time, CSFB has not produced the document.

[269] Confirmation (Swap) deal QH4715.1 between ENA and Morgan Stanley Capital Group, Inc., Dec. 18, 2000 (the "Original ENA/MS Swap") [AB0252 00881-AB0252 00884].

[270] Enron officials have acknowledged that "the amount of any given prepay transaction was determined by the targeted cash flow Enron wanted to show the Rating Agencies." Second Interim Report, Appendix E (Prepay Transactions), 7. See also Sworn Statement of Joseph Michael Deffner, Managing Director, Enron, to William C. Humphreys, Jr., A&B, Apr. 3, 2003, at 291, line 21 – 293, line 21; Email from Osmar Abib, Managing Director, CSFB, to James Fields, Managing Director, CSFB, Aug. 29, 2001 (the "Aug. 29, 2001 Abib Email") [CSFBCO 000092185]. Enron officials also have acknowledged that the funds generated by the Prepay Transactions were classified as cash flow from operating activities as opposed to cash flow from financing activities. Sworn Statement of William Brown, Managing Director, Enron, to William C. Humphreys, Jr., A&B, Apr. 14-15, 2003, at 45, lines 14-18.

[271] See "Fixed Amount Details," Original ENA/CSFB Swap, at 2; "Fixed Amount Details," Original ENA/MS Swap, at 2.

[272] See Original ENA/CSFB Swap; Original CSFB/MS Swap; Original ENA/MS Swap.

[273] Because these latter swap agreements governed the transaction as of the Petition Date, this analysis refers to them rather than the earlier CSFB-Morgan Stanley-ENA agreements. Instead of Credit Suisse First Boston International (USA) Inc. ("CSFBi (USA)"), CSFB's Cayman Island branch participated. See, e.g., Confirmation (Swap) between CSFB Cayman Island Branch and ENA, Sept. 27, 2001 (the "Amended CSFB/ENA Swap") (this copy signed only by CSFB Cayman Island Branch) [CSFBCO 000047317-CSFBCO 000047328]. The September 2001 extension of the CSFB Prepay resulted in the payment of approximately $153 million to CSFBi (USA) and an advance by the Cayman Island branch of CSFB of approximately $149 million. As discussed below, all or a portion of this $153 million payment may be avoided as a preference.

the refinancing closed, Barclays replaced Morgan Stanley, which was apparently dissatisfied with the fees it had received as the conduit in the transaction.[274]

---

[274] Email from James Moran, Director, CSFB, to Janelle Matharoo, Managing Director, CSFB, Sept. 26, 2001 [PSI00056338].

As of the Petition Date, the CSFB Prepay consisted of the following transfers:



To summarize:

- On the closing date, ENA received $150 million from CSFB.[275]

- Quarterly, ENA paid approximately $1,372,554.26 to Barclays under the ENA/Barclays Swap (which, except for $3,571.26 retained by Barclays, Barclays then paid to CSFB under the CSFB/Barclays Swap).[276]

---

[275] Amended CSFB/ENA Swap. For an identical copy of the confirmation, excluding exhibits, that is signed by ENA, see Confirmation (Swap) between CSFB Cayman Island Branch and ENA, Sept. 27, 2001 [CSFBCO 006029715-CSFBCO 006029720].

[276] Confirmation (Swap) between ENA and Barclays, Sept. 27, 2001, at (the "ENA/Barclays Swap") [BRC 000005129-BRC 000005133]. The amount retained by Barclays is determined by the difference between the quarterly payment from ENA to Barclays and the quarterly payment from Barclays to CSFB. *See id.*; Confirmation (Swap) between Barclays and CSFB, Cayman Island Branch, Sept. 27, 2001, at CSFBCO 000047267 (the "Barclays/CSFB Swap") [CSFBCO 000047263-CSFBCO 000047274]. Each of the confirmations contemplates that the quantities to be delivered or upon which payments are to be calculated and dates of delivery and payment are to be contained in an exhibit. Although the Examiner is in possession of signed copies of all of three confirmations, only one of the signed confirmations includes the contemplated exhibit. The Examiner has, however, obtained drafts of each of the confirmations that do include such exhibits. The information set forth herein is based on the information contained in those drafts.

- The quarterly payments based on the market price of the specified number of barrels payable among the parties under all three swap agreements effectively cancelled each other out.[277]

- At maturity, ENA was to pay $151,763,855 to Barclays under the ENA/Barclays Swap (which, except for $394,875.60 to be retained by Barclays, Barclays was then to pay to CSFB under the CSFB/Barclays Swap).[278]

- At maturity, the payments based on the market price of the specified number of barrels payable among the parties under all three swap agreements effectively cancelled each other out.[279]

With the oil-price-based swaps netted out, the CSFB Prepay thus operated as a loan between CSFB and ENA with no commodity risk to any counterparty.[280]

### The Accounting Effect of the CSFB Prepay

As discussed in the Second Interim Report, Enron accounted for cash received from Prepay Transactions as cash flow from operating activities rather than as cash flow from financing activities, and carried the liabilities under the swap transactions as "price risk management activities" rather than as debt.[281] This accounting effect permitted Enron to overstate its cash flow from operating activities,[282] close a gap between its cash

---

[277] The terms governing these market-price based payments are set forth in the "Floating Amount Details" section of the respective swaps. *See* Amended CSFB/ENA Swap, at CSBCO 000047318; ENA/Barclays Swap, at BRC 00005130-BRC 00005131; Barclays/CSFB Swap, at CSFBCO 000047264.

[278] ENA/Barclays Swap. The amount retained at maturity or cancellation by Barclays is determined by the difference of the final payment from ENA to Barclays and the final payment from Barclays to CSFB. *See id.*; Barclays/CSFB Swap.

[279] The terms governing these market-price based payments are set forth in the "Floating Amount Details" section of the respective swaps. *See* Amended CSFB/ENA Swap, at CSBCO 000047318; ENA/Barclays Swap, at BRC 00005130-BRC 00005131; Barclays/CSFB Swap, at CSFBCO 000047264.

[280] Sworn Statement of James Moran, Director, CSFB, by M. Russell Wofford, A&B, April 16 & 17, 2003 and May 8, 2003 (the "Moran Sworn Statement"), at 158, line 21 – 162, line 11.

[281] Second Interim Report, Appendix E (Prepay Transactions), 24-25.

[282] *Id.* at 25 ("any increase in price risk management liabilities, such as a borrowing under a Prepay Transaction, served to increase cash flow from operating activities").

- 67 -

and reported revenues[283] and disguise debt – all to ensure a better credit rating from the Rating Agencies.[284]

> *CSFB's Role and Knowledge of the CSFB Prepay*

CSFB came relatively late to the prepay business with Enron.[285] At the time of the initial funding of the CSFB Prepay in December 2000, CSFB representatives recognized that the transaction was, in substance, a loan from CSFB to Enron. For example, Ian Emmett, a CSFB employee in London, referred to the CSFB Prepay as an "obvious loan transaction."[286] A CSFB representative wrote in the margin of the September 19, 2001 credit memorandum requesting a renewal of the CSFB Prepay that "it is really a loan to ENE."[287] CSFB further understood that its own assessment of the CSFB Prepay contradicted Enron's intended accounting treatment of the CSFB Prepay, noting that:

> The net effect to ENA is they borrow USD150mm at L+0.75% for 9 months OBS. The net effect for us (the oil book) is we lend USD150mm to ENA . . . The net effect for MS is nothing except the credit on ENA and [CSFB]."[288]

---

[283] *Id.* at 2.

[284] *Id.*

[285] The initial CSFB prepay closed in December 2000. *See* Original ENA/CSFB Swap. By then, Enron had participated in prepays for many years with other investment banks and their affiliates. *See* Second Interim Report, Appendix E (Prepay Transactions).

[286] Email from Ian Emmett, CSFB, to Steven Wootton, Director, CSFB, Dec. 12, 2000 (the "Dec. 12, 2000 Emmett/Wootton Email") ("Is it OK for us to be entering into such an 'obvious' loan transaction?") [AB0507 00064]; Email from Ian Emmett, CSFB, to Geoff Smailes, CSFB, Dec. 12, 2000 (the "Dec. 12, 2000 Emmett/Smailes Email"), at 4 ("I am being asked to quote on a structure for Enron that enables Enron to borrow USD that are treated as price risk management rather than debt on balance sheet.") [CSFBCO 000044022-CSFBCO 000044026]; Email from James Moran, Director, CSFB, to Ian Emmett, CSFB, *et al.*, Dec. 8, 2000 (the "Dec. 8, 2000 Moran Email") (Ex. 69 to the Moran Sworn Statement) ("the swap is booked in their oil swap book and not treated as debt") [CSFBCO 000200220]; Moran Sworn Statement, at 174, line 15 - 175, line 2.

[287] *See* Sept. 19 Credit Memorandum, at 5.

[288] Dec. 12, 2000 Emmett/Smailes Email, at 4.

*CSFB's Review of the Prepay*

In addition to its regular analysis in connection with extending credit to Enron, CSFB addressed two issues in its review of the CSFB Prepay:  (i) the potential reputational risk to CSFB; and (ii) concerns about Enron's accounting for the CSFB Prepay.[289]

*"Reputational Risk."*  Within its Finance, Accounting and Operations Group, CSFB maintained a "reputational risk" department to "review transactions that could affect [CSFB's] reputation."[290]  According to CSFB's written guidelines, "accounting-driven" transactions – those entered "to secure a particular accounting treatment" – required reputational risk review.[291]  David Maletta ("Maletta") of CSFB's Credit Risk Management Committee determined, after the credit meeting at which Moran and others presented the proposed transaction, that CSFB's reputational risk experts should review the CSFB Prepay because of its "accounting driven" elements.[292]

At Maletta's instruction, Moran described the CSFB Prepay to Marc Steglitz ("Steglitz"), one of CSFB's reputational risk experts.[293]  Based on those conversations and others with Steve Wootton ("Wootton"), an in-house lawyer at CSFB,[294]  CSFB

---

[289]  *See* Dec. 14, 2000 Moran Email; *see also* Email from Nicolas Tjandramaga, CSFB, to Ian Emmett and Geoff Smailes, CSFB, Dec. 14, 2000, at 2 [CSFBCO 000044052.001-CSFBCO 000044053.001].

[290]  Moran Sworn Statement, at 170, lines 11-16.

[291]  CSFB Compliance Manual, at 120; Sworn Statement of Steven Wootton, Director, CSFB, to M. Russell Wofford, A&B, May 28, 2003 (the "Wootton Sworn Statement"), at 21, line 17 – 22, line 10.  Although the Compliance Manual describing CSFB's Reputational Risk Review Process dates from June 2001, well after these events, Wootton testified that neither CSFB's policies nor his role in this area has changed since these events.  *Id.*, at 54, line 13 – 55, line 21.

[292]  Moran Sworn Statement, at 170, line 24 – 173, line 5.

[293]  *Id.* at 172, lines 3-7.

[294]  Wootton Sworn Statement, at 16, line 22 – 17, line 9.  CSFB has waived the attorney-client privilege with respect to documents relating to the CSFB Prepay.  Letter from Julie North, Cravath, Swaine & Moore, LLP, to Frank G. Smith, A&B, Apr. 13, 2003 [AB1128 00497-AB1128 00498].

decided to include in the documentation for the CSFB Prepay the firm's "standard representations for accounting-driven transactions" to mitigate any reputational risk.[295] These representations included assurances that: (i) Enron had discussed the CSFB Prepay with its external auditors; (ii) those auditors had confirmed that the accounting treatment was appropriate; (iii) Enron's senior management was aware of, familiar with and had approved the CSFB Prepay; (iv) the CSFB Prepay and Enron's accounting therefore were consistent with all applicable laws and regulations; (v) Enron had not relied on CSFB "in respect of the accounting treatment [or] the overall suitability" of the CSFB Prepay; and (vi) the CSFB Prepay, and its accounting and tax treatment, are consistent with regulatory requirements, and Enron "will ensure that such accounting and tax treatment is appropriately reflected, if required, with the proper regulatory authorities in the applicable jurisdiction."[296] Steglitz apparently also required that ENA's Treasurer or Chief Financial Officer sign Enron's swap confirmations.[297]

Evidence suggests that Enron was reluctant to accept the inclusion of the requested representations in the documentation. Shortly after midnight on December 15, 2000, a CSFB employee reported it being "very important" to Enron "that the docs are as standard as possible and DO NOT include any representations on accounting driven

---

[295] Wootton Sworn Statement at 42, lines 17-22 and 46, lines 17-23; *see also* Email from Steven Wootton, Director, CSFB, to Nicolas Tjandramaga and Ian Emmett, CSFB, Dec. 14, 2000 (the "Dec. 14, 2000 Wootton Email"), at 1 ("If this is an accounting-driven transaction, and I had understood before that it is, the Firm's standard representations for accounting driven transactions will presumably be required to be inserted in the confirmations?") [AB0507 00041-AB0507 00042].

[296] Email from Steven Wootton, Director, CSFB, to Nicolas Tjandramaga, *et al.*, CSFB, Dec. 15, 2000 [AB0507 00074-0507 00076].

[297] Dec. 14, 2000 Moran Email; Email from Steven Wootton, Director, CSFB, to Nicolas Tjandramaga, CSFB, Dec. 14, 2000 [CSFBCO 000044800.001].

transactions."[298]  Later that morning, Nicolas Tjandramaga ("Tjandramaga") reported Wootton and Steglitz as "definitely want[ing] the rep risk stuff in the confirms."[299]  By mid-day, Enron appears to have acceded, at least in part, to that desire.[300]

Later that day, however, Enron and CSFB instead agreed that Enron would provide oral assurances on each of the questions addressed by CSFB's standard representations, and that CSFB would confirm that fact by letter.[301]  After Steglitz approved the arrangement,[302] Treasa Kirby, on Enron's behalf, provided those oral assurances to Moran, and Moran then asked Wootton to draft the confirming letter.[303] Although Moran thinks that CSFB sent that letter, CSFB has produced a draft, but not a copy of a final version.[304]  Wootton emphasized in his email forwarding the draft to Moran that the draft was designed to place the "blame" for requiring these assurances on CSFB's lawyers instead of business people.[305]

---

[298] Email from Nicolas Tjandramaga, CSFB, to Marc Steglitz, CSFB, Dec. 15, 2000 (the "Dec. 15, 2000 Tjandramaga Email") [CSFBCO 000044038.001].

[299] *Id.* Although Moran has no independent recollection of his communications with Tjandramaga, he believes that "rep risk stuff" refers to the written representations. Moran Sworn Statement, at 225, lines 6-11. *See also id.* at 232, lines 4-5 ("CSFB viewed these six representations as very important").

[300] Email from Nicolas Tjandramaga, CSFB, to James Moran, Director, *et al.*, CSFB, Dec. 15, 2000 (Enron "are principally OK on the 6 points but will DEFINITELY want to make some minor amendments in the wording") (emphasis in original) [CSFBCO 000044042]. At this point Enron apparently agreed to delay the transaction from Friday, December 15, 2000 until Monday, December 18, 2000. *Id.*

[301] Moran Sworn Statement, at 235, line 3 - 236, line 11; Wootton Sworn Statement, at 38, lines 5-15.

[302] Moran Sworn Statement, at 240, lines 19-24.

[303] *Id.* at 239, lines 4-8.

[304] *Id.* at 239, lines 11-12; Wootton suggested text that included the following sentence, "Whilst CSFB's internal legal and documentation procedures would normally require the additional representations we sent to you, your verbal assurances that the transaction had been passed by Arthur Andersen and otherwise complied with the substance of the representations proved to be much more valuable." Email from Steve Wootton, Director, CSFB, to James Moran, Director, CSFB, Dec. 15, 2000 (the "Dec. 15, 2000 Wootton Email") (Ex. 95 to the Moran Deposition) [CSFBCO 006092153].

[305] Dec. 15, 2000 Wootton Email; Wootton Sworn Statement, at 55, line 22-57, line 19.

*The Conflict Between the Prepay's Economics and Its Accounting.* CSFB understood the CSFB Prepay's economic reality.[306] Enron employees described the transaction to CSFB employees as involving "quarterly interest payments" and "principal repayment."[307] CSFB called it "an obvious loan transaction."[308] CSFB also understood from the outset of its involvement that Enron accounted for the prepays not as a loan, but as a price risk management liability,[309] thus demonstrating that they understood Enron's accounting treatment for the CSFB Prepay differed from its economic reality. On Enron's cash flow statement, "price risk management activities" appear under "cash flow from operating activities," and nowhere else.[310] No direct evidence discovered to date by the Examiner confirms that CSFB understood the proceeds from the CSFB Prepay would be recorded as cash flow from operating activities. However, given that CSFB routinely

---

[306] Ian Emmett of CSFB in fact appears to have been familiar enough with earlier prepays involving Enron and other banks to ask why Morgan Stanley, rather than a conduit entity set up by CSFB, was involved at all. Email from Ian Emmett, CSFB, to James Moran, Director, CSFB, Dec. 8, 2000 (the "Dec. 8, 2000 Emmett Email") [PSI00056835].

[307] Email from Treasa Kirby, Enron, to James Moran, Director, CSFB, July 12, 2000, at 1 [CSFBCO 000044715–CSFBCO 000044716].

[308] Dec. 12, 2000 Emmett Email; *see also* Email from James Moran, Director, CSFB, to Osmar Abib, Managing Director, CSFB, Dec. 5, 2000 (describing "prepaid oil swap" as "translation–A $150 [million] loan to ENE") [CSFBCO 005434585]; Dec. 8, 2000 Moran Email ("The net effect for [Enron] is raising $150 [million] at [LIBOR] + 75bps for nine months off-balance balance [sic] sheet"); Email from Adrian Cooper, CSFB, to David Maletta, Managing Director, James Moran, Director, and Osmar Abib, Managing Director, CSFB, Dec. 18, 2000 (referring to deal as "a nine month oil-linked loan to Enron") [CSFBCO 000200002]; Email from Geoff Smailes, CSFB, to Adrian Cooper, CSFB, Sept. 10, 2001 (discussing rollover of "a 150m$ oil-linked loan to Enron") [PSI00056248]; Email from Viral Patel, CSFB, to Leonora Daniel, CSFB, Sept. 11, 2001, at 1 (referring to "loan element" of prepay) [CSFBCO 000044147-CSFBCO 000044150].

[309] Dec. 8, 2000 Moran Email ("The swap is booked in [Enron's] oil swap book and not treated as debt."); Moran Sworn Statement, at 173, line 25 – 174, line 9 (before CSFB approved its participation in the CSFB Prepay, "it came out that the transaction would be viewed as a commodities swap and would not appear on their debt line of their balance sheet"); *id.* at 152, lines 9 –12 (the "three swaps in total are reflected in their price risk management book, which is a shorthanded way of price risk management book for their oil swap book"); *id.* at 174, line 25 – 175, line 2 ("Enron told me how they would book and treat the swap.").

[310] *See* Enron 1999 Annual Report, Statement of Cash Flows.

reviewed Enron's financial statements[311] and given that net changes in price risk management activities is a sub-account of cash flow from operating activities, a fact-finder could infer that CSFB understood that Enron accounted for the cash proceeds from the CSFB Prepay as cash flow from operating activities.

### C. The Nile FAS 140 Transaction

CSFB participated in three FAS 140 Transactions – Iguana, which closed in December 1999,[312] Nikita, which closed in September 2001,[313] and Nile, which also closed in September 2001. In each of these transactions, CSFB held the 3% equity in the borrower-SPE, and in Iguana and Nile, it also held the debt issued by that entity. The Nikita transaction has been fully discussed in the Prior Reports, particularly Appendix M (FAS 140 Transactions) to the Second Interim Report and Appendix F (Role of Barclays and its Affiliates) to the Third Interim Report. Evidence reviewed by the Examiner with respect to Iguana is not sufficient for the Examiner to reach a conclusion with respect to that transaction. Therefore, only the Nile transaction is discussed herein.

---

[311] Nearly all of credit approval memoranda prepared by CSFB in connection with its transactions with Enron contain financial data derived from Enron's financial statements. *See, e.g.*, Memorandum from James Moran, Director, CSFB, *et al.* to Credit Risk Management, CSFB, Sept. 8, 1998, regarding Enron interim synthetic lease, at CSFBCO 005423652 [CSFBCO 005423646-CSFBCO 005423653]; Memorandum from James Moran, Director, *et al.*, CSFB, to Credit Committee, CSFB, June 22, 1999, regarding Enron synthetic lease facility, at 3 and 8 [CSFBCO 005703083-CSFBCO 005703091]; Memorandum from James Moran, Director, CSFB, to Robert O'Brien, Chief Credit Officer, David Maletta, Managing Director, and Ed Devine, Managing Director, CSFB, July 15, 1999, regarding Enron $50 million 364-day letter of credit and $40 million 364-day revolving credit, at 2, 4-5 [CSFBCO 000718001-CSFBCO 000718008]; Nov. 19, 1999 Credit Memorandum, at CSFBCO 000722568; May 8, 2000 Credit Memorandum, at 3 and 6-8; Nov. 7, 2000 Credit Memorandum, at CSFBCO 000044697; Dec. 11, 2000 Credit Memorandum, at CSFBCO 000044757-CSFBCO 000044758; May 16, 2001 Credit Memorandum, at CSFBCO 005423490; Sept. 19, 2001 Credit Memorandum, at 8 and 15-20; Sept. 24 Credit Memorandum, at 16-21; Oct. 10, 2001 Credit Memorandum, at 14-19.

[312] CSFB Supplemental Responses.

[313] Second Interim Report, Annex 2 to Appendix M (FAS 140 Transactions).

In the Nile transaction, evidence suggests that CSFB received risk protection for its 3% equity[314] position in the form of the right to put its 3% equity to Enron at par value.[315] This put prevents the equity from being at risk, which CSFB understood was required for Enron to achieve its desired accounting results.[316]

*The Nile Transaction Structure*

In Nile, Enron monetized 24.1 million shares of common stock in an Enron subsidiary called ServiceCo Holdings, Inc. ("ServiceCo"), a "national facilities management" company.[317] Enron, through a subsidiary, contributed the shares to an Asset LLC.[318] In exchange, the Enron subsidiary received $25 million in cash from the Asset LLC and 100% of the voting interest in the Asset LLC.[319] Enron recorded $22.2 million[320] of cash flow from operating activities, $2.8 million[321] of cash flow from investing activities, and gain of $18.9 million.[322]

---

[314] As explained more fully in the Second Interim Report, SPE Accounting Consolidation Analysis requires that the SPEs comply with the 3% Equity Test in order to avoid consolidation with Enron. Second Interim Report, Appendix B (Accounting Standards).

[315] Moran has testified that the put was a "fair market value" put. Moran Sworn Statement, at 71, lines 15-19.

[316] *Id.* at 69, line 23 – 71, line 4.

[317] *See* Project Nile/ServiceCo Monetization, Oct. 1, 2001 (the "Project Nile/ServiceCo Monetization"), at AB1128 00097 [AB1128 00092-AB1128 00097].

[318] Project Nile – FAS 140 Financing Involving EES' Newco, Nov. 7, 2001 ("Project Nile FAS 140 Financing"), at 2-3 [AB1128 00098-AB1128 00101]. For a description of the role of an Asset LLC in a FAS 140 Transaction, see Second Interim Report, Appendix M (FAS 140 Transactions), *Structure of an Initial Monetization*.

[319] Section 6.01, Amended and Restated Limited Liability Company Agreement of Pyramid I Asset, LLC [CSFBCO 006052296-CSFBCO 006052337].

[320] Memorandum to Accounting Files from EES Transaction Support, Enron, Sept. 27, 2001, regarding merchant asset financial reporting (the "Enron Sept. 27, 2001 Memorandum to Accounting Files"), at AB0001223391 [AB0001223389-AB000123391].

[321] *Id.*

[322] *Id.*; Schedule of Enron FAS 125/140 & Total Return Swaps, undated [AB1128 00102].

- 74 -

The Asset LLC received the $25 million from the Sphinx Trust,[323] an SPE, in exchange for 99.99% of the economic interest in the Asset LLC.[324] CSFB purchased the 3% equity in Sphinx Trust intended to comply with the 3% Equity Test for approximately $1.0 million[325] and loaned the remaining approximately $24 million to the Sphinx Trust.[326] The Sphinx Trust entered into a Total Return Swap with ENA[327] pursuant to which ENA agreed to pay amounts equal to principal and interest on the loan that the Sphinx Trust had received from CSFB, and Sphinx Trust agreed to pay ENA all amounts produced by the ServiceCo stock (whether by sale of that stock or otherwise), except for amounts used to repay the equity and a capped return thereon.[328] Enron guaranteed ENA's obligations under this Total Return Swap.[329] A diagram depicting the Nile Transaction's structure appears below:

---

[323] Project Nile FAS 140 Financing, at 3; Receipt of Asset LLC, Sept. 28, 2001, at CSFBCO 006052353 [CSFBCO 006052353-CSFBCO 006052356].

[324] Project Nile FAS 140 Financing, at 2.

[325] *See* Asset Notice, Sept. 28, 2001 (the "Asset Notice") [CSFBCO 006052270-CSFBCO 006052271]. Enron described CSFB as "fully exposed to risk of ServiceCo valuation with no guaranty of return on or of capital." Project Nile/ServiceCo Monetization, at AB1128 0095.

[326] *See* Asset Notice.

[327] Project Nile/ServiceCo Monetization, at AB1128 0095.

[328] *Id.*

[329] *Id.*

- 75 -



A box in bold indicates that the entity is Enron or a wholly owned subsidiary of Enron

The parties' obligations in the Nile Transaction render the transaction virtually indistinguishable from an unsecured loan of approximately $24 million from CSFB to Enron, with Enron retaining the risks and benefits of the ServiceCo stock. Nevertheless, Enron accounted for $22.2 million of the $25 million it received as cash flow from operating activities and the remainder as cash flow from investing activities.[330]

---

[330] Enron Sept. 27, 2001 Memorandum to Accounting Files, at AB0001223391.

*The Accounting Effect of the Nile Transaction*

Although CSFB understood that its equity position in the Sphinx Trust "needed to be at risk"[331] to satisfy the accounting treatment that Enron gave the overall transaction, the evidence indicates that Enron agreed to repurchase CSFB's 3% equity in Project Nile "at par."[332] An internal CSFB document describes the "credit risk" of the equity as being "100% Enron via put."[333] Although this put is described in internal CSFB documents, it is not memorialized in the closing documents for the Nile transaction. CSFB, which has acknowledged it understood "that the equity tranche had to be at [CSFB's] risk,"[334] nevertheless asserts that the put option with Enron preserved that risk because the possibility remained that Enron would not honor its obligations under the put.[335]

---

[331] Moran Sworn Statement, at 69, lines 24-25.

[332] Sept. 24 Credit Memorandum, at 4. Moran has testified that the statement in the Sept. 24 Credit Memorandum was not accurate because, among other things, the equity was "supported by a fair market put. The fair market put if presented to Enron obligates Enron to purchase the security at the price of the put, the price of the fair market put." Moran Sworn Statement, at 92, line 15 – 93, line 10. *See also* Sworn Statement of Robert O'Brien, Chief Credit Officer, CSFB, by M. Russell Wofford, A&B, May 15, 2003, at 51, line 20 – 52, line 19. If the put were at fair market value, then it would provide no protection for CSFB's investment and would likely not have been included in a memorandum seeking credit approval for the transaction. If the put required Enron to purchase the equity at its fair market value rather than at "par," it is arguable that Moran might not have understood the put to have prevented the equity from being at risk.

[333] Sept. 24 Credit Memorandum, at 5; Oct. 10, 2001 Credit Memorandum, at 3-4. *See also* Moran Sworn Statement, at 71, lines 16 – 72, line 14. This put differed from the arrangement described in the Second Interim Report as included in several of the FAS 140 Transactions. Second Interim Report, Appendix M (FAS 140 Transactions). The put described there was between the Sponsor and the Asset LLC and allowed the Asset LLC to require the Sponsor to purchase all or a portion of the asset that was transferred by the Sponsor to the Asset LLC at closing. *Id.*

[334] Moran Sworn Statement, at 72, lines 7-24.

[335] *Id.* at 72, lines 11-24. While the risk exists that any party to a contract could refuse to honor its obligations under that contract, that risk is not the equity risk contemplated by the 3% Equity Test, but is rather a form of credit risk.

- 77 -

As discussed in Appendix B (Accounting Standards) to the Second Interim Report, the 3% Equity Test[336] requires that the equity be "at risk." Because of the existence of the put, CSFB's equity investment was not "at risk" as required by the 3% Equity Test and Enron could not have recognized the approximately $18.9 million in gain in accordance with GAAP. Enron's balance sheet should have reflected the Sphinx Trust's nearly $24 million in debt as Enron debt and should have reflected the cash flows from the transaction as cash flow from financing activities rather than as from operating or investing activities.

---

[336] The Examiner discussed the 3% Equity Test in the Second Interim Report. The relevance of the 3% Equity Test to Enron's FAS 140 Transactions is that in transactions, such as the Nile transaction, where the borrower-SPE is not a QSPE, the 3% Equity Test must be met or the borrower-SPE will be required to be consolidated with Enron, thereby bringing the debt incurred by that SPE onto Enron's balance sheet. *See* Second Interim Report, Appendix M (FAS 140 Transactions), at 27-30.

## IV.    POTENTIAL LIABILITY OF CSFB

### A.    <u>Arguments Supporting the Imposition of Aiding and Abetting Liability and Equitable Subordination</u>

*Aiding and Abetting Liability*

*Elements of Aiding and Abetting Liability.*  As described in Appendix C (Role of Enron's Officers) to the Third Interim Report, the Examiner concluded that certain of the Debtors' officers breached their fiduciary duties under applicable law by causing the Debtors to enter into certain SPE transactions, including FAS 140 Transactions and Prepay Transactions, that were designed to manipulate the Debtors' financial statements and that resulted in the dissemination of financial information known to be materially misleading.  CSFB participated in the formation and funding of LJM1, which facilitated the completion of the LJM1/Rhythms Hedging Transaction, a transaction in which those duties were breached, and in the CSFB Prepay and the Nile transaction, a Prepay Transaction and a FAS 140 Transaction, respectively, similar to transactions of those types in which those duties were breached.  In addition, the Examiner concluded that the Related Party Transactions present facts sufficient for a fact-finder to conclude that Fastow and other Enron officers engaged in self-dealing in violation of the duty of loyalty.  CSFB participated in the transactions involving LJM1, in which those duties were breached.

As set forth more fully in Appendix B (Legal Standards) to the Third Interim Report, assuming the Debtors have standing, an affirmative claim against CSFB for aiding and abetting these breaches of fiduciary duty will exist if:  (i) CSFB had actual knowledge of the wrongful conduct giving rise to the breaches of fiduciary duty; (ii) CSFB gave substantial assistance to the primary wrongdoers; and (iii) injury to the

- 79 -

Debtors was the direct or reasonably foreseeable result of CSFB's conduct. The evidence is sufficient for a fact-finder to conclude that CSFB aided and abetted Fastow and certain other Enron officers in breaching their fiduciary duties.

*Analysis of Evidence.* CSFB knew that LJM1 would enter into the LJM1/Rhythms Hedging Transaction with Enron and CSFB was in possession of all the facts necessary to conclude that the LJM1/Rhythms Hedging Transaction was a non-economic hedge. CSFB was also in possession of all the facts necessary to conclude that Enron paid significant value in a transaction in which it had no possibility of obtaining an economic return and that the transaction was designed to give Enron only a potential financial statement benefit. CSFB knew that the Enron stock held by LJM1 could not be hedged, sold or transferred and could not be used to enrich Fastow. There is also evidence that, through structuring and implementing the SAILS transaction, CSFB provided substantial assistance to Fastow, enabling him to profit from the Enron stock notwithstanding his representation to the Enron Board and the express prohibition contained in the Amended Partnership Agreement. In addition, there is evidence that CSFB knew that the CSFB Prepay and the Nile transaction would contribute to the materially misleading nature of Enron's financial statements, and that CSFB provided substantial assistance to Enron in completing those transactions.

With respect to LJM1, CSFB understood that Fastow had designed a transaction that resulted in the transfer of significant value in the form of Enron stock from Enron to LJM1. Because of the conflicts of interest between Fastow and Enron that were inherent in this arrangement, CSFB had concerns about the propriety of the transaction and took steps to ensure that the Enron Board and Enron's senior management, lawyers and

accountants had approved its terms. CSFB learned that the Enron Board had approved the transaction, subject to the condition that Fastow not be permitted to have any pecuniary interest in the Enron stock and the imposition of restrictions on the transfer or hedging of the Enron stock held by LJM1. CSFB was aware that Fastow was to share in only those distributions and allocations other than distributions or allocations of or resulting from the Enron stock transferred to LJM1 or proceeds resulting from those shares.[337] Further, CSFB knew that Fastow's management fee was to be calculated by reference to assets in LJM1 other than the shares of Enron stock transferred to LJM1 or proceeds resulting from those shares.[338]

Notwithstanding this knowledge, CSFB immediately after closing began to structure and implement the SAILS transaction, which accomplished precisely what had been prohibited by these restrictions. CSFB monetized the right to its allocable portion of the Enron shares held by LJM1, resulting in a substantial cash payment. CSFB then contributed that cash to LJM1 and, through LJM1, to Fastow. In so doing, CSFB enabled the parties to treat the proceeds of the transaction as an additional capital contribution by CSFB to LJM1 from which Fastow could profit. Over the life of LJM1, largely as a result of the asserted change in character of LJM1's assets through the SAILS transaction, Fastow and his colleagues received over $40 million.[339]

The outside counsel representing CSFB in connection with LJM1 understood this restriction. James Clark, an attorney with the firm of Cahill, Gordon & Reindel, LLP,

---

[337] Section 4.2, Partnership Agreement. As noted above, CSFB's subsidiary, ERNB, was a party to the Partnership Agreement.

[338] Id. Section 5.2.

[339] This number includes the amounts received by an entity controlled by Fastow and by certain of Fastow's colleagues in connection with Enron's termination of the LJM1/Rhythms Hedging Transaction.

testified that "I have a general recollection of a principle that Enron told us they had established, which was that they did not want Mr. Fastow to profit from transactions that resulted – as a result of sales of Enron's common stock or something of that nature."[340] Clark also testified that throughout the negotiations of the Partnership Agreement and his involvement with LJM1, this principle never changed.[341] As RBS explicitly noted at the time, the consequences of the SAILS transaction were never what had been contemplated by the parties at the outset. Further, while Causey consented to the SAILS transaction on behalf of Enron, there is no evidence that CSFB sought confirmation that the Enron Board, Enron's counsel or Enron's accountants approved the transaction.[342]

There is also sufficient evidence for a fact-finder to conclude that CSFB was in possession of all the facts necessary to conclude that the LJM1/Rhythms Hedging Transaction was a non-economic hedge that would contribute to Enron's financial statements being materially misleading. A fact-finder could also conclude that CSFB knew that Fastow and other Enron officers were engaged in self-dealing that constituted a breach of their fiduciary duties to Enron and that through SAILS, CSFB provided substantial assistance to these officers in effecting these breaches.

---

[340] Clark Sworn Statement, at 36, lines 2-7.

[341] *Id.* at 36, line 25 – 37, line 6.

[342] The Examiner has found no evidence that the SAILS transaction was considered or approved by the Enron Board.

Under the applicable law of aiding and abetting, courts often include, as part of the element of substantial assistance, a requirement that the harm caused must be a reasonably foreseeable result of the actions of the aider and abettor. In LJM1, CSFB's participation in a limited partnership that it understood was formed principally for the purpose of executing the LJM1/Rhythms Hedge Transaction – which CSFB had sufficient information to determine was a non-economic hedge – resulted in Enron transferring significant value for no economic return and led to the dissemination of materially misleading financial information by Enron. A fact-finder could conclude that this result was reasonably foreseeable. Similarly, a fact-finder could conclude that Enron would not have consented to Fastow's participation in LJM1 had it known that subsequent transactions would be designed and implemented to enable Fastow to profit personally from the Enron stock transferred to LJM1. A fact-finder could conclude that a reasonably foreseeable result of the SAILS transaction was to enable Fastow to profit from the Enron stock notwithstanding his prior representations to the Enron Board and the provisions of the Amended Partnership Agreement.

There is also sufficient evidence for a fact-finder to conclude that CSFB's conduct in connection with the CSFB Prepay and the Nile transaction would support an affirmative claim against CSFB for aiding and abetting breaches of fiduciary duty by Enron officers. In each case, there is evidence that CSFB knew that these transactions would contribute to Enron's financial statements being materially misleading. CSFB knew that the CSFB Prepay was effectively a loan. No direct evidence discovered to date by the Examiner confirms that CSFB understood that the cash flow from the CSFB Prepay would be recorded as cash flow from operating activities. However, given that

CSFB routinely reviewed Enron's financial statements and given that net changes in price risk management activities is a sub-account of cash flow from operating activities, a fact-finder could infer that CSFB understood that Enron accounted for the cash proceeds from the CSFB Prepay as cash flow from operating activities.

In the Nile transaction, CSFB made the 3% equity investment in Sphinx Trust only after obtaining a put from Enron that would require Enron to repurchase the equity at par. This prevented the equity from being at risk. CSFB knew that, despite the existence of this put, Enron would account for the Nile transaction as a sale.

Thus, a fact-finder could conclude that CSFB was aware that Enron's officers were breaching their fiduciary duties by completing transactions that would not be properly disclosed in its financial statements. A fact-finder also could conclude that by participating in and funding these transactions, CSFB provided substantial assistance to these officers in connection with these breaches. Finally, a fact-finder could conclude that the damages suffered by Enron as a consequence of the preparation and dissemination of these materially misleading financial statements, including incurring the costs of governmental investigations, the administrative costs of Enron's bankruptcy proceeding, and losses caused by the "deepening insolvency" of Enron that occurred while its true financial condition was disguised, were reasonably foreseeable results of CSFB's conduct in connection with these transactions.

*Equitable Subordination*

As set forth more fully in Appendix B (Legal Standards) to the Third Interim Report, CSFB's claims against the Debtors may be equitably subordinated if CSFB engaged in inequitable conduct and such conduct resulted in injury to creditors or an

- 84 -

unfair advantage to CSFB. The evidence discussed above supports a finding that CSFB engaged in inequitable conduct that allowed Enron to produce materially misleading financial statements and Fastow and other Enron officers to enrich themselves in violation of their duties of loyalty. Enron's other creditors were injured because Enron was damaged by transactions involving LJM1 and because the misleading financial results were publicly reported and disseminated by Enron. In addition, a fact-finder could conclude that by publishing Launer's positive equity analyst reports, while simultaneously discouraging Sakol from publishing her more negative fixed-income analyst reports and selling Enron securities in the open market, CSFB engaged in inequitable conduct and that such conduct resulted in injury to other creditors and an unfair advantage to CSFB. Therefore, the Examiner concludes that sufficient evidence exists for a court to equitably subordinate the claims of CSFB to those of other creditors.

### B.  Arguments Against the Imposition of Aiding and Abetting Liability and Equitable Subordination

The Examiner has considered certain of the arguments that CSFB might assert as defenses to aiding and abetting liability and equitable subordination, including:

- With respect to LJM1, CSFB may argue that it reasonably believed that there was no breach of any fiduciary duty by any Enron officer because the transfer of value to LJM1, and therefore to Fastow, was approved by the Enron Board after full disclosure;

- With respect to the SAILS transaction, CSFB may argue that it reasonably believed that there was no contravention of Enron's requirements with respect to the Enron stock because the SAILS transaction was known to, and approved by, a senior officer of Enron;

- CSFB, as a limited partner in LJM1, may argue that it did not approve or substantially participate in any decision by LJM1 to distribute value to Fastow or any other Enron officer and had no responsibilities with respect to the characterization of property held by LJM1 under the Amended Partnership Agreement;

- 85 -

- With respect to LJM1, the CSFB Prepay and Nile, CSFB may argue that it relied on Enron's obtaining its own independent accounting advice with respect to its financial statements and other disclosures;

- With respect to the CSFB Prepay and Nile, CSFB may argue that it did not have knowledge of Enron's accounting for significant aspects of the transactions;

- With respect to Nile, CSFB may argue that Enron's unwritten agreement to repurchase the equity was legally unenforceable and, therefore, did not adversely affect Enron's accounting for that transaction; and

- With respect to the CSFB Prepay and the Nile transaction, CSFB may argue that these transactions were not material to Enron's reported financial performance.

*Reliance on Enron Board Approval of LJM1*

CSFB sought and obtained confirmation that the Enron Board and Enron's senior management and accountants had approved the establishment of LJM1 and the transfer of value to LJM1 through the transfer of the Enron stock. The Examiner recognizes that CSFB's actions in this regard provide evidence from which a fact-finder could conclude that CSFB was not aware of any breach by Fastow of his duties to Enron in connection with this transaction.

*Reliance on Enron Approval of SAILS*

CSFB obtained Enron's approval of the SAILS transaction, including the Escrow Agreement through which LJM1 transferred one-half of its Enron shares into escrow for CSFB's benefit, as evidenced by the Enron SAILS Consent[343] executed on behalf of Enron by Causey. The Escrow Agreement contemplated the transfer of those shares from escrow to ERNB at any time upon receipt of a certificate from ERNB, but in no event later than October 15, 2001. Through the Enron SAILS Consent, Causey also consented,

---

[343] Enron SAILS Consent, at CSFBCO 000008678.

on Enron's behalf, to an amendment to the Partnership Agreement that characterized the payment by CSFB to LJM1 in December 1999 (a sum derived from the proceeds of the SAILS transaction) as an "Additional Capital Contribution." A fact-finder could therefore conclude that CSFB's role in the transfer of shares from LJM1 into escrow for the benefit of ERNB did not circumvent the Lock-Up Agreement or result in a violation of the Amended Partnership Agreement by providing Fastow with pecuniary value from the Enron shares transferred to LJM1. Such defenses must be weighed by the fact-finder against evidence suggesting CSFB understood that Fastow represented to the Enron Board at the time of its approval of LJM1 that he would not profit from the Enron shares transferred to LJM1. In addition, there is no evidence of approval by the Enron Board of the SAILS transaction, including the Escrow Agreement, or of any transaction that might have facilitated transfer to Fastow of the value of any Enron shares held by LJM1.

*CSFB's Role as Limited Partner of LJM1*

CSFB could argue that it did not substantially participate in any transfer of value to Fastow and other Enron officers. CSFB could argue that the transfer of value resulted from the declaration of distributions from LJM1 to Fastow and other Enron officers, that CSFB was a limited partner in LJM1 and that CSFB did not have any right to approve or disapprove (or duty to monitor) distributions of funds to the LJM1 partners. A fact-finder could view this as evidence that the "substantial participation" element of an aiding and abetting claim is not satisfied.

Evidence supports this defense and the defenses that CSFB believed the Enron Board approved LJM1 and Enron approved the SAILS transaction. A fact-finder would have to weigh this evidence against factors such as CSFB's knowledge that Fastow was

- 87 -

profiting from the transactions involving LJM1 and that the source of this profit was the Enron stock in LJM1. Further, CSFB's substantial participation in the SAILS transaction facilitated this transfer of value, which was prohibited by the terms of the Amended Partnership Agreement.

### Reliance on Independent Accounting Advice

The CSFB Prepay and the Nile transaction were complex and required sophisticated accounting analyses and interpretations. CSFB may argue that its reliance on Enron being financially sophisticated and receiving accounting advice from one of the most well-respected accounting firms in the world precludes it from having any scienter or intent to aid and abet Enron's financial misrepresentations.

CSFB may have relied on Enron's obtaining accounting advice from Andersen. For example, an internal email discussing the CSFB Prepay noted that the "structure [was] determined by Enron in consultation with the accountants (AA) [Arthur Andersen] and does not seem to be changeable."[344] CSFB also may argue that it acted in accordance with financial services industry standards in effect at those times. In fact, in the CSFB Prepay transaction, CSFB sought representations from Enron confirming elements of the foregoing.

Whether CSFB's reliance on Enron's obtaining independent accounting advice was reasonable is a question of fact. There is evidence from which a fact-finder could conclude that such reliance was not reasonable. Even if CSFB's reliance on Andersen's approval of the GAAP accounting was reasonable, evidence exists indicating that CSFB was aware that Enron's disclosure of the CSFB Prepay was not consistent with the

---

[344] Dec. 12, 2000 Emmett/Smailes Email, at 4.

economic substance of the transaction. A fact-finder could infer that CSFB knew that Enron's disclosure of the CSFB Prepay contributed to its cash flows from operating activities being materially inflated and its debt being materially understated.

With respect to potential aiding and abetting liability, whether a fact-finder would infer that CSFB knew that the lack of disclosure related to those transactions would contribute to the dissemination of materially misleading financial information is the fundamental issue, not whether the technical rules of GAAP were satisfied or whether CSFB relied on Enron's auditors. Accordingly, even if CSFB could demonstrate that it believed Enron's accounting for the Prepay Transactions was correct, the Examiner is unable to conclude that CSFB must be excused as a matter of law from potential aiding and abetting liability. Similarly, the Examiner is unable to conclude that a fact question on these issues would demand a finding that CSFB did not engage in inequitable conduct in connection with the CSFB Prepay.

*Lack of Knowledge Regarding Enron's Accounting*

CSFB may also argue that it lacked knowledge of how Enron accounted on its statement of cash flows for the proceeds it received from the CSFB Prepay, and that such a lack of knowledge precludes or mitigates against a finding of aiding and abetting liability or equitable subordination.

The Examiner has not uncovered any documentary evidence that conclusively establishes that CSFB knew how Enron accounted for the cash proceeds that it received from the CSFB Prepay. Thus, CSFB may argue that it was unaware of how Enron's officers used the CSFB Prepay to manipulate Enron's financial statements, at least with respect to its statement of cash flows.

- 89 -

Whether CSFB had sufficient knowledge of acts giving rise to breaches of fiduciary duty by officers of Enron is a question of fact. Evidence exists indicating that CSFB knew that the CSFB Prepay was in substance a loan but was not accounted for as debt by Enron on its balance sheet. CSFB also considered the CSFB Prepay a transaction for which it needed to obtain its "standard representations for accounting-driven transactions" to mitigate any reputational risk.[345] Such evidence, alone, is sufficient to create an issue of fact.

Finally, there is evidence from which a fact-finder could reasonably infer that CSFB had knowledge that Enron accounted for the cash proceeds it received from the CSFB Prepay as cash flow from operating activities. As noted above, CSFB understood that Enron accounted for the CSFB Prepay as price risk management activities and recorded obligations under the CSFB Prepay as price risk management liabilities. CSFB reviewed Enron's financial statements in connection with the preparation of internal memoranda seeking approval for various transactions with Enron. On Enron's statement of cash flows, the line item for price risk management activities appears under cash flow from operating activities and nowhere else.[346] Accordingly, a fact-finder could infer that CSFB, in its review of Enron's financial statements, understood that Enron accounted for the cash proceeds from the CSFB Prepay as cash flow from operating activities.

---

[345] Wootton Sworn Statement at 42, lines 17-22 and 46, lines 17-23; *see also* Dec. 14, 2000 Wootton Email, at 1 ("If this is an accounting-driven transaction, and I had understood before that it is, the Firm's standard representations for accounting driven transactions will presumably be required to be inserted in the confirmations?").

[346] *See* Enron 1999 Annual Report, Statement of Cash Flows.

*Enforceability of Unwritten Support*

The Examiner also has considered whether Enron's agreement to repurchase the equity in the Nile transaction, reflected in internal CSFB documents but not in a written agreement with Enron, was enforceable as a matter of law and a matter of fact. As discussed in the Third Interim Report, agreements that are "oral" or "unwritten" may be legally enforceable contracts.[347] Sufficient evidence exists for a fact-finder to conclude either that CSFB relied to its detriment by purchasing the equity based upon Enron's assurances that the equity investment would be repaid.[348] Thus, the fact-finder could determine that the assurances of repayment were offered as consideration for CSFB's agreement to purchase the equity, an offer that CSFB accepted. If the fact-finder were to make that determination, then the equity was not "at risk" as required by GAAP rules pursuant to traditional contract law, or pursuant to theories of promissory estoppel or detrimental reliance.

As discussed in the Third Interim Report, regardless of the enforceability of the put, a fair reading of the applicable GAAP suggests that the "at risk" rule of the 3% Equity Test requires that the equity be at risk not just as a matter of strict legal form, but that it be at risk in substance as well. Thus, the intentions of the parties must be considered in determining whether the equity is truly at risk. The evidence suggests that CSFB relied upon the existence of the put in purchasing the equity interest, fully

---

[347] Third Interim Report, *Potential Defenses to Aiding and Abetting Claims and Equitable Subordination – Impact of Agreements or Assurances on Equity at Risk.*

[348] The existence of the put is discussed in the credit approval memoranda prepared by CSFB in connection with the Nile transaction. Sept. 19 Credit Memorandum, at 4; Sept. 24 Credit Memorandum, at 4. As noted above, CSFB representatives have testified that the put required Enron to repurchase the equity at fair market value.

expecting Enron to honor the agreement.[349]   Thus a fact-finder could determine that CSFB was in fact looking to Enron for the return of its equity and, in substance, the equity was not at risk.  CSFB may have had other reasonable bases for concluding that its equity would be repaid in full at maturity.  For example, CSFB may have believed that, given Enron's requirement to repay the debt that represented approximately 97% of the amount owed in the transaction, it would have no incentive not to pay the additional 3% and reacquire the underlying asset.  Other structural elements of the Nile transaction may have also provided some degree of assurance to CSFB.

CSFB's expectations, considered in isolation, were based on economic realities and were consistent with the accounting rules.  These normal commercial expectations, however, did not arise, and may not be considered, in isolation.  They arose in the context of Enron's specific assurances regarding the repayment of the 3% equity.  Thus, a fact-finder could determine that the put was the principal or exclusive basis for CSFB's expectations of recovery from Enron of its 3% equity investment.  Accordingly, there is sufficient evidence for the fact-finder to conclude that the put was in fact and substance a "residual guarantee" under the applicable GAAP.  Under this analysis, the equity investments are not "at risk" as required under the 3% Equity Test.

*Lack of Materiality*

CSFB also may argue that the CSFB Prepay and the Nile transaction were not material to Enron's stated financial performance.  Accordingly, there would be no claims against CSFB based upon its participation in these transactions because no damages resulted from Enron's failure properly to disclose or account for these transactions.  The

---

[349] CSFB's credit approval memoranda refer to Enron's agreement to repurchase the equity "at par the principal and interest." Sept. 19 Credit Memorandum, at 4.

impact of the CSFB Prepay and the Nile transaction on Enron's reported financial statements was less significant than the impact of the Prepay Transactions and FAS 140 Transactions entered into between Enron and certain other financial institutions. However, as noted above, the CSFB Prepay and the Nile transaction contributed to allowing Enron to misstate significantly both its cash flow from operating activities and its debt. Thus, evidence exists from which a fact-finder could conclude that these transactions had a material impact on Enron's reported financial performance.

## C.    Conclusions

Through transactions involving LJM1, Enron entered into a non-economic hedge that resulted in Enron transferring significant value for no economic return and contributed to its financial statements being materially misleading, and Fastow and other Enron officers enriched themselves at the expense of Enron in violation of their fiduciary duties. CSFB participated in various aspects of these transactions. In addition, CSFB participated in SPE transactions, which contributed to Enron's misleading financial statements. While CSFB has various defenses, the evidence reviewed by the Examiner and the reasonable inferences that may be drawn from that evidence are sufficient for a fact-finder to conclude that CSFB aided and abetted certain Enron officers in breaching their fiduciary duties in connection with these transactions. There is also sufficient evidence of inequitable conduct by CSFB in connection with these transactions for a court to conclude that CSFB's claims should be equitably subordinated to the claims of other creditors.

As a result, CSFB's claims in the Bankruptcy Case totaling at least $417 million are susceptible of being equitably subordinated to the claims of other creditors. This

subordination would be in addition to any affirmative recovery that may be available to the Debtors against CSFB for aiding and abetting the officers' breaches of fiduciary duty, assuming that the Debtors have standing to pursue such a claim.

## V.    POTENTIAL VOIDABLE PREFERENCE LIABILITY OF CSFB

As noted in the Prior Reports, many of Enron's SPE transactions give rise to voidable preference claims under Section 547 of the Bankruptcy Code.  Section 547 permits a debtor to avoid certain prepetition transfers as preferences if there is (i) a transfer, (ii) of an interest of the debtor in property, (iii) to or for the benefit of a creditor, (iv) for or on account of an antecedent debt owed by the debtor before such transfer was made, (v) made while the debtor was insolvent, (vi) on or within ninety days (or one year for an "insider" transferee) before bankruptcy, (vii) that enables the creditor to receive more than it would receive in a Chapter 7 case if the transfer had not been made.[350] Section 547(c) of the Bankruptcy Code,[351] among other sections,[352] provides certain affirmative defenses to preference liability, depending on the nature and circumstances surrounding the transfer.

The refinancing of the CSFB Prepay in late September 2001 gives rise to potential preference liability for Credit Suisse First Boston International (USA) Inc. ("CSFBi (USA)").  Specifically, on September 27, 2001, ENA transferred approximately $153.9 million to CSFBi (USA).[353]  The amount transferred was property of ENA and was transferred to CSFBi (USA),[354] a creditor, on account of an antecedent debt, the CSFB Prepay.  The transfer was within ninety days of the Petition Date, when ENA is presumed

---

[350]  11 U.S.C. § 547(b).

[351]  11 U.S.C. § 547(c).

[352]  *See, e.g.*, 11 U.S.C. § 546(g).

[353]  *See* SAP Wire Transfer Request in respect of $153,945,728 paid by ENA to CSFBi, Sept. 27, 2001 [AB000271644-AB000271645].

[354]  The counterparty to the CSFB Prepay in September 2001 was CSFBi (USA).  CSFBi received the funds on account of the obligations under the CSFB Prepay.  Accordingly, the transfer was made on account of an antecedent indebtedness, the CSFB Prepay.

- 95 -

to be insolvent. Finally, the transfers enabled CSFBi (USA) to receive more than if ENA filed a Chapter 7 case, as this was a payment of unsecured debt. Accordingly, all of the elements of a preferential transfer can be established against CSFBi (USA) and ENA has a *prima facie* case for recovery of $153.9 million from CSFBi (USA).

CSFBi (USA) is likely to assert several defenses to this preference action. First, CSFBi (USA) is likely to argue that the payment is not recoverable because it was made under and in connection with a "swap agreement," and thus insulated from avoidance under Section 546(g) of the Bankruptcy Code. For the reasons set forth in the Third Interim Report,[355] the Examiner concludes that ENA likely would succeed in arguing that the CSFB Prepay swaps are not swap agreements for bankruptcy purposes, because these are swap agreements in name only and in all other respects functioned as loans and were intended by all the parties to function as loans; as noted above, CSFB representatives also viewed the CSFB Prepay as a loan. Thus, Section 546(g) of the Bankruptcy Code should not shield these transfers from avoidance.

In addition, for the reasons also set forth in the Third Interim Report,[356] the Examiner believes that CSFBi (USA) will not be able to establish that this transfer was in the ordinary course of business. Although the transfer in question appears to have been made in accordance with the terms of the documents governing the CSFB Prepay, the underlying transaction (and the debt it created) was not ordinary or customary, but rather, was a highly unusual financial arrangement designed to manipulate Enron's reported results of operations, cash flows and financial position. Thus, CSFBi (USA) will likely

---

[355] *See* Third Interim Report, Annex 6 to Appendix J (Avoidance Actions), at 29-39.

[356] *See id.* at 11-18.

not succeed in asserting an ordinary course of business defense under Section 547(c)(2) of the Bankruptcy Code.

However, the transfer to CSFBi (USA) was made as a part of the refinancing of the CSFB Prepay, in which approximately $150 million was advanced to ENA from CSFB's Cayman Island branch.[357] Thus, CSFBi (USA) likely will assert the additional affirmative defense that there was a contemporaneous exchange for new value under Section 547(c)(1).[358] The contemporaneous exchange defense under Section 547(c)(1) does not require that the creditor receiving the preferential payment extend the new value, if it caused another party to extend value to the debtor.[359] However, the defense is limited to the actual value provided to ENA[360] and, in the case of the CSFB Prepay refinance, $153.9 million was paid by ENA while only approximately $150 million was received by ENA. Accordingly, the contemporaneous exchange defense would not protect the full amount of the $153.9 million preferential payment, leaving approximately $3.9 million in liability.[361]

---

[357] Enron Cash Receipts Report [AB0971 02989].

[358] 11 U.S.C. § 547(c)(1).

[359] *See, e.g., Gulf Oil Corp. v. Fuel Oil Supply & Terminaling, Inc. (In re Fuel Oil Supply & Terminaling, Inc.),* 837 F.2d 224 (5th Cir. 1988) (where debtor's payments to creditor resulted in creditor's release of letters of credit, which then caused the banks issuing the letters of credit to release certain collateral to the debtor which benefited the debtor's estate, the creditor has provided a contemporaneous exchange for new value and is not liable on the preference to the extent of such value).

[360] *See* Third Interim Report, Annex 6 to Appendix J (Avoidance Actions), at 10.

[361] Another possible defense would be the new value defense under 11 U.S.C. § 547(c)(4). However, the new value defense likely will not apply here as the cases construing Sections 547(c)(4) typically require the new value to be advanced by the same creditor that received the preferential payment. *See* 11 U.S.C. § 547(c)(4) ("The trustee may not avoid under this section a transfer . . . to or for the benefit of a creditor, to the extent that, after such transfer, *such creditor* gave new value to or for the benefit of the debtor . . .") (emphasis added); *see also Sender v. Buchanan (In re Hedged-Investments Assocs., Inc.),* 163 B.R. 841, 852 (Bankr. D. Colo. 1994) ("The new value defense is unique to the specific creditor involved . . . [t]he Defendant cannot claim because *other* creditors made advances to the Debtor subsequent to the transfers [the Defendant] received, [the Defendant] gets the benefit of those subsequent advances under § 547(c)(4).") (emphasis in original), *aff'd on other grounds,* 84 F.3d 1286 (10th Cir. 1996); *Country Junction, Inc. v. Money Exch. (In re Country Junction, Inc.),* 49 B.R. 708, 709 (Bankr. W.D. Tex. 1985)

The burden of production and persuasion would be on CSFBi (USA) to demonstrate that the elements of the contemporaneous exchange for value defense exist. Assuming that CSFBi (USA) can establish the elements of the contemporaneous exchange for value defense under Section 547(c)(1), based on the above analysis, the Examiner concludes that approximately $3.9 million likely can be avoided as a preferential transfer and may be recoverable by the bankruptcy estate of ENA. If CSFBi (USA) cannot prove any other defenses, then approximately $3.9 million can be recovered from CSFBi (USA), for the benefit of ENA's estate. In addition, pursuant to Section 502(d) of the Bankruptcy Code,[362] if CSFBi (USA) does not pay ENA's estate on account of this preference claim, the claim it holds against ENA, in an amount of approximately $62 million,[363] will be disallowed.

---

("The statute requires that the 'new value' be extended by the same creditor which received the benefit of the preference payments."), *vacated by agreement*, No. 86-1741, 1987 WL 49438 (5th Cir. Aug. 3, 1987).

[362] 11 U.S.C. § 502(d).

[363] Proof of Claim of CSFBi, filed against ENA in the amount of $62,013,987, at 3 [Claim No. 0000007525].

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------- x
                                          :

In re:                            :         **Chapter 11**
                                            :

**ENRON CORP.,** *et al.,*         :         **Case No. 01-16034 (AJG)**
                                            :

                 **Debtors.**        :         **Jointly Administered**
                                            :

--------------------------------------------------- x

## APPENDIX G

### (Role of Toronto Dominion and its Affiliates)

to

## FINAL REPORT OF NEAL BATSON,
## COURT-APPOINTED EXAMINER

      Reference is made to the preceding Final Report of Neal Batson, Court-Appointed Examiner (the "Report"). This Appendix constitutes an integral part of the Report. All capitalized terms not otherwise defined herein shall have the meanings set forth in the Report.

TABLE OF CONTENTS

I.  INTRODUCTION ........................................................................... 1
    A.  Introduction and Overview ...................................................... 1
    B.  Toronto Dominion's Role in Enron's SPE and Related
        Transactions ...................................................................... 4
    C.  Background Information ........................................................... 6

II. HISTORY AND DEVELOPMENT OF TORONTO DOMINION'S
    INVOLVEMENT WITH ENRON ......................................................... 9
    A.  Relationship Between Toronto Dominion and Enron ................................. 9
    B.  Toronto Dominion's Knowledge of Enron's Financial Condition ........... 18

III. TORONTO DOMINION'S ROLE IN ENRON'S PREPAY
     TRANSACTIONS ...................................................................... 22

IV. POTENTIAL LIABILITY OF TORONTO DOMINION .................................... 53
    A.  Arguments Supporting the Imposition of Aiding and Abetting
        Liability and Equitable Subordination ........................................ 53
    B.  Arguments Against the Imposition of Aiding and Abetting
        Liability and Equitable Subordination ........................................ 57
    C.  Conclusions ...................................................................... 63

V.  POTENTIAL VOIDABLE PREFERENCE LIABILITY OF TORONTO
    DOMINION ............................................................................ 64

# I.    INTRODUCTION

## A.    <u>Introduction and Overview</u>

In Appendix C (Role of Enron's Officers) to the Third Interim Report, the Examiner concluded that there is sufficient evidence for a fact-finder to determine that certain of the Debtors' officers breached their fiduciary duties under applicable law by causing the Debtors to enter into certain SPE and related transactions that were designed to manipulate the Debtors' financial statements and that resulted in the dissemination of financial information known to be materially misleading.  These wrongful acts caused direct and foreseeable harm to Enron itself and resulted in harm to innocent parties that dealt with Enron, including certain creditors in the Bankruptcy Case.

This Appendix considers the role of Toronto Dominion Bank ("Toronto Dominion") in the Debtors' SPE and related transactions.  Toronto Dominion helped Enron implement a number of such transactions.  These include six Prepay Transactions, three of which the Examiner analyzed in the Third Interim Report[1] (these six Prepay Transactions are referred to collectively as the "Toronto Dominion Prepays").  In Appendix C (Role of Enron's Officers) to the Third Interim Report, the Examiner concluded that there is sufficient evidence for a fact-finder to determine that certain of the Debtors' officers breached their fiduciary duties by causing Enron to enter into the Prepay Transactions.

In this Appendix, the Examiner discusses evidence indicating that:  (i) Toronto Dominion had actual knowledge of the wrongful conduct giving rise to breaches of fiduciary duty by the Debtors' officers; (ii) Toronto Dominion gave substantial assistance

---

[1]  *See* Third Interim Report, Appendix D (Role of Citigroup and its Affiliates).

to the Debtors' officers by participating in the Toronto Dominion Prepays; and (iii) injury
to the Debtors was the direct or reasonably foreseeable result of this conduct.   The
evidence reviewed by the Examiner, and the reasonable inferences that may be drawn
from that evidence, are sufficient for a fact-finder to conclude[2] that Toronto Dominion
aided and abetted such officers in breaching their fiduciary duties.   In addition, there is
sufficient evidence of inequitable conduct by Toronto Dominion in connection with the
Toronto Dominion Prepays for a court to conclude that Toronto Dominion's claims
should be equitably subordinated to the claims of other creditors.

As set forth more fully below, Toronto Dominion's conduct in the Toronto
Dominion Prepays enabled Enron to complete approximately $2 billion of financings.[3]
As a result of these financings, Enron improperly recorded approximately $1.5 billion of
cash flow from operating activities and understated the debt on its balance sheet by
approximately $250 million on December 31, 1998, $500 million on June 30, 1999, $324
million on December 31, 1999, and $270 million on December 31, 2000.

The evidence would allow a fact-finder to conclude that Toronto Dominion
assisted Enron in completing the Toronto Dominion Prepays, with gross proceeds totaling

---

[2]  *See* Report, *Standard Adopted by the Examiner.*

[3]  The proceeds of one of the Toronto Dominion Prepays appears to have been used to repay an outstanding Toronto Dominion Prepay that was maturing.  The $675 million Jethro Prepay Transaction refinanced and extended the $500 million Truman Prepay Transaction. *See* Toronto Dominion Corporate Credit Review for Enron, Firefly Trust and ENA, Sept. 25, 1999 (the "Sept. 25, 1999 Corporate Credit Review") [TDB-EX 000170-TDB-EX 000198].   The $2 billion total represents the gross amount of the six Toronto Dominion Prepays.  This total includes the proceeds of three prepay transactions that were either partially or completely funded by other financial institutions, including:  (i) Truman, a $500 million transaction, in which Citigroup funded $250 million and Toronto Dominion funded $250 million; (ii) Jethro, a $675 million transaction, in which Citigroup funded $337.5 million and Toronto Dominion funded $337.5 million; and (iii) Nixon, a $324 million transaction, in which Barclays funded $110 million, RBS funded $110 million and Citigroup funded $104 million.  The Examiner has included the total amounts of these transactions in the $2.0 billion total because, as discussed below, Toronto Dominion played roles in each transaction that facilitated Enron's ability to obtain the full amount of each transaction, and Enron considered each transaction to be a single transaction. *See* Enron Corp. Chief Financial Officer Report, Aug. 13, 2001 (the "August 2001 Fastow Report"), at 2-12 [AB0247 02299-AB0247 02310].

approximately $2 billion, even though Toronto Dominion knew that Enron's accounting for these transactions, with no other meaningful related disclosure, would result in the misleading presentation of Enron's financial condition.

The Examiner has reviewed a substantial amount of evidence, including documentary and testimonial evidence, and has noted reasonable inferences that could be drawn from the evidence. A fact-finder may draw alternative or contrary inferences from the same evidence. Moreover, there are certain defenses to aiding and abetting liability and equitable subordination available to Toronto Dominion. Whether Toronto Dominion will succeed on one or more defenses will depend upon the fact-finder's resolution of the facts.

The elements most likely to present issues of material fact for consideration by the fact-finder are:

- The degree of Toronto Dominion's *knowledge* of the acts giving rise to the breaches of fiduciary duty. In particular, whether Toronto Dominion knew that Enron's reporting of the Toronto Dominion Prepays would result in the materially misleading presentation of Enron's financial condition because the transactions were disclosed in a manner that disguised their economic substance so as to mislead Rating Agencies, creditors and investors. As part of this determination, the fact-finder may consider, among other things: (i) Toronto Dominion's knowledge that the economic substance of these transactions was inconsistent with the disclosure; and (ii) whether there was any reliance on accounting representations from Enron or from Andersen through Enron, and if so, whether this reliance was reasonable.

- The degree of *assistance* provided by Toronto Dominion to Enron's officers. As part of this determination, the fact-finder may consider whether Toronto Dominion designed the transaction, structured the transaction, consummated the transaction or took any action that assisted Enron in the misleading presentation of its financial condition.

- 3 -

- Whether it would have been *reasonably foreseeable* to Toronto Dominion that these transactions would cause injury to Enron and/or its creditors. As part of this analysis, a fact-finder may consider whether the transaction had a material impact on Enron's financial statements.

Toronto Dominion's claims in the Bankruptcy Case, which total approximately $57.8 million,[4] are susceptible of being equitably subordinated to the claims of other creditors. This would be in addition to any affirmative recovery that would be available to the Debtors against Toronto Dominion for aiding and abetting the Debtors' officers in breaches of fiduciary duty, assuming the Debtors have standing to pursue such a claim.

### B.   Toronto Dominion's Role in Enron's SPE and Related Transactions

Toronto Dominion played an important role in Enron's Prepay Transactions, participating in six Prepay Transactions from December of 1998 through December of 2000 that generated total proceeds of approximately $2 billion. In five of the six Toronto Dominion Prepays, Toronto Dominion loaned funds to Enron. These loans totaled over $1.1 billion, although some of the funds appear to have been immediately returned to Toronto Dominion to repay existing Prepay Transactions. In each of the six Toronto Dominion Prepays, a financial institution served as the conduit entity that Enron believed was necessary to accomplish its accounting objectives.[5] In one Prepay Transaction,

---

[4] The Examiner has reviewed: (i) the proofs of claim filed by Toronto Dominion against the Debtors; (ii) Toronto Dominion's responses to the Examiner's request for information about its relationship with Enron; and (iii) information provided by Enron itself. Based on that information, it appears that Toronto Dominion's claims against the Debtors total approximately $57.8 million.

[5] In its Administrative Proceeding against Citigroup, the SEC indicated that it sees no distinction between the Prepays entered into by Citigroup that involved an SPE as the conduit entity and those in which another financial institution served as the conduit entity. *See In re Citigroup, Inc.*, Order Instituting a Public Administrative Proceeding Pursuant to Section 21C of the Securities Exchange Commission Act of 1934, Making Findings and Imposing a Cease-And-Desist Order and Other Relief, July 28, 2003 (the "Citigroup Administrative Proceeding"), at 7-8, n.20. In fact, the SEC criticized three of the Prepay Transactions in which Toronto Dominion participated. *See* Citigroup Administrative Proceeding, at 7-8, n.20. The SEC standard is a "should have known" standard, however, which is less stringent than the "actual knowledge" standard analyzed in this Report. Also, Toronto Dominion was not named as a party to the proceeding and no allegations were asserted against it.

- 4 -

Toronto Dominion functioned solely as the conduit entity.[6] In two of the Toronto Dominion Prepays, Citigroup was the conduit entity,[7] and Toronto Dominion reciprocated by serving as the conduit in mirror Prepay Transactions where Citigroup was the lender.[8] In two other Prepay Transactions, JPMorgan Chase served as the conduit entity.[9] Morgan Stanley served as the conduit entity in the final Toronto Dominion Prepay Transaction.[10]

Toronto Dominion played a lesser role in four SPE transactions with Enron. Toronto Dominion participated in transactions with Hawaii, JEDI, Firefly Trust and Bammel Gas Trust. In these transactions, Toronto Dominion provided commitments to credit facilities, term loans, or liquidity backstops ranging from $15 million to $50 million. In the Hawaii transaction, a FAS 140 Transaction led by CIBC, Toronto Dominion funded $50 million ($15 million in Hawaii I and $35 million in Hawaii II).[11]

---

[6] Toronto Dominion Corporate Credit Review for Enron, Firefly Trust and ENA, Toronto Dominion, Dec. 10, 1999 (the "Dec. 10, 1999 Corporate Credit Review"), at 20 [TDB-EX 002319-TDB-EX 002345]. This Prepay Transaction, called Nixon, was among those criticized by the SEC in its Administrative Proceeding against Citigroup. *See* Citigroup Administrative Proceeding, at 7-8, n.20.

[7] *See* Email from Doug Jones, Toronto Dominion, to Dan Carr, Toronto Dominion, June 24, 1999, at attachment (the "Gas Swap Diagram") [TDB-EX 000002-TDB-EX 000003]; Diagram entitled, "Crude Prepay 9/29/99," Enron, date unknown (the "Crude Prepay Diagram") [TDB-EX 000252]. These Prepay Transactions, Truman and Jethro, were also criticized by the SEC in the Citigroup Administrative Proceeding. *See* Citigroup Administrative Proceeding, at 7-8, n.20.

[8] *See* Sworn Statement of Douglas Jones, Vice President, TD Securities, to Robb E. Hellwig, A&B, Oct. 9, 2003 (the "Jones Sworn Statement, Vol. II"), at 163-64; *see also* Gas Swap Diagram; Crude Prepay Diagram.

[9] Sworn Statement of Douglas Jones, Vice President, TD Securities, to Steven M. Collins, A&B, Sept. 17, 2003 (the "Jones Sworn Statement, Vol. I"), at 41; Toronto Dominion Rapid Review for Enron, ENA and Enron Canada Corp., Sept. 27, 2000 (the "Sept. 27, 2000 Rapid Review"), at 5 [TDB-EX(1) 019957-TDB-EX(1) 019977].

[10] Toronto Dominion Corporate Credit Review for ENA and Enron, Nov. 24, 2000 (the "Nov. 24, 2000 Corporate Credit Review"), at TDB-EX 001516-TDB-EX 001517 [TDB-EX 001509-TDB-EX 001529].

[11] *See* Toronto Dominion's Responses and Objections to Matters on Which Examination is Requested, Aug. 22, 2003 (the "Toronto Dominion Aug. 22, 2003 Responses"), at 2-5; Toronto Dominion Corporate Credit Review for Enron, Enron Canada Corp., Hawaii I 125-0 Trust and Hawaii II 125-0 Trust, Nov. 8, 2000 (the "Nov. 8, 2000 Hawaii Corporate Credit Review") [TDB-EX(1) 000054-TDB-EX(1) 000090].

In the Bammel Gas transaction, which was led by Bank of America, Toronto Dominion had a $20 million participation in a $229 million inventory securitization backstop liquidation facility.[12] In the JEDI transaction, Toronto Dominion funded $30 million of a $513 million 364-day term loan to the JEDI SPE.[13] Finally, in the Firefly transaction, Toronto Dominion funded $50 million of a $425 million senior secured credit facility that was led by JPMorgan, BT/Duetsche and DLJ.[14] The Examiner has not found any evidence indicating that Toronto Dominion played a lead role in the structuring or execution of any of these SPE transactions.

## C.    Background Information

Toronto Dominion is Canada's third largest financial institution, providing consumer, corporate and government banking services, investment services and financial advisory services to businesses.[15] Toronto Dominion and its subsidiaries are collectively known as the TD Bank Financial Group.[16] Toronto Dominion serves more than 13 million customers in three key areas: (i) personal and commercial banking; (ii) wealth management; and (iii) wholesale banking services, which include corporate banking, investment banking, debt capital markets, institutional equities, foreign exchange and

---

[12] Toronto Dominion Aug. 22, 2003 Responses, at 6-8; Toronto Dominion Corporate Credit Review for Bammel Gas Trust, Nov. 8, 1999, at 5 [TDB-EX(1) 021635-TDB-EX(1) 021646].

[13] Toronto Dominion Aug. 22, 2003 Responses, at 9-11; Toronto Dominion Corporate Credit Review for JEDI SPV I L.L.C., Dec. 17, 1999 [TDB-EX(1) 015005-TDB-EX(1) 015017]

[14] Toronto Dominion Aug. 22, 2003 Responses, at 12-13; Toronto Dominion USA Division Credit Review, Dec. 15, 1998 (the "Dec. 15, 1998 Credit Review") [TDB-EX(1) 020257-TDB-EX(1) 020273].

[15] Hoover's Online Fact Sheet for The Toronto Dominion Bank, *available at* http://www.hoovers.com/free/co/factsheet.xhtml?ID=42383 (last visited Oct. 27, 2003); Toronto Dominion Annual Report 2002, at 13.

[16] Annual Information Form for the Toronto Dominion Bank, Jan. 24, 2003 (the "Annual Information Form"), at 1, *available at* http://www.td.com/investor/2002/2002aif.pdf.

private equity.[17]   In 2002, Toronto Dominion had assets of $278 billion.[18]   Toronto Dominion had a net loss of $160 million in 2002, as compared to net income of $1.3 billion in 2001.[19]

Toronto Dominion provides financial services and products to its corporate customers through TD Securities.[20]   TD Securities encompasses a number of business units, including the Energy Group, the business unit that had the primary relationship with Enron.[21]   The Toronto Dominion activities involving Enron that are the subject of this Appendix appear to have occurred within the TD Securities business unit.

Toronto Dominion appears to structure its operations around business segments rather than legal entities.[22]   Units such as TD Securities design the products, sell them, and use various legal entities within Toronto Dominion to participate in and book the transactions.   For example, Toronto Dominion used a subsidiary, Toronto Dominion (Texas), Inc., to enter into many of the Toronto Dominion Prepays.   According to the testimony, Toronto Dominion (Texas), Inc. was the entity of choice used by Toronto Dominion to enter into transactions in which it had agreed to participate.[23]   In this Appendix, the Examiner uses the term "Toronto Dominion" to refer to the institution as a

---

[17] *Id.*; *see also* Toronto Dominion Annual Report 2002, at 14.

[18] Toronto Dominion Annual Report 2002, at 44.

[19] *Id.* at 45.

[20] *Id.* at 13, 18.

[21] *See* Toronto Dominion's Responses and Objections to Matters on Which Examination is Requested, Aug. 6, 2003 (the "Toronto Dominion Aug. 6, 2003 Responses"), at 1-19; Sworn Statement of Thomas Richmond Spencer, Vice Chair and Chief Risk Officer, Toronto Dominion, to Robb E. Hellwig, A&B, Oct. 2, 2003 (the "Spencer Sworn Statement"), at 16, 28.

[22] Toronto Dominion Annual Report 2002, at 13.

[23] Sworn Statement of Julian Mark Bott, former Managing Director, Toronto Dominion, to Robb E. Hellwig, A&B, Oct. 8, 2003 (the "Bott Sworn Statement"), at 57.   TD Securities had the ability to cause Toronto Dominion (Texas), Inc. to enter into transactions agreed to by TD Securities.   Bott Sworn Statement, at 57.

whole and does not identify the specific affiliate that was involved in a particular aspect of a particular transaction. Similarly, the Examiner refers to "Enron" rather than identifying the specific Enron affiliate involved, because such detail was addressed in the Second and Third Interim Reports and is not relevant to the matters discussed in this Appendix.

## II.    HISTORY AND DEVELOPMENT OF TORONTO DOMINION'S INVOLVEMENT WITH ENRON

### A.    Relationship Between Toronto Dominion and Enron

Toronto Dominion's relationship with Enron began in 1982.[24]  By 1998, Toronto Dominion considered Enron an extremely important and profitable client, and Toronto Dominion was actively seeking to have Enron consider it one of Enron's Tier 1 Banks.[25] Although Toronto Dominion never achieved Tier 1 status, Toronto Dominion's relationship with Enron was nonetheless substantial, and Enron consistently rated Toronto Dominion as a Tier 2 bank.[26]

From 1997 through the Petition Date, Toronto Dominion completed approximately forty transactions with Enron.  These transactions included structured finance transactions, derivatives transactions, underwritings, letters of credit and numerous credit facilities.  The following timeline illustrates when each of these transactions was completed and highlights the specific transactions that are a focus of this Appendix.



```
January 1997
February 1997      ──  1 lending transaction
March 1997
April 1997
May 1997           ──  1 letter of credit
                       1 lending transaction
June 1997
July 1997
```

---

[24] Facsimile from Bob Gibson, Toronto Dominion, to Thomas Spencer, *et al.*, Toronto Dominion, Jan. 19, 2001 (the "Gibson/Spencer Fax"), at TDB-EX(1) 034610 [TDB-EX(1) 034608-TDB-EX(1) 034648]; Sworn Statement of Linda Lavin, Toronto Dominion, to Robb E. Hellwig, A&B, Sept. 25, 2003 (the "Lavin Sworn Statement"), at 71 ("[Enron] had been a client of the bank for 15-plus years.").

[25] Dec. 15, 1998 Credit Review, at TDB-EX(1) 020264 (Relationship Strategy); Bott Sworn Statement, at 82.

[26] Enron Relationship Review, Mid-Year, 1999 (the "Mid-Year, 1999 Relationship Review"), at AB0252 01560 [AB0252 01557-AB0252 01600]; Enron Relationship Review, Jan. 2000 (the "Jan. 2000 Relationship Review"), at AB0252 01612 [AB0252 01602-AB0252 01659].

| | |
|---|---|
| August 1997 | |
| September 1997 | |
| October 1997 | |
| November 1997 | |
| December 1997 | |
| January 1998 | |
| February 1998 | |
| March 1998 | |
| April 1998 | Bammel Gas Trust ($20 million) (closed on 4/21/98)<br>3 derivatives transactions<br>2 lending transactions |
| May 1998 | |
| June 1998 | |
| July 1998 | |
| August 1998 | 2 lending transactions<br>1 derivatives transaction |
| September 1998 | |
| October 1998 | 4 lending transactions |
| November 1998 | |
| December 1998 | Bammel Gas Trust extension<br><br>Firefly Trust ($50 million) (closed on 12/28/98)<br><br>**DECEMBER 1998 PREPAY**/$250 million prepay transaction (closed 12/30/98)<br><br>4 lending transactions |
| January 1999 | |
| February 1999 | |
| March 1999 | |
| April 1999 | |
| May 1999 | |
| June 1999 | **TRUMAN**/$500 million prepay transaction (Toronto Dominion funded $250 million, closed 6/29/99)<br><br>1 lending transaction |
| July 1999 | 1 lending transaction |
| August 1999 | |
| September 1999 | **JETHRO**/$675 million prepay transaction (Toronto Dominion funded $337.5 million, closed 9/29/99) |
| October 1999 | |
| November 1999 | Bammel Gas Trust extension |
| December 1999 | JEDI (closed on 12/3/99)<br><br>**NIXON**/$324 million prepay transaction (closed 12/15/99)<br><br>1 letter of credit |

- 10 -



| | |
|---|---|
| January 2000 | |
| February 2000 | |
| | **NIXON**/amendments |
| March 2000 | |
| | 1 lending transaction |
| April 2000 | |
| May 2000 | 2 lending transactions |
| June 2000 | |
| July 2000 | |
| August 2000 | |
| | **ALBERTA PREPAY**/CAD[27] $147 million prepay transaction |
| September 2000 | (closed on 9/29/00) |
| October 2000 | JEDI extension |
| | Bammel Gas Trust extension |
| | Hawaii I ($15 million participation) (closed on 11/20/00) |
| November 2000 | |
| | Hawaii II ($35 million participation) (closed on 11/20/00) |
| | 1 derivatives transaction |
| | **LONDON PREPAY**/$165 million prepay transaction (closed on |
| December 2000 | 12/15/00 ($135 million) and 12/22/00 ($30 million)) |
| January 2001 | |
| February 2001 | |
| March 2001 | |
| April 2001 | |
| May 2001 | |
| June 2001 | |
| July 2001 | |
| August 2001 | |
| September 2001 | |
| October 2001 | |
| November 2001 | |
| December 2001 | **PETITION DATE (12/02/01)** |

A bold line indicates the end of a quarterly or annual reporting period.

As the timeline indicates, during the years leading up to Enron's bankruptcy,
Toronto Dominion was an important source of funding for Enron, at least through 2000.
During this period, Toronto Dominion participated in more than $3 billion in financings

---

[27] "CAD" refers to Canadian dollars.

for Enron and its related entities, approximately $2 billion of which came from the six Toronto Dominion Prepays.

Notably, Toronto Dominion does not appear to have entered into any transactions with Enron in 2001. This was likely due to the mandate from Toronto Dominion's Risk Management Group in early 2001 that Toronto Dominion reduce its exposure to Enron from a guideline of approximately $480 million ($685 million CAD)[28] to approximately $175 million ($250 million CAD) by October 31, 2001, Toronto Dominion's fiscal year end.[29] As explained more fully below, by late 2000, senior Toronto Dominion Risk Management executives had become increasingly uncomfortable with Enron's financial condition and business strategy, culminating in this exposure reduction mandate.[30]

As a result of the varied roles that Toronto Dominion played for Enron, it had access to substantial information about the company. As a lender and underwriter, Toronto Dominion performed due diligence with respect to all aspects of Enron's operations, and most particularly with respect to its financial condition. Many of the internal approval documents at Toronto Dominion relating to Enron transactions included lengthy financial reviews of Enron.[31] These reviews often included sections on market statistics, core businesses, historical financial information, capital structure (including on

---

[28] Nov. 24, 2000 Corporate Credit Review, at TDB-EX 001511.

[29] Spencer Sworn Statement, at 150-51; Sworn Statement of Victor J. Huebner, Toronto Dominion, to Steven M. Collins, A&B, Oct. 10, 2003 (the "Huebner Sworn Statement"), at 108-10.

[30] Spencer Sworn Statement, at 128-29; Huebner Sworn Statement, at 108-10.

[31] See, e.g., Dec. 15, 1998 Credit Review; Dec. 10, 1999 Corporate Credit Review; Toronto Dominion Speedy Review, June 22, 1999 (the "June 22, 1999 Speedy Review") [TDB-EX 000033-TDB-EX 000042]; Toronto Dominion Corporate Credit Review for Enron, Firefly Trust and ENA, July 22, 1999 (the "July 22, 1999 Enron Annual Review") [TDB-EX(1) 032975-TDB-EX(1) 033004].

- 12 -

and off balance sheet debt), liquidity, credit rating, recent developments, financial and stock market performance, strategy, strengths and risk factors.[32]

*Revenues*

Toronto Dominion received in the aggregate approximately $30 million of revenue from Enron during 1997 through 2001, as reflected in the following chart:

| Year | Revenue |
|------|---------|
| 1997 | $ 2.2 million[33] |
| 1998 | $ 7.5 million[34] |
| 1999 | $ 9.0 million[35] |
| 2000 | $ 8.0 million[36] |
| 2001 | $ 2.5 million[37] |

The Enron relationship was particularly profitable for Toronto Dominion, providing it with a Risk Adjusted Return on Capital ("RAROC") of 39% during the period from late 1998 through year-end 2000.[38] This return represented nearly twice the return of 20% that Toronto Dominion targeted for its corporate customers.[39] In contrast,

---

[32] *See, e.g.*, Dec. 15, 1998 Credit Review; Dec. 10, 1999 Corporate Credit Review; June 22, 1999 Speedy Review; July 22, 1999 Enron Annual Review.

[33] Relationship RAROC Spreadsheet for Enron, Toronto Dominion, Sept. 25, 1997 [TDB-EX(1) 006807].

[34] Toronto Dominion USA Division Speedy Review, Dec. 17, 1998 (the "Dec. 17, 1998 Speedy Review"), at 1 (Account Profitability) [TDB-EX(1) 015111-TDB-EX(1) 015120].

[35] June 22, 1999 Speedy Review, at 1 (Account Profitability).

[36] Nov. 8, 2000 Hawaii Corporate Credit Review, at 29.

[37] SAP Wire Transfer Request for $2,556,901.25 paid by ENA to Toronto Dominion, Sept. 19, 2001 [AB000273465-AB000273466].

[38] *See* June 22, 1999 Speedy Review, at 1 (RAROC of 38.4%); July 22, 1999 Enron Annual Review, at 1 (RAROC of 43%); Dec. 10, 1999 Corporate Credit Review, at 1 (RAROC of 39.53%); Sept. 27, 2000 Rapid Review, at 1 (RAROC of 34.75%); Lavin Sworn Statement, at 75.

[39] Sworn Statement of Lisa A. Reikman, Toronto Dominion, to Robb E. Hellwig, A&B, Sept. 16, 2003 (the "Reikman Sworn Statement"), at 57; Sworn Statement of Ann Scully Malcolm, former Vice-President, Toronto Dominion, to Robb E. Hellwig, A&B, Sept. 30, 2003 (the "Malcolm Sworn Statement"), at 69-70.

in 1997, prior to the period in which Toronto Dominion engaged in Prepay Transactions

with Enron, the RAROC for the Enron relationship was just 12%.[40]

In July of 1999, Toronto Dominion acknowledged that Enron was "one of the

largest relationships in the Energy Group and is very profitable."[41]  There is evidence that

Toronto Dominion felt pressured to accommodate Enron's requests for transactions.

Often, Toronto Dominion participated in deals with the understanding that Enron would

reward the bank with future business.  Many Toronto Dominion internal documents and

communications contain references to such relationship pressure, including, for example:

- "Enron is extremely eager to complete this transaction and has indicated that TD's performance will earn us the opportunity to lead other profitable deals during 1999."[42]

- "Enron has specifically asked that we participate in Project Hawaii as a quid pro quo for the UK Pre-paid."[43]

- "Our participation in this transaction is critical to our ability to win a mandate for a $400 M prepaid swap."[44]

- "While these facilities are lower returning, it is necessary for us to be a part of Enron's core facilities in order to see the more profitable opportunities."[45]

---

[40] Toronto Dominion USA Division Credit Review, Oct. 7, 1997, at 1 (indicating a RAROC for the Enron Relationship of 11.72%) [TDB-EX(1) 020099-TDB-EX(1) 020108].  The dramatic increase in the profitability of the Enron relationship during the period 1998-2000 appears to have been driven by the Toronto Dominion Prepays.  As noted by one former Toronto Dominion relationship manager, "[t]hese Swaps are highly profitable for us and well received by [Enron]."  Nov. 8, 2000 Hawaii Corporate Credit Review, at 29 (Relationship Comments from Katherine Lucey).

[41] July 22, 1999 Enron Annual Review, at 26 (Relationship Strategy).  This sentiment was echoed in numerous subsequent credit approval memoranda. *See, e.g.*, Dec. 10, 1999 Corporate Credit Review, at 23 ("Enron is an extremely important and profitable relationship for the bank . . . ."); Sept. 27, 2000 Rapid Review, at TDB-EX(1) 109962 ("Enron is an extremely important and profitable relationship for the bank and we see a tremendous amount of opportunity with this client on the energy and communications side.").

[42] Dec. 17, 1998 Speedy Review, at TDB-EX(1) 015116.

[43] Nov. 8, 2000 Hawaii Corporate Credit Review, at 29 (Relationship Comments from Katherine Lucey, Toronto Dominion).

[44] *Id.* at 24 (Purpose of Review).

[45] *Id.* at 24 (Relationship Strategy).

- 14 -

*Exposure Limits*

Throughout most of 1998 and 1999, Enron's outstanding obligations to Toronto Dominion and, therefore, Toronto Dominion's credit exposure to Enron, exceeded the target amount, or "Exposure Guideline," that Toronto Dominion had set for Enron.[46] Toronto Dominion's general practice was to assign each client a risk rating, called an account rating, based in part on the client's credit rating.[47] For example, when Enron had a credit rating of BBB+ from S&P and Baa2 from Moody's, Enron was considered to have an account rating of "3a" on Toronto Dominion's scale.[48] This account rating, in conjunction with the client's industry risk rating, was used by Toronto Dominion to set its Exposure Guideline for Enron.[49] In December of 1998, Toronto Dominion's Exposure Guideline for Enron was $508 million.[50] By February of 2001, however, Toronto Dominion had decreased Enron's Exposure Guideline to approximately $175 million ($250 million CAD).[51]

Toronto Dominion did not always adhere to these Exposure Guidelines and would occasionally permit clients to exceed the limits, with the excess being referred to as the

---

[46] *See, e.g.,* Dec. 17, 1998 Speedy Review, at TDB-EX(1) 015112; June 22, 1999 Speedy Review, at TDB-EX 000034, TDB-EX 000042.

[47] Reikman Sworn Statement, at 12.

[48] Sworn Statement of Robyn Zeller, Head of Credit Management for the United States, Toronto Dominion, to Robb E. Hellwig, A&B, Sept. 9, 2003, at 42; *see also, e.g.,* Dec. 17, 1998 Speedy Review, at TDB-EX(1) 015111-TDB-EX(1) 015112; June 22, 1999 Speedy Review, at TDB-EX 000033-TDB-EX 000034.

[49] Reikman Sworn Statement, at 115-16; Huebner Sworn Statement, at 12-13.

[50] Dec. 17, 1998 Speedy Credit Review, at TDB-EX(1) 015112.

[51] Spencer Sworn Statement, at 150-51; Huebner Sworn Statement, at 108-10; Document entitled, "Enron Corporation – Relationship Review and Group Exposure Discussion," date unknown (the "Group Exposure Discussion"), at TDB-EX(1) 000045 [TDB-EX(1) 000044-TDB-EX(1) 000048].

- 15 -

amount "Over Guideline."[52]  It appears that Enron was a beneficiary of such a policy for

much of 1998 and 1999.[53]  Starting in mid-1999, however, Toronto Dominion began

enforcing its Exposure Guidelines against Enron, and did not allow Enron to exceed its

Exposure Guidelines from that point on.[54]

The following chart indicates Toronto Dominion's exposure to Enron during the

period 1998 through the Petition Date:



As indicated in the chart above, Toronto Dominion significantly decreased its

exposure to Enron by the end of 2000.  Toronto Dominion accelerated this exposure

reduction in 2001.  Toronto Dominion documents indicate, however, that as early as 1999

there was concern over Enron exposure within Toronto Dominion.[55]  For example, in a

---

[52] *See, e.g.*, Dec. 17, 1998 Speedy Review, at TDB-EX(1) 015112. Several Toronto Dominion witnesses testified that it was not unusual for large corporate customers to exceed their Exposure Guidelines. *See, e.g.*, Reikman Sworn Statement, at 14-15; Lavin Sworn Statement, at 26.

[53] *See* June 22, 1999 Speedy Review, at TDB-EX 000042 ("We have in the past expressed the concern [that] this relationship has frequently run well in excess of guidelines.")

[54] Toronto Dominion witnesses testified that this exposure reduction was at least partly attributable to a general policy shift within Toronto Dominion to reduce its single name exposures. *See, e.g.*, Reikman Sworn Statement, at 42-43; Spencer Sworn Statement, at 12-13.

[55] *See, e.g.*, Dec. 17, 1998 Speedy Review, at TDB-EX(1) 015117; June 22, 1999 Speedy Review, TDB-EX 000042.

June 1999 credit approval request for the Truman Prepay Transaction, one Toronto

Dominion executive noted:

> We have in the past expressed the concern [that] this relationship
> has frequently run well in excess of guidelines. In my view, we
> should not exceed guidelines, and I would only support [the
> requested participation] on basis of purchase of $100M Enron
> Corp credit default protection for term."[56]

Toronto Dominion's concern with exposure to Enron increased throughout 1999

and 2000, as did Toronto Dominion's use of credit default protection to limit that

exposure. Beginning in 1999, Toronto Dominion purchased credit protection on a large

portion of any new Enron exposure.[57] By the fall of 2000, senior Toronto Dominion

executives expressly prohibited any additional Enron exposure,[58] and Toronto

Dominion's approval of the Alberta and London Prepay Transactions was conditioned

upon obtaining credit default protection in the full amount of the exposure to Enron.[59]

Thus, although Toronto Dominion was willing to enter into these transactions to earn the

substantial fees that they generated, Toronto Dominion was so uncomfortable with

Enron's financial condition that it was unwilling to take on any exposure to Enron in

these transactions. Instead, Toronto Dominion shifted this exposure to third parties

through the purchase of credit default protection.

---

[56] June 22, 1999 Speedy Review, at TDB-EX 000042.

[57] *See, e.g.*, June 22, 1999 Speedy Review, at TDB-EX 000041-42 (approving Prepay Transaction subject to purchase of $100 million of credit default protection).

[58] Sworn Statement of Katherine Lucey, former Head of the Advisory Group, Toronto Dominion, to Robb E. Hellwig, A&B, Sept. 10, 2003 (the "Lucey Sworn Statement"), at 54; Reikman Sworn Statement, at 39-40.

[59] Sept. 27, 2000 Rapid Review, at 5 (Uses of Credit and Repayment); Nov. 24, 2000 Corporate Credit Review, at TDB-EX 001517; Email from Jo-Ann Burgess, Toronto Dominion, to Mary Teney, *et al.*, Toronto Dominion, Nov. 10, 2000, at TDB-EX 001324 ("[I]t is our intent going forward to offset all future Enron exposure via the credit derivatives market or other means.") [TDB-EX 001324-TDB-EX 001326]; Lucey Sworn Statement, at 33, 54.

In January of 2001, senior Toronto Dominion executives met with senior Enron executives, including Fastow, to address Toronto Dominion's concerns about Enron's business and financial strategies and risk management procedures.[60]  According to the head of Toronto Dominion's Risk Management Group who attended this meeting, the meeting did nothing to allay his concerns regarding Enron.[61]  Immediately following the meeting, this senior Toronto Dominion executive directed that Toronto Dominion reduce its exposure to Enron to approximately $175 million (CAD $250 million) by October 31, 2001, the end of Toronto Dominion's fiscal year.[62]  This mandate effectively precluded Toronto Dominion from entering into any new transactions with Enron in 2001.

**B.**      **Toronto Dominion's Knowledge of Enron's Financial Condition**

As a result of its substantial involvement with Enron between 1997 and 2001, Toronto Dominion had significant access to financial information about Enron, as well as Enron senior management.

Toronto Dominion prepared detailed analyses of Enron's financial condition for purposes of considering new transactions with Enron, or renewals or extensions of existing transactions.   Toronto Dominion also performed annual reviews of Enron's financial condition.  These analyses often included detailed descriptions of Enron and its business segments, Enron's financial strategy and liquidity, Enron's risk management infrastructure, Enron's ratings and Enron's debt, including off-balance sheet obligations.[63]   In some of these analyses, Toronto Dominion recharacterized as debt

---

[60]  Spencer Sworn Statement, at 23-24, 139-40.

[61]  Spencer Sworn Statement, at 140.

[62]  Spencer Sworn Statement, at 150-51; Huebner Sworn Statement, at 108-10; Group Exposure Discussion, at TDB-EX(1) 000045.

[63]  *See, e.g.*, Nov. 8, 2000 Hawaii Corporate Credit Review.

- 18 -

certain obligations that Enron did not report as debt, including items such as the Toronto Dominion Prepays, leases and guarantees of unconsolidated subsidiaries.[64]

For example, in a September 27, 2000 credit approval memorandum regarding the Alberta Prepay Transaction, Toronto Dominion reclassified the Toronto Dominion Prepays as debt and recalculated Enron's debt ratios to reflect more accurately Enron's true debt.[65] Toronto Dominion recomputed Enron's Debt/Cap Ratio to be 57.5% as of June 30, 2000,[66] compared to Enron's publicly reported Debt/Cap Ratio of 48.5%.[67] Further, a senior risk management official testified that Toronto Dominion was concerned with Enron's increasing leverage.[68] Documents produced by Toronto Dominion also indicate a concern with Enron's "true leverage."[69]

*Toronto Dominion's Concerns About Enron's Financial Condition*

Toronto Dominion's concerns with Enron's financial condition began as early as December of 1998. For example, in a comment to the credit approval memorandum for the December 1998 Prepay – the first Prepay Transaction that Toronto Dominion executed with Enron – the head of Toronto Dominion's Risk Management Group noted, "[t]he number of short term financing requests for the Enron group raises concerns regarding their financial strategy. I will support this request, but we need the longer term

---

[64] Nov. 8, 2000 Hawaii Corporate Credit Review, at 20; Sept. 27, 2000 Rapid Review, at TDB-EX(1) 019962 (Enron Corporate Strategy); Huebner Sworn Statement, at 106-07; Lucey Sworn Statement, at 72-73; Bott Sworn Statement, at 78-79.

[65] Sept. 27, 2000 Rapid Review, at TDB-EX(1) 019962.

[66] *Id.*

[67] Nov. 8, 2000 Hawaii Corporate Credit Review, at 12.

[68] Huebner Sworn Statement, at 77, 107-08

[69] Facsimile from R.M. Newman, Toronto Dominion, to Senior Vice President, U.S.A. Division, TD Bank Financial Group, Nov. 17, 2000, at TDB-EX 001425 [TDB-EX 001422-TDB-EX 001426].

- 19 -

strategic review quickly."[70]  Subsequent credit approval memoranda indicated the Risk

Management Group's increasing concerns with Enron's financial condition, financial

strategy and "manipulation" of its balance sheet,[71] prompting the meeting between

Toronto Dominion and Enron in early 2001 that centered on Enron's risk management

and financial strategy.[72]  Toronto Dominion did not execute any transactions with Enron

following this meeting.

Toronto Dominion also recognized that Enron's business was becoming

increasingly reliant upon trading activities.[73]  This recognition of the shift in Enron's

business caused Toronto Dominion to increase both Enron's account risk rating as well as

Enron's industry risk rating, indicating greater credit risk.  Enron's increased dependence

upon trading activities was of particular concern to the head of Toronto Dominion's Risk

Management Group, causing him to make the following comments in response to the

credit approval request for the final Prepay Transaction between Enron and Toronto

Dominion, which closed in December of 2000:

> I find such transactions inconsistent with our objectives of ensuring
> transparency in our relationships with customers/counterparties and it
> leads me to question why we should have any relationship to what is
> increasingly becoming a large unregulated derivatives trading house. In
> my view we should completely hedge our direct Enron exposure and
> future derivative dealings should be on a M2M collateralized basis.[74]

This concern was a motivating factor in the exposure reduction mandate issued by this

executive at the beginning of 2001.  As this senior Toronto Dominion executive testified,

---

[70] Dec. 17, 1998 Speedy Review, at TDB-EX(1) 015117.

[71] See, e.g., Dec. 10, 1999 Corporate Credit Review, at 20; Sept. 27, 2000 Rapid Review, at TDB-EX(1) 019962 (Enron Corporate Strategy), TDB-EX(1) 019965 (L.A. Reikman's comments).

[72] Lucey Sworn Statement, at 73-74; Spencer Sworn Statement, at 23-24.

[73] Huebner Sworn Statement, at 97; Spencer Sworn Statement, at 24; Lavin Sworn Statement, at 80-81.

[74] Nov. 24, 2000 Corporate Credit Review, at TDB-EX 001526 (Thomas Spencer's comments).

- 20 -

he "clearly wanted to send a message to the group that Enron was becoming too complex

for [Toronto Dominion] to really understand . . . ."[75]

---

[75] Spencer Sworn Statement, at 126.

## III. TORONTO DOMINION'S ROLE IN ENRON'S PREPAY TRANSACTIONS

The Prepay Transactions were a powerful tool that Enron used to manage its reported financial condition and satisfy Rating Agency expectations.[76] Enron's Prepay Transactions with Toronto Dominion, Citigroup and JPMorgan Chase constituted virtually all of the company's reported cash flow from operating activities in 1999 and 32% of its reported operating cash flow in 2000.[77]

Between 1998 and 2001, Toronto Dominion assisted Enron in completing the six Toronto Dominion Prepays, totaling approximately $2 billion, as identified in the following chart:

**Toronto Dominion Prepays**

| Name | Closing Date | Amount | Toronto Dominion Role |
|------|-------------|--------|----------------------|
| Dec. 1998 | Dec. 30, 1998 | $250 million | Funded $250 million (JPMorgan Chase was counterparty) |
| Truman | June 29, 1999 | $500 million | Funded $250 million and acted as swap counterparty for $250 million Citigroup-funded portion of prepay |
| Jethro | Sept. 29, 1999 | $675 million | Funded $337.5 million and acted as swap counterparty for $337.5 million Citigroup-funded portion of prepay |
| Nixon | Dec. 14, 1999 | $324 million | Acted as swap counterparty for prepays funded by Citigroup, RBS and Barclays |
| Alberta | Sept. 27, 2000 | CAD $147.4 million (approx. $105 million U.S.) | Funded approx. CAD $147.4 million (JPMorgan Chase acted as swap counterparty) |
| London | Dec. 2000 | $165 million | Funded $165 million (Morgan Stanley acting as swap counterparty) |
| | | $2.0 billion total | |

---

[76] For a more detailed analysis of Enron's Prepay Transactions, see Second Interim Report, Appendix E (Prepay Transactions) and Third Interim Report, Appendix D (Role of Citigroup and Its Affiliates) and Appendix E (Role of JPMorgan Chase and its Affiliates).

[77] See August 2001 Fastow Report, at 2-12; Enron Form 10-K filed with the SEC for the Year ended Dec. 31, 2000 (the "Enron 10-K for 2000"), Enron Corp. and Subsidiaries Consolidated Statement of Cash Flows; Enron Form 10-K filed with the SEC for the Year ended Dec. 31, 1999 (the "Enron 10-K for 1999"), Enron Corp. and Subsidiaries Consolidated Statement of Cash Flows.

- 22 -

Each of the Toronto Dominion Prepays was structured with the commodity price risk moving through the other parties and back to Enron in a circle, so that it was eliminated. Thus, the Toronto Dominion Prepays were simply debt structured as commodity swaps. Toronto Dominion credit approval memoranda regarding the Prepay Transactions make clear that Toronto Dominion considered the Prepay Transactions to be loans:

- "[T]he swap transaction is effectively a 2 month loan to Enron."[78]

- "We have been approached by Enron to structure a deal whereby TD provides a loan which is based on a future delivery of natural gas . . . . As a result, we have structured a fully-hedged $200MM 60-day Prepaid Natural Gas-Linked Term Loan."[79]

- "At closing, TD will fund a $200MM loan, which will be structured as a prepayment for the future delivery of specified volumes of natural gas at a market index."[80]

- "As this transaction effectively involves a fixed rate loan, there will be no interest resets over the term, and there will be only 1 repayment date."[81]

- "At maturity, [Enron] will repay [the swap] with the financial equivalent of a pre-determined value of crude oil at a specified price. The precise value of crude oil will be determined at the trade date in an amount sufficient to cover 100% of principal and interest."[82]

---

[78] Dec. 17, 1998 Speedy Review, at TDB-EX(1) 015117 (V.J. Huebner Remarks).

[79] *See* Draft Credit Approval Request, Dec. 1998, at TDB-EX 000558 [TDB-EX 000557-TDB-EX 000560].

[80] Dec. 17, 1998 Speedy Review, at TDB-EX(1) 015115.

[81] Sept. 25, 1999 Corporate Credit Review, at 24 (Energy Derivatives Comments).

[82] Letter from Ann Scully, Toronto Dominion, to Doug McDowell, Enron, June 28, 1999, at TDB-EX 002057 [TDB-EX 002057-TDB-EX 002058].

- 23 -

Similarly, the former and current Toronto Dominion employees who provided testimony to the Examiner uniformly acknowledged that the Toronto Dominion Prepays did not involve any commodity risk[83] and were simply loans to Enron.[84]

Nevertheless, Enron accounted for the Toronto Dominion Prepays as price risk management activities and characterized the proceeds of these financings as cash flows from operating activities rather than from financing activities.[85] This method of accounting significantly understated Enron's true debt obligations, significantly overstated Enron's true cash flow from operating activities, and favorably affected Enron's key financial ratios considered by the Rating Agencies when establishing Enron's credit rating.[86]

---

[83] *See, e.g.*, Jones Sworn Statement, Vol. I, at 35; Lavin Sworn Statement, at 34; Lucey Sworn Statement, at 86; Bott Sworn Statement, at 38; Reikman Sworn Statement, at 64, 120.

[84] Lucey Sworn Statement, at 96; Reikman Sworn Statement, at 134-35; Lavin Sworn Statement, at 51.

[85] *See* Memorandum from Financial Operations Accounting, ENA, to Distribution, regarding Prepaid Hydrocarbon Companies, Oct. 21, 1996 [AB0252 01068-AB0252 01073].

[86] *See The Role of Financial Institutions in Enron's Collapse: Hearing before the Permanent Subcomm. on Investigations, Senate Comm. on Governmental Affairs*, 107th Cong. (July 23-30, 2002) (the "PSI Financial Institutions Hearing"), Vol. I, at 29 (Testimony of John C. Diaz, Managing Director, Power & Energy Group, Moody's Investors Service, and Pamela M. Stumpp, Managing Director, Chief Credit Officer, Corporate Finance Group, Moody's Investors Service) ("If such transactions had been accounted for as a loan, Enron's operating cash flow would have been reduced and its debt would have been greater. The disclosure of these transactions as loans would have exerted downward pressure on Enron's credit rating."), *available at* http://frwebgate.access.gpo.gov/cgibin/getdoc.cgi?dbname=107_senate_hearings&do cid=f:81313.pdf; *id.* at 31 (Testimony of Ronald M. Barone, Managing Director, Utilities, Energy & Project Finance Group, Corporate & Government Ratings, S&P); Written Statement of Lynn Turner, Former Chief Accountant of the SEC, to the PSI, July 23, 2002, at ELIB00002247-00006-ELIB00002247-00007 ("When a company improperly reports cash flows generated by or used in financings as cash generated from typical business operations [then] investors, analysts and credit rating agencies will be misled as to the financial health of a company and its ability to meet future commitments on cash.") [ELIB00002247-00001-ELIB00002247-00013]; *see also id.* at ELIB00002247-00010 ("I have read the testimony of the subcommittee's chief investigator and various documents the staff of the subcommittee have provided to me. These documents lead to the conclusion that the Enron prepay transactions described therein should have been accounted for as bank or credit financings, rather than as liabilities from price risk management activities in the financial statements of Enron.").

The Toronto Dominion Prepays alone, without consideration of other Prepay Transactions that Enron completed, had a material effect on Enron's cash flows from operating activities, as reflected in the following table:

**Enron's Operating Cash Flows**

| Period (dollar amounts in millions) | Reported Cash Flows From (Used By) Operating Activities | Net Cash Flows From (Used By) Toronto Dominion Prepays | Cash Flows From Operating Activities Without Toronto Dominion Prepays | Percentage Impact |
|---|---|---|---|---|
| Year Ended Dec. 31, 1998 | $1,640[87] | $250 | $1,390 | 15% |
| 3 Mos. Ended Mar. 31, 1999 | ($660)[88] | ($250) | ($410) | (38%) |
| 6 Mos. Ended June 30, 1999 | ($38)[89] | $250 | ($288) | 658% |
| 9 Mos. Ended Sept. 30, 1999 | ($43)[90] | $425 | ($468) | 988% |
| Year Ended Dec. 31, 1999 | $1,228[91] | $74 | $1,154 | 6% |

In addition, had Enron reported its obligations arising out of the Toronto Dominion Prepays as debt, rather than as liabilities from price risk management activities, Enron's reported debt levels would have increased, as shown in the following table:

---

[87] See Enron Form 10-K filed with the SEC for the Year ended Dec. 31, 1998 (the "Enron 10-K for 1998"), Enron Corp. and Subsidiaries Consolidated Statement of Cash Flows.

[88] See Enron Form 10-Q filed with the SEC for the Quarter ended Mar. 31, 1999, Enron Corp. and Subsidiaries Consolidated Statement of Cash Flows.

[89] See Enron 10-Q filed with the SEC for the Quarter ended June 30, 1999, Enron Corp. and Subsidiaries Consolidated Statement of Cash Flows.

[90] See Enron 10-Q filed with the SEC for the Quarter ended Sept. 30, 1999, Enron Corp. and Subsidiaries Consolidated Statement of Cash Flows.

[91] See Enron 10-K for 1999, Enron Corp. and Subsidiaries Consolidated Statement of Cash Flows.

**Enron's Debt**

| As of<br>*(dollar amounts in millions)* | Reported Debt<br>(Does Not Include Prepay Transactions) | Amount Outstanding on Toronto Dominion Prepays | Debt Including Amount Outstanding on Toronto Dominion Prepays | Percentage Increase |
|---|---|---|---|---|
| Dec. 31, 1998 | $7,357[92] | $250 | $7,607 | 3% |
| Mar. 31, 1999 | $9,419[93] | $0 | $9,419 | 0% |
| June 30, 1999 | $8,979[94] | $500 | $9,479 | 6% |
| Sept. 30, 1999 | $8,592[95] | $675 | $9,267 | 8% |
| Dec. 31, 1999 | $8,152[96] | $324 | $8,476 | 4% |
| Dec. 31, 2000 | $10,229[97] | $270 | $10,499 | 3% |

Enron provided no meaningful disclosure of the Prepay Transactions in its financial statements,[98] notwithstanding their magnitude and significance, and notwithstanding advice from Andersen that Enron should provide more complete disclosure.[99] As discussed below, Toronto Dominion understood Enron's accounting for the Toronto Dominion Prepays and the inadequacy of the disclosures in Enron's financial

---

[92] *See* Enron 10-K for 1998, Enron Corp. and Subsidiaries Consolidated Balance Sheet.

[93] *See* Enron 10-Q filed with the SEC for the Quarter ended Mar. 31, 1999, Enron Corp. and Subsidiaries Consolidated Balance Sheet.

[94] *See* Enron 10-Q filed with the SEC for the Quarter ended June 30, 1999, Enron Corp. and Subsidiaries Consolidated Balance Sheet.

[95] *See* Enron 10-Q filed with the SEC for the Quarter ended Sept. 30, 1999, Enron Corp. and Subsidiaries Consolidated Balance Sheet.

[96] *See* Enron 10-K for 1999, Enron Corp. and Subsidiaries Consolidated Balance Sheet.

[97] *See* Enron 10-K for 2000, Enron Corp. and Subsidiaries Consolidated Balance Sheet.

[98] *See* Second Interim Report, Appendix D (Enron's Disclosure of its SPEs).

[99] *See* Third Interim Report, Appendix C (Role of Enron's Officers), at 84.

statements. Yet, Toronto Dominion provided substantial assistance to Enron in connection with the Toronto Dominion Prepays, including: (i) lending funds in five of the transactions; and (ii) serving as a conduit in three prepay transactions, two involving Citigroup (Truman and Jethro) and another transaction (Nixon) in which Citigroup, Barclays and RBS were lenders to Enron. Unlike JPMorgan Chase and Citigroup, Toronto Dominion does not appear to have created the structure for any of the Prepay Transactions. Rather, Enron provided Toronto Dominion with the Prepay structure.[100] Nor did Toronto Dominion ever establish an SPE to participate in the Prepay Transactions.

*Summary Description*

All of the Toronto Dominion Prepays were financially settled and followed generally the same structure, which had the effect of eliminating all commodity price risk. Although each of the Toronto Dominion Prepays had different details, with different parties playing the roles of lenders and conduit entities, the following description of a typical Toronto Dominion Prepay shows the basic circular nature of the common transaction structure:

---

[100] Lucey Sworn Statement, at 108.



**Step 3**

- *Step One: Toronto Dominion/Enron.* Toronto Dominion and Enron entered into a swap agreement pursuant to which Toronto Dominion paid Enron a fixed sum on the closing date, i.e., a "prepayment." This is the amount loaned by Toronto Dominion to Enron using the prepay structure. In exchange, Enron agreed to pay Toronto Dominion the floating price of a specified quantity of a commodity on a specified settlement date.

- *Step Two: Toronto Dominion/Conduit.* Toronto Dominion and a conduit entity entered into a swap agreement, pursuant to which Toronto Dominion agreed to pay the conduit entity the floating price of a specified quantity of a commodity, which matched the payment it would receive from Enron pursuant to the swap described in step one. In exchange, the conduit entity would pay Toronto Dominion a fixed amount equal to the payment of principal plus interest on the prepayment made by Toronto Dominion pursuant to the swap described in step one. This payment made by the conduit entity matched the payments it would receive from Enron pursuant to the swap described in step three.

- *Step Three: Conduit/Enron.* The conduit entity and Enron entered into a swap agreement, pursuant to which the conduit entity agreed to pay Enron on the settlement date an amount equal to the floating payment it would receive from Toronto Dominion. In exchange, Enron agreed to pay to the conduit entity on the settlement date an amount equal to the principal and interest on

- 28 -

the prepayment which, pursuant to the swap described in step two, the conduit entity would transfer to Toronto Dominion.[101]

The net economic effect of the three steps of each Toronto Dominion Prepay was that, at the closing, Enron received a prepayment that was effectively a loan. On the specified settlement dates, the circular floating payment obligations of the parties based on the price of the commodity would eliminate one another, ensuring that no party had any risk with respect to the commodity price. In addition, on the specified settlement dates, Enron would repay the principal it had borrowed plus interest, with such payment passing through the conduit entity to Toronto Dominion. In net economic substance, Toronto Dominion made a loan to Enron that Enron repaid with interest.

Each of the six Toronto Dominion Prepays was a variation of the structure described above, but regardless of the details, each transaction was circular. All commodity price risk was eliminated by having it circle back to Enron. The following is a brief summary of each of these transactions.

*December 1998 Prepay.* At the end of 1998, Enron requested that Toronto Dominion enter into a Prepay Transaction that would close prior to year-end.[102] This Prepay Transaction was a bridge financing with a term of sixty days. Toronto Dominion originally agreed to fund $200 million, but agreed to increase the amount to $250 million

---

[101] With respect to several of the early Prepay Transactions with Enron, several Toronto Dominion witnesses testified that they were unsure whether the transaction between the conduit entity and Enron – the third leg of the Prepay transaction – actually took place. *See, e.g.,* Jones Sworn Statement, Vol. I, at 87. However, documents produced by Toronto Dominion indicate that Toronto Dominion had knowledge of this leg of the transaction for all of the Toronto Dominion Prepays except possibly the first Prepay Transaction. *See, e.g.,* Gas Swap Diagram; Crude Prepay Diagram; Dec. 10, 1999 Corporate Credit Review, at 20; Sept. 27, 2000 Rapid Review, at TDB-EX(1) 019961; Nov. 24, 2000 Corporate Credit Review, at TDB-EX 001516-TDB-EX 001517. Even in the first Prepay Transaction, Toronto Dominion had reason to know of the third leg, because Enron provided the swap counterparty.

[102] Dec. 17, 1998 Speedy Review, at TDB-EX(1) 015114 (Purpose of Review).

pursuant to a last-minute request from Enron.[103]  This Prepay Transaction, like all of the Toronto Dominion Prepays, was financially settled, meaning that no physical delivery of a commodity was required or contemplated.



In this Prepay Transaction, Toronto Dominion entered into two swap agreements with Enron, pursuant to which Toronto Dominion paid Enron $250 million in the aggregate on the closing date.[104]  Enron agreed to pay Toronto Dominion the price of a notional volume of natural gas sixty days later.[105]  Toronto Dominion then shifted the

---

[103] Email from Robyn Zeller, Toronto Dominion, to Vic Huebner, Toronto Dominion, Dec. 29, 1998, at TDB-EX(1) 033050 [TDB-EX(1) 033049-TDB-EX(1) 033050].  Thus, this Prepay Transaction actually consisted of two related Prepay Transactions, executed on consecutive days.  In connection with this request, however, Toronto Dominion purchased $75 million in credit default protection to offset any additional exposure to Enron.  Id.

[104] Swap Transaction Confirmation between Toronto Dominion (Texas) and ENA, Dec. 29, 1998 (the "Dec. 29, 1998 Swap Confirmation") [TDB-EX 000908-TDB-EX 000911]; Swap Transaction Confirmation between Toronto Dominion (Texas) and ENA, Dec. 31, 1998 (the "Dec. 31, 1998 Swap Confirmation") [TDB-EX 000987-TDB-EX 000989]; ISDA Master Agreement between Toronto Dominion (Texas) and ENA, Dec. 18, 1998 (the "Toronto Dominion/ENA 1998 ISDA Master Agreement") [TDB-EX 000604-TDB-EX 000631].

[105] Dec. 29, 1998 Swap Confirmation; Dec. 31, 1998 Swap Confirmation.

price risk of the gas to JPMorgan Chase via swap agreements, whereby Toronto

Dominion agreed to pay JPMorgan Chase the same gas price on the notional amount on

the same settlement date, and JPMorgan Chase agreed to pay Toronto Dominion the fixed

sum of approximately $252.8 million, constituting the $250 million principal plus

interest.[106] Completing the circle, JPMorgan Chase entered into a swap with Enron, in

which it agreed to pay Enron the same gas price on the notional amount on the settlement

date, and Enron agreed to pay JPMorgan Chase the same fixed sum of approximately

$252.8 million.[107]

Toronto Dominion received an upfront fee of $875,000 for executing this

transaction, which had a RAROC of 35%.[108]

*Truman.* In June 1999, Enron requested that Toronto Dominion fund a $500

million Prepay Transaction, which would close by month end.[109] After Toronto

Dominion informed Enron that it was unwilling to fund more than $250 million, Enron

asked Toronto Dominion to serve as the conduit entity in a simultaneous $250 million

Prepay Transaction to be funded by Citigroup.[110] Thus, the Truman transaction was a

---

[106] Swap Transaction Confirmation between JPMorgan Chase and Toronto Dominion, Dec. 30, 1998 [TDB-EX(1) 034217-TDB-EX(1) 034220]; Swap Confirmation between JPMorgan Chase and Toronto Dominion, Dec. 30, 1998 [TDB-EX(1) 034230-TDB-EX(1) 034233].

[107] The Examiner has been unable to locate a copy of this swap confirmation. Further, some of the Toronto Dominion witnesses testified that they were unaware of the existence of this leg of the December 1998 Prepay Transaction. *See, e.g.,* Bott Sworn Statement, at 31. However, this confirmation is presumed to exist given the standard structure of Enron's Prepay Transactions (which would require such a swap). Further, at least one Toronto Dominion employee testified that he later learned of the existence of such a swap. Jones Sworn Statement, Vol. I, at 30-31, 35.

[108] *See* June 22, 1999 Speedy Review, at TDB-EX 000033; Email from David Silverstein, Toronto Dominion, to Vic Huebner, Toronto Dominion, Dec. 23, 1998 [TDB-EX 000821].

[109] Malcolm Sworn Statement, at 29-30.

[110] Malcolm Sworn Statement, at 29-30, 34-35; Email from Ann P. Scully, Toronto Dominion, to Danny Elias, Toronto Dominion, June 28, 1999 ("Given the above [referring to the $250 million Prepay funded by Toronto Dominion], however, Enron has approached us to stand in the middle of a similar transaction for Citibank.") [TBD-EX 002048]; Letter from Ann Scully, Toronto Dominion, to Doug McDowell, Enron, June 28, 1999 [TDB-EX 002059-TDB-EX 002060]; Gas Swap Diagram.

$500 million Prepay, in which Toronto Dominion and Citigroup each funded $250 million.[111] The two financial institutions entered into mirror-image Prepay Transactions that closed on the same day, and each served as the other's conduit entity.[112] The structure of this transaction was succinctly described by the Toronto Dominion employee in charge of executing the swap transaction, as indicated below:

---

[111] Gas Swap Diagram; Jones Sworn Statement, Vol. II, at 151-52.

[112] Although those responsible for executing this Prepay Transaction were aware of all of the legs of both the Toronto Dominion-funded and Citigroup-funded Prepay Transactions, several of the senior risk management personnel at Toronto Dominion in charge of approving this transaction did not appear to have a complete understanding of the transaction structure at the time they approved the transactions. Spencer Sworn Statement, at 62; Huebner Sworn Statement, at 47-49. This may have occurred because the complete transaction structure, including the swap between the conduit entity and Enron, was omitted from the credit approval memorandum for this transaction. *See generally* June 22, 1999 Speedy Review. Further, there was no mention of Toronto Dominion's participation in the Citigroup-funded portion of Truman in the credit approval memorandum. The Toronto Dominion Risk Management Group executives who provided testimony to the Examiner indicated that they would have expected full disclosure of all aspects of the transaction during the credit approval process and would have liked to have known this information at the time they reviewed the transaction. Spencer Sworn Statement, at 62, 64; Huebner Sworn Statement, at 48-49, 51-52.





Specifically, in the Toronto Dominion-funded Prepay Transaction, Toronto Dominion entered into a swap agreement with Enron, pursuant to which Toronto Dominion paid Enron $250 million on the closing date.[113] Enron agreed to pay Toronto Dominion the price of a notional volume of crude oil ninety days later.[114] Toronto Dominion then shifted the price risk of the oil to Citigroup via a swap agreement,

---

[113] Swap Transaction Confirmation between Toronto Dominion (Texas) and ENA, June 29, 1999 (the "June 29, 1999 Swap Confirmation") [TDB-EX 002063-TDB-EX 002066]; Swap Transaction Confirmation between Toronto Dominion (Texas) and ENA, Aug. 6, 1999 [SS000036591-SS000036593]; Toronto Dominion/ENA 1998 ISDA Master Agreement.

[114] June 29, 1999 Swap Confirmation.

- 33 -

whereby Toronto Dominion agreed to pay Citigroup the same floating oil price on the notional volume on the same settlement date, and Citigroup agreed to pay Toronto Dominion the fixed sum of approximately $254 million, constituting the $250 million principal plus interest.[115] Completing the circle, Citigroup entered into a swap with Enron, agreeing to pay Enron the same floating price of the oil on the notional volume on the settlement date.[116] Enron agreed to pay Citigroup the same fixed sum of approximately $254 million.[117]

The Citigroup-funded Prepay worked in the same fashion, except that Citigroup made the initial $250 million payment to Enron, and Toronto Dominion served as the conduit entity to shift the price risk back to Enron so that it would be eliminated.[118] Enron paid Toronto Dominion a $1 million upfront fee for funding its $250 million share,

---

[115] Amended Swap Transaction Confirmation between Toronto Dominion and Citigroup, July 6, 1999 (the "July 6, 1999 Amended Swap Confirmation") [CITI-B 00373899-CITI-B 00373901].

[116] Revised Confirmation between ENA and Citigroup, July 30, 1999 [SS000036617-SS000036629].

[117] *Id.*

[118] ISDA Master Agreement between ENA and Citigroup, Nov. 17, 1992 (the "Citigroup/ENA Master Agreement") [SS000037868-SS000037913]; Confirmation between ENA and Citigroup, June 29, 1999 (the "Citigroup/ENA Confirmation") [SS000036643-SS000036655]; Swap Transaction Confirmation between Toronto Dominion and Citigroup. The Examiner was unable to locate a copy of this swap confirmation but the transaction is acknowledged by Toronto Dominion to exist and is indicated in its diagram of the structure of the transaction. *See* Gas Swap Diagram; ISDA Interest Rate and Currency Exchange Agreement between ENA and Toronto Dominion, Mar. 4, 1992 (the "ENA/Toronto Dominion ISDA Interest Rate and Currency Exchange Agreement") [TDB-EX 002245-TDB-EX 002269]; Swap Transaction Confirmation between Toronto Dominion (Texas) and ENA, June 29, 1999 [TDB-EX 002067-TDB-EX 002070]; Revised Swap Transaction Confirmation between Toronto Dominion and ENA, Aug. 6, 1999 (the "Toronto Dominion/ENA Revised Swap Transaction Confirmation") [SS000036594-SS000036596]; Toronto Dominion/ENA 1998 ISDA Master Agreement. The Examiner was unable to locate a copy of the Swap Transaction Confirmation between TD Texas and Toronto Dominion; however, an Enron chart provided to Toronto Dominion shows that this leg of the transaction existed. *See* Crude Prepay Diagram.

- 34 -

as well as a $100,000 fee for serving as the conduit entity for the other lender.[119] The

transaction had a RAROC of 40%, twice Toronto Dominion's targeted return.[120]

    *Jethro.* On September 29, 1999, the day that the 90-day Prepay Transactions in

Truman were to settle, Toronto Dominion and Citigroup effectively refinanced and

increased the Truman obligations by executing two new Prepay Transactions. Although

Toronto Dominion and Citigroup generally referred to this follow-on transaction as an

extension of Truman,[121] Enron referred to it as Project Jethro.[122] The parties executed a

new set of documents as opposed to amending the then-expiring Truman documents.[123]

    Jethro mirrored the Truman transaction, with Toronto Dominion and Citigroup

again playing their same roles as lenders and conduit entities.[124] Each lender funded

---

[119] Upfront Fee Letter from Ann P. Scully, TD Securities (USA) Inc., to Doug McDowell, Enron, June 28, 1999 [TDB-EX 002061-TDB-EX 002062]; Swap Fee Letter from Ann P. Scully, TD Securities (USA) Inc., to Doug McDowell, Enron, June 28, 1999 (the "Scully/McDowell Swap Fee Letter") [TDB-EX 002059-TDB-EX 002060].

[120] June 22, 1999 Speedy Review, at TDB-EX 000033.

[121] Sept. 25, 1999 Corporate Credit Review, at 1; Toronto Dominion Aug. 6, 2003 Responses, at 6; Lavin Sworn Statement, at 45-46; Jones Sworn Statement, Vol. II, at 158; Global Loans Approval Memorandum, regarding Truman, Sept. 19, 1999, at 2 [CITI-B 0035822-CITI-B 0035888].

[122] Memorandum from Bill Brown, Enron, to Doug McDowell, Enron, regarding Annual Review – 1999, Nov. 30, 1999, at 1 [SS000036560-SS000036561].

[123] A Toronto Dominion employee involved in the swap confirmations testified that he believed that the swap confirmations from the Truman Prepay Transaction were amended to increase the amounts. *See* Jones Sworn Statement, Vol. I, at 73. However, the swap confirmations evidencing this Prepay indicate that new documents were executed. *See, e.g.,* Swap Transaction Confirmation between Toronto Dominion (Texas) and ENA, Sept. 29, 1999 (the "Sept. 29, 1999 Swap Confirmation between Toronto Dominion (Texas) and ENA") [SS000036413-SS000036415].

[124] As with the Truman Prepay, the Toronto Dominion credit approval memorandum for this transaction did not reflect the complete structure of this transaction. For instance, the diagram of the transaction contained in the approval memorandum did not show the swap between the conduit entity and Enron. *See* Sept. 25, 1999 Corporate Credit Review, at 24. Nor did the credit approval memorandum indicate that Toronto Dominion also would be participating in a mirror Prepay Transaction funded by Citigroup that was to close simultaneously with the Toronto Dominion-funded Prepay Transaction. *See generally* Sept. 25, 1999 Corporate Credit Review. The Toronto Dominion employee in charge of executing the swaps that comprised the transaction, however, was fully aware of the transaction structure. Jones Sworn Statement, Vol. II, at 163-64; Crude Prepay Diagram. Given that the Jethro Prepay employed the same structure as the Truman Prepay, it is unclear why the complete details were not included in the credit approval memorandum seeking approval for Toronto Dominion to participate in the transaction. Again, the senior risk management executives who approved this transaction testified that they were unaware of these

- 35 -

$337.5 million to Enron, and the Jethro Prepays were set to expire in sixty days on November 29, 1999.[125] Enron used the proceeds of Jethro, in part, to repay the maturing Truman obligations. Toronto Dominion received upfront fees of approximately $775,000 for this transaction, which had a RAROC of 38%.[126]

*Nixon.* The Nixon Prepay Transaction closed in December 1999 and was intended to be a 90-day bridge financing that would be repaid with proceeds of the Citigroup Yosemite II transaction scheduled for closing in first quarter 2000.[127] Nixon was actually a set of three interrelated Prepay Transactions that provided Enron with a total of $324 million.[128] Citigroup, Barclays and RBS financed the transaction, and Toronto Dominion served as the conduit entity for all three lenders.[129]

---

components of the Prepay Transaction when it was submitted to them. *See, e.g.*, Spencer Sworn Statement, at 46-47; Huebner Sworn Statement, at 67-68.

[125] The principal documents for the Toronto Dominion prepay were: (i) Sept. 29, 1999 Swap Confirmation between Toronto Dominion (Texas) and ENA; (ii) Confirmation between Toronto Dominion and Citigroup, Oct. 19, 1999 [TDB-EX(1) 034653-TDB-EX(1) 034657]; (iii) Confirmation between Citigroup and ENA, Oct. 19, 1999 [SS000036416-SS000036420]; (iv) a Revised Swap Confirmation between Toronto Dominion and Citibank, Nov. 19, 1999 [TDB-EX(1) 034305-TDB-EX(1) 034308]; and (v) a confirmation between TD Texas and Toronto Dominion. Although the Examiner was unable to locate a copy of this confirmation between TD Texas and Toronto Dominion, Toronto Dominion does not dispute that this swap existed, and charts of the Jethro Structure show this step of the transaction. *See* Crude Prepay Diagram. The principal documents for the Citigroup prepay were: (i) Confirmation between ENA and Citigroup, Oct. 6, 1999 [SS000036423-SS000036427]; (ii) Confirmation between Toronto Dominion and Citigroup, Oct. 18, 1999 [TDB-EX(1) 034649-TDB-EX(1) 034652]; and (iii) a confirmation between ENA and Toronto Dominion. Although the Examiner was unable to find a copy of this confirmation between ENA and Toronto Dominion, it is acknowledged by Toronto Dominion to exist and the swap is indicated in the diagram of the Jethro Prepay produced by Toronto Dominion. *See* Crude Prepay Diagram.

[126] Sept. 25, 1999 Corporate Credit Review, at 1.

[127] Dec. 10, 1999 Corporate Credit Review, at 20.

[128] *See generally id.*

[129] Toronto Dominion initially sought approval to underwrite a portion of the Nixon Prepay Transaction, as Enron had indicated that Barclays might not participate in the transaction. *Id.* at 19. Enron ultimately selected Barclays to fund the $110 million portion of the transaction, but selected Toronto Dominion to serve as the conduit entity for all three of the Prepay Transactions that formed Nixon. *Id.*



Citigroup paid Enron $104 million on the closing date pursuant to a swap agreement.[130]  Enron agreed to pay Citigroup an amount based on the price of a notional amount of crude oil on the settlement date.[131]  Citigroup then entered into a swap with Toronto Dominion, pursuant to which Citigroup agreed to pay the same price of the notional amount of crude oil to Toronto Dominion in exchange for a fixed payment equal to the $104 million prepayment amount plus an amount that functioned as interest.[132]

---

[130] Citigroup/ENA Master Agreement; Swap Transaction Confirmation between Citigroup and ENA, Dec. 14, 1999 (the "12/14/99 Citigroup/ENA Swap Transaction Confirmation") [CITI-B 0134703-CITI-B 0134706].  The initial settlement date of March 15, 2000 was extended to April 14, 2000.  Swap Transaction Confirmation between Citigroup and ENA, Mar. 15, 2000 (the "3/15/00 Citigroup/ENA Swap Transaction Confirmation") [SS000037716-SS000037719].

[131] Citigroup/ENA Master Agreement; 12/14/99 Citigroup/ENA Swap Transaction Confirmation; 3/15/00 Citigroup/ENA Swap Transaction Confirmation.

[132] Confirmation between Toronto Dominion and Citigroup, Dec. 22, 1999 (unsigned copy) [TDB-EX(1) 034234-TDB-EX(1) 034237].  The initial settlement date of March 15, 2000 was extended to April 14,

RBS also entered into a swap with Enron, paying Enron $110 million on the closing date.[133]  Enron agreed to pay RBS an amount based on the price of a notional amount of crude oil on the settlement date.[134]  RBS then entered into a swap with Toronto Dominion, pursuant to which RBS agreed to pay the same price of the notional amount of crude oil to Toronto Dominion, in exchange for a fixed payment equal to the $110 million prepayment amount plus an amount that functioned as interest.[135]

The third lender, Barclays, also entered into a swap with Enron, paying Enron $110 million on the closing date.[136]  Enron agreed to pay Barclays an amount based on the price of a notional amount of crude oil on the settlement date.[137]  Barclays then entered into a swap with Toronto Dominion, pursuant to which Barclays agreed to pay the same price of the notional amount of crude oil to Toronto Dominion, in exchange for a fixed payment equal to the $110 million prepayment amount plus an amount that functioned as interest.[138]

---

2000.  Revised Confirmation between Toronto Dominion and Citigroup, Mar. 15, 2000  [TDB-EX(1) 034313-TDB-EX(1) 034316].

[133]  Swap Transaction Confirmation between RBS and ENA, Dec. 14, 1999 (the "12/14/99 RBS/ENA Swap Transaction Confirmation") [CITI-B 0032451-CITI-B 0032454].  The initial settlement date of March 15, 2000 was extended to April 14, 2000.  Swap Transaction Confirmation between RBS and ENA, Mar. 15, 2000 (the "3/15/00 RBS/ENA Swap Transaction Confirmation") [SS000037780-SS000037783].

[134]  12/14/99 RBS/ENA Swap Transaction Confirmation; 3/15/00 RBS/ENA Swap Transaction Confirmation.

[135]  Swap Transaction Confirmation between Toronto Dominion and RBS, Dec. 14, 1999 [TDB-EX 034251-TDB-EX 034257]; Swap Transaction between Toronto Dominion and RBS, Mar. 15, 2000 (extension) [TDB-EX(1) 034258-TDB-EX(1) 034261].

[136]  Stand-Alone Swap Agreement between ENA and Barclays, Dec. 14, 1999 (the "12/14/99 ENA/Barclays Stand-Alone Swap Agreement") [CITI-B 0032445-CITI-B 0032450]; Stand-Alone Swap Agreement between ENA and Barclays, Mar. 14, 2000 (the "3/14/00 ENA/Barclays Stand-Alone Swap Agreement") (extension of prior swap) [SS000037751-SS000037757].

[137]  12/14/99 ENA/Barclays Stand-Alone Swap Agreement; 3/14/00 ENA/Barclays Stand-Alone Swap Agreement.

[138]  Swap Transaction Confirmation between Toronto Dominion and Barclays, Dec. 14, 1999 [TDB-EX(1) 034242-TDB-EX(1) 034246]; Swap Transaction Confirmation between Toronto Dominion and Barclays, Mar. 14, 2000 (extension) [TDB-EX(1) 034247-TDB-EX(1) 034250].

To complete the circle for all three sets of swaps, Toronto Dominion entered into a swap with Enron.[139] Toronto Dominion did not fund any of the interrelated prepays, but served as a conduit: passing the floating price back to Enron, receiving the principal repayments plus interest from Enron, and passing them on to the lenders.[140] Toronto Dominion received an upfront fee of approximately $825,000 for its participation in this transaction, which had a RAROC of 40%.[141]

*Alberta*. In September of 2000, Enron requested that Toronto Dominion participate in a Prepay Transaction involving Enron Canada Corporation ("Enron Canada"), which would close by month end.[142] Toronto Dominion agreed to participate, and funded approximately CAD $147.4 million pursuant to the following structure:

---

[139] Swap Transaction Confirmation between ENA and Toronto Dominion, Dec. 20, 1999 [TDB-EX(1) 034266-TDB-EX(1) 034269]; Revised Swap Transaction Confirmation among Toronto Dominion, ENA and Toronto Dominion, Mar. 14, 2000 (extension) [SS000037788-SS000037792].

[140] The documentary and testimonial evidence indicates that Toronto Dominion understood all legs of all three of these interrelated Prepay Transactions. *See, e.g.*, Dec. 10, 1999 Corporate Credit Review, at 20 (diagram indicating circular structure of Nixon Prepay Transaction); Email from Simon Crowe, Enron, to Douglas Jones, Toronto Dominion, *et al.*, Dec. 14, 1999, at TDB-EX 000387 (chart indicating circular structure of Nixon Prepay Transaction) [TDB-EX 000386-TDB-EX 000387]; Jones Sworn Statement, Vol. I, at 108-09.

[141] Dec. 10, 1999 Corporate Credit Review, at 1, 15.

[142] Sept. 27, 2000 Rapid Review.

- 39 -



In this Prepay Transaction, Toronto Dominion entered into a swap agreement with Enron Canada, pursuant to which Toronto Dominion paid Enron Canada CAD $147.4 million on the closing date.[143]   Enron Canada agreed to pay Toronto Dominion the price of a notional volume of gas quarterly (for the first three quarters) with a final payment based on the price of a larger fixed volume of gas.[144]   Toronto Dominion then shifted the price risk to JPMorgan Chase via a swap agreement, whereby Toronto Dominion agreed to pay JPMorgan Chase the same floating prices on the same notional amounts on the settlement dates, and JPMorgan Chase agreed to pay Toronto Dominion the fixed sum of approximately CAD $2.52 million each of the first three quarters, with a final payment of

---

[143] Swap Transaction Confirmation between Enron Canada Corp. and Toronto Dominion, Sept. 28, 2000 (the "Sept. 28, 2000 Swap Confirmation") [TDB-EX 001177-TDB-EX 001179].

[144] *Id.*

CAD $149.9 million.[145] The first three quarterly payments equaled the accrued interest on the principal funded by Toronto Dominion, while the final payment equaled the principal plus the remaining accrued interest.[146] Completing the circle,[147] JPMorgan Chase entered into a swap with Enron, in which it agreed to pay Enron the same floating prices on the notional amounts on the settlement dates, and Enron agreed to pay JPMorgan Chase the same fixed quarterly payments in the amount of CAD $2.52 million plus a final payment in the amount of CAD $149.9 million.[148]

Toronto Dominion received upfront fees of approximately $1.1 million for this transaction, which had a RAROC of 35%.[149] Toronto Dominion's Risk Management Group conditioned its approval of this transaction upon Toronto Dominion obtaining credit default protection in the entire amount of the exposure, which Toronto Dominion obtained.[150] Thus, Toronto Dominion effectively shifted the Enron credit risk it assumed in this Prepay Transaction to third parties.

*London.* Toronto Dominion's final Prepay Transaction with Enron closed in December of 2000. Similar to the December 1998 transaction, this transaction was

---

[145] Natural Gas Transaction Confirmation between Toronto Dominion and JPMorgan Chase, Sept. 29, 2000 (the "Sept. 29, 2000 Natural Gas Confirmation") [TDB-EX 001180-TDB-EX 001183]; Commodity Swap Transaction Confirmation between JPMorgan Chase and Toronto Dominion, Oct. 5, 2000 [TDB-EX 001188-TDB-EX 001194].

[146] *See* Sept. 27, 2000 Rapid Review, at TDB-EX(1) 019961.

[147] Toronto Dominion understood the circular structure of this prepay, which was set forth in a diagram contained in the Toronto Dominion credit approval memorandum for this transaction. *See id.*

[148] The Examiner was unable to locate a copy of the swap confirmation between JP Morgan Chase and Enron Canada Corp. However, the swap is acknowledged by Toronto Dominion to exist and is indicated in the diagram of the structure of the transaction contained in the Toronto Dominion credit approval memorandum for the Alberta Prepay. *See id.*

[149] *Id.* at TDB-EX(1) 019957, TDB-EX(1) 019962.

[150] *Id.* at TDB-EX(1) 019957, TDB-EX(1) 019964-TDB-EX(1) 019965; Lucey Sworn Statement, at 77.

- 41 -

accomplished via two related Prepay Transactions, with Toronto Dominion funding $135 million in one transaction and $30 million in another.



In this Prepay Transaction, Toronto Dominion entered into two swap agreements with Enron, pursuant to which Toronto Dominion paid Enron an aggregate of $165 million ($135 million on December 15, 2000 and $30 million on December 22, 2000) on the closing dates.[151] With respect to the $135 million transaction, Toronto Dominion paid Enron $135 million up front, and Enron agreed to pay Toronto Dominion the price of a fixed volume of oil quarterly, with a final payment based upon the price of a larger fixed volume of oil.[152] Toronto Dominion then shifted the price risk of the oil to Morgan

---

[151] Swap Transaction Confirmation between Toronto Dominion (Texas) and ENA, Dec. 15, 2000 (the "Dec. 15, 2000 Swap Confirmation") [TDB-EX 033249-TDB-EX 033256]; Swap Transaction Confirmation between Toronto Dominion (Texas) and ENA, Jan. 18, 2001 (the "Jan. 18, 2001 Swap Confirmation") [AB0911 2846-AB0911 2849]; Swap Transaction Confirmation between Toronto Dominion (Texas) and ENA, Dec. 19, 2000 (the "Dec. 19, 2000 Swap Confirmation") [TDB-EX(1) 033258-TDB-EX(1) 003265]; Swap Transaction Confirmation between Toronto Dominion (Texas) and ENA, Jan. 29, 2001 (the "Jan. 29, 2001 Swap Confirmation") [AB0911 2850-AB0911 2853].

[152] Dec. 15, 2000 Swap Confirmation; Jan. 18, 2001 Swap Confirmation.

Stanley via swap agreements, whereby Toronto Dominion agreed to pay Morgan Stanley the same oil prices on the same notional amounts on the same settlement dates, and Morgan Stanley agreed to pay Toronto Dominion three fixed quarterly payments in the amount of $2.42 million and a final payment of $137.26 million on December 7, 2001.[153] Completing the circle,[154] Morgan Stanley entered into a swap with Enron, agreeing to pay Enron the same floating prices on the same notional amounts of oil on the settlement date.[155] Enron agreed to pay Morgan Stanley three fixed quarterly payments in the amount of $2.42 million and a final payment of $137.26 million on December 7, 2001.[156]

With respect to the $30 million transaction, Enron agreed to pay Toronto Dominion one interim payment based upon the price of a fixed volume of oil, and a final payment based upon the price of a larger fixed volume of oil on the settlement date.[157] Toronto Dominion then shifted the price risk of the oil to Morgan Stanley via a swap agreement, whereby Toronto Dominion agreed to pay Morgan Stanley the same oil price on the notional amount on the same settlement dates, and Morgan Stanley agreed to pay Toronto Dominion one fixed interim payment in the amount of $1.053 million and a final payment of $30.99 million on December 7, 2001.[158] Completing the circle, Morgan

---

[153] Swap Confirmation between Morgan Stanley Capital Group, Inc. and Toronto Dominion, Jan 23, 2001 [TDB-EX(1) 034330-TDB-EX(1) 034332].

[154] Toronto Dominion understood the circular nature of this Prepay Transaction, as indicated in the diagram of the transaction contained in the Toronto Dominion credit approval memorandum for the transaction. *See* Nov. 24, 2000 Corporate Credit Review, at TDB-EX 001516-TDB-EX 001517.

[155] Swap confirmation between ENA and Morgan Stanley, Jan. 22, 2001, deal no. QH0092.1 (the "ENA/Morgan Stanley $135 million Swap") [AB0648 03718-AB0648 03722].

[156] *Id.*

[157] Dec. 19, 2000 Swap Confirmation; Jan. 29, 2001 Swap Confirmation.

[158] Swap Transaction Confirmation between Morgan Stanley Capital Group, Inc. and Toronto Dominion, Dec. 22, 2000 [TDB-EX 001836-TDB-EX 001838]; Swap Transaction Confirmation between Morgan Stanley Capital Group, Inc. and Toronto Dominion, Dec. 22, 2000 [TDB-EX 001839-TDB-EX 001841].

- 43 -

Stanley entered into a swap with Enron, agreeing to pay Enron the same floating price of oil on the same notional amounts on the settlement dates.[159] Enron agreed to pay Morgan Stanley a fixed interim payment in the amount of $1.053 million and a final payment of $30.99 million on December 7, 2001.[160]

Enron paid Toronto Dominion upfront fees totaling just over $1 million in connection with this transaction. The transaction had a RAROC that Toronto Dominion described as "infinite" because Toronto Dominion had purchased credit protection for the entire amount funded under the Prepay.[161] This Prepay Transaction was the only Toronto Dominion Prepay that remained outstanding as of the Petition Date.[162] However, because Toronto Dominion had purchased credit default protection on Enron for the full amount of this Prepay, Toronto Dominion effectively shifted the risk of Enron's payment failure to a third party.

*Enron's Accounting and Other Disclosure*

Enron used the Toronto Dominion Prepays for several important financial statement purposes: (i) to obtain cash when it needed financing, but in a manner that would not increase its reported debt; (ii) to increase its cash flows from operating activities, in order to match more closely its non-cash mark-to-market income; and (iii) thereby to maintain favorable credit ratings from the Rating Agencies.[163] Enron did not

---

[159] Swap Confirmation between ENA and Morgan Stanley, Jan. 29, 2001, deal no. QJ8903.1 (the "ENA/Morgan Stanley $30 million Swap") [AB0648 03714-AB0648 03717].

[160] ENA/Morgan Stanley $30 million Swap.

[161] Nov. 24, 2000 Corporate Credit Review, at TDB-EX 001509.

[162] As set forth in Section V of this Appendix, Toronto Dominion received a payment from Enron in the amount of $2.5 million in connection with this Prepay that is subject to being voided as a preference.

[163] *See* Second Interim Report, Appendix E (Prepay Transactions).

use the Toronto Dominion Prepays to sell commodities or transfer or manage any commodity price risk.[164]

Toronto Dominion understood how Enron accounted for the Toronto Dominion Prepays and the effect that the Toronto Dominion Prepays had on Enron's reported financial condition:

- "These prepaid swaps are classified as and shown on their balance sheet as price risk management liabilities, not as debt . . . . In summary, this structure keeps these liabilities on the balance sheet but does not show them as debt, thereby causing a decrease in [Enron's] leverage."[165]

- "These prepaid swaps do not affect Enron's debt covenants since they are not classified as debt."[166]

- "This transaction is essentially being undertaken instead of Enron conducting a securitization of the future cash flows from a portfolio of trading contracts in the European region. These contracts have a positive M2M of at least $200mm and this transaction allows Enron to . . . release the cash flow from the contracts without having to create a complex securitization and reveal details of their individual contracts. Enron have discussed the treatment of this transaction with their auditors (Andersen) who are comfortable with the structure."[167]

- "The proceeds of the loan will be used for general corporate purposes and, more specifically, to reduce on balance sheet debt and monetize existing assets."[168]

- "[T]he prepaid does have significant advantages, specifically, favourable balance sheet treatment."[169]

---

[164] See id.

[165] Dec. 10, 1999 Corporate Credit Review, at 20 (emphasis in original).

[166] Sept. 27, 2000 Rapid Review, at TDB-EX(1) 019962.

[167] Nov. 24, 2000 Corporate Credit Review, at TDB-EX 001515.

[168] June 22, 1999 Speedy Review, at TDB-EX 000037.

[169] Email from Steve Fuller, Toronto Dominion, to Teresa Kirby, Enron, Oct. 26, 2000, at TDB-EX 001255 [TDB-EX 001255-TDB-EX 001256].

The Toronto Dominion employees who provided testimony to the Examiner all testified that they understood Enron did not account for the Toronto Dominion Prepays as debt.[170] Several of these witnesses also testified that they understood that Enron was using the Toronto Dominion Prepays to monetize assets and thereby generate cash.[171] However, all of the Toronto Dominion witnesses denied having any understanding of how Enron accounted for the cash proceeds of the Toronto Dominion Prepays on its statement of cash flows.

Nevertheless, evidence exists from which a fact-finder could infer that Toronto Dominion possessed such knowledge. For example, Toronto Dominion understood that Enron accounted for the Toronto Dominion Prepays as price risk management activities, with the debt from the Prepays being recorded as price risk management liabilities.[172] Toronto Dominion representatives also reviewed Enron's financial statements in detail to analyze Enron's financial condition and to see how Enron accounted for its transactions with Toronto Dominion, in particular the Toronto Dominion Prepays.[173] Toronto Dominion knew that generating cash flow was an important reason for Enron to enter into the Toronto Dominion Prepays.[174] On Enron's statement of cash flows, net assets from price risk management activities appears as a line item under cash flow from operating activities, and nowhere else.[175] Accordingly, a fact-finder could reasonably infer that

---

[170] *See, e.g.*, Bott Sworn Statement, at 27; Lavin Sworn Statement, at 53; Reikman Sworn Statement, at 64; Lucey Sworn Statement, at 72.

[171] *See, e.g.*, Lavin Sworn Statement, at 66; Reikman Sworn Statement, at 62.

[172] *See* Dec. 10, 1999 Corporate Credit Review, at 20.

[173] Lucey Sworn Statement, at 44-45; Bott Sworn Statement, at 77-78.

[174] *See, e.g.*, Lavin Sworn Statement, at 66; Reikman Sworn Statement, at 62; Nov. 24, 2000 Corporate Credit Review, at TDB-EX 001515.

[175] *See* Enron 10-K for 1999, Enron Corp. and Subsidiaries Consolidated Statement of Cash Flows.

- 46 -

Toronto Dominion, in its review of Enron's financial statements, understood that Enron accounted for the cash proceeds from the Toronto Dominion Prepays as cash flow from operating activities.

Toronto Dominion also recognized the importance of the Toronto Dominion Prepays to Enron. Toronto Dominion knew that Enron used the Toronto Dominion Prepays to manage and manipulate its financial statement presentation:

- "Enron has approached us again to help them manage their balance sheet for the rating agencies and the analysts. The Company has come to TD as we have demonstrated the ability to deliver, on a short time frame, the same prepaid structured transaction."[176]

- Another credit approval memorandum notes a concern on the part of Toronto Dominion Risk Management regarding Enron's use of the prepay transactions: "To address head office's concern regarding balance sheet manipulation, we have discussed the use of this structure with Enron."[177] The document went on to note: "Risk management's concern regarding the Company's management of its balance sheet has been discussed with the Company, and it has advised that its auditors have reviewed this structure."[178]

- "[W]e've been warned about the balance-sheet games at least twice in the last few months . . . ."[179]

One Toronto Dominion executive was particularly blunt regarding Enron's use of the Toronto Dominion Prepays, noting "[y]es, they did an off balance sheet deal with us to help their year end reporting. Sort of just the kind of thing we do at quarter and year

---

[176] June 22, 1999 Speedy Review, at TDB-EX 000040.

[177] Dec. 10, 1999 Corporate Credit Review, at 20.

[178] Id. at 24 (Team Leader and USA Relationship Mgr Comments – Signed by Robyn Zeller).

[179] Email from Cori Novellino, Toronto Dominion, to Robyn Zeller, Toronto Dominion, Nov. 7, 2000 [TDB-EX 001266].

ends."[180] As shown in the timeline above, all of the Toronto Dominion Prepays closed near the end of a quarterly or annual financial reporting period.

Toronto Dominion also knew that Rating Agency pressure was an important part of Enron's motivation in doing the Toronto Dominion Prepays.[181] The credit approval request for the December 1998 Prepay noted that: "Based on conversations with Enron, the sole purpose of this facility is to satisfy promises made to the rating agencies early this year about reducing leverage."[182] In his comments to the credit approval request, the Toronto Dominion relationship manager for Enron noted that "[t]his is a short term transaction that provides Enron $200MM for 60 days. It is structured as a prepaid gas derivative which will facilitate them meeting their commitments to the rating agencies relative to leverage."[183] Similar statements appeared in the credit approval requests for subsequent Toronto Dominion Prepays.[184] Numerous Toronto Dominion witnesses testified that they understood that Rating Agency and analyst pressures were an important part of Enron's motivation in entering into the Toronto Dominion Prepays.[185]

---

[180] Email from Michael Mueller, Toronto Dominion, to Bob Gibson, *et al.*, Toronto Dominion, Feb. 6, 2001, at TDB-EX 002430 [TDB-EX 002430-TDB-EX 002431].

[181] *See, e.g.*, Bott Sworn Statement, at 27; Lavin Sworn Statement, at 47; Dec. 17, 1998 Speedy Review, at TDB-EX(1) 015115.

[182] Dec. 17, 1998 Speedy Review, at TDB-EX(1) 015115 (emphasis in original).

[183] *Id.* at TDB-EX(1) 015116.

[184] *See, e.g.*, June 22, 1999 Speedy Review, at TDB-EX 000037 ("The Company has requested the facility as they need to satisfy certain commitments made to the rating agencies and the analysts earlier this year with regard to leverage for the quarter ending June 30, 1999 . . . ."); Sept. 25, 1999 Corporate Credit Review, at 23 ("The Company has requested the facility as they need to satisfy certain commitments made to the rating agencies and the analysts earlier this year with regard to leverage for the quarter ending September 30, 1999 . . . .").

[185] *See, e.g.*, Lavin Sworn Statement, at 47; Bott Sworn Statement, at 27.

- 48 -

Toronto Dominion recognized that the Toronto Dominion Prepays had no net commodity price risk to any party[186] and were in substance loans to Enron.[187] Toronto Dominion, in some of its own analyses of Enron's financial condition, added back the amounts of the Toronto Dominion Prepays in calculating Enron's true debt and related financial ratios, including leverage.[188]

As noted in the Prior Reports, Enron's disclosure of its Prepay Transactions, to the extent any was provided, was merely a general description of Enron's accounting for price risk management and its various price risk management activities. In footnotes 1 and 3 to Enron's consolidated financial statements, Enron stated that its price risk management activities included "forwards, swaps and other financial instruments with third parties [that] are reflected at market value, net of future physical delivery related costs," but it never described any of the Prepay Transactions specifically or disclosed the amount or nature of its obligations thereunder.[189] These footnotes did not provide an investor with adequate information regarding the significant amount of cash flow from

---

[186] *See, e.g.*, Jones Sworn Statement, Vol. I, at 35; Lavin Sworn Statement, at 34; Lucey Sworn Statement, at 86; Bott Sworn Statement, at 38; Reikman Sworn Statement, at 64, 120; *see also* Dec. 17, 1998 Speedy Review, at TDB-EX(1) 015116 (stating "[t]his facility is structured to eliminate all commodity price and interest rate risk.").

[187] *See, e.g.*, Lavin Sworn Statement, at 51; Lucey Sworn Statement, at 96; Bott Sworn Statement, at 29; Reikman Sworn Statement, at 134-35; Malcolm Sworn Statement, at 63; Jones Sworn Statement, Vol. I, at 36.

[188] Sept. 27, 2000 Rapid Review, at TDB-EX(1) 019962; Lucey Sworn Statement, at 72-73; Bott Sworn Statement, at 78-79; Huebner Sworn Statement, at 106-07.

[189] Enron 10-K for 1998, Notes to the Consolidated Financial Statements, Notes 1 and 3; *see also* Second Interim Report, Appendix D (Enron's Disclosure of Its SPEs), at 15-17.

operating activities that Enron received from any of its Prepay Transactions or the amount Enron had to repay on these transactions.[190]

Enron also failed to disclose the impact of its Prepay Transactions in its MD&A disclosure. In the section of its MD&A captioned "Results of Operations" for the wholesale services segment, Enron provided generic descriptions of its price risk management activities that paralleled the descriptions found in the notes to the consolidated financial statements.[191] Again, however, Enron provided no separate

---

[190] In Note 1 to Enron's consolidated financial statements, captioned "Summary of Significant Accounting Policies," Enron stated:

> Financial instruments utilized in connection with trading activities are accounted for using the mark-to-market method. Under the mark-to-market method of accounting, forwards, swaps, options and other financial instruments with third parties are reflected at market value, net of future physical delivery related costs, and are shown as "Assets and Liabilities From Price Risk Management Activities" in the Consolidated Balance Sheet . . . .
>
> . . . .
>
> The cash flow impact of financial instruments is reflected as cash flows from operating activities in the Consolidated Statement of Cash Flows.

Enron 10-K for 1998, Notes to the Consolidated Financial Statements, Note 1. In Note 3, captioned "Price Risk Management and Financial Instruments," Enron disclosed that, through its wholesale services segment, it offered price risk management services through "a variety of financial and other instruments including forward contracts involving physical delivery of an energy commodity, swap agreements, which require payments to (or receipt of payments from) counterparties based on the differential between a fixed and variable price for the commodity, options and other contractual arrangements." Enron 10-K for 1998, Notes to the Consolidated Financial Statements, Note 3; *see also* Second Interim Report, Appendix D (Enron's Disclosure of Its SPEs), at 17-19.

[191] In the MD&A section of its 2000 Form 10-K, Enron described the following factors that contributed to cash flows from operating activities in 2000, 1999 and 1998:

> Net cash provided by operating activities increased $3,551 million in 2000, primarily reflecting decreases in working capital, positive operating results and a receipt of cash associated with the assumption of a contractual obligation. Net cash provided by operating activities decreased $412 million in 1999, primarily reflecting increases in working capital and net assets from price risk management activities, partially offset by increased earnings and higher proceeds from sales of merchant assets and investments. The 1998 amount reflects positive operating cash flow from Enron's major business segments, proceeds from sales of interests in energy-related merchant assets and cash from timing and other changes related to Enron's commodity portfolio, partially offset by new investments in merchant assets and investments.

Enron 10-K for 2000, Item 7 (MD&A) - Financial Condition - Cash flows; *see also* Second Interim Report, Appendix D (Enron's Disclosure of Its SPEs), at 17-19.

- 50 -

disclosure on the Prepay Transactions themselves, failing to make clear to investors the significant amount of reported cash flow from operating activities that was in fact generated by these financings or Enron's related repayment obligations.[192]

Evidence indicates Toronto Dominion knew that Enron did not provide meaningful disclosure regarding the Toronto Dominion Prepay Transactions. Two of Toronto Dominion's former employees, both of whom had served as Toronto Dominion's relationship managers for Enron, testified that they had examined Enron's financial statements to see how Enron had disclosed the Toronto Dominion Prepays.[193] Their reviews indicated that Enron had not made any disclosures regarding the Toronto Dominion Prepays.[194] Rather, the price risk management liabilities were simply indicated in the financial statements as "one number" without any separate disclosure.[195]

---

[192] In contrast to Enron's lack of disclosure, a number of companies that engaged in prepay transactions, some of which accounted for the transactions in a manner similar to Enron, provided some type of footnote and/or MD&A disclosure. As discussed in Appendix C (Role of Enron's Officers) to the Third Interim Report, Andersen had recommended that Enron model its disclosure of the Prepay Transactions on those of Aquila Energy Corporation ("Aquila"). Aquila discussed its prepay transactions in the MD&A of a registration statement filed with the SEC in 2000, as well as in the notes to the financial statements contained in that filing. Aquila wrote in its MD&A: "As part of our Wholesale Services segment, we periodically enter into long-term prepaid commodity contracts with our clients. Under these agreements, our clients pay us upfront for a specified commodity in exchange for a discounted, fixed-price for that commodity. To date, we have executed approximately $1 billion of these contracts, and we have used the proceeds to repay loans from UtiliCorp." Aquila Energy Corporation Form S-1 filed with the SEC on Dec. 13, 2000, at 42. Aquila also disclosed that it experienced "[a] $536 million increase in long-term price risk management liabilities due to additional commodity prepay transactions in 2000," id. at 42, and that its operating cash flow for the nine months ended September 30, 2000, was $270 million higher than in the comparable period of 1999 due in part to the impact of a gas prepay transaction. Id. at 43.

[193] Lucey Sworn Statement, at 44; Bott Sworn Statement, at 77-78.

[194] Lucey Sworn Statement, at 48-49; Bott Sworn Statement, at 78, 80; see also Huebner Sworn Statement, at 98.

[195] Lucey Sworn Statement, at 49; Bott Sworn Statement, at 78; see also Huebner Sworn Statement, at 98.

- 51 -

One of these former employees further testified that Toronto Dominion knew Enron was entering into Prepay Transactions with other financial institutions and also knew that Toronto Dominion was not "seeing all of the Prepays that [Enron] had."[196] Toronto Dominion sought to determine from Enron's financial statements the amount of Enron's Prepay Transactions with other financial institutions in order to understand better Enron's true debt,[197] but was unable to do so due to the lack of disclosures Enron made regarding the Prepay Transactions.[198] From its knowledge of the Toronto Dominion Prepays, however, Toronto Dominion knew that Enron's leverage was significantly greater than it publicly disclosed and this was an important factor in Toronto Dominion's decision in late 2000 to reduce substantially its exposure to Enron.[199]

From its involvement in the Toronto Dominion Prepays, Toronto Dominion knew that Enron was not recording the Prepays as debt, that these transactions had a material effect on Enron's financial statements and that Enron failed to disclose information publicly that would have allowed investors to understand the true nature and impact of the Toronto Dominion Prepays. Evidence also exists from which a fact-finder could conclude that Toronto Dominion knew Enron was inflating its reported cash flows from operating activities by including the proceeds from transactions that were effectively debt, which also had a material impact on Enron's financial statements.

---

[196] Lucey Sworn Statement, at 47.

[197] *Id.* at 48-49; Bott Sworn Statement, at 78-79; Huebner Sworn Statement, at 106-07.

[198] Lucey Sworn Statement, at 47-49.

[199] Huebner Sworn Statement, at 108-10.

## IV.    POTENTIAL LIABILITY OF TORONTO DOMINION

### A.    Arguments Supporting the Imposition of Aiding and Abetting Liability and Equitable Subordination

*Aiding and Abetting Liability*

*Elements of Aiding and Abetting Liability.*  As described in Appendix C (Role of Enron's Officers) to the Third Interim Report, the Debtors' officers breached their fiduciary duties under applicable law by causing the Debtors to enter into certain SPE and related transactions that were designed to manipulate the Debtors' financial statements and that resulted in the dissemination of financial information known to be materially misleading.  Toronto Dominion participated in a number of these transactions, including the Toronto Dominion Prepays.

As set forth more fully in Appendix B (Legal Standards) to the Third Interim Report, assuming the Debtors have standing, an affirmative claim against Toronto Dominion for aiding and abetting such breach of fiduciary duties will exist if Toronto Dominion had actual knowledge of the wrongful conduct giving rise to such breach, if Toronto Dominion gave substantial assistance to the primary wrongdoer, and if the injury to the Debtors was the direct or reasonably foreseeable result of Toronto Dominion's conduct.  The Examiner has concluded that there is sufficient evidence for a fact-finder to determine that Toronto Dominion aided and abetted the Debtors' officers in breaching their fiduciary duties.

*Analysis of Evidence.*  There is evidence indicating that: (i) Toronto Dominion knew Enron's Prepay Transactions would result in Enron's financial statements being materially misleading; and (ii) Toronto Dominion provided substantial assistance to Enron in completing those transactions.  Toronto Dominion knew Enron's accounting for

the Toronto Dominion Prepays, with no other meaningful related disclosure, would result in misleading financial presentation. Toronto Dominion understood that the Toronto Dominion Prepays did not effect any transfer of a commodity, and that there was no net commodity price risk, since all price risk was eliminated by virtue of the circularity of the transaction structure.[200] Therefore, a fact-finder could conclude that Toronto Dominion understood that the Toronto Dominion Prepays were effectively loans to Enron, but that Enron recorded the swap agreements as price risk management liabilities and reported the proceeds as cash flows from operating activities. Toronto Dominion also knew that Enron did not make any public disclosure that would allow a reader of its financial statements to understand either the nature or the magnitude of its Prepay Transactions.[201] The Toronto Dominion Prepays allowed Enron to obtain a gross amount of $2 billion in financing, none of which was reported on Enron's balance sheet as debt, and $1.5 billion of which was reported by Enron as cash flow from operating activities.

All of the Toronto Dominion Prepays closed at a quarter-end or at year-end. Many of the Toronto Dominion Prepays were short-term bridge financings that spanned the end of a reporting period. For example, the December 1998 Prepay Transaction had a tenor of just sixty days.[202] Similarly, the Nixon Prepay transaction, executed in December of 1999, had a ninety-day term.[203] Toronto Dominion was aware that Enron achieved significant accounting benefits from these transactions, and it was aware of Enron's pattern of closing transactions immediately prior to the end of a reporting period.

---

[200] *See, e.g.*, Jones Sworn Statement, Vol. I, at 35; Reikman Sworn Statement, at 64-65, 120; Lavin Sworn Statement, at 34; Lucey Sworn Statement, at 86.

[201] Lucey Sworn Statement, at 47-49; Bott Sworn Statement, at 80.

[202] Dec. 17, 1998 Speedy Review, at TDB-EX(1) 015111 (Purpose of Submission).

[203] Dec. 10, 1999 Corporate Credit Review, at 1 (Purpose).

This caused various individuals at Toronto Dominion to express concern that Enron was using the Prepay Transactions to manipulate or manage its financial statements.[204]

By September of 2000, the head of Toronto Dominion's Risk Management Group had become so concerned with Enron's financial condition and strategy that he refused to allow Toronto Dominion to execute any new transactions with Enron that would result in Toronto Dominion taking on additional exposure to Enron. Nonetheless, Toronto Dominion concluded two additional Prepay Transactions, the Alberta Prepay and the London Prepay, after this mandate was issued. In each transaction, Toronto Dominion purchased credit default protection for the entire amount of its exposure to Enron under the Prepay Transaction,[205] thereby effectively laying the Enron credit risk off on the market. Thus, although Toronto Dominion was unwilling to take on any new Enron exposure due to its concerns over Enron's financial strategy and condition, Toronto Dominion assisted Enron with these Prepay Transactions in order to receive the substantial fees that they generated.

There is evidence that these transactions also violated Toronto Dominion's own internal standards of transparency in its transactions. For example, a Toronto Dominion senior executive noted that the Toronto Dominion Prepays were "inconsistent with [Toronto Dominion's] objective of ensuring transparency in [Toronto Dominion's]

---

[204] *Id.* at 20 ("To address head office's concern regarding balance sheet manipulation, we have discussed the use of this structure with Enron."); June 22, 1999 Speedy Review, at TDB-EX 000040 ("Enron has approached us again to help them manage their balance sheet for the rating agencies and the analysts."); Email from Cori Novellino, Toronto Dominion, to Robyn Zeller, Toronto Dominion, Nov. 7, 2000 [TDB-EX 001266] ("[w]e've been warned about the balance-sheet games at least twice in the last few months . . . .").

[205] Lucey Sworn Statement, at 76, 81; Sept. 27, 2000 Rapid Review, at TDB-EX(1) 019957 (Purpose); Nov. 24, 2000 Corporate Credit Review, at TDB-EX 001509 (Purpose).

relationships with customers . . . ."[206] Another risk management executive stated that she understood this statement to be directed at the Prepay Transactions, because the true nature of the transactions could not necessarily be ascertained from simply looking at the transaction documents.[207] The Toronto Dominion Prepays, which totaled $2 billion, had a material effect on Enron's reported debt and cash flows from operating activities. Yet, Enron's disclosure was so minimal that not even a sophisticated financial institution like Toronto Dominion could determine the total amount of Enron's Prepay Transactions.

Under the applicable law of aiding and abetting, courts often include, as part of the element of substantial assistance, that the harm caused must be a reasonably foreseeable result of the actions of the aider and abettor. With respect to the Toronto Dominion Prepays, there is evidence of this element. These transactions were structured to enable Enron to produce materially misleading financial statements, which were disseminated to the public. Enron suffered damages by virtue of the preparation and dissemination of these materially misleading financial statements, including incurring the costs of governmental investigations, the administrative costs of Enron's bankruptcy proceeding, and losses caused by the "deepening insolvency" of Enron that occurred while its true financial condition was disguised. A fact-finder could conclude that damages such as these were a reasonably foreseeable result of Toronto Dominion's conduct in connection with the Toronto Dominion Prepays.

---

[206] Nov. 24, 2000 Corporate Credit Review, at TDB-EX 001526.

[207] Reikman Sworn Statement, at 128-29.

*Equitable Subordination*

As set forth more fully in Appendix B (Legal Standards) to the Third Interim Report, Toronto Dominion's claims against the Debtors may be equitably subordinated if Toronto Dominion engaged in inequitable conduct and such conduct resulted in an injury to creditors or an unfair advantage to Toronto Dominion. The evidence discussed above supports a finding that Toronto Dominion engaged in inequitable conduct that allowed Enron to produce materially misleading financial statements. Enron's other creditors were injured because such financial results were publicly reported and disseminated by Enron. Therefore, the Examiner concludes that sufficient evidence exists for a court to equitably subordinate the claims of Toronto Dominion to those of other creditors.

**B.      Arguments Against the Imposition of Aiding and Abetting Liability and Equitable Subordination**

The Examiner has considered several arguments that Toronto Dominion might assert as defenses to aiding and abetting liability and equitable subordination, including:

- Toronto Dominion may argue that it relied on Enron's obtaining its own independent accounting advice with respect to its financial statements and other disclosures;

- Toronto Dominion may argue that it did not have knowledge of Enron's accounting for significant aspects of the transactions;

- Toronto Dominion may argue that the Toronto Dominion Prepays were not material to Enron's reported financial performance; and

- Toronto Dominion may argue that its conduct in entering into the Toronto Dominion Prepays did not constitute substantial assistance required to support the imposition of aiding and abetting liability.

*Reliance on Independent Accounting Advice.* The Toronto Dominion Prepays were complex, and all required sophisticated accounting analyses and interpretations. Toronto Dominion may argue that its reliance on Enron being financially sophisticated

and receiving accounting advice from one of the most well-respected accounting firms in the world precludes it from having any scienter or intent to aid and abet Enron's financial misrepresentations.

Internal Toronto Dominion documents indicate that, at least in certain circumstances, Toronto Dominion may have relied on Enron's obtaining accounting advice from Andersen. For example, the credit approval memorandum for the London Prepay notes that "Enron have [sic] discussed the treatment of this transaction with their auditors (Andersen) who are comfortable with the structure."[208] An earlier credit approval memorandum contains a similar reference regarding accounting for the Prepay Transactions, "[w]e have also confirmed that Enron's internal and external auditors have continually reviewed and signed off on this structure."[209]

Similarly, a number of the current and former Toronto Dominion employees who provided testimony to the Examiner stated that they relied on Enron's obtaining its accounting advice from Andersen.[210] They knew that Enron had large and savvy financial and accounting staffs, and that Enron was represented by a "big five" accounting firm that was qualified to analyze and assess accounting issues regarding any of Enron's transactions.[211] None of the individuals who testified on behalf of Toronto Dominion recalled having spoken directly with Andersen or any of Enron's internal accountants, however.[212]

---

[208] Nov. 24, 2000 Corporate Credit Review, at TDB-EX 001515.

[209] Dec. 10, 1999 Corporate Credit Review, at 20.

[210] *See, e.g.*, Spencer Sworn Statement, at 53; Reikman Sworn Statement at 63, 100.

[211] Reikman Sworn Statement, at 63, 100; Spencer Sworn Statement, at 53.

[212] *See, e.g.*, Lavin Sworn Statement, at 69.

- 58 -

Whether Toronto Dominion's reliance on Enron's obtaining independent accounting advice was reasonable is a question of fact. There is evidence that Toronto Dominion believed Andersen approved Enron's transactions, and there is also evidence from which a fact-finder could conclude that such reliance was not reasonable. Even if Toronto Dominion's reliance on Andersen's approval of the GAAP accounting was reasonable, evidence exists indicating that Toronto Dominion was aware that Enron's disclosure of the Toronto Dominion Prepays was not consistent with the economic substance of the transactions. A fact-finder could infer that Toronto Dominion knew that Enron's disclosure of the Toronto Dominion Prepays resulted in its cash flows from operating activities being materially inflated and its debt being materially understated.

With respect to potential aiding and abetting liability, whether a fact-finder would infer that Toronto Dominion knew that the lack of disclosure related to those transactions would result in dissemination of materially misleading financial information is the fundamental issue, not whether the technical rules of GAAP were satisfied or whether Toronto Dominion relied on Enron's auditors. Accordingly, even if Toronto Dominion could demonstrate that it believed that Enron's accounting for the Prepay Transactions was correct, the Examiner is unable to conclude that Toronto Dominion must be excused as a matter of law from potential aiding and abetting liability. Similarly, the Examiner is unable to conclude that a fact question on these issues would preclude a finding that Toronto Dominion engaged in inequitable conduct in connection with the Toronto Dominion Prepays.

*Lack of Knowledge Regarding Enron's Accounting.* Toronto Dominion may also argue that it lacked knowledge of how Enron accounted on its statement of cash flows for

the proceeds it received from the Toronto Dominion Prepays, and that such a lack of knowledge precludes or mitigates against a finding of aiding and abetting liability or equitable subordination.

All of the Toronto Dominion witnesses who provided testimony to the Examiner denied having any knowledge of how Enron accounted for the cash proceeds that it received from the Toronto Dominion Prepays. Nor has the Examiner uncovered any documentary evidence that conclusively establishes this knowledge on the part of Toronto Dominion. Thus, Toronto Dominion may argue that it was unaware of how Enron's officers used the Prepay Transactions to manipulate Enron's financial statements, at least with respect to its statement of cash flows.

Whether Toronto Dominion had sufficient knowledge of acts giving rise to breaches of fiduciary duty by officers of Enron is a question of fact. Evidence exists indicating that Toronto Dominion knew that the Toronto Dominion Prepays were in substance loans[213] but were not accounted for as debt by Enron on its balance sheet.[214] Evidence also exists that Toronto Dominion had concerns that Enron was using the Toronto Dominion Prepays to manipulate or manage its financial statements.[215] Such evidence, alone, is sufficient to create an issue of fact.

Finally, there is evidence from which a fact-finder could reasonably infer that Toronto Dominion had knowledge that Enron accounted for the cash proceeds it received

---

[213] Lavin Sworn Statement, at 51; Lucey Sworn Statement, at 96; Bott Sworn Statement, at 29; Reikman Sworn Statement, at 134-35; Malcolm Sworn Statement, at 63; Jones Sworn Statement, Vol. I, at 36.

[214] Bott Sworn Statement, at 27; Dec. 10, 1999 Corporate Credit Review, at 20; Sept. 27, 2000 Rapid Review, at TDB-EX(1) 019962.

[215] Dec. 10, 1999 Corporate Credit Review, at 20 ("To address head office's concern regarding balance sheet manipulation, we have discussed the use of this structure with Enron."); June 22, 1999 Speedy Review, at TDB-EX 000040 ("Enron has approached us again to help them manage their balance sheet for the rating agencies and the analysts.").

from the Toronto Dominion Prepays as cash flow from operating activities. Toronto Dominion understood that Enron accounted for the Prepay Transactions as price risk management activities, and recorded obligations under the Prepay Transactions as price risk management liabilities.[216]   Toronto Dominion also reviewed Enron's financial statements in detail to analyze Enron's financial condition and to see how Enron accounted for its transactions with Toronto Dominion, in particular the Prepay Transactions.[217]   On Enron's statement of cash flows, the line item for price risk management activities appears under cash flow from operating activities, and nowhere else.[218]   Accordingly, a fact-finder could infer that Toronto Dominion, in its review of Enron's financial statements, understood that Enron accounted for the cash proceeds from the Toronto Dominion Prepays as cash flow from operating activities.

*Lack of Materiality*.   Toronto Dominion also may argue that the Toronto Dominion Prepays were not material to Enron's stated financial performance. Accordingly, there would be no claims against Toronto Dominion based upon its participation in these transactions because no damages resulted from Enron's failure properly to disclose or account for these transactions.   The impact of the Toronto Dominion Prepays on Enron's reported financial statements was less significant than the impact of the Prepay Transactions entered into between Enron and certain other financial institutions.   However, as noted above, the Toronto Dominion Prepays allowed Enron to misstate significantly both its cash flow from operating activities and its debt.   Thus,

---

[216] *See* Dec. 10, 1999 Corporate Credit Review, at 20; Lucey Sworn Statement, at 44; Bott Sworn Statement, at 80.

[217] Lucey Sworn Statement, at 44; Bott Sworn Statement, at 77-78.

[218] *See* Enron 10-K for 1999, Enron Corp. and Subsidiaries Consolidated Statement of Cash Flows.

evidence exists from which a fact-finder could conclude that the Toronto Dominion Prepays had a material impact on Enron's reported financial performance.

*No Substantial Assistance.* Toronto Dominion may argue that its conduct in entering into the Toronto Dominion Prepays did not constitute the substantial assistance necessary to support the imposition of aiding and abetting liability. Unlike certain other financial institutions, Toronto Dominion did not structure the Prepay Transactions, nor did Toronto Dominion create an SPE for use in any of the Prepay Transactions. All of the Toronto Dominion Prepays involved a third party financial institution that Enron brought to the transaction. Nor does it appear that Toronto Dominion, unlike other financial institutions, made or caused to be made any representations to Andersen in furtherance of Enron's desired accounting treatment for the Prepay Transactions. Accordingly, Toronto Dominion may argue that its role in the Toronto Dominion Prepays was limited to that of a mere participant in a transaction that Enron proposed, and that such a role is insufficient to constitute the substantial assistance that is required to support a claim for aiding and abetting.

Whether Toronto Dominion's role in the Prepay Transactions constituted substantial assistance to breaches of fiduciary duty by officers of Enron is a question of fact. Toronto Dominion participated in Prepay Transactions totaling $2 billion from 1998 through 2000. Toronto Dominion funded approximately $1.1 billion of this amount in five Prepay Transactions and served as a conduit entity in three other Prepay Transactions that other financial institutions funded. Although the volume of the Toronto Dominion Prepays is certainly less than that of the Prepay Transactions between Citigroup and Enron ($4.7 billion) or JPMorgan Chase and Enron ($3.7 billion), Toronto

Dominion's participation in Prepay Transactions totaling approximately $2.0 billion was nonetheless substantial. These transactions allowed Enron to misstate materially both its debt and cash flow from operating activities on its financial statements during this same period. Accordingly, the Examiner cannot conclude that Toronto Dominion's role in the Toronto Dominion Prepays does not constitute substantial assistance.

### C.   Conclusions

Toronto Dominion helped Enron implement six Prepay Transactions. With respect to these transactions, the evidence reviewed by the Examiner, and the reasonable inferences that may be drawn from that evidence, are sufficient for a fact-finder to conclude that Toronto Dominion aided and abetted certain of the Debtors' officers in breaching their fiduciary duties. There is also sufficient evidence of inequitable conduct by Toronto Dominion in connection with such Prepay Transactions for a court to conclude that Toronto Dominion's claims should be equitably subordinated to the claims of other creditors.

As a result, Toronto Dominion's claims in the Bankruptcy Case totaling approximately $57.8 million are susceptible of being equitably subordinated to the claims of other creditors. This would be in addition to any affirmative recovery that would be available to the Debtors against Toronto Dominion for aiding and abetting the breach of fiduciary duties by the Debtors' officers, assuming that the Debtors have standing to pursue such a claim.

## V.   POTENTIAL VOIDABLE PREFERENCE LIABILITY OF TORONTO DOMINION

As noted in the Prior Reports, many of Enron's SPE transactions give rise to voidable preference claims under Section 547 of the Bankruptcy Code.   Section 547 permits a debtor to avoid certain prepetition transfers as preferences if there is: (i) a transfer; (ii) of an interest of the debtor in property; (iii) to or for the benefit of a creditor; (iv) for or on account of an antecedent debt owed by the debtor before such transfer was made; (v) made while the debtor was insolvent; (vi) on or within ninety days (or one year for an "insider" transferee) before bankruptcy; (vii) that enables the creditor to receive more than it would receive in a Chapter 7 case if the transfer had not been made.[219] Section 547(c) of the Bankruptcy Code,[220] among other sections,[221] provides certain affirmative defenses to preference liability, depending on the nature and circumstances surrounding the transfer.

The Toronto Dominion Prepay known as the London Prepay gives rise to potential preference liability for Toronto Dominion.   Specifically, on September 19, 2001, ENA transferred approximately $2.5 million to Toronto Dominion.[222]   The amount transferred was property of ENA and was transferred to Toronto Dominion, a creditor, on account of an antecedent debt, the Toronto Dominion London Prepay.   The transfer was made within 90 days of the Petition Date, when ENA is presumed to be insolvent. Finally, the transfer enabled Toronto Dominion to receive more than if ENA filed a

---

[219]  11 U.S.C. § 547(b).

[220]  11 U.S.C. § 547(c).

[221]  *See, e.g.*, 11 U.S.C. § 546(g).

[222]  *See* SAP Wire Transfer Request regarding $2,556,901.25 paid by ENA to Toronto Dominion, Sept. 19, 2001 [AB000273465-AB000273466].

- 64 -

Chapter 7 case, as this was a payment of unsecured debt.[223]  Accordingly, all of the elements of a preferential transfer can be established against Toronto Dominion, and ENA has a *prima facie* case for recovery of approximately $2.5 million from Toronto Dominion.

Toronto Dominion will likely assert two defenses to such a preference claim. First, Toronto Dominion is likely to argue that the payment is not recoverable because it was made under and in connection with a "swap agreement," and thus is insulated from avoidance under Section 546(g) of the Bankruptcy Code.  For the reasons set forth in the Third Interim Report,[224] the Examiner concludes that ENA would likely succeed in arguing that the London Prepay swaps are not swap agreements for bankruptcy purposes, because these are swap agreements in name only and in all other respects functioned as loans, and were intended by all the parties to function as loans.  Thus, Section 546(g) of the Bankruptcy Code will not shield these transfers from avoidance.

In addition, for the reasons also set forth in the Third Interim Report,[225] Toronto Dominion likely will not be able to establish that this transfer was in the ordinary course of business.  Although the transfer in question appears to have been made in accordance with the terms of the documents governing the London Prepay, the underlying transaction (and the debt it created) was not ordinary or customary, but rather, was a highly unusual

---

[223] Toronto Dominion may assert that because it had credit default protection, it would have received this amount (albeit not from ENA) had ENA not made the payment and instead filed a Chapter 7 petition.  Such an argument would not likely succeed, as a transferee's/creditor's rights against a third party cannot be used by that transferee/creditor to show that it would have received the same recovery in a Chapter 7 case. Instead, for a transferee/creditor to defeat a preference on these grounds, it must show that it had a lien on, or similar rights against, property of the debtor.  *See, e.g., CEPA Consulting v. New York Nat'l Bank (In re Wedtech Corp.)*, 187 B.R. 105, 107-08 (S.D.N.Y. 1995).  Accordingly, Toronto Dominion's rights under its credit default protection should have no impact on its preference liability.

[224] *See* Third Interim Report, Annex 4 to Appendix J (Avoidance Actions), at 29-39.

[225] *See id.* at 11-18.

financial arrangement designed to manipulate Enron's reported results of operations, cash flows and financial position. Moreover, as noted above, the transfer was made in the context of Toronto Dominion's active efforts to reduce its exposure to Enron, which may also impair its ability to prove the transfer was ordinary between the parties. For these reasons, Toronto Dominion will likely not succeed in asserting an ordinary course of business defense under Section 547(c)(2) of the Bankruptcy Code.

Accordingly, the Examiner concludes that the approximately $2.5 million payment described above can likely be avoided as a preference. If, as the Examiner concludes, Toronto Dominion cannot successfully establish any defenses, then this approximately $2.5 million can be recovered from Toronto Dominion for the benefit of ENA's estate. In addition, pursuant to Section 502(d) of the Bankruptcy Code,[226] if Toronto Dominion does not pay ENA's estate on account of this preference claim, the claims it holds against ENA, which total approximately $57.8 million as set forth above, should be disallowed.

---

[226] 11 U.S.C. § 502(d).

# General Information

| | |
|---|---|
| **Case Name** | Enron Creditors Recovery Corp., et al |
| **Court** | U.S. Bankruptcy Court for the Southern District of New York |
| **Date Filed** | Sun Dec 02 00:00:00 EST 2001 |
| **Judge(s)** | Allan L. Gropper |
| **Docket Number** | 1:01-bk-16034 |
| **Status** | Closed |
| **Parties** | Ian Gazes; Philip D Dimick; Official Committee Of Unsecured Creditors; Enron Creditors Recovery Corp., et al; Epiq Corporate Restructuring, LLC Claims Agent; Marlin Ad Hoc Committee; United States Trustee |

© 2023 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

**Bloomberg Law**®