# **Exhibit F**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X

In re:

      **Residential Capital, LLC, et al**

                  Debtors.

-----------------------------------------------------------X

In Proceedings For A
Reorganization Under
Chapter 11
Case No. 12-12020
(Jointly Administered)

<u>**CONFIDENTIAL - SUBJECT TO BANKRUPTCY COURT ORDER**</u>

THE MATERIAL HEREIN HAS BEEN FILED UNDER SEAL PURSUANT TO AN ORDER OF THE BANKRUPTCY COURT, DATED, *May 13, 2013,* DIRECTING THE CLERK TO FILE SUCH MATERIAL UNDER SEAL.

UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

*In re:*          :   Chapter 11

RESIDENTIAL CAPITAL, LLC, *et. al.*    :   Case Number 12-12020 (MG)
                                          (Jointly Administered)

                Debtors.     :

## REPORT OF ARTHUR J. GONZALEZ, AS EXAMINER

### VOLUME 1

Sections I through V

CHADBOURNE & PARKE LLP
30 Rockefeller Plaza
New York, New York 10112
Telephone: (212) 408-5100
Facsimile: (212) 541-5369

Howard Seife
David M. LeMay
Thomas J. McCormack
N. Theodore Zink, Jr.
Robin D. Ball
Seven R. Rivera
Andrew Rosenblatt
Marc D. Ashley
Christy L. Rivera
Francisco Vazquez

*Counsel to Examiner*

MESIROW FINANCIAL CONSULTING, LLC
666 Third Avenue, 21st Floor
New York, New York 10017
Telephone: (212) 808-8330
Facsimile: (212) 682-4995

Ralph S. Tuliano
James C. Atkinson
James F. Feltman
Melissa Kibler Knoll
Jack F. Williams

*Financial Advisors to Examiner*

# TABLE OF CONTENTS

Page

**I.** **SUMMARY OF THE EXAMINER'S PRINCIPAL FINDINGS AND CONCLUSIONS** ................ I-1

**A.** **APPOINTMENT OF THE EXAMINER AND ISSUES PRESENTED IN THE REPORT** ................ I-1

**B.** **ORGANIZATION OF THE REPORT** ................ I-3

**C.** **THE INVESTIGATION** ................ I-4

**D.** **EXAMINER'S METHODOLOGY FOR PRESENTATION OF FINDINGS AND CONCLUSIONS** ................ I-5

**E.** **EXAMINER'S PRINCIPAL CONCLUSIONS REGARDING ESTATE CAUSES OF ACTION** ................ I-7

    *1. Claims Of GMAC Mortgage And ResCap Relating To The MMLPSA, Pipeline Swap, MSR Swap, And Broker Agreement* ................ I-7

        *a. Misallocation Of Net Revenues On Loans Brokered By GMAC Mortgage* ................ I-8

        *b. Failure To Pay The Value Of Purchased MSRs And Correspondent Loan MSRs To GMAC Mortgage Under The MSR Swap* ................ I-10

        *c. Representation And Warranty Liabilities Under The 2001 And 2006 MMLPSAs* ................ I-10

        *d. Application Of The Pipeline Swap To The "Funding To Sale" Period And To Ally Bank-Originated Loans* ................ I-10

        *e. Failure To Obtain Independent Director Approval* ................ I-11

    *2. Government Settlements* ................ I-12

    *3. Causes Of Action Relating To Use And Allocation Of ResCap's Tax Attributes* ................ I-13

    *4. Minnesota Insider Preference Claims* ................ I-14

    *5. Ally Bank Transactions* ................ I-16

        *a. 2006 Bank Restructuring* ................ I-16

        *b. 2008 Bank Transaction And 2009 Bank Transaction* ................ I-19

    *6. ResCap's Directors And Officers* ................ I-20

        *a. Examiner's Observations Regarding Protocol And Functioning Of The ResCap Board* ................ I-20

        *b. Indemnification And Exculpation* ................ I-20

        *c. Breach Of Fiduciary Duty Claims Against ResCap's Directors And Officers* ................ I-21

        *d. Aiding And Abetting Breach Of Fiduciary Duty Claims Against AFI* ................ I-22

    *7. Single Entity Theories Of Liability* ................ I-23

        *a. Piercing The Corporate Veil* ................ I-23

        *b. Substantive Consolidation* ................ I-25

    *8. Debt Recharacterization* ................ I-25

    *9. Equitable Subordination* ................ I-26

    *10. Constructive Trust Claims* ................ I-28

i

|                                                                                        | **Page** |
|----------------------------------------------------------------------------------------|----------|
| *11. Prepetition Asset Sales*                                                          | I-29     |
| *12. Financing Affiliate Transactions*                                                 | I-29     |
| **F.  EXAMINER'S EVALUATION OF ESTATE CLAIMS**                                          | I-29     |
| **G.  EXAMINER'S PRINCIPAL CONCLUSIONS REGARDING PROPOSED POSTPETITION TRANSACTIONS AND AGREEMENTS** | I-33 |
| *1.  Negotiation And Entry Into AFI Settlement And Plan Sponsor Agreement*             | I-33     |
| *2.  Negotiation And Entry Into RMBS Trust Settlement Agreements And RMBS Plan Support Agreements* | I-34 |
| **H.  EXAMINER'S PRINCIPAL CONCLUSIONS REGARDING THIRD-PARTY CLAIMS**                   | I-36     |
| *1.  Third-Party Claims Against AFI*                                                    | I-37     |
| *a.  RMBS Claims*                                                                       | I-37     |
| *b.  Fraudulent Transfer Claim*                                                         | I-39     |
| *2.  Third-Party Claims Against Ally Securities*                                        | I-39     |
| *3.  Third-Party Claims Against Ally Bank*                                              | I-41     |
| *4.  Unsecured Noteholder Causes Of Action*                                            | I-42     |
| *a.  Tortious Interference Under 2005 Indenture*                                        | I-42     |
| *b.  Claims Related To The 2006 Bank Restructuring*                                     | I-43     |
| *5.  Junior Secured Noteholder Causes Of Action*                                       | I-43     |
| **I.  EXAMINER'S EVALUATION OF CONSIDERATION FOR RELEASES**                             | I-44     |
| **J.  EXAMINER'S PRINCIPAL CONCLUSIONS REGARDING FINANCIAL CONDITION**                  | I-44     |
| *1.  Balance Sheet Test*                                                                | I-45     |
| *2.  Unreasonably Small Capital*                                                        | I-45     |
| *3.  Ability To Pay Debts As Due*                                                       | I-46     |
| *4.  Financial Condition Tests As Applied To ResCap's Subsidiaries*                     | I-46     |
| **II. PROCEDURAL BACKGROUND**                                                          | II-1     |
| **A.  COMMENCEMENT OF CHAPTER 11 CASES**                                                | II-1     |
| *1.  The Official Committee Of Unsecured Creditors*                                     | II-1     |
| *2.  The Committee's Rule 2004 Motion And Bankruptcy Court Order*                       | II-1     |
| *3.  Examiner Motion, Order, And Appointment*                                           | II-1     |
| *4.  The Examiner's Retention Of Professionals*                                         | II-2     |
| *5.  Scope Of The Investigation And Examiner Work Plan*                                 | II-2     |
| **B.  CONDUCT OF THE INVESTIGATION**                                                    | II-5     |
| *1.  Initial Stage Of The Investigation*                                                | II-5     |
| *2.  Rule 2004 Motion And Request For Production Of Documents*                          | II-6     |
| *3.  Discovery Conducted In Furtherance Of The Investigation*                           | II-7     |
| *a.  Document Requests And Subpoenas*                                                   | II-7     |
| *b.  Witness Interviews*                                                                | II-9     |
| *c.  Additional Presentations By And Meetings With Interested Parties*                  | II-12    |
| *d.  Informal Document Requests*                                                        | II-14    |

| | Page |
|---|---|

**III. CHRONOLOGICAL PRESENTATION OF TRANSACTIONS AND EVENTS RELEVANT TO THE ISSUES INVESTIGATED BY THE EXAMINER** ..... III-1

**A. GM'S DECLINING BUSINESS LEADS TO THE FORMATION OF RESCAP AND, ULTIMATELY, TO GM'S SALE OF A MAJORITY INTEREST IN AFI/RESCAP TO CERBERUS** ..... III-1

   *1. Background* ..... III-1
      *a. General Motors Corporation* ..... III-1
      *b. AFI* ..... III-1
   *2. GM's Declining Fortunes Led To Credit Rating Downgrades That Adversely Affected AFI's Access To Competitively Priced Funding* ..... III-3
      *a. Low-Cost Funding Is Critical To Mortgage Finance Operations* ..... III-3
      *b. GM's Credit Rating Downgrades* ..... III-4

**B. RESCAP WAS FORMED TO ISOLATE AFI'S RESIDENTIAL MORTGAGE OPERATIONS FROM THE FINANCIAL INSTABILITY OF ITS PARENT, GM** ..... III-6

   *1. August 2004 Incorporation* ..... III-6
   *2. The ResCap By-Laws* ..... III-7
   *3. The 2005 Operating Agreement* ..... III-8
      *a. The 2005 Operating Agreement Provides Separation By, Among Other Things, Placing Limitations On Affiliate Transactions.* ..... III-11
      *b. Amendment And Waiver Of The 2005 Operating Agreement* ..... III-12
      *c. The Arm's-Length And Fair Value Requirements For Material Transactions With GMAC Affiliates* ..... III-12
      *d. Dividend Limitations* ..... III-15
      *e. Limitations On The Prepayment Of GMAC Subordinated Debt Under The 2005 Operating Agreement* ..... III-16
      *f. The Independent Directors Requirement* ..... III-17
      *g. ResCap Actions That Required The Approval Of A Majority Of The ResCap Board, Including A Majority Of The Independent Directors* ..... III-17
      *h. The Independent Directors Were Required In Certain Circumstances To Consider Only The Interest Of ResCap, Including Its Creditors* ..... III-18
      *i. Separateness Provisions* ..... III-19
      *j. Indemnification Provisions* ..... III-20
      *k. Termination Of The 2005 Operating Agreement* ..... III-20
      *l. Guarantee And Third-Party Beneficiaries* ..... III-21

**C. RESCAP'S POST-FORMATION FUNDING, MANAGEMENT, AND BUSINESS PROFILE** ..... III-22

   *1. GMAC Mortgage Group Inc. Contributes GMAC Residential Holding Corp. And GMAC-RFC Holding Corp. To ResCap* ..... III-22
   *2. ResCap's Initial Funding And Capitalization* ..... III-22
      *a. Collateralized Borrowings In Securitization Trusts* ..... III-24
      *b. Short-Term Secured Borrowings* ..... III-24
      *c. Long-Term Unsecured Borrowings* ..... III-24
      *d. Bank Deposits And FHLB Advances* ..... III-25
      *e. Affiliate Borrowings* ..... III-25
      *f. Off-Balance Sheet Financings* ..... III-25

|  |  | Page |
|---|---|---|
| 3. | Initial ResCap Officers And Directors | III-26 |
| 4. | ResCap's Post-Formation Businesses | III-29 |
|  | a. Business Overview | III-29 |
|  | b. US Residential Real Estate Finance | III-30 |
| 5. | Old GMAC Bank | III-38 |
| 6. | Residential Finance Group Consisted Of GMAC Residential And Residential Capital Group | III-38 |
|  | a. GMAC Residential (GMAC Mortgage) | III-38 |
|  | b. Residential Capital Group (RFC) | III-39 |

**D. HOUSING AND MORTGAGE MARKETS EXPERIENCE RAPID GROWTH IN THE YEARS LEADING TO RESCAP'S FORMATION** — III-45

| 1. | The Subprime Mortgage Market Expands | III-47 |
|---|---|---|
| 2. | As Interest Rates Increase, Some Begin to Predict A Housing Slowdown | III-49 |

**E. GM'S SALE OF A 51% INTEREST IN AFI TO CERBERUS** — III-52

| 1. | GM's Ratings Continue To Decline | III-52 |
|---|---|---|
| 2. | AFI's Concerns Regarding GM's Ratings And The Affect On AFI Grows, Leading To Consideration Of Its Separation From GM | III-57 |
| 3. | Despite GM's Consideration Of Sale Of AFI, GM's Ratings Continue To Decline | III-60 |
| 4. | Execution Of The Cerberus PSA | III-60 |
| 5. | ResCap Converts To A Limited Liability Company | III-62 |
| 6. | 2006 ResCap LLC Agreement | III-62 |
| 7. | 2006 AFI Amended LLC Operating Agreement | III-63 |
| 8. | The 2006 Bank Restructuring | III-63 |
| 9. | The 2006 Amended Operating Agreement | III-64 |
| 10. | Purchase Price Adjustment | III-66 |
| 11. | Consulting Agreement | III-67 |
| 12. | Other Agreements | III-69 |

**F. INDUSTRY DISLOCATION LED BY SUBPRIME DISTRESS (DECEMBER 2006 THROUGH AUGUST 2007)** — III-71

| 1. | The Subprime Mortgage Industry Faced Significant Challenges | III-71 |
|---|---|---|
|  | a. Housing Appreciation Showed The Largest Decline In Three Decades | III-71 |
|  | b. Interest Rates Rise | III-73 |
|  | c. Mortgage Delinquencies | III-73 |
|  | d. Early Payment Defaults And Repurchases | III-74 |
|  | e. First Quarter 2007 Mortgage Company Bankruptcies | III-76 |
|  | f. Capital Market Response | III-77 |
|  | g. Mortgage Company Bankruptcies Increased Throughout 2007 | III-79 |
| 2. | ResCap's Returns Began To Reflect The Troubled Market | III-80 |
|  | a. Pre-Closing Indicators Showed That ResCap Was Vulnerable To The Deteriorating Conditions For Subprime Lenders | III-81 |
|  | b. Post-Closing Revelations Of Distressed Warehouse Lending Clients | III-84 |
|  | c. Cerberus PSA Post-Closing Adjustment Was Principally Attributable To Poor ResCap Performance | III-87 |
|  | d. ResCap Reported A Loss For The Fourth Quarter Of 2006 | III-87 |

12-12020-mg    Doc 3698-4    Filed 05/13/13    Entered 05/13/13 07:08:13    Full Table
Case 1:11-cv-03166-TD    Doc 513/63    Filed 02/08/23    Page 5 of 820
of Contents    Pg 5 of 20

|  |  | Page |
|---|---|---|
| 3. | *Further Market Dislocation In 2007; ResCap Begins An Era Of Parental Support And Affiliated Transactions* | III-92 |
|  | a. *Funding Initiatives* | III-92 |
|  | b. *Amended And Restated Master Mortgage Loan Purchase And Sale Agreement* | III-92 |
|  | c. *MSR Swaps* | III-93 |
|  | d. *August 2007 Severe Liquidity Crisis And The Health Capital Sale* | III-93 |
| **G.** | **RESCAP'S MOUNTING LIQUIDITY AND COVENANT ISSUES (SEPTEMBER 2007 THROUGH JULY 2008)** | III-95 |
| 1. | *Summary Of Industry Data And Environment* | III-95 |
|  | a. *Housing Market* | III-95 |
|  | b. *Unemployment* | III-97 |
|  | c. *Capital Markets* | III-97 |
|  | d. *Contingency Funding Plans Employed By ResCap To Prevent Market Turmoil From Having A Negative Effect On Liquidity* | III-98 |
|  | e. *Third Quarter 2007's Loss Marked ResCap's Fourth Consecutive Quarterly Loss* | III-100 |
| 2. | *Responses To Third Quarter 2007 Loss* | III-101 |
|  | a. *ResCap Leadership Changes In Third Quarter 2007* | III-101 |
|  | b. *Board Discussions Indicating Insolvency Concerns* | III-102 |
|  | c. *In Fall 2007, ResCap Announced Major Restructuring Plans* | III-103 |
|  | d. *November 1, 2007 Ratings Downgrade* | III-105 |
|  | e. *Analysts' Bankruptcy Speculation/ResCap And AFI Public Debt Repurchase Plans* | III-106 |
|  | f. *By December 2007, ResCap Needed Additional Cash; Fourth Quarter 2007 Operating Loss Totaled $921 Million* | III-107 |
| 3. | *Liquidity And TNW Concerns Continued Into 2008* | III-108 |
|  | a. *Significant Unsecured Debt Maturities On The Horizon* | III-108 |
|  | b. *AFI Provided A $750 Million Advance Facility* | III-109 |
|  | c. *ResCap's CEO Had Questions Regarding ResCap's Solvency As The Second Quarter Of 2008 Approached* | III-109 |
|  | d. *Amendment Of ResCap's LLC Agreement Created A Class Of Preferred Membership Shares, Which Would Be Transferred To AFI In Exchange For ResCap Notes Purchased By AFI In Open Market Transactions* | III-110 |
|  | e. *ResCap's $750 Million Credit Facility Secured by MSRs* | III-112 |
|  | f. *ResCap's Near Term Refinancing Needs Trigger Ratings Downgrade* | III-116 |
|  | g. *ResCap's Monetization Of Assets Over Time To AFI/Cerberus; Lack Of Marketability For Such Assets Due To Severe Market Dislocation And Disruption During Relevant Time Period* | III-117 |
| **H.** | **FINANCIAL MARKET DISLOCATION AND IMPACT ON RESCAP'S OPERATIONS (AUGUST 2008 THROUGH JANUARY 2009)** | III-119 |
| 1. | *The Period Of August 2008 Through January 2009 Was One Of Momentous Financial Dislocation* | III-119 |
| 2. | *ResCap Board Membership Was Stable During This Period* | III-125 |

|  |  | Page |
|---|---|---|
| 3. | *ResCap's Liquidity And TNW Covenants Concerns Continue* | III-126 |
| 4. | *ResCap Streamlines Its Business, Experiences Liquidity And Capital Challenges, And Engages In Multiple Inter-Company Transactions With AFI* | III-129 |
| 5. | *ResCap Continues To Experience Liquidity And Capital Challenges, Engages In Additional Inter-Company Transactions With AFI, And Announces That It Is "Dependent" On AFI* | III-138 |
| 6. | *AFI Becomes A Bank Holding Company; The Federal Government Supports AFI With First TARP Investment; And ResCap Sells Its Interest In Ally Bank To AFI* | III-152 |

**I. THE POST-TARP PERIOD (2009–2010)** — III-167

| | | | Page |
|---|---|---|---|
| 1. | | *ResCap's Financial Picture In 2009* | III-167 |
| | a. | *Rising Unemployment And Increasing Mortgage Delinquencies And Foreclosures Continued To Pressure The Mortgage And Capital Markets In 2009* | III-168 |
| | b. | *AFI Voiced Concerns About ResCap's Ability To Remain A Going Concern Early In 2009 And Made No Assurance That AFI Would Continue To Provide Support In The Form Of Liquidity Or Capital* | III-173 |
| | c. | *AFI Was Not A Lone Voice; ResCap Questioned Its Own Ability To Continue As A "Going Concern"* | III-176 |
| | d. | *The ResCap Board Also Looked Into The Ramifications Of A Bankruptcy Filing In 2009* | III-177 |
| | e. | *Project Origin Analyzed The Risk Of A ResCap Chapter 11 Filing On Various Constituents* | III-179 |
| | f. | *In August 2009, AFI Made An Opening Offer To Purchase Certain MSRs From ResCap, Which Appears To Have Been An Off-Shoot Of Project Origin* | III-181 |
| 2. | | *In March 2009, The ResCap Board Approved ResCap's 2009 Business Plan* | III-183 |
| 3. | | *ResCap Entered Into Several Related-Party Transactions in 2009* | III-185 |
| | a. | *In May 2009, ResCap Sold Its Interest In The US/UK Broker Dealers To AFI* | III-186 |
| | b. | *AFI Helped ResCap To Temporarily Overcome Liquidity Constraints Through Secured Credit Facilities* | III-186 |
| | c. | *AFI's Contributions In The Form Of Debt Forgiveness And ResCap Bond Retirements Assisted ResCap In Meeting Its TNW Requirements In 2009* | III-187 |
| 4. | | *The ResCap Board Reviewed Various "What If" Scenarios At Its June And July 2009 Board Meetings* | III-188 |
| 5. | | *In 2009, The SEC Approved ResCap's Request To Deregister ResCap's Securities* | III-190 |
| 6. | | *AFI Ratings Improved Slightly In 2009* | III-192 |
| 7. | | *AFI's Efforts To Recapitalize ResCap In December 2009 Was Part Of An AFI Strategic Review Of How Best To "Maximize Value"* | III-193 |
| 8. | | *The Year 2010 Was Economically Brighter For ResCap And AFI* | III-198 |
| | a. | *Steven Abreu Was Named ResCap President In January* | III-200 |
| | b. | *2010 Also Saw A Bump In Ratings For AFI And A Small Boost From S&P For ResCap* | III-200 |

|  | Page |
|---|---|
| 9. *ResCap Sold Its International Mortgage Business To Fortress, And AFI Entertained Two Offers For ResCap Itself* | III-201 |
| 10. *The ResCap Board Considered And Approved The First 2009 Tax Allocation Agreement In August 2010 And Later Considered And Approved The Second 2009 Tax Allocation Agreement In December 2010* | III-201 |
| 11. *The Debtors Settled Certain Fannie Mae And Freddie Mac Claims In 2010* | III-202 |
| 12. *The FHFA Raised New Concerns With ResCap On Behalf Of Fannie Mae And Freddie Mac* | III-203 |
| 13. *Fall 2010 Brought Investigations And Allegations By Various State And Federal Government Offices And Agencies Related To Mortgage Foreclosure Activities* | III-205 |
| 14. *2010 Ended With ResCap "Reasonably Well-Positioned"* | III-207 |
| **J. EVENTS LEADING TO THE CHAPTER 11 CASES AND PROPOSED POSTPETITION TRANSACTIONS AND AGREEMENTS** | III-208 |
| 1. *ResCap's Consideration Of Strategic Restructuring Scenarios* | III-208 |
| a. *ResCap's Initial Contingency Planning* | III-208 |
| b. *ResCap's Consideration Of Restructuring Alternatives And Asset Sales* | III-213 |
| c. *ResCap's Preparations For Chapter 11 Bankruptcy* | III-218 |
| 2. *AFI's Consideration Of Strategic Restructuring Scenarios* | III-253 |
| a. *AFI's Strategic Cost-Benefit Analysis Regarding Mortgage Business* | III-253 |
| b. *Investigation Of Legal Claims By Kirkland & Ellis On Behalf Of AFI* | III-258 |
| c. *Berkshire Hathaway Alternative Restructuring Proposal* | III-258 |
| 3. *Negotiation And Entry Into AFI Settlement And Plan Sponsor Agreement* | III-268 |
| a. *ResCap's Views Regarding Negotiations With AFI* | III-269 |
| b. *AFI's Views Regarding Negotiations With ResCap* | III-271 |
| c. *Direct Negotiations Between ResCap And AFI* | III-272 |
| d. *Third Party Involvement In Negotiations Of AFI Settlement Contribution* | III-288 |
| e. *ResCap And AFI Board Approvals For AFI Settlement And Plan Sponsor Agreement And Bankruptcy Filing* | III-289 |
| f. *AFI Settlement And Plan Sponsor Agreement As Filed* | III-291 |
| g. *Examiner's Conclusions Regarding Process Resulting In AFI Settlement and Plan Sponsor Agreement* | III-295 |
| 4. *Negotiation And Entry Into RMBS Trust Settlement Agreements And RMBS Plan Support Agreements* | III-300 |
| a. *Relevant Background Concerning Private Label RMBS And Potential Representation And Warranty Liability* | III-300 |
| b. *Scope Of The Investigation Of RMBS Trust Settlement Agreements And RMBS Plan Support Agreements* | III-301 |
| c. *Initiation Of Discussions With The Steering Committee Group* | III-302 |
| d. *Initiation Of Discussions With The Talcott Franklin Group* | III-307 |
| e. *Negotiations Resulting In The RMBS Trust Settlement Agreements And RMBS Plan Support Agreements* | III-309 |
| f. *Terms Of The RMBS Trust Settlement Agreements* | III-331 |
| g. *Terms Of The RMBS Plan Support Agreements* | III-333 |
| h. *Examiner's Conclusions Regarding Process Resulting In RMBS Trust Settlement Agreements And RMBS Plan Support Agreements* | III-336 |

|  | Page |
|---|---|
| 5. *The Now-Terminated Junior Secured Noteholders' Plan Support Agreement* | III-342 |
| a. *AFI Intercreditor Settlement with Consenting Junior Secured Noteholders* | III-343 |
| b. *Conditional Waiver Of Interest On Joint Collateral* | III-344 |
| c. *AFI's Obligations Under Junior Secured Noteholders' Plan Support Agreement* | III-344 |
| d. *Consenting Junior Secured Noteholders' Obligations Under Junior Secured Noteholders' Plan Support Agreement* | III-344 |
| e. *Debtors' Obligations Under Junior Secured Noteholders' Plan Support Agreement* | III-345 |

**IV. BOARD OF DIRECTOR AND MANAGEMENT ISSUES** — IV-1

**A. THE PROTOCOL AND FUNCTIONING OF RESCAP'S BOARD OF DIRECTORS** — IV-1
1. *The ResCap Board Was Increasingly Industrious Yet Beleaguered* — IV-1
2. *Governing Protocols Of The ResCap Board Were Not Consistently Applied* — IV-11
3. *Board Dynamics Created Obstacles To Optimal Functioning* — IV-15
4. *The Information Flow To Independent Directors Was Managed By Insiders* — IV-16
5. *The Mandate Of The "Super Independent" Directors Was Not Completely Fulfilled* — IV-20

**B. INDEPENDENT DIRECTOR COMPENSATION, INDEMNIFICATION, AND INSURANCE (YEARS 2005–2012)** — IV-24
1. *Independent Director Compensation, Indemnification, And Insurance* — IV-24
   a. *Requirement To Have Independent Directors* — IV-24
   b. *Independent Director Service Dates* — IV-25
   c. *Independent Director Recruitment* — IV-26
   d. *Independent Director Compensation* — IV-31
   e. *Indemnification Of ResCap Directors And Officers* — IV-45
   f. *ResCap Director And Officer Insurance* — IV-52
2. *Legal Analysis Regarding AFI's Indemnification Of ResCap Directors* — IV-60
   a. *Right To Indemnification And DGCL Sections 145(a) And (b)* — IV-61
   b. *DGCL Section 145(c)* — IV-67
   c. *D&O Insurance* — IV-67
   d. *Breaches Of Fiduciary Duty And Exculpation, Indemnification, And D&O Insurance* — IV-68

**V. AFFILIATE TRANSACTIONS**

**A. THE ALLY BANK TRANSACTIONS** — V-1
1. *Factual Narrative* — V-1
   a. *The 2006 Bank Restructuring* — V-3
   b. *The 2008 Bank Transaction* — V-24
   c. *The 2009 Bank Transaction* — V-33
2. *Ally Bank Transactions: Reasonably Equivalent Value* — V-44
   a. *Ally Bank Transactions – Overview Of Issues* — V-44
   b. *2006 Bank Restructuring Overview* — V-46
   c. *2008 Bank Transaction – Analysis And Examiner's Conclusions* — V-70
   d. *2009 Bank Transaction – Analysis And Examiner's Conclusions* — V-76
   e. *Subsequent Value Considerations* — V-88

**Page**

**B. GMAC MORTGAGE CONTRACTS WITH ALLY BANK GOVERNING LOAN SALE, BROKERAGE, AND SERVICING, AND RELATED DERIVATIVE TRANSACTIONS** ... V-89

1. *Restrictions On Affiliate Transactions Applicable To GMAC Mortgage And The Bank* ... V-92
    a. *The ResCap Operating Agreement* ... V-92
    b. *Bank Regulatory Restrictions* ... V-93
2. *The Correspondent Agreement* ... V-94
3. *The Master Mortgage Loan Purchase And Sale Agreement (Pre-July 2008)* ... V-96
    a. *The 2001 MMLPSA* ... V-96
    b. *The 2006 MMLPSA* ... V-105
    c. *The 2007 MMLPSA* ... V-109
4. *The Pipeline Swap (Pre-July 2008)* ... V-114
    a. *The 2004 Pipeline Swap For HFI Loans* ... V-115
    b. *The March 2005 Amended Schedule Eliminated Bank-"Originated" Loans From The Pipeline Swap* ... V-116
    c. *It Appears That The Pipeline Swap Was Not In Effect From April 1, 2006 To April 30, 2007* ... V-117
    d. *The May 2007 Pipeline Swap Remained Limited To Purchased HFI Loans And Limited GMAC Mortgage's Ability To Block Automatic Renewal* ... V-118
    e. *The March 2008 Pipeline Swap Schedule Prevented Application Of The Swap To HFI Loans The Bank Purchased From Certain Correspondent Lenders Not Acceptable To GMAC Mortgage* ... V-118
5. *The July 2008 Amendments To The MMLPSA And The Pipeline Swap* ... V-119
    a. *The Principal July 2008 Pipeline Swap Revisions* ... V-119
    b. *The 2008 MMLPSA's Revised Pricing Provisions* ... V-121
    c. *Implementation Of The HFS Swap/Pricing Revisions* ... V-122
6. *The Broker Agreement, Fair Value Election, And The Allocation Of Net Revenues Between Ally Bank And GMAC Mortgage* ... V-123
    a. *Genesis Of The Brokering Consumer Loans To Bank Project* ... V-124
    b. *The Parties' Agreement To Maintain The Existing Economics, Under Which The Bank Received Only Net Interest Carry For The Period Loans Were On Its Books* ... V-125
    c. *Ally Bank Initially Realized Only Net Interest Carry On GMAC Mortgage Brokered Loans* ... V-135
    d. *Ally Bank (Unwittingly, And Without GMAC Mortgage's Agreement) Altered The Net Revenue Allocation Through Its August 1, 2009 Fair Value Accounting Election* ... V-137
    e. *Glassner's Discovery Of The Net Revenue-Allocation Issue* ... V-140
    f. *The January 1, 2009 To July 31, 2009 Allocation Of Revenues Is Labeled An "Accounting Error" And ResCap Is Required To Pay Ally Bank The $47.4 Million Received For That Period, Plus Interest* ... V-143
    g. *The Financial Impact On GMAC Mortgage* ... V-153
7. *The April 2009 Pipeline Swap First Amendment* ... V-154

|  |  | Page |
|---|---|---|
| 8. | The Original Servicing Agreement | V-154 |
| a. | Compensation | V-155 |
| b. | Indemnity Provisions | V-155 |
| c. | Events Of Default | V-156 |
| d. | Term | V-156 |
| e. | Addenda | V-156 |
| 9. | The MSR Swap | V-157 |
| a. | Genesis Of The MSR Swap | V-157 |
| b. | 2007 MSR Swap | V-161 |
| c. | 2009 Revisions To Termination Provisions And The Issuance And Rescission Of Termination Notices | V-171 |
| d. | 2010 MSR Swap Revisions | V-171 |
| e. | 2010 AFI Guarantee And Indemnification Side Letter | V-174 |
| f. | The 2010 Servicing Agreement Negotiations | V-176 |
| 10. | 2011 Revisions To The Swaps/The Pipeline Letter Agreement | V-178 |
| a. | Continued FDIC Objections To The Swaps | V-178 |
| b. | April 2011 Swap Revisions | V-179 |
| c. | Sandler O'Neill's Review | V-185 |
| d. | The December 2011 Pipeline Letter Agreement | V-186 |
| 11. | 2012 Terminations/Revisions | V-188 |
| a. | The Termination Agreement | V-188 |
| b. | The May 2012 Amended And Restated MMLPSA | V-189 |
| c. | 2012 Amendment And Restatement Of Servicing Agreement | V-190 |
| 12. | Analysis Of The Financial Results Under The Derivative Agreements | V-190 |
| a. | The Pipeline Swap | V-192 |
| b. | The MSR Swap | V-199 |
| c. | Summary Of Analysis Of The Financial Results Under The Derivative Agreements | V-209 |
| 13. | Potential Claims Regarding The MMLPSA, Pipeline Swap, MSR Swap, And Loans Brokered To Ally Bank | V-209 |
| **C.** | **GOVERNMENT SETTLEMENTS & SUBSERVICING** | V-210 |
| 1. | Government Assesses Penalties Regarding Alleged Improper Mortgage Servicing Activities And Oversight | V-210 |
| a. | Overview Of Settlements And The Agreements Related Thereto | V-210 |
| b. | Public Events Leading To Government Settlements | V-213 |
| c. | Terms Of The FRB/FDIC Settlement | V-214 |
| d. | Terms Of The DOJ/AG Settlement | V-222 |
| e. | Negotiations Leading To The Government Settlements | V-236 |
| f. | Allocation Methods Discussed | V-246 |
| g. | Ultimate Payments Of Penalties Under The Government Settlements | V-258 |
| 2. | Agreements Between AFI And ResCap In Response To The Government Settlements | V-258 |
| a. | AFI, ResCap, And GMAC Mortgage Enter Into The January 30 Letter Agreement | V-258 |

|  | Page |
|---|---|
| b. *GMAC Mortgage Begins Performing Modifications To Ally Bank's Loan Portfolio* | V-274 |
| c. *GMAC Mortgage And Ally Bank Enter Into The A&R Servicing Agreement* | V-275 |
| d. *Prepetition Indemnity Payment To Ally Bank* | V-282 |
| e. *The Debtors And AFI Dispute Existence Of Cap On Indemnity Obligations* | V-286 |
| 3. *Motion Practice With Regard To PwC Fee Issue* | V-291 |
| a. *The Debtors File The PwC Compensation Motion* | V-291 |
| b. *The Creditors' Committee And Wilmington Trust File Objections To The Motion* | V-292 |
| c. *Court Proceedings* | V-293 |
| 4. *Motion Practice With Regards To Foreclosure Review* | V-295 |
| a. *The Debtors File The FRB Unsecured Claim Motion* | V-295 |
| b. *AFI And The FRB File Objections To The FRB Unsecured Claim Motion* | V-295 |
| c. *Wilmington Trust Files A Statement In Support Of And Limited Objection To The Motion* | V-296 |
| d. *The Debtors And Creditors' Committee File Replies In Support Of The FRB Unsecured Claim Motion* | V-296 |
| e. *Court Proceedings* | V-298 |
| 5. *Estimate Of Total Economic Impact Of Government Settlements* | V-299 |
| 6. *Conclusion* | V-299 |
| **D. TAX SHARING ARRANGEMENTS AND TAX ACCOUNTING AND CLASSIFICATION ISSUES** | V-300 |
| 1. *Consolidated Tax Reporting And The Role Of Tax Allocation Agreements* | V-300 |
| a. *Consolidated Tax Reporting* | V-301 |
| b. *Tax Allocation Agreements* | V-303 |
| 2. *ResCap Tax Sharing Arrangements* | V-305 |
| a. *Chronology Of ResCap's Tax Classification And Tax Allocation Agreements* | V-305 |
| b. *Drafting And Approval Processes For The Tax Allocation Agreements* | V-311 |
| c. *Provisions Of The Tax Allocation Agreements And Their Impact On ResCap* | V-330 |
| 3. *ResCap's Conversion To A Disregarded Limited Liability Company And Payment Of LLC Conversion Dividend* | V-345 |
| a. *ResCap's Conversion To A Limited Liability Company And Change In Tax Classification To A Disregarded Entity* | V-345 |
| b. *LLC Conversion Dividend* | V-345 |
| **E. FINANCINGS** | V-350 |
| 1. *Resort Finance Facility* | V-350 |
| 2. *Secured MSR Facility* | V-352 |
| 3. *Secured Revolver Facility* | V-357 |
| 4. *Servicing Advance Factoring Facility* | V-363 |
| 5. *Initial Line of Credit Facility* | V-368 |
| 6. *ResMor Loan Facility* | V-373 |
| 7. *Second Line of Credit Facility* | V-375 |

|  |  | Page |
|---|---|---|
| 8. | Amended and Restated Credit Facilities | V-377 |
| 9. | BMMZ Repo Facility | V-380 |
| 10. | Conclusion | V-383 |
| **F. PREPETITION ASSET SALES** | | V-383 |
| 1. | Overview | V-383 |
| 2. | Liquidity Concerns | V-384 |
| 3. | Reasonably Equivalent Value | V-384 |
| 4. | Summaries Of The Prepetition Asset Sales | V-385 |
|  | a. Health Capital Sale By RFC To GMAC CF In August 2007 | V-385 |
|  | b. June 2008 Model Home Sale By GMAC MHF To Cerberus | V-399 |
|  | c. Resort Finance Sale By RFC And GMAC Canada To GMAC CF In July 2008 | V-413 |
|  | d. Excess Servicing Rights Sales By GMAC Mortgage To Cerberus In July 2008 | V-429 |
|  | e. September 2008 Model Home Sale By DOA Holding Properties, LLC To Cerberus | V-435 |
|  | f. ResMor Sale By GMAC Canada To AFI In January 2009 | V-439 |
|  | g. US/UK Broker-Dealer Sale By RFC To AFI In May 2009 | V-456 |
| **G. MITCHELL BOND TRANSACTION** | | V-469 |
| 1. | Posting Of Bond In Mitchell Litigation | V-469 |
|  | a. Procedural Background And Trial | V-469 |
|  | b. ResCap/AFI Bond Posting Procedure And Approval | V-471 |
|  | c. Appeal Decision | V-473 |
|  | d. Disposition Of Bond And Settlement Of Mitchell Litigation | V-474 |
|  | e. Conclusion | V-475 |
| **H. SHARED SERVICES** | | V-476 |
| 1. | Background | V-476 |
| 2. | April 2005 Through December 2008 | V-476 |
| 3. | January 2009 Through May 14, 2012 | V-477 |
|  | a. Cost Of Shared Services Provided By AFI To ResCap | V-478 |
|  | b. Cost Of Shared Services Provided By ResCap To Ally Bank | V-480 |
|  | c. Statements Of Work And Negotiations Of Shared Services In Preparation For ResCap's Filing | V-481 |
| 4. | Postpetition | V-484 |
| 5. | AFI Proof Of Claim | V-485 |
| 6. | Conclusion | V-485 |
| **VI. EXAMINER'S ASSESSMENT OF RESCAP'S FINANCIAL CONDITION** | | VI-1 |
| **A. GENERAL INTRODUCTION TO ANALYSIS OF A DEBTOR'S FINANCIAL CONDITION** | | VI-1 |
| **B. BALANCE SHEET TEST** | | VI-2 |
| 1. | Introduction | VI-2 |
| 2. | Methodology | VI-3 |
|  | a. Standard Of Value | VI-3 |

|  |  | Page |
|---|---|---|
| | b. Premise Of Value | VI-4 |
| | c. Valuation Approaches | VI-5 |
| | d. Retrojection And Projection | VI-9 |
| 3. | Summary Of Examiner's Conclusions | VI-10 |
| 4. | Application Of The Balance Sheet Test | VI-15 |
| | a. Market Approach | VI-15 |
| | b. Asset-Based Approach | VI-33 |
| 5. | Contingent / Unliquidated Liabilities | VI-37 |
| | a. Legal Analysis | VI-37 |
| | b. Financial Analysis | VI-42 |

**C. UNREASONABLY SMALL CAPITAL** — VI-48

| 1. | Introduction | VI-48 |
|---|---|---|
| 2. | Conceptual Framework | VI-48 |
| | a. Industry And Company-Specific Capital Needs | VI-49 |
| | b. Operating Performance And Capital Cushion | VI-50 |
| | c. Reasonable Foreseeability | VI-52 |
| | d. Leverage And Debt Capacity | VI-53 |
| 3. | Summary Of Examiner's Conclusions | VI-54 |
| 4. | Analysis Of ResCap's Capitalization | VI-56 |
| | a. Industry And Economic Considerations | VI-57 |
| | b. Changes In ResCap's Business Model | VI-63 |
| | c. ResCap's Liquidity | VI-72 |
| | d. ResCap's Access To Capital Markets | VI-87 |
| | e. ResCap's Creditworthiness | VI-91 |
| | f. Other Considerations | VI-100 |

**D. ABILITY TO PAY DEBTS AS DUE** — VI-116

| 1. | Introduction | VI-116 |
|---|---|---|
| 2. | Conceptual Framework | VI-118 |
| 3. | Summary Of Examiner's Conclusions | VI-120 |
| 4. | Analysis Of Ability To Pay Debts As Due | VI-120 |
| | a. Subjective Intent Inquiry | VI-120 |
| | b. Objective Intent Inquiry | VI-121 |

**E. FINANCIAL CONDITION TESTS AS APPLIED TO RESCAP'S SUBSIDIARIES** — VI-124

| 1. | Introduction | VI-124 |
|---|---|---|
| 2. | Summary Of Examiner's Conclusions | VI-124 |
| 3. | Analysis Of Separate Subsidiary Financial Distress | VI-125 |
| | a. Solvency | VI-125 |
| | b. Unreasonably Small Capital | VI-127 |
| | c. Ability To Pay Debts As Due | VI-129 |

**VII. REVIEW AND ANALYSIS OF ESTATE CAUSES OF ACTION IMPLICATED BY AFFILIATE TRANSACTIONS AND THE RELATIONSHIP AND COURSE OF DEALING AMONG RESCAP, AFI, ALLY BANK, AND CERBERUS** — VII.A-1

|  |  | **Page** |
|---|---|---|
| **A. SINGLE ENTITY THEORIES OF LIABILITY** | | VII.A-1 |
| 1. | *Piercing The Corporate Veil And Alter Ego Claims* | VII.A-1 |
| | a. *Choice Of Law* | VII.A-3 |
| | b. *Can A Debtor Pierce Its Own Corporate Veil?* | VII.A-5 |
| | c. *How Many Corporate Veils Must Be Pierced To Reach The Ultimate Parent Company?* | VII.A-12 |
| | d. *Elements That Must Be Pleaded And Proved* | VII.A-14 |
| | e. *Pleading Standard And Burden Of Proof* | VII.A-15 |
| | f. *Single Economic Entity* | VII.A-18 |
| | g. *Overall Element Of Injustice Or Unfairness* | VII.A-59 |
| 2. | *Substantive Consolidation* | VII.A-65 |
| | a. *Introduction* | VII.A-65 |
| | b. *The Evolution Of Substantive Consolidation* | VII.A-66 |
| | c. *Substantive Consolidation In The Second Circuit Today* | VII.A-70 |
| | d. *Review Of Evidence Relating To Claim Of Substantive Consolidation* | VII.A-73 |
| | e. *Examiner's Conclusion* | VII.A-85 |
| **B. DEBT RECHARACTERIZATION** | | VII.B-1 |
| 1. | *Introduction* | VII.B-1 |
| 2. | *Overview* | VII.B-2 |
| 3. | *Legal Standards For Recharacterization* | VII.B-3 |
| | a. *Names Given To, And Terms Of, The Instruments* | VII.B-5 |
| | b. *Presence Or Absence Of A Fixed Maturity Date And Schedule Of Payments* | VII.B-6 |
| | c. *Presence Or Absence Of A Fixed Rate Of Interest And Interest Payments* | VII.B-6 |
| | d. *Source Of Repayment* | VII.B-7 |
| | e. *Adequacy Or Inadequacy of Capital* | VII.B-8 |
| | f. *Identity Of Interest Between The Creditor And Shareholder* | VII.B-10 |
| | g. *Security For The Advances* | VII.B-10 |
| | h. *The Debtor's Ability To Obtain Financing Elsewhere* | VII.B-11 |
| | i. *The Extent To Which The Advances Were Subordinated* | VII.B-11 |
| | j. *The Extent To Which The Advances Were Used To Acquire Capital Assets* | VII.B-12 |
| | k. *Presence Or Absence Of A Sinking Fund To Provide Repayment* | VII.B-12 |
| | l. *Other Factors* | VII.B-13 |
| 4. | *Statute Of Limitations* | VII.B-13 |
| 5. | *AFI Was And Is An Insider Of ResCap* | VII.B-14 |
| 6. | *Recharacterization Is A Fact Intensive Analysis* | VII.B-14 |
| 7. | *Analysis Of The AFI Secured Revolver Facility Claim* | VII.B-15 |
| | a. *The Secured Revolver Facility* | VII.B-15 |
| | b. *An Examination Of The AFI Secured Revolver Facility Claim Under The Autostyle Factors* | VII.B-17 |
| 8. | *Analysis Of The AFI Line Of Credit Agreement Claim* | VII.B-21 |
| | a. *The Line of Credit Facilities and the A&R Line of Credit Facility* | VII.B-21 |
| | b. *An Examination Of AFI Line Of Credit Agreement Claim Under The Autostyle Factors* | VII.B-23 |
| 9. | *Recharacterization Of The Unsecured Notes And Senior Secured Notes* | VII.B-25 |

|  | Page |
|---|---|
| *10. Summary Of Examiner's Conclusions* | VII.B-27 |
| **C. EQUITABLE SUBORDINATION** | VII.C-1 |
| *1. Factors To Determine Whether Equitable Subordination Is Appropriate* | VII.C-1 |
| *a. Inequitable Conduct* | VII.C-2 |
| *b. Injury To Creditors Or An Unfair Advantage For The Claimant* | VII.C-6 |
| *c. Equitable Subordination Must Not Be Inconsistent With Bankruptcy Law* | VII.C-6 |
| *2. Burden Of Proof And Statute Of Limitations* | VII.C-7 |
| *3. Other Limitations On Equitable Subordination* | VII.C-8 |
| *4. The Examiner Investigated Each Affiliate Transaction And AFI's General Course Of Dealings With ResCap And GMAC Mortgage For Evidence Of Inequitable Conduct And Resulting Harm To Creditors That Would Support A Claim Of Equitable Subordination* | VII.C-9 |
| *a. AFI And Ally Bank's Claims Against ResCap* | VII.C-9 |
| *b. AFI Was And Is An Insider Of ResCap And GMAC Mortgage* | VII.C-10 |
| *c. The Nature Of AFI's Conduct In Connection With The Affiliate Transactions And AFI's General Course Of Dealing* | VII.C-10 |
| *d. The Harm Resulting From AFI And Ally Bank's Conduct* | VII.C-14 |
| *e. The Harm Caused By AFI And Ally Bank May Be Offset In Whole Or In Part By Other Action Taken By AFI To Support ResCap* | VII.C-16 |
| *f. Claims Satisfied Before A Bankruptcy Filing And For Which No Proof Of Claim Has Been Filed May Not Be Equitably Subordinated* | VII.C-17 |
| **D. EQUITABLE DISALLOWANCE** | VII.D-1 |
| **E. CAUSES OF ACTION AGAINST RESCAP'S DIRECTORS AND OFFICERS** | VII.E-1 |
| *1. General Legal Principles Governing Potential Fiduciary Duty Claims* | VII.E-1 |
| *a. Delaware Law Applies To Breach Of Fiduciary Duty Claims* | VII.E-1 |
| *b. Legal Standards For Fiduciary Duty Claims* | VII.E-2 |
| *c. Fiduciary Duty Breaches May Be Continuing In Nature* | VII.E-7 |
| *d. Fiduciary Duties In Context Of Limited Liability Companies* | VII.E-8 |
| *e. Standing To Assert Fiduciary Duty Claims* | VII.E-10 |
| *f. Fiduciary Duties In The Parent-Subsidiary Context* | VII.E-11 |
| *g. Potential Defenses To A Claim For Breach Of Fiduciary Duty* | VII.E-15 |
| *h. Burden With Respect To Fraud-Based Fiduciary Duty Claim* | VII.E-20 |
| *i. Potential Remedies For Fiduciary Duty Breaches Can Vary* | VII.E-20 |
| *j. Choice Of Law Regarding Statutes Of Limitations Is Uncertain* | VII.E-22 |
| *2. Potential Claims Exist For Breaches Of Duties By ResCap Fiduciaries* | VII.E-28 |
| *a. Potential Fiduciary Duty Claims Relating To 2006 Bank Restructuring* | VII.E-28 |
| *b. Potential Breach Of Fiduciary Duty Claims Relating To Prepetition Asset Sales* | VII.E-39 |
| *c. Potential Breach Of Fiduciary Duty Claims Relating To The January 30 Letter Agreement, $48.4 million Prepetition Indemnity Payment, And A&R Servicing Agreement* | VII.E-40 |

|  |  | Page |
|---|---|---|
| d. | Potential Breach Of Fiduciary Duty Claims Relating To The Work Of The Special Review Committee And ResCap Board Regarding Approval Of The AFI And RMBS Trust Settlements | VII.E-42 |
| **F. AVOIDANCE ACTIONS** |  | VII.F-1 |
| 1. | Strong Arm Powers Of Bankruptcy Trustee Under Section 544(a) Of The Bankruptcy Code | VII.F-2 |
| 2. | Invocation Of State Avoidance Law Under Section 544(b) Of The Bankruptcy Code | VII.F-4 |
| a. | Choice Of Law Principles As Applied To Claims Under Section 544(b) Of The Bankruptcy Code | VII.F-6 |
| b. | Statutes Of Limitation And New York's Borrowing Statute | VII.F-14 |
| c. | Triggering Creditors | VII.F-16 |
| 3. | Section 546 Safe Harbors | VII.F-18 |
| a. | Settlement Payment Defense | VII.F-18 |
| b. | Swap Payment Defense | VII.F-22 |
| c. | The Tribune/Lyondell Workaround | VII.F-24 |
| 4. | Transfers Fraudulent As To Present Creditors Under Minn. Stat. § 513.45(b) | VII.F-26 |
| a. | Overview | VII.F-26 |
| b. | Statute Of Limitations | VII.F-27 |
| c. | Construction Of The Statute | VII.F-30 |
| d. | Elements Of The Minnesota Insider Preference Statute | VII.F-32 |
| e. | Affirmative Defenses | VII.F-40 |
| f. | Whether A Transfer To A Secured Creditor Can Be Avoided | VII.F-52 |
| g. | Transactions That Implicate Insider Preferential Transfer Law | VII.F-55 |
| h. | Availability Of The New Value Defense | VII.F-84 |
| 5. | Preferential Transfers Under Bankruptcy Code Section 547 | VII.F-95 |
| a. | Overview Of Elements | VII.F-95 |
| b. | Overview Of Defenses | VII.F-103 |
| c. | Transactions That Implicate Bankruptcy Code Section 547 | VII.F-107 |
| 6. | Fraudulent Transfers | VII.F-122 |
| a. | Actual Fraudulent Transfers | VII.F-122 |
| b. | Constructive Fraudulent Transfers | VII.F-128 |
| c. | Reasonably Equivalent Value For Constructive Fraudulent Transfer Purposes | VII.F-129 |
| d. | Transactions That Potentially Implicate Fraudulent Transfer Laws | VII.F-134 |
| 7. | Transfers Avoidable Under Section 549 Of The Bankruptcy Code | VII.F-148 |
| a. | Background | VII.F-148 |
| b. | Analysis | VII.F-149 |
| c. | Conclusion | VII.F-151 |
| 8. | Recovery Under Bankruptcy Code Section 550 | VII.F-151 |
| a. | Recovery Under Section 550(a)(1) | VII.F-152 |
| b. | Recovery Limited To A Single Satisfaction | VII.F-154 |
| c. | Statute Of Limitations Governing Section 550 | VII.F-154 |

|  | Page |
|---|---|
| **G. AIDING AND ABETTING BREACH OF FIDUCIARY DUTY** | VII.G-1 |
| 1. *General Principles Of Aiding And Abetting Breach Of Fiduciary Duty* | VII.G-1 |
|    *a. Choice Of Law Regarding Substantive Legal Standards* | VII.G-1 |
|    *b. Choice Of Law Regarding Statutes Of Limitations* | VII.G-3 |
|    *c. Elements Of A Claim For Aiding And Abetting Breach Of Fiduciary Duty* | VII.G-3 |
|    *d. Aiding And Abetting Principles Under Delaware Law* | VII.G-4 |
|    *e. Aiding And Abetting Principles Under Minnesota Law* | VII.G-6 |
|    *f. Aiding And Abetting Breach Of Fiduciary Duty In The Parent-Subsidiary Context* | VII.G-7 |
|    *g. Aiding And Abetting Breach Of Fiduciary Duty In The Limited Liability Company Context* | VII.G-8 |
|    *h. Potential Affirmative Defenses To An Aiding And Abetting Claim* | VII.G-9 |
|    *i. Burden With Respect To Fraud-Based Aiding And Abetting Claim* | VII.G-10 |
|    *j. Remedies On An Aiding And Abetting Claim* | VII.G-10 |
| 2. *Potential Claims Exist For Aiding And Abetting Breaches Of Duties By ResCap Fiduciaries* | VII.G-11 |
|    *a. Potential Aiding And Abetting Claims Relating To 2006 Bank Restructuring* | VII.G-11 |
|    *b. Potential Aiding And Abetting Claims Relating To Prepetition Asset Sales* | VII.G-13 |
|    *c. Potential Aiding And Abetting Claims Relating To The January 30 Letter Agreement, $48.4 Million Prepetition Indemnity Payment, And A&R Servicing Agreement* | VII.G-13 |
|    *d. Potential Aiding And Abetting Claims Relating To Approval Of The AFI And RMBS Trust Settlements* | VII.G-13 |
| **H. COMMON LAW CONTRIBUTION CLAIMS** | VII.H-1 |
| 1. *Choice-Of-Law* | VII.H-1 |
|    *a. Does An Actual Conflict-Of-Law Exist Between New York Law And The Laws Of Other Interested Jurisdictions?* | VII.H-1 |
|    *b. Application Of New York Choice-Of-Law Rules* | VII.H-3 |
| 2. *New York Contribution Law* | VII.H-4 |
|    *a. Principles Of A Contribution Cause Of Action* | VII.H-4 |
|    *b. Transactions Implicated By The Contribution Causes Of Action* | VII.H-6 |
| **I. CONSTRUCTIVE TRUST CLAIMS** | VII.I-1 |
| 1. *Introduction* | VII.I-1 |
|    *a. Unjust Enrichment And Constructive Trust* | VII.I-1 |
|    *b. Choice Of Law* | VII.I-2 |
|    *c. Statute Of Limitations* | VII.I-9 |
|    *d. Explanation Of Examiner's Conclusions* | VII.I-11 |
| **J. UNCONSCIONABLE CONTRACTS AND CONTRACTS OF ADHESION** | VII.J-1 |
| 1. *Choice Of Law* | VII.J-1 |
| 2. *Unconscionable Contracts And Contracts Of Adhesion* | VII.J-2 |

|  | | | Page |
|---|---|---|---|
|  | *a.* | *Unconscionable Contracts* | VII.J-3 |
|  | *b.* | *Contracts Of Adhesion* | VII.J-3 |
|  | *c.* | *Remedies* | VII.J-4 |
|  | *3.* | *Contracts Between Parent And Its Wholly Owned Subsidiary* | VII.J-5 |
|  | *4.* | *Conclusion* | VII.J-6 |
| **K.** | **ESTATE CAUSES OF ACTION ARISING OUT OF RESCAP'S TAX SHARING ARRANGEMENTS AND RESCAP'S CONVERSION TO DISREGARD ENTITY STATUS** | | VII.K-1 |
|  | *1.* | *ResCap's 2006 Conversion To A Limited Liability Company And Election To Become A Disregarded Entity For Tax Purposes* | VII.K-1 |
|  | *a.* | *Fraudulent Conveyance* | VII.K-2 |
|  | *b.* | *Post-2006 NOL Transfers Are Not Subject To Avoidance* | VII.K-9 |
|  | *c.* | *The 2006 Conversion And Election Does Not Result In Unjust Enrichment Or Breach Of Fiduciary Duty* | VII.K-11 |
|  | *d.* | *Payment Of The LLC Conversion Dividend Does Not Constitute A Fraudulent Conveyance* | VII.K-14 |
|  | *e.* | *ResCap Has A Contractual Claim for Compensation Under The Implemented 2005 Tax Allocation Agreement* | VII.K-16 |
|  | *2.* | *The 2009 Tax Allocation Agreement* | VII.K-17 |
|  | *a.* | *The First 2009 Tax Allocation Agreement Constitutes A Valid And Enforceable Contract* | VII.K-20 |
|  | *b.* | *Whether James Young's Failure To Execute The First 2009 Tax Allocation Agreement Constitutes A Breach Of Fiduciary Duty* | VII.K-31 |
|  | *c.* | *The Second 2009 Tax Allocation Agreement Is Likely To Be Avoided As A Fraudulent Transfer* | VII.K-38 |
|  | *d.* | *Potential Additional Basis To Set Aside A Tax Allocation Agreement Between A Parent Company And Its Subsidiary* | VII.K-41 |
|  | *e.* | *The Second 2009 Tax Allocation Agreement Is Not The Product Of Overreaching By AFI* | VII.K-42 |
|  | *f.* | *The ResCap Board's Approval Of The Second 2009 Tax Allocation Agreement Does Not Constitute A Breach Of Fiduciary Duty* | VII.K-45 |
| **L.** | **CONTRACTUAL ISSUES AND RELATED CLAIMS** | | VII.L-1 |
|  | *1.* | *Contract And Tort Claims Related To 2006 Bank Restructuring* | VII.L-1 |
|  | *a.* | *Summary Of Factual Background* | VII.L-1 |
|  | *b.* | *Fraud* | VII.L-8 |
|  | *c.* | *Breach Of Contract* | VII.L-21 |
|  | *d.* | *Tortious Interference With Contract* | VII.L-27 |
|  | *2.* | *Contractual Claims Related To The MMLPSA, Pipeline Swap, MSR Swap, And Broker Agreement* | VII.L-29 |
|  | *a.* | *Contractual Representation And Warranty Liabilities Under The 2001 and 2006 MMLPSAs* | VII.L-29 |
|  | *b.* | *Failure To Obtain Independent Director Approval/Waivers Under The Operating Agreements* | VII.L-56 |

|  |  | Page |
|---|---|---|
| c. | Application Of The Pipeline Swap To The Funding To Sale Period And To Bank-Originated Loans | VII.L-58 |
| d. | The Misallocation Of Revenues On Loans Brokered By GMAC Mortgage | VII.L-64 |
| e. | Failure To Pay The Value Of Correspondent-Loan And Purchased MSRs To GMAC Mortgage Under The MSR Swap | VII.L-66 |
| 3. | Dispute Regarding Application Of Indemnity Cap | VII.L-73 |
| a. | The Terms Of The January 30 Letter Agreement | VII.L-73 |
| b. | The Terms Of The A&R Servicing Agreement | VII.L-75 |
| c. | Ambiguity | VII.L-76 |
| d. | Analysis | VII.L-77 |

**VIII. THIRD-PARTY CLAIMS AGAINST THE AFI DEFENDANTS** — VIII-1

**A. INVESTIGATION OF THIRD-PARTY CLAIMS** — VIII-1
| 1. | Scope Of Third-Party Claims Investigation | VIII-1 |
| 2. | Conduct Of The Third-Party Claims Investigation | VIII-4 |
| 3. | The Debtors' Underlying Liability | VIII-7 |

**B. THE MORTGAGE SECURITIZATION BUSINESS** — VIII-8
| 1. | The Securitization Market In General | VIII-8 |
| a. | Key Securitization Parties | VIII-9 |
| b. | Securitization Process | VIII-12 |
| 2. | ResCap Securitization Processes | VIII-14 |
| a. | Overview | VIII-14 |
| b. | Types Of Loans | VIII-15 |
| c. | ResCap Depositor Entities And Shelves | VIII-15 |
| d. | RFC's PLS Business | VIII-16 |
| e. | GMAC Mortgage's PLS Business | VIII-23 |

**C. ANALYSIS OF CLAIMS** — VIII-24
| 1. | Choice Of Law | VIII-24 |
| 2. | RMBS Claims | VIII-27 |
| a. | Claims Against AFI | VIII-27 |
| b. | Claims Against Ally Securities As Securities Underwriter | VIII-109 |
| c. | Claims Against Ally Bank As Loan Originator And Custodian | VIII-129 |
| 3. | D&O RMBS Claims | VIII-150 |
| a. | Generally | VIII-150 |
| 4. | Non-RMBS Claims | VIII-154 |
| a. | Claims Relating To Origination, Acquisition, And Servicing Of Loans | VIII-155 |
| b. | Claims Relating To Alleged Insurance Schemes | VIII-156 |
| c. | Claims Unrelated To The Mortgage Business | VIII-161 |
| d. | Cases Not Naming The AFI Defendants | VIII-162 |
| 5. | Unsecured Noteholder Causes Of Action | VIII-163 |
| a. | Tortious Interference With The 2005 Indenture | VIII-163 |
| b. | Claims Related To The 2006 Bank Restructuring | VIII-190 |

|  | Page |
|---|---|
| **D. POTENTIAL ALLEGED DAMAGES** | VIII-201 |
| *1. Disclosed Alleged Damages* | VIII-201 |
|    *a. Additional Factors Relevant To Potential RMBS Claims Damages* | VIII-202 |
|    *b. Additional Factors Relevant To Potential Non-RMBS Claims Damages* | VIII-204 |
| *2. Release Of Third-Party Claims* | VIII-204 |
| *3. Transfer Of Liability In Connection With The Sale Of Ally Bank* | VIII-204 |
| *4. Transfer Of Liability In Connection With The Sale Of Ally Securities* | VIII-205 |
| *5. Potential Fraudulent Conveyance Exposure Of Ally Securities* | VIII-207 |
|    *a. Ally Securities Recapitalizes In 2011, Ceases Operations In 2012, And Makes Dividend Payments To AFI* | VIII-207 |
|    *b. Financial Condition Of Ally Securities At The Time Of The April 2012 And August 2012 Transfers* | VIII-209 |
|    *c. The Dividend Payments Are Likely To Be Constructive Fraudulent Transfers* | VIII-210 |
|    *d. Whether The Dividend Payments Constitute An Actual Fraudulent Transfer Is A Close Question* | VIII-212 |
|    *e. It Is Unlikely That The Dividend Payments Would Be Unlawful Dividends* | VIII-214 |
| **IX. EVALUATION OF CONSIDERATION FOR RELEASES** | IX-1 |
| **A. REVIEW OF PROPOSED RELEASE OF ESTATE AND THIRD-PARTY CLAIMS UNDER NOW-TERMINATED SETTLEMENT AGREEMENT WITH AFI** | IX-1 |
| **B. EVALUATION OF CONSIDERATION PROPOSED IN EXCHANGE FOR RELEASE OF ESTATE CLAIMS AGAINST AFI** | IX-2 |
| *1. Legal Standard Applicable To Debtors' Settlement Of Debtors' Claims Against AFI* | IX-2 |
| *2. Analysis Of Debtors' Proposed Settlement Of The Estates' Claims Against AFI* | IX-3 |
|    *a. AFI's Non-Cash Contributions To The Debtors' Estates* | IX-4 |
| **C. EVALUATION OF CONSIDERATION PROPOSED IN EXCHANGE FOR RELEASE OF THIRD-PARTY CLAIMS AGAINST AFI** | IX-10 |
| *1. Legal Standard Applicable To The Release Of Third Parties' Claims Against AFI* | IX-10 |
|    *a. Overview Of A Bankruptcy Court's Jurisdiction And Authority To Enjoin Claims Against Non-Debtor Third Parties* | IX-11 |
|    *b. The Evolution Of The Second Circuit's View Of The Propriety Of Third-Party Non-Debtor Releases* | IX-14 |
|    *c. The Second Circuit Landscape After Manville III* | IX-25 |
| *2. Analysis Of Possible Release Of Third-Party Claims Against AFI* | IX-26 |
|    *a. Jurisdictional Issues Faced By Parties In Releasing Third-Party Claims* | IX-26 |
|    *b. After Determining The Scope Of Its Jurisdiction, The Court Must Consider Whether Circumstances Merit Approval Of A Third-Party Release* | IX-27 |

**APPENDIX**

## I. SUMMARY OF THE EXAMINER'S PRINCIPAL FINDINGS AND CONCLUSIONS

### A. APPOINTMENT OF THE EXAMINER AND ISSUES PRESENTED IN THE REPORT

Arthur J. Gonzalez, Esq. was appointed as Examiner[1] in the Chapter 11 Cases on July 3, 2012. Shortly after his appointment, the Examiner retained Chadbourne & Parke LLP and Mesirow Financial Consulting LLC, and such retentions were subsequently approved by appropriate orders of the Bankruptcy Court.

The Examiner Order was entered as a result of the Examiner Motion, filed on June 4, 2012 by Berkshire Hathaway, which sought the appointment of an examiner to conduct an investigation pursuant to Bankruptcy Code section 1104(c) of, among other things: (1) prepetition transactions and agreements between the Debtors and AFI and its affiliates, including the sale, transfer, or dividend of assets or legal entities, the extension of credit, the contribution of capital, and any claims or causes of action arising therefrom; (2) the decision of the Debtors and AFI to commence the Chapter 11 Cases and pursue a sale of substantially all assets; (3) the negotiation and entry into the Plan Support Agreements, the AFI DIP Financing Agreement, and the stalking horse asset purchase agreement with AFI; (4) the recruitment, compensation, and indemnification of the Independent Directors of ResCap; (5) all state law or bankruptcy claims or causes of action of the Debtors against current or former directors and officers of the Debtors, and against AFI and its affiliates and insiders, including current and former directors, officers, and shareholders; (6) all state law or bankruptcy claims or causes of action that were subject to being released or barred under the terms of the Plan Term Sheet; and (7) any other matters as determined by an examiner and approved by the Bankruptcy Court.[2] The Bankruptcy Court entered the Examiner Order on June 28, 2012, directing the U.S. Trustee to appoint an examiner in the Chapter 11 Cases. On July 3, 2012, the Bankruptcy Court entered the Examiner Approval Order approving the appointment of the Examiner.

On July 27, 2012, the Bankruptcy Court entered the Examiner Scope Approval Order and, on August 6, 2012, the Examiner filed the Examiner Work Plan. As set forth in the Examiner Scope Approval Order and the Examiner Work Plan, after review of the Committee Rule 2004 Order and discussions with various parties in interest, the Examiner determined (with the Bankruptcy Court's approval) that, at a minimum, he would examine the following in the Report:

> a. all material prepetition transactions and all material verbal or written agreements or contracts between or among the Debtors on the one hand and any one or more of Ally Financial Inc., f/k/a GMAC LLC, and any of its current and former, direct and indirect affiliates and subsidiaries (collectively, "AFI"), Cerberus Capital Management, L.P. and any of its current and former direct and indirect affiliates and subsidiaries including Cerberus FIM, LLC,

---

[1]  Unless otherwise indicated, the capitalized terms used in the Report are intended to have the meanings set forth in the Glossary. *See* Appendix I.

[2]  Examiner Motion, Ex. A, at 2.

Cerberus FIM Investors LLC, and FIM Holdings LLC (collectively, "Cerberus") and/or Ally Bank, a commercial state non-member bank chartered under the laws of the State of Utah (f/k/a GMAC Bank) ("Ally Bank") on the other hand including (i) material agreements concerning transfers of cash, assets, property, stock, contracts, or other items of value including any servicing agreements, repurchase transactions, exchange offers, hedging arrangements, derivative agreements or contracts, swap agreements or contracts, or foreign exchange agreements or contracts, (ii) any payments, dividends or capital contributions, (iii) any extension of loans or lines of credit including any factoring arrangements, (iv) any debt, or liens related thereto, or the transfer, assignment, repayment or forgiveness of such debt, (v) any claims and all payments made on account of such claims, and (vi) any transfers of cash, assets, property, stock, contracts, or other items of value (collectively, the "Prepetition Transactions and Agreements");[3]

b.   the negotiation and entry into any plan sponsor, plan support, or settlement agreement, the debtor-in-possession financing with AFI, and the stalking horse asset purchase agreement with AFI, and any servicing agreement with Ally Bank (collectively, the "Postpetition Transactions and Agreements");

c.   (i) the activities of the Debtors' officers and board of directors (including any subcommittee thereof) concerning (A) the Prepetition Transactions and Agreements, (B) the Postpetition Transactions and Agreements, and (C) the investigation of the validity of claims against AFI, and (ii) the recruitment, compensation and indemnification of the Debtors' officers and the members of the Debtors' board of directors (including any subcommittee thereof);

d.   the corporate relationships between or among the Debtors, AFI, Cerberus and/or Ally Bank and the conduct of each of these entities in connection with the Debtors' decisions (i) to file (or to refrain from filing, or delaying the filing of) voluntary petitions under Chapter 11 of the United States Bankruptcy Code, (ii) to pursue (or refrain from pursuing) a sale of substantially all of their assets, and (iii) to enter into the Prepetition Transactions and Agreements and the Postpetition Transactions and Agreements;

---

[3]   The Examiner's Investigation of certain of the Debtors' entry into and performance under the "Consent Order," "DOJ/AG Settlement" and "CMP," each as defined and described in paragraphs 86 through 90 of the of the "Affidavit of James Whitlinger, Chief Financial Officer of Residential Capital, LLC, in Support of Chapter 11 Petition and First Day Pleadings," dated May 14, 2012 will be limited to the propriety of the allocation of obligations as among the Debtors and AFI under the "Consent Order," "DOJ/AG Settlement" and "CMP." (footnote appears in original).

    e.  all state and federal law claims or causes of action of the Debtors against current or former directors and officers of the Debtors, and against AFI and/or its insiders including current and former directors, officers, and shareholders;

    f.  all state and federal law claims or causes of action the Debtors propose to release or to be released as part of their plan including (i) preference and fraudulent transfer claims, (ii) equitable subordination claims, (iii) alter ego and veil piercing claims, (iv) debt recharacterization claims, (v) constructive trust and unjust enrichment claims, (vi) breach of fiduciary duty and aiding and abetting breach of fiduciary duty claims, (vii) securities law claims, and (viii) claims held by third parties, i.e., parties that are not affiliates of the Debtors, against current and former directors and officers of the Debtors and against AFI and its insiders including current and former directors, officers, and shareholders; and in respect of the claims identified in subclause (viii) of this paragraph f, the Examiner will (A) investigate the merits of such claims, (B) analyze the sufficiency of the consideration to be provided for such third party releases, and (C) solicit the parties' views concerning the merits of such claims and the potential amount of damages arising from such claims, but the Examiner will not attempt to independently quantify such damages;

    g.  the value of the releases contemplated by the Debtors including the releases by the Debtors' estates of all claims against current or former directors and officers of the Debtors, and against AFI and its insiders including current and former directors, officers, and shareholders, and the proposed releases by third parties of claims against AFI; and

    h.  other matters affecting the Debtors' assets, liabilities, and financial condition including all intercompany claims and the Debtors' solvency, capital adequacy and ability to pay debts as such debts become due at various dates prior to the Petition Date.[4]

## B. ORGANIZATION OF THE REPORT

    The Report consists of nine Sections and an Appendix.[5] Section I summarizes the Examiner's principal findings and conclusions. Section II presents the manner in which the Investigation was conducted. Section III contains a chronological presentation of transactions and events relevant to the Investigation, and the Examiner's conclusions with respect to certain postpetition transactions and agreements. Section IV addresses the activities of the Debtors' directors and officers. Section V describes certain material Affiliate Transactions.

---

[4]   Examiner Scope Approval Order, Ex. A, at 3–5.

[5]   The Report is issued in a number of volumes and totals over 1,800 pages.

Section VI examines ResCap's financial condition, including solvency, over time. Section VII analyzes Estate Causes of Action implicated by the Affiliate Transactions and the relationship and course of dealing between ResCap, AFI, Ally Bank, and Cerberus. Section VIII discusses the Third-Party Claims. Section IX evaluates whether the proposed consideration under the now-terminated AFI Settlement and Plan Sponsor Agreement would have been sufficient for Bankruptcy Court approval of the proposed releases.

## C. THE INVESTIGATION

As requested in the Examiner Motion and agreed upon by the parties in interest, the scope of the Investigation was exceptionally broad. The Examiner was asked to investigate the entire course of conduct and all material intercompany dealings involving ResCap, AFI, Ally Bank, and Cerberus over a period of almost a decade. In the years preceding the Chapter 11 Cases, there were dozens of Affiliate Transactions between the Debtors on the one hand and AFI, Ally Bank, Cerberus, and other affiliates of AFI on the other hand. These included discrete, one-time transactions, ongoing intercompany business arrangements, and various types of capital support including, but not limited to, asset purchases and sales, service agreements, swap agreements, financings, capital contributions, and dividends. These transactions included transfers involving many billions of dollars of value. The Examiner investigated the activities of the Debtors' directors and officers in connection with all of those transactions spanning the entire period subject to the Investigation.

The Examiner's Professionals gathered and analyzed almost nine million pages of documents, produced by twenty-three different parties.[6] The Examiner's Professionals conducted ninety-nine formal interviews (one of which was under oath) of eighty-three witnesses, including witnesses from ResCap, AFI, Ally Bank, Cerberus, and various counsel and advisors. In addition, the Examiner and/or his Professionals met on approximately sixty-six occasions with interested parties, including representatives of the Debtors, AFI, the Creditors' Committee, certain individual members of the Creditors' Committee, the Steering Committee Group, the Ad Hoc Group of Junior Secured Noteholders, and Berkshire Hathaway. The Examiner and/or his Professionals met with all parties that requested a meeting. The Examiner's Professionals also had an ongoing dialogue with the Debtors, their advisors, and various other parties to address pertinent topics and information requests. Finally, the Examiner solicited and reviewed multiple written submissions from at least a dozen parties with respect to Estate and Third-Party Claims.

The Examiner was also asked to investigate the negotiation and entry into any plan sponsor, plan support, or settlement agreement. The Investigation of proposed postpetition transactions was fact-intensive, and involved a review of the process underlying multiple settlement negotiations. In addition to the interviews, the Examiner's Counsel monitored the pending litigation regarding the RMBS Trust Settlement Agreements, attended the Rule 2004 depositions of twelve witnesses, and reviewed the transcripts of the depositions of at least six other witnesses.

---

6  For a detailed accounting of discovery conducted in furtherance of the Investigation, including document requests and subpoenas, interviews, and meetings with interested parties, see Section II.

As required by the Examiner Scope Approval Order, the Examiner considered and evaluated a wide array of potential state and federal law claims and Causes of Action. These claims and Causes of Action were proposed to be released pursuant to various agreements entered into in connection with the Debtors' Chapter 11 Cases, including a proposed broad and nonconsensual release of claims against AFI and its affiliates held by third parties. At the outset of the Investigation, many of these parties had not developed well-articulated positions on the merits of the Third-Party Claims or the potential damages that might be attributable to those claims. The briefing process instituted by the Examiner moved the process forward significantly, but left the Examiner to assess widely disparate views on a number of major issues. While the Examiner Scope Approval Order provided that the Examiner would not attempt to quantify independently the potential amount of damages attributable to Third-Party Claims, the Examiner did consider the legal merits of the Third-Party Claims.

The Examiner's review of the transactions required the Examiner's Professionals to perform discrete quantitative financial, accounting, tax, economic, and valuation analyses, as well as qualitative analyses regarding ResCap's strategy, decision making, and governance. The Examiner's Financial Advisors analyzed the financial condition of ResCap and its principal subsidiaries throughout the relevant time period, and assessed balance sheet solvency, adequacy of capital, and ability to pay debts. The Examiner's Professionals also determined whether reasonably equivalent value was exchanged in numerous transactions and analyzed damages related to potential claims.

In short, as observed by the Bankruptcy Court, the Investigation was "an enormous undertaking."[7] The Report contains dozens of discrete factual findings and legal conclusions. This summary does not attempt to describe each and every finding and conclusion in turn, nor is it a comprehensive mini-report. Instead, the summary is intended to serve only as a broad and general overview of the Examiner's *principal* findings and conclusions. The Examiner cautions that many of the issues discussed in the Report are complex and not conducive to summary treatment. Any reader wishing to obtain a thorough understanding of the Investigation and the Examiner's analytical processes, and the reasoning supporting the conclusions in the Report (including a discussion of inherent uncertainties and qualifications), should review the Report in its entirety and should not rely on this summary as a substitute for doing so.

## D. EXAMINER'S METHODOLOGY FOR PRESENTATION OF FINDINGS AND CONCLUSIONS

The Examiner believes it is important for the Report to use a generally consistent formulation of his findings and conclusions. The Examiner considered presenting his analyses in terms of whether legal claims would likely survive motions to dismiss or motions for summary judgment. However, given the circumstances of the Examiner's appointment and the status of the cases, and having performed an extensive factual investigation, the Examiner believes his conclusions should reflect his best and considered view on the ultimate merits of each issue examined in the Report. Accordingly, with the exception of the Examiner's conclusions with

---

[7]   Order Denying Oral Application By Ally Financial Inc. To Clawback Documents Produced By Cerberus To The Examiner [Docket No. 3516] at 2.

respect to evidentiary support for Third-Party Claims,[8] the Examiner's conclusions are generally presented in the Report in a uniform fashion in the following manner:

---

EXHIBIT I.D—1
**Examiner's Legal Conclusions and Factual Findings**

| Legal Conclusions | Factual Findings |
| --- | --- |
| 1. The Examiner concludes it is likely that the [claim or defense] would prevail. | 1. The Examiner concludes that the evidence supports the proposition that . . . |
| 2. While a close question, the Examiner concludes it is more likely than not that the [claim or defense] would prevail. | 2. While a close question, the Examiner concludes it is more likely than not that a court would find . . . |
| 3. While a close question, the Examiner concludes it is more likely than not that the [claim or defense] would not prevail. | 3. While a close question, the Examiner concludes it is more likely than not that a court would not find . . . |
| 4. The Examiner concludes it is unlikely that the [claim or defense] would prevail. | 4. The Examiner concludes that the evidence does not support the proposition that . . . |

---

The Examiner's conclusions with respect to evidentiary support for Third-Party Claims are generally presented in the following manner:

---

EXHIBIT I.D—2
**Examiner's Conclusions Regarding Evidentiary Support for Third-Party Claims**

**Evidentiary Support**

1. The Investigation has revealed significant evidence that supports the Third-Party Claimants' assertions that . . .

2. The Investigation has revealed evidence that supports the Third-Party Claimants' assertions that . . .

3. The Investigation has revealed no evidence that supports the Third-Party Claimants' assertions that . . .

4. The Investigation has revealed evidence that is inconsistent with the Third-Party Claimants' assertions that . . .

---

The methodology described above is meant to provide some appropriate level of consistency to an inherently imprecise exercise. Given the complex array of underlying evidence and data and the difficult and sometimes unsettled legal issues raised by many of the claims analyzed in the Report, the Examiner's conclusions are by necessity nuanced. The Examiner does not express his conclusions with

---

[8]    The Examiner did not have the benefit of comprehensive discovery in connection with the investigation of Third-Party Claims. Accordingly, the Examiner's conclusions with respect to evidentiary support for Third-Party Claims are presented using a different continuum.

the expectation that readers will assign probabilities or apply mathematical models to the Examiner's individual findings and conclusions, and the Examiner does not endorse any effort to do so. Except where specifically noted, the Examiner does not attempt to identify the extent to which his various findings or conclusions may be interdependent. The Examiner does not reach definitive conclusions regarding every issue considered in the Report because some issues examined are not susceptible to definitive conclusions under the circumstances. The Report does contain the Examiner's considered assessment, following a legal and factual review, of all the significant issues presented by the Examiner Scope Approval Order.

## E. EXAMINER'S PRINCIPAL CONCLUSIONS REGARDING ESTATE CAUSES OF ACTION

This Section summarizes the most significant potential Estate Causes of Action the Examiner investigated and presents the Examiner's principal conclusions regarding: (1) Estate Causes of Action that the Examiner believes have significant potential value; and (2) certain Estate Causes of Action that have been identified by parties in interest as having significant importance, but which the Examiner concludes are unlikely to succeed. The Examiner's full analysis of material Estate Causes of Action, including Causes of Action that are not reviewed in this summary, is contained in Section VII.[9]

Certain of the Estate Causes of Action rely on the Examiner's conclusions regarding financial condition. As summarized later in this Section, and as set forth in Section VI of the Report, the Examiner concludes that the evidence supports the proposition that ResCap, RFC, and GMAC Mortgage each: (1) was balance sheet solvent on May 4, 2005, the date that AFI announced the initial capitalization of ResCap, and was balance sheet insolvent from December 31, 2007 through the Petition Date; (2) was adequately capitalized on May 4, 2005, the date that AFI announced the capitalization of ResCap, and was left with unreasonably small capital from August 15, 2007 through the Petition Date; and (3) reasonably should have believed that it would incur debts beyond its ability to pay from August 15, 2007 through the Petition Date.

### 1. Claims Of GMAC Mortgage And ResCap Relating To The MMLPSA, Pipeline Swap, MSR Swap, And Broker Agreement

GMAC Mortgage historically focused on purchasing and originating conforming loans with the intent to sell them to government-sponsored enterprises (GSEs) while retaining the associated mortgage servicing rights (MSRs). Since 2001, a portion of GMAC Mortgage's production had involved the use of Old GMAC Bank and, subsequently, Ally Bank as a funding source. From and after 2007, Ally Bank came to account for an increasing proportion of GMAC Mortgage's loan production. By January 1, 2009, almost all of the production was being channeled through Ally Bank, which by then was also retaining title to MSRs on loans sold to Fannie Mae and Freddie Mac (but not to Ginnie Mae).

---

[9] The Report discusses all material transactions identified by the parties in interest, or independently by the Examiner, that arguably give rise to colorable Causes of Action, including those that the Examiner believes are unlikely to succeed. Given the volume of transactions in which one or more of the Debtors have been involved, the Investigation only addresses transactions of sufficient monetary value to be deemed material by the Examiner.

GMAC Mortgage and the Bank (either Old GMAC Bank or Ally Bank, depending on the time period) were parties to six principal agreements related to this business in effect at various times from 2001 forward:

- The Correspondent Agreement, which governed GMAC Mortgage's sale of loans to the Bank;

- The Master Mortgage Loan Purchase and Sale Agreement (MMLPSA), which governed GMAC Mortgage's purchase of loans from the Bank;

- The Pipeline Swap, a derivative transaction under which GMAC Mortgage assumed certain risks and rewards related to changes in the market value of certain Bank loans;

- The Broker Agreement, by which GMAC Mortgage ceased originating loans (in all but a few states) and instead began brokering loans to Ally Bank;

- The Original Servicing Agreement pursuant to which GMAC Mortgage serviced mortgage loans for the Bank; and

- The MSR Swap, another derivative transaction, under which GMAC Mortgage assumed certain risks and rewards related to the fluctuation in the value of Ally Bank's MSR portfolio.[10]

These agreements, particularly the MMLPSA, Pipeline Swap, Correspondent Agreement, and Broker Agreement, were interconnected. Certain of these agreements, particularly the MSR Swap and the Pipeline Swap, have attracted particular suspicion and concern that they were cogs in a scheme to impose losses on GMAC Mortgage/ResCap while insulating Ally Bank. The evidence of the history and purpose of these transactions, however, does not support this theory. Moreover, the Examiner's review and analysis of the pertinent accounting and financial records leads the Examiner to conclude that GMAC Mortgage was near break-even on the Pipeline Swap, and "in the money" on the MSR Swap and the market hedges relating to the two Swaps. In assessing the entirety of the economics of these transactions, GMAC Mortgage received a net benefit.

Nevertheless, the implementation of these agreements gives rise to potential claims on behalf of the Estates of GMAC Mortgage and/or ResCap, as set forth below.

### a. Misallocation Of Net Revenues On Loans Brokered By GMAC Mortgage

In 2008, ResCap and Ally Bank personnel undertook the "Brokering Consumer Loans to Bank" project. The project culminated in an arrangement implemented in January 2009 under which GMAC Mortgage brokered its loan production to Ally Bank, which originated (funded) the loans. GMAC Mortgage provided a hedge for the loans while they were held by the Bank through the Pipeline Swap. When GMAC Mortgage was ready to securitize the loans, it purchased them from the Bank under the MMLPSA. In the course of the Brokering Consumer

---

[10]   For the Examiner's full analysis of these transactions, see Sections V.B and VII.L.2.

Loans to Bank project, GMAC Mortgage and Ally Bank agreed to a specific allocation of revenues on the brokered loans. Specifically, GMAC Mortgage was to retain the gain on sale and the P&L (profit and loss) impact of origination fees and expenses for loans brokered to Ally Bank, while Ally Bank would have no gains or losses, earning only net interest carry. This allocation mirrored the parties' historical approach to revenue allocation under the MMLPSA and Pipeline Swap, in which GMAC Mortgage received the gain on sale and, in return, accepted representation and warranty and other risks, while Ally Bank provided conduit funding, earning coupon interest.

From January 1, 2009 to July 31, 2009, the Brokering Consumer Loans to Bank project proceeded as agreed, with Ally Bank realizing only net interest carry on the loans. On August 1, 2009, Ally Bank implemented an accounting change to convert to fair-value accounting. As a consequence of this accounting change, beginning August 1, 2009, Ally Bank began keeping a significant portion of the gain on sale and other revenues that had been allocated, while still assuming no representation and warranty exposure or hedge exposure, and paying a below-market, cost-based broker fee to GMAC Mortgage. The parties appear not to have recognized at the time that the fair-value election would have this effect (and, in fact, apparently did not comprehend that the revenue reallocation had occurred until December 2011). In any event, there was no agreement to this reallocation of revenues, and the Examiner has determined it is likely that Ally Bank's August 1, 2009 conversion to fair-value accounting resulted in a straightforward breach by Ally Bank of the parties' agreement, even if the breach was unintentional.

After the misallocation issue came to light in December 2011, the January 1, 2009 to July 31, 2009 allocation of revenues (the allocation the parties had agreed to) was labeled an "accounting error." In March 2012, GMAC Mortgage, at the insistence of Ally Bank, paid Ally Bank approximately $51.4 million on account of payments received during that period, including interest.

The Examiner concludes it is likely that GMAC Mortgage would prevail on a contractual claim that the allocation of revenues from January 1, 2009 to July 31, 2009 was proper, and that it is therefore entitled to payment of the revenues misallocated to Ally Bank from and after August 1, 2009. Accordingly, it is likely that GMAC Mortgage would prevail on a claim for: (1) payment of approximately $469.1 million in additional revenues (net of expenses including the below-market broker fee) that it would have received had the parties' agreed-upon revenue allocation been respected from August 1, 2009 to April 30, 2012; and (2) recovery of the approximately $51.4 million paid to Ally Bank in March 2012 as a matter of contractual right.

The misallocation of brokered loan revenues involves breach of the MMLPSA (which is governed by Delaware law) and the Pipeline Swap (which is governed by New York law), and the parties' agreement about the combined effect of those contracts. New York law would call for the application of interest at the rate of 9% per annum. Under Delaware law, the applicable rate would be 5% above the Federal Reserve discount rate. Precisely which rate a court would apply in these circumstances is unclear, but the pertinent rate would be applied to the $51.4 million component repaid to Ally Bank from the repayment date, and to the $469.1 million in revenues retained by the Bank for the period August 1, 2009 through April 30, 2012, from the date on which each of the constituent portions of those revenues was due to GMAC Mortgage (i.e., the sale date of the pertinent loan).

12-12020-mg   Doc 3698-8 TD   Doc 5713/63   Filed 02/03/13/13   Page 33 of 820   Section 1
12-12020-mg   Doc 3698-8 TD   Filed 05/13/63   Entered 09/23/13   Page 08 of 820   Section 1
Pg 10 of 47

### b. Failure To Pay The Value Of Purchased MSRs And Correspondent Loan MSRs To GMAC Mortgage Under The MSR Swap

Under the MSR Swap, Ally Bank paid to GMAC Mortgage, among other things, the value of MSRs arising from Bank-originated loans upon their initial capitalization, but never did so for MSRs purchased separately or for MSRs arising from correspondent loans the Bank purchased. The Bank recognized a gain when it capitalized MSRs arising from Bank-originated loans, but did not do so for purchased MSRs or for MSRs arising from purchased loans (since it paid to acquire these MSRs). However, the language of the MSR Swap as written applied to the value of *all* MSRs owned by Ally Bank as reported on its accounting general ledger, regardless of whether the Bank recognized a gain when it recorded the MSR on its balance sheet.

GMAC Mortgage has a potential claim that Ally Bank breached the MSR Swap's requirements by failing to pay to GMAC Mortgage the value of purchased MSRs and newly recognized MSRs arising from purchased loans. The value of such MSRs not paid by Ally Bank to GMAC Mortgage is approximately $1.725 billion, approximately $1.3 billion of which relates to the period after the 2009 Bank Transaction. The Examiner concludes that, while it is a close question, it is more likely than not that the MSR Swap would be reformed under the doctrine of mistake to require payment to GMAC Mortgage only for MSRs arising from loans originated by Ally Bank, and not for the $1.725 billion attributable to purchased MSRs and purchased-loan MSRs.

### c. Representation And Warranty Liabilities Under The 2001 And 2006 MMLPSAs

Under the 2001 MMLPSA, according to the language of the agreement, Old GMAC Bank provided representations and warranties for all mortgage loans, while under the 2006 MMLPSA, Ally Bank provided representations and warranties only for second lien loans.

The Examiner concludes it is unlikely that any claim against AFI or Ally Bank for loan representations and warranties under the 2001 MMLPSA would prevail because: (1) Ally Bank was not a party to, and did not assume, the 2001 MMLPSA, and is unlikely to be held liable on successor liability or indemnification theories; (2) it is likely that representation and warranty claims would be time-barred under the 2001 MMLPSA's two-year "survival" provision; and (3) for first lien loans (but not second lien loans), the evidence supports the proposition that the 2001 MMLPSA was modified to eliminate representation and warranty liability.

The Examiner concludes that, while Ally Bank likely would be held to have provided representations and warranties for second lien loans under the 2006 MMLPSA, representation and warranty (or indemnification) claims against Ally Bank for second lien loans sold under the 2006 MMLPSA are unlikely to prevail because they would be time-barred under the two-year "survival" provision in the 2006 MMLPSA.

### d. Application Of The Pipeline Swap To The "Funding To Sale" Period And To Ally Bank-Originated Loans

When HFS loans were added to the Pipeline Swap in July 2008, GMAC Mortgage and Ally Bank did not revise the terms of the Pipeline Swap to apply to: (1) the "funding to sale"

period for HFS loans; and (2) brokered loans originated by Ally Bank. However, from and after July 2008, the Pipeline Swap was implemented as though such changes to the terms of the agreement had been made. Despite the unambiguous language of the agreements, under governing law a contract may be: (1) reformed under the doctrine of mutual mistake; or (2) modified by implied agreement.

With respect to "funding to sale," while a close question, the Examiner concludes it is more likely than not that a court would find the doctrine of mistake to be applicable and that the Pipeline Swap would therefore be reformed to include coverage of the "funding to sale" period. In addition, based particularly on evidence relating to the Brokering Consumer Loans to Bank project, the Examiner concludes it is likely that an implied agreement existed to modify the Pipeline Swap to cover "funding to sale."

With respect to application of the Pipeline Swap to Ally Bank-originated loans, the Examiner concludes it is unlikely that the doctrine of mistake would apply. However, the Examiner concludes, based particularly on evidence relating to the Brokering Consumer Loans to Bank project, that it is likely that the Pipeline Swap was modified to apply to brokered loans originated by Ally Bank.

Accordingly, the Examiner concludes it is unlikely that breach of contract claims relating to the Pipeline Swap would prevail.

### e. Failure To Obtain Independent Director Approval

The 2005 Operating Agreement and the 2006 Amended Operating Agreement barred ResCap from entering into (or permitting any of its subsidiaries to enter into) any transaction with an AFI Affiliate unless the proposed transaction was at arm's length and for fair value. The arm's-length and fair-value requirements were permitted to be waived, provided that a majority of ResCap's directors (including a majority of Independent Directors) approved any such waiver that materially and adversely affected the rights of a class of rated indebtedness. The evidence shows that the original MSR Swap, and certain amendments to the MMLPSA, Pipeline Swap, and MSR Swap, were not approved by a majority of the Independent Directors, nor were these agreements on terms that were available in the market to which parties at arm's length would have agreed.

With respect to the MMLPSA, Pipeline Swap, and MSR Swap, the Examiner concludes it is unlikely that any claims against AFI relating to breaches of the 2005 Operating Agreement or the 2006 Amended Operating Agreement would prevail because: (1) the agreements at issue do not appear to have resulted in significant losses to GMAC Mortgage, or to have materially or adversely affected any class of rated indebtedness; (2) the information obtained in the Investigation does not suggest that AFI or Ally Bank was responsible for determining whether the agreements in question were submitted to the ResCap Board or Independent Directors for review; and (3) the remedies of third-party beneficiary creditors are limited to specific enforcement of the provisions of the Operating Agreements.

### 2. *Government Settlements*

The Examiner was asked to investigate the propriety of the allocation of obligations as between the Debtors and AFI with respect to two settlements between governmental entities and AFI, ResCap, and certain of their subsidiaries: (1) the FRB/FDIC Settlement, as memorialized by the FRB/FDIC Consent Order and related civil money penalty (CMP), between the FRB and the FDIC on the one hand and AFI, Ally Bank, ResCap, and GMAC Mortgage on the other (though Ally Bank was not a party to the CMP); and (2) the DOJ/AG Settlement, as memorialized in the DOJ/AG Consent Judgment, between the Department of Justice and various state Attorneys General on the one hand and AFI, ResCap, and GMAC Mortgage on the other.[11]

The Examiner considered various formal and informal agreements between AFI and ResCap allocating the costs, both direct and indirect, of the government settlements and providing for sufficient support, financial and otherwise, to ensure compliance with the government settlements. The aggregate effect of these agreements was that the vast majority of the costs of the settlements were allocated to ResCap entities, while AFI provided certain financial support so that the ResCap entities could comply with their obligations. While certain aspects of the process by which the Debtors and AFI internally allocated the burden of the government settlements are problematic, AFI ultimately bore the financial burden for a significant portion of the settlements by forgiving secured debt owed by the ResCap entities. Furthermore, it is beyond dispute that ResCap and its subsidiaries, as the mortgage servicers, were responsible for many of the actionable issues that were the subject of the FRB/FDIC Settlement and the DOJ/AG Settlement.

The Examiner evaluated whether the approximately $109.6 million payment made by GMAC Mortgage on March 14, 2012 pursuant to the DOJ/AG Consent Judgment may be avoidable as a preference under Bankruptcy Code section 547 and recoverable from AFI as "the entity for whose benefit such transfer was made" pursuant to Bankruptcy Code section 550. The Examiner concludes that the evidence supports the proposition that AFI was liable, together with ResCap, RFC, and GMAC Mortgage, for the full amount of $109.6 million, and that AFI therefore received a direct, ascertainable, and quantifiable benefit commensurate with the full amount of the value transferred by being relieved of its obligation to make the payment in the event ResCap did not. AFI also benefited by obtaining a release from certain claims and remedies that could have been asserted by the Department of Justice and the state Attorneys General. Accordingly, the Examiner concludes it is likely that an action on behalf of GMAC Mortgage against AFI to recover the March 14, 2012 payment as a preferential transfer under Bankruptcy Code sections 547 and 550 would prevail.

The Examiner also reviewed payments totaling approximately $48.4 million made by GMAC Mortgage to Ally Bank on May 10 and 11, 2012 pursuant to the terms of the January 30 Letter Agreement and the A&R Servicing Agreement, which required GMAC Mortgage to

_____

[11]   For the Examiner's full analysis of the government settlements, see Sections V.C and VII.F.5.

indemnify Ally Bank for losses incurred as a result of certain loan modifications undertaken in connection with the government settlements. The Examiner concludes it is likely that an action on behalf of GMAC Mortgage against Ally Bank to avoid and recover the May 10 and 11, 2012 payments as preferential transfers under Bankruptcy Code sections 547 and 550 would prevail.

In addition, the Examiner considered whether the postpetition payment of $12.9 million to Ally Bank relating to prepetition indemnification obligations under the terms of the A&R Servicing Agreement would be avoidable under Bankruptcy Code section 549. The Examiner concludes that the payment was not made in the ordinary course of the Debtors' business, and therefore could only be made if authorized by the Bankruptcy Court. While it is a close question, based on the Debtors' express representations in the related motion and the lack of complete disclosure, it appears more likely than not that the interim order authorizing continued performance under the A&R Servicing Agreement did not authorize the Debtors to make payments to satisfy prepetition obligations. Accordingly, the Examiner concludes that, while a close question, it is more likely than not that an action to avoid and recover the $12.9 million payment under Bankruptcy Code sections 549(a) and 550 would prevail.

### 3. Causes Of Action Relating To Use And Allocation Of ResCap's Tax Attributes

The Examiner reviewed the historical and prospective use and allocation, as between ResCap and AFI, of ResCap's tax attributes.[12] A primary focus of the Examiner's tax-related analysis was on ResCap's entry into a tax allocation agreement that was effective beginning in the 2009 tax year.[13] A first version of the tax allocation agreement (the First 2009 Tax Allocation Agreement) was drafted to treat ResCap as if it were a stand-alone taxpayer, with an additional proviso that was very favorable to ResCap—AFI would pay ResCap for ResCap's tax benefits that AFI could use even if ResCap could not yet use the tax benefits on a stand-alone basis.

The First 2009 Tax Allocation Agreement was signed by AFI and unanimously approved by the ResCap Board on August 6, 2010. But it was never signed by James Young, ResCap's officer who was meant to sign the agreement on behalf of ResCap. Sometime in October 2010, AFI asked Young not to sign the agreement. AFI had a change of heart after it calculated what it would owe ResCap under the agreement and realized it would owe ResCap hundreds of millions of dollars.

AFI then proposed a second version of the tax allocation agreement (the Second 2009 Tax Allocation Agreement) that not only removed ResCap's right to receive payments from AFI for AFI's use of ResCap's tax benefits, but resulted in ResCap having to pay AFI for tax on excess inclusion income, which from 2009 through 2012 totaled approximately $50 million. This Second 2009 Tax Allocation Agreement, portions of which counsel for the Independent Directors had described as being "very unfair" to ResCap, was nevertheless approved by the ResCap Board and signed by all parties. The Second 2009 Tax Allocation Agreement is still putatively in effect today.

_____

[12]  For the Examiner's full analysis of tax sharing and allocation issues, see Sections V.D and VII.K.

[13]  The Examiner also reviewed the Implemented 2005 Tax Allocation Agreement and concludes it is likely that ResCap would prevail on a contractual claim to receive compensation of up to $15.1 million.

Among other issues, the Examiner considered whether the First 2009 Tax Allocation Agreement is a valid and enforceable contract, despite not having been signed by a ResCap officer. Under Michigan contract law (the law governing both 2009 Tax Allocation Agreements), approval by the ResCap Board, after AFI and ResCap officers completed extensive negotiations over the terms of the agreement, constituted ResCap's consent to the contract. The Examiner concludes that, while a close question, it is more likely than not that the First 2009 Tax Allocation Agreement that was approved by the ResCap Board and signed by AFI was a valid and enforceable contract.

The Examiner also considered whether the Second 2009 Tax Allocation Agreement could be set aside as a fraudulent transfer. ResCap was insolvent when it entered into the Second 2009 Tax Allocation Agreement and did not receive reasonably equivalent value from AFI for entering into the agreement. Accordingly, the Examiner concludes it is likely that the Second 2009 Tax Allocation Agreement, which purports to supersede the First 2009 Tax Allocation Agreement, can be avoided as a constructive fraudulent transfer.

Based on the Examiner's conclusions, upon the avoidance of the Second 2009 Tax Allocation Agreement, ResCap would have a contractual claim against AFI under the First 2009 Tax Allocation Agreement based on AFI's use of ResCap's tax benefits that have passed since the 2009 tax year. Based on the anticipated use by AFI of ResCap's tax benefits, ResCap's contract claim against AFI is estimated to be $1.77 billion.

### 4. Minnesota Insider Preference Claims

After performing a choice of law analysis, the Examiner concludes that Minnesota's substantive fraudulent transfer law is likely to govern claims brought by the respective Estates of ResCap and RFC under Bankruptcy Code section 544(b). Minnesota's adoption of the Uniform Fraudulent Transfer Act contains an "Insider Preference" Cause of Action.[14] A transfer is fraudulent under the Insider Preference statute if: (1) there exists a creditor of the transferor-debtor whose claim arose before the transfer; (2) the transfer was made to an insider of the debtor; (3) the transfer was made for an antecedent debt; (4) the debtor was insolvent at the time of the transfer; and (5) the insider had reasonable cause to believe the debtor was insolvent. The premise of this Cause of Action "is that an insolvent debtor is obliged to pay debts to creditors not related to him before paying those who are insiders."[15]

Although this Cause of Action resembles the preference-avoidance provisions of Bankruptcy Code section 547, it does not contain a "hypothetical chapter 7" test to determine which transfers could be avoided. Accordingly, the Examiner concludes that—with certain limitations—the Insider Preference statute likely could be used to avoid payments made to a

---

[14]  *See* Minn. Stat. Ann. § 513.45(b). For the Examiner's full analysis of the Minnesota Insider Preference statute, see Section VII.F.4. For the Examiner's full analysis of potential actual and constructive fraudulent transfer claims that might be asserted on behalf of the Debtors' Estates pursuant to Bankruptcy Code sections 544(b) and 548, see Section VII.F.6.

[15]  UFTA, Prefatory Note, at 4.

secured creditor. The Insider Preference statute is, however, subject to three affirmative defenses: "new value"; "ordinary course"; and "good faith effort to rehabilitate." The first two defenses are derived from Bankruptcy Code sections 547(c)(2) and 547(c)(4), respectively, and are generally applied in a similar manner. The third defense has no Bankruptcy Code corollary, and protects transfers in which: (1) the transferee makes a good faith effort to rehabilitate a debtor; (2) the transferee provides present value with the goal of achieving that rehabilitation; and (3) the debtor grants the transferee a security interest with respect to an antecedent debt.

The Insider Preference cause of action is a standard feature of the Uniform Fraudulent Transfer Act, but in most states is coupled with a one-year statute of limitations. Under Minnesota law, however, the applicable statute of limitations is six years.[16] Once a bankruptcy petition is filed, section 546 of the Bankruptcy Code converts that statute of limitations into a six-year reach-back period from the petition date.

The Examiner reviewed a number of transactions between ResCap or RFC, on the one hand, and insiders of those Debtors, including AFI, on the other, and concludes that several of those transactions likely meet all of the prima facie elements for avoidance under the Minnesota Insider Preference statute.[17] The Examiner also concludes that the "ordinary course" and "good faith effort to rehabilitate" defenses likely do not protect any of the transactions at issue from avoidance. However, the Examiner concludes that AFI likely contributed substantial new value on December 30, 2009, that (subject to the resolution of potential valuation issues relating to new value that was contributed in forms other than cash) would likely offset any Insider Preference liability that it incurred before that date.

All of AFI's potential Insider Preference liability arising after December 30, 2009 stems from repayments made on the A&R Line of Credit Facility. Because the A&R Line of Credit Facility and its predecessor facilities continuously revolved on a secured basis, literal application of the statute—which would seemingly call for avoidance of every payment made by ResCap or RFC while not acknowledging amounts reborrowed as new value (because such reborrowings were secured by valid liens)—would lead to an absurd result in which AFI's Insider Preference liability with respect to the A&R Line of Credit Facility would vastly exceed the maximum amount to which AFI was ever exposed under the facility. After consultation with Examiner's Counsel and his Minnesota counsel, the Examiner concludes that such a result would not likely be upheld by any court interpreting Minnesota law.

The Examiner concludes that a court would instead likely resolve this issue in a way that comports with the premise of the statute. The highest balance drawn on the A&R Line of Credit Facility after December 30, 2009 was approximately $1.03 billion, which occurred on February 23, 2011. Deducting from that amount the balance that remained unpaid on the Petition Date—approximately $380 million—would yield a post-2009 Insider Preference

---

[16] New York also applies a six-year statute of limitations to fraudulent transfer actions. Accordingly, application of New York's borrowing statute would not shorten this limitations period.

[17] Because insolvency of the debtor-transferor is an element of the Insider Preference Cause of Action, the Examiner limited his review to transactions that took place on or after December 31, 2007, the date on which the Examiner's Financial Advisors have determined that the Debtors became insolvent under the Balance Sheet Test.

liability on the A&R Line of Credit Facility of $650 million. That liability would then be further reduced by approximately $116 million on account of additional contributions of new value made by AFI after February 23, 2011, yielding a final estimated Insider Preference liability for AFI of approximately $534 million. However, the Examiner notes that the particular manner in which a court would treat debt forgiveness for calculating Insider Preference liability in the context of a continuously revolving secured line of credit is uncertain. The Examiner stresses that a court could reasonably calculate AFI's ultimate Insider Preference liability in a variety of ways that would yield different results than those presented in this Report.

The Examiner also concludes that GMAC CF, a wholly owned indirect subsidiary of AFI, would likely have Insider Preference liability to RFC[18] for certain transfers made by RFC to GMAC CF in connection with the Servicing Advance Factoring Facility. The maximum amount of that liability is approximately $32 million, but the liability would be subject to reduction (to not less than $1.5 million) to the extent that GMAC CF could establish it provided new value in connection with the return of certain accounts receivable to RFC.

### 5. Ally Bank Transactions

Between November 2006 and January 2009, AFI and ResCap entered into a series of transactions that ultimately consolidated their mortgage and automotive banking operations under a single entity, Ally Bank, and transferred full ownership of Ally Bank to AFI. Before these transactions, AFI's automotive banking operations rested with GMAC Automotive Bank, a Utah industrial bank and a direct wholly owned subsidiary of AFI, and ResCap's mortgage banking operations were performed by Old GMAC Bank, a federal savings bank and an indirect wholly owned subsidiary of ResCap.[19]

#### a. 2006 Bank Restructuring

In 2005, AFI officials succeeded, after substantial efforts, in persuading AFI's parent, GM, that it should sell a majority interest in AFI to insulate AFI (and ResCap) from the impact, particularly the credit rating impact, of GM's continuing financial difficulties. GM entered into an agreement in March 2006 to sell 51% of AFI to an investment group led by Cerberus. To facilitate the sale, it was necessary for ResCap to divest its interest in Old GMAC Bank so that Cerberus would not become subject to federal Bank Holding Company Act (BHCA) regulations incident to ownership of a federal savings bank (but not to ownership of an industrial bank such as Ally Bank). To maintain ResCap's access to bank funding, the parties determined to transfer the assets of Old GMAC Bank to Ally Bank (then GMAC Automotive Bank), which would not trigger the BHCA regulations. Ally Bank would then house both AFI's automotive banking operations and ResCap's mortgage banking operations (which then accounted for about three-quarters of the combined operations).

---

[18] The Debtors' records are unclear as to whether the transfers in question were made by RFC or GMAC Mortgage. Because Pennsylvania law would likely govern fraudulent transfer claims brought by GMAC Mortgage, and because Pennsylvania has not adopted an Insider Preference statute, to the extent any of the transfers under the Servicing Advance Factoring Facility were in fact made by GMAC Mortgage rather than RFC, the Insider Preference liability of GMAC CF on this claim would be reduced dollar-for-dollar.

[19] For the Examiner's full analysis of the Ally Bank Transactions, see Sections V.A, VII.F.6, VII.L.1, and VIII.C–D.

While the Cerberus PSA required this restructuring, the PSA expressly contemplated that either ResCap or AFI (or both) could own Ally Bank. Thus, for ResCap to obtain the anticipated credit rating benefit (that is, to avoid the rating downgrade and increased cost of funds that were likely if the Cerberus transaction did not close), it was not mandatory, under the terms of the Cerberus PSA, that ResCap surrender a voting interest in the banking operations. In discussions among AFI and ResCap insiders (many of whom were affiliated with both entities), a variety of structures were considered. However, in an apparent effort to accommodate GM's interest in potentially exercising a call right concerning the Bank, AFI settled on the structure ultimately adopted, in which AFI retained 100% of the voting control of Ally Bank's newly created parent, IB Finance, and ResCap exchanged its interest in Old GMAC Bank at book value for non-voting interests in IB Finance tied to the economic performance of the Ally Bank mortgage operations.

ResCap's General Counsel, in an April 2006 memorandum circulated widely among the AFI and ResCap directors and management involved in these matters, concluded that, absent a waiver by ResCap's Independent Directors, this arrangement would violate several provisions of the 2005 Operating Agreement. In particular, he concluded that ResCap's surrender of its voting interest in the Bank would run afoul of the Operating Agreement requirement that Affiliate Transactions be "on terms and conditions that are consistent with those that parties at arm's length would agree to and for fair value."[20] He also pointed out that the Independent Directors were obligated to consider only the interests of ResCap and its creditors, and if either of the Independent Directors viewed the matter as a "close call" under the 2005 Operating Agreement, they would "likely veto" the transaction.[21] ResCap's CEO then submitted a proposal to AFI's President and others, along with the General Counsel's memorandum, voicing his misgivings about the loss of a "controlling interest in a bank" and proposing that ResCap retain a majority voting interest in the restructured bank. This proposal apparently was rejected by AFI.

Instead, a few days later, in the first communication to the Independent Directors about the contemplated restructuring, AFI's Chairman (who was also ResCap's Chairman) described the proposed transaction under which AFI would retain 100% of the IB Finance voting interests. Neither this communication nor, it appears, any subsequent communication to the Independent Directors, disclosed that this structure was not required by the Cerberus PSA or that alternative structures were permissible. While the other potential conflicts between the proposed transaction and the 2005 Operating Agreement that ResCap's General Counsel had noted were disclosed, the communications to the Independent Directors conspicuously failed to mention his conclusion that the loss of voting rights violated the Operating Agreement's arm's-length and fair-value requirements, or the concerns voiced by ResCap's CEO. Instead, incomplete and misleading information was provided—the Independent Directors were led to believe that failure to execute the 2006 Bank Restructuring in the proposed manner would cause the Cerberus PSA to fail, to the detriment of ResCap and AFI.

---

[20]  2005 Operating Agreement, § 2(b) [ALLY_0140795].

[21]  *See* Memorandum, GMAC Bank Restructuring, dated Apr. 20, 2006, at 6 [EXAM11248642].

I-17

Further, the Examiner concludes that ResCap did not receive reasonably equivalent value in the 2006 Bank Restructuring (for which no contemporaneous valuation was performed, and no fairness opinion was obtained). The value of the interest in Old GMAC Bank that ResCap surrendered exceeded the value of the IB Finance Class M Shares it received by $533 million to $608 million. Giving credit for the value of a de-linked credit rating for ResCap (an indirect benefit of the 2006 Bank Restructuring) leaves a Fair Market Value shortfall of $390 million to $465 million.

The Examiner has considered several potential Estate Causes of Action against AFI arising from these troubling facts, including fraud, breach of the 2005 Operating Agreement, tortious interference with contract, and fraudulent transfer.

### (1) Fraud

These facts arguably give rise to a claim of fraud. There are a number of obstacles to such a claim, however, including the *in pari delicto* doctrine and its Second Circuit analogue, the *Wagoner* Rule,[22] which generally precludes the estate of a debtor whose agents have engaged in wrongdoing from recovering from another wrongdoer. To the extent the circumstances here suggest wrongdoing by AFI through its agents, the same circumstances suggest wrongdoing by ResCap agents (many of whom had a dual AFI-ResCap affiliation). There is an "adverse interest" exception to the *in pari delicto* defense and the *Wagoner* Rule, under which an entity's agents' acts are not imputed to it where the agent has abandoned its principal's interests and is acting entirely for its own or another's purposes. One might argue that this was the case here, and that ResCap's officials had abandoned ResCap's interests for those of AFI, particularly if the 2006 Bank Restructuring is considered in isolation from the anticipated benefits of the larger Cerberus transaction. But, on balance, rather than viewing the restructuring in this manner, it appears more reasonable to take the view that the ResCap officials, having been motivated at least in part by the anticipated credit rating benefit, had not totally abandoned ResCap's interests so as to trigger the adverse interest exception. Considering these and all of the other facts and circumstances, the Examiner concludes that, while a close question, it is more likely than not that such a fraud claim by ResCap against AFI would not prevail.

### (2) Breach Of The 2005 Operating Agreement

ResCap might also assert a claim that the conduct of AFI's agents constituted a breach of the 2005 Operating Agreement, which is governed by New York law. Under that Agreement, compliance with certain requirements concerning the appointment of Independent Directors is identified as AFI's "sole obligation."[23] Despite these provisions, under New York law, a duty of good faith and fair dealing is implied into every contract, and that obligation was arguably breached here. Further, the 2005 Operating Agreement also explicitly states that the "sole remedy" available from AFI is "specific performance," and that "[u]nder no circumstances" is AFI to be subject to damages.[24] Nonetheless, under New York law, compliance with such

---

[22]  *Shearson Lehman Hutton, Inc. v. Wagoner,* 944 F.2d 114, 118–20 (2d Cir. 1991).

[23]  2005 Operating Agreement, § 7 [ALLY_0140795].

[24]  *Id.*

I-18

limitations may be excused in cases of bad faith or intentional wrongdoing. Ultimately, however, contractual claims that involve the same underlying facts as a fraud claim are also subject to the *Wagoner* Rule and the *in pari delicto* doctrine. Consequently, for reasons similar to those articulated concerning ResCap's potential fraud claim, the Examiner concludes that, while a close question, it is more likely than not that a claim for breach of the 2005 Operating Agreement would not prevail.

### (3) Tortious Interference With Contract

The Examiner concludes it is unlikely that a claim against AFI for tortious interference with contract would prevail because only a third party, unrelated to the contract, may be held liable for tortious interference.

### (4) Fraudulent Transfer

The Examiner concludes that a fraudulent transfer claim based on actual intent to hinder, delay, or defraud creditors within the meaning of the applicable statutes is unlikely to prevail with respect to the 2006 Bank Restructuring. The evidence does not support the proposition that the 2006 Bank Restructuring was entered into with actual intent to hinder, delay, or defraud either present or future creditors.

As noted above, ResCap did not receive reasonably equivalent value in the 2006 Bank Restructuring. However, the Examiner concludes it is unlikely that a constructive fraudulent transfer claim would prevail with respect to the 2006 Bank Restructuring because ResCap was not financially distressed within the meaning of the relevant statutes at the time of the transaction.[25]

### b. 2008 Bank Transaction And 2009 Bank Transaction

The Examiner concludes it is unlikely that actual fraudulent transfer claims would prevail with respect to either the 2008 Bank Transaction or 2009 Bank Transaction because the Investigation did not uncover the requisite "badges of fraud" or any evidence suggesting an actual intent by any party to hinder, delay, or defraud either present or future creditors with respect to these transactions.

Because these transactions occurred while ResCap was financially distressed within the meaning of applicable fraudulent transfer statutes, the Examiner's Professionals evaluated whether ResCap received reasonably equivalent value to determine whether the elements of a constructive fraudulent transfer claim were present.

The value transferred from ResCap in connection with the 2008 Bank Transaction consisted of: (1) the issuance of the ResCap Preferred Interests; and (2) the exchange option granted to AFI whereby it could convert the ResCap Preferred Interests into IB Finance Preferred Interests after January 1, 2009. The Examiner's Financial Advisors estimated that the

---

[25]   As discussed in Section VII.F.6(d)(4), the Examiner concludes that the evidence does not support the proposition that the Ally Bank Transactions should be collapsed for purposes of a fraudulent transfer analysis.

value transferred from ResCap was approximately $571 million to $714 million. The consideration received by ResCap was: (1) certain bonds contributed by AFI to ResCap; and (2) the retention of the right to redeem the IB Finance Preferred Interests at redemption value in the event that AFI exercised its exchange option. The Examiner's Financial Advisors estimated that the value received by ResCap was approximately $841 million. Accordingly, the Examiner concludes that the evidence supports the proposition that ResCap received reasonably equivalent value in the 2008 Bank Transaction. Therefore, it is unlikely that a constructive fraudulent transfer claim with respect to the 2008 Bank Transaction would prevail.

The value transferred from ResCap in connection with the 2009 Bank Transaction consisted of: (1) ResCap's remaining IB Finance Class M Shares; and (2) the right to redeem the IB Finance Preferred Interests at redemption value. The Examiner's Financial Advisors estimated that the value transferred from ResCap was approximately $106.5 million to $217.5 million. The consideration received by ResCap was: (1) certain bonds contributed by AFI; and (2) a sixty-day extension of the maturity of the Initial Line of Credit Facility. The Examiner's Financial Advisors estimated that the value of the bonds contributed by AFI to ResCap was approximately $600 million. Accordingly, the Examiner concludes that the evidence supports the proposition that ResCap received reasonably equivalent value in the 2009 Bank Transaction. Therefore, it is unlikely that a constructive fraudulent transfer claim with respect to the 2009 Bank Transaction would prevail.

### 6. ResCap's Directors And Officers

#### a. Examiner's Observations Regarding Protocol And Functioning Of The ResCap Board

Although the ResCap Board was industrious, it was not consistently effective. The ResCap Board met frequently in response to a variety of challenging circumstances, was subject to formal governance protocols, and had access to numerous sophisticated legal and financial advisors. But several factors diminished the ResCap Board's overall effectiveness. An onerous schedule, substantial inside director turnover, dual affiliations of ResCap Board members, underlying conflicts, and information management issues all contributed to a level of dysfunction in the processes of the ResCap Board. Quantity of meetings did not always correlate with quality. Overall, the ResCap Board's efficacy was compromised, and Independent Director decision making was handicapped by structural issues that beset the ResCap Board.[26]

#### b. Indemnification And Exculpation

Under Delaware law, a director is subject to the fiduciary duties of care and loyalty. A director can breach the duty of care through gross negligence, without having acted in bad faith. Under Delaware law, a director can be exculpated and/or indemnified for liability and expenses incurred as a result of a breach of the duty of care, but only if such breach was in good faith. A director cannot be exculpated or indemnified for a breach of the duty of loyalty.[27]

---

[26] For the Examiner's full analysis of the protocol and functioning of the ResCap Board, see Section IV.A.

[27] For the Examiner's full analysis of indemnification and exculpation issues relating to the ResCap Board, see Section IV.B.

The 2006 ResCap LLC Agreement and the 2008 ResCap Amended LLC Agreement both provide for indemnification and exculpation of directors for acts or omissions in good faith on behalf of ResCap that were reasonably believed to be within the scope of the director's authority. This indemnification and exculpation is subject to certain exclusions, such as for acts or omissions as a result of the director's willful misconduct or bad faith. AFI's certificate of incorporation generally provides for indemnification of directors serving on the boards of other entities at the request of AFI, if the directors acted in good faith and in a manner reasonably believed to be aligned with the best interests of AFI.

### c. Breach Of Fiduciary Duty Claims Against ResCap's Directors And Officers

As ResCap faced increasingly challenging circumstances over time, ResCap fiduciaries often operated under stressful conditions and within a tangled relationship with AFI. Despite the volume and intensity of the ResCap Board's activities, the protocol, processes, and functioning of the ResCap Board were far from optimal.

Yet there exist only a few potentially actionable claims for breaches of fiduciary duties against ResCap's directors and officers.[28] A threshold hurdle for any such claims is that, prior to August 15, 2007—the date at which the Examiner concludes that ResCap was left with unreasonably small capital and reasonably should have believed that it would incur debts beyond its ability to pay—ResCap fiduciaries owed duties to ResCap's parent shareholder and not to its creditors. The Examiner concludes that no potential claims for breach of fiduciary duty are likely, or more likely than not, to prevail, although troubling facts in connection with fiduciary conduct do exist.

The facts surrounding the ResCap Board's approval of the 2006 Bank Restructuring give rise to potential fiduciary duty claims that, although unlikely to prevail because of legal impediments, are close questions. The evidence indicates that certain material information, relating to ResCap's potential negotiating leverage with respect to obtaining a voting interest in the restructured bank, was purposefully withheld from ResCap's Independent Directors by inside managers in an effort to secure approval of the transaction on the proposed terms. The Independent Directors' approval of the 2006 Bank Restructuring, therefore, was arguably procured on false premises. However, several formidable legal obstacles exist to any related claim for breach of fiduciary duty, including the absence of a definitive fiduciary duty to disclose the withheld information, as well as a possible timeliness deficiency.

Similarly, the facts underlying approval of the Second 2009 Tax Allocation Agreement by the ResCap Board are troubling because the agreement imposed an obligation on ResCap to make certain payments to AFI that ResCap was not otherwise obligated to make as a disregarded entity, and did not contain any provisions providing for the possibility of any payments being made by AFI to ResCap for AFI's use of ResCap's tax benefits.[29] Despite the

---

[28] For the Examiner's full analysis of potential Causes of Action against ResCap's current or former directors and officers, see Section VII.E and VII.K. Potential fiduciary duty claims relating to transactions that the Examiner determined were not problematic are not addressed.

[29] For the Examiner's full analysis of tax sharing and allocation issues, see Sections V.D and VII.K.

unfair nature of the Second 2009 Tax Allocation Agreement, the evidence established that the agreement went through a thorough review process by the ResCap Board, including review and comment by the Independent Directors and their counsel. These and other relevant facts lead the Examiner to conclude that, while a close question, it is more likely than not that a breach of fiduciary duty claim based on the ResCap Board's approval of the Second 2009 Tax Allocation Agreement would not prevail.

The Examiner also analyzed whether Young violated a fiduciary duty for failing to sign the First 2009 Tax Allocation Agreement after it was approved by the ResCap Board and signed by AFI. Although the Examiner found evidence suggesting that Young did not advocate strongly for ResCap's interests in seeking to enforce or preserve the First 2009 Tax Allocation Agreement, the evidence does not establish that Young intentionally failed to advance ResCap's interests or failed to act in a way that would demonstrate a conscious disregard for his duties. Accordingly, the Examiner concludes that, while a close question, it is more likely than not that a claim for breach of fiduciary duty against Young would not prevail.

The Examiner concludes it is unlikely that potential claims for breach of fiduciary duty related to the Prepetition Asset Sales would prevail. In addition, while a close question, the Examiner concludes it is more likely than not that potential breach of fiduciary duty claims would not prevail with respect to the $48.4 million payment under the January 30 Letter Agreement and A&R Servicing Agreement in May 2012. Those various Affiliate Transactions were generally the product of extensive, arm's-length negotiations and informed decision making by ResCap fiduciaries, even if carried out in harried circumstances.

Finally, while the efforts of the ResCap Board in connection with approval of the AFI Settlement and Plan Sponsor Agreement and the RMBS Trust Settlement Agreements were flawed, the Examiner concludes that no viable claims exist for breaches of fiduciary duties tied to those Board approval processes. The performance of the Independent Directors who comprised the Special Review Committee responsible for the claims investigation that led to the now-terminated AFI Settlement and Plan Sponsor Agreement was incomplete, tainted by certain counsel conflicts, and otherwise flawed, thus creating a close question. But it is more likely than not that a related claim for breach of fiduciary duty would not prevail. Based on the investigation performed by its legal counsel, the ResCap Board concluded that the proposed settlement with AFI was a reasonable resolution of challenging litigation claims. Similarly, the process that led to approval by the ResCap Board of the RMBS Trust Settlement Agreements within a condensed timeframe was not optimal. However, the Examiner also concludes that, while a close question, it is more likely than not that a claim for breach of fiduciary duty against the ResCap Board related to its approval of the RMBS Trust Settlement Agreements would not prevail. The ResCap Board acted on a sufficiently informed basis and with a good-faith belief that the settlement of major claims embodied in the agreements would facilitate the interests of ResCap and its creditors.

### d. Aiding And Abetting Breach Of Fiduciary Duty Claims Against AFI

As noted above, the Examiner concludes that, although ResCap fiduciaries engaged in certain problematic conduct in connection with particular transactions, no related fiduciary

duty claims are likely, or more likely than not, to prevail. In the absence of a viable predicate claim of breach of fiduciary duty, it is unlikely as a matter of law that any associated aiding and abetting claim against AFI could survive.[30]

Thus, although AFI insiders participated in an apparent effort to withhold certain material information from the Independent Directors relating to the 2006 Bank Restructuring, while a close question, it is more likely than not that a related aiding and abetting claim would likely fail because, on balance, it is more likely than not that an underlying claim for breach of duty against ResCap fiduciaries would not prevail. Further, even if an underlying fiduciary duty claim related to the 2006 Bank Restructuring could overcome the legal impediments to its success, a corollary aiding and abetting claim would confront its own obstacles. Similarly, any aiding and abetting claims tied to the Prepetition Asset Sales, January 30 Letter Agreement, the A&R Servicing Agreement, or the $48.4 million payment under the January 30 Letter Agreement and A&R Servicing Agreement would likely not prevail in the absence of any viable underlying claims for breaches of duties by ResCap fiduciaries. Finally, AFI cannot be held legally responsible for any sub-optimal work of the Special Review Committee of the ResCap Board with respect to the investigation and settlement of potential claims against AFI, or for the ResCap Board's approval of the RMBS Trust Settlement Agreements, and therefore any related aiding and abetting claims against AFI are unlikely to prevail.

### 7. Single Entity Theories Of Liability

#### a. Piercing The Corporate Veil

The Examiner reviewed whether, under Delaware law (which would govern this issue), a claim could successfully be asserted on behalf of ResCap to pierce its corporate veil.[31] Such a claim could result in a judgment holding AFI liable for all of ResCap's debts. The Examiner concludes, however, that it is unlikely that any such potential veil-piercing claim would prevail. Courts do not lightly pierce the corporate veil. A successful veil-piercing claim would require proof both: (1) that ResCap and AFI operated as a single economic entity; and (2) of the presence of an overall element of injustice or unfairness. There is insufficient evidence to surmount these high legal hurdles.

##### (1) Single Economic Entity

The Investigation has uncovered evidence of certain indicia that ResCap and AFI operated as a single economic entity. ResCap's conduct in connection with a number of the Affiliate Transactions (e.g., the 2006 Bank Restructuring, the MSR Swap, the Pipeline Swap, the First 2009 Tax Allocation Agreement, the Second 2009 Tax Allocation Agreement, and the allocation of liability in connection with the FRB/FDIC Settlement and the DOJ/AG Settlement) departed in some important respects from appropriate corporate formalities, including the requirements of ResCap's operating agreements. For example, in the 2006 Bank Restructuring, ResCap transferred its 100% controlling interest in Old GMAC Bank for a non-

---

[30] For the Examiner's full analysis of potential Causes of Action against AFI for aiding and abetting breach of fiduciary duty, see Section VII.G.

[31] For the Examiner's full analysis of piercing the corporate veil, see Section VII.A.1.

voting interest in IB Finance. The Examiner concludes that the value of the non-voting interest was approximately $533 million to $608 million less than the value of the controlling interest in Old GMAC Bank that ResCap parted with and, considering the credit rating benefits to ResCap associated with the transaction, ResCap received $390 million to $465 million less than the Fair Market Value of the controlling interest it parted with. The 2006 Bank Restructuring was approved by the ResCap Board without any formal fairness opinion or valuation and without the Independent Directors being informed of potential alternatives that would have been more favorable to ResCap. Moreover, there is evidence—in particular after the closing of the Cerberus PSA—of interference by AFI and Cerberus outside the normal lines of corporate authority in the day-to-day operations of ResCap and its subsidiaries.

The Investigation also revealed evidence that could be used to attempt to prove that certain Affiliate Transactions constituted a "siphoning" of assets from ResCap, including with respect to the 2006 Bank Restructuring and the Second 2009 Tax Allocation Agreement. Affiliate Transactions where ResCap received less than reasonably equivalent value appear, however, to have been the exception—not the rule. Apart from those exceptions, the various asset sales, financings, and derivatives transactions ResCap entered into with AFI and its affiliates provided ResCap with essential liquidity and resulted in ResCap's receipt of at least—and sometimes more than—fair value. Moreover, any inference of "siphoning" that could otherwise arise would be undermined by the approximately $8 billion in capital support that ResCap received from AFI beginning in 2007 in the form of cash contributions, debt forgiveness, and contributions of other assets.

There is also other evidence in the factual record that appears inconsistent with the theory that ResCap and AFI operated as a single economic entity. For example, rather than being set up for financial failure, ResCap was neither inadequately capitalized nor insolvent at the time of its formation. ResCap is also unlikely to be considered a "mere façade" for AFI, given that ResCap and its subsidiaries operated multiple businesses, employed thousands of people, and entered into independent contractual relationships with a wide variety of outside parties.

### (2) Injustice Or Unfairness

Even assuming, arguendo, that ResCap and AFI were proven to be a single economic entity, the Examiner concludes it is unlikely that a plaintiff would prevail in establishing the "injustice or unfairness" element of any veil-piercing claim.

The evidence supports the proposition that ResCap became unable to satisfy its creditors because of the billions of dollars in operating losses it recorded beginning in the fourth quarter of 2006—not because of an abuse of the corporate form by AFI. The evidence supports the proposition that ResCap was not undercapitalized at formation, and that those Affiliate Transactions where ResCap received less than reasonably equivalent value were dwarfed in size by the $8 billion in contemporaneous capital support provided by AFI.

The Examiner does not expect any potential alternative theories of "injustice or unfairness" to fare better. For example, although the evidence supports the proposition that AFI's capital support of ResCap was at all times self-interested and generally inadequate to do more than maintain ResCap on "life support," the Investigation has uncovered no significant evidence that

ResCap or its creditors were harmed as a result. That AFI may have continued to support ResCap as a means to the end of achieving bank holding company status and obtaining TARP funds does not change the effect of that support on ResCap's financial condition. Without more, the Examiner expects that such theories would prove insufficient to warrant piercing the corporate veil and therefore concludes it is unlikely that such claims would prevail.

### b. Substantive Consolidation

The Examiner concludes it is unlikely that a motion for substantive consolidation of AFI with and into the Estate of any Debtor would prevail.[32] In the Second Circuit, substantive consolidation is warranted if either of the two following tests is met:

- whether creditors dealt with the entities as a single economic unit and did not rely on their separate identities in extending credit (corporate separateness test); or
- whether the entities' affairs are so entangled and confused that substantive consolidation will benefit all creditors (entanglement test).

The evidence does not support the proposition that either of these two tests is met such that substantive consolidation is warranted in these bankruptcy cases. The evidence does not support the proposition that entities reasonably relied on ResCap and AFI as a single economic unit at the time the entities extended credit to ResCap. Actions by creditors after they extended credit to ResCap that demonstrate a hope or expectation that such debt will be satisfied by AFI does not trigger application of the corporate separateness test. In addition, the Examiner concludes that the evidence does not support the proposition that AFI's and ResCap's affairs are so entangled and confused that substantive consolidation would benefit all creditors. While it may be argued that ResCap did not fully comply with all provisions of the 2005 Operating Agreement and 2006 Amended Operating Agreement (particularly in connection with entering into Affiliate Transactions), the Investigation has not uncovered any material evidence that ResCap failed to account for its assets and liabilities separately from those of AFI. There is a difference between financial affairs that are "entangled and confused" and those that are interrelated. The Investigation has shown that ResCap's and AFI's financial affairs were interrelated. For example, ResCap received billions of dollars in capital contributions from AFI, the two were parties to numerous transactions (including many specifically addressed in the Report), AFI and ResCap maintained an understanding of federal income tax allocations, and AFI and ResCap engaged in other transactions identified in the Report. However, the Debtors maintained separate accounts, books, and records at all relevant times. The Examiner's Professionals have not found the Debtors' financial affairs to be "so entangled and confused" as to warrant substantive consolidation.

### 8. Debt Recharacterization

The Examiner analyzed two categories of claims held by AFI for possible recharacterization to equity: (1) claims held by AFI that were outstanding as of the Petition Date under the A&R Secured Revolver Loan Agreement (approximately $747 million) and under the A&R Line of Credit Agreement (approximately $380 million); and (2) claims represented by Unsecured Notes

---

[32]   For the Examiner's full analysis of substantive consolidation, see Section VII.A.2.

and Senior Secured Notes (aggregating $2.4 billion in face principal amount) that were exchanged by AFI for, among other things, ResCap Preferred Interests in the 2008 Bank Transaction and ResCap's remaining IB Finance Class M Shares in the 2009 Bank Transaction.[33]

In determining whether to recharacterize an asserted loan as an equity investment, courts, including those in the Southern District of New York, generally consider the following:

- the names given to the instruments;

- the presence or absence of a fixed maturity date and schedule of payments;

- the presence or absence of a specified rate of interest and interest payments;

- the source of repayments;

- the adequacy or inadequacy of capitalization;

- the identity of interest between the creditor and shareholder;

- the security for the advances;

- the corporation's ability to obtain financing elsewhere;

- the extent to which the advances were subordinated;

- the extent to which the advances were used to acquire capital assets; and

- the presence or absence of a sinking fund to provide repayment.

The determination of whether an asserted debt should be recharacterized as equity depends on the facts and circumstances as they existed at the time of the issuance of the alleged debt.

The archetypal debt recharacterization case involves a situation where the same party controls both the putative obligor and obligee, and inferences can be drawn that funds were put into an enterprise with little or no expectation that they would be paid back along with other creditor claims. The Examiner concludes that the evidence relating to the factors identified above supports the proposition that the indebtedness, under the A&R Secured Revolver Loan Agreement, the A&R Line of Credit Agreement, the Unsecured Notes, and the Senior Secured Notes, is debt that may not appropriately be recharacterized as equity. The evidence does not support the proposition that funds advanced to ResCap pursuant to the A&R Secured Revolver Loan Agreement, the A&R Line of Credit Agreement, the Unsecured Notes, or the Senior Secured Notes were put into ResCap with the expectation that they would not be repaid. Accordingly, the Examiner concludes that a party seeking to recharacterize ResCap debt held by AFI or used by AFI as currency to acquire ResCap assets is unlikely to prevail.

9. *Equitable Subordination*

The Examiner reviewed AFI's outstanding claims as of the Petition Date including, without limitation, claims under the A&R Secured Revolver Loan Agreement (approximately

---

[33] For the Examiner's full analysis of debt recharacterization, see Section VII.B.

$747 million) and under the A&R Line of Credit Agreement (approximately $380 million) to assess whether they would be subject to equitable subordination.[34]

At all times relevant to the Investigation, ResCap was a wholly owned indirect subsidiary of AFI. Therefore, AFI was and is an "insider" of ResCap as that term is defined in the Bankruptcy Code. As an insider, AFI's conduct with respect to ResCap is subject to a higher degree of scrutiny than would be the conduct of a non-insider. During the course of the Investigation, the Examiner analyzed the Affiliate Transactions individually and collectively, as well as AFI's general course of conduct and dealings with ResCap, for any evidence of: (1) fraud; (2) illegality; (3) breach of fiduciary duty; (4) unconscionable, inequitable, unjust, or unfair conduct; (5) undercapitalization; or (6) AFI's control or use of ResCap as an alter ego for AFI's benefit. The Investigation also explored whether ResCap's creditors were harmed by AFI's conduct.

Specifically, the Examiner analyzed the conduct of AFI and, where appropriate, Ally Bank in connection with: (1) the 2006 Bank Restructuring; (2) the Second 2009 Tax Allocation Agreement; (3) the misallocation of net revenues on loans brokered by GMAC Mortgage; (4) ResCap's forgiveness of subsidiary indebtedness and the 2009 Bank Transaction; (5) the Line of Credit Facilities; and (6) AFI's general course of conduct and dealing with ResCap in light of alter ego, asset stripping, and aiding and abetting breach of fiduciary duty allegations.

The Examiner concludes that AFI engaged in unfair and inequitable conduct in connection with the 2006 Bank Restructuring and the Second 2009 Tax Allocation Agreement, and that, while a close question, it is more likely than not that a court would find that AFI and Ally Bank engaged in unfair and inequitable conduct in connection with the misallocation of revenues on loans brokered by GMAC Mortgage. ResCap and its creditors were harmed by AFI's inequitable and unfair conduct in connection with the 2006 Bank Restructuring in an amount not less than $390 million and perhaps as much as $608 million as measured by the difference between the Fair Market Value of what ResCap parted with and the Fair Market Value of what it received. The Examiner also concludes that ResCap and its creditors were harmed in the approximate amount of up to $50 million in connection with AFI's inequitable and unfair conduct in connection with the Second 2009 Tax Allocation Agreement. Finally, the Examiner concludes that GMAC Mortgage was harmed in the amount of approximately $520.5 million in connection with the inequitable and unfair conduct of AFI and Ally Bank with respect to the misallocation of revenues on loans brokered by GMAC Mortgage.

A principal narrative that emerges from the available evidence is that, from 2007 through 2012, AFI provided ResCap with capital support in excess of $8 billion in the form of cash contributions, debt forgiveness, and contributions of other assets. Indeed, absent AFI's contributions, ResCap could not have met its liquidity needs or satisfied its tangible net worth covenants. The Investigation uncovered no evidence that AFI's capital support of ResCap had the intent or effect of disguising or making possible further harm to ResCap and its creditors. The scale of AFI's capital support outweighs the harm that was caused by AFI's conduct.

---

[34] For the Examiner's full analysis of equitable subordination, see Section VII.C.

Because equitable subordination is remedial and not punitive, and is a drastic and unusual remedy that should be applied in limited circumstances, the Examiner concludes that, while a close question, it is more likely than not that a proponent of equitable subordination of AFI's claims would not prevail.

Because equitable disallowance requires a showing of more serious misconduct than necessary for equitable subordination, the Examiner concludes that is unlikely that a proponent of equitable disallowance of AFI's claims would prevail.[35]

*10. Constructive Trust Claims*

Certain parties have argued that a constructive trust should be imposed on: (1) ResCap's interest in the "mortgage division" of Ally Bank, which AFI allegedly obtained by violating a "confidential relationship" with ResCap; and (2) proceeds of TARP funds that AFI received by virtue of its relationship to ResCap.[36]

A constructive trust is an equitable device a court may impose when the holder of legal title to property acquired the property under such circumstances that the holder "in good conscience" should not be allowed to retain it. A claim for constructive trust is a remedy, often to a corresponding unjust enrichment claim. When a constructive trust is imposed, the holder becomes a trustee, holding the property for the benefit of the plaintiff. When considering such equitable relief, however, a court is constrained by two considerations: (1) the property must be discernible and traceable to the plaintiff; and (2) the requested relief may not be in lieu of damages—constructive trust is only available to prevent the title holder from being unjustly enriched, not to provide a second avenue to an award otherwise available under a breach of contract claim. Given that a constructive trust is designed to address a gap that could be remedied by a contract if one existed, a court also will not impose a constructive trust if an enforceable contract governs the parties' relationship.

Because the 2005 Operating Agreement, the 2006 Amended Operating Agreement, and the indenture that governs the Unsecured Notes control the parties' relationship, the Examiner concludes that there can be no constructive trust claim in connection with the Ally Bank Transactions. Further, there is no identifiable, discrete res on which to impose a constructive trust. As discussed in Section V.A.2.e, the Examiner's Financial Advisors concluded that there was no equity value remaining in the mortgage division of Ally Bank after December 31, 2009 that could have been attributed to ResCap's legacy equity interest in IB Finance.

In addition, the Examiner concludes it is unlikely that a party can demonstrate that ResCap had a legitimate expectation that TARP funds provided to AFI were earmarked for ResCap or that ResCap had an identifiable interest in TARP funding provided to AFI.

---

[35]  For the Examiner's full analysis of equitable disallowance, see Section VII.D.

[36]  For the Examiner's full analysis of constructive trust, see Section VII.I.

### 11. Prepetition Asset Sales

The Examiner reviewed the Prepetition Asset Sales to identify possible constructive fraudulent transfer claims and to factor the transactions into the Examiner's analysis of single entity theories of liability.[37] Because the Prepetition Asset Sales occurred while ResCap was financially distressed within the meaning of applicable fraudulent transfer statutes, the Examiner's Professionals evaluated whether ResCap received reasonably equivalent value in these transactions. The Examiner concludes that the evidence supports the proposition that ResCap and its affiliate sellers received reasonably equivalent value in each of the Prepetition Asset Sales, with the possible exception of the June 2008 Model Home Sale to a Cerberus subsidiary. With respect to the June 2008 Model Home Sale, the Examiner's Financial Advisors concluded that RFC received at least $30 million less than Fair Market Value. While a close question, the Examiner concludes it is more likely than not that a constructive fraudulent transfer claim against Cerberus would not succeed under prevailing law because, based on the totality of the circumstances, it is more likely than not that a court would find that the value exchanged in the June 2008 Model Home Sale constituted reasonably equivalent value.

### 12. Financing Affiliate Transactions

The Examiner reviewed the terms of material prepetition financing Affiliate Transactions[38]—including the Resort Finance Facility, Secured MSR Facility, Secured Revolver Facility, Servicing Advance Factoring Facility, Initial Line of Credit Facility, ResMor Loan Facility, Second Line of Credit Facility, A&R Line of Credit Facility, and BMMZ Repo Facility—and concludes that all such transactions were entered into at arm's length and on balance were more favorable to ResCap than would have been obtained in third-party financings of comparable size and nature.[39]

## F.  EXAMINER'S EVALUATION OF ESTATE CLAIMS

As described above, the Debtors' Estates could assert claims seeking:

- Up to approximately $1.31 billion in damages with respect to claims the Examiner believes are likely to prevail;

- Up to approximately $1.78 billion in damages with respect to claims the Examiner believes, while a close question, are more likely than not to prevail;

- Up to approximately $2.36 billion in damages with respect to claims the Examiner believes, while a close question, are more likely than not to fail; and

- Equitable subordination of AFI's claims (totaling approximately $1.13 billion), with respect to which the Examiner concludes, while a close question, is more likely than not to fail.

---

[37]  For the Examiner's full analysis of the Prepetition Asset Sales, see Sections V.F and VII.F.6.

[38]  For the Examiner's full analysis of financing Affiliate Transactions, see Section V.E.

[39]  Notwithstanding that conclusion, as discussed in Section VII.F, certain of the financing Affiliate Transactions implicate potential Estate Causes of Action.

I-29

The following four charts group the Estate Causes of Action according to the methodology set forth above in Section I.D. Except as otherwise noted, the potential defendant for each claim in the following charts is either AFI, Ally Bank, or another subsidiary of AFI.

---

EXHIBIT I.F—1
**Estate Causes of Action the Examiner Concludes are Likely to Prevail**
*($ in Millions)*

| Description | Potential Damages [1] |
|---|---:|
| Claims relating to Minnesota Insider Preference statute | $ 566.0 [2] |
| Claim relating to misallocation of net revenues on loans brokered by GMAC Mortgage | 520.5 |
| Preferential transfer in connection with March 2012 payment under the DOJ/AG Consent Judgment | 109.6 |
| Constructive fraudulent transfer in connection with Second 2009 Tax Allocation Agreement | 50.0 |
| Preferential transfer in connection with May 2012 payments under January 30 Letter Agreement and A&R Servicing Agreement | 48.4 |
| Contractual claim pursuant to Implemented 2005 Tax Allocation Agreement | 15.1 |
| Total | $ 1,309.6 |

[1] *Potential damages amounts are approximate, represent the upper end of the range considered reasonably possible, and do not account for interest.*

[2] *As set forth in Section VII.F.4.g(2)(d), the Examiner concludes that AFI likely has substantial Insider Preference liability with respect to payments that it received under the A&R Line of Credit Facility that would not be subject to offset based on new value contributed by AFI. However, because of the unique facts presented, the Examiner is unable to definitively determine how AFI's Insider Preference liability would be calculated. A court could reasonably calculate AFI's Insider Preference liability in a variety of ways that would yield different results. In particular, the Examiner notes that the manner in which a court would treat debt forgiveness for calculating Insider Preference liability in the context of a continuously revolving secured line of credit is uncertain.*

*As set forth in Section VII.F.4.g(4)(b), transfers to GMAC CF of approximately $32 million in connection with the Servicing Advance Factoring Facility, to the extent they were made by RFC, are likely to satisfy the prima facie elements of the Minnesota Insider Preference statute. $1.5 million of that amount will not likely be subject to any new value defense. The balance may be subject to reduction to the extent that GMAC CF can establish that it provided new value in connection with the return of certain receivables.*

EXHIBIT I.F—2
**Estate Causes of Action the Examiner Concludes are Close Questions, but More Likely to Prevail**
*($ in Millions)*

| Description | Potential Damages[1] |
|---|---|
| Enforcement of First 2009 Tax Allocation Agreement | $ 1,770.0 |
| Unauthorized postpetition transfer in connection with indemnification obligations under the terms of the A&R Servicing Agreement | 12.9 |
| Total | $ 1,782.9 |

[1] *Potential damages amounts are approximate, represent the upper end of the range considered reasonably possible, and do not account for interest.*

EXHIBIT I.F—3

**Estate Causes of Action the Examiner Concludes are Close Questions, but More Likely Not to Prevail**
*($ in Millions)*

| Description | Potential Damages [1] |
|---|---:|
| Failure to pay the value of purchased MSRs and correspondent loan MSRs to GMAC Mortgage under the MSR Swap | $ 1,725.0 |
| Fraud in connection with 2006 Bank Restructuring | 608.0 |
| Constructive fraudulent transfer against Cerberus in connection with June 2008 Model Home Sale | 30.0 |
| Total | $ 2,363.0 |

*Claims with Duplicative Potential Damages Not Included in Total* [2]

| | |
|---|---:|
| Breach of 2005 Operating Agreement in connection with 2006 Bank Restructuring | $ 608.0 |
| Breach of fiduciary duty against ResCap's directors and officers in connection with: | |
| • Failure to execute the ResCap Board-approved First 2009 Tax Allocation Agreement | 1,770.0 |
| • 2006 Bank Restructuring | 608.0 |
| • Approval of Second 2009 Tax Allocation Agreement | 50.0 |
| • May 2012 payment under January 30 Letter Agreement and A&R Servicing Agreement | 48.4 |
| • Investigation and negotiations that led to AFI Settlement and Plan Sponsor Agreement and approval of RMBS Trust Settlement Agreements | Unknown |
| Aiding and abetting breach of fiduciary duty claims against AFI in connection with the 2006 Bank Restructuring | 608.0 |

*Bankruptcy Claims Not Involving Affirmative Recovery*

Equitable subordination of AFI's Claims totaling $1.127 billion

[1] *Potential damages amounts are approximate, represent the upper end of the range considered reasonably possible, and do not account for interest.*

[2] *Potential damages amounts are not included in the total because they are duplicative of potential damages associated with other claims.*

EXHIBIT I.F—4

**Estate Causes of Action the Examiner Concludes are Unlikely to Prevail**

| Description |
| --- |
| Aiding and abetting breach of fiduciary duty claims against AFI other than in connection with the 2006 Bank Restructuring |
| Breach of contract claims relating to the Pipeline Swap |
| Breach of the 2005 Operating Agreement or the 2006 Amended Operating Agreement in connection with the MMLPSA, Pipeline Swap, or MSR Swap |
| Constructive trust |
| Debt recharacterization |
| Equitable disallowance |
| Fraudulent transfer in connection with Ally Bank Transactions |
| Fraudulent transfer in connection with Prepetition Asset Sales other than June 2008 Model Home Sale |
| Miscellaneous breach of fiduciary duty claims against ResCap's directors and officers |
| Representation and warranty liability under the 2001 and 2006 MMLPSAs |
| Single entity theories of liability with respect to AFI and ResCap and/or its affiliates, including piercing the corporate veil and substantive consolidation |
| Tortious interference with contract in connection with 2006 Bank Restructuring |

## G. EXAMINER'S PRINCIPAL CONCLUSIONS REGARDING PROPOSED POSTPETITION TRANSACTIONS AND AGREEMENTS

### 1. *Negotiation And Entry Into AFI Settlement And Plan Sponsor Agreement*

The Examiner reviewed the process that resulted in the AFI Settlement and Plan Sponsor Agreement, including the activities of the ResCap Board in connection with that agreement.[40] Although the AFI Settlement and Plan Sponsor Agreement has been terminated, a review of the settlement process remains relevant. AFI has not withdrawn its offer to provide a $750 million cash contribution to the Debtors' Estates "if an acceptable settlement can be reached."[41] As described below, the Investigation identified a number of issues that raise significant doubts as to whether ResCap's process reaching the AFI Settlement and Plan Sponsor Agreement was adequate. While a

---

[40]   For the Examiner's full analysis of the negotiation and entry into the AFI Settlement and Plan Sponsor Agreement, see Section III.J.3.

[41]   Ally Financial Inc., Quarterly Report (Form 10-Q) (May 1, 2013), at 11.

close question, the Examiner concludes it is more likely than not that a court would have found that the now-terminated AFI Settlement and Plan Sponsor Agreement was the product of a defective or deficient process.

In November 2011, ResCap appointed two new independent directors, Jonathan Ilany and John Mack, to act as the Special Review Committee of the ResCap Board and implement a process and procedure for the review and assessment of Affiliate Transactions, the historical course of dealing between ResCap and AFI, and potential claims arising therefrom. Despite authorization to engage independent counsel at the expense of ResCap, Ilany and Mack relied on Morrison & Foerster to perform that review. Morrison & Foerster's decision that it could independently assess the financial and operational course of dealing between AFI and ResCap is questionable in light of the firm's significant involvement in that very course of dealing during the preceding years. Given Morrison & Foerster's history of advising the ResCap Board, the fact that neither Ilany nor Mack raised any concerns with respect to the potential conflicts of their advisors is itself cause for concern.

In addition, Morrison & Foerster's investigation was conducted within a relatively compressed period, and the scope of Morrison & Foerster's written materials to the ResCap Board was limited. Ilany and Mack were unprepared to conduct an effective negotiation. They had limited understanding of Third-Party Claims and therefore did not ascribe appropriate value to the requested Third-Party Release. Instead, Ilany and Mack sought to achieve a "headline number" of approximately $1 billion and, to get to that number, likely ascribed too much value to the non-cash contributions from AFI.

Ilany was the primary negotiator for ResCap with respect to the AFI Settlement and Plan Sponsor Agreement, although Mack was also involved in portions of the negotiations. In early May 2012, after ResCap and AFI had already apparently reached agreement on an $850 million cash contribution by AFI to settle claims against it, AFI inexplicably reduced its proposed contribution to $750 million. Mack testified that the draft settlement agreements exchanged between AFI and ResCap with an apparently agreed-upon $850 million contribution were merely attempts by ResCap to extract additional settlement value above $750 million. The documentary evidence does not support that recollection. The sudden reduction of AFI's settlement amount by $100 million, with no record of any real protest from ResCap's representatives, raises serious questions as to ResCap's settlement process. It would appear that, whether by miscommunication or lack of aggressive negotiation, ResCap left that value on the table.

The deficiencies in the process leading to the AFI Settlement and Plan Sponsor Agreement are perhaps mitigated by ResCap's understanding that AFI's cash contribution was not the most important aspect of the "elegant" bankruptcy ResCap was seeking. ResCap understood that it would have "another bite at the apple" with respect to the amount of AFI's cash contribution. Viewed in that light, with the benefit of hindsight, and considering the termination of the settlement by the Debtors and the ongoing settlement negotiations in the Chapter 11 Cases, the pre-negotiated amount of AFI's cash contribution may be of less importance.

### 2. Negotiation And Entry Into RMBS Trust Settlement Agreements And RMBS Plan Support Agreements

Consistent with the scope of the Investigation, the Examiner reviewed the process that resulted in the RMBS Trust Settlement Agreements and RMBS Plan Support Agreements, including the

activities of the ResCap Board in connection with such agreements, and whether such agreements were negotiated at arm's length.[42] As set forth in the Examiner Scope Approval Order, the Examiner is not opining on whether the $8.7 billion unsecured claim proposed to be allowed by the RMBS Trust Settlement Agreements falls within the range of reasonableness. In connection with the pending contested motion before the Bankruptcy Court to approve the RMBS Trust Settlement Agreements under Bankruptcy Rule 9019, the parties engaged numerous experts to perform loan re-underwriting analyses and to estimate potential cumulative lifetime loss ranges, among other things, to evaluate the proposed allowed claim amount. The Examiner did not seek to duplicate the work of the parties' experts.

The objectors to the RMBS Trust Settlement Agreements argue that the Bankruptcy Court should decline to approve the settlement because it was not the product of arm's-length bargaining. The principal theory underlying the objections is that AFI "dominated and controlled" the negotiations to obtain a Third-Party Release, essentially "trading" an "excessive" $8.7 billion allowed claim against ResCap for an "inadequate" $750 million plan contribution by AFI.[43]

The objectors focus on the involvement of Tim Devine, AFI's Chief Counsel of Litigation, arguing that he "dominated" the settlement negotiations. The objectors rightly point out that Devine played one of the central roles in the settlement negotiation process. However, the totality of the evidence suggests that Devine advocated consistently in negotiations for as low an allowed claim amount as achievable. AFI had good reasons to negotiate with that objective, including: (1) AFI would potentially be liable for all of the Debtors' debts if an Estate representative successfully pierced the corporate veil between AFI and the ResCap entities; (2) AFI had publicly disclosed on April 27, 2012 that "ResCap's reasonably possible losses over time related to the litigation matters and potential repurchase obligations . . . could be between $0 and $4 billion over existing accruals [of $811 million],"[44] and was concerned that agreeing to an allowed claim well in excess of that amount could create potential liability; and (3) AFI was under pressure from federal regulators to settle at a defect rate that would not put stress on other banks.

The Examiner concludes that AFI was motivated to and did advocate consistently throughout the negotiations for a lower claim amount and, ultimately, AFI's involvement in the negotiations helped drive down the proposed allowed claim amount. The Examiner concludes that the evidence supports the proposition that the process underlying the RMBS Trust Settlement Agreements and RMBS Plan Support Agreements satisfied the "arm's length bargaining" factor under Rule 9019.

---

[42] For the Examiner's full analysis of the negotiation and entry into the RMBS Trust Settlement Agreements and RMBS Plan Support Agreements, see Section III.J.4.

[43] *See* Objection of the Official Committee of Unsecured Creditors to the Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreements [Docket No. 2825] at 1, 20–21.

[44] *See* Ally Financial Inc., Quarterly Report (Form 10-Q) (Apr. 27, 2012), at 69, 73. As discussed in Section III.J.4.h(3), the Examiner believes that AFI's SEC disclosures for the first quarter of 2012 offer relatively little guidance in the Investigation as to whether the negotiations between AFI, ResCap, and the Steering Committee Group were at arm's length.

The objectors also argue that the ResCap Board "rubber-stamped" the RMBS Trust Settlement Agreements on May 9, 2012 after reviewing a "cursory" and "flawed" presentation.[45] The presentation showed that the proposed $8.7 billion allowed claim amount implied a 19.72% defect rate, and presented a comparison suggesting that if the "BofA Baseline—36%" defect rate had been applied to the approximately $44.1 billion estimated lifetime losses for ResCap's RMBS issuance, the allowed claim amount would have been approximately $15.9 billion.[46] But the 36% comparative defect rate was not "apples to apples" with the ResCap settlement defect rate. If the analogous defect rate—approximately 14.4%— had been applied, the comparative allowed claim amount would have been approximately $6.35 billion.

The presence of flawed comparative data points in the May 9, 2012 presentation does not, by itself, render the ResCap Board approval process inadequate. The May 9, 2012 presentation set forth in detail other information that the ResCap Board needed to make an informed decision to approve the RMBS Trust Settlement Agreements and the RMBS Plan Support Agreements. In addition, the ResCap Board had significant experience and familiarity with the issues underlying the settlements. The Examiner concludes that, while a close question, it is more likely than not that a court would find that the ResCap Board had a sufficient understanding of the underlying Trust R&W Claims to vote on an informed basis with respect to the RMBS Trust Settlement Agreements.

Importantly, when the ResCap Board voted to approve the RMBS Trust Settlement Agreements, it understood that a settlement with the RMBS Institutional Investors on the allowed amount of Trust R&W Claims was critical to achieving a successful sale of ResCap's mortgage loan origination and servicing platform. Accordingly, the Examiner concludes that the evidence supports the proposition that the ResCap Board had a rational business purpose in mind when it approved the RMBS Trust Settlement Agreements.

While the May 9, 2012 presentation to the ResCap Board was flawed, the Examiner does not believe that such flaws undermine the conclusion that the settlement negotiations between ResCap, AFI, and the Steering Committee Group were conducted at arm's length.

## H. EXAMINER'S PRINCIPAL CONCLUSIONS REGARDING THIRD-PARTY CLAIMS

The AFI Settlement and Plan Sponsor Agreement originally provided for, among other things, a broad Third-Party Release of AFI and its affiliates from any and all Causes of Action arising from or related in any way to the Debtors. The Examiner Scope Approval Order

---

[45]  *See* Objection of the Official Committee of Unsecured Creditors to the Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreements [Docket No. 2825] at 18; *see also* Objection of Financial Guaranty Insurance Company to the Debtors' Second Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Trust Settlement Agreements [Docket No. 2819] at 2, 15–16; Objection of Wilmington Trust, National Association to the Debtors' Second Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Trust Settlement Agreements [Docket No. 2814] at 2.

[46]  *See* ResCap Private Label Securities Rep & Warrant Settlement Discussion Supporting Information, dated May 9, 2012, at RC40020578 [RC40020575].

directed the Examiner to: (1) investigate the merits of the claims to be released pursuant to the Third-Party Release; (2) analyze the sufficiency of the consideration to be provided for the Third-Party Release; and (3) solicit the parties' views concerning the merits of such claims and the potential amount of damages arising therefrom (but not to quantify independently such damages). Following the expiration of the AFI Settlement and Plan Sponsor Agreement, the Examiner determined, after participating in a February 28, 2013 chambers conference with the Bankruptcy Court and representatives of the Debtors, the Creditors' Committee, and AFI, that an analysis of Third-Party Claims remained important to any potential future global settlement and plan of reorganization.[47]

The RMBS Claims represent the single largest source of potential liability against the AFI Defendants. The lawsuits related to the RMBS Claims are large-scale, complex litigations, some of which have been pending in state or federal courts for years. The claims are based upon various legal theories, including breach of contract, fraud, and violation of state and federal securities laws. These claims arise from the same general body of facts as the Trust R&W Claims that are the subject of the RMBS Trust Settlement Agreements, but differ with respect to the Causes of Action asserted and the parties asserting them.

Given the Examiner's original charge to determine the sufficiency of the consideration to be provided for the Third-Party Release, the Investigation focused on the extent to which the AFI Defendants might be held liable for the Debtors' RMBS-related conduct if the Debtors were ultimately found liable in the first instance. Accordingly, the Examiner's Professionals did not undertake certain activities necessary to resolve the Debtors' primary liability, such as loan-level diligence, re-underwriting of loan files, or calculation of breach rates, loss-share rates, or the securitization trusts' estimated lifetime losses. While these issues are contested and could significantly affect any ultimate findings of liability and/or damages, a full investigation into the Debtors' underlying liability and the corresponding defenses would have dwarfed the already broad scope of the Investigation. Accordingly, the Examiner's findings with respect to the RMBS Claims are not meant to represent a dispositive analysis of all outstanding issues. Rather, they represent a limited evaluation of the claims most likely to affect the value of any future global settlement with AFI. Unless otherwise noted, the Examiner has not reached any final conclusions with respect to the Third-Party Claims, all of which would require further factual development before final determinations of liability are made.

### 1. Third-Party Claims Against AFI

#### a. RMBS Claims

A variety of Third-Party Claimants either have asserted or may assert claims against AFI seeking to impose liability on it based upon RMBS Claims asserted against one or more of the Debtors and/or Ally Securities. Such claims against AFI are premised upon three principal theories of liability: (1) piercing the corporate veil of the Debtors to hold AFI liable

---

[47]  For the Examiner's full analysis of Third-Party Claims, see Section VIII.

for underlying claims asserted against those Debtors; (2) "control person" claims seeking to hold AFI liable under federal or state securities laws for alleged primary securities law violations by the Debtors and/or Ally Securities in connection with their sale of RMBS to investors; and (3) common law aiding and abetting claims to hold AFI liable for alleged fraud or fraudulent inducement by the Debtors and/or Ally Securities in connection with their sale of RMBS to investors or their procurement of financial guaranty insurance for RMBS. The Examiner reaches conclusions concerning certain factual and legal issues that, if Third-Party Claimants were to succeed in proving underlying claims against the Debtors or Ally Securities, would affect Third-Party Claimants' likelihood of recovery from AFI under one or more of those three theories.

First, the Examiner concludes it is unlikely that any pending or potential claims by Third-Party Claimants seeking to hold AFI liable on a veil-piercing or alter ego theory of liability for RMBS Claims asserted against the Debtors would prevail. For the reasons explained above, the Examiner concludes that a potential veil-piercing claim asserted on behalf of the Debtors to hold AFI liable for all of those Debtors' debts is unlikely to prevail. Veil-piercing claims asserted by Third-Party Claimants would be governed by Delaware law and would face many of the same legal and factual hurdles as a potential veil-piercing claim asserted on behalf of the Debtors. Moreover, any such veil-piercing claim seeking to hold AFI liable for RMBS Claims against the Debtors would also appear vulnerable to an argument that such claim constitutes property of the Estates and Third-Party Claimants would lack standing to pursue it.

Second, several "control person" claims asserted against AFI under federal or state securities laws have survived motions to dismiss. However, the totality of the evidence indicates that it would be difficult to prove the necessary degree of control during the relevant period, from 2004 to 2007. The Investigation has not uncovered evidence that AFI—notwithstanding the existence of overlapping officers and directors and certain shared corporate functions and services—had any direct involvement in any of the Debtors' securitizations. Accordingly, while a close question, the Examiner concludes it is more likely than not that a court would not find the requisite control by AFI over the alleged primary securities violators. Moreover, were Third-Party Claimants to succeed in proving a prima facie case for control person liability, certain of those securities claims appear subject to potential statute of limitations or other affirmative defenses.

Third, in general, Third-Party Claimants face higher pleading standards and burdens of proof with respect to common law aiding and abetting fraud claims asserted against AFI than with respect to many of the claims asserted under state and federal securities laws. Despite the need to plead with particularity to meet those standards, at least one claimant's aiding and abetting fraud claims have survived the pleading stage and proceeded to discovery. Although the existence of overlapping officers and directors and the audits AFI conducted of the Debtors' securitization process provide some support for these claims, Third-Party Claimants have not produced to the Examiner nor has the Investigation revealed any evidence to establish that AFI possessed actual knowledge of the fraud alleged by Third-Party Claimants. Moreover, the Investigation has revealed no evidence that supports the assertion that AFI provided substantial assistance to the conduct alleged to give rise to Third-Party Claimants'

fraud claims. The available evidence does not indicate that AFI had any direct involvement in any of the securitizations at issue that could be considered the proximate cause of the Debtors' alleged fraud. Evidence concerning the capital support that AFI provided to the Debtors and the corporate functions and services that became increasingly integrated with AFI over time is not likely to suffice. Not only is such general assistance to the Debtors' businesses unlikely to be deemed the proximate cause of the Debtors' alleged fraud, but much of that assistance came after the Debtors ceased private label securitizations in 2007. While a plaintiff who undertakes the factual review necessary to conclusively determine liability for RMBS-related conduct might be able to prove otherwise, the Investigation has revealed no evidence that supports the Third-Party Claimant's assertions that AFI should be held liable for the alleged fraud of its subsidiaries.

### b. Fraudulent Transfer Claim

The Investigation revealed two transfers made by Ally Securities to AFI, one in April 2012 for $200 million and the other in August 2012 for $25.5 million. Ally Securities characterized these transfers as "distributions of excess capital." Immediately after the April 2012 transfer, Ally Securities had approximately $49.5 million in equity, while facing several pending RMBS Actions asserting billions of dollars in potential liability. Any reasonable quantification of this liability as of the time of transfer would likely overwhelm Ally Securities' $49.5 million in equity, as well as the $16.3 million in equity at the time of the August transfer. Accordingly, the Examiner has concluded that Ally Securities was insolvent as of the date of each transfer. Given the nature of the distributions, which were dividends to Ally Securities' sole member, they were not made for reasonably equivalent value.

The Examiner also concludes that, while a close question, it is more likely than not that an actual fraudulent transfer claim would prevail with respect to the transfers. While there is no direct evidence of fraudulent intent, there are a number of badges of fraud present. The transfers were made: (1) for no consideration; (2) between a parent and its wholly owned subsidiary; (3) while Ally Securities was likely insolvent; and (4) under the threat of massive pending litigation. Additionally, the circumstances surrounding the transfers support an inference of fraud. Just prior to the transfers, AFI offered to include the equity of Ally Securities in a settlement with ResCap. ResCap refused this offer based on the belief that the equity of Ally Securities was worthless. Shortly after this offer was rejected, Ally Securities began transferring its "excess capital" to its parent and sole member, AFI. Thus, while Ally Securities has asserted that the transfers were made because it had ceased all mortgage-related underwriting and trading activities, it is more likely than not that a court would find that the strong inference of fraudulent intent outweighs this stated business purpose.

### 2. Third-Party Claims Against Ally Securities

Based on Ally Securities' activities as securities underwriter, Third-Party Claimants assert that Ally Securities is directly liable for false statements in the RMBS Offering Documents. These claimants allege that Ally Securities provided critical underwriting services in connection with the securitizations, including reviewing, marketing, and distributing the Debtors' false and misleading Offering Documents. Claimants have asserted several causes of

action against Ally Securities including claims based on: (1) federal and state securities law; (2) common law fraud and fraudulent inducement; (3) aiding and abetting fraud; and (4) negligent misrepresentation.

In their Submission Papers, the Debtors and AFI do not challenge the Third-Party Claimants' standing to bring the asserted securities law claims, nor do they challenge that Ally Securities participated in the RMBS offerings in a manner sufficient to give rise to potential liability under pertinent securities laws. Thus, two central elements to the Third-Party Claimants' securities law claims remain, both of which must be demonstrated by a preponderance of the evidence: (1) that the RMBS Offering Documents contained an untrue or misleading statement; and (2) that the statement was material. In most of the actions asserting securities law claims against Ally Securities (or the Debtors), courts have held that the Third-Party Claimants have adequately alleged material misrepresentations in the RMBS Offering Documents. Generally, Third-Party Claimants also have adequately alleged that, if proven to be untrue or misleading, these misrepresentations would be material. Accordingly, the success of these claims will ultimately hinge upon whether the Third-Party Claimants can effectively demonstrate that untrue statements were made. In an attempt to prove that the statements at issue were indeed untrue or misleading, Third-Party Claimants allege to have conducted loan-level diligence, review of loan files, and interviews of confidential witnesses, among other undertakings. As noted above, however, the scope of the Investigation did not require such a granular analysis. While, within those limitations, the Investigation has revealed no evidence that supports the Third-Party Claimant's assertions, it appears that the Third-Party Claimants' securities law claims may have at least some viability based upon the pleadings and the current trends in case law. In subsequent stages of litigation, however, Ally Securities will also be able to advance several affirmative defenses, including due diligence and loss causation defenses, which may prove difficult hurdles for claimants to overcome.

Like Third-Party Claimants' securities law claims, their claims for fraud and fraudulent inducement allege material misrepresentations in the RMBS Offering Documents. In support of their fraud claims, Third-Party Claimants assert that Ally Securities knew these alleged misrepresentations were false. Third-Party Claimants state that they justifiably relied upon these misrepresentations and were damaged as a result. As with the securities law claims discussed above, however, the Investigation has revealed no evidence that supports the Third-Party Claimant's assertions that Ally Securities knowingly made untrue or misleading material statements. The Examiner notes that fraud and fraudulent inducement claims will be more difficult to prove than many securities law claims, as fraud claims require showing Ally Securities' knowledge of the fraud, intent to defraud, and damages causation, among the other elements. While it is possible that a plaintiff could prove such elements, this would require additional factual development.

With respect to claims against Ally Securities for aiding and abetting fraud, Third-Party Claimants must first show that there was an underlying fraud and that Ally Securities knew of that fraud and provided substantial assistance to the Debtors in perpetrating that fraud. Generally, the Investigation has revealed evidence to support the Third-Party Claimants' assertions that Ally Securities was intrinsically involved in the securitization

process. Given Ally Securities' position as underwriter, it is probable that Ally Securities would have had knowledge of the Debtors' fraudulent conduct to the extent such fraud existed. And it could possibly be determined through additional discovery that Ally Securities substantially assisted in the alleged fraud in its marketing of the RMBS.

Finally, the negligent misrepresentation claims against Ally Securities turn upon whether Third-Party Claimants can demonstrate a special relationship of trust and confidence with the defendant. The Investigation did not include an examination of the individual relationships between Third-Party Claimants and Ally Securities. Based upon a review of the existing RMBS Actions, however, while some negligent misrepresentation claims against Ally Securities have survived motions to dismiss, these rulings only allow plaintiffs to proceed to discovery and are not necessarily indicative of potential future success. In most cases where the court conducted a more thorough analysis regarding the nature of the parties' relationship in an RMBS transaction, the court concluded that a special relationship did not exist.

### 3. *Third-Party Claims Against Ally Bank*

The Investigation has revealed no evidence to support the Third-Party Claimants' assertions that Ally Bank breached its custodial obligations to obtain, review, and certify mortgage notes. However, because the Examiner's Professionals did not conduct an audit of individual mortgage notes held by Ally Bank pursuant to the custodial agreements, this conclusion should not be considered dispositive of these Third-Party Claims. Further, the Investigation has revealed no evidence to support the Third-Party Claimants' assertions that Ally Bank breached its obligation to alert the trustees and monolines to breaches of representation and warranties related to the securitizations. Given that Ally Bank custodial associates only performed a limited review of mortgage notes held in Ally Bank's custody, not entire loan files, it is unlikely that this review would have alerted Ally Bank's custodial division to the broad breaches of representations and warranties alleged by Third-Party Claimants.

Third-Party Claimants solicited by the Examiner were unable to identify any evidence of Ally Bank having actual knowledge of ResCap's alleged fraud. This lack of evidence is not wholly determinative, however, given the limited discovery conducted by most of the Submitting Parties. Generally, the Investigation has revealed evidence to support the Third-Party Claimants' assertions that Ally Bank was profoundly knowledgeable as to ResCap's operations. This evidence includes overlap between Ally Bank and ResCap leadership, the existence of several inter-company committees designed to centralize product and risk management, and shared information systems. Similarly, the Investigation has revealed evidence to support the Third-Party Claimants' assertions that Ally Bank's financing activities would be considered a form of substantial assistance if ResCap is found to have engaged in the alleged fraud. This finding is primarily supported by the fact that Ally Bank was created to serve as a conduit for funding GMAC Mortgage's securitization activity, which the entities carried out through a series of atypical and non-arm's-length financing transactions. While Ally Bank represented only one of many sources of loan origination for GMAC Mortgage, it was a strategic and steady source nonetheless.

A final and important consideration with respect to the RMBS Claims against Ally Bank is that such claims may be limited by the Examiner's conclusion that, under Utah law, a court is unlikely to find that Ally Bank is the successor in liability to Old GMAC Bank. If a court were to agree with this conclusion, RMBS Claims against Ally Bank may be limited to only those securitizations that contain loans sold by Ally Bank after the 2006 Bank Restructuring.

### 4. Unsecured Noteholder Causes Of Action

#### a. Tortious Interference Under 2005 Indenture

In connection with the Unsecured Noteholder Causes of Action, the Examiner investigated whether AFI tortiously interfered with the 2005 Indenture as a result of ResCap's alleged breach of the "all or substantially all" covenant included in the 2005 Indenture (the covenant prohibits the borrower from transferring all or substantially all of its assets without the transferee assuming the borrower's obligations under the agreement). The Unsecured Noteholders assert that by the end of 2008, ResCap's only operating assets of value were its equity interest in IB Finance and certain intercompany receivables owed to it by its operating subsidiaries. ResCap also possessed equity interests in its operating subsidiaries, but the Unsecured Noteholders argue that such interests were worthless given that those subsidiaries were insolvent at the time. The Unsecured Noteholders contend that, by the end of 2009, ResCap breached the covenant when AFI induced ResCap, as part of a pre-arranged plan that effectively left ResCap with no material assets, to enter into: (1) the 2009 Bank Transaction; and (2) a series of intercompany debt forgiveness transactions.

Because none of the transactions by themselves would trigger the covenant, the Investigation first considered whether all of these transactions could be aggregated for purposes of determining whether ResCap transferred "substantially all" of its assets. If the transactions were entered into as part of a preexisting plan of liquidation, then under prevailing case law they may be properly aggregated. The Investigation, however, did not uncover evidence of any such plan. As a result, while a close question, the Examiner concludes it is more likely than not that a court would not find that all of the transactions should be aggregated for purposes of determining whether the "substantially all" provision in the 2005 Indenture was breached.

Notwithstanding that conclusion, the Examiner also considered whether the transactions, in the aggregate, constituted a transfer of "substantially all" of ResCap's assets. When conducting that analysis, courts apply both a quantitative and qualitative analysis. A quantitative analysis may look to, among other things, the percentage of operating assets and total assets transferred. A qualitative analysis, on the other hand, considers whether the transfer violated the intent of the lenders and whether the transfers rendered the issuer incapable of operating as a going concern. After considering the quantitative and qualitative factors of the transactions at issue as a totality, the Examiner concludes, while a close question, it is more likely than not that a court would not find there was a breach of the "all or substantially all" covenant of the 2005 Indenture.

Given the possibility, although somewhat unlikely, that a court could find a breach of the "substantially all" covenant of the 2005 Indenture, the Examiner considered whether AFI could be found to have tortiously interfered with the contract by intentionally procuring ResCap's breach of the 2005 Indenture without justification. The Investigation did not uncover any evidence that AFI intended the 2009 Bank Transaction and the intercompany debt forgiveness transactions to cause a breach of the 2005 Indenture. Even if intentional procurement of the breach were established, the Investigation revealed evidence that AFI acted to protect its own legal or financial stake in ResCap's business and would have a viable economic justification defense to a tortious interference with contract claim. Therefore, the Examiner concludes it is unlikely that the Unsecured Noteholders' claim against AFI for tortious interference with the 2005 Indenture would prevail.

### b. Claims Related To The 2006 Bank Restructuring

As described above, the Examiner concluded that AFI engaged in questionable conduct in connection with the 2006 Bank Restructuring, including with respect to the waiver by the ResCap Board of certain provisions of the 2005 Operating Agreement. Because the Unsecured Noteholders are intended third-party beneficiaries of the 2005 Operating Agreement, the Examiner considered the Unsecured Noteholders' potential claims against AFI arising from the 2006 Bank Restructuring.

The Unsecured Noteholders might assert a claim that the conduct of AFI's agents constituted a breach of the 2005 Operating Agreement, which is governed by New York law. However, it appears that such a claim would be time-barred under the six-year statute of limitations. The Examiner therefore concludes it is unlikely that a claim by the Unsecured Noteholders arising from the 2006 Bank Restructuring for breach of either the express terms of the 2005 Operating Agreement and/or the covenant of good faith and fair dealing implied thereunder would prevail.

The Examiner considered whether the facts surrounding the 2006 Bank Restructuring would give rise to a claim of fraud. While likely not time-barred, the Unsecured Noteholders would face challenges in establishing reliance on any alleged misrepresentations by agents of AFI. It is possible that such a claim could be premised upon New York's "third-party reliance" doctrine, but the law is unsettled. Weighing these considerations and all of the facts and circumstances, the Examiner concludes that, while it is a close question, it is more likely than not that the Unsecured Noteholders' fraud claim would not prevail.

### 5. Junior Secured Noteholder Causes Of Action

The Examiner concludes that the evidence does not support the allegations made by the Ad Hoc Group of Junior Secured Noteholders that either: (1) entering into the Line of Credit

Facilities; or (2) releasing the liens on certain assets securing the Secured Revolver Facility, the Junior Secured Notes, and the Senior Secured Notes, and having such assets secure the Line of Credit Facilities, violated the terms of the Secured Revolver Loan Agreement, the Junior Secured Notes Indenture, the Senior Secured Notes Indenture, or the Intercreditor Agreement.[48]

## I.  EXAMINER'S EVALUATION OF CONSIDERATION FOR RELEASES

To provide some guidance to parties in connection with any future settlement discussions, the Examiner has reviewed the terms of the now-terminated AFI Settlement and Plan Sponsor Agreement to determine whether the Debtor Release and Third-Party Release contemplated by that agreement would have been warranted based on AFI's financial and non-financial contributions to the Debtors contemplated by that proposed but now-terminated settlement.[49]

The AFI Settlement and Plan Sponsor Agreement proposed to settle all Estate Causes of Action and Third-Party Claims against the AFI Released Parties. AFI proposed a cash contribution of $750 million (plus other non-cash contributions to the Debtors) to achieve the settlement of Estate Causes of Action *and* Third-Party Claims.

The Examiner concludes it is unlikely that a court would have approved a settlement of the Estate Causes of Action against AFI in exchange for AFI's contribution of $750 million in cash (and other non-cash contributions), as contemplated by the now-terminated AFI Settlement and Plan Sponsor Agreement. Given the Examiner's conclusion that the proposed consideration under the AFI Settlement and Plan Sponsor Agreement would not have been adequate to support a release of the Estate Causes of Action against AFI, the Examiner further concludes that a court would a fortiori not have approved the Third-Party Release contemplated by that agreement.

Although a Plan embodying a nonconsensual Third-Party Release is not categorically prohibited in the Second Circuit (as it effectively is in certain others), by far the best course for AFI to seek to achieve a Third-Party Release is to negotiate a Plan that enjoys very broad creditor support. In the absence of such support, and given that the Debtors no longer have a substantial ongoing business to reorganize and operate, Second Circuit law would make it quite difficult but not impossible to confirm a nonconsensual Plan that deprives third parties of their right to pursue their own claims in court.

## J.  EXAMINER'S PRINCIPAL CONCLUSIONS REGARDING FINANCIAL CONDITION

The Examiner and his Professionals analyzed the financial condition of ResCap, RFC, and GMAC Mortgage over time using the three tests embodied in the law applicable to

---

[48]  For the Examiner's full analysis of the Junior Secured Notes and the Line of Credit Facilities and Secured Revolver Facility, see Section V.E.

[49]  For the Examiner's full analysis of consideration for proposed releases, see Section IX.

I-44

constructive fraudulent transfers: (1) whether the sum of the debtor's debts (including its contingent and/or unliquidated liabilities) is greater than all of the debtor's assets, at a fair valuation (the Balance Sheet Test); (2) whether the debtor was left with "unreasonably small capital" to carry on its business (the "inadequate capital" test); or (3) whether the debtor intended or believed—or reasonably should have believed—that it was or would become unable to pay its debts as they became due (the "inability to pay" test).[50]

The Examiner's conclusions regarding each of these three conditions of financial distress are summarized below.

### 1. Balance Sheet Test

The Examiner concludes that the evidence supports the proposition that ResCap was balance sheet solvent on May 4, 2005, the date that AFI announced the capitalization of ResCap, and was balance sheet insolvent from December 31, 2007 through the Petition Date. The Examiner's conclusions are based on the results of the Balance Sheet Test prepared by the Examiner's Financial Advisors and consideration of the contemporaneous facts and circumstances underlying the changes in ResCap's financial condition from 2005 through the Petition Date.

The Examiner's Financial Advisors estimated the Fair Market Value of ResCap using a Market Approach and an Asset-Based Approach under a going concern premise of value. The Examiner's Financial Advisors employed the Market Approach using the Guideline Publicly Traded Company Method to value ResCap's equity and the Observable Market Value Method to value ResCap's interest-bearing debt. These values were then combined to yield the Fair Market Value of ResCap's invested capital. Under the Market Approach, ResCap's total interest-bearing debt was subtracted from the Fair Market Value of ResCap's invested capital to determine the Fair Market Value surplus/(deficit). The Examiner's Financial Advisors also employed the Asset-Based Approach using the Adjusted Book Value Method to estimate the Fair Market Value of ResCap's assets. Under the Asset-Based Approach, ResCap's total liabilities were subtracted from the Fair Market Value of ResCap's total assets to determine the Fair Market Value surplus/(deficit). The Examiner's Financial Advisors performed the Balance Sheet Test on a quarterly basis from December 31, 2005 through December 31, 2011.

The results of the Balance Sheet Test indicate insolvency for ResCap from December 31, 2007 through the Petition Date.

### 2. Unreasonably Small Capital

The Examiner concludes that the evidence supports the proposition that ResCap was adequately capitalized on May 4, 2005, the date that AFI announced the capitalization of ResCap, and was left with unreasonably small capital from August 15, 2007 through the Petition Date. The Examiner's conclusions are based upon a detailed quantitative and qualitative analysis of ResCap's historical and projected financial and performance characteristics, focusing upon the evolution in ResCap's business model and capitalization needs in response to rapidly changing market conditions from 2005 through the Petition Date.

---

[50] For the Examiner's full analysis of ResCap's financial condition, see Section VI.

This analysis included an assessment of ResCap's profitability and performance, operating cash flows, liquidity, leverage, and debt capacity. Additionally, the Examiner considered all reasonable external and internal sources of funds available to ResCap, including its ability to access capital markets through debt or equity issuances, and ResCap's ability to monetize assets to fund imminent financial needs. The Examiner considered the viability of ResCap's business model over time, including the reasonableness of ResCap's financial projections, liquidity forecasts, and business plans. The Examiner also considered the capital support received by ResCap from AFI in the form of intercompany loans, cash equity infusions, contributions of ResCap bond debt in the form of equity, and other forms of related-party support including purchases of certain ResCap assets by affiliates. Furthermore, the Examiner considered events occurring within the mortgage industry and the economy.

### 3. Ability To Pay Debts As Due

The Investigation has not uncovered evidence that ResCap possessed a subjective intent to incur, or belief that it would incur, debts beyond its ability to pay as they became due. The Investigation also revealed no evidence that any officer or ResCap Board member possessed a subjective intent for ResCap to incur (or belief that ResCap would incur) debts beyond its ability to pay at the time from 2005 through the Petition Date.

However, with respect to the objective intent element, the Examiner concludes that the evidence supports the proposition that ResCap reasonably should have believed that it would incur debts beyond its ability to pay from August 15, 2007 through the Petition Date. The Examiner rests this conclusion on a detailed quantitative and qualitative analysis of ResCap's ability to service its debts from 2005 through the Petition Date, giving full consideration to resources reasonably available to ResCap (such as available liquidity, cash flows, committed credit lines, reasonable sources of capital, and monetization of non-core assets through sales) to meet its imminent financial needs and to repay or refinance its longer term obligations.

### 4. Financial Condition Tests As Applied To ResCap's Subsidiaries

The Examiner concludes that the evidence supports the proposition that RFC and GMAC Mortgage each was balance sheet solvent and adequately capitalized on May 4, 2005, the date that AFI announced the capitalization of ResCap. The Examiner concludes that the evidence supports the proposition that RFC and GMAC Mortgage each: (1) was balance sheet insolvent from December 31, 2007 through the Petition Date; (2) had unreasonably small capital (assets) from August 15, 2007 through the Petition Date; and (3) reasonably should have believed that it would incur debts beyond its ability to pay from August 15, 2007 through the Petition Date.

Based on an analysis of certain financial and factual information made available to the Examiner, the Examiner determined that the financial condition of RFC and GMAC Mortgage could be reasonably estimated from 2005 through the Petition Date through: (1) a detailed analysis of the financial condition and operating results of ResCap on a consolidated basis, recognizing ResCap had no significant operations separate and apart from its subsidiaries; (2) an assessment as to the relative size and operating performance of RFC and GMAC Mortgage, as reflected in ResCap's consolidated financial statements and subsidiary trial

balances; (3) an assessment of various intercompany receivables and/or payables, between and among ResCap, RFC, GMAC Mortgage, and their respective subsidiaries; (4) an evaluation of the nature and timing of certain intercompany account activity between and among ResCap, RFC, GMAC Mortgage, and their respective subsidiaries; (5) consideration of potential contingent and/or unliquidated liabilities, including those arising from certain RFC and GMAC Mortgage guarantee obligations; and (6) consideration of the effects of industry and economic conditions on RFC and GMAC Mortgage over the relevant time period.

## II. PROCEDURAL BACKGROUND

### A. COMMENCEMENT OF CHAPTER 11 CASES

On the Petition Date, the Debtors filed voluntary petitions under chapter 11 of the Bankruptcy Code with the Bankruptcy Court. Pursuant to Bankruptcy Rule 1015, the Chapter 11 Cases have been consolidated for procedural purposes. The Debtors have continued in possession of their respective properties and have continued to operate and maintain their businesses as debtors in possession pursuant to section 1107 of the Bankruptcy Code.

#### 1. The Official Committee Of Unsecured Creditors

On May 16, 2012, the U.S. Trustee appointed the Creditors' Committee pursuant to section 1102 of the Bankruptcy Code. The current members of the Creditors' Committee are: (1) Wilmington Trust; (2) Deutsche Bank Trust Company Americas; (3) The Bank of New York Mellon Trust Company, N.A.; (4) MBIA Insurance Corporation; (5) Rowena L. Drennen; (6) AIG Asset Management (U.S.), LLC; (7) U.S. Bank National Association; (8) Allstate Life Insurance Company; and (9) FGIC.

#### 2. The Committee's Rule 2004 Motion And Bankruptcy Court Order

On June 1, 2012, the Creditors' Committee filed the Committee Rule 2004 Motion. Pursuant to the Committee Rule 2004 Motion, the Creditors' Committee requested an order for production of documents and testimony by, among others, the Debtors pursuant to Rule 2004. No objections to the Committee Rule 2004 Motion were filed. On June 5, 2012, the Bankruptcy Court entered the Committee Rule 2004 Order.

#### 3. Examiner Motion, Order, And Appointment

On June 4, 2012, Berkshire Hathaway filed the Examiner Motion requesting the appointment of an examiner to investigate and report on the actions of the Debtors, including the Debtors' prepetition transactions with AFI, any claims that the Debtors may hold against their officers or directors, any claims that the Debtors may hold against AFI's officers and directors, and any claims that the Debtors propose to release as part of their plan. The Debtors and the Creditors' Committee opposed the Examiner Motion. The U.S. Trustee filed a response to the Examiner Motion, arguing that the appointment of an examiner was mandatory under section 1104(c)(2) of the Bankruptcy Code because the Debtors' unsecured debts, other than debts for goods, services, or taxes, or owing to an insider, exceeded $5 million.[1]

---

[1]  Section 1104(c)(2) of the Bankruptcy Code provides, in pertinent part, that:

> If the court does not order the appointment of a trustee under this section, then at any time before the confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of an examiner to conduct such an investigation of the debtor as is appropriate . . . if. . . (2) the debtor's fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes, or owing to an insider, exceed $5,000,000.

  11 U.S.C. § 1104(c)(2).

On June 20, 2012, the Bankruptcy Court issued the Examiner Memorandum Opinion, pursuant to which the Bankruptcy Court granted the Examiner Motion. On June 28, 2012, the Bankruptcy Court entered the Examiner Order directing the U.S. Trustee to appoint an examiner in the Chapter 11 Cases. In addition, the Examiner Order directed the examiner to conduct an investigation. The U.S. Trustee appointed Arthur J. Gonzalez as examiner on July 3, 2012. On that same date, the Bankruptcy Court entered the Examiner Approval Order, pursuant to which the Bankruptcy Court approved the appointment of Arthur J. Gonzalez as Examiner.

### 4. The Examiner's Retention Of Professionals

On July 11, 2012, the Examiner selected Chadbourne & Parke LLP as his counsel, subject to Bankruptcy Court approval. Thereafter, the Examiner selected Mesirow Financial Consulting, LLC as his financial advisor, subject to Bankruptcy Court approval. In addition, the Examiner selected Wolf Haldenstein Adler Freeman & Herz LLP as conflicts counsel due to certain potential conflicts of Chadbourne & Parke LLP. In mid-April 2013, the Examiner selected Leonard, Street & Deinard as special Minnesota counsel. The Bankruptcy Court approved: (1) the retention of Chadbourne & Parke LLP *nunc pro tunc* to July 11, 2012 by order dated August 9, 2012; (2) the retention of Mesirow Financial Consulting, LLC *nunc pro tunc* to July 24, 2012 by order dated August 29, 2012; (3) the retention of Wolf Haldenstein Adler Freeman & Herz LLP as conflicts counsel *nunc pro tunc* to October 15, 2012 by order dated December 27, 2012; and (4) the retention of Leonard, Street & Deinard as special Minnesota counsel *nunc pro tunc* to April 15, 2013 by order dated April 29, 2013.

### 5. Scope Of The Investigation And Examiner Work Plan

Pursuant to the Examiner Order, and in accordance with the Examiner Memorandum Opinion, the Examiner was directed to conduct an investigation, the scope and timing of which was to be determined by the Bankruptcy Court after the Examiner conferred with various parties in interest. In the Examiner Memorandum Opinion, the Bankruptcy Court noted that:

> [t]he scope, timing and budget for the examiner's investigation will be set by the Court after the examiner is appointed and confers with other parties in interest. In the first instance, the scope of the investigation established by the [Committee Rule] 2004 Order sets the appropriate scope parameter for the investigation, subject to later adjustment if necessary.[2]

Beginning on July 18, 2012, the Examiner conducted a series of meetings and telephonic calls with representatives of the Debtors, the Creditors' Committee, Berkshire Hathaway, AFI, and certain holders of the Debtors' Unsecured Notes. The principal purpose of these meetings was to learn more about the Chapter 11 Cases and to ascertain each party's preliminary views

---

[2]  Examiner's Memorandum Opinion, at 6 n.4.

regarding the scope and timing of the Investigation. The Examiner invited the parties to share their views on these matters, as well as on the legal and factual issues implicated by the Investigation.

On July 24, 2012, the Bankruptcy Court held a Chambers conference at which the Examiner and his counsel and counsel for various parties in interest presented their respective views regarding the scope of the Investigation and estimates of the time necessary to complete the Investigation and prepare a report. After the Chambers conference, the Examiner discussed the scope of Investigation and the terms of the Examiner Scope Approval Order with the various parties in interest. Thereafter, on July 27, 2012, the Bankruptcy Court entered the Examiner Scope Approval Order setting forth the following minimum scope of the Investigation:

> a. all material prepetition transactions and all material verbal or written agreements or contracts between or among the Debtors on the one hand and any one or more of Ally Financial Inc., f/k/a GMAC LLC, and any of its current and former, direct and indirect affiliates and subsidiaries (collectively, "AFI"), Cerberus Capital Management, L.P. and any of its current and former direct and indirect affiliates and subsidiaries including Cerberus FIM, LLC, Cerberus FIM Investors LLC, and FIM Holdings LLC (collectively, "Cerberus") and/or Ally Bank, a commercial state non-member bank chartered under the laws of the State of Utah (f/k/a GMAC Bank) ("Ally Bank") on the other hand including (i) material agreements concerning transfers of cash, assets, property, stock, contracts, or other items of value including any servicing agreements, repurchase transactions, exchange offers, hedging arrangements, derivative agreements or contracts, swap agreements or contracts, or foreign exchange agreements or contracts, (ii) any payments, dividends or capital contributions, (iii) any extension of loans or lines of credit including any factoring arrangements, (iv) any debt, or liens related thereto, or the transfer, assignment, repayment or forgiveness of such debt, (v) any claims and all payments made on account of such claims, and (vi) any transfers of cash, assets, property, stock, contracts, or other items of value (collectively, the "Prepetition Transactions and Agreements");[3]

---

[3] The Examiner's Investigation of certain of the Debtors' entry into and performance under the "Consent Order," "DOJ/AG Settlement" and "CMP," each as defined and described in paragraphs 86 through 90 of the of the "Affidavit of James Whitlinger, Chief Financial Officer of Residential Capital, LLC, in Support of Chapter 11 Petition and First Day Pleadings," dated May 14, 2012 will be limited to the propriety of the allocation of obligations as among the Debtors and AFI under the "Consent Order," "DOJ/AG Settlement" and "CMP." (footnote appears in original).

b.  the negotiation and entry into any plan sponsor, plan support, or settlement agreement, the debtor-in-possession financing with AFI, and the stalking horse asset purchase agreement with AFI, and any servicing agreement with Ally Bank (collectively, the "Postpetition Transactions and Agreements");

c.  (i) the activities of the Debtors' officers and board of directors (including any subcommittee thereof) concerning (A) the Prepetition Transactions and Agreements, (B) the Postpetition Transactions and Agreements, and (C) the investigation of the validity of claims against AFI, and (ii) the recruitment, compensation and indemnification of the Debtors' officers and the members of the Debtors' board of directors (including any subcommittee thereof);

d.  the corporate relationships between or among the Debtors, AFI, Cerberus and/or Ally Bank and the conduct of each of these entities in connection with the Debtors' decisions (i) to file (or to refrain from filing, or delaying the filing of) voluntary petitions under Chapter 11 of the United States Bankruptcy Code, (ii) to pursue (or refrain from pursuing) a sale of substantially all of their assets, and (iii) to enter into the Prepetition Transactions and Agreements and the Postpetition Transactions and Agreements;

e.  all state and federal law claims or causes of action of the Debtors against current or former directors and officers of the Debtors, and against AFI and/or its insiders including current and former directors, officers, and shareholders;

f.  all state and federal law claims or causes of action the Debtors propose to release or to be released as part of their plan including (i) preference and fraudulent transfer claims, (ii) equitable subordination claims, (iii) alter ego and veil piercing claims, (iv) debt recharacterization claims, (v) constructive trust and unjust enrichment claims, (vi) breach of fiduciary duty and aiding and abetting breach of fiduciary duty claims, (vii) securities law claims, and (viii) claims held by third parties, i.e., parties that are not affiliates of the Debtors, against current and former directors and officers of the Debtors and against AFI and its insiders including current and former directors, officers, and shareholders; and in respect of the claims identified in subclause (viii) of this paragraph [6], the Examiner will (A) investigate the merits of such claims, (B) analyze the sufficiency of the consideration to be provided for such third

   party releases, and (C) solicit the parties' views concerning the merits of such claims and the potential amount of damages arising from such claims, but the Examiner will not attempt to independently quantify such damages;

  g. the value of the releases contemplated by the Debtors including the releases by the Debtors' estates of all claims against current or former directors and officers of the Debtors, and against AFI and its insiders including current and former directors, officers, and shareholders, and the proposed releases by third parties of claims against AFI; and

  h. other matters affecting the Debtors' assets, liabilities, and financial condition including all intercompany claims and the Debtors' solvency, capital adequacy and ability to pay debts as such debts become due at various dates prior to the Petition Date.[4]

  Upon review of the Examiner's Preliminary Statement, the Bankruptcy Court entered the Examiner Scope Approval Order, pursuant to which the Bankruptcy Court (1) approved the scope of the Investigation as set forth in the Examiner's Preliminary Statement and (2) required the Examiner to file a formal work plan. On August 6, 2012, the Examiner filed the Examiner Work Plan. To address certain inquiries regarding the Examiner Work Plan, the Examiner filed the Examiner Work Plan Supplement on August 23, 2012. The Examiner filed the Examiner Work Plan Second Supplement and the Examiner Work Plan Third Supplement, both describing modifications to the time frame for the preparation of the Report, on November 26, 2012 and February 8, 2013, respectively. On April 5, 2013, the Examiner filed the Examiner Work Plan Fourth Supplement containing an updated estimate for the fees of the Examiner and his professionals.

## B. CONDUCT OF THE INVESTIGATION

### *1. Initial Stage Of The Investigation*

  After reviewing the pleadings, the Examiner and his professionals began the Investigation by conducting meetings with interested parties to learn the issues and the parties' substantive positions and contentions.[5] In addition, the Examiner entered into a provisional confidentiality agreement with the Debtors in order to obtain immediate access to documents they had already produced that were germane to the Investigation. Review of the documents began upon receipt.

---

[4] Examiner Scope Approval Order, Ex. A, at 3–5.

[5] Several parties, including AFI, Wilmington Trust, the Creditors' Committee, and the Debtors provided the Examiner and his professionals with written presentations and materials setting forth their respective positions and conclusions.

## 2. *Rule 2004 Motion And Request For Production Of Documents*

In order to facilitate the Examiner's ability to timely and efficiently complete a comprehensive investigation and fulfill his duties, the Examiner filed the Examiner Rule 2004 Motion pursuant to which the Examiner requested an order:

> (1) authorizing the Examiner to issue subpoenas for the production of documents and the examination of persons and entities determined by the Examiner to have information relevant to the Investigation;
>
> (2) establishing procedures governing responses to those subpoenas;
>
> (3) approving the establishment of the Document Depository, a central document depository, and procedures to govern its use; and
>
> (4) approving the Protective Order, a uniform order governing the Examiner's discovery.

Cerberus and AFI filed limited objections to the Examiner Rule 2004 Motion. The Debtors filed a statement with respect to the Examiner Rule 2004 Motion stating their support of the Examiner's request to establish the Document Depository and discovery protocol. The Examiner filed a reply to the objections.

On August 20, 2012, the Bankruptcy Court entered the Examiner Rule 2004 Order pursuant to which, among other things, the Examiner was authorized to issue subpoenas necessary to compel the production of documents and the testimony of witnesses in connection with the Investigation. Pursuant to the Examiner Rule 2004 Order, subpoenaed parties generally had ten days from the service of a subpoena to either (1) produce all responsive documents requested in the Examiner's subpoena, "as soon as is reasonably practicable," using "reasonable best efforts," or (2) file an objection or response to the subpoena with the Bankruptcy Court.[6] Subpoenaed witnesses were directed to submit to oral examination upon reasonable notice no more than fifteen days from the date of service of the deposition subpoena.

Pursuant to the Examiner Rule 2004 Order, the Examiner established and maintains the Document Depository. The Document Depository is an electronic, Internet-accessible resource that enables approved parties to download or otherwise obtain for review on the software platform(s) of their choosing discovery materials produced to the Examiner in the forms in which they were produced to the Examiner.

In addition, the Bankruptcy Court approved the terms of the Protective Order that governs the disclosure, discovery, production, and use of all discovery material provided to the Examiner in the Chapter 11 Cases, including the information placed into the Document

---

[6] Examiner Rule 2004 Order, at 2.

Depository. The Protective Order serves as a uniform order governing all parties with access to the Document Depository and protecting proprietary information from public disclosure and from usage outside of the Chapter 11 Cases. The Protective Order alleviated the burden on the Examiner of having to negotiate, enter into, and monitor numerous separate confidentiality arrangements with a multitude of parties.

3.  *Discovery Conducted In Furtherance Of The Investigation*

a.  *Document Requests And Subpoenas*

Discovery had already begun prior to the appointment of the Examiner. Specifically, on June 11 and 12, 2012, the Creditors' Committee had served Rule 2004 subpoenas on the Debtors, AFI, and Cerberus. The Debtors and AFI had served responses and objections to these subpoenas, and they had begun producing responsive documents.

After discussions with interested parties, the Examiner agreed that the Creditors' Committee's Rule 2004 subpoenas would serve as his initial discovery requests. Supplementing these initial requests, the Examiner propounded further formal written discovery requests to the Debtors on September 4 and 13, 2012, and to AFI on September 4, 13, and 28, 2012. In addition, commencing on August 28, 2012, the Examiner served Rule 2004 subpoenas on numerous other parties.

Parties began producing documents to the Examiner on a rolling basis in late July 2012 and continuing into April 2013. Given time constraints and practical limitations, where reasonably requested by the producing party, the Examiner's Professionals agreed to limit the documents to be produced, by, among other things, designating specific e-mail custodians whose e-mails would be produced. Notwithstanding the agreed-upon limitations, throughout the course of the Investigation, and as discussed below, the Debtors, AFI, and other parties responded to numerous follow-up document requests made by the Examiner's Professionals. For this reason, the Examiner is satisfied that the parties exercised reasonable efforts to respond to the document requests, and that he obtained the substantial production of potentially relevant documents.

A full listing of the formal document requests listed by producing party, date of subpoena or document request, approximate production date, and approximate volume, is set forth in the table below:

EXHIBIT II.B.3.a
**Document Requests and Subpoenas**

| Producing Party(ies) | Date of Subpoena(s) and/or Document Request(s) | Approximates Date(s) of Production | Approximate Volume (Number of Documents/Pages) |
|---|---|---|---|
| Debtors | Jun. 12, 2012; Sep. 4 and 13, 2012 | Jul. 2012–Apr. 2013 | 1,013,162 documents / 5,970,146 pages |
| AFI / Ally Bank | Jun. 11, 2012; Sep. 4, 13, and 28, 2012 | Aug. 2012–Apr. 2013 | 105,808 documents / 948,104 pages |
| Blackstone Group Holdings L.L.C.; Blackstone Group Holdings L.P.; Blackstone Group Limited Partner L.L.C.; Blackstone Group Management, L.P. (Advisor to AFI) | Dec. 6, 2012 | Feb. 1 and 25, 2013 | 656 documents / 3,485 pages |
| Cerberus | Jun. 15, 2012; Aug. 28, 2012 | Aug. 2012–Apr. 2013 | 61,330 documents / 768,560 pages |
| Citigroup Global Banking; Citigroup Global Markets, Inc.; Citigroup Private Equity; Citigroup, Inc. (Advisor to AFI) | Dec. 6, 2012 | Jan. 23, 2013; Feb. 6, 2013; Mar. 21, 2013 | 17,161 documents / 138,435 pages |
| Clayton (RMBS diligence vendor) | Dec. 20, 2012 | Jan. 22, 2013 | 69 documents / 2,942 pages |
| Deloitte & Touche, LLP; Deloitte LLP (ResCap's external auditor 2010 forward) | Feb. 28, 2013 | Mar. 14, 15, and 25, 2013; Apr. 10 and 11, 2013 | 4,843 documents / 39,541 pages |
| General Motors LLC | Oct. 19, 2012 | Nov. 14, 2012 | 112 documents / 842 pages |
| Goldin Associates (Advisor to ResCap) | Aug. 29, 2012 | Oct. 1 and 2, 2012; Nov. 14, 2012; Jan. 25, 2013 | 5,658 documents / 135,297 pages |
| Goldman Sachs (Advisor to ResCap and AFI) | Dec. 6, 2012 | Feb. 5, 11, 12, 14, 19, 25, and 28, 2013; Mar. 14 and 21, 2013 | 13,030 documents / 266,668 pages |
| Karin Hirtler-Garvey; John Ilany; John Mack; Edward Smith; Pam West (Former and current ResCap Independent Directors) | Nov. 29, 2012 | Apr. 3 and 9, 2013 | 39 documents / 323 pages |
| Houlihan Lokey (Advisor to ResCap) | Aug. 28, 2012 | Oct. 2 and 17, 2012; Dec. 18 and 24, 2012 | 4,324 documents / 25,523 pages |
| J.P. Morgan Chase Bank N.A..; J.P. Morgan Securities LLC, as successor to Bear Stearns (Advisor to AFI) | Dec. 6, 2012 | Feb. 1, 4, 12, 13, 22, and 26, 2013; Apr. 11, 2013 | 2,486 documents / 63,032 pages |
| Tom Jacob; Tom Melzer (Former ResCap Independent Directors) | Informal requests starting on Nov. 13, 2012 | Jan. 10 and 20, 2013 | 1,464 documents / 9,313 pages |
| Lazard Ltd. (Advisor to ResCap and AFI) | Sep. 12, 2012 | Oct. 19, 2012; Nov. 9 and 14, 2012; Dec. 20, 2012 | 3,041 documents / 10,492 pages |
| MBIA | Informal requests starting on November 9, 2012 | Jan. 17, and Apr. 1, 2013 | 1,668 documents / 49,382 pages |
| Morgan Stanley (Advisor to ResCap and AFI) | Dec. 6, 2012 | Feb. 19, 2013 | 6,490 documents / 26,980 pages |
| Oliver Wyman, Inc. (Advisor to ResCap) | Nov. 15, 2012 | Dec. 24, 2012; Jan. 9 and 15, 2013; Feb.1 and 26, 2013 | 14,671 documents / 142,513 pages |
| Pentalpha Capital Group LLC; Pentalpha Capital, LLC; Pentalpha Group, LLC (Advisor to Debtors) | Dec. 6, 2012 | Jan. 2 and 8, 2013; Feb. 1 and 25, 2013 | 7,216 documents / 197,010 pages |
| PricewaterhouseCoopers LLP (ResCap's external auditor through 2009) | Feb. 28, 2013 | Mar. 26, 2013; Apr. 5, 2013 | 1,455 documents / 12,612 pages |
| R.R. Donnelley and Sons Company (RMBS diligence vendor) | Dec. 20, 2012 | Jan. 10, 2013; Mar. 4, 2013 | 169 documents / 4,739 pages |
| Sandler O'Neill (Advisor to AFI) | Aug. 29, 2012 | Sep. 21, 2012; Oct. 15, 2012; Dec. 6, 2012 | 1,965 documents / 16,304 pages |
| UBS Securities LLC; UBS Investment Bank (Advisor to ResCap and AFI) | Sep. 21, 2012 | Nov. 1, 2012; Dec. 5, 2012 | 14,453 documents / 71,394 pages |
| Total | | | 1,281,939 documents / 8,939,346 pages |

### b. *Witness Interviews*

Beginning in early September 2012 and continuing through April 2013, the Examiner's Professionals conducted eighty-three witness interviews. Documents obtained in response to the subpoenas and discovery requests were shown to the witnesses to facilitate their testimony. The length of the interviews varied, ranging from several hours, to a full day. Some witnesses were asked to, and did, return for further questioning on a second and, in a few cases, third day, to explore topics not covered earlier or to explore a topic in greater detail, oftentimes based on documents produced after the initial interview day. The interviews were audio taped and transcripts were prepared by a court reporting service from the audiotapes. The transcripts were not shared with any party. The transcripts are considered by the Examiner to be his work product for purposes of conducting the Investigation.

With one exception, all of the witnesses voluntarily attended the interviews. (A subpoena was needed to compel the attendance of one individual, although, once served, the individual agreed to testify without the need for a formal deposition.) All witnesses were represented by counsel. Where the witness was a current or former officer of ResCap, typically, the witness was represented by counsel for ResCap (Morrison & Foerster and Carpenter Lipps). Where the witness was a current or former officer of AFI or Ally Bank, typically, the witness was represented by counsel for AFI (Kirkland & Ellis). In some cases, a witness was represented by more than one counsel, usually where the witness had dual or changing roles at ResCap, AFI, and Ally Bank. In a handful of cases, witnesses who were former officers of ResCap or AFI had counsel separate from ResCap's or AFI's counsel.

The interviews were not conducted on notice, as a formal deposition would be, nor were the procedures used typical of a formal deposition. No parties attended the interviews other than the Examiner's Professionals, the witness, the witness' counsel, and, in some instances, counsel for the party or parties for whom the witness had worked or was then working. One session of one witness interview was conducted under oath. All other witness interviews were unsworn proceedings.

Given time constraints and practical limitations, the Examiner's Professionals did not interview every potentially relevant witness. However, given the number of witnesses interviewed, the Examiner's ability to use documents produced in discovery in the interviews, and the follow-up interviews of several witnesses, the Examiner is satisfied that his professionals interviewed the vast majority of the potentially relevant witnesses, concerning the vast majority of relevant topics. A full listing of the interviews, by witness, affiliation, and date, is set forth in the table below:

---

EXHIBIT II.B.3.b
**Witness Interviews**

| | Witness | Affiliation | Date(s) of Interview |
|---|---|---|---|
| 1. | Steven Abreu | ResCap | Jan. 22, 2013 |
| 2. | David Applegate | ResCap | Dec. 7, 2012<br>Mar. 14, 2013 |
| 3. | Halle Benett | UBS, Advisor to ResCap | Mar. 7, 2013 |
| 4. | Barry Bier | ResCap | Feb. 22, 2013 |
| 5. | Kenneth Blackburn | ResCap | Mar. 26, 2013 |
| 6. | Christopher Blahut | ResCap | Mar. 13, 2013 |
| 7. | Sandy Blitzer | ResCap | Mar. 5, 2013 |
| 8. | Paul Bossidy | Cerberus, ResCap | Dec. 14, 2012 |
| 9. | David Bricker | ResCap | Mar. 15, 2013 |
| 10. | Jeff Cancelliere | ResCap | Jan. 29, 2013 |
| 11. | Michael Carpenter | AFI | Mar. 4, 2013 |
| 12. | William Casey | ResCap | Jan. 31, 2013 |
| 13. | Albert Celini | Ally Bank | Feb. 18, 2013 |
| 14. | Jon Centurino | AFI | Nov. 9, 2012 |
| 15. | Joe Cortese | Ally Bank | Mar. 7, 2013 |
| 16. | Alvero ("Al") de Molina | AFI | Nov. 20, 2012 |
| 17. | Keenan Dammen | ResCap | Apr. 25, 2013 |
| 18. | David J. DeBrunner | AFI | Sep. 13, 2012<br>Apr. 18, 2013 |
| 19. | Timothy Devine | AFI | Mar. 19, 2013 |
| 20. | Cathy Dondzila | ResCap | Sep. 27, 2012<br>Nov. 9, 2012 |
| 21. | Eric Feldstein | AFI | Dec. 14, 2012 |
| 22. | Ralph Flees | ResCap | Jan. 18, 2013 |
| 23. | Lisa Gerner | Ally Bank | Nov. 13, 2012 |
| 24. | Lisa Gess | ResCap, Ally Bank | Nov. 30, 2012 |
| 25. | James Giertz | ResCap | Jan. 25, 2013 |
| 26. | Adam Glassner | ResCap, AFI | Mar. 20, 2013 |
| 27. | John Gray | ResCap | Mar. 1, 2013 |
| 28. | Lisa Gray | Cerberus | Mar. 7, 2013 |
| 29. | Robert Groody | Ally Bank | Dec. 17, 2012 |
| 30. | Isaac Grossman | Counsel to Independent Directors | Apr. 16, 2013 |
| 31. | Mark Hales | Ally Bank | Nov. 28, 2012 |
| 32. | Bill Hall | AFI | Dec. 13, 2012 |
| 33. | Lara Hall | AFI | Nov. 29, 2012 |
| 34. | Tammy Hamzehpour | ResCap | Oct. 5, 2012 |
| 35. | Michael Hebling | Ally Bank | Apr. 16, 2013 |
| 36. | Karin Hirtler-Garvey | ResCap Independent Director, AFI | Dec. 20, 2012 |
| 37. | Robert Hull | AFI | Feb. 7, 2013 |
| 38. | Russell Hutchinson | Goldman Sachs, Advisor to ResCap | Mar. 27, 2013 |
| 39. | Jonathan Ilany | ResCap Independent Director | Nov. 28, 2012 |
| 40. | Thomas Jacob | ResCap Independent Director | Nov. 7, 2012<br>Apr. 17, 2013 |
| 41. | Jim Jones | ResCap | Nov. 30, 2012 |
| 42. | Sanjiv Khattri | AFI, ResCap | Oct. 25, 2012<br>Apr. 5, 2013 |
| 43. | Ronald Kravit | Cerberus, ResCap Director | Mar. 4, 2013 |
| 44. | Gary Lee | Counsel to ResCap | Feb. 20, 2013 |
| 45. | Jerry Lombardo | Cerberus, ResCap, AFI | Sep. 17, 2012<br>Mar. 18, 2013 |
| 46. | Lisa Lundsten | ResCap | Feb. 20, 2013 |
| 47. | John Mack | ResCap Independent Director | Dec. 5, 2012<br>Jan. 15, 2013 |

| 48. | Thomas Marano | Cerberus, ResCap, AFI | Nov. 26, 2012 |
| | | | Feb. 27, 2013 |
| 49. | David Marple | ResCap | Jan. 22, 2013 |
| 50. | William Marx | AFI | Apr. 18, 2013 |
| 51. | Humphrey McKenzie | AFI | Apr. 23, 2013 |
| 52. | Thomas Melzer | ResCap Independent Director | Oct. 10, 2012 |
| | | | Mar. 22, 2013 |
| 53. | William Muir | AFI | Mar. 1, 2013 |
| 54. | Mark Neporent | Cerberus, AFI Director | Feb. 6, 2013 |
| 55. | James Nouss | Counsel to ResCap Independent Directors | Mar. 18, 2013 |
| 56. | Davee Olson | ResCap | Apr. 26, 2013 |
| 57. | Bruce Paradis | ResCap | Dec. 14, 2012 |
| 58. | Scott Parker | Cerberus | Mar. 15, 2013 |
| 59. | Kathy Patrick | Counsel to Steering Committee Group | Mar. 18, 2013 |
| 60. | Joseph Pensabene | ResCap | Jan. 9, 2013 |
| 61. | Corey Pinkston | AFI | Nov. 8, 2012 |
| 62. | Timothy Pohl | Lazard, Advisor to ResCap | Feb. 26, 2013 |
| 63. | Seymour Preston, Jr. | Goldin Associates, Advisor to ResCap | Feb. 15, 2013 |
| 64. | Jonathan Pruzan | Morgan Stanley, Advisor to ResCap | Mar. 28, 2013 |
| 65. | Samuel Ramsey | AFI | Dec. 10, 2012 |
| 66. | James Redmond | ResCap | Nov. 13, 2012 |
| 67. | Michael Rossi | ResCap | Nov. 27, 2012 |
| 68. | Tazewell Rowe | AFI | Dec. 7, 2012 |
| 69. | Erica Schenk | Counsel to ResCap Independent Directors | Apr. 24, 2013 |
| 70. | Eric Scholtz | ResCap | Mar. 28, 2013 |
| 71. | Charles Senick | ResCap | Nov. 16, 2012 |
| 72. | Edward ("Ted") Smith | ResCap Independent Director | Nov. 30, 2012 |
| 73. | William Solomon | AFI | Mar. 19, 2013 |
| 74. | Julie Steinhagen | ResCap | Apr. 3, 2013 |
| 75. | James Tanenbaum | Counsel to ResCap | Mar. 29, 2013 |
| 76. | Lenard Tessler | Cerberus, AFI Director | Nov. 16, 2012 |
| | | | Feb. 28, 2013 |
| 77. | Linda Voss | AFI | Dec. 13, 2012 |
| 78. | David Walker | AFI | Nov. 28, 2012 |
| 79. | Joshua Weintraub | Cerberus, ResCap Director | Apr. 11, 2013 |
| 80. | Pam West | ResCap Independent Director | Dec. 18, 2012 |
| | | | Jan. 11, 2013 |
| | | | Apr. 16, 2013 |
| 81. | James Whitlinger | ResCap | Nov. 30, 2012 |
| | | | Feb. 27, 2013 |
| 82. | James Young | ResCap, AFI | Sept. 28, 2012 |
| | | | Oct. 10, 2012 |
| | | | Mar.15, 2013 |
| | | | Apr. 22, 2013 |
| 83. | Linda Zukauckas | AFI | Oct. 19, 2012 |

### c. *Additional Presentations By And Meetings With Interested Parties*

As noted above, at the start of the Investigation, the Examiner received initial written presentations from, among others, AFI, Wilmington Trust, the Creditors' Committee, and the Debtors. Some of these written presentations were the subject of formal in-person presentations at meetings with the Examiner's Professionals. Subsequently, as explained in more detail in Section VIII.A.2, the Examiner requested and received written submission papers and damages letters from Third-Party Claimants regarding the existence, nature, and damages of pending or potential Third-Party Claims.

Beginning in late January 2013, after the Examiner's Professionals had conducted a substantial portion of the Investigation, the Examiner received further written and in-person presentations from the Creditors' Committee, AFI, and Wilmington Trust. In some instances, parties provided follow-up to earlier presentations, at their own initiative or as requested by the Examiner's Professionals. In other instances, the Examiner's Professionals provided in advance of the meeting questions or topics to be addressed.

In addition to more formal presentations, the Examiner and his professionals held numerous meetings with interested parties throughout the course of the Investigation. In some instances, meetings were initiated by the parties, and in others, by the Examiner's Professionals. Some meetings were telephonic, some in person. With the exception of those meetings attended only by the Examiner's Financial Advisors, the Examiner attended all meetings, most in-person, some by telephone. In particular, the Examiner's Financial Advisors maintained an ongoing dialogue with the Debtors and their financial advisors to obtain and discuss specific accounting and financial information needed for analysis. In addition to several individual meetings, the Examiner's Financial Advisors spent approximately two weeks on site at the Debtors in April 2013 with management and ResCap's financial advisors to resolve any remaining information requests and discuss outstanding questions and issues.

A listing of presentations and meetings is set forth in the table below:

EXHIBIT II.B.3.c
**Presentations and Meetings**

| Presentation or Meeting Date | Interested Party(ies) | Presentation or Meeting Date | Interested Party(ies) |
|---|---|---|---|
| Jul. 18, 2012 | Berkshire Hathaway | Jan. 23, 2013 | Creditors' Committee |
| Jul. 19, 2012 | Creditors' Committee | Jan. 29, 2013 | AFI |
| Jul. 20, 2012 | Debtors, Morrison & Foerster | Feb. 7, 2013 | FTI, Carpenter Lipps |
| Jul. 20, 2012 | Wilmington Trust, Ad Hoc Group of Unsecured Creditors | Feb. 14, 2013 | FTI |
| Jul. 23, 2012 | AFI | Feb. 21, 2013 | FTI |
| Jul. 31, 2012 | Debtors | Feb. 25, 2013 | FTI |
| Aug. 2, 2012 | AFI | Feb. 25, 2013 | FTI, Carpenter Lipps |
| Aug. 22, 2012 | FTI (Debtors' Advisor) | Feb. 26, 2013 | AFI |
| Sep. 6, 2012 | Evercore (AFI's Advisor) | Feb. 27, 2013 | FTI |
| Sep. 6, 2012 | MBIA | Mar. 2, 2013 | Debtors, FTI |
| Sep. 7, 2012 | FTI | Mar. 3, 2013 | Debtors, FTI |
| Sep. 7, 2012 | Ad Hoc Group of Consenting Junior Secured Noteholders | Mar. 5, 2013 | Debtors, FTI |
| Sep. 11, 2012 | Centerview (Debtors' Advisor) | Mar. 8, 2013 | Debtors, FTI |
| Sep. 12, 2012 | Steering Committee Group | Mar. 8, 2013 | Creditors' Committee |
| Sep. 13, 2012 | Steering Committee Group | Mar. 13, 2013 | Debtors, FTI |
| Sep. 13, 2012 | Triaxx | Mar. 18–29, 2013 | Debtors, FTI |
| Sep. 24, 2012 | Creditors' Committee | Mar. 21, 2013 | AFI, Kirkland & Ellis |
| Sep. 28, 2012 | AIG, Prudential, and Allstate | Mar. 29, 2013 | Wilmington Trust |
| Oct. 2, 2012 | RMBS Trustees | Apr. 2, 2013 | Debtors, FTI |
| Oct. 11, 2012 | AFI, Kirkland & Ellis | Apr. 3, 2013 | Debtors, FTI |
| Oct. 15, 2012 | FTI | Apr. 8, 2013 | Debtors, FTI |
| Oct. 18, 2012 | Creditors' Committee | Apr. 8, 2013 | Alvarez & Marsal |
| Oct. 23, 2012 | AFI, Ally Bank, Kirkland & Ellis | Apr. 9, 2013 | Debtors, FTI |
| Nov. 2, 2012 | AFI | Apr. 10, 2013 | Debtors, FTI |
| Nov. 5, 2012 | Debtors, FTI | Apr. 11, 2013 | AFI |
| Nov. 13, 2012 | Wilmington Trust | Apr. 16, 2013 | Debtors, FTI, Morrison & Foerster |
| Dec. 4, 2012 | Debtors, FTI | Apr. 17, 2013 | PwC |
| Dec. 10, 2012 | AFI, Kirkland & Ellis | Apr. 18, 2013 | Deloitte |
| Dec. 11, 2012 | Debtors, FTI | Apr. 18, 2013 | Alvarez & Marsal |
| Dec. 21, 2012 | FTI | Apr. 19, 2013 | Debtors, FTI |
| Jan. 4, 2013 | Debtors, FTI | Apr. 29, 2013 | AFI |
| Jan. 14, 2013 | Debtors, FTI | Apr. 29, 2013 | Debtors, FTI, Morrison & Foerster |
| Jan. 18, 2013 | Centerview | Apr. 30, 2013 | AFI |

### d. *Informal Document Requests*

As noted above, throughout the course of the Investigation, the Debtors, AFI, and other parties responded to numerous follow-up document requests made by the Examiner's Professionals to supplement the documents produced in response to the Rule 2004 subpoenas and other formal written document requests. In large part, the follow-up requests sought specific documents or types of documents that fell within the scope of the Rule 2004 subpoenas and document requests. The follow-up requests were made by e-mail, sometimes after in-person or telephonic meetings. In some cases, the parties supplemented prior productions. In others, the Examiner was directed to documents the parties had already produced within their voluminous productions. This informal discovery process, which was only possible with the cooperation of the parties, was essential to the Investigation. And, as also noted above, it is because of this process that the Examiner is satisfied that he obtained the vast majority of potentially relevant documents.

## III. CHRONOLOGICAL PRESENTATION OF TRANSACTIONS AND EVENTS RELEVANT TO THE ISSUES INVESTIGATED BY THE EXAMINER

The ResCap story spans approximately eight years—beginning with the concept that AFI's mortgage operations might attract lower cost funding if ring-fenced from AFI and its parent GM, and ending, at least nominally, with the commencement of the Chapter 11 Cases. A lot happened in that time frame—at ResCap and AFI—and within the mortgage lending industry, the capital markets, and the global economy. The analysis of the various related-party transactions and course of dealing by and among ResCap, AFI, and Cerberus are at the center of the Investigation and this Report; that analysis is best understood in the context of the chronological narrative set forth in this Section.[1]

### A. GM'S DECLINING BUSINESS LEADS TO THE FORMATION OF RESCAP AND, ULTIMATELY, TO GM'S SALE OF A MAJORITY INTEREST IN AFI/RESCAP TO CERBERUS

#### 1. Background

##### a. General Motors Corporation

ResCap's saga begins with GM, the automobile manufacturer founded in 1908 as a holding company for Buick Motor Company.[2] By 1916, GM had been incorporated in Delaware[3] and included Chevrolet, Pontiac, GMC, Oldsmobile and Cadillac.[4] Over the course of almost 100 years, GM grew into a multi-national conglomerate of over 450 direct and indirect subsidiaries operating in two business segments: (1) automotive and other operations, which engaged in the worldwide development, production and marketing of cars, trucks, and parts, with operations in almost every country;[5] and (2) financing and insurance operations, which, as discussed below, operated primarily through AFI.

Based on overall market capitalization, GM was the largest U.S. corporation from 1985 to 1999. But GM's fortunes dimmed thereafter. GM's market capitalization of $66 billion in May 2000 had eroded to approximately $25 billion by May 2004 amid a shrinking share of the automotive market and diminishing income. In 2004, GM's automotive segment generated a net loss of $89 million while its financing and insurance segment reported record net income of $2.9 billion.[6]

---

[1]  A timeline of significant events is set forth in Appendix III.

[2]  Aff. of F. A. Henderson Pursuant to Local Bankruptcy Rule 1007-2, *In re General Motors Corp.*, Case No. 09-50026, Docket No. 21, at 5.

[3]  General Motors Corp., Annual Report (Form 10-K) (Mar.16, 2005), at I-1.

[4]  Aff. of F. A. Henderson Pursuant to Local Bankruptcy Rule 1007-2, *In re General Motors Corp.*, Case No. 09-50026, Docket No. 21, at 5.

[5]  *Id.*

[6]  *See* General Motors Corp., Annual Report (Form 10-K) (Mar. 16, 2005), at II-5.

b. *AFI*

AFI was founded in 1919 as a wholly owned subsidiary of GM.[7] AFI was originally established to provide GM dealers with the automotive financing necessary for the dealers to acquire and maintain vehicle inventories and to provide retail customers the means by which to finance vehicle purchases through GM dealers.[8] Well before 2004, AFI's business had expanded to include insurance, online banking, mortgage operations, and commercial finance. AFI's entry into the mortgage industry dates back to 1985 when AFI formed GMAC Mortgage after it acquired the mortgage loan operations of the Colonial Mortgage Service companies and the servicing arm of the former Norwest Mortgage, Inc. In 1990, AFI acquired RFC.[9] In subsequent years, AFI acquired additional mortgage-related operations, including ditech.com.[10]

At the time of ResCap's incorporation in 2004, AFI's mortgage operations consisted of three separate operating and reporting segments: GMAC Residential Holding Corp. (GMAC Residential); GMAC-RFC Holding Corp. (GMAC-RFC); and GMAC Commercial Holding Corp. (GMAC Commercial Mortgage). The principal activities of the three segments included the origination, purchase, servicing, sale and securitization of residential and commercial mortgage loans and other real estate services. Each of these business segments is described in greater detail later in this report.[11]

---

[7]  General Motors Acceptance Corp., Annual Report (Form 10-K) (Mar. 28, 2006), at 18.

[8]  General Motors Acceptance Corp., Annual Report (Form 10-K) (Mar. 28, 2006), at 18.

[9]  *See* Residential Capital Corp., Registration Statement (Form S-4) (July 15, 2005), at 65.

[10]  In 2001, AFI (1) formed Old GMAC Bank, a federally chartered savings bank, and (2) acquired its healthcare finance business. *See* Section V.A.1 (discussing Old GMAC Bank). In 2002, AFI established its resort financing business. AFI entered the U.K. and Mexican residential mortgage loan markets in 1998. It also entered the residential real estate finance markets in The Netherlands in 2001 and in Canada and Germany in 2002. *See* Residential Capital Corp., Registration Statement (Form S-4) (July 15, 2005), at 65.

[11]  *See* Section III.C (discussing ResCap's post-formation funding, management, and business profile).

2. *GM's Declining Fortunes Led To Credit Rating Downgrades That Adversely Affected AFI's Access To Competitively Priced Funding*

In the several years before ResCap's incorporation, continued automotive pricing pressure, and increasing pension and post-retirement benefit expenses caused GM's net income to decline.[12] Lower levels of profitability led to a series of credit rating downgrades for GM[13] and AFI[14] that, while initially of only mild concern, became the impetus for the formation of ResCap[15] and, ultimately, for GM's sale of a controlling interest in AFI to a consortium of investors led by Cerberus.[16]

*a. Low-Cost Funding Is Critical To Mortgage Finance Operations*

The mortgage origination and securitization business is a low-margin, high-volume operation with each broker, originator, and servicer taking a small fee for their service as each

---

[12]  *See* General Motors Corp., Annual Report (Form 10-K) (Mar. 13, 2003), at II-8–9.

[13]  Commenting on the Rating Agencies' downgrades in late 2001 and 2002, GM noted:

> Downgrades to GM's and [AFI's] credit ratings in October 2002 have reduced GM's long-term credit rating by Standard & Poor's to BBB and A3 by Moody's ([AFI] is rated A2 by Moody's). Despite these downgrades GM's and [AFI's] access to the commercial paper and unsecured debt markets remains sufficient to meet the Corporation's capital needs. Moreover, the downgrades have not had a significant adverse effect on GM's and [AFI's] ability to obtain bank credit or to sell asset-backed securities. Accordingly, GM and [AFI's] expect that they will continue to have adequate access to the capital markets sufficient to meet the Corporation's needs for financial flexibility.

> *Id.* at II-8.

[14]  AFI noted the importance of credit ratings to the cost of funding in its 2002 Annual Report:

> The cost and availability of unsecured financing is influenced by credit ratings, which are intended to be an indicator of the creditworthiness of a particular company, security, or obligation. Lower ratings generally result in higher borrowing costs as well as reduced access to capital markets. This is particularly true with respect to the Company's commercial paper ratings as certain institutional investors (money market funds in particular) are limited to investing only in securities carrying the two highest rating categories for short-term debt.

> *Id.* at 29.

[15]  ResCap was initially formed because GM was having issues with declining credit ratings and AFI, as a wholly owned subsidiary of GM, was linked to GM. *See* Int. of J. Young, Sept. 28, 2012, at 9:2–10:3; *see also* Int. of T. Melzer, Oct. 10, 2012, at 42:6–11.

[16]  *See* Section III.E (discussing GM's sale of a 51% interest in AFI to Cerberus). Cerberus is a private equity firm founded in 1992 and headquartered in New York, New York. Cerberus specializes in investing in undervalued companies and distressed debt and pursues control and non-control private equity investment strategies in a variety of industries, including manufacturing, industrial, automotive, health care, financial services, and business services. Cerberus also focuses on investment strategies in commercial lending through Cerberus Business Finance, LLC and Ableco Finance LLC, and real estate, through Cerberus Real Estate Capital Management, LLC. THE FIRM, CERBERUS CAPITAL MANAGEMENT, L.P., www.cerberuscapital.com/ thefirm (see links for more information on the four primary business strategies). Cerberus generally refers to its controlled investments as "portfolio companies" and referred to ResCap as a Cerberus portfolio company. Cerberus Capital Management, L.P., U.S. Mortgage Market Distressed Opportunity, Preliminary Draft, at 25, 28 [CCM00525455].

loan is processed. The basic business model is to borrow at low short-term rates of interest and lend at higher long-term rates of interest.[17] The originator/securitizor will hold the loans for a short period of time as they aggregate similar loans to be sold or securitized.[18] During this holding (or aggregation) period,[19] it is important that the originator/securitizor receive more interest from its borrowers than it is paying to its lenders. Because the spread between short- and long-term rates is typically quite small, an originator/securitizor seeks to hold loans for a very short time, and make up for the low margin by processing large volumes. To finance the business model, originators/securitizors use many different funding sources, including the gains on sales of loans or securitization proceeds, secured aggregation facilities, asset-backed commercial paper, repurchase agreements, bank credit facilities, note or bond issuances and, in the case of banks and their affiliates, customer deposits, borrowings from the FRB, and advances from the FHLB.[20]

### b. GM's Credit Rating Downgrades

Downgrades to GM's and AFI's credit ratings in October 2002 reduced GM's long-term credit rating by S&P's to BBB and by Moody's to A3 (AFI was rated A2).[21] GM reported that, notwithstanding these downgrades, GM's and AFI's access to the commercial paper and

---

[17] *See* Int. of E. Feldstein, Dec. 14, 2012, at 14:13–16 ("And [AFI] was a large-scale borrower. The business was to borrow at one rate, lend at a slightly higher rate, and make something on the spread.").

[18] *See* Residential Capital Corp., General Form (Form 10) (July 15, 2005), at 12.

> The length of time from the origination or purchase of a mortgage loan to its sale or securitization generally ranges from 10 to 100 days, depending on a variety of factors including loan volume by product type, interest rates and other capital market conditions. During 2004, we typically sold loans within 20 to 60 days of purchase or origination. We generally sell or securitize mortgage loans in the secondary market when we have accumulated a sufficient volume of mortgage loans with similar characteristics, usually $150 million to $1.5 billion in principal amount.

*Id.*

[19] The "aggregation period" is the time period between the acquisition or origination of a loan and its subsequent sale or securitization. *Id.*

[20] S*ee* Residential Capital Corp., Registration Statement (Form S-4) (July 15, 2005), at 51–55. Likewise, the servicing business is also a low-margin, high-volume operation requiring a large infrastructure of personnel and information systems to process transactions. A servicing platform typically includes loan accounting, claims administration, oversight of primary servicers, loss mitigation, bond administration, cash-flow waterfall calculations, investor reporting, and tax reporting compliance. In return, a primary or master servicer is typically entitled to receive a fee equal to a specified percentage of the outstanding principal balance of the loans being serviced, as well as other compensation, including late payment fees and prepayment penalties. The servicer typically also receives interest income on the "float," or the number of days cash payments from borrowers are held prior to being distributed to securitization investors. *Id.* at 71–72.

[21] *See* General Motors Corp., Annual Report (Form 10-K) (Mar. 13, 2003), at II-8; General Motors Acceptance Corp., Current Report (Form 8-K) (Oct. 17, 2002).

unsecured debt markets remained sufficient to meet their capital needs.[22] GM further reported that these downgrades did not have a significant adverse effect on GM's and AFI's ability to obtain bank credit or to sell asset-backed securities.[23]

Rating pressure continued mid-year in 2003 when on June 13, 2003, Moody's lowered GM's long-term rating to Baa1 from A3; AFI's to A3 from A2, with a rating outlook of negative; and AFI's short-term rating to Prime-2 from Prime-1.[24] By year end 2004, GM acknowledged that additional rating downgrades would be problematic for GM and AFI:

> A further decline in the long-term ratings assigned by any one of the agencies to non-investment grade could temporarily limit GM's and [AFI]'s access to the unsecured debt markets and could severely limit GM's and [AFI']'s ability to access the retail debt market for a period of time. Additionally, GM may not be assured reliable future access to the unsecured debt markets subsequent to being assigned a non-investment grade rating by one or more agencies.[25]

AFI's credit ratings were linked to those of GM because the Rating Agencies believed that AFI's fortunes were inextricably tied to those of GM. As such, GM's declining ratings were of increasing concern to AFI's senior management. Eric Feldstein, AFI's Chairman and CEO, had several discussions with the rating agencies concerning ways to delink AFI's credit rating from that of GM. The goal was to get AFI "a credit rating that was not inextricably linked to that of GM," which was at that time "under pressure due to operating challenges."[26] Although Feldstein characterized those discussions as "constructive,"[27] and focused on how governance, outside directors, dividend limitations, and operating agreements might promote delinkage,[28] the efforts to delink AFI from GM were not successful.[29] The Rating Agencies told Feldstein that AFI's business was too highly correlated with GM: "the predominantly auto finance business was highly correlated to the auto business."[30]

Although Feldstein was not able to convince the Rating Agencies to untether AFI's credit rating from GM's, Feldstein nevertheless thought he had a "better argument" that AFI's mortgage business was "not necessarily correlated to that of the auto business or the auto

---

[22] *See* General Motors Corp., Annual Report (Form 10-K) (Mar. 13, 2003), at II-8.

[23] *See id.*

[24] *See* General Motors Corp., Annual Report (Form 10-K) (Mar. 11, 2004), at II-10.

[25] *See* General Motors Corp., Annual Report (Form 10-K) (Mar. 16, 2005), at II-12.

[26] Int. of E. Feldstein, Dec. 14, 2012, at 31:10–14.

[27] *Id.* at 31:19–23.

[28] *Id.*

[29] *Id.* at 31:24–32:5.

[30] *Id.*

finance business.[31] Feldstein thought that governance and dividend limitations and operating agreements, coupled with a business that was not correlated with GM's automotive business might be able to free AFI's mortgage business from the drag of GM's relatively poor credit ratings.[32]

With the help of several senior managers of AFI and AFI's mortgage operations, Feldstein worked to "structure [an] entity such that it could command a rating that might be higher than that of [AFI], by virtue of governance, dividend limitations and certain elements [of] an operating agreement."[33] Although there could be no assurance, the thought was a higher credit rating for the mortgage operations might lead to a lower cost of funds.[34]

## B. RESCAP WAS FORMED TO ISOLATE AFI'S RESIDENTIAL MORTGAGE OPERATIONS FROM THE FINANCIAL INSTABILITY OF ITS PARENT, GM

ResCap was incorporated in 2004 to combine AFI's two separate, fast-growing residential mortgage entities with the intention of de-linking the credit ratings of those businesses from AFI and, ultimately, GM by creating "some separation between GM and [AFI], on the one hand, and [ResCap], on the other."[35] It was critical to accomplish this quickly, because GM was facing challenges to its business on many fronts.

### 1. August 2004 Incorporation

ResCap was incorporated in Delaware as "Residential Capital Corporation" in August of 2004.[36] At its formation, ResCap was a wholly owned subsidiary of GMAC Mortgage Group, Inc., which was a wholly owned subsidiary of AFI.[37] AFI was then wholly owned by GM.[38]

---

[31] *Id.* at 32:11–14.

[32] *Id.* at 32:15–20. On this topic, David Walker, the CFO of GMAC Mortgage Group at the time of ResCap's formation, said the following:

> So we said, why don't we put residential and RFC together, put a firewall around them so that they can access the market perhaps at a different rating from either [AFI] or certainly from GM, and allow them to continue to grow while maintaining 100 percent economic benefit. Because we saw an upside in the business.

Int. of D. Walker, Nov, 28, 2012, at 15:24–16:5, 16:14–21.

[33] Int. of E. Feldstein, Dec. 14, 2012, at 29:12–18.

[34] *Id.* at 30:17–21.

[35] *See* Residential Capital Corp., General Form (Form 10) (July 15, 2005), at 46.

[36] *Id.* at 3.

[37] *Id.*

[38] *Id.* James Young, ResCap's Chief Accounting Officer and Controller, described the formation of ResCap as a "structured separation" of ResCap from AFI. Int. of J. Young, Sept. 28, 2012, at 14:21–25.

*2. The ResCap By-Laws*

The ResCap By-Laws called for ResCap's business to be managed by a board of directors consisting of at least one director. The ResCap By-Laws did not impose any limit on the number of directors and did not require the appointment of Independent Directors.[39] The By-Laws required that the chairman and president of the company serve on the ResCap Board. While ResCap's president had the power under the By-Laws to suspend any officer, no ResCap officer or director could be terminated without ResCap Board approval.[40]

---

[39] While ResCap's By-Laws do not require the appointment of Independent Directors, the 2005 Operating Agreement did contain such a requirement. *See* Section III.B.3.f (discussing the Independent Director provisions of the 2005 Operating Agreement).

[40] The ResCap By-Laws were superseded by the 2006 ResCap LLC Agreement that was executed in furtherance of ResCap's conversion from a corporation to a limited liability company. *See* Section III.E.5 (discussing ResCap's conversion from a corporation to a limited liability company); Section III.E.6 (discussing the 2006 ResCap LLC Agreement).

### 3. The 2005 Operating Agreement

ResCap, GM, and AFI entered into the 2005 Operating Agreement on June 24, 2005.[41] The 2005 Operating Agreement was structured in consultation with the Rating Agencies[42] and was designed to isolate ResCap's residential mortgage operations from AFI's automotive

---

[41] *See* 2005 Operating Agreement [ALLY_0140795]. On June 24, 2005, GM, AFI, and ResCap also entered into a Services and Facilities Agreement, under which the parties agreed to certain services being provided at cost. The services listed on the accompanying schedule were: (1) legal, regulatory, and corporate secretary services; (2) employee benefits administration; (3) tax services; (4) real estate services, including office facilities and related support services; (5) strategic sourcing; (6) government relations; (7) accounting and internal audit services; and (8) risk management, including insurance. The Agreement is silent as to who shall provide what service to whom. *See* Services and Facilities Agreement, dated June 24, 2005 [RC00028306]; Schedule to Services and Facilities Agreement, dated June 24, 2005 [RC00028311].

[42] In his interview, Walker stated:

> [B]ut we presented them the idea of ResCap. "Here's what we would like to do to get a different rating than [AFI]." "Okay, and you're going to need to do certain things." "Fine. We'll go back and work on that." One of them was an operating agreement, so we put together an operating agreement that encompassed what we thought the rating agencies, and in working with our bankers that we're going to be selling debt, what did they think investors were going to be looking for in terms of an operating agreement. What types of clauses would be necessary?

> We drafted a document. We had, obviously, ResCap folks look at it. We had [AFI] folks look at it. And, ultimately, obviously, the rating agencies required to see it in order to rate the bonds of ResCap and give them a rating. And obviously, you need to get the rating and then tell the investors, "These bonds are going to be rated X by the agencies. Now, would you like to buy them?" So, that was all sort of part of the process that took [a] period of time to get to the conclusion.

Int. of D. Walker, Nov. 28, 2012, at 21:1–24. In addition, ResCap, primarily through investment bankers, discussed the 2005 Operating Agreement with large institutional investors. *See id.* at 22:7–21 (stating that ResCap had discussions with market participants and that "we don't actually spend a lot of time directly with the investors" and "most of it was done by [investment bankers] saying, 'The market's telling us THIS. You will need THAT.'").

> In his interview, David Applegate, a former co-CEO of ResCap, stated:

> The need for an operating agreement. I became aware of in the formation process. Obviously, the rating agencies were a big driver of that. And that was part of the foundation of the separation of the organizations.

Int. of D. Applegate, Dec. 7, 2012, at 89:6–11; *see also* Int. of T. Melzer, Oct. 10, 2012, at 36:5–9.

finance and insurance business and from GM's automotive manufacturing operations.[43] According to Bruce Paradis, a former co-CEO of ResCap, "the finance businesses that were unaffiliated with the automobile business could likely raise capital more cheaply, at a lower price than our parent."[44] Thus, the 2005 Operating Agreement was intended to erect a "firewall" between GM and AFI, and ResCap.[45] The 2005 Operating Agreement, according to Young, was critical to ResCap's ability to issue debt rated separately from AFI.[46]

AFI publicly stated that the purpose of the 2005 Operating Agreement was to "create separation between GM and [AFI], on the one hand, and ResCap, on the other," by restricting "ResCap's ability to declare dividends or prepay subordinated indebtedness" to AFI.[47] As a result, ResCap was able to obtain "investment grade credit ratings for its unsecured

---

[43]  In her interview, Tammy Hamzehpour, Associate Counsel for RFC at the time of ResCap's formation, stated:

> So what kinds of separation would you have to have to convince a rating agency that you weren't going to be sucked into that downward spiral of the auto company? So that's why ResCap was created. We have an operating agreement, which I'm sure you've seen, with [AFI] and GM used to be a party to it when they [owned 100% of AFI]. That operating agreement was referred to as the firewall which set up the mechanisms by which we would maintain separateness with this company.

Int. of T. Hamzehpour, Oct. 5, 2012, at 128:6–16.

In his interview, Sanjiv Khattri, Executive Vice President and CFO of AFI at the time of ResCap's formation, observed:

> So, the [Independent Director] ring-fencing, firewall, operating agreement were all meant to convey the same message that ResCap was a quasi-independent standalone company with its own board, with its own plans. And the fact that it was a 100 [percent] owned subsidiary of [AFI] was just a by the way, and that it was independent. So things like ring-fencing, operating agreement, firewall were all used to convey that message.

Int. of S. Khattri, Oct. 25, 2012, at 21:19–22:2.

James Young, Chief Accounting Officer and Controller of ResCap at the time of its formation, remembered:

> And so, given the profitability of the mortgage business, the initiative, the strategic initiative was to create ResCap. And it was—operationally, through the operating agreement, separate it from [AFI]. So, even though it's a wholly owned sub, the operating agreement was effective at separating it through certain operational aspects . . . .

Int. of J. Young, Sept. 28, 2012, at 9:17–24.

[44]  Int. of B. Paradis, Dec. 14, 2012, at 33:4–8.

[45]  *Id.* at 40:14–17 ("[T]he primary objection or concern regarding the rating agencies, was the firewall or the independence between [AFI] and ResCap."); *see also* Int. of J. Young, Sept. 28, 2012, at 14:21–25 (describing the formation of ResCap as a "structured separation" of ResCap from AFI); Memorandum, GMAC Bank Restructuring, dated Apr. 20, 2006, at 3 [EXAM11248642] (noting that "the Operating Agreement lays the foundation for creating the legal and business separation between ResCap and its subsidiaries (on the one hand) and GM/[AFI] (on the other)").

[46]  *See* Int. of J. Young, Sept. 28, 2012, at 15:2–18.

[47]  *See* General Motors Acceptance Corp., Annual Report (Form 10-K) (Mar. 28, 2006), at 5.

III-9

indebtedness" that were separate from the ratings of GM and AFI.[48] Nevertheless, ResCap's ratings remained tied to those of GM and AFI given that ResCap was still a wholly owned, indirect subsidiary of AFI and GM.[49]

_____

[48] *Id.*

[49] Although "notching" refers primarily to a credit rating agency's assessment regarding the relative recovery prospects of different instruments issued by the same issuer, in common parlance notching may also refer to the Rating Agencies' views as to the relative recovery prospects of debt instruments issued by affiliated entities. In that regard, Rating Agencies are generally resistant to varying credit ratings of affiliated issuers beyond a certain number of levels or notches. Given that ResCap remained an indirect, wholly owned subsidiary of AFI and GM, ResCap's ratings could not be totally de-linked from those of AFI or GM. According to Feldstein:

> We didn't get a perfect delinking, meaning that we will look at ResCap completely independent of [AFI]. But I think it was a victory in that they were no longer inextricably linked.

> I don't remember which agency said what, but one said, you know, "Yes, we'll rate them independently, but can't have more than, you know, two notches above [AFI]." So, there's still a linkage, but not, you know, a mirror image. We viewed it as a success, and a mini-breakthrough.

Int. of E. Feldstein, Dec. 14, 2012, at 34:25–35:10; *see also* Int. of D, Walker, Nov. 28, 2012, at 127:15–129:2; Int. of S. Khattri, Oct. 25, 2012, at 59:18–60:3; Moody's, Press Release, *Moody's Downgrades Residential Capital's Senior Debt to Baa3; Rating Outlook is Negative* (Aug. 24, 2005) [EXAM11377860]. As further evidence that ResCap's credit rating remained linked to GMAC and GM, Moody's, when downgrading ResCap's rating in August 2005, stated:

> The rating downgrade of ResCap is not a result of any change in Moody's views regarding ResCap's intrinsic creditworthiness, which the rating agency deems to be "high Baa" on a stand-alone basis, but rather reflect the ratings of its parent, [AFI], and ultimate parent, GM. Although the residential real estate finance business of ResCap, and auto finance business of [AFI], are separate from an operating perspective, ResCap continues to be substantially dependent on the support of [AFI] in regards to its capital structure, though such support should continue to diminish. ResCap is also a wholly owned subsidiary of [AFI].

*Id.* Referring to a downgrade in September 2005, Fitch Ratings similarly stated:

> The rating action on ResCap solely reflects its ownership by [AFI]. While Fitch continues to believe that ResCap maintains investment grade fundamentals, its ownership by [AFI] is a limiting factor in terms of rating notching. At present, Fitch would allow for up to two notches between the ratings of ResCap and [AFI]. Although Fitch does not differentiate the ratings of GM and [AFI] currently, Fitch would consider a ratings distinction similar to ResCap in accordance with Fitch's criteria for parent and financial subsidiary relationships.

Fitch, Press Release, *Fitch Lowers GMAC & ResCap Ratings; Rating Outlook Remains Negative* (Sept. 26, 2005) [EXAM11700280].

a.  *The 2005 Operating Agreement Provides Separation By, Among Other Things, Placing Limitations On Affiliate Transactions.[50]*

Section 2 of the 2005 Operating Agreement is among the more important provisions of the Agreement. That section sought to promote separation between ResCap and GMAC Affiliates[51] by, inter alia:

1.  Prohibiting the guarantee by ResCap or by any of its subsidiaries of any indebtedness of any GMAC Affiliate;

2.  Prohibiting any Investment[52] by ResCap in any GMAC Affiliate;

3.  Restricting ResCap's "material" transactions with GMAC Affiliates;

4.  Limiting the circumstances in which ResCap might declare and pay any Dividend,[53] and capping the amount of dividends that might be paid if declaration and payment of dividends is permitted; and

5.  Limiting the ability of ResCap to prepay indebtedness owing to any GMAC Affiliate.[54]

---

[50]  The 2005 Operating Agreement was amended and restated pursuant to the 2006 Amended Operating Agreement, dated November 27, 2006. *See* Section III.E.9 (discussing the 2006 Amended Operating Agreement).

[51]  Under the 2005 Operating Agreement, "'GMAC Affiliate' means GM, [AFI] and any [p]erson that is an [a]ffiliate of GM or [AFI], other than ResCap and its [s]ubsidiaries." 2005 Operating Agreement, § 1 [ALLY_0140795].

[52]  Pursuant to the 2005 Operating Agreement, "'Investment' in any [p]erson means any loan, advance or other extension of credit (other than in the ordinary course of business) to such [p]erson (whether in cash or property) or any capital contribution or purchase or acquisition of any [c]apital [s]tock or indebtedness of such [p]erson (whether in cash or property); *provided, however,* that the terms 'Investment' shall not include any purchase of securities issued by a GMAC Affiliate through the use of funds in a custodial account held by ResCap or its [s]ubsidiaries relating to the sale of financial assets by ResCap or its [s]ubsidiaries." *Id.*

Notwithstanding the prohibition on Investments set forth in the 2005 Operating Agreement, section 8 of that Agreement authorized the waiver of the provisions of the Agreement with ResCap Board approval. *See* Section III.B.3.b (discussing the process to amend or waive provisions of the 2005 Operating Agreement); *see also* Section V.A.1.a (discussing how the Investment prohibition in the 2005 Operating Agreement was waived, purportedly in compliance with section 8 of the 2005 Operating Agreement, to approve the 2006 Bank Restructuring).

[53]  *See* Section III.B.3.d (defining Dividend for the purposes of the 2005 Operating Agreement).

[54]  The prohibitions and limitations imposed by section 2 of the 2005 Operating Agreement were subject to amendment or waiver under certain circumstances. *See* Section III.B.3.b (discussing the process to amend or waive provisions of the 2005 Operating Agreement).

###### b. *Amendment And Waiver Of The 2005 Operating Agreement*

The 2005 Operating Agreement specified the procedures and requirements for the amendment or waiver of its provisions. An amendment or waiver of any provision of the 2005 Operating Agreement was required to be in writing and signed by GM, AFI, and ResCap.[55] Any amendment or waiver that would "materially and adversely" affect the rights of any Class[56] of Rated Indebtedness[57] required approval by the majority of the ResCap Board, including a majority of the Independent Directors.[58] Pursuant to the 2005 Operating Agreement, the Independent Directors were required to consider "only the interest of ResCap, including its creditors," in considering an amendment or waiver that would materially and adversely affect the rights of any Class of Rated Indebtedness.[59] In addition, the 2005 Operating Agreement required approval by the majority of the Independent Directors to amend article VI of ResCap's By-Laws, the article that provided for the indemnification of and advancement of expenses to ResCap directors and officers.[60]

###### c. *The Arm's-Length And Fair Value Requirements For Material Transactions With GMAC Affiliates*

The 2005 Operating Agreement forbade ResCap and its subsidiaries from guaranteeing the indebtedness of any GMAC Affiliate, and prohibited Investments by ResCap in any GMAC Affiliates. ResCap was nevertheless permitted under the 2005 Operating Agreement to

---

[55] 2005 Operating Agreement, § 8 [ALLY_0140795].

[56] Under the 2005 Operating Agreement, "'Class' means, with respect to any Rated Indebtedness, all such Rated Indebtedness designated as belonging to the same class, series or issue or otherwise having substantially the same material terms and governed by substantially the same instruments." *Id*. § 1.

[57] Under the 2005 Operating Agreement, "'Rated Indebtedness' means any senior long-term unsecured debt of ResCap, that, at the relevant time, is outstanding and not defeased in accordance with its terms and that is at the time of its issuance rated by at least two of the Rating Agencies, unless the instruments governing such indebtedness provide that they are not entitled to the benefits of this [a]greement." *Id*.

[58] *Id*. § 8. Pursuant to the 2005 Operating Agreement, ResCap was required to provide a copy of any amendment or waiver to any trustee, administrative agent, or fiduciary responsible for any senior unsecured credit facility under which ResCap was a borrower or for any Class of Rated Indebtedness. *Id*. The 2005 Operating Agreement required that ResCap have at all times at least two Independent Directors. *Id*. § 2(g)(i); *see also* Section III.B.3.f (discussing of the Independent Director requirement imposed by the 2005 Operating Agreement).

[59] 2005 Operating Agreement, § 8 [ALLY_0140795].

[60] *Id*. § 2(g)(iii); *see also* Section III.B.3.j (discussing indemnification under the 2005 Operating Agreement).

"engage in material transactions" with any GMAC Affiliate provided that "such transactions [were] on terms and conditions that [were] consistent with those that parties at arm's length would agree to and for fair value."[61]

By its terms, the 2005 Operating Agreement did not mandate Independent Director review of all Affiliate Transactions, much less a general "veto right" with respect to all such transactions. Instead, the 2005 Operating Agreement prohibited material Affiliate Transactions that were not compliant with the arm's length and fair value requirements, while providing a mechanism for waiver of this requirement by a majority of the Independent Directors. Affiliate Transactions that were not material, or which were compliant with the arm's length and fair value requirements, were not prohibited by the agreement, regardless of whether they were reviewed or approved by the Independent Directors.[62] The 2005 Operating Agreement did not explicitly prohibit the ResCap Board from itself determining that an Affiliate Transaction was not material or that it met the arm's length and fair value requirements. However, if the ResCap Board were to make such a determination, and a reviewing court concluded that the Affiliate Transaction in fact was material and did not meet the arm's-length and fair-value requirements, the court would likely reject the Board's determination as inconsistent with the Operating Agreement's requirement of Independent

---

[61] *See* 2005 Operating Agreement, § 2(b) [ALLY_0140795]. The 2005 Operating Agreement also required that financing agreements and intercompany debt obligations with any GMAC Affiliate must be in writing, and any agreements that involve the transfer by ResCap of cash in an amount greater than $25 million per year or goods or services with a value in excess $25 million per year must be in writing. *See* 2005 Operating Agreement, § (2)(b)(i)–(ii) [ALLY_0140795]. In addition, notwithstanding the limitation on transactions with GMAC Affiliates, certain licensing, servicing and facilities, and employee financing accommodations were excepted from the limitations imposed by section 2(b) of the 2005 Operating Agreement. *See* 2005 Operating Agreement, § 2(c) [ALLY_0140795].

[62] See Section III.B.3.b (discussing the process to amend the 2005 Operating Agreement). Jacob, one of the initial Independent Directors of ResCap, stated:

> But in terms of some of these related party transaction, unless and until Tom Melzer [an Independent Director of ResCap] and I granted, you know, agreed on a specific waiver, you know, they could not do anything about it. They really could not carry the transaction forward.

Int. of T. Jacob, Nov. 7, 2012, at 176:22–177:4

Director approval of any waiver.[63] In any event, there do not appear to have been any occasions on which the ResCap Board approved an Affiliate Transaction without the approval of a majority of the Independent Directors. There were, however, occasions on which it

_____

[63] In discussing the prohibition of material transactions with GMAC Affiliates and the determination of whether a transaction was consistent with those that parties at arm's length would agree to and for fair value, Melzer stated, "I think it was really up to the two of us to make sure it was observed." Int. of T. Melzer, Oct. 10, 2012, at 97:8–9. Melzer further stated that "if you looked at the parties involved in that, who else was a disinterested party that could make that judgment but Tom Jacob and I?" *Id.* at 97:15–18. Although the 2005 Operating Agreement did not explicitly require the Independent Directors to confirm whether a particular transaction met the arm's length and fair value tests, according to Melzer, "to me it was pretty explicit in terms of our broader responsibilities with respect to the stakeholders, if you will, in ResCap." *Id.* at 98:1–3. Similarly, Jacob stated:

> If we have to engage in any transaction involving an affiliate, I really needed to get expert opinion which would satisfy me that this transaction—in terms of the condition of this transaction, is comparable to what is a similar transaction in the market, okay? So, that was my understanding of that. So, whenever a related party transaction was brought to us, the independent directors, you know, we basically said, you know, it needs opinion on both the arm's length terms and conditions as well as the fairness of the valuation.

Int. of T. Jacob, Nov. 7, 2012, at 130:18–131:7. Moreover, when it was pointed out that the 2005 Operating Agreement did not explicitly require the Independent Directors to analyze whether a particular transaction met the arm's length and fair value tests, Jacob stated:

> Because I'll tell you, I mean, that was my understanding. But also whenever there are related party transactions, you know, we had—Tom Melzer and I constituted a special committee of the board to review that, that related party transaction. So it was an established governance practice.

*Id.* at 134:16–22.

appears that one or more members of ResCap's management apparently concluded that it was unnecessary to submit an Affiliate Transaction for scrutiny and approval by the ResCap Board or by the Independent Directors.

As discussed more fully in Section V.B, several of the derivative transactions between ResCap and GMAC Affiliates included terms and conditions that were *not consistent* with those between parties at arm's length (a fact acknowledged by the parties at the time). The Investigation did not reveal any evidence that the Independent Directors were notified of these inconsistencies, or afforded the opportunity to waive the requirements as permitted by section 8 of the 2005 Operating Agreement or that the transactions were even presented to the ResCap Board.

### d.  Dividend Limitations

The 2005 Operating Agreement prohibited ResCap from declaring or paying a Dividend,[64] unless at the time a Dividend was declared and paid ResCap's Stockholder's Equity[65] exceeded $6.5 billion.[66] Assuming ResCap's Stockholder Equity exceeded the $6.5 billion threshold at the time of a dividend declaration and payment, the 2005 Operating Agreement further provided that the cumulative amount of dividends from and after the date of the 2005 Operating Agreement could not exceed (1) 50% of ResCap's Cumulative Net Income[67] at the time of the Dividend, minus (2) (to the extent a positive number) the cumulative amount of any Prepayments[68] (other than Excluded Prepayments[69]), minus 50% of

---

[64]  Under the 2005 Operating Agreement, "'Dividend' means any dividend or distribution of cash or property by ResCap on account of its [c]apital [s]tock or the repurchase by ResCap of its [c]apital [s]tock (other than dividends, distributions or repurchases payable in [c]apital [s]tock (other than Disqualified Stock))." 2005 Operating Agreement, § 1 [ALLY_0140795].

[65]  Under the 2005 Operating Agreement, "'Stockholder's Equity' means, at any time of determination, the amount which would be shown as stockholder's equity on the consolidated balance sheet of ResCap as of such time prepared in accordance with GAAP." *Id.*

[66]  *See id.* § 2(d). The 2005 Operating Agreement provided that the dividend restrictions would terminate when ResCap's Stockholder's Equity exceeded $12 billion as of the end of each of two consecutive quarters. *See id.* § 2(d)(iv).

[67]  Under the 2005 Operating Agreement, "'Cumulative Net Income' means the net income of ResCap and its [s]ubsidiaries on a consolidated basis determined in accordance with GAAP for the period beginning with the first day of the first fiscal quarter beginning after the date of this Agreement and ending on the last day of the fiscal quarter ending immediately preceding the date as of which a determination of Cumulative Net Income is required." *Id.* § 1.

[68]  Under the 2005 Operating Agreement, "'Prepayment' means any payment of principal in respect of GMAC Subordinated Debt prior to the stated maturity thereof." *Id.* The 2005 Operating Agreement defines "GMAC Subordinated Debt" as "any indebtedness owed by ResCap or any of its [s]ubsidiaries to any GMAC Affiliate that is subordinated to Rated Indebtedness in right of payment of principal, interest and premium, if any." *Id.*; *see* Section III.B.3.a.b (defining GMAC Affiliate and Rated Indebtedness, respectively).

[69]  Under the 2005 Operating Agreement, "Excluded Prepayments" means "Prepayments [by ResCap] of GMAC Subordinated Debt of up to a cumulative amount of $500 million after the date of this Agreement." 2005 Operating Agreement, § 1, 2(e) [ALLY_0140795].

ResCap's Cumulative Net Income at the time such dividend is declared and paid.[70] The 2005 Operating Agreement did not require that dividend declarations and payments be approved by the vote of any Independent Director. As previously discussed, any waiver of the dividend limitation required the approval by a majority of the ResCap Board, including a majority of the Independent Directors.

### e.   Limitations On The Prepayment Of GMAC Subordinated Debt Under The 2005 Operating Agreement

The 2005 Operating Agreement permitted ResCap to make Prepayments of GMAC Subordinated Debt of up to a cumulative amount of $500 million after the date of the Agreement (i.e., the Excluded Prepayments).[71] Any Prepayment of GMAC Subordinated Debt in excess of that amount could, however, only be made from: (1) ResCap's Cumulative Net Income at the time of such Prepayment less Dividends and Prepayments (other than Excluded Prepayments) made after the date of the 2005 Operating Agreement; (2) the net proceeds to ResCap from the issuance of Capital Stock[72] or indebtedness to any Person (other than a GMAC Affiliate) that was subordinated in right of payment to Rated Indebtedness; or (3) 50% of the net proceeds to ResCap from the issuance of indebtedness to any Person (other than a GMAC Affiliate) that was ranked pari passu in right of payment with Rated Indebtedness.[73] Independent Director approval was not required for the making of any Prepayment that was otherwise authorized under the 2005 Operating Agreement.

---

[70] *See id.* § 2(d). According to AFI's 2006 Annual Report, "as of Dec. 31, 2005, ResCap had consolidated stockholder's equity of approximately $7.5 billion," and owed AFI "$4.1 billion pursuant to a Subordinated Note Agreement, under which interest is payable quarterly and all outstanding principal is due at maturity on September 30, 2015." General Motors Acceptance Corp., Annual Report (Form 10-K) (Mar. 28, 2006), at 5.

[71] *See* 2005 Operating Agreement, § 2(e) [ALLY_0140795].

[72] Under the 2005 Operating Agreement, "'Capital Stock' of any [p]erson means any and all shares, interests, participations or other equivalents (however designated) of corporate stock, including any preferred stock." *Id.* § 1.

[73] *See id.* § 2(e); Section III.B.3.b (defining Rated Indebtedness).

### f.   The Independent Directors Requirement

Pursuant to the 2005 Operating Agreement, AFI was required to vote for, and ResCap was required to have, at least two Independent Directors[74] at all times.[75] In the event of a vacancy in the position of an Independent Director, AFI was required "as promptly as practicable" to elect a successor Independent Director.[76]

### g.   ResCap Actions That Required The Approval Of A Majority Of The ResCap Board, Including A Majority Of The Independent Directors

The 2005 Operating Agreement provided that ResCap could not, in connection with the commencement or pendency of a bankruptcy or insolvency proceeding of any GMAC Affiliate: (1) commence a bankruptcy or insolvency proceeding for ResCap; (2) consent to any involuntary bankruptcy or insolvency proceeding for ResCap; (3) file any petition seeking or consenting to the appointment of a receiver, assignee, trustee, sequestrator or other similar official of ResCap or for a substantial part of ResCap's assets; or (4) make an assignment for the benefit of creditors, unless the action was authorized by the prior approval of the ResCap Board, including the approval of a majority of the Independent Directors.[77]

---

[74]  The 2005 Operating Agreement defines an "Independent Director" as a person who:

> (A) is not and has not been an officer, director or employee, and has no immediate family member that is or has been an officer, of any GMAC Affiliate within the three years immediately prior to [being appointed];

> (B) has not received, and has no immediate family member who has received . . . more than $100,000 in direct compensation from any GMAC Affiliate, other than director fees and pension and other forms of deferred compensation for prior service that is not contingent in any way on continued service [in the immediately prior three years];

> (C) is not employed by, and has no immediate family member that is an officer of, any Person that has made payments to, or received payments from, any GMAC Affiliate for property or services in an amount which, in any of the last three fiscal years, exceeds the greater of $1 million or 2% of ResCap's consolidated gross revenues; and

> (D) is reasonably believed by the then current directors of ResCap to be financially sophisticated and otherwise qualified to fulfill the obligations [described in the Operating Agreement].

2005 Operating Agreement, § 1 [ALLY_0140795]; *see also* Section IV.B.1 (discussing Independent Director history).

[75]  *See* 2005 Operating Agreement, § 2(g)(i) [ALLY_0140795]. Melzer, one of the two initial Independent Directors of ResCap, believed that the Independent Director requirement in the 2005 Operating Agreement was critical to achieving a higher rating for ResCap. Int. of T. Melzer, Oct. 10, 2012, at 39:1–3, 39:25–40:1.

[76]  *See* 2005 Operating Agreement, § 2(g)(i) [ALLY_0140795].

[77]  *See id.* § 2(g)(iii). The 2005 Operating Agreement did not prohibit ResCap from taking any of the bankruptcy or insolvency actions without the affirmative vote of the Independent Directors if such was to be taken independently of the commencement or pendency of a bankruptcy or insolvency proceeding of any GMAC Affiliate. *Id.*

Indeed, the 2005 Operating Agreement forbade the ResCap Board from voting on or authorizing any such action unless there was at the time at least one Independent Director then serving in such capacity.[78] Similarly, the 2005 Operating Agreement provided that early termination of the Agreement required the approval of a majority of the ResCap Board, including a majority of the Independent Directors.[79]

As previously noted, the 2005 Operating Agreement provided a procedure to amend or waive the provisions thereof. In particular, the provisions of the 2005 Operating Agreement could not be amended or waived if the amendment or waiver would materially and adversely affect the rights of any Class of Rated Indebtedness unless such amendment or waiver was approved by a majority of the ResCap Board, including a majority of the Independent Directors.[80]

> ### h. The Independent Directors Were Required In Certain Circumstances To Consider Only The Interest Of ResCap, Including Its Creditors

The 2005 Operating Agreement provided that the Independent Directors "shall," when voting on bankruptcy and insolvency relief, early termination of the Agreement, or waiver or amendment of provisions that would materially and adversely affect the interests of any Class of Rated Indebtedness, "to the fullest extent permitted by law . . . consider only the interest of ResCap, including its creditors."[81] The Independent Directors' independence from AFI and its Affiliates was further underscored by a provision in the 2005 Operating Agreement that barred AFI from bringing any legal action against any Independent Director for considering only the interest of ResCap and its creditors when voting on the debtor relief measures set forth therein, early termination of the 2005 Operating Agreement, and amendments and waivers.[82] Melzer stated that he always considered only the interest of ResCap and its creditors while serving on the ResCap Board, notwithstanding that the requirement was applicable only in limited circumstances.[83]

---

[78] *See id.*

[79] *See id.* § 4. The Operating Agreement provided that it would terminate when ResCap ceased to be a direct or indirect subsidiary of AFI. The Operating Agreement was subject to termination beforehand upon agreement by ResCap, GM, and AFI and approval by a majority of the ResCap Board, including a majority of the Independent Directors. *See id.*

[80] *See id.* § 8. The 2005 Operating Agreement, however, "[did] not provide express guidance as to what constitutes a waiver that materially and adversely affects senior noteholders—nor [did] it prohibit the independent directors from approving any such waiver." Walker Report, at 6 [RC40008925].

[81] 2005 Operating Agreement, §§ 2(g)(i), 8 [ALLY_0140795].

[82] *Id.* § 2(g)(i).

[83] *See* Int. of T. Melzer, Oct. 10, 2012, at 104:10–16.

### i. *Separateness Provisions*

Section 2(f) of the 2005 Operating Agreement included a full array of provisions commonly employed in structured financings to mitigate the risk of substantive consolidation or to otherwise isolate or ring-fence the assets and operations of an entity from the bankruptcy risks of its affiliates. The 2005 Operating Agreement separateness covenants provided, inter alia, that ResCap should, at all times:

1.  Maintain its books, records and financial statements separate from those of any and all GMAC Affiliates;

2.  Maintain its assets in a manner such that it would not be costly to segregate and identify such assets from those of any and all GMAC Affiliates;

3.  Maintain bank accounts and cash management and account receivable collections systems separate from any and all GMAC Affiliates;

4.  Maintain its own asset investment, risk management and hedging programs separate for those of any and all GMAC Affiliates;

5.  Pay its own liabilities out of its own funds;

6.  Conduct the business operations of ResCap and its Subsidiaries by its or their own employees and officers, who would not also be employees or officers of any GMAC Affiliate;[84]

7.  Not commingle funds or other assets with those of any GMAC Affiliate; and

8.  Otherwise take such action so that ResCap would maintain its separate legal existence and identity.[85]

The requirement under section 2(f) of the 2005 Operating Agreement that ResCap conduct its business operations by its own employees and officers who were not also employees or officers of any GMAC Affiliate was later eliminated by an amendment approved by the two Independent Directors.[86]

---

[84] This separateness provision was deleted in the 2006 Amended Operating Agreement. *See* Section III.E.9 (discussing the 2006 Amended Operating Agreement). One might question the efficacy of such a provision to promote separateness during its abbreviated like span given that ResCap's employees and officers were subject to termination by the ResCap Board, which at all times relevant to the Investigation was dominated by AFI employees. Independent Director Melzer, however, never questioned the provision, but rather assumed that ResCap was in compliance at all relevant times. Int. of T. Melzer, Oct. 10, 2012, at 100:22–101:14, 102:4–9.

[85] 2005 Operating Agreement, § 2(f) [ALLY_0140795].

[86] *See* Section III.E.9 (discussing the 2006 Amended Operating Agreement).

### j.  Indemnification Provisions

Each party to the 2005 Operating Agreement agreed to indemnify the other parties from losses sustained as the result of the indemnifying party's indemnifiable liabilities.[87] In particular, GM agreed to indemnify ResCap and its subsidiaries from GM Indemnifiable Liabilities[88] and AFI agreed to indemnify ResCap and its subsidiaries from GMAC Indemnifiable Liabilities (other than GM Indemnifiable Liabilities).[89] Under the 2005 Operating Agreement, ResCap had a reciprocal obligation to indemnify GM Affiliates and GMAC Affiliates for ResCap Indemnifiable Liabilities.[90] The parties also limited the ability to assign rights under the 2005 Operating Agreement, with GM being permitted to assign its rights "to any other GM Affiliate," and AFI being permitted to assign its rights "to any other GMAC Affiliate." Such assignments were not to have any effect on the parties' obligations under the 2005 Operating Agreement.[91]

### k.  Termination Of The 2005 Operating Agreement

The 2005 Operating Agreement provided that it would terminate automatically if ResCap ceased to be a direct or indirect AFI subsidiary.[92] The 2005 Operating Agreement was also terminable by agreement of the parties, which, as noted above, required not just the approval of a majority of the members of the ResCap Board, but also the approval of the majority of the Independent Directors, who in considering termination of the 2005 Operating Agreement were required pursuant to its terms to consider to the fullest extent permitted by law only the interest of ResCap and its creditors.[93]

---

[87] *See* 2005 Operating Agreement, § 3 [ALLY_0140795].

[88] Under the 2005 Operating Agreement, "'GM Indemnifiable Liabilities' means all Liabilities of any GM [a]ffiliate to the extent such Liabilities (a) relate to, (b) arise out of or (c) result principally from any of the following items: (i) the failure of any GM [a]ffiliate to pay, perform or otherwise promptly discharge any Liabilities of such GM [a]ffiliate in accordance with their terms; or (ii) the GM [a]ffiliate Business." *Id.* § 1.

[89] Under the 2005 Operating Agreement, "'GMAC Indemnifiable Liabilities' means all Liabilities of any GMAC [a]ffiliate to the extent such Liabilities (a) relate to, (b) arise out of or (c) result principally from any of the following items: (i) the failure of any GMAC [a]ffiliate to pay, perform or otherwise promptly discharge any Liabilities of such GMAC [a]ffiliate in accordance with their terms; or (ii) the GMAC [a]ffiliate Business." *Id.*; *see also* Section L.2.a(1)(a)(ii)(B) (discussing whether a claim may be asserted by ResCap against AFI for indemnification under either the 2005 Operating Agreement or the 2006 Amended Operating Agreement for the breach of representations and warranties by Old GMAC Bank).

[90] Under the 2005 Operating Agreement, "ResCap Indemnifiable Liabilities' means all Liabilities ResCap or any of its [s]ubsidiaries to the extent such Liabilities (a) relate to, (b) arise out of or (c) result principally from any of the following items: (i) the failure of ResCap or any of its [s]ubsidiaries to pay, perform or otherwise promptly discharge any Liabilities of ResCap or such [s]ubsidiary, as the case may be, in accordance with their terms; or (ii) the ResCap Business." 2005 Operating Agreement, § 1 [ALLY_0140795].

[91] *See id.* § 9.

[92] *See id.* § 4.

[93] *See id.*

*l.*  *Guarantee And Third-Party Beneficiaries*

The 2005 Operating Agreement expressly stated that it was not a guarantee by GM or AFI of ResCap's indebtedness.[94] Pursuant to section 7 of the 2005 Operating Agreement, AFI's "sole obligation[s]" were limited to those set forth in:

1.  Section 3, which required AFI to indemnify ResCap from GMAC Indemnifiable Liabilities (other than GM Indemnifiable Liabilities);

2.  Section 2(g), which required ResCap to have two or more Independent Directors at all times, and required AFI to promptly elect a new Independent Director upon a vacancy;

3.  Section 2(h), which required AFI to prepare consolidated financial statements, in accordance with GAAP and SEC rules, including with respect to ResCap;[95] and

4.  Section 2(i), which required AFI to hold out ResCap and its subsidiaries as "legal entities separate and distinct" from AFI, and to "correct any known misunderstanding about ResCap's separate identity."[96]

GM's "sole obligation" under the 2005 Operating Agreement was to indemnify ResCap from and against GM Indemnifiable Liabilities.[97] The 2005 Operating Agreement further provided that "[u]nder no circumstances shall GM or [AFI] be liable for damages for breach of this Agreement (other than Section 3 [indemnification provision])."[98]

In addition, the 2005 Operating Agreement provided that it inured solely to the benefit of GM, AFI, and ResCap.[99] The holders of Rated Indebtedness and any lenders under any credit facility under which ResCap was a borrower, however, were deemed to be third-party beneficiaries.[100] Pursuant to the 2005 Operating Agreement "the remedies of such holders or lenders [under the 2005 Operating Agreement] shall be limited to specific enforcement of the provisions of [the 2005 Operating Agreement] as the same may be amended and waived

---

[94] *Id.* § 7 ("This Agreement is not, and shall not be construed to be, a guarantee by GM or [AFI] of any indebtedness of ResCap or an agreement by GM or [AFI] to contribute additional capital to ResCap.").

[95] "The supplemental disclosures to such financial statements shall provide that ResCap's creditors will be entitled to be satisfied out of ResCap's assets prior to ResCap's equity holders and that [AFI] conducts its residential mortgage operations and related businesses through ResCap." *Id.* § 2(h).

[96] *Id.* § 2(i).

[97] ResCap had a reciprocal obligation to indemnify GM for ResCap Indemnifiable Liabilities. *See* Section III.B.3.j (discussing indemnification under the 2005 Operating Agreement); *see also* 2005 Operating Agreement, § 3(c) [ALLY_0140795].

[98] 2005 Operating Agreement, § 7 [ALLY_0140795].

[99] *See id.* § 11.

[100] *See id.*

pursuant to [s]ection 8 [of the 2005 Operating Agreement] . . . ."[101] The 2005 Operating Agreement did not contemplate or require that notice or other communications given or made pursuant to the 2005 Operating Agreement be given to the holders of Rated Indebtedness or lenders under any credit facility.[102]

## C. RESCAP'S POST-FORMATION FUNDING, MANAGEMENT, AND BUSINESS PROFILE

### 1. GMAC Mortgage Group Inc. Contributes GMAC Residential Holding Corp. And GMAC-RFC Holding Corp. To ResCap

Although incorporated in 2004, ResCap conducted no operations until March 2005, when AFI's wholly owned subsidiaries GMAC Residential (based in Horsham, Pennsylvania) and GMAC-RFC (based in Minneapolis, Minnesota) were transferred to ResCap.[103]

### 2. ResCap's Initial Funding And Capitalization

Before their transfer to ResCap in March 2005, AFI's residential mortgage-finance subsidiaries funded their operations primarily through sales and securitizations of mortgage loans, and borrowings under secured and unsecured lines of credit. AFI was the lender under the majority of the unsecured lines of credit, including a $20 billion domestic revolving credit facility that the mortgage subsidiaries shared with other AFI subsidiaries.[104]

In the second quarter of 2005, upon the commencement of operations, ResCap restructured its subsidiaries' domestic credit facility with AFI. AFI contributed $2 billion of equity to ResCap by forgiving a portion of the existing borrowings. The remaining domestic intercompany borrowings were converted from a single revolving facility to a $5 billion ten-year subordinated note; a $1.5 billion, one-year term loan; and a $2.5 billion, two-year revolving line of credit. In the second quarter of 2005, the subordinated note and the term loan were funded.[105] ResCap then issued $4 billion of senior unsecured debt through a private placement in June 2005.[106] The proceeds from the notes were used to repay a portion of

[101] *Id.*

[102] *See id.* (noting that "any action to enforce the rights of the holders of Rated Indebtedness of any Class or any lenders under any credit facility under which ResCap is a borrower as third-party beneficiaries shall be undertaken only by the Class Agent for such Class or any Bank Agent, as applicable"); Section V.A.1.a (discussing how the 2005 Operating Agreement may have been breached in connection with the 2006 Bank Restructuring and other material issues brought to the ResCap Board for approval).

[103] *See* Residential Capital Corp., Registration Statement (Form S-4) (July 15, 2005), at 62.

[104] *See* Residential Capital Corp., Annual Report (Form 10-K) (Mar. 28, 2006), at 73.

[105] *See id.*

[106] *See* General Motors Acceptance Corp., Current Report (Form 8-K) (Aug. 3, 2005). On June 24, 2005, ResCap closed a private placement of $4 billion in senior unsecured bonds, utilizing the proceeds to repay borrowings under the initial capitalization by AFI. *Id.*; *see also* Residential Capital Corp., Annual Report (Form 10-K) (Mar. 28, 2006), at 73.

ResCap's domestic AFI credit facility as well as for general corporate purposes.[107] Thereafter, the privately placed notes were exchanged for new notes issued pursuant to an indenture dated June 24, 2005.[108] The issuance of the new notes was registered under the Securities Act. The form and terms of the new notes were intended to be identical in all material respects to those of the old notes, except that the transfer restrictions and registration rights provisions relating to the old notes did not apply to the new notes.[109]

In July 2005, ResCap obtained $3.5 billion in syndicated bank credit facilities. These credit facilities included a $1.75 billion term loan due in 2008, an $875 million revolving credit facility due in 2006, and an $875 million revolving credit facility due in 2008. At the closing of the credit facilities in July 2005, ResCap borrowed the entire $1.75 billion under the term loan, and repaid all amounts then outstanding under the $1.5 billion term loan from AFI, plus accrued interest.[110]

On September 29, 2005, ResCap filed a $12 billion shelf registration statement so that it could offer, from time to time, senior and/or subordinated debt securities.[111] ResCap issued $1.25 billion of unsecured debt from this shelf registration statement in November 2005, and used the proceeds to repay $620 million under the subordinated note held by AFI and the remainder for general corporate purposes.[112] ResCap terminated its $2.5 billion two-year revolving line of credit with AFI in December 2005.[113] In addition, ResCap made a $250 million payment on the subordinated note held by AFI in December 2005. The balance of this note was $4.1 billion as of December 31, 2005.

In February 2006, ResCap issued $1.75 billion of unsecured debt from the shelf registration, and stated its intent to use the proceeds for general corporate purposes. ResCap made a $500 million payment on the subordinated note to reduce the balance to $3.6 billion.[114]

In April 2006, ResCap issued $3.5 billion of unsecured debt to investors. The issued debt included $2.5 billion of senior unsecured debt from the $12 billion shelf registration and $1 billion of unregistered subordinated unsecured debt.[115] A portion of the proceeds of both the senior unsecured and the unregistered subordinated issuances were used to further prepay the subordinated GMAC note.[116] In May 2006, ResCap issued the following senior long-term

---

[107] *See* Residential Capital Corp., Annual Report (Form 10-K) (Mar. 28, 2006), at 73.

[108] Residential Capital Corp., Registration Statement (Form S-4) (July 15, 2005), at 119.

[109] *Id.* at 136.

[110] *See* Residential Capital Corp., Annual Report (Form 10-K) (Mar. 28, 2006), at 73.

[111] *See* Residential Capital Corp., Registration Statement (Form S-3) (Sept. 29, 2005).

[112] *See* Residential Capital Corp., Annual Report (Form 10-K) (Mar. 28, 2006), at 73.

[113] *See id.*

[114] *See id.*

[115] *See* Residential Capital Corp., Quarterly Report (Form 10-Q) (May 12, 2006), at 39.

[116] *See* Residential Capital Corp., Annual Report (Form 10-K) (Mar. 28, 2006), at 73.

unsecured notes: a May 2006 issuance of €750 million 5.125% six-year notes and £400 million 6.375% seven-year fixed rate notes ($1.7 billion U.S. dollars).[117]

The funding sources used by ResCap upon formation were primarily determined by the type and volume of the assets that it sought to finance. In general, short-term funding was used to finance: (1) mortgage loans pending permanent sale or securitization; and (2) lending receivables.[118] ResCap required longer-term funding to finance mortgage loans HFI and other assets related to securitization activities.[119] ResCap's sources of funding included asset securitization programs, asset-backed financing vehicles, whole-loan and securities repurchase agreements and other secured lending facilities, issuances of publicly-traded senior unsecured notes, unsecured lines of credit and borrowings, and bank deposits, as described in more detail below.

### a. Collateralized Borrowings In Securitization Trusts

As part of its funding and risk-management practices, ResCap established secondary market trading and securitization arrangements that provided long-term financing primarily for its mortgage loans.[120]

### b. Short-Term Secured Borrowings

ResCap used both committed and uncommitted secured facilities to fund inventories of mortgage loans, whether HFI or HFS, lending receivables, mortgage servicing cash flows and securities. ResCap used such facilities to provide funding for residential mortgage loans prior to their subsequent sale or securitization. These facilities, generally referred to as aggregation facilities, were funded primarily through the issuance of asset-backed commercial paper or similar short-term securities issued by vehicles administered by third parties. Other short-term secured borrowings were funded by transactions under repurchase agreements or similar arrangements or secured bank loans.[121]

### c. Long-Term Unsecured Borrowings

ResCap met its long-term unsecured financing needs from a variety of sources, including public corporate debt and bank credit facilities. ResCap primarily used its long-term unsecured borrowings to fund: (1) its long-term assets (MSRs and other retained interests); (2) over collateralization required to support ResCap's conduits; (3) the liquidity portfolio; and (4) the continued growth of ResCap's mortgage loan investment portfolio.[122]

---

[117] *See* Residential Capital Corp., Free Writing Prospectus (Mar. 28, 2006).

[118] *See* Residential Capital Corp., Annual Report (Form 10-K) (Mar. 28, 2006), at 72.

[119] *See id*.

[120] *See id.* at 74.

[121] *See id*.

[122] *See id.* at 77.

#### d.  Bank Deposits And FHLB Advances

ResCap's sources of liquidity also included Old GMAC Bank.[123] Old GMAC Bank, in turn, obtained access to funding by, among other things, accepting deposits[124] under an agreement with FHLB.[125] ResCap was able to use the proceeds of this arrangement to fund mortgage loans, investments securities, and certain lending receivables.[126]

#### e.  Affiliate Borrowings

ResCap obtained some funding from its affiliates through domestic and international intercompany credit lines. Before June 24, 2005, as previously noted, ResCap had access to a $20 billion domestic line provided by AFI to ResCap and certain other AFI subsidiaries. From January 1, 2003 through June 24, 2005, borrowings by these entities under this line averaged approximately $10.3 billion. On May 4, 2005, AFI forgave $2 billion of these borrowings resulting in a corresponding increase to ResCap's capital. Under international lines of credit from certain affiliates, ResCap had access to a total of approximately $2.6 billion as of December 31, 2005.[127]

#### f.  Off-Balance Sheet Financings

ResCap's total off-balance sheet financings were $6.1 billion as of December 31, 2004 and increased to $78.3 billion as of December 31, 2005. A significant portion of such financing related to securitizations issued in off-balance-sheet trusts. As of December 31, 2005, these trusts had aggregate outstanding balances of $77.6 billion.[128]

ResCap, through off-balance sheet structured facilities, also funded mortgage loans during the aggregation period and warehouse lending receivables. Such off-balance sheet structured facilities provided funding for these assets through the issuance of commercial paper from multi- and single-seller asset-backed commercial paper conduits.[129]

---

[123] *See* Section V.B.3 (discussing the MMLPSA and related transactions).

[124] A significant percentage of Old GMAC Bank's deposits were escrows related to ResCap's mortgage loans. *See* Residential Capital Corp., Annual Report (Form 10-K) (Mar. 28, 2006), at 77 ("As of December 31, 2005, [Old] GMAC Bank had approximately $4.1 billion of deposits, $1.4 billion of which were escrows related to our servicing of mortgage loans.").

[125] *See id.* (noting that as of December 31, 2005, Old GMAC Bank had a "total borrowing capacity of $7.1 billion under this agreement").

[126] *See id.*

[127] *See id.*

[128] *See id.* at 78.

[129] *See id.*

### 3. Initial ResCap Officers And Directors

The initial directors of ResCap were: (1) Eric A. Feldstein, Chairman; (2) David M. Applegate, Co-CEO; (3) Bruce J. Paradis, Co-CEO; (4) Davee L. Olson, CFO; (5) Sanjiv Khattri, VP; (6) Jerome B. Van Orman, Jr., VP; and (7) David Walker, VP.[130] Subsequently, the directors elected members of the executive committee, all of whom were also AFI officers,[131] and certain officers. The following is a list of ResCap's initial directors and officers and their association with GM and AFI:

EXHIBIT III.C.3
**ResCap's Initial Directors and Officers**

| Individual | Position [(1)] | GM/AFI Association [(2)] |
|---|---|---|
| Eric Feldstein | • Chairman<br>• Member of Executive Committee | • Group Vice President of GM<br>• Chairman of AFI<br>• Chairman of GMAC Mortgage Group, Inc.<br>• Former Vice President and Treasurer of GM<br>• Former Executive Vice President and CFO of AFI |
| David M. Applegate | • Co-Chief Executive Officer | • None |
| Bruce J. Paradis | • Co-Chief Executive Officer | • None |
| Davee L. Olson | • CFO | • None |
| Sanjiv Khattri | • Vice President<br>Member of Executive Committee | • Executive Vice President and CFO of AFI<br>• Director of GMAC Mortgage Group<br>• Former Assistant Treasurer of GM<br>• Former Comptroller of sales, marketing and consumer care of a GM subsidiary in the UK |
| Jerome B. Van Orman, Jr. | • Vice President<br>Member of Executive Committee | • None |
| David C. Walker | • Vice President<br>Member of Executive Committee | • Group Vice President of AFI<br>• Former Managing Director, CFO and director of GMAC Mortgage Group<br>• Former Director of U.S. funding and securitizations at AFI |
| Louise M. Herrle | • Treasurer | • None |
| Charmain T. Uy | • Assistant Treasurer | • Former Director of domestic finance in charge of capital markets, foreign exchange and commodities for GM<br>• Former Director of special project in GM's treasurer's office<br>• Former Managing Director and Vice President of Finance at GMAC Mortgage Group, Inc. |
| Cathy L. Quenneville | • Secretary | • Secretary of AFI [(3)] |
| Justine M. Lantgios | • Assistant Secretary | • None |

[(1)] Unless otherwise noted, the source of the information in this column is Consent of the Directors of Residential Capital Corporation, dated Sept.15, 2004, at 1-2 [RC40006721]; see also Residential Capital Corporation, Registration Statement (Form S-4) (July 15, 2005), at 98.
[(2)] Unless otherwise noted, the source of the information in this column is Residential Capital Corporation, Registration Statement (Form S-4) (July 15, 2005), at 99 -100.
[(3)] See Int. of B. Paradis, Dec. 14, 2012, at 182:25–183:2 (stating that "[Quenneville] was, I think, [an AFI] secretary").

---

[130] See Statement of Organization of the Incorporator of Residential Capital Corporation, dated Aug. 21, 2004, at RC40006726 [RC40006721]; Consent of the Directors of Residential Capital Corporation, dated Sept. 15, 2004, at 1 [RC40006721].

[131] Int. of D. Applegate, Dec. 7, 2012, at 121:7–12.

On April 20, 2005, the number of ResCap directors was increased from seven to nine.[132] On the same day, Independent Directors Jacob and Melzer were elected to the ResCap Board.[133] Neither Jacob nor Melzer appear to have had any prior relationship to GMAC Affiliates.[134] In addition, Van Orman resigned from the ResCap Board and was replaced, on the Board and the Executive Committee, by Linda Zukauckas, a Vice President, Corporate Controller, and Chief Accounting Officer of AFI.[135]

---

[132] *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital Corporation, Apr. 20, 2005, at RC40005473 [RC40005468].

[133] *See id.* Jacob joined the ResCap Board as the result of a recruiting search initially conducted by a firm in Chicago. In the first quarter of 2005, Jacob met with and was "screened" by an AFI executive. He subsequently met with Feldstein, then CEO of AFI, who asked him to join the ResCap Board. *See* Int. of T. Jacob, Nov. 7, 2012, at 25:10–28:4. At the time of his appointment, Jacob understood that the retention by ResCap of Independent Directors was necessary to obtaining an independent credit rating for ResCap. According to Jacob:

> Basically they were concerned about retaining the investment grade of ResCap because GM was being downgraded and it was affecting [AFI]. So they really were looking for a way to obtain an independent credit rating for ResCap. I believe credit rating agencies probably said hey, the only way we can do that is if you have independent directors.

Int. of T. Jacob, Nov. 7, 2012, at 32:4–11. Similarly, Melzer joined the ResCap Board after being approached by a search firm. Thereafter, he was interviewed by, among others, AFI executives Jerry Van Orman and Feldstein and ResCap co-CEOs Applegate and Paradis. Int. of T. Melzer, Oct. 10, 2012, at 32:24–34:21. Melzer also understood that independent directors were necessary to obtaining an independent credit rating for ResCap. Melzer stated:

> You know, I understood—certainly they explained the rationale of why they were doing this, that ResCap was growing rapidly, you know, had a tremendous appetite for capital. If independently rated from [AFI], it probably could raise capital at a lower rate than [AFI]. They had met with the rating agencies and, you know, worked out the details of what an operating—the operating agreement would have to provide to give the rating agencies the comfort to rate—you know, independently rate the debt. So, you know, I understood the—sort of the strategic rationale of what they were doing and, you know, why it was important to have truly independent directors.

*Id.* at 35:23–36:13.

[134] Jacob served as chairman of Chase Manhattan Mortgage Corporation (and its predecessor Chemical Residential Mortgage Corporation) from 1992 until 2003, and as chief executive officer from 1992 until 2001. Prior to becoming chairman and chief executive officer of Chemical Residential Mortgage Corporation, Jacob held various other positions with Chemical Bank, including as head of its credit card operations. Residential Capital Corp., Registration Statement (Form S-4) (July 15, 2005), at 100. Melzer is the co-founder and has served as managing director of RiverVest Venture Partners, a venture capital firm focused on investments in medical device and biopharmaceutical companies. Prior to founding RiverVest Venture Partners, Melzer served as president and chief executive officer of the Federal Reserve Bank of St. Louis from 1985 until 1998 and, in that capacity, served on the Federal Open Market Committee during that time. Prior to joining the Federal Reserve Bank, Melzer spent sixteen years in the corporate finance, real estate and securities businesses of Morgan Stanley & Co., including service as a managing director and as head of its U.S. government securities department. *Id.*

[135] *See id.* at 99 ("Prior to becoming chief accounting officer of [AFI], Zukauckas served as head of audit for [AFI] from January 2000 until May 2002.").

On June 15, 2005, the ResCap Board established the ResCap Audit Committee.[136] The ResCap Audit Committee initially consisted of Zukauckas and the Independent Directors, Jacob and Melzer.[137] The 2005 Operating Agreement provided that the chairperson of the ResCap Audit Committee had to be an Independent Director.[138] Accordingly, Jacob, one of the Independent Directors, was appointed as chairperson of the ResCap Audit Committee.[139]

Initially, ResCap had two CEOs: Applegate and Paradis.[140] Before serving as co-CEO of ResCap, (1) Applegate was, among other things, the President and CEO of GMAC Holding and (2) Paradis was, among other things, President and CEO of RFC.[141] This co-CEO structure was purportedly installed to avoid conflict between GMAC Residential and GMAC-RFC, and to ensure that their operations were unaffected after their contribution into ResCap.[142] The co-CEO structure ended on October 19, 2005, when Paradis was named CEO

---

[136] *See* Residential Capital Corporation Unanimous Consent to Action, dated June 15, 2005, at RC40005493 [RC40005468].

[137] *See id.*

[138] *See* 2005 Operating Agreement, § 2(g)(iii) [ALLY_0140795]; Section III.B.3.f (discussing the Independent Director requirement imposed by the 2005 Operating Agreement).

[139] *See* Residential Capital Corp., Registration Statement (Form S-4) (July 15, 2005), at 100.

[140] Initially, ResCap had two of everything. "[E]ssentially you had two companies that had two of everything. We called it Noah's Ark. You know, two finance departments, two servicing platforms, 13 origination platforms." Int. of J. Whitlinger, Nov. 30, 2012, at 11:4–7; *see also* Int. of R. Flees, Jan. 18, 2013, at 135:19–25.

[141] *See* Residential Capital Corp., Registration Statement (Form S-4) (July 15, 2005), at 98.

[142] Int. of D. Applegate, Dec. 7, 2012, at 106:9–15 ("Well, the initial structure was put in place so that GMAC Residential and RFC really ran pretty consistently as they had in the past. So there was not a lot of inherent business conflict, because it was really a business-as-usual situation."). David Walker, CFO of GMAC Mortgage Group at the time of ResCap's formation, recalled that there were some personality and cultural issues involved in combining GMAC Mortgage and RFC to form ResCap. Walker explained:

> Well, as I said, we sort of hatched the idea in June of '03 to put them together. We didn't get to the debt market until June of '05. Part of that was, literally, combining accounting, scrubbing the data for three years and all of that. But part of was, literally, some of that integration. Because even, again, even though the equity's being retained, the creditors putting up money, buying ResCap bonds at a different price than they would buy GMAC bonds, was a story that had to be told.

> And, you know, it was a challenge to get everybody to sort of be more harmonious with each other. So, I would say something similar. That reflected the independence of the two units. It was not unlike any sort of merger of banks, where sort of on high they're going to merge, but, you know, in the trenches, there's a lot of in-fighting going on because people protect turf or ideas that they need for capital or whatever. And you had Philadelphia. You had Minnesota. You know. We knew that was a risk in putting them together. We weighed that against just selling one or the other, and ultimately decided that we should do that.

> We talked. It wasn't like we came in and said, "You're going to do this, guys." There was a lot of discussion. "Do you think it can work?" "Can we get it to work?" And then I think it was, I don't know, sometime, maybe the fall of '05, we got Dave and Bruce. They sort of restructured a couple of the management levels to sort of get a little bit more harmony. And, you know, it grew on them a bit.

Int. of D. Walker, Nov. 28, 2012, at 40:15– 41:23.

of ResCap.[143] Applegate was named Chief Operating Officer of ResCap, and President of ResCap's U.S. Residential Finance Group, responsible for ResCap's "U.S. residential real estate finance segments—the Residential Capital Group and GMAC Residential."[144]

### 4. ResCap's Post-Formation Businesses

#### a. Business Overview

Upon formation, ResCap was a real estate finance company focused primarily on the residential real estate market.[145] ResCap's businesses included:

> US Residential Real Estate Finance, operated through two segments, GMAC Residential and Residential Capital Group, through which ResCap (i) originated, purchased, sold and securitized residential mortgage loans in the United States; (ii) provided primary and master servicing to investors in ResCap's residential mortgage loans and securitizations; (iii) provided warehouse lending facilities to other originators of residential mortgage loans; (iv) held a portfolio of residential mortgage loans for investment and retained interests from its securitization activities; and (v) conducted limited banking activities through Old GMAC Bank;

> Business Capital, through which ResCap provided financing and equity capital to residential land developers and homebuilders and financing to resort developers and healthcare related enterprises; and International, through which ResCap originated, purchased, sold and securitized residential mortgage loans in the United Kingdom, The Netherlands, Germany, Canada and Mexico.[146]

---

[143] *See* ResCap, Press Release, *Residential Capital Corporation Refines Executive Leadership* (Oct. 19, 2005) [EXAM11830536] ("[T]he executive changes are the next logical step in the launch of ResCap."). According to ResCap's press release:

> After successfully accomplishing several key milestones in launching ResCap, including raising $4 billion in a recent private bond offering," says Feldstein, "ResCap needs to focus on attacking market opportunities." Bruce [Paradis] will be charged with leading all of ResCap's businesses and its 14,000 employees. One of his key roles will be to drive ResCap's growth in real estate markets worldwide and to secure the capital resources to fuel that growth.

*Id.*

[144] *Id.* According to ResCap's press release:

> Dave [Paradis] will leverage the strengths of the company's U.S. real estate finance business," says Feldstein. "By integrating the skills, talents and resources of two premier organizations, ResCap will be better able to capitalize on market opportunities and provide ResCap's consumer and business clients with superior products and service.

*Id.*

[145] *See* Residential Capital Corp., Annual Report (Form 10-K) (Mar. 28, 2006), at 2.

[146] *Id.*

### b.  U.S. Residential Real Estate Finance

#### (1) Principal Activities

ResCap's principal activities in its U.S. residential real estate finance business included:

> (a) Originating, purchasing, selling and securitizing residential mortgage loans;
>
> (b) Servicing residential mortgage loans for itself and others;
>
> (c) Providing warehouse financing to residential mortgage loan originators and correspondent lenders to originate residential mortgage loans;
>
> (d) Creating a portfolio of mortgage loans and retained interests from its securitization activities;
>
> (e) Conducting limited banking activities through Old GMAC Bank; and
>
> (f) Providing real estate closing services.[147]

#### (2) Loan Origination And Acquisition

Initially, ResCap had three principal sources for residential mortgage loan production: (a) the origination of loans through its direct lending network; (b) the origination of loans through its mortgage brokerage network; and (c) the purchase of loans in the secondary market primarily through correspondent lenders.[148]

##### (a) Direct Lending Network

ResCap's direct lending network consisted of retail branches, internet and telephone-based operations. ResCap's retail network was targeted at customers desiring face-to-face service.[149]

##### (b) Mortgage Brokerage Network

In addition to mortgage loans originated through its direct lending network, ResCap originated residential mortgage loans through mortgage brokers. Most loans sourced by mortgage brokers were funded by ResCap and closed in ResCap's name.[150] ResCap also purchased loans from Old GMAC Bank pursuant to the 2001 MMLPSA. See Section V.B.3 for a discussion of the MMLPSA.

---

[147] See id. at 3.

[148] See id.

[149] See id. at 4. ("Typical referral sources are realtors, homebuilders, credit unions, small banks and affinity groups.").

[150] See id. ("Loans sourced by mortgage brokers are funded by us and generally closed in our name.").

### *(c) Correspondent Lender And Other Secondary Market Purchases*

Loans purchased from correspondent lenders were originated or purchased by the correspondent lenders, and subsequently sold to ResCap. ResCap also purchased pools of residential mortgage loans from entities other than correspondent lenders, mostly large financial institutions.[151]

### *(3) Types Of Mortgage Loans*

ResCap originated or purchased five categories of loans:

(a) *Prime Conforming Mortgage Loans*—prime credit quality first-lien mortgage loans secured by single-family residences that met or "conformed" to the underwriting standards established by Fannie Mae or Freddie Mac for inclusion in their guaranteed mortgage securities programs.

(b) *Prime Non-Conforming Mortgage Loans*—prime credit quality first-lien mortgage loans secured by single-family residences that either (1) did not conform to the underwriting standards established by Fannie Mae or Freddie Mac, because they had original principal amounts exceeding Fannie Mae and Freddie Mac limits, which are commonly referred to as jumbo mortgage loans, or (2) had alternative documentation requirements and property or credit-related features (e.g., higher loan-to-value or debt-to-income ratios) but were otherwise considered prime credit quality due to other compensating factors.

(c) *Government Mortgage Loans*—first-lien mortgage loans secured by single-family residences that were insured by the FHA or guaranteed by the VA.

(d) *Nonprime Mortgage Loans*—first-lien and certain junior lien mortgage loans secured by single-family residences, made to individuals that did not qualify for a prime loan, had credit-related features that fell outside the parameters of traditional prime mortgage products or had performance characteristics that otherwise exposed ResCap to comparatively higher risk of loss.

(e) *Prime Second-Lien Mortgage Loans*—open and closed-end mortgage loans secured by a second or more junior lien on single-family residences, including home equity mortgage loans.[152]

### *(4) Sale And Securitization Activities*

Initially, ResCap sold most of the mortgage loans it originated or purchased. According to James Young, ResCap's Chief Accounting Officer and Controller at the time of ResCap's

---

[151] *See id.*

[152] *See id.* at 5.

formation, this was the "core mortgage business."[153] This part of the business (and servicing) was "heavily dependent upon market forces."[154] Indeed, according to Young:

> The more—this is a flow business. Originating with the intent to sell, sell through securitization, retain the servicing. This is obviously heavily dependent upon market forces. When refis are going, you're making a ton of money. When they're not, you know, the rates are high, you're struggling. It is a very volatile business at its core. It's volatile because of that. And, its core and it's volatile, particularly from a financial perspective, speaking as a financial guy, because we record these gains when we sell these loans. And so, we are doing really—you know, you're doing really well when you're selling loans for gains. And when it dries up, you don't have your gains anymore. Again, it's a financial services company, so the only thing you really gotta look at is your variable of people costs.[155]

In 2005, ResCap sold $149.2 billion in mortgage loans.[156] ResCap typically sold: (1) its Prime Conforming Mortgage Loans through securitizations guaranteed by Fannie Mae or Freddie Mac; and (2) its Government Mortgage Loans through securitizations guaranteed by Ginnie Mae.[157] In 2005, ResCap sold $50.6 billion of mortgage loans, or 34% of the total loans ResCap sold, to GSEs and $98.6 billion to other investors through whole-loan sales and securitizations, including both on-balance sheet and off-balance sheet securitizations. ResCap held the mortgage loans that it did not sell, and the securities and subordinated interests that it retained in its securitizations, as part of its investment portfolio. Until 2008, ResCap generally retained the servicing rights for the loans that it sold or securitized.[158]

---

[153] Int. of J. Young, Sept. 28, 2012, at 30:20–31:8 ("This is the core mortgage business, which is you originate loans with the intent to sell. And you sell the loans primarily in securitizations and you retain the servicing because your primary business is you have the servicing platform.").

[154] *Id.* at 38:7–8.

[155] *Id.* at 38:4–25.

[156] Residential Capital Corp., Annual Report (Form 10-K) (Mar. 28, 2006), at 7.

[157] *Id.* In general, according to Young,

> [W]hen you do a securitization, you pool all these loans and you give 'em to the underwriter and the underwriter's going to help you sell these loans in the form of securitization, which is where you pool all the loans and then you issue your securities, and the securities are sort of not whole loans. They're actually securities that can be traded on the market. And the underwriter, you know, helps pool and package the nonconforming securitizations. When you put—when you originate with the intent to sell, you'll hold 'em on your balance sheet, you'll gather them up till you've got enough. You got an aggregation period. Sometimes during that aggregation period, somebody's not going to pay their mortgage. And so, it may take 60 or 90 days to aggregate a pool for securitization.

Int. of J. Young, Sept. 28, 2012, at 73:16–74:9.

[158] *See* Residential Capital Corp., Annual Report (Form 10-K) (Mar. 28, 2006), at 7–8; Section V.B.9 (discussing the MSR Swaps).

In conducting its securitizations, ResCap typically sold the related pool of mortgage loans to one of its wholly owned special-purpose entities, which then sold the loans to a separate, transaction-specific securitization trust in exchange for cash and, in certain cases, trust interests that ResCap retained.[159] The securitization trust issued and sold interests, generally represented by notes or certificates, to third-party investors that entitled the investors to cash flows generated from the securitized loans.[160]

In general, the securitization trust and the third-party investor had no recourse against ResCap or its assets.[161] Their recourse was generally limited to the trust's assets. Nevertheless, in the event ResCap breached certain representations or warranties concerning the mortgage loans being securitized, ResCap could be required to repurchase the loan from the securitization trust.[162] Although ResCap did not guarantee any securities issued by the securitization trusts, ResCap had, in certain instances, issued guarantees or pledged collateral to third-party credit-enhancement providers in support of certain securitization activities.[163]

---

[159] *See* Int. of J. Young, Sept. 28, 2012, at 143:3–13. Young stated that:

> Keep in mind the securitization is in a separate legal entity. All these are special purpose entities, these are all legal entities. So, the loans drop into the special purpose entity and securities are taken out the back, right? So, loans go in to the SPE, and then secure certificates are issued at the back end. And this is, of course, a legal entity and this is how the economics work. The loans go in there, certificates are sold, cash comes back through. It pays for the loans.

*Id.*

[160] *See* Residential Capital Corp., Annual Report (Form 10-K) (Mar. 28, 2006), at 7 ("These interests were usually represented by notes or certificates with various interest rates and were supported by the payments on the loans acquired by the trust."). According to Young:

> Now, securitization structures always include a residual, that is, basically acts as collateral support. So, in other words, these certificates generally come out of this rated—there's tranches, but, you know, you've got a triple A tranche and so far down the line, and then a residual at the back end— at the bottom of this waterfall. The residual is generally owned by the issuer of the securitization, which in our case is ResCap. So, the economics again are always the same. The real risk, so it's a way of funding the loan sale so that we can retain the servicing, capitalize the MSR and retain the servicing for that core business. So it's a funding mechanism.

Int. of J. Young, Sept. 28, 2012, at 143:14–144:14. Further, ResCap, as the residual holder, was "at the bottom." *Id.* at 144:21. Young provided the following example to describe the securitization risk:

> [I]f there's $100,000 worth of loans, you're only going to sell $90—or 90,000 of securities. Let's just use 100. There's $100 loan, you sell 90 of securities, so in this transaction it's an effective 90 percent advance rate but that $10 is a residual risk and it's high—it's risky because as these loans deteriorate everybody else gets paid but the residual holder is—it's not pari passu, it's not pro-rata.

*Id.* at 144:22–145:6.

[161] *See* Residential Capital Corp., Annual Report (Form 10-K) (Mar. 28, 2006), at 7.

[162] *See id.* In particular, ResCap made representations and warranties regarding the lien status or mortgage insurance coverage of the securitized mortgage loans. *Id.*

[163] *See id.*

III-33

According to ResCap's 2005 Annual Report, no claims had been made under these guarantees, nor had any of the collateral been subject to any claims.[164]

In addition to cash, ResCap often retained interests in the securitization trust to which it sold loans as partial payment for the loans. ResCap generally held these retained interests in its investment portfolio. These retained interests included mortgage-backed and mortgage-related asset-backed securities[165] (including senior and subordinated interests), interest-only, principal-only, investment-grade, non-investment grade and unrated securities. With respect to subordinated retained interests, ResCap was entitled to receive payment only after the investors holding more senior interests were repaid their investment plus interest and there was excess cash remaining in the securitization trust.[166] Accordingly, ResCap's subordinated retained interests served as a credit enhancement for the more senior securities issued by the securitization trust.[167]

### (5) Servicing Activities

ResCap generally retained the rights to service the loans it sold.[168] MSRs generally consist of (a) primary or (b) master servicing rights.[169]

### (a) Primary Servicing

Primary servicing rights refer to: (1) a mortgagor's right to service certain mortgage loans originated or purchased and later sold on a servicing-retained basis through securitizations and whole-loan sales; and (2) primary servicing rights purchased from other mortgage industry participants.[170] As a primary servicer, ResCap collected and remitted mortgage payments, responded to borrower inquiries, accounted for principal and interest, held custodial and escrow funds, worked with delinquent borrowers, supervised foreclosures

---

[164] *See id.*

[165] *See id.* at 8.

[166] *See id.* ResCap's ability to receive payment on its subordinated retained interests "depended on the performance of the underlying mortgage loans, and material adverse changes in performance of the loans, including actual credit losses and prepayment speeds, could have a material adverse effect on the value of these retained interests." *Id.*

[167] *See id.*

[168] *See* First Day Affidavit, ¶ 25; *see also* Residential Capital Corp., Annual Report (Form 10-K) (Mar. 28, 2006), at 8. According to Young, "you retain the servicing because your primary business is you have the servicing platform. That's the group of people, thousands of people who take the payments and process the payments." Int. of J. Young, Sept. 28, 2012, at 30:23–31:1.

[169] *See* Residential Capital Corp., Annual Report (Form 10-K) (Mar. 28, 2006), at 8. In addition to retaining primary servicing rights on the loans it produced, ResCap purchased primary servicing rights from other mortgage industry participants or agreed to provide primary mortgage servicing as a subservicer. *Id.*

[170] *See id.*; *see also* First Day Affidavit, ¶ 26.

and property dispositions, and generally administered the mortgage loans.[171] As a primary servicer, ResCap was required to make certain advances, including in the foreclosure context: (1) fees and expenses to servicing vendors, including property inspectors and maintenance contractors; (2) fees and expenses associated with enforcement or judicial proceedings, including foreclosure, bankruptcy, and eviction actions; and (3) costs and expenses associated with the management, maintenance, preservation, and liquidation of the property.[172] Such advances are generally reimbursed from the sale proceeds and from the applicable GSE to the extent the sale proceeds are insufficient to cover the advances.[173]

In addition, ResCap, as primary servicer, was required to advance funds to investors and other parties with respect to MBS and mortgage-related asset-backed securities and whole-loan packages to pay the principal and interest on the related pool of mortgage loans and other charges, including taxes and insurance premiums.[174] In general, ResCap was required to use its own funds to pay such advances, which were reimbursable.[175] Nevertheless, "the primary servicer is responsible for any loss in excess of the guarantee on an FHA-insured, VA- or USDA-guaranteed mortgage loan."[176] In addition, the primary servicer may incur other losses, including "costs of services exceeding expense caps or allowable amounts set forth in servicing agreements, making certain interest payments, penalties for failure to comply with require foreclosure timelines, costs related to restarting suspended foreclosures and assuming losses relating to Fannie Mae loans if the loss resulted from a rescinded mortgage insurance policy."[177]

---

[171] *See id.* According to Whitlinger:

> Once it's securitized, then it flips over into the servicing side, when I say [Forecasting Planning and Analysis group] for servicing, and now we're servicing a loan and I'm in that world of—you know, the MSR got created, I'm getting service fees every month, I have to call the borrowers and collect payments, make their taxes and insurance. If they go delinquent, we have to make sure that we follow the servicing guides for following what the processes they require in a loan that's delinquent, etc. So, to me origination is from app till sale.

Int. of J. Whitlinger, Nov. 30, 2012, at 28:12–23. The First Day Affidavit stated that:

> As a primary servicer, the Debtors collect and remit mortgage loan payments, respond to borrower inquiries, account for and apply principal and interest, hold custodial and escrow funds for payment of property taxes and insurance premiums, provide ancillary products, counsel or otherwise work with delinquent borrowers (including helping borrowers modify their loans in accordance with federal programs and public policy intended to assist homeowners' efforts to remain in their homes in the face of the recession and housing market collapse), supervise foreclosures and property dispositions and generally administer the mortgage loans consistent with contractual undertakings and business practices.

First Day Affidavit, ¶ 26.

[172] *See* First Day Affidavit, ¶ 27.

[173] *See id.*

[174] *Id.* ¶ 28.

[175] *Id.* ¶ 29–30.

[176] *Id.* ¶ 30.

[177] *Id.*

### (b) Master Servicing

Master servicing rights generally refer to a mortgagor's right to service mortgage-backed and mortgage-related asset-backed securities and whole-loan packages sold to investors.[178] As master servicer, ResCap collected mortgage loan payments from primary servicers and distributed those funds to investors in mortgage-backed and mortgage-related asset-backed securities and whole-loan packages.[179] In addition, ResCap, as master servicer, provided loan accounting, claims administration, oversight of primary servicers, loss mitigation, bond administration, cash flow waterfall calculation, investor reporting, and tax reporting compliance.[180] As master servicer, ResCap advanced certain amounts, including the principal and interest on "real estate owned" or "REO" properties, which generally refers to properties that have been foreclosed and will remain on the master servicer's balance sheet until sold to a third-party, to the extent the primary servicer did not make such advances.[181] Master servicing advances are generally recoverable, because they are "priority cash flows in the event of a default by the underlying borrower."[182]

In exchange for acting as primary or master servicer, ResCap was paid fees equal to a percentage of the outstanding principal balance of the loans being serviced, and was entitled to other forms of ancillary compensation, including late payment fees, prepayment penalties and interest income (i.e., the "float" earned on collections deposited in custodial accounts between the date of receipt and ResCap's distribution of such funds to investors).[183] The value of MSRs generally depends on interest rates and other factors.[184] This part of ResCap's business was

---

[178] *See* Residential Capital Corp., Annual Report (Form 10-K) (Mar. 28, 2006), at 8.

[179] *See id.*; First Day Affidavit, ¶ 32 ("In this capacity, the Debtors interact with investors, not homeowners.").

[180] *See* Residential Capital Corp., Annual Report (Form 10-K) (Mar. 28, 2006), at 8.

[181] *See* First Day Affidavit, ¶ 32.

[182] *Id.*

[183] *See* Residential Capital Corp., Annual Report (Form 10-K) (Mar. 28, 2006), at 9. In describing the servicing platform, Young stated:

> That's the group of people, thousands of people who take the payments and process the payments. And there's value to that course because you get servicing fees and you get float from the MSR . . . . But this is the core of these businesses. They all did the same thing, with this side of the house dealing with the GSE's and this side of the house doing the non-GSE.

Int. of J. Young, Sept. 28, 2012, at 30:25–31:8.

[184] *See* Residential Capital Corp., Annual Report (Form 10-K) (Mar. 28, 2006), at 9.

volatile.[185] To mitigate the overall risk of loss due to a change in the fair value of the MSRs, ResCap implemented a hedge program.[186]

### (6) Warehouse Lending

In its 2005 Annual Report, ResCap stated that it believed it was "the largest provider of warehouse-lending facilities to correspondent lenders and other mortgage originators in the United States."[187] These warehouse lending facilities enabled lenders and originators to finance a full complement of residential mortgage loans, including loans acquired by ResCap through correspondent lenders, until the loans were sold in the secondary market (sometime to ResCap). Advances under the warehouse lending facilities were generally secured by the underlying mortgage loans.[188]

### (7) HFI Loans And Retained Interests

ResCap held a portfolio of assets consisting of (1) residential mortgage loans HFI, including residential mortgage loans sold in on-balance sheet securitizations and (2) retained interests from its securitization activities. As of December 31, 2005, the principal balance of ResCap's mortgage loan portfolio was approximately $67.9 billion and the fair value of its retained interests was approximately $1.3 billion.[189] This portfolio provided ResCap with a source of revenue as it recognized interest income over the life of the underlying mortgage loans.[190]

---

[185] *See* Int. of J. Young, Sept. 28, 2012, at 129:19–25 ("We need to keep in mind it's a profitable business but also adds to the volatility—if you do sell the loan, you capitalize the MSR, it's on your balance sheet and you've got this big infrastructure of thousands of people processing these payments and making money on that.").

[186] *See* Residential Capital Corp., Annual Report (Form 10-K) (Mar. 28, 2006), at 9; *see* Section V.B.9 (discussing the MSR Swap and derivative transactions). MSRs related to HFI loans were not hedged, because, according to Young:

> [W]hen you hold the loan, you originate it, pay off, it's in HFI the entire time and there is no MSR on the balance sheet. So, you only hedge the MSR when it's on your balance sheet. So there's no—so, if things are going down into HFI because we can't sell them—it never gets to the point of sale, and there's no MSR ever put on the balance sheet, there's no hedging of any MSR, which is in a sense kind of beautiful because you get the economics with servicing but you don't have to deal with the ugly asset that's on your books.

Int. of J. Young, Sept. 28, 2012, at 132:6–20.

[187] Residential Capital Corp., Annual Report (Form 10-K) (Mar. 28, 2006), at 10.

[188] *See id.*; Int. of A. Celini, Feb. 18, 2013, at 23:21–24:11 (discussing transfer of mortgage lending to Old GMAC Bank).

[189] These amounts include assets held by Old GMAC Bank.

[190] *See* Residential Capital Corp., Annual Report (Form 10-K) (Mar. 28, 2006), at 11.

### 5. Old GMAC Bank

As an extension of its real estate finance business, ResCap owned, at the time of its formation through the November 2006 consummation of the Cerberus PSA,[191] Old GMAC Bank, a federally chartered savings bank, which provided ResCap with an additional source of funding for ResCap's U.S. residential real-estate finance business. In addition, Old GMAC Bank provided collateral/pool certification and collateral document custodial services to ResCap's U.S. residential real-estate finance business and third-party customers.[192] As of December 31, 2005, Old GMAC Bank had $9.6 billion in assets, with approximately $4.1 billion in customer deposits, approximately 33% of which consisted of custodial funds deposited by other parts of ResCap's business.[193]

### 6. Residential Finance Group Consisted Of GMAC Residential And Residential Capital Group

Initially, ResCap carried out its U.S. residential real estate finance operations through two operating entities: GMAC Residential (GMAC Mortgage and its subsidiaries)[194] and Residential Capital Group (RFC and its subsidiaries).[195]

#### a. GMAC Residential (GMAC Mortgage)

GMAC Mortgage, headquartered in Horsham, Pennsylvania, offered residential mortgage and mortgage-related products and services to consumers and businesses throughout the United States.[196] GMAC Mortgage, was the parent of Old GMAC Bank.[197]

GMAC Mortgage focused on the direct origination of mortgage loans with consumers of prime credit quality that generally conformed to the underwriting requirements of Fannie Mae or Freddie Mac (i.e., "conforming loans").[198] GMAC Mortgage also sold some non-conforming loans (e.g., HELOCs). Substantially all of GMAC Mortgage's direct origination

---

[191] *See* Section V.A.1.a (discussing the 2006 Bank Restructuring).

[192] *See* Residential Capital Corp., Annual Report (Form 10-K) (Mar. 28, 2006), at 11.

[193] *See id.* at 12.

[194] GMAC Residential is the term ResCap sometimes used to refer to the operations of GMAC Mortgage. Int. of J. Young, Sept. 28, 2012, at 29:9–18.

[195] Residential Capital Group is the term ResCap sometimes used to refer to the operations of RFC. *See, e.g.,* Residential Capital Corp., Annual Report (Form 10-K) (Mar. 28, 2006), at 12.

[196] *See id*.

[197] *See id*.; *see also* Section V.A.1 (discussing Old GMAC Bank).

[198] *See* Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 28, 2007), at 12; *see also* Residential Capital Corp., Registration Statement (Form S-4) (July 15, 2005), at 62 (describing conforming mortgage loans as "prime credit quality first-lien mortgage loans secured by single-family residences that meet or 'conform' to the underwriting standards established by Fannie Mae or Freddie Mac for inclusion in their guaranteed mortgage securities programs").

of mortgage loans was conducted through retail branches and a direct lending network.[199] GMAC Mortgage did, however, originate certain mortgage loans sourced from mortgage brokers, and it purchased mortgage loans from correspondent lenders.[200] GMAC Mortgage produced approximately $91.5 billion in residential mortgage loans in 2005.[201]

GMAC Mortgage sold most of the mortgage loans it originated or purchased. Such sales were generally in the form of securitizations guaranteed by a GSE, primarily Fannie Mae or Freddie Mac.[202] GMAC Mortgage also sold mortgage loans to other investors through whole-loan sales or securitizations.[203] The loans that GMAC Mortgage did not sell were generally held by Old GMAC Bank as part of a portfolio of HFI mortgage loans.[204]

GMAC Mortgage typically retained the MSRs with respect to loans it sold or securitized.[205] GMAC Mortgage also purchased MSRs from other servicers or acted as a subservicer of mortgage loans.[206] In addition, GMAC Mortgage, primarily through Old GMAC Bank, provided warehouse lending facilities to mortgage originators to finance residential mortgage loans.[207]

### b. Residential Capital Group (RFC)

RFC was headquartered in Minneapolis, Minnesota and focused primarily on the purchase of residential mortgage loans in the secondary market and the origination of loans through mortgage brokers.[208] Unlike GMAC Mortgage, RFC originated mortgage loans that covered a broad spectrum of the credit scale, from prime to nonprime.[209] RFC's mortgage loans generally did not conform to the underwriting requirements of Fannie Mae or Freddie Mac.[210]

---

[199] *See* Residential Capital Corp., Annual Report (Form 10-K) (Mar. 28, 2006), at 12.

[200] *See id*.

[201] *See id*.

[202] *See id.* 13–14.

[203] *See id.* at 14.

[204] *See id*.

[205] *See id*.

[206] *See id*.

[207] *See id*.

[208] *See id*.

[209] *See id*.

[210] *See id.* Residential Capital Group's loans were generally considered non-conforming because (1) of the size of the loans or (2) they had more expansive documentation, property or credit-related features (e.g., higher debt-to-income or loan-to-value ratios), and therefore did not fit within the Fannie Mae or Freddie Mac guidelines. *See id*.

RFC purchased and originated first-lien and second-lien residential mortgage loans from correspondent lenders throughout the United States and through mortgage brokers to whom it provided wholesale funding.[211] RFC also purchased both "seasoned" mortgage loans that had been funded for more than twelve months and "distressed" mortgage loans that were in default or otherwise not performing.[212] RFC retained the MSRs for most of the loans it obtained or securitized.[213] In addition, RFC provided: (1) wholesale funding services to U.S. mortgage brokers for the origination of residential mortgage loans; and (2) warehouse lending to the residential mortgage lending industry in the United States.[214] According to ResCap's 2005 Annual Report:

> Our Residential Capital Group was the fifth-largest non-agency issuer of mortgage-backed and mortgage-related asset-backed securities in the United States in 2005. The Residential Capital Group issued approximately $56.7 billion of mortgage-backed and mortgage-related asset-backed securities in 2005. The Residential Capital Group is also a leading provider of wholesale funding services to U.S. mortgage brokers for the origination of residential mortgage loans and, as of December 31, 2005, we believe the Residential Capital Group was the largest provider of warehouse lending to the residential mortgage lending industry in the United States. The Residential Capital Group is also a leading primary and master servicer of residential mortgage loans and serves in that capacity for most of the loans it originates or purchases.[215]

### (1) Sale And Securitization Activities Of RFC

Like GMAC Mortgage, RFC sold nearly all of the mortgage loans it produced. Such sales were primarily through ResCap's securitization programs or in whole-loan sales to third-party investors. In general, RFC segregated the types of mortgage loans it acquired into specific securitization programs, each having distinct underlying collateral characteristics. According to ResCap, this process of securitizing mortgage loans with similar prepayment and credit-related characteristics through dedicated securitization programs resulted in RFC being able to more efficiently obtain funding for those assets through the capital markets.[216]

### (2) Servicing Activities Of RFC

RFC acted as the primary servicer of most of the residential mortgage loans it obtained, and as the master servicer of substantially all of the loans it sold in whole-loan sales or securitizations.[217] As of December 31, 2005, as primary servicer, RFC managed a portfolio of approximately    792,000    loans    with    an    aggregate    unpaid    principal    balance    of

---

[211] *See id.* at 15.

[212] *See id.* at 17.

[213] *See id.* at 16.

[214] *See id.* at 15.

[215] *See id*.

[216] *See id.* at 16.

[217] *See id*.

approximately $105 billion, and, as master servicer, a portfolio of approximately 826,000 loans with an aggregate unpaid principal balance of approximately $115 billion, which amounts included loans for which RFC also served as primary servicer.[218]

### (3) Seasoned And Distressed Mortgage Loans

RFC purchased seasoned and distressed residential mortgage loans.[219] RFC purchased many seasoned loans "from previously sold or securitized pools that had been paid down to less than 10% of their original aggregate principal balance, and were therefore 'called' out of these deals because administering such a small pool is economically inefficient."[220] Other seasoned loans were purchased in the secondary market. RFC purchased distressed residential mortgage loans with the goal of resolving or restructuring them and then selling them through securitizations or whole-loan transactions.[221] In 2005, RFC: (1) acquired more than $5.4 billion of face-amount seasoned mortgage loans, of which $1.9 billion were called loans and $3.5 billion were seasoned or distressed mortgage loans; and (2) securitized approximately $2.6 billion of seasoned and performing distressed mortgage loans.[222]

### (4) Business Capital Group

In 2005, ResCap's BCG conducted various business activities including residential construction finance; residential equity; and model home finance, pursuant to which ResCap provided capital to residential land developers and homebuilders to finance real estate projects. In addition, ResCap's BCG engaged in: (1) the resort finance business, which provided debt capital to resort and timeshare developers;[223] and (2) the health capital business; which provided debt capital to health care providers, primarily in the health care services sector.[224] Loans by ResCap's BCG were generally HFI.[225]

---

[218] *See id.*

[219] *See id.*

[220] *See* Residential Capital Corp., Annual Report (Form 10-K) (Mar. 28, 2006), at 17.

[221] *See id.* The Residential Capital Group obtained resolution of these mortgage loans "by working with the borrower to return the loan to performing status (in some cases under renegotiated terms), obtaining a payoff of the loan or selling the underlying residential property." *See id.*

[222] *See id.*

[223] *See id.* at 19. ResCap's BCG provided "revolving lines of credit secured by eligible timeshare receivables consisting of consumer timeshare notes." *See id.* The proceeds of such lines of credit were generally used to fund operations. In addition, ResCap's BCG made "loans to finance the acquisition, development and construction of the timeshare resort themselves, which are secured by a first lien on the real estate." *See id.*

[224] *See id.* at 17.

[225] *See* Int. of J. Young, Sept. 28, 2012, at 51:8–15.

### (a) Residential Construction Finance

ResCap's BCG provided capital to homebuilders, residential land developers and related market participants for the acquisition, development and construction of residential housing developments in the United States. It also provided debt capital, primarily in the form of first-lien loans and working capital loans, to finance specific projects for joint ventures that developed land into for sale lots. As of December 31, 2005, ResCap had total first-lien and working capital commitments of approximately $3.3 billion, with $2.2 billion in outstanding principal.[226]

ResCap's BCG also made equity investments with certain customers in specially created single-purpose entities to acquire residential projects and a certain other types of real estate. In addition, the BCG owned a significant amount of equity in a large regional homebuilder. As of December 31, 2005, the BCG had total equity investments of approximately $420 million.[227]

### (b) Residential Equity

The BCG provided mezzanine debt financing to homebuilders and residential land developers.[228] Such financings generally covered 80% to 90% of the homebuilder's or developer's required equity contribution for a particular real estate project, typically single- and multi-family housing or conversions of properties to condominiums. The BCG usually: (1) made these loans to single-purpose entities specifically formed to acquire and own a single project; and (2) obtained a security interest in the homebuilder's or developer's equity interest in the single-purpose entity. As of December 31, 2005, the BCG had mezzanine financing commitments of approximately $398 million with $341 million in principal outstanding.[229]

### (c) Model Home Finance

The BCG offered two major model-home products: (1) a model-home lease program; and (2) a lot option program. Under the model-home lease program, a homebuilder built a model home for the BCG, which would lease the model home to the homebuilder at a lease

---

[226] *See* Residential Capital Corp., Annual Report (Form 10-K) (Mar. 28, 2006), at 18.

[227] *See id.*

[228] *See* Int. of J. Young, Sept. 28, 2012, at 50:21–51:2. According to Young,

> The [Business Capital Group], completely different, structured mezzanine financing to businesses that just happened to be in the home building business, so that was the strategic connection. Of course, in hindsight, you know, it was—I'm doubling down on the—you know, it's the housing market, but— . . . .

*Id.*

[229] *See* Residential Capital Corp., Annual Report (Form 10-K) (Mar. 28, 2006), at 18–19.

rate tied to a monthly floating interest rate.[230] The homebuilder would use the model home as a sales model. In exchange for a market commission, the homebuilder would sell the model home on behalf of the BCG. As of December 31, 2005, the BCG had more than 3,150 model homes with a net book value of approximately $776.5 million under lease.[231]

Under the lot option program, the BCG purchased land that a homebuilder designated. Simultaneously, the BCG entered into a contract with the homebuilder to develop the land into completed lots and an option contract with the homebuilder to purchase the finished lots. As of December 31, 2005, the BCG owned approximately 11,900 residential lots with a book value of approximately $543.8 million through the lot option program.[232]

### (d) Resort Finance

The BCG provided revolving lines of credit secured by eligible timeshare receivables consisting of consumer timeshare notes, generally to mid-size resort and timeshare developers. The developers typically used these loan proceeds to fund operations. In certain instances, the BCG made loans secured by the underlying real estate to developers to finance the acquisition, development and construction of the actual timeshare resorts. As of December 31, 2005, the BCG had: (1) total committed working capital lines of credit of approximately $1 billion, with $545.6 million in principal outstanding; and (2) total committed facilities for the acquisition, development and construction of resort and timeshare facilities of approximately $425 million, with approximately $146 million in principal outstanding.[233]

### (e) Health Capital

The BCG also provided financing to healthcare-related enterprises, including physician groups, hospitals, in-home service providers, medical staffing companies, medical equipment manufacturers and distributors, in patient/out patient care facilities, other healthcare service providers, and similar businesses, for working capital and for acquiring other healthcare-related enterprises. The health capital loans primarily took the form of: (1) working capital lines of credit secured by accounts receivable; (2) loans based primarily on

---

[230] *See* Int. of J. Young, Sept. 28, 2012, at 52:16–53:2. According to Young,

> The model home was—we owned the home—and leased it back to the builder, which was like, sort of an offshoot again of federal issue with the builder, we get all the financing, of some kind you know, and the business group, you know, was creative and talked to them about, "Well, you got model home needs. So, we'll buy a little bit more—build or buy the model home and lease it back to you." So, they took it off their balance sheet basically.

*Id.*

[231] *See* Residential Capital Corp., Annual Report (Form 10-K) (Mar. 28, 2006), at 19.

[232] *See id.*

[233] *See id.*

the cash flow generated by the healthcare-related enterprise; or (3) short-term loans secured by real estate.[234] As of December 31, 2005, the BCG had total committed facilities related to its health capital business of approximately $792.5 million with $598.2 million in principal outstanding.[235]

### (5) International Business Group

In 2005, ResCap's IBG conducted operations in the United Kingdom, The Netherlands, Germany, Canada, and Mexico.[236] According to Young, ResCap's International Business Group conducted the functional equivalent of non-conforming business in those countries.[237]

#### (a) United Kingdom

ResCap's U.K. operations included residential mortgage loan origination, acquisition, sale and securitization. Although ResCap retained the right to service the loans it securitized in the U.K., it outsourced the servicing activities to a third party. In 2005, ResCap originated approximately $12.5 billion of residential mortgage loans in the U.K. making it, according to ResCap, "the largest originator of nonprime residential mortgage loans in the" U.K.[238] In addition, ResCap issued residential mortgage-backed securities of approximately $5.3 billion in 2005 making it the "third largest issuer" of such securities in the U.K.[239]

#### (b) Continental Europe

The IBG operated in The Netherlands and Germany. In 2005, the IBG originated approximately $2.8 billion in mortgage loans in Continental Europe.[240]

---

[234] *See id.* at 19–20. In connection with its health capital business, the BCG offered cash flow loans to certain healthcare-related enterprises with better credit quality than the customers of its accounts receivable secured lines of credit. These loans were usually secured by all the assets of the enterprise, including equity stakes in all related entities and cash flow. The real estate loans offered through the BCG's health capital business were generally short-term loans that served as bridge financing while the borrower sought financing insured by HUD. *See id.* at 20.

[235] *See id.*; *see also* Section V.F.4.a (discussing the August 2007 sale of the Health Capital business to GMAC CF).

[236] *See* Residential Capital Corp., Annual Report (Form 10-K) (Mar. 28, 2006), at 20.

[237] *See* Int. of J. Young, Sept. 28, 2012, at 46:3–13, (noting that the IBG "was basically non-conforming, the same business model . . . from the U.S., taken internationally, on the non-conforming side, because they don't have Fannie and Freddie and things like that"); *id.* at 48:18–21 ("So, yeah, the same basic business model, but outside the U.S., nonconforming, originate, sell, retain the servicing."). IBG's business, however, was "not nonprime." *Id.* at 47:3–6.

[238] *See* Residential Capital Corp., Annual Report (Form 10-K) (Mar. 28, 2006), at 20–21.

[239] *See id.*

[240] *See id.* at 21.

*(c) Canada*

In April 2002, the IBG acquired the largest non-bank owned mortgage brokerage network in Canada. This mortgage brokerage network brokered loans to other lenders in Canada. Through its Canadian operations, the IBG (1) received approximately $10.8 million in brokerage fees and (2) originated approximately $1 billion of mortgage loans through its mortgage broker network in 2005.[241]

*(d) Mexico*

In 2000, the IBG began its Mexican lending operations. In Mexico, the IBG provided (1) capital to developers to acquire and develop land and build homes; (2) mortgage lending; and (3) warehouse facilities to financial intermediaries in Mexico to create an origination network. As of December 31, 2005, the IBG had approximately $42 million in outstanding loans from its operations in Mexico.[242]

*(6) Other*

ResCap provided real-estate brokerage in markets including New England, Chicago, the New York City metropolitan area, and San Francisco. In 2005, ResCap's networks of real-estate brokerage offices, including franchised and company-owned, were among the ten largest in the United States. In addition, ResCap provided full-service global relocation to consumers. ResCap's global relocation services business was one of the largest providers of global relocation services.[243]

## D. HOUSING AND MORTGAGE MARKETS EXPERIENCE RAPID GROWTH IN THE YEARS LEADING TO RESCAP'S FORMATION

Beginning in the late 1990's, the housing and related mortgage markets experienced rapid growth. A number of factors contributed to this growth including, most significantly: (1) historically low interest rates; (2) promotion of home ownership by the Federal Government through various programs; and (3) growth of owner's equity attributable to increasing real-estate prices in hot markets, such as southern California.[244] Home prices in the United States experienced a historic boom from 2001 through 2005. "Nationally, real home prices rose 86% [corrected for inflation] between the bottom in the fourth quarter of 1996 and

---

[241] *See id.*

[242] *See id.*

[243] *See id.* at 21–22.

[244] *See* Anna J. Schwartz, *Origins of the Financial Market Crisis of 2008*, 29 CATO J. 19 (Winter 2009); *see also* OFFICE OF FEDERAL HOUSING ENTERPRISE OVERSIGHT, U.S. HOUSE PRICES CONTINUE TO RISE RAPIDLY (June 1, 2005), http://www.fhfa.gov/webfiles/1184/1q05hpi.pdf.

the peak 9.25 years later in the first quarter of 2006."[245] By other estimates, the price of a typical American house increased by 124% between 1997 and 2006.[246]

In 2002 and 2003, fueled by demand from private-label MBS investors, mortgage lenders created numerous alternative loan products,[247] many of which traded traditional risk-based pricing (i.e., higher interest rates and LTV ratios) for premium pricing and upfront fees.[248] Increasingly, lenders and borrowers turned to more exotic mortgage products, most significantly the "2/28 Option ARM" in 2004 and 2005, combined with lower and lower credit and documentation standards to qualify.[249]

The MBS market evolved as a means for mortgage originators to finance their business by selling pools of loans to a special purpose entity known as an investment trust.[250] The investment trust would then rank the mortgages into credit quality strips or tranches, and sell interests to private investors. The better credit quality tranches received the first right to payment, while investors in the lower graded tranches received higher rates of return for accepting greater risk.[251] Investors from around the globe flocked to the MBS market.

> The private label market grew dramatically, with issuances rising from $586 billion in 2003 to $1.2 trillion in 2005. A large share of the growth came from the subprime and Alt-A markets, whose share of the private label market grew from 41% to 76% . . . .[252]

---

[245] Robert J. Shiller, the Federal Reserve Bank of Kansas City, Understanding Recent Trends in House Prices and Homeownership (Sept. 14, 2007), at 4, http://www.nber.org/papers/w13553.pdf.

[246] *CSI: Credit Crunch, Central Banks have Played a Starring Role*, The Economist, Oct. 18, 2007.

[247] Cynthia Angell & Clare D. Rowley, FDIC, FDIC Outlook, Breaking New Ground in U.S. Mortgage Lending (last updated Mar. 21, 2007), http://www.fdic.gov/bank/analytical/regional/ro20062q/na/2006_summer04.html.

[248] *Id.*

[249] *See id.*; *see also* Chris Isidore, *Liar Loans: Mortgage Woes Beyond Subprime*, CNNMoney.com, Mar. 19, 2007, http://money.cnn.com/2007/03/19/news/economy/next_subprime/?postversion=2007031913; *see also* The Subprime Mortgage Crisis Explained, Stock Market Investors, http://www.stock-market-investors.com/stock-investment-risk/the-subprime-mortgage-crisis-explained.html.

[250] The Bond Market Association, International Swaps & Derivatives Association, Securities Industry Association, Special Purpose Entities and the Securitization Market (Feb. 1, 2002), at 1, http://www.isda.org/speeches/pdf/SPV-Discussion-Piece-Final-Feb01.pdf.

[251] Working Group, Committee on the Global Financial System, The Role of Ratings in Structured Finance; Issues and Implications (Jan. 2005), at 1, http://www.bis.org/publ/cgfs23.pdf.

[252] Richard K. Green & Susan M. Wachter, Federal Reserve Bank of Kansas City, The Housing Finance Revolution (Aug. 31, 2007), at 34, http://www.kc.frb.org/publicat/sympos/2007/PDF/2007.08.21.WachterandGreen.pdf.

As developing economies and emerging markets grew, so did the global supply of money to be invested.[253] With the Fed Funds Rate—the rate of interest at which banks lend available cash at the Federal Reserve to each other—pegged at 1% after the economic downturns caused by the burst of the "dot-com" bubble and the tragedies of September 11, 2001, MBS increased in appeal to this global money pool.[254] By 2003, there were insufficient loans produced by traditional lending standards to meet investor demand. With demand remaining strong, lending standards began to weaken.[255]

### 1. The Subprime Mortgage Market Expands

The subprime mortgage market, which was virtually nonexistent before the mid 1990's, rose to account for a fifth of all new mortgages by 2005.[256] New loan denial rates fell sharply after 2000, with these newly available mortgages going to lower-income borrowers.[257] Along with the growth of subprime mortgages, new products were developed and introduced to the market over time included ones with acronyms such as:

- "*SIVA*"—Stated Income, Verified Assets;

- "*NIVA*"—No Income, Verified Assets;

- "*NINA*"—No Income, No Assets (a/k/a "Liar Loans"); and, later,

- "*NINJA*"—No Income, No Job or Assets.[258]

---

[253] Ben S. Bernanke, Governor, FRB, Remarks at the Sandridge Lecture, Virginia Association of Economists (Mar. 10, 2005), http://www.federalreserve.gov/boarddocs/speeches/2005/200503102/.

[254] *Id.*

[255] This American Life: The Giant Pool of Money, National Public Radio (May 9, 2008); *see also* Dr. Faten Sabry & Dr. Chudozie Okongwu, *How Did We Get Here? The Story of the Credit Crisis*, J. OF STRUCTURED FIN. (Spring 2009), at 6 ("According to annual surveys conducted by the Office of the Comptroller of the Currency (OCC), credit underwriting standards were eased during the years 2004 to 2006.").

[256] NIKOLA KOJUCHAROV, CLYDE F. MARTIN, ROBERT F. MARTIN, & LILI XU, THE FEDERAL RESERVE BANK OF SAN FRANCISCO, THE SUBPRIME MORTGAGE CRISIS: IRRATIONAL EXUBERANCE OR RATIONAL ERROR? (July 2008), at 6, http://www.frbsf.org/economics/conferences/0901/Kojucharov-Martin-Martin-Xu.pdf.

[257] ROBERT J. SHILLER, THE FEDERAL RESERVE BANK OF KANSAS CITY, UNDERSTANDING RECENT TRENDS IN HOUSE PRICES AND HOMEOWNERSHIP (Sept. 14, 2007), at 17–18, http://www.nber.org/papers/w13553.pdf.

[258] *See* THE SUBPRIME MORTGAGE CRISIS EXPLAINED, STOCK MARKET INVESTORS, http://www.stock-market-investors.com/stock-investment-risk/the-subprime-mortgage-crisis-explained.html; *see also* CHARLES R. MORRIS, THE TWO TRILLION DOLLAR MELTDOWN: EASY MONEY, HIGH ROLLERS, AND THE GREAT CREDIT CRASH (2008).

In a NINJA loan, the borrower needed only a qualifying credit score; the lender was not required to verify any other information.[259] These lower underwriting standards were further coupled with riskier structures such as the "2/28" or "3/27" (two or three year low teaser rate followed by twenty-seven or twenty-eight years of adjustable rates).[260] Adjustable rate mortgages were not new. The practice of qualifying the borrower based on the lower teaser rate payment amount not the future adjusted rate, however, was an innovation.[261]

By 2004, lenders began placing substantial prepayment penalty clauses into loans to ensure that the loan either remained outstanding through the first reset date, or the borrower paid a premium to retire the loan.[262] As low teaser rates became more common, so did optional products allowing borrowers to choose to pay interest only or even something less, creating a negative amortization loan.[263] Increasing risk even further, lenders also began to combine the exotic mortgage products with a means for little or no down payment.[264] LTV of 80%, long considered the minimum lending standard, were quickly being replaced with 90% LTV, or the "80/20" loan, where the lender made an 80% first mortgage coupled with a 20% second mortgage that could be used as the down payment to avoid requiring personal mortgage insurance also known as PMI.[265]

By 2005, 22% of new loans were considered subprime, up from 8% in 2003.[266] Further, at the peak of the lending frenzy in 2006, subprime loans had an average cumulative LTV of 95% and more than one half were low or no documentation loans. In addition, 55% were

---

[259] *See id.*

[260] RICHARD K. GREEN & SUSAN M. WACHTER, FEDERAL RESERVE BANK OF KANSAS CITY, THE HOUSING FINANCE REVOLUTION (Aug. 31, 2007), at 37, http://www.kc.frb.org/publicat/sympos/2007/PDF/2007.08.21. WachterandGreen.pdf.

[261] *Id.* at 37–38.

[262] *Id.*

[263] CYNTHIA ANGELL & CLARE D. ROWLEY, FDIC, FDIC OUTLOOK, BREAKING NEW GROUND IN U.S. MORTGAGE LENDING (last updated Mar. 21, 2007), at 37–38, http://www.fdic.gov/bank/analytical/regional/ ro20062q/na/ 2006_summer04.html.

[264] *Id.*

[265] THE FINANCIAL CRISIS INQUIRY COMMISSION, THE FINANCIAL CRISIS INQUIRY REPORT (Jan. 2011), at 109– 110, http://www.gpo.gov/fdsys/pkg/GPO-FCIC/pdf/GPO-FCIC.pdf; *see also* Glenn Setzer, *Piggybacks Arouse Interest—and Concerns*, MORTGAGE NEWS DAILY, Aug. 9, 2005, http://www.mortgagenewsdaily.com/892005_Piggyback_Loans.asp; Jody Shen, *Subprime Second-Mortgage Bond Downgrades Surging, Moody's Says*, BLOOMBERG, June 12, 2007, http://www.bloomberg.com/apps/ news?pid=newsarchive&sid=aJHB7OMXxFT4.

[266] RICHARD K. GREEN & SUSAN M. WACHTER, FEDERAL RESERVE BANK OF KANSAS CITY, THE HOUSING FINANCE REVOLUTION (Aug. 31, 2007), at 36, http://www.kc.frb.org/publicat/sympos/2007/PDF/2007.08.21. WachterandGreen.pdf.

accompanied by a piggyback second loan, thereby permitting the borrower to avoid paying PMI.[267] In 2006, as interest rates began to reset on early vintage 2/28 Option ARM's, the subprime market began to see a significant rise in defaults.[268] Borrowers' interest rates reset from initial low teaser rates of 2% to 3% to market rates as high as 8% to 9% in some cases. At the same time, home prices were leveling off or, in some markets, declining, further hampering homeowners' ability to sell their home or refinance their loans. In 2006, the median price of new homes dropped 3% from January to August, while the Dow Jones U.S. Home Construction Index was down 35% in August 2006 from the prior year.[269] Subsequent research shows that the housing bubble peaked in 2006.[270]

### 2. As Interest Rates Increase, Some Begin To Predict A Housing Slowdown

By 2004, the FRB and other monetary fund leaders around the world began to see signs of looming inflation and introduced increasing interest rates to combat these signs.[271] LIBOR and Fed Funds rates increased from historic lows of 1% in 2002, to 2.3% by the end of 2004.[272] By the end of 2005, the continued rate increases brought LIBOR and the Fed Funds

---

[267] Mark Zandi & Celia Chen, *Aftershock: Housing in the Wake of the Mortgage Meltdown*, MOODY'S ECONOMY.COM, Dec. 2007, at 21, http://www.economy.com/home/products/samples/2007-12-01-Aftershock-Housing-Wake-Mortgage-Meltdown.pdf.

[268] Noelle Knox, *Some Homeowners Struggle to Keep Up With Adjustable Rates*, USA TODAY, Apr. 3, 2006, http://usatoday30.usatoday.com/money/perfi/housing/2006-04-03-arms-cover-usat_x.htm.

[269] John Spence, *More Builders Lower Expectations,* MARKETWATCH (WALL ST. J.), July 27, 2006, http://articles.marketwatch.com/2006-07-27/news/30812021_1_meritage-homes-corp-orders-for-new-homes-housing-market.

[270] Henry M. Paulosn, Jr., Sec'y, U.S. Dep't of the Treasury, Remarks on Current Housing and Mortgage Market Developments, Georgetown Law Center (Oct. 16, 2007), http://blogs.wsj.com/economics/2007/10/16/text-of-paulsons-remarks-on-housing/.

[271] THE FEDERAL RESERVE AND INTEREST RATES, BRANCH BANKING AND TRUST COMPANY, http://www.bbt.com/bbtdotcom/financial-education/PLANNING/federal-reserve-and-interest-rates.page.

[272] LIBOR RATES HISTORY: HISTORICAL LIBOR RATES INFORMATION, FEDPRIMERATE.COM, http://www.fedprimerate.com/libor/libor_rates_history.htm#liborpreviousmonth; FEDERAL FUNDS TARGET RATE HISTORY, FEDPRIMERATE.COM, http://www.fedprimerate.com/fedfundsrate/federal_funds_rate_history.htm.

Rate up to 4.25%,[273] and by August 2006, both rates were at 5.3%.[274] As Moody's economists Mark Zandi and Celia Chen pointed out:

> The tightening in monetary policy between mid-2004 and early 2006 was the catalyst for the rapid shift from boom to bust in the housing market. . . . Long term rates ultimately rose in response, although more modestly. . . . Rates on adjustable mortgages and fixed mortgage rates moved higher in response . . . . Higher mortgage rates, when mixed with very lofty house prices, undermined housing affordability.[275]

Further, Federal Reserve Bank of Dallas President Richard Fisher noted:

> In retrospect, the real fed funds rate turned out to be lower than what was deemed appropriate at the time and was held lower longer that it should have been. In this case, poor data led to a policy action that amplified speculative activity in the housing and other markets. Today, as anybody not from the former planet of Pluto knows, the housing market is undergoing a substantial correction and inflicting real costs to millions of homeowners across the country.[276]

In addition, the U.S. current account deficit also peaked in 2006.[277] FRB President Ben Bernanke explained how trade deficits required the U.S. to borrow from abroad, in the process bidding up bond prices and lowering interest rates. In April 2005 he stated: "The greater the extent to which [foreign] capital inflows act to augment residential construction and especially current consumption spending, the greater the future economic burden of repaying the foreign debt is likely to be."[278]

---

[273] *Id.*

[274] *Id.*

[275] Mark Zandi & Celia Chen, *Aftershock: Housing in the Wake of the Mortgage Meltdown*, MOODY'S ECONOMY.COM, Dec. 2007, at 23, http://www.economy.com/home/products/samples/2007-12-01-Aftershock-Housing-Wake-Mortgage-Meltdown.pdf.

[276] Richard W Fisher, President, The FRB of Dallas, Speech to the New York Association for Business Economics: Confessions of a Data Dependent (Nov. 2, 2006), http://www.dallasfed.org/news/speeches/fisher/2006/fs061102.cfm.

[277] THE FINANCIAL CRISIS INQUIRY COMMISSION, THE FINANCIAL CRISIS INQUIRY REPORT (Jan. 2011), at 104, http://www.gpo.gov/fdsys/pkg/GPO-FCIC/pdf/GPO-FCIC.pdf

[278] Ben S. Bernanke, Chairman, The FRB, Remarks At the Sandridge Lecture, Virginia Association of Economists, Richmond, Virginia: The Global Saving Glut and the U.S. Current Account Deficit (Apr. 14, 2005), http://www.bis.org/review/r050318d.pdf.

Though few foresaw the looming crisis, Yale University Professor Robert Shiller was one of the earliest to sound the warnings in 2005, followed in August/September 2006 by several other voices expressing grave concern. Prof. Shiller stated:

> In 2005, in the second edition of my book "Irrational Exuberance," I stated clearly that a catastrophic collapse of the housing and stock markets could be on its way. I wrote that "significant further rises in these markets could lead, eventually, to even more significant declines," and that this might "result in a substantial increase in the rate of personal bankruptcies, which could lead to a secondary string of bankruptcies of financial institutions as well," and said that this could result in "another, possibly worldwide, recession.[279]

In August 2006, *Barron's* included a warning of the approaching housing crisis noting that 32.6% of new mortgages were interest only and that 43% of first time home buyers in 2005 put no money down.[280] Further, *Barron's* noted that "[e]ven a relatively brief period of rising mortgage payments, rising debt and falling home values will collapse the system."[281] These stresses were not just on home owners. In 2001, approximately 54% of subprime loans were bundled and securitized to third-party investors. By 2006, this percentage increased to 75%.[282] During the period when interest rates were low, refinancing was an option to relieve stress on home owners. For example, "[i]n 2005, when mortgage interest rates were low, around 40% of existing mortgages were refinanced in a single year."[283] In September 2006, Professor Nouriel Roubini noted:

> We have a glut of housing stock . . . . Whenever you have a glut … demand for these goods becomes interest insensitive . . . . The market consensus is still that there will be a soft landing. My concern today is that the bursting of the housing bubble—we haven't seen it yet—is going to lead to broader systemic banking problems. It's going to start with subprime lenders—they are already in trouble because of increased delinquencies and foreclosures—and then it is going to be transmitted to other banks and financial institutions.[284]

---

[279] Robert J. Shiller, *Challenging the Crowd in Whispers, Not Shouts*, N.Y. Times, Nov. 1, 2008, http://www.nytimes.com/2008/11/02/business/02view.html?pagewanted=all&_r=0.

[280] Lon Witter, *The No Money Down Disaster*, Barron's, Aug. 21, 2006.

[281] *Id.*

[282] Katalina M. Bianco, The Subprime Lending Crisis: Causes and Effects of the Mortgage Meltdown, CCH Federal Banking Law Reporter, CCH Mortgage Compliance Guide and Bank Digest (2008), http://www.business.cch.com/bankingfinance/focus/news/Subprime_WP_rev.pdf.

[283] Richard K. Green & Susan M. Wachter, Federal Reserve Bank of Kansas City, The Housing Finance Revolution (Aug. 31, 2007), at 32, http://www.kc.frb.org/publicat/sympos/2007/PDF/2007.08.21.WachterandGreen.pdf.

[284] Nouriel Roubini, Stern School of Business, NYU, Featured Speaker at the International Monetary Fund Seminar: Nouriel Roubini on the U.S. and Global Outlook, Washington, D.C. (Sept. 7, 2006), http://www.economonitor.com/nouriel/2010/09/02/economonitor-flashback-roubinis-imf-speech-september-7-2006/.

Roubini also noted "credit supply conditions have not tightened. You do not see any signal of a real tightening of the standards."[285] At an IMF symposium, economist Anirvan Banerji noted Roubini had predicted a slowdown in 2005 and that he was "concerned that [Roubini's] approach amounts to subjective forecasting by selective analogy."[286] *The New York Times* reported that:

> The audience seemed skeptical, even dismissive. As Roubini stepped down from the lectern after his talk, the moderator of the event quipped, "I think perhaps we will need a stiff drink after that." People laughed—and not without reason. At the time, unemployment and inflation remained low, and the economy, while weak, was still growing, despite rising oil prices and a softening housing market. And then there was the espouser of doom himself: Roubini was known to be a perpetual pessimist, what economists call a "permabear."[287]

The markets were enjoying healthy investment returns on MBSs, so these few individuals were easily overshadowed by the majority who believed the boom would continue. Indeed, many others continued to see opportunity even in late 2006, as illustrated in an August 2006 *Barron's* article claiming housing and construction related stocks look very attractive as they were trading around book value.[288]

## E. GM'S SALE OF A 51% INTEREST IN AFI TO CERBERUS

### *1. GM's Ratings Continue To Decline*

GM's operational problems and credit rating issues continued relatively unabated after ResCap's incorporation. On October 14, 2004, S&P downgraded GM's and AFI's long-term credit rating from BBB with a negative outlook to BBB- with a stable outlook and, at the same time, downgraded GM's and AFI's commercial paper rating from A-2 with a negative outlook to A-3 with a stable outlook.[289]

---

[285] *Id.*

[286] Anirvan Banerji, Chief Research Officer, Economic Cycle Research Institute, Discussant at the International Monetary Fund Seminar: Nouriel Roubini on the U.S. and Global Outlook, Washington, D.C. (Sept. 7, 2006), http://www.economonitor.com/nouriel/2010/09/02/economonitor-flashback-roubinis-imf-speech-september-7-2006/.

[287] Stephen Mihm, *Dr. Doom,* N.Y. TIMES, Aug. 15, 2008, http://www.nytimes.com/2008/08/17/magazine/17pessimist-t.html.

[288] Lon Witter, *The No Money Down Disaster*, BARRON'S, Aug. 21, 2006.

[289] *See* General Motors Corp., Annual Report (Form 10-K) (Mar. 16, 2005), at II-12; *see also* Section III.A.2 (discussing the declining credit ratings of GM and AFI).

On November 4, 2004, Moody's downgraded GM's long-term credit rating from Baa1 with a negative outlook to Baa2 with a stable outlook and, at the same time, downgraded AFI's long-term credit rating from A3 with a negative outlook to Baa1 with a stable outlook.[290] Moody's affirmed GM's and AFI's commercial paper rating at Prime-2 with a stable outlook. On February 14, 2005, Moody's lowered the outlook on GM's and AFI's long-term credit ratings of Baa2 and Baa1, respectively, to negative from stable and, at the same time, lowered the outlook on GM's and AFI's commercial paper rating of Prime-2 to negative from stable.[291] Refer to the tables below for a summary of GM's, AFI's, and ResCap's credit ratings subsequent to these rating actions:

---

[290] *See* General Motors Corp., Annual Report (Form 10-K) (Mar. 16, 2005), at II-12.

[291] *See id.*

III-53

EXHIBIT III.E.1—1
**GM Historical Credit Ratings**
December 2004 – May 2012



*Source: Moody's; Fitch; S&P.*

EXHIBIT III.E.1—2
**AFI Historical Credit Ratings**
December 2004 – May 2012



*Source: Moody's; Fitch; S&P.*

EXHIBIT III.E.1—3
**ResCap Historical Credit Ratings**
December 2004 – May 2012



*Source: Moody's; Fitch; S&P.*

GM's long-term credit rating fell from BBB (high) on February 14, 2005[292] to BB on October 17, 2005. On October 11, 2005, DBRS placed the ratings of AFI and ResCap under review with developing implications. Fitch later downgraded GM's senior unsecured rating from B+ to B. Fitch maintained the rating watch negative outlook for GM's ratings.[293]

### 2. AFI's Concerns Regarding GM's Ratings And The Affect On AFI Grows, Leading To Consideration Of Its Separation From GM

Although Eric Feldstein, AFI's Chairman and CEO, could not pinpoint the exact time frame for his mounting concerns regarding GM's ratings erosion and AFI's concomitant ratings slide, he did recall that GM's ratings were under constant pressure in 2003, 2004, and 2005.[294] Moreover, although he could not recall the precise rating, Feldstein did remember that when there was a ratings change, it was always a downward change and GM was often on credit watch.[295]

Feldstein "felt that it was [his] responsibility and [AFI's main] responsibility to anticipate, given the trajectory . . . . that [GM's credit rating] could one day become noninvestment grade."[296] While Feldstein believed that GM, without enormous borrowing requirements, could withstand a noninvestment grade rating, he thought that a financial services company, like AFI, with borrowings between $125 and $175 billion, might well suffocate unless its credit rating remained at investment grade because liquidity was like "oxygen" for a financial services company.[297] Feldstein believed that if AFI were "to become noninvestment grade," it would have "transform[ed] the junk market."[298] Feldstein's concerns prompted him to approach GM in 2005 about possible steps to delink the credit rating of AFI and GM.[299]

Feldstein believed that when GM was an A-rated company or better, it made sense for AFI to be wholly owned by GM,[300] but when GM was approaching noninvestment grade, he thought that GM should think about separating AFI in some way "and maybe even ced[e] a majority interest."[301] Accordingly, Feldstein approached GM with the thought of separating the two companies. GM's senior management was "not enamored in the first instance with

---

[292] See id.

[293] See id. at II-32–33.

[294] Int. of E. Feldstein, Dec, 14, 2012, at 61:10–14.

[295] Id. at 61:15–21.

[296] Id. at 61:24–62:3.

[297] Id. at 62:8–23.

[298] Id. at 63:8–11.

[299] Id. at 64:1–17.

[300] Id. at 64:23–25.

[301] Id. at 64:23–65:5. One or more investment banks were of the same view because they presented to Feldstein why it made sense for GM and AFI to consider separating. See id. at 77:9–11.

this proposal because [AFI] was considered the 'crown jewel' of GM."[302] According to Feldstein, GM could have at one time achieved a de-linking with a sale of a 20% interest in AFI,[303] but things got progressively worse at GM and by the time GM became comfortable selling 20% of AFI, that was no longer enough to de-link AFI's credit rating from that of GM.[304] In order to de-link the rating, GM would have to sell 51%.[305]

GM's initial hesitation gave way to practical reality. Feldstein believes that GM's senior management ultimately came to understand that not parting with a majority interest in AFI was worse than a sale of its captive automobile finance business.[306] Feldstein speculated "that ultimately, [GM] determined that it was better to own 49 percent of a viable, economically viable, profitable company than 100 percent of a company that could be at risk."[307] Feldstein did not recall the precise date of GM's decision to pursue a sale of AFI but believes the process began in earnest in mid- to late-2005[308] when GM formed a team led by the CFO and Treasurer to explore a sale of GM's interest in AFI.[309]

On October 17, 2005, GM announced that it was exploring the possible sale of a controlling interest in AFI, with the goal of de-linking AFI's credit rating from GM's credit rating and renewing its access to low-cost financing. In it is 2005 Annual Report, GM acknowledged the steps it had taken to separate ResCap from GM's credit rating noting the 2005 Operating Agreement between AFI and ResCap and the limitations the 2005 Operating Agreement imposed on the payment of dividends to AFI and repayment of subordinated debt.[310] Additionally, after being pressured by AFI's management and the investment

---

[302] *Id.* at 67:24–68:2.

[303] *Id.* at 69:20–22.

[304] *Id.* at 70:12–14. Walker noted:

> [A]s much as we wanted ResCap to be distinct from GMAC, we also wanted GMAC to be distinct from GM, distinct in the agencies' minds. They would allow less linkage than they would between ResCap and GMAC, but there was still some element of de-linkage, and these guys are clearly stating that if we don't get this deal done, they're going to equalize our ratings and that's going to be bad news for everybody in the GMAC family relative to getting this deal done.

Int. of D. Walker, Nov. 28, 2012, at 120:2–13.

[305] Int. of E. Feldstein, Dec. 14, 2012, at 70:21–22.

[306] *Id.* at 78:4–9.

[307] *Id.* at 78:10–15. Similarly Walker noted: "GM had owned GMAC for 80 years, was selling 51 percent because they had financial distress." Int. of D. Walker, Nov. 28, 2012, at 117:7–9.

[308] Int. of E. Feldstein, Dec. 14, 2012, at 79:12–14.

[309] *Id.* at 85:2–6.

[310] General Motors Corp., Annual Report (Form 10-K) (Mar. 28, 2006), at I-22–I-23.

community to improve the debt ratings and lower the cost of borrowings at AFI and ResCap, GM announced:

> We are considering the sale of a controlling interest in [AFI] as well as exploring strategic and structural alternatives for ResCap.
>
> \*       \*       \*
>
> The extent of the effect on [AFI's] and ResCap's credit ratings, if any, will depend on the structure and other terms of any potential transaction as well as the extent of [AFI's] ongoing credit exposure to GM.
>
> \*       \*       \*
>
> Failure to execute a AFI strategic transaction will place further pressure on both GM's and [AFI's] credit profiles, potentially resulting in further downgrades with [AFI's] credit ratings explicitly re-linked to those of GM.
>
> \*       \*       \*
>
> In the absence of a transaction:

- [AFI's] access to capital may be seriously constrained, as most unsecured funding sources may decline, including bank funding;

- The cost of funds related to borrowings that are secured by assets may increase, leading to a reduction in liquidity for certain asset classes;

- It may be increasingly difficult to securitize assets, resulting in reduced capacity to support overall automotive originations;

- Uncompetitive funding costs may result in a lower return on capital and significantly lower earnings and dividends; and

- [AFI] may need to consider divesting certain businesses in order to maintain adequate liquidity to fund new originations or otherwise preserve the value of its businesses.[311]

---

[311] *Id.* at I-20–I-21. GM further reported:

> Although any transaction involving [AFI] would reduce our interest in the earnings of [AFI], it is expected that the financial effects of that reduction would be offset by the value of any consideration we receive from a purchaser. We are working to finalize a transaction as rapidly as we can. Structuring a [AFI] transaction is a complex endeavor and we cannot predict whether any transaction with respect to [AFI] will occur, the terms of any transaction, the identity of any purchaser, or whether and over what period a transaction could achieve the principal strategic goals.

*Id.* at II-26.

### 3.  Despite GM's Consideration Of Sale Of AFI, GM's Ratings Continue To Decline

On December 12, 2005, S&P resolved GM's issuer credit rating by downgrading the rating from BB minus, CreditWatch with negative implications to B, outlook negative, and downgraded GM's short-term ratings from B-2, CreditWatch with negative implications to B-3 outlook negative. GM's ratings were removed from CreditWatch. The long-term ratings of AFI and ResCap were unchanged at BB and BBB minus, respectively, both under CreditWatch with developing implications. On December 16, 2005, DBRS downgraded GM's long-term debt to B (high) and GM's short-term rating to R-3 (mid), both with negative trends.[312]

While GM experienced limited access to the capital markets in 2005 as a result of deterioration in its credit ratings, it was able to use available liquidity to meet its capital requirements. Similarly, due to the downgrade of its unsecured debt to non-investment grade, AFI's access to the unsecured capital markets was limited. AFI was able to meet its capital requirements by accessing alternative funding sources, with a focus on secured funding and automotive whole loan sales.

On February 21, 2006, Moody's downgraded GM's senior unsecured debt to B2 with a negative outlook from B1 under review for a possible downgrade. On March 16, 2006, Moody's placed the senior unsecured ratings of GM, AFI, and ResCap under review for a possible downgrade.[313]

### 4.  Execution Of The Cerberus PSA

On April 3, 2006, GM announced the sale of a 51% stake in AFI to FIM Holdings, an investment vehicle formed by a group led by Cerberus.[314] AFI, GM, GM Finance Co. Holdings Inc. (a wholly owned subsidiary of GM), and FIM Holdings had entered into the Cerberus PSA on April 2, 2006.[315] The Cerberus PSA contemplated a series of transactions to accomplish the sale of 51% of GM's interest in AFI to FIM Holdings. The sale ultimately closed in November 2006.[316]

---

[312] *Id.* at II-31–II-3.

[313] General Motors Corp., Quarterly Report (Form 10-Q) (June 8, 2006), at I-53–I-54.

[314] *See* GM, Press Release, *GM Reaches Agreement to Sell Controlling Stake in GMAC* (Apr. 3, 2006) [EXAM11496076]; *see also* GMAC LLC, Current Report (Form 8-K) (July 26, 2006) ("In addition to continuing to enable [AFI] to support the sale of GM vehicles, the transaction is intended to support [AFI]'s strategic goal of a stable investment grade credit rating and profitable growth."); Int. of L. Tessler, Nov. 16, 2012, at 16:14–17:3 ("Cerberus' [sic] whole investment strategy in private equity is focused on operationally challenged and operationally distressed businesses. . . . So, there's always an operational orientation with regard to the type of investments we make where we believe that we will be able to go in to a company and improve its quality of operations and its profitability."); *id.* at 18:16–19 ("[Cerberus] felt . . . there were operational improvements [at AFI]. After all, it was owned by General Motors."); *id.* at 20:11–21:13 ("[Q:] Were you interested principally in the automotive side, or were you interested in the mortgage side of the business, as well? [A:] We were interested in the totality of [AFI].").

[315] *See* General Motors Acceptance Corp., Current Report (Form 8-K) (Apr. 3, 2006). Pursuant to the Cerberus PSA, HoldCo acquired the Call Option. *See* Section V.A.1 (discussing the Call Option and HoldCo's acquisition of the Call Option).

[316] *See* General Motors Corp., Current Report (Form 8-K) (Nov. 30, 2006), at 3.

In particular, the Cerberus PSA provided that certain entities, including AFI, ResCap, and RFC, would be converted into limited liability companies.[317] In addition, the Cerberus PSA required Old GMAC Bank to be removed from the Cerberus ownership chain so that Cerberus would not become subject to regulations relating to thrift holding companies.[318] Thereafter, GM would sell 51% of the common limited liability company interests in AFI to FIM Holdings in exchange for $7.353 billion, the Cerberus PSA Equity Purchase Price.

According to AFI, the sale to FIM Holdings "strengthens [AFI's] ability to support GM's automotive operations, improves [AFI's] access to cost-effective funding, provides significant liquidity to GM and allows GM to continue to participate in the profitability of AFI over the long term through its 49-percent ownership stake."[319] Moreover, it was anticipated that the sale would "reduce [AFI's] cost of funds as [AFI's] ratings are delinked from GM's and improve over time. Under the [Cerberus PSA and related] agreements, GM will directly benefit from [AFI's] lower cost of funds."[320] At the time the sale was announced, both GM and Cerberus publicly expressed expectations as to the emergence of a stronger AFI.

> We look forward to working with Cerberus to maintain and grow [AFI's] traditional strong performance and contribution to the GM family, said GM Chairman and Chief Executive Officer Rick Wagoner. This agreement is another important milestone in the turnaround of General Motors. It creates a stronger [AFI] while preserving the mutually beneficial relationship between GM and [AFI]. At the same time, it provides significant liquidity to support our North American turnaround plan, finance future GM growth initiatives, strengthen our balance sheet and fund other corporate priorities.

> We are committed to helping [AFI] compete even more effectively and continuing its tradition of strong growth and success," added Lenard Tessler, Cerberus' head of Private Equity and senior managing director. We recognize that GM's dealers are a cornerstone for growth in this business, and we are committed to maintaining the strong support that [AFI] provides to its dealer customers. Moreover, we have great confidence and respect for the people of

---

[317] Cerberus PSA, § 2.3(a) [CERB000521]; Cerberus PSA, Disclosure Schedules, at Sched. 2.3(a) [CERB000731].

[318] The Cerberus PSA was silent as to the mechanics to remove Old GMAC Bank from the Cerberus chain of ownership. Indeed, as of April 4, 2006, ResCap's management was exploring three potential ownership structures: (1) AFI owning 100% of voting control of IB Finance with proportional earnings distribution to ResCap; (2) proportional voting control and earning distribution; and (3) formation of ResCap's own industrial bank. *See* Section V.A.1.a (discussing the 2006 Bank Restructuring). The Cerberus PSA, however, did provide that "[a]fter the Bank Restructuring, [AFI] or ResCap will wholly own [GMAC Automotive Bank], or it will be co-owned by [AFI] and ResCap." Cerberus PSA, Ex. H, at 2 [CERB039811].

[319] GM, Press Release, *GM Reaches Agreement to Sell Controlling Stake in GMAC* (Apr. 3, 2006) [EXAM11496076].

[320] General Motors Acceptance Corp., Current Report (Form 8-K) (Apr. 10, 2006).

[AFI], and look forward to the continued success of the [AFI] automotive financing, mortgage and insurance, banking, and real estate services businesses around the globe.[321]

Following GM's announcement that it agreed to sell a 51% interest in AFI, Fitch revised AFI's rating watch status to Positive from Evolving, indicating that the ratings may be upgraded or maintained at current levels.[322]

### 5. ResCap Converts To A Limited Liability Company

As required by the Cerberus PSA, ResCap converted from a corporation to a single member limited liability company. Effective as of the conversion, the ResCap By-Laws were superseded by the ResCap LLC Agreement.[323] Although ResCap initially chose to remain treated as a corporation for tax purposes, it later elected to change its classification to a disregarded entity effective November 21, 2006. A discussion of tax issues is contained in Section V.D.

### 6. 2006 ResCap LLC Agreement

In connection with the conversion of ResCap to a limited liability company, a certificate of conversion and a certificate of formation was filed with the Secretary of State of Delaware. In addition, GMAC Mortgage Group LLC, as the sole member of ResCap, entered into and executed the 2006 ResCap LLC Agreement.[324]

Pursuant to the 2006 ResCap LLC Agreement, the management of ResCap was vested exclusively with the ResCap Board subject to any delegation to officers as provided or contemplated by the Agreement.[325] The 2006 ResCap LLC Agreement further provided that the directors serving on the ResCap Board before the conversion of ResCap to a limited

---

[321] GM, Press Release, *GM Reaches Agreement to Sell Controlling Stake in GMAC* (Apr. 3, 2006) [EXAM11496076]. When Cerberus began considering the acquisition of a controlling interest in AFI, it viewed ResCap as a unique, well-run, and profitable asset. Int. of L. Tessler, Nov. 16, 2012, at 22:17–23:17 ("Our initial interest in [AFI] was based upon a view that the mortgage business was very large, fairly unique one of the few assets that was, of its type, that was not part of a bank at [sic] our initial impressions were that it was well-run and very profitable.").

[322] *See* GMAC LLC, Quarterly Report (Form 10-Q) (Aug. 8, 2006), at 37.

[323] 2006 ResCap LLC Agreement, at 1 [ALLY_0255865].

[324] *Id.*

[325] *Id.* § 14 ("Subject to the delegation to the Officers of the Company provided herein and any delegation otherwise herein contemplated the business and affairs of the Company shall be managed by or under the direction of the Board."). The 2006 ResCap LLC Agreement contemplated meetings of the ResCap Board, during which a majority of the directors present (assuming a quorum was present) could authorize ResCap to act. *See id.* § 15(b). The ResCap Board could act without meeting if a written consent to act was signed by a majority of the directors entitled to vote at a ResCap Board meeting. *See id.* § 15(d).

liability company would continue to serve on the ResCap Board.[326] Because the 2006 ResCap LLC Agreement did not delegate management to any officers, the full ResCap Board was entrusted with the management of ResCap, including the review and consideration of any transaction with any GMAC Affiliate.

### 7.   2006 AFI Amended LLC Operating Agreement

In connection with the Cerberus acquisition of a 51% interest in AFI on November 30, 2006, GM and Cerberus entered into the 2006 AFI Amended LLC Operating Agreement,[327] which gave Cerberus the right to appoint six representatives and two independent managers to the thirteen person AFI Board.[328] Also on November 30, 2006, Cerberus appointed, as its representatives, Frank Bruno, Lenard Tessler, Mark Neporent, Seth Plattus, J. Ezra Merkin, and Michael Klein, with Merkin serving as Chairman.[329] Bruno, Tessler, Neporent, and Plattus also held executive positions at Cerberus.[330]

### 8.   The 2006 Bank Restructuring[331]

As part of the sale of a 51% interest in GMAC to the Cerberus-led consortium, Cerberus required[332] ResCap to divest Old GMAC Bank so that Cerberus could avoid bank holding company status and the restrictions on non-banking activities that would have been triggered by ownership of a federal savings bank.[333] In order to comply with this requirement, AFI and ResCap undertook a fundamental restructuring of their automotive and mortgage banking operations. Substantially all of the assets and liabilities of Old GMAC Bank were transferred to GMAC Automotive Bank while the Old GMAC Bank entity and its remaining assets and liabilities were transferred to GM.[334] Full ownership of GMAC Automotive Bank was then transferred to IB Finance, a newly created wholly owned direct subsidiary of AFI.[335] By

---

[326] *See id.* § 14(b).

[327] *See* 2006 AFI Amended LLC Operating Agreement [CERB001063].

[328] Written Consent of the Initial Class A and Initial Class B Holders to Action in Lieu of Meeting of GMAC LLC, dated Nov. 30, 2006, at 1 [CERB003011].

[329] *Id* at 1–2. In his role at Cerberus, Tessler led the due diligence on the acquisition. Int. of L. Tessler, Nov. 16, 2012, at 22:5–8.

[330] SENIOR   EXECUTIVES/MANAGING   DIRECTORS,   CERBERUS   CAPITAL   MANAGEMENT,   L.P., www.cerberuscapital.com/team/senior_executives_managing_directors.

[331] *See* Section V.A.1.a (discussing details of the 2006 Bank Restructuring).

[332] Cerberus PSA, Ex. H [CERB039811].

[333] Walker Report, at 2 [RC40008925].

[334] Certificate of Share Transfer, dated Nov. 21, 2006 [ALLY_0401265]; Transfer of Shares Agreement, dated Nov. 22, 2006 [CERB001787].

[335] Share Contribution Agreement [CERB001521].

conveying Old GMAC Bank's assets and operations to GMAC Automotive Bank and transferring the Old GMAC Bank entity to GM, ResCap maintained, through membership interests in IB Finance, the benefits of bank funding while the possibility that Cerberus would become subject to federal regulations related to ownership of a federal savings bank was eliminated.[336]

### 9. The 2006 Amended Operating Agreement

On November 27, 2006, GM, AFI, and ResCap entered into the 2006 Amended Operating Agreement, which amended and superseded the 2005 Operating Agreement.[337] The amendments reflected by the 2006 Amended Operating Agreement were approved by the ResCap Board, including the Independent Directors.[338] Melzer, however, does not recall having any discussions regarding the 2006 Amended Operating Agreement in connection with its approval.[339]

---

[336] The transaction's structure (specifically, the use of an industrial loan bank, instead of a federal savings and loan bank or "thrift") was driven by Cerberus's desire to avoid bank holding company regulations. Under a "loophole" in the Bank Holding Company Act, ownership of an industrial loan bank did not trigger bank holding company status. Debate over this "loophole" prompted the FDIC, on July 28, 2006, to issue a six-month moratorium on deposit insurance and change of control approvals for industrial loan banks. Despite the moratorium, Cerberus received FDIC approval in November, 2006 for its acquisition of 51% of AFI by agreeing that Ally Bank would be subject to any changes that the FDIC might make to the regulation and supervision of industrial loan banks once the moratorium was lifted (agreeing, if necessary, to sell its interest in the bank, to convert the bank to a thrift or to obtain a waiver from the FDIC). *See, e.g.*, FDIC, Press Release, *FDIC Places Six-Month Moratorium on Industrial Loan Company Applications and Notices* (July 28, 2006), http://www.fdic.gov/news/news/press/2006/pr06073.html; FDIC, Press Release, *FDIC Board Approves Change in Control Notice for GMAC Automotive Bank, Midvale, Utah* (Nov. 15, 2006) [EXAM10241413]; *see also* Section V.A.1.a (discussing the 2006 Bank Restructuring).

[337] According to the ResCap Board minutes, it was unanimously resolved that the 2005 Operating Agreement is amended to "(a) permit the LLC Tax Dividend and not subject it to the dividend restrictions contained in the [2005] Operating Agreement; (b) amend certain other provisions of the [2005] Operating Agreement related to the conversion of the Company to a limited liability company; and (c) implement other amendments the [2005] Operating Agreement, including amendments related to the conversion of the Company to become a limited liability company." Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, dated Nov. 20, 2006, at 1–2 [RC00016852].

[338] *See* Residential Capital, LLC Written Consent in Lieu of Meeting, dated Nov. 29, 2006, RC4006849–55 [RC40006748].

[339] *See* Int. of T. Melzer, Oct. 10, 2012, at 121:2–12.

The 2006 Amended Operating Agreement largely followed the 2005 Operating Agreement. There are a few notable exceptions. In particular, the 2006 Amended Operating Agreement enabled the declaration and payment of a dividend[340] that would have not been permitted under the 2005 Operating Agreement; eliminated section 2(e) of the 2005 Operating Agreement, which established parameters for prepaying subordinated debt;[341] and deleted section 2(f)(vii), which required ResCap to employ individuals and have officers who were not also employees or officers of any GMAC Affiliate.[342]

The 2006 Amended Operating Agreement sections pertaining to the appointment and rights and obligations of the Independent Directors are largely consistent with the 2005 Operating Agreement.[343] Like the 2005 Operating Agreement, the 2006 Amended Operating Agreement prohibited transactions with GMAC Affiliates unless such transactions were at arm's length and for fair value.

---

[340] As a result of the conversion of ResCap and certain domestic subsidiaries, and their election to be treated as a "multi-member limited liability company" for tax purposes, ResCap's equity increased. *See* Residential Capital, LLC, Current Report (Form 8-K) (Nov. 30, 2006), at 2. ResCap desired to pay a dividend in the amount of such increase. On November 27, 2006, ResCap declared a dividend in an amount equal to the net increase of its equity. *See id.* ResCap, GM, and AFI entered into the 2006 Amended Operating Agreement to permit, inter alia, the declaration and payment of this dividend. *See id.*; *see also* Section V.D.3.b (discussing the tax considerations).

[341] The full text of § 2(e) in the 2005 Operating Agreement states:

> Without limiting the applicable provisions in the relevant underlying loan documents, ResCap shall not make any Prepayment of any GMAC Subordinated Debt, except from (i) ResCap's Cumulative Net Income at the time such Prepayment is made, less any Dividends previously paid after the date of this Agreement and any Prepayments of GMAC Subordinated Debt mad after the date of this Agreement (to the extent that such Prepayment was made from ResCap's Cumulative Net Income), other than Excluded Prepayments, (ii) the net proceeds to ResCap from the issuance of Capital Stock or indebtedness to any Person (other than a GMAC Affiliate) that is subordinated in right of payment of principal, interest and premium, if any, to Rated Indebtedness, or (iii) 50% of the net proceeds to ResCap from the issuance or incurrence of indebtedness to any Person (other than a GMAC Affiliate) that ranks *pari passu* with Rated Indebtedness in right of payment of principal, interest and premium, if any. Notwithstanding the foregoing, ResCap may make Prepayments of GMAC Subordinated Debt of up to a cumulative amount of $500 million after the date of this Agreement ('Excluded Prepayments').

2005 Operating Agreement, § 2(e) [ALLY_0140795].

[342] *Compare* 2006 Amended Operating Agreement, §§ 2(e)(i)–(ix) (attached to Residential Capital, LLC, Current Report (Form 8-K) (Nov. 30, 2006), Ex. 10.1), *with* 2005 Operating Agreement, §§ 2(f)(i)–(x) [ALLY_0140795]. Eliminating the prohibition on shared employees allowed Cerberus to pursue its investment strategy of imbedding Cerberus and COAC employees throughout the companies it controlled to implement operational improvements. *See* Consulting Agreement, Recital B [ALLY_0401248].

[343] *Compare* 2006 Amended Operating Agreement, § 2(f) (attached to Residential Capital, LLC, Current Report (Form 8-K) (Nov. 30, 2006), Ex. 10.1), *with* 2005 Operating Agreement, § 2(g) [ALLY_0140795]. Indeed, Melzer did not believe the 2006 ResCap LLC Agreement affected his duties as an Independent Director. *See* Int. of T. Melzer, Oct. 10, 2012, at 114:9–12. According to him, the Independent Director provisions were left unchanged by the 2006 Amended Operating Agreement. *See id.* at 106:14–18. Note also that a typographical error in the 2006 Amended Operating Agreement fails to modify internal references within section 2(f) and instead refers to section 2(g), which relates back to the wording of the 2005 Operating Agreement.

In addition the 2006 Amended Operating Agreement released GM from all of its obligations under the Agreement from and after November 30, 2006.[344] GM remained liable, however, for any obligations related to the pre-November 30, 2006 period.[345]

### 10. Purchase Price Adjustment

Pursuant to the Cerberus PSA, the Equity Purchase Price was subject to two adjustments.[346] The first adjustment was calculated based on the Initial Tangible Net Book Value[347] calculated at least two days prior to the closing date minus $14.4 billion, with GM receiving any Initial Tangible Net Book Value in excess of $14.4 billion and paying AFI any shortfall.[348]

The second and final adjustment was based on a closing balance sheet prepared within ninety days following the closing date.[349] The amount of the adjustment was calculated based on the difference between the Adjusted Final Tangible Net Book Value[350] and the Initial Tangible Net Book Value.[351] GM Finance Co. Holdings, Inc. would have received the amount by which the Adjusted Final Tangible Net Book Value exceeded the Initial Tangible Net Book Value as a distribution.[352] Because the Adjusted Final Closing Balance Sheet was less than the Initial Tangible Net Book Value, GM Finance Co. Holdings, Inc. made a capital contribution to AFI in the amount of the shortfall, without adjusting the capital accounts of AFI's

---

[344] 2006 Amended Operating Agreement, § 9 (attached to Residential Capital, LLC, Current Report (Form 8-K) (Nov. 30, 2006), Ex. 10.1). In connection with the consummation of the transactions contemplated by the Cerberus PSA, ResCap and AFI released GM from its obligations under a Services Facilities Agreement and a Trademark License Agreement. *See* Residential Capital, LLC, Current Report (Form 8-K) (Nov. 30, 2006), at 2. The Services Facilities Agreement was amended and restated to release GM from its obligations and to provide for certain services to ResCap by AFI and vice-versa. *See* Amended and Restated Services Facilities Agreement, dated Nov. 30, 2006 [ALLY_0013267]. The Trademark License Agreement was terminated because the parties agreed to an alternative arrangement for the use of certain intellectual property. *See* Termination Agreement, dated Nov. 30, 2006 [CERB002157].

[345] *See* 2006 Amended Operating Agreement, § 9 (attached to Residential Capital, LLC, Current Report (Form 8-K) (Nov. 30, 2006), Ex. 10.1).

[346] Cerberus PSA, §§ 3.3, 3.4 [CERB000521].

[347] "Initial Tangible Net Book Value" is defined in the Cerberus PSA as the amount resulting from subtracting the Tangible Adjustment Amount from an amount equal to total assets less total liabilities of the FinanceCo Companies on a consolidated basis as shown on the schedule to the Initial Closing Balance Sheet. *Id.* § 1.1.

[348] *Id.* § 3.3.

[349] *Id.* § 3.4(a).

[350] "Adjusted Final Tangible Net Book Value" is defined in the Cerberus PSA as the amount resulting from subtracting the Tangible Adjustment Amount from an amount equal to the total assets less total liabilities of the FinanceCo Companies on a consolidated basis as shown on the schedule to the Adjusted Final Closing Balance Sheet. *Id.* § 1.1.

[351] *Id.* § 3.4(e).

[352] *Id.*

members.[353] As a result of the final purchase price adjustment, GM contributed approximately $1 billion in equity to AFI during the first quarter of 2007.[354]

### 11. Consulting Agreement

AFI, Cerberus, and COAC entered into a Consulting Agreement, effective as of April 1, 2007 (the "Consulting Agreement"),[355] pursuant to which Cerberus was granted the right to place consultants at AFI.[356] The Consulting Agreement does not include ResCap and other AFI subsidiaries and affiliates unless they "opt-in" to the agreement by executing a copy of an addendum to the agreement.[357] The "Company's Direct and Indirect Subsidiaries" provision states that AFI's direct and indirect subsidiaries are not parties to the Consulting Agreement, but gives AFI subsidiaries the option to become parties to the Consulting Agreement by filling out and executing the Opt-in Letter attached as Exhibit B to the Agreement.[358] It does not appear that ResCap or any other AFI affiliate executed an "opt-in" letter. Indeed, Melzer stated that he never saw the Consulting Agreement.[359] Nevertheless, Cerberus also placed COAC consultants at ResCap.[360]

A list of consultants serving under the Consulting Agreement is attached as an Exhibit to the Agreement. Under the heading, "Cerberus Capital Management, L.P." there are 29 consultants listed and under the heading "Cerberus Operations Advisory Company, L.L.C." there are 44, for a total of 73 consultants. According to the column headed, "Primary functional area/business line," there were at any one time 59 consultants at ResCap, 11 consultants at AFI, one consultant at Ally, and one consultant at "Auto." According to the column, "Type of Advisory Services Provided," three of the consultants are "Legal."

Cerberus advisors at AFI consulted in areas including information technology, human resources, risk management, financial planning and analysis, and finance and treasury.[361]

---

[353] *Id.*; GMAC LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 17.

[354] GMAC LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 17.

[355] Although effective as of April 1, 2007, the Consulting Agreement was not signed by the parties until late October 2007. *See* Consulting Agreement, at 1, 8 [ALLY_0401248].

[356] *Id.* § 1. In addition to having upper level executives from Cerberus sit on the boards of portfolio companies, Cerberus uses a subsidiary, COAC, to assist Cerberus in running its portfolio companies.

[357] *Id.* § 19, Ex. B.

[358] *Id.*

[359] Int. of T. Melzer, Mar. 22, 2013, at 55:2–56:14.

[360] *See* Consulting Agreement, Ex. A [ALLY_0401248]. As noted above, the 2005 Operating Agreement prohibited employees from filling dual roles at ResCap and any AFI affiliate, including Cerberus; however, the November 27, 2006 amendments eliminated this prohibition. *Compare* 2005 Operating Agreement, § 2(f)(vii) [ALLY_0140795], *with* 2006 Amended Operating Agreement, § 2(e) (attached to Residential Capital, LLC, Current Report (Form 8-K) (Nov. 30, 2006), Ex. 10.1).

[361] Consulting Agreement, Ex. A [ALLY_0401248].

Cerberus advisors at ResCap provided consulting services in areas including credit management, financial planning and analysis, legal, restructuring and monetization, cash management, work out, risk management, assessment management, finance, treasury, lending, and human resources.[362]

Upon consummation of the transactions contemplated by the Cerberus PSA, Cerberus took an active role in the management of AFI and its subsidiaries, including ResCap.[363] Indeed, Cerberus's initial interest in acquiring a majority position in GM was predicated on improving AFI's operations.[364] After acquiring control of AFI, Cerberus began implementing its strategy of imbedding Cerberus and COAC employees throughout AFI and ResCap to implement operational improvements.[365] Soon after the acquisition, however, ResCap began experiencing liquidity problems.[366]

Following Cerberus's acquisition of AFI, Eric A. Feldstein, William F. Muir, Sanjiv Khattri, Barbara J. Stokel, and Mark F. Bole resigned from the AFI Board of Managers.[367] G. Richard Wagoner, Jr., Frederick A. Henderson, Mark R. LaNeve, and Walter G. Borst

---

[362] *Id.* The Consulting Agreement also recognized that Cerberus advisors might gain access to confidential AFI and ResCap information. *Id.* § 3. The Consulting Agreement permitted advisors to disclose confidential information to any member, partner, manager, director, officer, employee, financial or legal advisor of Cerberus or any of its affiliates to the extent a legitimate business need to know existed. *Id.* §§ 3.1(a), 3.4. Furthermore, the Consulting Agreement specified that:

> Notwithstanding the foregoing or any other provision of this Agreement, the parties understand and agree that nothing set forth in this Agreement shall operate or be construed to operate to restrict in any manner the rights of Cerberus and/or its affiliates under the Operating Agreement, including the ability of Cerberus to consider Confidential Information in connection with corporate governance, oversight and investment management activities.

*Id.* § 3.2. Thus, the Consulting Agreement explicitly gave Cerberus the right to access information from all of its consultants at both AFI and ResCap in order to manage its investment in those Cerberus portfolio companies.

[363] Int. of P. Bossidy, Dec. 14, 2012, at 53:2–4.

[364] Int. of L. Tessler, Nov. 16, 2012, at 18:8–19.

[365] *See* Consulting Agreement, Recitals, Ex. A [ALLY_0401248]. Through AFI's ability to appoint ResCap Board members and officers and the Consulting Agreement with AFI, Cerberus placed employees in executive and director positions at ResCap. *See* Ex. A (listing fifty-nine Cerberus employees providing consulting services to ResCap); Minutes of a Regular Meeting of the Board of Directors of Residential Capital, LLC, Mar. 23, 2007, at RC40005567–68 [RC40005558] (appointing Cerberus employees as ResCap directors and Jim Jones as ResCap CEO).

[366] *See* Section V.F (discussing asset sales due to liquidity crisis). In May, 2007, only about six months after acquiring a controlling stake in AFI in November 2006, Cerberus also acquired 80.1% of Chrysler Holdings from Daimler Benz for $7.8 billion (about ten years after Daimler paid $36 billion for Chrysler). The Chrysler acquisition also gave Cerberus control of Chrysler Financial. As Tessler noted, "We had a unique window into the capital markets at that time as a result of also owning Chrysler Automotive and Chrysler Financial. So, our window was not simply through a [AFI] lens." Int. of L. Tessler, Feb. 28, 2013, at 38:20–24.

[367] *See* GMAC LLC, Current Report (Form 8-K) (Nov. 30, 2006), at 5.

remained as GM-appointed members of the AFI Board of Managers.[368] FIM Holdings elected Frank W. Bruno, Lenard B. Tessler, Mark A. Neporent, Seth P. Plattus, J. Ezra Merkin, and Michael Klein to the AFI Board of Managers.[369] In addition, (1) FIM Holdings elected T.K. Duggan and Douglas A. Hirsch as independent managers, and (2) GM Holdco elected Robert Scully of Mortgage Stanley as the third independent manager.[370] Merkin was elected chairman of the board of managers.[371] AFI's existing management team remained and Feldstein, Muir, and Khattri continued serving as Chief Executive Officer, President, and Chief Financial Officer, respectively.[372]

### 12. Other Agreements

In connection with the consummation of the Cerberus PSA, GM, and AFI entered into a number of agreements that were purportedly consistent with their historical practices that were intended to continue the global relationship between GM and AFI,[373] including the United States Consumer Financing Agreement, pursuant to which AFI preserved its exclusive relationship with GM for vehicle financing and leasing incentives.[374]

---

[368] *See id.* Pursuant to the GMAC LLC Agreement, GM Holdco elected these individuals to the AFI board of managers. *See* Written Consent of the Initial Class A and Initial Class B Holders to Action in Lieu of Meeting of GMAC LLC, dated Nov. 30, 2006 [CERB003011].

[369] *See* Written Consent of the Initial Class A and Initial Class B Holders to Action in Lieu of Meeting of GMAC LLC, dated Nov. 30, 2006 [CERB003011].

[370] *See id.*

[371] *See* GMAC LLC, Current Report (Form 8-K) (Nov. 30, 2006), at 5.

[372] *See* GMAC LLC, Press Release, *GMAC Financial Services Begins New Era as an Independent Global Financial Services Company* (Nov. 30, 2006) [EXAM10016428].

[373] *See* General Motors Corp., Annual Report (Form 10-K) (Mar. 15, 2007), at 9.

[374] *See* GMAC LLC, Current Report (Form 8-K) (Nov. 30, 2006), at .2.

The following diagram illustrates AFI ownership as of November 30, 2006:



EXHIBIT III.E.12
**AFI Ownership**
As of November 30, 2006

*Source:  See Amended and Restated LLC Operating Agreement of GMAC LLC, dated Nov. 30, 2006, Schedule of Members, at CERB001165-
66 [CERB001063].*

## F.  INDUSTRY DISLOCATION LED BY SUBPRIME DISTRESS (DECEMBER 2006 THROUGH AUGUST 2007)

### 1.  The Subprime Mortgage Industry Faced Significant Challenges

By year-end 2006, subprime mortgage originations had decreased by 4% from 2005 and numerous factors signaled that the decline in subprime mortgage loans would continue in 2007.

#### a.  Housing Appreciation Showed The Largest Decline In Three Decades

Signs of trouble in the housing market became more evident as 2006 progressed. Home price appreciation began to slow almost to the point of stagnation.[375] The second quarter of 2006 exhibited the slowest rate of appreciation since the fourth quarter of 1999.[376] The S&P Case-Shiller 20-City Composite Home Price Appreciation Index, after having risen nearly every month for six years, remained flat through 2006, and even declined in several markets.[377]

During 2006, new housing starts fell significantly below prior-year levels and the supply of homes on the market began to grow.

EXHIBIT III.F.1.a—1
**Industry Data: Case Shiller 20 City Composite Home Price Appreciation Index**
2002 – 2012
*($ in Thousands)*



*Source: Standard & Poor's / Case-Shiller Home Price Index.*

---

[375] *See generally* ROBERT J. SHILLER, UNDERSTANDING RECENT TRENDS IN HOUSE PRICES AND HOMEOWNERSHIP, YALE ECONOMICS DEPARTMENT WORKING PAPER NO. 28, COWLES FOUNDATION DISCUSSION PAPER NO. 1630, Oct. 18, 2007, http://ssrn.com/abstract=1017546.

[376] Office of Federal Housing Enterprise Oversight (OFHEO), Press Release, *House Price Appreciation Slows: OFHEO House Price Index Shows Largest Decline in Three Decades* (Sept. 5, 2006), http://www.fhfa.gov/webfiles/1179/2q06hpi.pdf.

[377] S&P/CASE-SHILLER HOME PRICE INDICES 2008, A YEAR IN REVIEW (Jan. 13, 2009), at 2–3, https://www.standardandpoors.com/indices/index-research/en/us/?type=All&category=Economic.

EXHIBIT III.F.1.a—2
**Industry Data: Housing Starts**
March 2002 – July 2012
*($ in Thousands)*



*Source: Housing starts data per Census Bureau.*

EXHIBIT III.F.1.a—3
**Industry Data: Existing and New Home Inventory**
**Months of Supply**
2002 – 2012



*Source: Home inventory data per Census Bureau.*

### b.  Interest Rates Rise

Well before the subprime distress began, the FRB, fearing inflation, began raising interest rates in June 2004. By mid-December 2004, the prime interest rate was at 5.25% and it continued to climb, reaching 8.25% by June 2006.[378] The combination of rising interest rates, waning home appreciation rates, and increasing inventories of homes for sale made it difficult for borrowers to continue refinancing and servicing their debts by using home equity.[379]

### c.  Mortgage Delinquencies

A large number of ARMs that had originated in earlier years were reaching the point at which their interest rates reset, often to a rate that was higher than the already increased prevailing interest rates. The resulting increase in monthly mortgage payments meant many borrowers were unable to make their new monthly payments. In 2006, delinquencies on subprime mortgages began to grow, increasing from 10% to almost 15%.[380]

EXHIBIT III.F.1.c
**Industry Data: Prime and Subprime Mortgage Delinquencies**
2002 – 2012



*Note: A mortgage delinquency is defined as being at least 90 days past due.*
*Source: Mortgage Bankers Association.*

---

[378] Bank Prime Loan Rate Changes: Historical Dates of Changes and Rates, (Dec. 17, 2008), http:// research.stlouisfed.org/fred2/data/PRIME.txt.

[379] David Muir, *Americans in Debt: 'Using Home Equity as an ATM Machine'*, ABC News, June 17, 2008, http:/ /abcnews.go.com/Business/story?id=5187754&page=1—.UV24DL91-Gs.

[380] U.S. Census Bureau, Statistical Abstract of the United States (2012).

In the fourth quarter of 2006, the delinquency rate was 14.4% for subprime ARMs and 13.3% for all subprime mortgage loans, the highest in four years.[381] In the first quarter of 2007, the delinquency rate for all subprime mortgage loans rose to 13.77%, compared to only 2.58% for prime mortgage loans.[382] In the second quarter of 2007, the delinquency rate for subprime mortgages jumped again, to 14.82%, compared to 2.73% for prime mortgage loans.[383] In the third quarter of 2007, the delinquency rate for subprime mortgages increased yet again, to 16.31%, compared to 3.12% for prime mortgage loans.[384] One in every five subprime ARM loans had a late payment in third quarter 2007, and that did not include the one in every ten subprime ARM loans in foreclosure.[385]

Mortgage foreclosures also soared to record highs, with 0.54% of all outstanding mortgages entering the foreclosure process in the fourth quarter of 2006.[386] The percentage of all outstanding mortgages entering the foreclosure process rose to new records of 0.58% in first quarter 2007, 0.65% in second quarter 2007, and 0.78% in third quarter 2007.[387] While subprime ARMs represented only 6.8% of all mortgage loans outstanding in the third quarter of 2007, they represented 43% of the foreclosures started during that quarter.[388]

### d. Early Payment Defaults And Repurchases

Many of the subprime mortgage loan payment delinquencies and defaults occurred in the first few months after their origination. The FRB Chair pointed to such EPDs as likely evidence that lenders had loosened underwriting standards to continue increasing loan volume

---

[381] Douglas Dyer & Sarah Woo, *Analyzing the Subprime Market Fallout Using EDF Credit Measures*, MOODY'S K.M.V. COMPANY (Apr. 16, 2007), at 7, https://riskcalc.moodysrms.com/us/research/docs/General/Analyzing Sub-Prime Fallout Using EDF Credit Measures Apr 2007.pdf.

[382] Mortgage Bankers Ass'n, Press Release, *Delinquencies Decrease in Latest MBA National Delinquency Survey,* (June 14, 2007), http://www.mortgagebankers.org/NewsandMedia/PressCenter/55132.htm.

[383] *Id.*

[384] Mortgage Bankers Ass'n, Press Release, *Delinquencies and Foreclosures Increase in Latest MBA National Delinquency Survey* (Dec. 6, 2007), http://www.mortgagebankers.org/NewsandMedia/PressCenter/58758.htm.

[385] *Id.*

[386] *See* Statement of Roger T. Cole, Dir., Div. of Banking Supervision and Regulation, Before the U.S. Senate Committee on Banking, Housing and Urban Affairs (Mar. 22, 2007), http://www.federalreserve.gov/ newsevents/testimony/cole20070322a.htm.

[387] Mortgage Bankers Ass'n, Press Release, *Delinquencies Decrease in Latest MBA National Delinquency Survey,* (June 14, 2007), http://www.mortgagebankers.org/NewsandMedia/PressCenter/55132.htm; Mortgage Bankers Ass'n, Press Release, *Delinquencies Increase in Latest MBA National Delinquency Survey* (Sept. 6, 2007), http://www.mortgagebankers.org/NewsandMedia/PressCenter/56555.htm; Mortgage Bankers Ass'n, Press Release, *Delinquencies and Foreclosures Increase in Latest MBA National Delinquency Survey* (Dec. 6, 2007), http://www.mortgagebankers.org/NewsandMedia/PressCenter/58758.htm.

[388] Mortgage Bankers Ass'n, Press Release, *Delinquencies and Foreclosures Increase in Latest MBA National Delinquency Survey* (Dec. 6, 2007), http://www.mortgagebankers.org/NewsandMedia/PressCenter/58758.htm.

when mortgage loan originations began to slow.[389] The rise in EPDs had adverse consequences for subprime mortgage lenders, including ResCap. In connection with secondary mortgage market sales—both whole loan sales and securitizations—lenders typically commit to repurchasing loans upon an EPD. Thus, as EPDs rose, many lenders were forced to repurchase loans.

By the first quarter of 2007, the handwriting began to appear on the wall. Reuters, documenting the toll EPDs and related repurchases would have on lenders, reported that "[l]enders have been battered by rising defaults and demands from their own lenders to take back soured loans at a loss."[390] In April 2007, *The New York Times* further documented the problem:

> Some of the problems afflicting mortgages sold to borrowers with weak, or subprime, credit increasingly appear to be cropping up in loans made to homeowners who were thought to be less risky. The latest sign of possible further deterioration in the credit market came yesterday as American Home Mortgage, a lender based in Melville, N.Y., said that it would earn less and pay out a smaller dividend because it was being asked to buy back and write down the value of certain loans . . . . Reports that Wall Street, which made millions of dollars securitizing mortgages in recent years, is becoming more wary of Alt-A by putting loans back to lenders or by bidding less for them could be an indication that default rates will worsen before they improve.[391]

By the summer of 2007, "[s]everal mortgage lenders—particularly monoline subprime lenders—experienced substantial losses, as they had to repurchase larger-than-expected volumes of previously securitized loans because of so-called early payment defaults."[392]

Subprime mortgage lenders' short-term lending arrangements with warehouse lenders also took a hit because of EPDs when warehouse lenders began to exercise rights to compel the subprime mortgage lenders to repurchase loans that did not satisfy contractual

---

[389] Speech of Ben S. Bernanke, Chairman, at the Federal Reserve Bank of Chicago's 43rd Annual Conference on Bank Structure and Competition, The Subprime Mortgage Market (May 17, 2007), http://www.federalreserve.gov/newsevents/speech/bernanke20070517a.htm.

[390] Jonathan Stempel & Dan Wilchins, *Accredited, New Century Lead Subprime Meltdown*, REUTERS, Mar. 13, 2007, http://www.reuters.com/article/2007/03/13/us-newcentury-inquiry-idUSN1342127420070313.

[391] Vikas Bajaj, *Defaults Rise in Next Level of Mortgages*, N.Y. TIMES, Apr. 10, 2007, http://www.nytimes.com/2007/04/10/business/10lend.html.

[392] FRB., MONETARY POLICY AND THE ECONOMIC OUTLOOK (July 18, 2007), at 22, http://www.federalreserve.gov/monetarypolicy/mpr_20070718_part1.htm.

representations. The repurchase demands by warehouse lenders exacerbated the strain on the subprime mortgage lenders' liquidity.[393] As explained by the head of the specialty finance team at S&P:

> Warehouse lenders are the lifelines for a lot of these subprime originators because they don't have the financial capacity to fund these loans by themselves . . . . To the extent that these warehouse lenders go away, the whole process starts to unravel.[394]

In addition to exercising repurchase rights, "warehouse lenders [worried] about the quality of subprime loans . . . originated in recent years . . . began asking subprime specialists for bigger haircuts, putting the originators in financial peril and forcing some into bankruptcy."[395]

At the same time, investors became more reluctant to purchase subprime MBS in light of the increasingly poor performance of the underlying loans, driving total MBS issuance in 2006 down to $1.93 trillion, from a peak of $3 trillion in 2003.[396] To the extent subprime lenders were able to securitize loans, it was on conditions much less favorable to them.

### e. First Quarter 2007 Mortgage Company Bankruptcies

As subprime mortgage delinquencies increased, credit markets as well as underwriting criteria began to tighten. In the first quarter of 2007, the first wave of mortgage company bankruptcies began. Ownit Mortgage Solutions,[397] American Freedom Mortgage,[398] and Mortgage Lenders Network[399] filed bankruptcy petitions on December 28, 2006, January 30, 2007, and February 5, 2007, respectively. By the end of first quarter of 2007, "[m]ore than two

---

[393] Alistair Barr, *Big Banks Control Fate of Subprime Lenders*, WALL ST. J. MARKETWATCH, Feb. 16, 2007, http://articles.marketwatch.com/2007-02-16/news/30722912_1_subprime-loans-ownit-mortgage-solutions-warehouse-lenders.

[394] *Id.* (quoting Emie Napier, head of the specialty finance team at Standard & Poor's).

[395] *Id.* ("It usually takes at least several weeks for subprime specialists to sell their loans. During that time, big banks provide a 'warehouse' in which to store them. In return for passing the loan onto these warehouse lenders, the originators get cash equal to the value of the asset, minus a fee, called a 'haircut', which provides a cushion against late payments and delinquencies.").

[396] Gretchen Morgenson, *Crisis Looms in Market for Mortgages,* N.Y. TIMES, Mar. 11, 2007, http://www.nytimes.com/2007/03/11/business/11mortgage.html?pagewanted=all&_r=0.

[397] Bradley Keoun, *Ownit Files for Bankruptcy as Merrill Seeks to Return Bad Loans*, BLOOMBERG, Jan. 2, 2007, http://www.bloomberg.com/apps/news?pid=conewsstory&refer=conews&tkr=MER:US&sid=akwzqnZA.euU.

[398] Joe Rauch, *Ad Bill Forces Mortgage Lender Out of Business*, ATLANTA BUS. CHRONICLE, Feb. 19, 2007, http://www.bizjournals.com/atlanta/stories/2007/02/19/newscolumn3.html?page=all.

[399] *Mortgage Lenders Network Files for Chapter 11*, REUTERS, Feb. 5, 2007, http://www.reuters.com/article/2007/02/05/mortgagelendersnetwork-bankruptcy-idUSN0546894120070205.

dozen subprime lenders ha[d] quit the industry" in a year's time.[400] In March 2007, New Century Mortgage announced it would be unable to timely file its 10-K,[401] and ultimately filed a bankruptcy petition on April 2, 2007.[402]

### f.  Capital Market Response

On June 7, 2007, Bear Stearns halted redemptions for two of its CDO hedge funds. On June 22, 2007, it was widely reported that Bear Stearns pledged up to $3.2 billion to bail out one of the two troubled hedge funds because of subprime mortgages.[403] Reporting analysts noted:

> Bear may have prevented a wider meltdown—and kept many of the subprime bonds from plunging in value in a fire sale. Its injection of money also will help bring order to the market and pay back loans made by other big Wall Street banks to the Bear-managed hedge fund . . . . The firm, whose move helps preserve its reputation, eventually might even make some money from the struggling investments.[404]

Less than a month later—July 18, 2007—Bear Stearns announced its two hedge funds were essentially worthless, having lost over 90% of their value, a loss equal to over $1.4 billion.[405] On August 1, 2007, the hedge funds filed for bankruptcy protection and investors in the funds filed suit against Bear Stearns alleging that the investment bank misled them about the extent of the funds' exposure.[406]  It was noted at that time:

> After Bear Stearns was forced to write off the value of two large hedge funds that had invested heavily in securities backed by subprime debt, it could take just one more "Bear-like event" for

---

[400] Jonathan Stempel & Dan Wilchins, *Accredited, New Century Lead Subprime Meltdown*, REUTERS, Mar. 13, 2007, http://www.reuters.com/article/2007/03/13/us-newcentury-inquiry-idUSN1342127420070313.

[401] Compl., *SEC v. Morrice*, Case No. 8:09-CV-01426-DDP-FMP, Docket No. 1, at 3.

[402] *Id*. at 4.

[403] Kate Kelly and Serena NG, *Bear Stearns Bails Out Fund With Big Loan: Injection of $3.2 Billion Caps Days of Drama; Subprime Sector Fears*, WALL ST. J., June 23, 2007, http://online.wsj.com/article/SB118252387194844899-search.html.

[404] *Id*.

[405] THE JOINT ECONOMIC COMMITTEE: SUBPRIME MORTGAGE MARKET CRISIS TIMELINE (July 2008), at 21, http://www.jec.senate.gov/public/?a=Files.Serve&File_id=4cdd7384-dbf6-40e6-adbc-789f69131903.

[406] *Id*.

> the financial system to freeze up. "If there's another major
> hedge fund that does stumble, that could elicit a crisis of
> confidence and a global shock."[407]

On August 9, 2007, the "one more Bear Stearns-like event" happened: BNP Paribas suspended three subprime investment funds because of liquidity concerns.[408] Meanwhile, Alan Greenspan, in an editorial entitled *The Roots of the Mortgage Crisis*, noted:

> On Aug. 9, 2007, and the days immediately following, financial
> markets in much of the world seized up. Virtually overnight the
> seemingly insatiable desire for financial risk came to an abrupt
> halt as the price of risk unexpectedly surged. Interest rates on a
> wide range of asset classes, especially interbank lending, asset-
> backed commercial paper and junk bonds, rose sharply relative
> to riskless U.S. Treasury securities. Over the past five years, risk
> had become increasingly underpriced as market euphoria,
> fostered by an unprecedented global growth rate, gained
> cumulative traction. The crisis was thus an accident waiting to
> happen.[409]

In an effort to soothe credit markets, "[c]entral banks around the world injected more cash into the international banking system as problems that began with U.S. subprime mortgages rattle[d] the world economy.[410] This marked "the first time U.S., European, and Japanese central banks had taken such action together since the aftermath of the September 11 terrorist attacks," and resulted in banks calling in "notes from hedge funds and denying private equity funds new loans for questionable investments."[411] It was described as a "modern-day run on the bank."[412]

---

[407] Rex Nutting, *Subprime Could Create Global Crisis, Economist Says*, WALL ST. J. MARKETWATCH, July 26, 2007, http://articles.marketwatch.com/2007-07-26/news/30730663_1_financial-crisis-mark-zandi-housing-crisis (quoting economist Mark Zandi, who stated that "global financial shock" was just one "Bear-like" event away); *see also* Rex Nutting, *Financial crisis just one 'Bear-like' event away*, WALL ST. J. MARKETWATCH, July 26, 2007, http://articles.marketwatch.com/2007-07-26/news/30971052_1_financial-crisis-bear-stearns-funds-mark-zandi.

[408] *CSI: Credit Crunch*, ECONOMIST, Oct. 18, 2007, http://www.economist.com/node/9972489; *see also* Matt Moore (Associated Press), *ECB, Fed Inject More Cash to Ease Fears*, WASH. POST, Aug. 10, 2007, http://www.washingtonpost.com/wp-dyn/content/article/2007/08/10/AR2007081000500_pf.html.

[409] Alan Greenspan, *The Roots of the Mortgage Crisis*, WALL ST. J., Dec. 12, 2007.

[410] Matt Moore (Associated Press), *ECB, Fed Inject More Cash to Ease Fears*, WASH. POST, Aug. 10, 2007, http://www.washingtonpost.com/wp-dyn/content/article/2007/08/10/AR2007081000500_pf.html.

[411] *Id.* (noting that "WestLB Mellon Asset Management . . . suspended redemptions from its asset-backed securities ABS Fund" and "French bank BNP Paribas SA announced the suspension of three asset-backed securities funds").

[412] *Id.*

The moves by the Central Bankers only slowed the downward spiral. On August 14, 2007, Sentinel Management Group suspended redemptions.[413] About this same time AIG warned that mortgage defaults were spreading beyond the subprime sector, with delinquencies becoming more common in the mortgage category just above subprime.[414] A new wave of mortgage company bankruptcies occurred thereafter.[415]

### g. *Mortgage Company Bankruptcies Increased Throughout 2007*

By mid-2007, fifteen of the top twenty-five subprime lenders in 2006 had shut down, been acquired, or were seeking buyers.[416] On August 16, 2007, Countrywide needed an $11.5 billion rescue-financing package to survive.[417] On August 31, 2007, Ameriquest ceased operations.[418]

---

[413] Jenny Strasburg and Matthew Leising, *Sentinel Management Group Halts Client Redemptions (Update5)*, BLOOMBERG, Aug. 14, 2007, http://www.bloomberg.com/apps/news?pid=newsarchive&sid=a_af.hVzN_Ys.

[414] THE JOINT ECONOMIC COMMITTEE: SUBPRIME MORTGAGE MARKET CRISIS TIMELINE (July 2008), at 21, http://www.jec.senate.gov/public/?a=Files.Serve&File_id=4cdd7384-dbf6-40e6-adbc-789f69131903.

[415] *Id.* (By way of example, American Home Mortgage filed for bankruptcy on August 6, 2007; Aegis Mortgage filed for bankruptcy on August 13, 2007; and Countrywide Financial, the nations's then-largest mortgage lender, drew down $11.5 billion from its credit lines on August 16, 2007.).

[416] *The Subprime Lending Industry: A Look At The Restructuring of a Market in Turmoil*, prepared for ABA Annual Meeting, Business Law Section, Aug. 11, 2007, at 6, http://www.abanet.org/buslaw/newsletter/0063/materials/ ppla.pdf.

[417] FEDERAL RESERVE BANK OF ST. LOUIS, THE FINANCIAL CRISIS: A TIMELINE OF EVENTS AND POLICY ACTIONS (Apr. 13, 2011), http://timeline.stlouisfed.org/pdf/CrisisTimeline.pdf.

[418] Mathew Padilla, *Ameriquest to Shut Down*, ORANGE COUNTY REG., Aug. 31, 2007, http://mortgage.ocregister.com/2007/08/31/ameriquest-to-shut-down/.

Four of the top five largest bankruptcy filings in the United States in 2007, measured by the amount of the debtors' prepetition assets, were made by subprime mortgage lenders, and the fifth was a prime mortgage lender. The aggregate total of prepetition assets reported by these mortgage lender-debtors was in excess of $63 billion, as shown in the following table:[419]

EXHIBIT III.F.1.g
**Mortgage Lender Debtors**
*($ in Millions)*

| Mortgage Lender | Bankruptcy Date | Prepetition Assets |
|---|---|---|
| New Century Financial Corp. | 04/02/07 | $ 26,147 |
| American Home Mortgage Investment Corporation | 08/06/07 | $ 18,829 |
| HomeBanc Corp. | 08/09/07 | $ 6,823 |
| Delta Financial Corp. | 12/17/07 | $ 6,589 |
| NetBank, Inc. | 09/28/07 | $ 4,772 |

Source:   *BankruptcyData.com, Press Release, Number of Public Bankruptcies Slightly up in 2007, Fifth Lowest Ever, According to BankrupcyData.com (Jan. 16, 2007), http://www.businesswire.com/portal!site/home/index.jsp?epi_menuItem1D=887566059a3aedb6efaaa9e27a808a0c&ndm ViewId=news_view&ndmConfigid=I 0089I8&newsld =20080II6006I69&newsLang=en.*

## 2.  ResCap's Returns Began To Reflect The Troubled Market

Analysts were bullish on ResCap debt in early 2006, calling "ResCap one of the more attractive opportunities in the investment grade market,"[420] and noting:

> We remain buyers of Residential Capital paper. As the GM story becomes less ominous, the likelihood of the sale of a controlling stake in [AFI] to Cerberus in a credit-improving transaction increases.[421]

As the year progressed and the subprime mortgage market began to deteriorate, analysts continued to comment favorably regarding ResCap, forecasting that ResCap would weather any downturn in the long term:

> ResCap also cited competitive pricing pressure leading to lower margins; we expect the industry to produce subpar results into 2007; we continue to like ResCap paper particularly for investors with longer term investment horizon.[422]

---

[419] BankruptcyData.com, Press Release, N*umber of Public Bankruptcies Slightly up in 2007, Fifth Lowest Ever, According to BankruptcyData.com* (Jan. 16, 2007), http://www.businesswire.com/portal!site/home/ index.jsp?epi_menuItem1D=887566059a3aedb6efaaa9e27a808a0c&ndm_ViewId=news_view&ndmConfigid=I 0089I8&newsld =20080II6006I69&newsLang=en.

[420] Van Hesser and Daphne Feng, HSBC Global Research, Inc., *Credit Research US Financials: Residential Capital Corp.*, dated Apr. 20, 2006, at 1.

[421] *Id*. at 5.

[422] *Id.* at 1.

With the pending Cerberus acquisition and credit rating delinkage from GM, analysts noted at the time that "[r]atings are set to move higher, which will likely produce a stronger technical bid for ResCap over the near term,"[423] and that "[t]he rally in the Treasury market has given a boost to the refinance market in particular, which should increase the probability of an industry soft landing."[424]

> ### a. Pre-Closing Indicators Showed That ResCap Was Vulnerable To The Deteriorating Conditions For Subprime Lenders

Before the Cerberus PSA transactions closed in November 2006, Cerberus received information indicating that ResCap was beginning to evidence vulnerability to the deteriorating conditions for sub-prime lenders. In a mid-September 2006 e-mail to Cerberus, ResCap CEO David Applegate advised that "RFG's August [2006] results were poor and deviated significantly from forecast."[425] The "ResCap 2006 Earnings Update" stated that "RFG missed its forecast for August by $42mm on a[n] after-tax basis ($70mm pre-tax)."[426] The document explained the reasons for the $70 million unfavorable pre-tax variance:

> ### Net Interest Income
>
> The unfavorable variance is primarily due to spread compression. The yield on loans held for sale and loans held for investment was 24 bps lower than forecast, due to lower base mortgage rates, and the average cost of funds was approximating 23 bps higher than forecast.
>
> ### Provision For Credit Losses
>
> The negative variance related to RFG's provision for loan losses was largely attributable to an increase in observed delinquencies when compared to forecast;
>
> Early look at September delinquencies show levels slightly below August, September provisions are expected to be in line with the prior forecast;
>
> Charge-offs (severity) are exceeding forecasted levels; may be reflective of slower home price appreciation; and

_____

[423] *Id.*

[424] *Id.* at 2.

[425] E-mail from D. Applegate (Sept. 12, 2006) [CCM00065049].

[426] ResCap 2006 Earnings Update, at 2 [CCM00065050] (attached to E-mail from J. Jones (Sept. 13, 2006) [CCM00065049]).

> Our provision forecast anticipated normal property appreciation
> levels and is now being stress tested for more challenging
> scenarios; newer originations are more susceptible to severity
> risk.
>
> . . .
>
> *Gain On Sale Of Loans*
>
> The negative variance in gain on sale primarily reflects timing
> differences as hedge losses for certain loans accounted for at the
> lower of cost or market were recorded in August while the gain
> on sale will not be recorded until the loans are sold.[427]

Two weeks later, ResCap's September 2006 pre-close operating results again reflected an
unfavorable variance to the forecast. A September 29, 2006 internal ResCap e-mail reported:

> Estimated net income for September 2006 is 56.7 million, which
> is 22.1 million unfavorable to the [ResCap] September forecast
> of $78.8 million and $21.4 million unfavorable to the [AFI]
> September forecast of $78.1 million.[428]

RCG contributed $12.2 million to the unfavorable variance due to:

> $8.3 million unfavorable net interest income primarily due to
> unfavorable shared execution revaluation and speed and loss
> model updates ($4.9 million) and lower average HFI asset
> balances of $882 million ($3.1 million) . . . ;
>
> 10.2 million unfavorable provision for loan losses due to higher
> delinquencies than forecasted.[429]

AFI's October 25, 2006 Form 8-K described AFI's Preliminary Third Quarter 2006
Earnings Summary, including ResCap's contribution to its performance, as:

> ResCap's net income was $76 million in the third quarter of
> 2006, down from $280 million earned in the third quarter of
> 2005. The decrease in earnings was the result of a number of
> factors in ResCap's U.S. residential mortgage business. In
> particular, competitive pricing pressures negatively impacted
> margins, which led to lower gains despite year-over-year
> increases in production. Results were also affected by higher
> credit provisions resulting from increases in delinquencies,

---

[427] *Id.* at 23.

[428] E-mail from L. Hankom (Sept. 29, 2006) [EXAM10194958].

[429] *Id.*

lower net interest margins as a result of a flatter yield curve, and a decrease in net servicing income due to the effect of lower long-term rates on expected prepayments of mortgages. Mortgage originations were $51.5 billion for the third quarter of 2006, representing a slight increase from $51.3 billion in the same period in the prior year.[430]

Lenard Tessler, Cerberus's lead negotiator in the acquisition of a 51% interest in AFI, acknowledged that Cerberus recognized before the closing that "there was a deterioration in the quality of new originations in the mortgage business that was manifesting itself in early payment defaults."[431] Cerberus also appeared to have earlier indicators of the profitability and liquidity issues on ResCap. Cerberus's due diligence on ResCap from January and February 2006 included a downward adjustment to ResCap's September 2005 book value, noting that ResCap had a weak fourth quarter in 2005 and was losing money on its retail operations, and observed that the industry as a whole was experiencing a downturn.[432] Additionally, communications between Cerberus and AFI personnel indicate that Cerberus was concerned about ResCap's performance prior to completing the acquisition.[433]

Tessler, however, stated that those concerns did not cause Cerberus to reconsider its purchase of AFI because Cerberus "believed in the unique value" of AFI, ResCap, and the insurance company and thought Cerberus could "provide the appropriate guidance to the investment to be successful post-closing."[434] Cerberus believed that there were opportunity areas, which would help guarantee success even if ResCap's projected growth in its core U.S. mortgage business proved difficult to maintain.[435] Cerberus's due diligence focused on three key areas:

- Integration of RCG and RFC: Integration of these two mortgage origination units was viewed as having the potential to generate upwards of $100 million in savings annually;[436]

_____

[430] GMAC LLC, Current Report (Form 8-K) (Oct. 25, 2006), Item 2.02.

[431] Int. of L. Tessler, Nov. 16, 2012, 71:15–17.

[432] Memorandum, ResCap Update, dated Feb. 28, 2006, at 2–3 [CCM00524428]; Cerberus Capital Management GMAC ResCap Investment Committee Presentation Draft, dated Jan. 2006, at 22 [CCM00524735].

[433] E-mail from E. Feldstein (Nov. 19, 2006), at EXAM10166717 [EXAM10166716]. ("I had a frank conversation with Lenard regarding Friday's Cerberus/ResCap call and the upcoming meetings this week. . . . I advised Lenard whether they are underwhelmed with our operating results and earnings power or whether they are extremely impressed by our earnings power in this tough market. It doesn't matter right now, because there is nothing much they can do about it between now and 11/30.").

[434] Int. of L. Tessler, Nov. 16, 2012, at 72:21–25.

[435] Draft Memorandum, Cerberus Capital Management L.P. Acquisition Evaluation, at 12 [CCM00496103].

[436] *Id*.

- Improvement of ResCap's Credit Rating: An upgrade of ResCap's corporate credit rating [would] allow it to access lower cost capital and according to ResCap management could generate an additional $100 million in pre-tax savings . . .;[437] and

- Growth opportunities related to BCG and IBG.[438]

### b. *Post-Closing Revelations Of Distressed Warehouse Lending Clients*

Cerberus viewed the market downturn as temporary.[439] Cerberus believed ResCap had a powerful platform that, combined with Cerberus's ability to operate more efficiently than GM, positioned ResCap for profitability once the market recovered.[440] Hence, despite the warning signals exhibited in the third quarter earnings report, Cerberus forged ahead with the transaction, and on November 30, 2006, the transactions contemplated by the Cerberus PSA closed, FIM Holdings acquired 51% of the common limited liability interests in AFI in exchange for $7.353 billion, and certain preferred membership interests in AFI in exchange for $500 million.[441]

The ResCap Board held its first regular meeting after the Cerberus transaction on December 12, 2006.[442] Various members of the Cerberus Investment Team, including Jones, Kravit, and Yaghoobzadeh, attended. During the meeting, Applegate, COO of ResCap, presented the RFG market update, during which he "discussed the competitive challenges and overall U.S. residential real estate market conditions."[443] The ResCap Board discussed the status of the MLN/EMX warehouse lending accounts.[444] According to Jones, Applegate reported there being a $50–$100 million loss with regard to the MLN/EMAX account.

---

[437] *Id.*

[438] *Id.*

[439] Memorandum, ResCap Update, dated Feb. 28, 2006, at 2–3 [CCM00524428]; Int. of M. Neporent, Feb. 6, 2013, at 18:5–19.

[440] Int. of M. Neporent, Feb. 6, 2013 at 17:17–23; 18:7–19:3.

[441] General Motors Corp. Current Report (Form 8-K) (Nov. 30, 2006), Item 2.01.

> On November 30, 2006, GM, GMAC, GM Finance Co. Holdings LLC, a Delaware limited liability company and a wholly owned subsidiary of GM ("Holdco"), and FIM Holdings LLC, a Delaware limited liability company ("Purchaser"), successfully completed a series of transactions pursuant to which GM has sold to Purchaser common limited liability company interests of GMAC representing 51% of the aggregate common limited liability company interests of GMAC for a purchase price of approximately $7.353 billion (the "Transactions") subject to the terms and conditions set forth in the Purchase and Sale Agreement Residential Capital 10K for year ended 12/31/06.

> *Id.; see also* Cerberus PSA, §§ 2.1, 2.2 [CERB000521]. "In addition, certain officers and directors of ResCap and its subsidiaries also became officers and/or directors of the new GMAC Bank." Residential Capital, LLC Current Report (Form 8-K) (Nov. 27, 2006), at 2.

[442] Minutes of a Regular Meeting of the Board of Directors of Residential Capital, LLC, Dec. 12, 2006, at RC4000685664 [RC40006748].

[443] *Id.* at RC40006857.

[444] *Id.*

Applegate reported that, during October, these related companies were added to the Credit Watch List due to concerns over liquidity and underwriting standards. Combined commitments and outstandings for MLN and EMAX were reported as $1.6 billion and $1.5 billion, respectively. MLN/EMAX was ResCap's largest warehouse lending client, largest volume client for all products, and the largest servicing exposure/counterparty exposure within ResCap's portfolio.[445]

---

[445] E-mail from B. Cleary (Oct. 20, 2006) [EXAM11331654].

Jones recalled that this disclosure created a fair amount of commotion because it came as a "surprise."[446] Jones also recalled that Applegate described the problem as specific to MLN, as opposed to a market-wide category problem. Jones believes that, as of the date of the Board meeting, Applegate still felt that ResCap's warehouse lending sector "was largely secure in terms of the assets at that point in time—and while there may be some amount of loss, [Applegate did not believe] that it was a particularly large exposure."[447] Nevertheless,

---

[446] Jones described the revelation of the problems with MLN/EMAX as a "surprise" during his interview Int. of J. Jones, Nov. 30, 2012, at 20:7–20. While the exposure ResCap faced due to the distressed state of MLN/EMAX may have been a surprise to Cerberus, it is not as clear that ResCap was surprised. On November 17, 2006, less than two weeks before the Cerberus transaction closed, Stenger forwarded an e-mail authored by Klun to ResCap's CEO, Giertz, because Stenger thought Giertz would want to be "up to speed on ResCap's largest commercial exposure." E-mail from T. Stenger (Nov. 17, 2006) [EXAM11605863] (forwarding e-mail from Kuhn). The original e-mail authored by Kuhn stated in part:

> Background: MLN/EMAX combined are ResCap's largest customer. Basically, MLN originates prime and subprime loans domestically. Most or all subprime volume is purchased by EMAX, a US Virgin Island domiciled company. This arrangement provides tax benefits that in theory allows EMAX to operate more aggressively. We had been buying 100% of EMAX production, which we have securitized in pools labeled EMAX 1, 2 etc. Historically, there have been no collateral quality issues with the pools and MLN/EMAX operations have not been a concern despite high growth. The companies have been profitable.

> Current situation: RFG purchases EMAX loans out of the warehouse for securitization stripped of 3 cash flow components-residual, servicing, and prepayment penalty, each of which are kept on the EMAX balance sheet. We finance these components via an advancing term loan. The residual piece is subject to a 75% advance rate on new advances and up to 85% on existing advances. At present, the blended effective advance is 83%. Structure/advances around the servicing component appear to be less formal, with periodic advances made at 75% of value. "Value" may be determined by RVA or we may use an outside resource. The client of course has their own valuation ideas and techniques which usually yield a bigger number. We do not presently advance against prepayment penalty, instead viewing it as a cushion. RVA recently changed their model components to reflect lower home value appreciation. Simply put, this causes the EMAX collateral we hold (the capitalized value of residuals, servicing, etc) to decline. As the arrangement currently stands, we are looking at a collateral shortfall upward of $15 million in December. RVA has apparently gone through their proper governance in approving the new model assumptions.

> Another factor to consider in general and with respect to the margin issue has been a recent general deterioration of underwriting standards (lower FICO, higher LTV), admitted to by the client to fuel their substantial growth. Recent securitization pools (EMAX 7, 8, 9, 10) have been affected. The client has agreed to revert to more conservative standards going forward.

> Nonetheless, rapid growth has stressed cash and capital. This, and to a lesser degree the underwriting issue, has caused MLN/EMAX to end up on the watch list. It is generally agreed that more capital is needed to sustain future growth.

> Ultimately, warehouse lending and ResCap will have to decide if we want our exposure to increase beyond $1.6 billion, but that is another matter. There are some warehouse personnel who feel that we may be under financing a rapidly growing customer by not advancing against prepayment penalties. It is projected that the potential December shortfall goes away if we factor in an advance against prepayment penalty capitalized cash flows. Problem is, this may not address the issue beyond December if collateral continues to deteriorate.

E-mail from E. Klun (Nov. 17, 2006) [EXAM11605863].

[447] Int. of J. Jones, Nov. 30, 2012, at 20:15–20.

Applegate's disclosure of warehouse lending problems at the meeting led Cerberus to form a "SWAT team" to assess and address problems as ResCap.[448]

### c. Cerberus PSA Post-Closing Adjustment Was Principally Attributable To Poor ResCap Performance

Applegate's disclosure resulted in immediate action by Cerberus to undertake a comprehensive analysis of non-prime collateral supporting warehouse advances.[449] Additionally, Cerberus analyzed ResCap's (1) MLHFI; (2) MLHFS; (3) MSRs; (4) residuals; (5) lending receivables; and (6) reserves for liabilities related to representation and warranties and early payment defaults, in part for the purpose of determining whether the Cerberus PSA closing balance sheet should be adjusted.[450]

In early January 2007, GM announced that it would not report its results as scheduled, in part, because of the need to finalize AFI's numbers, the report of which had been delayed while GM and Cerberus reviewed the $14.4 billion tangible net book value ascribed to AFI at November 30, 2006, the date on which GM sold 51% of AFI to Cerberus. In March 2007, GM made a "capital contribution to AFI of approximately $1 billion to restore its adjusted tangible equity balance to the contractually required amount of $14.4 billion, due to the decrease in the adjusted tangible equity balance of GMAC as of November 30, 2006."[451] Nearly all of the $1 billion adjustment was ResCap-related with close to 90% of the ResCap portion of the adjustment being attributable to RCG.

### d. ResCap Reported A Loss For The Fourth Quarter Of 2006

ResCap reported an operating loss of $651 million for fourth quarter 2006, compared to net income of $118 million in the fourth quarter of 2005. According to ResCap, the loss reflected increased reserves related to both higher delinquencies and greater loss severity in the nonprime HFI portfolio, difficult market conditions for mortgages, and HFS and credit losses related to lending relationships with certain third-party nonprime market participants. In addition, rising short-term interest rates and market volatility suppressed the value of mortgage servicing assets, and the slowdown in new home construction negatively affected financial performance.[452]

---

[448] Int. of R. Kravit, Mar. 4, 2013, at 13:5–15; 14:13–15; 15:21–16:5.

[449] *See* Minutes of a Regular Meeting of the Board of GMAC LLC, Mar. 15, 2007, at ALLY_PEO_000088992 [ALLY_PEO_0000860].

[450] *See generally* ResCap Discussion Document, dated Jan. 30, 2007 [CCM00355071]; GMAC ResCap Audit Committee Materials Recent Events, dated Mar. 6, 2007 [EXAM12341494].

[451] General Motors Corp., Annual Report (Form 10-K) (Mar. 15, 2007), at 120.

[452] Residential Capital, LLC, Current Report (Form 8-K) (Mar. 13, 2007), Ex. 99.1; *see also* Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 34–36.

ResCap reported 2006 net income of $705 million, compared to net income of $1 billion in 2005. Net income in 2006 was significantly affected by a one-time tax benefit of $523 million in the fourth quarter from the conversion of ResCap to a limited liability company in connection with the Cerberus PSA. ResCap's 2006 operating earnings, excluding the LLC conversion benefit, were $182 million, compared to $1 billion of operating earnings in 2005. The challenging market environment—including pressure on home prices and weakening consumer credit—severely depressed the value of ResCap's large nonprime asset portfolio, resulting in significant operating losses at its operating segment. These losses more than offset the record earnings achieved at ResCap's IBG and BCG, including a one time $259 million after-tax gain on the second quarter sale of an equity investment in a regional homebuilder.

Eric Feldstein, CEO of AFI, ascribed the disappointing 2006 results to "[t]he sharp downturn in the U.S. mortgage market in the fourth quarter," noting that the industry as a whole was left to deal with enormous challenges including a decrease in origination volume, narrowing margins, rising delinquencies, and increased pressure on home prices. Feldstein noted that a profitable year was achieved amidst the turmoil in the U.S. mortgage markets because of ResCap's geographic and product diversity: "At ResCap, net losses were incurred in its core U.S. mortgage business in the wake of this difficult industry environment. Nonetheless, ResCap's geographic and product diversity helped the company maintain a profitable bottom line overall for the year."[453]

### (1) Losses Reported For 1st Quarter 2007

Deterioration in the nonprime mortgage market resulted in ResCap incurring a net loss for first quarter 2007, despite increased prime originations and strong international performance. A January 28, 2007 e-mail from Sanjiv Khattri to Bruce Paradis, ResCap Director and CEO, and David Applegate, ResCap Director and COO, reflected a belief that ResCap's poor results resulted from more than poor industry fundamentals. Khattri noted that management "really let our shareholders down in a very big way."[454] Khattri faulted Paradis and Applegate for not being "much more involved" and recounted that he had heard that "there were traders in RCG who were buying paper based on model pricing even though they knew [the] model couldn't be right."[455] Khattri opined that the finance group let Applegate and Paradis down by not providing the "the succin[c]t analysis for [the] forecasting knowledge/tools to help the business."[456]

---

[453] Residential Capital, LLC, Current Report (Form 8-K) (Mar. 13, 2007), Ex. 99.1.

[454] E-mail from S. Khattri (Jan. 28, 2007) [EXAM10163216].

[455] *Id.*

[456] *Id.*

*(2) Business Plan Modifications Following The Disappointing Year-End 2006 And First Quarter 2007 Results Focused On Establishing Cerberus-Designated Management Ranks*

In his interview, Tessler stated that Cerberus had targeted Applegate and Paradis as necessary casualties of the Cerberus purchase even before the transaction closed. According to Tessler, Cerberus lacked confidence in the ability of Paradis and Applegate to execute the necessary underwriting discipline and believed that Paradis and Applegate "were not as in touch with the market in their business as they should [have been] given the changing environment."[457] Mark Neporent, COO and General Counsel of Cerberus and a member of AFI's Board from 2006 to March 2009, echoed Tessler's sentiments, indicating that even before consummation of the Ceberus PSA, Cerberus identified Applegate and Paradis as "not the strongest possible people in these markets."[458] Subsequently, the decision to force the resignations of Applegate and Paradis was made by the AFI Board in early 2007.[459] Cerberus's view was that "a change in leadership at ResCap" was necessary.[460] Shortly before 2006 earnings were released, David Applegate resigned as a director and as COO of ResCap.[461]

Applegate's departure was an early example of Cerberus taking an active role in the management of AFI and its subsidiaries, including ResCap.[462] After acquiring control of AFI, Cerberus began imbedding Cerberus and COAC employees throughout AFI and ResCap to implement operational improvements.[463] On March 23, 2007, Jim Jones was elected a member of the ResCap Board and COO. Additionally, the composition of the ResCap Board was increased by two additional members, and Paul T. Bossidy and Ronald J. Kravit were appointed to the newly created memberships.[464] Bossidy, Kravit, and Jones were all affiliated with Cerberus. Kravit and Jones had been members of the Cerberus investment team responsible for putting together and conducting the due diligence related to the Cerberus transaction. Prior to Bossidy joining the ResCap Board, a position was proposed for Bossidy at an AFI Board meeting that would have allowed Bossidy "the opportunity to go anyplace that [he] wanted to go and operate on Steve[] [Feinberg's] behalf."[465] According to Bossidy,

---

[457] Int. of L. Tessler, Nov. 16, 2012, at 87:23–88:1.

[458] Int. of M. Neporent, Feb. 6, 2013, at 55:11–56:20.

[459] *Id*.

[460] Int. of L. Tessler, Nov. 16, 2012, 89:13–19.

[461] Walden, Siew, *Bond investors bet on bankruptcy for ResCap*, REUTERS, Nov. 20, 2007 (noting that "ResCap's chief executive Bruce Paradis and co-chief executive David Applegate left the company this year, as did its chief financial officer in the wake of the global credit crunch this summer), http://www.reuters.com/article/2007/11/20/us-rescap-bonds-idUSN1962256020071120.

[462] Int. of P. Bossidy, Dec. 14, 2012, at 53:2–4.

[463] *See* Consulting Agreement, effective as of April 1, 2007, by and among Cerberus, COAC, and AFI, Recitals, Ex. A [ALLY_0401248]. Cerberus's initial interest in acquiring a majority interest in AFI was predicated on improving AFI's operations. Int. of L. Tessler, Nov. 16, 2012, at 18:8–19.

[464] *See* Minutes of a Regular Meeting of the Board of Residential Capital, LLC, Mar. 23, 2007, at RC40005567 [RC40005558].

[465] Int. of P. Bossidy, Dec. 14, 2012, at 66:21–67:10. Steven Feinberg is the founder and head of Cerberus.

his formal involvement in ResCap was a result of Feinberg's perception that ResCap was a risk to Cerberus's investment in AFI.[466] Bossidy stated that when he joined the ResCap Board, he "began to focus intensely on behalf of Steve [Feinberg] on trying to diagnose some of the issues that [were] affecting ResCap."[467]

It also was not uncommon for a Cerberus employee to hold positions at or advise on multiple AFI entities simultaneously.[468] Cerberus employees moved between AFI, ResCap, and other AFI or ResCap subsidiaries as a need arose.[469] As a result, it was not always clear to employees as for whom they were working, Cerberus, AFI, or ResCap.[470] And employees, themselves, occasionally felt conflicted.[471] Some ResCap employees working at ResCap reported to Cerberus or AFI management in addition to, or instead of, reporting to ResCap management.[472] For example, as Vice Chairman of ResCap, Weintraub reported to AFI CEO Alvaro de Molina.[473]

Employee discomfort with Cerberus's management style surfaced quickly, and remained a theme at least through 2008. By way of example, in a late March 2007 e-mail explaining his resignation, James Giertz, ResCap CFO, wrote:

> First, the random management style of Cerberus makes me very uncomfortable, especially as the Chief Financial Officer of this company. It isn't clear to me who is making the key decisions within the business but certainly the official management structure and decision making processes are not being respected frequently. . . . Second, the drive to dismantle the ResCap structure and replace it with a more substantial infrastructure within the parent company [AFI] is not attractive to me personally and I'm not sure if it is the best strategy for the ResCap business.[474]

---

[466] *Id.* at 22:10–13.

[467] *Id.* at 22:13–17.

[468] *See* Cerberus Capital Management GMAC Investment Oversight Key Initiatives Presentation, dated Apr. 23, 2007, at 1 [CCM00271744]; Int. of P. Bossidy, Dec. 14, 2012, at 24:13–25.

[469] Int. of J. Lombardo, Sept. 17, 2012, at 45:14–47:17.

[470] Int. of P. Bossidy, Dec. 14, 2012, at 190:23–191:6.

[471] E-mail from J. Lombardo (Aug. 7, 2009) [EXAM20033432].

[472] *See, e.g.*, Memorandum, ResCap Leadership Changes, July 28, 2008, at 1 [CCM00148289]; Int. of E. Feldstein, Dec. 14, 2012, at 200:17–201:4; Int. of P. Bossidy, Dec. 14, 2012, at 190:23–191:6; Int. of J. Lombardo, Mar. 18, 2013, at 31:20–32:1 ("On a daily basis, I was reporting to Mike Rossi, but I was also communicating with Paul Bossidy, who is the senior operational person from COAC or Cerberus Ops, and certainly, I was keeping Scott Parker in the loop as well, because he was also involved in ResCap.").

[473] Memorandum, ResCap Leadership Changes, dated Jul. 28, 2008, at 1 [CCM00148289].

[474] E-mail from J. Giertz (Mar. 26, 2007) [EXAM11606784].

Sanjiv Khattri became the newly elected CFO and Craig Chapman was elected a member of the ResCap Board.[475] Khattri would eventually voice similar concerns and took issue with the degree to which Cerberus expected AFI management to perform work at the ResCap level.[476] Khattri stated that "[Cerberus] had little respect for organizations."[477]

In May 2007, Bruce J. Paradis "resigned" as Director and CEO.[478] Jim Jones was appointed President and CEO of ResCap in lieu of COO, and joined AFI as an Executive Vice President and member of the Executive Committee.[479] According to Bossidy, Feinberg made the decision to hire Jones as CEO.[480]

Linda Zukauckas was elected Chief Accounting Officer and Controller.[481] Additionally, Louise M. Herrle resigned as Treasurer effective June 1, 2007; William Casey became the newly elected Treasurer. Although his resignation would occur much later, Casey would echo the concerns about Ceberus and AFI involvement before departing.[482]

With new management in place, ResCap embarked upon a "Business Plan Reset." Key objectives for the reset were:

- Diversification of earnings domestically and internationally through production, servicing, investment portfolio, and fee based businesses;

- Returning RFG to profitability;

- Improving credit controls;

- Maintaining fundamental BCG marketing position while reducing risk and exposure; and

- Expanding existing IBG businesses and selectively exporting BCG's capabilities internationally.[483]

---

[475] *See* Minutes of a Special Meeting of the Board of Residential Capital, LLC, Apr. 20, 2007, at RC40005577–78 [RC40005558].

[476] Int. of S. Khattri, Apr. 5, 2013, at 119:23–120:17.

[477] *Id.* at 120:12–13.

[478] *Jones to succeed Paradis as ResCap CEO*, REUTERS, Apr. 17, 2007, http://www.reuters.com/article/2007/04/17/rescap-ceo-idUSN1725565320070417.

[479] *See, e.g.*, Individual Profiles, dated June 25, 2012 [ALLY_0004637].

[480] Int. of P. Bossidy, Dec. 14, 2012, at 17:11–20.

[481] *See* Minutes of a Regular Meeting of the Board of Residential Capital, LLC, May 11, 2007, at RC40005587 [RC40005558].

[482] *See* Section III. G.3.e(2) (discussing ResCap management resignations).

[483] *Id*.

### 3. Further Market Dislocation In 2007; ResCap Begins An Era Of Parental Support And Affiliated Transactions

By mid-2007, AFI and ResCap were striving to avoid the hate met by fifteen of the top twenty-five mortgage lenders, described earlier in this section.[484] In AFI and ResCap entered an era of parental support involving numerous affiliated transactions; the goal was to weather the storm and still be standing when the markets improved.[485] Tessler acknowledged that he knew ResCap was in "desperate" need of capital starting in early 2007, and found itself in such a position "on a somewhat continuous basis, whether it was primarily to meet the net worth covenant."[486] Tessler also explained, however, that Cerberus felt it had a unique window into the capital markets at this time and was well-suited to see ResCap through the storm. Tessler attributed this "unique window into the capital markets" to the fact that Cerberus also owned Chrysler Automotive and Chrysler Financial during this time period. As Tessler explained, "our window was not simply through [an AFI] lens."[487]

#### a. Funding Initiatives[488]

In March 2007, AFI made a $500 million cash equity contribution to ResCap. It made another $500 million cash equity contribution in April 2007. In May 2007, ResCap entered into a $2.25 billion dual tranche transaction that included $1 billion two-year floating rate debt and $1.25 billion five-year fixed rate debt. In June, ResCap issued an EU 600 million three-year floating rate note, a GBP 400 million seven-year fixed rate note, and an MXP 1.8 billion five-year fixed rate note.

#### b. Amended And Restated Master Mortgage Loan Purchase And Sale Agreement

Effective June 1, 2007, GMAC Mortgage and Ally Bank entered into an "Amended and Restated" MMLPSA.[489] This version of the MMLPSA, adopted as ResCap was confronting worsening market conditions, made several key revisions.[490]

---

[484] The American Bar Association, Annual Meeting Presentation, *The Subprime Lending Industry: A Look At The Restructuring of a Market in Turmoil*, dated Aug. 11, 2007, http://apps.americanbar.org/buslaw/newsletter/0063/materials/pp1a.pdf; *see also* Section III.F.1.g.

[485] *See* Int. of J. Jones, Nov. 30, 2012, at 59:20–60:21 (noting the amount of support AFI had provided prior to 2008).

[486] Int. of L. Tessler, Feb. 28, 2013, at 15:20–22.

[487] *Id.* at 38:20–24. In May, 2007, only six months after acquiring a controlling stake in AFI in November, 2006, Cerberus also acquired 80.1 percent of Chrysler Holdings from Daimler Benz for $7.8 billion (about ten years after Daimler paid $36 billion for Chrysler). The Chrysler acquisition also gave Cerberus control of Chrysler Financial.

[488] *See* Section V.E (discussing these funding initiatives).

[489] 2007 MMLPSA [ALLY_0018275].

[490] *See* Section V.B (discussing the 2007 MMLPSA).

### c. *MSR Swaps*

In 2007, Ally Bank and GMAC Mortgage entered into two swap transactions related to mortgage servicing rights (i.e., the MSR Swap). One was based on a net funding component and exchanged all servicing fees received by the Bank to GMAC Mortgage for a LIBOR-based fixed income stream;[491] the second was based on a FMV component and swapped the risks of changes in the FMV of MSRs to GMAC Mortgage by obligating GMAC Mortgage to pay Ally Bank for any decrease in the value of the MSRs (e.g., decrease in interest rates or increases in delinquencies or foreclosures would decrease the value of MSRs). The MSR Swap protected the Bank from market and credit risk.[492]

### d. *August 2007 Severe Liquidity Crisis And The Health Capital Sale*

According to Tessler, by the summer of 2007, cracks were becoming visible in the U.S. economy, which were largely connected to the downturn in the housing market and the impending subprime mortgage crisis. Tessler described the situation as a "storm" until August 2007 when it became a "global catastrophe."[493] While the downturn in the housing market was not a sudden, unexpected event, the adverse impact was greater than ResCap, AFI, or Cerberus anticipated. Liquidity was drying up in the capital markets and for a business such as ResCap, not having access to capital meant that it could not operate.

At the end of June 2007, there was an urgent need to take steps to address the current pending liquidity problem at ResCap and to do so quickly, while at the same time starting the process to make more permanent changes to ResCap's operations to address liquidity. The belief within AFI and Cerberus was that ResCap was still a viable and valuable business but that changes were needed to its business model to focus more on the prime mortgage market rather than the non-prime market. Tessler noted that in August and September 2007 it was Cerberus's view that ResCap was valuable and unique and should receive support during the crisis because it would remain one of the few surviving mortgage service companies and would make a lot of money.[494]

To address the immediate liquidity problem that ResCap was facing in August 2007, one option involved ResCap selling BCG's Health Capital business to GMAC CF because this could be done quickly. Moreover, from a business standpoint, the Health Capital business arguably was a better fit for GMAC CF than for ResCap.[495]

---

[491] A December 2010 Ally Bank internal memo indicates that costs incurred on account of GSE repurchase requests were deducted from GMAC Mortgage's net servicing fees paid under the MSR Swap. The memo states "[s]ince implementation of the MSR swap in 2007, the Bank has never been required to pay a repurchase or indemnification demand from Fannie Mae or Freddie Mac. All such demands have been administered and satisfied by GMACM, either as direct recipient of the investor demand, or pursuant to its obligations under the MSR swap." Draft Memorandum, Evolution Of Ally Bank Processes For Purchase, Origination, Sale, And Servicing Of Mortgage Loans, dated Dec. 2, 2010, at 6–7 [EXAM11216070].

[492] *See* Section V.B.9 (discussing the MSR Swaps).

[493] Int. of L. Tessler, Nov. 16, 2012, at 95:25–97:11.

[494] Int. of L. Tessler, Nov. 16, 2012, at 143:24–147:4.

[495] Int. of S. Khattri, Oct. 25, 2012, at 212:23–223:24.

The Health Capital Sale was conceived, and an agreement executed, in one month. The Health Capital Sale closed in August 2007 and the post-closing true-up payment was made before the end of September 2007 so that the cash could be shown on ResCap's September 30, 2007 balance sheet.[496] On August 21, 2007, prior to the close of the transaction, ResCap CFO, Sanjiv Khattri expressed concern regarding the "rush and scope" of the transaction and stated at that time that he did "not support [the] plan."[497]

---

[496] Residential Capital, LLC, Quarterly Report (Form 10-Q) (Nov. 7, 2007) ("On August 27, 2007, . . . wholly owned subsidiaries of [ResCap], sold substantially all of the assets and operations comprising their healthcare finance business to GMAC [CF], a wholly owned subsidiary of [AFI], pursuant to an asset purchase agreement. [ResCap] received $900.5 million, which represents the fair value of the business as valued by an independent third-party valuation. Net book value totaling $876.8 million was transferred as part of the sale resulting in a capital contribution from [AFI] of $23.7 million.").

[497] E-mail from S. Khattri (Aug. 21, 2007) [ALLY_0110176].

### G. RESCAP'S MOUNTING LIQUIDITY AND COVENANT ISSUES (SEPTEMBER 2007 THROUGH JULY 2008)

#### 1. Summary Of Industry Data And Environment

During the first half of 2007, market dislocation was mostly confined to the subprime mortgage markets.[498] These problems, however, migrated quickly to other areas including employment and the capital markets.

##### a. Housing Market

The near elimination of nonprime mortgage originations and the tightening of lending standards in early 2007 exacerbated the contraction in housing demand and construction in the latter part of 2007 and in 2008.[499] According to the National Association of Realtors, the number of detached single family homes on the market in October 2007 was sufficient inventory for approximately 10.5 months, "more than double the level of two years [before] and the highest since 1985."[500] Moody's noted that in addition to the number of detached, single family homes, there was "over 11 months of unsold condo inventory, nine months of existing single family homes and eight months of new homes (vacant for sale inventory)."[501] Housing starts were off from their previous year peak.[502] The FRB reported that new construction in the fourth quarter of 2007 had been cut dramatically and was off 50% from the high in the first quarter of 2006.[503]

---

[498] Alister Bull, et al., *Fed Missed Warning Signs in 2007 as Crisis Gained Steam*, REUTERS, Jan. 18, 2013, http://www.reuters.com/article/2013/01/19/us-usa-fedidUSBRE90H13Q20130119?feedType=RSS&feedName=businessNews.

[499] FRB MONETARY POLICY REPORT TO CONGRESS (Feb. 27, 2008), at 5, http://www.federalreserve.gov/monetarypolicy/files/20080227_mprfullreport.pdf.

[500] James Hagerty, *Home Listings in 18 Metro Areas Decline*, WALL ST. J., Dec. 6, 2007, http://biz.yahoo.com/wallstreet/071206/sb119691376974115539_id.html.

[501] Mark Zandi & Celia Chen, *Aftershock: Housing in the Wake of the Mortgage Meltdown*, MOODY'S ECONOMY.COM, Dec. 2007, at 18, http://www.economy.com/home/products/samples/2007-12-01-Aftershock-Housing-Wake Mortgage-Meltdown.pdf.

[502] *Id.*

[503] FRB MONETARY POLICY REPORT TO CONGRESS (Feb. 27, 2008), at 1, http://www.federalreserve.gov/monetarypolicy/files/20080227_mprfullreport.pdf.

The housing sector continued to look dismal as early 2008 numbers were reported. "U.S. home prices fell another 11.4% in January 2008, the housing market's steepest drop since S&P started collecting data in 1987."[504] The numbers looked no better in February with new home sales falling for "a fourth straight month, pushing activity down to a 13-year low. . . ."[505]

In addition to the weakness in home sales and the decline in home prices, foreclosures continued to rise. In early 2008, RealtyTrac reported that the foreclosure process had begun on 1.3 million properties in 2007, a 79% increase over 2006.[506] It became apparent that the 2006 and 2007 vintages of mortgages would pose the greatest risks for lenders. According to a 2008 report:

> For subprime ARMs originated in 2006, about 10 percent had defaulted in the first twelve months, more than double the fraction for mortgages originated in earlier years. Furthermore, the path of the default rate for subprime ARMs originated in 2007 has run even higher. For subprime mortgages with fixed interest rates, delinquency rates have moved up significantly in recent months, to the upper end of their historical range.[507]

Additionally, LIBOR had risen to 6.8%, its highest point since 1998.[508] Rising interest rates caused an increase in monthly loan payments after teaser rates expired; for example, "[t]he average subprime borrower [would] experience an increase in their monthly payment at the first reset of approximately $350, lifting the payment from $1,200 to $1,550."[509] These types of increases were expected to lead to an increase in defaults. Industry expert Marc Zandi, testifying before Congress, stated:

> I expect 2.8 million mortgage loan defaults (the first step in the foreclosure process) in 2008 and 2009. Of these, 1.9 million

---

[504] Katalina M. Bianco, *The Subprime Lending Crisis: Causes and Effects of the Mortgage Meltdown*, CCH Fed. Banking L. Rep., CCH Mortgage Compliance Guide & Bank Dig. 2008, at 18, http://www.business.cch.com/bankingfinance/focus/news/Subprime_WP_rev.pdf.

[505] *Id.*

[506] Associated Press, *Number of Foreclosures Soared in 2007*; *Stage is Set for More Foreclosures in Year Ahead, Data Show,* NBCNews.com, Jan. 29, 2008, http://www.nbcnews.com/id/22893703/ns/business-real_estate/t/number-foreclosures-soared/.

[507] FRB Monetary Policy Report to Congress (Feb. 27, 2008), at 6, http://www.federalreserve.gov/monetarypolicy/files/20080227_mprfullreport.pdf.

[508] Mauro F. Guillen, *The Global Economic & Financial Crisis: A Timeline*, The Lauder Inst., U. Pa., at 2, http://unpan1.un.org/intradoc/groups/public/documents/apcity/ unpan033507.pdf.

[509] Mark Zandi & Celia Chen, *Aftershock: Housing in the Wake of the Mortgage Meltdown*, Moody's Economy.com, Dec. 2007, at 9–10, http://www.economy.com/home/products/samples/2007-12-01-Aftershock-Housing-Wake-Mortgage-Meltdown.pdf.

homeowners will go through the entire foreclosure process and ultimately lose their homes.[510]

### b. Unemployment

In September 2007, the Department of Labor reported the first month of negative job growth since 2003.[511] This was only the beginning as data in subsequent months worsened. The Department of Labor announced in December 2007 that the economy had gained only 94,000 jobs in November.[512] This was significantly below the 125,000 non-farm new jobs the economy needed to absorb new workers and those losing their jobs on a monthly basis.[513] While in the previous year, jobs in the financial services and construction were stable, by the middle of 2007 these areas were experiencing losses in excess of 25,000 jobs a month, increasing to 50,000 jobs lost in October and 75,000 jobs in November.[514] By the Summer of 2008, the Department of Labor reported that unemployment rates had moved upward from 4.7% in September 2007 to 5.8% in July 2008.[515]

### c. Capital Markets

With the considerable uncertainty in the investment markets caused by the sheer dollar amount of subprime mortgage-backed securities, by January 2008, the lending system had effectively closed. The FRB continued to react to the growing crisis by cutting an additional 125 basis points from the Federal Funds Rate in an attempt to keep banks lending, and lower long-term rates to more affordable levels.[516] The market forces were moving faster, however, and in January 2008, ABX stopped issuing subprime indices[517] and S&P downgraded or placed on credit watch more than 8,000 RMBS and CDO securities, further affecting the

[510] HEARING BEFORE THE SENATE COMMITTEE ON THE JUDICIARY, THE LOOMING FORECLOSURE CRISIS: HOW TO HELP FAMILIES SAVE THEIR HOMES (Dec. 5, 2007) (written testimony of Mark Zandi, Chief Economist and Co-founder, Moody'sEconomy.com), http://townhall.abiworld.org/node/281.

[511] Tom Redburn, *Bernanke, The Fed and 2008*, N.Y. TIMES, Sep. 9, 2007, http://www.nytimes.com/2007/09/09/weekinreview/09redburn.html?_r=0.

[512] Peter Goodman & Michael Grynbaum, *Slowing Growth in Jobs Seen as Ominous Sign for Economy*, N.Y. TIMES, Dec. 8, 2007, http://www.nytimes.com/2007/12/08/business/08econ.html?pagewanted=.

[513] Peter Goodman, *Wall St. Sees Silver Lining*, N.Y. TIMES, Dec. 1, 2007, http://www.nytimes.com/2007/12/01/business/01econ.html.

[514] Peter Goodman & Michael Grynbaum, *Slowing Growth in Jobs Seen as Ominous Sign for Economy*, N.Y. TIMES, Dec. 8, 2007, http://www.nytimes.com/2007/12/08/business/08econ.html?pagewanted&_r=0.

[515] DATABASES, TABLES & CALCULATORS BY SUBJECT, LABOR FORCE STATISTICS FROM THE CURRENT POPULATION SURVEY (from 2003 to 2013), http://data.bls.gov/timeseries/LNS14000000.

[516] FRB MONETARY POLICY REPORT TO CONGRESS (Feb. 27, 2008), at 2, http://www.federalreserve.gov/monetarypolicy/files/20080227_mprfullreport.pdf.

[517] Liang Simon, An Examination of the Subprime Crisis, Implications from the ABX Index (B.S. thesis, Leonard N. Stern School of Business, New York University) at 3, http://w4.stern.nyu.edu/emplibrary/Simon%20Liang_Thesis_Honors%202008.pdf.

balance sheets of those invested in MBS markets.[518] A report from market analysts at UBS in late February 2008 showed that losses within the financial sector from subprime MBS could reach $600 billion. This new report on expected losses marked a 50% rise from previous estimates made just months earlier.

By March 2008, mounting subprime issues had taken their toll on U.S. investment bank Bear Stearns.[519] By the end of the month, working with the FRB, JP Morgan acquired Bear Stearns.[520] The news would continue to get worse as the year progressed. Federal regulators seized IndyMac Bank in July on fears of subprime issues consuming depositors' funds.[521]

### d.   Contingency Funding Plans Employed By ResCap To Prevent Market Turmoil From Having A Negative Effect On Liquidity

As a result of the domestic and international mortgage and capital markets dislocation,[522] ResCap experienced margin calls, changes to advance rates on its secured facilities, and a loss of significant asset-backed commercial paper conduit financing capacity, all of which negatively affected ResCap's liquidity.[523] Consequently, ResCap took several important

---

[518] U.S. SENATE PERMANENT SUBCOMMITTEE ON INVESTIGATIONS, COMMITTEE ON HOMELAND SECURITY & GOVERNMENT AFFAIRS, WALL STREET AND THE FINANCIAL CRISIS: ANATOMY OF A FINANCIAL COLLAPSE (Apr. 13, 2011), at 45, http://www.hsgac.senate.gov//imo/media/doc/Financial_Crisis/FinancialCrisisReport.pdf?attempt=2.

[519] *CSI: Credit Crunch, Central Banks Have Played a Starring Role*, ECONOMIST, Oct. 18, 2007, http://www.economist.com/node/9972489; *see also* FEDERAL RESERVE BANK OF ST. LOUIS, THE FINANCIAL CRISIS: A TIMELINE OF EVENTS AND POLICY ACTIONS (Sept. 21, 2008), at 5, http://www.stlouisfed.org/timeline/pdf/CrisisTimeline.pdf.

[520] FEDERAL RESERVE BANK OF ST. LOUIS, THE FINANCIAL CRISIS: A TIMELINE OF EVENTS AND POLICY ACTIONS (Sept. 21, 2008), at 5, http://www.stlouisfed.org/timeline/pdf/CrisisTimeline.pdf.

[521] Ari Levy & David Mildenberg, *IndyMac Seized by U.S. Regulators: Schumer Blamed for Failure,* BLOOMBERG, July 12, 2008, http://www.bloomberg.com/apps/news?pid=newsarchive&sid=aAYLeK3YAie4.

[522] *See* Residential Capital, LLC, Quarterly Report (Form 10-Q) (Nov. 8, 2007), at 32. According to ResCap:

> During the third quarter, the mortgage and capital markets have continued to experience stress due to credit concerns and housing market contractions in the United States. The reduced accessibility to cost efficient capital in the secondary markets has made the residential mortgage industry even more capital intensive. In the short-term, it is probable the mortgage industry will continue to experience both declining mortgage origination volumes and reduced total mortgage indebtedness due to the deterioration of the nonprime and non-conforming mortgage market and a challenging interest rate environment. Due to these market factors, particularly interest rates, the business of acquiring and selling mortgage loans is cyclical. The industry is experiencing a downturn in this cycle.

*Id*.

[523] *Id.* at 50.

III-98

measures in third quarter 2007 to augment cash balances during the mortgage and capital markets turmoil. The extensive contingency funding plans that enabled ResCap to meet its significant liquidity demands included:

> (1) The elimination of exposure to extendable commercial paper conduit liquidity due to market dislocation by the movement of collateral to alternative financing sources including ResCap's Mortgage Asset Lending Agreement (MALA)/Receivables Lending Agreement (RLA) facilities and repurchase agreements;[524]

> (2) The securing of $2 billion of new committed repurchase agreements to fund conforming mortgage production;[525]

> (3) The sale of substantially all of the assets and operations comprising ResCap's healthcare finance business to [GMAC CF], for $900.5 million;[526]

> (4) The receipt of capital contributions totaling $1 billion from AFI in the third quarter of 2007;[527] and

> (5) The increase of funding at Ally Bank, which offered a competitive cost of funding, in anticipation of ResCap increasing its loan production through Ally Bank.[528]

Additionally, AFI entered into an agreement with Citibank, effective September 6, 2007, pursuant to which Citibank committed to provide up to $21.4 billion in various asset-backed funding facilities through September 2008.[529] A total of $14.4 billion became available for immediate funding upon execution of such facilities, with the additional $7 billion becoming available if and when certain conditions were met, including the syndication of the facility to other lenders. Up to $8 billion of the facilities, depending on AFI's usage of the facilities,

---

[524] *Id.*

[525] *Id.*

[526] *Id.*; *see also* Section III.F.3.d (discussing the Health Capital transaction in greater detail).

[527] Residential Capital, LLC, Quarterly Report (Form 10-Q) (Nov. 8, 2007), at 50 ("GMAC also contributed $256.0 million of capital to GMAC Bank isolated to its auto division. [As of September 30, 2007], we have received $2.0 billion in capital contributions from [AFI], excluding the contribution to the auto division of GMAC Bank").

[528] *Id.*

[529] *Id.*; GMAC LLC, Current Report (Form 8-K) (Sept. 11, 2007). These facilities replaced a $10 billion asset-backed funding facility that had been entered into with Citibank in August 2006. *Id.*

could be made available to ResCap to fund mortgage assets.[530] As of September 30, 2007, ResCap had a net increase in secured committed funding capacity for its MSRs of $950 million from AFI's new facilities.

### e. Third Quarter 2007's Loss Marked ResCap's Fourth Consecutive Quarterly Loss

As a result of the measures taken by ResCap to stave off a negative liquidity event, its equity base stood at $6.2 billion as of September 30, 2007.[531] ResCap's improved equity position, however, was not accompanied by operating profit. Indeed, the third quarter of 2007 marked ResCap's fourth consecutive quarterly loss with ResCap incurring a net loss of $2.3 billion,[532] as compared to net income of $83 million in the third quarter of 2006.[533] ResCap reported that the losses in 2007 were not caused by competitive pricing pressures as had been the case in 2006,[534] but rather were the result of "i) higher provision for credit losses; ii) mark-to-market adjustments on trading securities and mortgage loans held for sale; iii) tighter

---

[530] Residential Capital, LLC, Quarterly Report (Form 10-Q) (Nov. 8, 2007), at 50; *see also* GMAC LLC, Current Report (Form 8-K) (Sept. 11, 2007) (noting that the Citi facilities included "commitments to provide funding for U.S. automobile related assets, mortgage assets, and other assets across GMAC and its subsidiaries").

[531] Residential Capital, LLC, Quarterly Report (Form 10-Q) (Nov. 8, 2007), at 3; *see also* GMAC LLC, Current Report (Form 8-K) (Nov. 1, 2007) ("In the third quarter, GMAC injected $1 billion of equity into ResCap to bolster the company's capital base. As of Sept. 30, 2007, ResCap's equity base stood at $6.2 billion.").

[532] Residential Capital, LLC, Current Report (Form 8-K) (Nov. 1, 2007), at 1.

[533] Residential Capital, LLC, Quarterly Report (Form 10-Q) (Nov. 8, 2007), at 33 ("Our net loss was $2.3 billion for the three months ended September 30, 2007, compared to net income of $83.4 million for the same period in 2006, and our net loss was $3.4 billion for the nine months ended September 30, 2007, compared to net income of $833.1 million for the same period in 2006."); *see also* Residential Capital, LLC, Current Report (Form 8-K) (Nov. 1, 2007), at 1; Residential Capital, LLC, Current Report (Form 8-K) (Oct. 25, 2006) (noting that ResCap's "preliminary net income was $76 million in the third quarter of 2006, down from $280 million earned in the third quarter of 2005").

[534] Residential Capital, LLC, Current Report (Form 8-K) (Oct. 25, 2006). According to ResCap:

> The decrease in earnings [in 2006] was the result of a number of factors in ResCap's U.S. residential mortgage business. In particular, competitive pricing pressures negatively impacted margins, which led to lower gains despite year-over-year increases in production. Results were also affected by higher credit provisions resulting from increases in delinquencies, lower net interest margins as a result of a flatter yield curve, and a decrease in net servicing income due to the effect of lower long-term rates on expected prepayments of mortgages.

margins on the sale of mortgage loans; iv) a decrease in net financing revenue driven by higher borrowing costs; and v) lower production levels."[535] AFI CEO Eric Feldstein pronounced ResCap's third quarter 2007 financial performance "a major disappointment."[536]

### 2. *Responses To Third Quarter 2007 Loss*

#### a. *ResCap Leadership Changes In Third Quarter 2007*

With two dismal months in the third quarter 2007 nearly completed, ResCap announced leadership changes as it entered the final month of the third quarter. On August 21, 2007, Alvaro de Molina was nominated and elected to the ResCap Board.[537] At the same time, de Molina, who had joined Cerberus in June 2007, was named Chief Operating Officer of AFI.[538] "In this newly created role, de Molina [was] responsible for AFI's real estate finance and commercial finance businesses, and for all of AFI's global finance and risk functions."[539]

A little over two weeks after de Molina's appointment, the ResCap Board accepted AFI CEO Eric Feldstein's resignation as Chairman of the ResCap Board. Feldstein described these changes in leadership at ResCap and AFI as the result of Cerberus's growing criticism of AFI management.[540] Michael Rossi was elected Chairman of the ResCap Board immediately

---

[535] Residential Capital, LLC, Current Report (Form 8-K) (Nov. 1, 2007), at 1; *see also* Residential Capital, LLC, Quarterly Report (Form 10-Q) (Nov. 8, 2007), at 33–34 ("Our 2007 results continued to be adversely affected by domestic economic conditions, including increases in delinquencies on our mortgage loans held for investment portfolio and a significant deterioration in the securitization and residential housing markets. In addition, during the third quarter of 2007 we began to experience a downturn in certain foreign mortgage credit markets.").

[536] GMAC LLC, Current Report (Form 8-K) (Nov. 1, 2007), at 2.

[537] *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Aug. 21, 2007, at RC40005615 [RC40005558].

[538] *See* GMAC LLC, Current Report (Form 8-K) (Aug. 20, 2007).

[539] *Id.*

[540] Int. of E. Feldstein, Nov. 16, 2012, at 188:7–193:19. Around this time, Sanjiv Khattri, who was serving as CFO for both AFI and ResCap, was named to a new position as AFI Executive VP of Corporate Development and Strategy, and Robert Hull was named AFI CFO. *See* E-mail from J. Young, Nov. 14, 2007 [EXAM10175200] (forwarding Feldstein e-mail announcing changes). Khattri remained CFO of ResCap. *Id.* Again, Feldstein described this change in management to be the result of Cerberus's critical view of Khattri's performance. *See* Int. of E. Feldstein, Nov. 16, 2012, at 188:7–193:19; *see also* GMAC LLC, Current Report (Form 8 K) (Nov. 14, 2007) ("Sanjiv Khattri, [CFO], will be named to a new position as executive vice president of Corporate Development and Strategy, effective Dec. 3. He will continue to report to [AFI] Chief Executive Officer Eric Feldstein. In this new position, Khattri will have responsibility for strategic planning and business development as well as continuing as [CFO] of [ResCap]. He will remain a member of the [AFI] Executive Committee and the ResCap Board of Directors.").

thereafter.[541] Rossi, a former member of Cerberus's senior advisory board, was chosen by Cerberus to lead a turnaround and restructuring at ResCap.[542]

When asked how serious the ResCap situation was, Rossi responded:

> We're not going to sugarcoat it. ResCap reported a net loss for the third quarter of $2.3 billion, as weakness in the housing market and mortgage industry continued to prevail. As of 12 weeks ago, the subprime and non-conforming markets in the U.S. had pretty much melted down, and the international mortgage and capital markets had begun to experience extreme dislocation. These market pressures revealed weaknesses in [ResCap's] controls and risk management processes and put unprecedented stress on our cash position and ability to fund our business.[543]

### b. Board Discussions Indicating Insolvency Concerns

During the September 7, 2007 ResCap Board meeting at which Rossi was elected as a director and Chairman of the ResCap Board, outside counsel Fredrick Thomas of Mayer Brown made a presentation on the fiduciary duties of directors of a Delaware corporation.[544] During the presentation, the ResCap Board engaged in a discussion of the fiduciary duties owed by directors of a company that is or becomes financially distressed. Thomas, as well as in-house counsel, William Solomon and David Marple, "participated in the discussion and commented on the duties owed by the directors to shareholders and creditors when a company reaches the zone of insolvency or becomes insolvent."[545]

Later in the meeting, during a discussion on a proposed sale of warehouse lending receivables from certain ResCap affiliates to Ally Bank, one of the ResCap Independent Directors, Thomas Melzer, questioned whether the transaction would affect adversely ResCap bondholders' economic rights should ResCap become financially distressed.

---

[541] *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Sept. 7, 2007, at RC40005619 [RC40005558].

[542] *See* Memorandum, November MD Meeting-Follow-up Q&A for Associates, dated Nov. 14, 2007, at EXAM10125766 [EXAM10125763] ("GMAC and our shareholders have put into place a team that has turnaround experience and works well together."). Despite a plethora of material referring to efforts undertaken to affect a turnaround at ResCap in late 2007 and Rossi's role in spear-heading those efforts, Rossi was adamant during his interview that no one ever described to him a desire that he lead a "ResCap turnaround" or "ResCap restructuring." *See* Int. of M. Rossi, Nov. 27, 2012, at 20:21–21:3.

[543] Int. of M. Rossi, Nov. 27, 2012, at 20:21–21:3.

[544] *See* Minutes of a Regular Meeting of the Board of Directors of Residential Capital, LLC, Sept. 7, 2007, at RC40005619 [RC40005558]

[545] *Id.*

Melzer was specifically concerned with an aspect of the transaction that would require ResCap to provide four-year credit warranties on the transferred assets.[546]

### c.  In Fall 2007, ResCap Announced Major Restructuring Plans

On October 17, 2007, ResCap announced that it was restructuring its mortgage operations, as severe weakness in the housing market and mortgage industry continued to prevail.[547] ResCap planned to streamline operations and revise its cost structure in an attempt to enhance its flexibility to meet changing market conditions.[548] ResCap recognized that the "[s]uccessful execution of these plans [was] essential to restoring the mortgage business to profitability."[549] The restructuring of the mortgage operations included plans to:

- Reduce product offerings;[550]

- Eliminate 25% (approximately 3,000) of the company's existing positions, with the majority of the reduction in force taking place in the remainder of 2007. These planned reductions were intended to be in addition to the elimination of 2,000 positions announced earlier in the year;[551]

- Close 50 sales and servicing locations;[552]

- Shift more towards direct consumer origination channels with operations focusing on originating and servicing prime conforming and high quality jumbo product with leveraging of [Ally Bank];[553]

---

[546] *See id.*

[547] Residential Capital, LLC, Current Report (Form 8-K) (Oct. 17, 2007), at 1.

[548] *Id.*

[549] GMAC LLC, Current Report (Form 8-K) (Nov. 1, 2007).

[550] *See* Residential Capital, LLC, Current Report (Form 8-K) (Oct. 17, 2007) ("ResCap will continue to modify its product offerings based on market conditions, and has sharply reduced its exposure to nonprime and prime non-conforming loans this year. Nevertheless, ResCap will continue to offer a broad and competitive menu of high quality products and will pursue growth plans opportunistically in areas where the company maintains a competitive advantage.").

[551] *See id.* ("On Oct. 15, 2007, a restructuring plan was approved that will include ResCap reducing its current worldwide workforce of 12,000 associates by approximately 25 percent, or by approximately 3,000 associates, with the majority of reductions occurring in the fourth quarter of 2007. This reduction in workforce is in addition to the measures undertaken in the first half of 2007 in which 2,000 positions were eliminated.").

[552] ResCap Review Presentation prepared for a Special Meeting of the Board of Directors of Residential Capital, LLC, dated Sept. 26, 2007, at RC40012910 [RC40012907]

[553] *Id.*

- Reduce risk and income volatility by balance sheet restructuring that results in reduction of HFS inventories and the sale of nonprime HFI residuals;[554] and

- Expand credit and control environment to manage risk while simplifying control process and systems.[555]

The planned workforce reductions were estimated to result in ResCap incurring restructuring charges ranging between $90 and $100 million in fourth quarter 2007.[556]

Although not publicly reported, the presentation made to the ResCap Board on September 26, 2007 that outlined the restructuring plan and ResCap's potential options made clear that while attempting to execute the restructuring plan, ResCap was also preparing contingency plans which included exploring the "viability and economics of an orderly liquidation."[557]

---

EXHIBIT III.G.2.c
**ResCap Options**
**ResCap Board of Directors Meeting Presentation**
September 26, 2007

| **Current Path** | **JV/Sale** | **Orderly Liquidation** |
|---|---|---|
| • Aggressively restructure<br>• Achieve profitability in 2008<br>• Inject $725M equity<br>• Stabilize operations, preserve the franchise and fight for survival until conditions improve<br>• Return to Board within 60 days to discuss capital situation and other business options | • Explore opportunities to sell ResCap in whole or in part<br>• Understand valuation for whole business/part of the business (i.e., RFG, IBG, BCG, Servicing) in the current environment<br>• Identify potential acquisitions and/or JV partners<br>• Discuss potential M&A options with Board within 60 days | • Explore viability and economics of an orderly liquidation<br>• Explore viability and economics of other exit or partial exit options |

*Source: See ResCap Review Presentation prepared for a Special Meeting of the Board of Directors of Residential Capital, LLC, Sept. 26, 2007 [RC40012910].*

---

[554] *Id.*

[555] Residential Capital, LLC, Current Report (Form 8-K) (Nov. 1, 2007), Ex. 99.2, at 18.

[556] *See* Residential Capital, LLC, Current Report (Form 8-K) (Oct. 17, 2007). This estimate included "costs related to severance and other employee-related costs of approximately $55 to $65 million and the closure of facilities of approximately $35 to $45 million" the majority of which were anticipated to occur in the fourth quarter of 2007. *Id*.

[557] ResCap Review Presentation prepared for a Special Meeting of the Board of Directors of Residential Capital, LLC, dated Sept. 26, 2007 [RC40012907].

### d.   November 1, 2007 Ratings Downgrade

ResCap's announced restructuring and improved equity position was not enough to prevent a ratings downgrade. On November 1, 2007, Moody's announced it was downgrading its ratings on ResCap's senior debt to Ba3 from Ba1, with a negative outlook. Moody's explained:

> This rating action follows ResCap's $2.3 billion loss in Q307. The loss was primarily driven by marks on the company's residential mortgage held-for-sale inventory and mortgage backed securities, high levels of provisioning and an impairment of goodwill of $455 million. This represents ResCap's fourth consecutive quarterly loss. As a result of this loss the company received a $1.0 billion capital injection from its parent to avoid violating its minimum net worth covenant of $5.4 billion at September 30, 2007.

> The downgrade and negative outlook reflect the company's significant asset quality issues and potential franchise impairment. The non-performing level of ResCap's held-for-investment portfolio is well above its rated peer group across loan types, and Moody's expects elevated provisioning levels for several more quarters. "The company's continued exposure to held-for-sale loan write-downs and high provisioning could result in operating losses in the fourth quarter and beyond that reduce capital below the minimum net worth covenant without further support from its parent," said Moody's Vice President Craig Emrick.

> Additionally, Moody's has concerns about potential franchise impairment at ResCap. Emrick added that "the current market disruption requires ResCap to shift its origination channel, product mix, and secondary marketing strategies. The business model that will return ResCap to adequate profitability is unclear."

> In regards to liquidity, the company is inherently weaker than many of its mortgage banking peers due to its focus on secured market funding versus retail deposits and Federal Home Loan Bank advances. As a result, the company has a very low level of unencumbered assets which leave it vulnerable to disruptions in the wholesale markets. However, the company ... plans to utilize its bank, and the related deposit and Federal Home Loan Bank funding, to a much larger degree going forward.[558]

---

[558] *Moody's Downgrades ResCap to Ba3, from Ba1; Outlook Negative*, MOODY'S INVESTORS SERVICE, Nov. 1, 2007, http://www.moodys.com/research/Moodys-downgrades-ResCap-to-Ba3-from-Ba1-outlook-negative—PR_143543.

### e. *Analysts' Bankruptcy Speculation/ResCap And AFI Public Debt Repurchase Plans*

ResCap's November ratings downgrade resulted in numerous press reports speculating as to the willingness of AFI and Cerberus to allow ResCap to fail. A November 15, 2007 Bloomberg article reported that "[t]raders [were] speculating that Cerberus Capital Management LP and General Motors Corp. may allow the Minneapolis unit of [AFI] to fall into bankruptcy as the U.S. housing slump continue[d] to deepen."[559] Four days later, in a November 19, 2007 article, Bloomberg reported that Kathleen Shanley, an analyst at independent bond research firm GimmeCredit Publications, Inc., had issued a report recommending that investors sell ResCap debt in light of "significant risks embedded in the portfolio." Shanley advised that "GM/Cerberus may elect to put ResCap into bankruptcy given its exposures to homebuilders, and recoveries given defaults may be even lower than implied by current distressed levels."[560] Shanley speculated that ResCap's announcement that investments in model homes and lots may be "impaired at any time" coupled with the third quarter 2007 $2.3 billion in losses—the largest loss in AFI's 88-year history—could "lead [ResCap] to violate terms of its debt agreements."[561]

Investors' confidence in ResCap faltered with these reports;[562] the price of ResCap's bonds decreased throughout 2008 and ResCap CDS prices reflected a correlated increase.[563] ResCap bonds declined from approximately 70 cents on the dollar in August 2007 after being downgraded to below investment grade, to approximately 41.5 cents in June 2008. Bloomberg reported in November 2007 that the bond-pricing service for the main U.S. brokerage watchdog, the Financial Industry Regulatory Authority, had announced that ResCap's $2.5 billion of 6.375 percent notes due in 2010 fell 0.2 cents to 55.4 cents on the dollar. According to Bloomberg, "[t]he implied probability of default assumes funds would be worth 40 cents on the dollar in the event of bankruptcy."[564] As bond prices decreased, ResCap CDS prices

---

[559] Shannon D. Harrington, *ResCap Credit Swaps Soar on Concern It May Default*, BLOOMBERG, Nov. 15, 2007, http://www.bloomberg.com/apps/news/?pid=newsarchive &sid=aTXFFjlPAPUk.

[560] *See* E-mail from S. Cohen to L. Tessler (Nov. 19, 2007) [CCM00176101] (attaching the article); *see also* Caroline Salas & Shannon D. Harrington, *ResCap Investments May Lead to Bankruptcy, Gimme Credit Says*, BLOOMBERG, Nov. 19, 2007, http://www.safehaven.com/article/8904/no-regrets.

[561] Caroline Salas & Shannon D. Harrington, *ResCap Investments May Lead to Bankruptcy, Gimme Credit Says*, BLOOMBERG, Nov. 19, 2007, http://www.safehaven.com/article/8904/no-regrets.

[562] *See* Section VI (discussing ResCap's overall financial condition, including solvency).

[563] A Credit Default Swap or CDS is a derivative financial instrument used to hedge investments against potential default. When CDS prices rise, it indicates that market participants are becoming more concerned about a potential default.

[564] Caroline Salas & Shannon D. Harrington, *ResCap Investments May Lead to Bankruptcy, Gimme Credit Says*, BLOOMBERG, Nov. 19, 2007, http://www.safehaven.com/article/8904/no-regrets.

increased significantly, rising from approximately 2% in June 2007, to 30% in November 2007, and further still to over 57% by March 2008.[565]

The press reports and investor response did not go unnoticed by AFI management. On November 15, 2007, AFI CEO Eric Feldstein, citing press reports indicating that GM/ Cerberus/AFI were "potentially willing to allow ResCap to fail," stated in an e-mail to then AFI COO de Molina that the "[m]arket has completely lost confidence in ResCap."[566] That same day Feldstein sent an e-mail to Cerberus-appointed non-executive AFI Chairman, Ezra Merkin stating:

> It is compelling that we execute a $1 billion + tender offer for the 2008 and possibly 2009 Rescap bonds. Not only would this be economically attractive, it would halt the erosion in market confidence, it would alleviate the anxiety among ResCap banks (currently lending us significant sums of money under bank lines maturing over the coming months), and would begin to address the employee panic which has set in amid reports that GM/Cerberus/GMAC may let ResCap default on its obligations.[567]

On November 21, 2007, ResCap announced that it commenced a cash tender offer for several of its debt securities. ResCap offered to purchase up to $750 million aggregate principal amount (the maximum tender amount) of the notes. Upon the offer's expiration (12:00 midnight EST Dec. 19, 2007), $389.1 million face value was tendered and accepted for payment. Total cash outflow (principal and accrued interest) to the bondholders totaled $240.8 million.

During this same time (November/December 2007), AFI executed a program of open market repurchases of ResCap's publicly traded debt. The open market repurchase program resulted in the repurchase of debt with a book value of approximately $1.3 billion for a cost of $895 million, including accrued interest. On December 28, 2007, ResCap's debt with a face value of approximately $1.1 billion and a AFI cost basis of approximately $740 million was contributed to ResCap by AFI as a capital injection. As a result, ResCap recorded a gain on extinguishment of debt of $369 million.

### f. By December 2007, ResCap Needed Additional Cash; Fourth Quarter 2007 Operating Loss Totaled $921 Million

Having purchased outstanding ResCap debt at a steep discount to face value when ResCap turned to AFI for assistance in overcoming a TNW shortfall at year-end 2007, AFI

---

[565] Market analysts reported in August 2008 that "ResCap's credit default swaps ha[d] been trading at levels that indicate investors have been expecting bankruptcy since the fall of 2007." *See* Cynthia Koons, *ResCap Bonds Command Pricey Insurance*, WALL ST. J., Aug. 2, 2008, http://online.wsj.com/article/SB121759683223604485.html.

[566] *See* E-mail from E. Feldstein (Nov. 15, 2007), at CCM00496802 [CCM00496800].

[567] *See id.*

contributed equity to ResCap in the form of bonds with carrying value of $1.1 billion, which AFI had acquired in the open market for $763 million. AFI forgave the debt in exchange for common equity.[568] Even after including the gain ResCap experienced upon extinguishment of debt resulting from the $1.1 billion in bonds contributed by AFI, ResCap incurred an operating loss of $921 million in the fourth quarter of 2007[569] and reported a net loss for the year of $4.3 billion.[570]

### 3. Liquidity And TNW Concerns Continued Into 2008

#### a. Significant Unsecured Debt Maturities On The Horizon

ResCap began the fourth quarter of 2007 in an improved liquidity position as a result of the sale of its healthcare business and the $1 billion cash contribution from AFI. Nevertheless, ResCap's access to capital markets continued to be "restricted, both domestically and internationally, impacting the renewal of certain facilities and [its] cost of funding."[571] Consequently, during the fourth quarter of 2007, ResCap recorded further asset write-downs and impairments, and higher credit provisions and restructuring costs.[572] This led to a TNW deficiency, thereby requiring an additional capital contribution from AFI. In addition to the concerns presented by the TNW deficiency, ResCap faced significant unsecured debt maturities in the coming quarters. Approximately $4.4 billion of ResCap's $18 billion in unsecured debt was scheduled to mature in 2008:

EXHIBIT III.G.3.a
**ResCap Debt Maturities Schedule**
September 1, 2007 – December 31, 2008
*($ in Billions)*

| Debt | 2007 Sep - Dec | | 2008 Q1 | | Q2 | | Q3 | | Q4 | | Total 2008 | |
|------|------|------|------|------|------|------|------|------|------|------|------|------|
| Unsecured | $ | 0.1 | | | $ | 1.5 | $ | 1.8 | $ | 1.3 | $ | 4.5 |
| Secured | | 12.1 | | 7.4 | | 5.4 | | | | 6.7 | | 19.5 |
| Total | $ | 12.2 | $ | 7.4 | $ | 6.9 | $ | 1.8 | $ | 8.0 | $ | 24.0 |

*Source: D. Walker & B. Casey Treasury/Funding Analysis Presentation, dated Sept. 7, 2007, at RC40012731 [RC40012695].*

ResCap thus found itself in the position of having to continue to work aggressively to maintain adequate liquidity, including having to negotiate renewals of credit facilities, asset sales, strategic initiatives, and replacement facilities as well as having to consider the possibility of using existing alternative liquidity sources.

---

[568] *See* Minutes of a Meeting of the Special Committee of the Independent Directors of the Board of Residential Capital, LLC, Mar. 25, 2008, at RC40005687 [RC40005652]

[569] Residential Capital, LLC, Current Report (Form 8-K) (Feb. 5, 2008), Ex. 99.1, at 1.

[570] Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2008), at 101.

[571] *Id.* at 48.

[572] *See* Residential Capital, LLC, Current Report (Form 8-K) (Feb. 5, 2008) (announcing operating results for fourth quarter 2007 and the full year ended December 31, 2007).

### b. AFI Provided A $750 Million Advance Facility

In February 2008, to address a liquidity shortfall, AFI provided a $750 million advance facility to ResCap, which was to be repaid from proceeds of the sale of Resort Finance, a business unit of ResCap's BCG. Ultimately, with no unaffiliated buyers located, GMAC CF purchased the unit in July 2008.[573]

### c. ResCap's CEO Had Questions Regarding ResCap's Solvency As The Second Quarter Of 2008 Approached

Jones explained that while the possibility of ResCap's insolvency had not occurred to him prior to 2008, by the second quarter of that year, he considered insolvency a serious issue, "given the obligations of the parent and the amount of support that [AFI] had provided and the amount of ongoing global market pressures that ResCap continued to experience . . . ."[574] Moreover, various debt maturities were looming in the near-term. ResCap needed to roll the debt, or find alternative sources, or dispose of assets.

Jones stated that he planned to retain Lazard and another firm (a firm "that assists in bankruptcy activities operationally")[575] sometime in the second quarter of 2008. The firms were retained as a contingency: if ResCap was not successful in rolling the debt maturities, ResCap was going to face a serious wall. Jones was concerned that something would happen that would trigger a cross-default or a "very visible lack of ability to meet debt maturities on any rational terms."[576] According to Jones, he wanted to make sure that ResCap's only option was not a "disorderly liquidation."[577] Morgan Stanley had been retained to work on debt restructuring. Lazard knew that Morgan Stanley was involved; Morgan Stanley did not know that Lazard and the other firm were there.[578] Jones was concerned that "the very fact of retaining people" and planning for an orderly liquidation would make debt refinancing harder, if not impossible. So Lazard and the other firm "stayed down the hall and in the dark."[579]

---

[573] *See* Section V.E.1 (discussing the Resort Finance Facility); *see also* Section V.F.4.c (discussing the Resort Finance Sale).

[574] *See* Int. of J. Jones, Nov. 30, 2012, at 60:10–17.

[575] *See id.* at 64:5–6.

[576] *See id.* at 61:10–62:7.

[577] *See id.* at 62:4–6.

[578] *See id.* at 62:20–63:1.

[579] *See id.* at 61:10–65:17.

#### d. Amendment Of ResCap's LLC Agreement Created A Class Of Preferred Membership Shares, Which Would Be Transferred To AFI In Exchange For ResCap Notes Purchased by AFI In Open Market Transactions

As first quarter 2008 was drawing to a close, ResCap again was in jeopardy of breaching its TNW covenant. A proposal for increasing ResCap's consolidated TNW to ensure ResCap's compliance with certain covenants was presented to the Special Committee of the Independent Directors of the ResCap Board on March 24, 25, and 26, 2008, and the ResCap Board on March 28, 2008. Pursuant to the proposal, AFI would contribute approximately $1.18 billion face amount of ResCap unsecured bonds to ResCap, with an observed market value at the time of contribution of approximately $583 million in exchange for approximately $583 million of ResCap preferred membership interests.[580] As discussed below, AFI's unwillingness in March 2008 to accept a common equity position in exchange for debt forgiveness as it had done in December 2007, and instead to require preferred interests in ResCap with an option to convert the preferred interests into ResCap's non-voting Class M Interests in Ally Bank, was identified by Independent Directors Melzer and Jacob as a concern.[581]

##### (1) Concerns Raised By ResCap Independent Directors

During the special meetings, Melzer and Jacob raised certain issues that seemed to echo Jones's concerns regarding ResCap's likelihood of insolvency. The questions recited in the minutes of the various ResCap Board meetings reflect concerns about preferences, fraudulent conveyances, and an acknowledgment of the effect of looming insolvency on fiduciary duties. The Independent Directors pointed out that the relative values of the ResCap bonds and interest in Ally Bank had not been assessed[582] for purposes of the transaction and expressed concern that AFI was converting unsecured bonds into preferred interest in Ally Bank that would be "structurally senior" to ResCap's unsecured creditors.[583] Jacob also inquired as to whether the transaction was likely to provide ResCap with needed liquidity beyond the first quarter of 2008.[584]

---

[580] *See* Minutes of a Meeting of the Special Committee of the Independent Directors of Residential Capital LLC, Mar. 24, 2008 at RC40006615 [RC40006611]; Minutes of a Meeting of the Special Committee of the Independent Directors of Residential Capital LLC, Mar. 25, 2008 at RC40006620 [RC40006611]; Minutes of a Meeting of the Special Committee of the Independent Directors of Residential Capital LLC, Mar. 26, 2008 at RC40006623 [RC40006611]; Minutes of a Special Meeting of the Board of Directors of Residential Capital LLC, Mar. 28, 2008 at RC40017152 [RC40017140]

[581] *See* Section V.A.2 (discussing further this transaction).

[582] *See* Minutes of a Meeting of the Special Committee of the Independent Directors of Residential Capital LLC, Mar. 24, 2008 at RC40006615 [RC40006611].

[583] *Id.*; see also Minutes of a Meeting of the Special Committee of the Independent Directors of Residential Capital LLC, Mar. 25, 2008 at RC40006620 [RC40006611].

[584] Minutes of a Meeting of the Special Committee of the Independent Directors of Residential Capital LLC, Mar. 25, 2008 at RC40006620 [RC40006611].

The Independent Directors were advised that Morgan Stanley would be consulted regarding the relative values of the ResCap bonds and interest in Ally Bank.[585] As to the concern that unsecured bonds were being transformed into a preferred interest, the advisors noted that AFI could have sold the bonds for FMV in the open market. Additionally, outside counsel from Skadden advised that absent the transaction, there certainly would be a breach of the TNW covenant as of March 31, 2008, and that absent prior reorganization planning there would be a "terrible outcome for all constituencies."[586]

> ### (2) AFI Rejected A Proposal That AFI Take An Equity Interest In ResCap Similar To The December 2007 Equity Infusion Due To Purported Pressure From AFI Shareholders And Bondholders

During a March 25, 2008 Special Meeting of the ResCap Board, a discussion ensued as to whether there were means by which the preferred conversion features of the transaction could be removed. Melzer proposed that AFI instead take an equity interest in ResCap similar to the December 2007 equity infusion.[587] ResCap CEO Jones explained that he had made such a proposal to AFI, and it had been rejected by the AFI Board because of significant pressure the AFI Board faced from shareholders and bondholders who believed AFI should get more than common equity for future capital infusions into ResCap.[588]

During this same discussion, Timothy Pohl, outside counsel from Skadden, explained to the Independent Directors that he "believed that the opportunity exist[ed] to improve the terms for ResCap and create a substantive transaction that [was] in the best interest of [ResCap] its shareholders and its creditors and bondholders."[589] Additional discussion thereafter resulted in

---

[585]  The retention of Morgan Stanley presented conflict concerns in light of the fact that Morgan Stanley officer R. Scully was a director on the AFI Board. To remedy this concern, Morgan Stanley reported that an ethical wall between Scully and the ResCap valuation team would be established. For purposes of valuing the ResCap bonds, Morgan Stanley observed Market Value; for purposes of the valuation of ResCap Preferred Interests, Morgan Stanley compared existing short-term debt to determine interest rate; and as respects IB Finance Class M Shares Morgan Stanley looked to other regional bank preferred to determine interest rate. The transaction was ultimately presented and approved on March 31, 2008; thus, Morgan Stanley had a very short period of time in which to conduct the valuation. Morgan Stanley did not provide a formal valuation or written fairness opinion.

[586]  Minutes of a Meeting of the Special Committee of the Independent Directors of Residential Capital, LLC, Mar. 25, 2008, at RC40006620 [RC40006611].

[587]  *Id.*

[588]  *Id.*

[589]  *See id.* at RC40005687.

a proposal to eliminate the conversion right.[590] Ultimately, after further negotiations with AFI and Cerberus, the only substantive change made to the original proposal was a provision prohibiting AFI from exercising the conversion right if ResCap filed for bankruptcy prior to year-end 2008.[591]

### (3) Proposal Approved By Unanimous Written Consent On March 31, 2008

Effective March 31, 2008, the ResCap LLC Agreement was amended and restated to create the ResCap Preferred Interests, a class of non-cumulative, non-participating, perpetual preferred membership interests consisting of up to 872,971 units with an aggregate liquidation preference of up to $872.971 million. Also, on March 31, 2008, AFI contributed notes of ResCap that AFI had previously purchased in open market purchase transactions with a face amount of approximately $1.2 billion and a fair value of approximately $607.192 million to ResCap in exchange for 607,192 ResCap Preferred Interests with a liquidation preference of $1,000 per unit. ResCap cancelled the $1.2 billion face amount of the notes. In addition, AFI retained the option to contribute—in its sole discretion, on or before May 31, 2008—up to additional $340 million of ResCap notes, having a fair value of approximately $265.779 million, in exchange for additional ResCap Preferred Interests.[592]

### e.  ResCap's $750 Million Credit Facility Secured By MSRs[593]

On April 9, 2008, a Meeting of the Special Committee of the Independent Directors of ResCap was held to discuss a proposal whereby AFI would provide ResCap a $750 million line of credit secured by certain MSRs.[594] At the beginning of the meeting, Jim Young gave an overview of ResCap's projected first quarter 2008 results, explaining that ResCap was

---

[590] Before giving final approval, the Independent Directors insisted that the consummation of the conversion transaction be scheduled for January 2009. At the time that the controversial deal was put before the Independent Directors, ResCap was planning a debt restructuring, the result of which would be evident in the 2008 period. The Independent Directors did not want to risk putting AFI in a position ahead of other creditors in the event the restructuring plan did not work and ResCap was forced into bankruptcy. *See* Int. of T. Melzer, Oct. 10, 2012, at 256–76.

[591] Minutes of a Meeting of the Special Committee of the Independent Directors of Residential Capital, LLC, Apr. 9, 2008, at RC40006626 [RC40006611].

[592] *See* Section V.A.1.b (discussing the 2008 Bank Transaction).

[593] *See* Section V.E.2 (discussing further this transaction).

[594] *See* Minutes of a Meeting of the Special Committee of the Independent Directors of Residential Capital, LLC, Mar. 24, 2008, at RC40006615 [RC40006611]; Minutes of a Meeting of the Special Committee of the Independent Directors of Residential Capital, LLC, Mar. 25, 2008, at RC40006620 [RC40006611].

expected to report net income of approximately negative $850 million.[595] Young explained that the funding facility under consideration was necessary to support April 2008 servicing advances. Morgan Stanley advised that, given the state of the economy and the disruption in the mortgage markets, there was no longer a significant availability of the type of funding being proposed. The Morgan Stanley representative further advised that the proposed AFI funding facility was reasonably priced and consistent with market terms and other similar transactions.[596]

The proposed facility was intended to be bridge financing while ResCap negotiated with Barclays Bank on a lending facility secured by unencumbered MSR assets backed by non-agency mortgage backed securities. Because several months of negotiations could be required before the Barclays Facility was finalized, the proposal for the Secured MSR Facility was necessary. The facility was approved during a Special Meeting of the Board of Directors of ResCap on April 14, 2008.[597]

On June 2, 2008, the Secured MSR Facility was amended to increase the facility size from $750 million to $1.2 billion and the advance rate was increased from 50% to 85%, giving ResCap even more liquidity.[598] Unwilling to accept more than a 60% advance rate,[599] in addition to having growing concerns with its overall exposure to ResCap, Barclays backed out of the originally contemplated facility.[600]

### (1) In April 2008, ResCap's Independent Directors Resigned

As part of a debt restructuring taking place at approximately the same time, the ResCap Board was asked to approve a proposed $3.5 billion AFI credit facility, which would place AFI in a senior position to all other ResCap creditors. The Independent Directors were not comfortable approving such a transaction and thought it was not in the best interests of all of ResCap's stakeholders.[601]

Both Independent Directors resigned from the ResCap board on April 20, 2008. Melzer identified three reasons for the resignation: (1) the growing time commitment to the board and his inability to sustain it because of other career responsibilities; (2) the "merry-go-round"

---

[595] *See* Minutes of a Meeting of the Special Committee of the Independent Directors of Residential Capital, LLC, Apr. 9, 2008, at RC40006626 [RC40006611].

[596] *Id.*

[597] *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Apr. 14, 2008, at RC40005712 [RC40005652].

[598] *See* Amendment No. 3 to the Loan and Security Agreement, dated June 2, 2008, at RC40006474 [RC40006437].

[599] *See* E-mail from J. Peterson to J. Weintraub (June 12, 2008) [EXAM10172519].

[600] *See* Section V.E (discussing the Secured MSR Facility).

[601] *See* Int. of T. Melzer, Oct. 10, 2012, at 159–62, 171–72; Int. of T. Jacob, Nov. 7, 2012, at 216–18.

changes in company management and his lack of familiarity with new executives; and (3) his concern with and refusal to approve the proposed AFI credit facility because of his concerns regarding AFI's seniority vis-à-vis ResCap's existing bondholders.[602]

Jones predicted the resignation of the Independent Directors in an earlier e-mail:

> [The Independent Directors are] being advised by their counsel that solvency is a real issue, and that they in particular must assure that the creditors have not been disadvantaged in any way by related party transactions. I think they would love to be off the board at this point and avoid any potential liabilities, but realize that their leaving could also be seen as damaging at this time.[603]

In this same e-mail, Jones appears to caution de Molina that he should expect that going forward the Independent Directors would be more assertive:

> Expect strict attention to related party transactions as to terms, and they are beginning to raise increasing questions about the individuals in combined roles with both companies and the potential conflicts that may arise.[604]

Apparently, the Independent Directors' concerns over conflicts prompted Jones to relinquish his officer title with AFI as he concluded his e-mail by stating, "[t]o that end I have told Bill Soloman that I wish to resign as a[n] [AFI] officer to solely focus on my role at ResCap."[605]

### (2) Management Resignations

The resignation of the Independent Directors came within a month or less of the resignation of AFI CEO, Eric Feldstein, the resignation of ResCap Chairman Mike Rossi and the announcements of intentions to resign by Jim Jones and James Redmond.

There are indications that many if all not all of these departures were at least in part related to discontent with the amount of involvement Cerberus interjected into the running of AFI and ResCap. Feldstein acknowledged that his departure was in part because his authority at AFI had been "pretty well diminished" and because he "didn't feel like [he] was really running the company anymore." Feldstein explained that previously he had been "running the business day to day . . . And now, [he] felt there were several people at Cerberus who really were calling all the major shots . . . Cerberus had injected people into ResCap and other places who felt like they were reporting to Cerberus not to [Feldstein].[606]

---

[602] *See* Int. of T. Melzer, Oct. 10, 2012, at 159–62, 171–72.

[603] E-mail from J. Jones (Apr. 14, 2008) [EXAM12381623].

[604] *Id.*

[605] *Id.*

[606] *See* Int. of E. Feldstein, Dec. 14, 2012, at 199–200.

Rossi left in March 2008 for health reasons.[607] However, certain e-mails indicate that the relationships between Rossi and others at Cerberus had become strained, and that Cerberus did not always respect the independence Rossi believed he should have in operating ResCap.[608] Thomas Marano, a Cerberus employee who first replaced Rossi as Chairman and then Jones as CEO noted that Jones was a nice guy but not aggressive enough at the pace at which things needed to occur.[609] Marano conceded that prior to Jones leaving ResCap, Jones was unhappy with the level at which Marano interceded as a non-executive chairman.[610]

Alvaro de Molina replaced Feldstein as AFI CEO, but even before becoming CEO, de Molina brought in "many, many new people," making personnel and operational changes viewed as drastic by "legacy" AFI employees.[611] Among de Molina's recruits to AFI was Sam Ramsey, who controlled the type and amount of support ResCap received from AFI during ResCap's liquidity problems.[612] He also recruited Karin Hirtler-Garvey, with whom he had worked at Bank of America, initially as a ResCap Independent Director and later as an AFI employee.[613] Concerns expressed by COAC's COO, Keith Tietjen, during this time period suggest that AFI was wielding a heavy hand in ResCap management, and that de Molina was a big part of that control. Tietjen wrote in an April 17, 2008 e-mail: "I'm fearful that there will be a mass exodus of the leadership team at the ResCap & RFG level at some point if Al [de Molina]'s team continues to treat them like second class citizens [and] impose the corporate agenda without their input."[614] Less than a week thereafter, Paul Bossidy, ResCap director and RFG President, resigned. Shortly after Bossidy's resignation, ResCap Treasurer, Bill Casey, sent an e-mail to Jones detailing his frustration with AFI's involvement in ResCap decisions. Casey complained, "ResCap did not have a seat at the table and... [AFI] was negotiating on [ResCap's] behalf."[615]

---

[607] *See* Int. of M. Rossi, Nov. 27, 2012, at 9–10.

[608] *See, e.g.*, E-mail from L. Tessler to F. Bruno (Mar. 22, 2008) [CCM00049165]; *see also* E-mail from P. Bossidy to L. Tessler (Sept. 12, 2007) [CCM00119095]; E-mail from J. D'Ascoli to J. Lombardo (Jan. 15, 2008) [CCM00150783].

[609] Int. of T. Marano, Nov. 26, 2012, at 17.

[610] *Id.*

[611] Int. of E. Feldstein, Dec. 14, 2012, at 190:7–9, 194:1–8.

[612] Int. of A. de Molina, Nov. 20, 2012, at 18:21–25, 33:24–34:11.

[613] Int. of K. Hirtler-Garvey, Dec. 20, 2012, at 67:20–24.

[614] E-mail from K. Tietjen (Apr. 17, 2008) [CCM00005242]. Casey expressed his frustration over AFI siphoning away the handling of ResCap's "Funding and Bank Relations" and, thus, diminishing significantly the role he felt he had been placed in by the ResCap Board. *Id.*

[615] *See* E-mail from B. Casey (Apr. 28, 2008) [EXAM10173943].

### f. *ResCap's Near Term Refinancing Needs Trigger Ratings Downgrade*

On April 23, 2008, Moody's downgraded its ratings for both AFI and ResCap. The rating agency lowered AFI's senior rating to B2 from B1, and ResCap to Caa1 from B2. Moody's stated that the ratings would remain on review for a further downgrade. Moody's further reported: "The [AFI] downgrade is based upon Moody's opinion that further operating weakness at ResCap poses risks to [AFI]'s capital position and liquidity that exceed previous estimates." Moody's stated that the ResCap downgrade resulted from the mortgage unit facing significant near-term refinancing needs.[616]

#### (1) In May 2008/June 2008 ResCap Engaged In A Private Debt Offering, Note Exchange, And Dutch Auction

On May 5, 2008, ResCap announced that it had commenced accepting offers to exchange certain securities with a total value of $12.8 billion in return for one of two series of ResCap's newly issued notes.[617] Specifically, ResCap offered Senior Secured Notes and Junior Secured Notes in exchange for (1) the Unsecured Notes; and (2) the subordinated notes issued under an indenture dated as of April 17, 2006 (together with the Unsecured Notes, the "Old Notes").

The Senior Secured Notes and Junior Secured Notes issued in connection with the exchange offer were guaranteed by ResCap's subsidiaries and "secured by a security interest in substantially all of ResCap's existing and after-acquired unencumbered assets."[618] Noteholders participating in the exchange offer also had the option of exchanging their Old Notes for cash instead of the Senior Secured Notes or Junior Secured Notes through a modified Dutch Auction.[619]

When ResCap closed the private debt tender and exchange offers on June 6, 2008,[620] ResCap had issued $1.7 billion initial aggregate principal amount of Senior Secured Notes, and $4 billion initial aggregate principal amount of Junior Secured Notes due 2014 in exchange for $2.6 billion of Senior Unsecured Notes due to mature in 2008–2009, and $6 billion of Senior Unsecured Notes that were scheduled to mature in 2010–2015. An additional $1.6 billion of notes scheduled to mature in 2008–2009, and $2.6 billion of notes scheduled to mature in 2010 through 2015, were exchanged for cash. The auction price was $920 per $1,000 principal amount of Senior Secured Notes, and $650 per $1,000 principal

---

[616] Wallace Witkowski, *Moody's Downgrades GMAC, ResCap Ratings*, WALL ST. J. MARKETWATCH, Apr. 23, 2008, http://articles.marketwatch.com/2008-04-23/news/30946308_1_rescap-downgrade-gmac-llc.

[617] *See* ResCap Press Release*, ResCap Commences Private Exchange Offers and Cash Tender Offers for U.S. Dollar Equivalent $14.0 Billion Outstanding Principal Amount of Its Outstanding Debt Securitie*s (May 5 2008), http://media.ally.com/index.php?s=43&item=232 (quoting*Offering Memorandum and Consent Solicitation Statement*, dated May 5, 2008).

[618] *See id*.

[619] *See id*.

[620] *See* Residential Capital LLC, Current Report (Form 8-K), June 12, 2008, Item 1.01.

amount of Junior Secured Notes.[621] Significantly, amendments effected pursuant to the exchange offer released the subsidiary guarantees of ResCap's obligations under the Old Notes and eliminated certain restrictive covenants and events of default in the indentures governing the Old Notes.[622]

### (2) Additional Related Party Transactions Undertaken To Provide Liquidity And To Prevent Breach Of Tangible Net Worth Covenant

In June 2008, AFI provided a $3.5 billion secured line of credit to ResCap. ResCap utilized $1.75 billion to repay its outstanding unsecured term loan and subsequently utilized the remaining capacity for other operational purposes.[623] In addition, AFI arranged for GMAC CF to provide a servicing advance receivables factoring facility of $600 million.[624]

### (3) Transactions Lead to Further AFI Rating Downgrades

On June 16, 2008, citing ResCap's lack of sufficient committed contingent liquidity, Moody's downgraded AFI to B3 from B2 with a negative outlook due to its exposure to ResCap. Moody's noted that the $3.5 billion credit facility provided by AFI replaced ResCap's committed, undrawn revolving bank credit facilities of $1.75 billion and was likely utilized to pay $900 million of bonds maturing on June 9, 2008, to fund the $1.2 billion modified Dutch auction that was offered as part of the bond exchange, and transfer to AFI/ prepay a $1.75 billion bank term loan due in July 2008.[625]

### g. ResCap's Monetization Of Assets Over Time To AFI/Cerberus; Lack Of Marketability For Such Assets Due To Severe Market Dislocation And Disruption During Relevant Time Period

### (1) GMAC CF's Purchases Resort Financing Business

As noted above, in April 2008 there was a failed attempt to sell the Resort Finance business in the open market. On July 2, 2008, ResCap, agreed to sell ResCap's Resort Finance business to GMAC CF.[626]

---

[621] *See id.*

[622] *See id.*, Item 3.03.

[623] *See* Section V.E.3.

[624] *See* Section V.E.4 (discussing the factoring facility).

[625] Sue Chang, *Moody's Cuts GMAC to 'B3'; Outlook Negative*, WALL ST. J. MARKETWATCH, June 16, 2008, http://articles.marketwatch.com/2008-06-16/news/30862108_1_gmac-residential-capital-llc-rescap; *see also Moody's downgrades GMAC on ResCap exposure*, CREDITFLUX, http://www.creditflux.com/Trading/2008-06-16/Moodys-downgrades-GMAC-on-ResCap-exposure/.

[626] *See* Section V.F.4.c (discussing Resort Finance Sale).

The sale was finalized on July 30, 2008 for a purchase price of $96.1 million, and the difference between the deposit amount and the purchase price (or $153.9 million) was returned to AFI. ResCap booked an impairment of $153.9 million for the portion of the deposit returned. [627]

### (2) In June 2008, Cerberus Purchased Certain ResCap Assets[628]

In June 2008, Cerberus arranged to purchase certain assets, including certain model home assets, for approximately $230 million.[629] Ron Kravit, Managing Principal of Cerberus Real Estate, appeared to represent Cerberus interests in the transaction while concurrently serving as a director on the ResCap Board.[630]

In connection with the refinancing, and to reflect the revised business of ResCap, the TNW covenant was reduced from $5.4 billion to $250 million.

_____

[627] *See* Section V.F.4.c for a discussion of the Resort Finance Sale.

[628] *See* Section V.F.

[629] *See id.* (discussing the sale to Cerberus). The model home assets on ResCap's balance sheet had been purchased from homebuilders at a discount to appraisal value and then leased back for use as sales models from ResCap. The homebuilder would generally agree to lease the model home for eighteen to twenty four months. ResCap then generally contracted with homebuilders to sell the model homes for which they would pay the homebuilder a commission. This enabled the homebuilder to get cash for the models while still using them to showcase a development.

[630] *See* Letter from Cerberus to ResCap signed on behalf of Cerberus Capital Management by R. Kravit (Sept. 25, 2008) [CERB000009].

## H. FINANCIAL MARKET DISLOCATION AND IMPACT ON RESCAP'S OPERATIONS (AUGUST 2008 THROUGH JANUARY 2009)

### 1. The Period Of August 2008 Through January 2009 Was One Of Momentous Financial Dislocation

The period of August 2008 through January 2009 was a tumultuous one for financial markets in the United States and the rest of the world. Following the seizure by regulators of mortgage bank IndyMac in July 2008,[631] and other events described in Section III.F, the global financial crisis expanded during this period. By September 2008, market concerns in the U.S. over credit quality led hedge funds, pension funds, and institutional investors to begin pulling cash out of investment banks and money market funds; individual investors followed.[632]

As September progressed, consumer and investor confidence were further challenged by a series of high-profile events and increasingly disturbing economic trends.[633] These included the federal takeover of Fannie Mae and Freddie Mac on September 7, 2008,[634] followed the next week by two near simultaneous and momentous announcements: the collapse and

[631] *See* FDIC, Press Release, *FDIC Establishes IndyMac Federal Bank, FSB as Successor to IndyMac Bank, F.S.B.* (July 11, 2008), http://www.fdic.gov/news/news/press/2008/pr08056.html.

[632] Joe Nocera, *36 Hours of Alarm and Action as Crisis Spiraled,* N.Y. TIMES, Oct. 2, 2008, http://www.nytimes.com/2008/10/02/business/worldbusiness/02iht-crisis.1.16638063.html?pagewanted=all&_r=0 ("Since that Monday, big institutional investors—like pension funds and college endowments—had been pulling money out of money funds. On Tuesday, individual investors joined the stampede.").

[633] *See generally* CONGRESSIONAL OVERSIGHT PANEL, MARCH OVERSIGHT REPORT: FINAL REPORT OF THE CONGRESSIONAL OVERSIGHT PANEL (Mar. 16, 2011), http://cybercemetery.unt.edu/archive/cop/20110401232213/http://cop.senate.gov/documents/cop-031611-report.pdf.

[634] In July 2008, following sharp declines in the share prices of Fannie Mae and Freddie Mac, U.S. Treasury announced its intention to seek approval from Congress to increase the lines of credit available to the GSEs and, if necessary, to purchase stock of the GSEs. *See* U.S. Treasury, Press Release, *Paulson Announces GSE Initiatives* (July 13, 2008), http://www.treasury.gov/press-center/press-releases/Pages/hp1079.aspx. Also in July, as the GSE share prices plummeted and fears of a liquidity crunch in the mortgage sector increased, the FRB voted to give Freddie Mac and Fannie Mae access to its discount window. *See* FRB, Press Release, *Board Grants Federal Reserve Bank of New York Authority to Lend to Fannie Mae and Freddie Mac* (July 13, 2008), http://www.federalreserve.gov/newsevents/press/other/20080713a.htm. On September 7, 2008, the newly created FHFA placed both Freddie Mac and Fannie Mae into conservatorship. *See* U.S. Treasury, Press Release, *Statement of FHFA Director James B. Lockhart* (Sept. 7, 2008), http://www.treasury.gov/press-center/press-releases/Documents/fhfa_statement_090708hp1128.pdf. At the same time, the U.S. Treasury announced that it had entered into preferred stock purchase agreements with the GSEs in order to avoid triggering mandatory receiverships, and that it had established a new secured lending facility to serve as the "ultimate liquidity backstop" for the GSEs. *See* U.S. Treasury, Press Release, *Statement by Secretary Henry M. Paulson, Jr. on Treasury and Federal Housing Finance Agency Action to Protect Financial Markets and Taxpayers* (Sept. 7, 2008), http://www.treasury.gov/press-center/press-releases/Pages/hp1129.aspx. Such explicit government backing of the GSEs was unprecedented. *See generally* U.S. Treasury, *Fact Sheet: Treasury Senior Preferred Stock Purchase Agreement* (Sept. 7, 2008), http://www.fhfa.gov/webfiles/23896/pspa_factsheet_090708%20.pdf (noting that prior to this initiative ambiguities in the Congressional charters of the GSEs "created a perception of government backing").

bankruptcy of Lehman Brothers on September 15, 2008,[635] and the government "bailout" of AIG on September 16, 2008.[636] On the same day that Lehman sought protection under the Bankruptcy Code, Merrill Lynch avoided a similar fate only by agreeing to be purchased by Bank of America,[637] and the next day several money market funds announced that they had "broken the buck."[638] Following those developments, the week of October 6, 2008 was the worst for U.S. stock markets in decades.[639]

Meanwhile, by October 2008 housing prices were down approximately 20 percent from their peak in 2006,[640] and U.S. unemployment rates were rising sharply—from 6.1 percent in August 2008 to 7.8 percent in January 2009.[641]

---

[635] *See* Joe Nocera, *36 Hours of Alarm and Action as Crisis Spiraled*, N.Y. TIMES, Oct. 2, 2008, http://www.nytimes.com/2008/10/02/business/worldbusiness/02iht-crisis.1.16638063.html?pagewanted=all&_r =0. The Lehman bankruptcy has deservedly been called "one of the signal events of the financial crisis." *The Orderly Liquidation of Lehman Brothers Holdings Inc, under the Dodd Frank Act*, FDIC QUARTERLY, Vol. 5, No. 2, 2011, at 1, https://www.fdic.gov/bank/analytical/quarterly/2011_vol5_2/lehman.pdf.

[636] *See, e.g.*, FRB, Press Release, *Federal Reserve Board, With Full Support of the Treasury Department, Authorizes the Federal Reserve Bank of New York to Lend Up to $85 billion to the American International Group* (Sept. 16, 2008), http://www.federalreserve.gov/newsevents/press/other/20080916a.htm. Ultimately, federal support of AIG would include lending it an additional $37.8 billion, as well as government support under TARP. *See* CONGRESSIONAL OVERSIGHT PANEL, JUNE OVERSIGHT REPORT: THE AIG RESCUE, ITS IMPACT ON MARKETS, AND THE GOVERNMENT'S EXIT STRATEGY (June 10, 2010), at 65, 68, 228, http://cybercemetery.unt.edu/archive/cop/20110402010341/ http://cop.senate.gov/documents/cop-061010-report.pdf.

[637] *See* Bank of America, Press Release, *Bank of America Buys Merrill Lynch Creating Unique Financial Services Firm* (Sept. 15, 2008), http://newsroom.bankofamerica.com/press-release/corporate-and-financial-news/bank-america-buys-merrill-lynch-creating-unique-financial. With the encouragement of the FRB, that transaction closed in 2009. *See* FRB, Press Release, *Testimony of Chairman Ben S. Bernanke Before the Committee on Oversight and Government Reform, U.S. House of Representatives* (June 25, 2009), http://www.federalreserve.gov/newsevents/testimony/bernanke20090625a.htm.

[638] Joe Nocera, *36 Hours of Alarm and Action as Crisis Spiraled*, N.Y. TIMES, Oct. 2, 2008, http://www.nytimes.com/2008/10/02/business/worldbusiness/02iht-crisis.1.16638063.html?pagewanted=all&_r=0. In addition, on September 18, 2008, there was a run on the Putnam Prime Money Fund that caused Putnam to shutter it. *See id.* The FRB opened the discount window to money market funds for borrowings, and Britain's Financial Services Authority banned short selling of 29 financial stocks for thirty days, with the SEC placing similar restrictions on 799 financial stocks. *See id.*

[639] *See* Vikas Bajaj, *Whiplash Ends a Roller Coaster Week*, N.Y. TIMES, Oct. 11, 2008, http://www.nytimes.com/2008/10/11/business/11markets.html?_r=1&pagewanted=print&.

[640] STANDARD & POOR'S, S&P/CASE SHILLER HOME PRICE INDICES 2008, A YEAR IN REVIEW (Jan. 13, 2009), at 13, http://www.standardandpoors.com/servlet/BlobServer?blobheadername3=MDT-Type&blobcol=urldata &blobtable=MungoBlobs&blobheadervalue2=inline%3B+filename%3DCase-Shiller_Housing_Whitepaper_ YearinReview%2C0.pdf&blobheadername2=Content-Disposition&blobheadervalue1=application% 2Fpdf&blobkey =id&blobheadername1=content-type&blobwhere=1243618038238&blobheadervalue3=UTF-8.

[641] U.S. DEPARTMENT OF LABOR, BUREAU OF LABOR STATISTICS, LABOR FORCE STATISTICS FROM THE CURRENT POPULATION SURVEY, http://data.bls.gov/timeseries/LNS14000000 (unemployment rate from 2003–2013).

Seeking to stem the worsening economic disaster, U.S. Treasury Secretary Paulson and FRB Chairman Bernanke proposed the rapid adoption and implementation of a program of government support, stating on September 18, 2008: "If we don't do this, we may not have an economy on Monday."[642] While initially hesitant,[643] following the President's urging,[644] the U.S. Congress passed the $700 billion TARP on October 3, 2008, and the President signed the bill that day.[645] As summarized in a report prepared (with the benefit of hindsight) by the Congressional Oversight Panel established pursuant to the same act that created TARP:

> In September, the housing bubble, the liquidity crunch, and the financial crisis culminated in a string of unprecedented events and government interventions that took place over a 19-day stretch. During this period, Fannie Mae and Freddie Mac were placed into conservatorship, Lehman Brothers filed for bankruptcy, the Federal Reserve initiated an $85 billion government rescue of American International Group (AIG), Treasury announced a temporary guarantee of the $3.7 trillion money market funds (MMFs), and the FDIC steered Washington Mutual through the largest bank failure in U.S. history. By the beginning of October 2008, the value of the stock market had declined by nearly 20 percent from its level in January of that year, losing 10 percent in September alone.[646]

> \*       \*       \*

> In response to rapidly deteriorating financial market conditions, Congress passed and the President signed into law the Emergency Economic Stabilization Act of 2008 (EESA) on

---

[642] *See* Joe Nocera, *36 Hours of Alarm and Action as Crisis Spiraled*, N.Y. Times, Oct. 2, 2008, http://www.nytimes.com/2008/10/02/business/worldbusiness/02iht-crisis.1.16638063.html?pagewanted=all&_r=0.

[643] Initially, Congress rejected the TARP proposal, complaining that members did not have sufficient time to fully review it. *See id.; see also* U.S. Treasury, Press Release, *Statement by Secretary Henry M. Paulson, Jr. on Emergency Economic Stabilization Act Vote* (Sept. 29, 2008), http://www.treasury.gov/press-center/press-releases/Pages/hp1168.aspx.

[644] Executive Office of the President, Statement of Administration Policy on H.R. 1424, Oct. 3, 2008, http://www.whitehouse.gov/sites/default/files/omb/assets/omb/legislative/sap/110-2/saphr1424-h2.pdf.

[645] TARP was created pursuant to the Emergency Economic Stabilization Act of 2008, Pub. L. No. 110-343, 122 Stat. 3765 (2008); *see also* U.S. Treasury, Press Release, *Paulson Statement on Emergency Economic Stabilization Act* (Oct. 3, 2008), http://www.treasury.gov/press-center/press-releases/Pages/hp1175.aspx.

[646] Congressional Oversight Panel, March Oversight Report: The Final Report of the Congressional Oversight Panel (Mar. 16, 2011), at 21, http://cybercemetery.unt.edu/archive/cop/20110401232213/http://cop.senate.gov/documents/cop-031611-report.pdf (citations and references omitted).

October 3, 2008, creating the Troubled Asset Relief Program
(TARP). The Act was intended to "immediately provide
authority and facilities that the Secretary of the Treasury can use
to restore liquidity and stability to the financial system of the
United States" and "to ensure that such authority and such
facilities are used in a manner that protects home values, college
funds, retirement accounts, and life savings; preserves
homeownership and promotes jobs and economic growth;
maximizes overall returns to the taxpayers of the United States;
and provides public accountability for the exercise of such
authority."[647]

\*         \*         \*

The law–EESA–authorized the Treasury Secretary to purchase
not only mortgage-related securities under the TARP, but also
"any other financial instrument" the purchase of which the
Secretary determined to be "necessary to promote financial
market stability."[648]

The Congressional Oversight Panel observed that "[a]lthough the federal government has
intervened to rescue financial institutions and prevent bank runs on several previous occasions
in U.S. history, the scale and breadth of the financial rescue authorized in EESA was
unprecedented."[649] And, indeed, less than two weeks after passage of TARP, the U.S.
Treasury announced that "to restore confidence and stability to our financial markets and get
credit flowing again," it would "purchase equity stakes in a wide array of banks and thrifts."[650]
Initially, Secretary Paulson noted that the U.S. Treasury would make some $250 billion
available to such institutions in the form of preferred stock purchases.[651]

---

[647] *Id.* at 13.

[648] *Id*. at 22.

[649] *Id*.

[650] U.S. Treasury, Press Release, *Statement by Secretary Paulson on Actions to Protect the U.S. Economy* (Oct. 14, 2008), http://www.treasury.gov/press-center/press-releases/Pages/hp1205.aspx; *see also* U.S. Treasury, Press Release, *Joint Statement by Treasury, Federal Reserve and FDIC* (Oct. 14, 2008), http://www.treasury.gov/press-center/press-releases/Pages/hp1206.aspx.

[651] U.S. Treasury, Press Release, *Statement by Secretary Paulson on Actions to Protect the U.S. Economy* (Oct. 14, 2008), http://www.treasury.gov/press-center/press-releases/Pages/hp1205.aspx.

Those institutions, which ultimately would include AFI, initially consisted of: (1) four commercial banks—JP Morgan, Bank of America, Citibank, and Wells Fargo; (2) three investment banks—Goldman Sachs, Morgan Stanley, and Merrill Lynch; and (3) two custodian banks—State Street and BNY Mellon.[652] On October 28, 2008, these institutions received an aggregate infusion of $125 billion in TARP funds in exchange for preferred stock.[653]

Less than a week after passage of TARP, central banks worldwide announced a coordinated rate cut.[654] Two days later, and following a meeting of the G7 central bankers and finance ministers, Secretary Paulson released a statement concerning further coordinated efforts to address domestic and worldwide financial dislocations, pointing specifically to the role of the housing and mortgage markets:

> Global financial market conditions are severely strained. In the United States, our economy has been facing a prolonged period of uncertainty and our financial markets are experiencing unprecedented and extraordinary challenges. A root cause of this situation is the housing correction and a lack of confidence in mortgage assets, as well as a lack of confidence in many of the financial institutions that hold these assets.[655]

Secretary Paulson's description and the foregoing summary of events only scratch the surface of the extent of the emerging financial market dislocations (and government/regulatory efforts to address them) in the Fall and Winter of 2008. Indeed, the history is still being written.[656] The Examiner relies here on reports of the Congressional Oversight Panel not

---

[652] *See* CONGRESSIONAL OVERSIGHT PANEL, MARCH OVERSIGHT REPORT: THE FINAL REPORT OF THE CONGRESSIONAL OVERSIGHT PANEL (Mar. 16, 2011), at note 41 and accompanying text, http://cybercemetery.unt.edu/archive/cop/20110401232213/http://cop.senate.gov/documents/cop-031611-report.pdf. Applications by Morgan Stanley and Goldman Sachs to become bank holding companies had been approved by the FRB on September 21, 2008. *See* FRB, Press Release, *Order Approving Formation of Bank Holding Companies* (Sept. 21, 2008), http://federalreserve.gov/newsevents/press/orders/orders20080922a1.pdf; FRB, Press Release, *Order Approving Formation of Bank Holding Companies and Notice to Engage in Certain Nonbanking Activities* (Sept. 21, 2008), http://federalreserve.gov/newsevents/press/orders/orders20080922a2.pdf.

[653] CONGRESSIONAL OVERSIGHT PANEL, MARCH OVERSIGHT REPORT: THE FINAL REPORT OF THE CONGRESSIONAL OVERSIGHT PANEL (Mar. 16, 2011), at 23, http://cybercemetery.unt.edu/archive/cop/20110401232213/http://cop.senate.gov/documents/cop-031611-report.pdf (citations omitted).

[654] *See* Fed, *European Banks Coordinate Interest Rate Cut*, PBS NEWSHOUR, Oct. 8, 2008, http://www.pbs.org/newshour/updates/business/july-dec08/ratecut_10-08.html.

[655] U.S. Treasury, Press Release, *Statement by Secretary Henry M. Paulson, Jr. Following Meeting of the G7 Finance Ministers and Central Bank Governors* (Oct. 10, 2008), http://www.treasury.gov/press-center/press-releases/Pages/hp1194.aspx.

[656] *See, e.g.*, ALAN S. BLINDER, AFTER THE MUSIC STOPPED: THE FINANCIAL CRISIS, THE RESPONSE, AND THE WORK AHEAD (Penguin Press 2013).

to express agreement or disagreement with the conclusions of that body, but rather as a convenient compendium of certain relevant facts and observations constituting the backdrop for the AFI-ResCap narrative in this timeframe.

Other notable developments forming that backdrop in the period of August 2008 through January 2009 include the following:

- The FRB's announcement on October 7, 2008 of its new Commercial Paper Funding Facility, to provide a liquidity "backstop" to non-financial sector companies.[657] It was reported that as much as $1.3 trillion of commercial paper would be eligible for financing under this facility.[658] Ultimately this facility's purchases aggregated to approximately $738 billion.[659]

- The acquisition by Wells Fargo of Wachovia Bank on October 12, 2008.[660]

- By the third quarter of 2008, commercial real estate market lending and securitizations had all but dried up.[661]

- The U.S. Treasury's announcement in November and December 2008 that in addition to the TARP investments noted above, it would make additional investments in Citigroup and Bank of America preferred shares, and the joint announcement by the U.S. Treasury, the FRB, and the FDIC in November 2008 of a $301 billion guarantee of Citibank assets.[662]

---

[657] *See* FRB, Press Release, *Board Announces Creation of the Commercial Paper Funding Facility (CPFF)* (Oct. 7, 2008), http://federalreserve.gov/newsevents/press/monetary/20081007c.htm.

[658] *See, e.g.,* Mark Felsenthal & Glenn Somerville, *Fed Creates Facility to Buy Commercial Paper*, REUTERS, Oct. 7, 2008, http://www.reuters.com/article/2008/10/07/us-financial-fed-paper-idUSTRE4964S420081007.

[659] *See* FRB, Press Release, *Commercial Paper Funding Facility* (Dec. 13, 2012), http://www.federalreserve.gov/newsevents/reform_cpff.htm (follow embedded links to data). AFI sold approximately $10.5 billion dollars of commercial paper to the CPFF, beginning on or about October 28, 2008, and concluding on January 29, 2009. *See id.*; *see also* Greg Bensinger & Ari Levy, *GMAC Says Fed Grants Access to Commercial-Paper Plan,* BLOOMBERG, Oct. 28, 2008, http://www.bloomberg.com/apps/news?pid=newsarchive&sid=ahh__3XylWUE (quoting de Molina as having said "the company has 'limited if any access to funding' for its mortgage and auto-lending units").

[660] *See* FRB, Press Release, *Approval of Proposal by Wells Fargo & Company to Acquire Wachovia Corporation* (Oct. 12, 2008), http://federalreserve.gov/newsevents/press/orders/20081012a.htm.

[661] *See* PRUDENTIAL REAL ESTATE INVESTORS, U.S. QUARTERLY MARKET PERSPECTIVE (Oct. 2008), at 2, http://www2.prudential.com/o&s/prei.nsf/14ef712a6b099d9d852566ef005111d0/1b5ef60e780618d1852574f1 00679b91/$FILE/Pru_US_3Q08.pdf ("The commercial MBS market is for all intents and purposes closed. Only $12.1 billion of CMBS has been issued in the United States so far this year, none in the third quarter.").

[662] *See* CONGRESSIONAL OVERSIGHT PANEL, MARCH OVERSIGHT REPORT: THE FINAL REPORT OF THE CONGRESSIONAL OVERSIGHT PANEL (Mar. 16, 2011), at notes 37, 38 and accompanying text, http://cybercemetery.unt.edu/archive/cop/20110401232213/http://cop.senate.gov/documents/cop-031611-report.pdf.

- The distribution of $33.6 billion of TARP funds to 21 smaller and regional banks.[663]

- In December 2008, the National Bureau of Economic Research declared that the U.S. had entered recession in December 2007.[664]

- For the full year ended December 2008, there were over 3 million real property foreclosures in the U.S., an 81% increase over the previous year.[665]

- The announcement by the U.S. Treasury on December 19, 2008, of loans to GM and Chrysler in the amounts of $13.4 billion and $4 billion, respectively.[666]

## 2. *ResCap Board Membership Was Stable During This Period*

In contrast to the period addressed in Section III.G (during which ResCap Board member Paul Bossidy resigned, Independent Directors Thomas Melzer and Thomas Jacob resigned, Edward Smith and Karen Hirtler-Garvey were appointed separately as new Independent Directors, and Thomas Marano and Joshua Weintraub were installed as directors), during the period of August 2008 through January 2009 there were no changes to the membership of ResCap's Board, although Jim Jones' resignation as President and CEO, and the appointment to those roles of Marano, occurred just prior, at the end of July 2008. During August 2008 through January 2009 the ResCap Board consisted of the following members:

- Marano: ResCap Chairman, President, and CEO. Until April 2009, Marano remained a Cerberus employee. He maintained an office at Cerberus, and his salary was paid by Cerberus while he was on secondment to ResCap.[667] Thereafter, from May 2009 to May 2012, he was also the Chief Capital Markets Officer and Chief Mortgage Officer of AFI.

---

[663] *See* Greg Robb, *Treasury Gives $33.6 Billion to 21 Banks*, WALL ST. J. MARKET WATCH, Nov. 17, 2008, http://articles.marketwatch.com/2008-11-17/news/30801650_1_suntrust-banks-bb-t-corp-publicly-traded-banks. As of January 30, 2009, all of but approximately $70 billion of the $301 billion TARP program to date had been distributed to just thirteen recipients. These were: Citigroup, Bank of America, JP Morgan, Wells Fargo, Goldman Sachs, Merrill Lynch, Morgan Stanley, Bank of New York, State Street, GM, Chrysler, Chrysler Financial, and AFI. *See* CONGRESSIONAL OVERSIGHT PANEL, MARCH OVERSIGHT REPORT: THE FINAL REPORT OF THE CONGRESSIONAL OVERSIGHT PANEL (Mar. 16, 2011), at note 41 and accompanying text, http://cybercemetery.unt.edu/archive/cop/20110401232213/http://cop.senate.gov/documents/cop-031611-report.pdf.

[664] NATIONAL BUREAU OF ECONOMIC RESEARCH, DETERMINATION OF THE DECEMBER 2007 PEAK IN ECONOMIC ACTIVITY (Dec. 11, 2008), http://www.nber.org/dec2008.pdf.

[665] RealtyTrac Staff, *Foreclosure Activity Increases 81 Percent In 2008*, REALTYTRAC, Jan. 15, 2009, http://www.realtytrac.com/content/press-releases/foreclosure-activity-increases-81-percent-in-2008-4551.

[666] *See* U.S. Treasury, Press Release, *Secretary Paulson Statement on Stabilizing the Automotive Industry* (Dec. 11, 2008), http://www.treasury.gov/press-center/press-releases/Pages/hp1332.aspx; *see also Indicative Summary of the Terms for the Secured Loan Facility*, (Dec. 19, 2008) (GM term sheet), http://www.treasury.gov/press-center/press-releases/Documents/gm%20final%20term%20_%20appendix.pdf; *Indicative Summary of the Terms for the Secured Loan Facility*, (Dec. 19, 2008) (Chrysler Holding LLC term sheet), http://www.treasury.gov/press-center/press-releases/Documents/chrysler%20final%20term%20_%20 appendix.pdf.

[667] Int. of T. Marano, Nov. 26, 2012, at 9:11–23, 194:24–195:6.

- James Young: ResCap CFO.

- David DeBrunner: AFI Chief Accounting Officer and Controller.

- Karin Hirtler-Garvey: ResCap Independent Director. Hirtler-Garvey became an employee of Ally Bank in May of 2009, and later joined AFI.

- Ronald Kravit: Cerberus partner.

- Alvaro de Molina: AFI CEO. De Molina resigned from the ResCap Board in March 2009.[668]

- Edward Smith, III: ResCap Independent Director.

- David Walker: AFI Treasurer.

- Joshua Weintraub: ResCap Vice Chairman, Cerberus partner.

- Catherine Dondzila: ResCap Chief Accounting Officer and Controller.

### 3. ResCap's Liquidity And TNW Covenants Concerns Continue

The broad market dislocations presented growing challenges to the businesses of AFI and ResCap in this period. In the second quarter 2008 earnings conference call on July 31, 2008, AFI's CFO observed that the worsening economy and its effect on the auto industry and the mortgage industry were "the perfect storm for our business and we see no meaningful sign of it blowing over."[669] Indeed, AFI finished the second quarter of 2008 with a consolidated loss of $2.5 billion[670]—$1.9 billion of which came from ResCap (as compared to a loss of $254 million for the same quarter a year earlier).[671] At the end of the third quarter of 2008, the loss figures were flat: $2.5 billion loss for AFI[672] and $1.9 billion loss for ResCap.[673] While AFI

---

[668] Although de Molina recalled that he resigned from the ResCap Board when he became CEO of AFI (in April 2008), Int. of A. de Molina, Nov. 20, 2012, at 112:5–113:7, that recollection seems incorrect, as minutes reflect that he was a member of ResCap's Board through March 23, 2009, at which meeting Anthony Renzi became a member of ResCap's Board. *See* Minutes of a Special Meeting of the Board of Residential Capital, LLC, Mar. 23, 2009, at RC40006091–92 [RC40005949]. ResCap Board meeting minutes from this period reflect that de Molina was often not in attendance, but that was not always the case. *See, e.g.*, Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 28, 2008, at RC40005894–96 [RC40005652] (recording that de Molina briefed the ResCap Board regarding "pending strategic initiatives that are being pursued by [AFI]," including its application under the Bank Holding Company Act, and efforts to access TARP).

[669] Transcript of GMAC Q2 2008 Earnings Call (July 31, 2008), at 2 (available from Bloomberg Transcript).

[670] *See id.*

[671] *See* Residential Capital, LLC, Quarterly Report (Form 10-Q) (Aug. 8, 2008), at 4.

[672] *See* Transcript of GMAC Q3 2008 Earnings Call (Nov. 5, 2008), at 2 (available from Bloomberg Transcript).

[673] *See* Residential Capital, LLC, Quarterly Report (Form 10-Q) (Nov. 10, 2008), at 4.

reported a profit of $7.5 billion for the fourth quarter of 2008 (largely arising from a debt exchange and cash tender and the benefit of an infusion of TARP funds),[674] ResCap reported a loss of $981 million.[675] For the entire 2008 year, AFI reported a profit of $1.9 billion (compared to $2.3 billion loss in 2007),[676] and ResCap finished 2008 with a loss of $5.6 billion (compared to a loss of $4.3 billion in 2007).[677]

As of September 1, 2008, AFI had a Moody's credit rating of B3 (negative outlook) and ResCap's was Ca (under review). On October 30, 2008, AFI was downgraded by Moody's to Caa1 (under review). Then, on November 20, 2008, Moody's further downgraded AFI's unsecured debt to C, and downgraded ResCap to C as well.[678]

For ResCap, the period of August 2008 through January 2009 was one of continuing concerns about liquidity and the ability to satisfy TNW covenants. ResCap and its parent company engaged in multiple "fire drills,"[679] and ResCap was reliant on AFI for liquidity and capital support, as projections repeatedly pointed to imminent TNW covenant violations.[680] Marano is reported as having said in a meeting with the company's financial and legal advisors that ResCap was "simply not able to take advantage of market opportunities due to lack of capital."[681] He stated, however, that ResCap was always capitalized sufficiently to avoid covenant violations.[682]

---

[674] *See* Transcript of GMAC Q4 2008 Earnings Call (Feb. 3, 2009), at 2 (available from Bloomberg Transcript); *see also* GMAC LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 29 ("The 2008 results were primarily driven by a fourth quarter private debt exchange and cash tender offers that resulted in a $11.5 billion pretax gain on extinguishment of debt. The majority of the gain was offset by losses experienced by ResCap and our Global Automotive Finance operations as adverse market conditions continued to persist, both domestically and internationally.").

[675] *See* Residential Capital, LLC, Current Report (Form 8-K) (Feb. 3, 2009), Ex. 99.1.

[676] *See* GMAC LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 107.

[677] *See* Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 119.

[678] ResCap's credit rating would never recover to a level above Ca. Moody's historical data for AFI and ResCap are available to registered users at http://www.moodys.com.

[679] Int. of L. Hall, Nov. 29, 2012, at 41:21–25 ("I would have loved to say there was a lot of planning for the future going on, but I think a lot of it was we were trying to address fire drills all throughout 2008 and the capital needs.").

[680] As addressed in Section VI, the Examiner concludes that the evidence supports the proposition that ResCap was balance sheet insolvent as of December 31, 2007, and remained so through the Petition Date. In addition, the Examiner concludes that the evidence supports the proposition that ResCap was left with unreasonably small capital not later than August 15, 2007, and that this remained the case through the Petition Date.

[681] Minutes of an Executive Session of the Board of Residential Capital, LLC, Sept. 23, 2008, at RC40006865 [RC40006865].

[682] Int. of T. Marano, Nov. 26, 2012, at 114:17–20 ("I always wanted more capital so we could grow the business. But we had enough capital according to our debt covenants, so we were okay.").

As further addressed below in this Section, the ResCap Board was advised during this period that ResCap was operating in the "zone of insolvency."[683] Both ResCap and AFI focused explicitly and repeatedly on the questions of whether and when ResCap should file for bankruptcy, particularly at and after the end of the third quarter. As officials from AFI candidly acknowledged, in November 2008 the survival of both companies was in serious question.[684] And various officials from both companies recognized that ResCap became during this period (if not sooner) dependent upon AFI[685]—its "lender of last resort"[686]—for its own survival. However, December 2008 culminated in AFI's successful conversion to a bank holding company and, concomitant with that, the injection by the U.S. Government of $5 billion in capital into AFI pursuant to the EESA. AFI's own survival made it possible for AFI to continue to provide a degree of financial support for ResCap.

Finally, effective January 30, 2009, AFI exercised the option to convert its ResCap Preferred Interests to IB Finance Preferred Interests, and AFI purchased from ResCap all of its remaining IB Finance Class M Shares. As a result, AFI (through IB Finance) became the sole owner of Ally Bank, and embarked upon a plan to grow its deposits.[687]

During this period, there were multiple inter-company assets sales, multiple instances of inter-company debt forgiveness and other capital contributions, and the establishment of a new inter-company financing facility. AFI's Lara Hall explained that while "cash contributions" could supply liquidity as well as address TNW issues, AFI recognized that "we'd never be able to get it back out," so "we chose to put a financing facility in place [if] . . . it was a liquidity need, not a tangible net worth need."[688] Significant transactions during this period are highlighted in the following discussion.

---

[683] *See* Minutes of an Executive Session of the Board of Directors of Residential Capital, LLC, Sept. 23, 2008, at RC40006865 [RC40006865].

[684] *See* Int. of R. Hull, Feb. 7, 2013, at 142:24–25 ("[I]n November of '08 . . . we didn't know that we'd survive at [AFI] . . . .").

[685] *See, e.g.*, *id*. at 140:18–141:12; Int. of T. Marano, Nov. 26, 2012, at 59:5–16.

[686] *See, e.g.*, Int. of J. Lombardo, Sept. 17, 2012, at 145:15–17; Int. of D. Walker, Nov. 28, 2012, at 274:6–8; Int. of C. Pinkston, Nov. 8, 2012, at 93:1–4; Int. of L. Gray, Mar. 7, 2013, at 52:19–24; Int. of R. Hull, Feb. 7, 2013, at 73:20–74:19, 141:23–142:10; Int. of T. Marano, Feb. 27, 2013, at 189:5–12; *see also* Int. of S. Preston, Jr. (Goldin Associates), Feb. 15, 2013, at 41:14–22.

[687] *See* Section V.A.1.c (examining the 2009 Bank Transactions in detail).

[688] Int. of L. Hall, Nov. 29, 2012, at 110:21–111:1.

### 4. *ResCap Streamlines Its Business, Experiences Liquidity And Capital Challenges, And Engages In Multiple Inter-Company Transactions With AFI*

Marano's plans for restructuring ResCap, which had been in development since on or about July 25, 2008,[689] were approved by the ResCap Board on August 27, 2008.[690] At that meeting, the ResCap Board reviewed materials summarizing Marano's intention to focus ResCap's business on originating and servicing conforming mortgages, while shedding much of the company's business lending and international operations.

The restructuring was publicly announced on September 3, 2008.[691] The salient features of this "remediation plan"[692] were: closure of all 200 GMAC Mortgage retail offices; ceasing originations through the Homecomings Financial wholesale broker channel; and further curtailing business lending and international business activities.[693] ResCap also announced that it was "evaluating strategic alternatives for the GMAC Home Services business and the non-core servicing business."[694] Implementation of these decisions was said to implicate the elimination of approximately 5,000 employee jobs—3,000 immediately, and 2,000 more by the end of the year.[695]

---

[689] *See* Presentation to ResCap Board, dated Aug. 21, 2008, at RC40008455 [RC40008442] (schedule for restructuring).

[690] *See* Minutes of a Meeting of the Board of Residential Capital, LLC, Aug. 27, 2008, at RC40005846–47 [RC40005652].

[691] Residential Capital, LLC, Current Report (Form 8-K) (Sept. 3, 2008), Ex. 99.1 ("GMAC Financial Services and ResCap Announce Further Streamlining of Mortgage Operations").

[692] Int. of T. Marano, Nov. 26, 2012, at 42:3–44:18.

[693] *See* Residential Capital, LLC, Current Report (Form 8-K) (Sept. 3, 2008), Ex. 99.1.

[694] *See id.* At the August 27, 2008 ResCap Board meeting, approval was obtained by management to sell "AFI Home Services" (consisting of AFI Home Services, LLC and GHS Global Relocation U.K. Limited), real-estate brokerage, and relocation subsidiaries of Debtors' Residential Finance Group, to a third party. The minutes reflect Marano's advice to the ResCap Board that the business was unprofitable, and that it was more cost-effective to sell it than to incur shutdown costs. Houlihan Lokey assisted in finding the buyer. This deal was not consummated, however, until November 14, 2008, as noted below. *See* Minutes of a Meeting of the Board of Residential Capital, LLC, Aug. 27, 2008, at RC40005844–46 [RC40005652].

[695] *See* Residential Capital, LLC, Current Report (Form 8-K) (Sept. 3, 2008), Ex. 99.1. In 2009, Debtors reported that the actual reduction in force pursuant to this initiative was 3,300 employees (37%), with an additional 500 notified of terminations effective in the first quarter of 2009. A further 1,000 employees were transferred in connection with Debtors' sale of AFI Home Services to a third party in November 2008. ResCap estimated annual cost reductions of $625 million from the workforce reduction. *See* Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 55.

At the same time, ResCap affirmed its intention to continue originating conforming products through its direct lending centers and Ally Bank correspondents, and to maintain its servicing business:

> ResCap will continue to originate loans in the U.S. and internationally where there is a secondary market to sell the loans. The company will originate products through its correspondent and direct lending channels. ResCap's commitment to servicing loans is unchanged by the actions announced today, and the company will continue to expand and enhance its industry-leading servicing platform, including further development of high-touch special servicing operations to help preserve homeownership and support investors that own distressed and special situation loan portfolios.[696]

Origination and servicing of mortgage loans was described to the Examiner's Professionals as the remaining "core" business of ResCap,[697] and the conforming agency products as "the core of the core."[698]

The ResCap Board met frequently during this period, as liquidity and TNW continued to be topics of concern. At the September 12, 2008 meeting of ResCap's Audit Committee, the members (consisting of the two Independent Directors, Smith and Hirtler-Garvey, together with DeBrunner, who was AFI's Chief Accounting Officer) delegated to the entire ResCap Board future discussion of ResCap's liquidity.[699] In a presentation to the ResCap Board distributed in advance of its September 23, 2008 meeting, bankruptcy specialists from Lazard and Skadden observed that "ResCap faces a challenging operating and liquidity situation," with liquidity expected to be depleted by mid-November.[700]

The ultimate transfer of ResCap's interest in Ally Bank, as mentioned, occurred at the end of January 2009. But consideration of such a transaction (in various forms) began at the ResCap Board level as early as September 2008, in the course of addressing ResCap's TNW

---

[696] *See* Residential Capital, LLC, Current Report (Form 8-K) (Sept. 3, 2008), Ex. 99.1. Debtors also continued on a limited basis to provide warehouse lending to other mortgage originators through Ally Bank. *See* Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 53.

[697] *See, e.g.*, Int. of J. Young, Sept. 28, 2012, at 30:20–24 ("This is the core mortgage business, which is you originate loans with the intent to sell. And you sell the loans primarily in securitizations and you retain the servicing because your primary business is you have the servicing platform.").

[698] *Id.* at 120:11.

[699] *See* Minutes of Residential Capital, LLC, Audit Committee Meeting, Sept. 12, 2008, at RC40005407, RC40005410 [RC40005375].

[700] Draft Skadden and Lazard Project Scout Presentation, dated Sept. 2008, at RC40008640 [RC40008601]. It appears that this presentation was distributed to the following AFI personnel, all of whom also attended the September 23, 2008, ResCap Board meeting by telephone: DeBrunner (AFI Controller; also ResCap Director); de Molina (AFI CEO; also ResCap Director); Walker (AFI Treasurer; also ResCap Director); Hull (AFI CFO); Solomon (AFI General Counsel); and Ramsey (AFI Chief Risk Officer). *See id.* at RC40008601 (distribution list); *see also* Agenda, Residential Capital, LLC, Sept. 23, 2008, at RC40006954–55 [RC40006934] (annotated); Minutes of a Special Meeting of the Board of Residential Capital, LLC, Sept. 23, 2008, at RC40005872 [RC40005652] (attendance list).

covenant as of September 30, 2008.[701] The notion of ResCap selling its stake in Ally Bank to AFI was first brought to the attention of the ResCap Board by Young on September 12, 2008, as one of a variety of "strategic alternatives / liquidity initiatives."[702] Presentation papers advised that ResCap, AFI, and Ally Bank had "formed a cross-functional team to review the potential sale."[703] The presentation identified "several benefits for ResCap" of such a sale, namely:

- A sale would generate cash that could be redeployed into other operations.

- The sale would have a significant positive impact on ResCap's minimum net worth covenant, as ResCap's investment in the bank is subtracted from total ResCap net worth under the covenant.[704]

This initial brief presentation also identified factors "[o]ffsetting these positives," namely, that "a sale of the bank would reduce ResCap's long-term earnings and cash generation power."[705] The ResCap Board minutes noted that a more complete update of any such transaction would be provided at a future meeting.[706] Although no minutes were kept, the potential transaction was also addressed in an executive session on September 12, 2008, after which Young wrote: "Board did decide to go for two fairness opinions on the transaction and no valuation of the bank."[707]

At its September 19, 2008 meeting, the ResCap Board heard a presentation from Young on "the timing of the potential sale of ResCap's stake in [Ally] Bank."[708] At this stage, the minutes reflect that at least three potential structures for the transaction were under

_____

[701] The September 23, 2008 Skadden and Lazard presentation stated: "A proposed resolution to the CTNW covenant issue entails selling ResCap's equity position in [Ally] Bank to [AFI]; this transaction is expected to defer liquidity and equity covenant issues by several months but does not resolve the Company's long-term challenges." Draft Skadden and Lazard Project Scout Presentation, dated Sept. 2008, at RC40008640 [RC40008601].

[702] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Sept. 12, 2008, at RC40005865 [RC40005652]. The AFI Board had been advised not later than August 21, 2008, that management was "[r]eviewing options to purchase ResCap's remaining equity interest in [Ally] Bank." GMAC—Phase II Update, dated Aug. 21, 2008, at ALLY_PEO_0003605 [ALLY_PEO_0003591]. Distribution for those materials included de Molina and Marano, both of whom were ResCap Board members at that time. *Id*. at ALLY_PEO_0003591.

[703] ResCap Board of Directors Update, dated Sept. 12, 2008, at RC40008581 [RC40008541].

[704] *Id*.

[705] *Id*.

[706] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Sept. 12, 2008, at RC40005865 [RC40005652].

[707] E-mail from J. Young to J. Kilman (Sept. 15, 2008) [MS-RESCAP_003756].

[708] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Sept. 19, 2008, at RC40005870 [RC40005652].

consideration: (1) cash purchase by AFI of 100% of ResCap's interest on September 30, 2008; (2) partial purchase by AFI on September 30, 2008 in exchange for debt forgiveness; and (3) debt forgiveness by AFI on September 30, 2008 and a future transfer of ResCap's interest in Ally Bank.[709]

The potential acquisition by AFI of ResCap's entire interest in IB Finance was again addressed at the September 23, 2008 ResCap Board meeting. Advisors and lawyers at this meeting also addressed "preliminary considerations on structuring a potential chapter 11 case, in the event that ResCap pursues such a strategy."[710] The "hypothetical" bankruptcy was evaluated based upon a filing date of October 17, 2008, "[i]n the event that ResCap believes that the asset sales referenced are unlikely to be realized or to deliver the estimated proceeds."[711]

Not later than July 2008, the ResCap Board had constituted the ResCap Independent Directors as a "Special Committee" to which the board delegated "full authority . . . to review and approve (or to recommend for approval . . . ) any Affiliate Transaction involving aggregate consideration of $10 million or more."[712] Procedures for the Special Committee's operations[713] were discussed at a ResCap Board meeting on August 21, 2008.[714] The single-page document sets out what it describes as mandatory procedures to be followed "in considering approval of, or recommending to the full Board approval of, any proposed transaction with [AFI], Cerberus or any of their respective affiliates." Most saliently, these procedures stated that:

> The Special Committee shall not approve or recommend approval of any proposed transaction unless either ResCap management and/or outside advisors advise that they believe the proposed transaction is on terms and conditions consistent with those that parties at arms-length would agree to for fair value.[715]

_____

[709] *See id.*

[710] *See* Minutes of a Special Meeting of the Board of Residential Capital, LLC, Sept. 23, 2008, at RC40005874 [RC40005652]; *see also* Draft Skadden and Lazard Project Scout Presentation, dated Sept. 2008, at RC40008640 [RC40008601].

[711] Draft Skadden and Lazard Project Scout Presentation, dated Sept. 2008, at RC40008649, RC40008652 [RC40008601].

[712] Unanimous Written Consent of the Board of Directors of Residential Capital, LLC, dated July 14, 2008, at RC40005807 [RC40005652].

[713] *See* ResCap Special Committee Procedures, dated Aug. 8, 2008, at RC40008488 [RC40008442].

[714] *See* Minutes of a Special Meeting of the Board of Residential Capital, LLC, Aug. 21, 2008, at RC40005843 [RC40005652].

[715] *See* ResCap Special Committee Procedures, dated Aug. 8, 2008, at RC40008488 [RC40008442].

Independent Director Smith had only a general recollection of this Special Committee procedures document, although he did recall the arm's-length guidance and said that the Independent Directors received advice both from company and outside counsel on complying with it.[716] Independent Director Hirtler-Garvey did not specifically recall the document either, nor did she recollect "the circumstances under which [the Independent Directors] could approve an affiliate transaction in the absence of a fairness opinion."[717]

Consideration of the potential sale to AFI of ResCap's interest in Ally Bank had progressed sufficiently in September 2008 that the two Independent Directors, as the "Independent Committee of the Board of Directors," discussed the potential transaction on September 22, 2008, and arranged to retain Goldin Associates as their financial advisor with respect to the potential transaction.[718] At a September 25, 2008 meeting, ResCap's Independent Directors reviewed a draft term sheet for the bank acquisition by [AFI], but "concluded that [AFI's] offer and the proposed counter offer . . . would not provide the Company with sufficient liquidity for a significant period of time."[719] Additional discussion and negotiations between ResCap and AFI occurred in September 2008, but at the October 16, 2008 ResCap Board meeting, it was announced that AFI was no longer considering this transaction.[720] Nevertheless, in December 2008 that transaction again moved to the forefront, and closed in January 2009.

As noted, prior to closing the third quarter of 2008, ResCap received advice on, and engaged in planning for, a potential bankruptcy filing. At an executive session of the ResCap Board on September 23, 2008, those present received advice from David Kurtz, of Lazard, that "ResCap's balance sheet and current liquidity situation place it within the zone of insolvency and that the best course of action for the Directors is to act as if the company were insolvent and consider the best interest of all its creditors."[721]

The same ResCap Board minutes also record Marano's observation that "the most realistic view from the materials [presented by Lazard] would mean ResCap's unsecured

---

[716] Int. of E. Smith, Nov. 30, 2012, at 108:15–20, 111:19–113:8.

[717] Int. of K. Hirtler-Garvey, Dec. 20, 2012, at 219:14–25, 226:20–24.

[718] Minutes of a Meeting of the Independent Committee of the Board of Directors of Residential Capital, LLC, Sept. 22, 2008, at RC40006642–43 [RC40006611].

[719] Minutes of a Telephonic Meeting of the Independent Committee of the Board of Directors of Residential Capital, LLC, Sept. 25, 2008, at RC40006678 [RC40006611].

[720] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 16, 2008, at RC40005882 [RC40005652].

[721] Minutes of an Executive Session of the Board of Directors of Residential Capital, LLC, Sept. 23, 2008, at RC40006865 [RC40006865]. Timothy Pohl, a Skadden restructuring attorney who was present at that meeting and who continued to advise ResCap when he moved to Lazard, said in an interview with the Examiner's Professionals that Lazard actually never concluded that ResCap was in the zone of insolvency, but rather had advised that it would be "prudent" for ResCap's directors to proceed as if it were in the zone. Int. of T. Pohl, Feb. 26, 2013, at 29:5–30:9.

creditors would be unlikely to receive anything if the business were liquidated at this time."[722] Kurtz is also reported to have advised "that Lazard has not made a determination as to whether or not it is advisable for ResCap to file for bankruptcy protection," and that the subject should be revisited in mid-October.[723]

In the final week of September 2008, both the ResCap Board and the AFI Board continued to consider the proposed bank transaction, and more generally were occupied with considering forms of support for ResCap that could be concluded in sufficient time to address ResCap's need for liquidity and its looming default of TNW covenants on September 30, 2008. ResCap and AFI also continued to receive advice on planning for a possible bankruptcy of ResCap, and AFI was faced as well with liquidity concerns regarding its auto finance business.

At its meeting on September 29, 2008, the AFI Board was introduced to attorneys from Kirkland & Ellis and Mayer Brown. The minutes reflect that these "Special Counsel" were in attendance in order to "discuss[ ] the fiduciary duties owed by directors of a company that is or becomes financially distressed," including "duties owed by the directors to shareholders and creditors when a company reaches the zone of insolvency or becomes insolvent."[724] This advice was in regard to the financial situation then faced by AFI,[725] and at this meeting it is clear that the AFI Board was concerned with both the liquidity and the capital adequacy of AFI. One AFI Board member recalled as follows: "[T]here was no liquidity in the capital markets for any organization, and [AFI] didn't have access to the [FRB] window. So, I can't speak to whether or not I was concerned about [AFI] being in the zone of insolvency. What I can tell you—we were concerned about the ability to continue to make [auto] loans."[726]

_____

[722] Minutes of an Executive Session of the Board of Directors of Residential Capital, LLC, Sept. 23, 2008, at RC40006865 [RC40006865].

[723] *Id.* at RC40006866; *see also* Int. of T. Pohl, Feb. 26, 2013, at 65:5–17 (confirming that at that juncture it was Lazard's view that those unsecured creditors who by virtue of the June 2008 bond exchange had become subordinate to holders of ResCap secured debt, would be unlikely to recover anything in bankruptcy).

[724] The advice was with respect to acting "in the best interests of the Company," which is defined in the minutes to mean AFI. Minutes of a Special Meeting of the Board of Directors of GMAC LLC, Sept. 29, 2008, at ALLY_PEO_0001281 [ALLY_PEO_0001009].

[725] *See id.*

[726] Int. of L. Tessler, Feb. 28, 2013, at 69:10–17. Neporent said there was no concern at this point regarding AFI's solvency: "[T]his is just a prophylactic measurement. Good corporate governance. Reminding everybody about their responsibilities." Int. of M. Neporent, Feb. 6, 2013, at 151:10–17.

Mark Neporent[727] had the following comments regarding the economic condition of ResCap at this point and about the approach AFI was taking to its support of ResCap as of September 29, 2008:

> There was always a debate at the time. "What should be done with ResCap? Should we continue to fund it? Should we continue to support its liquidity?" And I think, obviously, our consistent answer was, "Yes. We think it's a valuable platform. We think they have adequate capital. We think that if we can just get to the other side of the crisis, whenever that is, we'll have an even more valuable platform. Because by now more and more of our competitors have just simply gone away."[728]

More generally, Lenard Tessler said the following regarding access to capital, liquidity challenges, and fiduciary duties:

> [T]hroughout this period, we were consistently evaluating how to manage the business given the lack of access to the capital markets and the lack of available liquidity. That was not just being done at the ResCap level; that was also being done at the [AFI] level. I mean, during this period of time, and probably in—I believe it was in August of 2008 as an example that we were having the . . . conversations about whether or not to continue to provide origination and financing to GM and the auto dealers. So, I mean, liquidity was a precious commodity, and access to the capital markets was a precious commodity that was neither available to [AFI] or ResCap at this time. So, this was a consistent theme, in discharge of our fiduciary duties, on how we thought about what was the right course of action for every one of the business units of [AFI]. So, this was not unusual to ResCap.[729]

With respect to the potential purchase by AFI of ResCap's interest in Ally Bank, the Kirkland & Ellis lawyers are noted as having "responded to questions pertaining to the

---

[727] Neporent was the COO and General Counsel of Cerberus and, until March 2009, a member of AFI's Board. *See* Int. of M. Neporent, Feb. 6, 2013, at 8:7–9, 11:14–21.

[728] *Id.* at 152:1–11. Neporent elaborated: "There was never, ever an obligation of [AFI] to provide any support to ResCap. Only . . . what we as [AFI] directors decided was in our best interests. And I think we had an identity of interest with ResCap, because ResCap was a valuable asset that we were preserving for ourselves and for the ResCap platform." *Id.* at 152:21–153:3.

[729] Int. of L. Tessler, Feb. 28, 2013, at 36:11–37:6.

III-135

consummation of such a transaction outside of or within a ResCap Chapter 11 filing."[730] Further discussion by the AFI Board at the September 29 meeting "focused on valuation of the non-voting interest held by ResCap; feasibility of completing the [Ally] Bank transaction in the event of a bankruptcy filing by ResCap and implications of such a filing on [AFI]."[731] At an AFI Board meeting the next day, "[m]anagement addressed the difficulty in establishing proper valuation of [Ally] Bank given its ownership structure."[732] It is likely that the referenced information was provided by AFI Chief Risk Officer Sam Ramsey, but it is unclear whether this discussion focused on the value of ResCap's interest in IB Finance, on the combined valuation of IB Finance Class M Shares and IB Finance Class A Shares, or on something else.[733]

With regard to ResCap's immediate need for capital to avoid defaulting on minimum TNW covenants as of the end of the third quarter, the AFI Board was advised (and ultimately agreed) that "[t]he exact amount of debt forgiven, if any, would be determined as part of ResCap's accounting close for the quarter."[734] That is, the amount of equity injected into ResCap by AFI was based upon the TNW shortfall that would otherwise exist when ResCap closed its quarter.[735] The AFI Board was advised by CFO Robert Hull that in the event ResCap fell short of its TNW covenants, "management believes that it is highly likely that

---

[730] Minutes of a Special Meeting of the Board of GMAC LLC, Sept. 29, 2008, at ALLY_PEO_0001282 [ALLY_PEO_0001009]. In this regard, Kirkland & Ellis evidently recommended "that the Board require ResCap to commission independent fairness opinions to analyze a possible purchase from ResCap and its stakeholders' perspective." *Id.* The ResCap Independent Directors did engage advisors, specifically Goldin Associates, to provide a fairness opinion when the 2009 Bank Transaction ultimately occurred.

[731] *Id.* at ALLY_PEO_0001283.

[732] Minutes of Special Meeting of the Board of GMAC LLC, Sept. 30, 2008, at ALLY_PEO_0001287 [ALLY_PEO_0001009].

[733] *See* Int. of S. Ramsey, Dec. 10, 2012, at 153:16–154:11 (does not recall what the "difficulties" were); Int. of T. Rowe, Dec. 7, 2012, at 149:8–19, 155:1–7 (demonstrating that Ramsey was presenter, and the discussion reflected that: "[A]bsent a transaction that provides ResCap additional headroom . . . ResCap will file for bankruptcy. In that bankruptcy the bank has no value"); Int. of R. Hull, Feb. 7, 2013, at 168:4–21 ("[I]t's hard to value any stock in a falling, you know, stock environment like that, let alone a bank stock, and one that was unique—as unique as this one.").

[734] Minutes of a Special Meeting of the Board of GMAC LLC, Sept. 29, 2008, at ALLY_PEO_0001283 [ALLY_PEO_0001009].

[735] Int. of R. Hull, Feb. 7, 2013, at 170:19–171:10.

ResCap will file for Chapter 11 bankruptcy protection."[736] The AFI Board adopted resolutions authorizing contributions of up to $400 million, which were implemented through debt forgiveness.[737] It was in its self-interest to do so, as Neporent explained:

> [W]e had extensions of credit to ResCap as well. So there was an economic component from the [AFI] perspective also. It obviously wasn't helpful for [AFI's] debt investment or credit relationship with ResCap to have them go into an uncontrolled bankruptcy.[738]

No agreement was reached on the 2009 Bank Transaction in time to have any bearing on ResCap's third quarter financials. The September 30, 2008 AFI Board minutes suggest that "matters associated with preference and fraudulent transfers" were addressed in the context of considering "the disposition of [Ally] Bank."[739] Neporent disputes that such concerns played a role in consideration of this transaction.[740]

As of September 30, 2008, AFI made a capital contribution to Debtors by forgiving $101.5 million of indebtedness under the Secured MSR Facility.[741] Also, on the same day, AFI contributed ResCap notes to ResCap that AFI had obtained in the June 2008 bond exchange, with a face value of $92.8 million and an approximate fair value of $51 million. ResCap recorded a capital contribution in that amount, and recognized a gain of $42.2 million on extinguishment of debt. In addition, AFI forgave $2.5 million of accrued interest on the notes, increasing the total capital contribution to $53.5 million.[742]

On September 30, 2008, as well, ResCap completed the September 2008 Model Home Sale to an affiliate of Cerberus known as MHPool Holdings LLC, for a net purchase price of approximately $59 million, after adjustments.[743] This was one of three transactions pursuant to

---

[736] Minutes of a Special Meeting of the Board of GMAC LLC, Sept. 30, 2008, at ALLY_PEO_0001286 [ALLY_PEO_0001009].

[737] *Id.* at ALLY_PEO_0001288–90. The AFI Board also requested that an independent financial advisor be engaged immediately "to undertake a review of ResCap and the decisions that will need to be made by AFI on or before October 18, 2008." *Id.* at ALLY_PEO_0001288. At the next AFI board meeting, Hull announced that Goldman Sachs had been retained "as financial advisor to [AFI]." Minutes of a Special Meeting of the Board of GMAC LLC, Oct. 3, 2008, at ALLY_PEO_0001291 [ALLY_PEO_0001009].

[738] Int. of M. Neporent, Feb. 6, 2013, at 157:9–14.

[739] Minutes of a Special Meeting of the Board of GMAC LLC, Sept. 30, 2008, at ALLY_PEO_0001287–88 [ALLY_PEO_0001009].

[740] Int. of M. Neporent, Feb. 6, 2013, at 158:1–16.

[741] *See* Residential Capital, LLC, Current Report (Form 8-K) (Oct. 23, 2008); *see also* Section V.E.2 (addressing the Secured MSR Facility).

[742] *See* Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 89.

[743] *See* Residential Capital, LLC, Current Report (Form 8-K) (Oct. 6, 2008). The sale was conducted as an auction, in which there were five bidders in addition to Cerberus. *Id.*

an agreement in the second quarter of 2008 between ResCap and Cerberus entities, whereby the latter committed to purchase assets (to be identified later) for net cash proceeds of $300 million.[744]

GMAC CF continued purchases pursuant to the June 17, 2008 Servicing Advance Factoring Agreement in the third quarter of 2008.[745] During 2008, total purchases pursuant to the Servicing Advance Factoring Agreement were $949.1 million, the total cash proceeds were $806.7 million, and the cumulative net loss recorded by ResCap was $142.4 million.[746]

ResCap's third quarter results (preliminarily announced on November 5, 2008) showed a net loss for the quarter of $1.9 billion (compared to $2.3 billion a year earlier), which ResCap advised was "primarily attributable to continued adverse market conditions, which drove high credit-related provisions and weak revenue."[747] ResCap also disclosed that "absent economic support from [AFI], substantial doubt exists regarding ResCap's ability to continue as a going concern."[748]

5. *ResCap Continues To Experience Liquidity And Capital Challenges, Engages In Additional Inter-Company Transactions With AFI, And Announces That It Is "Dependent" On AFI*

Having avoided TNW covenant breaches at the close of the third quarter, ResCap immediately faced the same concerns in the fourth quarter. At the October 1, 2008 ResCap Board meeting, Young observed that even with the contributions just received, which enabled ResCap to comply with its TNW covenants, his forecast indicated that ResCap's TNW would drop below the required level in December.[749]

---

[744] *See* Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 90. The other transactions related to that commitment (i.e., the Excess Servicing Rights Sales and the June 2008 Model Home Sale) had closed on July 30, 2008. *See* Section V.F (describing asset sales).

[745] The total of such purchases in the third and fourth quarters of 2008 was reported to be $362.7 million. *See* Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 90; *see also* Section V.E.4 (addressing the Servicing Advance Factoring Facility).

[746] *See* Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 90–91.

[747] *See* Residential Capital, LLC, Current Report (Form 8-K) (Nov. 5, 2008), Ex. 99.1.

[748] *See id.*

[749] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Oct. 1, 2008, at RC40005875 [RC40005652].

Also on October 1, 2008, the ResCap Board, in executive session,[750] was advised by Pohl (counsel from Skadden) that in light of cash projections, "ResCap would not need to make a decision as to a bankruptcy filing prior to the end of October."[751] Pohl responded to various questions about bankruptcy and strategy. For example, in response to a query from de Molina (ResCap director and AFI officer) as to whether stalking horse bids from affiliates would be acceptable, Pohl advised in the affirmative, "as the auction process that would occur in the bankruptcy would ensure the best price and terms for ResCap."[752] He noted that "one way to quietly arrange stalking horse bids would be to work with [AFI] and Cerberus if they were interested in any of the assets or businesses."[753]

ResCap Board minutes also reflect AFI's continued interest in obtaining full economic ownership of IB Finance. "A discussion followed as to the amount of indebtedness that [AFI] has already forgiven and the fact that it would be interested in buying ResCap's shares of the holding company of [Ally] Bank."[754] And, de Molina "noted that the best way to proceed may be to have [AFI] purchase those shares inside a bankruptcy proceeding," with Pohl advising that "the primary concern is about the process and making sure the Directors did what was in the best interest of its creditors."[755]

A possible bankruptcy filing continued to be an agenda item for the ResCap Board throughout October 2008, which heard from advisors and lawyers on that topic, inter alia, in executive session on October 1, 2008,[756] and at regular or special meetings on

---

[750] This meeting occurred prior to the end-of-quarter SEC filings. During the meeting, Marano "asked whether there could be discussion about possibly raising capital from third parties," and Young "responded that something like that could be included if we have a reasonable belief it might materialize." Minutes of an Executive Session of the Board of Residential Capital, LLC, Oct. 1, 2008, at RC40006867 [RC40006865].

[751] Id.

[752] Id. at RC40006868.

[753] Id.

[754] Id.

[755] Id.

[756] Id. at RC40006867.

October 8,[757] October 10,[758] October 17,[759] October 20,[760] and October 23, 2008.[761] As already described, by October 8, 2008, TARP had been enacted.[762] Kurtz is recorded at the October 8, 2008 ResCap Board meeting as having "stated that absent an infusion of third party capital or government assistance or support, the decision of whether to file for bankruptcy and the timing of a filing would depend on the availability of, and consideration received in, a[n] [Ally] Bank transaction."[763]

At its October 10, 2008 meeting, the AFI Board focused on AFI's own liquidity concerns, with AFI President William Muir noting plans to reduce consumer auto loan originations.[764] Hull explained that Goldman Sachs would perform an AFI liquidity analysis, including an assessment of "material, investment and credit initiatives concerning ResCap and their impact on [AFI] liquidity."[765] Marano, ResCap's President and CEO, presented "an analysis of the impact of a hypothetical ResCap bankruptcy filing (and the timing of filing) on ResCap's cash flows."[766] Marano's presentation assumed a sale of ResCap's interest in Ally Bank, with ResCap's resultant "cash runway" extending somewhere between "December and February/March," depending upon whether the assumed consideration of approximately $1.2 billion included $400 million cash or $700 million cash.[767] As became the norm, the meeting was also attended by attorneys from Kirkland & Ellis and Mayer Brown.

---

[757] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 8, 2008, at RC40005877 [RC40005652].

[758] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 10, 2008, at RC40005880 [RC40005652].

[759] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 17, 2008, at RC40005884 [RC40005652].

[760] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 20, 2008, at RC40005887 [RC40005652].

[761] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 23, 2008, at RC40005890 [RC40005652]. "Mr. Young noted that the Company's expected loss for October is approximately $650 million and as equity at September 30 was $350 million, a large capital injection will be needed in order to maintain compliance with tangible net worth covenants." *Id.*

[762] As had the FRB's Commercial Paper Funding Facility, of which (as already mentioned) AFI availed itself beginning on or about October 29, 2008.

[763] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Oct. 8, 2008, at RC40005878 [RC40005652].

[764] Minutes of a Special Meeting of the Board of GMAC LLC, Oct. 10, 2008, at ALLY_PEO_0001296 [ALLY_PEO_0001009].

[765] *Id.* at ALLY_PEO_0001297.

[766] *Id.* at ALLY_PEO_0001297–98.

[767] *Id.* at ALLY_PEO_0001297. The projections were developed by Lazard, and had been presented to the ResCap Board on October 8, 2008. *See* Skadden and Lazard Project Scout Presentation, dated Oct. 8, 2008, at RC40008687 [RC40008678]. Pohl explained that the two dates were selected in order to demonstrate the effect on creditors over time. *See* Int. of T. Pohl, Feb. 26, 2013, at 73:1–5.

Later that day, the ResCap Board held its own meeting, at which a wide range of liquidity options were discussed. Marano reported on the AFI Board meeting held earlier in the day, noting that the potential purchase by AFI of ResCap's interest in Ally Bank had been discussed, and that AFI was considering alternative liquidity options for ResCap as well.[768]

Marano also raised the subject of whether TARP might "present an opportunity for ResCap to access additional liquidity and/or sell assets at potentially attractive prices relative to those which could be achieved in today's market place."[769] He expressed the view that ResCap should "accelerate contingency planning efforts," while such options were under consideration.[770]

At one point in October, Marano was personally in contact with one or more U.S. Treasury officials and had broached the subject of a $5 billion injection under TARP, unaware that AFI was making similar overtures.[771] When he became aware that AFI and Cerberus did not view it advisable for ResCap and AFI both to pursue TARP, Marano stood down his own efforts in favor of a coordinated approach lead by AFI[772] and Cerberus.[773]

Marano recalled that despite bankruptcy preparations in 2008, he did not then believe that ResCap would ultimately seek such relief, since he believed that TARP funds would be

---

[768] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 10, 2008, at RC40005880 [RC40005652].

[769] *Id*. at RC40005881.

[770] Marano "said that it would be prudent to accelerate contingency planning efforts with a staged approach while other options such as the TARP, a[n] [Ally]Bank transaction with [AFI], possible servicing sale transaction with Fannie Mae, and other actions to bolster the Company's liquidity are considered." *Id*. Marano had sought advice regarding access to TARP within days of its enactment. *See* E-mail from T. Marano to J. Kilman (Oct. 7, 2008) [MS-RESCAP_005319].

[771] *See, e.g.*, E-mail from T. Marano to N. Kashkari (Oct. 22, 2008) [CCM00012371] ("As we discussed, I believe it will take an equity investment of approximately $5 billion dollars [sic] to recapitalize ResCap and provide stability for the next 24 months. . . . [A]n investment of $3 billion would provide needed capital through 2009 as we work to find additional partners to preserve our platform."). According to Marano, however, he intentionally inflated the $5 billion estimate by as much as $3 billion, to account for anticipated "horse-trading." Int. of T. Marano, Nov. 26, 2012, at 206:3–23.

[772] *See* Int. of T. Marano, Nov. 26, 2012, at 22:2–14 ("And so at one point [in the Fall of 2008], unbeknownst to me, [AFI], the parent, was asking for assistance from TARP. I was asking for assistance from TARP. . . . And then actually, I found out Cerberus was looking for assistance as well for the combined outfit. That was a very memorable moment when I found out all three of us were seeking assistance from some of the same people."); *id.* at 24:9–15 ("[I]t was logical that the parent would be the one that would be seeking support. And so I made sure the parent knew everything that I was aware of that we needed and what the challenges were so that the parent could seek the support."); *see also* Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 17, 2008, at RC40005885 [RC40005652] ("Mr. Marano mentioned that he is working with Cerberus and with Morrison & Foerster on a term sheet to use in communicating a request to the Treasury Department for participation in the TARP program.").

[773] Former U.S. Treasury Secretary John Snow was at the time Vice Chairman of Cerberus and was "our conduit to the Treasury." Int. of L. Tessler, Feb. 28, 2013, at 104:6–16.

obtained either independently or through AFI,[774] and he suggested that he did not believe that a bankruptcy filing would be in the best interest of ResCap's creditors.[775] Moreover, Marano recalled that on several occasions, AFI officials advised against bankruptcy, and reassured him that ResCap would get the support it needed from AFI.[776] In this respect, Marano also observed that the more aggressive ResCap was in contingency planning, the harder AFI worked to provide capital support for ResCap.[777] Pohl explained that while there could neither be certainty of support for ResCap from AFI, nor certainty of a TARP infusion to AFI,[778] Lazard never recommended that ResCap pull the trigger on a chapter 11 filing.[779]

Independent Director Hirtler-Garvey said that it was her understanding that the question of whether and when ResCap would file for bankruptcy called for "a vote of the Independent Directors," and that while she and Smith viewed bankruptcy as "one of many paths to be considered," there was never a time when they thought that ResCap would have to file for bankruptcy.[780] Hirtler-Garvey never thought that ResCap was insolvent during her tenure on the ResCap Board.[781]

On October 16, 2008, Marano told the ResCap Board that AFI was "no longer considering a purchase of the ResCap interest in [Ally] Bank."[782] The next day, during his "ResCap Update" to the AFI Board, Marano said that the deal was off the table "for strategic business reasons."[783] The "tabled"[784] transfer was renewed in December 2008, and it ultimately closed in January 2009.

---

[774] Int. of T. Marano, Nov. 26, 2012, at 163:18–20.

[775] *Id*. at 218:1–7 ("[Q:] Did you believe in this timeframe that keeping ResCap alive and trying to save the company would improve value for creditors and stakeholders? [A:] I definitely believed at this point in time not filing was in the interest of the creditors, yes.").

[776] *See id*. at 158:3–8.

[777] *See id*. at 160:14–22 ("And there were times that, by—in my opinion, by working relatively hard on contingency planning, we made them work harder on capital support for us.").

[778] Pohl said there was a "strong belief" that if AFI received a TARP investment it would facilitate "ongoing funding" for ResCap. Int. of T. Pohl, Feb. 26, 2013, at 42:8–16.

[779] *Id*. at 54:20–23.

[780] Int. of K. Hirtler-Garvey, Dec. 20, 2012, at 247:20–248:1, 256:3–6.

[781] *Id*. at 140:24–141:2. It may or may not be significant that neither Hirtler-Garvey nor Smith were familiar during their interviews with the Examiner's Professionals with the term "zone of insolvency." *See id*. at 139:20–140:2; Int. of E. Smith, Nov. 30, 2012, at 75:22–25.

[782] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 16, 2008, at RC40005882 [RC40005652]. Marano said he did not recall why this was the case. *See* Int. of T. Marano, Feb. 27, 2013, at 185:9–14.

[783] Minutes of a Special Meeting of the Board of GMAC LLC, Oct. 17, 2008, at ALLY_PEO_0001301 [ALLY_PEO_0001009].

[784] Int. of R. Hull, Feb. 7, 2013, at 165:1–7. "It is a complex transaction, so I'm not surprised that on the . . . first or second blush we still wanted more time to digest it." *Id*. at 164:4–7.

The October 17, 2008 ResCap Board minutes also reflect that ResCap agreed to repay a borrowing base shortfall of $168 million under the Secured MSR Facility in exchange for AFI's agreement to extend until May 2009 the maturity date of that facility, which was due to expire that day; ResCap also accepted a reduction in capacity of the Secured MSR Facility from $1.2 billion to $900 million,[785] and, as discussed in Section V.E.2, thereafter the capacity of the Secured MSR Facility declined dollar for dollar with any debt forgiveness thereunder.

At its October 28, 2008 meeting, the ResCap Board heard presentations regarding the possible sale of ResCap's Canadian mortgage banking subsidiary (ResMor) to AFI,[786] as well as regarding the possible sale of ResCap's domestic and international broker-dealer subsidiaries to AFI.[787] Both transactions were subsequently considered by the Independent Directors, were the subject of fairness opinions, and ultimately closed—ResMor on January 1, 2009 for $67 million, and the broker-dealers in March 2009 for $110.4 million.[788]

The AFI Board met on October 31, 2008,[789] and agreed to make a capital contribution to ResCap by forgiving a further $238.9 million indebtedness under the Secured MSR Facility.[790] At this meeting, the AFI Board also heard from management regarding a bond exchange proposal intended to raise capital in contemplation of qualifying AFI as a bank holding company, as well as regarding the purchase from ResCap of ResMor and the two broker-dealers, intended to "allow ResCap to meet near-term cash needs and remain in compliance with tangible net worth covenants."[791] The AFI Board "expressed support" for the asset purchases.[792]

---

[785] *See* Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 17, 2008, at RC40005885–86 [RC40005652]; *see also* Minutes of a Special Meeting of the Board of GMAC LLC, Oct. 17, 2008, at ALLY_PEO_0001301–02 [ALLY_PEO_0001009] ("It was noted that if [AFI] chose not to extend the maturity of the facility, ResCap would have been unable to pay down the facility when due.").

[786] *See* Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 28, 2008, at RC40005895 [RC40005652]; ResMor Trust Valuation Analysis, dated Oct. 28, 2008, at RC40008766–77 [RC40008754].

[787] *See* Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 28, 2008, at RC40005896 [RC40005652]; Proposed Transfer of Ownership of Residential Funding Securities (RFS) LLC to GMAC LLC, dated Oct. 27, 2008, at RC40008778–86 [RC40008754].

[788] These transactions are discussed in Section V.F.4.f and Section V.F.4.g of this Report, respectively.

[789] Minutes of a Special Meeting of the Board of GMAC LLC, Oct. 31, 2008, at ALLY_PEO_0001310–11 [ALLY_PEO_0001009].

[790] *See* Residential Capital, LLC, Current Report (Form 8-K) (Nov. 20, 2008), Ex. 99.1. The Secured MSR Facility had matured on October 17, 2008, but was renewed to May 1, 2009. *See id.*; *see also* Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 90.

[791] Minutes of a Special Meeting of the Board of GMAC LLC, Oct. 31, 2008, at ALLY_PEO_0001309 [ALLY_PEO_0001009].

[792] *Id.* at ALLY_PEO_0001310.

On November 5, 2008, Hull conducted an earnings conference call for the third quarter of 2008. Hull focused his remarks on what he called "important transformative initiatives," including but not limited to AFI's application for bank holding company status to improve AFI's capital position. Specifically, he noted AFI's belief that as a bank holding company it "would have a greater chance of participating in the various government liquidity programs."[793]

It was Hull's practice to conduct earnings calls which addressed both AFI and its subsidiary, ResCap, and the latter did not otherwise hold such calls (although ResCap commonly had a representative present).[794] With respect to ResCap, Hull noted continued efforts to "reduce the balance sheet . . . and lower operating expenses," but observed that "market conditions have overwhelmed these efforts somewhat."[795] Furthermore, he stated the following regarding the financial relationship between ResCap and its parent and sole member: "In addition, market conditions have made it difficult for ResCap to maintain capital and liquidity. As a result, ResCap has become dependent on [AFI] for support."[796] Asked about this observation, Hull confirmed that the statement reflected his view at the time and further explained that he meant:

> Just exactly what it says, I think they really needed the help of these injections. And I think we'd have had a hard time finding someone on the outside to come up with them, although that's just conjecture.[797]

*       *       *

---

[793] Transcript of GMAC Q3 2008 Earnings Call (Nov. 5, 2008), at 7 (available from Bloomberg Transcript).

[794] Int. of R. Hull, Feb. 7, 2013, at 24:3–8.

[795] Transcript of GMAC Q3 2008 Earnings Call (Nov. 5, 2008), at 4 (available from Bloomberg Transcript).

[796] *Id.*

[797] Int. of R. Hull, Feb. 7, 2013, at 141:8–12. The "conjecture" comment can be discounted. *Id.* at 141:13–17 ("[Q:] [I]s that just conjecture? I mean, third quarter '08, did ResCap have the ability to borrow from third parties? [A:] I don't believe so.").

> And I can't tell you if there wasn't an investor or a banker in the
> country that would or wouldn't have stepped in, but none whom
> I knew of at the time.[798]

AFI's CEO at the time (and a member of the ResCap Board), de Molina, acknowledged that, in hindsight, he agreed with Hull's observation that ResCap was "dependent" on AFI, but said he would move that "dependent" status earlier in the time line, perhaps back to 2007.[799]

On November 8, 2008, the ResCap Board heard a presentation from Corey Pinkston addressing the proposed bond exchange and AFI's contemplated application to become a bank holding company, which he said would facilitate access to government financial support.[800] While AFI had considered becoming a bank holding company as early as March 2008, to obtain access to more consumer deposits and to the FRB discount window,[801] the November initiative was directed particularly at TARP eligibility.[802] Pinkston (an AFI official) advised the ResCap Board that:

> From a ResCap perspective . . . the bond exchange transaction
> plays a key part of a potential interim solution to provide
> required near term support and taking on material ResCap debt
> at discounted levels would provide [AFI] with better flexibility
> to potentially review and consider alternatives for additional
> support and/or liability restructuring.[803]

At this stage, AFI had developed two alternative structures for the bond exchange, and in each instance, Pinkston explained that "the transaction would result in substantial equity generation on a combined basis as part of the required bank holding company capital raise and a material reduction in total debt of the consolidated company."[804]

---

[798] *Id.* at 142:7–10.

[799] *See* Int. of A. de Molina, Nov. 20, 2012, at 80:1–7 ("[Q:] Okay. At what point in time do you think ResCap became dependent on [AFI] for support? [A:] Well, ex-post, I'd say it was sometime in '07. Did I realize it then? No. I didn't realize it until, you know, much, much later."); *see also* Int. of S. Preston, Jr., Feb. 15, 2013, at 41:14–22 (AFI was ResCap's lender of last resort in the last quarter of 2008); *id.* at 70:25–71:8 (ResCap and AFI were in "survivor mode" as of fourth quarter 2008).

[800] *See* Minutes of a Special Meeting of the Board of Residential Capital, LLC, Nov. 8, 2008, at RC40005902–03 [RC40005652]; Draft GMAC Bond Exchange Presentation, dated Nov. 7, 2008, at RC40008804–19 [RC40008802].

[801] *See, e.g.*, Int. of L. Tessler, Nov. 16, 2012, at 176:25–178:9.

[802] *See, e.g.*, Int. of L. Tessler, Feb. 28, 2013, at 54:14–20 (explaining that after Lehman went bankrupt "and liquidity is gone for everybody . . . we then accelerate our efforts to become a bank holding company to get access to TARP and to get access to the [FRB] window").

[803] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Nov. 8, 2008, at RC40005903 [RC40005652].

[804] *Id.* at RC40005902–03.

The AFI Board minutes for November 2008 demonstrate that: (1) AFI considered achieving bank holding company approval (and, thereby, eligibility for TARP funds) as critical to its own survival; (2) AFI management believed that such approval was unlikely should ResCap file for bankruptcy;[805] and (3) accordingly, it was necessary for AFI to continue to support ResCap. For example, materials presented to the AFI Board in support of its November 28, 2008 meeting include a decision tree analysis that highlighted the contrast among multiple "potential scenarios for [AFI]."[806] While to be sure, none indicated any guarantee of AFI's (or ResCap's) future, lack of support by AFI for ResCap was shown as the shortest path to AFI failure. Accordingly, management advised the AFI Board as follows:

> Under the scenarios where BHC status is not achieved, [AFI] faces almost immeasurable near-term and long-term liquidity risks that threaten the company's business model[.]
>
> Although there are challenges, management believes that BHC status is achievable, but has been advised that support for ResCap is a prerequisite[.]
>
> Despite the many permutations of the bond exchange, OEM health and government support, based on the information available today, Management requests ongoing support for ResCap[.][807]

De Molina explained that in 2008 his view was that obtaining bank holding company approval for AFI was its only lifeline and, concomitantly, ResCap's only lifeline.[808] Further, he believed that ResCap's liquidity problems could be solved by developing an expanded Ally Bank depositor base.[809] And, he said, he never seriously considered supporting a ResCap bankruptcy filing in 2008 because he "was so petrified that that would derail the entire bank holding company strategy."[810]

---

[805] AFI had evidently received advice to that effect from its consultants: "[AFI's] advisors continue to believe that a ResCap bankruptcy would make it politically impossible for [AFI] to achieve BHC status." ResCap Decisions and Support Action, AFI Board Meeting, dated Nov. 24, 2008, at EXAM10277375 [EXAM10277369]. Among others, such advice may have been provided by Goldman Sachs. "[W]e definitely felt that the ResCap filing would create a lot of uncertainty for the BHC application." Int. of R. Hutchinson, Mar. 27, 2013, at 34:14–16.

[806] ResCap Decisions and Support Action, AFI Board Meeting, dated Nov. 24, 2008, at EXAM10277374–78 [EXAM10277369].

[807] *Id*. at EXAM10277378; *see also* Government Support Presentation, dated Nov. 11, 2008, at ALLY_0259602 [ALLY_0259598] (noting under "Status" of "Resolve ResCap" initiative: "Necessary part of bond exchange in order to achieve required capital").

[808] Int. of A. de Molina, Nov. 20, 2012, at 100:14–101:5.

[809] *Id*. at 63:12–64:11 ("So in my mind, that was the long-term solution to all the businesses, to ResCap, to [AFI], to everybody.").

[810] *Id*. at 101:25–102:2.

While AFI's achievement of bank holding company status and its completion of the acquisition of ResCap's interest in Ally Bank were distinct and not necessarily related steps,[811] records reflect similar concerns on the part of AFI regarding how a ResCap bankruptcy would bear on completion of the latter transaction. On September 30, 2008, the AFI Board had been presented with a management report addressing the risks to AFI of a ResCap bankruptcy including, inter alia, "the fate of [Ally] Bank," which stated:

> Though the FDIC is likely to approve a transfer of the ResCap interest in the Bank to [AFI], a bankruptcy filing by ResCap could complicate, if not delay, this action. In addition, the ResCap bankruptcy would necessitate an auction of its interests in the Bank, thereby putting at risk [AFI's] ability to acquire it. It is unclear whether the FDIC would seize the bank in the event of a bankruptcy. The bank is critical to [AFI's] future liquidity. This uncertainty poses a significant risk.[812]

Hull stated that the fates of AFI and ResCap were intertwined at this point, because the ability to obtain support from the U.S. Treasury turned in part on the viability of Ally Bank, which was partially owned by ResCap:

> I can tell you then, as the fate of both companies was really in the balance now, right? So, for the first time [AFI's] liquidity was clearly—the parent was clearly in question, right, and hence, the request for TARP that all came through and so forth. . . . So, we had had multiple meetings with the [FRB] and the FDIC, telephonic and otherwise, and I think through one communiqué or another, it became clear that a filing of ResCap at all in the context of this BHC [request], it would complicate matters immensely, let alone whether the bank, you know, was the pivotal component to that. It was one of many, and I think

---

[811] *See* Int. of S. Ramsey, Dec. 10, 2012, at 142:19–22 ("I don't recall, at the moment, that there were any strings involved in the [conversion] of [AFI] to a bank holding company related to the shares of the bank.").

[812] ResCap Capital Action, AFI Board Meeting, dated Sept. 30, 2008, at ALLY_0361451 [ALLY_0361444]; *see also* Int. of S. Ramsey, Dec. 10, 2012, at 129:19–22 ("De Molina and I knew that strategically long-term, you know, the only true solution to the liquidity of the overall company was a bank charter.").

> we started to realize that, I mean, you know, we probably
> needed not to have a BK, whether we'd been of the view to
> prevent that anyways, now it was getting harder because we
> didn't have the cash to sustain them with a passage of time.
> And, the bank looked like a more important component, I'm
> sure. And I'm sure the regulators made that clear to us.[813]

This assessment may not have been unanimous. Neporent disputes the notion that a ResCap bankruptcy would have been fatal to the ability of AFI to obtain bank holding company status and, therefore, to its ability to access TARP support.[814] The AFI Board minutes and presentations, however, do not reflect that Neporent or anyone else expressed this view at the time. In his interview with the Examiner's Professionals, Neporent acknowledged that AFI's bank regulatory lawyers had advised that a ResCap bankruptcy would have complicated AFI's ability to become a bank holding company.[815]

On November 20, 2008, AFI formally submitted its application to the FRB to become a bank holding company. Concurrently, it applied to the U.S. Treasury to participate in the Capital Purchase Program ("CPP") created under EESA, i.e., TARP, conditional upon becoming a bank holding company.[816] In its public statement, AFI referenced "mortgage financing" as part of its "core mission," though it did not specifically mention ResCap:

> As a bank holding company, [AFI] would obtain increased
> flexibility and stability to fulfill its core mission of providing
> automotive and mortgage financing to consumers and
> businesses. [AFI] also expects to have expanded opportunities
> for funding and for access to capital as a bank holding
> company.[817]

---

[813] Int. of R. Hull, Feb. 7, 2013, at 176:22–177:20; *see also* Int. of A. de Molina, Nov. 20, 2012, at 100:14–21 ("I didn't think that filing a major subsidiary when you had—that was in the middle of the mortgage servicing business during the middle of the biggest mortgage crisis in history was a way to [endear] yourself to the Federal Reserve Board as they considered your application as a good citizen to become a bank holding company.").

[814] Int. of M. Neporent, Feb. 6, 2013, at 189:11–190:3, 191:19–23 ("We had our own pipeline and our own counsel. . . . It was all speculation. I just didn't accept that as QED. If ResCap filed, we were dead."). By contrast, de Molina had reported to the AFI Board that "a ResCap bankruptcy filing would be severely detrimental, and likely fatal, to [AFI's] bank holding company application." Minutes of a Special Meeting of the Board of GMAC LLC, Oct. 31, 2008, at ALLY_PEO_0001308 [ALLY_PEO_0001009].

[815] *See* Int. of M. Neporent, Feb. 6, 2013, at 189:21–24 (referring to the view expressed by Edward Herlihy of Wachtell, Lipton, Rosen & Katz); *id*. at 191:15–19 ("We were told that [AFI's] bank reg counsel reached that conclusion. . . . based on his discussions with the regulators.").

[816] *See* AFI, Press Release, *GMAC Files Application with Federal Reserve to Become Bank Holding Company* (Nov. 20, 2008), http://media.ally.com/index.php?s=43&item=288.

[817] *See id*. at 1.

Meanwhile, several more inter-company transactions between ResCap and AFI—asset sales and a financing facility—were finalized, and a new bond exchange was commenced.

On November 3, 2008, ResCap posted two cash-collateralized supersedeas bonds totaling $127.5 million, in connection with the Mitchell Trial Order.[818] Concerned about the liquidity impact of the cash collateral, ResCap obtained support from AFI, which agreed to replace ResCap as the surety provider on November 11, 2008 for $100 million of the $127.5 million bonds.[819]

On November 20, 2008, ResCap and AFI announced the commencement of separate private exchange offers and cash tender offers pursuant to which AFI would purchase and/or exchange certain outstanding notes of AFI (and non-Debtor subsidiaries), as well as certain notes of ResCap, for cash, newly issued notes of AFI and, with regard to the repurchase of AFI's notes, preferred stock of an AFI Subsidiary.[820]

In addition, on November 20, 2008, ResCap announced an agreement with AFI whereby AFI would provide up to $500 million to ResCap through various transactions "intended to improve ResCap's liquidity and support its capital structure."[821] Such transactions would include, but not necessarily be limited to: (1) the purchase by AFI of ResMor, the Canadian mortgage bank indirectly wholly owned by ResCap; (2) a bridge loan in an amount equal to the sale price for ResMor; and (3) a new senior revolving loan facility.[822]

AFI entered into an agreement with a Canadian subsidiary of ResCap to purchase the parent company of ResMor Trust, on November 20, 2008. Following consideration at several ResCap Board meetings and a meeting of the Independent Directors,[823] the transaction had been approved by the AFI Board on November 11, 2008, and by the ResCap Board on November 20, 2008.[824] Funds in the amount of approximately $67 million were advanced

---

[818] *See* ResCap Legal Matters Update, dated Dec. 11, 2009, at RC40018301 [RC40018295].

[819] *See* Minutes of a Special Meeting of the Board of GMAC LLC, Nov. 11, 2008 at ALLY_PEO_0001316 [ALLY_PEO_0001009]. As de Molina recalled, the $27.5 million ResCap share reflected ResCap's assessment of its "maximum exposure" in the case. Int. of A. de Molina, Nov. 20, 2012, at 175:19–177:17. Accordingly, it was the companies' intention that AFI would support ResCap's liquidity by bearing the credit risk, while ResCap retained the litigation risk. *Id.* at 177:12–15. As further discussed in Section V.G.1.c of this Report, the Missouri Court of Appeals reversed the punitive damages award in November 23, 2010, and remanded for a new trial.  Most of the bond collateral was thereafter ultimately released.

[820] *See* Residential Capital, LLC, Current Report (Form 8-K) (Nov. 20, 2008), Item 8.01.

[821] *Id.* Ex. 99.1.

[822] *See id.*

[823] *See* Minutes of a Telephonic Meeting of the Independent Committee of the Board of Directors of Residential Capital, LLC, Nov. 3, 2008, at RC40006691 [RC40006611].

[824] *See* Minutes of a Special Meeting of the Board of GMAC LLC, Nov. 11, 2008, at ALLY_PEO_0001316 [ALLY_PEO_0001009]; Action by Written Consent of the Board of Directors of Residential Capital, LLC, dated Nov. 20, 2008, at RC40005913–24 [RC40005652]; *see also* Residential Capital, LLC, Current Report (Form 8-K) (Nov. 26, 2008), Item 1.01.

by AFI to GMAC Residential Funding of Canada on November 20, 2008, and the sale was completed on January 1, 2009 for the same amount, i.e., payment was made by forgiveness of the debt (as more particularly described in Section V.E.6).[825] In connection with this sale, ResCap obtained a fairness opinion from Goldin Associates.[826]

Also on November 20, 2008, AFI entered into the $430 million Initial Line of Credit Agreement with PATI and RAHI, two ResCap subsidiaries.[827] The Initial Line of Credit Facility included guarantees by RFC, GMAC Mortgage, and ResCap. The purpose of the Initial Line of Credit Facility was to provide contingency liquidity on a daily basis. Draws were only permitted if ResCap's liquidity dropped below a certain level (as further described in Section V.E.5). The Initial Line of Credit Facility was immediately drawn upon for $115 million.[828]

As of December 31, 2008, the Initial Line of Credit Facility did not have any indebtedness outstanding, and its maturity date was extended to January 31, 2009, and thereafter further extended to March 31, 2009.[829] Some records suggest that this two-month extension of maturity was contemplated as part of the consideration for the 2009 Bank Transaction.[830] However, the Membership Interest Purchase Agreement associated with that

---

[825] Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 91.

[826] *See* Opinion Letter from Goldin Associates to the Committee of the Independent Members of the Board of Directors of ResCap (Dec. 3, 2008) [RC00027945]; *see also* Goldin Associates Presentation to The Committee of Independent Members of the Board of Directors of Residential Capital, LLC Regarding The Purchase of ResMor Trust Company by GMAC, LLC, dated Dec. 2, 2008 [GOLDIN00127218]. Although Goldin Associates had earlier been retained to provide a fairness opinion in connection with ResCap's transfer of its interest in IB Finance to AFI, the ResMor Sale closed first, and thus was the first such opinion Goldin Associates provided to ResCap's Independent Directors. *See* Int. of S. Preston, Jr., Feb. 15, 2013, at 73:2–13. It was also the first formal fairness opinion Goldin Associates had ever rendered. *See id.* at 31:21–23. The ResMor Loan Agreement and ResMor Sale are addressed in Sections V.E.6 and V.F.4.f, respectively.

[827] *See* Residential Capital, LLC, Current Report (Form 8-K) (Nov. 26, 2008), Item 1.01; *see also* Section V.E.5.

[828] *See* Residential Capital, LLC, Current Report (Form 8-K) (Nov. 26, 2008), Item 1.01.

[829] *See* Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 89. In December 2008, the parties took steps to increase the limits of the Initial Line of Credit Facility. *See* Opinion Letter from Goldin Associates to the Committee of the Independent Members of the Board of Directors of ResCap (Dec. 22, 2008) [GOLDIN00126301]. That contemplated transaction was not concluded, and in June 2009 a complementary facility, the Second Line of Credit Facility, was established (addressed in Section V.E.7). As addressed in Section V.E.8, both facilities were amended and restated in December 2009. Under the resulting $1.1 billion A&R Line of Credit Facility, the borrowers were RFC and GMAC Mortgage. Approximately $380 million remained unpaid under the A&R Line of Credit Facility as of the Petition Date. *See* First Day Affidavit, ¶ 61.

[830] *See, e.g.*, Draft GMAC Bank Transaction Term Sheet, dated Jan. 13, 2009 [GOLDIN00126222].

transaction (dated January 30, 2009) does not show this to be the case,[831] nor does the final draft of the term sheet so indicate;[832] and the fairness opinion associated with the 2009 Bank Transaction mentions but ascribes no value to the maturity extension.[833]

Finally, as described below, as of November 30, 2008 (and finalized in early December), AFI made a capital contribution to ResCap by forgiving a further $451.5 million of indebtedness under the Secured MSR Facility, in order to keep ResCap in compliance with its $250 million TNW covenant.[834] ResCap reported that total debt forgiveness under the Secured MSR Facility during the third and fourth quarters of 2008 was $791.9 million.[835]

By the end of November 2008, ResCap and Ally Bank had entered into a Broker Agreement,[836] whereby GMAC Mortgage (and its subsidiary, ditech, LLC) could channel production to Ally Bank, on whose books mortgage loans would be originated:

> Under the terms of a broker agreement (the "broker agreement"), the Company acts in a broker capacity and provides loan processing services to [Ally] Bank to support its origination and purchase of loans as well as loan closing services. The broker agreement has no mandatory expiration date and can be terminated by either party on 30 days notice. Under the terms of the broker agreement, loans meeting the underwriting standards of [Ally] Bank are originated by [Ally] Bank while loans not meeting those standards may be originated by the Company and sold directly into the secondary market. The Company also provides certain representations and warranties and indemnifications to [Ally] Bank with respect to

---

[831] *See* Residential Capital, LLC, Current Report (Form 8-K) (Feb. 3, 2009), Ex. 10.1.

[832] *See* Draft GMAC Bank Transaction Term Sheet, dated Jan. 23, 2009 at RC40011107–08 [RC40011078] (describing the sixty-day extension as a "simultaneous transaction" to be executed on the closing date of the 2009 Bank Transaction).

[833] *See* Goldin Associates Presentation to The Committee of Independent Members of the Board of Directors of Residential Capital, LLC Regarding The GMAC Bank Transaction with GMAC, LLC, dated Jan. 22, 2009, at 34 [GOLDIN00128045]. ("Goldin does not quantify any value associated with the $430 million secured credit facility from [AFI] to ResCap subsidiaries."). Goldin Associates also did not consider whether in sixty days ResCap would have had the wherewithal to repay this facility, but "assumed that these credit facilities as they matured would be extended." Int. of S. Preston, Jr., Feb. 15, 2013, at 145:23–146:10.

[834] *See* Residential Capital, LLC, Current Report (Form 8-K) (Dec. 2, 2008) (announcement); Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), Ex. 10.14 (amount).

[835] *See* Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 90. The Secured MSR Facility was entirely repaid through debt forgiveness and was terminated as of December 30, 2009. *See* Letter from GMAC to ResCap, et al. (Dec. 30, 2009) [ALLY_0353025].

[836] *See* Broker Agreement [RC00030534].

> brokered loans. The Company recorded broker fee income of
> $11.0 million for these services for the three months ended
> March 31, 2009.[837]

This arrangement took advantage of Ally's Bank's relatively strong liquidity position and its relatively low costs of funds (via the FHLB and consumer deposits).[838] Thereafter, GMAC Mortgage essentially ceased loan origination, instead channeling production in most instances through Ally Bank.[839] In addition, because brokered loans were originated by Ally Bank in its own name, and therefore were not subject to the limits of the 250.250 exception for affiliate transactions that applied to loans purchased by Ally Bank from GMAC Mortgage, the Broker Agreement facilitated an increased volume of MSRs on Ally Bank's balance sheet.[840]

It was the intention of the parties to the Broker Agreement, however, that the economics as between Ally Bank and GMAC Mortgage would remain under the Broker Agreement as they were under the 250.250 sales arrangement, i.e., that GMAC Mortgage would retain the profit and loss (P&L) impact of origination fees and expenses for loans brokered to Ally Bank.[841] The manner in which the parties attempted to accomplish this, and additional details regarding the Broker Agreement and its relationship to the relevant derivative transactions, are addressed in detail in Section V.B.6.

### 6. AFI Becomes A Bank Holding Company; The Federal Government Supports AFI With First TARP Investment; And ResCap Sells Its Interest In Ally Bank To AFI

On December 2, 2008, ResCap reported that AFI had approved additional forgiveness of ResCap's indebtedness under the Secured MSR Facility in an amount "equal to the amount required for ResCap to maintain a consolidated tangible net worth of $300 million"—i.e., $50 million above its $250 million covenant under its Bilateral Facilities—as of November 30, 2008, but not to exceed $683 million.[842] ResCap's announcement also reported two caveats: (1) if the foregoing amount was not sufficient to allow TNW compliance, AFI "does not currently intend that any forgiveness will take place," since "additional forgiveness subsequent to November 30, 2008 would not remedy ResCap's non compliance as of such

---

[837] Residential Capital, LLC, Quarterly Report (Form 10-Q) (May 11, 2009), at 58.

[838] Int. of A. Celini, Feb. 18, 2013, at 120:11–17, 220:11–15.

[839] *See* E-mail from L. Kelly (July 23, 2009) [EXAM10115666].

[840] *See* Int. of A. Celini, Feb. 18, 2013, at 208:13–17. At its meeting on October 21, 2008, the Bank Board had approved an exception to Ally Bank's "Counterparty Credit Policy" in recognition that its affiliate-counterparty on the MSR and Pipeline Swaps, GMAC Mortgage, had a credit rating lower than otherwise called for by the credit policy. *See* Minutes of a Regular Meeting of the Board of Directors of GMAC Bank, Oct. 21, 2008, ALLY_PEO_0001593–94 [ALLY_PEO_0001488]. This action was taken in response to findings of a regulatory examination. *Id.*; *see also* Summary of Approval of Exception to Counterparty Credit Policy and Proposed Resolution of the Board of Directors, dated Oct. 21, 2008, at ALLY_PEO_0007393–95 [ALLY_PEO_0007331] (addressing rationale for exception).

[841] *See* Int. of A. Celini, Feb. 18, 2013, at 225–26.

[842] Residential Capital, LLC, Current Report (Form 8-K) (Dec. 2, 2008), Item 8.01.

date"; and (2) AFI did not "currently intend to take further actions in support of ResCap if the [AFI] offers [i.e., AFI's repurchase of its own debt] are not completed, although it reserves the right to do so."[843] As noted, AFI ultimately forgave $451 million under the Secured MSR Facility effective November 30, 2008.

By December 19, 2008, the purchase by AFI of ResCap's interest in Ally Bank was back on the table. AFI Board minutes reflect that in the context of addressing support for ResCap's liquidity and net worth potentially needed by year end, AFI's Tazewell Rowe "reviewed possible forms of support that [AFI] might provide to ResCap including contribution of exchanged bonds, debt forgiveness on the mortgage servicing rights facility, and acquisition by [AFI] of the non-voting interest ResCap holds in IB Finance Holdings, LLC, the parent company of [Ally] Bank."[844] Neporent pointed out that the purchase of Ally Bank shares differed from a bond exchange or debt forgiveness, because AFI would "actually get something in return other than just an effective capital contribution."[845]

On December 19, 2008, ResCap publicly announced the contemplated 2009 Bank Transaction.[846] ResCap's filing advised that AFI and ResCap were "in negotiations to undertake a transaction or series of transactions pursuant to which, concurrently with or shortly following completion of the [AFI] offers and ResCap offers [i.e., the tender and exchange offers] . . . [AFI] would transfer ResCap old notes acquired by [AFI] in the ResCap debt-for-debt exchange offers . . . in exchange for all or a majority of the non-voting common equity of IB Finance Holding Company, LLC . . . held by ResCap."[847]

Of course, AFI already had the ability, as of January 1, 2009, to exercise its conversion rights under the ResCap Preferred Interests it owned, and thereby obtain ownership of 806,344 IB Finance Preferred Interests. In this regard, ResCap requested that AFI postpone its exercise of such rights until not earlier than February 28, 2009, a request that AFI management supported (although ultimately the 2009 Bank Transaction closed earlier than that date).[848] This request reflected concern on the part of the ResCap Board about concluding the transfer to its parent company of Ally Bank assets in the face of substantial uncertainty as to whether ResCap would soon face bankruptcy:

> The Board also engaged in discussion with respect to the extension of the date on which ResCap's preferred units could be exchanged for IB Finance Class M preferred units from

---

[843] *Id.*

[844] Minutes of a Special Meeting of the Board of GMAC LLC, Dec. 19, 2008, at ALLY_PEO_0001371 [ALLY_PEO_0001009].

[845] Int. of M. Neporent, Feb. 6, 2013, at 214:5–7.

[846] Residential Capital, LLC, Current Report (Form 8-K) (Dec. 19, 2008).

[847] *Id.*

[848] *See* Minutes of a Special Meeting of the Board of GMAC LLC, Dec. 19, 2008, at ALLY_PEO_0001371–72 [ALLY_PEO_0001009].

> January 1, 2009 to February 23, 2009 in light of continued
> deterioration and concerns regarding a potential bankruptcy
> filing by ResCap or any of its significant subsidiaries. It was the
> consensus of the Board that the date should be extended.[849]

Neporent's recollection is that in November and December, while a TARP infusion to AFI was not yet a certainty, AFI's approach in terms of supporting ResCap was "to provide as little as possible [while] . . . not inadvertently blowing it up."[850] In other words, to preserve the option of saving ResCap at the least cost if the effort proved futile:

> As we were getting to the end with the application and
> expecting to get the TARP funds, we, you know, not knowing
> which way it was going to go, we would have been irresponsible
> just to throw good money after bad. But we wanted to preserve
> the option value because we, again, thought the platform was
> very valuable. But if we weren't going to get the money, it was
> going to be taken away from us. There was no reason to
> downstream the cash.[851]

The FRB approved AFI's application to become a bank holding company on December 24, 2008.[852] AFI and ResCap actors recalled that bank holding company approval was viewed contemporaneously with a sense of optimism and relief.[853] In its order, the FRB noted that it had acted expeditiously on the application:

> In light of the unusual and exigent circumstances affecting the
> financial markets, and all other facts and circumstances, the
> Board has determined that emergency conditions exist that

---

[849] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Dec. 29, 2008, at RC40005948 [RC40005652].

[850] Int. of M. Neporent, Feb. 6, 2013, at 204:16–20. Hull evinced certitude about the bank holding company application as early as late November. *See* E-mail from R. Hull to J. Young (Nov. 27, 2008) [EXAM10172908] ("I am still very confident a GM loan, a bondex and a BHC will come together—mostly [because] it is abundantly logical and unavoidable given the alternatives.").

[851] Int. of M. Neporent, Feb. 6, 2013, at 205:18–206:3.

[852] *See* FRB, Press Release, *Order Approving Formation of Bank Holding Companies and Notice to Engage in Certain Nonbanking Activities* (Dec. 24, 2008), http://www.federalreserve.gov/newsevents/press/orders/orders 20081224a1.pdf. More specifically, the FRB approved the application of both AFI and of IB Finance (the direct parent of Ally Bank) under section 3 of the Bank Holding Company Act, 12 U.S.C. § 1842. *See id.* at 13; *see also* GMAC LLC, Current Report (Form 8-K) (Dec. 24, 2008).

[853] *See, e.g.*, Int. of T. Marano, Nov. 26, 2012, at 157:1–21 (noting regulators had never let a subsidiary of a bank holding company file for bankruptcy); Int. of T. Rowe, Dec. 7, 2012, at 37:15–17 ("I was one of the receivers of the call and I recall running out of my office to celebrate . . . ."); Int. of S. Ramsey, Dec. 10, 2012, at 143:7–18 ("I remember where I was when I got the call."); Int. of J. Lombardo, Sept. 17, 2012, at 107:4–6 ("We'd gotten bank holding company status. This was a big win. This was going to put us on solid footing.").

> justify expeditious action on this proposal in accordance with
> the provisions of the BHC Act and the Board's regulations.[854]

In connection with the conversion of Ally Bank from an industrial bank to a commercial bank, and the approval of AFI's bank holding company status, it became necessary to revise the ownership structure of AFI, since under the Bank Holding Company Act and the FRB order, GM and the Cerberus investors were permitted to have no more than between 7.5% to 10% of voting and total equity interest. The FRB order outlined the elements of this requirement, and the commitments by GM and Cerberus to comply therewith.[855] The FRB order included additional elements of a "passivity commitment" whereby, inter alia, "Cerberus employees and consultants would cease providing services to, or otherwise functioning as dual employees of, [AFI], and neither Cerberus nor any affiliated entity will have any advisory relationships with [AFI] or any investor regarding the vote or sale of shares or the management or policies of [AFI] or [Ally] Bank."[856] Cerberus agreed that it would not directly or indirectly "[e]xercise or attempt to exercise a controlling influence over the management or policies of [AFI] or any of its subsidiaries."[857] Cerberus employees resigned from the ResCap Board,[858] and Cerberus reduced its AFI Board membership to one director (initially, Steve Feinberg); Cerberus was also permitted to designate Tessler as an AFI "board observer" on behalf of Cerberus investors.[859]

Shortly after the approval under the Bank Holding Company Act, the U.S. Treasury announced its initial $5 billion TARP investment in AFI.[860] AFI received this first tranche (as it turned out) of TARP funding from the U.S. Treasury on or about December 30, 2008, in

---

[854] FRB, Press Release, *Order Approving Formation of Bank Holding Companies and Notice to Engage in Certain Nonbanking Activities* (Dec. 24, 2008), at 2 (citations omitted), http://www.federalreserve.gov/ newsevents/press/orders/orders20081224a1.pdf.

[855] *Id.* at 5–7.

[856] *Id*. at 7; *see also* FRB, 2009 Fed. Res. Interp. Ltr. LEXIS 19, at App. (Mar. 24, 2009).

[857] FRB, 2009 Fed. Res. Interp. Ltr. LEXIS 19, at App. (Mar. 24, 2009).

[858] Marano's secondment to ResCap was terminated, and he became a direct employee of AFI, continuing to serve as ResCap's CEO and Chairman of the ResCap Board. *See* Separation and General Release Agreement, dated Apr. 30, 2009 [CCM00552554].

[859] *See* FRB, 2009 Fed. Res. Interp. Ltr. LEXIS 19, at App. (Mar. 24, 2009).

[860] U.S. Treasury, Press Release, *Treasury Announces TARP Investment in GMAC* (Dec. 29, 2008), http://www.treasury.gov/press-center/press-releases/Pages/hp1335.aspx. The Term Sheet, Securities Purchase Agreement, and related documents are available on the U.S. Treasury's website at http://www.treasury.gov/ initiatives/financial-stability/TARP-Programs/automotive-programs/Documents/GMAC%20Agreement%20 Dated%2029%20December%202008.pdf.

exchange for preferred membership interests and equity warrants.[861] Ultimately, additional TARP funds would be provided to AFI in May and December 2009, for a total government investment of roughly $18 billion.[862]

There was nothing explicit in either the approval of bank holding company status, or in the documentation associated with the TARP investment, that called upon or prohibited AFI from using TARP funds to support ResCap. Jerry Lombardo said: "[I]t wasn't like the money came into [AFI] and [AFI] cut a check to ResCap. ResCap didn't get any money."[863] Rather, he observed, AFI would "be in better financial shape to potentially provide" support to ResCap.[864] Ramsey pointed out that, inasmuch as money is fungible, no dollar can be traced directly from TARP to ResCap.[865] But, he said, "we had $5 billion in additional cash and capital . . . [s]o clearly, that had a long term impact on ResCap in that it increased the flexibility of the holding company to support ResCap."[866] Similarly, Independent Director Smith expressed no view as to whether TARP enabled AFI to support ResCap,[867] but observed that AFI "got billions of dollars in TARP support and [AFI] supported us with billions."[868] And Marano believed that in seeking TARP funds, AFI took into account ResCap's needs, and that when the funds were received "[t]hey gave us what was needed as it was deemed necessary."[869]

---

[861] *See* E-mail from R. Hull (Dec. 30, 2008) [EXAM10807243]; *see also* GMAC LLC, Current Report (Form 8-K) (Jan. 2, 2009), at 2–3; GMAC LLC, Annual Report (Form 10-K) (Feb. 27, 2009), Item 5.

[862] The figure is inclusive of a loan of $884 million to GM on Dec. 29, 2008, for participation in AFI's December 2008 bond exchange. *See* CONGRESSIONAL OVERSIGHT PANEL, JANUARY OVERSIGHT REPORT: AN UPDATE ON TARP SUPPORT FOR THE DOMESTIC AUTOMOTIVE INDUSTRY (Jan. 13, 2011), at 74–76, http://cybercemetery.unt.edu/archive/cop/20110402010325/http://cop.senate.gov/documents/cop-011311-report.pdf.

[863] Int. of J. Lombardo, Sept. 17, 2012, at 291:13–16.

[864] *Id.* at 291:10–11. Lombardo also observed that it was the "[AFI] family . . . receiving money." *Id.* at 106:25–107:1.

[865] Int. of S. Ramsey, Dec. 10, 2012, at 104:20–105:11 ("[T]o the extent some of that cash 'found its way' into ResCap . . . [i]t was not because you followed a line. It was because at some point in the future of [AFI], it determined that there was an amount of support it wanted to provide ResCap."); *id.* at 110:24–111:1 ("[F]unds within a company of that nature are fungible.").

[866] *Id.* at 103:7–12.

[867] Smith said that "I honestly don't know if [AFI] would have supported us or not without that money" nor did he know whether it would have had the ability to do so. Int. of E. Smith, Nov. 30, 2012, at 36:22–37:2.

[868] *Id.* at 34:23–35:14.

[869] Int. of T. Marano, Nov. 26, 2012, at 205:20–206:2. A 2009 UBS and Lazard strategy presentation mentions "TARP capital allocated to the mortgage business." UBS and Lazard Project Scout II Presentation, dated July 2009, at RC40010740 [RC40010645]. In respect of this reference, Marano thought "it would be interesting to know if TARP funds were allocated specifically." Int. of T. Marano, Nov. 26, 2012, at 252:8–11; *see also* CONGRESSIONAL OVERSIGHT PANEL, MARCH OVERSIGHT REPORT: THE UNIQUE TREATMENT OF GMAC UNDER THE TARP (Mar. 10, 2010), at 41, http://cybercemetery.unt.edu/archive/cop/20110402042135/http://cop.senate.gov/documents/cop-031110-report.pdf ("[AFI]'s contributions to ResCap would not have been possible . . . had [AFI] not received TARP assistance.").

In February 2010—by which time there had been two additional TARP investments in AFI and a recapitalization by AFI of ResCap at the end of 2009 (addressed in Section III.I)— both AFI CEO Michael Carpenter and CFO Hull testified before the Congressional Oversight Panel.[870] In his written submission to the Panel, Hull stated that the TARP infusions had "allowed our subsidiary . . . ResCap . . . to continue servicing approximately three million residential mortgage loans and assisted approximately 500,000 borrowers [to] avoid risk of imminent default or foreclosure."[871]

The Congressional Oversight Panel expressed skepticism over reasoning offered by U.S. Treasury officials in support of the initial and subsequent decisions to support AFI.[872] Notably, it is unclear that supporting or saving ResCap, per se, was among those reasons: "Treasury has stated that . . . it regarded ResCap as 'marginal, at best' as a factor in the decision to support [AFI]."[873] In an e-mail, however, Tessler opined that "Rescap [sic] was one of the significant reasons the [FRB] and FDIC decided to support [AFI] in becoming a BHC."[874]

Little more than a week after the initial receipt of TARP funds, AFI issued a public statement of support for ResCap, announcing as follows in a disclosure on January 8, 2009:

> In response to various questions that have come to [AFI's] . . . attention, [AFI] reiterated in an announcement that Residential Capital, LLC ("ResCap") is an important subsidiary of [AFI], and [AFI] has made significant progress in reshaping ResCap to better align it with current market conditions. [AFI] stated that it believes that the support it has provided to ResCap to date was in the best interests of [AFI] stakeholders. It further stated that if ResCap were to need additional support, [AFI] would provide that support so long as it was in the best interests of [AFI]

---

[870] *See* E-mail from M. Lieber (Mar. 8, 2010) [ALLY_0227856] (including attached February 25, 2010 draft transcripts).

[871] WRITTEN STATEMENT OF ROBERT S. HULL, GMAC CHIEF FINANCIAL OFFICER, GMAC FINANCIAL SERVICES, BEFORE THE CONGRESSIONAL OVERSIGHT PANEL, Feb. 25, 2010, at 1–2, http://cybercemetery.unt.edu/archive/cop/20110402012141/http://cop.senate.gov/documents/testimony-022510-hull.pdf. In the same statement, Hull described AFI's actions in the fourth quarter of 2009 as "minimizing further adverse effects on [AFI] related to ResCap." *Id.* at 6.

[872] *See* CONGRESSIONAL OVERSIGHT PANEL, MARCH OVERSIGHT REPORT: THE UNIQUE TREATMENT OF GMAC UNDER THE TARP (Mar. 10, 2010), at 78–79, http://cybercemetery.unt.edu/archive/cop/20110402042135/http://cop.senate.gov/documents/cop-031110-report.pdf; *see also* CONGRESSIONAL OVERSIGHT PANEL, JANUARY OVERSIGHT REPORT: AN UPDATE ON TARP SUPPORT FOR THE DOMESTIC AUTOMOTIVE INDUSTRY (Jan. 13, 2011), at 71–103, http://cybercemetery.unt.edu/archive/cop/20110402010325/http://cop.senate.gov/documents/cop-011311-report.pdf.

[873] CONGRESSIONAL OVERSIGHT PANEL, MARCH OVERSIGHT REPORT: THE UNIQUE TREATMENT OF GMAC UNDER THE TARP (Mar. 10, 2010), at 79, http://cybercemetery.unt.edu/archive/cop/20110402042135/http://cop.senate.gov/documents/cop-031110-report.pdf.

[874] E-mail from L. Tessler to M. Carpenter (Dec. 3, 2009), at CCM00065542 [CCM00065540].

> stakeholders. While there can be no assurances, [AFI's] recently approved status as a regulated bank holding company has increased the importance of its support for ResCap.[875]

Hull recalled that this announcement was made because ResCap was receiving multiple inquiries to the effect of "what happens to me now, to ResCap,"[876] and Hull also observed that this announcement had "the benefit of being the truth."[877] He recalled, further:

> The thing I can remember the most is that we didn't want . . . it would not be a good fact pattern for the government to grant us a bank holding company [and] for us to have the very first event be a bankruptcy filing of one of our active businesses. . . . So, we hadn't intended to bankrupt it all along. We certainly evaluated, but our actions showed that we were committed to supporting it. . . . I think that support just got stronger here.[878]

The same qualified statement of support appears in AFI's 2008 Annual Report, although AFI also disclosed therein that since "there are currently no commitments or assurances for future funding and/or capital support . . . there remains substantial doubt about ResCap's ability to continue as a going concern."[879]

Other significant end-of-the-year developments in connection with recapitalizing Debtors and AFI were announced as well. As part of the required capital raise in connection with obtaining bank holding company approval,[880] on December 29, 2008, AFI announced that GM and Cerberus contributed to AFI their $750 million subordinated participation in the Secured Revolver Facility in exchange for new common equity of AFI.[881] The Secured Revolver Facility

---

[875] Residential Capital, LLC, Current Report (Form 8-K) (Jan. 8, 2009).

[876] Int. of R. Hull, Feb. 7, 2013, at 185:11–23.

[877] *Id.* at 185:23–24; *see also* Minutes of a Special Meeting of the Board of Residential Capital, LLC, Dec. 29, 2008, at RC40005947 [RC40005652] ("Mr. Marano remarked that [AFI] views ResCap as an important component of its bank holding company platform and that the Company offers diversification to [AFI's] business model.").

[878] Int. of R. Hull, Feb. 7, 2013, at 187:6–24.

[879] *See* GMAC LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 113.

[880] *See* Capital Raising Actions Presentation, dated Dec. 28, 2008, at ALLY_PEO_0002703 [ALLY_PEO_0002659] ("Contribution will be to [AFI] without any current plan to downstream the loan to ResCap").

[881] GMAC LLC, Current Report (Form 8-K) (Jan. 2, 2009), Item 1.01.

commitment was reduced to $3 billion as of December 31, 2008.[882] Cerberus and GM also made an equity investment of $1.25 billion in AFI as of December 29, 2008.[883]

And, on December 31, 2008, AFI announced the completion of its private exchange offer and cash tender offer, inter alia, to purchase and/or exchange certain outstanding ResCap notes.[884] Specifically, approximately $3.7 billion in aggregate principal amount of the outstanding ResCap notes were validly tendered and accepted. On December 31, 2008, AFI tendered $937.4 million par value ResCap bonds to ResCap for retirement, resulting in: (1) gain on debt extinguishment of $756.6 million; (2) common equity increase of $219.9 million; and (3) write down of bond carrying value of $976.5 million.[885] The AFI private debt exchange and cash tender offers generated pretax gains of $11.5 billion for AFI (inclusive of the ResCap gain), representing the difference between carrying cost of the tendered notes and fair value of the new notes.[886]

On January 21, 2009, Young provided a presentation for Hull, addressing ResCap's financial condition as of the end of fourth quarter 2008.[887] The "Executive Overview" included the following data and observations:

> Execution of strategic initiatives are continuing to reduce the balance sheet and lower operating costs; however, significant losses continue, driven by high credit-related costs associated with legacy assets and low/negative net interest margins while revenue opportunities are limited to sales of conforming mortgage product and the performance of the servicing asset.[888]

\*     \*     \*

---

[882] *Id.* at 8; *see also* Section V.E.3 (addressing the Secured Revolver Facility).

[883] *See* Opinion Letter from Morgan Stanley to the AFI Board (Jan. 16, 2009) [MS-RESCAP_024297]. Morgan Stanley had assisted AFI in efforts to obtain $2 billion of "fresh" equity from unrelated parties, without success. *See, e.g.*, Morgan Stanley Presentation for AFI Board, dated Dec. 8, 2008, at MS-RESCAP_024636–47 [MS-RESCAP_024630].

[884] GMAC LLC, Current Report (Form 8-K) (Jan. 2, 2009), at 8.

[885] Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 87.

[886] GMAC LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 29.

[887] *See* ResCap CFO Presentation, dated Jan. 21, 2009 [EXAM10750436] (attached to E-mail from M. Wright (Jan. 20, 2009) [EXAM10750435]).

[888] *Id.* at EXAM10750437.

> Fourth quarter equity infusions of $1.67 billion ($690 million of
> MSR debt; $977 [million] of bonds received in exchange offer)
> required to maintain capital covenants resulted in a recorded
> gain of $756.5 million in the quarter.[889]

In the "Capital, Liquidity and Related Disclosure" section, Young noted that "ResCap capital and cash needs [are] expected to continue to be significant in 2009," and that "Management is developing 'self-help' plans to address cash and capital needs for 2009."[890] The report observed, however: "it is unlikely that ResCap will be able to demonstrate sufficiently firm 'self-help' actions for the next twelve months to avoid 'substantial doubt' disclosures without a firm commitment of financial support from [AFI]."[891]

Finally, on January 30, 2009, the 2009 Bank Transaction was concluded.[892] AFI exercised its option to convert its 806,344 ResCap Preferred Interests into the same number of IB Finance Preferred Interests.[893] In addition, AFI purchased all of ResCap's remaining IB Finance Class M Shares.[894] According to the Membership Interest Purchase Agreement filed by ResCap, consideration for the transaction was the contribution to ResCap of its 8.5% Senior Secured Notes acquired by AFI in its recent bond exchange, notes having a face amount of approximately $830.5 million and accrued interest, and fair value of approximately $608.5 million.[895] Although not reflected in the Membership Interest Purchase Agreement,[896]

---

[889] *Id.*

[890] *Id.* at EXAM10750440.

[891] *Id.; see also* GMAC LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 34 ("As a result of the difficult market conditions and resulting impact on ResCap's business, ResCap is likely to continue to rely on [AFI] for support in the near-term.").

[892] *See* Section V.A.2.c (examining the 2009 Bank Transaction).

[893] Residential Capital, LLC, Current Report (Form 8-K) (Feb. 3, 2009), Item 1.01. As noted in Section III.G, AFI had obtained the convertible preferred shares in March and June 2008, in exchange for its contribution to Debtors of certain bonds issued by Debtors which AFI has purchased on the open market.

[894] *Id.; see also* Action by Written Consent of the Board of Directors of Residential Capital, LLC, dated Jan. 30, 2009, at RC40005965 [RC40005949] (reflecting consent of the ResCap Board and of its Independent Directors, having taken note of the fairness opinion by Goldin Associates); January 26 Goldin Letter [RC00027940].

[895] Residential Capital, LLC, Current Report (Form 8-K) (Feb. 3, 2009), Ex. 10.1, at 8 (Membership Interest Purchase Agreement, § 2.2); *see also* Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at Note 25; ResCap Support and IB Finance Transaction Presentation, dated Jan. 30, 2009, at ALLY_PEO_0002114-17 [ALLY_PEO_0002000].

[896] Residential Capital, LLC, Current Report (Form 8-K) (Feb. 3, 2009), Ex. 10.1.

certain documents referred to other consideration, i.e., previous debt forgiveness[897] and the sixty-day extension of the maturity of the Initial Line of Credit Facility.[898] ResCap recognized a gain on extinguishment of $510.9 million and additional consideration of $383.4 million,[899] i.e., Debtors' TNW[900] increased by approximately $894 million (the carrying value of the extinguished debt).[901]

Upon completion of the sale, ResCap no longer had any ownership interest in Ally Bank, since it was (and is) wholly owned by IB Finance. IB Finance, including its subsidiary Ally Bank, was therefore deconsolidated by ResCap.[902] Marano recalled that in light of ResCap's economic circumstances, he was pleased to sell Ally Bank, and more than satisfied with the transaction:

> You know, when we sold the bank, that did come into my mind. Was it to our advantage or not to retain our interest in the bank? And then I started looking at the losses coming out of the bank portfolio and I was skeptical that we could ever make enough money to cover the bank losses. So when I was afforded the opportunity to sell—to get economic benefit from a money

[897] *See* Letter from R. Hull to T. Marano (Sept. 30, 2008) [ALLY_0141114]; Letter from R. Hull to T. Marano (Dec. 31, 2008) [ALLY_0141115]. Although not reflected in the January 30, 2009 Membership Interest Purchase Agreement, these documents characterize as additional consideration the debt forgiveness granted by AFI to ResCap as of September 30, 2008, and as of December 31, 2008.  In the course of the Investigation, Hull was not able to clarify the matter of debt forgiveness in the context of the transfer of ResCap's interest in IB Finance: "So I don't have any clarity for you. I just do remember doing this and I remember thinking, 'This'll go toward that purchase.' It's part of it. Whether it was formally memorialized, I can't say. I suspect it wasn't." Int. of R. Hull, Feb. 7, 2013, at 174:4–9. Rowe said that Hull's letters were, if nothing more, good optics: "[I]t's a construct meant to keep people happy. . . . But optically to certain members of the [AFI] board they felt this was valuable and it gave them more comfort in supporting the transaction." Int. of T. Rowe, Dec. 7, 2012, at 186:10–21; *see also* ResCap Support and IB Finance Transaction Presentation, dated Jan. 30, 2009, at ALLY_PEO_0002115 [ALLY_PEO_0002000] ("This consideration is in addition to the capital contributions made to ResCap on 12/31/08 and 9/30/08 which represented a fair market value of approximately $423 million.").

[898] The contemporaneous granting by AFI of an extension (to March 31, 2009) of the Initial Line of Credit Agreement appears to have been contingent on completion of the 2009 Bank Transaction. *See, e.g.*, Draft GMAC Bank Transaction Term Sheet, dated Jan. 23, 2009, at RC40011108 [RC40011078] (describing the sixty-day extension as a "simultaneous transaction" to be executed on the closing date of the 2009 Bank Transaction). Although not reflected in the January 30, 2009 Membership Interest Purchase Agreement as consideration, the extension is referenced in the declarations thereof. *See* Residential Capital, LLC, Current Report (Form 8-K) (Feb. 3, 2009), Ex. 10.1, at 1.

[899] *See* Residential Capital, LLC, Quarterly Report (Form 10-Q) (May 11, 2009), at 56.

[900] For this purpose, TNW was defined as ResCap's consolidated equity, excluding any tangible assets and excluding any equity in Ally Bank to the extent such equity was included in ResCap's consolidated balance sheet. *See id.* at 8.

[901] *See id.* at 12.

[902] *See id.*

losing portfolio I was like done. You know, and then we had warehouse financing provided by the bank for our warehouse customers. So, to me it was a good trade.[903]

   The Independent Directors obtained a fairness opinion from Goldin Associates in advance of closing the transaction,[904] and it was supplemented on the day of closing.[905] The Membership Interest Purchase Agreement incorporated a sixty-day post-closing marketing period,[906] during which time ResCap had the opportunity to seek a third-party buyer on better

─────────────────────────

[903] Int. of T. Marano, Nov. 26, 2012, at 111:5–21. Although the sequence of events suggests otherwise, Marano also said that AFI needed full ownership of Ally Bank in order to facilitate the bank holding company application. *See* Int. of T. Marano, Feb. 27, 2013, at 185:19–21. Another view, which seems plausible but incomplete, was that expressed by Ramsey: "an outright acquisition . . . would have been in [AFI's] interest to simplify the ownership structure of the bank . . . with regard to regulators." Int. of S. Ramsey, Dec. 10, 2012, at 141:7–13 (i.e., even though the "tracking shares" did not have "a great deal of economic value").

[904] *See* January 26 Goldin Letter [RC00027940]; *see also* Goldin Associates Presentation to The Committee of Independent Members of the Board of Directors of Residential Capital, LLC Regarding The GMAC Bank Transaction with GMAC, LLC, dated Jan. 22, 2009 [GOLDIN00128045].

[905] *See* January 30 Goldin Letter [RC00027949] (noting that the market price of the 8.5% second lien notes constituting the "principal[ ]" consideration at closing may differ from that as of the date of the earlier opinion letter).

[906] The minutes reflect that ResCap's Board had directed in December 2008 that management seek other buyers. *See* Minutes of a Special Meeting of the Board of Residential Capital, LLC, Dec. 29, 2008, at RC40005948 [RC40005652]. Marano said he had "worn out a lot of shoe leather" doing so. Int. of T. Marano, Nov. 26, 2012, at 39:7–11. UBS was engaged in such efforts, as directed by Marano, as early as October 2008. *See, e.g.*, Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 30, 2008, at RC40005897 [RC40005652] ("Mr. Benett reported on preliminary discussions with certain banks and private equity firms regarding potential opportunities to enter into a strategic alliance or arrangement with ResCap."). UBS viewed that assignment as "a fishing expedition," and had found "[n]o interest." Int. of H. Benett, Mar. 7, 2013, at 38:9, 39:24–25; *see also* Int. of L. Hall, Nov. 29, 2012, at 240:20–22 ("Corey [Pinkston] and I were pretty big proponents of the after-marketing period that ResCap would have available to it."); *id.* at 265:15–19 ("We wanted to ensure ResCap got the best value for their assets, and if we needed to pay more for the IB Financing, so be it. I think it was just an extra check-the-box to make sure that it was a fair transaction."); Int. of D. DeBrunner, Sept. 13, 2012, at 207:17–20 ("So that . . . was to protect ResCap's interests. So as a Board member those were important considerations for me to make sure that it was a fair, arm's length transaction.").

terms; AFI had a right of first refusal should ResCap have found a willing buyer.[907] UBS was engaged to conduct the marketing effort.[908]

UBS reported that it found no interest in purchasing the IB Finance Class M Shares among the banks, private equity firms and other private investors, insurance companies, and special purpose acquisition companies with which it engaged.[909] Marano was not surprised at this result; he described it as an effort to sell "a 51% interest with non-voting shares in a loan portfolio that . . . was several billion dollars of loans and it was hemorrhaging hundreds of millions of dollars a year."[910] Ramsey's view was similar: "I can tell you what my opinion of what their success was going to be. And it was next to nil because there was not going to be any market associated value with those shares."[911] Both Marano and Ramsey

---

[907] Residential Capital, LLC, Current Report (Form 8-K) (Feb. 3, 2009), at 1.

[908] *See* Minutes of a Special Meeting of the Board of Residential Capital, LLC, Jan. 23, 2009, at RC40005963–64 [RC40005949]; Draft GMAC Bank Transaction Term Sheet, dated Jan. 23, 2009, RC40011107–08 [RC40011078] (the term sheet states it is a draft, but the context of the January 23, 2009 meeting reflects the terms as final); *see also* UBS Presentation on GMAC Bank Tracking Stock Overview, dated Jan. 2009, at RC40011109–14 [RC40011078]. As noted, UBS had evidently been engaged in such marketing already, but it apparently viewed this assignment as a renewed effort. *See, e.g.*, Memorandum, UBS Call re GMAC Bank, dated Jan. 7, 2009 [GOLDIN00090358] (Goldin Associates to file: VanDerKnapp of UBS "was just getting started and had been on the job for less than 24 hours"). According to Benett of UBS, the presentation materials reflect only "discussion points" for its marketing efforts. Int. of H. Benett, Mar. 7, 2013, at 86:25–87:4. Documents suggest that UBS proposed to solicit investments in AFI as part of the same process, but Hull told Marano to decline the suggestion. *See* E-mail from R. Hull (Jan. 20, 2009) [CCM00503395].

[909] *See* Minutes of a Special Meeting of the Board of Residential Capital, LLC, Jan. 23, 2009, at RC40006091–92 [RC40005949]; *see also* Letter from H. Benett to T. Marano [CCM00257945] ("[T]hese prospective investor[s] have been unwilling to pursue a transaction further."). The letter is undated but what appears to be an earlier draft is dated April 2, 2009. *See* E-mails between J. Nance and H. Benett (Apr. 2, 2009) [UBS-RESCAP-0052371]. The UBS letter is directed to Marano's attention but is addressed to "GMAC." Benett could not say why. Int. of H. Benett, Mar. 7, 2013, at 94:20–23. In any event, Benett said that such "go shop" efforts are rarely successful, because "interest typically goes way down after a deal's already been struck." *Id.* at 90:3–4.

[910] Int. of T. Marano, Nov. 26, 2012, at 38:11–15. Marano said that the "general consensus was, 'You'd have to pay us to take this thing because it has no voting rights and it keeps losing money.'" *Id.* at 38:17–20.

[911] Int. of S. Ramsey, Dec. 10, 2012, at 145:20–23. Ramsey believed that the non-voting nature of ResCap's interest in IB Finance was no more than "a footnote" to the valuation of ResCap's interest. *Id.* at 156:2–7. Hull, AFI's CFO, said: "I'm sure the voting status . . . informs value at some level. It can't not." Int. of R. Hull, Feb. 7, 2013, at 169:6–8. UBS (which was engaged in marketing, not valuation) had highlighted this factor in the discussion materials it presented to the ResCap Board on January 23, 2009. See UBS Presentation on GMAC Bank Tracking Stock Overview, dated Jan. 2009, at RC40011109–14 [RC40011078]. Benett said that "we would have given them advice that non-voting stock is going to be harder to sell." Int. of H. Benett, Mar. 7, 2013, at 78:21–24. Although the discussion points prepared by UBS for the ResCap Board intimate that "add[ing] voting rights" or "restructur[ing] the profit rights" would enhance marketability of the interests, Benett had no specific recollection of such considerations in the context of UBS marketing efforts or in discussions with ResCap's Board in general or with its Independent Directors. *Id.* at 86:15–88:14.

(among others) were on the distribution list for an October 31, 2008 presentation by Goldman Sachs which had opined: "Despite limited rights and other issues, third party interest in Class M Common Units still possible."[912]

In this regard, Seymour Preston, one of the professionals from Goldin Associates who provided the fairness opinion, said that Goldin Associates did not give any thought at the time to what a third party might have paid for ResCap's interest in the Ally Bank holding company,[913] but surmised that it would have been "well below" the consideration obtained from AFI, in part because the shares were "non-voting, had no controlling capabilities, and were highly illiquid."[914]

Notwithstanding that limited recollection, it is evident that in evaluating the fairness of the transaction, Goldin Associates took into account the fact that the IB Finance Class M Shares owned by ResCap conferred only limited rights. Goldin Associates' presentation noted that "[t]he potential fair value of the Class M Common Interests is in large measure a function of the rights conferred upon holders of those interests,"[915] and went on to observe: "In fact, the rights associated with the Class M Common Interests are significantly limited; such limitations pose significant risks to any third party buyer of the Class M Common Interests."[916]

Accordingly, Goldin Associates reported that it applied less weight to certain comparable transactions considered in connection with the valuation process associated with preparation of the fairness opinion:

> Goldin determined to underweight the Comparable Company analysis . . . . Shareholders of the public companies have greater protections, including the right to vote . . . . Goldin determined to underweight the Precedent Transactions analysis because the transactions analyzed include control / strategic premiums that are not relevant to the limited rights of the Class M Interests.[917]

---

[912] Goldman Sachs Discussion Materials on AFI, Oct. 31, 2008, at ALLY_0259085 [ALLY_0259003]. The thought process of Goldman Sachs at the time was that a potential buyer may have thought market expectations of losses were overstated. *See* Int. of R. Hutchinson, Mar. 27, 2013, at 35:19–36:7.

[913] Int. of S. Preston, Jr., Feb. 15, 2013, at 113:19–25.

[914] *Id.* at 113:3–8; *see also* Goldin Associates Presentation to The Committee of Independent Members of the Board of Directors of Residential Capital, LLC Regarding The GMAC Bank Transaction with GMAC, LLC, dated Jan. 22, 2009, at 9 [GOLDIN00128045] ("tracking interests . . . are not readily marketable"); Int. of S. Preston, Jr., Feb. 15, 2013, at 135:9–13 (stating that one reason the shares were not readily marketable is that they were non-voting).

[915] Goldin Associates Presentation to The Committee of Independent Members of the Board of Directors of Residential Capital, LLC Regarding The GMAC Bank Transaction with GMAC, LLC, dated Jan. 22, 2009, at 35 [GOLDIN00128045].

[916] *Id.*

[917] *Id.* at 36; *see also* E-mail from S. Preston, Jr. (Dec. 30, 2008) [GOLDIN00126262] (stating "Discounts for lack of control range from 20% to 65%, or even higher").

On November 14, 2008, prior to approval of bank holding company status and the subsequent sale of ResCap's interest in Ally Bank, the AFI Board had adopted a resolution delegating to the Bank Board the authority to change the name of the bank (then known as GMAC Bank) should the Bank Board determine it was necessary to do so "to preserve or enhance the reputation of GMAC Bank and better enable GMAC Bank to maintain liquidity and continue operations."[918] On November 19, 2008, the Bank Board delegated to the bank's President the authority to change the name of the bank.[919] Following completion of the consolidation of AFI's bank ownership, the Bank Board ratified a change of the name of the corporation to "Ally Bank."[920] The moniker "Ally Bank" was rolled out to the public on May 15, 2009, with the assertion that the rebranded institution would "take banking in a new direction."[921]

As 2008 drew to a close, ResCap "was still very dependent on its parent for capital support and liquidity support."[922] ResCap's Preliminary Fourth Quarter and Full-Year Financial Results, released on February 3, 2009, announced a fourth quarter net loss of $981 million (approximately $60 million more than the same period in 2008) and a net loss for the year of $5.6 billion—exceeding its 2007 loss by $1.3 billion.[923] The report noted AFI's fourth quarter $1.67 billion "contribution" to ResCap, including $690 million of debt forgiveness under the Secured MSR Facility, and $976 million of ResCap bonds. It advised that "[a]s a result of these actions, ResCap remained in compliance with its tangible net worth covenants at Dec. 31, 2008."[924]

With respect to future support, and echoing AFI's January 8, 2009 statement of support for ResCap, ResCap's February 3, 2009 filing advised:

> As previously disclosed, if ResCap were to need additional support, [AFI] would provide that support so long as it was in the best interest of [AFI] stakeholders. While there can be no assurances, [AFI's] recently approved status as a regulated bank holding company has increased the importance of its support for ResCap.[925]

---

[918] Minutes of a Special Meeting of the Board of GMAC LLC, Nov. 14, 2008, at ALLY_PEO_0001326 [ALLY_PEO_0001009].

[919] *See* Minutes of a Regular Meeting of the Board of GMAC Bank, Nov. 19, 2008, at ALLY_PEO_0001635–36 [ALLY_PEO_0001488].

[920] *See* Minutes of a Regular Meeting of the Board of GMAC Bank, Apr. 21, 2009, at ALLY_PEO_0018213–14 [ALLY_PEO_0018165]; *see also* Rebranding GMAC Bank Presentation, dated Jan. 30, 2009, at ALLY_PEO_0002060–90 [ALLY_PEO_0002000].

[921] *See* AFI, Press Release, *Ally Bank Challenges Banking Industry with "Straight Talk" for Customers* (May 15, 2009), http://media.ally.com/index.php?s=43&item=328.

[922] Int. of C. Dondzila, Sept. 27, 2012, at 149:9–12.

[923] *See* Residential Capital, LLC, Current Report (Form 8-K) (Feb. 3, 2009), Ex. 99.1.

[924] *Id.*

[925] *Id.*

On February 3, 2009, Hull (together with Young, Muir, and others) conducted the fourth quarter 2008 earnings conference call to "go over [AFI] and ResCap's fourth quarter 2008 results."[926] In his remarks, Hull described as "critical," the federal bank holding company approval and $5 billion TARP investment received at the end of December 2008.[927]

In his opening narrative, Hull said that the funds permitted AFI to immediately "expand[ ] our consumer auto lending," and that while the TARP investment was as yet "not fully used or applied," the funds had to date been put "toward consumer auto lending and toward cash required in our bond exchange."[928] Asked by one participant in the conference call to address "what actions [you are] taking with the BHC status to improve [ResCap's] profitability," Hull stated that "there are open discussions going on and we think we have as good a position as anybody to help that business out," but he declined to give a more specific response.[929]

---

[926] Transcript of GMAC Q4 2008 Earnings Call (Feb. 3, 2009), at 1 (available from Bloomberg Transcript). Hull specifically indicated in his statement that he would be addressing ResCap's results as well. It was not the practice of ResCap's management to hold a separate investor call. *See* Int. of R. Hull, Feb. 7, 2013, at 24:3–8.

[927] Transcript of GMAC Q4 2008 Earnings Call (Feb. 3, 2009), at 2 (available from Bloomberg Transcript).

[928] *Id.*

[929] *Id.* at 9.

## I.   THE POST-TARP PERIOD (2009–2010)

### 1.   ResCap's Financial Picture In 2009

In January 2009, ResCap was coming out of a year in which it had suffered a net loss of $5.6 billion, as compared to a $4.3 billion net loss in 2007, and a fourth quarter in which it had suffered a net loss of $981 million, as compared to the fourth quarter of 2007 when its net loss had been $921 million.[930]

ResCap blamed its revenue decline in 2008 on the domestic and European housing markets, funding costs, and adverse mortgage conditions in general, all of which continued to have an effect on ResCap's performance in 2009.[931] In addition, lower mortgage production during the fourth quarter of 2008—because of tight underwriting as well as "the closing of certain retail and wholesale lending channels, and lower net servicing fees"[932]—affected ResCap's domestic residential finance business. ResCap's declining asset values and its increasing losses and liabilities in the fourth quarter of 2008 led AFI to contribute $1.67 billion of equity to ResCap.[933] That figure included $690 million of debt forgiveness and $976 million (face value and accrued interest) of ResCap bonds that AFI contributed to ResCap in fourth quarter 2008, and which ResCap thereafter retired.[934] As a result of AFI's contributions, ResCap was in compliance with its consolidated TNW covenants as of December 31, 2008.

As 2009 dawned, experts made different negative economic forecasts for the coming year. The International Monetary Fund, for example, projected world economic growth in 2009 to be the slowest growth rate since World War II.[935] Other experts projected "by far the worst year for the global economy since the Great Depression."[936]

Across the economic landscape, pressures mounted in 2009, and efforts to stimulate the economy escalated. On February 17, 2009, President Obama signed a $787 billion stimulus

---

[930] *See* Residential Capital, LLC, Current Report (Form 8-K) (Feb. 3, 2009), Ex. 99.1 (providing preliminary financial results for fourth quarter 2008 and full year 2008).

[931] *See id.*

[932] *Id.*

[933] *See id.*

[934] *See id.*

[935] IMF, *World Economic Outlook Update* (Jan. 28, 2009), http://www.imf.org/exter nal/pubs/ft/weo/ 2009/update/01/index.htm.

[936] Simon Johnson, Testimony to the Senate Budget Committee Hearing on the Global Economy: Outlook, Risks, and the Implications for Policy, Peterson Institute for International Economics, Jan. 29, 2009, http://www.iie.com/publications/testimony/print.cfm?ResearchId=1111&doc=pub (predicting "a severe slump" of the global economy "with declining output in the near term and no clear turnaround in sight").

package.[937] On March 18, 2009, the FRB announced a decision to buy $1.2 trillion of government bonds and mortgage-related securities, including $200 billion of Fannie Mae and Freddie Mac debt.[938] The FRB's earlier, similar effort to stimulate the economy pushed 30-year fixed-rate mortgages down by one percentage point, and economic analysts anticipated that the FRB's additional investment would push interest rates down another one-half of one percent.[939]

On April 30, 2009, Chrysler filed for chapter 11 bankruptcy protection.[940] On June 1, 2009, GM also sought chapter 11 protection with $172 billion in debt and $82 billion in assets.[941]

> ### a. Rising Unemployment And Increasing Mortgage Delinquencies And Foreclosures Continued To Pressure The Mortgage And Capital Markets In 2009

By the end of the first quarter of 2009, the prognosticators were proven right about just how bad the economy had become. The U.S. saw the fifth consecutive month of job losses totaling 600,000 or more. Unemployment, which had been at a discouraging 7.6% in January 2009, climbed to 8.5% in March 2009.[942] By October 2009, unemployment peaked at 10.2%, the highest unemployment rate since 1983, and an increase from 5.3% in December 2007.[943] Rising unemployment affected other parts of the economy, particularly the housing market.

In the U.S., high unemployment led to record numbers of homeowners being pushed into delinquency or foreclosure during the first quarter of 2009. The Mortgage Bankers

---

[937] *See* Laura Meckler, *Obama Signs Stimulus Into Law,* WALL ST. J., Feb. 18, 2009, http://online.wsj.com/article/SB123487951033799545.html.

[938] *See* Neil Irwin, *Fed To Pump $1.2 Trillion Into Markets*, WASH. POST, Mar. 19, 2009, http://www.washingtonpost.com/wp-dyn/content/article/2009/03/18/AR2009031802283.html.

[939] *See id*.

[940] Jim Ruttenberg & Bill Vlasic, *Chrysler Files to Seek Bankruptcy Protection*, N.Y. TIMES, Apr. 30, 2009, http://www.nytimes.com/2009/05/01/business/01auto.html?pagewanted=all.

[941] Neil King & Sharon Terlep, *GM Collapses Into Government's Arms,* WALL ST. J., June 2, 2009, http://online.wsj.com/article/SB124385428627671889.html.

[942] CNN MONEY, *Job Loss: Worst in 34 Years*, Feb. 6, 2009, http://money.cnn.com/2009/02/06/news/economy/jobs_january/(comparing January job losses and unemployment statistics with other post-World War II periods); *see also* Donald L. Kohn, Vice-Chairman, FRB, *The Economic Outlook* (Apr. 20, 2009), http://www.federalreserve.gov/newsevents/speech/ kohn20090420a.htm (noting that the labor market and production data continued to deteriorate in first quarter 2009, but finding a little light in the darkness with respect to the housing market where "declines in sales and construction of single-family homes" seemed to have abated in the preceding two months "in part, perhaps, because of the low levels of mortgage interest rates and the greater affordability of housing").

[943] U.S. DEP'T OF LABOR, BUREAU OF LABOR AND STATISTICS, UNEMPLOYMENT IN OCTOBER 2009 (Nov. 10, 2009), http://www.bls.gov/opub/ted/2009/ted_ 20091110.htm.

Association estimated that 12.7% of mortgage loans were delinquent, an increase from 8% for the same quarter in 2008.[944] Foreclosures also increased year-to-year. For the full year ended December 2009, RealtyTrac reported 3,957,643 foreclosure filings, up 21% from 2008,[945] while the U.S. Census Bureau reported that subprime mortgage delinquencies during the same period increased from 19.9% to 25.5% and prime loan delinquencies increased from 4.3% to 5.4%.[946]

Consumer Confidence Index, after bottoming out at 26.9 during the first quarter of 2009, climbed to 53.6 by year-end.[947] In addition, the S&P/Case-Shiller home price appreciation index, which had declined more than 50 points from its 2006 peak, leveled off and stabilized during the second half of 2009.[948] The rate of new housing starts in 2009, at a seasonally adjusted annualized rate of 456,000,[949] was less than half of the 1.2 million housing starts in 2006. This had the combined effect of limiting both the number of homes on the market and the number of months any individual house was available for sale.[950] Mortgage lenders,

---

[944] *See* Renae Merle, *Mortgage Delinquency Reaches Record High*, WASH. POST, May 29, 2009, http://articles.washingtonpost.com/2009-05-29/business/36897739_1_foreclosure-crisis-foreclosure-prevention-foreclosure-rates.

[945] Daren Blomquist, *A Record 2.8 Million Properties Receive Foreclosure Notices in 2009,* undated, http://www.realtytrac.com/landing/2009-year-end-foreclosure-report.html (noting that "2.21 percent of all U.S. housing units (one in 45) received at least one foreclosure filing during the year, up from 1.84 percent in 2008, 1.03 percent in 2007, and 0.58 percent in 2006").

[946] U.S. CENSUS BUREAU, STATISTICAL ABSTRACT OF THE UNITED STATES: 2012, TABLE 1194, MORTGAGE ORIGINATIONS AND DELINQUENCY AND FORECLOSURE RATES: 1990 TO 2010, BANKING, FINANCE, AND INSURANCE 743, http://www.census.gov/compendia/statab/2012/tables/12s1194.pdf. The abstract is based on the National Delinquency Survey, which covers 45 million loans on one-to-four-unit properties, representing 80 to 85% of all 'first-lien' residential mortgage loans outstanding. The loans surveyed were reported by approximately 120 lenders, including mortgage bankers, commercial banks, and thrifts.

[947] *See* THE CONSUMER CONFIDENCE INDEX, JAN. 2009 TO DEC. 2009. *Id.* THE CONFERENCE BOARD, http://www.conference-board.org. Consumer Confidence in the United States is reported by The Conference Board. Historically, from 1967 until 2013, U.S. Consumer Confidence averaged 92.86 reaching an all-time high of 144.70 in January 2000 and a record low of 25.30 in February 2009. The Consumer Confidence Index is a barometer of the health of the U.S. economy from the perspective of the consumer. The Index is based on approximately 3,000 completed questionnaires reflecting consumers' perceptions of current business and employment conditions, as well as their expectations for the next six months regarding business conditions, employment, and income. The Consumer Confidence Index and its related series are among the earliest sets of economic indicators available each month and are closely watched as leading indicators for the U.S. economy. *See id.*

[948] S&P/CASE-SHILLER HOME PRICE INDICES 2009, A YEAR IN REVIEW, at Chart 3, http://www.cm egroup.com/trading/real-estate/files/SP-CSI-2009-Year-in-Review.pdf. The S&P/Case-Shiller index declined slightly during 2010 and 2011 before returning to 2009 levels in 2012. *Id.*; *see also* Section III.F.1.a (reviewing charts relevant to home price indices for the ten-year period ending 2012).

[949] S&P DOW JONES INDICES: RESIDENTIAL REAL ESTATE INDICATORS—JANUARY 2010, http://us.spindices.com/indices/real-estate/sp-case-shiller-us-national-home-price-index.

[950] *Id.*

however, began to face new troubles in 2009 as the monoline insurers and government agencies suffered significant losses caused by the growing number of delinquencies and foreclosures and began to seek recourse against the lenders.[951]

### (1) Rising Mortgage Delinquencies Negatively Affected ResCap's MSR Assets And Servicing Platform, Making ResCap Increasingly Dependent On AFI

In early 2009, ResCap's liquidity portfolio—"cash readily available to cover operating demands from across [their] business operations and maturing obligations"—totaled only $0.5 billion.[952] ResCap was continuing to implement the restructuring plan that it had adopted in September 2008. That plan called for the reduction of ResCap's workforce by 60% (equaling approximately 5,000 employees) to achieve "estimated annual cost reductions of $410 million in compensation and benefits and a further $25 million of reduced rent and asset depreciation."[953] As 2008 came to a close, ResCap employed a total of 6,100 workers, which included 1,000 GMAC Home Services employees who were retained on ResCap's payroll through year-end 2008 as part of the GMAC Home Services sale transition agreement.[954] An additional 500 employees were given termination notices in 2008 and removed from ResCap's rolls in early 2009.[955] ResCap hired a limited number of additional personnel in the origination area during the second quarter of 2009 as a result of increased consumer demand for mortgages resulting from lower interest rates,[956] but by early 2010, it appears that ResCap had continued to reduce the size of their workforce overall.[957]

### (2) The Makeup Of The ResCap Board Changed During 2009

When 2009 began, the ResCap Board included AFI's David DeBrunner, Alvaro de Molina, and David Walker; Cerberus executives Joshua Weintraub, and Ronald Kravit; Independent Directors Karin Hirtler-Garvey and Ted Smith; and ResCap's CFO James Young, and Chairman and CEO, Thomas Marano. Kravit's and Weintraub's resignations were announced at the March 23, 2009 ResCap Board meeting. They said they had to resign from the ResCap Board because of rules and conditions associated with AFI obtaining bank holding

---

[951] *See, e.g.* Lorraine Woellert & Clea Benson, *Banks Resisting Fannie, Freddie Demands to Buy Back Mortgages*, BLOOMBERG, Nov. 30, 2010, http://www.bloomberg.com/news/2010-11-30/banks-in-u-s-resisting-calls-to-repurchase-fannie-mae-freddie-mac-loans.html.

[952] *See* Residential Capital, LLC, Annual Report (Form 10-K/A) (Aug. 25, 2009), at 62–63.

[953] Residential Capital, LLC, Quarterly Report (Form 10-Q) (Nov. 10, 2008), at 49.

[954] *See* Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 26, 2009), at 30.

[955] *See id.*

[956] Jeff Blumenthal, *ResCap hiring at least 100 in Fort Washington*, PHILA BUS. J., Apr. 15, 2009, http://www.bizjournals.com/philadelphia/stories/2009/04/13/daily18.html.

[957] Goldman Sachs Presentation to AFI, dated Mar. 17, 2010, at 12 [ALLY_0355162] (listing the total number of employees at 3,998).

company status.[958] During that meeting, Marano nominated ResCap EVP and CFO, Anthony Renzi, to the ResCap Board,[959] and on March 26, 2009, Renzi and Young joined Marano on the Executive Committee.[960]

AFI's de Molina also left the ResCap Board in March 2009, at approximately the same time he joined the AFI Board and became AFI CEO.[961] Although de Molina described his attendance at ResCap Board meetings as "spotty," he said he was "involved in all the conversations around liquidity and so forth during the whole period."[962]

On April 30, 2009, Marano informed the ResCap Board that Independent Director Karin Hirtler-Garvey was joining AFI as Chief Risk Executive, but that she would continue on the ResCap Board until her replacement was appointed.[963] At the end of May 2009, Pam West began serving as an Independent Director with Ted Smith, and Hirtler-Garvey apparently remained on the ResCap Board as an inside director.

A month later, Marano informed the ResCap Board that (1) Hirtler-Garvey had tendered her resignation from the Board and from the Audit Committee, which she had chaired in her capacity as an Independent Director; and (2) he did not anticipate the vacated Board seat being filled at that time.[964] Marano could not recall if Hirtler-Garvey ever advised the ResCap Board that she was interviewing with AFI for a potential position while sitting as an Independent Director on the ResCap Board, but he knew that there was a point where she informed the ResCap Board, and it was "determined that she needed to get off the Board, she was no longer an independent."[965] Hirtler-Garvey stated that she recommended West, who

---

[958] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Mar. 23, 2009, at RC40006091 [RC40005949].

[959] *Id.* at RC40006092.

[960] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Mar. 26, 2009, at RC40006109 [RC40005949].

[961] *Id.*

[962] Int. of A. de Molina, Nov. 20, 2012, at 13:13–15:3.

[963] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Apr. 30, 2009, at RC40006152 [RC40005949]. At this time, as an Independent Director, Hirtler-Garvey was also chair of the ResCap Audit Committee and had chaired a meeting the previous day and chaired another meeting of the ResCap Audit Committee on May 7, 2009. *See* Minutes of the Meeting of the Residential Capital Audit Committee, Apr. 29, 2009, at RC40020707 [RC40020694]; Minutes of the Meeting of the Residential Capital Audit Committee, May 7, 2009, at RC40020712 [RC40020694]. Hirtler-Garvey's online resume indicates that she was AFI's Chief Risk Officer from May 2009 to November 2011.

[964] *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, June 23, 2009, at RC40006224 [RC40005949]. West stated that it was her understanding that Hirtler-Garvey ceased being an Independent Director and became an Inside Director when West joined the ResCap Board. Int. of P. West, Dec. 18, 2012, 177:15–178:23.

[965] Int. of T. Marano, Nov. 26, 2012, at 98:13–99:7.

III-171

came out of Bank of America, to be the incoming Independent Director. Hirtler-Garvey advised that she remained on the ResCap Board for a month after joining AFI so that West would have the benefit of the overlap.[966]

On July 15, 2009, Young informed the ResCap Board that David Walker had resigned from the Board on that date, effective immediately.[967] The following day, on July 16, 2009, DeBrunner resigned from the ResCap Board, effective July 17, 2009.[968] DeBrunner acknowledged that he resigned from the ResCap Board because, as an AFI officer, he began to believe he was conflicted.[969]

On September 8, 2009, the ResCap Board was informed that Renzi had tendered his resignation from the Board and all related committees.[970] The ResCap Board was reduced to four people: Marano and Young, and Independent Directors West and Smith.

### (3) The ResCap Board Met Regularly To Review Liquidity In 2009

Liquidity concerns and the strategic direction of the company were two key agenda items for the ResCap Board by the summer of 2009. Although ResCap complied with its consolidated TNW covenants in the first six months of 2009, ResCap acknowledged that there was a risk that it would "not be able to meet its debt service obligations, and would default on its financial debt covenants due to insufficient capital and/or be in a negative liquidity position

---

[966] Int. of K. Hirtler-Garvey, Dec. 20, 2012, at 296:20–297:15.

[967] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, July 15, 2009, at RC40006249 [RC40005949]. Walker resigned from AFI a month later. Int. of D. Walker, Nov. 28, 2012, at 6:19–21.

[968] *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, July 16, 2009, at RC40006251 [RC40005949].

[969] Int. of D. DeBrunner, Sept. 13, 2012. The following colloquy is enlightening with respect to what DeBrunner was thinking at the time of his resignation:

[Q:] I understood what you said. Your duty was to provide knowledge and wisdom, if you will, on accounting related issues. I guess I had a different question in mind, which is sitting on the ResCap [B]oard did you consider you had a duty to ResCap? Did you consider you had a duty to GMAC?

[A:] I considered I had a duty to ResCap.

[Q:] All right. And how did you reconcile in your mind your role as GMAC officer with interest presumably as a fiduciary to GMAC as an officer with your role as a fiduciary to ResCap?

[A:] Well, and maybe this gets to where the question is going, but that was part and parcel the reason why when I did resign from the board. It was because at the time there started to be discussions about should we consider a bankruptcy. And at that point, given my role at GMAC, as an officer of GMAC, I felt that that was a conflict and that it was hard for me to separate the two. So I resigned from the [B]oard because I didn't want to be in that position.

*Id.* at 73:8–74:7. DeBrunner added that had he previously felt conflicted, he would have recused himself. *Id*. at 74:8–14.

[970] *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Sept. 8, 2009, at RC40006291 [RC40005949].

in 2009 or future periods."[971] From June 2009 through approximately November 2009, the ResCap Board scheduled a standing daily 6:00 p.m. meeting to discuss liquidity.[972] Marano explained:

> [Liquidity] was something that we were worried about, because we had facilities that were up, and we did have projections that showed we could potentially run into a liquidity problem. And those would largely be caused by movements in the MSR valuation. A lot of times, the MSR came back in value and we were able to borrow against it no problem from Citi or [AFI]. There . . . were times where it definitely got tight. But . . . it wasn't a problem, because [AFI was] more than willing to provide the liquidity to us. It was capital that [AFI] got more worked up about, providing capital support.[973]

> ### b. AFI Voiced Concerns About ResCap's Ability To Remain A Going Concern Early In 2009 And Made No Assurance That AFI Would Continue To Provide Support In The Form Of Liquidity Or Capital

As 2009 progressed, the mortgage and capital markets remained under a period of severe stress in the United States, the United Kingdom, and the European continent.[974] ResCap, which required substantial capital to support its operations," was now "heavily dependent" on AFI and its affiliates for "funding and capital support," and faced the reality that there was no longer any assurance that AFI could continue to support ResCap's capital and liquidity needs.[975] On January 8, 2009, ResCap filed the following Regulation FD (Fair Disclosure) statement with the SEC:

> In response to various questions that have come to [AFI's] attention, [AFI] reiterated in an announcement that Residential Capital, LLC ("ResCap") is an important subsidiary of [AFI], and [AFI] has made significant progress in reshaping ResCap to better align it with current market conditions. [AFI] stated that it believes that the support it has provided to ResCap to date was

---

[971] Residential Capital, LLC, Quarterly Report (Form 10-Q) (Aug. 7, 2009), at 8.

[972] *See* Int. of T. Marano, Nov. 26, 2012, at 133:16–134:18; *see also* Minutes of a Special Meeting of the Residential Capital Board of Directors, June 5, 2009, at RC40006172 [RC40005949]. Scheduling a standing meeting at 6:00 p.m. daily to discuss liquidity was done at the behest of Marano. *Id.* at RC40006173. The meetings were often telephonic and on many occasions were held for the sole purpose of discussing liquidity.

[973] Int. of T. Marano, Nov. 26, 2012, at 134:4–18.

[974] *See, e.g.*, EUROPEAN COMMISSION, DIRECTORATE-GENERAL FOR ECONOMIC AND FINANCIAL AFFAIRS, ECONOMIC CRISIS IN EUROPE: CAUSES, CONSEQUENCES AND RESPONSES (July 2009), http://ec.europa.eu/ economy_finance/publications/publication15887_en.pdf (describing the European economy as being "in the midst of the deepest recession since the 1930s, with real GDP projected to shrink by some 4% in 2009").

[975] GMAC LLC, Annual Report (Form 10-K) (Feb. 26, 2009), at 14 (emphasis added).

> in the best interests of [AFI] stakeholders. It further stated that if
> ResCap were to need additional support, [AFI] would provide
> that support *so long as it was in the best interests of [AFI]
> stakeholders*. While there can be no assurances, [AFI's] recently
> approved status as a regulated bank holding company has
> increased the importance of its support for ResCap.[976]

The above statement makes clear that AFI was giving no assurance that its support for
ResCap would continue. ResCap knew that losing AFI's financial support would have a
material adverse effect on ResCap's businesses and financial position, particularly given the
likelihood that ResCap (and other ResCap subsidiaries with similar debt obligations) could not
remain in compliance with TNW and debt covenants without AFI's support.[977]

As 2009 proceeded, the subject of ResCap's reliance on AFI to meet its capital and
liquidity needs—and what would happen if the AFI spigot were turned off—became an on-
going theme, not just at ResCap, but also within AFI.

AFI's lack of unconditional support for ResCap was expressed again in AFI's 2008
Annual Report, which was filed with the SEC on February 26, 2009:

> ResCap remains heavily dependent on [AFI] for funding and
> capital support, and there can be no assurance that [AFI] will
> provide such support. In light of ResCap's liquidity and capital
> needs, combined with volatile conditions in the marketplace,
> *there is substantial doubt about ResCap's ability to continue as
> a going concern*. If [AFI] determines to no longer support
> ResCap's capital or liquidity needs, or ResCap is unable to

---

[976] Residential Capital, LLC, Current Report (Form 8-K) (Jan. 8, 2009), Item 7.01 (emphasis added). At AFI's
first quarter 2009 earnings call, AFI CFO Robert Hull reiterated AFI's position in response to a question:

> We evaluate our support of ResCap just like all of our businesses, frankly; although ResCap,
> because it's walled off, requires special care. We, both from a capital and liquidity basis, we
> evaluate it constantly; monthly, if not more regularly. It continues to get our support. . . . *And as
> long as it's in the interest of the core [AFI] stakeholder base, we will continue to support it*.

GMAC Earnings Call, dated May 5, 2009, http://www.ally.com/about/investor/events-presentations/
(emphasis added). Thus ResCap's future was in the hands of AFI and its "core . . . stakeholder[s]." *Id.*

[977] *See* Residential Capital, LLC, Annual Report (Form 10-K/A) (Aug. 25, 2009), at 61.

> successfully execute its other initiatives, it could have a material adverse effect on ResCap's business, results of operations, and financial position.[978]

> ResCap has significant near-term liquidity issues. There is a significant risk that ResCap will not be able to meet its debt service obligations and other funding obligations in the near-term. . . . We have extensive financing and hedging arrangements with ResCap, which could be at risk of nonpayment if ResCap were to file for bankruptcy.[979]

In its May 2009 10-Q filing reporting on the first of quarter of 2009, AFI provided a similar, but slightly more nuanced version of its position, while at the same time underscoring that it had concerns about the implications of a ResCap bankruptcy:

> ResCap remains heavily dependent on [AFI] and its affiliates for funding and capital support, and there can be no assurance that [AFI] or its affiliates will continue such actions. We have previously disclosed that ResCap is an important subsidiary and that we believed the support we have provided to ResCap was in the best interests of our stakeholders. We have further disclosed that if ResCap were to need additional support, we would provide that support so long as it was in the best interests of our stakeholders. While there can be no assurances, our recently approved status as a regulated bank holding company has increased the importance of our support for ResCap as its core origination and servicing business provides diversification benefits for us.

> Although our continued actions through various funding and capital initiatives demonstrate support for ResCap and our status as a bank holding company and completion of our private debt exchange and cash tender offers better position us to be capable of supporting ResCap, *there are currently no commitments or assurances for future funding and/or capital support. Consequently, there remains substantial doubt about ResCap's ability to continue as a going concern.* Should we no longer continue to support the capital or liquidity needs of ResCap or

---

[978] GMAC LLC, Annual Report (Form 10-K) (Feb. 26, 2009), at 14. AFI's recognition of the Debtors' possible bankruptcy continued throughout 2009. *See, e.g.*, Minutes of a Special Meeting of the Board of Directors of GMAC LLC, Oct. 28, 2009, at ALLY_0115266 [ALLY_0114717] (noting that Sam Ramsey had updated the AFI Board on ResCap's cash position and the status of management's analysis of different strategic alternatives to which the AFI Board responded with questions regarding capital considerations related to a ResCap bankruptcy or implications of a potential chapter 11 filing).

[979] GMAC LLC, Annual Report (Form 10-K) (Feb. 26, 2009), at 15.

> should ResCap be unable to successfully execute other
> initiatives, it would have a material adverse effect on ResCap's
> business, results of operations, and financial position.[980]

At this time, AFI also participated in "Project Windmill," which analyzed AFI's exposure in the event ResCap filed for bankruptcy in 2009.[981]

### c. AFI Was Not A Lone Voice; ResCap Questioned Its Own Ability To Continue As A "Going Concern"

The concerns AFI voiced in the first quarter of 2009 were echoed by ResCap:

> The occurrence of recent adverse developments in the mortgage
> finance and credit markets has adversely affected our business,
> our liquidity and our capital position and has raised substantial
> doubt about our ability to continue as a going concern. . . . [982]

After discussing: (1) the negative effect on ResCap of the conditions in the mortgage industry; (2) the deteriorating fair market valuations of mortgage loans held for sale, mortgage servicing rights, and securitized interests attributable to weakening housing prices and increasing mortgage loan delinquency rates; and (3) recent rating agency downgrades of asset-backed and mortgage-backed securities, which significantly reduced the levels of liquidity available to ResCap to finance its operations; ResCap added:

> We are highly leveraged relative to our cash flow and continue
> to recognize substantial losses resulting in a significant
> deterioration in capital. There continues to be a risk that we will
> not be able to meet our debt service obligations, [that we will]
> default on our financial debt covenants due to insufficient
> capital and/or [that we will] be in a negative liquidity position in
> 2009. We remain heavily dependent on our parent and affiliates
> for funding and capital support, and there can be no assurance
> that our parent or affiliates will continue such actions. . . .
>
> In light of our liquidity and capital needs, combined with
> volatile conditions in the marketplace, *there is substantial doubt
> about our ability to continue as a going concern. If our parent
> no longer continues to support our capital or liquidity needs, or*

---

[980] GMAC LLC, Quarterly Report (Form 10-Q) (May 11, 2009), at 8 (emphasis added).

[981] *See* Draft GMAC Presentation on Project Windmill, Exposure Review and Key Points, dated Mar. 6, 2009 [ALLY_0199540] (estimating that if ResCap filed for bankruptcy that day, AFI's exposure would be between $3.1 and $4.9 billion).

[982] Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 26, 2009), at 31–32 (emphasis added).

III-176

> *we are unable to successfully execute our other initiatives, it would have a material adverse effect on our business, results of operations and financial position.*[983]

### d. The ResCap Board Also Looked Into The Ramifications Of A Bankruptcy Filing In 2009

On several occasions in 2009, the ResCap Board considered the implications of a bankruptcy filing or other scenarios, including merging ResCap into AFI. In May 2008, ResCap had retained Lazard as its "investment banker and financial advisor with respect to an on-going contingency planning process," which later became known as Project Scout I.[984] Project Scout I involved developing "a strategy for a potential chapter 11 process,"[985] which included, at various times, projected ResCap chapter 11 filing dates of June 9, 2008[986] and October 31, 2008.[987] Project Scout I, and Lazard's services in relation to Project Scout I, were terminated when "TARP relief was granted" to AFI in December 2008.[988]

In 2009, ResCap retained Lazard to oversee Project Scout II. The project was described as being a "different project in a sense" than Project Scout I because "things had changed" as a result of AFI's receipt of TARP funding.[989]

---

[983] *See* Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 26, 2009), at 31–32. As noted above, the debtors' liquidity portfolio ("cash readily available to cover operating demands from across [its] business operations and maturing obligations") totaled \$.05 billion at the end of 2008. *Id*. at 31. ResCap anticipated liquidity pressures to continue through 2009. *Id.* In the same report, ResCap acknowledged the risk that AFI could require ResCap to act against ResCap's own interests:

> [AFI] controls all fundamental matters affecting us, and its interests may differ from ours. [AFI] indirectly owns all of our outstanding membership interests and has the power to elect and remove all of our directors, including the two Independent Directors who are required under an operating agreement to which we and [AFI] are a party. The operating agreement may be amended by the parties thereto, except for amendments that materially and adversely affect the rights of the holders of our outstanding notes, which require the approval of a majority of the Independent Directors. The operating agreement may be terminated by the parties thereto provided a majority of the Independent Directors approve the termination. The operating agreement also terminates if we cease to be a direct or indirect subsidiary of [AFI]. [AFI's] interests may differ from ours and, subject to the applicable provisions of the operating agreement; AFI may cause us to take actions that are materially adverse to us.

*Id*. at 32.

[984] Int. of T. Pohl, Feb. 26, 2013, at 8:5–9. In total, there appear to have been three iterations of Project Scout over as many years.

[985] Lazard/Skadden Draft Presentation, Project Scout, dated May 2008, at 1 [LAZ-RSCP-XMR00010457].

[986] *Id*.

[987] Lazard/Skadden Presentation for GMAC, dated Oct. 2008, at EXAM20020827 [EXAM20020824].

[988] Int. of T. Pohl, Feb. 26, 2013, at 35:20–36:6.

[989] *Id.* at 36:7–16.

Project Scout II focused on the ramifications of a "sudden" ResCap chapter 11 filing.[990] On June 10, 2009, Lazard presented to the ResCap Board materials on a "free-fall" chapter 11 filing by ResCap and the potential ramifications for Ally Bank and AFI. With respect to Ally Bank, the Project Scout II team examined:

- The effect of an immediate cessation of all lending and servicing operations;

- The risk of rising (and potentially doubling) default rates and the impact on investors and the government;

- The reputational harm that could adversely impact Ally Bank's (and AFI's) "ability to participate in the mortgage, depository and auto finance markets";

- The termination of hedges, which would leave Ally Bank with pipeline and MSR exposure; and

- The significant risk of litigation, brought by "customers, investors, clients, [and] vendors."[991]

The Project Scout II team also examined the potential collateral harm to AFI, which included placing at risk: (1) $5 billion of AFI debt and equity; (2) AFI's state and federal licenses; (3) AFI's reputation; (4) $300 million of ResCap cash, which was on deposit at Fannie Mae; and (5) AFI, with respect to an increased risk of litigation.[992] The Project Scout II presentation to the ResCap Board reviewed the strategic importance of mortgage operations, and noted the critical importance of ResCap to AFI's mortgage operations.[993] Although the Project Scout II materials were shared with the AFI Board as well as the ResCap Board on June 10, 2009, only the AFI Board minutes reflect a related discussion.[994] At the AFI Board meeting, "it was agreed that a free fall chapter 11 filing would be detrimental to ResCap and its enterprise value. It was also agreed that the AFI Board would need additional analysis with respect to strategic options available for ResCap."[995]

On June 16, 2009, the ResCap Board met telephonically in a reconvened session to hear from ResCap counsel, Morrison & Foerster, "with respect to information and guidance

[990] *See* Lazard, Project Scout II Presentation, prepared for a Special Meeting of the Board of Directors of Residential Capital, LLC, dated June 10, 2009, at RC40011255–59 [RC40011250] (discussing a "free fall" chapter 11 filing).

[991] *See* Project Scout II Presentation, prepared for a Special Meeting of the Board of Directors of Residential Capital, LLC, dated June 10, 2009, at RC40011256 [RC40011250].

[992] *See id*.

[993] *See id*. The June 10, 2009 ResCap Board minutes reflect no related discussion. *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, June 10, 2009, at RC40006224 [RC40005949].

[994] *See* Minutes of a Special Meeting of the Board of GMAC LLC, June 10, 2009, at ALLY_0114989 [ALLY_0114717].

[995] *See id*. at ALLY_0114989–90.

relating to the possibility of a ResCap bankruptcy filing."[996] This included "a detailed presentation [by counsel] on a chapter 11 bankruptcy filing" and a discussion of "asset sale alternatives in a chapter 11 filing."[997]

### e.    *Project Origin Analyzed The Risk Of A ResCap Chapter 11 Filing On Various Constituents*

On July 7, 2009, the ResCap Board considered a presentation prepared by Lazard under a new project name, "Project Origin." The project considered the risks to various constituents if ResCap instituted a chapter 11 case.[998] Marano informed the ResCap Board that ResCap management had reviewed the Project Origin presentation earlier the same day with U.S. Treasury officials.[999] Project Origin made certain assumptions with regard to a bankruptcy filing, including that: (1) ResCap would "reorganize as a going concern"; (2) the "contingency planning" would include "reaching out to certain constituencies prior to filing"; and (3) ResCap would engage in an out-of-court restructuring with contingency planning involving a smaller subset of the constituent list discussed below.[1000] In other words, unlike Project Scout II, Project Origin's focus was not on a free fall bankruptcy.

For each constituent on a list carrying the heading, "Constituent Risk Assessment," the Project Origin presentation identified the risk/issue, the exposure, the next steps to be

---

[996] Minutes of the Reconvened Meeting of the Board of Directors of Residential Capital, LLC, June 16, 2009, at RC40006184 [RC40005949]. The ResCap Board's meeting earlier the same day ended at 6:25 p.m., in time for the reconvened meeting to begin at 6:30 p.m. Minutes for the earlier meeting were distributed separately. *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, June 16, 2009, at RC40006183 [RC40005949].

[997] Minutes of a Reconvened Meeting of the Board of Directors of Residential Capital, LLC, June 16, 2009, at RC40006184 [RC40005949]. The presentation materials provided to the ResCap Board for this meeting do not appear to have been produced in this proceeding. The minutes of the Board meeting are not marked privileged, but within the context of the minutes is a reference to the Board engaging in a privileged discussion with counsel. *Id.*

[998] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, July 7, 2009, at RC40006240 [RC40005949]; *see also* Project Origin Presentation to the Board of Directors of Residential Capital, LLC, dated July 2009, at RC40011389 [RC40011378].

[999] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, July 7, 2009, at RC40006240 [RC40005949].

[1000] Project Origin Presentation to the Board of Directors of Residential Capital, LLC, dated July 2009, at RC40011389 [RC40011378].

taken, and the priority of each constituent. The following chart contains examples of the Constituent Risk Assessment from the presentation:

EXHIBIT III.I.1.e
**Constituent Risk Assessment Examples**

| Constituent | Risk / Issue | Exposure | Next Steps | Priority Level |
|---|---|---|---|---|
| AFI shareholders | Need buy-in for strategy on ResCap Reputational risk Capital/value risk | N/A | On-going discussions | High |
| Federal Reserve | Regulatory authority over AFI BHC status Reputational risk | N/A | [AFI] to meet with Federal Reserve on July 14 | High |
| FDIC | Regulatory authority over Ally Bank Reputational risk | N/A | Determine timing of meeting based on discussion with Fed prior to July 14 | High |
| Federal Housing Financing Agency | Oversees GSEs | TBD | Make contact once decision is made and plan mapped out | High |
| HUD | Key mortgage policy maker/regulator | TBD | Make contact once decision is made and plan mapped out | High |
| FNMA | Potential to transfer servicing and discontinue purchasing of loans | ResCap: $1.1 billion in MSRs Ally: $505 million in MSRs | Make contact once decision is made and plan mapped out | High |
| FHLMC | Potential to transfer servicing and discontinue purchasing of loans | ResCap: $4.4 million in MSRs Ally: $210 million in MSRs | Make contact once decision is made and plan mapped out | High |
| Federal Home Loan Bank | Potential to cease lending to Ally Bank | $8.7 billion outstanding amount | Make contact once decision is made and plan mapped out | High |
| GNMA | Potential to transfer servicing and discontinue purchasing of loans | ResCap: $376 million in MSRS | Make contact once decision is made and plan mapped out | High |

*Source: Project Origin Presentation to the Board of Directors of Residential Capital, LLC, July 7, 2009 at RC40011391-92 [RC40011378].*

Twenty-two additional constituents, either by name or by type (with some types representing multiple entities) were identified on the draft chart including banks, vendors, derivative counterparties, monoline bond insurers, PMI insurers, noteholders, and foreign regulators.[1001]

---

[1001] Project Origin Presentation to the Board of Directors of Residential Capital, LLC, July 7, 2009, at RC40011391–92 [RC40011378].

The possibility of a ResCap bankruptcy went beyond internal discussions. At its August 5, 2009 meeting, the ResCap Board considered the implications of a Bloomberg News article, which had been forwarded to Marano by a senior executive from AFI's Capital Markets Division. The article began: "[AFI] the auto lender that took $13.5 billion of U.S. bailout funds, may cut losses and the need for capital by sending its home mortgage unit, Residential Capital LLC, into bankruptcy."[1002] Quoting CreditSights, the article stated that by doing so, AFI "could keep ResCap's 'remaining good assets' and leave behind $11.4 billion of debt"; Bloomberg News noted that CreditSights had queried whether it was "'time to put ResCap out of its misery.'"[1003] The ResCap Board considered the effect the article might have on employees and the possible effect on renewing lines of credit.[1004]

> ### f.    In August 2009, AFI Made An Opening Offer To Purchase Certain MSRs From ResCap, Which Appears To Have Been An Off-Shoot Of Project Origin

On August 4, 2009, AFI Executive Vice President Samuel Ramsey sent a letter to Marano, attaching a draft, non-binding proposal by which one or more AFI[1005] Subsidiaries would acquire ResCap's MSRs and its origination platform.[1006] Ramsey's letter was captioned "Project Origin," but this potential transaction transformed into "Project Timex" shortly thereafter.[1007] The assets that AFI offered to purchase included:

- MSRs related to certain mortgage loan portfolios (including the obligation to make servicer advances);

- All contracts with Fannie Mae, Freddie Mac, and Ginnie Mae (the "GSE contracts");

---

[1002] E-mail from K. Skover (Aug. 5, 2009) [RC40011015] (forwarding to the ResCap Board an e-mail from AFI's Seth Silverstein attaching the Bloomberg article).

[1003] *Id.*

[1004] *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Aug. 5, 2009, at RC40006272 [RC40005949].

[1005] GMAC LLC converted from a Delaware limited liability company to a Delaware corporation, renamed GMAC Inc., effective June 30, 2009. *See* GMAC Inc., Quarterly Report (Form 10-Q) (Aug. 7, 2009), at 5.

[1006] *See* Draft Proposal for the Acquisition of the Origination/Servicing Assets of Residential Capital, LLC and Cover Letter from AFI to ResCap, dated Aug. 4, 2009, at RC40011007 [RC40011000]. Ramsey's August 4, 2009 letter and proposal were included among the materials sent to the ResCap Board the same day. *See* ResCap Board Materials Prepared for a Special Meeting of the ResCap Board, dated Aug. 4, 2009, at RC40007038 [RC40007006].

[1007] Project Timex Presentation Prepared for a Special Meeting of the Board of Directors of GMAC Inc., dated Sept. 10, 2009, at 2 [ALLY_PEO_0025671]. Project Timex was intended to be an "out of court" purchase of ResCap's origination and servicing business, including Agency and private label MSRs, conforming mortgage loans held for sale, derivatives related to the MSRs, etc. for a purchase price of $3.8 billion, offset by representation and warranty liabilities, and other credits. The deal was intended to include a $600 million capital contribution from AFI to ResCap. *Id.* De Molina referred to Project Timex as "Sam Ramsey's baby," and said Ramsey "was trying to find solutions." He added that Ramsey found Project Timex to be an attractive solution, although de Molina said he did not know if Ramsey felt that way in the end. Int. of A. de Molina, Nov. 20, 2012, at 208:2–13. Ramsey, when interviewed, could not recall the specifics of Project Timex. Int. of S. Ramsey, Dec. 10, 2012, at 135:25–136:5.

- All accounts receivable that were servicer advances made by ResCap in connection with Fannie Mae, Freddie Mac, and Ginnie Mae transactions;

- Certain prime conforming loans that were held for sale and eligible for delivery to Fannie Mae, Freddie Mac, and Ginnie Mae;

- All related sub-servicing contracts and agreements; and

- Other ancillary assets, property, equipment employees, records, etc. required to conduct the business.[1008]

The ResCap Board was introduced to AFI's proposal at an August 4, 2009 meeting,[1009] and they considered the matter again in a special session on August 9, 2009, in order to allow the Independent Directors an opportunity to discuss the draft term sheet.[1010] Among the topics discussed by the ResCap Board were "the assets available for sale, rep and warranty considerations, and timing of a potential transaction."[1011] Between meetings, Marano, on behalf of ResCap, and Ramsey, on behalf of AFI, exchanged letter proposals and counter-proposals.[1012] The discussion continued at August 10, 2009 and August 12, 2009 ResCap Board meetings.[1013] On August 13, 2009, Ramsey provided ResCap with a revised term sheet and counter-offer that included the following AFI commitments:

- AFI would make a further equity investment in ResCap of $500 million in connection with the completion of the proposed transactions so long as there was a "simultaneous transfer by [AFI] of 100% of ResCap's common equity interests to [AFI's] current shareholders";

- AFI would work with ResCap "to develop a solution to provide" ResCap with $300 million in additional liquidity that ResCap anticipated needing through September 30, 2009; and

---

[1008] *See* Draft Proposal for the Acquisition of the Origination/Servicing Assets of Residential Capital, LLC and Cover Letter from AFI to ResCap, dated Aug. 4, 2009, at RC40011007 [RC40011000].

[1009] *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Aug. 4, 2009, at RC40006287 [RC40005949].

[1010] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Aug. 9, 2009, at RC40006276 [RC40005949]. A marked-up draft of the Servicing Proposal was provided to the ResCap Board in advance of this meeting. *See* Comments by ResCap and its Advisors, Acquisition of the Origination/Servicing Assets of Residential Capital, LLC, dated Aug. 7, 2009, at RC40009422–43 [RC40009421].

[1011] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Aug. 9, 2009, at RC40006276 [RC40005949].

[1012] *See* Board Materials Prepared for a Special Meeting of the Board of Directors of Residential Capital, LLC, dated Aug. 12, 2009, at RC40009510 [RC40009497].

[1013] *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Aug. 10, 2009, at RC40006277 [RC40005949]; *see also* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Aug. 12, 2009, at RC40006278 [RC40005949].

- ResCap would continue to be a viable asset management company following the completion of the transfer.[1014]

The ResCap Board reviewed liquidity issues, confidentiality concerns, servicing and origination platforms, and lines of credit related to AFI's revised proposal at its August 13, 2009 meeting,[1015] and the "potential structure of a transaction, legal issues, and funding and timing considerations" at its August 17, 2009 meeting.[1016] On August 17, 2009, the ResCap Board reviewed a list of "non-negotiable items," including (1) the business remaining within ResCap Asset Management Company be viable; (2) AFI providing financial support to keep ResCap within its covenants through the closing; (3) "[AFI providing] provide post-closing funding through the extension or revision of the Secured Revolver Facility or other funding mechanism"; and (4) ResCap obtaining a fairness opinion with respect to AFI's proposal.[1017]

The Project Timex proposal required AFI to complete an out-of-court purchase of ResCap's origination and servicing business prior to September 30, 2009. The ResCap Board continued the discussion at its September 17, 2009 meeting. At that meeting, it reviewed a pro forma balance sheet setting forth the securitized and non-securitized assets included in AFI's proposal, an updated term sheet, details of the transaction, timing, regulatory reporting and required disclosures.[1018] The ResCap Board also discussed the "risk and benefits of entering into the proposed transaction."[1019] Ultimately, ResCap did not enter into the transaction. According to AFI's Head of Corporate Debt and Equity, Corey Pinkston, the reason the sale did not proceed is because the arrangements represented "pretty complicated thinking," and it was ultimately decided that Project Timex "was too complicated to work."[1020]

## 2. In March 2009, The ResCap Board Approved ResCap's 2009 Business Plan

In March 2009, a ResCap team consisting of CEO Marano; COO Renzi; CFO Young; a junior associate from Cerberus, Edward Buttacavoli (who shortly thereafter became a senior analyst at AFI); and others from the GMAC ResCap Financial Planning and Analysis[1021] department; prepared a 2009 business plan, which was presented to the ResCap Board on

---

[1014] Letter from S. Ramsey to T. Marano (Aug. 13, 2009), at RC40009538 [RC40009525] (distributed to the ResCap Board in advance of its August 13, 2009 meeting).

[1015] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Aug. 13, 2009, at RC40006280 [RC40005949].

[1016] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Aug. 17, 2009, at 1 RC40006281 [RC40005949].

[1017] See Non-Negotiable Items Draft Discussion Document Prepared for a Special Meeting of the Board of Directors of Residential Capital, LLC, dated Aug. 17, 2009 at RC40007032 [RC40007006].

[1018] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Sept. 8, 2009, at RC40006290 [RC40005949].

[1019] Id.

[1020] Int. of C. Pinkston, Nov. 8, 2012, at 63:10–65:9.

[1021] See E-mail from M. Wright (Mar. 24, 2009) [CCM00028868]; see also Attachment to E-mail from M. Wright (Mar. 24, 2009) [CCM00028869] (draft business plan).

March 26, 2009.[1022] The purpose of the 2009 business plan was to "focus on leveraging ResCap's capital markets expertise and winding down ResCap's non-core businesses."[1023] Reflecting a loss of $1.072 billion and ending assets of $20.8 billion, the 2009 business plan distinguished ResCap, the "Legal Entity," from what was called "GMAC ResCap Managerial." The latter, the business plan reported, "represent[ed] all business activities managed by Tom Marano," including "[a]ll RFG, BCG, IBG, PIA and Corporate activities and financial statements."[1024] "GMAC ResCap Managerial" related to planning as well as to measuring outcomes and performance. "ResCap LLC (Legal Entity)," on the other hand, represented the "consolidation of all entities owned by ResCap."[1025]

The 2009 business plan set forth four strategic initiatives for ResCap:

- "Rationalize Business and Asset Portfolio," which the business plan described as streamlining and managing "businesses and assets considered to be viable and aligned with [AFI's] long term strategy," and otherwise liquidating or selling non-core businesses;

- Capitalize on Deposit Funding to Drive Profitability," which meant leveraging Ally Bank in the U.S. and ResMor in Canada, and exploring the "sale of RFG core businesses to Ally Bank to access cheaper funding";

- "Grow Revenue and Market Share in Core Businesses," which focused on continuing to originate primarily conforming mortgages in the U.S. that would be eligible for sale to GSEs, among other items; and

- "Reposition Risk Profile and Maximize Efficiencies," which the business plan described as capitalizing on "servicing expertise," maximizing "the value of serviced assets," and implementing "aggressive loan-loss modification strategies to reduce foreclosures, credit losses and funding advances."[1026]

Put more plainly, a significant focus of ResCap's 2009 business plan was on growing revenue and market share in ResCap's core businesses, including mortgage origination and servicing, by:

- Continuing to produce with an originate-to-sell strategy;

- In the U.S., originating primarily conforming mortgages that are eligible for sale to GSEs;

---

[1022] Seven directors sat on the ResCap Board as of March 26, 2009, including the two Independent Directors, Hirtler-Garvey and Smith. The other five directors were Marano, DeBrunner, Walker, Young, and Renzi, the newest director, appointed March 13, 2009 and attending his first official meeting as a director when the business plan was discussed.

[1023] ResCap 2009 Business Plan Review (Legal Entity), Mar. 26, 2009, at RC40011150–72 [RC40011135].

[1024] *Id.*

[1025] *Id.*

[1026] *Id.*

- Implementing pricing strategy and marketing initiatives;

- Driving revenue growth through fee-based servicing and loan modifications; and

- Striving for improved work-flow quality by leveraging existing innovative on-line systems.[1027]

The 2009 business plan also focused on process improvement and expense reductions. Base expenses for the year were projected to be lower, down from $3 billion in 2008 to $1.2 billion in 2009, but the plan assumed continued AFI support to maintain ResCap's TNW covenant of $350 million, and debt forgiveness of $631 million.[1028]

ResCap's 2009 business plan provided that ResCap would continue to be an originator of consumer loans for Ally Bank and a servicer of Ally Bank's HFI portfolio and MSR assets, as well as a provider of certain administrative support to Ally Bank. ResCap also would continue to provide "executive oversight, finance and accounting support, IT, treasury and legal services to" ResMor.[1029] ResMor, in turn, would provide the same litany of services to ResCap's remaining Canadian entity, Residential Funding of Canada, and Ally Bank would provide funding to ResCap through its purchases of ResCap's consumer loan originations.[1030] ResCap's 2009 business plan projected a loss of $1.072 billion and assets of $20.8 billion,[1031] but a need for $631 million in AFI capital contributions in order to comply with ResCap's TNW covenant of $350 million.

### 3. ResCap Entered Into Several Related-Party Transactions In 2009

Throughout 2009, ResCap continued its efforts to reduce its balance sheet through asset sales and other strategic transactions. ResCap began the year with two significant transactions bookending the month of January: the sale of ResMor to AFI, which closed on January 1, 2009,[1032] and the 2009 Bank Transaction, pursuant to which ResCap sold its remaining interest in IB Finance (the direct parent of Ally Bank) to AFI, which closed on January 30, 2009.[1033]

---

[1027] *See id.*

[1028] *Id.*

[1029] *Id.*

[1030] *Id.*

[1031] *Id.*

[1032] As of January 1, 2009, ResCap's subsidiary, Residential Funding of Canada, completed the sale of ResMor to AFI for $67 million, pursuant to the agreement entered into on November 2008. ResCap had suspended mortgage loan production in its other foreign markets for most of 2008 and the sale of ResMor effectively ended loan production within IBG. *See* Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 26, 2009), at 30, 38; *see also* Section V.F.4.f (detailing the ResMor transaction).

[1033] *See* Section V.A.1.c (discussing the 2009 Bank Transaction).

III-185

Later in the spring of 2009, ResCap engaged in a transaction to sell its US/UK Broker-Dealer business unit to AFI.[1034] Out of concern for keeping ResCap in compliance with its TNW covenant and debt covenants, AFI made multiple capital contributions to the Debtors throughout the year in the form of cash and forgiveness of debt.[1035]

> a.  In May 2009, ResCap Capitalized Sold Its Interest In The US/UK Broker Dealers To AFI

The US/UK Broker-Dealer Sale, which began in 2008, closed in May 2009. The details of this transaction are discussed in Section V.F.4.g.

> b.  AFI Helped ResCap To Temporarily Overcome Liquidity Constraints Through Secured Credit Facilities

ResCap's covenants in the second half of 2009 required ResCap to have $250 million in liquid cash and $750 million in total cash, including cash located in operating accounts.[1036] During spring 2009, mortgage interest rates rose, which benefitted ResCap's MSRs (and led to fewer borrowers seeking to refinance), but "generated losses on associated hedge positions," with a resulting need for ResCap to post collateral. To meet ResCap's liquidity concern, AFI provided incremental funding to ResCap in late spring/early summer 2009.[1037]

Before approving the incremental $370 million credit line, the ResCap Board agreed to appoint a financial advisor and to wait until the Independent Directors met to consider matters related to the approval of the $370 million credit facility.[1038] Thereafter, on June 1, 2009, PATI and RAHI entered into a credit agreement for a short-term $370 million revolving credit facility guaranteed by RFC, GMAC Mortgage, and ResCap.[1039]

In June 2009, the ResCap Board met to discuss having AFI provide additional support to meet ResCap's short-term cash and liquidity requirements.[1040] The outstanding amount on the Secured MSR Facility was $240 million against $926 million of MSR collateral (a 26%

---

[1034] See Section V.F.4.g (discussing the US/UK Broker-Dealer Sale).

[1035] *See* Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 26, 2009), at 31 (describing ResCap as heavily reliant on its parent and affiliates); GMAC LLC, Quarterly Report (Form 10-Q) (May 11, 2009), at 8.

[1036] *See* Presentation prepared for GMAC LLC Strategy Group, dated June 10, 2009, at RC40011260 [RC40011250] (distributed to the ResCap Board in advance of its June 10, 2009 Board meeting).

[1037] *See* Presentation prepared for GMAC LLC Strategy Group, dated June 10, 2009, at RC40011260 [RC40011250] (distributed to the ResCap Board in advance of its June 10, 2009 Board meeting); *see also* Section V.E.7 (discussing the Second Line of Credit Facility).

[1038] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, May 28, 2009, at RC40006154 [RC40005949].

[1039] *See* Section V.E.7.

[1040] *See, e.*g., Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, June 5, 2009, at RC40006172–6173 [RC40005949]; *see also* Minutes of a Special Meeting of the Residential Capital Board of Directors, June 8, 2009, at 1 RC40006174 [RC40005949] (the Board "discussed possible modifications to expand funding capacity under existing loan facilities in place with AFI," and agreed to "meet with [AFI] management to discuss available options").

advance rate). In order to address its liquidity concerns, ResCap requested an increase in the advance rate and the facility limit of the Secured MSR Facility. AFI proposed increasing the advance rate to 40% of ResCap's marked MSR collateral and the Secured MSR Facility limit to $400 million.[1041]

On June 12, 2009, ResCap reported that the Secured MSR Facility was amended to "increase [AFI's] maximum lending commitment to up to $400 million, such availability being based on advance rates against the amount of eligible collateral."[1042] AFI extended the loan repayment dates for the Initial Line of Credit Facility, the Second Line of Credit Facility, and the Secured MSR Facility, on July 31, 2009; the Secured MSR Facility, Initial Line of Credit Facility, and Second Line of Credit Facility.[1043] For a further discussion of the Secured MSR Facility and the Line of Credit Facilities, see Sections V.E.2, V.E.5, and V.E.7, respectively.

### c. *AFI's Contributions In The Form Of Debt Forgiveness And ResCap Bond Retirements Assisted ResCap In Meeting Its TNW Requirements In 2009*

On March 31, 2009, AFI contributed to ResCap Junior Secured Notes, and Senior Unsecured Notes. The Junior Secured Notes had a face amount of a $478 million plus accrued interest. The Senior Unsecured Notes had a face amount of a $40.3 million plus accrued interest.[1044] The forgiveness and extinguishment of the debt resulted in a gain on extinguishment of $389.5 million and capital contribution of $263.3 million.[1045]

ResCap's consolidated TNW was $1.05 billion as of June 30, 2009, which allowed ResCap to remain in compliance with its TNW and debt covenants.[1046] This was achieved in

---

[1041] Presentation prepared for the GMAC LLC Strategy Group, dated June 10, 2009, at RC40011260 [RC40011250] (made a part of the Board presentation prepared for the June 10, 2009 ResCap Board meeting). The AFI Board recognized that there was "some risk that any loan would be re-characterized as equity in a bankruptcy given [AFI's] status as a lender of last resort under the doctrine of Debt Re-characterization" and acknowledged the "potential for further funding to create lender liability risk for [AFI] under the doctrines of Deepening Insolvency and Equitable Subordination." *Id.* at 4.

[1042] Residential Capital, LLC, Current Report (Form 8-K) (June 18, 2009), Item 1.01.

[1043] Residential Capital, LLC, Current Report (Form 8-K) (Aug. 4, 2009), at 2; *see also* Residential Capital, LLC, Quarterly Report (Form 10-Q/A) (Aug. 25, 2009), at 66.

[1044] Residential Capital, LLC, Quarterly Report (Form 10-Q) (May 8, 2009), at 81.

[1045] *Id*.

[1046] Residential Capital, LLC, Current Report (Form 8-K) (Aug. 4, 2009), at Ex. 99.1.

part through AFI's forgiveness of $1.4 billion (face value) of ResCap bonds, which resulted in a pre-tax gain to ResCap in the form of debt extinguishment of $817 million.[1047] The capital contributions made by AFI in 2009 included:

| March 2009: | $263.3 million (bonds) |
| April 2009: | $ 34.7 million (bonds) |
| May 2009: | $112.6 million (bonds) |
| June 2009: | $750.8 million (bonds) |
| November 2009: | $ 23.6 million (bonds) |
| November 2009: | $ 52.4 million (MSR debt forgiveness) |
| December 2009: | $262.7 million (MSR debt forgiveness) |
| December 2009: | $1.436 billion (loans held for sale) |
| December 2009: | $600 million (cash) |
| December 2009: | $316.2 million (receivables) |
| December 2009: | $195 million (intercompany payable)[1048] |

Although ResCap was consistently plagued by liquidity concerns throughout the year, ResCap met its TNW and debt covenants at the end of the third quarter of 2009, with TNW of $409 million, and ended 2009 in compliance with its covenants as well.

### 4. The ResCap Board Reviewed Various "What If" Scenarios At Its June And July 2009 Board Meetings

On multiple occasions in June and July 2009, the ResCap Board was presented with and discussed two scenarios that were under consideration.[1049] Noting that ResCap continued to rely on monthly support from AFI in the form of capital and cash in order to meet its minimum TNW and cash requirements, the ResCap Board considered (1) the effect of having its core business absorbed into AFI against (2) the effect of having both its core and non-core businesses absorbed into AFI.[1050] Under the partial absorption scenario, ResCap would file for bankruptcy and AFI would buy ResCap's core business for fair value. In order to determine the effect on ResCap and AFI, the ResCap Board was shown forecasted balance sheets and cash flow analyses for 2010 to 2011 and forecasted income statements for the core

---

[1047] *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, June 30, 2009, at RC40006236 [RC40005949]. ("Mr. Marano reported that during its meeting held earlier this day the [AFI] Board had approved additional capital support of ResCap. He said that the capital contribution [would] be made through the forgiveness of ResCap bonds acquired by [AFI] in the December 2008 bond exchange transaction.").

[1048] Residential Capital, LLC, Consolidated Financial Statements For The Years Ended December 31 2010 and 2009 (Feb. 28, 2011) [EXAM00123052].

[1049] *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, June 15, 2009 at RC40006181 [RC40005949].

[1050] ResCap's core business was identified as the consumer lending business and the capital markets business, servicing platform, and assets. ResCap's non-core business was identified as the "Business Lending Group, the International Business Group, and domestic non-core mortgage." Partial Absorption into GMAC (Core) Presentation to the Board of Directors of Residential Capital LLC, dated June 15, 2009, at RC40011293 [RC40011291].

servicing business, segregated into (1) GMAC Mortgage prime and conforming MSR; (2) GMAC Mortgage non-conforming MSR; (3) HFN MSR; and (4) fee-based servicing.[1051]

Under the full absorption scenario, ResCap could avoid bankruptcy by having its cash and capital needs met by AFI, its core businesses grown, and its non-core businesses run off or sold. The analysis included balance sheets, income statement and cash flows for 2009 to 2011 and the same segregated income statement for the core servicing business.[1052] Young led the ResCap Board discussion at its June 15, 2009 meeting.[1053]

The ResCap Board renewed its discussion of the 2010–2011 pro forma analysis at its June 23, 2009 meeting, when Young led a discussion concerning both the partial and full absorption scenarios.[1054] These discussions, with modified versions of the pro forma analyses, also took place at the ResCap Board meeting held on (1) June 25, 2009,[1055] where Young focused on the full-absorption scenario; (2) June 30, 2009, where Young focused on adjustments made to the International Business Group and BCG activities, MSRs, and accounts receivable;[1056] and (3) July 9, 2009, where the ResCap Board also considered the run-off of the ResCap business.[1057] Under the run-off of ResCap's non-core assets scenario, the following assumptions were made:

- AFI would acquire the core business assets and liabilities of ResCap LLC as of June 30, 2009 for market value (i.e., book value);

---

[1051] *Id.*

[1052] *Id.*

[1053] *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, June 15, 2009, at RC40006181 [RC40005949].

[1054] *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, June 23, 2009, at RC40006224–25 [RC40005949]. The ResCap Board also discussed at this meeting whether to continue the daily liquidity calls and agreed that it would be best to continue holding them for the time being and to revisit the meeting schedule in late July. *Id.* at RC40006225; *see also* Material for Discussion, dated June 23, 2009, at RC40011335 [RC40011334].

[1055] *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, June 25, 2009, at RC40006228 [RC40005949]; *see also* Material for Discussion, dated June 25, 2009, at R40010474 [RC40010472].

[1056] *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, June 30, 2009, at RC40003536 [RC40005949]; Material for Discussion, dated June 30, 2009 RC40010577 [RC40010575].

[1057] *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, July 9, 2009, at RC40006242 [RC40005949]. At the July 17, 2009 ResCap Board meeting, Young advised the ResCap Board that the pro forma analyses would be extended to 2012. *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, July 17, 2009, at RC40006252 [RC40005949]; *see also* 2009–2011 Pro Forma ResCap, LLC Modified Non Core Run-off, dated July 16, 2009, at RC40011463 [RC40011453]. The pro forma analyses were modified to include non-agency servicing advances and other receivables. *Id.* at RC40011468. Also provided to the Board in advance of the July 17, 2009 Board meeting was a letter from de Molina to Marano stating: "I am in receipt of your July 10, 2009 note requesting confirmation from the [AFI] Board of Directors concerning its intentions for providing additional liquidity to ResCap should the need arise. This request has been delivered to the [AFI] Board which will be considering it in the days ahead." Materials for Discussion, dated July 17, 2009, at RC40011502 [RC40011453].

- ResCap would continue "under a mission to run-off remaining non-core business assets leveraging existing cash, the proceeds from the sale of the core business";

- The AFI line of credit would be paid off and the AFI revolver extended; and

- No additional support in the form of cash, capital or borrowings would be assumed from AFI.[1058]

At the July 20, 2009 meeting, Young presented to the ResCap Board a revised pro forma analysis, extended to 2012.[1059] Although the ResCap Board continued meeting almost daily through the month of August 2009, the meetings do not reflect that further attention was paid to the pro forma analyses during this period. Rather, the ResCap Board focused on the sale of certain MSRs and other assets to AFI.[1060] The ResCap Board does not appear to have revised the pro forma analyses until September 2009, at which time the ResCap Board linked AFI's proposed asset purchase that had been before it for a month to the "Non-Core Run-off" scenario.[1061]

### 5. In 2009, The SEC Approved ResCap's Request To Deregister ResCap's Securities

In August 2008, Young proposed to Marano as well as to Robert Hull and Sam Ramsey at AFI that they consider "having ResCap deregister as a separate filer with the SEC," as it would "reduce audit costs, printing costs, some people, etc."[1062] At its June 24, 2009 meeting,

---

[1058] *See* 2009–2011 Pro Forma ResCap, LLC Modified Non Core Run-off Presentation for Special Meeting of the Board of Directors of Residential Capital, LLC, dated July 8, 2009 [RC40010645]. A Lazard opinion included in the July 9, 2009 ResCap Board materials suggests that these scenarios were prepared at the request of AFI. Lazard noted "[AFI] has requested that ResCap provide it with various integration strategies for the ResCap franchise. ResCap, its Board and its advisors believe that it is in the best interests of ResCap and its stakeholders (including [AFI]) that there be a full integration of ResCap into [AFI]." Lazard Project Scout II Presentation, dated July 7, 2009, at RC40010737 [RC40010645] (noting that full absorption would "result in substantial benefits to [AFI]." The ResCap Board discussed Project Scout II, and the possible sale of ResCap assets to AFI, at its July 22, 2009 and July 27, 2009 Board meetings. *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, July 22, 2009, at RC40006256 [RC40005949]; *see also* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, July 27, 2009, at RC40006259 [RC40005949].

[1059] *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, July 20, 2009, at RC40006253 [RC40005949]; *see also* Materials for Discussion, dated July 20, 2009 at RC40010791 [RC40010781].

[1060] *See generally* Section III.I.1.f.

[1061] *See* 2009–2012 Pro Forma ResCap, LLC Project Newton Non-Core Runoff Presentation, dated Aug. 27, 2009, at RC40009730 [RC40009729].

[1062] E-mail from J. Young to R. Hull, S. Ramsey, and T. Marano (Aug. 11, 2008) [EXAM10174901].

the ResCap Board discussed the rationale supporting de-registration of ResCap from the SEC reporting requirements. Young reviewed the material laying out the rationale for deregistration that was provided in advance of the call:[1063]

- It was allowed because ResCap's exchanged instruments were deemed "freely tradable under the indentures as of June [6], 2008, subject to confirming that less than 300 investors currently held the bonds";

- Financial information (more limited than what would be included in SEC filings) would be provided to debt investors;

- Full audited financial statements would continue to be required of ResCap;

- Deregistration would reduce regulatory risk, facilitate further finance consolidation and drive incremental cost savings; and

- The current restructuring alternatives being considered by ResCap were not expected to preclude deregistration.[1064]

---

[1063] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, June 24, 2009, at RC40006226 [RC40005949].

[1064] ResCap's De-registration from SEC Filing Requirements Presentation, dated June 24, 2009, at RC40010462 [RC40010460]. Young also apprised the ResCap Board of the status of ResCap's request to de-register as an SEC registrant at the July 29, 2009 Board meeting. *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, July 29, 2009, at RC40006262 [RC40005949]. Young updated the ResCap Audit Committee on August 3, 2009. *See* Minutes of a Meeting of the Audit Committee of Residential Capital, LLC, Aug. 3, 2009, at RC40005459 [RC40005434] (informing the Audit Committee that "in response to comments from the SEC, ResCap [would] file amendments to the Company's Quarterly Report for September 30, 2008, Annual Report for December 31, 2008, and Quarterly Report for March 31, 2009"). The disclosures in the amended filings were described as "not material." *Id.*

Young again updated the ResCap Board on de-registration at the August 19, 2009 Board meeting. *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Aug. 19, 2009, at RC40006283 [RC40005949]. Although ResCap initially anticipated the de-registration to be accomplished by June 20, 2009, according to what Young told the ResCap Board at its June 24, 2009 meeting, the SEC did not approve the de-registration until November 3, 2009, shortly before ResCap's 10-Q report for third quarter 2009 was scheduled to be filed. A draft of ResCap's third quarter 2009 report was prepared, but never filed. *See* Certification Draft of ResCap Quarterly Report (Form 10-Q), at RC40018129 [RC40018123] (as provided to the ResCap Audit Committee on November 5, 2009). From the outset, the ResCap Board had been advised that the de-registration would "reduce regulatory risk, facilitate further finance consolidation, and drive incremental cost saves." ResCap's De-registration from SEC Filing Requirements Presentation, dated June 24, 2009, at RC40010462 [RC40010460]. No material produced in this proceeding appears to indicate de-registration led to any significant cost-savings.

On November 3, 2009, the SEC approved ResCap's request to stop filing reports, including the quarterly report for the quarter ending September 30, 2009.[1065] Thereafter, ResCap ceased making any independent filings to the SEC.

### 6.  AFI Ratings Improved Slightly In 2009

While Fitch's ratings of AFI remained static, the other three Rating Agencies saw some positive growth in AFI's outlook in the second quarter of 2009:

- On June 10, 2009, Moody's upgraded AFI's senior debt rating to CA from C, affirmed the commercial paper rating of Not-Prime, and changed the outlook to Review-Positive;

- On May 26, 2009, S&P affirmed AFI's senior debt rating of CCC, affirmed the commercial paper rating of C, and changed the outlook to Developing; and

- On May 26, 2009, DBRS affirmed AFI's senior debt rating of CCC, affirmed the commercial paper rating of R-5, and changed the outlook to "Review-Developing."[1066]

In addition, on June 22, 2009, Marano informed the ResCap Board that "Fitch had upgraded ResCap's servicer ranking and had provided positive comments on the operation."[1067]

---

[1065] *See* SEC No Action Letter (Nov. 3, 2009) (responding to Letter from Mayer Brown, Sent on Behalf of Residential Capital, LLC (Nov. 3, 2009)).

[1066] *See* GMAC LLC, Quarterly Report (Form 10-Q) (Aug. 7, 2009), at 104.

[1067] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, June 22, 2009, at RC40006223 [RC40005949]. Fitch's support for the ResCap's servicer operation continued into 2010, when Fitch stated that in the intervening year, ResCap had "continued to make incremental improvements to its servicing platform to address changing market conditions and to enhance loss mitigation and default management processes"; had "implemented functionality for customers to complete Home Affordable Modification Program (HAMP) financial forms via its website, with automated feeds to the servicing system" and that ResCap continued to "maintain a solid servicing platform with the appropriate staff, default procedures and controls in place to manage its servicing portfolio." Fitch warned that it would continue to monitor ResCap's ability "to maintain servicing performance in a high delinquency environment." Fitch Ratings, *Fitch Affirms ResCap's Residential Servicer Ratings*, Dec. 3, 2010, http://www.bus inesswire.com/news/home/20101203005963/en/Fitch-Affirms-ResCap's-Residential-Servicer-Ratings.

### 7. AFI's Efforts To Recapitalize ResCap In December 2009 Was Part Of An AFI Strategic Review Of How Best To "Maximize Value"

AFI experienced a significant change at its helm in November 2009, when Michael A. Carpenter replaced de Molina as AFI CEO.[1068] Carpenter began his tenure as AFI CEO—a role he continues to play—through media interviews in which he laid out AFI's priorities going forward, making clear that they were different under his leadership than they had been under de Molina's.[1069] Carpenter described his first priority as making AFI "the premier auto-finance company."[1070] He asserted that AFI needed "a very strong strategic direction," and a "turnaround orientation."[1071] Carpenter described the mortgage business as "a drag on the economy" that required a solution.[1072]

Tessler, who was no longer a member of the AFI Board, attended the December 14, 2009 AFI Board meeting as a "non-voting observing designee."[1073] At that meeting, a decision was made to recapitalize ResCap. In an early December 2009 e-mail to Carpenter, Tessler gave the following piece of advice to Carpenter: "Recap and sell ResCap, merge it with [AFI] and keep it or file it, but my advice whatever you decide is to put uncertainty about ResCap behind you before the end of '09."[1074] Carpenter responded that "clear, decisive action" was needed in

---

[1068] *See* Minutes of Special Meeting of the Board of Directors of GMAC Inc., Nov. 16, 2009, at ALLY_0115270–72 [ALLY_0114717]. Forbes subsequently described de Molina's departure as one of the top 12 CEO departures of 2009: "In November the board of automobile lender [AFI] ousted its chief executive, Alvaro de Molina, after 19 months on the job. Between December 2008 and the time of de Molina's departure, [AFI] had received $12.5 billion in taxpayer money, which gave the U.S. government a 35.4% stake in the Detroit company." *Top 12 CEO Departures*, FORBES, http://www.forbes.com/2009/12/15/ceo-departures-employment-leadership-ceo network-fired_slide_4.html.

Carpenter joined the AFI Board as an independent director on May 21, 2009, along with Franklin W. Hobbs (who later became AFI Board chair) and Mayree C. Clark. They were a part of a "newly reconstituted" AFI Board, which also included de Molina, Cerberus appointee Stephen Feinberg and two appointees of the U.S. Treasury, Robert T. Blakely and Kim S. Fennebresque. GMAC LLC, Current Report (Form 8-K) (May 29, 2009), Ex. 99.1.

[1069] *See, e.g.*, Dakin Campbell, *GMAC's New CEO Focuses on Autos, 'Solution' at ResCap*, BLOOMBERG NEWS, Nov. 17, 2009, http://www.bloomberg.com/apps/news?pid=newsarchive&sid= aNNg1tH1YKq4.

[1070] *Id.*; *see also* GMAC Press Release, *GMAC Names Michael A. Carpenter Chief Executive Officer; Will Lead Next Phase Of Renewal*, Nov. 16, 2009, http://www.prnewswire.com/news-releases/gmac-names-michael-a-carpenter-chief-executive-officer—will-lead-next-phase-of-renewal-70219362.html ("'A renewed [AFI] is crucial to business and public sector efforts to bolster the U.S. auto industry, and we have a special obligation to the public to do everything we can to ensure [AFI] succeeds,' Carpenter said. His mission, he noted, includes operating [AFI] the rigorous standards required of a bank holding company, resolving the difficult issues we face with the mortgage business, and repaying in full the funds the U.S. government has invested in [AFI].'").

[1071] Dakin Campbell, *GMAC's New CEO Focuses on Autos, 'Solution' at ResCap*, BLOOMBERG NEWS, Nov. 17, 2009, http://www.bloomberg.com/apps/news?pid=newsarchive&sid= aNNg1tH1YKq4.

[1072] *Id.*

[1073] Minutes of Special Meeting of the Board of Directors of GMAC Inc., Dec. 14, 2009, at ALLY_0115287 [ALLY_0114717].

[1074] E-mails between M. Carpenter and L. Tessler (Dec. 3–4, 2009) [CCM00065644].

2009. He opined that his problem had been "lack of clarity" on ResCap's numbers and proposed solutions that "often resulted in increased commitment[,] not isolating the cancer."[1075] It thus appears that Carpenter's inclination in December 2009 was finality, in whatever form it arrived.

At the time Carpenter became AFI CEO, the U.S. Treasury appeared poised to make an additional $5.6 billion TARP investment in AFI before the end of the 2009 fiscal year, when TARP funding was set to expire. The media at the time reported that Carpenter had tabled that injection of funds until he could assess AFI's needs,[1076] including evaluating ResCap. Carpenter clarified that it was actually the U.S. Treasury that slowed the funds down until AFI produced a "game plan" with respect to AFI's business, including ResCap.[1077]

AFI began an ongoing strategic review of how to best deploy AFI's current and future capital and liquidity, which included a decision to "pursue strategic alternatives for" ResCap.[1078] In its Quarterly Report for the quarter ended September 30, 2009, AFI acknowledged that ResCap expected to have "significant near-term liquidity issues," and that there was a "significant risk that ResCap [would] not be able to meet its debt service obligations and other funding obligations in the near term."[1079] AFI noted:

> ResCap expects continued liquidity pressures for the remainder of 2009 and into 2010. ResCap is highly leveraged relative to its cash flow…. ResCap also must find alternate funding sources for assets that must periodically be withdrawn from some of its financing facilities as maximum funding periods for those assets expire. In addition, in connection with the recent restructuring of ResCap's credit facilities, ResCap became subject to requirements to maintain minimum consolidated tangible net worth and consolidated liquidity balances in order to continue its access to those facilities. ResCap will attempt to meet these and other liquidity and capital demands through a combination of operating cash and additional asset sales. The sufficiency of these sources of additional liquidity cannot be assured, and any asset sales, even if they raise sufficient cash to meet ResCap's liquidity needs, may result in losses that negatively affect our overall profitability and financial condition. Moreover, even if ResCap is successful in implementing all of the actions described above, its ability to satisfy its liquidity needs and comply with any covenants included in its debt agreements requiring maintenance of minimum cash balances may be affected by additional factors and events (such as interest rate fluctuations and margin calls) that increase ResCap's cash needs making ResCap unable to independently satisfy its near-term liquidity requirements.[1080]

---

[1075] Id.

[1076] Dakin Campbell, *GMAC's New CEO Focuses on Autos, 'Solution' at ResCap*, BLOOMBERG NEWS, Nov. 17, 2009, http://www.bloomberg.com/apps/news?pid=newsarchive&sid= aNNg1tH1YKq4.

[1077] Int. of M. Carpenter, Mar. 4, 2013, 86:16–90:17.

[1078] GMAC Inc., Current Report (Form 8-K) (Dec. 30, 2009), Ex. 99.1.

[1079] GMAC Inc., Quarterly Report (Form 10-Q) (Nov. 10, 2009), at 109.

[1080] *Id*.

On December 11, 2009, AFI made a presentation to the U.S. Treasury, requesting an infusion of funds under the SCAP program.[1081] During the meeting, AFI noted that its corporate objectives included taking the following actions:

- Build a world class auto finance franchise;

- Repay the U.S. Government investment as soon as possible; and

- Resolve ResCap drag.[1082]

AFI described its "Auto Finance franchise" to the U.S. Treasury as "strong with substantial room for improvement," and with a "[s]trong management team."[1083] Noting that ResCap had "reduced its assets to approximately $20 billion," from its "peak of over $135 billion,"[1084] AFI took a different tone with respect to the mortgage business. It declared the challenge with regard to ResCap to be "neutralizing/exiting at lowest cost," and proposed that in order for AFI to repay the U.S. Treasury in full by the end of 2012, three things needed to happen:

(1) ResCap had to be "neutralized";

(2) AFI had to "return to profitability in 2009; and

(3) an appropriate capital structure had to be implemented in 2009.[1085]

AFI discussed what it called the "ResCap Containment Strategy," which called for AFI to exit the mortgage business over time rather than to pursue an "in court solution."[1086] AFI

---

[1081] *See* GMAC Presentation to the U.S. Department of the Treasury Regarding Request for SCAP Funding, dated Dec. 11, 2009, at ALLY_0271776 [ALLY_0271648] (discussed in AFI Board materials for December 14, 2009 [ALLY_0271648]). SCAP—the Supervisory Capital Assessment Program—was a program established under the Capital Assistance Program (a component of TARP) "to assess whether the 19 largest U.S. bank holding companies had enough capital to withstand a severe economic downturn." GOVERNMENT ACCOUNTING OFFICE, TROUBLED ASSET RELIEF PROGRAM BANK STRESS TEST OFFERS LESSONS AS REGULATORS TAKE FURTHER ACTIONS TO STRENGTHEN SUPERVISORY OVERSIGHT (Sept. 27, 2010), http://www.gao.gov/products/GAO-10-861. Through the SCAP program, federal bank regulators would conduct a stress test to determine if the bank holding company needed to raise additional capital.

[1082] *See* GMAC Presentation to the U.S. Department of the Treasury Regarding Request for SCAP Funding, dated Dec. 11, 2009, at ALLY_0271779 [ALLY_0271648] (discussed in AFI Board materials for December 14, 2009 [ALLY_0271648]).

[1083] *Id.* at ALLY_0271780.

[1084] *Id.* at ALLY_0271782.

[1085] *Id.* at ALLY_0271783.

[1086] *Id.* at ALLY_0271784–86.

posited that such an outcome would be "counterproductive" to AFI's objectives because asset values (particularly MSRs) would be impaired, AFI would have to provide financing to ResCap, and the risk of multi-billion dollar litigation would further "delay any improvement in AFI's debt ratings, restrict demand in AFI's unsecured bonds, and delay the timing of AFI's IPO.[1087]

AFI advised the U.S. Treasury that it would be making the following recommendations to the AFI Board:

- Recognize embedded losses on remaining distressed mortgage assets (estimated at $3.3 billion, including $1.3 billion at Ally Bank);

- Recapitalize ResCap in the most efficient way possible, using a combination of inter-company debt forgiveness, asset contributions and cash;

- Restructure the intercompany facilities to improve the repayment of the facilities over time;

- Explore all options to distribute assets or businesses and monetize bond discounts where possible; and

- Recognize up to an addition $295 million of Reps and Warranties expense.[1088]

AFI offered a series of recommended "capital structure transactions" to be executed prior to year-end, which it asserted would position AFI for "future success."[1089]

At a December 14, 2009 meeting, Carpenter, along with Hirtler-Garvey and Ramsey, made a presentation to the AFI Board on alternative scenarios for ResCap, and Marano discussed ResCap's proposed sale of "selected international assets" to Fortress. After Marano left the meeting, Carpenter turned to a discussion of ResCap's strategic alternatives.[1090] A draft of the December 14 AFI Board deck suggests that AFI sought to:

- Insulate AFI from ResCap "earning surprises";

- Distance ResCap from AFI to allow AFI "better access to public markets";

---

[1087] *Id.* at ALLY_0271785.

[1088] *Id.* at ALLY_0271786.

[1089] *Id.* at ALLY_0271799.

[1090] *See* Minutes of Special Meeting of the Board of Directors of GMAC Inc., Dec. 14, 2009, at ALLY_0115293–94 [ALLY_0114717] (noting that capital infusions of more than $50 million required the approval of the AFI Board). At this meeting, the AFI Board agreed to permit a capital contribution in the amount of $77.325 million "in the form of forgiveness of inter-company debt held by GMAC-RFC Holding Company" from ResCap to its wholly owned indirect subsidiary, RFC, so that RFC could meet its own minimum net worth targets. *Id.* at ALLY_0115291.

- Minimize AFI's "capital infusion to facilitate ResCap wind-down";

- "Maximize exit value over time"; and

- Enable AFI to repay the government quickly.[1091]

The strategic alternatives discussed included having ResCap (1) running off or selling assets in a chapter 11 or chapter 7 bankruptcy case, possibly with AFI bidding on ResCap's origination and servicing business in a sale under section 363 of the Bankruptcy Code; (2) maintaining the status quo; (3) merging ResCap into AFI; (4) spinning off ResCap; (5) restructuring ResCap and selling ResCap's mortgage operations; or (6) restructuring ResCap and AFI buying ResCap's agency origination and servicing business.[1092] The presentation underscored that AFI investors would view a ResCap merger into AFI as "extremely unattractive."[1093] The AFI Board was advised that a recommended next step would be to recapitalize ResCap.[1094] AFI did just that. The AFI Board reviewed the alternatives and "unanimously concluded" that the proposed actions were in the best interest of AFI and its stakeholders.[1095]

On December 30, 2009, AFI announced a series of what it described as "key capital and strategic actions" designed to strengthen AFI's capital base, position AFI for "improved financial performance, minimize further adverse effects" on AFI related to ResCap, and "improve access to the capital markets over time."[1096] The capital actions included a capital infusion of $3.79 billion from the U.S. Treasury, which was less than the originally anticipated

---

[1091] Draft Presentation to the Board of Directors of GMAC Inc. Regarding Proposed ResCap Actions, dated Dec. 14, 2009, at ALLY_0385303 [ALLY_0385276].

[1092] *Id.* at ALLY_0385307.

[1093] *Id.* at ALLY_0385305.

[1094] *Id.* at ALLY_0385309.

[1095] *See* GMAC Inc., Current Report (Form 8-K) (Dec. 30, 2009), Ex. 99.1.

[1096] *See id.* During his interview, Carpenter explained that he personally went to U.S. Treasury on December 22, 2009 and advised the U.S. Treasury that AFI had a strategy going forward with regard to ResCap. He said he requested a smaller sum than the $5.6 billion that was earmarked for the third TARP payment. Carpenter stated that during this period AFI also marked the mortgages in Ally Bank to market and used the marked-down mortgages as a capital contribution to ResCap, which, in combination with debt forgiveness "created about $2.8 billion of capital for ResCap." As Carpenter expressed it, they "did a complete reset with the government's money in December of 2009." Int. of M. Carpenter, Mar. 4, 2013, at 95:7–15.

III-197

$5.6 billion. AFI described the need for fewer dollars as being "due in large part to lower-than-expected losses related to the General Motors bankruptcy filing."[1097]

With respect to ResCap, AFI reclassified certain mortgage assets from "HFI" to "HFS," which resulted in an estimated pre-tax charge of $1.3 billion for international mortgage assets and businesses and $700 million for domestic mortgage assets.[1098] AFI also repurchased reserve expense of $500 million associated with the mortgage servicing business. The actions taken by AFI called for a capital contribution to ResCap of $2.7 billion in the form of mortgage loans that AFI acquired from Ally Bank, debt forgiveness, and cash. The infusion of capital permitted ResCap's net worth to exceed its TNW and debt covenants.[1099]

AFI stated that, following the transactions that took place in December 2009, it did not expect to incur any further significant losses from ResCap. Rather, AFI expected that ResCap going forward would be in a position to explore strategic alternatives.[1100]

### 8. The Year 2010 Was Economically Brighter For ResCap And AFI

In contrast to 2009, the year 2010 began on a stronger economic note. Mortgage interest rates had fallen to historic lows in 2009, which benefited homeowners and homebuyers, if not

---

[1097] *See* GMAC Inc., Current Report (Form 8-K) (Jan. 5, 2010), Item 9.01, Ex. 99.1. Under the plan, the U.S. Treasury also would transfer $3 billion of Mandatorily Convertible Preferred (MCP) into common equity increasing its common equity ownership of AFI to approximately 56.3%. AFI's remaining common equity holdings following the conversion are as follows: Cerberus and its affiliates hold approximately 14.9%, third party investors hold approximately 12.2%, a trust managed by an independent trustee for the benefit of General Motors holds approximately 9.9%, and an affiliate of General Motors LLC holds approximately 6.7%.

[1098] ResCap Chief Account Officer and Controller, Cathy Dondzila, explained that this constituted a large transfer of assets from "held for investment" to "held for sale," and that not many loans have transferred the opposite way since the 2009 transaction. Int. of C. Dondzila, Sept, 27, 2012, at 28:1–4. Loans that are "held for sale" typically are held for a short time and put into the market; "held for sale" accounting requirements called for the assets to be held "at the lower of cost or market" but different accounting rules applied for "held for investment," which was "more of a cost basis less an allowance for expected losses." *Id.* at 27:22–24.

[1099] *See* GMAC Inc., Current Report (Form 8-K) (Jan. 5, 2010), Item 9.01, Ex. 99.1

[1100] *See id.* In its 2009 Annual Report, AFI made the following year-end statement with regard to ResCap:

> On December 31, 2009, we announced that due to our ongoing strategic review of how to best deploy GMAC's current and future liquidity, we decided to pursue strategic alternatives with respect to ResCap and committed to a plan involving a series of specific actions related to management's intent to sell certain ResCap related assets and businesses. These actions resulted in the reclassification of certain international and domestic mortgage-related assets and businesses of ResCap from held-for-investment to held-for-sale, which included ResCap's United Kingdom operations, continental Europe operations, and certain domestic assets. In order to maximize value, we will consider a variety of options including one or more sales, spin-offs, or other potential transactions. The timing and form of execution of any such transaction will depend on market conditions. We believe these transactions should minimize the impact of any significant future losses related to ResCap's legacy mortgage business and position us to explore strategic alternatives for ResCap.

GMAC Inc., Annual Report (Form 10-Q) (Mar. 1, 2010), at 4.

necessarily the business of mortgage servicing. In December 2010, the unemployment rate was 9.4%.[1101] Mortgage delinquencies also leveled off in 2010, and new housing starts held steady at 417,000.[1102] The FRB cut its target funds rate to near zero, actually reaching 0.01% in December 2009.[1103] The yield curve, which had inverted in 2006 and 2007 when short-term interest rates exceeded long term rates, had now normalized as the FRB held short-term rates low.[1104]

Under Carpenter's leadership, AFI, which became Ally Financial Inc. as of May 10, 2010, had a profitable year in 2010. AFI earned core pretax income of $2.5 billion in 2010 and was profitable in all four quarters in 2010.[1105] For ResCap, too, 2010 showed promise. Marano stated that he believed the mortgage and capital markets business to be "a very good opportunity in 2010.[1106] He added: "And, you know, we did make money in 2010."[1107]

As part of its future business plans, ResCap considered various scenarios, including Project Gemini, which provided for recapitalizing the core operations of ResCap into a new entity, as modeled by Bank of America. As Marano succinctly put it: "We were marketing ResCap in 2010."[1108] As part of the 2010 "sale process," AFI was "considering a sale, a spin-off or retaining" ResCap.[1109]

---

[1101] *See* U.S. DEP'T OF LABOR, BUREAU OF LABOR AND STATISTICS, THE EMPLOYMENT SITUATION–DECEMBER 2010 (Jan. 7, 2011), at http://www.bls.gov/news.release/archives/empsit_01072011.pdf.

[1102] S&P DOW JONES INDICES: RESIDENTIAL REAL ESTATE INDICATORS—JANUARY 2011, http://us.spindices.com/ indices/real-estate/sp-case-shiller-us-national-home-price-index.

[1103] FRB, Press Release (Dec. 16, 2009), http://www.federalreserve.gov/newsevents/press/ monetary/ 20091216a.htm. The press release reads in part: "The Committee will maintain the target range for the federal funds rate at 0 to 1/4 percent and continues to anticipate that economic conditions, including low rates of resource utilization, subdued inflation trends, and stable inflation expectations, are likely to warrant exceptionally low levels of the federal funds rate for an extended period. To provide support to mortgage lending and housing markets and to improve overall conditions in private credit markets, the Federal Reserve is in the process of purchasing $1.25 trillion of agency mortgage-backed securities and about $175 billion of agency debt. In order to promote a smooth transition in markets, the Committee is gradually slowing the pace of these purchases, and it anticipates that these transactions will be executed by the end of the first quarter of 2010. The Committee will continue to evaluate the timing and overall amounts of its purchases of securities in light of the evolving economic outlook and conditions in financial markets."

[1104] Larry Kudlow, *The Yield Curve Is Signaling Bigger Growth,* 1260 WRC, Dec. 22, 2009, http://www.1260wrc.com/column.aspx?id=5c932231-63c0-4d2f-895a-90474faf4212.

[1105] Ally Financial Inc., Annual Report (Form 10-K) (Feb. 25, 2011), at 261.

[1106] Int. of T. Marano, Nov. 26, 2012, at 71:24–72:18; 76:7–15.

[1107] *Id.*

[1108] Int. of T. Marano, Feb. 27, 2013, at 111:4–8.

[1109] *Id.* at 132:16–19.

### a. Steven Abreu Was Named ResCap President In January

The new year also brought a change to the executive ranks of ResCap when Steven Abreu joined as president on January 29, 2010. A special meeting of the ResCap Board was called to introduce Abreu as a candidate for ResCap president. In response to a director's question, Marano advised that if Abreu were appointed president, Abreu would be responsible for the day-to-day operations of ResCap. Following a question/answer period and discussion among the directors, the ResCap Board voted unanimously to appoint Abreu effectively immediately.[1110] Abreu was elected to the ResCap Board on March 29, 2010.[1111]

### b. 2010 Also Saw A Bump In Ratings For AFI And A Small Boost From S&P For ResCap

With AFI having received substantial support in the form of TARP funds from the U.S. Treasury, both AFI and ResCap bonds traded higher.[1112] The beginning of 2010 brought a boost to AFI's ratings:

> (1) On January 19, 2010, DBRS upgraded AFI's senior debt rating to BB-Low from CCC, upgraded the commercial paper rating to R-4 from R-5, and changed the outlook to Stable (from Review-Developing);
>
> (2) On January 21, 2010, Fitch upgraded AFI's debt to B from CC, upgraded the commercial paper rating to B from C, and changed the outlook to Positive;
>
> (3) On January 27, 2010, S&P upgraded AFI's senior debt rating to B from CCC, affirmed the commercial paper rating of C, and changed the outlook to Stable (from Developing); and
>
> (4) On February 5, 2010, Moody's upgraded AFI's senior debt rating to B3 from Ca, affirmed the commercial paper rating of Not-Prime, and changed the outlook to Stable (from Review-Positive).[1113]

ResCap's ratings otherwise remained static.

---

[1110] *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Jan. 29, 2010, at RC40018731 [RC40018729].

[1111] Unanimous Written Consent of the Residential Capital, LLC Board of Directors, dated Mar. 29, 2010, at RC40018746 [RC40018729].

[1112] Matt Townsend, *GMAC, ResCap Bonds Rally on Bailout, Rejection of Bankruptcy*, BLOOMBERG, Jan. 6, 2010, http://www.bloomberg.com/apps/news?pid=newsarchive&sid=aM794waDGk94&pos=4.

[1113] *See* GMAC, Inc., Annual Report (Form 10-K) (Feb. 25, 2011), at 104.

9. *ResCap Sold Its International Mortgage Business To Fortress, And AFI Entertained Two Offers For ResCap Itself*

ResCap spent much of 2010 negotiating a sale of its European mortgage assets and operations to Fortress. Although Carpenter described 2010 as "quite benign," the sale of ResCap's European mortgage assets involved a difficult negotiation, and it was not clear until the end "whether there would be a deal or not."[1114] At the time of closing, Carpenter made the following public statement:

> The completion of these sales is another milestone toward our objective of reducing exposure in the legacy mortgage operation . . . . In addition to these transactions, we continue to sell other legacy assets and remain focused on defining the best long-term strategy for our origination and servicing business. The sales include a combination of approximately US $11 billion of securitized loans, other loan assets (including non-performing loans) and servicing rights, and the shares of the related operating entities in the United Kingdom, Germany and The Netherlands. With the completion of these transactions, [AFI] has effectively exited the European mortgage market.[1115]

During this period, AFI considered selling ResCap. Fortress and Centerview each submitted bids to buy ResCap outright.[1116] During his interview, Carpenter explained that the sale did not happen because the bidders were taking advantage of the market, and wanted AFI to continue holding the historical exposures. For Carpenter, this made no sense because it meant AFI would have all of the exposure and no business in which to manage any problems. He explained that because of this, AFI dropped the idea "pretty quickly. [1117]"

10. *The ResCap Board Considered And Approved The First 2009 Tax Allocation Agreement In August 2010 And Later Considered And Approved The Second 2009 Tax Allocation Agreement In December 2010*

From ResCap's inception in 2005, ResCap had in place tax allocation agreements with AFI that created contractual rights to cash flows between ResCap and AFI that were tied to the income taxation of the operations of ResCap and AFI.[1118] Tax allocation agreements relating

---

[1114] Int. of M. Carpenter, Mar. 4, 2013, at 141:16–145:6.

[1115] AFI, *Ally Financial Completes Sales of European Mortgage Assets and Operations*, Oct. 1, 2010, http://media.ally.com/index.php?s=43&item=419.

[1116] Int. of M. Carpenter, Mar. 4, 2013, at 147:7–148:14.

[1117] *Id.* at 141:16–148:14.

[1118] Implemented 2005 Tax Allocation Agreement, at ALLY_0178780–86 [ALLY_0178779]; Other 2005 Tax Allocation Agreement [MELZER.009035]; 2006 Tax Allocation Agreement, at ALLY_0178787–93 [ALLY_0178779]; First 2009 Tax Allocation Agreement, at RC40016379–84 [RC40016362]; Second 2009 Tax Allocation Agreement [RC00028796].

to federal income tax liabilities and refunds were in effect only during the periods when ResCap was included on either a GM or AFI consolidated federal income tax return. In early August 2010, ResCap management presented to the ResCap Board the First 2009 Tax Allocation Agreement.[1119] It had been drafted by AFI and negotiated with ResCap's counsel,[1120] and it provided for federal income tax liabilities and refunds to be covered by a tax allocation agreement effective as of November 1, 2009,[1121] which was when ResCap joined the AFI consolidated federal income tax return.[1122] The ResCap Board approved the First 2009 Tax Allocation Agreement,[1123] but no ResCap officer ever signed the agreement.[1124] AFI drafted and presented the Second 2009 Tax Allocation Agreement to ResCap management in October 2009 after AFI had calculated that it would be required to make large payments to ResCap before the end of the 2010 under the First 2009 Tax Allocation Agreement.[1125] In drafting the Second 2009 Tax Allocation Agreement, AFI started with the First 2009 Tax Allocation Agreement and removed the provision that created ResCap's contractual right to receive payments from AFI.[1126] The ResCap Board later approved the Second 2009 Tax Allocation Agreement in December 2010.[1127] The Second 2009 Tax Allocation Agreement was fully executed by all parties in January 2011.[1128]

### 11. The Debtors Settled Certain Fannie Mae And Freddie Mac Claims In 2010

The year 2010 saw lawsuits and repurchase demands beginning to mount against mortgage originators and servicers by a number of state attorneys general, federal agencies,

---

[1119] *See* Minutes of a Regular Meeting of the Board of Directors of Residential Capital, LLC, Aug. 6, 2010, at RC40018820–22 [RC40018729].

[1120] *See* Memorandum, Revised Tax Allocation Agreement Draft, dated July 11, 2010 [EXAM20269709]; E-mail from W. Marx (Dec. 6, 2009) [EXAM12308200].

[1121] First 2009 Tax Allocation Agreement, at RC40016379 [RC40016362].

[1122] *See* Tax Classification and Allocation History, prepared by AFI, at ALLY_0178779 [ALLY_0178779].

[1123] *See* Minutes of a Regular Meeting of the Board of Directors of Residential Capital, LLC, Aug. 6, 2010, at RC40018820–22 [RC40018729].

[1124] *See* E-mail from W. Marx (Oct. 13, 2010), at ALLY_0245484 [ALLY_0245484] ("Under proposed and partially executed tax allocation agreements (Jim Young has not yet executed on behalf of ResCap), [AFI] would be required to pay ResCap for losses used by other members of the group.").

[1125] *See* E-mail from W. Marx (Oct. 18, 2010) [ALLY_0424659] ("In light of the potentially large capital contributions that could result under [the First 2009 Tax Allocation Agreement], I have requested review and approval by [AFI's] current senior leadership."); E-mail from W. Marx (Oct. 15, 2010), at 2 [ALLY_0434931] ("Calculations were started immediately upon filing the first consolidated return on September 15. . . . [W]e realized that we might be locking up cash inside ResCap and raised the alarm.").

[1126] *See* Draft of Second 2009 Tax Allocation Agreement, dated Nov. 2, 2009 [ALLY_0424672].

[1127] *See* Minutes of Special Meeting of Board of Directors of Residential Capital, LLC, Dec. 22, 2010, at RC40018862 [RC40018729].

[1128] Second 2009 Tax Allocation Agreement, at RC00028801 [RC00028796]; *see also* Section V.D.2 (discussing the tax allocation agreements in greater detail).

and investors based on allegations of non-compliance with underwriting standards.[1129] As of December 31, 2009, Freddie Mac had outstanding repurchase requests to its sellers and servicers of $3.8 billion.[1130] This figure grew to $4.8 billion by March 31, 2010.[1131] The first quarter of 2010 repurchase requests of $1.3 billion represented a 65% increase over $789 million in repurchase requests in the first quarter of 2009.

In March 2010,[1132] ResCap reached an agreement with Freddie Mac to settle purported repurchase obligations (for loans written that did not meet Freddie Mac's standards) for the period prior to 2009 for a one-time payment of $325 million.[1133] The Freddie Mac settlement did not settle any alleged violations of servicing obligations or any purported failure to comply with property foreclosure laws.[1134]

### 12. The FHFA Raised New Concerns With ResCap On Behalf Of Fannie Mae And Freddie Mac

On July 12, 2010, the FHFA, conservator to Fannie Mae and Freddie Mac, issued 64 subpoenas to some of the major lenders seeking loan files and transaction documents related to private label mortgage-backed securities in which Fannie Mae and Freddie Mac had

---

[1129] *See, e.g.*, *Countrywide Agrees to Pay $600 Million to Settle Mortgage Lawsuits*, N.Y. TIMES, Aug. 3, 2010, http://www.nytimes.com/2010/08/03/business/03countrywide.html?_r=0; *see also Loan Servicers Prepare for Borrower Backlash, Lawsuits Mounting*, MORTGAGE NEWS DAILY, Oct. 1, 2010, http://www.mortgagenews daily.com/10012010_servicer_lawsuits.asp; *We'd Like to Return These Bad Loans, Please*, CNN Oct. 22, 2010, http://money.cnn.com/2010/10/22/real_estate/repurchase_banks/index.htm.

[1130] Federal Home Loan Mortgage Corporation (Freddie Mac), Quarterly Report (Form 10-Q) (May 5, 2010), Item 2 at 65.

[1131] *Id*.

[1132] The GMAC Board reviewed the proposed legal settlement with Freddie Mac at its regular Board meeting on January 29, 2010. *See* Proposed Legal Settlement—Freddie Mac/ResCap, presented at a Regular Meeting of the Board of Directors of GMAC Inc., Jan. 29, 2010 [ALLY_0267940].

[1133] Monique Lewis & Tibita Kaneene, *Ally Financial starts talks on ResCap, CEO says*, THE FINANCIAL TIMES, May 21, 2010, http://www.ft.com/intl/cms/s/2/1e73a0e2-6ced-11df-91c8-00144feab49a.html#axzz2Kcg80dPx. GMAC Mortgage, RFC, and Freddie Mac were the parties to the Freddie Mac settlement. A draft term sheet, endorsed by Marano and Carpenter, was presented to the ResCap Board Executive Committee on March 15, 2010. The term sheet stated that AFI was not a party to the agreement, but was required by Freddie Mac to enter into a guaranty or "keep well agreement" related to the settlement. *See* GMAC Mortgage Repurchase Settlement Term Sheet, attached to e-mail from C. Quenneville, Mar. 15, 2010 [RC40015746]; *see also* Ally Financial Inc., Annual Report (Form 10-K) (Feb. 25, 2011) (noting that settlement agreements had been reached with Freddie Mac and Fannie Mae during the fiscal year, which had significantly limited AFI's and the Debtors' repurchase obligations, and noting that AFI's mortgage operations held reserves of $830 million as of December 31, 2010 for potential breaches of representations and warranties).

[1134] Ally Financial Inc., Annual Report (Form 10-K) (Feb. 25, 2011), at 247. At least one media outlet tried to make the case that the timing of the spring 2010 Freddie Mac settlement was influenced by the U.S. Treasury's desire to see ResCap sold. *See* Josh Kosman, *Freddie Lets GMAC Loan Go Free For Fee*, N.Y. POST, May 11, 2010, http://www.nypost.com/p/news/business/recycling_bad_ paper_ yxUqiKN54z7ZZ85wRrFXKJ.

invested only to suffer substantial losses.[1135] The agency and its clients wanted to learn whether in securitizing and selling the loans, the lenders had made material misrepresentations or omissions such that the lenders would be obligated to repurchase the loans. Private label securities were "among the poorest performing mortgages," representing 27% of all mortgages that were ninety days or more past due.[1136] Fannie Mae and Freddie Mac were large investors in the securities.[1137] Certain of the subpoenas were directed at ResCap entities.[1138]

In an agreement dated December 23, 2010, between Fannie Mae and GMAC Mortgage, ResCap, RFS, RAMP, RFC, RALI, and Homecomings, ResCap settled Fannie Mae's claims. In exchange for making a cash payment of $461.5 million (involving approximately $292 billion unpaid principal balance ($84 billion of current unpaid principal balance)),[1139] Fannie Mae agreed to release ResCap and its affiliates, officers, directors, and shareholders (other than Ally Bank) "from certain potential mortgage liabilities," related to mortgage repurchase obligations triggered by representation and warranty breaches.[1140] The settlement agreement covered "loans serviced by GMAC Mortgage on behalf of Fannie Mae prior to June 30, 2010 and all mortgaged-backed securities that Fannie Mae purchased at various times prior to the settlement, including private label securities."[1141] The settlement did not (1) release ResCap of its obligations to indemnify Fannie Mae or (2) protect ResCap from any potential liability for any failure to comply with any state or federal law applicable to foreclosing on property serving as mortgage collateral.[1142] ResCap and AFI described the settlement as "modestly in excess of" the amount that the ResCap had previously reserved.[1143]

---

[1135] Nick Timaros, *U.S. Queries 64 Issuers of Mortgage Securities, Others*, WALL ST. J., July 13, 2010, http://online.wsj.com/article/SB10001424052748704288204575362882033038278.html; *see also* Suzanne Kapner, *Fannie, Freddie Regulator Issues Subpoenas*, THE FIN. TIMES, http://www.ft.co m/intl/cms/s/0/75d669c0-8e01-11df-b06f-00144feab49a.html#axzz2Kcg 80dPx.

[1136] Nick Timaros, *U.S. Queries 64 Issuers of Mortgage Securities, Others*, WALL ST. J., July 13, 2010, http://online.wsj.com/article/SB10001424052748704288204575362882033038278.html.

[1137] *Id*.

[1138] Ally Financial Inc., Current Report (Form 8-K) (Dec. 23, 2010).

[1139] Ally Financial Inc., Press Release, *Ally Financial's Mortgage Subsidiaries Reach Agreement with Fannie Mae on Repurchase Exposure* (Dec. 27, 2010), http://media.ally.com/index.php?s=43&item=437.

[1140] Ally Financial Inc., Current Report (Form 8-K) (Dec. 23, 2010).

[1141] Ally Financial Inc., Press Release, *Ally Financial's Mortgage Subsidiaries Reach Agreement with Fannie Mae on Repurchase Exposure* (Dec. 27, 2010), http://media.ally.com/index.php?s=43&item=437.

[1142] Ally Financial Inc., Current Report (Form 8-K) (Dec. 23, 2010); *see also* Ally Financial Inc., Annual Report (Form 10-K) (Feb. 25, 2011), Ex. 10.9.

[1143] Ally Financial Inc., Press Release, *Ally Financial's Mortgage Subsidiaries Reach Agreement with Fannie Mae on Repurchase Exposure* (Dec. 27, 2010), http://media.ally.com/index.php?s=43&item=437.

When fiscal year 2010 drew to a close, ResCap was still responding to the Freddie Mac subpoenas for documents connected to Freddie Mac's investments in private label mortgaged backed securities. In its 2010 Annual Report, AFI stated that it was not possible to determine what the potential losses might be related to these claims.[1144]

### 13. Fall 2010 Brought Investigations And Allegations By Various State And Federal Government Offices And Agencies Related To Mortgage Foreclosure Activities

In fall 2010, U.S. state and federal government offices and agencies, including the attorneys general of all fifty states, the DOJ, U.S. Treasury, HUD,[1145] the FRB, the FDIC, the SEC and other agencies, regulators, government offices, and Congressional committees opened investigations into the procedures followed by mortgage servicing companies and banks, including ResCap, "in connection with mortgage foreclosure home sales and evictions."[1146] AFI and its subsidiaries cooperated with the investigations and anticipated that AFI or its subsidiaries would be subject to penalties and sanctions related, in part, to foreclosures begun through an automated "robo-signing" system where the person signing the foreclosure affidavit had no knowledge of what it contained.

On September 17, 2010, GMAC Mortgage "temporarily suspended mortgage foreclosure home sales and evictions and postponed hearings on motions for judgment in certain states"[1147] when in some states, questions arose as to whether the persons signing the affidavits (1) verified the information contained in the affidavits and (2) actually signed the affidavits in the physical presence of a notary.[1148] AFI also reported that GMAC Mortgage had implemented additional procedures to be used in all foreclosure cases going forward that would ensure that all affidavits were "properly verified and executed."[1149] Following the suspension of activity, GMAC Mortgage would only proceed with the foreclosure following an individualized review of each file.[1150] Two weeks later, ResCap executives, including Marano, Abreu, and Hamzehpour were advised by AFI's Chief Public Policy Officer to start

---

[1144] Ally Financial Inc., Annual Report (Form 10-K) (Feb. 25, 2011), at 247.

[1145] *See, e.g.*, Zachary Goldfarb, *Task force probing whether banks broke federal laws during home seizures*, WASH POST, Oct. 20, 2010, http://www.washingtonpost.com/wp-dyn/content/article/2010/10/19/AR201010 1904845.html.

[1146] Ally Financial Inc., Annual Report (Form 10-K) (Feb. 25, 2011), at 246.

[1147] *Id*.

[1148] *Id*.

[1149] *Id*.

[1150] *Id*; *see also* TESTIMONY OF T. MARANO, BEFORE THE SUBCOMMITTEE ON HOUSING AND COMMUNITY OPPORTUNITY, COMMITTEE ON FINANCIAL SERVICES, U.S. HOUSE OF REPRESENTATIVES, Nov. 18, 2010, at 6, http://financialservices.house.gov/media/file/hearings/111/marano111810.pdf.

identifying all of the stakeholders and to determine what information would be shared with them, and to start identifying the relevant documents, in anticipation of possible public scrutiny.[1151]

Congress got involved in October 2010. Senators Jeanne Shaheen (D-N.H.), Al Franken (D-Minn.), Sheldon Whitehouse (D-R.I.) and Carl Levin (D-Mich.) sent a letter to Carpenter requesting that AFI immediately extend suspension of foreclosure activities in all 50 states, rather than in the 23 states that required judicial involvement.[1152] On November 10, 2010, Marano, in his capacity as CEO of Mortgage Operations for AFI, was invited by the U.S. House of Representatives' Subcommittee on Housing and Community Opportunity to testify at a hearing eight days later taking up the foreclosure issue.[1153] Marano testified to Congress that it was GMAC Mortgage's position that foreclosure is a last resort as "[p]reserving home ownership is in the best interest of all parties," including GMAC Mortgage, which is able to recover its advances following a loan modification, but must continue paying advances on a foreclosure until the foreclosure is finalized, without any hope of having the advances repaid.[1154]

---

[1151] E-mail from M. Leiber to T. Marano, W. Solomon, S. Abreu, J. Pensabnee, T. Hamzehpour, and P. Hobbib, copied to M. Carpenter, B. Yastine, and G. Proia (Sept. 30, 2010) [EXAM11135342].

[1152] Letter from Sen. J. Shaheen, et. al to M. Carpenter (Oct. 8, 2010) [EXAM10425702]. A similar letter was sent to JP Morgan Chase, and the date of the letter coincides with the date that Bank of America agreed to halt foreclosures in all fifty states.

A judicial foreclosure involves a court proceeding, where the lender files a complaint, records a notice among the land records, and properly serves the borrower. The complaint asks the court to allow the lender to foreclose the lien and take possession of the property for nonpayment of the debt. The borrower is given an opportunity to dispute the facts asserted in the complaint, show that the lien has been paid, make any relevant counterclaims, and to appear in any court proceeding. (In most cases, foreclosure actions are undisputed because the borrower has defaulted on the repayment of a valid debt.) If the court determines that foreclosure is appropriate, it will issue a judgment for the lender or servicer for the total amount owed plus the costs of the foreclosure proceeding. Once a judgment has issued, the court will authorize a sheriff's sale of the property, although generally the lender or servicer will be the highest bidder and will take possession of the property.

Non-judicial foreclosures do not involve courts, but rather are controlled by state statute. Typically, in non-judicial proceedings, the borrower is sent a notice of default, which may or may not be recorded among the land records, depending on the individual state law. If the borrower does not cure the default within a set period, the borrower will be sent a Notice of Sale, which generally must be published, and then the property is sold at public auction. A borrower in non-judicial states still may seek the help of a court to enjoin the foreclosure activity. *See* Mortgage Bankers Ass'n, *Judicial Versus Non-Judicial Foreclosure*, http://www.mbaa.org/files/ResourceCenter/ForeclosureProcess/JudicialVersusNon-JudicialForeclosure.pdf.

[1153] Letter from Rep. M. Waters to T. Marano (Nov. 10, 2010) [EXAM10425695].

[1154] TESTIMONY OF T. MARANO, BEFORE THE SUBCOMMITTEE ON HOUSING AND COMMUNITY OPPORTUNITY, COMMITTEE ON FINANCIAL SERVICES, U.S. HOUSE OF REPRESENTATIVES, NOV. 18, 2010, at 3, http://financialservices.house.gov/media/file/hearings/111/marano111810.pdf.

In its 2010 Annual Report, AFI "recorded a liability of approximately $13 million related to potential fines and penalties [it] determined were probable and estimable."[1155] AFI also expressed concerns about other risks that could lead to unforeseen costs, including litigation, delays in the foreclosure process, state interference with foreclosures even after the submission of corrected affidavits, claims from investors holding securities that were impacted by continued delays in the foreclosure process, regulatory fines and sanctions, and reputational harm.[1156]

### 14. 2010 Ended With ResCap "Reasonably Well-Positioned"

As Marano noted, 2010 was a profitable year. It was a year in which ResCap did not repeatedly need to look to AFI for liquidity funding and capital contributions, at least in part, because of the recapitalization in December 2009.[1157] Carpenter described 2010 as "a year of tremendous accomplishment."[1158] He added, "[i]n 2009, [ResCap's problems] were critical and urgent. In 2010, ResCap's problems were time-consuming, but were part of a well-thought out plan"; the year 2010 was one in which Carpenter says the ResCap team accomplished what it set out to do, leaving ResCap smaller and not as important to AFI, but "reasonably well positioned."[1159]

---

[1155] Ally Financial Inc., Annual Report (Form 10-K) (Feb. 25, 2011), at 246. At December 31, 2010, we recorded liability of approximately $13 million related to potential fines and penalties we determined were probable and estimable.

[1156] *Id.*

[1157] That being said, at the end of 2010, ResCap and AFI added an unsecured $500 million "Swingline tranche" to the A&R Line of Credit Agreement. *See* Minutes of a Special Meeting of the Board of Residential Capital, LLC, Dec. 22, 2010, at RC40018857 [RC40018729]; *see also* Fourth Amendment to the Amended and Restated Loan Agreement (Line of Credit Agreement), dated Dec. 23, 2010 [RC00025467]. A "Swingline" loan provides an entity immediate access to large amounts of cash in order to cover possible shortfalls from other debt commitments.

[1158] Int. of M. Carpenter, Mar. 4, 2013, at 143:16–145:6.

[1159] *Id.* at 145:2–6.

## J. EVENTS LEADING TO THE CHAPTER 11 CASES AND PROPOSED POSTPETITION TRANSACTIONS AND AGREEMENTS

By summer 2011, notwithstanding the efforts to stabilize ResCap's business, ResCap "continued to lack liquidity and capital and the market began to perceive that AFI's support for [ResCap] was weakening."[1160] Following the June 2011 Countrywide Settlement, ResCap's and AFI's views evolved as to the substantial magnitude of the potential representation and warranty liabilities.[1161] Indeed, according to AFI's financial advisor, the Countrywide Settlement was a major event culminating in AFI's determination that the potential downside of the mortgage business ultimately outweighed ResCap's value as an asset.[1162]

### 1. ResCap's Consideration Of Strategic Restructuring Scenarios

#### a. ResCap's Initial Contingency Planning

As it became more apparent that AFI would not support ResCap indefinitely, ResCap's management began efforts to "create leverage" over AFI—and thereby persuade AFI to continue to support ResCap for an additional time—by, among other things, threatening that ResCap could "either file for bankruptcy or look for alternative outcomes that were not controlled by or most desired by AFI."[1163] ResCap's goal was to obtain the ability to "self-determine."[1164] In other words, according to ResCap's counsel, if at some point AFI decided to end its support for ResCap, ResCap wanted to be in a position to implement an "elegant-like exit through spin, sale, or ultimately bankruptcy."[1165]

One example of ResCap's efforts to create leverage in connection with preparations for the 2012 bankruptcy filing was the August 12, 2011 letter from Thomas Marano, CEO of ResCap, to Michael Carpenter, CEO of AFI, sent pursuant to a resolution of the ResCap Board.[1166] In his letter, Marano described ResCap's precarious financial condition,

---

[1160] First Day Affidavit, ¶ 86.

[1161] Meeting with Evercore, Financial Advisors to AFI, in N.Y., N.Y. (Sept. 6, 2012); *see also* E-mail from J. Mackey (Aug. 19, 2011) [ALLY_0169890] (noting that representation and warranty claims are "coming" and "[i]t will be an avalanche").

[1162] Meeting with Evercore, Financial Advisors to AFI, in N.Y., N.Y. (Sept. 6, 2012).

[1163] Int. of G. Lee, Feb. 20, 2013, at 38:10–39:21.

[1164] *Id*. at 38:14–21.

[1165] *Id*. at 38:10–40:19. ResCap's Board preferred an out-of-court restructuring to an in-court restructuring. *See id*. at 75:23–77:1. Accordingly, it began to consider a possible transaction with Cerberus in late July 2011. *See* Section III.J.1.b(1).

[1166] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Aug. 12, 2011, at RC40018649–50 [RC40018411]. At the August 12, 2011 meeting, the ResCap Board agreed to "re-engage Morrison & Foerster to refresh bankruptcy planning" and FTI and Lazard as ResCap's "financial advisors and investment bankers, respectively." *Id*. at RC40018650.

acknowledged that AFI had engaged Kirkland & Ellis for bankruptcy planning advice, and informed Carpenter that ResCap would be engaging Morrison & Foerster and Lazard to assist the ResCap Board in preparing for a possible ResCap bankruptcy filing.[1167] Marano noted that if ResCap violated its net worth covenants, it would be forced to file a free fall bankruptcy and warned, "[w]ithout sufficient time to prepare, a filing would be extremely disorganized and would damage the board's efforts to preserve asset value."[1168] Marano asked AFI to provide ResCap with "assurance of sufficient equity to ResCap so it does not violate its net worth covenants" or, in the alternative, "a sufficient equity injection to allow sufficient time for ResCap, if necessary, to file for bankruptcy in a planned and orderly manner."[1169]

AFI was reluctant to provide any support to ResCap unless it believed such support would benefit AFI's own stakeholders. On August 10, 2011, two days prior to sending the above-referenced letter, Marano e-mailed Carpenter to preview ResCap's concerns regarding its ability to meet tangible net worth (TNW) covenants and warned that ResCap may "request an equity injection" from AFI.[1170] Carpenter forwarded Marano's e-mail to Jeff Brown, AFI's Senior Executive Vice President of Finance and Corporate Planning, and noted that "an equity infusion [to ResCap] is the LAST thing I want to do."[1171] On August 16, 2011, Carpenter responded to Marano with a letter noting that "[AFI] has provided substantial support to ResCap in the past and would consider doing so again if it were determined to be in its shareholders' best interest although that does not appear to be necessary at the present time."[1172] Carpenter further noted:

> [AFI] certainly has no interest in seeing the ResCap Board of Directors pursue a free fall bankruptcy and assumes that there would be considerable dialogue with AFI before such an action were contemplated. AFI and ResCap should, therefore, each monitor developments over the coming weeks and months and consider the impact of alternative scenarios on future plans.[1173]

---

[1167] Letter from T. Marano to M. Carpenter (Aug. 12, 2011) [ALLY_0150092]. The ResCap Board eventually ascertained that Lazard had been retained by the U.S. Treasury and instead hired Centerview, a financial advisory firm that had not been "previously engaged by ResCap or any of its affiliated entities." *See* Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 4, 2011, at RC40018690–91 [RC40018411].

[1168] Letter from T. Marano to M. Carpenter (Aug. 12, 2011), at 1 [ALLY_0150092].

[1169] *Id*. at 1–2.

[1170] E-mail from T. Marano to M. Carpenter (Aug. 10, 2011) [ALLY_0170697].

[1171] E-mail from M. Carpenter to J. Brown (Aug. 11, 2011) [ALLY_0170697].

[1172] Letter from M. Carpenter to T. Marano (Aug. 18, 2011) [EXAM11101715] (attached to E-mail from M. Carpenter to T. Marano (Aug. 16, 2011) [EXAM11101714]) (the letter is dated August 18, 2011 but was sent by e-mail on August 16, 2011).

[1173] *Id*.

Carpenter's response to Marano's letter was acknowledged by the ResCap Board as "constructive but non-committal."[1174]

Two days later, on August 18, 2011, the ResCap Board met with attorneys from Morrison & Foerster and Morrison Cohen and discussed "a variety of strategic matters including, but not limited to, various contingencies including a potential bankruptcy and matters associated therewith."[1175] Over the following two weeks, the ResCap Board met on four separate occasions (August 19, 23, 25, and 31) to discuss preparations for a bankruptcy or restructuring.[1176]

With bankruptcy planning underway, ResCap still needed to continue satisfying its TNW covenants in order to have enough time to consummate an out-of-court restructuring or prepare an orderly bankruptcy filing.[1177] To that end, the ResCap Board authorized Marano on August 25, 2011 to deliver a letter to AFI requesting that AFI forgive sufficient ResCap indebtedness so that ResCap could end August 2011 with a TNW level of $500 million.[1178] In the letter, Marano noted that ResCap's estimate of TNW as of August 25, 2011 was $309.7 million, "barely $59 million over our $250 million funding facility covenant levels."[1179] Although Marano conceded in the letter that ResCap's request for sufficient capital to achieve a net worth of $500 million was more than what would "be necessary to avoid breaching the covenants from a technical perspective," he explained that the ResCap Board expected further liquidity drain to occur at the end of August 2011.[1180]

Carpenter forwarded Marano's letter to Brown stating, "This is nuts!"[1181] AFI remained reluctant to provide ResCap with financial support and, rather than accede to ResCap's request for sufficient capital to maintain $500 million of TNW, the AFI Board resolved to provide ResCap with only enough capital for it to exceed its $250 million minimum TNW

---

[1174] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Aug. 16, 2011, at RC40018652 [RC40018411].

[1175] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Aug. 18, 2011, at RC40018653–54 [RC40018411].

[1176] *See* Minutes of a Special Meeting of the Board of Residential Capital, LLC, Aug. 19, 2011, at RC40018655–56 [RC40018411]; Minutes of a Special Meeting of the Board of Residential Capital, LLC, Aug. 23, 2011, at RC40018657–58 [RC40018411]; Minutes of a Special Meeting of the Board of Residential Capital, LLC, Aug. 25, 2011, at RC40018659–60 [RC40018411]; Minutes of a Special Meeting of the Board of Residential Capital, LLC, Aug. 31, 2011, at RC40018661–62 [RC40018411].

[1177] *See* Letter from T. Marano to M. Carpenter (Aug. 12, 2011) [ALLY_0150092].

[1178] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Aug. 25, 2011, at RC40018660 [RC40018411]. Marano delivered the letter requesting AFI's debt forgiveness to Carpenter on August 26, 2011. *See* Letter from T. Marano to M. Carpenter (Aug. 26, 2011) [ALLY_0380110].

[1179] Letter from T. Marano to M. Carpenter (Aug. 26, 2011) [ALLY_0380110].

[1180] *Id.*

[1181] E-mail from M. Carpenter to J. Brown (Aug. 26, 2011) [ALLY_0380109].

covenants by $50 million.[1182] Carpenter explained that Marano's request was "nuts" because ResCap was "$50 million above their minimum and they wanted $500 million. They didn't need $500 million."[1183] In his letter to Marano dated August 30, 2011, Carpenter expressed a hope that AFI's support for ResCap would "allow the ResCap board to focus on permanent solutions rather than devoting resources to near term catastrophe scenarios."[1184]

Notwithstanding AFI's reluctance to provide support to ResCap, it recognized that a breach by ResCap of its TNW covenants would likely result in an "immediate liquidity event" that would need to be disclosed by AFI and would also "put[] ResCap and its independent directors in a much more tenuous position regarding [bankruptcy] preparations . . . ."[1185] Accordingly, the AFI Board resolved again in September, October, November, and December 2011 to ensure that ResCap maintained sufficient capital for it to exceed its TNW covenants by $50 million.[1186]

With its immediate equity concerns temporarily alleviated, but having received the message that AFI's support for ResCap would not necessarily continue indefinitely, the ResCap Board continued to evaluate "various different strategic scenarios" and "contingency planning" options during September and October 2011.[1187] To assist it in its restructuring efforts, ResCap retained Centerview as its investment banker on October 18, 2011.[1188] Centerview's role was focused on "assisting ResCap in restructuring its balance sheet or

---

[1182] *See* Unanimous Consent to Action, dated Aug. 29, 2011, at ALLY_0115739–48 [ALLY_0115565].

[1183] Int. of M. Carpenter, Mar. 4, 2013, at 223:8–224:23.

[1184] Letter from M. Carpenter to T. Marano (Aug. 30, 2011), at RC40019728 [RC40019727].

[1185] *See* E-mail from L. Hall to M. Carpenter (Sept. 26, 2011) [ALLY_0359385].

[1186] *See* Unanimous Consent to Action, dated Sept. 27, 2011, at ALLY_0115751–60 [ALLY_0115565]; Unanimous Consent to Action, dated Oct. 25, 2011, at ALLY_0115768–77 [ALLY_0115565]; Unanimous Consent to Action, dated Nov. 30, 2011, at ALLY_0115789–98 [ALLY_0115565] (apparently supplanting a November 29, 2011 AFI Board action to provide ResCap with enough capital for it to exceed its TNW covenants by just $25 million, *see* Unanimous Consent to Action, dated Nov. 29, 2011, at ALLY_0115779–88 [ALLY_0115565]); Unanimous Consent to Action, dated Dec. 29, 2011, at ALLY_0115843–52 [ALLY_0115565]. AFI forgave $109.4 million of ResCap's debt on December 30, 2011. In addition, AFI forgave $196.5 million of ResCap's debt on January 30, 2012 in connection with the FRB/FDIC Settlement and the DOJ/AG Settlement. *See* Residential Capital, LLC Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010, at 11, 39 [EXAM00122651]. As discussed in Section V.C.1, through those settlements AFI, Ally Bank, ResCap, and GMAC Mortgage addressed certain allegations related to purportedly improper oversight and servicing of residential mortgage loans.

[1187] *See* Minutes of a Regular Meeting of the Board of Residential Capital, LLC, Sept. 15, 2011, at RC40018675 [RC40018411]; Minutes of a Special Meeting of the Board of Residential Capital, LLC, Sept. 27, 2011, at RC40018677 [RC40018411]; Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 4, 2011, at RC40018691 [RC40018411]; Minutes of a Regular Meeting of the Board of Residential Capital, LLC, Oct. 7, 2011, at RC40018695 [RC40018411]; Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 10, 2011, at RC40018696 [RC40018411].

[1188] *See* Centerview Engagement Letter and Indemnification Agreement, dated Oct. 18, 2011, at 1 [EXAM20178226]; Dep. of M. Puntus, Nov. 5, 2012, at 11:7–13.

disposing of assets, and/or financing the Chapter 11 cases."[1189] FTI, which had been working with ResCap intermittently since 2008,[1190] was more focused on the day-to-day financial analyses ResCap required to support those efforts.[1191] The ResCap Board referred to its evaluation of strategic alternatives for ResCap as "Project Bounce."[1192]

Recognizing the company's precarious financial position, the ResCap Board requested that Morrison & Foerster answer the question: "who do we owe our [fiduciary] duties to . . . on any particular day."[1193] On October 28, 2011, Morrison & Foerster gave "a detailed presentation . . . with respect to fiduciary duties of directors."[1194]

As the market became increasingly aware that ResCap was preparing for a potential restructuring, ResCap began to experience difficulty obtaining financing. Following the November 2, 2011 AFI earnings conference call, Randall Newman, Assistant Treasurer of ResCap, e-mailed Jerry Lombardo, Treasury Executive of ResCap, and noted that "renewing the GSAP [F]acility is going to be 50-100bps more exciting."[1195] In response, Lombardo wrote "I knew that was going to happen. . . . [W]hile they are looking to save the [AFI] ship, they are dumping buckets of water into the ResCap vessel."[1196]

On November 8, 2011, the ResCap Board held a special meeting for the purpose of hearing a presentation from Morrison & Foerster, Centerview, and FTI regarding "guidance relating to ResCap contingency planning."[1197] Attorneys from Morrison & Foerster gave a "detailed presentation on matters relating to bankruptcy planning and a sale of assets under Section 363 of the Bankruptcy Code," and the ResCap Board discussed "potential asset sale structures, sale process considerations, and debtor in possession financing and use of cash collateral."[1198] Marano presented, reviewed, and discussed "a series of charts that further described potential strategic alternatives for ResCap, including details of a potential sale transaction.[1199] In addition, Morrison & Foerster attorneys discussed with the ResCap Board

---

[1189] *See* Dep. of M. Puntus, Nov. 5, 2012, at 13:19–24.

[1190] *See* Dep. of M. Renzi, Nov. 7, 2012, at 17:25–19:8.

[1191] *See* Dep. of M. Puntus, Nov. 5, 2012, at 14:12–21.

[1192] *See, e.g.*, Centerview Project Bounce Materials for Discussion, dated Oct. 31, 2011 [EXAM11219455].

[1193] Int. of G. Lee, Feb. 20, 2013, at 146:24–147:20.

[1194] Minutes of a Regular Meeting of the Board of Residential Capital, LLC, Oct. 28, 2011, at RC40018698 [RC40018411].

[1195] E-mail from R. Newman to J. Lombardo (Nov. 3, 2011), at EXAM10460161 [EXAM10460160].

[1196] E-mail from J. Lombardo to R. Newman (Nov. 3, 2011), at EXAM10460160 [EXAM10460160].

[1197] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Nov. 8, 2011, at RC40018701 [RC40018411].

[1198] *Id.*

[1199] *Id.*

"potential legal claims against [AFI] under different strategic scenarios for the mortgage operations."[1200]

On November 25, 2011, the ResCap Board held another special meeting and invited Carpenter to attend. At the meeting, Carpenter discussed, among other things, "the recent historical relationship between [AFI] and ResCap and the impact of external factors, such as capital markets volatility, challenges in the residential mortgage market, and changes in the economy, on mortgage operations and on the business of [AFI] and ResCap."[1201] Carpenter also discussed "the recent reevaluation of potential strategic alternatives and contingency plans for the business."[1202]

### b. ResCap's Consideration Of Restructuring Alternatives And Asset Sales

As noted above, ResCap retained Centerview as its investment banker on October 18, 2011. Centerview was retained to advise ResCap in connection with "any Restructuring, Sale Transaction and/or Financing."[1203] Part of Centerview's mandate was to consider the possible disposition of ResCap's assets.[1204] Centerview was to begin working immediately on "the evaluation and execution of various strategic alternatives including a potential sale of the Company."[1205] Although Centerview analyzed potential out-of-court asset sales and asset sales that would be effectuated in a chapter 11 proceeding, it recognized that an out-of-court transaction would only be successful if AFI could "sever its relationship with ResCap" in a structure that would "eliminate/mitigate current and future financial and legal liabilities."[1206]

---

[1200] *Id*.

[1201] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Nov. 25, 2011, at RC40018712 [RC40018411].

[1202] *Id*. At the same meeting, advisors from Centerview verbally provided a "detailed report" to the ResCap Board regarding bankruptcy planning and "matters related to a potential asset sale," among other topics. *Id*. at RC40018713. Centerview provided an update report on similar matters to the ResCap Board on December 9, 2011. *See* Minutes of a Special Meeting of the Board of Residential Capital, LLC, Dec. 9, 2011, at RC40018725 [RC40018411].

[1203] Centerview Engagement Letter and Indemnification Agreement, dated Oct. 18, 2011, § 1 [EXAM20178226].

[1204] From 2010 through 2012, AFI and ResCap had evaluated a number of strategic alternatives for their mortgage operations, "including 'status quo,' a sale of [AFI's] equity interest in ResCap as well as a spin-off of ResCap to [AFI's] equity holders." *See* Discussion Materials—Joint Presentation by Ally and ResCap, dated Jan. 23, 2012, at 5 [RC00096076]. A sale process conducted in 2010 had failed because, among other things, the bids were "not compelling," bidders were "unwilling to assume contingent liabilities," and "most required [AFI] indemnity." *See id*. Similarly, the "status quo" alternative was not viable because of the "[c]ontinued increase in contingent litigation liabilities," the need for "significant cash infusion by [AFI]," and the potential delay of AFI's initial public offering or sale. *See id*.

[1205] Joint Project Bounce Presentation by Centerview, FTI, and Morrison & Foerster, dated Dec. 15, 2011, at 2 [RC00096142].

[1206] *Id*. at 2–3.

Centerview prepared a preliminary assessment of ResCap's "asset sale alternatives . . . [a]ssuming a chapter 11 sale process is required"[1207] and, on November 16, 2011, Sam Greene from Centerview reported to the ResCap Board regarding "a potential asset sale transaction."[1208] In the presentation, Centerview analyzed ResCap's options with respect to potential asset sales, including whether the business should be marketed "as a whole" or as "separate assets," and evaluated how ResCap's alternatives would be influenced by external factors, including, among other things, AFI's "willingness to contribute assets to and/or sell assets alongside ResCap . . . [and] to provide DIP financing."[1209]

### (1) Evaluation Of Out-of-Court Restructuring Options With Cerberus

Beginning in July 2011, Cerberus, ResCap, and AFI began the process of conducting due diligence for a potential out-of-court transaction by which Cerberus might have purchased the ResCap platform.[1210] As Lenard Tessler of Cerberus summarized:

> [W]e went through an analysis in the third and fourth quarters [of 2011]. Was there a check that [AFI] could write where they could be confident that they would shed themselves of ResCap and we would be confident that we would be able to continue to operate ResCap and fight the litigation in a way that would provide both parties certainty that we would continue to operate and prosper and be able to meet all of our obligations as they come due and that [AFI] would not have to worry about these liabilities coming back at them?[1211]

AFI viewed a ResCap spin-off or sale as "likely not viable paths . . . without more capital and liquidity support."[1212] AFI was also concerned that it might "lose control of managing the liabilities" if ResCap were sold.[1213]

Notwithstanding that the parties believed an out-of-court transaction would be difficult to achieve, ResCap and AFI worked with Cerberus on a potential transaction.[1214] As of

---

[1207] Centerview Project Bounce Materials for Discussion, dated Nov. 14, 2011, at 1–2 [RC00096119].

[1208] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Nov. 16, 2011, at RC40018710 [RC40018411].

[1209] Centerview Project Bounce Materials for Discussion, dated Nov. 14, 2011, at 1 [RC00096119].

[1210] *See* Int. of M. Neporent, Feb. 6, 2013, at 235:15–236:17; E-mail from T. Marano (July 20, 2011) [EXAM11107725]; E-mail from A. Saperstein (July 28, 2011) [EXAM11091053]; ResCap Preliminary Diligence List, dated July 19, 2011 [EXAM11091055]; Project Bounce: Information Provided to Cerberus, dated July 28, 2011 [EXAM11091059].

[1211] Int. of L. Tessler, Feb. 28, 2013, at 176:14–178:4.

[1212] E-mail from J. Brown (Sept. 21, 2011) [ALLY_0237702]; *see also* E-mail from J. Brown to M. Carpenter (Jan. 31, 2012) [ALLY_0141903] (noting that a spin or sale transaction would cost AFI more than $3 billion).

[1213] E-mail from J. Brown (Sept. 21, 2011) [ALLY_0237702].

[1214] Indeed, Centerview complained about the amount of time it spent working on a "highly speculative" Cerberus transaction. *See* E-mail from D. Ying to M. Carpenter (Dec. 12, 2011) [ALLY_0380152]. AFI's advisors believed it was AFI's decision "as to how much time going forward that ResCap should continue to devote to Cerberus." *Id.*

November 14, 2011, Centerview considered Cerberus to be the "top potential buyer" for ResCap assets.[1215] In November and December 2011, ResCap and its advisors spent "significant time working with [AFI] and Cerberus to determine which assets . . . Cerberus would be interested in purchasing."[1216] Discussions between the parties included negotiations regarding the possibility of "Cerberus purchasing ResCap equity, assuming [ResCap]'s contingent legal liabilities and [AFI] providing a significant monetary contribution to capitalize the business."[1217] After "additional due diligence," Cerberus decided to pursue "an asset sale transaction . . . with no legacy financial or legal liabilities."[1218]

As of December 5, 2011, the key terms of the "understanding of the proposed out-of-court transaction" between ResCap, Cerberus, and AFI were as follows: (1) Cerberus would have created a new entity "NewCo" (to be owned 51% by Cerberus and 49% by AFI) and would have invested capital to fund the purchase of ResCap's mortgage loan origination and servicing platform and to adequately capitalize NewCo; (2) AFI would have invested approximately $3.1 billion of cash into ResCap, structured as secured debt, which would have been used to repay the Junior Secured Notes and the Unsecured Notes at a discount in order to "eliminate [the] 'all or substantially all' limitation"; and (3) AFI would have retained 100% ownership of ResCap, which would continue to hold liabilities for potential litigation claims.[1219]

---

[1215] Centerview Project Bounce Materials for Discussion, dated Nov. 14, 2011, at 7 [RC00096119].

[1216] Materials for Discussion, dated Dec. 12, 2011, at 4 [RC00000114].

[1217] Joint Project Bounce Presentation by Centerview, FTI, and Morrison & Foerster, dated Dec. 15, 2011, at 4 [RC00096142].

[1218] *Id*.

[1219] Project Bounce Illustrative Out-of-Court Transaction Structure, dated Dec. 5, 2011, at 1–3 [RC00000068].

EXHIBIT III.J.1.b(1)—1
**Proposed Out-of-Court Transaction Structure**
As of December 5, 2011



Note: Exhibit is verbatim excerpt from source.
Source:  Project Bounce Illustrative Out-of-Court Transaction Structure, dated Dec. 5, 2011, at 1 [RC00000068].

By December 15, 2011, the key terms of the proposed out-of-court Cerberus transaction structure had changed such that: (1) ResCap would have "spun-out" from AFI and would have ceased to be a subsidiary of AFI; and (2) ResCap would have owned between 19% and 49% of NewCo, with Cerberus owning the remainder.[1220]

---

[1220] Joint Project Bounce Presentation by Centerview, FTI, and Morrison & Foerster, dated Dec. 15, 2011, at RC00096147 [RC00096142].

EXHIBIT III.J.1.b(1)—2
**Proposed Out-of-Court Transaction Structure**
As of December 15, 2011



Note: Exhibit is verbatim excerpt from source.
[1] Current potential Cerberus transaction grants partial sweep of NewCo excess cash flow to Legacy Co for specified time period. Equity ownership percentages dependent on percentage and tenor of cash flow sweep.
Source: Joint Project Bounce Presentation by Centerview, FTI, and Morrison & Foerster, dated Dec. 15, 2011, at 5 [RC00096142].

Regardless of the transaction structure, there were a number of concerns regarding the attractiveness and viability of a proposed out-of-court transaction, including whether AFI could achieve its "desire to separate itself from potential ResCap [litigation] liabilities and successfully launch an initial public offering."[1221] Centerview also acknowledged a risk that AFI's capital contribution could "subsequently [be] recharacterized as an equity investment."[1222] In a December 12, 2011 presentation prepared "at the suggestion of" AFI, the ResCap management team and its advisors identified similar issues and noted that execution of a potential out-of-court transaction with Cerberus would be "challenging."[1223]

---

[1221] Project Bounce Illustrative Out-of-Court Transaction Structure, dated Dec. 5, 2011, at RC00000071 [RC00000068]; *see also* Discussion Materials—Joint Presentation by Ally and ResCap, dated Jan. 23, 2012, at 5 [RC00096076].

[1222] *Id.*

[1223] Materials for Discussion, dated Dec. 12, 2011, at RC00000115,–18 [RC00000114].

Likewise, Cerberus identified a number of concerns regarding the proposed transactions. Most significantly, with respect to exposure to potential RMBS-related representation and warranty liabilities, Cerberus "did not agree with ResCap . . . that they had appropriately reserved and that they had appropriately projected out the losses and the liabilities."[1224] Ultimately, ResCap, AFI, and Cerberus viewed an asset sale effectuated through a chapter 11 bankruptcy filing as the "most advantageous strategy."[1225] As Tessler explained:

> We could never develop enough certainty around that process, so we abandoned that effort sometime[] in the third quarter of 2011. . . . [W]e are concerned about the success of [AFI] as we are about the success of the acquisition we'd otherwise be making . . . . It was a series of projections, so therefore, you know, [AFI has] to get comfortable that we would be able to operate the business, generate appropriate cash flows, meet our obligations as they came due . . . so that the liabilities wouldn't necessarily . . . boomerang back at [AFI] because they were not getting third party releases. . . . [T]hey were passing the baton over to somebody who was going to indemnify them, but . . . the indemnification would come from ResCap, it wasn't going to come from us as acquirers, and therefore . . . [i]t made [doing the transaction outside of bankruptcy] less certain, and it was the lack of certainty that made it something that they were unwilling to engage in.[1226]

### c. ResCap's Preparations For Chapter 11 Bankruptcy

In late 2011, according to ResCap's counsel, ResCap had not yet reached the point of no return in connection with a chapter 11 filing and purportedly still held out hope that an out-of-court restructuring was a possibility.[1227] Nonetheless, ResCap's primary efforts shifted towards preparations for a chapter 11 proceeding that would include an asset sale and provide a forum for resolution of financial and litigation claims.[1228]

————————————————————————————

[1224] *See* Int. of M. Neporent, Feb. 6, 2013, at 236:25–237:16.

[1225] *See* Houlihan Lokey Residential Capital LLC Restricted Presentation to the Ad Hoc Noteholder Group, dated May 2012, at CCM00447534 [CCM00447520] (attached to E-mail from J. Strelcova (May 5, 2012) [CCM00447519] ("ResCap has signed off on this document to be distributed.")); *see also* Discussion Materials—Joint Presentation by Ally and ResCap, dated Jan. 23, 2012, at 5 [RC00096076].

[1226] Int. of L. Tessler, Feb. 28, 2013, at 178:5–180:14.

[1227] Int. of G. Lee, Feb. 20, 2013, at 78:22–80:24 ("I still, until Michael Carpenter said they weren't going to fund the business any longer, was of the view that another alternative might come up . . . .").

[1228] Discussion Materials—Joint Presentation by Ally and ResCap, dated Jan. 23, 2012, at 5–6 [RC00096076].

With the hope of making any bankruptcy filing as "elegant" as possible, the ResCap management team and the ResCap Board determined that its priorities were first to obtain a DIP financing commitment to "get the liquidity [ResCap] need[ed] to live," and second to get "a stalking horse bid so that [ResCap] could have some certainty" as to a potential purchaser.[1229] ResCap's third priority, according to Marano, was the negotiation of a settlement with AFI—a task which he stated was "outsourced" to the Special Review Committee.[1230]

On November 28, 2011, ResCap made certain formal "asks" for support from AFI, including a commitment from AFI to: (1) provide ResCap with DIP financing on reasonable commercial terms; and (2) act as "a back-up § 363 purchaser of ResCap's assets."[1231]

### (1) Securing DIP Financing

#### (a) Initial AFI DIP Financing Proposal

On December 2, 2011, the ResCap Board discussed the need for "continued capital support for ResCap and potential DIP financing from AFI in the event ResCap were to file for bankruptcy."[1232] At that meeting, the ResCap Board directed Marano to negotiate a letter agreement with AFI which would "provide for liquidity support for [ResCap], and provide assurance, subject to acceptable conditions, regarding [AFI's] present intention to provide DIP financing (as detailed in the letter agreement) to [ResCap]."[1233]

On December 4, 2011, AFI's counsel memorialized AFI's intention to provide ResCap with DIP financing in the event of a ResCap bankruptcy in an amount "consistent with ResCap's anticipated needs," estimated to be "as high as $1 to $2 billion."[1234] AFI's counsel stressed that the agreement was "not an enforceable commitment to make a DIP Loan."[1235]

AFI understood that the main risk in providing DIP financing was that the recoverability of the DIP financing largely depended upon the value of the section 363 asset sale bids.[1236] However, AFI also understood that it could extract significant benefits by providing DIP

---

[1229] Dep. of T. Marano, Nov. 12, 2012, at 81:20–84:5; *see also* E-mail from T. Marano to J. Mackey (Feb. 19, 2012) [ALLY_0150256]. For a discussion of ResCap's efforts to secure DIP financing, *see* Section III.J.1.c(1). For a discussion of ResCap's efforts to solicit bids on certain assets, *see* Section III.J.1.c(2).

[1230] Dep. of T. Marano, Nov. 12, 2012, at 83:20–25.

[1231] *See* E-mail from T. Marano to M. Carpenter et al. (Nov. 28, 2011) [ALLY_0237877].

[1232] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Dec. 2, 2011, at RC40018716 [RC40018411].

[1233] *Id.*

[1234] E-mail from R. Schrock (Dec. 4, 2011) [ALLY_PEO_0030848]. Specifically, ResCap's estimate of the DIP financing need was $1.7 billion, which included refinancing prepetition indebtedness of $1.2 billion and additional liquidity needs of $0.5 billion. Evercore, Kirkland & Ellis, and Mayer Brown Project Rodeo Discussion Materials, dated Dec. 13, 2011, at 30 [CCM00336243].

[1235] E-mail from R. Schrock (Dec. 4, 2011) [ALLY_PEO_0030848].

[1236] Evercore, Kirkland & Ellis, and Mayer Brown Project Rodeo Discussion Materials, dated Dec. 13, 2011, at 30 [CCM00336243].

financing, such as protecting the value of the platform servicing Ally Bank's assets, obtaining leverage in the negotiations of the AFI Settlement and Plan Sponsor Agreement, and securing a potential lien on any unencumbered cash.[1237]

In January 2012, ResCap and its financial advisors engaged in meetings with AFI and Evercore in which they discussed DIP financing scenarios.[1238] ResCap asked AFI to provide two DIP financing proposals, one that included unencumbered assets in the collateral package and one that excluded unencumbered assets.[1239]

On January 20, 2012, AFI provided a draft DIP financing term sheet to ResCap.[1240] The proposed DIP lenders were AFI and BMMZ (solely with respect to the BMMZ Master Repo Agreement), with a provision for potentially one or more additional financial institutions selected by AFI.[1241] The proposed financing consisted of a senior secured credit facility in the amount of up to $721 million with three sub-facilities.[1242] The proposed AFI DIP financing was to be guaranteed by substantially all of the direct and indirect subsidiaries of ResCap LLC, other than GMAC Mortgage, RFC, and certain bankruptcy remote entities, and secured by all of the related Debtors' interests in the assets sold under the BMMZ Master Repo Agreement, certain GSAP Facility collateral, and the Debtors' mortgage servicing rights related to mortgage loans owned by Fannie Mae and Freddie Mac (subject to obtaining the necessary consent of the applicable GSEs).[1243] No maturity date, interest, or fees were

---

[1237] *Id.*

[1238] E-mail from K. Chopra (Jan. 11, 2012) [EXAM00011218] (certain scenarios allowed repayment from asset sale proceeds, while other scenarios required DIP to "remain in place during a portion of the asset run-off").

[1239] *See* E-mail from K. Chopra (Jan. 13, 2012) [EXAM00077639].

[1240] *See* Draft Summary of Terms and Conditions for Debtor-in-Possession Financing to Residential Capital, LLC and certain of its subsidiaries, dated Jan. 20, 2012 [EXAM00077225] (attached to E-mail from T. Goren to T. Marano (Jan. 27, 2012) [EXAM00077205]).

[1241] *See id.* at 1. Subject to the satisfaction of the closing conditions for the DIP facility, BMMZ proposed to amend and restate the BMMZ Master Repo Agreement to provide that BMMZ would continue to honor transactions executed prepetition under the BMMZ Master Repo Agreement and would commit to execute new transactions on the same terms postpetition. *See id.* at 2.

[1242] *Id.* The draft DIP financing term sheet appeared to assume that AFI would provide only a portion of ResCap's total DIP financing need. *See id.*

[1243] *See id.* at 1, 6.

determined as of the date of the AFI proposed DIP financing term sheet. AFI's proposed DIP financing assumed the following sources and uses of proceeds:

EXHIBIT III.J.1.c(1)(a)
**AFI DIP Financing Proposal — Sources and Uses**
*($ in Millions)*

| Sources | | Uses | |
|---|---|---|---|
| Repo sub-facility initial commitment | $ 250 | Repo sub-facility — repo transactions | |
| GSAP incremental funding sub-facility | 76 | GSAP sub-facility — sale of receivables | |
| Revolving credit sub-facility | 395 | Repayment of Fannie Mae EAF facility | |
| | | Fees and expenses, including DIP facility | |
| | | Working capital, capex, Ginnie Buybacks, other | |
| | $ 721 | | $ 721 |

*Source: Draft Summary of Terms and Conditions for Debtor-In-Possession Financing to Residential Capital, LLC and certain of its subsidiaries, dated Jan. 20, 2012, at 2—4 [EXAM00077225].*

AFI was also cognizant of the potential settlement value of providing DIP financing. On January 17, 2012, Carpenter e-mailed the AFI Board and noted that the issue of whether ResCap should negotiate with "[a]lternative DIP providers and [p]otential third party stalking horses" was an "important one" because, "without Rescap seeking third party expressions of interest, AFI will not get full value in its negotiations with Rescap for whatever DIP financing it provides or any seller financing."[1244]

### (b) Third-Party DIP Financing

Centerview initiated a third-party DIP financing marketing process in January 2012, viewing a facility from AFI as a contingency plan in the event that a third-party DIP financing lender could not be identified.[1245] The process initially undertaken by Centerview was to identify major financial institutions that could support a large, complex DIP financing.[1246] Centerview and ResCap focused primarily on lenders that had the best knowledge of the assets and identified JPMorgan, Barclays, Citibank, Deutsche Bank, and Goldman Sachs as potential DIP financing sources.[1247] Deutsche Bank was the only lender that did not have a prior lending relationship with ResCap.[1248]

During the week of January 30, 2012, ResCap provided Barclays and Citibank with due diligence and allowed them two to three weeks to submit non-binding DIP financing proposals.[1249] On February 17, 2012, Barclays provided ResCap with a DIP financing proposal that provided

[1244] E-mail from M. Carpenter (Jan. 17, 2011) [ALLY_0182854].

[1245] Meeting with Centerview, Investment Banker to the Debtors, in N.Y., N.Y. (Jan. 18, 2013).

[1246] *Id.*

[1247] *Id.*

[1248] *Id.*

[1249] Materials for Discussion, dated Feb. 24, 2012, at EXAM20194425 [EXAM20194424].

for a $1.8 billion facility consisting of a $200 million revolving credit facility, a $1 billion term loan ("A-1 TL"), and a $600 million term loan ("A-2 TL").[1250] On February 21, 2012, Citibank provided ResCap with a DIP financing proposal that provided for DIP financing of up to $1.8 billion, structured with a term loan tranche and a revolving loan tranche in unspecified amounts.[1251]

After receiving the DIP financing proposals from Citibank and Barclays, Centerview advised the ResCap Board that the "proposals were for considerably larger amounts" than the AFI DIP proposal.[1252] Negotiations with both Barclays and Citibank continued through March 2012.[1253] The primary adjustment made in the March DIP financing proposals by Barclays and Citibank was the amount of the DIP facility, which was driven primarily by the decision on whether to refinance certain prepetition facilities.[1254] For a detailed evolution of the different Barclays and Citibank DIP financing proposals, refer to Appendix III.J.1.c(1)(b)—1 and Appendix III.J.1.c(1)(b)—2.

On March 8, 2012, the ResCap Board also considered "the need to reach out to potential additional lenders [other than Barclays and Citibank] because of the expected size of the DIP financing."[1255] Accordingly, ResCap and its advisors engaged in discussions with JPMorgan, Goldman Sachs, and Deutsche Bank regarding additional DIP financing opportunities.[1256] ResCap management believed that soliciting additional third parties would also create more

---

[1250] *Id.* at EXAM20194432.

[1251] Citibank DIP Financing Considerations Presentation, dated Feb. 21, 2012, at RC40020349–50 [RC40020290]. For additional terms included in the February 17, 2012 Barclays DIP financing proposal and the February 21, 2012 Citibank DIP financing proposal, refer to Appendix III.J.1.c(1)(b)—1 and Appendix III.J.1.c(1)(b)—2.

[1252] Draft Minutes of a Special Meeting of the Board of Residential Capital, LLC, Feb. 24, 2012, at 3–4 [EXAM11088866].

[1253] During that month, Barclays submitted revised term sheets on March 8, 19, and 21. *See* Materials for Discussion, dated Mar. 8, 2012, at 2 [RC00000286]; Confidential Presentation of Financing Discussion Materials, dated Mar. 19, 2012, at 1–2 [EXAM00073480]; Centerview Materials for Discussion, Mar. 23, 2012, at 1 [RC00000304]. Citibank submitted a revised DIP financing proposal on March 6. *See* Citibank DIP Financing Considerations Presentation, dated Mar. 6, 2012 [EXAM00074757]; Materials for Discussion, dated Mar. 8, 2012, at 2 [RC00000286].

[1254] *See* Materials for Discussion, dated Mar. 8, 2012, at 2 [RC00000286]; Citibank DIP Financing Considerations Presentation, dated Mar. 6, 2012, at 1 [EXAM00074757].

[1255] Draft Minutes of a Special Meeting of the Board of Residential Capital, LLC, Mar. 8, 2012, at 1 [EXAM11088874].

[1256] Meeting with Centerview, Investment Banker to the Debtors, in N.Y., N.Y. (Jan. 18, 2013); *see also* E-mail from M. Puntus (Mar. 6, 2012) [EXAM00074767] (informing Marano of discussion with Goldman Sachs with respect to participation in the DIP facility); Centerview Materials for Discussion, dated Mar. 23, 2012, at RC00000305 [RC00000304] (noting continuing discussions with Citibank, Deutsche Bank, and Goldman Sachs to "select co-arranger(s)"). This effort was undertaken in part because Citibank expressed discomfort with financing servicing advances. *See* E-mail from M. Puntus (Mar. 6, 2012) [EXAM00074767].

competition.[1257] Goldman was not able to participate in the financing process because of a conflict of interest.[1258] JPMorgan and Deutsche Bank undertook due diligence but ultimately chose not to make a DIP financing proposal.[1259]

On March 23, 2012, Centerview indicated to the ResCap Board that the Barclays DIP financing proposal was more favorable than the Citibank proposal "based on both economic (all-in-yield) and non-economic (collateral, borrowing base) terms," as shown in the exhibit below.[1260]

---

[1257] *See* E-mail from T. Marano to M. Puntus (Mar. 11, 2012) [EXAM00005017]; Meeting with Centerview, Investment Banker to the Debtors, in N.Y., N.Y. (Jan. 18, 2013).

[1258] Meeting with Centerview, Investment Banker to the Debtors, in N.Y., N.Y. (Jan. 18, 2013).

[1259] *Id*.

[1260] Centerview Materials for Discussion, dated Mar. 23, 2012, at 1 [RC00000304].

EXHIBIT III.J.1.c(1)(b)—1
**Barclays Versus Citibank DIP Financing Proposals**
March 2012

| Term | Barclays March 21st DIP Financing Terms[1] | Citibank March 6th DIP Financing Terms[2] |
|---|---|---|
| Borrowers | GMAC Mortgage and new SPV subsidiary that would own certain first lien collateral | ResCap |
| Facility Summary | $1.5 billion facility comprised of: <br> $200 million revolver <br> $1.1 billion term loan (A-1 TL) <br> $200 million term loan (A-2 TL) | $1.35 billion facility comprised of: <br> $800 million Advance Facility (Barclays) <br> $550 million Liquidity Facility (Citibank) |
| Prepetition Facilities Refinanced | GSAP Facility <br> BMMZ Repo Facility <br> FNMA EAF facility | GSAP Facility (Advance Facility) <br> BMMZ Repo Facility (Liquidity Facility) |
| Pricing | Revolver: L + 400 bps <br> A-1 TL: L + 400 bps (LIBOR floor of 1.25%) <br> A-2 TL: L + 600 bps (LIBOR floor of 1.25%) | Approximately 7.00% |
| Maturity | 18 months from closing | 12 months from closing |
| Upfront Fees/OID | Revolver: 150 bps <br> A-1 TL: 99 OID <br> A-2 TL: 98 OID | Liquidity Facility: 98 OID |
| Underwriting Fee | Underwriting fee: 200 bps <br> Structuring fee: 50 bps | 250 bps |
| Collateral | - First lien on collateral of prepetition facilities <br> - Second lien on A&R Line of Credit Facility collateral <br> - No priming liens or liens on unencumbered assets | - First lien, and as applicable, priming lien on: <br> - All BMMZ Repo Facility collateral <br> - All A&R Line of Credit Facility collateral <br> - A percentage of asset sale proceeds <br> - All existing unencumbered cash available for use by ResCap |

[1] *Barclays also submitted a March 19, 2012 DIP proposal.*
[2] *Terms are related only to the Citibank Liquidity Facility and do not include the Barclays Advance Facility.*
*Source: Confidential Presentation of Financing Discussion Materials, dated Mar. 19, 2012, at 1 [EXAM00073480]; Citibank DIP Financing Considerations Presentation, dated Mar. 6, 2012, at 1—3 [EXAM00074757]; Materials for Discussion, dated Mar. 8, 2012, at 3 [RC00000286]; Centerview Materials for Discussion, dated Mar. 23, 2012, at 2—4 [RC00000304]; Materials for Discussion, dated Feb. 24, 2012, at 8—10 [EXAM20194424].*

The Barclays DIP Financing Agreement triggered certain approval requirements under AFI's bylaws because Barclays was a common stockholder of AFI.[1261] On April 4, 2012, the AFI Board approved a waiver of the section of AFI bylaws governing affiliate transactions.[1262] ResCap executed a committed DIP facility term sheet with Barclays on April 9, 2012.[1263]

On May 14, 2012 (the Petition Date), ResCap filed a motion requesting approval of the Barclays DIP Financing Agreement.[1264] The Barclays DIP financing of $1.45 billion included $1.25 billion outstanding as of the Petition Date and up to $200 million in new revolver draws.[1265] The Barclays DIP Financing Agreement included the following modifications in comparison to the Barclays proposal of March 21, 2012. First, the Barclays DIP Financing Agreement removed the refinancing of the FNMA EAF Agreement.[1266] Consequently, the Barclays DIP Financing Agreement amended the collateral to change the first lien on the assets securing the FNMA EAF Loan Agreement to a junior lien.[1267] Second, the Barclays DIP Financing Agreement increased the unused line fee to 75 bps on the undrawn portion of the revolver,[1268] compared to 50 bps in the proposal of March 21, 2012.[1269] Approximately $52 million in total fees, net of credits ($18.75 million was paid prior to the Petition Date), were provided for under the Barclays DIP Financing Agreement.[1270]

The Creditors' Committee filed an objection on June 11, 2012 in which it objected to, among other things, the $52 million in fees under the Barclays DIP Financing Agreement. The

---

[1261] *See* E-mail from A. Bhama to T. Hamzehpour and T. Marano (Mar. 28, 2012), at EXAM00064966 [EXAM00064965].

[1262] *See* Minutes of a Regular Meeting of the Board of Directors of Ally Financial Inc., Apr. 4, 2012, at ALLY_PEO_0020549 [ALLY_PEO_0020479].

[1263] *See* Barclays DIP Financing Agreement, Summary of Indicative Terms and Conditions, dated Apr. 9, 2012 [EXAM20122499].

[1264] *See* Debtors' Motion For Interim And Final Orders Pursuant To 11 U.S.C. §§ 105, 362, 363(b)(1), 363(f), 363(m), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) And 364(e) And Bankruptcy Rules 4001 And 6004 (I) Authorizing The Debtors To (A) Enter Into And Perform Under Receivables Purchase Agreements And Mortgage Loan Purchase And Contribution Agreements Relating To Initial Receivables And Mortgage Loans And Receivables Pooling Agreements Relating To Additional Receivables, And (B) Obtaining Postpetition Financing On A Secured, Superpriority Basis, (II) Scheduling A Final Hearing Pursuant To Bankruptcy Rules 4001(b) and 4001(c), And (III) Granting Related Relief [Docket No. 13] [hereinafter Barclays DIP Motion].

[1265] *Id.* at 5.

[1266] *Id.* at 16.

[1267] *Id*. at 12–13.

[1268] *Id*. at 11.

[1269] *See* Centerview Materials for Discussion, dated Mar. 23, 2012, at 4 [RC00000304].

[1270] Barclays DIP Motion, at 11. For further comparison of the Barclays DIP Financing Agreement to the prior Barclays DIP financing proposals, refer to Appendix III.J.1.c(1)(b)—1.

Creditors' Committee argued that the fees were excessive considering that almost half of the Barclays DIP facility was used to roll up a prepetition facility in which Barclays was the sole lender.[1271]

On June 15, 2012, an amendment to the Barclays DIP financing fee letter was filed.[1272] Barclays agreed to: (1) reduce the applicable margin with respect to A-1 TL by 0.25%; (2) reduce the applicable margin with respect to A-2 TL by 0.50%; and (3) limit the ability to decrease the revolving facility by no more than an aggregate principal amount of $10 million.[1273] In turn, the Debtors agreed to pay Barclays an additional upfront fee equal to 0.50% of up to $56 million aggregate principal amount of the revolving commitments of each revolving lender, minus a credit for a portion of the upfront fees on the revolving commitments previously paid to Barclays equal to 0.50% of $10 million of the aggregate principal amount of the revolving commitments.[1274]

On June 25, 2012, a final order was entered authorizing GMACM Borrower and RFC Borrower to enter into a postpetition secured superpriority financing in aggregate principal amount up to $1.45 billion provided by Barclays acting as administrative agent, comprised of: (1) up to $190 million under the revolver; (2) up to $1.06 billion under the A-1 TL; and (3) up to $200 million under the A-2 TL.[1275]

The following exhibit provides an overview of the anticipated total sources and uses relating to the Barclays DIP Financing Agreement as of May 16, 2012:

EXHIBIT III.J.1.c(1)(b)—2
**Barclays DIP Financing — Sources and Uses**
*($ in Millions)*

| Sources | | | Uses | | |
|---|---|---|---|---|---|
| New revolver draw | $ | - | Refinance GSAP Facility | $ | 652.7 |
| New DIP A-1 term loan | | 1,050.0 | Refinance BMMZ Repo Facility | | 251.5 |
| New DIP A-2 term loan | | 200.0 | Unrestricted cash | | 100.0 |
| | | | DIP fees and expenses | | 35.1 |
| | | | DIP restricted cash | | 210.8 |
| | $ | 1,250.0 | | $ | 1,250.0 |

*Source: DIP Lender's Presentation, dated May 16, 2012, at 20 [EXAM00092938].*

---

[1271] Omnibus Objection Of The Official Committee Of Unsecured Creditors To The Debtors' Motions Seeking (I) Entry Into The Barclays DIP Facility, (II) Entry Into The Ally DIP Facility And The Use Of Certain Cash Collateral, And (III) The Use Of The Citibank Cash Collateral [Docket No. 301] ¶¶ 43–44.

[1272] Notice of Filing Of Amendment To Financing Fee Letters [Docket No. 417].

[1273] Amendment Agreement to Facility Fee Letter [Docket No. 417-1] at 1.

[1274] *Id.*

[1275] Barclays DIP Order, at 4.

The exhibit below compares the prepetition liabilities to the postpetition liabilities anticipated as of May 16, 2012 as a result of the Barclays DIP Financing Agreement:

EXHIBIT III.J.1.c(1)(b)—3
**ResCap (Consolidated) Estimated Prepetition and Postpetition Debt**
*($ in Millions)*

| Facility | Estimated Balance Prepetition | Adjustments | Estimated Balance Postpetition |
|---|---|---|---|
| DIP restricted cash | $          - | $        210.8 | $        210.8 |
| Unrestricted cash | 666.9 | 100.0 | 766.9 |
| Total cash and equivalents | 666.9 | 310.8 | 977.7 |
| New DIP revolver | - | - | - |
| New DIP A-1 term loan | - | 1,050.0 | 1,050.0 |
| New DIP A-2 term loan | - | 200.0 | 200.0 |
| GSAP Facility | 652.7 | (652.7) | - |
| A&R Line of Credit Facility | 600.0 | - | 600.0 |
| Citibank MSR Loan | 160.0 | - | 160.0 |
| A&R Secured Revolver Loan | 745.5 | - | 745.5 |
| BMMZ Repo Facility | 251.5 | (251.5) | - |
| Home equity funding facility | 135.8 | - | 135.8 |
| FNMA EAF facility | 50.2 | - | 50.2 |
| Total loans and securitized borrowings | 2,595.7 | 345.9 | 2,941.5 |
| Junior Secured Notes | 2,120.0 | - | 2,120.0 |
| Total secured debt | 4,715.7 | 345.9 | 5,061.5 |
| US Dollar senior Unsecured Notes | 675.1 | - | 675.1 |
| UK Sterling senior Unsecured Notes | 164.2 | - | 164.2 |
| Euro senior Unsecured Notes | 128.6 | - | 128.6 |
| Interest rate swaps | 244.8 | - | 244.8 |
| Other debt | 784.8 | - | 784.8 |
| Total debt | $    6,713.2 | $        345.9 | $    7,059.0 |

*Source: DIP Lender's Presentation, dated May 16, 2012, at 20 [EXAM00092938].*

ResCap indicated that it needed to refinance the GSAP Facility and the BMMZ Repo Facility to release collateral for the Barclays DIP Financing Agreement.[1276] The GSAP Facility, for which Barclays was the counterparty, was the primary facility used to finance and fund servicing advances and was structured as an offshore special purpose entity that would go into a "rapid amortization" as a result of a chapter 11 filing.[1277] ResCap justified refinancing the

---

[1276] Declaration Of Marc D. Puntus In Support Of The Debtors' Motions For Interim And Final Orders Authorizing The Debtors To Enter Into The Barclays DIP Facility And The AFI DIP Facility [Docket No. 20] ¶¶ 26–27 (the "Puntus Declaration").

[1277] *Id.* ¶ 15.

GSAP Facility by noting that the facility was: (1) structured to require "rapid amortization" repayments; and (2) over-secured by approximately $208 million.[1278] ResCap also highlighted that it negotiated advantageous terms under the Barclays DIP Financing Agreement (marginal advance rates on servicing advance receivables of 70% under the GSAP Facility as compared to 90% to 95% under the Barclays DIP Financing Agreement).[1279]

The BMMZ Repo Facility was a repo/factoring facility with BMMZ, an indirect wholly owned subsidiary of AFI.[1280] Prior to entering into the BMMZ Master Repo Agreement, ResCap was also party to repurchase agreements with Citibank and Goldman Sachs.[2181] These agreements offered short-term liquidity through financing secured by a collateral pool of jumbo, Alt-A, second lien, and subprime mortgage loans.[1282] On December 20, 2011, the Citibank and Goldman Sachs repurchase agreements terminated.[1283] Although Citibank offered to renew its repurchase facility and take on Goldman Sachs's position, BMMZ proposed to provide a facility on slightly more favorable terms.[1284] ResCap entered into the BMMZ Master Repo Agreement on December 21, 2011.[1285]

BMMZ had the right to terminate the BMMZ Repo Facility in the event of a chapter 11 filing and sell the underlying mortgage loans to third parties, potentially eliminating ResCap's interests.[1286] ResCap justified refinancing the BMMZ Master Repo Agreement to maintain control of the subject assets, to access approximately $223 million in excess collateral value, and to obtain more advantageous terms under the Barclays DIP Financing Agreement (60% advance rate under the BMMZ Master Repo Agreement as compared to 75% under the Barclays DIP Financing Agreement).[1287]

---

[1278] *Id.* ¶¶ 27–28.

[1279] *Id.* ¶ 28.

[1280] *See id.* ¶ 15; Meeting with Centerview, Investment Banker to the Debtors, in N.Y., N.Y. (Jan. 18, 2013).

[2181] ResCap Certificate of Assistant Secretary, dated Dec. 19, 2011 [GOLDIN00119483].

[1282] *See* Goldin Associates Presentation to The Committee of Independent Members of the Board of Directors of Residential Capital, LLC Regarding Proposed Master Repurchase Facility Between GMAC Mortgage, LLC and Residential Funding Company, LLC and BMMZ Holdings LLC, dated Dec. 20, 2011, at 4 [GOLDIN00131711].

[1283] *See id.* at 4.

[1284] *See id.* at 10–11. BMMZ terms were better than those offered by Citibank with respect to: (1) the MSR facility step-down; (2) pricing and advance rates; and (3) a commitment fee of $1.875 million to Citibank versus no fee to BMMZ. *See id.*

[1285] BMMZ Master Repo Agreement [EXAM20068893].

[1286] Puntus Declaration, ¶ 29.

[1287] *Id.*

### (c) AFI DIP Financing Agreement

Before the Petition Date, the Debtors determined that the negotiated Barclays DIP Financing Agreement would be insufficient to cover the Debtors' second largest expense of repurchases of whole loans that were sold into securitization trusts guaranteed by Ginnie Mae ("Ginnie Buybacks").[1288] In April 2012, ResCap began negotiations with AFI regarding funding the Ginnie Buybacks prior to and during the Chapter 11 Cases.[1289] Previously, the repurchases had been funded by draws under the A&R Line of Credit Facility.[1290] When Centerview negotiated the Barclays DIP Financing Agreement, Centerview had not included the Ginnie Buybacks in the DIP budget because it assumed ResCap would draw down the A&R Line of Credit Facility prepetition to fund the Ginnie Buybacks postpetition.[1291] However, AFI never consented to the use of its line of credit for postpetition needs and instead indicated a preference to provide supplemental DIP financing.[1292]

ResCap negotiated the additional postpetition financing from AFI in the form of postpetition draws on the A&R Line of Credit Facility.[1293] AFI agreed to provide the additional DIP financing in an amount up to $150 million, which was subsequently increased to $220 million.[1294] Under the terms of the AFI DIP Financing Agreement, ResCap agreed that AFI would be permitted to prime itself in its capacity as lender under the A&R Line of Credit Facility.[1295] The agreement specified that ResCap could use the financing proceeds for the following purposes:

- To repurchase whole loans from Ginnie Mae pools in order to avoid GMAC Mortgage being in violation of delinquency triggers applicable under chapter 18 of the Ginnie Mae guide;[1296]

- To effect foreclosures, conveyance, or other normal course loss mitigation activities of the related properties in connection with the submission of HUD claims;[1297] and

- To allow for trial modification under programs implemented by the Debtors for which the related loan and borrowers were qualified.[1298]

---

[1288] Id. ¶ 18.

[1289] Id. ¶ 20.

[1290] Id. ¶ 18.

[1291] Meeting with Centerview, Investment Banker to the Debtors, in N.Y., N.Y. (Jan. 18, 2013).

[1292] Meeting with Centerview, Investment Banker to the Debtors, in N.Y., N.Y. (Sept. 11, 2012).

[1293] Puntus Declaration, ¶ 18.

[1294] AFI DIP Order, at 5; Meeting with Centerview, Investment Banker to the Debtors, in N.Y., N.Y. (Jan. 18, 2013).

[1295] Puntus Declaration, ¶ 24.

[1296] AFI DIP Order, at 20–21.

[1297] Id.

[1298] Id.

The AFI DIP Financing Agreement specified the termination date as the effective date of a Plan for any of the Debtors or upon written notice of AFI,[1299] an interest rate of LIBOR + 4.00% with a LIBOR floor of 1.25%,[1300] and carve-out fees not to exceed $25 million.[1301] There were no additional fees included in the AFI DIP Financing Agreement.[1302] As adequate protection, AFI received a perfected first priority lien on collateral securing the A&R Line of Credit Facility and the Secured Revolver Facility, and payments consisting of accrued and unpaid prepetition and postpetition interest on both facilities.[1303] The AFI DIP Financing Agreement also included additional adequate protection covenants.[1304]

### (2) Solicitation Of Bids For ResCap Assets

Centerview indicated that, as of December 15, 2011, excluding Cerberus, no third parties had been contacted regarding their interest in purchasing ResCap.[1305] At that time, Centerview was preparing an information memorandum and was ready to approach third parties "when given permission to do so."[1306]

By January 2012, Centerview was preparing for a pre-filing marketing process for ResCap's assets. On January 10, 2012, Centerview provided the ResCap Board with a detailed presentation regarding, among other things, "several potential asset sale structures for the Board's consideration including, but not limited to, a hypothetical in-court process utilizing Chapter 11."[1307]

After negotiating non-disclosure agreements with Centerbridge, Cerberus, Fortress (through its home mortgage subsidiary, Nationstar), Ocwen, and Private National Mortgage Acceptance Company, LLC (PennyMac), these potential "stalking horse" bidders received substantial due diligence during the week of January 30, 2012 and were given over two weeks to submit preliminary non-binding letters of intent ("LOIs").[1308] ResCap solicited interest in a "NewCo" business structure in which the "Investor," or bidder, would have 100% equity ownership in NewCo, which had servicing (MSR-based and fee-based) and origination (retail/ call center) platforms.[1309] However, bidders were encouraged to submit proposals for other

---

[1299] *Id*. at 36.

[1300] AFI DIP Financing Agreement, § 2.1(e).

[1301] AFI DIP Order, at 31–32.

[1302] Meeting with Centerview, Investment Banker to the Debtors, in N.Y., N.Y. (Jan. 18, 2013).

[1303] AFI DIP Order, at 26.

[1304] *Id*. at 33.

[1305] *See* Joint Project Bounce Presentation by Centerview, FTI, and Morrison & Foerster, dated Dec. 15, 2011, at 3 [RC00000121].

[1306] *Id*.

[1307] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Jan. 10, 2012, at RC40019183 [RC40019179].

[1308] Materials for Discussion, dated Feb. 24, 2012, at 1 [EXAM20194424].

[1309] *Id*. at 2.

structures and asset combinations that they believed maximized their return and provided value to ResCap.[1310] The exhibit below presents an example of the proposed structure.



EXHIBIT III.J.1.c(2)—1
**Proposed Stalking Horse Bid Structure** [1]
February 2012

*Note: Exhibit is verbatim excerpt from source.*
*Source: Materials for Discussion, dated Feb. 24, 2012, at 2 [EXAM20194424].*

On February 17, 2012, Centerview received preliminary LOIs from Centerbridge and Fortress.[1311]

Centerbridge's February 17, 2012 LOI included a bid of $1.5 billion, which was approximately 76% of the $2 billion book value (as of December 31, 2011) of the following assets: FNMA/FHLMC MSRs and advances, GNMA MSRs and advances, PLS MSRs, first lien performing whole loans (less than 60 days delinquent), the servicing platform, and the consumer origination platform.[1312] The Centerbridge bid excluded assets with a book value of $4.4 billion,

---

[1310] *Id.*

[1311] *See* Letter from L. West to K. Chopra (Feb. 17, 2012) [CCM00483106]; Letter from W. Edens to K. Chopra (Feb. 17, 2012) [ALLY_0367789]; *see also* Materials for Discussion, dated Feb. 24, 2012, at 1 [EXAM20194424]. Cerberus and PennyMac elected not to submit bids at this time. Materials for Discussion, dated Feb. 24, 2012, at 1 [EXAM20194424]. Owcen also submitted a preliminary LOI on February 20, 2012. *See* Letter from R. Faris to K. Chopra (Feb. 20, 2012) [RC00000585]. Centerview advised ResCap that it should primarily consider the bids from Fortress and Centerbridge because Owcen bid only on the PLS portfolio. Meeting with Centerview, Investment Banker to the Debtors, in N.Y., N.Y. (Jan. 18, 2013), at 1. Owcen's LOI also required debt financing to support the transaction. Materials for Discussion, dated Feb. 24, 2012, at 6 [EXAM00015700].

[1312] Materials for Discussion, dated Feb. 24, 2012, at 4–5 [EXAM20194424].

III-231

or 69% of the assets of ResCap, including GNMA AR and GNMA loans included in the whole loan portfolio, certain legacy assets, other MSRs and advances, existing fee based advances, and certain other assets.[1313] While Centerbridge did not have licenses required to originate and service loans, it was willing to explore alternate solutions such as acquiring BMMZ, which held the necessary licenses.[1314] The exhibit below shows the assets included in the Centerbridge stalking horse bid.



EXHIBIT III.J.1.c(2)—2
**Assets Included in the Centerbridge Stalking Horse Bid**
February 17, 2012

*Source: Materials for Discussion, dated Feb. 24, 2012, at 2–4 [EXAM20194424].*

Centerbridge's bid included equity of $700 million and debt financing of $900 million.[1315] Wells Fargo proposed $825 million of structured asset-based financing contingent on agreement with GSEs limiting set-off rights.[1316] Barclays also proposed a $700 million term loan facility.[1317]

Fortress's February 17, 2012 LOI included a bid of $2.6 billion, which was approximately 94% of the $2.8 billion book value (as of December 31, 2011) of the following assets: FNMA/ FHLMC MSRs, GNMA MSRs, PLS MSRs, first lien performing whole loans (less than 60 days delinquent), first lien non-performing whole loans, second lien whole loans, home equity and other whole loans, trading securities, the servicing platform, and the consumer origination platform.[1318] The Fortress bid excluded assets with a book value of $3.6 billion, or 56% of assets of ResCap, including PLS and other advances, Master Servicing MSRs, GNMA AR and GNMA loans included in the whole loan portfolio, existing fee-based advances, MSR advances, legacy asset advances, and certain other assets.[1319] Unlike Centerbridge, Fortress had the necessary

---

[1313] *Id.*

[1314] Materials for Discussion, dated Feb. 24, 2012, at 6 [EXAM00015700].

[1315] *Id.*

[1316] *Id.*

[1317] *Id.*

[1318] Materials for Discussion, dated Feb. 24, 2012, at 4 [EXAM20194424].

[1319] *Id.*

licenses to originate and service loans through its Nationstar and Newcastle portfolio companies.[1320] The exhibit below shows the assets included in the Fortress stalking horse bid.



EXHIBIT III.J.1.c(2)—3
**Assets Included in the Fortress Stalking Horse Bid**
February 17, 2012

*Source: Materials for Discussion, dated Feb. 24, 2012, at 2–4 [EXAM20194424].*

On February 22, 2012, ResCap distributed letters to Centerbridge and Fortress requesting additional information and detail with respect to potential bid adjustments.[1321]

In response, on February 28, 2012, Centerbridge revised its LOI to incorporate a broader range of assets, including PLS advances, non-performing first lien loans, and second lien loans in the ResCap legacy portfolio.[1322] Additional terms of Centerbridge's revised LOI are summarized below:

- Removed the financing contingency related to GSE stipulations but increased required financing support from ResCap/AFI;[1323]

- Included a request of AFI to purchase GNMA Department of Veterans Affairs (VA) MSR and subservice them back to NewCo or indemnify NewCo against costs arising from VA servicing obligations;[1324] and

---

[1320] Materials for Discussion, dated Feb. 24, 2012, at 6 [EXAM00015700]

[1321] Materials for Discussion, dated Feb. 24, 2012, at 1 [EXAM20194424].

[1322] *See* Letter from L. West to M. Puntus and S. Greene (Feb. 28, 2012) [RC00000560]; Materials for Discussion, dated Feb. 29, 2012, at 1 [RC40020394].

[1323] Materials for Discussion, dated Feb. 29, 2012, at 1 [RC40020394].

[1324] *Id.*

- Reduced the purchase price on assets included in the initial bid to $1.4 billion from $1.5 billion[1325] but increased the total bid to $3.2 billion.[1326]



EXHIBIT III.J.1.c(2)—4
**Comparison of Assets Included in the Centerbridge Stalking Horse Bids**
February 17, 2012 and February 28, 2012

Source: Materials for Discussion, dated Feb. 24, 2012, at 2–4 [EXAM20194424]; Materials for Discussion, dated Feb. 29, 2012, at 1—2 [RC40020394].

Fortress also responded to ResCap's request and, on February 28, 2012, revised its LOI to increase the purchase price on assets included in the initial bid by $100 million and expanded the assets purchased to include Agency and PLS advances, which increased the total bid to $4.2 billion.[1327] The exhibit below shows the assets included in and excluded from the Fortress February 17, 2012 and February 28, 2012 stalking horse bids.

---

[1325] *Id*.

[1326] *Id*. at 2.

[1327] *See* Letter from W. Edens to S. Greene (Feb. 28, 2012) [ALLY_0001709]; Materials for Discussion, dated Feb. 29, 2012, at 1 [RC40020394].



EXHIBIT III.J.1.c(2)—5
**Comparison of Assets Included in the Fortress Stalking Horse Bids**
February 17, 2012 and February 28, 2012

*Source: Materials for Discussion, dated Feb. 24, 2012, at 2—4 [EXAM20194424]; Materials for Discussion, dated Feb. 29, 2012, at 1—2 [RC40020394].*

The Fortress LOI included equity of $1.3 billion ($1 billion for the servicing/origination platform assets and $320 million for the HFS Portfolio), which would be sourced from Nationstar and Newcastle.[1328] There were no financing contingencies for the purchase of the platform assets; Fortress, however, requested seller financing to purchase the HFS Portfolio.

The below exhibit compares the February 28, 2012 revised bids of Centerbridge and Fortress.

EXHIBIT III.J.1.c(2)—6
**Comparison of Centerbridge and Fortress Stalking Horse Bids**
February 28, 2012
*($ in Millions)*

| | Centerbridge February 28, 2012 Bid | | | Fortress February 28, 2012 Bid | | |
| | Assets Purchased | | Assets Remaining | Assets Purchased | | Assets Remaining |
| | Bid Amount | Bid as % of Book Value | Book Value | Bid Amount | Bid as % of Book Value | Book Value |
|---|---|---|---|---|---|---|
| Servicing/origination platform | $ 648 | 54% | $ 30 | $ 1,100 | 89% | $ - |
| Servicing advances | 1,550 | 98% | 531 | 1,505 | 95% | 531 |
| HFS Portfolio/other | 1,028 | 80% | 1,752 | 1,601 | 102% | 1,461 |
| Total bid | $ 3,225 | 79% | $ 2,313 | $ 4,206 | 96% | $ 1,992 |
| Common assets bid | $ 3,225 | 79% | | $ 3,894 | 96% | |

*Source: Materials for Discussion, dated Feb. 29, 2012, at 2 [RC40020394].*

---

[1328] Materials for Discussion, dated Feb. 24, 2012, at 6 [EXAM00015700]

On February 29, 2012, Centerview presented the bid summaries to the ResCap Board.[1329] Fortress was selected as the "exclusive bidder" by ResCap with the goal of working expeditiously towards a binding asset purchase agreement in advance of a chapter 11 filing.[1330]

The Fortress proposed transaction overview is presented in the exhibit below. Fortress anticipated that its Nationstar portfolio company would acquire and operate ResCap as a standalone platform.[1331] As the primary operating owner and GSE interface, Nationstar would contribute a significant portion of the purchase price with the balance from other Fortress affiliates.[1332]



EXHIBIT III.J.1.c(2)—7
**Fortress Transaction Overview**
March 19, 2012

- - - - → Transfer of assets

(1) Transaction would be funded by Nationstar and other Fortress affiliates.
(2) At acquisition the ResCap platform would run parallel to the existing Nationstar operations.
Source: Transaction Discussion, dated Mar. 19, 2012, at 7 [EXAM00015730].

---

[1329] Id. at 1.

[1330] Transaction Discussion, dated Mar. 19, 2012, at 3 [EXAM00015730].

[1331] Id. at 7.

[1332] Id. at 7.

Fortress and its advisors conducted extensive legal and business due diligence after becoming the exclusive bidder on February 29, 2012.[1333] In addition to ongoing due diligence and the drafting of an asset purchase agreement, Fortress and ResCap worked together to develop short-term and long-term integration plans.[1334]

Fortress submitted a revised bid on April 12, 2012 for ResCap's assets.[1335] The "headline" bid amount did not materially change from the prior bid,[1336] but the bid was revised to include the following AFI support conditions:

- AFI was to provide financing for the purchase of the HFS Portfolio at an 80% advance rate of LIBOR+250. Without financing, the HFS Portfolio purchase price would have decreased by $200 million;[1337]

- AFI was to provide financing for the purchase of $223 million of subservicing advances and finance new advances (with a book value of $248 million) at an 80% advance rate of LIBOR+250;[1338] and

- Without financing, the MSR purchase price would have been reduced by $30 million, and the old advances would have been left in the Estate.[1339]

Additionally, Fortress assigned a value of $150 million to the long-term subservicing contract for the Ally Bank MSR portfolio with full refinancing and solicitation rights.[1340] Without the sub-servicing agreement with Ally Bank, the MSR purchase price would have been reduced by $180 million ($150 million value of long-term subservicing contract plus $30 million reduction to the MSR purchase price).[1341] Below is a summary of the February 28, 2012 bid versus the revised April 12, 2012 bid with and without AFI support.

---

[1333] *Id.* at 3.

[1334] *Id.* While Fortress conducted additional due diligence, various other parties expressed interest in other strategic alternatives that were outside of the section 363 marketing process. Elliott Associates LP ("Elliott") sent two letters to AFI suggesting that an in-court restructuring was not the best option for AFI. Elliot indicated that an in-court restructuring would accelerate putbacks, trigger a torrent of lawsuits, and cause the U.S. Treasury, GM, AFI shareholders, and AFI creditors to suffer. Elliott indicated that the liabilities stemming from representation and warranty claims would be a large risk to AFI in bankruptcy. Additionally, Elliott noted that AFI should minimize the perceived risk for putback liabilities by improving the capitalization of AFI. *See* Letter from D. Cederholm (Mar. 22, 2012) [ALLY_PEO_0035610]; E-mail from D. Cederholm (Feb. 15, 2012), at ALLY_0380883–85 [ALLY_0380883] (detailing Elliot's views on a ResCap bankruptcy).

[1335] Evercore, Kirkland & Ellis, and Mayer Brown Project Rodeo Discussion Materials, dated Apr. 23, 2012, at 2 [CCM00335615].

[1336] *Id.*

[1337] *Id.*

[1338] *Id.*

[1339] *Id.*

[1340] *Id.*

[1341] *Id.*

EXHIBIT III.J.1.c(2)—8
**Comparison of Fortress Stalking Horse Bids**
February 28, 2012 and April 12, 2012
*($ in Millions)*

|  | February 28, 2012 Bid [(1)] | April 12, 2012 Bid – Without AFI Support | April 12, 2012 Bid – With AFI Support | Variance Between April Bids |
|---|---|---|---|---|
| Servicing/origination platform | $ 1,100 | $ 920 | $ 1,100 | $ 180 |
| Servicing advances | 1,505 | 1,505 | 1,728 | 223 |
| HFS Portfolio | 1,601 | 1,400 | 1,600 | 200 |
| Total bid | $ 4,206 | $ 3,825 | $ 4,428 | $ 603 |

*[(1)] Fortress submitted an initial bid on February 17, 2012 for $2.6 billion.*

*Source: Evercore, Kirkland & Ellis, and Mayer Brown Project Rodeo Discussion Materials, dated Apr. 23, 2012, at 2 [CCM00335615]; Centerview Materials for Discussion, dated May 4, 2012, at RC40020573 [RC40020568]; Materials for Discussion, dated Feb. 24, 2012, at 2–4 [EXAM20194424].*

After Fortress revised its bid on the HFS Portfolio to be $1.6 billion with financing from AFI or $1.4 billion without,[1342] AFI indicated it would not provide financing but offered to purchase the HFS Portfolio for $1.6 billion if sold pursuant to a plan of reorganization that included a Third-Party Release or $1.4 billion pursuant to a section 363 sale.[1343] AFI sought to have its $200 million incremental bid considered "firm settlement credit" even if it was overbid in the auction.[1344] ResCap, concerned that it could lose AFI's bid altogether, agreed to confirm the settlement credit.[1345]

---

[1342] *Id.*

[1343] Centerview Materials for Discussion, dated May 4, 2012, at RC40020573 [RC40020568]; Evercore, Kirkland & Ellis, and Mayer Brown Project Rodeo Discussion Materials, dated Apr. 23, 2012, at 3–4 [CCM00335615]. Centerview stated that the AFI settlement credit relating to the stalking horse bid on the HFS Portfolio was heavily negotiated between AFI and ResCap. At one point, AFI's bid was $1.2 billion pursuant to a section 363 sale and $1.6 billion pursuant to a plan, which would have resulted in a $400 million AFI settlement credit. Meeting with Centerview, Investment Banker to the Debtors, in N.Y., N.Y. (Jan. 18, 2013).

[1344] E-mail from L. Tessler (Apr. 28, 2012) [EXAM11114982].

[1345] E-mails between J. Ilany and T. Marano (Apr. 28–29, 2012) [EXAM11114982].

On May 2, 2012, Fortress revised its bid again to reduce its bid value for the Platform Sale by $380 million, of which $170 million stemmed from AFI's decision not to offer subservicing on the Ally Bank MSR and HFI/HFS portfolios.[1346] Below is a comparison of the Fortress bids from February 2012 and May 2012.

EXHIBIT III.J.1.c(2)—9
**Comparison of Fortress Stalking Horse Bids**
February 2012 versus May 2012
*($ in Millions)*

| | | February 28, 2012 Bid | May 2, 2012 Bid |
|---|---|---|---|
| Servicing/ Origination Platform | FNMA/FHLMC MSR | | $ 380 |
| | GNMA MSR | $ 870 | 100 |
| | PLS MSR | | 200 |
| | Master servicing MSR | | 10 |
| | Third-party subservicing | 60 | 30 |
| | Ally Bank MSR subservicing | 150 | - |
| | Ally Bank HFI/HFS subservicing | 20 | - |
| | Total servicing/origination | 1,100 | 720 |
| Servicing Advances | FNMA/FHLMC advances | 218 | 218 |
| | GNMA advances | 106 | 106 |
| | PLS advances | 1,181 | 1,181 |
| | Third-party subservicing | - | 223 |
| | Total servicing advances | 1,505 | 1,728 |
| HFS Portfolio | HFS - first lien performing | 797 | |
| | HFS - second lien | 512 | 1,400 – 1,600 |
| | HFS - HELOC/other | 245 | |
| | Trading securities | 46 | |
| | Total HFS Portfolio | 1,601 | 1,400 – 1,600 |
| | Total bid | $ 4,206 | $ 3,848 – $ 4,048 |

*Source: Centerview Materials for Discussion, dated May 4, 2012, at RC40020573 [RC40020568].*

Centerview determined that, even though the AFI and Fortress stalking horse bids on the HFS Portfolio were of similar amounts, AFI's bid was better.[1347] Centerview indicated that Fortress had not done due diligence on the HFS Portfolio and, thus, its final bid amount could be reduced downward after additional due diligence.[1348] Additionally, AFI was not requesting a break-up fee.[1349] Centerview believed that AFI's stalking horse bid was a good backup plan since lack of a break-up fee would not discourage bidders from participating in the auction.[1350]

[1346] Centerview Materials for Discussion, dated May 4, 2012, at RC40020573 [RC40020568].

[1347] Meeting with Centerview, Investment Banker to the Debtors, in N.Y., N.Y. (Jan. 18, 2013).

[1348] *Id.*

[1349] *Id.*

[1350] *Id.*

On the Petition Date, ResCap filed two stalking horse bids with the Bankruptcy Court. Fortress (through Nationstar) was the proposed stalking horse bidder for the Platform Sale,[1351] and AFI was the proposed stalking horse bidder for the Legacy Sale of the HFS Portfolio.[1352] The Fortress bid was $2.3 billion for the Platform Sale, of which approximately $200 million was related to the GNMA MSR.[1353] If Fortress was not the successful bidder, it would have been entitled to a $72 million break-up fee plus reimbursement of actual, reasonable, out-of-pocket expenses incurred, not to exceed $10 million.[1354]

As noted above, AFI's bid was $1.6 billion if the sale was consummated pursuant to a chapter 11 plan or $1.4 billion if pursuant to section 363.[1355] Subject to a higher bid, the AFI purchased assets could be sold separately or together with the Fortress assets.[1356] There were no break-up fees required in the AFI stalking horse bid.[1357]

On June 11, 2012, Berkshire Hathaway filed an objection to the Debtors' Postpetition Asset Sales.[1358] In its objection, Berkshire Hathaway argued that the structure of the Legacy Sale provided AFI with an unfair advantage at the auction and would discourage third-party

---

[1351] *See* Debtors' Motion Pursuant to 11 U.S.C. §§ 105, 363(b), (f), and (m), 365 and 1123, and Fed. R. Bankr. P. 2002, 6004, 6006, and 9014 For Order: (A)(I) Authorizing and Approving Sale Procedures, Including Break-Up Fee and Expense Reimbursement; (II) Scheduling Bid Deadline and Sale Hearing; (III) Approving Form and Manner of Notice Thereof; and (IV) Granting Related Relief and (B)(I) Authorizing the Sale of Certain Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Authorizing and Approving Asset Purchase Agreements Thereto; (III) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto; and (IV) Granting Related Relief [Docket No. 61] at 2, ¶ 7 [hereinafter Sale Procedures Motion]; *see also* Nationstar Asset Purchase Agreement [Docket No. 61-2].

[1352] *See* Sale Procedures Motion [Docket No. 61] at 3, ¶ 6; *see also* AFI Asset Purchase Agreement [Docket No. 61-3].

[1353] Sale Procedures Motion [Docket No. 61] ¶ 7. Subject to a higher bid, the GNMA MSRs could be sold separately from the other Platform Assets. *Id.* ¶ 50.

[1354] *Id.* ¶ 58(i).

[1355] *Id.* ¶¶ 6–7.

[1356] *Id.*

[1357] *Id.* ¶ 58(i); Meeting with Centerview, Investment Banker to the Debtors, in N.Y., N.Y. (Jan. 18, 2013).

[1358] Objection of Berkshire Hathaway Inc. to Debtors' Motion Pursuant to 11 U.S.C. §§ 105, 363(b), (f), and (m), 365 and 1123, and Fed. R. Bankr. P. 2002, 6004, 6006, and 9014 For Orders: (A)(I) Authorizing and Approving Sale Procedures, Including Break-Up Fee and Expense Reimbursement; (II) Scheduling Bid Deadline and Sale Hearing; (III) Approving Form and Manner of Notice Thereof; and (IV) Granting Related Relief and (B)(I) Authorizing the Sale of Certain Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Authorizing and Approving Asset Purchase Agreements Thereto; (III) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto; and (IV) Granting Related Relief [Docket No. 284].

bidding because of the conditional increase in purchase price from $1.4 billion to $1.6 billion.[1359] In addition, Berkshire Hathaway offered to serve as the designated stalking horse bidder for either or both the Platform Sale and the Legacy Sale.[1360] Berkshire Hathaway's bid with respect to the Platform Sale proposed the same purchase price with substantially the same terms as Fortress, but reduced the break-up fees and related expenses to $24 million.[1361] The Berkshire Hathaway bid for the Legacy Sale was for $50 million more than AFI's bid, but included a 3% break-up fee.[1362]

Centerview believed that, if Berkshire Hathaway had served as stalking horse bidder for the Platform Sale, other parties might not have participated in the auction as they may not have wanted to bid against Berkshire Hathaway because of its size and reputation.[1363]

On June 28, 2012, the Bankruptcy Court entered an order ruling that Berkshire Hathaway would replace AFI as the stalking horse bidder for the Legacy Sale with a $10 million break-up fee, and that Fortress (through Nationstar) would serve as the stalking horse bidder for the Platform Sale with a $24 million break-up fee.[1364]

On October 23, 2012, the Debtors conducted the auction for the Platform Sale in which Fortress had the opening bid of $2.4 billion.[1365] Ultimately, Walter Investment Management Corp. ("Walter") and Ocwen offered the highest and best bid of $3 billion.[1366] The sale of the

---

[1359] *Id*. ¶ 5.

[1360] *Id*. ¶ 2.

[1361] *Id*. ¶ 3.

[1362] *Id*. ¶ 4.

[1363] Meeting with Centerview, Investment Banker to the Debtors, in N.Y., N.Y. (Jan. 18, 2013).

[1364] Order Under 11 U.S.C. §§ 105, 363(b) And 365 (I) Authorizing And Approving Sale Procedures, Including Payment Of Break-Up Fees; (II) Scheduling Bid Deadline, Auction (If Necessary) And Sale Hearing; (III) Establishing Assumption And Assignment Procedures, Including Procedures For Fixing Cure Amounts; And (IV) Establishing Notice Procedures And Approving Forms Of Notice [Docket No. 538] at 1–2 [hereinafter Order Approving Sale Procedures].

[1365] On June 28, 2012, Fortress amended its Asset Purchase Agreement to, among other things, increase the aggregate purchase price for the Platform Sale by $125 million (or, if the MSR related to the loans guaranteed by Ginnie Mae and the related servicing advances were sold to another bidder, by $85 million). This increased the Fortress stalking horse bid from $2.3 billion, as filed on the Petition Date, to $2.4 billion. Sales Procedure Motion, ¶ 6; Nationstar Mortgage LLC, Current Report (Form 8-K) (July 5, 2012), Item 1.01.

[1366] Notice of Successful Bidders at the Auctions and Sales of (A) the Platform Assets to Ocwen Loan Servicing, LLC and (B) the Whole Loan Assets to Berkshire Hathaway Inc. [Docket No. 1960] at 3; Third Stipulation and Order Amending the AFI DIP and Cash Collateral Order [Docket No. 3230] at 2–3 [hereinafter Third AFI DIP Order].

origination and capital markets platform assets to Walter closed on January 31, 2013.[1367] The sale of the servicing platform assets to Ocwen closed on February 15, 2013.[1368]

On October 25, 2012, the Debtors conducted the auction for the Legacy Sale in which Berkshire Hathaway had the opening bid of $1.45 billion.[1369] Berkshire Hathaway ultimately prevailed after raising its bid to $1.5 billion because of competition from a number of bidders, including Bayview Acquisitions LLC, DLJ Mortgage Capital Inc., Roosevelt Depositor LLC, Roosevelt Mortgage Acquisition Co., and Selene Finance LP.[1370] The sale to Berkshire Hathaway closed on February 5, 2013.[1371]

### (3) Bankruptcy Filing Timing Considerations

In January 2012, AFI and its advisors suggested that ResCap be prepared to file the Chapter 11 Cases by March 30, 2012, which was the maturity date of the Citibank MSR Loan Agreement.[1372] Although AFI recognized that "Centerview [was] setting the pace," as the sale process moved forward, AFI became concerned that the overall bankruptcy project was progressing too slowly.[1373] On January 20, 2012, Carpenter informed Marano that "we need any third party stalking horse[] bid[s] nailed down by [February] 28 to meet the necessary timeline."[1374]

Meanwhile, AFI understood that several other involved parties—including ResCap and its advisors, the GSEs, ratings agencies, and the U.S. Treasury—viewed AFI's proposed timeline as "too aggressive."[1375] As Jeff Brown, AFI's Senior Executive Vice President of Finance and Corporate Planning, explained in an e-mail to Carpenter, "[m]ore time allows smoother process, but also comes at the expense of more support in the interim. Centerview

---

[1367] Residential Capital, LLC, Press Release, *ResCap Completes Sale of Origination and Capital Markets Platform Assets to Walter Investment Management Corp.* (Jan. 31, 2013), http://www.kccllc.net/documents/1212020/1212020130131000000000013.pdf; Third AFI DIP Order, at 2–3.

[1368] Residential Capital, LLC, Press Release, *ResCap Completes Sale of Servicing Platform Assets to Ocwen Loan Servicing, LLC* (Feb. 15, 2013), http://www.kccllc.net/documents/1212020/1212020130215000000000010.pdf; Third AFI DIP Order, at 2–3.

[1369] Sales Procedure Motion,¶ 6: Order Approving Sale Procedures, at 4.

[1370] Notice of Successful Bidders at the Auctions and Sales of (A) the Platform Assets to Ocwen Loan Servicing, LLC and (B) the Whole Loan Assets to Berkshire Hathaway Inc. [Docket No. 1960] at 3.

[1371] Residential Capital, LLC, Press Release, *ResCap Completes Sale of Whole Loan Portfolio to Berkshire Hathaway* (Feb. 5, 2013), http://www.kccllc.net/documents/1212020/1212020130205000000000002.pdf; Third AFI DIP Order, at 2–3.

[1372] *See* Materials for Discussion, dated Jan. 10, 2012, at 30 [RC00000200].

[1373] E-mail from M. Carpenter (Jan. 17, 2012) [ALLY_0187331]

[1374] E-mail from M. Carpenter to T. Marano (Jan. 20, 2012) [EXAM00010758].

[1375] E-mail from J. Brown to M. Carpenter (Jan. 31, 2012) [ALLY_0141903].

thinks end May or June realistic, but that may mean several hundred million more in support to ResCap."[1376] In response, Carpenter e-mailed Brown stating, "[n]o way we can do this through May/June."[1377]

On February 2, 2012, William Solomon, General Counsel of AFI, reportedly committed to being "done" with Project Bounce by "the 10th."[1378] In response to concerns from ResCap's in-house counsel regarding that deadline, Solomon reportedly stated, "[Hamzehpour] reports to me and I'm commiting [sic] to getting it done by the 10th. . . . [C]rank up MoFo if you have to because it needs to get done."[1379] By April 11, 2012, Pam West, an Independent Director on the ResCap Board, understood AFI to be "pushing for [an] April 30 filing."[1380]

Notwithstanding the timing pressure from AFI, ResCap's counsel asserted that ResCap "took whatever time [it] thought was necessary and appropriate" and did not think the timing pressure had any impact on the pre-bankruptcy marketing of ResCap's assets.[1381] John Mack, an Independent Director of the ResCap Board, explained that AFI's timing suggestions were "never an issue" because it was ResCap's "position that we couldn't logistically get there."[1382]

On April 12, 2012, the ResCap Board resolved not to make the scheduled April 17, 2012 interest payment due under the Unsecured Notes, but instead to use "the 30-day grace period allowed under the related indenture."[1383] At that point, a bankruptcy filing the week of May 14, 2012 was all but settled.[1384] When the ResCap Board made that decision, ResCap had

[1376] *Id.*

[1377] E-mail from M. Carpenter to J. Brown (Feb. 1, 2012) [ALLY_0141903].

[1378] E-mail from M. Fahy Woehr to T. Hamzehpour (Feb. 2, 2012) [EXAM20180037]. It is unclear which month is being referred to in the e-mail. Solomon agreed that the quote attributed to him in the e-mail "sounds like me." Int. of W. Solomon, Mar. 19, 2013, at 98:19–99:8. Solomon stated that he believes the e-mail and the deadline referred to therein related only to the Shared Services Agreement, *see id.* at 97:12–98:18, and that appears to be true. *See* E-mail from J. Mackey (Feb. 18, 2012) [EXAM20283454] ("We all had agreed [the Shared Services Agreement] would be finalized and ready to go on feb 10th. Obviously we have missed that deadline.").

[1379] E-mail from M. Fahy Woehr to T. Hamzehpour (Feb. 2, 2012) [EXAM20180037]. Solomon characterized the statement that Hamzehpour reported to him as a "non-sequitur" and explained that the statement was "really more about whatever we need to do to get this done we need to get it done by the 10th." Int. of W. Solomon, Mar. 19, 2013, at 99:22–101:20.

[1380] Notes of P. West (Apr. 11, 2012), at EXAM00128221 [EXAM00128214]; *see also* E-mail from C. Dondzila to J. Whitlinger (Apr. 20, 2012) [EXAM11114890] ("[N]ow we are pushing to be able to file on the 30th, which may or may not be the real date.").

[1381] Int. of G. Lee, Feb. 20, 2013, at 203:11–204:23.

[1382] Int. of J. Mack, Jan. 15, 2013, at 193:3–15.

[1383] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Apr. 12, 2012, at 1 [EXAM00094875].

[1384] ResCap had additional obligations maturing on May 14, 2012, including payments due to AFI under the A&R Secured Revolver Loan Agreement and A&R Line of Credit Agreement. *See* GMAC ResCap Executive Liquidity Report, dated Apr. 16, 2012 [ALLY_0194266].

already executed a committed DIP facility term sheet with Barclays,[1385] and had made significant progress towards negotiating a stalking horse bid for the sale of its business.[1386]

Although AFI may have indirectly affected ResCap's timing considerations through its willingness or unwillingness to provide additional capital support, the evidence does not support the proposition that AFI controlled the timing of the bankruptcy filing. Indeed, ResCap did not file the Chapter 11 Cases until May 14, 2012, which was after it had conducted a marketing process, obtained stalking horse bids on its assets, secured DIP financing, and reached settlements with certain creditor constituencies.

### (4) ResCap Considers Potential Legal Claims Against AFI

As discussions of a possible bankruptcy filing became more frequent in late 2011, the ResCap Board determined that it would need to conduct a retrospective review of ResCap's relationships with certain affiliates and investigate potential legal claims in connection with any "grant of releases of potential liability to the counterparties under" various related-party transactions.[1387]

Sometime around November 2011, Marano and his team began brainstorming on a "range of possible claims" that ResCap may have against AFI.[1388] According to Marano, the senior management team—including Jim Whitlinger, Steve Abreu, Adam Glassner, and Cathy Dondzila—spoke with Morrison & Foerster and was told that there was "an opportunity to settle claims between ResCap and [AFI] and that [management] needed to come up with areas for [counsel] to look into that could be a possible area where [AFI] might have done something wrong."[1389]

With that directive, Marano stated that management, individually and occasionally together, tried to come up with ideas of "what exactly we could get [AFI] for."[1390] As a result of that process, management considered several areas worth further consideration, including claims against AFI or Ally Bank related to loans originated or underwritten by Ally Bank, the factoring agreement, representation and warranty risk, and the bank's underwriting

---

[1385] *See* Barclays DIP Financing Agreement, Summary of Indicative Terms and Conditions, dated Apr. 9, 2012 [EXAM20122499].

[1386] Transaction Discussion, dated Mar. 19, 2012, at 3 [EXAM00015730].

[1387] Residential Capital, LLC Resolutions for Adoption by the Board of Directors, dated Dec. 5, 2011, at RC40020104 [RC40020073]; Minutes of a Special Meeting of the Board of Residential Capital, LLC, Dec. 5, 2011, at RC40018719–21 [RC40018411].

[1388] Int. of T. Marano, Nov. 26, 2012, at 168:24–169:14.

[1389] *Id*. at 170:5–11; *see also* Int. of J. Whitlinger, Nov. 30, 2012, at 62:24–63:10 (noting he "had helped do a brainstorming session on potential claims to try and negotiate a settlement").

[1390] Int. of T. Marano, Nov. 26, 2012, at 170:12–15.

practices.[1391] When asked whether management came to believe any of these areas were good grounds for seeking relief against AFI, Marano noted:

> The problem with that is that we gave a bunch of possible areas for Morrison & Foerster to look into. Then we formed an independent committee of directors to take on responsibility for that. They did the work.[1392]

### (5) ResCap Appoints Additional Independent Directors And Establishes Special Review Committee

The ResCap Board recognized that, as it was constituted at the time, it could not settle ResCap's potential claims against AFI and other affiliates because the directors had participated in many of the transactions that would be investigated.[1393] Accordingly, ResCap sought "to increase the size of the board to have a majority of independent directors" by adding two additional independent directors.[1394]

In November 2011, after an interview process,[1395] Marano recommended the appointment of Jonathan Ilany and John Mack.[1396] The ResCap Board appointed Ilany and Mack members of the ResCap Board effective November 16, 2011.[1397] By hiring the new independent directors, ResCap's management could focus on securing DIP financing and stalking horse bids—two matters which it deemed to be of higher priority than the negotiation of a settlement with AFI[1398]—and "outsource[] or kind of create[] a separate committee to deal with the

---

[1391] *Id.* at 170:20–171:4; *see also* Dep. of J. Whitlinger, Nov. 15, 2012, at 129:3–132:10.

[1392] Int. of T. Marano, Nov. 26, 2012, at 171:12–20.

[1393] *See* Int. of J. Ilany, Nov. 28, 2012, at 64:10–65:8; *see also* Int. of J. Tanenbaum, Mar. 29, 2013, at 171:1–21 ("[F]rom a good corporate governance standpoint, one would not want any of the directors who participated in approving those interested transactions to approve the settlement, because they'd be approving their own work, in effect.").

[1394] Dep. of J. Mack, Nov. 14, 2012, at 30:8–15.

[1395] Int. of J. Tanenbaum, Mar. 29, 2013, at 177:8–178:3; Minutes of a Special Meeting of the Board of Residential Capital, LLC, Nov. 4, 2011, at RC40018700 [RC40018411].

[1396] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Nov. 16, 2011, at RC40018710 [RC40018411]. Ilany was first contacted about the ResCap board position by James Tanenbaum of Morrison & Foerster. Int. of J. Ilany, Nov. 11, 2012, at 47:23–48:7. Ilany had met Tanenbaum when Ilany worked at Bear Stearns and Tanenbaum's firm at the time was advisor to Bear Stearns. *See id.* at 49:14–51:15; *see also* Int. of J. Tanenbaum, Mar. 29, 2013, at 171:24–172:21. While at Bear Stearns, Ilany also worked with Marano, and for a period of time Marano reported directly to Ilany. Int. of J. Ilany, Nov. 11, 2012, at 57:14–58:19. Tanenbaum met Mack when Mack worked at what is now Bank of America and also viewed Mack as extremely qualified to serve as an independent director. Int. of J. Tanenbaum, Mar. 29, 2013, at 178:16–179:18.

[1397] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Nov. 16, 2011, at RC40018710 [RC40018411].

[1398] *See* E-mail from T. Marano to Mackey (Feb. 19, 2012) [ALLY_0150256].

9019" and the investigation of potential claims against AFI.[1399] Even though it was not the focus of ResCap's management, the "[p]otential settlement of ResCap claims against [AFI] under Rule 9019" was considered by ResCap to be a major element of the chapter 11 filing process.[1400]

Ilany understood that he was joining the ResCap Board as a "super independent" because ResCap needed "a fresh set of eyes that was not involved with anything that happened" to perform the retrospective review of ResCap transactions.[1401] Likewise, Mack understood that he and Ilany were "truly independent" in a way that the other independent directors—Edward Smith and Pam West—were not, and that the Special Review Committee needed to be "independent of the past" to properly investigate the Affiliate Transactions.[1402]

Effective December 5, 2011, the ResCap Board established the Special Review Committee, consisting of Ilany and Mack, for the purpose of:

> [I]mplementing a process and procedure for the review and assessment of (i) all material transactions entered into between [ResCap] and any affiliate (other than [ResCap's] subsidiaries) of [ResCap], including [Cerberus, AFI] and any of their respective affiliates (each, an "Affiliate Transaction") that occurred since the formation of [ResCap] in 2004 . . . , (ii) the historic course of dealing and interrelationships between [ResCap] and [AFI] and their respective subsidiaries and affiliates over the same time period and (iii) potential claims arising in relation to these transactions and interrelationships . . . .[1403]

In addition to delegating full authority to the Special Review Committee to conduct its review of Affiliate Transactions, interrelationships and potential legal claims, the ResCap Board authorized the Special Review Committee to approve or recommend for approval "any potential release of liability of any counterparty to any Affiliate Transactions that may be considered by [ResCap]."[1404]

Ilany understood that it was his and Mack's mandate to review Affiliate Transactions and "everything that was done" between ResCap and AFI and Cerberus to see if it was "done in a

---

[1399] Dep. of T. Marano, Nov. 12, 2012, at 81:20–84:5.

[1400] Joint Project Bounce Presentation by Centerview, FTI, and Morrison & Foerster, dated Dec. 15, 2011, at 10 [RC00000121].

[1401] Int. of J. Ilany, Nov. 28, 2012, at 18:1–13, 64:10–65:8.

[1402] Int. of J. Mack, Dec. 5, 2012, at 77:13–20, 78:13–24, 138:21–140:14.

[1403] Residential Capital, LLC Resolutions for Adoption by the Board of Directors, dated Dec. 5, 2011, at RC40020104 [RC40020073]; Minutes of a Special Meeting of the Board of Residential Capital, LLC, Dec. 5, 2011, at RC40018719–20 [RC40018411].

[1404] Id.

commercial arm's length transaction at market."[1405] If Affiliate Transactions were not done "in market or in arm's length transactions," Ilany understood that it was his and Mack's mandate to negotiate with AFI a resolution of any claims arising out of those transactions.[1406] According to Marano, as part of their review of the Affiliate Transactions, Ilany and Mack did not seek out the thoughts or views of senior management to any great extent,[1407] apparently choosing to rely mainly on Morrison & Foerster's analysis to understand the prior transactions and any related claims.

To perform its responsibilities, the Special Review Committee was authorized to engage "financial and other experts and consultants, including legal counsel . . . at the expense of [ResCap]."[1408] Despite that authorization, Ilany and Mack continued to use Morrison & Foerster and Morrison Cohen.[1409] Ilany understood that he could hire professionals to help him understand the transactions,[1410] but he never considered hiring separate counsel, stating "our belief was that these professionals were representing us versus another entity and they were our lawyers and [Morrison Cohen] represent[s] the independent people of the board which is including us and [Morrison & Foerster] represents the company and the board. We have not seen any need to hire anybody else."[1411]

### (6) Morrison & Foerster Investigates Legal Claims On Behalf Of ResCap And Special Review Committee

The primary investigation into ResCap's potential legal claims against AFI was conducted by ResCap's restructuring counsel Morrison & Foerster,[1412] which was "asked by ResCap to conduct a review of the related party transactions as well as the financial and operational course of dealing between [AFI] and ResCap."[1413] Thus, the Special Review Committee did not itself investigate potential legal claims against AFI, but rather was formed "to consider [Morrison & Foerster's] report on potential claims . . . [and] then determine next steps."[1414] Indeed, Morrison & Foerster's claims investigation was already underway when the

---

[1405] Int. of J. Ilany, Nov. 28, 2012, at 106:14–108:7.

[1406] *Id.* at 109:7–19 ("[I]f transactions were not done in market or in arm's length transactions that there might be claims and my advisors will help me figure them out. This is what we were hired to do and if there are claims to negotiation with the parent.")

[1407] *See* Int. of T. Marano, Nov. 26, 2012, at 172:4–22.

[1408] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Dec. 5, 2011, at RC40018722 [RC40018411].

[1409] *See* Int. of J. Ilany, Nov. 28, 2012, at 116:7–16.

[1410] *See id.* at 116:7–11.

[1411] *Id.* at 118:19–119:7.

[1412] Materials for Discussion, dated Dec. 12, 2011, at 6 [RC00000114].

[1413] Morrison & Foerster Report on the Independent Review Claims Analysis, dated Jan. 25, 2012, at 4 [RC00023710].

[1414] Materials for Discussion, dated Dec. 12, 2011, at 6 [RC00000114].

two new independent directors were retained.[1415] Morrison & Foerster "was the driving force in the analysis of legal claims that were settled in the [AFI] settlement."[1416]

Morrison & Foerster's decision that it could perform an "independent" review on the "financial and operational course of dealing between [AFI] and ResCap"[1417] is questionable in light of the firm's significant involvement in that very course of dealing during the preceding years. From September 2008 through November 2011, Morrison & Foerster attended over 100 ResCap Board meetings, including meetings at which discussions occurred regarding Affiliate Transactions subject to the Special Review Committee's scrutiny, including the 2009 Bank Transaction;[1418] the First 2009 Tax Allocation Agreement;[1419] the Initial Line of Credit Facility;[1420] and the ResMor Sale,[1421] among others.[1422] James Tanenbaum of Morrison & Foerster explained that his firm frequently advised the ResCap Board on a variety of issues relating to the Affiliate Transactions and corporate governance.[1423]

Tanenbaum stated that he did not believe there was any conflict that should have precluded Morrison & Foerster from conducting the investigation. In fact, he noted that Morrison & Foerster was "exactly the right [firm] to do it. Because at that point, we had some background with the company."[1424] Tanenbaum asserted that Mack's and Ilany's appointment as Independent Directors to review the Affiliate Transactions was necessary because the other ResCap Board members had *voted* on those transactions.[1425] Tanenbaum acknowledged that

---

[1415] *See* Int. of T. Hamzehpour, Oct. 5, 2012, at 233:10–20; Int. of J. Tanenbaum, Mar. 29, 2013, at 189:13–190:9.

[1416] Dep. of M. Puntus, Nov. 5, 2012, at 28:3–6.

[1417] Morrison & Foerster Report on the Independent Review Claims Analysis, dated Jan. 25, 2012, at 4 [RC00023710].

[1418] *See, e.g.*, Minutes of a Special Meeting of the Board of Residential Capital, LLC, Sept. 19, 2008, at RC40005870–71 [RC40005652] (discussing potential transaction structures for 2009 Bank Transaction).

[1419] *See* Minutes of a Regular Meeting of the Board of Directors of Residential Capital, LLC, Aug. 6, 2010, at RC40018820–22 [RC40018729].

[1420] *See* Minutes of a Special Meeting of the Board of Residential Capital, LLC, Nov. 12, 2008, at 2 [RC00017340] (during the meeting at which the ResCap Board approved an AFI support offer, including the Initial Line of Credit Facility, Tanenbaum of Morrison & Foerster "noted the importance of disclosing the deferral of [a ResCap bond interest payment due November 17, 2008] in the context of the overall support plan" and "discussed the potential impact that the delayed interest payment might have on the bond exchange").

[1421] *See id.*

[1422] *See* Morrison & Foerster Report on the Independent Review Claims Analysis, dated Jan. 25, 2012, at 8 [RC00023710].

[1423] Int. of J. Tanenbaum, Mar. 29, 2013, at 217:6–22 ([Q:] "[D]id you have an understanding of whether MoFo had given any legal advice with respect to any of the transactions that were the subject of the special review committee's work?" [A:] "I would've hoped that we would've given advice on process, board process and consideration of the issues. I think, during the course of our relationship, I would be very surprised if we did not give an advice on governance and process relating to these and other issues.").

[1424] *Id.* at 215:6–216:1.

[1425] *Id.* at 218:6–25.

Morrison & Foerster advised the ResCap Board on the Affiliate Transactions,[1426] but did not view that as creating the same conflict that voting on those transactions arguably created.[1427]

The ability of Morrison & Foerster to review transactions on which it had previously advised the ResCap Board should have been considered by Ilany and Mack, and, at a minimum, also discussed with Morrison & Foerster. But Morrison & Foerster's potential conflicts did not cause Ilany or Mack any concern. Ilany explained that "the lawyers that have conflicts tell you that they have conflicts. I'm not a lawyer."[1428] Mack also did not feel the need to retain counsel that had not been involved in the Affiliate Transactions to be scrutinized by the Special Review Committee.[1429]

Notwithstanding the possible conflicts of interest, Morrison & Foerster conducted the investigation. The stated objective of Morrison & Foerster's investigation was "to identify and analyze claims that may be made by ResCap against [AFI] in the context of an insolvency proceeding."[1430] Gary Lee of Morrison & Foerster explained that Morrison & Foerster's goal was to create "the existential threat, the threat that would persuade somebody to write a very

---

[1426] *Id.* at 217:6-22.

[1427] *Id.* at 217:6–219:21. When asked why the logic that required the retention of Mack and Ilany did not apply to Morrison & Foerster, Tanenbaum replied:

> You've mixed up two things. They were tasked with this responsibility because they had not been involved in voting on those transactions. Voting. . . . In respect of the interested transactions, they didn't sit on the board and had never exercised a vote. . . . Our view was that the best governance would entail having [Mack and Ilany] negotiate and ultimately, if possible, resolve those claims. However, I can't—could not then and cannot now, think of anything associated with the work that MoFo had done up to that point which would not put them in the position of being able to conduct effectively—in fact, perhaps, most effectively—an analysis of claim and other issues that could be relevant to the settlement process.

> *Id.*

[1428] Int. of J. Ilany, Nov. 28, 2012, at 120:19–21. Ilany understood that both Morrison & Foerster and Morrison Cohen had been advising ResCap and its independent directors, respectively, for several years, and that each had been involved in transactions to be reviewed by the Morrison & Foerster. *See id.* at 117:2–118:11, 120:5–120:16 (explaining that he was not concerned by the use of potentially conflicted lawyers because "they are professionals. They are bound by duty to me and they are my advisors. They are going to do what is right for the company going forward and for the committee that I represent going forward. There is no limit to how many more you can hire.").

[1429] *See* Int. of J. Mack, Dec. 5, 2012, at 155:8–21 (Mack understood Morrison & Foerster, Morrison Cohen, FTI, and Centerview to be the advisors for the Special Review Committee, noting "I felt very good about the advisors we had, the advice we got, the professionalism. I didn't feel a need to have more advisors. I thought we were well advised, completely advised, thoroughly advised, appropriately advised.").

[1430] Morrison & Foerster Report on the Independent Review Claims Analysis, dated Jan. 25, 2012, at 4 [RC00023710]. Morrison & Foerster did not investigate potential claims against Cerberus despite the Special Review Committee's authorization to do so. Tanenbaum explained that an investigation of claims against Cerberus was not necessary because Cerberus would not be a released party under any Plan. *See* Int. of J. Tanenbaum, Mar. 29, 2013, at 190:14–191:3, 209:8–214:10 ("To the extent that ResCap had then claims against Cerberus, it would have those claims now. . . . Cerberus was not going to be a party to the [settlement] . . . . Everybody knew that. There would've been no basis for them to become a party.").

big check."[1431] To that end, Morrison & Foerster sought to develop three basic types of claims ResCap could assert against AFI: (1) single entity type claims, including substantive consolidation, pooling of the assets of the entities, alter ego, and veil piercing claims;[1432] (2) bankruptcy claims, including equitable subordination, recharacterization of debt as equity, and constructive or actual fraudulent conveyance;[1433] and (3) contribution claims arising as a result of ResCap's liability to third parties.[1434]

As part of its investigation, Morrison & Foerster reviewed ResCap Board meeting minutes and other materials dating from mid-2007, the ResCap LLC Agreement and the ResCap 2006 Amended Operating Agreement, certain AFI Board meeting minutes and other materials, relevant agreements and materials relating to certain Affiliate Transactions, fairness opinions and legal opinions addressed to ResCap, and SEC filings for ResCap and AFI.[1435] In addition, Morrison & Foerster conducted interviews of several current or former ResCap and AFI employees, including, among others: (1) Tom Marano;[1436] (2) Lisa Gess;[1437] (3) Tammy Hamzehpour;[1438] (4) Joe Pensabene;[1439] (5) Cathy Dondzila;[1440] and (6) Steve Abreu.[1441]

In the course of its investigation, Morrison & Foerster did not review any contemporaneous e-mails and did not have access to any AFI files other than certain AFI Board materials.[1442] When asked if there was anything on his "wish list of what [Morrison &

---

[1431] Int. of G. Lee, Feb. 20, 2013, at 125:7–20.

[1432] *See* Morrison & Foerster Report on the Independent Review Claims Analysis, dated Jan. 25, 2012, at RC00023725–27 [RC00023710].

[1433] *Id.* at RC00023725, –28–32.

[1434] *Id.* at RC00023725, –33.

[1435] *Id.* at RC00023720–21.

[1436] Int. of T. Marano, Nov. 26, 2012, at 168:24–169:8, 172:13–173:3; *see also* Int. of S. Abreu, Jan. 22, 2013, at 55:2–20.

[1437] Int. of L. Gess, Nov. 30, 2012, at 13:16–14:1.

[1438] Int. of T. Hamzehpour, Oct. 5, 2012, at 113:5–7.

[1439] Int. of J. Pensabene, Jan. 9, 2013, at 121:17.

[1440] Int. of C. Dondzila, Sept. 27, 2012, at 176:11–24.

[1441] Int. of S. Abreu, Jan. 22, 2013, at 55:2–20.

[1442] Meeting with Morrison & Foerster, Counsel to the Debtors, in N.Y., N.Y. (July 20, 2012); *see also* Morrison & Foerster Report on the Independent Review Claims Analysis, dated Jan. 25, 2012, at RC00023720–21 [RC00023710].

Foerster] might have had access to," Mack stated, "I would've loved to have had access to [AFI] e-mails. I would love to be able to interview anybody at [AFI].... [B]ut, we didn't have the power."[1443] Mack added that he never specifically asked Morrison & Foerster whether they should have asked AFI for access to additional information.[1444]

As noted above, Morrison & Foerster began meeting with ResCap officers to investigate possible claims before the Special Review Committee was formed.[1445] Morrison & Foerster initially "anticipate[d] completing its review" of potential claims "and discussing its conclusions with the Special Review Committee before the end of December 2011."[1446] Ultimately, the results of the investigation were presented to the ResCap Board on January 25, 2012.[1447]

### (a) Morrison & Foerster Presentation Of Claims Analysis To ResCap Board

On January 25, 2012, at a special meeting of the ResCap Board, Morrison & Foerster presented "the initial results of their independent review of historical transactions between ResCap and [AFI], its predecessors and affiliates, including Cerberus entities" and "their initial analysis of potential claims that could be made against [AFI] in a potential Rule 9019 settlement discussion with [AFI] . . . ."[1448]

Mack stated that his overall conclusion from Morrison & Foerster's report was that there were no "smoking guns, but that an aggregate taken as a holistic view, we thought we had a case, but not any specific transaction or specific legal claim here could be or would be successful."[1449] Mack explained that the presentation was "designed to be . . . one-sided in a way" that was "favorable to ResCap, not favorable to [AFI]," but that the ResCap Board and its advisors engaged in "full and thorough discussion" on the claims analysis.[1450] According to Smith, Morrison & Foerster noted that potential claims against AFI "could be as much as $12 billion."[1451]

---

[1443] Int. of J. Mack, Jan. 15, 2013, at 109:17–24; *see also* Int. of J. Tanenbaum, Mar. 29, 2013, at 196:4–17 ("The one external factor that shaped timing is that ResCap didn't have subpoena power as [the Examiner has]. So there are many things that we probably would've liked to have looked at that we really didn't have occasion to do.").

[1444] Int. of J. Mack, Jan. 15, 2013, at 109:25–110:6.

[1445] *See id.* at 108:13–16 ("I understand that MoFo had begun the investigation prior to our joining the board. And so, that must've come from somebody, but I don't know who.").

[1446] Materials for Discussion, dated Dec. 12, 2011, at 6 [RC00000114].

[1447] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Jan. 25, 2012, at RC40019194 [RC40019179].

[1448] *Id.* The minutes suggest that Morrison & Foerster presented the "initial results" of its investigation, but no subsequent presentation on the results of Morrison & Foerster's claims investigation was ever provided to the Special Review Committee. *See* Int. of J. Mack, Jan. 15, 2013, at 85:17–87:1, 144:15–145:2.

[1449] Int. of J. Mack, Jan. 15, 2013, at 105:1–23.

[1450] *Id.* at 152:1–8.

[1451] Int. of E. Smith, Nov. 30, 2012, at 199:8–203:1.

Specifically, the Morrison & Foerster presentation observes, among other things, that "a strong argument can be made that the course of conduct [between AFI and ResCap] changed following the restructuring events in 2008."[1452] The presentation explains that, in connection with the review of the relationship between AFI and ResCap, it is "highly relevant . . . whether and when ResCap was undercapitalized and/or in the 'zone of insolvency'"[1453] and "ResCap may have been in the 'zone of insolvency' from 2008 onward."[1454] When asked about those points, Mack stated unequivocally that ResCap was "never insolvent" but that he had not reached a conclusion as to whether ResCap was ever in the "zone of insolvency" because "that's kind of a vague concept."[1455] Notwithstanding Morrison & Foerster's advice that solvency was "highly relevant,"[1456] when asked for his "understanding of how the zone of insolvency analysis figured into [his] review of the potential claims,"[1457] Mack stated, "I don't know that it affects my view of the individual claims. It affects the way you run the company, but it doesn't affect my view of the individual claims."[1458]

In addition, the Morrison & Foerster presentation noted that it is arguable that ResCap and AFI acted "as a single, integrated operation in certain respects" during "the post-TARP period."[1459] When Mack was asked what the relevance was to the claims analysis of "whether ResCap and [AFI] had acted as a single, integrated operation," he stated "[j]ust trying to make sure we understood the way the company was run. . . . I don't recall anything about whether it had any impact on my assessment of the claims."[1460]

Morrison & Foerster's presentation did not review claims relating to AFI's potential liability directly to third parties, nor did it analyze breach of fiduciary duty claims against ResCap's directors and officers that could have given rise to claims against AFI for aiding and abetting breach of fiduciary duty.[1461]

---

[1452] Morrison & Foerster Report on the Independent Review Claims Analysis, dated Jan. 25, 2012, at RC00023773 [RC00023710].

[1453] *Id.* at RC00023774.

[1454] *Id.* at RC00023756.

[1455] *See* Int. of J. Mack, Jan. 15, 2013, at 135:23–136:25, 148:5–150:16; *see also* Dep. of T. Hamzehpour, Nov. 13, 2012, at 103:10–104:6 (asserting she did not consider ResCap to be insolvent until the bankruptcy filing).

[1456] Morrison & Foerster Report on the Independent Review Claims Analysis, dated Jan. 25, 2012, at RC00023774 [RC00023710].

[1457] Int. of J. Mack, Jan. 15, 2013, at 137:17–20.

[1458] *Id.* at 137:21–138:24.

[1459] Morrison & Foerster Report on the Independent Review Claims Analysis, dated Jan. 25, 2012, at RC00023774 [RC00023710].

[1460] Int. of J. Mack, Jan. 15, 2013, at 140:17–141:15.

[1461] Morrison & Foerster Report on the Independent Review Claims Analysis, dated Jan. 25, 2012 [RC00023710]. Gary Lee of Morrison & Foerster asserted that the firm considered Third-Party Claims in its investigation, *see* Int. of G. Lee, Feb. 20, 2013, at 59:12–60:21, 222:14–223:1, but Lee could not recall whether Morrison & Foerster had investigated breach of fiduciary duty claims. *See id.* at 219:1–9.

### (b) *Morrison & Foerster Presentation Of Claims Analysis To Kirkland & Ellis*

After the January 25, 2012 presentation, either the ResCap Board or the Special Review Committee directed Morrison & Foerster to meet with AFI's counsel Kirkland & Ellis to present the results of Morrison & Foerster's claims investigation.[1462] That meeting took place on February 14, 2012.[1463] It appears that the presentation Morrison & Foerster gave to Kirkland & Ellis was not shared with the members of the ResCap Board.[1464]

There are certain differences between the two Morrison & Foerster presentations. Notably, the February 14 presentation to Kirkland & Ellis noted that "FTI analyzed whether ResCap was insolvent at various times and concluded that ResCap may have been insolvent as early as 2006" and, under certain measures, "ResCap has been insolvent during the entire period [from 2006 through 2011.]"[1465] In contrast, Morrison & Foerster's strongest statement on ResCap's solvency in the January 25 presentation was that "ResCap may have been in the 'zone of insolvency' from 2008 onward."[1466] In addition, whereas the January 25 presentation did not address potential damages, the February 14 presentation asserted that AFI's control over ResCap had resulted in a $7.6 billion diminution of ResCap's estimated enterprise value and that the market value of ResCap's equity had declined by $12 billion.[1467]

### 2. *AFI's Consideration Of Strategic Restructuring Scenarios*

#### a. *AFI's Strategic Cost-Benefit Analysis Regarding Mortgage Business*

While ResCap was considering its options, AFI was undertaking similar analyses to evaluate strategic scenarios for ResCap and to understand its own contingent liability exposure. By June 2011, Jeff Brown, AFI's Senior Executive Vice President of Finance and Corporate Planning, viewed the mortgage business as "a weight" and doubted whether a scenario existed in which AFI could be released from all contingent liabilities.[1468] By August 19, 2011, James Mackey, CFO of AFI, believed that representation and warranty claims against ResCap and/or AFI were inevitable and would be an "avalanche."[1469]

---

[1462] Int. of J. Mack, Jan. 15, 2013, at 86:1–14.

[1463] *Id*. at 156:1–5.

[1464] *Id*. at 155:19–21, 159:13–22.

[1465] Morrison & Foerster ResCap Claims Presentation, dated Feb. 14, 2012, at RC00028281–83 [RC00028255]. The Examiner's Financial Advisors reviewed the calculations underlying FTI's February 14, 2012 solvency analysis and concluded that FTI's conclusions were not credible. For the Examiner's full analysis of ResCap's financial condition, *see* Section VI.

[1466] Morrison & Foerster Report on the Independent Review Claims Analysis, dated Jan. 25, 2012, at RC00023756 [RC00023710].

[1467] Morrison & Foerster ResCap Claims Presentation, dated Feb. 14, 2012, at 48–51 [RC00028255].

[1468] *See* E-mail from J. Brown to M. Carpenter (June 29, 2011) [ALLY_0225116].

[1469] *See* E-mail from J. Mackey (Aug. 19, 2011) [ALLY_0169890].

On September 16, 2011, Brown e-mailed Carpenter and recommended that AFI and ResCap "[s]top origination immediately" and "[a]nnounce we are exiting future mortgage business."[1470] Although Brown noted that bankruptcy would give AFI the "best protection," he viewed it as "unrealistic and unpalatable by [the U.S. Treasury]."[1471] He proposed instead to stop the business and stockpile cash to provide "a much longer runway of life" that could "support contingent liability claims."[1472] In response, Carpenter noted that, "as we know from [2010], the business has some value aside from contingent liabilities."[1473] He asked, "[s]hould we forego that?"[1474]

On September 23, 2011, the AFI Board held a special meeting for the purpose of "review[ing] strategic alternatives for [ResCap] and the impact on [AFI], in light of private label securitization and related litigation pending against ResCap and [AFI] and other entities in the organization to inform the Board's on-going deliberations pertaining to the mortgage operations."[1475] In connection with preparing the presentation for that AFI Board meeting, Brown queried whether they should "add some drama," and noted that "[m]ortgage has in many ways become a cancer for [AFI]" and "[a]ction is needed to take some of the cloud away from [AFI]."[1476]

The materials that were presented to the AFI Board on September 23, 2011 did not contain such dramatic statements. Instead, the presentation analyzed ResCap's obligations, ResCap's existing and potential litigation exposure, and AFI's potential exposure to ResCap-related liabilities.[1477] The analyses regarding AFI's exposure were then applied to the following "potential business scenarios": (1) status quo; (2) bankruptcy; (3) spin; and (4) sale.[1478]

On October 6, 2011, the AFI Board met and discussed the "merits and potential consequences of remaining in or exiting all or a portion of the mortgage business."[1479] At the meeting, members of the AFI Board "reviewed and discussed at length a presentation prepared by management that provided a detailed assessment of the potential strategic alternatives and contingencies for [AFI]'s mortgage operations . . . ."[1480] The presentation included, among

---

[1470] E-mail from J. Brown to M. Carpenter (Sept. 16, 2011) [ALLY_0170751].

[1471] *Id*.

[1472] *Id*.

[1473] E-mail from M. Carpenter to J. Brown (Sept. 16, 2011) [ALLY_0170751].

[1474] *Id*.

[1475] Minutes of a Special Meeting of the Board of Directors of Ally Financial Inc., Sept. 23, 2011, at ALLY_0115749–50 [ALLY_0115565]. Marano and Mackey participated in the AFI Board discussion regarding mortgage strategic alternatives and responded to various questions from AFI Board members.

[1476] E-mail from J. Brown (Sept. 21, 2011) [ALLY_0237702].

[1477] AFI Board Presentation, dated Sept. 23, 2011 [ALLY_0157602].

[1478] *Id*. at 20.

[1479] Minutes of a Regular Meeting of the Board of Directors of Ally Financial Inc., Oct. 6, 2011, at ALLY_0115762 [ALLY_0115565].

[1480] *Id*. at ALLY_0115761.

other things, detailed analyses regarding "each of the strategic alternatives evaluated, and management's observations as to these matters."[1481] AFI's priorities at the time included maximizing the consolidated equity value of AFI and insulating AFI from escalating mortgage issues.[1482]

AFI engaged Evercore on October 15, 2011 to analyze strategic alternatives in connection with AFI's mortgage business, including developing a ResCap bankruptcy plan and analyzing potential sale scenarios.[1483] The AFI Board referred to its evaluation of strategic alternatives for ResCap as "Project Rodeo."[1484]

In December 2011, AFI and its advisors began to focus on preparations for a ResCap bankruptcy case, including the "two important objectives" of obtaining "court approval of claims settlement under 9019" and "completion of a 363 sale of the servicing platform."[1485] As of December 16, 2011, Evercore assigned "low probability" to either a sale or spin-off transaction outcome for ResCap.[1486] Corey Pinkston, Head of Corporate Debt and Equity at AFI, was working with Evercore in considering strategic alternatives,[1487] and noted that AFI did not see any other viable options for ResCap to avoid bankruptcy, stating:

> [I]t was not like there was another silver bullet out there with respect of, okay, what potentially—the problem is, at that point in time, is you're dealing with this litigation that you don't have a definition around what is it? How do you box it, right? . . . [I]f you're looking at the portfolio of assets or your balance sheet, you're trying to figure out how many losses can you take in something? You think recovery of prices, et cetera, you know, this is a litigation issue out there. Nobody could really frame up what does it really mean, how legitimate is it . . . . [Y]ou're not solving for an ability to say, "Well, let me model up specifically what the number's going to be," when you've got this building.

---

[1481] *Id*.; *see also* Mortgage/ResCap Strategic Alternatives Discussion: Critical Issues, dated Oct. 6, 2011 [ALLY_0400275].

[1482] *See* Mortgage / ResCap Strategic Alternatives Discussion: Critical Issues, dated Oct. 6, 2011, at 2 [ALLY_0400275]. At the October 6, 2011 meeting, the AFI Board also discussed "hypothetical scenarios illustrative of potential legal claims against [AFI] and [ResCap]," and engaged in discussion with Solomon regarding "the legal risk analysis of mortgage servicing matters." Minutes of a Regular Meeting of the Board of Directors of Ally Financial Inc., Oct. 6, 2011, at ALLY_0115762–63 [ALLY_0115565].

[1483] *See* Evercore Engagement Letter, dated Oct. 15, 2011, at 1 [ALLY_0142108]; E-mail from D. Ying (Dec. 12, 2011) [ALLY_0380152].

[1484] *See, e.g.*, E-mail from D. Schaeffer (Sept. 20, 2011) [EXAM20192690].

[1485] E-mail from E. Mestre to M. Carpenter (Dec. 16, 2011) [ALLY_0142418].

[1486] *Id*.

[1487] Int. of C. Pinkston, Nov. 8, 2012, at 81:8–16.

> So, at a certain point in time, I think the folks realized that the
> whole idea of a spinoff or whatever those issues are, I mean, you
> just don't—you don't have a number that you can confidently
> say I think kind of solves this issue. Or, you can call somebody
> up and settle it or something like that, or if you're willing to
> try.[1488]

AFI recognized that there were significant challenges inherent in divorcing itself from the mortgage business, especially with respect to the "operational entanglement of [Ally] Bank and ResCap."[1489] As of December 13, 2011, AFI's business and financial goals in connection with a ResCap chapter 11 filing included, among other things, minimizing "guarantees, obligations, or unsecured exposures that would be injurious to [AFI] upon a ResCap filing," and maximizing the value of AFI's claims.[1490] AFI's legal goals included continuing AFI's "separation from current and potential litigation of ResCap claimants," implementing a settlement of any alleged claims against AFI held by the ResCap estate, and using the chapter 11 process "as a possible consolidated forum to address certain 3rd party litigation claims against [AFI]."[1491] On December 26, 2011, Carpenter informed the AFI Board that "[g]ood progress [was] being made on unscrambling the complex relationships between AFI, Ally Bank and Rescap/GMAC Mortgage. . . . This is consistent with Rescap's 363 plan also."[1492]

Over the following months, the AFI Board discussed strategic options for ResCap and the mortgage business or preparations for a ResCap bankruptcy on many occasions.[1493] Ultimately, AFI made an official determination to cease its support for ResCap and allow ResCap to file for bankruptcy. Brown's view that AFI was better off exiting the mortgage business remained consistent when he discussed the decision retrospectively. He wrote, "ResCap was maintained separately . . . [which] has afforded [AFI] options to deal with the pig. . . . [M]assive financing

---

[1488] *Id.* at 81:17–82:21.

[1489] *See* E-mail from B. Yastine to M. Carpenter (Dec. 1, 2011) [ALLY_0304495]; *see also* Int. of M. Carpenter, Mar. 4, 2013, at 240:2–241:25 (discussing the "challenges of separating ResCap from Ally Bank").

[1490] Evercore, Kirkland & Ellis, and Mayer Brown Project Rodeo Discussion Materials, dated Dec. 13, 2011, at 4 [CCM00336243].

[1491] *Id.*

[1492] E-mail from M. Carpenter (Dec. 26, 2011) [ALLY_0142356].

[1493] *See, e.g.*, Minutes of a Regular Meeting of the Board of Directors of Ally Financial Inc., Dec. 20, 2011, at ALLY_0115830 [ALLY_0115565]; Minutes of a Regular Meeting of the Board of Directors of Ally Financial Inc., Feb. 1, 2012, at ALLY_PEO_0020498 [ALLY_PEO_0020479] (discussion of ResCap strategic alternatives lasted approximately three and a half hours); Minutes of a Special Meeting of the Board of Directors of Ally Financial Inc., Mar. 14, 2012, at ALLY_PEO_0020540–41 [ALLY_PEO_0020479]; Minutes of a Regular Meeting of the Board of Directors of Ally Financial Inc., Apr. 4, 2012, at ALLY_PEO_0020548 [ALLY_PEO_0020479].

needs over coming years, regulatory mess, contingent clouds . . . all these things mean you must dump it."[1494] Carpenter outlined AFI's ResCap strategy as follows:

> 1. Rescap is a wholely [sic] owned sub of [AFI] but has always operated as a separate company (own BoD, own 10k etc). Therefore, and because of its separateness [AFI] can make decisions about [its] investment in the subsidiary.

> 2. Rescap and the mortgage business have struggled for years and [AFI] has supported the company through its difficulties.

> 3. However, three reasons for [AFI] not wishing to continue to invest are

> —the mortgage servicing business has become marginally profitable as a result of industry changes including substantial additional costs driven by new government rules and regulations (without the ability to recover through pricing)

> —approx 3 billion of Rescap bonds become due in the next several years and these cannot be refinanced in the capital markets

> —large contingent liabilities from governmental and unjustified suits and potential suits create an additional drain on the company.

> 4. For [AFI] to continue to support Rescap is hugely detrimental to our key objective of repaying the American taxpayer. Continuing to support Rescap will require billions of taxpayer capital [to] be invested in this unattractive business. In addition, it will raise [AFI]'s cost of funding in support of its principal objective, supporting the US auto industry. Further, it will preclude an IPO and other options for repaying the US taxpayer.

> 5. Several alternatives were examined to separate Rescap from [AFI], including sale, but bankruptcy was by far the best alternative.[1495]

---

[1494] *See* E-mail from J. Brown to J. Mackey and M. Carpenter (Apr. 13, 2012) [ALLY_0334715].

[1495] *See* E-mail from M. Carpenter (Apr. 15, 2012) [ALLY_0381153]; *see also* E-mail from M. Carpenter (Jan. 20, 2012) [EXAM00010735] (outlining similar "themes" with respect to AFI's decision to cease its support for ResCap).

### b.   Investigation Of Legal Claims By Kirkland & Ellis On Behalf Of AFI

Whereas ResCap's counsel began its investigation of legal claims in late 2011, AFI's counsel, Kirkland & Ellis, began investigating AFI's potential exposure to ResCap-related liabilities in 2008.[1496] Kirkland & Ellis interviewed AFI executives in fall 2008 and September 2011, reviewed SEC filings and certain transaction documents, and analyzed relevant law.[1497] However, Kirkland & Ellis counsel did not speak with ResCap employees, former AFI employees, or third parties, and did not review e-mails.[1498]

In a presentation given to the AFI Board on September 23, 2011, during which both Carpenter and Tessler were present,[1499] Kirkland & Ellis analyzed, among other things, (1) whether AFI could be held *directly* liable for litigation-related liabilities associated with the activities of ResCap;[1500] and (2) whether AFI could be *indirectly* liable for ResCap's obligations (under theories such as indemnity or veil piercing).[1501] Kirkland & Ellis also provided the AFI Board with analysis of AFI's potential litigation exposure to claims that could be brought by ResCap against AFI relating to intercompany transactions between AFI and ResCap, including capital contributions, loans, and asset or equity purchases.[1502]

### c.   Berkshire Hathaway Alternative Restructuring Proposal

On April 16, 2012, Carpenter met with Warren Buffett and Ted Weschler of Berkshire Hathaway.[1503] Following the meeting, Carpenter e-mailed Marano and informed him that Berkshire Hathaway was "unconcerned" regarding its position in the Junior Secured Notes, but "concerned" regarding its position in the Unsecured Notes.[1504] Carpenter explained that Berkshire Hathaway's representatives "[s]eemed surprised at likely donut [for Unsecured Noteholders] and status versus PLS," which led to a discussion of "numerous alternatives including no [bankruptcy]."[1505]

---

[1496] *See* AFI Board Presentation Appendix, dated Sept. 23, 2011, at 50 [ALLY_0157478] (noting "work done" by Kirkland & Ellis began in Fall 2008); Int. of G. Lee, Feb. 20, 2013, at 29:9–24 (noting Morrison & Foerster did not analyze ResCap's potential claims against AFI in connection with bankruptcy planning in 2009).

[1497] AFI Board Presentation Appendix, dated Sept. 23, 2011, at 50 [ALLY_0157478].

[1498] *Id.*

[1499] *See* Minutes of a Special Meeting of the Board of Directors of Ally Financial Inc., Sept. 23, 2011, at ALLY_0115749 [ALLY_0115565]

[1500] AFI Board Presentation Appendix, dated Sept. 23, 2011, at 17 [ALLY_0157602].

[1501] *Id.* at 19; *see also* AFI Board Presentation Appendix, dated Sept. 23, 2011, at 100–105 [ALLY_0157478].

[1502] AFI Board Presentation Appendix, dated Sept. 23, 2011, at 73–99 [ALLY_0157478].

[1503] *See* E-mail from M. Carpenter (Apr. 16, 2012) [ALLY_PEO_0028897]; E-mail from D. Schaeffer (Apr. 19, 2012) [RC40052879] ("AFI CEO met with Berkshire Hathaway CEO Monday 4/16").

[1504] E-mail from M. Carpenter to T. Marano (Apr. 16, 2012) [EXAM00010583].

[1505] *Id.*

That same day, Weschler sent Carpenter an e-mail stating that the "one big takeaway" that he and Buffett had from the meeting was that "we weren't convinced that a bankruptcy of ResCap actually betters [AFI]'s situation . . . conceptually we have a hard time seeing how [AFI] is any cleaner with an ongoing bankruptcy of a major sub vs the status quo or selling the entity for minimal consideration to a third party that would essentially operate the business in run off . . . ."[1506] Carpenter forwarded Weschler's e-mail to Tessler, who remarked, "[i]n the absence of a 9019 or 3rd party releases he is right regarding 'better off'. However, the other question he should be asking given the volume of already pending litigation . . . how is [AFI] worse off by trying?"[1507]

On April 18, 2012, Carpenter and Marano discussed Buffett's "thoughts about avoiding a [bankruptcy]."[1508] On April 19, 2012, Marano sent an e-mail noting that Buffett may not "get the most informed analysis from Evercore," and suggested that the ResCap Board consider providing Berkshire Hathaway "access to the data room and our advisors since they are more up to speed [than Evercore]."[1509]

On April 23, 2012, Carpenter e-mailed to Weschler a presentation prepared by Evercore responding to Berkshire Hathaway's request for AFI's "analysis of certain non-chapter 11 options to restructure ResCap."[1510] The presentation included two scenarios: (1) Platform Sale scenario to an investor; and (2) a ResCap standalone scenario.[1511] The Platform Sale was assumed to be contemporaneous with the sale of ResCap's platform assets and certain other assets to Fortress.[1512] Under the ResCap standalone scenario, upon a sale of ResCap to an investor, ResCap was assumed to operate in the ordinary course without support from AFI.[1513] Under both scenarios, AFI provided a forecast with no cash contribution to ResCap and another forecast with a $1 billion cash contribution.[1514] Additional common assumptions included: releases of AFI by ResCap creditors; ResCap litigation addressed in the ordinary course; a "creditworthy indemnity" to AFI from the investor; ResCap solvency on cash flow, adequate capital, and balance sheet basis; and consummation of the transaction outside of bankruptcy court.[1515]

---

[1506] E-mail from T. Weschler (Apr. 16, 2012) [ALLY_PEO_0028897].

[1507] E-mail from L. Tessler (Apr. 16, 2012) [ALLY_PEO_0028897].

[1508] E-mail from T. Marano (Apr. 19, 2012) [EXAM00004077].

[1509] *Id.*

[1510] *See* Evercore, Kirkland & Ellis, and Mayer Brown Project Rodeo Discussion Materials, dated Apr. 23, 2012, at 2 [CCM00200924]; E-mail from M. Carpenter to T. Weschler (Apr. 23, 2012) [ALLY_0142583].

[1511] Evercore, Kirkland & Ellis, and Mayer Brown Project Rodeo Discussion Materials, dated Apr. 23, 2012, at 2 [CCM00200924].

[1512] *Id.*

[1513] *Id.*

[1514] *Id.*

[1515] *Id.*

Under the Platform Sale scenario, the proceeds received from the Platform Sale and Legacy Sale to Fortress (assuming a $3.976 billion purchase price)[1516] would be used to pay down first lien debt and any excess proceeds would be left on the balance sheet.[1517] The remaining assets and liabilities would be run off at ResCap with the debt being repaid as it would come due.[1518] The Platform Sale scenario resulted in cash as of December 2015 of $439 million with AFI support, and negative $561 million without AFI support, as shown in Exhibit III.J.2.c—1 below.[1519]

---

EXHIBIT III.J.2.c—1
**Platform Sale Scenario**
*($ in Millions)*

| | April 23, 2013 Platform Sale Scenario | | | |
|---|---|---|---|---|
| | No AFI Contribution | | $1 Billion AFI Contribution | |
| 2012 beginning cash balance[(1)] | $ | 2,493 | $ | 3,493 |
| Cumulative 2012-2015 cash flows | | (3,055) | | (3,055) |
| 2015 ending cash balance | $ | (561) | $ | 439 |

[(1)] *2012 beginning cash balance includes sale procceds of approximately $4.0 billion net of secured debt repayments of $2.3 billion.*
*Source: Evercore, Kirkland & Ellis, and Mayer Brown Project Rodeo Discussion Materials, dated Apr. 23, 2012, at 7—11 [CCM00200924].*

---

Transaction considerations and potential obstacles under the Platform Sale scenario were noted to include, among other things:

- Fortress, the AFI Board, and AFI would require an opinion that the remaining ResCap was solvent;[1520]

- Bondholders would potentially have to waive the "all or substantially all" covenant (50% vote) for the sale of assets to Fortress; and[1521]

- AFI would face substantial risk that the transaction itself would serve as a catalyst for further litigation against AFI.[1522]

---

[1516] *Id*. at 7.

[1517] *Id*. at 6.

[1518] *Id*.

[1519] *Id*. at 8, 11.

[1520] *Id*. at 13.

[1521] *Id*.

[1522] *Id*.

The ResCap standalone scenario anticipated that ResCap would continue retail origination operations and execute a subservicing agreement with Ally Bank on a fee-for-service basis.[1523] ResCap would extend certain facilities against the HFS Portfolio and Servicing Advances at current effective advance rates, and debt would be repaid as it came due.[1524] The ResCap standalone scenario resulted in an ending cash balance at December 2015 of $1.021 billion with a $1 billion cash contribution from AFI, and $21 million without the AFI contribution, as shown in Exhibit III.J.2.c—2 below.[1525]

EXHIBIT III.J.2.c—2
**Standalone Scenario**
*($ in Millions)*

|  | April 23, 2013 ResCap Standalone Scenario | | | |
|  | No AFI Contribution | | $1 Billion AFI Contribution | |
|---|---|---|---|---|
| 2012 beginning cash balance | $ | 823 | $ | 1,823 |
| Cumulative 2012-2015 cash flows |  | (802) |  | (802) |
| 2015 ending cash balance | $ | 21 | $ | 1,021 |

*Source: Evercore, Kirkland & Ellis, and Mayer Brown Project Rodeo Discussion Materials, dated Apr. 23, 2012, at 17—20 [CCM00200924].*

Transaction considerations and potential obstacles under the ResCap standalone scenario were noted to include, among other things:

- ResCap and the AFI Board would likely require a solvency opinion;[1526]

- ResCap would likely not be able to replicate the funding that was being provided by AFI;[1527] and

- ResCap would need to demonstrate its ability to meet the GSE net worth covenant.[1528]

---

[1523] *Id*. at 16.

[1524] *Id*.

[1525] *Id*. at 17–19.

[1526] *Id*. at 21.

[1527] *Id*.

[1528] *Id*.

Exhibit III.J.2.c—3 below compares the Platform Sale scenario and ResCap standalone scenario presented to Berkshire Hathaway on April 23, 2012.

EXHIBIT III.J.2.c—3
**Platform Sale Versus ResCap Standalone Scenario Comparison**
*($ in Millions)*

|  | April 23, 2013 Platform Sale | | | | April 23, 2013 ResCap Standalone | | | |
|  | No AFI Contribution | | $1 Billion AFI Contribution | | No AFI Contribution | | $1 Billion AFI Contribution | |
|---|---|---|---|---|---|---|---|---|
| 2012 beginning cash balance | $ | 2,493 | $ | 3,493 | $ | 823 | $ | 1,823 |
| Cumulative 2012-2015 cash flows |  | (3,055) |  | (3,055) |  | (802) |  | (802) |
| 2015 ending cash balance | $ | (561) | $ | 439 | $ | 21 | $ | 1,021 |

*Source: Evercore, Kirkland & Ellis, and Mayer Brown Project Rodeo Discussion Materials, dated Apr. 23, 2012, at 8–11 and 17–20 [CCM00200924].*

Although AFI and Berkshire Hathaway were engaged in discussions regarding a potential out-of-court restructuring, AFI and ResCap also sought Berkshire Hathaway's support for the Chapter 11 Cases.[1529] On April 29, 2012, Carpenter sent an e-mail to Weschler explaining that the proposed mechanics of AFI's settlement contributions strengthened the position of the Junior Secured Noteholders and provided benefit to Unsecured Noteholders.[1530] According to Carpenter, as shown in Exhibit III.J.2.c—4 below, over 50% of the amount of AFI's settlement contribution that was allocated to ResCap LLC was estimated to go to Berkshire Hathaway.[1531]

---

[1529] Evercore, Kirkland & Ellis, and Mayer Brown Project Rodeo Discussion Materials, dated Apr. 23, 2012, at 9–10 [CCM00335615].

[1530] E-mail from M. Carpenter to T. Weschler (Apr. 29, 2012) [ALLY_0142587].

[1531] *Id*; Evercore, Kirkland & Ellis, and Mayer Brown Project Rodeo Potential Ally Settlement Allocation Mechanics, dated Apr. 29, 2012, at 1 [ALLY_0142588].

III-262

EXHIBIT III.J.2.c—4
**Berkshire Hathaway Recovery from AFI Settlement Allocated to ResCap LLC (Illustrative)**
*($ in Millions)*

| | | | | | Berkshire Hathaway | |
| Unsecured Claims[1] | Total Amount Outstanding | % of Claims at ResCap LLC | Allocated $1 Settlement[2] | | % Owned | Allocated Settlement[3] |
|---|---|---|---|---|---|---|
| Junior Secured Notes | $ 2,128 | 68% | $ 0.68 | | 45% | $ 0.31 |
| Unsecured Notes | 969 | 31% | 0.31 | | 76% | 0.23 |
| Other general unsecured claims | 50 | 2% | 0.02 | | 0% | - |
| Total | $ 3,147 | 100% | $ 1.00 | | N/A | $ 0.54 |

*[1] Excludes medium-term unsecured notes guarantee claim.*
*[2] Reflects illustrative amount of $1 in AFI support allocated to ResCap LLC (holding company).*
*[3] Berkshire Hathaway would recover $0.54 for every $1 of the AFI Settlement allocated to ResCap LLC.*
*Source: E-mail from M. Carpenter to T. Weschler (Apr. 29, 2012) [ALLY_0142587]; Evercore, Kirkland & Ellis, and Mayer Brown Project Rodeo Discussion Materials, dated Apr. 29, 2012, at 1 [ALLY_0142588].*

Berkshire Hathaway continued to view a potential non-bankruptcy solution as superior to a ResCap bankruptcy filing.[1532] On April 30, 2012, in response to Berkshire Hathaway's request, Evercore prepared a presentation that analyzed a potential sale of ResCap to Berkshire Hathaway for a nominal amount.[1533] The scenario had two key assumptions: (1) Berkshire Hathaway would purchase ResCap stock for $1; and (2) AFI would not make any contribution to ResCap.[1534] In that scenario, ResCap would operate in the ordinary course based on Centerview's projections and the following assumptions:

- ResCap would continue retention and retail originations, with the ability to retain the related MSR without compensation to Ally Bank;[1535]

- ResCap would implement a subservicing agreement in connection with Ally Bank's MSRs and its HFS Portfolio on a fee-for-service basis;[1536]

- ResCap would refinance senior debt secured by the HFS Portfolio and Servicing Advances and obtain a warehouse line at current effective advance rates (LIBOR+300);[1537] and

---

[1532] E-mail from T. Weschler and M. Carpenter (Apr. 30, 2012) [CCM00652529] ("As I waded through the documents this weekend, and compared notes with Warren [Buffett], we continue to be of a view that filing of ResCap will create much more harm than good to many key stakeholders of both ResCap and [AFI].").

[1533] Evercore, Kirkland & Ellis, and Mayer Brown Project Rodeo Discussion Materials, dated Apr. 30, 2012, at 1 [CCM00048209].

[1534] *Id.*

[1535] *Id.*

[1536] *Id.*

[1537] *Id.*

- ResCap would repay the Junior Secured Notes and Unsecured Notes as they came due.[1538]

The forecast for the Berkshire Hathaway potential sale scenario showed a negative equity position from 2012 through 2015, ranging from approximately $3.5 billion in 2012 to $2.9 billion in 2015.[1539] The GSE minimum net worth covenant was $250 million.[1540] AFI's advisors indicated that a sizeable cash contribution would likely have been required in order for ResCap to be considered a solvent and adequately capitalized standalone entity without Berkshire Hathaway providing a make-well guarantee of ResCap.[1541] Evercore, using Centerview's assumptions, prepared an analysis indicating that a $6.5 billion contribution would have been needed on day one assuming a 20% ratio of equity to assets.[1542]

Carpenter sent Evercore's analysis to Weschler on May 1, 2012 and noted that "the magnitude of the longer term commitment required of Berkshire is very large."[1543] Carpenter also suggested that Weschler consider reviewing Cerberus's analysis, noting that "Cerberus went very far down the road exploring a similar alternative and concluded that it was not workable . . . ."[1544] The Exhibit III.J.2(c)—5 below summarizes the scenarios evaluated with Berkshire Hathaway.

EXHIBIT III.J.2.c(2)—5
**Platform Sale Versus ResCap Standalone Versus Sale Scenario Comparison**
*($ in Millions)*

| | April 23, 2013 Platform Sale | | | | April 23, 2013 ResCap Standalone | | | | April 30, 2013 Sale of ResCap |
| | No AFI Contribution | | $1 Billion AFI Contribution | | No AFI Contribution | | $1 Billion AFI Contribution | | No AFI Contribution |
|---|---|---|---|---|---|---|---|---|---|
| 2012 beginning cash balance | $ | 2,493 | $ | 3,493 | $ | 823 | $ | 1,823 | $ | 823 |
| Cumulative 2012-2015 cash flows | | (3,055) | | (3,055) | | (802) | | (802) | | (3,223) |
| 2015 ending cash balance | $ | (561) | $ | 439 | $ | 21 | $ | 1,021 | $ | (2,400) |

*Source: Evercore, Kirkland & Ellis, and Mayer Brown Project Rodeo Discussion Materials, dated Apr. 23, 2012, at 8—11 and 17—20 [CCM00200924]; Evercore, Kirkland & Ellis, and Mayer Brown Project Rodeo Discussion Materials, dated Apr. 30, 2012, at 3 [CCM00048209].*

---

[1538] *Id.*

[1539] *Id.* at 2.

[1540] *Id.*

[1541] *Id.* at 4.

[1542] *Id.*

[1543] E-mail from M. Carpenter to T. Weschler (May 1, 2012) [ALLY_PEO_0079127].

[1544] *Id.*

On May 3, 2012, Berkshire Hathaway sent an offer letter to AFI, stating that it did not believe that a bankruptcy was in the best interests of AFI, the U.S. Treasury, Berkshire Hathaway, or any of the significant stakeholders.[1545] Berkshire Hathaway noted that a bankruptcy filing would likely trigger an extended and costly proceeding in which many of the past transactions between AFI and ResCap would be challenged by ResCap creditors, while plaintiffs pursuing representation and warranty claims would be encouraged to file claims as part of the bankruptcy process.[1546]

Berkshire Hathaway's proposed alternative scenario included the following terms:

- A Berkshire Hathaway subsidiary would purchase 100% of the equity interest in ResCap for $1.00;[1547]

- AFI would contribute $850 million of cash to ResCap (based on the range of the recently disclosed expected loss to be incurred by AFI pursuant to a potential bankruptcy filing by ResCap);[1548] and

- The sale of ResCap to a Berkshire Hathaway affiliate within 30 days would fully refinance what was, as of March 31, 2012, a $1.4 billion intercompany loan from AFI to ResCap.[1549]

Berkshire Hathaway believed that this structure would allow ResCap to continue to operate for the long-term as a viable, self-contained entity.[1550] It was Berkshire Hathaway's intent that ResCap would continue operating as a going concern and would pay its debts as they came due, while diligently reviewing and challenging any and all litigation claims to which ResCap might be subjected.[1551] Berkshire Hathaway proposed selling insurance to AFI to mitigate AFI's risk associated with past activities.[1552]

On May 4, 2012, Carpenter responded to Berkshire Hathaway with a counterproposal.[1553] The proposal included the following terms:

- Berkshire Hathaway would acquire AFI's 100% equity interest in ResCap for $1.00, on or prior to May 10, 2012;[1554]

---

[1545] *See id*. at 1; Letter from T. Weschler to M. Carpenter (May 3, 2012) [ALLY_0225404].

[1546] *See id*.

[1547] *Id*.

[1548] *Id*.

[1549] *Id*.

[1550] *Id*. at 2.

[1551] *Id*.

[1552] *Id*.

[1553] Letter from M. Carpenter to T. Weschler (May 4, 2012) [EXAM00010554].

[1554] *Id*. at 2.

- AFI would pay $850 million to Berkshire Hathaway or contribute $850 million to ResCap in exchange for a full indemnity or other satisfactory insurance from Berkshire Hathaway for any liability associated with the proposed transaction as well as for any liability associated with ResCap that would otherwise be discharged in a ResCap chapter 11 case;[1555] and

- Berkshire Hathaway would provide for the repayment of all of the AFI credit facilities and the repayment or refinancing of all third-party credit facilities as of the sale date.[1556]

On May 4, 2012, Berkshire Hathaway responded with a binding and unconditional commitment, which expired on May 6, 2012.[1557] The proposal included the following terms:

- Berkshire Hathaway would acquire AFI's 100% equity interest in ResCap for $1;[1558]

- The contemplated sale of ResCap's Platform Sale to Fortress would not be consummated;[1559]

- AFI would contribute $850 million to ResCap;[1560] and

- Berkshire Hathaway would share evenly with AFI in any liabilities in excess of $1 billion associated with ResCap that would otherwise be discharged in a ResCap chapter 11 case, subject to a cap of $3 billion, in exchange for a payment by AFI to Berkshire Hathaway of $500 million.[1561]

---

[1555] *Id.*

[1556] *Id.*

[1557] Letter from T. Weschler to M. Carpenter (May 4, 2012) [EXAM00010547].

[1558] *Id.*

[1559] *Id.*

[1560] *Id.*

[1561] *Id.*

On May 5, 2012, Carpenter forwarded Berkshire Hathaway's May 4, 2012 proposal to the AFI Board and informed them that, after consulting with Kirkland & Ellis, Davis Polk, and Evercore, he intended to reject Berkshire Hathaway's offer for the following reasons:

> Any proposal which leaves [AFI] with exposure in a worst case scenario is unattractive versus the [bankruptcy] alternative. In this case the [$]3 billion cap would leave [AFI] vulnerable in possible scenarios. . . . The cost of the insurance is very high. We would essentially be paying [$]1.35 billion for [$]1 billion dollars of insurance after we have absorbed the first [$]1 billion loss.[1562]

In response, Mayree Clark, an AFI Board member, suggested that AFI continue to explore options with Berkshire Hathaway because "[t]here is a number where I, for one, could get comfortable doing something . . . ."[1563] Carpenter e-mailed Clark and explained, "this is a game. This proposal is more costly than any of the sale/spin off scenarios we discussed. Can do a lot of settling for [$]3 billion!"[1564] But Clark continued to believe a deal was possible, and recommended that AFI insist that Berkshire Hathaway "buy equity in [AFI] as part of any transaction."[1565] Carpenter responded, "[W]e will consider any deal that separates [AFI] completely from Rescap including contingent liabilities. Any deal that does not accomplish that objective is a non starter. Berkshire is not willing to do such a deal. QED."[1566]

On May 5, 2012, Carpenter sent a response letter to Berkshire Hathaway stating that its May 4, 2012 proposal terms were "unworkable as written."[1567] According to Carpenter, AFI required "full and complete protection against liability associated with a Berkshire transaction for ResCap as well as liability associated with ResCap that would otherwise be discharged in a ResCap chapter 11 case."[1568] In response, Weschler wrote:

> [Y]ou have stressed to us that you believe such liabilities we suggest to insure are expected to be zero in the event of a ResCap bankruptcy. . . . [I]t is not clear to us that a ResCap bankruptcy would cleanse [AFI] of exposure to past intercompany transactions between [AFI] and ResCap. . . . Our offer set forth [May 4, 2012] remains open—with or without the insurance provision.[1569]

---

[1562] E-mail from M. Carpenter to the AFI Board (May 5, 2012) [ALLY_0381237].

[1563] E-mail from M. Clark to the AFI Board (May 5, 2012) [ALLY_0381237].

[1564] E-mail from M. Carpenter (May 5, 2012) [ALLY_0381237].

[1565] E-mail from M. Clark (May 6, 2012) [ALLY_PEO_0079157].

[1566] E-mail from M. Carpenter (May 6, 2012) [ALLY_PEO_0079157].

[1567] Letter from M. Carpenter to T. Weschler (May 5, 2012) [EXAM00063836].

[1568] *Id*.

[1569] E-mail from T. Weschler to M. Carpenter (May 5, 2012) [EXAM00069914].

On May 7, 2012, Carpenter wrote a brief letter to Weschler explaining that none of Berkshire Hathaway's proposals was acceptable to AFI's "baseline requirements" for a ResCap equity sale.[1570] Mark Neporent of Cerberus expressed the view that Berkshire Hathaway's offer to purchase the ResCap equity for $1 was "amateurish and ridiculous" and did not "address a fraction of the issues that would have to be addressed under the circumstances. Nobody was going to let them steal that platform for a dollar."[1571]

Marano, who was not a party to the negotiations, stated that he "wish[ed] [AFI] had made an effort to sell [ResCap] to Warren Buffett," as opposed to letting ResCap file bankruptcy, and "that probably would have been the better path."[1572]

On May 10, 2012, Berkshire Hathaway stated that it could step into Fortress's shoes with short notice if Fortress faded as a stalking horse bidder. Carpenter indicated that this made more sense than any of Berkshire Hathaway's other proposals.[1573]

As previously discussed, Berkshire Hathaway was later selected by the Bankruptcy Court to be the stalking horse bidder for the Legacy Sale and ultimately prevailed at the auction with a bid of $1.5 billion.[1574]

### 3. Negotiation And Entry Into AFI Settlement And Plan Sponsor Agreement

In connection with discussions regarding a possible settlement of Estate and Third-Party Claims, ResCap and AFI identified a range of possible chapter 11 restructuring scenarios. The least desirable option for all parties was a "free fall" restructuring,[1575] which contemplated "[a]sset sale(s) under section 363 . . . followed by a wind-down of the estate," with no ResCap-AFI settlement.[1576] The most preferable option—particularly from AFI's perspective—was referred to as the "elegant" restructuring,[1577] which contemplated support from AFI (including a settlement contribution in exchange for the Debtor Release and the Third-Party Release) and the sale of ResCap's assets pursuant to a plan of reorganization that would have been "pre-arranged with key stakeholders prior to filing."[1578] An intermediate option contemplated that the ResCap

[1570] Letter from M. Carpenter to T. Weschler (May 5, 2012) [EXAM00010538].

[1571] Int. of M. Neporent, Feb. 6, 2013, at 260:2–10.

[1572] Int. of T. Marano, Feb. 27, 2013, at 158:16–20.

[1573] E-mail from M. Carpenter (May 10, 2012) [CCM00120369] (discussing Berkshire Hathaway's interest in being stalking horse bidder).

[1574] Notice of Successful Bidders at the Auctions and Sales of (A) the Platform Assets to Ocwen Loan Servicing, LLC and (B) the Whole Loan Assets to Berkshire Hathaway Inc. [Docket No. 1960] at 3.

[1575] Dep. of J. Mack, Nov. 14, 2012, at 96:7–9, 101:3–6.

[1576] Discussion Materials—Joint Presentation by Ally and ResCap, dated Jan. 23, 2012, at RC00096080 [RC00096076].

[1577] See Dep. of J. Mack, Nov. 14, 2012, at 84:5–14, 96:5–15, 99:5–17; Int. of P. West, Jan. 11, 2013, at 190:3–16.

[1578] Discussion Materials—Joint Presentation by Ally and ResCap, dated Jan. 23, 2012, at RC00096080 [RC00096076].

asset sales could be consummated pursuant to section 363 rather than in a plan of reorganization, but still included support from AFI (including a settlement contribution in exchange for the Debtor Release).[1579] At a minimum, both AFI and ResCap wanted to ensure a "soft landing" for ResCap's mortgage business to "preserve[] the value and functionality of the operating platform."[1580]

### a. ResCap's Views Regarding Negotiations With AFI

ResCap and its advisors viewed a settlement with AFI as necessary to achieve the goal of an "elegant" chapter 11 filing. When asked to explain why this was the case, Puntus of Centerview said:

> [AFI] . . . is the debtor's parent. We originate loans through [AFI]. . . . [T]hey had secured facilities aggregating over a billion dollars outstanding to [AFI]. We had various contractual relationships with them. They provided us a DIP facility. They were potentially going to be a stalking horse not only for the whole loan portfolio but potentially for the platform. They were the stalking horse for the whole loan portfolio. So, from our perspective, Centerview's perspective, and the company's perspective as well, having them supportive of the case and supportive of ResCap continuing to do business in the ordinary course was crucial. In fact, had they not been supportive, and had we not been able to continue to do business in the ordinary course, then we wouldn't have had a stalking horse, and we wouldn't have had a successful auction like we did [in October 2012]. They were preconditions to ultimately selling these assets.[1581]

The ResCap management team and its advisors viewed "any consideration to be paid by [AFI] to ResCap" in connection with a settlement of claims as "separate from funding that may be required for the DIP loan, as a bidder for ResCap assets or as capital for any new entity owning former ResCap assets going forward."[1582] Centerview understood that AFI viewed negotiations differently, with AFI's willingness to provide any support to ResCap influenced by whether it would be able to settle its exposure to ResCap-related claims.[1583] According to Puntus,

---

[1579] *See* E-mails between L. Nashelsky and R. Schrock (May 13, 2012) [CCM00566819].

[1580] Int. of M. Carpenter, Mar. 4, 2013, at 234:1–18; *see also* Materials for Discussion, dated Feb. 24, 2012, at RC40020316 [RC40020290]; Discussion Materials—Joint Presentation by Ally and ResCap, dated Jan. 23, 2012, at RC00096081 [RC00096076].

[1581] *See* Dep. of M. Puntus, Nov. 5, 2012, at 30:20–31:25.

[1582] Materials for Discussion, dated Dec. 12, 2011, at RC00000120 [RC00000114].

[1583] *See* Dep. of M. Puntus, Nov. 5, 2012, at 32:2–12.

"[AFI] was using every lever it could to negotiate the best possible settlement."[1584] As Marano noted, the "mixture of currency from [AFI] changed at least two or three times a week."[1585]

AFI was seeking a global settlement, including a release of Third-Party Claims.[1586] However, it is not clear whether ResCap's independent directors ever understood the distinction between "claims of third parties that could flow through ResCap to [AFI]"[1587]— referred to in the January 25, 2012 Morrison & Foerster presentation as "[c]ontribution claims arising as a result of ResCap's liability to third parties"[1588]—and claims that third-party creditors could potentially assert directly against AFI, and therefore did not ascribe appropriate value to the requested Third-Party Release.[1589] Essentially, Mack and Ilany were prepared to negotiate primarily with respect to a potential release of the Debtors' claims against AFI, but were negotiating with highly-experienced AFI and Cerberus principals who were prepared to negotiate a release of both the Debtors' potential claims against AFI and Third-Party Claims.[1590]

---

[1584] *Id.* at 45:5–11. Puntus further suggested that AFI's provision of the DIP was influenced by the possible settlement of estate claims against it, noting that AFI used its willingness to continue originating loans for ResCap in bankruptcy "in the context of negotiating the settlement of the estate's claims against them." *Id.* at 45:12–18.

[1585] *See* Dep. of T. Marano, Nov. 12, 2012, at 255:8–10.

[1586] *See* Int. of J. Mack, Jan. 15, 2013, at 207:7–208:16; Dep. of T. Hamzehpour, Nov. 13, 2012, at 50:3–51:4 ("That Third-Party Releases would be required, in order to achieve a substantial contribution from AFI . . . was clear to everyone internally, in the context of the discussions that were beginning to take shape [in April 2012]."); Notes of P. West (Apr. 2, 2012), at EXAM00128216 [EXAM00128214] (AFI "wants 3rd party releases from creditors & litigants").

[1587] Int. of J. Mack, Jan. 15, 2013, at 206:3–208:3.

[1588] *See* Morrison & Foerster Report on the Independent Review Claims Analysis, dated Jan. 25, 2012, at RC00023725 [RC00023710].

[1589] *See* Int. of J. Mack, Jan. 15, 2013, at 206:3–209:16 (Mack assigned "no specific value" to a Third-Party Release); Int. of J. Ilany, Nov. 28, 2012, at 157:6–15 (Ilany did not remember that the AFI Settlement and Plan Sponsor Agreement included a proposed Third-Party Release for AFI and did not remember considering the value of Third-Party Claims for purposes of agreeing to a Third-Party Release). While Morrison & Foerster considered third-party claims, *see* Int. of G. Lee, Feb. 20, 2013, at 59:12–60:21, 222:14–223:1, Morrison & Foerster's January 25, 2012 report to the ResCap Board did not review claims relating to AFI's potential liability directly to third parties. *See* Morrison & Foerster Report on the Independent Review Claims Analysis, dated Jan. 25, 2012 [RC00023710].

[1590] *See* Section III.J.2.b (discussing investigation of legal claims by Kirkland & Ellis on behalf of AFI).

In addition, the ResCap principals approached the settlement as a business deal rather than a settlement reflecting the merits of legal claims. Mack testified that his settlement negotiations with Carpenter "really had nothing to do with the legal arguments" identified in the Morrison & Foerster claims analysis.[1591] As Mack testified:

> Mike Carpenter and I never discussed legal issues, legal matters . . . the legal basis for any of this. We would discuss the fact that we were able to—we were trying to settle lawsuits, that we were trying to settle I guess what you would broadly call legal claims. But we were not talking the specific legalities of the law. We rely on our advisors to do that.[1592]

Although Mack ostensibly recognized that the underpinning of any settlement between ResCap and AFI was a release of legal liabilities for AFI in exchange for consideration,[1593] Mack did not believe that he was "settling legal claims."[1594]

While Mack and Ilany negotiated directly with AFI principals, other ResCap Board members were kept apprised of the process and expressed views regarding the appropriate settlement amount. Marano testified that he was "fairly vocal" in expressing his view to Carpenter and other members of the ResCap Board that "it probably would take something close to $2 billion to settle this. . . . [N]o one was going to do a deal for 750 [million]."[1595] Marano later clarified that his $2 billion estimate was not "necessarily based on the merits of the claims,"[1596] but represented the amount he believed would be necessary "to get all of the investors or vulture funds in the deal to go away . . . to buy peace."[1597]

### b. AFI's Views Regarding Negotiations With ResCap

According to Tim Devine, AFI's Chief Counsel of Litigation, "[AFI] was looking to achieve an appropriately expedited, clean, clear, fair, comprehensive and quick resolution in connection with the ResCap filing. And that's what motivated [AFI]'s participation in the

---

[1591] Dep. of J. Mack, Nov. 14, 2012, at 92:6–93:4. Indeed, Mack testified that he left the Morrison & Foerster presentation in the board room when he left the meeting on January 25, 2012, and that he did not need to review the materials at all during the course of the negotiations. *Id*.

[1592] *Id*. at 163:22–164:18.

[1593] *Id*. at 84:19–85:5.

[1594] *Id*. at 131:13–24.

[1595] Dep. of T. Marano, Nov. 12, 2012, at 92:11–94:23. Mack characterized Marano's view of the appropriate settlement amount as suggesting that $2 billion was "desirable." Mack did not disagree with Marano's assessment, but stated that he believed the final settlement amount was nevertheless "fair." *See* Dep. of J. Mack, Nov. 14, 2012, at 115:21–116:22.

[1596] Dep. of T. Marano, Nov. 12, 2012, at 232:11–18.

[1597] *Id*. at 193:12–19.

[AFI]/ResCap settlement agreement and to—motivated the participation and the discussions with Kathy Patrick."[1598]

As noted above, ResCap viewed any settlement contribution to be paid by AFI as separate and distinct from AFI support for ResCap during a bankruptcy proceeding.[1599] AFI, on the other hand, actively sought to characterize any support it provided to ResCap, directly or indirectly, in or out of bankruptcy, as settlement value.[1600] As Carpenter described in a December 26, 2011 e-mail, AFI viewed support for ResCap "in terms of business transfers, ongoing relationships [and] DIP financing" as evidence of "substantial value AFI/[Ally Bank] can provide to the estate to justify a 9019 settlement."[1601] Carpenter further observed that "the difference between the 'bare minimum' support necessary from AFI to protect its own interests and the support required for ResCap to implement its desired post [bankruptcy] strategy to maximize value is quite substantial . . . ."[1602]

Indeed, AFI was frustrated that ResCap did not give them the settlement credit AFI believes to be appropriate. As Carpenter noted in December 2011, "topping up" ResCap's TNW was "real value" and should have been "part of a broader negotiation with Rescap (eg 9019). . . . I think we are nuts to forgive 200mm of debt and get nothing for it!"[1603] At an interview in March 2013, Carpenter stated that he could "confidently demonstrate a billion dollars of value created" by AFI—separate and apart from the proposed $750 million cash contribution—and was frustrated that AFI was told that that value "doesn't count."[1604] Tessler expressed similar frustration, noting that "ResCap and its creditors have profound amnesia with regard to anything that ever happened historically that is in any way not supportive of their desire to make outrageous claims."[1605]

### c. Direct Negotiations Between ResCap And AFI

On January 25, 2012, the same day Morrison & Foerster first presented the results of its investigation to the ResCap Board, the ResCap Board members met with Carpenter for approximately half an hour with no advisors present.[1606] Marano testified that, at that meeting,

---

[1598] Dep. of T. Devine, Nov. 19, 2012, at 148:23–149:6.

[1599] Materials for Discussion, dated Dec. 12, 2011, at 6 [RC00000114].

[1600] *See, e.g.*, E-mails between M. Carpenter and J. Mackey (Mar. 28, 2012) [ALLY_0381024] ("Question is how do we get credit for [capital injection of $150 million]" relating to the "unavoidable" transfer of certain reserves from ResCap's books to AFI's books).

[1601] E-mail from M. Carpenter (Dec. 26, 2011), at ALLY_0142357 [ALLY_0142356].

[1602] *Id.* at ALLY_0142356–57. In response, Tessler remarked that AFI's financial obligations with respect to various government settlements should also be "part of the consideration of the 9019 action." E-mail from L. Tessler (Dec. 26, 2011) [ALLY_0142356].

[1603] E-mail from M. Carpenter to J. Brown (Dec. 31, 2011) [ALLY_0142373].

[1604] Int. of M. Carpenter, Mar. 4, 2013, at 272:14–274:3.

[1605] Int. of L. Tessler, Feb. 28, 2013, at 192:16–193:8.

[1606] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Jan. 25, 2012, at RC40019194 [RC40019179].

"there was a desire expressed by Mr. Carpenter for [AFI] to try to come to a settlement with ResCap, if the number was fair and reasonable. And there were platitudes . . . from the ResCap board members saying they, too, would like to get to an agreement."[1607] Mack stated that his "sense" of the ResCap Board's meeting with Carpenter was that "it was a meeting to try to be sure we were on the same wave length, the same page, and that we can work together."[1608] When asked to explain the meaning of "to be on the same page with [AFI]," Mack explained, "we have a company that's in financial distress and they're the parent. We need their help."[1609]

Several weeks later, on February 14, 2012, Morrison & Foerster met with Kirkland & Ellis to present the results of the ResCap investigation of potential claims against AFI.[1610] As part of that presentation, Morrison & Foerster asserted that AFI's control over ResCap had resulted in a $7.6 billion diminution of ResCap's estimated enterprise value and that the market value of ResCap's equity had declined by $12 billion.[1611]

Both AFI and ResCap representatives have characterized the Morrison & Foerster damages analysis as ResCap's "initial ask" in the settlement negotiations. Jeff Brown explained to the FRB that "originally ResCap presented a $8 or $9B claim against [AFI]."[1612] Mack stated that he never personally presented such a claim,[1613] which is consistent with the fact that the damages claim was presented by ResCap's attorneys directly to AFI's attorneys. Marano testified that he could not precisely recall the amount of ResCap's "initial ask" but that it "was a really big number. It was much bigger than $2 billion. . . . [AFI]'s reaction was NFW, we'd rather litigate."[1614] Carpenter described the Morrison & Foerster damages analysis as "laughable and fatally flawed."[1615]

---

[1607] Dep. of T. Marano, Nov. 12, 2012, at 74:2–75:4.

[1608] *See* Int. of J. Mack, Jan. 15, 2013, at 93:9–16.

[1609] *Id*. at 93:18–25.

[1610] *Id*. at 86:1–14, 156:1–5.

[1611] Morrison & Foerster ResCap Claims Presentation, dated Feb. 14, 2012, at 48–51 [RC00028255].

[1612] E-mail from J. Brown (May 8, 2012) [ALLY_0141967] (Brown noted that the original $8–$9 billion claim was "totally gone" as of May 8, 2012).

[1613] Dep. of J. Mack, Nov. 14, 2012, at 130:10–131:24. Mack speculated that an $8 billion or $9 billion claim may have been presented "in an early meeting between [Morrison & Foerster] and [Kirkland & Ellis]," but noted that he never presented such an "ask" because "[t]hese are legal matters. I'm not going to discuss legal matters with principals." *Id.*

[1614] Dep. of T. Marano, Nov. 12, 2012, at 233:4–16.

[1615] Int. of M. Carpenter, Mar. 4, 2013, at 232:14–233:14.

It appears that the principals did not begin negotiating in earnest until March 2012.[1616] In the intervening period, attorneys from Morrison & Foerster and Kirkland & Ellis exchanged their differing views on the legal merits of ResCap's claims against AFI.[1617]

The principal negotiators of the economic terms of the AFI Settlement and Plan Sponsor Agreement were Mack and Ilany—the Special Review Committee—on behalf of ResCap, and Carpenter and Tessler on behalf of AFI.[1618] When asked about the process followed by the Special Review Committee, Ilany said:

> I do not remember the process. We went through a process which advisors told us we need to go as far as the process. We asked our advisors to tell us, to go over all the transactions and, for lack of a better word, I'll say translate it into English to us from legalese which they did and they produced a very, very large stack presentation which we went through excruciating detail, where they gave us their conclusions which we decided to accept. I don't remember if we voted on it or not. Then after the conclusions we were asked to go and talk with [AFI].[1619]

Mack explained that he primarily negotiated with Carpenter and Ilany negotiated with Tessler.[1620] Ilany asserted that, between him and Mack, he played the lead negotiating role on behalf of the Special Review Committee.[1621]

---

[1616] *See* Dep. of J. Mack, Nov. 14, 2012, at 94:14–22.

[1617] *See, e.g.*, Draft Minutes of a Special Meeting of the Board of Residential Capital, LLC, Feb. 22, 2012, at 2 [EXAM11088864]; Draft Minutes of a Special Meeting of the Board of Residential Capital, LLC, Feb. 24, 2012, at 4 [EXAM11088866].

[1618] Dep. of J. Mack, Nov. 14, 2012, at 81:18–82:19; *see also* Dep. of T. Marano, Nov. 12, 2012, at 76:14–77:2, 91:2–10. Marano testified that, even though he was not directly involved in settlement negotiations, whenever he spoke with Carpenter, he "always asked for more, including as it relates to [the settlement of claims]." Dep. of T. Marano, Nov. 12, 2012, at 92:11–21.

[1619] Int. of J. Ilany, Nov. 28, 2012, at 126:9–127:2.

[1620] Dep. of J. Mack, Nov. 14, 2012, at 101:25–102:13.

[1621] Int. of J. Ilany, Nov. 28, 2012, at 145:15–18, 153:20–154:21 ("[T]he majority of the negotiations were done between Lenard Tessler and me on the telephone . . . . Sometimes twice a day.").

The exhibit below presents a comprehensive list of the dates of Mack's and Ilany's negotiations with Carpenter and Tessler that occurred between March and May 2012.[1622]

EXHIBIT III.J.3.c—1
**Independent Director Negotiation Meetings with Carpenter and/or Tessler**

| Meeting/Call Date | Ilany | Mack |
|---|---|---|
| March 8, 2012 | Did not attend | Attended |
| March 23, 2012 (in person) | Attended | Attended |
| March 28, 2012 (2 calls with Lenard) | Attended | Did not attend |
| March 29, 2012 (2 calls with Carpenter) | Attended | Did not attend |
| April 4, 2012 (in person) | Attended | Attended |
| April 6, 2012 (2 calls with Carpenter) | Did not attend | Attended |
| April 9, 2012 (call with Lenard) | Attended | Did not attend |
| April 12, 2012 (call with Lenard) | Attended | Did not attend |
| April 18, 2012 (call with Lenard) | Attended | Did not attend |
| April 19, 2012 (2 calls with Lenard) | Attended | Did not attend |
| April 20, 2012 (4 calls with Lenard) | Attended | Did not attend |
| April 20, 2012 (call with Carpenter) | Attended | Did not attend |
| April 24, 2012 (call with Lenard) | Attended | Did not attend |
| April 25, 2012 (call with Lenard) | Attended | Did not attend |
| April 26, 2012 (call with Lenard) | Attended | Did not attend |
| April 26, 2012 (Settlement meeting with K&E) | Attended | Did not attend |
| April 30, 2012 (call with Lenard/Carpenter) | Attended | Did not attend |
| May 4, 2012 (call with Carpenter) | Did not attend | Attended |
| May 5, 2012 (call with Carpenter) | Did not attend | Attended |
| Date Unknown (call with Carpenter) | Did not attend | Attended |
| Date Unknown (call with Carpenter) | Did not attend | Attended |
| | | |
| Total Meetings Attended | 15 | 8 |
| Total Compensation ($1,500 per meeting) | $22,500 | $12,000 |

*Source: Independent Director Compensation, dated May 10, 2012, EXAM20124551 [EXAM20124550].*

According to the Debtors' records, Ilany engaged in at least fifteen negotiation sessions with either Carpenter or Tessler, while Mack engaged in at least eight sessions (including two calls with Carpenter on unknown dates). Ilany's final recorded involvement in direct settlement negotiations apparently occurred on April 30, 2012.

---

[1622] On May 4, 2012, Marano, Abreu, and Whitlinger, comprising the management members of the ResCap Board, approved an amended compensation plan for the ResCap independent directors. *See* Residential Capital, LLC Action by Written Consent of the Management Members of the Board of Directors, dated May 4, 2012, at RC40019214–16 [RC40019179]. The amended compensation plan added additional background information noting that Mack and Ilany had "taken on additional responsibilities and [we]re devoting a substantial amount of additional time related to certain strategic negotiations with executives of [AFI] and [Cerberus] in respect of the potential sale or restructuring of [ResCap]." *Id.* at RC40019217. Accordingly, the amended compensation plan provided that Mack and Ilany would each receive a fee of $1,500 per session of "strategic restructuring negotiations" attended, retroactive to the date of their engagement. *Id.* at RC40019218. Exhibit III.J.3.c—1 reflects the Debtors' records for purposes of compensating Mack and Ilany.

On March 19, 2012, Carpenter e-mailed Marano to request a meeting with the Special Review Committee.[1623]

The meeting took place on or about March 23, 2012 with Mack, Ilany, Carpenter, and Tessler present.[1624] Carpenter outlined various restructuring alternatives for ResCap—all of which involved a ResCap bankruptcy filing[1625]—and proposed a $750 million settlement comprised of (1) $350 million in cash; (2) contribution of all of the equity of Ally Securities, valued by AFI at $250 million; and (3) the value of the Ally Bank subservicing agreement, valued by AFI at $150 million.[1626] According to Mack, the non-cash aspects of that settlement offer were "ancillary items which in our view ultimately didn't really have value."[1627] As Gary Lee of Morrison & Foerster explained, "the perception was that in and of itself this represented an offer of $350 million full stop."[1628]

The next meeting of the four principal settlement negotiators occurred on or about April 4, 2012.[1629] In preparation for the April 4 meeting, Ilany, Mack, and ResCap's advisors developed the view that $1 billion dollars would be "good compensation" for claims against AFI.[1630] However, ResCap's "counterproposal" at the April 4 meeting did not include a specific number in terms of the AFI cash contribution, but instead "pointed out why [ResCap] . . . didn't assign value to certain parts of [AFI's] proposal" and stressed the need for "a reasonable headline number in terms of achieving credibility" for "the more elegant process, involving a plan."[1631] As Ilany explained, "everybody had the same [goal]—it was to keep the enterprise operating. . . . [S]o if you are to maximize the value for the company and for the creditors, which I was working for, I had to make sure that I kept the company and the

---

[1623] E-mail from M. Carpenter to T. Marano (Mar. 19, 2012) [EXAM00100919].

[1624] *See* E-mails between T. Marano and C. Ortiz-Zorn (Mar. 22, 2012) [ALLY_0142489]; Int. of J. Mack, Jan. 15, 2013, at 86:6–14.

[1625] Dep. of J. Mack, Nov. 14, 2012, 95:24–96:15.

[1626] Evercore, Kirkland & Ellis, and Mayer Brown Project Rodeo Discussion Materials, dated Apr. 4, 2012, at CCM00444815 [CCM00444794]. As described by Mack, the alternatives presented by Carpenter ranged from a "free fall 363 bankruptcy" to a "plan settlement" under which "there would be a greater contribution by [AFI]." Dep. of J. Mack, Nov. 14, 2012, at 96:5–15.

[1627] Dep. of J. Mack, Nov. 14, 2012, at 97:4–8.

[1628] Int. of G. Lee, Feb. 20, 2013, at 264:6–266:9. Lee further explained that "it was ResCap's view that the value of Ally Securities was functionally zero and maybe even a negative number." *Id.*

[1629] E-mail from C. Ortiz-Zorn (Apr. 3, 2012) [ALLY_0142547]. Wes Edens of Fortress also attended the meeting. *See* Int. of M. Carpenter, Mar. 4, 2013, at 245:8–246:20.

[1630] Int. of J. Ilany, Nov. 28, 2012, at 140:15–143:2 ("[Mack] and I, were advised that if we were to go to court, we—they [Morrison & Foerster, Centerview, and FTI] felt, okay, I can't give you percentages, I don't remember, that we could get somewhere around a billion dollars in value out of the other side.").

[1631] Dep. of J. Mack, Nov. 14, 2012, at 98:23–100:21; *see also* Notes of P. West (Mar. 30, 2012), at EXAM00128214 [EXAM00128214] ("Come back with counter proposal $$—give after [April 4 meeting]").

value of the company intact, if I could."[1632] Mack stated that, at the conclusion of the April 4 meeting, the principals encouraged their advisors to immediately begin working on "an agreement that mirrored" the proposed "elegant" resolution.[1633]

Following the April 4 meeting, Ilany and Mack, together with ResCap's advisors, determined that ResCap's counteroffer should be approximately $1.9 billion. As Ilany explained, "in order to get to a billion dollars you have to start somewhere and starting right under double sounded kind of right."[1634] In an April 5, 2012 presentation, ResCap proposed a settlement contribution from AFI of at least $1.9 billion, which included the following components: (1) $1 billion cash payment; (2) $500 million of value provided by AFI via the transition services agreement, sub-servicing, and parent-financing; (3) $400 million of value related to the assumption of regulatory costs; and (4) purchase by AFI through credit bid of the assets secured by the A&R Secured Revolver Loan Agreement.[1635] According to Lee, the components of the $1.9 billion counteroffer were not particularly meaningful, but rather were "simply a way to get to [$]1.9 [billion]."[1636]

By April 5, 2012, AFI had revised its $750 million settlement offer by increasing the proposed cash contribution to $600 million.[1637] As of April 11, 2012, according to West's handwritten notes, ResCap was considering a settlement proposal of $1.55 billion, although it is not clear what portion of that proposal was comprised of a cash contribution from AFI. West observed, "[we] need to get somewhere in [the] middle."[1638]

---

[1632] Int. of J. Ilany, Nov. 28, 2012, at 141:12–25.

[1633] Dep. of J. Mack, Nov. 14, 2012, at 100:3–7, 100:22–101:9.

[1634] Int. of J. Ilany, Nov. 28, 2012, at 140:15–143:2 ("[Mack] and I, were advised that if we were to go to court . . . we could get somewhere around a billion dollars in value out of the other side."). In contrast to Ilany's statements, Mack testified that he and Ilany did not have an "ask" but rather argued for "a headline number" that they believed "needed to be" about $1 billion "to be credible." Dep. of J. Mack, Nov. 14, 2012, at 83:3–23. But Gary Lee of Morrison & Foerster characterized the $1.9 billion as an "all-in ask," Int. of G. Lee, Feb. 20, 2013, at 272:19–273:14, and Carpenter understood ResCap to have made a "counterproposal." Int. of M. Carpenter, Mar. 4, 2013, at 250:19–251:4, 256:5–22.

[1635] Draft FTI Presentation to the Board of Residential Capital, LLC, dated Apr. 5, 2012, at 5 [EXAM00176483]. As of April 5, 2012, waterfall analyses prepared by FTI of the recoveries implied by the proposal did not provide an assumption related to allocation of the settlement between the Debtor entities. *Id.* at 3–4. West's notes dated April 5, 2012 appear to show that ResCap was considering a settlement proposal of $1.55 billion, comprised of $1.4 billion in cash and $150 million in subservicing. *See* Notes of P. West (Apr. 5, 2012), at EXAM00128218 [EXAM00128214]. It is not clear if or when that offer was conveyed to AFI.

[1636] Int. of G. Lee, Feb. 20, 2013, at 276:10–277:17 (noting that the goal was to get Ally Bank to be willing to allow ResCap to continue originating mortgages, creating value of what was perceived to be $100 million, to get DIP financing, and to get cash, and "there was a view that with those pieces of support together we'd be able to continue to underwrite and originate in bankruptcy and sell a platform as opposed to financial assets. And that that was going to be a big part of what would enhance the value of the return to creditors.").

[1637] *See* Notes of P. West (Apr. 5, 2012), at EXAM00128218 [EXAM00128214]; E-mail from M. Carpenter to L. Tessler (Apr. 19, 2012) [CCM00652320] ("Our last offer was 750 with 600 cash.").

[1638] Notes of P. West (Apr. 11, 2012), at EXAM00128221 [EXAM00128214].

On April 12, 2012, Carpenter sent an e-mail to Caribel Ortiz-Zorn, his administrative assistant, with the subject line "To Lenard, Rick, Ray, David, Yelena, JB."[1639] In the e-mail, Carpenter wrote that he had spoken with Mack and "took the opportunity to explain to him," among other things, "that our proposal was not an opening low ball but was responsive to the facts as we know them and that the waterfall analysis comparison did not indicate that we were off base," whereas "the [Morrison & Foerster] ask did not seem to have any basis in logic."[1640] Carpenter noted that Mack "got it, restated our mutuality of interest and his optimism that we could reach a deal."[1641]

On April 19, 2012, AFI proposed that it could contribute the Ally Bank MSR portfolio to ResCap—thereby allowing ResCap to sell the MSR portfolio to Fortress as part of the Chapter 11 Cases—as an alternative to cash as the principal form of settlement consideration.[1642] According to Carpenter, MSR and cash were "fungible."[1643] Carpenter initially recommended a settlement proposal that included the contribution of $800 million of Ally Bank's MSR portfolio and support for continued retail channel origination, which he valued at $200 million.[1644] Carpenter noted that such an offer would have been a "big jump, a big headline number, above 750 in 'cash equivalent' and leaves room for another round."[1645]

Ultimately, AFI proposed to contribute Ally Bank's entire MSR portfolio to ResCap. ResCap could sell the portfolio to a purchaser in the Chapter 11 Cases, but ResCap's share of

---

[1639] E-mail from M. Carpenter to C. Ortiz-Zorn (Apr. 12, 2012) [ALLY_0142576]. Carpenter may have intended for Ortiz-Zorn to forward the e-mail to Tessler, Rick Cieri and Ray Schrock of Kirkland & Ellis, David Ying and Jelena Strelcova of Evercore, and Jeff Brown.

[1640] *Id.* According to Lee, the "ask" that purportedly had no "basis in logic" was not the April 5, 2012 counteroffer, but rather Morrison & Foerster's February 14, 2012 damages assertion that AFI's control over ResCap had resulted in a $7.6 billion diminution of ResCap's estimated enterprise value. *See* Int. of G. Lee, Feb. 20, 2013, at 272:11–19.

[1641] E-mail from M. Carpenter to C. Ortiz-Zorn (Apr. 12, 2012) [ALLY_0142576]. In the same E-mail, Carpenter also noted that he explained to Mack "how out of line I thought Tom's behavior was yesterday." *Id.* At his deposition, Marano stated that there is "no doubt" Carpenter was referring to him in that e-mail, and explained that "Carpenter frequently thought my behavior was out of line as I advocated for ResCap." Dep. of T. Marano, Nov. 12, 2012, at 88:14–17.

[1642] Summary Discussion of Ally Financial Inc. Support For a ResCap Chapter 11 Plan of Reorganization, dated Apr. 19, 2012, at 1–2 [RCES00002362] (attached to E-mail from A. Grossi to L. Nashelsky, J. Tanenbaum, and G. Lee (Apr. 19, 2012) [RCES00002361]).

[1643] E-mail from M. Carpenter to L. Tessler (Apr. 19, 2012) [CCM00652320]; *see also* Dep. of T. Marano, Nov. 12, 2012, at 132:5–134:12 ("I thought it was an interesting idea because it added more value to the estate not only from the cash value but it maintained a servicing asset that could have been sold away from the estate."); Int. of M. Carpenter, Mar. 4, 2013, at 251:12–20, 257:5–9 ("The idea of using the MSR from Ally Bank was part of the conversation, which actually was very appealing to ResCap because it took the whole issue of the subservicing agreement stuff off the table, and gave them an asset that had, you know, a significant value."). Divestiture of Ally Bank's MSR portfolio was also beneficial to AFI for several reasons, and Tessler did not think AFI would retain it "under any circumstance." E-mail from L. Tessler to C. Pinkston (Mar. 20, 2012) [CCM00565103].

[1644] E-mail from M. Carpenter to L. Tessler (Apr. 19, 2012) [CCM00652320].

[1645] *Id.*

the sale proceeds would be capped.[1646] Kirkland & Ellis sent Morrison & Foerster a "settlement discussion document" that set forth the terms of an AFI settlement contribution in exchange for a Debtor Release and a Third-Party Release as follows: (1) AFI would contribute Ally Bank's MSR portfolio to ResCap, with sale proceeds received by ResCap on account of the Ally Bank MSR to be capped at $750 million; (2) AFI would purchase ResCap's HFS Portfolio at Fortress's proposed bid price; and (3) Ally Bank would support the continuation of origination of MSR through the ResCap chapter 11 case.[1647] The terms of AFI's settlement proposal were conveyed to the ResCap Board at a special meeting on April 20, 2012.[1648]

The April 19, 2012 settlement proposal included essentially the same three components of AFI support that were memorialized in the AFI Settlement and Plan Sponsor Agreement and presented to the Bankruptcy Court on the Petition Date (assuming cash and MSR to be fungible). However, ResCap and AFI had not finished negotiating at that point. As described below, although AFI's offers to bid on the HFS Portfolio and to support retail origination remained constant, the cash/MSR portion of the settlement contribution was an open item. Indeed, on April 23, 2012, pursuant to a conversation between Ilany and Carpenter,[1649] Morrison & Foerster sent a revised settlement proposal to AFI's Project Rodeo team that removed the $750 million cap on AFI's contribution and replaced it with brackets signifying the amount of AFI's contribution remained subject to further negotiation.[1650]

Ilany explained that, in late April, he and Tessler reached a "handshake" agreement on an AFI settlement contribution of $1.1 billion, comprised of cash and "things that I thought are extremely important for the business."[1651] However, according to Ilany, Tessler informed him shortly thereafter that "the trade is off" because "Carpenter will not let me do—I cannot do that."[1652] Ilany stated that he "went ballistic" and called Carpenter:

> I'm not paraphrasing—[Carpenter] basically said that he has an
> FDIC to deal with, that he knows that he's going to have to
> maybe pay some more money a little bit later, that at a certain

---

[1646] Summary Discussion of Ally Financial Inc. Support For a ResCap Chapter 11 Plan of Reorganization, dated Apr. 19, 2012, at 1 [RCES00002362] (attached to E-mail from A. Grossi to L. Nashelsky, J. Tanenbaum, and G. Lee (Apr. 19, 2012) [RCES00002361]).

[1647] *Id.* AFI valued the settlement contributions at $750 million for the Ally Bank MSR, $200 million for the purchase of the HFS Portfolio, and $200 million for the support of originations. *See* Evercore, Kirkland & Ellis, and Mayer Brown Project Rodeo Discussion Materials, dated Apr. 23, 2012, at 3 [CCM00335615].

[1648] Draft Minutes of a Special Meeting of the Board of Residential Capital, LLC, Apr. 20, 2012, at 1 [EXAM11088893].

[1649] *See* E-mail from T. Goren (Apr. 23, 2012) [CCM00534282].

[1650] Blackline Summary Discussion of Ally Financial Inc. Support For a ResCap Chapter 11 Plan of Reorganization, dated Apr. 23, 2012, at 1 [CCM00534287] (comparing AFI's April 19, 2012 proposal to ResCap's April 23, 2012 proposal) (attached to E-mail from T. Goren (Apr. 23, 2012) [CCM00534282]).

[1651] Int. of J. Ilany, Nov. 28, 2012, at 145:15–148:11.

[1652] *Id.*

point whatever he pays—we didn't talk about—but we were at a billion-one, that he was pealing me off—he said, the FDIC is going to step in. . . . So, he said, "I cannot do that." And we ended up at a billion-50.[1653]

Mack, like Ilany, also suggested that his intervention was needed in late April 2012 to keep the settlement on track for ResCap. According to Mack, ResCap and AFI purportedly reached agreement in principle on the $1.05 billion "headline number" during "the last weekend of April 2012."[1654] Mack testified that the parties negotiated over the weekend of April 28 and 29, 2012 "to bridge a difference of economics of about $150 million."[1655] At that time, Mack testified, "the bid and the ask" on the settlement was between $750 million and $1.1 billion, but the parties "were still working on some of the fine points."[1656] According to Mack, to bridge the gap, certain advisors proposed that AFI, ResCap, and Fortress each contribute approximately $50 million in value, but "not cash necessarily."[1657] Mack testified that the advisors' proposal was "not consistent with the understanding" he had reached with Carpenter and, after Carpenter contacted Mack, Mack contacted "the lawyers" and Marano and "put people back on track."[1658]

On April 30, 2012, after ResCap and AFI had purportedly reached an agreement in principle, the ResCap Board was presented with a draft settlement agreement which contemplated that "[AFI] will make a Cash contribution to the Debtors in the amount of $850 million."[1659] A blackline comparison that was also presented to the ResCap Board reflected that the amount of the AFI cash contribution had changed from "[$750] million" on April 29, 2012 to "$850 million" on April 30, 2012.[1660]

---

[1653] *Id*. When asked to explain the statement that Carpenter reportedly said that AFI would "maybe pay some more money a little bit later," Ilany stated that Carpenter meant that he "might have other liabilities." *Id.* at 147:5–148:11.

[1654] Dep. of J. Mack, Nov. 14, 2012, at 102:14–105:5.

[1655] *Id*. at 102:20–103:15; *see also* E-mail from T. Marano to J. Ilany (Apr. 29, 2012) [EXAM11114982] ("[W]e all doing docs at mofo now.").

[1656] Dep. of J. Mack, Nov. 14, 2012, at 104:6–16.

[1657] *Id*. at 103:8–24.

[1658] *Id*.

[1659] Draft Settlement Agreement, dated Apr. 30, 2012, at RC40020541 [RC40020521]. The draft settlement agreement also contemplated that AFI would serve as the stalking horse bidder for the HFS Portfolio and would provide consumer lending origination support to the Debtors. *Id*.

[1660] Blackline Draft Settlement Agreement, dated Apr. 30, 2012, at RC40020556 [RC40020521] (comparing April 30, 2012 draft to April 29, 2012 draft).

Ilany, who asserted he was the lead negotiator for ResCap,[1661] was "away" beginning on April 30, 2012 and did not have any recorded involvement in settlement negotiations after that date.[1662] Mack apparently took over in Ilany's absence.[1663]

Mack testified that AFI had never agreed to a cash contribution of $850 million and explained that the $850 million number in the April 30, 2012 draft settlement agreement was merely an "effort" by ResCap "to get a greater contribution from [AFI]" that AFI "never agreed to."[1664] However, that statement is not consistent with the documents. Drafts of the settlement agreement exchanged between ResCap and AFI suggest that, by May 4, 2012, AFI had indeed agreed to a contribution of $850 million in cash or MSR.

On May 2, 2012, Kirkland & Ellis sent a "draft settlement agreement incorporating AFI's comments" to Morrison & Foerster and principals at AFI and Cerberus.[1665] In that draft, Kirkland & Ellis revised AFI's cash contribution from "$850 million" to "$850,000,000; provided that a purchaser acceptable to [AFI] purchases the [Ally Bank] MSR . . . ."[1666] In other words, AFI's May 2, 2012 draft tied AFI's cash contribution to a successful sale of the Ally Bank MSR portfolio.

On May 3, 2012, after a discussion with Ray Schrock of Kirkland & Ellis,[1667] Morrison & Foerster sent a draft settlement agreement to AFI's Project Rodeo team that provided that AFI would make a contribution of $850 million to the Debtors, whether in the form of cash or by contributing the Ally Bank MSR portfolio. Specifically, ResCap's May 3, 2012 draft agreement read as follows:

> [AFI] will make a Cash contribution to the Debtors in the amount of $850,000,000. Without limiting the forgoing, to the extent that the Purchaser agrees to purchase the Ally MSR for a

---

[1661] Int. of J. Ilany, Nov. 28, 2012, at 145:15–18, 153:20–154:21.

[1662] *See* E-mail from T. Marano (Apr. 30, 2012) [EXAM11114989] ("Ilany is away [so] I [am] fairly certain he will not be able to dial in."); E-mail from J. Ilany to T. Marano (Apr. 29, 2012) [EXAM11114982] ("Remember that I am leaving tommorow [sic] . . . ."); Independent Director Compensation, dated May 10, 2012, at EXAM20124551 [EXAM20124550].

[1663] *See* Independent Director Compensation, dated May 10, 2012, at EXAM20124551 [EXAM20124550]; Dep. of J. Mack, Nov. 14, 2012, at 125:4–16 ("The 850 [million] was a number that perhaps [Ilany] had, but I'll take the credit for it or blame for it.").

[1664] Dep. of J. Mack, Nov. 14, 2012, at 124:7–125:16; *see also* Int. of J. Mack, Jan. 15, 2013, at 185:19–186:14 (stating that AFI's proposed settlement contribution "never got above $750 [million] in conversations between [Carpenter] and myself. . . . [T]here was at one time an attempt to get it to be greater than that. And that appeared in a document, but that was never something that [Carpenter] had ever agreed to").

[1665] E-mail from N. Ornstein to L. Nashelsky and G. Lee (May 2, 2012) [CCM00449220].

[1666] Blackline Draft Settlement Agreement, dated May 2, 2012, at 6 [CCM00449236] (attached to E-mail from N. Ornstein to L. Nashelsky and G. Lee (May 2, 2012) [CCM00449220]).

[1667] *See* E-mail from T. Goren (May 3, 2012) [RCES00001556].

> purchase price of at least $1,150,000,000 and assume representation and warranty liability associated with the Ally MSR (the "MSR Sale Conditions"), [AFI] shall make such contribution by contributing the Ally MSR to the Debtors on or before the Effective Date; provided that [AFI] shall be entitled to receive direct payment of any Ally MSR sale proceeds received by the Debtors between $850,000,000 and $1,150,000,000 and [AFI] and the Debtors shall share all proceeds in excess of $1,150,000,000, [   ]% to the Debtors and [   ]% to [AFI]. [To be discussed].[1668]

On May 4, 2012, ResCap and AFI apparently reached agreement on a guaranteed $850 million contribution in the form of either cash or MSR sale proceeds. First, at approximately noon, Lee e-mailed Devine and wrote:

> There needs to be a back stop to the Ally Bank MSR proceeds. As drafted, we get nothing under the plan if you decide not to sell the Ally Bank MSR to Fortress or a higher bidder. If you choose not to sell the Ally Bank MSR for any reason, AFI must fund the settlement amount with cash ($850 million).[1669]

Then, in an e-mail to Carpenter at approximately 2:30 p.m., Marano identified "the withdrawal of Cash in event of no MSR sale as a re-trade" that was a "major road block[] to moving forward."[1670] Marano did not mention the amount of the proposed settlement in his e-mail and appears to have been focused on the form of the contribution.[1671] At approximately 11:40 p.m. that night, Kirkland & Ellis sent a "draft settlement agreement incorporating AFI's comments" that accepted the pertinent language from ResCap's May 3, 2012 draft, such that AFI's May 4, 2012 draft agreement read as follows:

> [AFI] will make a Cash contribution to the Debtors in the amount of $850,000,000. Without limiting the forgoing, to the extent that the Purchaser agrees to purchase the Ally MSR for a purchase price of at least $1,100,000,000 and assume representation and warranty liability associated with the Ally MSR (the "MSR Sale Conditions"), [AFI] shall make such contribution by contributing the Ally MSR to the Debtors on or before the Effective Date; provided that [AFI] shall be entitled

---

[1668] Draft Settlement Agreement, dated May 3, 2012, at 6–7 [RCES00001557] (attached to E-mail from T. Goren (May 3, 2012) [RCES00001556]).

[1669] E-mail from G. Lee to T. Devine (May 4, 2012) [ALLY_0334556]. Devine forwarded Lee's email to Solomon, who forwarded Lee's e-mail to Carpenter, Tessler, and Kirkland & Ellis. E-mail from W. Solomon (May 4, 2012) [ALLY_0334556].

[1670] E-mail from T. Marano to M. Carpenter (May 4, 2012) [EXAM00003199].

[1671] *Id.*

> to receive direct payment of any Ally MSR sale proceeds between $850,000,000 and $1,100,000,000 and [AFI] and the Debtors shall share all proceeds in excess of $1,100,000,000, 50% to the Debtors and 50% to [AFI].[1672]

Again, there were no brackets around the $850 million to suggest the amount remained subject to further negotiation and, moreover, Kirkland & Ellis deleted the phrase "[To be discussed]" from the "Cash Contribution" section of the agreement.[1673]

Notwithstanding the apparent agreement on the terms of an $850 million contribution from AFI, Kirkland & Ellis sent a revised draft settlement agreement to Morrison & Foerster on May 5, 2012 at approximately 12:30 p.m., which changed AFI's contribution to either $750 million in cash or $850 million upon the successful sale of the Ally Bank MSR.[1674] Almost contemporaneously with the transmittal of AFI's revised draft settlement agreement, Larren Nashelsky of Morrison & Foerster e-mailed Schrock and requested, on behalf of Marano, "an email from [Kirkland & Ellis] (not the settlement agreement) with 3-4 bullets of the settlement terms around the cash/Ally MSR payment to ResCap and any straight cash backstop. He wants no misunderstanding."[1675] It is unclear why Marano, rather than either Ilany or Mack, was requesting information from AFI on the terms of the settlement. Marano explained that he was seeking "clarification" regarding "additional support that could come to ResCap" in connection with the valuation of the Ally Bank MSR portfolio, and he "wanted to see if it was in the agreement."[1676] In response, Schrock wrote:

> Here it is. Straight from the agmt—with plain english to assist. Hope helpful.
>
> Upon satisfaction of the conditions set forth in the settlement Agmt:
>
> [AFI] will make a Cash contribution to the Debtors in the amount of $750,000,000;
>
> provided that if the Purchaser agrees to purchase the Ally MSR for a purchase price of at least $1,100,000,000 and assume representation and warranty liability associated with the Ally

---

[1672] Draft Settlement Agreement, dated May 4, 2012, at 6 [RCES00001523] (attached to E-mail from M. Meltzer to L. Nashelsky and G. Lee (May 4, 2012) [RCES00001506]).

[1673] Blackline Draft Settlement Agreement, dated May 4, 2012, at 6–7 [RCES00001507] (comparing ResCap's May 3, 2012 draft to AFI's May 4, 2012 draft) (attached to E-mail from M. Meltzer to L. Nashelsky and G. Lee (May 4, 2012) [RCES00001506]).

[1674] Blackline Draft Settlement Agreement, dated May 4, 2012, at 6 [RCES00001459] (attached to E-mail from V. Cole to L. Nashelsky and G. Lee (May 5, 2012) [RCES00001443]).

[1675] E-mail from L. Nashelsky to R. Schrock (May 5, 2012) [ALLY_0021383].

[1676] Dep. of T. Marano, Nov. 12, 2012, at 132:5–133:2.

> MSR (the "MSR Sale Conditions"), [AFI] shall make a contribution of the Ally MSR to the Debtors immediately before the effective date of the plan of reorg with
>
> The debtors receiving the first $850,000,000 of Ally MSR sale proceeds,
>
> [AFI] receiving direct payment of any Ally MSR sale proceeds between $850,000,000 and $1,100,000,000
>
> [AFI] and the Debtors shall share all proceeds in excess of $1,100,000,000, 50% to the Debtors and 50% to Ally.[1677]

It appears that Marano was unaware that AFI had sent ResCap a draft settlement agreement the previous evening proposing a cash contribution of $850 million. Marano testified that his recollection as to the amount AFI was offering in the settlement negotiations at the time was as follows:

> [T]here had been talk of a 750 [million] settlement. Then there was an effort to try and get additional proceeds above the 750 [million]. Keep in mind Mr. Mack and Ilany did most of this negotiation or all this negotiation. At one point in order to get more money from [AFI], something above 750 [million], there apparently was a discussion of [AFI] selling their MSR and contributing some portion of the MSR to ResCap."[1678]

Marano stated that AFI estimated its MSR to have a value of approximately $1.1 billion and, if certain sale conditions were met, AFI would have agreed to contribute the first $850 million of sale proceeds to ResCap.[1679] Marano testified that he believes the concept "became too complex to incorporate into the document" and that ultimately, "Ilany and Mack decided . . . to take the 750 or Carpenter decided to take [the MSR Sale] off the table."[1680]

Carpenter, at his interview, initially explained that he remembered ResCap's representatives asking for an $850 million cash contribution from AFI, but that AFI "declined to pay it."[1681] Upon further review of the iterations of the draft settlement agreements, Carpenter

---

[1677] E-mail from R. Schrock to L. Nashelsky (May 5, 2012) [ALLY_0021383].

[1678] Dep. of T. Marano, Nov. 12, 2012, at 129:14–136:4.

[1679] *Id*. at 134:13–135:3 (explaining his understanding of the settlement proposal, based on review of Schrock's May 5, 2012 e-mail, at ALLY_0021383).

[1680] *Id*. at 135:15–136:4. Carpenter stated that, ultimately, "the MSR piece came off the table, not because we wanted to—I think we just couldn't figure out how to make it work." Int. of M. Carpenter, Mar. 4, 2013, at 257:20–265:23. Carpenter could not recall why the MSR idea did not work and did not explain AFI's apparent agreement to contribute $850 million in cash separate from the proposed MSR sale. *Id*.

[1681] Int. of M. Carpenter, Mar. 4, 2013, at 257:20–258:20.

stated, "I said to you a minute ago that I knew that we turned the 850 [million] down. Now that I'm looking at this, I withdraw that."[1682] Carpenter could not explain why the amount of AFI's proposed cash contribution changed from \$850 million to \$750 million,[1683] but noted:

> [T]his was a multi-faceted negotiation. It was heavily contested. . . . It was aggressively pursued by the other side. And, it was very tough. And the terms of it changed numerous times because each side was not only trying to get some economic value, but they were trying to get it in the form that was beneficial to them in one way or another.[1684]

---

[1682] *Id*. at 258:21–265:23.

[1683] *Id*. at 261:23–262:5 ("I don't remember what exactly—because obviously it morphed from then to here.").

[1684] *Id*. at 261:23–265:23. Lee stated that he did not know whether AFI had ever agreed to contribute \$850 million in cash to the Debtors because he was not involved in "the turns of the documents." Int. of G. Lee, Feb. 20, 2013, at 333:7–335:11. Lee also stated he did not remember ever having discussions in which \$850 million was discussed as the AFI cash contribution. *Id.* at 333:7–335:11.

On May 6, 2012, Marano e-mailed Carpenter and informed him, "[o]n settlement we s/b fine w your offer."[1685] It is not clear why Marano conveyed ResCap's acceptance of AFI's offer to Carpenter. Carpenter asserted that Marano "was nowhere to be seen" in the AFI-ResCap settlement negotiations.[1686]

Exhibit III.J.3.c—2 below reflects the evolution of negotiations related to AFI's cash contribution to the AFI Settlement.



EXHIBIT III.J.3.c—2
**Cash or MSR Component of the AFI Settlement**
**ResCap Versus AFI Positions**
*($ in Millions)*

*Source: EXAM00176483; EXAM00128214; RC40020521; RCES00001556; RCES00001573; ALLY_0334556; EXAM00002973; CCM00444794; CCM00449220; CCM00449236; RCES00001506; RCES00001523; ALLY_0021383; RCES00002361; RCES00002362 .*

---

[1685] E-mail from T. Marano to M. Carpenter (May 6, 2012) [EXAM00002973]; *see also* E-mail from R. Schrock (May 6, 2012) [EXAM00069808] (noting that the "[s]ettlement agreement is agreed upon (today we all hope)").

[1686] Int. of M. Carpenter, Mar. 4, 2013, at 271:17–272:2.

III-286

Ultimately, ResCap and AFI presented the settlement as one by which AFI provided $1.05 billion to ResCap, in addition to other non-financial contributions, in exchange for a Debtor Release and a Third-Party Release.[1687] Mack stated at his deposition that the settlement was comprised of "750 of cash and then there were a couple of other components, some financing, some loan sales. So in total it was around a billion dollars."[1688] Mack asserted that the final settlement amount achieved "the headline number [he was] looking for."[1689] Ilany was also very satisfied with the final settlement amount:

> [W]hen my advisors and my—when my lawyer tells me "I can take you to court and you'll win a billion dollars" and I can settle 850 million without paying his fee and going to court, I call that a good workday. When I get to billion-50, it's even a better workday.[1690]

In reality, it is questionable whether the AFI Settlement and Plan Sponsor Agreement actually provided the $1 billion in settlement value that Mack and Ilany believed was achieved.[1691] Indeed, Ilany thought the settlement amount he and Mack had been able to negotiate with Carpenter and Tessler was *more* than his advisors had told him ResCap would be able to recover through litigation.[1692] His belief that AFI was willing to settle for more than it would have supposedly been liable if the claims were litigated apparently did not give Ilany any pause as to whether his advisors' advice was sound. More noteworthy, however, was that Ilany could not remember if the settlement with AFI was to release only ResCap's claims against AFI or to also include a release of claims held by third parties against AFI.[1693] Ilany also did not remember giving any consideration to the value of those Third-Party Claims in connection with the release given to AFI.[1694]

---

[1687] *See* Section III.J.3.f (discussing terms of AFI Settlement and Plan Sponsor Agreement as filed).

[1688] Dep. of J. Mack, Nov. 14, 2012, at 104:22–25.

[1689] *Id.* at 105:2–5.

[1690] *See* Int. of J. Ilany, Nov. 28, 2012, at 151:21–152:6. Ilany also noted "[W]e ended up with 850 million of what I believe right then and there of good value . . . . And I believe it was more than that because it was the 750 in cash and $100 million that we ascribed to the ability to keep and originate mortgages, which means . . . that allows us to keep our doors open, our originators open, paying our originators, keeping the machine going, and that is valued at much more than $100 million . . . ." *Id.* at 147:22–148:11.

[1691] For the Examiner's full analysis of proposed consideration for releases, see Section IX.

[1692] Int. of J. Ilany, Nov. 28, 2012, at 156:23–157:5.

[1693] *Id.* at 157:6–15 ("[Q:] Right, but [AFI was] getting a release from parties other than ResCap. Did you understand that? [A:] I don't remember.").

[1694] *Id.* at 157:16–20 ("[Q:] Do you recall any consideration of the value of those third party claims for purposes of that release in the settlement? [A:] I don't remember.").

#### d.  Third Party Involvement In Negotiations Of AFI Settlement Contribution

In April 2012, certain of ResCap's advisors—including Lee and Jamie Levitt of Morrison & Foerster and Mark Renzi of FTI—prepared a presentation of hypothetical waterfall scenarios to be given to the Steering Committee Group (represented by Kathy Patrick of Gibbs & Bruns LLP), and considered including scenarios in which AFI would contribute greater than $750 million in cash.[1695] On April 23, 2012, Devine, who maintained that he was not directly involved in the AFI-ResCap settlement negotiations,[1696] recommended to Hamzehpour that the hypothetical waterfall analysis include a maximum contribution from AFI of "$750 million rather than one billion" because "it would be better to leave some room for negotiation," presumably with Patrick.[1697] Hamzehpour responded by saying she was unable to comment on the proposed settlement with AFI, "as MoFo [wa]s much closer to that."[1698] ResCap ultimately decided not to incorporate such scenarios into their April 25, 2012 presentation to the Steering Committee Group.[1699]

Devine explained that he preferred using $750 million rather than $1 billion because he "didn't want a number that had no basis, to [his] knowledge, involved in presentations that people would rely on and later be surprised and disappointed in."[1700] When asked at his deposition why he recommended leaving "some room for negotiation," Devine stated that he "was mistaken" and he "overspoke with regard to the status of the communications at that point."[1701] He added that "[t]he 750 was not being negotiated with Kathy Patrick" and "Patrick wasn't demanding a certain amount of money from AFI into the estate."[1702] Furthermore, according to Devine:

> Patrick understood that the negotiation of a dollar number between AFI and ResCap was going on separately from the discussions over the RMBS settlement . . . [and] that she had no direct role or—or standing to bargain for a number there . . . since that agreement was between the estate and [AFI]. She did care about the number and she told me that she cared about the number for the obvious reason that she wanted to maximize that figure from [AFI].[1703]

---

[1695] *See* Dep. of M. Renzi, Nov. 7, 2012, 72:7–73:7.

[1696] *See, e.g.*, Dep. of T. Devine, Nov. 19, 2012, at 227:4–12.

[1697] E-mail from T. Devine to T. Hamzehpour (Apr. 23, 2012) [EXAM00345835]. Devine further indicated that to "use a billion we will need clearance from AFI and I haven't spoken to [Carpenter]." *Id.*

[1698] *See id.*; Dep. of T. Hamzehpour, Nov. 13, 2012, at 57:13–60:9.

[1699] *See* Centerview and FTI Discussion Materials Presentation, dated Apr. 25, 2012, at 7–11 [EXAM00176409]; Dep. of M. Renzi, Nov. 7, 2012, 72:7–73:7.

[1700] Int. of T. Devine, Mar. 19, 2013, at 70:5–72:25.

[1701] Dep. of T. Devine, Nov. 19, 2012, at 91:4–93:18.

[1702] *Id.* at 95:22–25, 142:18–20.

[1703] *Id.* at 142:21–143:22.

Although Devine suggested the use of $750 million in the presentation, ResCap was represented by sophisticated bankruptcy advisors throughout the relevant period and ultimately controlled which numbers were used. The $750 million figure included in the presentation to the Steering Committee Group accurately reflected AFI's highest offer as of April 25, 2012 in connection with the AFI-ResCap settlement negotiations.[1704]

After ResCap and AFI had settled on the amount and form of AFI's settlement contribution, Patrick made a demand that AFI increase its cash contribution by $150 million "above the 750 + 200 + 100 previously agreed."[1705] As Patrick explained, she "tried very hard to get partly at [Lee's] urging, another $100 or $150 million in cash out of AFI. And it almost broke everything."[1706] Lee stated that he believed it was his "obligation to take one final crack at AFI to get more money . . . . And I went back to Tim Devine, and I think I told [Patrick] to go back to Tim Devine and see if she could help me get more money."[1707] According to Patrick, Devine conveyed the demand to Carpenter and then reported to her that he "had almost been fired. . . . He looked white as a sheet."[1708] According to Devine, "[AFI] wasn't interested in negotiating with [Patrick] the dollar amount that was contained in the [AFI] and ResCap settlement."[1709]

On May 9, 2012, Devine e-mailed Lee and stated that "[t]here is no new [AFI] money. Hard stop at 750 + 200 + 100."[1710] Based on that e-mail, it appears AFI had decided that, regardless of the ultimate terms of the Plan Support Agreements, AFI would not agree to contribute any additional funds into the Estates before the bankruptcy filing.[1711]

### e. ResCap And AFI Board Approvals For AFI Settlement And Plan Sponsor Agreement And Bankruptcy Filing

On May 4, 2012, all of the independent directors of AFI, in addition to Carpenter, consented to the declaration of a bankruptcy by ResCap.[1712] On May 9, 2012, the AFI Board consented to waive its rights to approve certain actions by ResCap, including, among other

---

[1704] *See* Summary Discussion of Ally Financial Inc. Support For a ResCap Chapter 11 Plan of Reorganization, dated Apr. 19, 2012, at 1 [RCES00002362] (attached to E-mail from A. Grossi to L. Nashelsky, J. Tanenbaum, and G. Lee (Apr. 19, 2012) [RCES00002361]).

[1705] E-mail from T. Devine to M. Carpenter (May 8, 2012), at CCM00565465 [CCM00565463].

[1706] Int. of K. Patrick, Mar. 18, 2013, at 91:23–92:7.

[1707] Int. of G. Lee, Feb. 20, 2013, at 327:4–18.

[1708] Int. of K. Patrick, Mar. 18, 2013, at 175:1–177:4.

[1709] Int. of T. Devine, Mar. 19, 2013, at 130:2–133:1.

[1710] E-mail from T. Devine to G. Lee (May 9, 2012) [EXAM00180215]; Dep. of T. Devine, Nov. 19, 2012, at 229:24–230:6.

[1711] *See* Dep. of T. Devine, Nov. 19, 2012, at 233:20–234:4.

[1712] Ally Financial Inc. Consent to Action, dated May 4, 2012, at ALLY_PEO_0020551–59 [ALLY_PEO_0020479].

things, ResCap's ability to enter into any legal settlement greater than $25 million and ResCap's ability to divest a major line of business or exit major business activities.[1713]

On May 13, 2012, the ResCap Board formally authorized Ilany and Mack to execute the AFI Settlement and Plan Sponsor Agreement.[1714] Marano testified that the ResCap Board concluded that the settlement with AFI was "fair" based on the recommendation of the "independent directors who . . . told us this was the best deal they could get."[1715]

Marano noted that, although the ResCap Board "got the best deal we could get from [AFI] at the time we filed," the ResCap Board "knew there would be an opportunity to challenge that settlement and to have another bite at the apple."[1716] James Tanenbaum of Morrison & Foerster agreed with Marano. Tanenbaum asserted that the settlement was "within the range of a fair offer because it permitted so much more to be done that protected and enhanced the value of the estate."[1717] However, he went on to note that he did not think at that time that the AFI settlement contribution would be sufficient "to get the creditors to bite off and be satisfied."[1718] He further explained:

> [T]here was a high likelihood that [AFI's settlement contribution] would not remain as is and would have to be increased by [AFI] pretty substantially in order to get a settlement. So it was one of those very good opportunities for a company to be able to obtain financing and obtain the wherewithal to effect an orderly filing and maintain an enterprise preserving great value in bankruptcy while at the same time having an opportunity to recut the settlement number in the future which I thought was an exceptional opportunity. To bring it to very granular level, look at the asset sales. They were

---

[1713] Ally Financial Inc. Consent to Action, dated May 9, 2012, at ALLY_PEO_0020560–69 [ALLY_PEO_0020479].

[1714] Minutes of a Special Meeting of the Board of Residential Capital, LLC, May 13, 2012, at 9 [EXAM00184467].

[1715] Dep. of T. Marano, Nov. 12, 2012, at 194:8–18.

[1716] Id. at 191:9–195:12.

[1717] Int. of J. Tanenbaum, Mar. 29, 2013, at 227:7–230:18.

[1718] Id.

terrific. That wouldn't have been a possibility in the absence of reaching a settlement number with [AFI].[1719]

### f.  AFI Settlement And Plan Sponsor Agreement As Filed

On the Petition Date, the Debtors and AFI entered into the AFI Settlement and Plan Sponsor Agreement, which set forth the terms of the global settlement between the Debtors and AFI and its direct and indirect subsidiaries and affiliates other than the Debtors. These terms were to be implemented in a chapter 11 plan consistent with the Plan Term Sheet.

#### (1) AFI Settlement And Plan Sponsor Agreement Termination

The AFI Settlement and Plan Sponsor Agreement was terminated by the Debtors as of February 28, 2013.[1720] As a result, AFI is not obligated to make the $750 million cash contribution nor is AFI entitled to receive any releases from the Debtors or any Third-Party Claimants.[1721] However, AFI has not withdrawn its offer to provide a $750 million cash contribution to the Debtors' estates "if an acceptable settlement can be reached."[1722]

Prior to the expiration of the AFI Settlement and Plan Sponsor Agreement, AFI fulfilled the following obligations: (1) served as the stalking horse bidder for the Legacy

---

[1719] *Id*. According to Lee:

> We meaningfully negotiated the plan support agreement so that we, ResCap on behalf of our creditors, would get all of the benefits of origination and bankruptcy and support and the ability to sell a clean platform. And AFI left itself with the risk that at the end of that process, we would have sold a clean servicing platform and gotten all the money in, and there would be no settlement with it. I mean, that's been their risk throughout this process. . . . And the reality is, ResCap was focused on getting a clean sale because the view of the board and the management was that a clean sale and a robust auction would generate the most value in this case. And everybody who signed the plan support agreement had taken a risk that that value will come in and they'll be left with, you know, a litigated claim, in [Patrick's] case depending on what happens with the settlement. In AFI's case creditor reaction to a $750 million settlement.

Int. of G. Lee, Feb. 20, 2013, at 291:1–292:7.

[1720] Ally Financial Inc., Annual Report (Form 10-K) (Mar. 1, 2013), at 17.

[1721] *Id*. at 17–18. The Debtors were permitted to terminate their obligations under the AFI Settlement and Plan Sponsor Agreement, including the obligation to seek approval of a plan that provides a Third-Party Release, if they made a good faith determination that an alternative restructuring was "reasonably likely to be more favorable to the Debtors' estates, their creditors, and other parties to whom the Debtors owe fiduciary duties" than the restructuring contemplated by the Plan Term Sheet. *See* AFI Settlement and Plan Sponsor Agreement, § 3.2(c). Following such determination to pursue an alternative restructuring, AFI's only remaining obligations under the AFI Settlement and Plan Sponsor Agreement are to continue (a) performing under the Shared Services Agreement, and (b) providing ResCap with the use of cash collateral pursuant to the terms of the Cash Collateral Order. *See id*. § 7.6.

[1722] Ally Financial Inc., Quarterly Report (Form 10-Q) (May 1, 2013), at 11.

Sale with no break-up fees or other bid protections (until replaced by Berkshire Hathaway pursuant to Bankruptcy Court order on June 28, 2012) ;[1723] (2) provided consumer lending origination support through and until the closing of the Platform Sale;[1724] (3) provided up to $220 million of DIP financing and provided ResCap with the use of cash collateral;[1725] (4) performed under the Shared Services Agreement;[1726] and (5) negotiated and entered into a transition services agreement with the purchaser in connection with the Platform Sale.[1727]

The AFI Settlement and Plan Sponsor Agreement would have obligated AFI to make the following additional contributions to the Debtors in exchange for the Debtor Release and Third-Party Release: (1) provide a cash contribution to the Debtors in the amount of $750 million, to be used to fund the settlement of pending and future claims and to secure the Debtor Release and Third-Party Release;[1728] and (2) release the Debtors and all related persons from any and all causes of action arising from or related in any way to the Debtors.[1729]

---

[1723] AFI Settlement and Plan Sponsor Agreement, § 2.1(b). AFI submitted an original stalking horse bid of $1.6 billion if the assets were sold pursuant to a plan that provided a Third-Party Release but only $1.4 billion if the assets were sold in a section 363 sale. *See id*. Although the Debtors selected Berkshire Hathaway as the stalking horse, the Debtors assert that AFI complied with its obligations under the AFI Settlement and Plan Sponsor Agreement to act as the stalking horse for the Legacy Sale and that AFI's stalking horse bid was valuable to the estate because it set a floor on bidding. *See* Transcript of Hearing at 8:4–11, In re Residential Capital, LLC, No. 12-12020 (Bankr. S.D.N.Y. June 6, 2012).

[1724] AFI Settlement and Plan Sponsor Agreement, § 2.1(h).

[1725] *Id*. §§ 2.1(d), (f).

[1726] *Id*. § 2.1(c).

[1727] *Id*. § 2.1(e).

[1728] *Id*. § 2.1(a).

[1729] *Id*. at § 2.3. Specifically, AFI agreed that on the Effective Date of the Plan it and its direct and indirect subsidiaries and affiliates other than the Debtors would release the Debtors and each of their respective members, officers, directors, agents, financial advisors, attorneys, employees, partners, affiliates, and representatives and their respective properties from any and all Causes of Action, whether known or unknown, whether for tort, fraud, contract, violations of federal or state securities laws, or otherwise, arising from or related in any way to the Debtors, including those that AFI or any of its direct or indirect subsidiaries or affiliates (other than the Debtors) would have been legally entitled to assert against any of the parties above in their own right (whether individually or collectively). However, the following claims held by AFI against the Debtors were specifically carved out of this release: (1) claims under the A&R Secured Revolver Loan Agreement, (2) claims under the A&R Line of Credit Agreement, and (3) claims arising after the Petition Date in the ordinary course of business or otherwise agreed to by the Debtors and AFI. *Id*.

### (2) Debtor Release And Third-Party Release

The Debtors' settlement with AFI was built around releases that each party purported to grant to the other and, significantly, the proposed Third-Party Release. The scope of the Claims that would have been released was extremely broad. First, the Debtors agreed to provide the Debtor Release, as follows: [1730]

> On and as of the Effective Date, for the good and valuable consideration provided by each of the [AFI] Released Parties, including: (a) the discharge of debt and all other good and valuable consideration provided pursuant to the Plan; (b) pursuant to the terms of [the AFI Settlement and Plan Sponsor Agreement]; and (c) the services of the Debtors' present officers and directors in facilitating the expeditious implementation of the restructuring contemplated by the Plan, each of the Debtors shall provide a full discharge and release to the [AFI] Released Parties (and each such [AFI Released Party] so released shall be deemed released and discharged by the Debtors)) and their respective properties from any and all Causes of Action, whether known or unknown, whether for tort, fraud, contract, violations of federal or state securities laws, or otherwise, including those Causes of Action based on avoidance liability under federal or state laws, veil piercing or alter-ego theories of liability, a theory of debt recharacterization, or equitable subordination liability, arising from or related in any way to the Debtors, including those that any of the Debtors or Reorganized Debtors would have been legally entitled to assert against a[n AFI] Released Party in their own right (whether individually or collectively) or that any holder of a Claim or Interest or other entity, would have been legally entitled to assert on behalf of any of the Debtors or any of their Estates, including those in any way related to the [Chapter 11] Cases or the Plan to the fullest extent of the law; provided that [AFI] shall reaffirm its obligations under Section 2.2 [of the AFI Settlement and Plan Sponsor Agreement] in conjunction with the Plan; provided, further, that the Debtors' rights to any insurance shall not be adversely affected.[1731]

---

[1730] Capitalized terms used in the quoted text but not otherwise defined herein shall have the meanings ascribed to such terms in Article I of the AFI Settlement and Plan Sponsor Agreement.

[1731] *Id.* § 3.1(d)(i).

The proposed Third-Party Releases were just as broad, providing:

> On and as of the Effective Date, the holders of Claims and Interests shall be deemed to provide a full discharge and release to the [AFI] Released Parties and their respective property from any and all Causes of Action, whether known or unknown, whether for tort, fraud, contract, violations of federal or state securities laws, veil piercing or alter-ego theories of liability, or otherwise, arising from or related in any way to the Debtors, including those in any way related to residential mortgage backed securities issued and/or sold by Debtors and/or the Chapter 11 Cases or the Plan; provided that claims of the Debtors' directors and officers against [AFI] pursuant to [AFI]'s indemnification obligations and Section 2.2 [of the AFI Settlement and Plan Sponsor Agreement] (as well as any applicable insurance related thereto) shall not be released.[1732]

The importance of the releases, particularly to AFI and its affiliates, was underscored by the parties' identification in the AFI Settlement and Plan Sponsor Agreement of the numerous Causes of Action the Debtors and AFI believe to exist between the parties. The Debtors asserted that the Debtors' Estates have claims against AFI relating to the corporate relationship between the Debtors and AFI, including equitable subordination, debt recharacterization, fraudulent conveyance, avoidance liability under federal or state laws, and other claims under theories of veil piercing and alter ego liability.[1733] AFI maintained it has substantial claims against the Debtors (although these claims—outside of funded debt—were not identified in the AFI Settlement and Plan Sponsor Agreement or in any other document produced by AFI).[1734] Finally, the parties noted in the AFI Settlement and Plan Sponsor Agreement that AFI and certain of its affiliates, including GMAC Mortgage Group LLC, Ally Securities LLC, and Ally Bank, have been named as defendants in lawsuits brought by third parties in connection with, or arising from, the Debtors' business activities, including with respect to residential mortgage backed securities issued and/or sold by the Debtors.[1735] All of these claims were also purposed to be released, which made the Third-Party Release a valuable component of the AFI Settlement and Plan Sponsor Agreement for AFI.

---

[1732] *Id*. § 3.1(d)(ii). On August 23, 2012, the Debtors filed a motion which attached a draft Plan that modified the release language for the proposed Debtor Release and Third-Party Release. *See* Debtors' Motion for the Entry of an Order Extending Their Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof [Docket No. 1248] at Ex. 1. As of the date of the Examiner's Report, the Debtors have not filed a Plan that includes either the Debtor Release or Third-Party Releases.

[1733] AFI Settlement and Plan Sponsor Agreement, at 1.

[1734] *Id*.

[1735] *Id*. at 2.

*(3) Debtors' Obligations Under AFI Settlement And Plan Sponsor Agreement*

Pursuant to the terms of the AFI Settlement and Plan Sponsor Agreement, the Debtors were obligated to (1) use commercially reasonable efforts to obtain approval of the Debtors' obligations under the AFI Settlement and Plan Sponsor Agreement;[1736] (2) use good faith efforts to file and prosecute the Plan as set forth in the Plan Term Sheet;[1737] (3) perform all of the obligations required under the Consent Materials and fund any and all costs related to such performance through and until the closing of the Platform Sale;[1738] and (4) obtain entry of a Confirmation Order that allows the following claims held by AFI against the Debtors in full: (a) claims under the A&R Secured Revolver Loan Agreement; (b) claims under the A&R Line of Credit Agreement; and (c) claims arising after the Petition Date in the ordinary course of business or otherwise agreed to by the Debtors and AFI.[1739]

### g. *Examiner's Conclusions Regarding Process Resulting In AFI Settlement and Plan Sponsor Agreement*

Pursuant to the Examiner Scope Approval Order, the Examiner reviewed the process that resulted in the AFI Settlement and Plan Sponsor Agreement, including the activities of the ResCap Board in connection with that agreement. Although the AFI Settlement and Plan Sponsor Agreement has been terminated, a review of the settlement process remains relevant. AFI has not withdrawn its offer to provide a $750 million cash contribution to the Debtors' Estates "if an acceptable settlement can be reached."[1740] As described below, the Investigation identified a number of issues that raise significant doubts as to whether ResCap's process reaching the AFI Settlement and Plan Sponsor Agreement was adequate. While a close question, the Examiner concludes it is more likely than not that a court would have found that the now-terminated AFI Settlement and Plan Sponsor Agreement was the product of a defective or deficient process.

### *(1) Morrison & Foerster's Investigation Of Legal Claims*

In November 2011, ResCap appointed two new independent directors, Jonathan Ilany and John Mack, to act as the Special Review Committee of the ResCap Board and "implement[] a process and procedure for the review and assessment" of Affiliate Transactions, the historical course of dealing between ResCap and AFI, and potential claims arising therefrom.[1741] Despite

---

[1736] *Id*. § 3.1(a).

[1737] *Id*. § 3.1(b).

[1738] *Id*. § 3.1(c). After the Platform Sale, unless the purchaser assumes such obligations on terms reasonably acceptable to AFI, the Debtors were required to escrow proceeds from the asset sales to fund any remaining obligations. *See id*.

[1739] *Id*. § 3.1(e).

[1740] Ally Financial Inc., Quarterly Report (Form 10-Q) (May 1, 2013), at 11.

[1741] *See* Residential Capital, LLC Resolutions for Adoption by the Board of Directors, dated Dec. 5, 2011, at RC40020104 [RC40020073]; Minutes of a Special Meeting of the Board of Residential Capital, LLC, Dec. 5, 2011, at RC40018719–20 [RC40018411].

authorization to engage independent counsel at the expense of ResCap, Ilany and Mack relied on Morrison & Foerster to perform that review.

Morrison & Foerster's decision that it could "independently" assess the "financial and operational course of dealing between [AFI] and ResCap"[1742] is questionable in light of the firm's significant involvement in that very course of dealing during the preceding years. From September 2008 through November 2011, Morrison & Foerster attended over 100 ResCap Board meetings, including meetings at which discussions occurred regarding Affiliate Transactions subject to the Special Review Committee's scrutiny. Morrison & Foerster acknowledged that it had advised the ResCap Board on a variety of issues relating to the Affiliate Transactions and corporate governance,[1743] but did not believe it had a conflict of interest in investigating its prior work.[1744]

In light of Morrison & Foerster's history advising the ResCap Board, Ilany and Mack should have questioned whether Morrison & Foerster was the appropriate firm to perform the investigation and, at a minimum, Ilany and Mack should have discussed the potential conflict with Morrison & Foerster. But Morrison & Foerster's potential conflict did not cause Ilany or Mack any concern. Ilany explained that "the lawyers that have conflicts tell you that they have conflicts. I'm not a lawyer."[1745]

Notwithstanding the possible conflicts of interest, Morrison & Foerster conducted the investigation and presented "the initial results of their independent review of historical transactions" to the ResCap Board on January 25, 2012. The investigation was conducted within a relatively compressed period. As such, in the course of its investigation, Morrison & Foerster did not review any contemporaneous e-mails and did not have access to any AFI files other than certain AFI Board materials.[1746] The scope of Morrison & Foerster's written materials to the ResCap Board was limited: those materials did not review direct Third-Party Claims against AFI; nor did they analyze breach of fiduciary duty claims against ResCap's directors and officers that could have given rise to claims against AFI for aiding and abetting breach of fiduciary duty.[1747]

---

[1742] Morrison & Foerster Report on the Independent Review Claims Analysis, dated Jan. 25, 2012, at RC00023718 [RC00023710].

[1743] Int. of J. Tanenbaum, Mar. 29, 2013, at 217:6–22.

[1744] *Id.* at 215:6–219:21.

[1745] Int. of J. Ilany, Nov. 28, 2012, at 117:2–120:21 (stating he was not concerned by the use of potentially conflicted lawyers because "they are professionals . . . bound by duty to me and they are my advisors").

[1746] Meeting with Morrison & Foerster, Counsel to the Debtors, in N.Y., N.Y. (July 20, 2012); *see also* Morrison & Foerster Report on the Independent Review Claims Analysis, dated Jan. 25, 2012, at RC00023720–21 [RC00023710].

[1747] Morrison & Foerster Report on the Independent Review Claims Analysis, dated Jan. 25, 2012 [RC00023710]. Gary Lee of Morrison & Foerster asserted that the firm considered Third-Party Claims in its investigation, *see* Int. of G. Lee, Feb. 20, 2013, at 59:12–60:21, 222:14–223:1, but Lee could not recall whether Morrison & Foerster had investigated breach of fiduciary duty claims, *see id.* at 219:1–9.

Perhaps because of the compressed period in which it conducted its investigation, Morrison & Foerster failed to inform the ResCap Board of significant Estate Causes of Action. For example, as discussed in Sections V.B.6 and VII.L.2.d, ResCap may have a claim in excess of $500 million relating to misallocation of net revenues under the Broker Agreement. Morrison & Foerster's failure to explore the potential ramifications of this issue with the ResCap Board as part of its investigation is surprising in light of the fact that, in January 2012, Morrison & Foerster apparently advised ResCap in connection with its investigation of the "whistleblower" allegations regarding this very claim.[1748] In addition, despite Morrison & Foerster's involvement in the ResCap Board's analysis and approval of the First 2009 Tax Allocation Agreement, Morrison & Foerster did not investigate claims arising from the tax allocation agreements or advise the ResCap Board that ResCap may have a claim in excess of $1 billion relating to those agreements.[1749] Although the Examiner does not necessarily fault Morrison & Foerster for failing to report on all potential Estate Causes of Action, there is little doubt that a more thorough investigation would have put the ResCap Board in a better position to assess the claims against AFI.

After receiving Morrison & Foerster's presentation on ResCap's potential claims against AFI, Ilany and Mack approached the settlement negotiations with AFI as a business deal, using these potential claims as a means to create "the existential threat, the threat that would persuade somebody to write a very big check."[1750] But Ilany and Mack did not have an adequate understanding of all of the legal claims involved. In particular, they had a very limited understanding of Third-Party Claims, and it did not appear that Ilany and Mack understood that these claims were proposed to be released as part of the settlement they were negotiating. As discussed in Section IX, the threshold for obtaining third-party releases in the Second Circuit is extremely high and, absent the consent of all or substantially all creditors, a third-party release is very difficult to obtain. A nondebtor can provide consideration to a debtor's estate in attempt to obtain such a third-party release, but the consideration must be substantial. There is no evidence that Morrison & Foerster explained to Ilany and Mack the relevance of that high standard in connection with AFI's request for a Third-Party Release. And Ilany and Mack did not seem to have ascribed any value to the requested Third-Party Release.[1751] Instead, Mack and Ilany simply sought to achieve a "headline number" of approximately $1 billion and, to get to that number, likely ascribed too much value to the non-cash contributions from AFI.[1752]

---

[1748] *See* Ally Global Security Investigation Report, dated Mar. 14, 2012, at RC40022054 [RC40022044] (noting that Morrison & Foerster reviewed "whether the definition of cost basis in the [MMLPSA] was consistent with the accounting agreement."). For the Examiner's full analysis of issues relating to GMAC Mortgage's contracts with Ally Bank, see Sections V.B and VII.L.

[1749] For the Examiner's full analysis of tax sharing and allocation issues, see Sections V.D and VII.K.

[1750] Int. of G. Lee, Feb. 20, 2013, at 125:7–20.

[1751] *See* Int. of J. Mack, Jan. 15, 2013, at 206:3–209:16 (Mack assigned "no specific value" to a Third-Party Release); Int. of J. Ilany, Nov. 28, 2012, at 157:6–15 (failing to remember that the AFI Settlement and Plan Sponsor Agreement included a proposed Third-Party Release for AFI and did not remember considering the value of Third-Party Claims for purposes of agreeing to a Third-Party Release).

[1752] For the Examiner's full analysis of proposed consideration for releases, see Section IX.

### (2) Apparent Agreement On $850 Million Cash Contribution From AFI

Ilany was the primary negotiator for ResCap with respect to the AFI Settlement and Plan Sponsor Agreement, although Mack was also involved in portions of the negotiations. ResCap and AFI purportedly reached an agreement in principle in late April 2012. On April 30, 2012, the date of Ilany's final recorded involvement in the settlement negotiations, the ResCap Board was presented with a draft settlement agreement which contemplated that "[AFI] will make a Cash contribution to the Debtors in the amount of $850 million."[1753] Mack, who had been involved in the settlement negotiations in a more limited capacity before then, at that point apparently took over for Ilany. Mack testified that AFI never agreed to a cash contribution of $850 million and explained that the April 30, 2012 draft settlement agreement was merely an "effort" by ResCap "to get a greater contribution from [AFI]."[1754] The documentary evidence does not support that recollection.

ResCap and AFI exchanged draft settlement agreements on May 2, 3, and 4. On May 2, AFI's counsel, Kirkland & Ellis, sent a draft settlement agreement to Morrison & Foerster that provided that AFI would make a cash contribution of $850 million, but tied such contribution to a successful sale of the Ally Bank MSR portfolio.[1755] Given the inherent uncertainty in such a transaction, ResCap and its representatives insisted on a "back stop" under which AFI would be required to fund the settlement amount with $850 million in cash, whether or not it was successful in selling the Ally Bank MSR portfolio.[1756] On May 3, Morrison & Foerster responded to AFI with a draft settlement agreement that provided that AFI would make a cash contribution of $850 million, not conditioned on any outcome with respect to the proposed MSR sale. On May 4, at approximately 11:40 p.m., Kirkland & Ellis sent a "draft settlement agreement incorporating AFI's comments" providing:

> [AFI] will make a Cash contribution to the Debtors in the amount of $850,000,000. Without limiting the forgoing, to the extent that the Purchaser agrees to purchase the Ally MSR . . . [AFI] shall make such contribution by contributing the Ally MSR to the Debtors . . . .[1757]

---

[1753] Draft Settlement Agreement, dated Apr. 30, 2012, at RC40020541 [RC40020521].

[1754] Dep. of J. Mack, Nov. 14, 2012, at 124:7–125:16; *see also* Int. of J. Mack, Jan. 15, 2013, at 185:19–186:14 (stating that AFI's proposed settlement contribution "never got above $750 [million] in conversations between [Carpenter] and myself. . . . [T]here was at one time an attempt to get it to be greater than that. And that appeared in a document, but that was never something that [Carpenter] had ever agreed to").

[1755] Blackline Draft Settlement Agreement, dated May 2, 2012, at 6 [CCM00449236] (attached to E-mail from N. Ornstein to L. Nashelsky and G. Lee (May 2, 2012) [CCM00449220]).

[1756] *See* E-mail from G. Lee to T. Devine (May 4, 2012) [ALLY_0334556]; *see also* E-mail from T. Marano to M. Carpenter (May 4, 2012) [RC40027673]; Draft Settlement Agreement, dated May 3, 2012, at 6–7 [RCES00001557] (attached to E-mail from T. Goren (May 3, 2012) [RCES00001556]).

[1757] Draft Settlement Agreement, dated May 4, 2012, at 6 [RCES00001523] (attached to E-mail from M. Meltzer to L. Nashelsky and G. Lee (May 4, 2012) [RCES00001506]).

There were no brackets around the $850 million (as there had been in drafts prior to April 30, 2012) to suggest the amount remained subject to further negotiation and, moreover, Kirkland & Ellis deleted the phrase "[To be discussed]" from the "Cash Contribution" section of the draft settlement agreement.[1758]

Approximately twelve hours later, seemingly without explanation, Kirkland & Ellis sent a revised draft settlement agreement to Morrison & Foerster that revised AFI's settlement contribution to either $750 million in cash or $850 million upon the successful sale of the Ally Bank MSR.[1759] AFI's revised offer was accepted by Marano on behalf of ResCap.[1760] Marano had not been involved in any of the prior negotiations regarding the amount of AFI's cash contribution. It is therefore not clear why Marano, rather than either Ilany or Mack, conveyed ResCap's acceptance to Carpenter.

The *form* of AFI's settlement contribution—whether cash or MSR—should not have had any impact on the proposed *amount* of the contribution. The MSR contribution was essentially equivalent to a cash contribution because it was dependent upon a third party purchasing the portfolio and providing cash to ResCap. Indeed, Carpenter recognized that MSR and cash were "fungible."[1761] Any alert negotiator should have recognized that there was an additional $100 million of settlement value available for ResCap's taking.

The sudden reduction of AFI's settlement amount by $100 million, with no record of any real protest from Ilany (who was not present) or Mack, raises serious questions as to ResCap's settlement process. It would appear that, whether by miscommunication or lack of aggressive negotiation, ResCap left that value on the table.

### (3) ResCap's "Second Bite At The Apple"

The deficiencies in the process leading to the AFI Settlement and Plan Sponsor Agreement are perhaps mitigated by ResCap's understanding that AFI's cash contribution was not the most important aspect of the "elegant" bankruptcy ResCap was seeking. Tanenbaum explained that ResCap viewed the settlement with AFI primarily as an opportunity "to effect an orderly [bankruptcy] filing and maintain an enterprise preserving great value in bankruptcy."[1762] Marano testified that ResCap knew it would have "another bite at the apple" with respect to the amount of AFI's cash contribution.[1763] Tanenbaum candidly explained that

---

[1758] Blackline Draft Settlement Agreement, dated May 4, 2012, at 6–7 [RCES00001507] (comparing ResCap's May 3, 2012 draft to AFI's May 4, 2012 draft) (attached to E-mail from M. Meltzer to L. Nashelsky and G. Lee (May 4, 2012) [RCES00001506]).

[1759] Blackline Draft Settlement Agreement, dated May 4, 2012, at 6 [RCES00001459] (attached to E-mail from V. Cole to L. Nashelsky and G. Lee (May 5, 2012) [RCES00001443]).

[1760] E-mail from T. Marano to M. Carpenter (May 6, 2012) [EXAM00002973].

[1761] E-mail from M. Carpenter to L. Tessler (Apr. 19, 2012) [CCM00652320].

[1762] Int. of J. Tanenbaum, Mar. 29, 2013, at 227:7–230:18.

[1763] Dep. of T. Marano, Nov. 12, 2012, at 191:9–195:12.

he expected the settlement would be "revised," stating that the proposed $750 million "would have to be increased by [AFI] pretty substantially in order to get a settlement" and that ResCap was going to have an "opportunity to recut the settlement number in the future."[1764]

Viewed in that light, with the benefit of hindsight, and considering the termination of the settlement by the Debtors and the ongoing settlement negotiations in the Chapter 11 Cases, the pre-negotiated amount of AFI's cash contribution may be of less importance. While AFI, for its part, professed to be "very disappointed" and "very upset" that ResCap "turned their back" on the settlement agreement,[1765] Tanenbaum asserted his belief that AFI also expected that its cash contribution would ultimately be "revised upward in connection with a resolution of creditor issues."[1766]

4. *Negotiation And Entry Into RMBS Trust Settlement Agreements And RMBS Plan Support Agreements*

a. *Relevant Background Concerning Private Label RMBS And Potential Representation And Warranty Liability*

ResCap and its affiliates underwrote and sold 392 separate securitizations of private label RMBS between 2004 and 2007, with original principal balances totaling $221 billion.[1767] In a typical private label securitization, ResCap entities pooled together non-conforming mortgage loans in their own names ("private label") and conveyed the pool of loans to a newly formed private label securitization trust (or SPE).[1768] The PLS trust raised cash to purchase the mortgage loans from ResCap and its affiliates by issuing RMBS to investors.[1769] The securities entitled their holders to receive the principal (including prepayments) and interest collected on the mortgage loans in the PLS trust.[1770]

In connection with securitization and loan sales, investors were provided various representations and warranties related to the loans sold.[1771] Such representations and warranties were made on a deal-by-deal basis and pertained to, among other things, ownership of the loan, the validity of the lien securing the loan, the loan's compliance with the criteria for inclusion in the transaction, the ability to deliver required documentation, and compliance

---

[1764] Int. of J. Tanenbaum, Mar. 29, 2013, at 227:7–230:18.

[1765] Int. of M. Carpenter, Mar. 4, 2013, at 272:14–274:3.

[1766] Int. of J. Tanenbaum, Mar. 29, 2013, at 227:7–230:18.

[1767] *See* Debtors' Reply Brief Re Iridium Factors In Support Of Motion For Approval Of RMBS Settlement Agreements [Docket No. 2803] at 9. As explained in the First Day Affidavit, after the collapse of the mortgage loan industry in 2007, the Debtors ceased to be an active sponsor of PLS. *See* First Day Affidavit, ¶ 23 n.15.

[1768] *See* First Day Affidavit, ¶ 23 n.15.

[1769] *Id.*

[1770] *Id.*

[1771] Mortgage Contingencies Review with Disclosure Benchmarking, dated July 27, 2011, at 4 [RC40021333].

with applicable laws.[1772] As discussed below, certain RMBS Institutional Investors have asserted claims against various ResCap entities for alleged breaches of such representations and warranties included in the documentation governing the securitization trusts. The alleged breaches relate to the quality of loans contributed by ResCap or its affiliates to the trusts.[1773]

ResCap sought support from certain key creditor constituencies, including the RMBS Institutional Investors, in connection with preparing for its chapter 11 bankruptcy filing.[1774] At the same time, AFI sought support from the RMBS Institutional Investors for a plan of reorganization that would include a Third-Party Release in favor of AFI.[1775]

Prior to filing bankruptcy, the Debtors and AFI negotiated two substantially similar RMBS Trust Settlement Agreements and two substantially similar RMBS Plan Support Agreements with the Steering Committee Group and the Talcott Franklin Group.[1776] The RMBS Trust Settlement Agreements seek to resolve, in exchange for an allowed general unsecured claim of up to $8.7 billion, any alleged and potential representation and warranty claims held by up to 392 securitization trusts in connection with approximately 1.6 million mortgage loans and approximately $221 billion in original issue balance of associated RMBS, comprising all such securities issued by the Debtors' affiliates from 2004 to 2007 (the "Trust R&W Claims").[1777] Pursuant to the RMBS Plan Support Agreements, the RMBS Institutional Investors agreed, among other things, to support a plan that included a Third-Party Release in favor of AFI.[1778] In exchange, AFI agreed to support consummation of the RMBS Trust Settlement Agreements and to make a significant contribution of value to the Debtors pursuant to the AFI Settlement and Plan Sponsor Agreement.[1779]

### b. Scope Of The Investigation Of RMBS Trust Settlement Agreements And RMBS Plan Support Agreements

Consistent with the scope of the Investigation, the Examiner reviewed the process that resulted in the RMBS Trust Settlement Agreements and RMBS Plan Support Agreements, including the activities of the ResCap Board in connection with such agreements, and whether such agreements were negotiated at arm's length. As set forth in the Examiner Scope

---

[1772] *Id.*

[1773] RMBS Trust Settlement Agreements, at 1.

[1774] *See* RMBS Plan Support Agreements, at 2–3; RMBS Trust Settlement Agreements, at 1–2.

[1775] *See* RMBS Plan Support Agreements, at 2–3; RMBS Trust Settlement Agreements, at 2.

[1776] *See* RMBS Plan Support Agreements; RMBS Trust Settlement Agreements.

[1777] *See* Debtors' Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreements [Docket No. 1176] at 1–2; Objection of the Official Committee of Unsecured Creditors to the Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreements [Docket No. 2825]. at 1, 41.

[1778] RMBS Plan Support Agreements, § 3.1(i).

[1779] *See id.* § 4.

Approval Order, the Examiner is not opining on whether the $8.7 billion unsecured claim proposed to be allowed by the RMBS Trust Settlement Agreements falls within the range of reasonableness. In connection with the pending contested motion before the Bankruptcy Court to approve the RMBS Trust Settlement Agreements under Bankruptcy Rule 9019, the parties engaged numerous experts to perform loan re-underwriting analyses and to estimate potential cumulative lifetime loss ranges, among other things, to evaluate the proposed allowed claim amount. The Examiner did not seek to duplicate the work of the parties' experts. Those analyses are, in any event, not within the scope of the Investigation, and it is within the province of the Bankruptcy Court to determine the reasonableness of the settlement amount.

### c.   Initiation Of Discussions With The Steering Committee Group

On October 17, 2011, Kathy Patrick of the firm Gibbs & Bruns LLP—the lead counsel to the Steering Committee Group and the institutional investors in the Countrywide Settlement—sent a letter to William Solomon, General Counsel of AFI, advising him that her firm represented a number of investment advisers and holders of RMBS issued and/or underwritten by AFI and/or its affiliates, which collectively held 25% or more of the voting rights in 242 RMBS trusts issued or underwritten by AFI or one of its affiliates (with an aggregate outstanding balance of more than $51 billion).[1780] According to Patrick's letter, "large numbers of the mortgages securing the certificates held by [the Steering Committee Group] were sold or deposited into the RMBS pools based on false and/or fraudulent representations and warranties by the mortgage originators, sellers and/or depositors,"[1781] and, as a result, AFI and/or its affiliates have "substantial repurchase liability for such loans."[1782]

Patrick alleged that the evidence supporting such Trust R&W Claims included, among other things, (1) excess early default and foreclosure rates in the relevant mortgage pools; (2) an FHFA loan-level analysis, which purportedly showed that up to 49% of the mortgage loans in AFI or ResCap RMBS breached certain representations and warranties; (3) MBIA's loan-level analysis (as reported in MBIA's lawsuits against AFI), which purportedly showed that high numbers of mortgages in the RMBS pools were ineligible at origination;

---

[1780] *See* Letter from K. Patrick to W. Solomon (Oct. 17, 2011) [ALLY_0212896]. Patrick's letter also indicated that the Steering Committee Group collectively held 50% or more of the voting rights in 173 RMBS trusts issued or underwritten by AFI or one of its affiliates (with an aggregate outstanding balance of more than $36 billion). *See id.* at 1. As of February 1, 2013, the Steering Committee Group investors owned at least 25% of the voting rights in 300 of the securitizations issued by the Debtors. *See* Debtors' Reply Brief Re Iridium Factors In Support Of Motion For Approval Of RMBS Settlement Agreements [Docket No. 2803] at 10.

[1781] *See* Letter from K. Patrick to W. Solomon (Oct. 17, 2011), at 1 [ALLY_0212896].

[1782] *Id.* at 3. Patrick explained that her letter was an "advocacy document" that was "basically making the point to Ally: this is your tar baby. And I will find a way to make it your tar baby no matter how much you try to pull it off." Int. of K. Patrick, Mar. 18, 2013, at 41:22–42:5.

(4) downgrades in the credit ratings of the certificates issued by the RMBS trusts; and
(5) AFI's reserve in the amount of $829 million for repurchase liabilities as of June 30,
2011.[1783]

The letter concluded with Patrick's Steering Committee Group requesting a meeting "to begin a constructive dialogue regarding these issues" with "appropriately senior legal and business personnel."[1784]

On October 19, 2011, Solomon forwarded Patrick's letter to, among others, Michael Carpenter, CEO of AFI, Barbara Yastine, CEO and President of Ally Bank, Thomas Marano, CEO of ResCap, and Tammy Hamzehpour, General Counsel of ResCap, and noted that "Patrick represented the claimants in the $8.5 billion settlement with [Bank of America]."[1785] Solomon added that he would meet with the litigation team and Tim Devine, Chief Counsel of Litigation for the consolidated AFI/ResCap legal department,[1786] "to develop a recommend[ed] approach for dealing with this."[1787] In response to Solomon's e-mail, Carpenter suggested that "we should meet" with Patrick "but that it should be with Rescap personnel with no one from [AFI] present."[1788]

After meeting with Devine,[1789] Solomon sent a reply letter to Patrick on October 21, 2011 in which he indicated that "it would be inappropriate [for AFI] to engage [Patrick] on the

---

[1783] *See* Letter from K. Patrick to W. Solomon (Oct. 17, 2011), at 1–2 [ALLY_0212896]. Patrick further alleged that AFI and/or ResCap, "as servicer and/or master servicer of mortgage loans securing the certificates held by [her firm's] clients, has failed to observe and perform the covenants and agreements imposed on it by the governing agreements, and has failed to meet its duty to prudently service those mortgage loans . . . ." *Id.* at 2.

[1784] *Id.* at 4.

[1785] E-mail from W. Solomon (Oct. 19, 2011) [ALLY_0209221].

[1786] Beginning in January 2011 and continuing until early 2012, Devine was the "main lawyer" advising the ResCap Board with respect to RMBS-related legal issues. *See* Int. of T. Devine, Mar. 19, 2013, at 12:3–18:17 (noting that Hamzehpour "was frequently updated and in the loop."); *see also* Minutes of a Special Meeting of the Board of Residential Capital, LLC, Sept. 7, 2011, at RC40018664 [RC40018411] (Devine updated the ResCap Board regarding a lawsuit filed by FHFA relating to the sale of private-label mortgage-backed securities to Freddie Mac); Minutes of a Regular Meeting of the Board of Residential Capital, LLC, July 1, 2011, at RC40018628 [RC40018411] (Devine gave a "detailed presentation" to the ResCap Board regarding PLS investor litigation, representation and warranty litigation, and government subpoenas); Minutes of a Regular Meeting of the Board of Residential Capital, LLC, May 6, 2011, at RC40018459–60 [RC40018411] (showing that Devine gave the ResCap Board an overview of the "mortgage business litigation docket," and noted that the legal staff "meets regularly with senior management to identify and communicate legal risk identified in litigation."). Devine's role in advising the ResCap Board with respect to RMBS-related legal issues appeared to significantly diminish after Morrison & Foerster was re-engaged as ResCap's counsel in August 2011. Indeed, John Mack, who became a ResCap Independent Director in November 2011, testified that he does not know Devine. *See* Dep. of J. Mack, Nov. 14, 2012, at 43:19–21, 126:5–7.

[1787] *See* E-mail from W. Solomon (Oct. 19, 2011) [ALLY_0209221].

[1788] *See* E-mail from M. Carpenter (Oct. 19, 2011) [ALLY_0209221].

[1789] *See* Dep. of T. Devine, Nov. 19, 2012, at 16:5–17:17.

issues" because "[n]one of the transactions [Patrick] described in [her] letter involved [AFI]."[1790] Solomon provided Patrick with contact information for Hamzehpour.[1791]

On October 25, 2011, Patrick responded by letter and indicated that she would forward her October 17, 2011 letter to Hamzehpour, but insisted that AFI, as the ultimate parent and indirect owner of the "parties to the pooling and serving agreements at issue, . . . ultimately bear[s] the liability associated with the repurchase and servicing claims described in [the] October 17 letter."[1792] Solomon forwarded Patrick's October 25, 2012 letter to Carpenter, Yastine, Marano, Devine, and Hamzehpour, among others, and wrote "[t]he issues are beginning to crystallize. I do not intend answering."[1793]

On October 26, 2011, Hamzehpour sent a letter to Patrick and offered dates on which the litigation team could meet with Patrick in ResCap's Minneapolis offices, with no business personnel present (despite Patrick's request for business personnel to attend).[1794] The letter was transmitted on GMAC Mortgage letterhead and signed by Hamzehpour on behalf of GMAC Mortgage in her capacity as general counsel.[1795]

Prior to meeting with Patrick, certain members of the AFI and ResCap consolidated legal team, including Devine, David Hagens, and John Ruckdaschel, discussed possible defenses to the types of claims raised by the Steering Committee Group. In addition to the obvious defense—arguing that certain of the representations and warranties had not been breached—the group considered a "loss causation" defense, but did not attempt to quantify the potential claims or defenses.[1796] The group apparently did not consider a potential statute of limitations defense.[1797]

On November 21, 2011, Hamzehpour, Devine, Ruckdaschel,[1798] and Hagens met with Patrick and certain of her team members at ResCap's offices in Minneapolis to discuss the potential claims held by the Steering Committee Group.[1799] According to Devine, "[t]he

---

[1790] *See* Letter from W. Solomon to K. Patrick (Oct. 21, 2011) [EXAM00185054].

[1791] *See id.*

[1792] *See* Letter from K. Patrick to W. Solomon (Oct. 25, 2011) [EXAM40000700].

[1793] E-mail from W. Solomon (Oct. 26, 2011) [ALLY_PEO_0042786].

[1794] *See* Letter from T. Hamzehpour to K. Patrick (Oct. 26, 2011) [EXAM40000705].

[1795] *See id.* It is not clear why Hamzehpour drafted the letter on behalf of GMAC Mortgage rather than ResCap. *See* Int. of W. Solomon, Mar. 19, 2013, at 92:22–93:9.

[1796] *See* Dep. of J. Ruckdaschel, Nov. 8, 2012, at 34:5–39:4.

[1797] *See id.* at 39:18–20.

[1798] Patrick understood Ruckdaschel's role to be that of the "data person" who understood ResCap's securitization structures. Int. of K. Patrick, Mar. 18, 2013, at 21:9–22:9.

[1799] *See id.* at 17:7–19:8; Int. of T. Devine, Mar. 19, 2013, at 21:21–22:11; Dep. of T. Hamzehpour, Nov. 13, 2012, at 26:17–27:4, 27:8–28:22.

conversation was, from our point of view, a ResCap conversation . . . ."[1800] Devine stated that he told Patrick "from the beginning" that "the contract claims which she purported to have . . . would have been against other contracting counterparties, which were . . . in fact, subsidiaries of the ResCap business."[1801]

When asked if there had been any discussion of the Steering Committee Group's potential claims against AFI, Devine stated that "[t]he meeting was expressly a ResCap meeting. To the extent [that issue] came up, and it may have, I would have said . . . there's no claim. There's no exposure to [AFI]."[1802] Patrick recalled that Devine asked whether the Steering Committee Group could agree to a resolution with ResCap independent of a resolution with AFI and her answer was "of course, but then [AFI] will not get a release as a part of any such deal."[1803]

At the meeting, Patrick rejected the argument that "loss causation" was a viable defense to her clients' claims and noted that the parties could spend "years and years litigating that point."[1804] Hamzehpour understood that Patrick was seeking a settlement negotiation, and recalled that Devine asked Patrick what she would view as a successful outcome.[1805] According to Hamzehpour, Patrick stated that "she would like to arrive at an agreed settlement" and asked for data access "to help refine [the Steering Committee Group's] exposure analysis."[1806] The meeting concluded with a discussion of the specific types of data sought by Patrick and next steps,[1807] which would include entering into confidentiality and tolling agreements with respect to the Steering Committee Group's potential claims.[1808]

---

[1800] Int. of T. Devine, Mar. 19, 2013, at 23:6–12. There is some confusion with respect to who Devine was representing at the November 21, 2011 meeting. Devine testified that he "was there in [his] capacity as chief counsel for litigation for ResCap . . . ." Dep. of T. Devine, Nov. 19, 2012, at 360:15–361:3. Patrick stated that she believed Devine had dual roles at ResCap and AFI, but that Devine "appeared to be . . . acting for ResCap because he talked about . . . ResCap wanting to get a resolution; they may not be able to get one, depending on what [AFI] did or didn't do." Int. of K. Patrick, Mar. 18, 2013, at 17:16–19, 23:9–22. Ruckdaschel testified that, prior to 2012, Devine was the head of litigation for the entire enterprise and it was not clear whether anyone at the meeting with Patrick was representing AFI because "[a]t that time we were still the integrated global legal department." Dep. of J. Ruckdaschel, Nov. 8, 2012, at 31:19–24, 44:10–45:21. Hamzehpour testified that "Devine from [AFI]" attended the meeting. Dep. of T. Hamzehpour, Nov. 13, 2012, at 26:21–27:4.

[1801] Int. of T. Devine, Mar. 19, 2013, at 23:6–25:22.

[1802] *Id*. at 32:6–23.

[1803] Int. of K. Patrick, Mar. 18, 2013, at 23:19–22, 25:23–26:3.

[1804] *See* Dep. of J. Ruckdaschel, Nov. 8, 2012, at 43:16–44:9.

[1805] *See* Dep. of T. Hamzehpour, Nov. 13, 2012, at 29:3–29:21.

[1806] *See id*. at 29:22–30:5.

[1807] *See id*. at 30:6–15.

[1808] *See id*. at 34:17–35:7.

On December 7, 2011, David Sheeren of Gibbs & Bruns LLP sent an e-mail to Hamzehpour attaching a draft confidentiality agreement and a draft tolling agreement.[1809] The AFI/ResCap legal team decided that Devine would act as the primary "interface with Patrick" on behalf of ResCap.[1810] Pursuant to the AFI/ResCap plan for interacting with Patrick,[1811] on December 19, 2011, Devine sent a letter to Patrick seeking confirmation of the identity of her clients.[1812] Later that day, Patrick responded by e-mailing a letter containing a list of the twenty entities that comprised the Steering Committee Group, and requested that AFI promptly execute the proposed confidentiality agreement so that substantive discussions could begin.[1813]

In January 2012, Devine and Gibbs & Bruns LLP negotiated a confidentiality agreement and a tolling agreement.[1814] On January 20, 2012, Devine informed Solomon, Hamzehpour, Hagens, and Ruckdaschel that negotiations regarding the terms of the tolling and forbearance agreements were effectively concluded and "[w]e . . . got everything we needed."[1815] Devine explained that he had demonstrated a "willingness to hear [Patrick] out, but skepticism over their claims and over the vehicle she is proposing for resolution."[1816]

On March 9, 2012, Devine asked Jeff Cancelliere, a ResCap officer, and Todd Kushman of AFI to perform certain calculations regarding "exposure to claims represented by Patrick and Franklin."[1817] In his e-mail, Devine stated that, although Kushman and Cancelliere would be responsible for the quantitative analyses, Devine would remain responsible for "vocaliz[ing] or add[ing] legal limitations and caveats . . . ."[1818] On March 22, 2012, the Steering Committee Group provided a "template" spreadsheet relating to ResCap's RMBS deals and requested that ResCap populate the spreadsheet with GSE demand rates and repurchase rates.[1819]

On April 5, 2012, Devine and Patrick exchanged a short series of e-mails in which Devine stated that progress was being made with respect to the information Patrick had

---

[1809] *See* E-mail from D. Sheeren to T. Hamzehpour (Dec. 7, 2011) [ALLY_0158609].

[1810] *See* Dep. of T. Devine, Nov. 19, 2012, at 43:14–18.

[1811] *See* E-mail from T. Devine (Dec. 15, 2011) [ALLY_PEO_0042503].

[1812] *See* Letter from T. Devine to K. Patrick (Dec. 19, 2011) [ALLY_0158616].

[1813] *See* Letter from K. Patrick to T. Devine (Dec. 19, 2011) [ALLY_0158641].

[1814] *See* E-mails between T. Devine, K. Patrick and D. Sheeren (Jan. 13, 2012) [ALLY_0158753]; E-mails between T. Devine, K. Patrick, S. Humphries, and D. Sheeren (Jan. 20, 2012) [ALLY_0158769]; Dep. of T. Hamzehpour, Nov. 13, 2012, at 37:20–38:11.

[1815] E-mail from T. Devine (Jan. 20, 2012) [EXAM00230900].

[1816] *Id*.

[1817] E-mail from T. Devine (Mar. 9, 2012), at ALLY_0210958–59 [ALLY_0210958].

[1818] *Id*.

[1819] *See* E-mail from D. Sheeren to T. Devine (Mar. 22, 2012) [ALLY_0159888]; Dep. of T. Hamzehpour, Nov. 13, 2012, at 46:15–47:5; Int. of K. Patrick, Mar. 18, 2013, at 26:21–28:12, 49:23–50:19.

requested.[1820] That same day, Patrick requested information concerning AFI and ResCap so that her clients could perform an assessment of capital structure, substantive consolidation, and successor liability issues, and build such "litigation risk" into their discount analysis.[1821] Patrick explained that her clients sought that information for the purpose of analyzing past transactions between AFI and ResCap "to understand whether there were any holes in the fence, so to speak."[1822]

On April 16, 2012, Ruckdaschel returned the template spreadsheet to Patrick "populated with aggregated data."[1823] According to Patrick, the April 16, 2012 spreadsheet did not contain the GSE repurchase data she was looking for.[1824] On April 30, 2012, ResCap provided Patrick with an updated spreadsheet that included the requested GSE repurchase data.[1825]

### d.   Initiation Of Discussions With The Talcott Franklin Group

On November 18, 2011, Talcott Franklin of the firm Talcott Franklin, P.C. sent a letter to Hamzehpour, advising her that his firm represented a number of holders of ownership interests in securitization trusts backed by loans sold or serviced by RFC and/or its affiliates.[1826] Franklin's letter explained that his clients had "serious concerns regarding the manner in which these Trusts have been serviced, including the negative impact certain RFC servicing practices may have had on the borrowers whose loans back our investments."[1827]

---

[1820] *See* E-mail from T. Devine to K. Patrick (Apr. 5, 2012) [ALLY_0143539].

[1821] *See* E-mail from K. Patrick to T. Devine (Apr. 5, 2012) [ALLY_0143539]. On April 16, 2012, at the request of Morrison & Foerster, Devine sent Patrick a draft confidentiality agreement which he explained was in addition to the existing confidentiality agreement and "was drafted to permit the sort of information exchange" Patrick had requested. *See* E-mail from T. Devine to K. Patrick (Apr. 16, 2012) [ALLY_0159943]. The additional confidentiality agreement was executed by Patrick on April 25, 2012. *See* Letter from T. Hamzehpour to K. Patrick (Apr. 25, 2012), at 1, 5 [ALLY_0159971].

[1822] Int. of K. Patrick, Mar. 18, 2013, at 47:20–48:8.

[1823] *See* E-mail from J. Ruckdaschel to K. Patrick (Apr. 16, 2012) [EXAM00191015]. FTI provided additional financial analytical support in connection with the analysis of ResCap's potential RMBS repurchase exposure, analyzing information provided by ResCap and publicly available information. *See* Dep. of M. Renzi, Nov. 7, 2012, 19:9–26:7.

[1824] Int. of K. Patrick, Mar. 18, 2013, at 49:23–50:19.

[1825] *See id.* at 50:21–51:9, 68:15–70:2; E-mail from J. Ruckdaschel (Apr. 30, 2012) [ALLY_0159984]; GSE Repurchase Requests 04-08 Vintage, prepared by ResCap, dated Apr. 30, 2012 [ALLY_0159987] (attached to E-mail from J. Ruckdaschel (Apr. 30, 2012) [ALLY_0159984]).

[1826] *See* Letter from T. Franklin to T. Hamzehpour (Nov. 18, 2011) [EXAM00215992]. According to the Debtors' court filings, as of February 1, 2013, the Talcott Franklin Group investors owned at least 25% of the voting rights in 31 of the securitizations issued by the Debtors. *See* Debtors' Reply Brief Re Iridium Factors In Support Of Motion For Approval Of RMBS Settlement Agreements [Docket No. 2803] at 10; *see also* Letter from T. Franklin to T. Hamzehpour (Nov. 18, 2011) [EXAM00215992].

[1827] *See* Letter from T. Franklin to T. Hamzehpour (Nov. 18, 2011) [EXAM00215992].

After negotiating the terms of a tolling agreement with respect to the claims of Franklin's clients in December 2011,[1828] Devine proposed to hold an in-person meeting to discuss those claims.[1829] The parties ultimately agreed to meet at ResCap's Minneapolis offices in early February 2012.[1830] The meeting was subsequently rescheduled for February 28, 2012.[1831]

Internally at ResCap and AFI, Devine took a leading role in addressing the claims of the Talcott Franklin Group,[1832] and indeed proposed the strategy for the February 28, 2012 meeting.[1833] Specifically, Devine suggested that ResCap and AFI "use" the meeting to "smoke them out regarding the extent to which [Franklin's firm would be] prepared to act across their various representations."[1834]

On February 28, 2012, Hamzehpour, Hagens, and Ruckdaschel met with Franklin at ResCap's offices in Minneapolis.[1835] At that meeting, Franklin discussed who his clients were, what he believed their claims to be, and then proposed a general strategy for resolving those claims.[1836] The settlement structure proposed by Franklin—which bore no resemblance to the structure ultimately adopted in the RMBS Trust Settlement Agreements—would have involved ResCap (or affiliated entities) repurchasing bonds from the Talcott Franklin Group, packaging those bonds with additional collateral and then re-securitizing those bonds back to the Talcott Franklin Group.[1837] The meeting was concluded in much the same manner as the initial meeting held between ResCap/AFI and Patrick, with promises that, among other things, Franklin would provide additional information and evidence as to his clients' holdings.[1838]

---

[1828] *See* E-mails between T. Devine and T. Franklin (Dec. 23, 2011) [ALLY_0142715].

[1829] E-mail from T. Devine to T. Franklin (Jan. 6, 2012) [ALLY_0142715].

[1830] *See* E-mails between L. Rosten and T. Franklin (Jan. 9–12, 2012) [ALLY_0142721]; Dep. of T. Devine, Nov. 19, 2012, at 54:23–57:2.

[1831] *See* E-mail from J. Phelps to T. Devine (Feb. 23, 2012), at ALLY_0209507 [ALLY_0209505]; E-mail from T. Devine (Feb. 23, 2012), at ALLY_0209506 [ALLY_0209505] (noting "we pushed them off at last minute on Feb 2 meeting").

[1832] *See* Dep. of T. Hamzehpour, Nov. 13, 2012, at 38:12–15; Dep. of T. Devine, Nov. 19, 2012, at 53:25–54:9.

[1833] *See* E-mail from T. Devine (Feb. 23, 2012), at ALLY_0209506 [ALLY_0209505].

[1834] *See id.* Additionally, Devine suggested that they "pre-set" Franklin's expectations, such that ResCap and AFI would not be expected to respond or react during the meeting. Devine believed that the meeting would be an opportunity for ResCap and AFI to develop information about Franklin's clients without having to provide information in return. Devine did, however, expect to face demands for information regarding insurance coverage and other facets of ResCap or AFI's business. *See id.*

[1835] *See* Dep. of T. Hamzehpour, Nov. 13, 2012, at 42:9–43:16. According to Hamzehpour, Devine did not attend the meeting with Franklin in Minneapolis. *Id.* at 43:17–43:19.

[1836] *See id.* at 43:20–44:13.

[1837] *See id.* at 44:2–13. Hamzehpour stated that she asked some questions about how Franklin's proposed settlement could be implemented. *See id.* at 44:19–45:2. The Examiner has uncovered no evidence to show that Franklin's structure was ever seriously considered by ResCap or AFI.

[1838] *See id.* at 45:3–12.

### e. Negotiations Resulting In The RMBS Trust Settlement Agreements And RMBS Plan Support Agreements

Although ResCap had initial discussions with both the Steering Committee Group and the Talcott Franklin Group, ResCap primarily negotiated the terms of the RMBS Trust Settlement Agreements (and the allowed amount of the Trust R&W Claims) with the Steering Committee Group. As Gary Lee of Morrison & Foerster explained:

> [P]ractically, they have very different footprints across the trusts. . . . Patrick had a far greater concentration within the trusts. So, if you're talking about why one would negotiate with her as opposed to him, I mean, she fundamentally, in a bankruptcy, would have significant control over . . . your ability to sell a business. . . . [H]er group, because they control the trust to a sufficient extent, could kill a sale, full stop. . . . And that wasn't true for Talcott Franklin . . . .[1839]

Before the substantive negotiations on the RMBS Trust Settlement Agreements began, ResCap and AFI conducted analyses attempting to estimate the total potential Trust R&W Claims. In an April 5, 2012 presentation to the ResCap Board, FTI estimated the Trust R&W Claims to be approximately $6.1 billion.[1840] According to Mark Renzi of FTI, the April 5, 2012 estimate may have been a "placeholder" while further analysis was ongoing.[1841] As of April 19, 2012, based on an analysis of estimated total losses and a range of defect rates from 10% to 20%, FTI estimated the potential Trust R&W Claims to range from $4.4 billion to $8.8 billion, with a midpoint of $6.6 billion.[1842]

While there may have been confusion regarding Devine's role at the November 21, 2011 meeting (as discussed above), by mid-April 2012, Devine was representing AFI only in connection with RMBS settlement negotiations. In Devine's words, the negotiations with the Steering Committee Group were "about a potential bankruptcy deal, and people knew I wasn't representing ResCap in connection with the bankruptcy."[1843] Ruckdaschel, at his deposition, testified repeatedly that he understood Devine to be representing AFI in the RMBS settlement discussions in April and May 2012.[1844] According to Patrick, by April 25, 2012, Devine "was always talking for [AFI] and [Lee] was always talking for ResCap. And [Devine] was not

---

[1839] Int. of G. Lee, Feb. 20, 2013, at 151:23–153:3.

[1840] *See* Draft FTI Presentation to the Board of Residential Capital, LLC, dated Apr. 5, 2012, at 3–5 [EXAM00176483].

[1841] Dep. of M. Renzi, Nov. 7, 2012, at 31:3–19.

[1842] Draft FTI Litigation Claims Presentation, dated Apr. 19, 2012, at 4–5 [EXAM00176361].

[1843] Int. of T. Devine, Mar. 19, 2013, at 47:6–19; *see also* Dep. of T. Devine, Nov. 19, 2012, at 126:16–24 ("But clearly by that point I would have been participating in attorney-client discussions with the [AFI] client with regard to the Kathy Patrick discussions.").

[1844] Dep. of J. Ruckdaschel, Nov. 8, 2012, at 66:21–67:4, 110:10–20, 142:5–11.

talking for ResCap. And [Lee] made clear to me at various points that ResCap was willing to do things that [AFI] did not want them to do."[1845] Regardless, Devine remained a central figure in the negotiations. At his deposition, Devine explained his role as "driving a deal to conclusion" between ResCap, the RMBS Institutional Investors, and AFI.[1846]

On April 17, 2012, Devine e-mailed Lee and Hamzehpour and described for Hamzehpour a "very constructive" conversation he had the previous day with Lee.[1847] In the e-mail, Devine recommended that the next step in negotiations with Patrick should focus on "the structure of the proposed outcomes, the potential for a substantial contribution from AFI, fragility of the goal but clarity of purpose for comprehensive third-party releases, etc."[1848] Hamzehpour understood Devine's statement to mean that a Third-Party Release in favor of AFI would "be required in order to achieve a substantial contribution from AFI."[1849] Devine explained that "fragility of the process" was a reference to the fragility of selling the ResCap business as a going concern, which required support from AFI.[1850] According to Lee, notwithstanding Devine's e-mail, there was no "clarity of purpose" for a comprehensive Third-Party Release.[1851] Instead, as Lee explained, ResCap "care[s] about the releases only insofar as it's a vehicle to get what we think is the best deal we can from AFI."[1852]

On April 19, 2012, Devine arranged a meeting with the Steering Committee Group for April 25, 2012 and contacted Lee and Hamzehpour to confirm their availability.[1853] In preparation for the meeting, FTI was directed by Morrison & Foerster to prepare a hypothetical waterfall analysis presentation.[1854]

On April 23, 2012, Devine sent Hamzehpour an e-mail setting out his proposed strategy for the upcoming meeting with Patrick. Devine suggested that the presentation to Patrick include assumptions of $3 billion, $4 billion, and $6 billion (rather than $4 billion, $5 billion, and $6 billion) as the potential low, medium, and high amounts at which the Trust R&W

---

[1845] Int. of K. Patrick, Mar. 18, 2013, at 140:14–141:20.

[1846] Dep. of T. Devine, Nov. 19, 2012, at 248:4–249:4.

[1847] E-mail from T. Devine to G. Lee and T. Hamzehpour (Apr. 17, 2012) [EXAM00345280].

[1848] *Id*.

[1849] Dep. of T. Hamzehpour, Nov. 13, 2012, at 50:3–17.

[1850] *See* Int. of T. Devine, Mar. 19, 2013, at 82:23–83:24 ("[Patrick] was taking advantage of the fact that . . . [AFI] would put money in on the front end and would provide the indispensable support that only [AFI] could provide to sell the assets as a going concern. . . . And that's what . . . the fragility of the process to my mind was . . . is this going to sell as something rather historic a going concern of this fifth largest mortgage servicer in the country or not?").

[1851] Int. of G. Lee, Feb. 20, 2013, at 288:22–25.

[1852] *Id*. at 288:26–289:18.

[1853] E-mail from T. Devine to T. Hamzehpour and G. Lee (Apr. 19, 2012) [EXAM00180025].

[1854] *See* Dep. of M. Renzi, Nov. 7, 2012, at 36:13–37:7, 69:3–22.

Claims might be allowed in a ResCap bankruptcy.[1855] According to Devine, the goal was not to convince Patrick that such a range was correct (indeed, he noted that Patrick would likely dispute the range as "unrealistically low"), but rather to make Patrick aware that "ratcheting up those ranges leads automatically to lower percentage recoveries, by simple math in light of [the] fact that there will only be X or Y real dollars available."[1856] Such a message, Devine believed, would clearly tell Patrick to "get on board."[1857] Hamzehpour responded by indicating that it would be acceptable not to raise Patrick's expectation, so long as the projections provided to Patrick had a sound basis in the analytics.[1858] In any event, Devine's proposed changes were probably irrelevant, as Patrick focused only on the "high" scenario assumptions.[1859]

As planned, various ResCap and AFI representatives met with Patrick and her team on April 25, 2012 at Morrison & Foerster's New York office.[1860] According to Patrick, the principal purpose of the meeting was *not* to negotiate "the price of the repurchase settlement," but rather to discuss the structure of the proposed sale of the ResCap servicing platform.[1861]

---

[1855] *See* E-mail from T. Devine to T. Hamzehpour (Apr. 23, 2012) [EXAM00345835]; Dep. of T. Devine, Nov. 19, 2012, at 85:19–87:20. When asked why he proposed lowering the claim assumptions if he was not representing ResCap at the time, Devine explained, "I wasn't representing ResCap in connection with the development of these plans. I was still representing ResCap with regard to the defense of the litigation. And so to me, as sort of a subject matter expert with regard to ResCap's actual litigation exposure, I was saying those numbers don't look right to me." Int. of T. Devine, Mar. 19, 2013, at 42:4–16.

[1856] *See* E-mail from T. Devine to T. Hamzehpour (Apr. 23, 2012) [EXAM00345835].

[1857] *See id.*

[1858] *See* E-mail from T. Hamzehpour to T. Devine (Apr. 23, 2012) [EXAM00345835]. Indeed, the "high" claim scenario presented to the Steering Committee Group was near the midpoint of FTI's analysis. *See* Draft FTI Litigation Claims Presentation, dated Apr. 19, 2012, at 4–5 [EXAM00176361]. The range of potential claim amounts included in the April 25, 2012 presentation, while being deemed "reasonable for the purposes of negotiating," were not necessarily reflective of ResCap's opinion of the potential liability. *See* Dep. of M. Renzi, Nov. 7, 2012, at 74:16–75:2. At a minimum, ResCap "recognized that the [potential RMBS liability] was likely going to be higher than what was on the books and records of the company." *See id.* at 62:20–23.

[1859] Int. of K. Patrick, Mar. 18, 2013, at 101:17–102:8.

[1860] *See* Dep. of T. Hamzehpour, Nov. 13, 2012, at 57:25–59:15; Int. of K. Patrick, Mar. 18, 2013, at 75:14–22. ResCap's representatives included, among others, Hamzehpour, Renzi, Ruckdaschel, Lee, and Puntus. AFI's representatives included Devine and two attorneys from Kirkland & Ellis, Rick Cieri and Ray Schrock. *See* Dep. of T. Hamzehpour, Nov. 13, 2012, at 57:25–59:15; Int. of K. Patrick, Mar. 18, 2013, at 75:14–22.

[1861] Int. of K. Patrick, Mar. 18, 2013, at 78:25–80:25. Patrick explained that her clients had a "high degree of concern about the potential buyers for the servicing. And they wanted to be sure that the servicing would not be dumped out for dollars in derogation of servicing performance. . . . [P]eople treat this 9019 settlement as a repurchase settlement, but it was balled up . . . in a significant way with our willingness to consent to the sale of the servicing platform unobstructed." *Id.* According to Patrick, Puntus, Nashelsky and Hamzehpour participated in the conversation regarding the servicing sale. *See id.* at 80:9–25. Puntus explained that Centerview's role was to describe what ResCap was seeking to accomplish through an elegant bankruptcy filing and how it proposed to implement the process. *See* Dep. of M. Puntus, Nov. 5, 2012, at 54:8–18. Hamzehpour testified that she led a brief discussion regarding servicing standards. *See* Dep. of T. Hamzehpour, Nov. 13, 2012, at 59:22–60:9.

When ResCap presented its position on the exposure to Trust R&W Claims, Lee walked through the waterfall and "how they had approached sizing the potential claims."[1862] As Devine had suggested, the final presentation used at the meeting reflected $3 billion (low), $4 billion (middle), and $6 billion (high) valuations for the allowed amount of the Trust R&W Claims.[1863] Patrick recalled stating at the meeting that $6 billion "was not enough . . . to settle the case."[1864] She added, "I think I said I was closer to 11 or 11 and a half or 12 [billion]."[1865]

The April 25, 2012 waterfall presentation also reflected Devine's suggestion of $750 million, rather than $1 billion, as the highest settlement contribution from AFI.[1866] Devine participated in the portion of the meeting related to "the waterfall and the ranges of recoveries, losses, et cetera, that were the topic of the discussion around the settlement,"[1867] and took that opportunity to inform Patrick that AFI would support a settlement on an allowed claim but AFI would seek support from the Steering Committee Group for the Third-Party Release.[1868] Patrick recalled that Rick Cieri of Kirkland & Ellis stated that AFI viewed the settlement process as "extortion."[1869] According to Patrick, she responded as follows:

> I said, "Well, I have a different view." . . . "My view is, it's just a question of how much you want your IPO because you don't have to settle with me. I'll settle with ResCap. We'll . . . get this done in the bankruptcy and you and I can go in down the road. So I don't view these as related, so don't feel like you have to if you don't like the price."[1870]

---

[1862] Int. of K. Patrick, Mar. 18, 2013, at 78:6–141:14.

[1863] *See* Centerview and FTI Discussion Materials Presentation, dated Apr. 25, 2012, at 7–11 [EXAM00176409]; Dep. of T. Hamzehpour, Nov. 13, 2012, at 58:7–11. Renzi, who was responsible for portions of the presentation, agreed that Devine was involved in determining "what range to present for these negotiations," but rejected the assertion that he simply did as instructed by Devine. *See* Dep. of M. Renzi, Nov. 7, 2012, at 96:7–25, 99:6–101:4.

[1864] Int. of K. Patrick, Mar. 18, 2013, at 94:9–95:19.

[1865] *Id*. Patrick noted that the Apr. 25, 2012 meeting was not a negotiation session on the amount of the Trust R&W Claims, but that she nevertheless provided her "reactions" to the proposed allowed claim amount. *See id*.

[1866] *See* Centerview and FTI Discussion Materials Presentation, dated Apr. 25, 2012, at 7–11 [EXAM00176409]. For a discussion of the implications of Devine's e-mail in connection with the negotiations of the AFI Settlement and Plan Sponsor Agreement, see Section III.J.3.d.

[1867] Dep. of T. Hamzehpour, Nov. 13, 2012, at 60:14–25.

[1868] *See* Dep. of T. Devine, Nov. 19, 2012, at 98:5–99:2.

[1869] Int. of K. Patrick, Mar. 18, 2013, at 81:2–12.

[1870] *Id*. at 81:13–24. Patrick noted that she ultimately concluded that the AFI contribution was "quite satisfactory given what we understood the liabilities and how we assessed them." *Id*. at 81:25–82:10.

Hamzehpour understood that AFI was "negotiating [the settlement] to the extent that if they were making a contribution to ResCap in a settlement separately, they wanted Third-Party Releases from [Patrick]. So the two things were related to each other somewhat."[1871]

Exhibit III.J.4.e—1 below reflects the estimated recovery to holders of Trust R&W Claims—assuming a $6 billion claim amount, a $750 million cash contribution from AFI, and an 85% allocation of AFI's cash contribution to creditors of GMAC Mortgage and RFC—as presented to the Steering Committee Group on April 25, 2012.[1872]

EXHIBIT III.J.4.e—1
**Projected RMBS Claim Recovery**
April 25, 2012
*($ in Millions)*

| | | | April 25, 2012 Presentation $750M AFI Settlement | | |
| --- | --- | --- | --- | --- | --- |
| **RMBS Claims** | | Total Claim | | $ Recovery | % Recovery |
| R&W claims | $ | 1,080 | $ | 424 | 39% |
| PLS claims | | 4,920 | | 568 | 12% |
| Total RMBS Claims | $ | 6,000 | $ | 992 | 17% |
| **Allocation of AFI settlement to RFC and GMAC Mortgage general unsecured claims** | | | | | |
| Distributable value from AFI settlement | | | | $ | 750 |
| Recovery to RFC/GMACM from AFI settlement | | | | | 639 |
| % of settlement distributable value | | | | | 85% |

*Source: Centerview and FTI Discussion Materials Presentation, dated Apr. 25, 2012, at 10 [EXAM00176409].*

On April 27, 2012, Devine spoke with Patrick to discuss "next steps."[1873] Devine then sent an e-mail to Solomon, Hamzehpour, Lee, Ruckdaschel, and AFI's outside counsel at Kirkland & Ellis providing an update on the conversation with Patrick.[1874] According to Devine, Patrick had presented the "'input' dollars as [ResCap and AFI] had presented" to the Steering Committee Group, and the Steering Committee Group investors had authorized Patrick to continue working

---

[1871] Dep. of T. Hamzehpour, Nov. 13, 2012, at 67:24–68:7. Devine reiterated the necessity of Third-Party Releases to Patrick in an e-mail on May 12, 2012, noting that Patrick's support for Third-Party Releases was a "drop dead"—meaning non-negotiable—issue that AFI would insist on. *See* E-mail from T. Devine (May 12, 2012) [EXAM00345296]; Dep. of T. Devine, Nov. 19, 2012, at 281:12–282:8.

[1872] *See* Centerview and FTI Discussion Materials Presentation, dated Apr. 25, 2012, at 7–11 [EXAM00176409].

[1873] *See* E-mail from T. Devine to K. Patrick (Apr. 27, 2012) [EXAM00345814]. When asked why Patrick was communicating "next steps" directly with him (after he had made clear he was representing AFI only), Devine stated, "I think it was just force of habit that we had an easy, professional, clear working relationship and [Patrick] was relaying questions to me . . . ." Int. of T. Devine, Mar. 19, 2013, at 56:9–58:13. Devine explained that he distributed Patrick's inquiries and messages to the appropriate parties at ResCap, Morrison & Foerster, AFI, or Kirkland & Ellis, or some combination thereof. *See id.*

[1874] *See* E-mail from T. Devine (Apr. 27, 2012) [EXAM00345814].

with ResCap and AFI towards resolving their claims.[1875] He continued by noting that Patrick intended to send follow up questions from her clients and that he would "forward them to all on this e-mail so we can have both teams collaborate in drafting responses, ensuring alignment at every step."[1876] Devine concluded by noting that "[t]his has been an exemplary team effort, with expert support from both 'sides.'"[1877]

On May 1, 2012, Devine e-mailed the rest of the AFI/ResCap team, informing them that Patrick was ready for them to present directly to the steering committee of her group of investors via a web meeting.[1878] He then followed up with the team, stating that the meeting was set for May 3, 2012, and the "[o]nly presentation material will be the waterfall deck."[1879] According to Patrick, the May 3, 2012 meeting was "not a negotiation session, it was just a presentation to my steering committee, so they had the same universe of information . . . about the proposed structure . . . ."[1880] The waterfall presentation given to the Steering Committee Group on May 3, 2012 included the same scenarios as the waterfall presentation given to Patrick and her colleagues on April 25, 2012.[1881]

On May 4, 2012, Lee sent an e-mail to Devine and Hamzehpour regarding a series of meetings and calls with Patrick. According to Lee, Patrick proposed the following:

> 1. ResCap and the [Steering Committee Group] will settle all claims (including servicing and contract claims) other than securities claims (which she does not control).
>
> 2. The settlement will be effectuated through a motion under Rule 9019 . . . .
>
> 3. In exchange, ResCap will give the [Steering Committee Group] an allowed claim that will be characterised as a cure payment (ie to cure loan repurchase and service defects).
>
> 4. The [Steering Committee Group] will enter into a plan support agreement which would support the DIP, sale, sale process, servicing, shared services and plan releases provided that [AFI] contributes no less than $x in cash.

---

[1875] *Id.*

[1876] *Id.*

[1877] *Id.*

[1878] *See* E-mail from T. Devine (May 1, 2012) [EXAM00345816].

[1879] *Id.* Devine was responsible for coordinating this web meeting with Patrick. *See* Dep. of T. Hamzehpour, Nov. 13, 2012, at 67:9–13.

[1880] Int. of K. Patrick, Mar. 18, 2013, at 129:16–132:1.

[1881] *Compare* Centerview and FTI Discussion Materials Presentation, dated Apr. 25, 2012 [EXAM00176409], *with* Centerview and FTI Discussion Materials Presentation, dated May 3, 2012 [EXAM00178949].

> 5. [Patrick] also intimated a willingness to do a back-stop deal
> with [AFI] in the event the plan fails (ie only a sale occurs and
> the releases fail). In other words she is willing to agree [to] a
> deal with [AFI] even if the third party releases-settlement
> through a plan fail.[1882]

Devine responded by e-mail stating, "[o]ur notes match. This is very good new[s]."[1883]

According to Devine, at this juncture, Patrick was not demanding a certain amount of contribution from AFI to enter into the proposed settlement.[1884] Rather, Patrick "understood that the negotiation of a dollar number between AFI and ResCap was going on separately from the discussions over the RMBS settlement."[1885] Patrick explained that the "X dollars" represented her desire to "get more" money from AFI.[1886] Devine also noted that, by early May 2012, Lee was "having a variety of conversations with Kathy Patrick . . . some of which [Devine] would have been included on and some of which [he was not] included on."[1887]

On May 6, 2012, Devine e-mailed Renzi and expressed an urgent need for him to revise FTI's waterfall analysis.[1888] Devine then spoke with Patrick and sent a follow-up e-mail to Renzi explaining, "[i]t is ver[y] important for [Patrick] to have the waterfall . . . reflect the attribution over to GMACM we have discussed. . . . She will be in much better position to deliver for us if I can give the revised waterfalls, below, to her by bedtime tonight."[1889]

On the morning of May 7, 2012, Devine sent an e-mail to Patrick stating that, based on "preliminary runs" of the waterfall analysis using all of the assumptions and caveats that the two had discussed, holders of Trust R&W Claims "across the entire run of all the trusts would

---

[1882] *See* E-mail from G. Lee to T. Devine and T. Hamzehpour (May 4, 2012) [EXAM00191506].

[1883] *See* E-mail from T. Devine to G. Lee and T. Hamzehpour (May 4, 2012) [EXAM00191506].

[1884] *See* Dep. of T. Devine, Nov. 19, 2012, at 142:18–20.

[1885] *Id.* at 143:10–14.

[1886] Int. of K. Patrick, Mar. 18, 2013, at 138:15–139:2 ("I tried up until the last to get more. I couldn't get any more.").

[1887] *See* Dep. of T. Devine, Nov. 19, 2012, at 138:10–16.

[1888] *See* E-mail from T. Devine M. to Renzi and J. Cancelliere (May 6, 2012) [EXAM00345833]. Devine did not recall who asked him to have these waterfalls prepared. *See* Dep. of T. Devine, Nov. 19, 2012, at 167:7–169:10.

[1889] *See* E-mail from T. Devine to M. Renzi and J. Cancelliere (May 6, 2012) [EXAM00345833]. The "attribution over to GMACM" appears to refer to an allocation of some recovery to PLS claims asserted against GMAC Mortgage. In waterfall analyses prior to May 7, 2012, no such claims were assumed to be asserted against GMAC Mortgage. *Compare* Centerview and FTI Discussion Materials Presentation, dated Apr. 25, 2012, at 8–10 [EXAM00176409], *with* Centerview and FTI Discussion Materials Presentation, dated May 7, 2012, at 8 [EXAM00176519]. Patrick explained, "we had to have the right number and the number had to be allocated to all of the trusts, not just to some of the trusts because all of the trusts were being asked to give a release. . . . [E]very trust that's going to give a release gets value." Int. of K. Patrick, Mar. 18, 2013, at 162:17–164:3.

*take at above the threshold you had mentioned to me of a billion*."[1890] As Patrick explained, "we wanted at least a billion dollars to flow to these trusts if we were going to support this deal."[1891]

During the evening of May 7, 2012, Lee and Patrick had "several calls" discussing the possible allowed claim amount.[1892] Shortly before 9:00 p.m., Patrick e-mailed Lee and wrote:

> [T]he number you suggested is a problem. At a defect rate of 22[%], the stated claim is 10.0 billion. That insulates the settlement substantially from objectors because it is certainly within the realm of reason. I can deliver a deal at 10 [billion]. Please get your last and best.[1893]

About ten minutes after receiving Patrick's e-mail, Lee e-mailed Devine, Hamzehpour, Renzi, and Cancelliere, among others, and reported Patrick's counter.[1894] Lee explained, "[Patrick's] view is that she can get her clients there, its within industry benchmark etc. . . . She thinks this number allows her to dis-arm other rmbs holders as this ties to other rmbs defect rates."[1895] Lee asked Renzi to run a waterfall analysis incorporating new assumptions, including a $10 billion total claim, "in addition to the other model you are doing for [Patrick]."[1896]

In response, Devine tried to convince his colleagues at ResCap and AFI (and their advisors) that they could potentially "pick away" at the $10 billion by "pursuad[ing] [Patrick's] team that they are using the wrong severities etc. . . ."[1897] Devine also raised concerns that stipulating to a $10 billion allowed claim would create "securities/SEC/ disclosure risk"[1898] because AFI had publicly disclosed on April 27, 2012 that "ResCap's

---

[1890] *See* E-mail from T. Devine to K. Patrick (May 7, 2012) [ALLY_PEO_0028927] (emphasis added).

[1891] Int. of K. Patrick, Mar. 18, 2013, at 162:3–163:8.

[1892] *See* E-mail from G. Lee (May 7, 2012) [EXAM00345282]. Patrick also spoke with Devine on the evening of May 7, 2012. *See* E-mails between K. Patrick and T. Devine (May 7, 2012), at EXAM00180194 [EXAM00180193].

[1893] E-mail from K. Patrick to G. Lee (May 7, 2012) [EXAM00180187].

[1894] *See* E-mail from G. Lee (May 7, 2012) [EXAM00345282].

[1895] *Id.*

[1896] *Id.*

[1897] *See* E-mail from T. Devine (May 7, 2012) [EXAM00345282].

[1898] *Id.*

reasonably possible losses over time related to the litigation matters and potential repurchase obligations . . . could be between $0 and $4 billion over existing accruals."[1899] Devine noted:

> If we want to prove we're correct at something less than 4 billion let's just skip the filing and try the cases. If [Patrick] can't make a deal with us at a stipulated valuation at 10 [billion], she will file proofs of claim which would equate to valuation at 40 billion.[1900]

At around 11:00 p.m., after additional discussions with Patrick, Lee e-mailed Devine and Hamzehpour and noted he was "getting a signal [Patrick] may go a little lower [than $10 billion] but not much."[1901]

Shortly after midnight on May 8, 2012, Renzi distributed two revised waterfall presentations to Lee and Devine, among others.[1902] The first presentation was meant for distribution to Patrick and showed scenarios with $3.5 billion (low), $4.7 billion (middle), and $7.1 billion (high) for the allowed amount of the Trust R&W Claims.[1903] The second presentation, meant for "internal" use only, contained alternate recovery scenarios assuming $4 billion (low), $6 billion (middle), and $10 billion (high).[1904] In addition, the revised waterfall analyses assumed that approximately 90% of AFI's settlement contribution would be allocated to creditors of GMAC Mortgage and RFC, with the remaining 10% allocated to creditors of ResCap LLC (a change from the 85%/15% allocation assumption in the April 25, 2012 and May 3, 2012 waterfalls).[1905]

The most significant driver of funds to holders of Trust R&W Claims was AFI's cash contribution. In the scenarios distributed to Patrick, the estimated total recovery to holders of Trust R&W Claims ranged from $494 million to $624 million if AFI did not contribute any cash

---

[1899] *See* Ally Financial Inc., Quarterly Report (Form 10-Q) (Apr. 27, 2012), at 73. Notwithstanding Devine's insistence in the e-mail that he "need[ed] an answer" regarding "SEC/disclosure risk . . . in comparison to the risk that we'll blow the chance to get third party releases," *see* E-mail from T. Devine (May 7, 2012) [EXAM00345282], Devine testified that the question was purely rhetorical and that he "knew that the answer was no risk." *See* Dep. of T. Devine, Nov. 19, 2012, at 201:24–25.

[1900] E-mail from T. Devine (May 7, 2012) [EXAM00345282].

[1901] E-mail from G. Lee (May 7, 2012) [EXAM00345241].

[1902] *See* E-mails from M. Renzi to G. Lee and T. Devine (May 8, 2012) [EXAM00176430].

[1903] *See* Centerview and FTI Discussion Materials Presentation, dated May 7, 2012, at 7–9 [EXAM00176421] (attached to E-mail from M. Renzi to G. Lee and T. Devine (May 8, 2012) [EXAM00176420]). The "high" allowed claim amount of approximately $7.1 billion appears to reflect ResCap's negotiating position at the time. *See* Dep. of M. Renzi, Nov. 7, 2012, at 139:4–143:5; Int. of K. Patrick, Mar. 18, 2013, at 164:7–165:2.

[1904] *See* Centerview and FTI Discussion Materials Presentation, dated May 7, 2012, at 10–12 [EXAM00176431] (attached to E-mail from M. Renzi to G. Lee and T. Devine (May 8, 2012) [EXAM00176430]).

[1905] *Compare* Centerview and FTI Discussion Materials Presentation, dated May 7, 2012, at 8 [EXAM00176519], *with* Centerview and FTI Discussion Materials Presentation, dated Apr. 25, 2012, at 10 [EXAM00176409].

to the Estates (depending on the allowed claim amount), compared to a range of $961 million to $1.19 billion if AFI contributed $750 million.[1906] Assuming the "high" allowed claim amount of approximately $7.1 billion and a $750 million AFI cash contribution allocated 90% to creditors of GMAC Mortgage and RFC, the total recovery to holders of Trust R&W Claims was calculated to be approximately $1.19 billion.[1907]

EXHIBIT III.J.4.e—2
**Projected RMBS Claim Recovery**
May 7, 2012
*($ in Millions)*

| | | May 7, 2012 Presentation $750M AFI Settlement | | |
| --- | --- | --- | --- | --- |
| **RMBS Claims** | | Total Claim | $ Recovery | % Recovery |
| R&W claims | $ | 2,160 | $ 611 | 28% |
| PLS claims | | 4,920 | 579 | 12% |
| Total RMBS Claims | $ | 7,080 | $ 1,190 | 17% |

**Allocation of AFI settlement to RFC and GMAC Mortgage general unsecured claims**

| | | |
| --- | --- | --- |
| Distributable value from AFI settlement | $ | 750 |
| Recovery to RFC/GMACM from AFI settlement | | 671 |
| % of settlement distributable value | | 90% |

*Source: Centerview and FTI Discussion Materials Presentation, dated May 7, 2012, at 8 [EXAM00176519].*

That same evening, Devine e-mailed Patrick after midnight and wrote:

> I'm getting lots of pressure on valuation now. [Bank of America's settlement of $]8.5 billion represents 14[%] defect rate, correct? Everything we know about our product—from origination through pooling through reps and diligence through[] servicing—makes our folks believe we are better (lower) than Countrywide by a large margin. I am being asked to explain how we could agree to a defect rate 150[%] of Countrywide's.[1908]

Devine explained that the "pressure on valuation" meant pressure from AFI to reduce the implied defect rate of the claim settlement.[1909] Patrick responded by indicating that while Bank of America *argued* that their defect rate was 14%, the parties ultimately settled using a 36% defect rate, which was then discounted for risk concerning Bank of America's liability for

---

[1906] *See* Centerview and FTI Discussion Materials Presentation, dated May 7, 2012, at 9 [EXAM00176519].

[1907] *See id.*

[1908] E-mail from T. Devine to K. Patrick (May 8, 2012), at EXAM00180194 [EXAM00180193].

[1909] Int. of T. Devine, Mar. 19, 2013, at 120:8–122:9.

Countrywide's actions.[1910] Patrick explained that in the Bank of America settlement, "the CLAIM size was $32 billion against them, and we settled for $8.5 billion."[1911] In the ResCap settlement, Patrick analogized, the claim size would be $10 billion (subsequently negotiated to $8.7 billion) and the "[s]ettlement" would be "whatever is distributed" in the ResCap bankruptcy case.[1912] Devine forwarded that analysis, with a brief explanation of his own, to Lee and Cieri, among others.[1913]

On the morning of May 8, 2012, Lee e-mailed Patrick and asked her to send him Countrywide Settlement-related documents "to show apples to apples on this deal."[1914] Patrick agreed to send a spreadsheet to Lee, who requested that Patrick speak with Cancelliere to explain the data.[1915] The spreadsheet showed, among other things, a "BOA" scenario with 36% breach rate and 40% success rate—a combined rate of 14.4%—applied to estimated losses of $107.8 billion, which resulted in a claim of approximately $15.5 billion.[1916]

Later that morning, e-mails between Lee and Devine suggest that Lee would have been willing to settle the allowed amount of the Trust R&W Claims at or near Patrick's demand of $10 billion, whereas Devine continued to press for a "lower" dollar number, suggesting $8 billion as a possible stipulated allowed claim.[1917] Lee responded to Devine and wrote that Patrick's proposal (then at $10 billion) was "lower than we thought we would end up with. [Patrick] is taking the discount already because its [bankruptcy] dollars not [Bank of America] dollars."[1918] But Devine continued to pressure his colleagues and suggested a further

---

[1910] *See* E-mail from K. Patrick to T. Devine (May 8, 2012), at EXAM00180193–94 [EXAM00180193].

[1911] *Id.* at EXAM00180193. Indeed, the Countrywide Settlement provided for a cash payment of $8.5 billion to certain trusts in connection with $424 billion in original principal balance of associated RMBS. *See* Bank of America Corp., Annual Report (Form 10-K) (Feb. 28, 2013), at 213–14.

[1912] *See* E-mail from K. Patrick to T. Devine (May 8, 2012), at EXAM00180193–94 [EXAM00180193]. As noted above, as of May 7, 2012, the waterfall scenarios estimated a range of $494 million to $1.19 billion for total recovery to holders of Trust R&W Claims. *See* Centerview and FTI Discussion Materials Presentation, dated May 7, 2012, at 9 [EXAM00176519].

[1913] *See* E-mail from T. Devine to G. Lee and R. Cieri (May 8, 2012) [EXAM00180193].

[1914] *See* E-mail from G. Lee to K. Patrick (May 8, 2012) [EXAM00180201]. Lee asked Patrick to "[p]lease just reply back to me for now—have to guide our board." *Id.* Lee forwarded Patrick's spreadsheet to Devine and others almost immediately after he received it. *See* E-mail from G. Lee (May 8, 2012) [EXAM00191369].

[1915] *See* E-mails between G. Lee and K. Patrick (May 8, 2012) [EXAM00188953]. Cancelliere apparently spoke with Patrick at around 10:30 a.m. on May 8, 2012. *See* E-mail from J. Cancelliere (May 8, 2012) [EXAM00193761].

[1916] *See* BOA Loss Estimation [EXAM00180200] (attached to E-mail from D. Sheeren to G. Lee (May 8, 2012) [EXAM00180199]). As noted above, the Countrywide Settlement provided cash payment of approximately $8.5 billion on that claim. *See* Bank of America Corp., Annual Report (Form 10-K) (Feb. 28, 2013), at 213–14

[1917] *See* E-mail from T. Devine (May 8, 2012) [EXAM00191095] ("Isn't the obvious answer that [Patrick] states her 22%—[$]11 billion or whatever—and then takes an appropriate haircut (analogous to the 36% to 14% haircut she took in [Bank of America]) to get to a lower $ number ($8B?) as stipulated allowed claim?").

[1918] *See* E-mail from G. Lee (May 8, 2012) [EXAM00191095].

conversation with Patrick. He wrote, "[i]f we can articulate the proper haircut, [Patrick] can get her defect rate and we can get a reasonable dollar number."[1919]

On the evening of May 8, 2012, according to Patrick, there were two "parallel negotiations": (1) Patrick was "trying to agree [to] the size of the claim number with [Lee] and [Hamzehpour]"; and (2) Patrick was separately negotiating with Devine about "whether [AFI] would put in more cash."[1920] At some point during negotiations that evening, Patrick spoke with Lee and offered to settle with ResCap for an allowed claim of $9 billion.[1921] According to Patrick, Lee responded that $9 billion was more than AFI wanted him to pay, but he would do his best to get "close to that."[1922] Later that night, according to Patrick, Lee came back and offered to settle for $8.7 billion, but requested that Patrick speak with Devine and demand that AFI agree to contribute additional cash to the Estates.[1923]

As requested by Lee, Patrick conveyed the demand to Devine.[1924] That night, at around 11:45 p.m., Devine reported to Carpenter and others at AFI and Kirkland & Ellis that Patrick had demanded an "allowed claim at $8.7 billion" and "$150 million increase in [AFI] cash contribution above the 750 + 200 + 100 previously agreed."[1925] According to Patrick, after Devine conveyed the demand to Carpenter, he came back "white as a sheet" and reported that he "had almost been fired."[1926] Patrick then spoke with Lee in a separate room and, according to Patrick, Lee stated that they may have "tried to build a bridge too far. I don't care whether you sign a plan support agreement with [AFI] or not. I will settle with you for [$8.7 billion]. This is the best I can do. Will you take it?"[1927] And Patrick accepted the deal.[1928]

The next morning, on May 9, 2012 at approximately 6:00 a.m., Devine sent an e-mail to Cancelliere asking him to determine what defect rate would be implied by an $8.7 billion allowed claim.[1929] Cancelliere calculated that an $8.7 billion claim implied a defect rate of 19.7% using the ResCap/AFI assumption of $44.1 billion in aggregate losses, or 17.9% using the Steering Committee Group's assumption of $48.7 billion in aggregate losses.[1930] At

---

[1919] *See* E-mail from T. Devine (May 8, 2012) [EXAM00191095].

[1920] *See* Int. of K. Patrick, Mar. 18, 2013, at 175:1–10.

[1921] *See id*. at 172:8–177:4.

[1922] *See id*.

[1923] *See id*.

[1924] *See id*.

[1925] E-mail from T. Devine to M. Carpenter (May 8, 2012) [CCM00565463].

[1926] *See* Int. of K. Patrick, Mar. 18, 2013, at 172:8–177:4.

[1927] *See id*.

[1928] *See id*.

[1929] *See* E-mails between T. Devine and J. Cancelliere (May 9, 2012) [EXAM00345832].

[1930] *See id*.

9:00 a.m., Devine e-mailed Lee and informed him that AFI would "support the $8.7 billion allowed claim" but that there was "no new [AFI] money."[1931]

Exhibit III.J.4.e—3 below reflects the evolution of negotiations related to the allowed claim amount for holders of Trust R&W Claims.



EXHIBIT III.J.4.e—3
**RMBS Claim Settlement**
**ResCap Versus Steering Committee Group Positions**
*($ in Billions)*

*Source: EXAM00176409; EXAM00176337; EXAM00178949; CCM00565463; EXAM00176421; EXAM00176548; EXAM00180187; Int. of K. Patrick, Mar. 18, 2013, at 94:9—95:19, 172:8—177:4.*

---

[1931] *See* E-mail from T. Devine to G. Lee (May 9, 2012) [EXAM00180215]; Dep. of T. Devine, Nov. 19, 2012, at 229:24–230:6. Although ResCap agreed upon an allowed claim of $8.7 billion on or about May 9, 2012, as of that date, neither ResCap nor AFI had performed a loan sampling in an effort to calculate ResCap's actual liability. *See* Dep. of J. Ruckdaschel, Nov. 8, 2012, at 39:21–40:25; Dep. of M. Renzi, Nov. 7, 2012, at 81:9–82:12, 91:11–92:17. Such approach was not necessarily unreasonable, as calculating actual liability would have required loan by loan analysis of "literally . . . millions of loan files." *See* Dep. of J. Ruckdaschel, Nov. 8, 2012, at 129:2–19.

The Steering Committee Group also agreed to support a Plan that provided a Third-Party Release in favor of AFI. The Steering Committee Group performed an independent analysis of the sufficiency of the proposed AFI settlement contribution, and concluded that it was acceptable.[1932] Patrick explained:

> [AFI] had infused far more capital into these entities than it ever was required to do to keep them afloat. . . . And while we think and maintain that we have direct alter ego claims that we will pursue, . . . from our perspective in the total context of what was being offered here, substantial value from [AFI] for claims that were aggressively postured, let's put it that way. Tenuous, it would be another adjective you could use. To get that value, stabilize the servicing platform and get a number that the trustees could defend on the size of the repurchase claim to us seemed obvious.[1933]

Exhibit III.J.4.e—4 below reflects the evolution of estimated recoveries for holders of Trust R&W Claims, as presented to the Steering Committee Group during the course of negotiations.

EXHIBIT III.J.4.e—4
**Evolution of Projected RMBS Claim Recoveries**
*($ in Millions)*

| RMBS Claims | April 25, 2012 Presentation $750M AFI Settlement | | | May 7, 2012 Presentation $750M AFI Settlement | | | May 9, 2012 Presentation $1,050M AFI Settlement[1] | | |
|---|---|---|---|---|---|---|---|---|---|
| | Total Claim | $ Recovery | % Recovery | Total Claim | $ Recovery | % Recovery | Total Claim | $ Recovery | % Recovery |
| R&W claims | $ 1,080 | $ 424 | 39% | $ 2,160 | $ 611 | 28% | $ 3,132 | $ 738 | 24% |
| PLS claims | 4,920 | 568 | 12% | 4,920 | 579 | 12% | 5,568 | 556 | 10% |
| Total RMBS Claims | $ 6,000 | $ 992 | 17% | $ 7,080 | $ 1,190 | 17% | $ 8,700 | $ 1,294 | 15% |
| **Allocation of AFI settlement to RFC and GMAC Mortgage general unsecured claims** | | | | | | | | | |
| Distributable value from AFI settlement | | $ 750 | | | $ 750 | | | $ 865 | |
| Recovery to RFC/GMACM from AFI settlement | | 639 | | | 671 | | | 779 | |
| % of settlement distributable value | | 85% | | | 90% | | | 90% | |

[1] $1,050 million AFI settlement included $750 million cash, $200 million incremental Legacy Sale bid, and $100 million origination support. Only $115 million of the additional $300 million was assumed to be distributable to general unsecured creditors.
Source: Centerview and FTI Discussion Materials Presentation, dated Apr. 25, 2012, at 10 [EXAM00176409]; Centerview and FTI Discussion Materials Presentation, dated May 7, 2012, at 8 [EXAM00176519]; Centerview and FTI Discussion Materials Presentation, dated May 9, 2012, at 4 [EXAM00176544].

---

[1932] Int. of K. Patrick, Mar. 18, 2013, at 124:20–125:13 ("[W]e made our own judgment about the fairness of the deal from our perspective. . . . One of my partners is very deep in the weeds on those kinds of issues for all of these banks, and so we did our own analysis of it.").

[1933] *Id.* at 121:22–124:3.

On May 10, 2012, Carpenter e-mailed the AFI Board and informed them of the agreement with the Steering Committee Group:

> [W]e have a deal with Kathy Patrick and 50/60 percent of pls/ r and w claimants. Our [$]750 [million] contribution does not change but the waterfall will deliver over [$]1 billion to her class; trustees seem to be very relieved that servicer disruption in a free fall will be avoided. The big negotiating point was the amount of claims we would agree to (because this sets up for the next negotiation with eg Wells); the ask was [$]12 [billion] (about double the [Bank of America] settlement[)] and we ended up at [$]8.7 billion. There are some risks with this approach if, in the end, the plan falls apart bu[t] risks worth taking to have pls supporting the deal.[1934]

### (1) ResCap Board Approval Of RMBS Trust Settlement Agreements and RMBS Plan Support Agreements

On May 9, 2012, the ResCap Board met to consider the RMBS Trust Settlement Agreements.[1935] An e-mail was circulated to the ResCap Board at 2:08 p.m. scheduling a meeting to approve the settlement for 3:00 p.m.[1936] According to the agenda, a total of thirty minutes was allotted to consideration of the RMBS Trust Settlement Agreements.[1937] Lee provided the ResCap Board with discussion materials regarding the proposed settlement at 2:38 p.m.—leaving the board only twenty-two minutes (at most) to review and develop an understanding of those materials before the start of the meeting.[1938] Although the ResCap Board had been updated on the status of settlement negotiations on May 4, 2012,[1939] the May 9, 2012 meeting was the first occasion on which most of the ResCap Board members were informed of the $8.7 billion settlement amount, given that the agreement had been reached earlier that day.[1940]

_____

[1934] E-mail from M. Carpenter (May 10, 2012) [CCM00120369].

[1935] *See* Minutes of a Special Meeting of the Board of Residential Capital, LLC, May 9, 2012, at 1–2 [EXAM00126544].

[1936] *See* E-mail from A. Ellenburg (May 9, 2012) [EXAM00230295].

[1937] *See* Agenda, Special Meeting of the Residential Capital, LLC Board of Directors, dated May 9, 2012, at RC40020576 [RC40020575].

[1938] *See* E-mail from G. Lee (May 9, 2012) [EXAM00230295]; Dep. of J. Whitlinger, Nov. 15, 2012, at 31:6–11.

[1939] *See* Draft Minutes of a Regular Meeting of the Board of Residential Capital, LLC, May 4, 2012, at 2 [EXAM11088898] ("Lee discussed the status of a proposed settlement of certain representation and warranty and private label securitization litigation claims.").

[1940] *See* Dep. of J. Whitlinger, Nov. 15, 2012, at 47:13–48:7.

At the May 9, 2012 meeting, the ResCap Board discussed the terms of the RMBS Trust Settlement Agreements and reviewed the presentation materials.[1941] Cancelliere advised the ResCap Board on, among other things, settlement defect rates and the allocation of liability among the Debtors.[1942] Renzi reviewed some of the key assumptions regarding the settlement and the preliminary agreements reached.[1943]

The board materials showed, among other things, that the proposed $8.7 billion allowed claim implied a 19.72% defect rate.[1944] In the presentation, the $8.7 billion allowed claim was juxtaposed against what the allowed amount of Trust R&W Claims would have been if alternative defect rates had been used.[1945] Notably, the presentation showed that the allowed claim would have been approximately $15.9 billion if the "BofA Baseline—36% Defect" rate had been applied.[1946] A footnote on the page explained that "BofA proposed settlement defect rate set at 36% prior to litigation adjustments."[1947] These figures were presented to the ResCap Board as "comparative data point[s] to the ResCap settlement"[1948] and were treated by at least certain members of the ResCap Board in exactly that manner.[1949] Their inclusion in the board presentation was ordered by Lee.[1950]

The inclusion of the Bank of America comparative defect rate in the board materials could have caused confusion among the ResCap Board members because the 36% "baseline" Bank of America defect rate was not "apples to apples" with the 19.72% ResCap "settlement" defect rate. The 19.72% ResCap defect rate reflected the total allowed claim of $8.7 billion divided by the estimated aggregate losses of $44.1 billion. If a similar calculation were applied to the Bank of America materials Patrick had sent Lee—a $15.5 billion claim divided by

---

[1941] *See* Minutes of a Special Meeting of the Board of Residential Capital, LLC, May 9, 2012, at 1 [EXAM00126544].

[1942] *See id.*

[1943] *See id.* On May 9, 2012, the AFI Board consented to waive its rights to approve certain actions by ResCap, including, among other things, ResCap's ability to enter into any legal settlement greater than $25 million. *See* Ally Financial Inc. Consent to Action, dated May 9, 2012, at ALLY_PEO_0020560–69 [ALLY_PEO_0020479].

[1944] *See* ResCap Private Label Securities Rep & Warrant Settlement Discussion Supporting Information, dated May 9, 2012, at RC40020578 [RC40020575].

[1945] *See id.*

[1946] *See id.* The "BofA Baseline" defect rate was not derived by ResCap or its professionals, but was provided by Patrick. *See* Dep. of J. Cancelliere, Nov. 14, 2012, at 184:9–20.

[1947] *See* ResCap Private Label Securities Rep & Warrant Settlement Discussion Supporting Information, dated May 9, 2012, at RC40020578 [RC40020575].

[1948] *See* Dep. of J. Cancelliere, Nov. 14, 2012, at 182:11–18.

[1949] *See* Dep. of J. Whitlinger, Nov. 15, 2012, at 38:10–40:16, 45:15–46:13; Dep. of J. Mack, Nov. 14, 2012, at 68:8–71:7.

[1950] *See* Dep. of J. Cancelliere, Nov. 14, 2012, at 183:4–10.

estimated aggregate losses of $107.8 billion—the "defect rate" would have been approximately 14.4%, not 36%.[1951]

During the meeting, Marano "requested that a report with separate line items identifying the different settlement amounts be prepared to provide the ResCap Board with additional details on the settlements."[1952] It is unclear if such materials were ever prepared and provided to the ResCap Board.[1953]

Compounding the confusion, at least some members of the ResCap Board erroneously believed that the $8.7 billion dollar claim amount accounted for the Debtors' potential litigation defenses to putback claims.[1954] The proposed claim amount, however, was not reduced for such litigation defenses.[1955] Other ResCap Board members understood the settlement to include a release of claims based on securities law violations,[1956] which also was not the case.

---

[1951] *See* BOA Loss Estimation [EXAM00180200] (attached to E-mail from D. Sheeren to G. Lee (May 8, 2012) [EXAM00180199]).

[1952] *See* Minutes of a Special Meeting of the Board of Residential Capital, LLC, May 9, 2012, at 1 [EXAM00126544].

[1953] *See* Dep. of J. Cancelliere, Nov. 14, 2012, at 204:2–205:8.

[1954] *See* Dep. of J. Whitlinger, Nov. 15, 2012, at 115:24–117:8. Steven Abreu, a ResCap Board member, stated that he understood that the allowed claim amount did not include any reductions for potential litigation defenses. *See* Int. of S. Abreu, Jan. 22, 2013, at 350:22–351:2.

[1955] *See* Dep. of J. Cancelliere, Nov. 14, 2012, at 189:24–190:2; Dep. of J. Mack, Nov 14, 2012 52:25–53:7.

[1956] *See* Dep. of J. Mack, Nov. 14, 2012, 108:25–109:11. Abreu stated that he knew securities claims were not part of the settlement with Patrick because securities claims were not part of Lee's presentation to the board on May 9, 2012. *See* Int. of S. Abreu, Jan. 22, 2013, at 323:1–24.

There is evidence showing that the ResCap Board had a substantive familiarity with representation and warranty claims prior to receiving the settlement materials because of, among other things, prior discussions with its advisors, accounting policy teams, and in-house counsel.[1957] According to Lee:

> I actually recall having had several discussions with the board about the comparison with Lehman and Bank of America. I think the board was actually very familiar with the Bank of America settlement, either through presentations we made or independently. . . . [T]he board was perfectly comfortable with the range that we settled in. Because I think the view that we had been articulating was if the collective action lawsuits were brought, we'd be facing potentially a $44 billion claim. So, seemed to be perfectly rational. . . . There had been several discussions prior to that board meeting about people's perception of what ranges were appropriate. Because there had been several different waterfalls of analysis that were done and allocations of claims between GMAC and ResCap arising out of the PLS. My recollection was that Tom Marano and Jonathan Ilany, really the two people who traded these types of securities, both were of the view that they wouldn't be surprised if the ultimate number was well in excess of eight and probably closer to $20 billion. So I didn't get the impression that the board was remotely concerned with a number less than 10 [billion]. Given, I think, that their ultimate expectation was that the number could well be 20 [billion].[1958]

The ResCap Board voted to approve the settlement in approximately thirty minutes, subject to "such changes as [ResCap LLC] management, upon the advice of legal counsel, shall make with the understanding that if such changes are material they will be reviewed with

---

[1957] *See* Dep. of J. Whitlinger, Nov. 15, 2012, 30:23–31:5 ("[W]hen we talk about rep and warrant topics, the board has had plenty of experience around this discussion with our advisors, with our accounting policy teams and in-house counsel."); s*ee also* Minutes of a Regular Meeting of the Board of Residential Capital, LLC, July 1, 2011, at RC40018628 [RC40018411] (noting that Devine gave a "detailed presentation" to the ResCap Board regarding, among other things, PLS investor litigation and representation and warranty litigation). According to Devine:

> The business was deeply familiar for many years with . . . what representations were made in connection with and what potential exposures existed in connection with the various kinds of loan sales, whether they were GSE, whole loan, direct, or RMBS. . . . And when I presented to the Board . . . the discussions were lively and many-sided. It was not a one-way presentation. The questions were smart and well-informed.

Int. of T. Devine, Mar. 19, 2013, at 20:9–21:12.

[1958] Int. of G. Lee, Feb. 20, 2013, at 301:18–307:19; *see also* Dep. of J. Whitlinger, Nov. 15, 2012, 97:10–98:3 (noting that he understood the Countrywide Settlement amount was $8.5 billion).

the Board."[1959] On May 13, 2012, the ResCap Board formally resolved to enter into the RMBS Trust Settlement Agreements and the RMBS Plan Support Agreements.[1960]

> ### (2) Apparent Confusion During Attempts To Finalize Settlement Language After ResCap Board Approval

After approval of the economics of the settlement by the ResCap Board, counsel for the settling parties continued working towards memorializing the agreement. On May 9, 2012, after the ResCap Board had approved the settlement, Lee sent an e-mail to Patrick stating that "[t]here seems to be a disagreement . . . on one fundamental point" concerning the settlement.[1961] Lee noted that he understood "that the $8.7bn [proposed allowed claim] settles all claims arising from the sale and servicing of the RMBS."[1962] He noted, however, that Ross Martin of Ropes & Gray, which had been retained to act as the Steering Committee Group's bankruptcy counsel, understood the $8.7 billion dollar settlement would not involve a release of individual investors' securities law claims.[1963] Lee went on to state that such an arrangement was unacceptable and contrary to the understanding of the deal as approved by the ResCap Board, "because [it would] render[] a deal at $8.7bn illusory."[1964]

Lee's e-mail prompted Patrick to ask Devine to intercede and correct Lee's misunderstanding or risk the deal falling apart. She wrote:

> [Lee] is claiming he was "told" that [the Steering Committee Group] would release securities claims in the plan. We never told him that and we have never offered or agreed to release securities claims. We've been very clear about that from the very beginning. It's the basis on which I got my clients to approve it, it's what I've told the Trustees this morning. [I]t's also what I assured Freddie Mac. As you and I discussed: a release of securities claims is not part of this putback settlement. [Lee's] misunderstanding—*or his effort to extract something that we never offered and don't have to give*—is impeding getting the deal documented. Would you please intercede with him and tell him to move on? Insisting on this will destroy any

---

[1959] *See* Minutes of a Special Meeting of the Board of Residential Capital, LLC, May 9, 2012, at 1–2 [EXAM00126544]; Dep. of J. Whitlinger, Nov. 15, 2012, at 26:24–27:4 (confirming that thirty minutes was allotted for discussion of the proposed legal settlement).

[1960] Minutes of a Special Meeting of the Board of Residential Capital, LLC, May 13, 2012, at 9–10 [EXAM00184467].

[1961] E-mail from G. Lee to K. Patrick (May 9, 2012) [EXAM00345817].

[1962] *Id.*

[1963] *Id.*

[1964] *Id.*

chance of the deal happening. I understand his determination to try again, but we need to move on. I'm sorry to bother you, but we need you to intercede here.[1965]

Devine indicated that he would "try to straighten everything out."[1966] Patrick thanked Devine and noted that she had just received a further call from Lee in which she informed him that a deal would never be reached if he insisted on attempting to roll securities claims into the settlement.[1967]

Following his e-mails with Patrick, Devine sent an e-mail to Lee, among others, explaining that:

> The [RMBS Trust Settlement Agreement] is for *everything* except securities claims. . . . The circle is squared at the Plan. . . . though [Patrick's] clients don't release securities claims, they sign Plan Support Agreements, and the Plan includes very simple comprehensive releases, which of course include third party release of all claims, which of course includes securities claims. . . . This is the beauty of it."[1968]

Devine's explanation of how the RMBS Trust Settlement Agreement fit into the larger plan architecture apparently had the desired effect—Jamie Levitt of Morrison & Foerster replied that ResCap would agree to exclude securities law claims from the RMBS Trust Settlement Agreement.[1969] Lee, Devine, and others then went on to discuss the importance of including a clear statement in the RMBS Plan Support Agreements that the Steering Committee Group would "support[] all releases including securities and fraud releases."[1970] Devine underscored that point, stating "It must say so. That's the deal."[1971]

---

[1965] E-mail from K. Patrick to T. Devine (May 9, 2012), at ALLY_0143982–83 [ALLY_0143982] (emphasis added).

[1966] E-mail from T. Devine to K. Patrick (May 9, 2012) [ALLY_0143982].

[1967] E-mail from K. Patrick to T. Devine (May 10, 2012) [ALLY_0143982].

[1968] E-mail from T. Devine (May 10, 2012) [EXAM00345817]. This and other communications suggest that Devine had a sophisticated understanding of the RMBS Trust Settlement Agreements and how that settlement fit in with the broader reorganization. In light of Devine's demonstrably sophisticated understanding of the deal, it is difficult to give significant credence to his statements at his deposition that he "may very well not have understood what [he] was talking about" with respect to the bankruptcy. Dep. of T. Devine, Nov. 19, 2012, at 246:7–13.

[1969] *See* E-mail from J. Levitt (May 10, 2012) [EXAM00345817]. On May 12, 2012, Levitt e-mailed Gibbs & Bruns and Ropes & Gray and stated "we do not have authority at this time to accept your removal of [the securities claims provisions] from the release and related provisions." E-mail from J. Levitt (May 12, 2012) [EXAM00179203]. But those provisions were eventually removed from the agreement.

[1970] *See* E-mail from G. Lee (May 10, 2012) [EXAM00345823].

[1971] E-mail from T. Devine (May 10, 2012) [EXAM00345823].

III-328

Lee's apparent confusion was curious because, less than a week earlier, he seemingly understood that "ResCap and the [Steering Committee Group] will settle all claims . . . *other than securities claims (which [Patrick] does not control)*."[1972] Despite Patrick's initial concerns, she apparently figured out that Lee was perhaps making an "effort to extract something."[1973] And, indeed, Lee admitted as much, explaining:

> There are a couple of things that happened right at the end. One is, you know, we settled on a deal with AFI at that point, and we're still in the final throes of negotiation with [Patrick]. You know, and I believe that it's my obligation to take one final crack at AFI to get more money and one final crack at [Patrick] to get something else. . . . And I was prepared, as I did, to negotiate right up until the time that we basically hit the button. . . . And I went back to [Patrick] and I told her that we'd like you to get the securities claims in. And, you know, we had a good fight about it, but, at the end of the day, the reason we backed down was she was correct. That's what the deal was and that's what she told us.[1974]

### (3) Negotiations With The Talcott Franklin Group

As noted above, ResCap primarily negotiated the terms of the RMBS Trust Settlement Agreements with the Steering Committee Group because, unlike the Talcott Franklin Group, the Steering Committee Group "could kill a sale, full stop."[1975]

On March 22, 2012, Franklin sent a letter to Devine expressing his frustration at AFI's failure to move forward in negotiating a resolution of his client's claims.[1976] In his letter, Franklin stated that his clients were "concerned that [AFI] may be holding out on [them] so it can place RFC in bankruptcy and force an untenable resolution" on them.[1977] Franklin suggested that there would be adverse consequences for AFI if it pursued such a strategy, reiterated his desire to resolve his clients' claims, and requested a response no later than March 26, 2012.[1978]

On April 19, 2012, Franklin, apparently having become frustrated by the slow pace at which settlement negotiations were advancing, informed Devine that he intended to

---

[1972] E-mail from G. Lee to T. Devine and T. Hamzehpour (May 4, 2012) [EXAM00191506] (emphasis added).

[1973] E-mail from K. Patrick to T. Devine (May 9, 2012) [ALLY_0143982].

[1974] Int. of G. Lee, Feb. 20, 2013, at 321:15–328:12.

[1975] *Id*. at 151:23–153:3.

[1976] *See* Letter from T. Franklin to T. Devine (Mar. 22, 2012) [ALLY_0143503].

[1977] *Id*.

[1978] *See id*.

independently reach out to Fortress to discuss his clients' interests following a ResCap bankruptcy filing.[1979] On April 19, 2012, Devine e-mailed Hamzehpour and Solomon to update them on this development with the Talcott Franklin Group.[1980] In that e-mail, Devine indicated that he had attempted to dissuade Franklin from directly engaging with Fortress, and recommended "giving Talcott a 'KP-Lite' meeting."[1981]

On May 9, 2012, Devine reported receiving a call from Franklin in which Franklin indicated that he was "very favorably inclined to support and participate in" the plan support and settlement agreements that were then in the progress of being developed.[1982] Lee responded by stating that he would send Franklin a revised settlement agreement and plan support agreement after receiving a revised draft from Patrick.[1983]

On May 11, 2012, Levitt emailed Devine, copying Lee and Noah Ornstein of Kirkland & Ellis, stating that she had:

> spent a considerable amount of time today talking first with Talcott Franklin and then on two occasions with his gaggle of lawyers. It is pretty clear they are coming to understand the economics and advantages of the proposal and want in. . . . With all this in mind, we would like to pick your brain tomorrow on how you best see fit to maneuver the Kathy/Talcott discussions and intrigue.[1984]

On May 12, 2012, Devine sent an e-mail to Levitt, Lee, Ornstein, and Ruckdaschel asking if "Talcott Franklin [had] signed on without reservation to support the Plan, including broad third party release of all claims against [AFI] etc including security claims?"[1985] Lee responded that it was "complicated—they are trying to preserve lots of other claims . . . . [W]e sent Talcott the agreement the way we wanted it and told him he couldn't really negotiate it—but if [Patrick] doesnt sign I dont know if he will."[1986]

On May 13, 2012, Devine e-mailed Franklin and informed him that he could not "expose [AFI] to any claims however remote."[1987] By this statement, Devine intended to convey that

---

[1979] *See* E-mail from T. Devine to W. Solomon and T. Hamzehpour (Apr. 19, 2012) [EXAM00191427].

[1980] *See id.*

[1981] *Id.*

[1982] E-mail from T. Devine (May 9, 2012) [EXAM00180216]; Dep. of T. Devine, Nov. 19, 2012, at 239:12–240:25.

[1983] E-mail from G. Lee (May 9, 2012) [EXAM00180216]; Dep. of T. Devine, Nov. 19, 2012, at 242:10–18.

[1984] E-mail from J. Levitt (May 11, 2012) [EXAM00345831].

[1985] E-mail from T. Devine (May 12, 2012) [EXAM00345296].

[1986] E-mail from G. Lee (May 12, 2012) [EXAM00345296].

[1987] E-mails between T. Devine and T. Franklin (May 13, 2012) [ALLY_0144252].

AFI's support for the plan was contingent on Franklin's clients agreeing to support a "third-party nonconsensual release" for AFI.[1988] Later that day, Devine again e-mailed Franklin stating that they "need[ed] to close now . . . this is my last chance [to] get you in the deal pre-filing . . . ."[1989] Franklin thanked Devine and asked for a call to "tell [him] what we're able to do so there's no confusion."[1990] Ultimately, the Talcott Franklin Group agreed to the RMBS Trust Settlement Agreements and RMBS Plan Support Agreements.[1991]

### f.   Terms Of The RMBS Trust Settlement Agreements

#### (1) Allowed Claim

The RMBS Trust Settlement Agreements seek to resolve all the Trust R&W Claims in exchange for an allowed general unsecured claim of up to $8.7 billion.[1992] The proposed settlement extends to all securitizations issued by the Debtors, not just those in which the Steering Committee Group or the Talcott Franklin Group have significant holdings.[1993] The final amount of the allowed claim will be reduced from $8.7 billion based upon the total dollar amount of original principal balance for the trusts participating in the settlement.[1994] Each of the RMBS trusts that accepts the settlement will receive an allocated portion of the allowed claim pursuant to the determination of a "qualified financial advisor" after application of certain allocation formulas.[1995]

#### (2) Amendments To RMBS Trust Settlement Agreements

On August 15, 2012, the Debtors filed amended and restated RMBS Trust Settlement Agreements.[1996] The most significant amendment permitted each settling trust to reallocate up to 20% of its share of the $8.7 billion allowed claim as a general unsecured claim against

---

[1988] *See* Dep. of T. Devine, Nov. 19, 2012, at 286:15–287:20.

[1989] E-mail from T. Devine to T. Franklin (May 13, 2012) [ALLY_0144252].

[1990] E-mail from T. Franklin to T. Devine (May 13, 2012) [ALLY_0144252].

[1991] *See* Talcott Franklin Group RMBS Trust Settlement Agreement, dated May 13, 2012 [RC00031542]; Talcott Franklin Group Plan Support Agreement, dated May 13, 2012 [RC00031742].

[1992] *See* Debtors' Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreements [Docket No. 1176]; Objection of the Official Committee of Unsecured Creditors to the Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreements [Docket No. 2825].

[1993] RMBS Trust Settlement Agreements, § 5.01.

[1994] *Id*.

[1995] *See id*. Ex. B. The Examiner did not investigate the proposed allocation methodology.

[1996] *See* Amended and Restated RMBS Trust Settlement Agreement with the Steering Committee Group [Docket No. 1176-2]; Amended and Restated RMBS Trust Settlement Agreement with the Talcott Franklin Group [Docket No. 1176-3] (together, the "First Amended RMBS Trust Settlement Agreements").

ResCap LLC (the "HoldCo Election").[1997] For each settling trust that could have made the HoldCo Election, the amount of the allowed claim to be asserted against the other Debtors would have been reduced on a dollar-for-dollar basis.[1998] The Debtors asserted that the HoldCo Election was meant to resolve "direct purported alter ego claims against [ResCap LLC] that the [RMBS] Institutional Investors argue they could have directed the Trustees to assert."[1999]

As originally proposed, the RMBS Trust Settlement Agreement provided that the allowed $8.7 billion claim would be against RFC and GMAC Mortgage.[2000] As amended, the RMBS Trust Settlement Agreements provide that the Depositor Entities would be jointly liable with RFC and GMAC Mortgage for the allowed claim.[2001]

On October 19, 2012, the Debtors again filed amended and restated RMBS Trust Settlement Agreements.[2002] The Third Amended and Restated RMBS Trust Settlement Agreements formally removed the Holdco Election but, unlike the original RMBS Trust Settlement Agreement, allowed for possible recoveries against ResCap LLC.[2003] The total potential liability of ResCap LLC is limited to $8.7 billion and any recovery by an accepting trust on any allowed claim against ResCap LLC will be reduced by any amounts paid to such accepting trust by RFC, GMAC Mortgage, or any of the Depository Entities on account of the Trust R&W Claims.[2004]

---

[1997] *See id.* § 6.02.

[1998] *Id.*

[1999] *See* Debtors' Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreements [Docket No. 1176] at 12.

[2000] *See* Declaration of William J. Nolan in Support of Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreements [Docket No. 320-7] ¶ 9.

[2001] *See* First Amended RMBS Trust Settlement Agreements, §§ 1.03, 5.01.

[2002] *See* Third Amended and Restated RMBS Trust Settlement Agreement with the Steering Committee Group [Docket No. 1887-2]; Third Amended and Restated RMBS Trust Settlement Agreement with the Talcott Franklin Group [Docket No. 1887-3] (together, the "Third Amended RMBS Trust Settlement Agreements"). The parties also entered into Second Amended and Restated RMBS Trust Settlement Agreements, but such agreements were never filed with the Bankruptcy Court.

[2003] *See id.* §§ 6.02, 8.01. Under the Third Amended RMBS Trust Settlement Agreements, accepting trusts are permitted to file proofs of claim against ResCap LLC. Such proofs of claim will remain subject to objections in all respects. *See id.* §8.01.

[2004] *See id.*

### (3) Released Claims

Under the RMBS Trust Settlement Agreement, in exchange for the allowed $8.7 billion claim, the RMBS Institutional Investors, each of the accepting trusts, and the trustees in respect of such trusts will release the Debtors (excluding ResCap LLC) and their current and former officers, directors, and employees (excluding AFI and its officers or directors) from all Trust R&W Claims that arose prior to the Petition Date.[2005] The claims allowance and releases are effective on the date on which the Bankruptcy Court enters an order approving the RMBS Trust Settlement Agreement.[2006] The RMBS Trust Settlement Agreement does not release individual direct claims for securities fraud or other disclosure-related claims arising from the purchase or sale of RMBS.[2007]

### g. Terms Of The RMBS Plan Support Agreements

The Steering Committee Group and the Talcott Franklin Group entered into substantially similar RMBS Plan Support Agreements with the Debtors and AFI that obligated the RMBS Institutional Investors to direct the securitization trustees to support the terms of the proposed Plan Term Sheet and the AFI Settlement and Plan Sponsor Agreement, including the Third-Party Release for AFI.[2008]

### (1) Distributions To RMBS Institutional Investors

The RMBS Plan Support Agreements require that the Plan "be materially consistent with the methodology of allocation of sale proceeds, settlement proceeds, and all other matters that determine distributions to creditors as set forth in the May 9, 2012 and May 12, 2012 Executive Summaries . . . given by Debtors' counsel to the steering committee appointed by

---

[2005] See id. § 7.01. Specifically, the RMBS Institutional Investors, each of the accepting trusts, and the trustees in respect of such trusts will release claims arising out of and/or relating to the following: (1) the origination and sale of mortgage loans to the accepting trusts; (2) documentation of the underlying mortgage loans held by the accepting trusts; (3) the servicing of the mortgage loans held by the accepting trusts, but only to the extent assumed pursuant to the sales of the Debtors' assets; (4) any duty of a debtor as master servicer, servicer, or sub-servicer to notice and enforce remedies in respect of alleged breaches of representations and warranties; (5) setoff or recoupment under the accepting trusts' governing agreements; and (6) any mortgage loan seller that either sold loans to ResCap or AFI that were sold and transferred to an accepting trust or sold loans directly to an accepting trust. Id.

[2006] See id. § 2.01.

[2007] See id. § 7.01.

[2008] RMBS Plan Support Agreements, at 2.

the Consenting Claimants."[2009] Accordingly, the RMBS Institutional Investors apparently have a preset ratable share of creditor recoveries, including recoveries from any contribution by AFI.[2010] As Patrick explained:

> You don't know what's going to happen on the size of [AFI]'s contribution, which is why the plan support agreement we negotiated negotiates for a waterfall treatment, not an absolute size because we wanted to be sure that if there was more money that came in, the trust would be treated . . . the same. That is, not the same in dollars, but the same rateable take of the number.[2011]

### (2) Termination Rights Regarding RMBS Plan Support Agreements

The RMBS Institutional Investors are permitted to terminate the RMBS Plan Support Agreements with three days' advance written notice upon the occurrence of a variety of events or conditions, including the Debtors' failure to comply with the deadlines and conditions set forth in the milestones.[2012] Although a number of termination events have been triggered, the Steering Committee Group has not terminated its agreement, and therefore the Steering Committee Group RMBS Plan Support Agreement remains binding on the parties.[2013]

The RMBS Plan Support Agreements automatically terminate upon a breach by the RMBS Institutional Investors of any material provision of either the RMBS Plan Support Agreements or the RMBS Trust Settlement Agreements, unless such breach is waived in writing by the Debtors or AFI.[2014] In addition, if the Debtors make a good faith determination that an alternative restructuring proposal is "reasonably likely to be more favorable" than the restructuring contemplated by the Plan "to the Debtors' estates, their creditors, and other parties to whom the Debtors owe fiduciary duties," then the Debtors are permitted to immediately terminate their obligations under the RMBS Plan Support Agreement, including the obligation to seek approval of a plan that provides a Third-Party Release.[2015] However, if the Debtors determine to pursue such an alternative restructuring, it must be "no less favorable to the [RMBS] Consenting Claimants than the [r]estructuring contemplated by the Plan."[2016]

---

[2009] *Id.* § 1(c).

[2010] *See* Int. of K. Patrick, Mar. 18, 2013, at 118:8–120:15, 154:25–155:8, 213:7–215:15.

[2011] *Id.* at 119:23–120:8.

[2012] RMBS Plan Support Agreements, §§ 6.1, 6.4.

[2013] *See* Ally Financial Inc., Quarterly Report (Form 10-Q) (May 1, 2013), at 10. The Steering Committee Group RMBS Plan Support Agreement remains in effect notwithstanding the termination of the AFI Settlement and Plan Sponsor Agreement. Patrick explained that if AFI ultimately contributes an amount greater than $750 million, the RMBS Institutional Investors are "going to do better." Int. of K. Patrick, Mar. 18, 2013, at 214:14–216:11. However, if AFI's cash contribution is lower, according to Patrick, "[w]e'll all be very unhappy that we screwed with [AFI] . . . which is what I told people at the time." *Id.* On April 18, 2013, the Talcott Franklin Group sent the Debtors and AFI a notice of termination of its RMBS Plan Support Agreement. *See* Ally Financial Inc., Quarterly Report (Form 10-Q) (May 1, 2013), at 10.

[2014] RMBS Plan Support Agreements, §§ 6.2, 6.4.

[2015] *Id.* at § 2.4.

[2016] *Id.*

### (3) Debtors' Obligations Under RMBS Plan Support Agreements

Under the RMBS Plan Support Agreements, the Debtors agreed to the following obligations: (1) file a motion within fourteen days of the petition date seeking approval of the RMBS Trust Settlement Agreements and obtain an order approving the motion by the earlier of (a) sixty days after the petition date, and (b) the date on which the disclosure statement is approved;[2017] (2) for sixty days following the petition date, offer to all other RMBS holders a settlement of their claims on the same economic terms;[2018] and (3) file a motion within twenty-one days of the petition date seeking authority to perform under the RMBS Plan Support Agreements.[2019]

### (4) RMBS Institutional Investors' Obligations Under RMBS Plan Support Agreements

Under the RMBS Plan Support Agreements, the RMBS Institutional Investors agreed to direct the trustees to undertake the following obligations: (1) use commercially reasonable efforts to obtain agreement to the RMBS Plan Support Agreements and the RMBS Trust Settlement Agreements from holders of mortgage-backed securities held by the securitization trusts other than the RMBS Institutional Investors;[2020] (2) support the Debtors' restructuring, the prosecution of the first and second day pleadings, and prosecution of the chapter 11 cases;[2021] (3) support entry of an injunction staying litigation against AFI and current and former directors and officers of AFI and ResCap during the pendency of the chapter 11 cases;[2022] (4) vote to accept the plan;[2023] and (5) support confirmation of the plan and approval of any settlement with AFI, including approval of the Third-Party Release, on terms no less favorable than the AFI Settlement and Plan Sponsor Agreement and take no action otherwise adverse to AFI during the chapter 11 cases.[2024] The RMBS Institutional Investors also agreed to maintain holdings aggregating 25% of the voting rights in one or more classes of securities of not less than 235 of the securitizations issued by the Debtors.[2025] The RMBS Institutional Investors did not waive their right to file an objection to a motion of the Junior Secured Noteholders requesting payment of any interest on account of their claims.[2026]

---

[2017] *Id*. at § 2.1(a).

[2018] *Id*. at § 2.1(b).

[2019] *Id*. at § 2.2(b).

[2020] *Id*. at § 3.1(b).

[2021] *Id*. at §§ 3.1(a), (c)–(d).

[2022] *Id*. at § 3.1(e).

[2023] *Id*. at § 3.1(h).

[2024] *Id*. at § 3.1(i).

[2025] *Id*. at § 3.3.

[2026] *Id*. at § 2.2.

*(5) AFI's Obligations Under RMBS Plan Support Agreements*

AFI consented to approval of the RMBS Trust Settlement Agreement or any allowance of the claims of the trusts in any amount at or less than the aggregate amount of $8.7 billion, or to any allocation of such claims among the trusts reasonably proposed by the RMBS Institutional Investors.[2027]

### h. Examiner's Conclusions Regarding Process Resulting In RMBS Trust Settlement Agreements And RMBS Plan Support Agreements

### (1) Role Of AFI And Tim Devine In Negotiations

The objectors to the RMBS Trust Settlement Agreements argue that the Bankruptcy Court should decline to approve the settlement because it was not the product of arm's length bargaining.[2028] The principal theory underlying the objections is that AFI "dominated and controlled" the negotiations to obtain a Third-Party Release, essentially "trading" an "excessive" $8.7 billion allowed claim against ResCap for an "inadequate" $750 million plan contribution by AFI.[2029]

The objectors focus on the involvement of Tim Devine, AFI's Chief Counsel of Litigation, arguing that he "dominated" the settlement negotiations.[2030] Devine has suggested that his role was minimal and that many of his communications with Patrick were then distributed to the appropriate parties at ResCap, Morrison & Foerster, AFI, or Kirkland & Ellis, or some combination thereof.[2031] Such assertions understate Devine's role in the negotiations. The RMBS objectors rightly point out that Devine played one of the central roles in the settlement negotiation process. Indeed, Devine testified that he viewed his role as "driving a deal to conclusion" between ResCap, the RMBS Institutional Investors, and AFI.[2032]

---

[2027] *Id.* at § 4(a).

[2028] *See* Objection of the Official Committee of Unsecured Creditors to the Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreements [Docket No. 2825] at 1–3; Objection of Financial Guaranty Insurance Company to the Debtors' Second Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Trust Settlement Agreements [Docket No. 2819] ¶¶ 2–4; Objection of MBIA Insurance Corporation to Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreements [Docket No. 2810] at 1–3.

[2029] *See* Objection of the Official Committee of Unsecured Creditors to the Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreements [Docket No. 2825] at 1, 20–21.

[2030] *See, e.g.*, Objection of Financial Guaranty Insurance Company to the Debtors' Second Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Trust Settlement Agreements [Docket No. 2819] ¶¶ 7–9.

[2031] *See* Int. of T. Devine, Mar. 19, 2013, at 56:9–58:13.

[2032] Dep. of T. Devine, Nov. 19, 2012, at 248:4–249:4.

However, the totality of the evidence suggests that Devine advocated consistently in negotiations for as low an allowed claim amount as was achievable.[2033] Notably, as the negotiations were drawing close to a resolution, Devine was the principal advocate among the representatives of ResCap and AFI for continuing to "pick away" at Patrick's demands.[2034] Correspondence between Lee and Devine on May 8, 2012 suggests that Lee would have been willing to settle the allowed amount of the Trust R&W Claims at or near Patrick's demand of $10 billion, whereas Devine continued to press for a "lower" dollar number, suggesting $8 billion as a possible stipulated allowed claim.[2035]

The Creditors' Committee argues that AFI's "primary—or sole—motivation" in reaching the RMBS settlement was to obtain a Third-Party Release.[2036] The evidence does not support that assertion. AFI had good reasons to negotiate for as low an allowed claim amount as was achievable, including: (1) AFI would potentially be liable for all of the Debtors' debts if an Estate representative successfully pierced the corporate veil between AFI and the ResCap entities;[2037] (2) AFI had publicly disclosed on April 27, 2012 that "ResCap's reasonably possible losses over time related to the litigation matters and potential repurchase obligations . . . could be between $0 and $4 billion over existing accruals [of $811 million],"[2038] and was concerned that agreeing to an allowed claim well in excess of that amount could create "securities/SEC/disclosure risk";[2039] and (3) AFI was under pressure from federal regulators to settle at a defect rate that would not put stress on other banks.[2040]

The Examiner concludes that AFI was motivated to and did advocate consistently throughout the negotiations for a lower claim amount and, ultimately, AFI's involvement in the negotiations helped drive down the proposed allowed claim amount. The Examiner

[2033] *See, e.g.*, Int. of G. Lee, Feb. 20, 2013, at 103:10–23 (Lee: "My personal experience with [Devine] was, irrespective of whether he was considered a badged [AFI] employee, that he was acting in—throughout the period of time I engaged with him, in a way that was consistent with the best interests of ResCap.").

[2034] *See* E-mail from T. Devine (May 7, 2012) [EXAM00345282]; *see also* Dep. of T. Marano, Nov. 12, 2012, at 249:4–20 ("I think [Devine] was negotiating his position, trying to get Ms. Patrick down from a number that was in the vicinity of 30 percent. . . . Clearly in this context he was assisting . . . in negotiating this defect rate.").

[2035] *See* E-mails between T. Devine and G. Lee (May 8, 2012) [EXAM00191095].

[2036] *See* Objection of the Official Committee of Unsecured Creditors to the Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreements [Docket No. 2825] at 17–18.

[2037] *See, e.g.*, Motion of the Official Committee of Unsecured Creditors for Entry of an Order Authorizing the Committee to Prosecute and Settle Certain Claims on Behalf of the Debtors' Estates [Docket No. 3412] at 1 (seeking authority to pursue claims that "may render AFI liable for the entire $20-25 billion of the estates' unsecured liabilities").

[2038] *See* Ally Financial Inc., Quarterly Report (Form 10-Q) (Apr. 27, 2012), at 69, 73.

[2039] *See* E-mail from T. Devine (May 7, 2012) [EXAM00345282].

[2040] *See* E-mail from T. Devine to K. Patrick (May 8, 2012), at EXAM00180194 [EXAM00180193] ("I'm getting lots of pressure on valuation now."); E-mail from M. Carpenter (May 10, 2012) [CCM00120369] ("The big negotiating point was the amount of claims we would agree to (because this sets up for the next negotiation with eg Wells)."); s*ee also* Int. of K. Patrick, Mar. 18, 2013, at 191:10–194:9.

concludes that the evidence supports the proposition that the process underlying the RMBS Trust Settlement Agreements and RMBS Plan Support Agreements was sufficiently robust to satisfy the "arm's length bargaining" factor under Rule 9019.

### *(2) ResCap Board Approval Process*

The objectors to the RMBS Trust Settlement Agreements argue that the ResCap Board "rubber-stamped" the RMBS Trust Settlement Agreements on May 9, 2012 after reviewing a "cursory" and "flawed" presentation.[2041]

The presentation provided to the ResCap Board on May 9, 2012 showed that the proposed $8.7 billion allowed claim amount implied a 19.72% defect rate, and presented a comparison to what the proposed claim amount would have been if supposedly comparable alternative defect rates had been used.[2042] Specifically, the presentation showed that if the "BofA Baseline—36%" defect rate had been applied to the approximately $44.1 billion estimated lifetime losses for ResCap's RMBS issuance, the allowed claim amount would have been approximately $15.9 billion.[2043] As discussed above in Section III.J.4.e(1), ResCap's advisors knew or should have known that the 36% "baseline" Bank of America defect rate was not "apples to apples" with the 19.72% ResCap "settlement" defect rate.[2044] An "apples to apples" calculation based on the Bank of America materials provided to ResCap's advisors by the Steering Committee Group would have yielded a defect rate of approximately 14.4%, not 36%.[2045] If a 14.4% rate had been applied to ResCap's $44.1 billion estimated lifetime losses, the comparative allowed claim amount would have been approximately $6.35 billion. At least

_____

[2041] *See* Objection of the Official Committee of Unsecured Creditors to the Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreements [Docket No. 2825] at 18; *see also* Objection of Financial Guaranty Insurance Company to the Debtors' Second Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Trust Settlement Agreements [Docket No. 2819] ¶ 4, 26–32; Objection of Wilmington Trust, National Association to the Debtors' Second Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Trust Settlement Agreements [Docket No. 2814] at 2. The RMBS objectors also assert that the Debtors and the ResCap Board breached their fiduciary duties to creditors by approving the RMBS Trust Settlement Agreements. *See* Objection of Financial Guaranty Insurance Company to the Debtors' Second Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Trust Settlement Agreements [Docket No. 2819] ¶ 41–43. For the Examiner's analysis of potential breach of fiduciary duty claims in connection with the ResCap Board's approval of the RMBS Trust Settlement Agreements, see Section VII.E.

[2042] *See* ResCap Private Label Securities Rep & Warrant Settlement Discussion Supporting Information, dated May 9, 2012, at RC40020578 [RC40020575].

[2043] *See id.*

[2044] As discussed in Section III.J.4.e(1), the 19.72% "settlement" defect rate reflected a calculation of the $8.7 billion total allowed claim divided by the $44.1 billion estimated aggregate losses.

[2045] *See* BOA Loss Estimation [EXAM00180200] (attached to E-mail from D. Sheeren to G. Lee (May 8, 2012) [EXAM00180199]).

one ResCap Board member, John Mack, apparently relied on the flawed comparative figures in evaluating the reasonableness of the $8.7 billion allowed claim amount.[2046]

The presence of flawed comparative data points in the May 9, 2012 presentation does not, by itself, render the ResCap Board approval process inadequate. The May 9, 2012 presentation set forth in detail other information that the ResCap Board needed to understand to make an informed decision to approve the RMBS Trust Settlement Agreements and the RMBS Plan Support Agreements.[2047] According to Jim Whitlinger, the comparative data points were not the primary focus of the presentation to the ResCap Board:

> We had, you know, conversations regarding the types of claims that could be brought forth. Our lawyers and our advisors and our numbers people had talked about what types of risk could come from litigation and our advisors told us that this settlement was a good settlement based on all those risks. It wasn't pointed to just saying this Lehman claim amount defect rate or this BofA baseline defect rate is the most important thing on this page. It's a data point.[2048]

In addition, the ResCap Board had significant experience and familiarity with the issues underlying the settlements.[2049] Because of that familiarity with the underlying issues, the brief time allotted for consideration of the proposed settlement (approximately thirty minutes) does not necessarily mean the consideration was inadequate. Certain ResCap Board members explained that they independently believed the $8.7 billion allowed claim settlement was appropriate based on their understanding of the claims at issue and past review of internal

_____

[2046] *See* Dep. of J. Mack, Nov. 14, 2012, at 68:8–71:7 ("[W]e thought the number was—well, it was, by evidence, lower than two other settlements, one of which Ms. Patrick had been engaged with. That was the Bank of America. And it was within the range of defects that we his—we, ResCap, historically had. It was kind of the midpoint of that range. So in a market sense, it seemed to be a reasonable number. . . . The BofA defect rate was higher. That's what I was looking at.").

[2047] *See* ResCap Private Label Securities Rep & Warrant Settlement Discussion Supporting Information, dated May 9, 2012, at RC40020579 [RC40020575].

[2048] Dep. of J. Whitlinger, Nov. 15, 2012, 45:6–46:13

[2049] *See id.* at 30:23–31:5 ("[W]hen we talk about rep and warrant topics, the board has had plenty of experience around this discussion with our advisors, with our accounting policy teams and in-house counsel."); *see also* Draft Minutes of a Regular Meeting of the Board of Residential Capital, LLC, May 4, 2012, at 2 [EXAM11088898] ("Lee discussed the status of a proposed settlement of certain representation and warranty and private label securitization litigation claims."); Minutes of a Regular Meeting of the Board of Residential Capital, LLC, July 1, 2011, at RC40018628 [RC40018411] (Devine gave a "detailed presentation" to the ResCap Board regarding, among other things, PLS investor litigation and representation and warranty litigation); Int. of T. Devine, Mar. 19, 2013, at 20:9–21:12 (ResCap management was "deeply familiar" with representation and warranty claims).

ResCap analyses.[2050] The Examiner concludes that, while it is a close question, it is more likely than not that a court would find that the ResCap Board had a sufficient understanding of the underlying Trust R&W Claims to vote on an informed basis with respect to the RMBS Trust Settlement Agreements.

Importantly, when the ResCap Board voted to approve the RMBS Trust Settlement Agreements, it understood that a settlement with the RMBS Institutional Investors on the allowed amount of Trust R&W Claims was critical to achieving a successful sale of ResCap's mortgage loan origination and servicing platform.[2051] Accordingly, the Examiner concludes that the evidence supports the proposition that the ResCap Board had a rational business purpose in mind when it approved the RMBS Trust Settlement Agreements.

While the May 9, 2012 presentation to the ResCap Board was flawed, the Examiner does not believe that such flaws undermine the conclusion that the settlement negotiations between ResCap, AFI, and the Steering Committee Group were conducted at arm's length.

### (3) Disclosure Of Reasonably Possible Losses On Trust R&W Claims

As noted above, just a few weeks before the $8.7 billion claim amount was agreed upon in connection with the RMBS Trust Settlement Agreements, AFI publicly disclosed that "ResCap's reasonably possible losses over time related to the litigation matters and potential repurchase obligations . . . could be between $0 and $4 billion over existing accruals."[2052] In that same SEC filing, AFI disclosed it had established a reserve of $811 million for such liabilities.[2053]

---

[2050] *See* Int. of J. Ilany, Nov. 28, 2012, at 169:9–173:24 ("[W]e looked at numbers that were in the 40-plus, $50 billion type of numbers, and that we settled it in 20 cents on the dollars, and that given the recovery expectation . . . that ResCap had, because everybody in the industry has different ones, the number we thought could be as high as—closer to [$]20 billion."); *see also* Int. of P. West, Jan. 11, 2013, at 188:17–189:4 ("[A]s we looked at where we had settled claims in the past which was somewhere between 10 and 30 percent, we looked at some market data and said, you know, if we can settle the 45 billion for 20 percent, that that would be a good thing to do.").

[2051] *See* Dep. of T. Marano, Nov. 12, 2012, at 171:8–176:12 ("[R]esolution of the PLS claims was critical to enhancing the value of the platform for a sale. . . . [B]y settling those claims, we put the assets in a position where . . . [w]e could sell them at a higher price."); Int. of E. Smith, Nov. 30, 2012, at 193:14–195:6 ("[W]e were trying to maximize the pie for creditors. Part of doing that was selling the platform and the legacy bonds. And, without that [RMBS Trust] settlement, I don't think we could have sold the mortgage platform for anything close to what we sold it for, $3 billion. I think that it would be at least $1 billion less."); Int. of J. Ilany, Nov. 28, 2012, at 169:9–173:24 ("[W]ithout getting a release from the trustees, this transaction is not closing. . . . It's not closing because nobody's buying. You need to inoculate this platform and this platform, somebody bid $3 billion for it, a big number for the creditors . . . ."); Int. of P. West, Jan. 11, 2013, at 190:9–16 ("[Y]ou've got to have, you know, we wanted to have a settlement of RMBS claims. So, we had a window to sell a very clean platform."); Int. of J. Mack, Jan. 15, 2013, at 211:19–212:4 ("[T]he RMBS Trust Settlement, to me, . . . allows us to sell a clean platform, the value of which [inures] to all of the creditors. So that's a huge benefit to the creditors, being able to sell a clean platform.").

[2052] *See* Ally Financial Inc., Quarterly Report (Form 10-Q) (Apr. 27, 2012), at 73.

[2053] *See id.* at 69.

The Creditors' Committee has suggested that a comparison between the claim amount ultimately agreed with the Steering Committee Group and the exposure disclosed in AFI's SEC filing is evidence of a flawed negotiation process.[2054] To explain the apparent discrepancy between the settlement amount and AFI's disclosures to the SEC, the Debtors assert that the $0 to $4 billion range estimates the liability that the Debtors "would have faced had they continued as [a] going concern outside of bankruptcy."[2055] The Debtors note that the disclosed range was based on non-litigation loan repurchase history, for the "obvious" reason that not one trust had brought a lawsuit against the Debtors before that point in time. The Debtors then contrast these facts with the proposed $8.7 billion allowed claim amount under the RMBS Trust Settlement Agreements. The Debtors assert the $8.7 billion reflected the assumption that all of the 392 trusts would assert all claims against the Debtors through the proof of claim process in the Chapter 11 Cases.[2056]

The Debtors assert that AFI was required to disclose and estimate, if possible, its "reasonably possible" future losses.[2057] In a presentation to the AFI Audit Committee dated July 27, 2011, AFI noted several factors that contributed to AFI's inability to estimate a reasonably possible range of loss in excess of its then current reserve levels with respect to representation and warranty claims, including: (1) there were limited data points for comparative purposes; (2) loss calculation required a loan-by-loan review; and (3) there were significant hurdles for plaintiffs, including the requirement that investors comprise 25% of a class of securities issued by a trust before the trust can pursue representation and warranty claims.[2058]

In the first quarter of 2012, AFI determined that estimation of losses was possible. In an internal accounting memo, AFI referred to several factors in support of its decision that it was now possible for AFI to report a range of possible losses, including: (1) increased activity by trustees relating to PLS representation and warranty claims on behalf of investors; (2) increased activity by investors in their own right relating to PLS representation and warranty claims, "including additional clarity regarding extent of investor power to compel trustees to make PLS R&W claims"; and (3) developments in AFI's PLS representation and warranty cases.[2059] AFI's internal accounting memo specifically referred to the "substantial engagement with Gibbs & Bruns" and "substantial engagement with Talcott Franklin."[2060]

---

[2054] *See* Objection of the Official Committee of Unsecured Creditors to the Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreements [Docket No. 2825] at 14–15, 18.

[2055] Debtors' Reply Brief re *Iridium* Factors in Support of Motion for Approval of RMBS Settlement Agreements, dated Jan. 15, 2012, at 54.

[2056] *Id*.

[2057] *Id*. at 53.

[2058] *See* AFI Audit Committee Mortgage Contingencies Review with Disclosure Benchmarking Presentation, dated July 27, 2011, at 8–9 [RC40021333].

[2059] Memorandum, Legal/Rep and Warrant—Range of Reasonably Possible Loss Disclosure Considerations—Q1 2012, dated Apr. 27, 2012, at 1–2 [ALLY_PEO_0074712].

[2060] *Id*.

As of April 27, 2012, the same date of AFI's accounting memo in which AFI estimated its range of reasonably possible losses at $0 to $4 billion above its accrual of $811 million, ResCap, with AFI's knowledge, was presenting scenarios in which the allowed amount of Trust R&W Claims ranged from $3 to $6 billion, and AFI knew that this range was likely too low.[2061] There is a disconnect between AFI's disclosures in its SEC filings and the settlement discussions with Patrick. As discussed above, Devine was concerned that this disconnect could give rise to "securities/SEC/disclosure" risk for AFI.[2062] On balance, the Examiner believes that AFI's SEC disclosures for the first quarter of 2012 offer relatively little guidance in the Investigation as to whether the negotiations between AFI, ResCap, and the Steering Committee Group were at arm's length. The evidence demonstrates that AFI was considering claims in excess of its SEC disclosure before its 10-Q was filed—it is not the case that AFI believed on April 27 that $4.8 billion was the maximum claim that could be asserted in bankruptcy and later influenced ResCap to agree to settle at a number twice that amount. Instead, from the start, AFI seemingly understood that representation and warranty litigation exposure could well exceed the $4.8 billion disclosed, which disclosure appeared to rely on different assumptions and circumstances than ultimately came to fruition through the RMBS Trust Settlement Agreements.[2063]

### 5. The Now-Terminated Junior Secured Noteholders' Plan Support Agreement

On May 13, 2012, the Debtors, AFI, and the Consenting Junior Secured Noteholders[2064] entered into the Junior Secured Noteholders' Plan Support Agreement. The Junior Secured Noteholders' Plan Support Agreement provided for an intercreditor settlement between AFI and the Consenting Junior Secured Noteholders as to the division of collateral in which both parties purportedly hold security interests.[2065]

---

[2061] *See* E-mail from T. Devine to T. Hamzehpour (Apr. 23, 2012) [EXAM00345835].

[2062] *See* E-mail from T. Devine (May 7, 2012) [EXAM00345282]; Dep. of T. Devine, Nov. 19, 2012, at 201:11–25.

[2063] To be clear, by noting that SEC disclosure requirements and settlement considerations differ, the Examiner is not opining on AFI's disclosure obligations pursuant to GAAP requirements or relevant accounting regulations. AFI's reporting requirements and the considerations in the RMBS Trust Settlement Agreements may not have been the same. *See* E-mails between J. Mackey, D. DeBrunner, and C. Dondzila (Apr. 27, 2012) [ALLY_0226233] (noting that range of $0-$4 billion had been revised from earlier draft of $3-$7 billion and that "finalized proposed range" was based on, among other things, a "variety of discussions with the auditors").

[2064] As of June 11, 2012, the ad hoc group of Consenting Junior Secured Noteholders consisted of the following entities: Alliance Bernstein LP; Appaloosa Management LP; Davidson Kempner Capital Management LLC; DO S1 Limited; Loomis, Sayles & Company, L.P.; Marathon Asset Management, L.P.; P. Schoenfeld Asset Management LP; Pentwater Capital Management LP; Silver Point Finance, LLC; Taconic Capital Advisors LP; Venor Capital Management LP; York Capital Management. *See* Notice Of Filing Of Corrected Exhibit A To Verified Statement Of White & Case LLP Pursuant To Federal Rule Of Bankruptcy Procedure 2019 [Docket No. 488].

[2065] Junior Secured Noteholders' Plan Support Agreement, at 2. The Debtors attested that, "[b]esides for obtaining the support of a key creditor constituency, the settlement with the junior secured noteholders also has the benefit of reducing the estate's interest obligations by $350 million." First Day Affidavit, ¶ 108.

The Junior Secured Noteholders' Plan Support Agreement was terminated by the Consenting Junior Secured Noteholders on or about September 28, 2012.[2066] Because the Junior Secured Noteholders' Plan Support Agreement was primarily an intercreditor settlement and because it was terminated approximately two months after the entry of the Examiner Scope Approval Order, the Examiner did not investigate the process underlying the negotiation and entry into that settlement. Presented below are certain terms of the Junior Secured Noteholders' Plan Support Agreement, as it existed on the Petition Date.

### a. AFI Intercreditor Settlement With Consenting Junior Secured Noteholders

Pursuant to the Junior Secured Noteholders' Plan Support Agreement, distribution of proceeds from Joint Collateral would have occurred in the following sequence:[2067]

- AFI would receive first payment of proceeds from Joint Collateral in the amount of $400 million plus postpetition interest accrued on account of $400 million;

- Holders of Junior Secured Notes Claims would receive the next $1 billion;

- Holders of Junior Secured Notes Claims would receive 81% of the next proceeds from Joint Collateral (and AFI would receive 19%) until the Junior Secured Notes Claims have been paid in full;

- AFI would receive all remaining proceeds from Joint Collateral up to the full amount of the AFI Secured Revolver Facility Claims plus all postpetition interest accrued on account of the AFI Secured Revolver Facility Claims to the extent such interest has not been paid.

If the proceeds from Joint Collateral were insufficient to pay the AFI Secured Revolver Facility Claims and the Junior Secured Notes Claims in full, distributions under the Plan on account of the related deficiency claims would have occurred as follows:

- Holders of Junior Secured Notes Claims would receive 81% of deficiency distributions (and AFI would receive 19%) until Junior Secured Notes Claims have been paid in full;

- AFI would receive all remaining deficiency distributions.

---

[2066] *See* E-mail from G. Proia (Sept. 26, 2012) [ALLY_0209104]; E-mail from G. Proia (Sept. 28, 2012) [ALLY_0209106]. According to a statement from AFI, the termination enabled the Consenting Junior Secured Noteholders to transfer rights in and sell claims arising under the Junior Secured Notes "without waiving the right to accrued and unpaid interest" during the Chapter 11 Cases, and "also free[d] [AFI] from subordinating its recovery by $350 million." *Id.*

[2067] Junior Secured Noteholders' Plan Support Agreement, §§ 5.1, 5.2. In the event of a section 363 sale, the Debtors were to seek authority to pay the holders of Junior Secured Notes Claims in advance of confirmation of a plan of reorganization. *See id.* § 5.5.

### b. Conditional Waiver Of Interest On Joint Collateral

The Consenting Junior Secured Noteholders agreed to waive all rights to any interest on account of the Junior Secured Notes Claims that may be due and owing after the Petition Date through and including December 31, 2012.[2068] That proposed interest waiver was contingent upon the Debtors' compliance with certain deadlines and conditions regarding the Effective Date of the Plan, among other things. Because such deadlines were not met, the terms of the proposed interest waiver would need to be renegotiated by the parties in connection with any new plan support agreement or intercreditor settlement with the Junior Secured Noteholders.

### c. AFI's Obligations Under Junior Secured Noteholders' Plan Support Agreement

Under the Junior Secured Noteholders' Plan Support Agreement, in addition to its general obligations to support the Debtors' restructuring efforts consistent with the AFI Settlement and Plan Sponsor Agreement, AFI agreed to support the prompt payment of proceeds of the Platform Sale and any other assets and cash on hand that represent Joint Collateral or proceeds thereof to the Consenting Junior Secured Noteholders.[2069]

### d. Consenting Junior Secured Noteholders' Obligations Under Junior Secured Noteholders' Plan Support Agreement

Under the Junior Secured Noteholders' Plan Support Agreement, the Consenting Junior Secured Noteholders agreed to the following obligations: (1) support the Debtors' efforts to pursue the restructuring contemplated by the Plan Term Sheet;[2070] (2) support approval of the Cash Collateral Order, Disclosure Statement, DIP facilities, and the relief requested in all first day pleadings;[2071] (3) not contest the validity and enforceability of the Intercreditor Agreement;[2072] and (4) vote to accept the plan, and support confirmation of the plan, including the Debtor Release and Third-Party Release.[2073] In addition, the Consenting Junior Secured Noteholders agreed to restrict themselves from transfer of claims unless the transferee agreed to be bound by the terms of the Junior Secured Noteholders' Plan Support Agreement.[2074]

---

[2068] *Id.* § 5.4(a). After Dec. 31, 2012, the Consenting Junior Secured Noteholders may seek a determination from the Bankruptcy Court that the holders of Junior Secured Notes Claims are entitled to receive postpetition interest accruing from and after January 1, 2013. *See id.*

[2069] *Id.* § 3.1(h).

[2070] *Id.* § 4.1(a).

[2071] *Id.* §§ 4.1(b), (d).

[2072] *Id.* § 4.1(c).

[2073] *Id.* §§ 4.1(f), (g).

[2074] *Id.* § 4.2.

   *e.* *Debtors' Obligations Under Junior Secured Noteholders' Plan Support*
     *Agreement*

  Under the Junior Secured Noteholders' Plan Support Agreement, the Debtors agreed to the following obligations: (1) use good faith obligations to consummate the restructuring as set forth in the Plan Term Sheet and seek bankruptcy court approval of the Junior Secured Noteholders' Plan Support Agreement;[2075] (2) in the Cash Collateral Order, stipulate to the validity of the liens securing the Junior Secured Notes Claims and grant adequate protection for the Junior Secured Notes Claims;[2076] (3) reimburse or pay the out-of-pocket costs and expenses reasonably incurred by the Ad Hoc Group as allowed administrative expenses pursuant to Bankruptcy Code sections 503(b)(1) and 507(a)(2).[2077]

---

[2075] *Id.* §§ 2.1(a), (d).

[2076] *Id.* §§ 2.1(b), (c).

[2077] *Id.* §§ 2.3(b), 11.1(a)(3).

## IV. BOARD OF DIRECTOR AND MANAGEMENT ISSUES

## A.  THE PROTOCOL AND FUNCTIONING OF RESCAP'S BOARD OF DIRECTORS

The ResCap Board was subject to formal governance protocols and requirements, met frequently in response to a variety of challenging circumstances, and had access to numerous sophisticated legal and financial advisors. The statistical data indicate that the ResCap Board was extremely active. Yet, despite the general volume and intensity of the ResCap Board's activities, several factors diminished the Board's overall effectiveness.

Those factors included a grueling rate of activity, substantial turnover of inside directors, dual affiliations of many Board members, underlying conflicts, and information flow management issues. All of this contributed to a level of dysfunction in Board processes, which compromised the Board's capacity to respond optimally to deteriorating conditions. The presence of the Independent Directors was supposed to safeguard ResCap's interests, but their performance was, to a degree, handicapped by problematic structural issues that beset the Board.

### 1.  The ResCap Board Was Increasingly Industrious Yet Beleaguered

In 2005, when ResCap was thriving financially and viewed as having bright prospects going forward, the ResCap Board attended to its duties with fairly conventional diligence. Events occurring during that year demanded no extraordinary attention from the ResCap Board. The ResCap Board was quite stable and methodical in 2005 as compared to later periods.

Worsening market conditions and financial performance starting in the third quarter of 2006 prompted the ResCap Board, by necessity, to become more active. Indeed, from 2005 through 2008, the activity of the ResCap Board eventually reached nearly frenzied levels of meetings and proposals, which in part led to the resignations of the two original Independent Directors of the Board.

Statistics reflect the escalating activity of the ResCap Board during the relevant period. In 2005, a year of significant financial achievements for ResCap, Tom Jacob and Tom Melzer became the Board's first Independent Directors pursuant to dictates of the 2005 Operating Agreement.[1] The ResCap Board (after the appointments of Jacob and Melzer) was then comprised of eight directors and met a total of four times. In 2006, the ResCap Board held six regular and four special meetings, along with fifteen Audit Committee and eleven Executive Committee meetings.

The greater frequency of ResCap Board meetings in 2006 was tied to certain substantial transactions implicating ResCap, namely the November 2006 closing of the Cerberus acquisition of a majority stake in AFI and the 2006 Bank Restructuring. Yet by late 2006, the pace of ResCap Board activity began to accelerate as rapidly changing market circumstances produced dramatic shifts in the mortgage industry. On December 12, 2006, a new business

---

[1] Section 2(g)(i) of the 2005 Operating Agreement required that "[AFI] shall vote for, and ResCap shall at all times have, at least two Independent Directors." 2005 Operating Agreement, § 2(g)(i) [ALLY_0140795]. Jacob and Melzer joined the ResCap Board concurrently on April 20, 2005, in connection with the subsequent execution of the 2005 Operating Agreement.

plan was presented to the ResCap Board, which included projections for 2007 and a three-year 2007–2009 operating plan.[2] The business plan and projections presented to the ResCap Board contemplated a long-term deterioration in the market. But, as it turned out, ResCap's actual results for year-end 2006 were in fact materially worse than the related estimates presented to the Board less than three weeks earlier.[3] These were early signs that ResCap's forecasting capabilities were deficient in the face of a rapidly declining mortgage industry.

After the first quarter of 2007, the ResCap Board met to grapple with recurring liquidity and net worth covenant crises for the company. The need to respond to the magnitude and velocity of declining conditions in the mortgage industry led to an upsurge in activity of the ResCap Board. The Board considered and approved multiple business plans during the course of 2007, reflecting periodic resets of ResCap's operating strategies crafted to secure ResCap's survival.[4] Among other attempted cures to its growing financial woes, ResCap inaugurated a series of asset sales to its parent company in mid-2007 designed to address severe liquidity deficiencies. Several of these sales occurred within compressed timeframes, affording the ResCap Board (and particularly its Independent Directors) a narrow window within which to consider each transaction between negotiation and closing.[5]

On September 7, 2007, the law firm of Mayer Brown made a presentation to the ResCap Board regarding duties owed to various constituencies by directors of a company in the "zone of insolvency," including advice about the risks of engaging in potential fraudulent transfers at a time of financial distress.[6] While Mayer Brown did not opine that ResCap was in the zone of

---

[2] Minutes of a Regular Meeting of the Board of Directors of Residential Capital, LLC, dated Dec. 12, 2006, at RC40006856–57 [RC40006748]; Residential Capital, LLC, ResCap Board of Directors Meeting, 2007–2009 Operating Plan Review, dated Dec. 2006 [EXAM10468633].

[3] Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 101.

[4] Each of the three separate and superseding 2007–2009 business plans presented to the ResCap Board from December 2006 through September 2007—three business plans presented to a board in less than a year itself an extraordinary occurrence—underestimated the severity of worsening mortgage market conditions and overestimated ResCap's financial performance in the face of those conditions. Minutes of a Regular Meeting of the Board of Directors of Residential Capital, LLC, dated Dec. 12, 2006, at RC40006856–57 [RC40006748]; Residential Capital, LLC, ResCap Board of Directors Meeting, 2007–2009 Operating Plan Review, dated Dec. 2006 [EXAM10468633]; Minutes of a Regular Meeting of the Board of Directors of Residential Capital, LLC, May 11, 2007, at RC40005588–89 [RC40005558]; Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Sept. 26, 2007, at RC40005624–26 [RC40005558].

[5] *See* Sections III.G, VII.E.

[6] Minutes of a Regular Meeting of the Board of Directors of Residential Capital, LLC, Sept. 7, 2007, at RC40005620–21 [RC40005558]; Mayer Brown Presentation on Fiduciary Duties of Directors and Related Legal Issues, dated Sept. 7, 2007, at RC40012721–23 [RC40012695]. Mayer Brown gave a similar presentation regarding directors' fiduciary duties in distressed financial circumstances to the AFI Board in May 2008. Minutes of a Special Meeting of the Board of Directors of GMAC LLC, May 30, 2008, at ALLY_PEO_0001080–81 [ALLY_PEO_0001009]. Independent Director Jacob stated that he believed ResCap was in the "zone of insolvency" in August 2007, shortly before Mayer Brown gave its fiduciary duty presentation to the ResCap Board. Int. of T. Jacob, Nov. 7, 2012, at 63:23–64:1 ("Tom Melzer and I said hey listen, we are in the zone of insolvency. We want to understand the duties and responsibilities of the board members of a company which is in a zone of insolvency."), 197:1–6 ("I think [the first time I thought the company was in the zone of insolvency] it was in—toward the third quarter, August of 2007 when they had this credit crunch.").

insolvency, it did advise the ResCap Board that "if insolvency (or potentially a zone of insolvency) is present, the Company's directors should carefully consider the disinterestedness and independence of directors . . . in the context of any proposed transaction among the Company . . . or any of [its] respective affiliates."[7] At the same meeting, Sanjiv Khattri, ResCap's CFO, delivered a ResCap consolidated review presentation to the Board; materials from that meeting detailed strategic considerations and major initiatives being implemented or contemplated to address the various financial and liquidity issues. Those initiatives included planned or potential asset sales, monetization of loan portfolios, expanded use of Ally Bank, a business restructuring, funding considerations, and a potential equity injection by AFI.[8] In light of ResCap's precipitously deteriorating financial performance and the Mayer Brown fiduciary duty presentation, the members of the ResCap Board were on notice of the precarious nature of ResCap's financial condition heading into 2008.

As 2007 progressed, the ResCap Board (and primarily its two Independent Directors) was being updated with greater frequency on numerous actions initiated by managers to deal with various financial and operational issues. The severe volatility and dislocation in market conditions caused ResCap to cease its origination and securitization business for non-conforming loans by September 2007 and to suspend its program of purchasing distressed mortgage loans at about the same time.[9] ResCap suffered downgrades to its credit ratings, thereby increasing its cost of funds. Thus, over the course of 2007, the ResCap Board confronted an array of acute challenges and grave consequences.[10]

Not surprisingly, in light of the escalating urgency of ResCap's business hurdles, the ResCap Board met more often in 2007 than it had in the prior year. The ResCap Board met a total of twelve times in 2007, which included six "special" (i.e., not regularly scheduled) meetings. Further, the ResCap Board experienced substantial turnover in 2007, during which six new "inside" directors were appointed to the Board. Five of the new directors were affiliated with Cerberus (Bossidy, Jones, Kravit, de Molina, and Rossi), the first Cerberus-affiliated appointments to the ResCap Board following consummation of Cerberus's purchase

---

[7] Mayer Brown Presentation on Fiduciary Duties of Directors and Related Legal Issues, dated Sept. 7, 2007, at RC40012726 [RC40012695].

[8] Minutes of a Regular Meeting of the Board of Directors of Residential Capital, LLC, Sept. 7, 2007, at RC40005621–22 [RC40005558]; ResCap Consolidated Review, dated Sept. 7, 2007, at RC40012737–40 [RC40012695].

[9] Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2008), at 6, 18, 48, 63.

[10] *See* Sections III.F–G.

of its stake in AFI in late 2006.[11] Three directors resigned from the ResCap Board in 2007 (Applegate, Giertz, and Paradis),[12] occasioned by the recent transition in ownership control of AFI.[13]

The rate of ResCap Board activity escalated dramatically in 2008 and 2009 as ResCap's financial problems deepened. The ResCap Board met fifty times in 2008 and eighty-seven times in 2009. The quality of ResCap Board conduct, however, could not keep pace with the frequency of meetings. The frenetic rate of ResCap Board activity hampered the Independent Directors' ability to fulfill the role they were appointed to play as guardians of ResCap's separateness and independence.

As ResCap's financial problems mounted, the Board's original Independent Directors Jacob and Melzer began to feel the burden of rapid-fire activity as the frequency of Board meetings and management turnover spiked beyond their expectations.[14] In 2008, ResCap consummated the greatest number of Affiliate Transactions (e.g., asset sales and financing transactions), with respect to which the Independent Directors paid particular scrutiny. Jacob and Melzer eventually both concluded that the hectic circumstances of ResCap's fight for survival, as well as ResCap's increasing dependence on its parent company, compelled their resignations from the ResCap Board. They resigned on April 20, 2008, three years to the day after they had joined.[15] The following morning, Bossidy tendered his own Board resignation.[16]

The immediate impetus behind the resignations of Independent Directors Jacob and Melzer appears to be twofold: (1) dissatisfaction with the proposed Affiliate Transaction through which ResCap's $3.5 billion credit facility would be restructured, with the result that AFI would displace unsecured lenders and obtain a priority over certain of ResCap's other

---

[11] *See* Minutes of a Regular Meeting of the Board of Directors of Residential Capital, LLC, Mar. 23, 2007, at RC40005567–68 [RC40005558]; Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Aug. 21, 2007, at RC40005615 [RC40005558]; Minutes of a Regular Meeting of the Board of Directors of Residential Capital, LLC, Sept. 7, 2007, at RC40005619 [RC40005558]; *see also* Appendix IV.A.1—1; Appendix IV.A.1—2.

[12] Craig Chapman also became a member of the ResCap Board on April 20, 2007, but he resigned soon after, on July 17, 2007, apparently having attended only a single Board meeting on May 11, 2007. *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Apr. 20, 2007, at RC40005578 [RC40005558]; Minutes of a Regular Meeting of the Board of Directors of Residential Capital, LLC, May 11, 2007, at RC40005587 [RC40005558]; Minutes of a Regular Meeting of the Board of Directors of Residential Capital, LLC, July 17, 2007, at RC40005602 [RC40005558].

[13] *See* Minutes of a Regular Meeting of the Board of Directors of Residential Capital, LLC, Mar. 23, 2007, at RC40005567 [RC40005558] (resignation of Applegate); Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Apr. 20, 2007, at RC40005577–78 [RC40005558] (resignation of Giertz); Minutes of a Regular Meeting of the Board of Directors of Residential Capital, LLC, May 11, 2007, at RC40005587 [RC40005558] (resignation of Paradis).

[14] *See* Int. of T. Jacob, Nov. 7, 2012, 216:25–219:20; Int. of T. Melzer, Oct. 10, 2012, 161:2–20, 170:15–171:1; *see also* Appendix IV.A.1—3.

[15] *See* E-mail from A. de Molina (Apr. 20, 2008) [EXAM12336204]; *see also* E-mails between J. Jones and A. de Molina (Apr. 13–14, 2008) [EXAM12381623].

[16] *See* E-mail from P. Bossidy (Apr. 21, 2008) [EXAM12336092].

creditors; and (2) weariness resulting from the increasingly onerous ResCap Board duties with which they were saddled.[17] Jacob and Melzer resigned from the Board without having approved the $3.5 billion facility restructuring that they had resisted because they believed AFI was overreaching.[18]

The concerns of Jacob and Melzer about their roles as ResCap's Independent Directors, however, dated from an earlier period, when management turnover at ResCap began to proliferate. After the Cerberus acquisition in late 2006, both Jacob and Melzer felt a shift in dynamics on the ResCap Board. By the end of the first quarter of 2007, there was a substantial change in senior ResCap and AFI management, which directly affected the composition of the ResCap Board. After amendment of the 2005 Operating Agreement (through the 2006 Amended Operating Agreement) deleted a provision that had previously required that "ResCap shall at all times . . . conduct or cause to be conducted the business operations of itself and its Subsidiaries by its or their own employees and officers, who will not also be employees or officers of any [AFI] affiliates,"[19] Cerberus began to insert its own personnel into the ResCap and AFI organizational structures, including the entities' boards of directors. The deletion of this separateness provision eventually served to dilute ResCap's independence.

Within four months of the Cerberus acquisition, ResCap CFO James Giertz resigned, citing "the random management style of Cerberus" and "the drive to dismantle the ResCap structure and replace it with a more substantial infrastructure within the parent company [AFI]."[20] In November 2007, Michael Rossi, ResCap's Board Chairman, asked Jerry Lombardo, then a Cerberus-affiliated ResCap advisor, to lead a team in "develop[ing] a plan to reconstruct [ResCap's] governance and organization structure."[21] In response, Lombardo prepared a presentation entitled "ResCap Governance Project Approach Proposal," which recognized the presence of ResCap "[c]ulture clashes," observed that both AFI and Cerberus were "*perceived* to be trying to drive the bus," and acknowledged operational issues such as

---

[17] Int. of T. Jacob, Nov. 7, 2012, at 212:21–218:4; Int. of T. Melzer, Oct. 10, 2012, at 159:6–161:11.

[18] Jacob and Melzer, through their counsel at Bryan Cave, went out of their way to propose revisions to certain April 2008 ResCap Board meeting minutes, which were never adopted. *See* Minutes of Prior Meetings April 14, April 18, and April 20, 2008: Review Comments Received From Counsel to Former Independent Directors After Meeting Minutes Were Approved, at RC40008502–13 [RC40008489]; Int. of T. Jacob, Nov. 7, 2012, at 237:13–240:1; Int. of T. Melzer, Oct. 10, 2012, at 279:5–285:9, 287:12–289:15. No one from ResCap contacted Jacob and Melzer after their resignations, and the subsequent Independent Directors (and, indeed, most ResCap and AFI officers and directors)—particularly the two "super" Independent Directors appointed in 2011 to evaluate prior Affiliate Transactions, several of which were approved by Jacob and Melzer—exhibited a surprising lack of curiosity as to the reason(s) for the simultaneous resignations of the Board's original Independent Directors. Int. of T. Jacob, Nov. 7, 2012, at 221:12–223:14; Int. of T. Melzer, Oct. 10, 2012, at 171:2–172:7; Int. of E. Smith, Nov. 30, 2012, at 44:16–45:4, 48:24–49:15; Int. of K. Hirtler-Garvey, Dec. 20, 2012, at 70:14–72:6; Int. of P. West, Dec. 18, 2012, at 54:5–23; Int. of J. Ilany, Nov. 28, 2012, at 65:9–66:12; Int. of J. Mack, Dec. 5, 2012, at 81:9–82:12.

[19] *Compare* 2005 Operating Agreement, § 2(f)(vii) [ALLY_0140795], *with* 2006 Amended Operating Agreement, § 2(f).

[20] E-mail from J. Giertz (Mar. 26, 2007) [EXAM10166630].

[21] E-mail from J. Lombardo (Dec. 5, 2007) [CCM00498698].

"unclear roles & responsibilities [and] overlapping, inefficient and ineffective oversight processes . . . ."[22] Cerberus instituted numerous managerial changes to remedy the perceived administrative inefficiency.[23]

Jacob described this management turnover as a "revolving door" and felt the frequent management changes were "extremely disruptive" to the operations of ResCap and Board.[24] Similarly, Melzer recalled a "parade of people" entering and exiting management in 2007, with the rapid ResCap and AFI management turnover akin to a "merry-go-round," leading to a situation in which he was largely unfamiliar with "the executives that were driving the train."[25] Jacob felt that Cerberus was bringing in new people to "[put] out fires" but was neglecting the impact that Cerberus-directed management changes had on the rest of the organization.[26] The initial Independent Directors were never consulted in advance with respect to the substantial managerial changes that affected their ResCap Board service.[27] Eventually, they lost familiarity with and confidence in the senior ResCap management with whom they interacted.[28]

Moreover, the rapid pace of proposed Affiliate Transactions late in the tenure of Jacob and Melzer convinced them that ResCap's leverage in ongoing negotiations with AFI was waning, and that their opportunity for measured consideration of significant issues was a thing of the past. Jacob felt pressured to approve Affiliate Transactions that for him were problematic:

> [W]e were feeling rushed the entire [first] quarter [of 2008] . . . .
> I never met all these guys who were making the presentations
> [to the ResCap Board] . . . . [T]hat was really extremely
> uncomfortable with the new management that was rushing us
> into making the decisions . . . . And here we are in 2008, a
> distressed company, you know, kind of scrambling to find
> liquidity and rushing the [I]ndependent [D]irectors to approve

---

[22] ResCap Governance Project Approach Proposal, dated Nov. 29, 2007, at 2 [CCM00498699] (emphasis in the original).

[23] Int. of L. Tessler, Nov. 16, 2012, at 86:4–19, 89:7–19, 115:22–116:10; Int. of E. Feldstein, Dec. 14, 2012, at 188:19–189:20, 200:7–201:4; Int. of P. Bossidy, Dec. 14, 2012, at 120:13–121:6.

[24] Int. of T. Jacob, Nov. 7, 2012, at 60:2–63:19.

[25] Int. of T. Melzer, Oct. 10, 2012, at 63:13–64:5, 161:12–162:24, 223:3–225:17.

[26] Int. of T. Jacob, Nov. 7, 2012, at 61:6–8, 62:21–63:3.

[27] *Id.* at 218:24–220:10. Tellingly, Jacob and Melzer learned of the Cerberus acquisition at about the same time it was publicly announced. *See id.* at 120:12–25. To the extent that the ResCap Board was not consulted or informed with respect to termination of ResCap officers, the relevant sections of the 2006 ResCap LLC Agreement and 2008 ResCap Amended LLC Agreement, addressing the appointment and removal of ResCap officers, may have been violated.

[28] Int. of T. Jacob, Nov. 7, 2012, at 61:6–8, 62:23–63:2; Int. of T. Melzer, Oct. 10, 2012, at 225:24–227:6. An aggregate total of fourteen inside directors populated the ResCap Board during the co-terminous tenures of Jacob and Melzer. *See* Appendix IV.A.1—1.

IV-6

> related party transactions [to] which we knew that we could not
> in good conscience agree. And so, we were in a totally different
> company [from the one we originally joined] . . . . [T]he whole
> thing was crazy.[29]

In early 2008, when Jacob and Melzer felt harried by a flurry of proposed Affiliate Transactions, the rest of the ResCap Board (consisting of several AFI-affiliated directors) unanimously approved an increase in Independent Director annual fees. After initially expressing gratitude, Jacob and Melzer renounced such award in March 2008 because they were concerned about the appearance of impropriety created by a compensation increase they felt was designed to entice them regarding consideration of Affiliate Transactions.[30] Soon after, the Independent Directors decided they had endured enough on the ResCap Board and resigned in tandem.

Overall, there was significant turnover and instability on the ResCap Board in 2008. Seven new directors were appointed (two of whom (Marano and Weintraub) were affiliated with Cerberus), and nine directors resigned (two of whom (Jones and Rossi) were Cerberus-affiliated).

Following the resignations of Jacob and Melzer in April 2008, the ResCap Board appointed and then withdrew the appointments of two new directors (David DeBrunner and Clifford Skelton).[31] AFI spearheaded the attempt to identify, recruit, and appoint two new Independent Directors to the ResCap Board,[32] as required by the 2006 Amended Operating Agreement. AFI appointed James Chapman to serve as an Independent Director as of May 15, 2008, but AFI swiftly rescinded his appointment after he attended a single Board meeting by

---

[29] Int. of T. Jacob, Nov. 7, 2012, at 217:3–218:13.

[30] *See id.* at 213:9–214:9; Int. of T. Melzer, Oct. 10, 2012, at 239:8–21; Int. of T. Jacob, Apr. 16, 2013, at 44:23–45:3; *see also* Section IV.B.1.d(4).

[31] At its meeting on April 21, 2008, the ResCap Board elected three new "directors to fill the vacancies on the Board": David DeBrunner (AFI VP, Corporate Controller, and Chief Accounting Officer), Clifford Skelton (AFI Chief Information Officer), and James Young (ResCap CFO). Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Apr. 21, 2008, at RC40005731 32 [RC40005652]. DeBrunner was not only absent from the meeting, but had not even been contacted prior to his appointment. *See* Int. of D. Debrunner, Sept. 13, 2012, at 52:12–53:3. On April 23, 2008, another ResCap Board meeting was convened at the request of ResCap's shareholder GMAC Mortgage Group LLC, "to reassess and revise the composition of the ResCap Board of Directors." *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Apr. 23, 2008, at RC40005741 [RC40005652]. By resolution of the ResCap Board, the appointments of Skelton and Young were "rescinded and nullified, *ab initio*, as though [they] never occurred." *See id.* A slate of eight directors was then elected, including new appointees Marano, Weintraub, and Linda Zukauckas. *See id.* The Investigation uncovered insufficient evidence to determine whether any of the April 21, 2008 appointees were intended to serve as Independent Directors.

[32] *See* E-mails between R. Hull and W. Solomon (May 15, 2008) [EXAM12337817]; E-mail between J. Jones, A. De Molina, and W. Solomon (May 20, 2008) [EXAM11305628]; Int. of D. DeBrunner, Sept. 13, 2012, at 53:11–19, 65:3–66:1; Int. of T. Hamzehpour, Oct. 5, 2012, at 232:20–233:9; Int. of K. Hirtler-Garvey, Dec. 20, 2012, at 67:20–68:5, 69:25–70:22.

telephone.[33] AFI also appointed Smith as an Independent Director at the same time as Chapman (Smith continues to serve as of the current time, making him the longest-tenured Independent Director).[34] AFI then appointed Hirtler-Garvey as the second Independent Director of the ResCap Board on June 12, 2008.[35] For approximately four weeks only one Independent Director served on the ResCap Board.

The newly minted Independent Directors (Smith and then Hirtler-Garvey) were promptly confronted by worsening market conditions, financial distress contingency planning, and a series of Affiliate Transactions that demanded their close scrutiny. As it turned out, the four-week period during which only one Independent Director (Smith) was seated on the ResCap Board encompassed Board approval of several Affiliate Transactions. On June 1, 2008, less than two weeks after he had joined the ResCap Board, Smith participated in a meeting that addressed a series of complex and sizeable Affiliate Transactions, which implicated contract-governed relationships between ResCap and two affiliated entities: (1) a proposed $3.5 billion senior secured facility with AFI (the terms of which in part had precipitated the resignations of Jacob and Melzer); (2) three commitment letters from Cerberus for the purchase of assets totaling $1.175 billion; (3) the sale of the Resort Finance business to AFI; (4) an amendment to the Secured MSR facility; and (5) the proposed Servicing Advance Factoring Facility from AFI. Despite a blunt admonition from AFI CEO and ResCap Director de Molina regarding the need for ResCap Board members with affiliations to AFI and Cerberus to take account of conflicts of interests that could cloud their judgment (discussed further below), the full ResCap Board approved these various Affiliate Transactions without abstention and with Smith voting as a solo Independent Director.[36]

Similarly, at Hirtler-Garvey's first ResCap Board meeting shortly thereafter on June 13, 2008, the Board approved a waiver of a section of the 2006 Amended Operating Agreement (in respect of the model home transaction) that prohibited a ResCap investment in an affiliate entity.[37] Hirtler-Garvey's task at her very first Board meeting to review effectively and understand intricacies of both the 2006 Amended Operating Agreement and the proposed Affiliate Transaction was a challenging one.

---

[33] *See* Letter from R. Hull to J. Chapman (May 15, 2008) [EXAM10146754]; E-mail from W. Solomon (May 28, 2008) [EXAM11234241]; Participant List for a Meeting of the Board of Directors, Residential Capital, LLC, May 22, 2008, at RC40006981 [RC40006934] (identifying Chapman as a participant by telephone). The Investigation has revealed little about the mysterious circumstances surrounding Chapman's short-lived appointment to, and speedy disappearance from, the ResCap Board. The e-mail withdrawing Chapman's appointment suggests that his lack of "independence" was one of a number of factors on which AFI's decision was based, and Chapman's reply similarly acknowledges an "existing conflict." E-mails between W. Solomon and J. Chapman (May 27–28, 2008) [EXAM11234241].

[34] *See* Letter from R. Hull to E. Smith (May 15, 2008) at EXAM10146755 [EXAM10146754].

[35] *See* Letter from C. Quenneville to K. Hirtler-Garvey (Jun. 12, 2008) [CCM00388535].

[36] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, June 1, 2008, at RC40005749, RC40005755–56 [RC40005652]. The transactions addressed at the June 1, 2008 ResCap Board meeting appear to be the only Affiliate Transactions presented for approval to any Independent Directors that were subject to the vote of only a single Independent Director.

[37] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, June 13, 2008, at RC40005783–84 [RC40005652].

The new Independent Directors also soon addressed the imminent prospects of a ResCap bankruptcy. By September 2008 and over the coming months, Lazard made several presentations and frequent appearances as ResCap's financial advisor at ResCap Board meetings as part of potential pre-bankruptcy and restructuring planning.[38] On September 15, 2008, the ResCap Board agreed to meet as frequently as needed to address market and business updates.[39] Numerous subsequent Board meetings through early November 2008 (including four meetings in a single week in October), led primarily by Lazard and Skadden, focused on bankruptcy planning and solvency issues.[40] On September 23, 2008, Lazard made explicit to the ResCap Board what the Mayer Brown fiduciary duty presentation of a year earlier had implied: "ResCap's balance sheet and current liquidity situation place it within the zone of insolvency and . . . the best course of action for the Directors is to act as if the company were insolvent and consider the best interest of all its creditors."[41]

From at least that time forward, the ResCap Board was largely focused on ResCap's survival, rather than its mere stabilization. ResCap managed to secure its survival primarily through continuing financial support from AFI following AFI's receipt of TARP funds, until a

---

[38] *See, e.g.,* Minutes of a Reguler [sic] Meeting of the Board of Residential Capital, LLC, Sept. 12, 2008, at RC40005863–65 [RC40005652]; Minutes of a Special Meeting of the Board of Residential Capital, LLC, Sept. 15, 2008, at RC40005866–67 [RC40005652]; Minutes of a Special Meeting of the Board of Residential Capital, LLC, Sept. 17, 2008, at RC40005868–69 [RC40005652]; Minutes of a Special Meeting of the Board of Residential Capital, LLC, Sept. 23, 2008, at RC40005872–74 [RC40005652]; Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 1, 2008, at RC40005875–76 [RC40005652]; Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 8, 2008, at RC40005877–79 [RC40005652]; Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 10, 2008, at RC40005880–81 [RC40005652]; Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 16, 2008, at RC40005882–83 [RC40005652]; Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 17, 2008, at RC40005884–86 [RC40005652]; Minutes of a Meeting of the Board of Residential Capital, LLC, Oct. 20, 2008, at RC40005887–89 [RC40005652]; Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 23, 2008, at RC40005890–93 [RC40005652]; Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 28, 2008, at RC40005894–96 [RC40005652].

[39] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Sept. 15, 2008, at RC40005867 [RC40005652].

[40] *See* Minutes of a Special Meeting of the Board of Residential Capital, LLC, Sept. 23, 2008, at RC40005874 [RC40005652]; Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 8, 2008, at RC40005875–76 [RC40005652]; Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 16, 2008, at RC40005882–83 [RC40005652]; Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 17, 2008, at RC40005884–85 [RC40005652]; Minutes of a Meeting of the Board of Residential Capital, LLC, Oct. 20, 2008, at RC40005887–88 [RC40005652]; Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 23, 2008, at RC40005891–93 [RC40005652]; Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 30, 2008, at RC40005897–98 [RC40005652]; Minutes of a Special Meeting of the Board of Residential Capital, LLC, Nov. 8, 2008, at RC40005905 [RC40005652].

[41] Minutes of a Meeting of an Executive Session of the Board of Residential Capital, LLC, Sept. 23, 2008, at RC40006865 [RC40006865].

bankruptcy filing—which had seemed imminent in 2008[42] and was likely deferred for years due to considerations relating to AFI's circumstances—was finally deemed to be in the interests of both ResCap and its parent.[43]

The ResCap Board continued to be extremely active (although not necessarily proactive) during this entire challenging period. After peaking at eighty-seven meetings in 2009 (as ResCap's fragile existence persisted), the ResCap Board met twenty-six times in 2010 (after AFI received TARP funds), thirty-one times in 2011, and nineteen times in 2012 up until the Petition Date.

EXHIBIT IV.A.1
**ResCap Board of Director Meetings**
2005 – 2012 (until Petition Date)



*Source: Minutes of Meetings of the ResCap Board Produced to Examiner; Independent Director Compensation, April 1, 2012 – Present, Meeting Attendance Fees, Board and Committees, dated May 16, 2012 [EXAM00294338].*

Starting in 2008, the ResCap Board was advised by a coterie of legal and financial advisors, including the law firms Bryan Cave (counsel to Jacob and Melzer); Morrison & Foerster (counsel to Cerberus secondee Marano and then to the full ResCap Board); Morrison Cohen (counsel to the Independent Directors who succeeded Jacob and Melzer); Skadden (counsel to the ResCap Board); and Mayer Brown (counsel to both the ResCap and AFI Boards);[44] as well as financial advisors and/or fairness opinion providers Morgan Stanley,

---

[42] For example, at a ResCap Board meeting on October 17, 2008, Skadden presented contingency and bankruptcy planning updates to the Board, and indicated that it had begun drafting chapter 11 bankruptcy pleadings. Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 17, 2008, at RC40005884–85 [RC40005652].

[43] *See generally* Sections III.I and III.J.

[44] ResCap General Counsel Tammy Hamzehpour was not a particularly influential figure with respect to the functioning of the ResCap Board, especially regarding Independent Directors. *See* Int. of T. Jacob, Nov. 7, 2012, at 83:23–84:1 84:4–7; Int. of T. Melzer, Oct. 10, 2012, at 237:17–24; Int. of E. Smith, Nov. 30, 2012, at 51:7–22; Int. of P. West, Dec. 18, 2012, at 76:4–13, 234:13–22; Int. of J. Ilany, Nov. 28, 2012, at 89:19–90:22, 104:8–14; Int. of J. Mack, Dec. 5, 2012, at 98:22–99:6.

Lazard, FTI, Goldin Associates, Houlihan Lokey, UBS, and PwC. Yet, despite the substantial professional resources at the ResCap Board's disposal, the functioning of the Board suffered from flaws that eroded its performance.

### 2. *Governing Protocols Of The ResCap Board Were Not Consistently Applied*

The composition and conduct of the ResCap Board were subject to various requirements intended to facilitate ResCap's independence and separateness from AFI (initially bolstering ResCap's credit rating), primarily through appointment of at least two Independent Directors at any given time.[45] The key documentary sources of ResCap Board protocol were the 2005 Operating Agreement and the 2006 Amended Operating Agreement (collectively, the "Operating Agreements") and relevant provisions in ResCap's bond indentures.[46] Certain Board resolutions (seemingly lifted from Cerberus Secondment Agreements) and an unidentified memorandum also reflected ResCap Board protocol.[47]

Although the Operating Agreements did not expressly require Independent Director approval of all Affiliate Transactions,[48] the Independent Directors nevertheless believed that they were obligated under governing Board protocol sources (e.g., the Operating Agreements and indenture provisions) to scrutinize all proposed Affiliate Transactions carefully. As a threshold matter, Independent Directors generally believed that the Operating Agreements governed their duties on the ResCap Board.[49] The Independent Directors also generally believed (despite the technical intricacies of the Operating Agreements) that they owed

---

[45] In compliance with the dictates of the Operating Agreements, the ResCap Board continuously encompassed at least two Independent Directors, with the notable exception described above following the simultaneous resignations of Jacob and Melzer, when Smith was for a period of time the lone Independent Director on the Board in the wake of mishaps in efforts to fill the two vacancies.

[46] *See* Section IV.A.2.

[47] *See* Unanimous Written Consent of the Residential Capital, LLC, Board of Directors, dated July 14, 2008, at 1–2 [EXAM20213485]; Draft ResCap Special Committee Procedures, dated Aug. 8, 2008, at RC40008488 [RC40008442]; Resolutions for Adoption by the Residential Capital, LLC, Board of Directors, dated Dec. 5, 2011, at RC40020104–07 [RC40020073]; Minutes of a Special Meeting of the Board of Residential Capital, LLC, Dec. 5, 2011, at RC40018719–22 [RC40018411]. Notably, the AFI Board also adopted independent director governance requirements for proposed Affiliate Transactions with Cerberus above a certain monetary threshold, but did so shortly after the closing of the Cerberus acquisition and long before the ResCap Board adopted similar requirements. *See* GMAC LLC Board of Directors Meeting Appendix III—Report on Affiliated Transactions, dated Feb. 8, 2007, at 95 [ALLY_0259170] ("[A]ll new [Affiliate Transactions] are subject to review by . . . Independent Directors if transactions larger than $5 million."); *see also* E-mail from J. Giertz (Feb. 13, 2007) [EXAM11371431] (referencing "a new governance requirement for any significant transactions with a [C]erberus affiliated company" that requires review by AFI independent directors of all such transactions for $5 million or more).

[48] *See generally* Section III.B.

[49] *See* Int. of T. Jacob, Nov. 7, 2012, at 127:22–23, 128:14–129:2; Int. of T. Melzer, Oct. 10, 2012, at 82:21–83:4; Int. of K. Hirtler-Garvey, Dec. 20, 2012, at 109:6–12, 184:5–16. For example, Hirtler-Garvey stated that the 2006 Amended Operating Agreement governed the responsibilities of the Special Committee, which was comprised of Hirtler-Garvey and Smith and, later, of West and Smith. *See* Int. of K. Hirtler-Garvey, Dec. 20, 2012, at 109:6–12, 184:5–16; Int. of P. West, Dec. 18, 2012, at 118:17–22.

fiduciary duties to, and were appointed to protect the interests of, ResCap's creditors.[50] For example, Melzer and Smith were consistently concerned with voting in the best interests of only ResCap and its creditors when making decisions about proposed Affiliate Transactions because they believed that they were obligated to do so under the Operating Agreements.[51]

West and Hirtler-Garvey specifically noted that, pursuant to their understanding of the dictates of the 2006 Amended Operating Agreement, the fiduciary duties of the Independent Directors included "determin[ing] when it was appropriate to look at Affiliate Transactions," which occurred whenever the proposed transactions satisfied certain criteria.[52] West and Smith believed that the Independent Directors were required to review and obtain fairness opinions for every proposed Affiliate Transaction that exceeded certain monetary thresholds.[53]

The initial Independent Directors began the special scrutiny of proposed Affiliate Transactions. Jacob believed that "it was an established governance process" that he and Melzer would review all proposed Affiliate Transactions, and he stated that they in fact convened to review every such proposed transaction.[54] Jacob and Melzer believed that, as the only disinterested parties on the ResCap Board, they were bound to determine whether each proposed Affiliate Transaction was at arm's length and for fair value.[55] West also thought that, if a proposed transaction satisfied the criteria of an Affiliate Transaction, there were no circumstances under which Independent Director approval of that proposed Affiliate Transaction was not necessary or could be excused.[56] West never recalled receiving advice to the effect that "the Board could decide that it did not need the Independent Directors to approve Affiliate Transactions under certain circumstances."[57]

Notably, Jacob and Melzer believed that either of them could have singlehandedly vetoed any proposed Affiliate Transaction, as long as he felt that such veto was "in the best interests of all the stakeholders," particularly ResCap's creditors.[58] Smith also emphasized that the prerogative of the Independent Directors to approve or veto any proposed Affiliate

---

[50] *See* Int. of T. Melzer, Oct. 10, 2012, at 54:4–55:5; Int. of K. Hirtler-Garvey, Dec. 20, 2012, at 141:16–18, 141:25–142:4; Int. of P. West, Dec. 18, 2012, at 69:10–14, 69:21; Int. of J. Ilany, Nov. 28, 2012, 79:22–80:4; Int. of J. Mack, Dec. 5, 2012, 69:15–20, 69:25–70:3.

[51] *See* Int. of T. Melzer, Oct. 10, 2012, at 55:21–56:8, 104:1–16; Int. of E. Smith, Nov. 30, 2012, at 139:12–140:1, 141:12–20.

[52] *See* Int. of P. West, Dec. 18, 2012, at 96:22–24; Int. of K. Hirtler-Garvey, Dec. 20, 2012, at 161:4–14, 173:18–174:2.

[53] *S*ee Int. of E. Smith, Nov. 30, 2012, at 91:25–92:20; Int. of P. West, Dec. 18, 2012, at 70:13–18, 71:24–72:4, 131:11–16; Int. of P. West, Jan. 11, 2013, at 139:17–140:8, 144:3–12. West stated that the Special Committee always had to review any proposed Affiliate Transaction with a value exceeding $10 million and obtain fairness opinions for transactions over $500 million. Int. of P. West, Jan. 11, 2013, at 139:17–140:7, 144:3–12.

[54] Int. of T. Jacob, Nov. 7, 2012, at 134:17–22, 134:25–135:4.

[55] *Id.* at 130:18–131:7; Int. of T. Melzer, Oct. 10, 2012, at 96:17–98:6.

[56] Int. of P. West, Dec. 18, 2012, at 143:9–18.

[57] *Id.* at 141:19–142:1.

[58] Int. of T. Jacob, Nov. 7, 2012, at 145:6–10; Int. of T. Melzer, Oct. 10, 2012, at 163:13–164:4; 199:21–200:03.

Transaction "was an extremely important part of [their] function" in order to ensure that the transaction was "fair" to ResCap's stakeholders, specifically its creditors.[59] However, although certain Independent Directors expressly believed that they each had effective pocket veto power with respect to Affiliate Transactions, they *never* exercised that solo veto power and *always* voted the same way.[60]

Despite the fairly uniform understanding over time by the various Independent Directors of their fiduciary duties under governing Board protocol documents, those governance provisions were often applied imprecisely or loosely, perhaps because the Board protocol requirements in the various documentary sources were not fully consistent.[61] Indeed, certain transactions that appeared to qualify as Affiliate Transactions, and arguably should have been subject to focused Independent Director assessment, were authorized by ResCap management outside the purview of related-party transaction protocol under the Operating Agreements and indenture provisions.[62]

Counsel for Jacob and Melzer (Bryan Cave) specifically questioned the failure of ResCap management to bring to the attention of the Independent Directors a related-party transaction with Cerberus in November 2007.[63] Hamzehpour, ResCap's General Counsel, responded to the Bryan Cave attorney (James Nouss) that ResCap management had internally decided that such transaction was not "material" ("given the small [$3.2 million value] involved"), but that in any event it satisfied the "arm's length" and "fair value" requirements of the 2006 Amended Operating Agreement, thereby mooting the need to bring it to the Independent Directors to make their own separate assessment of those terms.[64]

Other examples exist of inconsistent or relaxed application of ResCap Board protocol governing approval of proposed Affiliate Transactions. The issue of government settlement allocations as between ResCap and AFI appears never to have been perceived or considered by the ResCap Board as subject to special Independent Director scrutiny as Affiliate Transactions.[65] Similarly, various derivative transaction agreements and amendments were never reviewed by the ResCap Board and thus were not scrutinized as Affiliate Transactions by the Independent

---

[59] Int. of E. Smith, Nov. 30, 2012, at 95:21–96:10.

[60] *See* Int. of T. Jacob, Nov. 7, 2012, at 144:11–145:10; Int. of T. Melzer, Oct. 10, 2012, at 153:12–14, 157:23–159:5, 163:7–164:4; Int. of E. Smith, Nov. 30, 2012, at 96:11–21, 97:13–19.

[61] *See* Section IV.A.2.

[62] Even when the protocol requirements of the Operating Agreements were technically honored, they were eventually eroded through recurring waivers secured in connection with various Affiliate Transactions, including with respect to the 2006 Bank Restructuring. Indeed, by late 2010, ResCap CEO Marano wrote in an email to AFI colleagues: "We are doing dumb stuff to maintain a charade of a fig leaf," presumably referring to the debilitated "firewall" created through the 2006 Amended Operating Agreement. E-mail from T. Marano (Nov. 22, 2010) [ALLY_0359049].

[63] E-mail from J. Nouss to T. Hamzehpour (Dec. 11, 2007), at MELZER.006947 [MELZER.006946].

[64] E-mails from T. Hamzehpour to J. Nouss (Dec. 11, 19, 2007), at MELZER.006946–47 [MELZER.006946].

[65] *See* Int. of K. Hirtler-Garvey, Dec. 20, 2012, at 317:20–318:5; Int. of P. West, Dec. 18, 2012, at 105:6–16; Int. of P. West, Jan. 11, 2013, at 53:19–56:16, 57:3–12, 58:8–59:25, 61:13–63:8; Int. of J. Mack, Jan. 15, 2013, at 96:15–97:7, 97:18–98:14, 99:13–16, 99:24–100:16.

Directors.[66] Further, an approximately $433 million in-kind dividend paid out by ResCap to GM in 2006 seems never to have been specifically approved by the Board, let alone by the Independent Directors.[67] Some evidence, therefore, creates the impression that certain Affiliate Transactions with AFI and Cerberus entities, through either design or carelessness by ResCap's management, circumvented the scrutiny of ResCap's Independent Directors.[68]

### 3. Board Dynamics Created Obstacles To Optimal Functioning

The composition and conduct of the ResCap Board inhibited its optimal functioning. The ResCap Board was consistently populated by directors with dual affiliations. Over its history, 43% of non-independent ResCap Board members had affiliations with either AFI, Cerberus, or both; until 2009, the majority of its seats were filled by dual-affiliated directors.[69] The dynamics of the ResCap Board were thus complex, as potential conflicts loomed perpetually.

AFI executive David Walker—who was involved in the decision to form ResCap, helped craft the 2005 Operating Agreement, was a founding member of the ResCap Board, and helped recruit original Independent Directors Jacob and Melzer—described the ResCap Board as having had "three heads in the room," namely AFI, ResCap, and the set of two Independent Directors.[70] The Board's effectiveness in managing the intricate affiliate-entity relationships hinged on the diligence and skill of the Independent Directors, who contended with the three "heads in the room."[71]

---

[66] Int. of T. Melzer, Oct. 10, 2012, at 245:11–22; Int. of P. West, Dec. 18, 2012, at 242:17–244:21; Int. of P. West, Jan. 11, 2013, at 50:21–51:3, 52:16–24.

[67] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Dec. 12, 2006, at RC40006860 [RC40006748]; Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 104–05.

[68] The issue of management control of information vis-à-vis the Independent Directors is discussed further below, including the most egregious example of possible insider manipulation of the Independent Director review process in connection with the 2006 Bank Restructuring. *See* Section V.A.1.a (providing more detail regarding the respective roles of inside managers and Independent Directors in the 2006 Bank Restructuring).

[69] *See* Appendices IV.A—2,—3.

[70] Int. of D. Walker, Nov. 28, 2012, at 46:13–15.

[71] Each of the Independent Directors possesses impressive experience and skills. But none of them previously faced the challenges that ResCap came to pose for them, some seemed to lack familiarity with certain key concepts at the core of those challenges, and collectively they had somewhat differing understandings of facets of their fiduciary duties, all of which may bear on the judgment they employed in their capacity as Independent Directors. Int. of T. Jacob, Nov. 7, 2012, at 11:7–17, 11:22–12:20, 64:4–7, 229:21–231:6; Int. of T. Melzer, Oct. 10, 2012, at 29:2–4, 199:13–200:8, 202:10–19; Int. of E. Smith, Nov. 30, 2012, at 16:7–16, 32:12–22, 67:5–17, 71:17–22, 73:14–75:25; Int. of K. Hirtler-Garvey, Dec. 20, 2012, at 93:13–95:19, 117:20–118:9, 139:20–140:23, 142:5–9; Int. of P. West, Dec. 18, 2012, at 58:6–59:14, 62:13–64:5, 65:19–66:9, 68:23–70:18, 71:14–72:5, 93:11–18, 96:17–97:9, 156:14–22, 157:12–23, 158:16–159:21; Int. of P. West, Jan. 11, 2013, at 179:5–180:5; Int. of J. Ilany, Nov. 28, 2012, at 95:1–17, 103:8–21, 203:3–6; Int. of J. Mack, Dec. 5, 2012, at 111:15–114:6, 116:4–117:21, 118:15–25, 123:13–17; Int. of J. Mack, Jan. 15, 2013, at 137:17–24, 138:14–24, 158:9–159:11. Further, the Independent Directors' personal views on ResCap's solvency at any particular time have no bearing on the Examiner's Financial Advisors' objective analysis of whether ResCap was or was not insolvent at any such time.

The specter of conflicts of interest within the ResCap Board, which routinely was either unrecognized or disregarded, percolated to the surface of a Board discussion at least one time. At a June 1, 2008 ResCap Board meeting, de Molina expressly articulated the actual conflicts of interest that ResCap directors had to evaluate and subdue before voting on proposed Affiliate Transactions involving AFI and Cerberus:

> Mr. de Molina noted to the Board, before it took any action on the proposed transactions, that there does exist for the [AFI] and Cerberus members of the Board a conflict of interest, including for himself as the CEO of [AFI]. He stated that if these transactions do not go forward it could have a substantial negative impact on [AFI] (and several Directors agreed), but that, without regard to that concern, the Directors must vote in the best interest only of ResCap and its creditors.[72]

The frank articulation by de Molina of the challenges generated by conflicts of interest that all dual-affiliated ResCap directors faced when considering Affiliate Transactions seems unique in the annals of ResCap. There does not appear to be any other such acknowledgment in ResCap Board materials. Nor was any response to de Molina's cautionary statement recorded in the June 21, 2008 minutes. However, one ResCap director (DeBrunner) did state that he resigned from the ResCap Board (on July 16, 2009) because he felt increasingly conflicted as a result of his dual affiliations.[73]

The potential conflicts of interest that permeated the conduct of the ResCap Board were embodied in 2008 in the arrival of new ResCap CEO Tom Marano. In the wake of the Cerberus acquisition of its AFI ownership stake, numerous Cerberus employees, including Marano, were seconded to ResCap in an effort by Cerberus to cure the ailments of its portfolio company and subsidiaries. For the first year of his tenure as ResCap CEO and Board Chairman, Marano was employed pursuant to a Cerberus Secondment Agreement.[74] Marano was personally represented on the ResCap Board by Morrison & Foerster attorney James Tanenbaum, who subsequently emerged as primary outside counsel to the ResCap Board, including its Independent Directors.[75] Further, AFI and Cerberus representatives, including

---

[72] Minutes of a Meeting of the Board of Directors of Residential Capital, LLC, June 1, 2008, at RC40005754 [RC40005652].

[73] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, July 16, 2009, at RC40006251; Int. of D. DeBrunner, Sept. 13, 2012, at 73:8–74:7.

[74] Minutes of a Special Meeting of the Board of Residential Capital, LLC, July 21, 2008, at RC40005828–30 [RC40005652]; Minutes of a Special Meeting of the Board of Residential Capital, LLC, Dec. 29, 2008, at RC40005948 [RC40005652]; Int. of T. Marano, Nov. 26, 2012, at 9:11–23, 193:20–194:8; Int. of K. Hirtler-Garvey, Dec. 20, 2012, at 74:19–22, 194:19–195:16, 198:2–13.

[75] Int. of J. Tanenbaum, Mar. 29, 2013, at 45:17–47:25.

inside counsel of those entities, often attended ResCap meetings, not always with apparent specific purpose and sometimes in connection with ResCap Board discussion of proposed Affiliate Transactions.[76]

The independence of certain Independent Directors may also have been somewhat compromised because of prior ties to AFI employees as well as to Tanenbaum, the Morrison & Foerster attorney who arrived on the ResCap scene with Marano. Hirtler-Garvey and West worked together previously at Bank of America; Hirtler-Garvey helped recruit West to the ResCap Board; and, before joining the Board, Hirtler-Garvey and West knew various AFI personnel from their prior work together at Bank of America, including de Molina, who (in his capacity as a dual-affiliated ResCap director) recruited and appointed Hirtler-Garvey and West to the ResCap Board.[77] Hirtler-Garvey was on the ResCap Board for approximately a year; she went from being a ResCap Independent Director to a full-time AFI employee, but she did not immediately resign from the Board upon her move to AFI (much less upon consideration of that employment change).[78] The most recently appointed Independent Directors, Special Review Committee members Ilany and Mack, each had long professional associations with Tanenbaum, who recruited them to the ResCap Board in late 2011;[79] Ilany and Mack then were responsible for the claims investigation that Tanenbaum's law firm conducted.

### 4. The Information Flow To Independent Directors Was Managed By Insiders

The flow of significant information within the ResCap Board, and particularly the circulation of information to the Independent Directors of the Board, was occasionally deficient. By their own description, the Independent Directors did not proactively formulate or revise ResCap's strategic plans but, rather, reacted to initiatives already developed and then brought to them by the inside directors.[80] Inside directors (many with dual affiliations)

---

[76] *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, June 13, 2008, at RC40005781–86 [RC40005652]; Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, July 3, 2008, at RC40005801–04 [RC40005652]; Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Nov. 12, 2008, at RC40005906–08 [RC40005652]; Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, May 28, 2009, at RC40006154–55 [RC40005949]; Int. of T. Jacob, Nov. 7, 2012, at 80:12–17; Int. of K. Hirtler-Garvey, Dec. 20, 2012, at 146:25–147:17, 156:12–156:22, 184:17–185:10, 263:15–264:7; Int. of P. West, Dec. 18, 2012, at 125:22–126:16.

[77] *See* Int. of K. Hirtler-Garvey, Dec. 20, 2012, at 67:20–24, 68:6–69:10, 70:8–10, 75:2–5, 82:12–25, 300:16–301:20; Int. of P. West, Dec. 18, 2012, at 41:5–42:24, 45:25–46:3, 47:15–48:13, 95:2–7.

[78] *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Jun. 13, 2008, at RC40005781 [RC40005652] (appointment of Hirtler-Garvey); Minutes of a Special Meeting of the Board of Residential Capital, LLC, June 23, 2009, at RC40006224 [RC40005949] (notice of Hirtler-Garvey resignation); Int. of K. Hirtler-Garvey, Dec. 20, 2012, at 296:19–297:15.

[79] Int. of J. Ilany, Nov. 28, 2012, at 48:1–4, 49:14–53:22; Int. of J. Mack, Dec. 5, 2012, at 72:1–3, 72:11–77:4; Int. of J. Tanenbaum, Mar. 13, 2013, at 170:19–24, 172:1–173:15, 178:13–179:9.

[80] *See* Int. of T. Jacob, Nov. 7, 2012, at 101:14–104:19; Int. of T. Melzer, Oct. 10, 2012, at 291:8–16; Int. of P. West, Dec. 18, 2012, at 194:12–195:7; Int. of J. Ilany, Nov. 28, 2012, at 16:7–17:8; Int. of J. Mack, Dec. 5, 2012, at 18:23–19:10.

generally vetted strategic initiatives and potential transactions within their management group before bringing such plans to the attention of the Independent Directors of the ResCap Board, which influenced the dynamics of Board meetings by presenting the Independent Directors with seemingly pre-packaged plans, which often lacked optionality.[81]

Further, the overall pattern of interaction between ResCap and AFI seems to have been that potential Affiliate Transactions were generally conceptualized by the AFI Board and subsequently discussed with inside manager directors of the ResCap Board, who then proposed them to the Independent Directors of the ResCap Board when they deemed it appropriate. On some occasions, certain pertinent information regarding proposed Affiliate Transactions appears to have reached Independent Directors in either untimely fashion or not at all, which jeopardized the Independent Directors' ability to assess transactions in a fully informed and measured manner.[82] Such circumstances imperiled compliance with Board protocol requirements.

An example of a pre-packaged management presentation of core and highly developed business strategies to the ResCap Board's Independent Directors was the rollout of the 2007 Restructuring Plan, discussed at a September 26, 2007 ResCap Board meeting.[83] The 2007 Restructuring Plan—which included substantial cost and headcount reductions, rationalization of several ResCap businesses, identification for the first time of the company's non-core assets, and contingencies that included a liquidation option—was not devised or developed by the ResCap Board; rather, it was presented to the full ResCap Board for support.[84] The Board at that meeting expressed support for the 2007 Restructuring Plan—including Jacob and Melzer, who likely heard about the plans for the first time on that day, in contrast to the inside directors—although it essentially (and perhaps unrealistically) forecast a $3 billion improvement in net income for 2008, based on a projection (later seen to be erroneous) of final losses for 2007.[85]

---

[81] Int. of T. Jacob, Nov. 7, 2012, at 55:6–10, 56:2–9.

[82] *See id.* at 216:25–218:4; Int. of T. Melzer, Oct. 10, 2012, at 266:18–23, 272:8–20, 273:1–24, 276:15–23.

[83] ResCap announced the 2007 Restructuring Plan to the public via a Form 8-K filing on October 17, 2007. Residential Capital, LLC, Current Report (Form 8-K) (Oct. 17, 2007), Ex. 99.1, at 1–2.

[84] Rossi, who had been appointed to the ResCap Board only weeks earlier, presented the 2007 Restructuring Plan to the ResCap Board. Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Sept. 26, 2007, at RC40005624–26 [RC40005558].

[85] *Id.* at RC40005625–26. On February 1, 2008, the ResCap Board was presented with materials detailing the final 2007 actual net loss of $4.3 billion, approximately one-quarter greater than the prior forecasted loss for the year ($3.4 billion) when the full ResCap Board expressed its support for the 2007 Restructuring Plan on September 26, 2007. *Compare* Business and Liquidity Update, ResCap Board of Directors, dated Feb. 1, 2008, at EXAM12125418 [EXAM12125414] *and* ResCap Review, ResCap Board of Directors Meeting, dated Sept. 26, 2007, at RC40012919 [RC40012907]. ResCap's 2008 business plan was also overly optimistic in its forecasts, predicting that ResCap would break even for the year despite having incurred massive losses in 2007 and witnessing increasing degradation in the market. The ResCap Board, including its Independent Directors, never expressed substantial concerns about management's ability to forecast properly or respond effectively to severe conditions.

An example of AFI effectively dictating plans to ResCap's management, which in turn shaped what was subsequently discussed (or not) by the ResCap Board, was in respect of ResCap's potential application for TARP funds. When apprised of ResCap management's consideration of submitting a TARP funds application on behalf of ResCap, AFI management rebuffed that option and asserted that AFI would alone submit a TARP application.[86] The ResCap Board never seriously entertained the possibility of a ResCap TARP application.

The AFI Board also expressly discussed the potential implications of a ResCap bankruptcy filing in 2008 during the pendency of (and following) AFI's bank holding company application to the FRB. The AFI Board was informed by its advisors that a ResCap bankruptcy filing would be detrimental, and potentially fatal, to AFI's bank holding company application, among other potentially injurious factors affecting AFI.[87] AFI managers informed ResCap inside directors of their concerns regarding the timing of a ResCap bankruptcy, which in turn shaped the ResCap Board's deliberations and decisions.[88]

By 2009, the ResCap Board was grappling with successive years of: (1) multi-billion dollar losses; (2) a balance sheet reflecting asset values of approximately 40% of their peak values of just a few years earlier; (3) recurring liquidity crises and potential tangible net-worth covenant breaches; and (4) financial dependence on AFI for survival. Yet, despite the dire circumstances and numerous liquidity-related meetings, the ResCap Board relegated itself to reactive, rather than proactive, strategic planning. Its Independent Directors did not aggressively confront ResCap's situation. Throughout the period after the resignations of Jacob and Melzer, AFI and its advisors provided informational updates to the ResCap Board, which relied on both AFI's largesse and guidance.

Meanwhile, the AFI Board had reached its own stark conclusions about ResCap's future, viewing ResCap as a corporate burden that had to be alleviated. In a presentation to the U.S. Treasury on December 11, 2009, AFI described ResCap as a "millstone around the neck, . . . [with] no businesses that are strategic for the future," and AFI's challenge as "[r]esolv[ing] [the] ResCap [d]rag" by "neutralizing/exiting at the lowest cost."[89] In a section of the presentation entitled "ResCap Containment Strategy," AFI concluded that "an in-court solution is counterproductive to [AFI's] objectives," and that "[m]ultibillion litigation risk is material in any in-court solution and would likely . . . delay the timing of an initial public

───────────────────────

[86] Int. of T. Marano, Nov. 26, 2012, at 22:2–23:11, 24:9–11, 204:4–14, 205:1–3, 207:21–208:7.

[87] Minutes of a Special Meeting of the Board of Directors of GMAC, LLC, Oct. 31, 2008, at ALLY_PEO_0001307–08 [ALLY_PEO_0001009].

[88] AFI obtained bank holding company status on December 24, 2008. FEDERAL RESERVE RELEASE, FEDERAL RESERVE BOARD OF GOVERNORS (week ending Dec. 27, 2008), http://www.federalreserve.gov/releases/ h2/20081227/h2.pdf. On December 29, 2008, Marano noted to the ResCap Board that AFI "view[ed] ResCap as an important component of its bank holding company platform and that [ResCap] offer[ed] diversification to [AFI's] business model." Minutes of a Special Meeting of the Board of Residential Capital, LLC, Dec. 29, 2008, at RC40005947 [RC40005652].

[89] Presentation to the U.S. Department of the Treasury: GMAC Request for SCAP Funding, dated Dec. 11, 2009, at 4–5 [ALLY_0231352].

offering."[90] Accordingly, AFI maintained its financial support of ResCap because it continued to believe that a ResCap bankruptcy filing would undermine AFI's own interests.[91]

In 2010 and 2011, AFI's advisors and officers made periodic presentations to the ResCap Board reflecting AFI's deliberations about ResCap's future.[92] On November 5, 2010, Michael Constantino of AFI's Capital Markets Group reported on the results of a bidding process orchestrated by AFI for the sale of ResCap's assets.[93] Notably, the materials presented by Constantino to the ResCap Board indicated that all three potential bids implied a transaction loss and negative cash at closing of a sale, suggesting a market view that ResCap was then insolvent.[94] There is no indication that ResCap employees or advisors were involved in the (unconsummated) bidding process for ResCap's assets, nor is there any reference in ResCap Board minutes as to why AFI discontinued the ResCap sale process. During this period, the ResCap Board seems to have taken no concrete actions in response to the various presentations to it by AFI's advisors; rather, it appears to have been a fairly passive audience for AFI's strategic planning. It was not until late 2011 that the ResCap Board proactively initiated its own independent consideration of strategic alternatives through advisors that it—rather than AFI—had retained.

The Independent Directors who succeeded Jacob and Melzer were nominally presented by ResCap management with strategic alternatives for ResCap's future, but often were given inadequate information about the various options.[95] For example, West, appointed as an Independent Director in 2009, did not seem to fully understand certain ResCap strategic alternatives, nor certain key affiliate agreements with certain AFI entities (regarding mortgage servicing rights and hedging) as to which she nevertheless approved amendments.[96]

Perhaps the most prominent example of management control of information that likely influenced decision-making of ResCap Independent Directors related to the 2006 Bank Restructuring, which required the scrutiny of Independent Directors Jacob and Melzer.[97] The

---

[90] *Id.* at 10.

[91] *See generally* Section III.I.

[92] *See, e.g.,* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Apr. 29, 2010, at RC40018773–74 [RC40018729] (discussing joint presentation by Oliver Wyman, Citi, and Goldman Sachs entitled "Strategic Evaluation of AFI's Mortgage Business," dated Apr. 30, 2010 [EXAM10424634]).

[93] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Nov. 5, 2010, at RC40018846 [RC40018729].

[94] Mortgage Strategic Alternatives Presentation to the ResCap Board of Directors, dated Oct. 29, 2010, at RC40016894, RC40016897–98 [RC40016871].

[95] Int. of P. West, Jan. 11, 2013, at 7:20–11:10.

[96] Int. of P. West, Dec. 18, 2012, at 242:9–243:16, 243:20–244:4, 244:13–21; Int. of P. West, Jan. 11, 2013, at 50:21–52:5, 52:16–24.

[97] The 2006 Bank Restructuring contemplated an investment by ResCap in an AFI affiliate, which was prohibited under the 2005 Operating Agreement. That proposed affiliate investment required a waiver of the 2005 Operating Agreement that could only be obtained by affirmative vote of a majority of the Board's two Independent Directors. *See* Section V.A.1.a.

Cerberus PSA required that Old GMAC Bank be removed from Cerberus ownership but did not mandate any particular future ownership structure for the Bank.[98] AFI and ResCap officers eventually agreed that AFI would own 100% of the Bank's voting interests, yet Jacob and Melzer were never informed that the option of ResCap retaining voting shares in the Bank was viable and, therefore, never considered whether to press for that position in negotiations with AFI. The Examiner is aware of no evidence suggesting that Jacob and Melzer, or their counsel at Bryan Cave LLP, were ever informed that ownership structures different from the one to which they agreed were in fact available to ResCap, despite ResCap CEO David Applegate having previously memorialized an alternative structure in a memorandum to AFI President Bill Muir, which promoted the viability and efficiency of ResCap retaining voting rights in the restructured bank.[99] If information had freely flowed from inside managers to the Independent Directors regarding the option of ResCap retaining voting interests in Ally Bank, the transaction may have been structured very differently.[100]

### 5. The Mandate Of The "Super Independent" Directors Was Not Completely Fulfilled

The relevant performance of the ResCap Board has been reflected most recently in connection with the process through which the (now-abandoned) bankruptcy-related settlement with AFI was investigated and negotiated in 2011–2012. That process again exhibits a ResCap Board that fell short of peak performance.

As set out more fully in Section III.J, Special Review Committee members (and most recently appointed Independent Directors) Ilany and Mack were asked to assess potential claims against both AFI and Cerberus and then potentially approve (or recommend to the ResCap Board that it approve) a settlement of such claims. The mandate of the Special Review Committee was detailed and challenging, yet it was not fulfilled according to its express terms. The Special Review Committee's investigation of potential claims and subsequent negotiation of a proposed settlement with AFI was flawed.

As a threshold matter, the pertinent resolutions of the ResCap Board authorized the Special Review Committee to investigate potential claims and to approve (or recommend for approval) a possible settlement of any such claims, but was silent as to its authority to negotiate the possible settlement of claims.[101] Arguably, the resolution was designed precisely to establish a committee of new Independent Directors who would leave to others the negotiation of a settlement that the Special Review Committee would then evaluate for adequacy in light of the claims investigation it had supervised. That is *not* what occurred; Ilany and Mack investigated claims, and subsequently voted to approve the settlement that they themselves had negotiated.

---

[98] *See* Cerberus PSA, Exhibit H [CERB039811].

[99] Memorandum from D. Applegate to B. Muir (Apr. 24, 2006) [EXAM11248641]; s*ee generally* Section V.A.1.a.

[100] ResCap CEO Marano, whose tenure at ResCap post-dated the 2006 Ally Bank transaction, stated that he found it "odd" that ResCap maintained non-voting shares in Ally Bank, that he had "never heard" of such an arrangement, and that he had received no response to his inquiry about why the 2006 Bank Restructuring had been structured to provide ResCap with non-voting interests. Int. of T. Marano, Nov. 26, 2012, at 35:21–36:23.

[101] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Dec. 5, 2011, at RC40018720–22 [RC40018411].

Further, Ilany and Mack—self-described as "super" Independent Directors—were appointed for the specific task of assessing potential claims against AFI and Cerberus entities. That mandate was spelled out in no uncertain terms in the ResCap Board resolutions.[102] Ilany and Mack, however, appear not to have considered any potential claims against Cerberus, as such potential claims were not encompassed within Morrison & Foerster's investigation.[103]

Ilany and Mack also seemed oblivious to potential conflicts relating to issues within their bailiwick. For example, Mack was unconcerned with potential conflict arising from Marano's membership on ResCap's Compensation Committee, which addressed (among other things) ResCap executives' (including Marano's) compensation in the form of AFI equity.[104]

Similarly, Ilany and Mack were expressly authorized by ResCap Board resolutions to retain their own separate legal and financial advisors to fulfill their duties on the Special Review Committee, but they never seriously considered the option.[105] As a result, Ilany and Mack relied (with little or no consideration of alternatives) on the counsel of Morrison Cohen and Morrison & Foerster, both of whom by late 2011 had longstanding associations with the ResCap Board, including with respect to strategic planning and Affiliate Transactions that were to be the subject of the Special Review Committee's investigation.[106] Ilany believed that he did not need to be concerned about potential conflicts of his advisors because they would have apprised him of any conflicts if they existed. He therefore believed that no conflicts existed because his advisors (including Morrison & Foerster) did not apprise him of any.[107] Perhaps this apparently naïve belief was attributable to the fact that both Ilany and Mack were recruited to the ResCap Board by Tanenbaum, a Morrison & Foerster attorney who had a multi-decade professional and social relationship with both men leading up to their appointments to the Board.[108]

The failure of "super" Independent Directors Ilany and Mack to give serious consideration to the option of retaining separate legal counsel to conduct the seminal investigation on their behalf of potential claims relating to several years' worth of prior Affiliate Transactions is troubling. By the time that it commenced its investigation of potential

---

[102] *Id.* at RC40018721 [RC40018411].

[103] Morrison & Foerster's Report on Independent Review Claims Analysis to the Residential Capital, LLC, Board of Directors, dated Jan. 25, 2012, at RC00023718 [RC00023710]; Int. of J. Ilany, Nov. 28, 2012, at 142:1–5; Int. of J. Mack, Dec. 5, 2012, at 164:16–165:7, 172:5–12, 176:10–14; Int. of J. Mack, Jan. 15, 2013, at 87:15–88:14.

[104] Int. of J. Mack, Dec. 5, 2012, at 63:10–67:15.

[105] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Dec. 5, 2011, at RC40018722 [RC40018411]; Int. of J. Ilany, Nov. 28, 2012, at 118:19–119:21; Int. of J. Mack, Dec. 5, 2012, 183:8–18, 190:14–25. Moreover, the Special Review Committee had no retention letters with any of its advisors. *See* Int. of J. Mack, Dec. 5, 2012, at 186:22–187:3.

[106] *See* Minutes of a Special Meeting of the Board of Residential Capital, LLC, Sept. 15, 2008, at RC40005866–67 [RC40005652]; Minutes of a Special Meeting of the Board of Residential Capital, LLC, Sept. 19, 2008, at RC40005870–71 [RC40005652].

[107] Int. of J. Ilany, Nov. 28, 2012, at 120:5–20.

[108] *Id.* at 48:1–4, 49:14–53:22; Int. of J. Mack, Dec. 5, 2012, at 72:1–3, 72:11–77:4.

claims in late 2011, Morrison & Foerster had previously advised the ResCap Board with respect to several proposed Affiliate Transactions.

Morrison & Foerster had been involved with ResCap Board activities since Tanenbaum attended a special meeting of the Board on September 19, 2008.[109] In November 2008, Tanenbaum appears to have advised the ResCap Board about an AFI support offer, which the Board ultimately approved, as well as a bond exchange.[110] The AFI support offer included the ResMor Sale to AFI, the Mitchell litigation bond, and the $320 million extension of secured credit by AFI.[111] At the November 12, 2008 ResCap Board meeting, Tanenbaum discussed "the probability of deferring a ResCap bond interest payment due November 17, 2008" in the context of the AFI support offer.[112] Tanenbaum subsequently advised the ResCap Board about the term sheet for a potential transaction with AFI in August 2009.[113] That term sheet, which ResCap and its "advisors" marked up, involved AFI's acquisition of ResCap's origination and servicing assets and AFI's forgiveness of ResCap's debt upon closing.[114] Clearly, by the time Morrison & Foerster launched its investigation of potential claims in late 2011, it had been advising the ResCap Board for several years, including with respect to Affiliate Transactions that were the subject of its own investigation. Yet, despite the long entanglement of Morrison & Foerster (and Morrison Cohen) with the ResCap Board, Ilany and Mack never pursued the option of retaining new legal counsel, although they were specifically authorized to do so.

Gary Lee, current chair of Morrison & Foerster's Business Restructuring and Insolvency Group and a senior member of the team that advised the ResCap Board, stated that Morrison & Foerster presented to the Board about the best practices for conducting an internal investigation and recommended the creation of the Special Review Committee (later comprised of Ilany and Mack) to assess the historical Affiliate Transactions that had previously been approved by current Board members.[115] Yet the practice guide (authored by a Morrison & Foerster attorney) on which Lee relied in giving that advice to the ResCap Board

---

[109] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Sept. 19, 2008, at RC40005870 [RC40005652]. Tanenbaum attended the September 19, 2008 meeting, likely in his capacity as counsel to ResCap CEO Marano, at which the Board, "its advisors," and management discussed the potential sale of ResCap's stake in Ally Bank to AFI. The minutes do not specify which advisors (including Tanenbaum) participated in this discussion; other advisors at this meeting included Timothy Pohl of Skadden, and Michael Connolly, Jack Levy, and Joseph Moldovan of Morrison Cohen.

[110] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Nov. 12, 2008, at RC40005907–8 [RC40005652].

[111] *Id.* at RC40005907.

[112] *Id.*

[113] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Aug. 10, 2009, at RC40006277 [RC40005949].

[114] Comments by ResCap and Its Advisors, dated Aug. 7, 2009 [RC40009421].

[115] CARL H. LOEWENSON, ETHICS OF INTERNAL INVESTIGATIONS, MORRISON & FOERSTER LLP, http://www.mofo.com/files/Publication/055a0d6e-c9b7-4230-b2a2-d9dad9daae94/Presentation/PublicationAttachment/34bd7647-30d8-4d3f-8e8c-db99dfee280e/Loewenson_Ethics_of_Internal_Investigation.pdf; Int. of G. Lee, Feb. 20, 2013, at 145:15–146:4, 156:7–22, 168:3–9.

itself advises that "the firm that was involved in the underlying conduct [under investigation] is *not* the appropriate firm to do an internal investigation."[116] Notably, Lee did not recall any discussions about whether it was appropriate for Ilany and Mack to retain new legal counsel to conduct their claims investigation in light of Morrison & Foerster's protracted involvement with the ResCap Board.[117] Similarly, Tanenbaum stated that the Special Review Committee never raised with Morrison & Foerster the issue of retaining special counsel to conduct the claims investigation, and did not believe that Morrison & Foerster had ever discussed the issue.[118]

In any event, the Special Review Committee's assessment of potential claims was done through an investigation that was necessarily limited by time and access to information.[119] Ilany and Mack believed, however, that Morrison & Foerster's investigation on their behalf was fully comprehensive and exhaustive.[120] In their effort to fulfill their Special Review Committee obligations, Ilany and Mack do not appear to have given any interim investigation status updates to the ResCap Board leading up to Morrison & Foerster's January 25, 2012 claims presentation.[121] Further, despite their mandate to investigate potential claims relating to historical Affiliate Transactions, Ilany and Mack did not seem particularly interested in the history of either of those related-party transactions or of ResCap's prior consideration of a bankruptcy filing, nor in the legal merits of claims that emerged through the investigation.[122] Overall, conflicts and deficiencies associated with the Special Review Committee's investigation diminished its utility in assessing the value of potential Estate and Third-Party Claims against the AFI entities.

---

[116] CARL H. LOEWENSON, ETHICS OF INTERNAL INVESTIGATIONS, MORRISON & FOERSTER LLP, at 10 (emphasis in the original), http://www.mofo.com/files/Publication/055a0d6e-c9b7-4230-b2a2-d9dad9daae94/Presentation/PublicationAttachment/34bd7647-30d8-4d3f-8e8c-db99dfee280e/Loewenson_Ethics_of_Internal_Investigation.pdf.

[117] Int. of G. Lee, Feb. 20, 2013, at 196:17–197:11.

[118] Int. of J. Tanenbaum, Mar. 29, 2013, at 214:11–217:5.

[119] *See* Section III.J.3.

[120] Int. of J. Ilany, Nov. 28, 2012, at 190:16–19, 192:13–22; Int. of J. Mack, Jan. 15, 2013, at 34:1–9, 36:1–5, 111:3–14.

[121] *See* Minutes of a Special Meeting of the Board of Residential Capital, LLC, Dec. 9, 2011, at RC40018724–26 [RC40018411]; Minutes of a Special Meeting of the Board of Residential Capital, LLC, Jan. 10, 2012, at RC40019179-84 [RC40019179], Minutes of a Special Meeting of the Board of Residential Capital, LLC, Jan. 11, 2012, at RC40019185-86 [RC40019179].

[122] The lack of interest by Ilany and Mack in ResCap's history is striking. *See* Int. of J. Ilany, Nov. 28, 2012, at 67:1–23, 73:1–74:3, 83:21–84:4, 100:13–101:6; Int. of J. Mack, Dec. 5, 2012, at 80:8–25, 110:20–111:5, 124:4–10, 158:23–161:2; Int. of J. Mack, Jan. 15, 2013, at 116:10–20. For example, Ilany and Mack had never heard of original Independent Directors Jacob and Melzer despite their crucial role in ResCap's formative history. Int. of J. Ilany, Nov. 28, 2012, at 65:15–66:12; Int. of J. Mack, Dec. 5, 2012, at 81:9–82:6. Similarly, their lack of interest in the legal merits of the potential claims they investigated and subsequently sought to settle is notable. *See* Int. of J. Ilany, Nov. 28, 2012, at 157:16–20; Int. of J. Mack, Jan. 15, 2013, at 166:24–172:3.

## B. INDEPENDENT DIRECTOR COMPENSATION, INDEMNIFICATION, AND INSURANCE (YEARS 2005–2012)

### 1. *Independent Director Compensation, Indemnification, And Insurance*

#### a. *Requirement To Have Independent Directors*

Since June 24, 2005, ResCap has been required to have at all times at least two Independent Directors. Specifically, section 2(g)(i) of the 2005 Operating Agreement states:

> [AFI] shall vote for, and ResCap shall at all times have, at least two Independent Directors. In the event of a vacancy in the position of an Independent Director, whether as a result of resignation, removal, or otherwise, [AFI] shall, as promptly as practicable, elect a successor Independent Director. No appointment of an Independent Director or successor Independent Director, shall be effective until such Independent Director or successor shall have (y) accepted his or her appointment as an Independent Director by a written instrument, which may be a counterpart signature page to this Agreement, and (z) executed a counterpart to this Agreement.[123]

Section 2(g)(ii) requires that the chairperson of the Audit Committee of the ResCap Board shall be an Independent Director.[124]

The 2005 Operating Agreement defines "Independent Director" generally to include an individual who is not and has not been an officer, director, or employee of an AFI affiliate

---

[123] 2005 Operating Agreement, § 2(g)(i) [ALLY_0140795]. Each Independent Director has executed a counterpart signature page. Independent Directors Thomas Jacob and Thomas Melzer together executed a counterpart signature page to the 2005 Operating Agreement. *Id.* at 13. Independent Directors Edward Smith, Karin Hirtler-Garvey, Pamela West, Jonathan Ilany, and John Mack each executed counterpart signature pages to the 2006 Amended Operating Agreement. *See* Edward F. Smith, III Signature Page for 2006 Amended Operating Agreement [MC-Examiner-000022]; Karin Hirtler-Garvey Signature Page for 2006 Amended Operating Agreement, dated June 12, 2008 [MC-Examiner-000021]; Pamela E. West Signature Page for 2006 Amended Operating Agreement [MC-Examiner-000023]; John Mack Signature Page for 2006 Amended Operating Agreement, dated Nov. 16, 2011 [MC-Examiner-000024]; Jonathan Ilany Signature Page for 2006 Amended Operating Agreement, dated Nov. 16, 2011 [MC-Examiner-000025]. The 2006 Amended Operating Agreement did not substantively change the provisions related to the Independent Directors.

[124] 2005 Operating Agreement, § 2(g)(ii) [ALLY_0140795].

IV-24

within the three-year period immediately prior to such individual's appointment, subject to certain additional limitations.[125]

Sections III.B.3 and IV.A.2 provide a more detailed summary and analysis of the 2005 Operating Agreement and the 2006 Amended Operating Agreement with respect to requirements applicable to Independent Directors.

### b. Independent Director Service Dates

The following chart sets forth the service dates of the Independent Directors:

EXHIBIT IV.B.1.b
**Independent Director Service Dates**

| Independent Director | Date Appointed To ResCap Board | Date Resigned From ResCap Board |
|---|---|---|
| Thomas Jacob | April 20, 2005 | April 20, 2008 |
| Thomas Melzer | April 20, 2005 | April 20, 2008 |
| Edward Smith | May 15, 2008 | Presently Serving |
| Karin Hirtler-Garvey | June 12, 2008 | June 23, 2009 |
| Pamela West | May 8, 2009 | Presently Serving |
| Jonathan Ilany | November 16, 2011 | Presently Serving |
| John Mack | November 16, 2011 | Presently Serving |

*Source: See Residential Capital, LLC Company Profile, dated Jan. 31, 2012, at 2–3 [EXAM00121209]; Officer Listing, dated June 20, 2012 [ALLY_0020862]. See also Appendix IV.A.1—1.*

A chart setting forth all directors who served on the ResCap Board from 2004–2012, their dates of service, and their affiliations can be found at Appendix IV.A—1.

---

[125] *See id.* § 1. The 2005 Operating Agreement defines "Independent Director" as an individual who:

(A) is not and has not been an officer, director or employee, and has no immediate family member that is or has been an officer, of any [AFI] Affiliate within the three years immediately prior to such individual's appointment as an Independent Director; (B) has not received, and has no immediate family member who has received, during any twelve-month period in the three years immediately prior to such individual's appointment as an Independent Director, more than $100,000 in direct compensation from any [AFI] Affiliate, other than director fees and pension and other forms of deferred compensation for prior service that is not contingent in any way on continued service; (C) is not employed by, and has no immediate family member that is an officer of, any Person that has made payments to, or received payments from, any [AFI] Affiliate for property or services in an amount which, in any of the last three fiscal years, exceeds the greater of $1 million or 2% of ResCap's consolidated gross revenues; and (D) is reasonably believed by the then current directors of ResCap to be financially sophisticated and otherwise qualified to fulfill the obligations of an Independent Director as set forth in this Agreement. For purposes of this definition, 'immediate family member' means an individual's spouse, parents and parents-in-law, siblings and siblings-in-law, children and children-in-law and anyone (other than domestic employees) who shares such individual's home. Notwithstanding anything contained in clauses (A) through (D) above, any Independent Director may serve or have served as an Independent Director of one or more limited purpose entities organized for the purpose of acquiring, financing or otherwise investing, directly or indirectly, in assets or receivables originated, owned or serviced by any [AFI] Affiliate or ResCap Subsidiary or holding equity beneficial interest in trusts formed by any [AFI] Affiliate or ResCap Subsidiary.

### c. *Independent Director Recruitment*

#### *(1) Thomas Melzer And Thomas Jacob*

Thomas Jacob and Thomas Melzer served as Independent Directors from April 20, 2005 through April 20, 2008.[126] Melzer stated that he was initially contacted regarding the position by a search firm, Crist and Company, and did not know anyone at AFI or ResCap. He met with ResCap Director and AFI VP Jerome Van Orman, AFI Board Chairman Eric Feldstein, and ResCap Co-CEOs David Applegate and Bruce Paradis.[127] Jacob was initially contacted regarding the position by "a headhunting firm in Chicago," and was previously familiar with Paradis and Applegate. He subsequently met with Van Orman, Feldstein, and Applegate.[128] ResCap VP David Walker also recalled personal involvement in recruiting the initial Independent Directors.[129]

Jacob and Melzer were present at the April 20, 2005 meeting of the ResCap Board at which they were elected to serve as Independent Directors.[130] Their appointments were announced in an AFI press release dated May 4, 2005.[131] As to whether Jacob and Melzer were recruited by and serving as Independent Directors at the request of AFI (which, as discussed further in Section IV.B.2, is a prerequisite to AFI's indemnification of such Independent Directors), William Solomon, General Counsel of AFI, stated in an e-mail dated April 14, 2008 to Jacob and Melzer:

> Gentlemen: In response to a recent inquiry, I researched how it came to be that you have become associated with ResCap as independent directors of that company. I am writing on behalf of [AFI] to confirm that you were originally recruited, and continue to serve, as independent directors of Residential Capital, LLC at the request of [AFI], the sole shareholder of that

---

[126] *See* Residential Capital, LLC Company Profile, dated Jan. 31, 2012, at 3 [EXAM00121209]; Officer Listing, dated Jun. 20, 2012 [ALLY_0020862]; *see also* Appendix IV.A.1—1.

[127] *See* Int. of T. Melzer, Oct. 10, 2012, 32:21–34:17; *see* Int. of T. Melzer, Mar. 22, 2013, 32:23–33:15.

[128] *See* Int. of T. Jacob, Nov. 7, 2012, at 25:6–33:11.

[129] *See* Int. of D. Walker, Nov. 28, 2012, at 24:16–25:16.

[130] *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital Corporation, Apr. 20, 2005, at RC40005473 [RC40005468].

[131] General Motors Acceptance Corporation, Press Release, *GMAC Capitalizes New Residential Mortgage Subsidiary; Elects Jacob and Melzer to Board of Directors* (May 3, 2005), http://media.ally.com/ index.php?s=43&item=133.

> company. I trust that this e-mail communication will suffice for the present but I will send each of you an original version of this note, in the form of a letter, by first class mail.[132]

The resignation of Jacob and Melzer after the April 20, 2008 ResCap Board meeting was announced at the April 21, 2008 ResCap Board meeting.[133] The reasons for their resignations are described in Section IV.A.1.

### *(2) Edward Smith*

Edward Smith has served as an Independent Director since May 15, 2008.[134] AFI appointed Smith to the ResCap Board.[135] Smith stated that Hull had been a casual, long-time acquaintance.[136] ResCap CEO Thomas Marano spoke with Smith over the subsequent weekend (May 17–18, 2008) and confirmed Smith's qualifications.[137] Unlike the process used to recruit Jacob and Melzer, it does not appear that AFI used an executive search firm to recruit Smith.[138] Smith's appointment to serve as an Independent Director was announced in a press release dated May 22, 2008.[139]

---

[132] E-mail from W. Solomon to T. Melzer and T. Jacob (Apr. 14, 2008) [MELZER.004778]. AFI not only recruited each independent director candidate, but, starting with Smith, vetted each candidate using a "Questionnaire for Director Independence" which requested that the candidate candidly complete and return a signed copy to AFI. *See*, *e.g.*, Questionnaire of Edward Farrelly Smith, III [EXAM20181465]. Such Questionnaire was "modeled after the one used at the [AFI] Board level" and adapted to the Independent Director requirements of the 2006 Amended Operating Agreement. *See* E-mail from W. Solomon (May 8, 2008) [CCM00549322]. AFI's appointment of certain Independent Directors is further evidenced by the letters sent "on behalf of [AFI]," confirming each director's appointment and thanking him or her "[o]n behalf of [AFI] . . . for serving as an Independent Director of ResCap." *See*, e.g., Letter from R. Hull to E. Smith (May 15, 2008) at EXAM10146755 [EXAM10146754]; Letter from C. Quenneville to K. Hirter-Garvey (Jun. 12, 2008) [CCM00388535].

[133] *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Apr. 21, 2008, at RC40005731 [RC40005652]; *see also* E-mail from A. de Molina (Apr. 20, 2008) [EXAM12336204].

[134] *See* Residential Capital, LLC Company Profile, dated Jan. 31, 2012, at 2 [EXAM00121209]; Officer Listing, dated Jun. 20, 2012 [ALLY_0020862]; *see also* Appendix IV.A.1—3.

[135] *See* Letter from R. Hull to E. Smith (May 15, 2008) at EXAM10146755 [EXAM10146754].

[136] *See* Int. of E. Smith, Nov. 30, 2012, at 20:14–21:18; *see also* E-mail from R. Hull (May 15, 2008) [EXAM12337817] ("I approached Ted Smith, a friend of mine with capital markets and portfolio management background from Goldman and Bank of America. He is willing to take the other Indy spot . . . .").

[137] E-mail from C. Quenneville (May 19, 2008) [EXAM10146753].

[138] *See* E-mail from R. Hull (May 15, 2008) [EXAM12337817].

[139] Residential Capital, LLC, Press Release, *Independent Director Appointed to the ResCap Board* (May 22, 2008), http://media.ally.com/index.php?s=43&item=238. Such press release makes no mention of James Chapman, who AFI appointed as an Independent Director the same day as it did Smith, but whose appointment was subsequently rescinded. *See* Section IV.A.1. The supporting materials for the May 22, 2008 ResCap Board meeting list Smith and Chapman as participants and the first agenda item was "Welcome New Independent Directors" by Marano. Hand-marked agenda and participant list for a meeting of the Board of Directors, Residential Capital, LLC, May 22, 2008, at RC40006980–81 [RC40006934]. Because the minutes for this meeting have not been produced to Examiner's Counsel, the Examiner cannot determine if Smith's appointment was subject to ratification by the ResCap Board.

### (3) Karin Hirtler-Garvey

Karin Hirtler-Garvey served as an Independent Director from June 12, 2008 through June 23, 2009.[140] Hirtler-Garvey was recruited by AFI CEO Alvaro de Molina and interviewed by Marano.[141] AFI appointed Hirtler-Garvey to the ResCap Board.[142]

Marano introduced Hirtler-Garvey as "the newly appointed Independent Director" in the ResCap Board meeting held on June 13, 2008.[143] The ResCap Board then elected Hirtler-Garvey as a Member and Chair of the ResCap Audit Committee.[144] Hirtler-Garvey's appointment as an Independent Director and Chair of the ResCap Audit Committee was announced in a June 13, 2008 press release.[145]

At the Board meeting held on June 23, 2009, Marano informed the ResCap Board that Hirtler-Garvey had tendered her resignation as a member of the ResCap Board and Audit Committee, and that at this time, "the vacated Board seat is not expected to be filled."[146]

### (4) Pamela West

Pamela West has served as an Independent Director since May 8, 2009.[147] West stated that she was recruited by Hirtler-Garvey, with whom she had previously worked at Bank of America and with whom she was friends.[148] AFI appointed West to the ResCap Board.[149]

Various documents list West's date of appointment as an Independent Director as May 8, 2009.[150] The minutes of the May 28, 2009 ResCap Board meeting list West as "present," but make no reference to any ResCap Board changes.[151]

---

[140] *See* Residential Capital, LLC Company Profile, dated Jan. 31, 2012, at 3 [EXAM00121209]; Officer Listing, dated Jun. 20, 2012 [ALLY_0020862]; *see also* Appendix IV.A.1–3.

[141] Int. of K. Hirtler-Garvey, Dec. 20, 2012, at 67:20–84:15.

[142] Letter from C. Quenneville to K. Hirtler-Garvey (Jun. 12, 2008) [CCM00388535].

[143] *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Jun. 13, 2008, at RC40005781 [RC40005652].

[144] *Id.*

[145] Residential Capital, LLC, Press Release, *Independent Director Appointed to the ResCap Board* (Jun. 13, 2008), http://media.ally.com/index.php?s=43&item=245.

[146] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Jun. 23, 2009, at RC40006224 [RC40005949].

[147] *See* Residential Capital, LLC Company Profile, dated Jan. 31, 2012, at 2 [EXAM00121209]; *see also* Officer Listing, dated Jun. 20, 2012 [ALLY_0020862].

[148] *See* Int. of P. West, Dec. 18, 2012, at 41:5–42:24.

[149] *Id.* at 45:25–46:3. West stated that she received a letter of appointment from de Molina, who she had known from Bank of America, "inviting [her] to join the [ResCap] board as an independent director." *Id.* Examiner's Counsel requested but did not receive a copy of this letter of appointment.

[150] *See* Residential Capital, LLC Company Profile, dated Jan. 31, 2012, at 2 [EXAM00121209]. *See* Officer Listing, dated Jun. 20, 2012 [ALLY_0020862].

[151] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, May 28, 2009, at RC40006154–55 [RC40005949].

### (5) Jonathan Ilany And John Mack

As the ResCap Board began preparing for a possible bankruptcy filing, it was expanded to provide for two additional Independent Directors who could assess potential legal claims against AFI and Cerberus entities and potentially approve (or recommend for approval) a settlement of any such claims.[152] Jonathan Ilany and John Mack have served as Independent Directors since November 16, 2011.[153]

Ilany stated that James Tanenbaum of Morrison & Foerster, with whom he was acquainted from prior professional dealings, first contacted him regarding service as an Independent Director.[154] Subsequently, Ilany met with West and Smith, and with Marano, who had worked for Ilany at Bear Stearns earlier in their careers.[155]

Mack recalled that Tanenbaum, with whom he was also acquainted from extensive prior professional dealings, first contacted him regarding service as an Independent Director.[156] Subsequently, Mack met West, with whom he was acquainted from prior dealings, and Smith.[157] Although Mack and Ilany were interviewed on the same day, they were interviewed separately.[158]

On November 12, 2011, AFI Legal Counsel Anita Bhama forwarded to AFI CEO Michael Carpenter and Ally Bank Chair Barbara Yastine an e-mail from ResCap General Counsel Tammy Hamzehpour regarding the pending appointment of two individuals (presumably Ilany and Mack) that the ResCap Board had interviewed and was recommending for appointment as Independent Directors.[159] Bhama responded with an analysis of how AFI's

---

[152] *See* Sections III.J.1.c and IV.A.5; Dep. of John E. Mack, Nov. 14, 2012, at 30:8–15; Int. of T. Marano, Nov. 26, 2012, at 170:14–17; Int. of J. Ilany, Nov. 28, 2012, at 64:10–65:8. The new Independent Directors' mandate was set forth in ResCap Board resolutions setting up the Special Review Committee. Minutes of a Special Meeting of the Board of Residential Capital, LLC, Dec. 5, 2011, at RC40018721 [RC40018411].

[153] *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Nov. 16, 2011, at RC40018710 [RC40018411]; *see also* Appendix IV.A.1—3.

[154] *See* Int. of J. Ilany, Nov. 28, 2012, at 47:25–53:23.

[155] *See id.* at 54:14–55:9; 57:22–58:19.

[156] *See* Int. of J. Mack, Dec. 5, 2012, at 72:1–77:4.

[157] *See id.* at 82:13–19, 83:15–85:20.

[158] *See id.* at 85:22–86:2. At the ResCap Board meeting on November 4, 2011, "Mr. Marano referred to discussions previously held regarding the appointment of two additional directors to the ResCap Board. He commented on the scheduling of interviews with potential candidates." *See* Minutes of a Special Meeting of the Board of Residential Capital, LLC, Nov. 4, 2011, at RC40018700 [RC40018411]. Marano's reference to "discussions previously held" does not appear to correspond to any recorded prior discussion at any meeting of the ResCap or AFI Boards.

[159] *See* E-mail from A. Bhama (Nov. 12, 2011) [ALLY_0207114]. Note that while a forwarded message is referenced both by Bhama's message ("per Tammy's Hamzehpour's note below") and by her subject line ("FW: As requested by the Board…."), the document produced to Examiner's Counsel was redacted starting immediately after Bhama's sign off ("Thanks."), and continuing for almost two pages thereafter.

appointment of Independent Directors would trigger AFI's indemnification liability and recommended that the Independent Directors be appointed by the ResCap Board.[160] Carpenter's reply to both Bhama and Yastine instructs them to "[p]roceed as you think appropriate."[161] Independent Director appointment as it relates to indemnification by AFI is discussed further in Sections IV.B.1.e(6) and IV.B.2.a.

The ResCap Board appointed Ilany and Mack as Independent Directors at a November 16, 2011 meeting of the ResCap Board.[162]

---

[160] *See id.*

[161] E-mail from M. Carpenter (Nov. 12, 2011) [ALLY_0207114].

[162] *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Nov. 16, 2011, at RC40018709 [RC40018411].

### d. Independent Director Compensation

The following chart sets forth a brief summary of the compensation for Independent Directors:

EXHIBIT IV.B.1.d
**Independent Director Compensation**
2005 – 2012

| Year | RCID | Annual Base Retainer | Annual Committee Fees | Special Payment | Other Amounts |
|------|------|------|------|------|------|
| 2005 | Jacob | Not disclosed | Not disclosed | N/A | Not disclosed |
| | Melzer | Not disclosed | Not disclosed | | |
| 2006 | Jacob | $100K | Audit: 30K (chair) | N/A | Pre-paid 2-year GM auto lease; Expense reimbursement |
| | Melzer | $100K | Audit: 10K (member) | | |
| 2007 | Jacob | $110K | Audit: 30K (chair) | N/A | Pre-paid 2-year GM auto lease; Expense reimbursement |
| | Melzer | $110K | Audit: 10K (member) | | |
| 2008 | Jacob | $110K | Audit: 30K (chair) | $8,333 monthly [1] | Expense reimbursement |
| | Melzer | $110K | Audit: 10K (member) | | |
| | Hirtler-Garvey | $110K | Audit: 30K (chair) | $100K annual single sum | |
| | Smith | $110K | Audit: 10K (member) | | |
| 2009 | Hirtler-Garvey | $110K | Audit: 30K (chair) | $100K annual single sum | Expense reimbursement |
| | West | $110K | Audit: 30K (chair) | | |
| | Smith | $110K | Audit:10K (member) | | |
| 2010 | West | $110K | Audit: 30K (chair) | $100K annual single sum | Expense reimbursement |
| | Smith | $110K | Audit: 10K (member) | | |
| 2011 | West | $120K | Audit: 30K (chair) | N/A | $1500 per meeting (after first 4 meetings, total capped at $25k); Expense reimbursement |
| | Smith | $120K | Audit: 10K (member) | | |
| | Ilany | $120K | N/A | | |
| | Mack | $120K | N/A | | |
| 2012 | West | $180K | Audit: 30K (chair) Compensation [2]: 10K (member) | Payment for retroactive increase to 2011 base retainer and meeting fees | $1500 per meeting Expense reimbursment |
| | Smith | $180K | Audit: 10K (member) | | |
| | Illany | $180K | Audit: 10k (member) | | $1500 per meeting; $1500 per negotiation; Expense reimbursement |
| | Mack | $180K | Audit: 10k (member) Compensation [2]: 20K (chair) | | |

[1] Whether payment was made is disputed. See Section IV.B.1.d(4).
[2] Pro-rata payment of annual fees in 2012 following March, 2012 establishment of Compensation Committee.
*Source: See E-mail from W. Hasson (Jan. 8, 2007) at EXAM10164167 [EXAM10164165]; E-mail from D. Marple (Jan. 9, 2007) [EXAM10165583]; Minutes of a Special Meeting of the Board of Directors of Residential Capital Corporation, Oct. 19, 2006, at RC40006816 [RC40006748]; Proposed 2008 Compensation Plan for ResCap Independent Directors, dated Jan. 31, 2008, at RC40007277 [RC40007261]; Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Feb. 1, 2008, at RC40005653–54 [RC40005652]; Minutes of a Meeting of the Special Committee of the Independent Directors of the Board of Residential Capital, LLC, Mar. 25, 2008, at RC40006622 [RC40006611]; See E-mail from T. Hamzehpour to R. Hull (Apr. 30, 2008) [EXAM20248306]; E-mail from C. Quenneville (May 23, 2008) [EXAM11234420]; Spreadsheet, PAYMENT INFO BY VEND Number, Edward F. Smith, III [EXAM00294352]; Spreadsheet, PAYMENT INFO BY VEND Number, Karin Hirtler-Garvey, [EXAM00294334]; Spreadsheet reflecting payments to Pamela E. West [EXAM00294341]; Spreadsheet, PAYMENT INFO BY VEND Number, Jonathan Ilany [EXAM00294335]; Spreadsheet, PAYMENT INFO BY VEND Number, John E. Mack [EXAM00294337].*

Appendices IV.B.1.d—1, IV.B.1.d—2, and IV.B.1.d—3, and Section IV.B.1.d(8) and Appendices cited therein set forth additional information regarding Independent Director compensation.[163]

The following provides a more detailed narrative chronology of the compensation arrangements for Independent Directors based upon documentation and information received.[164]

### (1) 2005 Independent Director Compensation Documentation Is Limited

Examiner's Counsel has requested but not received any documentation that specifies the compensation paid to Independent Directors for 2005.

### (2) 2006 Independent Director Compensation Was Relatively Modest

Jacob and Melzer were paid an annual base retainer of $100,000 and an annual $10,000 fee for audit committee membership for 2006. Jacob also was paid an annual fee of $20,000 for his service as audit committee chair.[165]

### (3) 2007 Independent Director Compensation Included A Modest Increase In Annual Base Retainer

Jacob and Melzer were paid an annual base retainer of $110,000 and an annual $10,000 fee for Audit Committee membership for 2007. Jacob also was paid an annual fee of $20,000 for his service as Audit Committee Chair. Jacob and Melzer also were entitled to a pre-paid two-year auto lease with GM and reimbursement of expenses.[166]

---

[163] *See* Spreadsheet, Payment Info By Vend Number, Edward F. Smith, III [EXAM00294352]; Spreadsheet, Payment Info By Vend Number, Karin Hirtler-Garvey, [EXAM00294334]; Spreadsheet reflecting payments to Pamela E. West [EXAM00294341]; Spreadsheet, Payment Info By Vend Number, Jonathan Ilany [EXAM00294335]; Spreadsheet, Payment Info By Vend Number, John E. Mack [EXAM00294337]. Similar charts were not provided with respect to Jacob and Melzer.

[164] Examiner's Counsel received incomplete documentation in response to an omnibus request for production of all information regarding compensation for the Independent Directors, including detailed information on the time, form and source of payment of such compensation for each Independent Director.

[165] *See* E-mail from W. Hasson (Jan. 8, 2007) at EXAM10164167 [EXAM10164165] (requesting an updated spreadsheet for 2007 director compensation and providing that current monthly payments for Jacob and Melzer were $9,166.67 and $10,833.34, respectively); E-mail from D. Marple (Jan. 9, 2007) [EXAM10165583].

[166] Specifically, at a special meeting held on October 19, 2006, the ResCap Board discussed and approved Independent Director compensation for 2007. Independent Directors Jacob and Melzer were recused from the discussion and approval of such Independent Director compensation. The ResCap Board approved an increase of $10,000 in the base retainer and re-affirmed the extension of a pre-paid two-year lease on a GM vehicle and full reimbursement of expenses related to performing duties as an Independent Director and committee member. Jacob and Melzer re-joined the meeting and were apprised of the 2007 compensation plan approved by the ResCap Board. Minutes of a Special Meeting of the Board of Directors of Residential Capital Corporation, Oct. 19, 2006, at RC40006816 [RC40006748]. Such minutes do not reflect the specific amounts of the base retainer, committee membership fees, pre-paid auto lease or expense reimbursement limits, *but see* E-mail from D. Marple (Jan. 9, 2007) [EXAM10165583].

An e-mail from ResCap's General Counsel Marple dated January 9, 2007 notes that "[r]egarding contracts with the independent directors—there are none that relate to their term or compensation. As with all directors, they simply serve at the discretion of ResCap's shareholder."[167]

> ### (4) 2008 Independent Director Compensation Included An Award Of A Special Payment That Was Renounced As Improper By Certain Independent Directors But Continued To Be Paid

The Independent Directors were paid an annual base retainer of $110,000 and an annual $10,000 fee for audit committee membership for 2008. The audit committee chair was paid an annual $20,000 fee.[168] The 2008 Compensation Plan for Independent Directors (the "Compensation Plan") makes no reference to an extension of their pre-paid two-year GM auto leases, and subsequent compensation plans are silent on whether such leases were provided.[169]

In addition, in February 2008, the ResCap Board approved a special supplemental payment to each Independent Director of $100,000 per year for a three-year period, with annual installments to be paid on each April 1st of 2008, 2009, and 2010 (the "2008 Supplemental Award").[170]

---

[167] E-mail from D. Marple (Jan. 9, 2007) [EXAM10165583].

[168] The 2007 base retainer and committee fee compensation levels were extended into 2008 by the ResCap Board resolution approving the Proposed 2008 Compensation Plan for ResCap Independent Directors, dated Jan. 31, 2008, at RC40007277 [RC40007261]. *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Feb. 1, 2008, at RC40005653–54 [RC40005652]. *See also* Karin Hirtler-Garvey—Independent Board Member payment schedule [EXAM00294336] (reflecting 2008 monthly payments equal to an annual base retainer of $110,000, an annual $10,000 fee for audit committee membership, and an annual $20,000 fee for the audit committee chair).

[169] Note, however, that a week after Smith was appointed as Independent Director, Hamzehpour wrote an e-mail which states "Rob Hull asked me yesterday to set up Ted Smith with the appropriate compensation, car, etc." E-mail from Hamzehpour (May 23, 2008) [EXAM11234420].

[170] *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Feb. 1, 2008, at RC40005653–54 [RC40005652] (approving the Proposed 2008 Compensation Plan for ResCap Independent Directors, dated Jan. 31, 2008, at RC40007277 [RC40007261]).

Specifically, at a special meeting held on February 1, 2008, the ResCap Board discussed and approved Compensation Plan for Independent Directors.[171] Jacob and Melzer were recused from the discussion and approval of the Compensation Plan.[172] The Compensation Plan is summarized in a proposal distributed to the ResCap Board (presumably excluding Jacob and Melzer) prior to the special meeting.[173] The proposal states that:

> Management of [AFI] and ResCap recognize the incremental burdens and obligations recently placed on the independent directors, particularly in the third and fourth quarters of 2007, in respect of a higher than usual number of board and committee meetings, the oversight of the extensive restructuring of ResCap and the substantial increase in the number of material transactions that require review by the directors. It is management's expectation that the [sic] ResCap's business and financial circumstances will continue to place these incremental requirements on the independent directors in the near term and desire to provide an additional component of compensation to them as part of their compensation plan . . . .[174]

The amount of the annual payment under the 2008 Supplemental Award was almost double the $110,000 annual base retainer then being paid to Independent Directors. The 2008 Supplemental Award was payable without regard to whether the 2006 Amended Operating Agreement remained in effect through 2010 and was subject to acceleration and payment in full in the event of a change in control of ResCap or the termination of the 2006 Amended Operating Agreement.[175]

When Jacob and Melzer rejoined the meeting and were apprised of the details of the compensation plan that the ResCap Board had just approved, "each expressed appreciation for the recognition of the increased responsibility and commitment required in connection with the appointment as Independent Directors of ResCap."[176]

During a subsequent telephonic meeting of the Special Committee of the Independent Directors of the ResCap Board held on March 25, 2008, Melzer raised a concern about the increase in Independent Director annual fees.[177] The minutes state that "[i]n order to avoid

---

[171] *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Feb. 1, 2008, at RC40005653–54 [RC40005652].

[172] *See id.*

[173] *See* Proposed 2008 Compensation Plan for ResCap Independent Directors, dated Jan. 31, 2008, at RC40007277 [RC40007261].

[174] *Id.*

[175] *See id.*

[176] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Feb. 1, 2008, at RC40005654 [RC40005652].

[177] *See* Minutes of a Meeting of the Special Committee of the Independent Directors of the Board of Residential Capital, LLC, Mar. 25, 2008, at RC40006622 [RC40006611].

even an appearance of impropriety or influence, both Jacob and Melzer advised management that they would not accept such amount scheduled to be paid on April 1, 2008" and that ResCap President and CEO "Jim Jones said he would advise the Board of their decision."[178]

When interviewed, Melzer questioned the timing of the 2008 Supplemental Award, stating:

> [T]hey came up with a proposal to increase our compensation significantly . . . when we were right in the middle of one of these related party transactions . . . . And I said—we both did, said "No way. There's no way we're taking that compensation. This is going to look like somehow our independence and judgment was influenced by a large payment of that magnitude." I frankly couldn't have believed—I couldn't believe they proposed it.[179]

Jacob stated that accepting the 2008 Supplemental Award would have created "an appearance of impropriety" because of the many related party transactions that he and Melzer were then being asked to approve.[180] Jacob also felt uneasy about the timing: "we were working very hard. It is not that we were not worth it, but in the context of all the related party transactions that we were asked to approve, I was uncertain about the motives for this, the timing . . . ."[181] Asked if he thought the ResCap Board had been "trying to entice [him and Melzer] to approve the transactions by that hike in compensation," Jacob stated: "Yeah, you're exactly right. There was an attempt to influence us in a sense, okay. And so, we told them that we would not accept [the annual single sum payments of $100,000 starting that April 1] . . . ."[182]

Notwithstanding such concerns, and only one day after Jacob and Melzer advised that they would not accept their upcoming lump sum payment, on March 26, 2008, counsel for Jacob and Melzer, James Nouss, wrote to Hamzehpour and proposed restructuring the supplemental award in the form of monthly payments equal to the same $100,000 annual increase, and retroactive to January 1, 2008.[183] Nouss suggested the following:

> [Jacob and Melzer] would like to propose alternatively that the Board consider restructuring their approved compensation adjustment to be included in 12 monthly payments in the amount of $8,333.33 per month. (So, for example, Tom Melzer would now receive $18,333.33 per month for his services.) This

---

[178] *See id.*

[179] Int. of T. Melzer, Oct. 10, 2012, 239:8–239:21.

[180] Int. of T. Jacob, Nov. 7, 2012, at 213:14–24.

[181] *Id.* at 213:20–24.

[182] *Id*. at 213:25–214:6.

[183] *See* E-mail from J. Nouss (Mar. 26, 2008) [MELZER.008841].

IV-35

> change would be retroactive to January 1, 2008. Could this item be added to the agenda of this week's Board meeting in order to avoid even the appearance that Tom and Tom somehow would be receiving a lump-sum payment in exchange for their favorable vote on matters considered at the upcoming Board meeting? They would, of course, recuse themselves from deliberation on this matter.[184]

On March 28, 2008, the ResCap Board approved by unanimous written consent a resolution to restructure the 2008 Supplemental Award in accordance with Nouss's proposal.[185]

Although Jacob and Melzer previously had renounced the 2008 Supplemental Award, Hamzehpour reports that they were paid a pro rata share of the 2008 Supplemental Award for 2008.[186] However, Jacob stated that he does not believe he received any part of the 2008 Supplemental Award.[187]

The form of payment of the 2008 Supplemental Award was subsequently converted back to annual single sum payments[188] and paid to certain Independent Directors. Smith received 2008 Supplemental Award payments of $100,000 for each of 2008, 2009 and 2010.[189] Hirtler-Garvey received 2008 Supplemental Award payments of $100,000 for each of 2008 and 2009.[190] West received a 2008 Supplemental Award payment of $100,000 for 2010.[191]

---

[184] *Id.*

[185] Unanimous Written Consent of the Board of Directors of Residential Capital, LLC, dated Mar. 28, 2008, at RC40005692–99 [RC40005652].

[186] *See* E-mail from T. Hamzehpour to R. Hull (Apr. 30, 2008) [EXAM20248306]. Hamzehpour states:

> Also, I think you're aware, but just in case—although the supplemental compensation plan for 2008 contemplated lump sum payments of $100K to each independent on April 1, the independent directors requested late in March that the supplemental comp be paid out on a monthly basis instead. Therefore, they both received those additional monthly installments for January–April, as well as their regular monthly payments. They will now receive no further payments, except for any expense reimbursements that they may submit related to dates prior to their resignation.

[187] Int. of T. Jacob, Apr. 17, 2013, at 46:25–47:13; *see also* Int. of T. Jacob, Apr. 17, 2013, at 48:18–49:7.

[188] E-mails between J. Jones and T. Hamzehpour (May 23–27, 2008) [EXAM11234420].

[189] E-mails between T. Hamzehpour and M. Brunette (May 27–30, 2008) [EXAM11306589].

[190] Karin Hirtler-Garvey—Independent Board Member payment schedule [EXAM00294336]; *see also* Spreadsheet, Payment Info By Vend Number, Karin Hirtler-Garvey [EXAM00294334].

[191] Spreadsheet reflecting payments to Pamela E. West [EXAM00294341]. Also, in an e-mail to Hamzehpour, West notes that Smith "has received his $100m [sic.] april bonus payment but mine must be lost in the mail." E-mail from P. West to T. Hamzehpour (April 08, 2009), at EXAM10434898–99 [EXAM10434896]. Upon learning from Kollenberg that West's $100,000 2008 Special Award payment for 2010 had been omitted from her pre-approved payment schedule, Hamzehpour requests Kollenberg's assistance correcting West's payment schedule and processing the missing payment. E-mails between T. Hamzehpour and C. Kollenberg (April 12–13, 2010) [EXAM10434896].

An e-mail dated May 23, 2008 from Jones sheds light on a purpose of the 2008 Supplemental Award:

> Part of the idea of the supplemental payments in the first place is that they automatically receive an accelerated payment if we ever vote to take down the firewall. Otherwise they would be voting to disband the board and cease their compensation. We could arrange separate comp for them in that event, but it may look like a payment for their votes. The way the supplemental was originally structured they get that pay if there is a board or not, and there should be no voting conflicts, real or perceived. It was the Toms that felt the first annual payment coincided with the Q1 bond contribution to preferred, and they did not like the optics of that. So we went to monthly payments.
>
> I would like to go back to annual payments each April for the next two years or upon dissolution of the board, whichever is first.[192]

*(5) 2009 Independent Director Compensation Remained Relatively Stable*

The Independent Directors were paid an annual base retainer of $110,000 and an annual $10,000 fee for audit committee membership for 2009. The audit committee chair was paid an annual $20,000 fee.[193]

Specifically, Hirtler-Garvey was paid a total of $146,666.68 in Independent Director compensation in 2009, with the last payment on April 24, 2009.[194] Smith was paid a total of $320,000 in Independent Director compensation in 2009.[195] West, who joined the ResCap Board on May 8, 2009, was paid a total of $86,666.64 in Independent Director compensation for 2009.[196]

---

[192] E-mail from J. Jones (May 23, 2008) [EXAM11234420].

[193] *See, e.g.*, Spreadsheet, Payment Info By Vend Number, Edward F. Smith, III [EXAM00294352]; Spreadsheet reflecting payments to Pamela E. West [EXAM00294341].

[194] Hirtler-Garvey continued to receive $11,666.67 per month through April 2009, and as noted in Section IV.B.1.d(4), also received an additional $100,000 in March 2009. Spreadsheet, Payment Info By Vend Number, Karin Hirtler-Garvey, dated Jan. 29, 2013 [EXAM00294334]. An e-mail sent January 10, 2011 from Kollenberg to Hamzehpour states that "[a]ccording to the payment history and old schedule for Karin Hirtler-Garvey, her monthly payment was $11,666.67 (aside from the additional comps received)." E-mail from C. Kollenberg to T. Hamzehpour (Jan. 10, 2011) [EXAM20136494].

[195] Spreadsheet, Payment Info By Vend Number, Edward F. Smith, III, dated Jan. 29, 2013 [EXAM00294352].

[196] Vendor Payment Activity Spreadsheet With Respect to Pamela E. West, dated Jan. 14, 2013 [EXAM00294341].

*(6) 2010 Independent Director Compensation Remained Relatively Stable*

For 2010, the Independent Directors were paid an annual base retainer of $110,000 and an annual $10,000 fee for audit committee membership. The audit committee chair was paid an annual $20,000 fee.[197]

Specifically, for 2010, West was paid $219,166.63 in Independent Director compensation and Smith was paid $210,000 in Independent Director compensation.[198]

*(7) 2011 Independent Director Compensation Included An Increase In Base And New Excess Meeting Fees*

For 2011, the Independent Directors initially were paid an annual base retainer of $120,000 and an annual $10,000 fee for audit committee membership. The audit committee chair was paid an annual $20,000 fee. The Independent Directors were paid additional compensation for each ResCap Board meeting of $1,500 per meeting, though subject to limitations described immediately below.[199]

At a special telephonic meeting held on January 27, 2011, the ResCap Board discussed and approved Independent Director compensation for 2011.[200] Smith and West were recused from the discussion and approval of such Independent Director compensation.[201] The ResCap Board unanimously approved the following non-employee director compensation effective January 1, 2011: (1) an annual base retainer of $120,000; (2) an annual audit committee chair fee of $20,000; (3) an annual audit committee membership fee of $10,000; (4) additional compensation for ResCap Board meetings in excess of four per year of $1,500 per excess meeting (capped at $25,000); and (5) full reimbursement of expenses incurred in carrying out

---

[197] *See, e.g.*, Spreadsheet, Payment Info By Vend Number, Edward F. Smith, III [EXAM00294352]; Spreadsheet reflecting payments to Pamela E. West [EXAM00294341].

[198] *See Id.* In e-mails exchanged on December 3, 2010, Kollenberg and Hamzehpour discuss the continuation of director payments for Smith and West in 2011. Hamzehpour responds that: (1) both Smith and West are still directors; (2) payments should continue through 2011; and (3) "[i]n fact, there may be an adjustment to the compensation and, if so, that would be effective in January." E-mail from T. Hamzehpour to C. Kollenberg (Dec. 3, 2010) [EXAM10357376]. In a follow-up e-mail to Hamzehpour, dated January 10, 2011, Kollenberg notes that West received twenty payments of $10,833.33 per month for the period from June 2009 through November 2010, and that West had not been paid her monthly $833.33 Audit Committee Member fee and is due a make-up payment of $16,666.60 for her twenty missing Audit Committee Member fees. E-mail from C. Kollenberg to T. Hamzehpour (Jan. 10, 2011) [EXAM20136494].

[199] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Jan. 27, 2011, at RC40018421–22 [RC40018411]. Note, however, that the annual base retainers were increased to $180,000 and all limitations on per meeting fees were lifted in December 2011, with payment retroactive to January 2011. *See* Section IV.B.1.d(7); s*ee also* Unanimous Written Consent of the Management Members of the Board of Directors of Residential Capital, LLC, dated Dec. 9, 2011, at RC40018727–28 [RC40018411].

[200] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Jan. 27, 2011, at RC40018421–22 [RC40018411].

[201] *Id*. at RC40018421.

IV-38

responsibilities as directors and committee members.[202] The retroactive payment of Independent Director compensation for 2011 is discussed further in Section IV.B.1.d(8).

In an e-mail dated January 3, 2012 from Jennifer Shank of AFI Legal Staff to Hamzehpour, Shank asks Hamzehpour how she should determine the meetings for which West and Smith previously received compensation.[203] Shank notes:

> Per Kitty's e-mail from last week, there were 51 ResCap Board and Committee meetings held in 2011, not including the 12/15/2011 Business Review/Executive Session, which was not a regular meeting and for which minutes were not taken (see below)

| | BOARD | AUDIT | COCC |
|---|---|---|---|
| Q1 | 5 | 3 | — |
| Q2 | 2 | 2 | 1 |
| Q3 | 13 | 5 | 4 |
| Q4 | 11 | 3 | 2 |
| Total | 31 | 13 | 7 |

> According to the resolution adopted by ResCap Management on 12/9/2011, Pam and Ed both need to receive $60K for the retainer increase that was made retroactive to 1/1/2011 and should receive meeting fees past the $25K for 2011 meetings. For the two new independent directors, they need the base retainer of $180K as well as payment for any meetings they attended since their appointment on 11/15/2011.[204]

### (8) 2012 Independent Director Compensation Was Significantly Higher Than Any Previous Year

For 2012, the Independent Directors were paid an annual base retainer of $180,000 and an annual $10,000 fee for audit committee membership. The audit committee chair also was paid an annual $20,000 fee for his services as audit committee chair. The Independent Directors also were paid additional compensation for each ResCap Board meeting of $1,500 per meeting.[205]

---

[202] *Id.* at RC40018421–22.

[203] E-mail from J. Shank to T. Hamzehpour (Jan. 3, 2012) [EXAM20136494].

[204] *Id.*

[205] Unanimous Written Consent of the Management Members of the Board of Directors of Residential Capital, LLC, dated Dec. 9, 2011, at RC40018728 [RC40018411].

IV-39

On December 9, 2011, the management members of the ResCap Board approved by unanimous written consent the proposed 2012 compensation plan for the Independent Directors.[206] The proposal states that ResCap management:

> [R]ecognizes the incremental burdens and obligations placed on the independent directors during 2011, and anticipated during 2012, in respect of a higher than usual number of board and committee meetings, ResCap's unrelenting capital and liquidity challenges and continuing need to evaluate material transactions (including affiliate transactions) that require review by the directors.[207]

The proposal calls for: (1) increases in the base retainer amount from $120,000 to $180,000 per year; (2) the continuance of the audit committee membership fee of $10,000 and audit committee chair fee of $20,000 per year; (3) the continuance of the fee of $1,500 per meeting (but without the "in excess of four" and $25,000 cap restrictions that were in place in 2011); and (4) the continuance of full reimbursement of expenses in carrying out responsibilities as directors and committee members.[208] In addition, the proposal provides that: (1) the increased base retainer will be retroactive to January 1, 2011 for Smith and West and retroactive to the date of engagement for Mack and Ilany; (2) to the extent that any Independent Directors reach the $25,000 cap on meeting fees during 2011, the company will nevertheless pay any excess meeting fees; and (3) the company will pay to each Independent Director the meeting fees for the first four meetings each attended during 2011.[209]

On May 4, 2012, the management members of the ResCap Board approved by unanimous written consent proposed amendments to the 2012 director compensation plan.[210] The amendments provide for additional compensation to Independent Directors who serve on the ResCap Board compensation committee that was established in March 2012: (1) an annual compensation committee membership fee of $10,000; (2) an annual compensation committee chair fee of $10,000; (3) a fee of $1,500 per meeting attended; and (4) full reimbursement of expenses incurred in carrying out the responsibilities as committee members.[211] The amendments also approve additional compensation to Independent Directors, "in particular Messrs. Mack and Ilany, who have taken on additional responsibilities and are devoting a substantial amount of additional time related to certain strategic negotiations with executives

---

[206] *Id.* at RC40018727–28.

[207] *Id.* at RC40018728.

[208] *Id.*

[209] *Id.* In addition, in an e-mail dated December 30, 2011 from Hamzehpour to Kollenberg, Hamzehpour notes the need for retroactive adjustments in 2011 director compensation so that they will effectively have been paid the $180,000 base for all of 2011. E-mail from T. Hamzehpour to C. Kollenberg (Dec. 30, 2011) [EXAM20119671].

[210] Unanimous Written Consent of the Management Members of the Board of Directors of Residential Capital, LLC, May 4, 2012, at RC40019214–18 [RC40019179].

[211] *Id.* at RC40019217–18.

of [AFI] and Cerberus Capital Partners in respect of the potential sale or restructuring of [ResCap]."[212] The additional fees for such strategic negotiations were set at $1,500 per negotiating session (regardless of whether held in person or telephonically).[213] The Independent Directors were required to notify ResCap's Secretary or Assistant Secretary of all such meetings so that the related payments could be included in the regular quarterly payments of meeting fees.[214]

The special fees for meetings held in 2012 were substantial. For example, in the period from March 1, 2012 through May 16, 2012, there were a total of eight ResCap Board meetings, three Audit Committee meetings, one Consent Order Compliance Committee Meeting, four Compensation Committee meetings (one not included in 1Q compensation) and twenty-nine "Negotiation Meetings/Calls with Carpenter and Lenard."[215] Independent Directors received a total of $112,500 in special meeting fees for such meetings.

Studies of board of director practices and compensation indicate a trend among publicly traded companies to eliminate per meeting fees to simplify compensation structures. The *Spencer Stuart Board Index* reported that the number of companies paying per meetings fees in addition to annual retainers decreased from 70% in 2002 to approximately 33% in 2012.[216] According to a study of 240 publicly traded companies conducted by Frederick W. Cook & Co., Inc., in 2012 only 51% of mid-cap companies surveyed paid per meeting fees to directors.[217] Fifty-two-percent of financial services companies surveyed paid per meeting fees.[218] A 2011 survey by The Conference Board, Inc. of 334 publicly traded companies reported that meeting fees comprised approximately 13% of directors' total compensation for financial services companies, and approximately 21% of total compensation for directors of publicly traded companies with $1 billion to $9.9 billion of assets.[219] By comparison, per meetings fees

---

[212] *Id.* at RC40019217.

[213] *Id.* at RC40019218. Based on the compensation records produced for Ilany and Mack, it appears that this $1,500 payment was paid on a per day rather than per event basis. *See* Residential Capital, LLC Independent Director Compensation, Apr. 1, 2012–Present, dated May 16, 2012, at EXAM00294339 [EXAM00294338].

[214] Unanimous Written Consent of the Management Members of the Board of Directors of Residential Capital, LLC, May 4, 2012, at RC40019218 [RC40019179].

[215] Residential Capital, LLC, Independent Director Compensation: Meeting Attendance Fees, Board and Committees, Apr. 1, 2012–Present, dated May 16, 2012 [EXAM00294338]. Note that it appears Ilany and Mack were compensated for each day and not by meeting or call.

[216] SPENCER STUART, 2012 SPENCER STUART BOARD INDEX (Nov. 6, 2012), 39, http://www.spencerstuart.com/research/articles/1621/.

[217] *See* FREDERIC W. COOK & CO., 2012 DIRECTOR COMPENSATIONREPORT: NON-EMPLOYEE DIRECTOR COMPENSATION ACROSS INDUSTRIES AND SIZE (Oct. 2012), at 10, http://www.fwcook.com/alert_letters/2012_Directors_Compensation_Report_Non-Employee_Director_Compensation_Across_Industries_and_Size.pdf.

[218] *Id.*

[219] Tonello, Matteo, & Judit Torok, THE 2011 U.S. DIRECTOR COMPENSATION AND BOARD PRACTICES REPORT (November 2, 2011), at 24–25, http://ssrn.com/abstract=2032229. THE CONFERENCE BD., THE 2011 U.S. DIRECTOR COMPENSATION AND BOARD PRACTICES REPORT (Nov. 2011), at 24–25, http://www.conference-board.org/publications/publicationdetail.cfm?publicationid=2040.

accounted for approximately 41% of the total compensation paid to the ResCap Independent Directors for 2012.[220] Exhibit IV.B.1.d(8) shows the composition of total compensation for the Independent Directors in 2012.



EXHIBIT IV.B.1.d(8)
**ResCap Independent Director Compensation**
Paid in 2012

Source: *PAYMENT INFO BY VEND Number, John E. Mack [EXAM00294337]; Spreadsheet, PAYMENT INFO BY VEND Number, Jonathan Ilany [EXAM00294335]; Spreadsheet, PAYMENT INFO BY VEND Number, Edward F. Smith, III [EXAM00294352]; Spreadsheet reflecting payments to Pamela E. West [EXAM00294341].*

It is noteworthy that other financially distressed financial services companies did not remove caps or minimum meeting requirements from compensation plans prior to a bankruptcy filing. Lehman reported in its 2008 Proxy Statement that the final quarterly installment of a director's annual retainer would be withheld if the director failed to attend at least 75% of the total number meetings.[221] Lehman Brothers only paid per meeting fees for committee meetings, not board meetings.[222] Similarly, IndyMac compensated directors for per meeting attendance of special board functions and committee meetings over a minimum of four meetings; its directors did not receive per meeting fees for board meetings.[223]

---

[220] This calculation does not include the retroactive meeting fees paid to the Independent Directors in 2012 for 2011.

[221] Lehman Brothers, Proxy Statement (Schedule 14A) (Mar. 5, 2008), at 14–15.

[222] *Id*.

[223] Indymac Bancorp, Inc., Proxy Statement (Schedule 14A) (Mar. 24, 2008), at 21.

Based on calculations by Examiner's Financial Advisors, compensation paid to Independent Directors in 2012 was $409,000 to Mack, $373,000 to Ilany, $464,500 to West and $409,500 to Smith. The $414,000 average amount paid to Independent Directors in 2012 is higher than the $165,000 average amount of Independent Director compensation in 2011 and approximately twice the average amount of Independent Director compensation paid for the preceding four years.[224]

Examiner's Professionals obtained peer group information and compared the amount of compensation paid to Independent Directors with compensation paid to independent directors of peer group companies for the period from 2005 to the present, which is summarized in the charts in Appendix IV.B.1.d(8)—1 and —2. The peer group includes financially distressed financial services companies that either filed for bankruptcy or were sold on the brink of bankruptcy between 2008 and 2012. Notably, the Independent Directors' $414,000 average total compensation ranks as the second highest among the peer group. Only non-employee directors of Countrywide received more average total compensation, $472,800, than the Independent Directors in the year preceding Countrywide's sale to Bank of America. Lehman's directors received $365,000 in average total compensation in the year prior to Lehman's bankruptcy filing. There was no clear pattern of increasing board compensation in the year prior to a bankruptcy filing among financially distressed peers.

Moreover, annual compensation paid to Independent Directors was significantly higher than compensation paid to independent directors of AFI. For example, average annual total cash compensation for the Independent Directors was $414,000 for 2012, whereas average annual total cash compensation for AFI's independent directors was approximately $314,000. For more detail, see Appendix IV.B.1.d(8)—3, Appendix IV.B.1.d(8)—4, and Appendix IV.B.1.d(8)—5.

Indeed, the Independent Directors' average annual compensation is greater than the average compensation received by directors at some of the U.S.'s largest publicly traded financial institutions. For 2012, the directors of Morgan Stanley were paid an average of $351,080, while directors of Wells Fargo received approximately $299,429.[225] Also for 2012, the directors of Citigroup, Bank of America, and JPMorgan received an average of $315,000, $275,000, and $278,194, respectively.[226] By comparison, the Independent Directors received average annual compensation of approximately $414,000 for 2012.[227]

---

[224] Compensation paid in 2012 was significantly increased by the lump sum payment in January 2012 of compensation, made retroactive to 2011. The effect was a significant increase in compensation paid to the Independent Directors in 2012. If the retroactive fees were considered on an accrual versus on a cash basis, the 2012 average would be $342,125, which would still exceed the average compensation paid to AFI and peer group independent directors in 2012.

[225] Susanne Craig, *At Banks, Board Pay Soars Amid Cutbacks*, N.Y. TIMES, Mar. 31, 2013, http://dealbook. nytimes.com/2013/03/31/pay-for-boards-at-banks-soars-amid-cutbacks/.

[226] *Id.*

[227] Compensation paid in 2012 was significantly increased by the lump sum payment in January 2012 of compensation, made retroactive to 2011. The effect was a significant increase in compensation paid to the Independent Directors in 2012. If the retroactive fees were considered on an accrual versus on a cash basis, the 2012 average would be $342,125, which would still exceed the average compensation paid to AFI and peer group independent directors in 2012.

### *(9) Other Independent Director Compensation*

With the exception of the Independent Director compensation described above (most notably the 2008 Supplemental Award), no documentation or information was produced that reflects any special payments made by ResCap, AFI, or any of their respective affiliates to the Independent Directors.[228] Moreover, the form of payment for Independent Directors appears to be limited to cash payments and prepaid auto leases and does not appear to include any equity-based compensation of ResCap or any of its related entities.

### *(10) Source Of Independent Director Compensation*

Examiner's Professionals have been unable to verify from the documents produced the source of Independent Director compensation, including both the original source of payment and any intercompany or affiliate accounting adjustments or charge-backs. Such information is important to determining whether there may be a basis to assert a claim that the Independent Directors breached their fiduciary duties and may have been improperly influenced by payments made from AFI or other affiliates of ResCap.

Examiner's Professionals note that AFI shared services processed ResCap Independent Director compensation under the direction of Hamzehpour, who sent periodic e-mails updating AFI shared services on the compensation due to each Independent Director.[229]

Counsel for Independent Directors, Morrison Cohen, told Examiner's Counsel that the Independent Directors were ultimately paid by AFI shared services from ResCap funds, indentifying a general ledger account number from which AFI shared services' debited Independent Directors payments as an account for professional fees relating to RFC, and a cost center referenced on certain director invoices as a ResCap-related cost center.

### *(11) Independent Director Compensation Development*

Examiner's Counsel did not receive sufficient documentation or information to determine which entity created or proposed Independent Director compensation plans each year, or whether outside compensation consultants or peer group information was received or considered in developing such compensation arrangements.

### *(12) Non-Independent Director Compensation*

As noted in Appendix IV.A.1—1, certain directors and officers of ResCap were also employed by one or more AFI affiliates. This is not uncommon, as many wholly owned subsidiaries often share officers, directors, and employees with their parents.

---

[228] For example, in his Rule 9019 deposition of November 14, 2012, Mack confirmed that he did not have any additional director incentive compensation. *See* Dep. of J. Mack, Nov. 14, 2012, at 24:15–25:2.

[229] *See, e.g.*, E-mails between T. Hamzehpour and C. Kollenberg (Apr. 12–13, 2008) [EXAM10434896]; E-mail from T. Hamzehpour to M. Brunette (May 27, 2008) [EXAM11306589]; E-mail from T. Hamzehpour to C. Kollenberg (Dec. 3, 2010) [EXAM10357376].

As is not uncommon for employees of a wholly owned subsidiary or dual service directors, certain senior ResCap executives earned deferred incentive compensation based on parent AFI's value and performance and were paid AFI equity-based compensation, including restricted stock units. Appendix IV.B.1.d(12) sets forth a summary of compensation paid to ResCap directors and officers that were not Independent Directors, including directors and officers who served in a dual capacity with both ResCap and AFI.

It is important to note that at least one ResCap director, Marano, was considered among the top twenty-five most highly paid individuals of AFI and its subsidiaries. In recent testimony before the U.S. House of Representatives oversight panel, Rep. Jim Jordan (R. Ohio) "took aim at special paymaster Patricia Geoghegan who approved $8 million in compensation for ResCap Chief Executive Tom Marano just weeks before the company filed for Chapter 11."[230] In response, Special Paymaster Patricia Geoghegan noted that "[t]he salary was at the request of [the] ResCap board of directors."[331] AFI spokeswoman Gina Proia told the Wall Street Journal that "Tom Marano's compensation for periods following ResCap filing for bankruptcy is the responsibility of ResCap, not [AFI]."[332] Proia added that Marano, a former Bear Stearns executive, is seeking compensation for 2013 of $2 million.[333]

Debtors sought and obtained approval from the U.S. Treasury's Office of the Special Master to have any deferred compensation elements arising just after the Petition Date to be issued in the form of deferred cash rather than AFI stock units, so that postpetition compensation to ResCap employees is not tied to the value of AFI stock.[334]

### e. Indemnification Of ResCap Directors And Officers

This Section summarizes the entity indemnification as between ResCap and AFI and the indemnification provisions applicable to ResCap directors and officers, including Independent Directors.

#### (1) 2005 And 2006 Operating Agreements—Entity Indemnification

Pursuant to the 2005 Operating Agreement and the 2006 Amended Operating Agreement, AFI agrees to indemnify and hold harmless ResCap and its subsidiaries against certain losses, including liabilities related to or arising "from and against any Losses related to [AFI]

---

[230] Patrick Fitzgerald, *Lawmakers Grill Treasury on ResCap Executive Pay*, WALL ST. J., Feb. 27, 2010, http://blogs.wsj.com/bankruptcy/2013/02/27/lawmakers-grill-treasury-on-rescap-executive-pay/.

[331] *Id*.

[332] *Id*.

[333] *Id*.

[334] *See* Debtors' Submission Paper, April 11, 2013, at 17–18.

Indemnifiable Liabilities."[335] Specifically excluded are liabilities related to or arising from and against any Losses related to GM Indemnifiable Liabilities, for which GM is responsible.[336] ResCap, in turn, agrees to indemnify and hold harmless GM, AFI, and their affiliates from and against any Losses related to ResCap Indemnifiable Liabilities.[337]

### (2) ResCap By-Laws

Pursuant to section 6.1 of the ResCap By-Laws, ResCap was required to indemnify and advance expenses to every director and officer in the manner and to the full extent permitted by applicable law.[338] In particular, such section provides that:

> Subject to the other provisions of this article, the corporation shall indemnify and advance expenses to every director and officer (and to such person's heirs, executors, administrators or other legal representatives) in the manner and to the full extent permitted by applicable law as it presently exists, or may hereafter be amended, against any and all amounts (including judgments, fines, payments in settlement, attorneys' fees and other expenses) reasonably incurred by or on behalf of such person in connection with any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative ("a proceeding"), in which such director or officer was or is made or is threatened to be made a party or is otherwise involved by reason of the fact that such person is or was a director or officer of the corporation, or is or was serving at the request of the corporation as a director, officer, employee, fiduciary or member of any other corporation, partnership, joint venture, trust, organization or

---

[335] 2005 Operating Agreement, § 3(b) [ALLY_0140795]; 2006 Amended Operating Agreement, § 3(b) [ALLY_0041818]. AFI Indemnifiable Liabilities are defined as "all Liabilities of any [AFI] Affiliate to the extent such Liabilities (a) relate to, (b) arise out of or (c) result principally from any of the following items: (i) the failure of any [AFI] Affiliate to pay, perform or otherwise promptly discharge any Liabilities of such [AFI] Affiliate in accordance with their terms; or (ii) the [AFI] Affiliate Business." *Id.*

[336] *See* 2005 Operating Agreement, § 3(a) [ALLY_0140795]; 2006 Amended Operating Agreement, § 3(a) [ALLY_0041818]. GM Indemnifiable Liabilities are defined as "all Liabilities of any GM Affiliate to the extent such Liabilities (a) relate to, (b) arise out of or (c) result principally from any of the following items: (i) the failure of any GM Affiliate to pay, perform or otherwise promptly discharge any Liabilities of such GM Affiliate in accordance with their terms; or (ii) the GM Affiliate Business." *Id.*

[337] *See* 2005 Operating Agreement, § 3(c) [ALLY_0140795]; 2006 Amended Operating Agreement, § 3(c) [ALLY_0041818]. ResCap Indemnifiable Liabilities are defined as "all Liabilities of ResCap or any of its Subsidiaries to the extent such Liabilities (a) relate to, (b) arise out of or (c) result principally from any of the following items: (i) the failure of ResCap or any of its Subsidiaries to pay, perform or otherwise promptly discharge any Liabilities of ResCap or such Subsidiary, as the case may be, in accordance with their terms; or (ii) the ResCap Business." *Id.*

[338] ResCap By-Laws, § 6.1 [EXAM12325305].

other enterprise. The corporation shall not be required to
indemnify a person in connection with a proceeding initiated by
such person if the proceeding was not authorized by the board of
directors of the corporation.[339]

The ResCap By-Laws also include detailed provisions with respect to the advancement of
expenses of directors and officers, claims by officers and directors, non-exclusivity of rights,
offsets for other indemnification, indemnification insurance and other related terms. Such
provisions of the ResCap By-Laws are relevant with respect to claims for indemnification
from ResCap that relate to periods prior to conversion of ResCap from a corporation to a
limited liability company.

### (3) 2006 ResCap LLC Agreement

The 2006 ResCap LLC Agreement provides for exculpation and indemnification of
ResCap directors and officers.[340]

Specifically, section 17 of the 2006 ResCap LLC Agreement sets forth an exculpation
provision which provides, in pertinent part, that no director, officer or employee of ResCap or
any subsidiary of ResCap (each a "Covered Person") will be liable to ResCap or any person
bound by such agreement for any loss, damage, or claim incurred by reason of any act or
omission performed or omitted by such Covered Person in good faith on behalf of ResCap and
in a manner reasonably believed to be within the scope of the Covered Person's authority,
except for any loss, damage or claims incurred by reason of such covered person's willful
misconduct or bad faith.[341] As a result, claims that relate to acts or omissions performed or
omitted by ResCap directors and officers in good faith and in a manner reasonably believed to
be within the scope of such director or officer's authority have been exculpated by ResCap.[342]

Section 18 of the 2006 ResCap LLC Agreement provides, subject to limitations set forth
therein and "to the fullest extent permitted by applicable law," for indemnification of Covered
Persons for acts or omissions of the Covered Person performed in good faith on behalf of
ResCap and in a manner reasonably believed to be within the scope of authority conferred on
such Covered Person by such agreement.[343]

The 2006 ResCap LLC Agreement indemnification provisions do not provide
indemnification in respect of: (1) the Covered Person's willful misconduct or bad faith with
respect to such acts or omissions; (2) claims, issues, or matters to which the Covered Person is

---

[339] *Id.*

[340] 2006 ResCap LLC Agreement, §§ 17, 18 [KL000000474].

[341] *Id.* § 17 ("Any repeal or modification of this Section 17 shall not adversely affect any right or protection of a
Covered Person existing hereunder with respect to any act or omission occurring prior to such repeal or
modification.").

[342] *See* Section VII.E.1.g(3).

[343] 2006 ResCap LLC Agreement, §18(a) [KL000000474].

IV-47

determined to be liable to ResCap, unless a court determines that the Covered Person is entitled to such indemnification; (3) claims initiated by the Covered Person (other than claims for indemnification and claims authorized or consented to by the ResCap Board); (4) settlements entered into without the prior written consent of ResCap, which consent shall not be unreasonably withheld; and (5) certain other matters.[344] Importantly, the 2006 ResCap LLC Agreement makes clear that the indemnification provided pursuant to section 18 thereof "shall be provided out of and to the extent of Company assets only, and the Member shall not have personal liability on account thereof."[345] The 2006 ResCap LLC Agreement contains detailed indemnification provisions, including provisions on successful defense, partial indemnification, advancement of payment of expenses, notification and defense of claims, and procedures for indemnification.[346]

### (4) 2008 ResCap Amended LLC Agreement

The 2006 ResCap LLC Agreement was amended and restated, effective as of March 31, 2008, to reflect the addition of AFI as a preferred member and the issuance of Preferred Units (as defined therein) to AFI.[347] The exculpation and indemnification provisions generally do not appear to be substantively changed in the 2008 ResCap Amended LLC Agreement.[348]

### (5) ResCap Indemnification Agreements With Independent Directors

ResCap entered into an Indemnification Agreement with Melzer dated as of June 21, 2005,[349] and into Amended and Restated Indemnification Agreements with Jacob and

---

[344] *See id.* § 18(a)(i), (a)(iii), (h), (i).

[345] *Id.* § 18(a)(i).

[346] *See Id.* § 18.

[347] 2008 ResCap Amended LLC Agreement [KL000000433].

[348] However, the indemnification provision in the 2006 ResCap LLC Agreement, § 18(a)(i) [KL000000474], which states that "the Member shall not have personal liability on account thereof," was amended to read as follows in the 2008 ResCap Amended LLC Agreement, § 18(a)(i) [KL000000433]: "no Member shall have personal liability on account thereof."

[349] Indemnification Agreement between Residential Capital, Corporation and Thomas Melzer, dated June 21, 2005 [MELZER.000886]. Examiner's Counsel believes that ResCap entered into a similar Indemnification Agreement with Jacob dated on or about June 21, 2005. *See* Minutes of the Annual Meeting of the Board of Directors, Residential Capital Corporation, Jun. 21, 2005, at RC40005518–19 [RC40005468] (showing that the ResCap Board authorized certain executive officers of ResCap to enter into and execute indemnification agreements with Jacob and Melzer, of same scope as afforded to directors in the ResCap By-Laws); Minutes of a Special Meeting of the Board of Directors, Residential Capital Corporation, Oct. 19, 2006, at RC40006812 [RC40006748] (recapping that ResCap Director David Walker "referred to previously approved indemnification agreements with each of the Independent Directors"); Amended and Restated Indemnification Agreement between Residential Capital, LLC and Thomas Jacob, dated Oct. 24, 2006 [EXAM00296828] (amending, presumably, ResCap's original Indemnification Agreement with Jacob). However, the original Indemnification Agreement for Jacob was requested and not produced.

Melzer dated as of October 24, 2006[350] (collectively, the "Individual Indemnification Agreements"). ResCap does not appear to have entered into any individual indemnification agreements with any other Independent Director.

The indemnification provisions set forth in the Individual Indemnification Agreements provide that ResCap will indemnify the Indemnitees (Jacob and Melzer):

> [I]f Indemnitee is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, by reason of the fact that Indemnitee is or was or has agreed to serve at the request of [ResCap] as a director of [ResCap], or while serving as a director of [ResCap] or by reason of any action alleged to have been taken or omitted in such capacity.[351]

Indemnification is provided only if "Indemnitee acted in good faith and in a manner Indemnitee reasonably believed to be in or not opposed to the best interests of [ResCap], and with respect to any criminal action, suit or proceeding, had no reasonable cause to believe Indemnitee's conduct was unlawful."[352] The Individual Indemnification Agreements contain a number of other exclusions, including exclusions for claims, issues or matters as to which Indemnitee shall have been adjudged to be liable to ResCap, unless a court determines that the Indemnitee is entitled to such indemnification.[353] The Amended and Restated Indemnification Agreements contain other exclusions that are consistent with the 2006 ResCap LLC

---

[350] Amended and Restated Indemnification Agreement between Residential Capital, LLC and Thomas Jacob, dated Oct. 24, 2006 [EXAM00296828]; Amended and Restated Indemnification Agreement between Residential Capital, LLC and Thomas Melzer, dated Oct. 24, 2006 [EXAM00296838]. In a special meeting of the ResCap Board held on October 19, 2006, ResCap Director David Walker "recommended approval of updated indemnification agreements [with each of the Independent Directors] to reflect changes related to the conversion of ResCap to a limited liability company." Minutes of a Special Meeting of the Board of Directors, Residential Capital Corporation, Oct. 19, 2006, at RC40006812 [RC40006748]. At this meeting, the ResCap Board approved the form and execution of amended indemnification agreements with each of the Independent Directors in substantially the form presented at such meeting. Minutes of a Special Meeting of the Board of Directors, Residential Capital Corporation, Oct. 19, 2006, at RC40006813 [RC40006748].

[351] Indemnification Agreement between Residential Capital, Corporation and Thomas Melzer, dated June 21, 2005, § 1(a) [MELZER.000886]; Amended and Restated Indemnification Agreement between Residential Capital, LLC and Thomas Jacob, dated Oct. 24, 2006 [EXAM00296828], § 1(a); Amended and Restated Indemnification Agreement between Residential Capital, LLC and Thomas Melzer, dated Oct. 24, 2006 [EXAM00296838], § 1(a).

[352] Indemnification Agreement between Residential Capital, Corporation and Thomas Melzer, dated June 21, 2005 [MELZER.000886]; Amended and Restated Indemnification Agreement between Residential Capital, LLC and Thomas Jacob, dated Oct. 24, 2006 [EXAM00296828]; Amended and Restated Indemnification Agreement between Residential Capital, LLC and Thomas Melzer, dated Oct. 24, 2006 [EXAM00296838].

[353] Indemnification Agreement between Residential Capital, Corporation and Thomas Melzer, dated June 21, 2005 [MELZER.000886]; Amended and Restated Indemnification Agreement between Residential Capital, LLC and Thomas Jacob, dated Oct. 24, 2006 [EXAM00296828]; Amended and Restated Indemnification Agreement between Residential Capital, LLC and Thomas Melzer, dated Oct. 24, 2006 [EXAM00296838].

Agreement,[354] plus an exclusion for claims related to certain violations of section 16(b) of the Exchange Act, as amended.[355] The Individual Indemnification Agreements set forth detailed provisions for partial indemnification, indemnification determinations, advance of payment of expenses, notification and defense of claims, and procedures for indemnification, insurance, and subrogation.[356]

### (6) AFI Indemnification Provisions

Pursuant to the 2011 AFI Amended Certificate, AFI agrees to indemnify and hold harmless ResCap's directors and officers who are serving at the request of AFI against claims incurred if the directors or officer acted in good faith and in a manner reasonably believed to be in or not opposed to the best interests of AFI, "other than claims arising from: (1) bad faith acts; (2) claims for which the individual is liable to [AFI], unless an applicable court finds the individual is entitled to indemnity; and (3) derivative actions not approved by the [AFI Board]."[357]

Specifically, the 2011 AFI Amended Certificate states:

> [AFI] shall indemnify and hold harmless each person who was or is made a party or is threatened to be made a party to or is involved in or participates as a witness with respect to any action, suit or proceeding, whether civil, criminal, administrative or investigative (each a "Proceeding"), by reason of the fact that he or she, or a person of whom he or she is the legal representative, is or was a director or an officer, or is or was serving at the request of [AFI] as a manager, director, officer, employee, fiduciary or agent of another entity (collectively, the "Indemnified Persons") from and against any and all loss, cost, damage, fine, expense (including reasonable fees and expenses of attorneys and other advisors and any court costs incurred by any Indemnified Person) or liability actually and reasonably incurred

---

[354] *See* Section VI.B.1.e(3).

[355] Amended and Restated Indemnification Agreement between Residential Capital, LLC and Thomas Jacob, dated Oct. 24, 2006 [EXAM00296828]; Amended and Restated Indemnification Agreement between Residential Capital, LLC and Thomas Melzer, dated Oct. 24, 2006 [EXAM00296838].

[356] Indemnification Agreement between Residential Capital, Corporation and Thomas Melzer, dated June 21, 2005 [MELZER.000886]; Amended and Restated Indemnification Agreement between Residential Capital, LLC and Thomas Jacob, dated Oct. 24, 2006 [EXAM00296828]; Amended and Restated Indemnification Agreement between Residential Capital, LLC and Thomas Melzer, dated Oct. 24, 2006 [EXAM00296838].

[357] Ally Board Presentation Appendix, dated Sept. 23, 2011, at 24 [ALLY_0157478]. *But see* 2011 AFI Amended Certificate, at Art. VII, § F [GSResCap0000065785] (Ally Financial Inc., Current Report (Form 8-K) (Mar. 25, 2011), Ex. 3.1) ("The Corporation shall not be required to indemnify a Person in connection with a Proceeding initiated by such Person against the Corporation or any of its subsidiaries if the Proceeding was not authorized by the Board of Directors. The ultimate determination of entitlement to indemnification of any Indemnified Person shall be made by the Board of Directors in such manner as the Board of Directors may determine.").

by the person in connection with the Proceeding, if the person acted in good faith and in a manner the person reasonably believed to be in or not opposed to the best interests of [AFI] and except that no indemnification shall be made in respect of any claim, issue, or matter as to which such person has been adjudged to be liable to [AFI], unless, and only to the extent that, the Court of Chancery of the State of Delaware or the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses which the Court of Chancery or such other court shall deem proper. The termination of any Proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the person did not act in good faith or in a manner such person reasonably believed to be in or not opposed to the best interests of [AFI].[358]

An e-mail from Bhama to Carpenter and Yastine regarding AFI's indemnification of Independent Directors, previously discussed in Section IV.B.1.c(6), notes two issues with respect to the pending appointments of two additional Independent Directors: (1) increasing the number of director seats on the ResCap Board; and (2) who should appoint the directors.[359] Bhama notes that, as to the second issue, under the 2008 ResCap Amended LLC Agreement, the new Independent Directors can be appointed by either GMAC Mortgage Group, LLC, as ResCap's immediate shareholder, or by the ResCap Board itself (subject to GMAC Mortgage Group, LLC's right to unilaterally remove any director from the ResCap Board with or without cause).[360] Bhama states that she recommends the latter approach for two reasons:

(1) It will further reinforce the separation and independence of each individual from [AFI] as the ultimate shareholder since each appointment will be an act of the ResCap board itself without [AFI] involvement. This should mitigate perceptions of [AFI] "taint."

---

[358] 2011 AFI Amended Certificate, at Art. VII, § D [GSResCap0000065785].

[359] E-mail from A. Bhama (Nov. 12, 2011) [ALLY_0207114].

[360] Examiner's Counsel notes that Bhama's advice about GMAC Mortgage Group LLC's ability to appoint Independent Directors appears to be incorrect. *See* 2008 ResCap Amended LLC Agreement, § 14(e) [KL000000433] ("Notwithstanding anything to the contrary in this Agreement, the provisions of the Operating Agreement shall govern the qualifications, duties, powers, appointment, removal and other corporate governance matters of the Independent Directors."); 2006 Amended Operating Agreement, § 2(f)(i) ("[AFI] shall vote for, and ResCap shall at all times have, at least two Independent Directors. In the event of a vacancy in the position of an Independent Director, whether as a result of resignation, removal, or otherwise, [AFI] shall, as promptly as practicable, elect a successor Independent Director.").

(2) It will help insulate [AFI] from liability for indemnifying these individuals, if they are ever sued in connection with their services as directors on the ResCap board. Under [AFI's] corporate charter, [AFI] essentially must indemnify, and advance litigation defense expenses to, any person who serves as an officer or director of another entity "at the request of [AFI]", if that person is (or is threatened to be) named in a lawsuit related to their officer/director service. If the person does not serve "at the request of AFI", then these financial obligations do not arise. This means that if the ResCap board appoints these individuals as directors of ResCap, then they will not be serving "at the request of [AFI]", but rather at the request of the ResCap board. Therefore, [AFI's] indemnification and expense advance obligation would not be triggered in future lawsuit brought against these individuals. This may become important in light of the various ResCap strategic alternatives under consideration. (In this regard, [AFI] is facing this issue today as to former ResCap directors who have been sued as part of the PLS, etc. cases, though I am exploring our defenses along the lines noted above.)[361]

Note, however, that even if the ResCap Board appointed these individuals, as discussed in Section IV.B.2.a(1), it is more likely than not that a court would find that they were still serving "at the request of" AFI. The indemnification of ResCap directors by AFI is discussed further in Section IV.B.2.

### f.   ResCap Director And Officer Insurance

This Section summarizes certain aspects of the director and officer ("D&O") insurance arrangements for ResCap directors and officers. These insurance arrangements are sponsored by AFI and cover both AFI and ResCap directors and officers. Such arrangements are multiple-layer "claims-made" policies. A full coverage analysis is beyond the scope of the Examiner's Investigation, and would depend in large part upon facts particular to whatever claims, if any, are ultimately pursued against ResCap directors or officers. Accordingly, this summary and overview of the D&O insurance arrangements are included to illustrate a potential additional source to pay successful claims against directors, albeit subject to important caveats. Such arrangements likely also impact the ultimate financial exposure of AFI to such claims. This is because, to the extent indemnification is payable by AFI to the directors for such claims, the D&O insurance arrangements are potential sources of recovery for AFI, subject to the terms of those policies. Even for covered claims, AFI would be required to absorb one or more deductibles of $10 million each.

---

[361] E-mail from A. Bhama (Nov. 12, 2011) [ALLY_0207114]. Examiner's Counsel notes that Bhama's advice appears to be incorrect. *See* Section IV.B.2.a(1); *VonFeldt v. Stifel Fin. Corp.*, 714 A.2d 79, 85 (Del. 1998).

### (1) *ResCap Charter Documents Authorize ResCap To Purchase And Maintain D&O Insurance, And Such Insurance Was Obtained Through AFI*

Each of the ResCap charter documents sets forth provisions which authorize ResCap to purchase and maintain at ResCap's expense insurance to indemnify directors, officers, and employees, which seem to contemplate ResCap purchasing and maintaining D&O insurance for directors either itself or through its affiliates.[362] It appears that, in fact, such insurance was obtained through AFI. All of the D&O insurance documents produced by ResCap and AFI to Examiner's Counsel are in respect of coverage obtained through and shared with AFI. In this regard, a presentation to the ResCap Board dated April 19, 2012 states "D&O coverage is shared with [AFI]," and "ResCap does not have separate coverage."[363]

### (2) *Types of D&O Insurance Coverage Obtained Beginning December 15, 2005*

The D&O insurance documents produced to Examiner's Counsel relate to policy periods beginning December 15, 2005 and running through December 15, 2013. The terms of those policies vary somewhat from year to year but, as a general matter, the policies include four types of coverage:

- "Side A" coverage, which applies to losses for which directors and officers are not and cannot be indemnified by the company;

- "Side B" coverage, which reimburses the company for costs incurred in indemnifying a director or officer;

- "Side C" coverage, which pays for losses the company sustains from litigation involving securities violations; and

---

[362] Specifically, section 6.8 of the ResCap By-Laws permits the ResCap Board, to the fullest extent permitted by applicable law, to authorize officers to purchase and maintain at ResCap's expense insurance to: (1) indemnify ResCap for any obligation it incurs as a result of the indemnification of directors, officers and employees under the indemnification provisions of the ResCap By-Laws; and (2) indemnify or insure directors, officers, and employees against liability in instances in which they may not otherwise be indemnified by ResCap under the indemnification provisions of the ResCap By-Laws. *See* ResCap By-Laws, § 6.8 [EXAM12325305]. Section 18(f) of the 2006 ResCap LLC Agreement provides that ResCap may purchase and maintain (itself or through its affiliates) insurance on behalf of any Covered Person (which, as noted in Section IV.B.1.e(3), includes any ResCap director) who has agreed to serve at the request of ResCap as a director, officer, or employee of ResCap against any liability asserted against, and incurred by, the Covered Person or on the Covered Person's behalf, or arising out of the Covered Person's status as a director, officer, or employee, whether or not ResCap would have the power to indemnify the Covered Person against such liability under the provisions of section 18 of the 2006 ResCap LLC Agreement. *See* 2006 ResCap LLC Agreement, § 18(f)(i) [KL000000474]. The 2008 ResCap Amended LLC Agreement contains an insurance provision that is substantively identical to the provisions set forth in the 2006 ResCap LLC Agreement. *Compare* 2006 ResCap LLC Agreement, § 18 [KL000000474], *with* 2008 ResCap Amended LLC Agreement, § 18 [KL000000433].

[363] Morrison & Foerster presentation to the Board of Residential Capital, LLC, dated Apr. 19, 2012, at 9 [EXAM11131326].

- "Side D" coverage, which pays for losses arising out of breach of fiduciary duty obligations for establishing and administering AFI-sponsored employment benefit and retirement plans.

"Side A" and "Side B" are the coverages relevant to whether the D&O insurance represents a potential additional source by which successful claims against the directors and officers, if any, may be paid. The policy periods, limits, and deductibles (except for "Side A" coverage, which is not subject to a deductible) for the period from December 15, 2005 through December 15, 2013 are summarized in the following table:

EXHIBIT IV.B.1.f(2)
**Key Elements Of AFI D&O Insurance Policies**
December 15, 2005 – December 15, 2013

| Policy Period | Side A (Non-Indemnifiable Claims) | Side B (Indemnifiable Claims) | Side C (Entity Claims) | Side D (Fiduciary Claims) |
|---|---|---|---|---|
| 12/15/05–12/15/06 [(1)] | $490M with no deductible ($250M shared with Side D) | $130M ($16M co-insurance) with $25M deductible, shared with Side C | $130M ($16M co-insurance) with $25M deductible, shared with Side B | $250M shared with D&O coverage |
| 11/30/06–11/30/07 | $300M with no deductible ($100M for Side A only and $200M shared with Sides B, C, and D) | $200M with $10M deductible. Limit shared with Sides A, C, and D | $200M with $10M deductible. Limit shared with Sides A, B, and D | $200M with $1M deductible. Limit shared with Sides A, B, and C |
| 11/30/07–11/30/08 [(2)] | $300M with no deductible (Likely $200M shared with Sides B, C, and D) | Likely $200M with $10M deductible. Limit shared with Sides A, C, and D | Likely $200M with $10M deductible. Limit shared with Sides A, B, and D | Likely $200M with $10M deductible. Limit shared with Sides A, B, and C |
| 12/15/08–12/15/09 | $220M with no deductible ($70M for Side A only, $50M shared with Sides B, C, and D, $100M shared with errors and omissions ("E&O") and employment practices liability ("EPL") | $150M with $10M deductible. Limit shared with Sides A, C, D, E&O and EPL | $150M with $10M deductible. Limit shared with Sides A, B, D, E&O and EPL | $150M with $1M deductible. Limit shared with Sides A, B, C, E&O and EPL |
| 12/15/09–12/15/10 | $275M with no deductible ($125 Side A only, $150M shared with other coverage) | $150M with $10M deductible. Limit shared with Sides A, C, D, E&O and EPL | $150M with $10M deductible. Limit shared with Sides A, B, D, E&O and EPL | $150M with $1M deductible. Limit shared with Sides A, B, C, E&O and EPL |
| 12/15/10–12/15/11 | $275M with no deductible ($125 Side A only, $150M shared with fiduciary coverage) | $150M with $10M deductible. Limit shared with Sides A, C, and D | $150M with $10M deductible. Limit shared with Sides A, B, and D | $150M with $1M deductible. Limit shared with Sides A, B, and C |
| 12/15/11–12/15/13 | $275M with no deductible ($125 Side A only, $150M shared with fiduciary coverage) | $150M with $10M deductible. Limit shared with Sides A, C, and D | $150M with $10M deductible. Limit shared with Sides A, B, and D | $150M with $1M deductible. Limit shared with Sides A, B, and C |

[(1)] *This is a GM policy that pre-dates GM's sale of a majority interest in AFI. The inception of the AFI D&O insurance program on November 30, 2006 coincides with that sale.*

[(2)] *Certain documentation concerning this and other policy years was produced late in the Examiner's Investigation and may be incomplete. However, the fact that the insurers treated coverage as having been continuous supports the conclusion that this policy was extended to December 15, 2008, which was confirmed by counsel to AFI in an April 18, 2013 e-mail to Examiner's Counsel.*

*Source: Draft General Motors' New Directors and Officers and ERISA-Fiduciary Liability Insurance Coverages for 2004–2006 Summary, dated Dec. 21, 2005 [EXAM11405951]; GMAC's 2006–2007 Director's Officers, and Fiduciary Liability Insurance Coverages [EXAM10281860]; GMAC's 2008–2009 Blended Liability Insurance Coverages [CCM00327263]; GMAC's 2009–2010 Blended Liability Insurance Coverages, dated Apr. 8, 2010 [EXAM20109362]; Ally's 2010–2011 Blended Liability Insurance Coverages, dated Feb. 22, 2011 [EXAM20119524]; Ally's 2011–2012 Management Liability Insurance Coverages, dated Feb. 24, 2012, at ALLY_0267089–92 [ALLY_0266553]; Policy Term Extension Endorsement to Dec. 15, 2013, Allied World Side 'A' Directors & Officers Excess and Lead Difference-in-Conditions ("DIC") Insurance Policy number C012138/004 for Dec. 15, 2011 to Dec. 15, 2012, at ALLY_PEO_0093982 [ALLY_PEO_0093898].*

In addition to the (generally) annual-period policies summarized in Exhibit IV.B.1.f(2), in 2009 AFI purchased a multi-year "run-off" Side-A-only policy, which provided a total of $105 million for limits on an excess basis,[364] as discussed further in Section IV.B.1.f(2).

As issued, the last policy would have expired December 15, 2012. However, coverage was extended by endorsement (rather than by renewal of the policy).[365] It therefore appears that, to date, the D&O insurance has been extended for just one year. In that regard, in an April 10, 2013 e-mail, AFI's counsel has confirmed Examiner's Counsel that, based on their inquiries, AFI has not purchased a six-year run-off policy covering the ResCap directors. This is of interest in light of a letter dated May 4, 2012 from Mack to Franklin Hobbs, AFI Board Chairman, and Carpenter, in which Mack expressed concern on behalf of all directors and officers of ResCap regarding the insurance coverage available under AFI's current blended D&O and fiduciary insurance programs:

> We are concerned because claims may arise later against ResCap's directors and officers that relate to activities prior to the closing of a significant transaction and it is (at least theoretically) possible that after the closing of the transaction, but before the claims arise, the Current Program could be amended to exclude coverage for such claims. If that happened, ResCap's directors and officers could be exposed to ResCap-related liability.[366]

Mack suggests that the best way to address this concern and protect ResCap's directors and officers is to put the current program, which insures both AFI and ResCap, into run-off for a period of six years following a significant transaction involving ResCap. The run-off period would be prepaid. Similarly, the AFI Settlement and Plan Sponsor Agreement between the Debtors and AFI had, as executed, obligated AFI to use commercially reasonable efforts to continue to renew its current D&O insurance program for a run-off period of six years, on substantially the same terms and conditions as under existing D&O insurance programs.[367] The AFI Settlement and Plan Sponsor Agreement was subject to Bankruptcy Court approval, and has since expired.

### (3) The D&O Coverage Is On A "Claims-Made Basis," Which Determines Which Policies Are Potentially Applicable

As is typical for D&O insurance, each of the annual-period polices set forth in Exhibit IV.B.1.f.(2) provide coverage on a "claims-made basis." This, together with

---

[364] *See* GMAC's 2009–2010 Blended Liability Insurance Coverages, dated Apr. 8, 2010 [EXAM20109362].

[365] *See* Policy Term Extension Endorsement to Dec. 15, 2013, Allied World Side 'A' Directors & Officers Excess and Lead Difference-in-Conditions ("DIC") Insurance Policy number C012138/004 for Dec. 15, 2011 to Dec. 15, 2012, at ALLY_PEO_0093982 [ALLY_PEO_0093898].

[366] Letter from J. Mack to F. Hobbs and M. Carpenter (May 4, 2012) [EXAM00092188].

[367] *See* Settlement and Plan Sponsor Agreement, § 2.2(b).

provisions linking claims that arise from the same or interrelated wrongful acts and requiring relatively prompt notice, will typically substantially narrow the number of potentially-applicable policies, as follows.

- *Claim "First Made" Requirement.* Such policies limit coverage only to loss on account of any "Claim" (as defined) "first made" against an insured during the policy period. As stated in the policy incepting December 15, 2011, in respect of "Side A" and "Side B" coverage, the insurers' obligation to pay otherwise-covered loss only applies where the loss is "on account of any Claim first made against such Insured Person, individually or otherwise, during the Policy Period . . . . "[368]

- *Same and Interrelated Wrongful Acts.* Such policies also link claims that arise from the same wrongful act, or interrelated wrongful acts, thereby limiting coverage of such linked claims to the first policy period in which any of them was first made. As stated in the policy incepting December 15, 2011: "All Loss arising out of the same Wrongful Act and all Interrelated Wrongful Acts of any Insured Persons shall be deemed one Loss, and such Loss shall be deemed to have originated in the earliest Policy Period in which a Claim is first made against any Insured Person alleging any such Wrongful Act or Interrelated Wrongful Acts."[369]

- *Notice to the Insurer.* In addition to requiring that the claim have been "first made" against an insured within the policy period, such policies also require relatively prompt notice to the insurer, including a requirement that such notice be given within a specified period after the end of the policy period. As stated in the policy incepting December 15, 2011: "The Insured shall, as a condition precedent to exercising any right of coverage under this Policy, give to the [insurer] written notice of any Claim as soon as practicable, but in no event later than . . . sixty (60) days after the effective date of expiration or termination" of the policy.[370]

As a result of these provisions in the D&O insurance policies, an analysis of any potential claim against a director to determine whether D&O insurance is potentially available must begin with an analysis of whether that claim: (1) has already been made against an insured under the D&O insurance policies; or (2) will be deemed to have already been made because it is linked to an earlier claim that arises from the same "Wrongful Act" or "Interrelated Wrongful Acts." In either case, coverage would typically be limited to the earliest policy period in which such claim or linked claim was first made. However, for most of the annual-period policies described in Exhibit IV.B.1.f(2) the period in which timely notice could be given to the insurer has already passed, such that the carrier would likely deny coverage unless notice has already been given.[371]

---

[368] DFI Primary Professional Liability Policy number 8207-6455 for Dec. 15, 2011 to Dec. 15, 2012, at RCES00000138 [RCES00000130] (defined terms bolded in original).

[369] *Id.* at RCES00000140 (defined terms bolded in original).

[370] *Id.* at RCES00000138, RCES00000167 (defined terms bolded in original).

[371] A presentation to the ResCap Board dated April 19, 2012 states that "there are no claims against the D&O coverage." Morrison & Foerster Residential Capital, LLC Board Presentation, dated Apr. 19, 2012, at 9 [EXAM11131326].

For claims that have not yet been "first made," two avenues remain to potential D&O coverage.

First, although the original policy period for the last policy as described in Exhibit IV.B.1.f(2) was to have expired December 15, 2012, that policy period was later extended by endorsement to December 15, 2013.[372] As a result, a "Policy Period" remains in effect, during which the requirement of a "Claim first made" can be satisfied.

Second, as noted in Section IV.B.1.f(2), in 2009 AFI purchased a multi-year "run-off" Side-A-only policy.[373] Because this policy was effective May 22, 2009, and had a six-year term (i.e., through May 21, 2015), it is also potentially available for not-yet-made claims. To the extent other coverage is available, the "run-off" policy applies only excess of that other coverage. A more important limitation on the potential applicability of the "run-off" policy is that it only applies to loss arising from "wrongful acts" that took place during the period from November 30, 2006 through May 22, 2009.[374] In contrast, at least some portion of the limits for the other annual period policies described in Exhibit IV.B.1.f(2) including the last policy, are not subject to any similar restriction. Since that policy ran through at least December 15, 2012—after the Petition Date—there is at least some potential coverage for "Wrongful Acts" taking place during the entire time period being investigated by the Examiner, subject to satisfaction of the "first made," notice, and other requirements of the policy.

### (4) Other Circumstances That Will Impact The Existence, And Amount, Of Coverage Available

Once a policy is identified as being potentially applicable to a particular claim, a full analysis of the specific facts of that particular claim, in relation to the specific wording of the particular policy, would be required to determine the existence and amount of coverage potentially available. Certain key, but certainly non-exclusive, considerations are identified below. Because the annual policy beginning December 15, 2011 (as extended) is the policy most likely to be relevant to any not-yet-made claims (the "run-off" policy would apply only excess of that policy), those considerations are analyzed below in terms of the language of that policy.[375]

------

[372] *See* Policy Term Extension Endorsement to Dec. 15, 2013, Allied World Side 'A' Directors & Officers Excess and Lead Difference-in-Conditions ("DIC") Insurance Policy number C012138/004 for Dec. 15, 2011 to Dec. 15, 2012, at ALLY_PEO_0093982 [ALLY_PEO_0093898].

[373] *See* GMAC's 2009–2010 Blended Liability Insurance Coverages, dated Apr. 8, 2010 [EXAM20109362].

[374] *See Id.*

[375] Specifically, the discussion is based on the terms of the policy issued by Federal Insurance. DFI Primary Professional Liability Policy number 8207-6455 for Dec. 15, 2011 to Dec. 15, 2012 [RCES00000130]. The coverage described in Exhibit IV.B.1.f.(2) for each policy period actually consists of several layers of coverage, each provided by various insurers and thus subject to certain variations that would need to be taken into account in a full insurance coverage analysis. For purposes of this discussion, the wording of just one policy, the policy issued by Federal Insurance, is highlighted.

### (a) Definition Of "Wrongful Act"

As an initial matter, the scope of coverage under the D&O insurance policies is determined by the definition of "Wrongful Act." The December 15, 2011 policy defines "Wrongful Act" to mean:

> [A]ny error, misstatement, misleading statement, act, omission, neglect, or breach of duty committed, attempted, or otherwise allegedly committed or attempted, by an Insured Person, individually or otherwise, in his Insured Capacity, or any matter claimed against him solely by reason of his serving in such Insured Capacity. [376]

In addition to determining whether coverage is available under the policy, where this definition is broader than the director's rights to indemnification from either ResCap or AFI, such a difference in scope creates the possibility of a payment being made under "Side A," rather than "Side B."

### (b) "Side A" Versus "Side B"

"Side A" coverage applies to "Loss for which the Insured Person is not indemnified by the Organization . . . ."[377] In contrast, "Side B" coverage applies to "Loss for which the Organization grants indemnification to each Insured Person . . . ."[378]

Here, the definition of "Organization" ("the Parent Organization and/or any Subsidiary")[379] would encompass both AFI and ResCap, thus making indemnification by either of them relevant as an initial matter. However, in light of ResCap's bankruptcy, the focus would be on whether the claim is indemnifiable by AFI, and not on whether ResCap fails to indemnify owing to its bankruptcy:

> If the Organization:
>
> (a) fails or refuses, other than for reason of Financial Impairment, to indemnify the Insured Person for Loss; and
>
> (b) is permitted or required to indemnify the Insured Person for such Loss pursuant to the fullest extent permitted by law;
>
> then, notwithstanding any other conditions, provisions or terms of this Policy to the contrary, any payment by the [insurer] of such Loss shall be subject to [Side-B coverage] . . . .[380]

---

[376] *Id*. at RCES00000147 (defined terms bolded in original).

[377] *Id*. at RCES00000138 (defined terms bolded in original).

[378] *Id.* at RCES00000138 (defined terms bolded in original).

[379] *Id*. at RCES00000147 (defined terms bolded in original).

[380] *Id.* at RCES00000141 (defined terms bolded in original).

Thus, to the extent that the claim is indemnifiable by AFI, the insurer would assert that it is a "Side B" claim, under which the proceeds could not be directly accessed by directors, but are instead payable only by way of the insurer indemnifying AFI, after AFI has absorbed the "Side B" deductible, which is $10 million in this case. That deductible applies separately to each "Loss" (as defined), so AFI could potentially be required to absorb multiple deductibles.

In contrast, to the extent the claim is otherwise covered under the policy, but is a claim for which AFI is neither permitted nor required to indemnify the director, then "Side A" would apply. Under "Side A" coverage, the insurer's payment obligation is directly to the director and there is no deductible.

### (c) "Insured Versus Insured" And Other Exclusions

D&O insurance policies typically include a so-called "insured vs. insured" exclusion, for claims brought against, or with the involvement of, another insured. Under the policy beginning December 15, 2011, this excludes coverage "for Loss on account of any Claim made against any Insured Person . . . brought by an Organization against (i) any other Organization; or (ii) an Insured Person of such Organization. . . ."[381] This exclusion is subject to certain exceptions, including one of particular relevance to this proceeding, stating that the exclusion does not apply to "any Claim brought . . . (B) in the event of Financial Impairment of the Organization."[382] In any event, any claim brought on behalf of ResCap, or by AFI or another D&O insured, would require further analysis.

There are also a number of other exclusions that vary from policy to policy, that would require analysis in light of the particular claim. For example, the policies will generally include exclusions relating to the conduct of the insured. For example, the December 15, 2011 policy contains "Side A" exclusions for claims against an Insured Person that are:

> (a) [B]ased upon, arising from, or in consequence of any deliberately fraudulent act or omission or any willful violation of any statute or regulation by such Insured Person, if a final, non-appealable adjudication in any underlying proceeding or action establishes such a deliberately fraudulent act or omission or willful violation; or
>
> (b) [B]ased upon, arising from, or in consequence of such Insured Person having gained any personal profit, remuneration or other advantage to which such Insured Person was not legally entitled, if a final, non-appealable adjudication in any underlying proceeding or action establishes the gaining of such a personal profit, remuneration or advantage.[383]

---

[381] *Id.* at RCES00000139, RCES00000201 (defined terms bolded in original).

[382] *Id*. at RCES00000201 (defined terms bolded in original).

[383] *Id.* at RCES00000194 (defined terms bolded in original).

### (d) Erosion Of Limits

The D&O insurance available to any particular claim will be subject to insurer liability limitations that apply on a per-"Loss" basis, as well as to overall aggregate limits. As a result, other claims have the potential to exhaust or erode the available aggregate limits, or (if the claims are part of the same "Loss") the available per-"Loss" limits, thereby leaving the claim with no or reduced limits available. In addition, as set forth in Exhibit IV.B.1.f(2), certain of the "Side A" and "Side B" limits are shared with other coverages under the policies, which increase the potential for exhaustion or erosion of limits.[384] On the other hand, some of the limits are subject to provisions that provide for certain priorities in payments designed to protect the availability of coverage for the directors. These provisions changed over time, including in respect of the relative priority of AFI directors and ResCap directors.[385]

### 2. Legal Analysis Regarding AFI's Indemnification Of ResCap Directors

Examiner's Counsel has been asked to review the circumstances in which directors on the ResCap Board could be indemnified by AFI for claims related to their service on the ResCap Board. Delaware corporate law permits a parent company like AFI to indemnify directors of its subsidiaries, such as ResCap, in certain circumstances. AFI elected to do so via the 2011 AFI Amended Certificate, the 2009 AFI Certificate and the 2009 AFI Amended Certificate, as well as when AFI was a limited liability company via the 2006 AFI Amended LLC Operating Agreement (collectively, the "Indemnification Provisions").[386]

Examiner's Counsel notes that AFI, in the 2006 AFI LLC Agreement, did not provide indemnification rights to ResCap directors unless such directors were also members of

_____

[384] The increased risk of erosion of limits because various coverages share limits was previously identified as a concern. In May 2008, Chapman, as a prospective independent director, provided copies of certain of the D&O policies to his counsel, Thorn Rosenthal. After reviewing those policies, Rosenthal identified several provisions and ambiguities in the policies that could result in the erosion of limits as a result of other claims and other coverages. *See* E-mail from T. Rosenthal (May 5, 2008) [CCM00557210]. Other concerns identified by Rosenthal included that the policies might not cover defense costs before a claim had formally been asserted; that injunctive relief might not be covered; and that the notice provisions included significant particularity requirements, and were subject to strict deadlines. *Id.*

[385] Minutes of a Regular Meeting of the Board, GMAC LLC, Mar. 10, 2009, at ALLY_0114747 [ALLY_0114717]. The Independent Directors requested, at a meeting of the AFI Board on March 10, 2009, that they be ranked the same as the AFI independent directors in the order of payment provisions; following such discussion, the AFI Board approved a change in the order of payments endorsement in the AFI D&O policy to rank the Independent Directors pari passu with the independent directors of AFI. *See also* Minutes of a Special Meeting of the Board, GMAC LLC, Jan. 30, 2009, at ALLY_0114729 [ALLY_0114717].

[386] *See* 2011 AFI Amended Certificate, at Art. VIII, § D [GSResCap0000065785] ("To the fullest extent permitted by the DGCL or applicable Law . . . the Corporation will indemnify and hold harmless each person by reason of the fact that he or she . . . is or was a director or an officer, or is or was serving at the request of the Corporation as a manager, director . . . or agent of another entity . . . ."); *see also* 2009 AFI Amended Certificate, at Art. VIII, § D [GSResCap0000064387]; 2009 AFI Certificate, at Art. VIII, § D [KL000000204]; 2006 AFI Amended LLC Operating Agreement, at Art. XI, § 11.1 [CERB001063].

the AFI Board or officers of AFI.[387] However, the Indemnification Provisions conferred upon ResCap directors certain broadly-drafted indemnification rights, which rights apply to a director who "is or was serving at the request of [AFI]."[388] Such rights are not limited to claims made during any particular time period, nor are they limited to directors serving at the time that the Indemnification Provisions were adopted.[389] The Indemnification Provisions should be treated as an enforceable contract between AFI and the covered directors.[390] Examiner's Counsel was unable to locate any information as to what the intention was at the time of adopting the Indemnification Provisions. Thus, while a close question, based on a plain language reading of the Indemnification Provisions, the Examiner concludes it is more likely than not that a court would determine that even ResCap directors who served on the ResCap Board only prior to November 30, 2006 and who were not also members of the AFI Board or officers of AFI would have rights under the Indemnification Provisions, including rights with respect to claims arising from acts that occurred prior to November 30, 2006.

In addition, AFI, ResCap, and/or the directors of the ResCap Board may be entitled to indemnification under AFI's director and officer insurance policies.[391]

### a. Right To Indemnification And DGCL Sections 145(a) And (b)

Delaware General Corporation Law sections 145(a) and (b) ("DGCL sections 145(a) and (b)") are enabling provisions that give Delaware corporations the statutory authority to indemnify directors that serve "at the request of the corporation," provided that the director "acted in good faith and in a manner the [director] reasonably believed to be in or not opposed to the best interests of the corporation . . . ."[392] The Indemnification Provisions apply "to the fullest extent permitted by the DGCL or applicable Law" and contain the same requirements that the director have acted "at the request of" AFI (and/or a predecessor entity, if applicable) (AFI and/or any applicable predecessor entity are referred to herein as a "Parent Entity"), "in good faith," and "in a manner reasonably believed to be in or not opposed to the best interests

---

[387] *See* 2006 AFI LLC Agreement, at Art. VI, § 6.1 [GSResCap0000078836]. Note, however, that the Independent Directors may be entitled to mandatory indemnification by ResCap. *See* Section IV.B.1.e.

[388] 2011 AFI Amended Certificate, at Art. VIII, § D [GSResCap0000065785]; 2009 AFI Amended Certificate, at Art. VIII, § D [GSResCap0000064387]; 2009 AFI Certificate, at Art. VIII, § D [KL000000204]; 2006 AFI Amended LLC Operating Agreement, at Art. XI, § 11.1 [CERB001063].

[389] *See* 2011 AFI Amended Certificate, at Art. VIII, § D [GSResCap0000065785]; 2009 AFI Amended Certificate, at Art. VIII, § D [GSResCap0000064387]; 2009 AFI Certificate, at Art. VIII, § D [KL000000204]; 2006 AFI Amended LLC Operating Agreement, at Art. XI, § 11.1 [CERB001063].

[390] *See Beneficial Indus. Loan Corp. v. Cohen,* 170 F.2d 44, 50 (3d Cir. 1948) (applying Delaware law) ("Generally, corporate documents such as bylaws have the force of a contract between the corporation and the directors."); Bishop, *Law of Corporate Officers and Directors,* Ch. 7.05 (1991); 8 WILLIAM MEADE ET AL. FLETCHER CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 4177 (West 2012).

[391] *See* Section IV.B.1.f. While the Investigation has revealed that Jacob and Melzer had indemnification agreements with ResCap, the Investigation has uncovered no evidence of any Independent Directors having such agreements with AFI.

[392] DEL. CODE ANN. tit. 8, § 145(a)–(b).

of the Corporation."[393] Thus, to determine whether an Independent Director may be indemnified under DGCL sections 145(a) or (b) and the Indemnification Provisions, it is necessary to determine whether the director acted "at the request" of a Parent Entity, whether the director acted in "good faith" in the performance of his duties, and whether the director acted in a manner "reasonably believed to be in or not opposed to the best interests of the corporation."[394]

It should be noted that where the operative indemnification provisions specify that an entity "shall indemnify" an individual, as is the case here, at least one Delaware court has stated that the burden shifts to the entity to demonstrate that the individual is not entitled to indemnification (as opposed to the burden being on the individual to demonstrate that he is entitled to indemnification).[395]

### (1) Serving "At The Request Of" The Corporation

DGCL sections 145(a) and (b) provide that a corporation has the power to indemnify any person who "is or was serving at the request of the corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise . . . ."[396] The Indemnification Provisions contain similar language. To determine whether a director may be indemnified under DGCL sections 145(a) or (b), and therefore under the Indemnification Provisions, it must be determined whether he was serving "at the request of" the corporation from which the indemnity is sought.

---

[393] 2011 AFI Amended Certificate, at Art. VIII, § D [GSResCap0000065785]; 2009 AFI Amended Certificate, at Art. VIII, § D [GSResCap0000064387]; 2009 AFI Certificate, at Art. VIII, § D [KL000000204]; 2006 AFI Amended LLC Operating Agreement, at Art. XI, § 11.1 [CERB001063] (stating "the best interests of *the Company*") (emphasis added).

[394] It should be noted that the 2011 AFI Amended Certificate, the 2009 AFI Amended Certificate, and the 2009 AFI Certificate provide that reasonable expenses incurred by a Independent Director in connection with a covered proceeding are to be advanced or reimbursed to the director prior to a final determination of whether the director is entitled to be indemnified, provided that the director agrees to repay those amounts to the Parent Entity if it is finally judicially determined by a court of competent jurisdiction that the director is not entitled to indemnification. *See* 2011 AFI Amended Certificate, at Art. VIII, § E [GSResCap0000065785]; 2009 AFI Amended Certificate, at Art. VIII, § E [GSResCap0000064387]; 2009 AFI Certificate, at Art. VIII, § E [KL000000204] (collectively, the "Reasonable Expense Indemnification Provisions").

[395] *VonFeldt v. Stifel Fin. Corp.*, No. 15688, 1999 Del. Ch. LEXIS 131, at 10 (Del. Ch. June 11, 1999) ("By using the phrase 'shall indemnify,' the bylaw not only mandates indemnification; it also effectively places the burden on [the parent entity] to demonstrate that the indemnification mandated is not required.").

[396] DEL. CODE ANN. tit. 8, § 145(a)–(b).

In the context of a parent corporation that owns 100% of the stock of a subsidiary—as in the case of AFI and ResCap—the Supreme Court of Delaware has noted that the parent corporation owning the 100% interest in the subsidiary is the only entity with the right to vote in board elections and thus is solely responsible for electing all of the subsidiary's directors.[397] On those facts, the Delaware Supreme Court held as follows:

> [W]here a 100% stockholder elects a director to the board of a subsidiary, that director thereafter serves the subsidiary "at the request of" the stockholder, within the meaning of 8 Del. C. § 145(a). By virtue of the fact that [the parent company] elected [the director] to the board of its wholly-owned subsidiary, [the director] is deemed to be serving the subsidiary at the request of the parent. He therefore has standing to invoke the protections offered by Section 145 and [the parent company's] Indemnification bylaw.[398]

The Delaware Supreme Court has held that, in these circumstances, a director is not required to prove any additional facts, such as pointing to a specific "request" made by the parent corporation, to demonstrate that he served "at the request of" the parent corporation.[399]

One Delaware court has applied the reasoning of this holding even where there was no formal election or vote for the director serving on the subsidiary's board.[400] In *Zaman v. Amedeo Holdings*, two individuals served as directors of the New York Palace Hotel. The New York Palace Hotel had a complex multi-layered chain of ownership, at the top of which was a trust of which one individual was the sole beneficiary.[401] The directors of the New York Palace Hotel were not elected, but rather were appointed directly by this sole beneficiary. Because it appeared that corporate formalities had been ignored, the court found that the directors of the New York Palace Hotel "were serving at the requests of the subsidiaries above them in the chain of ownership flowing down from [the sole beneficial owner],"[402] and held that the directors were entitled to seek indemnification from the defendant parent company for any claims for breaches of their duties as directors of the New York Palace Hotel.[403]

To the extent that it can be shown that an Independent Director was elected to the ResCap Board by a Parent Entity, such director should be deemed to be serving "at the request of" the Parent Entity as a matter of law, without having to prove any additional facts.

---

[397] *See VonFeldt v. Stifel Fin. Corp.*, 714 A.2d 79 (Del. 1998).

[398] *Id.* at 85*; see also Cochran v. Stifel Fin. Corp.*, No. 17350, 2000 Del. Ch. LEXIS 58, 55 (Del. Ch. Mar. 8, 2000).

[399] *See, e.g.*, *VonFeldt*, 714 A.2d at 85.

[400] *See Zaman v. Amedeo Holdings, Inc.*, No. 3115–VCS, 2008 Del. Ch. LEXIS 60 (Del. Ch. May 23, 2008).

[401] *Id.* at *11–12.

[402] *Id.* at *60–61.

[403] *Id.* at *63.

Similarly, to the extent that it can be shown that an Independent Director was appointed to the ResCap Board by a Parent Entity, it is likely that the director would also be deemed to be serving "at the request of" the Parent Entity as a matter of law. Note that, pursuant to the 2005 Operating Agreement and 2006 Amended Operating Agreement, only AFI could vote for and fill vacancies with respect to the Independent Directors.[404]

To the extent that it cannot be established that an Independent Director was elected or appointed to the ResCap Board by a Parent Entity, it is not clear what factors a court would consider to determine whether the director was serving "at the request of" the Parent Entity, as Examiner's Counsel has not found case law addressing that circumstance. However, some factors that a court may consider in making this determination include evidence that the Parent Entity controlled and/or dominated ResCap, such as by setting ResCap's corporate policy, controlling ResCap's operations, selecting ResCap's key personnel, determining compensation for ResCap's key personnel, considering and approving employment and termination fee contracts with ResCap's key personnel, and/or terminating ResCap's key personnel.[405] Other relevant factors may include to what extent the Parent Entity recruited and/or compensated the director.[406] Based on the fact that the 2005 Operating Agreement and the 2006 Amended Operating Agreement provide that only AFI could vote for and fill vacancies with respect to the Independent Directors, in addition to the level of control AFI exerted over ResCap (and, with respect to certain Independent Directors, the involvement of AFI in their recruitment), the Examiner concludes that it is likely that a court would find that the Independent Directors served "at the request of" AFI.

---

[404] *See* 2006 Amended Operating Agreement, § 2(f)(i); [ALLY_0041818] ("[AFI] shall vote for, and ResCap shall at all times have, at least two Independent Directors. In the event of a vacancy in the position of an Independent Director, whether as a result of resignation, removal, or otherwise, [AFI] shall, as promptly as practicable, elect a successor Independent Director."); 2005 Operating Agreement, § 2(g)(i) [ALLY_0140795] (same). Examiner's Counsel notes that Bhama's advice about GMAC Mortgage LLC's ability to appoint Independent Directors appears to be incorrect. *See* 2008 ResCap Amended LLC Agreement, § 14(e) [KL000000433] ("Notwithstanding anything to the contrary in this Agreement, the provisions of the Operating Agreement shall govern the qualifications, duties, powers, appointment, removal and other corporate governance matters of the Independent Directors.").

[405] *See VonFeldt v. Stifel Fin. Corp.*, 714 A.2d 79, 81, 83 (Del. 1998).

[406] It should be noted that there is an e-mail from AFI's General Counsel to Jacob and Melzer confirming, on behalf of AFI, that Jacob and Melzer served on the ResCap Board as independent directors "at the request of" AFI, so it is unlikely that any further would be required to demonstrate that these two independent directors were serving "at the request of" AFI. *See* E-mail from W. Solomon to T. Melzer and [T. Jacob] (April 14, 2008) [MELZER.004778]; Section IV.B.1.c(1). Also, an e-mail from ResCap's General Counsel indicates that in his estimation, all ResCap directors serve at the discretion of AFI. E-mail from D. Marple (Jan. 9, 2007) [EXAM10165583] ("As with all directors, [Independent Directors] simply serve at the discretion of ResCap's shareholder."). Moreover, AFI's appointment of certain Independent Directors is reflected in the letters sent "on behalf of [AFI]" confirming each director's appointment and thanking him or her"[o]n behalf of [AFI] . . . for serving as an Independent Director of ResCap." *See, e.g.,* Letter from R. Hull to E. Smith (May 15, 2008) at EXAM10146755 [EXAM10146754]; Letter from C. Quenneville to K. Hirler-Garvey (Jun. 12, 2008) [CCM00388535].

### (2) Acting "In Good Faith"

To be indemnified under DGCL sections 145(a) and (b) and under the Indemnification Provisions, a director must have acted "in good faith." As one Delaware court has stated, "as a matter of public policy it simply would not make sense for a corporation to have the power to indemnify agents who do not act in its best interests."[407] In fact, if a Delaware corporation adopts a provision (e.g., in its charter or bylaws) that "expands the permissive nature of indemnification to mandatory indemnification, the good faith requirement survives."[408] The law in Delaware is that "Delaware corporations lack the power to indemnify a party who did not act in good faith or in the best interests of the corporation."[409] Accordingly, a director who breaches a fiduciary duty can only be entitled to indemnification if such breach of a fiduciary duty was in "good faith."[410]

Under Delaware law, a director is subject to the fiduciary duties of (1) due care and (2) loyalty.[411] To determine whether a fiduciary has breached a duty in "good faith," the Delaware Supreme Court has articulated a "spectrum" of the shades of "good faith" and "bad faith" acts by fiduciaries.[412] At one end of the spectrum are acts involving "fiduciary conduct motivated by an actual intent to do harm," which are acts in bad faith.[413] In the middle of the spectrum are acts such as the "intentional dereliction of duty or a conscious disregard of one's responsibilities," which the Delaware Supreme Court has found to be a "non-Indemnifiable violation of the fiduciary duty to act in good faith."[414] At the farthest end of the spectrum are fiduciary acts taken "solely by reason of gross negligence and without any malevolent intent," which are indemnifiable because "grossly negligent conduct, without more, does not and cannot constitute a breach of the fiduciary duty to act in good faith."[415] Conduct at this farthest end of the spectrum has important consequences because "director conduct amounting *only* to a violation of the duty of care, but otherwise taken in good faith, is . . . indemnifiable under 8 Del. C. § 145."[416] Thus, circumstances may arise in which a director can be found to have breached the duty of care, but still may be indemnified under DGCL sections 145(a) and (b).

---

[407] *VonFeldt v. Stifel Fin. Corp.*, 1999 Del. Ch. LEXIS 131, at *5–6 (Del. Ch. June 11, 1999).

[408] *Id.*

[409] *Id.* at *8.

[410] Note that when indemnification is claimed under state law for amounts paid in connection with federal securities law violations, federal law generally preempts state law and disallows claims for indemnification because such claims run counter to the policies underlying the federal securities acts by reducing their deterrent effect. *See*, *e.g.*, *Eichenholtz v. Brennan*, 52 F.3d 478, 484 (3d Cir. 1995). However, there is some precedent for state law indemnification when there has been no judicial finding of federal securities law violations by the potential indemnitee, and indemnification is available for amounts paid in settlement and for defense of such claims. *See, e.g.*, *CFTC v. Richards*, No. 96 C 334, 1996 U.S. Dist. LEXIS 5359 (N.D. Ill. Apr. 19, 1996); *Raychem Corp. v. Fed. Ins. Co.*, 853 F. Supp. 1170, 1177 (N.D. Cal. 1994).

[411] *See* Section VII.E.1.

[412] *See Ryan v. Lyondell Chem. Co.*, C.A. No. 3176–VCN, 2008 Del. Ch. LEXIS 125, at *22–23 (Del. Ch. Aug. 29, 2008).

[413] *See Brehm v. Eisner* (*In re Walt Disney Co. Derivative Litig.*), 906 A.2d 27, 64 (Del. 2006).

[414] *See Ryan*, 2008 Del. Ch. LEXIS 125, at *23.

[415] *See In re Walt Disney Co. Derivative Litig.*, 906 A.2d at 64–65.

[416] *See Ryan*, 2008 Del. Ch. LEXIS 125, at *22–23 (emphasis in original).

While a fiduciary may violate the duty of care and still act in good faith, "the requirement to act in good faith is a subsidiary element, i.e., a condition, of the fundamental duty of loyalty."[417] A director "cannot act loyally towards the corporation unless she acts in the good faith belief that her actions are in the corporation's best interest."[418] Because "good faith" is a "subsidiary element" of the duty of loyalty, a director who has breached the duty of loyalty has not done so in good faith, and thus cannot be indemnified under DGCL sections 145(a) and (b).

Simply put, under Delaware law, a director "can be indemnified for liability (and litigation expenses) incurred by reason of a violation of the duty of care, but not for a violation of the duty to act in good faith."[419] If an Independent Director is found to have breached his or her duty of loyalty, then that finding should preclude the director from being indemnified under the Indemnification Provisions. If, however, an Independent Director is found to have breached only his duty of care, then such breach could be found to have been in "good faith" and is potentially indemnifiable under the Indemnification Provisions.[420]

### (3) "Best Interests Of The Corporation"

To be indemnified under DGCL sections 145(a) and (b), a director must have acted "in a manner the person reasonably believed to be in or not opposed to the best interests of the corporation."[421] The Indemnification Provisions require that the ResCap director have acted "in a manner the person reasonably believed to be in or not opposed to the best interests of" the Parent Entity (i.e., AFI).[422] This language in the Indemnification Provisions generally tracks the language of DGCL sections 145(a) and (b), except that it specifically defines the term "corporation" as referring to the Parent Entity (i.e., AFI). A Delaware court would likely agree with the interpretation that the term "corporation" within the clause "best interests of the corporation" in DGCL sections 145(a) and (b) refers to the parent corporation from which the indemnification is sought.[423]

---

[417] *See Stone v. Ritter*, 911 A.2d 362, 270 (Del. 2006) (citations omitted).

[418] *Id*. (citing *Guttman v. Huang*, 823 A.2d 492 (Del. Ch. 2003)).

[419] *In re Walt Disney Co. Derivative Litig*., 906 A.2d at 64-66.

[420] Note that, in the 2012 case of *Hermelin v. K-V Pharm. Co.*, the Court of Chancery noted that "no Delaware case has squarely addressed what evidence is relevant to an inquiry into whether an indemnitee acted in good faith for the purposes of permissive indemnification under DGCL §§ 145(a) and (b)" and that ". . . there is a dearth of case law addressing the scope of relevant evidence with respect to good faith under Section 145(a)." *Hermelin v. K-V Pharm. Co.*, 54 A.3d 1093, 1112 (Del. Ch. 2012).

[421] DEL. CODE ANN. tit. 8, § 145(a)–(b).

[422] 2011 AFI Amended Certificate, at Art. VIII, § D [GSResCap0000065785]; 2009 AFI Amended Certificate, at Art. VIII, § D [GSResCap0000064387]; 2009 AFI Certificate, at Art. VIII, § D [KL000000204]; 2006 AFI Amended LLC Operating Agreement, at Art. XI, § 11.1 [CERB001063].

[423] *See Cochran v. Stifel Fin. Corp.*, No. 17350, 2000 Del. Ch. LEXIS 58, 45 (Del. Ch. Mar. 8, 2000) ("And under § 145(a), the parent corporation could indemnify the subsidiary directors for an adverse judgment against them so long as the directors 'acted in good faith and in a manner [they] reasonably believed to be in or not opposed to the best interests of the [parent] corporation.'") (brackets in original); *see also* Section VII.E.1.f (discussing whether the directors owe a fiduciary duty to the subsidiary and/or the parent company).

Thus, to be indemnified under DGCL sections 145(a) or (b) and the Indemnification Provisions, an Independent Director will likely need to show that, in the performance of his duties on the ResCap Board, he was acting in a manner that he reasonably believed to be in or not opposed to the best interests of the Parent Entity, and not just ResCap.

### b. DGCL Section 145(c)

While DGCL sections 145(a) and (b) provide permissive authority pursuant to which corporations may provide indemnification to their directors, Delaware General Corporations Law section 145(c) ("DGCL section 145(c)") is a mandatory indemnification statute that requires:

> To the extent that a present or former director or officer of a corporation has been successful on the merits or otherwise in defense of any action, suit or proceeding referred to in subsections (a) and (b) of this section, or in defense of any claim, issue or matter therein, such person shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by such person in connection therewith.[424]

DGCL section 145(c) requires a corporation to indemnify a director who is successful, on the merits or otherwise, in an action that would otherwise fall within DGCL sections 145(a) and (b), even if the director may not have acted in good faith—for example, if the director prevailed based "on a technicality in a proceeding within the scope of section 145(a)," or "if an action for breach of fiduciary duty brought against the [director] were dismissed on non-merits grounds."[425]

DGCL section 145(c) mandates this indemnification for "a present or former director or officer of a corporation," so it is clear that a director of ResCap who was successful on the merits or otherwise in defending any action that falls within the scope of DGCL sections 145(a) or (b) would be entitled to mandatory indemnification under DGCL section 145(c). However, DGCL section 145(c) does not appear to mandate indemnification for a director of a subsidiary of a corporation. As such, a director of ResCap would probably not be entitled to mandatory indemnification by a Parent Entity under DGCL section 145(c). While Delaware case law does not squarely address this question, *Cochran v. Stifel Financial Corp.* indicates that indemnification by a parent company under DGCL section 145(c) does not extend to directors of a subsidiary corporation.[426]

### c. D&O Insurance

Even if an Independent Director is not entitled to indemnification under the Indemnification Provisions and/or the Reasonable Expense Indemnification Provisions, the director may still be covered and insured under a Parent Entity's D&O insurance policy, subject to applicable deductibles and coverage limits.[427]

---

[424] DEL. CODE ANN. tit. 8, § 145(c).

[425] *See Cochran v. Stifel Fin. Corp.*, No. 17350, 2000 Del. Ch. LEXIS 179, 32 (Del. Ch. Dec. 13, 2000).

[426] *Id.* at *34–37.

[427] *See* Section IV.B.1.f.

### d. Breaches Of Fiduciary Duty And Exculpation, Indemnification, And D&O Insurance

The following chart summarizes how each type of breach of a director's fiduciary duty would coordinate with exculpation by ResCap, indemnification by AFI, and coverage under AFI's "Side A" D&O insurance:

EXHIBIT IV.B.2.d
**Breaches Of Fiduciary Duty And Exculpation, Indemnification, And D&O Insurance**

| Director's Breach of Fiduciary Duty | Exculpation of Director by ResCap | Indemnification of Director by AFI | Coverage of Director Under AFI "Side A" D&O Policy |
|---|---|---|---|
| Breach of Duty of Care But Acted in Good Faith (grossly negligent, but without malevolent intent) | ResCap exculpates director if acted in good faith on behalf of ResCap in scope of authority as director | AFI indemnifies director of ResCap serving at its request, if director acted in good faith and in a manner reasonably believed to be in best interests of AFI | If claim is indemnifiable by AFI, it is not covered under "Side A" D&O policy (but AFI may be entitled to recover costs of indemnification under "Side B" D&O policy, subject to terms of policy) |
| Breach of Duty of Care Acted in Bad Faith (motivated by actual intent to do harm) | ResCap does not exculpate director for willful misconduct or bad faith | AFI Charter and Delaware public policy do not permit indemnification if director did not act in good faith | "Side A" D&O policies cover wrongful acts that are not indemnifiable by AFI, such as non-indemnifiable breaches of duty; coverage would be subject to policy terms, including deductibles and coverage limitations; claims would have to be made during applicable period specified under applicable policy; and must not be excluded owing to dishonesty exclusion in policy for deliberately criminal or fraudulent acts, etc. |
| Breach of Duty of Loyalty Acted in Bad Faith (motivated by actual intent to do harm) | ResCap does not exculpate director for willful misconduct or bad faith | AFI Charter and Delaware public policy do not permit indemnification if director did not act in good faith | "Side A" D&O policies cover wrongful acts that are not indemnifiable by AFI, such as non-indemnifiable breaches of duty; coverage would be subject to policy terms, including deductibles and coverage limitations; claims would have to be made during applicable period specified under applicable policy; and must not be excluded owing to dishonesty exclusion in policy for deliberately criminal or fraudulent acts, etc. |

*Source: See Section IV.B.2.*

The Examiner notes that a variation unique to the parent-subsidiary context, in which a fiduciary affiliated with both the parent and subsidiary entities could at the direction of the parent entity breach his duty of loyalty in bad faith to the subsidiary but act in good faith with respect to the parent, might apply to potential claims encompassed by the Investigation.[428] The parent may indemnify such a director because such a breach would be in good faith with respect to the parent entity under Delaware General Corporate Law section 145(d).[429] However, the Examiner is aware of no existing case law that would support the argument of a director bringing suit against the parent entity to compel such indemnification. The outcome of such a hypothetical argument in the absence of case law on point is uncertain.[430]

---

[428] See Section VII.E.1.f(1) for a discussion of the duties owed by directors of a wholly owned subsidiary and Section VII.E.2.a for a discussion of such a potential claim.

[429] DEL. CODE ANN. tit. 8, § 145(d) (allowing permissive indemnification if approved by majority vote of the directors who are not parties to such action, by a committee designated by a majority vote of such directors, by independent legal counsel in a written opinion if elected by such directors, or by the stockholders).

[430] Equitable considerations might dictate that the parent entity that benefited from and arguably directed the breach of fiduciary duty vis-à-vis the subsidiary should be compelled to indemnify its director even though not obligated to do so under conventional indemnification principles.

## V. AFFILIATE TRANSACTIONS

## A. THE ALLY BANK TRANSACTIONS

### 1. Factual Narrative

Between November 2006 and January 2009, AFI and ResCap entered into three transactions that ultimately consolidated their mortgage and automotive banking operations under a single entity, Ally Bank, and transferred full ownership of Ally Bank to AFI. Despite this cumulative effect, the Examiner has considered each of the three transactions separately because the Investigation did not reveal evidence suggesting that the Ally Bank Transactions were part of an integrated whole or presupposed the occurrence of each other. Additionally, regardless of the Examiner's ultimate conclusions with respect to any causes of action implicated by the Ally Bank Transactions, each of the transactions appears to have been motivated independently by separate business considerations.

Before the Ally Bank Transactions, AFI's automotive banking operations rested with GMAC Automotive Bank, a Utah industrial bank and a direct wholly owned subsidiary of AFI,[1] and ResCap's mortgage banking operations were performed by Old GMAC Bank, a federal savings bank and an indirect wholly owned subsidiary of ResCap.

---

[1]   The formation of GMAC Automotive Bank was previously approved by the DFI on April 8, 2004. *See* Minutes of the Annual Meeting of the Board of Directors of General Motors Acceptance Corporation, May 10, 2004, at ALLY_PEO_0028505 [ALLY_PEO_0028475]. *See generally* Order Approving Application for Federal Deposit Insurance, FDIC (June 25, 2004) [GOLDIN00092209].



EXHIBIT V.A.1
**Bank Subsidiaries**
Pre-November 2006

*Source: See Walker Report, at Ex. A-1 [RC40008925].*

In 2006, Old GMAC Bank's operations represented a relatively small but important piece of ResCap's business.[2] Despite a small deposit base, Old GMAC Bank remained important as it provided various value-added components, including the ability to provide low-cost secured and unsecured funding, preemption benefits (simplified licensing and regulatory environment), bank funding to hedge against potential problems with existing structured transaction facilities, exclusive banking activities (trust and custodial businesses), and a

---

[2]   As of September 30, 2006, Old GMAC Bank had approximately $14.1 billion of total assets and $1.1 billion of equity while ResCap had approximately $132.6 billion of total assets and $8.4 billion of equity. *See* GMAC Bank FDIC Thrift Financial Report (Call Report) (Sept. 30, 2006); Residential Capital, LLC, Quarterly Report (Form 10-Q) (Nov. 7, 2006), at 3; *see also* Int. of J. Young, Sept. 28, 2012, at 87:16–88:2 ("[T]he bank was a facilitator of a very small piece and facilitating what was going on with respect to ResCap."); Int. of L. Tessler, Nov. 16, 2012, at 150:20–23 ("Being a deposit-funded institution for any wholesale-funded enterprise on a global basis became increasingly important as we moved through 2007 and into 2008.").

diversified income stream.[3] As David Walker, then Chief Financial Officer of GMAC Mortgage Group, explained, these advantages were most pronounced in times of economic stress.[4] In addition, ResCap planned for Old GMAC Bank to become a larger source of mortgage production through a restructuring of certain origination channels and to significantly increase its acquisition of MSRs in an effort to grow its HFI portfolio.[5] In fact, just a year earlier, Walker had argued that "growing GMAC Bank is the single most important non-revenue focused project within ResCap, and it's likely to remain so through the end of 2007."[6]

### a. The 2006 Bank Restructuring

#### (1) Purpose Of The 2006 Bank Restructuring

During the first quarter of 2005, AFI experienced a series of negative credit rating actions as a result of its exposure to GM.[7] These downgrades had negative implications for AFI's business model, namely, impairing AFI's ability to maintain automotive origination levels.[8] Despite being "ring-fenced" from AFI, the downgrades also had negative implications for ResCap because its credit rating remained linked to AFI's and could only be a limited number of "notches" above AFI's rating.[9] Thus, a further downgrade in AFI's ratings likely would have resulted in ResCap being downgraded to below investment grade.[10] A downgrade in

---

3   *See* ResCap GMAC Bank Strategies Presentation, dated Jan. 31, 2006, at 131–32 [RC40012974] (indicating a bank funding advantage of 13 basis points over various other internal and external funding sources); *see also* Int. of S. Khattri, Oct. 25, 2012, at 8:2–16 ("[A] good financial services company has several sources of capital, all the way from equity to unsecured, to secured, different types of conduits. At that time and probably always, the cheapest form of financing is bank deposits because they are guaranteed and they are normally very low interest. So, typically, to the extent that the mix of assets allow it and regulators allow it, that is always the cheapest source of financing. And because a lot of the conforming mortgage business, which is what [GMAC Mortgage] did, they were competing with the banks and they were competing with Fannie, they were competing with Freddie, this was important to have.").

4   *See* Int. of D. Walker, Nov. 28, 2012, at 53:19–23, 55:9–10 ("When times are very, very good, typically in a market, the benefit and cost of the bank is minimal relative to the non-bank. It's in times of great stress when the bank probably has better value than a non-bank. . . . And from 2000 to 2006, times were pretty good.").

5   *See* ResCap GMAC Bank Strategies Presentation, dated Jan. 31, 2006, at 133–35 [RC40012974]; s*ee also* Int. of S. Khattri, Oct. 25, 2012, at 33:8–12; E-Mail from D. Walker to S. Khattri (Apr. 1, 2006) [EXAM11315506] ("[Old GMAC Bank] has more than $11 billion in assets and is growing rapidly."); Residential Capital Corp., Annual Report (Form 10-K) (Mar. 28, 2006), at 72 ("We plan to further diversify our funding sources by, among other things, further expanding our use of [Old] GMAC Bank . . . .").

6   Memorandum, RFC/ResCap Financial Staff Issues, dated July 18, 2005, at 3 [EXAM11826950].

7   *See* GMAC Board of Directors Meeting Presentation, dated July 25, 2005, at 8, 10 [ALLY_0258663].

8   *Id*. at 10.

9   *See* Walker Report, at 9 [RC40008925] ("Given that [AFI]'s and ResCap's credit ratings are linked, we expect that if [AFI] is downgraded, ResCap will be downgraded to non-investment grade."); Int. of D. Walker, Nov. 28, 2012, at 127:24–129:1 ("The [rating agencies] would say in looking at the linkage. . . 'We're giving [ResCap] these ratings because there's de-linkage from [AFI] because of the operating agreement . . . .' They may have had language that said, 'We're notching it two because we'll go no more than two on any kind of entity that's wholly owned by the parent.").

10  Walker Report, at 9 [RC40008925].

ResCap's credit ratings would have triggered step-up provisions on its unsecured debt and bank facilities.[11]

GM, at the urging of AFI management and after initial resistance, evaluated strategic alternatives for AFI, including the sale of a controlling interest in AFI.[12] AFI management believed that such a transaction would restore its investment grade credit rating and access to low-cost funding, allowing it to continue to provide GM with cost-effective auto financing.[13] While GM had alternative plans in the event it was unable to sell a controlling interest in AFI, the Ratings Agencies made clear that a successful closing was imperative to de-linking AFI's credit ratings from those of GM.[14]

In early 2006, approximately five months after GM began actively marketing a majority (51%) interest in AFI, GM, AFI, and Cerberus entered into the Cerberus PSA.[15] Pursuant to the Cerberus PSA, FIM Holdings LLC, an investment vehicle formed by Cerberus, acquired a 51% stake in AFI for a purchase price of approximately $7.4 billion.[16] As part of that sale, Cerberus required that ResCap divest Old GMAC Bank so that Cerberus could avoid thrift holding company status and the restrictions on non-banking activities that would have been triggered by ownership of a federal savings bank.[17]

In order to comply with this requirement, AFI and ResCap undertook a fundamental restructuring of their automotive and mortgage banking operations. Substantially all of the assets and liabilities of Old GMAC Bank were transferred to GMAC Automotive Bank while the Old GMAC Bank entity and its remaining assets and liabilities were transferred to GM.[18]

---

[11]  The impact of these potential changes is addressed in Section V.A.2.b(6).

[12]  *See* Section III.E (providing background on the AFI-Cerberus transaction).

[13]  *See* GMAC Board of Directors Meeting Presentation, dated Nov. 7, 2005, at 17 [ALLY_0258741].

[14]  *See* GMAC Board of Directors Meeting Presentation, dated Mar. 23, 2006, at 17–18 [ALLY_PEO_0002478];

> Walker Report, at 9 [RC40008925]. The Walker Report quoted the following ratings agency statements:
>
> S&P—"If the transaction is not completed and GM does not take other steps to justify rating it differently from [AFI], [AFI]'s ratings would be equalized with those of GM."
>
> Moody's—"If the sale does not close, Moody's would re-link [AFI]'s credit rating with GM's rating."
>
> DBRS—"[A] lack of progress could lead to rating actions including potentially lowering [AFI]'s rating several notches to bring it more in line with the rating of GM in accordance with DBRS's captive finance policy."

> Walker Report, at 9 [RC40008925].

[15]  Walker Report, at 2 [RC40008925].

[16]  General Motors Acceptance Corp., LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 17.

[17]  *See* Walker Report, at 2 [RC40008925]; Cerberus PSA, § 4.1(e)(i) [CERB000521]; Cerberus PSA, Ex. H, at 1 [CERB039811].

[18]  Certificate of Share Transfer, Nov. 21, 2006 [CERB001732]; Transfer of Shares Agreement, dated Nov. 22, 2006 [CERB001787].

Full ownership of GMAC Automotive Bank was then transferred to IB Finance, a newly created wholly owned direct subsidiary of AFI.[19] By conveying Old GMAC Bank's assets and operations to GMAC Automotive Bank and transferring the Old GMAC Bank entity to GM, ResCap maintained the benefits of bank funding while simultaneously eliminating the possibility that Cerberus would become subject to federal regulations related to ownership of a federal savings bank.[20] Following the consolidation, the mortgage assets contributed by Old GMAC Bank comprised approximately 76% of GMAC Automotive Bank's assets.[21]

The Cerberus deal provided substantial benefits to ResCap.[22] The sale of AFI allowed the further de-linking of the credit ratings of ResCap, AFI, and GM,[23] thereby helping to protect against credit downgrades at GM resulting in corresponding downgrades at AFI and ResCap.[24] Accordingly, restructuring Old GMAC Bank and helping to close the Cerberus deal created value for ResCap in that it avoided a potential ResCap credit rating downgrade and, in fact,

---

[19] Share Contribution Agreement [CERB001521].

[20] As a result of a "loophole" in the Bank Holding Company Act, ownership of an industrial bank did not trigger consolidated federal regulation of certain commercial activities. Debate over this "loophole" prompted the FDIC, on July 28, 2006, to issue a six-month moratorium on deposit insurance and change of control approvals for industrial loan banks. Despite the moratorium, Cerberus received FDIC approval in November, 2006 for its acquisition of 51% of AFI by agreeing that Ally Bank would be subject to any changes that the FDIC might make to the regulation and supervision of industrial loan banks once the moratorium was lifted (agreeing, if necessary, to sell its interest in the bank, to convert the bank to a thrift, or to obtain a waiver from the FDIC). *See, e.g.*, FDIC, Press Release, *FDIC Places Six-Month Moratorium on Industrial Loan Company Applications and Notices* (July 28, 2006), http://www.fdic.gov/news/news/press/ 2006/pr06073.html; FDIC, Press Release, *FDIC Board Approves Change in Control Notice for GMAC Automotive Bank, Midvale, Utah* (Nov. 15, 2006) [EXAM10241413]. Cerberus appears to have received a further ten-year waiver of these requirements on July 15, 2008. *See* FDIC, Order, *In re GMAC Bank, Midvale, Salt Lake County, Utah, Request for Waiver of Certain Conditions*, dated July 15, 2008 [ALLY_0000032]; *see also* Int. of L. Tessler, Feb. 28, 2013, at 110:15–19 ("We only had a two-year license to operate the bank . . . when we closed the transaction in 2006. We didn't get an extension on that two-year license until . . . 2008.").

[21] As of December 31, 2006, the mortgage division had approximately $15.4 billion of assets compared to the bank's consolidated total assets of approximately $20.2 billion. *See* GMAC Bank 2007 Business Plan Review, dated Jan. 25, 2007, at ALLY_PEO_0006858, –65 [ALLY_PEO_0006664].

[22] *See* Int. of T. Jacob, Nov. 7, 2012, at 136:25–137:5 ("[T]he decision that faced Tom Melzer and I was . . . the risk of not letting this restructuring take place because that risked the closing of the . . . Cerberus deal with General Motors and that was very important for ResCap."); Memorandum, Proposed Restructuring of GMAC U.S. Banking Entities, dated May 5, 2006, at 2 [EXAM10258913] (explaining that the sale "should result in [AFI] and ResCap ratings being de-linked from GM's rating"); Int. of T. Melzer, Mar. 22, 2013, at 80:6–12 ("I didn't look at the bank transaction as a separate transaction. I looked at the totality of bringing in an investor like Cerberus to buy a majority interest in [AFI], getting [AFI] and ResCap out from under GM's credit rating and the benefit that would have overall for ResCap and its creditors.").

[23] Int. of D. Walker, Nov. 28, 2012, at 120:2–13, 132:8–12; Int. of T. Melzer, Oct. 10, 2012, at 180:12–14 ("[M]y perception was that [the] acquisition was really important to get [AFI]. . . less attached to GM . . . .").

[24] Int. of D. Walker, Nov. 28, 2012, at 132:8–12.

paved the way for a future ResCap credit rating upgrade.[25] That said, however, issues remain concerning the form of the 2006 Bank Restructuring and whether, taking account of the credit ratings benefit, ResCap received reasonably equivalent value in the transaction.

### (2) Lead-Up To The 2006 Bank Restructuring

The Cerberus PSA, which is dated April 2, 2006,[26] required Old GMAC Bank to be removed from the Cerberus ownership chain and required its assets and liabilities to be transferred to GMAC Automotive Bank.[27] However, the Cerberus PSA did not specify a particular structure for GMAC Automotive Bank's future ownership, except that it had to be "directly or indirectly wholly owned" by AFI.[28] In fact, the Cerberus PSA provided that either "[AFI or ResCap will wholly own the Industrial Bank, or it will be co-owned by [AFI] and ResCap,"[29] and Cerberus officers confirmed in their interviews that Cerberus did not dictate a specific form of ownership for the restructured bank.[30]

AFI and ResCap management clearly were concerned with the reaction that ResCap bondholders might have to the 2006 Bank Restructuring.[31] David Applegate, then Chief Operating Officer of ResCap, thought it best to "keep the Bank below the radar scope" until a sensible restructuring strategy could be developed and approved.[32] As of April 4, 2006, ResCap management was exploring the advantages and disadvantages of three potential

---

[25]   *See* Int. of D. Walker, Nov. 28, 2012, at 159:8–16 ("Moody's went from a negative outlook at Baa3 to a stable at Baa3. S&P went from a triple B-minus to a triple B-flat. Fitch went from a triple B-minus to a triple B-flat with a positive outlook. And DBRS went from under review to stable. So, we actually, as a result of this deal, got increased ratings or increased outlooks from all four rating agencies as a result of the positive transaction."); *see also* E-mail from R. Hall to D. Applegate (Mar. 2, 2006) [EXAM11740350] ("I view this as a material negative to ResCap, but acknowledge that at a[n] [AFI] level it is a negative that should potentially be absorbed if ResCap and [AFI] get improved ratings outlooks, etc.").

[26]   Cerberus PSA, at 1 [CERB000521].

[27]   Cerberus PSA, Ex. H, at 1 [CERB039811].

[28]   Cerberus PSA, § 4.1(e)(i) [CERB000521]; *see also* Cerberus PSA, Ex. H, at 1 [CERB039811].

[29]   Cerberus PSA, Ex. H, at 2 [CERB039811].

[30]   *See* Int. of M. Neporent, Feb. 6, 2013, at 24:20–25:8; Int. of L. Tessler, Nov. 16, 2012, at 27:11–23 ("The bank restructuring was a prerequisite for us to be able to succeed to a 51 percent control interest in [AFI]. . . . The specifics of how that ultimately got structured was more likely left in the hands of [AFI] and ResCap . . . .").

[31]   *See* E-mail from D. Olson (Apr. 1, 2006) [EXAM11265206] ("I believe the ResCap bond investors may be concerned not only with funding but also control of the ILC . . . ."); E-mail from D. Applegate to S. Khattri and D. Walker (Apr. 2, 2006) [EXAM11265206] ("We need to have a concise picture (document) in place that shows why the overall transaction and the final outcome for the Bank support the best interest of ResCap bondholders—a group we have made multiple statements to regarding the importance of the Bank to ResCap's growth and liquidity plans—and an investor base that is critical to our long term success.").

[32]   E-mail from D. Applegate to S. Khattri and D. Walker (Apr. 2, 2006) [EXAM11265206] ("[W]e are trying to keep the Bank below the radar scope. If we do say something about the Bank the statement would focus on Cerberus's lack of ability to retain the Bank (Thrift), GM's desire to keep the Thrift and ResCap and [AFI's] confidence that via [GMAC Automotive Bank] we can create a similar operating environment for our banking entities post the transaction . . . .").

ownership structures for the reorganized bank: (1) 100% AFI ownership of voting control of IB Finance with proportional earnings distribution to ResCap; (2) proportional voting control and earnings distribution; and (3) ResCap formation of its own industrial bank.[33]

However, it appears that through formal and informal discussions among officers of AFI and ResCap,[34] some of whom held positions with both companies,[35] AFI management quickly settled on the first of the proposed ownership structures—AFI ownership of 100% of voting control, with proportional earnings distribution to ResCap.[36]

---

[33] *See* Draft Memorandum, IB Alternatives, dated Apr. 4 2006, at 1 [EXAM11237439] (attached to E-mail from D. Applegate to B. Paradis (Apr. 4, 2006) [EXAM11237438]). Despite being drafted by ResCap and Old GMAC Bank employees, the memorandum analyzing these structures regards "[AFI] Control" as a "Pro" and "[AFI] shared control" as a "Con." *See* Draft Memorandum, IB Alternatives, dated Apr. 4 2006, at 1 [EXAM11237439]; *see also* E-mail from R. Hall to D. Applegate, Mar. 2, 2006 [EXAM11740350] ("I view this as a material negative to ResCap, but acknowledge that at a[n] [AFI] level it is a negative that should potentially be absorbed if ResCap and [AFI] get improved ratings outlooks, etc.").

[34] *See* Int. of S. Khattri, Oct. 25, 2012, at 72:1–73:9.

[35] *See* Director and Officer Appendix, dated June 25, 2012 [ALLY_0004637] (indicating dual roles held by Khattri and Walker, among others).

[36] *See* Memorandum, GMAC Bank Restructuring, dated Apr. 20, 2006, at 1 [EXAM11248642].

David Marple, then General Counsel of ResCap, prepared a memorandum dated April 20, 2006 regarding the transaction. The memorandum explains that the structure was proposed because "[AFI] maintains that it must control the Industrial Bank in order for its automotive businesses to be covered under the 'call option' provided [to GM] by the [Cerberus PSA]."[37] As a result of some ambiguity regarding the interaction between the Cerberus PSA and ResCap's financial reporting,[38] it appears that the non-voting structure was developed by AFI as a means to ensure that, if GM exercised its call option, the GMAC Automotive Bank entity could be transferred to GM without hindrance or delay from

---

[37]  *Id.* at 2. William Muir, AFI's President, offered a different explanation in his interview with the Examiner's Professionals. Muir suggested that AFI control of the restructured bank was favorable from a regulatory perspective. *See* Int. of W. Muir, Mar. 1, 2013, at 34:25–36:13 ("[A]t the time, having a bank inside of a company like ours was a somewhat politically contentious issue. And so, you had to run a very clean operation . . . . [I]n order to manage that reputational and regulatory risk, it was very important to us that there be one voice, not two, but one voice that clearly had that mandate and could run the bank for the benefit of the bank . . . . So, there are two different things. One is actually running a regulated enterprise and establishing the right kind of regulation reputation and conduct with the regulator, and the other is getting the economic benefits of being able to fund assets in the bank. . . . [W]e didn't think you could have more than one voice up here, but that we could still give everybody who was a part of our enterprise the economic benefit of funding assets in the bank."). The Investigation revealed no documentary evidence suggesting that this regulatory concern, rather than the GM call option, was AFI's reason for the proposed structure, and this justification does not appear to have been raised with either of the Independent Directors. Further, Muir's comment seems inconsistent with the reality that, at a higher level, the bank would already have multiple owners (GM and Cerberus), and that even if ResCap was given partial voting control of the industrial bank, AFI's parental control over ResCap would have likely ensured "one voice" with respect to regulators.

[38]  The call option provided GM, through its wholly-owned subsidiary GM Finance Co Holdings Inc., with a 10-year option to repurchase certain assets from AFI related to the North American and international automotive finance operations, if certain conditions were met (including that GM have an investment grade rating). Specifically, the assets covered by the call option were equity interests of (1) the "NAO Subsidiary" (defined in the Cerberus PSA as a wholly owned subsidiary to be created by AFI pursuant to which all (with one exception) of AFI's *consolidated* subsidiaries that conduct the North American auto finance business would be contributed); and (2) the IO Subsidiaries (defined in the Cerberus PSA as certain direct and indirect consolidated subsidiaries of AFI engaged in the international auto finance business). Because GMAC Automotive Bank was consolidated with ResCap for financial reporting purposes, it would not have been one of the subsidiaries contributed to the NAO Subsidiary. However, the Cerberus PSA required that the "Auto Business," defined to specifically include GMAC Automotive Bank, be owned by the NAO Subsidiary and the IO Subsidiaries as of the closing of any exercise of the call option. Accordingly, AFI's full control of GMAC Automotive Bank ensured that it could transfer the entity to the NAO Subsidiary, if necessary. *See* Cerberus PSA, Art. X [CERB000521]; Cerberus PSA, Disclosure Schedules, Sched. 10.1(3) [CERB000731]; Memorandum, Bank Restructuring Accounting Implications, dated July 20, 2007, at 12 [EXAM10198423].

ResCap.[39] This justification is called into question, however, by Walker's later observation that GM's exercise of the call option was a "remote" risk given its unlikely ability to maintain an investment grade credit rating in late 2006.[40]

Marple's April 20, 2006 memorandum also explained that certain aspects of the 2006 Bank Restructuring raised potential conflicts under the 2005 Operating Agreement.[41] Specifically, Marple identified and analyzed three provisions of the 2005 Operating Agreement that were implicated by the 2006 Bank Restructuring:[42]

- First, Marple opined that there would be a conflict with section 2(b) of the 2005 Operating Agreement, which prohibited ResCap from entering into any agreements with AFI Affiliates unless the transactions were "on terms and conditions that are consistent with those that parties at arm's-length would agree to and for fair value."[43] Marple noted that because "ResCap will not be given any voting control with regard to . . . material business activities or the entity itself," it is "not reasonable to believe that ResCap's leadership would agree to transfer a material business to a third-party under a similar agreement."[44]

- Second, Marple concluded that "ResCap's proposed investment in [the] Industrial Bank would be a violation of [s]ection 2(a)(ii) of the [2005] Operating Agreement,"[45] which prohibited ResCap and its affiliates from making any investment in any AFI Affiliates.[46]

- Third, Marple recognized that the proposed restructuring "blurs the lines" between ResCap's and AFI's businesses[47] and thus would potentially violate section 2(f) of the 2005 Operating Agreement, which required ResCap to run its business separately from AFI and to "maintain, or cause to be maintained, its assets and the assets of its Subsidiaries in such a manner that it would not be costly or difficult to segregate . . . such assets from those of any and all [AFI] Affiliates."[48]

---

[39] *See* Memorandum, GMAC Bank Restructuring, dated Apr. 20, 2006, at 2 [EXAM11248642]; Int. of D. Marple, Jan. 22, 2013, at 122:14–18.

[40] *See* Walker Report, at 6–7 [RC40008925]; *see also* Int. of S. Khattri, Oct. 25, 2012, at 68:5–13 ("Candidly the option agreement was put in place because certain members of the GM management were of the strong belief that the GM recovery was around the corner . . . . I personally did not rate the chances of their option ever being exercised seriously.").

[41] *See* Memorandum, GMAC Bank Restructuring, dated Apr. 20, 2006, at 1 [EXAM11248642] (attached to E-mail from K. Sabatowski to W. Muir, S. Khattri, D. Walker, J. Vanorman, B. Paradis, D. Applegate, R. Hall and D. Marple (Apr. 26, 2006) [EXAM11248640]).

[42] Memorandum, GMAC Bank Restructuring, dated Apr. 20, 2006, at 3–5 [EXAM11248642].

[43] 2005 Operating Agreement, § 2(b) [ALLY_0140795].

[44] Memorandum, GMAC Bank Restructuring, dated Apr. 20, 2006, at 4 [EXAM11248642].

[45] *Id*.

[46] 2005 Operating Agreement, § 2(a)(ii) [ALLY_0140795].

[47] Memorandum, GMAC Bank Restructuring, dated Apr. 20, 2006, at 5 [EXAM11248642].

[48] 2005 Operating Agreement, § 2(f) [ALLY_0140795].

The transaction's potential conflicts could be waived by ResCap's Independent Directors,[49] but Marple noted that "if either of the independent directors believes that the amendment is a 'close call' under the [2005] Operating Agreement—they will likely veto the amendment."[50] As Marple further noted, the 2005 Operating Agreement required that, in considering whether to grant such a waiver, the Independent Directors were to "consider *only* the interest of ResCap, including its creditors."[51]

After reviewing Marple's memorandum, Applegate prepared a one-page memorandum of his own to AFI's president, William Muir, proposing an alternate ownership structure whereby ResCap would manage and control at least 51% of the restructured bank.[52] Applegate observed that "ResCap and [AFI] have made multiple statements about the ground breaking nature of the ResCap structure and our mutual commitment to ResCap's firewalls."[53] Consequently, Applegate was "fearful our long-term credibility in the markets will be impaired, if we pursue a course of action which leaves ResCap without controlling interest in a bank."[54] Applegate thought that ResCap control of at least 51% of the reorganized bank would "seem to address the conflicts in the [2005] Operating Agreement" and "[AFI] would still retain 100% ownership of [Ally Bank] through its sole ownership of ResCap."[55] Applegate's proposal seems to have been rejected,[56] however, because less than two weeks later, AFI and ResCap personnel had apparently settled on a structure whereby AFI would have full voting control of the restructured bank.[57]

The first written communication from ResCap or AFI management to the Independent Directors regarding the details of the 2006 Bank Restructuring appears to be a memorandum

---

[49] 2005 Operating Agreement, § 8 [ALLY_0140795] ("The provisions of this Agreement may not be amended or waived except by an instrument in writing signed by the parties hereto; *provided* that no amendment or waiver that materially and adversely affects the rights of any Class of Rated Indebtedness shall become effective unless such amendment or waiver has been approved by a majority of the members of ResCap's Board of Directors, including a majority of the Independent Directors.") (emphasis in original).

[50] Memorandum, GMAC Bank Restructuring, dated Apr. 20, 2006, at 6 [EXAM11248642].

[51] *Id.*; 2005 Operating Agreement, § 8 [ALLY_0140795] (emphasis added). It is perhaps notable that, unlike ResCap's later indentures, the 2005 Indenture did not restrict ResCap transactions with AFI affiliates. *Compare* 2005 Indenture, Art. 4 [EXAM40024737], *with* Junior Secured Notes Indenture, § 4.11 [ALLY_0122066], *and* Senior Secured Notes Indenture, § 4.11 [GOLDIN00000019].

[52] Memorandum, ILC Ownership and Control, dated Apr. 24, 2006 [EXAM11248641].

[53] *Id.*

[54] *Id.*

[55] *Id.*

[56] Muir suggested to the Examiner's Professionals that Applegate's proposal of shared control of the restructured bank was never seriously considered by AFI. *See* Int. of W. Muir, Mar. 1, 2013, at 25:20–26:7 ("[Q:] And, to the extent that ResCap did ask to take control of the ILC once the transaction was done, who made the decision that ResCap should not have control? . . . [A:] Well, I would say my recollection is that it wasn't . . . a seriously considered proposition. It was not something that, I don't think, Dave himself ever really thought was reasonable and was going to fly. But it didn't hurt to ask.").

[57] *See* Memorandum, Proposed Restructuring of GMAC U.S. Banking Entities, dated May 5, 2006, at 1 [EXAM10258913] (attached to E-mail from K. Sabatowski to T. Melzer and T. Jacob (May 4, 2006) [EXAM10258912]).

from Eric Feldstein, then President of AFI and Chairman of the ResCap Board, dated May 5, 2006 (but apparently sent on May 4, 2006).[58] Feldstein's memorandum specified that "voting ownership of [the restructured bank] (i.e., shareholder votes) would remain 100% with [AFI]."[59] Feldstein further stated that the 2006 Bank Restructuring would require "waivers of certain provisions of the [2005] Operating Agreement" to allow ResCap to invest in an AFI affiliate and to enable Applegate and others to be officers of an AFI Affiliate, but made no mention of Marple's prior concern that the restructuring was not at arm's length or for fair-value.[60] The memorandum also suggested that ResCap could later regain control over its mortgage operations by applying for a second industrial bank charter, which entity would then reacquire ResCap's banking assets from the restructured bank.[61] Given that the 2006 Bank Restructuring would preserve ResCap's economic rights and "result in [AFI] and ResCap ratings being de-linked from GM's ratings," Feldstein concluded that the 2006 Bank Restructuring was "prudent and sound for ResCap."[62] Despite Marple's and Applegate's prior memoranda, there was no indication in Feldstein's memorandum or the accompanying e-mail that alternate ownership structures had been contemplated, were possible under the terms of the Cerberus PSA, or had been rejected to accommodate GM at ResCap's expense.[63]

---

[58] Memorandum, Proposed Restructuring of GMAC U.S. Banking Entities, dated May 5, 2006, at 1 [EXAM10258913] (attached to E-mail from K. Sabatowski to T. Melzer and T. Jacob (May 4, 2006) [EXAM10258912]). Jacob and Melzer learned of the Cerberus acquisition just shortly before it was made public on April 3, 2006. *See* Int. of T. Jacob, Nov. 7, 2012, at 120:12–25; GMAC, LLC, Current Report (Form 8-K) (Apr. 2, 2006), Item 1.01. It is unclear when Jacob and Melzer first learned that the bank restructuring was a necessary component of the Cerberus deal. *See* Int. of T. Melzer, Oct. 10, 2012, at 178:23–179:3 ("[Q:] Can you tell us what you recall about the board's consideration of the . . . GMAC Bank deal, that first phase of it in 2006? [A:] Well, and that had been going on for some time, I think maybe going back initially to March of that year.").

[59] Memorandum, Proposed Restructuring of GMAC U.S. Banking Entities, dated May 5, 2006, at 1 [EXAM10258913].

[60] *Id*. at 2.

[61] *Id*. at 2. This concept was developed further in the Walker Report. *See* Walker Report, at 6–7 [RC40008925].

[62] Memorandum, Proposed Restructuring of GMAC U.S. Banking Entities, dated May 5, 2006, at 2 [EXAM10258913]; *see also* Int. of D. Marple, Jan. 22, 2013, at 127:21–128:8 ("[Q:] When you received a copy of Mr. Feldstein's memorandum, do you recall if you . . . agreed or disagreed with his assessment? . . . [A:] The short answer is, no, I didn't. But . . . my understanding at the time as to why I was personally comfortable with this under the agreement was we were getting the economic benefits . . . . Two, we . . . had a commitment to get another charter. Three, we were going to dot I's and cross T's under the operating agreement and get the independent directors comfortable.").

[63] Memorandum, Proposed Restructuring of GMAC U.S. Banking Entities, dated May 5, 2006, at 1 [EXAM10258913] (attached to E-mail from K. Sabatowski to T. Melzer and T. Jacob (May 4, 2006) [EXAM10258912]); *see also* Int. of E. Schenk, Apr. 24, 2013, at 35:23–36:5 ("By the time [Bryan Cave, counsel to the Independent Directors,] received information about the transaction . . . [it was] presented as this is the . . . proposed transaction; here is what we have determined, and then we obviously worked through questions, comments, et cetera. But there was no presentation of alternatives . . . .").

Interviewed AFI officers said that briefings to Jacob and Melzer were detailed,[64] but none of them recalled any communication to Jacob and Melzer suggesting that alternative ownership structures were possible, and Jacob and Melzer recalled no such communication.[65] Instead, several AFI officers, including recipients of the Marple and Applegate memoranda, portrayed the lost voting interest as a non-issue.[66] In addition, Sanjiv Khattri, then Chief Financial Officer of AFI, suggested that full AFI control of IB Finance was simply "cleaner."[67]

---

[64] Int. of S. Khattri, Oct. 25, 2012, at 80:22–81:5 ("We spent a lot of time with [Melzer and Jacob] educating them on why the [AFI] sale made sense. It was very important for us that not only are they made aware of it, but they are enthusiastically supporting it and as part of that exercise there was a regular briefing that I was holding with them to update them on what was going on. As part of that things like the bank and a lot of other stuff would come up."); Int. of E. Feldstein, Dec. 14, 2012, at 119:3–12 ("[W]e were fairly forthcoming to the independent directors irrespective of whether [a given transaction] legally needed their action or waiver or approval. But [the bank restructuring], we reviewed with them in painstaking detail with painstaking care . . . and discussed with them to ensure that they were very comfortable, with what we were doing.").

[65] *See* Int. of S. Khattri, Oct. 25, 2012, at 73:10–17 ("[Q:] Was there any presentation to the independent directors that suggested it was an option that ResCap receive something other than a non-voting interest? [A:] To the best of my knowledge no."); Int. of E. Feldstein, Dec. 14, 2012, at 112:25–113:10 ("[Q:] Do you ever remember . . . any discussions you had with the independent board members as to why they were non-voting shares . . . ? [A:] . . . I don't recall discussing the issue of voting shares versus non-voting shares."); Int. of T. Melzer, Mar. 22, 2013, at 62:14–63:12, 74:6–9, 85:12–19, 89:22–25 ("[W]hen the transaction was presented to us . . . my recollection is it was always presented to the ResCap board from the perspective of this bank would end up in [AFI], not in ResCap."); Int. of T. Jacob, Apr. 17, 2013, at 70:7–22 ("[Q:] [H]ere Mr. Applegate is saying it makes sense for ResCap in fact to have the majority voting control of the bank. First of all did you ever have any discussion with Mr. Applegate about that option? [A:] Never. . . . [Q:] Did you ever have any conversations with anyone at ResCap about what they were obviously considering? . . . About having voting ownership in the bank. [A:] No.").

[66] *See* Int. of S Khattri, Oct. 25, 2012, at 97:18–98:15 ("I think the focus was this was considered a successful way where we were enabling the transaction and also protecting everybody's funding sources. . . . This is going to allow automotive finance to continue to diversify away from GM and this is going to continue to allow the mortgage business to get capital. That was the big theme."); Int. of J. Young, Sept. 28, 2012, at 89:19–91:25 ("I guess all I'm trying to say is I believe there wasn't a lot of debate just because it really wasn't that critical to [] what was going on in the core business and . . . ResCap ended up in the same position they would've had before."); Int. of E. Feldstein, Dec. 14, 2012, at 110:17–111:1 ("I don't recall that being an issue. . . . [A]n accommodation was being made for ResCap to use this bank that was owned by [AFI] and to get all the economic benefits associated with the low-cost funding, economic benefits directly proportional with the assets . . . that were being housed in the bank, economic benefits very, very much, if not precisely along the lines of the same benefits they had in their own bank."); Int. of M. Neporent, Feb. 6, 2013, at 25:19–26:4 ("What mattered was that ResCap had access to the bank. . . . And the voting or non-voting interest sort of seemed irrelevant at the time, at least from my perspective. ResCap wound up with an economic interest that was the same before and after."); Int. of W. Muir, Mar. 1, 2013, at 31:13–32:5 ("[Q:] Do you recall discussing with anyone this concern that the bank transaction was not going to be perceived as an arm's-length agreement for purposes of the operating agreement that was in place? . . . [A:] I remember the issue being brought up by Dave [Applegate] that . . . there were some concerns that one might have about that. Now, I will also tell you that I didn't agree, people generally didn't agree, with the level of concern that was being raised, and that this type of analysis—I just think the discussions that we had with Dave were more—it was like a 'Nice try.' You know, you wanted to make an attempt to come up with a justification as to . . . why things had to be the way you wanted them to be. That's really what it was.").

[67] *See* Int. of S. Khattri, Oct. 25, 2012, at 66:9–15 ("[T]he thinking was that you wanted to keep the control of [Ally Bank] clean, but do it in such a way that ResCap continues to enjoy the benefits of having a bank fund a certain amount of its qualifying assets.").

In an e-mail dated May 10, 2006, Bryan Cave, on behalf of Jacob and Melzer, posed a series of questions to Marple regarding the details of the transaction, including, for example, with respect to GMAC Automotive Bank's cost of funds and licensing requirements.[68] Most notably, the Bryan Cave e-mail stated that "[a]lthough not a direct request for information, the independent directors have noted and are considering the impact of the difference between the economic stake of ResCap and the voting rights in [IB Finance] . . . ."[69] Despite the fact that Marple had determined that the proposed structure could not reasonably be considered "arm's-length,"[70] his May 12, 2006 response to the Independent Directors' note that they were considering the impact of the non-voting structure was simply, "let me know if you would like

---

[68] E-mail from E. Schenk to D. Marple (May 10, 2006) [JACOB.000010]; Int. of T. Jacob, Nov. 7, 2012, at 136:16–137:15.

[69] E-mail from E. Schenk to D. Marple (May 10, 2006) [JACOB.000010].

[70] Memorandum, GMAC Bank Restructuring, dated Apr. 20, 2006, at 4 [EXAM11248642].

any further information in connection with your consideration of this matter."[71] Although Jacob and Melzer engaged in ongoing discussions with Bryan Cave and various AFI and ResCap executives regarding the 2006 Bank Restructuring,[72] the Investigation revealed no documentation showing that the Independent Directors were ever informed of the possibility of alternate ownership structures, such as the one proposed by Applegate in his April 24 memorandum, or that the proposed structure was not mandated by the Cerberus PSA.[73]

Instead, it appears that this information was withheld from the Independent Directors, as was the fact that such structures had been rejected by AFI personnel to accommodate GM's call option. This restricted flow of information takes on additional significance when considered in light of the fact that many of the individuals with whom the Independent Directors communicated concerning this transaction (including Walker, Khattri, and Feldstein) held dual affiliations with ResCap and AFI.[74]

---

[71] Memorandum, GMAC Bank Restructuring, dated May 12, 2006, at Question 4 [ALLY_0401600]; *see also* Int. of E. Schenk, Apr. 24, 2013, at 53:9–54:1, 89:3–18 ("[Q:] Going back to the Marple memo . . . . This is within his discussion of the arm's length and fair value requirements of the operating agreement. . . . [I]t says, 'However, ResCap will not be given any voted control with regard to either of these material business activities or the entity itself. It is not reasonable to believe that ResCap's leadership would agree to transfer a material business to a third party under a similar arrangement. Hence, the restructuring of GMAC Bank as currently proposed cannot reasonably be deemed a transaction to which parties at arm's length would agree.' Did Mr. Marple ever convey that view to you? [A:] No.").

[72] *See* Int. of T. Jacob, Nov. 7, 2012, at 136:16–137:22 ("[W]e had extensive discussions back and forth . . . regarding [the bank restructuring], Tom Melzer and I, talking to David Marple, Bryan Cave . . . ."); Int. of S. Khattri, Oct. 25, 2012, at 80:13–15, 80:21–81:4 ("I believe that there were sort of discussions held with [Melzer and Jacob] before the formal board meeting, yes. . . . I think explaining the whole transaction. We spent a lot of time with [Melzer and Jacob] educating them on why the [AFI] sale made sense. It was very important for us that not only are they [made] aware of it, but they are enthusiastically supporting it and as part of that exercise there was a regular briefing that I was holding with them to update them on what was going on."); Int. of T. Melzer, Oct. 10, 2012, at 252:23–253:21 ("I know this concept was around for quite a while and we worked on it for quite a while in terms of getting our mind around it.").

[73] *See* Memorandum, ILC Ownership and Control, dated Apr. 24, 2006 [EXAM11248641]; *see also* E-mail from D. Applegate to J. Barr and R. Hall (Mar. 21, 2006) [EXAM11740324] (deciding that talking points regarding the restructuring would not go to the ResCap Board and that "[t]he goal is to solidify our leadership of the process and end ownership."); Int. of S. Khattri, Oct. 25, 2012, at 73:10–17 ("[Q:] Was there any presentation to the independent directors that suggested it was an option that ResCap receive something other than a non-voting interest? [A:] To the best of my knowledge no.").

[74] The protocol and functioning of the ResCap Board is explored in more depth in Section IV.A.

The regulatory application for the 2006 Bank Restructuring was submitted by GMAC Automotive Bank to the FDIC and DFI on May 19, 2006.[75] The application's cover letter stated that "[AFI] will hold 100% of voting interests in [IB Finance], and ResCap will hold non-voting interests . . . ."[76] The proposed structure of the reorganized bank, including ResCap's non-voting interest, remained unchanged throughout future ResCap Board discussions.[77]

On November 15, 2006, the FDIC and the DFI approved the application for the change in control of GMAC Automotive Bank from GM to Cerberus.[78] A condition of the DFI's approval of the 2006 Bank Restructuring was that the restructured bank "hold capital of no less than 10% of total assets until August 2007 and no less than 9.25% of total assets until November 2008."[79] GMAC Automotive Bank (i.e., the automotive division) already met this requirement, but Old GMAC Bank (the mortgage division) did not.[80] ResCap was thus required to contribute (through IB Finance) an additional $360 million to the mortgage division of GMAC Automotive Bank in connection with the 2006 Bank Restructuring.[81]

To assist the ResCap Board with its evaluation of the 2006 Bank Restructuring, Walker authored a report which explained the transaction.[82] The final version of the Walker Report was presented to the ResCap Board on November 20, 2006, the same day the matter was to be

[75] *See* Letter from J. Feinberg to FDIC and DFI (May 19, 2006), at 2 [ALLY_0397537]; Walker Report, at 5 [RC40008925]; Memorandum, Bank Restructuring Accounting Implications, dated July 20, 2007, at 2 [EXAM10198423]. The Independent Directors were aware of the application, but did not formally approve it. *See* Bank Restructuring Project Plan, dated July 25, 2006, at Task E.19 [EXAM10256021] ("5/18 - Dave Marple and Karen [Sabatowski] had a call with Bryan Cave, the ResCap independent directors' outside counsel. . . . We all agreed that there is no need for formal ResCap Board approval at this time . . . .").

[76] Letter from J. Feinberg to FDIC and DFI (May 19, 2006), at 2 [ALLY_0397537].

[77] *See* ResCap Performance and Market Update, dated June 22, 2006, at 12 [RC40011836] ("ResCap will purchase non-voting interests in GMAC Automotive Bank from [AFI] at which time GMAC Automotive Bank will create a mortgage operation."). *Compare* Draft Report to the Board of Directors of ResCap, dated Oct. 16, 2006, at 3 [RC00016501], *with* Walker Report, at 3 [RC40008925].

[78] DFI, Findings, Conclusions, and Order Conditionally Approving Application, dated Nov. 15, 2006 [CERB003827]; FDIC Approval Letter from S. L. Thompson (Nov. 15, 2006) [GOLDIN00093066]; Walker Report, at 3 [RC40008925].

[79] Walker Report, at 5 [RC40008925]; Capital Maintenance Agreement, dated Nov. 15, 2006 [GOLDIN00093168]; 12 C.F.R. § 325.103(b) (2000).

[80] Walker Report, at 5 [RC40008925].

[81] Walker Report, at 5 [RC40008925]; Capital Contribution Agreement, dated Nov. 22, 2006 [ALLY_PEO_0021232].

[82] The ResCap Board received a draft of the Walker Report at their October 19, 2006 meeting and a final version at their November 20, 2006 meeting. *Compare* Draft Report to the Board of Directors of ResCap, dated Oct. 16, 2006 [RC00016501], *with* Walker Report [RC40008925]. The Walker Report was presented by Karen Sabatowski and was jointly prepared by David Walker and Sanjiv Khattri, among others. *See* Int. of S. Khattri, Oct. 25, 2012, at 85:15–86:6 (demonstrating Khattri's involvement); Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Nov. 20, 2006, at 3 [RC00016852] (demonstrating. Sabatowski's involvement); Walker Report, at 10 [RC40008925] (demonstrating Walker's involvement).

voted on, including by the Independent Directors.[83] The Walker Report offered no explanation of why ResCap's interest in IB Finance would be non-voting. Similarly, the Walker Report provided no valuation of the voting interest that ResCap was giving up or of the non-voting interest that ResCap would receive.[84] In later years, AFI would acknowledge difficulty in valuing ResCap's non-voting interest in IB Finance.[85]

With the exceptions noted above, the Walker Report explained the details of the proposed restructuring and acknowledged that "waivers of the relevant provisions of the [2005] Operating Agreement would need to be made and approved by the ResCap Board as a condition to the proposed [IB Finance] structure."[86] As discussed above, Marple had identified in his April 20, 2006 memorandum a conflict with the 2005 Operating Agreement's requirement that ResCap not make investments in AFI Affiliates as well as two potential conflicts with its requirements that affiliate transactions be arms-length and for fair value and that ResCap maintain separateness from AFI.[87] However, the Walker Report only disclosed two of these conflicts: ResCap's preclusion from making investments in AFI Affiliates and the requirement that ResCap maintain separateness from AFI.[88] The Walker Report made no mention of section 2(b)'s requirement that any agreements between ResCap and AFI be "on terms and conditions that are . . . arm's-length . . . and for fair value,"[89] or of Marple's prior conclusion that the proposed restructuring "cannot reasonably be deemed a transaction to which parties at arm's-length would agree."[90]

---

[83] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Nov. 20, 2006, at 3 [RC00016852] ("Ms. Sabatowski presented Report No. DCW-3 that recommended approval of certain actions necessary to effect the restructuring of the two U.S. banking entities currently owned directly and indirectly, by [AFI].").

[84] In his interview, Melzer acknowledged that a voting interest would have been better for ResCap. *See* Int. of T. Melzer, Oct. 10, 2012, at 206:18–25, 208:24–209:7 ("[Q:] Was it your understanding that nonvoting shares were less valuable than voting shares? And would it have been better for ResCap to have voting shares, if that could be arranged? [A:] Yeah, I think . . . voting would be better."); *see also* Int. of T. Hamzehpour, Oct. 5, 2012, at 157:14–19 ("[Q:] Do you recall any discussions about whether [the 2006 Bank Restructuring] was a good or bad deal for ResCap? [A:] Other than a feeling personally that we should have at least had a voting interest versus a non-voting interest.").

[85] *See* Agenda and Supporting Materials, GMAC Board of Directors Meeting, Sept. 30, 2008, at ALLY_PEO_0003724 [ALLY_PEO_0003715] ("Because of a number of factors, including . . . the non-voting nature of ResCap's ownership, valuation of the bank is somewhat subjective and exposes [AFI] to purchase price litigation."). *But see* Int. of T. Rowe, Dec. 7, 2012, at 159:11–160:19 ("I don't know that it was a significant issue or we didn't think it was a significant issue. . . . No one was going to make a financially driven investment in this type of structure because they don't serve the kinds of purposes or there is too much difficulty. Not having voting rights might be one more component of that, but it's much broader in just the overall structure.").

[86] Walker Report, at 3–6 [RC40008925].

[87] *See* Memorandum, GMAC Bank Restructuring, dated Apr. 20, 2006 [EXAM11248642].

[88] Walker Report, at 5 [RC40008925].

[89] 2005 Operating Agreement, § 2(b) [ALLY_0140795].

[90] Memorandum, GMAC Bank Restructuring, dated Apr. 20, 2006, at 4 [EXAM11248642].

The Walker Report also stated that "ResCap's control over the bank would also be unchanged relative to its current position" because while AFI would own 100% of the voting shares of the restructured bank, "[AFI] currently wholly owns ResCap and controls the ResCap board . . . ."[91] It is unclear to what extent the Independent Directors considered and/or agreed with this proposition at the time, but both Melzer and Jacob appear to disagree with this statement in hindsight.[92]

In addition to the transfer of assets from Old GMAC Bank to GMAC Automotive Bank, the Walker Report contemplated a "Phase II" of the 2006 Bank Restructuring, whereby ResCap would acquire its own industrial bank charter to later re-acquire the mortgage division assets.[93] This would have resulted in ResCap and AFI each holding their own industrial bank to carry on their respective mortgage and automotive businesses. While the proposal to acquire a second industrial bank appears to have been sincere,[94] as the Walker Report acknowledged, by November 2006 there were significant obstacles to acquiring a second industrial bank charter, including the FDIC's moratorium on new industrial banks.[95] Nonetheless, in approving the 2006 Bank Restructuring, both Independent Directors

---

[91]  Walker Report, at 9 [RC40008925]; *see also* Int. of D. Walker, Nov. 28, 2012, at 141:6–9 ("[Q:] The ResCap entity has less control at the end of the day than it started with. Am I missing something there? [A:] Well, again, I would argue that I don't think control, as I described it here is really any different. Control is sort of the power to elect the board. And then, the board members themselves are the ones that operate the business day to day.").

[92]  *See* Int. of T. Melzer, Oct. 10, 2012, at 207:1–18 ("[Q:] If you look at [RC40008939], the last two lines, 'ResCap's control over the bank would also be unchanged relative to its current position. Under the proposed restructuring, [AFI] would own 100 percent of the voting shares of the bank. But, since [AFI] currently wholly owns ResCap and controls the ResCap board, there would be no effective change in control' . . . . [A:] You know, frankly, I didn't pay any attention to that. . . . [Q:] Do you agree with that statement? [A:] No. No, not if you're sitting there looking after the interests of ResCap's creditors."); Int. of T. Jacob, Nov. 7, 2012, at 177:4–5, 177:15–17 ("[T]hat looks like an unfortunate choice of words from DCW. . . . [I]t's always better to have voting shares, but I do not know why we could not achieve that . . . ."). *But see* Int. of L. Zukauckas, Oct. 19, 2012, at 156:8–14, 157:4–6 ("But the fact that in substance there was no meaningful change . . . it influenced me being supportive of the transaction. . . . [ResCap] still enjoyed the benefits of the bank and so the substance in my opinion was still there."); Int. of T. Melzer, Mar. 22, 2013, at 88:17–89:5 ("[I]f you think about it in substance there wasn't really a change. . . . It's in a different form, but the reality is that [AFI] controlled that bank both before and after, if you will, what was the ResCap piece that became part of the Industrial Bank.").

[93]  Walker Report, at 6–7 [RC40008925].

[94]  *See, e.g.*, E-mail from S. Khattri (Oct. 26, 2006) [EXAM10165848] ("[G]oal is in to have separate banks however, not clear when and how . . . mortgage 'branch' will be very separate from day [zero] so even though charter is shared it is implicitly two banks."); Int. of E. Feldstein, Dec. 14, 2012, at 104:23–105:2 ("I do recall certainly inquiring about it and exploring its viability. I also recall a fairly negative response . . . about that viability.").

[95]  Walker Report, at 7–8 [RC40008925].

appear to have relied, at least in part, on the possibility of a second bank.[96] Ultimately, Phase II did not occur.[97]

Another risk disclosed in the Walker Report was GM's call option on the AFI automotive business, as described earlier.[98] If GM exercised the call option and acquired GMAC Automotive Bank before ResCap obtained its own industrial bank, ResCap might be left without access to bank funding.[99] The Walker Report characterized this risk as "remote," because GM needed to have an investment grade rating in order to exercise this option and, at the time, GM's credit ratings were declining.[100] Other risks the Walker Report noted were that "[s]ome senior employees of the FSB could resign as a result of the restructuring" and that "ResCap's growth strategy for the FSB could be slowed significantly during the pendency of the restructuring."[101] In the end, the Walker Report concluded that "[t]he proposed bank restructuring will not have a material adverse impact on ResCap" and that "ResCap's earnings from its bank activities would be essentially unchanged."[102]

On November 20, 2006, the ResCap Board unanimously approved the 2006 Bank Restructuring in all respects.[103] To address conflicts with the 2005 Operating Agreement,

---

[96] *See* Int. of T. Jacob, Nov. 7, 2012, at 180:21–181:1 ("The big issue for me was economic interest in the assets that were transferred over according to ResCap. And also, an ability to get those assets back to domicile it in our own bank once the FDIC gave us their charter."); Int. of T. Melzer, Mar. 22, 2013, at 92:4–20; *see also* Bank Restructuring Project Plan, dated July 25, 2006, at Task E.19 [EXAM10256021] ("Independent directors would like more definitive information and documentation regarding the re-transfer of mortgage assets to a new ILC . . . before providing formal approval.").

[97] Int. of E. Feldstein, Dec. 14, 2012, at 104:23–105:9 ("I do recall certainly inquiring about [obtaining a second charter] and exploring its viability. I also recall a fairly negative response from Michelle Lieber about that viability. . . . Michelle Lieber was either a GM employee or a[n] [AFI] employee who was based in Washington and worked closely with expert lobbyists in this arena and offered us advice on ILCs and the like.").

[98] Walker Report, at 7 [RC40008925].

[99] Walker Report, at 7 [RC40008925]. This concern was also raised by the Independent Directors. *See* E-mail from E. Schenk (May 10, 2006) [JACOB.000010]; Memorandum, GMAC Bank Restructuring, dated May 12, 2006 [ALLY_0401600]. On behalf of the Independent Directors, Bryan Cave questioned whether the GM call option could be waived, "at least so far as it relates to ResCap's assets that will be moved into [GMAC Automotive Bank]." Marple responded that "the parties can always agree to waive or amend the provisions in the agreement" and that AFI did in fact intend "to seek a waiver/amendment that codifies the repurchase of mortgage assets in the event of a call by GM." Memorandum, GMAC Bank Restructuring, dated May 12, 2006 [ALLY_0401600].

[100] Int. of D. Walker, Nov. 28, 2012, at 119:19–24; Int. of S. Khattri, Oct. 25, 2012, at 68:5–22 ("I personally did not rate the chances of their option ever being exercised seriously.").

[101] Walker Report, at 8 [RC40008925]. The risk of slowing the bank's growth strategy appears to be attributable to the fact that ResCap's mortgage business would cease being regulated by OTS and instead be monitored by the FDIC and DFI. *See* Int. of D. Walker, Nov. 28, 2012, at 123:25–124:8 ("[P]ragmatically the OTS is going to be the regulator for the thrift, now that business unit is moving to the DFI and the FDIC, and certainly they're familiar with mortgage companies generically. But, our particular team, they're going to have to get to know. So, this is the outcome of having to make the move in the first place.").

[102] Walker Report, at 9 [RC40008925].

[103] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Nov. 20, 2006, at 3 [RC00016852].

the ResCap Board granted a "waiver of the Operating Agreement, *including [s]ection 2(a) and [s]ection 2(f) thereof*, in connection with the restructuring of the two U.S. banking entities as described in all material respects in [the Walker Report]."[104] While the relevant board resolution explicitly waives sections 2(a) (investments in AFI affiliates) and 2(f) (AFI/ResCap separateness) of the 2005 Operating Agreement, it does not mention section 2(b) (transactions must be at arm's length and for fair value).[105] Despite the requirement in the Cerberus PSA that the "purchase price for [Old GMAC Bank's] assets and liabilities will be established by an independent third-party valuation,"[106] the parties to the transaction do not appear to have solicited any formal fairness opinions or valuations in connection with the 2006 Bank Restructuring.[107] Additionally, ResCap was not represented by outside counsel in connection with negotiating or finalizing the transaction.[108]

### (3) The 2006 Bank Restructuring

Effective November 22, 2006, Old GMAC Bank transferred substantially all of its assets (approximately $11.7 billion at book value) and liabilities (approximately $10.7 billion at book value) to GMAC Automotive Bank for the purchase price of $1.161 billion, the net book value of Old GMAC Bank's assets and liabilities.[109] The $1.161 billion purchase price was then sent as a dividend from Old GMAC Bank, through a series of holding companies, to ResCap.[110] ResCap's equity in Old GMAC Bank (along with its remaining assets and

---

[104] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Nov. 20, 2006, at 3 [RC00016852] (emphasis added); *see also* Int. of T. Jacob, Nov. 7, 2012, at 172:8–173:24; Int. of T. Melzer, Oct. 10, 2012, at 213:5–17 ("So as to not leave the . . . bank discussion open, there were aspects of that transaction that concern me. But, on balance, all things considered, I felt it was in the best interests of all stakeholders . . . . [W]e did not have independent valuations of the interests in this particular case. But I think it was probably a book value transaction, which is not uncommon, and I wasn't uncomfortable with that approach. But . . . I had some discomfort with it.").

[105] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Nov. 20, 2006, at 3 [RC00016852].

[106] Cerberus PSA, Ex. H, at 1 [CERB039811].

[107] *See* Int. of T. Melzer, Oct. 10, 2012, 213:5–17 ("So as to not leave the . . . bank discussion open, there were aspects of that transaction that concern me. But, on balance, all things considered, I felt it was in the best interests of all stakeholders . . . we did not have independent valuations of the interests in this particular case. But I think it was probably a book value transaction, which is not uncommon, and I wasn't uncomfortable with that approach.").

[108] The Independent Directors themselves consulted with Bryan Cave in an informal review of the 2006 Bank Restructuring. *See* Int. of T. Melzer, Oct. 10, 2012, at 184:9–186:7; *see also* Memorandum, Bank Restructuring Project Plan, dated July 25, 2006, at Tasks E.19, E.20 [EXAM10256021].

[109] Purchase and Assumption Agreement [CERB001654]; Bill of Sale, Assignment and Assumption Agreement, dated Nov. 22, 2006 [ALLY_0018322]. The FDIC approved this transfer on November 15, 2006. Order and Basis for Corporation Approval, Division of Supervision and Consumer Protection, FDIC (Nov. 15, 2006) [GOLDIN00093168].

[110] Unanimous Written Consent of Executive Committee of GMAC Bank, dated Nov. 20, 2006 [CERB001608] (declaring dividend of to GMAC Residential Holding Company, LLC); GMAC Residential Holding Company, LLC Certification, dated Nov. 20, 2006 [CERB001610] (declaring dividend of approximately $1.1 billion to ResCap).

liabilities)[111] was then transferred to GM through a series of dividends, thus removing Old GMAC Bank from the Cerberus ownership chain.[112] Old GMAC Bank subsequently changed its name from "GMAC Bank" to "National Motors Bank FSB,"[113] and was eventually voluntarily dissolved in February 2009.[114] The result of this transaction was that AFI's automotive banking operations and ResCap's mortgage banking operations were consolidated within GMAC Automotive Bank.

EXHIBIT V.A.1.a(3)—1
**Consolidation of Bank Assets and Divestiture of Old GMAC Bank**



*Source: See AFI Certain Key Factual Background Presentation, Sept. 23, 2011, at [ALLY_0157478].*

Contemporaneously with the consolidation of these operations, AFI contributed 100% of its interests in GMAC Automotive Bank to a newly-created limited liability holding company, IB Finance.[115] This transfer eliminated AFI's direct ownership of GMAC Automotive Bank, and placed IB Finance in a holding position between AFI and GMAC Automotive Bank. AFI

---

[111] Following Old GMAC Bank's transfer of assets and liabilities to GMAC Automotive Bank, Old GMAC Bank retained approximately $105 million in assets, $93 million in liabilities, and $13 million in equity. *See* Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 11–12.

[112] Certificate of Share Transfer, Nov. 21, 2006 [CERB001732]; Transfer of Shares Agreement, dated Nov. 22, 2006 [CERB001787].

[113] Residential Capital, LLC, Current Report (Form 8-K) (Nov. 27, 2006), Item 2.01, at 2.

[114] FDIC, *Institution Directory—National Motors Bank FSB*, http://www2.fdic.gov/idasp/confirmation_outside.asp?inCert1=35054 (last updated Dec. 20, 2012) (providing that National Motors Bank FSB was "involved in a Voluntary Liquidation and Closing").

[115] Share Contribution Agreement, Art. 1 [CERB001521].

retained two million voting IB Finance Class A Shares, which entitled AFI to earnings and distributions from the automotive division of GMAC Automotive Bank, and were the only voting interests in IB Finance.

Immediately following the transfer of GMAC Automotive Bank to IB Finance, ResCap purchased two million non-voting IB Finance Class M Shares for the price of $1.161 billion (the same amount that Old GMAC Bank had received for its assets and sent by dividend to ResCap).[116] While the IB Finance Class M Shares entitled ResCap to the earnings and distributions of GMAC Automotive Bank's mortgage division,[117] their non-voting nature effectively stripped ResCap of formal legal control over its mortgage banking operations. In terms of day-to-day operations, the change in control may have been less pronounced than the transaction suggests, because the personnel from Old GMAC Bank were simply moved to GMAC Automotive Bank.[118] However, all of the business and affairs of IB Finance were to be managed solely by AFI.[119] Following these equity transfers, GMAC Automotive Bank changed its name to "GMAC Bank,"[120] and later to "Ally Bank," which is the term used herein.

---

[116] Equity Purchase Agreement, dated Nov. 20, 2006 [ALLY_0018330].

[117] Memorandum, Bank Restructuring Accounting Implications, dated July 20, 2007, at 4 [EXAM10198423]. At the time, the mortgage division appears to have represented approximately 82% of the bank's asset base and approximately 78% of the income. Memorandum, Bank Restructuring Accounting Implications, dated July 20, 2007, at 7 [EXAM10198423].

[118] *See, e.g.*, Walker Report, at 5 [RC40008925]; Int. of D. Walker, Nov. 28, 2012, at 141:6–9 ("[Q:] The ResCap entity has less control at the end of the day than it started with. Am I missing something there? [A:] Well, again, I would argue that I don't think control, as I described it here is really any different."); Int. of E. Feldstein, Dec. 14, 2012, at 121:9–11 ("I guess if [AFI] owns ResCap and ResCap owns the bank, then [AFI] really owns the bank. So it doesn't really matter."); Int. of D. Marple, Jan. 22, 2013, at 138:14–17 ("As a practical matter, yeah, [AFI was the] 100% shareholder—they could wipe out the board if they wanted including the independent directors.").

[119] IB Finance 2006 LLC Agreement, § 3.1(a) [ALLY_0401862].

[120] Articles of Amendment to Articles of Incorporation of GMAC Automotive Bank, dated Nov. 22, 2006 [ALLY_0104546].

EXHIBIT V.A.1.a(3)—2
**Creation of IB Finance**
November 20 and 22, 2006



*Source: See AFI Certain Key Factual Background Presentation, Sept. 23, 2011, at 14 [ALLY_0157478].*

The 2006 Bank Restructuring imposed certain capital maintenance requirements on AFI and ResCap.[121] Under the IB Finance 2006 LLC Agreement, ResCap was required to make additional capital contributions "as necessary to support and grow the assets and businesses" of the mortgage division, while AFI was obligated to support the automotive division.[122] Both AFI and ResCap were required to maintain sufficient capital in each of their respective divisions "at a level of capitalization that qualifies as 'well-capitalized' under applicable federal banking laws or such higher level of capitalization as may be required by the [FDIC] or the [DFI]."[123]

### (4) Post-Closing Events

As required by the DFI, ResCap contributed approximately $360 million in additional capital to the mortgage division of GMAC Automotive Bank on November 22, 2006.[124] This capital contribution consisted of $302 million in cash and approximately $58 million in low-

---

[121]  IB Finance 2006 LLC Agreement, § 2.1(b) [ALLY_0401862].

[122]  *Id.*

[123]  *Id.* ResCap contributed additional capital to the mortgage division of Ally Bank on five subsequent occasions between April 2007 and July 2007, totaling $200 million. *See* Capital Contributions—ResCap to Ally Bank [EXAM00221558].

[124]  *See* Walker Report, at 5 [RC40008925]; Capital Contribution Agreement, dated Nov. 22, 2006 [ALLY_PEO_0021232].

quality mortgage assets.[125] A week later, on November 30, 2006, Cerberus and GM finalized the sale of 51% of AFI for a purchase price of $7.35 billion.[126]

### (5) Value Of Exchange[127]

In order to assess reasonably equivalent value for the 2006 Bank Restructuring, the Examiner's Financial Advisors estimated the value transferred from ResCap as well as the consideration received by ResCap. The value transferred from ResCap consisted of: (1) a controlling interest in 100% of the equity of Old GMAC Bank; and (2) $360 million in cash and mortgage assets contributed by ResCap to IB Finance. The consideration received by ResCap consisted of: (1) two million IB Finance Class M Shares; and (2) the indirect benefit of avoiding a credit downgrade by facilitating the sale of a 51% interest in AFI to Cerberus.

To value the interest in Old GMAC Bank, the Examiner's Financial Advisors considered three traditional and commonly used approaches to estimating FMV: (1) the Market Approach, using public stock prices and transaction prices for comparable thrift institutions; (2) Income Approach; and (3) the Asset-Based Approach. These approaches yield a value of the controlling interest in Old GMAC Bank of approximately $1.62–1.90 billion.

To value the IB Finance Class M Shares, the Examiner's Financial Advisors used the same approach and assumptions as for valuing the interest in Old GMAC Bank, with adjustments to reflect the different form of ownership (such as lack of marketability, lack of control, and lack of voting rights). The Examiner's Financial Advisors also considered the IB Finance Class M Shares' "tracking stock" structure, a form of investment that was generally viewed as unfavorable by investors. The estimated value of ResCap's two million IB Finance Class M Shares, after discounting for these factors, is approximately $1.44–1.65 billion.

To quantify the indirect benefit to ResCap of avoiding the likely credit downgrades that would have occurred had the sale to Cerberus not closed, the Examiner's Financial Advisors considered: (1) the costs that would have been incurred by ResCap as a result of a credit ratings downgrade; and (2) the time horizon over which such cost savings could reasonably be attributed to the successful closing of the Cerberus sale. The Examiner's Financial Advisors quantified this benefit as the present value of after-tax cost savings over a one-year period. This calculation yields an indirect benefit to ResCap of approximately $143 million.[128]

In sum, the Examiner concludes that a fair estimate of the value transferred from ResCap in connection with the 2006 Bank Restructuring, including the $360 million capital contribution, is approximately $1.98–2.26 billion, while a fair estimate of the value received by ResCap is approximately $1.58–1.79 billion. Accordingly, the Examiner concludes that the

---

[125] *See* Capital Contribution Agreement, dated Nov. 22, 2006 [ALLY_PEO_0021232].

[126] *See* Cerberus PSA [CERB000521]; General Motors Acceptance Corp., LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 17.

[127] This Section provides a summary of the more detailed analysis in Section V.A.2.b.

[128] For a discussion of the law regarding intangible benefits and their effect on reasonably equivalent value, *see* Section VII.F.5.d.

consideration received by ResCap in the 2006 Bank Restructuring was less than the value that was transferred from ResCap in that transaction. A more detailed analysis of these valuations is contained in Section V.A.2.b. Additionally, a summary of these findings is presented in Appendix V.A.2.b.

### (6) Causes Of Action Implicated By The 2006 Bank Restructuring

The causes of action potentially implicated by the 2006 Bank Restructuring include (1) actual and constructive fraudulent transfer pursuant to section 544 of the Bankruptcy Code; (2) breach of fiduciary duty and aiding and abetting breach of fiduciary duty; (3) breach of the 2005 Operating Agreement and tortious interference with the 2005 Operating Agreement; (4) common law fraud; and (5) equitable subordination with respect to some or all of AFI's claims against the Debtors. The Examiner also considered the 2006 Bank Restructuring in connection with the alter ego claims alleged against AFI. An analysis of these claims is provided in Section VII.

### b. The 2008 Bank Transaction

### (1) Background

The Investigation revealed no evidence that the 2008 Bank Transaction was contemplated at the time of the 2006 Bank Restructuring. In fact, as discussed below, the 2008 Bank Transaction seems not to have been considered before March 2008. Throughout 2007 and the first quarter of 2008, ResCap faced ongoing challenges with respect to its liquidity and TNW.[129] In December 2007, it was clear that addressing ResCap's TNW covenants was a "primary" objective for the first quarter of 2008.[130] By early March 2008, it became clear to AFI and ResCap senior officers that the TNW shortfall for the first quarter would be greater than anticipated and that AFI would potentially need to make a substantial equity infusion into ResCap ("in the $1.75–2.25 billion zone") before the end of the quarter.[131] ResCap's interest in IB Finance does not appear to have been part of the discussion surrounding the potential equity infusion,[132] but it was considered as collateral for a potential secured loan from AFI.[133] Throughout March 2008, the ResCap Board considered several options to address both

---

[129] *See, e.g.,* Minutes of a Regular Meeting of the Board of Directors of Residential Capital, LLC, Feb. 22, 2008, at 2 [RC00017129]; Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Mar. 17, 2008, at 5 [RC00017144]. ResCap's principal credit facilities contained TNW covenants requiring ResCap to maintain $5.4 billion in TNW. *See* Minutes of the Meeting of the Special Committee of the Independent Directors of the Board of Residential Capital, LLC, Mar. 26, 2008, at 2 [MELZER.008984]. As part of a June 2008 refinancing of certain credit facilities, these TNW covenants were reduced from $5.4 billion to $250 million.

[130] *See* Minutes of a Regular Meeting of the Board of GMAC LLC, Dec. 13, 2007, at ALLY_PEO_0001001 [ALLY_PEO_0000860].

[131] *See* E-mail from E. Feldstein (Mar. 6, 2008) [EXAM11306297].

[132] *See id.* (discussing a potential equity infusion, but making no mention of IB Finance or Ally Bank).

[133] *See* E-mail from J. Young (Mar. 5, 2008) [EXAM10209694].

liquidity and TNW concerns, including a bond exchange and a restructuring of ResCap's debt facilities,[134] but management ultimately determined that these solutions could not be implemented in time to meet ResCap's TNW covenants as of March 31, 2008.[135]

On March 24, 2008, one week before ResCap was expected to breach its TNW covenants, Corey Pinkston, then head of Capital Markets at GMAC Financial Services, presented the Independent Directors with a proposal developed jointly by him and PwC only days earlier.[136] Pursuant to the proposal, AFI would contribute to ResCap up to $1.5 billion in ResCap bonds that AFI had purchased on the open market during the first quarter of 2008 in exchange for ResCap Preferred Interests, convertible at AFI's option into IB Finance Preferred Interests.[137] If exercised, AFI's conversion of the ResCap Preferred Interests into IB Finance Preferred Interests would reduce ResCap's IB Finance Class M Shares on a unit-for-unit basis.[138] The ResCap Preferred Interests and the IB Finance Preferred Interests would have fixed interest rates of 13% and 10%, respectively.[139] It is unclear whether the Independent Directors were informed of this proposal before the March 24, 2008 meeting, but if they were, it appears that such notice would have come only days earlier.[140] It is likewise unclear why, given that ResCap and AFI were aware since December 2007 that ResCap likely would have difficulty meeting its TNW covenant, this proposal was not developed until

---

[134] *See, e.g.*, Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Mar. 17, 2008, at 5 [RC00017144].

[135] Int. of S. Khattri, Oct. 25, 2012, at 247:7–248:13 ("Most of the other transactions involved third parties. And, with the environment like it was, [] the timeframe would have taken too long. And many of them turned out to be dead ends anyway. . . . So, this one was something you controlled and could make it happen much faster, because it was [between] two sort of affiliated parties."); Int. of T. Jacob, Nov. 7, 2012, at 237:2–12 ("I would say there was a sense of urgency here to provide some liquidity sources. Unrelated parties were not willing to provide any liquidity and their only choice was related parties.").

[136] *See* E-mail from C. Pinkston (Mar. 20, 2008) [EXAM11308640] ("[M]ultiple calls and structures discussed internally and with [accountants] today. . . . [H]ave to also consider timing for the rescap board ([including] the independents). Timing is just very tight on all of this."); Minutes of a Meeting of the Special Committee of the Independent Directors of the Board of Residential Capital, LLC, Mar. 24, 2008, at 2 [MELZER.008984]; Int. of C. Pinkston, Nov. 8, 2012, at 164:14–18 ("I'm pretty sure that . . . everybody except the independents should have been pretty apprised on this at that point in time."); s*ee also* E-mail from J. Jones to T. Melzer and T. Jacob (Mar. 22, 2008) [MELZER.008822] (giving a "heads-up on the form of capital infusion [AFI] is proposing" and setting up call for March 24, 2008 to get the Independent Directors "current as soon as possible").

[137] Minutes of a Meeting of the Special Committee of the Independent Directors of the Board of Residential Capital, LLC, Mar. 24, 2008, at 2 [MELZER.008984].

[138] *Id*.

[139] Morgan Stanley Project Duvall Presentation, dated Mar. 28, 2008, at 5–6 [RC40007480].

[140] *See* Int. of S. Khattri, Oct. 25, 2012, at 245:15–18 ("[Q:] Had [the preferred stock bank transaction] been discussed with the independent directors before [March 24, 2008]? [A:] I think it had."); E-mail from T. Hamzehpour to T. Melzer and T. Jacob (Mar. 20, 2008) [MELZER.008815] (attaching Morgan Stanley Engagement Letter from D. Ammann to J. Jones (Feb. 13, 2008) [MELZER.008816]).

one week before a potential breach.[141] Pinkston advised the Independent Directors at the March 24, 2008 special meeting that this was a "good transaction" for ResCap and a "fair way for [AFI] to contribute additional capital [to ResCap]."[142]

Pinkston's opinion of the transaction appears to have been based first on the fact that the bonds to be contributed likely would be worth less upon the date of contribution than when AFI had purchased them,[143] and second, on ResCap's retention of a future call option on the interest in IB Finance.[143] In response, Melzer noted that "it might appear that [AFI] is converting the ResCap bonds that it currently holds into something worth more than they are now," that is, a preferred interest in IB Finance and indirectly, Ally Bank.[144] At the urging of Jacob and Melzer,[145] ResCap proposed that the bond contribution from AFI be in exchange for simple common equity, but this proposal was reportedly rejected by AFI.[146] AFI reportedly insisted on this type of exchange instead of a straight capital infusion because the prevailing

---

[141] *See* Int. of S. Ramsey, Dec. 10, 2012, at 128:1–129:1 ("[W]e were making decisions continuously and in real time . . . . But it is not particularly unlikely that the reason the timeframe was as short as it was is because the [AFI Board] said you need to do something better. And, so, we'd come up with an idea of what something better is in the context of what the [AFI] Board thought. And that was it."); Int. of A. de Molina, Nov. 20, 2012, at 139:24–140:10 (explaining that the parties waited until the end of the quarter to see how much of a shortfall would exist before deciding how to address that shortfall).

[142] Minutes of a Meeting of the Special Committee of the Independent Directors of the Board of Residential Capital, LLC, Mar. 24, 2008, at 3 [MELZER.008984].

[143] *Id.*

[144] *Id.*; *see also* E-mail from J. Jones (Mar. 25, 2008) [EXAM11307284] ("[The Independent Directors] are completely focused on ResCap, and there to both the shareholder and to the bondholders. They are trying to enforce our Operating Agreement and ensure that bondholders are not inappropriately disadvantaged. . . . They do not want this seen as a preferential exchange for ResCap bonds."). At a subsequent meeting, Melzer reiterated this concern, observing that "if the ResCap Preferred is exchanged, the IB Finance Holding Company Preferred would represent a claim on ResCap's economic interest in the mortgage division of [Ally Bank] that is structurally senior to the claim on that economic interest held by the ResCap unsecured creditors." Minutes of a Meeting of the Special Committee of the Independent Directors of the Board of Residential Capital, LLC, Mar. 25, 2008, at RC40006621 [RC40006611].

[145] Meeting of the Special Committee of the Independent Directors of Residential Capital, LLC, Mar. 24, 2008, at 2 [MELZER.008984].

[146] *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Mar. 28, 2008, at 4 [RC00017152].

view among AFI's shareholders and bondholders was that if ResCap needed additional assistance, AFI should receive something of value in return.[147]

At a meeting the next day, Jacob expressed concern about whether the transaction would provide ResCap with liquidity beyond the first quarter of 2008.[148] Jacob was told that the proposed transaction was meant to satisfy short-term TNW covenants, not to provide additional liquidity.[149] Skadden, as special legal counsel to ResCap, advised that the likely result of a breach of ResCap's TNW covenants would be bankruptcy and "in the absence of prior reorganization planning, it would create a terrible outcome for all constituencies, including the Company, its shareholder and the public bondholders."[150] Conversely, approving the exchange would "buy the Company time to negotiate successfully the restructuring of the bank facilities and to complete planned asset sales which themselves are paramount to ensuring that ResCap has sufficient liquidity required to continue its restructuring efforts . . . ."[151] Skadden informed Jacob and Melzer, who were being advised independently by Bryan Cave, that the terms of the proposed transaction were still under active negotiation and that it believed the opportunity existed to improve the terms of the transaction for ResCap.[152] One such concession that was asked for, and received, by the Independent

---

[147] *See* Minutes of a Meeting of the Special Committee of the Independent Directors of the Board of Residential Capital, LLC, Mar. 25, 2008, at RC40006621 [RC40006611] ("Mr. [James G.] Jones advised that he understands that [AFI] is under significant pressure from its shareholders and bondholders to receive more value and security in respect of future capital infusions into ResCap."); *see also* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Mar. 28, 2008, at 4 [RC00017152]; Int. of L. Hall, Nov. 29, 2012, at 157:24–158:24 ("[T]here was a view . . . in [AFI] management, that we should try to get some type of value back for these contributions. And a lot of this . . . drives all back to this operating agreement because whatever capital you put in, unlike a regular parent subsidiary relationship, that capital is never going to be able to come back to the parent . . . because of the stipulations in the operating agreement. . . . I don't know specifically who started to come up with the idea of getting back value. To me, it was a natural progression based on the number of capital contributions . . . .").

[148] Minutes of a Meeting of the Special Committee of the Independent Directors of the Board of Residential Capital, LLC, Mar. 25, 2008, at RC40006621 [RC40006611]; E-mail from J. Jones (Mar. 25, 2008) [EXAM11307284] ("The independent directors are quite concerned about the preferred exchange for the bond contribution by [AFI]. Their concerns largely fall into two categories: how much time do we buy and how much does it cost."); E-mail from J. Young (Mar. 25, 2008), at EXAM11307404 [EXAM11307403] ("Long story, but the independent directors of ResCap are unlikely to approve a preferred structure in time to close the quarter.").

[149] Minutes of a Meeting of the Special Committee of the Independent Directors of the Board of Residential Capital, LLC, Mar. 25, 2008, at RC40006621 [RC40006611].

[150] *Id.*

[151] *Id.*

[152] *Id.*

Directors was that the ResCap Preferred Interests not be convertible into IB Finance Preferred Interests if ResCap filed for bankruptcy before January 1, 2009.[153]

At ResCap's request, Morgan Stanley undertook a valuation of the bonds to be contributed by AFI.[154] Morgan Stanley apparently was chosen because it was already advising ResCap as to other potential strategic transactions,[155] and management reportedly thought that it would be difficult for another financial advisor to come up to speed in time to meet the March 31 deadline.[156] At the time, a Morgan Stanley officer named Robert Scully was also a member of the AFI Board.[157] This potential conflict was disclosed to the Independent Directors on March 20, 2008,[158] and the ResCap Board was later informed that an "ethical wall" had been established between Scully and the Morgan Stanley team working on the engagement.[159] It is unclear when this ethical wall was established, and more to the point, whether a prohibition on communications could cure the fact that the Morgan Stanley

---

[153] *Id.*; Minutes of the Meeting of the Special Committee of the Independent Directors of the Board of Residential Capital, LLC, Mar. 26, 2008, at 1 [MELZER.008984].

[154] Minutes of a Meeting of the Special Committee of the Independent Directors of the Board of Residential Capital, LLC, Mar. 24, 2008, at 3 [MELZER.008984]. It appears that Morgan Stanley was not asked to prepare a valuation of the bonds until the March 24, 2008 board meeting. *Id.* ResCap had previously engaged Morgan Stanley for other purposes. As a practical matter, there may have been few other parties with sufficient understanding of ResCap and its affiliates to provide a valuation on such short notice. *See, e.g.*, Int. of S. Khattri, Oct. 25, 2012, at 265:1–267:17.

[155] *See* Morgan Stanley Engagement Letter from D. Ammann to J. Jones (Feb. 13, 2008) [MELZER.008816].

[156] *See* Int. of S. Khattri, Oct. 25, 2012, at 265:21–25 ("[Morgan Stanley] knew [AFI] really well, because they represented GM on the sale of [AFI] to Cerberus. So, they really knew the asset well. So, the thinking was that they could come up to speed quickly and provide value.").

[157] *See* Morgan Stanley Engagement Letter from D. Ammann to J. Jones (Feb. 13, 2008), at 4 [MELZER.008816] ("Additionally, as you know, an executive office of Morgan Stanley is a member of the Board of Directors of [AFI]."); Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Mar. 28, 2008, at 3 [RC00017152].

[158] *See* Morgan Stanley Engagement Letter from D. Ammann to J. Jones (Feb. 13, 2008), at 3–4 [MELZER.008816] (attached to E-mail from T. Hamzehpour to T. Jacob and T. Melzer (Mar. 20, 2008) [MELZER.008815]).

[159] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Mar. 28, 2008, at 3 [RC00017152] ("In response to a question by Mr. Melzer, Mr. Ammann advised that an appropriate Chinese Wall had been established in respect of Mr. Scully, and that absolutely no discussions had been had between anyone on Mr. Ammann's team and Mr. Scully on the subject of this engagement.").

personnel performing the valuation knew that one of their senior officers was on the board of the other party to the transaction.[160]

While Morgan Stanley did not prepare a formal valuation or written fairness opinion,[161] its presentation concluded that "the terms and conditions of the proposed transaction are consistent with those to which parties at arm's length would agree, and is for fair value."[162] Additionally, Morgan Stanley informed the ResCap Board that the final proposal was "materially more favorable to ResCap than the initial proposal made by [AFI] within the last several days" and "better than market terms."[163] Skadden reiterated at the March 28, 2008 meeting that failing to meet ResCap's TNW covenants would be "very detrimental" to

---

[160] *Cf. Concat LP v. Unilever, PLC*, 350 F. Supp. 2d 796, 822 (N.D. Cal. 2004) (explaining that "[s]creening measures . . . do nothing to mitigate conflict[s] arising from concurrent adverse client relationships, since the purpose of the prohibition against such relationships is to preserve the attorney's duty of loyalty, not confidentiality," but also suggesting that an "informed waiver" is sufficient to cure such a conflict); *In re Trust Am. Serv. Corp.*, 175 B.R. 413, 421 (Bankr. M.D. Fla. 1994) ("A 'chinese wall' typically protects a client from the past activities and information of representation of an adverse client. The 'chinese wall' is generally not an acceptable means of conflict avoidance where the same professional organization actively represents two adverse interests."). Additionally, while Morgan Stanley advised ResCap on several subsequent affiliate transactions with AFI, the Investigation revealed no evidence that subsequent Independent Directors were informed of this conflict.

[161] *See* E-mail from T. Pohl (Mar. 27, 2008) [EXAM11234652] (explaining that Jacob and Melzer understood "the kind of presentation and recommendation [Morgan Stanley], management and [Skadden] are planning to make . . . that this type of [transaction] is not 'opinionable' in normal sense (and that there simply is not going to be one), and . . . 'will be ok with this'"). The only written product memorializing Morgan Stanley's conclusions is a presentation deck given to the ResCap Board on March 28, 2008. *See* Morgan Stanley Project Duvall Presentation, dated Mar. 28, 2008, at 5–6 [RC40007480]. Morgan Stanley's valuation methodology appears to have rested on: (1) the observed market value of the ResCap bonds to be contributed; (2) a comparison of the ResCap Preferred Interests dividend rate to existing ResCap short-term debt; and (3) a comparison of the IB Finance Preferred Interests dividend rate to other regional bank preferred interests. *See id.* at 7–10.

[162] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Mar. 28, 2008, at 4 [RC00017152]; *see also* Morgan Stanley Project Duvall Presentation, dated Mar. 28, 2008, at 7–10 [RC40007480]; Int. of S. Ramsey, Dec. 10, 2012, at 204:9–20 ("[Q:] What is your opinion . . . on whether that price of one times book value was a fair price to ResCap at that time? [A:] It could only be characterized as more than fair. . . . Because as I said, the underlying assets in terms of their market value would have to be severely discounted and questioned as to whether or not there was any true achievable economic value in the marketplace.").

[163] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Mar. 28, 2008, at 3–4 [RC00017152].

ResCap and, given ResCap's lack of bankruptcy planning,[164] could lead to a "free fall" bankruptcy.[165] Skadden and Morgan Stanley both advised that the only downside of the proposed transaction was AFI's potential preferred claim on ResCap's economic interest in the mortgage division of Ally Bank.[166] Despite this potential preferred claim, ResCap's management, financial advisors and counsel were all in agreement that the proposed transaction was fair to ResCap, its creditors and its shareholder.[167] The proposal was

---

[164] It is unclear why ResCap performed so little in the way of bankruptcy planning prior to this point, but it potentially reflected ResCap management's optimism that the business could be saved. *See* Int. of S. Khattri, Oct. 25, 2012, at 259:11–261:5 ("I think the feeling was . . . that we had a decent handle on stuff and there were enough options available that that would be unnecessary. I think the other feeling was, because everybody was already working round the clock on the current steps of what we were taking, not only would the effort on bankruptcy be a distraction, but it would . . . create issues, because people would say, 'Oh my god, these guys are planning that.' Instead, the focus was that we were planning on fixing the company. And there was a genuine belief, which, in hindsight, turned out to be misplaced, that there was a way out."); Int. of J. Jones, Nov. 30, 2012, at 126:9–127:9 ("I don't think that there was ever even a cavalier conversation about bankruptcy until maybe the end of 2007. And at that point in time, I think there tended to be more speculative conversations about, well, gee, how bad does this get or how long does it remain bad or what other things could take place or those kinds of things that there was ever even any, as I say, speculative conversation among ResCap management. . . . [T]here began to be, perhaps with the Board, a question . . . of how far can we go with this, how much can we rely on [AFI]. What I would call a[n] extended vision in terms of how we managed through this downturn. But there was [never] . . . a conversation in terms of we should file and/or we ought to get ready to file or anything else . . . . [When] I did begin to make some contingency preparations in the second quarter of '08, I did that largely on my own authority. And I did not take it to the Board.").

[165] Minutes of the Meeting of the Special Committee of the Independent Directors of the Board of Residential Capital, LLC, Mar. 26, 2008, at 3 [MELZER.008984]; Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Mar. 28, 2008, at 4 [RC00017152].

[166] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Mar. 28, 2008, at 5 [RC00017152].

[167] *Id*. at 5–6.

unanimously approved by the ResCap Board on March 28, 2008,[168] and then modified on March 31, 2008 to permit the exchange to occur in tranches.[169]

### (2) Bond Exchange

The transaction was consummated on March 31, 2008, the same day that ResCap was required to meet its TNW covenants. AFI contributed ResCap bonds with a face value of approximately $1.2 billion and an FMV of $607.192 million to ResCap.[170] In return for the bonds, ResCap provided to AFI 607,192 ResCap Preferred Interests.[171] The stated purpose of this transaction was to "increase ResCap's Consolidated [TNW] . . . which will allow ResCap to meet certain covenants in its various credit facilities"[172] and to avoid "an immediate liquidity crisis and probable bankruptcy."[173] The ResCap Preferred Interests were exchangeable, at AFI's option, on a unit-for-unit basis for IB Finance Preferred Interests at any time on or after January 1, 2009,[174] as long as neither ResCap nor any of its significant

---

[168] *Id.* (reciting that Independent Directors Jacob and Melzer "believed that they had been afforded sufficient time to review all materials provided in respect of the proposed transaction, sufficient time to consult with their legal counsel on this matter, and were informed to the extent necessary to reach a decision on the proposal").

[169] *See* Unanimous Written Consent of the Board of Directors of Residential Capital, LLC, dated Mar. 31, 2008, at 1–2 [RC00017159]; *see also* Exchange Agreement, dated Mar. 31, 2008 (attached to Residential Capital, LLC, Current Report (Form 8-K) (Apr. 4, 2008), Ex. 10.1); Int. of L. Hall, Nov. 29, 2012, at 204:16–24, ("[T]he structure was created in March. And the operating agreement at that point in time created . . . 806,000 units . . . . When we did the initial part or the first part of that trade, . . . ResCap only needed a certain amount of capital contribution, . . . so we did 600 and something units initially."); E-mail from T. Hamzehpour (Mar. 30, 2008) [EXAM11233449] ("Corey Pinkston let us know that [AFI] Board would indeed want to receive additional preferred interests of ResCap for any [supplemental] contributions. We've modified the amended and restated LLC agreements for ResCap and IB Finance Holding to contemplate that such additional contributions may be made, up to the full $1.5 billion of bonds [AFI] holds, with $1.2 billion being contributed March 31, and any remaining contributions to be made prior to May 31."); Memorandum, Written Consent of Directors, dated Mar. 31, 2008 [JACOB.000057] (explaining revisions to ResCap and IB Finance LLC agreements and attaching revised resolutions in the form of a written consent).

[170] Unanimous Written Consent of the Board of Directors of Residential Capital, LLC, dated Mar. 31, 2008, at 1 [RC00017159]. This FMV is supported by the Examiner's findings. *See* Section V.A.2.c(3).

[171] The ResCap Preferred Interests were created pursuant to a March 31, 2008 amendment and restatement of the ResCap Limited Liability Company Agreement. *See* 2008 ResCap Amended LLC Agreement [ALLY_0255882].

[172] Morgan Stanley Project Duvall Presentation, dated Mar. 28, 2008, at 4 [RC40007480].

[173] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Mar. 28, 2008, at 5 [RC00017152].

[174] It was necessary to delay this exchange until January 1, 2009 because of a new GAAP principle that went into effect on that date. Prior to January 1, 2009, the exchange would have been viewed as a "minority interest," while after January 1, 2009, the exchange would be classified as "shareholder equity." It appears that shareholder equity provided ResCap with certain capital impact benefits that a minority interest would not have. *See* Minutes of a Meeting of the Special Committee of the Independent Directors of the Board of Residential Capital, LLC, Mar. 24, 2008, at 2–3 [MELZER.008984]; Int. of D. DeBrunner, Sept. 13, 2012, at 95:15–98:12; Int. of C. Pinkston, Nov. 8, 2012, at 184:16–185:9.

subsidiaries was the subject of a bankruptcy proceeding on or before that date.[175] In the event that it was financially able to do so, ResCap retained a right to redeem the ResCap Preferred Interests and/or the IB Finance Preferred Interests at par, thereby regaining its full economic interest in Ally Bank.[176]

On May 30, 2008, the AFI Board approved an additional contribution of ResCap bonds to ResCap in the approximate face amount of $249 million and an FMV of $199.152 million.[177] Such contribution was made on June 3, 2008.[178] In exchange for the bonds, AFI received an additional 199,152 ResCap Preferred Interests, bringing AFI's total ownership of ResCap Preferred Interests to 806,344 units.[179] The value of the additional contributed bonds seems to have been set at the time of the March phase of the 2008 Bank Transaction[180] and the ResCap Board does not appear to have requested, or received, an updated valuation of the bonds.[181]

### (3) Value Of Exchange[182]

In order to assess reasonably equivalent value for the 2008 Bank Transaction, the Examiner's Financial Advisors estimated the value transferred from ResCap and the consideration received by ResCap. The value transferred from ResCap consisted of (1) the issuance of the ResCap Preferred Interests; and (2) the exchange option granted to AFI whereby it could convert the ResCap Preferred Interests into IB Finance Preferred Interests after January 1, 2009. The consideration received by ResCap in connection with the 2008 Bank Transaction consisted of (1) certain bonds contributed by AFI to ResCap; and (2) the retention of the right to redeem the IB Finance Preferred Interests at par in the event that AFI exercised its exchange option.

---

[175] Exchange Agreement, dated Mar. 31, 2008, § 1 (attached to Residential Capital, LLC, Current Report (Form 8-K) (Apr. 4, 2008), Ex. 10.1).

[176] 2008 ResCap Amended LLC Agreement, §§ 11(b)(iii), 13(a) [ALLY_0255882] (providing ResCap "may redeem the [ResCap Preferred Interests] then outstanding, in whole or in part, on any Distribution Payment Date . . . or on the date of the Preferred Exchange"); IB Finance 2008 LLC Agreement, § 2.1(b)(iii) [GOLDIN00007614]; Minutes of a Meeting of the Special Committee of the Independent Directors of the Board of Residential Capital, LLC, Mar. 24, 2008, at 3 [MELZER.008984]; Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Mar. 28, 2008, at 3 [RC00017152]. This option was never exercised by ResCap, presumably because it did not thereafter have the financial ability to do so.

[177] Minutes of a Special Meeting of the Board of GMAC LLC, May 30, 2008, at ALLY_PEO_0001082 [ALLY_PEO_0001009]; *accord* Residential Capital, LLC, Current Report (Form 8-K) (June 9, 2008), Item 3.02. The Examiner concludes that this contribution may have actually been worth as much as $249 million, as discussed in Section V.A.2.c(3).

[178] Residential Capital, LLC, Current Report (Form 8-K) (June 9, 2008), Item 3.02.

[179] *Id.*

[180] *See* 2008 ResCap Amended LLC Agreement, § 10, Sched. B [ALLY_0255882] (providing that for purposes of determining the value of additional capital contributions, the existing indebtedness shall have the value set forth on Schedule B).

[181] *See* Minutes of a Meeting of the Board of Residential Capital, LLC, June 1, 2008, at RC40005749–50 [RC40005652]; Residential Capital, LLC, Current Report (Form 8-K) (June 9, 2008), Item 3.02 (disclosing FMV of the bonds as of March 31, 2008).

[182] This Section provides a summary of the more detailed analysis contained in Section V.A.2.c.

In light of the Examiner's conclusion that ResCap was insolvent at the time of the 2008 Bank Transaction, the Examiner concludes that the ResCap Preferred Interests had no value at such time. The real value transferred to AFI in connection with these transactions was the right to exchange the ResCap Preferred Interests for IB Finance Preferred Interests. The Examiner's Financial Advisors estimated the value of the IB Finance Preferred Interests using a capitalization of annual dividends approach, with capitalization rates determined by benchmark preferred yields. The Examiner's Financial Advisors determined the value of the IB Finance Preferred Interests as of the date of their expected conversion, January 1, 2009, and then discounted this value to the time of each phase of the 2008 Bank Transaction, March and June 2008. This discount reflects the time value of money and the probability that ResCap would file for bankruptcy before January 2009, thus nullifying AFI's exchange rights. The Examiner's Financial Advisors used the yield-to-maturity on ResCap's short-term notes to quantify this last adjustment. Based upon the above approach, the Examiner's Financial Advisors estimate the value of the right to exchange the ResCap Preferred Interests into IB Finance Preferred Interests to be between approximately $403–504 million for the March phase of the 2008 Bank Transaction and between $168–210 million for the June phase of the 2008 Bank Transaction (see Appendix V.A.2.c).

The Examiner's Financial Advisors estimated the value of the bonds contributed by AFI to ResCap by referencing available price quotations proximate to the time of the transactions, plus accrued interest. The estimate of the value of these contributions is approximately $595 million for the March phase of the 2008 Bank Transaction and $246 million for the June phase of the 2008 Bank Transaction.

Thus, the Examiner concludes that the consideration received by ResCap was greater than the value transferred from ResCap in connection with the 2008 Bank Transaction. A more detailed analysis of these valuations is contained in Section V.A.2.c. Additionally, a summary of these findings is presented in Appendix V.A.2.c.

### *(4) Causes Of Action Implicated By The 2008 Bank Transaction*

The Examiner believes that the only causes of action potentially implicated by the 2008 Bank Transaction would be avoidance actions. An analysis of these claims is provided in Section VII.F.

### *c. The 2009 Bank Transaction*

The final stage of the Ally Bank Transactions occurred in January 2009. At this time, the capital structure of IB Finance was as follows:

- ResCap owned two million IB Finance Class M Shares, representing a non-voting interest in IB Finance and an economic interest in the mortgage division of Ally Bank; and

- AFI owned (1) two million IB Finance Class A Shares, representing all of the voting interest in IB Finance and an economic interest in the automotive division of Ally Bank; and (2) 806,344 units of ResCap Preferred Interests, which were exchangeable at AFI's option into IB Finance Preferred Interests.[183]

While ResCap's remaining interest in IB Finance was considered as a possible source of liquidity only a few months after the 2008 Bank Transaction, the Investigation revealed no evidence to suggest that the 2009 Bank Transaction was contemplated at the time of the 2008 Bank Transaction.

### (1) Early Consideration Of An IB Finance/Ally Bank Sale

As discussed in Section III.H.4, the period of August 2008 through January 2009 was a tumultuous one for financial markets in the United States and the rest of the world. Broad market dislocations presented growing challenges to both AFI and ResCap, though both companies managed to weather the storm, in part, because of AFI's decision to seek bank holding company status and its successful application for TARP funds.[184] Before receiving access to TARP funds, however, AFI and ResCap explored several potential transactions whereby AFI would acquire certain "core" and "non-core" assets of ResCap.[185] All the while, AFI and Cerberus management remained aware of the challenges that such transactions would present for ResCap's creditors.[186] Additionally, it had become clear to Cerberus and AFI management just how interdependent AFI and ResCap had become.[187] There was a growing concern that "[a]ny actions taken to divorce ResCap from [AFI] during this period would have resulted in [AFI's] bank lines either being pulled or not renewed and the probable [loss] of the Bank to the FDIC."[188] Further, some thought "ResCap was one of the significant reasons that the Fed and FDIC [ultimately] decided to support [AFI] in becoming a [bank holding company]."[189]

In September 2008, the ResCap Board began considering several initiatives that would further ease ResCap's ongoing liquidity and TNW difficulties, including a potential sale of

---

[183] If exchanged, the IB Finance Preferred Interests would reduce ResCap's IB Finance Class M Shares on a unit-for-unit basis.

[184] *See* Section III.H.6.

[185] *See, e.g.,* ResCap Capital Requirement Analysis: Core Business, prepared by UBS, dated Nov. 2008 [EXAM10159892]; ResCap Capital Requirement Analysis: Core Business and Bank Managerial, prepared by UBS, dated Nov. 2008 [EXAM10159894]; UBS Good Bank/Bank Bank Considerations, dated Dec. 2008 [UBS-RESCAP-0000001].

[186] *See, e.g*., E-mail from L. Tessler to A. De Molina (Aug. 9, 2008) [CCM00121378] ("We can't hollow out all of ResCap or we are going to have a problem with Bonds but I am sure we can figure out something that works.").

[187] *See, e.g*., Strategy Discussion, GMAC Board of Directors Meeting, May 15, 2008, at ALLY_0259428 [ALLY_0259388] (explaining that "ResCap's non-voting interest in [Ally] Bank would be part of the bankruptcy estate").

[188] E-mail from L. Tessler to M. Carpenter (Dec. 3, 2009) [CCM00065540].

[189] *Id*.

ResCap's remaining interest in IB Finance.[190] AFI and ResCap management initially considered three transaction structures, all with a scheduled close of September 30, 2008: (1) a cash purchase by AFI of 100% of ResCap's interest in IB Finance; (2) a partial purchase by AFI of ResCap's interest in IB Finance in exchange for debt forgiveness; and (3) debt forgiveness by AFI, which would be earmarked toward AFI's future purchase of ResCap's interest in IB Finance.[191] The Independent Directors at the time, Edward Smith and Karin Hirtler-Garvey, retained Goldin Associates to act as their financial advisor with respect to the potential transactions.[192]

On September 23, 2008, Lazard, acting as ResCap's financial advisor, advised the ResCap Board that "ResCap's balance sheet and current liquidity situation place it within the zone of insolvency and . . . the best course of action for the Directors is to act as if the company were insolvent and consider the best interest of all its creditors."[193] A joint presentation prepared by Skadden and Lazard further advised that the sale of ResCap's remaining interest in IB Finance would not, in and of itself, be sufficient to resolve ResCap's liquidity issues, and therefore the ResCap Board should contemplate additional initiatives.[194] The presentation also advised that "[i]n the event that ResCap believes that the asset sales referenced are unlikely to be realized or to deliver the estimated proceeds, [ResCap] should consider whether a bankruptcy filing would afford an opportunity both to preserve value and to maximize liquidity."[195] During this presentation, ResCap management expressed its hope that a sale of ResCap's interest in IB Finance would provide a "runway" to prevent further deterioration of ResCap's net worth.[196]

On September 25, 2008, the Independent Directors considered a purchase offer by AFI for 100% of ResCap's interest in IB Finance, as well as a counter offer proposed by ResCap's

---

[190] Minutes of a Regular Meeting of the Board of Residential Capital, LLC, Sept. 12, 2008, at RC40005864–65 [RC40005652]; Minutes of a Special Meeting of the Board of Residential Capital, LLC, Sept. 17, 2008, at RC40005868–69 [RC40005652]; *see also* AFI Board Structural Initiatives and Strategic Discussion, dated Aug. 21, 2008, at ALLY_PEO_0003605 [ALLY_PEO_0003591] ("Bank Strategy: Reviewing option to purchase ResCap's remaining equity interest in [Ally] Bank and Broker-Dealer").

[191] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Sept. 19, 2008, at RC40005870 [RC40005652]. While all of these structures contemplated a closing date of September 30, 2008, it was acknowledged in the board minutes that it would be a challenge to obtain the required third-party fairness opinion and valuation in such a short timeframe. *See id.* at RC40005870–71.

[192] Minutes of Meeting of the Independent Directors of the Board of Directors of Residential Capital, LLC, Sept. 22, 2008, at RC40006643 [RC40006611]; *see also* Engagement Letter from Goldin Associates to the Special Committee of the Board of Directors of ResCap (Sept. 23, 2008) [GOLDIN00072892].

[193] Minutes of an Executive Session of a ResCap Board Meeting, Sept. 23, 2008, at 1 [RC40006865].

[194] Skadden and Lazard Project Scout Presentation, dated Sept. 2008, at 8–9 [RC00018721].

[195] *Id*. at 8. The Skadden and Lazard presentation also contained several pages of "Preliminary Observations on Bankruptcy Strategy." *See id*. at 11–23.

[196] Minutes of an Executive Session of a ResCap Board Meeting, Sept. 23, 2008, at 1 [RC40006865].

management.[197] Following a discussion of the various term sheets, the Independent Directors "concluded that [AFI's] offer and the proposed counter offer as outlined . . . would not provide [ResCap] with sufficient liquidity for a significant period of time."[198] ResCap's management offered to revise the counter offer and present the revisions to the Independent Directors at a later date.[199] The Independent Directors subsequently requested that the counter offer seek to eliminate AFI's option to convert the ResCap Preferred Interests into IB Finance Preferred Interests.[200]

The AFI Board was determined to support ResCap at this time, in part, because of its concern that a ResCap bankruptcy could derail AFI's then pending application for bank holding company status.[201] Such a result would have undermined AFI's effort to obtain access to the FRB window and receive TARP funds, which were critical to AFI's own survival.[202]

---

[197] Minutes of a Telephonic Meeting of the Independent Committee of the Board of Directors of Residential Capital, LLC, Sept. 25, 2008, at RC40006678–83 [RC40006611] (providing that the proposed consideration would consist of mostly debt forgiveness plus $400 million cash). ResCap's counter offer proposed that, for an additional $100 million in cash and approximately $820 million in debt forgiveness, ResCap would also transfer to AFI the GMAC Mortgage servicing platform, the ditech and direct origination channels and its Charlotte FHA call center. *See id.* at RC40006682–83 [RC40006611]; Acquisition Term Sheet, Draft [EXAM10090723] (attached to E-mail from J. Young (Sept. 24, 2008) [EXAM10090721]).

[198] Minutes of a Telephonic Meeting of the Independent Committee of the Board of Directors of Residential Capital, LLC, Sept. 25, 2008, at RC40006678 [RC40006611].

[199] *Id.*

[200] Minutes of a Meeting of the Special Committee of the Board of Residential Capital, LLC, Sept. 27, 2008, at RC40006685 [RC40006611].

[201] Minutes of a Special Meeting of the Board of GMAC LLC, Sept. 29, 2008, at ALLY_PEO_0001283 [ALLY_PEO_0001009] ("Mr. Ramsey discussed the potential consequences of failure to approve the [equity injection into ResCap], and the risks to [AFI] of a bankruptcy filing by ResCap."); Int. of M. Neporent, Feb. 6, 2013, at 154:5–155:6 ("[W]e were talking about what the risks were to [AFI] if we were not to support ResCap, or if ResCap couldn't support itself. We were in the process of the bank holding company license. . . . [A]gain, the capital markets were a mess. I think by this time, Fannie and Freddie had been nationalized. And we were concerned that if ResCap went down, that could, from the [AFI] perspective, have an adverse effect on our application to become a bank holding company, because we'd be effectively putting four million homeowners—four million mortgages—out into the market, where there wasn't enough servicing capacity in the market to take them up. . . . We thought we'd have been looked at very cross-eyed by the regulators if we were to have allowed that to happen."); Int. of L. Tessler, Feb. 28, 2013, at 94:5–14 ("[H]istorically, there had never been a circumstance where a bank holding company had its subsidiary file for bankruptcy. And there was expressed concern provided to the [AFI] board as part of its application process from its legal advisors . . . that if we had a subsidiary file for bank holding . . . the likelihood of us getting our license was very low.").

[202] Int. of M. Neporent, Feb. 6, 2013, at 145:10–146:1 ("Well, it's pretty simple. Now we're in the fall of 2008. The financial crisis is in full swing. Capital markets are in total disarray. There are hundreds and hundreds of . . . non-depository institutions . . . that were falling off the cliff because they couldn't get access to the securitization markets. To the extent that you're originating an asset and then you have no place to offload it, you're going to run out of gas pretty quickly. And by having the bank holding company license, we'd have access to the Fed window for TARP . . . . And you'd have the support of a deposit-based funding source, as opposed to a wholesale-funded funding source.").

Additionally, AFI Board materials from this time indicate that the AFI Board was concerned that a ResCap bankruptcy filing would interfere with AFI's future ownership of Ally Bank by allowing another purchaser to acquire ResCap's shares of IB Finance in a bankruptcy auction, or by giving the FDIC cause to seize Ally Bank.[203]

ResCap and AFI were unable to agree on and finalize a satisfactory transaction involving IB Finance by September 30, 2008. Accordingly, on that day, the AFI Board passed a resolution providing ResCap with up to $400 million in debt forgiveness to satisfy ResCap's TNW covenants.[204] The AFI Board materials describing this transaction conclude that "[b]ecause the capital contribution is structured as debt forgiveness, and because ResCap is not currently in a position to repay these obligations, there is no near-term impact on cash at the [AFI] level."[205] Additionally, it was noted that "in the event there is a subsequent transaction whereby [AFI] purchases ResCap's stake in [Ally] Bank, it is intended that the amount of the contribution would be deemed to be part of the consideration for such a purchase."[206]

Despite the $400 million debt forgiveness by AFI, ResCap's liquidity remained a concern and the ResCap Board continued to consider a sale of ResCap's interest in IB Finance as a way to "extend the Company's cash runway" through December 2008 or February/March 2009.[207] However, on October 16, 2008, Thomas Marano informed the ResCap Board that AFI was no longer considering a purchase of ResCap's interest in IB Finance, and was instead exploring other initiatives, such as a potential securitization transaction in Europe or a

---

[203] *See* Minutes of a Special Meeting of the Board of GMAC LLC, Sept. 29, 2008, at ALLY_PEO_0001283 [ALLY_PEO_0001009] ("Discussion by the [AFI] Board focused on valuation of the non-voting interest held by ResCap; feasibility of completing the [Ally] Bank transaction in the event of a bankruptcy filing by ResCap and implications of such a filing on [AFI]."); Agenda and Supporting Materials, GMAC Board of Directors Meeting, Sept. 30, 2008, at ALLY_PEO_0003722 [ALLY_PEO_0003715]; *see also* Int. of S. Ramsey, Dec. 10, 2012, at 157:24–158:4 ("The joint ownership of the bank could've been very disruptive with the regulators. If there was a single ownership of the bank by [AFI] when a [ResCap bankruptcy] occurred, if it was to occur, it would be less risk. It was that simple."); Int. of L. Tessler, Feb. 28, 2013, at 93:19–94:4 ("[Q:] Why was there specific focus on the bank and the need to try to preserve your ownership interest in the bank in the event of a ResCap bankruptcy? [A:] Well, I mean, again, I don't have specific recollection of this particular board meeting. What I do know is as part of a critical element of the application to become a bank holding company was we had to have our deposit-taking institution there in order to achieve such status.").

[204] Minutes of a Special Meeting of the Board of GMAC LLC, Sept. 30, 2008, at ALLY_PEO_0001288–90 [ALLY_PEO_0001009]; Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 1, 2008, at 1–2 [RC00017309].

[205] Agenda and Supporting Materials, GMAC Board of Directors Meeting, Sept. 30, 2008, at ALLY_PEO_0003720 [ALLY_PEO_0003715].

[206] *Id.* at ALLY_PEO_0003721; *see also* Letter from R. Hull to T. Marano (Sep. 30, 2008) [ALLY_0141114].

[207] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 8, 2008, at 2 [RC00017311].

forgiveness of bond or MSR debt.[208] AFI's decision to walk away from the potential purchase of IB Finance at this time appears to have been driven, at least in part, by its own economic difficulties[209] as well as concerns over fraudulent transfer liability in the event of a ResCap bankruptcy filing.[210]

### *(2) Subsequent Consideration Of An IB Finance/Ally Bank Sale*

In December 2008, the ResCap Board once again began considering a sale of ResCap's interest in IB Finance, this time in connection with AFI's conversion to a bank holding company and subsequent access to TARP funds.[211] In preparation for a potential sale, the ResCap Board asked that an independent third-party commence a valuation of IB Finance.[212] Additionally, the Independent Directors requested that AFI delay the effectiveness of its option to convert the ResCap Preferred Interests into IB Finance Preferred Interests until February 28, 2009.[213] AFI's management supported this request and the AFI Board seemingly consented as well.[214]

On December 24, 2008, the FRB approved AFI's application to become a bank holding company.[215] Four days later, the AFI Board approved another capital contribution to ResCap

---

[208] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 16, 2008, at 1 [RC00017316].

[209] *See, e.g*., E-mail from T. Marano (Oct. 30, 2008) [CCM00199669] ("I have been offered limited shorter term support from our parent [AFI]. I have yet to receive longer term support as they themselves are challenged.").

[210] *See* Minutes of a Special Meeting of the Board of GMAC LLC, Sept. 30, 2008, at ALLY_PEO_0001287–88 [ALLY_PEO_0001009] ("Mr. Ramsey presented materials that . . . provided an overview of the risks to [AFI] in the event of a ResCap bankruptcy filing. . . . Management and the advisors in attendance at the meeting responded to questions raised regarding the disposition of [Ally] Bank; the impact on [AFI's] 11:1 leverage ratio covenant; and matters associated with preference and fraudulent transfers."); Agenda and Supporting Materials, GMAC Board of Directors Meeting, Sept. 30, 2008, at ALLY_PEO_0003722–24 [ALLY_PEO_0003715]; *see also* Int. of M. Neporent, Feb. 6, 2013, at 173:24–174:10.

[211] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Dec. 21, 2008, at 2 [RC00017375].

[212] *Id*.

[213] Minutes of a Special Meeting of the Board of GMAC LLC, Dec. 19, 2008, at ALLY_PEO_0001371 [ALLY_PEO_0001009] (indicating that the ResCap Board was "concerned that the potential transfer of value out of ResCap associated with the exercise will raise concerns with ResCap bondholders"); *see also* Letter from R. Hull to ResCap and IB Finance (Dec. 30, 2008) [EXAM12047807] (agreeing that the effective date of the Exchange Agreement shall not occur prior to February 28, 2009).

[214] Minutes of a Special Meeting of the Board of GMAC LLC, Dec. 19, 2008, at ALLY_PEO_0001372 [ALLY_PEO_0001009] (after discussion of this topic, AFI's general counsel, Bill Solomon, "affirmed that formal approval of the extension of the exercise date is not required by the [AFI] Board"). AFI's consent to this delayed conversion was later revoked on January 23, 2009. *See* Exchange Notice, dated Jan. 23, 2009, at ALLY_0031220 [ALLY_0031012].

[215] Order Approving Formation of Bank Holding Companies and Notice to Engage in Certain Nonbanking Activities, Federal Reserve Board of Governors (Dec. 24, 2008) [EXAM10278872]; *see also* Section III.H.6 (for a discussion of AFI's application for bank holding company status).

in the form of debt forgiveness.[216] In a "non-binding" letter, dated December 31, 2008, AFI stated that if it subsequently purchased ResCap's interest in IB Finance, AFI intended to treat the December 2008 debt forgiveness as a portion of the consideration paid for ResCap's interest in IB Finance.[217] It appears that ResCap management agreed to this proposal, in part, because of the fact that it did not obligate ResCap to sell the tracking stock to AFI.[218] Despite this letter, it appears that no such pre-sale contributions were ultimately treated as consideration for the sale of the remaining IB Finance Class M Shares.[219]

---

[216] Minutes of a Special Meeting of the Board of GMAC LLC, Dec. 28, 2008, at ALLY_PEO_0001378–79 [ALLY_PEO_0001009]; Minutes of a Special Meeting of the Board of Residential Capital, LLC, Dec. 29, 2008, at 1–2 [RC00017379]; *see also* E-mail from A. Rutter (Nov. 15, 2008) [GSResCap0000198483] ("[AFI] will continue to support ResCap because management has received indications from the government that BHC and TARP are no-go if ResCap files for bankruptcy.").

[217] Letter from R. Hull to T. Marano (Dec. 31, 2008) [ALLY_0141115]; *see also* Minutes of a Special Meeting of the Board of Residential Capital, LLC, Dec. 29, 2008, at 1–2 [RC00017379]. A similar letter had been sent by AFI on September 30, 2008, with respect to a previous capital contribution. *See* Letter from R. Hull to T. Marano (Sept. 30, 2008) [ALLY_0141114].

[218] *See* E-mail from T. Marano (Dec. 30, 2008) [EXAM10289305].

[219] *See* Goldin Associates Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital, LLC Regarding the GMAC Bank Transaction with GMAC, LLC, dated Jan. 22, 2009, at 8 [GOLDIN00129860] (listing as consideration only the $830.5 million in second lien notes and the extension of maturity on a $430 million secured credit facility); Memorandum, GMAC Bank Sale & Deconsolidation, dated Feb. 3, 2009, at 3 [EXAM00220301] (same); Memorandum, Accounting Impact, dated Jan. 13, 2009, at 5 [EXAM12047802] (providing that consideration for the bank sale would be "principally in the form of debt forgiveness from [AFI] to ResCap in January, rather than consideration in the form of past capital contributions"); Int. of T. Rowe, Dec. 7, 2012, at 185:9–186:21 ("To bridge the gap between ResCap's need to survive and [those who] felt like there should be consideration for the support that was being given . . . we created this type of language and I believe there was a letter signed by Tom Marano that said we hereby agree you're giving us a capital contribution and it needs to be a capital contribution because capital is what's required to be in our covenant and therefore it can't be contingent or recoverable or anything else so that it gets the right accounting treatment and we survive. However we'll give you credit for it in the future when we get around to doing the [IB Finance] trade. . . . Honestly it's a construct meant to keep people happy. Tom gets the capital that he needs. It's real capital. It's not contingent upon anything else. He signs a commitment saying we promise to give you credit . . . optically to certain members of the [AFI] board they felt this was valuable and it gave them more comfort in supporting the transaction."). *But see* ResCap Support and IB Finance Transaction Presentation, prepared by GMAC, dated Jan. 30, 2009, at ALLY_PEO_0002114–15 [ALLY_PEO_0002000] (describing the consideration for this transaction as: (1) previous debt forgiveness from September 30, 3008 and December 31, 2008 in the amount of approximately $423 million; and (2) current debt forgiveness of approximately $570 million); E-mail from T. Hamzehpour (Dec. 30, 2008) [EXAM10281879] ("[T]he debt forgiveness granted in September has now been added as a credit toward the purchase price, in addition to the forgiveness [AFI] will provide on December 31."). While there is some conflicting communications about whether the September 2008 and December 2008 debt forgiveness was credited toward the sale of IB Finance, the issue is ultimately irrelevant because, as discussed in Section V.A.2.d, the Examiner concludes that ResCap received well in excess of reasonably equivalent value for the transfer of its remaining interest in IB Finance.

On January 23, 2009, the ResCap Board received presentations on the potential IB Finance sale from both UBS and ResCap management.[220] UBS discussed a strategy to market ResCap's IB Finance Class M Shares for a sixty-day period following the closing, on the same or better terms as contained in the proposed agreement with AFI.[221] This sixty-day marketing period, which was eventually incorporated into the sale agreement, provided AFI with a right to match any third-party buyer offering more than what AFI had paid.[222] In the event that a third party offered a higher purchase price, the sale agreement provided that the third party would acquire the assets from AFI and AFI would remit the excess purchase price to ResCap.[223] In connection with this effort, UBS "remarked on possible challenges in successfully marketing the non-voting interest in IB Finance to a third party."[224] It is not clear whether AFI's right to match any third party offers presented an additional challenge to the marketing efforts.[225] It should be noted that had ResCap been successful in selling its IB Finance Class M Shares to a third party before entering into the sale agreement with AFI,

---

[220] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Jan. 23, 2009, at 1–2 [RC00021108]. It appears that UBS was asked to undertake this evaluation approximately three weeks earlier. *See* Memorandum, UBS Call re GMAC Bank, dated Jan. 7, 2009 [GOLDIN00090358] ("UBS . . . was just getting started and had been on the job for less than 24 hours."); *see also* E-mail from T. Marano (Jan. 5, 2009) [UBS-RESCAP-0036534] ("In order to fulfill [Marano's] fiduciary responsibility and that of my [Independent Directors], we would like [UBS] to work on selling [the bank stock].").

[221] GMAC Bank Transaction Term Sheet, Draft, dated Jan. 23, 2009 [RC40011078]; Minutes of a Special Meeting of the Board of Residential Capital, LLC, Jan. 23, 2009, at 1–2 [RC00021108] ("Mr. Benett joined the discussion and discussed plans to solicit a series of potential third party investors who had been previously contacted to determine possible interest in acquiring the Class M shares. Mr. Marano noted that he had discussed the solicitation of potential third party investors with [AFI] management. . . . Mr. Van Der Knaap said Berkshire Hathaway will be among the parties contacted."). In his interview, Benett of UBS suggested that there was no practical difference between the pre-closing and post-closing marketing efforts. *See* Int. of H. Benett, Mar. 7, 2013, at 89:13–20.

[222] *See* Membership Interest Purchase Agreement, dated Jan. 30, 2009, § 5.4 [ALLY_0031012] (providing that a third party had to offer more than the purchase price of $608.5 million, either in cash, FMV of ResCap notes, or some combination of the two); Int. of L. Hall, Nov. 29, 2012, at 240:20–241:13, 265:15–19 ("I think Corey [Pinkston] and I were pretty big proponents of the after-marketing period that ResCap would have available to it. . . . It was just an added layer of ensuring fair value and third-party-type transaction and just making sure it was compliant with indentures. . . . We wanted to ensure ResCap got the best value for their assets, and if we needed to pay more for [IB Finance], so be it. I think it was just an extra check-the-box to make sure that it was a fair transaction.").

[223] *See* Membership Interest Purchase Agreement, dated Jan. 30, 2009, § 5.4 [ALLY_0031012].

[224] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Jan. 23, 2009, at 1 [RC00021108]. This statement echoed earlier concerns of AFI itself, as expressed at the September 30, 2008 AFI Board Meeting. *See* Agenda and Supporting Materials, GMAC Board of Directors Meeting, Sept. 30, 2008, at ALLY_PEO_0003724 [ALLY_PEO_0003715] ("Because of a number of factors, including . . . the non-voting nature of ResCap's ownership, valuation of the bank is somewhat subjective and exposes [AFI] to purchase price litigation.").

[225] As a general matter, Benett of UBS suggested in his interview that the post-closing marketing period likely would present additional challenges. *See* Int. of H. Benett, Mar. 7, 2013, at 90:2–8 ("[P]eople's interest[ ] typically goes way down after a deal's already been struck. So, the likelihood of . . . breaking up a deal that's already been set up and agreed to is very low. Not specific to this case, just general market knowledge.").

AFI would not have had any consent or approval right over the third-party buyer under the IB Finance 2008 LLC Agreement.[226] Also on January 23, 2009, ResCap received an "Exchange Notice" from AFI revoking its offer not to exchange the ResCap Preferred Interests before February 28, 2009 and informing ResCap that AFI intended to convert such interests as of January 30, 2009.[227]

On January 26, 2009, the Independent Directors received a limited fairness opinion on the proposed transaction from Goldin Associates.[228] The fairness opinion was limited in that it did not provide an explicit valuation of ResCap's interest in IB Finance and expressed no opinion with respect to "the consideration that could actually be received by [ResCap] in an open market sale of the Interests," or "whether any alternative transaction might produce [greater] consideration for [ResCap] . . . ."[229] A supplemental fairness letter was delivered by Goldin Associates on January 30, 2009, confirming its opinion as to the fairness of the consideration as of that date (subject to the same limited terms).[230] Given the express limitations of the opinion, it seems to provide little real comfort as to the fairness of the transaction.

Nonetheless, a majority of the ResCap Board approved the 2009 Bank Transaction on January 30, 2009, though it does not appear that a formal board meeting was held.[231] The ResCap Board resolutions from that day recite that the Independent Directors "reviewed and considered the fairness opinion of Goldin Associates" and that the transaction is fair from a financial point of view and "not materially less favorable to [ResCap] than those that could reasonably have been obtained in a comparable arm's length transaction . . . ," despite Goldin Associates' express refusal to opine on what consideration could be obtained in an open market transaction.[232]

### (3) Conversion And Sale

On January 30, 2009, AFI exercised its option to exchange its ResCap Preferred Interests into the same number of IB Finance Preferred Interests. Upon conversion of ResCap Preferred Interests into IB Finance Preferred Interests, the IB Finance Class M Shares held by ResCap were reduced on a unit-for-unit basis with the ResCap Preferred Interests exchanged.[233]

---

[226] IB Finance 2008 LLC Agreement, §§ 2.3, 8.5 [GOLDIN00007614].

[227] *See* Exchange Notice, dated Jan. 23, 2009, ALLY_0031220 [ALLY_0031012].

[228] *See* January 26 Goldin Letter, at 1 [RC00027940].

[229] *Id*. at 3–4. *But see* Int. of E. Smith, Nov. 30, 2012, at 182:20–24 ("I thought that, by [Goldin] saying that the transaction was fair to ResCap and its creditors, that they were saying that it was at least in the range of what anybody else would pay.").

[230] *See* January 30 Goldin Letter [RC00027949].

[231] Action by Written Consent of the Board of Directors of Residential Capital, LLC, dated Jan. 30, 2009, at RC00021956–63 [RC00021956] (Resolutions of the Board of Directors of Residential Capital, LLC).

[232] *Id*. at RC00021963–64 (Resolutions of the Board of Directors of Residential Capital, LLC).

[233] IB Finance 2008 LLC Agreement, § 2.6 [GOLDIN00007614].

Accordingly, the exchange of 806,344 ResCap Preferred Interests for IB Finance Preferred Interests reduced ResCap's two million IB Finance Class M Shares by 806,344, leaving ResCap with 1,193,656 IB Finance Class M Shares.

Immediately following the exchange of ResCap Preferred Interests, ResCap sold its remaining 1,193,656 IB Finance Class M Shares to AFI.[234] As consideration for the IB Finance Class M Shares, AFI contributed to ResCap Senior Secured Notes of ResCap's that AFI had previously acquired in a December 2008 exchange offer.[235] ResCap's and AFI's professionals determined at the time that these notes had a face amount of approximately $830.5 million and a market value of approximately $608,522,330.63.[236] Following this transfer, AFI directly owned all of the equity interest in IB Finance and thus, indirectly, all of the equity interest in Ally Bank.[237] Simultaneously with the 2009 Bank Transaction described above, AFI provided a sixty-day extension of the maturity date of the Initial Line of Credit Facility, a short-term $430 million revolving credit facility with AFI as lender to two of ResCap's indirect subsidiaries.[238]

On March 23, 2009, UBS reported to the ResCap Board that "no serious interest to acquire the tracking stock was expressed from the hedge funds and private equity firms that were solicited."[239] Although UBS suggested in its solicitations to third parties that the

---

[234] Membership Interest Purchase Agreement, dated Jan. 30, 2009, at 1–2 [ALLY_0031012].

[235] Residential Capital, LLC, Current Report (Form 8-K) (Feb. 3, 2009), Item 1.01, at 1; *see also* Certificate of Forgiveness of Indebtedness of Residential Capital, LLC, dated Jan. 30, 2009 [ALLY_0031012].

[236] The market value of this transaction was determined based on the average of two price quotations obtained by ResCap and AFI from independent broker-dealers. *See* E-mail from E. Graber (Jan. 29, 2009) [GOLDIN00133022] (providing that prior to Goldin Associates releasing its opinion, Goldin Associates "would like to know the price for the bonds that results from . . . UBS and Goldman Sachs [obtaining] midpoints for the bid/ask quotes for the bonds"); Valuation Methods for Debt Forgiveness [UBS-RESCAP-0063993] (attached to E-mail from M. Monson (Jan. 28, 2009) [UBS-RESCAP-0063992]); E-mail from Goldman Sachs (Jan. 30, 2009) [GSResCap0000241578]; E-mail from B. Conway (Jan. 29, 2009) [CCM00651618] (providing information as to valuation). ResCap later extinguished the $830.5 million face amount of the Second Lien Notes.

[237] AFI's ownership was as follows 2,000,000 IB Finance Class A Shares, 806,344 IB Finance Class M Preferred Shares, and 1,193,656 IB Finance Class M Shares.

[238] *See* Membership Interest Purchase Agreement, dated Jan. 30, 2009, at 1 [ALLY_0031012]. An early term sheet listed this extension as part of the consideration that ResCap would receive for its IB Finance Class M Shares, but the extension was referred to merely as a "Simultaneous Transaction" in subsequent term sheets and excluded as consideration from the final purchase agreement. *See* Draft GMAC Bank Transaction Term Sheet, dated Jan. 13, 2009, at 1 [GOLDIN00126222]; Draft GMAC Bank Transaction Term Sheet, dated Jan. 23, 2009, at RC40011107 [RC40011078]; Membership Interest Purchase Agreement, dated Jan. 30, 2009, § 2.2 [ALLY_0031012]. For additional information on the Initial Line of Credit Facility, *see* Section V.E.5.

[239] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Mar. 23, 2009, at RC40006091–92 [RC40005949]; *see also* E-mail from H. Benett (Jan. 27, 2009) [UBS-RESCAP-0064068] (indicating that UBS contacted several hedge funds and investment firms including CVC, Blackstone, and Warburg Pincus, among others); Letter from UBS to T. Marano [EXAM00220064]; Int. of H. Benett, Mar. 7, 2013, at 23:10–22 ("We made a series of phone calls. Interest came back as zero.").

structure of the security could be altered to add voting rights,[240] it seems that the non-voting aspect of ResCap's interest represented a substantial barrier to marketability.[241]

### (4) Value Of Exchange[242]

In order to assess reasonably equivalent value for the 2009 Bank Transaction, the Examiner's Financial Advisors estimated the value transferred from ResCap as well as the consideration received by ResCap. The value transferred from ResCap consisted of (1) ResCap's remaining IB Finance Class M Shares; and (2) the right to redeem the IB Finance Preferred Interests at redemption value. The consideration received by ResCap consisted of certain bonds contributed by AFI.

To value the remaining IB Finance Class M Shares, the Examiner's Financial Advisors valued the total equity of the Mortgage Bank (before deducting the value of the IB Finance Preferred Interests) giving consideration to three traditional and commonly used approaches to estimating FMV: (1) the Market Approach, using public stock prices for comparable institutions; (2) the Income Approach; and (3) the Asset-Based Approach. From the total equity value of the Mortgage Bank, the Examiner's Financial Advisors then subtracted their estimate of the value of the IB Finance Preferred Interests, calculated based on a capitalization of annual dividends approach, with capitalization rates determined by benchmark preferred yields. The Examiner's Financial Advisors made further adjustments to value to reflect the tracking stock nature of the interests as well as the form of ownership (including lack of marketability, lack of control, and lack of voting rights). The Examiner concludes that in January 2009, the value of ResCap's remaining IB Finance Class M Shares was approximately between $107–218 million. The Examiner attributed no material value to the right to redeem

---

[240] Draft UBS GMAC Bank Tracking Stock Overview Presentation, dated Jan. 2009, at 3 [UBS-RESCAP-0064039] ("This security may not have the precise terms to make it an attractive investment, however there may be flexibility to amend the terms if this entity is attractive to an investor: add voting rights; restructure profit rights (e.g., share in profits of entire bank)."); Int. of H. Benett, Mar. 7, 2013, at 86:15–87:20 ("[Q:] Do you recall conversations about changing the interest? [A:] No . . . these would've simply been discussion points, particularly for members of the company. . . . when you have a nonvoting stock, the easiest option to consider would be putting voting rights on a nonvoting stock.").

[241] Int. of T. Marano, Nov. 26, 2012, at 38:9–39:11 ("The challenge with this transaction was that you were actually not buying into a whole bank. You were selling a 51% interest with non-voting shares in a loan portfolio that . . . was hemorrhaging hundreds of millions of dollars a year. So after marketing it to several institutions, I recall the general consensus was, 'You'd have to pay us to take this thing because it has no voting rights and it keeps losing money. And by the way, we're not used to buying companies where we can't . . . control . . . our interests in the bank.' . . . And by the end of a couple weeks, I'm kind of saying, 'Well, I've now worn out a lot of shoe leather up and down Park Avenue and 6th Avenue. And I sort of understand why people don't really want to buy this thing.'"); Int. of H. Benett, Mar. 7, 2013, at 78:20–79:1 ("I don't recall any specific conversations, but I'm sure we would have given them advice that non-voting stock is going to be harder to sell as of than this type of voting, as well as selling a minority interest would be difficult versus selling a controlling interest . . . ."). Additionally, while certain UBS marketing materials incorrectly stated that "[a]ll of the voting shares of [Ally] Bank are owned by General Motors," there is no evidence to suggest that this mistake had a material impact on UBS's attempts to solicit third party purchasers. *See* UBS GMAC Bank Tracking Stock Overview Presentation, dated Jan. 2009, at 2 [UBS-RESCAP-0064024]; E-mail from M. Monson (Jan. 27, 2009) [UBS-RESCAP-0064068].

[242] This Section provides a summary of the more detailed analysis contained in Section V.A.2.d.

the IB Finance Preferred Interests at the redemption value, given that the estimated value of the units as of January 2009 was significantly lower than the redemption value.

The Examiner's Financial Advisors estimated the value of the bonds contributed by AFI by referencing available price quotations proximate to the date of the transaction, plus accrued interest. The Examiner's Financial Advisors estimated that the value of the bonds contributed was approximately $600 million.

Thus, the Examiner concludes that the consideration received by ResCap was greater than the value transferred from ResCap in connection with the 2009 Bank Transaction. A more detailed analysis of these valuations is contained in Section V.A.2.d. Additionally, a summary of these findings is presented in Appendix V.A.2.d.

### (5) Causes Of Action Implicated By The 2009 Bank Transaction

The Examiner believes that the only causes of action implicated by the 2009 Bank Transaction would be avoidance actions. An analysis of these claims is provided in Section VII.F.

### 2. Ally Bank Transactions: Reasonably Equivalent Value

#### a. Ally Bank Transactions – Overview Of Issues

The Examiner evaluated whether ResCap received less than reasonably equivalent value in connection with the Ally Bank Transactions, which consist of three separate transactions: (1) the 2006 Bank Restructuring; (2) the 2008 Bank Transaction; and (3) the 2009 Bank Transaction. Each of the Ally Bank Transactions is described in detail in Section V.A.1 of the Report. The Examiner addressed three fundamental questions regarding reasonably equivalent value as it relates to the Ally Bank Transactions:

  (1) What was the form and value of the property transferred by ResCap?

  (2) Did ResCap receive value in exchange for the property transferred, and, if so, in what form and amount?

  (3) Was the value received by ResCap reasonably equivalent in exchange for the property transferred?

Reasonably equivalent value compares the property transferred from a debtor with the value actually received by the debtor. Reasonably equivalent value is not susceptible to simple formulation; rather, an analysis of reasonably equivalent value begins with a range of values. Moreover, an assessment of reasonably equivalent value is guided by its purpose—to protect against the unjust diminution of the bankruptcy estate. Reasonably equivalent value may not be synonymous with Fair Market Value, although the latter may be an important factor in determining whether a debtor received reasonably equivalent value. Ultimately, an assessment

of reasonably equivalent value requires a consideration of the totality of the circumstances in addition to a value comparison, including earmarks of an arm's-length transaction, good faith, and the degree of difference between the market value of property transferred and the value actually received by the debtor.

For each of the Ally Bank Transactions, the Examiner's Financial Advisors employed traditional and commonly used valuation methods to assess the value ResCap transferred and received. Appendix V.A.2.a provides a summary of the value determinations for each of the Ally Bank Transactions.[243]

The Examiner's Financial Advisors assessed the value of Old GMAC Bank and the IB Finance Class M Shares using a Fair Market Value standard. For the case at hand, a going concern premise of value reflects the highest and best use of the assets in place. A going concern premise reflects the value of a business expected to continue to operate into the future. The liquidation premise of value was considered and rejected as not applicable. There was no evidence that liquidation of Old GMAC Bank or Ally Bank would have been considered imminent at the time of any of the Ally Bank Transactions or would have resulted in the highest and best use of the assets.[244]

In Section V.A.2, Old GMAC Bank (prior to the 2006 Bank Restructuring) and the mortgage division of Ally Bank (after the 2006 Bank Restructuring) will, at times, be referred to as the "Mortgage Bank" when discussing the methodology and assumptions that apply to the valuation of Old GMAC Bank and the IB Finance Class M Shares, respectively. For the 2006 Bank Restructuring, a valuation of the Mortgage Bank is used in determining the value of what was transferred from ResCap—Old GMAC Bank—and what ResCap received—IB Finance Class M Shares.

The Examiner concludes that the evidence supports the proposition that ResCap did not receive reasonably equivalent value in the 2006 Bank Restructuring. The Examiner concludes that the evidence supports the proposition that ResCap received reasonably equivalent value in the 2008 Bank Transaction and the 2009 Bank Transaction.

Appendix V.A.2.a presents summary financial information for the Mortgage Bank over the period from 2003 through 2008.[245] Appendix V.A.2.a shows loan performance and delinquency trends of the Mortgage Bank.[246]

_____

[243] Appendix V.A.2.a, at 1.

[244] For further discussion of the standard and premise of value, including definitions, see Section VI.B.2.a and Section VI.B.2.b, respectively.

[245] Appendix V.A.2.a, at 2–3.

[246] Appendix V.A.2.a, at 4.

### b. 2006 Bank Restructuring Overview

When the assets of Old GMAC Bank were transferred to Ally Bank, ResCap received IB Finance Class M Shares. The transferred assets became the mortgage division of Ally Bank[247] with a "tracking stock" structure.[248] Under that structure, ResCap's IB Finance Class M Shares gave ResCap an interest in the financial performance of Ally Bank's mortgage division, but the assets of the mortgage division were wholly owned by IB Finance and its subsidiary, Ally Bank.[249]

For the 2006 Bank Restructuring, the Examiner's Financial Advisors estimated the value of the following:

*Value Transferred from ResCap*

- Controlling interest in 100% of the equity of Old GMAC Bank;

- $360 million in cash and debt contributed by ResCap to IB Finance;

*Value Received by ResCap*

- IB Finance Class M Shares; and

- Value of a de-linked credit rating (an indirect benefit of the 2006 Bank Restructuring).

Appendix V.A.2.b presents a summary of value determinations for the 2006 Bank Restructuring.[250]

Because the IB Finance Class M Shares provided ResCap with the economic benefits of substantially all of the assets of Old GMAC Bank through a tracking stock structure, the analysis in this Report used the same approach and assumptions in valuing both assets—Old

---

[247] Residential Capital, LLC, Current Report (Form 8-K) (Nov. 27, 2006).

[248] *See* B. Espen Eckbo & Karin S. Thorburn, *Corporate Restructuring: Breakups and LBOs* 29 (Tuck Sch. of Bus. Working Paper No. 2008-49, 2008), http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1133153. ("Tracking stock—also called targeted stock or letter stock—is a separate class of parent company common stock whose dividends track the performance of a given division. That is, the holders of the tracking stock are entitled to the cash flow generated by this division, hence determining the value of the stock."); Matthew T. Billet & Anand M.Vijh, *The Wealth Effects of Tracking Stock Restructurings*, 27 J. FIN. RESEARCH 559, 559–83 (2004) ("Tracking stocks are newly issued stocks created by distributing a nontaxable stock dividend to existing shareholders . . . [a] tracking stock is an equity claim intended to reflect the performance of a certain division of a multidivisional firm . . . .").

[249] Equity Purchase Agreement, dated Nov. 20, 2006, § 1.A [CERB001530].

[250] Appendix V.A.2.b, at 1.

GMAC Bank and the IB Finance Class M Shares—making appropriate adjustments to reflect differences in the value arising from the different form of ownership, including marketability and control.[251]

The Examiner's Financial Advisors considered traditional and commonly used approaches to estimating the Fair Market Value of the interests:

- The Market Approach using guideline financial institutions and considering both the Guideline Publicly Traded Company Method and the Guideline M&A Method;

- The Income Approach using the DCF Method; and

- The Asset-Based Approach using the Adjusted Book Value Method.

### *(1) Market Approach – Guideline Publicly Traded Company Method*

The Guideline Publicly Traded Company Method provides an indication of the Fair Market Value of a business by developing valuation multiples based on prices at which securities of similar companies trade in a public market.[252] These market-based multiples are then applied to the operating results of the subject business, resulting in an estimate of the Fair Market Value of the invested capital or equity (depending on the nature of the multiple applied) on a marketable, minority basis. A premium for control, if applicable, is then applied to the equity to indicate the Fair Market Value of the equity of the subject business on a marketable, controlling basis.[253] The Fair Market Value of debt is then added to derive the Market Value of Invested Capital.

### *(a) Selection Of Guideline Companies*

The first step in the application of this methodology is the selection of guideline publicly traded companies. The Examiner's Financial Advisors selected a group of companies with similar characteristics that provide a meaningful basis for comparison to the Mortgage Bank. Appendix V.A.2.b presents a brief description of each guideline company.[254] Appendix V.A.2.b presents various financial ratios for the guideline companies compared to the Mortgage Bank.[255]

---

[251] In addition to the assets transferred to Ally Bank, approximately $13 million in net assets remained with Old GMAC Bank, which was transferred via dividend to GM along with Old GMAC Bank's Federal Savings Bank charter. The Examiner's Financial Advisors treated this amount as immaterial to its analysis and made no adjustment for it in its calculations.

[252] SHANNON P. PRATT WITH ALINA V. NICULITA, VALUING A BUSINESS: THE ANALYSIS AND APPRAISAL OF CLOSELY HELD COMPANIES 265 (5th ed. 2008).

[253] *Id.* at 265–69.

[254] Appendix V.A.2.b, at 5–7.

[255] Appendix V.A.2.b, at 3–4.

*(i)  Guideline Companies Selection Criteria*

The selected set of guideline companies consisted of large financial institutions whose principal subsidiary operated as either a federal savings bank or a state-chartered thrift institution. The Examiner's Financial Advisors identified the selected set of guideline companies by querying the Capital IQ database for companies with the following characteristics:

- Operating primarily in Standard Industrial Classifications 6035 (Savings Institutions, Federally Chartered) or 6036 (Savings Institutions, Not Federally Chartered);

- Total assets greater than $5 billion; and

- Residential mortgage loans greater than 50% of total loans.

This process identified thirteen guideline companies for consideration.

*(ii) Comparison With Guideline Companies*

The Mortgage Bank was exposed to greater risk in its operations than many of the publicly traded guideline companies considered in this analysis. Areas of greater risk included:

- *Lending Standards*: Most of the guideline companies held relatively high quality loan portfolios. The majority of the Mortgage Bank's HFI Portfolio was comprised of interest-only loans.[256] The Mortgage Bank also engaged in Alt-A lending, including interest-only Alt-A.[257] The HFI Portfolio also included loans originally issued with limited documentation, high DTI levels, high LTV ratios, and/or low credit scores, particularly in the home equity products.[258] These loans gave the Mortgage Bank significant exposure in the event of a downturn in the economy or a decline in home values.

- *Age and Location*: As a result of rapid growth in lending activities, the Mortgage Bank's portfolio was heavily weighted by loans originated after 2004.[259] This gave the Mortgage Bank significant exposure to loans made near the peak of the real estate market (circa mid-to-late 2006). The Mortgage Bank's geographic concentrations included states that experienced rapid increases in housing prices during the real

---

[256]  For example, as of April 30, 2007 approximately 81% of the HFI first mortgage portfolio was comprised of interest-only loans. *See* GMAC Bank Mortgage Operation Credit Review, dated Apr. 30, 2007, at EXAM11415745 [EXAM11415741].

[257]  *See id.* For example, as of April 30, 2007, approximately 20% of the HFI first mortgage portfolio was comprised of Alt-A loans, most of which were interest only. *See id.*

[258]  *See* GMAC Bank Mortgage Division Credit Review Monthly Executive Summary, dated Dec. 31, 2008, at 4–5 [EXAM11629614].

[259]  *See id.* at 6.

estate boom. Approximately 23% of the Mortgage Bank's residential mortgage portfolio was concentrated in California as of the end of 2006,[260] with significant exposure in other high-appreciation states including Virginia, Florida, and Arizona.[261] Approximately 7% of its portfolio was in Michigan,[262] which was expected to experience high subprime default rates.[263] By December 2006, housing prices were expected to decline in most of metropolitan areas in which the Mortgage Bank had substantial exposure.[264] The guideline companies generally had longer histories with less exposure to loans issued during the recent run-up in real estate prices, and included a number of regional banks operating in more stable markets such as New England and Kansas.

- *Funding Base*: The Mortgage Bank operated without a branch banking network and relied on funding primarily through advances from the FHLB; brokered deposits also contributed a large share of funding.[265] The guideline companies generally had networks of branch banking offices, providing them with a more stable base of retail deposits characterized by long-term customer relationships and lower interest rates, though maintaining a branch network adds to operating costs.[266]

### (b) Calculation Of Market Multiples

The Guideline Publicly Traded Company Method entails the calculation of valuation multiples based on those of publicly traded guideline companies that are then applied to a subject company's relevant metrics. The Examiner's Financial Advisors calculated ratios of MVE to several historical and projected metrics. The Examiner's Financial Advisors relied on three commonly used valuation multiples in its analysis:

- Ratio of MVE to tangible book value of equity (the P/TBVE multiple);

- Ratio of MVE to last twelve months' earnings (the LTM P/E multiple); and

- Ratio of MVE to projected earnings for the current or upcoming year (the Forward P/E multiple).

---

[260] *See* GMAC Bank Consolidated Financial Statements as of December 31, 2006 and Independent Auditors' Report, dated Mar. 27, 2007, at 20 [RC00035095].

[261] *See* GMAC Bank Mortgage Operation Credit Review, dated Apr. 30, 2007, at EXAM11415747 [EXAM11415741].

[262] *See id.*

[263] *See, e.g.*, Ron Nixon, *Study Predicts Foreclosure for 1 in 5 Subprime Loans*, N.Y. TIMES (Dec. 20, 2006), http://www.nytimes.com/2006/12/20/business/20home.html?_r=0.

[264] *See* GMAC Bank Mortgage Operation Credit Review, dated Apr. 30, 2007, at EXAM11415748 [EXAM11415741] (citing December 2006 forecasts by Economy.com).

[265] *See* Board of Director Meeting: 2007 Business Plan Review, dated Jan. 25, 2007, at ALLY_PEO_0006858 [ALLY_PEO_0006664].

[266] *See* Appendix V.A.2.b, at 5–7 (providing descriptions of the guideline companies).

These ratios measure the value of equity (common stock outstanding multiplied by the price per share) as a multiple of either book value or net income. TBVE was used rather than NBV to place the guideline companies—several of which had goodwill on their balance sheets—on a similar basis to the Mortgage Bank, which had no goodwill on its balance sheet.

### (c) Selecting Appropriate Multiples

As discussed above, the Mortgage Bank had a riskier business model, resulting in a poorer financial condition than many of the guideline companies. Analysis of the guideline companies showed that companies with riskier business models generally had lower multiples in 2006 than companies with less risky business models.[267] Accordingly, the Examiner's Financial Advisors selected market multiples below the average of the guideline companies to adjust for differences in relative risk profiles of the Mortgage Bank and the guideline companies taken as a whole.

### (d) Control Premium

A control premium is an amount by which the pro rata value of a controlling interest exceeds the pro rata value of a non-controlling interest in a business enterprise. This premium or upward adjustment in value reflects the right and power of control, a property interest.[268] The Guideline Publicly Traded Company Method derives value indications from trading prices of minority equity interests in a liquid market and indicates value on a marketable, minority basis. A control premium is then applied, when warranted, to estimate the value of equity on a controlling basis.[269]

The Examiner's Financial Advisors gave consideration to premiums paid for controlling interests for similar companies during 2006 in determining an appropriate control premium for a 100% equity interest in the Mortgage Bank. The Examiner's Financial Advisors compiled data on premiums paid in control transactions involving targets primarily operating as savings institutions (Standard Industrial Classifications 6035 and 6036) as reported in the *Mergerstat Control Premium Study*.[270] The median premium for these companies was 29.6% in 2006.[271] The Examiner's Financial Advisors noted that for a broader group (financial services), Mergerstat reported a median premium of 19.6% during 2006,[272] while across all industries the median premium was 20.6%.[273] Premiums paid for the five companies considered in the

---

[267] *See* Appendix V.A.2.b, at 3–4 (providing ratio analyses of the guideline companies); Appendix V.A.2.b, at 5–7 (providing additional descriptions of the guideline companies). Guideline companies with heavy concentrations in subprime, Alt-A, or non-traditional mortgage products such as option ARMs include BankUnited Financial Corp., Downey Financial Corp., and FirstFed Financial Corp.

[268] SHANNON P. PRATT, BUSINESS VALUATION: DISCOUNTS AND PREMIUMS 16, 32 (2d ed. 2009).

[269] *Id.* at 5.

[270] *See* MERGERSTAT, CONTROL PREMIUM STUDY: 4TH QUARTER 2006, at 17–19.

[271] *See id.* at 18.

[272] *See id.* at 17.

[273] *See id.* at 5.

Guideline M&A Method discussed below ranged from 10% to 33%. Observed premiums include payment for synergies and tend to overstate the value of control per se. Accordingly, the Examiner's Financial Advisors applied a 10% control premium in this analysis. Appendix V.A.2.b provides a summary of data on control premiums.[274]

### (e) Guideline Publicly Traded Company Method: Conclusion

Based on the application of the Guideline Publicly Traded Company Method, the indicated range of total equity value of Old GMAC Bank on a marketable, controlling basis before adjustments is estimated to be approximately $1.69 billion to $2.13 billion as of November 22, 2006. Appendix V.A.2.b provides a summary of the Guideline Publicly Traded Company Method conclusion.[275]

### (2) Market Approach – Guideline M&A Method

The Guideline M&A Method estimates the Fair Market Value of a business based on exchange prices in actual transactions for controlling interests in similar companies.[276] This process involves comparison and correlation of the subject business with similar companies acquired within a reasonable time of the valuation date. Considerations such as location, time of sale, operating characteristics, and conditions of sale are analyzed for the guideline companies. This variation of the Market Approach results in an indicated Fair Market Value of the subject business on a marketable, controlling basis.[277]

### (a) Selection Of Guideline Merged And Acquired Companies

The first step in the application of this methodology is the selection of guideline transactions involving similar companies. Selected guideline merged and acquired companies were identified by querying the Capital IQ database for acquisitions involving target companies whose primary operating subsidiaries included federal savings banks or state-chartered thrift institutions with assets greater than $5 billion.

### (b) Calculation Of Multiples

The Guideline M&A Method involves the calculation of valuation multiples based on those of the guideline merged and acquired companies that are then applied to the Mortgage Bank's operating results in a similar manner as the previously described Guideline Publicly Traded Company Method. The primary difference is that a control premium is generally not applied in the Guideline M&A Method because the observed transactions are typically for controlling interests. The analysis in this Report relied on the P/TBVE multiple and the LTM P/E multiple.

---

[274] Appendix V.A.2.b, at 9.

[275] Appendix V.A.2.b, at 2.

[276] *See* JAMES R. HITCHNER, FINANCIAL VALUATION: APPLICATIONS AND MODELS 259 (3d ed. 2011).

[277] *See id.*

### (c) Selecting Appropriate Multiples

The Examiner's Financial Advisors generally focused on multiples at the lower end of the indicated range, because of the relatively higher risk associated with the operations of the Mortgage Bank as compared to the guideline companies.

### (d) Guideline M&A Method: Conclusion

Based on the application of the Guideline M&A Method, the indicated range of total equity value of Old GMAC Bank on a marketable, controlling basis before adjustments is estimated to be approximately $2.69 billion to $2.85 billion as of November 22, 2006. Appendix V.A.2.b presents detail of the Guideline M&A Method conclusion.[278]

### (3) Income Approach – DCF Method

The Income Approach indicates the Fair Market Value of a business based on the value of the cash flows the business can be expected to generate in the future.[279] This analysis is commonly performed using the DCF Method, which discounts a projection of a company's future cash flows to present value at an appropriate discount rate.[280] Typically, the DCF Method has three basic components: (1) an estimation of projected net cash flows the firm will generate over a relevant and discrete period; (2) a terminal or residual value equal to the future value, as of the end of the projection period, of the firm's net cash flows beyond the projection period; and (3) a cost of capital with which to discount to a present value both the projected net cash flows and an estimated terminal or residual value.[281]

As applied to financial institutions, this method is commonly formulated as the value of future cash flows to equity holders and that approach is adopted here.[282] Since the projections here do not contemplate distributions during the forecast horizon, this approach becomes a quantification of dividend paying capacity in the residual period, net of the present value of any projected or required capital contributions.

---

[278] Appendix V.A.2.b, at 11–12.

[279] SHANNON P. PRATT WITH ALINA V. NICULITA, VALUING A BUSINESS: THE ANALYSIS AND APPRAISAL OF CLOSELY HELD COMPANIES 175–76 (5th ed. 2008).

[280] *See, e.g., MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 925 (S.D.N.Y. 1995); *see also* SHANNON P. PRATT WITH ALINA V. NICULITA, VALUING A BUSINESS: THE ANALYSIS AND APPRAISAL OF CLOSELY HELD COMPANIES 174–76 (5th ed. 2008).

[281] *See id.*

[282] *See generally* TIM KOLLER ET AL., VALUATION: MEASURING AND MANAGING THE VALUE OF COMPANIES 745 (5th ed. 2010); ASWATH DAMODARAN, INVESTMENT VALUATION: TOOLS AND TECHNIQUES FOR DETERMINING THE VALUE OF ANY ASSET 579 (2d ed. 2002).

### (a) Estimation Of Discount Rate

When applying the Income Approach, the cash flows a business expects to generate are discounted to their present value equivalent using a rate of return that reflects the relative risk of the investment and the time value of money.[283] The Examiner's Financial Advisors used the MCAPM to determine the required return on equity. The CAPM estimates the rate of return on common equity as the current risk-free rate of return on U.S. Treasury bonds, plus a market risk premium expected over the risk-free rate of return, multiplied by the "beta" for the stock.[284] Beta is a risk measure that reflects the sensitivity of a company's stock return to the changes in returns for the stock market as a whole.[285] The MCAPM adjusts the CAPM with a "Size Premium" to correct for a historical tendency of the CAPM to underestimate rates of return for small and mid-cap companies, and a "Company-Specific Adjustment" to account for risk factors not accounted for elsewhere in the analysis.[286] The assumptions used in this calculation are:

- *Risk-Free Rate*: The risk-free rate is based on the yield on 20-Year U.S. Treasury bonds as of November 22, 2006.

- *Beta*: This analysis used predicted betas for the guideline publicly traded companies published by MSCI Barra.[287] The Examiner's Financial Advisors also considered historical betas, but determined that the predicted betas better reflected changes in the industry during the relevant time period not adequately captured by the historical betas. The Examiner's Financial Advisors considered the risk and financial condition of the Mortgage Bank relative to the guideline companies. As discussed in the section on the Market Approach, the Examiner's Financial Advisors determined that the Mortgage Bank exhibited above-average risk, and accordingly selected betas from approximately the 75th percentile of the guideline company betas. Appendix V.A.2.b presents betas for the guideline companies.[288]

---

[283] *See* SHANNON P. PRATT & ROGER J. GRABOWSKI, COST OF CAPITAL: APPLICATIONS AND EXAMPLES 6 (4th ed. 2010).

[284] *Id.* at 106.

[285] *See id.* at 107.

[286] *Id.* at 110.

[287] *See* Section V.A.2.b(1)(a) (providing a more detailed discussion of the selection of guideline companies).

[288] Appendix V.A.2.b, at 4.

- *Market Risk Premium*: The Examiner's Financial Advisors considered a variety of historical and forward-looking sources for the market risk premium in their analyses of the Ally Bank Transactions.[289] The Examiner's Financial Advisors used a market risk premium judged as representative of the consensus of alternative sources as of the relevant dates (5.0% for the 2006 Bank Restructuring and 6.5% for the 2009 Bank Transaction).[290]

- *Size Premium*: Historical evidence indicates that rates of return vary with the size of a company in a manner not fully captured by the CAPM.[291] The MCAPM rate of return is adjusted by a premium that reflects the increased risk (or premium over CAPM) for an investment in a company that is of a size similar to that of the Mortgage Bank.[292] This premium is derived from historical differences in returns between small companies and large companies using data published by Ibbotson Associates.[293] The Examiner's Financial Advisors determined a premium consistent with the size of the Mortgage Bank.[294]

- *Company-Specific Adjustment*: This adjustment may be upward or downward, depending on how the risks of the subject company compare to the risks of the guideline companies used in the analysis, as well as the risks of the companies that comprise the general market indices used in the analysis of the discount rate.[295] The

---

[289] *See, e.g.,* Ibbotson Associates, SBBI: Valuation Edition 2006 Yearbook (2006); Morningstar, Inc., SBBI: Valuation Edition 2007 Yearbook (2007); Morningstar, Inc., Ibbotson SBBI: 2008 Valuation Yearbook (2008); Morningstar, Inc., Ibbotson SBBI: 2009 Valuation Yearbook (2009); Bloomberg L.P., Country Risk Premium for United States, Sept. 30, 2006–Mar. 31, 2009; Bradford Cornell, The Equity Risk Premium: The Long-Run Future of the Stock Market 201–02 (1999); Shannon P. Pratt & Roger J. Grabowski, Cost of Capital: Applications and Examples 89–113 (3d ed. 2008); Shannon P. Pratt & Roger J. Grabowski, Cost of Capital: Applications and Examples 117–45 (4th ed. 2010); Tim Koller et al., Valuation: Measuring and Managing the Value of Companies 297–306 (4th ed. 2005); Tim Koller et al., Valuation: Measuring and Managing the Value of Companies 238–45 (5th ed. 2010); Pablo Fernandez, Market Risk Premium Used in 2008 by Professors: A Survey with 1,400 Answers (Apr. 16, 2009), http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1344209; Duff & Phelps LLC, Risk Premium Report (2012), http://www.duffandphelps.com/SiteCollectionDocuments/Reports/2012%20Risk%20Premium%20Report%20EXCERPT%20(DP).pdf.

[290] The calculation of a Market Risk Premium was not applicable for the 2008 Bank Transaction.

[291] Ibbotson Associates, SBBI: Valuation Edition 2006 Yearbook 136 (2006).

[292] Shannon P. Pratt & Roger J. Grabowski, Cost of Capital: Applications and Examples 110 (4th ed. 2010).

[293] Ibbotson Associates, SBBI: Valuation Edition 2006 Yearbook 137 (2006).

[294] The Examiner's Financial Advisors also considered small stock premium data published by Duff & Phelps, but elected not to use this data because it excludes financial institutions in its derivation. *See* Duff & Phelps LLC, Risk Premium Report (2012), http://www.duffandphelps.com/SiteCollectionDocuments/Reports/2012%20Risk%20Premium%20Report%20EXCERPT%20(DP).pdf.

[295] Shannon P. Pratt & Roger J. Grabowski, Cost of Capital: Applications and Examples 110 (4th ed. 2010).

Examiner's Financial Advisors concluded no adjustment for company-specific risk was necessary given the other adjustments made in this analysis.

Appendix V.A.2.b presents details of the calculation of the discount rate for the 2006 Bank Restructuring.[296]

### (b) Present Value Of Future Cash Flows

The Examiner's Financial Advisors estimated the Fair Market Value of the equity of the Mortgage Bank using the DCF Method. The Examiner's Financial Advisors used projections prepared by Ally Bank management for the Mortgage Bank around the time of the transaction[297] as the basis for calculating projected cash flows to equity holders.[298]

The DCF Method was based on a one-year business plan presented to the board of directors of Ally Bank on January 25, 2007.[299] The business plan contained projections for the Mortgage Bank, including a projected balance sheet and income statement. These projections were provided by management approximately two months after the 2006 Bank Restructuring. The projections were based on financial information reasonably available at the time of the 2006 Bank Restructuring and provided evidence of reasonably foreseeable financial performance at that date.

### (c) Calculation Of Residual Value

The present value of the residual represents the amount an investor would pay today for the expected cash flows of the business for years subsequent to the discrete projection period. In calculating the residual value, the Examiner's Financial Advisors estimated a normalized cash flow to equity holders for the residual period. Changes in assets and liabilities were normalized to match the assumed long-term growth rate. Normalized cash flows were then capitalized using a rate calculated by subtracting the residual growth rate from the overall required return on equity estimated previously. The present value factor from the last year of the forecast horizon was then applied to estimate the present value of the residual cash flows. The present value of the residual and the sum of the present value of available cash flows for the discrete projection period were then summed to arrive at the indicated value of equity on a marketable, controlling basis.

---

[296] Appendix V.A.2.b, at 14.

[297] Board of Director Meeting: 2007 Business Plan Review, dated Jan. 25, 2007, at ALLY_PEO_0006858–59 [ALLY_PEO_0006664].

[298] The Examiner's Financial Advisors estimated cash flows to equity holders using the following formula: Projected Net Income – Projected Increase in Stockholders' Equity = Estimated Cash Flows to Equity Holders.

[299] Board of Director Meeting: 2007 Business Plan Review, dated Jan. 25, 2007, at ALLY_PEO_0006858–59 [ALLY_PEO_0006664].

### (d) Adjustment For Capital Excess Or Deficiency

The Examiner's Financial Advisors' analysis included an adjustment to account for the value of projected shortfalls or surpluses in equity capitalization, in recognition of the requirement to maintain adequate capital. The adjustment was based on an assumption that departures from the normal industry equity-to-asset ratio would be addressed by future capital contributions (in the case of a shortfall, as in the 2009 Bank Transaction analysis) or a distribution (as in the case of an equity surplus for the 2006 Bank Restructuring analysis). For the 2006 Bank Restructuring, the capital distribution was partially offset by the present value of future interest expense associated with the borrowings required to enable the distribution of the equity surplus.[300] The analysis assumes that equity can revert to a normal industry capitalization after the expiration of binding agreements on capital requirements with bank regulators.[301] These agreements required capital in excess of the industry norm.

To analyze levels of equity capital maintained by the guideline depository institutions, the Examiner's Financial Advisors identified the principal depository subsidiary of each of the guideline publicly traded banking organizations selected in the Guideline Publicly Traded Company Method. Data was gathered for the regulated depository subsidiary (rather than the consolidated organization) because the bank subsidiaries are most directly affected by regulatory capital requirements. IB Finance had no subsidiary other than Ally Bank.

For each of these depository institutions, the Examiner's Financial Advisors obtained call reports from the FDIC and determined the "Tier 1 Leverage Ratio" as defined by, and reported to, the FDIC.[302] The Mortgage Bank's Tier 1 Leverage Ratio was similar to its ratio of equity to total assets.[303] Appendix V.A.2.b presents data on guideline Tier 1 Leverage Ratios as of the most recent quarter-end prior to the transaction date.[304] The average guideline bank Tier 1 Leverage Ratio was approximately 9% before the 2006 Bank Restructuring. The Examiner's Financial Advisors assumed that a normal Tier 1 Leverage Ratio in the industry was 9% for purposes of this analysis.

The Examiner's Financial Advisors also determined the present value of future cash flows before adjustment for excess capital. This alternative estimate assumes that the "excess"

---

[300] The applied present value of future interest expense was calculated using the Mortgage Bank's projected interest rate on borrowed funds on an after-tax basis.

[301] Ally Bank had commitments to the DFI (as of the 2006 Bank Restructuring) and to the FDIC (as of the 2009 Bank Transaction) to maintain capital ratios at prescribed levels for a period of time.

[302] 12 C.F.R. § 325.2, FDIC Minimum Capital Requirements—Definitions, http://www.fdic.gov/regulations/laws/rules/2000-4400.html#fdic2000part325.2.

[303] The Tier 1 Leverage Ratio includes a number of adjustments from a simple equity-to-assets ratio, including adjustments for goodwill, preferred stock, unrealized gains, and various other items. In the case of the Mortgage Bank, these adjustments were not material.

[304] Appendix V.A.2.b, at 8. The Examiner's Financial Advisors reviewed FDIC call reports for the primary depository subsidiaries of the guideline companies available as of September 30, 2006, March 31, 2008, and December 31, 2008.

capital is actually necessary to achieve the projected level of earnings over the longer term, and therefore could not be distributed to shareholders. The level of projected earnings for the Mortgage Bank in 2007 (and the residual period) was higher than 2006 even though, at the time, the industry outlook was softening. These projected earnings could be difficult to obtain over the long term without a larger banking operation, which would require more capital. This calculation establishes the lower value in the DCF Method.

### (e) Income Approach–DCF Method: Conclusion

Based on the application of the DCF Method, the indicated value of Old GMAC Bank on a marketable, controlling basis before adjustments is estimated to be approximately $1.67 billion to $1.97 billion as of November 22, 2006. Appendix V.A.2.b presents detail of the DCF Method conclusion.[305]

### (4) Asset-Based Approach

The Asset-Based Approach indicates the Fair Market Value of a business by adjusting the assets and liabilities of the subject company to their market value equivalents. The Asset-Based Approach is based on the summation of the individual values of the underlying assets, properties, and/or business units of a company. This approach can be performed using the "Adjusted Book Value Method,"[306] which involves examining the book value of a company's assets and liabilities and making adjustments to reflect market value. The book value is generally the accounting value of a company's assets and liabilities as determined under GAAP, which is then subjected to adjustments to reflect market value.[307] One should also consider any off-balance sheet assets or liabilities when applying the Adjusted Book Value Method to estimate the Fair Market Value of a business. Courts caution that accounting values may not be reflective of Fair Market Value, and, in particular, certain assets and liabilities may not be listed on the balance sheet because GAAP limits inclusion on the balance sheet to known and quantifiable assets and liabilities.[308] The Examiner's Financial Advisors estimated the Fair Market Value of the equity of the Mortgage Bank by adjusting the balance sheet to reflect the Fair Market Value of the individual assets and liabilities.

### (a) Fair Value Estimates

The Examiner's Financial Advisors used Ally Bank management's estimates of fair value for certain assets and liabilities as reported in the notes to audited financial statements as of

---

[305] Appendix V.A.2.b, at 13.

[306] SHANNON P. PRATT WITH ALINA V. NICULITA, VALUING A BUSINESS: THE ANALYSIS AND APPRAISAL OF CLOSELY HELD COMPANIES 352 (5th ed. 2008).

[307] *See Lids Corp. v. Marathon Inv. Partners, L.P.* (*In re Lids Corp.*), 281 B.R. 535, 542–43 (Bankr. D. Del. 2002).

[308] *See Trans World Airlines, Inc. v. Travellers Int'l AG.* (*In re Trans World Airlines, Inc.*), 180 B.R. 389, 405 (Bankr. D. Del. 1994) (noting that "the balance sheet is merely the starting point for the analysis"), *aff'd in part, rev'd in part*, 203 B.R. 890 (D. Del. 1996), *rev'd*, 134 F.3d 188 (3d Cir. 1998).

December 31, 2006.[309] For several major items on the balance sheet, the notes to audited financial statements report Ally Bank management's estimated fair values, including HFS loans, HFI loans, deposits, advances from the FHLB, and other items. Except as otherwise indicated (see discussion of the loan loss reserve below), the Examiner's Financial Advisors accepted Ally Bank management's audited estimate of fair value (where available) and (where not available) assumed that the book value was indicative of fair value

### (b) Loan Loss Reserves

The loan loss reserve was reflected in the fair value of loan estimates.[310] Accordingly, the reserve of approximately $23.8 million as of December 31, 2006 was reduced to zero.

### (c) Goodwill

The Asset-Based Approach applied here adjusts for items carried on the Mortgage Bank's balance sheet. The Asset-Based Approach does not adjust for items such as goodwill or other intangibles not reported on the Mortgage Bank's balance sheet.

### (d) Asset-Based Approach: Conclusion

Based on the application of the Asset-Based Approach, the indicated value of Old GMAC Bank on a marketable, controlling basis before adjustments is estimated to be approximately $1.19 billion. Appendix V.A.2.b provides detail of the Asset-Based Approach conclusion.[311]

### (5) Adjustments To Value

The methods employed provide preliminary value indications prior to certain necessary adjustments. All valuation methods are developed based on a specific set of facts, circumstances, and assumptions that result in a particular valuation basis or level (e.g., all of the indications of value described above are presented on a marketable, controlling interest basis). Therefore, adjustments are often required, and are typically accomplished through applying discounts and/or premiums to account for differences in certain ownership characteristics of the subject interest such as the degree of ownership control and marketability.

The Examiner's Financial Advisors considered adjustments to the value of the Mortgage Bank attributable to certain affiliate transactions between ResCap and the Mortgage Bank that may have had terms inconsistent with arm's-length transactions. However, during the time period of the Ally Bank Transactions, certain transactions benefitted the Mortgage Bank—

---

[309] *See* GMAC Bank Consolidated Financial Statements as of December 31, 2006 and Independent Auditors' Report, dated Mar. 27, 2007, at 35 [RC00035095].

[310] Int. of J. Cortese, Mar. 7, 2013, at 170:25–172:18.

[311] Appendix V.A.2.b, at 15.

such as general and administrative services and interest-free deposits provided by ResCap—while others benefited ResCap. Accordingly, the Examiner's Financial Advisors made no adjustment for affiliate transactions.

### (a) Old GMAC Bank: Private Company Discount

Old GMAC Bank was a wholly owned subsidiary of ResCap, did not have publicly traded common stock, and was not an SEC registrant. A controlling interest in a private company may sell at a discount to a controlling interest in a publicly traded company for various reasons. A private company generally has limited access to financial markets, may have less financial transparency, and may incur additional costs to function on a stand-alone basis once separate from its current owner. There may also be less knowledge about the business among potential investors, including a more limited number of potential buyers and an inherently less competitive "bidding" process.[312]

Empirical evidence indicates that controlling interests in stand-alone private companies (and divisions of larger public companies) tend to sell at a discount to the values observed in control transactions involving similar publicly traded companies.[313] Estimated private company discounts range from 0% to 30%. Evidence suggests that such discounts are related to size and other characteristics, with smaller and lower growth privately held companies selling for higher discounts.[314] Other evidence suggests that the observed discounts may be exaggerated to the extent that they include depressed prices for businesses sold by financially troubled parent companies.[315] The Examiner's Financial Advisors considered the facts and circumstances, including that Old GMAC Bank was a profitable institution with assets in excess of $10 billion, with audited financial statements, and a history of publicly available financial reporting to regulators, and determined that a relatively low discount was appropriate. The Examiner's Financial Advisors applied a 5% private company discount to the controlling interest in Old GMAC Bank based upon these factors.

---

[312] Kathleen Fuller et al., *What Do Returns To Acquiring Firms Tell Us? Evidence From Firms That Make Many Acquisitions*, 57 J. FIN. 1763, 1784 (2002); *see also* SHANNON P. PRATT WITH ALINA V. NICULITA, VALUING A BUSINESS: THE ANALYSIS AND APPRAISAL OF CLOSELY HELD COMPANIES 443–45 (5th ed. 2008).

[313] *See generally* John Koeplin et al., *The Private Company Discount*, J. APPLIED CORP. FIN., 94, 94–101 (Winter 2000); Micah S. Officer, *The Price of Corporate Liquidity: Acquisition Discounts for Unlisted Targets*, 83 J. FIN. ECON. 571, 571–98 (2007); Jean-Francois L'Her et al., *A New Examination of the Private Company Discount: The Acquisition Approach*, J. PRIVATE EQUITY, 48, 48–55 (Summer 2003).

[314] *See* Jean-Francois L'Her et al., *A New Examination of the Private Company Discount: The Acquisition Approach*, J. PRIVATE EQUITY, 48, 53–54 (Summer 2003).

[315] *See* Micah S. Officer, *The Price of Corporate Liquidity: Acquisition Discounts for Unlisted Targets*, 83 J. FIN. ECON. 571, 596–97 (2007).

### (b) IB Finance Class M Shares: Discount For Attributes Of Shares

The IB Finance Class M Shares have a number of attributes that require a lower valuation than indicated for otherwise similar interests. These include:

- Lack of control;

- Lack of voting rights;

- Lack of marketability; and

- Tracking stock structure.

### (i) Lack Of Control

The valuation methods used in this analysis provide an estimate of the value of the Mortgage Bank on a controlling interest basis. Valuation theory and practice holds that a non-controlling interest will generally be valued at less than an otherwise similar controlling interest.[316] The IB Finance 2006 LLC Agreement[317] gave AFI complete control over IB Finance. ResCap's interest in IB Finance was disadvantaged in a number of ways:

- AFI had complete power to appoint directors, managers, and determine strategic direction;[318]

- AFI had sole power to determine financial policy, including payment of dividends;[319] and

- AFI had sole power to make decisions regarding such matters as acquisitions or sales of the business or assets of the business, including the Mortgage Bank.[320]

A commonly used method of quantifying a discount for lack of control is based on the inverse of the control premium used in arriving at the controlling interest value.[321] Application of this method would give an approximately 9% lack of control discount using the 10% control premium from the Examiner's Financial Advisors' Guideline Publicly Traded Company Method analysis.

---

[316] SHANNON P. PRATT WITH ALINA V. NICULITA, VALUING A BUSINESS: THE ANALYSIS AND APPRAISAL OF CLOSELY HELD COMPANIES 65–66 (5th ed. 2008).

[317] *See, e.g.,* IB Finance 2006 LLC Agreement, §§ 3.1–3.10 [ALLY_0401862].

[318] *See id.* § 3.1.

[319] *See id.* §§ 2.5, 3.1(a)–(b).

[320] *See id.* § 3.10.

[321] Discount for Lack of Control = 1– (1 ÷ (1 + Control Premium) ). *See* JAMES R. HITCHNER, FINANCIAL VALUATION: APPLICATIONS AND MODELS 377 (3d ed. 2011).

### (ii) Lack Of Voting Rights

Voting shares are more valuable than non-voting shares because of the value associated with control for the reasons previously described. There is extensive empirical evidence supporting a premium for voting rights (or a discount for lack of voting rights) based on studies of companies with dual share structures (wherein one class of shares either lacks voting power or has limited voting power).[322] This body of research studied the market value attributed to voting rights by comparing the difference in prices paid for voting and non-voting minority shares of dual class firms. Average discounts reported for the lack of voting rights for minority interests in these studies ranged from approximately 3% to 10%.

### (iii) Lack Of Marketability

The IB Finance Class M Shares require a discount for lack of marketability.[323] Investors prefer equity investments with access to a liquid secondary market and that may be readily converted into cash. Equity investments without such marketability and liquidity characteristics normally sell at a discount to provide an investor with compensation for this lack of liquidity. Shares not readily marketable sell at a discount because of higher transaction costs, longer time requirements associated with selling the shares, and the interim risks associated with selling the shares. In general, the diminution in value associated with this factor is referred to as a discount for lack of marketability.[324]

Numerous studies have attempted to measure the diminution of value associated with an investment which lacks a ready market or involves various stock restrictions.[325] A common approach is the study of discounts on restricted stock. In general, restricted stock is the term used to describe shares of publicly traded companies subject to limitations or restrictions on transfer or trading. The limitations generally relate to legal restrictions on resale placed on shares by Rule 144 under the Securities Act of 1933.[326] A company's restricted stock is identical in every aspect to similar, publicly traded shares except for the applicable restrictions. Average discounts in these studies typically ranged from 20% to 40%.[327]

---

[322] *See, e.g.,* STEVEN R. COX & DIANNE M. RODEN, THE SOURCE OF VALUE OF VOTING RIGHTS AND RELATED DIVIDEND PROMISES, 8 J. CORP. FIN. 337 (2002), https://scholarworks.iu.edu/dspace/bitstream/ handle/ 2022/6919/Voting_Rights_and_Dividends.pdf?sequence=1 (summarizing academic research); SHANNON P. PRATT, BUSINESS VALUATION: DISCOUNTS AND PREMIUMS 246–51 (2d ed. 2009) (summarizing a number of studies by practitioners).

[323] The Examiner's Financial Advisors distinguish the discount for lack of marketability from the "private company discount" discussed above for the controlling interest in Old GMAC Bank. Controlling interests are generally considered to be easier to liquidate than minority interests.

[324] *See* SHANNON P. PRATT WITH ALINA V. NICULITA, VALUING A BUSINESS: THE ANALYSIS AND APPRAISAL OF CLOSELY HELD COMPANIES 416 (5th ed. 2008).

[325] *See Id.* at 415–57 (summarizing a number of studies).

[326] 17 C.F.R. § 230.144.

[327] *See* SHANNON P. PRATT WITH ALINA V. NICULITA, VALUING A BUSINESS: THE ANALYSIS AND APPRAISAL OF CLOSELY HELD COMPANIES 431 (5th ed. 2008).

Several studies of restricted stocks and other private placements suggest that observed discounts are related to the characteristics of the issuing company.[328] Studies have found relationships between the observed discounts and such characteristics as the size of the company, size of the offered block, financial condition, and volatility of stock price or earnings. Generally, the studies suggest that discounts are larger if:

- The issuing company is small or the value of the deal is small;[329]

- The deal involves a large percent of outstanding stock;[330]

- The issued shares lack registration rights;[331]

- The issuing company is unprofitable or has uncertain prospects; [332] and/or

- The volatility of stock price is high.[333]

The Examiner's Financial Advisors obtained information on restricted stock discounts for twenty-eight transactions involving restricted stock issued by publicly traded banking organizations. Appendix V.A.2.b presents data for these transactions.[334] The mean discount

---

[328] *See, e.g.,* William L. Silber, *Discounts on Restricted Stock: The Impact of Illiquidity on Stock Prices*, FIN. ANALYSTS J., 60, 60–64 July–Aug. 1991; Michael Hertzel & Richard L. Smith, *Market Discounts and Shareholder Gains for Placing Equity Privately*, 48 J. FIN. 459, 459–85 (1993); Bruce A. Johnson, *Quantitative Support for Discounts for Lack of Marketability*, BUS. VALUATION REV., 152, 152–55 (Dec. 1999); Mukesh Bajaj et al., *Firm Value and Marketability Discounts*, J. CORP. L., 89, 89–115 (Fall 2001).

[329] *See generally* William L. Silber, *Discounts on Restricted Stock: The Impact of Illiquidity on Stock Prices*, FIN. ANALYSTS J., 60, 60–64 (July–Aug. 1991); Michael Hertzel & Richard L. Smith, *Market Discounts and Shareholder Gains for Placing Equity Privately*, 48 J. FIN. 459, 459–85 (1993); Bruce A. Johnson, *Quantitative Support for Discounts for Lack of Marketability*, BUS. VALUATION REV., 152, 152–55 (Dec. 1999).

[330] *See generally* William L. Silber, *Discounts on Restricted Stock: The Impact of Illiquidity on Stock Prices*, FIN. ANALYSTS J., 60, 60–64 (July–Aug. 1991); Michael Hertzel & Richard L. Smith, *Market Discounts and Shareholder Gains for Placing Equity Privately*, 48 J. FIN. 459, 459–85 (1993); Bruce A. Johnson, *Quantitative Support for Discounts for Lack of Marketability*, BUS. VALUATION REV., 152, 152–55 (Dec. 1999); Mukesh Bajaj et al., *Firm Value and Marketability Discounts*, J. CORP. L., 89, 89–115 (Fall 2001).

[331] *See generally* Michael Hertzel & Richard L. Smith, *Market Discounts and Shareholder Gains for Placing Equity Privately*, 48 J. FIN. 459, 459–85 (1993); Bruce A. Johnson, *Quantitative Support for Discounts for Lack of Marketability*, BUS. VALUATION REV., 152, 152–55 (Dec. 1999); Mukesh Bajaj et al., *Firm Value and Marketability Discounts*, J. CORP. L., 89, 89–115 (Fall 2001).

[332] *See generally* William L. Silber, *Discounts on Restricted Stock: The Impact of Illiquidity on Stock Prices*, FIN. ANALYSTS J., 60, 60–64 (July–Aug. 1991); Michael Hertzel & Richard L. Smith, *Market Discounts and Shareholder Gains for Placing Equity Privately*, 48 J. FIN. 459, 459–85 (1993); Mukesh Bajaj et al., *Firm Value and Marketability Discounts*, J. CORP. L., 89, 89–115 (Fall 2001).

[333] *See generally* Mukesh Bajaj et al., *Firm Value and Marketability Discounts*, J. CORP. L., 89, 89–115 (Fall 2001).

[334] Appendix V.A.2.b, at 10.

was approximately 14.2% and the median was 9.1%, while the inter-quartile range (25th to 75th percentile) was approximately 5.3% to 16.0%, for these transactions. This range is relatively low compared with the typical average reported in published studies of restricted stock as summarized above.

Legal or contractual restrictions on transfer may also impact marketability.[335] The marketability of the IB Finance Class M Shares was impaired by the requirement for approval by AFI for any sale to a third party.[336]

### (iv) Tracking Stock Structure

The IB Finance Class M Shares were structured as a tracking stock of the Mortgage Bank. A tracking stock is an equity stake in a parent company that gives investors an economic interest in only one division or subsidiary of the parent.[337] Such stocks do not share in the consolidated performance of the company pro rata with other equity holders.

There was an interest in the U.S. public markets in tracking stocks and a number of companies issued tracking stocks for a time in the 1980s and 1990s. However, this form of ownership became unpopular after 2000, leading companies to retire these shares.[338] By 2009, there was only one company (Liberty Media) in the U.S. with a tracking stock structure.[339] Shareholders of a tracking stock do not have a separate board of directors with a fiduciary responsibility to look solely after their interests, and there is no assurance that conflicts of interest between divisions will be resolved favorably.[340] Moreover, the possibility of weak legal protection against intercompany transfers that disadvantage investors is an undesirable aspect of a tracking stock.[341]

---

[335] *See* SHANNON P. PRATT WITH ALINA V. NICULITA, VALUING A BUSINESS: THE ANALYSIS AND APPRAISAL OF CLOSELY HELD COMPANIES 66 (5th ed. 2008).

[336] *See* IB Finance 2006 LLC Agreement, § 2.3 [ALLY_0401862] ("No additional members will be admitted to the Company without the consent of the Members.").

[337] *See* B. Espen Eckbo & Karin S. Thorburn, *Corporate Restructuring: Breakups and LBOs* 29 (Tuck Sch. of Bus. Working Paper No. 2008-49, 2008), http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1133153.

[338] Palash R. Ghosh, *Tracking Stocks Are Now Relics*, WALL ST. J., Jan. 9, 2008, http://online.wsj.com/article/SB119985406966877497.html.

[339] Stephani A. Mason & Meera Rani Behera, *Were We Better Off Without the Invention of Tracking Stocks?: The Wealth Effects of the Elimination of Tracking Stock Structures* 5 (Jan. 6, 2012), http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1986132.

[340] *See* TIM KOLLER ET AL., VALUATION: MEASURING AND MANAGING THE VALUE OF COMPANIES 472 (5th ed. 2010).

[341] *See* B. Espen Eckbo & Karin S. Thorburn, *Corporate Restructuring: Breakups and LBOs* 31–32 (Tuck Sch. of Bus. Working Paper No. 2008-49, 2008), http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1133153.

Studies of retirements of publicly traded tracking stocks have found that, on average, the announcement of retirement was associated with abnormal positive returns to shareholders in excess of 10%.[342] These studies suggest the magnitude of discount that may result from this form of ownership.

### (v) Discount For IB Finance Class M Shares: Conclusion

The various discounts described above (for lack of control, lack of voting rights, lack of marketability, and tracking stock structure) considered together indicate a substantial discount from a marketable, controlling interest value. The Examiner's Financial Advisors recognized that there is overlap between these discounts (e.g., lack of control in this instance largely results from lack of voting rights), and did not treat these discounts as additive. The Examiner's Financial Advisors applied a discount of 30% to the marketable, controlling value of the IB Finance Class M Shares to reflect the value on a non-marketable, non-controlling basis as of November 22, 2006.[343]

The Examiner's Professionals considered arguments that the IB Finance Class M Shares could not be materially less valuable than the equity of Old GMAC Bank because the IB Finance ownership structure gave ResCap an interest in the financial performance of essentially the same Old GMAC Bank assets it previously owned, and ResCap's management had control of the day-to-day operations of the Mortgage Bank. However, the Examiner's Professionals determined that those arguments failed to account for the material diminution in value resulting from: (1) the loss of legal *rights* to control the business; (2) the loss of voting rights; (3) the increased lack of marketability; and (4) the undesirability of the tracking stock structure from an investor's point of view.

### (6) Assessment Of The Value Of Obtaining A De-Linked Credit Rating

ResCap had exposure to a credit downgrade if the Cerberus PSA failed to close and AFI's rating remained linked to that of GM. Failure to maintain an investment-grade rating would have increased ResCap's funding costs by an amount that ResCap management estimated would be $250 million per year before taxes.[344]

---

[342] *See* Stephani A. Mason & Meera Rani Behera, *Were We Better Off Without the Invention of Tracking Stocks?: The Wealth Effects of the Elimination of Tracking Stock Structures* 3 (Jan. 6, 2012), http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1986132. *See generally* Matthew T. Billet & Anand M. Vijh, *The Wealth Effects of Tracking Stock Restructurings*, 27 J. FIN. RESEARCH 559, 559–83 (2004).

[343] A combined discount in a range of approximately 29% to 38% was obtained by sequentially applying four distinct discounts: (1) a discount for lack of control of approximately 8% to 10%; (2) a discount for lack of marketability of approximately 15% to 20%; (3) a non-voting discount of approximately 5%; and (4) a discount for the tracking stock structure of approximately 5% to 10%.

[344] Walker Report, at RC40008939 [RC40008925] ("Additionally, the downgrade would trigger step-up provisions on ResCap's outstanding unsecured debt and bank credit facilities, which would increase ResCap's cost of funds and reduce earnings by approximately $250 million per year (pre-tax).").

The Examiner's Financial Advisors accepted management's estimate of $250 million per year in cost savings before taxes. The Examiner's Financial Advisors then recognized that cost savings benefit for a one-year period, resulting in a $150 million cost savings after applying a tax rate of 40% for purposes of assessing REV. Although the ResCap Board contemplated that ResCap would be a disregarded entity for federal income tax purposes as of November 22, 2006, the ResCap Board was clearly aware that any future income would be subject to the economic equivalent of a federal income tax. Further, the ResCap Board had knowledge of the terms and conditions of the 2005 Operating Agreement, which required that "ResCap and GMAC shall maintain in effect an income tax allocation agreement that shall provide for two-way sharing payments based on the separately calculated tax liability or benefit of ResCap."[345] Therefore, the Examiner's Financial Advisors conclude that tax affecting the cost savings benefit is entirely appropriate in these circumstances.

The Examiner's Financial Advisors viewed the credit rating as transitory because ResCap's profitability in late 2006 was suffering from pricing pressure, deteriorating asset quality, unfavorable interest rates, and other factors attributable to the mortgage industry downturn.[346] This trend was expected to continue, if not deteriorate further, in the near term. ResCap's credit rating would also continue to be linked to that of AFI, which had a below-investment grade rating, putting ResCap at risk of a downgrade if AFI was downgraded.[347] The Examiner's Financial Advisors viewed the cost savings associated with de-linking AFI's credit rating from GM as a short-term benefit for these reasons.

S&P upgraded ResCap from BBB- to BBB on November 27, 2006 contemporaneously with the closing of the Cerberus transaction, but gave this new rating a "negative" outlook citing a challenging industry environment and a link to AFI's rating (which remained below investment grade).[348] Moody's gave ResCap a stable outlook but kept its rating at Baa3 on November 15, 2006.[349] Fitch upgraded ResCap from BBB- to BBB on November 30, 2006 and gave a "positive" outlook (citing developments at AFI rather than ResCap).[350]

A future downgrade over the near term was reasonably foreseeable as of November 22, 2006 because of the deteriorating conditions in ResCap's business, the mortgage industry, and financial condition of its parent, AFI (with which it remained linked). The Examiner's Financial Advisors selected a one-year time horizon to value the cost savings benefit, and

---

[345] 2005 Operating Agreement, § 2(b)(iii) [ALLY_0140795].

[346] *See* Section VI.C.4.b(3) (providing additional discussion regarding the financial condition and outlook for ResCap during late 2006 period).

[347] These factors were confirmed by S&P when it upgraded ResCap to BBB (negative outlook) on November 27, 2006. *See* S&P, Research Update, *Residential Capital LLC Rating Raised to 'BBB', Removed From CreditWatch; Outlook Negative* (Nov. 27, 2006).

[348] *See id.*

[349] *See* Moody's, Announcement, *Moody's Expects to Confirm ResCap's Debt at Baa3 Stable* (Nov. 15, 2006), http://www.moodys.com/research/Moodys-expects-to-confirm-ResCaps-debt-at-Baa3-stable--PR_122397.

[350] Fitch, Press Release, *Fitch Upgrades GMAC LLC to 'BB+' & ResCap to 'BBB'; Outlook Positive* (Nov. 30, 2006), http://www.fitchratings.com/creditdesk/press_releases/detail.cfm?print=1&pr_id=326772.

concluded that the present value of the $150 million cost savings to ResCap from de-linking AFI's credit rating from GM's was approximately $143 million.[351]

### (7) 2006 Bank Restructuring Valuation Conclusion

#### (a) Value Of Transfers From ResCap

Based on the analysis described above, the Examiner's Financial Advisors considered the results of each valuation approach to determine a range of the Fair Market Value of the equity of Old GMAC Bank on a marketable, controlling basis to be $1.70 billion to $2 billion.[352]

The Examiner's Financial Advisors relied on an average of the Guideline Publicly Traded Company Method and the DCF Method in determining their conclusion of value. The other methods were considered but given no explicit weight. There were relatively few timely precedent transactions under the Guideline M&A Method at a time when the market outlook was changing. The Asset-Based Approach applied here adjusts for items carried on the Mortgage Bank's balance sheet. The Asset-Based Approach does not adjust for items such as goodwill or other intangibles not reported on the Mortgage Bank's balance sheet.

---

[351] The Examiner's Financial Advisors conclude that the gross value (before taxes) of the indirect benefit reasonably related to the credit rating de-linkage is $250 million per year, based on the estimate made by Walker in his memorandum to the ResCap Board. Walker Report, at RC40008939 [RC40008925]. The Examiner's Financial Advisors' conclusion that the cost savings associated with a credit rating de-linkage constitutes a benefit for purposes of assessing reasonably equivalent value generates a question as to how long that benefit should be counted for purposes of assessing reasonably equivalent value. The Examiner's Financial Advisors conclude that the transitory nature of the cost savings associated with a credit rating de-linkage justifies a time horizon of no greater than one year in these circumstances. A credit rating is influenced by a host of factors; it is the result of a dynamic process that will likely be influenced by post-transfer data that have nothing to do with the de-linkage event. Thus, beyond a short-term realization of cost savings, any continued favorable or unfavorable credit rating simply becomes too tenuous to suggest a reasonable nexus between it and the de-linkage event.

In contrast, during the Investigation, Walker projected that additional cost savings (beyond the $250 million per year before taxes previously identified above) could be "a little more than a billion dollars" *over a three-year time period*. Int. of D. Walker, Nov. 28, 2012, at 137:1–12. Walker provided no basis for this statement. The Examiner's Financial Advisors have found none. The Examiner's Financial Advisors reviewed the minutes of the ResCap Board meetings during the relevant time period, including a thorough consideration of the detailed memorandum prepared by Walker for the ResCap Board. The Examiner's Financial Advisors found that Walker never shared with the ResCap Board any additional cost savings estimates beyond the $250 million per year already identified in his memorandum. The Examiner's Financial Advisors conclude that incorporating the cost savings associated with a credit rating de-linkage over a one-year time horizon is reasonable because the assessment should recognize the ephemeral and transitory nature of any benefits actually received by the debtor.

[352] All values reflected in this Section V.A.2 are approximate.

EXHIBIT V.A.2.b(7)(a)—1
**2006 Bank Restructuring – Old GMAC Bank Equity Value (Marketable, Controlling)**
November 22, 2006
*($ in Millions)*

| Valuation Method | Fair Market Value | | | | Weighting |
|---|---|---|---|---|---|
| | Low | | High | | |
| Guideline Publicly Traded Company Method | $ | 1,691.7 | $ | 2,125.5 | 50.0% |
| Guideline M&A Method | | 2,689.9 | | 2,848.8 | 0.0% |
| DCF Method | | 1,667.8 | | 1,965.3 | 50.0% |
| Adjusted Book Value Method | | 1,192.2 | | 1,192.2 | 0.0% |
| Equity value of Old GMAC Bank (marketable, controlling) | $ | 1,679.7 | $ | 2,045.4 | |
| Equity value of Old GMAC Bank (marketable, controlling), rounded | $ | 1,700.0 | $ | 2,000.0 | |

*Source: Appendix V.A.2.b, at 1.*

The Examiner's Financial Advisors applied a 5% private company discount to reflect the equity value of Old GMAC Bank on a non-marketable, controlling basis. The Examiner's Financial Advisors included the $360 million capital contribution to estimate the range of value transferred from ResCap on November 22, 2006 at approximately $1.98 billion to $2.26 billion.

EXHIBIT V.A.2.b(7)(a)—2
**2006 Bank Restructuring – Value of Transfers from ResCap**
November 22, 2006
*($ in Millions)*

| | Fair Market Value | | | |
|---|---|---|---|---|
| | Low | | High | |
| Equity value of Old GMAC Bank (marketable, controlling) | $ | 1,700.0 | $ | 2,000.0 |
| Private company discount of 5% | | (85.0) | | (100.0) |
| Equity value of Old GMAC Bank (non-marketable, controlling) | | 1,615.0 | | 1,900.0 |
| Capital contribution to IB Finance | | 360.0 | | 360.0 |
| Total property transferred | $ | 1,975.0 | $ | 2,260.0 |

*Source: Appendix V.A.2.b, at 1.*

### (b) Value Received By ResCap

The Examiner's Financial Advisors applied a 30% discount for lack of control and marketability in determining the value of the IB Finance Class M Shares received by ResCap, which is estimated to be approximately $1.44 billion to $1.65 billion. The Examiner's Financial Advisors included approximately $143 million reflecting the value of de-linking AFI's credit rating from GM's to estimate the range of value received by ResCap at $1.58 billion to $1.79 billion.[353]

---

[353] *See* Section V.A.2.b(6).

EXHIBIT V.A.2.b(7)(b)
**2006 Bank Restructuring – Value Received by ResCap**
November 22, 2006
*($ in Millions)*

|  | Fair Market Value | |
|---|---|---|
|  | **Low** | **High** |
| Equity value of Old GMAC Bank | | |
|   before capital contribution (marketable, controlling) | $ 1,700.0 | $ 2,000.0 |
| Capital contribution to IB Finance | 360.0 | 360.0 |
| Value of IB Finance Class M Shares (marketable, controlling) | 2,060.0 | 2,360.0 |
| Discount for attributes of shares of 30% | (618.0) | (708.0) |
| Value of IB Finance Class M Shares | | |
|   (non-marketable, non-controlling) | 1,442.0 | 1,652.0 |
| Cost savings to ResCap as a result of de-linking AFI's credit rating from GM | 142.7 | 142.7 |
| Total property received | $ 1,584.7 | $ 1,794.7 |

*Source: Appendix V.A.2.b, at 1.*

### (8) 2006 Bank Restructuring Reasonably Equivalent Value Conclusion

Based upon the above discussion and analysis of the 2006 Bank Restructuring, the Examiner concludes that the evidence supports the proposition that ResCap did not receive reasonably equivalent value in the 2006 Bank Restructuring. Appendix V.A.2.b details the Examiner's conclusions.[354]

EXHIBIT V.A.2.b(8)
**2006 Bank Restructuring – Values Transferred from and Received by ResCap**
November 22, 2006
*($ in Millions)*

| Value Transferred from ResCap | | | Value Received by ResCap | | |
|---|---|---|---|---|---|
| **Component** | **Low** | **High** | **Component** | **Low** | **High** |
| Equity value of Old GMAC Bank | $ 1,615.0 | $ 1,900.0 | IB Finance Class M Shares | $ 1,442.0 | $ 1,652.0 |
| Capital contribution to IB Finance | 360.0 | 360.0 | Cost savings to ResCap as a result of de-linking AFI's credit rating from GM | 142.7 | 142.7 |
| Total property transferred | $ 1,975.0 | $ 2,260.0 | Total property received | $ 1,584.7 | $ 1,794.7 |

Value received by ResCap less value transferred from ResCap, rounded [(1)]   $ (390.3)  to  $ (465.3)

[(1)] *The low end of the range of value for property transferred is paired with the low end of the range of value for property received (with a similar pairing of the respective high ends) in order to maintain consistency between the economic assumptions associated with the respective ranges.*
*Source: Appendix V.A.2.b, at 1.*

---

[354]  Appendix V.A.2.b, at 1.

Whether reasonably equivalent value was received is normally a question of fact,[355] and valuation factors will "turn on the case-specific circumstances surrounding the debtor's decision to enter into the challenged transaction."[356] Courts look to, among other things: (1) whether the value of what was transferred is equal to the value of what was received; (2) the market value of what was transferred and received; (3) whether the transaction took place at arm's length; and (4) the good faith of the transferee.[357] The inquiry of whether reasonably equivalent value was received "is fundamentally one of common sense, measured against market reality . . . ."[358]

Reasonable, not exact, equivalence is all that is required.[359] In *Calvillo*, the bankruptcy court noted "[t]here is no set minimum percentage or monetary amount necessary" for a court to find that the debtor received reasonably equivalent value.[360]

The Examiner concludes that the evidence supports the proposition that ResCap did not receive reasonably equivalent value for the property transferred as part of the 2006 Bank Restructuring by considering the totality of the circumstances. First, the disparity in values of the properties is significant. ResCap suffered a diminution in value of approximately 20% resulting from the differential between the value of property transferred and the value of the property received (including the cost savings resulting from the maintenance of a transitory credit rating). Part of the outbound value from ResCap included $360 million of cash and debt, or approximately 18% to 16% of the property transferred; ResCap received no cash or cash equivalent in return.

---

[355] *See, e.g., Klein v. Tabatchnick*, 610 F.2d 1043, 1047 (2d Cir. 1979) ("Fairness of consideration is generally a question of fact."); *Texas Truck Ins. Agency, Inc. v. Cure* (*Matter of Dunham*), 110 F.3d 286, 288–89 (5th Cir. 1997); *Jacoway v. Anderson* (*In re Ozark Rest. Equip. Co., Inc.*), 850 F.2d 342, 344 (8th Cir. 1988); *Daley v. Chang (In re Joy Recovery Tech. Corp.*), 286 B.R. 54, 75 (Bankr. N.D. Ill. 2002); *Leonard v. Mylex Corp.* (*In re Northgate Computer Sys., Inc.*), 240 B.R. 328, 365 (Bankr. D. Minn. 1999); *Alberts v. HCA Inc.* (*In re Greater Se. Cmty. Hosp. Corp. I*), No. 11-5279-BK, 2008 WL 2037592, at *8 (Bankr. D. Dist. Col. May 19, 2008). *But see Liquidation Trust v. Daimler AG* (*In re Old Carco LLC*), 2013 WL 335993, at *1 (2d Cir. Jan. 30, 2013) (concluding as a matter of law that the plaintiff in a fraudulent transfer suit failed to plausibly allege that the debtor received less than reasonably equivalent value).

[356] *Lowe v. B.R.B. Enters., Ltd.* (*In re Calvillo*), 263 B.R. 214, 220 (W.D. Tex 2000) (citation omitted).

[357] *See Barber v. Golden Seed Co., Inc.*, 129 F.3d 382, 387 (7th Cir. 1997); *Mellon Bank, N.A, v. Official Comm. of Unsecured Creditors of R.M.L. Inc.* (*In re R.M.L. Inc.*), 92 F.3d 139, 149 (3d Cir. 1996).

[358] *In re Northgate Computer Sys.,* 240 B.R. at 365 (citation omitted).

[359] *Murphy v. Meritor Sav. Bank* (*In re O'Day Corp.*), 126 B.R. 370, 393 (Bankr. D. Mass. 1991); *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 937 (S.D.N.Y. 1995); *see also Rubin v. Mfrs. Hanover Trust Co.*, 661 F.2d 979, 994 (2d Cir. 1981); *Butler Aviation Int'l, Inc. v. Whyte* (*Matter of Fairchild Aircraft Corp.*), 6 F.3d 1119, 1125–26 (5th Cir. 1993); *Waste Mgmt., Inc. v. Danis Indus. Corp.*, No. 3:00CV256, 2009 WL 347773, at *21 (S.D. Ohio Feb. 10, 2009); *In re Calvillo*, 263 B.R. at 220; *Coan v. Fleet Credit Card Servs., Inc.* (*In re Guerrera*), 225 B.R. 32, 36 (Bankr. D. Conn. 1998) ("It is not necessary that there be 'mathematical precision' or a 'penny-for-penny' exchange.").

[360] *In re Calvillo*, 263 B.R. at 220.

Second, the nature, attributes, and characteristics of the properties exchanged were significantly different. The 2006 Bank Restructuring left ResCap with a stake in the financial performance of substantially the same assets as it held through its position in Old GMAC Bank. However, the form of ownership—IB Finance Class M Shares—was significantly different. ResCap held a controlling interest in 100% of the equity of Old GMAC Bank before the transfer, whereas the 2006 Bank Restructuring left ResCap with a non-controlling and non-voting interest in a tracking stock. These new shares were significantly less valuable than the interests transferred. The evidence discussed in this Report shows that market participants place less value on equity interests that lack control, lack voting rights, lack marketability, and are structured as tracking stocks, as compared to equity interests that do not have these undesirable attributes.

Third, the properties were not exchanged through an arm's-length transaction. The Investigation revealed that the specific characteristics of the properties exchanged and the disparity of value clearly fall outside the range of characteristics and values one would expect reasonable parties to reach based on the information available to each at the time of the transfer with both parties acting at arm's length.[361] Therefore, in the absence of other consideration, the 2006 Bank Restructuring was for less than reasonably equivalent value even when the indirect benefits received by ResCap—maintenance of its credit rating—are included.

### c.   2008 Bank Transaction – Analysis And Examiner's Conclusions

The ResCap Preferred Interests issued to AFI in the 2008 Bank Transaction were exchangeable into IB Finance Preferred Interests after January 1, 2009.[362] For the 2008 Bank Transaction, the Examiner's Financial Advisors estimated the value of the following:

*Value Transferred from ResCap*

- ResCap Preferred Interests issued to AFI;

- AFI's right to exchange the ResCap Preferred Interests for IB Finance Preferred Interests;

*Value Received by ResCap*

- ResCap bonds contributed by AFI to ResCap; and

- Right to redeem IB Finance Preferred Interests for $1,000 per unit.

Appendix V.A.2.c presents a summary of the reasonably equivalent value determinations for the 2008 Bank Transaction.[363]

---

[361]   *See* Section V.A.1 (providing a detailed description of the 2006 Bank Restructuring).

[362]   *See* Residential Capital, LLC, Current Report (Form 8-K) (Apr. 4, 2008), at Item 5.03.

[363]   Appendix V.A.2.c, at 1.

### (1) Value Of The ResCap Preferred Interests

The Examiner concludes that the ResCap Preferred Interests had little to no value, given the conclusions discussed in Section VI of this Report that ResCap was insolvent, inadequately capitalized, and could not have reasonably believed it was able to pay its debts as they became due, both immediately before and after the 2008 Bank Transaction.

### (2) Value Of Right To Exchange ResCap Preferred Interests For IB Finance Preferred Interests

Because the ResCap Preferred Interests issued to AFI had little to no value in and of themselves, the Examiner's Professionals concluded that the value transferred from ResCap was AFI's right to exchange the ResCap Preferred Interests into IB Finance Preferred Interests. AFI, in effect, received an option on the IB Finance Preferred Interests with a zero exercise price. While ResCap did not own the IB Finance Preferred Interests (the units would be newly issued at the time of a future exchange), the units still represented value transferred from ResCap because any future issuance of these units to AFI would diminish the value of ResCap's remaining IB Finance Class M Shares.

The Examiner's Financial Advisors estimated the expected future value of the IB Finance Preferred Interests as of January 1, 2009—the earliest date at which AFI could exercise its exchange rights—by capitalizing the annual dividends on those interests.[364] Under this method of the Income Approach, value is calculated as the annual dividend divided by the discount rate, representing the present value of the annual dividend received in perpetuity.

The annual dividend on the IB Finance Preferred Interests equals the 10% dividend rate times the redemption value of approximately $806 million (approximately $607 million and $199 million, respectively, for the March 2008 and June 2008 contributions).[365] The Examiner's Financial Advisors' estimate of the discount rate was derived from a study of yields on preferred stock and debt for various benchmarks as of March and June 2008.[366] The benchmarks considered in this analysis included:

- Dividend yields on the preferred stock issues identified in Morgan Stanley's presentation to the ResCap Board. The Examiner's Financial Advisors obtained yields on these instruments as of March 31, 2008, and June 3, 2008, using data available from Bloomberg.

---

[364] *See* SHANNON P. PRATT WITH ALINA V. NICULITA, VALUING A BUSINESS: THE ANALYSIS AND APPRAISAL OF CLOSELY HELD COMPANIES 580 (5th ed. 2008).

[365] *See* Appendix V.A.2.c, at 2.

[366] The Examiner's Financial Advisors did not identify publicly available pricing on preferred stock issued by any of the guideline companies selected in this analysis.

- Yields on publicly traded preferred stock issued by a selection of major financial companies, including Bank of America, Citigroup, J.P. Morgan Chase, Merrill Lynch, Wachovia, and Wells Fargo.

- Yields to maturity for various indices of high-yield debt published by Merrill Lynch, including an index of high-yield banks and thrift institutions.

Appendix V.A.2.c presents these various benchmarks.[367]

The Examiner's Financial Advisors concluded that yields of 8% to 10% were appropriate for the 2008 Bank Transaction after reviewing the benchmark yield data described previously. The present value of dividends provides a future value of the exchange rights for the IB Finance Preferred Interests as of January 1, 2009 (the assumed date of exchange); however, it is necessary to discount this future value to determine the present value as of the 2008 Bank Transaction (for the March 31, 2008 and June 3, 2008 contributions). A high discount rate was determined to be necessary because the exchange rights were only exercisable if ResCap did not file for bankruptcy before January 2009. Market pricing of ResCap bonds at the time of these transactions shows that market participants were steeply discounting ResCap's bonds with short-term maturities, a reflection of perceived bankruptcy risk. The Examiner's Financial Advisors therefore used a discount rate of approximately 71.9% for the March 31, 2008 transaction, and 33.7% for the June 3, 2008 transaction, based on yields of ResCap's short-term debt. The different discount rates reflect changes in the price of ResCap's notes between the two dates.

Based on this approach, the estimated value of the right to exchange the ResCap Preferred Interests into IB Finance Preferred Interests was approximately $403 million to $504 million as of the March 31, 2008 contribution, and approximately $168 million to $210 million as of the June 3, 2008 contribution. These values were discounted to reflect the risk of a ResCap bankruptcy before January 1, 2009, as discussed previously.[368]

### (3) Fair Market Value Of Bonds Contributed By AFI To ResCap

AFI contributed bonds on both March 31, 2008 and June 3, 2008 with a reported Fair Market Value of approximately $806 million (consisting of approximately $607 million for the March contribution and $199 million for the June contribution). Price quotes were available for each of the bond issues included in these contributions. The Examiner's

---

[367] Appendix V.A.2.c, at 4.

[368] The discount rates' reflection of bankruptcy risk has a material impact on the valuation of the IB Finance Preferred Interest exchange rights. If the dividend yields of 8% to 10% were used as discount rates in the high and low scenarios, the resulting present values would be $565 million to $716 million as of March 31, 2008 and $188 million to $238 million as of June 3, 2008. This alternative calculation ignores the actual risk of a near-term ResCap bankruptcy and is presented only for informational purposes.

Financial Advisors determined that the Observable Market Value Method[369] or quoted trading prices provided a suitable basis for determining the value of these securities contributed to ResCap.

The Examiner's Professionals considered arguments that the contribution of bonds may have had no value to ResCap, or that market prices may not have provided a meaningful measure of value at the time of the Ally Bank Transactions. The Examiner's Professionals reasoned that: (1) the bonds represent obligations by ResCap; (2) prices paid for these bonds reflect the expectations of market participants about the present value of expected future payments by ResCap (possibly including restructured payments or recoveries in reorganization); and (3) eliminating ResCap's obligations on these future payments represents value to ResCap and its creditors, even if ResCap remained insolvent after the contribution.

The Examiner's Financial Advisors gathered pricing data as of the transaction date for each of the bonds contributed in the 2008 Bank Transaction.[370] This analysis indicates the following approximate value of these contributions:[371]

---

[369] *See* Section VI.B.2.c(1)(c) (providing further discussion of the Observable Market Value Method).

[370] Pricing per Interactive Data Corporation, a provider of securities pricing data.

[371] Section 548 of the Bankruptcy Code, as well as comparable state statutes, define satisfaction of an antecedent debt as value for fraudulent transfer purposes. *See* 11 U.S.C.A. § 548. Possible avoidance issues raised by Minnesota's insider preference statute (Minn. Stat. Ann. section 513.45(b)) with respect to contributions of ResCap bonds are analyzed in Section VII.F.

EXHIBIT V.A.2.c(3)

**2008 Bank Transaction – Value of ResCap Bonds Contributed by AFI**

March 31, 2008 and June 3, 2008

*($ in Millions, except bond prices, rounded)*

| Coupon | Debt Rank | Maturity | [A]<br>Price | [B]<br>Face Amount Contributed | [C] =<br>[A] × [B]<br>Observed Market Value | [D]<br>Accrued Interest | [E] =<br>[C] + [D]<br>Observed Market Value Plus Accrued Interest | |
|---|---|---|---|---|---|---|---|---|
| *March 31, 2008:* | | | | | | | | |
| Floating | Sr unsecured | 11/21/08 | 68.0 | $ 71.0 | $ 48.3 | $ 0.5 | $ 48.8 | |
| Floating | Sr unsecured | 04/17/09 | 57.0 | 36.0 | 20.5 | 0.5 | 21.0 | |
| Floating | Sr unsecured | 05/22/09 | 57.0 | 51.0 | 29.1 | 0.3 | 29.4 | |
| 6.375% | Sr unsecured | 06/30/10 | 50.3 | 206.9 | 104.0 | 4.2 | 108.2 | |
| Floating | Sr unsecured | 09/27/10 | 45.0 | 31.2 | 14.0 | - | 14.0 | |
| 6.000% | Sr unsecured | 02/22/11 | 49.0 | 60.0 | 29.4 | 0.5 | 29.9 | |
| 5.125% | Sr unsecured | 05/17/12 | 45.5 | 163.7 | 74.5 | 8.7 | 83.2 | |
| 6.500% | Sr unsecured | 06/01/12 | 49.0 | 135.0 | 66.2 | 3.7 | 69.9 | |
| 6.500% | Sr unsecured | 04/17/13 | 48.5 | 63.0 | 30.6 | 2.3 | 32.9 | |
| 6.375% | Sr unsecured | 05/17/13 | 44.5 | 20.0 | 8.9 | 1.3 | 10.2 | |
| 7.875% | Sr unsecured | 07/01/14 | 44.5 | 44.0 | 19.6 | 1.0 | 20.6 | |
| 6.875% | Sr unsecured | 06/30/15 | 48.5 | 113.0 | 54.8 | 2.4 | 57.2 | |
| Floating | Sr subordinated | 04/17/09 | 37.0 | 181.4 | 67.1 | 2.8 | 69.9 | |
| Total | | | | $ 1,176.2 | $ 566.9 | $ 28.2 | $ 595.1 | [F] |
| *June 3, 2008:* | | | | | | | | |
| Floating | Sr unsecured | 06/09/08 | 98.0 | $ 249.1 | $ 244.1 | $ 2.1 | $ 246.3 | [G] |
| Contribution of Bonds | | | | | | | $ 841.3 | [F] + [G] |

*Source: Appendix V.A.2.c, at 3.*

    The estimate of the June 2008 bond contribution is approximately $50 million higher than the Fair Market Value estimate in ResCap's public disclosures. The Examiner's Financial Advisors determined that this variance appears to be a result of AFI pricing the Fair Market Value of the bonds contributed in June at the Fair Market Value of the bonds as of March 31, 2008. Appendix V.A.2.c presents details of this analysis.[372]

---

[372] Appendix V.A.2.c, at 3.

#### *(4) Third Party Valuations*

ResCap did not obtain a written fairness opinion for this transaction.[373] ResCap did obtain advice from its financial advisor, Morgan Stanley, concerning the value of bonds to be contributed to ResCap in March 2008. Morgan Stanley also made an assessment of market dividend rates for the ResCap Preferred Interests and the IB Finance Preferred Interests that would potentially be created by the 2008 Bank Transaction.[374]

For each bond issue included in the contribution by AFI to ResCap, Morgan Stanley adjusted the face value to Fair Market Value using a recent market price quotation, and added accrued interest thereto. Morgan Stanley's estimate of the Fair Market Value of the March 31, 2008 contribution was approximately $607 million.[375]

Morgan Stanley did not explicitly value the portion of the IB Finance Class M Shares that ResCap would exchange as part of the transaction. Instead, its presentation included an analysis of yields on securities that Morgan Stanley deemed comparable to the ResCap Preferred Interests and IB Finance Preferred Interests. Morgan Stanley made the presumption that the ResCap Preferred Interests should be analyzed as two pieces: (1) an interest in ResCap until January 2009; and (2) a preferred interest in IB Finance after January 2009. Thus, their analysis implicitly presumes that these interests would be exchanged.

Morgan Stanley analyzed the yield on short-term ResCap bonds as a benchmark for the ResCap Preferred Interests and noted yields in excess of 100% for ResCap bonds, but suggested that a 13% coupon rate was reasonable. As a benchmark for the IB Finance Preferred Interests, Morgan Stanley compiled data on yields for preferred stocks issued by banks in recent transactions and concluded that 10% was a reasonable dividend rate for the IB Finance Preferred Interests.

#### *(5) 2008 Bank Transaction Valuation Conclusion*

##### *(a) Value Transferred From ResCap*

Based on the analysis described above, the Examiner's Financial Advisors estimated the value of the right to exchange the ResCap Preferred Interests into IB Finance Preferred Interests on March 31, 2008 and June 3, 2008 transferred from ResCap to be approximately $571 million to $714 million in the aggregate.

---

[373]  Morgan Stanley's transaction work was described as not "opinionable." E-mail from T. Pohl (Mar. 26, 2008) [EXAM11234652]. However, Morgan Stanley delivered the following oral opinions to the ResCap Board regarding the 2008 Bank Transaction on March 28, 2008: (1) the terms and conditions of the transaction were consistent with those to which parties at arm's length would agree and was for fair value; (2) the transaction was fair to ResCap, its shareholder, and its creditors; and (3) the transaction was "absolutely" in the best interests of ResCap, its shareholder, and its creditors. *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Mar. 28, 2008, at 4–5 [RC00017152].

[374]  Morgan Stanley Project Duvall Discussion Materials, dated Mar. 28, 2008, at RC40007500 [RC40007480].

[375]  Draft Morgan Stanley Project Duvall Discussion Materials, dated Mar. 31, 2008, at 3 [EXAM12112699]. Note that this analysis did not address the bonds contributed on June 3, 2008.

ResCap retained a right to retire the IB Finance Preferred Interests at redemption value of approximately $806 million.[376] This right gave ResCap the potential to recover any value of the IB Finance Preferred Interests to the extent that: (1) the value of the IB Finance Preferred Interests exceeded the redemption price; and (2) ResCap had the resources to exercise the option. The Examiner's Financial Advisors did not attribute value to this right, regarding it as speculative given ResCap's likely inability to obtain funds to make redemption payments.

### (b) Value Received By ResCap

The Examiner's Financial Advisors estimated the value received by ResCap for the contribution of ResCap bonds made by AFI on March 31, 2008 and June 3, 2008, in the aggregate, to be approximately $841 million.

### (6) 2008 Bank Transaction Reasonably Equivalent Value Conclusion

Based on the above discussion and analysis of the 2008 Bank Transaction, the Examiner concludes that the evidence supports the proposition that ResCap received reasonably equivalent value for the 2008 Bank Transaction. Appendix V.A.2.c presents a summary of the analysis detailing these conclusions.[377]

EXHIBIT V.A.2.c(6)
**2008 Bank Transaction – Value Transferred from and Received by ResCap**
March 31, 2008 and June 3, 2008
*($ in Millions)*

| Value Transferred from ResCap | | | Value Received by ResCap | | |
|---|---|---|---|---|---|
| **Component** | **Low** | **High** | **Component** | **Low** | **High** |
| ResCap Preferred Interests | $    - | $    - | Contribution of bonds | $   841.3 | $   841.3 |
| Right to exchange ResCap Preferred Interests for IB Finance Preferred Interests | 571.4 | 714.2 | Right to redeem IB Finance Preferred Interests | - | - |
| Total property transferred | $  571.4 | $  714.2 | Total property received | $  841.3 | $  841.3 |
| Value received by ResCap less value transferred from ResCap, rounded | | | | $   269.9   to   $   127.1 | |
| *Source: Appendix V.A.2.c, at 1.* | | | | | |

### d. 2009 Bank Transaction – Analysis And Examiner's Conclusions

AFI exercised the exchange rights it received in the 2008 Bank Transaction and converted its ResCap Preferred Interests into IB Finance Preferred Interests on January 30, 2009.

---

[376] *See* IB Finance 2008 LLC Agreement, §§ 2.1(b)(iii), 2.1(d) [EXAM10801679] (providing that, in the option of ResCap's Independent Directors, ResCap could make a special capital contribution to IB Finance and the proceeds would be used to redeem the IB Finance Preferred Interests at redemption value); Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital, LLC Regarding the GMAC Bank Transaction with GMAC, LLC, dated Jan. 22, 2009, at 11 [GOLDIN00129860].

[377] Appendix V.A.2.c, at 1.

AFI also purchased the remaining IB Finance Class M Shares owned by ResCap in exchange for AFI's contribution of additional ResCap bonds on the same day. The Examiner's Financial Advisors estimated the value of the following in connection with the 2009 Bank Transaction:

*Value Transferred from ResCap*

- IB Finance Class M Shares remaining after AFI received the IB Finance Preferred Interests;

- Loss of the right to redeem IB Finance Preferred Interests for $1,000 per unit; and

*Value Received by ResCap*

- ResCap bonds contributed by AFI to ResCap.

Appendix V.A.2.d presents a summary of reasonably equivalent value determinations for the 2009 Bank Transaction.[378]

### *(1) IB Finance Preferred Interests*

A valuation of the IB Finance Preferred Interests as of January 30, 2009 is a required step in estimating the value of the remaining IB Finance Class M Shares held by ResCap after the exchange. The Examiner's Financial Advisors estimated the value of the IB Finance Preferred Interests using a capitalization of annual dividends, with a discount rate derived from a study of yields on preferred stock and debt for guideline banks (and general market benchmarks) as of January 30, 2009.

The annual dividend was the 10% dividend rate on the IB Finance Preferred Interests times the redemption value of $806 million.[379] The estimate of the discount rate was derived from the study of yields on preferred stock and debt for various benchmarks as described above for the 2008 Bank Transaction, updated to reflect pricing in January 2009. This data is detailed in Appendix V.A.2.c.[380]

---

[378] Appendix V.A.2.d, at 1.

[379] *See* IB Finance 2008 LLC Agreement, § 2.5(a) [EXAM10801679].

[380] Appendix V.A.2.c, at 4.

The Examiner's Financial Advisors concluded that a range of capitalization rates from 15% to 25% was appropriate as of January 30, 2009,[381] and, correspondingly, valued the IB Finance Preferred Interests at approximately $323 million to $538 million. Appendix V.A.2.d presents details of this analysis.[382]

The Examiner's Financial Advisors also reviewed analyses prepared by third parties, such as Goldin Associates, who assumed that the value of the IB Finance Preferred Interests was a fixed proportion of the value of total equity (in proportion to the ratio of redemption value to total book value of equity).[383] However, the economic attributes of these interests do not support such an assumption because the IB Finance Preferred Interests had a fixed dividend,[384] a dividend preference,[385] a liquidation preference,[386] and no obligation to contribute capital.[387]

### (2) Remaining 1.2 Million IB Finance Class M Shares

The Examiner's Financial Advisors estimated the value of ResCap's remaining 1,193,656 IB Finance Class M Shares. This value was determined using the following steps:

- Step 1: Determine the value of 100% of the equity of the Mortgage Bank on a marketable, controlling interest basis;

- Step 2: Subtract the value of IB Finance Preferred Interests to determine the value of the remaining IB Finance Class M Shares on a marketable, controlling interest basis; and

- Step 3: Adjust the value for lack of control, lack of voting rights, lack of marketability, and tracking stock structure to determine the value of the remaining IB Finance Class M Shares on a non-marketable, non-controlling basis.

---

[381] The valuation model is developed using a capitalization of the stated dividends rather than forecasted dividends. Management projections did not contemplate dividends for at least three years. An alternative approach could determine the present value of annual dividends in perpetuity commencing in 2012, discounted at a required rate of return on the preferred interest. In this alternative approach, a value at the lower end of the value range corresponds to a discount rate of approximately 16% (which is the same discount rate used in the discounted cash flow analysis of the equity of the Mortgage Bank), while the upper range of value would correspond to an approximately 11% discount rate. Because the IB Finance Preferred Interests are senior to common equity and should have a lower discount rate, this alternative framework confirms the reasonableness of the results of the capitalization approach.

[382] Appendix V.A.2.d, at 8.

[383] *See* Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital, LLC Regarding the GMAC Bank Transaction with GMAC, LLC, dated Jan. 22, 2009, at 11, 37 [GOLDIN00129860].

[384] *See* IB Finance 2008 LLC Agreement, § 2.5(a) [EXAM10801679].

[385] *See id.* § 2.5(b).

[386] *See id.* § 7.1.

[387] *See id.* § 2.1(d).

The Examiner's Financial Advisors considered traditional and commonly used approaches to estimate the Fair Market Value of 100% of the equity of the Mortgage Bank on a marketable, controlling interest basis as of January 30, 2009:

- The Market Approach using guideline financial institutions. The Examiner's Financial Advisors considered the Guideline Publicly Traded Company Method of the Market Approach. The Examiner's Financial Advisors did not employ the Guideline M&A Company Method because of a lack of relevant transactions;

- The Income Approach using the DCF Method; and

- The Asset-Based Approach using the Adjusted Book Value Method.

### (a) Guideline Publicly Traded Company Method

The Examiner's Financial Advisors considered the results of the Guideline Publicly Traded Company Method, as previously described, for the 2009 Bank Transaction.

### (i) Selection Of Guideline Companies

The Examiner's Financial Advisors selected a group of companies that provide a meaningful basis for comparison to the Mortgage Bank. Appendix V.A.2.b presents a brief description of each guideline company.[388]

### (A) Guideline Companies Selection Criteria

The Examiner's Financial Advisors employed the same criteria as previously discussed for the 2006 Bank Restructuring, resulting in a set of ten guideline banking institutions for the 2009 Bank Transaction valuation.[389]

### (B) Comparison With Guideline Companies

The Examiner's Financial Advisors observed that the Mortgage Bank was exposed to greater risk in its operations than many of the publicly traded guideline companies considered in this analysis, as described above for the 2006 Bank Restructuring. By the time of the 2009 Bank Transaction, the Mortgage Bank was losing money and suffering from the results of deteriorating asset quality, as evidenced by large loan losses recognized in 2008, and escalating levels of delinquencies and non-performing assets. As a result, the Mortgage Bank's financial performance compared unfavorably to the majority of guideline companies.

---

[388] Appendix V.A.2.b, at 5–7.

[389] The guideline company set for the 2009 Bank Transaction differed from the set used for the 2006 Bank Restructuring as follows: (1) Downey Financial Corp. and Franklin Bank Corp. were removed because they filed for bankruptcy relief in 2008; (2) MAF Bancorp. was removed because it was acquired in 2007; (3) Northwest Bancshares, Inc. was removed because it did not meet the criterion requiring residential mortgage loans to be greater than 50% of total loans in 2009; and (4) TFS Financial Corp was added (it was not a publicly traded company before 2007).

Appendix V.A.2.d presents key financial ratios comparing the Mortgage Bank with the guideline companies.[390] Appendix V.A.2.a shows a graph of the loan performance history or delinquency trends of the Mortgage Bank.[391]

### (ii) Calculation Of Market Multiples

The Examiner's Financial Advisors considered three commonly used valuation multiples: the P/TBVE multiple, the LTM P/E multiple, and the Forward P/E multiple. In this analysis, the Examiner's Financial Advisors relied solely on a multiple of tangible book value of equity. The Examiner's Financial Advisors did not use a price-to-earnings multiple because the Mortgage Bank's earnings were negative (both on an LTM basis and projected 2009 earnings).

In determining appropriate multiples, the Examiner's Financial Advisors observed that three guideline companies displayed notably worse financial performance than the Mortgage Bank.[392] As shown in Appendix V.A.2.d,[393] relative to the Mortgage Bank, those companies had suffered larger losses (e.g., worse ROE ratio), and had lower asset quality (e.g., higher non-performing assets-to-equity ratio). Those three companies had P/TBVE ratios in a 0.0x to 0.1x range. All of the other guideline companies (whose lowest P/TBVE ratio was 0.8x) were in better financial condition than the Mortgage Bank because they had superior measures of asset quality, were expected to be profitable in 2009, and all but one was profitable in the most recent prior year. The Examiner's Financial Advisors determined that an appropriate multiple for the Mortgage Bank should fall between the respective ranges of these two groups of companies. Further, in evaluating an appropriate P/TBVE multiple, the Examiner's Financial Advisors noted the low quality of the Mortgage Bank's book value of equity. This is revealed by a comparison of the reserve for loan losses as of December 31, 2008, with Ally Bank management's projection of future charge-offs and provisions over the 2009 to 2011 period.[394] These future losses exceeded the year-end 2008 reserve by over $820 million, as detailed in Appendix V.A.2.d.[395] This amount is over 40% of the NBV for the Mortgage Bank as of December 31, 2008, and over 80% of the book value of the remaining IB Finance Class M Shares after giving effect to the exchange of IB Finance Preferred Interests.

---

[390] Appendix V.A.2.d, at 3–4.

[391] Appendix V.A.2.a, at 4.

[392] These guideline companies include Bank United Financial Corporation, FirstFed Financial Corp., and Flagstar Bancorp.

[393] Appendix V.A.2.d, at 3–4.

[394] Ally Bank's projections for future charge-offs and provisions were prepared in March 2009. *See* GMAC Bank Board of Director Meeting: 2009–2011 Business Plan Review, dated Mar. 17, 2009, at 12–15, 23–25, 31–33 [ALLY_0199599].

[395] Appendix V.A.2.d, at 7.

The Examiner's Financial Advisors also noted that the Mortgage Bank was undercapitalized relative to the FDIC's 11% Tier 1 capital requirement for Ally Bank.[396] The amount of undercapitalization was nearly one-third of NBV.

Because of the Mortgage Bank's poor earnings performance, low quality of NBV, and shortfall in capitalization, the Examiner's Financial Advisors determined that an appropriate P/TBVE multiple should be within a range of 0.3x to 0.5x.

### (iii) Control Premium

The Examiner's Financial Advisors gave consideration to premiums paid for controlling interests for similar companies during 2008 in determining an appropriate control premium for a 100% equity interest in the Mortgage Bank. The Examiner's Financial Advisors compiled data on premiums paid in control transactions involving targets primarily operating as savings institutions (Standard Industrial Classifications 6035 and 6036) as reported in the *Mergerstat Control Premium Study*. The median premium for these companies was 8.3% in 2008.[397] The Examiner's Financial Advisors noted that for a broader group (financial services), Mergerstat reported a median premium of 29.3%[398] during 2008, while across all industries the median premium was 31.4%.[399] The observed premiums included value paid for synergies in addition to value of control per se. Appendix V.A.2.b provides a summary of data on control premiums.[400] The Examiner's Financial Advisors applied a 10% control premium in this analysis.

### (iv) Guideline Publicly Traded Company Method: Conclusion

Based on the application of the Guideline Publicly Traded Company Method, the indicated range of value of the remaining 1,193,656 IB Finance Class M Shares on a marketable, controlling basis, before adjustments, is estimated to be approximately $602 million to $1 billion. Appendix V.A.2.d presents detail of the Guideline Publicly Traded Company Method conclusion.[401]

### (b) Income Approach–DCF Method

The Examiner's Financial Advisors considered the results of the DCF Method, as previously described, for the 2009 Bank Transaction.

---

[396] ResCap was obligated to provide capital to the Mortgage Bank by terms of the IB Finance LLC Agreements. *See* Section V.A.2.d(2)(b)(iii) (providing a more detailed discussion of ResCap's capital support obligations under the IB Finance LLC Agreements).

[397] MERGERSTAT, CONTROL PREMIUM STUDY: 4TH QUARTER 2008, at 20.

[398] *Id.* at 19.

[399] *Id.* at 3.

[400] Appendix V.A.2.b, at 9.

[401] Appendix V.A.2.d, at 2.

### (i) Estimation Of Discount Rate

The Examiner's Financial Advisors used the MCAPM to determine the required return on equity. The assumptions used in this calculation are consistent with the assumptions described for the 2006 Bank Restructuring, updated to reflect market conditions in January 2009. Appendix V.A.2.b presents details of the calculation of the discount rate.[402]

### (ii) Present Value Of Future Cash Flows And Calculation Of Residual Value

The Examiner's Financial Advisors used Ally Bank management's projections as the basis for calculating projected cash flows to equity holders. The Examiner's Financial Advisors used projections prepared by Ally Bank management for the Mortgage Bank around the time of the transaction[403] and employed a methodology substantially similar to that described for the 2006 Bank Restructuring.

The DCF Method was based on a three-year business plan presented to the board of directors of Ally Bank on March 17, 2009.[404] The business plan contained projections for the Mortgage Bank, including projected balance sheets and income statements. These projections were provided by management approximately seven weeks after the 2009 Bank Transaction. The projections are based on financial information reasonably available at the time of the 2009 Bank Transaction and provide evidence of reasonably foreseeable financial performance at that date.

### (iii) Adjustment For Capital Deficiency

The DCF Method considers potential obligations for shareholders to provide adequate capital. The Ally Bank management projections that the Examiner's Financial Advisors relied on were prepared in March 2009,[405] after Ally Bank became wholly owned by AFI. The projections include substantial growth in the automotive division of Ally Bank but not the Mortgage Bank. The projections also assume significant capital contributions to the automotive division of Ally Bank but none to the Mortgage Bank.

In the IB Finance 2006 LLC Agreement, ResCap and AFI committed to make capital contributions sufficient to: (1) support and grow their respective divisions; and (2) maintain a level of capitalization in their respective divisions that qualified as "well capitalized" under federal rules or such higher level of capitalization as may be required by the FDIC or DFI. [406]

---

[402] Appendix V.A.2.b, at 14.

[403] *See* GMAC Bank Board of Director Meeting: 2009–2011 Business Plan Review, dated Mar. 17, 2009, at 12–15, 23–25, 31–33 [ALLY_0199599].

[404] *See* GMAC Bank Board of Director Meeting: 2009–2011 Business Plan Review, dated Mar. 17, 2009 [ALLY_0199599].

[405] *See id.*

[406] IB Finance 2006 LLC Agreement, § 2.1(b) [ALLY_0401862].

The FDIC's definition of "well capitalized" (including a 5% Tier 1 Leverage Ratio) was lower than the requirements imposed on Ally Bank by the FDIC and the DFI during the relevant period. The IB Finance 2006 LLC Agreement effectively committed ResCap to maintain capital at the level specified in the agreements with the FDIC and DFI.

The IB Finance 2008 LLC Agreement retained ResCap's obligation to provide capital.[407] The IB Finance 2008 LLC Agreement made possible a future issuance of IB Finance Preferred Interests to AFI and clarified that "[t]he holder of any Class M Preferred Units shall not be required to make any additional capital requirements."[408] Therefore, ResCap would retain its obligation to provide 100% of any capital required by the Mortgage Bank, even in the event that AFI became a part-owner of the division as a holder of preferred units.

The FDIC, Ally Bank, IB Finance, AFI, and Cerberus entered into a "Capital and Liquidity Maintenance Agreement" on July 21, 2008,[409] whereby the parties agreed to maintain the Tier 1 Capital Ratio of Ally Bank at a minimum of 11% for the following three years.[410]

The Mortgage Bank had deficient capital relative to ResCap's obligations under the IB Finance 2008 LLC Agreement at the time of the 2009 Bank Transaction. Ally Bank reported a consolidated Tier 1 leverage ratio of 11.1% as of December 31, 2008,[411] thus satisfying (on a consolidated basis) the bank's agreement with the FDIC. However, this ratio was achieved via surplus capital in the automotive division of Ally Bank (with a 17.5% ratio)[412] and a deficiency in the Mortgage Bank (with an 8.3% ratio).[413] The deficiency in the Mortgage Bank was expected to deepen after projected losses—Ally Bank management expected the Tier 1 leverage ratio to fall to approximately 5.9% by the end of 2009.[414]

### (iv) Adjustment For Capital Deficiency: Conclusion

Regulators imposed certain capital support requirements with regard to Ally Bank. There is no evidence that AFI or IB Finance made a capital call to ResCap during 2008 or 2009 arising from these requirements. Nevertheless, the Examiner's Professionals viewed ResCap's

---

[407] *See* IB Finance 2008 LLC Agreement, § 2.1(d) [EXAM10801679].

[408] *See id.*

[409] *See* Capital and Liquidity Maintenance Agreement, dated July 21, 2008, at ALLY_0000042–50 [ALLY_0000032].

[410] *See id.* at ALLY_0000043–44.

[411] *See* GMAC Bank Consolidated Financial Statements as of December 31, 2008 and December 31, 2007 and Independent Auditors' Report, dated Mar. 17, 2009, at 43 [RC00034535].

[412] *See* GMAC Bank Board of Director Meeting: 2009–2011 Business Plan Review, dated Mar. 17, 2009, at 17 [ALLY_0199599].

[413] *See id.* at 13.

[414] *See id.*

contingent capital support obligation as binding. The FDIC restriction was scheduled to end during 2011. The analysis presented here assumes that equity could revert to a normal industry capitalization after the expiration of the FDIC restriction.

ResCap would have had a substantial obligation to contribute additional capital under this premise. The capital shortfall was treated as a future out-of-pocket obligation for an investor in the IB Finance Class M Shares. The Examiner's Financial Advisors limited the obligation to providing sufficient capital to bring equity to a normal industry equity-to-assets ratio of 9%, rather than to the 11% required (temporarily) by the FDIC.[415]

The Examiner's Financial Advisors also considered the present value of future cash flows before considering the obligation to provide additional capital. This implicitly assumes that the future capital requirement is no higher than the level of capital actually projected (approximately 6% equity-to-total asset ratio). Under this premise, ResCap would have no obligation to contribute additional capital, and the Tier 1 leverage ratio would remain above the FDIC's minimum threshold of 5% for a "well capitalized" institution (the IB Finance LLC Agreements required contributions to maintain a "well capitalized" rating in the absence of more stringent requirements from the FDIC). This premise results in a materially higher value compared to the alternative premise in which additional capital is required to bring equity to a normal industry level.

### (v)  Income Approach–DCF Method: Conclusion

Based on the application of the DCF Method, the indicated value of the remaining 1,193,656 IB Finance Class M Shares on a marketable, controlling basis before adjustments is estimated to be approximately $412 million to $875 million. Appendix V.A.2.d presents the details of the DCF Method for the 2009 Bank Transaction.[416]

### (c)  Asset-Based Approach

The Examiner's Financial Advisors estimated the Fair Market Value of the equity of the Mortgage Bank by adjusting the balance sheet to reflect the Fair Market Value of the individual assets and liabilities. The Examiner's Financial Advisors used Ally Bank management's estimates of fair value for certain assets and liabilities[417] as reported in the notes to audited financial statements as of December 31, 2008.

---

[415]  *See* Appendix V.A.2.b, at 8.

[416]  Appendix V.A.2.d, at 5.

[417]  The notes to the audited financial statements included fair value disclosures for HFS and HFI mortgage loans, MSRs, deposits, FHLB borrowings, and other balance sheet items.

### (i) Fair Value Estimates

The Examiner's Financial Advisors accepted Ally Bank management's estimate of fair value (where available) and (where not available) assumed that the carrying value was indicative of fair value, except as otherwise indicated (see discussion of the loan loss reserve below).

### (ii) Loan Loss Reserves

The Examiner's Financial Advisors made an adjustment to the value of assets to reflect projected losses and provisions foreseen in Ally Bank management's three-year business plan, but not provided for by the current level of reserves. The derivation of this adjustment is presented in Appendix V.A.2.d.[418]

### (iii) Goodwill

The Asset-Based Approach applied here adjusts for items carried on the Mortgage Bank's balance sheet. The Asset-Based Approach does not adjust for items such as goodwill or other intangibles not reported on the Mortgage Bank's balance sheet.

### (iv) Asset-Based Approach: Conclusion

The Asset-Based Approach, as presented here, provides a measure of the value of the assets and liabilities on the Mortgage Bank's balance sheet before consideration of certain intangible assets. Appendix V.A.2.d presents a summary of the analysis showing the results of the Asset-Based Approach.[419]

### (d) Adjustments To Value

The Examiner's Financial Advisors relied on an average of the Guideline Publicly Traded Method and the DCF Method to determine the range of the value of the equity of the Mortgage Bank on a marketable, controlling basis to be $500 million to $900 million as of January 30, 2009. These indications of value, as previously described, are determinations prior to certain necessary valuation adjustments. The Examiner's Financial Advisors made the adjustments described below.

### (i) IB Finance Preferred Interests

The Examiner's Financial Advisors deducted the value of the IB Finance Preferred Interests, as previously described, from the indicated range of value of the total equity of the Mortgage Bank. This results in an estimated value of the remaining IB Finance Class M Shares on a marketable, controlling basis.

---

[418]  Appendix V.A.2.d, at 7.

[419]  Appendix V.A.2.d, at 6.

### *(ii) IB Finance Class M Shares: Discount For Attributes Of Shares*

The remaining IB Finance Class M Shares have a number of attributes that require a lower valuation than indicated for otherwise similar interests. As discussed previously in connection with the 2006 Bank Restructuring, these include:

- Lack of control;

- Lack of voting rights;

- Lack of marketability; and

- Tracking stock structure.

For the 2009 Bank Transaction, the Examiner's Financial Advisors used a discount of 40%.[420] This is higher than the discount used for the 2006 Bank Restructuring because of the deteriorating financial condition of Ally Bank and distressed industry conditions in 2009.

### *(3) Bonds Contributed By AFI*

The Examiner's Financial Advisors estimated the value of the bonds contributed by AFI in the 2009 Bank Transaction by using the Observable Market Value Method and by referencing available price quotes proximate to the time of the 2009 Bank Transaction. This estimate of the Fair Market Value of those bonds, or $600 million, is lower than the value of $608.5 million that ResCap's management ascribed to them.[421] Appendix V.A.2.d summarizes this analysis.[422]

### *(4) 2009 Bank Transaction Valuation Conclusion*

### *(a) Value Transferred From ResCap*

Based on the analysis described above, the Examiner's Financial Advisors estimated the range of value for the transfer from ResCap on January 30, 2009 (the value of the remaining 1,193,656 IB Finance Class M Shares) to be approximately $107 million to $218 million.

### *(b) Value Received By ResCap*

The Examiner's Financial Advisors estimated the value received by ResCap from AFI's contribution of ResCap bonds on January 30, 2009 to be approximately $600 million.

---

[420] A combined discount in a range of approximately 38% to 46% is obtained by sequentially applying four distinct discounts: (1) a discount for lack of control of approximately 8% to 10%; (2) a discount for lack of marketability of approximately 25% to 30%; (3) a non-voting discount of approximately 5%; and (4) a discount for tracking stock structure of approximately 5% to 10%.

[421] *See* Residential Capital, LLC, Current Report (Form 8-K) (Feb. 3, 2009), at Item 1.01.

[422] Appendix V.A.2.d, at 9.

### (5) 2009 Bank Transaction Reasonably Equivalent Value Conclusion

Based upon the above discussion and analysis of the 2009 Bank Transaction, the Examiner concludes that the evidence supports the proposition that ResCap received reasonably equivalent value for the 2009 Bank Transaction. Appendix V.A.2.d presents a summary of this analysis and details the conclusions.[423]

---

EXHIBIT V.A.2.d(5)
**2009 Bank Transaction – Value Transferred from and Received by ResCap**
January 30, 2009
*($ in Millions)*

| Value Transferred from ResCap | | | Value Received by ResCap | | |
|---|---|---|---|---|---|
| Component | Low | High | Component | Low | High |
| Remaining 1.2 million IB Finance Class M Shares | $ 106.5 | $ 217.5 | Contribution of bonds | $ 600.2 | $ 600.2 |
| Forfeited right to redeem IB Finance Preferred Interests | - | - | | | |
| Total property transferred | $ 106.5 | $ 217.5 | Total property received | $ 600.2 | $ 600.2 |
| Value received by ResCap less value transferred from ResCap, rounded | | | | $ 493.7 to | $ 382.7 |

*Source: Appendix V.A.2.d, at 1.*

---

### (6) Third Party Valuations

Goldin Associates prepared a fairness opinion regarding the 2009 Bank Transaction for the Committee of the Independent Members of the ResCap Board. Their supporting analysis was detailed in a presentation dated January 22, 2009.[424]

---

[423]  Appendix V.A.2.d, at 1.

[424]  *See* Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital, LLC Regarding the GMAC Bank Transaction with GMAC, LLC, dated Jan. 22, 2009 [GOLDIN00129860].

Goldin Associates employed four valuation methodologies: (1) the Asset-Based Approach; (2) the DCF Method; (3) the Guideline Publicly Traded Company Method; and (4) the Guideline M&A Method, the results of which are summarized in the following table.[425]

---

EXHIBIT V.A.2.d(6)
**2009 Bank Transaction – Third Party Valuations**
**Goldin Associates Fairness Opinion Summary**
January 22, 2009
*($ in Millions)*

| Valuation Method | Weight | Range of value of remaining IB Finance Class M Shares | | |
|---|---|---|---|---|
| Adjusted Book Value Method | 40.0% | $ 240.7 | – | $ 645.5 |
| DCF Method | 40.0% | 343.4 | – | 462.8 |
| Guideline Publicly Traded Company Method | 7.5% | 1,072.4 | – | 1,206.9 |
| Guideline M&A Method: | | | | |
|     Guideline M&A Method: Historical | 5.0% | 1,618.9 | – | 1,888.4 |
|     Guideline M&A Method: Recently announced | 7.5% | 726.0 | – | 941.3 |
| Concluded range of value | 100.0% | $ 449.5 | – | $ 698.9 |

*Source: Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital, LLC Regarding the GMAC Bank Transaction with GMAC, LLC, dated Jan. 22, 2009, at 37 [GOLDIN00129860].*

---

Goldin Associates' analysis differed from the analysis of the Examiner's Financial Advisors in various ways, and the observed differences in assumptions, methodologies, and conclusions led to a range of value that was higher than the Examiner's Financial Advisors' estimate of the value transferred from ResCap as a result of the 2009 Bank Transaction. While the Examiner's Financial Advisors have a different determination on the value transferred from ResCap, this third-party valuation provides an additional data point that supports the reasonably equivalent valuation determination regarding the 2009 Bank Transaction as outlined previously.

### e. Subsequent Value Considerations

The Mortgage Bank reported loan loss provisions of approximately $2.7 billion in 2009, which contributed to a net loss of over $2 billion in that year.[426] A loss of that magnitude would have eliminated all of the legacy ResCap equity in the Mortgage Bank (even if ResCap had retained ownership of the remaining IB Finance Class M Shares), which was approximately $1.8 billion as of December 31, 2008.[427] The Examiner's Financial Advisors concluded that there was no equity value remaining in the Mortgage Bank after December 31, 2009 that could have been attributed to ResCap's legacy equity interest in IB Finance.

---

[425] *See id*. at 37.

[426] *See* Ally Bank Summary Financials [ALLY_PEO_0089617] (showing pre-tax income).

[427] *See* GMAC Bank Board of Director Meeting: 2009–2011 Business Plan Review, dated Mar. 17, 2009, at 14 [ALLY_0199599].

A roll-forward of ResCap's IB Finance Class M interest would result in a negative capital balance as of April 30, 2013. Key assumptions for this conclusion are: (1) elimination of capital contributions made by AFI after January 2009; and (2) adjustment for the net earnings impact that Ally Bank would have recognized had the parties' agreed-upon allocation of revenues and expenses on loans brokered by GMAC Mortgage been respected from August 1, 2009 to April 30, 2012.[428]

## B.  GMAC MORTGAGE CONTRACTS WITH ALLY BANK GOVERNING LOAN SALE, BROKERAGE, SERVICING, AND RELATED DERIVATIVE TRANSACTIONS

ResCap's GMAC Mortgage subsidiary historically focused on purchasing and originating conforming loans with the intent ultimately to sell them to GSEs while retaining the associated MSRs (though it also engaged in some business involving non-conforming products such as home-equity loans and jumbo prime loans).[429] A portion of GMAC Mortgage's production had involved use of Old GMAC Bank since the Bank's founding in 2001. Old GMAC Bank had been formed in August 2001 to engage in mortgage lending and investment activities traditionally associated with federal savings banks. The Bank was able to provide a lower-cost source of funds by virtue of its access to FDIC-insured deposits and borrowings from the Federal Home Loan Bank Board.[430] Conversely, Old GMAC Bank (and later, Ally Bank) did not have the infrastructure in place to conduct appropriate hedging, to securitize loans (with GSEs or private-label investors), or to perform servicing for loans and MSRs, and it looked to GMAC Mortgage to perform these functions (or to arrange for their performance through ResCap affiliates).

---

[428]  *See* Section V.B.6.

[429]  Int. of J. Young, Sept. 28, 2012, at 30:20–31:8, 118:8–16, 120:9–15, 127:10–129:25, 167:7–170:6, 195:1–196:21. ResCap essentially ceased purchasing and originating non-conforming loans in 2007, and the conforming business remained as the core of ResCap's ongoing operations.

[430]  *Id.* at 196:17–197:24 (noting "[t]his is all about funding"); Int. of David Applegate, Dec. 7, 2012, at 38:5–13 ("[W]e structured the bank so that certain origination activity would occur through it, so that, while the loans were funded, they were utilizing, during that funding period, GMAC Bank's lower cost access. And then the loans would generally be sold back to Mortgage and then securitized and put into the, you know, secondary market. And then GMAC Mortgage would retain the servicing."), 93:1–2 ("[T]he goal around the bank was to optimize it as a funding source."); Int. of S. Khattri, Oct. 25, 2012, at 28:19–30:15; Int. of A. Celini, Feb. 18, 2013, at 22:11–22 ("The bank's primary business during that time was really to serve as a funding conduit. We had access to the federal home loan bank, consumer deposits . . . . We'd provide liquidity. That was our goal at that time."). This advantage was relatively small in "bull" market periods, when ResCap's (and other enterprises') cost of borrowing from other sources was relatively inexpensive, and more pronounced in "down" markets, when ResCap's cost of borrowing from other sources increased. *See* Int. of D. Walker, Nov. 28, 2012, at 53:18–55:15; 2006 ResCap Plan Presentation, dated Jan. 31, 2006, at 133 [RC40012974] (describing Old GMAC Bank's then-current funding advantage as 13 basis points).

Of course, GMAC Mortgage's use of the Bank as a conduit or source of loans that GMAC Mortgage could securitize or service was limited by the size of the Bank's balance sheet, the volume of deposits, and regulatory restrictions, including restrictions on transactions with affiliates.[431] Nonetheless, from and after 2007, Ally Bank came to account for an increasing proportion of GMAC Mortgage's loan production. By January 1, 2009, almost all of the production was being channeled through the Bank, which by then was also retaining title to MSRs on Fannie Mae and Freddie Mac loans (but not Ginnie Mae loans).

GMAC Mortgage and the Bank were parties to six principal agreements related to this business in effect at various times from 2001 forward:

(1) The Correspondent Agreement, which governed GMAC Mortgage's sale of loans to the Bank;

(2) The Master Mortgage Loan Purchase and Sale Agreement or MMLPSA, which governed GMAC Mortgage's purchase of loans from the Bank;

(3) The Pipeline Swap, a derivative transaction under which GMAC Mortgage assumed certain risks and rewards related to changes in the market value of certain loans;

(4) The Broker Agreement, entered into effective January 1, 2009, when GMAC Mortgage ceased originating loans (in all but a few states), and instead began brokering loans to Ally Bank;

(5) The Original Servicing Agreement pursuant to which GMAC Mortgage serviced mortgage loans for the Bank;[432] and

(6) The MSR Swap, another derivative transaction, under which GMAC Mortgage assumed certain risks and rewards related to the fluctuation in the value of the Bank's MSR portfolio.

These agreements, particularly the MMLPSA, Pipeline Swap, Correspondent Agreement, and Broker Agreement, were interconnected. Corey Pinkston, Head of Corporate Debt and Equity of GMAC's Treasury, aptly described understanding them as "detangl[ing] the spaghetti."[433]

---

[431] *See* Section V.B.1.b (discussing regulatory restrictions); Int. of R. Groody, Dec. 17, 2012, at 246:6–16.

[432] GMAC Mortgage and Ally Bank are also parties to the A&R Servicing Agreement, as discussed in Section V.C.

[433] Int. of C. Pinkston, Nov. 8, 2012, at 127:4–128:18 ("It's spaghetti in the term that you have a series of transactions that at the end of the day provided the ability for ResCap to continue to do the business that it was in but use the bank as effectively a funding vehicle . . . . [I]f you're thinking about certain strategic transactions you've got to deal with all of these various touch points and coordination to make sure that it all works. So that's where the spaghetti term was probably used a fair amount. Detangle the spaghetti."); *see also* Int. of J. Young, Oct. 10, 2012, at 6:3–18 (noting that components of the MMLPSA, Pipeline Swap, and MSR Swap work together).

This enterprise is further complicated by several additional factors: First, the various agreements underwent numerous amendments over time. Second, over the course of the period in question, a number of the employees most knowledgeable about the agreements left or were discharged, including, in particular, Bank officials Albert Celini and Robert Groody. The personnel who replaced them in later years, reliant on the vagaries of imperfect institutional memory, frequently demonstrated an understanding of the agreements that was less than accurate or complete.[434] Third, there have been a number of anomalies in the implementation of these agreements. These anomalies include the parties' application of certain of the agreements in ways that cannot be squared with their language (but which application some witnesses nonetheless maintain reflected the parties' "intent"),[435] and, in one significant instance, a substantial shift away from the negotiated and agreed-upon economics of a set of transactions, apparently as the unwitting result of a shift in Ally Bank's accounting methodology.

Certain of these arrangements, particularly the MSR Swap and the Pipeline Swap, have attracted particular suspicion and concern that they were key cogs in a scheme to impose losses on GMAC Mortgage/ResCap while insulating the Bank. The evidence concerning the purpose and history of these transactions, however, does not support this theory. Moreover, review and analysis of the pertinent accounting and financial records does not bear out the notion that GMAC Mortgage incurred significant net losses as a result of these transactions.[436] As discussed in greater detail in Sections V.B.12.a and V.B.12.b, GMAC Mortgage was near break-even on the Pipeline Swap and "in the money" on the MSR Swap. Indeed, as discussed in Section V.B.9.b(5), provisions of the MSR Swap governing the disposition of assets on termination arguably were unduly favorable to GMAC Mortgage. Of course, that is not the end of the analysis; the parties understood that ResCap/GMAC Mortgage would hedge these risks in the market. However, while there are substantial obstacles to allocating the results of ResCap's market hedges specifically to the loans subject to the Pipeline Swap and the Ally Bank-owned MSRs, the available evidence suggests that ResCap/GMAC Mortgage were also "in the money" on these market hedges as well. In sum, the evidence indicates that GMAC Mortgage received a net benefit from the Pipeline Swap, the MSR Swap and the market hedges relating thereto, assessing the entirety of the economics of these transactions as they were implemented by the parties.

[434] For example, as discussed in Sections V.B.4 and V.B.5, from 2004 to July 2008, the Pipeline Swap applied only to the Bank's HFI portfolio; the Pipeline Swap did not apply to the Bank's HFS portfolio until July 1, 2008. Yet, in interviews and meetings with the Examiner's Financial Advisors, current Ally Bank and ResCap personnel repeatedly asserted that the Pipeline Swap had always applied to HFS loans; *see, e.g.,* Int. of J. Whitlinger, Nov. 30, 2012, at 134:19–137:20; Int. of C. Dondzila, Sept. 27, 2012, at 252:14–253:2.

[435] *See* Sections V.B.3.a(4), V.B.5.a.

[436] Concerns about the MSR Swap, in particular, seem to stem from statements made by Marano, who described the MSR Swap as an "absurd transaction" in a 2010 e-mail responding to FDIC objections that the interest rate used to calculate payments to the Bank under the Swap was too low. E-mail from T. Marano (Apr. 14, 2010) [ALLY_PEO_0065507] ("In essence we all know the bank owns the MSR. Yet they have shifted the risk to Rescap—that borders on an absurd transaction."). When interviewed, Marano explained that initially he had not understood the transaction, and that he subsequently learned that the rate economics were roughly equivalent to the Citibank MSR credit facility. Int. of T. Marano, Nov. 26, 2012, at 239:16–240:14. In any event, as discussed in text and in Section V.B.12.b, the claims made by or attributed to Marano about the MSR Swap's economics are contradicted by analysis of the actual results under the Swap.

There nonetheless remain several issues concerning the implementation of these agreements that give rise to potential claims on behalf of the Estate, detailed below and in Section VII.L.2.

### 1. Restrictions On Affiliate Transactions Applicable To GMAC Mortgage And The Bank

These contractual relationships between GMAC Mortgage and Ally Bank implicated restrictions on affiliate transactions imposed by ResCap's Operating Agreement and by federal banking regulations.

#### a. The ResCap Operating Agreements

As discussed in Sections III.E and VII.L.2.a(1)(a)(ii)(B), the 2005 Operating Agreement and 2006 Amended Operating Agreement imposed restrictions on ResCap's transactions with GMAC Affiliates, requiring, inter alia, that they be "*consistent with* those that parties at *arm's-length* would agree to and *for fair value,*"[437] and any departure from these strictures had to be approved by ResCap's Independent Directors.[438] As discussed below, the contemporaneous documentation confirms that, with the exception of the Correspondent Agreement, *none* of these agreements is consistent with the terms into which parties at arm's length would have entered.[439] The relationship between GMAC Mortgage and Ally Bank was sui generis, and all of the agreements have terms that were not available in the market.

Nonetheless, with three exceptions in 2010 and 2011 (all occurring in the context of increased involvement by outside counsel),[440] these agreements and amendments thereto were not brought to the ResCap Board[441] for approval, and, a fortiori, were not approved by ResCap's Independent Directors.

Whether this gives rise to a viable cause of action is discussed in Section VII.L.2.a(1)(a)(ii)(B).

---

[437] *See* 2005 Operating Agreement, § 2(b) [ALLY_0140795] (emphasis added); 2006 Amended Operating Agreement, § 2(b) (Residential Capital, LLC, Current Report (Form 8-K) (Nov. 30, 2006), Ex. 10.1) (emphasis added).

[438] 2005 Operating Agreement, § 8 [ALLY_0140795]; 2006 Amended Operating Agreement, § 8 (Residential Capital, LLC, Current Report (Form 8-K) (Nov. 30, 2006), Ex. 10.1).

[439] *See* Sections V.B.10.c, V.B.6.f; *see also* KPMG Report, at RC40022079 [RC40022044] (noting that the agreements include provisions "not typically seen in 'arm's length' transactions").

[440] The three occasions on which agreements or amendments thereto were presented to the ResCap Board are expressly noted in Sections V.B.9.d, V.B.10.b, and V.B.10.d. In the discussion below, unless presentation to the ResCap Board is specifically noted, the Examiner has found no evidence that the matter was submitted to the ResCap Board.

[441] Nor were the agreements approved by the GMAC Mortgage board of directors, which was composed entirely of insiders.

### b. Bank Regulatory Restrictions

Ally Bank was subject to federal regulatory restrictions on its transactions with affiliates. In particular, under Federal Reserve Act sections 23A and 23B,[442] the terms of the Bank's agreements with its affiliates are required, inter alia, to be no less favorable to the Bank than an arm's-length, market transaction.[443] Further, Ally Bank was only permitted to purchase up to 50% of GMAC Mortgage's loan production under 12 C.F.R. § 250.250 (an exemption from broader restrictions on an "extension of credit" by a bank to an affiliate).[444] The general aim of these regulations, and of the FDIC in enforcing them, is to protect depositors and the Deposit Insurance Fund from depredations by a bank's affiliates.

Ally Bank generally attempted to document that these agreements complied with regulatory requirements through Affiliate Transaction Memos explaining that the particular agreement's terms were at market or better than market from Ally Bank's perspective. The Bank periodically re-reviewed the transactions, documenting continued compliance in a

---

[442] 12 U.S.C. §§ 371c, 371c-1.

[443] Sections 23A and 23B of the Federal Reserve Act are intended to limit the risks that may arise when a bank that is a member of the Federal Reserve system engages in transactions with one of its affiliates.

Section 23A has four primary components. First, the statute limits a member bank's "covered transactions" with its affiliates, including, among other things, asset purchases from, extensions of credit, investments in securities issued by and guarantees for the benefit of such affiliates. *See* 12 C.F.R. § 223.3(h). Covered transactions with any single affiliate may not exceed 10% of the member bank's capital and surplus, while aggregate covered transactions with all affiliates may not exceed 20% of that amount. *See* 12 C.F.R. §§ 223.11, 223.12. Second, subject to certain exceptions, a member bank may not purchase "low quality assets" from an affiliate. *See* 12 C.F.R. § 223.15. Third, covered transactions between member banks and their affiliates must be "consistent with safe and sound banking practices." 12 C.F.R. § 223.13. Finally, a bank's loans to, or guarantees for the benefit of, its affiliates must be secured by an amount of collateral fixed by statute. *See* 12 C.F.R. § 223.14.

Additionally, section 23B requires that certain transactions between a bank and its affiliates occur on an arm's-length, market-rate basis. In particular, bank transactions that must be arm's-length include: (1) "covered transactions"; (2) asset sales to the affiliate; (3) payment of money or provision of services to an affiliate; (4) any transaction in which an affiliate acts as an agent or broker or receives a fee for its services to the bank or to any other person; and (5) any transaction or series of transactions with a third party if an affiliate has a financial interest in the third party or if an affiliate is a participant in such transaction or series of transactions. *See* 12 C.F.R. §§ 223.51–223.56.

[444] Regulation W implements and clarifies the scope of sections 23A and 23B of the Federal Reserve Act. *See* 12 C.F.R. § 223.1. In particular, Regulation W contains what is generally referred to as the "250.250 exemption." Under the 250.250 exemption, a member bank may purchase a loan receivable from an affiliate, without regard to the quantitative or asset quality limits of sections 23A and 23B, if: (1) the loan was originated by the affiliate; (2) the bank independently evaluates the borrower's credit before the affiliate commits to make the loan; (3) the bank commits to purchase the loan before the affiliate commits to make the loan; (4) the bank does not make a blanket advance commitment to purchase loans from the affiliate; and (5) the amount of the loan, aggregated with the amount of all other loans purchased from the affiliate during the preceding 12 calendar months by the bank and its depository affiliates, is no more than 50% of the affiliate's loan originations during that period. *See* 12 C.F.R. § 223.42(k).

further Affiliate Transaction Memo.[445] In addition, the various agreements and amendments were presented to the Bank's Board for approval, accompanied by representations from management that the arrangements were compliant with Rules 23A and 23B.[446]

As discussed below, from at least 2007 forward, the agreements discussed here became the subject of increasing FDIC scrutiny, concern that the transactions were not properly documented, and demands that Ally Bank better justify that the transactions were compliant or alter their terms.

### 2. The Correspondent Agreement

Shortly after Old GMAC Bank was chartered, it entered into an August 21, 2001 Correspondent Agreement with GMAC Mortgage, which provided for GMAC Mortgage sales of loans it had originated or purchased to the Bank.[447] The Correspondent Agreement was a standard form used by the Bank with other correspondent lenders[448] from whom it purchased loans.[449] The Agreement provided for purchase at "product market pricing existing on the day of sale" as evidenced by the Bank's "wholesale pricing grid" used to purchase loans from other correspondents.[450] The Agreement specifically noted that GMAC Mortgage would be entitled to charge and retain origination fees and any collected discounts in excess of the purchase price.[451] Further, GMAC Mortgage provided to the Bank the standard loan-level representations and warranties that were required of all correspondent lenders.[452]

;————————————————————————

[445] *See, e.g.,* GMAC Bank Affiliate Transaction Memorandum, Master Mortgage Loan Purchase and Sale Agreement, dated Dec. 14, 2001 [ALLY_0018320]; GMAC Bank Affiliate Transaction Memorandum, Master Mortgage Loan Purchase and Sale Agreement Amended and Restated 6/1/07, dated June 6, 2007 (Revised Oct. 31, 2007) [ALLY_0017869].

[446] *See, e.g.,* Minutes of a Regular Meeting of the Board of Directors of GMAC Bank, Nov. 30, 2006, at 2 [ALLY_PEO_0020880].

[447] Correspondent Agreement, at 1 [ALLY_0017350].

[448] A "correspondent" mortgage lender is a lender that originates and funds loans in its own name, but sells the loans to larger mortgage lenders or on the secondary market. *See* COMPTROLLER OF THE CURRENCY, ADMINISTRATOR OF NATIONAL BANKS, MORTGAGE BANKING COMPTROLLER'S HANDBOOK (Procedures dated Mar. 1998), at 9 (Wholesale) and 31 (definition of Correspondent), http://www.occ.gov/publications/publications-by-type/comptrollers-handbook/mortgage.pdf.

[449] *See* Int. of A. Celini, Feb. 18, 2013, at 33:24–34:14 (as a general rule, the affiliate correspondent agreements were based on market agreements at the start but over time they may have been modified to reflect changes in the business practices).

[450] *See* Correspondent Agreement, § 3(f) [ALLY_0017350]; Int. of A. Celini, Feb. 18, 2013, at 37:5–24.

[451] *See* Correspondent Agreement, § 5 [ALLY_0017350].

[452] *See id.* § 7.

The Correspondent Agreement was assumed by Ally Bank in the 2006 Bank Restructuring.[453] While there were subsequent revisions of the form of agreement governing GMAC Mortgage sales to the Bank, the market pricing terms and allocation of revenues effected by the Agreement were unchanged through the adoption of the Broker Agreement in late 2008,[454] discussed in Section V.B.6.

As noted above, the Bank's purchase of loans from GMAC Mortgage was permissible under the "250.250 exception," but was limited to 50% of GMAC Mortgage's twelve-month rolling production.[455] These loans essentially were "warehouse[d]"[456] with the Bank (taking advantage of its lower cost of funds) until GMAC Mortgage was ready to pool them with other loans for sale to a GSE[457] or to another investor.[458] The Bank then sold the loans back to GMAC Mortgage pursuant to the Master Mortgage Loan Purchase and Sale Agreement,[459] discussed below. Loans that first had been sold by GMAC Mortgage to Ally Bank under the 250.250 exception were 6.5% of the total volume of loans sold to GMAC Mortgage under the MMLPSA in 2003; this figure grew to a peak of 46.1% in 2007, before dropping to approximately 14.3% in 2008 as GMAC Mortgage's loan production decreased.[460]

––––––––––––––––––––––––––––––––––––––

[453] *See* Purchase and Assumption Agreement, at Sched. A [ALLY_PEO_0021066]; Review of GMAC Bank Affiliate Agreements Assigned from GMAC Bank FSB to GMAC Bank ILB, dated Nov. 30, 2006, at ALLY_0260095–96 [ALLY_0260087].

[454] *See* Int. of A. Celini, Feb. 18, 2013, at 38:11–14, 35:16–23; Correspondent Agreement, at Recitals [ALLY_0017350] (incorporating terms and conditions in the GMAC Bank Credit Policy Manual and Correspondent Manual); Client Contract, dated Mar. 1, 2008 [ALLY_0248292] (incorporating terms and conditions in the GMAC Bank Correspondent Manual).

[455] 12 C.F.R. §§ 250.250, 223.42(k); *see also* E-mail from S. Whilden to S. McCumber (Feb. 18, 2008) [EXAM30329671]; GMAC Bank Charter–Strategic Analysis, Draft Discussion Document, dated Nov. 1, 2007, at 19 [EXAM10152682].

[456] Memorandum, GMAC Mortgage to GMAC Bank Loan Transfer SAB99 Review, dated Jan. 6, 2009, at 2 [EXAM12042904].

[457] GMAC Mortgage: (1) resold Fannie Mae-eligible and Freddie Mac-eligible loans to those entities, who in turn deposited them into securitization trusts; and (2) deposited Ginnie Mae-guaranteed loans into securitization trusts itself and sponsored the issuance of mortgage-backed securities or certificates by such trust in whole-loan sales and securitizations. First Day Affidavit, ¶ 22; *see also* Int. of R. Groody, Dec. 17, 2012, at 73:12–74:8.

[458] Int. of R. Groody, Dec. 17, 2012, at 73:12–74:8, 85:10–86:9; *see also* Int. of A. Celini, Feb. 18, 2013, at 29:3–15 ("The bank never funded or purchased any loans that . . . didn't have a take-out investor."). "Held for sale" loans were held on Ally Bank's balance sheet for an average of twenty-seven days until the loans were sold. Letter from Arnold & Porter LLP to Board of Directors of Ally Bank (May 24, 2011), at 2 [EXAM00000137].

[459] Int. of R. Groody, Dec. 17, 2012, at 73:12–74:8, 18:9–12.

[460] GMAC Mortgage Corporation Consolidated Financial Statements as of and for the years ended December 31, 2004 and 2003 (Restated), at 46 [EXAM00231260]; GMAC Mortgage Corporation Consolidated Financial Statements As of and for the years ended December 31, 2005 and 2004 (Restated), at 51 [EXAM00231553]; ResCap Financial Statements-Related Party Footnotes—2006–2011 [EXAM00229659].

### 3.  The Master Mortgage Loan Purchase And Sale Agreement (Pre-July 2008)

#### a.  The 2001 MMLPSA

The original Master Mortgage Loan Purchase and Sale Agreement (the 2001 MMLPSA) was entered into between GMAC Mortgage and Old GMAC Bank on December 15, 2001, to govern GMAC Mortgage's purchases of loans (including both First Lien Loans[461] and Second Lien Loans[462] such as home equity loans) from the Bank.[463] Subject to certain amendments,[464] the 2001 MMLPSA remained in place until the 2006 Bank Restructuring discussed in Section V.A.[465]

Most loans sold by Old GMAC Bank to GMAC Mortgage were loans originated by third-party correspondent lenders.[466] As noted above, the Bank also sold a small volume of loans purchased from GMAC Mortgage pursuant to the Correspondent Agreement. In addition the Bank sold a small volume of loans that were brokered by third parties and originated by the Bank itself.[467]

---

[461]  As used in this Section, "First Lien Loan" shall mean (1) an individual mortgage loan (other than a HELOC) secured by a mortgage that creates a first priority lien upon the pledged collateral; and/or (2) in the context of an MMLPSA, a "First Lien Mortgage Loan" as defined in the applicable MMLPSA.

[462]  As used in this Section, "Second Lien Loan" shall mean (1) an individual mortgage loan secured by a mortgage that creates a second priority lien upon the pledged collateral; (2) a HELOC; and/or (3) in the context of an MMLPSA, a "Second Lien Mortgage Loan" as defined in the applicable MMLPSA.

[463]  2001 MMLPSA [ALLY_0018253].

[464]  Amendments to the 2001 MMLPSA include the Addendum to 2001 MMLPSA, dated Jan. 22, 2002 [ALLY_0201226]; Second Addendum to 2001 MMLPSA, dated June 4, 2002 [ALLY_0018245]; Third Addendum to 2001 MMLPSA, dated Jan. 1, 2003 [ALLY_0018247]; Fourth Addendum to 2001 MMLPSA, dated Sept. 1, 2004 [ALLY_0018249].

[465]  GMAC Mortgage entered into a new MMLPSA with new GMAC Bank dated October 6, 2006. *See* Section V.B.3.b.

[466]  In January 2002, Old GMAC Bank acquired GMAC Mortgage's correspondent lending business, pursuant to which Old GMAC Bank purchased closed mortgage loans from correspondents. *See* Int. of A. Celini, Feb 18, 2013, at 53:9–15. By 2007, most purchases from correspondent lenders were conducted through GMAC Bank. *See* Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2008), at 5; *see also* Int. of R. Groody, Dec. 17, 2012, at 16:17–22.

[467]  Int. of R. Groody, Dec. 17, 2012, at 18:1–2; Int. of A. Celini, Feb. 18, 2013, at 40:17, 41:19–23.

Significant terms of the 2001 MMLPSA included the following:

### *(1) Loan Purchase Requirements*

The 2001 MMLPSA initially did not mandate that GMAC Mortgage purchase, or that Old GMAC Bank sell, any particular loans, but instead simply provided a framework for sales otherwise agreed upon through separate offers by the Bank and acceptances (as to some or all of the offered loans) by GMAC Mortgage.[468]

A June 2002 amendment mandated that GMAC Mortgage purchase and Old GMAC Bank sell all "First Lien Mortgage Loans to be originated or acquired by" Old GMAC Bank[469] (but did not include Second Lien/home equity loans in this obligation).[470] Then, in a September 2004 amendment, the purchase/sale obligation was limited to "any and all First Lien Mortgage Loans to be originated by [the Bank] that are classified on the balance sheet of the [Bank] as 'held for sale.'"[471]

To facilitate purchases and their coordination with GMAC Mortgage's sales and securitizations of packages of loans,[472] Old GMAC Bank was required to provide GMAC Mortgage with loan-level information.[473] Identification of the specific loans to be included in a particular purchase was then left to GMAC Mortgage, which was required to notify Old GMAC Bank of its intent to purchase and submit a list of the loans to be purchased.[474] While

---

[468] 2001 MMLPSA, Art. II [ALLY_0018253].

[469] Second Addendum to 2001 MMLPSA, dated June 4, 2002, ¶ 3 [ALLY_0018245].

[470] According to Celini, there was no hedging done for home equity loans as most were floating rate loans. As there was minimal interest rate and market risk, "the mandatory nature of the sale isn't as explicit here . . . . But there was no change in the intent that . . . the affiliate would take us out." Int. of A. Celini, Feb. 18, 2013, at 105:1–8.

[471] Fourth Addendum to 2001 MMLPSA, dated Sept. 1, 2004, ¶ 2 [ALLY_0018249]. This change was made when the Bank decided to begin maintaining an HFI portfolio. Int. of A. Celini, Feb. 18, 2013, at 101:4–18.

[472] According to Dondzila:

> [W]hat would, practically speaking, be happening is that the group within ResCap that pools loans would be looking at, collectively, its portfolio, meaning ResCap's portfolio of saleable loans and Ally Bank's portfolio of saleable loans, and would be looking to pool those loans for sale.

> And so, they don't just say, 'Oh, give me all the production,' . . . [b]ut, . . . the onus was on the purchaser to say, "Here are the loans that I'm intending to purchase," and then providing presumably some of this notification, and then those loans would subsequently be sold, and then ResCap would have already probably sold those loans to one of the agencies or into a Ginnie [Mae] securitization.

Int. of C. Dondzila, Sept. 27, 2012, at 201:6–24; *see also* Int. of R. Groody, Dec. 17, 2012, at 85:16–86:9.

[473] Second Addendum to 2001 MMLPSA, dated June 4, 2002, § 2.2(a) [ALLY_0018245].

[474] *Id*. § 2.2(b), (c).

mandating the purchase and sale of all of the Bank's HFS loans, the 2001 MMLPSA, as amended, did not specify a mechanism for assuring that all subject loans were purchased, or deadlines for such purchases.[475]

### (2) Servicing Rights

The 2001 MMLPSA, as amended, provided that Old GMAC Bank would not retain MSRs for loans sold under the agreement, but would instead sell the loans "as whole loans and on a servicing-released basis."[476]

### (3) Purchase Price

The 2001 MMLPSA initially provided that the Purchase Price for loans would be the "unpaid principal balance" of the loan ("UPB"), plus "any accrued and unpaid interest," plus a "Purchase Price Premium" to be specified in Exhibits to the Agreement.[477] Exhibit C to the 2001 MMLPSA specified that the Premium for (second-lien) Home Equity Loans was to be 450 basis points.[478] However, the version of the first-lien loan pricing exhibit attached to the 2001 MMLPSA as Exhibit B says it is "TO BE SUPPLIED."[479] The parties' productions did not contain a version of Exhibit B specifying the original Purchase Price Premium for First Lien Loans. A contemporaneous Old GMAC Bank Affiliate Transaction Memo prepared by Celini, the Bank official primarily responsible for affiliate transactions,[480] stated that the Purchase Price Premium for loans was 250 basis points (without distinguishing between first-lien and second-lien loans).[481] In his interview, Celini explained that the first-lien loan pricing

---

[475]  *Id*. § 2.2; Fourth Addendum to 2001 MMLPSA, dated Sept. 1, 2004 [ALLY_0018249].

[476]  2001 MMLPSA, § 2.1 [ALLY_0018253]; Second Addendum to 2001 MMLPSA, dated June 4, 2002, § 2.1 [ALLY_0018245]; Fourth Addendum to 2001 MMLPSA, dated Sept. 1, 2004, § 2.1 [ALLY_0018249].

[477]  2001 MMLPSA, §§ 1.21, 1.22, 2.4(c), 2.4(d) [ALLY_0018253]. As discussed in Section V.B.3.a(4), the development of these pricing provisions relates to issues regarding representations and warranties provided under the 2001 MMLPSA; accordingly, it is discussed in some detail here.

[478]  *Id.* Ex. C. The Premium for Home Equity Loans was later reduced to 175 basis points. Third Addendum to 2001 MMLPSA, ¶ 2 [ALLY_0018247].

[479]  2001 MMLPSA, Ex. B [ALLY_0018253].

[480]  Celini, hired in 2000 to become the CFO of Old GMAC Bank, worked on the initial chartering process for the Bank, and then also served as chief credit and risk officer from 2003–2006. His primary responsibility was to expand the lending capacity of the Bank through the 250.250 exemption. Int. of A. Celini, Feb. 18, 2013, at 6:15–17, 7:22–8:3, 9:3–10:13, 11:1–8. He became CFO of Ally Bank in November 2006. Celini's responsibilities also included the Bank's affiliate agreements. Int. of A. Celini, Feb. 18, 2013, at 8:14–18. He signed a number of the subsequent agreements and amendments addressed in this Section on behalf of the Bank, and authored several of the related Bank Affiliate Transaction Memoranda. He left the Bank in October 2009. Int. of A. Celini, Feb. 18, 2013, at 15:11–15.

[481]  GMAC Bank Affiliate Transaction Memorandum, Master Mortgage Loan Purchase and Sale Agreement, dated Dec. 14, 2001, at 2 [ALLY_0018320].

had not been settled at this point, since the Bank started off by selling home equity loans rather than first-lien loans, and first-lien loan pricing was not resolved until just over a month later, when the parties adopted an Addendum to the 2001 MMLPSA.[482]

The January 22, 2002 Addendum replaced the Purchase Price Premium Exhibit for First Lien Loans with a new Exhibit B specifying that "Pricing for first mortgage loans sold from GMAC Bank to [GMAC Mortgage] will be at the Bank's *cost basis* in the loan (UPB + Premium/Discount + SRP) as of the date of sale."[483] As noted above, "UPB" references the unpaid principal balance on the loan. "Premium/Discount" references an adjustment made to the carrying value of a loan where, e.g., the interest rate varies from the market rate because the buyer pays points up front for a lower rate or accepts a higher rate but pays no points.[484] "SRP" references the "servicing-released premium," a payment by the purchaser of a mortgage to the seller for the release of the servicing rights on the underlying loan.

Celini and Groody[485] explained that the effect of these provisions was that GMAC Mortgage acquired First Lien Loans at Old GMAC Bank's cost (rather than paying market value for the loans), so that GMAC Mortgage recognized the gain (or loss) on sale for any mortgage, including the benefit (or loss) resulting from any change in the market value of the

---

[482] Int. of A. Celini, Feb. 18, 2013, at 51:11–21, 52:3–13, 53:22–24. This account is in some tension with Celini's contemporaneous Bank Affiliate Transaction Memorandum's recitation of a premium of "250 basis points" for "loans" generically. This does not appear to have been a reference to the premium for Home Equity Loans (as defined in the 2001 MMLPSA) and Lines of Credit (as defined in the 2001 MMLPSA), which were subject to the 450 basis point premium specified in Exhibit C. The "250 basis points" reference in the Affiliate Transaction Memorandum consequently might most readily be understood as a statement of the premium applicable to first-lien loans. *But see* Int. of A. Celini, Feb. 18, 2013, at 50:6–51:10.

[483] Addendum to 2001 MMLPSA, dated Jan. 22, 2002, ¶ 2, Ex. B [ALLY_0201226] (emphasis added). The revision of Exhibit B is not entirely harmonious with the text of sections 1.21 and 1.22, which indicate that the Exhibit is simply supposed to set forth the "Purchase Price Premium." 2001 MMLPSA, §§ 1.21, 1.22 [ALLY_0018253]. The revised Exhibit B in the Addendum to the 2001 MMLPSA speaks not merely to the Purchase Price Premium, but sets forth the complete "Pricing for first mortgage loans." Addendum to 2001 MMLPSA, dated Jan. 22, 2002, Ex. B [ALLY_0201226].

[484] Int. of A. Celini, Feb. 18, 2013, at 56:6–24.

[485] Groody joined Old GMAC Bank as its CFO in May 2005, became Chief Mortgage Accountant of Ally Bank in the 2006 Bank Restructuring, and became Ally Bank's EVP and COO in December 2007. Int. of R. Groody, Dec. 17, 2012, at 8:5–9:3, 9:19–25, 10:12–11:13, 60:15–20, 67:1–5, 280:24–281:8. He was a signatory to every version and amendment of the MMLPSA adopted after he joined Old GMAC Bank in May 2005, beginning with the 2006 MMLPSA; he also executed a number of Pipeline Swap and MSR Swap schedules and amendments. He left the Bank in May 2009. *Id.* at 11:24–12:1.

loan before its sale under the MMLPSA.[486] Thus, the 2001 MMLPSA was a forward sale commitment that essentially served as a hedge for Old GMAC Bank against loan market-value fluctuations.[487] Old GMAC Bank's revenue from the loans consisted of the net interest carry for the period that the loan was on Old GMAC Bank's books.[488] According to Celini, the pricing structure was the same for each of Old GMAC Bank's loan channels—loans were purchased at Old GMAC Bank's cost basis.[489]

These terms were not "market" terms, from either party's perspective. In a sale to a third party, Old GMAC Bank ordinarily would have retained the gain on sale, not merely the net interest carry. However, Old GMAC Bank would have been un-hedged, could not have purchased a similarly complete hedge in the market, and would have incurred significant expense in constructing a (less complete) hedge through third-party arrangements.[490]

### (4) Loan-Level Representations And Warranties

In Article IV, Old GMAC Bank provided a lengthy series of "loan-level" representations and warranties to GMAC Mortgage for "each Mortgage Loan sold" under the 2001 MMLPSA, including representations and warranties that the loan had been originated and serviced in accordance with applicable law, was enforceable, etc.[491]

Celini and Groody both asserted that, despite the presence of these representations and warranties in the text of the 2001 MMLPSA, the parties' "intent" was that Old GMAC Bank not be held responsible for representations and warranties.[492] While their recollection or

---

[486] Int. of A. Celini, Feb. 18, 2013, at 55:1–18 ("So our goal for pricing would be for us to be taken out at our cost basis. In other words, whatever the basis of the asset that the bank had acquired the loan at, that it would be removed at that cost basis, so that this would be a risk-free transfer from the bank's perspective."); Int. of R. Groody, Dec. 17, 2012, at 88:17–89:6 (discussing cost basis under 2001 MMLPSA), 90:22–91:25, 92:21–93:6.

[487] Int. of R. Groody, Dec. 17, 2012, at 96:20–97:18; *see also* GMAC Bank Affiliate Transaction Memorandum, Master Mortgage Loan Purchase and Sale Agreement Amended and Restated 6/1/07, dated Oct. 31, 2007, ¶ 2 [ALLY_0017869] (explaining that the June 2007 MMLPSA functioned as a hedge for the Bank).

[488] Int. of A. Celini, Feb. 18, 2013, at 232:8–233:14 (Bank revenues on first lien HFS loans were limited to net carry, and, in later years, revenues associated with retained MSRs under the MSR Swap); Int. of R. Groody, Dec. 17, 2012, at 96:20–97:15.

[489] Int. of A. Celini, Feb. 18, 2013, at 59:5–13.

[490] GMAC Bank Affiliate Transaction Memorandum, Master Mortgage Loan Purchase and Sale Agreement Amended and Restated 6/1/07, dated Oct. 31, 2007, ¶ 2 [ALLY_0017869].

[491] 2001 MMLPSA, §§ 4.1–4.26 [ALLY_0018253].

[492] *See* Int. of R. Groody, Dec. 17, 2012, at 121:21–122:3; Int. of A. Celini, Feb. 18, 2013, at 159:6–8.

knowledge of negotiations or discussions leading to the arrangement was limited, ResCap personnel also uniformly understood that Old GMAC Bank was not to have any exposure for representation and warranty liability.[493]

Celini explained that the 2001 MMLPSA, including the representation and warranty provisions, had been copied from a third-party arrangement.[494] As noted above, Celini believed that the pricing for First Lien Loans was not resolved at the time the parties first entered into the 2001 MMLPSA. When they agreed upon cost-basis pricing in the Addendum adopted in January 2002, Old GMAC Bank's revenue on loans was limited to "net carry," while any gain on sale consequently would be recognized by GMAC Mortgage, rather than Old GMAC Bank.[495] Old GMAC Bank was acting simply as a funding vehicle for GMAC Mortgage, and the "net carry" margin was too thin, Celini asserted, to support assumption of representation and warranty liability.[496] This was true even though the risk assumed—given that the vast majority of loans had not been originated by Old GMAC Bank, but had been purchased from correspondents (or GMAC Mortgage) who had themselves given representations and warranties—was largely limited to credit risk.[497] Celini advised that he had discussed the matter with ResCap/GMAC Mortgage personnel in advance of the adoption of the Addendum, and it was agreed that Old GMAC Bank would not have representation and

---

[493] *See, e.g.,* Int. of D. Bricker, Mar. 15, 2013, at 95:19–99:14; Int. of B. Bier, Feb. 22, 2013, at 22:15–24:9; Int. of S. Blitzer, Mar. 5, 2013, at 26:18–28:15.

[494] Int. of A. Celini, Feb. 18, 2013, at 64:11–18 ("[W]e started most of our affiliate agreements with market terms. And these look like market terms as it applied to representations and warranties.").

[495] *Id.* at 58:14–18, 66:1–3. This was Bier's understanding as well. *See* Int. of B. Bier, Feb. 22, 2013, at 27:4–28:1 (". . . [G]enerally speaking, the bank was financing the loans. So, the bank was entitled to a financing spread, and to cover whatever its costs were related to the transactions. But, all the risk and reward from a capital markets perspective were retained by the mortgage company. So, essentially, that's not . . . inconsistent with other financing type of arrangements . . . .").

[496] Int. of A. Celini, Feb. 18, 2013, at 88:25–89:12. Celini also noted that it would not have passed the scrutiny of the regulators or auditors. *Id.* at 89:13–18; *see also* Int. of B. Bier, Feb. 22, 2013, at 23:7–13, 45:12–46:15 (agreeing, and noting that the Bank was set up as a financing vehicle and in financing, financier is entitled to its cost plus a spread).

[497] Int. of A. Celini, Feb. 18, 2013, at 90:13–91:5.

warranty obligations to GMAC Mortgage.[498] Asked, why, if this had been discussed, the 2001 MMLPSA had not been revised accordingly in the January 2002 Addendum when the pricing provision was revised, Celini said "we should have addressed the complete agreement at the time," and that "it was an error for us not to go back and make that change at the time."[499]

Groody, who joined the Bank in 2005, reached the same substantive result by a somewhat different route. While asserting that the representation and warranty provisions in the 2001 MMLPSA were intended to be in the agreement,[500] Groody seems to have understood the provisions to function essentially as pass-throughs or assignments of the representations and warranties Old GMAC Bank had itself received from third-party correspondents from whom it had purchased the loans,[501] though that is not what the

---

[498]  *Id.* at 66:16–72:13. Celini also stated,

> when you look at the true cash flows and the financial activities [and] the intention of the parties at the time, we were funding loans and our specific intention was not to take market risk, not to take credit risk or any risk for the activity because we were providing interim funding. So we earned coupon interest and coupon interest only. We got no gain on sale. And because of that treatment, it was not the expectation of the parties that the depositary would take any reps and warrants on the loans that it originated . . . . And while the agreement indicates reps and warrants, that would not be a matching of the rewards and the benefits—the expenses and the revenues associated with the traditional mortgage banking practice.

> *Id.* at 65:20–66:15. Bricker and Blitzer, two GMAC Mortgage personnel that Celini recalled speaking with about representations and warranties, did not recall any such discussions but did not dispute that they spoke with Celini about the issue, and agreed that the Bank was not supposed to be retaining representation and warranty risk. Int. of D. Bricker, Mar. 15, 2013, at 107:25–108:6; Int. of S. Blitzer, Mar. 5, 2013, at 26:16–22, 86:16–87:20.

[499]  Int. of A. Celini, Feb. 18, 2013, at 74:14–16, 74:24–75:1. Celini also observed that "[a]t a point in the future, I do recall that we went back and did a cleanup of the agreement," apparently referencing MMLPSA revisions in 2006 and 2007, discussed in Sections V.B.3.b and V.B.3.c. *Id.* at 74:17–19.

[500]  Indeed, Groody went so far as to suggest that later versions of the MMLPSA, which appear first to limit the effect of the representations and warranties to second-lien loans, and then to eliminate them altogether, were themselves errors. *See* Sections V.B.3.b(3), V.B.3.c(2); Int. of R. Groody, Dec. 17, 2012, at 86:19–87:23, 120:16–122:11.

[501]  Int. of R. Groody, Dec. 17, 2012, at 122:4–11.

provisions state.[502] Normally, the representation and warranty claim would be pursued "up the chain" and come to rest with the third party that originated the loan. Asked what would occur if a third-party loan originator was insolvent and unable to satisfy the representation and warranty claim, Groody concluded that "[w]e would have figured out a mechanism to put that loss, if any, back to GMAC Mortgage," because the "intent" and "understanding" of the program was always that Old GMAC Bank would not actually bear this risk.[503] In a number of subsequent documents and in his interview, Groody expressed the maxim that, as between the Bank and GMAC Mortgage, "the party [that] retains the Gain on sale of the mortgage loans retains the rep and warrant risk."[504]

Barry Bier, who had held senior positions in capital markets and lending for GMAC Mortgage since 1997,[505] echoed this view, agreeing that GMAC Mortgage would bear the loss if no recovery was possible from the third-party correspondent because the Bank was "really a financing vehicle for the inventory" and GMAC Mortgage took all the risk and reward with respect to the loans.[506]

————————————————————

[502] *Id.* at 122:4–11. One might expect that, absent GMAC Mortgage's receipt of representations and warranties from the Bank, or the Bank's assignment in some form of the representations and warranties it had received from third-party correspondents, GMAC Mortgage would be unable to pursue representation and warranty claims against third parties. However, the terms of the parties' agreements with the correspondents from whom the Bank purchased loans permitted GMAC Mortgage to pursue representation and warranty claims in these circumstances. Int. of A. Celini, Feb. 18, 2013, at 80:1–84:7; Int. of B. Bier, Feb. 22, 2013, at 36:8– 37:17. Old GMAC Bank's correspondent agreements provided indemnification and repurchase rights that explicitly extended to Old GMAC Bank's affiliates. *See* Correspondent Agreement, dated Apr. 4, 2006, § 9 [RCUW00140906]; Correspondent Agreement, dated Oct. 17, 2005, § 9 [RCUW00145416]; Correspondent Agreement, dated Sept. 24, 2004, § 9 [RCUW00141132]; *see also* Response to UBS Questions as of May 14, 2010, dated Feb. 10, 2010, at EXAM11011434 [EXAM11011422] ("To the extent these loans were originated by third-parties and sold to [GMAC Mortgage] under the MMLPSA, [GMAC Mortgage] pursues recovery of losses from third-parties under breach of customary representation[s] and warranties.").

[503] Int. of R. Groody, Dec. 17, 2012, at 127:12–128:4. Groody's belief that the Bank would be able to put any losses for unsatisfied representation and warranty claims on GMAC Mortgage was not tested during his tenure at Old GMAC Bank or at Ally Bank. The parties did not encounter any situations where insolvent third-party originators were unable to satisfy representation and warranty claims before he left in May 2009. *Id.* at 126:18–127:10.

[504] E-mail from R. Groody to C. Dondzila, J. Peterson, and J. Whitlinger (Mar. 13, 2009) [ALLY_0329052]; Int. of R. Groody, Dec. 17, 2012, at 252:13–254:2; *see also* Int. of J. Whitlinger, Nov. 30, 2012, at 68:1–3 ("[M]y understanding at the time was that whoever got gain on sale got the rep and warranty:"); Int. of A. Celini, Feb. 18, 2013, at 58:14–19 ("We earned coupon interest during the period of holding and the asset was removed from our balance sheet at basis. We received no gain or loss on the transaction and it was not our intent to take any risk during that time.").

[505] Bier held various positions during his tenure with the companies, including Senior VP for Capital Markets of GMAC Mortgage when he joined the company in 1997, EVP of Capital Markets and Lending; COO of GMAC Mortgage, and EVP Asset Manager of ResCap. Int. of B. Bier, Feb. 22, 2013, at 5:18–6:4, 7:9–15.

[506] *Id.* at 39:16–40:13.

Thus, Celini stated, it was normal practice for GMAC Mortgage to accept put-back requests from Fannie Mae and Freddie Mac.[507] GMAC Mortgage's own Quality Control unit was "charged with the responsibility of reviewing repurchase requests from all Investors on GMAC Mortgage *and GMAC Bank originated loans.*"[508] But such repurchase requests were never tendered back to Old GMAC Bank.[509] These loans included both loans originated by Old GMAC Bank and loans originated by third-party correspondents.[510]

Consequently, Celini noted, while GMAC Mortgage carried representation and warranty reserves,[511] Old GMAC Bank never carried a reserve for representation and warranty exposure.[512]

### (5) Termination

Either party could terminate the 2001 MMLPSA without cause on 30 days' notice.[513]

### (6) Disposition Of The 2001 MMLPSA In The 2006 Bank Restructuring

Neither the 2001 MMLPSA nor any contingent liabilities of Old GMAC Bank thereunder were assumed by Ally Bank in the 2006 Bank Restructuring.[514]

The OTS approved the transfer of assets under the 2006 Bank Restructuring subject to certain conditions, including the provision of a "holding company guarantee confirming

---

[507] Int. of A. Celini, Feb. 18, 2013, at 78:19–79:3, 79:23–25.

[508] Executive Summary, Repurchases—December, 2004, at 1 [EXAM20056326] (emphasis added).

[509] Int. of A. Celini, Feb. 18, 2013, at 78:19–79:3, 79:23–25.

[510] *Id.* at 79:13–18, 83:6–9.

[511] *See* ResCap Rep and Warranty Reserves as of November 30, 2006, dated Dec. 14, 2006, at 9 [EXAM10183443]; Memorandum, Contingent Liability for Reps and Warranties related to Repurchase, dated Nov. 28, 2006, at EXAM10183454 [EXAM10183443].

[512] Int. of A. Celini, Feb. 18, 2013, at 86:8–87:9 (discussing period from 2001 to January 2005); *see also* Memorandum, Ally Bank Representation & Warrant Position on Affiliate Mortgage Loan Sales, dated Mar. 3, 2011, at 2 [EXAM20276496] ("As there is no exposure to [GMAC Mortgage], the Bank does not record an R&W reserve related to the sale with [GMAC Mortgage]."); *see also id.*, at 3 ("Therefore, even though the Bank maybe the servicer of record for the loan and has an obligation under the agency seller and servicer guides, as seller [GMAC Mortgage] holds the initial obligation as between the Bank and [GMAC Mortgage], and as such records 100% of the R&W reserve for the loans it sells to the agencies.").

[513] 2001 MMLPSA, § 7.1 [ALLY_0018253].

[514] The 2001 MMLPSA was not listed as an "Acquired Asset" in the Purchase and Assumption Agreement nor was it listed in the Old GMAC Bank board minutes approving the assignment of certain affiliate agreements. Purchase and Assumption Agreement [ALLY_PEO_0021066]; Minutes of a Regular Meeting of the Board of Directors of GMAC Bank, Nov. 30, 2006, at 2 [ALLY_PEO_0020880]; Review of GMAC Bank Affiliate Agreements Assigned from GMAC Bank FSB to GMAC Bank ILB, dated Nov. 30, 2006, at ALLY_0260095–97 [ALLY_0260087].

responsibility for any of [Old GMAC Bank's] contingent liabilities following the consummation of the transaction" and the receipt of written non-objection thereto from the OTS.[515] In a November 10, 2006 response, AFI agreed only to "indemnify, defend and hold harmless [Old GMAC Bank] with respect to any post-closing claims or liabilities relating to the assets sold to [GMAC Bank]" as described in the applications to the OTS.[516] The OTS issued a non-objection letter with respect to the indemnity AFI provided.[517]

### b. The 2006 MMLPSA

In late 2006, GMAC Mortgage entered into a new MMLPSA with Ally Bank (the 2006 MMLPSA).[518] The 2006 MMLPSA is dated October 31, 2006,[519] shortly before the 2006 Bank Restructuring occurred in connection with the Cerberus acquisition of a majority interest in AFI.[520] The loans sold to GMAC Mortgage under the 2006 MMLPSA consisted of loans purchased from third-party correspondents and from GMAC Mortgage itself, as well as brokered loans originated in Ally Bank's name.[521]

---

[515]  Letter from OTS to J. Feinberg (Aug.16, 2006) [EXAM10221739].

[516]  Letter from S. Khattri to R. Albanese (Nov. 10, 2006) [ALLY_0402156]. In consideration of AFI's agreement to provide the holding company guarantee requested by the OTS, ResCap agreed to counter-indemnify AFI with respect to the same post-closing claims or liabilities. Letter from S. Khattri to B. Paradis (Nov. 10, 2006) [ALLY_0018335]. This indemnity was approved by the ResCap Board. Certificate of C. Quenneville (Nov. 22, 2006) [CERB001616].

[517]  Letter from R. Albanese to J. Feinberg (Nov. 20, 2006) [ALLY_0401904].

[518]  2006 MMLPSA [ALLY_0018291].

[519]  Groody, who executed the agreement on behalf of the industrial bank, did not become an officer of the industrial bank until the restructuring occurred on November 20, 2006, and consequently was at something of a loss to explain why the agreement was dated October 31, 2006. Int. of R. Groody, Dec. 17, 2012, at 64:21–68:13. He believed that the agreement was not actually executed until Old GMAC Bank and GMAC Automotive Bank consummated the Purchase and Assumption Agreement under which Old GMAC Bank transferred the bulk of its assets to GMAC Automotive Bank on November 22, 2006. *Id.* at 68:18–22; *see also* Section V.A (discussing the Purchase and Assumption Agreement).

[520]  *See* Section V.A.

[521]  Groody suggested that the Bank ceased producing brokered loans in 2006. *Id.* at 72:21–73:4. *Compare* GMAC Mortgage Corporation Consolidated Financial Statements as of Dec. 31, 2005 and 2004, at 6 [EXAM00231553] (noting Bank loan production through "network of brokers and correspondents") and GMAC Bank Audited Financial Statements as of Dec. 31, 2005 and 2004, at 5 [GOLDIN00091763], *with* GMAC Bank Consolidated Financial Statements as of Dec. 31, 2006, at 9, 23 [EXAM00231722] (referencing correspondents, not brokers), and GMAC Bank Consolidated Financial Statements as of Dec. 31, 2007 and 2006, at 9 [EXAM00125246] (same). However, it appears that the Bank continued to have brokered loans through the life of the agreement. *See* E-mails among C. Dondzila, J. Cortese, S. Ruby, et al. (Feb. 10–11, 2010), at EXAM11891922 [EXAM11891921] (discussing continued production of brokered loans since 2006). There apparently was some confusion caused by the fact that the Bank in Q2 2006 placed its Broker Fulfillment group under the aegis of its Correspondent Lending operation. *Id.* It continued to close brokered loans "in the name of the Bank," though the volume appears to have been relatively small. *Id.* Then, with the advent of the Broker Agreement at the end of 2008, loans brokered to Ally Bank by GMAC Mortgage were sold to GMAC Mortgage under the MMLPSA. *See* Section V.B.6.

The 2006 MMLPSA was modeled on the 2001 MMLPSA, but materially changed some of the significant terms described above:

### *(1) Loan Purchase Requirements*

While the 2006 MMLPSA did not change the scope of the loans GMAC Mortgage was obligated to purchase (First Lien HFS loans), or the procedures for selection of loans for purchase, it did add a provision barring GMAC Mortgage from using "adverse selection procedures" in choosing loans for purchase.[522]

### *(2) Servicing Rights*

While the 2001 MMLPSA only provided for the sale of loans on a "servicing-released" basis, the 2006 MMLPSA permitted the Bank to sell loans on either "a servicing-retained or servicing-released basis."[523] From at least as early as 2005, ResCap and Old GMAC Bank had contemplated moving MSRs to the Bank, and ResCap and Bank personnel had embarked on a project with this aim by the fall of 2006.[524] This change from the 2001 MMLPSA was made to align the agreement with this plan.[525]

### *(3) Loan-Level Representations And Warranties*

Potentially the most noteworthy language change effected by the 2006 MMLPSA was the revision of Article IV's loan-level representation and warranty provisions to eliminate their application to First Lien Loans. As revised, the preamble to Article IV provided that Ally Bank made such representations and warranties only "with respect to each Second Lien Mortgage Loan sold and transferred to Purchaser."[526] GMAC Mortgage, of course, was still required to make such representations and warranties on First Lien Loans to GSEs or other third parties when it sold or securitized these loans.[527]

---

[522] 2006 MMLPSA, § 2.2(e) [ALLY_0018291].

[523] *Id.* § 2.1.

[524] *See* Section V.B.9.a.

[525] Int. of R. Groody, Dec. 17, 2012, at 81:23–82:15.

[526] 2006 MMLPSA, Art. IV [ALLY_0018291]. The title of Article IV was also changed from "Representations and Warranties of Seller Relating to Mortgage Loans" to "Representations and Warranties of Seller Relating to *Second Lien* Mortgage Loans." *Id.* (emphasis added). *Compare* 2001 MMLPSA, Art. IV [ALLY_0018253] *with* 2006 MMLPSA, Art. IV [ALLY_0018291].

[527] There are two additional loan purchase agreements dated October 31, 2006, one between ResCap and Old GMAC Bank [ALLY_PEO_0021142], and the other between ResCap and GMACB Asset Management Corp. (a subsidiary of Old GMAC Bank) [CERB001537]. These agreements each govern the sale of discrete packages of existing loans to ResCap; notably, under Article IV of each agreement, all of the loans sold (not just second lien loans) are subject to substantially the same representations and warranties that were applicable under the 2001 MMLPSA.

Celini viewed the elimination of representations and warranties for First Lien Loans as a "clean up" of the agreement to make it consistent with the parties' understanding that the Bank would not have representation and warranty liability.[528] But he was at a loss to explain why the 2006 MMLPSA explicitly retained representations and warranties for Second Lien Loans, since he maintained that the Bank's margins on those loans were also too thin to support accepting representation and warranty liability and that it had been agreed in 2002 that the Bank would have no such liability for *any* loans under the MMLPSA.[529]

Groody, in contrast, asserted that, despite the revision to Article IV's preamble, the "understanding" remained that the representations and warranties applied to *all* loans sold under the 2006 MMLPSA, including First Lien Loans.[530] However, Groody was unable to satisfactorily explain why, if this was the case, the preamble language had been changed.[531] It is difficult to read the preamble revisions as anything other than a statement that

---

[528] Int. of A. Celini, Feb. 18, 2013, at 149:21–150:6.

[529] *Id.* at 151:5–21, 156:1–157:23.

[530] Int. of R. Groody, Dec. 17, 2012, at 86:19–87:8.

[531] Groody noted that his "focus" had been on the individual representations and warranties, which continued to include provisions germane only to First Lien Loans. *Id.* at 87:9–23. For example, section 4.21 of the 2006 MMLPSA provides a representation and warranty that loan proceeds "have been fully disbursed," but expressly carves out "home equity lines of credit"—Second Lien Loans—from its application. 2006 MMLPSA, § 4.21 [ALLY_0018291].

Groody further observed that the term "Mortgage Loan" used throughout the individual representations and warranties (*see, e.g.,* §§ 4.1, 4.2, 4.3) is elsewhere defined broadly, so that it would include First Lien Loans and home equity loans and lines of credit. Int. of R. Groody, Dec. 17, 2012, at 87:4–8; 2006 MMLPSA, § 1.17 [ALLY_0018291] (defining "Mortgage Loan"). However, the individual sections in Article IV were copied wholesale from the 2001 MMLPSA; the references to Mortgage Loans did not need to be revised or narrowed to give effect to the intent apparent from the revision of the preamble to limit the application of the representations and warranties to Second Lien Loans, which were a species of "Mortgage Loans."

AFI counsel noted that perhaps the reference to Second Lien Loans in the preamble was an error somehow produced because Second Lien Loans had not been encompassed in the 2001 MMLPSA. However, in fact, the 2001 MMLPSA, though it did not set forth either "First Lien Mortgage Loan" or "Second Lien Mortgage Loan" as separate defined terms, clearly encompassed both sorts of loans. *See* 2001 MMLPSA, § 1.15 [ALLY_0018253] (definition of Mortgage Loan includes home equity loans and lines of credit), Ex. B, C (separate exhibits for "First Mortgage Pricing" and "Home Equity Loan/Line Pricing").

AFI counsel also suggested that the preamble should be ignored, citing section 8.11 of the agreement, which contains a commonplace provision stating that "Paragraph captions" are "for ease of reference only and shall be given no substantive or restrictive meaning or significance." The difficulty with this argument is that section 8.11 applies to "captions," not to preambles, and the various preambles in the agreement (including the preambles in Articles I, III, IV, and V) seem clearly to have been intended to have operative effect. Indeed, only the preambles to Articles III, IV, and V specify that the statements in the various sections of those articles are representations and warranties of the pertinent party; absent the preamble to Article V, for example, there would be nothing in the text of the various sections of that Article that explains that they are representations and warranties of the Purchaser, as opposed to mutual statements of understanding made by both parties.

representations and warranties are not to apply to First Lien Loans.[532] In any case, Groody maintained his view was that, even though the Bank continued to provide representations and warranties to GMAC Mortgage for First Lien Loans, the parties' "intent" had always (even under the 2001 MMLPSA) been that the Bank would not ultimately be held responsible for any breach.[533]

In any case, neither Celini nor Groody could provide an explanation for the 2006 MMLPSA representation and warranty provisions for Second Lien Loans that could be reconciled with their respective explanations concerning the parties' "intent" that there would be no Bank representation and warranty liability for *any* loans.[534] Moreover, as discussed in Section V.B.3.a(3), while First Lien Loans were priced at the Bank's cost,[535] the purchase price for Second Lien Loans under the 2006 MMLPSA included a purchase price premium with a basis points component.[536]

Individuals who only became involved in these matters in later years, including ResCap officials involved in addressing the substantial "rep & warranty" issues and settlements with Fannie Mae and Freddie Mac, were unaware or had no recollection that the Bank had ever provided loan-level representations and warranties.[537] As James Whitlinger noted, even if the third-party originator was not solvent and no longer paying claims, "[w]e didn't go back to Ally Bank."[538]

---

[532] Kenneth Blackburn, the GMAC Mortgage employee who executed the 2006 MMLPSA on behalf of GMAC Mortgage, was unable to recall executing the agreement or any involvement in negotiating its terms; he speculated that he may have been called upon to execute the agreement because his office was near Groody's. Int. of K. Blackburn, Mar. 26, 2013, at 13:17–14:8.

[533] Int. of R. Groody, Dec. 17, 2012, at 121:21–122:18, 127:12–128:4.

[534] Blackburn had no recollection of the agreement or its terms and therefore was unable to provide any insight on the representation and warranty provisions for Second Lien Loans. Int. of K. Blackburn, Mar. 26, 2013, at 11:1–13:23. Blackburn "at a high level" was aware that the Bank sold loans to GMAC Mortgage, but was not involved in any of the transaction's details and had no recollection of whether the Bank provided representations and warranties to GMAC Mortgage under the MMLPSA. *Id.*

[535] 2006 MMLPSA, § 1.24, Ex. B [ALLY_0018291].

[536] *Id.* § 1.24, Ex. C [ALLY_0018291].

[537] Int. of C. Dondzila, Sept. 27, 2012, at 213:20–219:13; Int. of J. Young, Sept. 28, 2012, at 262:22–263:23; Int. of J. Whitlinger, Nov. 30, 2012, at 51:2–14.

[538] Int. of J. Whitlinger, Nov. 30, 2012, at 68:13–69:4.

### (4) Pricing And Termination Provisions

The 2006 MMLPSA left unchanged the provisions of the 2001 MMLPSA (as amended) concerning the purchase price of First Lien Loans[539] and termination.[540] The pricing of Second Lien Loans still included a purchase price premium, with a basis-point component of 175 bps. [541]

### c.   The 2007 MMLPSA

Effective June 1, 2007, GMAC Mortgage and Ally Bank entered into an "Amended and Restated" MMLPSA (the "2007 MMLPSA").[542] This version of the MMLPSA, adopted as ResCap was confronting worsening market conditions (though the market for conforming loans, the loans principally at issue under the MMLPSA, was comparatively strong), made several key revisions:

### (1) Loan Purchase

The 2007 MMLPSA imposed several new requirements concerning GMAC Mortgage's loan purchase obligations:

> (1) First, GMAC Mortgage was now required to purchase not only First Lien Loans HFS, but also "any and all Mortgage Loans to be originated or acquired by Seller" classified on Ally Bank's balance sheet as HFS (i.e., including Second Lien Loans HFS not previously subject to this mandate).[543]

> (2) Second, for all mortgage loans now subject to GMAC Mortgage's expanded purchase obligation, Ally Bank was given the right once a year (on or about June 15th) to identify any loans that were aged 180 days or more and require that GMAC Mortgage "promptly" purchase such loans.[544]

---

[539] *See* 2006 MMLPSA, §§ 1.23 (Purchase Price), 1.24 (Purchase Price Premium), Ex. B [ALLY_0018291]. These provisions replicate the MMLPSA as amended by the Addendum to 2001 MMLPSA, dated Jan. 22, 2002 [ALLY_0201226], including the inharmonious aspects of those provisions discussed in Section V.B.3.a(3). *See also* Int. of R. Groody, Dec. 17, 2012, at 88:11–89:16.

[540] *See* 2006 MMLPSA, § 7.1 [ALLY_0018291] (Termination without Cause).

[541] *See id.* §§ 1.23 (Purchase Price), 1.24 (Purchase Price Premium), Ex. C [ALLY_0018291].

[542] 2007 MMLPSA [ALLY_0018275].

[543] *Id.* § 2.1. Groody, while he could not recall the precise impetus for this change, explained that the general "intent" was that the Bank would not keep any HFS loans, but would instead sell them all to GMAC Mortgage. Int. of R. Groody, Dec. 17, 2012, at 104:1–105:16, 107:3–7.

[544] 2007 MMLPSA, § 2.2(c) [ALLY_0018275].

(3) Third, for First Lien Loans, the Bank was entitled "from time to time" to identify loans that had been "delinquent for a period of sixty (60) days or more" and require that GMAC Mortgage "promptly" purchase the loans.[545]

Given that, for First Lien Loans HFS, GMAC Mortgage had been required to purchase all such loans since adoption of the June 4, 2002 Second Addendum to the 2001 MMLPSA, the latter two provisions essentially operated to provide deadlines for the purchase of loans that GMAC Mortgage had not pooled for sale/securitization.[546]

### (2) Loan-Level Representations And Warranties

The 2007 MMLPSA eliminated all loan-level representations and warranties, including those for Second Lien Loans that had been retained by the 2006 MMLPSA.[547] Groody did not recall why this change was made,[548] but asserted that the "business understanding" remained unchanged from prior versions of the agreement—that the Bank would pass on the representations and warranties received from third parties to GMAC Mortgage, but would not itself ultimately be responsible for remedying any breach.[549] Celini, of course, believed that this was simply a further clean-up of the Agreement to reflect the parties' long-standing intent.[550]

---

[545]  *Id.* § 2.2(f) [ALLY_0018275].

[546]  Celini noted that the clean-up of aging loans had been taking place in practice on an ad hoc basis and the parties amended the agreement to reflect their business practice. Int. of A. Celini, Feb. 18, 2013, at 76:12–77:18; *see also* Int. of R. Groody, Dec. 17, 2012, at 108:10–109:11; Int. of C. Dondzila, Sept. 27, 2012, at 241:15–244:9. In the Letter Agreement Re: Performance Indemnification - GMAC Bank HFS to HFI Transfers, dated April 16, 2008 [ALLY_0017926], GMAC Bank agreed to forbear from exercising its rights under these provisions to require GMAC Mortgage to purchase certain loans with an unpaid principal balance of $166 million (and a carrying value of $118 million). (The Letter Agreement references MMLPSA "Section 2.2(d)" instead of section 2.2(c) or (f), but this appears to be in error.) In exchange, GMAC Mortgage agreed that if, over the next four years, any of the loans became so delinquent that GMAC Bank had to charge it off, GMAC Mortgage would indemnify GMAC Bank for any realized losses in an amount not to exceed the net carrying value of the loan as of April 1, 2008 (the principal balance reduced by any charge-offs or reserves). Groody explained that the Bank made this accommodation because of the "cash flow sensitivity of GMAC Mortgage" at the time that would have been exacerbated had GMAC Mortgage been required to purchase the loans in question. Int. of R. Groody, Dec. 17, 2012, at 288:7–17.

[547]  2007 MMLPSA, Art. IV [ALLY_0018275] (prior content of the section replaced with "[RESERVED]").

[548]  Int. of R. Groody, Dec. 17, 2012, at 120:10–23, 125:14–18.

[549]  *Id.* at 121:5–7, 121:21–122:11.

[550]  Int. of A. Celini, Feb. 18, 2013, at 74:5–22.

### (3) Pricing Provisions

The 2007 MMLPSA substantially revised the Purchase Price provisions, stating that the price for a portfolio of Mortgage Loans:

> shall be calculated as (a) the difference between [i] the Market Value and [ii] the Cost Basis of such Mortgage Loans, calculated as of [the last Business Day of the month preceding the Closing Date], plus (b) the Cost Basis of the Mortgage Loans calculated as of the Closing Date.[551]

The same pricing now applied to all "Mortgage Loans," which included both First Lien Loans and Second Lien Loans.[552] The pricing for Second Lien Loans was revised and no longer included the 175 basis points purchase price premium.[553] The Market Value was defined as "the market value of such Mortgage Loan, as determined by the Seller with reference to independent pricing sources."[554] The "Cost Basis" of a loan was defined as "the sum of the unpaid principal balance . . . plus premium and the Servicing released premium, plus accrued interest minus any discount."[555] The language of these provisions appears to provide for sale at a market price, adjusted by any changes in the Cost Basis from the end of the month preceding the sale to the date of the sale. Groody recommended approval of the 2007 MMLPSA to the Bank's Board, explaining that it would "provide for the sale of the loans by the Bank at market value as determined by independent pricing sources."[556]

According to an Affiliate Transaction Memorandum prepared by Celini in June 2007, the pricing under the 2007 MMLPSA was stated to be at market value determined by GMAC Bank using independent pricing sources.[557] Celini prepared a revised version of this Affiliate Transaction Memorandum in October 2007 which states that the sales to GMAC Mortgage

---

[551] 2007 MMLPSA, §§ 1.24 (Purchase Price), 1.10 (Cutoff Date) [ALLY_0018275].

[552] *Id.* §§ 1.18 (Mortgage Loan), 1.24 (Purchase Price), 2.1 [ALLY_0018275].

[553] As noted above, the 2007 MMLPSA also eliminated the loan-level representations and warranties for Second Lien Loans. ResCap's representation and warranty reserve on loan sales for the quarter ended March 31, 2007 was 170 basis points. GMAC–Residential Capital, LLC, Review Status–Quarter Ended September 30, 2007, dated Nov. 1, 2007, at 12 [PWC00663]. Notably, when the MMLPSA was amended on May 1, 2012, the Bank agreed to accept responsibility for customary loan-level representations and warranties and increased the purchase price by the estimated cost plus a margin to compensate for this risk. 2012 MMLPSA, §§ 1.31, 2.5 [RC00027892].

[554] *Id.* § 1.13 (Market Value) [ALLY_0018275].

[555] *Id.* § 1.9 (Cost Basis) [ALLY_0018275].

[556] Minutes of a Regular Meeting of the Board of Directors of GMAC Bank, June 19, 2007, at ALLY_PEO_0001435 [ALLY_PEO_0001400].

[557] GMAC Bank Affiliate Transaction Memorandum, dated June 6, 2007 [ALLY_0017783].

will occur at the actual market value price paid by Ally Bank to acquire such loan.[558] When asked about the discrepancy, Celini explained that the regulators had wanted to see a market-based transaction.[559] Originally the parties thought they would mark the loans to market but the process turned out to be impractical.[560] Despite the language of the 2007 MMLPSA, the parties did not change their practice of selling loans at the Bank's cost, described as the market value paid by the Bank to acquire the loan from the third-party or affiliate correspondent.[561]

Groody similarly explained that, while these changes were made to the language of the MMLPSA to make it "more in conformance with the affiliate transaction policy the Bank had, which specified market terms,"[562] the changes were essentially cosmetic. In fact, "the intent never changed" and the Bank continued to sell loans on a cost basis, rather than on a basis consistent with marking the loans to market after purchase.[563] The "market price" utilized was the price the Bank had paid for First Lien Loans, so that, for the Bank "there was never a gain or a loss associated with the transactions."[564]

---

[558] GMAC Bank Affiliate Transaction Memorandum, dated Oct. 31, 2007 [ALLY_0017869] (stated: "[Rule] 23b compliant pricing source for 1st Lien loan sales is arrived at through the following constructs: 1. Loan sales to Affiliate occur at *the actual market value price paid by [Ally Bank] to acquire such loan* from affiliated or third-party correspondents (+/- accrued interest, discount and premium)") (emphasis added). The original, June 6, 2007 version of the Affiliate Transaction Memorandum notably does not include this language. It instead references the use of "independent pricing sources," and "GAAP pricing source for loan sales . . . derived from various market inputs—(including but not limited to Wall Street Analytics, Yield Book, observed market price sales, current/forward yield curves) and are identical to values utilized within primary accounting systems utilized to drive mark to market valuations for [Ally Bank] GAAP financial statements." GMAC Bank Affiliate Transaction Memorandum, Master Mortgage Loan Purchase and Sale Agreement Amended and Restated 6/1/07, dated June 6, 2007, at 1, 2 [ALLY_0017783]. On October 31, 2007, the date of the revised Affiliate Transaction Memorandum, Jonathan Andrews issued a Memorandum to the Bank Board certifying that, based on his review of the Agreement and the revised Memorandum, and assuming their content to be accurate, the Agreement complied with Federal Reserve Act sections 23A and 23B, and with Regulation W. GMAC Bank Affiliate Transaction Memorandum, Master Mortgage Loan Purchase and Sale Agreement Amended and Restated 6/1/07, dated Oct. 31, 2007 [ALLY_0017867].

[559] Int. of A. Celini, Feb. 18, 2013, at 170:22–25; *see also* ResCap Controls Follow-Up Materials, dated May 15, 2007, at 17 [EXAM10241180] ("In view of the new regulator (FDIC) mngmnt will be changing their process of selling loans to affiliates, which will include a monthly mark-to-market that will provide the Bank with a market price for all assets sold to [GMAC Mortgage].").

[560] Int. of A. Celini, Feb. 18, 2013, at 177:6–13 (noting that they would have to also mark-to-market the forward commitment (the MMLPSA)).

[561] *Id.* at 174:5–7 ("[I]t basically restates what we always had been doing, except the fact that we tried to articulate to the regulator that this is market."); *see also* Minutes of a Regular Meeting of the Board of Directors of GMAC Bank, Jan. 22, 2008 [ALLY_PEO_0001488] (discussing proposed changes to MMLPSA, apparently never adopted, to conform pricing language to the October 2007 version of the GMAC Bank Affiliate Transaction Memorandum).

[562] Int. of R. Groody, Dec. 17, 2012, at 112:24–113:3, 111:12–21.

[563] *Id.* at 110:11–111:10.

[564] *Id.* at 113:21–114:2.

David Bricker executed the 2007 MMLPSA on behalf of GMAC Mortgage. While his recollection was limited, he concurred that loans historically had been purchased at cost[565] and believed that the 2007 MMLPSA had not changed to market-basis pricing.[566]

Based on a review of loan accounting examples,[567] this appears to be what in fact happened. The purchase price paid by GMAC Mortgage under the 2007 MMLPSA was consistent with the historical pricing under prior agreements, and defined there as the Bank's "cost" basis: the unpaid principal balance (UPB) plus or minus the premium or discount. The individual loans were carried at this "cost" basis in the accounting records throughout this process and were not adjusted to market value at any point in time. Until the Bank began selling Fannie Mae and Freddie Mac loans on a servicing-released basis in August 2007 (and continuing for Ginnie Mae loans thereafter), the purchase price also included the servicing-released premium (the amount paid to acquire the MSRs). For loans where interest had accrued, the interest was a component of both the purchase price paid by GMAC Mortgage to the Bank and the purchase price received by GMAC Mortgage upon sale of the loan to third-party investors.[568] The Bank recorded the net interest earned during the period it held the loan as income. GMAC Mortgage recorded the difference between the purchase price paid to the Bank (the Bank's cost) and the purchase price received from the third-party investors as a gain on sale. For loans GMAC Mortgage sold to the Bank, it retained the origination income, including points paid by borrowers and processing or underwriting fees net of origination expenses.[569] Celini testified that the Bank likewise retained only net interest carry on brokered loans, with the effect of origination fees, premium pricing, etc., passing to GMAC Mortgage under the MMLPSA.[570]

Consequently, the 2007 MMLPSA continued to act as a hedge for the Bank, so that it was "exposed to no negative pricing risk during its holding period."[571] Further, in the Affiliate

---

[565] Int. of D. Bricker, Mar. 15, 2013, at 94:17–23.

[566] *Id.* at 109:20–110:4. Bricker did not recall negotiating with Groody any revisions to the pricing provision of the 2007 MMLPSA and did not seem to understand the changes to this provision during his interview. *Id.* at 105:11–109:17.

[567] The parties produced accounting entries and supporting detail for sample loans with varying characteristics for the period September 2005 to November 2012. Loan Summary [EXAM00229653]; Loan Summary [EXAM00233017]; Examiner Loan Selections 03 11 13 [EXAM00339939]; Examiner Loan Selections 04 15 13 [EXAM00345279].

[568] Note that GMAC Mortgage's purchase of loans from the Bank occurred shortly before their sale to third-party investors, as further described in Section V.B.12.a.

[569] *See* Loan Summaries, at Example Nos. 2, 3, 5 [EXAM00229653]. These loan examples are loans funded by GMAC Mortgage, and reflect that it retained the origination income.

[570] Int. of A. Celini, Feb. 18, 2013, at 59:5–19.

[571] GMAC Bank Affiliate Transaction Memorandum, Master Mortgage Loan Purchase and Sale Agreement Amended and Restated 6/1/07, dated Oct. 31, 2007, at 2 [ALLY_0017869].

Transaction Memo prepared to document compliance with federal regulatory restrictions on affiliate transactions, Bank officials stated that because such a complete hedge—which protected the Bank from "all interest rate, credit and fallout risk"—was not commercially available in the marketplace, and because the Bank was able to avoid the cost of purchasing "stand alone derivatives to hedge its risks," the 2007 MMLPSA provided terms "*better* than those prevailing at the time for comparable transactions with unaffiliated parties in the marketplace."[572] The memo, seeking to portray the pricing to the Bank as better than "market pricing," notably does not explicitly acknowledge that the gain on sale is being passed on to GMAC Mortgage, the buyer (even though in arm's-length market transactions it typically would be retained by the seller).

#### (4) Termination Provision

While earlier versions of the MMLPSA permitted either party to terminate without cause upon appropriate notice, the 2007 MMLPSA provided only Ally Bank with this right.[573] The 2007 MMLPSA had no expiration date, so GMAC Mortgage could terminate only for cause.

### 4. The Pipeline Swap (Pre-July 2008)

The original Pipeline Swap was entered into between GMAC Mortgage and Old GMAC Bank as of October 1, 2004. It was documented under an International Swaps and Derivatives Association ("ISDA") Master Agreement—Multicurrency-Cross Border (1992 form) and related Schedule.[574] As discussed below, until 2008, the Pipeline Swap covered only the Bank's HFI portfolio.[575] The swap was designed to insulate the Bank from changes in the market value of loans (generally due to market interest rate changes) between "rate lock" (when the funding price to the borrower or purchase price to a third party was fixed) and "funding" (the date on which the loan was funded to the Borrower or purchased from a correspondent by the Bank). This allowed Old GMAC Bank to avoid recognizing a loss (or gain) on the date they were funded for the loans that it intended to hold as an investment.[576]

---

[572]  *Id.*

[573]  2007 MMLPSA, § 7.1 [ALLY_0018275].

[574]  2004 Pipeline Swap [ALLY_0041583]; 2004 Pipeline Swap Schedule [ALLY_0041808]. Derivative contracts are typically documented with an ISDA Master Agreement, one or more schedules, and one or more confirmations. Until later years (when the Bank and GMAC Mortgage changed the forms of their derivative contract documentation in response to FDIC criticism), the Pipeline Swap (and the MSR Swap, discussed in Section V.B.9), were documented only on a Master Agreement and schedules, without use of confirmations.

[575]  HFS loans were sold to GMAC Mortgage under the MMLPSA and already hedged under that agreement. *See* Section V.B.3.a(3).

[576]  Int. of R. Groody, Dec. 17, 2012, at 134:18–135:21; Int. of J. Whitlinger, Nov. 30, 2012, at 122:12–123:4; Int. of A. Celini, Feb. 18, 2013, at 108:9–18.

So long as the Pipeline Swap remained limited to HFI loans, there was no real benefit to GMAC Mortgage if the arrangement is considered independently of the parties' other arrangements.[577] It was understood that GMAC Mortgage, rather than retaining the hedged risk, would in turn hedge the risk in the market.[578] Assuming its hedges were effective, GMAC Mortgage would realize neither profit nor loss from the HFI Pipeline Swap.[579] However, GMAC Mortgage presumably incurred some incremental hedging expense, which, under the terms of the Swap, the Bank was not required to reimburse. Bier noted that, at this time, Old GMAC Bank and GMAC Mortgage were owned by the same holding company, with the trading desk in GMAC Mortgage. He posited that, given the objective to be "business efficient," it was appropriate that GMAC Mortgage do the hedging for the Bank's loans.[580]

### a. The 2004 Pipeline Swap For HFI Loans

The 2004 Pipeline Swap identified as "Subject Transactions" covered by the swap legally binding commitments by Old GMAC Bank:

> (A) to *originate* a loan or *purchase* a loan that has *not* been originated by [GMAC Mortgage], that is . . . secured by a mortgage on [U.S.] residential real estate . . . and that [Old GMAC Bank] intends to originate or purchase *for its "Held For Investment" (HFI) portfolio*;[581]

---

[577]  Int. of A. Celini, Feb. 18, 2013, at 175:22–176:10.

[578]  *Id.* at 116:18–21; Int. of S. Blitzer, Mar. 5, 2013, at 47:3–9.

[579]  Int. of A. Celini, Feb. 18, 2013, at 282:21–283:8; *see also* Int. of S. Blitzer, Mar. 5, 2013, at 38:23–39:8 ("My general understanding of how the swap worked was that it was intended to keep economics neutral between the mortgage company and the bank. . . . [I]f the loans increased or decreased in value, no one side should have seen a large gain or loss based on that change in value because in relation to it, there were hedges that should have been acting in an opposite but highly correlated manner.").

[580]  Int. of B. Bier, Feb. 22, 2013, at 50:17–52:7 (noting also that the holding company "had a business intent that was around utilizing the resources that were available within the holding company, organization structure to basically manage risk prior to the loans going on the bank's balance sheet.").

[581]  Dondzila and Whitlinger were surprised in their interviews to see that the language of the earlier versions of the Pipeline Swap limited its coverage to the HFI portfolio, asserting that their understanding was that the Pipeline Swap had always covered HFS loans. *See* Int. of C. Dondzila, Nov. 9, 2012, at 13:6–10; Int. of J. Whitlinger, Nov. 30, 2012, at 126:19–21. Other personnel, including Joe Cortese and Nikki Rock, asserted likewise in meetings with the Examiner's Professionals. This appears to be a misconception arising from their understanding that the HFS portfolio was hedged and an assumption that the hedging was accomplished through the Pipeline Swap; in fact, as discussed above, before 2008, the MMLPSA, through its cost-based pricing, is the instrument that functioned as a hedge on the Bank's HFS portfolio. *See* Int. of J. Whitlinger, Feb. 27, 2013, at 14:10–17:12 (acknowledging that this may be correct). Blitzer believed GMAC Mortgage was hedging HFS loans for the Bank before the July 2008 amendment to the Pipeline Swap, but he but did not recall whether the HFS hedging at that time (before 2008) was governed by the Pipeline Swap or not. Int. of S. Blitzer, Mar. 5, 2013, at 60:13–61:20.

(B) that has been entered into by [Old GMAC Bank] with a borrower or a mortgage correspondent that is not an Affiliate of [Old GMAC Bank or GMAC Mortgage];

(C) in respect of which the funding price to the borrower or the purchase price from the mortgage correspondent has been fixed; and

(D) in respect to certain loan products listed in [an attached schedule (such as six-month LIBOR loans and jumbo fixed-rate loans)].[582]

For loans that had been funded ("Funded Loans"), the 2004 Pipeline Swap tracked changes in the loan's fair market value ("FMV Changes") from the price at which the loan had been locked ("Lock FMV") to the value on the funding date ("Funding FMV").[583] On each "Payment Date" (the fifth day of each month), positive FMV Changes in the preceding month required the Bank to make payments to GMAC Mortgage, and negative changes required GMAC Mortgage to make payments to the Bank.[584] The Swap similarly covered changes in the fair market value of loans that had not yet been funded ("Pipeline Loans"), measured from the Lock FMV to the fair market value as of the last day of the preceding month (such changes were referred to as the "Pipeline FMV").[585]

The 2004 Pipeline Swap had a one-year term, but was subject to automatic one-year extensions absent prior notice by either party that the termination date would not be extended.[586]

### b. The March 2005 Amended Schedule Eliminated Bank-"Originated" Loans From The Pipeline Swap

The Pipeline Swap's Schedule was amended as of March 30, 2005.[587] The amended Schedule revised the definition of Subject Transaction to eliminate references to loans "originated" by the Bank, limiting its scope to loans "purchased" by the Bank.[588] Thus, loans

---

[582] 2004 Pipeline Swap Schedule, part 6(a)(xiii) [ALLY_0041808] (emphasis added).

[583] *Id.* parts 6(a)(iv), (vi), (viii), (ix).

[584] *Id.* parts 6(a)(x), (d).

[585] *Id.* parts 6(a)(iv)(B), (xi), (xii).

[586] *Id.* part 6(a)(xiv).

[587] 2005 Pipeline Swap Schedule [ALLY_0041601].

[588] *Id.* part 6(a)(xiii)(A).

V-116

brokered to the Bank and originated by it (that is, funded in Old GMAC Bank's name), apparently were eliminated from the scope of the Swap's coverage.[589]

In addition, the 2005 Pipeline Swap Schedule revised the term provisions, eliminating the automatic extension provisions and setting a fixed Termination Date of March 31, 2006.[590]

### c. *It Appears That The Pipeline Swap Was Not In Effect From April 1, 2006 To April 30, 2007*

The parties produced no Pipeline Swap agreements or schedules effective after March 2006 and before May 2007. There is some evidence suggesting that the Swap was nonetheless in place during this period. In particular, documentation of contracts being assumed in the 2006 Bank Restructuring suggest that an agreement hedging HFI pipeline risk is being assumed.[591] However, documentation from approval of the next Schedule for which the Examiner's Professionals found copies of agreements, the 2007 Pipeline Swap Schedule discussed in Section V.B.4.d, indicates that it was modeled on an Old GMAC Bank agreement in place from 2005 through 2006, suggesting that the Swap had not been in place in the interim.[592] Celini believed that the Pipeline Swap should have continued and did so during this period even if there was not an agreement in place.[593] Groody and Sandy Blitzer, who was responsible for hedging the loans in the market on behalf of GMAC Mortgage, were unable to recall whether the Pipeline Swap had lapsed during this period.[594] While it was difficult for ResCap personnel to find accounting documentation reflecting the results of the Pipeline Swap

---

[589] Groody was not certain of the reason for this change, but noted his belief that the Bank ceased originating brokered loans at some point, and thought this might reflect that shift. Int. of R. Groody, Dec. 17, 2012, at 18:1–8, 73:1–4, 73:9–11. Blitzer also could not recall why reference to originated loans was deleted, surmising that the deletion could have been because the Bank was no longer originating loans. Int. of S. Blitzer, Mar. 5, 2013, at 48:20–49:18. However, it appears that the Bank continued to have brokered loans until at least the fall of 2008 (and that it thereafter originated loans brokered by GMAC Mortgage under the Broker Agreement). E-mails among C. Dondzila, J. Cortese, S. Ruby, et al. (Feb. 10–11, 2010) [EXAM11891921]. There apparently was some confusion caused by the fact that the Bank in Q2 2006 placed its Broker Fulfillment group under the aegis of the Correspondent Lending operation. *Id.* It continued to close brokered loans "in the name of the Bank," though the volume appears to have been relatively small. *Id*. These loans would not have been "purchased" and therefore would not have been subject to the Pipeline Swap.

[590] 2005 Pipeline Swap Schedule, part 6(a)(xiv) [ALLY_0041601].

[591] *See* Review of GMAC Bank Affiliate Agreements Assigned from GMAC Bank FSB to GMAC Bank ILB, dated Nov. 30, 2006, at ALLY_0260095 [ALLY_0260087].

[592] *See* Approval of GMAC Bank Affiliate Agreements, dated May 17, 2007, at ALLY_PEO_0005523 [ALLY_PEO_0005512].

[593] Int. of A. Celini, Feb. 18, 2013, at 114:12–22.

[594] Int. of R. Groody, Dec. 17, 2012, at 138:5–18; Int. of S. Blitzer, Mar. 5, 2013, at 71:3–17, 73:2–11 ("I have zero recollection as to when or when it was not in place."). Blitzer did not recall any change in his market hedging activity with respect to loans held by the Bank during this time. *Id.* at 73:12–20.

for HFI loans, they eventually located such records. The documents located notably include records from the inception of the Pipeline Swap through March 2006, and from and after May 1, 2007; thus, there is a gap in the accounting records that corresponds to the gap in the periods covered by the written agreements that have been produced.[595] Accordingly, while there is some evidence to the contrary, it appears that the Pipeline Swap was not in effect from April 1, 2006 through April 30, 2007.

### d. The May 2007 Pipeline Swap Remained Limited To Purchased HFI Loans And Limited GMAC Mortgage's Ability To Block Automatic Renewal

GMAC Mortgage and Ally Bank entered into a new Pipeline Swap schedule effective May 1, 2007.[596] The substantive provisions of the 2005 Pipeline Swap Schedule were unchanged, including the limitation of the Swap's application to "purchased," as opposed to "originated" loans.[597] The term provision was revised, setting a May 1, 2008 termination date, subject to automatic one-year extensions absent (1) a default by the Bank continuing on the day before termination, or (2) notice by the Bank of non-renewal.[598] Unlike the automatic-extension provisions of earlier versions of the Pipeline Swap that allowed either party to prevent renewal upon notice to the other, GMAC Mortgage had no right to block the extension of the Swap, absent a breach by the Bank. This revision notably paralleled the June 2007 amendments to the MMLPSA's termination provisions, which eliminated GMAC Mortgage's right to terminate the MMLPSA without cause.

### e. The March 2008 Pipeline Swap Schedule Prevented Application Of The Swap To HFI Loans The Bank Purchased From Certain Correspondent Lenders Not Acceptable To GMAC Mortgage

The parties entered into a new Schedule to the Pipeline Swap dated March 14, 2008.[599] The "Subject Transaction" definition continued to be limited to loans the Bank intended to "*purchase* for its 'Held for Investment' (HFI) portfolio," but added a further restriction, limiting the loans covered to those "whose 'pipeline risk' is managed by the ResCap Capital

---

[595] Bank HFI Swap [EXAM00344897]; Bank Flow HFI Portfolio (May 2007–Mar. 2008) [EXAM00344891–902].

[596] 2007 Pipeline Swap Schedule [ALLY_0041789].

[597] *See id.* 7–8.

[598] *Id.* part 6(a)(xiv).

[599] March 2008 Pipeline Swap Schedule [ALLY_0018074]. There are several anomalies in this Schedule, including: (1) a definition of "Commencement Date" as "May 1, 2007" (unchanged from the 2007 Pipeline Swap Schedule); and (2) even though the Schedule is fully executed, a header on each page after the first page reading "DRAFT DATED 5/7/07." *Id.* part 6(a)(ii), 2–9. These appear to be clerical errors in completion of the document arising from use of the prior version as a template; Groody's best understanding was that this Schedule became effective March 14, 2008. Int. of R. Groody, Dec. 17, 2012, at 150:11–151:20.

Markets Group [sic] a legally binding commitment."[600] Groody explained that this provision was added because Ally Bank had begun to purchase HFI loans from new correspondents who had not previously been GMAC Mortgage correspondent lenders, and that GMAC Mortgage did not want to assume the risk for such loans.[601] The reference to risks managed by the ResCap Capital Markets Group served to exclude such loans from the Pipeline Swap.

### 5. The July 2008 Amendments To The MMLPSA And The Pipeline Swap

Effective July 1, 2008, GMAC Mortgage and Ally Bank agreed to amended versions of the MMLPSA and the Pipeline Swap.[602] Groody explained that these amendments were interrelated and were prompted, at least in part, by the FDIC's urging that Ally Bank document its hedges with a standard ISDA Master Agreement and appropriate supplemental documentation.[603] The MMLPSA, as noted above, had functioned as a hedge for Old GMAC Bank and Ally Bank by virtue of its cost-based pricing, but was not in the form of an ISDA derivative contract. According to Groody, to address the FDIC's criticism, the parties decided to add Ally Bank's HFS loans to the Pipeline Swap, while amending the MMLPSA's pricing provisions.[604] While the documentation was changed, however, the goal was to preserve the existing economics, so that the Bank would earn the net interest carry for the period the loan was on its books, and would be hedged against market, interest, and fallout risk, while GMAC Mortgage would earn the gain on sale, and would accept all market, interest, and fallout risk.[605] As described below, the loan accounting examples reviewed confirm that there were, in fact, no changes in the underlying loan accounting following implementation of the July 2008 agreements.

### a. The Principal July 2008 Pipeline Swap Revisions

The July 2008 Pipeline Swap Schedule redefined the "Subject Transaction[s]" to which the swap applied to include both HFS and HFI loans; the revised definition is "a legally binding commitment by [the Bank] to *purchase*, *either for its 'Held for Sale' (HFS) portfolio*

---

[600] March 2008 Pipeline Swap Schedule, part 6(a)(xiii) [ALLY_0018074].

[601] Int. of R. Groody, Dec. 17, 2012, at 147:2–150:2.

[602] 2008 MMLPSA [ALLY_0201210]; July 2008 Pipeline Swap Schedule [ALLY_0018237].

[603] Int. of R. Groody, Dec. 17, 2012, at 156:2–8, 159:2–161:13. The impetus is described somewhat differently in the Minutes of a Regular Meeting of the Board of Directors of GMAC Bank, July 22, 2008, at ALLY_PEO_0001551 [ALLY_PEO_0001488] (reporting that GMAC Bank General Counsel J. Andrews, presenting the revisions for approval, said that "the proposed amendments respond to comments made by the Federal Deposit Insurance Corporation ('FDIC') recommending clarification of certain provisions pertaining to *pricing*.") (emphasis added).

[604] Int. of R. Groody, Dec. 17, 2012, at 160:14–161:3, 164:22–165:10, 167:2–20.

[605] *Id.* at 167:6–174:11. GMAC Mortgage, in turn, would hedge these risks in the market as part of its broader hedging program.

or its 'Held for Investment' (HFI) portfolio" loans from certain loan products or programs "for which 'Pipeline Risk' is managed by the ResCap Capital Markets Group."[606]

While the July 2008 Pipeline Swap Schedule added HFS loans to the Pipeline Swap, it continued to limit the scope of the Pipeline Swap to loans "purchased" by the Bank, and did not revise the language to include loans "originated" by the Bank.

Further, the July 2008 Pipeline Swap Schedule did not change the Swap's terms governing the period over which valuation changes were measured. The agreement's language continued to state that it applied to changes from rate lock to *funding* (as discussed at Section VII.L.2.c).[607] For HFI loans (which the Bank intended to keep as an investment), the language made sense because the Bank sought to avoid recognizing losses (or gains) on the loans between rate lock and funding when it recorded the loans on its books.[608] After initially booking HFI loans, Ally Bank generally would continue to carry them at its original basis less a reserve, without having to mark them to market. For HFS loans, however, the language failed.

For HFS loans to be fully hedged by the Pipeline Swap, the Swap needed to cover not just the period from rate lock to funding, but from rate lock to *sale*. By its written terms, the July 2008 Pipeline Swap Schedule left Ally Bank un-hedged (and exposed to shifts in market value) for the period from loan funding until sale of the loan to GMAC Mortgage.[609] The Bank's contemporaneous June 2008 Affiliate Transaction Memo expressly stated that the swap covered only the period "from the rate lock date to *the time of funding for HFI and HFS*."[610]

Despite the terms of the Pipeline Swap, several witnesses asserted that their understanding was that loans were hedged from rate lock all the way to sale.[611] An April 2010 Ally Bank Affiliate Transaction Memo, revisiting the July 2008 Pipeline Swap Schedule, asserts that it

---

[606] July 2008 Pipeline Swap Schedule, part 6(a)(xvi) [ALLY_0018237] (emphasis added).

[607] *Id.* part 6(a)(iv)(A), (viii).

[608] *See* Section V.B.4; Int. of J. Whitlinger, Nov. 30, 2012, at 122:12–123:4; Int. of R. Groody, Dec. 17, 2012, at 131:25–132:11, 134:14–135:21.

[609] *See* Int. of C. Dondzila, Nov. 9, 2012, at 10:13–21; Int. of R. Groody, Dec. 17, 2012, at 162:6–163:17.

[610] GMAC Bank Affiliate Transaction Memorandum, July 1, 2008 Schedule to ISDA Master Agreement, dated June 30, 2008, ¶ 2 [ALLY_0017919] (emphasis added).

[611] Int. of J. Young, Sept. 28, 2012, at 202:13–205:14; Int. of J. Young, Oct. 10, 2012, at 9:17–10:12; Int. of C. Dondzila, Sept. 27, 2012, at 252:14–253:2; Int. of C. Dondzila, Nov. 9, 2012, at 13:1–10; Int. of J. Whitlinger, Nov. 30, 2012, at 134:19–135:5, 137:10–20, 147:25–148:11.

covers "from the lock date to the time of funding (for HFI) and from funding to final sale (for HFS)."[612] Blitzer recalled hedging loans acquired from the Bank all the way to sale.[613]

### b. The 2008 MMLPSA's Revised Pricing Provisions

The 2008 MMLPSA defined the "Purchase Price" for First Lien Mortgage Loans as "the Cost Basis plus reserves associated" with the loan.[614] "Cost Basis," in turn, was defined to mean:

> with respect to a Mortgage Loan, its net carrying value, as defined by accounting principles generally accepted in the United States of America (as amended) *to include* without limitation the unpaid principal balance of such Mortgage Loan, plus or minus any premium or discount paid, *net deferral fees or costs,* accrued interest and basis adjustments from derivative loan commitments, *hedge accounting* or *lower of cost or market adjustments*.[615]

Witnesses explained that, based on the understanding that the Pipeline Swap applied from rate lock to sale, the loans were accounted for on a hedge-accounting basis, and this meant that they were "marked to market" and sold to GMAC Mortgage at *market value* (rather than Ally Bank's cost, notwithstanding the use of the term "Cost Basis" in the agreement).[616] In theory, through application of the Pipeline Swap, GMAC Mortgage would then recover (or pay) the difference between the market price it had paid under the MMLPSA and the Bank's cost basis (as defined in prior MMLPSAs) in the loan. Thus, the combined application of the revised 2008 MMLPSA and the Pipeline Swap would be to preserve the same economics that had prevailed under prior versions of the MMLPSA.[617]

---

[612] Ally Bank Affiliate Transaction Memorandum, July 1, 2008 Schedule to ISDA Master Agreement, dated April 30, 2010, ¶ 2 [ALLY_0018059]; *see also* Ally Bank Pipeline Swap with GMAC Mortgage, LLC [EXAM10880562] (attached to E-mail from N. Rock (Nov. 15, 2010) [EXAM10880561]) ("The principal purpose of the Pipeline Swap is to insulate the Bank from the volatility in the valuation change of HFS assets from the time of interest rate commitment through the time of loan sale.").

[613] Int. of S. Blitzer, Mar. 5, 2013, at 105:21–107:24. Blitzer's recollection of the terms of the Pipeline Swap, of which he signed several iterations, was minimal.

[614] 2008 MMLPSA, § 1.24 [ALLY_0201210].

[615] *Id.* § 1.9 [ALLY_0201210] (emphasis added).

[616] *See* Int. of C. Dondzila, Sept. 27, 2012, at 228:14–229:11; Int. of C. Dondzila, Nov. 9, 2012, at 142:22–143:10; Int. of J. Whitlinger, Nov. 30, 2012, at 105:24–108:11.

[617] Whitlinger observed that, consistent with this view of the Pipeline Swap and MMLPSA, GMAC Mortgage/ResCap entered into hedging transactions with third parties predicated on the view that GMAC Mortgage bore the risk from rate lock to sale, not just lock to funding. Int. of J. Whitlinger, Nov. 30, 2012, at 134:19–137:20.

However, if the July 2008 Pipeline Swap Schedule were applied as written and covered only the period from rate lock to funding, rather than sale, then (1) application of hedge accounting would be improper under GAAP,[618] so that the MMLPSA pricing would not be a marked-to-market price, and (2) the changes in the fair market value of the loans between funding and sale would not flow to GMAC Mortgage under the Pipeline Swap, and this risk would instead reside with the Bank. Further, the Pipeline Swap would be inapplicable to brokered loans originated by the Bank (rather than purchased).

### c. Implementation Of The HFS Swap/Pricing Revisions

Based on a review of accounting records for sample loans and interviews with accounting personnel,[619] the combined effect of the accounting for MMLPSA sales and the Pipeline Swap was to preserve the same economics that had prevailed under prior versions of the MMLPSA, as though the Pipeline Swap applied from rate lock to sale (and as though it applied to brokered/bank-originated loans, and not merely to purchased loans). But the accounting process through which this was accomplished was not what one would expect, with fair market value pricing under the MMLPSA (due to application of hedge accounting), and the change in value between rate lock and sale exchanged under the Pipeline Swap.

Instead, for purposes of the MMLPSA, loans were not marked to market by Ally Bank and sold to GMAC Mortgage at a market price. The accounting records for sales under the MMLPSA reflect that the purchase price paid by GMAC Mortgage continued to be the Bank's cost basis as historically defined (UPB plus or minus premium or discount plus servicing released premium where the Bank did not retain servicing rights).[620] Thus, the MMLPSA pricing was unchanged despite implementation of the July 2008 agreements.

---

[618] *See* Int. of C. Dondzila, Nov. 9, 2012, at 73:18–74:9. Dondzila explained that the Bank had designated the Pipeline Swap as a hedge of its HFS portfolio under FAS 133, and that "the held for sale portfolio would have been marked to fair value consistent with the mark on its derivative, in this case the hedge, which was the held for sale swap." *Id.* at 74:4–9. In accordance with FAS 133, if changes in the fair value of the loans were highly correlated to changes in the fair value of the Pipeline Swap, the loans would properly be carried at an estimated fair value with unrealized gains and losses recorded in the statement of operations. *Id.* However, if the Pipeline Swap did not cover the period from funding to sale, then changes in the value of the Swap would *not* be highly correlated to changes in the loan value for that period. If FAS 133 were not applicable, the GAAP carrying value would change to the lower of the cost of the loan or its market value. The net effect would be to subject the Bank to reductions in the value of the loans during the holding period between funding and sale.

FAS 133, "Accounting for Derivative Instruments and Hedging Activities (as amended), was superseded by the FASB Accounting Standards Codification ("ASC") 815, "Derivatives and Hedging" on September 15, 2009.

[619] Meeting with C. Dondzila and N. Rock in Fort Washington, P.A. (Jan. 16, 2013).

[620] Loan Summary [EXAM00229653]; Loan Summary [EXAM00233017]; Examiner Loan Selections 03 11 13 [EXAM00339939]; Examiner Loan Selections 04 15 13 [EXAM00345279]; *see* E-mail from C. Dondzila to M. Sitlinger and N. Rock (Nov. 22, 2011) [EXAM11892942] ("When the loans are actually 'delivered' to [GMAC Mortgage] under the MMLPSA the transfer is recorded at Bank[']s cost.").

In separate accounting records maintained for the Pipeline Swap, changes in loan value were assessed for the Bank's whole HFS portfolio on a daily basis, and the net gain or loss was settled daily through the Pipeline Swap.[621] Upon sale of the loan to GMAC Mortgage, however, the Pipeline Swap entries were simply reversed, resulting in repayment under the Pipeline Swap of any amounts that had been previously paid by either party with respect to that loan under the Pipeline Swap.[622]

Thus, upon sale of a loan, the net payments made after lock under the Pipeline Swap for that individual loan totaled $0, and the loan was sold at the Bank's "cost" basis (as historically defined under the MMLPSA).[623] Although this accounting does not actually align with the terms of the agreements, the net effect was to obtain the same economic result (if the Pipeline Swap is understood to include the period from funding to sale, and originated loans).

### 6. The Broker Agreement, Fair Value Election, And The Allocation Of Net Revenues Between Ally Bank And GMAC Mortgage

On November 20, 2008, GMAC Mortgage and Ally Bank entered into a "Broker Agreement" pursuant to which GMAC Mortgage brokered loans to the Bank.[624] GMAC Mortgage then essentially ceased originating loans and instead channeled its production through Ally Bank (except in four states (later two) where Ally Bank could not originate loans).[625] As discussed below, there are substantial issues about how revenues related to the loans brokered under this arrangement were allocated between GMAC Mortgage and the Bank.

---

[621] ResCap—Pipeline Swap Template [EXAM00231094]. Beginning in October 2008, the parties settled two days in arrears; beginning in May 2009, they switched to settle daily one day in arrears with a monthly "catch up"; and in January 2011, they switched to a weekly "catch up." Meeting with C. Dondzila, J. Whitlinger, et al. in Fort Washington, P.A. (Dec. 11, 2012).

[622] E-mails among J. Cortese, T. Kushman, et al. (Mar. 13, 2012) [ALLY_0381701]; E-mail from J. Cortese to C. Dondzila (Nov. 22, 2011) [EXAM11892955] (example of loan accounting entries showing "Loan Sold" at "Loan Origination Cost," rather than marked to market "Adjusted Fair Value," with offsetting positive and negative "MTM Swap" entries reflecting the "MTM while in HFS").

[623] *See* E-mail from K. Walsh to C. Dondzila and J. Kothe (July 31, 2009) [EXAM12056469] ("[H]ow the swap works is that the Bank is made whole at cost by the time we get to sale.").

[624] Broker Agreement [RC00030534]. GMAC Mortgage subsidiary ditech, LLC is also a party to the Broker Agreement, and, together with GMAC Mortgage, is identified as the "Broker" in the agreement. Broker Agreement, Preamble [RC00030534].

[625] Detailed Analysis of Ally Bank's Affiliate Agreements, dated June 12, 2012, at 29 [SOP0000380]; E-mail from L. Kelly (July 23, 2009) [EXAM10115666] (loans originated by GMAC Mortgage in four states represent less than 5% of the Bank's HFS portfolio).

### a.   Genesis Of The Brokering Consumer Loans To Bank Project

In or around March 2008, as ResCap faced severe liquidity issues,[626] ResCap and Ally Bank personnel began work on the "Brokering Consumer Loans to Bank" (or "Broker to Bank") project.[627] The Bank, in contrast to ResCap, had excess liquidity, and was looking for ways to grow consistent with its regulator-approved business plan.[628] As noted above, the Bank's ability to purchase loans originated by GMAC Mortgage was limited under the 250.250 exception to 50% of GMAC Mortgage's production over the preceding twelve months.[629] The 250.250 program sales to the Bank were reaching this limit in the summer and fall of 2008 (and, in at least one instance, the limit was exceeded).[630] However, loans brokered to the Bank by GMAC Mortgage and then originated by the Bank in its own name would not be subject to this limit.[631] Further, switching to a broker model not only offered the prospect of increasing the number of loans which could be funded through the Bank (with a projected savings to GMAC Mortgage of 10 to 21 basis points over loans originated by GMAC Mortgage),[632] but would increase the volume of MSRs that could be retained by the Bank.[633] As Celini, the "Sponsor" of the Broker to Bank Project for the Bank,[634] noted, "there was very widespread knowledge that the affiliate had high cost liquidity or no liquidity and that if we didn't do this, if we didn't find a way to do this that there would be a bad outcome on the other side."[635] The project "was made a priority,"[636] and the assembled project team, under the direction of Bank Project Leader (and Celini's subordinate) Debra Scott,[637] was "basically working this during the day and had to do [their] other jobs at night."[638]

---

[626]   *See* Section III.G.

[627]   Int. of A. Celini, Feb. 18, 2013, at 207:23–209:18; Brokering Consumer Loans to GMAC - Project Overview, dated Mar. 11, 2008, ¶¶ 1–2 [EXAM10087770] (noting that project will expand use of Bank's lower cost funding, deepen liquidity, avoid 250.250 limitations, and allow the bank to build its MSR position faster).

[628]   Int. of A. Celini, Feb. 18, 2013, at 208:7–17.

[629]   *See* Section V.B.1.b.

[630]   Int. of A. Celini, Feb. 18, 2013, at 41:2–10; Minutes of Mortgage Credit Policy Committee Meeting, June 25, 2008, at 3 [EXAM11445640].

[631]   Int. of A. Celini, Feb. 18, 2013, at 208:13–17.

[632]   Brokering Consumer Loans to Bank Project Charter, dated Nov. 10, 2008, at 6 [EXAM12253233].

[633]   Int. of A. Celini, Feb. 18, 2013, at 209:9–18.

[634]   Brokering Consumer Loans to Bank Project Charter, dated Nov. 10, 2008, at 4 [EXAM12253233].

[635]   Int. of A. Celini, Feb. 18, 2013, at 220:11–15.

[636]   *Id.* at 208:25.

[637]   Brokering Consumer Loans to Bank Project Charter, dated Nov. 10, 2008, at cover page, 5 [EXAM12253233].

[638]   Int. of A. Celini, Feb. 18, 2013, at 220:3–5.

It should also be noted that a significant accounting issue had arisen as to whether the 250.250 program sales were actually "true sales" or were instead required to be accounted for as a financing, given that the MMLPSA required that loans be sold back to GMAC Mortgage.[639] This posed a significant problem, given that an extension of credit by the Bank to GMAC Mortgage would have required collateral, and for non-cash collateral (such as the loans), the collateral posted would have to equal 110% or 120% of principal.[640] While it is not clear whether this problem was one of the initial reasons for the brokering project, Bank personnel recognized that "the 250.250 issue will be greatly reduced" by implementation of the Broker-to-Bank arrangement.[641]

> ### b. The Parties' Agreement To Maintain The Existing Economics, Under Which The Bank Received Only Net Interest Carry For The Period Loans Were On Its Books

As discussed above, for loans GMAC Mortgage sold under the Correspondent Agreement pursuant to the 250.250 exception,[642] the Bank recognized as revenue only the "net interest carry" for the period the loan was on the Bank's books. GMAC Mortgage realized the benefit of any points or other origination fees charged. One of the key issues addressed by the Brokering Consumer Loans to Bank team was how revenues and expenses would be allocated under a brokering arrangement. Matthew Whitehead, a ResCap representative, was tasked with mapping out and getting agreement on these issues.[643]

As detailed in a Tuesday, September 2, 2008, e-mail exchange between Celini and Whitehead, as Celini confirmed in his interview with the Examiner's Professionals, and as

---

[639] Memorandum, GMAC Mortgage to GMAC Bank Loan Transfer Accounting Review, dated Nov. 24, 2008, at 1, 2–3 [EXAM00233961] (noting that the Bank Controller's "Q4 2007 Senior Financial Officer Controls Certification" had noted that the Bank was reviewing the 250.250 purchases for sales treatment, and that in Q2 2008, the qualification was revised to note that "as reported in prior quarter, and *concluded this quarter*, Bank purchases from [GMAC Mortgage] under 250.250 *do not qualify for sale treatment*") (emphasis added); E-mail from K. Walsh to C. Dondzila, et al. (Dec. 23, 2008), at EXAM12378491 [EXAM12378490] ("The 250.250 program . . . never qualified for transfer accounting by [GMAC Mortgage] under FAS 140 (and therefore purchase accounting by Bank) as a true-sale opinion is unattainable (confirmed with outside counsel earlier this year").

[640] E-mail from K. Walsh to C. Dondzila, et al. (Dec. 23, 2008), at EXAM12378491–92 [EXAM12378490]; *see* Section V.B.1.b (regulatory discussion).

[641] E-mail from K. Walsh to C. Dondzila, et al. (Dec. 23, 2008), at EXAM12378492 [EXAM12378490] (noting that the issue would remain problematic for states where the broker arrangement could not be put into effect, and where loans would continue to be sold to the Bank under the 250.250 program).

[642] *See* Section V.B.2.

[643] Int. of A. Celini, Feb. 18, 2013, at 221:21–22:8; Brokering Loans to Bank Project Issue Log, dated July 3, 2008, at 4 [EXAM20052676]; *see also* E-mail from D. Scott (July 3, 2008) [EXAM20052672] (circulating log).

Scott stated when interviewed by KPMG in early 2012, the agreement ultimately reached was to maintain the same economics that had been in place for loans sold under the 250.250 program.[644] In the e-mail exchange, Whitehead recapitulated the conclusions reached in a call the preceding Friday, and asked that Celini confirm his understanding; Celini responded by interlineating the word "Correct" at several junctures in response to Whitehead's statements.[645] As interlineated, the e-mail reads as follows in pertinent part:

> Based on our conversation on Friday, I wanted to confirm that *{the} only revenue the Bank is going to recognize is the Net Carry (i.e. Interest Income/Expense). All of the other income/ fees (i.e. Origination Fee, Loan Discount Fee income (points)*, Rate Lock Fee, Overage/Shortage/Subsidies, Underwriting Fee, other ancillary fees) *will be payable to the Bank (lender) from the borrower, and will be capitalized within the cost basis of the loan and essentially sold to Mortgage at that cost basis as the purchase price*. CORRECT. *All the traditional rev{enue}/ exp{ense} reimbursement items that normally {would} be recognized by the originator {will} be born by GMACB{ank} and capitalized into the loan basis {in} accordance with GAAP. These items will not reside on the Bank P&L [deferred onto B{alance}/S{heet}] and will be recognized on the Mortgage P&L once the loan is sold to GSEs*. Likewise, *the Broker Fee will be paid to Mortgage from the Bank and will also be capitalized within the basis of the loan* and sold to Mortgage at which time it would be recognized as a{n} expense and offset [eliminated in consolidation] any Broker Fee income on the Mortgage entity. *This would effectively make the Bank P&L neutral to the way it currently conducts business* and would act essentially as a funder of loans and not impacted by any market or interest rate movement. [correct].[646]

---

[644] Int. of A. Celini, Feb. 18, 2013, at 242:22–24 ("We essentially replicated the economics of the 250.250 transaction in a broker form."); E-mails between M. Whitehead and A. Celini (Sept. 2, 2008) [EXAM00003975]; Ally Global Security Investigation Report, dated Mar. 14, 2012, at RC40022063–64 [RC40022044] (summary of KPMG interview of Debra Scott) ("In her opinion the bank was suppose[d] to receive the same income as it received from the prior 250/250 agreement and the bank was to 'remain income neutral' . . . any points or premium pricing income would be discounted from the price [when] GMAC Mortgage purchased the loan from Ally Bank"); *see also* E-mail from D. Scott to M. Whitehead, et al. (Aug. 28, 2008) [EXAM10286218].

[645] E-mails between M. Whitehead and A. Celini (Sept. 2, 2008) [EXAM00003975]; Int. of A. Celini, Feb. 18, 2013, at 225:1–226:19 (confirming the "correct" interlineations were Celini's, and his continued agreement with Whitehead's statements).

[646] E-mails between M. Whitehead and A. Celini (Sept. 2, 2008) [EXAM00003975] (alterations in original) (emphasis added) (material with "{   }" added).

In the e-mail forwarding the interlineation, Celini further noted his understanding that the arrangement "would have Bank Legal entity recognize the typical[ ] revenues of an originator, bear the cost of U/W, pay the broker a Respa/23B fee for taking the application and bringing the loan to [the Bank] and processing it to close," but then,

> [T]he appropriate items would be capitalized into the loan basis such that when the loan is sold under the MMLPSA (fwd sale agreement) there would be *no gain or loss on sale* for the [Bank] Legal entity. I would believe this to be "market risk neutral[.]"[647]

A few days earlier, Scott had exchanged e-mails with Whitehead and others that similarly described the arrangement as:

> (1) [GMAC Mortgage] will broker loan to bank at the channel price sheet;
>
> (2) If loan is underwritten and approved by [the Bank], loan is funded by [the Bank];
>
> (3) All traditional non-pass through fees (application, origination, copying, courier, etc) and points are paid to [the Bank];
>
> (4) [The Bank] pays [GMAC Mortgage] broker fee for services rendered;
>
> (5) [GMAC Mortgage] records broker fee as income (will get eliminated in consolidation);
>
> (6) [The Bank] capitalizes the broker and origination fee in accordance with GAAP. Any portion of the broker fee not capitalized should be off-set by fees collected from borrower;
>
> (7) *[The Bank] records loan origination at cost (includes origination fee income[648] and broker and admin services expense);*

---

[647] E-mails between M. Whitehead and A. Celini (Sept. 2, 2008) [EXAM00003975] (emphasis added).

[648] It has been suggested by AFI counsel that Scott's e-mail does not address the capitalization of "points" income. However, as discussed below, under FAS 91, "origination fee income" includes "points"; thus, Scott's reference to the inclusion of "origination fee income" in the cost-basis pricing of the loan reflects an understanding that the loan's cost would be reduced where points had been paid. *See* Section V.B.6.d; FIN. ACCOUNTING STANDARDS BD., STATEMENT OF FINANCIAL ACCOUNTING STANDARDS NO. 91, Accounting for Nonrefundable Fees and Costs Associated with Originating and Acquiring Loans and Initial Direct Costs of Leases, ¶ 80 (Dec. 1986). FAS 91, "Accounting for Nonrefundable Fees and Costs Associated with Originating or Acquiring Loans and Initial Direct Costs of Leases (as amended)," was superseded by the FASB Accounting Standards Codification ("ASC") 310–20, "Nonrefundable Fees and Other Costs" on September 15, 2009.

(8) *[The Bank] sells loan to [GMAC Mortgage] at cost (no gain or loss to [the Bank])* which means that loan is net of expense incurred not covered by borrower or capitalized. [The Bank] retains float income during . . . the hold period;

(9) [GMAC Mortgage] hedges loan in accordance to the existing [Bank/GMAC Mortgage] swap agreement;

(10) [*GMAC Mortgage*] sells loan to GSE - (eliminates broker and admin fee) and *realizes gain or loss*; and

(11) [*The Bank*] *should not have gains or losses* due to this transaction.[649]

Thus, the agreement reached was that GMAC Mortgage would continue to retain the profit and loss impact of origination fees and expenses for loans brokered to the Bank, just as it had when it sold loans to the Bank under the 250.250 program, while the Bank would have no "gains or losses," earning only net interest carry—the "float income during the hold period."

There are two significant alternative scenarios to bear in mind in connection with understanding the impact of this arrangement—"discount points" and "premium pricing"[650]—illustrated in Exhibit V.B.6.b:

EXHIBIT V.B.6.b
**Generic Loan Scenario Examples Comparing Discount Points vs. Premium Pricing**

| *Loan Scenario 1 - "Discount Points"* | | | *Loan Scenario 2 - "Premium Pricing"* | | |
|---|---|---|---|---|---|
| Loan type | | 30-Year Fixed | Loan type | | 30-Year Fixed |
| Loan amount (UPB) | $ | 200,000 | Loan amount (UPB) | $ | 200,000 |
| Par rate | | 5.00% | Par rate | | 5.00% |
| Note rate | | 4.50% | Note rate | | 5.50% |
| Closing costs paid by lender | | N/A | Closing costs paid by lender | $ | 2,000 |
| Broker fee paid by lender | $ | 1,500 | Broker fee paid by lender | $ | 1,500 |
| Discount points (per 0.25%) | $ | 2,000 | Discount points | | N/A |
| Total points collected from borrower ($0.25\% \times 2$) | $ | 4,000 | Total points collected from borrower | | N/A |
| Bank's cost basis | $ | 197,500 | Bank's cost basis | $ | 203,500 |

As illustrated in Loan Scenario 1, a borrower may pay "discount points" in connection with a loan to reduce the rate from 5.00% to 4.50%. The total mortgage discount points paid to obtain the desired mortgage note rate are $4,000 ($2,000 x 2) and the bank's cost basis is $197,500 ($200,000 UPB - $4,000 points collected + $1,500 broker fee). The reduced note rate will negatively affect the gain on sale recognized when the loan is sold to an investor due to the note rate being below par.

---

[649] E-mail from D. Scott to M. Whitehead, et al. (Aug. 28, 2008) [EXAM10286218] (emphasis added).

[650] These two examples illustrate two common scenarios that help illuminate the issues addressed; there are, of course, many other alternative scenarios not described here.

Conversely, as illustrated in Loan Scenario 2, a borrower may instead accept a higher mortgage interest rate ("premium pricing") while paying "no discount points." In this scenario, the borrower qualifies for a mortgage par rate of 5.00%, but the bank offers a rate of 5.50% using a "lender credit" to cover the borrower's closing costs. This is known as a "no-closing cost loan" and is considered "premium pricing." In this scenario, the bank's cost basis is $203,500 ($200,000 UPB + $2,000 bank-paid closing costs + $1,500 broker fee). The increased, above-par note rate will positively affect the gain on sale recognized when the loan is sold to an investor. Furthermore, a portion of this gain on sale, referred to as the "day one gain on sale" relates to the difference between the Bank's cost and the value of the loan on the day the loan is recorded on the Bank's books (the Capital Markets Required Price or "CMRP"); as discussed below, this "day one gain on sale" was treated as a form of origination income.

The accounting treatment for nonrefundable fees and costs associated with lending, committing to lend, or purchasing a group of loans was governed by Statement of Financial Accounting Standards No. 91 ("FAS 91").[651] Under FAS 91, nonrefundable fees include origination fees (points and placement fees), commitment fees (application fees, management fees, and restructuring fees), and syndication fees.[652] Origination fees are fees charged to the borrower in connection with the process of originating, refinancing, or restructuring a loan and include (but are not limited to) points, management fees, arrangement fees, placement fees, application fees, and underwriting fees.[653] FAS 91 specifies that loan origination fees and related direct loan origination costs for a given loan shall be offset, and only the net amount shall be deferred and recognized as an adjustment to the cost basis of the loan.[654] For example, if a lender pays a broker fee of $2,000 and collects points of $1,500, the net deferred amount is an expense of $500 ($2,000 broker expense less $1,500 fee income). For loans classified as held for sale, the deferred amount is not amortized before the sale, but is recognized through the income statement as a component of gain on sale when the loan is sold.[655]

Thus, Scott's e-mail and Celini's exchange with Whitehead reflect that origination fees (e.g., discount points) would be paid by the borrower to the Bank in the first instance, and the Bank would then defer and "capitalize" the income under FAS 91, *reducing* the cost basis of the loan. This, in turn, would serve to *reduce* the price charged to GMAC Mortgage when it purchased the loan from the Bank, due to the combined effect of the MMLPSA and the Pipeline Swap (which, as discussed above, were designed to operate together to result in the transfer of loans to GMAC Mortgage at the Bank's cost).[656]

---

[651] Fin. Accounting Standards Bd., Statement of Financial Accounting Standards No. 91, Accounting for Nonrefundable Fees and Costs Associated with Originating and Acquiring Loans and Initial Direct Costs of Leases (Dec. 1986).

[652] *Id.* ¶ 2.

[653] *Id.* Appx. C.

[654] *Id.* ¶ 5.

[655] *Id.* ¶ 27c; Ally Accounting Policy 2740, Loan Premiums, Discounts, and Deferred Fees or Costs, dated Jan. 1, 2012, at 10 [RC40000936].

[656] *See* Section V.B.5.

In contrast, in the "premium pricing" scenario, the Bank would defer and capitalize the amounts related to uncompensated origination expenses (such as underwriting expense and other closing costs). The market value of the loan (and day one gain on sale) would be higher (because of the above-market note rate), but the Bank would, under FAS 91, capitalize a corresponding expense item for its uncompensated origination expense. The deferral of these expenses would increase the price of the loan to GMAC Mortgage under the combined cost-basis pricing effect of the MMLPSA and Pipeline Swap.

The Celini/Whitehead and Scott e-mails discussed above reflect an intent to maintain cost-based pricing for loans brokered to the Bank, so that the Bank would recognize neither gains nor losses on sale of the loans.[657] While the parties also contemplated that GMAC Mortgage would charge the Bank a broker fee, this expense would likewise be capitalized and deferred under FAS 91, so that it would serve to *increase* the price of the loan under the MMLPSA/Pipeline Swap. Thus, the Bank would recoup the cost of the broker fee from GMAC Mortgage when GMAC Mortgage purchased the loan.[658]

The parties' agreement about the allocation of revenue on brokered loans is further reflected in a slide presentation dated November 19, 2008 (the day before the Broker Agreement was executed), entitled "Brokering Consumer Loans 2 Bank Project (BCL2B), Legal Entity Revenue, Expense, and Broker Fee Proposal" (the "BCL2B Presentation").[659] The BCL2B Presentation describes the "Base Assumptions" for the Broker to Bank Project, including:

- "[GMAC Bank], acting as the lender[,] will remain *P&L neutral from the brokered transaction with the exception of net interest carry";*

- "FAS91 will be booked on [GMAC Bank] at loan level to include deferrable fees and expenses" and "will include Broker Fee expense"; and

_____

[657] E-mails between M. Whitehead and A. Celini (Sept. 2, 2008) [EXAM00003975]; E-mail from D. Scott to M. Whitehead, et al. (Aug. 28, 2008) [EXAM10286218]. Celini also stated that this also replicated the economics of other brokered loans originated by the Bank. Int. of A. Celini, Feb. 18, 2013, at 229:20–230:7 (explaining that for other bank-originated loans before the advent of the Broker Agreement with GMAC Mortgage, "the affiliate" (GMAC Mortgage) received the P&L impact of origination income and expenses, noting "we were not recognizing gains and losses on these activities").

[658] E-mails between M. Whitehead and A. Celini (Sept. 2, 2008) [EXAM00003975]; E-mail from D. Scott to M. Whitehead, et al. (Aug. 28, 2008) [EXAM10286218].

[659] Materials for Audit Committee Meeting of Residential Capital, LLC, Mar. 20, 2012, at RC40022103–24 [RC40022044].

- "GMAC[ Bank] will receive payment for that loan upon sale to Mortgage that is equal to the originated cost basis of the loan rather than a purchase price equal to the capital markets required price," and "[t]he Cost basis of the loan would include any origination and loan processing fee income and any broker fee expenses."[660]

Elsewhere the BCL2B Presentation similarly states that the Bank will "recognize":

- (G) Income related to:

  - Fees paid by the borrower for loan origination services performed by [GMAC Mortgage] (broker) on behalf of GMAC Bank (lender)

  - Origination fee and ditech/GMAC fee (may be renamed)

  - Fee/income for loan discount/rate buydowns

  - Fees for services provided with locking the rate on the loan being originated

  - Fees for underwriting services performed by the bank underwriters

  - Other miscellaneous ancillary fees or "Lender Loan Services Fee: (i.e. document prep, processing, etc.)

- (H) Receive overage/shortage or pricing subsidies

- (I) Net Carry while loan is in pipeline at the bank

- (J) Will pay "Broker fee" to GMACM (broker for loan origination expenses through a broker agreement (inter-company transaction) and offset by (A) on GMACM. Eliminated in ELIM17 for management reporting purposes

- (K) Expense for headcount and related expense associated with the underwriting and credit decisioning

---

[660] BCL2B Presentation, at 5 [EXAM00075395] (emphasis added). Counsel for AFI notes that, on the same page, the Presentation, after stating that "[c]ompensation in the form of a 'Broker Fee' must be paid to [GMAC Mortgage] (Broker) and disclosed to borrower in order to remain RESPA compliant," then states that "No yield spread premium or admin services fee will be paid to [GMAC Mortgage]." AFI and Young suggest that the reference to "yield spread premium" is a reference to premium pricing, indicating that GMAC Mortgage was not to get the benefit of premium pricing. Int. of J. Young, Mar. 15, 2013, at 202:1–5. However, "yield spread premium" is a typical component of many broker fee arrangements. *See* Dep't of Hous. and Urban Dev. Real Estate Procedures Act (RESPA) Statement of Policy 1999-1 Regarding Lender Payments to Mortgage Brokers, Final Rule (1999), at 3, http://www.hud.gov/offices/hsg/ramh/res/fr-4450.pdf. The BCL2B Presentation thus makes clear that the Broker Fee to be paid to GMAC Mortgage is not to include such a component. It then goes on in the next entries, quoted in text, to state that the Bank "will remain P&L neutral . . . with the exception of net interest carry," that FAS 91 deferrals to be booked by the Bank "will include Broker Fee expense," and that the loans will be transferred at "the originated cost basis of the loan rather than . . . the capital markets required price," with "any origination and loan processing fee income and any broker fee expenses" included in the cost basis. BCL2B Presentation, at 5 [EXAM00075395].

- (L) Receive and fund the capitalized servicing asset [MSR] on the balance sheet

- (M) *Fees and expenses will be deferred through FAS91 and capitalized in cost basis of loan on balance sheet (related to items G, H, J, and K)*.[661]

Thus, while the Bank would "recognize" origination income, overage/shortage or pricing subsidies, broker fees, and underwriting expense (items G, H, J and K), these items would be deferred and capitalized, and their resulting economic effects would be transferred to GMAC Mortgage through the MMLPSA and Pipeline Swap upon sale of the loan. The Bank would retain Net Carry (item I), and would retain the MSR (item L) upon sale of the loan.

Further, the BCL2B Presentation explained that the Broker Fee would be set at GMAC Mortgage's cost. The Presentation identified the fees (in terms of basis points) to be charged for conventional/conforming loans and for government loans,[662] demonstrating that the fees had been calculated on a cost basis and "[d]id NOT include a premium on top of the actual expenses."[663] This pricing reflected the fact that the Broker Fee would ultimately be a "wash," since it would be paid to GMAC Mortgage by the Bank and then recouped through including this amount as a FAS 91 deferral, increasing the MMLPSA/Pipeline Swap cost-based purchase price of the loan.[664]

Finally, the BCL2B Presentation provided loan-level accounting examples and a 2009 consumer lending operating plan profit and loss statement (comparing GMAC Mortgage and the Bank), illustrating the allocation of revenues and expenses just described. The sample loan-level accounting journal entries associated with an HFS loan brokered from GMAC Mortgage to the Bank included origination fee income, loan discount income and broker fee

---

[661] BCL2B Presentation, at 7 [EXAM00075395] (emphasis added).

[662] *Id.* at 4; *see also* GMAC Bank Affiliate Transaction Memorandum Re Broker Agreement - GMAC Mortgage LLC & GMAC Bank, dated Nov. 30, 2008, at 1 [ALLY_0017944] (reciting same fees reflected in the BCL2B Presentation); Int. of A. Celini, Feb. 18, 2013, at 240:21–243:3.

[663] BCL2B Presentation, at 11 [EXAM00075395]. The February 2012 Sandler O'Neill presentation to the Bank Board (discussed in Section V.B.10.c) noted that the broker fee was not on market terms. At the time of that presentation—February 2012—the Bank was paying GMAC Mortgage a broker fee of 65 basis points to cover a number of GMAC Mortgage's costs, including loan officer compensation, overhead, infrastructure and marketing costs. Sandler O'Neill noted that this fee was below market, observing that the market was paying 50–75 basis points for loan officer compensation alone. Based on that observation, Sandler O'Neill stated that it "would expect the total origination fee paid by knowledgeable market participants to be greater than 50–75 basis points because originators would need to cover additional costs (e.g., overhead, infrastructure and marketing costs) over and above loan officer compensation." Sandler O'Neill Report to the Board of Directors of Ally Bank Re: Analysis of Financial Terms of Certain Affiliate Agreements between Ally Bank and GMAC Mortgage LLC, dated Feb. 28, 2012, at 59 [ALLY_PEO_0084709].

[664] Int. of A. Celini, Feb. 18, 2013, at 236:22–237:13.

expense as components of the FAS 91 deferral.[665] The 2009 operating plan identified the projected income statement impact upon implementation of the Broker to Bank Project. The loan-level accounting samples and the profit and loss statements illustrated the elimination of the broker fee and the recognition of the economics of the FAS 91 deferrals by GMAC Mortgage.[666]

In connection with implementation of the Broker to Bank Project, approximately 65 ResCap/GMAC Mortgage underwriters were transferred to Ally Bank.[667] ResCap received no compensation in exchange for the transfer of this unit.[668] This absence of consideration can be justified by the structure of the contemplated arrangement through which the underwriters were not to function as a profit center for the Bank but instead as a cost center whose expense was to be capitalized, deferred, and passed on to GMAC Mortgage when it purchased the loans. Had it been intended that the Bank would realize additional profits by virtue of assuming the underwriting and origination functions, one would expect that GMAC Mortgage would have been compensated for the transfer of this unit.

The only new written agreement into which the parties entered in connection with the BCL2B was the November 20, 2008 Broker Agreement. The Broker Agreement notably does not specify the fee that is to be paid to GMAC Mortgage for acting as a broker.[669] A November 30, 2008 GMAC Bank Affiliate Transaction Memo (authored by Celini) addressing the Broker Agreement discusses the broker fees to be charged, reciting the same figures as the BCL2B Presentation and the services to be provided by GMAC Mortgage.[670] Subsequent documentation (including the report of a review performed by KPMG in 2012, discussed

---

[665] BCL2B Presentation, at 20 [EXAM00075395]. The journal entries include an origination fee credit of ($1,179.00), a discount for net loan discount income debit of $640.92 and broker fee expense debit of $1,568.00. The combination of these line items ($1,568.00 + $640.92—$1,179.00) equals the FAS 91 Deferral of $1,029.92.

[666] BCL2B Presentation, at 8 [EXAM00075395].

[667] E-mail from S. McCumber to L. Gess (July 7, 2008) [EXAM20052672]; Brokering Contact List [EXAM20052675]; *see also* Int. of A. Celini, Feb. 18, 2013, at 217:12–218:8.

[668] Int. of A. Celini, Feb. 18, 2013, at 217:6–19.

[669] *See* Broker Agreement, § 4 [RC00030534] ("Broker Compensation" provision specifies circumstances in which fee is to be paid, requires appropriate consumer disclosures, and provides that the Bank can limit the fee where it exceeds the normal market price, but does not specify the fee).

[670] GMAC Bank Affiliate Transaction Memorandum Re Broker Agreement- GMAC Mortgage LLC & GMAC Bank, dated Nov. 30, 2008, at 1–3 [ALLY_0017944]. The Memorandum notably does *not* address the revenue allocation that will apply to the brokered loans by operation of the MMLPSA and the Pipeline Swap.

below) and witness interviews confirm that the broker fee GMAC Mortgage charged over the ensuing years was based on its cost, rather than a market-based fee, and that the parties periodically reevaluated the fee to assure that it equated to actual cost.[671]

It does not appear that the parties thought any further agreements or modifications to existing agreements were necessary to effectuate their agreed-upon allocation of revenues and expenses.[672] Celini explained that the contemplated allocation of revenues and expenses generally was the same as that under the existing contractual arrangements;[673] in particular, for pre-Broker Agreement third-party brokered loans, the economic impact of "points" and the day one gain on sale were being passed on to GMAC Mortgage and were not retained by Ally Bank.[674] AFI counsel confirmed that pre-Broker Agreement loan accounting shows that this was the case,[675] and sample brokered loans from this period[676] show that the Bank, as Celini indicated, was not "recognizing gains or losses on these activities."[677] The cost-based pricing

---

[671] *See, e.g.,* Int. of C. Dondzila, Nov. 9, 2012, at 50:24–52:10; ResCap Audit Committee Presentation, dated Mar. 20, 2012, at RC40022051 [RC40022044] (noting GMAC Mortgage will "realize a net loss" on each transaction unless the broker fee is "increased significantly"); KPMG Report, at RC40022044 [RC40022044] ("[T]he broker fee would likely not cover GMAC [Mortgage's] costs to perform services to broker loans to the Bank."); *see also* Ally Bank Affiliate Transaction Memorandum Re Broker Agreement- GMAC Mortgage LLC & GMAC Bank, dated Sept. 7, 2011, at 1 [ALLY_0018206] (reflecting updated broker fees).

[672] Int. of A. Celini, Feb. 18, 2013, at 244:2-19; Int. of R. Groody, Dec. 17, 2012, at 176:21–177:25.

[673] Int. of A. Celini, Feb. 18, 2013, at 229:20–230:7 (for pre-Broker Agreement bank-originated loans "the affiliate" (GMAC Mortgage) received the P&L impact of origination income and expenses; "we were not recognizing gains and losses on these activities").

[674] It appears that there were two categories of items whose impact accrued to the Bank for earlier brokered loans that were to be deferred under the new arrangement: First, it appears that there were several ancillary fees sometimes charged by the Bank that were being retained by the Bank, including tax service fees and loan processing fees. Second, even though FAS 91, paragraph 65 specifically contemplates that broker fees are to be deferred, historically the Bank had not done so. As part of the new process, the parties agreed that the broker fee should be treated as part of the Bank's cost to originate the loan, and that it therefore, was to be included in the FAS 91 deferral. *See* E-mail from L. Corrigan to S. Bode, S. Ruby, et al. (Oct. 28, 2009) [EXAM12008765]; Section V.B.6.c. Of course, had this expense not been deferred, it would have been paid by the Bank to GMAC Mortgage and would not then have been recouped through application of the MMLPSA and Pipeline Swap on sale of the loan to GMAC Mortgage; in other words, revising the parties' prior practice and deferring the broker expense benefited the Bank.

[675] Meeting with Kirkland & Ellis, AFI Counsel, in N.Y., N.Y. (Apr. 11, 2013).

[676] Broker Loans Before 2009 [ALLY_0434976]. As discussed above, the sample loans show that the Bank was receiving, in addition to net interest carry, certain miscellaneous fees such as tax service fees, but was not recognizing other gains or losses, which instead were recognized by GMAC Mortgage.

[677] Int. of A. Celini, Feb. 18, 2013, at 229:20–230:7

for loans purchased (effectuated under the 2008 MMLPSA and July 2008 Pipeline Swap as implemented) would have captured the effect of the FAS 91 deferrals.[678]

Further, Celini stated that to effectuate any change in these economics (or any change in the accounting that resulted in such a change) would have required "a change in affiliate agreements" then in place.[679]

### c. Ally Bank Initially Realized Only Net Interest Carry On GMAC Mortgage Brokered Loans

When Ally Bank and GMAC Mortgage initially implemented the broker arrangement, the revenue and expense allocation was implemented as they had agreed. From January 1, 2009 to July 31, 2009 (when the Bank elected an accounting change discussed below), the Bank realized only the net interest carry on the loans, while also retaining the MSRs on the increased volume of loans passing through the Bank by virtue of avoiding the 250.250 limits. GMAC Mortgage, through the impact of FAS 91 deferrals (inclusive of discounts/premiums/day one gains on sale), continued to reap the profit and loss ("P&L") benefit of points and other origination-related revenues, as well as the impact of capitalized expenses. In a review performed several years later, Joe Cortese[680] summarized the accounting for brokered loans during this initial period from January 1, 2009, to July 31, 2009, as follows:

> Upon origination, the carrying value of the loan on the Bank consisted of the UPB, plus or minus discount/premium (collected from borrower and CMRP);[681] and net deferred fees (FAS91). Net deferred fees consisted of premium/discount collected/paid at closing; the capital markets required price (CMRP); broker fee expense; and a per unit deferral for internal costs. Upon sale of the loan, the UPB was derecognized; the net deferred fee was reversed into earnings; the discount/premium on the loan was derecognized; and interest income representing

---

[678] Indeed, the 2008 MMLPSA pricing provisions specifically stated that, for MMLPSA pricing purposes, the loan's "net carrying value" determined in accordance with GAAP, was

> *to include* without limitation the unpaid principal balance of such Mortgage Loan, plus or minus any premium or discount paid, *net deferral fees or costs,* accrued interest and basis adjustments from derivative loan commitments, hedge accounting or lower of cost or market adjustments.

2008 MMLPSA, § 1.9 [ALLY_0201210] (emphasis added).

[679] Int. of A. Celini, Feb. 18, 2013, at 246:4–248:18; *see also* Int. of R. Groody, Dec. 17, 2012, at 259:25–260:11 (agreeing change from cost-basis pricing would have required amendment of agreements).

[680] Cortese joined Old GMAC Commercial Mortgage as an accounting director in June 2000 before leaving in October 2004. In July 2008, Cortese joined ResCap as an accounting director. He became Chief Accounting Officer for Ally Bank in August 2009, and became Ally Bank Mortgage Controller in August/September 2012. Int. of J. Cortese, Mar. 7, 2013, at 7:19–25, 9:15–25, 10:20–12:3.

[681] "CMRP," or "Capital Markets Required Price," is a market valuation of the loan; as Cortese explained, the discount/premium consisted of loan discount income, which was "inclusive of what they're referring to as the capital markets required price, which again, is the day one estimate of the gain on sale." Int. of J. Cortese, Mar. 7, 2013, at 68:15–69:3.

> the carry of the loan was recognized. These items were offset to intercompany with [GMAC Mortgage]. An entry was then recorded to transfer the net deferred fee to [GMAC Mortgage] (DR to revenue) with offset to intercompany with [GMAC Mortgage]. The net intercompany balance would be settled with a cash transfer. *Net revenue to the Bank consisted of interest carry only.*[682]

The accounting for sample loans from this period produced by the Debtors confirms the above-described treatment.[683] Further, this accounting also matched the sample loan-level accounting provided by the BCL2B Presentation.[684]

The net P&L benefit to GMAC Mortgage from adjusting the purchase price of the brokered loans by the FAS 91 deferrals—not only for points, fee revenues and the day one gain on sale (which benefited GMAC Mortgage by making loans less expensive) but also for lender-paid closing costs and broker fee expense (which adversely affected GMAC Mortgage by making loans more expensive)[685]—was $47.18 million for the period January 1, 2009 through July 31, 2009.[686]

---

[682] Broker to Bank Contract Accounting Review, at 2 [EXAM12253506] (attached to e-mail from J. Cortese to C. Dondzila, J. Young, J. Whitlinger, and J. Andrews (Feb. 27, 2012) [EXAM12253505]) (emphasis added).

[683] *See* Loan Summary [EXAM00229653]; Loan Summary [EXAM00233017]; Examiner Loan Selections 03 11 13 [EXAM00339939]; Examiner Loan Selections 04 15 13 [EXAM00345279].

[684] The overall net effect of the accounting resulted in the Bank receiving interest income and GMAC Mortgage receiving the risks and rewards associated with the loan, including points paid, gain on sale and origination fees.

[685] To effectuate the appropriate accounting upon implementation of the broker to bank process in January 2009, manual adjustment to the general ledger was required relating to the appropriate FAS 91 deferral. The entry had no net income effect and represented a reclassification of the appropriate income statement line item. The FAS 91 fee entry was net of loan revenue (origination fees, loan processing income, etc.) and broker fee expense. E-mail from L. Corrigan to S. Bode, S. Ruby, C. Cowley, and C. Dondzila (Oct. 28, 2009) [EXAM12008765]. As part of the month-end process whereby the FAS 91 deferral was reallocated from "gain on sale" line item to the appropriate income statement line items, the broker fee expense was excluded in error. *Id.* In October 2009, a correcting entry was made to reclassify $39.8 million (for the period January 1, 2009 through September 30, 2009) and $7.1 million (for the quarter ending September 30, 2009). *Id.* The correcting entry was a debit to "gain on sale" and a credit to "other expenses" and had no impact on the economics of the transaction. *Id.*

[686] E-mail from S. Ruby to J. Cortese, C. Dondzila, et al. (Dec. 16, 2011) [EXAM12253153], attaching Ally Bank Consumer-Broker to Bank, HFS Loans Income Statement [EXAM12253154]; Memorandum to ALLY Bank 2011 Financial Statement Files, SAB 99 & 108 Analysis – Broker to Bank Error (Mar. 13, 2012) [ALLY_0401565].

#### d. Ally Bank (Unwittingly, And Without GMAC Mortgage's Agreement) Altered The Net Revenue Allocation Through Its August 1, 2009 Fair Value Accounting Election

Effective August 1, 2009, Ally Bank elected to implement the fair value option to account for HFS loans[687] in accordance with Statement of Financial Accounting Standards ("FAS") No. 159, The Fair Value Option for Financial Assets and Financial Liabilities.[688] The Bank reportedly made this election because the mechanics of implementing fair value accounting were simpler than those for hedge accounting.[689] Under the fair value election, loans were required to be marked to market.[690] The Bank ostensibly was doing this already as a function of applying hedge accounting for HFS loans based on the applicability of the MMLPSA and the Pipeline Swap (though, as discussed above, this in fact is not quite how the Bank performed the loan-level accounting for these transactions).[691] Consequently, witnesses suggested, the fair value election really should not have made a difference in loan pricing.[692] This view, however, ignores that the combined effect of the 2008 MMLPSA and the Pipeline Swap was to transfer loans to GMAC Mortgage not at market value (or even at the Bank's "carrying value"), but at Ally Bank's cost (UPB + discount/premium + SRP).[693] Most significantly, this view also disregards the fact that when it elected fair value accounting, Ally Bank no longer recorded FAS 91 deferrals.[694]

───────────────────────

[687] Audit Committee Meeting Presentation, Significant Judgments and Estimates and Other Accounting Matters, dated Oct. 29, 2009, at RC40017984 [RC40017954]; KPMG Report, at RC40022072 [RC40022044].

[688] FAS 159, "The Fair Value Option for Financial Assets and Financial Liabilities (as amended), was superseded by the FASB Accounting Standards Codification ("ASC") 825, "Financial Instruments" on September 15, 2009.

[689] Int. of C. Dondzila, Nov. 9, 2012, at 130:17–31:19; Audit Committee Meeting Presentation, Significant Judgments and Estimates and Other Accounting Matters, dated Oct. 29, 2009, at RC40017984 [RC40017954].

[690] FINANCIAL ACCOUNTING STANDARDS BOARD, STATEMENT OF FINANCIAL ACCOUNTING STANDARDS No. 159, The Fair Value Option for Financial Assets and Financial Liabilities (Feb. 2007); GMAC Fair Value Measurements, DRAFT Accounting Policy #1060, Sept. 1, 2009, at 2 [EXAM12299919]; Int. of C. Dondzila, Nov. 9, 2012, at 132:3–15.

[691] As discussed in Section V.B.5.c, the Bank was not transferring the loans at market price under the MMLPSA, and recovering the difference between its cost and the market price under the Pipeline Swap hedge, as specified by the agreements. Instead, the Bank was transferring the loans at cost (UPB+discount/premium+SRP (where the Bank released the servicing rights)) and, after accounting for market value shifts under the Pipeline Swap at various junctures before sale, "zeroing out" the payments under the Pipeline Swap at sale, so that the net cumulative payments under the Pipeline Swap on any given loan were always $0 when sold under the MMLPSA.

[692] Int. of C. Dondzila, Nov. 9, 2012, at 89:23–90:7.

[693] See Section V.B.5.c.

[694] FINANCIAL ACCOUNTING STANDARDS BOARD, STATEMENT OF FINANCIAL ACCOUNTING STANDARDS No. 159, The Fair Value Option for Financial Assets and Financial Liabilities (Feb. 2007). According to paragraph 3, "Upfront costs and fees related to items for which the fair value option is elected shall be recognized in earnings as incurred and not deferred."

Thus, the Bank ceased capitalizing and deferring points and other origination income, and ceased capitalizing and deferring premium pricing-related expense and broker fees. Consequently, as Cortese later summarized the change:

> Post-Fair Value Election—Upon origination, the carrying value of the loan on the bank consists of the UPB; plus or minus discount/premium (collected from borrower and CMRP). Upon sale, the UPB would be derecognized; discount/premium would be reversed; and interest income representing the carry of the loan is recognized. These items are offset to intercompany with [GMAC Mortgage]. The net intercompany balance is then settled with a cash transfer. *Net revenue to the Bank consists of discount/premium; broker fee paid; and interest carry.*[695]

Cortese further explained in his interview that the discount/premium consisted of loan discount income, which he defined as "any points that the Bank has received from the borrower, net of any expenses that the Bank paid on origination directly to the borrower for the net premium pricing . . . inclusive of what they're referring to as the capital markets required price, which again, is the day one estimate of the gain on sale."[696] GMAC Mortgage no longer received the net FAS 91 deferred income and expenses, and the Bank began keeping, inter alia, a portion of the "gain on sale."

As a result, beginning August 1, 2009, rather than realizing the P&L benefit of points and the gain on sale as the parties had agreed (and as it had received under the 250.250 program and for third-party brokered loans), GMAC Mortgage instead received the cost-based, below-market broker fee (which, since it was no longer capitalized, GMAC Mortgage did not have to repay to Ally Bank when it purchased the loan). Of course, GMAC Mortgage had agreed to such a fee with the understanding that, whatever the fee charged, the fee would be a "wash" because of the FAS 91 deferrals, and with the expectation that it would continue to receive the P&L benefit of the FAS 91 deferrals.

---

[695] Broker to Bank Contract Accounting Review, at 2 [EXAM12253506] (attached to e-mail from J. Cortese to C. Dondzila, J. Young, J. Whitlinger, and J. Andrews (Feb. 27, 2012) [EXAM12253505]) (emphasis added).

[696] Int. of J. Cortese, Mar. 7, 2013, at 68:18–69:3.

Thus, with this shift, the Bank got to "have its cake and eat it too," keeping a significant portion of the gain on sale, but still assuming no representation and warranty exposure or hedge exposure, and paying a below-market broker fee in the bargain. The changed allocation of revenues is illustrated in Exhibit V.B.6.d below:

EXHIBIT V.B.6.d
**Accounting for Loans Brokered by GMAC Mortgage to the Bank**
**Pre and Post Fair Value Election**

GMAC Mortgage    Ally Bank

|  | Pre-Fair Value Election | Post-Fair Value Election |
|---|---|---|
| Points collected | GMACM | BANK |
| Lender paid closing costs | GMACM | BANK |
| "Day one" gain | GMACM | BANK |
| Net interest carry | BANK | BANK |
| Gain on sale to third party | GMACM | GMACM |
| Broker fee (at cost) | N/A | GMACM |

*Source: Broker to Bank Contract Accounting Review, at 2 [EXAM12253506] (attached to e-mail from J. Cortese to C. Dondzila, J. Young, J. Whitlinger, and J. Andrews (Feb. 27, 2012) [EXAM12253505].*

As noted above, Celini stated that any change from the revenue allocation agreed upon in the Brokering Consumer Loans to Bank Project, particularly any change resulting from the adoption of fair-value accounting, would have required a change in the parties' agreements.[697] There appears to be no evidence that this change in the underlying economics was understood and agreed to by GMAC Mortgage. Indeed, there appears to be no evidence that the parties even recognized at the time that the fair-value election would have the effect described above. Celini, for example, did not believe there were "any changes to intention" when the fair-value election was made.[698] In fact, it appears that the impact of the change was not discovered until two years later, in late 2011.

---

[697] Int. of A. Celini, Feb. 18, 2013, at 246:4–248:18.

[698] *Id.* at 246:4–21.

### e. *Glassner's Discovery Of The Net Revenue-Allocation Issue*

The matter appears to have come to light in December 2011, when an issue was raised by Ally Bank Senior Managing Director Adam Glassner (who also served the functional role of Executive VP and Managing Director for Ally Capital Markets)[699] with Young (who had become the Bank's Chief Financial Executive in 2011), and Whitlinger (then ResCap's CFO, Mortgage Operations).[700]

In his Ally Bank capacity, Glassner was responsible for warehouse and correspondent lending, and also became "the point of contact for Ally Bank's mortgage business with both the FDIC and the Utah Department of Financial Institutions."[701] In his Capital Markets function, Glassner's responsibilities included, inter alia, pricing for each of the Bank and ResCap loan channels.[702] When he raised the issue, Glassner was on the verge of leaving the Bank to take a position with Fannie Mae; he resigned January 3, 2012, but was asked to stay until January 26, 2012.[703]

According to Glassner, the issue arose when he was reviewing a report or presentation concerning profitability by origination channel and by legal entity, and "the revenue recognition by legal entity was more in the bank and less in ResCap" than he believed it should be, based on his "high level" understanding of the economics.[704] Glassner's understanding—echoing the views expressed by Celini, Groody and others in their interviews—was that under the parties' agreements, GMAC Mortgage was supposed to receive the "gain on sale,"[705] and it appeared that the Bank was retaining a portion of this revenue.[706]

---

[699] Glassner had joined Ally Bank as Senior Vice President in May 2009, and was one of a number of former Bank of America executives who joined AFI or its affiliates during this timeframe, including Al de Molina. Int. of A. Glassner, Mar. 20, 2013, at 8:11–9:12; Section V. Glassner took on the responsibilities of Executive Vice President and Managing Director of Capital Markets in July 2009, though he believes he was never formally given this title. Int. of A. Glassner, Mar. 20, 2013, at 14:12–22.

[700] Ally Global Security Investigation Report, dated Mar. 14, 2012, at RC40022053 [RC40022044].

[701] Int. of A. Glassner, Mar. 20, 2013, at 26:7–10, 16:6–9. *See also* Section V.B.9.d(1) (discussing Glassner's 2010 involvement in responding to FDIC criticisms of the interest rate applicable to the MSR Swap Funding Fee).

[702] *Id.* at 16:6–17:13.

[703] *Id.* at 98:5–8; 133:22–134:19.

[704] *Id.* at 135:10–136:23.

[705] *Id.* at 148:15–19, 150:7–18 (noting that his opinion "around the gain on sale" was formed in conversations several years earlier with Bank officials Mark Hales, Groody, and Celini "in an attempt to understand the business").

[706] *Id.* at 136:15–137:9.

Glassner asked Whitlinger and Young "to investigate the split of the revenue between the legal entities by channel to make sure that they were appropriately being accounted for and transacted for under the swap agreements—and given, again, at a high level that that split was incongruous with my generic understanding of [the proper revenue allocation]."[707] Glassner further raised the concern with Young and Whitlinger that, if he was correct, the Bank "would have overstated [its] earnings and, thus, capital at the bank."[708]

In a December 14, 2011 e-mail, Young, noting that he (Young) had "spoken with Adam," requested that Cortese meet with Dondzila and Rock the following day to discuss "consumer loan/HFS swap accounting."[709] The next day, Cortese e-mailed back that the meeting had occurred and reported:

> The consensus is that a piece of [Gain on Sale] is being recorded in the Bank as loan discount. *We believe that the intent of the Broker to Bank initiative was not to have any piece of sale execution revenue at the Bank.* This treatment appears to have begun in the beginning of 2009 when the program started. We are working to quantify the amount, however for 2011 thru [sic] November it was $136MM.
>
> This issue does impact the amount of broker fee that Bank pays Mortgage, as *the intent is for Bank to be neutral for originating consumer loans.* . . . [W]e are continuing to work on quantification and determination of intent.[710]

---

[707] Int. of A. Glassner, Mar. 20, 2013, at 138:11–18. Whitlinger later suggested that Glassner initially inquired of Whitlinger as to whether ResCap would earn more if loan pricing were structured to result in more premium pricing arrangements, rather than the payment of points, an objective Whitlinger suggested would raise regulatory concerns. *See* Ally Global Security Investigation Report, dated Mar. 14, 2012, at RC40022057 [RC40022044]; *see also* Int. of J. Whitlinger, Nov. 30, 2012, at 187:24–88:13. In his interview, Glassner vehemently denied making such an inquiry. Int. of A. Glassner, Mar. 20, 2013, at 138:3–139:23 ("[a]bsolutely 100 percent false"). Glassner also explained that it would not really be possible, given the market environment, to achieve such a result through structuring pricing to encourage one form of loan instead of another. *Id.* at 141:6–143:18. This issue is discussed further in Section V.B.6.f.

[708] Int. of A. Glassner, Mar. 20, 2013, at 169:1–6. Glassner initially suggested that he "raised the concern that it would present regulatory problems to the bank because if the accounting for the issue was wrong, we would have had different income, thus different capital." *Id.* at 162:17–21; 163:1–8. Later, he indicated that he did not specifically recall going beyond the statements about potential overstatement of the Bank's income and capital to say that this would pose regulatory problems for the Bank. *Id.* at 170:1–171:7.

[709] E-mails among J. Young, J. Cortese, J. Mackey, et al. (Dec. 14–15, 2011), at 1–2 [ALLY_0387143].

[710] *Id.* at 1 (emphasis added).

In an e-mail exchange with Cortese the following day, Ally Bank Accounting Director Sylvia Ruby documented the $47.18 million in FAS 91 deferrals (net of expense, including broker fees) that had flowed to GMAC Mortgage from January 1, 2009 to July 31, 2009.[711] Ruby's analysis also reflected the value for the period from August 1, 2009 to November 2011 of the points and day one gain-on-sale revenues that had accrued to the Bank instead of GMAC Mortgage; these items alone (excluding other FAS 91 deferrals) totaled $253.5 million (loan discount income of $444.4 million net of $190.9 million in broker fees paid but not deferred/recouped by the Bank for this period).[712] For the later years, these numbers were substantially a function of the day one gain on sale on "no points," premium pricing loans, which had become an increasingly popular option for refinancing as interest rates declined.

Glassner himself conducted limited additional inquiry before resigning on January 3, 2012.[713] Another employee who was cleaning up files belonging to an employee who had left the company provided a mortgage-related file to Glassner to determine whether its contents were worth keeping, and he found among them a copy of the BCL2B Presentation, which he in turn provided to Young and Whitlinger.[714] Glassner reviewed the Swap agreements and prior presentations to the FDIC and the DFI, confirming that they were consistent with his views that the Bank was not to receive gain on sale revenues.[715] He did not review other documents related to the Broker to Bank Project,[716] and does not recall speaking with any of the personnel involved in the project.[717] With respect to the BCL2B Presentation, Glassner concluded that the document as a whole was consistent with his general conclusion, though there were parts of it that he did not understand, and, in particular, he did not fully understand FAS 91 or the impact of the Presentation's statements concerning FAS 91.[718] Glassner maintained that the Bank was not supposed to receive any gain on sale income; however, reflecting his lack of understanding concerning the impact of deferring origination point and

---

[711] E-mail from S. Ruby (Dec. 16, 2011) [EXAM12253153]; Ally Bank Consumer—Broker to Bank, HFS Loans Income Statement [EXAM12253154].

[712] E-mail from S. Ruby (Dec. 16, 2011) [EXAM12253153]; Ally Bank Consumer—Broker to Bank, HFS Loans Income Statement [EXAM12253154].

[713] Int. of A. Glassner, Mar. 20, 2013, at 159:14–23.

[714] *Id.* at 144:20–146:11. Whitlinger later stated that he provided the BCL2B presentation to Glassner. Ally Global Security Investigation Report, dated Mar. 14, 2012, at RC40022058 [RC40022044].

[715] Int. of A. Glassner, Mar. 20, 2013, at 146:18–147:1–4, 148:24–149:6.

[716] *Id.* at 162:1–9.

[717] *Id.* at 147:5–148:9. Glassner thought that he might have spoken with Jill Horner, but does not specifically recall doing so. *Id.*

[718] *Id.* at 153:12–15 ("At the most high level, I understand what FAS 91 is. . . . But I could not make a FAS 91 adjustment if my life depended on it"); *id.* at 153:25–154:6 ("I understood that certain expenses were amortized under rules within FAS 91 over the asset and included in the amortized cost of the asset. Outside of that, the extent of my knowledge around FAS 91 or really any accounting issues is zero").

fee income under FAS 91, Glassner believed that these revenues were intended to flow to the Bank.[719] In late January 2012, just as he was about to leave the company, Glassner voiced his concerns about the propriety of the revenue recognition that had occurred to AFI's General Auditor, Ann Cummings.[720] He then refused to sign a Sarbanes Oxley certification [721] upon his departure. [722]

> ### f. The January 1, 2009 To July 31, 2009 Allocation Of Net Revenues Is Labeled An "Accounting Error" And ResCap Is Required To Pay Ally Bank The $47.4 Million Received For That Period, Plus Interest

The response to Glassner's concerns was threefold. First, in an effort that appears to have been coordinated by Young, Cortese (for Ally Bank), and Dondzila (for ResCap) prepared virtually identical memoranda addressing the issue dated, respectively, March 13 and March 10, 2012.[723] Second, AFI General Counsel William Solomon retained the accounting firm KPMG to investigate the matter on AFI's behalf, and KPMG formally delivered its report on March 16, 2012.[724] Third, Ally Global Security conducted an internal investigation, delivering a report dated March 14, 2012 (but which quotes extensively from the KPMG Report delivered two days later, and, with one exception, appears to rely on the same materials as the KPMG Report).[725]

---

[719] *Id.* at 168:7–9 (points and fees to be recognized by the Bank); 172:23–173:3 (same); 153:16–25 (acknowledging lack of understanding of impact of FAS 91 deferral of income and expenses described in BCL2B Presentation).

[720] Ally Global Security Investigation Report, dated Mar. 14, 2012, at RC40022053 [RC40022044].

[721] The Sarbanes-Oxley Act of 2002, § 302, requires the principal executive officer or officers and the principal financial officer or officers, or persons performing similar functions, of publicly traded companies to certify the appropriateness of their financial statements and disclosures and to certify that they fairly present, in all material respects, the operations and financial condition of the company. The Sarbanes-Oxley Act of 2002, Pub. L. 107-204, 116 Stat. 745 (2002).

[722] Int. of J. Whitlinger, Nov. 30, 2012, at 109:1–110:13; Int. of C. Dondzila, Nov. 9, 2012, at 43:4–44:2; KPMG Report, at RC40022071 [RC40022044]; Ally Global Security Investigation Report, dated Mar. 14, 2012, at RC40022053 [RC40022044].

[723] Memorandum, SAB 99 & 108 Analysis—Broker to Bank Error, dated Mar. 13, 2012 [ALLY_0401565]; Memorandum Re SAB 99 & 108 Analysis - Broker to Bank Error, dated Mar. 10, 2012 [EXAM12219169].

[724] KPMG Report, at 2 [RC40022044].

[725] Ally Global Security Investigation Report, dated Mar. 14, 2012, at RC40022052 [RC40022044].

### *(1) The Internal Accounting Memos*

The Cortese and Dondzila memos announce a conclusion that the revenue recognition for January 1, 2009 to July 31, 2009, "was done in error."[726] They then analyze whether the error requires an out-of-period accounting adjustment (involving a restatement of the relevant party's prior-period financials), concluding that the $47 million error is too small to require such an adjustment.[727] As Cortese acknowledged in his interview, had the conclusion instead been that the post-July 31, 2009 revenue allocation was an error, given the increased magnitude of the error, there is a "very strong likelihood" that restatement of the Bank's prior-period financials would have been required.[728]

With respect to the "error," the memos state that there were "conflicting corporate evidential documents, which in certain cases clearly describe an intention that Ally Bank would not recognize gains or losses with respect to loans originated under the Broker Agreement other than net carry," and in others "contradict this intention and suggest that Ally Bank, as originator was entitled to all fees, including points, and would merely pay GMAC Mortgage a market rate broker fee for the services it provided."[729] The conflict, Cortese explained in his interview, was between statements that the Bank would "recognize" certain revenues (such as points) and statements that the P&L impact of those items would nonetheless accrue to GMAC Mortgage, which he thought suggested that "those items don't get recognized by the Bank ever"; he characterized this as a "technical accounting" inconsistency.[730]

In fact, however, for the loan examples from the January 1, 2009 through July 31, 2009 reviewed as part of this Investigation, and for the loan accounting examples in the BCL2B Presentation Exhibit D (which Cortese had not reviewed),[731] the deferred revenues and costs *were* recognized in the Bank's income statement; they were then derecognized upon sale of the loan to GMAC Mortgage through the FAS 91 accounting entries. From a technical accounting perspective, the Bank did in fact "recognize" the net deferred fees during this period. Moreover, in the view of the Examiner's Financial Advisors, the accounting

---

[726] Memorandum, SAB 99 & 108 Analysis—Broker to Bank Error, dated Mar. 13, 2012, at 2 [ALLY_0401565]; C. Dondzila, Memorandum Re SAB 99 & 108 Analysis—Broker to Bank Error, dated Mar. 10, 2012, at 2 [EXAM12219169].

[727] Memorandum, SAB 99 & 108 Analysis—Broker to Bank Error, dated Mar. 13, 2012, at 2, 10 [ALLY_0401565]; C. Dondzila Memorandum Re SAB 99 & 108 Analysis—Broker to Bank Error, dated Mar. 10, 2012, at 2, 12 [EXAM12219169].

[728] Int. of J. Cortese, Mar. 7, 2013, at 172:20–173:20.

[729] Memorandum, SAB 99 & 108 Analysis—Broker to Bank Error, dated Mar. 13, 2012, at 2 [ALLY_0401565]; C. Dondzila, Memorandum Re SAB 99 & 108 Analysis—Broker to Bank Error, dated Mar. 10, 2012, at 2 [EXAM12219169].

[730] Int. of J. Cortese, Mar. 7, 2013, at 122:15–123:21; 124:19–125:16.

[731] *Id.* at 119:14–20:19.

methodology of capitalizing and deferring origination related fees and costs, as reflected in these loan examples, was in accordance with GAAP as required by FAS 91. Notably, neither the Cortese nor the Dondzila memo concluded that pre-August 2009 accounting was not in accordance with GAAP.[732] Of course, even if it were not, the ultimate issue to be addressed in determining whether the parties' agreement was complied with is not whether the accounting they agreed upon to determine the revenue allocation for purposes of the broker arrangement was GAAP-compliant, but whether the allocation of revenues was as they had agreed.

### (2) The KPMG And Ally Global Security Reports

AFI tasked KPMG with (1) "[a]ssess[ing] whether or not the accounting for the transaction was consistent with the agreements," and (2) "[a]ssessing whether or not the Company's accounting policies for the transaction have been consistently applied."[733] With respect to the second assessment AFI sought—as to whether the company's accounting policies had been applied consistently—KPMG concluded only that the policies had been applied consistently "after the fair value election,"[734] while elsewhere acknowledging that a different accounting treatment had been applied before the fair-value election.[735]

With respect to the first portion of the assignment, KPMG provided an assessment only as to whether the post-fair value election accounting could be reconciled with the parties' agreements. The KPMG Report curiously notes that it "will not cover the accounting for the transaction *prior to the fair value election,"* adding, in an apparent reference to the Cortese and Dondzila memos, that Ally had *already* concluded that the accounting implemented from January 1, 2009 to July 31, 2009 was the result of an error.[736] The documents produced do not disclose KPMG's view of the accounting for this pre-fair value period (and whether or not it, too, complied with GAAP or the parties' agreements in KPMG's view), or whether KPMG was directed not to opine on this period by AFI.[737]

---

[732] Memorandum, SAB 99 & 108 Analysis—Broker to Bank Error, Mar. 13, 2012, at 2 [ALLY_0401565]; C. Dondzila, Memorandum Re SAB 99 & 108 Analysis—Broker to Bank Error, Mar. 10, 2012, at 2 [EXAM12219169]. The Cortese and Dondzila memos were provided to Deloitte, AFI's and ResCap's auditors, to support the position that no out-of-period adjustment was required. Deloitte accepted the conclusion that no such adjustment was required; while Deloitte echoed the Cortese/Dondzila conclusion that the pre-August 2009 accounting had been an "error" in application of the parties' agreements, it notably did not conclude that the pre-August 2009 accounting was not in accordance with GAAP. Memorandum, Broker to Bank Retrospective Adjustment Overview, at 3 [DT032536]. Deloitte representatives indicated that they accepted ResCap's conclusion that the issue stemmed from a misinterpretation of contractual terms leading to accounting that did not reflect the intent of the parties, rather than a misapplication of GAAP. However, Deloitte representatives were unable to explain what aspect of the parties' agreements precipitated the pre-August 2009 accounting "error." Meeting with Deloitte, AFI's and ResCap's Auditors (Apr. 18, 2013) (telephonic).

[733] KPMG Report, at RC40022079 [RC40022044].

[734] *Id.* at RC40022072.

[735] *Id.*

[736] *Id.*

[737] Solomon could not recall details concerning this issue. Int. of W. Solomon, Mar. 19, 2013, at 157:10–18.

KPMG was provided with copies of certain (but not all) versions of the MMLPSA, Pipeline Swap and MSR Swap, the Broker Agreement, the BCL2B Presentation, and the Bank's November 30, 2008 Affiliate Transaction Memo.[738] KPMG was provided two loan-level accounting examples, one for the period from January 1, 2009 to July 31, 2009, and one from the period after the Bank's fair-value election. Neither KPMG, nor, for that matter, any of the other persons or entities who investigated this issue in early 2012 reviewed pre-2009 loan-level accounting examples.[739] Further, KPMG apparently was not provided a copy of the September 2008 e-mail exchange between Celini and Whitehead described above,[740] even though Scott had located it and, noting that it supported her view of "the broker project being economically neutral to the Bank," circulated it in early March 2012 to Young and Cortese, who forwarded it on to Whitlinger, Dondzila and Cummings.[741] Nor does it appear that KPMG received a copy of the August 28, 2008, Scott/Whitehead e-mail exchange.

KPMG interviewed Glassner, six current Ally and Ally Bank officials (including Young and Cortese), and three current ResCap officials, including Whitlinger.[742] Only one of the KPMG interviewees, Scott, was involved in the Broker to Bank Project revenue-allocation discussions.[743]

Glassner explained that his view was that from 2009 through 2011, "gain on sale income and fee income from mortgage loan origination and sale was incorrectly credited to GMAC Bank," that "today's interpretation [of the agreements] is a stretch as the agreements do not talk about the impact from fair value option accounting," and "the Bank does not have 'hedge risk, eligibility risk or default risk,' and therefore should not obtain gain on sale or premium pricing income."[744]

---

[738] *See* KPMG Report, Appx. I [RC40022044].

[739] *Id.* at RC40022076; Int. of J. Cortese, Mar. 7, 2013, at 119:5–21:7; Int. of C. Dondzila, Nov. 9, 2012, at 104:20–05:14; Int. of J. Whitlinger, Nov. 30, 2012, at 109:11–110:13; Int. of J. Young, Mar. 15, 2013, at 198:6–199:25.

[740] KPMG Report, at Appx. I [RC40022044].

[741] E-mail from D. Scott to J. Young and J. Cortese (Mar. 1, 2012) [EXAM00003975].

[742] KPMG Report, Appx. II [RC40022044]. The Report mis-identifies Nikki Rock as an Ally Bank Senior Accounting Director. *Id.*; *compare* Ally Global Security Investigation Report, dated Mar. 14, 2012, at RC40022061 [RC40022044] (identifying Rock's affiliation as ResCap Capital Markets Accounting).

[743] The only ResCap-side officials interviewed, Dondzila and Whitlinger, were not involved in the Broker to Bank Project. Dondzila and Whitlinger were relied upon primarily to provide an overview of the MMLPSA, Pipeline Swap, and Broker Agreement, though they were not involved in the development of the MMLPSA or Pipeline Swap, and, in the interviews conducted by the Examiner's Professionals, they professed limited familiarity with the terms of those agreements (though they had some familiarity with how loans subject to those agreements had been accounted for). *See* Int. of C. Dondzila, Sept. 27, 2012, at 41:11–17, 180:17–181:8, 271:6–13, 286:21–287:20; Int. of J. Whitlinger, Nov. 30, 2012, at 41:1–15, 44:25–45, 111:11–15, 126:7–16, 239:5–23.

[744] Ally Global Security Investigation Report, dated Mar. 14, 2012, at RC40022062 [RC40022044].

Scott asserted that "the bank was suppose[d] to receive the same income as it received from the prior 250/250 agreement and the bank was to 'remain income neutral.'"[745] She is further reported to have "felt that any points or premium pricing income would be discounted from the price [for which] GMAC Mortgage purchased the loan from Ally Bank."[746] The summary for KPMG's interview dismisses Scott's summary of how revenues were to be allocated as "mechanical," observing that she was unable to "describe how this transaction was accounted for" or "how the accounting practices impacted the economics."[747]

KPMG did not interview Celini. Ally Global Security interviewed Celini (then at Freddie Mac) telephonically[748] without KPMG involvement; this interview is omitted from the KPMG Report's list of interviews conducted and is not referenced in KPMG's report.[749] No documents were provided to Celini for review beforehand or during the interview.[750] The Ally Global Security account of his interview attributes statements to Celini to the effect that the Bank would receive income from points and premium pricing,[751] statements at odds with those in his interview with the Examiner's Professionals discussed in Section V.B.6.e and in his September 2008 e-mail exchange with Whitehead. Celini, however, specifically denied that his statements in the telephonic interview concerning the Broker to Bank arrangement and the agreed allocation of revenues were in any way different from those made when he was interviewed by the Examiner's Professionals (that the Bank was to receive only net interest carry, while GMAC Mortgage received the gain on sale and other economics), which notably were made in conjunction with a review of the contemporaneous documentation.[752]

KPMG did interview Ally Bank General Counsel Jonathan Andrews, who was involved in the Broker to Bank Project, but does not appear to have been involved in the discussion of revenue allocation.[753] Andrews opined that he "believe[d] that it was the intention of the parties that the Bank, in its capacity as an originator of brokered loan applications, receive income traditionally received by a mortgage lender, consistent with market terms (including pricing)," and that to deviate from market pricing would "result[  ] in excessive income" to

---

[745]  *Id.* at RC40022064.

[746]  *Id.*

[747]  *Id.*

[748]  *Id.*

[749]  KPMG Report, Appx. II [RC40022044].

[750]  Int. of A. Celini, Feb. 18, 2013, at 288:2–14.

[751]  Ally Global Security Investigation Report, dated Mar. 14, 2012, at RC40022064 [RC40022044].

[752]  Int. of A. Celini, Feb. 18, 2013, at 288:2–20.

[753]  E-mails between M. Whitehead and A. Celini (Sept. 2, 2008) [RC40057139]; E-mail from S. McCumber to L. Gess (July 7, 2008) [EXAM20052672]; Brokering Contact List [EXAM20052675]; Brokering Consumer Loans to Bank Project Charter, dated Nov. 10, 2008 [EXAM12253233]; Project Issues Log [EXAM20052676].

GMAC Mortgage, potentially violating Rule 23A.[754] However, Andrews responded to a KPMG request that he "provide a formal opinion" that the shift in economics would constitute a regulatory violation not by providing such an opinion but by indicating that an analysis of the economics in comparison with the economics of market transactions would be required.[755] Absent from the summary of KPMG's Andrews interview is any suggestion that Andrews was shown the BCL2B Presentation, that he explained the pre-Broker Agreement economics under the agreements, or that he acknowledged the demonstrably non-market terms of the MMLPSA and Pipeline Swap, including the fact that the Bank avoided representation and warranty risk while giving up the gain on sale.[756]

Young, both in his interview with KPMG and in his interview with the Examiner's Professionals, echoed the view that the revenue to the Bank would be inadequate if it were to give up the revenue items it kept after July 31, 2009.[757] In his interview with the Examiner's Professionals, Cortese asserted a similar position[758] (despite his initial, unvarnished reaction in December 2011 that the "the intent of the Broker to Bank initiative was not to have any piece of sale execution revenue at the Bank").[759] Young and Cortese both suggested that the Bank, as the originator who funded the brokered loans, would have expenses not covered by this arrangement.[760] But, as discussed above, the Bank's origination expenses, including, specifically, its underwriting expenses, were capitalized and recovered by the Bank from GMAC Mortgage. While Cortese asserted that some component of expense was not recouped by the Bank through deferrals,[761] he acknowledged that he did not know how much or what was not included, or whether the quantum of expense not captured was more than a very small

---

[754] Ally Global Security Investigation Report, dated Mar. 14, 2012, at RC40022060 [RC40022044].

[755] *Id.*

[756] *Id*. The other KPMG interviewees addressed the mechanics of how the loans had been accounted from January 1, 2009, to July 31, 2009, and under the fair-value election, but do not appear to have provided evidence of the parties' intent (nor do they appear to have been competent to do so). *See id.* at RC40022059–64 (summaries of the remaining interviews).

[757] *Id.* at RC40022061; Int. of J. Young, Mar. 15, 2013, at 204:3–207:24.

[758] Int. of J. Cortese, Mar. 7, 2013, at 59:12–62:18.

[759] E-mails among J. Young, J. Cortese, J. Mackey, et al. (Dec. 15, 2011), at 1 [ALLY_0387143].

[760] Ally Global Security Investigation Report, dated Mar. 14, 2012, at RC40022061 [RC40022044]; Int. of J. Young, Mar. 15, 2013, at 196:17–24; Int. of J. Cortese Mar. 7, 2013, at 137:4–138:10.

[761] Int. of J. Cortese, Mar. 7, 2013, at 74:10–24.

fraction (or a large multiple) of the amounts that were deferred.[762] (Of course, the contemporaneous BCL2B materials appear to contemplate that the Bank would defer all related expenses.)[763]

To this, Young and Whitlinger added an additional concern that transferring the loan economics other than net interest carry to GMAC Mortgage would pose a Regulation W issue by empowering the Capital Markets group to skew the pricing on points and no-points loans to favor GMAC Mortgage at the Bank's expense.[764] Whitlinger suggested that Glassner's original inquiry concerned the possibility of manipulating pricing in this fashion;[765] Glassner vehemently denied this assertion as "[a]bsolutely 100 percent false."[766] It is not clear why Glassner, the Bank EVP with principal responsibility for dealing with the Bank's regulators would have had such an agenda (particularly given that he was then about to accept other employment). More to the point, as Glassner further explained, in light of the market context, it seems apparent that such an effort would be doomed to failure:

> Clearly, ResCap, GMAC Mortgage and Ally is not bigger than the residential mortgage loan market, so while its tactics and strategies may be relevant, at the end of the day, the market is the key driver of that activity. I have views on that from an opinion perspective. At this point in time, the market is heavily refinanced—a refinanced transaction, and my view is that in a heavily refinanced transaction very rarely do consumers pay points or any money out of pocket. So, you can implement a strategy to want to collect points and fees upfront and you are most likely to not get any loans because that's not the market and the loan that the consumers want.

> . . .

---

[762] *Id.* at 75:15–77:4 ("I couldn't venture to guess right now.").

[763] AFI's counsel suggested that, if the Bank did not keep the "day one gain on sale," the revenues to the Bank would be inadequate to cover the broker fee paid to GMAC Mortgage. But, of course, this presupposes that the broker fee would not be recaptured by the Bank through its inclusion in the cost-basis price charged for the loan under the MMLPSA/Pipeline Swap, as the parties did from January 1, 2009 to July 31, 2009 (and as the contemporaneous documents from negotiation of the broker arrangement show they agreed to do).

[764] Ally Global Security Investigation Report, dated Mar. 14, 2012, at RC40022059, RC40022061 [RC40022044]; Int. of J. Whitlinger, Nov. 30, 2012, at 186:16–187:14; Int. of J. Young, Mar. 15, 2013, at 196:17–197:1.

[765] Ally Global Security Investigation Report, dated Mar. 14, 2012, at RC40022059 [RC40022044]; Int. of James Whitlinger, Nov. 30, 2012, at 187:24–188:19.

[766] Int. of A. Glassner, Mar. 20, 2013, at 139:19–20.

> And so you can attempt to dictate things to the market—
> generally speaking, the market is highly efficient and will not
> react to whatever you dictate no matter your size or scope.[767]

The KPMG Report ultimately concluded that the post-fair value election accounting was consistent with the parties' agreements.[768] First, it concluded that the agreements and the BCL2B Presentation are not clear, though it does not explain why it comes to this conclusion.[769] The KPMG Report's description of the BCL2B Presentation inexplicably omits any acknowledgement of the Presentation's explicit references to FAS 91 deferrals of fees and expenses,[770] and instead simply notes that "this document is unclear,"[771] without specifying what is unclear.[772] Consequently, the KPMG Report does not explain how KPMG understands the BCL2B Presentation's seemingly unambiguous comments about the allocation of revenues accomplished through FAS 91 deferrals, or reconcile the Bank's retention of the day one gain on sale with the repeated statements that the Bank is not to realize any gain or loss on these transactions. The KPMG Report likewise does not address the sample accounting provided with the BCL2B Presentation, or the fact that it aligns with the accounting treatment implemented from January 1, 2009 to July 1, 2009 by those who had just negotiated the broker arrangement, but not with the accounting treatment implemented after the Bank's fair-value election.

Rather than relying on the agreements or the BCL2B Presentation (or the September 2, 2008 Whitehead/Celini e-mail exchange, or the August 28, 2008 Scott/Whitehead e-mail exchange), to divine the parties' intent, the KPMG Report ultimately rests instead on the conclusion that "had the economics not been shared between the two parties as was done [post-fair value election], the two entities would have been in violation of Regulation W."[773]

---

[767] *Id.* at 141:6–20, 142:6–10; *see also id.* at 142:24–143:18.

[768] KPMG Report, at RC40022080–81 [RC40022044].

[769] *Id.* at RC40022071 (asserting that the agreements "do not provide sufficiently specific details on the revenue sharing arrangement"); *id.* at RC4002280–81.

[770] KPMG Report, at RC40022073 [RC40022044]; *see* Section V.B.6.b; BCL2B Presentation, at 5, 7 [RC40037557].

[771] KPMG Report, at RC40022080–81 [RC40022044].

[772] The Ally Global Security Investigation Report notes that the BCL2B Presentation refers principally to [the deferral of] origination fees, and does not explicitly address premium pricing expense deferrals. Ally Global Security Investigation Report, dated Mar. 14, 2012, at RC40022062 [RC40022044]. But, ironically, this only shows that the BCL2B Presentation is particularly clear about the deferrals that would benefit GMAC Mortgage by reducing loan prices (origination fee deferrals), as opposed to deferrals that would increase loan prices (for premium pricing-related expense).

[773] KPMG Report, at RC40022080 [RC40022044]. While the KPMG Report suggests that Celini's November 30, 2008 Affiliate Transaction Memorandum supports this conclusion, that Memorandum simply addresses the broker fee, which it asserts meets regulatory requirements, without discussing the overall allocation of revenues. GMAC Bank Affiliate Transaction Memorandum Re Broker Agreement—GMAC Mortgage LLC & GMAC Bank, dated Nov. 30, 2008, at 1–3 [ALLY_0017944].

This is not a conclusion about what the parties actually agreed to when they negotiated the broker arrangement in 2008, but an attempt to divine their intent from statements about potential regulatory considerations first made years later. Indeed, in his interview, Young tellingly suggested that, from his review of the BCL2B Presentation in 2012, he was left "wondering if this team even thought about regulatory," and saw "nothing in [the Presentation] about regulatory considerations."[774]

The evidence, moreover, is that the terms of the pertinent agreements were *never* on market terms. While there is extensive evidence that there was close regulatory scrutiny of these agreements from well before the inception of the Broker Agreement, there is no evidence that any regulator ever made the claim that regulatory requirements would be violated by a revenue allocation in which the Bank did not retain the gain on sale. This is true not only for the period from January 1, 2009 to July 31, 2009, but for earlier periods; the same economics—in which the Bank received only "net interest carry"—had been in place for years. Given that GMAC Mortgage would be absorbing the Bank's expenses, and would be accepting the representation and warranty risk, hedge risk, and eligibility risk or default risk, it is difficult to see how this allocation of revenues is any more objectionable than that for the remainder of the loans sold under the MMLPSA.

Indeed, the revised allocation of revenues effected by the Bank's fair-value election is plainly at odds with the fundamental tenet of the arrangement described by Groody and Celini from the advent of the MMLPSA, in which the Bank receives net interest carry, while the remainder of the economics pass to GMAC Mortgage in exchange for its acceptance of representation and warranty liability, hedging risk, and other risk; "the party [that] retains the Gain on sale of the mortgage loans retains the rep and warrant risk."[775]

The Ally Global Security Investigation Report, citing the KPMG Report and the same evidence as that Report (plus a summary of Celini's interview), concludes that "[t]he investigation revealed that $47.2 million of income was inappropriately credited to GMAC Mortgage prior to the election of fair value accounting (January 1, 2009 to July 31, 2009)."[776]

---

[774] Int. of J. Young, Mar. 15, 2013, at 194:24–195:1. Young notably was forwarded a copy of the BCL2B Presentation on November 20, 2008, for a meeting on November 21, 2008. E-mail from J. Young (Nov. 20, 2008) [EXAM10608856]. Young does not recall reviewing the BCL2B Presentation at the time. Int. of J. Young, Mar. 15, 2013, at 185:15–186:18; 194:5–22. The documents produced do not include any suggestion that, when analyzing the broker arrangement in 2008, Young, or, for that matter, anyone else, raised a claim that the contemplated revenue allocation would violate regulatory requirements.

[775] E-mail from R. Groody to C. Dondzila, J. Peterson, and J. Whitlinger (Mar. 13, 2009) [ALLY_0329052]; Int. of R. Groody, Dec. 17, 2012, at 252:13–254:2; *see also* Int. of J. Whitlinger, Nov. 30, 2012, at 68:1–3 ("[M]y understanding at the time was that whoever got gain on sale got the rep and warranty"); Int. of A. Celini, Feb. 18, 2013, at 58:14–19 ("We earned coupon interest during the period of holding and the asset was removed from our balance sheet at basis. We received no gain or loss on the transaction and it was not our intent to take any risk during that time").

[776] Ally Global Security Investigation Report, dated Mar. 14, 2012, at RC40022052 [RC40022044].

As previously noted, the KPMG Report explicitly stated that it was not assessing whether the pre-fair value accounting was consistent with the parties' agreements.[777] The Ally Global Security Investigation Report suggests, without further analysis, that the evidence shows the accounting for this period was "the result of a potential miscommunication regarding the economics associated with the loan sale agreements that led to FAS 91 fees being inappropriately reversed back to GMAC Mortgage."[778]

Following issuance of these reports, they were presented by AFI's General Auditor, Ann Cummings, at a March 20, 2012 meeting of ResCap's Audit Committee.[779] The Audit Committee reviewed management's conclusion that no out of period adjustment was necessary. There notably is no record of any approval of a settlement of these matters by the ResCap Independent Directors or the ResCap Board.

ResCap personnel then acquiesced to demands that ResCap reimburse Ally Bank for the $47.2 million received for the January 1, 2009 to July 31, 2009 time period, plus interest. On March 27, 2012, GMAC Mortgage remitted $51,419,494 to Ally Bank.[780] At the same time, contingent on GMAC Mortgage's payment to Ally Bank, AFI forgave an equivalent amount of debt.[781]

---

[777] KPMG Report, at RC40022072 [RC40022044].

[778] Ally Global Security Investigation Report, dated Mar. 14, 2012, at RC40022052 [RC40022044].

[779] Materials for Audit Committee Meeting of Residential Capital, LLC, dated Mar. 20, 2012 [RC40022044]; Minutes of a Meeting of Audit Committee Meeting of Residential Capital, LLC, dated Mar. 20, 2012 [RC40019158]. The Audit Committee tabled approval of the financial statements pending further advice.

[780] AFI Letter re: Forgiveness of Certain Indebtedness under LOC Loan Agreement, dated Mar. 27, 2012 [EXAM40066674]; Transaction Detail Archive, dated Mar. 28, 2013 [EXAM00339992].

[781] *See* E-mails between J. Whitlinger and J. Mackey (Mar. 22, 2012) [EXAM00072999]; E-mail from J. Ruhlin (Mar. 23, 2012) [EXAM11004221]; AFI Letter re: Forgiveness of Certain Indebtedness under LOC Loan Agreement, dated Mar. 27, 2012 [EXAM40066674]; GMAC ResCap Report, dated May 9, 2012 (cell D6 comment showing subtraction of $51,419,494) [EXAM00339993].

### g.   The Financial Impact On GMAC Mortgage

Exhibit V.B.6.g below reflects the revenues that the Bank retained from the August 1, 2009, fair value election through April 2012 that would have been allocated to GMAC Mortgage under the revenue allocation implemented from January 1, 2009 through July 31, 2009. As it illustrates, in addition to the $51.4 million ($47.18 million plus interest) GMAC Mortgage paid in March 2012, from August 2009 to April 2012, Ally Bank retained a further $469.1 million that would have been paid to GMAC Mortgage had the revenue allocation originally agreed to remained in place:

EXHIBIT V.B.6.g
**Amounts Retained by Ally Bank But Owed to GMAC Mortgage Under the Revenue Allocation Implemented Between January 1, 2009, and July 31, 2009**
August 2009 – April 2012
*($ in Thousands)*

|  | 2009 | 2010 | 2011 | YTD April 2012 | Total |
|---|---|---|---|---|---|
| Loan discount (net, borrower and lender paid) | $ 144,503 | $ 40,461 | $ 10,540 | $ 513 | $ 196,017 |
| Loan discount (Capital Markets Required Price) | 209 | 113,920 | 158,852 | 137,775 | 410,756 |
| Non-broker activity | 853 | 178 | 635 | - | 1,667 |
| Loan discount income | 145,566 | 154,559 | 170,028 | 138,288 | 608,440 |
| Loan processing fee income | 44,268 | 47,419 | 46,709 | 12,267 | 150,663 |
| Pricing adjustments | (7,551) | (9,064) | (9,831) | (3,816) | (30,262) |
| Overage/shortage | 17 | - | - | - | 17 |
| Origination fee | 16,801 | (666) | (13) | (17) | 16,104 |
| Broker fee expense | (78,089) | (64,543) | (55,622) | (30,416) | (228,670) |
| Total FAS 91 deferral at origination for the period January 1, 2009 to YTD April 2012 | $ 121,010 | $ 127,704 | $ 151,270 | $ 116,306 | $ 516,291 |
| FAS 91 deferral at origination for the period January 1, 2009 to July 31, 2009 | (47,180) | - | - | - | (47,180) |
| Total amount retained by Ally Bank but owed to GMAC Mortgage under the revenue allocation implemented from Jan. 1, 2009 – July 31, 2009 [1] | $ 73,830 | $ 127,704 | $ 151,270 | $ 116,306 | $ 469,111 |

*[1] Under this allocation, Ally Bank receives interest carry only and GMAC Mortgage receives the effect of income and expense items that would have been deferred under FAS 91 before the fair value election consistent with the original accounting allocation for the period January 1, 2009 through July 31, 2009.*

*Source:   Exam Requested Loan Origination Revenue [ALLY_0402447]; Broker to Bank Contract Accounting Review, at 2 [EXAM12253506] (attached to e-mail from J. Cortese to C. Dondzila, J. Young, J. Whitlinger, and J. Andrews (Feb. 27, 2012) [EXAM12253505].*

As discussed above, given its expectations about the application of FAS 91 deferrals, GMAC Mortgage agreed to a below-market, cost-based broker fee. As the KPMG Report acknowledged, the fees actually charged "would likely not cover GMAC Mortgage's costs to perform services to broker loans to the Bank."[782] In December 2011, Whitlinger undertook an analysis of the difference between the cost-based broker fees GMAC Mortgage charged and

---

[782]   KPMG Report, at RC40022079 [RC40022044].

the fees it would have received had it charged a "Broker's Fee at Arm's Length" for the years 2009 through 2011.[783] His analysis produced a range of estimates, with a difference of $162.1 million at the low end, a mid-range estimate of $236.9 million, and an upper-end estimate of $343.9 million.[784]

### 7. The April 2009 Pipeline Swap First Amendment

Effective April 6, 2009, the parties entered into a First Amendment to the ISDA Master Agreement.[785] The sole revision wrought by this First Amendment was the elimination of HFI loans from the Pipeline Swap by re-defining "Subject Transaction" to include only loans purchased for Ally Bank's "'Held for Sale' (HFS) portfolio."[786] Thus, the Pipeline Swap, which had covered only HFI loans until July 2008, now covered only HFS loans. Groody explained that this likely reflected the fact that the Bank was no longer purchasing HFI loans, so that there was no longer a need for the HFI lock-to-funding hedge.[787]

### 8. The Original Servicing Agreement

GMAC Mortgage and Old GMAC Bank entered into the Original Servicing Agreement in 2001 at the time Old GMAC Bank received its charter to operate as a federal savings bank. As noted above, Old GMAC Bank had just commenced the mortgage loan business and did not have the infrastructure to service the loans it owned so it engaged GMAC Mortgage to do so. The Original Servicing Agreement was a largely bare-bones agreement designed to cover home equity loans although it also covered other loans before their sale by the Bank.[788] GMAC Mortgage was required under the Original Servicing Agreement to service loans in accordance with all laws and regulations, the Original Servicing Agreement, and the terms of the GMAC Bank Servicing Guides (as incorporated into the Original Servicing Agreement by reference).[789] Servicing activities included all operational servicing functions with respect to these loans.[790]

---

[783] Int. of J. Whitlinger, Nov. 30, 2012, at 212:3–220:11; Consumer-Broker to Bank HFS Loans [RC40056678].

[784] Consumer-Broker to Bank HFS Loans, at 1 [EXAM00003654]; *see also* Memorandum, Affiliate Transaction, dated Apr. 9, 2010 [SOP0016050] (comparing fees to those that would be paid to third-party brokers).

[785] First Amendment to ISDA Master Agreement, dated Apr. 6, 2009 [ALLY_0017963].

[786] *Id.* ¶ 1.

[787] Int. of R. Groody, Dec. 17, 2012, at 175:12–176:10.

[788] Original Servicing Agreement [ALLYKE000000741].

[789] *Id.* § 2.2(b).

[790] *Id.* This would include collecting the monthly mortgage payments from the borrowers, remitting principal and interest due to the investor in the loan, paying property tax and insurance bills from the escrow funds collected from the borrowers, and performing collection activity with respect to delinquent borrowers.

Important terms of the Original Servicing Agreement included the following:

### a.  Compensation

GMAC Mortgage earned the greater of (1) a $15,000 per month minimum servicing fee and (2) the aggregate of the base fees which was $8.25 per serviced loan for home equity loans and a fee based on principal amount for agency loans.[791] All collections on the loans were for the account of Old GMAC Bank.[792] The agreement provided that if either party believed that the compensation was less favorable than what it could obtain from an independent third party the parties would enter into good faith negotiations to adjust the compensation.[793]

### b.  Indemnity Provisions

GMAC Mortgage and Old GMAC Bank each agreed to indemnify the other for all losses arising from an event of default by the other party.[794] Most significantly, GMAC Mortgage's maximum liability under the Original Servicing Agreement was limited to the total compensation paid by Old GMAC Bank to GMAC Mortgage under the Agreement within the twelve-month period before a demand for payment pursuant to these provisions.[795] The obligation was contingent on the receipt of timely notice of the claim, an opportunity to defend the claim, and cooperation of the non-defaulting party.[796] The Original Servicing Agreement provided that the indemnity provisions would survive termination.[797] In addition, the agreement expressly relieved GMAC Mortgage of liability related to the purchase or origination of any loan or for any prior servicing of a loan.[798]

_____

[791]  *Id.* Ex. A.

[792]  *Id.* § 2.1. The agreement provided a separate pricing schedule for GSE First Lien Mortgage Loans which provided for fees of between 0.25% and 0.50% of the principal amount. All ancillary income and principal and interest and escrow float related to such loans was for the account of GMAC Mortgage. In addition, GMAC Mortgage earned certain additional fees for matters such as delinquent loan handling and credit line increases. *See id.* § 3.3, Ex. A. Old GMAC Bank was required to reimburse GMAC Mortgage for certain out-of-pocket expenses and other expenses it expressly agreed to pay. *Id.* § 3.5. GMAC Mortgage was required to advance money to fund draws on the loans and Old GMAC Bank was required to reimburse GMAC Mortgage for the advances. These payments were made on a net basis by deducting such amounts from principal and interest payments received by GMAC Mortgage on account of the loans. *Id.* Art. 4.

[793]  *Id.* § 10.2.

[794]  *Id.* § 7.3.

[795]  *Id.* § 8.2 ("Anything to the contrary not-withstanding, [GMAC Mortgage's] maximum liability under this Agreement shall in no event exceed the Servicing Compensation paid by the Bank to [GMAC Mortgage] within the twelve-month period prior to a demand for payment made by the Bank to [GMAC Mortgage], resulting from [GMAC Mortgage's] liability under this Agreement.").

[796]  *Id.* § 7.3.

[797]  *Id.* § 7.3.

[798]  *Id.* § 7.1.

The Original Servicing Agreement did not contain a specific provision governing indemnification in the event that loans were modified. As noted above, the agreement did require GMAC Mortgage to service the loans in accordance with all applicable laws and regulations and the terms of the GMAC Bank Servicing Guide stated to be attached as an exhibit to the Original Servicing Agreement (as amended from time to time) and failure to do so would constitute an event of default.[799] Furthermore, the Fourth Addendum to Original Servicing Agreement permitted certain modifications without Ally Bank consent.[800]

### c.   Events Of Default

Events of default included: (1) failure to make any payment required to be made under the terms of the Original Servicing Agreement; (2) breach of any representation and warranty;[801] and (3) bankruptcy.[802]

### d.   Term

The term of the Original Servicing Agreement was from August 21, 2001 through August 21, 2004 (unless previously terminated pursuant to the agreement). The agreement would automatically extend for additional one-year terms unless either party gave the other party 120 days' prior notice of its intent not to extend.[803]

### e.   Addenda

Although, as noted above, the Original Servicing Agreement provided for re-negotiation of the pricing provisions, no amendments were executed until July 2004 when GMAC Mortgage and Old GMAC Bank entered into an Addendum to the Original Servicing

--------------------------------------------------

[799]  Material failure to perform any obligations under the Original Servicing Agreement within 60 days following receipt of a written notice constitutes an event of default. *Id.* §§ 2.2(b), 8.1.

[800]  The Approval Matrix attached to the Fourth Addendum to the Original Servicing Agreement provided the parameters for when the approval of Ally Bank would be required for particular actions with respect to the loans. Specifically, with respect to loan modifications, any loan modifications (i) which did not reduce the interest more than 2% or extend the maturity beyond 480 months or (ii) where capitalization of delinquent interest, escrow and/or servicing advances did not exceed $20,000 over the original principal balance did not require Ally Bank approval. Fourth Addendum to Original Servicing Agreement, dated Sept. 1, 2007 [ALLYKE000000741].

[801]  Under the Original Servicing Agreement, in addition to the normal corporate representations and warranties, GMAC Mortgage represented that the terms of the Original Servicing Agreement were no less favorable to Old GMAC Bank than those that would be offered by GMAC Mortgage to a third party. Original Servicing Agreement, § 7.8 [ALLYKE000000741]. Old GMAC Bank also represented that all loans to be serviced pursuant to the Original Servicing Agreement were originated in compliance with all applicable state and federal laws and regulations except to the extent that the failure to so comply would not have a material effect on the servicing of any such loan. *Id.* § 7.9.

[802]  *Id.* §§ 8.1 (Default by GMAC Mortgage), 8.3 (Default by Ally Bank).

[803]  *Id.* § 9.1.

Agreement.[804] The Addendum allocated certain ancillary income between GMAC Mortgage and Old GMAC Bank. Line fees and late charges as well as principal and interest float were for the account of Old GMAC Bank while tax and insurance float was for the account of GMAC Mortgage.[805] The agreement further provided that the principal and interest payments were passed on to Old GMAC Bank as received rather than being held by the servicer until the payments were due to the investor in the loan.[806] Thus, GMAC Mortgage did not earn the "float" on the principal and interest payments. The fee schedule was again amended in April 2005.[807]

The Original Servicing Agreement, as amended, was assumed by GMAC Bank in November 2006.[808]

### 9. The MSR Swap

#### a. Genesis Of The MSR Swap

When ResCap was formed, its subsidiaries GMAC Mortgage and RFC owned substantial portfolios of mortgage servicing rights (MSRs), which are contractual rights to service loans and receive the related fees and certain ancillary income. As an accounting memorandum discussing the MSR Swap explained:

> MSRs represent the capitalized value of the right to receive future cash flows from the servicing of mortgage loans for others. Because residential mortgage loans typically contain a prepayment option, borrowers often elect to prepay their

---

[804] Addendum to Original Servicing Agreement, dated July 1, 2004 [ALLYKE000000741]. For pre-July 2004 first mortgage loans classified as HFI and all first mortgages classified as HFS there was "no change from the practice of passing through net interest [to the investor] after deducting the applicable servicing fee (25 or 37.5 bps depending on the loan type)" on the outstanding unpaid principal balance. For first lien loans funded after June 30, 2004 and classified as HFI, the fee was 1.62 basis points per annum. For home equity loans, the fee was 16.18 basis points per annum and for HELOCs the fee was 23.43 basis points per annum. *Id.* Ex. A.

[805] *Id.* Ex. A.

[806] *Id.*

[807] Second Addendum to Original Servicing Agreement, dated Apr. 1, 2005 [ALLYKE000000741]. The Second Addendum distinguished between "prime" and "ALT-A" first lien loans and amended the fee schedule to provide for a 2.0 basis points per annum fee on ALT-A loans.

[808] The Original Servicing Agreement was not listed as an "Acquired Asset" in the Purchase and Assumption Agreement but the materials for the board of directors meeting approving the assumption of affiliate agreements lists the Servicing Agreement; *see* Purchase and Assumption Agreement, at Schedule A [ALLY_PEO_0021066]; Minutes of a Regular Meeting of the Board of Directors of GMAC Bank, Nov. 30, 2006, at 2 [ALLY_PEO_0020880]; Agenda and Supporting Materials, GMAC Bank Board of Directors Meeting, dated Nov. 30, 2006, at 9–12 [ALLY_0260087]. The parties also entered into a Third Addendum to Original Servicing Agreement, dated June 1, 2007 [ALLYKE000000741].

> mortgage loan by refinancing at lower rates during declining
> interest rate environments. When this occurs, the stream of cash
> flows generated from servicing the original mortgage loan is
> terminated. As such, the market value of mortgage servicing
> rights has historically been very sensitive to changes in interest
> rates and tends to decline as market interest rates decline and
> increase as interest rates rise.[809]

Further, one of the obligations attendant to being the servicer of record who holds an MSR is an obligation to make servicer advances where the borrower does not make timely payments, advancing the delinquent amounts to the owner of the loan (with rights to recoup the payment from later collections).[810]

These assets were notoriously difficult to value; while there was some limited market trading activity for conforming loan MSRs, there was little or no observable market trading activity in non-conforming MSRs.[811] RFC and GMAC Mortgage initially had different discounted cash flow models (proprietary to RFC/GMAC Mortgage) used to value their MSR portfolios; each used a different third-party vendor's "platform," and each engaged in different third-party "benchmarking" as a check on its proprietary valuation.[812] In the first quarter of 2007, the GMAC Mortgage valuation model was adopted for the whole portfolio.[813] Further, MSR values were volatile due to their sensitivity to interest rate and prepayment risk, and consequently were particularly difficult to finance through third-party lenders, who would lend only with relatively low "advance" rates. For example, the Citibank MSR credit facility

---

[809] Memorandum, Ally Bank/GMAC Mortgage Affiliate Total Return Swap Accounting Analysis Revised for April 2011 Agreement, dated (Jul. 25, 2011), at 6 [ALLY_0171117].

[810] COMPTROLLER OF THE CURRENCY, ADMINISTRATOR OF NATIONAL BANKS, MORTGAGE BANKING COMPTROLLER'S HANDBOOK (1998), at 2–3, http://www.occ.gov/publications/publications-by-type/comptrollers-handbook/mortgage.pdf.

[811] Int. of R. Flees, Jan. 18, 2013, at 198:1–13, 194:5–9 ("[E]ven at the best days of the mortgage environment, very few firms sold servicing rights. So you did not have an active market in which you could see trades."); Memorandum, Ally Bank/GMAC Mortgage Affiliate Total Return Swap Accounting Analysis Revised for April 2011 Agreement, dated July 25, 2011, at 6 [ALLY_0171117] ("[O]bservable market prices are not available.").

[812] Int. of R. Flees, Jan. 18, 2013, at 201:1–204:12. MSR Value was benchmarked against peer survey data, broker quotes, bulk trades and the IO market. E-mail from N. Rock (Dec. 10, 2010), at EXAM10872298 [EXAM10872295].

[813] Int. of R. Flees, Jan. 18, 2013, at 195:22–197:15; E-mail between R. Flees, J. Lundgren, et al. (May 16–18, 2006) [EXAM11604538]; Memorandum, Change in Estimate Conclusion regarding MSR replatform in Q1 2007, dated Apr. 27, 2007 [EXAM10131487]; Draft Memorandum, Conclusion regarding Q1 2007 change in value of Master Mortgage Servicing Rights (MMSRs), dated Apr. 30, 2007 [EXAM10130221].

that GMAC Mortgage had in place from September 10, 2007 through 2012 had an advance rate of only 60%, meaning that Citibank would lend only 60% of the value of the MSRs used to collateralize the loan.[814]

While the MSR Swap did not become effective until August 2007, plans to enter into such an arrangement had been on the "drawing board" since 2005 or earlier, before the Cerberus acquisition, the 2006 Bank Restructuring, and the advent of ResCap's financial troubles.[815] Old GMAC Bank and ResCap had undertaken a review of the GMAC and ResCap businesses in the summer and fall of 2005 to analyze how the Bank could better serve its primary purpose of serving as a funding vehicle for GMAC Mortgage and ResCap.[816] One of the conclusions reached was that the Bank should be used to hold MSRs.[817] The difficulty with financing MSRs through regular lending channels (with low advance rates) made use of the Bank (financing the asset through deposits) particularly desirable.[818] Moving the MSRs to the Bank was projected to result in savings of approximately 206 basis points.[819] Further, from early on, the personnel involved contemplated that the movement of the MSRs to the Bank would be accompanied by a "total return swap," transferring the MSRs' economics (positive and negative) back to ResCap in exchange for providing the Bank a fixed rate of return.[820] ResCap would continue to service the MSRs under the Original Servicing Agreement.[821]

---

[814] Loan and Security Agreement, dated Sept. 10, 2007 [GOLDIN00044759]; *see also* Sandler O'Neill Report to the Board of Directors of Ally Bank Re: Analysis of Financial Terms of Certain Affiliate Agreements between Ally Bank and GMAC Mortgage LLC, dated Feb. 28, 2012, at 38 [ALLY_PEO_0084709]; Morgan Stanley Project Duvall Presentation, MSR Facility—Discussion Materials, dated Apr. 14, 2008, at 4 [EXAM10279337] ("Advance rates on agency MSR assets are ranging between 50% and 60%.").

[815] According to Celini, the retention of MSRs was contained in the business plan for Old GMAC Bank in 2001, but the OTS rejected the idea. Int. of A. Celini, Feb.18, 2013, at 127:6–16.

[816] *See* Int. of R. Groody, Dec. 17, 2012, at 19:5–20; Build out GMAC Bank, dated Aug. 29, 2005 [EXAM10181192].

[817] Int. of R. Groody, Dec. 17, 2012, at 26:22–27:17.

[818] *Id.* at 197:23–198:20, 53:6–60:9 (explaining that the proposal did not stem from the Cerberus acquisition or related Bank restructuring); Int. of J. Whitlinger, Nov. 30, 2012, at 228:1–229:4; Int. of B. Bier, Feb. 22, 2013, at 81:18–24; Build out GMAC Bank, dated Aug. 29, 2005 [EXAM10181192] ("Strategies and Actions" include "[b]uild investment philosophy to include . . . [m]ortgage servicing rights"); GMAC Bank Presentation on Retention of MSRs by the Bank, dated Mar. 27, 2006 [EXAM10607865].

[819] GMAC Bank Inter-office Memorandum, from R. Groody and K. Lunde to J. Peterson, dated Oct. 16, 2007 [EXAM10092812] (noting that, under the swap arrangement, half of the savings would remain in the Bank).

[820] Preliminary Analysis of Bank Opportunity [EXAM11248134] (referring to total return swap) (attached to e-mail from B. Bier (Dec. 14, 2006) [EXAM11232773]).

[821] *See* Section V.B.8.e (Original Servicing Agreement, Addendum 4).

By the fall of 2006, ResCap/GMAC Mortgage personnel and Bank personnel were actively engaged in a project aimed at moving MSRs to the Bank.[822] The project involved substantial work within ResCap and the Bank on a number of complex systems and process issues, GSE approval of the Bank as a master servicer, and regulatory approval of (1) a Bank business plan involving the retention of MSRs and (2) the Bank's acquisition of existing MSRs from ResCap. The project, at least initially, seems to have been slowed by the 2006 Bank Restructuring (which resulted in the mortgage banking business being moved to a different entity with a different regulator, and involved substantial efforts by the parties' personnel).[823] By March 2007, the project was again a focal point of the parties' efforts.[824] According to Celini, at the time Ally Bank had excess capital and management felt that building an MSR portfolio would enhance the Bank's balance sheet and portfolio.[825] At the same time ResCap's liquidity position was weak and Ally Bank viewed this as a "win-win" situation for the parties.[826]

While the FDIC eventually approved Ally Bank's retention of MSRs on loans sold by the Bank to GMAC Mortgage, it refused to approve the Bank's acquisition of existing MSRs from ResCap entities; indeed, it repeatedly refused such applications to have the Bank acquire an existing ResCap-affiliate MSR portfolio.[827] Further, while the Bank gained approval to act as a master servicer on Fannie Mae and Freddie Mac loans, the parties ran into an insuperable obstacle on Ginnie Mae loans. Ginnie Mae's governing statute and regulations prohibited designation of more than one affiliated entity as a master servicer; because GMAC Mortgage retained possession of a portfolio of MSRs it could not transfer to the Bank, it continued as the designated Ginnie Mae master servicer, and the Bank continued to sell Ginnie Mae loans to GMAC Mortgage on a servicing-released basis.[828]

The regulators were opposed to Ally Bank's retention of the MSRs without the protection of the MSR Swap, as discussed below, which finally went into effect on August 31, 2007. This came just as ResCap had experienced significant liquidity problems and the disruption in

---

[822] E-mail from B. Bier (Dec. 14, 2006) [EXAM11232773]; Preliminary Analysis of Bank Opportunity [EXAM11248134].

[823] Int. of R. Groody, Dec. 17, 2012, at 53:18–54:24 (discussing delay in getting business plan approval due to restructuring).

[824] Grow the Bank Balance Sheet Strategy, dated Mar. 23, 2007 [EXAM10060869]; E-mail from T. Grzeskiewicz (Mar. 27, 2007) [EXAM10060574]; GMAC Bank Presentation on Retention of MSRs by the Bank, dated Mar. 27, 2006 [EXAM10607865].

[825] Int. of A. Celini, Feb. 18, 2013, at 133:1–134:21.

[826] *Id.* at 134:6.

[827] Int. of R. Groody, Dec. 17, 2012, at 278:3–17; E-mail from J. Peterson (Sept. 24, 2008) [EXAM10839861].

[828] Int. of R. Groody, Dec. 17, 2012, at 298:2–300:15; E-mails between K. Walsh, A. Celini, R. Groody et al. (Sept. 19–22, 2008) [EXAM10286196].

credit markets that occurred in mid-August 2007.[829] Nonetheless, Groody stated that the timing of the MSR Swap was not driven by these factors, but by the fact that the parties had finally gotten all of the necessary approvals and completed all the groundwork necessary to put the swap into effect.[830] Given that the regulators did not approve the Bank's acquisition of ResCap's existing MSR portfolio, the initial economic impact of the transaction was small: the Bank's MSR portfolio, which grew organically as the Bank sold (non-Ginnie Mae) loans to GMAC Mortgage, was only $120 million at the end of 2007,[831] grew to $420 million by the end of 2008,[832] and then, as more of GMAC Mortgage's loan production was routed through the Bank under the Broker Agreement, grew to $1 billion in 2009, and $1.7 billion by year-end 2010.[833]

### b. 2007 MSR Swap

The original MSR Swap is documented on an ISDA Master Agreement[834] and two Schedules—the FMV Schedule and the Net Funding Schedule, each dated August 31, 2007.[835]

#### (1) The FMV Schedule

The FMV Schedule applied to the "dollar amount of mortgage servicing rights owned by [Ally Bank] as reported on the accounting general ledger of [the Bank]."[836] The FMV Schedule required payments for the "FMV Change," defined as the "FAS 156 mark to market for the Valuation Period as recorded by [the Bank] against the mortgage servicing right asset."[837] The FMV Change was to be measured each business day; if the change was positive

---

[829] *See* Sections III.F (financial history), V.F (healthcare asset sale).

[830] Int. of R. Groody, Dec. 17, 2012, at 197:20–199:2; *see also* Int. of A. Celini, Feb. 18, 2013, at 134:22–140:17 (Celini noted that MSR retention had been in the Bank's business plan for a long time and part of its ongoing strategic planning process, but did not recall what drove the particular timing of the MSR Swap).

[831] GMAC Bank Consolidated Financial Statements as of Dec. 31, 2008 and 2007, at 2 [RC00034535].

[832] *Id.* at 2.

[833] December 2009 Business Review—Core Mortgage Business & Operations, dated Jan. 25, 2010 at 37 [ALLY_0222595]; Ally Financial Inc. 4Q and Full Year 2010 Earnings Review, dated Feb. 1, 2011, at 38 [ALLY_PEO_0069372]; *see* Section V.B.12.b (analyzing economic impact of the MSR Swap).

[834] ISDA Master Agreement, dated June 12, 2007 [ALLY_0041610].

[835] 2007 FMV Schedule [RC00027822]; 2007 Net Funding Schedule [RC00027852].

[836] 2007 FMV Schedule, part 6(a)(v) [RC00027822].

[837] *Id.* part 6(a)(iii). FAS 156, "Accounting for Servicing of Financial Assets (as amended)," was superseded by the FASB Accounting Standards Codification ("ASC") 860, "Transfers and Servicing" on September 15, 2009.

(i.e., if the combined value of the MSRs[838] on the Bank's books had increased), then the Bank owed GMAC Mortgage the amount of the increase, and if the change was negative (the value of the Bank's MSR portfolio had decreased), then GMAC Mortgage owed the Bank the amount of the decrease.[839]

Thus, the FMV Schedule applied not to shifts in the value of individual MSRs, but to changes in the value of the Bank's MSR portfolio as a whole. Such FMV changes could be the result of changes in the market valuations of MSRs, triggered, e.g., by shifts in interest rates or in borrower delinquency rates (which affect the cost to service the loan) and severity (affecting the financial impact of the master servicer's obligation to make servicing advances). As discussed in Section V.B.10.b(2), there is a substantial issue concerning the applicability of the FMV Schedule where the value of the Bank's MSR portfolio increases through the capitalization or purchase of new MSRs.

---

[838] The "mortgage servicing rights asset" on the Bank's general ledger included not just MSRs, but "excess servicing rights" as well. Excess servicing rights arise where the borrower note rate exceeds the interest provided to investors when a loan is sold or securitized and the mortgage servicing fees payable under the MSR. The remaining amount of interest is considered an "excess servicing fee" and is often retained by the holder of the MSR. Excess servicing rights are a form of cash flow associated with future "Interest Only" ("I/O") income; they do not include ancillary income such as float or late fees. *See* Ally Bank Excess Servicing Transaction Presentation, at 2 [ALLY_PEO_0065951]. The excess servicing right asset represents the interest collected and retained by the servicer that is not considered payment for the actual services being performed. This asset is also referred to as an interest-only strip, and ResCap reported it as part of the MSR assets on its balance sheet. FINANCIAL ACCOUNTING STANDARDS BOARD, STATEMENT OF FINANCIAL ACCOUNTING STANDARDS NO. 156, Accounting for Servicing of Financial Assets, an amendment of FASB Statement No. 140, at ¶¶ 14, 63, 65. For purposes of the MSR Swap, excess servicing rights were generally treated in the same way as MSRs (with one exception discussed in Sections V.B.9.b(4) and V.B.12.b(1)). Bank MSR TRS Daily Settlement, May 2011 [EXAM00234419]; ResCap—MSR Cash Summary [EXAM00231039]; MSR ARB Interest Expense Allocation, dated Mar. 31, 2012 [EXAM00233968]. For the sake of convenience, the term MSR is used generically in Section V.B to refer to both MSRs and excess servicing rights, except where the distinction is significant. (*See, eg.,* Sections V.B.9.b(4), V.B.12.b(1)).

[839] 2007 FMV Schedule, parts 6(a)(vii), 6(d) [RC00027822].

*(2) The Net Funding Schedule*

The Net Funding Schedule provided for two payments.

*(a) The Net Servicing Fee Paid To GMAC Mortgage*

The Schedule obligated the Bank to pay GMAC Mortgage a "Net Servicing Fee," defined as:

> the sum of the amounts posted to the general ledger of [the Bank] for amounts collected or earned by [the Bank] (i.e.[,] *normal servicing fees and ancillary income*) less any associated servicing expenses paid or incurred, as is customary for normal servicing of residential mortgage loans.[840]

Thus, the Bank was required to pay GMAC Mortgage all the servicing income it received on its portfolio of MSRs, net of expenses incurred.

The expenses to be deducted included the fees paid to GMAC Mortgage under the Original Servicing Agreement for Bank-owned MSRs.[841] In connection with the MSR Swap, the parties entered into a Fourth Addendum to Servicing Agreement amending the fee schedule pertaining to loans for which Ally Bank held the MSR.[842] The servicing fee for such loans was changed to a flat $46.00 per annum from a fee based on a percentage of principal, subject to quarterly adjustment based on GMAC Mortgage's actual cost to service the loans. On the other hand, while the Addendum specifies that all float on principal and interest payments and on tax and insurance escrows, as well as other ancillary income, will be for the account of GMAC Bank,[843] this income was part of the normal "ancillary" servicing income required to be paid to GMAC Mortgage under the MSR Swap.[844]

---

[840] 2007 Net Funding Schedule, parts 6(a)(v), 6(d) [RC00027852] (emphasis added).

[841] Int. of C. Dondzila, Sept. 27, 2012, at 294:1–15; Int. of J. Young, Sept. 28, 2012, at 210:24–211:13; Int. of R. Groody, Dec. 17, 2012, at 232:16–233:16. Consequently, whether the fees paid to GMAC Mortgage for servicing the Bank's MSR portfolio were at market or at cost seems to be immaterial, given that the cost would have been passed back to GMAC Mortgage through the Net Servicing Fee. "So if you charged a gazillion dollars per loan for the subservicing . . . then a gazillion dollars would come back through the swap." Int. of J. Whitlinger, Feb. 27, 2013, at 93:25–94:4. (Of course, this is not true for the fees charged to service the bank's HFI portfolio.)

[842] Fourth Addendum to Original Servicing Agreement, dated Sept. 1, 2007 [ALLYKE000000741].

[843] *Id.*

[844] 2007 Net Funding Schedule, part 6 [RC00027852].

### (b) The Funding Fee Paid To Ally Bank

The Net Funding Schedule also required GMAC Mortgage to pay the Bank a "Funding Fee," which was defined as the product of an interest rate (set at LIBOR plus 1%) and the "dollar amount of Mortgage Servicing Rights owned by [the Bank] as reported on [the Bank's] accounting general ledger . . . and the dollar amount of Servicing Advances owned by [the Bank] as reported on [the Bank's] accounting general ledger."[845]

### (3) Termination Provisions

Both the FMV Schedule and the Net Funding Schedule had a one-year term subject to automatic renewal for successive one-year periods absent 120 days' notice by Ally Bank.[846] Termination of either Schedule would trigger termination of the other.[847] The Schedules' provisions notably did not contemplate any sort of unwinding of the Swap on termination,[848] a fact whose significance is discussed below.

### (4) Application Of The MSR Swap To The Recognition Of New MSRs

As discussed above, the FMV Schedule required payment of the FMV Change, the "FAS 156 mark to market for the Valuation Period as recorded by [the Bank] against the mortgage servicing right asset" on the Bank's general accounting ledger.[849]

When Ally Bank sold loans to GMAC Mortgage and retained the related servicing rights, it capitalized the newly recognized MSRs (including excess servicing rights),[850] adding their value to the mortgage servicing right asset on the Bank's general accounting ledger.[851] The Bank also periodically purchased MSRs (as opposed to whole loans) from third parties, adding the value of these MSRs to the mortgage servicing right asset on the Bank's general accounting ledger as well. Consequently, when GMAC Mortgage paid the LIBOR-based

---

[845] 2007 Net Funding Schedule, parts 6(a)(iii), (iv), (vi) [RC00027852]; Serv Fee JE & Query, dated Dec. 31, 2008 [EXAM00233021].

[846] 2007 FMV Schedule, part 6(a)(vi) [RC00027822]; 2007 Net Funding Schedule, part 6(a)(vii) [RC00027852].

[847] 2007 FMV Schedule, part 1(h) [RC00027822]; 2007 Net Funding Schedule, part 1(h) [RC00027852].

[848] 2007 FMV Schedule, parts 1(f), 5e [RC00027822]; 2007 Net Funding Schedule, parts 1(f), 5e [RC00027852]; Int. of R. Groody, Dec. 17, 2012, at 220:9–224:6 (FMV payments remain with GMAC Mortgage upon termination).

[849] 2007 FMV Schedule, part 6(a)(iii) [RC00027822]; *see also* E-mails between R. Groody, S. Griffith, N. Rock et al. (Apr. 5–6, 2007) [EXAM 10287667].

[850] Excess servicing rights are discussed in Section V.B.9.b(1) and the accompanying footnotes.

[851] Int. of J. Cortese, Mar. 7, 2013, at 19:12–20.

Funding Fee, the value of the newly recognized MSRs was included in the "dollar amount of Mortgage Servicing Rights . . . reported on the [Bank's] accounting general ledger"[852] used to calculate the Funding Fee.[853]

However, while the Bank paid to GMAC Mortgage the capitalized value of new MSRs and excess servicing rights related to Bank-originated loans that were added to the value of the Bank's MSR asset, it did not do this for MSRs arising from correspondent loans the Bank had purchased or for MSRs purchased separately.[854] For correspondent loans, the Bank paid the capitalized value of excess servicing rights to GMAC Mortgage, but not the capitalized value of the MSRs themselves.[855] The Bank's records likewise reflect that the value of purchased MSRs was not paid to GMAC Mortgage. From the August 2007 inception of the MSR Swap, the capitalization and purchase of new MSRs was always handled in this fashion.[856] This appears to be a significant anomaly in the application of the FMV Schedule. The Schedule appears to require that all increases in the value of the Bank's mortgage servicing right asset flow to GMAC Mortgage, without distinguishing among MSRs arising from Bank-originated loans, purchased MSRs, and MSRs arising from purchased loans.

In their interviews, Bank and ResCap personnel involved in putting the MSR Swap in place generally had little recollection or understanding of how the Swap applied to the value of new MSRs.[857] Groody presented the MSR Swap to the Ally Bank Board for approval in August 2007; the written materials he provided to the Board state:

> [t]he Total Return Swap will be transacted monthly with GMACM where the Bank will pay cash to GMACM in the event the market value of the asset increases and will receive

---

[852] 2007 Net Funding Schedule, part 6(a)(vi) [RC00027852].

[853] Int. of J. Cortese, Mar. 7, 2013, at 38:14–39:14; MSR ARB Interest Expense Allocation, dated Mar. 31, 2012 [EXAM00233968]; MSR ARB Interest Expense Allocation, dated Apr. 30, 2012 [EXAM00233969].

[854] Int. of J. Cortese, Mar. 7, 2013, at 19:3–11; Ally Bank Overview Accounting for Mortgage Servicing Rights [ALLY_PEO_0042124] (reflecting payment to GMAC Mortgage for MSRs related to Bank-originated loans, but not for MSRs related to purchased loans); Detailed Analysis of Ally Bank's Affiliate Agreements, dated June 12, 2012, at 18 [SOP0000380]; Bank MSR TRS Daily Settlement, dated Apr. 30, 2012 [ALLY_PEO_0070279].

[855] Int. of J. Cortese, Mar. 7, 2013, at 19:3–11; Ally Bank Overview Accounting for Mortgage Servicing Rights [ALLY_PEO_0042124] (reflecting payment to GMAC Mortgage for MSRs related to Bank-originated loans, but not for MSRs related to purchased loans); Detailed Analysis of Ally Bank's Affiliate Agreements, dated June 12, 2012, at 18 [SOP0000380]; Bank MSR TRS Daily Settlement, dated May 2011 [EXAM00234419].

[856] Int. of J. Cortese, Mar. 7, 2013, at 36:3–37:15; Int. of J. Young, Mar. 15, 2013, at 85:19–21; MSR Swap Review (May 2012) [ALLY_0368244].

[857] *See* Int. of R. Groody, Dec. 17, 2012, at 215:21–216:5; Int. of B. Bier, Feb. 22, 2013, at 154:23–158:5 (Bier had no independent recollection on how the MSR Swap was to apply to capitalization of MSRs and, based solely on his review of the MSR Swap's language during his interview, assumed that the Bank would pay the market value of MSRs for both originated and correspondent loans to GMAC Mortgage and would recoup the SRP for the correspondent loans under the MMLPSA).

> cash in the event the market value of the MSR decreases. *The swap will use the recorded amounts in the Bank's income statement as the basis for the cash settlement of the swap to ensure all income statement volatility is removed from the Bank each month.* The Bank will also receive a fee equal to a spread above the LIBOR one-month rate under the terms of the swap agreement.[858]

While this statement does not focus specifically on the capitalization or purchase of MSRs, or on the mechanics of either the FMV Schedule or the Net Funding Schedule, it is notable that the statement describes the Swap as focusing on the Bank's income statement (rather than its balance sheet), and asserts that the Swap will eliminate income-statement volatility.

Cortese, who was not involved in the original negotiations of the 2007 MSR Swap but had substantial experience with the MSR Swap after he became CAO of Ally Bank in August 2009,[859] explained the different treatment of MSRs from Bank-originated loans and those from purchased loans as follows: For Bank-originated loans, the Bank recognized a gain corresponding to the value of the MSR when it was capitalized. In contrast, for purchased correspondent loans, since the Bank had paid a purchase price that included an SRP for the loan servicing rights, the Bank did not recognize a gain when it capitalized the corresponding MSR.[860] Similarly, the Bank did not recognize a gain when it added the value of purchased MSRs to its balance sheet (since it had paid to purchase the MSRs). The Bank did, however, recognize a gain when it capitalized the value of any excess servicing rights associated with either a correspondent or Bank-originated loan.[861]

In Cortese's view, "the whole intent that ResCap and the [B]ank manager had in drafting this was that the [B]ank was not to have any economics related to holding the MSR asset"; he added that, "the swap is more of a revenue, of a P&L view, than, say, the balance sheet," and "[t]he intent of the swap was to have all those economics, net cash flows, go back to GMAC Mortgage," since "[t]he Bank was holding the MSR for, I think, purely financing purposes."[862] Asked what in the language of the MSR Swap supported this view, Cortese responded, "I would say that the language at that point in time was pretty vague," and "I don't think it's specifically identified."[863] However, as discussed in greater detail below, Cortese referred to

---

[858] Materials for GMAC Bank Board of Directors Meeting, dated Aug. 16, 2007, at ALLY_PEO_0005805 [ALLY_PEO_0005782] (emphasis added).

[859] Int. of J. Cortese, Mar. 7, 2013, at 14:12–16. Cortese joined ResCap in July 2008 as an accounting director, and became Chief Accounting Officer of Ally Bank in August 2009. *Id*. at 9:15–10:3.

[860] *Id.* at 28:19–29:9.

[861] MSR Rollforward Q1 2011 and Q4 2010 [ALLY_PEO_0069504] (attached to e-mail from L. Gerner to B. Yastine and J. Young (Apr. 27, 2011) [ALLY_PEO_0069503]).

[862] Int. of J. Cortese, Mar. 7, 2013, at 28:19–29:9.

[863] *Id*. at 30:2–16.

revisions to the FMV portion of the MSR Swap in April 2011 amendments as reflecting his understanding that newly capitalized MSRs were to flow to GMAC Mortgage when they involved a "gain or loss," rather than a "change[] in the balance sheet."[864]

   Young[865] offered a different explanation for the treatment of MSR capitalization under the MSR Swap. Young pointed out that the FMV Schedule's provisions defining FMV Changes cover "the FAS 156 mark to market for the valuation period," and asserted that "[t]he creation of an MSR is not a marked-to-market adjustment."[866] Consequently, he explained that the Bank's payments related to the recognition of MSRs related to the Bank-originated loans were not made under the FMV Schedule, but as part of the Net Servicing Fee under the Net Funding Schedule.[867] The Net Servicing Fee, as noted above, required payment of "amounts posted to the general ledger of [the Bank] for amounts collected or earned by [the Bank] (i.e.[,] *normal servicing fees and ancillary income*) less any associated servicing expenses paid or incurred, as is customary for normal servicing of residential mortgage loans."[868] According to Young, the Bank's gain on sale for MSRs arising from Bank-originated loans was an amount "earned" by the Bank; conversely, there was no gain on sale and consequently "no earning" on correspondent loan MSRs.[869] It should be noted that the Net Servicing Fee provision references "amounts collected or earned by [Ally Bank] (i.e.[,] *normal servicing fees and ancillary income*)." Young agreed that the gain related to capitalization of Bank-originated loan MSRs was neither a "normal servicing fee" nor "ancillary income."[870] He suggested that these items were meant to be examples of MSR-related earnings, rather than an exhaustive list,[871] saying, in effect that the provision should be read as though it says "(*e.g.,* normal servicing fees and ancillary income)," rather than "(*i.e.,* normal servicing fees and ancillary income)."

---

[864] Int. of J. Cortese, Mar. 7, 2013, at 33:19–34:14, 37:23–38:13 (discussing April 2011 MSR Swap Confirmation, § 2, definitions of FMV Change, FMV Value, and MSR Amount [ALLY_0041799]). *See* Section V.B.10.b.

[865] Young signed the 2007 MSR Swap for ResCap, but in his interview acknowledged that he had not been involved in the development or negotiation of the arrangement, first became aware of it when it was adopted, and did not recall having executed the document; consequently, his knowledge, like Cortese's, was predicated on his subsequent involvement. Int. of J. Young, Oct. 10, 2012, at 90:12–18; Int. of J. Young, Mar. 15, 2013, at 72:6–75:4.

[866] Int. of J. Young, Mar. 15, 2013, at 82:19–23.

[867] *Id*. at 83:7–21.

[868] 2007 Net Funding Schedule, part 6(a)(v) [RC00027852] (emphasis added).

[869] Int. of J. Young, Mar. 15, 2013, at 82:24–83:6, 83:21–24.

[870] *Id.* "Ancillary income" in the loan servicing context typically refers to revenues such as the "float" on loan payments collected by the servicer. *See* Fourth Addendum to Original Servicing Agreement, dated Sept. 1, 2007 [ALLYKE000000741].

[871] Int. of J. Young, Mar. 15, 2013, at 84:6–21.

However, the few documents that explicitly discuss how capitalizations of MSRs flowed under the MSR Swap do not support Young's explanation. Instead, they reflect that the parties understood that the FMV Schedule "fair value changes to the MSR asset" included "the [G]ain recognized . . . on newly capitalized MSR[s]."[872] The Investigation has revealed no documents saying that the Net Funding Fee was the applicable portion of the Swap.

Further, a review of FAS 156 indicates that it applies not only to the adjustment of asset values already on an entity's books, but to the initial recognition of assets.[873] FAS 156, Accounting for Servicing of Financial Assets, speaks in terms of the "fair value" of assets, rather than using the phrase "mark to market."[874] Recording an asset at fair value is a concept used interchangeably in accounting literature with "mark to market."[875] FAS 156 specifically requires "all separately recognized servicing assets and servicing liabilities to be initially measured at fair value."[876] Indeed, paragraph 65 of FAS 156 provides an example of an MSR asset being recorded at fair value upon the transfer of the loan and the retention of servicing.[877] Moreover, Ally Bank's own audited financial statements, as well as the governing Ally Accounting Policy, state that mortgage servicing assets and liabilities are initially measured at fair value.[878] Of course, FAS 156 also contemplates the subsequent measurement of servicing assets and liabilities at "fair value," with changes in "fair value" reported in earnings in the period in which the changes occur (though, again, it does not use the phrase "mark to market").[879] Nothing in FAS 156 suggests that the initial measurement of an asset at fair value is not a "mark to market."

---

[872] Memorandum, Ally Bank/GMAC Mortgage Affiliate Total Return Swap Accounting Analysis, dated Feb. 25, 2011, at 2, n.2 [ALLY_0202271]; MSR Swap Between GMACM and Ally Bank Presentation, dated Feb. 2011, at 5 [EXAM11190199] ("Capitalization of New Servicing" identified as flowing under the "FMV Swap"). The Investigation has uncovered no documentary evidence which indicates the MSR capitalization flowed to GMAC Mortgage under the Net Funding Fee, as Young asserted.

[873] FINANCIAL ACCOUNTING STANDARDS BOARD, STATEMENT OF FINANCIAL ACCOUNTING STANDARDS No. 156, Accounting for Servicing of Financial Assets, an amendment of FASB Statement No. 140, Summary ¶ 2.

[874] *Id.*

[875] *See, e.g.,* FINANCIAL ACCOUNTING STANDARDS BOARD, STATEMENT OF FINANCIAL ACCOUNTING STANDARDS No. 107, Disclosures about Fair Value of Financial Instruments, ¶ 9; Report and Recommendations Pursuant to Section 133 of the Emergency Economic Stabilization Act of 2008: Study on Mark-To-Market Accounting, Office of the Chief Accountant, Division of Corporate Finance, United States Securities and Exchange Commission, at 1.

[876] FINANCIAL ACCOUNTING STANDARDS BOARD, STATEMENT OF FINANCIAL ACCOUNTING STANDARDS No. 156, Accounting for Servicing of Financial Assets, an amendment of FASB Statement No. 140, Summary ¶ 2.

[877] *Id*. ¶ 65.

[878] GMAC Bank, Consolidated Financial Statements as of December 31, 2008 and 2007 and Independent Auditor's Report, at RC00034550–51 [RC00034535]; Accounting Policy 2451, Mortgage Servicing Rights, Sept. 1, 2011, at RC40000806 [RC40000802].

[879] Financial Accounting Standards No. 156, Accounting for Servicing of Financial Assets, an amendment of FASB Statement No. 140, Summary ¶ 3.

This issue is addressed further in connection with the revisions to the MSR Swap adopted in April 2011, discussed in Section V.B.10.

### (5) The Combined Economic Effect: "Synthetic Lending"?

Ally Bank officials, in Affiliate Transaction Memos prepared at the time of the MSR Swap and in an April 2010 reassessment, characterized the FMV portion of the MSR Swap as a straightforward hedge of the fair market value of the MSRs.[880] They noted that MSR assets are volatile, that providing a 100% hedge of MSRs in the marketplace was not possible (citing communications with a third-party swap provider, Lehman Brothers, to the effect that such a swap was not available in the marketplace), and that there were no administrative costs or fees paid to GMAC Mortgage (and hence no hedge ineffectiveness).[881] The Net Funding portion of the exchange was described as an exchange of "net servicing fees, a variable cash flow for a fixed payment that provides the Bank with a 100 bp over libor risk free return on its MSR asset," a return that was "commensurate with other low/no risk investments in the marketplace (fed funds and short term treasury notes in the current market)."[882]

While the analogy is imperfect, Ally Bank's role has been described as that of a "synthetic lender"[883] and the MSR Swap is similar in many respects to a loan: GMAC Mortgage received (almost) all of the economic benefit (and detriment) from owning the MSR portfolio without actually having to purchase the assets or pay a servicing-released premium. It received the value of each Bank-originated loan MSR and excess servicing rights upon recognition on the Bank's balance sheet. GMAC Mortgage paid the amortization of the value of the entire MSR asset to the Bank each month, receiving in exchange the corresponding servicing fees (net of expense) for that month. GMAC Mortgage paid the Bank, in effect, interest on the capital the Bank had tied up in the assets, including the amounts paid by the

---

[880] GMAC Bank Affiliate Transaction Memorandum, Swap Agreement for Mortgage Servicing Rights with GMAC Mortgage Corp., dated Sept. 1, 2007, at 2 [ALLY_0017878]; GMAC Bank Affiliate Transaction Memorandum, Assessment of Swap Agreement for Mortgage Servicing Rights with GMAC Mortgage LLC, dated Apr. 30, 2010, at 1 [ALLY_0018063].

[881] GMAC Bank Affiliate Transaction Memorandum, Swap Agreement for Mortgage Servicing Rights with GMAC Mortgage Corp., dated Sept. 1, 2007, at 2 [ALLY_0017878]; GMAC Bank Affiliate Transaction Memorandum, Assessment of Swap Agreement for Mortgage Servicing Rights with GMAC Mortgage LLC, dated Apr. 30, 2010, at 1 [ALLY_0018063]; E-mail from T. O'Hara, Lehman Brothers, to R. Groody (Sept. 20, 2007) [ALLY_0017960] (Lehman is unable to structure "all-encompassing" hedge for MSRs).

[882] GMAC Bank Affiliate Transaction Memorandum, Assessment of Swap Agreement for Mortgage Servicing Rights with GMAC Mortgage LLC, dated Apr. 30, 2010, at 1 [ALLY_0018063]; GMAC Bank Affiliate Transaction Memorandum, Swap Agreement for Mortgage Servicing Rights with GMAC Mortgage Corp., dated Sept. 1, 2007, at 2 [ALLY_0017878]; *see also* Minutes of a Regular Meeting of the Board of Directors of GMAC Bank, Aug. 22, 2007 [ALLY_PEO_0001400]; Proposal to Invest in Mortgage Servicing Rights, dated Aug. 22, 2007, at ALLY_PEO_0005803 [ALLY_PEO_0005782] (stating 100 basis point return spread is "significantly greater than alternative risk-free investments," and "[r]eturns on equity will be in excess of 8.5% annually"); Int. of R. Groody, Dec. 17, 2012, at 194:19–196:24.

[883] Int. of J. Young, Oct. 10, 2012, at 22:4–5.

Bank as servicing advances. In a sense, the MSR Swap functioned as though GMAC Mortgage had borrowed the funds necessary to purchase the MSRs and the funds needed to make related servicing advances.[884]

Of course, there are key differences between the MSR Swap and a scenario in which GMAC Mortgage had borrowed money from Ally Bank to purchase the asset itself. These include the following: First, the Bank had actual title to the MSR assets, instead of a security interest in the assets.

Second, as noted above, there was no provision for unwinding any of the prior payments on termination of the Swap. Thus on termination, GMAC Mortgage would get to keep an element of the "principal"—the amounts that had been advanced to it under the Swap resulting from the initial capitalization of MSRs from Bank-originated loans—rather than repaying it to the Bank (as it would have done through paying for the decline in value attributable to economic amortization of the asset through the swap, had it not been terminated). Ally Bank would keep the MSRs themselves on termination, but of course had owned the MSRs from their inception, and GMAC Mortgage had not paid to purchase them.[885] The termination of the MSR Swap is not discussed in the Bank's Affiliate Transaction Memos.[886]

---

[884] According to Young, the MSR Swap essentially was a low-cost, convenient funding source for GMAC Mortgage to continue its core servicing business:

> [T]he whole theory is that you want to swap all the economics of that MSR to where they belong, if you will, in the core business that has the rest of the core. It has the hedging expertise, the capital markets expertise, the servicing expertise.

> They want the risk and—ResCap wants the risk and rewards of that MSR, but putting it in the bank provides a way of funding it, putting it on their balance sheet. But the economics of flowing back—so, in exchange for a LIBOR-based payment, all of the other economics of the MSR are coming back under the swap.

> So, servicing fees, any benefit of servicing from float, the cost of subservicing, which is really all embedded in ResCap, all those components of that core process are going back to ResCap in exchange for a LIBOR-based payment. So, it puts ResCap in the exact same position that they would be if they—as if they owned the asset.

Int. of J. Young, Sept. 28, 2012, at 210:18–211:13; *see also* Int. of B. Bier, Feb. 22, 2013, at 157:15–18 ("[T]he intent of the swap was that GMAC Bank would finance the fair value of the MSRs.").

[885] Before the adoption of the MSR Swap and retention of the MSR by Ally Bank, GMAC Mortgage would have paid the Bank an SRP (servicing-released premium) to purchase the MSR. Under the Swap, GMAC Mortgage did not pay for the MSR, but, for MSRs arising from Bank-originated loans, was paid the value of the MSR and was not obligated to return it (or the unamortized portion of the MSR) on termination.

It should be noted that excess servicing rights (discussed in Section V.B.9.b(1) and the accompanying footnotes) do not implicate the same considerations, since GMAC Mortgage would have been entitled to the benefit of this income without payment of an SRP or the equivalent as a perquisite of purchasing the loan itself (and controlled whether or to what extent excess servicing rights were created because it controlled the securitization process).

[886] *See* Section V.B.11.a (discussing economic results under the MSR Swap following 2012 termination).

### c. 2009 Revisions To Termination Provisions And The Issuance And Rescission Of Termination Notices

In response to FDIC expressions of dissatisfaction with Ally Bank's exposure to GMAC Mortgage,[887] as well as a threat by Ginnie Mae to cease permitting loan purchases from GMAC Mortgage given its precarious finances, Ally Bank considered terminating the MSR Swap.[888] On May 1, 2009, the parties agreed to reduce the advance notice the Bank was required to give to prevent renewal of the FMV and Net Funding Schedules to 90 days.[889] Ally Bank then issued notices of non-renewal on June 1, 2009, which would have resulted in termination effective September 1, 2009.[890] On August 31, 2009, Ally Bank confirmed that these notices had been withdrawn by mutual agreement,[891] and the following day the parties agreed to make both Schedules unilaterally terminable by Ally Bank on 30 days' notice (at any time, not merely at renewal).[892] Ally Bank sent 30-day notices of termination in September and October 2009, but they were subsequently rescinded.[893]

### d. 2010 MSR Swap Revisions

In or after November 2010, but with effect retroactive to July 1, 2010, the parties entered into an "Amended and Restated" Net Funding Schedule (the "2010 Net Funding Schedule").[894] The

---

[887] Int. of R. Groody, Dec. 17, 2012, at 156:2–8, 157:9–158:2. ResCap acknowledged that GMAC Mortgage was no longer "an acceptable counterparty to others." ResCap Presentation on Affiliate Agreements, at 4 [EXAM10787403].

[888] Review of GNMA Mortgage Hedging and MSR Hedging, dated June 30, 2009, at 9 [EXAM11621591].

[889] Letter Agreement Re Amendment of ISDA Schedules, dated May 1, 2009 [ALLY_0017962].

[890] Letter from A. Celini to J. Young (June 1, 2009) [ALLY_0212903].

[891] Letter from A. Celini to J. Young (Aug. 31, 2009), at 3 [RC00027847].

[892] Letter from A. Celini to J. Young (Sept. 1, 2009), at 1 [RC00027847].

[893] Letter from A. Celini to J. Young (Sept. 1, 2009) [RC00027847] (termination effective Oct.1, 2009); Letter from A. Celini to J. Young (Sept. 21, 2009) [EXAM00237972] (termination effective Nov. 1, 2009; rescinds prior termination notice); Letter from M. Hales to J. Young (Oct. 21, 2009) [ALLY_0212907] (termination effective Nov. 30, 2009; rescinds prior termination notice); Letter from M. Hales to J. Young (Nov. 18, 2009) [ALLY_0017995] (rescinding October 2009 termination notice). Apparently the parties tried to "operationalize the elimination of" the MSR Swap and Pipeline Swap but ultimately they were not terminated. E-mail from J. Whitlinger to J. Young et al. (Dec. 15, 2009) [EXAM10161997]. ResCap viewed the retention of the "total return swap" (referring to combined effect of MMLPSA and MSR Swap) as in its best interest and noted "without the total return swap relationship, ResCap would lose any future capability of delivering securities to the [GSEs]." Affiliate Agreements: GMAC Bank and ResCap, at 8–9 [EXAM10787403].

[894] 2010 Net Funding Schedule [ALLY_0018118].

amended agreement was approved by the ResCap Board[895] (although the parties applied the new pricing terms even before the amended agreement was executed or approved).[896] This appears to be the first instance after adoption of the 2005 Operating Agreement in which ResCap Board approval of any of the agreements discussed in this Section occurred. No fairness opinion was obtained.[897] The Amended and Restated Schedule contained two key revisions, both made in response to concerns or objections raised by FDIC officials:

### (1) Increase In The Funding Fee Interest Rate To 3.25%

First, the 2010 Net Funding Schedule increased the interest rate applicable to the Funding Fee to LIBOR plus 3.25%.[898]

FDIC officials had questioned, inter alia, whether LIBOR +1% was an adequate interest rate, comparing it to a facility that ResCap had in place with Citibank secured by MSRs (under which ResCap paid Citibank LIBOR +6%) and characterizing the LIBOR +1% rate as an "apparent violation" of section 23B.[899] Ally Bank management, particularly Glassner, disagreed with the comparison to the Citibank interest rate, noting that there were key structural differences that support a reduced pricing structure.[900] The differences cited included the "avoidance of hedge costs," the Bank's "ability to unilaterally terminate the swaps at any time," and the "[m]onetary benefit to the Bank resulting from availability of no-cost mortgage servicing escrow funds controlled by [GMAC Mortgage]."[901] Ally Bank argued to the FDIC that

---

[895] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Nov. 5, 2010, at RC40018847-48 [RC40018729]; *see also* Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 3, 2010, at RC40018840 [RC40018729] (discussing revisions); Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 5, 2010, at RC40018842–43 [RC40018729] (same).

[896] E-mail from A. Glassner to J. Andrews and J. Young (Aug. 26, 2010) [EXAM10436075].

[897] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Nov. 5, 2010, at RC40018844-45 [RC40018729]. *See also* Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 3, 2010, at RC40018840 [RC40018729] (discussing revisions); Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 5, 2010, at RC40018842–43 [RC40018729] (same). It was suggested that the Independent Directors discuss whether a fairness opinion should be obtained. E-mail from C. Quenneville to P. West and J. Young (Nov. 3, 2010) [EXAM10436173].

[898] 2010 Net Funding Schedule, part 6(a)(iv) [ALLY_0018118].

[899] Ally Bank Board Meeting Presentation, dated June 18, 2010, at 15 [EXAM11119117]. Int. of L. Gerner, Nov. 13, 2012, at 144:4–154:5, 175:8–176:19; E-mails among M. Hales, A. Glassner, D. Scott, et al. (Apr. 8–21, 2010) [ALLY_PEO_0065507].

[900] *See* Ally Bank Board Meeting Presentation, dated June 18, 2010, at 15 [EXAM11119117]; E-mail from A. Glassner to D. Scott (Apr. 14, 2010) [ALLY_PEO_0065507] (comparison of the Swap to the Citibank facility being fundamentally flawed).

[901] Detailed Analysis of Ally Bank's Affiliate Agreements, dated June 12, 2012, at 7, 15, 23 [SOP0000380]; *see also* Ally Bank Board Meeting Presentation, dated June 18, 2010, at 15 [EXAM11119117]. GMAC Mortgage maintained at Ally Bank non-interest bearing escrow accounts that it held on behalf of Borrowers for tax and insurance payments as well as other escrow accounts.

the differences justified a spread 2.75% less than the LIBOR +6% Citibank facility, i.e., of LIBOR +3.25%.[902] In his interview, Glassner acknowledged that this calculation did not include an adjustment based on other factors that could have supported a further downward adjustment, particularly the fact that the Bank, unlike a lender, held title to the MSRs.[903]

It seems clear from the record that the revised interest rate was developed essentially to palliate the regulators, rather than based on agreement that the adjustment was necessary. But as discussed below, the regulators remained dissatisfied with the increased rate.

### (2) Deducting Loan Repurchase Expense From The Net Servicing Fee

The parties amended the Net Servicing Fee definition, providing that Ally Bank could deduct from the servicing fees it was remitting to GMAC Mortgage not merely "any associated servicing expenses paid or incurred, as is customary for normal servicing of residential mortgage loans" (as the original schedule had provided),[904] but also:

> [t]he losses, liabilities, costs and expenses (collectively, "Losses") incurred by [Ally Bank] as owner of mortgage servicing rights or servicer of record under applicable Seller/Servicer Agreements or Master Agreements (including the respective Seller or Servicer Guides) between [Ally Bank] and either the Federal National Mortgage Association or the Federal Home Loan Mortgage Corporation (each, an "Agency") including without limitation Losses related to any Agency loan repurchase request, indemnification or make-whole agreement, to the extent such Losses remain unreimbursed by [GMAC Mortgage].[905]

This revision was portrayed at the time as merely a "clarification" of the agreement.[906]

The 2007 Net Servicing Fee provisions did not explicitly address whether Bank loan repurchase expenses are among the expenses to be deducted from the Net Servicing Fee. According to Groody, who presented the 2007 MSR Swap to the Bank Board for approval,[907] there was no discussion at the time of whether any representation and warranty or loan

---

[902] Ally Bank Board Meeting Presentation, dated June 18, 2010, at 15 [EXAM11119117].

[903] Int. of A. Glassner, Mar. 20, 2013, at 67:17–68:5, 72:15–73:22.

[904] 2007 Net Funding Schedule, part 6(a)(v) [RC00027852].

[905] 2010 Net Funding Schedule, part 6(a)(v) [ALLY_0018118].

[906] *See, e.g.,* Memorandum to Residential Capital, LLC Board of Directors, dated Oct. 3, 2010, at RC40016545 [RC40016545].

[907] Minutes of a Regular Meeting of the Board of Directors of GMAC Bank, Aug. 22, 2007, at ALLY_PEO_0001451 [ALLY_PEO_0001400].

repurchase expenses Ally Bank might incur in connection with its MSR ownership would be deductible from the Net Servicing Fee.[908] This is not surprising, given that the GSEs did not then make repurchase demands to master servicers, a practice they did not adopt until after 2007.[909] The witnesses interviewed agreed that Ally Bank had not, in the years between inception of the MSR Swap and these amendments, actually paid representation and warranty claims and then deducted them from the Net Servicing Fee.[910] Consequently, there was no "course of dealing" to confirm that these changes were merely a "clarification" of agreed intent. Moreover, in September 2008, in connection with a discussion about a new effort to permit Ally Bank to hold Ginnie Mae MSRs, Groody advised the Bank Board that the matter would be complicated by the fact that Ginnie Mae looks to servicers to fulfill repurchase obligations, and it would be necessary to "modify the scope of the total return [MSR] swap with [GMAC Mortgage] to ensure that it covers losses on repurchased loans."[911] This exchange reflects that it was at least unclear to the GMAC Bank architect of the MSR Swap in 2008 that repurchase obligations would be covered by GMAC Mortgage under the existing agreement.

Nonetheless, concerns about this modification to the terms of the MSR Swap appear to be moot because Ally Bank never actually paid any repurchase claims (or, consequently, deducted any such payments from the Net Servicing Fee).[912] Instead, representation and warranty liabilities were assumed by ResCap/GMAC Mortgage as a seller of the loans; it did not pursue recovery from Ally Bank on loans purchased under the MMLPSA, though it did pursue recovery from third-party correspondents who had sold the loans to the Bank.[913]

### e. 2010 AFI Guarantee And Indemnification Side Letter

In October 2010, various state and federal agencies commenced an investigation following revelations of the widespread practice of "robo-signing" affidavits in foreclosure proceedings across the country. Responding to FDIC and investor pressure, Ally Bank asked GMAC Mortgage to enter into an indemnification letter to "clarify" GMAC Mortgage's indemnification obligations under the Original Servicing Agreement in the event that any liabilities were incurred in connection with this activity;[914] in truth, the request was to expand GMAC Mortgage's indemnification obligations by eliminating the existing limitation on the obligations to one year's

---

[908] Int. of R. Groody, Dec. 17, 2012, at 236:18–237:5.

[909] Int. of J. Young, Oct. 10, 2012, at 165:10–166:6.

[910] Int. of R. Groody, Dec. 17, 2012, at 236:10–237:15; Int. of J. Young, Sept. 28, 2012, at 247:11–15; Int. of C. Dondzila, Sept. 27, 2012, at 227:16–22; Int. of J. Whitlinger, Nov. 30, 2012, at 67:13–68:12.

[911] Minutes of a Regular Meeting of the Board of Directors of GMAC Bank, Sept. 24, 2008, at ALLY_PEO_0001583 [ALLY_PEO_0001488].

[912] Int. of R. Groody, Dec. 17, 2012, at 236:10–237:15; Int. of J. Young, Sept. 28, 2012, at 247:11–15; Int. of C. Dondzila, Sept. 27, 2012, at 227:16–22; Int. of J. Whitlinger, Nov. 30, 2012, at 67:13–68:12.

[913] *See* Section V.B.3.a(4).

[914] Memorandum to Residential Capital, LLC Board of Directors, dated Oct. 3, 2010, at RC40016547 [RC40016545].

servicing fees. In October 2010, Barbara Yastine, Chief Administrative Officer of Ally Bank, wrote "[m]y fear here is if we don't get clear, unlimited indemnification in place for the bank, the FDIC will force us to cease providing financing to ResCap/[GMAC Mortgage]. I think that would shut the business down."[915] Yastine also noted that the indemnification had not yet been approved by the ResCap Board and that:

> [i]t seems this is not a slam dunk with the board. After all, they have gotten the bank to hold and fund the MSR, being the required face to Fannie and Freddie, and the bank has previously accepted an indemnification limited to one year's worth of servicing fees, which isn't much. Nice deal if you can get away with it, and ResCap has. But we have an answer due the FDIC on Tuesday, so Hu Benton has offered up a direct guarantee from Ally Financial to bank. Our alternative is to talk about our intentions, but that's not that strong, of course.[916]

The ResCap Board discussed this issue at a number of meetings including the October 3, 2010,[917] and October 5, 2010, meetings, but did not approve the proposed revision.[918] Considerable discussion was given to the exclusion of a liability cap, which would have resulted in unlimited indemnification liability for GMAC Mortgage.[919]

Instead, in a letter dated October 5, 2010, AFI provided a guarantee to Ally Bank of all of GMAC Mortgage's obligations under certain agreements, which include the Original Servicing Agreement and the MSR Swap.[920] In addition, AFI agreed to compensate Ally Bank for any losses arising out of violations by GMAC Mortgage of the Original Servicing Agreement, as amended, applicable law, or the Ally Bank Servicing Guides.[921] AFI reaffirmed this guarantee in a subsequent letter dated April 1, 2011.[922]

By a side letter dated October 5, 2010, GMAC Mortgage acknowledged it was responsible for "any aspect of the foreclosure affidavit process" to the extent it caused a violation of the covenant to service loans in accordance with all applicable laws and

---

[915] E-mail from B. Yastine (Oct. 4, 2010) [ALLY_0334586].

[916] E-mail from B. Yastine (Oct. 3, 2010) [ALLY_0334586].

[917] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Oct. 3, 2010, at RC40018840–41 [RC40018729].

[918] *Id.* at RC40018842–43.

[919] *Id.* at RC40018843.

[920] Letter from AFI to Ally Bank (Oct. 5, 2010) [ALLY_0018084].

[921] *Id.*

[922] Letter from AFI to Ally Bank (Apr. 1, 2011) [ALLY_0018204].

regulations.[923] GMAC Mortgage also agreed to indemnify Ally Bank in accordance with the terms of the Original Servicing Agreement for any breach thereof (and thus subject to the cap on liability set forth therein).[924] Apparently the letter was not presented to the ResCap Board for approval because it was viewed as not expanding the liability of GMAC Mortgage beyond what it had under the Original Servicing Agreement.[925] Ally Bank decided not to mention the side letter in its response to the FDIC but to disclose only the AFI guarantee.[926]

### f.  The 2010 Servicing Agreement Negotiations

A revised servicing agreement was prepared and negotiated in 2009 but not executed;[927] there were extensive additional negotiations in 2010, but the parties were ultimately unable to agree on a revision, so the Original Servicing Agreement remained in effect.

The materials presented to the ResCap Board in April 2010 included a summary of the differences between the Original Servicing Agreement and the draft revised servicing agreement, which noted that the indemnification in the draft was more favorable to GMAC Mortgage and similar to what GMAC Mortgage would receive from non-affiliated customers, due to the coverage for liability due to origination and prior servicing.[928] According to this summary, the Original Servicing Agreement no longer fit GMAC Mortgage's business practices at the time[929] because the Original Servicing Agreement was drafted primarily as a HELOC agreement and the draft revised servicing agreement covered primarily loans owned by one of the [GSEs].[930] In addition, the summary noted that the pricing under the Original Servicing Agreement was below-market but that the pricing in the draft revised servicing agreement was similar to what GMAC Mortgage would earn under a third-party agreement.[931] The difference was quantified at $18.8 million per year under the Original Servicing

---

[923] Letter from GMAC Mortgage to Ally Bank (Oct. 5, 2010) [ALLY_0099749].

[924] *Id.*

[925] E-mail from T. Hamzehpour (Oct. 5, 2010) [EXAM30020126].

[926] E-mail from J. Andrews (Oct. 5, 2010) [ALLY_0362953].

[927] *See* Minutes of a Regular Meeting of the Board of Directors of Ally Bank, Oct. 19, 2010, at ALLY_PEO_0018501 [ALLY_PEO_0018332].

[928] Materials for Presentation on Proposed Subservicing Agreement between GMAC Mortgage, LLC and Ally Bank by T. Hamzehpour, dated Apr. 29, 2010, at RC40016107–08 [RC40016061].

[929] *Id.* at RC40016107–08.

[930] *Id.* at RC40016107–08.

[931] *Id.* at RC40016107–08; *see also* Affiliate Transaction Memorandum, Apr. 30, 2010 [ALLY_0018036] (attaching term sheets for comparable servicing functions provided to third parties to demonstrate that the pricing under the Original Servicing Agreement was favorable to Ally Bank).

Agreement (based on amounts received in 2009) and $49.7 million per year under the draft revised servicing agreement (assuming the new pricing was effective at the start of 2010).[932] Surprisingly, the cap on GMAC Mortgage indemnification liability was not mentioned.[933]

The ResCap Board continued to discuss revision of the servicing agreement at numerous board meetings in 2010,[934] and the indemnification provisions were a focus of the discussions.[935] The materials presented to the ResCap Board in October 2010 stated that none of the four most recent sub-servicing agreements GMAC Mortgage entered into with third parties contained caps on liability and that GMAC Mortgage has generally not sought or received caps in other third-party servicing agreements.[936] The presentation also noted that servicing agreements that the Bank entered into with third-party servicers did not contain caps.[937] The Bank's indemnification of the servicer was also narrower under the Original Servicing Agreement as it was limited to breach of the agreement.[938] Under the draft revised servicing agreement, GMAC Mortgage as the servicer would be indemnified for origination errors and for acting at Ally Bank's direction. Further, the presentation noted that if the servicer obtained a cap on liability GMAC Bank would likely seek a reciprocal cap.[939] Despite the materials presented it appears the ResCap Board did not agree to remove the indemnity cap.[940] On December 7, 2010, the ResCap Board discussed revisions to the draft servicing agreement which incorporated a cap on GMAC Mortgage's liability in an amount equal to

---

[932] Materials for Presentation on Proposed Subservicing Agreement between GMAC Mortgage, LLC and Ally Bank by T. Hamzehpour, dated Apr. 29, 2010, at RC40016107–08 [RC40016061].

[933] *Id.* at RC40016107–08.

[934] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Apr. 29, 2010, at RC40018774 [RC40018729] (discussing whether a fairness opinion was needed and deciding to defer decision until the Independent Directors could discuss the draft revised servicing agreement with counsel). Although the proposed draft servicing agreement was approved via a Unanimous Written Consent of the Board of Directors of Residential Capital, LLC, dated Apr. 30, 2010 [RC40018729], the agreement was not entered into at the time due to operational and compliance issues. *See* Memorandum to Residential Capital, LLC Board of Directors, dated Oct. 3, 2010, at RC40018776 [RC40016545]; *see also* Minutes of Special Meetings of the Board of Residential Capital, LLC, Nov. 5, 2010, at RC40018848 [RC40018729].

[935] *See* Minutes of a Regular Meeting of the Board of Directors of Ally Bank, Oct. 19, 2010, at ALLY_PEO_0018501 [ALLY_PEO_0018332].

[936] Materials for Presentation on Ally Bank Servicing Agreement by T. Hamzehpour, dated Oct. 5, 2010, at RC40016594–95 [RC40016584].

[937] *Id.* at RC40016594–95.

[938] *Id.*

[939] *Id.*

[940] Apparently "to resolve the impasse over caps on [GMAC Mortgage's] indemnification obligations under the Servicing Agreement" the ResCap Board proposed that [GMAC Mortgage's] indemnity would be uncapped in all respects except for affidavit and related foreclosure issues, which would be capped at an amount equal to aggregate servicing fees payable over one year under the [Original Servicing] Agreement." E-mail from J. Andrews (Nov. 23, 2010) [EXAM10434855].

twelve months' servicing compensation—consistent with the Original Servicing Agreement—and an exclusion for liability for indirect or incidental damages.[941] GMAC Mortgage presented a revised draft containing the terms to Ally Bank.[942] Ultimately, the draft revised servicing agreement[943] was approved by the ResCap Board on December 22, 2010.[944] Marano attended the ResCap Board meeting in his capacity as a director. During the telephonic meeting, he e-mailed Barbara Yastine, stating "it seems as if the [ResCap Board] has to accept what may be 'non-market' ie [sic] uncapped liability, which I will get them to do."[945] Despite Marano's assertion, a revised servicing agreement was not entered into until May 11, 2012 and the indemnification cap remained in place.[946]

### 10. 2011 Revisions To The Swaps/The Pipeline Letter Agreement

#### a. Continued FDIC Objections To The Swaps

FDIC Examiners continued to express concern about the MMLPSA and the Swaps, suggesting that the combination of agreements "could be viewed as one extensive 'cradle-to-grave' transaction for purposes of analysis under section 23A," and that the "'overall process' . . . might be found to be 'abusive' to the Bank."[947] They further advised GMAC Bank management that "the Bank's efforts to cure the Apparent Violation with respect to the 'total return swap' for mortgage servicing rights between the Bank and GMAC [Mortgage] were not considered successful."[948] The FDIC Examiners "had the impression that if not for the various transactions between the Bank and ResCap, including the HFS portfolio and MSR swap, ResCap would have failed."[949] They advised Ally Bank management that "due to the repeat apparent violations of 23A and 23B they were considering imposition of civil money penalties on the Bank Officers and Board members."[950] The FDIC recommended that the Bank retain outside counsel "to obtain legal opinions on all affiliate transactions with respect

---

[941] *See* Minutes of a Regular Meeting of the Board of Residential Capital, LLC, Dec. 7, 2010, at RC40018850–51 [RC40018729].

[942] Privileged and Confidential Discussion Document as of December 7, 2010: Subservicing Agreement by and between GMACM and Ally, dated Dec. 7, 2010 [EXAM20131693].

[943] Servicing Agreement, dated Dec. 31, 2010, ALLY_0018127 [ALLY_0018160] (executed by only GMAC Mortgage, not Ally Bank).

[944] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Dec. 22, 2010, at RC40018862 [RC40018729].

[945] E-mail from T. Marano (Dec. 22, 2010) [ALLY_0386265].

[946] *See* Section V.B.11.c.

[947] Minutes of a Special Joint Meeting of the Board of Directors and the Compliance Committee of Ally Bank, Nov. 11, 2010, at ALLY_PEO_0018507 [ALLY_PEO_0018332].

[948] *Id.*

[949] *Id.*

[950] *Id.*

to market terms[,] obtain legal opinions on corrective actions taken to cure the Apparent Violation, and obtain legal review of the Total Return Swap to ensure that the Bank was adequately protected from repurchase demands from the GSEs."[951]

In response, Ally Bank retained Arnold & Porter LLP to conduct a legal review of the transactions and, later, retained Sandler O'Neill to conduct an economic analysis.

As part of its engagement, Arnold & Porter LLP reviewed the MMLPSA, the MSR Swap and the Pipeline Swap, as well as the Bank's affiliate transaction policies with the goal of confirming that the policies, the agreements and the related transactions complied with sections 23A and 23B of the Federal Reserve Act, implemented by Regulation W.[952]

### b. April 2011 Swap Revisions

In connection with Arnold & Porter LLP's review,[953] the parties entered into new documentation of the Pipeline Swap and the MSR Swap dated as of April 1, 2011.[954] The parties entered into a single 2002 ISDA Master Agreement covering both Swaps,[955] along with a Schedule[956] and a Credit Support Annex,[957] each likewise applicable to both Swaps, and separate confirmations for the Pipeline Swap[958] and the MSR Swap.[959] In addition, AFI at the same time reaffirmed its October 5, 2010 Guarantee, extending the scope of the Guarantee to include the Pipeline Swap and the 2008 MMLPSA.[960] According to Arnold & Porter LLP, the revised documentation contained "market terms, including terms related to events of default, termination events, credit support, payments and collateral requirements, that are at least as

---

[951] *Id.* at ALLY_PEO_0018508.

[952] GMAC Mortgage, as a wholly owned subsidiary of AFI, qualified as an affiliate of Ally Bank for purposes of this statute, and Arnold & Porter LLP's review was focused on the transactions between the Bank and GMAC Mortgage. *See* Letter from Arnold & Porter LLP to Board of Directors of Ally Bank (May 24, 2011), at EXAM00000137 [EXAM00000137].

[953] Letter from Arnold & Porter LLP to Board of Directors of Ally Bank (May 24, 2011), at 4–5 [EXAM00000137].

[954] April 2011 Pipeline Swap Confirmation [ALLY_0041695]; April 2011 MSR Swap Confirmation [ALLY_0041799]

[955] ISDA 2002 Master Agreement, dated Apr. 1, 2011 [RC00027962].

[956] Amended and Restated Schedule to the 2002 ISDA Master Agreement, dated Apr. 1, 2011 [RC00027879].

[957] ISDA Credit Support Annex to the Schedule to the Master Agreement, dated Apr. 1, 2011 [RC00027990].

[958] April 2011 Pipeline Swap Confirmation [ALLY_0041695].

[959] April 2011 MSR Swap Confirmation [ALLY_0041799].

[960] Letter from J. Mackey to Ally Bank (Apr. 1, 2011) [RC00067937] (amending the agreements covered by the guarantee to included, inter alia, "the Confirmation of the Swap Relating to Loans in the Held For Sale Portfolio, dated April 1, 2011").

favorable to Ally Bank as those prevailing for comparable transactions with unaffiliated market participants,"[961] and was compliant with sections 23A and 23B of the Federal Reserve Act and Regulation W.[962]

The ResCap Board referred the revision of the Swaps to the Independent Directors for separate consideration and for the purpose of obtaining a fairness opinion.[963] Instead of a fairness opinion, the Independent Directors arranged to have Goldin Associates provide a summary of its "understanding of the changes" effected by the agreement revisions; Goldin Associates was to "render no opinion, oral or written, regarding the [MSR Swap and the Pipeline Swap arrangements], or any aspect thereof."[964] On June 14, 2011, the ResCap Board (including the Independent Directors) gave unanimous written consent to the transaction.[965]

### *(1) The Pipeline Swap Confirmation*

As discussed in Section V.B.5, when the Pipeline Swap was amended to cover HFS loans, the period covered for funded HFS loans was not revised to cover the period from funding to sale. The April 2011 Pipeline Swap Confirmation cured this problem by providing for valuations on each Business Day the loan remained on the Bank's books (a "Valuation Date"), and requiring payments in respect of the change in the loan's value from the preceding Valuation Date. [966]

However, the April 2011 Pipeline Swap Confirmation did not address the omission of loans Ally Bank "originates" from the scope of the Swap. Instead, the "Loan Portfolio" subject to the Swap continued to be limited to "Loans that [the Bank] has *purchased or committed to purchase* . . . for [the Bank's] Held for Sale portfolio."[967]

---

[961] Letter from Arnold & Porter LLP to Board of Directors of Ally Bank (May 24, 2011), at 16 [EXAM00000137].

[962] *Id.* at 16.

[963] Minutes of Special Meeting of Board of Directors of Residential Capital, LLC, Apr. 1, 2011, at RC40018446 [RC40018411] (referring the matter to a Special Committee of the Independent Directors).

[964] Goldin Associates Presentation to The Committee of Independent Members of the Board of Directors of Residential Capital, LLC Regarding Proposed Amendments to the ISDAs and Other Documentation Related to Swap Transactions Between GMAC Mortgage, LLC and Ally Bank, dated Apr. 19, 2011, at 5 [GOLDIN00130788].

[965] Action by Written Consent of the Board of Directors [of] Residential Capital, LLC, dated June 14, 2011, at RC40018529–627 [RC40018411].

[966] April 1, 2011 Pipeline Swap Confirmation, at 2–4 [ALLY_0041695] (definitions of Valuation Date, Funded Loan FMV Change, and Funded Loan FMV Change Amount). The Pipeline Swap previously had been settled on a monthly basis. July 2008 Pipeline Swap Schedule, part 6(a)(xii) [ALLY_0018237] ("Payment Date" is the fifth business day of each calendar month), (d) (requiring payments on the Payment Date).

[967] April 1, 2011 Pipeline Swap Confirmation, at 2 [ALLY_0041695] (emphasis added).

### *(2) The MSR Swap Confirmation*

The April 2011 MSR Swap Confirmation covered both the FMV Swap and the Net Funding Swap, which previously were documented on separate Schedules.[968] On the Net Funding Swap, the Confirmation left the Interest Rate applicable to the Funding Fee unchanged at LIBOR + 3.25%,[969] which Ally Bank continued to justify based on the analysis previously provided in a June 22, 2010 letter to the FDIC.[970] For the Net Servicing Fee, the language added in the 2010 Schedule regarding deductions for GSE repurchases[971] was retained in a slightly modified form.[972] For both the Funding Fee and the Net Servicing Fee, the Confirmation provided a mechanism for estimated payments on a daily basis, with a monthly "true-up."[973] There remained no provision for payment to Ally Bank at termination based on any calculation of run-off or the unamortized balance of amounts advanced to GMAC Mortgage upon capitalization of MSRs.

However, the most notable revisions in the April 2011 MSR Swap Confirmation are changes to both the FMV Swap and the Net Servicing Fee provisions that bear on the issue of the treatment of newly recognized MSRs.

Under the FMV Swap, "FMV Change" (the measurement of the payment due under the Swap) was redefined to mean:

> For any Valuation Date, the sum of (i) the amount of the change, if any, in the FMV Value from the immediately preceding Valuation Date, and (ii) the MSR Amount for such Valuation Date.[974]

---

[968] April 2011 MSR Swap Confirmation, §2 [ALLY_0041799] (definitions of Funded Loan FMV Change Payer, Funded Loan FMV Change Amount, Funded Loan FMV Change and Valuation Date).

[969] *Id*. § 2.

[970] *See* Memorandum, April 1, 2011 ISDA 2002 Master Agreement, Amended and Restated Schedule to the Master Agreement, Transaction Reference #1, Transaction Reference #2, and ISDA Credit Support Annex to the Schedule to Master Agreement, dated Oct. 27, 2011, ¶ 6 [ALLY_0018216].

Arnold & Porter LLP and Sandler O'Neill also defended the fee. *See* Letter from Arnold & Porter LLP to Board of Directors of Ally Bank (May 24, 2011), at 14–16 [EXAM00000137]; Sander O'Neill Report to the Board of Directors of Ally Bank Re: Analysis of Financial Terms of Certain Affiliate Agreements between Ally Bank and [GMAC Mortgage], dated Sept. 30, 2011, at 11, 14 [ALLY_0207866].

[971] *See* Section V.B.9.d(2) (quoting 2010 provision).

[972] April 2011 MSR Swap Confirmation, § 2 [ALLY_0041799] (definition of Actual Net Servicing Fee, clause (ii)).

[973] *Id*. § 2.

[974] *Id*. § 2 (definition of FMV Change).

"FMV Value" in turn, was defined as:

> For any Valuation Date, the most recent estimated valuation of the mortgage servicing rights then owned by [the Bank], inclusive of any MSR Amount. Such valuation shall be based upon, among other things, techniques consistent with [GMAC Mortgage's] internal financial and risk management processes for financial statement and regulatory filing purposes.[975]

Finally, "MSR Amount," a new concept introduced in the April 2011 MSR Swap Confirmation, was defined as:

> For any Valuation Date, as applicable, (i) the *net loss* recorded by [the Bank] in respect of the *sale of mortgage servicing rights* then on [the Bank's] general ledger, *taking into account any **gain** on new origination and capitalization of mortgage servicing rights,* or gain or loss on the disposition thereof or in respect of the prepayment of any related mortgage loans, or (ii) the *net gain* recorded by [the Bank] in respect of the *sale of mortgage servicing rights* then on [the Bank's] general ledger, taking into account *any gain on new origination and capitalization of mortgage servicing rights,* or gain or loss on the disposition thereof or in respect of the prepayment of any related mortgage loans.[976]

Notably, eliminated from these definitions is any reference to the "FAS 156 mark to market"; the FMV Change applies simply to changes in the value of the Bank's mortgage servicing rights, regardless of whether the change reflects a "FAS 156 mark to market." On the other hand, the "MSR Amount" provisions, which were introduced because Ally Bank had sold MSR assets and the parties wanted to address the application of the FMV Swap in that circumstance,[977] do introduce the concept of "gain" on MSR capitalization.

The Net Servicing Fee provisions were also revised. As revised, the key term in defining how servicing-fee payments to GMAC Mortgage will be calculated is "Actual Net Servicing Fee," which is defined as follows:

> For any Calculation Period, (x) the sum of the *amounts posted to all servicing and mortgage servicing rights related income statements accounts* in the general ledger of [the Bank] to

---

[975]  *Id*. § 2 [ALLY_0041799] (definition of FMV Value).

[976]  *Id*. § 2 [ALLY_0041799] (definition of MSR Amount) (emphasis added).

[977]  Int. of J. Young, Mar. 15, 2013, at 87:4–24.

> include (i) any associated servicing expenses paid or incurred, as is customary for normal servicing of residential mortgage loans and (ii) the losses, liabilities, costs and expenses (collectively, "Losses") incurred by [the Bank] as owner of mortgage servicing rights, including without limitation Losses related to any agency loan repurchase request, indemnification or make-whole agreement, to the extent such Losses remain unreimbursed by [GMAC Mortgage].[978]

Thus, the definition of Actual Net Servicing Fee revised the Net Servicing Fee language, which had referenced "amounts collected or earned by [the Bank] (*i.e.,* normal servicing fees and ancillary income)," abandoning the reference to "normal servicing fees and ancillary income."

Cortese and Young offered differing accounts of these changes. Cortese, as noted in Section V.B.9.b(4), believed that the payments of the capitalized value of Bank-originated loan MSRs were being exchanged under the FMV Swap. He explained that the April 2011 Confirmation FMV Change/MSR Amount reference to "any *gain* on new origination and capitalization of MSRs" was the result of the accountants telling the Capital Markets teams involved in drafting the revised swap that it should be "specific to the gain or loss rather than what changed in the balance sheet."[979] The accountants told the "authors how they were doing it" and the authors "put together language that coincided with how [the accountants] were doing it."[980]

Young, however, maintained that the revisions in the Actual Net Servicing Fee definition, focusing on "amounts posted to all servicing and mortgage servicing rights related income statements accounts," make clear that it is the vehicle for the exchange of the gain (income) on capitalization of Bank-owned MSRs.[981] Young correctly noted that the "gain" reference in the FMV Swap occurs only in connection with provisions governing the sale of MSRs;[982] he explained that the addition to the FMV Swap language applies only where the Bank has sold MSRs, requiring adjustment of the FMV Change based on the gain or loss realized in such sales.[983] Young asserted the language was added as "belt and suspenders" and the gain remained covered by the Actual Net Servicing Fee as well.[984] This explanation

---

[978] April 2011 MSR Swap Confirmation, § 2, at 7 [ALLY_0041799] (definition of Actual Net Servicing Fee) (emphasis added).

[979] Int. of J. Cortese, Mar. 7, 2013, at 37:24–38:13 (emphasis added).

[980] *See id.*

[981] Int. of J. Young, Mar. 15, 2013, at 93:2–94:18.

[982] *Id.* at 79:8–80:2.

[983] *Id.* at 87:4-87:24.

[984] *Id.* at 93:8–93:19.

suggests that the gain would be included in the calculations of *both* the FMV Change and the Actual Net Servicing Fee, though Young denied that there was any intent to double-count the gain in this fashion.[985]

Indeed, if the April 2011 Swap Confirmation's Actual Net Servicing Fee definition—"amounts posted to all servicing and mortgage servicing rights related income statements accounts"—is read as Young argues, then it poses an even larger "double counting" problem: If the definition extends beyond "normal servicing fees and ancillary income" to embrace any and all amounts posted to the Bank's servicing rights related income statement accounts, then it includes even the items Young agrees are captured by the FMV Change provisions, the mark-to-market adjustments for MSRs that already have been capitalized on the Bank's books. These adjustments to the value of previously recognized MSRs are themselves recorded in the Bank's mortgage servicing rights related income statement accounts, and would consequently trigger payment under both the Actual Net Servicing Fee definition (as Young reads it) and the FMV Change definition.[986]

Exhibit V.B.10.b(2) below summarizes the total additions to the value of Ally Bank's MSR asset attributable to correspondent loans and purchased MSRs, which were not paid to GMAC Mortgage under the MSR Swap:

EXHIBIT V.B.10.b(2)
**Additions to the Value of Ally Bank's MSR Asset Attributable to Correspondent Loan MSRs and Purchased MSRs**
*($ in Thousands)*

|  | Sep. 2007 - Dec. 2008[1] | Jan.2009 - Mar. 2011 | Apr. 2011 - Mar. 2012 | Total |
|---|---|---|---|---|
| New capitalizations - purchased MSRs | $ 421,860 | $ 256,239 | $ 28,986 | $ 707,085 |
| New capitalizations - originated and correspondent loan MSRs | 19,035 | 923,463 | 404,805 | 1,347,303 |
| Sub-total new capitalization | 440,895 | 1,179,702 | 433,790 | 2,054,387 |
| New capitalizations - excess servicing (originated and correspondent) | 271,602 | 325,647 | 62,153 | 659,402 |
| Gain paid to GMAC Mortgage on new capitalizations | (310,934) | (578,364) | (99,152) | (988,450) |
| Additions attributable to correspondent loan MSRs and purchased MSRs | $ 401,563 | $ 926,985 | $ 396,791 | $1,725,340 |

*[1] Period before the 2009 Bank Transaction; monthly data not available for January 2009.*
*Source: MSR Swap Review, dated May 2012 [ALLY_0368244]; MSR Rollforward YTD 2009, dated Dec. 31, 2009 [EXAM00232590]; MSR Rollforward YTD 2010, dated Dec. 31, 2010 [EXAM00232591]; MSR Rollforward YTD 2011, dated Dec. 31, 2011 [EXAM00232592].*

Of the $1.7 billion total additions, $402 million related to 2007 and 2008, before the 2009 Bank Transaction, while $397 million related to the period after the April 2011 MSR Swap Confirmation.

---

[985]  *Id.* at 93:20–94:23.

[986]  Accounting Policy 2451, Mortgage Servicing Rights, Sept. 1, 2011, at RC40000816 [RC40000802]; Mortgage Segment Legacy YTD Consolidating Trial Balance (Dec. 31, 2011) [EXAM00228758].

### (3) The Credit Support Annex

The Credit Support Annex addressed concerns about Ally Bank's credit exposure to GMAC Mortgage by requiring that collateral be posted. Though obligations under the Swap could result in payments being due by either party, the collateral requirements imposed granted greater security to Ally Bank. Specifically, for purposes of calculating the collateral amount required to be posted, the amount was to be calculated by projecting the amount that would be payable if the transaction were terminated at the time and by whom (the Bank or GMAC Mortgage), and then adjusting that amount in favor of the Bank based on an "independent amount" calculated using certain metrics in the underlying transaction (the MSR Swap FMV Amount, Pipeline Swap Funded Loan Amount and Pipeline FMV Change Amounts).[987] Further, Ally Bank had the power, in its "reasonable discretion," to change the "independent amount" in the event of a material change in the financial condition of GMAC Mortgage or AFI. [988] Ally Bank invoked this right in February 2012, obtaining $40 million in additional collateral posted by AFI.[989]

### c. Sandler O'Neill's Review

Later that year, the Bank Board also retained Sandler O'Neill to review the terms of the MMLPSA, the MSR Swap, the Pipeline Swap, and the Broker Agreement. In February 2012, Sandler O'Neill's retention was amended to include an analysis of the Bank's exposure to counterparty credit risk with respect these agreements. On February 28, 2012, Sandler O'Neill presented its report to the Bank Board.[990]

Starting with the swaps, like Arnold & Porter LLP, Sandler O'Neill reviewed the revised April 1, 2011 documentation for the MSR Swap and the Pipeline Swap. Based on that review, Sandler O'Neill observed that GMAC Mortgage through the swap protected the Bank against changes in market value, changes in interest rates, credit losses, prepayments and illiquidity of the MSRs as well as the underlying loan portfolio. GMAC Mortgage also absorbed servicing costs and losses incurred by the Bank in connection with its servicing activities. Sandler O'Neill noted that these protections were customized for the Bank, not typically seen in arm's-length transactions and, if available in the market, would only be available at considerable expense.[991]

---

[987] Credit Support Annex, dated Apr. 1, 2011, ¶ 13(b)(iv)(A) [RC00027990]; April 2011 Pipeline Swap Confirmation, §5 [ALLY_0041695]; April 2011 MSR Swap Confirmation, §5 [ALLY_0041799].

[988] Credit Support Annex, dated Apr. 1, 2011, ¶ 13(b)(iv)(A) [RC00027990]; April 2011 Pipeline Swap Confirmation, §5 [ALLY_0041695]; April 2011 MSR Swap Confirmation, §5 [ALLY_0041799].

[989] E-mail from J. Young to T. Marano, S. Abreu, J. Whitlinger, and T. Hamzehpour (Feb. 20, 2012) [EXAM00076116].

[990] Sandler O'Neill Report to the Board of Directors of Ally Bank Re: Analysis of Financial Terms of Certain Affiliate Agreements between Ally Bank and GMAC Mortgage LLC, dated Feb. 28, 2012 [ALLY_PEO_0084709].

[991] *Id.* at 19.

As to the Bank's counterparty risk to GMAC Mortgage, Sandler O'Neill stated that the Bank's risk was significantly mitigated by several features of the April 1, 2011 documentation, including: (1) the Bank's ability to select the assets covered by the swap; (2) the daily mark to market of swap exposures as well as the daily settlement requirement; (3) the Bank's ability to terminate the swaps, without cause, on 30 days' notice; and (4) the Bank's ability to require additional collateral as the result of a credit deterioration of GMAC Mortgage or AFI.[992]

In evaluating the terms of the MSR Swap and the Pipeline Swap, Sandler O'Neill compared their provisions to those found in the Citibank MSR Loan Agreement, under which Citibank received a financing fee of LIBOR + 6% and maintained a security interest in the servicing rights.[993] Sandler O'Neill opined that, while the fee paid to the Bank under the MSR Swap was lower, Ally Bank's ownership of the MSRs under the MSR Swap protected the Bank "against any declines in market value, changes in interest rates, credit losses, prepayments and illiquidity with respect to the MSR assets."[994] Sandler O'Neill concluded that, had the MSR Swap been structured more like the Citibank MSR Loan Agreement, the Bank would be able to obtain these protections only through a series of hedges "at considerable cost" to the Bank.[995] After highlighting several advantages to the Bank under the MSR Swap compared to the Citibank MSR Loan Agreement, Sandler O'Neill noted that it considered other transactions with similar residential mortgage risk, but "[c]omparable transactions are not readily available due to the unique terms of the MMLPSA and related swaps."[996]

### d. The December 2011 Pipeline Letter Agreement

The MMLPSA had always required GMAC Mortgage to pay the purchase price for loans upon closing.[997] In 2011, a review determined that there sometimes was a delay of more than a day between the time loans were transferred to GMAC Mortgage and receipt of payment by Ally Bank.[998] ResCap personnel explained that this was not a recent development, or a reflection of ResCap's financial difficulties, but a product of normal delays in the

---

[992] *Id.* at 31.

[993] *Id.* at 33.

[994] *Id.* at 34.

[995] *Id.*

[996] *Id.* at 45.

[997] *See* 2001 MMLPSA, § 2.4(c) [ALLY_0018253]; 2006 MMLPSA, § 2.4(c) [ALLY_0018291]; 2007 MMLPSA, § 2.4(c) [ALLY_0018275]; 2008 MMLPSA, § 2.1 [ALLY_0201210].

[998] Letter from Arnold & Porter LLP to Board of Directors of Ally Bank (May 24, 2011), at 2 [EXAM00000137].

securitization process and receipt by ResCap of payment for the loans.[999] Nevertheless, such a delay was considered to constitute an extension of credit by the Bank to GMAC Mortgage; bank regulatory requirements required cash collateral for such obligations.[1000]

To address this issue, AFI, GMAC Mortgage Group, LLC, ResCap and GMAC Mortgage entered into a December 5, 2011, letter agreement (the Pipeline Letter Agreement).[1001] ResCap itself lacked the cash to provide the requisite collateral.[1002] GMAC Mortgage Group LLC (ResCap's immediate parent) had begun posting cash to collateralize GMAC Mortgage's obligations, using funds borrowed from AFI.[1003] In the Pipeline Letter Agreement, GMAC Mortgage Group and AFI agreed to continue to post up to $4 billion in cash collateral to satisfy bank regulatory requirements, and to "use commercially reasonable efforts to cause Ally Bank to continue to sell mortgage loans" under the MMLPSA for "not less than thirty (30) days."[1004] ResCap and GMAC Mortgage agreed, *inter alia*, that GMAC Mortgage (1) would take steps to expedite the pooling of loans into Mortgage-Backed Securities (MBSs), such as delivering loan schedules and other information necessary to facilitate pooling to the pertinent GSE contemporaneously with transfer of the loans under the MMLPSA; (2) arrange for the GSEs to wire MBSs directly to an agreed-upon account; and (3) grant Ally Bank and GMAC Mortgage Group, LLC a security interest in the loans and any proceeds.[1005]

---

[999] Int. of C. Dondzila, Sept. 27, 2012, at 257:5–262:15.

[1000] Letter from Arnold & Porter LLP to Board of Directors of Ally Bank (May 24, 2011), at 2 [EXAM00000137].

[1001] Pipeline Letter Agreement [ALLYKE000000579]. While the Pipeline Letter Agreement recites that it has been the subject of extensive negotiations involving Ally Bank, and that it memorializes the basis on which the Ally Bank is prepared to continue loan sales under the MMLPSA, *id.* at 1, Ally Bank is not a party to the Pipeline Letter Agreement.

[1002] *See* Section III.J (discussing ResCap's financial posture at this juncture).

[1003] Letter from Arnold & Porter LLP to Board of Directors of Ally Bank (May 24, 2011), at 2 [EXAM00000137]; Pipeline Letter Agreement, ¶ A [ALLYKE000000579].

[1004] Pipeline Letter Agreement, ¶ A(3), 4 ¶ B [ALLYKE000000579].

[1005] *Id.* at ¶¶ A(1), (2), (4), (5).

Following consideration by a Special Committee of the Independent Directors, the Pipeline Letter Agreement was approved at the December 5, 2011 meeting of the ResCap Board,[1006] subject to receipt of a fairness opinion from Goldin Associates[1007] and an opinion of counsel from Morrison & Foerster required to be delivered to AFI and GMAC Mortgage Group.[1008]

### 11. 2012 Terminations/Revisions

Just before ResCap filed its bankruptcy petition, the parties entered into an agreement terminating the MSR Swap and the Pipeline Swap, and entered into an Amended and Restated MMLPSA. These matters were apparently discussed with the ResCap Board in an April 30, 2012 ResCap Board meeting, but in-house counsel (with the concurrence of separate counsel for the Independent Directors) advised that no fairness opinion was required, at least for the terminations, and it does not appear that the agreements were voted on or otherwise approved by the Independent Directors or the ResCap Board.[1009]

#### a. The Termination Agreement

GMAC Mortgage and Ally Bank entered into a Termination Agreement dated April 30, 2012, terminating both the Pipeline Swap and the MSR Swap.[1010] The Termination Agreement provided that amounts due for prior periods and for the period ending on the April 30, 2012 termination date would not be discharged by termination,[1011] and agreed to the return of all posted collateral.[1012] The parties further agreed to negotiate a "termination payment" within seven days.[1013] The parties thereafter agreed that the Bank owed GMAC Mortgage a termination payment of $51.048 million, comprising true-up payments under the MSR Swap

---

[1006] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Dec. 5, 2011, at RC40018718–19, RC40018722–23 [RC40018411]; *see also* Minutes of a Special Meeting of the Board of Residential Capital, LLC, Dec. 2, 2011, at RC40018716–17 [RC40018411].

[1007] Opinion Letter from Goldin Associates to the Board of Directors of Residential Capital, LLC (Dec. 5, 2011) [GOLDIN00000683].

[1008] Letter from Morrison & Foerster, LLP to AFI, GMAC Mortgage Group, and Ally Bank (Dec. 5, 2011) [ALLYKE000000589]. The letter opines as to the good standing of ResCap and GMAC Mortgage, the due authorization of the Pipeline Letter Agreement, the lack of any need for additional authorizations or consents, and similar matters.

[1009] Draft Minutes of a Special Meeting of the Board of Residential Capital, LLC, Apr. 30, 2012, at 2–3 [EXAM11088895].

[1010] Termination Agreement, dated Apr. 30, 2012, Preamble, ¶ 2 [ALLY_0224353].

[1011] *Id.* ¶ 2(a).

[1012] *Id.* ¶ 2(b).

[1013] *Id.* ¶ 2(c).

and the Pipeline Swap through the date of termination totaling $18.2 million and the return of $32.8 million in collateral previously posted by GMAC Mortgage.[1014] Ally Bank paid this amount to GMAC Mortgage on May 4, 2012.[1015]

### b. The May 2012 Amended And Restated MMLPSA

Shortly before ResCap's bankruptcy filing, GMAC Mortgage and Ally Bank entered into an "Amended and Restated" MMLPSA dated May 1, 2012 (the "2012 MMLPSA").[1016] The MMLPSA amendments were presented to the ResCap Board at an April 30, 2012 meeting.[1017] In the months preceding the bankruptcy filing, Ally Bank obtained the necessary approvals and made the other arrangements necessary to become a direct seller of loans to Fannie Mae and Freddie Mac.[1018] Accordingly, the 2012 MMLPSA provides for the purchase and sale of loans eligible for securitization by Ginnie Mae, and not of Fannie Mae or Freddie Mac loans.[1019]

Under the 2012 MMLPSA, the Purchase Price for Mortgage Loans is:

> the Adjusted Carrying value of such Mortgage Loan as of the date such Mortgage Loan is funded, *plus* interest accrued on such Mortgage Loan from the date of funding through Closing Date, broker fees and Underwriting Fees and *minus* prepaid interest on such Mortgage Loan payable to Purchaser.[1020]

Adjusted Carrying Value is defined to mean

> with respect to any Mortgage Loan and any date of determination, the adjusted carrying value of such Mortgage Loan on Seller's books on such date calculated by Seller to be the unpaid principal balance of such Mortgage Loan on such date, *plus* any premium at origination and any servicing released premium, *minus* any discount at origination, and without consideration of any fair value adjustment, to the extent the

---

[1014] Affiliate Swap Termination Payment, dated May 4, 2012 [EXAM00233016].

[1015] Account Statement Detail Archive, dated Apr. 15, 2013 [EXAM00345836].

[1016] 2012 MMLPSA [RC00027892].

[1017] Draft Minutes of a Special Meeting of the Board of Residential Capital, LLC, Apr. 30, 2012, at 2–3 [EXAM11088895]. The Examiner has found no evidence that the matter was approved by the ResCap Board.

[1018] Detailed Analysis of Ally Bank's Affiliate Agreements, dated June 12, 2012, at 9 [SOP0000380].

[1019] 2012 MMLPSA, § 2.1 [RC00027892]. In addition, the MMLPSA provides for the sale of loans produced by USAA Federal Savings Bank, a Texas-based bank affiliated with United Services Automobile Association. *Id.* § 2.1.

[1020] *Id.* § 1.31.

> Mortgage Loan is subject to a fair value election, or LOCOM
> [lower of cost or market] adjustment to the extent the Mortgage
> Loan is not subject to a fair value election.[1021]

Thus, with the termination of the Pipeline Swap, the 2012 MMLPSA reverted to cost-based pricing, specifically excluding fair-value and LOCOM adjustments from calculation of the purchase price.

Under the 2012 MMLPSA, Ally Bank makes a loan-level representation and warranty that:

> each Mortgage Loan sold to Purchaser pursuant to this
> Agreement is eligible and insurable by the FHA, the VA or the
> USDA, and will remain eligible and insurable by the FHA, the
> USDA or the VA for purposes of Ginnie Mae pool certification
> until the issuance of a valid and binding mortgage insurance
> certificate or guaranty.[1022]

Ally Bank further agreed to repurchase any ineligible or uninsurable loan (subject to a right to promptly cure any curable issue).[1023]

Finally, the 2012 MMLPSA may be terminated by either party without cause on 30 days' notice.

### c. 2012 Amendment And Restatement Of Servicing Agreement

Ally Bank provided notice to GMAC Mortgage that it would not renew the Original Servicing Agreement on April 19, 2012. As a result, the Original Servicing Agreement would have expired pursuant to its terms on August 21, 2012.[1024] However, pursuant to negotiations described in Section V.B.9, the Original Servicing Agreement was replaced with the A&R Servicing Agreement dated May 11, 2012 as discussed at Section V.C.

### 12. Analysis Of The Financial Results Under The Derivative Agreements

The Examiner's Financial Advisors have analyzed the economic impact of the Pipeline Swap and the MSR Swap, as described in further detail below. First, on the Pipeline Swap, Ally Bank paid GMAC Mortgage a net total of $120.4 million during the period that the

---

[1021] *Id.* § 1.1.

[1022] *Id.* § 2.5(b).

[1023] *Id.* § 2.5(c).

[1024] *See* July 26, 2012, Hearing Transcript [Docket No. 942] at 20–21. The expiration date was extended at the request of the Bankruptcy Court to August 24, 2012.

V-190

Pipeline Swap was settled in cash from October 2008 through termination in April 2012.[1025] However, these payments are not reflective of the economics of the Pipeline Swap because the daily Pipeline Swap entries were simply reversed upon sale of the related loan to GMAC Mortgage, resulting in repayment under the Pipeline Swap of any amounts that had been previously paid by either party with respect to that loan. The best evidence of the actual impact of the Pipeline Swap is GMAC Mortgage's financial statements, which evidence net losses of $32.7 million on the Pipeline Swap from its inception in 2004 through 2011.[1026]

Second, as to the MSR Swap, Ally Bank paid GMAC Mortgage a net total of $699.7 million over the duration of the MSR Swap from September 2007 through termination in April 2012.[1027] GMAC Mortgage reported income related to the MSR Swap of approximately this same amount in its financial statements from 2007 through 2011.[1028]

GMAC Mortgage also hedged its pipeline and MSR risk, including risk associated with both loans and MSRs held by the Bank and those held by GMAC Mortgage itself. The Debtors' accounting and financial records do not allow the reliable allocation of the hedge results between those assets covered by the Pipeline Swap and the MSR Swap and those not subject to the Swaps. However, the overall hedge results and other analyses produced by the Debtors indicate that GMAC Mortgage did not incur hedging losses that would materially affect the overall economic impact of the swaps, and likely earned gains on these hedges.[1029]

Accordingly, the Examiner concludes that the evidence supports the proposition that GMAC Mortgage received a net benefit on the Pipeline Swap, the MSR Swap and the market hedges relating thereto when assessing the entirety of the economics as implemented by the parties.

---

[1025] ResCap—Pipeline Swap Template [EXAM00231094].

[1026] GMAC Mortgage, LLC Consolidated Financial Statements, as of and for the years ended December 31, 2005 and 2004, at 52 [EXAM00231553]; GMAC Mortgage, LLC Consolidated Financial Statements, as of and for the years ended December 31, 2007 and 2006, at 51 [EXAM00232043]; GMAC Mortgage, LLC Consolidated Financial Statements, as of and for the years ended December 31, 2009 and 2008, at 88 [EXAM00234189]; GMAC Mortgage, LLC Consolidated Financial Statements, as of and for the Years Ended December 31, 2011 and 2010, at 66 [EXAM00234281].

[1027] ResCap—MSR Cash Summary [EXAM00231039].

[1028] GMAC Mortgage, LLC Consolidated Financial Statements, as of and for the years ended December 31, 2008 and 2007, at 72 [EXAM00234112]; GMAC Mortgage, LLC Consolidated Financial Statements, as of and for the years ended December 31, 2010 and 2009, at 61 [EXAM00234350]; GMAC Mortgage, LLC Consolidated Financial Statements, as of and for the years ended December 31, 2011 and 2010, at 66 [EXAM00234281].

[1029] Meeting with J. Whitlinger in Ft. Washington, P.A. (Mar. 29, 2013).

*a.  The Pipeline Swap*

*(1) Financial Results Under The Pipeline Swap*

Ally Bank and GMAC Mortgage records reflecting the financial results of the Pipeline Swap show that the net result over the life of the Pipeline Swap was generally neutral from a financial standpoint, before consideration of related hedges. As mentioned above, the Pipeline Swap applied only to the Bank's HFI portfolio before July 1, 2008. ResCap produced financial records related to the Pipeline Swap from its inception in October 2004 through termination in April 2012, with certain exceptions. The Pipeline Swap was settled through intercompany accounts, rather than through the exchange of cash, before October 2008.[1030] The Debtors' internal records initially extend from October 2004 to March 2006, and then resume from May 2007 to March 2008, with the intervening time period corresponding to the gap in the periods covered by the written agreements that have been produced.[1031] These financial records showed activity under the HFI Pipeline Swap peaking in March through May 2005 and declining significantly hereafter, with a net benefit to GMAC Mortgage from the Pipeline Swap of approximately $2.4 million,[1032] as shown in Exhibit V.B.12.a(1)—1 below.

---

[1030] Accrual v. Cash Settlement [EXAM00339946].

[1031] *See* Section V.B.4 (discussing gap in documentation of Pipeline Swap).

[1032] Bank HFI Swap Analysis [EXAM00344897]; Bank Flow HFI Portfolio (May 2007–Mar. 2008) [EXAM00344891; EXAM00344892; EXAM00344893; EXAM00344894; EXAM00344895; EXAM00344896; EXAM00344897; EXAM00344898; EXAM00344899; EXAM00344900; EXAM00344901; EXAM00344902].

EXHIBIT V.B.12.a(1)—1

**Pipeline Swap (HFI) – Total Amount Swapped to GMAC Mortgage and Settled on an Intercompany Basis**
October 2004 – March 2006, May 2007 – March 2008

| Date | Loan Count | Loan UPB | Pipeline (HFI) Swap Total |
|------|-----------:|---------:|--------------------------:|
| October-04 | 169 | $ 56,738,541 | $ 449,347 |
| November-04 | 347 | 120,083,931 | 110,229 |
| December-04 | 430 | 157,715,377 | 318,588 |
| January-05 | 404 | 153,509,632 | 567,352 |
| February-05 | 452 | 160,416,552 | 485,984 |
| March-05 | 1,162 | 403,533,551 | (2,300,621) |
| April-05 | 1,069 | 347,575,939 | 618,671 |
| May-05 | 923 | 300,971,305 | 1,317,929 |
| June-05 | 623 | 178,070,670 | 662,065 |
| July-05 | 459 | 119,907,448 | (62,552) |
| August-05 | 544 | 140,812,565 | 45,635 |
| September-05 | 533 | 137,051,983 | 587,292 |
| October-05 | 89 | 32,670,082 | (95,949) |
| November-05 | 85 | 31,318,506 | (14,642) |
| December-05 | 52 | 18,449,152 | 66,608 |
| January-06 | 19 | 6,252,116 | 29,706 |
| February-06 | 15 | 4,756,337 | (8,881) |
| March-06 | 8 | 1,457,616 | 6,717 |
| Subtotal - October '04 - March '06 [1] | 410 | 131,738,406 | 2,783,478 |
| Subtotal - May '07 - March '08 [1] | 17 | 9,628,856 | (400,763) |
| Total | | | $ 2,382,715 |

[1] *The loan count and loan UPB reflected represent the monthly average for the period.*

*Source: Bank HFI Swap [EXAM00344897]; Bank Flow HFI Portfolio (May 2007-Mar. 2008) [EXAM00344891; EXAM00344892; EXAM00344893; EXAM00344894; EXAM00344895; EXAM00344896; EXAM00344898; EXAM00344899; EXAM00344900; EXAM00344901; EXAM00344902].*

The Examiner's Financial Advisors undertook certain efforts to validate the amounts provided by the Debtors. First, reference to GMAC Mortgage's financial statements indicated gains of $3.7 million related to the Pipeline Swap for 2004 through 2006,[1033] as compared to $2.8 million reflected in Exhibit V.B.a(1)—1 above. Intercompany accounting and period-end true-ups may account for this 32% discrepancy, but it appears no such documentation is available.[1034]

More generally, ResCap provided accounting data for August and September 2008 to demonstrate the method utilized for settlement of the Pipeline Swap through intercompany accounts.[1035] GMAC Mortgage recorded the total mark-to-market amount for pipeline and inventory loans as an accrual at month-end. GMAC Mortgage made another entry that same day to reclassify the portion of the mark-to-market adjustment related to the Bank through an intercompany entry, which reflected the settlement of the Pipeline Swap. For example, the total mark-to-market adjustment in August 2008 for pipeline and inventory loans before hedge results was $57.3 million, inclusive of $40.8 million attributable to Bank loans subject to the Pipeline Swap. Therefore, GMAC Mortgage recorded an intercompany receivable from the Bank for $40.8 million to reflect amounts due related to the increase in the value of the Bank's loans to reflect settlement of the Pipeline Swap through intercompany accounts.[1036] The Pipeline Swap was settled in cash from October 2008 through termination in April 2012.[1037] ResCap's records reflecting cash payments related to the Pipeline Swap for this period showed a net benefit to GMAC Mortgage from the Pipeline Swap of approximately $120.4 million,[1038] as shown in Exhibit V.B.12.a(1)—2 below.[1039]

---

[1033] GMAC Mortgage, LLC Consolidated Financial Statements, as of and for the years ended December 31, 2005 and 2004, at 52 [EXAM00231553]; GMAC Mortgage, LLC Consolidated Financial Statements, as of and for the years ended December 31, 2007 and 2006, at 51 [EXAM00232043].

[1034] According to Whitlinger, Debtors are unable to provide the information necessary to reconcile the amounts included in Exhibit V.B.12.a(1)—1 above to the general ledger. Meeting with J. Whitlinger in Ft. Washington, P.A. (Mar. 29, 2013).

[1035] Accrual v. Cash Settlement [EXAM00339946].

[1036] *Id.*

[1037] ResCap—Pipeline Swap Template [EXAM00231094].

[1038] *Id.*

[1039] Ally Bank also provided records reflecting approximately $106.6 million in cumulative net cash payments related to the Pipeline Swap made by the Bank to GMAC Mortgage for the period October 2008 to April 2012 but could not provide sufficient information to permit reconciliation with the ResCap data. Mortgage Division, Affiliate Transaction Summary [ALLY_0171134].



EXHIBIT V.B.12.a(1)—2
**Pipeline Swap Annual Payments (Net)**
October 2008 – April 2012
*($ in Millions)*

*Source: ResCap - Pipeline Swap Template [EXAM00231094].*

The cash payments are not truly reflective of the economics of the Pipeline Swap, however, because, as discussed in Section V.B.5.c, the parties' post-July 1, 2008 accounting for the MMLPSA and for the Pipeline Swap did not correspond to the terms of the agreements (though in combination they reached the same economic effect). While changes in loan value were tracked under the Pipeline Swap, upon the sale of the loan to GMAC Mortgage the daily Pipeline Swap entries were simply reversed, resulting in repayment under the Pipeline Swap of any amounts that had been previously paid by either party with respect to that loan.[1040] The loan was then purchased at the Bank's "cost basis" as historically defined, effectively shifting the impact of any subsequent changes in market value to GMAC Mortgage. The records provided by the Debtors were insufficient to isolate the "fair value exchange at sale" entry reversing the daily Pipeline Swap entries that would reflect the economics from lock to sale.[1041]

---

[1040] Loan Summary [EXAM00229653]; Loan Summary [EXAM00233017]; Examiner Loan Selections 03 11 13 [EXAM00339939]; Examiner Loan Selections 04 15 13 [EXAM00345279].

[1041] ResCap provided detailed information on 867,084 loans that were subject to the Pipeline Swap for the period from 2009 through 2012. Journal Entry Level Detail of Transactions [EXAM00338648; EXAM00338649; EXAM00338650; EXAM00338651; EXAM00338652; EXAM00338653; EXAM00338654; EXAM00338655; EXAM00338656; EXAM00338657; EXAM00338658; EXAM00338659; EXAM00338660; EXAM00338661; EXAM00338662]. Upon review and analysis, the information lacked certain components and key inputs, such as lock pull-through rate amounts, rendering the data inconclusive.

Consequently, the most reliable information regarding the overall economic impact of the Pipeline Swap appears to be the related party footnotes to GMAC Mortgage's financial statements. This information reflects losses of $32.7 million on the Pipeline Swap from its inception in 2004 through 2011, including losses of $1.5 million during the period from 2009 through 2011 when ResCap no longer owned an interest in IB Finance.[1042] This amount was reported as part of the *Gain on Sale of Mortgage Loans, Net* line item in the income statement of GMAC Mortgage.[1043] Exhibit V.B.12.a(1)—3 indicates that the annual gain or loss recognized by GMAC Mortgage on the Pipeline Swap averaged 7.6% and ranged from -23.5% to 116.3% of the amounts reflected on the GMAC Mortgage income statement for this line item. The Exhibit also demonstrates the shift of gain/loss related to HFS loans from the Correspondent Agreement in earlier periods to the Pipeline Swap in later periods.

EXHIBIT V.B.12.a(1)—3
**GMAC Mortgage Selected Financial Information – Overall Economic Impact of the Pipeline Swap**
Years Ended 2004 – 2011
*($ in Millions)*

| | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | Total | Average |
|---|---|---|---|---|---|---|---|---|---|---|
| Correspondent Agreement - Gain (loss) [1] | $ 29.6 | $ 54.5 | $ 94.1 | $ 50.8 | $ 3.1 | $ - | $ - | $ - | $ 232.0 | |
| Pipeline Swap - Gain (loss) [2] | $ 1.5 | $ 2.2 | $ 0.0 | $ 2.5 | $ (37.4) | $ (121.3) | $ (70.1) | $ 189.9 | $ (32.7) | |
| GMAC Mortgage, LLC - "Gain on mortgage loans, net" | $438.1 | $ 313.7 | $ 246.5 | $ 38.6 | $ 231.4 | $ 517.3 | $ 298.7 | $ 163.3 | $ 2,247.7 | |
| Pipeline Swap as a % of GMAC Mortgage, LLC - "Gain on mortgage loans, net" | 0.3% | 0.7% | 0.0% | 6.4% | -16.2% | -23.4% | -23.5% | 116.3% | -1.5% | 7.6% |

[1] *Related to the gain (loss) recognized upon the sale of mortgage loans sold to the Bank under the Correspondent Agreement between GMAC Mortgage and the Bank.*
[2] *Financial results from the Pipeline Swap are reported as a component of "Gain on mortgage loans, net." The financial statement impact of the Pipeline Swap is disclosed in the related party transaction footnotes contained in GMAC Mortgage's audited financial statements.*
*Source: GMAC Mortgage Corporation Consolidated Financial Statements as of and for the years ended December. 31, 2005 and 2004 (Restated), at 2, 52 [EXAM00232043]; GMAC Mortgage, LLC Consolidated Financial Statements, as of and for the years ended December 31, 2009 and 2008, at 5, 88 [EXAM00234189]; GMAC Mortgage, LLC Consolidated Financial Statements, as of and for the years ended December 31, 2011 and 2010, at 5, 66 [EXAM00234281].*

---

[1042] GMAC Mortgage, LLC Consolidated Financial Statements, as of and for the years ended December 31, 2005 and 2004, at 52 [EXAM00231553]; GMAC Mortgage, LLC Consolidated Financial Statements, as of and for the years ended December 31, 2007 and 2006, at 51 [EXAM00232043]; GMAC Mortgage, LLC Consolidated Financial Statements, as of and for the years ended December 31, 2009 and 2008, at 88 [EXAM00234189]; GMAC Mortgage, LLC Consolidated Financial Statements, as of and for the Years Ended December 31, 2011 and 2010, at 66 [EXAM00234281].

[1043] GMAC Mortgage, LLC Consolidated Financial Statements, as of and for the years ended December 31, 2009 and 2008, at 88 [EXAM00234189].

The *Gain on Mortgage Loans, Net* line item reflects mortgage loan purchase and sale activity between GMAC Mortgage and the Bank of $517 million in 2009, $299 million in 2010, and $163 million in 2011.[1044] The majority of this gain resulted from GMAC Mortgage's purchase of loans from the Bank and sale of those loans to third-party investors pursuant to the terms of the Pipeline Swap in conjunction with the MMLPSA.[1045] GMAC Mortgage activity that was independent of the Bank had accounted for a majority of the gain on sale of mortgage loans before implementation of the Broker to Bank initiative in 2009, as shown in Exhibit V.B.12.a(1)—4 below:

EXHIBIT V.B.12.a(1)—4
**Loans Sold by GMAC Mortgage to the Bank as a Percentage of Loans Purchased Under the MMLPSA (Includes Old GMAC Bank and Ally Bank)**
Years Ended 2004 – 2008
*($ in Millions)*



*Source: GMAC Mortgage Corporation Consolidated Financial Statements As of and for the years ended December 31, 2005 and 2004 (Restated), at 51 [EXAM00231553]; GMAC Mortgage, LLC Consolidated Financial Statements, as of and for the years ended December 31, 2007 and 2006, at 51 [EXAM00232043]; GMAC Mortgage, LLC Consolidated Financial Statements, as of and for the years ended December 31, 2009 and 2008, at 86 [EXAM00234189].*

---

[1044] GMAC Mortgage, LLC Consolidated Financial Statements, as of and for the years ended December 31, 2009 and 2008, at 5 [EXAM00234189]; GMAC Mortgage, LLC Consolidated Financial Statements, as of and for the Years Ended December 31, 2011 and 2010, at 5 [EXAM00234281].

[1045] GMAC Mortgage, LLC, Notes to Consolidated Financial Statements for the years ended December 31, 2010 and 2009, at EXAM00234358 [EXAM00234350].

## *(2) Financial Results Of GMAC Mortgage's Market Pipeline Risk Hedging*

GMAC Mortgage also hedged its pipeline risk in the market, including the risk absorbed through the Pipeline Swap.[1046] GMAC Mortgage hedged at the portfolio level, which included all of GMAC Mortgage's pipeline risk, and did not allocate hedges to specific Bank loans covered under the Pipeline Swap. The results of GMAC Mortgage's hedging activity, the purpose of which was to neutralize market risk, are an important consideration in assessing the economics of the Pipeline Swap.

GMAC Mortgage reported the results of its pipeline and inventory trading activity, including hedging, through the Trading P&L, which ties to GMAC Mortgage's general ledger.[1047] As illustrated in Exhibit V.B.12.a(2) below, the total trading P&L impact for January 2006 through April 2012 was a $1.5 billion gain,[1048] after adjustment.

EXHIBIT V.B.12.a(2)

**Cumulative Pipeline Trading Profit and Loss Change According to GMAC Mortgage Pipeline Hedged Reports**
January 2006 – April 2012
*($ in Millions)*

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | YTD April | Total |
|---|---|---|---|---|---|---|---|---|
| Total pipeline trading P&L change | $ (5) | $ (59) | $ (34) | $ 628 | $ 600 | $ 399 | $ 159 | $ 1,688 |
| - Net interest income [1] | - | - | - | - | (106) | (89) | (16) | (210) |
| - Interest carry [1] | - | - | - | - | (3) | 3 | 7 | 7 |
| Total pipeline trading P&L change after adjustment for interest [2] | $ (5) | $ (59) | $ (34) | $ 628 | $ 491 | $ 314 | $ 150 | $ 1,485 |

*[1] According to Debtor's management, net interest income and interest carry were removed from the total profit and loss change because they are unrelated to analyzing hedge results.*

*[2] According to Debtor's management, total profit and loss change contains certain manual adjustments, including HFS to HFI transfer adjustments which cannot be hedged. Therefore, Pipeline Hedged Reports do not fully reflect true hedge performance, and should be adjusted further. Debtors' management nonetheless advises that the adjustments would not significantly alter overall results, and this appears to the Examiner's Professionals to be reasonable.*

*Source: Pipeline Hedged Reports [EXAM00338641]; [EXAM00338642]; [EXAM00338643]; [EXAM00338644]; [EXAM00338645]; [EXAM00338646]; [EXAM00338647]; Meeting with J. Whitlinger in Ft. Washington, PA (Mar. 29, 2013).*

---

[1046] Int. of A. Celini, Feb. 18, 2013, at 116:18–21.

[1047] The Trading P&L was a component of the Pipeline Hedged Report, a daily summary of pipeline and inventory trading results and related financial information. Pipeline Hedged Report Detail, dated Apr. 24, 2012 [EXAM00000916].

[1048] 2006 Monthly Sum of Sum [EXAM00338641]; 2007 Monthly Sum of Sum [EXAM00338642]; 2008 Monthly Sum of Sum [EXAM00338643]; 2009 Monthly Sum of Sum [EXAM00338644]; 2010 Monthly Sum of Sum [EXAM00338645]; 2011 Monthly Sum of Sum [EXAM00338646]; 2012 Monthly Sum of Sum [EXAM00338647].

The Debtors' accounting and financial records do not allow the reliable allocation of the hedge results to loans subject to the Pipeline Swap. The overall hedging gains are likely indicative of hedging gains related to the Pipeline Swap, according to the Debtors' management.[1049] Based on the available evidence, it appears that GMAC Mortgage did not incur hedging losses that would materially affect the overall economic impact of the Pipeline Swap, and likely earned offsetting gains on these hedges.[1050]

### b. The MSR Swap

#### (1) Financial Results Under The MSR Swap

Ally Bank and GMAC Mortgage records reflecting the financial results of the MSR Swap show that the net result over the life of the MSR Swap was substantially in GMAC Mortgage's favor, before consideration of related hedges.[1051] As described above, GMAC Mortgage and Ally Bank entered into a number of revisions and amendments to the MSR Swap and the related documentation between its inception in August 2007 and its termination in April 2012. While certain terminology changed over time, the substance of the components comprising the calculation of payments between the parties generally did not change and included the following:

> (1) The gain or loss on servicing rights—GMAC Mortgage received payments from Ally Bank for the gain related to the creation of MSRs and other servicing related assets. The Bank recognized this gain, which was recorded on the income statement as a component of the line item *Gain on Sale of Mortgage Loans to Affiliate,* when it capitalized the assets at the time of sale of the underlying loans to GMAC Mortgage. As discussed above, loans sold by Ally Bank created two separate types of gains that were transferred to GMAC Mortgage—gain on originated MSRs (referred to as "OMSRs") and gain on excess servicing rights. While Bank-originated loans resulted in gains from both MSRs and excess servicing rights, correspondent loans resulted in gains only from excess servicing rights because the purchase price the Bank paid to the correspondent included an SRP corresponding to the MSR value.

---

[1049] Meeting with J. Whitlinger in Ft. Washington, P.A. (Mar. 29, 2013).

[1050] *Id. See* 2006 Monthly Sum of Sum [EXAM00338641]; 2007 Monthly Sum of Sum [EXAM00338642]; 2008 Monthly Sum of Sum [EXAM00338643]; 2009 Monthly Sum of Sum [EXAM00338644]; 2010 Monthly Sum of Sum [EXAM00338645]; 2011 Monthly Sum of Sum [EXAM00338646]; 2012 Monthly Sum of Sum [EXAM00338647].

[1051] Ally Bank provided records reflecting approximately $585.2 million in cumulative net cash payments related to the MSR Swap made by the Bank to GMAC Mortgage for the period January 2008 to April 2012 but did not provide sufficient information for reconciliation with the ResCap data. Mortgage Division, Affiliate Transaction Summary [ALLY_0171134]. The data provided by the Bank included monthly information presented to the Ally Bank Board for the period November 2007 to April 2012; *see also* ResCap—MSR Cash Summary [EXAM00231039]. ResCap provided a detailed schedule for the period September 2007 to April 30, 2012.

(2) The change in value of MSR assets after origination—GMAC Mortgage received or made payments to Ally Bank based on changes in the fair market value of the MSR assets on the Bank's balance sheet. These fair market value changes were generally due either to changes in interest rate assumptions, which could result in either gains or losses, or to the amortization expense recognized each month as a result of servicing fees being earned.

(3) The net fees earned on servicing—GMAC Mortgage received payments from Ally Bank for the net fees earned by Ally Bank on servicing for its MSR assets. This amount generally included servicing revenue less servicing expenses or losses.[1052] Servicing expenses included the servicing fees paid to GMAC Mortgage. As a result, GMAC Mortgage received all of the income from servicing through receiving both the contractual servicing fee and the profit (or loss) remaining after payment of that fee.

(4) The funding fee on the MSR and related servicing assets—GMAC Mortgage paid to Ally Bank a funding fee that was calculated by applying an agreed-upon interest rate to the total of all MSRs, servicing advances and related payables reflected on the Bank's balance sheet. The parties increased the margin over LIBOR from the 1.0% rate established in 2007 to 3.25% in July 2010.[1053]

---

[1052] As discussed above, while the amended and restated Schedule from July 2010 added references to certain losses related to representations and warranties, Ally Bank never actually paid any repurchase claims and thus did not deduct any such payments from the Net Servicing Fee. 2010 Net Funding Schedule, part 6(a)(v) [ALLY_0018118].

[1053] 2007 Net Funding Schedule, parts 6(a)(iii), (iv), (vi) [RC00027852], 2010 Net Funding Schedule, part 6(a)(iv) [ALLY_0018118].

The exchange proved to be a financially beneficial one to GMAC Mortgage. ResCap's records indicate that Ally Bank paid GMAC Mortgage a total of $699.7 million[1054] over the duration of the MSR Swap from September 2007 through termination in April 2012, as shown in Exhibit V.B.12.b(1)—1 below.[1055]



EXHIBIT V.B.12.b(1)—1
**MSR Swap Annual Payments (Net)**
September 2007 – April 2012
*($ in Millions)*

*Source: ResCap - MSR Cash Summary [EXAM00231039].*

GMAC Mortgage recorded gains in its financial statements from 2007 through 2011 of approximately the same amount as the cash payments shown above.[1056] The income or loss on the MSR Swap was reported as part of the *Servicing Valuation and Hedge Activities, Net* line item that is part of *Net Servicing Fees* in the income statement of GMAC Mortgage.[1057]

---

[1054] Ally Bank also provided records reflecting approximately $585.2 million in cumulative net cash payments related to the MSR Swap made by the Bank to GMAC Mortgage for the period January 2008 to April 2012 but did not provide sufficient information for reconciliation with the ResCap data. Mortgage Division, Affiliate Transaction Summary [ALLY_0171134].

[1055] ResCap—MSR Cash Summary [EXAM00231039].

[1056] GMAC Mortgage, LLC Consolidated Financial Statements, as of and for the years ended December 31, 2008 and 2007, at 72 [EXAM00234112]; GMAC Mortgage, LLC Consolidated Financial Statements, as of and for the years ended December 31, 2010 and 2009, at 61 [EXAM00234350]; GMAC Mortgage, LLC Consolidated Financial Statements, as of and for the years ended December 31, 2011 and 2010, at 66 [EXAM00234281] (showing total impact of the MSR Swap as $699 million from 2007 through 2011, though differences from cash payments were noted in 2007 and 2008).

[1057] GMAC Mortgage, LLC Consolidated Financial Statements, as of and for the years ended December 31, 2008 and 2007, at 72 [EXAM00234112]; GMAC Mortgage, LLC Consolidated Financial Statements, as of and for the years ended December 31, 2010 and 2009, at 61 [EXAM00234350]; GMAC Mortgage, LLC Consolidated Financial Statements, as of and for the years ended December 31, 2011 and 2010, at 66 [EXAM00234281].

Exhibit V.B.12.b(1)—2 indicates that the annual gain or loss recognized by GMAC Mortgage on the MSR Swap averaged 21.6% and ranged from -82.2% to 141.9% of the amounts reflected on the GMAC Mortgage income statement for this line item.

EXHIBIT V.B.12.b(1)—2
**GMAC Mortgage Selected Financial Information – Overall Economic Impact of the MSR Swap**
Years Ended 2007 – 2011
*($ in Millions)*

|  | 2007 | 2008 | 2009 | 2010 | 2011 | Total | Average |
|---|---|---|---|---|---|---|---|
| GMAC Mortgage "Servicing assets valuation and hedge activities, net — derivative instruments with Ally Bank" [1] | $  3.9 | $  103.2 | $ 481.6 | $  469.9 | $(359.5) | $  699.1 | |
| GMAC Mortgage, LLC - "Net servicing fees" | $ 817.0 | $1,234.4 | $ 339.4 | $1,189.0 | $ 437.5 | $4,017.3 | |
| MSR Swap as a % of GMAC Mortgage, LLC - "Net servicing fees" | 0.5% | 8.4% | 141.9% | 39.5% | -82.2% | 17.4% | 21.6% |

[1] *A review of the line item, "Servicing Assets valuation and hedge activities, net – derivative instruments with Ally Bank" and the related footnotes included in the corresponding financial statements indicate this line item reflects the financial results of the MSR Swap.*
*Source:  GMAC Mortgage, LLC Consolidated Financial Statements, as of and for the years ended December 31, 2007 and 2006, at 2, 51 [EXAM00232043]; GMAC Mortgage, LLC Consolidated Financial Statements, as of and for the years ended December 31, 2009 and 2008, at 5, 87 [EXAM00234189]; GMAC Mortgage, LLC Consolidated Financial Statements, as of and for the years ended December 31, 2011 and 2010, at 5, 66 [EXAM00234281].*

ResCap also provided accounting records quantifying each of the above-described elements of the MSR Swap. Exhibit V.B.12.b(1)—3 below summarizes the cumulative changes related to each element of the MSR Swap for the period September 2007 to April 2012. The inflows from net servicing fees generally offset the outflows from market value changes, while the gain on servicing assets far outweighed the funding fees.[1058]

---

[1058] GMAC Mortgage did not calculate economic amortization separately from changes in interest rate assumptions in 2007 and 2008. The impact of the increase in the interest rate used to calculate the funding fee (from LIBOR plus 1% to LIBOR plus 3.25%) was immaterial relative to the total amount of funds exchanged under the MSR Swap.

EXHIBIT V.B.12.b(1)—3
**MSR Swap Cumulative Activity by Element**
September 2007 – April 2012
*($ in Millions)*



*Source: ResCap - MSR Cash Summary [EXAM00231039]; OMSR Values [EXAM00339036].*

Ally Bank paid GMAC Mortgage a total of $608.3 million during the period from January 2009 through April 2012 (after ResCap sold its interest in IB Finance), as shown in Exhibit V.B.12.b(1)-4 below.[1059] The relationship between the various elements remained generally consistent. Available information segregating market value changes indicated that virtually the entire net adjustment in this category related to economic amortization rather than changes in interest rate assumptions.

---

[1059] ResCap - MSR Cash Summary [EXAM00231039].



EXHIBIT V.B.12.b(1)—4
**MSR Swap Cumulative Activity by Element**
January 2009 – April 2012
*($ in Millions)*

*Source: ResCap - MSR Cash Summary [EXAM00231039]; OMSR Values [EXAM00339036].*

Considerable volatility due to interest rate changes is evident when looking at the MSR Swap data on an annual rather than aggregated basis, as shown in Exhibit V.B.12.b(1)-5 below:

EXHIBIT V.B.12.b(1)—5
**MSR Swap – Key Financial Elements**
September 2007 – April 2012
*($ in Millions)*

|  | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | Total |
|---|---|---|---|---|---|---|---|
| FMV change - interest rate [1] | $ (0.0) | $ (296.4) | $ 257.8 | $ 171.7 | $ (430.0) | $ (0.2) | $ (297.3) |
| FMV change - amortization [1] | - | - | (117.9) | (318.2) | (364.1) | (127.2) | (927.4) |
| Funding fees (LIBOR +) | (0.4) | (14.0) | (9.1) | (23.5) | (59.6) | (16.1) | (122.6) |
| Gain on new cap - MSR | 8.6 | 53.4 | 77.6 | 136.1 | 61.6 | 27.0 | 364.2 |
| Gain on new cap - excess servicing | 14.6 | 219.5 | 95.9 | 209.9 | 69.4 | 10.9 | 620.2 |
| Net servicing fees | 3.9 | 102.2 | 177.3 | 294.0 | 362.8 | 122.2 | 1,062.5 |
| Total cash settlement paid to GMAC Mortgage | $ 26.6 | $ 64.7 | $ 481.6 | $ 469.9 | $ (360.0) | $ 16.7 | $ 699.7 |

*[1] For 2007 to 2008, economic amortization was not calculated separately from changes to interest rate assumptions.*
*Source: ResCap - MSR Cash Summary [EXAM00231039]; OMSR Values [EXAM00339036].*

The payments under the MSR Swap due to periodic interest rate-driven changes in market value were particularly pronounced in 2011, giving rise to $430 million of payments for that element from GMAC Mortgage to Ally Bank. Exhibit V.B.12.b(1)-6 below, which shows monthly MSR Swap payments from inception through April 2012, indicates that the most significant changes occurred in the third quarter of 2011.



EXHIBIT V.B.12.b(1)—6
**MSR Swap Monthly Payments**
September 2007 – April 2012
*($ in Millions)*

*Source: ResCap - MSR Cash Summary [EXAM00231039].*

ResCap, Ally Bank, and other mortgage servicers revised assumptions in their MSR valuation models during 2011 to reflect changes in the macroeconomic environment, including increases in prepayments rates and discounts rates and the impact of government initiatives and settlements on both servicing costs and borrower behavior, all of which negatively affected the value of MSRs.[1060] Exhibits V.B.12.b(1)-7 and V.B.12.b(1)-8 below compare a measure of MSR value for AFI and Ally Bank to a subset of other large financial institutions with significant MSR portfolios. The AFI and Ally Bank MSR portfolios dropped in book value from 1.0% to 0.7% of servicing unpaid principal balance between the second and third quarters of 2011, which was in line with other industry participants. This market change in turn was the driver for many of the payments under the MSR Swap related to changes in market value.

---

[1060] MSR Performance Presentation, dated Aug. 2011 [ALLY_PEO_0031247].

EXHIBIT V.B.12.b(1)—7
**Industry MSR Valuation – Quarterly MSR Book Value Comparisons**
March 31, 2011 – March 31, 2012
*($ in Billions)*

| Company | MSR Book Value | | | | |
| --- | --- | --- | --- | --- | --- |
| | 3/31/11 | 6/30/11 | 9/30/11 | 12/31/11 | 3/31/12 |
| Ally Financial Inc. | $ 3.8 | $ 3.7 | $ 2.7 | $ 2.5 | $ 2.6 |
| Bank of America | 15.3 | 12.4 | 7.9 | 7.4 | 7.6 |
| JPMorgan Chase | 13.1 | 12.2 | 7.8 | 7.2 | 8.0 |
| Citigroup | 4.7 | 4.2 | 2.9 | 2.6 | 2.7 |
| Wells Fargo | 15.6 | 14.7 | 12.4 | 12.6 | 13.6 |
| U.S. Bancorp | 2.1 | 2.0 | 1.5 | 1.5 | 1.7 |
| PNC | 1.1 | 1.0 | 0.7 | 0.6 | 0.7 |
| SunTrust | 1.5 | 1.4 | 1.0 | 0.9 | 1.1 |
| High | $ 15.6 | $ 14.7 | $ 12.4 | $ 12.6 | $ 13.6 |
| Median | 4.3 | 4.0 | 2.8 | 2.5 | 2.7 |
| Mean | 7.2 | 6.5 | 4.6 | 4.4 | 4.8 |
| Low | 1.1 | 1.0 | 0.7 | 0.6 | 0.7 |
| Ally Bank | $ 1.7 | $ 1.8 | $ 1.3 | $ 1.3 | $ 1.3 |

Source: Individual Company SEC filings; MSR Rollforward (2010-2011) [EXAM00232591]; [EXAM00232592]; MSR Swap Review [ALLY_0368244]; See Appendix X.

EXHIBIT V.B.12.b(1)—8
**Industry MSR Valuation – Quarterly MSR Book Value/UPB Ratio Comparisons**
March 31, 2011 – March 31, 2012

| Company | MSR Book Value / UPB | | | | |
| --- | --- | --- | --- | --- | --- |
| | 3/31/11 | 6/30/11 | 9/30/11 | 12/31/11 | 3/31/12 |
| Ally Financial Inc. | 1.1% | 1.0% | 0.7% | 0.7% | 0.8% |
| Bank of America | 0.8% | 0.6% | 0.4% | 0.4% | 0.5% |
| JPMorgan Chase | 1.4% | 1.3% | 0.8% | 0.8% | 0.9% |
| Citigroup | 1.1% | 1.0% | 0.7% | 0.6% | 0.7% |
| Wells Fargo | 0.8% | 0.8% | 0.7% | 0.7% | 0.7% |
| U.S. Bancorp | 1.1% | 1.1% | 0.8% | 0.8% | 0.9% |
| PNC | 0.9% | 0.8% | 0.6% | 0.5% | 0.6% |
| SunTrust | 0.9% | 0.9% | 0.6% | 0.6% | 0.7% |
| High | 1.4% | 1.3% | 0.8% | 0.8% | 0.9% |
| Median | 1.0% | 0.9% | 0.7% | 0.7% | 0.7% |
| Mean | 1.0% | 0.9% | 0.7% | 0.6% | 0.7% |
| Low | 0.8% | 0.6% | 0.4% | 0.4% | 0.5% |
| Ally Bank | 1.1% | 1.0% | 0.7% | 0.7% | 0.8% |

[1] The Servicing Unpaid Principal Balance ("UPB") for Ally Bank was calculated by using the percentage of MSR Book Value to Servicing UPB for Ally Financial Inc. multiplied by the MSR Book Value for Ally Bank.
Source: Individual Company SEC filings; MSR Rollforward (2010-2011) [EXAM00232591]; [EXAM00232592]; MSR Swap Review [ALLY_0368244]; See Appendix X.

## (2) Financial Results Of GMAC Mortgage's Market MSR Risk Hedging

GMAC Mortgage hedged all of its MSR risk, including the risk absorbed through the MSR Swap, in the market[1061] but did not allocate hedges between the Bank and GMAC Mortgage.[1062] The results of GMAC Mortgage's hedging activity are an important consideration in assessing the economics of the MSR Swap.

For the period January 2008 to March 2012, the MSR hedges for AFI on a consolidated basis generated gains of $2.3 billion, though $2.0 billion of that amount was related to 2008. These results were reported in the income statement as a component of the line item, *Servicing Valuation and Hedge Activities, Net*.[1063] The decrease in the fair value of AFI's MSR assets during this period was $4.8 billion. The hedges, which generally correlate to interest rate risk as opposed to other value inputs such as cost to service, therefore offset only a portion of the volatility in the value of the MSR asset, as shown in Exhibit V.B.12.b(2)-1 below.

EXHIBIT V.B.12.b(2)—1
**AFI – Total Aggregate MSR Results, Net of Hedging**
Years Ended 2008 – 2011, Quarter Ended March 31, 2012
*($ in Millions)*

|  | 2008 | 2009 | 2010 | 2011 | YTD March 2012 | Total |
|---|---|---|---|---|---|---|
| Change in fair value of mortgage servicing rights | $ (2,250) | $ (106) | $ (872) | $ (1,606) | $ 1 | $ (4,833) |
| Change in fair value of derivative financial instruments | 2,000 | (998) | 478 | 817 | 8 | 2,305 |
| Servicing valuation and hedge activates, net | $ (250) | $ (1,104) | $ (394) | $ (789) | $ 9 | $ (2,528) |

*Note: Reflects the entire AFI MSR portfolio, inclusive of ResCap and Ally Bank for the period January 1, 2009 to March 31, 2012.*
*Source: Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2008), at 10; Ally Financial Inc., Annual Report (Form 10-K) (Feb. 28, 2012), at 169; Ally Financial Inc., Quarterly Report (Form 10-Q) (Apr. 27, 2012), at 43.*

---

[1061] Int. of A. Celini, Feb. 18, 2013, at 116:18–21.

[1062] The Debtors attempted to estimate the allocation of hedge results between the Bank and GMAC Mortgage using certain assumptions as to risks hedged and relative changes in market inputs. The results of the analyses did not provide a reliable basis upon which to allocate the results to Bank-owned MSRs given the number of factors that can influence hedge movement and changes in asset values. However, each of the allocation scenarios analyzed indicated significant gains on GMAC Mortgage's hedges of the risk associated with the Bank's MSR assets. MSR Hedge Allocation [EXAM00339989].

[1063] This line item also included the net impact of the MSR Swap, as previously noted.

The above consolidated hedge results include GMAC Mortgage, RFC and Ally Bank. The exhibit below demonstrates the relative MSR balances for each of these entities from 2003 through 2011. The Bank held no MSRs on its balance sheet before August 2007, but its portfolio grew to $1.3 billion and approximately 51.1% of the GMAC Mortgage/RFC/Ally Bank combined MSR balance as of December 2011.[1064] This data provides a general framework for considering the allocation of hedge results, though the portfolio age and composition are among the factors that affect the level of interest rate sensitivity for any given portfolio.

EXHIBIT V.B.12.b(2)—2
**MSR Asset – Year End Balances by Entity**
Years Ended 2003 – 2011
*($ in Millions)*



*Source:  GMAC Mortgage LLC Consolidated Financial Statements [EXAM00231553]; [EXAM00232043]; [EXAM00234189]; [EXAM00234281]; GMAC Bank Audited Financial Statements [RC00034535]; Residential Funding Company, LLC Consolidated Financial Statements [EXAM00231149]; [EXAM00231642]; [EXAM00124988]; MSR Rollforward YTD 2011, dated Dec. 31, 2011 [EXAM00232592].*

---

[1064] MSR Rollforward YTD 2011, dated Dec. 31, 2011 [EXAM00232592].

The Debtors' accounting and financial records do not allow the reliable allocation of the hedge results to assets subject to the MSR Swap. However, the overall hedging gains, as well as other allocation scenarios analyzed, are likely indicative of hedging gains related to the MSR Swap, according to the Debtors' management.[1065] Consequently, it appears that GMAC Mortgage did not incur hedging losses that would materially affect the overall economic impact of the MSR Swap, and likely earned gains on these hedges.

### c. Summary Of Analysis Of The Financial Results Under The Derivative Agreements

Review and analysis of the pertinent accounting and financial records and inquiry of the Debtors' and Ally Bank's employees and management regarding the same indicate that the Pipeline Swap and the MSR Swap provided value to the Debtors. The information demonstrates that the Pipeline Swap was near break-even from 2004 through 2011, while value transferred from Ally Bank to GMAC Mortgage under the MSR Swap approximated $700 million over its existence from 2007 through April 2012. The overall hedge results and other analyses produced by the Debtors indicate that GMAC Mortgage did not incur hedging losses that would materially affect the overall economic impact of the swaps, and likely earned gains on these hedges. Accordingly, the Examiner concludes that the evidence supports the proposition that GMAC Mortgage received a net benefit from the Pipeline Swap, the MSR Swap and the market hedges relating thereto, assessing the entirety of the economics as implemented by the parties.

### 13. Potential Claims Regarding The MMLPSA, Pipeline Swap, MSR Swap, And Loans Brokered To Ally Bank

Based on the analysis of the transactions described above in this Section, the transactions implicate the following issues, which raise potential contractual claims and other causes of action:

(1) representation and warranty liability under the MMLPSA;

(2) failure to comply with the 2005 and 2006 Operating Agreements;

(3) application of the Pipeline Swap to the funding to sale period and to Ally Bank-originated loans;

(4) misallocation of net revenues on loans brokered to Ally Bank by GMAC Mortgage under the Broker Agreement; and

(5) failure to pay the value of correspondent-loan MSRs and purchased MSRs to GMAC Mortgage under the MSR Swap.

The basis for these claims and the Examiner's determination regarding each are further addressed in Section VII.L.2.

---

[1065] Meeting with J. Whitlinger in Ft. Washington, P.A. (Mar. 29, 2013).

## C. GOVERNMENT SETTLEMENTS & SUBSERVICING

The Examiner Scope Approval Order specifically identifies two settlements among AFI and ResCap, on the one hand, and various governmental entities, on the other, as worthy of investigation. The objective is to determine whether such settlements properly allocated the costs, both direct and indirect, between AFI entities and ResCap entities. The first is the settlement with the Board of Governors of the Federal Reserve System and the Federal Deposit Insurance Corporation, as memorialized by the FRB/FDIC Consent Order and related CMP, among the FRB and the FDIC on the one hand and AFI, Ally Bank, ResCap, and GMAC Mortgage on the other (though Ally Bank was not a party to the CMP) (the "FRB/FDIC Settlement"). The second is the settlement with the U.S. Department of Justice and the state Attorneys General, as memorialized by the DOJ/AG Consent Judgment, among the DOJ and various state AGs on the one hand and AFI, ResCap, and GMAC Mortgage on the other (the "DOJ/AG Settlement"). These settlements deal with a variety of allegations concerning improper oversight of and execution of mortgage servicing, including allegations of "robo-signing"—the practice of individuals signing foreclosure affidavits without reviewing the validity or accuracy of the sworn statements.[1066]

While these settlements are technically separate, they concern the same alleged misconduct and were negotiated during the same time period with an understanding of the aggregate penalties that would be imposed as a result of the settlements as a whole. Furthermore, these settlements spurred agreements between AFI and ResCap and tangential agreements with third parties. The aggregate effect of these various agreements was that a majority of the costs of the settlements were allocated to ResCap entities, while AFI provided certain support so that the ResCap entities could comply with these obligations. As explained below and in Section VII of this Report, these related agreements implicate several potential claims assertable on behalf of the Estate, which, in turn may be offset by potential defenses assertable on behalf of AFI.

   1. *Government Assesses Penalties Regarding Alleged Improper Mortgage Servicing Activities And Oversight*

      a. *Overview Of Settlements And The Agreements Related Thereto*

The agreements relating to the FRB/FDIC Settlement include: (1) the FRB/FDIC Consent Order, filed on April 13, 2011, which required a foreclosure review by independent consultants and imposed non-monetary restitution and changes to mortgage servicing and mortgage servicing oversight that the AFI corporate group agreed to enact; (2) the CMP, agreed to on February 9, 2012, and executed on February 10, 2012, which set forth the monetary fine imposed on the AFI corporate group; and (3) the FRB Supplemental Agreement

---

[1066] *See* Philip A. Lehman, EXECUTIVE SUMMARY OF MULTISTATE/FEDERAL SETTLEMENT OF FORECLOSURE MISCONDUCT CLAIMS, http://nationalmortgagesettlement.com/about.

(as hereafter defined), dated April 26, 2012, whereby AFI agreed to be secondarily liable for ResCap's obligations under the FRB/FDIC Consent Order in the event that ResCap commenced bankruptcy proceedings.

The agreements that relate to the DOJ/AG Settlement include: (1) the DOJ/AG Consent Judgment, agreed to in principle on February 9, 2012, and filed on April 4, 2012, whereby AFI, ResCap, and GMAC Mortgage agreed to comply with certain servicing standards and provide monetary and non-monetary restitution; and (2) the DOJ/AG Earmark and Indemnification Agreement (as hereafter defined), dated March 9, 2012, whereby AFI agreed to indemnify the U.S. and certain state AGs in the event that they are required to make payments as a result of an avoidance action under chapter 5 of the Bankruptcy Code.

Additionally, the AFI corporate group entered into several affiliate agreements concerning the government settlements. The first is the January 30 Letter Agreement, which set forth the terms of support to be provided to ResCap and GMAC Mortgage related to the not-yet-finalized DOJ/AG Settlement. Subsequently, GMAC Mortgage and Ally Bank negotiated and entered into the A&R Servicing Agreement. Finally, AFI and ResCap entered into the Earmark Agreement, dated March 14, 2012, which dictated the terms of ResCap's use of liquidity provided by AFI pursuant to the January 30 Letter Agreement solely to fund the payments required under the DOJ/AG Consent Judgment.

Below is an overview of the timing of these settlements and related agreements:



EXHIBIT V.C.1.a
**Government Settlements & Subservicing Timeline**
2001 – 2013

*Source: ALLY_0251264; ALLY_0251201; Residential Capital, LLC, Annual Report (Form 10-K/A) (Aug. 25, 2009); Ally Financial Inc.,*
*Annual Report (Form 10-K) (Feb. 25, 2011); First Day Affidavit; SOP0000176; ALLY_0318475; ALLY_0364373; [RC40018411] at*
*RC40018445-47; RC00067937; Ally Financial Inc., Current Report (Form 8-K) (Apr. 13, 2011); ALLY_0194817; EXAM11092238;*
*[RC40019179] at RC40019205-08; FRB, Press Release (Feb. 9, 2012),*
*http://www.federalreserve.gov/newsevents/press/enforcement/20120209a.htm; ALLY_0001961; ALLY_0001865; ALLY_0000001;*
*EXAM11004487; RC00027463; ALLY_0182267; EXAM20203413; ALLY_0114469; Voluntary Petition for Residential Capital, LLC*
*[Docket No. 1]; Office of Mortgage Settlement Oversight, Press Release, National Mortgage Settlement Monitor: Ally Has Met its*
*Consumer Relief Obligations (Feb. 14, 2013), https://www.mortgageoversight.com/wp-content/uploads/2012/03/Ally-Report.pdf.*

As explained in greater detail below, the government settlements and related agreements resulted in ResCap incurring significant liabilities. However, the Examiner was not charged with second-guessing these settlements, but rather with examining "the propriety of the allocation of obligations as among the Debtors and AFI" under these settlements.[1067] To accomplish this task, the Examiner's Professionals analyzed the final settlements and related agreements, the negotiations leading up to the settlements, and, finally, the allocation of monetary and non-monetary costs of the settlements.

### b. Public Events Leading To Government Settlements

As early as August 25, 2009, ResCap notified the public of developments related to predatory lending practices that could affect its mortgage lending or servicing business.[1068] Specifically, ResCap stated that it could be subject to fines or other penalties based on the conduct of independent mortgage brokers through which ResCap originated mortgage loans and lenders from which ResCap acquired mortgage loans.[1069]

In October 2010, various state and federal agencies commenced an investigation following revelations of the widespread practice of "robo-signing" affidavits in foreclosure proceedings across the country. In the course of the investigation, other mortgage servicer-related problems were identified, including deceptive loan modification practices that resulted in unnecessary foreclosure proceedings. Ultimately, this investigation led to: (1) the FRB commencing fourteen corrective actions against large mortgage servicers or their parent-holding companies for unsafe and unsound processes and practices in residential mortgage loan servicing and foreclosure processing; and (2) negotiations between five leading bank mortgage servicers (including AFI) and a coalition of state AGs, state banking regulators, the Federal Trade Commission, the Consumer Financial Protection Bureau, and the Departments of Justice, Treasury, and Housing and Urban Development.

On September 17, 2010, GMAC Mortgage suspended mortgage foreclosure home sales and evictions, and postponed hearings on motions for judgment in certain states based on concerns of "robo-signing."[1070] As of December 31, 2010, AFI recorded a liability of approximately $13 million for possible fines and penalties with respect to the newly discovered issues related to foreclosure proceedings.[1071] On February 25, 2011, AFI notified

---

[1067] Examiner Scope Approval Order, at 4 n.2.

[1068] Residential Capital, LLC, Annual Report (Form 10-K/A) (Aug. 25, 2009), at 44–45. *See also* E-mail from Michele Lieber (Sept. 30, 2010) [EXAM11135342] (detailing a discussion Lieber had with Jeff Eller, a "crisis political advisor," regarding the best steps to take to deal with the robo-signing issue). Lieber was the Vice President of Government Relations for AFI during this period.

[1069] Residential Capital, LLC, Annual Report (Form 10-K/A) (Aug. 25, 2009), at 48.

[1070] Ally Financial Inc., Annual Report (Form 10-K) (Feb. 25, 2011), at 246.

[1071] *Id.*

the public[1072] that representatives of federal and state governments had announced investigations into procedures followed by AFI's subsidiaries in connection with mortgage foreclosure home sales and evictions and that, while the results of these investigations were uncertain, it was expected that "Ally or its subsidiaries will become subject to fines, penalties, sanctions or other adverse actions."[1073]

Ultimately, the investigation by the FRB led to a settlement agreed to on February 9, 2012, between the FRB and the FDIC and five major bank mortgage servicers, including AFI.[1074] Similarly, the negotiations with a coalition of state AGs, state banking regulators, the Federal Trade Commission, the Consumer Financial Protection Bureau, and the Departments of Justice, Treasury, and Housing and Urban Development led to a settlement with the five leading bank mortgage servicers.[1075] Except for the 1998 Master Tobacco Settlement, this settlement represents the largest financial recovery obtained by the AGs in history, resulting in an estimated $25 billion in monetary sanctions and relief.[1076]

### c.   Terms Of The FRB/FDIC Settlement

AFI is subject to the supervision and examination of the FRB because it is a bank holding company. As a federally-insured depository institution, Ally Bank is subject to the regulation and examination of the FDIC.[1077]

### (1) FRB/FDIC Consent Order

On April 13, 2011,[1078] AFI, Ally Bank, ResCap, and GMAC Mortgage entered into the FRB/FDIC Consent Order to address allegations that the AFI corporate group, including GMAC Mortgage and its subsidiaries, engaged in a variety of harmful acts in connection with

---

[1072] It was believed by some members of ResCap's management that the investigations regarding these robo-signing issues had a negative impact on the possibility of an AFI IPO in 2011. *See* Int. of T. Marano, Nov. 26, 2012, at 188:3–7. Marano was the CEO of ResCap during this period.

[1073] Ally Financial Inc., Annual Report (Form 10-K) (Feb. 25, 2011), at 13.

[1074] In addition to AFI, the four other major banking organizations that reached agreement with the FRB on Feb. 9, 2012 were: Bank of America Corporation, Citigroup Inc., JPMorgan Chase & Co., and Wells Fargo & Company. *See* FRB, Press Release (Feb. 13, 2012), http://www.federalreserve.gov/newsevents/press/enforcement/20120213a.htm.

[1075] The four other bank mortgage servicers that settled with the DOJ and the state AGs are: Bank of America Corp., Citigroup, Inc., J.P. Morgan Chase & Co., and Wells Fargo & Co. *See* Philip A. Lehman, EXECUTIVE SUMMARY OF MULTISTATE/FEDERAL SETTLEMENT OF FORECLOSURE MISCONDUCT CLAIMS, ABOUT THE SETTLEMENT, http://nationalmortgagesettlement.com/about.

[1076] *See* Philip A. Lehman, EXECUTIVE SUMMARY OF MULTISTATE/FEDERAL SETTLEMENT OF FORECLOSURE MISCONDUCT CLAIMS, ABOUT THE SETTLEMENT, http://nationalmortgagesettlement.com/about.

[1077] *See, e.g.*, GMAC Inc., Annual Report (Form 10-K) (Mar. 1, 2010), at 5, 9–11.

[1078] Ally Financial Inc., Current Report (Form 8-K) (Apr. 13, 2011).

foreclosure activities involving the servicing of residential mortgage loans.[1079] These alleged harmful acts included: (1) filing (or causing to be filed) false affidavits of employees of GMAC Mortgage, its subsidiaries or third-party providers; (2) litigating foreclosure and bankruptcy proceedings without confirming accurate documentation of ownership; (3) failing to increase financial, staffing and managerial resources in a manner sufficient to respond to increased foreclosure levels; (4) failing to ensure timely, effective and efficient communications with borrowers with respect to loss mitigation activities and foreclosures; and (5) failing to have adequate internal controls, policies and procedures and oversight of the foreclosure process, including over outside counsel and other third-party providers.[1080]

Pursuant to the FRB/FDIC Consent Order, AFI, Ally Bank, ResCap, and GMAC Mortgage agreed to cease and desist any actions related to these allegations and to take affirmative actions, both individually and as a group, to address these allegations.[1081]

With respect to AFI, the FRB/FDIC Consent Order requires:

> (1) that AFI utilize its resources to serve as a "source of strength" to Ally Bank as defined in Regulation Y of the FRB (12 C.F.R. § 25.4(a)) including, but not limited to, taking steps to ensure that Ally Bank complies with the applicable provisions of the FRB/FDIC Consent Order as issued by the FDIC;[1082]

> (2) that the AFI Board, together with the ResCap Board, submit an acceptable written plan to strengthen the boards' oversight of GMAC Mortgage and its subsidiaries, including provisions that provide for proper risk management of independent contractors and adequate funding of personnel, systems and resources;[1083]

> (3) that AFI, together with ResCap, for itself and on behalf of GMAC Mortgage and its subsidiaries, retain an independent consultant acceptable to the FRB to conduct an assessment of GMAC Mortgage and its subsidiaries' risks, particularly in the area of residential mortgage loan servicing, loss mitigation and foreclosures;[1084]

---

[1079] *See* FRB/FDIC Consent Order [ALLY_0203290].

[1080] *See id*. at 3–4.

[1081] *See id*. at 6.

[1082] *See id*. at 7.

[1083] *See id*. at 7–10.

[1084] *See id*. at 27–28.

(4) that AFI submit acceptable plans to: (a) enhance its compliance program to ensure that the operations of GMAC Mortgage and its subsidiaries comply with legal requirements and that internal policies are conducted in a safe and sound manner; and (b) enhance the internal audit program with respect to residential mortgage loan servicing, loss mitigation, and foreclosure activities and operations;[1085] and

(5) that AFI and ResCap jointly submit: (a) an acceptable comprehensive risk management program for GMAC Mortgage and its subsidiaries; and (b) an acceptable enhanced written internal audit program to periodically review compliance with applicable legal requirements and supervisory guidance of the FRB.[1086]

With respect to GMAC Mortgage, the FRB/FDIC Consent Order requires:

(1) that GMAC Mortgage retain an independent consultant to conduct an independent review of foreclosure actions and sales from January 1, 2009 through December 31, 2010 (the "Foreclosure Review"). Following the Foreclosure Review, the independent consultant shall prepare a written report of its review and, within 45 days of receipt of such review, GMAC Mortgage shall submit an acceptable plan to, among other things, (a) remediate any errors or deficiencies in any foreclosure filing, and (b) reimburse or remediate any borrower for any fees or other financial injury;[1087]

(2) that GMAC Mortgage submit a plan and timeline for strengthening communications between GMAC Mortgage and its subsidiaries and borrowers, including the establishment of a "single point of contact" that will be available for borrowers to obtain information through the loss mitigation and foreclosure processes;[1088]

(3) that GMAC Mortgage submit acceptable policies and procedures for outsourcing any residential mortgage loan servicing, loss mitigation activities, or foreclosure functions to any independent contractor, consulting firm, law firm, property manager, or any other third party, including appropriate oversight and due diligence of such outside parties;[1089] and

---

[1085] *See id*. at 20–24.

[1086] *See id.* at 28–32.

[1087] *Id*. at 11–15.

[1088] *Id*. at 15–17.

[1089] *Id*. at 18–20.

(4) that GMAC Mortgage submit acceptable plans: (a) to ensure appropriate controls and oversight over GMAC Mortgage and its subsidiaries' activities with respect to the Mortgage Electronic Registration System; (b) to review and remediate, if necessary, GMAC Mortgage and its subsidiaries' management information systems to ensure timely delivery of complete and accurate information; and (c) to ensure improved training of all officers and staff.[1090]

With respect to Ally Bank, the FRB/FDIC Consent Order required that Ally Bank implement a mortgage servicing management and oversight program that, at a minimum and among other things, maintains a reserve sufficient to cover identified servicing risks.[1091]

The FRB/FDIC Consent Order required that each of AFI, Ally Bank, ResCap, and GMAC Mortgage submit written programs for approval to the FRB (or, in the case of Ally Bank, the FDIC), which are intended to address how each entity will implement the actions set forth above.[1092] The AFI entities were then required to implement these programs and submit written progress reports to the FRB or, the FDIC, as applicable.[1093] AFI, ResCap, and GMAC Mortgage were also required to submit a validation report prepared by an independent third-party consultant with respect to compliance with the FRB/FDIC Consent Order during the first year after the FRB/FDIC Consent Order became effective.[1094]

### (2) CMP Order, Dated February 10, 2012

The FRB/FDIC Consent Order did not impose any monetary penalties on the AFI corporate group. Instead, the parties negotiated the amount of a civil money penalty over the course of several months, which culminated in the CMP Order. Notably, Ally Bank was not a party to the CMP Order. Instead, AFI, ResCap, and GMAC Mortgage executed the order.

The CMP Order entered by the FRB provides that AFI, ResCap, and GMAC Mortgage and its subsidiaries are jointly and severally assessed the CMP in the amount of $207 million.[1095]

---

[1090] *Id*. at 24–27.

[1091] *See id.* at 32–34.

[1092] *See id.* at 34.

[1093] *See id.* at 34–36.

[1094] *See id.* at 36.

[1095] *See* CMP Order, at 7 [ALLY_0001961].

V-217

### *(3) FRB Supplemental Agreement, Dated April 26, 2012*

Concurrently with discussions regarding the CMP and DOJ/AG Settlement, the FRB became concerned about the possibility of ResCap filing for bankruptcy and not being able to comply with the terms of the various government settlements.[1096] As a result, on April 26, 2012, AFI and the FRB entered into a supplemental agreement concerning the obligations of ResCap and GMAC Mortgage and its subsidiaries under the FRB/FDIC Settlement (the "FRB Supplemental Agreement").[1097] Pursuant to the terms of the FRB Supplemental Agreement, AFI agreed that if ResCap or its subsidiaries commence bankruptcy cases or are otherwise subject to protection under the Bankruptcy Code, AFI would be secondarily liable for the obligations to timely pay any portion of: (1) the fee owed to PricewaterhouseCoopers or any successor consultant to complete the Foreclosure Review; and (2) the monetary reimbursement or remediation payments under the FRB/FDIC Consent Order (together, the "ResCap FRB/FDIC Obligations").[1098] The FRB Supplemental Agreement explicitly provided that the FRB in no way released, reduced, or alleviated GMAC Mortgage of its obligations under the FRB/FDIC Consent Order and confirmed that GMAC Mortgage would be primarily liable for such obligations.[1099] Furthermore, the FRB Supplemental Agreement provided that nothing in the agreement or any payments that AFI made with respect to the ResCap FRB/FDIC Obligations would prejudice AFI's right to seek reimbursement of the ResCap FRB/FDIC Obligations as administrative or priority payments under the Bankruptcy Code.[1100] According to the terms of the FRB Supplemental Agreement, AFI's secondary liability became effective only when, ResCap became subject to protection under the Bankruptcy Code.[1101]

### *(4) Economics Related To The FRB/FDIC Settlement*

Appendix V.C.1.c(4) identifies the various costs incurred as of December 31, 2012 by ResCap and AFI related to the FRB/FDIC Settlement as well as the most recent estimates made available of future costs to be incurred. These costs are summarized in Exhibit V.C.1.c(4) below. As of the date of this Report, none of the costs associated with the FRB/FDIC Settlement have been paid by AFI.

---

[1096] *See, e.g.*, Int. of J. Pensabene, Jan. 9, 2013, at 189:20–190:2 (noting that the government "insisted on [AFI being party to the settlement] . . . because of concerns about ResCap's ability to pay the fine."). Pensabene was the Chief Servicing Officer and Senior Vice President of GMAC Mortgage during this period.

[1097] *See* FRB Supplemental Agreement, dated Apr. 26, 2012 [ALLY_0193256].

[1098] *Id*. at 2–3.

[1099] *Id*. at 2.

[1100] *Id*. at 3.

[1101] *Id*.

EXHIBIT V.C.1.c(4)
**FRB/FDIC Settlement Costs Incurred to Date and Estimated Future Costs**
*($ in Millions)*

| Item | | ResCap Costs |
|------|------|------|
| FRB/FDIC Consent Order costs | $ | 517.0 |
| CMP Order costs | | N/A |
| Total FRB/FDIC Settlement costs incurred to date and estimated future costs | $ | 517.0 |

*Source: Ally Financial Inc., Annual Report (Form 10-K) (Feb. 28, 2012), at 12; Declaration of Thomas Marano, Chief Executive Officer of Residential Capital, LLC, in Support of Debtors' Motion Pursuant to Bankruptcy Rule 3013 and Bankruptcy Code Section 362(a) for a Determination that (I) GMAC Mortgage's FRB Foreclosure Review Obligation is a General Unsecured Claim and (II) the Automatic Stay Prevents Enforcement of the FRB Foreclosure Review Obligation [Docket No. 3055-3] at 4-5; FRB Unsecured Claim Motion [Docket No. 3055] at 7 (as defined below).*

### (5) FRB/FDIC Consent Order Costs - $517 Million

As shown in Exhibit V.C.1.c(5) below, ResCap currently expects to incur a total of $517 million in costs as a result of the FRB/FDIC Consent Order. The components of the $517 million estimate include incremental compliance costs and costs resulting from the Foreclosure Review and remediation.

EXHIBIT V.C.1.c(5)
**FRB/FDIC Consent Order Costs**
*($ in Millions)*

| Item | | ResCap Costs |
|------|------|------|
| FRB/FDIC Consent Order costs | | |
| Incremental compliance costs | $ | 80.0 |
| Foreclosure Review and remediation costs | | 437.0 |
| Total FRB/FDIC Consent Order costs | $ | 517.0 |

*Source: Ally Financial Inc., Annual Report (Form 10-K) (Feb. 28, 2012), at 12; Declaration of Thomas Marano, Chief Executive Officer of Residential Capital, LLC, in Support of Debtors' Motion Pursuant to Bankruptcy Rule 3013 and Bankruptcy Code Section 362(a) for a Determination that (I) GMAC Mortgage's FRB Foreclosure Review Obligation is a General Unsecured Claim and (II) the Automatic Stay Prevents Enforcement of the FRB Foreclosure Review Obligation [Docket No. 3055-3] at 4-5; FRB Unsecured Claim Motion [Docket No. 3055] at 7.*

### (a) Incremental Compliance Costs - $80 Million

AFI, Ally Bank, ResCap, and GMAC Mortgage made certain operational improvements to various aspects of their residential mortgage loan servicing business as a result of the FRB/FDIC Consent Order including, but not limited to, the following: compliance programs, internal audit, communications with borrowers, vendor management, management information systems,

employee training, and oversight by the AFI and ResCap Boards.[1102] As of February 28, 2012, AFI estimated that the incremental costs to ResCap and GMAC Mortgage would be approximately $40 million annually during 2012 and 2013, and would then decline over time.[1103]

### (b) Foreclosure Review And Remediation—$437 Million

As stated above, the FRB/FDIC Consent Order required GMAC Mortgage to hire an independent consultant to perform a Foreclosure Review. AFI and GMAC Mortgage retained PwC on February 1, 2012 to perform this review.[1104]

Following the completion of the Foreclosure Review, the FRB/FDIC Consent Order requires GMAC Mortgage to reimburse or remediate any borrower for any fees or other financial injury discovered during the Foreclosure Review.[1105] Because the review is still ongoing, remediation costs have not yet been incurred.[1106]

As of February 27, 2013, the Debtors estimated that the costs of the Foreclosure Review and remediation could be as high as $415 million to $459 million.[1107] For the purpose of this

---

[1102] Ally Financial Inc., Annual Report (Form 10-K) (Feb. 28, 2012), at 12. These improvements required ResCap and GMAC Mortgage to hire additional servicing personnel, enhance information systems, increase audit and compliance costs, etc.

[1103] Ally Financial Inc., Annual Report (Form 10-K) (Feb. 28, 2012), at 12. ResCap did not provide the total incremental compliance costs incurred through December 31, 2012, nor did ResCap provide a more current estimate of the incremental compliance costs to be incurred going forward.

[1104] PwC Foreclosure Review Engagement Letter, dated Feb. 1, 2012 [EXAM11092238] (the "PwC Engagement Letter").

[1105] FRB/FDIC Consent Order, at 13–14 [ALLY_0203290].

[1106] *See* Sections V.C.3, V.C.4 (discussing the status of, and issues surrounding, the PwC Compensation Motion (defined below) and the FRB Unsecured Claim Motion (defined below), respectively).

[1107] *See* Debtors' Motion Pursuant to Bankruptcy Rule 3013 and Bankruptcy Code Section 362(a) for a Determination that (I) GMAC Mortgage's FRB Foreclosure Review Obligation is a General Unsecured Claim and (II) the Automatic Stay Prevents Enforcement of the FRB Foreclosure Review Obligation [Docket No. 3055] at 7 (the "FRB Unsecured Claim Motion"). This estimate was a dramatic increase from the amounts previously estimated. *See* Declaration of Joseph A. Pensabene in Support of Debtors' Motion for Entry of an Order Under Bankruptcy Code Section 363 and Bankruptcy Rule 6004 (I) Authorizing the Debtors to Compensate PricewaterhouseCoopers, LLP for Foreclosure Review Services in Furtherance of the Debtors' Compliance Obligations Under Federal Reserve Board Consent Order and (II) Reaffirming Relief Granted in the GA Servicing Order [Docket No. 1357-5] at 5 (the Debtors estimated that the total costs of the Foreclosure Review could be as high as $180 million as of the Petition Date); *id.* (stating that the estimate of total Foreclosure Review costs had been revised upward to a total of $250 million as of September 5, 2012 and also explaining that this estimate included law firms and other third-party advisors who were retained to assist with the Foreclosure Review, in addition to PwC); *id.* (as of September 5, 2012, Pensabene estimated the Foreclosure Review remediation costs to be between $35 million and $60 million).

analysis, the Examiner's Financial Advisors assumed the costs to be $437 million, representing the midpoint of the most current range estimated by the Debtors. Included in this estimate are total fees paid to PwC through December 31, 2012, of $73 million.[1108]

According to Thomas Marano, the estimated total costs associated with the Foreclosure Review and remediation have grown significantly due to the continued extension of the time period during which borrowers were allowed to request that their loan be reviewed and due to a lack of clarity surrounding the exact review parameters.[1109]

### (6) CMP Order Costs

Per the CMP Order, AFI, ResCap, and GMAC Mortgage consented to the assessment of a CMP in the amount of $207 million. However, the terms of the CMP Order provide that the FRB will remit up to $207 million of the CMP by amounts equivalent to: (1) the aggregate dollar value of borrower assistance and payments pursuant to the DOJ/AG Consent Judgment; and (2) the aggregate amount expended on funding for nonprofit housing counseling organizations, approved by the HUD.[1110] As discussed below, to date, ResCap has provided over $250 million in borrower relief (also known as "soft costs") and paid a $110 million fine (referred to as "hard costs") as a result of the DOJ/AG Settlement and DOJ/AG Consent Judgment. Therefore, AFI and ResCap will not incur additional costs associated with the CMP Order.

### (7) Accounting For FRB/FDIC Settlement Costs

ResCap did not accrue a liability for the costs associated with the FRB/FDIC Consent Order. Rather, ResCap expensed the costs associated with the FRB/FDIC Consent Order as incurred.[1111]

In contrast, AFI and ResCap did accrue a liability for the combined effect of the CMP Order and the DOJ/AG Settlement. On January 30, 2012, AFI and ResCap estimated that they could incur an expense as great as $268 million relating to the CMP Order in conjunction with the DOJ/AG Settlement.[1112] Therefore, AFI and ResCap originally recognized a combined

---

[1108] Declaration of Thomas Marano, Chief Executive Officer of Residential Capital, LLC, in Support of Debtors' Motion Pursuant to Bankruptcy Rule 3013 and Bankruptcy Code Section 362(a) for a Determination that (I) GMAC Mortgage's FRB Foreclosure Review Obligation is a General Unsecured Claim and (II) the Automatic Stay Prevents Enforcement of the FRB Foreclosure Review Obligation [Docket No. 3055-3] at 5.

[1109] *Id*.

[1110] *See* CMP Order, at 7–9 [ALLY_0001961].

[1111] Meeting with ResCap and FTI, Financial Advisor to the Debtors, in Ft. Washington, PA (Dec. 11, 2012).

[1112] *See* Memorandum, Accrual for DOJ Settlement at December 31, 2011, dated Feb. 28, 2012, at 3 [EXAM00220938]; *see also* Memorandum, Significant Transaction Memo: General Information and Transaction Description Re Mortgage Fine, Waivers and Debt Forgiveness, dated Feb. 2012, at EXAM00220149 [EXAM00220147].

liability of $268 million in their December 31, 2011 financial records.[1113] Of this $268 million liability, $196.5 million was recorded by ResCap and the remaining $71.5 was recorded by AFI.[1114] ResCap and AFI calculated these reserves using a 73% (ResCap) and 27% (AFI) division of the total estimated liability.[1115] The basis for these allocation percentages will be discussed in Section V.C.1.f below.

AFI and ResCap reduced their estimate of this liability to $230 million in AFI's December 31, 2011 consolidated financial statements after the announcement of the CMP Order and the DOJ/AG Settlement on February 9, 2012.[1116] The basis for the $230 million liability will be discussed in detail in Section V.C.1.d(4)(b)(v). AFI and ResCap also modified the percentage of the total estimated liability allocated to ResCap and AFI to 92% and 8%, respectively. Therefore, although AFI and ResCap reduced the amount of the total liability accrued by $38 million, the total amount of the liability allocated to ResCap increased from $196.5 million to $211.5 million and the total amount allocated to AFI decreased from $71.5 million to $18.5 million.[1117]

### (8) Allocation Of The FRB/FDIC Settlement Costs

The amounts above assumed that all of the $207 million CMP would be offset by the borrower relief associated with the DOJ/AG Settlement, resulting in an effective cost for the CMP Order of $0 to both AFI and ResCap.[1118] All of the above-described costs resulting from the FRB/FDIC Consent Order have been and will be borne by ResCap. To date, none of these costs have been allocated to AFI.

### d.  Terms Of The DOJ/AG Settlement

### (1) DOJ/AG Consent Judgment, Dated April 4, 2012

The DOJ/AG Settlement was agreed to by the parties on February 9, 2012, prior to the filing of a formal complaint by the United States, acting through the DOJ and the AGs of various states

---

[1113] *See id.*

[1114] Memorandum, Significant Transaction Memo: General Information and Transaction Description Re Mortgage Fine, Waivers and Debt Forgiveness, dated Feb. 2012, at EXAM00220149 [EXAM00220147].

[1115] Accounting Presentation by C. Dondzila to the ResCap Board, dated Jan. 10, 2012, at RC40020152 [RC40020121].

[1116] Memorandum, Accrual for DOJ Settlement at December 31, 2011, dated Feb. 28, 2012, at 3 [EXAM00220938].

[1117] *See* Memorandum, Significant Transaction Memo: General Information and Transaction Description Re Mortgage Fine, Waivers and Debt Forgiveness, dated Feb. 2012, at EXAM00220149 [EXAM00220147]; Residential Capital, LLC Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010 (Mar. 28, 2012), at 70 [EXAM00122651].

[1118] *See* Residential Capital, LLC Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010 (Mar. 28, 2012), at 70 [EXAM00122651].

(the "DOJ/AG Plaintiffs").[1119] After negotiating the terms of the consent judgment based on allegations of improper conduct relating to mortgage servicing activities, as a formality, the DOJ/ AG Plaintiffs filed a formal complaint against defendants AFI, ResCap, and GMAC Mortgage on March 12, 2012. The complaint alleged certain civil claims for conduct related to the servicing of mortgage loans, the servicing of loans of borrowers in bankruptcy,[1120] and the origination of mortgage loans.[1121] The DOJ/AG Consent Judgment memorializing the terms of the settlement agreed to on February 9 was filed on April 4, 2012.

The DOJ/AG Consent Judgment and its related exhibits identified various actions that AFI, ResCap, and GMAC Mortgage agreed to take in settlement of claims alleged. These actions included:

> (1) The adoption of new servicing standards by AFI, ResCap, and GMAC Mortgage related to loans secured by owner-occupied properties that serve as the primary residence of the borrower, including: (a) standards relating to foreclosure and bankruptcy information, documentation of the borrower's account information, and chain of ownership; (b) oversight and management of third party providers of foreclosure, bankruptcy, or mortgage servicing activities; and (c) restrictions on servicing fees;[1122]

> (2) Payment by AFI, ResCap, and GMAC Mortgage (collectively defined as "Defendant" under the DOJ/AG Consent Judgment)[1123] of hard costs in the amount of $109,628,425;[1124] and

---

[1119] The states that are party to the DOJ/AG Settlement include: Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Louisiana, Maine, Maryland, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Washington, West Virginia, Wisconsin, Wyoming, the Commonwealths of Kentucky, Massachusetts, Pennsylvania and Virginia, and the District of Columbia. *See* DOJ/AG Consent Judgment, at 1 [RC00027463]. A separate consent judgment was entered into with the State of Oklahoma and the Oklahoma State Banking Department. Pursuant to this settlement, AFI, ResCap, and GMAC Mortgage agreed to pay $935,208 to the state of Oklahoma.

[1120] *See* DOJ/AG Consent Judgment, Ex. F-9, § E [RC00027463].

[1121] *See id.* Ex. F-6, § D.

[1122] *See id.* Ex. A.

[1123] *See id.* at 1.

[1124] *See id.* at 3. This amount was paid into an escrow fund along with other institutions resolving claims asserted by the DOJ and AGs, which aggregate amount was then to be distributed in the manner and for the purposes set forth in Ex. B1 and Ex. B2. Ex. B1 and Ex. B2 include an allocation of the settlement amount among the various states. *See id.* Ex. B1, B2.

(3) Providing a total of $200 million in consumer relief and refinancing to consumers meeting certain eligibility criteria.[1125] AFI, ResCap, and GMAC Mortgage could receive credit towards these obligations by performing certain types of loan modifications, deficiency waivers and forbearances ("soft credits").[1126] The details of this "borrower relief program" are set forth in detail below. Further, as noted below, the amount of soft credits permitted was subject to significant negotiations.[1127] Failure to earn sufficient soft credits to cover the $200 million consumer relief obligation would result in an additional payment of hard costs equal to, depending on the circumstances of the failure, either 125% or 140% of the unmet commitment amount.[1128]

In addition to imposing payment obligations on AFI, ResCap, and GMAC Mortgage, the DOJ/AG Consent Judgment also established a "monitor" to oversee compliance[1129] and provided for enforcement mechanisms.

In exchange for the payment of the settlement amounts, the DOJ/AG Consent Judgment provided for a federal[1130] and state[1131] release of claims[1132] against AFI and its affiliates[1133] based on conduct connected with the servicing of mortgage loans, the origination of mortgage loans, and the servicing of loans of borrowers in bankruptcy. The release did not cover certain other specified claims and remedies.[1134] Notably, the broad language contained in the release provisions arguably released Ally Bank, despite the fact that Ally Bank was not a party to the DOJ/AG Consent Judgment.[1135]

---

[1125] *See* DOJ/AG Consent Judgment, at 4 [RC00027463].

[1126] *See id.* Ex. D-1–12.

[1127] *See* Section V.C.1.e (discussion on negotiations leading up to the DOJ/AG Settlement).

[1128] *See* DOJ/AG Consent Judgment, Ex. D-11 [RC00027463].

[1129] *See id.* at 4, Ex. E-1.

[1130] *See id.* Ex. F-1–43.

[1131] *See id.* Ex. G-1–12.

[1132] There is also a section of the settlement that provides for the release of claims under the Servicemembers Civil Relief Act ("SCRA"), in exchange for certain obligations. *See id.* Ex. H-1–13.

[1133] Ex. F of the DOJ/AG Settlement, governing the federal releases, uses the term "Company," defined as AFI. Throughout, the releases include a release of "Company and any current or former affiliated entity (to the extent the Company retains liabilities associated with such former affiliated entity), and any of their respective successors or assigns, as well as any current or former director, current or former officer, and current or former employee of any of the foregoing, individually and collectively . . . ." *Id.* Ex. F-12, § F(2)(a). Similarly, Ex. G of the DOJ/AG Settlement, governing the state releases, provides a release for the "Bank", which is defined for the purposes of that section as AFI and "its current and former parent corporations or other forms of legal entities, direct and indirect subsidiaries, brother or sister corporations or other forms of legal entities divisions or affiliates." *Id.* Ex. G-1, § I.

[1134] *See id.* Ex. F-29–38.

[1135] *See id.* Ex. F, G.

*(a) Exhibit I Of The DOJ/AG Consent Judgment And The Allocation Of Responsibilities*

Exhibit I of the DOJ/AG Consent Judgment was the subject of much negotiation among the governmental entities and the AFI corporate family. It provides additional terms and clarifications of the judgment and exhibits. Exhibit I specifically notes that ResCap, GMAC Mortgage, RFC (collectively, the "DOJ/AG ResCap Parties"), and AFI have agreed to certain conditions in recognition of ResCap's "financial situation."[1136]

*(i) Provisions Governing Payment Of And Credit Towards Hard And Soft Costs*

Exhibit I specifically provides that the DOJ/AG ResCap Parties shall make the hard costs payment of $109.6 million and that AFI has agreed to enter into the DOJ/AG Earmark and Indemnification Agreement in furtherance of such payment.[1137] Exhibit I also states that the DOJ/AG ResCap Parties (and to the extent the DOJ/AG ResCap Parties do not perform such obligations, AFI) shall be responsible for the $200 million in soft costs. Notably, Exhibit I also provides that any successor or purchaser of all or a substantial portion of the assets of the DOJ/AG ResCap Parties shall not be obligated to pay any of the amounts owed by the DOJ/AG ResCap Parties or AFI under the DOJ/AG Consent Judgment.[1138]

*(ii) Provisions Governing Loan Modification Programs*

Exhibit I of the DOJ/AG Consent Judgment also requires that the DOJ/AG ResCap Parties and AFI conduct nationwide loan modification programs to be offered to borrowers suffering economic hardship with respect to both first-lien and second-lien loans.[1139] Pursuant to the terms of the DOJ/AG Consent Judgment, the DOJ/AG ResCap Parties are required to offer relief to all borrowers who meet the eligibility criteria in the owned-loan portfolios of the DOJ/AG ResCap Parties, AFI, and its affiliates, with the exception of certain Ally Bank-owned loans.[1140] Failure on behalf of the DOJ/AG ResCap Parties to satisfy the $200 million commitment would result in an additional assessment.[1141] Furthermore, even if more than $200 million in consumer relief were completed, the DOJ/AG ResCap Parties were required to continue to make offers to eligible borrowers during the solicitation period (which ultimately resulted in the parties providing relief in excess of the $200 million commitment).[1142]

---

[1136] *See id.* Ex. I-1.

[1137] *See id.*

[1138] *See id.*

[1139] *See id.* Ex. I-2.

[1140] *See id.*

[1141] *See id.* Ex. I-10–11.

[1142] *See id.* Ex. I-6.

### *(iii) Representations And Warranties*

Finally, Exhibit I contained provisions that governed the responsibilities of the DOJ/AG ResCap Parties in the event of a bankruptcy or other "transformative transaction," including, without limitation, a change of control transaction, a sale of all or substantially all of their assets (or assets that together are material to the performance of the obligations of the DOJ/AG ResCap Parties), or a reorganization or similar transaction. The DOJ/AG ResCap Parties agreed that in the event of such a transformative transaction, they would ensure the continued performance of their obligations under the DOJ/AG Consent Judgment, including requiring any successor or purchaser of substantially all the assets of a DOJ/AG ResCap Party to honor and perform the obligations under the DOJ/AG Consent Judgment.[1143]

Furthermore, the DOJ/AG ResCap Parties and AFI agreed that they would not enter into a transformative transaction without the consent of AFI; and AFI agreed that it would not consent to any such transformative transaction (or provide financial support in connection with any such transaction) unless the DOJ/AG ResCap Parties (including any successor to or purchaser of the assets from a ResCap Party) agreed to ensure the continued performance of the obligations under the DOJ/AG Consent Judgment.[1144] However, any successor or purchaser of all or a substantial portion of the assets of the DOJ/AG ResCap Parties would not be obligated to pay any of the amounts owed by the DOJ/AG ResCap Parties or AFI under the DOJ/AG Consent Judgment or the exhibits thereto.[1145]

### *(2) DOJ/AG Earmark And Indemnification Agreement, Dated March 9, 2012*

AFI, the U.S. government, and certain states entered into the DOJ/AG Earmark and Indemnification Agreement in contemplation of the fact that ResCap's payment of the hard costs might may be at risk of avoidance in any subsequent ResCap bankruptcy case.[1146] The terms of this agreement required that prior to payment of the $109.6 million, AFI and ResCap would execute Earmark Agreement (summarized below).[1147] Additionally, AFI agreed to indemnify the U.S. and certain states for any payments they are required to make as a result of an avoidance action pursuant to chapter 5 of the Bankruptcy Code, including all reasonable costs and expense in defending against such action.[1148]

---

[1143] *See id.* Ex. I-12–13.

[1144] *See id.*

[1145] See *id*. Ex. I-12.

[1146] *See* DOJ/AG Earmark and Indemnification Agreement, dated Mar. 9, 2012 [ALLY_0001865].

[1147] *See id.* at 1–2.

[1148] *See id.* ¶ 2.

*(3) Earmark Agreement, Dated March 14, 2012*

AFI and ResCap entered into the Earmark Agreement, dated March 14, 2012.[1149] Pursuant to the terms of the Earmark Agreement, ResCap agreed that, inter alia:

(1) The debt forgiveness set forth in the January 30 Letter Agreement was to allow ResCap to fund the hard costs under the DOJ/AG Consent Judgment;

(2) Without the capital support provided by AFI, ResCap could not have funded the hard costs;

(3) The $109.6 million of liquidity provided by AFI will be used solely to fund the hard costs; and

(4) AFI's capital support, and ResCap's use of that support does not result in any additional debt obligations of ResCap.[1150]

*(4) Economics Related To The DOJ/AG Settlement*

To ascertain the cost to ResCap of obtaining $200 million in soft credits, ResCap first determined which loans were eligible for borrower relief. Next, ResCap reviewed each individual loan to determine whether it was qualified for one of the forms of relief available from the "menu" or "waterfall" set forth in the DOJ/AG Consent Judgment.[1151] ResCap then utilized a model to estimate the expected accounting loss on these qualifying loans.[1152] The $200 million in borrower relief credits required under the DOJ/AG Settlement did not correspond dollar-for-dollar to the actual accounting loss incurred by ResCap due to previous accounting adjustments relating to the market value of the subject loans. For example, if ResCap held a loan in its HFS portfolio with an unpaid principal balance of $200,000 that it wrote down to a market value of $100,000 prior to the DOJ/AG Settlement, an offer by ResCap to the borrower of a $20,000 principal reduction, under the borrower relief program, would not decrease the market value of the loan by a corresponding $20,000 because the entire amount of the principal reduction was encompassed in the previous write-down of the loan.

The projected accounting loss associated with each loan often depended on the portfolio from which the loan came. For example, if a loan was in ResCap's HFS portfolio and the borrower was offered principal forgiveness, that form of relief on that type of loan could cost the company nothing because the loan had already been marked down to zero.[1153] On the other

---

[1149] *See* Earmark Agreement [ALLY_0000001].

[1150] *Id.* at 2.

[1151] DOJ/AG Consent Judgment, Ex. D [RC00027463].

[1152] Int. of C. Dondzila, Nov. 9, 2012, at 228:1–21.

[1153] *See id.* at 228:22–229:2.

hand, if a loan was in Ally Bank's portfolio, because it was considered HFI and had an allowance, then the accounting loss could be higher because in addition to reducing the unpaid principal balance of the loan, there would also only be a partial recovery of the allowance.[1154] The final step in the process was to determine whether Ally Bank should be reimbursed for any of the relief taken, based on a separate reimbursement schedule/matrix which was to be negotiated in accordance with the Servicing Agreement Modification Terms.[1155]

Appendix V.C.1.c(4) identifies the various costs incurred by ResCap and AFI related to the DOJ/AG Consent Judgment as well as the most recent estimates made available of future costs to be incurred. The costs incurred by ResCap and AFI and estimated future costs stemming from the DOJ/AG Settlement are summarized in Exhibit V.C.1.d(4) below.[1156]

EXHIBIT V.C.1.d(4)
**Summary of Total DOJ/AG Consent Judgment Costs**
*($ in Millions)*

| Item | Total |
|---|---:|
| Penalty/fine | $ 109.6 |
| Ally Bank reimbursement – borrower relief | 134.5 |
| Accounting impact of ResCap loan modifications – borrower relief | 15.7 |
| Subtotal borrower relief costs | 150.2 |
| Other costs associated with DOJ/AG Consent Judgment | 4.0 |
| Total DOJ/AG Consent Judgment costs | $ 263.8 |

*Source: EXAM00220897; EXAM11004487; ALLY_0196290; EXAM2020343; ALLY_0402171; ALLY_0402172; ALLY_0402173; EXAM00221497; EXAM00221498; ALLY_0402174; EXAM00237710; ALLY_0402175; ALLY_0402176; ALLY_0402177.*

### (a) Penalty / Fine – $109.6 Million

ResCap, through GMAC Mortgage, remitted the full fine of $109.6 million to an escrow account created pursuant to the DOJ/AG Consent Judgment on March 14, 2012.[1157]

---

[1154] *See id.* at 229:3–14.

[1155] *See id.* at 231:4–11; *see also* A&R Servicing Agreement, §§ 10.01(e)–(f), Ex. 4-B [ALLY_0114469].

[1156] Exhibit V.C.1.d(4) provides actual costs incurred through January 31, 2013 and estimates of future costs to be incurred as of November 1, 2012. As described below, adjustments have been made to eliminate double counting due to overlap of the estimation period and the period for which actual costs incurred were available (November 2012–January 2013).

[1157] *See* E-mail from C. Dondzila (Mar. 15, 2013) [EXAM11004487]; ResCap Liquidity Update: A Presentation for the ResCap Board of Directors, dated Mar. 23, 2012, at RC40020491 [RC40020488]; Special Examiner Presentation: DOJ/AG Settlement, dated Dec. 11, 2012, at EXAM00220908 [EXAM00220897]; ResCap Consolidating Financial Statements – 2012, dated Oct. 29, 2012 [ALLY_0244598] (showing payment of the funds was recorded under GMAC Mortgage).

*(b) Borrower Relief Program – $150.2 Million*

*(i) Description Of Borrower Relief Program*

As stated in Section V.C.1.d(1) above, AFI, ResCap, and GMAC Mortgage are required to offer relief to borrowers meeting certain criteria as outlined in Exhibit D of the DOJ/AG Consent Judgment.[1158] All borrowers meeting these criteria must be offered the relief, and ResCap must honor the relief regardless of the amount of time it takes the borrower to accept the offer. However, ResCap no longer has to honor the solicitations if the borrower does not respond within 180 days of the initial solicitation once ResCap exceeds its borrower relief obligation by $50 million (i.e. $250 million in borrower relief credits have been provided).[1159]

According to scenario analyses performed by ResCap in January 2012, ResCap did not have a large enough portfolio to earn the $200 million in borrower relief credits without modifying loans held in Ally Bank's portfolio.[1160] As shown in Exhibit V.C.1.d(4)(b)(i)—1 below, full access to the Ally Bank loan portfolio was necessary for ResCap to exceed the $200 million threshold in borrower relief credits and to avoid the resulting potential hard dollar penalty.[1161] ResCap estimated that it would incur an additional $56.0 million to $114.3 million under the DOJ/AG Consent Judgment if it were not able to modify Ally Bank loans or were allowed to do so only on a limited basis.[1162]

EXHIBIT V.C.1.d(4)(b)(i)—1
**Summary of Settlement Scenario Analyses**
*($ in Millions)*

| Settlement Scenario | Total Earned Soft Credits | | Soft Menu Shortfall (vs $200 million) | | Potential Soft Menu Penalty (at 25%) | | Additional Hard Dollar Impact | |
|---|---|---|---|---|---|---|---|---|
| Bank portfolio excluded entirely | $ | 108.6 | $ | 91.4 | $ | 22.9 | $ | 114.3 |
| Limit bank participation to contractual cap | $ | 155.2 | $ | 44.8 | $ | 11.2 | $ | 56.0 |
| Uncapped bank participation | $ | 203.4 | $ | - | $ | - | $ | - |

*Source:  Settlement Credit Model, prepared by ResCap [EXAM20276481] (attached to E-mail from C. Dondzila (Jan. 23, 3012) [EXAM20276480]).*

---

[1158] *See* DOJ/AG Consent Judgment, Ex. D [RC00027463].

[1159] *See id.* Ex. I-6 [RC00027463]; Residential Capital, LLC Condensed Consolidated Financial Statements for the Periods Ended March 31, 2012 and 2011 (Unaudited), at 44 [EXAM00070376].

[1160] *See* Settlement Credit Model, prepared by ResCap [EXAM20276481] (attached to E-mail from C. Dondzila (Jan. 23, 2012) [EXAM20276480]).

[1161] *See id.*

[1162] Settlement Credit Model, prepared by ResCap [EXAM20276481] (attached to E-mail from C. Dondzila (Jan. 23, 2012) [EXAM20276480]). This estimate assumes a 25% penalty. *See id.* As described in Section V.C.1.d(1), failure to earn sufficient soft credits to cover the $200 million consumer relief obligation would result in an additional payment of hard costs equal to, depending on the circumstances of the failure, either 125% or 140% of the unmet commitment amount. *See* DOJ/AG Consent Judgment, Ex. D-11 [RC00027463].

ResCap reviewed the loans contained in the ResCap and Ally Bank portfolios and determined that as of March 1, 2012,[1163] a total of 14,071 loans, with an unpaid principal balance of approximately $2.2 billion, were eligible for the borrower relief program.[1164] As shown in Exhibit V.C.1.d(4)(b)(i)—2 below, according to a ResCap report created on March 22, 2013, prior to the implementation of the borrower relief program, 6,033 of these loans, with an unpaid principal balance of $1.3 billion, were in the Ally Bank portfolio, and 8,038 of these loans, with an unpaid principal balance of $910 million, were in the ResCap portfolio.[1165]

EXHIBIT V.C.1.d(4)(b)(i)—2
**Summary of Loans Subject to Borrower Relief**
*($ in Millions)*

| | Number of Loans | | UPB | % of Total (Count) | % of Total (UPB) |
|---|---|---|---|---|---|
| Ally Bank loans | 6,033 | $ | 1,253 | 43% | 58% |
| ResCap loans | 8,038 | | 910 | 57% | 42% |
| Total loans to be solicited | 14,071 | $ | 2,163 | 100% | 100% |

*Source: Analysis of AG Consumer Relief: Eligibility and Solicitation Progress, dated March 22, 2013 [EXAM00339991].*

## (ii) Current Status Of Borrower Relief Program

Exhibit V.C.1.d(4)(b)(ii) provides a summary of the current solicitation status of the borrower relief program. As of March 22, 2013, ResCap and GMAC Mortgage had either solicited or borrowers had fully paid off the principal balances of all eligible loans under the borrower relief program.

EXHIBIT V.C.1.d(4)(b)(ii)
**Summary of Borrower Relief Solicitation Status**
As of March 22, 2013
*($ in Millions)*

| | Number of Loans | | UPB | % of Total (Count) | % of Total (UPB) |
|---|---|---|---|---|---|
| Ally Bank loans solicited | 5,704 | $ | 1,252 | 41% | 58% |
| Ally Bank loans paid off | 329 | | 1 | 2% | 0% |
| ResCap loans solicited | 7,532 | | 906 | 54% | 42% |
| ResCap loans paid off | 506 | | 3 | 4% | 0% |
| Total loans to be solicited | 14,071 | $ | 2,163 | 100% | 100% |

*Source: Analysis of AG Consumer Relief: Eligibility and Solicitation Progress, dated March 22, 2013 [EXAM00339991].*

---

[1163] *See* Special Examiner Presentation: DOJ/AG Settlement, dated Dec. 11, 2012, at EXAM00220903 [EXAM00220897].

[1164] *See* Analysis of AG Consumer Relief: Eligibility and Solicitation Progress, dated Mar. 22, 2013 [EXAM00339991] (providing an updated status of solicitation progress as of March 22, 2013).

[1165] *See id.*

In February 2013, the court-appointed monitor of the borrower relief program certified that AFI, ResCap, and GMAC Mortgage had satisfied the terms of the DOJ/AG Consent Judgment.[1166]

### (iii) Economic Impact Of Modifications

### (A) Modifications Of Ally Bank Loans – $134.5 Million

As described in Section V.C.2 below, GMAC Mortgage reimbursed Ally Bank for modifications made to Ally Bank loans in accordance with the January 30 Letter Agreement, in addition to the A&R Servicing Agreement between GMAC Mortgage and Ally Bank and the related AG Menu Matrix.

As shown in Exhibit V.C.1.d(4)(b)(iii)(A) below, ResCap, through GMAC Mortgage, remitted reimbursement payments totaling $96.8 million to Ally Bank from April 2012 through January 31, 2013.[1167] Two of these payments occurred in the days leading up to ResCap's bankruptcy filing—$45.0 million on May 10, 2012 and $3.4 million on May 11, 2012.[1168]

---

[1166] Office of Mortgage Settlement Oversight, Press Release, *National Mortgage Settlement Monitor: Ally Has Met its Consumer Relief Obligations* (Feb. 14, 2013), https://www.mortgageoversight.com/wp-content/uploads/2012/03/Ally-Report.pdf.

[1167] Ally Bank sent reimbursement invoices to ResCap dated May 9, 2012, May 10, 2012, June 4, 2012, June 28, 2012, July 3, 2012, August 3, 2012, September 7, 2012, October 2, 2012, November 2, 2012, December 6, 2012, January 3, 2013, and February 4, 2013. *See* Invoice from Ally Bank to ResCap (May 9, 2012) [ALLY_0196290]; Invoice from Ally Bank to ResCap (May 10, 2012) [EXAM20203413]; Invoice from Ally Bank to ResCap (June 4, 2012) [ALLY_0402171]; Invoice from Ally Bank to ResCap (June 28, 2012) [ALLY_0402172]; Invoice from Ally Bank to ResCap (July 3, 2012) [ALLY_0402173]; Invoice from Ally Bank to ResCap (Aug. 3, 2012) [EXAM00221497]; Invoice from Ally Bank to ResCap (Sept. 7, 2012) [EXAM00221498]; Invoice from Ally Bank to ResCap (Oct. 2, 2012) [ALLY_0402174]; Invoice from Ally Bank to ResCap (Nov. 2, 2012) [EXAM00237710]; Invoice from Ally Bank to ResCap (Dec. 6, 2012) [ALLY_0402175]; Invoice from Ally Bank to ResCap (Jan. 3, 2013) [ALLY_0402176]; Invoice from Ally Bank to ResCap (Feb. 4, 2013) [ALLY_0402177]. *See also* Special Examiner Presentation: DOJ/AG Settlement, dated Dec. 11, 2012, at EXAM00220908 [EXAM00220897]; ResCap Consolidating Financial Statements – 2012, dated Oct. 29, 2012 [ALLY_0244598]. Payments made after the Petition Date relating to postpetition modifications were expressly authorized by an interim order entered on May 16, 2012, and by a final stipulation and order entered on September 12, 2012. *See* Interim Order Pursuant to Sections 105(a) and 363 of the Bankruptcy Code Authorizing the Debtors to Continue to Perform Under the Ally Bank Servicing Agreement in the Ordinary Course of Business [Docket No. 90]; Stipulation and Order Reserving Rights with Respect to Debtors' Motion for Interim and Final Orders Under Bankruptcy Code Sections 105(a) and 363 Authorizing the Debtors to Continue to Perform Under the Ally Bank Servicing Agreement in the Ordinary Course of Business [Docket No. 1420].

[1168] *See* E-mail from M. Rosen (May 10, 2012), at ALLY_0182324 [ALLY_0182323]; Invoice from Ally Bank to ResCap (May 9, 2012) [ALLY_0196290]. Rosen was a member of the Capital Markets Team at AFI during this period. *See also* Invoice from Ally Bank to ResCap (May 10, 2012) [EXAM20203413]; Agreement for AG Settlement Loan Modifications for April 2012, dated May 11, 2012 [ALLY_PEO_0087335] (letter agreement between Ally Bank, ResCap, and GMAC Mortgage clarifying the modification and reimbursement agreement between GMAC Mortgage and Ally Bank as provided under the January 30 Letter Agreement).

EXHIBIT V.C.1.d(4)(b)(ii)(A)
**Summary of Ally Bank Reimbursement Payments**
*($ in Millions)*

| Date of Invoice | Covered Monthly Period Ending | Invoice Amount |
|---|---|---|
| May 9, 2012 | April 30, 2012 | $    45.0 |
| May 10, 2012 | April 30, 2012 | 3.4 |
| June 4, 2012 | May 31, 2012 + prior true-up amounts | 19.9 |
| June 28, 2012 | May 31, 2012 + prior true-up amounts | 1.1 |
| July 3, 2012 | June 30, 2012 + prior true-up amounts | 3.6 |
| August 3, 2012 | July 31, 2012 + prior true-up amounts | 2.9 |
| September 7, 2012 | August 31, 2012 + prior true-up amounts | 5.3 |
| October 2, 2012 | September 30, 2012 + prior true-up amounts | 1.7 |
| November 2, 2012 | October 31, 2012 | 3.5 |
| December 6, 2012 | November 30, 2012 | 1.3 |
| January 3, 2013 | December 31, 2012 | 0.3 |
| February 4, 2013 | January 31, 2013 | 8.8 |
| Total Ally Bank reimbursements | | $    96.8 |

*Source: ALLY_0196290; EXAM2020343; ALLY_0402171; ALLY_0402172; ALLY_0402173; EXAM00221497; EXAM00221498; ALLY_0402174; EXAM00237710; ALLY_0402175; ALLY_0402176; ALLY_0402177.*

As of November 1, 2012, ResCap estimated that GMAC Mortgages' future reimbursement payments to Ally Bank would total $48.1 million.[1169] Given that actual reimbursement payments for the period beginning November 1, 2012 through January 31, 2013 were $10.4 million, the Examiner's Financial Advisors assumed that estimated reimbursement payments from February 1, 2013 through the end of the borrower relief program would be $37.7 million ($48.1 million – $10.4 million = $37.7 million).[1170] As a result, the total reimbursement payments to Ally Bank are estimated to be $134.5 million ($96.8 million + $37.7 million = $134.5 million).

### (B) Modifications Of ResCap Loans – $15.7 Million

As of October 31, 2012, ResCap, had incurred $12.2 million in costs associated with the modification of loans held in the ResCap portfolio.[1171] As of the same date, ResCap estimated that it would incur an additional $3.5 million in costs associated with future modifications of loans held in the ResCap portfolio, for a total of $15.7 million.[1172]

---

[1169] Special Examiner Presentation: DOJ/AG Settlement, dated Dec. 11, 2012, at EXAM00220908 [EXAM00220897].

[1170] ResCap did not provide a more current estimate of post-January 2013 reimbursement payments to Ally Bank.

[1171] Special Examiner Presentation: DOJ/AG Settlement, dated Dec. 11, 2012, at EXAM00220907 [EXAM00220897].

[1172] ResCap did not provide updated information regarding the total costs incurred to date or future costs to be incurred by ResCap due to modification of loans held in the ResCap portfolio.

As shown in Exhibit V.C.1.d(4)(b)(iii)(B) below, the vast majority of costs related to borrower relief result from GMAC Mortgage's reimbursement payments to Ally Bank.[1173]

EXHIBIT V.C.1.d(4)(b)(iii)(B)
**Comparison of ResCap Borrower Relief Costs to Loans Solicited to Date**
*($ in Millions)*

| ResCap Borrower Relief Costs | ResCap Subtotal | % of Total | Loan Portfolio | Loans Solicited (Units) | % of Total | UPB | % of Total |
|---|---|---|---|---|---|---|---|
| Ally Bank reimbursement | $ 134.5 | 89.5% | Ally Bank | 5,704 | 43.1% | $ 1,251.8 | 58.0% |
| Accounting impact of ResCap loan modifications | 15.7 | 10.5% | ResCap | 7,532 | 56.9% | 906.4 | 42.0% |
| Total | $ 150.2 | | Total | 13,236 | | $ 2,158.2 | |

*Source: Appendix V.C.1.c(4); Analysis of AG Consumer Relief: Eligibility and Solicitation Progress, dated March 22, 2013 [EXAM00339991].*

Nearly 60% of the solicitations as of October 31, 2012 were for ResCap loans. However, over 89% ResCap's costs related to borrower relief resulted from reimbursement payments to Ally Bank. This discrepancy is due in part to different accounting methodologies for HFS and HFI loans, as well as the fact the reimbursement payments to Ally Bank did not account for the reserves Ally Bank recorded on its HFI portfolio.

The ResCap loans subject to borrower relief were held in ResCap's HFS portfolio. The Ally Bank loans subject to borrower relief were held in Ally Bank's HFI portfolio.[1174] AFI's accounting policy[1175] requires that ResCap record the carrying value its HFS portfolio based on the lower of cost or market (fair value), commonly referred to as "LOCOM," if it does not elect the option to record the loans at fair value.[1176] The carrying value of the loans in ResCap's HFS portfolio closely approximated the fair value of those loans as of December 31, 2011.[1177]

AFI's accounting policy requires that Ally Bank record the carrying value of its HFI portfolio on an adjusted cost basis.[1178] AFI's accounting policy for HFI loans states that carrying

---

[1173] Special Examiner Presentation: DOJ/AG Settlement, dated Dec. 11, 2012, at EXAM00220904, 08 [EXAM00220897].

[1174] Meeting with ResCap and FTI, Financial Advisor to the Debtors, in Ft. Washington, PA (Dec. 11, 2012).

[1175] AFI's accounting policies for HFS and HFI applied to both ResCap and Ally Bank.

[1176] Accounting Policy: Loans—Held for Sale or Held for Investment, dated June 1, 2010, at RC40000591 [RC40000585].

[1177] The fair value of the HFS loans held by GMAC Mortgage was $3.13 billion, or less than 1%, greater than the carrying value for these loans of $3.11 billion. GMAC Mortgage, LLC Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010 (Mar. 28, 2012), at 48 [RC00032177].

[1178] *See* Accounting Policy: Loans—Held for Sale or Held for Investment, dated June 1, 2010, at RC40000593–94 [RC40000585].

value for purchased HFI loans is based on the loan's unpaid principal balance, the purchase premium or discount, and the change in value of the loan commitment derivative.[1179] The initial carrying value of originated HFI loans is calculated in the same manner as the purchased HFI loans with the inclusion of any charge-offs or allowances for estimated uncollectible amounts and impairments in value.[1180] AFI's accounting policy also states that HFI loans must be evaluated for possible credit impairment. If it is probable that AFI has incurred a loss and the amount is reasonably estimable, the loss should be recognized in the period in which the loss occurred.[1181] This credit impairment is recorded in the form of a reserve on the balance sheet.

In general, the accounting methodology employed for the HFS portfolio resulted in greater reductions to the carrying value of the HFS loans compared to the accounting methodology employed for the HFI loans.[1182] This premise is corroborated by an analysis of the write-offs and reserves related to HFS and HFI loans. GMAC Mortgage wrote-down the unpaid principal balance of its HFS portfolio of residential mortgage loans by $318.2 million (9.2% of carrying value) and $427.7 million (11.2% of carrying value) in 2011 and 2010, respectively.[1183] On the other hand, AFI's reserves related to the consumer mortgage HFI loans for the origination and servicing operations were $16 million (0.6% of carrying value) and $13 million (0.6% of carrying value) in 2011 and 2010, respectively.[1184]

Furthermore, Ally Bank's reserves on its HFI portfolio were not accounted for in the calculation of the reimbursement payments due from GMAC Mortgage to Ally Bank. Therefore, the reimbursement payment is based on the impact of the borrower relief on Ally Bank's gross carrying value of its HFI loans as opposed to the carrying value net of reserves. The exclusion of Ally Bank's reserves from the reimbursement calculations will be discussed in greater detail in Section V.C.2.c(4) below.

---

[1179] *Id.*

[1180] *See id.* at RC40000594.

[1181] *See id.* at RC40000595.

[1182] Meeting with ResCap and FTI, Financial Advisor to the Debtors, in Ft. Washington, PA (Dec. 11, 2012).

[1183] *See* GMAC Mortgage, LLC Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010 (Mar. 28, 2012), at 20 [RC00032177].

[1184] Ally Financial Inc., Annual Report (Form 10-K) (Feb. 28, 2012), at 61.

*(iv) Other Costs Associated With DOJ/AG Consent Judgment–$4 Million*

ResCap, through GMAC Mortgage, had incurred approximately $4 million in "other" costs relating to the borrower relief program as of November 1, 2012.[1185] These costs included attorneys' fees, other fines and penalties, and costs associated with the Hope for Homeowners Program.[1186]

*(v) Accounting For DOJ/AG Settlement*

As noted in Section V.C.1.c(7), on January 30, 2012, AFI and its subsidiaries estimated their liability associated with the CMP Order and DOJ/AG Settlement to be $268 million and accrued a liability in the December 31, 2011 financial records.[1187] After the announcement of the CMP Order and the DOJ/AG Settlement on February 9, 2012, AFI and its subsidiaries reduced their estimate of this liability to $230 million in their December 31, 2011 financial statements.[1188] Exhibit V.C.1.d(4)(b)(v) outlines the elements comprising this $230 million liability.

EXHIBIT V.C.1.d(4)(b)(v)
**DOJ/AG Settlement: Summary of $230 Million Accrued Liability**
December 31, 2011
*($ in Millions)*

|  |  |  |
|---|---|---|
| Hard dollar penalties | $ | 112.5 |
| Soft dollar penalties | | 99.0 |
| Other [(1)] | | 18.5 |
| Total | $ | 230.0 |

*[(1)] Includes $9 million Service Member Civil Relief Act, $7.5 million servicer advance reserve, and $2.0 million rounding.*
*Source: Memorandum, Accrual for DOJ Settlement at December 31, 2011, dated Feb. 28, 2012, at 3 [EXAM00220938].*

As will be discussed in Section V.C.1.f, ResCap and AFI considered various allocation scenarios when estimating the total cost of the DOJ/AG Settlement. Ultimately, ResCap and AFI decided to match the allocation methodology set forth in the February 9, 2012 FRB press release announcing the CMP Order,[1189] and agreed to allocate the estimated $230 million liability for the DOJ/AG Settlement and the CMP Order 8% to AFI and 92% to ResCap.[1190] Therefore, AFI

---

[1185] Special Examiner Presentation: DOJ/AG Settlement, dated Dec. 11, 2012, at EXAM00220908 [EXAM00220897].

[1186] *See id.*

[1187] Memorandum, Accrual for DOJ Settlement at December 31, 2011, dated Feb. 28, 2012, at 3 [EXAM00220938].

[1188] *Id.*

[1189] FRB, Press Release (Feb. 9, 2012), http://www.federalreserve.gov/newsevents/press/enforcement/ 20120209a.htm.

[1190] *See* Section V.C.1.f(4) (discussing AFI's and ResCap's decision to use the FRB press release as the proper allocation method of penalties imposed under the government settlements).

recorded $18.5 million of the total liability, and ResCap (through GMAC Mortgage) recorded the remaining $211.5 million liability.[1191]

### e. *Negotiations Leading To The Government Settlements*

The government's investigation in the latter half of 2009 was followed by intense negotiations between the governmental entities and the AFI corporate group.[1192] While the settlement negotiations with the DOJ and AGs were lengthy, the road to settlement with the FRB and FDIC was relatively short and was accomplished in two stages, with the agreement regarding the FRB/FDIC Consent Order coming first, and the agreements regarding the CMP Order and the DOJ/AG Consent Judgment coming last. During these negotiations there was a general view that the interests of AFI and ResCap were aligned regarding getting the lowest possible penalty amount.[1193] However, there was tension between the two companies[1194] and their subsidiaries regarding the ultimate allocation of costs between them.[1195]

#### (1) *Involvement Of The AFI Board And The ResCap Board In The Negotiations Concerning The Government Settlements*

According to Pamela West, the ResCap Board, including the Independent Directors, had "robust discussions about the consent order"[1196] and was kept abreast of developments regarding the

---

[1191] *See* Residential Capital, LLC Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010 (Mar. 28, 2012), at 70 [EXAM00122651].

[1192] Marano noted that there was "minimal discussion" regarding the FRB/FDIC Settlement, due to its nature as a "natural order from the regulator" and that the FRB/FDIC Settlement "largely copied what we negotiated with the [DOJ and AG]. Int. of T. Marano, Feb. 27, 2013, at 5:10–19, 6:9–10. However, the discussions regarding the DOJ/AG Settlement involved a lot of back and forth and entailed several meetings a week over the course of a year. *See id*. at 6:15–7:8.

[1193] *See id*. at 16:18–17:8 ("While the negotiations were going on, the general view was that some portion of this would have to get picked up by ResCap, and the enforcement activity was largely tar—initially targeted at the servicer. So, the approach I took was, get the lowest fine possible for the servicer, and that should, you know, be fine for everybody."); Int. of M. Carpenter, Mar. 4, 2013, at 217:11–220:12 ("[T]he interest of ResCap and of the parent were completely aligned in terms of getting the lowest possible cost and settlement that we could."). Carpenter was the CEO of AFI during this period.

[1194] *See* Int. of T. Marano, Nov. 26, 2012, at 280:3–25 (noting that Solomon was "consistently trying to shift the responsibility from Ally to ResCap" while the FRB was simultaneously and "consistently trying to make sure that if anything happened to ResCap, that Ally would be ultimately responsible.").

[1195] *Compare* Int. of T. Marano, Feb. 27, 2013, at 18:25–19:14 ("There was definitely pushback from the bank to have as much fall on ResCap as possible. And, ResCap was actually doing the servicing. . . . I obviously was pushing for the lowest possible fees, and to minimize the impact to ResCap."), *with* Int. of M. Carpenter, Mar. 4, 2013, at 219:10–220:12 ("Now, in terms of how it gets allocated, it is 100 clear to everybody that everything that happened for which we paid a fine was because of ResCap's operations. There was nothing in there having to do with anything the parent company did with one minor exception. And so by any logic, 100 percent of whatever it costs should go to ResCap.").

[1196] Int. of P. West, Jan. 11, 2013, at 55:3–4. At this point, West was the Chairperson of the ResCap Audit Committee.

settlements and compliance efforts, despite the fact that they did not take part in the negotiations themselves.[1197] The discussions appear to have been focused on understanding the settlement itself, rather than on the allocation of settlement responsibilities between AFI and ResCap.[1198]

On January 27, 2011, the ResCap Board was informed of information requests and inquiries from the SEC, the DOJ, and the state AGs, and was presented with "the findings of the interagency mortgage foreclosure examination of Ally Financial, its nonbank mortgage subsidiaries and Ally Bank conducted by the Federal Reserve."[1199] In February 2011, Marano briefed the ResCap Board on "the results of the mortgage foreclosure target examination conducted by the Federal Reserve."[1200] By letter dated February 18, 2011, the FRB provided the AFI corporate group with a draft of the FRB/FDIC Consent Order.[1201]

As early as February 25, 2011, the ResCap Board discussed the proposed FRB/FDIC Settlement, led by Diane Citron (who was assigned to head the task force devoted to addressing the issues the FRB had identified).[1202] Communications between ResCap and AFI revealed that the FRB indicated in discussions regarding the FRB/FDIC Consent Order that it expected AFI to be "on notice that it is fully accountable for its businesses and must take a

───────────────────────

[1197] *Id.* at 61:17–22 ("We were certainly updated on a very regular basis as the negotiations and discussions were going along, yes. Did we take an active participatory part in them, no. But the independent directors were certainly kept up to date on the status of the negotiations."); Int. of J. Mack, Jan. 15, 2013, at 96:17–97:7. Mack was a Director of the ResCap Board during this period.

[1198] *See* Int. of P. West, Jan. 11, 2013, at 54:17–56:16; *see also* Int. of J. Pensabene, Jan. 9, 2013, at 190:9–192:22 (noting that there were no discussions with the government during negotiations of the DOJ/AG Settlement regarding what entities were responsible for the conduct underlying the settlement or which entities were liable under the statutes being violated).

[1199] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Jan. 27, 2011, at RC00023406 [RC00023397] (noting that Marano presented a series of charts summarizing the FRB investigation, paying particular attention to issues raised in "the review of foreclosure and delinquent loan files, the Document Custodian activity and Risk Management[,]" and also the next steps in responding to the investigation's findings). *See also* Federal Reserve Bank of Chicago AFI Supervisory Team Presentation, Interagency Mortgage Foreclosure Examination of Ally Financial, Inc., its Nonbank Mortgage Subsidiaries, and Ally Bank, dated Jan. 27, 2011, at RC40019274–84 [RC40019219].

[1200] Minutes of a Regular Meeting of the Board of Residential Capital, LLC, Feb. 11, 2011, at RC00023418 [RC00023397].

[1201] *See* Minutes of a Special Meeting of the Board of Residential Capital, LLC, Feb. 25, 2011, at RC00023419 [RC00023397]; Letter from the Federal Reserve Bank of Chicago to T. Marano, W. Solomon, and Mark Weintraub (Feb. 18, 2011) [ALLY_0359123]. During this period, Weintraub was the Executive Vice President of Mortgage Servicing Remediation Oversight at AFI, and was designated the "Engagement Manager" on behalf of AFI for the implementation of the PwC Engagement Letter.

[1202] *See* FRB Program Charter, Presentation to the ResCap Board, dated Mar. 7, 2011, at RC40019421 [RC40019366] ("A Task Force led by Ms. Citron was established."); Minutes of a Special Meeting of the Board of Residential Capital, LLC, Feb. 25, 2011, at RC00023419 [RC00023397].

more active role in setting risk tolerances and assuring adherence."[1203] The draft FRB/FDIC Consent Order listed AFI, Ally Bank, ResCap, and GMAC Mortgage as responsible parties from the beginning,[1204] but the ResCap Board apparently discussed only the applicability of items in the draft to ResCap or GMAC Mortgage, not to AFI or Ally Bank.[1205] The ResCap Board was informed, during its regular meeting in March 2011, that the proposed FRB/FDIC Consent Order was directed at each of AFI, Ally Bank, ResCap, and GMAC Mortgage.[1206]

ResCap's management determined that it had concluded negotiations with respect to the FRB/FDIC Consent Order on April 1, 2011. At that time, the ResCap Board was provided with a near-final draft order.[1207] Cathy Quenneville, the Corporate Secretary of ResCap and AFI, informed the ResCap Board that ResCap should enter into the order quickly, lest it be the only target of the investigations subject to a separate announcement by the FRB.[1208] That same day, following a discussion on the version of the FRB/FDIC Consent Order circulated to the ResCap Board earlier in the morning,[1209] the ResCap Board authorized Marano to enter into the FRB/FDIC Consent Order.[1210]

---

[1203] E-mail from B. Yastine to D. Citron, T. Marano, and S. Abreu (Feb. 22, 2011) [EXAM11084270]. Abreu was the President of both GMAC Mortgage and ResCap during this period. He was also a member of the ResCap Board and the ResCap Executive Committee.

[1204] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Feb. 25, 2011, at RC00023419 [RC00023397].

[1205] *Id.* ("Discussion was given to, among other things, applicability of the items to ResCap or to GMAC Mortgage, LLC; regulatory recommendations and actions required; and topics or areas identified in the draft Consent Order for which actions have been implemented or initiated by management prior to receipt of the draft Consent Order.").

[1206] Minutes of a Regular Meeting of the Board of Residential Capital, LLC, Mar. 9, 2011, at RC00023423 [RC00023397]. ("[Citron] informed the Board that the draft Consent Order is directed at Ally, Ally Bank, ResCap, GMAC Mortgage, LLC and Residential Funding, LLC and that the primary focus is on controls around the risks attendant to mortgage servicing.").

[1207] E-mail from C. Quenneville (Apr. 1, 2011), at RC40019516 [RC40019428].

[1208] *Id.*

It is in ResCap's interest to execute the Consent Order relatively quickly. While the [FRB] and OCC have agreed to a joint announcement, the [FRB] confirmed today that the OCC and its banks are well ahead of us on the execution process, and the OCC may proceed on its own with a public announcement. If we have already executed our Consent Order, we would likely be included in any such announcement. If we have not executed, we might find our self being the sole subject of a subsequent announcement.

[1209] Draft FRB/FDIC Consent Order, dated Apr. 1, 2011, at RC40019518–57 [RC40019428] (attached to E-mail from C. Quenneville (Apr. 1, 2011), at RC40019516 [RC40019428]).

[1210] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Apr. 1, 2011, at RC00023432–33 [RC00023397].

### *(2) Compliance With The FRB/FDIC Consent Order*

Following the formal settlement, on May 6, 2011, the ResCap Board discussed the formation of a ResCap Consent Order Compliance Committee to oversee compliance with the FRB/FDIC Consent Order and update the ResCap Board on compliance with the order,[1211] which was authorized in late-May.[1212] The ResCap Board further suggested the possibility of holding joint meetings of the ResCap and AFI sub-committees "established for the same purpose to ensure consistency in the communication of required information and follow-through plans."[1213] These joint meetings were held by a "Combined" Consent Order Compliance Committee, which included representatives from AFI and ResCap.[1214]

---

[1211] Minutes of a Regular Meeting of the Board of Residential Capital, LLC, May 6, 2011, at RC00023444–45 [RC00023397]. On April 28, 2012, the AFI Board similarly discussed the formation of a special committee to "oversee compliance and to review and monitor management's action plan to comply with the Consent Order." Minutes of a Regular Meeting of the Board of Directors of Ally Financial Inc., Apr. 28, 2011, at ALLY_0115679–80 [ALLY_0115565].

[1212] Action by Written Consent of the Board of Directors of Residential Capital, LLC, dated May 26, 2011, at RC00023453–54 [RC00023397]. Prior to his appointment to the ResCap Consent Order Compliance Committee, Edward Smith was a member of the ResCap Audit Committee.

[1213] Minutes of a Regular Meeting of the Board of Residential Capital, LLC, May 6, 2011, at RC00023444–45 [RC00023397].

[1214] *See, e.g.,* Minutes of the Ally Financial Inc./Residential Capital, LLC Combined Consent Order Compliance Committee Meeting, June 7, 2011 [RC40019071]; Minutes of the Ally Financial Inc./Residential Capital, LLC Combined Consent Order Compliance Committee Meeting, July 12, 2011, at RC40019075 [RC40019071]; Minutes of the Ally Financial Inc./Residential Capital, LLC Combined Consent Order Compliance Committee Meeting, July 27, 2011, at RC40019088 [RC40019071]; Minutes of the Ally Financial Inc./Residential Capital, LLC Combined Consent Order Compliance Committee Meeting, Aug. 22, 2011, at RC40019091–93 [RC40019071] (noting that "a report on the costs associated with the foreclosure review and overall Consent Order compliance program will be presented at an upcoming meeting of the COCCs."); Minutes of the Ally Financial Inc./Residential Capital, LLC Combined Consent Order Compliance Committee Meeting, Sept. 27, 2011, at RC40019095 [RC40019071]; Minutes of the Ally Financial Inc./Residential Capital, LLC Combined Consent Order Compliance Committee Meeting, Oct. 28, 2011, at RC40019137 [RC40019109]; Minutes of the Residential Capital, LLC Consent Order Compliance Committee Meeting, Dec. 16, 2011, at RC40019143–44 [RC40019109] ("Mr. Weintraub noted that certain process improvements implemented to comply with Consent Order requirements are benefiting other areas of the business, and that there is evidence of the effectiveness of the policies, practices, and procedures that have been put into operation, specifically reference enhancements to oversight of legal suppliers and SPOC."); Minutes of the Ally Financial Inc./Residential Capital, LLC Combined Consent Order Compliance Committee Meeting, Jan. 25, 2012, at RC40019148 [RC40019109]; Minutes of the Ally Financial Inc./Residential Capital, LLC Combined Consent Order Compliance Committee Meeting, Mar. 8, 2012, at RC40019152 [RC40019109]. The Examiner was able to uncover evidence of only one meeting individually held by the ResCap Consent Order Compliance Committee, and even in that circumstance, a representative of the AFI Consent Order Compliance Committee, John Durrett, was present. *See* Minutes of the Residential Capital, LLC Consent Order Compliance Committee Meeting, Dec. 16, 2011, at RC40019143 [RC40019109].

The ResCap Consent Order Compliance Committee updated the ResCap Board regarding the progress of compliance with the FRB/FDIC Consent Order.[1215] The ResCap Board was further informed by Citron that while "the focus of the Consent Order is on the mortgage servicing activity," compliance was "a company-wide effort with multiple requirements for Ally and Ally Bank as well."[1216]

The ResCap Board approved an oversight plan prepared for the FRB and FDIC[1217] addressing, among other things, funding of the items set forth in the FRB/FDIC Consent Order (the "Board Oversight Plan"). The Board Oversight Plan identified the AFI Board and the ResCap Board as the appropriate parties to ensure adequate funding of mortgage servicing operations,[1218] but additionally identified two AFI Board committees as being responsible, together with ResCap, for adequate funding of risk management, audit and compliance programs.[1219] The Board Oversight Plan reflected comments by the FRB and was to be reviewed by the Combined Consent Order Compliance Committee.[1220] In addition, draft action plans related to compliance with the FRB/FDIC Consent Order were submitted to the FRB to incorporate feedback received prior to the submission of the final action plans by the July 13, 2011 due date.[1221]

The members of the ResCap Consent Order Compliance Committee gave oral updates to the ResCap Board covering costs associated with such compliance.[1222] As the compliance

---

[1215] *See, e.g.,* Minutes of a Regular Meeting of the Board of Residential Capital, LLC, May 6, 2011, at RC00023444 [RC00023397]; Draft Minutes of a Regular Meeting of the Board of Residential Capital, LLC, Mar. 23, 2013, at EXAM11088883 [EXAM11088882].

[1216] Minutes of a Regular Meeting of the Board of Residential Capital, LLC, May 6, 2011, at RC00023444 [RC00023397].

[1217] Action by Written Consent of the Board of Directors of Residential Capital, LLC, dated June 9, 2011, at RC00023465–69 [RC00023397].

[1218] The Boards of Directors of Ally Financial and Residential Capital, LLC; Board Oversight Plan, dated June 13, 2011, at RC00023481 [RC00023397] (attached to Action by Written Consent of the Board of Directors of Residential Capital, LLC, dated June 9, 2011, Ex. A, [RC00023397]).

[1219] *See id.* at RC00023492.

[1220] Minutes of a Regular Meeting of the Board of Residential Capital, LLC, July 1, 2011, at RC40018631 [RC40018411].

[1221] Minutes of a Regular Meeting of the Board of Directors of Residential Capital, LLC, July 1, 2011, at RC40018631 [RC40018411]; Consent Order Compliance Program Update, Presentation to the Board of Residential Capital, LLC, dated July 1, 2011, at RC40019649–53 [RC40019597].

[1222] *See, e.g.,* Minutes of a Regular Meeting of the Board of Residential Capital, LLC, Oct. 7, 2011, at RC40018694–95 [RC40018411] (noting that West "informed the Board that she will present to the Board on a regular basis a verbal report regarding the activities of the combined Ally Financial Inc., and ResCap Consent Order Compliance Committees" and that West reported on "program costs through 2013, and costs associated with the foreclosure review."); Materials of a Special Residential Capital, LLC Board of Directors Meeting, Oct. 7, 2011, at RC00023278 [RC00023248] (inserted document stating that a "verbal" update to the Board was made by the Consent Order Compliance Committee).

program progressed, it became clear that the original cost estimate for an independent consultant to conduct an assessment of GMAC Mortgage's and its subsidiaries' risk would be insufficient.[1223] The Combined Consent Order Compliance Committee likewise included a review of costs in its normal reporting and efforts to ensure compliance with the FRB/FDIC Consent Order.[1224] Discussions regarding the settlement with the state AGs and the DOJ

---

[1223] Minutes of a Regular Meeting of the Board of Residential Capital, LLC, July 1, 2011, at RC40018631 [RC40018411].

> Ms. Citron next commented on the status of the Consent Order requirement that an independent consultant be engaged to conduct a comprehensive assessment of the mortgage servicing companies' risk, and she explained that the review is to include testing as well as the assessment of risk controls. She added that the testing component significantly increases the scope and cost of the engagement.

[1224] Minutes of the Ally Financial Inc./Residential Capital, LLC Combined Consent Order Compliance Committee Meeting, Sept. 27, 2011, at RC40019096 [RC40019071].

> Mr. Weintraub briefed the COCCs and Mr. Geer on program finances, which he said would be reviewed in more detail later in the meeting. Responding to a question asked by Mr. Geer, Mr. Weintraub said that Ally Bank expenses are included in reported Consent Order program costs. During the discussion that ensued, Ms. [Barbara] Yastine commented on quarterly and monthly reporting requirements imposed on Ally Bank under the Consent Order.

*Id.* at RC40019097.

> Mr. Weintraub presented a series of charts that provided a detailed review of Consent Order program finances. Mr. Weintraub reviewed and discussed one time spend amounts, recurring expenses and approved spend amounts compared with forecasted amounts . . . Mr. Weintraub explained the distribution of Rust Consulting costs among the mortgage services subject to Consent Orders and said that [AFI's] reimbursement to Rust Consulting is reflected in foreclosure review costs.

Rust Consulting was a third party administrator retained by GMAC Mortgage to "send[] notices to eligible borrowers" under the FRB/FDIC Consent Order as part of the mortgage "complaint review process" in conjunction with the Foreclosure Review. *Id.*, at RC40019096. *See also* Minutes of the Residential Capital, LLC Consent Order Compliance Committee Meeting, Dec. 16, 2011, at RC40019145 [RC40019109].

> Mr. Weintraub presented dashboard charts that illustrated year-to-date actual financial data as of Nov. 30, 2011. . . . Responding to questions asked, Mr. Weintraub said that the projected recurring spend of $99.9 million represents cumulative recurring costs from 2011 through 2013. He pointed out that the financial projections for the foreclosure review do not include associated remediation costs.

became more active in September 2011,[1225] and continued through December 2011,[1226] as efforts to comply with the FRB/FDIC Consent Order and its provisions continued.[1227]

### (3) Major ResCap Board Actions Leading To CMP Order And DOJ/AG Consent Judgment

Despite the formal settlement with the FRB and FDIC, the total cost of the settlement and the outcome of the DOJ's and state AGs' investigation remained uncertain. Additionally, the parties had not settled on the total amount of the CMP associated with the FRB/FDIC Consent Order.

In a special meeting on January 10, 2012, the ResCap Board focused on the reporting of potential losses related to the federal and state investigations, including "considerable discussions regarding, among other topics, the timing and implications of the anticipated issuance to mortgage loan servicers of possible fines and penalties in connection with the mortgage foreclosure matter,"[1228] and also the possibility that fines relating to these government investigations could have a "material adverse impact on ResCap's financial position."[1229] In connection with an accounting analysis focused on loss contingencies, Cathy Dondzila informed the ResCap Board that the following amounts related to the potential settlement with the DOJ and the state AGs were "potentially achievable":

> (1) $75 million hard dollar amount, comprised of $25 million AFI "upfront," $25 million ResCap "upfront," and a $25 million installment by ResCap over a two-year period;

---

[1225] *See* Minutes of a Special Meeting of the Board of Residential Capital, LLC, Sept. 27, 2011, at RC40018677 [RC40018411].

> The Board and members of management and legal advisors in attendance at the meeting engaged in full discussion of various matters relating to the residential mortgage foreclosure issues and potential settlements with the Federal Housing Finance Agency and the Department of Justice; ResCap's near-term projected equity position vis-à-vis tangible net worth financial covenant requirements; shareholder support; and contingency planning.

[1226] *See* ResCap Board—Business Review Presentation, dated Dec. 15, 2011, at ALLY_0309734 [ALLY_0309689] (noting that there were still major issues outstanding with respect to the "AG Settlement," including the finalization of the monetary component).

[1227] *See* Minutes of a Special Meeting of the Board of Residential Capital, LLC, Nov. 16, 2011, at RC40018710 [RC40018411] ("Mr. Marano commented on the Consent Order and matters pertaining to the Single Point of Contact and foreclosure review requirements. Hamzehpour informed the Board that the terms of the engagement letter with PricewaterhouseCoopers LLP for their work on the foreclosure review were being finalized.").

[1228] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Jan. 10, 2012, at RC40019181 [RC40019179].

[1229] *Id.* at RC40019183.

(2) $40 million contingent hard dollar amount (comprised of $10 million per year, contingent upon ResCap annual revenues in excess of $1.1 billion); and

(3) $200 million soft dollar amount (estimated at a $100 million accounting loss and including $17 million in indemnification payment obligations to Ally Bank).[1230]

Simultaneously, Dondzila informed the ResCap Board that ResCap's then-current ability to pay was $50 million.[1231] Ultimately, the ResCap Board determined that $150 million was an appropriate amount to reserve against the potential assessment of a civil money penalty from the FRB.[1232] However, this decision was retracted the next day because AFI had not yet closed its books for the year ending December 2011, and Marano planned on having additional conversations with the FRB to clarify the potential amount of the penalty.[1233]

On January 25, 2012, following a discussion led by Marano, Steven Abreu, and James Whitlinger[1234] regarding the status of the proposed DOJ/AG Settlement, the ResCap Board granted Marano the authority "to enter into a Consent Assessment Order by and among Ally Financial, Inc., Residential Capital, LLC, GMAC Mortgage, LLC and the Board of Governors of the Federal Reserve System."[1235]

### (4) Discussions Regarding Ally Bank's Responsibilities Under The Government Settlements

The FDIC and the Utah Department of Financial Institutions required Ally Bank to explain the DOJ/AG Consent Order's impact on its various hedging and swap agreements.[1236] Internally, Ally Bank performed analyses regarding a proposed modification strategy on HFI loans related to the potential DOJ/AG settlement and the eligible population for such

---

[1230] Accounting Presentation by C. Dondzila to the ResCap Board, dated Jan. 10, 2012, at RC40020151 [RC40020121]. The estimated $17 million in indemnification payment obligations appears to represent only a portion of the estimated indemnification payments to Ally Bank.

[1231] *See id.*

[1232] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Jan. 10, 2012, at RC40019183 [RC40019179].

[1233] *Id.* at RC40019185.

[1234] Whitlinger was the CFO of ResCap during this period.

[1235] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Jan. 25, 2012, at RC40019195 [RC40019179].

[1236] Int. of L. Gerner, Nov. 13, 2012, at 203:21–207:2 (stating that John Andrews, Adam Glassner and James Young were the primary Ally Bank representatives who worked with the FDIC and Utah Department of Financial Institutions on these matters). Gerner was the CFO of Ally Bank from 2004 until October 2011. Glassner was also the Executive Vice President of Capital Markets at GMAC Mortgage during this period. Young was the Chief Financial Executive of Ally Bank during this period.

modifications.[1237] However, it is unclear whether there were any discussions about Ally Bank contributing financially to the DOJ/AG Settlement, even though the broad release ultimately agreed upon in the DOJ/AG Consent Judgment appears to have covered Ally Bank.[1238] Internal AFI documents from this period also indicate that Ally Bank was aware that it would be reimbursed for damages it suffered as a result of the settlement.[1239] As an apparent result of this benefit, Ally Bank elected to participate in loan modifications imposed under the DOJ/AG Settlement.[1240] However, law firm Bradley Arant Boult Cummings LLP ("Bradley Arant") was eventually able to negotiate a removal of Ally Bank from the DOJ/AG Settlement documents. Ultimately, Ally Bank was not a party to the DOJ/AG Consent Judgment (though it arguably is included in its broad releases).[1241]

### (5) Representation Of ResCap And AFI In The DOJ/AG Settlement Negotiations

Bradley Arant represented both AFI and ResCap and was instrumental in negotiating the DOJ/AG Settlement.[1242] AFI also retained its own separate counsel, hiring the law firm of Sullivan & Cromwell LLP to represent its interests in these negotiations.[1243] ResCap, by contrast, did not retain separate counsel and made no particular effort to segregate ResCap's interests from AFI's during settlement negotiations.[1244] Marano and Joseph Pensabene, together with Robert

---

[1237] E-mail from X. Portillo (July 25, 2011) [EXAM11088091]; AG Settlement Items and Delegation Authority Exceptions: Discussion Materials, dated July 25, 2011 [EXAM11088092] (attached to E-mail from X. Portillo (July 25, 2011) [EXAM11088091]) (presentation covering, among other things, an estimated total $25.4 million loss related to the economic effect of a proposed first lien modification process on Ally Bank's HFI loans).

[1238] Int. of L. Gerner, Nov. 13, 2012, at 207:21–208:11.

[1239] Ally Bank Affordability Preservation Program: Program Summary Presentation, dated Sept. 21, 2011, at 2–3 [ALLY_0033594] (noting that GMAC Mortgage's proposed program related to the DOJ/AG Settlement would "reimburse the Bank for the gross principal forgiveness" and that a benefit to Ally Bank of the DOJ/AG Settlement would therefore be a "free option to improve portfolio" because "[GMAC Mortgage] reimburses Bank for all principal forgiveness activities").

[1240] See E-mail from M. Rosen to T. Marano et al. (Sept. 21, 2011) [ALLY_0206899].

[1241] See Int. of T. Marano, Feb. 27, 2013, at 57:19–58:10.

[1242] See Int. of T. Hamzehpour, Oct. 5, 2012, at 98:8–100:18 ("[Bradley Arant Boult Cummings] were keeping everybody informed of the direction things were going and as with the consent order work it was I think a group conversation about the direction things were taking, where we should be trying to push back and not, etcetera."); Second Supplemental Declaration of Robert R. Maddox in Support of Debtors' Application for Authorization (I) to Employ and Retain Bradley Arant Boult Cummings LLP as Special Litigation and Compliance Counsel to the Debtors, Nunc Pro Tunc to May 14, 2012, and (II) to Approve Alternative Billing Arrangement [Docket No. 1008] at 3–4. Hamzehpour was General Counsel and Assistant Secretary of ResCap during this period.

[1243] See Int. of T. Hamzehpour, Oct. 5, 2012, at 99:13–100:2.

[1244] See id. at 99:13–17; Int. of T. Marano, Nov. 26, 2012, at 279:13–24 (noting that Marano represented both AFI and ResCap's interests in the negotiations and that AFI was a "tagalong" beneficiary of the settlement because the federal entities "consistently looked at Ally as . . . having some exposure as well because they were the parent.").

V-244

Maddox of Bradley Arant, were the primary negotiators on behalf of ResCap with respect to the DOJ/AG Settlement.[1245] Marano believed that despite representing both AFI and ResCap, Bradley Arant fought "very, very hard" for ResCap and was able to help ResCap (and AFI) achieve a comparably low fine.[1246]

### (6) Cerberus Influence Over AFI During Final Negotiations And Implementation Of Government Settlements

In February 2012, AFI hired Lenard Tessler to help with AFI's turnaround efforts, particularly in connection with the restructuring of ResCap, so that an AFI IPO could move forward.[1247] In this role, Tessler had access to confidential information regarding acquisition and financing proposals for ResCap.[1248] While advising AFI, Tessler maintained his position as managing director and co-head of private equity at Cerberus, and Cerberus continued to consider bidding on ResCap assets.[1249] Tessler also served on AFI's behalf as a negotiator of the AFI Settlement and Plan Sponsor Agreement.[1250]

Tessler obtained permission from the FRB to serve in an advisory capacity to AFI, notwithstanding the requirement that "any existing business relationships and transactions between AFI and Cerberus . . . be limited to their existing scope and terms, and no new business relationships, including any advisory agreements, with [AFI] . . . be permitted."[1251]

---

[1245] *See* Int. of J. Pensabene, Jan. 9, 2013, at 183:14–19.

[1246] Int. of T. Marano, Feb. 27, 2013, at 56:11–57:12.

[1247] *See* E-mail from G. Kosinski to L. Tessler (Feb. 24, 2012) [CCM00121169] (e-mailing Bloomberg article regarding Tessler's hiring). In addition to his advisory role at AFI, Tessler was, and continues to be, a Senior Managing Director and Co-Head of Global Private Equity at Cerberus.

[1248] *See* E-mail from L. Tessler (Feb. 26, 2012) [EXAM00075603].

[1249] *See* E-mail from L. Tessler to J. Ilany (Apr. 28, 2012) [ALLY_0158581]. Ilany was an independent director of the ResCap Board and a member of the ResCap Audit Committee during this period.

[1250] *See* Int. of L. Tessler, Feb. 28, 2013, at 195:3–16.

[1251] *Id.* at 189:7–18.

#### f. Allocation Methods Discussed

As previously noted, the FRB/FDIC Consent Order, CMP Order, and DOJ/AG Consent Judgment did not allocate the costs of such settlements among the AFI and ResCap entities.[1252] This left AFI and ResCap to determine the appropriate allocation of these costs themselves, with the understanding that many of the costs of the settlements were interrelated.[1253] The process of determining this allocation occurred over the course of several months[1254] and required constant revision as the settlement discussions with the government progressed and the details of the ultimate costs associated with the settlements were finalized.[1255] Three primary methods for allocating the joint and several costs of the government settlements among the members of the AFI corporate group appear to have been discussed by ResCap and AFI.

#### (1) 0% Allocation To AFI Based On Nature Of Penalty

Several members of AFI's and ResCap's Boards believed that AFI should not be responsible for any amount of the costs associated with the government settlements.[1256] However, outside of a few emails among various AFI and ResCap employees, there is scarce

---

[1252] Int. of D. DeBrunner, Apr. 18, 2013, at 35:18–36:5 (noting that the FRB/FDIC Consent Order and the CMP Order did not contain allocations and in fact dictated joint and several liability among AFI, ResCap, and GMAC Mortgage and certain of its subsidiaries); Int. of P. West, Jan. 11, 2013, at 56:12–16 ("[Q:] Was there discussion of the fairness to ResCap of the allocation within the consent order? [A:] I do not recall that discussion."); *id.* at 59:20–25 ("[Q:] So to your knowledge, was there any negotiation between ResCap and Ally as to the allocation of the financial impact or burden of those government settlements? [A:] Not to my knowledge."); Int. of J. Pensabene, Jan. 9, 2013, at 189:13–19 (noting that, with respect to the DOJ/AG Settlement, there was never any discussion by the government about allocation among the Ally or ResCap entities but that the "discussion with the government about the amount was just whether or not Ally would be a party to the settlement."). Arguably, the DOJ/AG Consent Judgment did impose an allocation method by expressly requiring ResCap, GMAC Mortgage, and RFC to make all hard payments and incur all of the soft costs. DOJ/AG Consent Judgment, Ex. I [RC00027463].

[1253] *See* Int. of D. DeBrunner, Apr. 18, 2013, at 9:24–10:14.

[1254] *See id.* at 38:3–16.

[1255] *See id.* at 38:8–39:12.

[1256] *See, e.g.,* Int. of P. West, Jan. 11, 2013, at 55:21–56:5 ("Well, first of all, you don't evaluate the fairness of what your regulator is telling you have to do. I mean, that's just kind of the way the banking business works. And it was a mortgage issue. And so we looked at it as a ResCap obligation, but it was a mortgage obligation."); *id.* at 62:21–63:8 (noting that the FRB/FDIC Consent Order involved a "servicing issue," that "Rescap's taken responsibility" for such issue and that West never came to think that AFI should bear some of the burden of the government settlements); Int. of M. Carpenter, Mar. 4, 2013, at 219:10–220:12.

documentary evidence of formal presentations outlining this option.[1257] Further, there appears to have been a general view among both AFI and ResCap employees that AFI would ultimately bear the burden for some portion of the costs,[1258] and so this possible allocation was apparently not extensively considered.

### (2) 27% Allocation To AFI Based On 15 Possible Actionable Issues

At some point, the DOJ indicated that the fines to be levied against the various mortgage servicers and bank holding companies would be based on a market share fine, which would then be adjusted based on the performance of each company as a servicer.[1259] AFI internally debated whether, and to what extent, AFI should share responsibility for the fines levied under any settlement with ResCap or Ally Bank and what impact ResCap's lack of financial stability would have on that decision, while acknowledging that there was "some logic/benefit in splitting the fine."[1260] Michael Carpenter took the position that ResCap was the responsible

---

[1257] *See, e.g.*, DOJ/AG Settlement—Allocation Scenarios, dated Feb. 13, 2012 [EXAM10999353] (attached to E-mail from Heather McKay (Feb. 13, 2012) [EXAM10999352]). McKay was the Senior Director of Finance at AFI during this period.

[1258] *See, e.g.*, Int. of S. Abreu, Jan. 22, 2013, at 366:2–3; E-mail from J. Whitlinger to T. Marano and T. Hamzehpour (Jan. 2, 2012) [ALLY_0171726] (noting that "D&T has expressed a view that the DOJ/[FRB] Fines should be borne by the servicer entirely (i.e. ResCap)[]," but that "[w]e have previously discussed that some portion of the $268 M would be expensed at [AFI]."); E-mail from J. Brown (Jan. 25, 2012) [ALLY_0171733] (showing an early belief that AFI would bear a portion of the financial burden, as evidenced by Brown stating "plan to book an entry over next 24/48 hrs. Basis will be [FRB] CMP or $268m. 11/15 goes to RC or abt $196m. Rest to ally."); Memorandum, Accrual for DOJ Settlement at December 31, 2011, dated Feb. 28, 2012, at 8 [EXAM00220938] ("[W]e [AFI] believe that a portion of the DOJ/AG Settlement liability should be allocated to AFI."). Brown was the Senior Executive Vice President of Finance and Corporate Planning of AFI during this period.

[1259] *See* Int. of T. Marano, Nov. 26, 2012, at 275:11–19.

[1260] *See* E-mail from M. Carpenter (Nov. 3, 2011) [ALLY_0228577].

> If we settled with DoJ at 300 or so and the plan was to modify some mortgages at the bank for credit and others at Rescap. And we know that Rescap net worth will go below minimums and require a capital infusion. And do we know if Rescap has the liquidity without drawing the [AFI] line. What I am getting at is there some logic/benefit in splitting the fine between Recap and AFI of Ally Bank and, correspondingly, where we get credit for mods etc.

party for the settlement, or at least for the "servicer fine," and expressed concern regarding undermining that or other legal arguments if AFI were to "[take] part of the settlement."[1261]

Eventually, oral discussions with the FRB and FDIC revealed that the federal government's method for computing the penalty apparently was based on three factors: (1) severity of the issues; (2) number of actionable issues—15; and (3) period of time during which such issues occurred—two years. Based on these variables, the ResCap Board estimated that the total penalty could be $268 million.[1262] Of this amount, Dondzila estimated that $196.5 million (based on 11 of the 15 issues) should be allocated to ResCap; the remaining $71.5 million (based on the remaining four of the 15 issues) should be allocated to AFI.[1263] Based on these allocations, ResCap would be responsible for approximately 73% of the monetary fine and AFI would be responsible for the remaining 27%.[1264]

During this stage of the negotiations in early January 2012, there continued to be tension between the apparent acceptance that AFI would be held jointly and severally responsible for the settlement (and possibly assume some of the burden of the settlement) on the one hand,

---

[1261] E-mail from M. Carpenter (Nov. 4, 2011) [ALLY_0228577] ("[I]f we take part of it at [AFI] do we undermine the argument that Rescap is the responsible party or even weaken our legal case—what should AFI receive from Rescap in exchange for taking part of the settlement?"); E-mail from M. Carpenter (Dec. 16, 2011) [ALLY_PEO_0080176] ("Seems to me servicer fine should go to Rescap and rest to BHC for supervision lapses."); E-mails between M. Carpenter and L. Tessler (Dec. 27, 2011) [ALLY_0142356].

Tessler: Is Ally accepting financial responsibility for all of these settlements and if so how does that integrate in to the BK discussions? . . .

Carpenter: No but DOJ making noise about [AFI] guaranteeing the cash portion for obvious reasons!

Tessler: . . . I am concerned about timing sequence in getting this right given the push for resolution with [AFI] before the Rescap Board is prepared to negotiate other matters. I think we need to start thinking about this because I believe it is a high probability that the UST is going to insist that [AFI] honor all governmental obligations.

Carpenter: Timing is not going to be perfect. We will have to decide on DOJ and figure out how it gets split between the three entities including soft dollars. Any settlement may be a preference item anyway. Not much we can do until we know what the deal is.

[1262] See Accounting Presentation by C. Dondzila to the ResCap Board, dated Jan. 10, 2012, at RC40020151 [RC40020121].

[1263] See id. at RC40020152.

[1264] E-mail from R. Zachary to M. Carpenter (Jan. 25, 2012) [EXAM00077270] (stating that "[i]t is expected that [AFI] and ResCap will share the $268 million [FRB] CMP 4/15 ($71.5 million) and 11/15ths ($196.5 million) respectively," and noting that it was discussed that each of AFI and ResCap would contribute 50% to the full "hard dollars" fine). Zachary was a member of the AFI Capital Markets Team during this period.

and AFI's efforts to exclude itself from the settlement on the other.[1265] As negotiations progressed, beginning in late January 2012, it was expressly contemplated by members of AFI's and ResCap's management that AFI would be responsible for a hard dollar payment of at least $50 million.[1266] When Carpenter questioned this allocation of hard dollar payments to AFI and indicated it was unacceptable,[1267] he was informed that Deloitte (which was then the auditor for both AFI and ResCap[1268]) "remained very firm in their position on the economic splits between [ResCap] and [AFI]."[1269]

---

[1265] *Compare* E-mail from J. Whitlinger to T. Marano and T. Hamzehpour (Jan. 2, 2012) [ALLY_0171726] (noting that "D&T has expressed a view that the DOJ/[FRB] Fines should be borne by the servicer entirely [(i.e. ResCap)]," but that "[w]e have previously discussed that some portion of the $268 M would be expensed at [AFI]."), *with* E-mail from M. Carpenter (Jan. 13, 2012) [RC40053347] (responding in the affirmative to the question posed by Solomon of whether the companies should "try to exclude [AFI] from the Order (and leave only the mortgage entities as parties)," responding in the negative to the question posed by Solomon of whether, "[i]f [AFI] remains a part of the Order, should it be *jointly* and severally liable with ResCap for the full amount of the fine" (emphasis added), and responding in the affirmative to the question posed by Solomon of whether Ally Bank should be removed entirely from the draft settlement order).

[1266] *See* E-mail from C. Dondzila to D. DeBrunner (Jan. 23, 2012), at ALLY_0359579 [ALLY_0359578].

[1267] *See* E-mails between M. Carpenter and James Mackey (Jan. 23–24, 2012) [ALLY_0359578]. Mackey was the CFO of AFI during this period.

[1268] *See* Int. of D. DeBrunner, Apr. 18, 2013, at 92:7–9.

[1269] E-mail from J. Mackey to M. Carpenter (Jan. 24, 2012) [ALLY_0359578]. In early January 2012, Deloitte expressed the view that the costs of the settlements should primarily be allocated to ResCap. Meeting with Deloitte and Touche, LLP, Independent Financial Statement Auditor of the Debtors, via conference call (Apr. 18, 2012). No documentation has been identified either confirming or refuting that this is the position to which Mackey was referring.

### *(3) 8% Allocation To AFI Based On FRB Press Release*

On February 9, 2012, the FRB issued a press release announcing that it had reached an agreement in principal with Bank of America Corporation, Citigroup Inc., JPMorgan Chase & Co., Wells Fargo & Company and AFI.[1270] In the press release, the FRB identified each institution, the total penalty assessed against each, and the allocation of the total penalty amount between penalties attributable to servicers and penalties attributable to bank holding companies, as follows:[1271]

EXHIBIT V.C.1.f(3)
**Penalties Attributable to Servicers and Bank Holding Companies**
*($ in Millions)*

| Institution | BHC Penalty | Servicer Penalty | Total |
|---|---|---|---|
| Bank of America | $ 175.5 | $ - | $ 175.5 |
| Wells Fargo | $ 87.0 | $ - | $ 87.0 |
| JPMorgan Chase | $ 106.5 | $ 168.5 | $ 275.0 |
| Citigroup | $ 22.0 | $ - | $ 22.0 |
| Ally Financial | $ 17.0 | $ 190.0 | $ 207.0 |

*Source: FRB, Press Release, (Feb. 9, 2012), http://www.federalreserve.gov/newsevents/press/enforcement/20120209a.htm*

This announcement came as a surprise to the persons within ResCap familiar with the negotiations to date.[1272] As an initial matter, ResCap was pleased with the amount of the fine, given that it internally believed the fine could have been as high as $2 billion.[1273] The FRB press release also introduced a new possible allocation methodology by attributing 92% of the FRB settlement amount (or $190 million of the total $207 million penalty) to a "servicer penalty," and only 8% (or $17 million of the total $207 million penalty) to a "bank holding company penalty." There appears to have been a general acceptance that the "servicer penalty" was tied to GMAC

---

[1270] *See* FRB, Press Release (Feb. 9, 2012), http://www.federalreserve.gov/newsevents/press/enforcement/20120209a.htm.

[1271] *Id.* Notably, unlike JPMorgan Chase and others, AFI and ResCap were not subject to a fine from the OCC. *See* E-mail from J. Mackey (Feb. 9, 2012) [EXAM00076554] ("Don't we also have to point out that others got OCC and Fed fines. Ours was just Fed."); Final Regulatory Settlement Numbers—2/9/2012, dated Feb. 9, 2012 [ALLY_PEO_0034437] (attached to E-mail from T. Marano to C. Carpenter (Feb. 9, 2012) [ALLY_PEO_0034436] (containing the subject line "cleaner number we never want to leak")) (showing the breakdown of the final penalty figures (hard and soft costs) imposed by the DOJ/AG, FRB, and OCC on the five bank mortgage servicers).

[1272] *See* Int. of J. Pensabene, Jan. 9, 2013, at 209:17–212:20; Int. of S. Abreu, Jan. 22, 2013, at 368:4–368:8.

[1273] *See* Int. of T. Marano, Nov. 26, 2012, at 273:21–24 ("I got the best deal of anybody here and we should've had about a $2 billion fine and we got a fine of about $300 million."); *id.* at 273:25–274:13 (noting that (a) the fine could have been as high as $2 billion because it was based on market share as a servicer and the actions and conduct of the companies as servicers and (b) that ResCap and AFI were able to reduce their possible fine by modifying their loan portfolio); Int. of W. Solomon, Mar. 19, 2013, at 175:11–177:1 (noting that AFI and ResCap did "far better than the other four financial institutions" largely based on their efforts to address problems with their mortgage servicing prior to the government becoming involved in investigation such activities).

Mortgage, that the "BHC penalty" was tied to AFI,[1274] and that this press release represented the FRB's guidance regarding the allocation of the settlement.[1275]

Following the publication of the press release, AFI and ResCap perceived that there were now three possible structures for determining how to allocate settlement costs.[1276] First, ResCap could bear the entirety of the costs because "the penalties were very much geared toward the presumptive behavior and misdoings, to the extent those were ultimately confirmed, of the servicer."[1277] Second, the costs could be allocated based on the initial communications from the FRB that identified 15 possible wrongful categories of acts (i.e., the 73%/27% allocation). Finally, ResCap and AFI could use the allocation set forth in the press release, based on the assumption that ResCap would be responsible for the entirety of the servicer penalty (i.e., the 92%/8% allocation).[1278]

In addition to these general allocations, as late as February 15, 2012, AFI also considered whether the allocation should take into account the fair value of the release provided to AFI under the terms of the DOJ/AG Consent Judgment.[1279] The fair value assigned to this release in internal AFI communications was $25 million, though it is unclear how that figure was determined.[1280] However, AFI ultimately decided that there was no "good mechanism" to come up with an appropriate fair value of the release, which played a role in the ultimate decision to apply the allocation contained in the February 9, 2012 press release.[1281]

_____

[1274] *See*, *e.g.*, Int. of D. DeBrunner, Apr. 18, 2013, at 29:20–31:6; Int. of C. Dondzila, Nov. 9, 2012, at 195:25–197:3.

[1275] *See*, *e.g.*, Int. of D. DeBrunner, Apr. 18, 2013, at 40:3–6 (noting that the final agreement did not reference any of the earlier allocations and that the press release was "the final record" with respect to the proper allocation); *id*. at 57:17–24 (noting that the press release "was the best evidence that we had," that Deloitte agreed with that conclusion and that AFI believed that it was relying on the FRB's assessment of the liability when it determined that the 8% allocation was appropriate); Int. of C. Dondzila, Nov. 9, 2012, at 198:1–8.

[1276] Int. of C. Dondzila, Nov. 9, 2012, at 198:1–8 ("So, those were sort of the three that we triangulated around: everything to ResCap; a split that was based on the original civil monetary penalty letter, which had a reference to—I think it was 15, maybe, findings; or this press release. And, because the press release was final and was public, the conclusion was to go with that.").

[1277] *Id.* at 197:11–197:16.

[1278] *See* E-mail from H. McKay (Feb. 9, 2012), at EXAM12400363 [EXAM12400360] ("To us, these revised facts really point to the fact that there continue to be multiple paths that may be taken from an allocation perspective (100% to [GMAC Mortgage] as servicer, allocation of $17 mm to AFI, etc.).").

[1279] DOJ/AG Settlement—Allocation Scenarios, dated Feb. 13, 2012 [EXAM10999353] (attached to E-mail from H. McKay (Feb. 13, 2012) [EXAM10999352]).

[1280] *Id.* (describing "Allocation Scenario #3" as "$25 million to [AFI] (based on FV of DOJ/AG Release); E-mail from M. Anspach (Jan. 8, 2012), at ALLY_PEO_0082426 [ALLY_PEO_0082426] ("Secondly, we told Deloitte we felt that the $25 million is a reasonable approximation of the fair value of what AFI will be receiving by being released under the DOJ/AG settlement."); Int. of D. DeBrunner, Apr. 18, 2013, at 77:17–24, 81:20–82:8.

[1281] Int. of D. DeBrunner, Apr. 18, 2013, at 77:17–24, 81:20–82:8.

#### *(4) Decision To Apply 8% Allocation To AFI*

Following the filing of the CMP Order and the initial agreement with respect to the DOJ/ AG Consent Judgment (which was ultimately filed on April 4, 2012), a small group of AFI and ResCap accounting employees appeared to assume responsibility for determining how the settlement costs should be allocated,[1282] in consultation with Deloitte.[1283] The Investigation has not uncovered any evidence that either the AFI Board or the ResCap Board themselves were involved in determining how the settlement costs should be allocated.[1284] Witness testimony does indicate that AFI senior management reviewed the final allocation conclusions and that the AFI Board approved the allocation as part of the larger approval process associated with AFI's public filings.[1285] There are some contemporary emails that indicate that Whitlinger, ResCap's CFO at the time, was kept informed regarding the allocation discussions.[1286] However, it is not clear whether ResCap's Board was aware of the ultimate 8% allocation. Further, the Investigation has uncovered some confusion among ResCap personnel regarding: (1) whether the CMP Order or DOJ/AG Consent Judgment dictated an

---

[1282] *See* Int. of T. Marano, Feb. 27, 2013, at 21:4–21:17 (noting that the decision on what allocation would apply "may have been determined by the accounting people."); *id.* at 49:11–23 (stating that whether or not the costs should be allocated to "one or the other, I think was the decision of the accountants.").

[1283] *See* E-mail from T. Robinson (Feb. 10, 2012), at EXAM12400362 [EXAM12400360] ("The original 11/15-4/15 [FRB] allocation provided a starting point for allocating the amounts. The updated [FRB] Fine/ Announcement seems to refine that starting point."). Robinson, a representative from Deloitte, worked on behalf of ResCap and AFI during these discussions. *See also* Int. of J. Whitlinger, Feb. 27, 2013, at 154:15–163:25 (noting, among other things, that he (Whitlinger) believed there was a difference between the legal allocation of responsibility and treatment for accounting purposes and that Deloitte was involved in discussing the accounting treatment).

[1284] Int. of T. Marano, Feb. 27, 2013, at 51:17–23 ("I am not aware that [the ResCap Board] specifically approved the allocation."). Marano expressed the view that by authorizing ResCap's entry into the CMP Order and the DOJ/AG Consent Order the ResCap Board had implicitly approved any allocation contained in those documents. *See* Int. of T. Marano, Feb. 27, 2013, at 51:17–23.

[1285] Int. of D. DeBrunner, Apr. 18, 2013, at 33:7–33:24 ("[W]e reviewed the conclusions with the senior management of [AFI] . . . . And it also got reviewed up through at the board level as part of our quarterly financial filings, where we discussed accounting conclusions and disclosures."); *see id.* at 94:7–96:1.

[1286] *See, e.g.*, E-mail from C. Dondzila to J. Whitlinger (Feb. 17, 2012) [EXAM10345198] (noting that AFI was recommending an 8% allocation consistent with the FRB press release); E-mail from M. Anspach to J. Whitlinger (Feb. 17, 2012), at EXAM10345151 [EXAM10345150] (requesting a call to discuss the DOJ/AG Settlement expense allocation); E-mail from M. Anspach to J. Whitlinger (Feb. 15, 2012) [EXAM10999352] (forwarding the slide titled DOJ/AG Settlement—Allocation Scenarios, dated Feb. 13, 2012 [EXAM10999353], originally attached to E-mail from H. McKay (Feb. 13, 2012) [EXAM10999352])).

allocation;[1287] (2) who, exactly, was involved in determining how the settlement costs should be allocated;[1288] and (3) how the settlement was ultimately allocated.[1289]

Despite the fact that the CMP Order did not contain an allocation, did not specify which legal entity should be allocated what percentage of the penalty,[1290] and was apparently not accompanied by any explanation as to the division of the fine,[1291] there appears to have been a

_____

[1287] According to Marano, the allocation between AFI and ResCap was an "[FRB] concept," whereby "the [FRB] said that Ally bore . . . about 25 percent of the responsibility for failure to supervise and provide adequate resources. And ResCap bore 75 percent of the fine because they were . . . the operator of the servicing business." Int. of T. Marano, Nov. 26, 2012, at 275:22–276:4. The Chairperson of the ResCap Consent Order Compliance Committee also appeared to be under the impression that the FRB/FDIC Consent Order imposed a determination regarding which entity should be responsible for the costs of the settlement and imposed such determination on AFI and ResCap. *See* Int. of P. West, Jan. 11, 2013, at 55:9–11 ("I recollect that the bank was required to sign [the FRB/FDIC Consent Order]"); *id*. at 55:21–56:5 ("And I believe it was the regulator that asked Ally to sign it as well.").

[1288] According to Tammy Hamzehpour, the General Counsel and Assistance Secretary of ResCap during this time, discussions regarding allocating the settlement burden among the various AFI entities were largely between Dondzila, Marano, and Carpenter, though Whitlinger and the financing department were also involved. *See* Int. of T. Hamzehpour, Oct. 5, 2012, at 254:9–256:17. Abreu, ResCap's President at the time, also believed that Marano and Whitlinger were involved, but also thought Pensabene had a role in these discussions. *See* Int. of S. Abreu, Jan. 22, 2013, at 364:22–365:13. In contrast, Pensabene, ResCap's Chief Servicing Officer at the time, was under the impression that these discussions occurred between Marano, Solomon, Hamzehpour, and Carpenter. *See* Int. of J. Pensabene, Jan. 9, 2013, at 180:20–181:13. However, Marano disclaimed involvement in determining the appropriate allocations, noting that it was more of "an accounting concept" and that Whitlinger or Dondzila would have been involved in those determinations. Int. of T. Marano, Feb. 27, 2013, at 44:21–45:3.

[1289] *See* Int. of M. Carpenter, Mar. 4, 2013, at 219:10–220:12 (noting that the FRB "imputed a percentage" for AFI's failure to supervise, which Carpenter believed was 15%, and that "whatever that allocation was what we used as the basis to do the accounting"); Int. of T. Marano, Feb. 27, 2013, at 19:16–21:2 (noting that he (Marano) was fairly certain that the allocation was imposed by the FRB and that the allocation was a 75/25 split); Int. of J. Whitlinger, Feb. 27, 2013, at 150:18–22 (noting that he (Whitlinger) was not aware of an allocation embedded in the actual settlement agreements).

[1290] An e-mail dated February 9, 2012 from McKay of AFI to Robinson at Deloitte states that there was a separate press release "by the [FRB]" that included "an allocation of $190 mm to [GMAC Mortgage] and $17 million to [AFI]." E-mail from H. McKay (Feb. 9, 2012), at EXAM12400363 [EXAM12400360]. However, despite diligent efforts on behalf of the Examiner's Professionals, this second press release with an allocation divided according to legal entity has not been located nor produced.

[1291] *See* E-mail from H. McKay (Feb. 9, 2012), at EXAM12400363 [EXAM12400360] (noting that Weintraub indicated that "there is no science behind this number (e.g. no specific # of issues cited for [GMAC Mortgage]/AFI."). DeBrunner noted that the fact that the press release did not tie specific actionable issues to the dollar amounts would not necessarily be relevant for purposes of performing the accounting allocation. *See* Int. of D. DeBrunner, Apr. 18, 2013, at 63:6–67:11.

general assumption of the idea, by both AFI and ResCap, that the federal government, through the press release, had dictated the allocation methodology to be applied.[1292]

Ultimately, after consultation with AFI and Deloitte, it appears that sometime in mid-February, AFI's and ResCap's accounting departments[1293] made the determination that the 92%/8% allocation contained in the February 9 press release should govern.[1294] Contemporaneous e-mails indicate that this logic was not something that ResCap wanted to highlight. In fact, Dondzila advised the AFI employees preparing ResCap's public filings that David DeBrunner, AFI's Chief Accounting Officer and Corporate Controller, should be consulted to "ensure any public statements about how this was allocated are consistent" and that the "answer, not for public disclosure" on how the allocation was determined was "that we allocated 8% to [AFI] and 92% to ResCap consistent with the public allocation of the [FRB] fine ($17 million—8%—to [AFI] and $190 million—92%—to ResCap)."[1295] As previously noted, it is not clear if ResCap's Board was presented with explicit information regarding this allocation.[1296]

### (5) Application Of 8% Allocation To DOJ/AG Settlement

Despite the fact that the FRB press release was issued only in relation to the CMP, and that the FRB/FDIC Settlement and the DOJ/AG Settlement were perceived, at least by

---

[1292] *See* Int. of S. Abreu, Jan. 22, 2013, at 368:22–369:11 (noting that once the February 9 press release was filed it was generally accepted that the FRB had made a ruling and that "you abide by it and you kind of step in line and do what they ask."); Int. of M. Carpenter, Mar. 4, 2013, at 219:10–220:12; Int. of D. DeBrunner, Apr. 18, 2013, at 26:22–27:6 (noting that AFI and ResCap both agreed that 8% should be allocated to AFI and that this allocation was approved by Deloitte and that "when you look at the [press release] that came out from the [FRB], it was pretty clear."); *id.* at 70:9–12 (noting that when the press release was issued it made the other allocation methods previously discussed no longer appropriate considerations).

[1293] *See* Int. of T. Marano, Feb. 27, 2013, at 44:21–45:15 (noting that "the allocations . . . were more an accounting concept" and that such allocations were "largely . . . a topic of discussion with Deloitte and the accounting and finance people"); Int. of D. DeBrunner, Apr. 18, 2013, at 91:17–23 (noting that the decision to use the 8% allocation was made "sometime in that middle of February [2012]").

[1294] Int. of C. Dondzila, Nov. 9, 2012, at 196:15–197:3, 198:1–8 ("[B]ecause the press release was final and public, the conclusion was to go with that."); Int. of D. DeBrunner, Apr. 18, 2013, at 32:9–33:16.

[1295] E-mail from C. Dondzila (Feb. 27, 2012) [EXAM11893483].

[1296] DeBrunner indicated in his interview that though he was not aware of whether Dondzila presented this information to the ResCap Board but that he would assume that she did. *See* Int. of D. DeBrunner, Apr. 18, 2013, at 25:5–10. On March 21, 2012, the ResCap Audit Committee approved ResCap's consolidated financial statements for the year ended December 31, 2011, which included adjustments for the portion of the fine that ResCap was allocated as determined by the ResCap and AFI accounting teams. *See* Minutes of a Meeting of the Residential Capital, LLC Audit Committee, Mar. 21, 2012, at RC40019172–73 [RC40019158]. However, there is no evidence that the 92%/8% split was expressly discussed or focused upon during this or prior meetings of the ResCap Audit Committee. Further, Ilany and Mack, the independent members of the ResCap Audit Committee, abstained from this vote. *See id.*

Marano, as involving separate criteria,[1297] ResCap and AFI decided that the same allocation percentages should also be used to allocate the costs of the DOJ/AG Settlement between them.[1298] Arguably, Exhibit I of the DOJ/AG Consent Judgment could have dictated a different result, given that it expressly provided that ResCap, GMAC Mortgage, and RFC were responsible for: (1) making the $109.6 million hard dollar payment; and (2) the $200 million soft costs.[1299] In short, AFI and ResCap allowed the FRB press release to dictate how *all* costs associated with the government settlements were allocated between them,[1300] apparently without considering or making any effort to allocate costs based the allegations being settled in the DOJ/AG Settlement, or considering whether to assign some responsibility to Ally Bank,[1301] or considering any other basis of allocation.[1302]

---

[1297] Int. of T. Marano, Feb. 27, 2013, at 23:1–24:12 (noting that the FRB used different criteria than the DOJ in evaluating the settlements and that the FRB criteria involved a separate examination resulting in the identification of 15 statutory violations, 11 of which were attributable to ResCap and 4 of which were attributable to AFI).

[1298] Int. of C. Dondzila, Nov. 9, 2012, at 196:15–197:3 ([A]fter consultation with our parent and with our auditors, the decision was made that that was the only—that that was the appropriate way to allocate the obligation, because, again, under both of these—under the [FRB] civil money penalty and under the DOJ settlement, both ResCap, GMAC Mortgage and Ally Financial were parties to those agreements. And so the decision was to use the only publicly communicated attribution of responsibility, which was the [FRB] press release, and to split what we ultimately recorded consistent with those percentages that they had disclosed.); Int. of D. DeBrunner, Apr. 18, 2013, at 32:9–33:6 (explaining that the decision to allocate the DOJ/AG Settlement based on the numbers provided in the February 9, 2012 press release issued by the FRB was made "because . . . the [FRB/FDIC Settlement] was satisfied by the [DOJ/AG Settlement] . . . such that if you met the requirements of the [DOJ/AG Settlement], then that satisfied the [FRB/FDIC Settlement]. So, we went through and we researched that from an accounting perspective, we had significant discussion with Deloitte, including consultation with their national professional standards office, and concluded that that was the right way to allocate."); *id*. at 23:2–23:12 (noting that AFI and ResCap made their conclusions regarding the proper accounting and that Deloitte also agreed).

[1299] *See* DOJ/AG Consent Judgment, Ex. I [RC00027463].

[1300] *See* Int. of C. Dondzila, Nov. 9, 2012, at 195:25–198:8.

[1301] *See id.* at 202:16–203:4 (noting that Dondzila was not aware of any discussions regarding whether Ally Bank should be a party to any of the settlement agreements and that as a result Ally Bank was not allocated any of the liabilities of the settlement agreements).

[1302] *See id.* at 199:18–24.

An internal AFI memorandum dated February 28, 2012, discussed the decision to employ the 92%/8% allocation and the resulting accounting treatment. This memorandum notably states:

> *Legal Entity Allocation*
>
> AFI and ResCap are both liable under the DOJ/AG Settlement and the CMP Order. . . . Both the CMP Order and the DOJ/AG Settlement indicate that AFI and ResCap are jointly and severally liable for the settlements. The settlement stems from perceived wrong-doing by the servicer as it relates to foreclosure process. As primary servicer among the named parties, ResCap (through its subsidiary [GMAC Mortgage]) has the primary obligation for servicing. However, as the parent company of ResCap, AFI is partially liable given they are responsible for providing oversight to ResCap. Therefore, we believe a portion of the DOJ/AG Settlement liability should be allocated to AFI. While [GMAC Mortgage] (as Servicer) contributed to "reckless unsafe or unsound practices" pursuant to servicing activities it was also acknowledged that AFI failed to provide sufficient oversight over such practices.
>
> While neither the DOJ/AG Settlement nor the CMP Order specifically allocate a portion of the fine to AFI, such an allocation was inferred in a press release issued by the [FRB] dated February 9, 2012 which allocates $190 million (of the total $207 million fine) to [GMAC Mortgage] as Servicer, and $17 million to AFI, as the associated Bank Holding Company. . . . Using these allocation amounts, this would indicate that an allocation of 8% of the expense to AFI and 92% of the expense to ResCap would be appropriate. Therefore, the following allocation will be recorded for each legal entity (rounded, in millions):
>
> | | |
> |---|---|
> | AFI | $ 18.5 million |
> | ResCap | 211.5 million |
> | Consolidated | $230.0 million |
>
> On January 30, 2012, ResCap and AFI entered into [the January 30 Letter Agreement] which, among other things, obligated ResCap to agree to pay to the applicable governmental authorities any and all cash payments with respect to Hard Dollar Penalties owed to such governmental authorities under the DOJ/AG Settlement. Therefore, ResCap will be required to make cash payments for amounts which have otherwise been recorded at AFI. Any amounts paid by ResCap (yet incurred by

V-256

AFI) could be considered a deemed dividend from ResCap to
AFI, to the extent that AFI does not otherwise reimburse
ResCap for such amounts paid, as it would represent an amount
paid by a subsidiary on behalf of a parent company.[1303]

Notably, there appears to have been some confusion between AFI and ResCap regarding the extent of this agreed-upon 8% allocation. There was an apparent belief on ResCap's part that AFI had agreed to pay 8% of the total costs of the settlement, including any costs that were incurred beyond the $230 million estimated amount.[1304] However, AFI apparently believed that this agreement was related to the "amount that was accrued" and not to any additional costs, such as the higher amount of soft costs that ResCap ultimately incurred in complying with the DOJ/AG Settlement.[1305] The fact that the apparent agreement from late-February 2012 between AFI and ResCap to allocate 8% to AFI was not memorialized in writing[1306] may have contributed to the confusion regarding AFI's ultimate responsibilities under the government settlements. Ultimately, AFI determined that it would not accept an 8% responsibility for the additional amounts associated with the soft costs.[1307]

The parties' intentions were also unclear as to the mechanism under which AFI would discharge any of its allocated liability. Dondzila stated in a January 27, 2012 e-mail to Whitlinger that AFI could make direct payments to the settlement counterparties or make payments to ResCap as ResCap incurred the settlement related costs.[1308] Dondzila further stated that another option was for AFI to deem the unpaid liability a dividend from ResCap to AFI once ResCap relieved its portion of the liability.[1309] As noted above, a February 28, 2012 AFI accounting memo regarding the accrual for the DOJ/AG Settlement referred to both the option that AFI would reimburse ResCap for their allocated share, and the option that any

---

[1303] Memorandum, Accrual for DOJ Settlement at December 31, 2011, dated Feb. 28, 2012, at 8–9 [EXAM00220938].

[1304] *See* E-mail from D. DeBrunner to J. Mackey (May 17, 2012) [ALLY_0385806]) ("[Dondzila] said that there was an agreement for AFI to cover 8% of any additional liability in line with how the original settlement was allocated between ResCap and AFI.").

[1305] *See id*. ("I am not aware of any formal agreement for us to cover 8% of an additional liability."); Int. of D. DeBrunner, Apr. 18, 2013, at 99:17–100:7 ("We had agreed on the amount that was accrued, on the calculated amount, that 8 percent related to [AFI], 92 percent related to [ResCap].").

[1306] Int. of D. DeBrunner, Apr. 18, 2013, at 99:7–11 ("I don't recall any written formal agreement between [AFI and ResCap] but we each had to conclude on our accounting treatment at that point in time.").

[1307] *See* E-mail from C. Dondzila (May 22, 2012) [EXAM10418886] ("I understand . . . that 100% of this additional liability [associated with the soft dollar costs under the DOJ/AG Consent Judgment] would be recorded by ResCap as AFI does not believe there is any AFI obligation with respect to this matter.").

[1308] E-mail from C. Dondzila (Jan. 27, 2012) [EXAM10995269].

[1309] *Id.*

payment by ResCap would be considered a deemed dividend to AFI and thus not repaid.[1310] As recently as April 18, 2013, DeBrunner appeared to believe that AFI would repay ResCap for AFI's $18.5 million portion, and he confirmed in his interview the understanding that AFI had recorded a payable to ResCap in this amount.[1311] However, any such claim by ResCap or obligation by AFI does not appear to have been formally documented.

### g. Ultimate Payments of Penalties Under The Government Settlements

In due course, ResCap and AFI earned sufficient credits to remit the $207 million fine set forth in the CMP Order. The hard costs set forth in the DOJ/AG Consent Judgment were ultimately paid when GMAC Mortgage remitted the full fine of $109.6 million on March 14, 2012.[1312]

Notably, the determination of how to allocate the government settlements appears to have been limited in effect to AFI and ResCap's accounting, since this allocation ultimately did not tie to the actual costs associated with the government settlements that were paid by AFI. As noted in Exhibit V.C.5 below, even though AFI was only "allocated" 8% of the costs of the government settlements, it will ultimately end up "paying" for 25% of the total costs of the government settlements (in large part due to the $196.5 million debt forgiveness made pursuant to the January 30 Letter Agreement).

### 2. Agreements Between AFI And ResCap In Response To The Government Settlements

AFI negotiated and entered into several affiliate agreements to provide ResCap and GMAC Mortgage with the financial support to comply with their obligations under the various government settlements.

### a. AFI, ResCap, And GMAC Mortgage Enter Into The January 30 Letter Agreement

On January 30, 2012, ResCap, GMAC Mortgage, and AFI entered into the January 30 Letter Agreement regarding "Terms of Support Relating to Possible DOJ/State Attorneys' General Settlement."[1313] Ally Bank is not a party to the January 30 Letter Agreement, but is identified as a third party beneficiary.[1314] The January 30 Letter Agreement details the support

---

[1310] Memorandum, Accrual for DOJ Settlement at December 31, 2011, dated Feb. 28, 2012, at 9 [EXAM00220938].

[1311] Int. of D. DeBrunner, Apr. 18, 2013, at 86:12–18 ("we still have the payable and I would assume ResCap has the receivable. But that was not settled because prior to that being settled, there was a bankruptcy filing. So we're waiting for a direction from counsel as everything goes through. But we still have the payable.").

[1312] *See* E-mail from C. Dondzila (Mar. 15, 2013) [EXAM11004487]; ResCap Liquidity Update: A Presentation for the ResCap Board of Directors, dated Mar. 23, 2012, at RC40020491 [RC40020488].

[1313] January 30 Letter Agreement [ALLY_0194817].

[1314] *See id.* ¶ 9.

to be provided to ResCap and GMAC Mortgage by AFI so that ResCap and GMAC Mortgage could satisfy the terms of a possible CMP Order or DOJ/AG Settlement.[1315]

Pursuant to the material terms of the January 30 Letter Agreement:

(1) AFI agreed to provide capital support to ResCap and GMAC Mortgage by forgiving indebtedness of $196.5 million under the A&R Line of Credit Agreement;[1316]

(2) AFI agreed, and agreed to cause BMMZ to waive any default under the consolidated TNW covenants in those credit facilities listed in Exhibit B to the January 30 Letter Agreement, where such default resulted from any amounts recorded in the financial statements of ResCap and its subsidiaries with respect to the FRB/FDIC Settlement or DOJ/AG Settlement;[1317]

(3) ResCap and its relevant subsidiaries, including GMAC Mortgage: (a) agreed that they would not enter into the FRB/FDIC Consent Order or DOJ/AG Settlement without AFI's prior written consent; and (b) acknowledged that AFI would not consent to any DOJ/AG Settlement that did not contain, at a minimum, a release of AFI and its affiliates;[1318]

(4) ResCap and GMAC Mortgage agreed to pay the hard costs (defined in the January 30 Letter Agreement as "hard dollar payments"—estimated at the time to be $100 million) owed pursuant to a FRB/FDIC Consent Order or DOJ/AG Settlement within two business days of the date on which such amounts are agreed in principle in writing;[1319]

(5) ResCap and GMAC Mortgage agreed to promptly perform all of their obligations under any FRB/FDIC Consent Order or DOJ/AG Settlement;[1320]

(6) ResCap and GMAC Mortgage each agreed to fully reimburse AFI and Ally Bank for: (a) any amounts AFI or Ally Bank expended in connection with their performance under the FRB/FDIC Consent Order or DOJ/AG Settlement; and (b) any fines levied against AFI or Ally Bank, in each case, as a result of the failure of ResCap, GMAC Mortgage or their subsidiaries to perform their obligations under the FRB/FDIC Consent Order or DOJ/

---

[1315] *See id.*

[1316] *Id.*

[1317] *Id.*

[1318] *Id.*

[1319] *Id.*

[1320] *Id.*

AG Settlement (the January 30 Letter Agreement defined the amounts which may be reimbursed pursuant to this provision as "Settlement Costs");[1321]

(7) ResCap and GMAC Mortgage would not have any further reimbursement obligation for Settlement Costs from and after the time ResCap and GMAC Mortgage paid the hard costs and earned $200 million of funds paid or credited as a result of mitigation, remediation or other financial accommodation to mortgage loan borrowers or other third parties pursuant to the DOJ/AG Settlement (defined by the January 30 Letter Agreement as "soft dollar credits");[1322]

(8) GMAC Mortgage agreed to negotiate an amendment to the Original Servicing Agreement which would permit GMAC Mortgage to implement modifications and perform other loss mitigation activities to loans owned by Ally Bank that GMAC Mortgage was servicing to earn soft dollar credits in accordance with the requirements of the DOJ/AG Settlement. The amendment was required to contain the Servicing Agreement Modification Terms as set forth in Exhibit C to the January 30 Letter Agreement;[1323]

(9) ResCap and GMAC Mortgage agreed to terminate the Amended and Restated ISDA Master Agreement, dated April 1, 2011, between GMAC Mortgage and Ally Bank, as well as the related credit support annex and confirmations, and to enter into new derivative documentation on the same economic terms with Ally Investment Management;[1324] and

(10) AFI, subject to the authorization of the AFI Board, committed to provide capital to ResCap in an amount necessary for ResCap to exceed its TNW covenants for January 2012 by $25 million, provided that such contribution was required as a result of operating losses in the ordinary course of business and did not exceed $100 million.[1325]

The January 30 Letter Agreement did not expressly provide that GMAC Mortgage may "implement modifications and other loss mitigation activities and earn soft dollar credits in accordance with the requirements" of the DOJ/AG Settlement "in respect of mortgage loans owned by Ally Bank that [GMAC Mortgage] is servicing for Ally Bank."[1326] Instead, it only provided that GMAC Mortgage, in good faith, would negotiate an amendment to the Original

---

[1321] *Id.*

[1322] *Id.*

[1323] *Id.* ¶ 7.

[1324] *Id.* ¶ 8.

[1325] *Id.* ¶ 10.

[1326] *Id.* ¶ 7.

Servicing Agreement, consistent with the Servicing Agreement Modification Terms, permitting GMAC Mortgage to implement such modifications.[1327] It also did not provide terms relating to any indemnification for losses due to such modification activities as set forth in the Servicing Agreement Modification Terms. The terms of any potential indemnification (as well as the methodology for calculating what was owed) were only considered over the course of negotiating the A&R Servicing Agreement.[1328]

### (1) Modification Terms

Paragraph 7 of the January 30 Letter Agreement required GMAC Mortgage to negotiate, in good faith, an amendment to the Original Servicing Agreement,[1329] which amendment was to contain the Servicing Agreement Modification Terms.[1330] Thus, it was contemplated that an amended servicing agreement would (1) permit GMAC Mortgage to perform loan modifications on certain loans in Ally Bank's portfolio; and (2) provide an indemnification in favor of Ally Bank for losses incurred in connection with any such loan modifications.[1331] Specifically, the Servicing Agreement Modification Terms provide that:

> (1) Any modification of the Original Servicing Agreement would provide GMAC Mortgage with the right, but not the obligation, to offer modifications to borrowers holding subject loans (loans owned and held for investment by Ally Bank that GMAC Mortgage was servicing and that qualify for soft dollar credit pursuant to the DOJ/AG Settlement);[1332]

> (2) Ally Bank would allow GMAC Mortgage to continue to implement modifications permitted under the Original Servicing Agreement. Ally Bank and GMAC Mortgage agreed to develop new matrices and processes related to the implementation of modifications and loss mitigation activities under the DOJ/AG Settlement;[1333]

> (3) GMAC Mortgage agreed to indemnify Ally Bank for any loss suffered by Ally Bank with respect to any subject loan as a result of any modification

---

[1327] *Id.*

[1328] *See*, *e.g.*, E-mail from C. Dondzila to J. Whitlinger (Feb. 22, 2012) [EXAM11893427] ("FYI regarding where Bank is landing in terms of requiring indemnification payments. I think we are back to where we started, that we will be making payments to them on virtually all of the modification activity, and in amounts in excess of their actual incurred accounting losses."); E-mail from R. Fowlie to C. Dondzila and J. Whitlinger (Mar. 16, 2012) [EXAM10994711] ("As the negotiations between us and the Bank continue on the sub servicing agreement one process that should be in there is around the AG settlement and how we should reimburse the Bank for losses on their portfolio.").

[1329] January 30 Letter Agreement, ¶ 7 [ALLY_0194817].

[1330] *Id.*

[1331] *See id.* Ex. C.

[1332] *Id.* Ex. C-1.

[1333] *Id.*

or loss mitigation, provided that GMAC Mortgage would not be required to indemnify Ally Bank for any losses in connection with any modification or loss mitigation activities permitted under the terms of the Original Servicing Agreement. GMAC Mortgage would be required to make such indemnification payments no later than two business days after the last day of each calendar month for all modifications or loss mitigation activities undertaken in such calendar month;[1334]

(4) If a modification or other loss mitigation alternative was extended to a customer of Ally Bank, GMAC Mortgage, as servicer, would be required to complete such modification or other loss mitigation activity if such customer provided the necessary data;[1335] and

(5) GMAC Mortgage would not be permitted to perform modifications or other loss mitigation activities once indemnification payments to Ally Bank pursuant to an amended servicing agreement exceeded $75 million in the aggregate. If GMAC Mortgage desired to perform modifications or other loss mitigation activities resulting in indemnification payments to Ally Bank pursuant to an amended servicing agreement in excess of the aggregate amount of $75 million, then Ally Bank and GMAC Mortgage agreed to discuss the terms on which such additional loss mitigation activities could proceed.[1336]

### *(2) Subsequent E-Mail Correspondence*

The parties quickly realized that the January 30 Letter Agreement did not expressly provide for the use of Ally Bank's portfolio for loan modifications, and that such activity was only to be explicitly permitted under an amended and restated servicing agreement as set forth in the Servicing Agreement Modification Terms. The parties attempted to remedy this issue by e-mail in early February, 2012. Ross Zachary sent an e-mail to Jim Young and Hu Benton, General Counsel of Ally Bank, copying Tammy Hamzehpour and Pensabene, which stated

---

[1334] *Id*. Ex. C-1.

[1335] *Id.* Ex. C-1–2.

[1336] *Id.* Ex. C-2.

"[r]ealizing that the actual agreement under which ResCap will use the Bank assets is not complete, can you confirm that the Ally Bank board of directors did, in fact, agree in that second meeting to allow the assets to be used?"[1337] Young provided a response the same day, stating:

> Yes, under the agreement of full reimbursement for all losses related to loan preservation activities that would be adopted outside of the pre-existing delegation of authority matrix for modifications; as documented under Exhibit C of the recently completed capital support agreement along it [sic] the other terms documented in that Exhibit.[1338]

The use of Ally Bank's portfolio for modifications was critical to ResCap and GMAC Mortgage. Without "having access to those loans, [ResCap and GMAC Mortgage would] not . . . meet [the required] $200 million credit."[1339] The ability to perform enough modifications to meet the requirements of the DOJ/AG Settlement was a constant concern of parties on both sides of the transactions.[1340]

### (3) The January 30 Letter Agreement Was The Product Of Extensive Negotiations

In late 2011, ResCap was again having difficulty meeting its covenants under various funding agreements that required it to have a TNW of greater than or equal to $250 million.[1341] This required ResCap to repeatedly request support from AFI or, as Carpenter

---

[1337] E-mail from R. Zachary (Feb. 9, 2012), at EXAM20169860 [EXAM20169858].

[1338] E-mail from J. Young to R. Zachary, H. Benton, T. Hamzehpour, J. Pensabene, C. Evans, and J. Whitlinger (Feb. 9, 2012), at EXAM20169859–60 [EXAM20169858]. The parties generally recognized this informal agreement. *See* Int. of J. Whitlinger, Feb. 27, 2013, at 237:7–238:2.

[1339] Int. of J. Whitlinger, Feb. 27, 2013, at 186:8–11. Whitlinger went on to say that "our view was that . . . if we didn't have access to modify bank loans at the bank portfolio, we were going to have a soft menu shortfall and potentially incur a penalty for not being able to meet it. And it would be more costly to the estate." *Id.* at 192:12–17.

[1340] *See, e.g.*, E-mails between M. Detwiler, C. Schares, and M. Rosen (Apr. 12–13, 2012), at EXAM00001279–80 [EXAM00001279] (Rosen asked whether reimbursements were capped at $75 million. In response, Schares stated "[u]nfortunately, yes. But we could still argue for our interpretation and we can also ask to increase the cap." Rosen replied, "[o]k, well, this makes it pretty clear that we need to get the servicing agreement done."). Detwiler was the Senior Vice President of Servicing Solutions at GMAC Mortgage during this period. Schares was the Vice President of Fee Based Operations at ResCap during this period.

[1341] *See, e.g.*, Unanimous Consent to Action of Ally Financial Inc. Board of Directors, dated Aug. 29, 2011, at RC40019729 [RC40019727]; Draft Discussion Materials—Joint Presentation by Ally and ResCap, dated Jan. 23, 2012, at 2 [EXAM00010740] ("ResCap's net worth has fallen from approximately $850mm at the beginning of 2011 to $250mm by year end"). *See also* Section VI.

phrased it, to "devot[e] resources to near term catastrophe scenarios."[1342] AFI's support came often in the form of debt forgiveness.[1343] For example, on August 29, 2011, the AFI Board approved liquidity support and a capital contribution to ResCap in the form of debt forgiveness under the A&R Line of Credit Agreement and the A&R Secured Revolver Loan Agreement.[1344]

TNW concerns came into focus again near the end of 2011. In late November 2011, decision-makers at ResCap and AFI began discussing the provision of "near and medium term support" to ResCap.[1345] Specifically, ResCap requested that AFI provide capital support to ResCap through June 30, 2012, including a "commitment to fund any and all potential DOJ/AG settlement and foreclosure file review costs."[1346] AFI responded to this request with a December 5, 2011 support agreement in which AFI committed to contribute capital to ResCap "in an amount necessary for ResCap to exceed its TNW covenants . . . by $50 million . . . provided that such capital contribution shall not exceed $200 million, to the extent necessary for ResCap to exceed its TNW Covenants by $50 million for the month of November 2011."[1347] Additionally, AFI represented that it would "seek approval from the AFI board for the month of December to provide similar tangible net worth support for the month of December 2011 (including with a buffer of $50 million over the TNW Covenant)," and that "AFI management currently intends to seek the same required board approval for the month of January 2012."[1348] AFI also stated its intention to provide debtor-in-possession financing for ResCap and its subsidiaries should ResCap determine to commence chapter 11 cases.[1349]

On December 30, 2011, consistent with the terms of the December 5, 2011 letter agreement, the AFI Board approved a net worth support agreement which capped support at

---

[1342] Letter from M. Carpenter to T. Marano (Aug. 30, 2011), at RC40019728 [RC40019727] (attached to E-mail from C. Quenneville (Sept. 8, 2011) [RC40019727]). Carpenter preferred that ResCap focus on long-term solutions rather than month-by-month survival.

[1343] *See, e.g.*, Unanimous Consent to Action of Ally Financial Inc. Board of Directors, dated Aug. 29, 2011, at RC40019729–30 [RC40019727].

[1344] Unanimous Consent to Action of Ally Financial Inc. Board of Directors, dated Aug. 29, 2011, at RC40019729–30 [RC40019727].

[1345] *See* E-mail from T. Marano (Nov. 28, 2011) [ALLY_0366218].

[1346] *Id.*

[1347] Letter Agreement Re: Preservation of Sales of Mortgage Loans to ResCap and Other Matters, dated Dec. 5, 2011, § D [EXAM00000127].

[1348] *Id.*

[1349] *Id.*

$200 million.[1350] ResCap was informed of AFI's support on the same day.[1351] AFI conditioned this support commitment, however, by an e-mail dated January 1, 2012 (sent by Anita Bhama on behalf of Carpenter),[1352] which stated:

> The amount of any contribution will not exceed $200 million, and in determining the amount of any debt to be forgiven, any amounts for a DOJ settlement or for any fines issued by the Federal Reserve Board will not be taken into account in determining whether ResCap has met the CTNW Covenants or exceeded the CTNW Covenants by $50 million, or how much of a debt forgiveness would be required for ResCap to do the same.[1353]

Discussion within AFI about imposing this additional condition reveals some internal discord, as Jeffrey Brown, James Mackey, Carpenter, and Bhama exchanged e-mails from December 29 through December 31 regarding whether such a condition was appropriate.[1354] Specifically, Bhama suggested that the condition could be included, while Brown and Mackey suggested that Deloitte would not accept any conditionality on the support commitment.[1355]

Carpenter saw the condition as an opportunity to gain leverage in future negotiations with ResCap, because AFI would not have a pre-existing obligation to provide ResCap with capital support in the event of a DOJ/AG Settlement.[1356] Specifically, Carpenter stated that:

> My thought here is, in the event of a unique event (eg DoJ) that, before automatically topping up [ResCap's] net worth (which is real value) that it becomes part of a broader negotiation with ResCap (eg 9019). Particularly in the (likely) event that the DoJ number comes in higher than our current expectation. I think we are nuts to forgive 200mm of debt and get nothing for it![1357]

---

[1350] *See* E-mail from M. Carpenter (Dec. 30, 2011), at ALLY_0171727 [ALLY_0171726].

[1351] *See* E-mail from M. Carpenter to T. Marano (Dec. 30, 2011), at EXAM11006579 [EXAM11006578] ("Tom,[  ]I am pleased to inform you that the Ally Financial Board has approved the ResCap net worth support agreement for December. Regards,[  ]Mike").

[1352] Bhama was Legal Counsel for AFI during this period.

[1353] E-mail from A. Bhama to T. Marano (Jan. 1, 2012) [ALLY_0192373].

[1354] *See* E-mails between M. Carpenter, J. Brown, J. Mackey, and A. Bhama (Dec. 29–31, 2011), at ALLY_0142373–76 [ALLY_0142373].

[1355] *See* E-mail from M. Carpenter to A. Bhama and J. Mackey (Dec. 30, 2011), at ALLY_0142374 [ALLY_0142373] ("Anita,[ ]Jim [Mackey's] strong view is that Deloitte will not accept any conditionality on the commitment. I will send an e mail to Tom Marano notifying him.").

[1356] *See* E-mail from M. Carpenter to J. Brown (Dec. 31, 2011) [ALLY_0142373].

[1357] *Id.*

Ultimately, despite advice to the contrary from Brown,[1358] Carpenter decided to include the proposed condition.[1359] This new condition did not sit well with ResCap, which saw it as a "retrade" of the "support of the TNW from the [December 5, 2011] Letter Agreement up and through the e-mail of December 30, 2011."[1360]

Around this time, all parties started to consider options relating to the potential DOJ/AG Settlement. On December 29, 2011, Young circulated an e-mail discussing "Bank Indemnifications."[1361] Specifically, Young reached out to Joe Cortese[1362] and Dondzila "to lay out the work we need to do between now and Jan 5th related to the settlement."[1363] Young states that he would like to discuss a few topics, including "[s]oft credit[s]" as well as "potential indemnification payments."[1364] With respect to indemnification payments, Young stated that the parties should consider payments in light of the "cap in the servicer agreement (one-year of servicing fees, which . . . is roughly $35 million). Hu and Bank management are still contemplating the application of the existing agreement to the situation . . . ."[1365]

---

[1358] *See, e.g.,* E-mail from J. Brown to M. Carpenter (Dec. 31, 2012) [ALLY_0142373] ("On the Anita [Bhama] logic, I have about 25 other emails . . . saying she is . . . wrong . . . . I do understand the logic . . . but . . . [i]f this was truly the case, then we should have put conditions in place all along.").

[1359] *See* E-mail from A. Bhama to T. Marano (Jan. 1, 2012) [ALLY_0192373] (informing Marano of Carpenter's decision to include the proposed condition).

[1360] Letter from L. Nashelsky to C. Hoyt (Jan. 20, 2012), at 2 [RC00068545]. Hoyt, of Mayer Brown, negotiated on behalf of AFI with respect to the January 30 Letter Agreement.

[1361] E-mail from J. Young (Dec. 29, 2011) [EXAM11892941].

[1362] Cortese was the Chief Accounting Officer of Ally Bank during this period.

[1363] E-mail from J. Young (Dec. 29, 2011) [EXAM11892941].

[1364] *Id.*

[1365] *Id.* Even at this early point in considering how to deal with the DOJ/AG Settlement, the parties understood that it would be problematic to operate under the Original Servicing Agreement, which contained a cap on indemnification obligations. *See* E-mail from H. McKay (Dec. 30, 2011) [EXAM11893283].

> There is a cap on indemnification payments required to be made to the Bank under the servicing agreement, of $35 million. While this is still being evaluated by the Bank, it is expected that the Bank will still make their portfolio available for soft dollar credits even after this cap is reached . . . . Even though this changes the fact pattern slightly in that the Bank losses on mods may not be fully covered in excess of this cap . . . .

This was also considered by Ally Bank later in negotiations. *See* E-mail from B. Yastine (Jan. 25, 2012) [ALLY_0342613] ("Appears we still don't have agreement on whether is only going to mod 35 under cap or all. Not comfortable going back to the Board until we have clarification."). *See also* GMAC Mortgage, LLC Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010 (Mar. 28, 2012), at 66 [RC00032177] (stating that GMAC Mortgage earned $34.8 million in servicing fees from Ally Bank in 2011). As stated in Section V.C.1.d(4)(b)(iii)(A) above, total indemnification payments to Ally Bank are estimated to be $134.5 million.

Immediately after receiving the conditioned support commitment on January 1, 2012, ResCap was also forced to turn its attention to funding a potential DOJ/AG Settlement.[1366] At this time, it was unclear which AFI or ResCap entities would be responsible for paying a potential settlement.[1367] Regardless of who was to bear this burden, ResCap was not certain of AFI and Ally Bank support in the event it incurred government fines.[1368]

This was a major concern for ResCap, because ResCap realized that it continued to face "difficult tangible net worth issues."[1369] AFI was not eager to support ResCap as evidenced by Carpenter's statement that AFI had a "limited appetite" for supporting ResCap.[1370] Despite this reluctance, Carpenter informed Marano on January 17, 2012, that "we reviewed a second draft of a term sheet yesterday which you should get today. Assuming the terms are agreeable, we should be able to turn it into a letter quickly." On the same day, Mayer Brown, counsel to AFI, sent a draft term sheet to Morrison & Foerster providing terms of potential support relating to a possible DOJ/AG Settlement.[1371]

This initial draft term sheet laid out the framework of the ultimate support agreement, including: (1) AFI's provision of capital support to ResCap such that ResCap could meet its TNW covenants as of December 31, 2011; and (2) ResCap's agreement to pay to the applicable governmental authorities any and all amounts owed when determined as part of the FRB/FDIC Consent Order and the DOJ/AG Settlement.[1372] Additionally, the term sheet provided the first iteration of a proposed indemnity with respect to losses incurred by Ally Bank due to GMAC Mortgage modification activity, as well as a proposed amendment to the A&R Line of Credit Agreement that would secure certain loans relating to that credit facility.[1373]

---

[1366] *See* E-mail from J. Whitlinger (Jan. 2, 2012) [EXAM11006608] ("I received this morning [AFI's] commitment for December support. They will support up to $200M….the DOJ/Fed Fines may put us right up to this limit; if not over….stay tuned.").

[1367] *See* Section V.C.1.f regarding settlement allocation issues.

[1368] *See* E-mail from J. Whitlinger (Jan. 2, 2012) [ALLY_0171726].

[1369] ResCap was also considering other potential options to solve its net worth problem. *See* E-mail from J. Whitlinger (Jan. 11, 2012), at EXAM10419200–01 [EXAM10419200]. ("Given the difficult tangible net worth issues that ResCap is facing, would the FRB entertain a penalty amount in a much smaller amount, such that booking that penalty would not cause ResCap to default under its credit facilities by reducing tangible net worth below its $250mm covenant level (i.e. a penalty of no more than $50mm all-in)?").

[1370] E-mail from M. Carpenter to J. Brown, J. Mackey, and B. Yastine (Jan. 17, 2012) [ALLY_0182854] ("AG's are struggling with what they perceive as [AFI's] small contribution—Tom continues to educate DoJ on ResCap's overall situation . . . . [AFI] believes [the State Attorneys General] have no case and has limited appetite for supporting ResCap.").

[1371] MB Draft Terms of Potential Support relating to a Possible DOJ/State Attorneys' General Settlement, dated Jan. 17, 2012 [ALLY_0394178] (attached to E-mail from C. Hoyt (Jan. 17, 2012) [ALLY_0394176]).

[1372] *Id.* ¶¶ 1–4.

[1373] *Id.* ¶ 6.

Morrison & Foerster, on behalf of ResCap and GMAC Mortgage, responded to the January 17 term sheet in a letter dated January 20, 2012.[1374] This letter highlighted ResCap's previously described issues with what it deemed the "retrad[ing]" of the December 5, 2011 letter agreement by AFI.[1375] The letter nevertheless addressed each enumerated paragraph of the January 17 term sheet "in an effort to obtain the support previously agreed to by AFI."[1376]

ResCap pushed back on a number of proposed provisions. Specifically, ResCap refused to "accept full responsibility 'for actions or inactions that are the basis of the DOJ/AG Settlement[,]'" as AFI requested, and also stated that "[GMAC Mortgage] will not indemnify Ally Bank for any los[s]es resulting from [loan] modifications [as potentially could be required under a DOJ/AG Settlement], other than as currently agreed to by the parties."[1377] Further, ResCap rejected AFI's proposal of securing certain loans under the A&R Line of Credit Agreement. In sum, as the letter expressly stated, ResCap's response was based on the belief that:

> AFI should rethink the Proposed Terms and limit them solely to the mechanics of ResCap's payment of any settlement amounts to DOJ/State AGs following AFI's capital contribution of amounts necessary to permit ResCap to make such payment and continue to be in compliance with its TNW at December 31, 2011.[1378]

Kirkland & Ellis responded in a January 25, 2012 letter from Richard Cieri to Larren Nashelsky of Morrison & Foerster,[1379] and also provided a draft agreement based on the January 17 term sheet, which incorporated some of ResCap's comments.[1380] Kirkland's letter cited the December 5, 2011 letter agreement as the "foundation for AFI's potential support for ResCap in this context" and disputed Morrison & Foerster's assertions "that AFI is seeking to renegotiate, or otherwise declining to satisfy, the terms of the December 5 Letter Agreement . . . ."[1381] Kirkland asserted that "AFI's sole obligation was to 'seek' board approval, and it fulfilled this

---

[1374] Letter from L. Nashelsky to C. Hoyt (Jan. 20, 2012) [RC00068545].

[1375] *Id.* at 2. This "retrade" essentially related to the revision of the AFI provision of support on December 30–31, 2011.

[1376] *Id.* at 3.

[1377] *Id.* at 3–4.

[1378] *Id.* at 4.

[1379] Letter from R. Cieri to L. Nashelsky (Jan. 25, 2012) [EXAM20276355].

[1380] AFI Draft Terms of Support Relating to Possible DOJ/State Attorneys' General Settlement, dated Jan. 25, 2012 [EXAM20276340] (attached to E-mail from N. Ornstein to L. Nashelsky (Jan. 25, 2012) [EXAM20276338]).

[1381] Letter from R. Cieri to L. Nashelsky (Jan. 25, 2012), at 1–2 [EXAM20276355].

obligation. The December 5 Letter Agreement does not require a December capital contribution. As such, your statement that AFI 'undid that which it agreed to and had confirmed' is wholly without merit."[1382] Kirkland & Ellis concluded by stating that:

> Last and most importantly, AFI has been engaging, and remains committed to continuing to engage, ResCap in consensual and constructive discussions on all aspects of ResCap's restructuring efforts—including the proposed terms on which AFI would support ResCap's obligations under the Potential DOJ/State AG Settlement.[1383]

AFI's proposed terms were communicated to ResCap in the draft agreement the same day.

AFI's January 25 draft agreement accepted essentially just one comment from Morrison & Foerster's January 20 letter, deleting the provision which had allocated to ResCap responsibility for activity which formed the basis of the DOJ/AG Settlement.[1384] Most other provisions included in the January 17 term sheet remained, including the provision of support to ResCap, ResCap's payment of the applicable governmental authorities, and the proposed amendment to the A&R Line of Credit Agreement.[1385] Notably, a new paragraph of the draft agreement provided for a right of reimbursement:

> [F]or any and all amounts expended by AFI or Ally Bank in connection with their performance or satisfaction of obligations under any DOJ/State AG Settlement or FRB Order and for any fines, penalties or other amounts levied against AFI or Ally Bank as a result of the failure of ResCap, [GMAC Mortgage] or their subsidiaries to perform their obligations under any DOJ/ State AG Settlement or FRB Order . . . .[1386]

In addition to this proposed obligation, paragraph 5 of the draft agreement provided that GMAC Mortgage would implement the modifications and loss mitigation activities designated on Exhibit A to the draft agreement, and that "[GMAC Mortgage] shall reimburse Ally Bank for any loss suffered by Ally Bank with respect to any mortgage loan as a result of any modification or loss mitigation in accordance with the Modification Plan, as calculated

---

[1382] *Id*. at 2.

[1383] *Id.*

[1384] AFI Draft Terms of Support Relating to Possible DOJ/State Attorneys' General Settlement, dated Jan. 25, 2012, at 1–4 [EXAM20276340].

[1385] *Id.*

[1386] *Id.* ¶ 4.

pursuant to Exhibit A hereto . . . ."[1387] The draft thus contemplated two distinct rights of reimbursement, one relating to "amounts expended by AFI or Ally Bank" in connection with their performance under any settlement or for any related penalties, and the other relating to "any loss suffered by Ally Bank . . . as a result of [loan] modification or loss mitigation."

After "robust" discussions among the members of ResCap's Board at their meeting on January 26,[1388] ResCap responded with a marked-up draft of the proposed agreement on the same day.[1389] This version incorporated a cap on the reimbursement for "amounts expended by AFI or Ally Bank" in connection with the DOJ/AG Settlement "from and after the time ResCap and [GMAC Mortgage] have effected the hard dollar payments . . . and $200 million of soft dollar credits pursuant to the DOJ/State AG Settlement."[1390] ResCap additionally deleted most of what was paragraph 5 of the January 25 draft agreement regarding the reimbursement of "Ally Bank for any loss suffered by Ally Bank with respect to any mortgage loan as a result of any modification or loss mitigation" while providing that GMAC Mortgage would negotiate in good faith an amendment to the Original Servicing Agreement "to implement modifications and other lost mitigation activities" in connection with the DOJ/AG Settlement.[1391] ResCap once again refused to include a provision amending the A&R Line of Credit Agreement.[1392]

ResCap received a revised draft agreement from AFI on January 30, which was substantially similar to the January 30 Letter Agreement.[1393] This version added a waiver of defaults relating to TNW covenants by AFI and BMMZ and a commitment from AFI to "contribute capital to ResCap in an amount necessary for ResCap to exceed its TNW Covenants . . . by $25 million for the month of January, 2012."[1394] It also included an

---

[1387] *Id*. ¶ 5.

[1388] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Jan. 26, 2012, at RC40019196 [RC40019179].

> At Mr. Marano's request, Ms. Nashelsky described the terms of the capital support letter draft prepared by the advisers for Ally Financial Inc. received earlier that day and distributed to the members of the Board, including changes therein since the first indicative terms were sent on January 18, 2012. After a robust discussion among the members of the Board and its advisers about the appropriate responses to the terms of the capital support letter, the Board directed Mr. Marano and Morrison & Foerster to negotiate changes to the proposed support letter.

[1389] Draft Terms of Support Relating to Possible DOJ/State Attorneys' General Settlement - ResCap Comments, dated Jan. 26, 2012 [RC00067767].

[1390] *Id*. ¶ 4.

[1391] *Id*. ¶ 6.

[1392] *Id*. at 4.

[1393] *See* AFI Draft Terms of Support Relating to Possible DOJ/State Attorneys' General Settlement, dated Jan. 30, 2012 [ALLY_0018546].

[1394] *Id*. at 2, 4.

Exhibit C which set forth terms to be included in any amendment to the Original Servicing Agreement, which GMAC Mortgage, per the terms of the draft agreement, had agreed to negotiate.[1395] These Servicing Agreement Modification Terms included a reimbursement provision similar to that included in the January 25 draft (and which was struck in ResCap's January 26 response), wherein "[GMAC Mortgage] shall indemnify Ally Bank for any loss suffered by Ally Bank with respect to any Subject Loan as a result of any modification or loss mitigation . . . ."[1396]

### (4) The ResCap Board Approves The January 30 Letter Agreement

At a ResCap Board meeting held January 30, Marano "described the nearly final terms of the capital support letter from Ally Financial Inc. . . . received shortly before the meeting and distributed to the members of the Board."[1397] The ResCap Board and its advisers then discussed the remaining open items and ultimately gave Marano "full authority . . . to enter into a final capital support letter . . . in substantially the form and on the terms set forth in the draft thereof previously delivered to the Board members, with such changes therein as he deems necessary or appropriate."[1398] When asked about their rationale for supporting ResCap's entry into the January 30 Letter Agreement, certain ResCap Board members could not recall any details, but only that the January 30 Letter Agreement "allowed ResCap to continue to operate."[1399] The approval of the January 30 Letter Agreement was not voted on by a committee of Independent Directors,[1400] was not subject to an independent valuation,[1401]

---

[1395] *Id*. ¶ 7, Ex. C.

[1396] *Id*. Ex. C.

[1397] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Jan. 30, 2012, at RC40019197 [RC40019179].

[1398] *Id*. Ilany did not attend this meeting.

[1399] Int. of S. Abreu, Jan. 22, 2013, at 370:4–22; Dep. of J. Whitlinger, Aug. 3, 2012, at 52:14–53:17 (stating that if "ResCap didn't have the funds available" from AFI pursuant to the January 30 Letter Agreement, ResCap and GMAC Mortgage couldn't have entered into the DOJ/AG Settlement as they did not have the requisite net worth or liquidity).

[1400] *See* Dep. of J. Whitlinger, Aug. 3, 2012, at 68:5–70:10, 73:5–14. Whitlinger stated that he did not believe that having the special committee of independent directors review and approve the January 30 Letter Agreement was necessary because the "agreement for AFI provide[d] that forgiveness to allow [ResCap and GMAC Mortgage] to settle . . . and be able to make our payments, and, in my opinion, was straightforward." *Id*. at 70:9–18. Regardless, Whitlinger believed that "the independent directors were fully a part of this decision." *Id*. at 72:11–19.

[1401] *See id.* at 73:15–74:15.

and was not considered or approved at a separate meeting of the GMAC Mortgage Board of Directors.[1402] Ultimately, members of the ResCap Board expressed pleasure with the result of the negotiations,[1403] which they considered contentious.[1404]

### (5) Economics Of The January 30 Letter Agreement

In the January 30 Letter Agreement, AFI agreed to forgive $196.5 million of ResCap debt under the A&R Line of Credit Agreement.[1405] The amount of the debt forgiveness appears to have been based upon the estimates of ResCap's portion of the potential settlements under one of the approaches previously described in Section V.C.1.f(2) ($11/15 \times \$268$ million = $196.5 million).[1406]

GMAC Mortgage and RFC were the borrowers under the A&R Line of Credit Agreement.[1407] When accounting for AFI's forgiveness of $196.5 million under the A&R Line

---

[1402] *See id*. at 91:10–92:14. Whitlinger stated that he did not believe that there was a "separate board meeting" of the GMAC Mortgage Board to consider and vote on whether GMAC Mortgage should enter into the January 30 Letter Agreement, however, he felt that they had "concurrence of the board." *Id.* Whitlinger further stated that "Steve Abreu and myself are both GMAC Mortgage board members. Joe Pensabene was intimately involved with all of the discussions. I believe that we had concurrence of the board." *Id.*

[1403] *See* E-mails between P. West and J. Whitlinger (Jan. 31, 2012) [EXAM10345463] (after Whitlinger stated that the January 30 Letter Agreement provided that "ResCap would not indemnify bank for soft menu credits on normal course of business as it is processed today" and that "no minimum usage of bank portfolio is necessary," West commented that this was "[g]reat. Looks like we got most of what we wanted. Good work."); Int. of T. Marano, Feb. 27, 2013, at 69:7–17 (when discussing the agreement regarding the amount of debt forgiveness to be provided by AFI, Marano stated "[b]ecause I felt that's about the number I would need not to have a negative impact to my net worth . . . related to this settlement. So I think I won this one."); Int. of J. Whitlinger, Feb. 27, 2013, at 202:19–203:15, 223:5–12 ("I got them to pay the whole $196.").

[1404] *See* Int. of T. Marano, Feb. 27, 2013, at 70:17–20 ("[T]his is like every agreement was [sic] extremely contentious between us and [AFI] . . . .").

[1405] January 30 Letter Agreement, ¶ 1 [ALLY_0194817].

[1406] *See* Section V.C.1.f regarding allocation. It has also been suggested that the amount of debt forgiveness was intended to act as a cap on amounts to be paid by ResCap under the January 30 Letter Agreement. *See* Int. of J. Whitlinger, Feb. 27, 2013, at 206:25–207:8 ("[O]ur view was—and I was very clear when we were negotiating some of this—that 'You're giving us debt forgiveness of $196.5 million. And once we hit above that amount, we don't have to pay anymore. Because you only gave us debt forgiveness up to that amount. . . .'").

[1407] *See* A&R Line of Credit Agreement [ALLY_0240633].

of Credit Agreement, ResCap allocated $124.2 million of debt forgiveness to GMAC Mortgage and the remaining $72.3 million to RFC.[1408]

The A&R Line of Credit Facility provided ResCap with a maximum capacity of $1.6 billion ($1.1 billion secured and $500 million unsecured).[1409] Draws on the unsecured portion of the line of credit were available only after the secured portion had been fully utilized.[1410] As of December 31, 2011, ResCap's total borrowings under the A&R Line of Credit Facility were $185.0 million.[1411] GMAC Mortgage's portion was $111.5 million,[1412] while RFC's portion was $73.5 million.[1413] After giving effect to the debt forgiveness required under Exhibit A of the January 30 Letter Agreement, the amount of outstanding debt under the A&R Line of Credit Agreement was $311.5 million.[1414] Therefore, the $196.5 million in debt that was forgiven under the January 30 Letter Agreement had been drawn on the secured portion of the A&R Line of Credit Agreement.

---

[1408] *See* GMAC Mortgage, LLC Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010 (Mar. 28, 2012), at 11, 69 [RC00032177] (stating that on January 30, 2012 GMAC Mortgage "recognized a capital contribution . . . of $124.4 million, and a corresponding reduction in borrowings under the [A&R Line of Credit Agreement]"); Residential Funding Company, LLC Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010 (Mar. 28, 2012), at 11, 61 [RC00032246] (stating that on January 30, 2012, RFC "recognized a capital contribution . . . of $72.3 million, and a corresponding reduction in our borrowings under the [A&R Line of Credit Agreement]"); Memorandum, Significant Transaction Memo: General Information and Transaction Description Re Mortgage Fine, Waivers and Debt Forgiveness, dated Feb. 2012, at EXAM0220160 [EXAM00220147].

[1409] *See* Residential Capital, LLC Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010 (Mar. 28, 2012), at 38 [EXAM00122651].

[1410] *See id*. at 39.

[1411] *Id*. at 76.

[1412] *See* GMAC Mortgage, LLC Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010 (Mar. 28, 2012), at 65 [RC00032177].

[1413] *See* Residential Funding Company, LLC Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010 (Mar. 28, 2012), at 60 [RC00032246].

[1414] *See* January 30 Letter Agreement, Ex. A [ALLY_0194817]; E-mail from E. Kahan (Jan. 31, 2012), at ALLY_PEO_0034525–26 [ALLY_PEO_0034500] (providing the description of the daily outstanding balance on the A&R Line of Credit Facility. According to ResCap's January 31, 2012 unaudited "Trial Balance," GMAC Mortgage's outstanding balance on the A&R Line of Credit Facility was $156.7 million, and RFC's outstanding balance was $103.4 million, for a total balance of $260.1 million. *See* Residential Capital, LLC Unaudited Trial Balance for Month ended 2012-01-31, dated January 31, 2012 [EXAM00228752]; *see also* Ally Financial Inc. Summary of Intercompany Balances with ResCap, dated May 28, 2012, at ALLY_0182819 [ALLY_0182793] (also stating that the outstanding balance on the A&R Line of Credit Facility was $261 million including interest as of January 31, 2012). This difference of $51.4 million (between the $311.5 million and the $260.1 million) is due to an additional $51.4 million of debt forgiveness (in connection with the payment by GMAC Mortgage to Ally Bank due to the "accounting error" under the Broker Agreement, as described in Section V.B.6) recorded on March 1, 2012 that was retroactively applied to the December 31, 2011 financial records. Conference call with ResCap and FTI, Financial Advisor to the Debtors (Apr. 29, 2012).

### b. GMAC Mortgage Begins Performing Modifications To Ally Bank's Loan Portfolio

ResCap and GMAC Mortgage had to determine which population of loans could be modified, what type of modification could be made, and the costs associated with such modifications to receive credits against the soft costs of the CMP. The ResCap and GMAC Mortgage capital markets and servicing teams applied a "waterfall" to determine what types of loans were subject to the modification provisions in the DOJ/AG Settlement and what type of model should apply to those loans.[1415] The ResCap and GMAC Mortgage risk analysis team then ran the models on the loans to compare the pre-modification financials with the post-modification financials,[1416] or, in other words "present what happens economically as a result of the modifications."[1417] This information was then provided to the ResCap and GMAC Mortgage accounting, servicing management and capital markets groups.[1418]

Solicitations to borrowers from the Ally Bank portfolio began at the end of March 2012, and modifications began to occur in April.[1419] Both of these activities commenced prior to the negotiation of the AG Menu Matrix, as discussed below, which governed the reimbursement

---

[1415] Int. of C. Senick, Nov. 16, 2012, at 66:23–67:2, 239:20–240:14. Senick was the Risk Officer of GMAC Mortgage during this period.

[1416] *Id.* at 66:23–67:2, 239:20–240:14.

[1417] *Id.* at 240:11–13.

[1418] *See id.* at 240:13–14.

[1419] *See* Dep. of J. Whitlinger, Aug. 3, 2012, at 94:19–24; Residential Capital, LLC Condensed Consolidated Financial Statements for the Periods Ended March 31, 2012 and 2011 (Unaudited), at 44 [EXAM00070376].

by ResCap and GMAC Mortgage to Ally Bank of costs associated with the loans modified pursuant to the government settlements.[1420] Each type of modification had a specific associated reimbursement calculation.[1421]

### c.  GMAC Mortgage And Ally Bank Enter Into The A&R Servicing Agreement

GMAC Mortgage and Ally Bank entered into the A&R Servicing Agreement, which is dated May 11, 2012.[1422] The A&R Servicing Agreement incorporates the Servicing Agreement Modification Terms and includes the AG Menu Matrix.[1423]

### (1) Indemnity Provisions

The A&R Servicing Agreement incorporated the indemnity provision required by the Servicing Agreement Modification Terms. Specifically, the A&R Servicing Agreement provided that:

> [GMAC Mortgage] shall indemnify [Ally Bank] for losses
> suffered by [Ally Bank] as a result of any action taken in
> accordance with the AG Menu Items attached hereto as Exhibit
> 4-B; provided, that [GMAC Mortgage] shall not be required to

---

[1420] Int. of C. Senick, Nov. 16, 2012, at 242:9–245:19 (noting that the parties that negotiated this matrix likely were (a) for ResCap and GMAC Mortgage: Mark Schaeffer, Peter Muriungi and Feyera Milkessa, and (b) for Ally Bank: Joe Cortese and Young).

[1421] Int. of C. Senick, Nov. 16, 2012, at 243:2–244:14 (referring to the AG Menu Matrix as the "reimbursement matrix").

What we were talking about there is what are the economics, what are you being made whole for— you being the bank. Our recommendation was to try to keep the reimbursement consistent with the economics coming out of the model. So in terms of a principal forgiveness if you're forgiving $10,000 of principal that's a $10,000 charge off to the bank with a few nuances that I'm not familiar with. For the most part you get reimbursed $10,000. That one is fairly easy and was managed outside of our process. For loans where the modification resulted in a refinance, a new loan there you don't have an amount of principal that was forgiven. So the question is how much has the bank lost or gained from that modification. One argument is well if you're reducing interest, the note rate on the loan, that's less interest over time. So one suggestion on the bank side was let's calculate that lifetime interest change. My response to that was yes, but you should receive more payments over time. So there are pros and there are cons. Why don't we apply the net present value of those cash flows to determine fair value which is consistent with the bank's fair value disclosure on its quarterly statements on the portfolio on which it has a reserve? They need to disclose what the fair value of those loans would be under an HFS or a fair value methodology. So I said if we have this methodology that we're all comfortable with in what is the fair value of a loan let's run the fair value of the loan before, the fair value after and if you get more principal back than interest or vice versa that will show up in that NPV calculation. That ultimately made its way into the reimbursement.

[1422] Additional discussion related to the A&R Servicing Agreement can be found in Section V.B.9.

[1423] *See* A&R Servicing Agreement, §§ 10.01(e)–(f), Ex. 4-B [ALLY_0114469]. The AG Menu Matrix is described in detail in Section V.C.2.d.

> indemnify [Ally Bank] for any losses in connection with any
> such action that also would have been permitted under the terms
> of the Standard Matrix.[1424]

Exhibit 4-B provides the framework for "ResCap AG Consumer Relief," or the implementation of the consumer relief required by the DOJ/AG Settlement.[1425]

The A&R Servicing Agreement also included the limitation on modifications as set forth in the Servicing Agreement Modification Terms, which states that "[i]n no case shall [GMAC Mortgage] evaluate additional Portfolio Loans for actions pursuant to the AG Menu Items in the month following the month in which indemnification payments to [Ally Bank] . . . exceed $75,000,000 in the aggregate."[1426] This $75 million cap was generally viewed as a protection for Ally Bank.[1427]

The A&R Servicing Agreement omitted, however, any cap on this indemnity like the cap included in paragraph 5 of the January 30 Letter Agreement, which limits ResCap's and GMAC Mortgage's reimbursement liabilities once the hard dollar payments have been made under the DOJ/AG Settlement, and ResCap and GMAC Mortgage have earned $200 million of soft dollar credits.[1428]

---

[1424] A&R Servicing Agreement, § 10.01(e) [ALLY_0114469].

[1425] *See id.* Ex. 4-B.

[1426] *Id.* § 10.01(f). The parties generally referred to this as a "speed bump." E-mail from J. Young (May 31, 2012) [ALLY_0197143] ("The key question we will need to address and recommend is whether we should approve them moving beyond our $75 million speed bump given our view of collection of reimbursement."); *see also* Int. of J. Whitlinger, Feb. 27, 2013, at 209:18–210:2 ("Our view on the $75 million speed bump was that we're going to do modification activities. . . . When we've done those activities and we've made payments of $75 million, we'd get back together and talk about, should we have to pay anything more to them, and who should take it?").

[1427] *See* Int. of J. Whitlinger, Feb. 27, 2013, at 211:5–16 (responding to the question of whether the $75 million was a "cap on the level of their consent to modifications" Whitlinger stated "[t]hat's Jim Young's view. . . . And he'd probably tell you that that $75 million was for that, because we needed to tell the regulators and show the regulators that we have control and how much of our portfolio is getting modified.").

[1428] January 30 Letter Agreement, ¶ 5 [ALLY_0194817].

### (2) Negotiation Of The A&R Servicing Agreement

Negotiations regarding the various provisions of the A&R Servicing Agreement took place over an extended period of time,[1429] from at least from February 1, 2012[1430] through May 11, 2012.[1431] Throughout the negotiation process, GMAC Mortgage was eager to finalize the A&R Servicing Agreement,[1432] which it viewed as critical to the future sale of its platform.[1433] GMAC Mortgage, however, perceived that Ally Bank was dragging its feet.[1434]

---

[1429] *See, e.g.,* Letter from T. Marano to B. Yastine (May 9, 2012) [EXAM00069159] ("[GMAC Mortgage] offered Ally Bank an amendment in March to the 2001 Servicing Agreement in accordance with the terms of the Support Letter. While that amendment was not pursued, both parties have been working towards finalizing the [Subservicing Agreement] for quite some time.").

[1430] *See, e.g.,* E-mails between B. Yastine and T. Marano (Feb. 1, 2012) [ALLY_0194846] (Yastine stated to Marano that "[w]e all want to move fast on the servicing agreement, but to date it has not been reviewed through a BK lens. . . . That will not happen in 1–2 days." Marano responded that "[w]e banged 2 of the issues out this am. Can u stop by at 10:30am tomw . . . so we can wrap u[sic] the r3d [sic] issue . . . .").

[1431] While the A&R Servicing Agreement is dated May 11, 2012, it appears as though signature pages were held in escrow until GMAC Mortgage and Ally Bank had come to an agreement on a letter detailing the terms of an indemnity payment from GMAC Mortgage to Ally Bank based on April loan modifications, as discussed in Section V.C.2.e. *See* E-mail from T. Hamzehpour (May 13, 2012) [EXAM11151314] ("Also, signature pages are standing by on the Servicing Agreement for both [GMAC Mortgage] and [Ally] Bank, so as soon as we sign off on this letter those should be able to be released.").

[1432] *See, e.g.,* E-mail from M. Detwiler (Feb. 13, 2012) [EXAM00001482] ("Joe/Gary, wanted to give you an update that I anticipate that we will execute the new subservicing agreement with Ally Bank sometime this month . . . ). *See also* Letter from T. Marano to B. Yastine (May 9, 2012) [EXAM00069159].

[1433] *See* Int. of J. Pensabene, Jan. 9, 2013, at 245:4–12 ("If we lost rights to service one-third of our overall portfolio and . . . even more as it relates to just the value of the portfolio then the auction of the business would not have been nearly as successful as it turned out to be. The value of the platform would have been diminished dramatically.").

[1434] *See, e.g.,* E-mail from M. Carpenter (Feb. 24, 2012) [ALLY_0195356]. In an e-mail to Yastine, Carpenter, when discussing the negotiations surrounding the servicing agreement, suggested that Marano "says you don't return phone calls, answer e mails promptly or talk to the right people!! My only point is if you and he talked once a day we would avoid a lot of bs." *Id.* In response to being asked why it took so long to get a new servicing agreement in place, Marano responded "the folks at Ally Bank were extremely slow and had a tendency to nitpick every detail. And so, I think they just—I would put responsibility on them. They were very slow." Int. of T. Marano, Feb. 27, 2013, at 87:25–88:7. At various points early in the negotiations, the parties would state that they had drafts that were "nearly complete." *See, e.g.,* E-mail from M. Detwiler (Feb. 13, 2012) [EXAM00001482] ("Joe/Gary, wanted to give you an update that I anticipate that we will execute the new subservicing agreement with Ally Bank sometime this month . . .); E-mail from K. Kohler to C. Hoyt (Mar. 14, 2012), at EXAM00073758 [EXAM00073757] ("I just heard from Mary Fahy Woehr, the ResCap in-house lawyer working on the subservicing agreement . . . . [S]he has a draft that is nearly complete and that she could try to turn tonight if you and she were able to address several of the key points."). However, as previously stated, the A&R Servicing Agreement was not finalized until at least May 11, 2012.

There was voluminous regular correspondence between the parties during this time period discussing terms of the A&R Servicing Agreement.[1435] The negotiations covered numerous issues,[1436] and involved internal as well as outside counsel.[1437] The parties do not appear to dispute the inclusion of the indemnity provision relating to loan modifications.[1438] The issue discussed most frequently was the structure of the AG Menu Matrix,[1439] which was

---

[1435] *See, e.g.*, E-mail from M. Rosen to J. Young (Apr. 20, 2012) [ALLY_0208224] (in providing an update regarding reimbursement issues, Rosen told Young that "I believe that both parties are still working on other items ties to the servicing agreement, so I don't think [the reimbursement issue] is the only thing holding up ratification.").

[1436] *See, e.g.*, E-mail from M. Fahy Woehr (Mar. 14, 2012) [EXAM00073757] (discussing thoughts regarding a number of issues including representations and warranties, consent rights to assignments and events of default, as well as a potential reimbursement matrix "under the AG Menu"). Fahy Woehr was in-house counsel for ResCap during this period and negotiated the A&R Servicing Agreement on ResCap's behalf. *See* E-mail from K. Kohler to C. Hoyt (Mar. 14, 2012), at EXAM00073758 [EXAM00073757].

[1437] Morrison & Foerster represented ResCap and GMAC Mortgage in these negotiations, while Mayer Brown and Kirkland & Ellis represented Ally Bank. *See, e.g.*, E-mails between C. Hoyt and K. Kohler (Mar. 14, 2012), at EXAM00073758 [EXAM00073757]; E-mail from K. Kohler (Apr. 16, 2012), at ALLY_0019252–53 [ALLY_0019252].

[1438] The parties viewed the inclusion of such an indemnification provision as a standard term. *See* Int. of J. Whitlinger, Feb. 27, 2013, at 189:9–17.

> But absolutely we ended up having to pay them. And I've said this very clearly in my other deposition, that as a third party, if I went to Fannie and Freddie and said, 'Hey, I have this DOJ settlement. I got to go solicit all these borrowers and I got to earn $200 million; can I use your loans, guys?' They would absolutely say, 'Sure. Pay me for the loss mods.'

*See also* Int. of T. Marano, Feb. 27, 2013, at 91:4–10 ("I was told that caps were not common, that for servicers to make an error, that usually the servicer was 100 percent liable. And I was also told in the current environment of the [DOJ/AG], many agreements were being renegotiated to increase the liability of the servicers.").

[1439] *See, e.g.*, E-mail from C. Dondzila to J. Whitlinger (Feb. 22, 2012) [EXAM11893427] ("FYI regarding where Bank is landing in terms of requiring indemnification payments. I think we are back to where we started, that we will be making payments to them on virtually all of the modification activity, and in amounts in excess of their actual incurred accounting losses."); E-mail from R. Fowlie to C. Dondzila and J. Whitlinger (Mar. 16, 2012) [EXAM10994711] ("As the negotiations between us and the Bank continue on the sub servicing agreement one process that should be in there is around the AG settlement and how we should reimburse the Bank for losses on their portfolio."); E-mail from M. Rosen (Apr. 13, 2012), at ALLY_0368406–07 [ALLY_0368405] ("Let us know if you have any questions or when you've finished your review and are ready to discuss next steps in finalizing the reimbursement matrix."); E-mail from M. Rosen to J. Young (Apr. 20, 2012) [ALLY_0208224] ("I've had a chance to follow up with [Pensabene]. He's reviewed the issue with [Marano] and his position remains that he does not agree to reimburse on the refinance program in a scenario where they would also be paying dollar-for-dollar on principal reduction."); E-mail from J. Pensabene (Apr. 24, 2012) [EXAM00066809] ("FYI – follow up to where we ended with the Bank on remediation. Tom and I met with Barbara and Jim yesterday. We essentially agreed that on the principal forgiveness mods we would reimburse $ for $. On the rate refi we would pay them for negative FMV and they would pay us for positive FMV. Tom felt like this was a compromise we could live with."); E-mail from C. Senick (Apr. 25, 2012) [ALLY_0208255].

not resolved until just prior to the Petition Date.[1440] Evidence suggests that all parties considered the negotiations to be contentious.[1441] ResCap seems to have been satisfied with the results of the negotiations. Marano observed that "what we negotiated was a much better deal for ResCap than what [ResCap] had before."[1442]

### (3) It Is Unclear If The GMAC Mortgage Board Approved Entry Into The A&R Servicing Agreement

The Investigation did not uncover any GMAC Mortgage Board minutes or written consents evidencing the approval of the A&R Servicing Agreement.[1443] Pensabene signed the A&R Servicing Agreement on behalf of GMAC Mortgage.[1444]

### (4) Economics Of The A&R Servicing Agreement

As of June 25, 2012, ResCap estimated that GMAC Mortgage would earn $41.6 million in subservicing revenue and $24.7 million in net income from June 2012 through December 2012 as a result of the A&R Servicing Agreement.[1445]

From May 2012 through February 2013, GMAC Mortgage paid Ally Bank a total of $96.8 million in connection with loan modifications under the indemnification provision of the January 30 Letter Agreement and the A&R Servicing Agreement.[1446]

---

[1440] *See, e.g.,* Letter from T. Marano to B. Yastine (May 9, 2012) [EXAM00069159] ("The AG Menu Matrix attachment to [the A&R Servicing Agreement] that sets forth the methodology for use of the soft dollar credits under the DOJ/AG settlement was only agreed to on Monday of this week, and agreement as to all other provisions of the new servicing agreement was reached yesterday."); E-mail from M. Fahy Woehr (May 7, 2012) [EXAM20139177] ("Attached is a final execution copy of the [A&R Servicing Agreement]. However, this afternoon, more comments came into the pricing exhibit from the Bank.").

[1441] *See, e.g.,* E-mail from B. Yastine (Apr. 25, 2012) [ALLY_0196078] (in response to an e-mail from Young which describes a potential compromise regarding the indemnification of Ally Bank which Benton and Young feel they can defend, Yastine states that negotiations were a "[h]ard fight, but best outcome."). *See also* E-mail from B. Yastine to T. Marano and M. Carpenter (Apr. 26, 2012) [ALLY_0196081].

   As you know, the teams had a call last night and have another scheduled for 10 am this morning. The only remaining issue is that [GMAC Mortgage] will not agree that it is a servicer event of default if it fails to comply with the Consent Order. We don't have much of an explanation for why, other than this wasn't in the "Support Letter." . . . We will see if the teams can make any progress at 10 am, but you and I will likely need to lead a summit again to come to terms on this one.

[1442] Int. of T. Marano, Nov. 26, 2012, at 243:24–244:5.

[1443] The GMAC Mortgage Board was comprised of Whitlinger, Abreu, and Pensabene. Dep. of J. Whitlinger, Aug. 3, 2012, at 36:24–37:5.

[1444] A&R Servicing Agreement, at ALLY_0114541 [ALLY_0114469].

[1445] Joint Servicing—Ally Subservicing Agreement Presentation by Centerview, Morrison & Foerster, and FTI, dated July 17, 2012, at RC00075962 [RC00075960].

[1446] Loan Level Reimbursements Through January 2013, prepared by ResCap [EXAM00345233].

Reimbursement payments made by ResCap to Ally Bank were based upon the parameters set forth within the AG Menu Matrix, which allows GMAC Mortgage to perform loan modifications to Ally Bank loans beyond the previously set modification parameters attached to the September 2007 Fourth Addendum to the Original Servicing Agreement.[1447]

As stated, the amount of the reimbursement to Ally Bank is calculated based on the collateral position of a particular loan as well as the type and amount of the modification performed for that loan. The majority of the reimbursement payments through the period ending January 2013 to Ally Bank resulted from principal reductions on mortgage loans where Ally Bank held a first lien position.[1448] For non-Home Affordable Modification Program-eligible first lien principal reduction modifications, the AG Menu Matrix allows for a dollar-for-dollar reimbursement payment from ResCap to Ally Bank if the unpaid principal balance was not previously charged off by Ally Bank. Home Affordable Modification Program-eligible first lien principal reduction modifications yield less than a dollar-for-dollar reimbursement payment if the post-modification loan retains a loan-to-value percentage of greater than 105%.[1449]

---

[1447] A&R Servicing Agreement, Ex. 4-B [ALLY_0114469]; *see also* Fourth Addendum to Servicing Agreement, dated Sept. 12, 2007, Ex. A-1 [ALLY_0251201]. Notably, GMAC Mortgage would not be required to reimburse Ally Bank for any losses incurred in connection with any modification or loss mitigation activities that were permitted under the terms of the Original Servicing Agreement, as amended. During negotiations, members of the ResCap Board viewed this as an important aspect of the agreement. *See* E-Mails between P. West and J. Whitlinger (Jan. 31, 2012) [EXAM10345463] (after Whitlinger stated that the January 30 Letter Agreement provided that "ResCap would not indemnify bank for soft menu credits on normal course of business as it is processed today," West commented that the terms were "[g]reat. Looks like we got most of what we wanted."). Despite this view, evidence demonstrates that ResCap and GMAC Mortgage did not keep track of whether any modifications conducted may have been previously permitted, and thus not subject to reimbursement. Pensabene stated that GMAC Mortgage did not look to see whether loans modified would have been eligible for modification under existing authority, as "it would be very difficult . . . to try and figure out what the loss to the bank would have been under a program we're already authorized to do versus what it is—you're basically asking operationally for us to underwrite the loan for two different programs." Int. of J. Pensabene, Jan. 9, 2013, at 229:22–230:3. Such an oversight could have led to GMAC Mortgage paying more than it was required to by the terms of the January 30 Letter Agreement and the A&R Servicing Agreement. However, the Examiner was unable to conclude, based on the information available, whether any overpayment was made.

[1448] Loan Level Reimbursements Through January 2013, prepared by ResCap [EXAM00345233] (providing detailed information on all reimbursements invoiced by Ally Bank to ResCap and analysis broken down by loan reimbursement amount, pre-modification unpaid principal balance, charge-off amount, and post-modification unpaid principal balance).

[1449] A&R Servicing Agreement, Ex. 4-B [ALLY_0114469].

The remainder of the Ally Bank reimbursement payments that ResCap made through the period ending January 2013 resulted from modifications performed on loans where Ally Bank held the second-lien position. For second-lien principal reduction loan modifications, reimbursements to Ally Bank are based on reductions in excess of 20% of the debtor's pre-modification unpaid principal balance multiplied by the U.S. Treasury Department's Second-Lien Modification Investor Incentive Schedule (set range of 20% to 42% based on current loan-to-value).[1450] For second-lien loan extinguishments, where the loan is deemed paid off, the lien is released, and all outstanding balances are forgiven, and reimbursement to Ally Bank are calculated based on the total amount of the extinguished loan unpaid principal balance multiplied by the net charge-off recovery rate (2.2%).[1451]

The AG Menu Matrix notably specifies that ResCap's reimbursement payments to Ally Bank for principal reductions will be reduced by the amount of charge-offs associated with the loans being modified.[1452] However, the AG Menu Matrix does not specify that the reimbursement payments will be further reduced by the amount of reserves recorded on these loans by Ally Bank.[1453] In his interview, Young stated:

> [L]osses are reserved for under Generally Accepted Accounting Principles when the loss is considered probable and can be estimated. That usually happens long—and it generally occurs at the time when there's some evidence of a potential loss; so delinquency, something of that nature. A charge-off would occur after a period of time where a loan has gone through 30, 60, 90 days, it's into foreclosure and it now has become very clear that there is a loss and that loss can be, of course, dollar amount can be known, and the loss is known. At that point in time it's charged off against that reserve. So, a reserve is an estimate of an event that occurred based on the information that you have, but it's not a final determination by any stretch of the imagination.[1454]

---

[1450] *Id.*

[1451] *Id.*

[1452] *Id.*

[1453] GMAC Mortgage previously entered into an agreement with Ally Bank (then GMAC Bank) whereby, in exchange for Ally Bank's forbearance from exercising its rights to require GMAC Mortgage to purchase certain loans, GMAC Mortgage would indemnify Ally Bank for any realized losses on any such loans that Ally Bank had to charge off in an amount not to exceed the net carrying value of the loan as of a certain date (the principal balance reduced by any charge-offs or reserves). GMAC Bank Indemnification Agreement, dated April 16, 2008 [ALLY_0017906]. This treatment differs from the AG Menu Matrix in that it considers reserves in calculating the indemnified losses of Ally Bank.

[1454] Int. of J. Young, Mar. 15, 2013, at 222:19–223:16.

As shown in Exhibit V.C.2.c(4) below, the total amount reserved on the modified loans held in the Ally Bank portfolio prior to the borrower relief modifications was approximately $50.6 million. Approximately $34.7 million of these reserves related to loans for which Ally Bank received reimbursement payments from ResCap. On certain loans, Ally Bank's reserves exceeded the amount of the reimbursement from ResCap. The total amount of the reserve was approximately $7.8 million greater than the reimbursement payment to Ally Bank for these loans. Based on the foregoing, ResCap reimbursed Ally Bank for $26.9 million ($34.7 million— $7.8 million) related to loan modifications for which Ally Bank had recorded reserves equal to or less than the reimbursement amount.

EXHIBIT V.C.2.c(4)
**Comparison of Reimbursement Payments to Pre-Modification Reserves**
*($ in Millions)*

| Item | Count | Reimbursement Payments | | Pre-Modification Reserve Amount | |
|---|---|---|---|---|---|
| Loans modified from April 2012 – January 2013 | 2,610 | $ | 96.9 | $ | 50.6 |
| Less: Modified loans with no reimbursements | 873 | | - | | 15.9 |
| Modified loans with reimbursements | 1,737 | $ | 96.9 | | 34.7 |
| Modified loans with reserve amounts in excess of reimbursements | | | | | |
| Reimbursement payments | | | | | 10.1 |
| Less: Pre-modification reserve amount | | | | | 17.9 |
| Amount of reserves in excess of reimbursement | | | | | (7.8) |
| Net reimbursement payments for loan modifications with pre-modification reserves | | | | $ | 26.9 |

*Source: Loan Level Reimbursements Through January 2013, prepared by ResCap [EXAM00345233].*

### d.  Prepetition Indemnity Payment To Ally Bank

On May 10 and May 11, 2012, just prior to the Petition Date, the Debtors made indemnity payments to Ally Bank totaling $48.4 million. Ally Bank's invoices for these payments stated that the payments related to "loan modification activities performed by GMAC Mortgage, LLC as sub-servicer, prior to April 30, 2012 and in connection with the DOJ/State AG Settlement."[1455]

---

[1455] This amount was paid in two installments. According to the invoices, $45 million was to be paid on May 10, 2012, with the remaining $3,432,719 to be paid on May 11, 2012. *See* Invoice from Ally Bank to ResCap (May 9, 2012) [ALLY_0196290]; Invoice from Ally Bank to ResCap (May 10, 2012) [EXAM20203413]; *see also* E-mail from J. Pensabene (May 9, 2012) [ALLY_0196286] ("The money will be transferred first thing tomorrow.").

This installment payment structure was employed because GMAC Mortgage had yet to determine the actual amount of reimbursement allegedly due to Ally Bank at the time of the payments.[1456]

The prepetition payments were the subject of significant dispute and confusion between Ally Bank, ResCap and GMAC Mortgage. Initially, ResCap had questions regarding the existence of any obligation to make an indemnity payment (as well as the right to perform the loan modifications giving rise to the alleged obligation).[1457] On May 8, 2012, this concern was addressed by Hamzehpour, who forwarded to Benton a February 9, 2012 e-mail from Young confirming that GMAC Mortgage could perform modifications to the Ally Bank loan portfolio "under the agreement of full reimbursement for all losses related to loan preservation activities . . . ."[1458] Hamzehpour suggested that the e-mail "seems to confirm an approval to move forward, conditioned on the full indemnification – which is where we should end up on this, as we just discussed."[1459]

The same day, Ally Bank was exerting pressure on ResCap and GMAC Mortgage to make the payments. In an e-mail to Marano, Yastine stated:

> Under the terms of the [January 30 Letter Agreement], ResCap committed to reimbursing the Bank for DOJ mods as a condition to doing such mods (appears in Exhibit C to the Agreement, which is attached). There was no connection to the new servicing agreement other than in 7(c), which states that similar provisions will be included in any new servicing agreement.
>
> ResCap tying reimbursement to the new servicing agreement puts ResCap in breach of the January 30 [Letter] Agreement. I don't think ResCap wants to go there, and it will blow things up if FDIC learns of this.
>
> Please consult with Tammy [Hamzehpour] asap, and have the funds released to the Bank.[1460]

---

[1456] *See, e.g.*, Letter from T. Marano to B. Yastine (May 9, 2012) [EXAM00069159]; E-mail from J. Pensabene (May 8, 2012) [EXAM00069549] ("FYI – the support letter does not outline how the reimbursement will be calculated. The new contract provides a matrix for the calculation."). Loan-level reconciliation information was also circulated between GMAC Mortgage and Ally Bank. *See* E-mails between M. Rosen, J. Cortese, J. Young, and J. Pensabene (May 10–11, 2012), at ALLY_0182323–24 [ALLY_0182323].

[1457] *See, e.g.*, E-mail from T. Marano (May 8, 2012) [EXAM20139177] ("I need the exhibits — esp Exhibit C as we have a dispute over the obligation to wire the $50mm payment related to mods, and further whether or not we had the right to even do the mods we did.").

[1458] E-mail from J. Young to T. Hamzehpour, J. Pensabene, H. Benton, C. Evans, and J. Whitlinger (Feb. 9, 2012), at EXAM20169859–60 [EXAM20169858]. This e-mail correspondence is referenced in Section V.C.2.a(2).

[1459] E-mail from T. Hamzehpour (May 8, 2012), at EXAM20169859 [EXAM20169858].

[1460] E-mail from B. Yastine to T. Marano (May 8, 2012) [EXAM00063493].

Marano responded that "we are in process of getting [Ally Bank] numbers to reconcile . . . have spoken with Tammy and would like to repeat my prior position, please finish the subservicing agreement."[1461] He later told Pensabene that "I will not be bullied. We will honor our specific contractual obligations and advise them professionally of what they need to do to protect their and our interests."[1462] Evidence indicates that Ally Bank remained intent on getting the payments as soon as possible,[1463] despite Ally Bank's consideration with both inside and outside counsel that these payments might be avoidable as preferential transfers.[1464]

On May 9, 2012, Marano sent a letter to Yastine in which he detailed ResCap's willingness to make the payments.[1465] The letter stated that:

> While working to achieve a mutually satisfactory amendment or agreement, management of the Bank authorized the use of its portfolio for modifications that would qualify for soft dollar credits . . . . This was done, of course, on the consistent that the Bank would be reimbursed for its losses consisted with the language in the Support Letter and with the methodology that ultimately was agreed in the [AG Menu Matrix].

The letter went on to state that "[b]ased on the above and your assurances that Ally Bank has submitted the new subservicing agreement to the FDIC for approval and will execute that agreement immediately upon receipt of that approval . . . ResCap is prepared to wire Ally Bank $45 million on May 9, 2012."[1466]

---

[1461] E-mail from T. Marano to B. Yastine, M. Rosen, and J. Pensabene (May 8, 2012), at ALLY_0368459 [ALLY_0368458].

[1462] E-mail from T. Marano to J. Pensabene (May 8, 2012) [EXAM00069549].

[1463] *See* E-mail from H. Benton (May 9, 2012), at ALLY_0021095 [ALLY_0021094] ("Just received their counter. Doesn't have any of the language we discussed this morning, but I think at this point the Bank should take the money. The references to the AG matrix and the negotiation process provide some nexus to the bundle we'll seek to have blessed in the continuation order."); E-mail from J. Young to B. Yastine, C. Evans, H. Benton, and T. Houghton (May 10, 2012) [ALLY_0196309] ("We are going to send another invoice for $3,432,719 tonight . . . . There are some very minor recon items to complete . . . but we can wrap into next month. Best to get the bigger number now."); Int. of T. Marano, Feb. 27, 2013, at 87:2–10 ("The bank was very restless because we had signed an agreement saying that we were going to reimburse them for the modifications. They had regulators looking over their shoulder to make sure they were getting paid. We did not want to be in default to Ally Bank on the subservicing contract, which we thought was valuable to the estate.").

[1464] *See* E-mail from H. Benton (May 7, 2012), at EXAM20272697 [EXAM20272696] (acknowledging that "[i]f ResCap pays [Ally Bank] now, there is some risk that the payment will be challenged as a voidable preference (preferential payment for a pre-petition debt)," yet continuing to advise Ally Bank that it is "[b]etter to have the money and fight over a preference than have an unsecured claim."); Dep. of J. Whitlinger, Aug. 3, 2012, at 99:19–105:16.

[1465] *See* Letter from T. Marano to B. Yastine (May 9, 2012) [EXAM00069159].

[1466] *Id*. at 2.

Following receipt of the May 9 letter, the parties began to draft an agreement setting forth their understanding regarding the modifications and any indemnification payments. On May 11, 2012, in reference to this agreement, Yastine told Marano "[p]er our discussion. Need to sign before signing servicing agreement."[1467] Similarly, over the weekend of May 11 to May 13, 2012, while discussing the terms of an agreement setting forth the details of the indemnity payment relating to April loan modifications, Hamzehpour mentioned that "signature pages are standing by on the [A&R] Servicing Agreement for both [GMAC Mortgage] and [Ally] Bank, so as soon as we sign off on this letter those should be able to be released."[1468] The agreement was ultimately finalized on May 13, 2012,[1469] and signature pages for the A&R Servicing Agreement were released.[1470]

This agreement stated that:

> [ResCap, GMAC Mortgage] and Ally Bank desire to clarify any misperceptions that may result from the letter dated May 9, 2012 . . . . [GMAC Mortgage] and Ally Bank have been negotiating (i) the reimbursement calculation methodology for modifications to loans in Ally Bank's mortgage portfolio, as contemplated under [the January 30 Letter Agreement], and (ii) the terms of the [A&R Servicing Agreement] . . . . The parties acknowledge that such modifications . . . are conditioned on full reimbursement to Ally Bank of all losses in accordance with the [January 30 Letter Agreement], as well as the matrix and reimbursement calculation methodology . . . that the parties have subsequently negotiated as part of the [A&R Servicing Agreement].[1471]

---

[1467] E-mail from B. Yastine to T. Marano (May 11, 2012) [EXAM20138580].

[1468] E-mail from T. Hamzehpour (May 13, 2012) [EXAM11151314].

[1469] *See* E-mail from T. Hamzehpour (May 13, 2012) [ALLY_PEO_0087330].

[1470] E-mail from H. Benton (May 13, 2012) [EXAM10346545] ("I have Barbara's signature page, and I will get the sig page to the servicing agreement so I can send both simultaneously. Assuming you're OK with the final language, can you send signature pages for both ResCap and [GMAC Mortgage] (and also for the servicing agreement) tonight?").

[1471] Agreement for AG Settlement Loan Modifications For April 2012, dated May 11, 2012 [ALLY_PEO_0087335].

The agreement further provided that:

> The parties acknowledge that the respective managements of Ally Bank and ResCap appear to have differing viewpoints concerning the outcome of discussions and negotiations with respect to the timing and commencement of the modification activity contemplated by the [January 30 Letter Agreement]. Nevertheless, based on both (i) the acknowledgements and the agreements of Ally Bank, ResCap and [GMAC Mortgage] above and (ii) the payments to Ally Bank, both made and to be made in accordance with, and subject to, numbered paragraph 4 above, the parties agree that ResCap and [GMAC Mortgage] will have provided the requisite reimbursement to Ally Bank for losses in connection with the April Modifications.[1472]

This agreement was intended to clarify the understanding between the parties that modifications were permitted to commence prior to the execution of the A&R Servicing Agreement.[1473] There is no evidence to indicate that the ResCap or GMAC Mortgage Board formally approved this agreement or the payments.[1474]

### e. The Debtors And AFI Dispute Existence Of Cap On Indemnity Obligations

#### (1) Revised Estimation Of Indemnification Obligations

Immediately prior to the Petition Date, ResCap and GMAC Mortgage realized that their estimate of Ally Bank's losses related to loan modifications, and thus ResCap and GMAC

---

[1472] *Id.* at ALLY_PEO_0087337.

[1473] *See* Int. of T. Marano, Feb. 27, 2013, at 93:5–14.

> I believe that the problem that [Yastine] was trying to address is that we had begun the modifications before the new subservicing agreement had been negotiated — or had been signed . . . . However, there were verbal understandings that we were going to be servicing under that agreement. And we were interested in doing the modifications as quickly as possible in order to facilitate as much credit as possible from the DOJ/AG monitor.

[1474] Whitlinger stated that he and Marano discussed the payments, particularly in light of discussions of whether this payment might have been considered a preferential transfer. *See* Dep. of J. Whitlinger, Aug. 3, 2012, at 106:13–109:19. However, no evidence demonstrates explicit Board approval by either ResCap or GMAC Mortgage.

V-286

Mortgage's indemnification obligations, was going to be inadequate.[1475] In an e-mail to Carpenter, Brown, and Whitlinger, Marano states that "the take up rate on mod offers is more than 2X what we modeled. . . . ResCap may need to make additional payments of between \$70 and \$120mm to [Ally Bank] if our revised projections pan out."[1476] There were a number of different revised estimates discussed at the time.[1477]

The updated estimates raised several issues. One of the most important considerations was "whether [Ally Bank] should approve [ResCap and GMAC Mortgage] moving beyond [Ally Bank's] \$75 million speed bump given our view of reimbursement."[1478] This refers to the "speed bump" limitation set forth in section 10.01(f) of the A&R Servicing Agreement.[1479] At the time, Ally Bank was considering a proposal to raise that limitation.[1480] ResCap and GMAC Mortgage were concerned about their ability to indemnify Ally Bank because of liquidity concerns.[1481]

---

[1475] In response to a question of why ResCap's and GMAC Mortgage's projections regarding the indemnity obligation were "much lower" in January 2012 than they were in early May 2012, Whitlinger explained that when ResCap and GMAC Mortgage entered into the January 30 Letter Agreement, they had no experience in this area and could only make rough estimates as to what the indemnity obligation might be. *See* Dep. of J. Whitlinger, Aug. 3, 2012, at 117:4–19 ("In January we hadn't even rolled out a solicitation program, so there has [sic] been no experience in the industry on what this DOJ settlement, and the modification program, could be. So in January we had estimates on what the [pull] through rates of borrowers being in the program could be.").

[1476] E-mail from T. Marano (May 12, 2012) [EXAM11027183].

[1477] *See* E-mail from C. Dondzila (May 22, 2012) [EXAM10418886] (estimating "an additional accrual of \$90 million"); E-mail from J. Ruhlin (May 25, 2012), at EXAM10345055 [EXAM10345054] (estimating "\$65M to fund those bank payments").

[1478] E-mail from J. Young (May 31, 2012) [ALLY_0197143].

[1479] *See* A&R Servicing Agreement, § 10.01(f) [ALLY_0114469] ("In no case shall the Servicer evaluate additional Portfolio Loans for actions pursuant to the AG Menu Items in the month following the month in which indemnification payments to the Owner pursuant to subsection (e) above exceed \$75,000,000 in the aggregate. . . . If the Servicer desires to perform modifications or other loss mitigation activities resulting in indemnification payments to the Owner in excess of . . . \$75,000,000, then the Owner and the Servicer will agree to discuss the terms on which such additional loss mitigation activities could proceed.").

[1480] *See* E-mail from B. Yastine (May 31, 2012) [ALLY_0197143] ("As for \$75 million, I think we should propose we raise limit to \$150mm, based on revised requirements in final DOJ settlement and Rescap's new estimate.").

[1481] *See* Int. of J. Whitlinger, Feb. 27, 2013, at 213:6–14 ("And then the pull-through started getting so much higher and more people were converting on the bank's portfolio is when we said, 'Whoa, whoa. Wait a minute. Time-out. We don't have the liquidity to pay for that.' And once we earned 200, we didn't have to pay for it. And that's when the disagreements happened . . . .").

*(2) ResCap And GMAC Mortgage Notify Ally Bank That Cumulative Indemnification Payments Are Nearing $75 Million*

On June 20, 2012, Marano wrote a letter to Carpenter notifying Ally Bank that "we are approaching cumulative indemnification payments of $75 million . . . . Additionally, at this point we have earned in excess of $200 million of credits as a result of mitigation, remediation or other financial accommodation to mortgage loan borrowers."[1482] The letter went on to state that:

> Pursuant to the terms of both the [January 30 Letter Agreement] and the [A&R Servicing Agreement], we do not intend to perform any further solicitations for programs under the Consumer Relief provisions of the Settlement on eligible loans in the Ally Bank portfolio until the terms on which such additional loss mitigation activities could proceed have been agreed.[1483]

On the same day, Pensabene wrote a similar letter to Craig Evans, with some subtle differences.[1484] First, the letter stated that "[ResCap and GMAC Mortgage] fully expect to make further indemnification payments to Ally Bank related to any currently outstanding solicitations on Ally Bank owned assets."[1485] Second, this letter did not mention having earned soft credits in excess of $200 million. This second distinction was immediately noted by Ally Bank.[1486]

---

[1482] Letter from T. Marano to M. Carpenter (June 20, 2012) [EXAM10421722].

[1483] *Id.*

[1484] Letter from J. Pensabene to C. Evans (June 20, 2012) [ALLY_0197307]. The Pensabene letter generally stated ResCap had reimbursed Ally Bank roughly $70 million, and that GMAC Mortgage and ResCap would like to discuss the terms on which such additional loss mitigation activities could proceed.

[1485] *Id.*

[1486] E-mail from J. Young to B. Yastine (June 20, 2012) [ALLY_0197305] (while comparing the two letters, Young stated: "[s]o, appears [ResCap and GMAC Mortgage] have stopped solicitations, but will honor outstanding solicitations. Also, appropriately, no mention in this letter of the $200 million.").

### *(3) The Parties Frame Their Indemnity Dispute*

In early July, Ray Schrock of Kirkland & Ellis wrote a letter to Larren Nashelsky of Morrison & Foerster setting forth AFI's and Ally Bank's combined position with respect to the January 30 Letter Agreement, the A&R Servicing Agreement, and the indemnity payments thereunder.[1487] Schrock stated that during a telephone conversation on June 27, 2012, ResCap and GMAC Mortgage took the position that GMAC Mortgage would "no longer issue any further reimbursements to Ally Bank under the [A&R Servicing Agreement] for loan modifications . . . based upon the [January 30 Letter Agreement] . . . and ResCap's and [GMAC Mortgage's] assertion that they have earned more than $200 million in 'soft dollar credits' under the DOJ/AG Settlement."[1488]

Schrock argued that such position was wholly inconsistent with the terms of the A&R Servicing Agreement and the parties' business discussions.[1489] The letter goes on to restate the indemnity provisions of the A&R Servicing Agreement, asserting that "[t]he [A&R Servicing Agreement] does not contain any limitation on [GMAC Mortgage's] indemnity obligation relating to 'soft dollar credits' earned under the DOJ/AG Settlement and is the 'entire agreement' between the parties as set forth in Section 12.03 of the [A&R Servicing Agreement]."[1490]

In a footnote, Schrock noted that even though the terms of the A&R Servicing Agreement are clear, the reimbursement obligation of the A&R Servicing Agreement is consistent with the January 30 Letter Agreement. He stated that the limitation of reimbursements to AFI and Ally Bank contained in paragraph 5 of the January 30 Letter Agreement once ResCap and GMAC Mortgage have affected the required hard dollar payments and have earned $200 million in "soft dollar credits" applies only to the obligation in paragraph 5. Instead, GMAC Mortgage's obligations to reimburse Ally Bank for its use of Ally Bank's loans to obtain the "soft dollar credits" was contemplated in paragraph 7 of the January 30 Letter Agreement, which contains no dollar limit.[1491]

Finally, Schrock acknowledged that the A&R Servicing Agreement provides that GMAC Mortgage shall cease soliciting Ally Bank loans for modification in the month after it has paid $75 million in reimbursements until GMAC Mortgage and Ally Bank can agree on terms on which additional loss mitigation activities can proceed, and that ResCap and GMAC Mortgage provided notification that this threshold may be crossed in the month of June in their June 20 letters.[1492]

---

[1487] Letter from R. Schrock to L. Nashelsky (July 2, 2012) [ALLY_0226606].

[1488] *Id.* at 1.

[1489] *Id.*

[1490] *Id.* at 1–2.

[1491] *Id.* at 2.

[1492] *Id.* at 2–3.

Nashelsky responded a week later.[1493] In his letter, Nashelsky stated that GMAC Mortgage disagrees with AFI's and Ally Bank's statements that ResCap and GMAC Mortgage were obligated to make further indemnity payments under the A&R Servicing Agreement.[1494] Nashelsky argued that "[t]he [January 30 Letter Agreement] capped the Debtors' reimbursement obligations to AFI and Ally Bank once the Debtors had made the $110 million cash payment and earned $200 million in Soft Dollar Credits . . . ."[1495] Nashelsky further asserted that:

> [C]ontrary to your suggestion that referring to the [January 30 Letter Agreement] constitutes improper reliance on extrinsic evidence, the [January 30 Letter Agreement] and the [A&R Servicing Agreement cannot be interpreted independently of each other. Importantly, nothing in the Servicing Agreement between the Debtors and Ally Bank modifies or eliminates the Reimbursement Cap contemplated under the [January 30 Letter Agreement] . . . and the course of dealing between the Debtors on the one hand, and AFI and Ally Bank on the other . . . .[1496]

Nashelsky went on to assert that "it is clear that the reference to the Reimbursement Cap in paragraph 5 of the [January 30 Letter Agreement] was intended to apply not just to direct settlement costs but also to the Indemnification Obligations."[1497] Based on this interpretation, and AFI's responsibility to indemnify Ally Bank pursuant to other agreements, Nashelsky argued that further indemnification payments are AFI's responsibility.[1498]

---

[1493] Letter from L. Nashelsky to R. Schrock (July 9, 2012) (attached to Declaration of Thomas Marano, Chief Executive Officer of Residential Capital, LLC, in Further Support of Debtors' Ally Servicing Motion [Docket No. 793-1] at Ex. 7).

[1494] *See id.*

[1495] *Id.* at 2 (emphasis in original).

[1496] *Id.*

[1497] *Id.* at 7.

[1498] *Id.* at 4, 7.

Although not necessarily germane to the indemnity cap dispute, Nashelsky highlighted another issue: that "the Debtors may have improperly paid Ally Bank approximately $12.9 million on account of a pre-petition general unsecured claim without Bankruptcy Court authorization."[1499]

### 3. Motion Practice With Regard To PwC Fee Issue

#### a. The Debtors File The PwC Compensation Motion

The requirements and obligations imposed under the FRB/FDIC Consent Order did not cease upon the Debtors' bankruptcy. Accordingly, on September 9, 2012, the Debtors sought to invoke the authority granted to them by the Court in the GA Servicing Order [Docket No. 401][1500] and continue their compliance with the FRB/FDIC Consent Order postpetition, including compensating PwC, by filing the Debtors' Motion for Entry of an Order Under Bankruptcy Code Section 363 and Bankruptcy Rule 6004 (I) Authorizing the Debtors to Compensate PricewaterhouseCoopers, LLP for Foreclosure Review Services in Furtherance of

---

[1499] *Id.* at 3. This issue has been highlighted by the parties at several junctures. The Committee noted that "Judge Peck's interim approval order was relied on as purported authority to make a $19.9 million postpetition indemnification payment to Ally Bank (including $13 million relating to *prepetition* loan modifications) . . . ." Statement of the Official Committee of Unsecured Creditors Regarding the Debtors' Motion for an Order Authorizing the Debtors to Continue to Perform Under the Ally Bank Servicing Agreement in the Ordinary Course [Docket No. 1280] at 6 (emphasis in original). In the stipulation reserving the parties' rights with respect to the indemnity dispute, the parties stated that "[t]his Stipulation's authorization to the Debtors to make the payments under the Indemnification Obligation shall not constitute a determination that . . . the Debtors' $19.9 million postpetition payment to Ally Bank was or was not authorized by the Interim Order, . . ." Notice of Presentment of Stipulation and Proposed Order Reserving Rights with Respect to Debtors' Motion for Interim and Final Orders Under Bankruptcy Code Sections 105(a) and 363 Authorizing the Debtors to Continue to Perform Under the Ally Bank Servicing Agreement in the Ordinary Course of Business [Docket No. 1275] at 14. The Interim Order was silent on whether the Debtors were authorized to make such payment, providing only that "[t]he Debtors are authorized and directed to continue to perform under the terms of the [A&R] Servicing Agreement . . . ." Interim Order Pursuant to Sections 105(A) and 363 of the Bankruptcy Code Authorizing the Debtors to Continue to Perform Under the Ally Bank Servicing Agreement in the Ordinary Course of Business [Docket No. 90] at 2. Notably, however, the related motion expressly stated that the Debtors "are not seeking to pay any prepetition claims through or pursuant to the [A&R] Servicing Agreement." Debtors' Motion for Interim and Final Orders Under Bankruptcy Code Sections 105(A) and 363 Authorizing the Debtors to Continue to Perform Under the Ally Bank Servicing Agreement in the Ordinary Course of Business [Docket No. 47] at 15.

[1500] On June 15, 2012, the Court entered an order granting the Debtors' GA Servicing Motion, which authorized the Debtors to continue their compliance with the terms of the FRB/FDIC Consent Order, including using estate assets to compensate PwC. *See* Order (I) Authorizing the Debtors to continue in the Ordinary Course of Business (A) Servicing Governmental Association Loans and (B) Foreclosure Activities Related to Certain Real Estate Owned by Fannie Mae, Freddie Mac, and Ginnie Mae; (II) authorizing the Debtors to Pay Certain Prepetition Amounts Due to Critical Servicing Vendors and Foreclosure Professionals; (III) Granting Limited Stay Relief to Enable Borrowers to Assert Direct Claims and Related Counter-Claims in Foreclosure and Eviction Proceedings; (IV) Authorizing the Debtors to Use Cash Collateral Under the Fannie Mae EAF Facility; and (V) Granting related Relief [Docket No. 401] (the "GA Servicing Order").

the Debtors' Compliance Obligations Under Federal Reserve Board Consent Order and (II) Reaffirming Relief Granting in the GA Servicing Order [Docket No. 1357] (the "PwC Compensation Motion").

The PwC Compensation Motion asked the Court to enter an order: (1) allowing the Debtors to compensate PwC for all obligations under the PwC Engagement Letter for services rendered in connection with the Foreclosure Review; (2) authorizing the Debtors to comply with the terms of the PWC Engagement Letter; and (3) reaffirming the relief granted in the GA Servicing Order with respect to compliance with the FRB Consent Order, the DOJ/AG Settlement and the CMP Order.[1501]

The Debtors asserted that continuing to pay PwC was necessary and appropriate to ensure compliance with the terms of the FRB/FDIC Consent Order, and was appropriate under Bankruptcy Code section 363, given PwC's role and the fact that its retention occurred prior to and not in connection with the commencement of the Chapter 11 proceedings.[1502] Further, the Debtors argued that failure to comply could lead to additional delays in foreclosures, possible monetary fines imposed by the FRB, and violations of the Debtors' DIP Facility with AFI.[1503]

### b.  The Creditors' Committee And Wilmington Trust File Objections To The Motion

The Creditors' Committee filed an objection to the PwC Compensation Motion on September 19, 2012, stating that continuing to pay PwC for the Foreclosure Review was not in the best interest of the Debtors' estate because the Debtors did not provide a valid business justification. The Creditors' Committee cited: (1) the added scrutiny warranted by the magnitude of the foreclosure obligations;[1504] (2) the severe impact the amounts expended would have on distributions to other creditors;[1505] and (3) the fact that the amounts to be spent on the review greatly outweighed the possible remediation liabilities to be uncovered or the potential penalties that might be assessed by government regulators.[1506] Further, to the extent the Court required the Debtors to continue complying with the terms of the FRB/FDIC

---

[1501] *See* PwC Compensation Motion [Docket No. 1357] at 7. The Debtors further proposed to continue to preserve any and all claims or causes of action the Debtors or any other party in interest may have against AFI for past or future costs of compliance with the FRB/FDIC Consent Order. *Id.*

[1502] *Id.* at 9–10, 18–21.

[1503] *Id.* at 10, 18.

[1504] *See* Omnibus Objection of the Official Committee of Unsecured Creditors to (A) The Debtors' Motion for Entry of an Order Under Bankruptcy Code Section 363 and Bankruptcy Rule 6004 (I) Authorizing the Debtors to Compensate PricewaterhouseCoopers, LLP for Foreclosure Review Services in Furtherance of the Debtors' Compliance Obligations Under Federal Reserve Board Consent Order and (II) Reaffirming Relief Granted in the GA Servicing Order [Docket No. 1493] at 3–4, 10.

[1505] *See id.* at 3–4.

[1506] *See id.* at 4, 11–12.

Consent Order, the Creditors' Committee argued that the costs of the Foreclosure Review should be allocated not to the Debtors, but to AFI, a solvent co-obligor, jointly and severally liable under the FRB/FDIC Consent Order.[1507]

Wilmington Trust also filed an objection to the PwC Compensation Motion. Wilmington Trust asserted that: (1) AFI—a solvent entity—should bear the responsibility for compensating PwC under a contractual obligation for which it was jointly and severally liable;[1508] (2) AFI improperly exerted its influence over the Debtors to impose on ResCap the added responsibilities of managing the Foreclosure Review and compensating PwC; and (3) legal responsibility for the costs lay not upon ResCap but rather only upon GMAC Mortgage and AFI.[1509]

### c. Court Proceedings

Following the initial hearing on the PwC Compensation Motion, the Debtors and Creditors' Committee engaged in negotiations to resolve the concerns the Creditors' Committee expressed in its omnibus objection and at the initial hearing.[1510] Both parties ultimately agreed upon a proposal for a 90-day interim order granting the PwC Compensation Motion on an interim basis, which would allow the Debtors to continue to use estate funds to compensate PwC in accordance with the terms of the PwC Engagement Letter and the FRB/ FDIC Consent Order and comply in all respects with the FRB/FDIC Consent Order up until a

---

[1507] *See id*. at 1–2, 4, 14–18.

[1508] *See* Limited Objection of Wilmington Trust, National Association to Debtors' Motion for Entry of an Order (I) Authorizing Debtors to Compensate PricewaterhouseCoopers, LLP for Foreclosure Review Services and (II) Reaffirming Relief Granted in the GA Servicing Order [Docket No. 1465] at 1–2, 5–6.

[1509] *See id*. at 3, 6–7.

[1510] *See, e.g.*, Debtors' Statement in Further Support of (A) Debtors' Motion for an Order (I) To Compensate PricewaterhouseCoopers, LLP for Foreclosure Review Services and (II) Reaffirming Relief Granting in the GA Servicing Order (B) Debtors' Application to Employ and Retain Hudson Cook, LLP as Special Counsel, and (C) Debtors' Application to Employ and Retain Pepper Hamilton LLP as Special Foreclosure Review Counsel for Bankruptcy Issues [Docket No. 1749] at 2–3; Supplemental Objection of the Official Committee of Unsecured Creditors to (A) the Debtors' Motion for Entry of an Order Under Bankruptcy Code Section 363 and Bankruptcy Rule 6004 (I) Authorizing the Debtors to Compensate PricewaterhouseCoopers, LLP for Foreclosure Review Services in Furtherance of the Debtors' Compliance Obligations Under Federal Reserve Board Consent Order and (II) Reaffirming Relief Granted in the GA Servicing Order, (B) Pepper Hamilton Retention Application, and (C) Hudson Cook Retention Application [Docket No. 1725] at 3–4.

final order decided the matter.[1511] On October 11, 2012, Judge Glenn entered an order approving the PwC Compensation Motion on an interim basis through and including January 14, 2013,[1512] which was extended through the final hearing date on this issue (currently May 14, 2013).[1513]

---

[1511] *See* Debtors' Statement in Further Support of (A) Debtors' Motion for an Order (I) To Compensate PricewaterhouseCoopers, LLP for Foreclosure Review Services and (II) Reaffirming Relief Granting in the GA Servicing Order (B) Debtors' Application to Employ and Retain Hudson Cook, LLP as Special Counsel, and (C) Debtors' Application to Employ and Retain Pepper Hamilton LLP as Special Foreclosure Review Counsel for Bankruptcy Issues [Docket No. 1749] at 2–3; Supplemental Objection of the Official Committee of Unsecured Creditors to (A) the Debtors' Motion for Entry of an Order Under Bankruptcy Code Section 363 and Bankruptcy Rule 6004 (I) Authorizing the Debtors to Compensate PricewaterhouseCoopers, LLP for Foreclosure Review Services in Furtherance of the Debtors' Compliance Obligations Under Federal Reserve Board Consent Order and (II) Reaffirming Relief Granted in the GA Servicing Order, (B) Pepper Hamilton Retention Application, and (C) Hudson Cook Retention Application [Docket No. 1725] at 2.

[1512] *See* Interim Order signed on 10/11/2012 Under Bankruptcy Code Section 363 and Bankruptcy Rule 6004 (I) Authorizing the Debtors to Compensate PricewaterhouseCoopers, LLP for Foreclosure Review Services in Furtherance of the Debtors' Compliance Obligations Under Federal Reserve Board Consent Order and (II) Reaffirming Relief Granting in the GA Servicing Order [Docket No. 1799] at 3, 7.

[1513] On January 13, 2013, the Court entered a second order approving the Motion on a further interim basis through and including February 28, 2013. *See* second Interim Order Under Bankruptcy Code Section 363 and Bankruptcy Rule 6004 (I) Authorizing the Debtors to Compensate PricewaterhouseCoopers, LLP for Foreclosure Review Services in Furtherance of the Debtors' Compliance Obligations Under Federal Reserve Board Consent Order and (II) Reaffirming Relief Granting in the GA Servicing Order [Docket No. 2622] at 3, 7. On February 28, 2013, the Court entered a third order approving the Motion on a further interim basis through and including March 21, 2013. *See* Third Interim Order Signed on 2/28/2013 (I) Authorizing the Debtors to Compensate PricewaterhouseCoopers, LLP for Foreclosure Review Services in Furtherance of the Debtors' Compliance Obligations Under Federal Reserve Board Consent Order and (II) Reaffirming Relief Granting in the GA Servicing Order [Docket No. 3062] at 3, 7. On March 21, 2013, the Court entered a fourth order approving the Motion on an interim basis through and including April 11, 2013. *See* Fourth Interim Order Signed on 3/21/2013 (I) Authorizing the Debtors to Compensate PricewaterhouseCoopers, LLP for Foreclosure Review Services in Furtherance of the Debtors' Compliance Obligations Under Federal Reserve Board Consent Order and (II) Reaffirming Relief Granting in the GA Servicing Order [Docket No. 3290] at 3, 7. On April 11, 2013, the Court entered a fourth order approving the Motion on an interim basis through and including April 30, 2013. *See* Fifth Interim Order Signed on 4/12/2013 (I) Authorizing the Debtors to Compensate PricewaterhouseCoopers, LLP for Foreclosure Review Services in Furtherance of the Debtors' Compliance Obligations Under Federal Reserve Board Consent Order and (II) Reaffirming Relief Granting in the GA Servicing Order [Docket No. 3425] at 3, 7. On April 29, 2013, the Court entered a sixth order approving the Motion on an interim basis through and including May 14, 2013. *See* Sixth Interim Order Signed on 4/29/2013 (I) Authorizing the Debtors to Compensate PricewaterhouseCoopers, LLP for Foreclosure Review Services in Furtherance of the Debtors' Compliance Obligations Under Federal Reserve Board Consent Order and (II) Reaffirming Relief Granting in the GA Servicing Order [Docket No. 3543] at 3, 7.

#### 4.  Motion Practice With Regards To Foreclosure Review

##### a.  The Debtors File The FRB Unsecured Claim Motion

On January 7, 2013, the FRB announced a resolution of foreclosure review requirements contained in consent orders with ten major mortgage servicers that now requires banks to pay lump sums into a settlement fund instead of continuing the expensive foreclosure review process.[1514] Ally Bank and ResCap were not part of these resolutions. However, in light of this settlement, on February 27, 2013, the Debtors filed a motion seeking entry of an order, pursuant to Bankruptcy Code section 362(a) and Bankruptcy Rule 3013, determining that: (1) GMAC Mortgage's obligation to conduct the Foreclosure Review represents a general unsecured claim for purposes of any chapter 11 plan proposed in the Debtors' chapter 11 cases; and (2) the automatic stay applies to prevent the FRB, FDIC, and other Government Entities from taking any action to enforce GMAC Mortgage's obligation to continue conducting the Foreclosure Review (the "FRB Unsecured Claim Motion").[1515]

The Debtors noted in the motion that GMAC Mortgage's Foreclosure Review obligation "can easily be quantified, can be satisfied by an alternative 'right to payment,' and represents a general unsecured claim against the Debtors."[1516] Further, the Debtors argued because the Foreclosure Review obligation is an unsecured claim, the FRB and FDIC (the holders of the claim) may not seek to enforce that claim outside of the bankruptcy process.[1517]

##### b.  AFI And The FRB File Objections To The FRB Unsecured Claim Motion

AFI and the FRB filed objections to the FRB Unsecured Claim Motion. The objections argued similar points, namely that: (1) the Debtors' obligation to conduct the Foreclosure Review is not a claim under section 101(5) of the Bankruptcy Code;[1518] and (2) any action by the FRB to enforce the Debtors' obligation fits within the police or regulatory powers

---

[1514] FRB/OCC, Joint Press Release, *Independent Foreclosure Review to Provide $3.3 Billion in Payments, $5.2 Billion in Mortgage Assistance* (Jan. 7, 2013), http://www.federalreserve.gov/newsevents/press/bcreg/20130107a.htm; *see also* FRB Unsecured Claim Motion [Docket No. 3055] at 9–10.

[1515] *See* FRB Unsecured Claim Motion [Docket No. 3055] at 10 (though not explicitly stated, arguably the implications of the requested relief would be for ResCap and GMAC Mortgage to cease all payments to PwC with respect to the PwC Engagement Letter).

[1516] *See id.* at 1–2.

[1517] *See id.* at 3.

[1518] *See* Objection to Motion of Debtors Pursuant to Bankruptcy Rule 3013 and Bankruptcy Code Section 362(a) for a Determination That (I) GMAC Mortgage's FRB Foreclosure Review Obligation Is a General Unsecured Claim and (II) The Automatic Stay Prevents Enforcement of the FRB Foreclosure Review Obligation [Docket No. 3149] at 1–2, 6–7; *See* Ally Financial Inc.'s Objection to Debtors' Motion for a Determination that (I) GMAC Mortgage's FRB Foreclosure Review Obligation is a General Unsecured Claim and (II) the Automatic Stay Prevents Enforcement of the FRB Foreclosure Review Obligations [Docket No. 3150] at 14–15, 17–18.

exception from the automatic stay.[1519] Additionally, AFI argued that: (1) the Debtors are equitably estopped from avoiding compliance with, or enforcement of, their obligations under the FRB/FDIC Consent Order;[1520] (2) all costs of compliance with the FRB/FDIC Consent Order, including the Foreclosure Review, are entitled to administrative expense priority;[1521] and (3) the motion is procedurally improper and requires an adversary proceeding.[1522]

### c. Wilmington Trust Files A Statement In Support Of And Limited Objection To The Motion

Wilmington Trust filed a statement in support, and limited objection to, the FRB Unsecured Claim Motion. Unlike AFI and the FRB, Wilmington Trust supported a determination that the Foreclosure Review obligation and any subsequent remediation be treated as an unsecured prepetition claim against GMAC Mortgage, as such obligations do not qualify as an administrative expense under section 503(b) of the Bankruptcy Code and are not otherwise entitled to priority under section 507 of the Bankruptcy Code.[1523] However, Wilmington Trust argued that the Debtors' proposed order is unclear in that its language imposes the obligation at issue under the Motion against the Debtors, while only GMAC Mortgage, not ResCap is responsible for the obligations arising under the FRB/FDIC Consent Order.[1524] Wilmington Trust accordingly requested that any relief granted under the motion make clear that no claim is being allowed against ResCap absent substantive consolidation.[1525]

### d. The Debtors And Creditors' Committee File Replies In Support Of The FRB Unsecured Claim Motion

On March 19, 2013, the Debtors filed an omnibus reply in further support of the FRB Unsecured Claim Motion. The Debtors asserted that they are not requesting the Bankruptcy Court to convert, or otherwise modify or alter, the Foreclosure Review or FRB/FDIC Consent Order, but rather reclassify it.[1526] As such, the Debtors argue primarily that the Foreclosure

---

[1519] *See id*. at 11–12.

[1520] *See* Ally Financial Inc.'s Objection to Debtors' Motion for a Determination that (I) GMAC Mortgage's FRB Foreclosure Review Obligation is a General Unsecured Claim and (II) the Automatic Stay Prevents Enforcement of the FRB Foreclosure Review Obligations [Docket No. 3150] at 19–20.

[1521] *See id*. at 22–24.

[1522] *See id*. at 24–25.

[1523] *See* Statement in Support of and Limited Objection to Debtors' Motion Pursuant to Bankruptcy Rule 3013 and Bankruptcy Code Section 362(a) for a Determination that (I) GMAC Mortgage's FRB Foreclosure Review Obligation Is a General Unsecured Claim and (II) the Automatic Stay Prevents Enforcement of the FRB Foreclosure Review Obligation [Docket No. 3139] at 2–3.

[1524] *See id*. at 3–4.

[1525] *See id*. at 4.

[1526] *See* Debtors' Omnibus Reply in Further Support of Motion Pursuant to Bankruptcy Rule 3013 and Bankruptcy Code Section 362(a) for a Determination that (I) GMAC Mortgages FRB Foreclosure Review Obligations is a General Unsecured Claim and (II) The Automatic Stay Prevents Enforcement of the FRB Foreclosure Review Obligation [Docket No. 3242] at 5–6.

Review obligation is retrospective and represents a general unsecured claim for the following reasons: (1) the review is a bankruptcy claim, not an administrative expense, by operation of law because it was aimed solely at remedying allegedly wrongful past conduct and the FRB has an alternative right to payment which it can (and has) asserted under 12 U.S.C. § 1818; [1527] (2) the Ocwen Platform Asset Purchase Agreement and Ocwen Sale Order [Docket No. 2246][1528] do not alter the nature of the claim;[1529] and (iii) the ongoing expenses associated with the review do not represent "actual, necessary costs or expenses of preserving the estate" and are thus not entitled to administrative expense priority.[1530]

Further, the Debtors argued that: (1) 12 U.S.C. § 1818(i) does not deprive the Bankruptcy Court of jurisdiction to determine the classification of a claim;[1531] (2) the police and regulatory exception to the automatic stay does not apply to any efforts by the FRB or other Government Entities to enforce the general unsecured Foreclosure Review obligation;[1532] and (3) the FRB Unsecured Claim Motion is procedurally proper in that the Bankruptcy Court is permitted under Bankruptcy Code Rule 3013 to make a determination regarding the appropriate classification of a claim under the Bankruptcy Code, and is otherwise authorized to enforce the automatic stay.[1533]

The Debtors also submitted a Supplemental Declaration of Thomas Marano as Exhibit 1 to the omnibus reply. The Declaration summarized the ongoing negotiations between the Debtors and the FRB regarding the Foreclosure Review, and stated that the Debtors were offered a lump-sum settlement similar in form to the settlements entered between the FRB and ten major non-debtor mortgage servicers on January 7, 2013.[1534]

---

[1527] *See id.* at 6–9.

[1528] Order Under 11 U.S.C. §§ 105, 363, and 365 and Fed. Bankr. P. 2002, 6004, 6006, and 9014 (I) Approving (A) Sale of Debtors' Assets Pursuant to Asset Purchase Agreement With Ocwen Loan Servicing, LLC; (B) Sale of Purchased Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (C) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Thereto; (D) Related Agreements; and (II) Granting Related Relief Platform Sale [Docket No. 2246] (the "Ocwen Sale Order").

[1529] *See* Debtors' Omnibus Reply in Further Support of Motion Pursuant to Bankruptcy Rule 3013 and Bankruptcy Code Section 362(a) for a Determination that (I) GMAC Mortgages FRB Foreclosure Review Obligations is a General Unsecured Claim and (II) The Automatic Stay Prevents Enforcement of the FRB Foreclosure Review Obligation [Docket No. 3242] at 9–10, 12.

[1530] *Id.* at 12.

[1531] *Id.* at 14–17.

[1532] *Id.* at 17.

[1533] *Id.* at 19–20.

[1534] *See* Supplemental Declaration of Thomas Marano, Chief Executive Officer of Residential Capital, LLC, in Support of Debtors' Motion Pursuant to Bankruptcy Rule 3013 and Bankruptcy Code Section 362(a) for a Determination that (I) GMAC Mortgages FRB Foreclosure Review Obligations is a General Unsecured Claim and (II) The Automatic Stay Prevents Enforcement of the FRB Foreclosure Review Obligation [Docket No. 3242-1] at 6.

In addition, on March 19, 2013, the Creditors' Committee filed a reply in support of the FRB Unsecured Claim Motion and asked the Court to authorize GMAC Mortgage to stop paying PwC for the Foreclosure Review that the government has admitted is an unnecessary and costly mistake.[1535] Further, the Creditors' Committee asserted that any claims arising from the FRB/FDIC Consent Order should be classified as general unsecured claims because all such claims relate to the investigation and remediation of prepetition conduct and any restitution to borrowers for such conduct "as pure example of payment on account of prepetition claims as exists."[1536] The two types of potential claims the Creditors' Committee explicitly addressed include: (1) restitution claims under either the existing FRB/FDIC Consent Order or an amended FRB/FDIC Consent Order; and (2) claims by AFI to recoup costs it may incur if GMAC Mortgage ceases to pay PwC for compliance with the existing FRB/FDIC Consent Order.[1537] Finally, the Creditors' Committee argued that AFI's equitable estoppel argument is meritless because there is no unfairness to AFI in the Debtors' attempting to cease paying AFI.[1538] They asserted that the Debtors properly exercised their fiduciary duties by making the FRB Unsecured Claim Motion to request relief that is in the best interest of all unsecured creditors and the Estate by avoiding the substantial waste of estate assets.[1539]

### e.  Court Proceedings

On March 21, 2013, the parties presented their arguments before Judge Glenn. At the conclusion of the hearing, Judge Glenn asked for supplemental briefs on the issues of whether: (1) restitution payments under the FRB/FDIC Consent Order are general unsecured claims; and (2) AFI would be liable for the shortfall if ResCap only paid this claim on a pro-rata basis. Judge Glenn encouraged the parties to reach an agreement on these issues, indicating that he would extend the briefing deadline if the parties made progress prior to April 5, 2013. The Debtors, Creditors' Committee, and FRB submitted supplemental briefs on April 5. The FRB Unsecured Claim Motion is still pending.

---

[1535] Reply of the Official Committee of Unsecured Creditors to the Debtors' Motion for a Determination that (I) GMAC Mortgage's FRB Foreclosure Review is a General Unsecured Claim and (II) the Automatic Stay Prevents Enforcement of the FRB Foreclosure Review Obligation [Docket No. 3245] at 4–5.

[1536] *Id*. at 3–4, 13–14.

[1537] *Id*. at 10.

[1538] *Id*. at 4, 14.

[1539] *See id*. at 17.

### 5. Estimate Of Total Economic Impact Of Government Settlements

As shown in Exhibit V.C.5 below, AFI and ResCap expect to incur a total of $780.8 million as a result of the government settlements. Based on current estimates ResCap is expected to incur 75% of these costs and AFI is expected to incur 25% of the total costs, as detailed below:[1540]

EXHIBIT V.C.5
**Summary of Current Allocation of Total Costs Associated with Government Settlements**
*($ in Millions)*

| Item | AFI | ResCap | Total |
|---|---|---|---|
| FRB/FDIC Consent Order costs | $ - | $ 517.0 | $ 517.0 |
| CMP Order costs | N/A | N/A | N/A |
| DOJ/AG Consent Judgment costs | - | 263.8 | 263.8 |
| January 30 Letter Agreement | 196.5 | (196.5) | - |
| Total costs incurred to date and estimated future costs | $ 196.5 | $ 584.3 | $ 780.8 |
| *Percent of total* | *25%* | *75%* | *100%* |

Source: Ally Financial Inc., Annual Report (Form 10-K) (Feb. 28, 2012), at 12; Declaration of Thomas Marano, Chief Executive Officer of Residential Capital, LLC, in Support of Debtors' Motion Pursuant to Bankruptcy Rule 3013 and Bankruptcy Code Section 362(a) for a Determination that (I) GMAC Mortgage's FRB Foreclosure Review Obligation is a General Unsecured Claim and (II) the Automatic Stay Prevents Enforcement of the FRB Foreclosure Review Obligation [Docket No. 3055-3] at 4-5; FRB Unsecured Claim Motion [Docket No. 3055] at 7; EXAM00002678; EXAM00002677; EXAM00220897; EXAM11004487; ALLY_0196290; EXAM20203413; ALLY_0402171; ALLY_0402172; ALLY_0402173; EXAM00221497; EXAM00221498; ALLY_0402174; EXAM00237710; ALLY_0402175; ALLY_0402176; ALLY_0402177; RC40020121.

### 6. Conclusion

The Examiner has determined that while there may have been some problematic aspects in the allocation of these settlements between the Debtors and AFI, AFI did ultimately pay for a portion of the settlements through debt forgiveness to ResCap. In addition, ResCap received ancillary benefits from the A&R Servicing Agreement, including the opportunity to earn an estimated $24.7 million in servicing income[1541] and an arguably enhanced ability to sell the servicing platform as a going concern.[1542] Furthermore, it is beyond dispute that ResCap and its

---

[1540] As discussed in Section V.C.1.f(5), AFI recorded a reserve for 8% of the estimated DOJ/AG Settlement cost ($230 million) in late February 2012. However, no record of an actual obligation from AFI to GMAC Mortgage has been identified in the accounting records or otherwise.

[1541] *See* Joint Servicing—Ally Subservicing Agreement Presentation by Centerview, Morrison Foerster, and FTI, dated July 17, 2012, at 2–3 [RC00075960].

[1542] *See id.* at 2 ("Additionally, the loss of Ally [Bank] loans limits [ResCap's] access to potential brokerage fees from refinancings. . . . The discontinuation of the subservicing agreement would result in collateral damage to [ResCap's] servicing platform overall, which would influence potential buyers when submitting their bids for the business. . . . Rejection of the agreement would also result in distractions in transferring approximately 700K loans to Ally Bank's designated servicer.").

subsidiaries, as the mortgage servicers, were responsible for a significant portion of the actionable issues that were the subject of the FRB/FDIC Settlement and the DOJ/AG Settlement. For a full discussion of the implications of AFI's conduct in connection with the government settlements and potential claims and defenses that could be asserted in connection with that conduct, please see Sections VII.F, VII.G, and VII.H.

## D.  TAX SHARING ARRANGEMENTS AND TAX ACCOUNTING AND CLASSIFICATION ISSUES

ResCap has made and received numerous payments in respect of the income tax attributes that it generated and the tax-related accounts on ResCap's balance sheet. Most of these payments were made pursuant to tax allocation agreements for periods when ResCap was part of a consolidated federal income tax return. One payment was the LLC Conversion Dividend distributed by ResCap in the amount of the equity impact of the elimination of ResCap's tax-related accounts upon a change in ResCap's federal tax classification. To provide a basis for understanding the role of the tax allocation agreements to which ResCap was a party, this Section first provides background on how consolidated federal income tax reporting works, why tax allocation agreements are used, and what are examples of typical provisions in tax allocation agreements. Second, this Section chronologically describes the changes in ResCap's and AFI's federal tax classification and the tax allocation agreements in place between them. Third, this Section describes the drafting and approval process for each tax allocation agreement. This Section then summarizes the amounts paid under each tax allocation agreement and whether additional amounts should have been paid or will soon become due under the terms of each agreement. Finally, this Section describes the approval process for and the payment of the LLC Conversion Dividend by ResCap.

### 1.  Consolidated Tax Reporting And The Role Of Tax Allocation Agreements

Since ResCap's formation in March 2005, there have been various tax allocation agreements in place between ResCap and AFI.[1543] These tax allocation agreements created contractual rights to cash flows between ResCap and AFI regarding U.S. federal and state income taxation of the operations of ResCap and AFI. ResCap has paid significant sums to AFI pursuant to these tax allocation agreements. The tax allocation agreements relating to U.S. federal income tax liabilities and refunds were in effect for all the time periods in which ResCap was included on GM's consolidated federal income tax returns (i.e., January 1, 2005 to November 30, 2006) and AFI's consolidated federal income tax returns (i.e., November 2, 2009 to present). In addition, a tax allocation agreement relating to state income tax liabilities and refunds was in effect for the time period in which AFI was a partnership between Cerberus and GM under U.S. federal income tax law.

---

[1543] Implemented 2005 Tax Allocation Agreement, at ALLY_0178780–86 [ALLY_0178779]; Other 2005 Tax Allocation Agreement [MELZER.009035]; 2006 Tax Allocation Agreement, at ALLY_0178787–93 [ALLY_0178779]; First 2009 Tax Allocation Agreement, at RC40016379–84 [RC40016362]; Second 2009 Tax Allocation Agreement [RC00028796].

### a. Consolidated Tax Reporting

The Internal Revenue Code allows affiliated corporations meeting certain requirements to elect to file federal tax returns on a consolidated basis.[1544] A principal policy objective of this allowance is the mitigation of the distorting impact that the separate existence of affiliated corporations has on their aggregate tax liability.[1545] When the first consolidated tax return statutes were enacted by Congress in 1918, the application of the statutes was mandatory to applicable corporations, with the rationale being that "the principle of taxing as a business unit what in reality is a business unit is sound and equitable . . . ."[1546] Notwithstanding this couching of the objective in terms of equity, Congress acknowledged that "its general and permanent effect is to prevent evasion which cannot be successfully blocked in any other way."[1547]

The consolidated return rules are designed to enable affiliated groups of corporations to file substantively as if they were a single entity. This treatment, however, can provide opportunities for related parties to engage in transactions that attempt to manipulate the realization of gains and losses.[1548] The current regulations generally handle this possibility by requiring the deferral of gains and losses from intercompany transactions to prevent these transactions from "creating, accelerating, avoiding, or deferring consolidated taxable income (or consolidated tax liability)."[1549] The intent is to produce tax results that would match the results of comparable transactions between divisions of a single corporation.[1550]

The filing of consolidated returns is now elective. Notwithstanding the government's use of the consolidated return rules to prevent certain forms of tax avoidance, taxpayers can obtain valuable benefits by electing to file consolidated tax returns. The most important benefit is the ability to use the losses of one member of the consolidated group against the income of another member.[1551] This offset ability can provide entities with the flexibility to join together

---

[1544] *See* I.R.C. § 1501.

[1545] *See* Andrew J. Dubroff et al., Federal Income Taxation of Corporations Filing Consolidated Returns § 1.01, 1–2 (2d ed. 2012).

[1546] S. Rep. No. 617, at 8–9 (1918); *see also* S. Rep. No. 960, at 13–15 (1928) ("The mere fact that by legal fiction several corporations owned by the same stockholders are separate entities should not obscure the fact that they are in reality one and the same business owned by the same individuals and operated as a unit.").

[1547] S. Rep. No. 617, at 8–9 (1918).

[1548] *See* Andrew J. Dubroff et al., Federal Income Taxation of Corporations Filing Consolidated Returns §§ 1.01, 31.01[1], 1–2, 31–4 to 31–5 (2d ed. 2012).

[1549] Treas. Reg. § 1.1502–13(a)(1).

[1550] *See* Andrew J. Dubroff et al., Federal Income Taxation of Corporations Filing Consolidated Returns § 31.01[1], 31–7 (2d ed. 2012).

[1551] *See id.* § 1.01, 1–2.

risky businesses and mature businesses with the expectation that tax losses may be available for current use while keeping each enterprise's exposure to liability separate by insulating the business activities under separate corporate entities.[1552]

Only "affiliated groups" can elect to file consolidated tax returns.[1553] An affiliated group is a chain of "includible corporations" that has a common parent that owns at least 80% of the stock of at least one other member in the chain and in which at least 80% of each member other than the common parent is owned directly by one or more of the other members in the chain.[1554] An affiliated group that elects to file consolidated tax returns is called a "consolidated group."[1555] The initial election to file consolidated tax returns requires all includible corporations in the affiliated group to consent to the election on Internal Revenue Service Form 1122.[1556]

The consolidated return regulations require the consolidated group to be treated as a single entity in some ways and as separate entities in other ways. The single entity approach applies in numerous respects. First, all members of the consolidated group must use the same taxable year.[1557] Second, gains and losses of all members are aggregated in determining consolidated taxable income or loss.[1558] Third, realization of gains and losses on intercompany transactions is deferred until the gain or loss can be matched with the offsetting item of the other member party to the intercompany transaction or a member, or the asset in the transaction, leaves the consolidated group.[1559] The character and source of tax items are determined on a separate group basis.[1560] The separate entity approach also applies when determining the amount and applicable accounting method of each member's tax items relating to intercompany transactions.[1561]

---

[1552] *See id.* § 1.01, 1–3.

[1553] I.R.C. § 1501.

[1554] *Id.* § 1504(a)(1).

[1555] Treas. Reg. § 1.1502–1(h).

[1556] I.R.C. § 1501; Treas. Reg. § 1.1502–75(a)(1), (b)(1); ANDREW J. DUBROFF ET AL., FEDERAL INCOME TAXATION OF CORPORATIONS FILING CONSOLIDATED RETURNS § 13.02[1][a][i], at 13–4 (2d ed. 2012).

[1557] Treas. Reg. § 1.1502–76(a).

[1558] *Id.* § 1.1501–21.

[1559] *See id.* § 1.1502–13.

[1560] *Id.* § 1.1502–13(a)(2); *see also* ANDREW J. DUBROFF ET AL., FEDERAL INCOME TAXATION OF CORPORATIONS FILING CONSOLIDATED RETURNS § 31.03[1][b], 31–26, 27 (2d ed. 2012).

[1561] *See* Treas. Reg. § 1.1502–17; ANDREW J. DUBROFF ET AL., FEDERAL INCOME TAXATION OF CORPORATIONS FILING CONSOLIDATED RETURNS § 31.03[1][b], 31-26, 27 (2d ed. 2012).

To prepare the consolidated tax return, the separate taxable income is first computed for each member of the consolidated group on a stand-alone basis with some modifications.[1562] The amount of consolidated taxable income or consolidated NOL is then determined by aggregating the separate taxable incomes and losses of all members, and then adding certain tax items that are required to be computed on a consolidated basis.[1563] Subject to certain limitations, the consolidated group is allowed to use a carryover or carryback of its members' separate NOLs from taxable years when they were not part of the consolidated group towards its available consolidated NOL deduction.[1564]

If a member leaves the consolidated group, the portion of the consolidated NOL that is attributable to the member, determined for each year by the proportion of the member's separate NOL for such year on a stand-alone basis to the consolidated NOL for such year, can be carried over for use by the departing member in a future year.[1565]

Regulations require certain methods of allocation of the consolidated tax liability among the members for tax accounting purposes. These rules are necessary to enable each member to keep track of adjustments to basis[1566] and adjustments to earnings and profits.[1567] In contrast, the consolidated return regulations do not impose any requirements on how the members of the consolidated group allocate the financial responsibility for tax liabilities and rights to tax refunds. These cash flow concerns are usually handled through tax allocation agreements.

### b. Tax Allocation Agreements

Parents and subsidiaries in consolidated groups frequently enter into tax allocation agreements to allocate the responsibilities for payments of tax liabilities and the right to receive tax refunds.[1568] The common parent of the consolidated group generally serves as a common agent for all the members of the group in making the tax payments to the IRS and receiving tax refunds.[1569] These rules, however, do not limit how the members of the group can divide the tax liabilities and refunds among themselves. A parent often will want to enter into a tax allocation agreement with a subsidiary member of the group to obtain a right as a

---

[1562] Treas. Reg. § 1.1502–12.

[1563] *Id.* §§ 1.1502–11(a), 21(e).

[1564] *Id.* § 1.1502–21(a).

[1565] *Id.* § 1.1502–21(b).

[1566] *Id.* § 1.1502–32(b).

[1567] I.R.C. § 1552; Treas. Reg. §§ 1.1502–33(d).

[1568] *See* Andrew J. Dubroff et al., Federal Income Taxation of Corporations Filing Consolidated Returns § 41.01, 41–5 (2d ed. 2012).

[1569] Treas. Reg. § 1.1502–77(a).

creditor to reimbursement for the subsidiary's share of tax liabilities because the subsidiary may have liabilities held by third-party creditors that take priority over the parent's equity position.[1570]

There are no statutory or regulatory limitations on the division of rights and responsibilities for taxes among members of consolidated groups. The consolidated return regulations mandate allocations of tax liability for purposes of determining adjustments to earnings and profits and tax basis but are irrelevant in determining cash flow rights.[1571]

The terms of tax allocation agreements vary widely. Often, a subsidiary will be required to pay a parent for the amount of the subsidiary's stand-alone positive tax liability. As for the subsidiary's right to receive a payment, a typical arrangement would have the parent pay to the subsidiary an amount equal to the tax savings attributable to a tax benefit generated by the subsidiary that the parent was able to use.[1572] A variation on this theme could also take into account whether the subsidiary would be able to use the tax benefit on a stand-alone basis; the amount of the payment could be reduced if it appears unlikely that the subsidiary will be able to use the tax benefit on a stand-alone basis in the future.[1573] Similarly, the agreement could provide that the parent's payment to the subsidiary for a tax benefit currently used by the parent would be postponed until a year when the subsidiary would have been able to use the tax benefit on a stand-alone basis.[1574] Another fairly common arrangement is to treat the subsidiary as a stand-alone taxpayer for all purposes. Thus, if the subsidiary would be entitled to a tax refund on a stand-alone basis, the parent would pay an amount equal to such tax refund to the subsidiary even if the parent cannot use the subsidiary's tax benefits in the current year.

Generally, business entities are classified as either corporations or pass-through entities under federal income tax law.[1575] A pass-through entity with a single owner is called a disregarded entity because it is treated as a branch or division of its owner rather than as a separate taxable entity from its owner.[1576] Nevertheless, a disregarded entity is a separate legal entity for non-tax purposes. A pass-through entity with multiple owners is treated as a partnership for tax purposes.[1577] Business entities that are not required to be classified as corporations for federal income tax purposes, which include limited liability companies, can

---

[1570] *See* Andrew J. Dubroff et al., Federal Income Taxation of Corporations Filing Consolidated Returns § 71.02[4], 71–195 (2d ed. 2012).

[1571] *See id.* § 71.02[4][a], 71–195.

[1572] *See id.* § 41.01, 41–5 n.9.

[1573] *Id.*

[1574] *Id.*

[1575] *See* Treas. Reg. § 301.7701–2(a).

[1576] *Id.*

[1577] *Id.*

elect to be treated as either corporations or pass-through entities.[1578] The default classification for such business entities that are organized in the U.S. is to be treated as pass-through entities.[1579] Thus, a single-member limited liability company is treated as a disregarded entity unless it elects to be taxed as a corporation. As noted above, the parent may want to be reimbursed for taxes it pays on the disregarded entity's income. Further, there may be different lending groups at the parent and disregarded entity levels who want the parent and disregarded entity to agree to a specific tax arrangement. There is no reason why a disregarded entity for federal income tax purposes cannot enter into a tax allocation agreement with its owner. In lieu of a tax allocation agreement, distributions by the disregarded entity to its owner of its stand-alone tax liability are not unusual.

### 2. ResCap Tax Sharing Arrangements

#### a. Chronology Of ResCap's Tax Classification And Tax Allocation Agreements

ResCap was first incorporated as a Delaware corporation on August 20, 2004,[1580] but it did not begin conducting operations until subsidiaries were transferred to it in March 2005.[1581] From March 2005 through November 30, 2006, ResCap was included in the GM consolidated federal income tax return.[1582] The Implemented 2005 Tax Allocation Agreement between AFI and ResCap was in effect for this period.[1583] Entry into the tax allocation agreement was required under the 2005 Operating Agreement, dated June 24, 2005,[1584] and the Implemented 2005 Tax Allocation Agreement was executed on that same date.[1585] Despite ResCap having no operations until March 2005, the Implemented 2005 Tax Allocation Agreement was made effective as of January 1, 2005, because GM's tax department believed splitting up the 2005

---

[1578] *Id.* § 301.7701–3(a).

[1579] *Id.* § 301.7701–3(b)(1).

[1580] *See* Certificate of Conversion to Limited Liability Company of Residential Capital Corporation to Residential Capital, LLC, dated Oct. 24, 2006, at ALLY_0003762 [ALLY_0003761].

[1581] Residential Capital Corporation, Annual Report (Form 10-K) (Mar. 28, 2006), at 2.

[1582] *See* Memorandum, Final Tax Liabilities Allocated from GM, dated Jan. 25, 2008, at ALLY_0208456 [ALLY_0208456]; *see also* Tax Classification and Allocation History, prepared by AFI, at ALLY_0178779 [ALLY_0178779]; Implemented 2005 Tax Allocation Agreement, at ALLY_0178780 [ALLY_0178779].

[1583] Implemented 2005 Tax Allocation Agreement, § 6.08 [ALLY_0178779]. Section 6.08 of the agreement states that the agreement generally "shall continue in effect until the ResCap Group is no longer included in the consolidated Federal income tax return of the [AFI] Group . . . ." Since GM, not AFI, was the common parent of the affiliated group that filed consolidated federal income tax returns, the Examiner assumes that the parties to the agreement intended for it to remain in effect until the ResCap Group, as defined in the agreement, was no longer included in either the GM consolidated federal income tax return or the "GMAC Group," as defined in the agreement.

[1584] *See* 2005 Operating Agreement, § 2(b)(iii) [MELZER.004869] ("ResCap and [AFI] shall maintain in effect an income tax allocation agreement that shall provide for two-way sharing payments based on the separately calculated tax liability or benefit of ResCap.").

[1585] Implemented 2005 Tax Allocation Agreement, at ALLY_0178786 [ALLY_0178779].

tax year between allocations under the Implemented 2005 Tax Allocation Agreement and allocations under the tax allocation agreements previously in place with ResCap's subsidiaries before they were transferred to ResCap would be unduly burdensome.[1586]

As required by the Cerberus PSA, under which 51% of AFI was to be sold to Cerberus,[1587] ResCap converted to a limited liability company on October 24, 2006.[1588] Upon conversion, ResCap initially elected to be taxable as a corporation for U.S. federal income tax purposes.[1589] Shortly thereafter, but before the Cerberus transaction closed, ResCap elected to change its federal tax classification to an entity disregarded as separate from GM (AFI had also elected to become an entity disregarded as separate from GM) effective as of November 21, 2006.[1590] The change in classification required consent from AFI.[1591] The election of disregarded entity status was treated as a tax-free liquidation of ResCap into GM,[1592] and all of ResCap's tax attributes were transferred to GM in the deemed liquidation. The sale of 51% of AFI to Cerberus closed on November 30, 2006.[1593] From ResCap's perspective, the Cerberus transaction was treated for federal income tax purposes as Cerberus purchasing 51% of ResCap's assets followed by Cerberus and GM making tax-free contributions of ResCap assets to the new AFI tax partnership, with ResCap becoming a disregarded entity treated as a branch or division of the AFI partnership.[1594] As a result of the Cerberus transaction, ResCap and AFI were no longer part of the GM consolidated group,[1595] which had the effect of terminating the Implemented 2005 Tax Allocation Agreement.[1596]

---

[1586] *See* E-mail from B. Belfore (Apr. 28, 2005) [EXAM11839057] ("GM Tax Department would like to make the agreement effective Jan.1.2005. Although the 2 operating companies weren't transferred to ResCap until Mar.30.2005, I am told it is extremely difficult to split up the year and try to allocate it 2 different ways.").

[1587] Cerberus PSA, § 2.3(a) [CERB000521].

[1588] Certificate of Conversion to Limited Liability Company of Residential Capital Corporation to Residential Capital, LLC, dated Oct. 24, 2006 [ALLY_0003761].

[1589] *See* Memorandum, Final Tax Liabilities Allocated from GM, dated Jan. 25, 2008, at ALLY_0208456 [ALLY_0208456].

[1590] *Id.*

[1591] Treas. Reg. § 301.7701–3(c)(2).

[1592] I.R.C. § 337(a) (no recognition of gain or loss by liquidating corporation on distributions to 80% distributee); Treas. Reg. § 301.7701–3(g)(iii) (election to change classification from association taxable as a corporation to disregarded entity treated as liquidation of corporation).

[1593] *See* Memorandum, Final Tax Liabilities Allocated from GM, dated Jan. 25, 2008, at ALLY_0208457 [ALLY_0208456].

[1594] I.R.C. § 721(a) (no recognition of gain or loss on contribution of property to partnership); Treas. Reg. § 301.7701–3(b)(1)(i), (f)(2) (addition of member to disregarded entity turns entity into partnership); Rev. Rul. 99–5, 1991–1 C.B. 434 (When an owner of a disregarded entity sells part of its interest in the disregarded entity to a buyer, the buyer and seller are treated as contributing their shares of the disregarded entity's assets to a new partnership in exchange for interests in the partnership.).

[1595] I.R.C. § 1504(a)(1).

[1596] Implemented 2005 Tax Allocation Agreement, § 6.08 [ALLY_0178779].

From December 1, 2006 through June 30, 2009, ResCap remained a disregarded entity treated as a division of AFI.[1597] AFI was a partnership owned by GM and Cerberus for tax purposes throughout this period.[1598] The 2006 Tax Allocation Agreement between AFI and ResCap was in place for this period for state and local jurisdictions that did not follow the disregarded entity classification rules under federal tax law.[1599] A tax allocation agreement was required to be in effect for this period by the 2006 Amended Operating Agreement.[1600] The 2006 Tax Allocation Agreement, however, was not fully executed until December 9, 2008. The parties did not act upon the requirement in the 2006 Amended Operating Agreement until they noted that the requirement was referenced in a May 5, 2008 offering memorandum for an exchange of outstanding ResCap notes for newly issued notes.[1601] Since AFI was a partnership for tax purposes, all of ResCap's income, loss, and other tax attributes during this period passed up to AFI's partners—Cerberus and GM—pursuant to the GMAC LLC Agreement.

ResCap became a partnership for federal income tax purposes on July 1, 2009.[1602] This change in federal tax classification was not the result of any tax election made by ResCap. Rather, the change was because ResCap gained an additional member. ResCap's direct owner, GMAC Mortgage Group LLC, contributed a one percent interest in ResCap to GMAC Mortgage Group LLC's newly-incorporated wholly-owned subsidiary, ResCap Investments Inc., on June 29, 2009.[1603] ResCap's ownership structure as a partnership resulting from these steps is provided in Exhibit V.D.2.a, below.

---

[1597] *See* Tax Classification and Allocation History, prepared by AFI, at ALLY_0178779 [ALLY_0178779].

[1598] *See id.*

[1599] *See* 2006 Tax Allocation Agreement, at ALLY_0178791 [ALLY_0178779]. Although the 2006 Tax Allocation Agreement makes some passing references to a few federal tax concepts, such as the Internal Revenue Service and the Internal Revenue Code, the agreement apparently did not apply with respect to federal income taxes. It was intended to apply with respect to income taxes in only those state and local jurisdictions that did not treat ResCap as a disregarded entity. *See* Letter from W. Marx to J. Young (Nov. 13, 2008), at ALLY_0178792 [ALLY_0178779] ("[T]his agreement is effective only with respect to those very few jurisdictions that treat ResCap as a taxable entity and only where ResCap would file a combined or unitary return with [AFI].").

[1600] *See* 2006 Amended Operating Agreement, § 2(b)(iii) [ALLY_0041818] ("ResCap and [AFI] shall maintain in effect an income tax allocation agreement that shall provide for two-way sharing payments based on the separately calculated tax liability or benefit of ResCap.").

[1601] *See* Letter from W. Marx to J. Young (Nov. 13, 2008), at ALLY_0178792 [ALLY_0178779] ("[W]e saw little need for a new tax allocation agreement between [AFI] and ResCap. Until now. Page 110 of the Offering Memorandum for the recent ResCap bond swap describes the ResCap Operating Agreement . . . . To comply with the terms of the Operating Agreement, we have drafted the attached new tax allocation agreement . . . ."); *see also* Residential Capital, LLC, Offering Memorandum (May 5, 2008), at 110 [ALLY_0103305] (describing the 2006 Amended Operating Agreement, including its requirement to have a tax allocation agreement providing for two-way sharing payments in effect between ResCap and AFI).

[1602] *See* Tax Classification and Allocation History, prepared by AFI, at ALLY_0178779 [ALLY_0178779].

[1603] *See* Memorandum, Year-End Transaction Regarding Mortgage Assets and Mortgage Companies, dated Jan. 27, 2010, at EXAM00220204 [EXAM00220202].

EXHIBIT V.D.2.a
**ResCap as a Partnership for Federal Income Tax Purposes**
July 1, 2009 – November 1, 2009



Thus, ResCap went from having a single tax-regarded member, AFI, to having two tax-regarded members, AFI and ResCap Investments Inc. This change in the number of members automatically converted ResCap from a disregarded entity to a partnership for federal income tax purposes.[1604] But ResCap was still a pass-through entity not responsible for the payment of federal income taxes under federal tax law. ResCap filed a federal partnership tax return for a tax

---

[1604] Treas. Reg. § 301.7701–3(b)(1)(i), (f)(2).

year beginning on July 1, 2009 and ending on November 1, 2009,[1605] and the 2006 Tax Allocation Agreement for state and local income tax purposes was treated by AFI and ResCap as remaining in effect for this period.[1606] The additional member was added to make ResCap a partnership prior to AFI's conversion to a Delaware corporation on June 30, 2009.[1607] AFI was concerned that had ResCap remained a disregarded entity when AFI was incorporated, ResCap would have been required to record on its book balance sheet a net current tax expense, a net deferred tax liability, and an offsetting decrease in net equity.[1608] By making ResCap a partnership prior to AFI's incorporation, the tax liabilities and reduction in net equity were recorded on AFI's book balance sheet instead of ResCap's.[1609]

ResCap became disregarded as separate from AFI once again on November 2, 2009 because of an election by ResCap's 1% owner to become disregarded as separate from AFI for

---

[1605] Residential Capital, LLC, U.S. Return of Partnership Income (I.R.S. Form 1065) [ALLY_0337795]. The Examiner notes that ResCap probably became a partnership on June 30, 2009, the day after the June 29, 2009 contribution of 1% of ResCap to ResCap Investments Inc. The Examiner assumes that ResCap's income for the day of June 30, 2006 was reported directly on AFI's federal partnership tax return for its tax year ending June 30, 2006 for administrative convenience, instead of having ResCap file a one-day federal partnership tax return for June 30, 2006 in addition to its federal partnership tax return for its short tax year beginning on July 1, 2006 and ending on November 1, 2006.

[1606] *See* Residential Capital, LLC U.S. Federal, State, and Local Tax Allocations Analysis, prepared by AFI [ALLY_PEO_0079527]; *see also* Residential Capital, LLC Tax Allocation Payment Detail Analysis, prepared by AFI [ALLY_PEO_0079528].

[1607] *See* Memorandum, Year-End Transaction Regarding Mortgage Assets and Mortgage Companies, dated Jan. 27, 2010, at EXAM00220204 [EXAM00220202].

[1608] *See* E-mail from S. Cohen (June 24, 2009), at EXAM12059274 [EXAM12059274] ("Upon conversion of [AFI] from LLC to C Corp on June 30, paragraph 28 of FAS 109 (and SAB Topic 1B) will require ResCap to record a tax a [sic] expense of $1.0 billion and a deferred tax liability of $1.0 billion (temporary tax difference)."); *see also* Memorandum, Agreements for Allocation of Taxes, dated Aug. 6, 2010, at 2 [RC40016362] ("If ResCap had remained a tax-disregarded LLC, it was estimated that it would have been required to book deferred tax assets and liabilities up to the corporate tax rate at the ResCap level of approximately $150 million, reducing its reported net equity."); E-mail from J. Aretakis (July 14, 2009), at EXAM12429610 [EXAM12429609] ("[H]ad ResCap remained an LLC subsidiary of a corporate [AFI], deferred taxes would have been required. The net DTL at ResCap would have triggered a P&L hit at ResCap.").

[1609] *See* E-mail from J. Aretakis (July 14, 2009), at EXAM12429610 [EXAM12429609] ("As a partnership, ResCap need not book any deferred taxes on various items on its balance sheet, most notably MSRs. . . . [The] hit was instead taken at the [AFI] level."); *see also* E-mail from T. Baker (June 29, 2009), at EXAM12421559 [EXAM12421559] ("We understand that PWC has concluded that if ResCap is converted to a tax partnership prior to incorporating [AFI] . . . . [AFI's] book/tax basis difference in its investment in the newly created ResCap partnership would give rise to a net deferred tax asset or liability at the [AFI] level . . . ."); Memorandum, Agreements for Allocation of Taxes, dated Aug. 6, 2010, at 2 [RC40016362] ("As a partnership, ResCap was not required to record deferred taxes[;] rather, its parent company was.").

federal income tax purposes.[1610] ResCap Investments Inc. had converted into a Delaware limited liability company on September 11, 2009[1611] and initially had elected to be treated as a corporation for federal income tax purposes.[1612] On December 30, 2009, ResCap Investments LLC changed its federal tax classification to disregarded entity status with a retroactive effective date of November 2, 2009.[1613] This change resulted in ResCap again having only one member, AFI, for federal income tax purposes.[1614] Accordingly, ResCap automatically became a disregarded entity under federal income tax law as of November 2, 2009.[1615]

AFI decided to return ResCap to disregarded entity status effective as of November 2, 2009 to preserve substantial tax losses that would be generated by Ally Bank and GMACB Asset Management Corporation, a wholly-owned subsidiary of Ally Bank. These tax losses arose from AFI's intercompany purchase of certain loans from Ally Bank and GMACB Asset Management Corporation and subsequent contribution of those loans to ResCap.[1616] AFI wanted to transfer those loans out of Ally Bank to "strengthen the asset quality profile of Ally Bank."[1617] If ResCap had remained a partnership at the time of the sale and contribution of the loans, then deductions for Ally Bank's and GMACB Asset Management Corporation's losses from the sale, estimated as of November 13, 2009 to be approximately $650 million,[1618] would have been permanently disallowed under federal income tax law because ResCap would have been a related party transferee but would not have been part of the same "controlled group" of

---

[1610] *See* Memorandum, Year-End Transaction Regarding Mortgage Assets and Mortgage Companies, dated Jan. 27, 2010, at EXAM00220204 [EXAM00220202].

[1611] Certificate of Conversion to Limited Liability Company of ResCap Investments Inc. to ResCap Investments LLC, dated Sept. 11, 2009 [RC40006869].

[1612] *See* Memorandum, Year-End Transaction Regarding Mortgage Assets and Mortgage Companies, dated Jan. 27, 2010, at EXAM00220204 [EXAM00220202].

[1613] *See id.*

[1614] *See id.*

[1615] Treas. Reg. § 301.7701–3(b)(1)(i), (f)(2).

[1616] *See* Memorandum, Agreements for Allocation of Taxes, dated Aug. 6, 2010, at 2 [RC40016362]; *see also* Memorandum, Year-End Transaction Regarding Mortgage Assets and Mortgage Companies, dated Jan. 27, 2010, at EXAM00220204–05 [EXAM00220202].

[1617] Memorandum, Year-End Transaction Regarding Mortgage Assets and Mortgage Companies, dated Jan. 27, 2010, at EXAM00220203 [EXAM00220202].

[1618] *See* E-mail from J. Aretakis (Nov. 13, 2009), at ALLY_0381586 [ALLY_0381585] ("Purchase of Bank loans by [AFI] and contribution to ResCap will generate a deferred tax loss . . . . Consolidated [AFI] will record a DTA (est. $650 million) for the deferred tax benefit.").

corporations as Ally Bank and GMACB Asset Management Corporation.[1619] By making ResCap a disregarded entity prior to the sale and contribution of the loans, the final transferee was considered to be AFI for federal income tax purposes, and the deductions for Ally Bank's and GMACB Asset Management Corporation's losses were merely deferred, instead of permanently disallowed, until ResCap disposed of the loans to a person outside the AFI consolidated group.[1620]

Since November 2, 2009, ResCap has been a disregarded entity owned by AFI through other disregarded entities, GMAC Mortgage Group LLC and ResCap Investments LLC.[1621] AFI has been a corporation since July 1, 2009.[1622] The Second 2009 Tax Allocation Agreement among GMAC Mortgage Group LLC, ResCap Investments LLC, and ResCap, effective as of November 1, 2009, was fully executed on January 26, 2011.[1623] This agreement is still putatively in effect.[1624]

### b. Drafting And Approval Processes For The Tax Allocation Agreements

#### (1) Implemented 2005 Tax Allocation Agreement And Other 2005 Tax Allocation Agreement

It is unclear when the process of drafting the Implemented 2005 Tax Allocation Agreement between ResCap and AFI was initiated and which party created the first draft. On

---

[1619] See Treas. Reg. § 1.267(f)–1(c)(1)(iii), (j) Ex. 6; see also Memorandum, Year-End Transaction Regarding Mortgage Assets and Mortgage Companies, dated Jan. 27, 2010, at EXAM00220204 [EXAM00220202]; E-mail from J. Aretakis (Nov. 13, 2009), at ALLY_0381586 [ALLY_0381586] ("The tax loss would be permanently disallowed if we leave ResCap in partnership form."); E-mail from J. Aretakis (July 14, 2009), at EXAM12429610 [EXAM12429609] ("Going forward, in general, tax gains on [AFI]/ResCap intercompany sales will be fully taxable, but tax losses will be disallowed. Tax losses subject to the disallowance rule are usually permanently disallowed, not merely deferred.").

[1620] See I.R.C. § 267(f)(2); see also Treas. Reg. § 1.1502–13(c); Memorandum, Year-End Transaction Regarding Mortgage Assets and Mortgage Companies, dated Jan. 27, 2010, at EXAM00220204–05 [EXAM00220202].

[1621] See Tax Classification and Allocation History, prepared by AFI, at ALLY_0178779 [ALLY_0178779]; see also Second 2009 Tax Allocation Agreement, at 1 [RC00028796]. ResCap Investments LLC merged into GMAC Mortgage Group LLC with GMAC Mortgage Group LLC surviving on July 31, 2011. See Debtor's Motion for Interim and Final Orders Under Bankruptcy Code Sections 105(a), 363, 506(a), 507(a)(8), 541, and 1129 and Bankruptcy Rule 6003 Authorizing Payment of Taxes and Regulatory Fees [Docket No. 37] at 8; see also Consent to Action of the Sole Director of ResCap Investments LLC, dated July 25, 2011, at RC40006896 [RC40006869].

[1622] See Ally Financial Inc. & Subs., U.S. Corporation Income Tax Return (I.R.S. Form 1120), at ALLY_0388747 [ALLY_0388745]; see also Tax Classification and Allocation History, prepared by AFI, at ALLY_0178779 [ALLY_0178779].

[1623] Second 2009 Tax Allocation Agreement [RC00028796].

[1624] See Debtor's Motion for Interim and Final Orders Under Bankruptcy Code Sections 105(a), 363, 506(a), 507(a)(8), 541, and 1129 and Bankruptcy Rule 6003 Authorizing Payment of Taxes and Regulatory Fees [Docket No. 37] at 8–9; see also Tax Classification and Allocation History, prepared by AFI, at ALLY_0178779 [ALLY_0178779].

April 28, 2005, GM sent to ResCap and AFI a revised draft of the Implemented 2005 Tax Allocation Agreement.[1625] GM notified ResCap that the revisions were designed to "deny ResCap a tax benefit for [three] specific tax attributes (foreign tax credits, capital losses, or net operating losses) until both GM and [AFI] could also enjoy the benefit."[1626] The revisions were proposed by GM because it wanted to "[p]revent cash from being 'trapped' in ResCap ([i.e.,] prevent GM from paying ResCap for tax losses that GM cannot use)."[1627] GM also noted that ResCap does not have to be able to use the tax benefits on a stand-alone basis to receive payment from GM as long as both GM and AFI can use the tax benefits.[1628]

In late May 2005, PwC, the auditor of ResCap's financial reports for 2005, gave comments to ResCap on the draft of the Implemented 2005 Tax Allocation Agreement suggesting that ResCap push back on the requirement that both GM and AFI have to use tax benefits for ResCap to receive payment.[1629] ResCap's Chief Financial Officer at the time, Davee Olson, expressed concerns about being able to push back because the terms of the 2005 Operating Agreement were still being negotiated by GM and AFI.[1630] ResCap continued to negotiate with GM and AFI over the terms of the Implemented 2005 Tax Allocation Agreement in late May and early June 2005.[1631] James Young, Chief Accounting Officer of ResCap at that time, made comments that focused on internal consistency in the agreement regarding the requirement that both GM and AFI had to use ResCap's losses for ResCap to be entitled to compensation and stated that he wanted the provisions to be "consistent (even if not in ResCap's best interest)."[1632] It appears that all or most of the parties signed off on the provisions of the Implemented 2005 Tax Allocation Agreement by June 3, 2005.[1633]

The ResCap Board delegated the negotiation and final approval of the terms of the Implemented 2005 Tax Allocation Agreement to certain officers. In a unanimous written consent dated June 15, 2005, the ResCap Board authorized certain officers to "negotiate,

---

[1625] *See* E-mail from B. Belfore (Apr. 28, 2005) [EXAM11839057], attaching draft of Implemented 2005 Tax Allocation Agreement [EXAM11839059].

[1626] E-mail from B. Belfore (Apr. 28, 2005), at EXAM11839057 [EXAM11839057].

[1627] *Id.*

[1628] *See* E-mail from J. Aretakis (Apr. 29, 2005), at EXAM10183493 [EXAM10183493].

[1629] *See* E-mail from S. Mooradian (May 21, 2005), at EXAM11738506 [EXAM11738506] ("I would push back and at least get a cash benefit if [AFI] is in a taxable position even if GM is not.").

[1630] *See* E-mail from D. Olson (May 23, 2005), at EXAM11864785 [EXAM11864785] (Pushing back to get a cash benefit even if only AFI can use the tax benefit is "a problem getting in place until GM and [AFI] get real about their operating agreement.").

[1631] *See* E-mail from J. Young (June 1, 2005) [EXAM10182754]; E-mail from J. Young (May 31, 2005) [EXAM10220414].

[1632] E-mail from J. Young (May 31, 2005) [EXAM10220414].

[1633] *See* Task List regarding ResCap Open Items as of June 24, 2005, at EXAM12180173 [EXAM12180165] ("Received signoffs from majority of reviewers, including Kevin Nowlan (GM). The 6/1/05 draft should be considered final. Need to obtain signatures.").

execute and deliver in the name of and on behalf of ResCap . . . the Tax Allocation Agreement . . . substantially in the form described to the Board and in such form as the Authorized Persons executing the same may approve, such approval to be conclusively evidenced by the execution thereof."[1634] The Implemented 2005 Tax Allocation Agreement was later executed on June 24, 2005.[1635]

In addition to the Implemented 2005 Tax Allocation Agreement, there was another tax allocation agreement purportedly executed on June 24, 2005, the Other 2005 Tax Allocation Agreement.[1636] The Other 2005 Tax Allocation Agreement requires only AFI to use ResCap tax benefits for ResCap to receive payment from AFI.[1637] It is unclear why two different tax allocation agreements between AFI and ResCap were executed for the 2005 tax year and whether each agreement was actually signed on the same date, but the Other 2005 Tax Allocation Agreement is far more favorable to ResCap than the Implemented 2005 Tax Allocation Agreement. The Other 2005 Tax Allocation Agreement was an exhibit in the first amendment to ResCap's registration statement for a $4 billion notes exchange offer filed with the SEC on September 2, 2005.[1638] ResCap later filed a second amendment to that registration statement on September 20, 2005 in which the Implemented 2005 Tax Allocation Agreement was included as an exhibit.[1639] The parties' use of the Implemented 2005 Tax Allocation Agreement resulted in ResCap not being compensated for some of its 2006 losses because GM had sufficient losses from its other subsidiaries to shield its income through 2006 on a consolidated basis.[1640]

### (2) 2006 Tax Allocation Agreement

Under the 2006 Amended Operating Agreement, a tax allocation agreement between AFI and ResCap was required to be in effect even after Cerberus's acquisition of 51% of AFI on November 30, 2006.[1641] Accordingly, AFI and ResCap had in place the 2006 Tax Allocation Agreement from December 1, 2006 through November 1, 2009 for state and local jurisdictions

---

[1634] Unanimous Consent to Action of the Board of Directors of Residential Capital Corporation, June 15, 2006, at 2 [RC40005468].

[1635] Implemented 2005 Tax Allocation Agreement, at ALLY_0178786 [ALLY_0178779].

[1636] Other 2005 Tax Allocation Agreement [MELZER.009035].

[1637] *See id.* § 1.03E.

[1638] Residential Capital Corporation, Amendment No. 1 to Registration Statement (Form S-4/A) (Sept. 2, 2005), Ex. 10.3.

[1639] Residential Capital Corporation, Amendment No. 2 to Registration Statement (Form S-4/A) (Sept. 20, 2005), Ex. 10.3.

[1640] *See* Section V.D.2.c(1).

[1641] *See* 2006 Amended Operating Agreement, § 2(b)(iii) [ALLY_0041818] ("ResCap and [AFI] shall maintain in effect an income tax allocation agreement that shall provide for two-way sharing payments based on the separately calculated tax liability or benefit of ResCap.").

that did not follow the disregarded entity classification rules under federal tax law.[1642] The 2006 Amended Operating Agreement is unclear as to whether the agreement had to apply to federal income taxes, or state and local income taxes, or both. The 2006 Tax Allocation Agreement, however, was not executed until late 2008. Neither AFI nor ResCap acted upon the requirement in the 2006 Amended Operating Agreement until William Marx, AFI's Director of Tax Operations and Analysis, noticed that the requirement was referenced in a May 5, 2008 offering memorandum for an exchange of outstanding ResCap notes for newly issued notes. He then wrote to David DeBrunner, AFI's Chief Accounting Officer, on September 30, 2008 about the need to get a tax allocation agreement in place to comply with the 2006 Amended Operating Agreement.[1643] On November 3, 2008, DeBrunner signed the 2006 Tax Allocation Agreement that AFI had prepared and that Marx had attached to his September 30, 2008 letter. Marx then sent the partially executed 2006 Tax Allocation Agreement to Young, ResCap's Chief Financial Officer at that time, for his review and signature on November 13, 2008.[1644] Young signed the 2006 Tax Allocation Agreement on December 9, 2008.

The Investigation has not uncovered any record in the minutes of the ResCap Board or Executive Committee or written consent of the ResCap Board that authorized Young to execute the 2006 Tax Allocation Agreement. Further, the Investigation has not uncovered any evidence that the ResCap Board was ever informed of the existence of the 2006 Tax Allocation Agreement prior to Young signing it. The only evidence of any kind of review of the provisions of the 2006 Tax Allocation Agreement comes from Marx's letters to DeBrunner and Young, in which Marx states that the "agreement has been reviewed and accepted by Dina Shapiro, relevant ResCap Legal Staff and Bond Counsel (see attached e-mail)."[1645]

---

[1642] *See* 2006 Tax Allocation Agreement, at ALLY_0178791 [ALLY_0178779]. Although the 2006 Tax Allocation Agreement makes some passing references to a few federal tax concepts, such as the IRS and the Internal Revenue Code, the agreement apparently did not apply with respect to federal income taxes. It was intended to apply with respect to income taxes in only those state and local jurisdictions that did not treat ResCap as a disregarded entity. *See* Letter from W. Marx to J. Young (Nov. 13, 2008), at ALLY_0178792 [ALLY_0178779] ("[T]his agreement is effective only with respect to those very few jurisdictions that treat ResCap as a taxable entity and only where ResCap would file a combined or unitary return with [AFI].").

[1643] *See* Letter from W. Marx to D. DeBrunner (Sept. 30, 2008), at ALLY_0178793 [ALLY_0178779] ("[W]e saw little need for a new tax allocation agreement between [AFI] and ResCap. Until now. Page 110 of the Offering Memorandum for the recent ResCap bond swap describes the ResCap Operating Agreement . . . . To comply with the terms of the Operating Agreement, we have drafted the attached new tax allocation agreement . . . ."); *see also* Residential Capital, LLC, Offering Memorandum (May 5, 2008), at 110 [ALLY_0103305] (describing the 2006 Amended Operating Agreement, including its requirement to have a tax allocation agreement providing for two-way sharing payments in effect between ResCap and AFI).

[1644] *See* Letter from W. Marx to J. Young (Nov. 13, 2008), at ALLY_0178792 [ALLY_0178779] (almost an exact copy of the letter from W. Marx to D. DeBrunner dated September 30, 2008).

[1645] *Id.*; Letter from W. Marx to D. DeBrunner (Sept. 30, 2008), at ALLY_0178793 [ALLY_0178779].

### (3) First 2009 Tax Allocation Agreement And Second 2009 Tax Allocation Agreement

In connection with the discussions in December 2009 about making ResCap a disregarded entity for federal tax purposes effective around November 1, 2009, AFI drafted the First 2009 Tax Allocation Agreement between ResCap and AFI (and GMAC Mortgage Group LLC) to be effective as of November 1, 2009.[1646] AFI stated that since ResCap will become a member of the AFI consolidated tax return as a result of converting to a disregarded entity, "tax allocation agreements are required to be in place to document the method of tax allocation."[1647] AFI drafted the First 2009 Tax Allocation Agreement to treat ResCap generally as if ResCap were a stand-alone taxpayer. The agreement, however, was more favorable to ResCap than a pure stand-alone agreement or being left as a disregarded entity without a federal income tax allocation agreement in place because it entitled ResCap to be paid for its tax benefits that AFI could currently use even if ResCap could not yet use the tax benefits on a stand-alone basis.[1648] AFI intentionally drafted the First 2009 Tax Allocation Agreement to provide this benefit to ResCap. As described in an e-mail from Marx to ResCap management and AFI management, on which DeBrunner and Young were copied, attaching a draft of the agreement:

> If ResCap or any of its relevant sub-groups or subsidiaries generates foreign tax credits, net operating losses, or capital losses that it would not be able to use on a stand-alone basis in the current period, but the [AFI] group can utilize the benefits on the consolidated [AFI] return, then the ResCap entity will be paid currently for those benefits. This deviation from strict stand-alone accounting will in all cases be either neutral or more beneficial to ResCap than strict stand-alone. [AFI] drafted the agreements in this manner to be consistent with other allocation agreements in the Group (Bank and Insurance have similar agreements already in place).[1649]

This provision was present not only in tax allocation agreements that AFI had in effect with Ally Bank and AFI's insurance subsidiaries, but also in the Implemented 2005 Tax Allocation Agreement and in the tax allocation agreement that was in effect between GM and

---

[1646] *See* Dec. 6, 2009 Draft of First 2009 Tax Allocation Agreement [EXAM12308207]; *see also* Int. of W. Marx, Apr. 18, 2013, at 36:24–37:16 (stating that Marx was the "primary drafter" of the First 2009 Tax Allocation Agreement among a group of people at AFI). As of the December 6, 2009 draft, only GMAC Mortgage Group LLC and ResCap were included as parties to the agreement. AFI and ResCap Investments LLC were added as parties in later versions of the agreement.

[1647] *See* E-mail from W. Marx (Dec. 6, 2009) [EXAM12308200].

[1648] *See id.*

[1649] *Id.*

AFI from November 1, 2000 to November 30, 2006.[1650] Another reason for the inclusion of the provision was to see if creating this contractual right for ResCap would allow ResCap to report an "equity bump" for its net deferred tax assets that were otherwise subject to a valuation allowance that resulted in no "equity bump."[1651] AFI had explored the possibility of taking this position with its external auditors.[1652]

The First 2009 Tax Allocation Agreement went through a series of revisions that resulted in substantial changes to its operative provisions. First, Morrison & Foerster, counsel to ResCap, and Morrison Cohen, counsel to the Independent Directors, reviewed a December 14, 2009 draft and submitted their collective comments on December 23, 2009.[1653] Their comments appear to have been rejected by AFI.[1654] Second, AFI made a set of changes and on July 19, 2010 sent a revised draft dated July 8, 2010[1655] to ResCap that incorporated some changes previously discussed between AFI and ResCap.[1656] Consideration of the agreement appears to have been a low priority for ResCap and AFI in early 2009, resulting in the six-month span that passed from the lawyers' submission of their collective comments to AFI on December 23, 2009 to AFI's revision of the draft agreement on July 8, 2010.[1657] The changes made in the July 8, 2010 draft of the First 2009 Tax Allocation Agreement were largely formatting changes and corrections of factual errors in the recitals as opposed to substantive changes to operative provisions. A few substantive changes, however, were made providing that ResCap would be compensated based on AFI's use of ResCap's tax benefits, not hypothetical use by GMAC Mortgage Group LLC, a disregarded entity, and that AFI would reimburse GMAC Mortgage Group LLC to the extent that GMAC Mortgage Group LLC would have to compensate ResCap for AFI's use of ResCap's tax benefits.[1658]

ResCap asked Morrison & Foerster to review and comment on the July 8, 2010 draft, and Morrison & Foerster provided comments in a memorandum dated July 11, 2010.[1659] The comments included that "[GMAC Mortgage Group LLC/AFI] only compensates ResCap for

---

[1650] *See* Implemented 2005 Tax Allocation Agreement, §§ 1.03F, 3.03 [ALLY_0178779]; Agreement for the Allocation of United States Federal Income Taxes, made effective as of December 8, 1994, by and between GM and AFI, as amended and in effect from November 1, 2000 to November 30, 2006 [ALLY_0434993].

[1651] *See* Int. of W. Marx, Apr. 18, 2013, at 29:12–31:10.

[1652] *See id.*

[1653] *See* Memorandum, Revised Tax Allocation Agreement Draft, dated July 11, 2010, at 1 [EXAM20269709].

[1654] *See id*.

[1655] July 8, 2010 Draft of First 2009 Tax Allocation Agreement [EXAM20132706].

[1656] *See* E-mail from W. Marx (July 19, 2010) [EXAM20132705].

[1657] *See* Int. of W. Marx, Apr. 18, 2013, at 44:12–46:5.

[1658] *Compare* July 8, 2010 Draft of First 2009 Tax Allocation Agreement, § 1.03D [EXAM20132706], *with* Dec. 6, 2009 Draft of First 2009 Tax Allocation Agreement, § 1.03C [EXAM12308207].

[1659] Memorandum, Revised Tax Allocation Agreement Draft, dated July 11, 2010 [EXAM20269709].

ResCap tax losses and credits that [GMAC Mortgage Group LLC/AFI] can actually use during the same taxable year" and reiterated that Morrison & Foerster and Morrison Cohen's previous "suggestion that ResCap be compensated to the extent such items create carrybacks and carryovers was not adopted."[1660] AFI had viewed such comment as an unnecessary change to the agreement because it believed the terms of the agreement already clearly provided for compensation based on tax attributes that ResCap could carry back or carry forward.[1661]

At an August 6, 2010 meeting, the ResCap Board "authorized and empowered" ResCap's officers to execute the First 2009 Tax Allocation Agreement.[1662] The version approved included some minor edits from the July 8, 2010 draft but no changes regarding Morrison & Foerster's suggestion to add clarifying language that ResCap would receive compensation for its carrybacks and carryovers. The First 2009 Tax Allocation Agreement was distributed to the ResCap Board the day before its August 6, 2010 meeting, in a package containing the meeting agenda and supporting materials,[1663] as an exhibit to the Joint ResCap-AFI Tax Memorandum to ResCap Board.[1664] The Joint ResCap-AFI Tax Memorandum, which was co-authored by Marx, Young, and Hamzehpour, summarized the history of ResCap's federal tax classification and provided a detailed analysis of the terms of the First 2009 Tax Allocation Agreement, ResCap's deferred tax position, and governance requirements relevant to the decision to approve the agreement.[1665] The benefit that AFI included in the first draft it sent to Young on December 6, 2009, that provided for ResCap to receive payments to the extent that AFI would use ResCap's tax benefits, remained in the version of the First 2009 Tax Allocation Agreement presented to the ResCap Board on August 6, 2010. The Joint ResCap-AFI Tax Memorandum explained and highlighted this benefit to the ResCap Board:

> The [First 2009 Tax Allocation Agreement] generally provide[s] that ResCap will be allocated income taxes under a hypothetical calculation that assumes ResCap to be a stand-alone taxpayer, filing its own tax returns, with full rights to make all accounting method choices and tax elections available under the law. *However*, in cases where the consolidated return regulations allow the [AFI] group of companies to benefit from net operating losses, capital losses or foreign tax credits before

---

[1660] *Id.* at 2.

[1661] *See* Int. of W. Marx, Apr. 18, 2013, at 40:17–43:8.

[1662] *See* Minutes of a Regular Meeting of the Board of Directors of Residential Capital, LLC, Aug. 6, 2010, at RC40018820–22 [RC40018729].

[1663] *See* Agenda and Supporting Materials for the Regular Meeting of the Board of Directors of Residential Capital, LLC, Aug. 6, 2010 [RC40016362].

[1664] Joint ResCap–AFI Tax Memorandum to ResCap Board, at RC40016374–84 [RC40016362].

[1665] *See* Joint ResCap–AFI Tax Memorandum to ResCap Board, at RC40016375–78 [RC40016362]. Marx prepared the language in the memorandum that explained the tax issues; Hamzehpour and Young prepared the language regarding ResCap governance requirements and ResCap management's recommendation to the ResCap Board. *See* Int. of W. Marx, Apr. 18, 2013, at 46:8–47:16, 50:19–54:12.

> ResCap could benefit from them on a stand-alone basis, the Agreement requires [AFI] to pay [GMAC Mortgage Group LLC] and [GMAC Mortgage Group LLC] to currently pay ResCap for those tax attributes. This is the only provision that differs from stand-alone treatment for ResCap, and in all cases can only be beneficial to ResCap, i.e. it may allow the monetization of tax benefits either earlier, or in some cases where the benefits would have expired and been permanently lost by ResCap, if it had filed as a stand-alone taxpayer.[1666]

In the Joint ResCap-AFI Tax Memorandum to the ResCap Board, it was noted that ResCap's legal staff believed that the First 2009 Tax Allocation Agreement was "on terms consistent with those that parties at arms' length would agree to and for fair value."[1667] ResCap's legal staff also suggested that the ResCap Board "exclude [the First 2009 Tax Allocation Agreement] from its prior delegation of affiliate agreements to the Special Committee of independent directors . . . ."[1668] The ResCap Board accepted this analysis, excluded the agreement from the requirement that affiliate agreements get recommended by the Special Committee before the ResCap Board considers them, and found that the First 2009 Tax Allocation Agreement was "on terms not more disadvantageous in any material respect to the holders of [ResCap's] notes than those existing tax allocation agreement(s) [it is] intended to replace[.]"[1669]

When the ResCap Board approved the First 2009 Tax Allocation Agreement on August 6, 2010 and authorized officers to execute it, the Board "assumed that [the officers] would execute and deliver the agreement."[1670] However, as of October 13, 2010, notwithstanding the ResCap Board's approval of the First 2009 Tax Allocation Agreement and its very favorable nature to ResCap, all parties except for ResCap had signed the agreement.[1671] The ResCap Board resolution did not specifically designate Young as ResCap's signatory on the First 2009 Tax Allocation Agreement, but there does not appear to be a question that Young would be the ResCap officer signing. Young testified that "it would make perfect sense that I was the one signing a tax allocation agreement being that I'm the chief financial officer of the company."[1672] Young's name appeared on the signature block for

---

[1666] Joint ResCap-AFI Tax Memorandum to ResCap Board, at RC40016377 [RC40016362].

[1667] *Id.* at RC40016378.

[1668] *Id.*

[1669] Minutes of a Regular Meeting of the Board of Directors of Residential Capital, LLC, Aug. 6, 2010, at RC40018822 [RC40018729].

[1670] Int. of P. West, Apr. 16, 2013, at 58:1–19.

[1671] *See* E-mail from W. Marx (Oct. 13, 2010), at ALLY_0245484 [ALLY_0245484] ("Under proposed and partially executed tax allocation agreements (Jim Young has not yet executed on behalf of ResCap), [AFI] would be required to pay ResCap for losses used by other members of the group.").

[1672] Int. of J. Young, Apr. 22, 2013, at 200:12–201:9.

ResCap in the version of the agreement that was presented to the ResCap Board at the August 6, 2010 board meeting, and he was the signatory on prior tax allocation agreements, as well as the signatory on the Second 2009 Tax Allocation Agreement.[1673]

The chain of events after the ResCap Board's approval of the First 2009 Tax Allocation Agreement on August 6, 2010 appears to have been as follows. On September 9, 2010, about a month after the ResCap Board approved the agreement, Marx prepared a memorandum to DeBrunner, Young, Dondzila, and Quenneville setting out instructions for signing the First 2009 Tax Allocation Agreement and similar tax allocation agreements between AFI and GMAC Mortgage Group LLC and between ResCap's subsidiaries.[1674] Marx also had binders created containing the First 2009 Tax Allocation Agreement and the other tax allocation agreements for signature. In the memorandum, Marx stated that the First 2009 Tax Allocation Agreement "has been reviewed by outside legal counsel representing the ResCap Board and by Tammy Hamzehpour of the ResCap Legal Staff, and has been approved by the ResCap Board," that "no additional governance is required at the [AFI] level" and that the agreement had been "previously circulated to [AFI] Accounting Policy, David DeBrunner, Cathy Dondzila, Jim Young and others."[1675] The Investigation has not uncovered a copy of the partially executed First 2009 Tax Allocation Agreement, but Marx and DeBrunner have confirmed that the memorandum and the binder of tax allocation agreements were hand-delivered to DeBrunner and that DeBrunner signed the First 2009 Tax Allocation Agreement on behalf of AFI around September 13, 2010.[1676] Marx was responsible for obtaining signatures for the First 2009 Tax Allocation Agreement and believed that the terms of agreement were final at the time he delivered the agreement to DeBrunner for signature.[1677] Marx did not expect any changes to its terms to be presented by either AFI or ResCap.[1678]

---

[1673] *See* First 2009 Tax Allocation Agreement, at RC40016384 [RC40016362]; *see also* 2006 Tax Allocation Agreement, at ALLY_0178791 [ALLY_0178779]; Second 2009 Tax Allocation Agreement, at 6 [RC00028796].

[1674] Memorandum, Action Required – ResCap Tax Allocation Agreements for Execution, dated Sept. 9, 2010 [ALLY_0435003].

[1675] *Id.*

[1676] *See* Int. of D. DeBrunner, Apr. 18, 2013, at 110:14–111:19, 115:11–116:22 ("Bill Marx told me that I would be getting a binder of tax allocation agreements that needed to be executed by an officer of [AFI] . . . . So, I signed those agreements, I gave the binder back or sent the binder back to Bill."); Int. of W. Marx, Apr. 18, 2013, at 57:20–58:9 ("So Monday the 13th, I believe I walked he binder down to David's office . . . . I don't recall exactly how long it was before I got it back. It might have been a day or two, or he might have gotten it back to me the same day.").

[1677] *See* Int. of W. Marx, Apr. 18, 2013, at 54:13–55:20 ("The expectation was that once these were executed that that would be the agreement.").

[1678] *See id*. at 55:12–55:24 ("We weren't expecting any additional edits at that point.").

AFI, however, apparently failed to deliver a copy of the memorandum and the binder containing the tax allocation agreements to Young for signature on behalf of ResCap in September 2010.[1679] AFI eventually mailed the binder to Young around (but most likely shortly before) October 15, 2010.[1680]

On September 15, 2010, AFI filed its consolidated federal income tax return for the tax year ending on December 31, 2009.[1681] Then, as required by the First 2009 Tax Allocation Agreement,[1682] AFI immediately started to calculate the amount it would have to pay to ResCap by October 31, 2010 under the agreement for ResCap's tax year beginning on November 2, 2009 and ending on December 31, 2009.[1683] In doing the calculation, AFI realized that the required payments to ResCap for 2009 and 2010 tax results would be substantial, perhaps as high as $250 million for 2009 and $400 million for 2010.[1684]

From October 13, 2010 to October 15, 2010, Marx communicated with AFI's Chief Financial Officer, Mackey, about the monetary impact to AFI of the First 2009 Tax Allocation Agreement. Marx discussed the possibility of proposing a less favorable tax allocation agreement to ResCap in an e-mail chain under the subject line "High Priority-Tax Allocation-

---

[1679] *See id*. at 57:1–59:18, 63:10–65:19, 90:22–92:7.

[1680] *See* Int. of J. Young, Apr. 22, 2013, at 101:4–104:23 ("I do not remember when I got the binder. . . . I would suspect that it was a relatively short period of time between the time I got the binder and the time that I was informed that [AFI] . . . had not gone through their appropriate governance with respect to the transaction."); *see also* Int. of W. Marx, Apr. 18, 2013, at 57:1–59:18, 63:10–65:19, 90:22–92:7.

[1681] *See* E-mail from W. Marx (Oct. 15, 2010), at ALLY_0424661 [ALLY_0424660].

[1682] *See* First 2009 Tax Allocation Agreement, § 3.02 [RC40016362]. Section 3.02 of the agreement provides as follows:

Within forty-five (45) days following the filing of the [AFI] Group consolidated Federal income tax return . . . [GMAC Mortgage Group LLC] shall notify ResCap of the amount of the Separate ResCap Group Tax Liability. Within fifteen (15) days after such notification, Rescap shall pay to [GMAC Mortgage Group LLC] or [GMAC Mortgage Group LLC] will pay to ResCap as the circumstances warrant, the difference between the Separate ResCap Group Tax Liability and the estimated tax payments previously made by ResCap.

[1683] *See* E-mail from W. Marx (Oct. 15, 2010), at ALLY_0424661 [ALLY_0424660] ("Calculations were started immediately upon filing the first consolidated return on September 15."); *see also* E-mail from W. Marx (Oct. 13, 2010), at ALLY_0245484 [ALLY_0245484] ("[P]ayment may be on the order of $200 to $250m, due 10/31.").

[1684] *See* E-mail from W. Marx (Oct. 13, 2010), at ALLY_0245484 [ALLY_0245484] ("Calculations are still in process, but the payment may be on the order of $200 to $250m, due 10/31 (Additional $300 to $400m would likely be due for the 2010 tax year, payable at this time next year).").

Large Payment Possibly due October 30."[1685] AFI, however, was aware that the ResCap Board had already approved the First 2009 Tax Allocation Agreement,[1686] and Marx believed that "[p]eople at ResCap think the method of allocation has been resolved and we are just finalizing docs and the allocation will follow"[1687] and that Young "has been in the loop on the development of [the First 2009 Tax Allocation Agreement and other tax allocation agreements] and thinks they are done."[1688] Marx testified that, at the time, he suggested a new method of allocation because he was concerned that AFI may want to retain discretion in deciding when to inject more capital into ResCap rather than be subject to contractual obligations that mandate payments by AFI to ResCap.[1689] AFI had already made a total of about $2.9 billion in cash capital contributions to ResCap from 2007 to 2009 to keep ResCap afloat.[1690] Marx testified that ResCap's consideration of a new and less favorable tax allocation agreement "would likely require a fairness opinion of outside counsel" and "will likely be unpopular as the Board has already been presented and approved a more beneficial agreement."[1691] Marx suggested that they let Young and DeBrunner know that AFI senior financial management is reconsidering the tax allocation approach and will get back to them in November 2010 with its modification plan.[1692] Mackey agreed that he did not want to make

---

[1685] *See* E-mail from W. Marx (Oct. 15, 2010), at ALLY_0424661 [ALLY_0424660]; E-mail from J. Mackey (Oct. 15, 2010), at ALLY_0424661 [ALLY_0424660]; E-mail from W. Marx (Oct. 15, 2010), at ALLY_0424661 [ALLY_0424660]; E-mail from J. Mackey (Oct. 15, 2010), at ALLY_0424661–62 [ALLY_0424660]; E-mail from W. Marx (Oct. 15, 2010), at ALLY_0424662 [ALLY_0424660]; E-mail from J. Mackey (Oct. 15, 2010), at ALLY_0424662–63 [ALLY_0424660]; E-mail from W. Marx (Oct. 15, 2010), at ALLY_0424663 [ALLY_0424660]; E-mail from J. Mackey (Oct. 15, 2010), at ALLY_0424663 [ALLY_0424660]; E-mail from W. Marx (Oct. 13, 2010), at ALLY_0424663–64 [ALLY_0424660].

[1686] *See* E-mail from W. Marx (Oct. 13, 2010), at ALLY_0245484 [ALLY_0245484] ("The [First 2009 Tax Allocation Agreement] was reviewed and approved by the ResCap Board. There is sensitivity here regarding arms-length dealings with affiliates.").

[1687] E-mail from W. Marx (Oct. 15, 2010), at ALLY_0424663 [ALLY_0424660].

[1688] *Id.* at ALLY_0424662.

[1689] *See* E-mail from W. Marx (Oct. 13, 2010), at ALLY_0245484 [ALLY_0245484] ("Today, it is not clear to me that [AFI] would desire to inject capital into ResCap or, once in, whether we could get it back out."); *see also* E-mail from W. Marx (Nov. 3, 2010), at EXAM10432503 [EXAM10432501] ("Current management does not want to put in place an allocation agreement that could compel capital contributions. Rather, capitalization of ResCap should be left to the discretion of the [AFI] Board."); E-mail from J. Mackey (Oct. 15, 2010), at ALLY_0424663 [ALLY_0424660] ("What happens if we just ignore this for now[?] Not sure I can get focus from decision makers by the end of the month. I don't really want to put in more capital . . . .").

[1690] *See* Capital Contributions to ResCap Legal Entity as of Jan. 31, 2012, [ALLY_PEO_0075634]; *see also* Residential Capital Company, LLC, Quarterly Report (Form 10-Q) (Nov. 8, 2007), at 50 ("[As of September 30, 2007], we have received $2.0 billion in capital contributions from GMAC, excluding the contribution to the auto division of GMAC Bank[.]").

[1691] E-mail from W. Marx (Oct. 13, 2010), at ALLY_0245484 [ALLY_0245484].

[1692] E-mail from W. Marx (Oct. 15, 2010), at ALLY_0424663 [ALLY_0424660].

payments to ResCap,[1693] and he asked Marx, "Do we have to go back to them [ResCap,] or can we just ignore it[?] Jim Y and team are very focused on other things[,] so they may not even think about it."[1694] Marx replied, "At some point, we will need formal agreements in place to document the timing of payments in both directions. Without such agreements, we may not be able to compel ResCap to pay its taxes up to [AFI]. In fact, under a strict stand-alone approach, they [ResCap] would owe [AFI] $6m this year."[1695] Marx later explained to Mackey the timeline of how Marx became aware of the potentially large payments that AFI would owe to ResCap under the First 2009 Tax Allocation Agreement: "Calculations were started immediately upon filing the first consolidated return on September 15. . . . During our deep dive review, [Mackey] commented on the need to tie into the cash forecasting team, raising our sensitivity. . . . [W]e realized that we might be locking up cash inside ResCap and raised the alarm."[1696] Mackey then stated, "We should consider how everything would look if we never execute the agreement. There will be resistance."[1697] Then Marx replied that:

> Things today would look just like they are currently booked. ResCap has a payable to [AFI] for about $6m related to excess inclusion income, which is a quirky type of REMIC income that results in current tax even though the company is in a deep overall loss. . . . Bottom line: [AFI] has a small receivable that ResCap may resist paying. [AFI] would avoid booking a large Q4 capital contribution.[1698]

When DeBrunner signed the First 2009 Tax Allocation Agreement, he believed he was acting under "delegated authority."[1699] AFI had an accounting policy in place since December 23, 2009 providing that "[a]ll tax sharing agreements must be approved by the respective boards of directors or appropriate management designee."[1700]

---

[1693] E-mail from J. Mackey (Oct. 15, 2010), at ALLY_0424663 [ALLY_0424660].

[1694] E-mail from J. Mackey (Oct. 15, 2010), at ALLY_0424662–63 [ALLY_0424660].

[1695] E-mail from W. Marx (Oct. 15, 2010), at ALLY_0424662 [ALLY_0424660].

[1696] E-mail from W. Marx (Oct. 15, 2010), at ALLY_0424661 [ALLY_0424660].

[1697] E-mail from J. Mackey (Oct. 15, 2010), at ALLY_0424661 [ALLY_0424660].

[1698] E-mail from W. Marx (Oct. 15, 2010), at ALLY_0424661 [ALLY_0424660].

[1699] *See* Int. of D. DeBrunner, Apr. 18, 2013, at 125:9–126:9 ("As an officer of the company, they asked me to be the signer on it. My recollection is it had been reviewed with multiple parties around the company and I was asked to sign on that. . . . So, again, you know, there was a delegated authority.").

[1700] AFI Accounting Policy 3330: Accounting for Income Taxes, effective Oct. 1, 2010, at EXAM12354094, – 101 [EXAM12354093].